# EXHIBIT 49



INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# CERTIFICATE

**CUBE INFRASTRUCTURE FUND SICAV AND OTHERS**

**v.**

**KINGDOM OF SPAIN**

**(ICSID CASE NO. ARB/15/20)**

**ANNULMENT PROCEEDING**

I hereby certify that the attached document is a true copy of the English version of the *ad hoc* Committee's Decision on Annulment dated 28 March 2022.

Meg Kinnear
Secretary-General

Washington, D.C., 28 March 2022



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**CUBE INFRASTRUCTURE FUND SICAV AND OTHERS**

Respondents on Annulment

and

**KINGDOM OF SPAIN**

Applicant on Annulment

**ICSID Case No. ARB/15/20**
**Annulment Proceeding**

---

# DECISION ON ANNULMENT

---

**Members of the *ad hoc* Committee**
Prof. Dr. Jacomijn van Haersolte-van Hof, President of the *ad hoc* Committee
Mr. Álvaro Castellanos Howell, Member of the *ad hoc* Committee
Mr. Timothy J. Feighery, Member of the *ad hoc* Committee

**Secretary of the *ad hoc* Committee**
Ms. Catherine Kettlewell
Ms. Anna Toubiana

*Date of dispatch to the Parties:* 28 March 2022

## REPRESENTATION OF THE PARTIES

*Representing the Applicant*:

Ms. María del Socorro Garrido Moreno
Mr. Javier Castro López
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatás Pérez
Ms. Ana Fernández-Daza Álvarez
Mr. Rafael Gil Nievas
Mr. José Manuel Gutiérrez Delgado
Ms. Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Mr. Francisco Javier Peñalver Hernández
Mr. Alberto Torró Molés
Mr. Luis Vacas Chalfoun
Abogacía General del Estado
Departamento de Arbitrajes Internacionales
Ministry of Justice of the Government of Spain
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

*Representing the Respondents on Annulment:*

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey
Ms. Héloïse Hervé
King & Spalding
48 bis rue de Monceau
75008 Paris
France

and

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding
1100 Louisiana St., Suite 4000
Houston, TX 77002
U.S.A.

and

Mr. Christopher S. Smith
King & Spalding LLP
1180 Peachtree St. NE, Suite 1600
Atlanta, GA 30309
U.S.A.

and

Ms. Verónica Romaní Sancho
Mr. Luis Gil Bueno
Ms. Inés Vázquez García
Ms. Teresa Gutiérrez Chacón
Ms. Inés Puig-Samper Naranjo
Ms. Cristina Matia Garay
Gómez-Acebo & Pombo
Castellana, 216
28046 Madrid
Spain

TABLE OF CONTENTS

**I. INTRODUCTION AND PARTIES** .... **1**

**II. PROCEDURAL HISTORY** .... **2**

**III. SUMMARY OF RELEVANT FACTS** .... **10**

**IV. SCOPE OF ANNULMENT** .... **14**

A. The Applicant's Arguments .... 15

B. The Respondents' Arguments .... 17

C. The Committee's Analysis .... 20

**V. MANIFEST EXCESS OF POWERS** .... **22**

A. The Applicant's Arguments .... 22

(1) Applicable Legal Standard .... 22

(2) Undue Declaration of Jurisdiction; Breach of EU Law .... 24

a. ECT does not apply between Member States of the EU as a matter of international law .... 25

b. EU law and primacy of EU law .... 25

c. The Achmea judgment .... 26

d. EC intervention/declarations .... 28

e. EU law and the ECT and the impact on this case .... 29

(3) EU Law as the Law Applicable to the Merits .... 31

B. The Respondents' Arguments .... 33

(1) Applicable Legal Standard .... 33

(2) Correct Declaration of Jurisdiction .... 36

a. ECT applies to intra-EU disputes .... 36

b. Irrelevance of the Achmea judgment .... 39

(3) Primacy or Autonomy Would Not Change the Outcome .... 41

(4) Breach of EU law .... 43

a. EU Law Not Applicable Under the ECT .... 43

b. Applying EU Law on State Aid Would Not Have Led to a Different Outcome 44

C. The Committee's Analysis .... 46

(1) Applicable Legal Standard .... 46

(2) The Tribunal's Jurisdiction .... 49

a. The Tribunal's Decision .... 49

b. The interpretation of Article 26 ..... 52
c. Article 26 ECT ..... 54
d. REIO ..... 55
e. Disconnection clause ..... 57
f. Primacy ..... 59
g. Achmea judgment ..... 62
(3) EU Law Applicable to the Merits ..... 64
(4) Manifest Excess – Conclusion ..... 67
**VI. FAILURE TO STATE REASONS ..... 69**
A. The Applicant's Arguments ..... 69
(1) Applicable Legal Standard ..... 69
(2) Failure to State Reasons in Determining the Applicable Law and Conclusions on State Aid ..... 72
a. Failure to explain that EU law was deemed not applicable ..... 72
b. Lack of reasoning why Articles 107 and 108 TFEU were not applied ..... 73
c. European Commission's reasoning in the State aid decision not assessed ..... 73
(3) Failure to State Reasons for the Conclusions on Liability ..... 73
a. FET standard in Article 10(1) ECT ..... 73
b. Lack of valid reasoning for violation of legitimate expectations ..... 74
c. Content of legitimate expectations and the assessment of the disputed measures ..... 80
(4) Failure to State Reasons for the Quantification of Damages ..... 81
a. Photovoltaic facilities ..... 81
b. Hydroelectric installations ..... 82
B. The Respondents' Arguments ..... 83
(1) Applicable Legal Standard ..... 83
(2) Failure to State Reasons in Determining the Applicable Law and Conclusions on State Aid ..... 86
a. Failure to explain that EU law was deemed not applicable ..... 86
b. Lack of reasoning why Articles 107 and 108 TFEU were not applied ..... 88
c. European Commission's reasoning in the State aid decision not assessed ..... 88
(3) Failure to State Reasons for Conclusions on Liability ..... 89
a. FET standard in Article 10(1) ECT ..... 89
b. Lack of valid reasoning for violation of legitimate expectations ..... 92

       c. Content of legitimate expectations and the assessment of the disputed measures ........ 96

(4) Failure to State Reasons for the Quantification of Damages ........ 97

a. Photovoltaic facilities ........ 97

b. Hydroelectric installations ........ 98

C. The Committee's Analysis ........ 99

(1) Applicable Legal Standard ........ 99

(2) Failure to State Reasons in Determining the Applicable Law and Conclusions on State Aid ........ 103

a. Failure to explain that EU law was deemed not applicable ........ 103

b. Lack of reasoning why Articles 107 and 108 TFEU were not applied ........ 105

c. European Commission's reasoning in the State aid decision not assessed . 106

(3) Failure to State Reasons for the Conclusions on Liability ........ 107

a. FET standard in Article 10(1) ECT ........ 107

b. Lack of valid reasoning for violation of legitimate expectations ........ 110

c. Content of legitimate expectations and the assessment of the disputed measures ........ 116

(4) Failure to State Reasons for the Quantification of Damages ........ 118

a. Photovoltaic facilities ........ 118

b. Hydroelectric installations ........ 120

**VII. SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE . 121**

A. The Applicant's Arguments ........ 121

(1) Applicable Legal Standard ........ 121

(2) Evidence, Burden of Proof and Right to be Heard ........ 123

(3) Right to be Heard and Quantum ........ 125

(4) European Commission's Request to Intervene ........ 126

(5) Declaration of the Member States of January 2019 ........ 127

(6) Lack of Impartiality and Unequal Treatment of the Parties ........ 128

B. The Respondents' Arguments ........ 129

(1) Applicable Legal Standard ........ 129

(2) Evidence, Burden of Proof and Right to be Heard ........ 130

a. Evidence ........ 130

b. Burden of proof ........ 132

c. Right to be heard ........ 132

        (3) Right to be Heard and Quantum ... 133
(4) European Commission's Request to Intervene ... 136
(5) Declaration of the Member States of January 2019 ... 137
(6) Lack of Impartiality and Unequal Treatment of the Parties ... 138
C. The Committee's Analysis ... 139
(1) Applicable Legal Standard ... 139
(2) Evidence, Burden of Proof and Right to be Heard ... 141
(3) Right to be Heard and Quantum ... 144
(4) European Commission's Request to Intervene ... 146
(5) Declaration of the Member States of January 2019 ... 147
(6) Lack of Impartiality and Unequal Treatment of the Parties ... 148
**VIII. COSTS ... 150**
A. The Applicant's Cost Submissions ... 150
B. The Respondents' Cost Submissions ... 151
C. The Committee's Decision on Costs ... 153
**IX. DECISION ... 155**

Case 1:20-cv-01618-TSC Document 63-50 Filed 06/09/22 Page 8 of 169

## TABLE OF SELECTED ABBREVIATIONS

| | |
|---|---|
| Application | Application for Annulment filed 12 November 2019 |
| Applicant's Submission on Costs | Applicant's Submission on Costs dated 19 April 2021 |
| Award | Award rendered on 15 July 2019 in the arbitration proceeding between Cube Infrastructure Fund SICAV and others, and the Kingdom of Spain (ICSID Case No. ARB/15/20) |
| BIT | Energy Charter Treaty signed in December 1994 and in force since 16 April 1998 |
| C-[#] | Respondents' Exhibit |
| CETA | EU-Canada Comprehensive Economic and Trade Agreement |
| CJEU or ECJ | Court of Justice of the European Union / European Court of Justice |
| CL-[#] | Respondents Legal Authority |
| C-Mem. | Respondents Counter-Memorial dated 16 September 2020 |
| Committee | Prof. Dr. Jacomijn van Haersolte-van Hof, President of the *ad hoc* Committee;<br>Mr. Álvaro Castellanos Howell, Member of the *ad hoc* Committee; and<br>Mr. Timothy J. Feighery, Member of the *ad hoc* Committee |
| Cube | Cube Infrastructure Fund SICAV, Cube Energy S.C.A., and Cube Infrastructure Managers S.A. |
| Decision | Decision on Jurisdiction, Liability, and Partial Decision on Quantum rendered on 19 February 2019 in the arbitration proceeding between Cube Infrastructure Fund SICAV and others, and the Kingdom of Spain (ICSID Case No. ARB/15/20) |

| | |
|---|---|
| Declaration | Declaration of the Representatives of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union dated 15 January 2019 |
| Demeter | Demeter Partners S.A., and Demeter 2 FPCI |
| EC | European Commission |
| ECT | Energy Charter Treaty |
| EIA | Economic Integration Agreements |
| EU | European Union |
| Hearing | Hearing held 16-17 March 2021 |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Mem. | Applicant's Memorial dated 8 July 2020 |
| R-[#] | Applicant's Exhibit |
| REIO | Regional Economic Integration and Organization |
| Rejoinder | Respondents' Rejoinder dated 8 January 2021 |
| Rejoinder on Stay of Enforcement | Respondents' Rejoinder to Spain's Reply in Support of the Continuation of Stay of Enforcement of the Award |
| RL-[#] | Applicant's Legal Authority |
| Reply | Applicant's Reply dated 9 November 2020 |

| Reply on Stay of Enforcement | Applicant's Reply in Support of the Continuation of the Stay of Enforcement of the Award dated 6 February 2020 |
|---|---|
| Respondents or Cube and Demeter or Cube Parties | Cube and Demeter |
| Respondents' Submission on Costs | Respondents' Submission on Costs dated 19 April 2021 |
| Response on Stay of Enforcement | Respondents' Opposition to Spain's Request for Continuation of the Stay of Enforcement of the Award dated 23 January 2020 |
| Spain or Applicant | Kingdom of Spain |
| Submission on Stay of Enforcement | Applicant's Submission in Support of the Continuation of the Stay of Enforcement of the Award dated 9 January 2020 |
| TFEU | Treaty on the Functioning of the European Union |
| Tr. Day [#] [Speaker(s)] [page:line] | Transcript of the Hearing |
| Tribunal | Prof. Vaughan Lowe (President), the Hon. James Spigelman and Prof. Christian Tomuschat |
| VCLT | Vienna Convention on the Law of Treaties |

## I. INTRODUCTION AND PARTIES

1. This annulment proceeding concerns an application for annulment (the "**Application**") of the Award rendered on 15 July 2019 in the arbitration proceeding between Cube Infrastructure Fund SICAV and others, and the Kingdom of Spain (ICSID Case No. ARB/15/20), (the "**Award**"). The Award was rendered by a Tribunal composed of Prof. Vaughan Lowe (President), the Hon. James Spigelman and Prof. Christian Tomuschat (the "**Tribunal**").

2. The Award decided on a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty ("**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "**ICSID Convention**")

3. The dispute in the original proceeding related to the regulatory measures implemented by Spain modifying the economic regime for renewable energy investments in Spain.

4. In the Award, the Tribunal ordered the Kingdom of Spain to pay the Claimants €2.89 million in respect of losses caused to their PV investments and €30.81 million in respect of losses caused to their hydro investments, together with pre-Award and post-Award interest and costs to Claimants.

5. The Applicant in the annulment proceeding and Respondent in the arbitration proceeding is the Kingdom of Spain ("**Spain**" or the "**Applicant**").

6. The Respondents in the annulment proceeding and Claimants in the arbitration proceeding are Cube Infrastructure Fund SICAV, Cube Energy S.C.A., and Cube Infrastructure Managers S.A. (referred to collectively as "**Cube**"), which are companies incorporated under the laws of the Grand Duchy of Luxembourg; and Demeter Partners S.A., and Demeter 2 FPCI (referred to collectively as "**Demeter**"), which are companies constituted under the laws of the French Republic. Cube and Demeter are collectively

referred to as "**Cube and Demeter**", "**Cube Parties**" or the "**Respondents**." The Parties' representatives and their addresses are listed above on page (i).

7.   The Applicant and the Respondents are collectively referred to as the "**Parties**."

8.   Spain applied for annulment of the Award on the basis of Article 52(1) of the ICSID Convention, identifying three grounds for annulment: (i) manifest excess of powers (Article 52(1)(b)); (ii) serious departure from a fundamental rule of procedure (Article 52(1)(d)); and (iii) failure to state reasons (Article 52(1)(e)).

## II.   PROCEDURAL HISTORY

9.   On 12 November 2019, ICSID received an application for annulment dated 12 November 2019 from the Kingdom of Spain. The Application also contained a request pursuant to Article 52(5) of the ICSID Convention and ICSID Arbitration Rule 54(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**") for the stay of enforcement of the Award until the Application was decided (the "**Request for Stay**").

10.   The ICSID Secretary-General registered the Application on 18 November 2019 pursuant to ICSID Arbitration Rule 50(2). On the same date, in accordance with ICSID Arbitration Rule 54(2), the Secretary-General informed the Parties that the enforcement of the Award had been provisionally stayed. On 6 December 2019, the Secretary-General informed the Parties of her intention to propose to the Chairman of the ICSID Administrative Council the appointment to the *ad hoc* Committee of Prof. Dr. Jacomijn van Haersolte-van Hof, a national of the Netherlands, as President of the *ad hoc* Committee, Mr. Álvaro Castellanos Howell, a national of Guatemala, and Mr. Timothy J. Feighery, a national of the United States of America and Ireland. The Parties were asked to submit any observations by 13 December 2019.

11.   Having not received any observations from the Parties, by letter dated 16 December 2019, the Secretary-General informed the Parties that the Chairman of the ICSID Administrative Council would proceed to appoint Prof. Dr. Jacomijn van Haersolte-van

Hof, Mr. Alvaro Castellanos Howell, and Mr. Timothy J. Feighery. The *ad hoc* Committee (the "**Committee**") was constituted on 18 December 2019 in accordance with ICSID Arbitration Rules 6, 52(2), and 53.

12. By letter dated 20 December 2019, the Committee informed the Parties of its availability to hold the First Session and requested that they confer regarding the timetable for the exchange of written submissions on the Kingdom of Spain's request for the stay of the enforcement of the Award.

13. On 30 December 2019, the Centre transmitted a draft Agenda and a draft Procedural Order No. 1 to the Parties in preparation for the first session and invited them to submit a joint proposal by 13 January 2020, advising the Committee of their points of agreement and/or their respective positions where they did not reach an agreement.

14. On 7 January 2020, the Parties informed the Centre of their agreement on the modality and date for the First Session as well as the timetable for the exchange of written submissions on the stay of enforcement of the Award. The Committee confirmed this agreement by letter of the same date.

15. The Parties also requested, on 7 January 2020 an extension until 17 January 2020 to submit their proposals for the draft agenda and Procedural Order No. 1. The Committee granted the extension by email of the same date.

16. On 9 January 2020, Spain filed its Submission in Support of the Continuation of the Stay of Enforcement of the Award, together with Annexes 1, 2, and 27 to 36 (the "**Submission on Stay of Enforcement**").

17. On 17 January 2020, the Parties transmitted their agreed joint draft Procedural Order No. 1.

18. On 22 January 2020, the Committee held the first session by telephone conference and issued Procedural Order No. 1 concerning procedural matters along with a procedural calendar.

19. On 23 January 2020, the Respondents filed their Opposition to Spain's Request for Continuation of the Stay of Enforcement of the Award, together with Legal Authorities CL-158, and CL-171 to CL-209 (the "**Response on Stay of Enforcement**").

20. By letter of 24 January 2020, the Committee confirmed the dates for the Hearing on Annulment.

21. On 6 February 2020, Spain filed its Reply in Support of the Continuation of the Stay of Enforcement of the Award, together with Annexes 37 to 53 (the "**Reply on Stay of Enforcement**").

22. On 24 February 2020, the European Commission ("**EC**") submitted with the ICSID Secretariat an Application for Leave to Intervene as a Non-Disputing Party dated 21 February 2020 pursuant to ICSID Arbitration Rule 37(2).

23. On 26 February 2020, the Committee invited the Parties to submit their comments on the EC's Application by 4 March 2020.

24. On 28 February 2020, the Respondents filed their Rejoinder to Spain's Reply in Support of the Continuation of Stay of Enforcement of the Award, together with Legal Authorities CL-210 to CL-214 (the "**Rejoinder on Stay of Enforcement**").

25. Pursuant to the Committee's instructions, Spain submitted their observations on the EC's Application on 4 March 2020, together with Annex 54 and the Respondents submitted their observations together with Exhibits C-326 to C-328 and Legal Authorities CL-215 to CL-256.

26. On 5 March 2020, pursuant to the procedural calendar, the Committee informed the Parties that a Hearing on the Stay of Enforcement of the Award was not necessary.

27. On 6 March 2020, the Committee invited the Parties to submit any observations they might have on the opposing party's observations by 16 March 2020. The Parties submitted their further observations by that date. Spain submitted its further observations along with Annexes 55 to 62 and the Respondents submitted their further observations along with Exhibits C-329 to C-334 and Legal Authorities CL-257 to CL-261.

28. By letter of 23 March 2020, Spain informed the Tribunal that the Spanish government had declared a "state of alarm, first degree of the state of emergency pursuant to Article 116 of the Spanish Constitution" due to the coronavirus/COVID-19 pandemic and "considered it necessary to inform the Committee of this most serious situation," hoping it would not affect the deadline for its submission of its Memorial on Annulment. The Committee acknowledged Spain's letter and informed the Parties that it would "proceed as scheduled, and should one or both Parties wish to raise specific concerns we will of course deal with those."

29. After reviewing the Parties' submissions, the Committee issued its Decision on the European Commission's Application for Leave to Intervene as a Non-Disputing Party on 2 April 2020, denying the EC's Application.

30. On 17 April 2020, the Committee issued its decision on the Continuation of the Provisional Stay of Enforcement of the Award. The Committee decided that the stay of enforcement of the Award should not be continued and that it reserved the issue of costs on this request to a further order or decision.

31. On 29 June 2020, Spain requested, with Respondents' agreement, a one week extension for the submission of its Memorial on Annulment from 1 July 2020 to 8 July 2020. The Committee confirmed the extension on the same date.

32. On 8 July 2020, Spain filed its Memorial on Annulment ("**Mem.**"), along with the Expert Report of Prof. Ricardo Gosalbo Bono with Exhibits 2 to 18, Exhibits R-0003, R-0037, R-0047, R-0056 to R-0059, R-0063, R-0064, R-0066, R-0067, R-0069, R-0071, R-0072, R-0074, R-0075, R-0080, R-0086, R-0092, R-0105, R-0117, R-0118, R-0121, R-0124, R-0123, R-0130, R-0140, R-0164, R-0165, R-0171, R-0184, R-0220, R-0221, R-0230, R-0231, R-0239, R-0241, R-0243, R-0245, R-0247, R-0250 to R-0253, R-0258, R-0265, R-0267, R-0273, R-0274, R-0276, R-0278, R-0286 to R-0292, R-0295, R-0302, R-0304 to R-0307, R-0310, R-0320, R-0321, and R-0370 to R-0404, Legal Authorities RL-0001, RL-0002, RL-0006, RL-0010, RL-0019, RL-0039, RL-0041, RL-0046, RL-0048, RL-0049, RL-0070, RL-0072, RL-0075, RL-0080, RL-0086, and RL-0088 to RL-0164, a consolidated list of Exhibits and a consolidated list of Legal Authorities.

33. On 7 September 2020, the Respondents informed the Committee that the Parties had agreed to a one week extension for the submission of their next pleadings. Pursuant to this agreement, the Respondents would file their Counter-Memorial on 16 September 2020 and Spain would file their Reply on 9 November 2020. The Committee confirmed the extension on 8 September 2020.

34. On 16 September 2020, the Respondents filed their Counter-Memorial on Annulment ("**C-Mem.**") together with Exhibits C-0001, C-0060, C-0070, C-0082, C-0092, C-0319, C-0323, C-0335 to C-0374, Legal Authorities CL-0004, CL-0045, CL-0047, CL-0095, CL-0096, CL-0098, CL-0102 to CL-0104, CL-0124, CL-0150, CL-0153, CL-0158, CL-0162, CL-0167, CL-0168, CL-0170, CL-0183, CL-0188, CL-0189, CL-0193 to CL-0195, CL-0200, CL-0207, CL-0209, CL-0214, CL-0226 to CL-0231, CL-0233, CL-0235 to CL-0242, CL-0244 to CL-0248, and CL-0261 to CL-0322, a consolidated list of Exhibits and a consolidated list of Legal Authorities.

35. By letter of 8 October 2020, the Committee asked the Parties to consult and agree on the modality of the hearing. On 22 October 2020, the Respondents wrote to the Committee on behalf of the Parties indicating that they would prefer to hold an in-person hearing but were also in agreement to proceed with a virtual hearing "if travel restrictions and health considerations persist[ed] in 2021." They requested to revisit the issue and provide a final decision in "early February 2021."

36. On 9 November 2020, Spain submitted its Reply on Annulment ("**Reply**"), together with the Second Expert Report of Prof. Ricardo Gosalbo Bono with Exhibits 19 to 54, Exhibits R-405 to R-406, Legal Authorities RL-0165 to RL-0215, a consolidated list of Exhibits and a consolidated list of Legal Authorities.

37. On 8 January 2021, the Respondents submitted their Rejoinder on Annulment ("**Rejoinder**") together Exhibits C-080, C-375 to C-377, Legal Authorities CL-091, CL-093, CL-204, CL-257 and CL-323 to CL-333, a consolidated list of Exhibits and a consolidated list of Legal Authorities.

38. On 12 January 2021, the Committee wrote to the Parties inviting them to confer and discuss the terms of a protocol for the conduct of a virtual hearing and agree on the exact duration and dates for such.

39. On 21 January 2021, the Committee wrote to the Parties with regards to the pre-hearing organizational meeting and requested the Parties to confirm their availability.

40. On 22 January 2021, the Respondents informed the Committee that the Parties had agreed to a virtual hearing, and proposed holding the hearing on 16-17 March, with 18 March in reserve.

41. On 27 January 2021, Spain confirmed its availability for a pre-hearing organizational meeting.

42. On 29 January 2021, the Respondents confirmed their availability for a pre-hearing organizational meeting. By letter of the same date, the Respondents also requested that the Committee disregard or strike from the record Professor Gosalbo Bono's opinions.

43. On 1 February 2021, the Secretary-General informed the Parties that Ms. Anna Toubiana would be taking maternity leave and therefore would be replaced by Ms. Catherine Kettlewell as Secretary of the Committee.

44. The Committee wrote to the Parties on 4 February 2021, requesting that they submit their respective comments by 11 February 2021, on the following questions:

- To what extent is the Committee limited to the record submitted to the Arbitral Tribunal in the original arbitration?
- In this context, is it relevant whether new submissions, and in particular the expert reports submitted by the Kingdom of Spain in these Annulment Proceedings, relate to law or fact? And if such distinction is relevant, what are the consequences of such distinction in the present case, both as a matter of principle and procedural implementation?
- Furthermore, in so far as new submissions, whether contained in expert reports or memorials and statements, relate to changes or developments in the law that occurred since the conclusion of the arbitration, does this affect the above?

The Committee also confirmed that a meeting between the Parties and the Committee would be held on 19 February 2021.

45.     On 11 February 2021 the Parties submitted their respective responses to the Committee's questions.

46.     On 15 February 2021, the Committee informed the Parties that it had decided to deny the Respondents' request to strike from the record the Expert Reports of Professor Ricardo Gosalbo Bono. Additionally, the Committee confirmed the modality of the hearing and transmitted an estimate from the vendor that would provide the Zoom platform services for the hearing. The Committee also transmitted a draft procedural order on the Hearing logistics and invited the Parties to submit their joint comments on the draft procedural order and the approval of the Hearing vendor by 18 February 2021.

47.     On 18 February 2021, Spain confirmed its approval for the estimate of the hearing vendor and also submitted a draft Procedural Order No. 2 which contained both Parties' positions. By separate email, the Respondents confirmed their agreement to the draft Procedural Order No. 2 and also approved the vendor estimate.

48.     On 19 February 2021, the Committee held a pre-hearing organizational meeting with the Parties by video conference.

49.     On 24 February 2021, the Committee issued Procedural Order No. 2 concerning organization of the Hearing.

50.     On 26 February 2021, Spain submitted the translation of relevant portions of RL-216 as requested by the Committee.

51.     On 5 March 2021, Spain requested the Committee's leave to introduce into the record new documents and legal authorities pursuant to paragraph 25.6 of Procedural Order No. 1 and section II.D.2 of Procedural Order No. 2.  On 8 March 2021, the Respondents submitted their comments to Spain's request.  On 10 March 2021, the Committee decided to reject Spain's request to introduce new documents into the record on the basis that the documents, on their face, did not satisfy the "exceptional circumstances" threshold provided in Procedural Order No. 1 and No. 2.

52. On 10 March 2021, the Committee and the Parties held a video conference test in preparation for the Hearing.

53. The Hearing took place on 16-17 March 2021 by video conference. The following persons attended the Hearing:

| | |
|---|---|
| *Committee*: | |
| Prof. Dr. Jacomijn van Haersolte-van Hof | President |
| Mr. Álvaro Castellanos Howell | Member of the Committee |
| Mr. Timothy J. Feighery | Member of the Committee |
| | |
| *ICSID Secretariat*: | |
| Ms. Catherine Kettlewell | Secretary of the Committee |
| | |
| *For the Applicant*: | |
| Mr. José Manuel Gutiérrez Delgado | State Attorney's Office |
| Ms. Lorena Fatás Pérez | State Attorney's Office |
| Ms. Lourdes Martínez de Victoria Gómez | State Attorney's Office |
| Ms. Elena Oñoro Sainz | State Attorney's Office |
| Mr. Alberto Torró Molés | State Attorney's Office |
| Ms. Gabriela Cerdeiras Megias | State Attorney's Office |
| Mr. Juan Quesada Navarro | State Attorney's Office |
| Mr. Javier Comerón Herrero | State Attorney's Office |
| Ms. Gloria de la Guardia Limeres | State Attorney's Office |
| *Expert:* | |
| Prof. Ricardo Gosalbo Bono | |
| | |
| *For the Respondents on Annulment*: | |
| Mr. Kenneth Fleuriet | King & Spalding |
| Ms. Amy Frey | King & Spalding |
| Mr. Enrique Molina | King & Spalding |
| Ms. Isabel San Martín | King & Spalding |
| Ms. Violeta Valicenti | King & Spalding |
| Mr. Giles Kwei | King & Spalding |
| Ms. Pam Anders | King & Spalding |
| Mr. Ovidiu Pitic | King & Spalding |
| | |
| *Court Reporters*: | |
| Mr. Trevor McGowan | Caerus Reporting Ltd |
| Ms. Georgina Vaughn | Caerus Reporting Ltd |
| Mr. Dante Rinaldi | DR-Esteno |
| Mr. Paul Pelissier | DR-Esteno |
| | |
| *Interpreters*: | |
| Mr. Jesús Getan Bornn | English/Spanish Interpreter |

| | |
|---|---|
| Ms. Amalia Thaler de Klemm | English/Spanish Interpreter |
| Ms. Anna Sophia Chapman | English/Spanish Interpreter |

*ICSID Observer*:

| | |
|---|---|
| Mr. Juan Francisco Fernández Garcés | ICSID Intern |

54. On 22 March 2021, ICSID informed the Committee and the Parties that the audio recording and transcripts were available on the file sharing platform created for the case.

55. As invited by the Committee, on 24 March 2021, the Parties informed the Tribunal their agreement on the deadline to submit transcript corrections and their submission on costs.

56. On 14 April 2021, the Parties submitted the agreed corrections to the Hearing transcript.

57. The Parties filed their submissions on costs on 19 April 2021.

58. On 4 January 2022, the Parties were informed that Ms. Toubiana would be resuming her work as Secretary of the Committee.

59. The proceeding was closed on 3 March 2022.

## III. SUMMARY OF RELEVANT FACTS

60. The Applicant provided a summary of the relevant facts of the case in the underlying arbitration which is recounted below.[1] Cube and Demeter note that the summary of facts as presented by Applicant is not complete and that a more thorough and reliable description can be found in the Decision.[2]

61. The production of electricity from renewable sources is a highly regulated industry in Spain. When regulating the electricity sector, in addition to complying with binding international targets, including those of the European Union ("**EU**"), Spain submits that it also had to comply with State aid rules imposed by the EU.

---

[1] Mem., ¶¶ 13-39.

[2] C- Mem., ¶ 10.

62. In November 1997, the Spanish Parliament approved the Electricity Sector Law 54/1997 ("**Law 54/1997**") that regulates the electricity sector. The Law 54/1997 distinguished between the "Ordinary Scheme" which was applicable to producers of conventional energy, and the "Special Scheme" for renewable energy producers. The intent of the dual system was to promote the production of renewable energy which "required public support because the price of energy in the ordinary market was not sufficient to cover the costs of building and operating the special installations needed…"[3] and consequently met the required objectives of the EU.

63. The objective of Law 54/1997 was to provide a "*reasonable* rate of *return* with reference to the cost of money on the capital market for renewable energy producers."[4] The Applicant submitted that "the concept of *reasonable return* implies that subsidies paid by the Government to renewable energy producers would enable them to cover capital costs (capex) and operating costs (opex) and to obtain a return that is neither too high nor too low."[5] The reasonableness was to be measured in light of the principles of Law 54/1997 and the economic and self-sufficiency of the Spanish electricity system.[6] The Applicant also notes that the 1997 Special Regime had two phases, the first phase was to identify the standard cost of the standard investment (capex) and the operation and maintenance costs (opex) done by a diligent investor and the second phase was to set a balanced and proportionate, *i.e.* reasonable target return.[7]

64. The reasonable rate of return was not quantified in the Law 54/1997 but was left to hierarchically lower legislation, such as regulations or royal decrees, to develop and

---

[3] Mem., ¶ 17.

[4] Mem., ¶ 19, **R-0059**, Law 54/1997, of November 27, 1997, on the Electrical Sector), Article 30(4) ("The remuneration system for electrical energy production facilities under the special regime shall be supplemented by the receipt of a premium, under the terms established by regulation, in the following cases: …. In determining the premiums, account shall be taken of the level of voltage at which the energy is delivered to the grid, the effective contribution to environmental improvement, primary energy savings and energy efficiency, the production of economically justifiable useful heat and the investment costs incurred, with a view to achieving reasonable rates of return in relation to the cost of money on the capital market"). (In the original Spanish text, the sentence is exactly written as follows: *"conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales*".)

[5] Mem., ¶ 20.

[6] Mem., ¶ 20.

[7] Mem., ¶ 21.

implement the objectives.[8]  This would allow modifications on the basis of the necessary adjustments to adapt to changes in the economic, technological and other market factors and to balance the various objectives and interests at stake.[9]

65.     The first regulation was Royal Decree 2818/1998 creating the special regime where renewable energy producers could choose to sell electricity at a fixed rate per kWh or at the free market price.[10]  This Royal Decree was repealed and in 2004 Royal Decree 436/2004 ("**RD 436/2004**") was enacted replacing the remuneration mechanisms with an average reference rate.[11]

66.     In 2007, Spain approved Royal Decree 661/2007 ("**RD 661/2007**") which repealed RD 436/2004 and "replaced the average reference tariff with specific values for premiums and tariffs, expressed in eurocents per kWh."[12]  Spain describes the contents of RD 661/2007 as follows: (i) contained the option for some technologies to choose between two different rates, a fixed tariff per unit of output or a premium over the market price for each unit of output; (ii) maximum and minimum payment limits for premium; (iii) rates based on production of entire facility; (iv) allow use of natural gas by renewable energy producers; (v) priority access and dispatch to and from the national grid, and (vi) principle of ensuring a reasonable rate of return for renewable energy producers.[13]

67.     In 2008, at the time of the financial crisis, the Spanish government began to consider measures to reduce an increasing tariff deficit and limit access to RD 661/2007.  In April 2009, Spain enacted Royal Decree Law 6/2009 introducing the pre-registration process for projects potentially eligible under the RD 661/2007 regime.  Plants which were not completed within three years would not be eligible for the RD 661/2007 regime.[14]

---

[8] Mem., ¶ 19.

[9] Mem., ¶ 22.

[10] Mem., ¶ 23; **R-0067**, Royal Decree 2818/1998 of 23 December 1998.

[11] Mem., ¶ 24, **R-0069**, Royal Decree 436/2004 of 12 March 2004.

[12] Mem., ¶ 25; **R-0071**, Royal Decree 661/2007 of 25 May 2007.

[13] Mem., ¶ 26, *citing* **R-0071**, Royal Decree 661/2007 of 25 May 2007.

[14] Mem., ¶ 28; **R-0057**, Royal Decree-Law 6/2009 of 30 April 2009.

68.     In 2010, Spain enacted Royal Decree 1565/2010 ("**RD 1565/2010**") which eliminated fixed tariffs for photovoltaic plants after year 25.[15]  Spain then enacted Royal Decree 1614/2010 which, among other things, "limited the number of hours of operation of solar thermal and wind power plants entitled to a premium and eliminated the premium option during the first year of operation of solar thermal facilities."[16]  That same year, Spain enacted Royal Decree Law 14/2010 extending the obligation to pay a toll for transmission and distribution networks to all electricity producers.[17]

69.     In 2012, the Spanish government requested the National Energy Commission ("**CNE**") to prepare a report for possible reforms in the energy sector.  After a consultation process, the CNE issued a report with recommendations to reduce the tariff deficit and rebalance the Spanish electricity system.  Spain then implemented a series of measures related to the production, transport and distribution of energy affecting all producers.[18]

70.     Law 15/2012 (i) imposed a 7% tax on income from energy generated by all electricity producers and fed into the grid; and (ii) imposed a hydroelectric charge with respect to the use and exploitation of inland waters in the case of hydroelectric installations.[19]

71.     On 1 February 2013, Spain enacted Royal Decree Law 2/2013 ("**RDL 2/2013**") which (i) instituted the corrected Consumer Price Index as a measure to update the inflation adjustments for tariffs; and (ii) eliminated the premium option for the Special Regime.[20]  On 12 July 2013, Spain enacted Royal Decree Law 9/2013 ("**RDL 9/2013**") which provided a specific remuneration on market price based on the costs per unit of installed energy plus standard amounts of operating costs for various types and outputs of renewable energy installations.[21]

---

[15] Mem., ¶ 29; **R-0074**, Royal Decree 1565/2010 of 19 November 2010.

[16] Mem., ¶ 29, **R-0075**, Royal Decree 1614/2010 of 7 December 2010.

[17] Mem., ¶ 29; **R-0058**, Royal Decree-Law 14/2010 of 23 December 2010.

[18] Mem., ¶¶ 30-31; **R-0171**, Information on the public consultation on regulatory adjustment measures in the energy sector of 2 February 2012 and 9 March 2012; **R-0105**, Report of the National Energy Commission (CNE) of 7 March 2012.

[19] Mem., ¶ 32; **R-0003**, Law 15/2012 of 27 December 2012 on fiscal measures for energy sustainability.

[20] Mem., ¶ 33, **R-0063**, Royal Decree-Law 2/2013 of 1 February 2013.

[21] Mem., ¶ 34; **R-0064**, Royal Decree-Law 9/2013 of 12 July 2013.

72.    On 26 December 2013, Spain enacted Law 24/2013 which replaced Law 54/1997 but was still based on the same principles, including the principle of reasonable return.[22]

73.    On 10 June 2014, Spain enacted Royal Decree 413/2014 ("**RD 413/2014**") which defined the remuneration of renewable energy producers under RDL 9/2013 providing a reasonable rate calculated on the basis of an "efficient plant."[23] On 16 June 2014, the Ministerial Order IET/045/2014 ("**Ministerial Order**") was issued to implement RDL 9/2013, Law 24/2013 and RD 413/2014, and setting specific economic parameters to calculate the remuneration of renewable energy producers.

74.    The Applicant describes that the principle of reasonable return as well as priority access to the electricity transmission and distribution networks to and from the grid were recognized and maintained in RDL 9/2013, Law 24/2013, RD 413/2014 and the Ministerial Order.[24]   The Applicant submits that the regulatory measures approved between December 2012 and June 2014 continued with the essential characteristics of the system and subsidies offered to the renewable energy producers as established in 1997.   The Spanish regulator updated the system considering the economic, technological and market changes as well as trying to reduce the tariff deficit and rebalance the Spanish electricity system.   According to the Applicant, such measures were "justified by the critical macroeconomic situation in Spain and by fulfilment of its obligations as a member of the European Union."[25]

## IV.    SCOPE OF ANNULMENT

75.    Spain requests the annulment of the Award on the following grounds referred to in Article 52(1)(b), (d) and (e) of the ICSID Convention:

a)      The Tribunal has manifestly exceeded its powers;

---

[22] Mem., ¶ 35; **R-0047**, Law 24/2013 of 26 December 2013 on the Electricity Sector.
[23] Mem., ¶ 36; **R-0080**, Royal Decree 413/2014 of 6 June 2014.
[24] Mem., ¶ 38.
[25] Mem., ¶ 39.

      b)     The Tribunal failed to express its reasons; and

      c)     There has been a serious departure from fundamental rule of procedure.

## A.   THE APPLICANT'S ARGUMENTS

76. The Applicant addressed the objections from the Respondents regarding the scope of the annulment. During the Hearing, Spain referred to the 2016 ICSID Updated Background Paper on Annulment[26] and addressed the principles that apply in relation to annulment.

77. *First*, Spain acknowledges that annulment under the ICSID Convention is an exceptional and narrowly circumscribed remedy and not an appeal.[27] Spain points out that it has "specifically raised the grounds set out in Article 52(1) of the ICSID Convention and notes that it has limited its arguments to those grounds."[28]

78. *Second*, Spain notes that there is no presumption either in favor or against annulment that would cause Article 52 of the ICSID Convention to be interpreted extensively or restrictively.[29] However, the Applicant submits that if the scope of annulment is interpreted as narrowly as Cube and Demeter argue it should be, annulment committees would be deprived of all their powers.[30]

---

[26] Applicant's Opening Presentation, Slide 4; **RL-0096**, Updated background paper on annulment for the administrative council of ICSID, 5 May 2016.

[27] Tr. Day 1 (Ms. Fatás Pérez), 8:7-9; Tr. Day 2 (Ms. Fatás Pérez), 4:13-16. *See also*, Spain's letter dated 11 February 2021 ("Needless to say, the Kingdom of Spain agrees with the Respondents on Annulment that annulment is an exceptional and narrowly circumscribed remedy and the role of the ad hoc Committee is limited. Bearing in mind the narrow scope of the annulment proceedings, the Kingdom of Spain has limited its written submissions and expert reports to those procedural and substantive breaches which fall within the specific scope of Article 52 of the ICSID Convention. As the Committee can easily verify, all the grounds for annulment raised by the Kingdom of Spain are included within the motives listed in such Article 52.).

[28] Tr. Day 1 (Ms. Fatás Pérez), 8:11-15.

[29] Reply, ¶ 3; **RL-0156**, *Mr. Patrick Mitchell v. The Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006 [hereinafter *Mitchell*], ¶ 19; **RL-0101**, *Maritime International Nominees Establishment (MINE) v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award, 22 December 1989 [hereinafter *MINE*] ¶ 4.05; **RL-0104**, *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Annulment Proceeding, 5 February 2002 [hereinafter *Wena*], ¶ 18; **RL-0097**, *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010 [hereinafter *Sempra*], ¶ 75.

[30] Tr. Day 2 (Ms. Fatás Pérez), 4:21-24.

79. *Third*, Spain recalls that under the ICSID Convention, annulment is the last remedy to ensure the integrity of the arbitral proceeding,[31] and that the legitimacy of the award is not undermined.[32] The Applicant submits that the Committee is the ultimate guarantor or guardian of the legitimacy of ICSID arbitrations.[33]

80. The Applicant also points to the awards that have been issued in the cases of *Eiser*, *Novenergia*, *Masdar* and *Antin* which were decided close in time and addressed issues that are also raised in the present annulment.[34] The Applicant has explained that the fact that it has requested the annulment in other arbitration proceedings is because there is a common ground at issue in all ECT cases against Spain which concern legal issues relating to EU law, both on jurisdiction and the merits.[35] Therefore, the Applicant concludes, it is logical that Spain is seeking annulment in all of these proceedings. According to the Applicant, the present annulment is vital for the entire "Spanish Saga" in view of the status of the aforementioned cases.[36]

81. To date, the Applicant recalls that one of the annulments has been resolved and resulted in the annulment of the award, *Eiser*.[37] According to the Applicant, "this proves that Spain's requests for annulment are not frivolous, unfounded, and that we understand the scope of annulment proceedings."[38]

82. The Applicant notes that the Committee is in a unique position to settle the link between the ECT and the ICSID Convention in relation to renewable energy arbitrations against

[31] Tr. Day 1 (Ms. Fatás Pérez), 9:1-3.

[32] Reply, ¶¶ 10, 16; **RL-0145**, *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L*, ICSID Case No. ARB/13/36, Decision on the Kingdom of Spain's Application for Annulment, 11 June 2020 [hereinafter *Eiser*], ¶ 178.

[33] Reply, ¶ 10; Tr. Day 1 (Ms. Fatás Pérez), 9:1-5.

[34] Applicant's Opening Presentation, Slide 5, The "Spanish Saga"; **RL-0145**, *Eiser*; **CL-168**, *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018 [hereinafter *Novenergia*]; **CL-170**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 [hereinafter *Masdar*]; **CL-193**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 [hereinafter *Antin*].

[35] Tr. Day 2 (Ms. Fatás Pérez), 5:7-12.

[36] Tr. Day 1 (Ms. Fatás Pérez), 9:17-20; Tr. Day 2 (Ms. Fatás Pérez), 5:14-15.

[37] **RL-0145**, *Eiser*. *See also* Tr. Day 2 (Ms. Fatás Pérez), 5:22-25, 6:1.

[38] Tr. Day 2 (Ms. Fatás Pérez), 5:19-21; Applicant's Closing Presentation, Slide 4.

Spain, as well as the ECT's position in the context of international law, and how the ECT will exist within the EU.[39]

## B.    THE RESPONDENTS' ARGUMENTS

83.    Cube and Demeter argue that ICSID annulment committees have limited jurisdiction and are prohibited from functioning as courts of appeal and stress that annulment is an extraordinary and narrowly circumscribed remedy.[40]  According to Cube and Demeter, annulment committees are limited to "serving as guardians of procedural uniformity and propriety and of due process" and "do not have jurisdiction to review the substantive factual or legal conclusions of ICSID awards."[41]

84.    In support of the argument that the annulment is not an appeal, Cube and Demeter cite the former Secretary-General, Ibrahim F.I. Shihata when he addressed the Administrative Council.  Shihata emphasized the exceptional nature of the annulment mechanism and the history of the Convention which showed that the intent was to "(i) assure the finality of ICSID awards; (ii) distinguish carefully an annulment proceeding from an appeal; and (iii) construe narrowly the ground for annulment, so that this procedure remained exceptional."[42]

85.    Cube and Demeter submit that the *travaux préparatoires* of the Convention, the text, and the object and purpose of both Articles 52 and 53 confirm that the grounds for annulment provided in the ICSID Convention are narrow and limited and that a substantive, or appellate review of awards, is foreclosed.[43]

86.    Cube and Demeter draw from what they refer as the "generations of annulment decisions" to show how annulment has "found a correct balance" and "recent generations of annulment decisions have shown unwillingness to overstep the boundaries prescribed

---

[39] Tr. Day 1 (Ms. Fatás Pérez), 9:21-25, 10:1-2.

[40] C-Mem., ¶ 25; **C-335**, A. Broches, *Observations on the Finality of ICSID Awards*, 6(2) ICSID REVIEW – FOREIGN INVESTMENT LAW JOURNAL, 321, 324 (1991).

[41] C-Mem., ¶ 25.

[42] C-Mem., ¶¶ 29, 65; **CL-338**, Report of Secretary-General Ibrahim F.I. Shihata to the Administrative Council at its Twentieth Annual Meeting, Oct. 2, 1986, Annex A, at 2. *See also* Tr. Day 1 (Mr. Fleuriet), 80:7-15.

[43] C-Mem., ¶ 49.

in the ICSID Convention."[44] Cube and Demeter submit that the basic principles which *ad hoc* committees have clearly established and which are also summarized in the 2016 Updated ICSID Background Paper on Annulment, are the following: [45]

- "*Ad hoc* Committees are not courts of appeal, annulment is not a remedy against an incorrect decision, and an *ad hoc* Committee cannot substitute the Tribunal's determination on the merits for its own;"[46]

- "Annulment is an exceptional and narrowly circumscribed remedy and the role of an ad hoc Committee is limited;"[47]

- "The grounds listed in Article 52(1) are the only grounds on which an award may be annulled;"[48] and

[44] C-Mem., 31 (citations omitted).

[45] C-Mem., ¶ 53; **CL-226**, ICSID, *Updated Background Paper on Annulment For the Administrative Council of ICSID*, May 5, 2016, ¶ 74. *See also* Tr. Day 1 (Mr. Fleuriet), 81-82.

[46] C-Mem., ¶ 89; *see* **CL-276**, *Postova Banka, a.s. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Decision on Annulment, 29 September 2016, ¶ 128; **CL-277**, *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited*, ICSID Case No. ARB/10/20, Decision on Annulment, 22 August 2018 [hereinafter *SBC*], ¶¶ 59-61; **RL-266**, *Bernhard Friedrich Arnd Rudiger von Pezold et al. v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Decision on Annulment, 21 November 2018, ¶ 239; **CL-188**, *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/12/23, Decision on Annulment, 28 December 2018 [hereinafter *Tenaris*] ¶¶ 43-44; **CL-278**, *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Annulment, 29 May 2019 [hereinafter *Teinver*], ¶ 47; **CL-267**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic,* ICSID Case No. ARB/14/3, Decision on Annulment [hereinafter *Blusun*], ¶ 148.

[47] C-Mem., ¶¶ 90-94; *see* **CL-279**, *Venoklim Holding B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/22, Decision on Annulment, 2 February 2018, ¶ 187; **CL-267**, *Blusun*, ¶ 149; **CL-228**, *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the ad hoc Committee on the Application for Annulment of Mr. Soufraki, 5 June 2007 [hereinafter *Soufraki*], ¶¶ 24, 27; **CL-280**, *Libananco Holdings Co. Ltd. v. Republic of Turkey*, ICSID Case No. ARB/06/8, Decision on Annulment, 22 May 2013, ¶ 102; **CL-230**, *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment, 10 July 2014 [hereinafter *Alapli*], ¶ 32.

[48] C-Mem., ¶ 95; **CL-282**, *Consortium R.F.C.C. v. Kingdom of Morocco*, ICSID Case No. ARB/00/6, Decision of the *ad hoc* Committee on the Application for Annulment of Consortium R.F.C.C., 18 January 2006 [hereinafter *Consortium R.F.C.C.*], ¶ 222; **CL-231**, *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, 25 September 2007, ¶ 43; **RL-97**, *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010, ¶ 74; **RL-0105**, *Pey Casado v. Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment, 18 December 2012 [hereinafter *Pey Casado*], ¶ 89; **CL-283**, *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, 22 September 2014, ¶ 137; **CL-284**, *EDF International S.A., SAUR International S.A and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Decision on Annulment, 5 February 2016 [hereinafter *EDF*], ¶ 67; **RL-0157**, *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016, ¶ 248 [hereinafter *TECO*], ¶ 73; **CL-266**, *Bernhard Friedrich Arnd Rudiger von Pezold et al. v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Decision on Annulment, 21 November 2018 [hereinafter *von Pezold*], ¶ 238.

• "*Ad hoc* Committees should exercise their discretion not to defeat the object and purpose of the remedy or erode the binding force and finality of awards."[49]

87. Cube and Demeter note that Spain has serially violated the principles noted above and has sought annulment in every award rendered.[50] Cube and Demeter submit that it cannot be the case that all awards finding Spain liable are flawed in a way to merit their annulment.[51] Furthermore, not only is Spain effectively attempting to appeal unsuccessful claims, which is impermissible in itself, but it is effectively requesting a retrial.[52]

88. Cube and Demeter argue that Spain is seeking to use the annulment process as a basis to introduce new arguments and new evidence.[53] They request the Committee, as other committees have confirmed, not to allow Spain to relitigate its case and to "restrict itself to a review of the underlying Award and the process followed by the original Tribunal, which necessarily entails limiting its review to the record before the original Tribunal."[54] In support of this argument, Cube and Demeter point to the committee's decision in *Von Pezold* confirming that the ICSID annulment proceeding is not a "retrial" and "accordingly, it is based on the record before the tribunal."[55] In particular, Cube and Demeter argue that Spain submitted an expert report on EU law with its Memorial on Annulment, while it never submitted one in the arbitration in support of the same of EU law arguments.[56] According to Cube and Demeter, the Committee should "ignore

---

[49] C-Mem., ¶¶ 96-100; **CL-316**, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines I*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010 [hereinafter *Fraport*], ¶ 235; **CL-264**, *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision of the *ad hoc* Committee on the Application for Annulment of the Republic of Seychelles, 29 June 2005 [hereinafter *CDC*], ¶ 37; **CL-282**, *Consortium R.F.C.C.*, ¶ 226; **RL-0133**, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015 [hereinafter *Tulip*], ¶ 45; **CL-284**, *EDF*, ¶ 165; **CL-267**, *Blusun*, ¶ 148.

[50] C-Mem., ¶ 102.

[51] C-Mem., ¶ 102.

[52] C-Mem., ¶ 103.

[53] C-Mem., ¶ 104.

[54] C-Mem., ¶ 105.

[55] C-Mem., ¶ 105; **CL-266**, *von Pezold*, ¶ 239.

[56] C-Mem., ¶ 134.

Spain's new evidence, disregard its attempt to replead its case, and strike the legal opinion of Professor Gosalbo."[57]

89. Cube and Demeter submit that since annulment committees are not appellate bodies, it follows that annulment is not a remedy against an incorrect decision and *ad hoc* committees cannot substitute tribunal decisions on the merits for their own. As the committee in *Adem Dogan* considered, it is not within an *ad hoc* committee's remit to re-examine the facts of the case to determine whether a tribunal erred in appreciating or evaluating the available evidence. Otherwise, it would act as an appellate body.[58]

90. Moreover, in this context, Cube and Demeter submit that it is not for an annulment committee to consider or apply new facts that Spain could have raised before the arbitration tribunal in accordance with the revision mechanism contained in Article 51(3).[59]

91. Finally, Cube and Demeter submit that as many annulment decisions have held, annulment is discretionary even when an annullable error is found to exist.[60]

## C. THE COMMITTEE'S ANALYSIS

92. Before addressing the specific annulment grounds invoked by Applicant and the scope of these individual grounds, the Committee will set out the basic framework of this Application, which both Parties have addressed, albeit in different level of detail. The Committee agrees with the Parties that a fundamental goal of the ICSID Convention is to assure the finality of awards and to provide limited exceptions to the concept of finality in the interest of fundamental procedural integrity. The Committee also agrees with the position presented by both Parties that annulment is an exceptional and narrowly

[57] C-Mem., ¶ 135.

[58] Rejoinder, ¶ 23; **CL-320**, *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, 15 January 2016 [hereinafter *Adem Dogan*], ¶ 129.

[59] C-Mem., n. 252.

[60] C-Mem., ¶ 100; **CL-264**, *CDC*, ¶ 37; **CL-282**, *Consortium R.F.C.C.*, ¶ 226; **RL-0133**, *Tulip*, ¶ 45; **CL-284**, *EDF*, ¶ 165; **CL-267**, *Blusun*, ¶ 148.

circumscribed remedy and that annulment proceedings cannot be equated with appeal proceedings.

93. The Committee agrees with the Applicant that there is no presumption either in favor of or against annulment and there is no basis for either an extensive or restrictive interpretation of Article 52 of the ICSID Convention.[61] Here again, the starting point of the annulment process is the finality of awards.

94. The scope of review, regardless of the specific annulment ground, is particularly relevant insofar as an applicant invokes new facts and/or evidence in support of its request for annulment.

95. In principle, the Committee agrees with the position set out by Cube and Demeter, by reference to the decision in *Von Pezold,* that a committee is to "restrict itself to a review of the underlying Award and the process followed by the original Tribunal, which necessarily entails limiting its review to the record before the original Tribunal."[62]

96. In the present case, the Committee will first address the new expert evidence presented by Spain. The Committee recalls that despite this starting point, Section 15.2 of Procedural Order No. 1, which was agreed by the Parties and based on a draft prepared by the Parties, explicitly addresses the eventuality of the submission of new legal expert reports. In its letter of 15 February 2021, the Committee therefore decided not to strike from the record the Expert Reports of Professor Ricardo Gosalbo Bono. At the same time, the Committee underlined that the fact the Expert Reports were not stricken from the record did not imply a decision on the probative value to be attributed to the contents of these reports. Rather, it considered that it remained for the Parties to address the significance, relevance and weight of these expert reports at the oral hearing in March, mindful in particular of the context of these annulment proceedings.

[61] Reply, ¶ 3; **RL-0156**, *Mr. Patrick Mitchell v. The Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006 [hereinafter *Mitchell*], ¶ 19; **RL-0101**, *MINE*, ¶ 4.05; **RL-0104**, , ¶ 18; **RL-0097**, *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010 [hereinafter *Sempra*], ¶ 75.

[62] C-Mem., ¶ 105. *See also*, **CL-266**, *von Pezold*, ¶ 239.

97. At the Hearing, and notwithstanding the Committee's invitation to do so, the Parties did not address this issue further. Consequently, while the Committee may return to this issue in the context of specific arguments made by the Parties, it will do so on the basis of the principles set out above and confirmed in the *Von Pezold* annulment decision.

98. Similarly, and generally, insofar as either Party has relied on new arguments and/or new legal developments that have taken place since the date of the Award in the underlying arbitration, the Committee will in principle, with the obvious exception of arguments and authorities addressing the scope of annulment, refrain from relying on subsequent developments and arguments, in relation thereto or otherwise. Doing so would fly in the face of the limited scope of these annulment proceedings, as understood and accepted by both Parties, and the commensurate, limited, role of an annulment committee.

## V. MANIFEST EXCESS OF POWERS

### A. THE APPLICANT'S ARGUMENTS

99. Spain argues that the Award must be annulled because the Tribunal clearly exceeded its powers. In particular, Spain claims that the excess is manifested in two ways: (***i***) by going beyond its jurisdiction in contravention of EU law; and (***ii***) by omitting the rules applicable to the disputes and, in particular, by not applying EU law.[63]

#### (1) Applicable Legal Standard

100. Spain explains that a manifest excess of power may exist where a tribunal does not apply the appropriate law or where a tribunal exceeds its jurisdiction or does not have jurisdiction or the tribunal rules on matters not raised by the Parties.[64] According to Spain, "the failure to apply the law in force occurs when the Tribunal disregards the

[63] Mem., ¶¶ 54, 68; Reply, ¶¶ 20-54. *See also* Tr. Day 1 (Ms. Fatás Pérez), pp. 10-11; Applicant's Opening Presentation, Slides 7-9.

[64] Mem., ¶ 56, *citing* **RL-0096**, Updated background paper on annulment for the administrative council of ICSID, 5 May 2016.

applicable law, or its misinterpretation or misapplication of the law is 'so gross or egregious as substantially to amount to failure to apply the proper law.'"[65]

101. Spain notes that committees have annulled an award under circumstances in which there is misapplication of the law amounting to a manifest excess of powers.[66] Spain also argues that "… even in cases where a Tribunal correctly states the applicable law, a manifest excess of powers may still exist if a review of the arbitral decision makes it clear that the Tribunal did not effectively apply the principles it had recognized."[67]

102. In response to Cube and Demeter's argument with respect to the "manifest" requirement, Spain responds by highlighting that "an extensive argumentation and analysis do not exclude the possibility of concluding that there is a manifest excess of power, as long as it is sufficiently clear and serious."[68] Spain adds that a tribunal may manifestly exceed its powers, for the purpose of Article 52(1)(b) of the ICSID Convention, if it does not apply the appropriate law.[69]

103. Spain objects to Cube and Demeter's view of the term "manifest" in Article 52 and argues that they have "decontextualized quotes from some annulment decision[s]."[70] On this point, Spain argues that this term must follow the interpretation in accordance with Article 31 of the VCLT.[71] Spain argues that the three authentic versions in English, French and Spanish of the ICSID Convention can be analyzed to this end.

---

[65] Mem., ¶ 57; **RL-0072**, *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the ad hoc Committee on the Application for Annulment, 5 June 2007 [hereinafter *Soufraki*], ¶ 86; **RL-0097**, *Sempra*, ¶¶ 164-165; **RL-0149**, *M.C.I. Power Group L.C. and New Turbine Inc. cv. Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment, 19 October 2009 [hereinafter *MCI*], ¶¶ 43, 49, 51; **RL-0102**, *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, Decision on Annulment, 2 November 2015 [hereinafter *Occidental*], ¶ 56.

[66] Mem., ¶ 58, *citing* **RL-0072**, *Soufraki*, ¶ 86.

[67] Mem., ¶ 59, *citing* **RL-0107**, *Iberdrola Energía v. Guatemala,* ICSID Case No. ARB/09/5, Decision on Application for Annulment, 13 January 2015 [hereinafter *Iberdrola*], ¶ 97.

[68] Reply, ¶ 38, *citing* **RL-0105**, *Pey Casado*, ¶ 70.

[69] Reply, ¶ 40*, citing* **RL-0072**, *Soufraki*, ¶¶ 41-45.

[70] Reply, ¶ 41.

[71] Reply, ¶ 42; **RL-0010**, Vienna Convention on the Law of Treaties, 23 May 1969, BOE 17 June 1980; Article 31 ("…a treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context, in view of its object and purpose.")

104. As to the Spanish version, it states "*que el tribunal se hubiera extralimitado manifiestamente en sus facultades*." The Applicant refers to the Dictionary of the Royal Spanish Academy of the Spanish language and points that "manifestly" means "in a manifest manner" and takes the first meaning given to "manifestly" which is "discovered." The Applicant concludes on the basis of this interpretation that if an excess of powers is discovered, the award must be annulled.[72] As to the French version, which reads "*excès de pouvoir manifeste du Tribunal*" the Applicant refers to the Larousse dictionary which defines "*manifeste*" as "[*d*]*ont la nature, la réalité, l'authenticité s'imposent avec evidence*." The Applicant concludes on this basis that "if it becomes evident that there is an over-riding of powers, the [ICSID] Convention imposes the annulment of the Award."[73] Finally, in relation to the English version which reads "that the Tribunal manifestly exceeded its powers," the Applicant refers to the Oxford dictionary which defines "manifest" as "easy to see or understand." In this regard, the Applicant concludes that "an exceeding of powers that is easy to see or understand should determine the annulment of the award."[74] Consequently, Spain argues that in this case it is easy to see that the "overreaching of powers is evident and is easily appreciated in view of the information available in the file."[75]

**(2) Undue Declaration of Jurisdiction; Breach of EU Law**

105. The Applicant states that the Tribunal lacked jurisdiction to hear the present case and that the lack of jurisdiction arises from the application of EU law. In support of the notion that its position is the logical consequence of the application of EU law, Spain submits the expert reports of Professor Gosalbo with its Memorial and Reply.[76]

106. In articulating its position, Spain presents its arguments in a multilayered fashion, with a certain amount of overlap. The Committee has carefully considered all arguments,

---

[72] Reply, ¶ 44; https://dle.rae.es/manifiestamente?m=form; https://dle.rae.es/manifiesto?m=form.

[73] Reply, ¶ 45; https://www.larousse.fr/dictionnaires/francais/manifeste/49162?q=manifeste%2349069.

[74] Reply, ¶ 46; https://www.oxfordlearnersdictionaries.com/definition/english/manifest_2.

[75] Reply, ¶ 47.

[76] Mem., ¶¶ 72-73.

even though the following overview is limited to a high level description of the main themes of Spain's argumentation.

***a. ECT does not apply between Member States of the EU as a matter of international law***

107. As the starting point, Spain argues that a proper application of customary rules of international law on the interpretation of treaties "… obliges us to conclude that the ECT (including Article 26) does not apply within the EU."[77] Spain further alleges that the Tribunal did not carry out an analysis of all the rules of interpretation set forth in Article 31 of the Vienna Convention on the Law of Treaties ("**VCLT**"), but merely indicated that there was no disconnection clause and, on that basis, concluded it had jurisdiction.[78]

***b. EU law and primacy of EU law***

108. Second, and alternatively, the Applicant alleges that even if it were possible to interpret Article 26 ECT as covering intra-EU disputes, such interpretation would conflict with the EU treaties, and that conflict, as a matter of international law, must be resolved in favor of EU law.[79]

109. Spain argues that the ECT as a multilateral treaty, which has been signed by the EU, was not designed to comprise the settlement of disputes between different Member States of the EU and that the proper application of the customary rules of international law of interpretation leads to the conclusion that the ECT (including Article 26(6)) does not apply within the EU.[80]

110. According to the Applicant, in case of conflict between the ECT and EU law, the EU Member States have agreed on a specific rule for resolution of treaty disputes. In other words, Spain says, "the primacy of EU law is a special conflict rule under international law."[81]

---

[77] Mem., ¶ 76.
[78] Mem., ¶ 76; *see also* Reply, ¶¶ 64 and 104.
[79] Mem., ¶ 77; *see also* Reply, ¶¶ 62 and 69.
[80] Mem., ¶ 82.
[81] Mem., ¶ 79; *see also* Reply, ¶¶ 105 and 110.

111. Spain further explains that relations between EU Member States are governed by the principle of "mutual trust," and as part of this system the autonomy and uniform application of EU law is guaranteed by the powers of the CJEU.[82] Spain explains that "… in view of Articles 267 and 344 of the Treaty on the Functioning of the EU ("**TFEU**"), the EU Treaties have always prohibited EU Member States from offering to settle investor-state disputes within the EU before international arbitration tribunals. This is true not only with respect to BITs, but also with respect to multilateral treaties, such as the ECT."[83]

112. The interpretation and application of EU law and its enforcement by the Member States is a matter for the CJEU as the ultimate interpreter of EU law and which has exclusive jurisdiction to determine its scope and content.[84] For purposes of ensuring consistency and uniform interpretation of EU law, Article 267 of the TFEU provides that the highest court in each Member State may refer questions of EU law to the CJEU for a preliminary ruling. The decision of the CJEU in resolving the preliminary ruling question is binding on all courts of the Member States.[85] Article 344 of the TFEU prohibits Member States from submitting disputes concerning interpretation or application to a method of dispute settlement other than their courts.[86]

### c. *The* **Achmea** *judgment*

113. The Applicant argues that the *Achmea* judgment is crucial.[87] Spain recalls that the CJEU stated in this decision that Member States of the EU are prohibited from submitting to

[82] Mem., ¶ 78; *see also* Reply, ¶ 106.

[83] Mem., ¶ 89; *see also* Reply, ¶ 107.

[84] Mem., ¶¶ 92-93.

[85] Mem., ¶ 95; **RL-0090**, Opinion 2/13 of the EU Court of Justice (Full Court) of 18 December 2014, pursuant to Article 218(11) TFEU (Accession of the EU to the ECHR), ¶ 176; **RL-0141**, Judgment of the Court of Justice of the European Union in Case C-689/13 (Puligienica Facility Esco SpA (PFE) and Airgest SpA). 5 April 2016, ECLI:EU:C:2016:199, ¶¶ 37-38, 42.

[86] Mem., ¶ 96; **RL-0090**, Opinion 2/13 of the UE Court of Justice (Full Court) of 18 December 2014, pursuant to Article 218(11) TFEU (Accession of the EU to the ECHR)), ¶¶ 210, 212, 213.

[87] **RL-0086**, *Republic of Slovakia / Achmea BV*, Judgment of the Court of Justice of the European Union Case C-284/16, 6 March 2018 [hereinafter *Achmea*].

dispute resolution mechanisms outside of the EU judicial system pursuant to Article 267 and 344 of the TFEU.[88]

114. The Applicant summarized the *Achmea* case in its pleadings as follows. In 2008, *Achmea* brought an arbitration proceeding against Slovakia under the Czechoslovakia-Netherlands BIT of 1991 on the grounds of a ban imposed on distribution of profits generated by health insurance activities. In 2012, the tribunal found Slovakia violated the BIT. Subsequently, Slovakia appealed to the German Courts on the basis that the arbitration clause of the Czechoslovakia-Netherlands BIT was contrary to several provisions of the TFEU. The German Court referred the question to the CJEU for a preliminary ruling on whether the arbitration clause was compatible with Articles 18, 267, and 244 of the TFEU.

115. The Applicant describes that the *Achmea* judgment is relevant to the present case because it specifically examined whether an arbitral tribunal in international investment arbitration complies and is compatible with the principles of EU law. Spain summarizes the conclusions of the CJEU as follows:[89]

> - The Arbitral Tribunal is not part of the European Union's judicial system, nor can it be described as a court "of a Member State" that can refer a question to the CJEU for a preliminary ruling.
>
> - Disputes before Investment Protection Arbitration Tribunals may affect the application or interpretation of EU law and should therefore be subject to the EU judicial system.
>
> - Through the arbitration clause, Member States agree to deviate from the jurisdiction of their own courts and therefore from the EU judicial review system, so that there can be no guarantee that disputes submitted to arbitration will be resolved in a way that ensures the full effectiveness of EU law.
>
> - Under Article 8(7) of the BIT the decision of the arbitral tribunal provided for in that article is final and the legal examination may be exerted by a National court only insofar as national law permits it.

[88] Mem., ¶ 98; **RL-0086**, *Achmea*.

[89] Mem., ¶ 103; **RL-0086**, *Achmea*.

116. Spain recounts that as a result of the *Achmea* judgment, the German Federal Court annulled the arbitration award on the basis that EU law provided that there was no agreement to submit the dispute to arbitration under German law. According to Spain, the reasoning followed by the CJEU in *Achmea* has been confirmed in cases where the EU itself is a party to the international treaty.[90]

***d. EC intervention/declarations***

117. Spain further states that "*Achmea*'s application to the underlying arbitration has been declared by two more sources: the European Commission and the Member States themselves involved in the dispute before this Committee."[91]

118. Spain submits that based on the *Achmea* decision, the European Commission issued its communication COM (2018) 547/2 which reads "[t]his implies that all investor-State arbitration clauses in intra-EU BITs are inapplicable and that any arbitration tribunal established on the basis of such clauses lacks jurisdiction due to the absence of a valid arbitration agreement. As a consequence, national courts are under the obligation to annul any arbitral award rendered on that basis and to refuse to enforce it. Member States that are parties to pending cases, in whatever capacity, must also draw all necessary consequences from the *Achmea* judgment. Moreover, pursuant to the principle of legal certainty, they are bound to formally terminate their intra-EU BITs. The *Achmea* judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations… Given the primacy of Union law, that clause, if interpreted as applying to intra-EU, is incompatible with EU primary law and thus inapplicable…"[92] More so, Spain submits, if one takes into account the reference to regional economic integration organizations.[93] Spain

[90] Mem., ¶¶ 104-105. *See* **RL-0137**, Opinion 1/17 of the Plenary of the Court of Justice ECJ, CETA, 30 April 2019.

[91] Mem., ¶ 110.

[92] Mem., ¶ 111; **RL-0136**, Communication from The European Commission to The European Parliament and The Council on the Protection of intra-EU investment. COM (2018) 547/2, 19 July 2018.

[93] Tr. Day 1 (Ms. Martínez de Victoria), 18:17-24. *See also*, Tr. Day 2 (Ms. Martínez de Victoria), 11-18; Applicant's Closing Presentation, Slides 15-30.

argues that Article 26 not only refers to "Contracting Parties" but also to "Areas" which the Tribunal did not even analyze.[94]

119. On a related note, Spain explained that in January 2019 almost all Member States signed a political declaration through which they stated that arbitration clauses such as the one provided in the ECT could not be understood as a consent to submit intra-EU disputes to arbitration.[95]

***e. EU law and the ECT and the impact on this case***

120. In light of its overview of these various sources and developments, Spain submits that the *Achmea* case is directly applicable to this case as it explains the interaction between EU law and the ECT. The Applicant argues that the *Achmea* judgment is applicable because "it is called for the application of EU law and is not the Award subject to review by the European Union's judicial system." By virtue of the *Achmea* judgment Spain submits that Article 26(4) ECT is not applicable to intra-EU disputes.[96]

121. Spain alleges that the ECT, as a multilateral treaty, has been signed by the EU as well as Member States that form part the EU. The Applicant recalls that the dispute resolution provisions contained in the ECT call for disputes to be resolved in "accordance with the ECT and applicable rules of international law"[97] which are applicable to the underlying arbitration under Article 26 ECT.[98]

122. Spain concludes its analysis of *Achmea* as follows: "the application of the position of the CJEU in its *Achmea* judgment to the present case is undisputed: clauses such as Article 26(6) ECT cannot be applied between Member States of the Union, as is the case here."[99]

---

[94] Tr. Day 1 (Ms. Martínez de Victoria), 19:1-10.

[95] Mem., ¶ 112. **RL-0098**, Declaration by the representatives of the Member States on the legal consequences of the judgment of the Court of Justice in the Achmea case and on the protection of investment in the European Union, 15 January 2019.

[96] Mem., ¶ 106.

[97] Mem., ¶ 108.

[98] Mem., ¶ 109.

[99] Mem., ¶ 109.

Consequently, Spain requests that the Committee "correct the incorrect determination of applicable law made by the Tribunal…"[100]

123. The Applicant alleges that the Tribunal's Decision is wrong in analyzing its jurisdiction. According to the Applicant, the Tribunal incorrectly interpreted EU law and consequently, contrary to the principles of EU law, decided it had jurisdiction. *First*, concerning the Tribunal's decision that the ECT does not provide a differentiated treatment for Member States of the EU, Spain argues that the Tribunal ignored (i) the series of treaties that make up EU law and prevail over the ECT on the basis of the principle of primacy, and (ii) the literal application of the phrase Regional Economic Integration and Organization ("**REIO**").[101]

124. *Second*, on the Tribunal's decision that the context and object of the ECT did not support Spain's position, the Applicant alleges that the Tribunal denied the implicit disconnection clause in Article 16 ECT.

125. *Finally*, the Applicant also argues that the Decision was wrong because it denied any relevance to the *Achmea* ruling. According to Spain, the Tribunal had to analyze the *Achmea* judgment to analyze the regulations on State aid. Spain also argues that it is concerning that the Tribunal decided to rely on the Advocate General's conclusions instead of the *Achmea* judgment itself.[102]

126. In its Reply, the Applicant addresses the requirement of Article 52(1)(b) that any excess of powers must be manifest. It submits that this requirement is fulfilled because from the outset, *i.e.* from the submission of the request for arbitration, it was evident that the dispute was an intra-EU dispute involving two EU investors against another EU State – a "notorious fact" which reinforced the manifest nature of the excess of jurisdiction. On this basis, Spain invoked the intra-EU objection from the outset of the arbitration. Additionally, Spain argues that the EU Commission sought to intervene to "question the

[100] Mem., ¶ 109.

[101] Mem., ¶ 117. *See also* Tr. Day 2 (Ms. Fatás Pérez), p. 9:14-23; Applicant's Closing Presentation, Slides 8-10.

[102] Mem., ¶¶ 122, 123, 126.

jurisdiction of the Award" because it was an intra-EU dispute. In conclusion, therefore, Spain submits that the excess of jurisdiction is more than evident.[103]

**(3) EU Law as the Law Applicable to the Merits**

127. Spain argues that the Tribunal manifestly exceeded its powers by disregarding the application of EU law to the merits.[104] Spain further argues that the Tribunal erred when drawing a distinction between the EU treaties and EU secondary legislation as well as by failing to recognize the supremacy of EU law.[105]

128. Spain also alleges that the Tribunal "… overlooked the fact that the rules on state aid are to be found in the Treaty on the Functioning of the European Union, specifically in Articles 107 and 108 of the TFEU… the Tribunal in *Cube* did not explain in any way why, if the treaties of the European Union were, according to its own conclusion, applicable rules under Article 26(6) ECT, Articles 107 and 108 of the TFEU should be ignored in the present case."[106] Spain states that the Tribunal decided that the European regulations were not applicable on an artificial distinction between the treaties of the Union and secondary legislation.[107]

129. As a result, according to Spain, the Tribunal "… does not correctly identify the law applicable to the dispute and in interpreting this law, clearly errs, incurring in the alleged cause of annulment for exceeding powers…. In short, the lack of application of the applicable rules is an obvious excess that should lead to the annulment of the award."[108]

130. According to Spain, if the Tribunal had applied EU law, it would have had to consider "… (i) whether RD 661/2007 had been notified to the European Commission and (ii) what impact such non-notification would have on investors' expectation."[109] Finally, Spain quotes Professor Gosalbo who states in his report that "[a]ccording to the state aid

---

[103] Reply, ¶¶ 80-86.
[104] Mem., ¶ 54; *see also* Reply, ¶¶ 128-236.
[105] Mem., ¶¶ 132-133.
[106] Mem., ¶ 135.
[107] Mem., ¶ 139.
[108] Mem., ¶¶ 140-141.
[109] Mem., ¶ 144.

law of the European Union an investor cannot rely on legitimate expectations to receive state aid that had not been notified to and approved by the Commission before being granted."[110]

131. In its Reply, Spain argues that EU law should be applied according to the law of treaties from, international custom as well as the general principles of law.[111] Specifically, Spain argues that the autonomy and supremacy of EU law must be respected internationally as constituting customary international law.[112] Spain submits that "… the effect of the autonomy and primacy of EU law is to allow the EU and states to apply EU law rather than international treaties for matters within the EU, even if those treaties do not have a disconnection clause."[113] Spain further argues that applying Article 30 of the VCLT, the Lisbon Treaty is *lex posterior* to the ECT, hence, the Lisbon Treaty (*i.e.* EU law) would prevail.[114]

132. Spain argues that the two elements necessary to constitute binding international customary law are present and therefore the principles of autonomy and supremacy of EU law must be respected.[115] Referring to various multilateral treaties, Spain argues that these have been replaced or suspended within the EU due to the autonomy and primacy of EU law.[116] Spain alleges that "customary international law concerning the autonomy and primacy of EU law makes this autonomy and primacy act bi-directionally: both in relation to previous treaties and in relation to future treaties. Thus, past and future treaties are not applicable to intra-Community matter if the EU understands that it has a legal regime on the same subject matter that makes the application of those conventions unnecessary."[117]

[110] Mem., ¶ 144.
[111] Reply, ¶¶ 133-201.
[112] Reply, ¶ 157.
[113] Reply, ¶ 159.
[114] Reply, ¶ 138.
[115] Reply, ¶ 160.
[116] Reply, ¶¶ 163-170.
[117] Reply, ¶ 170.

133. In relation to the general principles of law, according to Spain, the Tribunal ignored the practice of Member States to respect EU law on State aid and "completely dispensed with the application of applicable international law."[118]

134. Spain concludes, the Award should be annulled in accordance with Article 52(1)(b) of the ICSID Convention, because the Tribunal failed to apply, or alternatively misapplied, EU law and gave an interpretation contrary to EU law when it recognized the existence of legitimate expectations on the part of Cube and Demeter.[119]

## B. THE RESPONDENTS' ARGUMENTS

### (1) Applicable Legal Standard

135. Cube and Demeter argue that Spain has mischaracterized the applicable legal standard and that it "fails to note that there is a two-step approach in assessing whether an award must be annulled under Article 52(1)(b), namely whether (i) the tribunal has exceeded its powers; and (ii) whether the excess is manifest."[120]

136. Cube and Demeter submit that the ordinary meaning of "manifest" is obvious or clear.[121] The Respondents also provide the definition in Black's Law Dictionary defining "manifest injustice" as "an error in the trial court that is direct, obvious, and observable." Cube and Demeter conclude that the ordinary meaning of the terms of Article 52(1)(b) of the ICSID Convention solely concern obvious and clear excesses of power.[122] In support of their position, Cube and Demeter provide examples of other committees'

---

[118] Reply, ¶ 201.

[119] Reply, ¶¶ 216, 235.

[120] C-Mem., ¶ 114, *citing* **CL-285**, *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Application for Annulment, 6 December 2018 [hereinafter *OI European Group*], ¶ 180. *See also* Rejoinder, ¶¶ 36-57; Tr. Day 1 (Mr. Fleuriet), 100:2-9.

[121] C-Mem., ¶ 123, *citing* **CL-293,** The Oxford English Dictionary defines manifest as "clear or obvious to the eye or mind." CONCISE OXFORD ENGLISH DICTIONARY 868 (11th Ed. 2004). **CL-294,** The Webster Dictionary defines manifest as "1 b: capable of being easily understood or recognized at once by the mind: not obscure: OBVIOUS …" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1375 (1993).

[122] C-Mem., ¶ 123.

decisions showing that "manifest" requires "textual 'obviousness' and 'self-evidence' that is 'plain on its face" and require that the error be obvious and self-evident.[123]

137. Cube and Demeter submit that an excess of power may exist if the tribunal exercises jurisdiction that it does not have or if it fails to apply proper law. According to the Respondents, "in the present case there was not even an improper exercise of jurisdiction or a failure to apply the proper law to begin with, much less an instance of such that was 'manifest' or 'egregious.'"[124] The Respondents argue that the standard is "very high" and that for an error to be "egregious" the misapplication must be "of such a nature or degree as to constitute objectively (regardless of the Tribunal's actual or presumed intentions) its effective non-application."[125]

138. The Respondents note that a "disregard of the applicable rules of law must be distinguished from erroneous application of those rules which, even if manifestly unwarranted, furnishes no grounds for annulment."[126] What is more, the Respondents say, "a mere error in the tribunal's jurisdictional findings does not constitute a ground of annulment."[127] The Respondents sustain that for an error to constitute an excess of power, the error itself must be at a level of "gross and consequential" such that "no

[123] C- Mem., ¶ 124*, citing* **CL-264,** *CDC*, ¶ 41; **RL-97,** *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Application for Annulment of the Award, June 29, 2010, ¶ 218; **CL-47,** *Azurix Corp. v. the Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, 1 September 2009 [hereinafter *Azurix*], ¶ 68; **CL-292,** *Repsol YPF Ecuador S.A. v. Empresa Estatal Petróleos del Ecuador (Petroecuador) I*, ICSID Case No. ARB/01/10, Decision on the Application for Annulment, 8 January 2007 [hereinafter *Repsol*], ¶ 36; **RL-0155,** *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Annulment, 1 February 2016, [hereinafter *Total*], ¶ 185; **CL-296,** *Compañia Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentina*, ICSID Case No. ARB/97/3, Annulment Proceeding, Decision on the Argentine Republic's Request for Annulment of the Award rendered 20 August 2007, 10 August 2010 [hereinafter *Aguas*], ¶ 245; **CL-228,** *Soufraki*, ¶ 39; **CL-264,** *CDC,* ¶ 41 (citing *Wena* ¶ 25); **CL-229,** *M.C.I. Power Group, L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment, Oct. 19, 2009 ¶ 49; **CL-269,** *Rumeli v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision on Annulment, 25 March 2010 [hereinafter *Rumeli*], ¶ 96; **RL-0146,** *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision on Annulment, 14 June 2010, ¶ 55; *see* generally **CL-226,** ICSID, *Updated Background Paper on Annulment For the Administrative Council of ICSID*, 5 May 2016.

[124] C-Mem., ¶ 115.

[125] C-Mem., ¶ 116*, citing* **CL-289**, *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on Annulment, 3 July 2013 [hereinafter *Malicorp*], ¶ 43.

[126] C-Mem., ¶ 118, *citing* **CL-273**, *Maritime International Nominees Establishment (MINE) v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award, 22 December 1989 [hereinafter *MINE*], ¶ 5.04.

[127] C-Mem., ¶ 113*, citing* **CL-278**, *Teinver*, ¶ 59.

reasonable person… could accept" it.[128] Cube and Demeter explain that the alleged errors identified by Spain do not meet the required threshold and that the conclusions reached by the Tribunal are the same conclusions about the irrelevancy of EU law that have been reached by many other tribunals to date.[129]

139. The Respondents note that even assuming that the Tribunal erred, "the errors come nowhere near the level of 'manifest' or 'egregious' that Spain would need to demonstrate in order to demonstrate 'manifest excess of power.'"[130] Cube and Demeter submit that "the manifest nature of the excess of powers has been interpreted by most *ad hoc* committees to mean an excess that is obvious, clear or self-evident, discernable without the need for an elaborate analysis of the award."[131] The Respondents further contend that Spain's allegations do not constitute a manifest excess of powers and that "not a single ECT tribunal has concluded that EU law is relevant in the manner Spain suggests; and several dozen tribunals have concluded that it is not."[132]

140. Cube and Demeter explain the "manifest" threshold of the standard and recall that "[a]s decided by many annulment committees, an excess of power is manifest if it is obvious, clear or self-evident. In this regard, the fact that a tribunal has relied to make its decision on tenable solutions adopted in several previous cases may be considered as an indication that an excess of power is not manifest."[133]

[128] C-Mem., ¶ 118, *citing* **CL-228**, *Soufraki*, ¶ 86.

[129] C-Mem., ¶ 119.

[130] C-Mem., ¶ 119. *See also*, Tr. Day 1 (Mr. Fleuriet), 101:10-25.

[131] C-Mem., ¶ 124.

[132] C-Mem., ¶ 127.

[133] C-Mem., ¶ 128, *citing* **CL-278**, *Teinver*, ¶ 59. *See also*, Tr. Day 1 (Mr. Fleuriet) pp. 102-104.

### (2) Correct Declaration of Jurisdiction

#### *a. ECT applies to intra-EU disputes*

141. Cube and Demeter submit that the Tribunal correctly interpreted the ECT in accordance with the VCLT. Insofar as Spain now invokes customary international law, Cube and Demeter argue that this has no merit.[134]

142. As regards Spain's intra-EU objection, Cube and Demeter submit that the plain meaning of the terms of Article 26(3) ECT is that "each and every Contracting Party to the ECT, *i.e.,* including each and every EU country that has signed the ECT (which is all EU Member States, including Spain), give their 'unconditional consent' to investor-State dispute resolution in accordance with the terms of the article."[135]

143. Cube and Demeter argue that the Tribunal correctly interpreted the ECT in accordance with the VCLT and found no such exception. On this point, the Respondents note that the Tribunal, as have dozens of other tribunals, concluded that "the literal meaning leaves no doubts."[136]

144. Cube and Demeter object to Spain's argument regarding the interpretation of the historical "context" of the ECT, which Spain failed to make in the underlying arbitration and therefore falls outside the scope of these proceedings.[137] The Respondents argue that this argument has been rejected by other tribunals that have made a detailed analysis and found that there is "nothing in the context of the ECT [that] indicates an intent to exclude 'intra-EU' disputes from the scope of Article 26 ECT."[138] According to the Respondents, tribunals have found that the "terms of the ECT are unambiguous and do not lead to an outcome that is 'manifestly absurd and unreasonable,' there is no basis on

[134] Rejoinder, ¶ 58.

[135] C-Mem., ¶ 141.

[136] C-Mem., ¶ 142*, citing* **RL-0093**, *Cube Infrastructure Fund SICAV and others v. The Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 [hereinafter the Decision], ¶ 124.

[137] C-Mem., ¶ 144.

[138] C-Mem., ¶ 145, *citing* **CL-239**, *Eskosol S.p.A in Liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy´s Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019 [hereinafter *Eskosol*], § V.A.1-2.

which to proceed to an analysis of the ECT under the supplementary means of interpretation in Article 32 of the Vienna Convention."[139] Cube and Demeter also highlight that the Tribunal's conclusion is the same as that which at least 27 other ECT tribunals have reached, namely "that the plain terms of the ECT do not contain an exception to the dispute resolution provision of 'intra-EU' disputes."[140]

145. On the issue of the definition of REIO and Territory under the ECT, the Respondents emphasize that this is a new argument which Spain did not raise in the underlying arbitration other than to refer to the "special nature of the EU" in the ECT, and the Tribunal therefore did not need to address the arguments.[141]

146. Cube and Demeter dispute Spain's argument that because the ECT recognizes certain REIOs that enter into obligations amongst themselves, and because the EU is a REIO, this would entail a recognition that establishes some sort of exclusivity rendering the ECT inapplicable among the EU Members. According to Cube and Demeter, this is a "distortion of the explicit provisions of the ECT" because neither the definition of "REIO" or of "Territory" of a REIO in Articles 1(3) and 1(10) of the ECT contain language affecting the ability of Investors of EU Members States to commence arbitration against other EU Member States. Instead, the ECT merely acknowledges that some Contracting Parties are also members of regional organizations and these are defined terms, nothing more.[142] Other ECT tribunals have rejected this argument, and none has accepted it.[143] For example, in *PV Investors* the tribunal rejected the argument, holding that if this interpretation were accepted "with respect to a [REIO] (Article 1(10), second sentence), the relevant Area would be the entire EU Area and the diversity of

[139] C-Mem., ¶ 145, *citing* **CL-235**, *Vattenfall AB et al. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 [hereinafter *Vattenfall*], ¶¶ 173-84, 192-96.

[140] C-Mem., ¶ 163; Rejoinder, ¶ 68.

[141] C-Mem., ¶ 153.

[142] C-Mem., ¶ 148.

[143] C-Mem., ¶ 151, *citing e.g.*, **CL-239**, *Eskosol*, ¶ 88; **CL-193**, *Antin*, ¶ 221.

area requirement would have to be satisfied with respect to that territory. This is, however, not the scenario before the Tribunal."[144]

147. Cube and Demeter argue that there is no disconnection clause in the ECT and they reject the newly raised argument that the 1998 EC statement submitted to the Secretariat of the ECT upon its ratification shows that despite the clear and unambiguous terms of Article 26, "that provision was never intended to apply intra-EU."[145] "Had the EU and its Member States intended not to apply certain provisions of the ECT among themselves, they would have no doubt expressly included such a caveat in this statement that addresses the very possibility that EU Member States could be respondents to international arbitration proceedings. They did not do so."[146]

148. Cube and Demeter point out that "[i]t is notable that before the ECT entered into force the EU already had incorporated express disconnection clauses into other treaties, to ensure that the provisions of a mixed agreement would not apply as between EU Member States. This confirms the obvious, that it knew how to provide for these when it wished to do so."[147] In fact, the Respondents point out that the disconnection clause never made it to the final version of the Treaty as ratified by the Contracting Parties.[148] Furthermore, Cube and Demeter also dispute the novel argument that the Lisbon Treaty introduced an implicit disconnection clause in the ECT.[149]

149. Cube and Demeter also respond to Spain's argument related to Article 25 ECT. The Respondents argue that Article 25 does not recognize the primacy of EU law or that the Tribunal cannot hear an arbitration between two Member States. According to Cube and Demeter, Article 25 "provides an exception to the ECT's most-favored nation ("MFN")

[144] C-Mem., ¶ 151, *citing* **CL-301**, *PV Investors*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014 [hereinafter *PV Investors*], ¶¶ 179-180.

[145] C-Mem., ¶ 154.

[146] C-Mem., ¶ 155. *See also* Tr. Day 1 (Mr. Fleuriet), 111:2-21.

[147] C-Mem., ¶ 158, *citing* **CL-239**, *Eskosol*, ¶ 92. *See also* **CL-162**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 [hereinafter *Blusun* Award], ¶ 280.

[148] C-Mem., ¶ 159*, citing*, **C-342,** Note for the Attention of Ambassador Rutten from Secretary General Clive Jones, 19 February 1993. *See also* **CL-239**, *Eskosol*, ¶ 92; **CL-162**, *Blusun* Award, ¶ 280(4); *see also* Tr. Day 1 (Mr. Fleuriet), 112:16-24; Respondents' Opening Presentation, Slide 60.

[149] C-Mem., ¶ 161.

clause to parties in an 'Economic Integration Area,' and simply confirms that the ECT does not require the EU and its Member States to extend any 'preferential treatment' that may apply under EU treaties to the non-EU Contracting Parties to the ECT…".[150]

***b. Irrelevance of the* Achmea *judgment***

150. Cube and Demeter argue that another argument that Spain has continued to make and which has never succeeded in the ECT context is the citation of the *Achmea* judgment which was rendered during the underlying arbitration in this case. The Parties made submissions to the Tribunal on this issue following the rendering of the judgment.[151]

151. Cube and Demeter state that the Tribunal correctly found that there are certain specificities that make *Achmea* inapposite as precedent for this case.[152] Referring to *9REN*, the Respondents note that "the [European Court of Justice] affirmed the treaty-making authority of the EU to enter into treaties which include a dispute resolution mechanism *outside* the framework of the EU courts…"[153] The Respondents further state that no ECT tribunal has ever concluded that *Achmea* is relevant to the ECT context.[154]

152. Cube and Demeter also reject the allegation that the *Achmea* reasoning has been applied in the context of the EU-Canada Comprehensive Economic and Trade Agreement ("**CETA**"), to which the EU is a Contracting Party. The ECJ's Opinion 1/17, issued on April 30, 2019, on the compatibility with EU law of the investor-state dispute settlement mechanism in CETA in light of *Achmea*, was not part of the underlying arbitration record. Furthermore, the Opinion, in fact undermines Spain's argument, as it confirms that *Achmea* holds no relevance for treaties like the ECT concluded by the EU itself; and dispute resolution tribunals such as the Tribunal do not adversely affect the EU legal order by virtue of the fact that they sit outside the EU judicial system.[155]

---

[150] Rejoinder, ¶ 63.

[151] C-Mem., ¶ 164.

[152] C-Mem., ¶ 173, *citing* **RL-0093**, Decision, ¶ 142.

[153] C-Mem., ¶ 175. **CL-240**, *9REN Holdings S.á.r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 [hereinafter *9REN*], ¶ 152.

[154] C-Mem., ¶ 175.

[155] C-Mem., ¶ 178.

153. Lastly, the Respondents also argue that Spain has inappropriately tried to support its intra-EU objection by citing the January 2019 Declaration of the EU Member States and the EC's 2018 communication in relation to *Achmea*. Once again, the Respondents sustain, these documents were not before the Tribunal and should not be considered by the Committee.[156]

154. On the EC's 2018 Communication, the Respondents pose that this was issued by the EU parliament after the hearing in this case and neither party sought to introduce it to the Tribunal. The Respondents argue that it is "largely irrelevant" and that "it is a non-binding political statement."[157] Cube and Demeter point out that other tribunals have confirmed that "this 'communication' has no authoritative value whatsoever."[158]

155. As regards to the January 2019 Declaration of EU Member States, Cube and Demeter argue that those documents were not before the Tribunal and therefore should not be considered by the Committee.[159] In any case, the Respondents conclude by saying that this Declaration was issued after the Tribunal declared the proceedings closed and, upon Spain's request for introduction, the Tribunal refused to admit it. According to Cube and Demeter, the Tribunal was fully within its power to do so.[160]

156. Cube and Demeter add that as the Member States signed three different declarations they demonstrate there is in fact no common ground even within the EU as to the meaning or relevance of *Achmea*. Numerous tribunals have found that the EU Member States' various contradictory Declarations are not EU legal instruments and do not have an interpretive effect regarding EU law.[161]

---

[156] C-Mem., ¶ 180; *see* Mem., ¶¶ 112-114.

[157] C-Mem., ¶ 181; **RL-136**, Communication from the Commission to the European Parliament and Council, 19 July 2018.

[158] C-Mem., ¶ 181; **CL-236,** *Greentech Energy Systems A/S et al. v. Italy*, SCC Arb. No. 2015/095, Award, 23 December 2018 [hereinafter *Greentech*], ¶ 402.

[159] C-Mem., ¶ 180.

[160] C-Mem., ¶ 182.

[161] C-Mem., ¶ 184; *see also* **CL-241**; *Rockhopper Exploration Plc, Rockhopper Italia S.p.A. and Rockhopper Mediterranean Ltd v. Italian Republic*, ICSID Case No. ARB/17/14, Decision on the Intra-EU jurisdictional objection, 26 June 2019 [hereinafter *Rockhopper*].

157. The Respondents conclude that the 2018 Communication and the 2019 Declarations "are political statements with no authoritative force in terms of interpreting or applying EU law… From an EU law perspective, only the [European Court of Justice] has authority to extend its reasoning in *Achmea* to the ECT," which it has not.[162] According to Cube and Demeter, although the Committee is not tasked with considering new events and should disregard arguments relating thereto, Spain is selective and neglected other recent developments not supporting its case. In particular, in the Agreement for the Termination of the BITs between EU Member States adopted in May they confirmed that *Achmea* did not have an impact upon the ECT and that it would be dealt with at a later stage.[163]

**(3) Primacy or Autonomy Would Not Change the Outcome**

158. As regards Spain's EU primacy or autonomy argument, Cube and Demeter consider that this argument has been considered by the Tribunal and falls outside the Committee's scope of review.[164] Further to this argument, Cube and Demeter note that "EU law is subordinate to public international law, both generally and especially when the public international law in question is an international treaty such as the ECT to which the EU is a Contracting Party."[165] Cube and Demeter argue that Spain, and its expert Professor Gosalbo, "overlook Article 216 of the TFEU, which provides that 'Agreements concluded by the Union are binding upon the institutions of the Union and on its Member States.'"[166] The Respondents further argue that "since the ECT is an international agreement 'concluded by the Union,' it is binding on Spain, the EC, and the ECJ."[167]

159. Cube and Demeter explain that the principle of primacy "refers to the domestic law of Member States and says nothing about the relationship between the EU treaties and

[162] C-Mem., ¶ 185.

[163] C-Mem., ¶ 186; **CL-305**, Agreement for the Termination of Bilateral Investment Treaties Between the Member States of the European Union, 5 May 2020, at PDF p. 7.

[164] C-Mem., ¶ 188.

[165] C-Mem., ¶ 189.

[166] C-Mem., ¶ 192; **RL-1**, TFEU, Article 216(2). *See also* **CL-306**, Article 188(N) of the Treaty of Lisbon, Official Journal of the European Union, Vol. 50, 17 December 2007, p. 97.

[167] C-Mem., ¶ 192.

public international law, including international treaties such as the ECT to which the EU is a party."[168]

160. The Respondents contend that "even assuming a conflict between EU law and the ECT were to exist, which has been expressly rejected by multiple ECT tribunals faced with this identical argument, the principle of 'primacy' of EU law does not amount to a conflict rule under international law. International law is clear that in the event of a conflict, the next step is to apply any conflict-resolution clauses contained in the two treaties at issue."[169] According to the Respondents, the ECT contains a clear and unequivocal conflicts clause at Article 16. There is no scope therefore for the application of Article 351 TFEU, which in any event merely provides for the Member States to take steps to eliminate any incompatibilities.[170] Insofar as Spain, through Prof Gosalbo, advances in new argument that Article 351 of the TFEU codified the *lex posterior* rule of treaty interpretation which, if applied, would result the TFEU prevailing over the ECT, Cube and Demeter note that the requirements of Article 30 of the VCLT have not been

---

[168] C-Mem., ¶ 191; Rejoinder, ¶ 73.

[169] C-Mem., 195; *citing* **CL-102**, *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 [hereinafter *Electrabel* Award], ¶¶ 4.150–66; **CL-96**, *Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016 [hereinafter *Charanne*], ¶¶ 443–45, 447–50; **CL-103**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain,* ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 [hereinafter *RREEF* Decision on Jurisdiction, ¶¶ 79 et seq.; **CL-95**, *Isolux Infra. Netherlands B.V. v. Kingdom of Spain*, SCC Arb. No. 2013/153, Final Award, 12 July 2016 [hereinafter *Isolux*], ¶¶ 644–45, 655; **CL-162**, *Blusun* Award, ¶ 303; **CL-153**, *Eiser Infra. Ltd. & Energia Solar Lux. S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 [hereinafter *Eiser* Award], ¶¶ 198–99; **CL-168**, *Novenergia*, ¶¶ 459–61; **CL-170**, *Masdar*, ¶ 340; **CL-193**, *Antin*, ¶ 224; **CL-235**, *Vattenfall*, ¶¶ 166–67; **CL-194**, *Foresight Lux. Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Arb. No. 2015/150, Final Award, 14 November 2018 [hereinafter *Foresight*], ¶¶ 220–21; **CL-236**, *Greentech*, ¶¶ 350–51; **CL-237**, *Landesbank Baden-Württemberg et al. v. Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019 [hereinafter *LBBW*], ¶¶ 153–55; **CL-195**, *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Final Award, 31 May 2019 [hereinafter *NextEra*], ¶¶ 349–57; **CL-240**, *9REN*, ¶¶ 172, 174; **CL-241**, *Rockhopper*, ¶¶ 145–46; **CL-304**, *InfraRed Environmental Infrastructure GP Ltd and others v. Spain,* ICSID Case No. ARB/14/12, Award, 2 August 2019, [hereinafter *InfraRed*], ¶ 266; **CL-244**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019 [hereinafter *OperaFund*], ¶ 383; **CL-245**, *Stadtwerke München GmbH, RWE Innogy GmbH, and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 [hereinafter *Stadtwerke*], ¶¶ 135, 145; **CL-246**, *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 [hereinafter *BayWa],* ¶ 271; **CL-247**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019 [hereinafter *RWE*],¶ 366; **CL-248**, *Watkins Holdings S.à r.l. and others v. Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020 [hereinafter *Watkins*], ¶ 191; **CL-301**, *PV Investors*, ¶ 191.

[170] C-Mem., ¶¶ 198-202.

met, namely that the treaties are successive, have the same subject matter and are incompatible. According to the Respondents, Spain has not demonstrated that these requirements have been fulfilled and there is "simply no basis to apply the *lex posterior* rule."[171]

**(4) Breach of EU law**

***a. EU Law Not Applicable Under the ECT***

161. Cube and Demeter explained that in the underlying arbitration, Spain did not ask the Tribunal to apply EU law to the merits of the dispute.[172] Spain only argued that the Tribunal should have applied EU law for purposes of jurisdiction, since it could fall within the reference of "rules and principles of international law" in Article 26(6) ECT.[173] Cube and Demeter state that the Tribunal did analyze the applicability of EU law when interpreting the ECT.[174]

162. In response to Spain's argument that the Tribunal held that EU treaties (as primary sources of EU law) did fall within the category of 'rules and principles of international law' under Article 26(6), but that EU law from secondary sources did not, Cube and Demeter argue that what the Tribunal found was that "all EU law, whether from primary or secondary sources, did not fall within the scope of ECT Article 26(6)."[175]

163. The Respondents sustain that the Tribunal also correctly distinguished between two legal orders, that of general international law to which the ECT refers and the separate, regional system of EU law.[176] On that basis, Cube and Demeter say, the Tribunal concluded that the parties to the ECT could not have intended Article 26(6) to include EU law given the considerable number of non-EU contracting parties to the ECT.[177] Finally, Cube and Demeter argue that consistent with rulings in many other intra-EU

---

[171] C-Mem., ¶ 202.

[172] C-Mem., ¶¶ 204-209; Rejoinder, ¶ 85.

[173] Rejoinder, ¶ 85.

[174] C-Mem., ¶ 216. **RL-0093**, Decision, ¶ 158. *See also* **CL-239**, *Eskosol*, ¶ 181; **CL-236**, *Greentech*, ¶ 397.

[175] C-Mem., ¶ 213.

[176] C-Mem., ¶ 215.

[177] C-Mem., ¶ 216.

ECT cases, the Tribunal held that as a tribunal of public international law it was not bound by or subject to EU law or the European legal order.[178]

***b. Applying EU Law on State Aid Would Not Have Led to a Different Outcome***

164. With respect to rules on State aid, the Respondents point out that the Tribunal concluded that EU treaties (and EU law in general) were not principles of international law under Article 26(6) ECT and thus did not apply to the underlying dispute. Cube and Demeter highlight that the Tribunal noted that the dispute concerned a breach of the ECT, and not a breach of EU law or Spanish law.[179]

165. Cube and Demeter argue that in any event, Spain's arguments on EU State aid law are incorrect. *First*, Cube and Demeter explain, Spain bases much of its arguments on the 2017 EC Decision on State Aid, and "the 2017 EC Decision did not assess, much less reach any conclusions on, whether the Spanish incentives regime under which Cube and Demeter invested, known as RD 661/2007, constituted state aid under EU law, or if so, whether they were compatible with EU state aid law."[180] Cube and Demeter assert that the decision itself plainly states that it concerned exclusively Spain's New Regulatory Regime, which was not the regime under which Cube and Demeter invested. Cube and Demeter add that "even then the EC concluded that that particular regime was compatible, rather than incompatible, state aid."[181]

166. *Second*, Cube and Demeter add, "the evidence demonstrates that Spain itself never viewed RD 661/2007 'state aid,' much less incompatible state aid that violated EU law…"[182] *Third*, Cube and Demeter argue that even assuming for purposes of the argument that RD 661/2007 were State aid "within the meaning of EU law at the time

---

[178] C-Mem., ¶ 221; *citing* **CL-235**, *Vattenfall*, ¶ 131; **CL-308**, Global Arbitration Review, *Greenwood panel rejects intra-EU objection*, 21 June 2019 (discussing *Landesbank Baden-Württemberg v. Spain*); **CL-153**, *Eiser* Award, ¶ 199; **CL-241**, *Rockhopper*; **CL-168**, *Novenergia*, ¶ 461; **CL-244**, *OperaFund*, ¶ 330; **CL-242**, *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019, ¶ 167; **CL-103**, *RREEF* Decision on Jurisdiction, ¶¶ 74, 87.

[179] C-Mem., ¶¶ 222-223.

[180] C-Mem., ¶ 226.

[181] C-Mem., ¶ 226.

[182] C-Mem., ¶ 228.

they were enacted and at the time Cube and Demeter invested in Spain, that would only address the first of many steps that Spain's argument requires…"[183] And finally, the Respondents add, *fourth*, "compliance with EU state aid law is an obligation of Spain, not investors."[184]

167. Consequently, Cube and Demeter conclude, even if the Tribunal had applied EU law to the merits of the dispute, it would have made no difference to the outcome "because there was nothing about the regimes under which Cube and Demeter invested that involved those rules in any way…".[185]

168. In their Rejoinder, Cube and Demeter note that Spain developed an entirely new argument in support of the intra-EU objection that it never raised in the underlying arbitration or in the Memorial. Cube and Demeter describe that "Spain claims that the Tribunal should have applied certain, undefined principles of EU law which, in Spain's view, amount to customary international law, taking precedence over the ECT, and in doing so would have resulted in the Tribunal's lack of jurisdiction."[186] According to Cube and Demeter, this is another attempt by Spain to "apply an implied disconnection clause to the ECT, but this time alleging that an 'international custom' has arisen that would require the Tribunal to read the ECT as inapplicable among EU Member States."[187] Cube and Demeter oppose this argument as untimely and outside of the scope of the proceeding.[188]

169. Nonetheless, the Respondents addressed the issue for the sake of completeness and noted that Spain did not demonstrate how the purported regional custom on EU autonomy and primacy satisfies the legal standard of the *Right of Passage*[189] case. Cube and Demeter further explain that the International Court of Justice "… has in no way suggested that

[183] C-Mem., ¶ 233.
[184] C-Mem., ¶ 234.
[185] C-Mem., ¶ 235.
[186] Rejoinder, ¶ 87.
[187] Rejoinder, ¶ 87.
[188] Rejoinder, ¶ 87.
[189] **RL-199**, *Right of Passage Over India Territory (Portugal v. India)*, ICJ Judgment, 16 April 1960.

'bilateral' custom may equate to customary international law as Spain seems to suggest, since only the latter can be applied universally to all States."[190] The Respondents continue saying that they do not agree with Spain's view of the existence of an EU custom through which Member States are allowed to apply EU law rather that international treaties for matters within the EU, even if those treaties do not have a disconnection clause.[191]

170. According to Cube and Demeter, the examples provided by Spain do not support its position but rather they "show nothing more than the correct application of the Vienna Convention by the EU, in modifying certain international conventions in order to introduce more specific rules for its Member States on the same subject matter" and which has nothing to do with the status of the ECT.[192]

## C. The Committee's Analysis

### (1) Applicable Legal Standard

171. The Committee considers that Article 52(1)(b) provides that only instances of manifest excess of the tribunal's power may lead to an annulment, indicating a double requirement of "excess" that is "manifest."[193] Regardless of whether this double requirement amounts to a two-step analysis, as Cube and Demeter submit, or rather a *prima facie* test consisting of a summary examination to determine whether any of the excesses could be viewed as "manifest," there can be no doubt that an unqualified excess is insufficient.

172. In the present case, although Spain has sought to argue that based on the Spanish and French versions of the ICSID Convention the meaning of manifest may be somewhat more limited than argued by Cube and Demeter, this double standard requirement is not disputed. The Committee is not persuaded by Spain's argument that the Spanish and/or French versions suggest a different meaning than the English version of the ICSID

---

[190] Rejoinder, ¶ 95.
[191] Rejoinder, ¶ 96.
[192] Rejoinder, ¶ 103.
[193] **CL-226**, ICSID, *Updated Background Paper on Annulment For the Administrative Council of ICSID*, 5 May 2016, ¶ 82.

Convention. The Committee is of the view that in any version, the word "manifest", or the equivalent thereof, serves to qualify the reference to "excess" and not merely to confirm and duplicate the reference to "excess" or to refer to the "discovery" or manifestation of an excess.

173. In fact, Spain seems to acknowledge that the purpose of the term "manifest" is to qualify the meaning of excess of powers as being "easy to see or understand."[194] Furthermore, in its discussion whether and if so, to what extent there was a manifest excess of powers relating to the applicable law in this case, which will be further addressed below, Spain refers to a disregard of the applicable law that is "so gross or egregious as substantially to amount to a failure to apply the proper law,"[195] effectively again recognizing the qualified meaning of the term "manifest."

174. As the Updated ICSID Background Paper on Annulment states, by reference to numerous decisions, the manifest nature of an excess of powers has been interpreted by most *ad hoc* committees to mean an excess that is obvious, clear or self-evident, and is discernible without the need for an elaborate analysis of the award.[196]

175. An excess of power may arise when a tribunal exceeds the mandate given to it by the parties, in particular, by going beyond the scope of the arbitration agreement and by deciding on issues that were not submitted to it, and by failing to apply the proper law agreed on by the parties. A manifest excess of power may therefore occur both at the jurisdiction and at the merits stage.

176. As to jurisdiction, while an excess of power may relate to a tribunal's incorrect conclusion that it has jurisdiction, as the Updated ICSID Background Paper on Annulment notes, the tribunal is the judge of its own competence. This needs to be kept in mind in reviewing the alleged excess of power, to avoid straying beyond the limited remit of an annulment committee.

---

[194] Reply, ¶ 46.

[195] Mem., ¶ 57, *citing* **RL-0072**, *Soufraki*, ¶ 86.

[196] **CL-226**, ICSID, *Updated Background Paper on Annulment For the Administrative Council of ICSID*, 5 May 2016, ¶ 83.

177. Although every case must be viewed on its own merits, including the record before the relevant tribunal, the Committee is mindful of the fact that solutions adopted by a particular tribunal on the basis of other, potentially comparable, cases may impact the evaluation on whether an excess of powers is manifest. As the committee in *Teinver* considered: "as decided by many annulment committees, an excess of powers is manifest if it is obvious, clear or self-evident. In this regard, the fact that a tribunal has relied to make its decision on tenable solutions adopted in several previous cases may be considered as an indication that the excess of powers is not manifest."[197] It is on this basis that the Committee will consider the impact of the concrete manifestations of alleged excess of powers.

178. Spain has not explicitly addressed whether the "manifest" test requires a two-step analysis, *i.e.* a determination whether there was an excess of powers, and if so whether the excess was manifest, which is the approach Cube and Demeter favor. Nor has Spain addressed whether it is more appropriate to have a *prima facie* approach consisting of a summary examination to determine whether any of the alleged excesses of power could be viewed as "manifest."[198] Spain's main submissions in relation to the alleged "manifest" nature of the alleged excesses of powers, which will be discussed below (see Section V.C.(4)), provide some support for the notion that Spain too considers a two-step approach appropriate. For example, in its Reply, Spain refers to a number of reasons for a manifest excess of powers, and in particular the "notorious fact" that the Tribunal knew from the beginning of the arbitration that it was facing an intra-EU dispute, a fact that would reinforce the manifest nature of the excess of jurisdiction.[199]

179. In any event, under either approach, a committee's remit is limited and may not amount to an appeal. A committee should be cautious not to overstep the boundaries of the annulment, including the scope of the arguments made and the evidence submitted. Although a review in annulment will require a certain amount of analysis, this should, in

---

[197] Rejoinder, ¶ 55, *citing* **CL-0278**, *Teinver*, ¶ 59.

[198] **CL-226**, ICSID, *Updated Background Paper on Annulment For the Administrative Council of ICSID*, 5 May 2016, ¶ 82.

[199] *See* Reply, ¶¶ 81-87.

principle, not involve an extensive argumentation to prove that the excess of power has in fact occurred.[200]

### (2) The Tribunal's Jurisdiction

#### *a. The Tribunal's Decision*

180. The structure of Spain's argument contains a certain amount of duplication notably in relation to the first and the second ground. At the same time it refers to the Tribunal's rejection of the "intra-EU objection" as shorthand or a catchall phrase for its argument that the Tribunal incorrectly concluded that it had jurisdiction, and/or, in doing so misapplied the applicable law in respect of jurisdiction.

181. In addition, Spain submits that the Tribunal's treatment of the applicable law in so far as it relates to the merits is the second manifestation of the alleged failure to apply the correct law; this aspect of Spain's argument will be discussed separately in Section V.C.(3) (paras. 221 *et. seq.*).

182. The core issue before this Committee is: did the Tribunal manifestly exceed its powers by declaring that it had jurisdiction on the basis of Article 26 ECT in light of the fact that the dispute involves only EU Member States?[201]

183. The Tribunal relied on general rules of interpretation as laid down in Article 31 VCLT to support its conclusion that it had jurisdiction. In doing so, as a starting point, the Tribunal noted that the text of Article 26(1) ECT does not differentiate between different classes of Contracting Parties. It further noted that while the ECT does impose explicit restrictions in order to accommodate the position of particular States, namely in the event of a conflict between the Svalbard Treaty and the ECT, no such provision was made in

---

[200] **CL-226**, ICSID, *Updated Background Paper on Annulment For the Administrative Council of ICSID*, 5 May 2016, ¶ 82, *citing* that one *ad hoc* Committee has stated that "manifest" does not prevent that in some cases an extensive argumentation and analysis may be required to prove that the misuse of power has in fact occurred, **RL-0102**, *Occidental*, ¶ 267.

[201] **RL-0093**, Decision, ¶¶ 118 *et seq*.

order to restrict the application of the ECT to disputes involving the EU or its Member States.[202]

184. Next, the Tribunal considered whether the terms of the Treaty in context or the object and purpose of Article 26(1) ECT suggest a different meaning that would permit reading an implicit disconnection clause into the provision. In particular, in this context, it considered and rejected Spain's argument that the reference in Article 26(6) ECT to "applicable rules and principles of international law" includes EU law and furthermore that EU law has supremacy over other rules of international law, including the ECT. The Tribunal stated that EU law does not have supremacy and such claim to priority would challenge the basis of the ECT as a multilateral treaty,[203] The Tribunal concluded that Article 26(6) ECT does not reverse the clear meaning of the first paragraph of Article 26 ECT.[204]

185. The Tribunal addressed the question of the relevance of EU law to the merits in the context of its decision on jurisdiction. It recalled that these proceedings are brought pursuant to Article 26(4) ECT which provides for ICSID arbitration, whereas Article 26(6) ECT stipulates that the applicable law to the dispute is international law, and thus particularly the ECT. While EU treaties are international law, they are not "principles of international law."[205] The Tribunal considered that the submissions before it did not suggest that the EU treaties were directly applicable, and while the rules established by EU secondary legislation – such as rules against State aid – are EU law, they are plainly not "principles of international law."[206]

186. Moreover, the Tribunal considered that Article 16 ECT, and in particular Article 16(2) ECT is relevant and confirms that the ECT Contracting Parties did not agree that EU legal rules take precedence over any incompatible rules of whatever source, so that the ECT jurisdictional clause would become inapplicable should any inconsistency be

[202] **RL-0093**, Decision, ¶¶ 124-125.
[203] **RL-0093**, Decision, ¶¶ 127-130.
[204] **RL-0093**, Decision, ¶ 139.
[205] **RL-0093**, Decision, ¶ 158.
[206] **RL-0093**, Decision, ¶¶ 156-160.

found.[207]  The Tribunal found the construction defended by Spain, based on Article 16(1) ECT, all the less persuasive since it would mean that the explicit clauses of Article 26(1), (2), and (3) ECT would be undermined and deprived of their substance "through a back door."[208]

187. Finally, as to jurisdiction, the Tribunal held that the *Achmea* judgment was inapposite. The Tribunal distinguished the *Achmea* case in a number of ways, including by pointing out the strong territorial link in that case between the proceedings and the German legal order.  This Tribunal owes its emergence, not to a domestic legal order, but rather to two international treaties, the ECT and the ICSID Convention.[209]  Moreover, the Tribunal found that there is no evidence demonstrating that the three States involved exceeded the limits of their treaty making power to the detriment of the European Economic Community or the European Community. In this context, the Tribunal specifically referred to the Lisbon Treaty which allocated new powers to the EU, without addressing the position of existing BITs.  "If general agreement had existed to the effect that the procedural mechanisms of those BITs were incompatible with the applicable treaty regime presumed the effect could have been remedied easily."[210]  The Tribunal also deemed it highly significant that the EC did not launch infringement proceedings against EU States parties to bilateral intra-EU BITs as soon as the Lisbon Treaty entered into force.[211]

188. In formulating its request for annulment, Spain has to some extent reiterated its arguments and allegations in the underlying arbitration, and to some extent reformulated its position, enhancing and, in some cases, significantly supplementing its arguments and allegations.  This is apparent not only from the fact that it has submitted new expert reports containing legal arguments not previously made, but also from the fact that it seeks to submit documents not included in the arbitration record, notably in relation to

---

[207] **RL-0093**, Decision, ¶¶ 131-132.
[208] **RL-0093**, Decision, ¶ 133.
[209] **RL-0093**, Decision, ¶¶ 143-146.
[210] **RL-0093**, Decision, ¶ 150.
[211] **RL-0093**, Decision, ¶ 151.

various aspects of EU law and/or the position of the European Court of Justice ("**ECJ**") and CJEU and/or European Commission. There is also some fluidity in the way in which and the sequence in which certain arguments are addressed, for example, the alleged primacy of EU law and the impact thereof, and the meaning and impact of the concept of a REIO in Article 1 ECT. This fluidity and the many reformulations of arguments previously made, also within these annulment proceedings, complicates the assessment whether arguments are new and different or were made in the context of the original arbitration proceedings, as they should be or have been in order for this Committee to entertain the arguments.

189. Spain's arguments now consist of the following (interrelated) components:

a. Customary rules of international law on the interpretation of treaties lead to the conclusion that the ECT including Article 26 does not apply within the EU. The Tribunal has failed to apply Article 31 VCLT, nor did it consider the lack of competence of new Members to enter into obligations with each other as a result of the transfer of competence to the EU.
b. Even if Article 26 ECT covers intra-EU disputes, such an interpretation would conflict with the EU treaties and that conflict, as a matter of international law, must be resolved in favor of EU law.
c. The correctness of Spain's position is confirmed by the *Achmea* judgment, as well as by the European Commission and Member States;
d. Mutual trust further militates against the notion of intra-Community arbitration;
e. Primacy of EU law is a special conflict law so that Article 26 ECT is not applicable between Member States.

***b. The interpretation of Article 26***

190. The Committee will first address Spain's basis for the legal analysis and in particular whether there is room for an analysis on the basis of customary rules of international law.

191. The reliance on customary rules of international law appears to be a new argument, largely pleaded by reference to the Expert Reports submitted by Spain. While Spain refers to customary rules of international law as a tool for reviewing the Tribunal's decision that it had jurisdiction on the basis of Article 26 ECT, its argument has developed and changed over the course of these annulment proceedings. However that

may be, Spain does not (and cannot) dispute that in any event, the starting point for the analysis of the Tribunal's jurisdiction is Article 31 VCLT, and that on this basis, the relevant treaty provisions shall be interpreted by considering the text in their context and in the light of its object and purpose.

192. Spain appears to take issue with *the way in which* the Tribunal has applied Article 31 VCLT, not that it set out to do so in the first place: "[t]he Arbitral Tribunal has not carried out an analysis of the rules of interpretation provided for in Article 31 of the [VCLT], but merely indicated that there was no disconnection clause and on that basis indicated what its conclusion was."[212] Also in its Reply, Spain itself refers first to the literal interpretation of Article 26 ECT, and secondly refers to the interpretation of this provision "in accordance with the objective and purpose of the Treaty."[213]

193. Spain's interest in invoking customary international law appears to be an attempt to strengthen a number of specific arguments also raised separately, such as the alleged primacy of EU law as a special conflict rule under international law,[214] as well as invoking new arguments raised by reference to Prof. Gosalbo's Expert Reports, which contain numerous references to other treaties, State practice and other practice in relation thereto. While the Committee, on the basis of the terms of Procedural Order No. 1 agreed by the Parties, did not reject the introduction of expert reports *per se*, that does not imply a (positive) decision in relation to the probative value of these reports, in particular where they contain new arguments exceeding the scope of annulment.

194. Spain seeks to justify the fact that it submitted expert evidence by arguing that "this report" (and presumably Prof. Gosalbo's second report) demonstrate that the lack of jurisdiction "is not the result of a capricious interpretation by the Kingdom of Spain, but is the logical consequence of the application of the basic principles of European Union law."[215] This, however, is circular reasoning and does not outweigh the fact that the Committee is limited by the arguments and evidence before the Tribunal. These Expert

[212] Mem., ¶ 76.

[213] Reply, ¶¶ 112-116.

[214] Reply, ¶ 110.

[215] Mem., ¶ 73.

Reports cannot, therefore, constitute an independent basis for any finding of this Committee in so far as these reports contain new arguments not made in the underlying arbitration.

195. Insofar as Spain relies on substantive arguments that formed part of the Tribunal's and therefore the Committee's remit, the Committee will address these below in their most logical sequence and structure.

***c. Article 26 ECT***

196. As considered by the Tribunal and effectively accepted by both Parties,[216] the starting point of the analysis as to whether Article 26 ECT bestows jurisdiction on the Tribunal, pursuant to Article 31 VCLT, is the text of Article 26 ECT, which is clear and provides that an investor may submit for resolution "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former." The text refers to Contracting Parties in general and does not distinguish between different classes of Contracting Parties. As the Tribunal further considered: "the literal meaning leaves no doubts"[217] as to the ECT's jurisdictional remit.

197. Spain seeks to show that despite the unambiguous text of Article 26 ECT, in its context and in the light of the ECT's object and purpose, the Tribunal exceeded its powers by accepting jurisdiction. As stated above, this argument appears to be augmented in the course of these annulment proceedings, including by means of the newly introduced reference to customary international law. In the arbitration, Spain's argument centered on the alleged implicit disconnection clause that should be read into Article 26 ECT, an argument that will be addressed below in Section V.C.2.e. In the annulment proceedings, Spain expanded its argument by stressing that the ECT "was not designed to comprise the settlement of disputes between different members of the European Union",[218] and

[216] Mem., ¶ 76; *see also* Reply, ¶¶ 64 and 104; C-Mem., ¶¶ 183 *et seq.*

[217] **RL-0093**, Decision, ¶ 124.

[218] Mem., ¶ 82.

that the principle of primacy and the literal application of the phrase REIO were ignored by the Tribunal.[219]

***d. REIO***

198. Spain's REIO argument appears somewhat inconsistent. In its Memorial, it submits that the terms Investor, Contracting Party and Area referred to in Article 26 ECT and in turn defined in Article 1 ECT, *in light of the context, the object and purpose* of the ECT as an instrument of the external policy of the EU, and the circumstances of the conclusion of the ECT, the ordinary meaning of these provisions must be understood as excluding EU investors investing in the area of the EU. It also argues that the REIO concept in the ECT was specifically created, *inter alia*, to address the special nature of the EU as a single market.[220] In its Reply, however, and at the Hearing, Spain asserts that a *literal approach* to Article 26 ECT justifies the conclusion that intra-EU disputes are excluded from the scope of Article 26 ECT because of the lack of diversity of the Contracting Parties.[221]

199. First, the Committee notes that presenting this argument as a literal interpretation of Article 26 in conjunction with Article 1 ECT is unsustainable. As Cube and Demeter submit, the definitions of "REIO" and "Territory" of an REIO in Articles 1(3) and 1(10) of the ECT contain no language affecting the ability of Investors of EU Member States to commence arbitration against other EU Member States. Instead, the ECT merely states as a definitional matter that some Contracting Parties are members of regional organizations, which are simply defined terms.[222]

200. Further consideration of the text of other provisions of the Convention does not support Spain's view. The ECT could have stipulated that where an investor from one Contracting Party initiates a dispute against another Contracting Party, and both are within a REIO as Member States of the EU, their separate status as Contracting Parties

[219] Mem., ¶ 117.
[220] Mem., ¶ 85.
[221] Reply, ¶ 113; Tr. Day 1 (Ms. Martínez de Victoria), 13-14.
[222] C-Mem., ¶ 148.

is no longer recognized as they are replaced by or subsumed under the REIO to which they belong which is also a party to the ECT. However, it does not so stipulate, and in the absence of wording to this effect, the Committee considers that the constituent State parties do not, under the terms of the ECT, lose their status as Contracting Party by virtue of the fact that the regional organization of which they are a member has also signed the ECT.

201. Respondents explain at some length that other tribunals have addressed the wording of Article 26 ECT and have concluded, like the Tribunal, that nothing in the text of Article 26 itself suggests that its scope was intended to be restricted to disputes involving either an Investor or a Contracting Party outside the EU,[223] and that the argument of the historical context now raised by Spain was not advanced in the underlying arbitration.[224] Spain has not rebutted Respondents' allegation that in the underlying arbitration Spain never raised this line of argument based on the definition of "REIO" and "Area."[225] Moreover, the Committee notes that, as stated above in Section IV.C, also within these annulment proceedings, Spain's arguments have developed and changed. This is particularly visible in and apparently due to the introduction of the (new) Expert Reports of Prof. Gosalbo.

202. The arguments raised by Spain in relation to the REIO concept contained in the ECT, and the intention of the parties (or at least the EU Member State parties to the ECT) in relation to the alleged carve out of certain disputes from the scope of Article 26 ECT, are made with respect to the disconnection clause argument which will be separately addressed below. At this stage, the Committee concludes that even if the REIO-argument is entitled to consideration at this annulment phase, which is questionable given the very limited scope of Spain's reliance on it in the underlying arbitration, this argument does not support Spain's position. The text of Article 26 ECT is clear, also in respect of any alleged carve out of certain categories of disputes. As the Tribunal determined: "the regime of Article 26(1) ECT applies to all Contracting Parties. No

[223] C-Mem., ¶ 144.
[224] C-Mem., ¶ 145.
[225] C-Mem., ¶ 153.

Contracting Parties are excluded from that regime. The only requirement is that the investor must be of another nationality than the State Party charged with a violation of its duties under the ECT."[226]

### *e. Disconnection clause*

203. Related to Spain's argument that given the EU's status as a REIO, disputes involving the EU Member States and their Investors must be treated differently from other Contracting Parties and their Investors, is the argument that the EU effectively introduced a disconnection clause into the ECT. This argument is interwoven with the primacy argument which was addressed in the underlying arbitration at some length, and which is based on the scope of, and alleged impact of, Article 26(6) ECT and whether the reference to applicable rules and principles of international law incorporates and imposes the application of EU law to determine jurisdiction.[227]

204. Before addressing that broader issue, the Committee reiterates that the starting point of the analysis of Article 26 ECT is the text of the provision and the explicit restrictions contained in the ECT. Notably, as the Tribunal considered in its Decision, the ECT explicitly addresses the eventuality of conflict between the Svalbard Treaty and the ECT and provides that that Svalbard Treaty shall prevail in case of a conflict with the ECT.[228] No such provision was made to restrict the application to the ECT in relation to the EU or its Member States.[229] It is incongruous that the ECT Member States had agreed on an explicit carve out for disputes involving the 9 February 1920 Spitsbergen Treaty (Svalbard Treaty), but that the carve out for the EU should be read into the ECT implicitly. The fact that the EU itself is a member of the ECT and could have raised its desire to include a similar carve out, only reinforces the inability to read in a limitation comparable to the Svalbard Treaty.

[226] **RL-0093**, Decision, ¶ 124.
[227] **RL-0093**, Decision, ¶ 127.
[228] **RL-0093**, Decision, ¶ 125.
[229] **RL-0093**, Decision, ¶ 126.

205. By reference to Prof. Gosalbo's Expert Report, who in turn refers to a text proposal made by the EU, Spain seeks now to bolster its argument that a carve out should be read into Article 26 ECT as a result of the failed attempt of the European Commission to include an explicit disconnection clause into the ECT.[230] In addition, Spain raises the new argument that the Lisbon Treaty introduced an implicit disconnection clause in the ECT, for which Respondents assert there is no basis.[231]

206. Even more so than in relation to the REIO-argument, it is clear that Spain has introduced new arguments with respect to the disconnection clause, including argumentation which in turn relies on new expert evidence and new supportive documentation. As considered in paragraph 95 above, a committee's remit is to "restrict itself to a review of the underlying Award and the process followed by the original Tribunal, which necessarily entails limiting its review to the record before the original Tribunal."[232] The Committee is mindful that in formulating its grounds for annulment, an applicant will convey its arguments in the most comprehensive way possible and some flexibility is therefore appropriate in reviewing the phrasing of any particular argument. At the same time, the nature of annulment is that of an exceptional and narrow remedy, and the introduction of novel arguments is inconsistent with these attributes. The need to verify the scope of the initial debate also obscures the primary role of a committee, namely to review the annulment grounds.

207. Consequently, newly raised arguments exceeding the scope of arguments made in the underlying arbitration will not be considered by the Committee. Furthermore, in relation to the disconnection clause, the Committee finds that even if the newly introduced arguments are taken into consideration, they do not support Spain's position, but rather the opposite. The failure to include an explicit disconnection clause, where the relevant treaty contains an explicit carve out for other disputes, discredits the notion of implicit carve out. This is compounded by the fact that European Commission sought and failed to obtain an explicit disconnection clause: not only objectively, in the sense that it belies

[230] Mem., ¶ 84.

[231] C-Mem., ¶ 161, *citing* Prof. Gosalbo First Expert Report, ¶ 21.

[232] **CL-266**, *von Pezold*, ¶ 239.

the suggestion of the ability to read in implicit wording, but also subjectively, in the sense that the failure to achieve such clause should have put the EU on notice that the limitation it was seeking could not implicitly be read into the text of the ECT.

***f. Primacy***

208. Spain further addresses the argument that relates to the relationship between EU law and other sources and bodies of law, notably the ECT, and the significance of the alleged primacy of EU law. Spain invoked Article 26(6) ECT which provides that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

209. Spain argues that if Article 26 ECT were interpreted to cover intra-EU disputes, such an interpretation would conflict with the EU Treaties, and that conflict, as a matter of international law, must be resolved in favor of EU law.[233] It argues that the primacy of EU law is a special conflict rule under international law.[234] At the Hearing, Spain argued that the impact of Article 26(6) ECT "means treating EU law and applicable international law on equal terms when it comes to resolving the dispute."[235]

210. While the exact presentation and formulation of the argument varies somewhat in Spain's various submissions, it is a core building block of its case and it goes to the essence of the dispute.

211. Spain argues that as matter of EU law, EU law has priority over the national law of the Member States. As a corollary thereof, Article 267 of the TFEU contains a mechanism for ensuring the harmonious application of EU law within the EU. And finally, Spain adds that Article 344 of the TFEU prohibits Member States from submitting a dispute concerning the interpretation or application of EU treaties to a method of dispute settlement other than their national courts.[236] As a matter of international law, it is the view of the Committee that EU law does not have primacy, and this view extends to

[233] Mem., ¶ 77.

[234] Mem., ¶ 79.

[235] Tr. Day 1 (Ms. Martínez de Victoria), 15:4-6.

[236] Mem., ¶¶ 95-96.

situations such as in the present case where an Investor from one EU Member State invokes the ECT as the basis of a claim against another EU Member State. As the Tribunal considered "[w]ithin the system of international law, EU law does not have supremacy …"[237] Spain's arguments do not affect the conclusion that as a matter of international law, EU law does not have primacy. The provisions invoked by Spain are provisions of EU law and their scope and relevance must be determined insofar as EU law is applicable and relevant. They do not serve as a means of elevating EU law and equating it with international law. Insofar as the interpretation of the ECT is concerned, this is not a question to be addressed at the level of EU law. As a multilateral treaty, the ECT and the determination of the scope of jurisdiction of disputes submitted on the basis thereof is to be determined on the basis of international law.

212. Furthermore, as the Tribunal considered, the fact that the ECT Contracting Parties did not agree that EU legal rules take precedence over any incompatible rules of whatever other source, and that the ECT jurisdictional clause would become inapplicable should any inconsistency be found, is rebutted by Article 16(2) ECT. This provision establishes that the ECT Member States, including the EU, agreed the contrary ("nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty").[238]

213. Respondents moreover correctly refer to Article 216 of the TFEU, which provides that "Agreements concluded by the Union are binding upon the institutions of the Union and on its Member States." Rather than supporting the notion of primacy, the EU treaties themselves mandate Spain to apply and comply with the ECT, as an international agreement.[239]

214. The Tribunal also considered that the ECT Parties could have agreed expressly to give different treatment to the EU and its Member States in relation to the matters relevant to

---

[237] **RL-0093**, Decision, ¶¶ 129-130.
[238] **RL-0093**, Decision, ¶¶ 131-132.
[239] C-Mem., ¶ 192.

the present dispute, as they have done in Article 25 ECT in relation to certain matters not relevant to this dispute; but, as the Tribunal observed, the ECT Parties did not do so.[240] In its Reply, for what would appear to be the first time, Spain invokes Article 25 ECT, but in support for its position that the ECT recognizes the primacy of EU law.[241] This argument is surprisingly introduced late in the proceedings and is undisputedly novel which would justify its rejection for purposes of these annulment proceedings. Article 25 ECT deals with economic integration agreements ("**EIAs**") and provides that the ECT shall not be construed as obliging a Contracting Party which is party to an EIA to bestow on other ECT Member States most-favored-nation treatment based on that EIA. This provision allows the EU to limit preferences that would otherwise have been available to non-EU Member States but parties to the ECT on the basis of most-favored-nation treatment among the EU Member States. Rather than supporting Spain's case this provision detracts from it.

215. Finally, in another new argument raised for the first time in the annulment proceedings, Spain argues that Article 351 TFEU triggers the *lex posterior* rule of treaty interpretation, rendering the ECT inapplicable to the EU Member States.[242] This argument has been addressed by a number of other tribunals who have rejected the notion that this provision should apply as a conflict rule,[243] and rather supports the notion that the ECT does provide jurisdiction because Article 16(2) ECT confirms the applicability of jurisdiction pursuant to the ECT where any such provision is more favorable to the Investor or Investment.[244]

[240] **RL-0093**, Decision, ¶ 130, n. 66.

[241] Reply, ¶ 102.

[242] Reply, ¶ 138.

[243] *See* **CL-102**, *Electrabel* Award, ¶¶ 4.150–66; **CL-96**, *Charanne*, ¶¶ 443–45, 447–50; **CL-103**, *RREEF* Decision on Jurisdiction, ¶¶ 79 *et seq.*; **CL-95**, *Isolux*, ¶¶ 644–45, 655; **CL-162**, *Blusun* Award, ¶ 303; **CL-153**, *Eiser*, ¶¶ 198–99; **CL-168**, *Novenergia*, ¶¶ 459–61; **CL-170**, *Masdar*, ¶ 340; **CL-193**, *Antin*, ¶ 224; **CL-235**, *Vattenfall*, ¶¶ 166–67; **CL-194**, *Foresight*, ¶¶ 220–21; **CL-236**, *Greentech*, ¶¶ 350–51; **CL-237**, *LBBW*, ¶¶ 153–55; **CL-195**, *NextEra*, ¶¶ 349–57; **CL-240**, *9REN*, ¶¶ 172, 174; **CL-241**, *Rockhopper*, ¶¶ 145–46; **CL-304**, *InfraRed*, ¶ 266; **CL-244**, *OperaFund*, ¶ 383; **CL-245**, *Stadtwerke*, ¶¶ 135, 145; **CL-246**, *BayWa*, ¶ 271; **CL-247**, *RWE*, ¶ 366; **CL-248**, *Watkins*, ¶ 191, **CL-301**, *PV Investors* Preliminary Award, ¶ 191.

[244] **C-1**, ECT, Article 16.

216. The fact that this argument is newly raised and not rebutted, appears to be the result of the introduction of a new line of argumentation undertaken by Spain's expert, precludes the Committee from comprehensively reviewing Spain's arguments in relation to Article 351 TFEU. However, the Committee reiterates its considerations above at paragraph 212, that the Tribunal expressly considered the impact of Article 16(2) ECT and held that the ECT Contracting Parties did not agree that EU legal rules take precedence over any incompatible rules of whatever source, so that the ECT jurisdictional clause would become inapplicable should any inconsistency be found.[245] Given this express finding and the failure to invoke the argument which in any event has been rejected by other tribunals, the Committee fails to see how the reference to Article 351 TFEU and the alleged failure to apply this provision in the way proposed by Spain and Prof. Gosalbo can constitute an excess of powers, let alone of a manifest nature.

***g. Achmea judgment***

217. In further support of its arguments that the Tribunal exceeded its jurisdiction, Spain invokes the ECJ's *Achmea* decision. The Committee notes that to some extent Spain's argument is circular as it is prefaced on the notion that EU law comes into play. As stated above, the Tribunal's review of jurisdiction and any alleged excess of powers in accepting jurisdiction must be reviewed on the basis of the ECT and the rules of international law. Furthermore, the *Achmea* decision involves a number of issues and considerations, which Spain also addresses separately, such as the notion that Article 267 TFEU is one of the cornerstones of the EU judicial system,[246] and which this Committee addresses separately.

218. The Committee notes that Spain's reference to *iura novit curia* does not affect this conclusion.[247] *First*, the Tribunal extensively discussed the *Achmea* judgment and came to the conclusion that the case's specifics make "it inapposite as a precedent for the present proceedings."[248] Spain disagrees with the Tribunal's analysis and outcome, but

[245] **RL-0093**, Decision, ¶¶ 131-132.

[246] Mem., ¶ 95; Reply, ¶ 107.

[247] Reply, ¶ 108.

[248] **RL-0093**, Decision, ¶ 142.

there can be no doubt that the Tribunal considered the *Achmea* judgment and its potential implications. *Second*, the notion of *iura novit curia* and its role in international arbitration, and in particular in investment and ICSID arbitration, is not without complications and limitations, including in particular the limitations imposed by the ICSID annulment system.

219. The Tribunal distinguished the judgment carefully and at some length. It explained that *Achmea* related to a bilateral investment treaty providing for arbitration with the seat in Germany, and the ECJ explicitly caveated its consideration relating to Articles 267 and 344 TFEU by pointing out that the relevant jurisdictional provision was contained in an agreement between Member States. The Tribunal noted that the ECJ also confirmed that dispute settlement mechanisms in international treaties are not in principle incompatible with EU law. The governing law provision in *Achmea* involved a requirement for the tribunal to interpret the national law of a Member State, and finally, the ECJ considered that the German-Slovak BIT was not concluded by the EU but by the relevant Member States. The Committee sees no basis for questioning this reasoning, let alone concluding that in drawing its conclusions, the Tribunal exceeded its powers.

220. As Respondents point out, dozens of other ECT tribunals have reached the same conclusion as the Tribunal.[249] Spain refers to one source which argues that the reasoning of the *Achmea* judgment was followed, namely the ECJ's Opinion 1/17 in relation to the dispute settlement mechanism in CETA. Respondents submit and the Committee agrees with the position that this document postdates the *Cube* Award and therefore falls outside the scope of review by the Committee.[250] Similarly, Spain's reference to subsequent documents not part of the record before the Tribunal cannot be entertained by the Committee (namely the EC's 2018 Communication in relation to *Achmea*, and the 2019 Declarations by certain Member States).

[249] C-Mem., ¶¶ 167-173.
[250] C-Mem., ¶ 176.

### (3) EU Law Applicable to the Merits

221. The Tribunal, in its Decision, addressed the law applicable to the merits of the case in the context of its discussion of the *Achmea* judgment, and concluded that pursuant to Article 26(6) ECT the applicable law is international law, particularly the ECT.[251] This is one of the bases on which it distinguished the present case from the *Achmea* case, which required the tribunal to take account the law of the Contracting State, and thus EU law. In that context the Tribunal also made some references to rules against State aid, which it referred to as EU secondary legislation, and which cannot be considered principles of international law within the meaning of Article 26(6) ECT.[252] Furthermore, it considered that while the EU treaties are international agreements and governed by public international law they do not constitute "principles of international law" within the meaning of Article 26(6) ECT.[253] The Tribunal concluded that while Spanish law and EU law are relevant as facts, provisions on EU law concerning State aid are not applied by the Tribunal, and nor does the Tribunal make any decision on their interpretation.[254]

222. What this overview of the Tribunal's Decision demonstrates is that the context of the Tribunal's discussion of the law applicable to the merits was that of the Tribunal's jurisdiction. The considerations regarding the applicable law as well as the Tribunal's jurisdiction were based on and interwoven with the (rejection of) the argument that by virtue of Article 26(6) ECT and the alleged applicability or even primacy of EU law the unqualified attribution of jurisdiction pursuant to Article 26(1) ECT should be restricted. In the annulment proceedings, the Parties have vigorously debated whether and if so to what extent Spain raised the argument that EU law should be deemed applicable to the merits of the case, as distinct from the attribution of jurisdiction in the underlying

[251] **RL-0093**, Decision, ¶ 156.
[252] **RL-0093**, Decision, ¶ 159.
[253] **RL-0093**, Decision, ¶ 158.
[254] **RL-0093**, Decision, ¶ 160.

arbitration. Specifically, Spain submits that it invoked the applicability of EU law to the merits of the case in its post hearing brief.[255]

223. Even if this passage in the post hearing brief contains some reference to the substantive law argument, as Spain argues, it does not have the scope or the breath of the argument as raised in the annulment.

224. *First*, the Committee notes that the issue of the applicable law was also primarily argued in relation to jurisdiction in the annulment proceeding. The arguments made under that heading do not fundamentally differ from the arguments discussed above particularly in relation to the issue of the alleged primacy of EU law.[256] *Second*, while the scope of argument in the underlying arbitration may be debated, in the annulment there can be no doubt that Spain develops it as an independent line of argument based on the law applicable to the merits of the case, which considerably exceeds the scope of its argument in the underlying arbitration. Spain's argument in the underlying arbitration was that Spain's price support scheme should be characterized as impermissible State aid under EU rules. Given the actual decision of the Tribunal, however, which did address State aid as such, it is not entirely clear what Spain's interest is in raising this argument or issue under the heading "applicable law" and whether it is in fact seeking a reconsideration of the Tribunal's (substantive) decision. There is no clear indication that Spain's arguments would have been more effective or persuasive so as to justify a different outcome if the issue of State aid were reviewed on a different legal basis, let alone whether within the scope of the annulment this would constitute a manifest excess of powers.

225. The Tribunal held that "the obligations regarding State aid were incumbent upon the Respondent, and investors are entitled to assume that they had been taken into account by the Respondent when drafting its legislation. It was not for the Claimants to second-guess the Respondent's legislature."[257] On that basis, the Tribunal concluded that "the

---

[255] Reply, ¶127.
[256] *See* ¶¶ 208-216 above.
[257] **RL-0093**, Decision, ¶ 306.

provisions of EU law and State aid do not weaken the Claimants' entitlement to rely, at the time that they make their investments, upon the representations made in the Respondent's regulatory scheme."[258]

226. The key element of Spain's augmented argument relates to the 2017 Decision on State Aid. Spain argues that the Tribunal should have addressed the 2017 Decision on State Aid and use it as a basis to come to a different conclusion than it did because the rules on State aid are to be found in Articles 107 and 108 of the TFEU, and thus treaty law.[259] Spain seeks to support this argument further by arguing in its reply at the Hearing on Annulment that "the Tribunal did not apply EU law, which, even without Spain's argument, it should have applied on the basis of the *iura novit curia* principle."[260] Cube and Demeter, on the other hand, emphasized that the Tribunal did consider Spain's position and that while it rejected the relevance of EU State aid law as part of the governing law of the dispute, it did acknowledge that EU law, including State aid law was relevant as part of the factual background of the dispute. As to the 2017 EC State Aid Decision, Cube and Demeter argue that the Tribunal was not required explicitly to refer to this, and moreover that it relates to the current and not the incentive program under which Cube and Demeter invested.[261]

227. In essence, what Spain seeks is a review and reassessment of the Tribunal's substantive finding that the provisions of EU law and State aid do not impact Cube and Demeter's entitlement to rely, at the time they made their investments, on the representations made under Spain's regulatory regime. The most concrete argument Spain makes to support this reassessment is the reference to the 2017 EC State Aid Decision, on which the Tribunal sought the Parties' submissions but did not refer to explicitly in its reasoning and decision. It is undisputed that this Decision relates to a different investment regime. It is not for the Committee to second guess the Tribunal's reasons for not explicitly

---

[258] **RL-0093**, Decision, ¶ 307.
[259] Mem., ¶¶ 166-167.
[260] Tr. Day 1 (Ms. Martínez de Victoria), 22:6-9.
[261] C-Mem., ¶ 235.

including a reference to this 2017 EC State Decision (see also VI.C(2)c in reference to Ground II), but the fact that it relates to a different regime seems an ample explanation.

228. In any event, it is not appropriate and certainly not within the scope of an annulment committee's remit when reviewing whether a tribunal manifestly exceeded its powers to consider what, *if* certain provisions of law had been applicable and applied (and the Committee notes that it is not obvious that this was the case), would have happened *if* a particular piece of Spanish legislation (in this case RD 661/2007) had been notified to the EC and what then the impact *would have been* on investors' expectations.[262] That is not a matter of applying the law; that is speculation.

**(4) Manifest Excess – Conclusion**

229. Spain's argumentation in support of the alleged "manifest" nature of the Tribunal's excess of powers largely consists of a number of general arguments that go to the substance of the dispute. In particular, Spain argues that the Tribunal should have been well aware of the nature of the dispute and that it involved an intra-EU character, and that Spain had invoked the intra-EU objection from the outset. It also seeks to strengthen the manifest nature of the Tribunal's excess of powers by reference to the Tribunal's failure to allow the EC to intervene.[263]

230. Cube and Demeter, on the other hand, in addition to disputing that Spain's substantive arguments constitute an excessive power (let alone manifest excess of power), emphasize that the so-called intra-EU exception has never been accepted by the large number of tribunals who have addressed this issue.[264]

231. As the Committee considered at the outset, the question whether the "manifest" test requires a two-step analysis or a *prima facie approach* is of limited significance where, as is the case here, a committee finds that there is no excess.

[262] *See* Mem., 144.

[263] Reply, ¶¶ 81-87.

[264] Tr. Day 1 (Mr. Fleuriet), 109:22-110:5. *See also* Cube and Demeter's Opening Presentation, Slide 53.

232. The Committee recognizes that it is indeed clear, as Spain submits, that it was apparent from the outset that Spain was invoking the intra-EU nature of the dispute as a basis for rejecting the Tribunal's jurisdiction. At the same time, as the Committee has considered in relation to many of Spain's concrete arguments, Spain's arguments have changed and have been significantly augmented over time throughout the original proceeding and the annulment proceedings. It is not apparent to the Committee that the alleged notoriousness of the nature of the dispute would serve to support the manifest nature of any excess of powers committed by the Tribunal. Rather, it was the Tribunal's task to decide the dispute before it on the basis of the arguments submitted by the Parties.

233. The Committee also recognizes that, for Spain, the intra-EU nature and the intra-EU objection is a critical issue. This recognition notwithstanding, it does not justify the conclusion that a tribunal's decision should be reconsidered by an annulment committee, as an annulment procedure is not an appeal.

234. Cube and Demeter's reference to the consistent rejection of the intra-EU objection serves a different purpose and goes to the merits of the arguments raised in this case and in numerous others. While the Committee will not go so far as to say that the mere fact that many or indeed all other tribunals faced with these questions have come to a result in line with the Tribunal, and that therefore there is no need to go further to find an excess of power, which has found broad support by other tribunals for the interpretation embraced by the Tribunal reinforces the conclusion that there is no excess of powers, let alone of a manifest nature.[265]

235. To conclude, this ground of the Application must fail.

[265] *See* **CL-278**, *Teinver*, ¶ 59.

# VI. FAILURE TO STATE REASONS

## A. THE APPLICANT'S ARGUMENTS

### (1) Applicable Legal Standard

236. Spain argues that an award should be annulled "if it has not stated the reasons on which it is based" in accordance with Article 52(1)(e) of the ICSID Convention.[266] Spain further submits that pursuant to Article 48(3) of the ICSID Convention, the "tribunal must address all issues referred to it, and indicate the reasons on which it bases its conclusions."[267]

237. Spain submits that annulment committees have decided that, at a minimum, a ruling must allow a reader to "follow how the tribunal proceeded from Point A. to Point B."[268] Particularly, the supporting reasons "must constitute an appropriate foundation for the conclusions."[269]

238. Spain alleges that the task of a committee is to determine whether there has been a comprehensive and consistent reasoning that a reader can follow.[270] Spain argues that there is a need for a party to be able to understand the ruling because it is precisely the "statement of reasons and guarantees procedural legitimacy and validity."[271] Additionally, the Applicant contends that committees have clarified that insufficient and inadequate reasons as well as contradictory reasons can lead to the annulment of an

---

[266] Mem., ¶¶ 146-464; Reply, ¶¶ 237-433.

[267] Mem., ¶ 147.

[268] Mem., ¶ 148; **RL-0101**, *MINE*, ¶ 5.09. *See e.g.* **CL-233**, *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the ad hoc Committee, 1 March 2011 [hereinafter *Duke*], ¶ 203; **RL-0104**, *Wena*, ¶ 79; **RL-0151**, *Mr. Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment, 12 February 2015, ¶ 112; **RL-0107**, *Iberdrola*, ¶ 119; **RL-0103**, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines I*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, ¶ 197 [hereinafter *Fraport*], ¶ 249; **RL-0154**, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the ad hoc Committee on the Application for Annulment, 24 January 2014, ¶ 181; **RL-0155**, *Total*, ¶ 267. *See also* **RL-0128**, "The ICSID Convention: A commentary" Schreuer and others, 2013, p. 824.

[269] Mem., ¶ 148.

[270] Mem., ¶¶ 148-150, Reply, ¶ 272. *See e.g.* **RL-0097**, *Sempra*, ¶ 167.

[271] Mem., ¶ 150, *citing* **RL-0100,** *Tidewater Investment SRL and Tidewater Caribe, C.A. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016 [hereinafter *Tidewater*], ¶¶ 164, 166.

award.[272] Spain adds that there has to be sufficient and adequate reasons which are not contradictory or frivolous.[273]

239. Finally, Spain argues that Articles 48(3) and 52(1)(e) of the ICSID Convention impose the obligation on tribunals to address all issues, arguments and evidence presented. In that sense, a "failure to deal a particular matter submitted to it" or to "address certain relevant evidence" amounts to a failure to state reasons that would result in annulment.[274] Spain supports this argument by reference to the *MINE* and *TECO* annulment decisions where the committees decided to annul the damages section because the tribunal did not address certain arguments raised by a party or because the tribunal ignored the existence in the record of evidence.[275]

240. In its Reply, and in conclusion, Spain provides an overview of the of the cases where it finds support for its annulment application on the basis of failure to state reasons as follows:[276]

---

[272] Mem., ¶ 151; **RL-0072**, *Soufraki*, ¶¶ 122-123.

[273] Mem., ¶¶ 151-155. *See e.g.* **RL-0101**, *MINE*, ¶ 5.09; **RL-0150**, *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais S.A.*, ICSID Case No. ARB/81/2, Decision on the Application for Annulment Submitted by Klöckner Against the Arbitral Award, 3 May 1985 [hereinafter *Klöckner*], ¶ 116 ("As for 'contradiction of reasons,' it is in principle appropriate to bring this notion under the category 'failure to state reasons' for the very simple reason that two genuinely contradictory reasons cancel each other out"); **RL-0072**, *Soufraki*, ¶ 125 ("*contradictory reasons* may also be considered to mean the absence of indication of reasons") (emphasis in original); **RL-0105**, *Pey Casado*, ¶ 281 ("As is well established by the decisions of numerous ICSID *ad hoc* committees, 'no indication of reasons' can be composed of contradictory reasons"); **RL-0100**, *Tidewater*, ¶ 170 ("[C]ontradictions that are genuinely 'mutually exclusive' may be equivalent to no reasons at all."); **RL-0157**, *TECO*, ¶ 90 ("[W]here are contradictory reasons that may justify annulment."); **RL-0130**, *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application, 21 February 2014, ¶ 185 ("Only reasons considered contradictory or frivolous may be equivalent to failure to state reasons and may lead a committee to strike an award."); **RL-0158**, *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision on the Annulment Application, 29 June 2005 [hereinafter *CDC*] , ¶ 70 ("Article 52(1)(e) requires that the tribunal has indicated the reasons, and that those reasons are consistent, that is*, they* are neither 'contradictory' nor 'frivolous'"); **RL-0153**, *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment, 9 March 2017 [hereinafter *Venezuela Holdings*], ¶ 189 ("[T]he failure to indicate adequate and non-contradictory reasons takes on vital significance.") *See also* **RL-0128**, "The ICSID Convention: A commentary" Schreuer and others, 2013, p. 1011 ("Contradictory reasons will not enable the reader to understand the court's reasons. In strict logic, they are as useful as if there were no reason at all").

[274] Mem., ¶ 156; **RL-0096,** Updated background paper on annulment for the administrative council of ICSID, 5 May 2016, ¶ 104.

[275] Mem., ¶¶ 156-157*, citing* **RL-0101**, *MINE*, ¶ 6.99; **RL-0157**, *TECO*, ¶ 138.

[276] Reply, ¶ 269.

- That the mere expression in the Decision or the Award of an opinion is not an expression of reasoning, if it does not detail the reasoning which enabled the Tribunal to reach that conclusion: thus, *MINE* or *Teco* already cited.[277]

- That the mere expression of reasons is not sufficient to validate the Award, as the other party wrongly claims, if they are not adequate (*Mitchell*)[278]

- That, therefore, frivolous or contradictory reasons do not serve to support the Award, and the Annulment Committees may indeed annul on this ground (*MINE*).[279]

- And that such Failure to state reasons also occurs when the Tribunal fails to rule on relevant issues raised by the parties (*Pey Casado*).[280]

- And that it is not the Committee's task to reconstruct what the Award should have said and did not say (*Klöckner*)[281].

241. Furthermore, Spain quotes the committee in the *Tidewater* case to point out that "the statement of reasons is one of the central duties of arbitral tribunals."[282]

242. According to Spain, the Award should be annulled because the award failed to comply with essential obligations to express reasons concerning: *(i)* the applicability of EU law to jurisdiction and merits;[283] *(ii)* the conclusions on liability in relation to the alleged breaches of the ECT,[284] and *(iii)* the quantification on damages.[285]

---

[277] *See also* Reply, ¶¶254-256; **RL-0101**, *MINE*, ¶¶ 5.08-5.09, 6.99, 6.105, 6.107; Reply, ¶¶ 263-365; **RL-0147**, *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016 [hereinafter *TECO*], ¶¶ 87 and 128.

[278] *See* Reply, ¶¶ 257-258; **RL-0156**, *Mitchell*, ¶¶ 21, 40.

[279] *See* Reply,¶ 254; **RL-0101**, *MINE*, ¶ 5.07.

[280] *See* Reply, ¶ 262; **RL-0105**, *Pey Casado*, ¶¶ 285, 286.

[281] *See* Reply, ¶¶ 244-249; **RL-0150**, *Klöckner*, ¶¶ 115-120, 141, 144, 151. *See also*, Reply, ¶¶ 250-253; **RL-0152**, *Amco Asia Corporation, et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application for Annulment, 16 May 1986 [hereinafter *Amco*], ¶¶ 43, 97, 106, 110.

[282] Tr. Day 1 (Ms. Fatás Pérez), 34:4-5.

[283] Mem., ¶¶ 158-175.

[284] Mem., ¶¶ 176-451.

[285] Mem., ¶¶ 452-464.

### (2) Failure to State Reasons in Determining the Applicable Law and Conclusions on State Aid

#### *a. Failure to explain that EU law was deemed not applicable*

243. Spain points out that it invoked the application of EU law to both the substance of the dispute as well as to the determination of jurisdiction in the underlying arbitration. During the Hearing, Spain also raised the issue that the Tribunal did not specifically address the applicable law in a separate section but rather as part of the arguments on the intra-EU objection.[286] Spain argues that the Tribunal implicitly accepted the importance of EU law because it rejected its relevance for the resolution of the substance of the case on two occasions.[287]

244. Spain argues that although the Tribunal seems to acknowledge that treaties of the EU are "rules of international law" within the meaning of Article 26(6) ECT,[288] it incorrectly rejected the argument that State aid amounts to international law. According to Spain, the Tribunal was incorrect in holding that "the submissions before us do not suggest that the EU treaties are directly applicable to these proceedings; and while the rules established by EU secondary legislation – such as rules against State aid – are EU law, they plainly cannot be 'principles of international law' within the meaning of Article 26(6) ECT."[289] The Applicant argues that the last part in the Tribunal's holding concerning the "principles of international law" was not an argument raised by Spain in the underlying arbitration.[290] The Applicant further argues that "accepting that EU treaties can be categorized in any other concept but as rules of international law is accepting that in the decision making process arbitrariness is allowed even with regard to the principle of *iura novit curia*."[291]

[286] Tr. Day 1 (Ms. Fatás Pérez), 36:1-6.

[287] Mem., ¶¶ 158-159. *See also* **RL-0093**, Decision, ¶¶ 159-160.

[288] Mem., ¶ 160, fn 165.

[289] Mem., ¶ 161.

[290] Mem., ¶ 162.

[291] Tr. Day 1 (Ms. Fatás Pérez), 37:17-21.

*b. Lack of reasoning why Articles 107 and 108 TFEU were not applied*

245. Spain argues that the Tribunal failed to explain why, after qualifying EU treaties as international law, it did not apply these EU treaties regulating State aid (Articles 107 and 108 of the TFEU) to the merits of the case thus contradicting itself.[292]

246. Spain supports its argument by noting that the Tribunal further contradicted itself by considering that the Parties did not suggest that EU treaties were applicable to these proceedings when Spain frequently invoked Articles 107 and 108 of the TFEU in its submissions.[293]

*c. European Commission's reasoning in the State aid decision not assessed*

247. The Applicant also contends that the Tribunal ignored the EC Decision on State Aid[294] and did not provide any reasons for not addressing it in its ruling.[295]

**(3) Failure to State Reasons for the Conclusions on Liability**

*a. FET standard in Article 10(1) ECT*

248. On the FET standard contained in Article 10(1) ECT, Spain submits that the Tribunal does not provide reasons in support of its finding of a breach resulting from treatment that is unfair and inequitable.[296] According to Spain, the Tribunal contradicted itself later on in its ruling which is also basis for annulment.[297]

249. Spain argues that the Tribunal did not explain how it arrived at the elements that constitute legitimate expectations. According to Spain, the Tribunal also contradicted itself by first saying that legitimate expectations had to be justified, rational and

[292] Application, ¶ 39; Mem. ¶¶ 158-162; Reply, ¶¶ 280-284.

[293] Application, ¶ 40; Mem. ¶¶ 163-171; Reply, ¶¶ 286-287.

[294] **RL-0129**, Decision C(2017) 7384 of the European Commission, rendered on 10 November 2017, regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2015/NN)).

[295] Mem., ¶ 175.

[296] Mem., ¶¶ 177-180.

[297] Mem., ¶ 179, *citing* **RL-0093**, Decision, ¶ 410 ("The duty to accord fair and equitable treatment entailed an obligation not to defeat the basic expectations that had been created by the Respondent specifically in order to encourage the investments necessary to implement its policy on renewable energy."). *See also* **RL0093**, Decision, ¶¶ 389, 410.

reasonable, and then stating that the way in which the understanding of the representation on which the expectation is based is secondary.[298]

250. Spain asserts that the Tribunal conclusion had a contradiction; that "the regulatory power of the State and binding the obligations derived from guaranteeing a FET fundamentally to the obligation of stability, without stability being in any way equated to the petrification of the system."[299] According to Spain, this is the basis of the Tribunal's failure to state reasons that "[t]he Decision does not incorporate a sufficiently clear reasoning for the Parties to know why, if the State retains regulatory power to accommodate regulation in the economic situation for reasons of general interest (Point A), a State could not, for those same reasons, significantly modify the regulation, altering essential characteristics of the regulation (Point B)."[300]

251. Regarding the Tribunal conclusion that the FET obligation does not imply petrification, Spain argues that the Tribunal considered the economic impact of the changes (without any analysis of the particular impact of the Disputed Measures)[301] and concluded that if the "promise" was not clear, it gave "rise to legitimate expectations of petrification."[302] In doing so, Spain argues that the Tribunal failed to analyze the effects and damage of the measures, or at least should have made an analysis of the effects and the alteration of the 'economic basis.'[303]

***b. Lack of valid reasoning for violation of legitimate expectations***

252. Spain argues that the four elements of the Tribunal's decision on the breach of Article 10(1) of the FET are "supported by a series of considerations made by the Tribunal where multiple contradictions and failures or gaps in the reasoning are appreciated."[304]

---

[298] Mem., ¶¶ 181-182.

[299] Mem., ¶ 184.

[300] Mem., ¶ 193.

[301] Mem., ¶ 189, Reply, ¶ 304.

[302] Mem., ¶ 191.

[303] Reply, ¶ 317.

[304] Mem., ¶ 197, *citing* **RL-0093**, Decision, ¶ 401 ("The Tribunal, by a majority, considers that the Claimants' reliance on the representation was justified, for four reasons. First, the text of RD 661/2007 was itself clear and specific. The representations could be read by all, in a text with the force of law, accompanied by an explanatory preamble. Second,

(i) First element: Supposed immutability in RD 661/2007

253. On the *first element*, the supposed commitment on immutability contained in RD 661/2007,[305] Spain argues that the Tribunal was manifestly wrong when referring to RD 661/2007 as a rule "with the *force of law* when it is a regulatory norm that emanates from the Government" that "complements or develops Laws and is hierarchically inferior to them"[306] and "can never contradict the higher ranking Laws."[307] Spain further argues that the Tribunal did not "explain how a rule that is inferior to an Act… can be expected to petrify the entire legal system…"[308]

254. Spain supports its argument that the Tribunal's reasons are contradictory by pointing out that in some parts the Tribunal recognizes the "clear and specific" commitment to the Special Regime,[309] while in other parts it expressly admits that "661/2007 does not exclude changes to in the remuneration system for support to renewable energies."[310] The Applicant further argues that the Tribunal did not address an essential aspect of Article 44(3) of RD 661/2007, "namely the **wording of the** article itself ("[t]*he reviews* ***referred to in this section of the*** *regulated tariff…*')."[311]

255. Spain points out that the Tribunal only analyzed and considered the background of regulatory changes for the hydroelectric plants in its ruling.[312] According to Spain, the

those representations were emphasised by their clear and specific restatement in the Government Press Release issued on the same day as RD 661/2007.276 Claimants were professional investors, used to evaluating risk, and did in fact procure legal advice from Spanish counsel, even though no detailed written opinion was filed in these proceedings. Third, the Respondent has not shown that any more exhaustive legal analysis would have produced any different understanding of the Spanish measures. Fourth, the significance of the Respondent's representations as to the stability of RD 661/2007 is ultimately not a matter of Spanish law but of international law, operating in the context of Article 10(1) ECT."). *See also*, Reply, ¶¶ 330-356.

305 Mem., ¶ 199, *citing* **RL-0093**, Decision, ¶ 276 ("The Tribunal considers that the Respondent made such a commitment in relation to RD 661/2007, and that the commitment was that the regulated tariff regime – the Special Regime – established by that Royal Decree would continue to apply to power plants that opted for that regime and were registered as having been accepted into that regime.").

306 Mem., ¶ 204, **R-0374**, Reply on the Merits of 29 July 2016, ¶ 288; *see also* Reply, ¶¶ 331-334.

307 Mem., ¶ 202.

308 Mem., ¶ 209; *see also* Reply, ¶¶ 334-337.

309 Mem., ¶ 217, *citing* **RL-0093**, Decision, ¶ 276.

310 Mem., ¶ 218, *citing* **RL-0093**, Decision, ¶ 289; *see also* Reply, ¶¶ 338-343.

311 Mem., ¶ 223 (emphasis in the original).

312 Mem., ¶ 230, *citing* **RL-0093**, Decision, ¶¶ 437, 330-331; Reply, ¶¶ 344-347.

Tribunal did not provide any reasoning either to reject or admit the regulatory changes made prior to Cube and Demeter's investment "despite the fact it was extensively dealt with in the arbitration."[313]

256. Spain alleges that the Tribunal "failed to make a truly comprehensive analysis of the legal regime of the country in which the Claimants invested, which should have begun with a review of the content of the Electricity Sector Act [Law 54/1997]."[314] With respect to the principle of economic sustainability, Spain notes that the Tribunal did not make any mention of examples of legislation that enshrine this principle, nor did the Tribunal explain "why it was not expected that on the basis of this principle, the necessary measures would be taken to avoid the collapse of the system."[315]

257. Spain alleges that the Tribunal tried to minimize the reasonable rate of return principle in its conclusion[316] by failing to reference any exhibits or expert reports. Spain also points out that the Tribunal's decision omitted to indicate that the reasonable return rate was "not limited to Article 44 of RD 661/2007 but is imposed by Article 30(4) of the Electricity Sector Act … and reiterated by constant Supreme Court jurisprudence."[317] The Applicant further submits that the principle of reasonable return "is not simply a limit, as the Decision states, but a guarantee for investors in the Spanish renewable energy support sector"[318] and this was the only guarantee under Law 54/1997 and its successive implementing regulations.[319]

---

[313] Mem., ¶¶ 244-249.

[314] Mem., ¶ 256, *see also* Reply, ¶¶ 348-355.

[315] Mem., ¶¶ 276, 263-273.

[316] Mem., ¶ 280 ("We do not consider that the references in RD 661/2007 to a 'reasonable return' were intended to have any application outside the context of reviews of the tariffs and of the upper and lower limits under Article 44.3 RD 661/2007. In particular, we do not consider that the references to a 'reasonable return' signified a limit on the profit that a producer could earn from any power facility or group of facilities without suffering a reduction or lower-than-normal increase in tariffs, or that the references provided any basis for changes to the 2007 Regime outside the mechanisms set out in RD 661/2007.")

[317] Mem., ¶ 281.

[318] Mem., ¶ 285.

[319] Mem., ¶ 286.

(ii) Second element: Press Release

258. On the *second element*, the Press Release, Spain argues that it was also the subject of contradictions and obscurities when it was analyzed by the Tribunal.[320] When the Tribunal referred to the Press Release, it once again confused RD 661/2007 with a *law* and equated it to an independent source of legitimate expectations.[321] Spain points to a contradiction by the Tribunal when, "on one hand, it admits that Article 44(3) of RD 661/2007 does not exclude any modification of the regime but, on the other hand, it … excludes the retrospective modification of the regime."[322] Likewise, the Tribunal's considerations regarding "stability" in relation to the Press Release, clash.[323]

259. According to Spain, there are instances in the Tribunal's ruling that "one cannot be sure whether in the eyes of the Decision the Press Release is an autonomous source of commitment to stability, or a mere glossary of RD 661/2007, or can complement and make explicit what RD 661/2007 does not say, or can never say anything different from what RD 661/2007 supposedly expresses."[324]

260. Spain alleges that the Tribunal omitted to address particular issues of the Press Release in its ruling such as the fact that it was not signed or that it was on the website of the Government or Council of Ministers and not on the Ministry of Industry.[325] Spain also refers to the fact that press releases are merely informative and do not have any legal value, also a point that was not addressed by the Tribunal according to Spain.[326]

(iii)Third element: Due Diligence

261. The *third element*, according to Spain, is the absence of due diligence by Cube and Demeter and lack of evidence to support the reasonableness of their alleged

[320] Mem., ¶¶ 297-316; Reply, ¶¶ 357-363.
[321] Mem., ¶ 300, *citing* **RL-0093**, Decision, ¶¶ 401, 273, 277-278.
[322] Mem., ¶ 303.
[323] Mem., ¶ 304.
[324] Mem., ¶ 307, **RL-0093**, Decision, ¶ 294.
[325] Mem., ¶¶ 308-311.
[326] Reply, ¶ 361. *See also* Tr. Day 1 (Ms. Fatás Pérez), 41:5-9.

understanding as of the date of the investments.[327] Spain invokes the lack of analysis by the Tribunal of the understanding of the Spanish regulatory measures at the time that Cube and Demeter made their investments and the lack of evidence in the record as to any due diligence on regulatory risk.[328] Even though Cube and Demeter claimed Article 44(3) of RD 661/2007 as a fundamental part of their case, Spain stresses that the Tribunal admitted that there was no due diligence that would indicate the understanding of Article 44(3) at the moment of Cube and Demeter's investment.[329]

262. Spain notes that the "lack of an evidentiary element of such relevance to support the reasonability of such (alleged) expectations, should result in demerit of the Claimants in the underlying arbitration proceeding."[330] More so, Spain adds, "against the most elementary rules of the burden of proof… the Decision turns around the rules of the burden of proof and weighs on the Kingdom of Spain the negative consequences of such lack of proof."[331]

263. According to Spain, a more thorough analysis of the evidence in the proceeding would have produced a different understanding of the Spanish measures.[332] The Applicant argues that the Tribunal did not offer valid reasons to resolve contradictions. Spain highlights the Tribunal's contradictions in relation to (i) the understanding of the changes in the regulatory regime within the considerations of the Decision,[333] (ii) the case law of the Supreme Court which demonstrated that at the time of making the investments no investor could have a greater expectation than a reasonable return as provided in Article 30(4) of Law 54/1997 and entailed no petrification of the remuneration system,[334] (iii)

---

[327] Mem., ¶¶ 317-388; Reply, ¶¶ 364-380.

[328] Mem., ¶ 320.

[329] Mem., ¶¶ 325-331; **RL-0093**, Decision, ¶¶ 304, 340.

[330] Mem., ¶ 333; *see also* Reply, ¶¶ 368-371.

[331] Mem., ¶ 334; **RL-0093**, Decision, ¶ 401 ("has not shown that any more exhaustive legal analysis would have produced any different understanding of the Spanish measures.").

[332] Mem., ¶¶ 336-388.

[333] Mem., ¶¶ 338-340; **RL-0093**, Decision, ¶¶ 420, 353.

[334] Mem., ¶¶ 341-368; **RL-0093**, Decision, ¶¶ 299-300; **R-0118**, Sentence of the Third Chamber of the Supreme Court of 25 October 2006, (Rec. 12/2005); **R-0117**, Sentence of the Third Chamber of the Supreme Court of 15 December 2005. (Rec. 73/2004); **R-0121**, Sentence of the Third Chamber of the Supreme Court of 3 December 2009 (Rec. 151/2007); **R-0124**, Sentence of the Third Chamber of the Supreme Court of 20 December 2011 (ECR 16/2011); **R-0123**, Supreme Court Judgments 2011-2012) of 12 April 2012, rec. 50/11 and 112/11; of 19 April 2012, rec. 39/11

the documents in the record showing the opinion of the sector regarding the mutability of the legal framework,[335] and (iv) Cube and Demeter's own internal documents showing the awareness of a real risk of modification of the regulatory framework both for the hydroelectric plants as well as for the photovoltaic plants.[336]

(iv) Fourth element: Invocation of international law

264. The *fourth* element, according to Spain, is the invocation of international law as one of the sources of Cube and Demeter's legitimate expectations.[337] The Applicant argues that the Tribunal's invocation of Article 10(1) ECT cannot be understood as a separate source

and 97/11; of 23 April 2012, rec. 47/2011; of 3 May 2012, rec. 51/11 and 55/2011; of 10 May 2012, rec. 61/11 and 114/2011; of 14 May 2012, rec. 58/2011; of 16 May 2012, rec. 46/11; 18 May 2012, rec. 70/11 and 74/11; 22 May 2012, rec. 45/11 and 49/11; 30 May 2012, rec. 59/2011; 18 June 2012, rec. 54/11, 56/11, 57/11 and 63/11; 25 June 2012, rec. 109/11 and 121/11; 26 June 2012, rec. 566/10; 9 July 2012, rec. 67/11, 94/11 and 101/11; 12 July 2012, rec. 52/11; 16 July 2012, rec. 53/11, 75/11 and 119/11; 17 July 2012, rec. 19/11 and 37/11; 19 July 2012, rec. 44/2011; 25 July 2012, rec. 38/2011; 26 July 2012, rec. 36/11; 13 September 2012, rec. 48/11; 17 September 2012, rec. 43/11, 87/11, 88/11, 106/11 and 120/11; 18 September 2012, rec. 41/11; 25 September 2012, rec. 71/11; 27 September 2012, rec. 72/2011; 28 September 2012, rec. 68/2011; 8 October 2012, rec. 78/11, 79/11, 100/11 and 104/11; 10 October 2012, rec. 76/2011; 11 October 2012, rec. 95/11 and 117/11; 15 October 2012, rec.64/11, 73/11, 91/11, 105/11 and 124/11; 17 October 2012, rec. 102/2011; 23 October 2012, rec. 92/2011; 30 October 2012, rec. 96/2011; 31 October 2012, rec. 77/11 and 126/11; 26 November 2012, rec. 125/2011; 5 November 2012, ECR 103/2011; 9 November 2012, ECR 89/2011; 12 November 2012, ECR 98 and 110/11; 16 November 2012, ECR 116/11; **R-0130**, Judgment of the Third Chamber of the Supreme Court of 21 November 2012. (ECR 34/2011).

[335] Mem., ¶¶ 363-368; **R-0370**, Rejoinder Memorial, 27 April 2017, ¶¶ 638-697; **R-0276**, Allegations of APPA of 3 April 2007 against Draft RD 661/2007; **R-0278**, AEE Press Release on draft RD 661/2007, 9 May 2007; **R-0140**, Arguments of the AEE before the CNE during the hearing of the Electricity Advisory Council on the Proposal of Royal Decree 1614/2010 regulating and modifying certain aspects relating to the special regime), dated 30 August 2010, p. 6; **R-0239**, Solar Soil, 29 April 2010: APPA report (Retroactive summary), pp. 6 -7; **R-0380**, Application Brief of 9 May 2016, ¶¶ 121-123, 141, 150, 162, *inter alia;* **R-0258**, ILEX-Pöyry Report Current and future state of wind energy in Spain and Portugal 2007), July 2007 edition, p. 58; **R-0273**, Current state and future trends of solar power in Spain, Pöyry March 2011 Edition; **R-0221**, Informe pericial Deloitte, 23 May 2011, p. 57/177; **R-302**, Diario La Ley, 13 July 2010: "The risk of retroactive modification of the tariff of photovoltaic solar installations (especially those regulated by RD 1578/2008)", Yurena Medina; **R-0220**, KPMG Report May 2012. "Abengoa. Analysis of the profitability of solar thermal plants"; **R-0304**, Report Due Diligence 1 May 2007, Cuatrecasas; **R-305**, Suelo Solar, 22 December 2010, Interview with collaborating lawyers (Cuatrecasas and PROMEIN) of Plataforma Legal Fotovoltaica; **R-0306**, "Jurisprudence of the Supreme Court in the framework of appeals against Royal Decree 1565/2010", 12 April 2012, Luis Castro; **R-307**, "Spain: The regulation of renewables", Javier Santos, DLA Piper, 1 October 2008, p. 2; **R-0320**, II Renewable Encounter, DLA Piper, December 2009; **R-0321**, Five Days Newspaper. Companies - Article DLA Piper, Proposed new regulatory model, April 2013; **R-0388**, Reply on the Merits of the Proceedings and Memorial of Reply on Jurisdiction, 27 February 2017, ¶¶ 307-308; **R-0383**, Respondent's Post Hearing Brief, ¶¶ 113-114.

[336] Mem., ¶¶ 369-387; **RL-0093**, Decision, ¶¶ 301, 351; **R-0390**, Minutes of the Investment Committee, 18 April 2008, pp. 2 – 3 (formerly Exhibit C-197); **R-0391**, Minutes of the Investment Committee, 19 December 2008, pp. 2-4 (formerly Exhibit C-300_EN); **R-0310**, Note to the Investment Committee of 10 November 2009, p. 17; **R-0392**, Minutes of the Investment Committee, 11 June 2010, pp. 2-3 (formerly Exhibit C-302_EN); **R-0395**, Information Memorandum, Renewable Power Global Holding SL, 17 December 2010, p. 17 (formerly Exhibit C-218).

[337] Mem., ¶ 389; Reply, ¶¶ 381-390.

for legitimate expectations. Spain adds that if the Tribunal intended "by citing article 10(1) ECT [sic] as a separate source in support of legitimate expectations, … to establish it as an autonomous source of expectations, it would be departing, without any reason, from the arbitral precedents that indicate that such article is not in itself a stabilization clause."[338]

***c. Content of legitimate expectations and the assessment of the disputed measures***

265. Spain then turns to discuss the legitimate expectations and the Tribunal's assessment of the Disputed Measures (*i.e.* RD 1565/2010, RDL Law 14/2010, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and Ministerial Order 1045/2014).[339] Spain recalls that Cube and Demeter claimed the violation of the ECT by Spain for all of these Disputed Measures as a whole.[340]

266. According to Spain, when the Tribunal turned to the analysis of the FET with respect to the Disputed Measures, it did not clearly outline what the content of the legitimate expectations were, nor did it analyze each of the Disputed Measures in the light of the FET standard that it had set out.[341] Spain refers to ambiguities and contradictions in the Tribunal's analysis pointing out that "evidently it is not the same to allude as a parameter to the immutability of the system, as to allude to the possibility of changes, and even the parameters of 'radicality' and 'harm' are not the same, as the Decision itself admits."[342]

267. Spain notes that the Tribunal considered certain measures "not to be contrary to [Article]. 10 ECT because they did not alter 'the economic basis on which the investment was made'"[343] while considering that others had an economic impact.[344] In making this decision, Spain adds, the Tribunal did not provide any reasoning why it understood that those measures did not alter the 'economic base' of the investment,[345] why this

[338] Mem., ¶ 392.
[339] Mem., ¶ 394; Reply, ¶¶ 391-410.
[340] Mem., ¶ 395.
[341] Mem., ¶ 397.
[342] Mem., ¶ 402; **RL-0093**, Decision, ¶¶ 311, 353-355.
[343] Mem., ¶ 406; **RL-0093**, Decision, ¶¶ 419-423.
[344] Mem., ¶ 407; **RL-0093**, Decision, ¶¶ 425-427.
[345] Mem., ¶ 410.

'alteration of the economic base' should be understood as a parameter,[346] or on what basis the Tribunal considered the two disputed measures to be 'radical' changes.[347]

268. The Tribunal's reasoning supporting the radical changes particularly with respect to the introduction of the principle of reasonable return, Spain notes, was not supported in any exhibit or evidentiary material in the record.[348]

**(4) Failure to State Reasons for the Quantification of Damages**

269. Spain also alleges that the Tribunal failed to state the reasons, and was also inconsistent, when "calculating the compensation due, both in relation to photovoltaic plants and in relation to hydroelectric installations."[349] Spain explains that it is difficult to follow the decision of the Tribunal with respect to the determination of damages because the Tribunal failed to specify or justify the legitimate expectations of the investors.[350]

***a. Photovoltaic facilities***

270. According to Spain, the Tribunal's decision regarding the damages with respect to the photovoltaic plants contradicts its own decision on liability.[351] Spain explains that while the Tribunal decided that the measures after July 2013 were the ones that had an economic impact, the final damages awarded were only 26% of the total damages initially claimed by Cube and Demeter.[352] For Spain, this does not follow the 'radical' change decided by the Tribunal.

---

346 Mem., ¶ 411.

347 Mem., ¶ 413; **RL-0093**, Decision, ¶¶ 426-427.

348 Mem., ¶ 418.

349 Mem., ¶ 452; *see also* Reply, ¶¶ 411-432.

350 Mem., ¶ 453.

351 Mem., ¶¶ 454-458; **RL-0093**, Decision, ¶¶ 354-355, 479; *see also* Reply, ¶¶ 419-424.

352 Mem., ¶ 457.

***b. Hydroelectric installations***

271. With respect to the hydroelectric installations,[353] Spain argues that the Tribunal "used a methodology to apply the regulatory risk that lacked any basis."[354] The Respondents' expert understood that the risk was higher in the Actual Scenario than in the But For Scenario while Spain's expert understood that since the Disputed Measures restored the financial situation of the electricity sector, the Actual Scenario was less risky than the But For Scenario.

272. According to the Applicant, the Tribunal "ignored the methodology proposed by the two experts in relation to regulatory risk and preferred to apply its own methodology, despite the fact that it had not been alleged or discussed by the Parties to the proceedings. Thus, without any reasoning, the Tribunal held that a 'reasonable' approach would be to reduce the difference between the projected cash flows in the Prevailing Scenario and the But For Scenario by 40%."[355] Spain argues that the experts "had agreed that regulatory risk should be calculated by applying a 'revenue haircut' to revenue projections, *i.e.* that projected revenues should be reduced to reflect the likelihood that financial support for the plants might disappear. When affecting plant revenues, the adjustment of the projections was done at a firm level and therefore before considering the payment of any interest or debt."[356]

273. In its Reply, Spain further argues that the Award reached a contradictory position on damages with respect to the Decision. According to Spain, "[w]hile it clearly intended that hydroelectric investments would be subject to a higher degree of regulatory risk due to the later investment date in 2011, it actually applied a 51% discount, a lower discount for regulatory risk than the 75% reduction applied to photovoltaic investments."[357] At

---

[353] Mem., ¶¶ 459-464; **RL-0093**, Decision, ¶¶ 510, 529; **R-0396**, First Brattle Quantum Report, ¶ 108; **R-0397**, First Econ One Report, ¶¶ 218-219.

[354] Mem., ¶ 459.

[355] Mem., ¶ 461; **R-0396,** First Brattle Quantum Report; **RL-0093**, Decision, ¶ 529; *see also* Reply, ¶¶ 413, 425-431.

[356] Mem., ¶ 462; First Brattle Quantum Report, ¶ 108; **R-0397**, First Econ One Report, ¶¶ 218-219.

[357] Reply, ¶ 431.

the Hearing, Spain referred to a discount of 51% for hydro as opposed to 65% in relation to photovoltaic investments.[358]

## B. The Respondents' Arguments

### (1) Applicable Legal Standard

274. Cube and Demeter recall that Article 52(1)(e) of the ICSID Convention permits annulment when a tribunal has failed to "state the reasons which [the Award] is based." It argues that the scope of review is "strict and the threshold for annulment is high."[359]

275. According to the Respondents, Article 52(1)(e) "concerns only 'the absence of reasons and not their quality or correctness'"[360] and does not include "substituting [the committee's] own reasoning for that of the tribunal" or to judge either the "correctness" or "persuasiveness of the tribunal's reasons."[361] The Respondents add that this was confirmed by the committee in the *Vivendi I* case that said that "it is well accepted by both in the cases and literature that Article 52(1)(e) concerns a failure to state any reasons… not the failure to state correct or convincing reasons."[362] This approach, the Respondents add, "was rooted in the earliest annulment decisions and stems from the

---

[358] Tr. Day 1 (Ms. Oñoro Sainz), 70:9-19.

[359] C-Mem., ¶ 244; **CL-285**, *OI European Group*, ¶ 320; *see also* **CL-309**, *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Decision on Annulment, 7 January 2015 [hereinafter *Daimler*], ¶ 79; **CL-150**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal (formerly Compagnie Générale des Eaux) v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002 [hereinafter *Vivendi*], ¶ 65 (explaining that annulment on this ground should only occur in a "clear case"); **RL-0157**, *TECO*. *See also* Rejoinder, ¶ 112.

[360] C-Mem., ¶ 246; **CL-278**, *Teinver*, ¶ 209 ("Article 52(1)(e) expresses the minimum requirement that a good faith reader of the award can understand the motives that led the Tribunal to adopt its decisions."); **RL-0133**, *Tulip*, ¶ 105 ("[R]easons may be terse, summarizing a tribunal's overall impression of evidence without evaluating it in detail.").

[361] C-Mem., 246*, citing* **CL-312**, *Compagnie d'Exploitation du Chemin de Fer Transgabonais v. Gabonese Republic*, ICSID Case No. ARB/04/5, Excerpts of Decision on Annulment, 11 May 2010 ¶ 95; **CL-313**, *Kilic Insaat Ithalat Ihracat Sanayi ve Ticaret Anonim Sirketi v. Turkmenistan*, ICSID Case No. ARB/10/1, Decision on Annulment, 14 July 2015 [hereinafter *Kilic*], ¶ 64; *see also* **CL-150**, *Vivendi*, ¶ 64; **CL-314**, *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Decision on the Application for Partial Annulment of Continental Casualty Company and the Application for Partial Annulment of the Argentine Republic, 16 September 2011 [hereinafter *Continental*], ¶ 103; **CL-228**, *Soufraki*, ¶¶ 123-24; **CL-233**, *Duke*, ¶ 162; **CL-315**, *Capital Financial Holdings Luxembourg S.A. v. Republic of Cameroon*, ICSID Case No. ARB/15/18, Decision on Annulment, 25 October 2019 [hereinafter *Capital Financial*], ¶ 233; **CL-277**, *SBC*, ¶ 607.

[362] C-Mem., ¶ 246*, citing* **CL-250**, *Vivendi*, ¶ 64.

fact that annulment committees should not be assessing the merits of the Tribunal's conclusions."[363]

276. Cube and Demeter argue that there is a two-part requirement for the relevant legal standard, and both elements must be met.  The Respondents allege that not only there needs to be a lack of reasons but also the conclusion that lacks reasons has to be outcome-determinative.[364]  In its Rejoinder, Cube and Demeter add that a failure to state reasons within the meaning of Article 52(1)(e) happens when "(i) the conclusion that allegedly lacks reasons is 'outcome determinative' and (ii) it is 'impossible' to understand how the tribunal arrived at its conclusion."[365]

277. The Respondents further argue that committees must be careful not to transgress the mandates of Article 53(1) of the ICSID Convention or to include additional requirements.[366]  Cube and Demeter argue that "when assessing Spain's claims arising from this ground for annulment, the question for this Committee is simply whether the Tribunal included any reasons – either explicitly or implicitly – for its conclusions.  If reasons are given, the Committee's inquiry on this ground must end.  This is because tribunals must be permitted a 'degree of discretion' to determine the level of detail with which to present their reasons."[367]  Cube and Demeter note that a tribunal need not address every argument or every piece of evidence presented by the parties. The Respondents support this argument with the decision of the committee in the *Teinver* case.[368]  On this point, the Respondents note that committees have acknowledged that when "reasons are not stated but are evidence and a logical consequence of what is

---

[363] C-Mem., ¶ 246.

[364] Tr. Day 1 (Mr. Fleuriet), 123:6-9.  *See also* Respondents' Opening Presentation, Slide 81.

[365] Rejoinder, ¶ 118.

[366] C-Mem., ¶ 247, *citing* **CL-188**, *Tenaris*, ¶¶ 112-14. *See also* Rejoinder, ¶ 119.

[367] C-Mem., ¶ 251; **CL-150**, *Vivendi*, ¶ 64 (finding that "reasons may be stated succinctly or at length, and different legal traditions differ in their modes of expressing reasons" and that "[t]ribunals must be allowed a degree of discretion as to the way in which they express their reasoning."); **CL-290**, *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application by Parties for Annulment and Partial Annulment of the Arbitral Award, 5 June 1990 and the Application by Respondent for Annulment of the Supplemental Award, 17 October 1990, 17 December 1992, ¶ 7.56.  *See also* Rejoinder, ¶ 133.

[368] C-Mem., ¶ 250; **CL-278**, *Teinver*, ¶ 210.

stated," an award should not be annulled for failure to state reasons.[369] In any event, Cube and Demeter state that "in cases where the tribunal has failed to deal with a question submitted to it, the appropriate remedy under the ICSID Convention is not annulment, but rather, an application for a separate supplementary decision."[370]

278. Cube and Demeter point out that inconsistencies in an award "cannot lead to annulment unless they are so contradictory that they cancel each other out, leaving the award with no reasoning at all."[371] The Respondents submit that if there is an arguable contradiction, this is not to be resolved by a committee because they should "to the extent possible and considering each case, prefer an interpretation which confirms an award's consistency as opposed to its alleged inner contradictions."[372]

279. Cube and Demeter point that committees have decided not to annul awards even when they determine that the minimum standard of reasons required under Article 52(1)(e) of the ICSID Convention has not been satisfied. The reason, according to Cube and Demeter, is because "[i]nstead, reading the award 'as a whole in the context, and not by means of separate analysis of its different parts,' a committee may 'reconstruct' the Tribunal's reasoning and make implicit reasoning contained in the Award explicit to ensure that a 'reasonable' reader can follow the award."[373]

---

[369] C-Mem., ¶ 251; **CL-269**, *Rumeli*, ¶ 83.

[370] Rejoinder, ¶ 133.

[371] C-Mem., ¶ 252; Rejoinder, ¶ 121.

[372] C-Mem., ¶ 252*, citing* **CL-309**, *Daimler*, ¶¶ 78, 135; *see also* **CL-318**, *SAUR International v. Argentine Republic*, ICSID Case No. ARB/04/4, Decision on Annulment, 19 December 2016 [hereinafter *SAUR*], ¶ 216; **CL-289**, *Malicorp*, ¶ 43.

[373] C-Mem., ¶ 253; **CL-228**, *Soufraki*, ¶ 24; *see also* **CL-314**, *Continental*, ¶ 261 ("[I]n determining whether the reasons for a given conclusion on a particular question are sufficient, it is necessary not to look in isolation at the particular paragraphs of the award dealing specifically with that question. Those paragraphs must always be read together with the award as a whole.") *See also* **CL-316**, *Fraport*, ¶ 264 ("[A]n ad hoc committee may clarify the reasons of the decision when they are implicit."); **CL-207**, *Ioan Micula and others v. Romania I*, ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016, ¶ 138 (finding that "[e]ven where reasons on a particular point are missing, a committee may, in certain circumstances, reconstruct the reasons," and collecting cases); **RL-0133**, *Tulip*, ¶ 108 ("If the *ad hoc* committee can explain an award by clarifying reasons that may be only implicit, it may do so and need not annul."); **CL-314**, *Continental*, ¶ 101; **CL-296**, *Aguas*, ¶ 248 (recalling that an "*ad hoc* Committee may further explain, clarify, or supplement the reasoning given by the Tribunal rather than annul the decision."); **CL-47**, *Azurix*, ¶ 360 (reconstructing after identifying the tribunal's implicit findings); **CL-228**, *Soufraki*, ¶¶ 63-64 (reconstructing the tribunal's decision after finding that "the principle on which the Award is based [did] exist."); **CL-261**, *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Annulment Proceeding, 5 February 2002 [hereinafter *Wena*], ¶ 83 ("finding that "[i]f the award does not meet the minimal requirement as to

280. In their Rejoinder, Cube and Demeter point out that the cases cited by Spain actually supported Cube and Demeter's position in the annulment proceeding and "run counter to Spain's suggestion that this Committee can dissect the Tribunal's reasoning and substitute that reasoning for its own should the Committee find it wanting."[374]

**(2) Failure to State Reasons in Determining the Applicable Law and Conclusions on State Aid**

***a. Failure to explain that EU law was deemed not applicable***

281. Cube and Demeter argue that Spain misconstrued the Tribunal's decision with respect to applicable law. Cube and Demeter submit that Spain did not argue in the underlying arbitration that EU laws applied to the merits of the case. Rather, consistent with Cube and Demeter's position, Spain argued that "the ECT itself as well as applicable rules and principles of international law governed the dispute and that Spanish law was only relevant as a factual matter."[375] In response to Spain's reference to the paragraphs in its Counter-Memorial on the Merits where it supposedly addressed this issue, Cube and Demeter submit that in these paragraphs, Spain explained the procedure of notification of State aid but that it did not address the relevance, if any, of such procedure.[376] In any case, Cube and Demeter state that they have always taken the position that issues of State aid were irrelevant.[377]

282. The Respondents argue that the Award explains "why the Tribunal considered EU State aid law to be irrelevant to the question of the Claimants' expectations" and that the Tribunal "found that the obligations regarding state aid under EU law are obligations that fall on Spain" and are not binding on investors.[378] The Respondents note that the Tribunal did acknowledge that the European Commission's Decision on State Aid was introduced into the record but indeed does not address the decision further. According

the reasons given by the Tribunal" annulment is not required because the *ad hoc* Committee can explain "the reasons supporting the Tribunal's conclusions itself"). *See also* Rejoinder, ¶ 122.

[374] Rejoinder, ¶ 127.

[375] C-Mem., ¶ 257; **RL-0093**, Decision, ¶ 159 ("do not suggest that the EU treaties are directly applicable to these proceedings."); *see also* Rejoinder, ¶ 136.

[376] Rejoinder, ¶ 136. *See also* Tr. Day 1 (Ms. Frey), 131:9-19; Respondents' Opening Presentation, Slide 92.

[377] Rejoinder, ¶ 136.

[378] Tr. Day 1 (Ms. Frey), 133-134; Respondents' Opening Presentation, Slide 95.

to Cube and Demeter, the decision "was completely irrelevant to the question of … the incentives under which [Cube and Demeter] invested."[379]

283. The Respondents argue that even though the Tribunal was not asked specifically to decide on whether EU law applied to the merits, it did analyze and provide reasons on the jurisdictional question which necessarily entailed an assessment on whether EU law formed part of the ECT's governing provision.[380] Cube and Demeter submit that this analysis led the Tribunal to conclude that "[t]he wording of Article 26 ECT does not permit of any differentiation as regards the investor authorized to bring a claim to arbitration against another Contracting Party to the ECT."[381]

284. Cube and Demeter further describe the Tribunal's analysis whether EU law was incorporated in the reference to "applicable rules and principles of international law" in Article 26(6) ECT. In making this analysis, the Tribunal considered whether the ECJ's *Achmea* decision had any impact on its conclusion.[382] Furthermore, the Tribunal also considered the relevance of EU law to the merits of the dispute.[383]

285. The Respondents dispute Spain's premise that the Tribunal seemed to admit that treaties of the EU would be "rules of international law, within the meaning of Article 26(6) ECT." Rather, the Respondents submit that the Tribunal "affirmatively rejected that notion, explaining that the reference to 'applicable rules and principles of international law' in Article 26(6) does not include principles that are peculiar to a sub-system of international law, such as EU law, to which some but by no means all ECT Contracting Parties are subject.'"[384]

[379] Tr. Day 1 (Ms. Frey), 136:20-25, 137:1-3; *see also* **RL-0080**, Decision C(2017) 7384 of the European Commission on State Aid regarding the Spanish regime of support for electricity generation from renewable energy sources, cogeneration and waste, State Aid SA.40348 (2015/NN) – Spain, 10 November 2017.

[380] C-Mem., ¶ 258.

[381] C-Mem., ¶ 265; **RL-0093**, Decision, ¶ 138. *See also*, **RL-0093**, Decision, ¶¶ 128-138.

[382] C-Mem., ¶¶ 265-266.

[383] C-Mem., ¶ 267; **RL-0093**, Decision, ¶¶ 156-158.

[384] C-Mem., ¶ 268; **RL-0093**, Decision, ¶ 158 (underlining in the original).

*b. Lack of reasoning why Articles 107 and 108 TFEU were not applied*

286. The Respondents also oppose Spain's contention that the Tribunal "radically ignored" the relevance of Articles 107 and 108 TFEU and that the Tribunal contradicted itself in its finding when it later asserted that the Parties did not raise the relevance of State aid law.[385] Cube and Demeter submit that the Tribunal "rejected the relevance of EU state aid law as part of the governing law of the dispute, rightly acknowledging that the Parties never argued that it was" but acknowledged that "EU law, including state aid law, was relevant as part of the factual background of the dispute."[386]

*c. European Commission's reasoning in the State aid decision not assessed*

287. In relation to EU law and State aid, according to Cube and Demeter, the Tribunal disagreed with Spain and first noted that the State aid obligations are incumbent on Members States and that investors were entitled to assume that Spain had taken them into consideration when drafting its legislation.[387] With respect to RD 661/2007, the EC never opened an independent investigation to assess whether these regulations constituted State aid. Cube and Demeter conclude that there was simply no evidence that RD 661/2007 could constitute State aid, much less unlawful State aid at the time they made their investments and therefore could not have any bearing on their legitimate expectation.[388] Cube and Demeter point out that the Tribunal gave a further reason for rejecting Spain's State aid arguments by holding that at the time when Cube and Demeter invested "it was not at all clear that the tariff regime should be regarded as state aid, let alone impermissible state aid."[389]

288. In regard to Spain's argument that the Tribunal failed to assess the 2017 EC Decision on State Aid, and that this constitutes an unknowable error Cube and Demeter argue that this is incorrect. According to Cube and Demeter, the "Tribunal was clearly aware of the 2017 EC Decision on State Aid, which was issued after the hearing on the merits,

[385] C-Mem., ¶ 270.
[386] C-Mem., ¶ 271; **RL-0093**, Decision, ¶¶ 159-160.
[387] C-Mem., ¶ 273; **RL-0093**, Decision, ¶ 306.
[388] Rejoinder, ¶ 141.
[389] C-Mem., ¶ 273; **RL-0093**, Decision, ¶ 306.

because it allowed the Parties to address it in their Post-Hearing briefs, and this fact is noted in the Decision."[390] Cube and Demeter further point out that the Tribunal is not required to "address every single piece of evidence put before them" and that this argument "could only have merit if the 2017 EC Decision on State Aid would change the outcome of the case."[391]

**(3) Failure to State Reasons for Conclusions on Liability**

***a. FET standard in Article 10(1) ECT***

289. Cube and Demeter assert that there is no contradiction in the Tribunal's decision with respect to the correlation between "legitimate expectations" and the FET standard. According to the Respondents, the Tribunal "simply acknowledges that the term 'legitimate expectations' is not expressly found in the text of the ECT but that it is familiar enough from a wealth of investment treaty cases interpreting FET that it is acceptable to refer to it in the present case"[392] and then clarified that "it is only in so far as the negation of expectations constitutes unfair or inequitable treatment that there can be a breach of [the FET] provision."[393]

290. The Respondents point out that the Tribunal confirmed that a "specific commitment from the host State to each individual claimant" is not necessary to establish a legitimate expectations claim. Cube and Demeter noted the Tribunal's reasoning that "'sufficiently clear and unequivocal' regimes governing a 'highly-regulated industry' with the 'overt aim of attracting investments' by holding out certain prospects to potential investors that a system 'will be maintained for a finite length of time' in order to achieve a 'deliberate policy' can give rise to legitimate expectations, 'provided that those expectations are objectively reasonable' and that 'investments are in fact made in reliance upon them.'"[394] Cube and Demeter also recall that the Tribunal differentiated between different types of Respondents' investments due to the fact that nearly four years passed between the first

[390] C-Mem., ¶ 276; **RL-0093**, Decision, ¶¶ 41-59.
[391] C-Mem., ¶ 277.
[392] C-Mem., ¶ 283.
[393] C-Mem., ¶ 283; **RL-0093**, Decision, ¶ 387.
[394] C-Mem., ¶ 284; **RL-0093**, Decision, ¶ 388.

investment in the PV sector and later decision to invest in the hydro sector.[395] Cube and Demeter point out that the Tribunal went on to assess the changes that the regime and the market underwent during this period and concluded that "a 'legitimate expectations' claim must be based on 'more than a hope,' but instead on 'justified, rational and reasonable' expectations."[396] The Tribunal then assessed "whether such an understanding required a specific level of external due diligence, or whether it was sufficient for investors to have considered a risk, sought advice, and reached a conclusion that was proper."[397]

291. According to Cube and Demeter, the Tribunal explained that there were four reasons why it found their reliance on Spain's representations to be reasonable.[398] The Tribunal considered what degree of departure from the representation would constitute a breach and, thereafter, embarked on a detailed discussion of the distinction between stability and petrification.[399] Furthermore, the Tribunal considered that the State's obligation does "require that where the Respondent represented that certain provisions would be maintained for a certain time, those provisions either are maintained for that time or are adjusted in a manner that does not significantly alter the fundamental economic basis of investments made in reliance on that representation."[400]

292. Cube and Demeter dispute that the Tribunal's decision is contradictory in considering that an expectation must be justified but that the way which the understanding on which the expectations are formed is secondary.[401] The Tribunal considered and rejected the argument that the investors' understanding of the State's representation had to be justified by a certain type of evidence,[402] and second, the form in which is proven is of

[395] C-Mem., ¶ 285; **RL-0093**, Decision, ¶ 392.
[396] C-Mem., ¶ 286; **RL-0093**, Decision, ¶ 393.
[397] C-Mem., ¶ 287; **RL-0093**, Decision, ¶ 396.
[398] C-Mem., ¶ 288; **RL-0093**, Decision, ¶ 401.
[399] C-Mem., ¶ 289; **RL-0093**, Decision, ¶ 412.
[400] C-Mem., ¶ 292; **RL-0093**, Decision, ¶¶ 407-409.
[401] C-Mem., ¶ 294.
[402] C-Mem., ¶ 294; **RL-0093**, Decision, ¶ 393.

secondary significance because a tribunal could not have an exhaustive list of evidence that would provide this conclusion.[403]

293. The Respondents point out that the Tribunal acknowledged that no legal regime can remain petrified but also confirmed that there are limits to the State's right to regulate. On this issue, Cube and Demeter continue to note, and at the same time also point out that Spain is aware, that the Tribunal "found that RD 661/2007 contained a commitment to 'stability' (not petrification)."[404]

294. Cube and Demeter dispute that the Tribunal did not determine how a regulatory change violates the standard. The Respondents argue that contrary to what Spain alleged, the Tribunal "assessed each disputed measure to consider whether it violated the FET provision, and it explained whether each measure either amounted to a mere 'adjustment' of the original regime not arising to the level of a Treaty breach, or whether the measure marked a 'fundamental' change to or repudiation of the economic basis on which the investment was made, in which case it did amount to a violation of the ECT."[405]

295. In relation to Spain's argument that the Tribunal failed to conduct an analysis of the economic impact of the Disputed Measures, the Respondents submit that the Tribunal "reasoned that [the changes to the regulatory framework] could not [be viewed as a breach of the ECT in the aggregate], because they did not affect the fundamental 'economic basis' of the original regime and there was no 'decisive break' from the original regime." The Respondents recall that the Tribunal "found that the measures that make up the New Regulatory Regime – beginning with RDL 9/2013 in July 2013 – 'mark[ed] the beginning of a radical and decisive break with the earlier regime.'"[406]

296. In its Reply, Cube and Demeter argue that there is no contradiction in finding that not every defeat of an investor's expectations will imply a breach of the FET standard, while also finding that the FET standard includes an obligation not to defeat the basic

[403] C-Mem., ¶ 296.
[404] C-Mem., ¶ 299; Mem., ¶ 183; **RL-0093**, Decision, ¶¶ 408-411.
[405] C-Mem., ¶ 302; **RL-0093**, Decision, ¶ 419.
[406] C-Mem., ¶ 304; **RL-0093**, Decision, ¶ 425. *See also* Rejoinder, ¶¶ 151-155.

expectations that Spain created specifically to encourage investments to implement its renewable energy policies. According to the Respondents, the first assertion "provides no qualification on the type of expectations that might be protected…" but merely confirms that holding an expectation is not sufficient to give rise to a valid claim. The second part, Respondents argue, "adds qualifiers to confirm at least some types of expectations that *are* protected: namely, those that (i) the State created, (ii) to induce investment, (iii) to meet its policy objectives."[407]

297. The Respondents also dispute that the Award is inconsistent in stating, on the one hand that an expectation is more than a hope, while also finding that how the investor's understanding is obtained is of secondary significance. The Respondents note that the Tribunal rejected the notion that a particular form of evidence was required to establish how the investors' expectations were created. Furthermore, the Respondents add, the Award contains the Tribunal's assessment of the Cube and Demeter's legal due diligence reasoning for its conclusions.[408]

***b. Lack of valid reasoning for violation of legitimate expectations***

298. Cube and Demeter dispute Spain's argument that the Tribunal contradicted itself or failed to explain adequately the considerations with respect to the four elements that led to the conclusion that Cube and Demeter's reliance on Spain's representations that RD 661/2007 would remain stable for their plants was justified (the *first element*).[409]

(i) First element: Supposed immutability in RD 661/2007

299. On the nature of RD 661/2007 (the *first element*), Cube and Demeter point out that the Tribunal was not making a pronouncement about the rank of RD 661/2007 within the Spanish legal hierarchy, nor what relevance its status would have for purposes of legitimate expectations' in that specific paragraph.[410] Cube and Demeter add that the

---

[407] Rejoinder, ¶ 159 (italics in the original).
[408] Rejoinder, ¶¶ 161-162.
[409] C-Mem., ¶¶ 307-348.
[410] C-Mem., ¶ 312; Rejoinder, ¶ 167. *See also* Tr. Day 2 (Ms. Frey), pp. 117-119; Respondents' Closing Presentation Slide 59.

Tribunal "found that RD 661 contained the clear, unequivocal, and specific representations about the tariff rates that would apply for a defined duration on which the Tribunal determined Cube and Demeter were entitled to rely."[411] The Respondents note that the Tribunal was "fully aware of the 'rank'" of RD 661/2007 within Spanish law as explained in another part of the decision, and also addressed the particular effect of Article 44.3 of RD 661/2007.[412] Cube and Demeter note that the Tribunal "was also careful to explain that its finding of 'stabilization' was not equivalent to a finding of 'petrification'"[413] and in doing so, the Tribunal defined the scope of stabilization contained in Article 44(3).[414] On Spain's argument that the Tribunal failed to consider that RD 661/2007 was itself a modification of prior regimes within the context of Law 54/1997, the Respondents note that this argument was addressed by the Tribunal who simply did not agree with Spain on the particular issue.[415]

300. The Respondents dispute Spain's argument that the Tribunal failed to consider its argument on the fundamental principles of Law 54/1997, *i.e.* economic sustainability and reasonable rate of return.[416] With respect to economic sustainability, Cube and Demeter note that the Tribunal decided that "Spain as a sovereign state has the right to react to changing circumstances in the public interest, but that this right is not unfettered."[417] In relation to the reasonable rate of return, the Respondents note that the Tribunal addressed the issue of this principle as "an overriding element in terms of limiting the remuneration investors could expect"[418] and "addressed a related question with respect to 'reasonable return,' noting that Law 54/1997 treated that term as a floor or lower limit, whereas Spain's New Regulatory Regime treats it as a cap."[419]

---

[411] Rejoinder, ¶ 169*, citing* **RL-0093**, Decision, ¶¶ 398-92.

[412] C-Mem., ¶ 304; **RL-0093**, Decision, ¶¶ 262, 263, 273, 283, 287.

[413] Rejoinder, ¶ 173.

[414] Rejoinder, ¶ 173.

[415] C-Mem., ¶¶ 318-321; **RL-0093**, Decision, ¶¶ 263, 279; Rejoinder, ¶¶ 176-177.

[416] C-Mem., ¶ 322; Rejoinder, ¶¶178-179.

[417] C-Mem., ¶ 322; **RL-0093**, Decision, ¶¶ 289, 409.

[418] C-Mem., ¶ 323; **RL-0093**, Decision, ¶¶ 284-288.

[419] C-Mem., ¶ 324; **RL-0093**, Decision, ¶ 297.

(ii) Second element: Press Release

301. Cube and Demeter dispute Spain's argument regarding the Tribunal's analysis of the Press Release responding that the Tribunal was not required to explain the points raised by Spain (the *second element*).[420] The Respondents note that the Tribunal first analyzed the evidence on the industry awareness that the regime would be stable and not petrified, and then analyzed the Press Release, concluding that it was a statement attributable to the State.[421]

302. The Tribunal also noted, as the Respondents explain, that the Press Release was published by the Ministry of Industry on the date RD 661/2007 was adopted and also on the Council of Ministers website.[422] Cube and Demeter point out that the Tribunal concluded that the Press Release "served as additional evidence as to the meaning and effect of [RD 661/2007]"[423] and "was a strong corroboration that its 'plain language' analysis of RD 661/2007 was correct."[424] The Tribunal does not refer to the Press Release as an independent source of legitimate expectations but as one of the "four reasons" why the Respondents relied on the stability of the regulatory regime and which was justified.[425] Cube and Demeter point out that it was not the only piece of evidence considered by the Tribunal but was "additional evidence that emphasized how clear and specific the statement and the representation from Spain was."[426]

(iii) Third element: Due Diligence

303. Cube and Demeter dispute that the Tribunal contradicted its finding on the reasonable understanding of the incentive regime and that it failed to address the substance of evidence presented by Spain (the *third element*).[427] First, Cube and Demeter allege that Spain "misconstrues the Tribunal's assessment of Cube and Demeter's due diligence and

[420] C-Mem., ¶¶ 326-332.
[421] C-Mem., ¶¶ 327-328; Rejoinder, ¶¶ 180-183.
[422] C-Mem., ¶ 328; **RL-0093**, Decision, ¶ 277.
[423] C-Mem., ¶ 329; **RL-0093**, Decision, ¶ 277.
[424] C-Mem., ¶ 329.
[425] Rejoinder, ¶ 183.
[426] Tr. Day 2 (Ms. Frey), 121:3-8; Respondents' Closing Presentation, Slide 66.
[427] C-Mem., ¶¶ 333-345; Rejoinder, ¶¶ 184-190.

its conclusions on what they reasonably could have understood of the Spanish incentive regime."[428] According to the Respondents, the Tribunal undertook the appropriate level of consideration of Spain's representations[429] and noted that "Cube and Demeter could not justifiably expect no changes to the regime, but rather, they were only entitled to expect that 'the Special Regime would not be significantly amended or abolished retroactively, in respect of plants already registered and operating under the Special Regime.'"[430] The Respondents allege on this point that "the Tribunal's conclusion on the scope of the understanding that was justified is entirely consistent with the Tribunal's findings that some of the Disputed Measures were changes that investors should be deemed to expect, while others were fundamental changes that no investor could have expected."[431]

304. With respect to the Spanish Supreme Court decisions, the Respondents submit that the Tribunal was not persuaded by Spain's argument[432] and that the Tribunal "acknowledged that these judgments presented a 'general' rule that investors do not have 'any vested right' to the continuity of established tariffs."[433] Cube and Demeter allege that "[i]t is only logical that court decisions addressing a different investment framework cannot be said to automatically extend to a future (improved) investment framework." The Respondents note that the Tribunal decided "that the Spanish Supreme Court decisions were concerned with legitimate expectations under Spanish law, not under international law."[434]

305. In relation to the evidence from the renewable energy sector and Cube and Demeter's internal documents, the Respondents also dispute Spain's allegation that "these show a right to amend RD 661/2007 for enrolled plants limited only by the notion of 'reasonable rate of return' or that Claimants should have expected Spain to enact major changes or

---

428 C-Mem., ¶ 336.
429 C-Mem., ¶ 337; **RL-0093**, Decision, ¶ 396.
430 C-Mem., ¶ 337; **RL-0093**, Decision, ¶ 398.
431 C-Mem., ¶ 337.
432 C-Mem., ¶ 339; **RL-0093**, Decision, ¶ 300.
433 C-Mem., ¶ 340; **RL-0093**, Decision, ¶ 300.
434 C-Mem., ¶ 342.

even complete abolishment of the incentive regime."[435] The Respondents note that this issue was fully briefed before the Tribunal and that "(i) the Tribunal was not required to explain its rejection of every argument of Spain or its consideration of every piece of evidence, and (ii) the Decision nevertheless demonstrates that the Tribunal took this type of evidence into account and was not persuaded."[436]

(iv) Fourth element: Invocation of international law

306. Finally, Cube and Demeter dispute Spain's allegation that the Tribunal's reference to international law and the ECT cannot be a source of support for the investors' legitimate expectations (the *fourth element*).[437] Cube and Demeter note that "the Tribunal merely noted that its job was to consider Cube and Demeter's reliance in a context of international law, not Spanish law, which was a reasonable mention to make, particularly in light of Spain's insistence that principles of Spanish law (*e.g.* hierarchy of norms and domestic jurisprudence) would lead to a different conclusion."[438]

***c. Content of legitimate expectations and the assessment of the disputed measures***

307. The Respondents dispute Spain's allegation that the Tribunal committed errors in the assessment of the measures that Cube and Demeter disputed as treaty violations.[439] The Respondents allege that Spain continuously conflated issues of liability with issues of quantum. Cube and Demeter note that, with respect to liability, the Tribunal "found that 'the ECT protects investors against [] fundamental changes,' and it specifically found that Disputed Measures that did not alter or abolish the 'economic basis' of the original regime were not fundamental changes, *i.e.*, they were not sufficient to arise to the level of a Treaty breach, whereas Disputed Measures that did alter or abolish the economic basis of the original regime were fundamental changes that violated the Treaty."[440] Cube and Demeter note that the Tribunal "explained what it meant by a 'fundamental change,'

[435] C-Mem., ¶ 343, *see also,* C-Mem., ¶¶ 344-345; **RL-0093**, Decision, ¶¶ 265-267; 345-349, 304, 338-339.
[436] C-Mem., ¶ 343.
[437] C-Mem., ¶¶ 346-348; Rejoinder, ¶¶ 191-194.
[438] C-Mem., ¶ 347; **RL-0093**, Decision, ¶ 401.
[439] C-Mem., ¶¶ 349-357; Rejoinder, ¶¶ 195-200.
[440] C-Mem., ¶ 350; *see* **RL-0093**, Decision, ¶¶ 412, 427, 473. *See also*, Tr. Day 1 (Ms. Frey), pp. 139-140.

devoting at least a paragraph to each measure it considered."[441] As to Spain's argument that the Tribunal did not explain the "economic basis," Cube and Demeter point that the "economic basis" were understood to be whether incentives were based on the notion of promised tariffs, as in RD 661/2007, or on the notion of "reasonable return" (as a cap), as in the New Regulatory Regime.[442] Cube and Demeter's position is that the Tribunal was referring to the same issue in the Decision when it referred to 'economic basis' or to 'radical shift'.[443] Cube and Demeter conclude that the Tribunal "clearly explained when and why the changes that Spain imposed moved from being mere adjustments to the incentive framework to 'breaking' with the fundamental principles of the original regime."[444]

308. Cube and Demeter point out that the Tribunal agreed with Spain in that the principle of reasonable return existed in the original framework but disagreed that this principle "was used in the same manner in the original regime (*i.e.*, a target, and a floor, to incentivize investment) as in the New Regulatory Regime (*i.e.*, effectively a cap on remuneration)."[445]

**(4) Failure to State Reasons for the Quantification of Damages**

309. Cube and Demeter argue that Spain's complaints about the quantum analysis of the Tribunal reflects "nothing more than its disagreement with the Tribunal's conclusions" and do not meet the high threshold of annulment of the award based on failure to state reasons.[446]

***a. Photovoltaic facilities***

310. With respect to the PV Plants, the Respondents dispute that the Tribunal's calculation with respect to the PV plants contains an inconsistency because the Tribunal awarded

[441] Rejoinder, ¶ 17, *citing* **RL-0093**, Decision, ¶¶ 419, 422-423, 425.
[442] C-Mem., ¶ 351; **RL-0093**, Decision, ¶¶ 373, 412, 427, 473.
[443] Tr. Day 1 (Ms. Frey), pp. 141-142.
[444] Rejoinder, ¶ 198.
[445] C-Mem., ¶ 355; **RL-0093**, Decision, ¶ 287.
[446] C-Mem., ¶¶ 358-369; Rejoinder, ¶¶ 201-203.

damages for the July 2013 measures but not for the prior measures which were more harmful in quantitative terms.[447]

311. Cube and Demeter note that the Tribunal did not base its liability finding on the degree of harm of each measure but rather on the "qualitative effect of each measure and the kinds of reforms that investors in the position of Cube and Demeter should have reasonably expected at the time of each investment."[448] According to Cube and Demeter, while the Tribunal found that the prior measures were mere adjustments to the Special Regime that did not fundamentally alter the remunerative principles of the scheme,[449] it did conclude that the July 2013 measures violated the ECT because these constituted a fundamental change in the regulatory paradigm.[450]

312. Even if Spain were correct, Cube and Demeter allege that this would not merit annulment of the Award because "it in no way undermines the Tribunal's findings on liability or its calculation of damages as to the measures for which it found Spain liable."[451] If anything, if the earlier measures were more harmful than the July 2013 measures, which was the basis of the Tribunal's finding that there was a violation of the ECT, that would logically lead to the conclusion that both set of measures would have violated the ECT, which would only give Cube and Demeter, not Spain, a basis to complain about the Award.

***b. Hydroelectric installations***

313. In relation to the Tribunal's decision to apply a higher discount rate for regulatory risk to the hydro investments (made in 2011-2012) than the PV investments (which were made earlier in 2007-2008), the Respondents dispute Spain's allegation that the Tribunal's decision "represents an implicit assumption 'without any reasoning or basis, that hydroelectric investments appeared to be subject to less regulatory risk in the but-

[447] C-Mem., ¶ 359.
[448] C-Mem., ¶ 361.
[449] C-Mem., ¶ 362.
[450] C-Mem., ¶ 363.
[451] C-Mem., ¶ 365.

for scenario than PV plants.'"[452] The Respondents submit that the Tribunal clearly explained that it applied a higher discount regulatory risk rate to the hydro investment because they had a longer life expectancy and that Cube and Demeter should have anticipated a greater risk of regulatory change during the life of the investments at the time of their later investment in the hydro plants.[453]

314. With respect to Spain's claim of contradiction in the Tribunal's calculation of the regulatory risk discount by applying the 40% reduction to equity cash flows rather than planned revenues, Cube and Demeter submit that the Tribunal clearly set out its reasoning, which Spain may disagree with.[454] Furthermore, Cube and Demeter argue that the method applied by the Tribunal does not "result in a lower regulatory risk discount for the hydro investments than the PV investments."[455]

315. At the Hearing, the Respondents disputed the reductions discussed by Spain, and stated that even though it failed to understand why Spain changed the nature of the reductions, the reduction of 65% for PV plants cannot be compared with the reduction of 51% for hydro plants because the Tribunal added an additional discount to the valuation of the hydro damages, and it did so because of the nature of Claimants' investments in these plants.[456]

## C. THE COMMITTEE'S ANALYSIS

### (1) Applicable Legal Standard

316. As considered above, the starting point of the annulment process is the finality of awards.[457] This principle is especially relevant for the failure to state reasons as a ground for annulment, because potentially more than with the other grounds for annulment, a

---

[452] C-Mem., ¶ 366, *citing* Mem., ¶ 464.

[453] C-Mem., ¶ 367; **RL-0093**, Decision, ¶¶ 467, 506-507.

[454] C-Mem., ¶ 369*, citing* **RL-0092**, *Cube Infrastructure Fund SICAV and others v. the Kingdom of Spain,* ICSID Case No. ARB/15/20, Award, 15 July 2019, ¶ 22.

[455] C-Mem., ¶ 369. *See also*, Tr. Day 2 (Ms. Frey), pp. 100-108.

[456] Tr. Day 2 (Ms. Frey), 101:2-8.

[457] *See* ¶ 93 above.

review of an award's reasoning creates the danger of crossing the line of an appeal.[458] Once a committee starts looking into whether the tribunal's explanation is sufficient to constitute a statement of reasons, it has already embarked upon the quality control of the award.[459]

317. Both Parties have referred to the *MINE* standard pursuant to which the Committee should consider whether the reader of an award is able "to follow how the tribunal proceeded from Point A to Point B."[460] Indeed, the *MINE*-standard provides a useful starting point for determining the Committee's remit pursuant to Article 52(1)(e) of the ICSID Convention. At the same time, it is a starting point, not a comprehensive test.

318. Spain submits that the *MINE* standard is a minimum,[461] whereas Cube and Demeter emphasize that the standard does not involve or imply that a committee is entitled to review the quality or correctness of the reasons provided[462] and should limit itself to determining whether any reasons have been provided.[463]

319. The Committee does not agree with the proposition that "[t]he task of the *ad hoc* committees under Article 52(1)(e) is to determine whether there is a comprehensive and consistent reasoning on the part of the tribunal…"[464] This appears to be an overstatement of the standard identified by the *Sempra* committee, which referred to the requirement of identifying "reasons which are reasonably comprehensible and consistent, demonstrating, on the whole, a logical, and discernable line of thinking."[465]

320. Rather, the Committee agrees with the notion that the ability to follow the reasoning, does not imply a right or ability to review the adequacy of the reasons. At the same time, it is not limited to a complete absence of reasoning as Cube and Demeter submit (see

[458] *See* **CL-158**, C. Schreuer, THE ICSID CONVENTION: A COMMENTARY 1003 (2d Ed. 2009), ¶ 86.

[459] C-Mem., fn 359 *citing* **CL-158**, C. Schreuer, THE ICSID CONVENTION: A COMMENTARY 1003 (2d Ed. 2009).

[460] Mem., ¶ 148; *citing* **RL-101**, *MINE*, ¶ 5.09; *see also* C-Mem., ¶ 245, *citing* **CL-273**, ¶ 5.09.

[461] Mem., ¶ 148.

[462] C-Mem., ¶ 246, *citing* **CL-278**, *Teinver*, ¶ 209.

[463] C-Mem., ¶ 251.

[464] Mem., ¶ 149.

[465] **RL-0097**, *Sempra*, ¶ 167.

below). A more fulsome analysis of the considerations of *MINE* helps to identify the boundaries of the review in annulment. The review focuses on whether the reader can follow how the tribunal proceeded from one point to the next and eventually its conclusion. As put by the *MINE* committee, it "implies that, and only that…" and "[t]he adequacy of the reasoning is not an appropriate standard of review pursuant to Article 52 (1)(e) because it almost inevitably draws an *ad hoc* Committee into an examination of the substance of the tribunal's decision in this regard of the exclusion of the remedy of appeal by Article 53 of the Convention."[466] Similarly, the committee in *Fraport* considered that the "adequacy of the reasoning is not an appropriate standard of review."[467]

321. The ability to follow the reasoning of an award is sufficient and may even include situations where the tribunal made an error of fact or law.[468] Moreover, while some committees have entertained a review involving whether a tribunal's reasons were "contradictory or frivolous," such review should be considered with "prudence and measure" as it will inevitably cross the border to the scrutiny of the quality of the award and thereby to an appeal award.[469]

322. Consequently, in the words of the committee in *Tenaris*, "the Committee will proceed to assess the quality of the Tribunal's reasoning but will limit its examination to the question of whether the reasons are so incoherent and/or contradictory that they cannot be understood and followed. This threshold concerns the totality of the reasons in the Award."[470]

323. Moreover, the Committee agrees with the Respondents and notes that tribunals must be allowed a "degree of discretion" as to the way they express their reasons, and with what

---

466 **RL-101**, *MINE*, ¶¶ 5.08-5.09.

467 **CL-316**, *Fraport*, ¶ 277; *see also* **CL-264**, *CDC*, ¶ 70 (rejecting the suggestion that the annulment review provides a committee with the opportunity to opine on whether the tribunal's analysis was correct or its reasoning persuasive).

468 **RL-101**, *MINE*, ¶ 5.09; *see also* **CL-150**, *Vivendi*, ¶ 64 (explaining that the correctness of the reasons is beside the point in terms of Article 52 (1)(e)).

469 **CL-188**, *Tenaris*, ¶ 113.

470 **CL-188**, *Tenaris*, ¶ 114.

level of detail.[471]  Insofar as there are alleged inconsistencies in an award, these cannot lead to annulment unless they are so contradictory that they cancel each other out.[472]

324. The Committee also notes that in reviewing a tribunal's reasoning, the committee may clarify the reasons of the decision when they are implicit.[473]  Finally, the Committee also agrees with the Respondents when referring to the considerations of the committee in *Teinver*, "that a tribunal has no duty to follow the parties in the detail of their arguments, and that the sole fact of failing to address one or more of the same does not in itself entail annulment, unless the argument in question was so important that it would clearly have been determinative of the outcome.  Likewise, a tribunal has no duty to address in its award all the evidence that is in the record, and failure to do so does not entail annulment unless the evidence that such tribunal failed to address was manifestly so important as to change the outcome of the arbitration.  Apart from that situation, it is not the role of a Committee to step into the shoes of an arbitrator and engage into speculation as to the relevance that a piece of evidence that a tribunal did not address would have had on the award."[474]

325. To conclude, the review of whether an award has failed to state the reasons on which it is based is a fine balancing act.  It is for the moving party, *i.e.* Spain, to show that there is an absence of reasoning within the meaning of Article 52(1)(e) of the ICSID Convention.  In this particular instance, the admonition to consider an award as a whole is particularly relevant,[475] because many of the arguments presented in the arbitration are interdependent and overlapping.  As illustrated by the cases referred to above, a tribunal has considerable discretion on how it chooses to present its findings, and which elements of the parties' submissions and evidence it considers decisive.  It is not for a committee such as this to substitute its views for those of the Tribunal.  Furthermore, a tribunal need not address every argument or piece of evidence presented by the parties;

---

[471] *See* **CL-150**, *Vivendi*, ¶ 65; **RL-0152**, *Amco*, ¶ 7.56; *see also*, **CL-314**, *Continental*, ¶ 103.

[472] *See* **CL-150**, *Vivendi*, ¶ 65; **CL-314**, *Continental*, ¶ 103; *See also* Rejoinder, ¶ 121; Respondents' Opening Presentation, Slide 85.

[473] **CL-316**, *Fraport*, ¶ 264; *see also* Rejoinder, ¶ 202.

[474] **CL-278**, *Teinver*, ¶ 210. *See also* C-Mem., ¶ 250.

[475] **CL-228**, *Soufraki*, ¶ 24.

in cases where a tribunal has failed to deal with a question submitted to it, the appropriate remedy under the ICSID Convention is not annulment, but rather an application for a separate supplementary decision.[476] And finally, the Committee reiterates that this is particularly relevant where the dispute involves issues of law that are subject to numerous other proceedings in different legal settings, with decisions being promulgated that may or may not have direct or indirect relevance for the present proceedings, but which fall outside the scope of annulment, which is limited to the arguments and submissions presented to the Tribunal in the underlying arbitration.

**(2) Failure to State Reasons in Determining the Applicable Law and Conclusions on State Aid**

***a. Failure to explain that EU law was deemed not applicable***

326. Spain's arguments under this header have evolved somewhat in its various submissions. In its Memorial, Spain takes issue with the Tribunal's considerations in paragraph 159 of the Decision which refers to the decision that EU treaties are not directly applicable to these proceedings. In this specific paragraph, the Tribunal also decides that while the rules established by EU secondary legislation are EU law, they are not principles of international law within the meaning of Article 26(6) ECT. In that context, it submits that the Tribunal failed to explain the reasons why Articles 107 and 108 TFEU were not applied, and why the EC's reasoning regarding the State aid decision has not been assessed (see below).

327. At the Hearing, however, Spain put a slightly different slant on this argument, first by emphasizing that "the Cube Award does not specifically address the applicable law in a separate section. On the contrary, the Tribunal analyses this matter when dealing with the intra-EU jurisdictional objection with regard to both jurisdiction and the merits."[477]

[476] Rejoinder, ¶ 133.

[477] Tr. Day 1 (Ms. Fatás Pérez), 36:1-6.

328. It is not entirely clear what Spain's interest is in arguing that a separate section should have been dedicated to the issue of the applicable law as such. Furthermore, the Committee is not persuaded that Spain requested the Tribunal to do so.

329. Spain's arguments relating to the alleged failure to provide reasons in determining the applicable law effectively relate to the issue of State aid law. At the Hearing, Spain made additional references to the Tribunal's analysis in relation to jurisdiction and in doing so provided a very high level overview of the arguments discussed under the first annulment ground, the alleged manifest excess of power,[478] but these references do not constitute an independent basis for the allegation that the Tribunal failed to provide reasons, and in any event were not submitted in this form until at the Hearing.

330. Furthermore, the Tribunal did address the applicable law, both in relation to jurisdiction, and to a lesser extent in relation to the merits. The fact that the Tribunal addressed the applicable law in the way it did, primarily in the context of jurisdiction, is understandable and commensurate with the arguments made by the Parties and the focus of their submissions.

331. By reference to the slides used by Spain at the hearing in the underlying arbitration, and by reference to the submissions in the underlying arbitration, Cube and Demeter demonstrated that Spain referred to the State aid notification procedure as part of the factual context, to "make the [Tribunal] aware of the existence of said procedure."[479] It is not the case that the Tribunal disregarded EU State aid law. Rather, and understandably given the way Spain presented the issue, it considered EU State aid law in the context of the factual background and when assessing whether Claimants' expectations were legitimate. The Committee agrees with the Cube's and Demeter's point that the Tribunal found that the obligations regarding State aid under EU law are obligations that fall on Spain; they are not obligations that bind investors.[480]

[478] Tr. Day 1 (Ms. Fatás Pérez), 36:1-16.

[479] Respondents' Opening Presentation, Slide 92.

[480] Tr. Day 1 (Ms. Frey), pp. 133-134.

*b. Lack of reasoning why Articles 107 and 108 TFEU were not applied*

332. In the annulment proceedings, and in particular at the Hearing, Spain argued that the Tribunal failed to provide reasons because it was inconsistent in its reasoning in relation to Articles 107 and 108 TFEU against the background of the requirement of Article 26(6) ECT to apply principles of EU law. Even if one were to assume that in the underlying arbitration Spain had argued that EU State aid law, or at least Articles 107 and 108 TFEU should be deemed applicable pursuant to Article 26(6) ECT, which is not how Spain presented its case, the Committee does not see a basis for concluding that the Tribunal failed to provide reasons. Namely, the Tribunal considered first, that while the treaties are international agreements, they do not thereby become principles of international law. It then considered that there was no basis for concluding that the EU treaties are directly applicable to these proceedings. It then went on to consider that while the rules established by EU secondary legislation, such as rules against State aid, are EU law, they plainly cannot be principles of international law within the meaning of Article 26(6) ECT.[481]

333. Insofar as Spain seeks to argue that the Tribunal incorrectly considered that all rules against State aid are contained in secondary legislation, the Committee considers that this reflects an incorrect reading of the Decision. The Tribunal explicitly considers that while EU treaties, which obviously includes the TFEU, are international agreements, that does not make them principles of international law pursuant to Article 26(6) ECT and they are therefore not applicable.[482] This applies *a fortiori* to secondary provisions of EU law, such as (non-treaty) rules against State aid.

334. Insofar as Spain submits that the Tribunal failed to provide reasons where it considered the relevance of EU law to the merits of this case and considered that the applicable law is international law and particularly the ECT and not EU law, the Committee fails to see that this would amount to a failure to provide reasons, let alone that this has a bearing on the considerations in relation to State aid. In paragraphs 156-158 of the Decision, the

[481] **RL-0093**, Decision, ¶¶ 158-159.

[482] **RL-0093**, Decision, ¶¶ 158-159.

Tribunal set out its reasoning extensively and specifically in relation to the relevance of the law to the merits of this case.[483] It considered and rejected the notion that Article 26(6) ECT includes "principles that are peculiar to a sub-system of international law, such as EU law, to which some but by no means all ECT Contracting Parties are subject."[484] The Tribunal then continued to address why it disagreed with Spain's position that investors such as Cube and Demeter should have known that any State aid scheme has to comply with EU State aid rules, namely that State aid obligations are incumbent on Member States and that "investors were entitled to assume that they had been taken into account by [Spain] when drafting its legislation."[485] It also noted that at the time when Cube and Demeter invested "it was not at all clear that the tariff regimes should be regarded as State aid, let alone impermissible State aid."[486]

335. Thus, the Tribunal considered Spain's position and gave a reasoned rejection thereof, commensurate with Spain's position in the underlying arbitration that State aid law, and in particular the procedure envisaged by Articles 107 and 108 TFEU, might be relevant as part of the factual background.

***c. European Commission's reasoning in the State aid decision not assessed***

336. Finally, as to the decision of the 2017 EC Decision on State Aid, Cube and Demeter acknowledge that while the Tribunal allowed the Parties to comment on the decision, it is true that the Tribunal did not address this decision further.[487] However, as Cube and Demeter submit, in the reasoning of the Tribunal in relation to the assessment whether Cube and Demeter's expectations were legitimate, it did not consider EU State aid law relevant. It therefore did not need to address explicitly whether and, if so, to what extent it considered the EC's decision relevant.

337. It is not for this Committee to reassess the Tribunal's analysis or to seek to rewrite or enhance the Tribunal's reasoning, or, as Spain rightly submits "reconstruct what the

[483] **RL-0093**, Decision, ¶ 156.
[484] **RL-0093**, Decision, ¶ 158.
[485] **RL-0093**, Decision, ¶ 306.
[486] **RL-0093**, Decision, ¶ 306.
[487] Tr. Day 1 (Ms. Frey), pp. 133-134.

award should have said and did not say."[488] A tribunal has considerable freedom on what arguments and evidence to address and what not. It need not explicitly address every argument made. A failure to provide reasons, in any event, requires that the failure to address the specific argument or evidence would have changed the outcome of the award.[489] Spain has not demonstrated that the Tribunal would have decided different with respect to Cube and Demeter's expectations in light of the 2017 EC Decision on State Aid, and this is supported by the fact that this particular instrument was adopted long after Cube and Demeter made their investment and it relates to a different incentives regime.

338. Insofar as Spain invokes the *BayWa* award in support of their argument that investors cannot have a legitimate expectation of treatment because it is unlawful under the law of the host state, the Committee considers that this does not assist Spain. Regardless of the relevance and impact of this (majority) decision, as the Tribunal decided there is no evidence in the present case that RD 661/2007 was State aid, let alone evidence that RD 661/2007 constituted unlawful treatment.[490] In any event, the Committee reiterates that the standard pursuant to Article 52(1)(e) of the ICSID Convention is the failure to state reasons, which, given the Tribunal's assessment of the irrelevance of EU State aid law in determining Cube and Demeter's legitimate expectations, has not been met.

**(3) Failure to State Reasons for the Conclusions on Liability**

***a. FET standard in Article 10(1) ECT***

339. Essentially, Spain argues that the Tribunal's reasoning in relation to the FET standard in Article 10(1) of the ECT is unsupported and inconsistent. Spain's argument consists of two parts, a more general discussion of the Tribunal's decision, and a subsequent discussion of specific elements of the decision allegedly containing contradictions and gaps.

---

[488] Reply, ¶ 269; *see also* **Rl-0150**, *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais S.A.*, ICSID Case No. ARB/81/2, Decision on the Application for Annulment, 3 May 1985, ¶ 151.

[489] **CL-278**, *Teinver*, ¶ 210.

[490] **RL-0093**, Decision, ¶ 306.

340. The thrust of the general argument is that there is inconsistency in the Tribunal's considerations in relation to Article 10(1) ECT and whether there is a correlation between the FET standard in the ECT and the notion of legitimate expectations. Specifically, Spain argues that there is tension between the considerations in relation to the regulatory power of the state which distinguish between stability and petrification.

341. It is difficult to see what the actual inconsistency or contradiction is that Spain takes issue with. The Tribunal builds up its decision in a comprehensible way by first explaining that Article 10 ECT does not protect legitimate expectation as such, but that it is nevertheless a concept that can be usefully deployed to analyze the claim of an alleged breach of an FET provision. It then further considers that this does not imply that every breach of an investor's (subjective) expectations necessarily implies a breach of the FET standard, but that nevertheless, the applicable standard does not require that a specific commitment be made to each individual claimant in order for a legitimate expectation to arise.[491]

342. The essence of Spain's objection appears to be its dissatisfaction with the outcome, namely applying a standard that provides protection to investors based on the (general) establishment of a regulatory regime aiming to attract investors rather than requiring individual commitments. Thus, Spain objects to the assessment and the Tribunal's findings, with which it disagrees. It is not for the Committee to second-guess the evaluation of evidence, its remit is to review whether the Award fails to set out reasons for the decision contained therein.

343. Specifically, Spain takes issue with the Tribunal's considerations regarding the duty to provide stability while not necessarily imposing petrification, in that investors have no right to insist that a system of remuneration remains unchanged.[492] Spain characterizes the Decision in this respect as "notoriously confusing and contradictory,"[493] and suggests that an analysis of the economic impact of the Disputed Measures would have been

[491] **RL-0093**, Decision, ¶¶ 386-388.
[492] Mem., ¶ 184; Reply, ¶ 303.
[493] Mem., ¶ 186.

required.[494] However, the Committee, as Cube and Demeter explain, considers that there is no contradiction and/or an absence of reasons of the level required by Article 52(1)(e) of the ICSID Convention.[495]

344. The Committee reiterates that it is the task of an annulment committee, when reviewing whether there is a failure to provide reasons, to review the Tribunal's decision as a whole. The requirement to provide reasoning does not require or even justify a review of every single step in the decision-making process, nor a review whether every argument has been addressed, or a reassessment of the evidence and factual circumstances. In the present case, the Tribunal carefully reviewed Cube and Demeter's expectations and the legitimacy thereof. It came to a nuanced conclusion, distinguishing the more straightforward situation at the time of the photovoltaic investments in 2008, and the more ambiguous situation at the time of the hydro investments in 2011-2012.

345. The Tribunal considered that there is not a single prescribed form or acceptable manner in which investors confirm their understanding of a State's representation.[496] While on the one hand, the FET provision "does not require the maintenance by the Respondent of every aspect or every detail of the regulatory regime which existed when the Claimants made their investments," the FET obligation does require that "where the Respondent represented that certain provisions would be maintained for a certain time, those provisions either are maintained for that time or are adjusted in a manner that does not significantly alter the fundamental economic basis of investments made in reliance on that representation."[497] On this basis, the Tribunal assessed the Disputed Measures, and concluded that the New Regulatory Regime beginning with RDL 9/2013 "marked the beginning of a radical and decisive break with the earlier regime", with the changes constituting a "shift to a policy based not upon tariffs and premiums fixed for long

[494] Mem., ¶ 189.

[495] C-Mem., ¶¶ 282-293.

[496] C-Mem., ¶ 295.

[497] **RL-0093**, Decision, ¶¶ 411-412.

periods but upon the concept of the 'reasonable rate of return' and a 'reasonable return' over the lifetime of a plant."[498]

346. The Tribunal then considered that based on four reasons, Cube and Demeter's reliance on Spain's representation was justified – a finding with which Prof. Tomuschat in his Separate and Partial Dissenting Opinion disagreed. These separate reasons will be addressed below. At the outset, however, the Committee notes that the fact that there was a dissent regarding the evaluation of these reasons, if anything, demonstrates that a different assessment of the law and facts by one of the members of the Tribunal cannot be equated with a failure to provide reasons by the entire Tribunal.

***b. Lack of valid reasoning for violation of legitimate expectations***

347. The Tribunal by majority considered that Cube and Demeter's reliance on the representations by Spain in relation to the stability of the regulatory regime was justified for four reasons. Spain alleges that the considerations of the Tribunal contain contradictions and failures and gaps in reasoning.[499] As stated above, the Tribunal's decision needs to be reviewed as a whole, rather than by carving off distinct building blocks that are referred to in its reasoning. For the sake of completeness, the Committee will review the arguments made in relation to these four elements.

(i) First element: Supposed immutability in RD 661/2007

348. The first component of this argument relates to RD 661/2007, the text of which the Tribunal stated to be clear and specific. In particular, the Tribunal considered that "[t]he representations could be read by all, in a text with the force of law, accompanied by an explanatory preamble."[500] Spain argues that this "is manifestly wrong, since it equates the RD to a rule 'with the force of law.'"[501]

[498] **RL-0093**, Decision, ¶ 425.
[499] Mem., ¶ 197.
[500] **RL-0093**, Decision, ¶ 401.
[501] Mem., ¶ 207.

349. This argument appears to be based on a misunderstanding of the Decision or at least an attempt to reargue the nature of the relevant legislation. The Decision does not contain wording on the hierarchy of the Royal Decree, and while that may, in Spain's view, be a failing in the Tribunal's reasoning, it does not make the statement that the Royal Decree has force of law incorrect, let alone "manifestly wrong", or even constitute annullable flaw of the Award.

350. In addition, Spain argued that the failure to address its argument that as a Royal Decree, RD 661/2007 could always be amended constitutes an example of inadequate reasoning by the Tribunal. Furthermore, Spain argued that the decision is contradictory by considering on the one hand that Article 44(3) of RD 661/2007 is clear and specific while at the same time recognizing that it does not explicitly exclude the possibility of its repeal by a later law.[502]

351. First, inadequate reasons is not as such a sufficient ground for annulment. Second, the argument about the hierarchy of legal norms is closely connected with the argument relating to the content and nature of the relevant Royal Decree and other laws. What Spain appears to do is to unpick the Tribunal's decision and to take issue with and reargue certain aspects and issues, which have been addressed holistically by the Tribunal resulting in a skewed analysis of the decision, compounded by Spain's attempt to support its argument by pointing out that other tribunals have decided certain issues differently.

352. The Tribunal addressed Article 44.3 of RD 661/2007, and its nature as a stability guarantee while not imposing petrification, and considering that Article 44.3 stabilized only certain parts of the RD 661/2007 framework. The Tribunal also addressed Spain's argument that RD 661/2007 was a modification of prior regimes and that it must be viewed in the context of the law it implemented, namely the Electricity Sector Act. It also addressed the arguments on the fundamental principles of the electricity law, namely

[502] Mem., ¶ 217.

economic sustainability in reasonable rate of return and their impact on the meaning of RD 661/2007.

353. Specifically, the Tribunal found that Spain as a sovereign state had the duty to act in the public interest and had the right to react to changing circumstances and implement a change in government policies if they become unsustainable.[503] The Tribunal effectively set the parameters of this right of an investor to make certain changes while being obliged not to alter the fundamental economic basis of investments made.[504] The Tribunal thus provided a high level framework on which it based its assessment of the facts and circumstances raised and discussed by the Parties, including in particular whether the reference to the guarantee of a reasonable return also implied a cap of the remuneration that any individual electricity producer was entitled to expect.[505]

(ii) Second element: Press Release

354. The second specific element relied on by Spain is the Press Release issued after the approval of RD 661/2007. Spain argues that again, the Tribunal confused the status of this RD 661/2007, because in its discussion of the Press Release the Tribunal refers to RD 661/2007 as "a law" by stating that "these words [of the Press Release] reflect the statute itself."[506] Spain also added that the Tribunal failed to clarify whether it deemed this Press Release an independent source of the legitimate expectations or not.[507] Spain argues that the Press Release is not a Government Press Release, and moreover does not explicitly "speak of the petrification of the system."[508]

355. Cube and Demeter submit that the Tribunal was not required to explain these aspects, and that the reasoning on the importance of the Government Press Release is clear and

[503] **RL-0093**, Decision, ¶ 409.
[504] **RL-0093**, Decision, ¶ 412.
[505] **RL-0093**, Decision, ¶ 297.
[506] Mem., ¶ 300.
[507] Mem., ¶ 300.
[508] Mem., ¶ 312.

convincing. The conclusion that it was "a statement attributable to the State," only served as additional evidence as to the meaning and effect of that applicable regime.[509]

356. Spain seems to contradict itself: on the one hand it seems to question whether in the Tribunal's view the Press Release constitutes an independent source of legitimate expectation and on the other hand seems to posit that it does.[510]

357. In fact, the Tribunal refers to the Press Release in its discussion of meaning and scope of RD 661/2007 and stresses that the wording used in the Press Release matches the wording in the Decree. It refers to the Press Release as support for its finding.[511] Insofar as Spain takes issue with the qualification of the Press Release as emanating from the Government, this is a decision explicitly and amply reasoned by the Tribunal in its Decision where, for the reasons stated, it determines that the Press Release "is undoubtedly a statement attributable to the State."[512]

358. It is difficult to see how the Tribunal's careful considerations could be seen to be contradictory, let alone to such an extent that or otherwise so defective as to justify the conclusion that these passages reflect a failure to provide reasons. Rather, by seeking to segregate this building block in the reasoning of the Tribunal, Spain ignores the overall structure of the Tribunal's reasoning, illustrating the pitfalls of considering the reasoning piecemeal rather than holistically.

(iii) Third element: Due Diligence

359. The third element of the Tribunal's reasoning that Spain takes issue with relates to the Tribunal's consideration that "the Respondent has not shown that any more exhaustive legal analysis would have produced any different understanding of the Spanish measures."[513] Spain alleges that this consideration entails a serious lack of valid grounds

---

[509] C-Mem., ¶ 328.

[510] Reply, ¶ 362 ("paragraph 401 of the Decision makes it clear that the Press Release is a source of the legitimate expectations that the Decision itself places at the same level as RD 661/2007").

[511] **RL-0093**, Decision, ¶ 401 ("those representations were emphasized by their clear and specific restatement in the Government Press Release issued on the same day as RD 661/2007").

[512] **RL-0093**, Decision, ¶ 277.

[513] **RL-0093**, Decision, ¶ 401.

in addition to forming a serious breach of essential procedural rules.[514] Spain argues that the Tribunal contradicted itself by finding, on the one hand, that Cube and Demeter confirmed their understanding of the regulatory regime with external legal counsel and, on the other hand, that Cube and Demeter's claim to have understood the regime did not permit any retroactive changes was not justified; that the Tribunal failed to engage with the substance of a number of Spanish Supreme Court Decisions and does not explain whether they are applicable or not to the changes forming the Disputed Measures in the arbitration; and that the Tribunal failed to explain why it was not persuaded by Spain's evidence that the renewable energy industry purportedly knew to expect changes to the regime or Cube and Demeter's own documents that Spain argued showed awareness of the possibility of changes.

360. Spain's description of the Decision fails to reflect the Tribunal's considerations fully and/or correctly. Notably, the language used in the header B 3.2(c) of its Memorial ("the absence of due diligence by the claimant's and any evidence to support the reasonableness of their alleged understanding as at the date of the investments") shows that Spain essentially seeks a re-evaluation of the facts and circumstances as assessed by the Tribunal. Spain clearly disagrees with the outcome of the Decision and argues that the Tribunal's consideration and reasoning is unfair,[515] and that it amounts to a reversal of the burden of proof.

361. In fact, the Tribunal's analysis is much more comprehensive and nuanced than Spain acknowledges. In relation to the understanding of the incentive regime, the Tribunal considered the opposite of what Spain alleges, namely that Cube and Demeter did take professional advice, albeit that there was no evidence in the record of a detailed written analysis of the regulatory risk to the PV plants.[516] And contrary to what Spain argues, the Tribunal did not consider that Cube and Demeter could have legitimately understood the regime not to permit any retroactive changes; rather, its holding was more limited –

[514] Mem., ¶ 318.
[515] Mem., ¶ 335.
[516] **RL-0093**, Decision, ¶ 304.

namely that the due diligence conducted "[did] not cast doubt upon the stability or the duration of the Special Regime established by RD 661/2007."[517]

362. In relation to the Spanish Supreme Court decisions, Spain again seeks to take issue with the evaluation and decision of the Tribunal as it argues that the Tribunal failed to give "valid" reasons,[518] and that it should have considered and quoted Spanish Supreme Court cases law more extensively. The evaluation of case law, however, is the prerogative of the tribunal, and it is clear that the Tribunal engaged with Spanish Supreme court decisions and their potential relevance and impact.[519] Validity of reasoning is in any event not the appropriate standard for annulment, and there is no obligation to paraphrase case law and all relevant documentation comprehensively. Furthermore, as the Tribunal considered, the decisions do not address RD 661/2007 but its predecessors. Moreover, as Cube and Demeter point out, after having reviewed the Spanish decisions, the Tribunal considered that in any event these decision focus on the availability of causes of action and remedies under Spanish law, and not on the question of the position under the ECT.[520]

363. Also in relation to the last prong of its argument relating to the reasonableness of the investors' understanding, by reference to the views expressed by business associations and others, and by reference to internal documentation of Cube and Demeter, Spain essentially seeks a revision of the Tribunal's decision. The Tribunal considered the evidence and evaluated all of these instruments (which Spain acknowledges: "the Decision does not deny the existence of such evidence, but surprisingly it barely mentions it and tries to downplay its impact").[521] Consequently, this element of Spain's request cannot in itself or in conjunction with the other aspects of its submission justify the conclusion that the Tribunal has failed to set out reasons.

[517] **RL-0093**, Decision, ¶ 394.

[518] Mem., ¶ 341.

[519] **RL-0093**, Decision, ¶¶ 299-300.

[520] **RL-0093**, Decision, ¶ 300.

[521] Mem., ¶ 370.

(iv) Fourth element: Invocation of international law

364. The fourth element referred to by the Tribunal is the consideration that "the significance of Respondent's representations as to the stability of RD 661/2007 is ultimately not a matter of Spanish law but of international law, operating in the context of Article 10(1) ECT."[522] Spain appears to argue that this is a vicious cycle and that the reference to Article 10 ECT does not constitute an autonomous source of expectations. In fact, the section from the Decision which Spain quotes in support of its submission that the Tribunal failed to give reasons (paragraph 386-393, headed "Legitimate Expectations and Fair and Equitable Treatment") precedes the paragraph in which the Tribunal sets out the four reasons for accepting that Cube and Demeter's reliance on representations were justified, and in these paragraphs effectively "sets the scene" for the subsequent more detailed considerations. One element thereof is that the review of legitimate expectations is to be conducted on the basis of international law, rather than on the basis of Spanish law.

365. This section therefore clearly contains the reasons of the Tribunal, which Spain may or may not agree with. As Cube and Demeter submit, Spain's argument appears to reflect a misunderstanding of the structure of the decision. The Committee does not consider that the reference to international law and its relevance for determining the significance of the Spain's representations as to the stability of the regulatory framework constitutes a failure in the Tribunal's reasoning, let alone a failure of a level sufficient to satisfy the standard of Article 52 of the ICSID Convention.

***c. Content of legitimate expectations and the assessment of the disputed measures***

366. Building on the arguments discussed above, Spain submits in conclusion that the Tribunal's assessment of the conclusions on liability "evidence lack of valid grounds."[523] As the Committee considered above, Spain has not shown that the Tribunal's reasoning fails to provide reasons for the Tribunal's considerations in relation to the standard of

[522] **RL-0093**, Decision, ¶ 401.
[523] Mem., ¶ 451.

legitimate expectations. Essentially, therefore, the arguments in relation to the content of the legitimate expectation and the assessment of the Disputed Measures are moot.

367. In relation to the regime and the Disputed Measures that made up the regime, while the Tribunal accepted that Spain had been entitled to make some changes to the existing regime(s), it held that the move to a regime based on capped "reasonable returns" in RD 661/2007 amounted to a fundamental change. There is no inconsistency between this conclusion and the rejection of Cube and Demeter's position in the underlying arbitration that they could have expected the regime of RD 661/2007 to remain unaltered.

368. The Tribunal extensively discussed the scope of Spain's representation, in particular in relation to the cap allegedly imposed by RD 661/2007. It considered and addressed the meaning and scope of the concept of "a reasonable return" and while it rejected the notion of a guarantee, it considered that "conversely there is no indication that increases resulting from the annual updating of tariffs, premiums and supplements in accordance with Article 44.1 RD 661/2007 could be withheld or reduced if it was considered that a particular plant was earning more than a reasonable return."[524] The Committee is not persuaded that the Tribunal was inconsistent and/or otherwise failed to provide reasons by referring intermittently to "economic basis," "harm'" "injury" and "radical shift." Effectively, it introduced a materiality test in that it might not be reasonable for an investor to take a promise at face value, even though it could not legitimately expect the tariff structure of RD 661/2007 to remain in force in unabridged and unamended form.

369. In its submissions in the annulment proceedings, Spain has identified individual phrases in the Decision and its considerations, juxtaposed these and seeks to argue that these components of the Decision are inconsistent. What the Tribunal in fact has done is to undertake a comprehensive overview of pros and cons, weighing factors and ultimately coming up with an assessment (by majority). By picking out single sentences and phrases, the logic and structure of the decision is overlooked. The fact that a dissenting opinion was issued illustrates that there is not necessarily a single way to weigh factors and assess circumstances. It is not probative, in and of itself, of a failure to provide

[524] **RL-0093**, Decision, ¶ 287.

reasons. Equally, the fact that other tribunals in more or less similar situations have ruled differently, is not decisive.

**(4) Failure to State Reasons for the Quantification of Damages**

***a. Photovoltaic facilities***

370. In relation to the impact of the Disputed Measures on the photovoltaic facilities, the Tribunal distinguished between disputed regulatory measures prior to July 2013 and post-July 2013. In relation to the former, the Tribunal held that Spain did not breach the ECT or – in the case of the 7% tax and the water tax – the issues were deemed outside the Tribunal's jurisdiction. On these bases, the Award found that no compensation should be awarded for the damage caused by the pre-July 2013 measures. However, the Tribunal found that the post-July 2013 disputed measures did breach the ECT, and therefore that compensation was required for said measures.[525] Spain argues that the Decision contains an inconsistency insofar as the Tribunal considered that while the measures from July 2013 are in breach of the ECT they have a smaller economic impact than the measures from before July 2013, which are consistent with the ECT according to Tribunal.

371. Cube and Demeter rebut this argument by pointing out that the Tribunal's findings were not based on the degree of harm but rather the nature of the measures. While the quantitative impact of the earlier measures may have been larger, the nature and fundamental change in the regulatory measures as of July 2013 meant that only the impact of these measures justified compensation.

372. Spain expanded this argument at the Hearing, including by introducing slightly different numbers and/or calculations, intended to support the argument that the impact of post-July 2013 measures was smaller, namely 26% of the damages claimed compared with the impact of pre-July 2013 measures. Cube and Demeter took issue with these revised presentations and calculations. The Committee is of the view that indeed the Hearing on

[525] Tr. Day 1 (Ms. Oñoro Sainz), 63:6-17.

Annulment is not the time or place to present new calculations, even if they are intended to illustrate and expand arguments made in general terms earlier.

373. The considerations in relation to the hydroelectric installations are more elaborate and multifaceted (see below) than the photovoltaic installations but they are illustrative in relation to the distinction made by the Tribunal between identifying the fundamental nature of changes and quantification. The Tribunal refers to the fundamental characteristics of the Special Regime,[526] and states that the majority of the Tribunal is of the view that the FET standard in the ECT protects investors against the fundamental changes constituted by the changes of 2013-2014. It then caveats the conclusion, however, by referring to the need subsequently to assess the impact of the changes. It states explicitly that "[i]t is possible that there might be a radical change in regime which in fact produces no harmful effects on investors."[527]

374. Spain's argument that the Tribunal's decision in this regard is inconsistent is prefaced on the assumption that the radical or fundamental nature of the changes in the regulatory regime should be equated with and measured by reference to the quantitative impact of these measures. Notably, in its Memorial,[528] Spain argues that the Tribunal seems to have taken into account the radical nature of the change and then continues to state that this contradicts the calculations made by the Tribunal which indicate that the measures prior to July 2013 accounted for no less than 75% of the alleged damage to the PV installations.[529]

375. Spain itself quotes paragraph 425 of the Decision where the Tribunal refers to the "radical and decisive break with the earlier regime."[530] That is a statement of a qualitative nature and the Tribunal does not rely on any quantification in support of its conclusion. In the next paragraphs the Tribunal expands its reasoning, all in qualitative terms, to come to the conclusion that the regulatory changes of 2013-2014 constituted a

[526] **RL-0093**, Decision, ¶ 354.

[527] **RL-0093**, Decision, ¶ 355.

[528] Mem., ¶ 455.

[529] Mem., ¶ 456.

[530] **RL-0093**, Decision, ¶ 425.

fundamental change. In relation to the photovoltaic investments it concludes that "[t]he question of quantum is considered below'"[531] illustrating that the quantitative impact is simply not part of the equation. Rather, as the citation above demonstrates, the Tribunal expressly considered that a fundamental change does not produce harmful effects on investors. Consequently, Spain has failed to show that in relation to the photovoltaic installations, the Tribunal failed to set out reasons for the calculation of damages.

***b. Hydroelectric installations***

376. With respect to the hydro plants, Spain's argument is similar, but additionally addresses the alleged contradiction in the Tribunal's reasoning by applying a discount not applied by either Party's experts. Namely, Spain argues that the Tribunal's method of calculating the regulatory risk discount – *i.e.*, by applying a 40% reduction to equity cash flows rather than to plant revenues – results in an unexplained contradiction and is likewise incorrect.

377. First, the Tribunal clearly stated its reason for this decision in the Award, explaining that "the discount should be applied to equity cash flows, not to revenue or project cash flows. The 40% discount is the Tribunal's assessment of regulatory risk applied to recoverable damages, not revenue."[532] This was the basis of its instructions to and exchanges with the experts,[533] and cannot be said not to be a reasoned decision.

378. In its Reply and at the Hearing, Spain further amplified its argument by stating that the failure to apply the approach agreed by the experts led to the application of a 51% reduction, lower than the 75% (or 65% -- there appears to be some confusion about the relevant number, and Spain has at different times invoked either) reduction applied to PV investments.[534]

---

[531] **RL-0093**, Decision, ¶ 434.

[532] **RL-0092**, *Cube Infrastructure Fund SICAV and others v. The Kingdom of Spain*, ICSID Case No. ARB/15/20, Award, 15 July 2019 [hereinafter the Award], ¶ 22.

[533] Tr. Day 2 (Ms. Frey), pp. 103-104.

[534] Reply, ¶ 425; Tr. Day 1 (Ms. Oñoro Sainz), 70:13-19.

379. As Cube and Demeter explained at the Hearing, and regardless of the precise origin of the numbers presented at the Hearing by Spain, which had not been included in its written submissions in the Annulment, the Committee agrees that the 40% discount applied by the Tribunal was based on its discretion.[535] Furthermore, the Committee is of the view that the actual calculations and resulting reductions also took account of the fact that hydro installations operate for much longer than PV installations, effectively resulting in a higher risk for investor when investing in such plans. That makes it inappropriate to apply a one-on-one comparison of the reductions applied to each type of investment.

380. To conclude, Spain has failed to demonstrate the existence of the inconsistencies identified in its submissions. In addition, it is difficult to see that the alleged inconsistencies even if they did exist would be of the level to justify annulment pursuant to the standard imposed by Article 52(1)(e) of the ICSID Convention.

381. Based on the Committee's findings as set forth above, this ground of the Application therefore must also fail.

## VII. SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### A. THE APPLICANT'S ARGUMENTS

#### (1) Applicable Legal Standard

382. Spain argues that, pursuant to Article 52(1)(d), the Award must be annulled if there is a departure from a fundamental rule of procedure. It explains that "a rule of procedure is fundamental if it refers to the essential fairness that must govern all proceedings and is included within the minimum standards of 'due process' required by international law."[536] Spain further explains that it is considered a "serious" departure when (a) "a party is deprived of the protection afforded by the relevant procedural rule"[537] and (b) the fact that the violated procedural standard may be simple does not mean that the

[535] C-Mem., ¶ 369.

[536] Mem., ¶ 466; *see also* Reply, ¶ 436.

[537] Mem., ¶ 466; *see also* **RL-0096**, Updated background paper on annulment for the administrative council of ICSID, 5 May 2016, ¶ 98.

consequences cannot constitute a "serious" violation for the purposes of Article 52(1)(d) of the ICSID Convention.[538] According to Spain, an applicant does not need to show that the result of the Award would have been different in absence of the procedural infringement.[539] Spain adds that "the introduction of a plea by a Tribunal other than those put forward by the parties may indeed involve a ground for annulment"[540] and "the discretion that may be provided by a procedural rule infringed does not alter the fact that its breach may lead to invalidity."[541]

383. One rule of procedure that is uniformly recognized as fundamental is that a party must be given a full and fair opportunity to present its case, *i.e.* the "right to be heard."[542] Spain submits that the right to be heard also covers a "comparatively equal opportunity to present its case,"[543] which may be the situation when a party cannot present "all relevant arguments and evidence"[544] with "both parties [having] the opportunity to make submissions when the tribunal receives new evidence and considers it relevant to its final deliberations."[545] Spain points out that other committees have annulled awards on the basis that a party was not given "a real opportunity to rebut the evidence"[546] including the production of documents phase.[547] Spain submits that the Tribunal committed a

---

[538] Reply, ¶ 446, *citing* **RL-0215**, *Amco Asia Corporation, et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Applications for Annulment of the 1990 Award and the 1990 Supplemental Award, 17 December 1992, ¶ 9.10.

[539] Reply, ¶ 477, *citing* **RL-0105**, *Pey Casado*, ¶ 78. *See also* Reply, ¶¶ 536, 547.

[540] Reply, ¶ 451, *citing* **RL-0147**, *TECO*, ¶ 82 (quoting **RL-0101**, *MINE*, ¶ 5.05). *See also*, Reply, ¶¶ 452-453; Tr. Day 1 (Ms. Martínez de Victoria), 27:14-23; Applicant's Opening Presentation, Slides 43-44.

[541] Reply, ¶ 454, *citing* **RL-0147**, *TECO*, ¶ 82.

[542] Mem., ¶ 467, *citing* **RL-0096**, Updated background paper on annulment for the administrative council of ICSID, 5 May 2016, ¶ 99; **RL-0101**, *MINE*, ¶ 5.06; **RL-0100**, *Tidewater*, ¶ 149; **RL-0153**, *Venezuela Holdings*, ¶ 130; **RL-0102**, *Occidental*, ¶ 60; **RL-0104**, *Wena*, ¶ 57; **RL-0107**, *Iberdrola*, ¶ 105; **RL-0155**, *Total*, ¶ 314; **RL-0158**, *CDC*, ¶ 49; **RL-0103**, *Fraport*; **RL-0132**, *Azurix Corp. v. the Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic,1 September 2009 [hereinafter *Azurix*], ¶¶ 52, 212; **RL-0133**, *Tulip*, ¶¶ 80, 82; **RL-0105**, *Pey Casado*, ¶ 184.

[543] **RL-0105**, *Pey Casado*, ¶ 184; **RL-0102**, *Occidental*, ¶ 60; **RL-0107**, *Iberdrola*, ¶ 105; **RL-0133**, *Tulip*, ¶ 145; **RL-0103**, *Fraport*, ¶ 202; **RL-0101**, *MINE*, ¶ 5.06; **RL-0132**, *Azurix*, ¶¶ 213-214.

[544] Mem., ¶ 470.

[545] Mem., ¶ 471; **RL-0103**, *Fraport*, ¶ 202.

[546] Mem., ¶ 472.

[547] Mem., ¶¶ 473-475. *See also*, **RL-0105**, *Pey Casado*, ¶¶ 247-248, 263, 264, 331; **RL-0159**, Yves Derains, Towards Greater Efficiency in Document Production before Arbitral Tribunals – A Continental Viewpoint, in International Chamber of Commerce International Court of Arbitration Bulletin, Special Supplement 2006: Presentation of Documents in International Arbitration 83, International Chamber of Commerce, 2006, p. 87; **RL-0160**, Gabrielle

serious departure from fundamental rules and in particular deviated from Spain's fundamental right to be heard.[548]

384. On this basis, the Applicant alleges that the Tribunal seriously departed from a fundamental rule of procedure with respect to (***a***) the principle of burden of proof in various instances, (***b***) Spain's lack of opportunity to comment on Cube and Demeter's proposed compensation methodology, (***c***) the refusal to allow the European Commission to intervene as a non-disputing third party, (***d***) the refusal to introduce in the record the Declaration of Members States of January 2019, and (***e***) the lack of impartiality and equal treatment of the Parties.

**(2) Evidence, Burden of Proof and Right to be Heard**

385. First, Spain submits that the Tribunal failed to observe the rules on burden of proof. It argues that the basic principle of the burden of proof is *onus probandi actori incumbit*, and that the Tribunal failed to comply with this principle regarding both the "incorporation and [the] assessment" of evidence.[549]

386. Spain argues that the Tribunal seriously departed from the principle of burden of proof and right to be heard, both in relation to the practices at the hearing and in relation to the treatment of evidence. Specifically, Spain submits that the Tribunal's Decision and Award contained "scarce reference to evidentiary activity developed in the oral hearing."[550] Spain argues that this absence did not merely reflect a lack of analysis but that the Decision was written as if the evidence did not exist.[551]

Kaufmann-Kohler, Globalization of Arbitral Procedure, 36 Vanderbilt Journal of Transnational Law 1313, October 2003, pp. 1327-1328, n.º 66; **RL-0161**, Christoph H. Schreuer et al., The ICSID Convention: A Commentary, 2nd ed., Cambridge University Press 2009 (Excerpt), Art. 43, p. 642, ¶ 4; **RL-0162**, Klaus Peter Berger, Private Dispute Resolution in International Business: Negotiation, Mediation, Arbitration, 3.ª ed., Kluwer Law International 2015, pp. 585-586, ¶¶ 26.34-26.35; **RL-0163**, Jalal El-Ahdab y Amal Bouchenaki, Discovery in International Arbitration: A Foreign Creature for Civil Lawyers?, in Arbitration Advocacy in Changing Times, 15 ICCA CONGRESS SERIES 65, A. Jan van den Berg ed., Kluwer Law International 2011, p. 99.

[548] Mem., ¶ 477.

[549] Mem., ¶¶ 478-481.

[550] Mem., ¶ 482. *See also* Reply, ¶ 460.

[551] Mem., ¶ 485.

387. Spain also alleges that Cube and Demeter had the burden to prove that they had legitimate expectations and an important element thereof was Cube and Demeter's due diligence procedures to understand the framework in which the investment was being made.[552] Spain argues that the Tribunal "unjustifiably substitute[ed] the generally accepted principle of *onus probandi incumbit actori*"[553] when it considered that Spain had not shown that a more thorough analysis would have produced a different understanding of the Spanish measures.[554] This part of the Decision "clashes with a whole series of elements in the procedure that evidence precisely the opposite, without the Tribunal offering valid reasons to resolve such contradictions."[555]

388. Spain describes examples of the contradictions in the Decision such as that the Tribunal admitted that changes in the system could be expected; that it underestimated the relevance of Spanish court jurisprudence and the opinions of the sector associations on the changeability of the legal framework; and that Cube and Demeter's own internal documents showed that there was no real expectation of a commitment to immutability of the system.[556]

389. Spain also points out that it had argued in the underlying arbitration that there was no commitment to immutability or other binding commitments. The Tribunal in its Decision found that Article 44(3) of RD 661/2007 did not specifically and explicitly exclude the possibility of revocation by means of a subsequent law and that a diligent investor could expect changes.[557] Instead of dismissing the claim, however, the Tribunal decided to uphold Cube and Demeter's claims in the underlying arbitration "on the basis that the regime would nevertheless be expected not to be substantially or radically [be]

---

[552] Mem., ¶ 489.

[553] **RL-0134**, *Alpha Projektholding GmbH v Ukraine,* ICSID Case No. ARB/07/16, Award, 8 November 2010, ¶ 236.

[554] Reply, ¶ ¶ 475*, citing* **RL-0093**, Decision, ¶ 401.

[555] Mem., ¶ 494.

[556] Mem., ¶¶ 494-498.

[557] Reply, ¶ 493.

altered."[558] According to Spain, this is a clear violation of the principle of congruence that should be applicable to a tribunal's decision.[559]

390. In response to Cube and Demeter's argument that the Tribunal has discretion to refer to the evidence submitted, Spain submits a that the "right to defence would definitely be undermined by the fact that, even formally, one party's evidence was admitted, but the Tribunal would make no effort to assess, even superficially, the evidence of one of the parties" which, it alleges, the Tribunal did in this case.[560]

391. Spain further argues that by failing to take into account evidence, in particular the testimony of Mr. Carlos Montoya, or the two experts, Prof. Pérez Tremps and Vaquer Caballería, the Tribunal committed a serious breach of a fundamental rule of procedure guaranteeing the right to be heard.

392. In its Reply, Spain adds that the Tribunal, by rejecting Cube and Demeter's thesis about the immutability of the system, but nevertheless finding for Cube and Demeter, the Tribunal failed to safeguard Spain's rights (the "evident lack of consistency that breaks our right to defence: Spain could only foresee that it would have to defend itself from what was held in the Lawsuit, and it has done so successfully, and surprisingly finds itself with a new configuration of the case that the Decision introduces *ex novo* and from which it has not had the opportunity to defend itself effectively.")[561]

**(3) Right to be Heard and Quantum**

393. In addition, Spain submits that the Tribunal committed a serious departure from a fundamental rule of procedure when it calculated the damages on the basis of a Brattle Memorandum submitted with the Post-Hearing Briefs and to which Spain alleges it had "no opportunity to comment."[562]

---

[558] Mem., ¶ 509.
[559] Mem., ¶ 511.
[560] Reply, ¶ 463.
[561] Reply, ¶ 498.
[562] Mem., ¶ 516, *citing* **R-0400**, Claimants' Post-Hearing Brief, 31 January 2018, p. 49; **R-0394**, Letter from Tribunal, 29 October 2017, ¶ 3.

394. Spain argues that it had no opportunity to address Brattle's new calculation and methodology to assess the effect of RDL 2/2013, and specifically the "adjusted CPI." According to Spain, the Post-Hearing submissions were submitted simultaneously which did not allow Spain an opportunity to respond to Brattle's new calculations. The next step in which the experts of Spain could intervene, the Applicant adds, was when preparing an Expert Joint Model after the Tribunal's Decision was issued, which was done on the basis of the report by Brattle.[563] Thus, Spain submits the right to be heard was infringed.[564]

395. Spain disputes Cube and Demeter's allegation that the effect of RDL 2/2013 was minor. Spain submits that "[t]he damages, excluding the pre-2013 measures, would have been lower if Brattle had used the same methodology he assumed in his model in both his first and second reports."[565]

**(4) European Commission's Request to Intervene**

396. Spain asserts that the Tribunal committed another serious departure from a fundamental rule of procedure when it rejected the EC's request to intervene as a non-disputing party.[566] The EC submitted its application to intervene as *amicus curiae* in the proceedings on 31 October 2018. One day later, on 1 November 2018, the Tribunal rejected the request for intervention because "allowing the Commission to intervene at this stage would significantly disrupt the proceedings."[567]

397. Spain argues that the Tribunal's one-day decision deprived the Parties of input on intra-EU disputes. Furthermore, rejecting the EC's request "without in any way asking the parties to express their opinion regarding the relevance of such intervention"[568] in itself

[563] Mem., ¶¶ 514-525; Reply, ¶¶ 504-514. *See also*, Tr. Day 1 (Ms. Martínez de Victoria), 30:20-23; Applicant's Opening Presentation, Slide 48.

[564] Mem., ¶ 522. *See also*, **RL-0103**, *Fraport*, ¶¶ 155, 157, 159-160, 200, 202, 230, 235.

[565] Reply, ¶ 512.

[566] Mem., ¶¶ 526-538; Reply, ¶¶ 515-539. *See also*, Tr. Day 1 (Ms. Martínez de Victoria), 31-14-25; Applicant's Opening Presentation, Slide 49.

[567] Mem., ¶ 530, *citing* **RL-0093**, Decision, ¶ 62. *See also* Reply, ¶ 519.

[568] Mem., ¶ 533. *See also* Reply, ¶ 528.

constitutes evidence of a departure from fundamental rules of procedure[569]. Moreover, Spain adds, the Tribunal's rejection was brief and failed to provide justification for the rejection.[570]

398. In its Reply, Spain submitted that ICSID Arbitration Rule 37(2) of the ICSID Rules provides that the decision regarding a non-disputing party's intervention must be taken in consultation with the Parties,[571] and even if the Tribunal's power to admit the intervention is discretionary it "does not mean that such a decision can be taken arbitrarily, without hearing the parties and without sufficient reasoning."[572] Spain submits that in its rejection, the Tribunal failed to analyze the EC's intervention correctly, thus committing a serious breach of procedural rules.[573]

**(5) Declaration of the Member States of January 2019**

399. Spain contends that the Tribunal seriously departed from a fundamental rule of procedure by not allowing Spain to introduce into the record the Declaration of Member States of January 2019 ("**Declaration**").[574] Fourteen days after the Tribunal re-opened the procedure, Spain requested the Tribunal leave to submit the Declaration on 25 January 2019, which the Tribunal rejected three days later on 28 January 2019. Once again, Spain argues, the Tribunal's decision was taken without offering the Parties an opportunity to present their views.[575]

400. According to Spain, even though the Tribunal admitted that the opinion of the Member States was relevant to understand the primacy of EU law, "the Tribunal flatly denied

---

[569] Mem., ¶ 532.

[570] Reply, ¶ 528.

[571] Reply, ¶¶ 527-532.

[572] Reply, ¶ 532.

[573] Reply, ¶ 533.

[574] Mem., ¶¶ 539-544, *citing* Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the legal consequences of the Court of Justice's judgment in Achmea and on the Protection of Investments in the European Union. *See also* Reply, ¶¶ 540-552. *See also*, Tr. Day 1 (Ms. Fatás Pérez), 32:4-11.

[575] Mem., ¶ 540. *See also* Reply, ¶¶ 540-543.

such a possibility, depriving the Kingdom of Spain of its right to be heard on a key issue."[576]

401. In its Reply, Spain disputed Cube and Demeter's allegation that the Declaration was not relevant. It also submits that it is not required to prove that the outcome of the dispute would have been different, but only that potentially some aspect of the dispute would have changed.[577]

**(6) Lack of Impartiality and Unequal Treatment of the Parties**

402. Spain alleges that the lack of impartiality may be a ground for annulment.[578] Spain submits that the language used by the Tribunal in relation to Cube and Demeter and Spain reflects a "differentiation without just cause [implying] a breach of a basic procedural standard, such as the principle of equality of arms."[579]

403. Spain further argues that the language used by the Tribunal in the Decision "revealed reproaches to the Kingdom of Spain which, moreover, [were] unnecessary."[580] This, according to Spain, showed an "unjustified animus on the part of the Tribunal … which breaks the basic right of the parties to have an impartial Tribunal."[581] These procedural violations, Spain concludes, are also a demonstration of significant unequal treatment between the Parties.

404. Finally, the Applicant alleges that the procedural violations also constitute unequal treatment between the Parties.[582] One such instances is the Tribunal's decision regarding due diligence supporting Cube and Demeter's claims reversing the burden of proof against Spain. Specifically, the Tribunal decided that "Spain did not demonstrate that a

---

[576] Mem., ¶ 541.

[577] Reply, ¶¶ 545-551.

[578] Mem., ¶ 545, *citing* **RL-0108**, *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Application for Annulment of the Argentine Republic, 30 July 2010 [hereinafter *Enron*], ¶ 278.

[579] Mem., ¶ 554; Reply, ¶ 577.

[580] Mem., ¶ 555.

[581] Mem., ¶ 559. *See also*, Reply, ¶ 578.

[582] Mem., ¶¶ 560-565; Reply, ¶¶ 562-578.

more thorough study would have resulted in a different understanding."[583] This, Spain submits, in addition to failing to provide adequate grounds and a breach of procedural rules, shows "clearly favorable treatment" of Cube and Demeter and "excessively burdensome treatment" of Spain; in short, discrimination.[584]

## B. The Respondents' Arguments

### (1) Applicable Legal Standard

405. Cube and Demeter allege that Spain has mischaracterized the applicable legal standard to annul the Award on the basis of a serious departure of a fundamental rule of procedure and that Spain's arguments have no merit.

406. Cube and Demeter agree with Spain that the serious departure of a fundamental rule of procedure, as consistently interpreted by committees, has to satisfy both criteria of "fundamental" and "serious."[585] For Cube and Demeter, these criteria, however, have a highly restrictive character resulting in a particularly high threshold.[586]

407. The Respondents argue that the ordinary meaning of these two adjectives is devoid of ambiguity and to support this argument they point to the drafting history of the ICSID Convention. Cube and Demeter recall that "[t]he phrase 'fundamental rules of procedure' was explained by the drafters of the ICSID Convention as a reference to procedural principles, particularly the right to be heard."[587] They further explain that "[t]he drafting history further indicates that this ground is concerned with the integrity and fairness of the arbitral process."[588]

---

[583] Mem., ¶ 562.

[584] Mem., ¶ 563.

[585] C-Mem., ¶ 373*, citing e.g.* **RL-0145**, *Eiser*, ¶ 238.

[586] C-Mem., ¶ 374.

[587] C-Mem., ¶ 375, *citing* **CL-270**, ICSID, History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, Vol. I-IV 480 (1970).

[588] C-Mem., ¶ 375, *citing* **CL-226**, ICSID, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, 5 May 2016, ¶ 98.

408. Cube and Demeter note that "for a departure of a fundamental rule to be serious, the departure 'must have caused the Tribunal to reach a result substantially different from what it would have awarded had such rule been observed'" as it has been interpreted this way by the majority of committees.[589]

409. The Respondents state that Spain is replacing its burden of proof in the annulment with a mere conjecture by indicating that it is sufficient to show that the departure from a fundamental rule of procedure could have potentially affected the outcome. Cube and Demeter argue that committees have rejected this view and point to the *OI European Group* committee stating that "[a]nnulling an award based on [a] lesser showing would amount to excessive formalism, speculation and second-guessing of decisions taken in the original arbitration in a manner that is improper for an annulment proceeding, thus frustrating the purpose of the arbitration."[590] The committee in that case restated the appropriate test by indicating that "the departure must be shown effectively to have caused the Tribunal to reach a substantially different result from what it would have reached, if the relevant rule had been observed."[591]

**(2) Evidence, Burden of Proof and Right to be Heard**

***a. Evidence***

410. Cube and Demeter submit that the Tribunal did not disregard Spain's evidence, shift the burden of proof, or infringe Spain's right to be heard.[592] The Respondents submit that Spain is not alleging that the Tribunal refused to admit this evidence, rather it critiques the attention and consideration the Tribunal gave to that evidence.[593]

---

[589] Rejoinder, ¶ 207, *citing* **CL-261**, *Wena*, ¶ 58. *See also*, Rejoinder, ¶¶ 208-209, *citing e.g.*, **CL-285**, *OI European Group*, ¶ 248; **CL-319**, *Gambrinus Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/31, Decision on Annulment, 3 October, 2017; ¶ 231 (quoting *Wena*); **CL-318**, *SAUR*, ¶¶ 183-184; **CL-207**, *Ioan Micula and others v. Romania I*, ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016, ¶ 134; **RL-0155**, *Total*, ¶¶ 308, 313; **CL-320**, *Adem Dogan*, ¶ 208; **RL-107**, *Iberdrola*, ¶ 104; **CL-314**, *Continental*, ¶ 96; **CL-47**, *Azurix*, ¶ 51 (quoting *Wena*); **CL-292**, *Repsol*, ¶ 81; **CL-289**, *Malicorp*, ¶¶ 34-35; **CL-264**, *CDC*, ¶ 49. *See also*, Tr. Day 1 (Ms. Frey), 149:10-13; Tr. Day 2 (Mr. Fleuriet), 69:6-15; Respondents' Closing Presentation, Slides 5-7.

[590] C-Mem., ¶ 379*, citing* **CL-285**, *OI European Group*, ¶¶ 248-249.

[591] C-Mem., ¶ 379*, citing* **CL-285**, *OI European Group*, ¶¶ 249, 45-46.

[592] C-Mem., ¶¶ 380-387; Rejoinder, ¶¶ 211-214. *See also*, Tr. Day 1 (Ms. Frey), pp.149-150; Respondents' Opening Presentation, Slide 123.

[593] C-Mem., ¶ 381.

411.   There is no question that the Tribunal followed the proper rules of procedure with respect to the Parties' witnesses and experts.  According to Cube and Demeter, the Tribunal "accepted and considered multiple written statements from the Parties' witnesses" in its Decision and Award. Cube and Demeter argue that "a decision not to specifically cite certain witness or expert testimony is not evidence that the Tribunal failed to consider that testimony, nor that the Tribunal considered one party's witnesses and experts more thoroughly than the other's."[594]

412.   The Respondents argue that the legal authorities on which Spain relies to explain the standard for establishing a serious departure from a fundamental rule of procedure actually involved instances in which a tribunal "(i) refuses to allow evidence and then (ii) makes a decision on a disputed issue on the basis that it had no evidence for the party's position."[595]  Cube and Demeter argue that this type of breach never occurred in this case as the Tribunal accepted both written and oral statements from its witnesses and experts and Spain does not point to a Tribunal's conclusion on the basis that it did not have evidence that Spain was not permitted to present.[596]

413.   Cube and Demeter note that "[a]s annulment committees have found, tribunals are not required to address every argument or all evidence the Parties put before it."[597]  Cube and Demeter submit that there is no procedural rule requiring the Tribunal to cite the testimony of all witnesses and experts in an award and that, in any case, Spain's witnesses and experts were heard making both written and oral submissions and the Tribunal questioned them.[598]

---

[594] C-Mem., ¶ 383.
[595] C-Mem., ¶ 387, *see, e.g.,* Mem., ¶ 474 (*citing* **RL-0105**, *Pey Casado*).
[596] C-Mem., ¶ 387.
[597] C-Mem., ¶ 386, *citing* **CL-278**, *Teinver*, ¶ 210.
[598] Rejoinder, ¶¶ 212-213.

### *b. Burden of proof*

414. On Spain's argument that the Tribunal reversed the burden of proof in establishing Cube and Demeter's understanding of the legal regime that applied to their investments,[599] the Respondents argue that the Tribunal "simply did its job of assessing the evidence before it" and "weighed the evidence of both Parties and reached its own independent conclusion."[600] Cube and Demeter state that the Tribunal did recognize that the Respondents submitted evidence of their own internal and external due diligence, *e.g.* the April 2008 IC memo.[601]

415. The Respondents also note that "the Tribunal found that the totality of the evidence (including Spain's evidence) supported a narrower conclusion, namely, that Cube and Demeter could only expect Spain not to make changes that significantly altered or abolished the regime retroactively."[602] They argue that "far from departing from a fundamental rule of procedure, the Tribunal simply did its job of assessing evidence before it." According to the Respondents, the Tribunal weighed the evidence of both Parties and reach its own independent conclusion.[603]

### *c. Right to be heard*

416. Cube and Demeter dispute Spain's allegation that the Tribunal infringed Spain's right to a defense or its right to be heard on issues of liability.[604] The Respondents summarize that, in simple terms, "the dispute concerned Cube and Demeter's primary claim that they reasonably expected Spain not to make any changes to the incentive framework, while Spain contended that it was always permitted to make any changes as long as it respected the notion of affording plants a (dynamic) reasonable return."[605]

---

[599] C-Mem., ¶¶ 388-400; Rejoinder, ¶¶ 215-216. *See also*, Tr. Day 1 (Ms. Frey), pp. 150-151; Respondents' Opening Presentation, Slide 124.

[600] C-Mem., ¶ 399.

[601] C-Mem., ¶ 390; *see also* **RL-0093**, Decision, ¶ 401.

[602] C-Mem., ¶ 392.

[603] C-Mem., ¶ 399.

[604] Rejoinder, ¶¶ 217-223.

[605] Rejoinder, ¶ 218.

417. According to the Respondents, after reviewing the evidence, the Tribunal agreed with Spain that it was entitled to make changes but only to the extent that it did not alter the economic basis on which Cube and Demeter made its investments.[606] This, Cube and Demeter point out, was in line with what they pleaded as an alternative claim.

418. Cube and Demeter note that the Tribunal's finding partially accepted its "primary position (namely, that Spain guaranteed a level of stability), accepted [its] alternative position (that Cube and Demeter were 'at least' entitled to expect that Spain would make no fundamental change), and partially accepted Spain's position (namely, that Spain retained discretion to make some changes to its regulatory framework)…".[607]

**(3) Right to be Heard and Quantum**

419. The Respondents recall that the "Tribunal generally addressed the scope of the post-hearing briefs at the hearing on the merits, and it was understood that there would be one round of simultaneous submissions from the Parties that would be limited in scope and aimed at responding to specific questions that the Tribunal would send to the Parties."[608] At that time, the Respondents add, Spain agreed with this approach and did not request an opportunity to have multiple rounds of this submission.

420. The Respondents argue that due to the nature of the questions of the Tribunal, Spain could expect that there would be new damages calculations from Brattle. On 29 October 2017, the Tribunal instructed the Parties to respond in their post-hearing briefs about "the monetary value of each change to the legal regime… according to each Party's experts."[609]

[606] Rejoinder, ¶ 218.

[607] Rejoinder, ¶ 222.

[608] C-Mem., ¶ 402; *see* **C-353**, Hearing Tr., Day 5, 252:2-53:25. *See also*, Tr. Day 1 (Ms. Frey), 153:10-22.

[609] Rejoinder, ¶ 225; **C-350**, Tribunal Letter, 29 October 2017. *See* Rejoinder, ¶ 225 summarized relevant timeline; **C-353**, Hearing Transcript, Day 5, 252:5-253:25; **R-0383**, Spain's Post-Hearing Brief, ¶¶ 190-191; **C-355**, Cube and Demeter's Post Hearing Brief, pp. 49-52; **C-373**, Brattle Post-Hearing Memorandum, 15 January 2018; **C-376**, Brattle Spreadsheet "Tables P(ii) – PV Financial Model.xlsb," submitted with Brattle PHB Memorandum, 15 January 2018; **C-357**, Spain's Comments on *Achmea*, 3 April 2018; **C-358**, Spain's Comments on *Novenergia*, 3 April 2018; **C-359**, Spain's Comments on *Masdar*, 1 June 2018; **C-356**, Letter from the Tribunal declaring the proceeding closed, 12 November 2018; **RL-0093**, Decision; **C-367**, Joint Expert Report, 16 April 2019; **C-368**, Letter from the Tribunal on instructions to quantum experts, 29 April 2019; **C-369**, Supplementary Joint Expert Report, 13 May 2019.

421. Spain, however, did not object to the instructions nor did it request an opportunity to respond to the new calculations. According to Cube and Demeter, Spain's own post-hearing brief shows that it understood Brattle would submit new calculations and reserved its right to respond to such calculations.[610]

422. Cube and Demeter point out that the post-hearing briefs were submitted on 21 January 2018 and the proceeding was closed on 18 November 2018.[611] During this time, the Respondents add, "Spain made numerous requests to make submissions to the Tribunal, including a submission on the *Achmea* decision, a submission on the *Novenergia* award, and a submission on the *Masdar* award."[612] The Respondents add that Spain had other opportunities to raise it and did not do so, such as when Spain requested the Tribunal to reopen the proceedings to hear further evidence on the issue of *Achmea*[613] or when the Tribunal reopened the proceedings in January 2019 to seek clarification on a limited point related to quantum[614] or after the Tribunal's issuance of its partial decision on quantum.[615]

423. The Respondents argue that "[u]nder these circumstances, Spain plainly has waived any objection it ever had to the Tribunal's receipt of the Brattle [post-hearing brief] calculations" pursuant to ICSID Arbitration Rule 27.[616] Unlike in the *Fraport* case, which Spain invokes as sole authority for its argument on this topic,[617] it was obvious that there would be a new calculation of damages on the basis of the Tribunal's

---

610 C-Mem., ¶ 405.

611 C-Mem., ¶ 406; **C-356**, Letter from the Tribunal declaring the proceeding closed, 12 November 2018.

612 C-Mem., ¶ 406; *see* **C-357**, Spain's Comments on *Achmea*, 3 April 2018; **C-358**, Spain's Comments on *Novenergia*, 3 April 2018; **C-359**, Spain's Comments on *Masdar*, 1 June 2018.

613 C-Mem., ¶ 406; **C-365**, Letter from Spain requesting that an EU Declaration on *Achmea* be added and to submit comments, 25 January 2019.

614 C-Mem., ¶ 407.

615 C-Mem., ¶ 407.

616 C-Mem., ¶ 408; ICSID Arbitration Rule 27 ("A party which knows or should have known that a provision of the Administrative and Financial Regulations, of these Rules, of any other rules or agreement applicable to the proceeding, or of an order of the Tribunal has not been complied with and which fails to state promptly its objections thereto, shall be deemed—subject to Article 45 of the Convention—to have waived its right to object.").

617 C-Mem., 412; **CL-316**, *Fraport*, ¶¶ 224-226, 234.

instructions and Spain simply never attempted to comment on those calculations. According to Cube and Demeter, Spain has waived this objection.[618]

424. Finally, Cube and Demeter state that Spain did not allege in its Memorial any specific issue with Brattle's calculations that would make a material difference in the Tribunal's conclusions.[619] The revised "adjusted CPI" assumption raised by Spain is misconstrued. According to Cube and Demeter, "it is simply false that Brattle increased the projected tariffs in its [post-hearing brief] calculations. If it had done so, the total damages claim would have been larger in the [post-hearing brief] calculations, and it was plainly not."[620] In any case, Cube and Demeter further argue that "the issue is also immaterial because the adjusted CPI assumption about which it now complains it had no opportunity to respond is consistent with its own case, and thus Spain would have no basis for disagreeing with that assumption if it was proceeding in good faith."[621]

425. On this matter, Cube and Demeter conclude that the Committee should reject this argument because Spain had ample opportunity to comment on Brattle's new methodology and, even if Spain had commented on the calculations, this would not lead to a different outcome on quantum.[622]

426. In their Rejoinder, Cube and Demeter point out that Spain did not attempt to address the significance of the facts or the legal basis of the waiver position at all. Instead, the Respondents point out, "Spain baldly asserts that these facts 'do not detract from the basis of our request for annulment,' and then repeats the substance of its new complaint about the alleged change in Brattle's calculations that it never raised during the arbitration."[623]

[618] C-Mem., ¶ 413.
[619] C-Mem., ¶ 414.
[620] C-Mem., ¶ 414.
[621] C-Mem., ¶ 417.
[622] C-Mem., ¶ 418; *see also* Rejoinder, ¶¶ 225-227.
[623] Rejoinder, ¶ 227*, citing* Reply ¶¶ 506-512.

**(4) European Commission's Request to Intervene**

427. The Respondents allege that Spain's contentions that the Tribunal committed a serious departure from a fundamental rule of procedure by (i) not allowing the EC to intervene in the case and (ii) not reopening the proceeding to admit the Member State Declaration, are without merit.[624] Cube and Demeter further explain that in its Memorial, Spain did not point to a "rule of procedure" that these decisions purportedly violate.[625]

428. According to Cube and Demeter, Spain failed to acknowledge that ICSID Arbitration Rule 37(2) gives total discretion to tribunals to decide on whether to accept submissions from non-disputing parties.[626] Notably, the Respondents add, under ICSID Arbitration Rule 37 "while the Tribunal 'may' choose to decide whether or not to admit a non-disputing party, it is 'required' to protect against disruptions to the proceeding."[627]

429. With regard to the requirement to protect against any disruptions to the proceeding, there is no evidence that admitting the EC's perspective would result in a different outcome.[628] The Respondents argue that it is not evidence of a breach to a fundamental rule that the Tribunal reached its conclusion in one day as Spain alleges since the request to intervene had been sent on 24 October 2018. In any case, the Respondents state, "the issue could be decided in one day, if the Tribunal were so inclined."[629]

430. Cube and Demeter also point out that at that time Spain never objected to the Tribunal's decision on the EC's intervention. According to Cube and Demeter, this "matter of the [European Commission] intervention was apparently of no consequence to Spain then, so Spain cannot rely on it now as basis on which to seek to annul the Award."[630]

---

[624] C-Mem., ¶¶ 419-425; Rejoinder, ¶¶ 233-239. *See also*, Tr. Day 1 (Ms. Frey), p. 156; Respondents' Opening Presentation, Slide 130.

[625] C-Mem., ¶ 419.

[626] C-Mem., ¶ 421.

[627] C-Mem., ¶ 422.

[628] C-Mem., ¶¶ 422-424; Rejoinder, ¶¶ 233-234.

[629] C-Mem., ¶ 425.

[630] Rejoinder, ¶ 235.

Case 1:20-cv-01618-BAH Document 6-3 Filed 03/29/22 Page 147 of 169

431. Ultimately, the Respondents say, "if the Tribunal had allowed the [European Commission's] submission, there is no indication that this would have changed the Tribunal's findings on matters of the intra-EU objection or the applicability of EU law, because the Tribunal's findings on those issues are unanimous and are consistent with every other tribunal hearing them, even those that received submissions from the [European Commission]."[631]

**(5) Declaration of the Member States of January 2019**

432. With respect to the Member State Declaration, Cube and Demeter argue that there was no breach of a fundamental rule and note, *first*, that Spain's request was submitted after the Tribunal had closed the proceeding.[632] *Second*, even though the Tribunal reopened the proceeding thereafter on a limited basis, the Tribunal explained why it declined to receive the Declaration or comments on it stressing that it had already completed its deliberations.

433. Cube and Demeter argue that the Declaration was not relevant since it addressed the impact of *Achmea* and it was one of three declarations issued concurrently by the Member States. While the Member States that signed the Declaration proclaimed *Achmea* rendered the ECT inapplicable to intra-EU disputes, the other two concluded that *Achmea* had no impact. In any event, Cube and Demeter argue that "the Member States are not empowered to interpret EU law, and thus, their declarations as to the impact of *Achmea* on the ECT have no legal weight."[633]

434. Furthermore, Cube and Demeter point that the EU Member State declarations are not legal authorities but political declarations. The Respondents add that other tribunals have considered these declarations and characterized them as political statements with no weight and they would have not changed the outcome of any of the cases.[634]

---

[631] Rejoinder, ¶ 236.

[632] C-Mem., ¶¶ 426-429; Rejoinder, ¶¶ 237-239.

[633] C-Mem., ¶ 428.

[634] Tr. Day 1 (Ms. Frey), 157:6-21; Respondents' Opening Presentation, Slide 133.

435. More importantly, Cube and Demeter conclude that "the Tribunal afforded both Parties ample and equal opportunity to present their case and produce evidence on the intra-EU objection and *Achmea*."[635]

**(6) Lack of Impartiality and Unequal Treatment of the Parties**

436. On Spain's argument that the Tribunal lacked impartiality and did not treat the Parties equally, the Respondents explain that the examples shown by Spain point to the Tribunal's assessment of the Parties' positions and using its own judgment to reach conclusions.[636]

437. Cube and Demeter note that the specific passages of the Tribunal's decisions used as examples by Spain were not passing judgment on the Parties themselves or their intentions.[637] Cube and Demeter state that "Spain reformulating [the Tribunal's] arguments does not transform them into evidence of discrimination or unequal treatment."[638]

438. The Respondents argue that Spain has failed to show and cannot show that the Award meets the high standard described by the *Enron* committee, which considered that "lack of impartiality might be evidenced, for instance, by the fact that an Award consistently and perversely makes findings favourable to one party without any basis in the evidence."[639]

439. In conclusion, Cube and Demeter argue that "the fact remains that Spain has not established [ ] a failure on the Tribunal's part to treat the Parties fairly and, thus, has not shown a serious departure from a fundamental rule of procedure."[640]

---

[635] C-Mem., ¶ 429.

[636] C-Mem., ¶¶ 430-436; Rejoinder, ¶¶ 240-245. *See also* Tr. Day 1 (Ms. Frey), pp. 157-158; Respondents' Opening Presentation, Slide 134.

[637] C-Mem., ¶ 434; Rejoinder ¶ 243.

[638] C-Mem., ¶ 436.

[639] Rejoinder, ¶ 244*, citing* **RL-0108**, *Enron*, ¶ 278.

[640] C-Mem., ¶ 436.

## C. THE COMMITTEE'S ANALYSIS

### (1) Applicable Legal Standard

440. The starting point is the text of Article 52(1)(d) of the ICSID Convention which provides that annulment is permitted on the basis "that there has been a serious departure from a fundamental rule of procedure." As the ICSID's Updated Background Paper on Annulment sets out, this ground is concerned with the integrity and fairness of the arbitral process.[641]

441. Article 52(1)(d) refers to both "serious" and "fundamental" as components of the standard. Based on these words, committees have generally adopted what ICSID's Updated Background Paper on Annulment refers to as "a dual analysis" by considering both key concepts of "serious departure" and of "fundamental rules of procedure"; or, in other words, both components must be met. Not every rule of procedure is fundamental and not every breach is serious.

442. Clearly, a number of the examples provided by Spain and the cases cited constitute illustrations of fundamental rules of procedure, such as the right to be heard.[642] Spain, in describing the drafting history of the Convention, also referred to the right to be heard as a fundamental rule of procedure. Similarly, equality of the parties is a fundamental rule of procedure.[643]

443. Nevertheless, as much as these and other principles constitute fundamental rules of procedure in the abstract, in order to constitute a ground for annulment, a committee must review the alleged breach of the relevant rule of procedure, in the context of the specific facts and circumstances of the case.

444. Spain argues that a deviation is serious if a party is deprived of the protection afforded by the relevant procedural rule, *i.e.* suggesting that the requirement of serious departure has been met by virtue of the deviation from the procedural safeguard. Cube and

---

[641] **RL-0096**, Updated background paper on annulment for the administrative council of ICSID, 5 May 2016, ¶ 98.

[642] Mem., ¶ 467.

[643] Mem., ¶ 468.

Demeter, on the other hand, underline the dual nature of the legal standard, which they suggest imposes a requirement to make a showing that the departure would have caused the tribunal to reach a substantially different result from what it would have reached, if the relevant rule had been observed.[644]

445. As considered above, not every departure from a rule of procedure justifies annulment. The reference to "seriousness," whether as a distinct or as an intrinsic component of the applicable standard of (a breach of) a "fundamental" rule of procedure, necessitates therefore an assessment of (i) the relevant rule of procedure; and (ii) the facts and circumstances that potentially constitute the basis of a breach.

446. The fact that a tribunal would have reached a substantially different result had the relevant rule been observed may be one way, but need not be the only way in which an applicant can show that it has been deprived of the right which Article 52(1)(d) of the ICSID Convention seeks to protect. Furthermore, the assessment of whether a particular fundamental rule of procedure has been breached may also require an evaluation of other fundamental rules. For example, a party's right to an opportunity to present its case must be balanced against the aforementioned principle of equality of the parties, but also the requirement of the finality of proceedings.

447. The cases referred to by Spain underline that fundamental rules of procedure are not absolute and need to be seen in context. For example, in *Pey Casado* the committee considered that a party could not be expected to present its case "in one minute."[645] This example does not provide a positive standard as to how much time a party should be granted. Similarly, the commentators referred to by Spain provide examples cautiously, and stress that for instance the refusal to order the production of documents "may" constitute a breach of the arbitral procedure guarantee.[646]

---

644 C-Mem., ¶ 379, *citing* **CL-285**, *OI European Group*, ¶¶ 248-249.

645 **RL-0105**, *Pey Casado*, ¶ 263.

646 Mem., ¶ 475; *see also* **RL-0162**, Klaus Peter Berger, *Private Dispute Resolution in International Business: Negotiation, Mediation, Arbitration*, 3.ª ed., Kluwer Law International 2015, pp. 585-586, ¶¶ 26.34-26.35.

448. Of the principles invoked by Spain there can be little doubt that some, at least in abstract, can qualify as fundamental rules of procedure, such as the right to be heard, the principle of equality of the parties and the right to an impartial and independent tribunal. While allocating or applying the burden of proof may *result* in the breach of a fundamental rule of procedure (such as the equality of the parties), "[r]ules on the burden of proof"[647] are less obviously a fundamental rule of procedure as such.

449. Nevertheless, given the need to consider the alleged breach in the context of the specific facts and circumstances of the case, and the requirement to assess the seriousness of the breach, the abstract characterization of principles as fundamental or not is of limited effect. While a party should obviously be provided with the opportunity to present its case, and this should be a fair and equal opportunity, this may not always amount to an unabridged right to present documentation or other evidence.

450. Hereinafter, the Committee will review the concrete allegations made by Spain on the basis of a holistic analysis of the importance of the rule of procedure invoked, the seriousness of the impact of any breach, and generally the facts and circumstances in the context of which the alleged infringement took place.

**(2) Evidence, Burden of Proof and Right to be Heard**

451. Under this heading, Spain addressed a number of alleged breaches, namely the Tribunal's treatment and analysis of the evidence and, in particular, witness statements provided by Spain, as well as the Tribunal's treatment of the burden of proof and inconsistencies in its decision-making.

452. As to the first allegation, at first blush, Spain effectively argues that the Tribunal failed to respect the right of each Party to present its case and evidence[648] thus not respecting Spain's right of defense or its right to be heard.[649]

[647] Mem., ¶ 487.
[648] Mem., ¶ 486.
[649] Reply, ¶ 462.

453. However, a closer view of the specific allegations demonstrates that what Spain takes issue with is the Tribunal's assessment of the facts and evidence. Illustrative is Spain's statement that "it is *not true* that Spain has not prove[n] that a minimally more exhaustive analysis would have led to a different understanding of the regulatory framework,"[650] which Spain seeks to support by reference to a number of arguments made in the underlying arbitration.

454. However, while Spain may disagree with the Tribunal's assessment, determining whether Spain proved its case or not, was the Tribunal's prerogative. There is no right to a comprehensive reference to each and every argument made and this is not a case of failing to respect a party's right to be heard. This is a case of reviewing and assessing facts and allegations and in this case rejecting Spain's arguments and deciding against it. The Tribunal engaged with Spain's argument but was not persuaded by the arguments and evidence it invoked, including the witness and expert statements submitted by Spain. In the Committee's view, there is no indication that the Tribunal "disliked Spain"[651]:the Decision and the Award are written in a neutral and businesslike manner and do not reflect an emotive reaction to either Party.

455. The second component of Spain's arguments relates to the Tribunal's treatment of the investors' due diligence. First, as stated above, "burden of proof" is not a fundamental rule of procedure in abstract. Courts and tribunals in many legal systems generally adopt the principle that claimants need to prove their case (and respondents should prove the positive allegations which they rely on in rebuttal of claimants' arguments). However, this general principle is subject to many qualifications and nuances, leading courts and tribunals to adopt an approach including the use of rebuttable presumptions or other mechanisms to mitigate this general principle. Moreover, and importantly, evidence and burden of proof lie at the intersection between procedural and substantive law and ultimately courts and tribunals will assess the evidence presented by both parties.

[650] Mem., ¶ 494 (italics in the original).

[651] Mem., ¶ 499.

456. In the present case, the Tribunal clearly adopted as a starting point the principle that Cube and Demeter had to make a showing of their legitimate expectations. As the Tribunal's considerations show, whether the expectations created by the establishment of a regulatory regime were sufficiently demonstrated, involves a positive showing of due diligence,[652] the adequacy of which was questioned by Spain.[653] Specifically, Spain takes issue[654] with the Tribunal's consideration that "[Spain] has not shown that any more exhaustive legal analysis would have produced any different understanding of the Spanish measures."[655]

457. Contrary to what Spain submits, and in addition to the point made before that "burden of proof" as such is not a "fundamental rule of procedure" in the meaning of Article 52(1)(d) of the ICSID Convention, the Tribunal was not engaged in a reversal of the burden of proof; in fact, it is a direct response to an argument that Spain made in the case.[656]

458. As to the Tribunal's consideration of the scope and nature of the due diligence, in addition to the discussion contained in the Dissenting Opinion, the evaluation of the scope and relevance of the due diligence undertaken by Cube and Demeter, against the background of the factual and legal matrix of the case, is open to different interpretations. Reviewing this assessment is not the task of an annulment committee, and certainly does not meet the threshold of a showing a serious breach of a fundamental rule of procedure.

459. The third sub-element of this alleged ground for annulment is closely connected with the discussion under the heading "Failure to State Reasons on Conclusions of Liability", and indeed, Spain largely refers to its earlier arguments in relation to the alleged failure to provide reasons. It reiterates that while the Tribunal rejected Cube and Demeter's

[652] **RL-0093**, Decision, ¶ 393.
[653] **RL-0093**, Decision, ¶ 394.
[654] Mem., ¶ 493.
[655] **RL-0093**, Decision, ¶ 401.
[656] Tr. Day 1 (Ms. Frey), pp. 150-151.

arguments about the immutability of the system[657] it found for Cube and Demeter on the basis of arguments not made by Cube and Demeter.[658]

460. As considered above, the Tribunal conducted a comprehensive and integrated analysis of the facts and circumstances. After reviewing the evidence presented, the Tribunal agreed with Spain that it was entitled to make changes, but only those that did not alter the economic basis on which Cube and Demeter made their investments.[659] The Tribunal's finding amounted to a partial acceptance of both Parties' positions, namely that while Spain had guaranteed a level of stability precluding fundamental changes to the regulatory regime, Spain retained discretion to make some changes to the regulatory regime and Cube and Demeter could not expect petrification of the entire system. The Tribunal's decision cannot be characterized as one whereby a tribunal "effectively surprises the parties with an issue that neither party has invoked, argued or reasonably could have anticipated during the proceedings."[660] Rather, as considered above, the Tribunal's considerations and assessment of the evidence is firmly based on the Parties' debate in the arbitration.

**(3) Right to be Heard and Quantum**

461. Spain's argument in relation to the Tribunal's damages calculation is two-pronged. First, Spain argues that the Tribunal based the calculation on the Brattle memorandum submitted with Cube and Demeter's post hearing brief and that it did not have the opportunity to comment thereon. However, the procedure adopted by the Tribunal at the conclusion of the merits hearing explicitly provided for the submission of a single round of simultaneously filed post hearing briefs. Spain did not object to this procedure, even though the Tribunal explicitly instructed the presentation of new calculations by the Parties' experts in these briefs.

[657] Reply, ¶ 497.

[658] Reply, ¶ 496 (as "an alternative defence").

[659] Rejoinder, ¶ 218.

[660] Reply, ¶ 451, *citing* **RL-0147**, *TECO*, ¶ 82 (quoting **RL-0101**, *MINE*, ¶ 5.05).

462. In its post hearing brief Spain reserved its rights "to respond to new damages calculations"[661] submitted with Cube and Demeter's post hearing brief but it never raised the issue of the Brattle memorandum in the underlying arbitration. The first time it did so was during the annulment proceedings.

463. Furthermore, after receipt of the post hearing brief, and the Brattle memorandum contained therein, Spain made two additional submissions in relation to a number of legal decisions, but it did not seek the opportunity to comment on the memorandum. Moreover, after the Tribunal declared the proceedings closed, they were reopened to deal with issues of quantum in order for the Parties to submit further evidence on issues of quantum. The Parties also submitted a joint expert report identifying areas of agreement and disagreement regarding the implementation of the Tribunal's quantum instructions, as well as a supplemental joint expert report, and also these occasions Spain failed to raise the alleged procedural concern caused by the presentation of the Brattle memorandum in the context of a single round of simultaneous submissions.

464. This overview of the numerous procedural steps ordered by the Tribunal in consultation with the Parties, and the careful and transparent procedural timetable issued by the Tribunal demonstrate that the Parties were fully aware of the structure and sequence of submissions in relation to damages. Especially in light of the fact that Spain reserved its rights, showing awareness of the possible implications of the time schedule adopted, combined with the fact that there were exchanges in relation to quantum after the submission of the Brattle memorandum, including two joint expert reports which provided a platform for raising areas of agreement and disagreement, it is difficult to see that the procedure adopted by the Tribunal amounts to a breach of a fundamental rule of procedure.

465. Tribunals have considerable freedom whether to adopt consecutive or simultaneous exchanges, and in the present case, there was full transparency about the procedure. ICSID Arbitration Rule 27 stipulates that a party must promptly object to any failure of the tribunal to comply with rules applicable to the procedure, failing which it shall be

[661] **R-0383**, Spain's Post-Hearing Brief in Underlying Arbitration, ¶ 190.

deemed to have waived its right to object. It is telling that Spain did not object at the outset, and only reserved its rights for later, and in the end did not avail itself of the opportunity to invoke any allegedly infringed rights even though it had ample opportunity to do so in the context of the subsequent quantum submissions. Under these circumstances, the Committee finds that Spain has not demonstrated a breach of a fundamental rule of procedure.

466. The second prong of Spain's arguments relates to the impact of the alleged inability to comment on the Brattle memorandum, which goes to the potential seriousness of the breach. Spain argues that the inability to respond to the Brattle memorandum was particularly serious because Brattle changed its methodology. Whereas previously, Brattle had presented calculations on the basis of an adjusted CPI by subtracting 1% from the CPI, in the memorandum submitted with the post hearing brief, Brattle assumed that the CPI is equal to the adjusted CPI. Cube and Demeter dispute that the Brattle memorandum is in fact based on the assumption that the long-term delta between CPI and adjusted CPI would always be 1%. Moreover, Cube and Demeter stress that Spain itself had always argued that there was no material difference between CPI and adjusted CPI in the long run. In light of the Committee's decision that by adopting the procedure that it did, the Tribunal did not fail to provide Spain with an opportunity to be heard, the seriousness of this alleged breach is moot.

**(4) European Commission's Request to Intervene**

467. Spain submits that by deciding on and rejecting the EC's request to intervene as a non-disputing party within one day without granting the Parties the opportunity to comment on the request, the Tribunal seriously departed from a fundamental rule of procedure. Spain stresses the importance of the intervention and the opportunity for the Parties to comment thereon, and it questions the veracity of the Tribunal's response that it had completed its deliberations as it had just decided to reopen the proceedings.

468. First, the Committee notes that ICSID Arbitration Rule 37(2) provides that a tribunal may allow a non-party to file a written submission, but only after consulting both parties. While the wording of this provision therefore stipulates that a request may not be

accepted without consulting both parties, there is no comparable obligation addressing the scenario whereby a tribunal rejects a request to intervene. Given the potential impact of the intervention by a non-party it is understandable that additional procedural safeguards apply should a tribunal admit a third party intervention

469. Furthermore, a tribunal has discretion whether it allows a non-party submission ("the Tribunal *may* allow", italicizing added), and in applying that discretion at the stage of the proceedings and the potential impact on the proceedings are relevant considerations, in addition to the tribunal's basic assessment as to whether it anticipates that the submission "would assist" the tribunal. In this context, the Committee notes that EC's request came three years into the proceedings and after completion of deliberations, or at least the bulk thereof.

470. Finally, the Committee notes that Spain does not appear to have requested to be provided with the opportunity to comment on the request.

471. In sum, Spain has failed to show that by rejecting the request of the European Commission to be allowed to make a non-party submission, and in doing so within a day without the Parties' comments, the Tribunal committed a serious breach of a fundamental rule of procedure.

**(5) Declaration of the Member States of January 2019**

472. Spain alleges that by refusing to accept the Declaration of the Representatives of the Governments of the Member States of 15 January 2019, the Tribunal committed a further breach of a fundamental rule of procedure. ICSID Arbitration Rule 38 provides that when proceedings have been closed, the tribunal may exceptionally reopen the proceeding "on the ground that new evidence is forthcoming of such a nature as to constitute a decisive factor, or that there is a vital need for clarification of certain specific points." The Tribunal invoked this limited discretion when it sought additional and specific input from the Parties in relation to the calculation of damages. That does not create an entitlement to a subsequent reopening in relation to evidence which a party wants to bring to the attention of the tribunal.

473. The Committee emphasizes the limited scope of annulment, both as a result of the high threshold imposed by Article 52(1)(d) of the ICSID Convention and by the intrinsic limitations of the annulment system, which preclude a committee from second-guessing the impact of a subsequent evidentiary or legal development, because the scope of annulment is confined to the arguments, evidence and case law available to the tribunal in the underlying arbitration.

474. These limitations are compounded by and particularly pertinent in a situation such as in the present case where the law is being developed and where decisions by other tribunals and courts are constantly emerging. This constantly evolving environment places tribunals on a dilemma about how to balance the right of parties to present their case and the principle of finality, which underlies ICSID Arbitration Rule 38. There comes a point in every procedure when enough is enough. In conclusion, the Committee finds that Spain has failed to make a showing that by refusing to accept the submission of the 2019 Declaration, the Tribunal breached a fundamental rule of procedure.

**(6) Lack of Impartiality and Unequal Treatment of the Parties**

475. Spain submits that the Tribunal did not treat the Parties equally, and that it failed to show a comparable standard of respect vis-à-vis Spain as it did vis-à-vis Cube and Demeter. It argues that the Tribunal's attitude and terminology reflects bias, which it submits constitutes a ground for annulment for lack of impartiality.

476. First, the Committee notes that while there may be some scope for invoking lack of impartiality as a basis for annulment pursuant to Article 52(1)(d), this scope is limited. The high threshold in this respect is confirmed by the decision by the *Enron* committee which considered that "lack of impartiality may be a ground of annulment under Article 52(1)(d) of the ICSID Convention, and leaves open the possibility that such lack of impartiality might be evidenced, for instance, by the fact that an Award consistently and perversely makes findings favourable to one party without any basis in the evidence."[662]

[662] **RL-0108**, *Enron*, ¶ 278.

477.  At the Hearing, Spain also referred to the *Eiser* annulment decision as an example of a situation in which a committee effectively annulled an award on the basis of a lack of impartiality.  The *Eiser* case involved a review of circumstances pertaining to one of the arbitrators and his individual independence and impartiality and therefore arguably a more "classic" scenario of (potential) lack of impartiality.  These scant examples show that annulment on the basis of alleged impartiality is highly unusual and the threshold is high.

478.  Spain's argument consists of three parts, the way in which the Tribunal dealt with the jurisdictional objections, the language used and, effectively as catchall argument, an allegation of discrimination by reference to arguments previously presented under other annulment grounds.  Insofar as Spain's arguments, these duplicate the arguments made in relation to the other, rejected, annulment grounds, and effectively amount to a repetition of the substantive arguments made previously.  It is difficult to see that even hypothetically there is a separate and independent basis for concluding that the Parties were treated unequally, let alone that this was due to lack of impartiality.

479.  The most concrete argument made by Spain is the use of wording allegedly demonstrating an "unjustified animus."  Essentially, however, here too Spain takes issue with substantive considerations of the Tribunal.  There does not appear to be any objective basis for the suggestion that the Tribunal was anything but professional and treated the Parties fairly and equitably, and there has been no showing of conduct meeting the standard identified by Spain itself by reference to the *Enron* decision, namely consistently and insistently making findings in favor of one of the Parties without the corresponding factual support.

480.  For the reasons set out above, the Committee rejects Spain's request for annulment based on the Tribunal's alleged failure to state reasons.

# VIII. COSTS

## A. THE APPLICANT'S COST SUBMISSIONS

481. In its Memorial, Reply and submission on costs, Spain requested that the Committee order Cube and Demeter pay all the costs of the proceeding, including its legal fees, expert witness, translation and other costs, as well as ICSID costs. In its submission on costs, Spain indicated that the total amount of costs was EUR 1,519,098.42, broken down as follows:

| Category | Amount |
|---|---|
| ICSID fees and Advance Payments | 383,581.37 EUR |
| Legal fees directly incurred by the Kingdom of Spain | 1.058.000 EUR |
| Expert Reports | 33,254.83 EUR |
| Translations | 7,020.67 EUR |
| Other expenses | 37,241.55 EUR |
| TOTAL AMOUNT | 1,519,098.42 EUR |

482. On 18 May and 13 December 2021, after the Parties' submission on costs, the ICSID Secretariat requested two additional advance payments of USD 50,000 each. On 2 June 2021 and 4 January 2022, the ICSID Secretariat confirmed receipt of the amounts requested from the Applicant.

483. In its submission on costs, Spain also requests that Cube and Demeter be ordered to pay post-award interest on the abovementioned sums, at a compound rate of interest to be determined by the Committee until the date of full satisfaction of the Committee's decision.

484. The Applicant states that Article 61(2) of the ICSID Convention grants the Committee "the authority to assess and apportion the costs" and also confers a degree of discretion to decide on the allocation of costs.[663] Spain argues that the Committee "should be guided by the principle that 'costs follow the event' if there are no indications that a different approach should be called for."[664] According to the Applicant, other committees have decided to allocate the costs to the losing party.[665]

485. According to Spain, it was compelled to go through the annulment proceedings on the basis that it had argued from the commencement of the underlying arbitration that the Tribunal lacked jurisdiction. Spain argues that "the Applicant was left with no choice but to initiate this annulment proceedings and it should be compensated for the costs incurred."[666]

486. Spain submits that "if the *ad hoc* Committee understands – as the Kingdom of Spain is confident that it will – that the grounds for annulment raised by the Kingdom of Spain should be upheld and that the award must be annulled the Cube Parties should be ordered to pay for the legal, arbitration, and annulment costs of the Kingdom of Spain."[667]

487. Finally, Spain also alleges that its costs are reasonable in light of the complexity and duration of the case.[668]

## B. THE RESPONDENTS' COST SUBMISSIONS

488. In their Counter-Memorial, Rejoinder and submission on costs, Cube and Demeter request that the Committee order Spain to bear all the costs and expenses of these proceedings, including the costs and expenses of ICSID as well as the fees and expenses

[663] Applicant's Submission on Costs, ¶¶ 4-5.

[664] Applicant's Submission on Costs, ¶ 6.

[665] Applicant's Submission on Costs, ¶ 6; *see* **RL-0145**, *Eiser*, ¶ 267; **CL-230**, *Alapli*, ¶¶ 258-264; **RL-0158**, *CDC*, ¶¶ 88-90.

[666] Applicant's Submission on Costs, ¶ 8.

[667] Applicant's Submission on Costs, ¶ 9.

[668] Applicant's Submission on Costs, ¶ 10.

of the Members of the Committee, and Cube and Demeter's legal fees and expenses totaling EUR 1,037,773.63, broken down as follows:

| CATEGORY | AMOUNT |
|---|---|
| **King & Spalding's Legal Fees** | € 1,028,155.00 |
| **Expenses** | € 9,618.63 |
| **TOTAL** | **€ 1,037,773.63** |

489. The Respondents also request that Spain be ordered to pay post-decision interest, at a compound, commercial rate of interest to be determined by the Committee, until the date of Spain's full satisfaction with the Committee's order on costs.[669]

490. The Respondents state that committees enjoy "wide discretion to allocate fees, expenses, and costs between the parties as they see fit pursuant to Articles 52(4) and 61(2) of the ICSID Convention and ICSID Arbitration Rule 28(1), as affirmed by this Committee in Procedural Order No. 1."[670] According to the Respondents, committees do the allocation on the basis of a number of factors, including the success on claims and arguments.[671]

491. Cube and Demeter argue that "Spain abused its right to annulment by seeking an appeal or retrial on dozens of issues that go well beyond the limited grounds for annulment under Article 52 of the ICSID Convention."[672] On this basis, Cube and Demeter request that Spain be ordered to reimburse the legal fees and expenses.

---

[669] Respondents' Submission on Costs, ¶ 12.

[670] Respondents' Submission on Costs, ¶ 3; *See, e.g.,* **RL-0157**, *TECO*, ¶ 375; **CL-288**, *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision of the *ad hoc* Committee on the Application for Annulment, 29 June 2012 [hereinafter *AES*], ¶ 181; **CL-230**, *Alapli*, ¶ 263. *See also*, **CL-23**, *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, ¶ 130; **CL-20**, *ADC Affiliate Ltd. and ADC & ADMC Management Ltd. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶¶ 533, 535-542; **CL-16**, *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 [hereinafter *Siag*], ¶ 630.

[671] Respondents' Submission on Costs, ¶ 3, *citing* **RL-0157,** *TECO*, ¶ 375.

[672] Respondents' Submission on Costs, ¶ 4.

492. According to the Respondents, they were forced to incur in legal fees to defend against Spain's arguments and request the Committee to award Cube and Demeter the entirety of their legal fees and expenses "in order to wipe out as far as possible the consequences."[673]

493. Cube and Demeter argue that they should not be required to contribute to the costs of the proceeding (*i.e.*, the costs and expenses of ICSID, including fees and expenses of the Members of the *ad hoc* Committee). According to Cube and Demeter, "no *ad hoc* committee has ever required a successful annulment respondent to reimburse the applicant any of the proceeding."[674] The Respondents sustain that this is in line with Regulation 14(3) of the ICSID Administrative and Financial Regulations.

494. Finally, the Respondents argue that their legal fees and expenses are reasonable. According to Cube and Demeter, "factors relevant to determining whether fees and legal expenses are reasonable typically include the length of the proceeding, the complexity of the case, the amount in dispute, and the efficiency in which a party presents its case."[675] The Respondents allege that their legal fees are reasonable in light of the many issues raised by Spain to which they had to respond, the complexity of the arguments, and the steps in the proceeding. Therefore, the Respondents conclude, Spain should be ordered to bear the Respondents' legal fees and expenses in its entirety.[676]

## C. THE COMMITTEE'S DECISION ON COSTS

495. Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

---

[673] Respondents' Submission on Costs, ¶ 5. *See e.g.* **CL-288**, *AES*, ¶ 181; **CL-230**, *Alapli*, ¶ 263.

[674] Respondents' Submission on Costs, ¶ 6. *See e.g.* **RL-0149**, *MCI*, ¶ 230; **RL-0133**, *Tulip*, ¶ 88.

[675] Respondents' Submission on Costs, ¶ 8. *See e.g.* **CL-16**, *Siag*, ¶¶ 623-28.

[676] Respondents' Submission on Costs, ¶ 10.

496. This provision, together with ICSID Arbitration Rule 47(1)(j) (applied by virtue of ICSID Arbitration Rule 53) gives the Committee discretion to allocate all costs of the proceeding, including attorney's fees and other costs, between the Parties as it deems appropriate.

497. Both Parties have requested that the other Party be ordered to pay all the costs of the proceeding, including legal fees, expenses and ICSID costs, as well as post-decision interest at a compound rate of interest to be determined by the Committee. Both Parties have argued that their costs are reasonable.

498. Both Parties have acknowledged that the Committee has wide discretion to assess and apportion the costs, and Spain has invoked the principle that "costs follow the event." The Committee considers that this is indeed the appropriate starting point in relation to the awarding the cost of these proceedings. While potentially other factors may need to be taken into account, which may lead to some adjustment, in this case the Committee does not see any reason to do so, and in particular does not see the need to distinguish between cost of legal representation and other costs. The Application was of a very broad nature and included a certain amount of repetition. In addition, the Application considerably exceeded the scope of what can reasonably and properly be raised in annulment proceedings, notably by presenting new lines of argument, also supported by new documentation.

499. The costs incurred by Cube and Demeter are similar to those incurred by Spain and the Committee does not find the costs or expenses disproportionate to the issues presented. Consequently, Spain shall bear the costs of representation incurred by Cube and Demeter, as well as the costs of the proceeding.

500. Both Parties have claimed compound interest without specifying what they deem to be the appropriate rate. The Committee considers that the EURIBOR rate which was adopted by the Tribunal is the appropriate rate. The amounts awarded shall therefore bear interest at the six-month EURIBOR rate compounded semi-annually, with the remaining provisions relating to interest continuing to apply unchanged.

501. The costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Committee Members' fees and expenses | |
| Prof. Dr. Jacomijn van Haersolte-van Hof | 141,525.00 |
| Mr. Álvaro Castellanos Howell | 76,687.50 |
| Mr. Timothy J. Feighery | 87,037.50 |
| ICSID's administrative fees | 126,000.00 |
| Direct expenses | 49,830.90 |
| **Total** | **481,080.90** |

502. The above costs have been paid out of the advances made by the Spain pursuant to Administrative and Financial Regulation 14(3)(e).[677]

503. Accordingly, the Committee orders Spain to bear all costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses in the amount of USD 481,080.90 and to cover Cube and Demeter's legal fees and expenses in the amount of EUR 1,037,773.63

## IX. DECISION

504. For the reasons set forth above, the *ad hoc* Committee decides as follows:

(1) the Application is rejected;

(2) Spain shall bear all costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses amounting to USD 481,080.90;

(3) Spain is directed to pay to Cube and Demeter the principal sum of EUR 1,037,773.63 for their legal fees and expenses, and

[677] The remaining balance will be reimbursed to the Applicant.

(4)   If no payment in full is made within four months as of the dispatch date of this Decision on Annulment, the above amount will be increased at a six-month EURIBOR interest rate, compounded semi-annually until full payment.

Mr. Álvaro Castellanos Howell
Member of the *ad hoc* Committee

Date: 18 March 2022

Mr. Timothy J. Feighery
Member of the *ad hoc* Committee

Date:

Prof. Dr. Jacomijn van Haersolte-van Hof
President of the *ad hoc* Committee

Date:

Mr. Álvaro Castellanos Howell
Member of the *ad hoc* Committee

Date:

Mr. Timothy J. Feighery
Member of the *ad hoc* Committee

Date: 18 MARCH 2022

Prof. Dr. Jacomijn van Haersolte-van Hof
President of the *ad hoc* Committee

Date:

Mr. Álvaro Castellanos Howell
Member of the *ad hoc* Committee

Date:

Mr. Timothy J. Feighery
Member of the *ad hoc* Committee

Date:

Prof. Dr. Jacomijn van Haersolte-van Hof
President of the *ad hoc* Committee

Date: 21 March 2022