# EXHIBIT 51

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

# ARBITRATION ACCORDING TO THE STOCKHOLM CHAMBER OF COMMERCE INSTITUTE OF ARBITRATION RULES

### Isolux Infrastructure Netherlands, B.V.
*Claimant*

**-v-**

### Kingdom of Spain
*Respondent*

### Arbitration SCC V2013/153

---

### AWARD

---

### <u>Arbitration Panel Members</u>
Mr. Yves Derains (Chairman)

Prof. Guido Santiago Tawil (Co-Arbitrator)

Mr. Claus Von Wobeser (Co-Arbitrator)

### *Secretary to the Arbitration Panel*
Mrs. Aurore Descombes

*Counsel for the Claimant*

Mr. Hermenegildo Altozano García-Figueras
Mr. Coral Yáñez Cañas
*Bird & Bird LLP (Spain)*

Mr. Fernando Mantilla-Serrano
Mr. John Adam
*Latham & Watkins LLP (Paris)*

*Counsel for the Respondent*

Mr. José Luis Gómara Hernández
Mr. Diego Santacruz Descartin
Mr. Fernando Irurzun Montoro
*Government Attorney's Office*

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

# TABLE OF CONTENTS

I.  The Parties
    A.  Claimant
    B.  Respondent
II.  Consent to Arbitration
III.  Applicable Law
IV.  Procedural Background
V.  Summary of facts
    A.    Evolution of the Spanish legislative framework regulating electricity production from renewable sources
        1.    Electricity Generation Special Regime
            a.    Royal Decree 661/2007, of 25 May
            b.    RD 1578/2008 of 26 September
            c.    Royal Decree Law 6/2009, of 30 April, adopting certain energy sector measures and passing into law the discount rate
            d.    Royal Decree 1565/2010, of 19 November, regulating and amending certain aspects of electricity production under the Special Regime
            e.    Royal Decree Law 14/2010, of 23 December, establishing emergency measures to correct the electricity sector tariff deficit
        2.    Reform of the renewable energy sector in Spain and introduction of the specific remuneration regime.
            a.    Royal Decree Law 1/2012, of 27 January, suspending procedures for pre-allocation of remuneration and removing economic incentives for new installations producing electricity from cogeneration, renewable energy sources and residual waste
            b.    National Energy Commission Report on the Spanish Energy Sector, dated 7 March 2012
            c.    2012 National Reforms Programme, of 27 April
            d.    Adoption of Law 15/2012 on fiscal measures applicable to sustainable energy
            e.    Royal Decree-Law 2/2013 and emergency measures applicable to the electricity system and financial sector
            f.    Royal Decree-Law 9/2013, of 12 July, adopting emergency measures to guarantee financial stability of the electricity system
            g.    Law 24/2013 of 26 December, Electricity Sector Act (LSE 2013)
            h.    Royal Decree 413/2014 of 6 June and Order IET/1045/2014 of 16 June
    B.    Claimant structure and business activity

VI.  Positions of the Parties

    A.    Position of the Parties on Stockholm Arbitration Tribunal
        1.    Respondent's Position: SCC does not have jurisdiction

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

    a.    Jurisdictional Objection A: SCC Arbitration Tribunal has no jurisdiction as there is no protected investor in the terms of ECT

    b.    Jurisdictional Objection B: SCC Arbitration Tribunal has no jurisdiction due to absence of investor of another Contracting Party protected under Article 1(7) del ECT

    c.    Jurisdictional Objection C: absence of investment pursuant to Article 1(6) ECT

    d.    Jurisdictional Objection D: SCC Arbitration Tribunal has no jurisdiction due to abuse of process

    e.    Jurisdictional Objection E: Absence of Tribunal "*ratione voluntatis*" jurisdiction as IIN was refused application of ECT Part III because the elements of Article 17 ECT are present

    f.    Jurisdictional Objection F: SCC Arbitration Tribunal has no jurisdiction to hear an alleged breach by the Kingdom of Spain of obligations arising under Article 10(1) ECT due to the introduction of IVPEE in Law 15/2012

    g.    Jurisdictional Objection G: Claim on an alleged infringement by the Respondent of its obligations arising under Article 13 ECT due to the introduction of IVPEE in Law 15/2012 is inadmissible because the issue was not submitted to competent Spanish tax authorities as required in Article 21(5)(b) ECT

2.    Claimants' position: SCC Arbitration Tribunal does have jurisdiction

    a.    SCC Arbitration Tribunal does have jurisdiction pursuant to Article 26(1) ECT

        i.    The Investor area and the area where the investment was placed are different

        ii.    Criteria of different nationalities is met (Article 1(7) ECT)

        iii.    Claimant invested pursuant to Article 1(6) ECT

        iv.    There was no forum shopping

    b.    No obstacle to admissibility of the Claim

        i.    Respondent may not apply 17 ECT retroactively

        ii.    No legal grounds for objections in relation to Article 21

        iii.    Respondent failed to provide a mechanism for appealing before competent tax authorities

B.    Position of the Parties on the dispute merits

    1.    Claimant Position

    1.1.    Kingdom of Spain attracted investment by promising a stable and predictable Special Regime

        a.    Kingdom of Spain guaranteed a stable and predictable economic framework for the plants

        b.    Respondent guaranteed a long-term FIT for the Plants

        c.    Kingdom of Spain slowly emptied out and finally abolished the Special Regime

        d.    Kingdom of Spain abolished the Special Regime by replacing it with Specific Remuneration

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

       i.    Kingdom of Spain has imposed an arbitrary "ceiling" on reasonable rate of return

      ii.    New parameters for calculating the Specific Remuneration

     iii.    The new Specific Remuneration regime applies retroactively

     iv.    Specific Remuneration is subject to review at the discretion of the Kingdom of Spain

e.    Measures adopted by the Kingdom of Spain were not foreseeable

       i.    Kingdom of Spain failed to announce the measures to be adopted and the abolition of the Special Regime

      ii.    The legal precedent of the Spanish Supreme Court is irrelevant for the purposes of the legitimate expectations of the Claimant

     iii.    Legislative changes prior to the measures that are the object of this arbitration proceeding do not indicate the abolition of the Special Regime

f.    The measures adopted by the Kingdom of Spain are not reasonable.

1.2.    Respondent breach of obligations under ECT

a.    The claimant has failed to comply with its obligations under ECT Article 10

       i.    Kingdom of Spain is in breach of its obligation to foster and establish stable, equitable, favourable and transparent conditions for making investments

      ii.    The Kingdom of Spain has violated its obligation to provide fair and equitable treatment to the Claimant's investments

     iii.    Kingdom of Spain is in breach of its obligation to ensure the Claimant investment is completely protected and secure

     iv.    Kingdom of Spain is in breach of its obligation not to harm the administration, maintenance use or disposalof the Claimant investment through exorbitant or discriminatory measures

      v.    Kingdom of Spain is in breach of its obligation to comply with obligations taken on with regard to the Claimant or its investment

b.    Respondent is in breach of the obligation contained in Article 13 ECT with regard to the  prohibition of expropriation

       i.    Claimant's investment is protected under Article 13 ECT

      ii.    Kingdom of Spain cannot hide behind its regulatory authority to evade liability under Article 13 ECT

     iii.    Measures adopted by the Kingdom of Spain have resulted in expropriation of the Claimant investment

c.    Claimant is entitled to compensation

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

               i.      Method of valuation of the Damages Causes to IIN by the Kingdom of Spain

              ii.     The criticisms of the Kingdom of Spain with regard to the first Deloitte Report lack basis Report

             iii.    Calculation of damages suffered by IIN

2.     Position of the Respondent

    a.     Considerations on the facts

        i.      ISOLUX disinvestment

        ii.     Regulatory framework

        iii.    On a stable and predictable economic framework

        iv.    On the long-term FIT and reasonable rate of return

        v.     On foreseeability of measures adopted by the Kingdom of Spain

        vi.    On the reasonable nature of measures adopted by the Kingdom of Spain

        vii.   In May 2011 ISOLUX was aware of the framework and the regulatory risk

        viii.  T-Solar and the Plants knew the regulatory framework and risk in July 2011,

        ix.    Claimant was aware of the Supreme Court position on retroactivity

    b.     The Kingdom of Spain has not violated Article 10(1) ECT

        i.      Kingdom of Spain has not breached the obligation to create stable and transparent conditions for investors to perform investments.

        ii.     Kingdom of Spain has not infringed the FET standard in ECT

        iii.    Kingdom of Spain has not adopted exorbitant nor discriminatory measures

        iv.    Kingdom of Spain met its obligations toward the Claimant: absence of umbrella clause

    c.     Kingdom of Spain is not in breach of Article 13 ECT

        i.      Lack of legitimate object: future income expected by IIN cannot be deemed assets or rights capable of expropriation in accordance with Article 13 ECT

        ii.     Measures adopted do not comprise expropriation in accordance with international law

        iii.    Facts show that the measures do not amount to expropriation

    d.     Claimant is not entitled to compensation

        i.      The valuation method is not appropriate

        ii.     On profitability

        iii.    Other criticisms of the calculation methods

C.    Costs

    1.     Pleading of the Claimant

    2.     Pleading of the Respondent

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

VII.   DISCUSSION
   A.   Jurisdiction
      1.   Jurisdictional Objection A: ECT does not apply to disputes on intra-EU investments
         a.   That the Kingdom of Spain and the Netherlands belong to the same REIO does not imply this dispute may not be brought by an investor of a Contracting Party against an investor of another Contracting Party
         b.   EU European law does not prohibit submission of this dispute to arbitration
      2.   Jurisdictional Objection B: Claim is materially brought by a Spanish investor – Isolux - and by a Canadian investor - PSP Investments
      3.   Jurisdictional Objection C: Isolux IIN did not carry out an investment in the Kingdom of Spain in accordance with the definition of investment as set out in Article 1(6) ECT
      4.   Jurisdictional Objection D: Arbitration Court has no jurisdiction as there is abuse of process
      5.   Jurisdictional Objection E: absence of Arbitration Tribunal "*ratione voluntatis*" jurisdiction due to having refused IIN application of Part III ECT due to presence of circumstances referred to in Article 17 ECT
      6.   Jurisdictional Objection F: absence of Arbitration Tribunal jurisdiction to hear an alleged violation by the Kingdom of Spain of obligations arising under Article 10(1) ECT due to the introduction of IVPEE in Law 15/2012
      7.   Jurisdictional Objections G: inadmissibility of the claim on alleged infringement by the Respondent of its obligations arising from Article 13 ECT by having introduced IVPEE in Law 15/2012, due to having failed to submit the matter to competent national tax authorities as required in Article 21(5)(b) ECT
   B.   Analysis of the merits
      1.   Alleged violation of Article 10 ECT
         a.   The alleged violation by the Respondent of the obligation to grant fair and equitable treatment (FET) to the investments of the Claimant
         b.   The alleged violation by the Respondent of the obligation to ensure  complete protection and security for investments of the Claimant
         c.   The alleged violation of the Respondent of the obligation to not do harm through exorbitant or discriminatory measures, to the maintenance, use, utilisation, or payment of investments of the Claimant
      2.   Alleged violation of Article 13 ECT
         a.   The nature of the Claimant's investment and scope of protection of Article 13 ECT
         b.   Effects of the measures adopted by the Kingdom of Spain on the Claimant's investment

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

C.    Costs
VIII.    DECISION

## GLOSSARY OF TERMS AND ABBREVIATIONS

**Investment Agreement**: Investment Agreement signed on 29 June 2012 by shareholders in the Brazilian company Isolux Infrastructure, S.A., i.e. Spanish companies Grupo Isolux Corsan Concesiones, S.L., and Grupo Isolux Corsan, S.A. on the one hand and, on the other hand, the Canadian investment companies Public Sector Pension Investment Board ("PSP" or "PSP Investment") and their subsidiary Infra-PSP Canada Inc.

**Shareholders Agreement**: PSP, CIG and CIG Concesiones signed a Shareholders Agreement together with the company subject of the transaction, Isolux INBV, also on 29 June 2012. The purpose of the Shareholders Agreement was to establish and organise the entitlements of PSP and CIG Concesiones, new shareholders in the company Isolux INBV.

**CAPEX:** Capital Cost.

**NEC:** National Energy Commission. [*Comisión Nacional de Energía*]

**Viene Convention or VCLT***:* Vienna Convention on the Law of Treaties.

**Request:** Request for Arbitration dated 3 October 2013.

**Respondent**: The Kingdom of Spain.

**Claimant**: Isolux Infrastructure Netherlands B.V.

**DCF:** Discounted Cash Flow.

**DGT**: Spanish Tax Department. [*Dirección General de Tributos*]

**FIT:** Regulated tariffs referred to as "*Feed-in Tariff*".

**GIC:** Spanish company Grupo Isolux Corsan, S.A., shareholder in the Brazilian company Isolux  Infrastructure, S.A.

**GIC Concesiones or GICC**: Spanish company Grupo Isolux Corsan Concesiones, S.L., and shareholder in the Brazilian company Isolux Infrastructure, S.A.

**IDEA:** Institute for Energy Saving and Diversification. [*Instituto para la Diversificación y Ahorro de la Energía*].

**IIN or Isolux INBV:** Claimant, Isolux Infrastructure Netherlands B.V.

**Report 2/2012**: NEC Report 2/2012 "on the Spanish Energy Sector" dated 7 March 2012.

**Infra-PSP**: Canadian firm trading as Infra-PSP Canada Inc., subsidiary of the Canadian company Public  Sector Pension Investment Board.

**CPI:**  Spanish Consumer Price Index established in Section  44 of Royal Decree 661/2007 and used to update the FIT. [*Índice Nacional de Precios al Consumo*]

**IPVEE:** Tax on the value of electricity production brought in under Law 15/2012. [Impuesto Sobre el Valor de la Producción de la Energía

**ISOLUX**: Grupo Isolux Corsan Concesiones, S.L., and Grupo Isolux Corsan, S.A.

8

*This is an English courtesy translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

**Isolux Infrastructure**: Isolux Infrastructure, S.A., Brazilian company, subsidiary of Grupo Isolux Corsan Concesiones, S.L., and Grupo Isolux Corsan, S.A.

**Law 54/1997 or LSE:** Law 54/1997, Electricity Sector Act.

**Law 2/2011:** Law 2/2011 of 4 March, on the Sustainable Economy.

**Law 15/2012:** Law 15/2012 of 27 December 2012, on fiscal measures for sustainable energy, dated 27 December 2012.

**Law 24/2013 or LSE 2013**: Law 24/2013 of 26 December, Electricity Sector Act.

**Statement of Claim:** Statement of Claim filed by the Claimant on 11 July 2014, together with exhibits C-2 to C-171, legal authories CLA-1 to CLA-35, and the expert report on damages drawn up by Mr. Javier Acevedo Jiménez de Castro and Mr. Jesús Mota Robledo from Deloitte.

**Statement of Defence:** Statement of Defence filed by the Respondent on 3 December 2014, setting out Objections on jurisdiction and containing the Petition for Bifurcation. The aforesaid Statement was submitted together with its exhibits R-1 to R-163, legal authorities RL-1 to RL-85, the expert report drawn up by MaC Group and Altran dated 2 December 2014 carried out by the experts Grant Greatrex and David Pérez López.

**Reply: Reply**Reply to the Statement of Defence and Defence to jurisdictional objections filed by the Claimant on 4 June 2015, attaching exhibits C-172 to C-208 and legal authorities CLA-36 to CLA-91, the second Deloitte report dated 4 June 2015 and a report dated 3 June 2015 prepared by Carlos Solé Martin and Marta Serrano Pardo from KPMG.

**Rejoinder**: Rejoinder on the merits and Reply on jurisdictional objections dated 29 July 2015, attaching exhibits R-164 to R-228 and legal authorities RL-86 to RL-110, together with the second Altran-Mac Group expert report dated 28 July 2015, prepared by Grant Greatrex, David Pérez López and Jesús Fernández Salguero.

**Rejoinder on jurisdictional objections:** Rejoinder to Reply on jurisdictional objections dated 10 September 2015, together with exhibits C-209 and legal authorities CLA-92 to CLA-101.

**OPEX**: Operation Cost.

**REIO**: Regional Economic Integration Organisation as defind under Article 1(3) ECT. [*Organización Regional de Integración Económica*]

**Plants**: Refers to 34 photovoltaic plants the Claimant allegedly holds by means of its holding in T-Solar in TGOA and TZO, subject of these arbitration proceedings.

**RPR:** Register for Pre-allocation of Remuneration implemented in RD 1578/2008 and effectively established in Royal Decree Law 6/2009. [*Registro de Pre-asignación de la Retribución*]

**First Deloitte Report:** Report by experts Deloitte adduced by the Claimant on 11 July 2014.

**PSP or PSP Investments**: Canadian company known as the Public Sector Pension Investment Board.

**RAIPRE:** Administrative Register of Generation Facilities under the Special Regime brought in

*This is a true and complete translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

by Section 9 RD 661/2007. [*Registro Administrativo de Instalaciones de Producción en Régimen Especial*]

**Special Regime:** Legal regime applicable to electricity generation and remuneration initially implemented, characterised, by Law 54/1997.

**RD 2818/1998:** Royal Decree 2818/1998, of 23 December, on the production of electricity by installations supplied by renewable energy resources or sources, residual waste or co-generation.

**RD 436/2004:** Royal Decree 436/2004, of 12 March, establishing the methodology for the updating and systematising the legal and economic regime for electricity generation under the special regime.

**RD 661/2007:** Royal Decree 661/2007, of 25 May, regulating electricity generation under the special regime.

**RD 1578/2008:** Royal Decree 1578/2008, of 26 September, on the remuneration of electricity production photovoltaic solar technology for facilities registered after the deadline for maintaining the remuneration under Royal Decree 661/2007, of 25 May for that technology.

**RDL 6/2009:** Royal Decree Law 6/2009, of 30 April adopting certain energy sector measures and passing into law the "*discount rate*" [*bono social*].

**RD 1565/2010:** Royal Decree 1565/2010, of 19 November, regulating and amending certain aspects aspects pertaining to the electrical energy production under the special regime.

**RD 1614/2010**: Royal Decree 1614/2010, of 7 December, regulating and amending certain aspects regarding electricity generation using solar thermoelectric and wind technologies.

**RDL 14/2010**: Royal Decree Law 14/2010, of 23 December, establishing urgent measures for correcting tariff deficit of the electricity sector.

**RDL 1/2012**: Royal Decree Law 1/2012, of 27 January, suspending procedures for pre-allocation of remuneration and eliminating the economic incentives for new electricity generation facilities using cogeneration, renewable energy sources and waste.

**DL 2/2013:** Royal Decree-Law 2/2013 concerning urgent measures in the electricity system and the financial sector, dated 1 February 2013.

**RDL 9/2013**: Royal Decree Law 9/2013, of 12 July, adopting urgent measures to guarantee the financial stability of the electricity system.

**RDL 14/2010:** RDL 14/2010, of 23 December, establishing urgent measures for correcting the tariff deficit of the electricity sector.

**RD:** Royal Decree

**RDL**: Royal Decree Law

*This award is a free English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

**Specific Remuneration:** Remuneration system brought in under Royal Decree Law 9/2013 of 12 July 2013 and replacing the FIT system.

**RDs:** plural Royal Decrees

**SCC:** Stockholm Chamber of Commerce Institute of Arbitration.

**Second Deloitte Report:** Expert Deloitte report adduced by the Claimant on 4 June 2015

**ECT:** Energy Charter Treaty dated 17 December 1994.

**TFEU**: Treaty on the Functioning of the European Union.

**TGOA**: T-Solar Global Operating Assets, S.L., T-Solar subsidiary.

**IRR:** Internal Rate of Return. [*Tasa Interna de Rentabilidad*]

**FET**: Fair and equitable Treatment [*Trato Justo y Equitativo*].

**T-Solar**: Grupo T-Solar Global S.A.

**TZO**: Tuin Zonne Origen, S.L.U., T-Solar 100% subsidiary controlled by TGOA

**UE:**  European Union.

*This translation is an unofficial English translation of the original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

## I.   THE PARTIES

Parties to these arbitration proceedings are:

### A.   CLAIMANT

1. Isolux Infrastructure Netherlands, B.V. (Netherlands) ("**IIN**" or the "**Claimant**"), company incorporated on 13 June 2012 under the laws of the Kingdom of the Netherlands and with registered office in Strawinskylaan 411, 1077 XX, Amsterdam, Netherlands[1]. **IIN** acts in these arbitration proceedings in its capacity as the parent company and/or majority direct and/or indirect shareholder in the following Spanish commercial companies: Grupo  T-Solar Global, S.A., T-Solar Global Operating Assets, S.L. ("**TGOA**") and Tuin Zonne Origen, S.L.U. ("**TZO**"), TGOA and TZO in turn hold all or the majority of capital in 117 Spanish limited liability Sole Administrator partnerships[2] which own solar photovoltaic plants for electricity production in Spain.[3]

2. Messrs. Hermenegildo Altozano García- Figueras and Coral Yáñez Cañas from the law firm Bird & Bird LLP (Spain) and Messrs. Fernando Mantilla-Serrano and John Adam from the law firm Latham & Watkins LLP (Paris) act as Counsel for the Claimant.

### B.   RESPONDENT

3. The Respondent in these arbitration proceedings is the Kingdom of Spain ("**Respondent**").

4. The Government Attorneys Office of the Kingdom of Spain, and especially Messrs. José Luis Gómara Hernandez, Diego Santacruz Descartin and Fernando Irurzun Montoro act as Counsel for the Respondent.

5. The  Claimant and the Respondent are jointly referred herein as the "**Parties**" and separately as a "**Party**".

---

[1]   Statement of Claim, ¶32.
[2]   Except for companies (i) TZ Veguilla 1, S.L.U., TZ Veguilla 2, S.L.U., TZ Veguilla 3, S.L.U., TZ Veguilla 4, S.L.U., TZ Veguilla 5, S.L.U., TZ Veguilla 6, S.L.U. and TZ Veguilla 7, S.L.U., in which it holds 73.5% of the company capital; and (ii) Parque Solar Saelices, S.L., in which it holds only 5% of the company capital.
[3]   Statement of Claim dated 11 July 2014, ¶36.

## II.   CONSENT TO ARBITRATION

6.   The Kingdom of Spain is a signatory to the Energy Charter Treaty dated 17 December 1994 ("ECT") which establishes under Article 26: "Settlement of Disputes between an Investor and a Contracting Party" as follows:

> *"1)   Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *2)   If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*
>
> > *a) To the courts or administrative tribunals of the Contracting Party, party to the dispute;*
> > *b) in accordance with any applicable, previously agreed dispute settlement procedure;*
> > *c) in accordance with the following paragraphs of this Article.*
>
> *3)   a) Subject only to subparagraphs b) and c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*
> > *b)    i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2) a) or b).*
> > > *ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.*
> > *c) A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10 (1).*
>
> *4)   In the event that an Investor chooses to submit the dispute resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*
> > *a)    i) The International Centre for the Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Dispute between States and Nationals of other States opened for signature at Washington, 18 March 1965, (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party, party to the dispute, both parties to the ICSID Convention; or*
> > > *ii) The International Centre for Settlement of Investment Disputes,*

*established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if the Contracting Party of the Investor or the Contracting Party, party to the dispute, but not both, is a party to the ICSID Convention;*

b) *a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nation's Commission on International Trade gap law (hereinafter referred to as "UNC ITRAL"), or*

c) *an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber Commerce;*

5) a) *The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:*

i) *written consent of the parties to a dispute purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules;*

ii) *an "agreement in writing", for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and*

iii) *"the parties to a contract [to ] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules;*

b) *Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claim submitted to arbitration hereunder shall be considered to arise out of the commercial relationship or transaction for the purposes of article I of that Convention.*

6) *A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*

7) *An investor other than a natural person which is the nationality of a Contracting Party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1 (6) of the Additional Facility Rules be treated as a "national of another State".*

8) *The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards."*

*This translation is not a legally-binding substitute for the original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

## III.  APPLICABLE LAW

7.  In order to establish the applicable law, the Tribunal refers to Article 22 (1) of the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce in force since 1 January 2010 (the "**Rules**"), according to which the Arbitration Tribunal "*shall decide the merits of the dispute on the basis of the law(s) or rules of law agreed upon by the parties*".

8.  In this instance, the Arbitration Tribunal will settle this dispute as provided in Article 26 (6) ECT: "*The Tribunal shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of International Law*."

## IV.   PROCEDURAL BACKGROUND

9.  On 3 October 2013, IIN submitted a Request for Arbitration ("**Request**") to the Arbitration Institute of the Stockholm Chamber of Commerce ("**SCC**") against the Kingdom of Spain and under the SCC Rules.

10.  The Claimant requested in the aforesaid Request that the Arbitration Tribunal should be constituted by three arbitrators and duly designated Professor Guido Santiago Tawil as arbitrator s according to Article 13(3) of the SCC Rules[4]. The Claimant furthermore proposed that Spanish should be the language of the arbitration proceedings, Geneva the seat of the arbitration and that meetings and hearings should be held in Madrid, Spain.[5]

11.  On 18 October 2013, the Kingdom of Spain filed its Answer to the Request for Arbitration, proposing Madrid as the seat of the arbitration in order to guarantee the the arbitration proceedings and agreed the arbitration language should be Castilian Spanish.

12.  On 14 November 2013, the Kingdom of Spain duly designated Dr. Claus Von Wobeser as arbitrator.

13.  In response to the request received from the SCC Secretariat (SCC Secretariat's letter dated 19 November  2013) the Parties filed additional pleadings on 26 November 2013, prior to the SCC Board ruling on the seat of the arbitration under Article 20 of the SCC Rules.

14.  On 28 November 2013, the SCC Secretariat informed the Parties that the SCC Board had ruled designating Stockholm as the seat of arbitration.

---

[4]    Request, ¶80.
[5]    Request, ¶79.

*This translation is only a draft, the original prevails in its own terms.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

15. On 15 January 2014, the SCC Secretariat notified the Parties of the appointment of Mr. Yves Derains as Arbitration Tribunal Chairman as agreed by the Parties under Article 1.2.1 "Procedure for appointing the Arbitration Tribunal Chairman".

16. On 27 January 2014, the Arbitration Tribunal sent for comments to the Parties a draft Procedural Order No.1, regarding the organization of the arbitration proceedings.

17. On 28 January 2014, each Party sent their comments to the Arbitration Tribunal on the aforesaid draft Procedural Order. These were subsequently debated between the Parties and the Tribunal in the conference call held on 29 January 2014 and particularly concerning: (1) Claiman's request that the deadline for filing the Statement of Claim should be calculated from the publication date of a new Royal Decree (the "**New Decree**") referred to in the Second Final Provision of Royal Decree 9/2013 and also in a new ministerial order (the "**Claimant's Request**"); and (2) Respondent's Request regarding the introduction of a bifurcation proceeding within the arbitration timetable (the "**Respondent's Request**") (jointly, "the **Requests**"). The Arbitration Tribunal, with agreement of the Parties, considered it necessary, in order to finalise the procedural order and to establish the procedural timetable, that each Party should file a written response to the aforesaid Requests. A second conference call was held to complete the draft procedural order once the Arbitration Tribunal had ruled on the aforesaid Requests of the Parties.

18. On 4 February 2014, the Respondent sent its Answer to Claimant's Claim to both the Arbitration Tribunal and the counterpart. On the same date, Claimant's Anser to Respondent's Request was also sent to the Arbitration Tribunal and to the Respondent.

19. The Arbitration Tribunal decided on the proceedings timetable on 7 February 2014 and dismissed the aforesaid Requests. In so far as the Claimant's Request, the Tribunal ruled that a Party that instigates arbitration proceedings may not seek to make a Statement of Claim date subject to possible future events. Additionally, Article 25 of SCC Rules offers the possibility of amending or extending a claim should such future events occur. The Tribunal decided in relation to the Respondent's Request that the procedural timetable will provide the possibility to request for bifurcation after the submition of the Statement of Defence.

20. On 10 February 2014, the second case management conference call was held to decide the procedural timetable's dates.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 18 of 257
*This is a free translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

21. The Arbitration Tribunal issued Procedural Order No.1 on 11 February 2014 establishing case management and the procedural timetable, furthermore appointing Ms. Aurore Descombes as Secretary of the Arbitration Tribunal with the agreement of the Parties. On 20 May 2014, the Claimant wrote to the Arbitration Tribunal asking to modificate the procedural timetable as established in Procedural Order No.1.

22. At the request of the Arbitration Tribunal, Parties exchanged severalcorrespondences in order to set out their respective positions regarding the modification.

23. On 6 June 2014 and in response to the arguments put forward by the Parties in the aforesaid correspondence, the Arbitration Tribunal extended the deadline by 49 days for each Party and issued Procedural Order No.2, amending the procedural timetable.

24. On 14 June 2014 the Claimant submitted to the SCC a new Request for Arbitration and Consolidation. On 24 June 2014, the Respondent filed its Answer to the Request for Arbitration, dated 24 June 2014 [sic]. These new arbitration procedings were registered under number SCC V 2014/074.

25. On 8 July 2014, the SCC noted the Parties' agrement to consolidate arbitration proceedings SCC V 2013/153 and SCC V 2014/074. After confirming with the Arbitration Tribunal that it had no objection to the consolidation, the SCC confirmed the aforesaid arbitration proceedings, and ordered the accumulation by letter dated 14 July 2014.

26. According to the procedural timetable referred to in Procedural Order No.2, on 11 July 2014 the Claimant filed its Statement of Claim together with Exhibits C-2 to C-171, legal auhorities CLA-1 to CLA-35, and the expert report on damages ("**Statement of Claim**"). The Claimant set out its case in the aforesaid Statement of Claim, including claims put forward in the Request for Arbitration filed in case SCC V2014/074.

27. As a result of the above, and by email dated 15 July 2014, the Arbitration Tribunal noted there was no need to alter the procedure timetable and that the Respondent would respond directly to all the claims on 3 December 2014 in its Statement of DefenceReply. The Respondent confirmed this by email dated 16 July 2014.

28. On 24 September 2014, the Arbitration Tribunal asked for an extension to submit its award until the 30 June 2015 and this was accepted by the SCC on the same day.

29. On 17 November 2014 the SCC forwarded to the Parties and to the Arbitration Tribunal, a request from the European Commission, to be a party to the arbitration proceedings as *amicus  curiae* dated 12 November 2014.

*This is a certified English translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

30. Parties' initial comments to European Commission' request were sent on 27 November 2014. The Claimant objected to the involvement of the European Commission in these arbitration proceedings whereas the Kingdom of Spain asked the Arbitration Tribunal to authorise the European Commission to take part in the Arbitration Proceedings.

31. In view of the existing dispute between the Parties, the Arbitration Tribunal, by e-mails dated 1 and 3 December 2014, gave the Parties until 9 December 2014 for each to respond to the arguments put forward by the other Party.

32. On 3 December 2014, the Respondent submitted its Statement of Defence with its Jurisdictional Objections and its Application for Bifurcation ("**Statement of Defence**"). This Statement of Defence was submitted together with exhibits R-1 to R-163, legal authorities RL-1 to RL-85, and an expert report.

33. On 9 December 2014, according to the Arbitration Tribunal deadline, the Parties submitted their respective response to the requested involvement of the European Commission in these arbitration proceedings.

34. On 12 December 2014, the Arbitration Tribunal issued Procedural Order No.3 authorising the European Commission to file an *amicus curiae* statement by a date to be established in the procedural timetable after the ruling on bifurcation of the arbitration proceedings. The Arbitration Tribunal also ruled that the Parties would be granted a time period to comment on the *amicus curiae* statement filed. However, the Arbitration Tribunal did not authorise the European Commission either to access the documents of the arbitration proceedings or to participate in the hearings.

35. Also on 12 December 2014, the Arbitration Tribunal sent a letter to the European Commission setting out grounds for this Procedural Order No.3.

36. On 17 December 2014, the Arbitration Tribunal received the Claimant's Answer to the request for bifurcation.

37. On 12 January 2015 and in view of the arguments put forward by the Parties, the Arbitration Tribunal decided to dismiss Respondent's reaqest for bifurcation.

38. On 22 January 2015, having previously called each Party, the Arbitration Tribunal issued Procedural Order No.4 setting down the remaining arbitration proceedings dates.

39. On 20 February 2015, the European Commission sent its *Amicus Curiae* Statement to the Arbitration Tribunal.

*This is an official English translation of the original Spanish document (award).*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

40. On 17 March 2015, the Parties sent their ReplyReply to the Answer of their counterpart on objections raised against documents to be adduced.

41. On 27 March 2015, the Arbitration Tribunal ruled on applications regarding documents to be adduced agreed by the Parties.

42. On 4 May 2015, the Claimant requested an extension of time to 4 June 2015 to submit its ReplyReply to Respondent's Statement of Defence and Answer to Objections on Jurisdiction. The Claimant also proposed amending the following dates of the procedural timetable.

43. By letter dated 5 May 2015, the Respondent stated no opposition to the request for extension, as long as the Parties were granted identical time periods for providing their respective submissions.

44. At the request of the Arbitration Tribunal, the Parties exchanged further submissions on 6 May and 7 May 2015.

45. On 11 May 2015, the Arbitration Tribunal issued Procedural Order No. 6 amending Procedural Order No.4 and the procedural timetable, as follows [sic]:

46. on 22 May 2015 the Claimant alleged to the Arbitration Tribunal that the Respondent had failed (i) to comply with the Arbitration Tribunal rulings in Procedural Order No.5 regarding the production of documents in relation to petitions No.2 and No.3 on the production of reports prepared by the consulting firms Roland Berger Strategy Consultants (RBSC) and Boston Consulting Group (BCG); and (ii) to produce the calculation sheets used by those two consultants to draft their respective reports.

47. On 27 May 2015, the Respondent responded to Claimant's allegations and, on 28 May 2015, the Parties exchanged further emails discussing this issue.

48. In its Procedural Order No.7 date 29 May 2015, the Arbitration Tribunal ordered the Kingdom of Spain to produce by 2 June 2015 all RBCS and BCG reports in its possession and containing the consultants' professional opinions based on data available to them on the date the order was issued, notwithstanding the heading given to the report. The Arbitration Tribunal also ordered on the same date the production of calculation sheets in its possession and used to draft the reports produced.

49. On 29 May 2015, the Respondent wrote to the Arbitration Tribunal alleging that Claimant had complied with the Arbitration Tribunal rulings established in Procedural Order No.5 only on a gradual basis, especially the request to produce documents numbered 1, 19 to 23 and 32 to 34. The Respondent requested the Arbitration Tribunal to expressly ask the Claimant under sanction to produce the particular documents sufficiently in advance to permit their analysis and inclusion into the

*This is not an official Law-Court or the original Spanish original award in the event of any discrepancy or ambiguity*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

Respondent's Rejoinder Replyon the merits and Statement of Defence to jurisdictional objections.

50.  On 4 June 2015, the Claimant sent its Reply to Respondent's Statement of Defence and Defence to jurisdictional objections ("**Reply**"), attaching exhibits C-172 to C-208 and legal authorities CLA-36 to CLA-91, the second Deloitte report and a KPMG report.

51.  On 10 June 2015, the Claimant filed its comments responding to Respondent's request.

52.  On 24 June 2015, the Arbitration Tribunal adopted Procedural Order No.8, ordering the Claimant to produce, by 3 July 2015 at the latest: (i) the "*Disclosure Letter*", as requested by the Respondent, which is a part of the Investment Agreement, subject of Respondent's Request No.1; (ii) the credit agreements (including all annexes, appendices, addenda, additions and supplementary documents) entered into for financing plants relating to these arbitration proceedings; and subject of Respondent's Requests 19 to 23. The Arbitration Tribunal also ordered the production of (i) the photovoltaic solar plant Deterioration Reports referred to in Note 7 of the Claimant's 2013 consolidated annual accounts; in Note 4 of Grupo T-solar Global Operating Assets, S.L.'s 2013 Consolidated Annual Accounts; (ii) Sensitivity Analyses for deterioration tests referred to in the Notes to Annual Accounts of the aforementioned Companies; (iii) supporting documents for the aforesaid Deterioration Reports and Sensitivity Analysis, subject of Respondent's Requests numbered 32 to 34. The Arbitration Tribunal nevertheless refused the Respondent's request seeking the production by the Claimant of the "*Data Room Documentation*", the "*Disclosed Data Room Documentation,* and the DVD Rom "*Base case financial model*".

53.  The Respondent, in turn, submitted its Rejoinder on the merits and Reply to Jurisdiction Objections ("**ReplyRejoinder**") on 29 July 2015, together with exhibits R-164 to R-228 and legal auhorities RL-86 to RL-110 and the second Altran-Mac Group expert report.

54.  By letter addressed to the Arbitration Tribunal dated 12 August 2015, the Claimant again requested all BCG reports be produced, together with the calculation sheets used to draw up the report(s) ordered in Procedural Order No. 5 dated 27 March 2015, and especially in Procedural Order No. 7 dated 29 May 2015.

55. On 20 August of the same year, the Respondent sent to the Tribunal and the other Party its allegations in response to the Claimant's request.

56. In the light of Parties' arguments, the Arbitration Tribunal issued Procedural Order No.9, dated 26 August 2015, ordering the documents requested by the Claimant to be produced within 5 business days (i.e. an authorisation request addressed to BCG to produce to the Arbitration Tribunal the documents it had ordered be produced, subject to confidentiality rules applicable to these arbitration proceedings and BCG's refusal).

57. On 2 September, the Respondent wrote to both Arbitration Tribunal and to the other Party explaining why it was not possible to comply with Procedural Order No.9. The Claimant replied to this letter by asking the Arbitration Tribunal on 7 September 2015 to confirm Procedural Order No.9.

58. On 10 September and in accordance with the procedural timetable, the Claimant submitted its Rejoinder to the ReplyReply on jurisdictional objections, together with exhibit C-209 and legal auhoriies CLA-92 to CLA-101.

59. On 16 September 2015, the Arbitration Tribunal noted in Procedural Order No.10, that the Respondent had not complied with Procedural Order No.9, merely mentionoing in its letter dated 2 September 2015 a communication dated 17 March 2015 sent by BCG to the Institute for Energy Saving and Diversification [*Instituto para la Diversificación y Ahorro de la Energía*] (IDAE) in which BCG "reiterated that the contract confidentiality clause and intellectual property clause applied" and also simply referring to the possible difficulties of producing the documents but had failing to demonstrate that it had attempted to comply with the ruling of the Arbitration Tribunal as set out in Procedural Order No.9. Therefore, the Arbitration Tribunal reserved its right to draw appropriate inferences from the aforesaid failures to comply, at the appropriate time.

60. On 17 September 2015, the Parties provided the Arbitration Tribunal with the names of witnesses and/or experts each Party wished to cross-examine at the Hearing to be held on 14-16 October 2015. The Claimant specified that it wished to cross-examine the authors of the McGroup expert Reports and the authors of the Boston Consulting Group ("BCG") Reports, and also of the reports drawn up by Roland Berger Strategy Consultants ("RBSC") which,according to the Claimant, the Respondent had either failed to produce or had produced late and/or incompletely.

61. On 21 September, the Kingdom of Spain responded to the Claimant's requests.

62. The Arbitration Tribunal, in Procedural Order No.11 dated 28 September 2015, considerin Article 26 of Procedural Order No.1 and Parties' allegations, dismissed the Claimant's request in relation to appearance of the RBSC Report authors. However, the Arbitration Tribunal ordered the Respondent to write to the BCG authors and to invite them to attend the hearing as witnesses and to provide a copy of that written invitation

*This is a free translation of the original document in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

and of the BCG response to the Arbitration Tribunal and to the other Party, prior to the conference call to be held on 5 October 2015.

63. On 5 October 2015 and before the conference call took place, the Respondent sent a copy of the invitation dated 1 October 2015 sent by the Kingdom of Spain inviting BCG to take part in the Hearing.

64. The conference call on the organization of the 14-17 October 2015 Hearing took place on 5 October 2015 between the Parties and the Arbitration Tribunal, represented by the Tribunal Chairman. During this conference call, the Parties and the Arbitration Tribunal addressed the case management elements set out in the Agenda for the pre-Hearing conference call, provided to the Parties on 2 October 2015.

65. On 6 October 2015, the Kingdom of Spain forwarded the response from the BCG Reports experts to the Arbitration Tribunal and to the Claimant.

66. On the same date, the Arbitration Tribunal sent Procedural Order No.12 to the Parties with organisational details and details on holding the hearing, as discussed during the procedural conference call on 5 October 2016. The Tribunal also noted the response from Boston Consulting Group lawyers dated 6 October 2015, and which had been sent in response to the communication from the Kingdom of Spain dated 1 October 2015, announcing BCG refusal to give evidence at the Hearing for commercial policy reasons.

67. On 14, 15 and 16 October 2015 the hearing was held at the Madrid Chamber of Commerce, at which the Parties verbally stated their arguments on jurisdiction objections and on the merits of this case.

68. Following that audience, on 20 October 2015, the Arbitration Tribunal sent the Parties Procedural Order No.13 setting out a series of Tribunal rulings that had been argued at the end of the hearing with the Parties. The Arbitration Tribunal particularly ruled that the Parties should provide a final joint and agreed version of the Hearing transcript, on 6 November 2015 indicating, as appropriate, any one-off issues for correction which the parties were not able to agree and, by 22 December 2015, a Post-Hearing Brief with a total of 80 pages (or 40 sheets) setting out any points the Parties deemed useful and, especially, responding to questions raised by the Arbitration Tribunal during the Hearing.

69. The Arbitration Tribunal also asked the Parties to fil submissions on costs, by 15 January 2016, in the form of a declaration signed by the lawyers including a breakdown of costs sought without attaching supporting documents. The opponent Party would then have until 22 January 2016 to respond to the declaration of costs provided by the other Party.

70. Pursuant to paragraph 3 of Procedural Order No.13, the Parties sent their final joint versions of the Hearing transcripts on 7 November 2015.

71. On 22 December 2015 the Parties submitted their respective P

ost-Hearing Briefs and on 15 January 2016, filed their Declaration of arbitration costs.

72. Lastly, on 22 January 2016, and pursuant to Procedural Order No.13, the Claimant filed comments on the Respondent's Declaration of Costs and Expenses, dated 15 January 2016.

73. On 26 January 2016, the Claimant informed the Arbitration Tribunal that the Kingdom of Spain had decided to render public the award in arbitration proceedings SCC V 062/2012, Charanne B.V. & Construction Investments S.A.R.L. –v- the Kingdom of Spain, notwithstanding the duty of confidentiality to which, the Claimant affirmed, Spain is subject. In order to guarantee all members of the Arbitration Tribunal had the information, the Claimant attached a copy of that award to its communication, together with a copy of the dissending opinion of the arbitrator Prof. Dr. Guido Tawil.

74. The Respondent answered the Claimant by email that same day, denying there had been any breach of confidentiality. The Claimant responded to the aforesaid email on the same date, 26 January 2016.

75. The Arbitration Tribunal wrote to the Parties on 28 January 2016, acknowledging receipt of the emails exchanged between the Parties on 26 January 2016 concerning the award issued in arbitration proceedings SCC V 062/2012, and pointed out that neither Party had requested a ruling from the arbitrators on the matter.

76. The Parties sent additional comments by emails dated 28 and 29 January 2016, and the Arbitration Tribunal acknowledged receipt of those emails on 29 January 2016.

77. On 16 March 2016, the Claimant wrote to the Arbitration Tribunal informing that the Claimant had filed a request with the Spanish Tax Department [*Dirección General de Tributos* –DGT] on 3 February 2016, submitting a matter for consideration concerning the Tax applied to the Value of Electricity Production brought in under Law 15/2012, of 27 December, on fiscal measures applicable for sustainable energy ("Law 15/2012"). The Respondent had reminded the Arbitration Tribunal of the existence of those proceedings during the Hearings. The Claimant specified that it was still awaiting a

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

response from the administration.

78.  On 22 March 2016, the Respondent filed its comments to Claimant's letter and recalled the fact that the Claimant had not completed those proceedings and that the Claimant having filed the aforesaid request with the General Tax Authority amounted to recognition by the Claimant of the need to submit the deferred issue to the authorities and also stating that these proceedings were in process. The Kingdom of Spain also requested that the final Arbitration Tribunal ruling on costs should reflect the Claimant's intention to delay, having filed this particular request very late.

79.  On 19 April 2016, and in accordance with Article 34 of the SCC Arbitration Rules, the Arbitration Tribunal declared the investigative stage of these arbitration proceedings closed and established that Parties may not file any further requests from that date forward, without obtaining prior authorisation from the Arbitration Tribunal.

80.  The same day, the Claimant informed the Arbitration Tribunal that it had been notified by the Kingdom of Spain's General Tax Authorities, in response to its request dated 16 March 2016 regarding Article 21(5) ECT on tax measures already communicated to the Arbitration Tribunal, and that it was taking steps to send that notification to the Arbitration Tribunal and duly requesting authorisation to do it.

81.  On 20 April 2016, the Tribunal requested the Respondent to provide its comments on the Request submitted by the opponent Party. On the same day, the Kingdom of Spain confirmed that a copy of the General Tax Authority's Position Paper was available, including conclusions for the purpose of the proceding established by Article 21(5)(b) ECT and initiated by Claimant's request dated 3 February 2016. The Kingdom of Spain was willing to produce those documents.

82.  On 21 April 2016, accorin to Article 34 of the SCC Arbitration Rules, the Arbitration Tribunal authorised the Respondent to produce the aforesaid Position Paper and conclusions. These were produced by that Party on that same day.

83.  The deadline to submit the award was extended to 15 July 2016 by two rulings of the Stockholm Chamber of Commerce Institute of Arbitration, duly copied to the Parties, the latter ruling dated 13 June 2016.

*This document is a courtesy English translation of the Spanish original award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

V.    **BACKGROUND FACTS**

84.    The Arbitration Tribunal sets out below the main facts that led to this dispute, beginning by presenting the evolution of the Spanish legal framework regulating electricity production from renewable sources in Spain (**A**), before going on to present the Claimant structure and Claimant's activities in Spain (**B**).

A.    **EVOLUTION OF THE SPANISH LEGISLATIVE FRAMEWORK REGULATING ELECTRICITY PRODUCTION FROM RENEWABLE SOURCES**

85.    Investment in electricity production from alternative energy sources, such as photovoltaic energy, became necessary throughout Europe following the second oil crisis in 1979[6].

86.    The European Union adopted a series of Directives, particularly Directive 2001/77/EC[7] and subsequently Directive 2009/28/EC[8], which set targets for Member States on electricity production from renewable energy sources within certain deadlines.

87.    In the first instance, in order to remedy energy dependency problems and meet its international obligations, the Kingdom of Spain introduced a Special Regime on electricity generation attractive investment in renewable energy sources (**1**). Subsequently, in order to deal with a significant and growing tariff deficit, the Kingdom of Spain put legal reforms in place and as a consequence materially amended the existing Special Regime (**2**).

1.    **Electricity Generation Special Regime**

88.    To foster investment in the renewable energy sector, the Kingdom of Spain opted to introduce a Special Regime which, from the remuneration point of view *"is characterised by a possibility of supplementing the remuneration regime with receipt of a premium in the regulatory established terms (...)"*[9]. The Special Regime for electricity generation was initially developed in Law 54/1997, Electricity Sector Act ("**Law 54/1997**" or "**LSE**")[10]. The LSE was subsequently implemented by a series of regulations adopted to specify the applicable legal regime.

---

[6]    Statement of Claim, p. 16.
[7]    **Exhibit C-8**: Directive 2001/77/EC.
[8]    **Exhibit C-25**: Directive 2009/28/EC of the European Parliament and of the Council, of 23 April 2009, on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC.
[9]    **Exhibit C-18:** Royal Decree 661/2007, of 25 May, regulating electricity generation under the special regime, preamble.
[10]    **Exhibit C-5:** Electricity Sector Act.

*This is a free-text English translation of the original Spanish award.*
Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 27 of 257
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

Adjustments were introduced from 2012 onwards, announcing further substantial changes to the juridical regime applicable to electricity sector remuneration.

89.     Specifically, this law was originally implemented by means of Royal Decree 2818/1998 of 23 December 1998 ("**RD 2818/1998**")[11], subsequently by Royal Decree 436/2004, of 12 March 2004 ("**RD 436/2004**")[12], and also by Royal Decree 661/2007 of 25 May 2007 ("**RD 661/2007**")[13]. Thereafter, the following Royal Decrees were adopted: Royal Decree 1578/2008 of 26 September 2008 ("**RD 1578/2008**"), Royal Decree Law 6/2009 of 30 April 2009 ("**RDL 6/2009**"),  Royal Decree 1565/2010 of 19 November 2010 ("**RD 1565/2010**") and Royal Decree Law 14/2010 ("**RDL 14/2010**").

90.     According to the LSE, electricity producers subject to the Special Regime would enjoy a series of rights guaranteed under Section 30 of the Act. Section 30.2 LSE establishes that producers were entitled to "*Feed their excess energy into the system, being paid remuneration as established herein (...)*". The producers were also entitled to receive a premium in the regulatory established terms. The following would be used to calculate the premium amounts: "*the voltage level on delivery of the power to the grid, the effective contribution to environmental improvment, to primary energy savings and to energy efficiency, and the investment costs incurred, so as to achieve reasonable rates of return, with reference to the cost of money on capital markets*" (Artículo 30.4).

91.     RD 2818/1998 established a premium per kWh[14] to supplement the market price in such a manner that producers had to sell on the market, but were supported by a premium in addition to the price obtained for the sale of their energy [15].

92.     On 26 August 2005, the Spanish Government adopted the 2005-2010 Renewable Energies Plan[16] by Resolution of the Council of Ministers therby modifying the 2000-2010 Renewable Energies Plan and maintaining its commitment to cover at least 12% of total energy consumption with electricity from renewable sources in 2010. This 005-2010 Renewable Energies Plan also introduced two new guideline targets for 2010: 29.4% electricity generated from renewable sources and 5.75% for transport biofuels. These were adopted subsequent to the earlier plan.

---

[11]    **Exhibit C-7:** Royal Decree 2818/1998, of 23 December, on the production of electricity by installations supplied by renewable energy resources or sources, residual waste or co-generation.
[12]    **Exhibit C-11**: Royal Decree 436/2004, of 12 March, establishing the methodology for updating and systematising the legal and economic regime for electricity generation under the special regime.
[13]    **Exhibit C-18**: Royal Decree 661/2007.
[14]    **Exhibit C-7:** Royal Decree 2818/1998, Section 28.
[15]    Statement of Claim, ¶93.
[16]    **Exhibit C-14**, 2005-2010 Renewable Energy Plan approved by the Spanish Government by Resolution of the Council of Ministers, of 26 August 2005.

*This is a quick and unofficial translation of the original document in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

a. Royal Decree 661/2007, of 25 May

93.  On 25 May 2007, RD 661/2007 was adopted and established "*a new regulation applicable to electricity production under the special regime, maintaining the basic structure of its regulation*"[17].

94.  This Decree brought in an economic system of incentives developing principles set out in the LSE, and "*guaranteeing owners of installations under the special regime a reasonable remuneration for their investments and also guaranteeing electricity consumers a reasonable assignment of costs charged to the electricity system (...)*"[18].

95.  The aforesaid Decree established several requisites for accessing the Special Regime and its benefits, summed up in Section 6 of the Decree. One of these requisites was "*prior registration*" (Decree, Section 11) of the installations on the Administrative Register of Generation Facilities under the Special Regime [*Registro Administrativo de Instalaciones de Producción en Régimen Especial* - "**RAIPRE**"] brought in under Section 9 of the Decree, prior to carrying out the "*Final Registration*" on **RAIPRE** (Decree, Section12).

96.  This obligation was the outcome of several provisions set out in RD 661/2007, *inter alia*, Section 14, which states: "*installations will be effectively integrated in the special regime as from the date that their capacity of being integrated is duly granted by the competent*". Final registration on RAIPRE continued to be a "*necessary requirement for applying the economic regime regulated in this Royal Decree to the particular installation, effective from the first day of the following month to the date officially documented as the installation start-up.*"

97.  Additionally, according to Section 13, RD 661/2007, "*Prior registration of an installation on the Administrative Register of Generation Facilities under the Special regime, for which the General Directorate for Energy Policy and Mines is responsible, will be cancelled if within three months from the date the interested party received notice of prior registration, that party has failed to request its final registration*" except, in the view of the competent administration, there are "*reasoned grounds for the prior registration to remain on the register (...)*".

98.  Section 17, RD 661/2007, which lists electricity producers' entitlements and which guarantees them, *inter alia*, priority access and connection to the Electricity Network in the terms established in Annex XI of the same RD and as laid down in regulations that subsequently replaced that provision (Section 17(e) RD 661/2007), also made it possible to sell all or part of net energy production throughout a direct selling  (Section 17(d) RD 661/2007), similarly granting the right to receive the remuneration established for such purposes in Section 24

---

[17]    **Exhibit C-18**: Royal Decree 661/2007, preamble, p.1.
[18]    **Exhibit C-18:** Royal Decree 661/2007, preamble.

*This is a Tglisja-λωγ-σιατδ-λιβ-the Original Spanish Arbitration award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

, where it refers to "*mechanisms for remuneration of electricity produced under the special regime*" and further specifies that the regulated tariffs, or premium, would be paid as long as the installations were finally registered on the RAIPRE (Section(c) RD 661/2007).

99.   RD 661/2007 established a limited period for achieving final registration on RAIPRE and consequently for benefitting from the Special Regime established in the Royal Decree. Section 22, RD 661/2007, provided that once 85% of the target of photovoltaic sourced electricity had been duly installed in Spain, registration on the RAIPRE would then have to be achieved within the maximum period during which the tariff established in the Energy Ministry Resolution, of 27 September 2007, would be maintained[19]. That limited period was established as 12 months in the aforesaid Resolution, calculated from the date the Resolution was published and for that matter eventually closed on 29 September 2008.

100.  That said, by achieving final registration on RAIPRE producers could access two optional main classes of remuneration. Under Section 24, RD 661/2007, producers could choose firstly to sell the electricity produced at a regulated tariff. Section 25, RD 661/2007 established that regulated tariff as "*a single fixed amount for all scheduled periods and calculated in accordance with the category, group and subgroup of the installation, as well as the installed power and, if appropriate, the length of time operating since the date of the installation start-up (…)*". Section 36 of the Royal Decree established regulated Tariffs referred to as "*Feed-in Tariff*" ("**FIT**") for installations using solar energy as primary energy and these can be summed up as follows[20]:



Tarifas establecidas en el artículo 36 del Real Decreto 661/2007:

| POTENCIA | TARIFA REGULADA (2007) |
|---|---|
| P<100 kW; | 0,440381 €/kWh los primeros 25 años |
| | 0,352305 €/kWh a partir de entonces |
| 100 kW<P<10 MW; | 0,417500 €/kWh los primeros 25 años |
| | 0,334000 €/kWh a partir de entonces |
| P>10 MW; | 0,229764 €/kWh los primeros 25 años |
| | 0,183811 €/kWh a partir de entonces |

Las tarifas se actualizan anualmente con el **IPC-0,25%** hasta 2012, y con el IPC-0,50% a partir de entonces.

Tariffs established in Artcle 36, Royal Decree 661/2007:

| POWER | REGULATED TARIFFS (2007) |
|---|---|
| P <100kW; | 0.440381 €/kWh the first 25 years |
| | 0.352305 €/kWh thereafter |
| 100kW<P<10MW; | 0. 417500 €/kWh the first 25 years |
| | 0. 334000 €/kWh thereafter |
| P>10 MW; | 0. 229764 €/kWh the first 25 years |
| | 0. 183811 €/kWh thereafter |

Tariffs would be updated annually using IPC -0.25 % until 2012 and using IPC -0.50% thereafter

This document is a courtesy English translation of the Spanish original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 30 of 257

101. Alternatively, operators could opt to "*sell the electricity on the electricity production market. In that instance, the electricity would be sold at the price achieved on the organised market or at a price freely negociated by the owner or installation representative and that market rate would be supplemented, as the case may be, by a premium established as eurocents per kilowatt-hour*" (Section 24.b, RD 661/2007).

---

[19]    **Exhibit C-20:** Energy Ministry Resolution.
[20]    Statement of Claim, ¶81 y ¶105; Statement of Defence, ¶128.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 31 of 257
*This is a true and accurate original of the original document in English.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

The premium was defined and regulated in Section 27, RD 661/2007 and comprised "*an amount in addition to the price achieved on the organised market or freely negotiated by the owner or installation representative*".

102. According to Section 44, RD 661/2007 the FIT and premiums would be updated in line with increases in the Spanish Cost Living Index (*Índice nacional de Precios al Consumo* - "**CPI**") minus the value established in the First Additional Provision, which provided: "*the reference value to be deducted from the CPI, established in this Royal Decree for updating certain defined values, is set at twenty five basic points until 31 December 2012 and at fifty basic points thereafter*"[21].

103. RD 661/2007 also laid down other adjustments to the regulated tariffs: firstly, throughout 2010 and secondly, within four-year intervals (Section 44(3)). Nonetheless, Section 44(3) RD 661/2007 exempted any installations certified as having started up prior to 1 January of the second year following the year of the [first] 2010 tariff review i.e. installations that officially came into operation before 1 January 2012.

104. The 2007-2012-2020 Spanish Strategy for Climate Change and Clean Energy[22], dealt with renewable energy in Section 4.3.2 where it specified that, in order to achieve targets for electricity production from renewable energy sources, were expected to foster actions directed to stimulate investment in technological development and thereby reducing the cost of installing photovoltaic plants and "*to provide a more certain economic framework for investment in renewable and cogeneration energy, to better strengthen them, evaluating an improvement on the IAE [business activity tax]discounts granted to companies using or producing these energies. The purpose of this is to render renewable and cogeneration energies sufficiently competitive with regard to the traditional alternatives.*", running RD 661/2007 as one of the regulatory instruments used to achieve this.

      b.   <u>RD 1578/2008 of 26 September</u>

105. On 26 September 2008, the Kingdom of Spain passed into law Royal Decree 1578/2008, on regulating remuneration for electricity production from photovoltaic solar technology, applicable to installations implementedout of the limited period estipulated for maintaining remuneration established in Royal Decree 661/2007, of 25 May, for that technology.

106. The aforesaid Decree was principally adopted to permit photovoltaic installations that had missed the limited period to access the Special Regime established in RD

---

[21]   **Exhibit C-18**: Royal Decree 661/2007, Article 50.
[22]   **Exhibit C-21**, 2007-2012-2020 Spanish Strategy for Climate Change and Clean Energy, passed into law by the Council of Ministers on 2 November 2007, p. 46 et seq.

*This is a translation of the original Spanish Document 69-52.*   Filed 06/09/22   Page 32 of 257
Case 1:19-cv-01618-TSC   Document 69-52
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

661/2007. Deliberately, Article 1, RD 1578/2008 provided as follows:: "*the purpose of this Royal Decree is to establish an economic regime covering those electricity production installations using photovoltaic technology to which the values of the regulated tariffs established in Article 36, Royal Decree 661/2007, of 25 May, regulating electricity production under the special regime, do not apply by reason of the date on which they were finally registered in Section two of RAIPRE (...)*"[23].

107. According to its Article 2, RD 1578/2008 had to be applied to photovoltaic installations that achieved final registration on RAIPRE subsequently to 29 September 2008.

108. RD 1578/2008 introduced a new system of incentives for its prospectively application which enabled the aforementioned installations to access the economic regime established in RD 661/2007. Those incentives were introduced under Article 4.2 of the Register for Pre-allocation of Remuneration ("**RPR**"). That Article established that installation or installations projects should be prior registered on the RAIPRE, so as to be entitled to receive the remuneration established in this Decree as the FIT [Feed-in Tariff]. The purpose of RPR was "*to better follow through on the evolution of installed power and to ensure the requirement is met in the sense that the consumer shall have energy at a reasonable cost and that the cost of technological development of these electricity production sources permits a gradually reduction of associated costs and ensuring they can compete with traditional electricity production technologies*"[24]. Installations duly registered on the RPR would have a maximum period of 12 months calculated from the date the outcome was published, plus a further possible 4 month extension period, to finally registered on RAIPRE and to be able to start to sell electricity (Article 8.1, RD 1578/2008). Registrations accepted onto RPR would be linked to "*aparticular time period (...) being able to benefit from the remuneration stipulated for that time period*"[25]. This system of ascertaining remuneration, which differed from the existing system under RD 661/2007, was determined pursuant to Article 11, referred to the Decree tariffs. Article 6.3 of RD 1578/2008 established that the later the registration, the lower the remuneration.

109. Once the installations were finally registered on RAIPRE, the RPR registration would be cancelled and they would be entitled to receive a Feed-in-Tariff (FIT) pursuant to Article 11.5, RD 1578/2008, whose specific amount would depend on the date the particular installation was pre-registered on RPR and the time period for benefitting of the FIT amount was restricted in the aforesaid Royal Decree to

---

[23]   **Exhibit C-23:** RD 1578/2008, Article 1.
[24]   **Exhibit C-207,** 2011-2020 Renewable Energies Plan, passed into law by the Spanish government by means of Council of Ministers Resolution, on 11 November 2011, p. 536.
[25]   **Exhibit C-23:** RD 1578/2008, Article 4.3

*This Spanish original award is the true original Document of the Award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

25 years. FIT amounts would be updated by the same review mechanism established in RD 661/2007[26].

> c. Royal Decree Law 6/2009, of 30 April adopting certain energy sector measures and passing into law of the "*bono social*" [discount rate].

110. The RPR envisaged in RD 1578/2008 was established by means of Royal Decree Law 6/2009[27].

111. Bearing in mind the increasing tariff deficit that was occurring in relation to the system for financing and producing energy[28], this Decree established, *inter alia*, "*mechanisms with regard to the remuneration system for installations concerned under the special regime*". By adopting this Decree, the Kingdom of Spain manifested its intention to "*adopt an urgent measure guaranteeing the necessary legal certainty to whom that had invested and simultaneously setting down the basis for establishing new economic regimes that would favour the meeting of the the intended targets: particularly, to achieve certain targets regarding the installed power by technology, at a reasonable cost to the consumer and that those technologies should evolve in a manner that would permit costs to be gradually reduced, thereby ensuring they can compete with traditional technologies*".

> d. Royal Decree 1565/2010, of 19 November, regulating and amending certain aspects of electricity production under the special regime.

112. R D L 1565/2010[29] was the first Decree that amended the remuneration system brought in under RD 661/2007 as long as, in addition to making technical amendments, also introduced changes to Article 36, RD 661/2007, removing the entitlement to receive the regulated tariff as from year twenty-six of the investment[30]. Thus, from year twenty-six onwards the electricity production plants would be paid at the market price.

---

[26]    **Exhibit C-23**: RD 1578/2008, Article 12

[27]    **Exhibit R-54**: Royal Decree-Law 6/2009, of 30 April adopting certain energy sector measures and passing into law of the "*bono social*" [discount rate].

[28]    Preamble to **Exhibit R-54**: Royal Decree-Law 6/2009 recognises: "*The increasing tariff deficit, in other words, the difference between revenue collected by regulated tariffs established by the Government and paid by consumers for their regulated supplies and from the access tariffs established on the open market, and the actual costs associated to those tariffs, is creating serious problems which, in the current context of the international financial crisis is having a profound effect on the system and placing risk, not just in the financial position of electricity sector companies, but in the very sustainability of the system. This mismatch is not sustainable and has serious consequences, as the certainty and capability of financing the necessary investments to supply electricity at the quality and security levels required by Spanish society are deteriorating*".

[29]    **Exhibit R-41:** Royal Decree 1565/2010, of 19 November, regulating and amending certain aspects of electricity production under the special regime.

[30]    **Exhibit R-41:** Royal Decree 1565/2010, Article 1.10.

113. On the basis that Decrees previously adopted had already led to several Supreme Court decisions, this Royal Decree, given that it directly amended the period during which the FIT would be paid, gave rise to a substantial number of additional claims filed before the Supreme Court by various photovoltaic electricity producers. The first Supreme Court judgment handed down on this issue was published on 12 April 2012 and was followed by a long series of judgments[31]. On the aforementioned judgments Supreme Court set down and reiterated a series of legal reasonings and conclusionsand, among these, considered that RD 1565/2010 may not be reroactively deemed and that it did not contravene the legal principles of legal certainty and legitimate confidence. Deliberately, the Supreme Court ruled in April 2012, that changes in economic circumstances justifiably required adjustment in line with the investment rate of return in order to continue to be deemed reasonable, stating: *"Agents or private operators which "withdraw from"the market, even when more or less "induced" to do so by generous remuneration offered to them under the regulatory framework, without assuming significant risks, knew or should have known that the aforesaid public regulatory framework approved at the given time, just as it was consistent with the economic scenario conditions in force at that time and with the electricity demand expectations carried out then, could not subsequently unconnected to the effects produced by relevant changes to the basic economic data, in the face of which, the public authorities' reaction to those changes in order to encompass the new circumstances is logical"[32].* The Supreme Court furthermore ruled that Article 30.4, LSE, did not guarantee that the regulated tariff would be received for an indefinite period and that one could not expect the regulated tariff to be guaranteed beyond thirty years[33]. Quite to the contrary, those producers were entitled to receive a reasonable rate of return but not to an immutable remuneration regime[34]. Along general lines, the Supreme Court ruled as follows in June 2012:

> "*the principle of a reasonable rate of return must, in effect, apply to the overall life of the installation, but not as the appellant would appear to have construed in the sense that throughout the entire life of the installation that legal principle guarantees that profit will be made, but rather in the sense of guaranteeing a reasonable rate of return obtained by investments implemented in the installation throughout the installation's existence overall. What this means, clearly, is that the legal provision of guaranteeing a reasonable rate of return does not imply continuation of a specific premium throughout the life of an installation, in that what well may occur is that those investments have been amortised and have produced that reasonable rate of return bar before the end of the installation operation period. Therefore,*

---

[31] The Respondent cites those judgments at page 45 of the Respondent Statement of Defence.

[32] **Exhibit R-49:** Supreme Court Judgment dated 12 April 2012, Appeal 40/2011, ref. El Derecho  EDJ 2012/65328, Legal Ground Four.

[33] **Exhibit R-49:** Supreme Court Judgment dated 12 April 2012, Appeal 40/2011, ref. El Derecho  EDJ 2012/65328, Legal Ground Seven.

[34] **Exhibit R-55:** Supreme Court Judgment handed down by Chamber Three on 11 October 2011, Appeal 187/10,  ref. El Derecho EDJ 2011/240112, Legal Ground Three.

*This is a free translation of the original Spanish original document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 35 of 257

> *one cannot infer from the legal principle relied upon that the economic regime establishing the premium must last throughout the entire life of the installation."* [35]

    e.    <u>Royal Decree Law 14/2010, of 23 December, establishing urgent measures to correct the electricity sector tariff deficit.</u>

114. RDL 14/2010[36] raised the maximum deficit levels established in RDL 6/2009 for the years 2010, 2011 and 2012, as well as introducing certain significant changes to the Special Regime.

115. The aforementioned RDL, in the First Additional Provision on "*Limit to the equivalent operating hours for photovoltaic installations*", established a maximum annual limit to the number of hours during which installations could benefit from the premium economic regime for which were entitled such as the FIT, as the case may be. Whenever production exceeded those maximum established limits, electricity produced over and above the limit could not then be sold on the FIT basis but rather could be sold at market prices. Nevertheless, the Second Transitory Provision established a transitional regime up until 31 December 2013 for installations implemented under the RD 661/2007 and, thereafter, the general limit established in the aforesaid Additional Provision One would be applied.

116. The preamble of the citedRDL stated that energy generation installations subject to the Special Regime had experienced a significant growth and that this had consequently led to an increase in investment in the electricity transport and distribution networks to be able to evacuate the electricity being fed into them and cope with that increase. As a consequence of this, the RDL added the following: "*it is justified in the current context of crisis and tariff deficiency, that those generating the electricity contribute to cover the costs charged against the investments they require by paying distribution tolls and that they should do so until such a time as tolls payable by electricity producers, transporters and distributors are established by regulation. The toll consists on the payment of 0,5 EUR/MWh, serving as a reference the framework established in this regard under current European Union legislation"*.. In this way, Article 1.2, RDL 14/2010 therefore extended to all electricity producers the obligation to pay a toll to use the transport and distribution networks, and at the same time, applied European Union Regulation 838/2010 of 23 September 2010, on setting downguidelines relating to the inter-transmission system operator compensation

---

[35]    **Exhibit R-51**: Judgment handed down by Court Three, Supreme Court, on 19 June 2012, Appeal 62/2011, ref.El Derecho EDJ 2012/124000, Legal Ground Eight.

[36]    **Exhibit R-42:** Royal Decree-Law 14/2010, of 23 December, establishing urgent measures to correct the electricity sector tariff deficit.

*This Case 1:19-cv-01618-TSC  original  Document 69-52.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

mechanism and a common regulatory approach to transmission charging[37].

## 2. Reform of the renewable energy sector in Spain and introduction of the Specific Remuneration Regime.

117. From 2012 onwards, Spanish law started to introduce more substantial changes to the regime established for production and remuneration of electricity, in order to cope with the tariff deficit.

a. Royal Decree Law 1/2012 of 27 January, suspending procedures for pre-assignment of remuneration and removing economic incentives for new installations producing electricity from co-generation, renewable energy sources and wastes.

118. In line with RDL 1/2012[38], the Spanish government then went on to "*suspend the procedures to pre-assign remuneration and removed economic incentives for new installations producing electricity from cogeneration, renewable energy sources and wastes, and similarly removed incentives for implementing installations for technologies subject to the special regime, so as to avoid allocating new costs into the electricity system*"[39].

119. The Spanish State justified the aforesaid measures determining the high development of renewable energy installations and exceeding of targets, which have " *brought to light a mismatch between production costs and the premium amount, leading to an increase of the overrun of the system in the form of premiums paid for solar technologies amounting to more than 2 billion euros in 2010, and increasing by a further 2 billion euros per annum from 2014 onwards*". The State made the point that the measures adopted previously had been proven to be insufficient and compromised the consecution of the end objective consisting on eliminating the tariff deficit from 2013 onwards. Therefore '*the complex economic and financial scenario recommends the temporary removal of the the incentives for implementing this type of installations, and at least until the principal problem threatening economic*

---

[37]     **Exhibit R-58**: EU Commission Regulation No 838/2010, of 23 September 2010, on laying down guidelines relating to the inter-transmission system operator compensation mechanism and a common regulatory approach to transmission charging.

[38]     **Exhibit R-65**: Royal Decree-Law 1/2012, of 27 January, suspending procedures for pre-allocation of remuneration and removing economic incentives for new installations producing electricity from co-generation, renewable energy sources and residual waste.

[39]     **Exhibit R-86:** Royal Decree-Law 9/2013, of 12 July, adopting urgent measures to guarantee financial stability of the electricity system.

*This document is an English translation of the Spanish original document.*
Case 1:19-cv-01618-TSC    Document 69-52    Filed 06/09/22    Page 37 of 257
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

*sustainability of the electricity system is resolved: the electricity system tariff deficit.*"[40]

120. The Spanish Government announced "*the need to design a new remuneration model for this kind of technologies which considers the new economic scenario, fostering and efficient assignment of resources throughout market mechanisms.*"

**b.    The National Energy Commission Report on the Spanish Energy Sector, dated 7 March 2012**

121. In order to reduce the tariff deficit, the Spanish government solicited the National Energy Commission ("**NEC**") to draw up a report on regulatory measures.

122. NEC issued Report 2/2012 "On the Spanish Energy Sector ("*Report 2/2012*")"[41] and stated in that report that: "*Insufficient tolls are compromising the financial and economic sustainability of electricity and gas systems. In a significant fashion, the fundamental issue for the electricity sector is the mismatch between revenues and costs of regulated activities in the electricity sector befallen over the last 10 years and this has led to an increase of the electricity system debt. The imbalance between revenue and costs onto the system is unsustainable, due to the impact of the growing accumulated debt on current and future access tolls for consumers and also because of the temporary impact on indebtedness for companies obliged to finance the system deficit.*"[42] Compared to other European countries, the end prices for electricity in Spain are among the highest in Europe.

123. Among the measures recommended by the NEC and summarised in Table 11 at page 43 of the Report, there were measures related to the cost of the premium received under the Special Regime by installations using renewable energy sources. In the opinion of the NEC, the formula for reviewing the tariff or premium, revised corresponding to CPI by an efficiency factor X needed to be changed. Effectively, given the lack of fossil fuel it was indeed necessary to link the index to the inflation index, due tothe variable cost of these technologies depended on carrying out certain services( operation, maintenance, insurance…), and in the case of photovoltaic and wind farm installations this amounted to approximately 85% of annual revenue being used to cover the investment costs. Therefore, it was disproportionate

---

[40]    **Exhibit R-65**: Royal Decree-Law 1/2012.

[41]    **Exhibit R-69**: NEC Report on the Spanish energy sector, Part I. Measures to guarantee economic-financial sustainability of the electricity system, National Energy Commission, 7 March 2012; Exhibit R-70: NEC Report on the Spanish energy sector. Introduction and Executive Summary. National Energy Commission, 7 March 2012.

[42]    **Exhibit R-70**: NEC Report on the Spanish energy sector. Introduction and Executive Summary, National Energy Commission, 7 March 2012, pages 3 and 4.

This reproduction is an English translation of the original award document.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 38 of 257

to update the whole of the premium (only 15% should be updated)[43].

c.   2012 National Reforms Programme, of 27 April

124. On 27 April 2012, the Government approved the "2012 National Reforms Programme"[44] in which confirmed its intention to do away with the tariff deficit, specifying that "*it will be fairly shared among the consumers, the public sector and the private sector within the framework of a profound reform of the electricity sector involving cost reduction measures for regulated activities, an increase of the revenue obtained from tolls, and also by revising the energy planning and establishing a stable regulatory framework*"[45]. The program specified that the path of costs related to regulated activities had been strongly expansive since 2006, given that the average revenues from access tolls increased by 70% whereas access costs had increased by 140%. The most significant cost items included "*special regime premiums (40.3%), network costs (39.8%) and annual costs of financing the deficit of regulated activities (10.5%)*". It went on to say:

> "*Items that particularly contributed to increase costs of regulated activities specifically comprises special regime premiums and annual payments on tariff deficit. Those items have been multiplied fivefold since 2006.*
>
> *Various measures are being put in place to head off those costs and permit system costs to be reduced in the amount of 1.7 billion euros. These measures will be deepened in the immediate future in order to ensure all sectors contribute in an adequate manner to adjust the regulated costs*"[46].

---

[43] **Exhibit R-69**: NEC report on the Spanish Energy Sector, Part I, p.22: As a consequence, NEC proposed: "An increase in value of efficiency factor 'X'. This measure maintains the principle of obtaining a reasonable rate of return as established in the Act. For a 2% CPI [Consumer Price] value, the efficiency factor affecting CPI when reviewing economic incentives for renewable and cogeneration energy should be around 175 basic points if one wishes to adjust the value of tariffs and premiums by 15%. This is in line with proposals for other regulated sector activities and without prejudice to maintaining fuel price indexing for cogeneration or energy from residual waste. Due to the fact that tariff and premium values are calculated yearly (or quarterly) with regard to values for the previous period, this measure has an accumulative economic impact amounting to an annual reduction equivalent to approximately 200 million accumulated euros on the overall special regime premium amount as from 2013.

Furthermore, in 2012 and as an exception, the proposal was put forward to review premiums and tariffs as of 1 April, adjusting them to those applied in 2011 (therefore, the proposal was X=CPI). Given that the estimated 2011 CPI, used to review 2012 premiums, was 3.01%, these should now be reduced by the same proportion and would imply A saving on 2012access tariffs amounting to € 209 Million and without prejudice to retaining fuel price indexing for cogeneration or energy from residual waste."

[44] **Exhibit R- 72**: 2012 National Reforms Programme, Government of Spain.

[45] **Exhibit R- 72**: 2012 National Reforms Programme, Government of Spain, p. 208.

[46] **Exhibit R- 72**: 2012 National Reforms Programme, Government of Spain, p. 208-209.

*This is a true English translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

    **d.**    Adoption of Law 15/2012 on fiscal measures applicable to obtain the energy sustainability

125. On 27 December 2012, the Kingdom of Spain published Law 15/2012 of 27 December 2012, on fiscal measures applicable to obtain the energy sustainability ("**Law 15/2012**")[47]. This Law served to introduce three new taxes. One of these was the tax on electricity production value ("**IPVEE"),** introduced with the particular purpose of "*helping to achieve the budgetary balance*" of the State. This particular tax had to charge "*the economic capacity of electricity producers whose installations give rise to significant investments in electricity transport and distribution networks in order to be able to evacuate the energy fed into those networks and which involve unquestionable environmental effects, either directly or as a result of the very existence and development of those networks, as well as the generation of very significant and necessary costs in order to continue guaranteeing the supply of electricity. This tax applies to all electricity generation installations*"[48].

126. Pursuant to Article 4 of Law 15/2012, production and incorporation of electricity into the electricity system is the taxable transaction and the taxable base comprises "*the total amount the taxpayer will receive for producing and incorporating electricity into the electricity system, measured at busbar cost, for each installation for the given tax period*"[49]. The total amount is calculated including "*the various remunerations established in all economic regimes arising from the provisions laid down in Law 54/1997, of 27 November, Electricity Sector Act (...)*"[50]. Article 8 of the Act sets the compulsory tax at 7%.

    **e.**    Royal Decree-Law 2/2013 on urgent measures applicable to the electricity system and financial sector

127. Subsequently, on 1 February 2013, Royal Decree-Law 2/2013 on urgent measures applicable to the electricity system and financial sector ("**RDL 2/2013**")[51] was published to amend the FIT review mechanism established in RD 661/2007 and RD 1578/2008. First of all, the CPI [Consumer Price Index] used to update the FIT and premiums was replaced by the "*Consumer Price Index applicable to constant taxes not including processed foods and energy products*" (Article 1 RDL 2/2013). Secondly, direct changes were made to RD 661/2007, removing one of the two options for selling energy produced at installations under the Special Regime and

---

[47]   **Exhibit C-30**: Law 15/2012, of 27 December, on fiscal measures applicable to sustainable energy; **Exhibit R- 83** Law 15/2012, of 27 December, on fiscal measures applicable to sustainable energy.

[48]   **Exhibit C-30**: Law 15/2012, preamble.

[49]   **Exhibit C-30**: Law 15/2012, Article 6.1.

[50]   **Exhibit C-30**: Law 15/2012, Article 6.2.

[51]   **Exhibit C-31**: Royal Decree-Law 2/2013, of 1 February, on urgent measures applicable to the electricity system and financial sector; **Exhibit R- 85**: Royal Decree-Law 2/2013, of 1 February, on urgent measures applicable to the electricity system and financial sector.

established in Article 24, RD 661/2007, particularly this one consisting on thereceiption of a premium to supplement the market price obtained[52]. From the date on which this RDL came into force, the options for selling electricity produced in installations under the special regime became as follows: (i) transfer the electricity into the system in return of receiving a regulated tariff or (ii) sell the electricity on the electricity production market, with no supplementary premium.

128. The Spanish State said that that these measures were adopted due to further deviations that appeared in costs and revenues expectations for the electricity sector which, according to the preamble of this RDL, arose from the "*greater increase in the cost of the special regime due to increased operating hours over and above the estimated hours and due to an increase in remuneration values, subject to indexing against the Brent index; together with reduced toll revenue as a result of a steep drop in demand that is further consolidated for the current tax year*". The State also justified adopting these measures on the basis that "*in the current economic context, it would be virtually unfeasible to cover the costs by charging these against electricity tolls and against planned items in the General State Budget*". The State further specified that the alternative to the measures adopted in this RDL would have been a further increase in access tolls paid for by electricity consumers and that this would have "*directly affected household economies and the competitivity of companies, where both are already in a delicate situation given the current overall economic scenario*".

### f. Royal Decree-Law 9/2013, of 12 July 2013 adopting urgent measures to guarantee financial stability of the electricity system

129. RDL 9/2013[53] introduced a series of changes and particularly amended Article 30.4, LSE, regarding obligations and entitlements of producers under the Special Regime, which thereafter read as follows:

> «*4. Furthermore, subject to statutory terms and conditions established by Royal Decree as the Council of Ministers may decide and in addition to remuneration obtained from selling generated electricity valued at market price, these installations will be entitled to receive specific remuneration comprising a mathematical factor per unit of installed power which will, as appropriate, cover the investment costs of a standard installation that are not recoverable from the sale of the electricity on the market; together with an operating factor intended to cover, as the case may be, any difference between exploitation costs and revenue arising from participation of the standard installation in the electricity production market.*
> *To calculate the aforesaid specific remuneration for a standard installation, , throughout its regulatory useful life and with reference to business activity carried on by an efficient and well-managed company, the following shall be taken into account:*

---

[52] **Exhibit C-31**: Royal Decree-Law 2/2013, Articles 2 and 3.

This is a Tidal-generated English translation of the original Spanish Award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

53      **Exhibit R-86:** Royal Decree-Law 9/2013, of 12 July, adopting urgent measures to guarantee the financial stability of the electricity system.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 42 of 257
*This is a part of a non-binding English translation of the Spanish original document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

*a) Standard revenue from the sale of generated electricity valued at production market prices.*

*b) Standard exploitation costs.*

*c) The standard value of the initial investment.*

*To this end, in no event shall costs or investments established either in regulations or by administrative acts be considered unless they apply in the whole territory of Spain. Similarly, only costs and investments exclusively relating to electricity production business activities may be taken into account.*

*Given the singular nature of island and off-peninsular electricity systems, standard installations may be specifically defined for each of these categories.*

*The aforesaid remuneration regime may not exceed the minimum level necessary to cover costs needed to permit the installations concerned to compete on an equal footing with the other technologies on the market habilitating them to obtain a reasonable rate of return with reference to the applicable standard installation in each instance. Notwithstanding the above and exceptionally, the remuneration regime may furthermore include an incentive for investment and execution within a specific time period whenever installing the facility implies a significant reduction in the costs of island and off-peninsular systems.*

*The aforesaid reasonable rate of return shall be calculated, pre-tax, on the basis of the average yield on the secondary market of ten-year State Bonds, applying an appropriate differential.*

*Parameters used to calculate the remuneration regime may be reviewed every six years.»*

130. The Kingdom of Spain amended the Special Regime that had been established in Law 54/1997, which had substantiated the option of choosing between the Feed-in-Tariff (FIT) and a premium system, now introducing the entitlement to receive a remuneration from selling electricity at market prices, supplemented by a specific regulated remuneration that would not be automatically charged but conditioned to the fulfillment of a series of criteria. The Government specified that this remuneration system was intended to facilitate recovery of investments by preserving the principle of reasonable rate of return.

g.   Law 24/2013 of 26 December, Electricity Sector Act (LSE 2013)

131. In Law 24/2013, currently in force, the principle of economic and financial sustainability of the electricity system is given as a guiding principle for the actions of public administrations[54]. This principle is expressly acknowledged and guaranteed in Article 13 of the LSE 2013.

132. Article 14 of Law 24/2013 deals with Remuneration for business activities and, having set out general guidelines, establishes a new system of exceptional specific remuneration to continue fostering electricity production from renewable energy sources, high-efficiency cogeneration and from wastes, "*whenever there is an obligation to meet energy targets arising from Directives or other European Union legislation*

40

This is an unofficial English translation of the original Spanish award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 43 of 257

[54]     **Exhibit R-19**: Law 24/2013, of 26 December, Electricity Sector Act, p. 105201.

*This case should only be placed on the Spanish original document in the event of any discrepancy or ambiguity*

 *and whenever introducing such specific remuneration will reduce energy costs and the dependency on energy imports*"[55].

133. The aforementioned remuneration regime was no longer based on prior registration of installations on a given registry but was rather based on a "*competitive concurrence*" system [56].

134. This remuneration was a supplementary remuneration received from selling generated electricity valued at production market prices and "*would comprise a mathematical factor per unit of installed power which will, as appropriate, cover the investment costs of a standard installation that are not recoverable from the sale of the electricity on the market; together with an operating factor intended to cover, as the case may be, any difference between exploitation costs and revenues arising from participation of the standard installation in the electricity production market*"[57]. Article 14.7.b adds that in order to calculate the specific remuneration "*for a standard installation, throughout its useful regulatory life and with regard to the business activity carried on by an efficient and well managed company, values calculated shall be obtained by considering the following:*

> i. *Standard revenue from the sale of generated electricity valued at production market prices.*
> ii. *Standard exploitation costs.*
> iii. *Standard value of the initial investment.*
>
> (...)*The aforesaid remuneration regime may not exceed the minimum level necessary to cover costs needed to permit installations producing energy from renewable sources, high-efficiency cogeneration and from wastes, to compete on an equal footing with the other technologies on the market, habilitating them to obtain a reasonable rate of return with reference to the applicable standard in each instance. The aforesaid reasonable rate of return shall be calculated, pre-tax, on the basis of the average yield on the secondary market of ten-year State Bonds, applying an appropriate differential. Exceptionally, the remuneration regime may furthermore include an incentive for investment and execution within a specific time period whenever installing the facility implies significant reduction in the costs of non-peninsular systems.*
> (...)"

135. That said, it can be said that the new remuneration system implemented by the aforesaid Law revolves around three variables (i) the sale of generated energy valued at market prices, (ii) operating costs and (iii) the investment value.

136. Furthermore, Eleventh Additional Provision on "*References to the specific remuneration regime*", provides that "*In so far as installations producing electricity from*

---

[55]     **Exhibit R-19**: Law 24/2013, of 26 December, Electricity Sector Act, Article 14.7.

*This is a free translation of the 18th SCC original Spanish Award into English.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[56]     **Exhibit R-19**: Law 24/2013, of 26 December, Electricity Sector Act, Article 14.7.a.
[57]     **Exhibit R-19**: Law 24/2013, of 26 December, Electricity Sector Act, Article 14.7.a.

*This document is a courtesy English translation of the Spanish original award.*
Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 46 of 257
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

*renewable resources, high-efficiency cogeneration and wastes, references to the specific remuneration regime under Article 14.7 e) are deemed to refer to any of the premium economic regimes that existed prior to this Law coming into force.*"

### h.   Royal Decree 413/2014 of 6 June and Order IET/1045/2014 of 16 June

137. On 6 June 2014 the Spanish Government adopted RD 413/2014, regulating the business activity of electricity production from renewable energy sources, cogeneration and wastes[58] and also Order IET/1045/2014 dated 16 June, approving remuneration parameters for standard installations applicable to certain installations producing electricity from renewable sources, cogeneration and wastes[59].

138. These regulations develop the remuneration principles established in Law 24/2013, and particularly those contained in Article 12 RD 413/2014. Provisions regulating the application in time of new regulations are found in First and Second Additional Provisions, respectively, which deal with "*Features of the first regulatory period*" and "*Installations entitled to receive a premium economic regime when Royal Decree-Law 9/2013, of 12 July coming into force, in which urgent measures to guarantee the financial stability of the electricity system are adopted.*"

139. Deliberately, RD 413/2014 states as follows in the preamble:

> "*Under this new framework, installations will be entitled to receive a specific remuneration comprising a mathematical factor per unit of installed power, throughout the useful regulatory life of the installation concerned and in addition to remuneration from selling energy valued at market prices, permitting the covering, as appropriate, of the investment costs of the standard installation that are not recoverable from the sale of the electricity on the market; , and referred to as return on investment. Also, an operating factor intended to cover, as the case may be, any difference between exploitation costs and revenue arising from participation of the standard installation in the electricity production market; this is referred to as return on operations.*
>
> *Calculations regarding return on investment and return on operations would be carried out considering the existence of a standard installation, together with the standard revenue from the sale of energy valued at market prices, standard costs of exploitation as necessary to carry on the business activity and the standard value of the initial investment, all in relation to an efficient and well-managed company. Reference is made to a series of*

---

[58]   **Exhibit R- 87:** Royal Decree 413/2014, of 6 June, regulating electricity production business activities from renewable energy sources, cogeneration and residual waste.

[59]   **Exhibit R- 88**: Order IET/1045/2014, of 16 June, passing into law remuneration parameters for standard installations applicable to certain installations producing electricity from renewable energy sources, cogeneration and residual waste.

Case 1:19-cv-01618-TSC Document 69-52 Filed 06/09/22 Page 47 of 257
*This translation of the original Document is a courtesy translation.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

> *remuneration parameters to be approved, by order of the Ministry of Industry, Energy and Tourism, for each of the various types established for standard installations. Installations may be classified according to their technology, electricity system, power, length of time in operation, etc.*"

## B. CLAIMANT STRUCTURE AND BUSINESS ACTIVITY

140. Isolux Infrastructure Netherlands, B.V. ("IIN" or "Isolux INBV" or "The Claimant") was incorporated on 13 June 2012 under the laws of the Netherlands[60].

141. An Investment Agreement was signed on 29 June 2012 between, on the one hand, shareholders in the Brazilian company Isolux Infrastructure, S.A. ("Isolux Infrastructure"), i.e. the Spanish companies Grupo Isolux Corsan Concesiones, S.L. ("**GIC Concesiones**" or "**GICC**"), and Grupo Isolux Corsan, S.A. ("**GIC**") (jointly referred as "**ISOLUX**"), and, on the other hand, the Canadian investment companies Public Sector Pension Investment Board ("**PSP**" or "**PSP Investments**") and its subsidiary Infra-PSP Canada Inc. ("**Infra-PSP**") (the "**Investment Agreement**")[61].

142. At the time the cited Investment Agreement was signed, the companies GIC Concesiones and GIC respectively held 99.999999% (i.e. 125 369 760 shares) and 0.000001% (corresponding to 1 share) in Isolux Infrastructure company share capital. Isolux Infrastructure was a company carrying on activities related to the photovoltaic solar energy field throughout a large numer of subsidiaries[62].

143. Additionaly, Isolux INBV, the company subject to the Investment Agreement, was 100% owned by GIC Concesiones[63].

144. At that time, PSP declared its intention to purchase interests in businesses developed by Isolux Infrastructure, through its subsidiary PSP Infra. Pursuant to the Investment Agreement, PSP committed to invest a Total Contribution of US$ 627.7 million through Isolux INBV. Half of the aforementioned US$ 627.7 million would proceed as an Investor's Equity Contribution and the other half in the form of an Investor's Facility Loan.

145. Specifically, 50% of the total amount (USD 313 850 000) was to be invested by PSP using a convertible loan granted on the Investment Agreement date and which was necessarily to be converted to company share capital pursuant to the terms and conditions established in the Investor Convertible Loan agreement. The remaining 50% of the Total Contribution was to be invested by PSP by purchasing

---

[60] Certificate of IIN registration on the Netherlands Chamber of Commerce Register of Companies. IIN is recorded as company No.55492584
[61] **Exhibit R-180**: Investment Agreement dated 29 June 2012.
[62] **Exhibit R-180**: Investment Agreement dated 29 June 2012.
[63] **Exhibit R-180**: Investment Agreement 29 June 2012.

Isolux INBV shares by means of company share capital increase and according to the terms and conditions agreed between the Parties and detailed further below. In consideration for the aforesaid contribution, PSP would acquire 19.23% of Isolux INBV company share capital on a diluted basis, once the contribution had been duly accomplished.

146. In order to materialise the PSP investment, designated as Investor's Equity Contribution, GIC Concesiones and GIC had to implement a restructuring process: (i) Isolux Infrastructure had to merge with GIC Concesiones in such a manner that GIC Concesiones would become the sole shareholder of the subsidiary's overall which had, up until then, been held by Isolux Infraestructura; (ii) thereafter, GIC Concesiones had to transfer all its equity holdings in those subsidiaries to Isolux INBV in such a manner that, once the restructuring operation have been carried out, business developed by Isolux Infrastructure, through its subsidiaries, would have been completely transferred to Isolux INBV[64].

147. The PSP investment transaction would take place after the meeting of certain conditions precedent, ,up on 1 October 2012 and in accordance with Articles 6.1 and 6.2 of the Investors' Agreement.

148. In order to put into practice the contribution referred to as "Investor's Equity Contribution", on 1 October 2012, PSP, CIG and CIG Concesiones, together with the target company, Isolux INBV, signed a Shareholders Agreement dated 29 June 2012[65] for the purpose of establishing and organising the entitlements of PSP and CIG Concesiones, new shareholders in Isolux INBV.

149. In consideration for PSP Total Contribution, GIC Concesiones agreed to carry out an additional investment in Isolux INBV in an amount of 125 540 000 USD, split as follows: 50% of the amount (i.e. 62 770 000 USD) had to be provided by GIC Concesiones by means of a convertible loan granted on the date of the aforesaid Investment Agreement and had then to be converted into company share capital pursuant to the terms and conditions established in an agreement with regard to the Investor Convertible Loan. GIC Concesiones had to provide the remaining 50% by purchasing new shares arising from an Isolux INBV capital increase operation, subsequently to the capital increase underwritten by PSP in the terms and conditions agreed in the cited Shareholders Agreement ("GIC Concesiones's Additional Equity Contribution").

150. As a consequence of carrying out the GIC Concesiones contribution referred to as "GIC Concesiones's Additional Equity Contribution", PSP´s equity holdingsin Isolux INBV capital had to be reduced to 19.23% after

*This is a translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

---

[64] **Exhibit C-172 and Exhibit R-180**: Investment Agreement dated 29 June 2012.

[65] **Exhibit R-182**: Investment Agreement dated 29 June 2012.

GIC Concesiones had carried out its "GIC Concesiones's Additional Equity Contribution" and PSP had accomplished its "Investor's Equity Contribution".

151. On 29 October 2012, GIC Concesiones, Isolux INBV sole shareholder, ammended for the first time Isolux INBV Articles of Association so as to modify the composition of company share capital by carrying out ashare split and conversion. Each share was splitted into 100 shares with a nominal value of one eurocent (€0.01) each; subsequently, each share in the dominant company share capital, with a nominal value of one eurocent (€0.01), was converted to an ordinary share in the dominant company share capital with a nominal value of one American cent (0.01 US dollars), numbered from 1 to 1,800,000[66].

152. On 29 October 2012 several company share capital increases were carried out in order to implement the Investment Agreement..

153. Firstly, Isolux INBV issued 12,181,006 ordinary shares numbered from 1,800,001 to 13,981,680 with a nominal value of one American cent (0.01 USD) which were properly transferred to GIC Concesiones by a non-pecuniary provision of Accounts Receivable with group companies. The net value of the current accounts between group companies amounted to 39,762,408 USD. The sum of 121,816.18 USD was assigned to pay the nominal value of all the shares and the rest as a share premium[67].

154. Secondly, Isolux INBV issued 299,890,352 ordinary shares numbered from 13,981,619 to 313,871,970 inclusive, with a nominal value of one American cent (0.01 USD) each, and transferred to GIC Concesiones, being this last one obliged to pay the nominal value of each share and the share premium both in kind, as the following provision: (i) 2,535,311 subscribed and paid up shares, each with a nominal value of 10 euros, in Isolux Corsán Concesiones, S.A.U. company share capital: (ii) 65,434,200 shares, fully subscribed and paid up, and each with a nominal value of €0.5, in Grupo T-Solar Global, SA company share capital and (iii) 545,910 subscribed and paid up shares with a nominal value of 10 euros each in Isolux Corsan Concesiones de Infraestructuras, S.L. company share capital. The total sum of the shares contribution amounted to 1,199,566,401.8 [sic] dollars. A sum of 2,998,903.52 American dollars was assigned to pay the nominal value of all the aforesaid shares and the remaining amount of 1,196,567,498.31 American dollars was assigned as share premium[68].

155. Once Grupo Isolux Corsan Concesiones, S.L. had outplaced its equity holdings in Isolux INBV by means of the share capital increases described above, PSP Infra

---

[66]   **Exhibit R-104**: Isolux INBV 2013 Management Report pages 114 and 115.
[67]   **Exhibit R-104**: Isolux INBV 2013 Management Report pages 114 and 115.
[68]   **Exhibit R-104**: Isolux INBV 2013 Management Report pages 114 and 115; **Exhibit R-182**: Shareholders' Agreement dated 29 June 2012. "Agreement by and between Grupo Isolux Corsán Concesiones, S.L. and Grupo Isolux Corsán, S.A. and Infra-PSP Canada, Inc.and Isolux Infrastructure Netherlands B.V".

then made its provisions of funds. Thus, on 29 October 2012, once the assets had been outplaced in Isolux INBV, the General Shareholders Meeting in Isolux INBV decided, to issue 78,462,500 ordinary shares numbered from 313,871,971 to 392,334,470 inclusive. Each share had a nominal value of one American cent (0.01 US dollars) and were fully subscribed by Infra-PSP Canadá Inc. in the amount of 784,625 dollars, of which the payment of 588,469 American dollars was outstanding and the remaining amount corresponded to the share premium, in the amount 313,065,375 American dollars, also pending og being paid up [69].

156. Once PSP Infra became a shareholder in Isolux INBV, and also on 29 October 2012, the Isolux INBV General Shareholders Meeting agreed one last capital increase. Isolux INBV issued 15,686,851 ordinary shares numbered from 392,334,471 to 408,021,321 inclusive, with a nominal value of one American cent (0.01 American dollars) each, which were properly transferred to Grupo Isolux Concesiones, S.L. Twenty five percent of the nominal value of each share was fully paid up for the amount of 39,217.13 USD and the remainder, in the amount of 117,651.38, pending payment. The issue premium came to 62,590,534.29 USD, was still outstanding[70].

157. Finally, on 24 July 2013[71], Isolux INBV shareholders agreed the first novation to the aforesaid agreement, throughout it was agreed that Grupo Isolux Corsán Concesiones, S.A. had to pay the outstanding provision of capital as at that date and amounting to 62,708 [thousand] dollars in the following manner: a) 43,730 [sic] USD throught the provision of shares in Grupo T-Solar Global, S.A and belonging to GIC Concesiones; b) 18,978 [thousand] dollars by offsetting a credit amount with regard to GIC Concesiones for 18,978 thousand USD and corresponding to the convertible loan with GIC Concesiones[72].

150.

158. Isolux INBV currently holds 88.3413% of the share capital of the company Grupo T-Solar Global S.A. ("**T-Solar**"), which was duly incorporated on 23 March 2011 under Spanish law.[73]

159. IIN´s equity holding in T-Solar materialised on 29 October 2012, when the former acquired 65,434,220 nominal shares (equivalent to 58,8362% of the share capital of the latter company)

---

[69] **Exhibit R-104**: Isolux INBV 2013 Management Report pages 114 and 115;

[70] **Exhibit R-104**: Isolux INBV 2013 Management Report pages 114 and 115;

[71] **Exhibit R-183**: Amendment to the Investment agreement, 24 July 2013.

[72] See also: **Exhibit R-104**: Isolux INBV 2013 Management Report pages 114 and 115;

[73] See simple informative Note from T–Solar Global, S.A. issued on 3 June 2014 by Madrid Companies' Register. Until June 2004, the original T-Solar company trading name was Tuin Zonne, S.A. The company trading name was changed by public deed executed on 30 June 2008.

*This is an English language translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

in T-Solar.[74] On 24 July 2013 IIN purchased 32,813,861 nominal shares (equivalent to 28.5051% of the share capital of the company capital) in T-Solar.[75]

160. In turn, T-Solar controls TGOA[76] owning 51% of its share capital similarly being the owner of 100% of TZO [77]share capital.

161. T-Solar, through TGOA and TZO, owns all or the majority of share capital in 117 Spanish sole shareholder limited liability partnerships[78], who in turn own 34 photovoltaic solar plants for electricity production in Spain. The Claimant prepared an inventory of those solar plants in Exhibit A of the Statement of Claim (the "**Plants**")[79].

162. The Claimant sets out the legal grounds for its claim as in the interests it purports to hold in those 34 photovoltaic Plants.

.

## VI. POSITION OF THE PARTIES

163. Before going on to analyse the points object of this litigation, the Arbitration Tribunal sums up the position of the Parties and did so beginning with the jurisdiction objections filed by the Respondent **(A),** thereafter turning to the grounds developed by each Party in relation to the legal matter of this dispute **(B)**.

### A.   POSITION OF THE PARTIES ON JURISDICTION OF THE ARBITRATION TRIBUNAL

164. First of all, the Tribunal sets out the position of the Respondent, who filed a series of objections on jurisdiction of the SCC Arbitration Tribunal **(1)**, setting outthereafter arguments put forward by the Claimant in response to the aforesaid objections submitted by the Kingdom of Spain **(2)**.

---

[74]     See certificate issued by the Secretary to the Board of T-Solar Global, S.A., on 22 November 2013, and copy of the Register-Book of T-Solar Registered Shares.

[75]     See certificate issued by the Secretary to the Board of T-Solar Global, S.A., on 22 November 2013, and copy of the Register-Book of T-Solar Registered Shares.

[76]     See simple informative note of Grupo T-Solar Global Operating Assets, S.L. issued on 18 November 2013 by the Companies' Register of Madrid, certificate issued by the company management board confirming ownership of the shares and a copy of the shareholder register-book.

[77]     See simple informative note of Tuin Zonne Origen, S.L.U. issued on 18 November 2013 by the Companies' Register of Madrid, certificate issued by the company management board confirming ownership of the shares and a copy of the shareholder register-book.

[78]     Except for the companies: (i) TZ Veguilla 1, S.L.U., TZ Veguilla 2, S.L.U., TZ Veguilla 3, S.L.U., TZ Veguilla 4, S.L.U., TZ Veguilla 5, S.L.U., TZ Veguilla 6, S.L.U. and TZ Veguilla 7, S.L.U., in which regard it holds 73.5% of company capital; and (ii) Parque Solar Saelices, S.L., in which regard it holds only 5% of company capital.

[79]     Statement of Claim, ¶36.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 53 of 257
*This is an English Translation of the Original Document in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

### 1.   Respondent Position: SCC Arbitration Tribunal has no jurisdiction

165. The Kingdom of Spain underlies the lack of jurisdiction of the SCC Arbitration Tribunal on six legal jurisdiction objections. These are numbered from A to F[80].

#### a.   Jurisdiction Objection A: SCC Arbitration Tribunal has no jurisdiction as there is no protected investor in the terms of ECT

166.  The Kingdom of Spain brings to light the fact that Article 26.1 ECT[81] requires the dispute to arise between "a Contracting Party" and an "investor of another Contracting party"[82]. Therefore any dispute arising between an investor of an EU Member State and of another EU Member State with regard to an investment in the latter State is excluded from the scope of application of this particular Article.

167. Effectively, the Respondent says that the EU system grants investors that are EU citizens an specific and preferential protection over that granted in the ECT and in any TBI[83]. The EU has its own rights and duties and these are protected by the EU institutional and judicial framework, providing appeal mechanisms and appropriate and exclusive judicial actions[84].

168. The integrated system of fostering and protection of the investments in the EU also establishes that one shall not distinguish, within the EU, between investors of one or another Member State but rather between EU investors and investors of third countries[85].

169. The EU protection system is preferentially applied among EU Member States as a result of the aforesaid system. The Respondent says this is reflected in "*literal wording, context and purpose of the ECT*"[86], and especially in ECT Articles 1(3), 1(10), and 36(7). The Respondent furthermore makes mention of Article 16 ECT, which establishes compatibility rules between Treaties entered into prior to and subsequent to the ECT, among which one finds those regulating the EU and deemed to prevail over the ECT in so far as intra-EU relations. The Respondent also relies on Article 25 ECT, which serves to prevent that as a consequence of having signed the ECT and by means of the most-favoured-nation clause, the intra-EU

---

[80]   Rejoinder, pp. 25-120.
[81]   Rejoinder, p. 25
[82]   **Exhibit RLA-2**: Energy Charter Treaty, made in Lisbon on 17 December 1994, published in the Energy Charter Treaty and related documents, www.encharter.org. Articulo 26(1):  "*Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably*".
[83]   Rejoinder, p. 25-27
[84]   Rejoinder ¶ 51.
[85]   Rejoinder ¶ 52.
[86]   Rejoinder, ¶¶ 54-61.

Case 1:19-cv-01618-TSC    Document 69-52    Filed 06/09/22    Page 54 of 257
*This document is an unofficial English translation of the original document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

integrated system of fostering and protection of investments is extended to ECT Signatory states that are not EU Member States.[87]

170.  The Respondent especially refers to Article 26(6) ECT, which prohibits an EU investor from claiming against an EU Member State before an Arbitration Tribunal as a result of the former's investment. In the opinion of the Respondent, if such a possibility were allowed, this would contravene EU Law. The Respondent refers as example to the award in <u>Electrabel S.A –v-Republic of Hungary</u>[88]. Along the same lines, application of Article 344 TFEU prohibits Spain from submitting issues concerning the electricity market to an Arbitration Tribunal[89]. The Respondent also refers <u>Legal Ruling 1/91, Economic Area  Agreement</u> issued by the ECJ and in which the ECJ ruled on the "*Draft agreement between the Community, on the one hand, and the countries of the European Free Trade Association, on the other, relating to the creation of the European Economic Area*.", also de claring the judicial system created in the draft document to be incompatible in that it imposed conditions on future interpretation of EU rules on matters of free movement and competition[90].

171.  The Respondent highlights that the only possible arbitration proceedingsunder the scope of ECT, as confirmed that Tribunal in the case of <u>Electrabel S.A –v- Republic of Hungary</u>, would be proceedings between "*a non-EU investor and an EU Member State or between an EU investor and a  non-EU Member State*"[91].

172.  The Respondent cites the end purpose of the ECT to support its grounding[92] and also the European Commission *amicus curiae* petition where it states [93]:

> "*In the opinion of the Commission, the ECT does not create obligations between Member States, but rather obligations only arised from the ECT between the European Union and its member states, on the one hand, and other contracting parties (third-party countries), on the other hand. The ECT contains an implicit disconnection clause applicable in this sense for EU Member States. As the Commission shall attempt to explain in the following sections, according to Articles 31 and 32 Vienna Convention on the Law of Treaties ("Vienna Convention"), the ETC should be interpreted on the basis of its literal wording, and also its context, subject purpose, and its origination circumstances. Taking these indicators, one is led to the conclusion that at the time the ECT was adopted none of the contracting Parties intended to grant the right to EU investors to rely on ECT provisions to resolve disputes between an EU investor and an EU Member State*".

---

[87]  Rejoinder, ¶60.
[88]  Rejoinder, ¶62.
[89]  Rejoinder, ¶63.
[90]  Rejoinder, ¶¶65-67.
[91]  Rejoinder, ¶70.
[92]  Rejoinder, ¶¶72-75.
[93]  Rejoinder, ¶76; European Commission *amicus curiae* petition dated 20 February 2015.

173. The aforesaid position of the Commission was held by the Arbitration Tribunal in the case of <u>Electrabel S.A –v-Republic of Hungary</u>[94] which used the example of the position adopted by the Commission in the ruling dated 18 June 2015, wherein the Commission requested five EU Member States to terminate the intra – EU BTIs[95].

174. Particularly, the Respondent replied to the grounds put forward by the Claimant as follows[96]:

175. In response to the Claimant argument that contextual ETC elements serve to corroborate ECT application to intra-UE disputes, the Respondent notes that the Claimant maintains that ECT and the EU system are assumed to be and must necessarily be compatible. The Claimant, however, states: "*the fact that the EU has established certain guarantees and protections for investors by means of EU mechanisms does not mean that the EU cannot, as it effectively did when it supported and signed the ECT, act to encourage new guarantees and protections under an independent and differentiated investment regime that has its own mechanisms for resolving disputes between an investor and the State in which the investment is implemented.* Also, the Claimant mantains that the ECT "*grants rights to private investments substantive and procedural rights not covered by the EU"* and similarly states that the Respondent "*has forgotten the application of contained in Article 16 ECT"*[97]. In response to these arguments, the Respondent recalls the fact that Member States may not obligate themselves on internal market matters and that Respondent is mistaken by considering that ECT provisions "*are more favourable for investors or for investment*" than theestablished system for protecting investors and investments under the EU Law[98]. The Respondent determines that the Claimant failed to define what such aforesaid and different "*substantive rights*" granted by the ECT might be, and similarly states that in this instance those rights have to do with fair and equitable treatment and protection against the expropriations as provided for in ECT Articles 10(1) and 13, which are even more developed in the EU system and especially in ECJ jurisprudence[99].

176. According to the Respondent, the difficulty in this instance is not regarding with choosing and applying the more favourable legal rule, but rather that the issue posed is about deciding whether, under the EU Law, an international treaty can apply in relationships between EU citizens and EU Member States , or whether only EU Law applies to such intra-EU relationships. The Respondent's position is that EU Law

---

[94]     Rejoinder, ¶ 80.
[95]     Rejoinder, ¶ 81.
[96]     Rejoinder, pp. 33-37.
[97]     Rejoinder, ¶¶ 84-85.
[98]     Rejoinder, ¶¶ 86-87.
[99]     Rejoinder, ¶¶ 88-89.

*This is a free translation of the original in Spanish of the award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

takes precedence and prohibits the application of any other legal rule[100]. Draw from the premise that the Statement of Claim cites EU Directives on renewable energy as the framework for the Spanish legislation under which the Claimant made the alleged investment, the Respondent considers that the dispute must be resolved in the light of interpretation of EU Law and that "*with regard to these issues, Spain cannot submit its decision to any other jurisdictions than the EU judicial system, due to the compulsory nature of Article 344 TFEU*"[101]. Thus, a dispute resolution system brought in under a Treaty and affecting EU legal bases is incompatible with EU Law. Article 26 (6) ECT imposes the obligation to resolve disputes in accordance with the "*ECT and applicable rules of International Law*". As a result, one cannot turn to arbitration proceedings to resolve litigation between an EU investor in EU territory [sic] and which affects the freedom of establishment and free movement of capital in the renewable energy sector without thereby infringing EU Law and Article 26(6) ECT [102].

177. In response to the Claimant argument that due to the ECT containing no disconnection clause this proves that the dispute resolution mechanism provided in Article 26 ECT also applies to intra-EU disputes, the Respondent refers to the response set out by the ECJ in Ruling 1/03, of 7 February 2006. The Commission had raised the question on whether it was appropriate to introduce a disconnection clause for the purpose of regulating relations between legislation establishing a Community regime and an international Convention intended to extend that regime to third party States. "*The ECJ view, given that the envisage agreement had to do with fields in which harmonisation was complete, the existence of a disconnection clause was quite inappropriate.*" ECJ confirmed Comission´s position in this sense: "*in this regard, the existence of an agreement on a clause referred to as a «disconnection clause», and by means of which the particular agreement is deemed not affect Member States´rights of application of appropriate provisions of EU Law, does not guarantee that Community legal rules has not been affected by the provisions of the agreement due to delimitation of the respective application of one and the other set of legal rules, but rather, quite the opposite, can be taken as an indication that the aforesaid rules are in fact affected.*"[103] The Respondent ended by saying that neither was necessary of Article 26 ECT to introduce a disconnection clause, due to the fact that in the European common market there was already full harmonisation on protection of investments [104].

---

[100]    Rejoinder, ¶¶ 90-91.
[101]    Rejoinder, ¶91.
[102]    Rejoinder, ¶92.
[103]    Rejoinder, ¶¶93-95.
[104]    Rejoinder, ¶96.

*This document is a non-official translation of the original Spanish document it is based on.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

178. The Respondent also rebutted the Claimant's argument in the sense that the Claimant stated that arbitration tribunal rulings confirm the application of ECT in intra-EU. The Respondent highlights the fact that among the various awards cited only the award handed down in the case of <u>Electrabel</u> actually refers to the ECT. Given that the other awards referred to BTIs, the Respondent considers no analogy can be drawn with this case without the Claimant provides a due explanation.

179. With regard to case of <u>Electrabel S.A –v-Republic of Hungary</u>, the Respondent specifies that the ruling did not decide an identical case to this one, due to Spain and the Netherlands were EU Member States at the time the ECT was negotiated, ratified and came into force. Hungary, however, in the case forward by the Claimant, was not an EU Member State at the time the ECT was concluded.Therefore, had full sovereignty to oblige itself with other contracting parties on all matters subject of the ECT, as opposed to States that were already EC members when the ECT was concluded. In this case, however, the dispute is focused on arguing whether two States participating of the EC when the ECT was concluded, may or may not submit to arbitration those disputes that affect them and their citizens[105].

180. On the European Commission application to suspend the arbitration proceedings together with the Claimant's refusal to suspend these arbitration proceedings on the basis that "*this arbitration does not in any way involve a State aid and certainly not a breach of EU Law*", the Respondent makes reference to the possible future effect that proceedings brought in before the European Commission evaluating measures for supporting renewable energies and cogeneration in Spain (proceedings SA.40348 2014/N) might have on the outcome of these arbitration proceedings. The Respondent mantains that the cited outcomemust be understood in the light of ECJ Court Order dated 22 October 2014 l TJUE, which was issued with regard to pre-judicial matter C 275/13 of 22 October 2014 (Case of ELCOGAS)[106]. As a result of the ECJ juridical classification TJUE that Member States are obliged to bear in mind the 2014-2020 Guidelines on State aid for environmental protection and energy, which were passed into law as Communication 2014/C 200/01 from the European Commission, as well as those repealed by the and passed into law by means of European Commission Communication 2008/C 82/01.

181. The Respondent refers to the European Commission ruling dated 26 May 2014[107], ordering Romania to cease paying of an award handed down in ICSID arbitration, <u>Micula –v- Rumania</u>. Following its initial ruling which, pursuant to Council Regulation (EC) No 659/1999, permitted the Commission to suspend aid payments deemed unlawful, the European Commission ruled on 30 March

---

[105] Rejoinder, ¶¶ 97-102.
[106] Rejoinder, ¶¶ 105; **Exhibit R-171**: Court Order issued by the European Union Court justice on pre-judicial matter C- 275/13, ELCOGAS, de 22 October 2014, ¶33..
[107] **Exhibit R-97:** reference to the European Commission case file SA 38517Micula v. Romania (English).

that "*payment of compensations by Romania to two Swedish investors under the repealed aid regime is in breach of the EU State Aid rules*" and also stated that "*by paying the compensation granted to the Claimants, Romania in reality conceded an equivalent benefit for the repealed aid system*". The Respondent ended by saying that, in the aforesaid case, the Commission concluded that the compensation concerned was equivalent to an incompatible State Aid and should be returned by the beneficiary companies[108].

      **b.**   <u>Jurisdiction Objection B: lack of jurisdiction of SCC Arbitration Tribunal due to absence of investor of another Contracting Party protected under Article 1(7) ECT</u>

182. The issue raised by the Respondent here is as follows: Can a company formally incorporated in the Netherlands, but whose sole owners are a Spanish company and a Canadian company who hold all the company share capital and control all the company decisions, claim against the Kingdom of Spain? The Respondent believes it may not, because by lifting of the corporate veil permits to determine that the dispute has arisen because there is no protected investor according to ECT, as in this case Isolux INBV is completely controlled by a Spanish investor and a Canadian investor (PSP) [109]. Therefore, ECT cannot apply because Canada is not a party to ECT and a Spanish investor cannot claim against the Spanish State under the ECT.

183. Effectively and first of all, the Respondent says the total Claimant company share capital and full control of company decisions lies with regard to the Spanish ISOLUX and the Canadian PSP[110]. Thus, 2013 Annual Accounts states as follows: "*The parent company [Isolux INBV] is jointly controlled by Grupo Isolux Corsán Concesiones, S.A. (a subsidiary of Grupo Isolux Corsán, S.A.) and PSPEUR, S.à.r.l., which hold 80.77% and 19.23% of the shares respectively (directly or indirectly). This joint control is exercised due to shareholders´ agreements which state that the key strategic operational decisions have to be taken through supermajority involving both shareholders and other requirements*"[111].

184. Secondly was stated by the Respondent that GIC, which controlled Isolux INBV prior to signi the Investment Agreement through the company Isolux Infrastructure[112], held full and effective control of Isolux INBV jointly with the Canadian PSP since the signing

---

[108]    Rejoinder, ¶¶ 107.
[109]    Rejoinder, ¶¶ 110-111.
[110]    Rejoinder, pp.39-40
[111]    **Exhibit R-13**: Annual Consolidated Accounts paragraph 308.

This is a true and accurate copy of the original Tribunal Document.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

the same Agreement[113].

185.  The Respondent alleges that according to information in the public domain and not queried by the Claimant, Isolux INBV is in no way established as a Netherlands company and that the Spanish company ISOLUX is the actual Claimant in these arbitration proceedings[114],neither any human or material resources operates in the Netherlands. The Respondent says that, in effect, all Isolux INBV employees are in Spain[115]. Furthermore, Isolux INBV has no its own headquarters office, given that its registered office in the Netherlands coincides with the address as that of a business incubator trading known as United Trust[116] and that the only material resources the company has are shared with the Spanish Grupo Isolux at one single address: *calle Caballero Andante, 8 (Madrid)*[117]. Finally, the company Isolux Infrastructure INBV carries on all its business activities in Spain as it operates photovoltaic plants for the Isolux group [118]. According to the Respondent, the ReplyReply neither refutes the absence of Claimant business activities in the Netherlands nor that is controlled by the Spanish company GIC Concesiones and by the Canadian company PSP Investments[119].

186.  The Respondent believes the Claimant should not use a formalistic ground in its ReplyReply, such as the incorporation of Isolux INBV in the Netherlands, in order to request ECT protection meanwhile hiding behind a reality: there is no Investor protected under the ECT[120]. According to the Respondent, Article 1(7) [ECT] not only requires the company to be incorporated in a State that is a Party to the ECT, but further requires the effective existence of "a company or other organization" [TR. Spanish: "*empresa u otra organización*"], defined in the Spanish Royal Academy dictionary, as an "*organised combination of material and human resources directed for an economic purpose*"[121]. Whereas, the Respondent upholds that Isolux INBV neither has any business activity, nonmaterial nor human resources, and that it is simply a "*cascaron societario*"[122].

187.  In such instances, the Respondent says the absence of elements deemed necessary to confirm the nature of the company meets to exceptional circumstances which serve to justify lifting the corporate veil, given that the legal personality of the company is

---

[113]   Rejoinder, ¶123.
[114]   Rejoinder, pp.40-42
[115]   Rejoinder, ¶128-129; Statement of Defence dated 3 December 2014, paragraph 321; **Exhibit R-104**: Isolux INBV 2013 Consolidated Accounts, Isolux INBV Consolidated Management Report Note 1, page 160, And Accounting Note 24, page 136.
[116]   Rejoinder, ¶130.
[117]   Rejoinder, ¶¶131-134; **Exhibit R-172**: 2014 Management Report included into the 2014 Isolux Group Economic Report, page 140.
[118]   Rejoinder, ¶134.
[119]   Rejoinder, pp.42-44.
[120]   Rejoinder, pp.42 et seq.
[121]   Rejoinder, ¶138-141; see Spanish definitions of "empresa"[TR. company or enterprise], "organización" [TR. organisation] and "organizar" [TR. organise] in the *Spanish Royal Academy* dictionary, provided as **Exhibites R-173, R-174 and R-175.**
[122]   Rejoinder, ¶142;

merely a fiction, being no need to prove the existence of a fraud or judge intention[123]. In this instance, the actual Claimant in these arbitration proceedings is ISOLUX.[124] These circumstances differentiate this case from the cases of <u>Yukos</u> or <u>Tokios Tokeles</u> cited by the Claimant. In contrast to the <u>Tokios Tokeles</u> case, in this instance Isolux INBV is merely a shell company and has no business activity in the Netherlands. It was incorporated on 13 June 2012, i.e. one year prior to the litigation brought against the Spanish State[125]. The dissident judge in the case of <u>Tokios Tokelés</u>, and the award in the case of <u>Venoklim – v - Venezuela,</u> bring to light the fact that the corporate veil can be lifted whether or not procedural fraud exists, when the purpose of the Convention intended(in those instances, the ICSID Convention), to facilitate resolution of disputes between an investor in a State that is party to the Convention and another State party to the Convention, is infringed by an investor who shares its citizenship with the State that is party to the dispute..

188. In view of the above, the Respondent considers that in this instance there has been a flagrant breach of legal criteria on citizenships and therefore requests the lifting of the corporate veil to ascertain the identity of the actual Claimant, i.e. ISOLUX and the Canadian PSP Investments[126].

189. The Respondent concludes by affirming that INBV is no investor protected under the scope of application of Article 1(7) ECT due to the citizenships requirements under the Article are not met [127].

      c.   <u>Jurisdiction Objection C: Absence of investment pursuant to Article 1(6) ECT.</u>

190. Similarly, the Respondent considers that any investment exists in the sense of Article 1(6) ECT because no investment has been made in the objective or ordinary sense and because Isolux INBV does not indirectly own T-Solar profitabilities.

191. Firstly, the Respondent reminds that ECT establishes that the following requirements have to concur in an investment to be deemed to exist:

"*-There must be an investment in the objective or ordinary sense.*

*The investment activity in the objective or ordinary sense should be materialised in any class of asset, from among the broad listing of assets provided in Article 1(6) ECT.*

---

[123]    Rejoinder, ¶144-145, and 148;
[124]    Rejoinder, ¶145;
[125]    Rejoinder, ¶151;
[126]    Rejoinder ¶160; **Exhibit RLA-90**: Venoklim Holding B.V. – v - Republic of Venezuela, ICSID No. ARB/12/22 (3 April 2015) paragraph 156.
[127]    Rejoinder, ¶160;

*This translation is only for internal purposes. Reliance should be placed on the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 61 of 257

> *- The asset must be associated with an Energy Sector Economic Activity.*
>
> *The asset must be directly or indirectly owned or controlled by an investor"*[128].

192. The Respondent goes on saying that the absence of any of these requirements implies there is no investment pursuant to Article 1(6) ECT and, as a consequence, involves the lack of *ratione materiae* jurisdiction of the SCC Arbitration Tribunal according with contained in Article 26 ECT[129].

193. The first of the requirements consists on existing an investment in the objective sense[130]. This condition arises from the literal interpretation of Article 1(6) in accordance with Article 31 Vienna Convention on the Law of Treaties ("CVDT") which assumes the "investment" protected by the ECT is, above all, an investment in the ordinary sense[131].

194. The Kingdom of Spain considers that, in order to ascertain that objective sense, one should not only refer to the definition of "Investment" in quote marks in Article 1(6), but rather must also refer to "standard" criteria found in the word investment, also used in Article 1(6) ECT (without quote marks and in lowercase)[132], given that when one reads Article 1(6) ECT the concept of "investment" for the purposes of the Treaty is initially a very broad concept covering any kind of asset, including those not expressly listed in paragraph 1 of Article 1(6) ECT [133]. The

---

[128]     Rejoinder, ¶160.
[129]     Rejoinder, ¶161.
[130]     Rejoinder, pp. 48 et seq.
[131]     Rejoinder, pp. 48 et seq.
[132]     **Exhibit RL-2**: European Energy Charter. Article 1(6): *"Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes: 5 (a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges*; *(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise; (c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment; (d) Intellectual Property; (e) Returns; (f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector. A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date. "Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat."*
[133]     Rejoinder, ¶¶172 to 179.

Respondent supports its interpretation by referring to the posisiton adopted by the Tribunal in the case Romak – v – Uzbekistán[134].

195. Certain phrases used in Article 1(6) ECT, underline the fact that the meaning of the investment term is linked to an active behaviour consisting on accomplishing a cash contribution with the purpose of obtaining a profit or return[135], especially noted in paragraph 2 of Article 1(6) where the word "investment" is preceded by the verbs "to make" or "to carry out". As a result, according to Article 1(6), one speaks of an investment whenever that investment is materialised in any of the assets listed without limitation , and as long as these have to concern with a business activity in the energy sector. This interpretation is confirmed by Crina Baltag when commenting on the notion of investor in the ECT[136].

196. Furthermore, the purpose and objective of the ECT, which must also be considered in accordance with Article 31 CVDT, require that an investment must exist in the objective sense whether may be deemed as an investment to be protected for ECT purposes [137]. The Respondent states that the end purpose of the ECT is to encourage a long-term cooperation on economic matters and foster investment flow[138].

197. The Respondent concludes this analysis by stating that contrary to the allegations put forward by the Claimant, mantaining that the review of Article 1(6) ECT in accordance with criteria established in Article 31 CVDT, ireveals that obligations assumed by States when signing the Treaty and the co-relative rights offered to investments are not taken on and conveyed by considering one simple asset in relation to a static concept of the term "Investment", but rather to an asset that is subject of an investment in the objective or ordinary sense[139].

198. Insofar as the arbitration precedents cited by the Claimant, the Respondent refers first to the case of Anatolie Stati v. Kazakhstan, in which the Tribunal took notice of the effective provision of funds materialised trough a shareholders loan and subsequently, the provision of funds by reinvestment of profits obtained, as an essential element on which it constructed the existence of an investment in that particular scenario. In both instances the provisions of funds presuppose the corresponding assumption of a risk and a duration [140].

---

[134]    **Exhibit RL-17**: Romak – v – Republic of Uzbekistan, Award of 26 November 2009 (PCA Case No. AA280)
[135]    Rejoinder, ¶¶183-186.
[136]    Rejoinder, ¶¶188 a 191; Exhibit RLA-15: The Energy Charter Treaty. The Notion of Investor. Crina Baltag, Kluwer Law International BV, 2012, The Netherlands. Page 178; Rejoinder, ¶¶ 196 to 201.
[137]    Rejoinder, p. 53.
[138]    Rejoinder, ¶¶ 191 to 195.
[139]    Rejoinder, ¶202.
[140]    Rejoinder, ¶206.

Case 1:19-cv-01618-TSC Document 69-52 Filed 06/09/22 Page 63 of 257
*This is a certified English translation of the Spanish original document 69-52.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

199. The Respondent says that in this particular instance, Isolux INBV did not carry out any investment activity because it has not provided any financial resources and has not assumed any risks in relation to the assets subject of these arbitration proceedings. This conclusion has been reached by financial analysis of the operation that resulted in the incorporation of Isolux INBV.

200. First of all, the nature of the underlying financial operation that resulted in the incorporation of Isolux INBV was a partial disinvestment operation of the Spanish group GIC, carried out by signing an Investment Agreement and involving the sale of assets and subsequent investment on the part of the Canadian company PSP-Investments which purchased certain assets[141].

201. According to the investment agreements, and particularly the Investment Agreement signed on 29 June 2012 between ISOLUX and PSP through its subsidiary PSP Infra, PSP acquired shares in Isolux INBV share capital and joint control of Isolux INBV by ISOLUX and PSP Investments was established.. To put it another way, ISOLUX agreed to share with its new partner the returns on equity holdings provided to Isolux INBV. Prior to that date ISOLUX received 100% of those returns, and from that date onwards only receives 80.77%. Thus, the purpose sought by Isolux with this operation was not to obtain new returns[142]. Another consequence can be seen in the co-relative reduction in risk, since far from assuming new risks - the typical outcome of any investment -, ISOLUX obtained reduced risk exposure. Having provided those assets to Isolux INBV, ISOLUX managed to reduce the aforesaid risks from 100% to 80.77%[143].

202. Another factor that goes to show the operation we are concerned with here does not comprise an investment, is the absence of any financial provision on the part of Isolux INBV to acquire the shares in T-Solar[144]. In effect, implementation of the aforesaid investment agreements, and particularly the agreement dated 29 June 2012 between ISOLUX and PSP, was in part subject to fulfilment of several conditions precedent that had to be met by the deadline of 1 October 2012.[145] In consideration for the provision of capital into Isolux INBV materialized by the Canadian contracting party, ISOLUX had to provide and assign equity holdings into Isolux INBV with regard to the following companies:: Isolux Corsán Concesiones S.A.U., Isolux Corsán Concesiones de Infraestructuras S.L.U. and Grupo T- Solar Global, S.A[146]. On 29 October 2012, Isolux INBV carried out[147] "*a capital increase, fully subscribed and paid up by its partner Grupo Isolux Corsal* [sic]

---

[141] Rejoinder, ¶¶ 210 et seq.; Statement of Defence to Claim, Jurisdiction Objections and Bifurcation Petition of 3 December 2014, ¶¶ 361-382.
[142] Rejoinder, ¶218.
[143] Rejoinder, ¶219.
[144] Rejoinder, pp. 59-60
[145] Statement of Defence, ¶51.
[146] Statement of Defence, ¶53.

*This is a Freely-Available Non-Official English Translation of the Original Document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[147]     **Exhibit R-181:** Capital Increase Resolution of 29 October 2012.

*This is a free-translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

*Conseciones [sic] S.L., by an exchange of securities that involved acquiring equity holdings in the company share capital of Isolux Corsán Concesiones, S.A.U., of Isolux Corsán Concesiones de Infraesructuras, S.L.U. and of Grupo T-Solar Global, S.A.. The aforesaid companies were assigned to the branch in Spain of Isolux Infrastructure Netherlands, B.V.”[148].*

203. The Respondent says that this "reassignment" of assets in Isolux INBV did not involve any provision of funds by the latter Company, but that the latter merely received equity holdings in T-Solar[149]. Nor did the reallocation of assets involved transferring any risk in that the risks associated with the assets were maintained within the assets of GIC Concesiones[150].

204. In the Respondent's view, the only investment that could be deemed to exist was that carried out exclusively by PSP Investments, when its subsidiary PSP Infra subsequently came to form part of Isolux INBV company share capital once the T-Solar shares had been reassigned to Isolux INBV company share capital [151].

205. Also, signing of the Shareholders Agreement was a condition for the implementation of the Agreement used to design the investment of PSP Investments in GIC assets. By virtue of the first one the Parties to the latter accepted to establish a jointly control of the company, similarly implying the unanimousconsent of the Parties over any type of strategic, financial or operational decision[152]. Again in the view of the Respondent, under this principle, Isolux INBV was not responsible for managing and developing the business but rather did so jointly with the Spanish company GIC and the Canadian company PSP, sitting on the same Board of Directors[153]. Furthermore, day-to-day administration of assets included into Isolux INBV lay with GIC Concesiones, a consolidated GIC subsidiary and under GIC and PSP control[154]. The Respondent states this analysis is confirmed by Isolux INBV's own definition of its main business activity: "*The Parent company corporate purpose is the participation in other companies as a partner or shareholder in the country or abroad (holding)*"[155].

206. The Respondent allegation is based on the terms and conditions of the Investment Agreement dated 29 June 2012 wherein GIC undertook to provide Isolux INBV with 125.500 million dollars as follows: 50% as a convertible loan and 50% as capital

---

[148] **Exhibit R-14:** Note 5, Isolux INBV, *Sucursal en España*, 2012 Management Report.
[149] Rejoinder, ¶221.
[150] Rejoinder, ¶222.
[151] Rejoinder, ¶226.
[152] Rejoinder, ¶226-227; **Exhibit R-182**: Shareholders Agreement dated 29 June 2012.
[153] Rejoinder, ¶¶228-229; **Exhibit R-182**: Shareholders Agreement dated 29 June 2012, Clause 9 of the Agreement (pages 25 and 26) in relation to Schedule 3 pages 72 to 74; Clause 10 of the Agreement (Pages 26 and 27); Clause 19 of the Agreement (pages37 y 38) in relation to Schedule pages75 and 76.
[154] Rejoinder, ¶231; **Exhibit R-182**: Shareholders Agreement of 29 June 2012, Clause 4.2.7.
[155] **Exhibit R-13:** Isolux INBV 2012 Annual Accounts, Consolidated Management Report, Point 1 General Information, Page 115. R-12 and; Isolux INBV 2013 Annual Accounts, Note 1, General Information.

*This document is a true and faithful translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

provisions[156]. Nevertheless, during 2013 GICC received dividends from Isolux INBV in the amount of 88.039 million euros on 27 March 2013 and 28 October 2013[157]. The Respondent says those dividends were distributed by Isolux INBV and charged against the issue premium, considering that Isolux INBV had registered losses in the 2012 tax year, 2013 tax year and subsequently for the 2014 tax year. Those dividends therefore do not derive from profit share but rather correspond, to use the Respondent's terms, to "*simple return, cancellation, offsetting in accounting terms*" or "*were funds that GICC never in effect provided*"[158]. Therefore, the actual provision made by GICC amounts to 37.461 million dollars rather than the 125.500 million dollars shown on the contracts.

207. Furthermore, the Respondent adds that upon proposal of GICC, the original provision agreement was novated on 24 November 2013[159], by its virtue 50% of the 125,500 million dollar ("capital provisions"), still outstanding by GICC would be replaced by a provision in kind of equity holdings in Grupo T-Solar Global, S.A., valued at 43,730 million dollars. One can conclude from those considerations that, according to the Respondent, GIC made no provision of funds into Isolux INBV, and merely made an additional provision of financial equity holdings to be added to those already initially reassigned in October 2012[160].

208. The Respondent also argues that Isolux INBV does not directly or indirectly own or control the returns obtained by T-Solar from its partly owned companies[161]. The Respondent reminds the that the concept of Investment is established in Article 1(6) ECT, which requires that the asset in which regard the investment activities are carried out must be "directly or indirectly owned by an investor". Additionally, the Article requires that the direct or indirect ownership or control must be exercised by an investor, although the term investor is not defined.

209. This being so, in the present instance the asset in which regard one must make a judgment as to whether direct or indirect ownership or control is as identified by the Claimant, in other words, the returns from T-Solar[162]. The Respondent says that it is quite certain that Isolux INBV does not directly own T-Solar returns, in that direct control is exercised by T-Solar and the returns equally belong to T-Solar. Consequently, the Respondent [sic] has an indirect connection with these assets and one has to determine in this instance whether the term "indirect ownership" used in Article 1(6) ECT refers to any step in the chain of companies through which

---

[156] **Exhibit C-172**: Investment Agreement of 29 June 2012. Page 4.
[157] Rejoinder, ¶234; **Exhibit R-13**: Isolux INBV 2013 Annual Accounts. Note 14.2, page 66.
[158] Rejoinder, ¶235.
[159] **Exhibit R-183**: Amendment to Investment Agreement of 24 July 2013. Pages 4, 7 and 8.
[160] Rejoinder, ¶¶237-238.
[161] Rejoinder, p. 62
[162] Rejoinder, ¶242.

Case 1:19-cv-01618-TSC   Document 69-32   Filed 06/09/22   Page 67 of 257

*This passage is a free translation of the original Spanish award document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

an asset can be owned or whether, to the contrary, the concept refers to the last owner in the chain: the final owner[163].

210. The ECT provides no specific definition of the concept of indirect ownership, and one must therefore be guided by arbitration pronouncements and the considerations taken into account in the ECT Preparatory Work.

211. Insofar as arbitration awards ruling with an interpretation of Article 17 ECT, the Respondent states there are some of them that have indeed construed indirect ownership as referring to the final owner[164]. The Respondent does not share the position taken by the Claimant who upholds that those awards do not apply because Article 17 ECT is an exceptional mechanism and cannot be transferred to other scenarios. The Respondent, on the other hand, considers it absurd to take the meaning to be that the concept of indirect ownership may vary according to whether one applies Article 1(6) or Article 17. Additionally, the Claimant fails to refer to arbitration cases in which Article 1(6) ECT is interpreted and the conclusion drawn is that indirect ownership lies with the beneficial owner[165].

212. The Claimant notes that in ECT preparatory work, the meaning to be given to the adverb "indirectly" was analysed and refers in the first instance to the letter of 21 April 1994 addressed to the Chairman of the Legal Sub-Group by the Russian Delegation, and also to the response of the latter [sic] dated 22 April 1994[166]. The Respondent notes that the opinion of the Legal Sub-Group was to define "indirect ownership" in the sense that a shareholder owns a portion of the Company assets. However, one should point out that the Legal Sub-Group considered that a series of changes would be necessary to the Treaty draft in order to include that interpretation into the Treaty Wording. Nonetheless, it is true to say that neither Article 1(6), nor any other Article in the ECT, included any paragraph such as that proposed by the Legal Sub-Group. Furthermore, the wording of Article 15(3) remained unchanged. The Respondent says that as a result of this, the unusual opinion of the Legal Sub-Group on how to interpret the adverb "indirectly" was not included into the ECT wording and the signatory States accepted the idea that indirect ownership referred to "beneficial ownership of assets, maintained through a chain of entities" (free translation), where the notion of "beneficial ownership" refers to the last link in the aforesaid chain of ownership[167].

---

[163] Rejoinder, ¶246.
[164] Rejoinder, ¶248; **Exhibit RLA-24**: Plama Consortium Limited – v - Republic of Bulgaria, ICSID Case No. ARB/03/24, Jurisdiction Award of 8 February 2005, paragraph 170; **Exhibit RLA-25**: Libananco Holdings Co. Limited –v-Republic of Turkey, ICSID Case No. ARB/06/8, Award of 2 September 2011, ¶ 556.
[165] Rejoinder, ¶249.
[166] Rejoinder, ¶¶252-255; **Exhibit R-185**: Letter dated 21 April 1994 from the Russian Delegation; **Exhibit R-186:** Response to the Letter dated 21 April 1994 from the Russian Delegation, on 22 April 1994.

*This document is a true and faithful Spanish original award translation.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

213. On that basis, the Respondent has concluded that the concept of indirect ownership refers to the final owner. In the case of Isolux INBV, the latter is not the final owner of the assets, but rather the final owners are GIC and PSP Investment, in such a manner that there is no protected investment under the scope of application of Article 1 (6).

214. The Respondent concludes that this Tribunal has no *ratione materiae* jurisdiction.

### d.    Jurisdiction Objection D: lack of jurisdiction of SCC Arbitration Tribunal sue to abuse of the legal process.

215. The Respondent considers that the only purpose of the alleged investment carried out by Isolux INBV from the Netherlands has been to fraudulently access ECT investment arbitration. This amounts to an instance of prohibited *forum shopping* [168].

216. Firstly, the Respondent states that the Claimant has not accessed the investment arbitration jurisdiction in a lawful manner[169]. The Respondent makes the point that the Claimant continues to rely on the formalistic argument of Isolux INBV incorporation in the Netherlands to refute there has been any abuse of legal process or fraud. However, the only purpose of doctrine laid down on abuse of process is specifically to avoid the possibility of incorporating in the Netherlands under the appearance of a formal commitment, whilst in fact seeking a prohibited aim that cannot otherwise be lawfully achieved, such as accessing investment arbitration[170]. And [the Claimant] did so when the dispute was already predictable.

217. Contrary to Claimant allegations, the Respondent considers that the measures the Spanish Government adopted were indeed announced and predictable. For a dispute is predictable, there is no requirement for the measures to have been enacted but rather it suffices that the dispute can be seen as obvious[171]. The Respondent says that evidence of this can abounds, in addition to announcements and public speeches, in the bill of Parliament adopted by the Government which would become Law 15/2012 and which was submitted to the *Cortes Generales* on 14 September 2012[172]. This is duly recorded in the reference to resolutions adopted by the Council of Ministers on 14 September 2012, and published on the Spanish Government official website[173]. This occurred more than a month prior to the alleged investment made by the Claimant. The Respondent equally refers to the Letter from ISOLUX President, Mr. Luis Celso, sent to

---

[167]    Rejoinder, ¶256.
[168]    Rejoinder, p. 66.
[169]    Rejoinder, p. 66-68.
[170]    Rejoinder, ¶269.
[171]    Rejoinder, ¶271-272.
[172]    Statement of Claim of 3 December 2014, ¶541.
[173]    **Exhibit R-126**: Council of Ministers reference dated 14 September 2012, www.lamoncloa.gob.es

the Spanish Government in July 2012, which is prior to the date on which the alleged investment would have been carried out and further goes to show the fact that the measures were indeed foreseeable [174].

218. The position of the Respondent is that all the best doctrine upholds good faith and the prohibition of abuse of legal process as applicable to the ECT[175] The Respondent refers to the case of <u>Phoenix –v-Czech Republic</u> in which the Tribunal ruled that in order to ascertain whether the Claimant had made an investment in good faith, one had to consider when the investment was made, the initial claim to ICSID, the date on which the claim was implemented, the nature of the operation and the substance of the transaction[176]. As this is an ICSID case, the Claimant considers this doctrine cannot be applied to ECT matters. The Respondent, on the other hand, considers that while one cannot refute that an award is inapplicable as a precedent, the issue as to valuation of circumstances of the case is a different matter and in the case of <u>Phoenix –v- Czech Republic</u> it is that perspective that serves as a valid precedent for the matters submitted to the ECT[177]. The Respondent also refers to several other cases such as <u>ST-AD GmbH –v-Republic of Bulgaria</u>[178], <u>Pac Rim Cayman LLC –v-Republic of El Salvador</u>[179] and the matter of <u>Mobil Corporation et al –v- Venezuela</u>[180]. As it turns out, regard for good faith and the prohibition of abuse of legal process fully applies to the ECT and this is <u>acknowledged in the matter of <u>Plama Consortium Limited –v- República de Bulgaria</u>[181].

219. This being so, the Respondent says that in order to ascertain whether abuse of legal process has occurred, one must look at the circumstances of the specific instance. This was established in the case of <u>Mobil Corporation at al –v- Venezuela</u>[182]. One has to check the content and grounds for the transaction, and verify whether any existing economic activity has to be protected under the ECT. The Respondent states in this instance that Isolux INBV is a company that exclusively receives assets transferred by a Spanish company in favour of a Canadian company and in the context of a disinvestment process of the former. The sole purpose for carrying out the operation in the Netherlands was

---

[174] Rejoinder, ¶273; **Exhibit R-136:** Letter from Isolux to the Spanish Prime Minister dated 12 July 2012.
[175] Rejoinder, p. 68-69
[176] Rejoinder, ¶277; **Exhibit RLA-30**: Phoenix Action Ltd. –v-Czech Republic, ICSID Case No. ARB/06/5, Award dated 15 April 2009, ¶¶ 135-140.
[177] Rejoinder, ¶279.
[178] **Exhibit RLA-34**: ST-AD GmbH (Germany) –v- Republic of Bulgaria, UNCITRAL, PCA Case No. 2011-06 (ST-BG), Jurisdiction Award 18 July 2013, ¶ 416.
[179] **Exhibit RLA-31**: Pac Rim Cayman LLC –v-Republic of El Salvador, ICSID Case No. ARB/09/12, Ruling on Claimant jurisdiction objections dated 1 June 2012, ¶2.46.
[180] **Exhibit RLA-110**: Mobil Corporation et al –v- Venezuela, ICSID Case No. ARB/07/27, Ruling on Jurisdiction, 10 June 2010, ¶ 182.
[181] Rejoinder, ¶282; **Exhibit RLA-32**: Plama Consortium Limited –v-Republic of Bulgaria, ICSID Case No. ARB/03/24, Award dated 27 August 2008, ¶138.
[182] Rejoinder, p. 69-70

*This translation has no official status but is an unofficial translation of the original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

to access the international arbitration dispute resolution mechanism by means of Article 26 ECT[183].

220. The Respondent alleges that the presence of Isolux INBV in the Netherlands is simply formalistic and was set up as a fiction to access international arbitration [184].

221. The Respondent additionally alleges that the shares in T-Solar were re-assigned at a time when the dispute was already predictable[185].

222. The Respondent refers to grounds put forward by the Claimant in its ReplyReply, where it states that the date to be deemed is not just the date when the investment was actually made (i.e. 29 October 2012), but rather that one when it was planned and when the decision to invest was taken (i.e. on 29 June 2012, according to the Investment Agreement of the same date). The Claimant added that those dates were prior than the dates on which the Kingdom of Spain adopted the measures that have led to these arbitration proceedings, i.e., as from 27 December 2012, similarly specifying that the elements allegedly announcing the energy sector reform are no more than general elements, inferences to be drawn from electoral campaign speeches and that these only announced that adopting reforms were required due to the tariff deficit[186].

223. The Respondent does not share that vision but rather considers the Isolux INBV investment was not made prior to 29 October 2012. The Respondent brings to light that the Claimant repeatedly upheld in its Statement of Claim that its investment was dated 29 October 2012, stating at paragraph 34: "*IIN´s equity holdings in T-Solar materialised on 29 October 2012 when the former acquired 65,434,220 nominative shares (...)*", also set down at paragraph 132 and that paragraph 138 of the initial Statement of Claim[187]. Furthermore, the Claimant adduced no evidence as proof that the investment was made on 29 June 2012 and the Respondent insists on the fact that the Claimant did not voluntarily provide the court with the Investment Agreement dated 29 June 2012, because it might be detrimental to itself[188].

224. The Respondent alleges that no investment of any kind was made when signing the contract on 29 June 2012, given that the possible investment was subject to the fulfillment a series of conditions precedent. For that reason, the aforesaid agreement did not come into effect until all the conditions established by the Parties had met[189]. Article

---

[183]    Rejoinder, ¶285-286.
[184]    Rejoinder, p. 71-72.
[185]    Rejoinder, p. 77-78.
[186]    Rejoinder, ¶¶297-299.
[187]    Respondent's Post-Hearing Brief, ¶34.
[188]    Respondent's Post-Hearing Brief, ¶36.
[189]    Respondent's Post-Hearing Brief, ¶40.

Case 1:19-cv-01618-TSC   Document 69-32   Filed 06/09/22   Page 71 of 257
*This document is a courtesy English translation of the original Spanish document.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

of the preamble of the agreement rendered making the investment subject to a series of future and uncertain events occurring[190]. Likewise, Clause 4 of the Investment Agreement established the compliant a series of conditions precedent and breach of any one of them implied early termination of the contract with no right compensation for shareholders. Additionally, Clause 5.6.2 of the Investment Agreement permitted its early termination with no right to compensation, if any event occurred between the date of the agreement and the date the last condition precedent was fulfilled that resulted in or might result, at a later date, in a material drop in the business group value[191]. The Respondent also refers to the investment date ratified in the Agreement of 24 July 2013, which amended the Investment Agreement dated 29 June 2012[192]. Co-relative to the loss of assets experienced by ISOLUX, the Claimant Annual Accounts do not reflect the inclusion of those assets until as late as 29 October 2012[193]. In other words, that was the date of the alleged investment made by the Claimant.

225. The Respondent furthermore considers that the reform undertaken was predictable and that the Claimant refutes the reality of facts recalled by the Claimant in its Statement of Defence and which go to show the reform was predictable at the time Claimant effectively made the investment: 29 October 2012, and also on the date the Investment Agreement was signed: 29 July 2012. The Respondent makes reference to its Statement of Defence[194], and particularly:

- Announcement of the energy sector reforms in the investiture speech given in the Spanish Parliament by Mr Mariano Rajoy who, at that time on 19 December 2011, was still a candidate to become Prime Minister[195];

- Reference to the need to carry out an urgent energy reform in order to control the tariff deficit, stated in the interview held with the Spanish Prime Minister at the

---

[190]   Brief subsequent to the Respondent Audience, ¶41; Article H of the Introduction to the Agreement dated 29 June 2012: "*The Investors Equity Contribution shall only be carried out upon the Current Shareholders having implemented a restructuring process, pursuant to which, among other steps, (i) Isolux Infrastructure shall merge into GIC Concesiones, which, as a result thereof, shall become the sole owner of the entire stake currently held by Isolux Infrastructure in the Subsidiaries and (ii) subsequently, GIC Concesiones shall transfer to Target the ownership of such stake in the Subsidiaries (the "Restructuring"). Accordingly, as a result of the Restructuring, Isolux Infrastructure will cease to be the parent holding company of the Group and the Business, being replaced by Target. Prior to the Investor making the Investor's Equity Contribution, the Current Shareholders shall implement the Restructuring on the terms set forth in Schedule (H).*"
[191]   Brief subsequent to the Respondent Audience, ¶42-43.
[192]   Amendment to Investment Agreement dated 24 July 2013. Recital IV, Page 2.
[193]   Brief subsequent to the Respondent Audience, ¶50.
[194]   Statement of Defence, ¶¶503 et seq..
[195]   **Exhibit R-63***: Speech byMariano Rajoy at the investiture sesión as Spanish Prime Minister*,  Spanish Parliament, Monday 19 December 2011, www.lamoncloa.gob.es .

*This is a partial, unofficial English translation of the original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

Agencia EFE television, on 10 January 2012[196], and previously in the speech given when taking possession of positions at the Ministry[197];

- The reforms were also announced in the Speech inaugurating EXCELTUR *VI Foro de Liderazgo Turístico* [Tourism Leadership Forum][198], in press conferences with foreign authorities such as the Chairman of the European Council[199], the Portuguese Prime Minister[200] or the German Chancellor[201], and in appearances before the Congress of Deputies[202];

- Publication of the Europa Press news agency dated 15 February 2012 with the heading "*2011 tariff deficit exceeds 3,700 million and stands 23 % above the legal limit*" where it specified "*Soria has referred to regulatory changes to the "pool" and an energy reform.*"[203];

- On 27 January 2012 the Bloomberg stated on its website that Spain would be reducing is deficit over several stages[204].

- Press release from the Ministry of Industry, Energy and Tourism dated 27 January 2012, after the adoption of Decree-Law 1/2012[205] and where it acknowledges that "*maintaining the current remuneration system is not compatible with the present economic crisis scenario including the drop in demand and therefore, whilst the system is reformed and moving towards a remuneration framework for renewable energies that assists an efficient assignment of resources, the remuneration system is temporarily halted*";

- Newspaper El Mundo published the following on 27 January 2012, at the time Royal Decree-Law 1/2012 came into force: "*The Government is suspending premiums for new renewable energy installations*"and stated <u>*"A first step" whilst the electricity system reform is initiated.*</u>"[206];

---

[196] **Exhibit R-110**: *Interview with the Spanish Prime Minister at Agencia EFE*, Madrid, Tuesday, 10 January 2012, www.lamoncloa.gob.es.

[197] **Exhibit R-109**: José Manuel Soria chaired the taking up of new Executive department positions, press release from the Ministry of Industry, Energy and Tourism, 3 January 2012.

[198] **Exhibit R-11:** Spanish Prime Ministers speech during inauguration of VI *Foro de Liderazgo Turístico de EXCELTUR*, Madrid, Tuesday 17 January 2012, www.lamoncloa.gob.es.

[199] **Exhibit R-112**: *Press conference with the Spanish Prime Minister and Chairman of the European Council,* Madrid, Tuesday, 17 January 2012, www.lamoncloa.gob.es.

[200] **Exhibit R- 113**: *Press conference with Portuguese Prime Minister and Spanish Prime Minister*, Lisbon, Tuesday, 24 January 2012, www.lamoncloa.gob.es.

[201] **Exhibit R-114:** *Press conference with the German Chancellor and Spanish Prime Minister*, Berlin, Thursday, 26 January 2012, www.lamoncloa.gob.es.

[202] **Exhibit R-115**: *Speech of Spanish Prime Minister at Plenary session of Congress of Deputies forming on conclusions of Brussels European Council*, Congress of Deputies, Wednesday, 8 February 2012, www.lamoncloa.gob.es.

[203] **Exhibit R- 116**: "*El déficit de tarifa de 2011 supera los 3.700 millones y se sitúa un 23 % por encima del tope legal*", Europa Press, www.europapress.es, 15 February 2012.

[204] **Exhibit R-117**: Spain halts renewable subsidies to curb \$31 billion of debts, Bloomberg, www.bloomberg.com, 27 January 2012.

[205] **Exhibit R-66**: Spanish Government temporarily suspends premiums for new installations subject to the special regime, press release from the Ministry of Industry, Energy and Tourism, 27 January 2012.

[206] **Exhibit R-118**: "*El Gobierno suspende las primas a nuevas instalaciones de energías renovables*", El Mundo, www.elmundo.es, 27 January 2012.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

- NEC Report 2/2012, following a public consultation process, *"Sobre el Sector Energético Español"*[207] [TR. On the Spanish Energy Sector] published on 7 March 2012. Part one of the report focused on *"Medidas para Garantizar la Sostenibilidad Económico-Financiera del Sistema Eléctrico"*[208][TR. Measures to Guarantee Economic Financial Sustainability of the Electricity System]

- Adoption during the first months of 2012 of several measures such as Royal Decree-Law 1/2012[209]; Royal Decree-Law 13/2012, 30 March[210], and Royal Decree-Law 20/2012, of 13 July[211];

- Spanish Government 2012 National Reforms Programme of 27 April 2012, including Kingdom of Spain undertakings with the EU[212];

- Document entitled "*Seis meses de Gobierno: reformas para crecer*" [TR. Six months of Government: reforms for growth] published by the Spanish Government on 9 July 2012, and including "Energy System Reform", among planned structural reforms."[213].

- Report on the National Reforms Programme for the second semester of 2012 passed into law by the Council of Ministers on 13 July 2012 and containing plans to pass the Energy Reform Act into law[214].

- September 2012, publication of document "*Reforms of the Spanish Government: determination facing the crisis*" setting out plans to pass an Energy Reform Act[215] into law; and on 27 September 2012 the "*Spanish Economic Policy Strategy: Balance sheet and structural reforms for the next six month period*" was announced when the Bill for the 2013 National State Budget[216] was passed into law";

- On 11 July 2012, Reuters agency published the following information on its website quoting declarations of the Minister and referred to the next measures to be adopted and announcing the implementation of a tax on electricity production [217];

---

[207]   **Exhibit R-69**: *NEC Report on the Spanish energy sector Part I. Measures to guarantee economic financial sustainability of the electricity system*, National Energy Commission, 7 March 2012.
[208]   Statement of Defence, ¶¶522-524
[209]   **Exhibit R-65**: Royal Decree-Law 1/2012.
[210]   **Exhibit R-76**: Royal Decree-Law 13/2012, of 30 March, transposing electricity and gas domestic market directives and on electronic communications, adopting measures to correct deviations by adjusting costs and revenue in the electricity and gas sectors.
[211]   **Exhibit R-81**: Royal Decree-Law 20/2012, of 13 July, on measures to remunerate electricity generation plants under the ordinary regime and on remuneration of energy transport business.
[212]   **Exhibit R-72**: 2012 National Reforms Programme, 27 April 2012, Government of Spain, pages16 -17.
[213]   **Exhibit R-75**: *Six months of Government: reforms for growth*, Spanish Communications Ministry, Prime Ministers office, 9 July 2012, page 30.
[214]   **Exhibit R-122**: Ref. Council of Ministers on 13 July 2012, www.lamoncloa.gob.es .
[215]   **Exhibit R-77**: "*Las reformas del Gobierno de España: La determinación frente a la crisis*", Spanish Communications Ministry,  Prime Ministers office, September 2012, page 18.
[216]   **Exhibit R-78**: Ref. Council of Ministers on 27 September 2012, www.lamoncloa.gob.es
[217]   **Exhibit R-124**: "*Ministro Industria anuncia nuevo impuesto a generación eléctrica"*, Reuters Spain.  www.es.reuters.com., 11 July 2012.

- Newspaper El Páis stated as follows on 12 July 2012, under the heading "*El Gobierno aplicará impuestos a la energía para obtener 6.800 millones*" [218] [TR. The government will apply taxes to energy to obtain 6.800 million];
- The Bill of Law on Fiscal Measures for Energy Sustainability, subject of this arbitration, was submitted to the *Cortes Generales* on 14 September 2012. Resolutions adopted by the Council of Ministers on 14 September 2012 were published on the Spanish Government official website (www.lamoncloa.gob.es)[220].

226. Additionally, the Respondent notes that ISOLUX Chairman set out his concern with regard to the Government proposals in a letter addressed to the Spanish Prime Minister dated 12 July 2012[221]. One of his concerns had to do with the Government's intention to create a new tax. That letter goes to show that ISOLUX was perfectly aware that a series of measures were being adopted that would affect photovoltaic plants, including the creation of the tax subject of these arbitration proceedings.

227. Insofar as the NEC Report, the Respondent stated in its Post-Hearing Brief and in answer to Arbitration Tribunal question No.5, that this public body regulates operations of the Energy Sector in Spain. NEC particularly is involved as a consultation body for the government on energy and participates, either by way of proposals or report, in the process of drafting general legal provisions on energy-related matters[222]. The Respondent has specified that the NEC proposals do not neither include a review of macro economic or budgetary feasibility nor on compatibility of the international undertakings assumed by Spain[223].

228. NEC Report dated 7 March de 2012 and entitled "Measures to guarantee financial sustainability of the Electricity System" specifically describes the financial economic scenario in the economic area in which the Claimant carried out its investment months later and which was classified by NEC as "unsustainable"[224]. NEC highlighted that it was impossible to overcome the economic financial scenario of the SEE by turning exclusively to domestic and industrial consumers. The Report basically highlighted the tremendous effort of Spanish consumers in recent years to cope with mismatches in the Spanish energy system[225] Aditionally, goes on to say that any investor wishing to invest in the Spanish electricity

[218] **Exhibit R-125**: *The government will apply taxes to energy to obtain 6,800 million,* El País, www.elpais.es, 12 July 2012.
[219] **Exhibit R-126**: Reference of Council of Ministers dated 14 September 2012, www.lamoncloa.gob.es.
[220] **Exhibit R-126**: Reference of Council of Ministers dated 14 September 2012, www.lamoncloa.gob.es.
[221] **Exhibit R-136**: Letter from the President of Fotowatio, from the Managing Director of Renovables SAMCA, S.A., from the President of Gestamp Renewable, from the President of Sener, from the President of Isolux, from the President of Torresol Energy and from the President of OHL Industrial to the President of the Government dated 12 July 2012.
[222] Respondent's Post-Hearing Brief, ¶144.
[223] Respondent's Post-Hearing Brief,, ¶¶149-157.
[224] Respondent's Post-Hearing Brief, ¶159.
[225] Respondent's Post-Hearing Brief, ¶160.

*This award is a non-official English translation of the original award in Spanish.*
Case 1:19-cv-01618-TSC Document 69-52 Filed 06/09/22 Page 75 of 257
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

system in 2012 should be aware that there was a limited possibility of turning to consumers and that regulatory measures would have to be implemented to render the Spanish electricity system costs more effective[226].

229. NEC proposed several measures integrated into Laws and regulations. In relation to remuneration under the Special Regime, the NEC proposed a series of short and mid-term measures[227], as long as the principle of a reasonable rate of return guaranteed in the Act was respected[228]. Among these measures, the Respondent had referred to increasing the "x" factor for updating index for tariffs and premiums (CPI-X) [229]; harmonisation of the thermoelectric solar technology premium with regard to the regulated tariff, which measure was introduced in RDL 2/2013; establishing "competitive bid mechanisms" to decide subsidies to be received by producers to whom new capacity was assigned: the measure was introduced in Law 24/2013 and in RD 413/2014. Finally, the Respondent made the point that NEC had referred to the possible establishment of a remuneration system that would be based on a regulated costs system linking tariffs and premiums reviews to obtaining, maintaining and revising a regulatory data system for auditable costs permitting systematic follow-through and regulation of costs faced by sector companies[230]. The regulated costs system is the basis for the current remuneration system introduced in Royal Decree Law 6/2013[231] and is the subject of these arbitration proceedings[232].

230. The Respondent also stated that the Claimant was aware of Supreme Court jurisprudence on changes to the renewable energy regime in Spain, given that the Supreme Court had handed down judgments in two matters affecting the 34 plants subject of these arbitration proceedings, in cases brought against measures adopted by Spain in Royal Decree 1565/2010. In the first judgment, dated 24 September 2012, the , one month prior to the date on which ISOLUX reassigned assets to Isolux INBV, the Supreme Court dismissed the appealconfirming that owners to photovoltaic installations had not acquired a right to an immutable tariff[233]. In the judgment handed down on 15 October 2012, a few days before the alleged investment had been carried out by the Claimant, the Supreme Court dismissed the claim brought in by T-Solar and the 117 SPVs, also concluding there was no immutable right to receive a tariff,

---

[226] Respondent's Post-Hearing Brief, ¶161.
[227] Respondent's Post-Hearing Brief, ¶170.
[228] Respondent's Post-Hearing Brief, ¶171.
[229] **Exhibit R-68**: Information on public consultation regarding regulatory adjustment measures in the energy sector, dated 2 February 2012, pages 22 and 23.
[230] **Exhibit R-69**: NEC Report on the Spanish energy sector Part I. Measures to guarantee economic financial sustainability of the electricity system, NEC, 7 March 2012, pages 79 and 80.
[231] **Exhibit R-86**: Royal Decree-Law 9/2013, of 12 July, adopting urgent measures to guarantee financial stability of the electricity system, Spanish Official Gazette 13 July 2013. Article1 (2).
[232] Respondent's Post-Hearing Brief, ¶176.
[233] Rejoinder, ¶325; **Exhibit R-139**: Supreme Court Judgment of 24 September 2012 issued in Litigation brought by Isolux Corsán, S.A. against RD 1565/2010.

*This is an English courtesy translation of the Spanish original award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

and that neither did any right exist to freeze the economic regime for producers of electricity from renewable photovoltaic solar sources [234].

231.  On Supreme Court jurisprudence, the Respondent replied to Arbitration Tribunal question No.4 specifying that Supreme Court judgments are not deemed "precedents" but rather must be considered in the sense of "relevant and proven fact" together with the remaining circumstances[235]. The Arbitration Tribunal may not ignore that jurisprudence, which construes and supplements existing legislation[236]. The significance of this jurisprudence has been acknowledged by arbitration tribunals such as in the case of Nuaman Soufraki –v- United Arab Emirates[237], or the case of Victor Pey Casado – v- Republic of Chile[238].

232.  The Respondent then went on to insist that the Claimant knew or should have known the significant Supreme Court rulings if it had carried out a legal *Due Diligence*. When ISOLUX brought a claim before the Supreme Court in May 2011, the court upheld its opinion on the regulatory framework applicable to the Claimant in these arbitration proceedings [239]. At that time, ISOLUX referred to the Supreme Court judgment of 15 December 2005 where dealt with the parameters for regulated remuneration. The Supreme Court stated in that ruling that no legal obstacle existed to prevent the Government from changing a specific remuneration system as long as it remained within the framework established in the LSE[240]. Along the same lines and in relation to the remuneration regime not linked to a Feed-in-tariff [FIT], ISOLUX relied on the provisions of the Supreme Court ruling dated 25 October 2006[241]. The Respondent made the point that in this instance Isolux INBV, in a contradictory manner, explained that the aforesaid rulings were not relevant when considering the Claimant's legitimate expectations and the way the Kingdom of Spain had treated the Claimant's alleged investment[242]. The Respondent also highlighted the fact that the Claimant minority shareholder, PSP, also took the Supreme Court jurisprudence into account. Prior to carrying out its investment, PSP demanded to know the evolution of lawsuits brought against RD 1565/2010 before the Supreme Court by ISOLUX in relation to the assets subject of these Arbitration proceedings.This can be seen in the *Disclosure Letter* dated 29 June 2012.

---

[234]  Rejoinder, ¶329; **Exhibit R-141**: Supreme Court judgment of 15 October 2012 issued in Litigation T-Solar and 117 SPVs against RD 1565/2010. This judgment was served on Grupo T-Solar on 23 October 2012.

[235]  Respondent's Post-Hearing Brief, ¶¶109-108.

[236]  Respondent's Post-Hearing Brief, ¶135.

[237]  ICSID Case *Hussein Nuaman Soufraki v. United Arab Emirates*, ARB/02/7, Ruling of ad-hoc committee on the Application for Annulment, brought by Mr. Soufraki, 5 June 2007,¶97. http://www.italaw.com/sites/default/files/case-documents/ita0800.pdf

[238]  Case of *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012. H ttp://www.italaw.com/sites/default/files/case-documents/italaw1178.pdf

[239]  Petition filed by Isolux Corsán on 27 May 2011. R-214

[240]  Respondent's Post-Hearing Brief, ¶113.

*This is an unofficial English translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

---

[241] **Exhibit R-214**: Petition filed by Isolux Corsán on 27 May 2011, page 49.
[242] Reply, ¶ 471.

Shareholders also took Kingdom of Spain's Supreme Court Jurisprudence into account in Isolux INBV Shareholders Agreement of 29 June 2012[244]. Lastly, the company T-Solar, together with the companies holding the ownership to the photovoltaic Plants, relied on Supreme Court jurisprudence. The ownership Companies, in exactly the same manner as ISOLUX, draw up their expectations in accordance with the manner in which the Supreme Court had construed the 1997 LSE, in the Supreme Court judgment of 9 December 2009[245], which Isolux INBV againly refers to as "irrelevant" in its ReplyReply[246].

233. The Supreme Court has been clarifying the essential legal nature of the Special Regime since 2005. The Respondent recalled the wording of judgments dated 15 December 2005[247], and 3 December 2009, in which the Supreme Court confirmed that in relation to the principle of a reasonable rate of return as established in Article 30.4 1997 LSE, "*the remuneration regime we have analysed here does not guarantee [...] installationsownerships under the special regime intangibility of a specific level of profits or revenue in relation to those obtained in prior fiscal years, nor that the formulae used to establish the premiums will remain in place indefinitely.*"[248]

234. The Respondent reiterated that the Claimant was aware of all these characteristics due to the fact that the aforesaid doctrine was established, as *res judicata*, for GIC in the Supreme Court judgment of 24 September 2012 (served on 27 September 2012); and for T-Solar Group and the Plants ownership companies by means of STS of 15 October 2012 (served on 23 October 2012)[249].

---

[243] **Exhibit R- 215**: Respondents Post-Hearing Brief, ¶116; *Disclosure Letter* dated 29 June 2012, Article 11.1.4.a).

[244] Respondent's Post-Hearing Brief, ¶118; **Exhibit R-180**: Clause 9.8 Shareholders Agreement of 29 June 2012: Liability with regard to the other shareholder.

[245] **Exhibit R- 222**: Claim brought by T-Solar and the titleholder companies of the 34 FV Plants, page 124: "*To be even clearer, it is quite evident that LSE requires the Public Administration to establish the premiums that titleholders of photovoltaic solar installations are entitled to receive bearing in mind the criteria established in Article 30.4 of the Act, rather than any other. Thus, deciding the premium amounts (and, it must be said, the amounts of subsequent amendments) must be carried out exclusively considering, [inter alia], investment costs incurred.*"

[246] Reply, ¶ 471.

[247] Respondent's Post-Hearing Brief, ¶126; **Exhibit R-30**: STS 15 December 2005. Legal Ground 8. In the same sense, **Exhibit R- 31**: STS 25 October 2006. Legal ground 3.

[248] Judgment handed down by Division Three, Supreme Court, on 25 October 2006, RCA 12/2005. R-31; subsequently reiterated in the Judgment of 3 December 2009 (R-38), two judgments on 9 December 2009. (R-39 and R-40)

[249] Respondent's Post-Hearing Brief, ¶¶129-130.

e. <u>Jurisdiction Objection E: lack of "*ratione voluntatis*" jurisdiction of Arbitration Tribunal as INN was refused for the application of ECT Part III because concurring the circumstances provided by Article 17 ECT.</u>

235. Article E C T on "Non-application of Part III in certain circumstances" provides as follows:

> "*Each Contracting Party reserves the right to deny the advantages of this Part to:*
>
> *1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party on which it is organised; or*
>
> *2) an investment, if the denying Contracting Party establishes that such investment is an investment from an investor of a third state to which the denying Contracting Party:*
>
> > *a) does not maintain a diplomatic relationship; or*
> >
> > *b) adopts or maintains measures that:*
> >
> > > *i) prohibit transactions with investors of that state; or*
> > >
> > > *ii) would be violated or circumvented if the benefits of this Part were accorded to investors of that state or to their investments.*"

236. The Respondent's view is that the Clause Refusing the Benefits established in Article 17 ECT, cited above, does not simply have a forward-looking effect as the Claimant alleges but rather establishes lack of Arbitration Tribunal *ratione voluntatis* jurisdiction to resolve this dispute.

237. In effect, the legal grounds for Article 17 ECT arise from the literal wording of Article 26 ECT. According to Article 26(1) Parties to the ECT agreed to resolve "any alleged breaches by such Party of an obligation arising under Part III" by means of arbitration proceedings. The Respondent considers that according to the letter of Article 26(1), Part III must be applied in full. That it cannot suffice for the obligation just to originate from points set down in Articles 10 to 15 ECT. The Respondent deems continuation of the obligation after having applied Part III in its entirety to be necessary, and specifically, after having applied Article 17 ECT. Article 17 ECT is worded in a manner completely consistent with the limitation to consent established in Article 26 ECT, as set out in the heading. If Part III ECT

does not apply as a consequence of the circumstances referred to in Article 17 ECT being present, then clearly, there can be no "obligation deriving from Part III". Therefore, if there is no "obligation deriving from Part III", the Contracting Parties have not consented to submit the dispute to arbitration under the scope of Article 26 (1) ECT and the Arbitration Tribunal would not have "*ratione voluntatis*" jurisdiction .[250]

238. According to the position as put forward by the Respondent, the Claimant acknowledged the existence of the subjective circumstances established in Article 17 ECT when seeking application of the Refusal of Benefits clause: Isolux INBV is controlled by a Canadian company, being a holding company with no business activity in the Netherlands[251]. Additionally, according to the Consolidated Management Report attached to the Isolux INBV 2014 Consolidated Annual Accounts, the amount Isolux INBV paid in the Netherlands as income tax for 2012 was zero dollars and that no taxes were paid[252].

239. The Respondent therefore decided to activate this Clause and did so in due time, in the Statement of Defence. Effectively, according to the Respondent, the subjective circumstances established in Article 17 (1) ECT must be present in order to apply the Refusal of Benefits Clause at the time the arbitration notice is served, i.e. when the investor intends to use its ECT rights, and which can therefore be refused[253]. In this instance, the Kingdom of Spain received the first Notice of arbitration or "*Trigger Letter*" on 13 March 2013 and the Request was submitted on 3 October 2013. The second Notice of arbitration was sent to the Respondent on 3 October 2013 and the corresponding Request filed on 4 June 2014[254]. The events that gave rise to the dispute occurred in 2013. Nevertheless, the Kingdom of Spain needed to wait until 6 June 2014 to be able to activate Clause 17(1) ECT, i.e. the date when the annual accounts for the first complete Isolux INBV tax year were filed in the Netherlands, in order to obtain relevant accounting information on the aforesaid company[255]. As a result, the Respondent made use of the entitlement granted under Article 17 ECT in its Statement of Defence and in accordance with Articles 5 and 24 SCC Rules, which require objections to jurisdiction of the Arbitration Tribunal to be filed with the Defence or Statement of Defence[256]. The Respondent referred to arbitration cases in which the Tribunal is acknowledged that the Refusal of Benefits Clause

---

[250]   Rejoinder, ¶¶354.
[251]   Rejoinder, ¶¶341-342.
[252]   Rejoinder, ¶362; **Exhibit R-187**: Isolux Infrastructure Netherlands, B.V Financial Report 2014. Page 144.
[253]   Rejoinder, p. 370-372; **Legal Authority RL-82**: Ulysseas, Inc. v. Ecuador, Interim Award, UNCITRAL Case, Interim Award of 28 September 2010. Paragraph 174; **Legal Authority RL-88**: Guaracachi America Inc. & Rurelec, Plc. –v– Bolivia, PCA Case N°. 2011-17. Award of 31 January 2014. ¶379.
[254]   Rejoinder, ¶¶373-374.

*This is a free translation of the Spanish original document into English.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[255]   Rejoinder, ¶¶375-381.
[256]   Rejoinder, ¶¶

could be set out in the response to the claim, as in the cases of <u>Ulysseas, Inc</u>[257], <u>Empresa Eléctrica del Ecuador, Inc</u>[258], <u>Guaracachi & Rurelec c. Bolivia</u>[259].

240.  As a result, the Respondent is of the opinion that the terms in which Articles 17 and 26 ECT are drafted award jurisdiction to an Arbitration Tribunal to review whether or not in a specific case circumstances do exist to permit application of Article 17. However, if the Arbitration Tribunal concludes circumstances for Article 17 ECT are met, then it must conclude its own lack of *"ratione materiae"* jurisdiction to hear the legal matter [260]. The clause concerned cannot simply have a forward-looking effect as the Claimant states[261].

f.      Jurisdiction Objection F: lack of jurisdiction of SCC Arbitration Tribunal to hear an alleged breach by the Kingdom of Spain on obligations arising under Article 10 (1) ECT due to the introduction of IVPEE in Law 15/2012

241.  Article 21 ECT excludes tax measures from the scope of application of ECT, i.e. "*i) Provisions on taxation under national law of the Contracting Party (...)*", in such a manner that Section (1) of Article 10 TCE relied on by the Claimant cannot be applied to tax measures adopted by the contracting parties[262]. The Respondent therefore considers that it has not consented to submit to arbitration a dispute arising with regard to tax measures such as value-added tax on the electricity production value established in Law 15/2012 ("**IVPEE**")[263].

242.  The Respondent considers IVPEE established in Law 15/2012 to be a "tax measure" in the sense of Article 21(7) ECT. This is because Law 15/2012 forms part of the Kingdom of Spain national legislation and there is certainly no doubt that the provisions on IVPEE contained in Law 15/2012 are tax related provisions, both from the point of view of Kingdom of Spain domestic Law and of international Law[264].

243.  Kingdom of Spain domestic Law 15/2012 clearly establishes that IVPEE is tax related, given that this tax charges the revenue obtained by electricity producers for production and inclusion into the Spanish electricity system of electricity from both renewable

---

[257]  **Legal Authority RLA-82:** Ulysseas, Inc. v. Ecuador, Interim Award, UNCITRAL Case Interin [sic] Award,  28  September 2010, ¶ 172.

[258]  **Legal Authority RLA-89**: Empresa Eléctrica del Ecuador, Inc. –v- Republic of Ecuador, ICSID Case No. ARB/05/9,  Award, 2 June 2009, ¶ 71.

[259]  **Legal Authority RLA-88**: Guaracachi America Inc. & Rurelec, Plc. –v-  Bolivia, PCA Case Nº. 2011-17. Award of 31  January 2014, ¶ 378.

[260]  Rejoinder, ¶393.

[261]  Rejoinder, ¶398.

[262]  Rejoinder, ¶401.

[263]  Rejoinder, ¶404.

[264]  Rejoinder, ¶417.

and traditional sources [265]. IVPEE is a direct tax on income, in that it is raised on income that is an immediate and direct manifestation of the economic capacity of producers[266]. The tax is charged on gross income, which is no impediment to application of ECT given that Article 21 (7)(b) ECT does not restrict the concept of tax on income to tax on net income[267].

244. Additionally, as evidence that IVPEE is tax related, it is registered for accounting purposes as an accounting charge[268]. This was also confirmed by the Spanish Constitutional Court in the judgment dated 6 November 2014, which also declared this to be in accordance with the Spanish Constitution[269].

245. The Respondent considers the nature of IVPEE must be decided in accordance with domestic law[270], but nevertheless highlights that if it were decided in accordance with international law, this would also confirm that IVPEE is a tax. International arbitration tribunals particularly tend to use certain different criteria to decide if a measure conforms a tax measure: (1) was the tax established by Law? (2) does the Law concerned impose an obligation on a class of persons? and (3) does the obligation involve paying money to the State for public purposes? [271]. Law 15/2012 meets each and every one of these requirements. In so far as the third requirement, the Respondent has specified that IVPEE is a revenue included into the General Spanish State Budget[272].

246. The Respondent also explained that IVPEE is a generally applicable tax, in other words, it applies to all electricity production installations - from both renewable and traditional sources. The Spanish State legislator is lawfully entitled to make IVPEE generally applicable, as acknowledged by the Spanish Constitutional Court, and is solidly connected with the environmental nature of IVPEE[273].

247. The Respondent added that the EU confirmed the nature of IVPEE as a tax and that it is in accordance with EU law implemented in 2013, when the European Commission instigated a procedure requesting information from the Kingdom of Spain to verify that IVPEE was in accordance with EU law (EU Pilot proceedings 5526/13/TAXU).

---

[265] Rejoinder, ¶424, Brief Subsequent to Respondent Hearing, ¶6.
[266] Brief Subsequent to Respondent Hearing, ¶4.
[267] Brief Subsequent to Respondent Hearing, ¶9-10.
[268] Rejoinder, ¶428-428.
[269] Rejoinder, ¶430-433.
[270] Rejoinder, ¶408.
[271] Rejoinder, ¶440-443; especially: **Legal Authority RL-68:** EnCana Corporation –v- Republic of Ecuador, LCIA Case No. UN 3481, Award dated 3 febrero 2006, ¶ 142; **Legal Authority RLA-93**: Duke Energy Electroquil Partners & Electroquil S.A. –v- Republic of Ecuador, Case ICSID No. ARB/04/19, Award of 18 August 2008, ¶ 174.; Legal Authority RLA-94: *Burlington Resources Inc. –v- Republic of Ecuador*, ICSID Case No. ARB/08/5, Jurisdiction Ruling dated 2 junio 2010, ¶¶ 164 and 165.
[272] Rejoinder, ¶449.
[273] Rejoinder, pages107-109

The European Commission has closed those proceedings as considering that IVPEE is in accordance with EU law[274].

248. The Respondent ended by specifying that, therefore, pursuant to the aforementioned Article 21(7)(a)(i) ECT, IVPEE is indeed a tax measure for the purposes of Article 21 ECT and is excluded from the scope of application of ECT (*taxation carve-out*). The Respondent makes the point that the grounds for excluding IVPEE tax from the scope of application TCE, can basically be found economic nature[275]. Authority to establish taxes is a principal prerogative of sovereign States, and implies the intention of States not to waive their sovereignty on tax matters except in private instruments. Also, this area is already regulated in bilateral agreements drawn up in order to avoid double taxation on income and capital. Spain has a bilateral treaty of this nature with the Netherlands[276].

249. In direct response to arguments put forward by the Claimant, the Respondent answers as follows, who regards that in order to decide whether a measure is a tax measure one must look at its *bona fide* nature and similarly concluded that in this instance IVPEE is not in fact a tax, because i) IVPEE applies to all electricity producers, irrespective of technologies used; ii) IVPEE is allegedly discriminatory for photovoltaic producers, as they cannot charge IVPEE forward to consumers and iii) IVPEE has not allegedly been established for the purpose of collecting revenue for the Spanish State but rather with the end purpose of depriving investors in the photovoltaic sector of a portion of their income[277].

250. The Respondent first of all highlights that IVPEE is a generally applicable tax, extended to all electricity producers irrespective of the particular technology used and that tax application arises from legislative branch and the authority of the State under the Spanish Constitution to establish duties by applying the principle of generality[278]. The Respondent recalls the fact that the Constitutional Court declared IVPEE to be in line with the Spanish Constitution, on 6 November 2014[279]. Additionally, the fact that IVPEE applies to all electricity production installations, irrespective of the particular technology used, directs to consider it solidly connected with the environmental nature of the tax[280].

251. Also, the Respondent makes the point that IVPEE does not discriminate against photovoltaic producers in so far as juridical implications. IVPEE does not differentiate

---

[274]  Rejoinder, ¶460.
[275]  Respondent's Post-Hearing Brief, ¶16.
[276]  Respondent's Post-Hearing Brief, ¶18-19.
[277]  Rejoinder, ¶477.
[278]  Rejoinder, ¶480-485.
[279]  Rejoinder, ¶487-488.
[280]  Rejoinder, ¶489-491.

between producers and similarly Law 15/2012 does not permit any producers to charge IVPEE forward to consumers. Neither is IVPEE discriminatory from the economic point of view due to  is a cost that remunerated to renewable source electricity producers by means of the specific regulated remuneration regime that applies to them, and that therefore the effect of IVPEE on those renewable producers is neutralised[281].

252. Lastly, the Respondent went on to show there was no legal ground to consider the IVPEE tax had been brought in for any purpose other than obtaining revenue for the State[282]. The aforesaid purpose was suggested in the preamble to Law 15/2012, and the nature of the implementation had "*primary purpose of obtaining necessary revenue to cover public costs*"[283].

> g. Jurisdiction Objection G: Claim on an alleged infringement by the Respondent of its obligations arising under Article 13 ECT, due to the introduction of IVPEE in Law 15/2012, is inadmissible because the issue was not submitted to the competent Spanish tax authorities as required in Article 21(5)(b) ECT

253. The Respondent considers that if Article 13 ECT is directed to be applied for taxation, rather than Article 10(1) ECT, then the claim related to the alleged expropriatory nature of IVPEE pursuant to Article 13 ECT is inadmissible because it is compulsory for the Claimant to submit the issue as to whether IVPEE is or is not expropriaty to the competent Spanish tax authorities, in accordance with Article 21(5)(b) ECT [284], as opposed to what the Claimant is attempting to defence. The Respondent explained that Spanish law provides a procedure for submitting the issue as to whether IVPEE is expropriatory to competent tax authorities, under Article 96, Spanish Constitution. ECT forms part of the Spanish legal system and can be relied on in that regard when bringing the matter before the competent tax authorities [285]. During the Audience, held in October 2015, the Respondent stated that the competent authority to hear this appeal is the *Spanish Tax Department* ("STD") [286].

254. However, in response to that jurisdiction objection, the Claimant informed the Arbitration Tribunal, by letter dated 16 March 2016, that it had indeed effectively filed a letter before the SPD 3 February 2016 seeking a pronouncement on the expropriatory and discriminatory nature of IVPEE. The above, in accordance with the procedure referred to in Article 21(5)(b) ECT and in the terms and conditions

---

[281]  Rejoinder, ¶500-501.
[282]  Rejoinder, ¶510.
[283]  Rejoinder, ¶514; **Exhibit R-150**: Law 58/2003, of 17 December, General Tax Act, Article 2.
[284]  Rejoinder, pages118-119, 528.
[285]  Rejoinder, ¶536.
[286]  Transcription of Hearing, Day 1, page 101, lines 4-19.

*This is an English courtesy translation of the original award drafted in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

set out therein (6 months), in the light of arguments and indications introduced by the Kingdom of Spain during the Audience held in the month of October 2016. The STD issued its Report on 29 March 2016.

## 2. <u>Claimant position: SCC Arbitration Tribunal does have jurisdiction</u>

255. First of all, the Claimant put forward its groundings to show the Arbitration Tribunal does have jurisdiction in accordance with Article 26(1) ECT (a), and subsequently, mantaining that there is no obstacle to admissibility of the Isolux INBV claim (b).

### a. <u>The Arbitration Tribunal does have jurisdiction in accordance with Article 26(1) ECT</u>

256. The Claimant says that Article 26(1) establishes three requisites for an Arbitration Tribunal to have jurisdiction: (i) diversity of areas, (ii) diversity of citizenships and (iii) there must be an investment.

### i. *The diversity of areas between the investor area and that other in which the investment is implemented*

257. The Claimant explains the Article 26(1) requires the area where the investment is made to be different from the national area of the investor. In this instance the two areas concerned of Spain and the Netherlands, both Contracting Parties to the ECT[287].

258. European Union is also an ECT Contracting Party and in its capacity as an ECT subject, can be requested forinternational arbitration proceedings. Nevertheless, is the European Union is not deemed as a party in these arbitration proceedings, but rather the Kingdom of Spain who violated protection granted under ECT to Isolux INBV[288].

259. The Claimant insists that the particular dispute cannot in any way be connected with EU Law in that the rights on which the Claimant relies do not concern designated internal market free movement and establishment, but rather the Claimant seeks reparation for violations of Part III ECT[289]. The Respondent is in breach of standards protected under Article 10 (Fair and Equitable Treatment) and Article 13 (Expropriation) of the ECT, which is an International Law instrument rather than an EU Law instrument[290]. The Claimant refers to the judgment in the case of <u>Electrabel –v-Hungary</u>, where at the time of dismissing the 'intra-EU'objection raised by the respondent

---

[287] Rejoinder to jurisdiction objections, ¶¶23-24.
[288] Rejoinder to jurisdiction objections, ¶¶26-27.
[289] Rejoinder to jurisdiction objections, ¶33.
[290] Rejoinder to jurisdiction objections, ¶38

State, the Arbitration Tribunal specified: "*the Claimant here makes no complaint against the European Union or the European Commission;* […] *and its claims are not made under EU law*".[291]

260. In so far as the "specific and preferential" protection granted under EU law over any protection provided in the ECT and in the BTIs, the Claimant recalls the fact that the Respondent provides no evidence of the preferential nature of EU law over the ECT and that it is a fiction[292]. Additionally, EU rights are not only compatible, but must be assumed to be compatible, as can be concluded from the foreword to ECT[293]. Even beyond compatibility, the Claimant would go so far as to say that ECT provisions grant reinforced protection not available under EU law [294].

261. The Claimant particularly notes that Articles 1(2), 1(3) and 1(10) ECT do not suggest when EU law might apply "preferentially" with regard to ECT. Article 36(7) ECT is completely unrelated to the matters of these arbitration proceedings, as it deals with voting rights of the Contracting Parties. The Respondent mistakenly construed Article 16 ECT which governs the relationship between ECT and other investment agreements. That Article does not enshrine the alleged precedence of EU law but rather the principle of favouring the ECT with regard to earlier or subsequent international treaties entered into by and between ECT Contracting Parties[295], and particularly when ECT provisions are more favourable for investors or for the investment[296]. The Respondent apparently tacitly admits this by particularly referencing application of the favourability mechanism, alleging that application of EU Law would be more favourable than ECT contained. The Claimant considers that position is irrelevant in so far as ECT grants private investors direct rights on substantive and procedural aspects not covered in EU Law and which amounted infringements of international law rules as alleged by this Claimant party, rather than EU Law [297]: (i) stable and transparent conditions for carrying out the investment; (ii) fair and equitable treatment; (iii) complete protection and security of the Claimant investment; (iv) protection from exorbitant measures; and (v) protection from expropriatory measures.

262. Protection of those rights is reinforced by the resolution mechanism provided in Article 26 ECT. In that regard, the Claimant considers there are no legal grounds for the Respondent allegation according to which provisions of Article 26 ECT prohibiting the development of an arbitration procedure between an intra-EU investor and an EU Member State [298].

---

[291] Rejoinder to jurisdiction objections, ¶39; **Legal AuthorityRLA-3**: *Electrabel S.A. c. la República de Hungría*, ICSID Case No. ARB/07/19, Ruling on Jurisdiction, 30 November 2012, ¶ 4,171
[292] Rejoinder to jurisdiction objections, ¶¶34-36.
[293] Rejoinder to jurisdiction objections, ¶¶41; Preface to ECT, by Charles Rutten (Conference Chairman) and Peter Schütterle (Secretary General).
[294] Rejoinder to jurisdiction objections, ¶42.
[295] Rejoinder to jurisdiction objections, ¶49-52.
[296] Reply, ¶53.
[297] Rejoinder to jurisdiction objections, ¶55-56.
[298] Rejoinder to jurisdiction objections, ¶60.

*This award is an unofficial English translation of the original award in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

Neither does Article 344 TFEU, on which the Respondent relies, have any relevance for the purposes of these arbitration proceedings in that it only applies to disputes between States and not to investor-State disputes. Furthermore, Article 344 TFEU only concerns the interpretation of EU Treaties and not of other international law treaties such as the ECT[299]. Neither does ECJ Ruling 1/91 as cited by the Respondent establishes any connection with  these arbitration proceedings[300]. Lastly,  contrary to the matters as alleged by the Respondent, neither one can draw any conclusions as to precedence of the EU system over the ECT from the ECT context and purpose, nor any prohibition on solving dispute resolution by arbitration between an intra-EU investor and an EU Member State[301].

263.　The Claimant alleges there is no disconnection clause in the ECT and that therefore implies any conflict arising from an intra-EU dispute must be resolved in arbitration proceedings rather than by means of EU Law judicial mechanisms, as opposed to the assertions of both the Respondent and the European Commission [302].

264.　First of all, the Claimant states that Article 25 ECT is not an express disconnection clause. The Claimant disagrees with the Respondent's statement, by its virtue ECT recognises an "integrated" system to foster and protect intra-EU investments while saying that what it does is merely to circumscribe the extent of the most-favoured-nation treaty between contracting parties that are parties to "Economic Integration Agreements"and those that are not. That neither may one referred to an integrated system given that the ECT grants direct rights to private investors on material and procedural aspects that are not covered in EU Law[303].

265.　Secondly, the Claimant alleges that the ECT does not contain any implicit disconnection clause in view of the fact that a disconnection exception must be expressly enshrined in that it is an exception to the *pacta sunt servanda* legal principle. The Respondent may not refer either to the award in <u>Mox Plant</u>[304] nor to Article 344 TFEU, in that both those instances referred to disputes between States rather than investor-State disputes cannot therefore be used to justify an intra-EU exception being argued by Spain. This analysis is confirmed in the case of <u>EURAM –v-Republic of Slovakia</u>[305] · in which the Tribunal concluded as follows: "*Concerning arbitration between one Member State and nationals of another Member State – which is the situation encountered in the present*

---

[299]　Rejoinder to jurisdiction objections, ¶61.
[300]　Rejoinder to jurisdiction objections, ¶62.
[301]　Rejoinder to jurisdiction objections, ¶64.
[302]　Reply, ¶54.
[303]　Reply, ¶¶55-58.
[304]　Reply, ¶61-62; European Commission *Amicus Curiae* petition, 20 January 2015, ¶43
[305]　*European American Investment Bank AG –v-Republic of Slovakia*, PCA Case No. 2010-17, Ruling on Jurisdiction, 22 October 2012, ¶¶ 254 et seq.

*case – it is the view of the Tribunal that it does not come under Article 292 of the EC Treaty (now Article 344 TFEU) and is therefore perfectly compatible with EU law."*[306]

266. Thirdly, the Claimant states that the ECT Contracting Parties were themselves aware of the possibility of establishing exceptions to application of the ECT and that they did use that possibility, but not with regard to the European Union Treaties[307]. The opposition arguments put forward by the Respondent and the European Commission are disproven by Annex 2 of the Final Minutes of the Conference on the European Energy Charter[308]– The aforementioned Annex provides evidence that the Contracting parties to the ECT did in fact agree explicit disconnection mechanisms with regard to certain international Law instruments such as the Spitsbergen Treaty of 9 February 1920[309].

267. The Claimant's view is that the position of the Respondent contradicts arbitration jurisprudence, particularly as the latter relies on the case of <u>Electrabel S.A –v- Republic of Hungary</u>,[310] to argue that "*Article 26 ECT prohibits arbitration between an intra-EU investor and an EU Member State*".[311] The Claimant mantains that particular conclusion of the Tribunal is found in a section of the award where the Arbitration Tribunal, having duly affirmed the compatibility of EU law and the ECT, studies "*as a courtesy*" hypothetical incompatibility[312]. Also, the phrase the Claimant [sic] relies on to affirm that the only possible arbitration is between an EU Member State and an investor from a third party non-EU State is also taken out of context. The Claimant considers thatthat the Tribunal solely acknowledged that the European Commission when signing the ECT "*accepted the possibility of submitting an international arbitration under ECT*" in the aforementioned case, but did not actually say that arbitration between a Member State and a third party non-EU investor was the only possible type of arbitration [313]. Finally, the Claimant does not accept the Respondent's statement according to which cases filed by the Claimant on BTIs are not relevant as they involve investment treaties signed prior to the accession of those States to the EU[314]. The Claimant had referred to the cases of

---

[306]  Reply, ¶63.
[307]  Reply, ¶65.
[308]  Rulings on the Treaty for an Energy Charter (Annex 2, Ruling No. 1), Treaty for an Energy Charter, laid down in Lisbon on 17 December 1994 (Spanish Official Gazette of 17 May 1995).
[309]  Rulings on the Treaty for an Energy Charter (Annex 2, Ruling No. 1), Treaty for an Energy Charter, laid down in Lisbon on 17 December 1994 (Spanish Official Gazette of 17 May 1995).
[310]  **Legal Authority RLA-3:** *Electrabel S.A –v-Hungary*, ICSID Case No. ARB/07/19, Ruling on Jurisdiction, Applicable law and liability, 30 November 2012.
[311]  Rejoinder, heading to **Section III.A(3)(1)** (according to index numbering) ¶¶ 62 et seq.
[312]  Rejoinder to jurisdiction objections, ¶¶70-71.
[313]  Rejoinder to jurisdiction objections, ¶¶72-76.
[314]  Rejoinder to jurisdiction objections, ¶77; ReplyReply ¶¶71 et seq.

Eureko,[315] Electrabel,[316] Jan Oostergetel[317] and Eastern Sugar,[318] where the question arose as to whether the arbitration mechanism stipulated in a particular investment treaty should cede to European dispute resolution mechanisms. In each of those cases the ruling was that the mechanisms established in the investment treaty applied. The fact that the Treaties were signed before the States concerned joined the EU is neither here nor there, in that Article 26 ECT is the same for all Contracting Parties to this instrument, as strongly emphasised by one of the authors cited by the Kingdom of Spain[319]:

> *[…] the ECT does not contain any limitations regarding its applicability among the 'old' EU Member States. This 'original intra-EU' element has not yet come into play.*

268. According to the Claimant, nor is the European Commission petition to suspend the proceedings acceptable, because these arbitration proceedings do not involve any State nor any violation of EU Law. The only justification for the petition lies in the adverse attitude of the European Commission with regard to any possibility the ECT may give rise to intra-EU disputes, and this has not even been the subject of any expressly formulated petition of the Respondent[320]. European Commission only takes part as *amicus curiae*. The factual context for the ECJ ruling adopted in the matter of Elcogas, to which the Respondent refers, was different to this case and, according to the Claimant, no analogy can be made. In that matter, the company Elcogas was the only company that enjoyed a specific financial regime established by means of a mechanism that compensated system overruns. That individual financing regime bears no relation to the long-term Feed-in-Tariff Special Regime, such as in this case. Nor do the European Commission rulings in the matter of Micula –v- Rumania serve to justify any suspension of the proceedings, given the notably different factual context[321].

ii. *Diversity of citizenship criteria is met (Article 1(7) ECT)*

269. Pursuant to Article 1(7) ECT, the Claimant believes that the only criteria by which one can classify a company as an investor is according to the company incorporation under applicable law.

---

[315] *Eureko B.V. –v-Republic of Slovakia*, PCA Case No. 2008-13, UNCITRAL, Ruling on Jurisdiction, Settlement by Arbitration and Suspension, of 26 October 2010.

[316] **Legal Authority RLA-3:** *Electrabel S.A. –v-Republic of Hungary*, ICSID Case, No. ARB/07/19, Ruling on Jurisdiction, Applicable Law and Liability, 30 November 2012.

[317] *Jan Oostergetel and Theodora Laurentius –v- Slovakia*, CNUDMI, Ruling on Jurisdiction, 30 April 2012.

[318] *Eastern Sugar B. V. –v- Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007.

[319] Reply, ¶72; Legal Authority **RLA-8:** J. Kleinheisterkamp, "Investment Protection and EU Law: the Intra and Extra EU Dimension of the Energy Charter Treaty", *Journal of International Economic Law* 1, Oxford University Press, 2012.

This document is a translation of the Spanish original document. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

320    Rejoinder on jurisdiction objections, ¶¶79-82.
321    Rejoinder on jurisdiction objections, ¶¶84-86

*This is an unofficial English translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

Where the Respondent alleges that ECT requires the existence of a company or another organisation "*as an organised combination of material and human resources directed for an economic purpose*" it is adding a non-existent requirement. The Respondent does not provide a single jurisprudence doctrine reference to justify its position in relation to the ECT[322].

270. If the Tribunal did consider the Respondent statement to be valid, Isolux INBV would appear as an actual "company" and "organisation". This is confirmed in the Exhibits adduced by the Respondent, e.g. Exhibit R-173 on the legal definition of "*empresa*" [TR. Company or Enterprise] and "*organización*" [organisation] given in the *Spanish Royal Academy*[323] dictionary.

271. The Kingdom of Spain requested the lifting of corporate veil but failed to provide grounds in law to do so. To the contrary, arbitration jurisprudence has considered that in applying the ECT, the criteria to be taken into account is incorporation pursuant to applicable law and that it is not appropriate to lift the corporate veil. In the cases of Saluka –v-Czech Republic, and Tokios Tokelés –v- Ukraine, the Tribunal refused to lift the corporate veil. Especially, in the case of Saluka –v- Czech Republic, the Tribunal considered that: "*The Tribunal cannot in effect impose upon the parties a definition of "investor" other than that which they themselves agreed. That agreed definition required only that the claimant-investor should be constituted under the laws of (in the present case) The Netherlands, and it is not open to the Tribunal to add other requirements which the parties could themselves have added but which they omitted to add.*" [324] The corporate veil may be lifted in special circumstances that are not present in this instance, such as the existence of fraud for example or the need to protect third parties. This was the explanation given by the Tribunal in the case of Tokios Tokelés, taken from the Barcelona Traction matter [325]. The Claimant also refers to the case of Tokios Tokelés and goes on to an inappropriately application of the award in Venoklim –v- Venezuela. Contrary to the Respondent's aspirations, in the case of Tokios Tokelés, the Tribunal took the date of the investment into account and only considered the date the dispute was started to conclude there was no *forum shopping*. In relation to the case of Venoklim –v- Venezuela, the Claimant points out that the excerpt cited by Spain merely highlights the importance of the diversity of territory, as did the dissident vote in Tokios Tokeles, and this is not an issue disputed here. Additionally, Venezuela Law on Investments applies in the case of Venoklim. In Article 3 of that Law, Venezuela requires that beyond incorporation or constitution of the company, the nature and identity of the party controlling the investment must be reviewed and that is not at all the case in these arbitration proceedings [326].

---

[322]  Rejoinder to jurisdiction objections, ¶¶90-92.
[323]  Rejoinder to jurisdiction objections, ¶¶93-96.
[324]  Reply, ¶107;  **Legal Authority CLA-22:** *Saluka Investments BV –v- Czech Republic* PCA Case No. ARB/02/18, UNCITRAL.  Partial Award, 17 March 2006, ¶ 241.

*This is a free translation of the 8th original Spanish document. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[325] Rejoinder to jurisdiction objections, ¶100.
[C] Rejoinder to jurisdiction objections, ¶¶110-113.

*This translation is not an official translation of the original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

### iii.   *The Claimant invested pursuant to Article 1(6) ECT*

272. As alleged by the Claimant, the Isolux INBV investment comprises indirect equity holdings in the share capital of the company Grupo T Solar Global S.A. and indirect returns it receives through Grupo T-Solar Global, S.A.. The scenario meets the conditions established in Article 1(6) ECT as required to establish the nature of an investment.

273.  However, the Claimant considers that the Respondent is again trying to add extra conditions to the wording of Article 1(6) ECT when the respondent seeks to require that an investment must exist "*in the objective or ordinary sense*" and turns to the concept of investment established in Article 25 ICSID[327]. The aforesaid objective definition of the notion of investment is the definition that is been developed in arbitration jurisprudence in order to resolve the absence of a definition in Article 25,  ICSID. The Respondent may not refer to that definition in that Article 1(6) ECT, as opposed to Article 25 ICSID, given the former defines the concept of investment in a self-sufficient manner and this must be subjectively construed[328.] This position has been confirmed by arbitration tribunals. The Claimant considers that Mrs. Baltag's Article [329] to which the Kingdom of Spain refers to sure up its interpretation of Article 1(6) TCE falls quite outside the matter[330].

274.  The Claimant explained in its ReplyReply that the cases of <u>Saba Flakes</u>, <u>Alpha Projektholding</u>, <u>Toto Construzioni</u>, <u>KT Asia</u> and <u>Pantechniki</u> revolved around Article 25 of the ICSID Convention and that therefore could not be transferred by the Respondent to  Article 1(6) ECT[331] . As for the <u>Romak –v- Uzbekistan</u> case where the BTI just listed "assets", the Claimant highlighted the fact that neither may one compare that wording with Article 1(6) ECT [332].

275. The Claimant states that the Respondent intended to distort the jurisprudence it proffered, and particularly the case of <u>Anatolie Stati –v-Republic of Kazakhstan</u>, in the sense that the Respondent attempted to have the Arbitration Tribunal apply the criteria of financial provision as a "*fundamental element*" of the investment.[333] However, as the Claimant pointed out, the Arbitration Tribunal explicitly refused to apply any investment definition drawn up the context of the ICSID Convention. [334] Equally, in

---

[327]   Rejoinder to jurisdiction objections, ¶¶116-119 and 123.
[328]   Rejoinder to jurisdiction objections, ¶¶123-125.
[329]   **Legal Authority RLA-15**: C. Baltag, The Energy Charter Treaty: the Notion of Investor, Kluwer Law International  2012, pages172-174.
[330]   Rejoinder to jurisdiction objections, ¶135.
[331]   Reply, ¶ 134.   The Claimant applied the same legal reasoning to the Respondent reference to Zachary Douglas.
[332]   Rejoinder to jurisdiction objections, ¶139.
[333]   Rejoinder, ¶ 206.
[334]   **Legal Authority  RLA-28:** *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Trading Ltd –v-Republic of Kazakhstan*, SCC, award of 19 December 2013, ¶ 806.

This reproduction is only a non-authorized original translation.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 95 of 257

the <u>Yukos</u> case, the Arbitration Tribunal expressly ruled that Article 1(6) ECT covers "*nominal or record[ed] ownership*" of shares, and a provision of capital was not therefore deemed necessary.[335]

276.  Finally, the Claimant considers that the manner in which the Respondent has construed the purpose and context of the ECT do not support the Respondent's statement. In the first instance, the Claimant considers that none of these interpretations is necessary in that the terms of Article 1(6) ECT are clear [336].

277.  The Claimant notes that the initial interpretation by the Kingdom of Spain of Article 1(6) ECT, in the light of the purpose and end sought by the ECT, is merely to state that the ECT purpose is to "*foster the international flow of investments*"[337] , which necessarily means that a financial contribution must exist. The Respondent considers there is no logic to the Claimant's conclusion.

278.  The Respondent considers the Claimant may not refer to the case of <u>Caratube c. Uzbekistán</u>[338] to illustrate this initial interpretation, because the BTI in this instance, with the simple objective of fostering capital flows, does not seek the same objective as the ECT. Furthermore, the Arbitration Tribunal in the case of <u>Caratube</u> did not require an objective definition of investment but rather the existence of a *contribution*. Thus, the arbitration judges in <u>Caratube</u> only required that one – not all – of the components of the objective definition of the investment should apply.

279.  The second way in which the Kingdom of Spain interprets Article 1(6) ECT concerns the context of ECT, used to justify an alleged required "financial contribution", particularly by means of (i) Articles 8 and 9 ECT [339] and (ii) Part III ECT.[340] However, the Claimant says that Articles 8 and 9 are not in the section concerning to investment. As to Part III, the Kingdom of Spain satisfied just to point out that Articles 10, 11, 13 and 14 mention "making investments".[341] It is hard to see the alleged logical connection between that statement and the hypothesis that one should apply (*quod non*) an objective definition of the concept of investment [342].

---

[335]  **Legal Authority CLA-75:** *Yukos Universal Limited (Isle of Man) –v- Russian Federation*, CPA Case No. AA/227, Partial  parcial on Jurisdiction and Admissibility, 30 November 2009, ¶¶ 432 and 435;  **Legal Authority CLA-76:** *Veteran Petroleum Trust Limited (Cyprus) –v- Russian Federation*, CPA Case No. AA/228, Partial Award on Jurisdiction and Admissibility, 30 November 2009, ¶¶ 413 and 491;  **Legal Authority  CLA-74:** *HulLaw Enterprises Limited (Cyprus) –v- Russian Federation*, CPA Case No. AA/226, Partial Award on Jurisdiction  and Admissibility, 30 November 2009, ¶¶ 488-491.

[336]  Rejoinder to jurisdiction objections, ¶¶145-146.
[337]  Rejoinder, ¶ 193.
[338]  **Legal Authority RL-86**: *Caratube International Oil Company LLP v. The Republic of Kazakhstan*,  ICSID Case No.   ARB/08/12, Award of 5 June 2012.
[339]  Rejoinder, ¶¶ 197-200.
[340]  Rejoinder, ¶ 201.
[341]  Rejoinder, ¶ 201.
[342]  Rejoinder to jurisdiction objections, ¶¶145 to 155.

280. The Claimant maintains that Isolux INBV investment does meet the conditions of the "objective" information, if the Arbitration Tribunal were to deem that definition to be applied. The definition put forward by the Claimant is more flexible than that used by the Respondent where the latter considers it is necessary for the investor to transfer capital or property, or to inject foreign capital[343]. The Claimant refers in its ReplyReply to the case of <u>Petrobart –v- Kyrgyrstan</u> , in which the Tribunal confirmed that the particular purchase agreement amounted to an investment irrespective of whether or not it involved "*any transfer of money or property as capital in the business in the Kyrgyz Republic*"[344]. In the case of <u>OI European Group B.V. –v- Venezuela</u> the Tribunal also took the financial provisions made by companies in the group into consideration and stated that managing local companies in which the Claimant had equity holdings did constitute an industrial provision[340].

281. The Claimant described the corporate structure of Isolux INBV and the nature of its investment and demonstrated that it had made a contribution, especially at paragraphs 174 to 187 of its ReplyReply[346]. What one finds from those paragraphs is that the Respondent presented the Investment Agreement in a simplistic manner. The purpose of the aforesaid Agreement was to structure the Isolux INBV business activity and design modalities for equity holdings in various Isolux INBV companies. The Claimant specifies that the purpose of the Investment Agreement in relation to this company was to instruct the company to manage and develop the business, i.e. T-Solar. In order to do so, the provision was made for the Canadian investor PSP throught taking up part of the capital in Isolux INBV. The Investment Agreement conditioned the equity holding by PSP to the transfer of equity holdings in the Spanish photovoltaic sector to IIN, and to restructuring its corporate structure.[347] As a result of the restructuring, PSP bought into Isolux INBV share capital and obtained an equity holding of 19.23% (whereas GIC controlled 80.77%).[348] Secondly, with regard to GIC, the Investment Agreement also provided that the latter company should make a financial provision to Isolux INBV, in the amount of EUR 100 million.[349] The statement made by the Respondent that GIC did no more than carry out a "disinvestment" is not true. The Claimant is quite clear on the fact that Isolux INBV has an indirect equity holding in T-Solar, which in turn carries on a business activity in the photovoltaic energy sector. It manages and fosters the cited business activity and has not emptied out its profits from the companies in which it has equity holdings Based on the above, IIN has made a contribution and, furthermore, that contribution does have a risk component in that the permanent nature and duration of its involvement *per se*

---

[343] Rejoinder to jurisdiction objections, ¶157; Reply, ¶ 165.
[344] Reply, ¶¶166-167; **Legal Authority CLA-18:** *Petrobart Limited –v- República de Kyrgyztan*, SCC Case No. 126/2003, Award, 29 March 2005, ¶¶ 49-51.
[345] Reply, ¶¶168 -172; *OI European Group B.V. –v- Republic of Venezuela*, ICSID Case No. ARB/11/25, Award, 10 March 2015.
[346] Rejoinder to jurisdiction objections, ¶157.
[347] **Exhibit R-180**: Investment Agreement, page 21.

This document is a literal English translation of the original Spanish award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 97 of 257

348   **Exhibit R-180**: Investment Agreement, page. 4.
349   **Exhibit R-180**: Investment Agreement, page 4.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

implies greater risk than a simple purchase agreement.

282. In view of the fact that the Kingdom of Spain did not respond (i) either to the aforementioned explanation of the notion of contribution (ii) or to the corresponding characterisation of the IIN Investment as a contribution, the Claimant considers the Respondent has accepted these statements[350].

283. What is more, Isolux INBV assumes the risk inherent in its contribution and demonstrated in its Reply that the contribution does contain components of permanence and duration and therefore, *per se*, implied risk[351]. The Claimant considers that the fact that shareholders are implicated in corporate decisions is perfectly normal and does not mean that it is the shareholders that assume the inherent risk of the company business. Thus, even if the statements made by the Respondent were true, they would not affect the fact that the Claimant assumes the risk of its Investment[352].

284. The Claimant cannot agree with the Respondent statement whereby the latter states that the concept of indirect ownership refers to the final owner in the company chain. The precedents the Respondent puts forward do not establish that one must turn to the last link in the chain, in that, as in the cases given by the Respondent, the Claimant in these arbitration proceedings was the final owner and the arbitration tribunals nearly acknowledged that they effectively held an investment[353]. As to the respondent's reference to ECT Preparatory Works, Exhibit R-186 was incomplete when filed and the Claimant cannot therefore debate the content. Nevertheless, the Claimant would say that the excerpts do not show that the Legal Sub-Group had decided to define indirect ownership as "owning the last link in the corporate chain"[354] but rather, to the contrary, would extend it to "*ownership through shares or other interests in a company or enterprise which directly or indirectly owns* […]" (Added emphasis).[355]

### iv. *There was no forum shopping*

285. The Claimant also demonstrated that at the time its investment was made in the Kingdom of Spain, not only this dispute had not arisen, but that neither was it predictable. Therefore, the Kingdom of Spain allegation is not appropriate.[356]

---

[350] Rejoinder to jurisdiction objections, ¶158.
[351] Rejoinder to jurisdiction objections, ¶161
[352] Rejoinder to jurisdiction objections, ¶161-165.
[353] Rejoinder to jurisdiction objections, ¶¶166, 168, 172.
[354] Rejoinder to jurisdiction objections, ¶176.
[355] Rejoinder, ¶ 254.
[356] Rejoinder to jurisdiction objections, ¶182; Reply, ¶¶ 235 et seq.

This Case 1:19-cv-01618-TSC original award in the event of any discrepancy or ambiguity
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity
Case 1:19-cv-01618-TSC Document 69-52 Filed 06/09/22 Page 99 of 257

286. The Claimant specifies that IIN investment was carried out on 29 October 2012 when it acquired 65,434,220 nominative shares (equivalent to 58.8632% of the company share capital) in T-Solar.[357] On 24 July 2013 IIN acquired a further 32,813,861 nominative shares (equivalent to 28.5051% of company share capital) in T-Solar. However, the decision to carry out the investment was taken on 29 June 2012, when the Investment Agreement providing the form of the future acquisition by Isolux INBV of its equity holding in T-Solar was signed.[358]

287. The Claimant argues that the date on which the investor planned the investment has to be taken as the relevant date for deciding predictability of a measure or dispute. As evidence to justify that statement, the Claimant relies on the matter of <u>Aguas del Tunari –v-Bolivia</u>, in which the arbitration judges ruled that it was appropriate to consider not just the date on which the investment occurred but rather, at what point in time the investor planned to carry out its operation.[359] The Tribunal in the case of <u>Tidewater –v-Venezuela</u> came to the same conclusion.[360] According to the Claimant, the Respondent has never refused that jurisprudence, which must therefore be deemed an undisputed point between the Parties[361].

288. The Tribunal should take that date into consideration when deciding on predictability of the legal matter and whether or not abuse of legal process exists, and especially, the burden of proving the operation was fraudulent due to an absence of commercial content lies with the Respondent[362]. In so far as conflict abuse, this must be proven with regard to the conflict at the time of the investment and the circumstances of the investor. A very high possibility of conflict must be shown to exist rather than a possible conflict[363]. Insofar as the measures, arbitration jurisprudence imposes a requirement of reasonableness: i.e. that the measures best be reasonably predictable at the time the investment was made[364].

---

[357] Ver **Exhibit C-42:** Certificate issued by the Secretary to the Board of Directors of T-Solar Global, S.A., on 22 November 2013, and also **Exhibit C-40:** copy of Register-Book of Registered shares in T-Solar, page. 35.

[358] Investment Agreement dated 29 June 2012.

[359] *Aguas del Tunari, S.A., -v-Republic of Bolivia*, ICSID Case No. ARB/02/3, Ruling on Respondent objections to jurisdiction, 21 October 2005, ¶¶ 328 and 329.

[360] *Tidewater Inc., Tidewater Investment SRL, et al. –v-Republic of Venezuela*, ICSID Case No. ARB/10/5, Ruling on Jurisdiction, 8 February 2013, ¶ 197.

[361] Brief subsequent to Claimant audience, ¶33.

[362] Brief subsequent to Claimant audience, ¶¶36-40.

[363] Brief subsequent to Claimant audience, ¶42; *Pac Rim Cayman LLC –v- Republic of El Salvador*, ICSID Case No. ARB/09/12, Ruling on Claimant jurisdiction objections dated 1 June 2012, ¶ 2.99, **Legal Authority RLA-31**; Reply, ¶¶ 250-252.

[364] Brief subsequent to Claimant audience, ¶43; *Tidewater Inc., Tidewater Investment SRL, et al –v-Republic of Venezuela*, ICSID Case No. ARB/10/5, Ruling on Jurisdiction, 8 February 2013, ¶¶ 195 and 197, **Legal Authority CLA-84**: "*the Tribunal does not consider that the Respondent actions led to the expropriation of Claimant's operations being reasonably foreseeable. Despite the fact that in January 2009 and oil rig belonging to a company not connected to them was expropriated, this occurred subsequent to the Claimant decision to restructure its assets.[…] the Tribunal concluded that acts of expropriation that give rise to this dispute were not reasonably foreseeable by the Claimants either in*

*This is an unofficial English translation of the original Spanish award as issued.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

*December 2008,*

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

289. The Claimant also alleges that the factors relied on by the Kingdom of Spain do not pass the predictability threshold established in jurisprudence. That threshold was established in the Tribunal ruling in the case <u>Tidewater c. Venezuela</u> [365] and similarly concluded by arbitration judges in the case <u>Pacific Rim c. El Salvador</u> where, as the Respondent indicates as follows, was confirmed their jurisdiction: [366]

> In the Tribunal's view, the dividing-line occurs when the relevant party can see an actual dispute or can foresee a specific future dispute as a <u>very high probability and not merely as a possible controversy</u>. In the Tribunal's view, before that dividing-line is reached, there will be ordinarily no abuse of process; but after that dividing-line is passed, there ordinarily will be. (Emphasis added by the Claimant)

290. In the matter of <u>Lao Holding –v- Laos</u>, also cited by the Respondent,[367] the Tribunal referred to the notion of "*highly probable*", with regard to the degree to which the dispute was predictable[368]. As it turned out, the measures were not predictable.

291. The Claimant states at paragraphs 241 et seq. of the Reply that no dispute either existed or was predictable at the time Isolux INBV carried out its investment. The date the investment was planned and the date of taking the decision to go ahead with the investment (29 June 2012), as well as the date on which the investment was effectively made (29 October 2012), were all prior to 27 December 2012 (the date Law 15/2012 was adopted). The Claimant says that, at the time of the Claimant´s investment the Kingdom of Spain had not issued the measures have led to these arbitration proceedings and, certainly, the dispute did not exist. The factors put forward by the Respondent as announcing the reform of the energy sector are purely general factors, and have even been taken from electoral campaign speeches. They do nothing more than announce the need for reforms in view of the tariff deficit or stating that difficulties exist in the energy sector[369]. Nor do these factors meet the tests for "very high possibility" and "reasonably predictable" [370].

292. NEC Report 2/2012 included a list of possible energy sector reforms which, according to the Claimant, all appeared to suggest that the reform would not significantly affect the photovoltaic solar energy sector. Also, the Report did not included

---

[365] *when restructuring commenced, nor in March 2009, when restructuring became effective*"; Audience Transcription, day 1, page 84, lines 10-21.

[365] *Tidewater Inc., Tidewater Investment SRL, et al. –v- Republic of Venezuela*, ICSID Case No. ARB/10/5, Ruling on Jurisdiction, 8 February 2013, ¶¶ 195 and 197.

[366] **Legal Authority RLA-31:** *Pac Rim Cayman LLC –v-Republic of El Salvador*, ICSID Case No. ARB/09/12, Ruling on jurisdiction objections of the Respondent, 1 June 2012, ¶ 299.

[367] Statement of Defence, ¶ 500.

[368] Reply, ¶251; **Legal Authority RLA-37:** *Lao Holdings N.V. –v-Peoples Democratic Republic of Laos*, ICSID Case No. ARB(AF)/12/6, Ruling on Jurisdiction, 21 February 2014, ¶ 76.

[369] Reply, ¶¶ 506 et seq.

*This is an English courtesy translation of the original award in Spanish, prepared by Quevedo & Ponce. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[370]   Brief subsequent to Claimant audience, ¶47.

any of the measures subject of these arbitration proceedings[371]. All in all, the Spanish regulator, three months prior to 29 June 2016, had not announced any measures in this sense but had adopted a series of measures to try to achieve the deficit target immediately as from 2013, a far cry from the NEC proposals [372].

293. Neither did the Spanish Prime Minister Investiture speech of 19 December 2011 contain any wording from which one might deduce that dismantling the Special Regime was "*reasonablypredictable*" and that there was a "*very high probability*" that the dispute would arise between the Claimant and the Kingdom of Spain[372].

294.  Insofar as RDL 1/2012, dated 27 January 2012, the Claimant did not consider the aforesaid Decree contained any warning that the FIT would subsequently be revoked, due to the fact that, by means of this Decree, the Kingdom of Spain decided not to permit any new photovoltaic plants installations under the Special Regime but did not affect existing installations[374].

295.  Nor can the wording of the 2012 National Reforms Programme, as passed into law by the Council of Ministers of 27 April 2012, be construed as rendering the revocation of the FIT "*reasonably predictable*" nor that there was "*very high probability*"[375] that it would occur.

296. The Claimant finally concludes saying no statements of the Kingdom of Spain made prior to 29 June 2012 allowed one to foresee the measures subject of these arbitration proceedings.

297.  The Claimant acknowledges that after 29 June 2012 (but before 29 October 2012) the bill of law for fiscal measures on sustainable energy started to be processed, which would later become Law 15/2012 of 27 December, and which would enshrine the Tax.[376] The Claimant also acknowledges that the Photovoltaic sector shadowed the bill of law and informed the Spanish government of concern.[377] Nonetheless, the circumstances are not relevant, in that they occurred after 29 June 2012, and because they only concern the Tariff. In other words, they cannot in any event be deemed to "provide notice of" the other measures: (i) the changing nature of the FIT revision system and, subsequently, (ii) removal of FIT and (iii) removal of the Special Regime[378].

---

[371]  Brief subsequent to the Claimant audience, ¶¶49-50 and 52.
[372]  Brief subsequent to the Claimant audience, ¶112.
[373]  Brief subsequent to the Claimant audience, ¶54.
[374]  Brief subsequent to the Claimant audience, ¶49.
[375]  Brief subsequent to the Claimant audience, ¶60.
[376]  Law 15/2012, of 27 December, on fiscal measures for energy sustainability, **Exhibit C-30**; Statement of Defence, ¶¶ 536-542; Rejoinder, ¶ 336; Audience Transcription, day 1, page 40, lines 24-27.
[377]  Copy of letter from UNEF President to the Ministry of Finance and Public Administrations, dated 5 July

This document is a courtesy English translation of the original Spanish award rendered.
Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 104 of 257
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

2012, **Exhibit R-135**; Statement of Defence, ¶ 554; Audience Transcription, day 1, page  41, lines 9-14.

---

[378]     Brief subsequent to the Claimant audience, ¶¶63

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

298. Subsequent to 29 July 2012, the Claimant refers to the letter sent in July 2012 by Isolux[379] and which mentions "*leaks*" in the media, according to which the Government "*is considering*" adopting tax measures "*amounting to some 10% or even more*".[380] The Claimant specifies that one cannot declare predictability of any kind on the basis of that particular letter in that it refers to the type of measures that will be adopted, the extent of the measures and when they would be adopted. Additionally, the Government never replied to that letter.

299. As to the Respondent allegation that one must necessarily analyse the content and legal grounds of the operation that gave rise to the investment in order to discover whether there had been any *forum shopping*, criteria as identified by arbitration Tribunals for the case of Phoenix and Lao Holdings, the Claimant, in its Rejoinder, showed these cases to be irrelevant.[381] Insofar as great majority of judgments on which the Respondent relies[382] (including the judgement of 12 April 2012, and that of 24 September and 15 October), the Claimant reminds that the Supreme Court dismissed the appeals and confirm that "*the Government, which in the first instance decides the stimulate or incentives be paid for by society as a whole (as it is surely the consumers who do pay) may subsequently, in the face of new circumstances, make adjustments or corrections so as to ensure the public take-up of costs is reduced to levels which, while having due regard for minimum rates of return on investments already made, have the effect of moderating the "final"*remuneration[383]. The prior changes did not alter the basic principles of the remuneration. However, measures subject to these arbitration proceedings cannot be said to be "adjustments" but rather they completely wipe out the tariff system[384]. Finally, the Claimant specifies that neither

---

[379]   Statement of Defence, ¶ 562.
[380]   Statement of Defence, ¶ 562.
[381]   Rejoinder to jurisdiction objections, ¶191.
[382]   **Exhibit R-48**: Supreme Court Judgments of 12 April 2012, Appeal 35, 50 and 112/11; of 19 April 2012, Appeal 39 and 97/11, of 23 April 2012, Appeal 47/2011; of 3 May 2012, Appeal 51 and 55/2011; of 10 May 2012, Appeal 61 and 114/2011; of 14 May 2012, Appeal 58/2011; of 16 May 2012, Appeal 46/11; 18 May, Appeal 70 and 74/11; 22 May 2012, Appeal 45 and 49/11; 30 May 2012, Appeal 59/2011; 18 June 2012, Appeal 54, 56, 57 and 63/11; 25 June 2012, Appeal 109 and 121/11; 26 June 2012, Appeal 566/10; 9 July 2012, Appeal 67, 94 and 101/11; 12 July 2012, Appeal 52/11; 16 July 2012, Appeal 53, 75 and 119/11; 17 July 2012, Appeal 19 and 37/11; 19 July 2012, Appeal 44/2011; 25 July 2012, Appeal 38/2011; 26 July 2012, Appeal 36/11; 13 September 2012, Appeal 48/11; 17 September 2012, Appeal 43, 87, 88, 106 and120/11; 18 September 2012, Appeal 41/11; 25 September 2012, Appeal 71/11; 27 September 2012, Appeal 72/2011; 28 September 2012, Appeal 68/2011; 8 October 2012, Appeal 78, 79, 100 and 104/11; 10 October 2012, Appeal 76/2011; 11 October 2012, Appeal 95 and 117/11; 15 October 2012, Appeal 64, 73, 91, 105 and 124/11; 17 October 2012, Appeal 102/2011; 23 October 2012, Appeal 92/2011; 30 October 2012, Appeal 96/2011; 31 October 2012, Appeal 77 and 126/11; 5 November 2012, Appeal 103/2011; 9 November 2012, Appeal 89/2011; 12 November 2012, Appeal 98 and 110/11; 16 November 2012, Appeal 116/11; 21 November 2012, Appeal 34/2011 and 26 November 2012, Appeal 125/2011.
[383]   Brief subsequent to Claimant audience, ¶86-88; **Exhibit R-48:** Supreme Court Judgment of 12 April 2012, Appeal 35, 50 and 112/11, page 8.
[384]   Brief subsequent to Claimant audience, ¶81

*This is an unofficial English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

was it possible to see, in the light of Supreme Court jurisprudence, that the regulatory change would have back retroactive effects[385].

300. At all events, with regard to the Supreme Court judgments, the Claimant recalls that does not require this Arbitration Tribunal to take the national Law of the country receiving the investment into account in order to resolve the dispute. The Respondent failed to cite any doctrine, arbitration jurisprudence or opposition argument[386]. Supreme Court judgments may have relevance as matters of fact, but not as matters of law[387].

301. According to the Claimant, the Respondent also mistakenly relies on its argument on the award issued in the case of Mobil Corporation –v- Venezuela, maintainingthere was no requirement in the Mobil Corporation case to take the content and the grounds for the transaction into account, but rather makes the point that one should not rationally apply criteria used in other cases. In other words, Mobil Corporation confirms the opposite of the point made by the Kingdom of Spain in these arbitration proceedings[388].

302. The arguments in relation to the Phoenix case cannot be deemed relevant either because ECT did not apply[389].

b.      Obstacle to admissibility of the Claim

i.      *The Respondent may not apply Article 17 ECT retroactively*

303. The Claimant considers that the Respondent may not rely on the Refusal of Benefits Clause of Article 17 ECT because it has not met the basic conditions for notifying its intention to refuse ECT benefits to the Claimant. The Respondent could not rely on this time of filing Statement of Defence in that, within the ECT, this clause does not come into the scope of the Tribunal jurisdiction objections but rather connects with admissibility of the Claim. Therefore the Claimant did not activate this clause in time.

304. The Claimant specifies that in the case of ECT, refusal of benefits is restricted to Part III ECT. Part III does not include Article 26 ECT on jurisdiction. Therefore, Article 17 ECT cannot affect the jurisdiction of the Arbitration Tribunal.

---

[385]   Brief subsequent to the Claimant audience, ¶¶93 et seq.
[386]   Brief subsequent to the Claimant audience, ¶74.
[387]   Reply, ¶434; brief subsequent to the Claimant audience, ¶75.
[388]   Rejoinder to jurisdiction objections, ¶194.
[389]   Rejoinder to jurisdiction objections, ¶¶196-198-199

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

305. The Kingdom of Spain alleges that Article 17 ECT affects the *ratione voluntatis* jurisdiction of the Arbitration Tribunal in that Article 26 ETC, on jurisdiction, provides that the dispute must be "*in relation to the alleged breach* […] *of a Part III obligation*" of the ECT.[390] According to the Claimant, the argument of the Kingdom of Spain cannot thrive and that the condition concerned clearly refers to the *ratione materiae* competence of the Arbitration Tribunal in relation to the merits of the matter, rather than to its *ratione voluntatis* jurisdiction. In reality, the Kingdom of Spain is doubly confused: (i) confusing jurisdiction and admissibility and also (ii) confusing *ratione materiae* jurisdiction and *ratione voluntatis* jurisdiction[391].

306. The Claimant did not notify its intention to activate Article 17 ECT, which it should have done prior to commencing the arbitration proceedings. The Claimant considers the Article 5 SCC Rules, relied on by the Respondent, sets no obstacle to the Respondent filing of allegations or notices prior to its Statement of Defence and that, in this instance, it does not apply as the legal instrument as the ECT and Article 17 ECT does not concern an objection to jurisdiction. The Claimant refers to no arbitration cases in which ECT was applied but rather refers to the cases of Ulysseas, Inc. –v- Ecuador and EMELEC –v- Ecuador and Guaracachi[392]. The arbitration tribunal in both matters applied the United States BTI model in which activating the refusal of benefits clause was a jurisdictional matter rather than a matter of merit.[393] The Tribunals in those cases concluded that notifying refusal of benefits could be carried out at the same time as other objections to jurisdiction.

307. However, no tribunal has established the solution alleged by the Respondent in arbitration cases in which the ECT has been applied. The Claimant highlights the fact that in Liman Caspian Oil, the Arbitration Tribunal noted that notice to refuse benefit on the part of the receiving State was given one year after the arbitration application was filed and concluded that notice had been occurred late.[394] The Arbitration Tribunal in Ascom –v- Kazakhstan also considered that in order to activate the refusal of benefits clause under Article 17 TCE, notice of refusal had to be prior to the dispute start date[395].

308. In this instance, the Claimant considers that the Respondent had all the necessary information to activate Article 17 UTC in time, in other words,

---

[390]    Rejoinder, ¶ 347.
[391]    Rejoinder to jurisdiction objections, ¶¶217-219.
[392]    Rejoinder, ¶¶ 386-387.
[393]    Rejoinder to jurisdiction objections, ¶¶236-237.
[394]    **Legal Authority CLA-78:** *Liman Caspian Oil B.V. –v-Republic of Kazakhstan*, I CSID Case No. ARB/07/14, Award, 22 June 2010.
[395]    Rejoinder to jurisdiction objections, ¶¶239-242;  **Legal Authority RLA-28:** *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Trading Ltd –v- Republic of Kazajistán*, SCC Case No. 116/2010, Award, 19 December 2013, ¶ 745.

with regard to the Isolux IIN accounts at the time of the "Trigger Letters" in 2013 and at the time the Request first arose in 10 June 2014[396].

309. Lastly, the Claimant argues that activating Article 17 ECT cannot be retroactive, according to Arbitration Tribunal such as in the case of <u>Plama</u>[397], for example, or the case of <u>Liman Caspian Oil</u>[398].

### ii. *No legal grounds for the objections in relation to Article 21*

310. According to the Claimant, Article 21(1) ECT is a "*carve-out*" clause and its purpose is to exclude tax measures from the scope of application of ETC, whereas Article 21(5) ECT is a clause referred to as "*claw-back*" and precisely serves to clawback tax measures within the scope of protection of ETC, such as IVPEE, which has an expropriatory effect. The Claimant has specified that for the Kingdom of Spain, the tax has been "*carved-out*" and that there has not been any "*claw-back*" in relation to the expropriated effect of the tax[399].

311. The position of the Claimant is that States do not have absolute autonomy on tax matters due to the existence of a "*carve-out*" clause and the application of the "*carve-out*" therefore requires control of the intention of the tax measure under review. The tax measure must have been passed into law in good faith[400]. In this case IVPEE was adopted in bad faith, and therefore "*carve-out*" does not apply.

312. The Respondent attempted to show, in order to oppose the Claimant statements, that this measure is lawful and in good faith in that it is in accordance with Spanish law and EU Law. The Claimant points out that the Respondent's position fails to take into account that even if the taxes is deemed in accordance with the Spanish Constitution or EU Law that does not imply that the tax can automatically be defined as a Tax Measure for ETC purposes. Constitutional Court judgment 183/2014 of 6 November 2014, on which the Respondent relies, made no pronouncement as its nature as a Tax, in other words, whether or not Spanish law serves to determine that it is or is not a tax[401].

313. The Claimant states that in relation to proceedings EU Pilot 5526/13/TAXU, the Kingdom of Spain failed to provide any type of information to the Arbitration Tribunal as to the subject and grounds that led to the request for information. Therefore,

---

[396] Rejoinder to jurisdiction objections, ¶¶232-234.
[397] Rejoinder to jurisdiction objections, ¶¶248-250; **Legal Authority RLA-24:** *Plama Consortium Limited C. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Ruling on Jurisdiction, 8 February 2005, ¶ 161.
[398] **Legal Authority CLA-78:** *Liman Caspian Oil BV and NCL Dutch Investment BV –v-Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of Award, 22 June 2010, ¶ 225.
[399] Rejoinder to jurisdiction objections, ¶¶254-255.
[400] Reply, ¶¶ 288-294; Rejoinder on Jurisdiction, ¶¶283-284; Brief subsequent to the Claimant audience, ¶11.
[401] Rejoinder to jurisdiction objections, ¶¶264-265.

*This is a free translation from the original award made in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

the Claimant is in no position to make a pronouncement with regard to the Kingdom of Spain information. Even so, there are serious doubts as to the relevance of the argument put forward by the Kingdom of Spain and the Claimant notes that the Kingdom of Spain failed to provide any evidence that the European Commission had either ratified or confirmed it was a tax[403].

314. Additionally, the Claimant upholds that the tax cannot be the subject of "*carve-out*" as it is not a tax measure implemented in good faith.

315. According to the Claimant, the "*carve-out*" clause established in Article 21(1) ECT does not automatically apply to all legal regulations leveraging duties. This is because in order to activate the "*carve-out*" clause, there is a prior assumption by its virtue tax measures must have been brought into law in good faith.[404] Both in the Yukos[405] and in RosInvestCo[406] and Renta4 cases[407] the Arbitration Tribunals imposed the "*carve-out*" condition of good faith on the part of the receiving State at the time of issuing the tax measures. The same arbitration tribunals also highlighted that the *bona fides* criteria requires the intention of tax measures to be analysed and especially to check that it is intended to collect general revenue for the State.[408] To the contrary, a tax measure with an intention other than to do with collecting revenue shall be deemed to be in bad faith[409].

316. The Kingdom of Spain relies on several arbitration awards highlighting the existence of four criteria for characterising a tax measure. The fourth criteria, i.e. that the payment has to be carried out for public purposes, the Claimant says is to (i) review the purpose of the tax measure and (ii) check the purpose is to collect general revenue for the State. This criteria is identical to the good faith requirement[410].

317. This being so, it would seem the tax was not adopted in good faith and therefore could not have been excluded from the scope of application of ECT. In order to characterise that bad faith following must occur: (i) that there is a serious contradiction between the alleged purpose of Law 15/2012 and its effects; and (ii) that it has a discriminatory effect on the regulated photovoltaic sector[411].

---

[402]    Rejoinder to jurisdiction objections, ¶¶270-271.
[403]    Rejoinder to jurisdiction objections, ¶277.
[404]    Reply, ¶288.
[405]    **Legal Authority CLA-75:** *Yukos Universal Limited (Isle of Man) –v- Russian Federation*, CPA Case No. AA/227, Partial Award on Jurisdiction and Admissibility, 30 November 2009, ¶443,
[406]    **Legal Authority CLA-79:** *RosinvestCo UK Ltd. –v-Russian Federation*, SCC Case No. V079/2005, Award, 12 September 2010, ¶628.
[407]    **Legal Authority CLA-82:** *Renta 4 S.V.S.A., Ahorro Corporación Emergentes F.I., Ahorro Corporación Eurofondo F.I., Rovime Inversiones SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A. –* v-Russian Federation, SCC Case No. 24/2007, Award, 20 July 2012, ¶179.
[408]    See, e.g.,  **Legal Authority CLA-88:** *Yukos Universal Limited (Isle of Man) –v- Russian Federation*, CPA Case No. AA/227, Award, 18 July 2014, ¶ 1407. Original: "bona fide *taxation actions* [are] *actions that are  motivated by the purpose of raising general revenue for the State*".
[409]    Rejoinder to jurisdiction objections, ¶277.
[410]    Rejoinder to jurisdiction objections, ¶¶286-287.
[411]    Brief subsequent to the Claimant audience, ¶19.

318. The Claimant states with regard to the following arguments[412]:

> ➤ Tax is applied identically to all types of contamination levels. Contrary to what is advocated by any "green tax", the Taxes applied to fossil fuels and renewable fuels equally.[413]

> ➤ The Tax applies to all electricity producers, without taking into account any differences in the levels of amortisation between standard technologies, which are highly amortised — such as nuclear or hydroelectric energy — and the newer technologies. Given the high levels of initial investment required by the technologies, they have a far longer amortisation period.[414]

> ➤ Tax does not distinguish between the method of generating the energy produced: market price or regulated tariff. This difference is crucial, in that electricity producers receiving a regulated tariff cannot charge forward any additional cost on the energy price.[415] The Kingdom of Spain has admitted this: "*an inherent aspect of direct taxes is that they cannot be charged forward* [but] *the economic effect of impact of the taxes is remunerated to the renewable energy producers* ".[416]

319. Furthermore, there were many options available to the Kingdom of Spain in order to reduce the tariff deficit, relied on as justification for adopting the Tax, but without having to affect the IIN investment[417]. The KPMG[418] report made it clear that the Kingdom of Spain could have implemented other preferable measures to achieve the same deficit reduction targets and that this would have been more appropriate for purposes of complying with regulatory principles in domestic and EU Law and also with the principles of good practice on regulatory, as well as guaranteeing greater stability to the regulatory framework[419].

320. The Claimant recalls, with regard to the Respondent argument maintaining the tax is generally applicable, that the Claimant does not seek any preferential treatment. To the contrary, as the Claimant and Claimant experts have shown, it is in fact the general nature of the Tax that gives rise to the discriminatory effect, in that it ignores the specific details of each electricity production sector.[420]

---

[412] Brief subsequent to Claimant audience, ¶¶21-23.
[413] Law 15/2012, Arts. 4 y 6(1), **Exhibit C-30**.
[414] Rejoinder on Jurisdiction, ¶ 295.
[415] Rejoinder on Jurisdiction, ¶ 297.
[416] Transcripción de la Audiencia, día 1, pág. 62, líneas 1-4.
[417] Rejoinder to jurisdiction objections, ¶287.
[418] Report KPMG, Section 6.
[419] Brief subsequent to Claimant audience, ¶119.
[420] Reply, ¶ 512.

321. Neither can the Kingdom of Spain justify the Tax on the basis of its alleged environmental intention.[421] The experts have shown that the Tax does not meet any of the requirements of a tax measure [introduced] for environmental protection purposes.[422]

322. In relation to the Respondent argument where it states that the Tax is neutralised as a result of the remuneration regime established by the Respondent[423], the Claimant recalls that the Kingdom of Spain has explicitly admitted that the Tax reduces remuneration to photovoltaic producers and this, in the last instance, affects the rate of return on photovoltaic plants[424]. The Claimant has fared as shown that the remuneration parameters for the Tax are only received if the gap between revenue and operation costs is negative. Thus, no installations deemed to have a "reasonable" rate of return under the new remuneration regime - which, as it has already been shown, imposes a ceiling on the concept of "reasonable rate of return"[425]— will receive the 'Ro' (supplementary remuneration when remuneration is not sufficient to cover operation costs) but they must, nevertheless, pay the Tax. It is not therefore true to say that the impact of Tax is compensated in any way, as it is only "eliminated"whenever an installation is not profitable[426].

323. Lastly, the Claimant notes that the third argument put forward by the Kingdom of Spain comprises confirmation that the amounts collected through the Tax will be built into the General Spanish State Budget.[427] Obviously, no evidence is provided for this affirmation nor is any clarification given in relation to the implementation of the Tax in good faith[428].

324. The Claimant concludes by stating that the Kingdom of Spain has not succeeded in countering what Claimant has shown with regard to the Tax being in bad faith and, therefore, the Respondent cannot provide any justification for the Tax to be "*carved-out*" under Article 21(1) ECT.

   iii. *The Respondent failed to provide a mechanism for appealing before competent tax authorities*

325. The Claimant notes that another objection put forward by the Kingdom of Spain relies on Article ECT [sic] concerning admissibility of the Isolux INBV argument according to which the tax had an expropriatory effect.[429] The Kingdom of Spain objection could thrive even if one were to admit (*quod non*) that the tax had been excluded (or "*carved-out*").

---

[421]  Rejoinder, ¶ 486.
[422]  Reply, ¶ 512; Rejoinder to jurisdiction objections, ¶295.
[423]  Rejoinder, ¶¶ 501-505.
[424]  Rejoinder to jurisdiction objections, ¶295.
[425]  Statement of Claim, **Section IV.D.2 (iv)**; Reply, **Section III.B.2 (ii)**.
[426]  Brief subsequent to Claimant hearing, ¶24.
[427]  Rejoinder, ¶¶ 510-514.

*This is an unofficial translation of the original Spanish which remains authentic.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[428]     Rejoinder of jurisdiction objections, ¶300.
[429]     Rejoinder, ¶¶523-524

326. The Respondent alleged that the Claimant had not previously submitted the issue on the expropriatory nature of the tax to the competent tax authorities. However, the Respondent did specify that there is no requirement under the ECT to appeal before the competent tax authorities prior to bringing arbitration proceedings. The Claimant makes the point that all the arguments put forward by the Kingdom of Spain rely on a simplistic reading of Article 21(5) ECT, where it states that issues regarding the expropriated nature of a tax measure shall be submitted to the competent tax authorities. According to the Kingdom of Spain, the use of a future time is sufficient to conclude that such an appeal is compulsory and comprises an obstacle rendering the issue inadmissible.[430] In opposition, the Claimant considers the determinant factor to be the binding nature (or otherwise) rulings handed down by competent tax authorities.

327. By way of example, the Claimant goes on to compare the wording of Article 2103 (6) ALCAN where the compulsory nature of prior appeal to the competent authorities under ALCAN is justified as there is an obligation to appeal the competent authorities "*at the time that it gives notice under Article 1119*" and due to the firm and final nature of rulings issued by the competent authorities[431]. However, in the case of Article 21(5) ECT the mechanism for appealing to competent tax authorities is different. Article 21(5)(b)(i) provides as follows: (i) in instances when the Investor does not appeal before competent tax authorities, such appeal will be instigated by the Arbitration Tribunal; (ii) ECT provides a maximum six month time period in which competent tax authorities shall attempt to establish their view. [432] After that time period has elapsed, Arbitration proceedings will continue despite the absence of a ruling from the competent tax authorities; the Arbitration Tribunal "may" take the ruling of the competent tax authorities into account. [433] All in all, the Claimant says that the ECT "*claw-back*" mechanism is neither compulsory nor may it affects the admissibility of the claim[434].

328. Lastly, the Claimant alleged that it was not possible for the Claimant to appeal to the competent tax authorities because no mechanism existence in Spanish law to do so.[435]

329. However, in the course of the Hearing held in the month of October 2015, the Respondent stated that the competent authority to hear this appeal was actually the STD[436]. Thus, the Claimant informed the Arbitration Tribunal by letter dated 16 March 2016 that the Claimant had filed a petition before the STD on 3 February 2016

---

[430] Statement of Defence, ¶¶ 731-732; Rejoinder Brief, ¶ 528.
[431] Rejoinder Brief on jurisdiction objections, ¶¶313-314.
[432] **Exhibit C-1:** Article 21(5)(b)(ii)**.**
[433] **Exhibit C-1:** Article 21(5)(b)(iii)**.**
[434] Rejoinder Brief on jurisdiction objections, ¶¶315-318.
[435] Reply Brief, ¶¶ 309-314.
[436] Hearing Transcript, day 1, page 101, lines 4-19.

*This document is a courtesy translation. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

seeking a pronouncement from the latter on the expropriated nature of IVPEE, pursuant to the procedure referred to in Article 21(5)(b) ECT and similarly in the terms set out in that Article (6 months), in the light of elements relied upon and indications filed by the Kingdom of Spain in the course of the Hearing held in the month of October 2016. The STD issued its Report on 29 March 2016 and stated therein that the STD was indeed the competent Tax Authority to issue the aforesaid Report, going on to declare that IVPEE was neither an expropriatory nor discriminatory measure.

## B.    POSITION OF THE PARTIES ON THE MERITS OF THE DISPUTE

### 1.    Claimant's Position

1.1.    The Kingdom of Spain attracted investment by promising a stable and predictable Special Regime.

330.    The Claimant recalled that the written details of the Kingdom of Spain offer for photovoltaic Plants were set out in Royal Decrees [RDS] 661/2007 and 1578/2008, which enshrined a fixed FIT for a specific category of investors i.e. investors that met certain strict requirements on characteristics and at the time they were registered[437].

331.    The photovoltaic plants subject of these arbitration proceedings did meet those requirements and they are duly subject to the Special Regime established in RDS 661/2007 and 1578/2008[438].

332.    When RDL 9/2013 was adopted, coming into force as from 14 July 2013 and with the new Specific Remuneration, parameters were applied in the sense that investors could not have taken into account when deciding whether to invest. The Kingdom of Spain, whilst never giving an undertaking to provide an immutable legal framework, did have an obligation to ensure a stable juridical and economic context that was transparent and predictable[439].

### a.    The Kingdom of Spain guaranteed a stable and predictable economic framework for the photovoltaic plants

333.    The Claimant explained that its legitimate expectations at the time of making its investment derived not only from promises made by the Kingdom of Spain of a long-term FIT, but also from the promises of a transparent, stable and predictable framework and from declarations made by the Respondent[440].

---

[437]    Claimant Reply, ¶¶319-320.
[438]    Statement of Claim, ¶ 134.
[439]    Claimant Reply, ¶327.

*This is an English translation of the original Spanish document.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[440]   Statement of Claim, ¶¶ 77, 78, 83, 84, 87.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

334.   The Claimant refers to plans and programs of the Spanish Government, such as the Renewable Energies Plan ("REP") 2005-2010[441], and the REP 2011-20[442], passed into law by Resolution of the Council of Ministers on 11 November 2011, which clarified that: "*Support for electricity generation from renewable energies, in installations connected to the electricity system is based on a juridical framework that allows the use of electricity from renewable energy sources to be prioritised and enables this to occur within a stable and predictable economic framework that provides an incentive for generating electricity from such resources whilst at the same time permitting the associated investments to obtain reasonable rates of return.*"[443].The Spanish Government additionally announced that in view of the fact that this "*system was proven to be highly effective for developing electricity generation from renewable sources*", that it was appropriate to maintain the system that had been based on those earlier principles[444].

335.   The Spanish government set out targets in the 2007-2012-2020 Spanish Strategy for Climate Change and Clean Energy[445] such as providing investments in renewable energies and cogeneration with a more secure economic framework, specifying that one of the new and instrumental elements for bringing this about was the new RD 661/2007[446]. The Claimant makes the point that, contrary to the allegations put forward by the opponent Party, the Claimant never "*made reference*" in relation to that wording "*to a promise of immutability*". The Claimant did however refer to an undertaking to provide "*economic certainty*", [447] and this can be deduced from the wording set out in the Strategy[448].

336. IDAE published a great number of leaflets and publicity documents focusing on fostering the photovoltaic sector and capturing investment. An example of this is the 2010 IDAE prospectus entitled "*Renovables Made in Spain*" [TR. Renewables made in Spain] which reiterated the importance of a supporting legislative framework in which investors are confident and of stability[449] for developing renewable energies [450].

337. The NEC also issued Reports that repeatedly highlighted that the Kingdom of Spain was committed to maintaining a transparent, stable and predictable framework

---

[441]   **Exhibit C-14:** 2005-2010 Renewable Energies Plan passed into law by the Spanish government by Resolution of Council of ministers, of 26 August 2005.

[442]   2011-2020 Renewable Energies Plan passed into law by the Spanish government by Resolution of Council of ministers, of 11 November 2011.

[443]   2011-2020 Renewable Energies Plan passed into law by the Spanish government by Resolution of Council of ministers, of 11 November 2011, page XXXVIII.

[444]   2011-2020 Renewable Energies Plan passed into law by the Spanish government by Resolution of Council of ministers, of 11 November 2011, page. 690.

[445]   2007-2012-2020 Spanish Strategy for Climate Change and Clean Energy, passed into law by the Council of Ministers on 2 November 2007, **Exhibit C-21**.

[446]   **Exhibit C-21:** 2007-2012-2020 Spanish Strategy for Climate Change and Clean Energy, passed into law by the Council of Ministers on 2 November 2007.

[447]   Statement of Claim, ¶ 86.

*This is an English courtesy translation of the original Spanish document d.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

[448]   Claimant Reply, ¶312.
[449]   **Exhibit C-26:** "*Renovables made in Spain*", March 2010, IDAE, page 6.
[450]   Claimant Reply, ¶¶350-351.

*This is an unofficial English translation of the original award. Original in Spanish prevails.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

around the Special Regime. The Claimant upholds that the NEC sent a clear message in its 3/2007 Report,[451] stating that photovoltaic installations "*are capital intensive and have long recovery periods*", and that it is therefore necessary for "*regulation* [to offer] *sufficient guarantees to be able to achieve stability and predictability of financial incentives throughout the life of the installation*", where "*transparency and predictability at a later date of financial incentives reduce regulatory uncertainty and this incentivises investment in new capacity*"[452]. NEC also expressed itself the same sense, in its Report 30/2008[453]. The Claimant notes that NEC gives great weight to legal certainty, legitimate expectation and stability and predictability of financial incentives. And although it considers these principles "*cannot be* […]*used as instruments to set the juridical framework in stone*", neither can a juridical framework be amended at a whim, but rather all changes must, "*insofar as possible*" respect "*possible expectations generated by the prior regulation*". NEC recognises that any change to the regulatory framework must have regard for the legitimate expectations generated by that framework[454].

338. The Claimant insists that the NEC reiterated the importance of regulatory stability, in the Report dated 22 April 2009[455]on the Proposal for Royal Decree on electricity production installations subject to special regime accessing and connecting to the Electricity Network, referring to it as "*basic criteria*" and part of its "*methodology*". Lastly, the Claimant referred to the Recital of Legal Grounds for RD 436/2004, where the Kingdom of Spain promises stability[456].

b.   The Respondent guaranteed a long-term FIT for the Plants

339. The Claimant provided evidence in its Statement of Claim that the Kingdom of Spain committed, within the framework of the Special Regime, to pay the FIT over the long term, as enshrined in RD 661/2007 and RD 1578/2008[457]. Firstly, by means of the LSE in force at the time of the IIN investment in T-Solar, and thereafter through successive regulations adopted by the Kingdom of Spain and referred to in Section IV of this award. The evolution of this culminated in adopting RD 661/2007 which is enshrined FIT over the long term

---

[451]   **Exhibit C-17:** NEC Report 3/2007 on Royal Decree Bill for regulating electricity production under the special regime, dated 14 February 2007, pages 16 and 23.

[452]   Reply, ¶¶354-355.

[453]   **Exhibit C-22:** NEC Report 30/2008 on the Royal Decree Bill for remuneration of electricity produced from photovoltaic solar technology for installations (built) after the deadline for continuing to receive the remuneration established in Royal Decree 661/2007, of 25 May, for that technology, dated 29 July 2008, pages 9 and 20.

[454]   Reply, ¶¶357-360.

[455]   Report on the Royal Decree Bill for electricity production installations under the special regime to access and connect to the Electricity Network, dated 22 April 2009.

[456]   **Exhibit C-11:** Royal Decree 436/2004, of 12 March, establishing the methodology for updating and systematising the juridical and economic system applicable to electricity production under the special regime, page. 1.

This is a convenience English translation of the original Spanish award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

[457]     Statement of Claim, **Section IV.B**.

This document is a courtesy copy of the original award issued in Spanish.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity
Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 120 of 257

in such a manner that a party investing in photovoltaic installations and registering them on the RAIPRE before a certain specific date would be entitled to: (i) deliver its net electricity production into the network (in other words, the network would purchase all the electricity produced); (ii) receive a fixed FIT (only to be revised on the basis of CPI) as the price for the electricity fed into the network; (iii) and to receive that FIT in perpetuity (in other words, throughout the useful life of the installation)[458].

340. RD 1578/2008 confirmed FIT as a support system and introduced amendments to the system, limiting the useful life of installations to 25 years[459]. The Claimant acknowledges in that regard that the aforesaid measures generated (and continue to generate) wide criticism and controversy, and have led to numerous international arbitration proceedings against the Kingdom of Spain, also under the ECT. Although [the amendments] affected and limited the Special Regime it remains fully in force and applicable as an incentive to investment. Effectively, installations covered by RD 661/2007 and RD1578/2008 continued to receive the benefits of the Special Regime, and particularly the right to receive a fixed FIT over the long term[460]. At the time IIN carried out its investment in Spain with the legitimate expectation that the Special Regime would apply to the Plants.

341. The Claimant notes that the only defence the Kingdom of Spain puts forward in that regard is that its only commitment was to ensure a "reasonable rate of return" to any investor, as referred to in Article 30.4 LSE.[461] According to the Claimant, the Kingdom of Spain maintains that any minimally informed investor, such as the Claimant, investing in the photovoltaic sector in the year 2012, would have come to that conclusion and that therefore would have been on notice that RD 661/2007 and RD 1578/2008 did not contain actual undertakings on the part of the Spanish State. This argument, says the Claimant, *firstly,* is devastating for the posture adopted by the Respondent itself in these arbitration proceedings and, *secondly*, is far from the reality[462].

342. First of all, the Claimant noted that by making that statement the Respondent recognises that a legislative principle is capable of generating legitimate expectations[463].

343. The Respondent argument that international law does not permit legislative wording to give rise to legitimate expectations or to commit the State receiving the investment "to the legal framework being immutable", where only an undertaking in that sense could have that effect, must be dismissed. In effect this argument contradicts affirmations made by the Respondent where it acknowledges that a general legislative regulation

---

[458]   Statement of Claim, pages 27 to 35.
[459]   Statement of Claim, ¶121; RD 1578/2008, Article 12.
[460]   Statement of Claim, ¶125-126.
[461]   Writ of Response, ¶ 120.
[462]   Reply, ¶¶367-370.
[463]   Reply, ¶374.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

can protect legitimate expectations of investors in so far as the expectations of a "reasonable rate of return"[464].

344. Secondly, the Claimant states that no investor would have concluded that the offer of the Kingdom of Spain to attract investors was limited to guaranteeing the so-called "reasonable rate of return" of Article 30.4 LSE. The Claimant stated that not only the Respondent position is inconsistent with its interpretation of international law on matters of just and equitable treatment but that, furthermore, there is an absence of any legal basis[465].

345. The Claimant furthermore highlights the vague and indeterminate nature of the reference to a "reasonable rate of return" in Article 30.4 LSE and adds that, if LSE, set out as it is in general terms, is capable of creating expectations and committing the State with regard to international investors, then RD 661/2007 and RD1579/2008[466] are even more able to do with their comprehensive, clear and explicit wording.

346. According to the Claimant the only objective interpretation that can be made is that this regulation establishes a minimum or "base" for remunerating photovoltaic installations, as opposed to RDL 9/2013 which imposes the ceiling on the aforesaid reasonable rate of return[467]. Calculation of rates of return can, in fact, vary from one technology to another as the NEC itself stated in its Report 3/2007[468].

347. According to the Claimant, the reality is that until the reform accomplished by Article 30.4 LSE, which the Respondent brought in by way of the recent RDL 9/2013, the content of the concept of "*reasonable rate of return*" had never actually been specified. As already said, it was only *a posteriori*, by way of RDL 9/2013 that the Spanish legislator gave substance to the wording and designated it as a ceiling on remuneration[469]. Thus, if the Claimant had carried out its investment after RDL 9/2013 had been passed into law, they would have been alerted to the fact of a maximum limit on the rate of return of its investment[470].

      c.    The Kingdom of Spain slowly emptied out and finally abolished the Special Regime

348. IIN made its investment in T-Solar on 29 October 2012. The majority of T-Solar Plants were subject to the Special Regime provided in RD 661/2007. The remaining Plants were subject to the Special Regime under the scope of application of RD 1578/2008. Thus, all

---

[464]    Reply, ¶379; Statement of Defence, ¶ 786.
[465]    Reply, ¶380.
[466]    Reply, ¶376.
[467]    Reply, ¶388, 390.
[468]    **Exhibit C-17: NEC** Report 3/2007 on the proposed Royal Decree regulating the electricity production activity under special regime, dated 14 February 2007, page 16.
[469]    **Exhibit C-34:** Royal Decree-Law 9/2013, of 12 July, adopting urgent measures to guarantee financial

This is an unofficial English translation of the original Spanish award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity

stability of the electricity system, Article 1(2).

[470]   Reply, ¶394.

Plants were entitled to a fixed FIT over the long term. At the time IIN made its investment in October 2012, it did so on the basis of this regulatory framework with the legitimate expectation of obtaining the rate of return corresponding to the receipt of this FIT.

349. First of all, the Claimant considers that Law 15/2012 on fiscal measures applicable to sustainable energy, of 27 December 2012, introduced measures that emptied out the content from the Special Regime, in that it imposed a "*tax on the value of electricity production*" [471]. The tax applied to "*production and delivery of electricity into the electricity system*",[472] and the tax basis was "*total amount the taxpayer receive for producing and deliverying electricity into the electricity system*",[473] even under the Special Regime FIT.[474] The Claimant recalls that the tax rate is 7%[475] and that the tax period corresponds to the calendar year[476], going on to conclude by explaining that the Tax is of a confiscatory nature in that it removes 7% from the total of amounts collected from electricity production[477].

350. The Claimant does not accept the legal grounds set out in the recital of the Law for creating this tax, and considers that the Kingdom of Spain may not deprive Isolux INBV of its investment due to a tariff mismatch, when that problem has nothing to do with the latter and is the fault of the Kingdom of Spain. Furthermore, when the Respondent brought in the Special Regime it should have known the scope of investments necessary to maintain and operate the Spanish electricity transport and distribution networks[478].

351. All in all, this measure detracts from IIN legitimate expectation to receive FITs in force and applicable to the Plants at the time IIN made its investment, and this amounts to a confiscation nature[479].

352. Secondly, 1 February 2013 was published the RDL 2/2013 on urgent measures to the electricity system and the financial sector, amending the mechanism for reviewing FIT that had been laid down in RDS 661/2007 and 1578/2008 (which, in the case of Plants, only permitted the FIT to be reviewed in accordance with the Spanish Consumer Price Index - *CPI).* On that day, the legislator decided to replace the general CPI with a *sui generis* CPI specific to the electricity sector, "*exclusively for installations subject to the Special Regime*". This was the "*Consumer Price Index*

---

[471] See Recital of Grounds to Law 15/2012.
[472] Law 15/2012, Article 4.
[473] Law 15/2012, Article 6(1).
[474] Applies to "*Remuneration provided under all economic regimes deriving from the provisions of Law 54/1997, of 27 November, Electricity Sector Act*".
[475] Law 15/2012, Article 8.
[476] Law 15/2012, Article 7.
[477] Statement of Claim, ¶¶146-147.
[478] Statement of Claim, ¶¶150-151.
[479] Statement of Claim, ¶153.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 124 of 257
*This is an unofficial translation of the original award rendered in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

*at constant taxation without including non-manufactured foodstuffs or energy products*". This ad hoc CPI leads to a smaller annual increase of the FITs applicable to the Plants.[480]

353. Neither is the Claimant convinced by the legal grounds the Respondent puts forward to justify the measure, given that the tariff deficit and other budgetary problems are caused by and are the liability of the Respondent. Additionally, the Kingdom of Spain had preferred not to transfer those problems to the consumer merely for political reasons[481].

354. The Claimant concludes by stating that RDL 2/2013 violated the legitimate expectations of Isolux INBV and has a confiscatory effect on the FITs T-Solar should have received into the future, in breach of Articles 10 and 13 ECT.

> d. The Kingdom of Spain abolished the Special Regime by replacing it with Specific Remuneration.

355. The Claimant specifies that removing the Special Regime and replacing it with Specific Remuneration was announced in Royal Decree-Law 9/2013, of 12 July 2013[482]. Although the new "specific remuneration" theoretically started to come into effect from the date RDL 9/2013[483] came into force, —14 July 2013—, it actually meant that the various payment formulas and economic parameters were deferred to a future Royal Decree and implementation order.[484] Those implementation regulations were not adopted almost one year later, in June 2014, (Royal Decree 413/2014, of 6 June [485] and in Order IET/1045/2014, of 16 June[486]). Throughout that period of almost one year, IIN and the other investors affected by RDL

---

[480] Statement of Claim, ¶¶157-158; C Ministerial Order IET/221/2013, of 14 February, establishing access tolls as from 1 January 2013 and tariffs and premiums for special regime installations.

[481] Statement of Claim, ¶161.

[482] Royal Decree-Law 9/2013, of 12 July, adopting urgent measures to guarantee financial stability of the electricity system.

[483] RDL 9/2013, Second Final Provision: "*this new model… will apply from the date on which this Royal Decree-Law comes into force*".

[484] RDL 9/2013, Second Final Provision: "*the Government, as proposed by the Ministry of Industry, Energy and Tourism, shall approve a Royal Decree regulating the juridical and economic regime for installations producing electricity from renewable resources, cogeneration and residual waste, with a subsidised remuneration that will amend the remuneration model of the existing installations.*
*This new model will be in line with the criteria established in Article 30, Law 54/1997, of 27 November, Electricity Sector Act, introduced in this Royal Decree-Law and will apply from the date this Law Decree Law comes into force*".

[485] Royal Decree 413/2014, of 6 June, regulating electricity production activity from renewable energy sources, cogeneration and residual waste.

[486] Order IET/1045/2014, of 16 June, passing into law the remuneration parameters for standard installations applicable to certain electricity production installations producing electricity from renewable sources, cogeneration and residual waste.

9/2013, were unable to precisely quantify the effects of the measure brought in by the Spanish State, although they were aware that the Special Regime and its FIT were being destroyed[487].

356. This being so, RDL 9/2013 repealed RD 661/2007 and RD 1578/2008, amending Article 30(4) LSE. Law 24/2013 of 26 December, Electricity Sector Act confirmed in the Third Final Provision that installations subject to the former (and now extinct) Special Regime were fully subject to RDL 9/2013 and, therefore, to the Specific Remuneration enshrined in that RDL.[488]

357. The Claimant presented those characteristics of the new regime to highlight the breach by the Kingdom of Spain of its earlier commitment and of Isolux INBV legitimate expectations:

    i.   *Kingdom of Spain has imposed an arbitrary "ceiling" on reasonable rate of return*

358. The Claimant explained that the 1997 LSE established that the regulated tariff would be calculated "so as to achieve reasonable rates of return" (Article 30(4)). This LSE established no limit, or 'ceiling', to the concept of "reasonable rate of return". Neither did RDS 661/2007 and 1578/2008. The concept of "reasonable rate of return" was configured as a 'floor' rate of return, to develop renewable installations[489].

359. Thus, the new Article 30(4) Electricity Sector Act (as amended by RDL 9/2013) establishes that the new Specific Remuneration shall not in any event exceed: "*the minimum level necessary to cover costs that permit the installations to compete **on an equal footing** with the other technologies on the market and render it possible to obtain a reasonable rate of return*". Also, that the aforesaid reasonable rate of return "*shall be calculated, pre-tax, on the basis of the average rate of return on the secondary market of ten-year State Bonds, applying an appropriate differential*"[490].

360. The outcome of the new regulations was that the new and arbitrary 'ceiling' imposed by the Kingdom of Spain thus amounted to a tangibly lower rate than the rate calculated by applying the FITs established in RDS 661/2007 and 1578/2008. This was a material alteration of the premises on which IIN based its investment in Spain.

---

[487]  Statement of Claim, ¶¶166-167.
[488]  Law 24/2013. The Articles of Law 24/2013 included the legal basis for the "specific remuneration" in the same terms as RDL 9/2013.
[489]  Statement of Claim, ¶¶173-178.
[490]  Statement of Claim ¶185.

<u>ii. *New parameters for calculating the Specific Remuneration*</u>

361. The Claimant went on to explain that when IIN made its investment, the Special Regime that applied to the Plants was a simply payment of the fixed FIT over the long term. The new Specific Remuneration introduces new calculation parameters in relation to "*investment costs*" for a "*standard installation*", and in accordance with "*standard value of the initial investment*"[491].

362. Order 1045/2014 details 111 classes of standard installations and standard values calculated by the Respondent from the perspective of costs that an efficient and well managed company would have incurred, i.e. on the basis of theoretical analyses and without bearing in mind the actual costs incurred by investors at the time of implementing the investments [492].

363. Insofar as the Specific Remuneration assignment, the Claimant highlights that it only covers "*the difference between exploitation costs and revenue from market share for that installation type*". What this has meant is that the Specific Remuneration applies to installations with estimated exploitation costs per unit of energy is higher than average market price. In practice therefore, the Specific Remuneration does not apply to photovoltaic installations with exploitation costs, always lower than the average market price due to the fact that they use energy that costs nothing - the sun![493].

364. Another key element the Claimant points out is connected with the approach "*business activity carried on by an efficient and well run company*", used as a overall criterion when evaluating exploitation costs and the standard investment value[494], whereas the fixed FIT the Plants had been entitled to was deemed irrespective of the model or style of management chosen by the owners of those plants [495].

365. The Specific Remuneration is furthermore calculated on the basis of unpublished production and exploitation criteria and this adds uncertainty and insecurity: as "*standard revenue for the sale of energy generated valued at production market price*" and "*standard exploitation costs*". The Claimant makes the point that neither those criteria were taken into account at the time of investing in T-Solar or in the Plants.

366. Finally, the Claimant reminded 1 that considering those elements comprising revenue estimates projected *up to the end of the useful regulatory life*

---

[491] Statement of Claim, ¶191.
[492] Statement of Claim, ¶193.
[493] Statement of Claim, ¶195
[494] According to the Recital of Grounds for RDL 9/2013, "*in accordance with community jurisprudence, the term efficient and well-managed company, is deemed to refer to a company having the necessary means to carry on its business activity, incurring the costs of an efficient company in that field and bearing in mind the corresponding revenue and a reasonable profit for carrying out its tasks. The purpose of this is to guarantee that elevated costs incurred by an inefficient company are not used as a reference.*"
[495] Statement of Claim, ¶196.

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity*

of the facility give rise to a high degree of uncertainty when calculating the Specific Remuneration[496] and therefore cause financial and legal uncertainty for the investor.

### iii. *The new Specific Remuneration regime applies retroactively*

367. RDL 9/2013 provides that the new Specific Remuneration regime will be calculated and will apply "*throughout the useful life of [the installation]*": from the date the installation officially comes into operation and up to the end of the period of recognised remuneration. Thus, the Claimant makes the point that the new Specific Remuneration not only projects its effects toward the future, but also towards the past.

368. Furthermore, the new remuneration regime allows the Kingdom of Spain to reduce future rate of returns of installations by reducing and even cancelling remuneration in order to compensate any over-remuneration received and which the Kingdom of Spain no longer deems "reasonable". Such a consideration would be based on a tariff having been received in the past which, *a posteriori,* and based on the new regime, the Kingdom of Spain considers excessive[497]. By including past revenue, the new Specific Remuneration effectively reduces the number of years during which the installation is entitled to be paid the new remuneration and, in the most extreme instances, may imply that a given installation is no longer entitled to receive the specific remuneration at all[498]

369. Put another way, the Claimant insists that RDL 9/2013 effectively establishes 1) the cost at which the investment should have been made, for installations built years ago; 2) what the cost of operation and maintenance undertaken should have consist on and, finally, 3) calculates the reasonable rate of return that should have applied from the date an installation came into operation. Furthermore, that it does so without regard for the economic regime applicable to each installation under the extinct Special Regime[499].

370. The Claimant refers to the reaction of Mr. Mariano Bacigalupo, Secretary to the NEC Board in 2006 and 2012. Mr. Bacigalupo stated that a retroactive change "*of this proportion was not reasonably predictable, and is not therefore admissible without precautions that at least soften the extraordinarily harmful impact on the affected parties*":[500]

---

[496]    Statement of Claim, ¶199.
[497]    Although RDL 9/2013, Third Final Provision, provides: "*Remuneration received for electricity produced prior to 14 July 2013 may not, in any event, be reclaimed under the new remuneration model and not even if it can be shown that the aforesaid rate of return had been exceeded by that date*".
[498]    Statement of Claim, ¶202.
[499]    Statement of Claim, ¶203.
[500]    Mariano Bacigalupo, "*Energías renovables y regulación retroactiva*" [TR. Renewable energies and retroactive regulation], article published in *Energía del Economista*, 26 September 2013.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

iv.  *The Specific Remuneration regime is subject to discretionary review of the Kingdom of Spain*

371. The Claimant states that the Kingdom of Spain has mechanisms at its disposal to revise the Specific Remuneration regime at its discretion. With regard to the 'ceiling' of "reasonable rate of return", Article 19 of RD 1413/2014 sets out that the value on which reasonable rate of return may be calculated may be subject to revision (by Law), at the end of each regulatory period (that is, every six years). Concerning the rest of the parameters of the Specific Remuneration, these shall be subject to review by Ministerial Order in accordance with Article 20 of RD 413/2014[501].

e.  The measures taken by the Kingdom of Spain were not predictable

372. The Claimant provided detailed arguments relating to the unpredictability of the measures taken by the Kingdom of Spain in response to the jurisdiction objections of the Arbitral Tribunal, the same which were presented in Section V. With regard to the previous, the main arguments brought in the Claimant that also relate to the merits of the case will be reminded further down.

i.  *The Kingdom of Spain did not announce the adoption of the measures and the abolition of the Special Regime*

373. The Claimant considers that those measures were not predictable, and that the argument of the Respondent, given that the government had announced the need to reform the electricity sector from the end of 2011, should be rejected.

374. The Claimant does admit that, on October 2012, the Government had announced the reform of the electricity sector when IIN made its investment However, there was nothing to indicate that reforms would be carried out to abolish Special Regime[502].

375. The Claimant considers that the foregoing group of statements or prior measures were in fact "vague reform statements". No warning may be inferred from Prime Minister Mariano Rajoy's speech on 19 December 2011[503], nor from the NEC Press Release of 28 December 2011[504]. On the contrary, the NEC proposed alternative measures that would not have affected such remuneration, nor the

---

[501] Statement of Claim, ¶¶ 209-210.
[502] Reply, ¶400.
[503] Reply, ¶405; Statement of Defence, ¶ 846; **Exhibit R-63:** Transcript of the *Mariano Rajoy Speech during the inaugural session acting as Prime* Minister, Congress of Representatives, Monday, 19 December 2011.
[504] Statement of Defence, ¶ 846; **Exhibit R-64:** Press release *The NEC is analysing the review of the access charges and certain tariffs and premiums of the special regime facilities*, National Energy Committee, 28 December 2011.

*This document is a non-official translation of the original Spanish award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

legitimate expectations of the PV plants, which were up untill that point covered by the terms and conditions the Special Regime[505]. Royal Decree-Law 1/2012 of 27 January also did not announce it. As the Minister of Industry himself emphasised, "*the regulation is not retroactive, that is, it will not affect installations already in place, or previously authorised premiums, or installations already entered in the pre-assignment records.*"[506]

376. With regard to the NEC report of 7 March 2012[507], the Claimant agrees that it is in fact "extremely important", but for different reasons. The report proposes several measures that could be carried out to alleviate the tariff deficit, but does not contain any of the measures that are the object of this arbitration[508]. The Claimant states that the NEC report does not in fact contain a single line suggesting that the abolishment of the Special Regime is necessary, advisable, or predictable in order to combat the tariff deficit[509]

377. On the other hand, the "2012 National Reform Program" of 27 April 2012[510] only includes proclamations with regard to the desire to reform the electricity sector and to reduce the costs of regulated activities[511].

---

[505] Reply, ¶407; Response to Counterclaim, ¶ 846; **Exhibit R-64:** Press release *The NEC is analysing the review of the access charges and certain tariffs and premiums of the special regime installations*, National Energy Committee, 28 December 2011, page 1.

[506] Reply, ¶409; **Exhibit R-66:** Press release *The government shall temporarily suspend the premiums on new facilities of the special regime, Ministry Industry,* Energy, and Tourism, at 27 January 2012, page 3: "*the regulation is not retroactive, that is, it would not affect installations already up and running, or previously authorised premiums, nor facilities already entered in the pre-allocation records*".

[507] Response to Counterclaim, ¶ 846; **Exhibit R-69:** *Report on the Spanish electricity sector Part I. Measures to guarantee the economic-financial sustainability of the electrical system,* National Energy Committee, 7 March 2012.

[508] Reply, ¶413; **Exhibit R-69:** *Report on the Spanish electricity sector Part I. Measures to guarantee the economic and financial sustainability of the electrical system,* National Energy Board, 7 March 2012, page 43.

[509] Reply, ¶415. See **Exhibit R-109:** *José Manuel Soria shall preside over the introduction of the department's new Senior Positions,* press release from the Ministry of Industry, Energy, and Tourism, 3 January 2012; **Exhibit R-110:** *Interview with the Prime Minister made by Agencia EFE*, Madrid, Tuesday, 10 January 2012; **Exhibit R-111:** Speech by the Prime Minister at the inauguration of the VI Tourism Leadership Forum EXCELTUR, Madrid, Tuesday, 17 January 2012; **Exhibit R-112:** *Press Conference with the Prime Minister and the President of the European Council,* Madrid, Tuesday, 17 January 2012; **Exhibit R-113:** *Press conference with the Prime Minister of Portugal and the Spanish Prime Minister,* Lisbon, Tuesday, 24 January 2012; **Exhibit R-114:** *Press conference with the Chancellor of the Federal Republic of Germany and the Prime Minister,* Berlin, Thursday, 26 January 2012; **Exhibit R-115:** *Speech of the Prime Minister before the Plenary Congress announcing the conclusions of the European Council in Brussels, Congress,* Wednesday, 8 February 2012; **Exhibit R-116:** *The 2011 tariff deficit exceeds 3.7 billion, and is currently at 23% above the legal limit,* Europa Press, 15 February 2012; **Exhibit-117**: *Spain halts renewable subsidies to curb $ 31 billion of debts*, Bloomberg, 27 January 2012.

[510] **Exhibit R-72:** Statement of Defence, ¶ 846; National Reform Program, Government of Spain, 2012.

[511] Reply, ¶¶417-418

*This is an English translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

378. The same may be said of the various other documents that the Respondent refers to in their Statement of Defence[512].

379. *Finally,* with regard to the allegation of the Respondent according to which Ministry of Industry announced, in July 2012 (after IIN made the decision to invest, on 29 June 2012), the possibility of imposing a tax on the value of electrical production (eventually, the Tax was in fact enshrined in Law 15/2012),[513] and that the Spanish photovoltaic sector echoed this possibility[514], the Claimant responds by stating that the imposition of the tax was a mere possibility and that it was not, as a matter of fact, until 14 September 2012 that the Spanish Government took specific measures with regard to it, by sending Parliament the Draft Bill that would eventually become Law 15/2012[515], one month prior to Isolux INBV performing their investment in Spain. With regard to the imposition of the *ad hoc* CPI and the abolition of the Special Regime, the Kingdom of Spain had not made any announcement with regard to it[516].

381. The Claimant also does not agree with the statement of the Respondent with regard to the crisis in the Euro Zone and the Spanish socio-economic situation in that it should have alerted the Claimant of the need to make the necessary reforms The Claimant states that the Kingdom of Spain has had many means in its disposal, and that the Respondent did not, in fact, choose any of these means[517].

## ii.   *The legal precedent of the Spanish Supreme Court is irrelevant for the purposes of the legitimate expectations of the Claimant*

382. With regard to legal precedent of the Supreme Court and the effects on its rulings in the present arbitration process, the Claimant stated, in the Reply, and in the response to the fourth question of the Arbitral Tribunal, that this legal precedent is not binding and that the Claimant would not have had any obligation to be aware of it.

383.  The ECT does not require this Tribunal to take into account Internal Law of the investment receiving country of the investment for the resolution of this dispute. The Respondent has not provided any jurisprudence, arbitral precedent, or argument to the contrary[518].

384.  Furthermore, the Claimant argued that there was no obligation for the investor to perform such an exhaustive investigation of legal precedent before making the decision to invest[519]. The investor should "*have a general knowledge of regulatory*

---

512   Reply, ¶420.
513   Statement of Defence, ¶¶ 535y 537; **Exhibit R-124:** Press release *Ministry of Industry announced new tax on electrical generation*, Reuters Spain, 11 July 2012.
514   Statement of Defence, ¶¶ 548 and 557.
515   Statement of Defence, ¶ 850.
516   Reply, ¶¶424-425.
517   Reply, ¶¶429-431.
518   Post-hearing brief of the Claimant, ¶74.
519   Reply, ¶¶437-439.

*This is an English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*environment in which it operates*" and, in this sense, the Claimant legitimately trusted in the specific commitments established with absolute clarity in RDs 661/2007 and 1578/2008, as well as in the expert reports from which it could be seen that there were legitimate expectations with regard to regulatory stability on the tariff applicable to the Plants.[520]

384. According to the Claimant, it must also not be forgotten that the rulings which the Respondent refers to are those of 24 September 2012 and 15 October 2012, that is to say those that were announced a great deal of time after the Claimant made the decision to invest, i.e. 29 June 2012[521].

---

[520] Reply, ¶¶ 438-439; **Exhibit C-197:** Technical report for a 8.6 MW plant in Almodóvar del Río, dated 27 November 2008; **Exhibit C-198:** Technical report from a 700 kW plant named "Las Trencades" in Onda (Castellón), dated 27 November 2008; **Exhibit C-199:** Technical report from a 600 kW plant named "Tarifilla" in Morales (Sevilla), dated 27 November 2008; **Exhibit C-193:** Technical report from a 8.5 MW plant named "El Carpio" in El Carpio (Cordoba) dated 14 October 2008; **Exhibit C-176:** Technical report from a 10 MW plant named "Elduayen" in Valverde de Mérida (Badajoz), dated 17 April 2008; **Exhibit C-177:** Technical report for a 1 MW plant in La Seca, dated 17 April 2008; **Exhibit C-185:** Technical report for a 1.525 MW plant in Arico (Tenerife) dated 20 June 2008; **Exhibit C-186:** Technical report for a 4 MW plant in Pozal de Gallinas (Valladolid), dated 20 June 2008; **Exhibit C-178:** Technical report for a 2.9 MW plant named "Pozo Cañada in Chinchilla de Montearagón (Albacete), dated 17 April 2008; **Exhibit C-179:** Technical report for a 3.5 MW plant named "Pozohondo" in Pozohondo (Albacete), dated 17 April 2008; **Exhibit C-184:** Technical report for a 4 MW plant named "Fuentes de Valdepero" in Fuentes de Valdepero (Palencia), dated 20 June 2008; **Exhibit C-182:** Report on provisional acceptance test at a photovoltaic installation of 845 kW in the Autonomous University of Madrid, 24 May 2010; **Exhibit C-194:** Addendum to the technical evaluation reports for the photovoltaic plants presented by Tuin Zonne, dated 14 October 2008; **Exhibit C-187:** Technical report for a photovoltaic plant presented by Tuin Zonne in Arnedo (La Rioja), dated 3 July 2008; **Exhibit C-180:** Technical report for a 440 kW plant named "Madrigal," in Madrigal de las Altas Torres (Ávila), dated 17 April 2008; **Exhibit C-181:** Technical evaluation report for a photovoltaic plant presented by Tuin Zonne in Espejo (Córdoba), dated 13 May 2008; **Exhibit C-196:** BBVA Project, 2 MW Photovoltaic [plants] in Medina de las Torres, Badajoz; Technical Due Diligence for the Project dated 22 November 2008; **Exhibit C-173:** BBVA Project 3 MW Photovoltaic [plants] in Sigüenza, Province of Guadalajara, Technical Due Diligence for Financial Entities, dated 16 April 2008; BBVA Project 2.2 MW Photovoltaic [plants] in Marratxi, Province of Palma de Mallorca, Technical Due Diligence for Financial entities dated 16 April 2008, **Exhibit C-174:** BBVA Project 0.9 MW Photovoltaic plants in Talayuela, Cáceres, Technical Due Diligence for the Project dated 16 April 2008, **Exhibit C-175;** **Exhibit C-195:** CENER Due Diligence for a 1.76 MW photovoltaic installation in La Choza (Albacete), dated 20 October 2008; **Exhibit C-200:** CENER Due Diligence for the 3 MW photovoltaic installation "LA Puente de Piedra Phase II" in Frechilla de Almazán (Soria), dated 4 December 2008; **Exhibit C-201:** Technical evaluation report for solar photovoltaic plant presented by T-Solar in Saelices (Cuenca), dated 14 December 2010; **Exhibit C-188:** Technical evaluation report of a photovoltaic plant presented by Tuin Zonne in Alcolea (Córdoba), dated 2 October 2008; **Exhibit C-202:** Supervisory report on the provisional handover of three solar photovoltaic plants presented by T-Solar in the municipalities of el Carpio, Almodóvar del Río, and Villa del Río (Córdoba), dated 28 December 2010; **Exhibit C-189:** Evaluation of technical report from a photovoltaic plant presented by Tuin Zonne in Archidona (Málaga), dated 2 October 2008; **Exhibit C-190:** Evaluation of technical report from a photovoltaic plant presented by Tuin Zonne in Aguilar de la Frontera (Córdoba), dated 2 October 2008; **Exhibit C-191:** Evaluation of technical report for a photovoltaic plant presented by Tuin Zonne in Fuente Obejuna (Córdoba), dated 2 October 2008; **Exhibit C-192:** Evaluation of technical report for a photovoltaic plant presented by Tuin Zonne in Chiclana de Segua (Jaen), dated 2 October 2008; **Exhibit C-201:** Technical valuation report for the solar photovoltaic plant presented by T-Solar in Saelices (Cuenca), dated 14 December 2010.

[521] Claimant's Post-Hearing Brief, ¶78.

385.  In any case, the Claimant stresses that the legal precedent of the Supreme Court did not augur the suspension of the Special Regime, or its replacement by a completely different regime, with retroactive effect. The Claimant explains that the Supreme Court did not exclude the possibility of introducing changes in the regulatory framework, but that" *investments in this technology are protected and fomented by Spanish regulatory framework, that is, without a doubt, favourable overall*"[522].

386.  The Claimant recalls that, if the right may not be set in stone, it is also not possible to enact reforms that contradict the principle of stability, such as those measures introduced by RDL 9/2013, which changes the remuneration regime, which previously was calculated based on production (rate per kilowatt produced), to a regime that now is based on efficiency criteria (investment costs, operating costs, revenues). The Council of the State of the Kingdom of Spain spoke on this, stating that "*without setting in stone the current regime - (...) - it is certain that providing the system with stability and considering as exceptional any change to the tax regime applicable to an installation already authorised are unavoidable requirements in guaranteeing an adequate and attractive legal framework for investment and development*"[523].

387.  The Supreme Court, in pronouncement specifically with regard to the  ECT, distinguishes between the  "*absolute setting in stone of the regime*" and the concept of "*stability*" of the " *regulatory framework in all its parts*", indicating that it is possible to modify the regulatory framework, resulting in beneficial decreases of a "*very limited*" basis, but it assumes the existence of a "*regulatory framework that it is, without a doubt, favourable*" that protects and encourages investment, as well as "'stability*'* […] *referring to the regulatory framework in all its parts*"[524].

388.  The Claimant jointly refers to the rulings adopted by the Supreme Court and invoked by the Respondent to demonstrate the predictability of the measures. The large majority of these rulings refer to contentious-administrative matters brought in by various companies against RD 1565/2010 (which, among other things, limited the period for collection of the tariff under regulation to 25 years[525]). For all of these rulings, the Court rejected the contentious-administrative appeals filed, admitting that, in certain circumstances, the Government may establish "adjustments"

---

[522]   Post-Hearing Brief of the Claimant, ¶81-82; **Exhibit R-48:** Ruling of the Supreme Court of 12 April 2012, rec. 35/2011, reference El Derecho EDJ 2012/69822.

[523]   Reply, ¶ 443; **Exhibit C-22:** Report 30/2008 in relation to the Draft Royal Decree on subsidising electricity production activity through solar photovoltaic technology for facilities subsequent to the maintenance of the deadline for remuneration included in Royal Decree 661/2007 of 25 May, for said technology, dated 29 July 2008, page 9.

[524]   Reply, ¶444-445; **Exhibit R-48:** Ruling of the Supreme Court of 12 April 2012, rec. 35/2011, reference El Derecho EDJ 2012/69822.

[525]   Statement of Claim, ¶ 124 and footnote on page 93; **Exhibit C-27:** Royal Decree 1565/2010 of 19 November, which regulates and modifies certain aspects relating to the activity of production of electrical energy in the country under the special [tax] regime.

*This is an English translation of the Original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

or "corrections" of the regulated tariff, whenever they are of minimally reasonable performance[526].

389. Regardless, the Claimant adds that the conclusions of the Supreme Court in these cases may not be extrapolated to the current case, due to the fact that RDL 9/2013 does not impose "adjustments", but rather completely delays the system of premiums and tariffs included in the Special Regime No investor, in the view of this legal precedent, may expect that the Government would completely eliminate the Special Regime[527].

390. Furthermore, in the Supreme Court rulings cited by the Respondent, the Court insisted on the fact that RD 1565/2010 was a regulation whose efficacy was limited to the future In this case, a regulation such as RD 1565/2010 would fall within the scope of prohibited retroactivity[528]. The form of calculation used by the RDL 9/2013 and utilised in RD 413/2014 extends its effects to the past, taking into account income made by the installations and, therefore, affects prior acts. It seems that a regulation of this magnitude with retroactive effects cannot be effectively predicted by investors.

391. The Claimant reminds, as well, that the period of legal uncertainty in which investors are found in the adoption of RDL 9/2013 and RD 413/2014 and Order IET/1045/2014, an unusual situation that was not analysed by the Supreme Court[529].

392. The Claimant also states that the rulings cited by the Respondent relate to punctual modifications, in such manner that the Supreme Court, to this date, has not made any pronouncements with regard to conformity or lack of conformity with the Law as pertains to the act of complete abolition of the Special Regime[530].

393. The Claimant finishes their exposition affirming that the rulings of the Supreme Court are, in fact, irrelevant[531]:

---

526   Reply, ¶452; See, for example, **Exhibit R-48:** Ruling of the Supreme Court of 12 April 2012, rec. 35, 50, and 112/11, page 8, "(...) The Government that initially sets the stimuli or incentives that apply to all of society (since it is, finally, consumers who benefit), may later, before new circumstances arise, establish adjustments or corrections in such mater that the public assumption of costs remain at such levels that, respecting certain minimums for investments that were already made, moderating the "final" remuneration.

527   Reply, ¶¶454 and 456.

528   Statement of Claim, ¶458

529   Reply, ¶467.

530   Reply, ¶467.

531   Reply, ¶¶469-481.

*This translation is provided for information purposes only and has no legal effect.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> ➢ the rulings of the Supreme Court of 30 October 2012, 31 October 2012, 15 March 2013, and 25 June 2013[532] are all dated after the date of the IIN investment;

> ➢ the ruling of 15 December 2005[533] does not refer to the theoretical modification of premiums and tariffs, but rather, to the regime applicable to deviation costs and, therefore, there was no reason for this to be taken into consideration by IIN;

> ➢ the rulings of 25 October 2006, 20 March 2007, 9 October 2007 and 9 December 2009,[534] make reference to other technologies that are not considered as "renewable";

> ➢ regard to the ruling of 3 December 2009,[535] the sole conclusion that the IIN could glean from its contents is the manifest will of the Government in promoting solar-photovoltaic technology.

> ➢ the rulings of 11 October 2011 and 14 November 2011[536] are also not relevant, due to the fact that they are related to RDL 6/2009 which does not, in fact, have any application to photovoltaic technology..

        iii.    *Legislative changes prior to the measures that are the object of this arbitration proceeding do not indicate the abolition of the Special Regime*

394. With regard to RD 661/2007, the Claimant holds that this Decree brought in improvement in remuneration for photovoltaic installations in Spain, as was a type of *in melius* reform for these installations that would never have a negative impact on the photovoltaic sector. As a result, the Claimant affirms that investors in the photovoltaic sector could not have become aware of the transition from RD 436/2004 to 661/2007 that

---

[532] Statement of Defence, ¶¶ 110 and 193; **Exhibit R-34:** Ruling of the Third Chamber of the Supreme Court on 30 October 2012, rca [Appeal] 96/2011, reference El Derecho EDJ 2012/246354; **Exhibit R-35:** Ruling of the Third Chamber of the Supreme Court on 31 October 2012, rca 126/2011, reference El Derecho EDJ 2012/239604; **Exhibit R-36:** Ruling of the Third Chamber of the Supreme Court on 15 March 2013, rca 4146/2011, reference El Derecho EDJ 2013/32757; and **Exhibit R-60:** Ruling of the Third Chamber of the Supreme Court on 25 June 2013, rec. 252/2012, reference El Derecho EDJ 2013/120927.

[533] **Exhibit R-30:** Ruling of the Third Chamber of the Supreme Court on 15 December 2005, rec. 73/04, reference El Derecho EDJ 2005/237434.

[534] **Exhibit R-31:** Ruling of the Third Chamber of the Supreme Court on 25 October 2006, rca 12/2005, reference El Derecho EDJ 2006/282164; **Exhibit R-32:** Ruling of the Third Chamber of the Supreme Court on 20 March 2007, rca 11/2004, reference El Derecho EDJ 2007/18059; and **Exhibit R-33:** Ruling of the Third Chamber of the Supreme Court on 9 October 2007, rca 13/2006, reference El Derecho EDJ 2007/175313; **Exhibit R-39:** Ruling of the Third Chamber of the Supreme Court on 9 December 2009, rec. 149/07, reference El Derecho EDJ 2009/300085; **and Exhibit R-40:** Ruling of the Third Chamber of the Supreme Court on 9 December 2009, rec. 152/07, regarding the Law 2009/307357.

[535] Statement of Defence, ¶ 136; **Exhibit R-38:** Rulings of the Third Chamber of the Supreme Court on 3 December 2009, rca 151/07, reference El Derecho EDJ 2009/307349.

[536] **Exhibit R-55:** Ruling of the Third Chamber of the Supreme Court on 11 December 2011, rec. 187/2010, reference El Derecho EDJ 2011/240112; and **Exhibit R-56:** Ruling of the Third Chamber of the Supreme Court on 14 November 2011, rec. 165/2010, reference El Derecho EDJ 2011/270646.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

a movement away from the Special Regime o the Specific Remuneration Regime was predictable, and nor was a worsening in the regulatory treatment of photovoltaic installations[537].

395. It should be added that the Respondent expressly admits that change to RD 661/2007 only negatively affected investors in the wind power generation sector, affecting their remuneration through the "market option", when the producer opts to sell their power on the market and not to at a fixed FIT. Furthermore, it is a type energy that has very little to do with photovoltaic energy. It also indicates that RD 661/2007 assumed a major boost for renewable energy in Spain, and its impact on these was positive[538].

396. With regard to RD 1578/2008, the Claimant admits that this Decree designates a lower FIT for plants that were not covered by RD 661/2007, having exhausted the power rating reserved for RD 661/2007. At this time, the FIT decreased, taking into account the reduction of production and maintenance costs for photovoltaic plants. This rational decrease could not have predicted the regulatory change that would soon follow. Furthermore, it is certain that RD 1578/2008 followed along the same lines that RD 661/2007, that is, it guarantees a long-term FIT for PV plants. It did not abolish, nor did it even negatively affect the regime granted to plants as covered by RD 661/2007. On the contrary, in guarantees, *for the future,* for plants that were covered by the regime in RD 1578/2008, receiving FIT[539].

f.     The measures adopted by the Kingdom of Spain are not reasonable

397. In order to confront the tariff deficit, since 2009, the successive governments have adopted a series of measurements. However, faced with the impossibility of complying with the objectives set for 2012, the NEC issued its report of March, 2012. The Claimant highlights, again, that this report does not consider, among the measures proposed, the possibility of completely repealing the Special Regime applicable to existing installations, and substituting it with a new remuneration regime, with retroactive effect, as was later approved.

398. The KPMG report[540] states that at the time of the Isolux INBV investment being implemented, a diligent investor could not have reasonably anticipated economic cuts of this magnitude, given that the most up-to-date predictions for close of year that an investor such as Isolux INBV would have access to when it made its investment in June, 2012, predicated compliance with deficit objective for that year. KPMG also notes that the measures adopted had not been indicated in the NEC report of March 2012, and that

---

537   Reply, ¶489-491.
538   Reply, ¶¶492-495.
539   Reply, ¶¶497-501.
540   KPMG Report, pages 11 and 12.

*This document is a translation of the Original Spanish award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

there were no similar precedents in the evolution of Spanish legislation on the energy sector[541].

399.   At the European level itself, there are various guidelines in existence to avoid retroactive measures that would cause legal uncertainty For the specific case of the regulatory framework for renewable energy, Directive 2009/28/CE of 23 April 2009, in its articles 3.2 and 3, established the possibility that Member States could apply different support systems to renewable energy in order to meet community goals. With regard to these support systems, the work document states "*European Commission guidance for the design of renewables support schemes*", includes, as a suggested principal, that retroactive changes be avoided. The Claimant states that, more specifically, that among the best practices for reforming these support systems are measures such as ensuring long-term legal commitments regarding the timing and elimination of the support mechanism or to avoid changes that may affect return on investments already made.

400.   However, the measures adopted by the Kingdom of Spain run contrary to those principles. It is specified that the Tax (IVEPEE) is merely a revenue tax that, despite being formulated as an environmental tax, (i) does not comply with the basic principle that these types of taxes must adhere to; (ii) presents obstacles to the development of the interior market; and (iii) retroactively affects remuneration for certain specific technologies, which in turn gives rise to discrimination between technologies. With regard to modification of the methodology of updating tariffs introduced by RDL 2/2013, the Claimant explains that it assumes a retroactive modification of the regime, with impact on the return on projects, and makes the principle of objectivity vulnerable, in considering that an CPI that barely corresponds with the evolution of costs for generation of energy at photovoltaic plants.  Finally, the new remuneration framework of the special regime arising from RDL 9/2013, Law 24/2013, RD 413/2014 and IET Order/104572014 has been applied in a retroactive manner, to the detriment of principles of predictability, stability, efficacy, and efficiency, and furthermore indicates a lack of coherence and, therefore, objectivity in the application of the concept of reasonable rate of return. Likewise, during its legislative phase, it has suffered from a lack of transparency, in not taking into account the injured parties and not providing justification for the methodology of the calculation used[542].

401.   As can be seen in the KPMG report,[543] the Claimant notes that the Government would have been able to opt for the implementation of various alternative methods that would have avoided this situation. Section 6 of the KPMG Report contains a detailed description of the different measures among which the Government could have

---

541    Reply, ¶506.
542    Reply, ¶512.
543    KPMG Report, section 6

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 137 of 257
*This document is an unofficial English translation of the original award issued in Spanish.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

opted for[544]. The Claimant indicates that, as noted in the KPMG report,[545] the impact of the measures of the Government for the entirety of the sector has been estimated at being between 2.513 and 4.327 billion Euros in 2013 and 2014, when the alternative measures that the report proposes would have assumed an impact of 13.112 and 11.976 million Euros, far exceeding that approved by the government[546].

## 1.2 The Respondent's violation of its obligations under the ECT

402. The Claimant accuses the Respondent of having violated, in the first place, its obligations under Article 10 (a) ECT, and Article 13 ECT regarding expropriation, for which reason it is entitled to the right to compensation (c).

### a. The claimant has failed to comply with its obligations under Article 10 ECT

403. Article 10 ECT with regard to the promotion, protection, and handling of investments, states the following in its Article 10(1): "*In accordance with the provisions contained in this Treaty, the Contracting parties encourage and create stable, equitable, favourable, and transparent conditions so that investors from other Contracting Parties may make investments in its country. In these conditions, there shall exist the commitment to provide the investments of all investors from other Contracting Parties with fair and equitable treatment at all times. These investments shall thus enjoy protection and complete security, and no Contracting Party shall be harmed in any manner whatsoever, as a result of excessive or discriminatory measures, or the management, maintenance, use, utilisation, or payment of the same. In no case may these investments be provided with a less favourable treatment than that required by international law, including obligations arising by virtue of treaties. All Contracting Parties shall comply with the obligations that they have entered into with investors or with investments of investors of any other Contracting Party.*"

#### i. *The Kingdom of Spain has violated its obligation to promote and create stable, equitable, favourable, and transparent conditions for the performance of investments*

404. The Claimant considers, in the first place, that the Kingdom of Spain has violated its obligations to create *"stable, equitable, favourable conditions"* for the performance of investments.

405. The Claimant considers that this standard, including in the provisions of the Treaty, has a true binding value for the contracting parties of the ECT[547].

---

[544] Reply, ¶514.
[545] KPMG Report, Table 39. Summary of impact of alternative measures proposed.
[546] Reply, ¶515-516.
[547] Reply, ¶525.

*This is an unofficial translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

406. The Claimant also clarifies that this standard does not involve the setting in stone of the regulatory framework as suggested by the Respondent, but rather, a standard that prohibits any contracting Party from instituting a regulatory framework for the purpose of attracting investment and then, shortly after, abolishing it[548].

407. In this case, this is what occurred: the Kingdom of Spain attracted investment from IIN with the promise of a long-term FIT, falling within the Special [Tax] Regime, and with all modalities as specified in RDs 611/20017 and 1578/2008, only to abolish this Special Regime shortly thereafter[549].

408. The Claimant adds that this regulatory standard exists not only as an independent standard, but rather also as an "umbrella" standard, from which other obligations arise, such as the obligation to guarantee investments fair and equitable treatment ("**FET**")[550].

ii. <u>*The Kingdom of Spain has violated its obligation to provide fair and equitable treatment to the Claimant's investments*</u>

409. The behaviour of the Claimant generated legitimate expectations, protected by the FET standard, and contrary as stated by the Respondent, the FET standard protects legitimate expectations arising from regulatory frameworks. The Respondent has violated these legitimate expectations.

410. In effect, the Claimant explains that the Kingdom of Spain introduced the tax with the intent of depriving the investment of IIN of the expected profitability, and furthermore had a discriminatory and disproportionate effect on photovoltaic producers such as T-Solar, given that they were the only ones affected by the measure due to the inability to mitigate the economic impact that the Tax resulted in with regard to the end consumer (as other producers of electrical energy may have been[551]. The amendment, through RDL 2/2013, of the FIT update regime through an *ad hoc* CPI solely applicable for updates on incentives in the Special Regime, also amounts to an affront against the legitimate expectations of IIN and its investment in Spain, and constitutes a violation of the FET standard[552].

411. The measure constituting the most flagrant violation of this FET standard is the abolition of the Special Regime, and, as a result of this, receiving of the FIT. The result of the abolition of the Special Regime has been absolutely brutal. The measure adopted by the Kingdom of Spain, substituting the Special Regime for the Specific Remuneration Regime "*as if it had never, in fact, existed, and with clearly retroactive effects*"[553]. Specifically, it is considered that the Specific Remuneration Regime applies to Plants from the beginning of their useful life. This includes

---

548    Reply, ¶¶529-530.
549    Reply, ¶527.
550    Reply, ¶531.
551    Statement of Claim ¶231.
552    Statement of Claim ¶¶232-234.
553    Statement of Claim ¶243.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

the period prior to the entry into force of RDL 9/2013, of 12 July, during which the Plants were receiving the FIT. While it is true that the new regime does not consider the return of the FIT, it takes under consideration its amount for the purpose of determining the Specific Remuneration.

410. Furthermore, the determination and collection of the new Specific Remuneration depends on certain parameters that are, at the present time, non-existing, all defined by the regulatory norms included in RDL 9/2013[554]. Likewise, for the case of photovoltaic installations (such as the Plants), the Specific Remuneration [Regime] is below the new regime, circumscribed to the collection of the so-called "term of investment", which varies in each case and which determines the function of criteria that include, for example, *"installations such as"* set by regulation or *"the standard value of the initial investment"* (also set by regulation). In other words, the Specific Remuneration is calculate based on initial investment characteristics performed at the time that the Plants were implemented[555], while this was not a relevant factor under the Special Regime.

410. In addition, the new regime of RDL 9/2013 puts a ceiling on the Specific Remuneration, in guaranteeing only a "reasonable remuneration" equivalent to the average return from the secondary market of obligations of the state at ten years, with increments plotted out in 300 basic points[556]

410. Finally, under the new Specific Remuneration System, the Kingdom of Spain reserves the express right to modify all parameters applicable thereto, and to revise the amount of "reasonable remuneration". In comparison with the Special Regime, under which the FIT was *fixed* and lasted for the long term (a minimum of 25 years)[557].

411. For the Claimant, these measures in fact constitute a violation of the FET standard.

- *The expectations of the Claimant with regard to the conduct of the Respondent:*

410. The Claimant alleges that the investor expectations fall within the scope of the protection provided by the FET, as the Court itself recognised in the case El Paso v. Argentina[558] or in the case Perenco v. Ecuador[559].

411. Furthermore, the regulatory framework may generate legitimate expectations. This point was developed upon by UNCTAD and confirmed by arbitral tribunals, and in particular the

---

[554] Statement of Claim ¶244.

[555] Statement of Claim ¶245.

[556] See *above* ¶¶ 359 to 360.

[557] Statement of Claim ¶247.

[558] **Legal Authority RLA-55:** *El Paso Energy International Company v. the Republic of Argentina*, CIADI Case No. ARB/03/15, Award of 31 October 2011, ¶ 348.

[559] *Perenco Ecuador Limited v. the Republic of Ecuador*, ISCID Case No. ARB/08/6, Decision regarding pending questions relating to jurisdiction, and regarding liability, of 12 September 2014, ¶ 560.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

court in the case <u>Total v. Argentina</u>[560] whose application to the present case is recognised by the Respondent. The Respondent complies with the requirements set out by the court in the Total case to characterise the existence of legitimate expectations in accordance with the ECT standard and due to the fact that, in that case, the court emphasised that a legislative or regulatory instrument could potentially give rise to legitimate expectations protected by the FET standard when these are based on the intrinsically prospective nature "*of the regulation at issue aimed at providing a defined framework for future operations [...] applicable to long-term investments and operations*"[561]. Furthermore, the court, in <u>Perenco v. Ecuador</u> states that an examination of legitimate expectations of an investor requires "*an objective determination of these expectations, considering all of the relevant circumstances*".[562]

418. First, the Claimant calls attention to the special nature of the regime enshrined in RDs 661/2007 and 1578/2008 which is intended for a reduced number of installations: those which had met specified requirements within a limited period of time The Respondent offered these particular conditions in order to encourage investment in photovoltaic energy, and in order to comply in time with its scheduled objectives and international commitments [563]. Furthermore, those Decrees established a long-term fixed FIT system by means of a clear regime. The Respondent stated, on numerous occasions, that the applicable regime would be supported by a transparent, stable, and predictable framework[564].

419. The Claimant alleges that the conduct of the Kingdom of Spain and the commitments acquired were sufficient to generate legitimate expectations in accordance with the test and the criteria laid out in the Total case: (1) the Decrees are equivalent to "*conduct*" or "*declarations*" on the part of the State; (ii) the Kingdom of Spain indicated the intent to "*to pursue a certain conduct in the future*", that is to say, to remunerate certain photovoltaic installations; (iii) the Decrees were designed to attract foreign investors, (iv) the Claimant acted "in reliance on said conduct" in investing in the plants; (v) the [tax] regime established was extremely specific and detailed; (vi) the Decrees were intended to create "a *defined framework for future operations [...] applicable to long-term investments and operations*"[565].

420. The Claimant concludes indicating that the commitment of the Kingdom of Spain in terms of the remuneration regime established by RDs 611/2017 and 1578/2008 was capable of

---

[560]   Statement of Defence, footnote on page No. 373.

[561]   Reply, ¶544; **Exhibit R-57:** *Total S.A. v. the Argentine Republic,* ISCID Case No. ARB/04/01, Decision on Liability of 27 December 2010, ¶¶ 121.

[562]   Reply, ¶546; *Perenco Ecuador Limited v. the Republic of Ecuador*, ISCID Case No. ARB/08/6, Decision regarding pending questions relating to jurisdiction, and regarding liability, of 12 September 2014, ¶ 560.

[563]   Reply, ¶549-550.

[564]   Reply, ¶553.

[565]   Reply, ¶555-561.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

generating and, in fact, generated legitimate expectations on the part of the Claimant that invested in the plants, to have the right to the application of the FIT throughout a period of several years[566].

- *The FET Standard protects legitimate expectations arising from the Regulatory Framework.*

421. Contrary to that put forth by the Respondent, the Claimant has never stated that it possessed the right to an unchangeable regulatory framework, but rather, the collection of the FIT over a long-term period within a stable regulatory framework. The right to a stable regulatory framework is guaranteed by International Law and the ECT. The case law and arbitral doctrine makes it clear that the stability and predictability of the framework FET[567]. Furthermore, Article 10 (1) ECT contains the express obligation for the Kingdom of Spain to encourage and create stable and transparent conditions for investments[568].

422. The Claimant considers that the argument of the Respondent, according to which the legitimate expectations of an investor may solely arise when there exists a specific commitment in favour of the investor, and never within the scope of a regulatory framework, is incorrect, for the following reasons: (i) the Respondent expressly recognised that Article 30.4 LSE is capable of generating legitimate expectations; (ii) the Respondent adopted a regulatory system that was highly detailed and intended for specific investors; (iii) the legitimate expectations also arise from statements and commitments in relation to the stability of this special regime; (iv) Article 10(1) ECT must be interpreted in accordance with Article 31 of the VCLT, that is to say that, in good faith and in the interest of common sense, which assumes that stability is a founding principle and part of the backbone of the FET standard[569].

423. The Claimant then argues that the doctrine and case law which the Respondent is using for support in fact lacks relevance. The Respondent completely ignores the vast amount of awards that confirm that an investor may obtain legitimate expectations from regulatory standards approved by the state, and invoke violations of the FET standard such as in the following cases as laid out by the Claimant[570]: Total v. Argentina[571]; CMS v.

---

[566] Reply, ¶563.
[567] Statement of Claim, ¶¶ 221-223; **Legal Authority CLA-16:** *Occidental Exploration and Production Company v. Republic of Ecuador,* LCIA Case No. UN 3467, Award of 16 December 2003, ¶ 183; **Legal Authority CLA- 27:** *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Republic of Argentina*, ISCID Case No. ARB/01/3, Award of 22 May 2007, ¶ 260; **Legal Authority CLA-7:**
A. Newcombe, L. Paradell, *Law and Practice of Investment Treaties*, Kluwer Law International, 2009, page 279.
[568] Reply, ¶¶566-572.
[569] Reply, ¶¶574-577.
[570] Reply, ¶581.
[571] **Legal Authority RLA-57:** *Total S.A. v. the Republic of Argentina*, ISCID Case No. ARB/04/01, Decision on Liability of 27 December 2010, ¶¶ 120-121, 333.

Argentina[572]; Enron v. Argentina[573]; LG&E v. Argentina[574]; BG v. Argentina[575]; PSEG v. Turkey[576]; National Grid Plc. v. Argentina[577]; Sempra Energy v. Argentina[578]; Tecmed c. Mexico[579]; Occidental v. Ecuador[580];  LESI SpA and ASTALDI SpA v. Algeria[581]; National Grid v. Argentina[582]; Metalclad v. Mexico[583].

424. Furthermore, the Claimant considers that the majority of the awards which the Respondent is using as grounds in paragraphs 757-763 of its Statement of Defence are not applicable to this case. The Claimant is referring here to the cases MTD v. Chile[584]; to the award in Plama v. Bulgaria[585], to case EDF v. Romania,[586] the case Continental Casualty c. Argentina[587] where the tribunal analysed a regulatory standard that is not related to the Special Regime

---

[572] **Legal Authority CLA-19:** *CMS Gas Transmission Company v. the Argentine Republic*, ISCID Case No. ARB/01/8, Award of 12 May 2005, ¶¶ 274 and 277: "[t]*here can be no doubt, therefore, that a stable legal and business environment is an essential element of fair and equitable treatment.* […] *It is not a question of whether the legal framework might need to be frozen as it can always evolve and be adapted to changing circumstances, but neither is it a question of whether the framework can be dispensed with altogether when specific commitments to the contrary have been made. The law of foreign investment and its protection has been developed with the specific objective of avoiding such adverse legal effects*".

[573] **Exhibit R-27:** *Enron Corporation and Ponderosa Assets L.P. v. the* Argentine Republic, ISCID Case No. ARB/01/03, Award 22 May 2007, ¶ 260: "[a] *key element of fair and equitable treatment is the requirement of a 'stable framework for the investment', which has been prescribed by a number of decisions. Indeed, this interpretation has been considered 'an emerging standard of fair and equitable treatment in international law*".

[574] **Legal Authority CLA-25:** *LG&E Energy Corp. et al. v. the Republic of Argentina*, ICSID No. ARB(AF)/02/1, Decision on Liability of 3 October 2006, ¶¶ 125 and 127.

[575] **Legal Authority RLA-79:** *BG Group Energy International v. the Republic of Argentina*, CNUDMI, Final award of 24 December 2007, ¶¶ 298, 307, 310.

[576] *PSEG Global Inc. and Konya Ingin Electrik Üretim v, the Republic of Turkey*, ISCID Case No. ARB/02/5, Award of 19 January 2007, ¶¶ 252 and 254.

[577] **Legal Authority CLA-34:** *National Grid Plc. v. the Republic of Argentina*, CNUDMI, Award of 3 November 2008, ¶ 175.

[578] **Legal Authority CLA-30:** *Sempra Energy International v. the Republic of Argentina*, ISCID Case No. ARB/02/16, Award of 28 September 2007, ¶ 300.

[579] **Legal Authority RLA-73:** *Técnicas Medioambientales v. México*, ISCID Case No. ARB(AF)/00/02, Award of 29 May 2003, ¶ 154.

[580] *Occidental Exploration and Production Company v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004, ¶¶ 184, 191 and 196.

[581] *LESI SpA and ASTALDI SpA v. the Democratic and Popular Republic of Algeria*, ISCID Case No. ARB(AF)/05/3, Award of 4 November 2008, ¶ 151.

[582] **Legal Authority CLA-34**: *National Grid plc v. the Republic of Argentina*, CNUDMI Case, Award of 3 November 2008, ¶ 173.

[583] **Legal Authority CL-30:** *Metalclad Corporation v. the United Mexican States*, ISCID Case No. ARB(AF)/97/1, Award of 25 August 2000, ¶ 99.

[584] Reply, ¶ 583; Statement of Defence, ¶ 759; **Legal Authority RLA-43:** *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007, ¶ 67.

[585] Statement of Defence, ¶ 760; **Legal Authority RLA-32:** *Plama Consortium Limited v. the Republic of Bulgaria*, ISCID Case No. ARB/03/24, Award of 27 August 2008, ¶ 176.

[586] Statement of Defence, ¶¶ 918-924; **Legal Authority RLA-44:** *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, 8 October 2009, ¶ 221

[587] Reply, ¶ 588; **Legal Authority RLA-58:** *Continental Casualty Company v. the Republic of Argentina*,

*This is a Howard-Custom Translation from the Spanish original and should only be relied upon as such.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

ISCID Case No. ARB/03/9, Award of 5 September 2008, ¶ 260.

This is an English translation of the original Spanish award. In the event of discrepancy or ambiguity, the Spanish original shall prevail.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

contrary to the cases CMS,[588] Enron[589] and BG,[590] completely comparable, where the tribunals examined commitments taken on by virtue of Argentine regulations related to the concrete sector – as well as the gas sector – and applicable – as in the present case – to a certain specific group of investors; in the case El Paso v. Argentina where, at no time was the existence of a detailed commitment contained in national legislation comparable to RDs 661/2007 and 1578/2008, [591] AES v. Hungary[592] where the facts that gave rise to the dispute are completely different than those in the present case; the award Perenco v. Ecuador [593] which also establishes that legitimate expectations may *only* arise as a result of a specific commitment.

425. The Claimant concludes by stating that the Respondent is not covered by International law, or by the legal precedent that it has indicated, and that its position must be rejected.

426. That Claimant does not agree with the statement of the Respondent, according to which, when Isolux INBV made such investment[s], the socio-economic and political circumstances made it such that the legitimate expectations of any diligent investor should have been to foresee the possibility that the remuneration system would be subject to structural reform[594]. The Claimant insists that no investor would have been able to predict the complete abolition of the remuneration system. It considers that the reference to case Metalpar v. Argentina is not relevant, since, in this case, the crisis was already known to the investor, however, among the wide range of possible solutions to the tariff deficit, it was not possible to foresee that the State would choose the measures that are the object of this arbitration proceeding[595].

    iii.    *The Kingdom of Spain has violated its obligation to ensure complete protection and security to the investment of the Claimant*

427. The Claimant states that the Respondent based a part of its arguments on the FET standard in relation to Article 10(1) ECT, failing to present a defence in

---

[588] **Legal Authority CLA-19:** *CMS Gas Transmission Company v. the Republic of Argentina*, ISCID Case No. ARB/01/8, Award of 12 May 2005, ¶ 277.

[589] **Legal Authority CLA-27**: *Enron Creditors Recovery Corporation and Corporation and Ponderosa Assets L.P. v. the Republic* of Argentina, ISCID Case No. ARB/01/03, Award of 22 May 2007, ¶ 274-277.

[590] **Legal Authority RLA-79:** *BG Group Energy International v. the Republic of Argentina*, CNUDMI, Final award of 24 December 2009, ¶¶ 304-307.

[591] Reply, ¶591; **Legal Authority RLA-51:** *AES Summit Generation Ltd and AES-Tisza Erömü v. Hungary*, ISCID Case No. ARB/07/22, Award of 23 September 2010, ¶ 4.10, ¶ 9.3.25.

[592] **Legal Authority RLA-51:** *AES Summit Generation Ltd and AES-Tisza Erömü v. Hungary*, ISCID Case No. ARB/07/22, Award of 23 September 2010.

[593] Statement of Defence, footnote on page No. 373 and 399; Reply, ¶594 *Perenco Ecuador Limited v. the Republic of Ecuador*, ISCID Case No. ARB/08/6, Decision regarding pending questions relating to jurisdiction, and regarding liability, of 12 September 2014, ¶ 560.

[594] Reply, ¶597.

[595] Reply, ¶599.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 145 of 257

This summary of an unofficial original is a translation and is not official.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

regard to its violation of the standard of complete protection and security[596]. However, the Claimant requests that the Arbitral Tribunal reject the arguments regarding the FET brought by the Respondent.

428. The Respondent posits that the fact that the ECT was signed does not permit the assumption that Spain would be obligated to freeze its legal system and adds that, regardless, any legislative change must be "reasonable and necessary"[597].

429. However, the Claimant points out that the measures adopted by the Respondent were in no way reasonable, and that there existed more reasonable alternative measures[598].

430. The position of the Respondent is not correct in terms of international law. Article 10(1) ECT, in referring to "stable conditions", hinders the process of regulatory change of the contracting parties[599]. It also seems that legal precedent as indicated by the Respondent is not relevant or has been misinterpreted by the Kingdom of Spain. See cases such as EDF v. Romania[600] and El Paso v. Argentina,[601] only draw attention to the risk of exceedingly strict application of the notion of "stability"[602]. If Professor Schreuer[603] and his evaluation of the case El Paso v. Argentina[604] focus on the predictability of changes within the legal framework, it is such that, in the present case, nothing would have made it possible to predict the radical and structural change carried out by the Kingdom of Spain[605]. Furthermore, the Claimant highlights the fact that the court, in the case of Total, stated that it was necessary to consider a "standard of reasonableness and proportionality [...] the reasonableness of the normative changes challenged and their appropriateness in the light of a criterion of proportionality also have to be taken into account"[606].

431. The truth is that the reasonability and proportionality of the measure must be considered in light of the legitimate expectations of the investor, which are protected by the FET regulatory standard. The Respondent recognises that there are various "degrees" or intensities of protection of legitimate expectations, depending on the circumstances in question.[607] Thus, the Claimant explains that when the legitimate expectation of the investor is greater: (i) there shall be a greater requirement

---

596   Reply, ¶¶601-603.

597   Reply, ¶605-608; Likewise, this indicates that any regulatory change must be "reasonable". Statement of Defence, ¶ 875.

598   Reply, ¶611.

599   Reply, ¶¶613-614.

600   Statement of Defence, ¶¶ 918 and following; **Legal Authority RLA-44:** *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009.

601   Statement of Defence, ¶ 879; **Exhibit R-55:** *El Paso Energy International Company v. the Republic of Argentina*, ICSID Case No. ARB/03/15, Award, 31 October 2011.

602   Reply, ¶616.

603   Statement of Defence ¶ 876; **Legal Authority RLA-54:** *Fair and Equitable Treatment in Arbitral Practice*, 6, Journal of World Investment & Trade, 357.

604   Statement of Defence, ¶ 881; **Legal Authority RLA-46:** *El Paso Energy International Company v. the Republic of Argentina*, ICSID Case No. ARB/03/15, Award, 31 October 2011, ¶ 363.

605   Reply, ¶617.

606   Reply, ¶618.

607   Statement of Defence, ¶¶ 751 and following.

*This document is a translation of the original Spanish award issued by the Tribunal and was prepared.*
*Reliance should be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

for stability, (ii) there will be less margin for the State to regulate, and (iii) the requirement of reasonability and proportionality shall be greater[608].

432.    In this particular case, in accordance with that previously stated by the Claimant, the commitment of the Kingdom of Spain could not have been more specific. The only thing that would have been more specific would have been a stabilisation contract or clause. In this manner, the expectations of the Claimant were at a very high level[609]. Those methods are not reasonable with regard to their content, according to the KPMG report, and they are not reasonable in terms of their intensity, given that they annihilated the expectations of Isolux INBV.

> iv.    *The Kingdom of Spain has violated its obligation to not cause harm through exorbitant or discriminatory measures, the management, maintenance, use, utilisation, or disposal of the investment of the Claimant*

433. The Claimant argues that the Kingdom of Spain has failed to comply with the standard of protection granted by Article 10(1) ECT regarding the adoption of exorbitant measures. The Respondent intends to provide a defence with regard to the exorbitant character of the measures by referring to arbitral cases that the Claimant considers to be irrelevant, to the extant that in the cases <u>Convial Callao v. Peru</u>[610] and <u>EDF v. Romania</u>[611] did not analyse the correct standards. It also adds that the reading that the Respondent provides for the matter <u>Total v. Argentina</u>[612] is incorrect, and that in reality, in this matter, the Arbitral Tribune established that (i) that while the regulatory framework of the sectors that invites long-term investment may in fact be subject to changes, (ii)this does not deprive the investor of the right to file a claim against the State when it has taken actions against the stability of a regulatory framework that ensures certain specific conditions in light of future operations. To put it simply, the text does not have the meaning that the Kingdom of Spain wishes to state that it does[613].

> v.    *The Kingdom of Spain has violated its obligation to comply with the obligations contracted with the Claimant or its investment*

434. The Claimant explains that Article 10(1) ECT constitutes an umbrella clause. The Respondent interprets this clause as being applicable solely to specific obligations contracted by the State in a bilateral manner with regard to an investor through an

---

[608]    Reply, ¶¶620-621.

[609]    Reply, ¶¶624-625.

[610]    **Legal Authority RLA-60:** *Convial Callao S.A. and CCI - Compañía de Concesiones de Infraestructura S.A. v.*

        *Republic* of Peru, ISCID Case No. ARB/10/2, Award, 23 May 2013.

[611]    **Legal Authority RLA-44:** *EDF (Services) Limited v. Romania*, ISCID Case No. ARB/05/13, Award, 8 October 2009.

[612]    **Legal Authority RLA-57:** *Total S.A. v. Argentina*, ISCID Case No. ARB/04/01, Decision on Liability 27 December 2010, ¶122.

[613]    Reply, ¶¶645.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

individualised commitment[614]. The Claimant rejects this interpretation and believes that the Respondent should not indicate that the terms "*any obligation*" contained in ECT Article 10(1) must be interpreted in a broad sense[615].

435.  It refers to various arbitral cases, such as <u>SGS v. Pakistan</u> or in the case of <u>Liman Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan</u> where the tribunal, applying the same Article of the ECT, specified that[616]:

> "*On the other hand, the Tribunal acknowledges that in the context of consent to jurisdiction of arbitral tribunals, it is commonplace that the host state's unilateral offer in its national legislation to submit the dispute under certain international arbitration rules to the jurisdiction of an arbitral tribunal, once duly accepted by the claimant, is a sufficient and binding submission to arbitration. This offer can be accepted by the investor by submitting its claim to the arbitration institution or arbitral tribunal. Applying this reasoning to ECT Article 10(1), it could be argued that an abstract unilateral promise by the state in its national legislation and particularly in its laws directed to foreign investors is encompassed by the "umbrella clause".*

436.  The case <u>Eureko v. Poland</u>[617] also confirms that States may enter into obligations, including by means of unilateral acts, such as administrative or legislative acts[618]. Other sources of doctrine confirm this legal precedent[619].

437.  As a result, the Claimant considers that those obligations arising from administrative or legislative acts of the states are also, in fact, covered under this particular Article. The Kingdom of Spain is bound, in accordance with the umbrella clause of ECT Article 10(1), to take on very specific commitments with T-Solar, the Plants, and, finally, IIN[620].

438.  The Claimant specifies that the measures adopted by the Respondent (i) have assumed an agreement between the Kingdom of Spain and IIN and (ii) have taken on obligations that fall within the scope of the umbrella clause contained in ECT Article 10(1)[621]. This analysis also

---

[614]  Reply, ¶647.
[615]  Reply, ¶648.
[616]  *Liman Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan*, ISCID Case No. ARB/07/14, Excerpts of Award, 22 June 2010, ¶ 448.
[617]  Statement of Defence, ¶ 971.
[618]  Reply, ¶652; **Legal Authority RLA-64:** *Eureko B.V. v. Republic of Poland*, Ad Hoc Investment Treaty case, Partial Award, 19 August 2005, ¶ 246.
[619]  Reply,          ¶¶653-654.
[620]  Reply,          ¶¶656-658.
[621]  Reply, ¶660.

Case 1:19-cv-01618-TSC    Document 69-52    Filed 06/09/22    Page 148 of 257
*This document is a translation of the original award made into English.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

is illustrated in the cases <u>LG&E</u>[622] and <u>Micula v. Romania</u>[623] where the tribunals found that an administrative or legal norm could be considered to be a specific commitment[624].

> b.    The Respondent has violated the obligation contained in ECT Article 13 regarding the prohibition of expropriation

439.    Article 13 of the ECT reads as follows:

> "*Expropriation*
>
> *1. Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:*
>
> *a) for a purpose which is in the public interest;*
>
> *b) not discriminatory;*
>
> *c) carried out under due process of law; and*
>
> *d) accompanied by the payment of prompt, adequate and effective compensation.*
>
> *Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date")".*

440.    The Claimant pretends that, in the present case, there was an indirect expropriation of the IIN investment in the sense of ECT Article 13(1). It explains that IIN performed a substantial investment in Spain under the promise of "*maximum profitability*"[625] guaranteed by the payment of a long-term FIT. The economic value of IIN investment, as a result, relied on the security to sell electrical energy produced under the Special Regime, at a regulated tariff: the FIT. The abolition of the Special Regime has destroyed this economic value, in substituting it with a new regime with a retroactive value that leads to a much lower profitability[626].

---

[622]    **Legal Authority CLA-25:** *LG&E Energy Corp., LG&E Capital Corp., LG&E International Inc. v. Argentina*, ISCID Case No. ARB/02/1, Decision on Responsibility, 3 October 2006, ¶¶ 174-175.

[623]    *Ioan Micula, Viorel Micula and others c. Romania*, ISCID Case No. ARB/05/20, Award, 11 December 2013, ¶ 422.

[624]    Reply, ¶¶661-662.

[625]    "*El Sol Puede Ser Suyo*" [The Sun Can Be Yours], June 2007, IDAE, page 19.

[626]    Statement of Claim, ¶282

*This is an unofficial English translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

441. With regard to the conditions under which the expropriation would be legal, and in particular the reasoning of "reasons of public interest", found in ECT Article 13(1), the Claimant considers that the measures taken by the Kingdom of Spain cannot be justified by an imperative need to enact these measures. Furthermore, it was also not a proportional measure, since the three measures are intended to alleviate the tariff deficit whose burden the Kingdom of Spain has opted to shift to investors, instead of to the end consumer[627]. The decision to adopt these measures results from a political action for which Isolux INBV bears no responsibility.

   i. *Claimant's investment is protected under Article 13 of the ECT*

442. The Claimant explains that the Respondent seems to have confused the notion of investment with an economic value of said investment, that in the present case consists of the security of selling electrical energy produced at a regulated tariff. It alleges that the economic value of the IIN investment did not constitute a good that can be expropriated.

443. In response to those arguments, the Claimant notes that the definition of investment included in the ECT and in ECT Article 1(6) must be considered, where it defines the concept of investment as "*any type of asset, directly or indirectly held or controlled by an investor", which includes "shares,* securities, *or other forms of participation in a company or commercial business*" as well as "*earnings*" that would be obtained through this participation[628].

444. However, the Respondent intends that the concept of investment mentioned in Article 13(1) be considered as independent, and that the existence of an investment is conditioned on the existence of a tangible good that exists at the moment of adoption of the measures, in accordance with that contained in Article 13(3) of the ECT[629].

445. The Claimant does not admit this interpretation that pushes aside ECT Article 1(6), which expressly includes the earnings, while legal doctrine also states that it is possible to expropriate not only "*tangible property or physical assets*", but rather, also, "*a broad range of rights that are economically significant to the investor*"[630].

446. Furthermore, Article 13(1) is not limited to protecting acquired rights, contrary to that stated by the Claimant, which considers that the earnings from the T-Solar installations are in fact future earnings that may not be protected by the same

---

[627] Statement of Claim, ¶¶285-287.
[628] Reply, ¶¶678.
[629] Reply, ¶¶679 and 682.
[630] Reply ¶¶684 to 686.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

Article[631]. The Respondent adds a requirement that does not exist in the ECT, in demanding the existence of a vested right.

447.  International law does not establish that only those rights which have been vested may be expropriated. The reference to the contribution of Iñigo Iruretagoina Agirrezabalaga (Legal Authority RLA-69) refers, in reality, to an internal legal ordinance[632]. Furthermore, in the case <u>Nations Energy v. Panama</u>, the Claimant specifies that the tribunal in this case, at no time put forth that expropriation could potentially affect vested rights"[633].

448.  The Claimant in fact agrees with the Kingdom of Spain in that the case in which the expropriation of a right is alleged, this right must have been constituted, defined, formed, and recognised under applicable legal ordinances[634]. However, the Claimant insists that the only requirement with regard to the Rights of the State, recipient of the investment, is that the investment in fact exists. In this case, it is not under dispute that IIN benefited from the right to enjoy certain earnings, and it is for this reason that the right exists[635].

> ii.  *<u>The Kingdom of Spain cannot hide behind its regulatory powers to elude responsibility under ECT Article 13</u>*

449.  The Kingdom of Spain believes that the measures in question were adopted in the exercise of sovereign powers ("*police powers*"), which means that they cannot be considered as expropriatory.

450.  The Claimant explains that with regard to the doctrine of *"police powers"* in customary law is to permit that a State may legislate to the benefit of and to protect higher interests, such as the environment, morality, or public order, and that the Respondent may not in fact apply this doctrine to the case at hand.[636]

451.  In effect, it is specified that it is a norm relating to a customary right and that, like all general laws, it may be abolished in accordance with the principle of *generalia specialibus non derogant* [the provisions of a general statute must yield to those of a special one][637]. In the case at hand, Article 13(1) contains its own definition of the measures which should be considered as expropriatory, which is sufficient to reject the application of the "*police powers*" doctrine[638].

---

631  Reply, ¶688.
632      Reply,          ¶¶693-695.
633      Reply,          ¶¶696-698.
634   Reply, ¶699
635  Reply, ¶¶700-703
636  D. Bray (Devin), "Non-Compensatory versus Compensatory Takings Under NAFTA", *Transnational Dispute Management* 7, 2012, pages 17-18.
637  B. Mostafa, "The Sole Effects Doctrine, Police Powers and Indirect Expropriation under International Law", *Australian International Law* Journal, 2008, page 279.
638  Reply, ¶¶707-709.

*This translation is provided for convenience purposes only, based on the original award in Spanish.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

452. Furthermore, the Claimant emphasises that there exists great uncertainty in the accepted doctrine or in arbitral case law with regard to measures that may be considered as a result of legitimate exercise of a sovereign power by the State, within its scope of action[639].

453. In the third place, according to the argument of the Respondent, it would be sufficient to give effect to the doctrine of "*police power*" that the measures examined below were "*reasonable or proportional with the objective or public interest being pursued*".[640] The Claimant considers that this interpretation is not correct, and furthermore, it is not consistent with ECT Article 13(1).

454. The Claimant notes that, under the ECT, the pursuit of the public interest is a legal criteria for an expropriation, and if it is not present, of the lack of an expropriation, contrary to what it seems that the Respondent is stating when they suggest that a measure that pursues the public interest may not be expropriatory.[641] This serious inconsistency confirms that the doctrine of "*police power*" cannot be applied here.

455. The Claimant also considers that legal precedent in which the Respondent is seeking support does not advocate for the application of the "*police powers*", doctrine, but rather, on the contrary, such precedents generate doubts with regard to the relevance or the contents of this doctrine, when they do not exclude it[642].

456. In the case of Fireman's Fund v. Mexico,[643] and the case CME v. the Czech Republic[644] the Arbitral Tribunal, in reality, applied the doctrine of "*sole effects*"[645]. In the case Saluka v. the Czech Republic,[646] the Arbitral Tribunal expressed serious doubts regarding the contents of the "*police powers*" doctrine. Finally, the tribunal in El Paso v. Argentina[647] expressly excluded the application of the "*police powers*" doctrine, stating that[648]:

> "[T]he Tribunal subscribes to the decisions which have refused to hold that a general regulation issued by a State and interfering with the rights of foreign investors can never be considered expropriatory because it should be analysed as an exercise of the State's sovereign power or of its police powers."

---

[639] Reply, ¶¶110, 112.

[640] Statement of Defence, ¶ 1015.

[641] Reply, ¶¶715-719; Statement of Defence, ¶ 1015.

[642] Reply, ¶720.

[643] Statement of Defence, ¶ 1011.

[644] Statement of Defence, ¶ 1012.

[645] *Fireman's Fund Insurance Company v. United Mexican States,* ISCID Case No. ARB(AF)/02/01, Award of 17 July 2006, ¶ 176(f); **Legal Authority RLA-72:** *CME Czech Republic B.V. v. the Czech Republic*, CNUDMI, Partial Award of 13 September 2001, ¶¶ 200-201.

[646] Statement of Defence, ¶ 1013.

[647] Statement of Defence, ¶ 1014.

[648] Reply, 721-724; **Legal Authority RLA-55:** *El Paso Energy International Company v. the Republic of Argentina* ISCID Case No. ARB/03/15, Award of 31 October 2011, ¶ 234.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

457. The Claimant concludes by stating that, in the case at hand, there is no place for the application of the "*police powers*" doctrine in order to determine if the measures that are the object of this arbitration are, in fact, expropriatory measures. Therefore, the arguments of the Kingdom of Spain should be fully rejected.

458. However, even in the case of the application of the "*police powers*" doctrine, such measures would still be cause for compensation. It affirms that the Kingdom of Spain is responsible for the tariff deficit, that the measures adopted are not, in fact, reasonable, and that it had at its disposal a number of other measures that would not have had the effect of expropriating Isolux INBV. The Kingdom of Spain may not, therefore, attempt to avoid its obligations as indicated in ECT Article 13[649].

        iii.   *The measures adopted by the Kingdom of Spain have resulted in the expropriation of the Claimant's investment*

459. The Claimant notes that the Respondent estimates: that in order to consider that a measure significantly affects the value of an investment "*it is necessary that it prevents the investor from continuing to maintain their investment*"[650]. The Claimant notes that the Respondent ignores the fact that an indirect expropriation may result both in the loss of an investment value, as is the case in the current arbitration proceeding, as well as a loss of control over the investment[651].

460. The Claimant specifies that the arbitral case law in which the Kingdom of Spain is basing its arguments, such as the case of Electrabel v. Hungary[652], in order to insist that there may not be expropriation without loss of control over an investment, also considers the fact that expropriation consists of a substantial and significant deprivation, and that there is a consensus regarding the contents of the standard of substantial deprivation. It is considered that substantial deprivation has occurred when the measures have had the effect of dispossessing the investor of the investment or of its control, including when the loss suffered by the investor is considered as "severe" or "radical"[653].

461. The Kingdom of Spain also alleges that a measure must be permanent, however, the Claimant notes that the Respondent does not claim that the measures that are the object of this arbitration proceeding are not permanent[654].

462. Finally, the Claimant specifies that the argument of the Kingdom of Spain is not to be understood in the sense that "*when the measures adopted by the State assume an improvement*

---

[649]  Reply, ¶¶726-730

[650]  Statement of Defence, ¶ 1030.

[651]  Reply, ¶¶734-735.

[652]  *Electrabel S.A. v. Republic of Hungary*, ISCID Case No. ARB/07/19, **Legal Authority RLA-3:** Decision on Jurisdiction, Applicable Law, and Responsibility of 30 November 2012, ¶ 6.62.

[653]  Reply, ¶¶737-73-9

[654]  Reply, ¶740.

Case 1:19-cv-01618-TSC Document 69-52 Filed 06/09/22 Page 153 of 257
*This document is a Courtesy Translation of the Original Spanish Award of the Tribunal.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*for society in general, and there is no economic benefit or a clear transfer of assets to a private entity, there is no expropriation*".[655]

463.   However, the Claimant refers to the UNCTAD Report[656] and takes note of the fact that a <u>private</u> entity does not benefit from the measures is not, actually, mentioned as a negative condition for the existence of an expropriation. Furthermore, the references of the Kingdom of Spain to certain arbitral awards such as <u>S.D. Myers v. Canada</u> [657] and <u>Olguín v.</u> Paraguay[658] are neither relevant.

464.   The Claimant concludes by stating that the Kingdom of Spain has been incapable of sustaining its interpretation of the concept of expropriation.

c.   <u>The Claimant in fact has the right to compensation</u>

465.   The Claimant argues that the Respondent must compensate IIN for damages caused as a result of the violation of its obligations under the ECT[659], according to the principle of comprehensive reparation as recognised by the ECT[660] and under customary International Law [661], applies by the International Court of Justice and the arbitral tribunals,[662] and codified in Article 31 of the Draft articles on Responsibility of States for Internationally wrongful acts of the International Law Commission[663]. This principle is recognised by the Kingdom of Spain[664].

---

[655]   Statement of Defence, ¶ 1043.

[656]   United Nations Conference on Trade and Development (UNCTAD), Series on Issues in International Investment Agreements, *Expropriation*, United Nations Series, New York and Geneva, 2012, **Legal Authority RLA- 67**, page 104.

[657]   **Legal Authority RLA-80:** *S.D. Myers, Inc. v. Canada CNUDMI*, Partial Award of 13 November 2000, ¶284.

[658]   Reply, ¶¶ 744 a 746; Statement of Defence ¶¶ 1045-1046; **Legal Authority RLA-81:** *Audoro Armando Olguín v. Paraguay*, Caso ISCID Case No. ARB/98/5, Award of 26 July 2001.

[659]   Statement of Claim, ¶¶290-300.

[660]   **Legal Authority CLA-9:** International Court of Justice, *Case relating to German interests in the Polish Upper Silesia, Chorzów* Factory, Judgment of 13 September 1928.

[661]   Reply, ¶¶751-752.

[662]   Statement of Claim, ¶¶ 295; **Legal Authority CLA-1:** International Law Commission, "Draft articles on Responsibility of States for Internationally Wrongful Acts", A/RES/56/83, 28 January 2002.

[663]   Statement of Claim, ¶¶ 296; **Legal Authority CLA-10:** International Court of Justice, *Case relating to the Gabcikovo-Nagymaros draft (Hungary v. Slovakia)*, Judgment of 25 September 1997, page 5; **Legal Authority CLA- 11:** *CME Czech Republic B.V. v. the Czech Republic*, CNUDMI, Partial Award, 13 September 2001,
¶¶ 616-618; **Legal Authority CLA-26:** *Siemens A.G. v. Republic of Argentina*, ISCID Case No. ARB/02/08, Award, 6 February 2007, ¶ 353; **Legal Authority CLA-28:** *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Republic of Argentina*, ISCID Case No. ARB/02/1, Award, 25 July 2007, ¶ 267(e); **Legal Authority CLA-18:** *Petrobart Limited v. Republic of Kyrgyzstan*, Caso SCC Case No. 126/2003, Award, 25 March 2005, pages. 30-31; **Legal Authority CLA-30:** *Sempra Energy International v. Republic of Argentina*, ISCID Case No. ARB/02/16, Award, 18 September 2007, ¶¶ 400-401; **Legal Authority CLA-34:** *National Grid v. Republic of Argentina*, CNUDMI, Award, 3 November 2008, ¶¶ 269-270.

[664]   Reply, ¶¶754-755.

*This is an unofficial translation of the original award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

i.   *Method of valuation of the Damages Causes to IIN by the Kingdom of Spain*

466.   The Expert contracted by the Claimant for the evaluation of damages suffered by IIN, Deloitte, has followed the same methodology than the one previously applied in its report of 11 July 2014 (the "**First Deloitte Report**") in its Reply dated 4 June 2015 (the "**Second Deloitte Report**").

467.   The valuation method used is the same in both cases of violation of ECT Article 10(1) and ECT Article 13.

468.   The Claimant points out that in the First Deloitte report, it was demonstrated that the three measures, object of the current arbitration proceeding (Law 15/2012, RDL 2/2013, and RDL 9/2013), caused a loss or increase in the rightful market value of the Plants, in which IIN had a stake of 30.0065%, through its investment in T-Solar.[665]

469.   Contrary to that stated by the Respondent, which claims that the IIN damages are "*speculative and hypothetical*"[666] and that IIN is claiming that the FIT be granted to that which it has the right over, during the useful life of the plants, the Claimant points out that what it is requesting is that the loss of the Company value be compensated. These are actual and real damages[667].

470.   For the purposes of determining the loss or decrease in the fair market value of the Company, Deloitte has used the cash flow discount methodology, or the "*discounted cash flow*" ("**DCF**"). However, the Kingdom of Spain is now claiming that the DCF method is, in fact, "*speculative*"[668] and is in fact "*improper*" for this case[669]

471.   The Claimant rejects these allegations, stating that the DCF method is a recognised method, with greater accuracy and reliability to determine the value of a company, it has been used by IIN before various arbitral tribunals, [670] and permits the performance of an "*informed estimation*"[671] of the value of a company[672].

---

[665]   First Deloitte Report, pages. 23-24.
[666]   Statement of Defence, ¶ 1077.
[667]   Reply, ¶ 764.
[668]   Statement of Defence, ¶ 1078.
[669]   Statement of Defence, ¶ 1081.
[670]   **Legal Authority CLA-29:** *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. the Republic of Argentina*, ISCID Case No. ARB/97/3, Award of 20 August 2007, ¶ 8.3.3.
[671]   *Tidewater Inc., Tidewater Investment SRL, Tidewater Caribe, C.A., Twenty Grand Offshore, L.L.C., Point Marine, L.L.C., Twenty Grand Marine Service, L.L.C., Jackson Marine, L.L.C. and Zapata Gulf Marine Operators, L.L.C. v. Bolivarian Republic of Venezuela*, ISCID Case No. ARB/10/5, Award of 13 March 2015, ¶ 202.
[672]   Reply, ¶¶769.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

472. The Claimant also notes that the Kingdom of Spain places in doubt the relevance of the DCF method, while its own experts do not criticise it.[673]

473. The Claimant first states that the Kingdom of Spain provides certain specific "*circumstances*" as referred in an attempt to demonstrate that the DCF method is not adequate[674] and that these circumstances in fact have no relevance whatsoever. However, those arguments are not valid, according to that contained in the first Deloitte Report[675]:

- the cash flow projection is based on <u>actual</u> production data for the period between 2008 and 2013, for which there exists a broadly sufficient financial history;[676]

- there is data relating to the photovoltaic industry dating from, at a minimum, the year 2003, both on the national level, in Spain, as well as on the European Union level;[677]

- orthodox and non-volatile parameters have been used to make projections of cash flows such as the general characteristics of the installations, the annual variation of the General Consumer Price Index, etc.[678] and

- The 25-year projections are based on a conservative estimate of the useful life of a photovoltaic plant, for which reason they may not be considered disproportionate.[679]

> ii. *The criticisms of the Kingdom of Spain with regard to the first Deloitte Report lack basis*

474. The Claimant notes that the Kingdom of Spain alleges that the profitability of the plants has been artificially reduced[680], both with regard to the valuation of the previous Company and the promulgation of the measures object of the present arbitration proceeding, as well as those subsequent to them. This, in fact, does not make sense, since the IIN complaint concerns the difference in value of the Company before and after the implementation of the measures under litigation. Thus, even if this statement were true, it would not reduce the amounts claimed by IIN.

475. Furthermore, as the Second Deloitte report states, "*the expenses considered are identical in the situations under study, with the exception of the tax on the value of the production of electrical energy and the lease of the lands on which the*

---

[673]   See the report prepared by the MaC Group and Altran, of 3 December 2014.
[674]   Statement of Defence, ¶ 1081 (i), (iv) and (v).
[675]   Reply, ¶774.
[676]   First Isolux Report, page 51.
[677]   First Isolux Report, page 27.
[678]   First Deloitte Report, page 51.
[679]   First Deloitte Report, pages. 57 and 59.
[680]   Statement of Defence, ¶ 1083.

*solar photovoltaic plants of Arnedo and  Orense*".[681]    They are perfectly reasonable, in the fact that they are market costs.[682]

476.  With regard to the argument of the Kingdom of Spain that affirms that the valuation of the damage caused to IIN does not reflect the damage effectively suffered by IIN due to the fact that it did not have direct control over the investment and, even if the value of a company decreases, its parent companies continue benefiting from *cash flows*, the Claimant points out that this argument is irrelevant due to the fact that the quantification of the damage caused to IIN goes beyond the valuation of the effect on the Company value to that of its investment.

iii.    *Calculation of damages suffered by IIN*

477.  Once the DCF exercise was carried out, Deloitte determined that the measures of the Kingdom of Spain have caused, respectively, the following losses to the Fair Value of the Company:

   □     Law 15/2012: **€ 823,000**

   □     RDL 2/2013: **€ 458,000**

   □     RDL 9/2013: **€ 67,619,000**

478.  In total, the failure of the Kingdom of Spain to comply with the ECT has caused an overall economic damage of **€ 68,900,000**.

479.  The Claimant adds that, in addition to the aforementioned economic damage, the ECT violations carried out by the Kingdom of Spain have deprived IIN of the opportunity to invest and make use of the corresponding profits at the amounts that it had been entitled. Therefore, IIN has the right to compensation of interest on damage suffered, calculated from the date of promulgation of the last measure object of the present arbitration proceeding (13 July 2013), until the date covered by a potential award issued in its favour. Deloitte feels that if it had been able to invest freely in the market in amounts corresponding to the damage suffered, it would have been able to obtain a profitability of 7.398%, which corresponds to the "reasonable return" that the Kingdom of Spain guarantees, in accordance with the new regime enshrined in RDL 9/2013, for investors in the photovoltaic sector. Deloitte concluded that 7.398% is, therefore, an appropriate interest rate for the compensation of the financial loss suffered as a result of the violations committed by the Respondent[683].

---

681    Second Deloitte Report, page 61.
682    Reply ¶¶777-782; Second Deloitte Report, page 62.
683    Second Deloitte Report, page 17.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

480. Applying the previous rate to damage claimed by the Claimant, the interests accumulated at the date of the Reply comes to a total of: **€ 9,968,000**[684].

### 2. Position of the Respondent

481. With regard to the merits of the case, the Respondent first responds to the presentation of facts performed by the Claimant **(a)**, prior to responding to the arguments raised by the Claimant, affirming that ECT Article10(1) has not been violated **(b)** and that Article 13 has also not been violated **(c)**. Thirdly, it considers that the Claimant does not have the right to compensation since, the profitability of its investment was not reduced **(d)**.

#### a. Considerations relating to the facts

##### i. *The divestment of ISOLUX*

482. ISOLUX has moved forward with a divestment, and the intended investment of ISOLUX has been focused on an asset relocation operation in the Isolux INBV company. The asset relocation operation is shown in the Investment Agreement of 29 June 2012, by virtue of which the ISOLUX shares in T-Solar are contributed to IIN. This Agreement was entered into on 29 October 2012[685]. Furthermore, the 34 photovoltaic plants were already in a state of functioning and were financed when the investments in the T-Solar group were made. In effect, between 2008 and 2009, a total of 40 construction contracts were carried out by ISOLUX with initial installation costs totalling 820 million Euros. According to the Respondent, there is a very clear link, both in the initial investment costs for installations (EPC) as well as the later )&M points, which is reflected as well in the individual Accounts of the SPV companies in possession of the plants[686].

##### ii. *The regulatory framework*

483. The Respondent details this regulatory framework in their Statement of Defence in section III.D.

484. With regard to the regulatory framework, the Respondent agrees with the Statement of Claim in which it is stated that the 1997 LSE guaranteed a "reasonable return". However, the Respondent does not consider this concept to be a ceiling, nor a base, nor an objective[687].

---

684    Reply, pages 177-178.
685    Statement of Defence, ¶¶65-71; Rejoinder, ¶¶557-561.
686    Statement of Defence, ¶¶69-71.
687    Rejoinder, ¶562-563.

485. The Respondent also specifies that Article 30.4 of the LSE recognises that producers of electrical energy are granted a right to receive a reasonable return with regard to a specific indicator, that is, "the cost of the money on the capital market", without it possibly being derived from this recognition that the 1997 LSE ensures a freeze of initial incentives applicable to installations throughout their useful life, nor does it guarantee, in any manner, the [688].

486. Furthermore, the Statement of Defence clarifies that LSE Article 30.4 does not guarantee the right to the collection of a FIT or a tariff. In its various versions, the expression "tariff" was never used, but rather, the express reference was maintained with regard to the "reasonable rates of profitability with reference to the cost of cash on the capital market", such as with the collection of a "premium" complementary to the market remuneration[689].

487. There is no sole remuneration model applicable to photovoltaic installations. The purpose of RD 661/2007, as with successive standards adopted within the scope of LSE 1997, is to cease to continue to ensure the installations, covered under a special production regime, the right to a freeze in the incentive scheme contemplated therein, neither the indefinite permanent status of the formula utilised to set premiums, nor, much less, the immutability thereof throughout the course of time. Legal precedent confirms this[690].

488. The Supreme Court confirmed these considerations in two sentences directed at ISOLUX and T-Solar in September and October of 2012, dismissing the claims brought by ISOLUX and T-Solar against RD 1565/2010 of 19 November[691].

---

[688] Rejoinder, ¶564.

[689] Statement of Defence, ¶95.

[690] Rejoinder, ¶568.

[691] **Exhibit R-139**: Ruling of the Supreme Court, 24 September 2012, issued in the case of Litigio Isolux Corsán, S.A. v. RD 1565/2010, rec. 60/2011; **Exhibit R-141**: Ruling of the Supreme Court of 15 October 2012 issued in the case of T-Solar and 117 SPVs v. RD 1565/2010, rec. 64/2011; **Exhibit R-48**: Rulings of the Supreme Court of 20 December 2011, rec. 16/2011; 12 April 2012, rec. 35, 50 and 112/11; 19 April 2012, rec. 39 and 97/11, 23 April 2012, rec. 47/2011; 3 May 2012, rec. 51 and 55/2011; 10 May 2012, rec. 61 and 114/2011; 14 May 2012, rec. 58/2011; 16 May 2012, rec. 46/11; 18 May, rec. 70 and 74/11; 22 May 2012, rec. 45 and 49/11; 30 May 2012, rec. 59/2011; 18 June 2012, rec. 54, 56, 57 and 63/11; 25 June 2012, rec. 109 and 121/11; 26 June 2012, rec. 566/10; 9 July 2012, rec. 67, 94 and 101/11; 12 July 2012, rec. 52/11; 16 July 2012, rec. 53, 75 and 119/11; 17 July 2012, rec. 19 and 37/11; 19 July 2012, rec. 44/2011; 25 July 2012, rec. 38/2011; 26 July 2012, rec. 36/11; 13 September 2012, rec. 48/11; 17 September 2012, rec. 43, 87, 88, 106 and 120/11; 18 September 2012, rec. 41/11; 25 25 [sic] September 2012, rec. 71/11; 27 September 2012, rec. 72/2011; 28 September 2012, rec. 68/2011; 8 October 2012, rec. 78, 79, 100 and 104/11; 10 October 2012, rec. 76/2011; 11 October 2012, rec. 95 and 117/11; 15 October 2012, rec. 64, 73, 91, 105 and 124/11; 17 October 2012, rec. 102/2011; 23 October 2012, rec. 92/2011; 30 October 2012, rec. 96/2011; 31 October 2012, rec. 77 and 126/11; 5 November 2012, rec. 103/2011; 9 November 2012, rec. 89/2011; 12 November 2012, rec. 98 and 110/11; 16 November 2012, rec. 116/11; 21 November 2012, rec. 34/2011 and 26 November 2012, rec. 125/2011.

This is an unofficial English translation of the Spanish original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

489.   The regulatory framework at the time of Claimant's investment is reinforced by various declarations from the Government, as well as programs and other public documents that announce a reform in the Sector to any diligent investor willing to participate[692].

490.   Consequent to the investment of the Claimant, the legislative measures questioned were adopted in accordance with the ECT and they strictly accommodated interpretive principles that legal precedent had already set forth in various rulings issued after the adoption of RD 1565/2010[693].

491.   The Respondent notes that the Claimant, in its Statement of Claim, omits those acts which are clearly relevant, and demonstrates the good faith actions of the Kingdom of Spain at the time of adopting the measures in question[694]:

   a)   the appeals brought by ISOLUX and Grupo T-Solar Global, S.A. against Royal Decree 1565/2010, dismissed by Ruling of the Supreme Court on 23 September 2012, and 15 October 2012, noted previously;

   b)   the appeals brought by various dependent companies of Grupo T-Solar Global before the European Human Rights Tribunal against RD 1565/2010 and Royal Decree-Law 14/2010 due to impact on the economic regime of the

---

[692]   Transcript of the speech of Mariano Rajoy in the investiture session as prime minister, Congress, Monday, 19 December 2011, www.lamoncloa.gob.es (R-63); Press release The NEC is analysing the review of the access tolls and certain tariffs, and the premiums on certain special regime facilities, National Energy Commission, 28 December2011 (R-64); Press release The Government shall temporarily suspend the premiums on new installations under the special regime, Ministry of Industry, Energy, and Tourism, 27 January 2012 (R-66); Report on the energy sector in Spain, Part I. Measures to guarantee the economic-financial sustainability of the electrical system, National Energy Committee, 7 March 2012, page 69. Report on the energy sector in Spain. Introduction and Executive Summary, National Energy Commission, 7 March, 2012 (R-70), for the preparation of which the NEC had opened a period of public consultation; Information on the public consultation for regulatory adjustment measures in the energy sector of 2 February and 9March, 2012 published on the website of the National Energy Commissionwww.cne.es (R-68); National Reform Program 2012, Government of Spain, 27 April (R-72) announcing a thorough reform of the electricity sector, submitted by the Council of Ministers to the Council of the European Union and the European Commission; Document Six Months of Government: Reform for Growth, Secretary of State for Communication Ministry of the Presidency, July 9, 2012 (R-75), in which Royal Decree Law 13/2012 is announced; Document The reforms of the Government of Spain: Determination in the face of crisis, State Secretary of Communication, September 2012 (R-77) ; "Draft of the General Budget of the State for the year 2013" approved by the Government on 27 September 2012, Reference of the Council of Ministers of 27 September 2012,  www.lamoncloa.gob.es (R-78) Spanish Strategy for Economic Policy: Balance and structural reforms for the next semester, Government of Spain, September 27, 2012 (R-79), which contemplates the "Energy Reform" and its subsequent press conference; Press release from the Council of Ministers of 27 September 2012, www.lamoncloa.gob.es (R-80); Approval of Royal Decree-Law 13/2012 of 30 March, which transposes directives on the internal electricity and gas markets and on electronic communications, and adopting measures for the correction of deviations Due to mismatches between the costs and revenues of the electricity and gas sectors, published in the Official Gazette of March 31, 2012 (R-76) and approval of Royal Decree-Law 20/2012, of July 13, of measures To ensure budgetary stability and foster competitiveness, published in the Official State Gazette of July 14, 2012 (R-81). (R-81).

[693]   Rejoinder, ¶¶571-572.

[694]   Rejoinder, ¶573.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

photovoltaic sector. There is no record of the admission for processing of such claims by the European Court of Human Rights.

c)   the arbitration proceeding SCC V 062/2012 initiated by Charanne B.V. and Construction Investments S.à.r.l. v. the Kingdom of Spain, pursuant to Article 26 of the ECT regarding RD 1565/2010 and Royal Decree Law 14/2010.

### iii.   *On a stable and predictable economic framework*

492.   The Respondent [sic: the Claimant] responds to the statements of the Respondent, according to which Isolux INBV was guaranteed a stable and predictable economic framework, invoking the three Plans and Programs of the Government. In relation to the 2011-2020 Renewable Energy Plan, the Respondent notes that it does not refer to remuneration by means of a FIT, but rather a "stable and predictable economic framework" as per the Regulatory system in all its parts. This economic stability, in the words of the Plan itself, refers to the remuneration framework, not to the legal standards that are established. In fact, the aforementioned 2011-2020 Plan expressly foresees the revision of remuneration levels, "at all times guaranteeing reasonable rates of return"[695]. The Respondent also believes that the Claimant may not refer to the prospect of the 2010 IDEA or the NEC reports of 2007, 2008 and 2009 for reasons that shall be addressed below[696].

### iv.   *On the long-term FIT and reasonable return*

493.   The Respondent also disputes the fact that it guaranteed a long-term FIT to the Plants Article 30.4 of the 1997 LSE 1997 was not capable of generating legitimate expectations with regard to this, nor were RDs 661/2007 and 1579/2008. That was the opinion, according to the Respondent, of both the Claimant as well as ISOLUX, T-Solar and the companies holding Plants, that were claiming in 2011, that their right consisted not of a long-term FIT, but rather to obtain a profitability according to a model that guarantees reasonable remuneration for costs, investments, and risks incurred[697].

494.   Also in 2011, at the time when they brought their respective appeals before the Supreme Court, ISOLUX and T-Solar were not arguing against reasonable return as an end, rather than a floor or "minimum" for the Plants. Furthermore, they considered that its expected profitability was a fixed quantity that they estimated at approximately 7% and that they calculated the profitability for the Plants through an expert test at 6.19% according to Law 2/2011.

---

[695]   Rejoinder, ¶¶578; C-207, pp. 50, 14, 536.
[696]   Rejoinder, ¶578.
[697]   Reply, ¶580.

*This is an unofficial translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

v.   *On the foreseeability of the measures adopted by the Kingdom of Spain*

495.   The Claimant believes that the measures adopted were not foreseeable, and, according to the Respondent, minimises or interprets the successive announcements of the Government since November 2011 in the manner that it deems convenient, or denies the relevance and knowledge of legal precedents issued in the Supreme Court

496.   It denies that the successive government announcements since November 2011 may have permitted to antivipate the radical structural change[698]. The Respondent points out that these announcements included an explicit link between premiums, the costs they generate in the system or the willingness to adjust those costs[699]. It also does not acknowledge the reforms adopted subsequent to RDs 661/2007 and 1578/2008 and prior to the measures in question[700].

497.   As repeated by Respondent, in 2011 ISOLUX and T-Solar were fully aware of the potential reform of the remuneration regime, as evidenced by the legal precedent of rulings from the of the Supreme Court, as such that the existence of lawsuits before the Supreme Court was expressly communicated to its future Canadian partner, PSP Investments, in June 2012 [701]. All of this goes to show that the claims made by ISOLUX INBV are, in fact, baseless.

vi.   *On the reasonable character of the measures adopted by the Kingdom of Spain*

498.   As a new statement included in of the Reply, the Claimant posed arguments in opposition of the reasonability of the measures. The Claimant uses the KPMG report as grounds, where expert witnesses highlighted alternatives to the measures adopted by the Kingdom of Spain[702].

---

[698]   Rejoinder, ¶583.

[699]   Rejoinder, ¶583; **Exhibit R- 72**: National Reform Program of 27 April 2012, Government of Spain. "*The items with the greatest contribution to the growth of the costs of regulated activities have been the premiums of the special regime [...] In the immediate future, these effect of these measures will be broadened, so that all sectors contribute in a balanced manner to the adjustment of regulated costs.*"

[700]   Rejoinder, ¶588.

[701]   **Exhibit R-215**: Disclosure letter provided during the document discovery phase, by ISOLUX INBV, page 17: "*On-going regulatory or administrative actions on January 21, 2011, Grupo T-Solar Global S.A., together with the Spanish Companies engaged in the solar photovoltaic line of business, filed a claim before the Spanish Supreme Court against Royal Decree 1565/2010 for the purposes of requesting the annulment of the Royal Decree in those provisions that harm the legitimate rights and interests of Grupo T-Solar Global, S.A. and to order the General Administration of the Country of of Spain to repair damages that the application of the Royal Decree causes to T-Solar to the extent that they are forced to undertake major investments to meet certain requirements of technical nature that were not required at the time of the promotion of its solar power plants*".

[702]   Report attached to the Reply titled "KPMG Report".

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

499. The Claimant [sic: The Respondent] denies that these measures are not reasonable. The expert report of Mac Group-Altran[703] believes that (1) the proposed alternatives suffer from a basic error, which is to obviate its legal or budgetary aspects or consequences, and (2) even when they are examined as hypotheses, these are not preferable to the choice made by the Spanish legislator, it is necessary to deny that the measures adopted by the Kingdom of Spain were irrational[704].

500. The Respondent notes that the fact that the KPMG Report does not clarify the "irrationality" of the measures adopted by the Government. The Respondent notes that the criteria that the Arbitral Tribunal must follow in resolving is not to determine the preference of certain measures as opposed to other measures, but rather whether the measures in question are exorbitant or not : "*Unreasonable measures*"[705].

501. The measures appear to be reasonable, in addition, with regard to the profitability determined after the reform. The new regulatory norm grants 7.398% profitability with respect to the parameters established for certain plant types in the Ministerial Order of 16 June 2014[706]. This profitability is also reasonable in comparison to the forecasts of Isolux itself, given the fact that, in May 2011, the forecast for profitability of PV plants after the passage of Law 2/2011 was calculated professionally by experts at Deloitte at a maximum of 6.19%[707].

502. This reasonableness would, in accordance with the Respondent's position, persist even in the hypothetical assumption that the costs declared by ISOLUX were to be considered The Respondent denies that these costs are applicable to determining reasonable return. In this scenario, Isolux INBV would see a return of 6.39%, higher than the 6.19% expected in May 2011 by Deloitte[708].

503. The Claimant [sic: the Respondent] also makes a list of the relevant issues omitted by Isolux INBV in its Statement of Claim and in its Reply. Among them, it should be emphasised again that the existence of judicial proceedings, which could lead to a breach of the guarantees provided by Isolux to PSP and that were currently underway before the Supreme Court of the Kingdom of Spain, were noted by ISOLUX to PSP in the "Disclosure Letter" of 29 June 2012[709]. This letter makes it clear that both shareholders of Isolux INBV were perfectly aware of the pending matter of the Ruling on the plants owned by T-Solar[710].

---

[703]    Expert report of the Altran-Mac Group, included with the present Reply.

[704]      Rejoinder,        ¶597.

[705]      Rejoinder,        ¶598.

[706]    Reply, ¶601.

[707]    Rejoinder, ¶602; **Exhibit R-217**: Expert report from Deloitte of 23 May 2011, submitted by ISOLUX before the Supreme Court, page 54

[708]    Rejoinder, ¶¶603-607.

[709]    **Exhibit R- 215**: Disclosure Letter dated 29 June 2012. Clause 11.1.4.

[710]    SubReply, ¶609.

This is an English translation of the original Spanish award that is being submitted.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

vii.   *In May 2011 ISOLUX was aware of the framework and the regulatory risk*

504.   In May 2011, ISOLUX filed a claim before the Supreme Court challenging certain provisions of RD 1565/2010, a claim which then gave rise to a Ruling thereon, which was served to the Claimant on 29 September 2012[711]. The Respondent considers that the position adopted by ISOLUX at this time[712] is a determining factor, due to the fact that it contradicts the position it is taking within the framework of these arbitration proceedings[713].

505.   In this action taken in May 2011, it appears that:

-   ISOLUX admits some level of regulatory risk in the photovoltaic sector. ISOLUX expressly acknowledged the possibility that the legal regime governing the remuneration of renewable energies would be modified, and that the reform implemented by RD 1565/2010 turned Spain into a country lacking legal certainty for investors, "*rendering ineffective the Guarantee of promised stability*[714].

    In addition, ISOLUX, in its claim before the Supreme Court, not only maintains the lack of legal certainty in the renewable energy sector, but also asserts, on the one hand, that the guarantee of stability of the applicable legal regime was already no longer effective, and, on the other, that a change in the scheme was predictable given the existing crisis situation [715]. The Respondent notes that the contradiction lies between affirmations and allegations that ISOLUX INBV put forth in the arbitration proceeding with regard to the supposed stability of the regulatory framework until the promulgation of Law 15/2012, and, in particular, RDL 3/2009. The instability claimed by ISOLUX in 2011 is not only limited to remuneration questions involving suppression of tariffs, but rather, it also involves the demands of new technical requirements that decrease previous profitability[716].

-   The normative parameter applicable in this case is Article 30.4 LSE. ISOLUX considers that, in the year 2011, there was no guarantee nor any commitment of the Government with regard to photovoltaic plants, and that there is no limit whatsoever, except with regard to the legal principle of reasonable rate of return, to modify the remuneration system through a FIT established by means of regulations. It affirms that: "*There is no legal obstacle in place to prohibit the Government, in the exercise of its regulatory power and with broad authority over a strongly regulated matter such as the*

---

[711]   **Exhibit R-220**: Documentary support for the telematic notification made by the Supreme Court in the Ruling of 24 September 2102 [sic: 2012] to ISOLUX, on 27-09-2011, at 11:27:09´´.

[712]   **Exhibit R-214**: Claim filed by ISOLUX on 27 May 2011, in the Ordinary Proceeding 60/2011, resolved by means of a final Ruling of the Supreme Court dated 24 September 2012.

[713]   Rejoinder, ¶¶611-612.

[714]   Rejoinder, ¶614; **Exhibit R-214**: ISOLUX Claim, p.9 ; pp.10 and 11.

[715]   Rejoinder, ¶617; **Exhibit R-214**: ISOLUX Claim, p.30: "*All these statements of defence of legal certainty and the continuity of the economic regime could predict, as we said, a new rate reduction but never its total and absolute elimination, even more so when Article 44.3 of RD 661/2007 assured the Plant inverters in operation that would not happen.*".

716.   Rejoinder, ¶620

*This is an unofficial translation from the Spanish original award as adopted.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> *electrical [system], modify a concrete system of remuneration, remaining at all times within the framework established by the LSE (...). The framework is established, among other items, in Article 30.4*"[717].

- ISOLUX maintains a remuneration model that is not linked to a FIT. In the year 2011, ISOLUX argued and claimed remuneration that was not based on the maintenance of a FIT, but rather, a model that ensures an outcome of reasonability profitability for costs, investments, and risks incurred.[718]. According to ISOLUX, the stability of the regulatory framework is compliant with a model that allows companies to be confident that they will be able to recover their costs and obtain a reasonable return on their investment.[719].

- ISOLUX argued that a reasonable rate of return falls within the range of 7%[720].

- ISOLUX argued that the reasonable rate of return of 7% was an end or an objective and not, in fact a minimum or "floor" from which to obtain more benefits. ISOLUX had made profitability predictions after the passage of RDs 661/2007 and 1565/2010. The Respondent [sic: The Claimant] explains that, in its claim of 2011 before the Supreme Court, by means of an expert opinion, ISOLUX indicated the remuneration it expected to obtain for its photovoltaic plants when making its investment in accordance with Royal Decree 661/2007. The result was that it undertook investment, hoping to obtain 6.41%. It quantified it by using expert professionals the profitability obtained with the reform resulting from RD 1565/2010 at a rate of return that fell between 5.79% and 5.46%. ISOLUX argued that the first figure (6.41%) represented a reasonable rate of return, while a profitability of 5.46% was not reasonable, and as a result that it violated Article 30.4 LSE[721].

> After the adoption of the Law 2/2011, the Deloitte report of 23 May 2011[722] calculated *this new profitability "applying the most favourable price scenario (the highest) to the comparison, it continues to produce a reduction of profitability, 0.22% (going from 6.41% % to 6.19 %)"*[723]. Such is the case that profitability expectations, in June and October of 2012 when the Claimant performed its investment, could not have been greater than 6.19%.

---

[717]   Rejoinder, ¶622.
[718]   Rejoinder, ¶626; **Exhibit R-214**: ISOLUX Claim, p.49: "*The intention was to create a legal framework stable enough to encourage investors to develop such projects. Thus, the law assures the outcome of a reasonable compensation for costs, investments and risk incurred. " [...] "The defence of the general interests demands provision of stability to the regulatory [...] framework, which offers confidence to investors and to the capital markets. It is necessary that these follow a MODEL that allows companies to trust that they will be able to recover their costs and obtain a reasonable return on their investments.*"
[719]   Rejoinder, ¶627.
[720]   Rejoinder, ¶¶632-634.
[721]   Rejoinder, ¶637.
[722]   **Exhibit R-217**: Deloitte Report of 23 May 2011, pages 54 and 55.
[723]   Rejoinder, ¶641.

*This document is a translation of the Original Spanish award. Reliance should be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

viii.   *In July 2011, T-Solar and the Plants were aware of the framework and the Regulatory Risk*

506.   In July, 2011, T-Solar, along with the Plants, brought in a claim before the Supreme Court against the provisions of RD 1565/2010[724]. This claim highlights the following:

-   T-Solar argued with regard to instability of the Regulatory framework at the urging of ISOLUX[725].

-   T-Solar held that the regulatory framework that was applicable was that of Article 30.4 LSE. It did not argue or claim for any commitment with regard to the maintenance of a long-term FIT, nor did it argue that this was a limit to the regulatory authority of the Government[726]. The Respondent [sic: The Claimant] also notes that the companies that owned the Plants and T-Solar expressly invoked, in their claim, among others,[727] the judgement of the Supreme Court of 9 December 2009[728]. Paradoxically, Isolux INBV indicates, in the arbitration proceedings, that the ruling is in fact irrelevant and that it was not required to be aware of it[729].

-   T-Solar and the companies that owned the Plants expected a reasonable remuneration for costs, investments, and risk incurred, just as did ISOLUX[730].

-   The remuneration that T-Solar and the companies that were owned the Plants expected in return, according to profitability rates described previously, identical to that of ISOLUX. There was a predictable rate of return for plants of a maximum of 6.19%. Therefore, its expectations on profitability, in June and October of 2012, regarding the PV plants whose shares were held by T-Solar, could not exceed 6.19% IRR[731].

-   The Respondent [sic: The Claimant] points out that the companies that owned the Plants and T-Solar, in their claim from July 2011, performed a professional expert investigation regarding the

---

[724]   **Exhibit R-222**: Claim of T-solar and the Companies that own the Plants object of the present arbitration proceeding, 4 July 2011.

[725]   Rejoinder, ¶¶647-650; **Exhibit R-222**: Claim brought by T-Solar and the Plants object of the present arbitration proceeding, 4 July 2011, page 49: "*the RD 1565/2010 has given rise to a state of utter confusion and uncertainty as far as the legal regime applicable to the solar photovoltaic entities owned by appellant entities; and (ii) RD 1565/2010 has violated the legitimate expectations of the appellant entities with regard to the stability of the technical and economic regulatory framework applicable to photovoltaic solar installations owned by them, as a consequence of the extensive modifications of this regulatory framework that the Real Decree has in fact retroactively imposed.*"

[726]   Rejoinder, ¶651.

[727]   **Exhibit R-222**: The claim of T-Solar from 4 July 2011 cites and invokes: (page 143) STS of 9 December 2009; (pp. 125 and 144) STS of 25 October 2006; (p. 144) STS of 20 March 2007.

[728]   Idem. P. 143.

[729]   Rejoinder, ¶653.

[730]   Rejoinder, ¶655-657.

[731]   Rejoinder, ¶658-662.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

reasonability of the profitability obtained starting from RD 1565/2010, not yet taking the approximate 7% IRR into account. To do this, Deloitte in its Report of 23 May 2011 compared the profitability obtained with the cost of cash on the capital markets, taking parameters of this cost that are comparable. Deloitte chose as the most appropriate parameter, among the possibilities available, the profitability offered by the obligations of the Kingdom of Spain at ten and thirty years [732]. The Respondent [sic: The Claimant] adds that the Spanish 10-year bond has also been used by the Kingdom of Spain to determine reasonable return subsequent to the 2013 reforms in a manner that contradicts the alleged non-reasonableness of the measures adopted in 2013, which Isolux INBV now maintains. It concludes by stating that: "*the use by the Kingdom of Spain of the parameter of the 10-year Spanish bond (that argued by Deloitte), increased by 300 points according to the reform enacted with RDL 9/2013, gives an impression of the obvious reasonableness of the profitability which new system grants to all investors, Spanish or foreign, in the renewable energy sector*"[733].

ix. <u>The Claimant was aware of the position of the Supreme Court with regard to retroactivity</u>

507. With regard to the alleged retroactivity of the measures in question, the Respondent states that the Supreme Court also dismissed the claims of ISOLUX and T-Solar, ruling that the measures of immediate application did not fall within the scope of prohibited retroactivity. In particular, Respondent explains that, at the time of the performing the adjustment in October 2012, Isolux INBV was fully aware that regulatory changes, which lacked ablative or pejorative effects in terms of the past, implementing their immediate effectiveness towards the future, although this implies having an effect on relations or legal situations sustained during the time that began before its entry into force, did not fall within the scope of prohibited retroactivity. Prohibited retroactivity is only produced if the new norm obliges the owners of photovoltaic installations to return the amount of tariffs already collected in previous tax years[734].

508. In its Reply, the Claimant argues that RDL 9/2013 is retroactive, since "*the calculation formula [...] extends its effects into the past in taking into account the income received by the installations and, therefore, affects past events, alters the reality already consummated over time and cancels exhausted legal effects.*"[735] However, the Claimant does not understand that "*extends its effect into the past in taking*

---

| | | |
|---|---|---|
| [732] | Rejoinder, | ¶664. |
| [733] | Rejoinder, | ¶668. |
| [734] | Rejoinder, | ¶690. |
| [735] | Rejoinder, | ¶691. |

*This is an English translation of the original award that was rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*income received into account".* These revenues are taken into account, but they do not have any effect, as in no case is it necessary to return amounts that have been collected.

509. Finally, the Claimant highlights that the Supreme Court has specified that the legal system may be subject to a modification of the remuneration that, in permitting the outcome of reasonable return with regard to the cost of money, may not involve the collection of a regulated premium or tariff. When it made its investment, the Claimant known that the Government had not promised to maintain the FIT in the long term.[736]

        b.    <u>The Kingdom of Spain has not violated Article 10(1) ECT.</u>

            i.    *<u>The Kingdom of Spain has not violated its obligation to create stable and transparent conditions for investors to perform investments.</u>*

510. The Respondent finds that the Claimant introduces this new violation of the ECT in its Reply, and claims that these conditions constitute an "independent standard, with full effectiveness and specific content" and that the FET must be appreciated in light of these new conditions and not the other way around.[737]

511. However, the Respondent alleges that this is not an independent legal standard, but rather a part of the FET standard. The Claimant interprets the standard in question, as it is contained in the provisions of the Treaty, to be binding upon the contracting parties equally and in such manner as the standards of FET or of complete protection and security. However, in the <u>Plama Consortium Limited v. Republic of Bulgaria</u> case, the Arbitral Tribunal found that: "*stable and equitable conditions are clearly part of the FET standard within the framework of the ECT.*"[738] The Claimant argues that considering these conditions to be stable, equitable, favourable, and transparent, as autonomous conditions of the FET standard, does not make sense.

512. At the same time, even if it were, in fact, an independent condition, the Respondent considers that it was not violated by the Kingdom of Spain.

513. First, it considers that the Claimant is incorrectly interpreting the standard, in confusing the "stable conditions" of Article 10(1) with "stability of the regulatory framework". In the

---

[736] Rejoinder, ¶¶696-699.
[737] Rejoinder, ¶700.
[738] Rejoinder, ¶705; **Legal Authority RL-24:** Plama Consortium Limited v. Republic of Bulgaria, ICSID Case No. ARB/03/24, Award, 27 August 2008, paragraphs 172 and 173: "*The Tribunal observes that the second sentence of Article 10(1) indicates that the conditions listed in the first sentence ─shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment∖ and the next sentence links these Investments to the remainder of the protections of this Article. [...]*
*In addition, the conditions are dependent on their accordance with the other standards. For instance, stable and equitable conditions are clearly part of the fair and equitable treatment standard under the ECT.*"

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

AES Summit v. Hungary case [739] the tribunal distinguished between the two, specifying that the stable conditions referred to in Article 10(1) refer to the circumstances that surround the investment and the decision to invest [740].

514.   The Respondent, thus, compares elements existing in the regulatory framework of October 2012 and those existing after the reform enacted by RDL 9/2012, to demonstrate that the condition of stability has not been violated.

515.   The Respondent concludes by stating that there has not been any exorbitant or unjustified alteration in said economic framework for investors, and it specifies yet again that it never guaranteed the FIT, but rather the sustainability of a reasonable return as per Law [741].

516.   The Respondent notes that prior to RDL 9/2013 the reform of the remuneration system was performed by regulations issued by the Government. The Claimant states that, in regards to matters involving regulation of the energy sector, the first time that the profitability to which producers may aspire with renewable energy in a regulatory norm with a range under the Law has been established, it was from the issuance of RDL 9/2013, setting this profitability at 7.398. This Law grants investors greater security than the uncertainty of the concept of "reasonable return" established by the previous LSE. The Claimant concludes that this increase in range and the setting of profitability figures that are going to be granted to the investor may hardly be seen when ther is a violation of the stable conditions created by the State [742].

517.   The Respondent concludes its argument relating to the obligation to create stable and transparent conditions, highlighting the transparent character of these conditions. It recalls that when the placement of shares in Isolux INBV by ISOLUX in October 2012, the Government of Spain took more than 11 (eleven) months to announce an extensive structural reform of the electricity sector. In accordance with the award in Electrabel v. Hungary, "*Fairness and consistency must be assessed against the background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State.*" [743]

518.   The possibility of reform of the remuneration regime was announced and presented as a priority of the Government and, in any case, ISOLUX could have consulted the

---

[739]   **Legal Authority RLA-61**: AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary, ICSID Case No. ARB/07/22, Award, September 23, 2010, paras. 9.3.29 and 9.3.30.
[740]   Rejoinder,   ¶¶711-712.
[741]   Rejoinder,   ¶¶719-720.
[742]   Rejoinder, ¶¶722-726.
[743]   Rejoinder, ¶733; **Legal Authority RLA-3**: Electrabel S.A. v. Republic of Hungary, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para 7.78

Administration or a legal firm at that time [744]. The lack of Due Diligence highlights the actual willingness to not invest.

<strong>ii.</strong>   <em><u>The Kingdom of Spain has not infringed the FET standard in ECT</u></em>

519.  The Respondent notes that when the Claimant explains that an alleged violation of the FET standard has occurred, it is in fact focused on a breach of its legitimate expectations, i.e. the legitimate expectation that the Kingdom of Spain will respect its commitment to a long-term fixed FIT in a stable and predictable framework.

520.  It also dedicates a paragraph to attempting to undermine the claims of coherence, transparency, and lack of ambiguity of the reform.

521.  With regard to those statements, the Respondent reaffirms that this reform was not unforeseeable, given the declarations made by the Government (statements, Programs and Documents published by the Government announcing the need for extensive reform) and its regulatory authorities, and the legal precedent of the Supreme Court. The Respondent also highlights the coherence of the reform, given that it guarantees "reasonable return" [745].

522.  The Respondent also repeats that the measures in question do not have retroactive effect in light of arbitral jurisprudence and Spanish legal ordinances [746].

523.  In addition, the Respondent first recalls that Isolux INBV lacks legitimate standing to claim for damages prior to 29 October 2013, since it was not an investor and nor could damages be caused thereby. Furthermore, the Claimant makes a conceptual error here, since, in order for a rule to be retroactive, it must affect vested rights. However, according to the Respondent, the Claimant has never in fact had a "vested right" to remuneration by means of a FIT, since the legal precedent of the Supreme Court expressly recognises the mutability of the system, within the legal limits indicated by LSE article 30.4 [747].

524.  What the Claimant is calling retroactivity is not the same as the concept of retroactivity under international case law, and must be considered in light of the case of <u>Energy v. Panamá</u> where, according to the Tribunal, there was a significant confusion regarding retroactivity and immediate effects of the law, from which should be concluded that, given that the concept of retroactivity under international law does not extend to future modifications, the measures contained in RDL 9/2013 are not, in fact retroactive [748].

---

[744]  Rejoinder, ¶¶735-739
[745]  Statement of Defence, ¶861-865.
[746]  Reply, ¶¶743; Statement of Defence, ¶ 889-905.
[747]  Statement of Defence, ¶890-891.
[748]  Statement of Defence, ¶895-896.

*This document is a tool and has no official status. Reliance should only be placed on the Spanish original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

525. RDL 9/2013, with regard to remuneration collected by the installations, which cannot be claimed (as the claimant recognises, it does not considerate its return), is expressed with clarity in Final Provision Third.4 of the 2013 LSE. The new remuneration system only has effects for the future. The standard values determined by Article 30.4 LSE are taken into account for the calculation of the remuneration, ensuring that such remuneration, together with market revenues, will allow the installation to recover its investment and operating costs throughout its entire lifetime while at the same time obtaining the corresponding reasonable return[749].

526. The Respondent considers, as the Claimant, that the relevant circumstances need to be examined in order to evaluate their legitimate expectations. It agrees with the Claimant in that the requirements contained in the case <u>Perenco v. Ecuador</u>[750] and the case <u>Total v. Argentina</u> apply, and that the Tribunal should sets the standard for Legitimate Expectations of the Claimant in these arbitration proceedings based on those arbitration cases[751].

527. At the time of examining all of the relevant circumstances, the Respondent recalls that ISOLUX (in May 2011); T-Solar and the Companies that owned the plants (in July 2011) and the Claimant (in October 2012), were aware, either by their own statements or by way of settled legal matters applicable to the PV plants, that there was no commitment whatsoever for the 1997 LSE, nor was there one by the Government to maintain reasonable return by means of a FIT. One other thing that also had to be taken under account is the express connection that the National Reform Program 2012[752] made between the premiums, the costs that these generate in the system, and the desire of the Government to adjust these costs.

528. In the case of <u>Parkerings v. Lithuania</u>, the Tribunal ruled that: "*The investor will have a right of protection of its legitimate expectations provided it exercised due diligence and that its legitimate expectations were reasonable in light of the circumstances. Consequently, an investor must anticipate that the circumstances could change, and thus structure its investment in order to adapt it to the potential changes of legal environment.*"[753]. The Respondent recalls that, in this case, the Claimant did not perform and legal *due diligence,* it only relied on the technical *due diligence* for 2008 and 2010 projects[754].

---

[749] Statement of Defence, ¶897.

[750] **Legal Authority CL-89:** Perenco Ecuador Limited v. the Republic of Ecuador, ISCID Case No. ARB/08/6, Decision regarding pending questions relating to jurisdiction, and regarding liability, of 12 September 2014, ¶ 560.

[751] Rejoinder, ¶744

[752] **Exhibit R-72:** National Reform Program of 27 April 2012, Government of Spain: "The items with the greatest contribution to the growth of the costs of regulated activities have been the premiums of the special regime [...] In the immediate future, these effect of these measures will be broadened, so that all sectors contribute in a balanced manner to the adjustment of regulated costs."

[753] **Legal Authority RLA-42**: Parkerings-Compagniet AS v. Republic of Lithuania, ICSID Case No. ARB/05/8, Award, 11 Sept 2007, para 332.

[754] Rejoinder, ¶¶750-751.

*This is an English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

529. The Claimant intends to turn the regulatory norms, RDs 661/2007 and 1578/2008, into the only legislation applicable to the renewable energy sector. It focuses on these two regulations, failing to mention other legislation such as RD 1565/2010, RDL 14/2010, or Law 2/2011[755].

530. The Respondent argues stating that a regulation is an *erga omnes* norm; it is not a promise or a commitment of the State to certain specific installations. However, the Claimant intends to argue that the successive regulations and rulings of the Supreme Court were "offered" to specific installations, which, according to the Claimant, is unfounded. In government, it is not possible to make "offers" or "agreements" through regulatory norms with general scope. Any norm that refers to specific or limited recipients does not indicate a "commitment" by the State. This would lead to the immutability of the legal system, which is not admissible. In addition, the State may not make offers to installations due to the fact that they are simple assets and not investors, and do not fall within the scope of Article 10(1) ECT[756]. The Claimant refers to the case Plama v. Bulgaria[757] where the tribunal ruled that the regulatory framework in itself does not constitute a specific compromise. There was no commitment nor promise on the part of the Kingdom of Spain to maintain the FIT throughout a period of several years.

531. The Respondent focuses then on an examination of the elements of the Test Total v. Argentina, in order to demonstrate that these requirements are not fulfilled and that the conduct of the Kingdom of Spain could not have generated those legitimate expectations:

- First, RDs 661/2007 and 1578/2008 do not constitute *"conduct"* or *"declarations"* independent of the LSE and outside of jurisprudential interpretation by the Supreme Court. The Claimant omits the successive modifications of the RDs between 2008 and 2011 and the set of declarations, programs, and announcements of the normative change, or the Supreme Court rulings applicable res judicata to Plants[758].

- Second, for the same reasons, the Claimant cannot refer to the Kingdom of Spain's *"attempt to pursue certain conduct in the future"*.

- Third, contrary to the Claimant's claim, the RDs were created by domestic and foreign investors, without distinction between them.

- Fourth, the Claimant states that it acted *"in reliance on said conduct"*, but this cannot be true, since ISOLUX was already an investor in photovoltaic assets, so the

---

[755]  Rejoinder, ¶754.
[756]  Rejoinder, ¶757.
[757]  Plama Consortium Limited v. Republic of Bulgaria, ICSID Case No. ARB/03/24, Award, 27 Aug 2008, ¶219.
[758]  Rejoinder, ¶762.

*This is only a true and faithful translation from its original English into Spanish of the attached document.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

outplacement of shares in 2012 was not necessary, it simply served to obtain protection of its assets under ECT[759].

- Fifth, in asserting that the Kingdom of Spain's statement could not be more specific, the Claimant confuses the specificity of the statements with the regulatory as it concerns a particular matter. Specificity refers to the forming of commitments as a performance or behaviour of the State or to agreements between a State and an investor, as explained in the case <u>El Paso v. Argentina</u>[760]. RDs are subject to the 1997 LSE, which specifies the conditions of a legal regime, and this does not prevent these RDs from being modified.

- Sixth, the Claimant argues that the RDs were clearly intended to create, on a prospective basis, *"a defined framework for future operations ... applicable to long-term investments and operations"*. The Respondent answers by stating that once again the Claimant erroneously considers that the legal framework for renewable energies in Spain in 2012 was made up of 2 regulations of 2007 and 2008. The legal Framework in the Spanish system at that time was much broader[761].

532. The Claimant includes "stable conditions" within "stability of the regulatory framework," which was violated by the modification of the means of remuneration; the long-term FIT. However, the Respondent notes that the Claimant omits essential details necessary in order to determine the true legitimate expectations of the Claimant in 2012. The Claimant does not respond nor does it refer to the essential circumstances such as the Rulings of the Supreme Court, and in particular those of 15 October 2012, applicable to the Plants. In 2006 and 2007, the Supreme Court had stated that producers do not enjoy an immutable right to maintain unchanged the economic regime governing the modification of premiums, which also does not guarantee "intangibility" or "indefinite permanence" of the formulae used to set the premiums[762]. The Respondent also states that the Ruling of 15 October 2012 was notified to T-Solar on 23 October 2012, which reinforces the fact that, according to this Party, Isolux INBV had to know before its investment the possibility that the remuneration regime

---

[759] Rejoinder, ¶765.

[760] **Legal Authority RLA-55**: El Paso Energy International Company v. Argentine Republic, ICSID Case No. ARB/03/15, Award, 31 October 2011 paragraph 379: "specific commitments such as consistent behaviour of the State that have the purpose of convincing the foreign investor that it would be protected against excessively drastic changes should be considered with special attentions."

[761] Rejoinder, ¶767.

[762] Ruling of the Third Chamber of the Supreme Court on 25 November 2006, RCA 12/2005. **Exhibit R-31**; subsequently reiterated in a Ruling of 3 December 2009 (**Exhibit R-38**), of the Rulings 9 December 2009 (**Exhibit R-39** and **Exhibit R-40**).

*This document is a translation of the original award issued in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

would be modified, within the legal limit set forth by Ruling of the Supreme Court: "*the guarantee of the principle of reasonable return*"[763].

533. The Respondent also does not mention modifications to successive norms, of those that ISOLUX, T-Solar and the Companies that owned the plants stated in 2011 that "*turn Spain into a country without legal security for investors*"[764]. In addition, Isolux INBV continues to argue its claim for damages under Law 15/2012, when in the Statement of Defence it was demonstrated that on 29 October 2012, the Law was already being processed in the Parliament and does not explain to what extent its legitimate expectations were in fact hampered by the "unforeseeability" of a regulatory norm under the process parliamentary approval, and by a Government with an absolute parliamentary majority[765].

534. The Respondent also notes that the jurisprudence cited in paragraph 581 of the Reply is not applicable to the present case, as it deals with concession, license, contract between the investor and the State, and furthermore, in addition, none of the 13 cases cited apply the ECT[766]. On the contrary, Respondent explains that the jurisprudence cited in its Statement of Defence is fully applicable. In the case of the award in MTD v. Chile, also in Plama v. Bulgaria, where a policy change is examined in which the Bulgarian State did not make specific commitments in favour of the applicant investor and where the ECT applied[767]. The Respondent also notes that the Claimant did not formulate any criticism with regard to the case Parkerings v. Lithuania, and also notes the observations of the other Party with regard to EDF v. Romania, Continental casualty v.

---

[763] Statement of Defence, ¶¶794-796; Supreme Court Ruling of 15 October 2012, establishes in its Legal Basis Ten:
- P. 27, first paragraph: "The practical elimination of entrepreneurial risk entails taking advantage of the regulated tariff, without competing with other agents in the market in terms of prices, is in and of itself an advantage over the operators of the electricity sector subject to the vicissitudes of free competition, an advantage whose reverse is precisely the possibility, among other things, of altering administrative measures in the face of changes in subsequent circumstances (with respect to minimum profitability which at this time is not the case in question)."
- P. 33, second paragraph: ""The reasonable remuneration for investments that Law 54/1997 provides for does not have to imply, we repeat, that the remuneration must be provided specifically through a regulated tariff (it could be, in the future, at market prices)".
- P. 34, final paragraph.- "Investments in this technology are still protected and encouraged in Spain by a normative framework that is certainly favourable in its entirety (apart from the fact that it offers the guarantee of the principle of reasonable return)".
[764] Rejoinder, ¶¶771; **Exhibit R-214**: ISOLUX Claim of 27 May 2011, page 11.
[765] Rejoinder, ¶771.
[766] Rejoinder, ¶773.
[767] Rejoinder, ¶778; **Exhibit RL-32**: Plama Consortium Limited v. Republic of Bulgaria, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 219: "*the Tribunal believes that the ECT does not protect investors against any and all changes in the host country's laws. Under the fair and equitable treatment standard the investor is only protected if (at least) reasonable and justifiable expectations were created in that regard. It does not appear that Bulgaria made any promises or other representations to freeze its legislation on environmental law to the Claimant or at all.*"

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

Argentina, in the case of <u>Paso v. Argentina</u>, the case of <u>AES Summit v. Hungary</u>, or <u>Perenco v. Ecuador</u> [768].

535. The Claimant omits numerous socioeconomic circumstances which were of such magnitude in October 2012 that Isolux INBV should have reasonably foresaw that they would generate the need to enact legal measures to alleviate the electricity tariff deficit[769]. Those objective circumstances were what made it impossible to set legitimate expectations regarding the maintenance of the FIT in the long term, which generated an economic imbalance due to premiums paid to renewables, which implied both an excessive burden for consumers and the unsustainability of the system in the short and medium term[770]. The crisis circumstances as well as Government announcements and Programs were explicit.

536. The Respondent concludes that either from a subjective point of view of the Claimant, or from an objective point of view of any diligent investor, the Tribunal must reject Claimant's claim, because, in October 2012, the legitimate expectations that Isolux INBV could have been subject to with the outplacement of T-Solar's shares, and indirectly from the Plants that are object of the present arbitration proceeding had not been violated[771].

### iii. *The Kingdom of Spain has not adopted exorbitant nor discriminatory measures*

537. The Respondent also argues that no exorbitant measures have been taken in accordance with the legal precedent provided, a conclusion confirmed by the Test carried out by experts of T-Solar and the Companies that own the Plants are using before the Supreme Court to verify whether or not a reasonable return is achieved with the reforms being carried out[772].

538. The Claimant then proceeds in the study of the 4 tests proposed by the arbitration jurisprudence, demonstrating that those tests, in spite of the different requirements, highlight the fact that the measures are, in fact, not exorbitant and have not violated the other main elements of the FET standard.

539. First, the Respondent refers to the test used by the Tribunal in the case <u>Convial Callao v Peru</u> in order to determine whether the actions of the State were arbitrary or not[773]. The factual elements analysed by the Arbitral Tribunal were: a) whether the act of the State was

---

[768] Rejoinder, ¶¶779-784.
[769] Reply, ¶¶814 -843.
[770] Rejoinder, ¶¶788-790.
[771] Rejoinder, ¶794.
[772] Rejoinder, ¶¶809-812.
[773] Statement of Defence ¶¶911-917; Convial Callao S.A. and CCI - Compañía de Concesiones de Infraestructura S.A. v. Republic of Peru, ICSID Case No. ARB/10/2; Award 21 March 2013 ¶614.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

unforeseeable or not, that is to say, if from the factual situation it could possibly have been expected that such result would have occurred; b) whether the measure was capricious, tyrannical or disproportionate; that is to say, whether it was based on facts and foundations different from those in prevailing Law; c) whether the reasons that motivated the act as the procedures that were carried out were capricious or incoherent. According to the Respondent, conducting this test in the context of the present case leads to the conclusion that the measures adopted by the Kingdom of Spain are neither arbitrary nor inconsistent, and nor do they lack transparency, since these elements are in fact part of the FET standard, directly related to the determination of the measures as neither exorbitant nor discriminatory [774].

540. The Respondent notes that Claimant's main argument is that this arbitral case has no relation to the present case. However, it does not even examine the elements of the Test set out above, nor does it examine the arguments made by the Kingdom of Spain regarding compliance with that test. As a result of this, if applicable to the present case, the elements of the Test set forth, and the arguments for compliance with each of its elements, must be deemed to have been accredited (by not having discussed them). Furthermore, the Claimant may not consider that this case, because it does not apply the ECT, is not applicable, when it expressly mentioned these elements in examining the FET standard [775].

541. The Respondent also refers to the Test performed by the Tribunal in the case EDF v Romania [776], the Arbitral Tribunal accepted the criteria of verification presented by Dr Christoph Schreuer in order to estmate whether a State action is in fact discriminatory or arbitrary. In this sense Dr Schreuer considers the following to be arbitrary:

> "*a) A measure that inflicts damage on the investor without serving any apparent legitimate purpose;*
>
> *b) A measure that is not based on legal standards but on discretion, prejudice or personal preference;*
>
> *c) A measure taken for reasons that are different from those put forward by the decision maker;*
>
> *d) A measure taken in intentional disregard of due process and proper procedure*."

---

[774] Rejoinder, ¶817.

[775] Rejoinder, ¶¶814-816.

[776] *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13; Award 8 October 2009; ¶303 "*In an attempt to give a content to general expressions such as "unreasonable or discriminatory measures," Claimant relies on the categories of measures that its legal expert, PROFESSOR CHRISTOPH SCHREUER, has described in his opinion as "arbitrary":*
*a. a measure that inflicts damage on the investor without serving any apparent legitimate purpose;*
*b. a measure that is not based on legal standards but on discretion, prejudice or personal preference;*
*c. a measure taken for reasons that are different from those put forward by the decision maker;*
*d. a measure taken in wilful disregard of due process and proper procedure.*
*The Tribunal will consider the claim of "unreasonable or discriminatory measures" according to the terms proposed by Claimant.*"

This document is a translation of the original award rendered.
Case 1:19-cv-01618-TSC Document 69-52 Filed 06/09/22 Page 176 of 257
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

542. The Respondent concludes that none of the four criteria set forth in the Case <u>EDF v</u> <u>Romania</u> to determine whether an action is arbitrary or discriminatory is applicable to the investment made by the Claimant in October of 2012[777].

543. In response to this argument, the Claimant claims that the test referred to in this case also refers to arbitrariness as well, not [only] to the exorbitant nature of the measure. On the contrary, the Respondent considers that an arbitrary measure can very obviously be considered exorbitant within the FET standard. Therefore, this Test is also applicable to examine the reasonableness of measures adopted, or their exorbitant character[778].

544. The Respondent also examined the Test in the Case <u>AES SUMMIT</u>[779] matter, where the tribunal ruled on whether or not there existed an unacceptable (unreasonable) or discriminatory measure that violated the FET standard established in the ECT. Therefore, it used the most limited criteria that had been established by the Arbitral Tribunal in the Case <u>Saluka v. Czech</u> Republic[780]: the <u>existen</u>ce of a rational policy and that the Government's action is reasonable is to say that there is an appropriate correlation between the objective of state public policy and the measure adopted to be able to reach said target[781].

545. Regarding this Test, the Respondent notes that the Claimant acknowledges that this test is consistent with the appreciation of the standard of reasonableness in accordance with the ECT. However, the Claimant considers that the measures are, in fact, unreasonable, and that they are in fact exorbitant according to that shown by KPMG[782]. The Respondent concludes by stating that in applying this Test, as admitted by the Claimant, and considering the rationale of the measures, the Tribunal will reject Isolux INBV's claim that the Kingdom of Spain has adopted exorbitant measures.

546. The Respondent refers to a fourth test, the one used by the tribunal in the Case <u>Total v.</u> <u>Argentina</u>[783] where the minimum conditions required in the FET standard that

---

[777] Statement of Defence, ¶¶818-829.

[778] Rejoinder, ¶819.

[779] **Legal Authority RLA-61**: *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22; Award 23 September 2010; ¶10.3.7 to 10.3.9.

[780] **Legal Authority RLA-46**: *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, 17 March 2006; ¶307. To determine whether the conduct of a State was reasonable, it stated that it "*must be justified by showing that it <u>bears a</u> <u>reasonable relationship to rational policies</u> not motivated by a preference for other investments over the foreign-owned investment*".

[781] Statement of Defence, ¶¶926-935.

[782] Rejoinder, ¶821.

[783] *Total S.A. v. The Argentine Republic*, ICSID Case No. ARB/04/01; Decision on Liability, 27 December 2010, ¶122: "*when the basis of an investor's invocation of entitlement to stability under a fair and equitable treatment clause relies on legislation or regulation of a unilateral and general character. [...] This type of regulation is not shielded from subsequent changes under the applicable law. This notwithstanding, a claim to stability can be based on the inherently prospective nature of the regulation at issue aimed at providing a defined framework for future operations. This is the case for <u>regimes, which are applicable to long-term</u> <u>investments</u> and operations, and/or providing for "fall backs" or contingent rights in case the relevant framework would be changed in unforeseen circumstances or in case certain listed events materialise.*

*This is an unofficial English translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

would permit the demonstration of whether the State has broken the economic balance for investment, in cases of investment of a large scale with high amounts of capital at a long term, were examined. This Arbitral Tribunal ruled on certain measures taken by the Government of Argentina in the Electric and Gas sectors. The Arbitral Tribunal ruled that, in those cases where legitimate expectations derive from the general regulatory framework itself, this general egulatory framework cannot be shielded from subsequent amendments. However, in those sectors that involve long-term investments and large amounts of capital, the possibility for a given State to modify the legal framework must be carried out in the sense that the investor is able to recover its operational costs, amortise its investment and obtain a reasonable rate of return during that time period [784].

547. However, the Claimant refuses the application of this test, stating that the conclusion reached by the Kingdom of Spain is incorrect [785]. The Respondent considers that the Claimant has not understood its arguments and reaffirms its position. Spain has carried out the structural reform of the electricity sector for a reasonable reason and without breaking the economic balance of the Isolux INBV investment, respecting the minimum FET standard at all times [786].

548. Finally, the Respondent is interested in the test invoked by T-Solar and the holding companies of the Plants on July 4, 2011 in its lawsuit filed before the Supreme Court, to verify whether a reform is reasonable, insofar as it permits them to obtain a reasonable return. This emphasises the fact that these companies were, in July 2011, fully aware that the right they can claim to the Spanish State is to obtain a reasonable return on their investment and not through the application of a FIT. It was for this reason that they submitted an expert report from Deloitte, in order to demonstrate by means of comparison450 [787] whether the reform enacted would result in a reasonable return, or not. It so happens that T-Solar and all of the companies that owned the PV Plants considered that the reform would provide reasonable return if the expected return was greater than the 10-year bonus or the 30-year bonus [788].

---

*In such cases, reference to commonly recognised and applied financial and economic principles to be followed for the regular operation of investments of that type (...) may provide a yardstick. This is the case for* <u>capital intensive and long term investments</u> *[...]. The concept of "regulatory fairness" or "regulatory certainty" has been used in this respect. In the light of these criteria* <u>when a State is empowered to fix the</u> *tariffs of a public utility it must do so in such a way that the concessionaire is able* <u>to recover its operations</u> <u>**costs, amortise its investments**</u> <u>and make a</u> <u>**reasonable return**</u> <u>over time</u>" (emphasis added).

[784]  Statement of Defence, ¶944.
[785]  Rejoinder, ¶824.
[786]  Rejoinder, ¶¶828-829.
[787]  **Exhibit R-222**: Claim by the mercantile group T-Solar Global S.A (among others) of 4 July 2011 brought before the Supreme Court against Royal Decree 1565/2010, contentious-administrative appeal no. 64/2011; T-Solar and the companies that own the Plants argued in their claim (page 129): "Does the profitability of solar photovoltaic installation owned by appellant parties continue to be reasonable? The expert report that is included with the letter shows that the new profitability is no longer reasonable, for the following reasons (...)."
[788]  Rejoinder, ¶¶831-835.

This is only an English translation of the Spanish original award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

549. The Respondent notes that in the present arbitration proceedings, the measure under review currently challenged by Isolux INBV as being in breach of the FET standard, grants the 10-year Spanish Bonus interest increased by 300%. That is to say, 7.398% of interest on the cost of the investment made for an installation, in addition to paying the costs of operation and maintenance and the energy produced and sold, with preference the other energy producers. It concludes that the profitability granted by RDL 9/2013 exceeds 3%, the profitability threshold established by the companies whose shares are owns by Isolux INBV in such a way that Isolux INBV, a holding company, my not claim greater profitability or use a different criterion of reasonableness from that of the companies whose shares it holds directly and indirectly.[789]

iv. _The Kingdom of Spain has fulfilled its obligations to the Claimant: there is no umbrella clause in this instance_

550. The Respondent does not agree with the application of the concept of the "umbrella clause" used by the Respondent [sic: Claimant] in relation to the interpretation of Article 10 (1) of the ECT. The Claimant takes the scope of this clause beyond what is due, considering that this Article carries an umbrella clause, while it is a standard of the _erga omnes_ type and that the umbrella clauses are only in Agreements between a State and an investor.

551. According to the Respondent, the application of this umbrella clause in question can never be extended to a general regulation _erga omnes_, as the Claimant insists. This is confirmed by arbitral jurisprudence in <u>SGS v. the Philippines</u>[790] and the Ad Hoc Committee in the case <u>CMS v. Argentina</u>[791], at the time of the annulment of said award with regard to the application of an _"umbrella clause"_ which highlighted that the umbrella clause implied a specific relationship between the State and the investor[792].

552. The arbitral doctrine is also clear with regard to this. In the case of the authors Dolzer and Stevens[793] that noted that the scope of the umbrella clause is the protection of "investor's contractual rights" (and, therefore, arising from a contract), and of Wälde[794] which called it the "_pacta sunt servanda_ clause", highlighting its "contractual" nature. In effect, the umbrella or _pacta sunt servanda_ clause is created to ensure that contracts entered into by foreign investors with a State are respected, so that the State

---

[789]  Rejoinder, ¶¶834-835.
[790]  **Legal Authority RLA-99** : SGS Société Générale de Surveillance v. Republic of the Philippines, ISCID Case No. ARB/02/6, Decision on objections to jurisdiction, 29 January 2004, paragraph 121.
[791]  **Legal Authority RLA-100**: CMS Gas Transmission Company v. Republic of Argentina, ISCID Case No. ARB/01/8, Decision of the ad hoc Committee on Annulment, September 25th 2007, paragraph 95.
[792]  Rejoinder, ¶842.
[793]  R. Dolzer and M. Stevens, Bilateral Investment Treaties (1995), pp. 81-82.
[794]  **Legal Authority RLA-103**: The "Umbrella" Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases. Thomas W. Wälde. HEINONLINE 6 J. World Investment & Trade 183 2005, page 226.

cannot escape its contractual obligations by resorting to sovereign powers[795]. In addition, the Respondent states that, according to Wälde, the umbrella clause also cannot be equated with a stabilisation clause or a "freeze" clause for the regulations in force at the time of entering into the contract. This type of clause may not prohibit a State from regulating on materials that the contract governs[796].

553. Therefore, it is not possible to share the Claimant's thesis, which considers the possibility of referring the umbrella clause to *erga omnes* general provisions. The case of LG&E v. Argentina confirms this interpretation, as well as Axel Weissenfels in his interpretation of the award[797].

554. The Respondent concludes by stating that the Laws or the general provisions issued in the development thereof do not generate legal obligations applicable to the State that fall within the scope of the umbrella clause, which is logical consequence of the literal wording and of the purpose of the forecast of Article 10(1), final section of the ECT, which presupposes, first of all, a vis-à-vis relation between the State and the investor, and secondly, that in the case of such vis-à-vis relationship the State has consented to assume a specific obligation with that investor. The burden of proving the existence of said specific relation, a prerequisite for the application of the "umbrella clause" falls to the Claimant, and it has not done so[798].

555. Finally, the Respondent adds, that in accordance with the case of CMS v. Argentina[799], that in order to invoke the clause in question, it is also necessary to demonstrate what the applicable internal law is and, in addition, if in accordance with said internal law it so happens that non-compliance with said obligation, attributable to the State, has occurred. However, the Claimant does not even bother to make allegations nor demonstrate any of these aspects[800].

556. It seems, in this case, that the obligation whose compliance the Claimant is calling for with the support of the umbrella clause of ECT Article 10.1 has never, in fact, existed under Spanish Law. It states that, in 2011, the Claimant, argued that it did not exist[801] and that the Claimant's principal shareholder was aware of and accepted the Spanish regulatory system did not contemplate the existence of this obligation. The non-existence of this obligation was communicated by the Supreme Court itself[802].

---

[795] Rejoinder, ¶844.
[796] Rejoinder, ¶847.
[797] Rejoinder, ¶¶849-851.
[798] Rejoinder, ¶853-854.
[799] **Legal Authority RLA-100**: CMS Gas Transmission Company v. Republic of Argentina, ISCID Case No. ARB/01/8, Decision of the ad hoc Committee on Annulment, September 25th 2007, paragraph 95.
[800] Rejoinder, ¶¶855-856.
[801] Rejoinder, ¶347; Rejoinder. ¶ 342.
[802] Rejoinder, ¶861; **Exhibit R-139**: Ruling of the Supreme Court, 24 September 2012, issued in the case of Litigio Isolux Corsán, S.A. v. RD 1565/2010, rec. 60/2011. Legal Basis 6 p.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 180 of 257
*This document is a Draft Translation of the Original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

c.   The Kingdom of Spain has not violated Article 13 ECT

557.   The Claimant alleges that the measures adopted by the Respondent had an effect of "*cancelling, in full or in a significant portion, the economic interest of Claimant's investment*". According to the Claimant, the economic value of the IIN investment "*consisted in the security to sell electrical energy produced under the Special Regime, at a fixed rate: the FIT*". The measures in question had the effect of destroying this economic value upon applying, for the Claimant, "*a new regime that involves revenue, and, as a result, much lower profitability*"[803].

i.   <u>Lack of legitimate object: future income expected by IIN cannot be deemed assets or rights capable of expropriation  in accordance with Article 13 ECT</u>

558.   The Respondent believes that there was no violation of Article 13 ECT, mainly due to the fact that, in the first place, the economic interests of the Claimant did not constitute a "good" that could be expropriated in accordance with the ECT. This can be surmised from section (3) of Article 13 ECT.

559.   This assumes that the Claimant determined that the good is its property, or that it shared in its ownership. The Claimant has not demonstrated that it has ownership over the property supposedly expropriated, nor the existence of a relation of causality between the measures adopted by the State and its impact on the ownership of this property.

560.   However, in this case, the Respondent considers that the "*security of selling electrical energy under the Special Regime at a regulated rate*" does not constitute a property that could be expropriated under the terms of Article 13(3) ECT. It thus follows from the connection of said Article to the concept of protected investment as contained in Article 1(6) ECT, considering that this provision defines "investment" as "*any type of asset owned or controlled directly or indirectly by an investor*". Applying the foregoing to the present case, it must be concluded that the Claimant does not, in fact, "*own or control directly or indirectly*" the income it expected to receive in the future via tariffs under the Spanish legislative framework. It is clear that such expectations of returns or benefits may not be included in the concept of protected investment as laid out by ECT Article 1(6)[804].

561.   Effectively, the Respondent states that in order to be eligible for expropriation under the ECT, any investment must consist of a right or asset duly constituted, defined, formed and recognised under the laws of the host State that grants protection under the corresponding investment treaty. This is the case due to the fact that international law

---

35; **Exhibit R-141**: Ruling of the Supreme Court of 15 October 2012 issued in the case of T-Solar and 117 SPVs v. RD 1565/2010, rec. 64/2011. Legal Basis Ten. P. 34.

[803]   Rejoinder, ¶864.
[804]   Statement of Defence, ¶¶989-990.

158

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

on expropriations only regulates substantive protections of property rights or other economic interests, but not the process of creation of such rights[805].

562. In Spanish law there exists a clear distinction between an acquired right and an expectation, so that in order to determine whether compensable damage in fact exists, it is necessary that the injured party is entitled to a right and that this right has been incorporated into its equity[806].

563. In addition, the Supreme Court, in a ruling issued on 9 October 2007, confirmed that "simple expectations" are not eligible for expropriation rights[807].

564. It is the case that the Claimant neither "*possesses nor controls, directly or indirectly*", the returns that it hopes to receive in the future in the form of tariffs. Claimant's alleged investment would be limited to the stake it held in T-Solar. The yields of the Plants do not, in fact, constitute the Claimant's investment. In its case, it will be the dividends obtained indirectly due to the "profits" of the Plants, if the decision to distribute dividends is adopted. However, according to Spanish law, it is clear that it has no right in its [equity] to obtain a certain return, but only an expectation to obtain future dividends.

565. It also adds that the assumption of "security" is neither a good eligible for expropriation nor under Spanish law, to which the ECT refers, neither under the international jurisprudence cited in the Statement of Defence[808].

566. In light of the rulings of 24 September and 15 October 2012 directed at ISOLUX and T-Solar in relation to the appeals they had brought against RD 1565/2010, the Respondent states, as well, that, if there is no under Spanish legal ordinances an "*immutable right that the economic regime used to regulate the collection of remuneration be maintained*", this right also does not exist for the purposes of Article 13 ECT, and nor may it be the object of expropriation[809].

---

805  Statement of Defence ¶993; **Legal Authority RLA-67**: UNCTAD Series on Issues in International Investment Agreements, Expropriation, United Nations Series, New York and Geneva, 2012, page 22, ("Informe UNCTAD Expropriation"); **Legal Authority RLA-66**: Suez, Sociedad General de Aguas de Barcelona S.A., and InterAgua Servicios Integrales del Agua S.A. v. the Republic of Argentina, Decision on Responsibility of 30 July 2010.

806  Statement of Defence, ¶994.

807  **Exhibit R-155**: Ruling of the Third Chamber of the Supreme Court on 28 May 2001, rec. 462/1997.

808  Rejoinder, ¶¶877-880.

809  Rejoinder, ¶¶882-883.

*This document is a translation of the original Spanish award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

567. The Respondent also states that under international law, expropriation of hypothetical and contingent rights is not possible, but that this is only in fact possible in the case of certain, effective and current rights[810].

568. On the other hand, the Respondent points out that international law does not recognise the expropriation of hypothetical and potential rights, but indicates that these rights must be true, effective and current. Both case law as well as international jurisprudence confirm this, and in particular the case of <u>Nations Energy v. Panama</u>[811] where the tribunal analysed whether claimants had a vested right to the provisions contained in Panamanian Law 54, object of the dispute[812].

### ii. _The measures adopted did not constitute an expropriation in accordance with international law_

569. Secondly, in the event that the Claimant were in fact deemed to have "a good" that could be expropriated within the scope of Article 13 (3) ECT, the Respondent adds that the measures taken are not measures equivalent to expropriation, but rather non-discriminatory adaptations that have been made in good faith in order to protect public interests in proportion to the objective pursue, and in full compliance with due process (_Police Power_)[813]. The Respondent refers to various arbitral cases that confirm this theory such as <u>Fireman's Fund v. Mexico</u>[814], <u>CME v. the Czech Republic</u>[815], <u>Saluka v. the Czech Republic</u>[816], <u>Paso Energy International Company v. the Republic of Argentina</u>[817].

570. With regard to the public interest, the Respondent adds that at the time of determining or defining what public interest actually is, international jurisprudence has stated that there exists a presumption in favour of the State that it shall act in good faith in the defence of the

---

810    Statement of Defence, ¶997.

811    **Legal Authority RLA-69:** *El Arbitraje en los litigios de expropiación de Inversiones extranjeras* [Arbitration in cases of expropriation of foreign investments], Iñigo Iruretagoinea Agirrezabalaga, Bosh, 2010, page 291; **Legal Authority RL-143**: Nations Energy Inc. Electric Machinery Enterprises Inc and Jaime Jurado v. the Republic of Panama, ISCID Case No. ARB/06/19, Award of 24 November 2010, ("Nations Energy").

812    Statement of Defence, ¶¶999-1006.

813    Reply, ¶869; Statement of Defence, ¶1009.

814    UNCTAD Expropriation Report, pages 87-88; *El Arbitraje en los litigios de expropiación de Inversiones extranjeras* [Arbitration in cases of expropriation of foreign investments], Iñigo Iruretagoinea Agirrezabalaga, Bosh, 2010, paragraph 206 (RLA- ); OCDE, "Indirect Expropriation" and the "Right To Regulate" in International Investment Law Working Papers on International Investment, No. 2004/4, 2004, page 18

815    **Legal Authority RLA-72:** *CME Czech Republic B.V. v. the Czech Republic*, CNUDMI, Partial Award of 13 September 2001, paragraph 603.

816    *Saluka Investments BV v. The Czech Republic*, CNUDMI, Partial Award of 17 March 2006 ("Saluka"), paragraphs 255-265.

817    *El Paso Energy International Company v. Republic of* Argentina, ISCID Case No. ARB/03/15, Final Award of 31 October 2011, paragraphs 236-241.

*This is an unofficial translation of the original English award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

public interest[818]. In this manner, the burden of proof to demonstrate that the measure is not in the public interest and that it was adopted without good faith falls to the Claimant[819].

571. Now, the Respondent states that the ECT does not contain a definition of the concept of indirect expropriation. International jurisprudence on investment arbitration under the ECT has pointed out that for Article 13(1), to be considered equivalent to an expropriation, it is required that a measure adopted by a State prevent the investor from continuing to operate its investment, or to make use of it, or that it limits any of its right of ownership over it.

572. In order to clarify the concept of indirect expropriation, the Respondent refers to the test applicable in international jurisprudence, and concludes that there was in fact no expropriation in this case, due to the fact that those measures had not led to Spain's takeover of the control of the investment, nor had they impeded the continuity of investment, or destroyed the value of the investment forever[820]. The Respondent refers to the following cases: Electrabel S.A. v. the Republic of Hungary[821], Nykomb Synergetics Technology Holding AB v. the Republic of Latvia[822] applying Article 13 ECT, CMS v. Argentina[823], Pope and Talbot c. Canada[824], Feldman v. Mexico[825] Sempra v. Argentina, AES v. Hungary[826], Suez v. the Republic of Argentina[827], BG Group Plc. v. the Republic of Argentina[828], SD Myers v. Canada[829], Olguín v. Paraguay[830] or Ulysseas, Inc. v. Ecuador[831].

---

[818]  UNCTAD Expropriation Report page 80.
[819]  Statement of Defence, ¶1018; UNCTAD Expropriation report p. 80.
[820]  Rejoinder, ¶870.
[821]  *Electrabel S.A. v. the Republic of Hungary*, ISCID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law, and Responsibility of 30 November 2012 ("Electrabel"), paragraphs 6.53-6.57, 6.63.
[822]  Statement of Defence, ¶1032; *Nykomb Synergetics Technology Holding AB v. the Republic of Latvia*, Award of 16 December 2003, paragraph 4.3.1. RLA- 74
[823]  *CMS Gas Transmission Company v. the Republic of Argentina*, ISCID Case No. ARBI/01/8, Award of 12 May 2005, ("CMS"), paragraphs 262-264. RLA- 75
[824]  *Pope and Talbot, Inc v. Government of Canada*, CNUDMI/NAFTA, Interim award of 26 June 2000, paragraph 102. RLA- 76
[825]  *Marvin Roy Feldman Karpa v. Mexico*, ISCID Case No. ARB(AF)/99/1, Award of 16 December 2002, paragraphs 152-153. RLA- 77
[826]  *AES Summit Generation Ltd and AES-Tisza Erömü Kft v. Hungary*, ISCID Case No. ARB/07/22, Award of 23 September 2010, paragraphs 14.3.1 – 14.3.4.
[827]  *Suez, Sociedad General de Aguas de Barcelona S.A., and InterAguas Servicios Integrales del Agua S.A v. the Republic of Argentina*, ISCID Case No. ARB/03/17, Decision on Responsibility of 30 July 2010, paragraphs 134 and 140.
[828]  *BG Group Plc. v. the Republic of Argentina*, CNUDMI, Final Award of 24 December 2007, paragraphs 268-272. RLA-79
[829]  S.*D. Myers, Inc c. Canadá*, CNUDMI, Partial Award of 13 November 2000, paragraph 287. RLA-80
[830]  *Eudoro Armando Olguín v. Paraguay*, ISCID Case No. ARB/98/5, Award of 26 July 2001, paragraph 84. RLA- 81
[831]  *Ulysseas Inc. v. Ecuador*, UNCITRAL, Award of 12 June 2012, paragraph 189. RLA- 82

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

573. In its Rejoinder, the Respondent uses, in particular, the test adopted by the Claimant in the case Electrabel v. Hungary[832], indicating in this regard that the Parties agree to the existence of the expropriation in consideration of this test[833].

574. In accordance with the test used in Electrabel v. Hungary[834], in order for it to be deemed that expropriation has occurred, international law requires that the investor establish or demonstrate "*substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value, or enjoyment*".

575. According to the Respondent, this phrase must be broken down into two premises:

"*the substantial, radical, severe, devastating, o fundamental deprivation of its rights*"

"*and*"

"*the virtual annihilation, effective neutralisation, or factual destruction of its investments, its value, or enjoyment*".

576. The Claimant improperly applies the test when, in referring to the indirect expropriation of the value of the investment, it states that substantial deprivation is in fact considered to have occurred when the loss suffered by the investor is rated as "severe" or "radical"[835]. It so happens that the Claimant applies the test incorrectly, due to the fact that in the award from Electrabel, the adjectives "*severe*" and "*radical*" do not describe the "*investment value*" but rather "*the deprivation of rights*" (of the investor). In order for the value of the investment to be deemed expropriated, that value must undergo virtual annihilation, effective neutralisation or factual destruction. It is not sufficient that a deprivation of the value of the investment to be "severe" for expropriation to exist. The Respondent concludes that in the present case there was in reality no expropriation, due to the fact that neither "virtual annihilation" nor "effective neutralisation" or "factual destruction" of the "value" of Claimant's alleged investment in Spain occurred[836].

577. The application of another test as called for by the Claimant in its Reply also does not permit the conclusion of expropriation to be drawn, either[837].

578. Finally, Respondent states that the measures [enacted] by Spain do not constitute an indirect expropriation, even under the standard set out by the Claimant. It should be

---

[832] **Legal Authority RLA-3**: Electrabel S.A. v. Republic of Hungary, ISCID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law, and Responsibility of 30 November 2012, 6.62.
[833] Rejoinder, ¶887.
[834] Rejoinder, ¶¶888.
[835] Reply, ¶738; Rejoinder ¶890.
[836] Rejoinder, ¶891-893.
[837] Statement of Claim, ¶158; Rejoinder, ¶894-895.

noted that the only references provided by the Claimants with regard to the definition of the concept of indirect expropriation that it uses for support, are based on two quotes taken from the cases <u>Metalclad</u> and <u>Vivendi</u> and that these cases have nothing to do whatsoever with the current case[838].

iii. *The proven facts show that the measures do not, in fact, entail expropriation*

579. The Respondent concludes its demonstration of the absence of expropriation by making note of the effect of the measures on the Claimant's alleged investment.

580. The fact that the profitability of the disputed measures guarantees the investor a further 7.1% IRR after tax, i.e. at a rate that is higher than the maximum expected profitability admitted by ISOLUX itself (6.19% after Law 2/2011) in 2011. This profitability continues to be greater, including taking into consideration its own costs.

581. In addition, the Respondent recalls that the Spanish system guarantees the investor the recovery of its investment costs, its operating and maintenance costs, and the achievement of a return of more than 7% IRR. It is not possible that expropriation occurred[839].

582. It is stated that neither ISOLUX nor the group to which it belongs has reflected in its accounting statements any current deterioration of their assets.

583. With regard to the IVPEE, the Respondent also emphasises that it has no expropriatory effects, since the IVPEE, which is applied with a 7% rate of charge, is one of the costs that are paid back to renewable producers such as photovoltaics by means of the specific remuneration they receive, thus neutralising the effect of the IVPEE on such producers[840]. In addition, the IVPEE is a tax deductible expense with regard to the Tax on Companies for taxpayers of the IVPEE, as recognised by the General Directorate of Taxes of the Spanish Ministry of Finance and Public Administration.

584. In any event, the question of an alleged expropriation of the IVPEE is not admissible in an arbitration proceeding until the prior submission of the matter to the competent national tax authorities has been completed within a maximum period of six months, as required by Article 21(5)(b) of the ECT[841].

---

838  Statement of Defence, ¶¶1052-1062.
839  Rejoinder,          ¶900.
840  Rejoinder,          ¶903
841  Rejoinder, ¶902.

*This is an unofficial translation of the original Spanish award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

### d.   The Claimant has no right to compensation

585.   The Respondent argues that the Claimant is not entitled to compensation due to the fact that the return on its investment has not been reduced at all.

#### i.   *The valuation method is not appropriate*

586.   The Claimant uses the DCF method. However, the lack of sufficient financial history, the nature of the parameters to be considered, and the long-term range of the forecasts lead to, according to the Respondent, the irrelevance of determining magnitudes at 30 years in a viable manner[842].

587.   Firstly, the Respondent points out that the legislation itself establishes regulatory periods of 6 years and half periods of 3 years in order to be able to adapt the relevant parameters, in order to be able to guarantee a reasonable return at all times. In such manner that the setting in stone of the parameters by the Claimant for a period of 30 years is unreasonable and, in fact, speculative[843]. This has been reasonably demonstrated in the ruling of the Arbitral Tribunal dated 24 September 2012[844], relating to the Plants. "*(a) lack of sufficiently long performance record; (b) failure to establish future profitability of the investment;*
*(c) lack of sufficient finances to complete and operate the investment; and (d) large disparity in the amount actually invested and the FMV claimed*"[845].

588.   The tribunals frequently use other methods based on costs of assets, analysing whether these are recuperated. The Respondent states that when the investment is very recent and the date of acquisition of the assets is close to the valuation date, the focus on the rates of return on the value of the assets is preferably used[846].

589.   The Respondent specifies that this method was utilised by the experts from Deloitte in May 2011, and presented before the Supreme Court[847]. The Respondent specifies that the cost of these assets must be an actual or market cost, that is, reasonable costs that are adjusted to legal standards of to the market[848].

---

842   Rejoinder, ¶918.
843   Rejoinder, ¶919.
844   **Exhibit R-139**: Ruling of the Supreme Court, 24 September 2012, issued in the case of Isolux Corsán, S.A. v. RD 1565/2010, rec. 60/2011.
845   Rejoinder ¶928; **Legal Authority RLA-102**: Sergey Ripinsky with Kevin Williams. Damages in International Investment Law (BIICL, 2008), pp. 200 and in particular
846   Rejoinder, ¶¶925-928.
847   Rejoinder, ¶929.
848   Rejoinder, ¶930.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 187 of 257
*This English version is a translation of the original in Spanish for information purposes only.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

### ii.   *On profitability*

590. The Respondent centres its analysis on the Deloitte report of 23 May 2011[849] and points out that this report has made calculations and assessments of the internal rate of return of the photovoltaic plants involved in this arbitration proceeding that are very different from those submitted in said arbitration proceeding, in such manner that the Respondent does not understand why the Claimant did not use the same methods[850].

591. The experts from Altran McGroup have performed calculations of the internal rate of return (IRR) of the Plants in accordance with current norms, after the passage of the reform. It states that the comparison is clear: the profitability provided to plants under the regulation in force (7.19%) is higher than the maximum calculated by the Deloitte experts in their 2011 report as being expected (6.19%) for the plants subject to the present arbitration, and which corresponds to the maximum profitability that the Claimant could expect at the time when it allegedly performed the investments[851].

592. In addition, in its 2011report, the experts from Deloitte have compared the yields of Plants "with regard to benchmark yields" which are those that are issued by the Spanish State Obligations at 10 and 30 years, these Obligations being the reference that the regulation takes under account in granting reasonable return[852].

593. Before analysing this comparison, the Respondent makes references to other "*benchmarks*" available on the market, in order to demonstrate the reasonableness of the 7.398% granted under the applicable regulations. The Respondent then refers to the WACC (expected or required profitability) declared by ISOLUX and finds that the WACC declared in 2013 and 2014 was indicated at 5.5%[853]. On the other hand, Respondent notes that the European Commission has agreed to a WACC of 4.29% for photovoltaic plants in Germany[854].

594. Surprisingly, the Deloitte experts have calculated the WACC for the plants in a manner very similar to that of plants in Germany. They have calculated a weighted average cost of capital after taxes of 3.97% in their report dated 11 July 2014, i.e. an average cost of capital (shareholder and third party funds) that is much lower than the profitability which the current standard effectively guarantees[855].

595. Finally, Respondent notes that, in the Claimant's own application for interest presented in its last submission, as well as in the Deloitte report of June 2015,

---

849   **Exhibit R-217**: Deloitte Expert Report of 23 May 2011, pages 54 and 55.
850   Rejoinder, ¶932-934.
851   Rejoinder, ¶939-940.
852   Rejoinder ¶941-942; **Legal Authority RLA-217**: Deloitte Expert Report of 23 May 2011, pages 54 and 55.
853   Rejoinder, ¶¶945-946; Altran – MacGroup Expert Report of 28 July 2015
854   Rejoinder, ¶947; The European Commission, in evaluating the compatibility of the Law of Renewable Energy of Germany of 2014, establishes that ("State Aid SA.38632 (2014/N – Germany EEG 2014 – Reform of the Renewable Energy Law" European Commission 23.07.2014).
855   Rejoinder, ¶¶948-959.

*This document is a courtesy translation. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

an opportunity cost of 7.398% is requested, by means of interest, which necessarily implies that they expressly admit that the current regulation guarantees 7.398% and that they consider that this pre-tax rate in fact represents a reasonable return according to applicable market criteria[856].

596. Finally, with regard to the comparative exercise carried out by the Deloitte experts in the 2011 report, it appears that the profitability differential granted to Plants, when compared with the profitability granted by the Spanish public debt, is in fact much higher: it has gone from 2.26% to 5.52%, that is to say that the addition of profitability that has been granted has more than doubled with the current regulations[857].

597. The absence of deterioration in the value of Plants that also have a higher profitability than it had at the time of the alleged investment can be clearly surmised from these observations[858].

### iii. *Other criticisms of the calculation methods:*

598. The Respondent also notes that costs have been inflated via related transactions.

599. In fact, the Respondent notes that the construction, operation and maintenance of the Plants was carried out by companies of the same ISOLUX group, i.e. at a price different than the one offer in a market with third parties in conditions of free competition[859]. The McGroup-Altran expert report involved the performance of an analysis of market investment costs ("**CAPEX**") and market operating and maintenance costs ("**OPEX**") for photovoltaic plants such as the T-Solar plants, for the purpose of determining whether they correspond to those declared by T-Solar. It concludes in particular that the prices agreed in the related transactions are much higher than reasonable market prices, which would have allowed the plants to obtain an additional profitability higher than the implicit rate of return calculated based on the declared investment and the net cash flows provided thereby[860].

600. In addition, the Respondent considers that the valuation dates that are used are incorrect. In particular, the doctrine generally distinguishes between the different contexts in which we may find ourselves when determining the valuation date: in particular, it distinguishes between cases of expropriation and non-expropriation (the FET, for example). Regardless of this, the Claimant uses the same date of valuation

---

[856] Rejoinder, ¶951.
[857] Rejoinder, ¶¶952-954.
[858] Rejoinder, ¶955.
[859] Rejoinder, ¶959.
[860] Rejoinder, ¶961; Altran – MacGroup Expert Report of 28 July 2015. page 20, broadly presented in its Annex II.

*This is only a draft. Only the original award shall be considered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

for all cases of violation of the ECT. According to the Respondent, the date of valuation must be the date of the award[861].

601. Another argument brought by the Respondent relates to the Claimant's business chain that directly affects the "*Flow Through*" of the alleged damages. The Claimant cannot consider that the final damage is equivalent to the shareholder damage, since each intermediary company between the Claimant and its subsidiaries is in fact an independent entity with regard to various elements such as taxes, withholdings, obligatory reserves, and restrictions[862].

602. The Respondent also claims that "unavoidable" discounts for liquidity and lack of control or minority participation, which may exceed 50%, have been forgotten[863].

603. In addition, the Respondent insists that the tax rates considered by the Claimant in this case are not, in fact, accurate. Deloitte has not taken into account the effective tax rates derived from Corporation Tax actually paid by the companies, but an estimate of a mere nominal tax rate[864].

604. With regard to the interests claimed, the Respondent considers that they are unfounded due to the fact that the Claimant has not justified the claimed interest rate, nor has it compared the reasonable rate of return of 7.398% which it uses with other rates used in arbitration practice.

605. It should be noted that in the Deloitte report from 2011, the Claimant justified that the "benchmark profitability" is that one provided by the public debt, i.e. the profitability of the State Obligations. Therefore, the interest would have to be that profitability, has a maximum, or a lower reference figure[865].

606. The Respondent also rejects the fact that a compound interest may apply[866].

607. As a final criticism to the Deloitte report, the Respondent argues that this report is actually not transparent, with lack of grounds and justifications, in particular in the use of variables and values that it deems convenient for its purposes.

---

[861] Rejoinder, ¶965-966.
[862] Rejoinder, ¶969-972.
[863] Rejoinder, ¶¶973-978.
[864] Rejoinder, ¶980.
[865] Rejoinder, ¶¶988-990.
[866] Rejoinder, ¶¶993-996.

*This is a translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

### C. COSTS

608. The Parties submitted their corresponding briefs on the costs of the arbitration to the Tribunal on 15 January 2016.

609. In its Submission the Claimant requests that the Arbitral Tribunal order the Respondent to pay all costs and expenses arising from these arbitration proceedings, broken down in the following manner:

| Description | Value |
| --- | --- |
| Bird & Bird fees and expenses | € 180,410.64 |
| Fees and expenses incurred by Shearman & Sterling | €47,217.10 |
| Fees and expenses incurred by Latham & Watkins | € 925,872.13 |
| Fees and expenses of the Arbitral Tribunal and the SCC | € 414,100.00 |
| Fees and expenses incurred by Deloitte | € 58,000.00 |
| Fees and expenses incurred by KPMG | € 145,124.00 |
| Costs incurred by the use of the CAM facilities (holding of hearings) | €5,282.60 |
| Costs incurred by transcription services | € 6,699.50 |
| TOTAL | €1,782,706 |

610. The Respondent requested that the Arbitral Tribunal order the Respondent [sic: Claimant] to pay all costs and expenses arising from these arbitration proceedings, which are broken down in the following manner:

| Description | Value |
| --- | --- |
| Advance of Costs paid to the SCC | € 412,600.00 |
| Expert Report | € 283,185.07 |
| Reproduction services | € 12,788.61 |
| Courrier services | € 2,022.47 |
| Advance on costsf or Hearing transcription services | € 8,106.40 |
| Transportation expenses | € 367.60 |
| Rental of rooms | € 6,391.95 |
| Legal fees | € 469,230 |
| Other costs | € 137.02 |
| TOTAL | €1,198.290.10 |

*This is an unofficial translation of the original Spanish language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

611. On 22 January 2016, the Claimant communicated to the Arbitral Tribunal its observations regarding the statements made by the Respondent.

612. In its letter, the Claimant emphasised that the State Attorney's Office, being comprised of public officials, do not bill fees to the Kingdom of Spain, in such manner that it requests the Arbitral Tribunal to invite the Kingdom of Spain to justify the costs it lists in relation to those Attorney's services.

613. With regard to the intervention of the Respondent's experts, the Claimant requests that the Claimant [sic: Respondent] submit the documents awarding the contract file to MacGroup-Altran for this arbitration proceeding, in order to be able to compare them with the cost claimed by the Respondent.

614. In relation to the services of transcription and rental of rooms, the Claimant requests that the Kingdom of Spain submit all invoices proving the costs claimed, since those costs exceed those claimed by the Claimant

615. Finally, it is specified that the SCC has determined the arbitration costs in the following manner on 6 July 2016:

**Mr Yves Derains - Chairman**
Fees 225,592 EUR plus VAT
Expenses 4.459,83 EUR plus VAT
Total travel expenses 2000 EUR

**Prof Guido Tawil - Co-arbiter**
Fees 135,355 EUR
Expenses 5,948,09 EUR
Total travel expenses 2,500 EUR

**Mr Claus Von Wobeser - Co-arbiter**
Fees 135,355 EUR
Expenses 12,161,66 EUR

**Stockholm Chamber of Commerce**
Administrative fees 41,849 EUR plus VAT

616. The fees and expenses mentioned in paragraph no.615 shall be paid by the advance of costs paid by the Parties to the SCC.

617. The Arbitral Tribunal addresses the Claimant's claims below, **(1)** and the claims presented by the Respondent **(2)** submitted for its consideration and decision.

*This is an unofficial translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

### 1.  Pleading of the Claimant

618.  With regard to the jurisdiction of the Arbitral Tribunal, the Claimant requests that the Arbitral Tribunal reject the jurisdictional objections raised by the Respondent[867].

619.  With regard to the merits of the dispute, the Claimant requests that the Arbitral Tribunal[868]:

(a)  DECLARE that the Respondent has violated its obligations under Article 10 of the Energy Charter Treaty:

   i  To promote and create stable, equitable, favourable and transparent conditions for investors of other Contracting Parties investing in its territory;

   ii  To grant the Claimant's investments fair and equitable treatment at all times;

   iii  Ensure complete protection and security of the Claimant's investment;

   iv  To in no way cause harm, through exorbitant or discriminatory measures, to the management, maintenance, use, enjoyment or disposal of Claimant's investment in Spain;

   v  Comply with all obligations it has contracted with the Claimant or with regard to its investment in Spain;

(b)  RULE that the Respondent has violated its obligation under Article 13 of the ECT to refrain from nationalising, expropriating or adopting measures or actions having effect equivalent to nationalisation or expropriation, with regard to the Claimant's investment, and otherwise to provide payment of a rapid, adequate, and effective indemnity;

(c)  ORDER the Respondent to pay compensation to the Claimant of an amount not less than € 68,900,000 o the damages suffered by the Claimant in connection with the Respondent's violations of the Energy Charter Treaty, ECT;

(d)  ORDER the Respondent to pay interest on the compensation granted by this Tribunal at a rate of 7.398% from 13 July 2013 until the date of payment of the award by the Respondent;

---

867   Brief on jurisdictional objections, ¶324.
868   Reply, ¶¶793 and 794.

(e)     ORDER the Respondent to pay all costs of these arbitration proceedings, as well as all professional, legal and expert fees and expenses incurred by the Claimant in connection therewith;

(f)     GRANT any other reparations as deemed appropriate.

### 2.     Pleading of the Respondent

620.    The Kingdom of Spain requests that the Arbitral Tribunal[869] :

a)      Rule that it lacks jurisdiction to hear the present matter.

b)      Alternatively and only in the event that the Tribunal considers that it in fact does have jurisdiction to hear the present case, dismiss all the claims of the Claimant, following a declaration that the Kingdom of Spain has not failed to comply, regarding the Claimant, with its obligations under Articles 10(1) and 13 of the ECT.

c)      As a further alternative, dismiss all of Claimant's compensatory claims insofar as the Claimant is not, in fact, entitled to compensation for damages; and

c) [sic] in any event, Order the Claimant to pay all costs and expenses arising from this arbitration, including administrative expenses and the fees of the Tribunal's Arbitrators, as well as the fees of the legal representation of the Kingdom of Spain, its experts and advisers, and any other costs or expenses that may have incurred, all of which include a reasonable interest rate from the date these costs are incurred until the date of their actual payment.

## VII.   DISCUSSION

### A.     JURISDICTION

621.    As previously indicated, the Kingdom of Spain bases the lack of jurisdiction of the Arbitral Tribunal over six main jurisdictional objections, labelled from Letter A to Letter E.

### 1.     Jurisdictional Objection A: The ECT does not apply to disputes relating to intra-EU investments

622.    According to the Kingdom of Spain, the arbitral mechanism for disputes indicated in Article 26 of the ECT does not, in fact, apply to an intra-European Union ("**EU**") dispute

---

869     Rejoinder, ¶1000.

*This is an unofficial English translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

,such as the present, because it is incompatible with EU Law, which must prevail in cases of conflict with the ECT. The Kingdom of Spain relies, *inter alia*, on the *amicus curiae* submission brought by the European Commission on 20 February 2015.

623. The European Commission invites the Arbitral Tribunal to decline its jurisdiction. It considers that the ECT actually forms part of EU Law and that the courts of the Member States and the CJEU are, as a result, the competent courts for its interpretation and application. It points out that the ECT does not create obligations between Member States, but rather obligations are generated only between the European Union and its Member States, on the one hand, and contracting third party countries, on the other. The ECT would thus contain an implicit disconnection clause for Member states of the EU. If the ECT had in fact created the possibility of intra-European arbitration, such a dispute would be contrary to EU Treaties.

624. The European Commission explains that the ECT forms part of the EU's external energy policy without also having an impact on domestic policy. Investors from one EU Member State requesting the settlement of a dispute against another Member State cannot be considered as investors of *"another Contracting Party"*, in the sense of Article 26 (1) ECT. The EU is the "*Contracting Party*". The ECT considers that the EU acts as a single player. The EU Treaties contain a full set of regulations, including regulations that pertain to the legal protection of investments of nationals of a Member State making investments in a different Member State. The institutional and judicial framework of the EU provides for appropriate legal remedies when investor protection regulations are violated.

625. As a result of this, the right to resort to the dispute settlement mechanism between investors and States for an EU investor against another EU Member State would violate the EU Treaties. The European Commission refers in particular to Article 344 of the TFEU: *"Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein"*, interpreted in consideration of the ruling of the Court of Justice in the case Commission vs. Ireland *(MOX)*.[870]

626. The European Commission recalls that the Kingdom of Spain has announced the measures in question, i.e. the national incentive scheme for the production of electricity from renewable energy sources and amendments to this regime, to the Commission by virtue of Article 108 paragraph 3 of the TFEU, since the Spanish authorities consider that the national incentive regime in fact constitutes State aid within the context of Article107, paragraph 1 of the TFUE. The European Commission indicates that, if the Arbitral Tribunal

---

[870] TJUE, ruling on the *Commission v. Ireland matter,* C-459/03, EU:C:2006:345, section 123.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

considers that, in order to settle this dispute, it would be necessary to establish, in the first place, that the national measures effectively constitute State aid, the Commission would invite it to suspend the proceedings until the Commission could issue a ruling on the notification presented by the Kingdom of Spain.

627. These observations by the European Commission are of the utmost importance to the Arbitral Tribunal, which considered them with strict attention in order to rule on the arguments of the Parties, which are the only arguments which it can comment in order to make its decision with regard to its jurisdiction.

628. The arguments of the Kingdom of Spain to insist that the dispute settlement mechanism provided for in Article 26 of the ECT is not applicable to an intra-EU disputes are essentially as follows:

- The Kingdom of Spain and the Netherlands belong to the same Regional Economic Integration Organisation ("**REIO**") which means that this dispute did not arise between "one Contracting Party" and one "investor of another Contracting Party" (a);

- European Law of the EU, which is the applicable International Law, prohibits the submission of this dispute to jurisdictions other than the jurisdictions provided for in the European Treaties (b).

629. None of these arguments is convincing to the Arbitral Tribunal.

    a. <u>The fact that the Kingdom of Spain and the Netherlands belong to the same REIO does not, in fact, imply that this dispute may not be brought by one investor of another Contracting Party against another investor of another Contracting Party [sic: a Contracting Party]</u>

630. The Respondent clearly explains that "*the Arbitral Tribunal does not in fact have jurisdiction to hear the present case since, as will be demonstrated, Isolux INBV is not an investor of a Contracting Party different from the Respondent's Contracting Party or, therefore, an investor protected by the ECT*[871]." Article 26.1 of the ECT requires that the dispute be between "one Contracting Party" and an "investor of another Contracting Party", which inevitably implies the exclusion of the cases in which an investor of an EU State has a dispute with another EU State regarding an investment in that State from the scope of said article[872]. This position is also laid out by the European Commission in its *Amicus Curiae* Brief.

---

[871]    Statement of Defence, ¶261. 73.
[872]    Rejoinder, ¶45, p. 25.

*This is an unofficial translation of the original Spanish language award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

633. Article 26.1 ECT provides that "*To the extent that it is possible, disputes between a Contracting Party and an investor of another Contracting Party involving an alleged failure to comply with an obligation under Part III relating to an investment of the latter in the territory of the former shall be settled amicably.*" It can be surmised from the following paragraphs of Article 26 that, in the event that it is not possible to resolve such disputes in accordance with paragraph 1, they shall be settled by arbitration.

634. The Kingdom of Spain, the Netherlands and the EU are Contracting Parties to the ECT. The Claimant intends to be an investor in the Netherlands. By accepting on a provisional basis the veracity of such claim, which is in fact denied by the Respondent, the Arbitral Tribunal must determine whether the Netherlands and Spain's membership of the EU results in ISOLUX being considered as an EU investor that performed a supposed investment in the EU. If this were the case, the territorial diversity condition determined in Article 26.1 would not be fulfilled.

633. ECT Article 1.10 relating to the definition of the concept of territory indicates: "*With respect to a Regional Economic Integration Organisation which is a Contracting Party, Area means the Areas of the member states of such Organisation, under the provisions contained in the agreement establishing that Organisation..*" As a result, both the area of the Netherlands and the area of the Kingdom of Spain are effectively parts of the area of the EU, as REIO. However, the same Article specifies that regarding a State which is a Contracting State, the *"area"* is *"the territory under its sovereignty.*" There is no doubt that the Netherlands and the Kingdom of Spain exercise their sovereignty over their respective national territories.

634. Thus, the fact that the "*area*" of the EU, according to ECT Article 1.10 ECT, covers the territories of the Netherlands and the Kingdom of Spain, does not prevent each of them from retaining an "*area*" as well within the scope of the ECT. Only an interpretation of ECT Article 26.1 allows determining what "area" should be referred to in order to verify that the requirement of diversity of territories is met.

635. According to Article 31 of the VCLT "*A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be granted to the terms of the treaty in the context thereof and taking into account its object and purpose.*" In order to resolve any problem posed, the concept of area as defined in Article 1.10 ECT should be interpreted within the context of the object of Article 26.1 ECT itself.

636. Article 26.1 refers to disputes between "*a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former*". This clearly implies that the area in question is the territory of the Contracting Party against which the investor is acting [873]. In the present dispute,

---

[873] In this regard, Reply, ¶ 89, p. 19.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

the alleged investment was made in Spain by an investor that claims to be Dutch and is acting on the basis of the ECT against the Kingdom of Spain, not against the EU. Apart from any further developments in the debates on the nationality of the investor and the actual reality of the investment, the dispute before the Arbitral Tribunal is presented as a dispute between one Contracting Party (Spain) and an investor of another Contracting Party (Netherlands) concerning an investment made by the latter in the former. In this sense, the requirements of territorial diversity ECT Article 26.1 are to be respected.

637.   The above conclusion would be erroneous, if it were true that an implicit disconnection clause existed in the ECT. In its *Amicus Curiae* Submission, the European Commission expresses the view that the ECT contains an implicit disconnection clause for EU Member States. The Respondent shares this opinion[874]. It is not disputed between the Parties that a disconnection clause is a clause inserted in a multilateral convention that allows parties signatories of another treaty or members of a regional organisation not to apply or only partially apply the multilateral convention in their mutual relations.

638.   Regardless, neither the European Commission nor the Respondent put forward arguments based on the text of the ECT which would lead to the conclusion that the ECT in fact contains an implicit disconnection clause for the Member States of the European Union.

639.   The Respondent seems to seek support in ECT Article 25[875] which states, in its paragraph 1, that "*The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA*" Nonetheless, as the Claimant rightly observes, this Article "*confines itself to circumscribing the extent of the effect of the most-favoured-nation treatment between Contracting Parties that are parties to "Economic Integration Agreements" and those that are not*[876]." It may not, in fact, be interpreted as a disconnection clause with a general scope.

640.   As a result of this, the Tribunal concludes that the fact that the Kingdom of Spain and the Netherlands belong to the same REIO does not imply that this dispute may not be brought by the investor of one Contracting Party against another investor of another Contracting Party.

---

[874]   Statement of Defence, ¶ 286 and note no. 133, p.79; ¶ 288, p. 80.
[875]   Statement of Defence, ¶278, p. 77 and, although indirectly, note no. 133 p. 79; Rejoinder, ¶ 60, p. 28.
[876]   Reply, ¶57, p. 11.

*This is an unofficial translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

### b. EU law used by the European Union does not prohibit the submission of this dispute for an arbitration proceeding

641. The Respondent is of the opinion that the application of the ECT to intra-EU disputes runs contrary to the context, object and purpose of the ECT itself, and of EU law. The European Commission takes the same position. This would be justified in particular, in the view of the Respondent, due to the fact that both the Netherlands and the Kingdom of Spain are States that were already members of the EU at the time of the negotiation, ratification and entry into force of the ECT[877]. They were not able to sign international investment treaties which provided for autonomous mechanisms for resolving investor-state disputes when relating to intra-EU investment[878].

642. This conclusion would be motivated by an alleged incompatibility between the ECT and EU law[879]. According to the Respondent, such incompatibility would result from the existence of the freedoms of the EU Internal Market and the rights they recognise to intra-EU investment[880]. The Internal Market is a comprehensive system for the promotion and protection of intra-EU investment, which is broadly superior to that of the ECT[881]. To allow the arbitration to resolve disputes that affect the freedom of establishment and free movement of capital of a Community investor in EU territory in the field of renewable energy would be contrary to EU law[882].

643. The Respondent explains that "*to be of the opinion that intra-EU disputes fall within the scope of protection of the ECT would be to ignore the context, objective and purpose of the ECT and the EU. Specifically, it would mean assuming that the EU and its Member States, acting as key players, encouraged the creation and conclusion of the ECT to cover a certain scope, that of intra-EU investments, which had already been covered extensively and comprehensively for many years. Furthermore, this interpretation would contravene both the rules of the Internal Market as well as the principles of autonomy of EU Law and of a monopoly on the final interpretation thereof by the EU judicial system, which prevents the existence of a system of dispute settlement such as that described in Article 26(1) of ECT[883]*". This is in fact confirmed by TFUE Article 344, which states that:

> "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein*"[884].

---

[877] Statement of Defence, ¶266, p. 74.
[878] Idem, ¶ 267.
[879] Idem, ¶ 270.
[880] Idem,¶ 275.
[881] Idem, ¶ 278.
[882] Rejoinder, ¶92, p. 34.
[883] Idem, ¶ 285.
[884] **Legal Authority RLA-1**: Consolidated versions of the Treaty on European Union and the Treaty on the Functioning of the European Union, published in the Official Journal of the European Union on 26 October 2012 (C 326), Article 344.

*This is an unofficial translation of the Spanish original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

644. The Arbitral Tribunal deems that a potential incompatibility between the ECT and European Law does not necessarily affect its jurisdiction in this arbitration proceeding. This may not be the case if the alleged incompatibility concerns the substantive rights of the investor. In this scenario, the problem lies in the choice of the applicable regulation, and the solution of a conflict of this type in fact has nothing to do with a conflict of jurisdiction. The Arbitral Tribunal would thus have jurisdiction to resolve it.

645. *Ex abundanti cautela*, the Arbitral Tribunal notes that such an incompatibility is unlikely because it shares the tribunal's observation in the award of Electrabel v. Hungary, which both parties refer to, and which indicates that: "*the ECT's genesis generates a presumption that no contradiction exists between the ECT and EU law*[885]." The award specifically adds that "*the ECT was negotiated and ratified after the coming into existence of the Rome Treaty, by its Member States. The interpretation of the ECT's text should therefore take into account such circumstances, in accordance with Article 32 of the Vienna Convention (which provides that, in order to interpret a treaty "(r)ecourse may be had to supplementary means of interpretation, including ... the circumstances of its conclusion"). This means, in the Tribunal's view, that the ECT's conclusion by the European Union and its Member States at that time…. should be presumed, in the absence of clear language or cogent evidence otherwise, to have been made in conformity with EU law.*"[886]

646. Nevertheless, this observation would lose its relevance if there were in fact a disconnection clause in the ECT for the EU Member States. However, neither the Respondent nor the European Commission have identified an explicit disconnection clause, and nor have they established the existence of an implicit clause[887].

647. Both the Respondent and the European Commission invoke TFEU Article 344 to conclude that the monopoly on the interpretation of European law by the EU judicial system is inconsistent with ECT Article 26(1), which is what provides the basis for the jurisdiction of the Arbitral Tribunal to resolve the present dispute. If this were the case, a true conflict of jurisdiction would arise.

648. According to the Claimant, TFEU Article 344 is irrelevant for the purposes of this arbitration insofar as it applies strictly to disputes between States and not to Investor-State disputes, and involves only the Interpretation of the EU Treaties , and not of other treaties which exist apart from International Law, such as the ECT[888].

---

[885]  **Legal Authority RLA-3:** *Electrabel v. the Republic of Hungary,* ISCID Case No. ARBi07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, *("Electrabel v. Hungary")*, ¶ 4.134,

[886]  Idem.

[887]  See *above*, ¶¶ 116-181

[888]  Rejoinder to jurisdictional objections ¶ 61p. 14

*This document is a translation of the original Spanish award as provided by the appointed translator.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

649. Article 344 of the TFUE states the following:

> "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*"

650. The Respondent, in consideration of the *Amicus Curiae* Submission of the European Commission, states that the application of this concept prevents Spain from submitting questions of the internal electricity market for arbitration[889]. The Tribunal is not convinced by this statement of a general nature, which does not appear to apply to the current dispute.

651. On the one hand, there is no doubt that, as the Claimant states, the Treaties referred to in TFEU Article 344 are the EU Treaties to the exclusion of other international instruments such as the ECT. The claims submitted to the Arbitral Tribunal relate to alleged violations of the ECT and not to violations of the EU Treaties.

652. On the other hand, the reading of the Article proposed by the Respondent would imply that, by the interpretation or the application of a norm of a European Treaty, it would only be possible to resort to a procedure envisaged in The Treaty itself. This interpretation is incompatible with the reality of practical jurisdiction.

653. As was clearly noted in the case of Electrabel v. Hungary "*The ECJ's monopoly is said to derive from Article 292 EC (now Article 344 TFEU) which grants to the ECJ exclusive jurisdiction to decide disputes amongst EU Member States on the application of EU law……. However, as is well known and recognised by the ECJ, such an exclusive jurisdiction does not prevent numerous other courts and arbitral tribunals from applying EU law, both within and without the European Union. Given the widespread relevance and importance of EU law to international trade, it could not be otherwise.*[890]"

654. Furthermore, it is admitted today, in a general manner, that arbitral tribunals do not only have the power, but rather the obligation to apply EU law[891].

655. As a result, the Arbitral Tribunal concludes that European Union law does not, in fact, prohibit the submission of the present dispute to arbitration.

656. The Respondent's Jurisdictional Objection A, according to which the Arbitral Tribunal would not have jurisdiction due to the fact that the ECT does not apply to disputes involving intra-EU investment, is thus rejected.

---

[889] Rejoinder, ¶63, p. 28

[890] **Legal Authority RLA-3**: *Electrabel v. the Republic of Hungary,* ISCID Case No. ARBi07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, *("Electrabel v. Hungary")*, ¶ 4.147;

[891] TJCE, C-126/97, *Eco Swiss China Time Ltd v. Benetton International NV, 1 June 1999,* Rec 1- 3055.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

657.    The European Commission recalls that the Kingdom of Spain notified the measures at issue to the Commission under TFUE Article 108 (3). If the Arbitral Tribunal deems that, in order to be able to decide on the dispute in question, it is necessary first of all to establish whether the national measures in fact constitute State aid, the Commission would then invite it "as an alternative" to stay the proceedings until the Commission ruling on the notification submitted by the Kingdom of Spain.

658.    The Claimant points out that the European Commission's invitation to the Court to stay the proceedings until the Commission decides on the notification submitted by the Kingdom of Spain is, in fact, not substantiated. In the present arbitration there is actually no problem involving Community law[892]. It adds that the European Commission is not a party to this arbitration proceeding, and therefore has no procedural right in it[893]. The Claimant requests that the request for suspension be waived or rejected[894].

659.    The Respondent does not file a petition for the suspension of the procedure presented by the European Commission. However, it notes that if the European Commission decides that the measures discussed in this arbitration do, in fact, constitute State aid, its outcome would thus be affected.

660.    The Tribunal does not consider the European Commission's invitation "as an alternative" as a petition in the procedural sense, but rather as an alternative recommendation to that of declaring itself without jurisdiction. This type of recommendation falls within the scope of the role of an *Amicus Curiae*, and the European Commission did not err in any way in making it. Nonetheless, it is not possible for the Tribunal to suspend the arbitral proceedings without any request from the Parties. The Respondent does not request a stay of proceedings and the Claimant would oppose such a request if it were made by the Respondent. In such circumstances, the Tribunal has no need to rule with regard to this.

## 2.    <u>Jurisdictional Objection B: the claim has been made, materially, by a Spanish investor –Isolux– and by a Canadian investor –PSP Investments</u>

661.    The Kingdom of Spain argues that behind the legal personality of IIN, there is in fact a Spanish company, Isolux Corsan S.A., and a Canadian company, PSP Investments, which exercise total and effective control over the Claimant. With regard to Isolux Corsan S.A., it claims that it does not comply with the jurisdictional requirement of diversity of nationalities between investor-claimant and Contracting Party, as demanded by Article 26(1). With regard to the Canadian company – PSP Investments – it must be

---

[892]    Reply, ¶79, p. 16.
[893]    Rejoinder to jurisdictional objections ¶ 80 p. 19.
[894]    Idem.

*This is an English translation of the original Spanish award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

be taken into account that Canada is not a Contracting Party to the ECT, and as a result of this, Canadian investors are not protected by the ECT[895].

662. The Kingdom of Spain emphasises that all IIN business decisions are taken by its Spanish and Canadian shareholders and that IIN itself is a mere shell company with no business activity or workers whatsoever in the Netherlands. This would justify the lifting of the corporate veil, and would have the consequence that IIN could not be considered as a "company or organisation"[896]. The ECT would require "*the existence of a 'company or other organisation' as an organised set of material and human means directed to an economic purpose*", and not only the incorporation of a company in a Contracting State[897].

663. The conclusion reached by the Respondent is that IIN would not, in fact, be an investor, and thus could not invoke the dispute settlement mechanism of the ECT.

664. The Kingdom of Spain refers mainly to the dissenting vote of Chairman Prosper Weil in the case <u>Tokios Tokelés v. Ukraine</u>[898] and the case <u>Venoklim Holding B.V. v. the Bolivarian Republic of Venezuela</u>[899].

665. According to the Claimant, the sole criteria of nationality to be considered is that of Article 1(7)(a) (ii) of the ECT that defines the investor as a "*company or other organisation organised in accordance with the law applicable in that Contracting Party*". Being that IIN is a legally incorporated company in the Netherlands, the requirement of diversity of nationality would be satisfied[900]. It is deemed that the Respondent intends to add requirements that do not exist to ECT Article 1(7), and relies on jurisprudence that has no relevance here[901].

666. The Tribunal notes that the Claimant is a legal entity incorporated in the Netherlands and that the Netherlands is a Contracting Party to the ECT. It had never been in doubt that the IIN was not a validly incorporated company under the laws of the Netherlands. What the Respondent is arguing is that IIN may not be considered as a "*company*" or an "*organisation*" in the sense of ECT Article 1(7) due to the fact that it lacks economic and human means in the Netherlands.

---

[895] Rejoinder, ¶114, p. 38
[896] Rejoinder, ¶148- 155, p. 45.
[897] Rejoinder, ¶114, p. 38
[898] **Legal Authority RLA-14:** *Tokios Tokelés v. Ukraine,* ISCID Case No. ARB/02/18. Dissenting vote of 29 April 2004.
[899] **Legal Authority RLA-90**: *Venoklim Holding B.V. v. the Bolivarian Republic of Venezuela*, ISCID Case No.
   ARB/12/22, 3 April 2015.
[900] Reply, ¶96, p. 20.
[901] Rejoinder to jurisdictional objections ¶ 87-114, p. 21-26.

*This document is a courtesy translation of the original award in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

667. However, the Tribunal does not share the Respondent's reading of this Article. It could be argued indefinitely to determine whether or not IIN is, in fact, an enterprise from an economic point of view, but the discussion would have no merit in terms of interpreting ECT Article 1(7). The ECT does not require the protected investor to be a company from an economic point of view. Such an interpretation would exclude individuals who are protected just as legal entities. For them, the criterion is merely legal: constitution according to the legislation of the Contracting Party, pertaining to a "*company*" or an "*other organisation*". If IIN were not a company, it would be an "*other organisation*", but it is, in fact, organised as a corporation under the law of the Netherlands.

668. The conclusion is that the formal requirements of ECT Article 1(7) are, in fact, fulfilled in order to consider the Claimant as an investor of a Contracting Party.

669. However, the Kingdom of Spain does not consider this to be sufficient. It is of the opinion that the Tribunal would have to raise the corporate veil, and should, beyond to the nationality of the company, base its decision on jurisdiction on the nationality of the shareholders of the Claimant.

670. Prior to any further consideration, the Arbitral Tribunal notes that, the ECT does not contain, like other Treaties, a derogation clause excluding the application of the criterion of constitution under the laws of the country of another Contracting Party where a legal entity is controlled by nationals of the other Contracting State. Regardless of this, it would be necessary to lift the corporate veil in case of fraud in order to determine jurisdiction. Such fraud was, in fact, not established, as indicated below (¶¶ 695-715).

671. The arbitral jurisprudence invoked by the Respondent does not allow it to deviate from the clear wording of ECT Article 1(7). The dissenting vote of Chairman Weil en <u>Tokios Tokelés v. Ukraine</u> is a minority vote. The decision of the majority rejected the lifting of the corporate veil[902].

672. The case of <u>Venoklim Holding B.V. v. the Bolivarian Republic of Venezuela</u> had the peculiarity that the investor could only benefit from the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Republic of Venezuela through the filter of the Venezuelan Law on Promotion and Protection of Investments. Article 3(2) of this law defines international investment as "*investment that is owned by or effectively controlled by foreign individuals or legal entities*." Article 3(4) defines the international investor as "*the owner of an international investment, or whomever effectively controls it[903]*."

---

[902] *Tokios Tokelés v. Ukraine*, ISCID Case No. ARB/02/18, Decision on Jurisdiction, 29 April 2004.
[903] **Legal Authority RLA-90**: *Venoklim Holding B.V. v. Bolivarian Republic of Venezuela*, ISCID Case No. ARB/12/22, of 3 April 2013, ¶ 141.

This is an English translation of the original Spanish award rendered.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

Contrary to the ECT, the applicable text obliged the Tribunal to lift the corporate veil and verify that the foreign company was not under the control of companies or individuals of the State receiving the investment.

673. Furthermore, it involved an ICSID arbitration which poses problems of interpretation that do not exist within the framework of ECT.

674. In light of the foregoing, the Arbitral Tribunal rejects the Respondent's Jurisdictional Objection B, according to which the jurisdictional requirement of diversity of nationalities between the investor-claimant and the contracting party-respondent established by ECT Article 26(1) would not be met.

### 3. Jurisdictional Objection C: due to the fact that Isolux IIN did not make an investment in the Kingdom of Spain in accordance with the definition of an investment as contained in ECT Article 1(6)

675. It is evident that the company IIN has a 88.3413% equity interest in the share capital of T-Solar, a company engaged in economic activity in the energy sector in Spain and of which IIN indirectly yields.[904]

676. The Kingdom of Spain argues that IIN has not, in fact, performed any investment in Spain, due to the fact that it has not made an investment in the objective or ordinary sense of the concept of investment, given that it has not made any contribution of economic resources or assumed any risk linked to the assets subject to this arbitration proceeding at hand[905]. In order to justify its allegation that an investment in an objective or ordinary sense is needed, the respondent specially refers to a book by Dr Crina Baltag,[906] in addition to various arbitral awards[907].

677. The Kingdom of Spain explains that in execution of the Investment Agreement signed by the Spanish business group ISOLUX and the Canadian entity PSP Investments on 29 June 2012[908], ISOLUX acted to disinvest certain assets and PSP Investments thus acted to make an investment in those assets[909]. IIN would be simply the company that received the assets of ISOLUX and the cash of PSP Investments[910]. This latter company would be the only one that performed an investment with a contribution of funds, with the purpose of obtaining returns and a risk linked to this contribution of funds[911].

---

904    Statement of Claim, ¶ 45 p.12; Statement of Defence, ¶ 336, p. 91.

905    Statement of Defence, ¶333-338, p. 91-92.

906    **Legal Authority RLA-15**: *The Energy Charter Treaty. The Notion of Investor*. Crina Baltag, Kluwer Law International BV, 2012, The Netherlands.

907    Statement of Defence, ¶352-358, pp. 94-96.

908    **Exhibit R-9**: FileC/0452/12 brought before the National Competition Commission at the behest of Grupo Isolux Corsán S.A. and Infra-PSP Canadá Inc (non-confidential version).

909    Statement of Defence, ¶362, p.97.

910    Statement of Defence ¶363, p. 97

911      Idem.

*This is an English translation of the Spanish original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

678. The Kingdom of Spain also alleges that returns that were indirectly obtained by IIN may not be qualified as an investment, because the concept of indirect possession *refers to the final holder on the corporate*" chain.[912]. Such an interpretation would be fully consistent with the denial of benefits clause contained in ECT Article 17(1)[913].

679. According to the Claimant, the ECT defines the concept of "investment" with specificity, thus making the search for "objective definitions" not provided for in its wording unnecessary[914]. The definition of the concept of investment by the ECT would thus be sufficient in and of itself.[915]. It should be emphasised that the additional requirements mentioned by the Kingdom of Spain are included within the ICSID arbitration framework and, as a result, would not apply to the ECT[916]. The Claimant adds that, in any case, the participation of IIN falls under the category of being defined as an inappropriate investment of the Kingdom of Spain[917].

680. With regard to returns that were indirectly obtained by IIN, the Claimant considers that the Respondent's analysis to be without foundation and that the Kingdom of Spain seems to confuse the notion of investment with more specific criteria of denial of benefits[918].

681. ECT Article 1(6) ECT establishes the following:

> ""Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:
> (a)     tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;
> (b)     a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;
> (c)     claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;
> (d)     Intellectual Property;
> (e)     Returns;
> (f)     any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.
>
> A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of

---

912    Rejoinder, ¶ ¶ 244-246, p. 63.
913    Statement of Defence, ¶410. 106.
914    Reply, ¶138, p. 29
915    Reply, ¶146, p. 31
916    Reply, ¶141, p. 30
917    Reply, ¶163, p. 34
918    Reply, ¶190, p. 39

*This is an English translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> *this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.*
> *"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.*

682.  First of all, the Tribunal notes that Respondent does not deny that the investment claimed by the Claimant is related to an Economic Activity in the Energy Sector, as required by ECT Article 1(6). According to ECT Article 1(5): ""*Economic Activity in the Energy Sector" means an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale of Energy Materials and Products except those included in Annex NI, or concerning the distribution of heat to multiple premises..*"

683.  The Arbitral Tribunal does not share Claimant's position that the definition of the concept of investment in the ECT is sufficient in and of itself. The list of assets listed in ECT Article 1(6) provides examples of investment but does not define the concept. In a circular manner, it indicates that an investment is "*every kind of asset, owned or controlled directly or indirectly by an investor*". In other words, in order to be qualified as an investment, the asset must be owned or controlled by an investor. However, the definition of the investor in ECT Article 1(7) is solely concerned with its nationality or residence in the case of an individual, and in the laws governing its constitution if it is a legal entity. No element contained in Article 1(7) ECT makes it possible to distinguish the investor as being an individual or a legal entity. What distinguishes it is its possession or control of an investment, which confirms the circular nature of the reasoning and makes an additional definition of the concept of investment necessary.

684.  The Arbitral Tribunal shares the position of the Kingdom of Spain when it argues that this additional definition must be objective, in the absence of a subjective definition included in the ECT. It is not convinced by the Claimant's argument that the objective definition developed by many other courts faced with the absence of a definition in other bilateral or multilateral treaties, in particular but not exclusively within the ICSID arbitration, would be inapplicable. More than just the content of each treaty, what truly matters is the silence of each one regarding the definition of the concept of investment. This is the common feature of these treaties which justifies a definition of the concept of investment.

685. As noted by the Claimant [919], the source of this definition is the award of 2001 in the case <u>Salini Construttori Spa and Italstrade Spa v. Kingdom of Morocco</u> [920] where the court considered that an investment " *infers: contributions, a certain duration of performance of the contract and a participation in the risks of the transaction* ". It added the condition of "*contribution to the economic development of the host State of the investment*" (free translation). With the evolution of arbitral jurisprudence [921], the objective definition of the notion of investment now includes only: (i) a contribution, (ii) the receipt of returns and (iii) the assumption of risks [922].

686. The Arbitral Tribunal considers that this definition of the concept of investment, in the absence of another definition in the ECT, is applicable in this particular proceeding, since it corresponds to the precepts of interpretation of Article 31(1)of the Vienna Convention on the Law of Treaties (the "Vienna Convention"), which establishes that "*A treaty shall be interpreted in good faith in accordance with the ordinary meaning given to the terms of the treaty in their context and in the light of its object and purpose.*" Furthermore, in order to comply with the requirements of ECT Article 1(6), the investment must be related to an Economic Activity in the Energy Sector. The parties have not disputed this last point.

---

[919]  Reply, ¶ 132, p. 28

[920]  Salini Construttori Spa and Italstrade Spa v. Kingdom of Morocco, Decision on Jurisdiction of 23 July 2001, ICSID Case No. ARB/00/4, 42 ILM 609 (2003), available on the page http://www.italaw.com/sites/default/files/case-documents/ita0738.pdf

[921]  See *inter alia* on this point: Romak S.A. v. The Republic of Uzbekistan, PCA Case No. AA280, award of 26 November 2009, ¶ 207. See also the decisions of other tribunals on the objective notion of investment, following or modifying in turn the solution adopted by the Salini case: CSOB v. The Slovak Republic, ICSID Case No. ARB/97/4, Decision on Jurisdiction, 24 May 1999, ¶ 64; MCI Power Group, LC and New Turbine, Inc v. Ecuador, ICSID Case No. ARB/03/6, award of 31 July 2007, ¶ 165; CMS Gas Transmission Company v. Argentine, ICSID Case No. ARB/01/8, Decision of the ad hoc Board on the Request for annulment, 25 September 2007, ¶ 71; Biwater Gauff (Tanzania) Ltd v. United Republic of Tanzania, ICSID Case No. ARB/05/22, award of 24 July 2008,
¶ 312-317; Malaysian Historical Salvors SDN v. The Government of Malaysia, ICSID Case No. ARB/05/10, Decision of the ad hoc Board on the Request for annulment, 16 September 2009, ¶ 78-79 (citing Biwater v. Tanzania) ; Phoenix Action, Ltd v. Czech Republic, ICSID Case No. ARB/06/5, award of 15 April 2008, ¶ 81; Victor Pey Casado and President Allende Foundation v. Republic of Chile, ICSID Case No. ARB/98/2, award of 8 May 2008, ¶ 232 ; Consortium Groupement LESI-Dipenta v. People's Democratic Republic of Algeria, ICSID Case No. ARB/03/8, award of 10 January 2005, ¶ 13(iv); LESI, SpA and Astaldi, SpA v People's Democratic Republic of Algeria, Decision on Jurisprudence of 12 July 2006, ICSID Case No. ARB/05/3, ¶ 72(iv); Bayindir Insaat Turizm Ticaret Ve Sanayi AS v. Islamic Republic of Pakistan, ICSID Case No. ARB/03/29, Decision on jurisdiction of 14 November 2005, ¶ 130; Jan de Nul NV and Dredging International NV v. Arab Republic of Egypt, ICSID Case No. ARB/04/13, Decision on Jurisdiction of 16 June 2006, ¶ 91; Saipem SpA v. People's Republic of Bangladesh, ICSID Case No. ARB/05/07, Decision on jurisdiction and recommendation for provisional measures, 21 March 2007, ¶ 99; Ioannis Kardassopoulos v. Georgia, ICSID Case No. ARB/05/18, Decision on Jurisdiction of 6 July 2007, ¶ 116.

[922]  Statement of Defence, ¶¶352-353, pp. 94-95; Reply, ¶ 133, p. 28.

*This is an English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

687.  However, the Arbitral Tribunal's conformity with the Kingdom of Spain's position stops here. Contrary to the allegations made by the Kingdom of Spain, the IIN holds an investment in accordance with the objective definition of the concept of an investment.

688.  There is no doubt that the business assets that IIN controls are an investment that would not exist without initial contributions, which corresponds to a long-lasting activity and which, like any and all business activity, carries a risk. The Respondent does not deny the existence of an initial investment currently controlled by IIN. What it argues is that the Investment Agreement signed by the ISOLUX business group and the Canadian entity PSP on 29 June 2012 did not transformed this initial investment into a new investment. Thus, the Respondent indicates in its Statement of Defence that "*However, Infra-PSP Canada Inc.'s investment cannot be seen as having the effect of transforming a simple outplacement of shares into a new investment. The investment made by the Canadian entity cannot artificially transform a pre-existing investment into a new and different investment from the one that existed when the shares of T-Solar were held by Grupo Isolux Concesiones S.L/ or when it unilaterally decided to outplace these shares in Isolux INBV*[923]."

689.  The fact that the investment remains the same as the initial investment, does not prevent it from being an investment in the objective sense, protected by the applicable rules of international law. The realisation of a new investment by the person acquiring possession or control of the existing investment is not necessary. Likewise, the investment does not cease to be an investment simply due to a change of the person who owns or controls it. The Claimant notes that in the case of <u>OI European Group B.V. v. Bolivarian Republic of</u> Venezuela[924], where reference is made to the objective concept of the investment, the court took into account, in order to verify the existence of an investment, the monetary contributions made by companies of the Claimant's group prior to the date on which it assumed ownership of holdings in local companies[925].

690.  The solution is even clearer in terms of the ECT, which, in its Article 1(8), specifically defines "*Make Investments*" or "*Making of Investments*" as "*establishing new Investments, <u>acquiring all or part of existing Investments </u>or moving into different fields of Investment activity*", (Emphasis added). The method of acquisition of an existing investment, as long as it is in compliance with the law, is in fact irrelevant. Furthermore, the fact that the acquirer of the investment does not make any financial contribution to acquire the investment is also irrelevant. The investment is the thing that is protected, and not the price of its acquisition.

---

[923]  Statement of Defence, ¶ 396, p. 104.

[924]  **Legal Authority CLA-90**: OI European Group B.V. v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/11/25, Award, 10 March 2015.

[925]  Reply, ¶ 170, p. 36

*This is an unofficial translation of the original award rendered in Spanish.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

691. Furthermore, it is not certain that IIN did not make any contribution. The Kingdom of Spain acknowledges that PSP had made a contribution which had the effect of consolidating its indirect control of the existing investment in Spain. In addition, as noted by the Claimant[926], the implication of the IIN in its capacity as an instrument of control of investment in Spain in fact constitutes an industry contribution that cannot be ignored.

692. The Arbitral Tribunal can also not accept that returns, indirectly obtained by IIN, cannot be qualified as investment because the concept of indirect possession "*refers to the final holder in the corporate*" chain, as claimed by the Respondent[927]. Such analysis results in a denial of legal personality, considering that the last holders of the chain in this case are the last shareholders. This may not be the criterion of the ECT, which in its Article 1(6) distinguishes between individuals and legal entities without establishing differences between the rights of the former and the latter.

693. Based on the foregoing, the Arbitral Tribunal rejects the Respondent's Jurisdictional Objection C relating to Isolux INBV's failure to carry out an investment in the Kingdom of Spain in accordance with Definition of investment contained in ECT Article 1(6).

### 4. Jurisdictional Objection D: the lack of jurisdiction of the Arbitral Tribunal due to existence of abuse of the process

694. According to the Respondent, IIN was set up in the Netherlands for the purpose of fraudulently acceding to the ECT's investment arbitration, since a Spanish or Canadian investor could not prevail against such a dispute resolution mechanism[928]. Respondent also explains that the outplacement of T-Solar shares was made when the conflict was foreseeable[929]. Both ISOLUX and PSP wished to avoid the well-known jurisprudence of the Spanish Supreme Court that was not favourable for them. This constitutes the prohibited activity of *forum shopping*[930], which implies that the Court lacks jurisdiction in light of arbitration jurisprudence and the best doctrine.

695. The Claimant argues that the actions of IIN cannot be classified as a mere artifice or fraud in order to internationalise the dispute with the Kingdom of Spain[931]. It emphasises that the claim initiated by IIN was carried out in accordance with the law and that the

---

926   Reply, ¶ 170, p. 37
927   Rejoinder, ¶¶244-246, p. 63.
928   Rejoinder, pg. 66
929   Rejoinder, pg. 77-78
930   Rejoinder, pg. 66.
931   Reply, ¶196, p. 41.

investment operation carried out by the Claimant took place before the Kingdom of Spain adopted the measures that gave rise to the present dispute [932].

696. The Arbitral Tribunal does not doubt that the fact of organising an investment for the sole purpose of benefiting from the protection of an international treaty, to which it was not entitled, for the sake of protection of an existing or foreseeable dispute, is an unacceptable case of *forum shopping* that justifies the refusal of jurisdiction. This is accepted by both Parties [933]. The Claimant admits that it may be claimed that *forum shopping* exists within the scope of the ECT [934].

697. ~~In fact, as the~~ tribunal indicated in the matter of Mobil Corporation et al. v. Venezuela [935]:

> "….*in all systems of law, whether domestic or international, there are concepts framed in order to avoid misuse of the law. Reference may be made in this respect to "good faith" ("bonne foi"), "détournement de pouvoir" (misuse of power) or "abus de droit" (abuse of right)*."

698. However, this same award invoked by the Kingdom of Spain emphasises that in international law, in order to determine the existence of an abuse of process, all circumstances of a given case must be taken into account [936]. This is what the Arbitral Tribunal in fact does in this arbitration proceeding, without considering the factual elements of the various awards mentioned by the parties, which hardly apply to the circumstances of this case.

699. The first investment of IIN was on 29 October 2012 when it acquired 65,434,220 registered shares (equivalent to 58.8632% of the capital equity of T-Solar) [937]. However, the decision of the IIN shareholders to place their investment in a Netherlands company was prior to this. This is found in the Investment Agreement of 29 June 2012 [938].

---

[932]  Reply, ¶197, p. 41.
[933]  Rejoinder, pg. 66; Rejoinder to jurisdictional objections ¶ 181, p. 40.
[934]  Rejoinder to jurisdictional objections ¶ 188, p. 41.
[935]  **Legal Authority RLA-110**: *Mobil Corporation, Venezuela Holdings, b.v. Mobil Cerro Negro Holding, ltd.,Mobil Venezolana de Petróleos Holdings, Inc. Mobil Cerro Negro, ltd., and Mobil Venezolana de Petróleos, inc.(claimants) c Republica Boliviariana de Venezuela, Decision on Jurisdiction, 10 June 2010 (English version)*, ¶ 169 p. 46;
[936]  Idem, ¶ 177, p. 48.
[937]  See **Exhibit C-42** Certificate issued by the Secretary of the Board of Directors of T-Solar Global, S.A. of 22 November 2013; **Exhibit C-40:** Copy of the Shareholder Register Book of T- Solar, pg. 35.
[938]  **Exhibit C-172**: Investment Agreement signed on June 29, 2012 by IIN and its shareholders.

*This translation from the Spanish original award is provided for courtesy only.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

700. At that time, the measures that gave rise to the present arbitration had not been adopted by the Kingdom of Spain, since the first was on 27 December 2012[939]. However, a reform of the Spanish energy sector was already announced, as the Kingdom of Spain rightly indicates[940].

701. Under these circumstances, it would not seem unusual to the Arbitral Tribunal that foreign investors, such as PSP, have the interest of intervening in the Spanish energy market through a Dutch structure to protect themselves from possible damaging measures of the Spanish government and to be able to be endorsed by the ECT, even if the Respondent did not actually provide evidences that this was the case. This would be nothing more than a case of "*legitimate corporate planning*"[941]. On the contrary, it is very doubtful that PSP would have participated in the investment without a structure outside Spain.

702. In addition, the restructuring was not carried out in a secretive manner, as illustrated in the Notification to the National Competition Commission of 9 July 2012[942].

703. A restructuring so common in international economic relations is not equated with a fraud, an action whose sole purpose would be a manipulation of ordinary rules of competition. The conclusion of the Arbitral Tribunal would have been different if, at the time of the restructuring, the conflict had already arisen. Although applicable in the case of an ICSID arbitration, the distinction made in the award of <u>Mobil Corporation et al. v. Venezuela</u>[943] appears to be very certain for the Arbitral Tribunal. It states that:

> "*As stated by the Claimants, the aim of the restructuring of their investments in Venezuela through a Dutch holding was to protect those investments against breaches of their rights by the Venezuelan authorities by gaining access to ICSID arbitration through the BIT. The Tribunal considers that this was a perfectly legitimate goal as far as it concerned future disputes.*
>
> *With respect to pre-existing disputes, the situation is different and the Tribunal considers that to restructure investments only in order to gain jurisdiction under a BIT for such disputes would constitute, to take the words of the Phoenix Tribunal,*

---

[939] **Exhibit C-30**: Law 15/2012 of 27 December, on Fiscal Measures for Energy Sustainability, **Exhibit R-83**: Law 15/2012, of December 27, on Fiscal Measures for Energy Sustainability, published in the Official State Gazette of 28 December 2012.

[940] Rejoinder, ¶305, p. 73.

[941] See, with regard to this, **Legal Authority** RLA-110: *Mobil Corporation, Venezuela Holdings, b.v., Mobil Cerro Negro Holding, ltd., Mobil Venezolana de Petróleos Holdings, Inc., Mobil Cerro Negro, ltd., and Mobil Venezolana de Petróleos, inc.(claimants) v. Bolivarian Republic of Venezuela, Decision on Jurisdiction, 10 June 2010 (English version)*, ¶ 191,p. 52,

[942] **Exhibit R-9**: File C/0452/12 brought before the National Competition Commission at the behest of Grupo Isolux Corsán S.A. and Infra-PSP Canadá Inc (non-confidential version).

[943] **Legal Authority RLA-110**: Mobil Corporation, Venezuela Holdings, b.v., Mobil Cerro Negro Holding, ltd., Mobil Venezolana de Petróleos Holdings, Inc., Mobil Cerro Negro, ltd., and Mobil Venezolana de Petróleos, inc. (claimants) v. Bolivarian Republic of Venezuela, Decision on Jurisdiction, 10 June 2010 (English version).

*This is an unofficial English translation of the original Spanish award that was issued.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> *"an abusive manipulation of the system of international investment protection under the ICSID Convention and the BITs."*

704. In this arbitration proceeding, the origin of the conflict is found in the laws of 27 December 2012 and in the Royal Decree-Law of 1 February 2013[944] which, according to the Request for Arbitration, violated ECT Articles 10 and 13. The *"trigger letter"* sent to the Kingdom of Spain is dated 13 March 2013[945]. It is clear, then, that the conflict is subsequent to the restructuring discussed and the placement of the investment in a Dutch company.

705. For that presented above, the Arbitral Tribunal rejects the Respondent's Jurisdictional Objection D for lack of jurisdiction of the Arbitral Tribunal due to the existence of abuse of the process.

### 5.  Jurisdictional Objection E: the lack of "*ratione voluntatis*" jurisdiction of the Arbitral Tribunal on the grounds that it denied IIN the application of Part III of the ECT due to concurring with the circumstances of ECT Article 17.

706. With a subsidiary character in relation to jurisdictional objections C and D, the Respondent invoked the lack of *ratione voluntatis* jurisdiction of the Arbitral Tribunal in its Statement of Defence[946]. It argues that if the Tribunal were to consider that Isolux INBV in fact performed an investment in an objective sense and that it did not commit an abuse of process, it would have to deny the Claimant the application of Part III of the ECT by being fulfilled the circumstances of Article 17 ECT.

707. According to the Respondent, the denial of benefits as described under Article 17 ECT prevents the application of Part III of the ECT, with the consequence that the Tribunal, in turn, lacks *ratione voluntatis* jurisdiction to hear on compliance with obligations indicated in this Part III[947].

708. Prior to examining whether the conditions of Article 17 ECT are met, the Tribunal must first resolve two preliminary questions.

709. The first, relating to the nature of the objection: is it a jurisdictional exception, as alleged by the Respondent, or rather an objection of non-admissibility, as claimed by the Claimant?[948] If it were an exception of admissibility and not to jurisdiction, it would have to be examined at the outset of the examination of the merits of the case, provided that the Court does not decline jurisdiction for other reasons.

---

[944]  Royal Decree-Law 2/2013, of 1 February, of urgent measures in the electrical system and in the financial sector, **Exhibit** C-31; **Exhibit** R-85.

[945]  **Exhibit R-188**: Letter of friendly composition (Trigger Letter) of 13 March 2013.

[946]  Statement of Defence, ¶595, p. 144.

[947]  Statement of Defence, ¶615, p. 148

[948]  Rejoinder to jurisdictional objections ¶¶ 217-219.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

710. The second question is related to the effects, on these arbitration proceedings, of denial of benefits according to Article 17 ECT, as raised in the Statement of Defence. It concerns the retroactive or proactive nature of the denial.

711. Regarding the first question, the Arbitral Tribunal does not doubt that the denial of benefits under ECT Article 17 EC raises a question of admissibility.

712. The first paragraph of ECT Article 17 indicates that a Contracting Party may deny the benefits of Part III of the ECT to "*any legal entity when citizens or nationals of a third-party country owns or controls that entity and where it does not carry out significant business activities in the territory of the Contracting Party in which it is established".* The result is that legal entities with those characteristics are entitled to benefit from the ECT, except for the application of the denial provided for in Article 17, and that these characteristics are not sufficient for a court constituted according to ECT Article 26 to have no jurisdiction. ECT Article 26 does not belong to Part III of the ECT. On the basis of Article 26, this Arbitral Tribunal does in fact have jurisdiction to rule on the exercise and effects of the denial of benefits. The opposite solution would deprive the investor of any forum necessary to rule on this issue. The exercise of the denial of benefits of ECT Article 17 may deprive the investor of the right to demand compliance with the obligations of Part III of the ECT, it does not deprive it of doing so before another possible jurisdiction.

713. As noted by the Claimant, two arbitral tribunals also confirmed that the act of denial of benefits never affects the jurisdiction of an Arbitral Tribunal, but is rather a matter of admissibility or merits[949]. The Arbitral Tribunal agrees with the analysis they made.

714. On the basis of the foregoing, the Arbitral Tribunal rejects the Respondent's Jurisdictional Objection D for the Arbitral Tribunal's lack of "*ratione voluntatis*" jurisdiction due to having denied IIN the application of Part III of the ECT because of the fulfilment of the circumstances of Article 17 ECT.

715. The Arbitral Tribunal could examine the second preliminary question, if and at such time as it will examine the merits of this case. However, the solution is so obvious that it seems easier to decide immediately. The Arbitral Tribunal shares the Claimant's position that the activation of the denial of benefits clause can never function retroactively.[950] As emphasised by the Arbitral Tribunal in the case of *Ascom v. Kazakhstan* in order to activate the denial of benefits under Article 17 ECT, the notification

---

[949]   *Yukos Universal Limited v. Russian Federation*, CPA Case No. AA/227, Partial Award on Jurisdiction and Admissibility, 30 November 2009, ¶ 443; **Legal Authority RLA-28:** *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Trading Ltd v. Republic of Kazakhstan,* SCC Case No. 116/2010, Award, 19 December 2013, ¶ 745.

[950]   Rejoinder to jurisdictional objections ¶ 226.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

of such denial must be prior to the commencement of the dispute.[951] In the case at hand, there is no dispute that the Kingdom of Spain did not activate the denial of benefits clause prior to its Statement of Defence, during the course of the arbitration proceeding.

716. As a result, the Tribunal rejected the Respondent's jurisdictional objection E, after having re-qualified it as an objection of admissibility.

### 6. Juridical objection F: the lack of jurisdiction of the Arbitral Tribunal to rule on an alleged violation by the Kingdom of Spain of obligations arising from ECT Article 10(1) through the introduction of the IVPEE by Law 15/2012

717. Through Law 15/2012 of 27 December, the Kingdom of Spain regulated a new tax on the value of electricity production (IVPEE). The Claimant alleges that this tax constitutes the first measures that have given rise to this arbitration proceeding.

718. In light of Article 21 (1) ECT, which is a *"carve-out"* clause, one that excludes tax measures from the scope of the Treaty, the Respondent concludes that the Tribunal lacks jurisdiction to hear the Claimant's claims based on the alleged violation of Article 10(1) by the adoption of Law 15/2012.

719. The Claimant argues that the IVPEE is not a tax that was promulgated in good faith and, therefore, it has not been able to be subject to the "*carve-out*" described in ECT Article 21(1)[952].

720. Article 21(1) of the ECT provides that:

> *"Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.."*

721. As a result, by falling within the "*carve-out*" described by ECT Article 21(1), the IVPEE would be left out of the *ratione materiae* jurisdiction of the Tribunal whose authority is limited to rights and obligations under the ECT.

722. The Claimant does not question the tax nature of the IVPEE, which is therefore not the subject of discussion between the parties to the present arbitration proceeding.[953] The Arbitral Tribunal also has no doubts regarding it and, considering the circumstances, it does not need to enter into this debate.

---

[951] *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Trading Ltd v. Republic of Kazakhstan,* SCC Case No. 116/2010, Award, 19 December 2013, ¶ 745, **Legal Authority RLA-28**.

[952] Reply, ¶347, p. 65.

[953] Claimant's Post-hearing Brief, ¶4, pg. 1

Case 1:19-cv-01618-TSC Document 69-52 Filed 06/09/22 Page 215 of 257
*This document is an unofficial English translation of the Original Spanish-language award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

723. In its Post-hearing Brief, the Claimant explained that

> "As it did in its Reply and Rejoindes, during the Hearing, the Kingdom of Spain attempted to demonstrate the conformity of the Tax using definitions of tax measures under Spanish law or international law. However, for the purposes of this arbitration, it is only relevant to verify that the tax qualifies as a bona fide tax measure under the ECT.[954]"

724. As the Claimant accepts that the promulgation of the IVPEE is a tax measure, under Spanish law and under international law, the presumption that it is contemplated within the "*carve out*" contained in ECT Article 21(1) is thus established.

725. The argument based on the good faith used by the Claimant to destroy this presumption first assumes that it is verified that only the good faith tax measures can be contemplated in the "*carve out*". If that were indeed the case, the Arbitral Tribunal would have to decide whether the IVPEE constitutes a tax measure that was not enacted in good faith, as claimed by the Claimant.

726. The Claimant refers to arbitration jurisprudence to justify the position that good faith tax measures are the only ones that can be contemplated within the "*carve out*"[955]. It points out that, according to that case-law, the *bona fide* criterion requires an analysis of the intention of the tax measure, and in particular that it is determined to be intended to raise general State revenue.[956]

727. The definition of tax measures proposed by the Kingdom of Spain also requires that the State's general revenue collection be verified[957]. According to the Claimant, this final criterion would in fact be identical to the requirement of good faith. As a result, the Claimant considers that the need for good faith for the activation of the *"carve-out"* is not disputed between the Parties[958].

728. The Arbitral Tribunal doubts that this is the case. It is true that the Respondent considers that only measures ordering a payment of funds to the State for public purposes can be considered to fall within the "*carve-out*"[959]. The Respondent takes into account the effect of the measures: to raise general State revenues. It is not concerned, contrary to what the Claimant asserts, by the purpose of the measures and the

---

[954] Claimant's Post-hearing brief, ¶12, pg. 2-3.
[955] Rejoinder to jurisdictional objections ¶ 282, p. 60.
[956] The Claimant cites, in particular, **Legal Authority CLA-88:** *Yukos Universal Limited (Isle of Man) v. Russian Federation*, CPA Case No. AA/227, Award, 18 July 2014, ¶ 1407**.**
[957] Rejoinder, ¶443, p. 99
[958] Rejoinder to jurisdictional objections ¶ 288. 61.
[959] Rejoinder, ¶443, p. 99.

intention of the State to promulgate them. This difference is fundamental, as it is the intention of the State that can reveal, as the case may be, good faith or bad faith. The Respondent does not accept that the analysis of the purpose of the measure is necessary. The Kingdom of Spain submits that in order for ECT Article 21(1) to apply, it is necessary to exclusively examine the legal operation of the measure. Therefore, it is not appropriate to carry out an analysis of the IVPEE such as the one put forward by the Claimant, in particular because it includes an economic analysis of the measure[960].

729. The Arbitral Tribunal deems that in deciding whether a tax measure can be considered to fall within the "*carve out*" of ECT Article 21(1), it is necessary to determine whether its purpose is truly taxation, that is, whether it was enacted in good faith. ECT Article 21(1) is a tax exclusion clause similar to many other clauses included in Treaties relating to investment. It excludes the powers of the Contracting States to legislate on taxes from international supervision. Such exclusion is no longer justified if the State uses its prerogatives in the tax framework to achieve other types of purposes. In this case, the tax measures are not promulgated in good faith and the *"carve-out"* cannot be activated.

730. As the Tribunal highlighted in the case of <u>RosInvestCo</u>[961]:

> "....*it is generally accepted that the mere fact that measures by a host state are taken in the form of application and enforcement of its tax law, does not prevent a tribunal from examining whether this conduct of the host state must be considered, under the applicable BIT or other international treaties on investment protection, as an abuse of tax law* ..."

731. Without such investigation, as the Arbitral Tribunal indicated in the case of <u>Renta4</u>[962]:

> " .... *investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation.*"

732. The Tribunal, in the case of <u>Yukos</u> clearly expressed that[963]:

> "...*in any event, the carve-out of Article 21(1) can apply only to bona fide taxation actions, i.e., actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated*

---

960   Rejoinder, ¶ 475, p. 106.

961   *RosinvestCo UK Ltd. v. Russian Federation*, SCC Case No. V079/2005, Award, 12 September 2010, ¶ 628.

962   *Renta 4 S.V.S.A., Ahorro Corporación Emergentes F.I., Ahorro Corporación Eurofondo F.I., Rovime Inversiones SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A.* v. Russian Federation, SCC Case No. 24/2007, Award, 20 July 2012, ¶ 179.

963   *Yukos Universal Limited (Isle of Man) v. Russian Federation*, CPA Case No. AA/227, Award, 18 July 2014, ¶ 1407.

*This is an unofficial English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> *purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ETC under the taxation carve- out of Article 21(1)*".

733. The Arbitral Tribunal shares the analysis of these courts and concludes that the presumption that the IVPEE can be contemplated within the "*carve out*" provided by ECT Article 21(1) would remain destroyed if the tax measure was not promulgated in good faith.

734. However, the Arbitral Tribunal agrees with the the tribunal of the <u>Renta4 case</u>[964] that "*The assumption should be that the measures are in fact in good faith…*". That is, the Claimant has the burden of convincing the Tribunal that the IVPEE was not promulgated for the purpose of raising revenue for the State but for a different purpose.

735. The Claimant has not convinced the Arbitral Tribunal that the IVPEE is not a good faith tax measure. Its arguments are that there is a serious contradiction between the alleged object of Law 15/2012 and its effects and that it discriminates against the regulated photovoltaic sector[965].

736. The Claimant maintains that although the preamble of Law 15/2012 insists that its aim is "*to harmonise our fiscal system with a more efficient and respectful use of the environment and sustainability*", none of its provisions actually pursue this objective[966]. Three characteristics of the IVPEE would justify this conclusion.

737. In contradiction with the principle of "*the polluter pays*", the IVPEE would apply in the same way to all types of levels of pollution and unlike any sort of "*green tax*", it would apply to fossil and renewable energies alike. Secondly, the IVPEE would apply to all electricity producers alike, without taking into consideration differences in the levels of amortisation that exist between traditional technologies and more recent technologies. Finally, the IVPEE would not distinguish between the forms of remuneration of the energy produced: market price or regulated tariff, a difference that would in fact be crucial, since electricity producers who receive a regulated tariff cannot pass on additional costs on the price of the energy they provide[967].

738. Although the official purpose of the tax is the protection of the environment, its actual purpose would be decreasing the tariff deficit[968]. Claimant's position of the is summarised in the Reply:

---

[964] **Legal Authority CLA-82**: *Renta 4 S.V.S.A., Ahorro Corporación Emergentes F.I., Ahorro Corporación Eurofondo F.I., Rovime Inversiones SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A.* v. Russian Federation, SCC Case No. 24/2007, Award, 20 July 2012, ¶ 181.

[965] Claimant's Post-hearing brief, ¶19, p. 4.

[966] Claimant's Post-hearing brief, ¶20, p. 4.

[967] Claimant's Post-hearing brief, ¶ 21-22-23, p 4.

[968] Claimant's Post-hearing brief, ¶26, p. 5.

> *"the Tax (IVPEE) is a tax of a merely debt raising nature that, despite being formulated as an environmental tax, (i) fails to follow the basic principles that must orient these types of taxes; (ii) hinders the development of the internal market; and (iii) retroactively affects the remuneration of certain technologies, generating discrimination between technologies[969]."*

739. It is not easy to dismiss the presumption that the tax measures enacted by a State are *bona fide*. As highlighted by the Tribunal in the case <u>RosInvestCo</u>[970], "*States have a wide latitude in imposing and enforcing taxation law, even if resulting in substantial deprivation without compensation*". The <u>Yukos</u> and <u>RosInvestCo</u> cases contrast bona fide measures with measures taken with the purpose of destroying a party or political adversary[971]. The Claimant's criticisms of the IVPEE do not reveal such an extreme purpose. The economic repercussions or effects of the IVPEE may be obscure and debatable, but that does not constitute a sufficient argument to conclude that the IVPEE is a tax measure that was promulgated in bad faith.

740. It is probable that this tax measure does not have the intended effect in favour of the environment and that its promulgation had no other real purpose than to reduce the tariff deficit, according to the Claimant. However, the Arbitral Tribunal does not need to provide a ruling on this, since, if the true purpose of the measure were merely to raise funds, in accordance with the arguments developed by the Claimant, it would coincide with the legitimate purpose of any tax without the bad faith that this tax measure is being characterised with. If it were true that the State submitted a measure that would merely raise funds in the form of a favourable measure to the environment, the conclusion would be the same. It is the actual purpose of the measure that must be assessed by the Tribunal and not its cosmetic presentation which can be explained by political reasons that do not fit within the analysis of the Arbitral Tribunal.

741. As a result, the Arbitral Tribunal does not have jurisdiction to hear the dispute regarding the alleged infringement by the Kingdom of Spain of its obligations under ECT Article 10(1) by the introduction of the IVPEE under Law 15/2012.

---

[969] Reply, ¶512, p. 119.

[970] **Legal Authority CLA-79:** *RosinvestCo UK Ltd. v. Russian Federation*, SCC Case No. V079/2005, Award, 12 September 2010, ¶ 580.

[971] **Legal Authority CLA-88:** *Yukos Universal Limited (Isle of Man) v. Russian Federation*, CPA Case No. AA/227, Award, 18 July 2014, ¶ 1407; **Legal Authority CLA-79:** *RosinvestCo UK Ltd. v. Russian Federation,* SCC Case No. V079/2005, Award, 12 September 2010, *passim*.

*This is an unofficial English translation of the Spanish original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

**7. Jurisdictional Objection G: the inadmissibility of the claim on an alleged violation by the Respondent of its obligations arising from Article 13 ECT through the introduction of the IVPEE under Law 15/2012, due to the failure to submit the question to the appropriate national tax authorities as required by Article 21(5)(b) of the ECT.**

742     The Claimant considers that if the IVPEE had been excluded by the "*carve-out*" of ECT Article 21(1), the objection of the jurisdiction of the Kingdom of Spain could not be successful in light of the IIN argument, according to which, the Tax had an expropriation effect. This is by virtue of the exception ("*Claw-back*") contained in ECT Article 21(5) that establishes the following:

> *a) Article 13 shall apply to taxes.*

> *b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:*

>> *(i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;*

>> *(ii) The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. Where non-discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Cooperation and Development;*

>> *(iii) Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;*

197

*This is an English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> (iv) Under no circumstances shall involvement of the Competent Tax
> Authorities, beyond the end of the six-month period referred to in
> subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and
> 27."

743. According to the Respondent, it would appear from this Article that the investor, who believes that a tax has an expropriation effect, has the obligation to submit the matter to the competent tax authorities.[972]. If it does not, a claim relating to the expropriation of taxes could not be examined by an Arbitral Tribunal before it has submitted the matter to the competent tax authorities.

744. In noting that the Claimant had not referred the matter to the competent tax authorities, the Respondent requested in its Statement of Defence to the Arbitral Tribunal declare the Claimant's claim inadmissible with regard to an alleged expropriation effect of the IVPEE and to proceed to submit that question to the competent national tax authorities for a decision on the matter within a maximum period of six months[973]. The same petition is included in the Rejoinder[974].

745. The Claimant accepts that the purpose of the ECT is to favour the possibility of going to the competent tax authorities to determine whether a tax measure has an expropriation effect, but denies that such a remedy is mandatory and that it constitutes a requirement for the initiation of arbitration[975]. The ECT would not sanction the absence of an appeal with the inadmissibility of the claim, as it provides that the court may resort to the competent tax authorities and that, if they do not pronounce within period of six months, the arbitration may not be delayed[976].

746. In any event, this debate would have no practical interest according to the Claimant, due to the fact that there would be no mechanism under Spanish law for appeal before the competent prosecutorial authorities in accordance with ECT Article 21(5)(b). As a result, this Article of the ECT could not be activated[977], which the Respondent denies[978].

747. This discussion is now superseded by the fact that, on 3 February 2016, IIN requested in writing from the DGT, Sub Direction of Special Taxes of the Treasury Department and Public Administrations of the Kingdom of Spain confirming the expropriation and discriminatory nature of the IVPPE. Although by letter of 16 March 2016 to the Arbitral Tribunal, the Claimant confirmed that in its opinion the DGT had no jurisdiction

---

[972]   Statement of Defence, ¶731, p. 170.
[973]   Statement of Defence, ¶740, pp. 172-173.
[974]   Rejoinder, ¶530, p. 120.
[975]   Rejoinder to jurisdictional objections ¶ 307, p. 64
[976]   Rejoinder to jurisdictional objections ¶ 315/316, p. 66.
[977]   Reply, ¶¶309-315, pp. 65-66.
[978]   Rejoinder, ¶¶537, p. 120.

*This is only a true and faithful translation of the Spanish original award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

to rule on the expropriation nature of the IVPEE, its letter to the DGT expressly indicated that his request was intended to comply with ECT Article 21(5)(b).

748. By letter of 22 March 2016, to the Arbitral Tribunal, Respondent stated that it considered that the Claimant's submission of a letter to the DGT on 3 February 2016 was "*an acknowledgment by the Applicant itself of the need to submit to the competent tax authorities the question of the alleged expropriation effect of a tax – in this case the IVPEE – when an investor claims that a tax constitutes an expropriation, in accordance with Article 21(5)(b) of the ECT.*"

749. The Respondent's letter denounced the dilatory nature of Claimant's conduct "*as there is no reason why Claimant waited until the present arbitration was pending judgment to refer the matter to the competent tax authorities.*" The Respondent requested that this conduct be punished by the Arbitral Tribunal in its decision on costs.

750. The Respondent's letter of 22 March 2016 was accompanied by a DGT certificate of the same date, confirming that "*An application is currently in process related to the procedure provided by the Article 21.5 (b) of the Energy Charter Treaty presented by Isolux Infrastructure Netherlands B.V. with entry date of 3 February 2016 …*"

751. On 4 April 2016, the DGT replied to the IIN that the competent tax authority of the Kingdom of Spain had already issued the report for the Article 21 (5) (b) ECT, stating that a response was provided to the representation of the Respondent in the arbitration proceeding.

752. By letter of April 20, 2016, the Claimant noted that it had not received such a report, which was transmitted to the Arbitral Tribunal by the Respondent. The Claimant also emphasised that "*even if it were mandatory, necessary to activate (quod non) the procedure provided for in ECT Article 21(5)(b) this has in fact been exhausted with the issuance of said report.*"

753. The DGT report, dated 29 March 2016, was received by the Claimant and sent to the Arbitral Tribunal on 21 April 2016

754. Under these circumstances, the Respondent's objection relating to the inadmissibility of the Claimant's claim relating to the Respondent's alleged violation of its obligations under ECT Article 13 through the introduction of the IVPEE due to the lack of submission of the matter to the competent national tax authorities, has lost its factual basis. Whether it was necessary or not, the procedure provided for in Article 21 (5) (b) of the ECT has been exhausted.

*This is only a draft translation of the original Spanish award and cannot be relied.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

755.   As a result, the only thing that the Arbitral Tribunal will have to decide in this respect is the impact on its decision as to costs of the Claimant's behaviour that, after maintaining throughout these arbitration proceedings that the process of Article 21(5)(b) ECT was not mandatory and that there was no mechanism under Spanish law to appeal to the competent tax authorities that enabled it to be activated, it finally decided to do so. This impact will be assessed later in this award. However, the Arbitral Tribunal must first rule on the mandatory nature of the procedure of ECT Article 21(5)(b) ECT, in order to determine whether or not a claim relating to violation of ECT Article 13 by way of tax measures is or is not admissible That it is possible to activate the procedure under Spanish law is established.

756.   The Arbitral Tribunal considers that the wording of Article 21(5)(b)(i) of the ECT is absolutely clear:

> *"i) The Investor or the Contracting Party alleging expropriation **shall** refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) **shall** make a referral to the relevant Competent Tax Authorities".* (Emphasis added)

757.   Article 31 of the VCLT establishes that "*A treaty must be interpreted in good faith in accordance with the ordinary meaning attributed to the terms of the treaty in this context, and taking into account its object and purpose*". According to an interpretation of the ordinary meaning, the use of the future ("shall submit", "they shall submit") reflects a mandatory procedure for both the investor and the court, confirming the use of *"shall"* in the English language version of the Treaty. Also confirmed is the text of Article 21(5)(b)(iii) of the ECT where it indicates that "*Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation*" and that the same bodies *"shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.*" When the use of the future does not indicate an obligation, the introduction of the verb "may/can" is necessary.

758.   The Arbitral Tribunal shares the Claimant's analysis when it argues that the ECT does not sanction the absence of the procedure with the inadmissibility of the claim. However, even if the claim were admissible, a tribunal could not examine it without giving the

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

Competent Authorities the opportunity to rule within a period of six months.

759. These observations shall be taken into consideration by the Arbitral Tribunal when deciding on the impact of the Claimant's conduct relating to the application of Article 21(5)(b)(i) ECT in its decision on costs.

## B.    ANALYSIS OF THE MERITS

760. According to the Claimant, the Kingdom of Spain has violated its obligations under Articles 10(1)(a) and 13(b) of the ECT. These two claims will be examined successively. The Court will then rule on costs (c).

### 1.    The alleged violation of ECT Article 10

761. The Claimant explains that under Article 10(1) o the ECT, the Respondent has the following obligations: to create stable and transparent conditions for the realization of investments in its territory (1), to grant fair and equitable treatment to the investments of the Claimant at all times (2), to ensure complete protection and security to Claimant's investment (3), to not harm, in any manner whatsoever, through exorbitant or discriminatory measures, the management, maintenance, use, utilisation, or liquidation of Claimant's investment in Spain (4), and to comply with all obligations that it has entered into with the Claimant or its investment in Spain (5).[979]

762. The Claimant argues that the Kingdom of Spain has violated each of these obligations.

763. ECT Article 10 states the following:

> "*Each Contracting Party shall, in accordance with the provisions contained in this Treaty, encourage and create stable, equitable, favourable, and transparent conditions fo Investors of other Contracting Parties to make investments in its Area. Such conditions, shall include a commitment to accord at all time to Investments of Investors of other Contracting Parties fair and equitable treatment. Such investments shall also enjoy the most constant impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. shall such Investments be accorded treatment less favourable than that required by*

---

[979]    Reply, ¶ 521, p.122.

*This is an English translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> *International law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."*

764.   However, contrary to that what is stated by the Claimant[980], the Arbitral Tribunal did not find, in this Article, an autonomous obligation for the Contracting Parties to promote and create stable and transparent conditions for the performance of investments in its territory, and whose violation would generate rights in favour of the investors of other Contracting Party, *per se*. This would be absurd, for example, for an investor to claim indemnity from a State for not having promoted stable and transparent conditions for the performance of investments in its territory, if this was in fact caused by a violation of another obligation regarding the investor, such as that of conceding a fair and equitable treatment to the investment, protection and security, etc.

765.   The Claimant explains that "*this standard prohibits one Contracting Party from instituting a regulatory framework design in order to attract the investment – as was the case with the Respondent – only to later radically abolish it[981]*". However, this is nothing more than an illustration of the obligation to respect the legitimate expectations of the investor. In fact, the Claimant does not offer any type of convincing jurisprudence or case law to support its allegations. To the contrary, the Tribunal, in the <u>Plama</u>[982] case, adopted a similar position to that of the present, when it stated that "*stable and equitable conditions are clearly part of the fair and equitable standard under the ETC*". In fact, the Claimant implicitly recognises this in indicating that, under such standard, the reasonability and proportionality of the measures must be considered in light of the legitimate expectations of the investor, which are protected by the FET standard[983].

766.   As a result, the Arbitral Tribunal shall not examine the alleged violation of the Kingdom of Spain of an obligation to create stable and transparent conditions for investment in its territory as a separate matter.

767.   The Arbitral Tribunal also does not consider it appropriate to perform a separate analysis of the alleged violation by the Kingdom of Spain of the supposed fifth obligation of Article 10(1) ECT, mentioned by the Claimant, given that the argument of the Claimant is based solely on its interpretation of the final phrase in ECT Article 10(1) that the Arbitral Tribunal does not share.

---

[980]   Reply, ¶524, p. 123.
[981]   Reply, ¶530, p. 124.
[982]   *Plama Consortium Limited v. Republic of Bulgaria*, Award, ISCID Case No. ARB/03/24, 27 August 2008, ¶173.
[983]   Reply, ¶619.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 225 of 257
*This document is an English translation of the original award rendered in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

768. According to the Claimant, Article 10(1) ECT constitutes an umbrella clause that should be interpreted broadly: it would be understood not only as contractual commitments, but also as legal obligations assumed by virtue of the legislative framework of the host State. The Claimant points out that the terms "any obligations" contained in the English version of Article 10(1) ECT must be interpreted broadly[984]. It refers to decisions of other tribunals[985], and case law[986] to conclude that those obligations arising from administrative or legislative acts of the State are also considered by this Article. The Kingdom of Spain had, then, obligations to IIN, in accordance with the umbrella clause of Article 10(1) ECT, because it make very specific commitments to T-Solar, the Plants, and, finally, IIN[987].

769. The Arbitral Tribunal does not accept this reading of the final phrase of Article 10(1) ECT, that states: "*Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.*" The reference that the Claimant makes in the English version of the text, "any obligation" instead of referring to the Spanish version of the ECT, does not permit a different conclusion. Whether in English or Spanish, the last phrase of Article 10(1) ECT considers obligations that a Contracting Party "*haya contraído*" ("entered into" in the English version), with the investors or the investments of the investors of the other Contracting Party. What is important here is the existence of an obligation to investors or towards investments of investors of the other Contracting Party.

770. The Arbitral Tribunal shares, in a general manner, the analysis of the award <u>Noble Ventures, Inc. v. Romania</u>[988], which, in interpreting Article II(c) of the Bilateral Treaty between the United States and Romania dated 28 May 1992, very similar to the final phrase of Article 10(1) ECT, explained that:

> "[…] *considering the wording of Art. II (2)(c) which speaks of "any obligation [a party] may have entered into with regard to investments", it is difficult not to regard this as a clear reference to investment contracts. In fact, one may ask what other obligations can the parties have had in mind as having been "entered into" by a host State with regard to an investment. The employment of the notion "entered into" indicates that specific commitments are referred to and not general*

---

[984] Reply, ¶648.

[985] *Liman Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of Award, 22 June 2010, ¶ 448; *Eureko B.V. v. Republic of Poland*, Ad Hoc Investment Treaty case, Partial Award, 19 August 2005, ¶ 246, Legal Authority RLA-64.

[986] R. Dolzer and M. Stevens, *Bilateral Investment Treaties* (1995), pp. 81-82.

[987] Reply, ¶656-658.

[988] *Noble Ventures, Inc v. Romania*, ISCID Case No. ARB/01/11, Award of 12 October 2005, paragraph 51. RLA-62

*This is an English translation of the Spanish original award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> *commitments, for example by way of legislative acts. This is also the reason why Art. II (2)(c) would be very much an empty base unless understood as referring to contracts. […]".*

771.  The Arbitral Tribunal accepts that, in certain extraordinary cases, laws or administrative acts may contain commitments, in particular when they are specifically directed at foreign investors, as was indicated in the award for the case of <u>Limian Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan</u>[989]. The obligation to submit to arbitration that is found in various investment codes is a characteristic example. However, a regulation directed both at domestic as well as foreign investors may not, by means of its general character, generate obligations only for the former, including when they are investors of a Contracting Party.

772.  Contrary to what is indicated by the Claimant[990], RDs 661/2007 and 1578/2008 are not expressly designed *"[to] seek[] foreign investment".* In fact, the original investment in the plants, prior to the creation of IIN, was Spanish. The commitments that would have been taken on by the Kingdom of Spain with regard to T-Solar, the Plants, and, in the last instance, IIN, were commitments that were not specifically contracted with investors or investments of investors of a Contracting Party. As a result, the Arbitral Tribunal concludes that, as the Kingdom of Spain had not entered into agreements establishing specific obligations with the Claimant or their investment in Spain, it would make no sense to examine non-compliance with said obligations.

## a. The alleged violation by the Respondent of the obligation to grant fair and equitable treatment (FET) to the investments of the Claimant.

773.  The Claimant argues that the conduct of the Respondent generated legitimate expectations arising from the regulatory framework. The Respondent would have violated these expectations in introducing the IVPEE, by modifying, through RDL 2/2013, the updating regime of the FIT through an IPC, ad hoc, solely applicable to the updates on incentives for the Special Regime and, finally, with RDL 9/2013, by removing the Special Regime and replacing it with the Specific Remuneration Regime, with retroactive effects.

774.  The Respondent points out that *"there is a consolidated ordinary jurisprudence that does not admit the creation of legitimate expectations for the investor regarding the immutability of the legal framework, except when the host state issues a specific commitment with regard*

---

[989]  *Liman Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan*, ISCID Case No. ARB/07/14, Excerpts of Award, 22 June 2010, ¶ 448, «Applying this reasoning to ECT Article 10(1), it could be argued that an abstract unilateral promise by the state in its national legislation and particularly in its laws directed to foreign investors is encompassed by the "umbrella clause"».

[990]  Reply, ¶558, p. 130.

*This copy of the award is a translation of the original Spanish-language award.*
*Reliance should be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*to the investor".*[991] However, this debate is not relevant, given the fact that the Claimant indicates that, at no time, it has alleged that there was an expectation of "immutability of the legal framework", nor of "setting in stone", and specifies that it had the legitimate expectation that the Kingdom of Spain would respect its commitment to a long-term fixed FIT and a stable and predictable framework.[992]

775. The Arbitral Tribunal has already ruled that the Kingdom of Spain has not contracted commitments with investors, on the view of the general character of the regulations applicable to investments. However, the Arbitral Tribunal shares the UNCTAD analysis, which has presented the concept of legitimate expectations in the following manner:[993]

> "*Arbitral decisions suggest [...] that an investor may derive legitimate expectations either from (a) specific commitments addressed to it personally, for example, in the form of a stabilisation clause, or (b) rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investments and on which the foreign investor relied in making its investment*."

776. Furthermore, the Arbitral Tribunal notes that both parties refer to the award issued in the case of Total v. Argentina, for the purposes of illustrating the concept of legitimate expectations.[994] This award explains that legitimate expectations are generated in accordance with the FET standard when:[995]

> [...] *public authorities of the host country have made the private investor believe that such an obligation existed through conduct or by a declaration. Authorities may also have announced officially their intent to pursue a certain conduct in the future, on which, in turn, the investor relied in making investments or incurring costs. As stated within the NAFTA framework "the concept of "legitimate expectations" relates [...] to a situation where a Contracting Party's conduct creates reasonable and justifiable expectations on the part of an investor (or investment) to act in reliance on said conduct, such that a failure by the NAFTA party to honour those expectations could cause the investor (or investment) to suffer damages*."

777. The Arbitral Tribunal also shares the observation contained in the award Perenco v. Ecuador, that emphasises the fact that: *"a central aspect of the analysis for an alleged violation*

---

[991] Statement of Defence, ¶757.

[992] Reply, ¶536, p. 125.

[993] **Legal Authority RLA-53:** UN Conference on Trade and Development, *Fair and Equitable Treatment*, 2012, pg. 69.

[994] Statement of Defence, footnote on page No. 373. Rejoinder, ¶744, p.166 where the Respondent indicates "*This party shares the invocation of the cases Perenco v. Ecuador and Total v. Argentina made by the Claimant...*", Reply ¶541, p. 126.

[995] **Legal Authority RLA-57:** *Total S.A. v. the Republic of Argentina*, ISCID Case No. ARB/04/1, Decision on Liability of 27 December 2010, ¶¶ 121.

*This is an unofficial translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*of the standard of fair and equitable treatment is the investor's reasonable expectations regarding future treatment of its investment by the host State",* which requires *"an objective determination of these expectations, considering all relevant circumstances".*[996]

778. One of the relevant circumstances is the information that the investor would have or should have had at the time of investing. This reasoning was analysed in the <u>Electrabel v. Hungary</u> case, whose award states that:

> *"Fairness and consistency must be assessed against the amount of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State"*.[997]

779. The Claimant refers to the statement of the tribunal in the <u>Parkerings v. Lithuania</u> case:

> *"The investor will have a right of protection of its legitimate expectations provided it exercised due diligence and that its legitimate expectations were reasonable in light of the circumstances. Consequently, an investor must anticipate that the circumstances could change, and thus structure its investment in order to adapt it to the potential changes of legal environment* [998]*".*

780. The Respondent notes that the Claimant did not undertook a legal due diligence, and only relied on the technical due diligences reports of the 2008 and 2010 projects.[999] The Claimant recognises that it should have *"had a general knowledge of the regulatory environment in which it operates"*[1000] but alleges that there is no *"obligation, under International Law, for the investor to perform an exhaustive legal investigation, and much less of the jurisprudence, prior to making its investment"*[1001]

781. The Arbitral Tribunal accepts that the investor cannot be required to perform an extensive legal investigation. What is important in order to determine whether the alleged expectations of the investor are reasonable, is what any prudent investor must know regarding the regulatory framework before investing, and the effective information of the investor that invokes specific expectations. In particular, an investor may not have legitimate expectations generated by the regulatory framework when its personal information enables it to predict and anticipate, before investing, the unfavourable evolution of this regulatory framework. To violate the legitimate expectations of the investor, the new regulatory measures should not

---

[996] *Perenco Ecuador Limited v. the Republic of Ecuador*, ISCID Case No. ARB/08/6, Decision regarding pending questions relating to jurisdiction, and regarding liability, 12 September 2014, ¶560, Legal Authority CLA-89; See Reply, ¶539; Rejoinder, ¶ 745.

[997] *Electrabel v. the Republic of Hungary* ISCID Case No. ARBi07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.78.

[998] Parkerings-Compagniet AS v. Republic of Lithuania, ICSID Case No. ARB/05/8, Award, 11 September , 2007 ¶332.

[999] Rejoinder, ¶¶750-751.

[1000] Claimant's Post-hearing brief, ¶77, pg. 18.

[1001] Reply, ¶437, p. 99.

*This document is a translation of the original Spanish award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

have been foreseeable, either by a prudent investor, or by an investor which, due to its personal situation, was aware of certain specific elements allowing it to anticipate the new measures.

782.  The parties disagree regarding the date that should be considered in order to appreciate the capacity of the Claimant to foresee the evolution of the regulatory framework that, according to the Claimant, violates its legitimate expectations. According to the Claimant, it is the date of the decision to invest that is important here, the 29 June 2012[1002]. On the contrary, the Respondent refers to the 29 October 2012, the date of the acquisition by the Claimant of 65,434,220 nominal shares of T-Solar (equivalent to 58.8632% of the capital equity).[1003]

783.  The Arbitral Tribunal considers that it is the latter of these two dates that should be used as the reference date. While it is in fact true that the decision to invest was already taken at the end of June 2012, IIN could have renounce to make the investment until 29 October 2012, in particular, if the knowledge it had of circumstances regarding the reform of the Spanish electrical system allowed to anticipate an unfavourable evolution. Furthermore, clause 5.6.2 of the Investment Agreement dated 29 June 2012, included the possibility of termination without rights to compensation, if circumstances able to negatively affect the group value arised.

784.  In light of these observations, the Arbitral Tribunal must determine whether, at the time of the investment, ie. 29 October 2012, the regulatory framework that existed could have generated, for the Claimant, the legitimate expectation that there would be no modifications, when actually there were, with the regulations that were adopted in 2012 (Law 15/2012) and 2013 (RDL 2/2013), and, above all (RDL 9/2013).

785.  The Arbitral Tribunal concludes that the response to this question must be negative.

786.  The Claimant explains that, in order to ensure the investment in the renewable energy sector and to comply with the obligation to guarantee a stable and predictable economic framework for the plants, under the so-called Special Regime, the main tool at the disposal of the Kingdom of Spain was the FIT system, under which it granted the right to obtain a fixed long-term FIT as enshrined by RDs 661/2007 and 1565/2008.[1004] The Claimant argues that the Kingdom of Spain violated its legitimate expectation when the applicable regulation was modified through, (i) first of all, the imposition of a tax on the value of production of electrical energy (Law 5/2012) [sic:15/2012], and, (ii) secondly, the modification of the updating mechanism for the FIT, as applicable to the Plants (RDL 2/2013), in order to, (iii) finally,

---

1002   Claimant's Post-hearing brief, ¶78.
1003   Rejoinder, ¶678.
1004   Claimant's Post-hearing brief, ¶166.

This is only a draft version. Original award can be found here.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 230 of 257

abolish entirely the Special Regime and establish, in substitution, the Specific Retribution Regime with (RDL 9/2013).[1005].

787.    However, on 29 June 2012, when the Claimant decided to invest in Spain, the regulatory framework for renewable energy had already been modified and was being object of various studies which made its modification inevitable. As a result, no reasonable investor could have had the expectation that this framework would not, in fact, be modified in the future, and that it would remain immutable. The Claimant accepts this, but argues that "*no investor performing its investment in October 2012 would have concluded that its sole basic expectation would be to obtain a reasonable return*".[1007] The Arbitral Tribunal do not share this reasoning and, additionally, considers that the Claimant had special knowledges that could not have created the legitimate expectation that the long-term FIT system enshrined in RDs 661/2007 and 1565/2008 would have lasted the entire lifetime of the plants. The only legitimate expectation of the Claimant was to receive a reasonable return for its investment.

788.    In the first place, as previously mentioned, the regulatory framework had already been modified several times. The proper RDs 6611/2007 and 1565/2008 were no more than amendments to RD 436/2004. After that, RD 1565/2010 and Royal Decree Law 14/2010 modified the established economic regime in RD 661/2007 for the photovoltaic sector. All of these regulations issued for the implementation of Law 54/1997, of 27 November 1997, regarding the Electrical Sector (LSE), showed a very unstable character of a regulatory framework that the government has the power and the duty to adapt to the economic and technical needs of the moment, within the LSE framework.

789.    Secondly, the legality of these successive amendments had already been verified by several decisions of the Spanish Supreme Court, which emphasised in 2005 that "*there is no legal obstacle for the Government, in the exercise of its regulatory powers, and the broad which it has in a strongly regulated matter such as electricity, to modify a specific system of remuneration [...].*"[1007]

790.    Even more significant is another ruling of 25 October 2006, which states:

> "(…) the owners of electricity production installations under the special regime **do not have an "unalterable right" to remain in an unchanged economic regime governing the collection of premiums.** This scheme is designed to promote renewable energies by an incentive mechanism which, like all those of this type, does not guarantee to

---

1005   Claimant's Post-hearing brief, ¶166.
~~1006   Reply, ¶598.~~
1007 **Exhibit R-30**: Ruling of the Third Chamber of the Supreme Court on 15 December 2005

*This is an unofficial non-binding translation of the original Spanish text provided.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*remain unchanged in the future.*"[1008]. (Emphasis added).

791.    Another ruling of the same Supreme Court is even clearer:

> "*In the same manner as on the basis of economic policy factors of very different sign (relating to the promotion of renewable energy but also the planning of electricity sector networks, as well as other energy saving and efficiency considerations), **premiums and incentives for the production of electricity under the special regime can increase from one year to another, they may also fall when these same considerations also so advise**. Provided that, we would stress, these changes are kept within the legal limits which discipline this mode of promotion, the mere fact that the updating or economic direction of the premium rises or falls does not constitute in itself grounds for nullity or affect the legitimate expectation of recipients.*"[1009]

792.    According to that indicated by the Supreme Court, in its ruling of 9 December 2009, the only limit to the power of the Government to modify its regulatory framework is the guarantee given by the LSE of a reasonable return for the investors:

> "*[...]* [the Claimant] *has not paid sufficient attention to the case law of this court, specifically in relation to the concepts of legitimate expectation and non-retrospective effect applied to successive incentive regimes in relation to electricity generation. We are referring to the considerations expressed in our decision of 25 October 2006 and reiterated in our decision of 20 March 2007, among others applicable to the legal situation of the owners of electricity generation installations subject to the special regime, **which do not have an "enduring right" to an unaltered remuneration approved by the authorities, provided that there is respect for the provisions of the Electricity Sector Act in relation to reasonable profitability.*"*".[1010]     (Emphasis added)

793.    The Arbitral Tribunal shares the Claimant's position, that the rulings of the Spanish Supreme Court do not bind this Arbitral Tribunal, which must settle this dispute on the basis of the ECT and international law, exclusively.[1011] However, this observation is relevant at the time of considering the existence of Claimant's alleged legitimate expectations. It is precisely to settle this dispute based on the

---

[1008]  **Exhibit R-31:** Ruling of the Third Chamber of the Supreme Court on 25 October 2006.

[1009]  **Exhibit R-31:** Ruling of the Third Chamber of the Supreme Court on 25 October 2006, RCA 12/2005, reference El Derecho EDJ 2006/282164; Legal Basis Three.

[1010]  **Exhibit R-39:** Ruling of the Third Chamber of the Supreme Court on 9 December 2009.

[1011]  Claimant's Post-hearing brief, ¶73.

*This award is an unofficial English translation of the Spanish original award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

ECT and on international law, that the Arbitral Tribunal must determine whether the Claimant was aware that there were no obstacles under Spanish law to modify the regulatory framework including with regard to investor remuneration. The existence or inexistence of these obstacles in Spanish law is a fact, and the Supreme Court's rulings are part of this fact.

794.	Without requiring a reasonable investor to perform an extensive legal investigation at the time of investing, knowledge of important decisions from the highest authority regarding the regulatory framework for investment may be assumed.

795.	Thirdly, and above all, such assumption is not necessary in this case, given that it is established that the Claimant was perfectly aware of the Spanish Supreme Court's jurisprudence previously mentioned.

796.	Isolux Corsan, S.A. the parent company of Grupo Isolux, one of the signatories of the investment agreement dated 29 June 2012, submitted to the Spanish Supreme Court a contentious-administrative appeal against RD 1565/2010[1012]. Isolux Corsan's claim dated 27 May 2011, submitted before the Supreme Court, makes express reference to the jurisprudence mentioned above in paragraph 792[1014]. As a result, when it made its decision to invest, the Claimant was perfectly aware of the jurisprudence of the Supreme Court that allowed the government to modify the regulatory framework, guaranteeing the investor a reasonable return on its investment.

797.	On the 27 September 2012, the Supreme Court's ruling dated 24 September 2012 was notified to Isolux Corsan S.A. This ruling clearly states that:

> *"The reasonable remuneration for investments established by Law 54/1997 does not imply, we repeat, that the remuneration must necessarily be received through the regulated tariff [...]*
> *Private agents or operators that "waived" the market without bearing any significant risks in exchange knew or ought to have known that the public regulatory framework, approved at a given time, as well as being coherent with the previous economic climate and with the forecasts for electricity demand made at that time, could not subsequently be left untouched by the pertinent modifications made to the base economic data, in the face of which it was not only logical but also necessary for the public authorities to react to bring it into line with the new prevailing circumstances..*

---

[1012]	**Exhibit R-137**: Request for hearing dated 21 January 2011.

[1013]	**Exhibit R-214**: Claim of Isolux Corsán, S.A. of 27 May 2011 filed before the Supreme Court against ~~Royal Decree 1565/2010,~~ contentious-administrative appeal 60/2011.

[1014]	In particular to the rulings of 9 December 2009, p. 37, 25 October 2006 (R-214, p. 38).

> *The administratively set economic regime is based on a set of implicit assumptions that any diligent market operator – or who would have sought prior quality advice – could not have ignore.*[1015] *(Emphasis added).*

798.   When Isolux Corsan S.A. became aware of this decision on 27 September 2012, and in light of previous Supreme Court's jurisprudence, in particular the ruling of 9 December 2009 mentioned in paragraph 792, it had more than sufficient knowledge to be aware that the remuneration method for its investment could potentially be drastically modified, including with a removal of the regulated tariff. The confirmation and expansion of its prior knowledge did not permit the Claimant to have legitimate contrary expectations. There was still plenty of time for the IIN to renounce to the investment if it was not willing to assume the anticipated risk.

799.   The Claimant objects that no reasonable investor could have anticipated the abolition of the Special Regime, nor foreseen that a maximum limit would be imposed on the return of its investment.[1016] The Claimant also alleges that the retroactive nature of the reform was also unforeseeable[1017].

800.   The Arbitral Tribunal is not convinced by these arguments. First of all, the Claimant was not an ordinary reasonable investor, but rather an especially well-informed one. Secondly, the objections of the Claimant are not convincing, *per se.*

801.   According to the Claimant, the imposition of a special tax on the value of the production of electrical energy (the IVPEE) was the first measures that rendered the Special Regime void.[1018] The Arbitral Tribunal already decided that it has not jurisdiction on the dispute regarding the alleged violation, by the Kingdom of Spain, of the obligations arising from Article 10(1) ECT through the introduction of the IVPEE through Law 15/2012.[1019]

802.   However, it is not necessary to enter into a special discussion regarding the effects of the IVPEE in order to conclude that with its successive subsequent reforms, through which the Kingdom of Spain has finally completely abolished the Special Regime, substituting it with a new regime called the Specific Retribution regime, *which is radically different from the Special Regime and much less advantageous for owners of*

---

[1015]   **Exhibit R-139**: Ruling of the Supreme Court, 24 September 2012; **Exhibit R-141**: Ruling of the Supreme Court of 15 October 2012 issued in the case of T-Solar and 117 SPVs v. RD 1565/2010, rec. 64/2011.
[1016]   Reply, ¶394.
[1017]   Reply, ¶465.
[1018]   Statement of Claim, ¶143
[1019]   See above ¶ 741.

This is an unofficial translation of the original award rendered in Spanish.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

*Photovoltaic installations under RDs 611/2007 and 1578/2008*".[1020]. Finally, the FIT's concept itself was eliminated.

803.     The reality of these facts does not violate Claimant's legitimate expectations. The existence of the Special Regime during the entire lifetime of the Plants could not have been considered as an expectation per se, independently of its content. In October 2012, all of the investors were aware of or had to be aware that the system was going to be modified. For example, the NEC, in its report of 7 March 2012[1021] stated that:

> *"Due to the high cost of remuneration of the equivalent premium under the special regime, the difficulty of financing it from access tariffs (taking into consideration the current economic imbalance of the electricity system), and the needed revision of the efficiency incentives of the current regulation, it is necessary to review the existing regulation in order to achieve the objectives set forth in the recently approved Renewable Energy Plan, minimising the associated costs. Likewise, it is possible to contemplate other new sources of financing of the equivalent premium additional to the current one (exclusively based on the rate of access of electricity)."*

804.     In October 2012, any investor could have anticipated not only a fundamental modification of the contents of the Special Regime, but also the abolishment of the regime, whenever the principle of reasonable return on investment guaranteed by the LSE, also recalled by the NEC itself, is repected.[1022] With its special knowledge of the ruling of the Supreme Court dated 23 September 2012, the Claimant should have considered the possibility of the abolition of the Special Regime as a realistic possibility when making its investment.

805.     The Claimant alleges that it could not have foreseen that a maximum limit would be imposed on the return of its investment, because the principle of return on investment according to the LSE establishes, to promote renewable energy installations, a "*floor*", for profitability, and not a "*ceiling*".[1023] According to the Claimant, the only objective interpretation of Article 30.4 of the LSE is that it sets a minimum or "floor" for the remuneration of photovoltaic installations, contrary to RDL 9/2013, which imposes a ceiling on this reasonable return,[1024] in such manner that, if the Claimant had performed its investment after the approval of RDL 9/2013, it would have been aware of the maximum limit for the return on its investment.[1025]

---

[1020]   Statement of Claim ¶ 163.
[1021]   **Exhibit R-69**: NEC Report on the Spanish energy sector of 7 March 2012, p.75
[1022]   **Exhibit R-69**: NEC Report on the Spanish energy sector of 7 March 2012, p.23
[1023]   Statement of Claim, ¶¶173-178.
[1024]   Reply, ¶388, 390.
[1025]   Reply, ¶394.

*This is an unofficial English translation of the Spanish original award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

806.    Article 30.4 of the LSE states:

> "4. In addition, the production of electricity by means of non-hydraulic renewable energy, biomass, as well as hydroelectric plants whose power is equal to or lower than 10 Mw shall receive a premium set by the Government such that the price of electricity sold by those facilities falls within a percentage bracket of between 80% and 90% of the average price of electricity, which shall be calculated by dividing the income from billing for the supply of electricity by the energy supplied. The items used to calculate the average price shall exclude value added tax and any other tax levied on the consumption of electricity.
>
> In order to determine the premiums, the voltage of feeding the energy into the network, the effective contribution to improving the environment, to primary energy savings and to energy efficiency and the investment costs incurred will be taken into account with the aim of obtaining rates of reasonable return with reference to the cost on money in the capital markets. [...]."

807.    This text does not include the concepts of "*floor*" or "*ceiling*". The only guarantee that it contains for the investor is to receive, with regard to certain parameters, a reasonable rate of return with reference to the cost on money in the capital market. That is to say, that the regulator guarantees a minimum profitability, but does not guarantee that the investor will obtain a rate greater than the minimum guaranteed.

808.    The Respondent notes that prior to this arbitration proceeding, the Claimant shared that analysis. In fact, in its Claim before the Supreme Court dated 27 May 2011,[1026] Isolux Corsan alleged that, with the LSE, "*the intention was to create a legal framework stable enough to encourage investors to carry out these types of projects. Thus, the Law ensures them a reasonable remuneration for its costs, investments, and risks incurred. It is necessary that they* [the investors] *could see a model that allows companies to trust that they will be able to recover their costs and obtain a reasonable return on their investments*".

809.    The parties do not dispute the fact that the profitability guaranteed by RD-1 9/2013 is of 7.398%[1027] before taxes. A report prepared by Deloitte in May 2011 and

---

[1026]    **Exhibit R-214:** Claim of Isolux Corsán, S.A. of 27 May 2011 filed before the Supreme Court against Royal Decree 1565/2010, contentious-administrative appeal 60/2011. P. 49.

[1027]    Reply, ¶ 791 « *The Claimant's expert on damages, Deloitte, considers that if it had been possible to freely invest the amounts corresponding to the damages suffered, on the market, a return of 7.398%woulb have been obtained. This is precisely the "reasonable return" that the Kingdom of Spain guarantees, in accordance with the new regime established by Royal Decree 9/2013, to investors in*

*This is an English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

presented both by Corsan Isolux and by the companies of the Global T-Solar Group before the Spanish Supreme Court in its appeals against RD 1565/2010 indicates that the profitability of the Photovoltaic plants anticipated after the Law 2/2011 was of 6.19%,[1028]. The same report indicates that, within the regulatory framework of RD 661/2007, "*the profitability forecast by T-Solar to perform its investment was of 6.41%*"[1029]. This profitability was lower than the 7% rate provided by the Spanish Renewable Energy Plan 2005-2010, approved by Agreement of the Council of Ministers on 26 August 2005,[1030] a rate considered as "*reasonable*" by Isolux Corson, S.A. itself in its claim before the Spanish Supreme Court[1031].

810.    The Claimant could not have had legitimate expectations regarding the rate of return above 6.19% after taxes. The rate of 7.398% guaranteed by RD-1 9/2013 is a rate before taxes, and in order to compare it with the rate of 6.19%, it is necessary, to evaluate after taxes, the profitability guaranteed by RD-1 9/2013. Respondent's experts have made this calculation, using the calculation methods used by Deloitte in 2011, updated to take into account the calculation methods provided in the most recent legislative changes. They arrived at the conclusion that the "*average IRR considered for the plants after taxes arising from RD661/2007 reaches 7.11%, and for the 34 plants subject to this arbitral process, 7.19%*"[1032]. Neither the Claimant, nor its experts Deloitte and KPMG presented convincing evidence with regard to this calculation.

811.    As a result, the Claimant, which decided to invest when it knew that the plants had a profitability of 6.19%, may not argue that, in introducing the imposition of a limit of 7.19%, the Kingdom of Spain somehow violated its legitimate expectations.

812.    In order to reach a rate of return for the plants that is greater than 7.1%, the Respondent's experts took into account the effects of the IVPEE that did not fall within the scope of the jurisdiction of the Arbitral Tribunal, at the time of determining whether there was a violation of Article 10(6) ECT. That is to say, by ignoring the effects of this rate of return after taxes, it would be greater. This confirms that the Claimant's legitimate expectations regarding the return on its investment were not violated in any way by the abolition of the Special Regime.

---

the photovoltaic sector." Reply,¶ 699, M. Conclusions, d) " *The measures adopted in 2013 by the Kingdom of Spain are reasonable and guarantee the restitution to investors of the cost of the investment, operation, and sale of electricity, granting a reasonable return of 7.398% IRR.*"

[1028]    **Exhibit R-217**: Deloitte Expert Report of 23 May 2011, pg. 55.

[1029]    **Exhibit R-217**: Deloitte Expert Report of 23 May 2011, pg. 54.

[1030]    **Exhibit C-14**: Renewable Energy Plan 2005-2010 approved by the Spanish Government through an Agreement of the Council of Ministers of 26 August 2005, p. 274.

[1031]    **Exhibit R-214**: Claim of Isolux Corsán, S.A. of 27 May 2011 filed before the Supreme Court against Royal Decree 1565/2010, contentious-administrative appeal 60/2011, p. 50

[1032]    Mac Group Altran Report of 28 July 2015, p. 38-39.

*This is an unofficial English translation of the Spanish original award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

813. The Claimant also alleges that the Specific Remuneration Regime established by RDL 9/2013 does not only project its effects to the future, but also to the past, which gives it an unforeseeable retroactive nature that violated Article 10(1) ECT. The Respondent, on the contrary, explains that this measure is not, in fact, retroactive, and that the Claimant confuses the immediate application of this regulation with the concept of retroactivity.

814. The Arbitral Tribunal does not share Claimant's views. The Arbitral Tribunal considers, in accordance with the distinction between retroactivity and immediate application adopted by the tribunal in the <u>Nations Energy v. Panama</u> case,[1033] that the system put in place by RDL 9/2013 does not have retroactive effect, but is rather of immediate application. It is because it does not revoke any rights acquired by the Claimant regarding the use of the Plants. It applies to the future. RDL 9/2013 does not provide for the return of remuneration received prior to 14 July 2013, which are intangible. The fact that the new remuneration system takes existing and past parameters into consideration, such as those listed by the Claimant, is nothing abnormal, since it applies to installations constructed prior to the reform, projecting all of its effects to the future.

815. Based on the foregoing, the Tribunal notes that the Claimant has not established that the Kingdom of Spain in fact violated its obligation to provide a fair and equitable treatment (FET) to Claimant's investments.

        b.        <u>The alleged violation by the Respondent of the obligation to ensure complete protection and security for Claimant's investments</u>

816. For the Claimant, this standard implies "*an obligation to maintain this legal framework within an environment of stability. In the case at hand, in which the Kingdom of Spain committed to a specific regime (a long-term FIT, supported by the Special Regime), but only a few years later completely and utterly abolished it, the conduct of the Respondent does not comply with the concept of "stability", regardless of how this term is understood*".[1035] The Claimant further alleges that "*there is a legitimate expectation of stability of the legal framework as an essential element of the FET standard*"[1036] and that "*logically, the reasonability and proportionality of the measure should*

---

[1033] *Nations Energy Corporation, Electric Machinery Enterprises Inc., and Jamie Jurado v. The Republic of Panama*, ICSID Case No. ARB/06/19, ¶¶ 642-648; Statement of Defence, ¶895.
[1034] Statement of Claim, ¶203
[1035] Reply, ¶ 614.
[1036] Reply, ¶ 616.

*This is an unofficial translation of the original award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

> *be considered in light of the legitimate expectations of the investor, which are protected by the FET standard*".[1037]

817. Finally, the Claimant makes a presentation of the standard that can be confused with the FET and the issue of previsibility of measures, when the main purpose of the standard is to guarantee the investor against harmful acts of third parties and State agents. The Claimant has not alleged that it was the victim of such acts. The standard of protection and security cannot intervene to protect the investor against modifications of the legal framework in cases that do not justify such protection as a result of the obligation to ensure the FET. The Tribunal shares the tribunal's position in the <u>AES Summit v. Hungary</u> case regarding this issu, which states:

> "…*the duty to provide most constant protection and security to investments is a state's obligation to take reasonable steps to protect its investors (or to enable its investors to protect themselves) against harassment by third parties and/or state actors. But the standard is certainly not one of strict liability. And while it can, in appropriate circumstances, extend beyond a protection of physical security it certainly does not protect against a state's right (as was the case here) to legislate or regulate in a manner which may negatively affect a claimant's investment, provided that the state acts reasonably in the circumstances and with a view to achieving objectively rational public policy goals.*"

818. Furthermore, if someone wishes to enter into the realm of previsibility as alleged by the Claimant, it would be important to remember that prior to signing the Investment Agreement, Isolux Corsan stated to the Spanish Supreme Court that: *"More than five legislative changes in two years, with the resulting change of economic conditions for the affected parties, have turned Spain into a country lacking in legal security for investors, which leads to our international discreting"*[1038]. A party that decides to invest in a country that, according to it, lacks legal security, may not then turn to complain that such security was not provided.

819. The Tribunal concludes that the Claimant has not established the alleged violation committed by the Respondent with regard to its obligation to ensure protection and security for Claimant's investments.

---

1037   Reply, ¶ 619.

1038   **Exhibit R-214**: Claim of Isolux Corsán, S.A. of 27 May 2011 filed before the Supreme Court against Royal Decree 1565/2010, contentious-administrative appeal 60/2011, p. 11.

Case 1:19-cv-01618-TSC   Document 69-52   Filed 06/09/22   Page 239 of 257
*This is an unofficial translation from the original Spanish awarded rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

c.   <u>Respondent's alleged violation of the obligation to not damage by exorbitant or discriminatory measures,</u> the <u>management, maintenance, use, enjoyment or disposal of Claimant's investments</u>

820.   Article 10 (1) ECT prevents the Respondent not to impair "en modo alguno mediante medidas exhorbitantes…la gestión, mantenimiento, uso, disfrute o liquidación" of the INN investment. The Claimant states that in the English version the adjective "exorbitante" has been translated by "unreasonable" and that, as the measures taken by the Respondent have been "exorbitantes" in the sense of Article 10 (1), have impaired the management, use, benefit by INN of its investment in Spain, in direct violation of Article 10(1) ECT.

821.   The Arbitral Tribunal notes that the obligation whose violation is alleged by the Claimant is, first of all, an obligation not to harm " *…management, maintenance, use, enjoyment or disposal*" of the investment. In order for the violation to be valid, it would be necessary for the measures classified as exorbitant or discriminatory to have had a negative effect on the investment. The Arbitral Tribunal is not convinced that this is the case, given the fact that the measures in question have not negatively affecte the return on investment as has been established.[1040]

822.   Additionally, the Arbitral Tribunal does not consider that the measures taken were, in fact, exorbitant, nor were they unreasonable. The Arbitral Tribunal shares the criteria adopted in the award <u>Saluka Investments v. the Czech Republic</u>[1041] to which the Claimant refers.[1042] In this case, the Tribunal clearly indicated:

"*The standard of "reasonableness" has no different meaning in this context than in the context of the "fair and equitable treatment" standard with which it is associated; and the same is true with regard to the standard of "non- discrimination". The standard of "reasonableness" therefore requires, in this context as well, a showing that the State's conduct bears a reasonable relationship to some rational policy, whereas the standard of "non-discrimination" requires a rational justification of any differential treatment of a foreign investor.*

*Insofar as the standard of conduct is concerned, a violation of the non-impairment requirement does not therefore differ substantially from a violation of the "fair and equitable treatment" standard. The non-impairment requirement merely identifies more specific effects of any such violation, namely with regard to the operation,*

---

1039   Statement of Claim, ¶ 271
1040   *Above* ¶¶809-812
1041   *Saluka Investments B.V. v. Czech Republic*, Ad Hoc, Partial Award, 17 March 2006, ¶¶ 460-461, **Legal Authority CLA-22**.
1042   Reply, ¶640.

*This is an English translation of the original award issued in Spanish.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*management, maintenance, use, enjoyment or disposal of the investment by the investor."*

823.    In the case at hand, the measures adopted by the Kingdom of Spain may be criticised, in consideration of others available, proposed by the NEC, which would have been preferable and more favourable to the Claimant. If this were true, it would not be sufficient to conclude that the measures adopted were, in fact "*exorbitant*" or that they were unreasonable under the terms of the ECT. The behaviour of the State was a rational political action that was, like it or not, taken to protect the consumer. The Arbitral Tribunal has already ruled that the measures in question did not violate the FET, and may not, in any event, be a source of liability for the Kingdom of Spain with regard to the Claimant on the basis of Article 10(1) ECT.

824.    The Claimant considers that the Arbitral Tribunal has not established Respondent's violation of its obligation to not damage the management, maintenance, use, enjoyment or disposal of Claimant's investment by taking exorbitant or discriminatory measures.

825.    Based on the foregoing, the Arbitral Tribunal rejects Claimant's request to declare that the Respondent has violated its obligations under Article 10 ECT.

### 2.    <u>The alleged violation of Article 13 ECT</u>

826.    The Claimant alleges violation of Article 13 ECT by the Kingdom of Spain, basing this allegation on a series of arguments that may be summarised as follows:

-    The investment of the Claimant is protected by Article 13(1) ECT, which prohibits expropriation of investments in the sense of Article 1(6) ECT, and is not limited to the protection of vested rights;

-    The regulatory powers of the Kingdom of Spain may not be exempt from responsibility under Article 13 ECT;

-    The measures taken by the Kingdom of Spain had the effect of expropriating the investment of Isolux INBV, given the fact that it resulted in substantial limitation of its investment.

827.    The Respondent, as a response, states that:

-    The future returns that ISOLUX could expect do not constitute a good that is protected by Article 13(1) ECT;

-    This analysis is confirmed by international law;

-    It can be surmised from the facts that the measures in question did not, in fact, have the effect of expropriating Claimant's investment.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

823. In light of the nature of the arguments presented by the Parties, the Arbitral Tribunal will first rule wether the Claimant is requesting the protection for an investment protected by Article 13 ECT (i), and wether the measures in question had the effect of an expropriation (ii).

829. The Arbitral Tribunal considers that, in light of the crystal clear explanations provided by the parties, there is no need to take into account the report of the DGT dated 29 March 2016, as is permitted by Article 21(5)(b)(iii) of the ECT.

a.   The nature of Claimant's investment and the scope of the protection of Article 13 ECT

830. The Claimant alleges that an indirect expropriation of its investment occurred, which was protected by Article 13 ECT, that consisted of "*the shareholding stake in the equity capital of T-Solar, as well as earnings obtained from the activities of T-Solar*",[1043] and that the economic value of its investment, which was decreased or annihilated by the measures in question, consist in the "*security to sell electrical energy produced under the Special Regime, at a regulated tariff: the FIT*".[1044] The Claimant considers that the notion of "investment" must be interpreted in consideration of Article 1(6), and that, furthermore, this Article specifically includes benefits without specification of time periods.[1045] According to the Claimant, the Respondent confuses the investment that is the object of protection under Article 13 ECT with its economic value, in arguing that, in consideration of section 13(3), which provides an autonomous definition of the investment, only assets or acquired rights and within its capital, can enjoy the protection of the said article. Moreover, that in the present case "the security" of selling the energy and receiving "future returns" does not amount to a tangible asset capable of being expropriated under Article 13 (3) ECT.

831. According to the Respondent, Claimant's alleged investment would be limited to its shareholding stake in T-Solar and, therefore, to the potential indirect repossession, through the subsidiaries of T-Solar, of the shares of the companies that own the Plants.[1046] The benefits of the plants would truly not be the investment of the Claimant.[1047] The Respondent adds that, in order to be subject to expropriation, those benefits would have to be protected, as well, under Spanish law.

832.    Article 13 of the ECT states that:

"***Expropriation***

---

[1043]   Reply, ¶672.
[1044]   Statement of Claim, ¶282; Reply ¶673.
[1045]   Reply, ¶686.

*This is an unofficial translation of the original award rendered. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

1046   Rejoinder, ¶877.
1047   Rejoinder, ¶878.

*This is an English translation of the Spanish original award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*1. Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:*

*e) for a purpose which is in the public interest;*

*f) not discriminatory;*

*g) carried out under due process of law; and*

*h) accompanied by the payment of prompt, adequate and effective compensation.*

*Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").*

*Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.*

*2) The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1)..*

*3) For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.".*

833. From a reading of Article 13(1) ECT, it becomes very clear that it protects "*the investments*" made by the investors of a Contracting Party in the territory of another Contracting Party to the ECT. The Arbitral Tribunal, in relation to jurisdictional objection C, interpreted the concept of investment in consideration of Article 1(6) ECT and in accordance with the objective definition

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

of the concept of investment, and does not consider that the concept of "investment" must be interpreted in a manner different from that included in Article 13 ECT.

834.   There is no doubt whatsoever that, in accordance with Article 1(6), sections (b) and (e) of the ECT, and in accordance with the objective definition of the investment, the Claimant holds an investment, through its shareholding stake in the capital of T-Solar, that controls the Plants which generate benefits. In other words, in accordance with Article 13 ECT, and including with Article 13(3) ECT, the Claimant has the right to get protection for its shareholding stake in T-Solar. This means to get the protection for both the ownership of shares as well as for its value, against any substantial violation by the State, which the Arbitral Tribunal shall specify below.

835.   There is no doubt whatsoever that the Claimant did not invest in benefits, but rather in shares. However, a decrease in benefits of the investment as a result of the measures adopted by the State could be representative of the decrease of the economic value of the investment and, if substantial and significant, reflect a type of indirect expropriation. In such situation, it is not the benefits that are the subject of the expropriation, but rather the tangible goods that produce the benefits and, when these are violated lose their economic value.

836.   It derives from these observations that the arguments brought by the Respondent regarding the protection of tangible "goods" under Article 13(3), and the alleged obligation that all rights or goods subject to expropriation be protected by Spanish law, are not applicable. The only pertinent matter is to determine whether the benefits of the Claimant have been affected negatively as a result of the measures in question, a decrease in an amount such as it would reflect an indirect expropriation of the investment.

b.   The effects of the measures adopted by the Kingdom of Spain on Claimant's investment

837.   The Parties agree that, in order to determine the expropriation effect of these measures, it is sufficient to determine whether a substantial or significant deprivation of the investment has occurred, and wether this coincides with the "Test" used by the tribunals in the Electrabel v. Hungary case.[1048] In this case, the Tribunal stated that, in order to be characterised as an expropriation, there must have occurred "*a substantial, radical, severe, devastating, or fundamental deprivation of rights or the virtual annihilation, effective neutralisation, or factual destruction of its investment, its value, or enjoyment*".[1049]

---

1048   Rejoinder, ¶887; Reply ¶735-738.
1049   Reply, ¶888.

*This is an English translation of the original Spanish award.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

838. However, the Parties do not agree on the interpretation of this test. The Claimant concludes that it considers the test is passed when the measures have the effect of dispossessing the investor of its investment or control over it, and also when the loss suffered by the investor is "severe" or "radical".[1050] The Respondent consideres that the interpretation made by the Claimant of the Electrabel test is not correct, and that the terms "severe" and "radical" do not classify the loss of value, but rather the deprivation of rights. In order for there to be expropriation, the loss of value does not need to be "severe" but rather the amount must be annihilated, neutralised, or destroyed.[1051]

839. The Arbitral Tribunal considers that there is no need to enter into this debate, given the fact that the position adopted both by the tribunal in the Electrabel case, as well as by various international arbitral tribunals in this regard, is very clear and demonstrates the common conviction that the unlawful direct or indirect expropriation may affect both the investment and its control, and the affect must be substantial[1052]. That is to say, the impact to the rights or goods of the investor of the measures, must be of such magnitude that its investment loses all or a significant part of its value, which amounts to a deprivation of its property.

840. In the case at hand, Claimant's shareholding stake over T-Solar and its Plants has not been affected by any of the measures adopted by the Kingdom of Spain; T-Solar continues to fully control and operate its Plants, which is not disputed by the Parties. The Claimant is actually claiming for compensation for the losses of the value of its shares caused by a loss of profitability of the Plants controlled by T-Solar.

841. In order to determine whether an expropriation of Claimant's investment occurred, in accordance with Article 13 ECT, the Arbitral Tribunal must determine whether the measures in question had the result of a loss of profitability of those Plants, to such an extent that they substantially affected the investment of the Claimant,

842. In order to evaluate the existence of an indirect expropriation, the Arbitral Tribunal agrees with the method used by the Respondent, taking into account that the Deloitte experts

---

[1050] Reply, ¶738.

[1051] Rejoinder, ¶¶891-892.

[1052] **Legal Authority RLA-75:** CMS Gas Transmission Company v. the Republic of Argentina, ISCID Case No. ARBI/01/8, Award of 12 May 2005, ("CMS"), paragraphs 262-264.; **Legal Authority RLA- 77***: Marvin Roy Feldman Karpa v. Mexico, ISCID Case No. ARB(AF)/99/1, Award of 16 December 2002, paragraphs 100-152-153.*; Electrabel v. Hungary, paragraphs 6.53, 6.63; **Legal Authority RLA-76**: Pope and Talbot, Inc v. Government of Canada, CNUDMI/NAFTA, Interim Award of 26 June 2000, paragraph 102; **Legal Authority RLA- 78**: Sempra Energy International v. the Republic of Argentina, ISCID Case No. ARB/02/16, Award of 28 September 2007, paragraph 285; AES Summit Generation Ltd and AES-Tisza Erömü Kft v. Hungary, ISCID Case No. ARB/07/22, Award, 23 September 2010, paragraphs 14.3.1 – 14.3.4; UNCTAD Expropriation Report, page 69; Principles of International Investment Law Rudolph Dolzer and Christoph Schreuer, Oxford University Press, 2012, page 124.

*This is an unofficial translation of the original award rendered in Spanish.*
*Reliance should be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

at the request of the T-Solar group, also agreed to this same methodology in their report dated 23 May 2011 in order to "*quantify the expected impact on the profitability of the projects after the approval of Royal Decree 1565/2010*"[1053]. The Arbitral Tribunal has some difficulties to understand the reasons that conducted the Claimant not to use this method in this arbitration proceedings.

843.  The Arbitral Tribunal considers that the report, issued by the experts of Grupo T-Solar on 23 May 2011,[1054] is of particular relevance for the analysis, to the extent that it details the profitability expectations of the Plants by ISOLUX itself (i) prior to its investment and (ii) prior to the measures classified as amounting to expropriation by the Claimant, and subject of this arbitration. Specifically, the evaluations of profitability were performed after the adoption of RD 661/2007, and after RD 1565/2010. This export report was submitted with a claim before the Supreme Court presented in May 2011 by ISOLUX. Likewise, it was submitted with another claim, presented by T-Solar,[1055] against the modifications introduced by RD 1656/2010 and the corresponding Ruling notified on 29 September 2012.[1056]

844.  That said, using the "Internal Rate of Return" (IRR), in May 2011, Deloitte experts concluded that: "*benefits after taxes for the T-Solar installations, due to Royal Decree 1565/2010, has been reduced by 0.64% (it has decreased from 6.41%, to 5.77%, in the petroleum price landscape of 199$ 2005 (145 EUR 205/MWh) in 2030 and 0.98 (decreasing from 6.41 to 5.43%) in the petroleum price landscape of 63$ 2005 (85 EUR 2005/MWh) in 2030*".[1057]

845.  However, the experts specified that Royal Decree 1565/2010 was modified by Royal Decree Law 14/2010 (of 23 December) and by Law 2/2011 (of 4 March), expanding the period of time for photovoltaic installations to have the right to benefit of the premium-based economic regime, from 25 years, according to Royal Decree 1565/2010 to 30 years.[1058] The experts added that: "*for illustrative purposes, the loss of the differential in IRR by applying Royal Decree 1565/2010 with a time limit of 30 years, is softened with regard to the previous scenario of 25 years: by applying the scenario of more favourable prices (the highest) to the comparison, a reduction in profitability continues to occur, 0.22% (going from 6.41% to 6.19%), which means a relative loss of 3.45%*

---

1053  **Exhibit R-217**: Deloitte Report of 23 May 2011, page 7.
1054  **Exhibit R-217**: Deloitte Report of 23 May 2011, page 52.
1055  **Exhibit R-222**: Claim of T-solar and the Companies that own the Plants object of the present arbitration proceeding, 4 July 2011
1056  **Exhibit R-220**: Documentary support for the telematic notification made by the Supreme Court in the Ruling of 24 September 2102 [sic: 2012] to ISOLUX, on 27-09-2011, at 11:27:09´´.
1057  **Exhibit R-217**: Deloitte Report of 23 May 2011, p. 52.
1058  **Exhibit R-217**: Deloitte Report of 23 May 2011, p. 54.

*This is an unofficial translation of the original Spanish award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

*for all of the installations of T-Solar whose remuneration was established in Royal Decree 661/2007".*

846. With the adoption of Law Decree 14/2010 and Law 2/2011, which had the result of increasing the provision of premiums from 25 to 30 years, the IRR, initially fixed at 6.4% by RD 661/2007 came to amount to 6.19% after taxes.[1059] This is based on this IRR, quantified by Deloitte in 2011, at 6.19%, which the Claimant decided to invest with, as already established by the Arbitral Tribunal.[1060] This was the level of profitabiliy set for the investment when it was carried out.

847. The Arbitral Tribunal firsly concludes that, the Claimant may not argue that an expropriation of its investment occurred since the current IRR remains above the IRR of 6.19%. In order to prove that expropriation of Claimant's investment occurred, the current IRR should be lower than 6.19% at a proportion that would be qualify as "substantial and significant".

848. The Arbitral Tribunal has determined that this was not the case when it examined Claimant's request regarding the violation of its legitimate expectations.[1061]

849. It was established in this file that the "reasonability profitability" enshrined in RDL 9/2013 and established by Royal Decree 413/20143 is of 7.398%.[1062]

850. The real and current IRR of the Plants was calculated by the Respondent's experts using the calculation methods used by Deloitte experts in 2011, updated to take into account the calculation methods provided in recent legislative changes. They arrived at the conclusion that: "*average IRR considered for the plants after taxes arising from RD661/2007 reaches 7.11%, and for the 34 plants subject to this arbitration process, 7.19%*" and that this IRR "*is greater than the profitability established in the Spanish Regulations at the time when the holders of the plants made their investment*".[1063]

851. The Arbitral Tribunal states that neither Deloitte experts nor KPMG experts provided anything to demonstrate the contrary. The Claimant and its experts decided to invoke unusual grounds regarding the relevance and the evaluation of the reasonable profitability of the plants in this arbitration proceeding in such a manner that they have not convincingly or accurately contradicted the arguments of the Respondent.

852. In light of these observations, the Arbitral Tribunal states that no expropriation of the investment of the Claimant occurred, due to the fact that the benefits from which

---

[1059] Reply, ¶641; Exhibit R-217: Deloitte Report of 23 May 2011, pages 54 and 55. 52-55.
[1060] See *above*, ¶ 811
[1061] *See above*, ¶ 810
[1062] *See above*, ¶¶ 809
[1063] Mac Group Altran Report of 28 July 2015, p. 38-39.

*This is an English translation of the Spanish original award. Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

it was receiving a profitability at the time of the investment was not greater than 6.19%, and that the current profitability of the Plants is far greater than this, reaching a total of 7.11%. In no way it can be considered that there is a "severe" or "radical" loss according to the criteria accepted by the Claimant itself.[1064]

853. Taking into account the fact that the Arbitral Tribunal concluded that the measures adopted by the Kingdom of Spain were not expropriatory, it is not useful to decide whether the exception regarding the regulatory power of the State as a prerogative that excludes the right to receive remuneration.[1065] There is also no need to examine the arguments of the Parties relating to the damages requested by the Claimant.

854. In light of the foregoing, the Arbitral Tribunal rejects the request of the Claimant relating to the violation of Article 13 ECT by the Kingdom of Spain.

### C. COSTS

855. According to Article 43 of the SCC Arbitration Rules, the costs of an arbitration proceeding include fees and expenses of the Arbitral Tribunal, administrative costs, and all SCC expenses, as well as reasonable costs incurred by the parties.

856. Article 43(5) of the Rules establishes that, unless otherwise agreed by the parties, the Arbitral Tribunal shall, at the request of a party, apportion the costs of the arbitration proceeding between the parties, having regard to the outcome of the case and other relevant circumstances.

857. In the case at hand, there is no special agreement between the parties with regard to the distribution of costs.

858. The Claimant requested the Arbitral Tribunal to order the Respondent to pay all costs and expenses arising out of these arbitral proceedings. On the other hand, the Respondent requested the Arbitral Tribunal to order the Respondent [sic: Claimant] to pay all costs and expenses arising out of these arbitral proceedings. The corresponding amounts are detailed in Section VI.C of this Award.

859. On the one hand, the Claimant initiated the present arbitration proceeding based on alleged violations of the ECT by the Kingdom of Spain, arbitration whose scope was expanded by the Claimant itself when it requested the consolidation of the aforementioned arbitration with the arbitration proceeding that it already has initiated under number SCC V 2014/074. However, the truth is that none of the arguments brought by the Claimant allow a conclusion of a violation by the Kingdom of Spain of its obligations under the ECT.

---

1064   Reply, ¶738.
1065   Statement of Defence, ¶¶1007 et. seq., Reply ¶¶704 et. seq.

860.    On the other hand, the Respondent submitted 7 objections to the jurisdiction of the Arbitral Tribunal, with a very limited success since five of these jurisdictional objections were rejected.

861.    In light of the foregoing, the Arbitral Tribunal shall declare in the ruling part of this Award that the Respondent must bear 30% of all costs and expenses arising from these proceedings, and the Claimant shall bear 70%.

862.    The Respondent shall assume 30% of the arbitration costs set by the SCC which also include the fees and expenses of the arbitrators, amounting to a total of 565,220.58 EUR. Taking into consideration that the Respondent advanced 50% of these costs, the Claimant must reimburse the Respondent for 20% of the amount paid, that is, 113,044.11 EUR.

863.    With regard to costs incurred by the parties in the representation and defence of the proceeding, the Claimant, in its letter of 22 January 2016, requested clarifications and justifications regarding the costs in relation to the Respondent. The Arbitral Tribunal notes that the expenses declared by the Claimant are greater than those of the Respondent by more than €550,000. This does not mean that the expenses of the Claimant seem excessive to the Arbitral Tribunal, given that this difference is explained by the fact that the Respondent did not contract external attorneys. However, it is sufficient for the Arbitral Tribunal to deem that the expenses of the Respondent are reasonable, without need for further justification.

864.    In this matter, the Respondent is required to bear 30% of Claimant's costs, i.e. EUR 1,368,606, without including the costs of arbitration set by the SCC, and that the Claimant must bear 70% of the costs incurred by the Respondent, i.e. EUR 785,690, without including the arbitration costs set by the SCC.

865.    As a result, the Claimant will have to pay to the Respondent the amount of EUR 139,401.20 corresponding to the difference between 70% of EUR 785,690 and 30% of EUR 1,368,606.

866.    The Respondent requested interest to be set at "*a reasonable interest rate from the date these costs are incurred until the date of its actual payment*"[1066]. However, as it is not aware the precise dates of payment of each of the corresponding amounts, the Arbitral Tribunal will order the Claimant to pay interest only from the date of this award.

867.    In the case of the Kingdom of Spain, the application of the Spanish legal interest seems reasonable.

---

1066    Rejoinder, ¶1000.

*This is an unofficial translation of the original Spanish award rendered.*
*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

## VIII. DECISION

868.   For reasons laid out previously, the Arbitral Tribunal hereby resolves to:

(1) Declare that it lacks jurisdiction to hear the dispute regarding the alleged infringement by the Kingdom of Spain of obligations arising under the subsection (1) of Article 10 ECT by introducing the IVPEE tax with Law 15/2012;

b)   Reject all other Respondent's exceptions to jurisdiction and declare itself competent to resolve the present dispute, with the exception of the issue mentioned in a);

c)   Reject, whenever necessary, Respondent's objections of inadmissibility;

d)   Reject all Claimant's Claims;

e)   Decide that the Parties are jointly and severally liable for the following arbitration costs:
- Mr Yves Derains' fees amounting to EUR 225,592, expenses of EUR 4,459.83 and total travel expenses of EUR 2,000;
  In addition, the Claimant will be responsible for the payment of 20% VAT applicable to the following amounts: 67,677.60 EUR (corresponding to 30% of fees) and 1,337,949 EUR (corresponding to 30% of expenses).
- Prof Guido Tawil's fees amounting to EUR 135,355, expenses of EUR 5,948.09 and total travel expenses of EUR 2500;
- Mr Claus Von Wobeser's fee amounting to EUR 135,355, expenses of EUR 12,161.66;
- The administrative fees of the SCC amounting to EUR 41,849;
- In addition, the Claimant will be responsible for the payment of 25% VAT applicable to the amount of EUR 12,554.70 (corresponding to 30% of administrative fees).

These amounts will be paid through the advances on costs already paid by the Parties to the SCC.

Between the Parties, the Claimant must pay 70% of those costs and the Respondent must pay 30%.

*Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.*

f)   To order the Claimant to pay to the Respondent:

-   For the costs of arbitration set by the SCC the amount of EUR 113,044.11;

-   For reasonable expenses incurred by Respondent, the amount of EUR 139,401.20.

g)   The amounts mentioned in section f) will accrue interest in favour of the Respondent at the statutory rate in force in Spain from the date of this award until the date of the effective payment.

h)   All other claims of the Parties are rejected.

APPEAL

In accordance with Section 41 of the Swedish Arbitration Act (SFS 1999: 116), a party may bring an appeal against the award in relation to the decision on the fees of the arbitrators. Said action must be exercised within three months, calculated from the date the party received the award, and must appear before the court of first instance of Stockholm.

This is a translation from the original Spanish language award.
Reliance should only be placed on the Spanish original award in the event of any discrepancy or ambiguity.

Headquarters: Stockholm, Sweden

Date: [handwritten:] *12 July 2016*

_____
Dr Guido Tawil
Co-arbiter
[illegible
    handwriting]

_____
Mr Claus von Wobeser
Co-arbiter

[signature]
Yves Derains
Chairman

**ARBITRATION PROCEEDING UNDER
THE REGULATIONS OF THE ARBITRATION INSTITUTE
OF THE CHAMBER OF COMMERCE OF STOCKHOLM**

**Isolux Infraestructure Netherlands B.V.**

*Claimant*

**v.**

**Kingdom of Spain**

*Respondent*

**Arbitration Proceeding SSC V2013/153**

**Dissenting Opinion of the Arbitrator
Prof. Dr. Guido Santiago Tawil**

1. I agree with the conclusions drawn by my distinguished colleagues regarding the recognition of the jurisdiction of this Arbitral Tribunal to resolve this dispute between the Claimant and the Kingdom of Spain.

2. As to the merits of the case, I agree with my co-arbitrators that the existence of an indirect expropriation of Claimant's investment under Article 13(1) of the Energy Charter Treaty ("ECT") following the measures adopted by the Kingdom of Spain has not been demonstrated. At this point, I agree with the *standard* applied by the majority vote in paragraph 839 of the Award that, in order for indirect expropriation to exist, substantial or significant impairment of rights or property of the investor which amounts to a deprivation of its property has to be proven. This situation has not been duly proven in this case.

3. Unfortunately, I cannot agree with the view expressed by the majority on the treatment, in this specific case, of the *"legitimate expectations"* as they relate to the standard of " *fair and equitable treatment* ", under Article 10 (1) of the ECT.

4. First of all, I do not agree with the conclusions set out in paragraphs 772 and 775 of the Award that the Kingdom of Spain would not have entered into commitments with investors on the basis of the *"general nature"* of the applicable rules or of the potential recipients of these. Although the incentive regime implemented by Royal Decrees 661/2007 and 1578/2008 was not aimed at an indeterminate "generality", but rather at a small number of recipients (as I have said on other occasions),[1] my opinion is that Legitimate expectations can in fact be generated from the legal system in force at the time of the investment, especially when the rules issued – as was the case with RD 661/2007 and 1578/2008 – had the declared purpose of attracting investments in a specific sector of the economy (that is, in the generation of renewable energies). In this regard, my position is in line with the conclusions expressed by the UNCTAD on this point.[2]

---

See: mi dissenting opinion in the case SCC V 062/2012, *Charanne B.V. & Construction Investment S.A.R.L v. Kingdom of Spain,* 21 December 2015, para. 8.
[2] See: United Nations Conference on Trade and Development (UNCTAD), Fair and Equitable Treatment, 2012, p. 69: *"Arbitral decisions suggest [...] that an investor may derive legitimate expectations either from (a) specific commitments addressed to it personally, for example, in the form of a stabilisation clause, or (b) rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investments and on which the foreign investor relied in making his investment".* In the same sense, Rudolph Doizer and Christoph Schreuer, *"Principles of International investment Law",* Oxford University Press, Second Edition, 2012, p. 145.

5. Secondly, I do not consider the conclusion reached by the majority vote, that the date to be used as a reference to determine whether legitimate expectations were generated in the particular case should be that of 29 October 2012, to be correct. In my opinion, the relevant date to for these purposes was 29 June, 2012, that is, the day on which the Claimant entered into the Investment Agreement (and the date it entered into force).[1] The existence of suspensive conditions in the Investment Agreement or the possibility that the Claimant could retract its investment decision without penalties until 29 October 2012 are not convincing reasons to determine the moment from which the legitimate expectations could have been generated. The date of 29 October 2012 could be a valid limit in relation to possible actions or claims between shareholders, but it does not acquire similar relevance to the host State of the investment and regarding whose conduct that date must be evaluated in order to determine whether legitimate expectations were generated or not.

6. My main issue with the majority decision lies, however, in the way in which the factual circumstances were assessed in order to determine the *"foreseeability"* of the measures adopted by the Kingdom of Spain. In other words, if the change of legal regime that occurred in Spain shortly after the investment was made was foreseeable for the Claimant, a circumstance which – if true – would prevent it from invoking legitimate expectations as the basis of its claim.

7. Regardless of whether the date of 29 June 2012 or the date of 29 October 2012 is adopted, at the time of the investment, the legal framework of the special regime established by RD 661/2007 and 1578/2008 was fully in force,, setting a fixed *Feed-in Tariff*[1] ("FIT") with a temporary validity, which was declared not achieved in future tariff revisions. The Claimant made its investment – obtaining the rights acquired from an earlier investment – under a specific legal framework guaranteeing it a special remuneration regime, and the measures challenged by the Claimant (Law 15/2012, RDL 2/2013 and, fundamentally, RDL 9/2013) were, in all cases, after the date of the investment. [2]

8. Although the regime established by RD 661/2007 and 1578/2008 had been partially

---

[1] Both the majority and the minority of the Arbitral Tribunal agree that, in this case, the existence of an investment was verified and that it qualifies for protection under international law. See Award paras. 687 through 693 and 834.

[2] In this respect, both the majority vote and this dissenting opinion agree that the source of the conflict lies after the date of the investment. The discrepancy arises in relation to the date to be considered as a reference in order to determine whether or not the previous action of the Kingdom of Spain allowed the investor to invoke the legitimate expectations that it claimed, and their consequences. See, in this regard, Award, paras. 704 and 781/804, in particular 787.

modified by RD 1565/2010 and RDL 14/2010 and the report of the National Energy Commission (CNE)[3] of 7 March 2012 which give account of certain difficulties in the financing of the system and the need to adopt reforms, there was no evidence, on 29 June 2012 or 29 October 2012, to suggest that the Kingdom of Spain would completely eliminate the FIT – what happened only a year later with the enactment of RDL 9/2013 of 12 July 2013 – without recognising compensation for possible holders of rights affected by that measure. Between 29 June 2012 and 29 October 2012, the only relevant event that occurred with regard to regulatory matters was the beginning of the process which, several months later, would result in the Law 15/2012 of fiscal measures for the energy sustainability of 27 December 2012 which established, among others, a tax on the value of the production of electrical energy ("TVPEE") and on whose questioning the Arbitral Tribunal has declared its lack of jurisdiction.[4]

9.   The power of the host State to amend its legislation at any time is not under discussion, as no one has a vested right to the maintenance of laws and regulations. The host State can always modify a legal regime of general or specific scope for reasons of public interest. However, this does not prevent the recognition of the fact that if such legitimate action affects acquired rights or legitimate expectations, it is appropriate to compensate for the damages caused. This is a typical case of state liability for lawful activity, widely recognised in comparative doctrine and case law and in relation to which Spanish law has deservedly transformed, since at least the mid-twentieth century, into a source of knowledge of particular value.[5]

10.   Consequently, once the Claimant has made its investment, acquiring the right to the FIT under the regulations then in force, it is not reasonable to suppose that the State would in turn eliminate that right without adequate compensation.

11.   On the contrary, having to anticipate that the State will eliminate an acquired right without

---

[3] See: Report of the National Energy Commission on the Spanish Electric Sector, 7 March 2012, Exhibit R-69.
[4] Award, para. 741.
[5] Although some assumptions of recognition of state responsibility for licit activity can be traced, as in the Law of 9 April 1842, which –- as a consequence of the First Carlist War – declared an obligation of the Nation to "compensate for the material damages caused thusly in the attack, as in the defense of squares, villages, buildings, etc", the enactment of the Law of Forced Expropriation of 16 December 1954 ("LEF") led to the legislative consecration in Spain of the patrimonial responsibility of the Administration for both its licit and illicit activity. The LEF – an advanced regulation at the time of its enactment in comparative law- enshrined in article 121.1 of its original text a principle of general scope of singular importance in stating that "also provided compensation under the same procedure for any injury that Individuals suffer with regard to the property and rights referred to in this Law, provided that this is a consequence of the *normal* or abnormal functioning of public services or of the adoption of discretionary measures that can not be audited by litigation, without prejudice to the responsibilities that the Administration may require of its officials on such grounds"(emphasis added). See, likewise, the general principle enshrined in article 106.2 of the Spanish Constitution of 1978.

the corresponding compensation does not appear to be a reasonably conduct that can be required to an investor prior to having an effective knowledge of the rules involved, which in no way could have happened, in this case, before 29 June 2012 or, in any event, on the 29 October 2012.

12. If it were hypothesised that the special remuneration system (FIT) could be eliminated by the Kingdom of Spain without compensation, the same could possibly be argued in the future in relation to the possibility of the State deciding to remove the guarantee of reasonable profitability contained in article 30.4 of the Electricity Sector Law (ESL). Faced with the potential exercise of legislative or regulatory powers, I do not find any valid reason to distinguish, unlike the majority vote, between a guarantee (the right to the FIT) and another (the right to reasonable profitability) for remuneration purposes.[6]

13. In short, when an investor complies with all the established requirements of the current regulations in order to be entitled to an expected and determinable benefit, disregard on the part of the State receiving the investment violates a legitimate expectation. The Kingdom of Spain was authorized to amend or eliminate promotion regime. However, eliminating the benefit granted to someone who had invested those who had already invested as a result of this special regime without providing adequate compensation represents, in my opinion, it would violate the legitimate expectations created, and thus, of the fair and equitable treatment protected by article 10 of the ECT.

14. In light of on the decision taken by the majority of the Arbitral Tribunal, there will not be any judgment given in relation to the existence or inexistence of the alleged damage, the valuation method used or the *formula* for determining compensation required.



Prof. Dr. Guido Santiago Tawil

Arbitrator

Date: 6 July 2016

---

[6] I do not maintain that the latter would be valid, but – hypothetically speaking and in order to show the problems presented by that construction – the elimination of one or another right without compensation would find support and analogous objections.