# EXHIBIT 54

**PCA Case No. 2012-14**                                    **13 October 2014**

# UNCITRAL Arbitration

## The PV Investors

The Claimants

**v.**

## The Kingdom of Spain

The Respondent

---

## PRELIMINARY AWARD ON JURISDICTION

---

**ARBITRAL TRIBUNAL**

Prof. Gabrielle Kaufmann-Kohler, Presiding Arbitrator

The Hon. Charles N. Brower, Arbitrator

Judge Bernardo Sepúlveda-Amor, Arbitrator

**Secretary of the Tribunal**

Dr. Michele Potestà

**Registry**

Permanent Court of Arbitration

## TABLE OF CONTENTS

**ABBREVIATIONS**

**I.    INTRODUCTION** ............................................................................................... **9**

  A.    THE PARTIES ............................................................................................. 9
    1.    The Claimants ..................................................................................... 9
    2.    The Respondent ................................................................................. 9
  B.    OVERVIEW OF THE DISPUTE ................................................................... 10

**II.    PROCEDURAL HISTORY** ........................................................................... **12**

**III.    POSITION OF THE PARTIES** .................................................................... **17**

  A.    THE RESPONDENT'S POSITION AND REQUEST FOR RELIEF .................. 17
  B.    THE CLAIMANTS' POSITION AND REQUEST FOR RELIEF ....................... 19

**IV.    ANALYSIS** .................................................................................................. **22**

  A.    PRELIMINARY MATTERS ......................................................................... 22
    1.    Scope of this Award ......................................................................... 22
    2.    The relevance of previous decisions or awards ............................... 23
    3.    Law applicable to the jurisdiction of the Tribunal ........................... 23
    4.    The question concerning the Respondent's submission on *Rurelec* ... 23
  B.    OBJECTION TO THE AGGREGATION OF MULTIPLE CLAIMS ................... 24
    1.    The Positions of the Parties ............................................................. 24
      a.    Consent to the aggregation of multiple claims ......................... 25
      b.    Integrity, workability and fairness of any aggregate arbitration ...... 31
    2.    Analysis ............................................................................................ 33
      a.    Consent to aggregate proceedings? .......................................... 33
      b.    Due process and case management ........................................... 40
  C.    THE OTHER OBJECTIONS TO JURISDICTION ......................................... 42
    1.    Second objection: Claimants have not proven that they are "Investors" with "Investments". 42
    2.    Third objection: The Tribunal has no jurisdiction to deal with an intra-EU dispute ............... 44
      a.    The positions of the Parties ...................................................... 44
        i.    Ordinary meaning of the terms of the ECT, in their context and in light of the treaty's object and purpose (Article 31(1) VCLT) .......................................... 46
        ii.    Instruments made by one or more parties in connection with the conclusion of the treaty (Article 31(2)(b) VCLT) ............................................................. 49
        iii.    Subsequent agreements between the parties regarding the application of the treaty's provisions (Article 31(3)(a) VCLT) ....................................... 51
        iv.    Subsequent practice in the application of the treaty (Article 31(3)(b) VCLT) ............... 52
        v.    The preparatory work of the treaty as a supplementary means of interpretation (Article 32 VCLT) ........................................................................ 53
        vi.    The need for a "disconnection clause" in the ECT ................................ 54
        vii.    Are the substantive protections of the ECT and EU law in conflict? .............. 54
      b.    Analysis .................................................................................... 55
        i.    Interpretation of the treaty, its terms, and their ordinary meaning in context ........... 55
        ii.    Subsequent agreements and subsequent practice ................................. 61

      iii.   Supplementary means of interpretation ........................................................ 64

      iv.   Conclusion ................................................................................................. 65

   3.   Fourth objection: the Claimants have failed to make a *prima facie* showing that they have suffered financial harm ............................................................................................ 66

     a.   The Respondent's position ......................................................................... 66

     b.   The Claimants' position ............................................................................. 68

     c.   Analysis ...................................................................................................... 70

   4.   Fifth objection: entities organized under the laws of Spain have no standing to bring ECT claims under the UNCITRAL Rules .................................................................................. 74

     a.   The positions of the Parties ....................................................................... 74

     b.   Analysis ...................................................................................................... 78

      i.   The interpretation of Article 26(7) of the ECT ...................................... 78

      ii.   The Claimants' reliance on the MFN clause ......................................... 87

   5.   Sixth objection: Ceconat Germany has no standing to bring an ECT claim since it has triggered the "fork-in-the-road" clause in Article 26(3)(b)(i) of the ECT ................................ 89

     a.   The positions of the Parties ....................................................................... 89

      i.   The timing of the withdrawal of the Spanish courts claims .................. 92

      ii.   The triple identity test ............................................................................ 94

      iii.   Use of the MFN clause to avoid the fork-in-the-road .................... 97

     b.   Analysis ...................................................................................................... 99

**V.      COSTS ................................................................................................. 105**

  A.   THE CLAIMANTS' POSITION ............................................................................... 105

  B.   THE RESPONDENT'S POSITION ......................................................................... 106

  C.   THE COSTS OF THE PROCEEDINGS .................................................................... 107

   1.   Costs of the proceedings up to 11 January 2013 ............................................. 107

   2.   Costs of the proceedings from 11 January 2013 until completion of the jurisdictional phase 108

  D.   THE ALLOCATION OF COSTS .............................................................................. 108

**VI.     LANGUAGE OF THE AWARD ........................................................... 111**

**VII.    DECISION ............................................................................................ 111**

## ABBREVIATIONS

| | |
|---|---|
| *Abaclat* | *Abaclat et al. v. The Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility, 4 August 2011 (**Exh. CLA-39**) |
| Admissibility Objection | Respondent's objection to the admissibility of the additional evidence submitted by the Claimants with the Answer on Jurisdiction conveyed orally during the procedural conference call held among the Tribunal and the Parties on 8 May 2013 |
| Aggregation Objection | Jurisdictional Objection to the Consolidation of Multiple Arbitral Claims dated 11 January 2013 |
| *Ambiente* | *Ambiente Ufficio S.p.A. et al. v. The Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013 (**Exh. CLA-121**) |
| Answer on Jurisdiction | Claimants' Answer to Spain's Objection to Consolidation and Jurisdictional Objections dated 30 April 2013 (also referred to as "C-Answer") |
| Application for Bifurcation | Respondent's Application for Bifurcation and Jurisdictional Objections dated 11 January 2013 (also referred to as "Jurisdictional Objections") |
| Area | Area, as defined in Article 1(10) of the ECT |
| BIT | Bilateral Investment Treaty |
| CAFTA | Central America Free Trade Agreement |
| Ceconat España | Ceconat Point S.L and Ceconat Gestión S.L. |
| Ceconat Germany | Ceconat Energy GmbH |
| *Cemex* | *CEMEX Caracas Investments B.V. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/08/15, Decision on Jurisdiction, 30 December 2010 |
| CJEU | Court of Justice of the European Union |
| Claimants' Submission on Costs | Claimants' Submission on Costs dated 21 February 2014 |
| Council and Commission Decision | 98/181/EC, ECSC, Euratom: Council and Commission Decision of 23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects, Official Journal, 9 March 1998, L69/1 (**Exh. RLA-35**) |
| CWS | Claimants' Witness Statement |
| C-Answer | Claimants' Answer to Spain's Objection to Consolidation and Jurisdictional Objections dated 30 April 2013 (also referred to as |

4

|  |  |
|---|---|
| | "Answer on Jurisdiction") |
| C-Rejoinder | Claimants' Rejoinder on Jurisdiction dated 16 December 2013 (also referred to as "Rejoinder") |
| Dissent | Judge Brower's Concurring and Dissenting Opinion |
| *Eastern Sugar* | *Eastern Sugar v. The Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007 (**Exh. RLA-55**) |
| EC | European Communities |
| EC Statement | Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty, 9 March 1998, L69/115 (**Exh. RLA-37**) |
| EC Treaty | Treaty Establishing the European Community |
| ECJ | European Court of Justice |
| ECT | Energy Charter Treaty, Lisbon, 17 December 1994, 2080 UNTS 95 (also referred to as "Treaty") |
| *Electrabel* | *Electrabel S.A. (Belgium) v. Hungary*, ICSID Case No. ARB/07/19, Award, 30 November 2011 (**Exh. RLA-78**) |
| EU | European Union |
| EU draft Regulation on financial responsibility | COM (2012) 335 Final, Proposal for a Regulation of the European Parliament and of the Council establishing a framework for managing financial responsibility linked to investor-state dispute settlement tribunals established by international agreements to which the European Union is party, 21 June 2012 (**Exh. RLA-75**) |
| EU Regulation No. 1219/2012 | Regulation (EU) No. 1219/2012 of the European Parliament and of the Council establishing transitional arrangements for bilateral investment agreements between Member States and third countries, 12 December 2012 (**Exh. RLA-79**) |
| *Eureko* | *Eureko B.V v. The Slovak Republic*, UNCITRAL, PCA Case No. 2008-13 |
| *Eureko* Award | *Eureko*, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 (**Exh. RLA-69**) |
| *Eureko* Oberlandesgericht | *Slovak Republic v. Eureko B.V.*, Higher Regional Court of Frankfurt am Main, Judgment, 10 May 2012 (**Exh. CLA-46** [English translation]) |
| Evidentiary Annexes | Evidentiary Annexes to the Claimants' Answer on Jurisdiction |
| Exh. C- | Claimants' Exhibit |
| Exh. CLA- | Claimants' Legal Authority |
| Exh. R- | Respondent's Exhibit |
| Exh. RLA- | Respondent's Legal Authority |

| | |
|---|---|
| FET | Fair and equitable treatment |
| *Fisheries Jurisdiction* | *Fisheries Jurisdiction* (Spain v. Canada), Jurisdiction of the Court, Judgment, ICJ Reports 1998 |
| FIT | Feed-in-Tariff |
| *Funnekotter* | *Bernardus Henricus Funnekotter et al. v. Republic of Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009 (**Exh. CLA-98**) |
| Hearing | Hearing on Jurisdiction held on 31 January 2014 at the Peace Palace, in The Hague |
| Hearing Tr. [English version] | Transcript of the Hearing (corrected English version submitted by the Parties on 8 May 2014) |
| Hearing Tr. [Spanish version] | Transcript of the Hearing (Spanish version) |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ILC | International Law Commission |
| ILC Articles | The International Law Commission's Draft Articles on State Responsibility (2001) |
| Jurisdictional Objections | Respondent's Application for Bifurcation and Jurisdictional Objections dated 11 January 2013 (also referred to as "Application for Bifurcation") |
| Jurisdictional Phase | The procedural phase going from 11 January 2013 until the date of this Award |
| MFN | Most-favored-nation |
| *Mavrommatis Palestine Concessions* | *The Mavrommatis Palestine Concessions* (Greece v. Great Britain), PCIJ, Series A, No. 2, Judgment, 30 August 1924 |
| *Mobil* | *Mobil Corporation et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Jurisdiction, 10 June 2010 |
| *Mox Plant* | Case No. 459/03, *Commission v. Ireland*, Judgment of the ECJ, 30 May 2006 (**Exh. RLA-91**) |
| NAFTA | North American Free Trade Agreement |
| NoA | Claimants' Notice of Arbitration dated 16 November 2011 |
| *Noble Energy* | *Noble Energy, Inc. and MachalaPower Cia. Ltda. v. the Republic of Ecuador and Consejo Nacional de Electricidad*, ICSID Case No. ARB/05/12, Decision on Jurisdiction, 5 March 2008 (**Exh. CLA-33**) |
| *Oil Platforms* - Judge Higgins' Opinion | *Oil Platforms* (Islamic Republic of Iran v. United States of America), Preliminary Objection, Judgment, ICJ Reports 1996, pp. 847-861, Separate Opinion of Judge Higgins (**Exh. RLA-98**) |

| | |
|---|---|
| *Pac Rim* | *Pac Rim Cayman LLC v. Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, 1 June 2012 |
| PCA | Permanent Court of Arbitration |
| PCIJ | Permanent Court of International Justice |
| PILA | Swiss Private International Law Act of 18 December 1987 |
| *Plama* | *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 (**Exh. RLA-47**) |
| PO1 | Procedural Order No. 1 dated 31 July 2012 |
| PO2 | Procedural Order No. 2 dated 23 August 2012 |
| PO3 | Procedural Order No. 3 dated 16 November 2012 |
| PO4 | Procedural Order No. 4 dated 28 February 2013 |
| PO5 | Procedural Order No. 5 dated 14 March 2013 |
| PO6 | Procedural Order No. 6 dated 1 July 2013 |
| PO7 | Procedural Order No. 7 dated 10 January 2014 |
| PV | Photovoltaic |
| RAIPRE | Administrative Registry for Production Installations under the Special Regime / *Registro Administrativo de Instalaciones de Producción en Régimen Especial* |
| RD | Royal Decree |
| RD 661/2007 | Royal Decree No. 661/2007 of 25 May 2007 |
| RD 1565/2010 | Royal Decree No. 1565/2010 of 19 November 2010 |
| RDL | Royal Decree Law |
| RDL 14/2010 | Royal Decree Law 14/2010 of 23 December 2010 |
| REIO | Regional Economic Integration Organization, as defined in Article 1(3) of the ECT |
| Rejoinder | Claimants' Rejoinder on Jurisdiction dated 16 December 2013 (also referred to as "C-Rejoinder") |
| Respondent's Costs Submission | Respondent's Costs Submission dated 7 March 2014 |
| Reply | Respondent's Reply to the Claimants' Answer to the Objection to the Consolidation of Multiple Claims and Jurisdictional Objections dated 30 September 2013 (also referred to as "R-Reply") |
| *Rurelec* | *Guaracachi America, Inc. and Rurelec Plc. v. The Plurinational State of Bolivia*, UNCITRAL, PCA Case No. 2011-17, Award, 31 January 2014, available at http://www.pca-cpa.org |
| R-Reply | Respondent's Reply to the Claimants' Answer to the Objection to the Consolidation of Multiple Claims and Jurisdictional Objections dated |

| | 30 September 2013 (also referred to as "Reply") |
|---|---|
| SCC | Stockholm Chamber of Commerce |
| SoC | Claimants' Statement of Claim dated 28 September 2012 |
| Spain's Transparency Document | The document provided by Spain pursuant to Article 26(3)(b)(ii) of the ECT |
| SPV | Special Purpose Vehicle |
| Terms of Appointment | Terms of Appointment dated 4 July 2012 |
| TFEU | Treaty on the Functioning of the European Union |
| *Tidewater* | *Tidewater Inc. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Jurisdiction, 8 February 2013 |
| Treaty | Energy Charter Treaty, Lisbon, 17 December 1994, 2080 UNTS 95 (also referred to as "ECT") |
| UNCITRAL | United Nations Commission on International Trade Law |
| UNCITRAL Rules | UNCITRAL Arbitration Rules (as revised in 2010) |
| UNTS | United Nations Treaty Series |
| VCLT | Vienna Convention on the Law of Treaties of 23 May 1969 |

## I.     INTRODUCTION

1.     This is an *ad hoc* arbitration brought under the Energy Charter Treaty of 1994 ("ECT" or "Treaty")[1] pursuant to the United Nations Commission on International Trade Law ("UNCITRAL") Arbitration Rules, as revised in 2010 (the "UNCITRAL Rules").

## A.     THE PARTIES

### 1.     The Claimants

2.     The Claimants comprise the following fourteen groups of investors: HG Capital (Luxembourg), Ampere (The Netherlands), Element Power (The Netherlands), MEIF (Luxembourg), Impax (Luxembourg), Whiteowl (Germany), NIBC (The Netherlands), Werec (Luxembourg), AES (The Netherlands and Spain), Eoxis (The Netherlands and Luxembourg), MPC Capital (Germany), Ceconat (Germany), Arisol (Luxembourg and Germany), KGAL (Germany and Spain). Some of the fourteen groups comprise more than one entity or person, as a result of which the total number of Claimants is 88 (87 corporate entities and one natural person). The Claimants are described in greater detail in Annex A of the Notice of Arbitration dated 16 November 2011 ("NoA"), and are collectively referred to as the "PV Investors" or the "Claimants". Annex A is attached hereto and made an integral part of this Award.

3.     The Claimants are represented in this arbitration by:

Ms. Judith Gill QC
Mr. Jeffrey Sullivan
Mr. Ignacio Madalena
Mr. David Ingle
ALLEN & OVERY LLP
One Bishops Square
London E1 6AD
United Kingdom

Tel.:          + 44 (0) 203 088 0000
Fax:          + 44 (0) 203 088 0088
Email:       judith.gill@allenovery.com;
               jeffrey.sullivan@allenovery.com;
               ignacio.madalena@allenovery.com;
               david.ingle@allenovery.com.

### 2.     The Respondent

4.     The Respondent is the Kingdom of Spain (the "Respondent" or "Spain").

---

[1]     Energy Charter Treaty, Lisbon, 17 December 1994, 2080 UNTS 95.

5.    The Respondent is represented in this arbitration by:

Mr. Fernando Irurzun Montoro
Deputy Director-General of Legal Services
ATTORNEY GENERAL'S OFFICE
Calle Ayala 5
28001 Madrid
Spain

Tel.:        +34 91 390 47 36
Fax:        +34 91 390 47 40
Email:      fernando.irurzun@mjusticia.es

Mr. José Luis Gómara
State Attorney, International Arbitration Coordinator
ATTORNEY GENERAL'S OFFICE
Calle Ayala 5
28001 Madrid
Spain

Tel.:        +34 91 390 46 89
Fax:        +34 91 390 47 28
Email:      jose.gomara@mjusticia.es

Mr. Eduardo Soler Tappa
HERBERT SMITH FREEHILLS LLP
Paseo de la Castellana 66
28046 Madrid
Spain

Tel.:        +34 91 423 4000
Fax:        +34 91 423 4001
Email:      eduardo.soler-tappa@hsf.com

Mr. Christian Leathley
HERBERT SMITH FREEHILLS LLP
Exchange House
Primrose Street
London EC2A 2EG
United Kingdom

Tel.:        +44 20 7466 2532
Fax:        +44 20 7374 0888
Email:      christian.leathley@hsf.com.

B.    OVERVIEW OF THE DISPUTE

6.    The present dispute arises from a series of measures enacted by Spain in the solar
photovoltaic ("PV") electricity generation sector. According to the Claimants, these
measures have altered the regulatory regime which was in place when they carried

out their investments and have resulted in substantial losses for the Claimants. The latter argue that Spain has thereby breached several of its obligations under the ECT.

7.     The Claimants contend that in 2007, in order to attract investments in the PV sector, Spain issued Royal Decree No. 661 of 25 May 2007 ("RD 661/2007"), which provided certain investment incentives to qualifying PV installations. In particular, according to the Claimants, RD 661/2007 provided that qualifying PV installations would receive a fixed, lifetime "feed-in-tariff" ("FIT") for all electricity generated. A FIT is essentially a fixed tariff which is set at a rate above normal electricity market rates.[2] According to the Claimants, RD 661/2007 also provided that any future changes to the FIT would not affect existing investors.[3] The Claimants submit that they made their investments relying on these incentives and that they would not have made their investments without them.

8.     According to the Claimants, once the investment was made and Spain was receiving the benefits of that investment, it withdrew the incentives.[4] In particular, they contend that, between late 2008 and early 2011, Spain took a series of actions which fundamentally altered the legal framework of the Claimants' investment and, therefore, violated the ECT. First, on 19 November 2010, Spain passed Royal Decree No. 1565/2010 ("RD 1565/2010"), which limited the right of PV installations to receive the FIT to the first 25 years of the installations' existence. Subsequently, on 23 December 2010, Spain passed Royal Decree Law No. 14/2010 ("RDL 14/2010"), which cut the FIT by limiting the number of operating hours in which the FIT was available to installations registered under RD 661/2007.[5]

9.     The Claimants submit that Spain, through these measures, has violated obligations that it owed to the Claimants as foreign investors under the ECT. In particular, the Claimants contend that Spain has breached the obligations set out in Article 10 of the ECT, including the obligation to provide fair and equitable treatment;[6] the obligation not to impair by unreasonable or discriminatory measures the management, maintenance, use, enjoinment or disposal of the Claimants' investments;[7] and the obligation to provide constant protection and security.[8]

---

[2]     SoC, para. 6.

[3]     NoA, para. 43; SoC, paras. 10, 155-157.

[4]     NoA, para. 10.

[5]     NoA, paras. 69-77.

[6]     SoC, paras. 358-396.

[7]     SoC, paras. 397-403.

[8]     SoC, paras. 404-408.

10.    Beginning in March 2011, each of the Claimants notified Spain of their intention to commence arbitration proceedings in accordance with the requirements of Article 26(2) of the ECT, if the dispute could not be resolved.[9] An unsuccessful meeting between the Claimants and Government officials was held on 15 June 2011.[10]

11.    On 16 November 2011, the Claimants submitted a Notice of Arbitration, accompanied by an Annex A describing the Claimants.

## II.    PROCEDURAL HISTORY

12.    The Tribunal was constituted on 1 May 2012. It is composed of The Honorable Charles N. Brower, appointed by the Claimants; of Judge Bernardo Sepúlveda-Amor, appointed by the Respondent; and of Professor Gabrielle Kaufmann-Kohler, Presiding Arbitrator, appointed by agreement of the two co-arbitrators, with the consent of the Parties.

13.    On 4 July 2012, in compliance with the agenda set out in the Presiding Arbitrator's letter of 13 June 2012, the Arbitral Tribunal and the Parties held an initial procedural hearing in Geneva to discuss various procedural matters. In particular, the Tribunal and the Parties discussed, agreed and executed the Terms of Appointment in English and Spanish versions (the "Terms of Appointment"). The Parties submitted their respective powers of attorney authorizing the signature of the Terms of Appointment and confirmed that they had no objections to the constitution of the Arbitral Tribunal and to the appointment of the Arbitrators.[11] Mr. Gustavo Laborde was appointed as Secretary of the Tribunal with the consent of the Parties.[12] The Tribunal and the Parties also discussed and agreed on the Procedural Rules of the arbitration,[13] and discussed the calendar for the arbitration.[14] The Parties and the Tribunal agreed that the Permanent Court of Arbitration ("PCA") would act as Registry in the arbitration proceedings.[15]

---

[9]    NoA, para. 96. Annex A to the NoA sets out the dates on which each Claimant made their respective requests for amicable settlement of the dispute pursuant to Article 26(1) of the ECT.

[10]    NoA, para. 97.

[11]    Terms of Appointment, para. 2.3.

[12]    Terms of Appointment, para. 2.4.

[13]    A final and signed copy of the Procedural Rules was transmitted to the Parties on 20 July 2012.

[14]    The calendar of this arbitration was attached as Annex A to Procedural Order No. 1 of 31 July 2012 ("PO1").

[15]    Terms of Appointment, para. 8.

14.     During the initial procedural hearing of 4 July 2012, the Tribunal also decided that the arbitration would be conducted in both English and Spanish.[16]

15.     On 31 July 2012, the Tribunal issued Procedural Order No. 1 ("PO1") addressing certain procedural matters and the provisional calendar as discussed during the initial procedural hearing on 4 July 2012. Among other things, the Tribunal established a timeframe within which the Parties should present their submissions on the legal seat of the arbitration and report on the practicalities relating to the bilingual nature of the arbitration.

16.     The Parties filed initial submissions on the implementation of a bilingual arbitration on 1 August 2012 and reply submissions on 13 August 2012. On 23 August 2012, the Arbitral Tribunal issued Procedural Order No. 2 ("PO2") setting forth the details for the implementation of the bilingual arbitration.

17.     The Parties filed their initial submissions on the seat of the arbitration on 19 July 2012, with reply submissions following on 27 July 2012. On 16 November 2012, the Arbitral Tribunal issued Procedural Order No. 3 ("PO3"), in which it determined the place of arbitration within the meaning of Article 18 of the UNCITRAL Rules to be Geneva, Switzerland.

18.     On 28 September 2012, the Claimants filed their Statement of Claim ("SoC"), accompanied by 14 witness statements, one expert report and 279 exhibits.

19.     In accordance with the procedural calendar, on 11 January 2013, the Respondent made an application for the bifurcation of the proceedings into a jurisdictional phase and a liability phase (the "Application for Bifurcation" or "Jurisdictional Objections").[17] Together with the Application for Bifurcation, Spain submitted five objections to the jurisdiction of the Tribunal and a further separate Jurisdictional Objection to the Consolidation of Multiple Arbitral Claims (the "Aggregation Objection").[18] The Respondent contended that the issue of the aggregation of claims had to be addressed not only before the merits but also before the five other jurisdictional objections. On 1 February 2013, the Claimants filed an Answer to the Respondent's Application for Bifurcation. The Claimants requested that Spain's Application for

---

[16]   Terms of Appointment, para. 5.1.

[17]   The Respondent's Application for Bifurcation and Jurisdictional Objections of 11 January 2013 is referred to either as "Application for Bifurcation" or as "Jurisdictional Objections" depending on the context.

[18]   In Procedural Order No. 4 ("PO4"), the Tribunal noted that the term "aggregation" was more appropriate than "consolidation", since consolidation generally implies that pending parallel proceedings are joined into a single proceeding, a situation not present in this arbitration. See PO4, p. 2, fn. 1. See also *infra*, para. 93 (explaining in what sense the Tribunal will use the terms "aggregate proceedings" and "consolidation" for the purpose of this Award).

Bifurcation be denied, including Spain's request that the Objection to Aggregation be decided as a preliminary question. On 28 February 2013, the Arbitral Tribunal issued Procedural Order No. 4 ("PO4"), in which it granted the Respondent's request to bifurcate the arbitration proceedings into a jurisdictional phase and a liability phase, and denied the Respondent's request that the Aggregation Objection be dealt with before the other five objections to the Tribunal's jurisdiction.

20.    On 7 March 2013, the Claimants made an application for document disclosure and, in the alternative, for a time extension to file their Answer on Jurisdiction. The Respondent answered to the Claimants' application by electronic communication on 12 March 2013, objecting to the Claimants' disclosure request. On that same date, each party sent an additional electronic communication in reply to the other party's communication. In its Procedural Order No. 5 of 14 March 2013 ("PO5"), the Arbitral Tribunal denied the Claimants' request for document disclosure and granted the Claimants' request for a time extension to file their Answer on Jurisdiction until 30 April 2013.

21.    On 30 April 2013, the Claimants submitted their Answer to Spain's Objection to Consolidation and Jurisdictional Objections ("Answer on Jurisdiction" or "C-Answer").

22.    On 8 May 2013, the Tribunal and the Parties held a conference call for the purpose of discussing the next procedural steps of the jurisdictional phase. During the telephone conference, among other subjects addressed, Spain objected to the admissibility of the additional evidence submitted by the Claimants with the Answer on Jurisdiction of 30 April 2013 (the "Admissibility Objection"). In particular, Spain made an oral application for leave to file written submissions on the Admissibility Objection. The Claimants, in turn, pointed out that the issue had already been briefed. On 10 May 2013, the Tribunal invited the Parties to file written submissions on the Admissibility Objection, setting out a timetable for that purpose. Spain filed its submission on 24 May 2013 and the Claimants replied on 7 June 2013. On 1 July 2013, the Tribunal issued Procedural Order No. 6 ("PO6"), whereby it denied Spain's Admissibility Objection and admitted the additional evidence submitted by the Claimants with their Answer on Jurisdiction into the record.

23.    By letter of 19 July 2013, the Tribunal set out the calendar for the remaining portion of the jurisdictional phase of the arbitration.

24.    On 25 September 2013, Dr. Michele Potestà was appointed as Secretary of the Tribunal, with the consent of the Parties, in replacement of Mr. Laborde.

25.  On 30 September 2013, the Respondent submitted its Reply to the Claimants'
     Answer to the Objection to the Consolidation of Multiple Claims and Jurisdictional
     Objections ("Reply" or "R-Reply").

26.  On 16 December 2013, the Claimants submitted their Rejoinder on Jurisdiction
     ("Rejoinder" or "C-Rejoinder").

27.  On 7 January 2014, the Parties and the Tribunal held a pre-hearing telephone
     conference to discuss the organization of the upcoming hearing on jurisdiction. On 10
     January 2014, the Tribunal issued Procedural Order No. 7 ("PO7") on the
     organization of the hearing.

28.  On 31 January 2014, a hearing on jurisdiction was held at the PCA at the Peace
     Palace in The Hague ("Hearing"). The following persons participated in the Hearing:

     **Arbitral Tribunal:**

     Prof. Gabrielle Kaufmann-Kohler (President)
     The Hon. Charles N. Brower
     Judge Bernardo Sepúlveda-Amor

     **Secretary of the Tribunal:**

     Dr. Michele Potestà

     **For the Claimants:**

     Ms. Judith Gill QC
     Mr. Jeffrey Sullivan
     Mr. Ignacio Madalena
     Mr. Íñigo Gortázar
     Mr. Rafael Cruz
     Ms. Rebeca Quiroga
     Mr. Enrique Collado
     Mr. Luis Quiroga
     Mr. Tom Murley
     Mr. Andrew Jessop
     Mr. Roger Scherer
     Mr. Jürgen Voss
     Mr. Raúl Barrueco

     **For the Respondent:**

     Mr. Christian Leathley
     Mr. Eduardo Soler Tappa
     Mr. Miguel Riaño
     Ms. Pilar Colomes
     Mr. José Luis Gómara
     Mr. Diego Santacruz
     Ms. Maria Florencia Villaggi

15

**Registry - PCA:**

Dr. Aloysius P. Llamzon
Ms. Hyun Jung Lee
Mr. Benjamin Craddock

**Court Reporters:**

Mr. Trevor McGowan
Ms. Liliana Avalos Benetti
Ms. Imperio García Olmos
Ms. Eva Hernández Micó

**Interpreters:**

Mr. Thomas Gonzales
Mr. Jose Antonio Carvallo Quintana

**Law Clerks:**

Ms. Merryl Lawry-White (Law Clerk to Judge Sepúlveda-Amor)
Ms. Sarah Melikian (Law Clerk to The Hon. Charles N. Brower)

29.     At the Hearing, Ms. Gill and Mr. Sullivan addressed the Tribunal on behalf of the Claimants, and Mr. Leathley and Mr. Soler Tappa did so on behalf of the Respondent.

30.     On 31 January 2014, the award was issued in *Guaracachi America, Inc. and Rurelec, Plc. v. The Plurinational State of Bolivia* (PCA Case No. 2011-17) (hereinafter "*Rurelec*"),[19] which discusses, among other issues, an objection to jurisdiction based on aggregation of multiple claims. By letter of 7 February 2014, the Tribunal invited the Parties to comment on the *Rurelec* tribunal's decision in respect of the aggregation of multiple claims. On 28 February 2014, the Parties submitted their comments. The Respondent's submission on *Rurelec* prompted an objection from the Claimants, which is dealt by the Tribunal *infra* in this Award.[20]

31.     On 21 February 2014, the Parties submitted their respective cost statements. On 26 February 2014, in view of the Claimants' more extensive "submissions on costs" filed on 21 February 2014, the Tribunal gave an opportunity to the Respondent to comment on such submissions. The Respondent provided its comments on 7 March 2014.

---

[19]   *Guaracachi America, Inc. and Rurelec Plc. v. The Plurinational State of Bolivia*, UNCITRAL, PCA Case No. 2011-17, Award, 31 January 2014, available at http://www.pca-cpa.org.

[20]   See *infra*, paras. 57-59.

### III.    POSITION OF THE PARTIES

32.    The purpose of this section is to provide an overview of the Parties' positions. The Parties' detailed positions with respect to each objection are described in Section IV below (Analysis).

### A.    THE RESPONDENT'S POSITION AND REQUEST FOR RELIEF

33.    In its written and oral submissions, the Respondent has put forward one objection to the aggregation of multiple arbitral claims and five further jurisdictional objections.

34.    *First*, the Respondent submits that the Tribunal has no jurisdiction to deal with multiple claims in one single proceeding, because it has not consented to the aggregation of multiple claims. Article 26 of the ECT only provides for consent to arbitrate, but not for consent to arbitrate in multi-party proceedings. The silence in the ECT as to this latter aspect cannot be interpreted as acquiescence. For Spain, in the same way as consent of both Parties would be needed for *ex post* consolidation of separate ongoing arbitration, so too consent is needed when the aggregation of claims has been pursued from the outset as a result of the Claimants' joint notice of arbitration. In addition, even if the Tribunal had jurisdiction to hear multiple claims, the Respondent contends that it would not be suitable to hear such claims for reasons of procedural due process. The heterogeneity of the claims would make the proceedings unmanageable and potentially unfair for the Respondent.

35.    *Second*, Spain initially requested the Tribunal to decide whether it is satisfied that sufficient evidence has been provided to prove that each of the Claimants has the requisite standing, and to determine whether each of the Claimants is an "investor" with qualifying "investments" under the ECT. For the Respondent, the Claimants must establish at the jurisdictional stage that the jurisdictional requirements of the treaty which they invoke are met, which includes providing the facts necessary to meet these requirements. At the Hearing, the Respondent stated that it was not further pursuing this jurisdictional objection.[21]

36.    *Third*, the Respondent argues that the Tribunal has no jurisdiction to deal with an intra-EU dispute. Under the ECT, the Respondent contends, intra-EU investment disputes fall within the sphere of the EU internal market and therefore cannot be resolved under the dispute resolution mechanisms envisaged under the ECT. The proper interpretation of ECT Article 26(1) is that a tribunal has jurisdiction under the ECT only if there is a diversity of "Areas" (as defined in the ECT) between the

---

[21]    See Hearing Tr. [English version] (Leathley), at 148: 19-25; and 149: 1-9.

Contracting Party from which the claimants are and the respondent state. In this case, all of the Claimants come from EU member states (Germany, Spain, The Netherlands and Luxembourg), the Respondent is an EU member state and all of the alleged investments have taken place within the EU. As such, there is no diversity of Areas in an intra-EU dispute of this kind. The fact that all of the states involved were already members of the EU (then, the European Community) when the ECT was ratified reinforces, in the Respondent's opinion, the conclusion that this Tribunal does not have jurisdiction to hear the claims advanced in these proceedings.

37.    *Fourth*, according to Spain, the Tribunal also lacks jurisdiction because the Claimants have failed to make a *prima facie* showing that they have suffered financial harm as a result of the measures of which they complain. Spain contends that a claimant must establish at a jurisdictional stage that the facts relied upon, when tested on a *prima facie* basis, could amount to a breach of a Treaty obligation. Spain also contends that an allegation of a breach of Article 10(1) of the ECT (fair and equitable treatment) requires a showing of financial harm. Spain argues that even if all the facts alleged in the Claimants' Statement of Claim were established, no loss would be proven and no breach of either FET or legitimate expectations would have been alleged. The Respondent submits that because the Claimants have failed to establish that there is a dispute concerning "an alleged breach of an obligation [...] under Part III" of the ECT (Article 26(1) of the ECT), the Tribunal lacks jurisdiction.

38.    *Fifth*, Spain contends that 62 of the 88 Claimants are companies incorporated in Spain. As such, they are not entitled to bring an ECT claim under the UNCITRAL Rules against Spain. According to the Respondent, Article 26 of the ECT on investor-state arbitration provides, as a general rule, a diversity of nationality requirement. The only exception to such requirement is set out in Article 26(7) of the ECT which allows locally incorporated companies under foreign control to bring claims against the host state. Yet, this provision is, by its own terms, only applicable with respect to ICSID arbitrations, and does not apply to arbitrations commenced under the UNCITRAL Rules. Therefore, Spain states that the Tribunal lacks jurisdiction over the 62 entities incorporated in Spain.

39.    *Sixth*, Spain argues that Ceconat Energy GmbH ("Ceconat Germany") has no standing to bring an ECT claim, because it has already pursued dispute resolution in the Spanish courts, thus triggering the "fork-in-the-road" clause in Article 26(3)(b)(i) of the ECT. Ceconat Germany allegedly triggered the fork-in-the-road clause when Roger Scherer, who owns 50% of Ceconat Germany, and 34 Spanish Special Purpose Vehicles ("SPVs"), who are indirectly owned and controlled by Ceconat

Germany, filed a petition before the Supreme Court of Spain seeking the reinstatement of benefits abrogated by RD 1565/2010. While the 34 SPVs have withdrawn their domestic court claims, such withdrawal occurred after the NoA had been filed, and thus the fork-in-the-road clause had already been triggered.

40.     For all these reasons, the Respondent requests the following relief:

> 330. [...] to dismiss the Claimants' claims on the basis of lack of jurisdiction on the grounds that:
>
> a) In relation to the numerous parties involved and the claims commenced in this arbitration, the Respondent has never provided its consent to being subjected to a unilateral decision of the Claimants to consolidate 88 claimants in one proceeding;
>
> b) The dispute resolution provisions of the ECT do not apply to this arbitration given that this is an intra-EU dispute;
>
> c) The Claimants have failed to establish a *prima facie* case that financial harm has been suffered and, therefore, no claim or dispute has been made out pursuant to Article 26(1);
>
> d) In relation to the 62 Spanish claimants identified in paragraph 252 of the Respondent's Jurisdictional Objections, Article 26(7) does not permit their respective claims to be brought in an UNCITRAL arbitration; and
>
> e) Spain has not provided the requisite consent under Article 26(3)(b)(i) to permit Ceconat Energy GmbH's claims to be brought in this arbitration.
>
> 331. In relation to the Respondent's objection to the standing of the Claimants, the Respondent respectfully requests that the Tribunal decides whether it is satisfied that sufficient evidence has been provided to prove that each of the 88 Claimants has the requisite standing, and specifically determines whether each of the Claimants is an "investor" with qualifying "investments" under the ECT.
>
> 332. The Respondent respectfully requests that the Tribunal order the Claimants to bear all of the costs of this arbitration and to reimburse the Respondent in respect of all legal and other costs and expenses in connection with this arbitration. In addition, and without prejudice to the Tribunal's decision on the Respondent's jurisdictional objections, the Respondent requests that the Claimants are ordered to pay all of the Respondent's costs in relation to the preparation of its objection to the Claimant's [sic] *ius standi.*[22]

## B.     THE CLAIMANTS' POSITION AND REQUEST FOR RELIEF

41.     In their written and oral submissions, the Claimants have replied to the Respondent's objections with the following arguments:

---

[22]  R-Reply, paras. 330-332. As mentioned in fn. 21 above, the Respondent decided not to further pursue the objection set out in para. 331 of the R-Reply.

42.    *First*, the Tribunal has jurisdiction to hear all of the Claimants' claims in one arbitration. Article 26 of the ECT does not provide that a respondent state must specifically consent to aggregate proceedings. If there exists mutual consent to arbitrate the particular dispute submitted to an arbitral tribunal, the tribunal has jurisdiction and it does not lose this jurisdiction simply because there are multiple claimants. The Claimants submit that to uphold jurisdiction over multiple claimants would be in line with the over 120 multi-party investor-state cases in which the tribunals took no issue of the multiple number of claimants. The Claimants further deny that aggregate proceedings would result in procedural unfairness towards the Respondent. To the contrary, it is the Claimants' position that aggregate proceedings would promote cost-efficiency, avoidance of unnecessary delay and consistency of outcome.

43.    *Second*, the Claimants argue that the "sufficiency of evidence" objection presented by Spain has been abandoned and therefore is no longer an issue before the Tribunal. The Tribunal in PO6 accepted into evidence the Claimants' additional documents filed to support their nationality and ownership of the investments. Because the Respondent has not identified any shortcomings in the evidence produced nor queried the veracity or probative value of any of such evidence, the Respondent accepts that the Claimants have established that they are "investors" with qualifying "investments" under the ECT.

44.    *Third*, the Claimants argue that the Tribunal has jurisdiction over an intra-EU dispute. The Claimants submit that the ordinary meaning of Article 26 of the ECT in its context, taking into account the object and purpose of the treaty, is clear: investors from one Contracting Party may bring an arbitral claim against another Contracting Party concerning a dispute arising out of an investment in the territory of that Contracting Party. In the absence of a disconnection clause, the Claimants argue, the ECT applies also in relations among EU member states. The Claimants note that to date every tribunal and court which has addressed an intra-EU objection has accepted jurisdiction. Contrary to what the Respondent submits, this conclusion applies *a fortiori* where the states involved were all part of the EU at the time the ECT was signed, as in the present dispute.

45.    *Fourth*, the Claimants submit that Spain's objection relating to the Claimants' alleged failure to make a *prima facie* showing that they have suffered financial harm must be rejected. The Claimants do not dispute that in order to invoke the ECT's dispute resolution provision, the investor must show "an alleged breach of an obligation" under Part III of the Treaty. However, they contend that, at the jurisdictional stage, a

tribunal simply needs to be satisfied that the facts relied upon by the Claimants may *prima facie* amount to a breach of an obligation. Such *prima facie* demonstration does not require a showing of damages. In any event, the Claimants submit that assuming *arguendo* that they must make a *prima facie* showing of financial harm, they have met this requirement.

46. *Fifth*, the Claimants submit that entities incorporated in Spain which are under foreign control have standing to bring an UNCITRAL arbitration claim against Spain pursuant to Article 26 of the ECT. For the Claimants, locally incorporated entities under foreign control are entitled to bring an ECT claim under any of the arbitration rules listed in Article 26 (i.e., ICSID, ICSID Additional Facility, UNCITRAL, and SCC Rules). The fact that Article 26(7) of the ECT only mentions ICSID arbitration is due to the fact that the ICSID Convention contains separate jurisdictional requirements that must be met in addition to the ECT jurisdictional requirements. Because the UNCITRAL Rules do not contain such separate jurisdictional requirements, there was no reason for the ECT to provide an explicit carve-out with respect to these latter rules. Therefore, the Spanish entities which are subject to foreign control have standing to bring an UNCITRAL arbitration claim against the Respondent. Finally, if the limitation in Article 26(7) of the ECT were found to apply in respect of the Spanish entities, the Claimants would – through the most-favored-nation ("MFN") clause in the ECT – invoke the more favorable treatment in a third party BIT which allows Spanish entities to sue under the UNCITRAL Rules.

47. *Sixth*, the Claimants contend that the fork-in-the-road clause does not bar Ceconat Germany's treaty claims. The Claimants argue that the fork-in-the-road clause was never triggered because the petition filed by the 34 Spanish SPVs was withdrawn before the Supreme Court issued a decision, in compliance with Spain's statement made in relation to the fork-in-the-road-clause in the ECT. Furthermore, for the fork-in-the-road to apply, the so-called "triple identity test" must be met, which is not the case here, since the parties in the two proceedings, the subject matter in the two disputes as well as the causes of action are different. Finally, if the fork-in-the-road were to apply, the Claimants would – through the MFN clause in the ECT – be able to invoke the dispute settlement provision in a third party BIT which does not contain the fork-in-the-road clause, and is thus more favorable to them.

48. For all these reasons, the Claimants request that:

> […] the Tribunal enter an award on jurisdiction in their favour against Spain as follows:

(i) dismissing Spain's objections;

(ii) declaring that this Tribunal has jurisdiction to hear multiple arbitral claims in one proceeding;

(iii) declaring that the Claimants have produced sufficient evidence proving that they are investors with qualifying investments, within the meaning of the ECT, in the area of Spain;

(iv) declaring that this Tribunal has jurisdiction to deal with a dispute where the Claimants are nationals of EU States and that Spain is an EU State;

(v) declaring that, to the extent necessary, the Claimants have presented a *prima facie* case of financial harm;

(vi) declaring that the KGAL entities La Solana 1 S.L. to La Solana 60 S.L. have standing to bring their claims against Spain under the ECT;

(vii) declaring that AES Solar España Finance S.L. and AES Solar España B.V. y CIA S.C. have standing to bring their claims against Spain under the ECT; and

(viii) declaring that Ceconat Energy GmbH's claims are not precluded by Article 26(3)(b)(i) of the ECT.[23]

49.    Finally, the Claimants request that the Tribunal direct Spain "to bear all of the Claimants' legal fees and costs associated with its jurisdictional objections as well as all of the Tribunal's costs and related administrative expenses".[24]

## IV.    ANALYSIS

### A.    PRELIMINARY MATTERS

50.    Prior to considering the merits of the Parties' positions, the Tribunal will address the scope of this Award (1); the relevance of previous decisions or awards (2); and the law applicable to the jurisdiction of the Tribunal (3). It will also address an outstanding request by the Claimants in relation to the Respondent's submission on *Rurelec* (4).

### 1.    Scope of this Award

51.    The present proceedings were bifurcated between jurisdiction and liability in PO4. The Tribunal decided that it would deal with both the Aggregation Objection and the further five jurisdictional objections at the same time.[25] The present Award thus addresses both the Aggregation Objection and the five further objections to the Tribunal's jurisdiction.

---

[23]  C-Rejoinder, para. 162.

[24]  C-Rejoinder, para. 163.

[25]  See *supra*, para. 19.

**2.      The relevance of previous decisions or awards**

52.    Both Parties have relied on previous decisions or awards in support of their positions, either to conclude that the same solution should be adopted in the present case, or in an effort to explain why this Tribunal should depart from that solution.

53.    The Tribunal considers that it is not bound by previous decisions. At the same time, in its judgment it must pay due consideration to earlier decisions of international tribunals. Specifically, it believes that, subject to compelling contrary grounds, it has a duty to adopt principles established in a series of consistent cases. It further believes that, subject always to the specific text of the ECT, and with due regard to the circumstances of each particular case, it has a duty to contribute to the harmonious development of international investment law, with a view to meeting the legitimate expectations of the community of States and investors towards the certainty of the rule of law.

**3.      Law applicable to the jurisdiction of the Tribunal**

54.    It is not in dispute that the Tribunal's jurisdiction is governed by the ECT, the relevant provisions of which are reproduced below when dealing with each jurisdictional objection.[26]

55.    Both Parties agree that the interpretation of the ECT is governed by the customary international law principles on treaty interpretation as codified in the Vienna Convention on the Law of Treaties of 23 May 1969 ("VCLT").[27]

56.    It is also undisputed that the Tribunal has the power to rule on its own jurisdiction.[28]

**4.      The question concerning the Respondent's submission on *Rurelec***

57.    Before delving into the jurisdictional objections raised by the Respondent, the Tribunal has to rule upon a request made by the Claimants in respect of the Respondent's submission dated 28 February 2014 on *Rurelec* (see *supra*, para. 30).

---

[26]  To the extent relevant to determine issues of jurisdiction where jurisdiction is founded, as in this case, upon an investment treaty, Article 178(2) of the Swiss Private International Law Act ("PILA"), which is the *lex arbitri*, refers in relation to the substantive validity of the arbitration agreement to the ECT (and international law) as the "law governing the subject-matter of the dispute". As to the formal validity, Article 178(1) of the PILA requires an agreement in writing, which requirement is met here.

[27]  Spain, The Netherlands, Germany and Luxembourg (the Respondent state as well as the home states of the Claimants) are all contracting parties to the VCLT.

[28]  Art. 23(1) of the UNCITRAL Rules; Art. 186(1) of the PILA.

58.    By letter of 4 March 2014, the Claimants argued that sections 3 and 4 of the Respondent's submission on *Rurelec* were not responsive to the Tribunal's invitation of 7 February 2014, but rather to arguments made by the Claimants during the Hearing. The Claimants therefore requested that the Tribunal strike from the record those sections of Spain's submission on *Rurelec* and direct Spain to submit a revised submission containing sections 1 and 2 only. By letter of 11 March 2014, the Tribunal invited the Respondent's comments on the Claimants' request, and held that it would thereafter either render a decision on this issue or keep it for determination within the context of its decision on jurisdiction. By letter of 21 March 2014, the Respondent provided its views as to why the entire submission in relation to *Rurelec* should remain in the record.

59.    It is undisputed that sections 1 and 2 of the Respondent's submission directly address the *Rurelec* award, and clearly conform to the Tribunal's invitation of 7 February 2014. Sections 3 and 4 address issues relating to the Aggregation Objection more generally and are not strictly confined to the *Rurelec* award. In its invitation of 4 February 2014, the Tribunal essentially aimed at seeking the Parties' views on the issue of aggregation of claims as reflected in *Rurelec* and it was not absolutely clear what would be within or without the scope of the invitation. Although the Respondent's submission is broadly framed, the Tribunal does not find its sections 3 and 4 outside the scope of its invitation. Therefore, the Respondent's submission on *Rurelec* shall remain on record in its entirety.

**B.    OBJECTION TO THE AGGREGATION OF MULTIPLE CLAIMS**

**1.    The Positions of the Parties**

60.    First of all, Spain objects to the Tribunal dealing with multiple claims in aggregate proceedings. When first presenting this objection, Spain noted that "[w]hether the Respondent's objection to consolidated proceedings is an issue of jurisdiction, admissibility or procedure/case management, is not the primary concern".[29] Yet, both Spain's Aggregation Objection and its Reply evinced that such objection has two different facets. First, Spain objects to the Tribunal hearing multiple claims in aggregate proceedings because the requisite consent to such aggregation is lacking.[30] Such objection, being framed as a matter of consent, thus clearly goes to jurisdiction. Spain's second concern with respect to the aggregation of multiple claims

---

[29]   Aggregation Objection, para. 4.

[30]   R-Reply, paras. 7-26.

is one of case management and/or due process.[31] The two grounds will be analyzed in turn.

### a. Consent to the aggregation of multiple claims

61.  First, Spain argues that, where several investors together commence one arbitration against a host state, specific consent of the respondent host state is required and no such consent was given in this case.

62.  According to the Respondent, there is no language in the ECT to evidence "clear and unconditional consent" to aggregate proceedings.[32] Consent to *aggregate* claims is independent of consent to *arbitrate* claims. Arbitration with multiple parties includes "two instances of consent"[33] and "is subject to a dual test".[34] First, there must be consent to arbitration and, second, there must be consent to arbitrate in multi-party proceedings.

63.  For the Respondent, Article 26 of the ECT does not contain such second-level consent. Because consent in international arbitration (especially where a state is involved) must be "clear" and "unambiguous",[35] the ECT's silence cannot be interpreted to support the existence of jurisdiction. If the parties decided not to address consent in respect of arbitrations with multiple parties, it is because they did not want to provide for such type of arbitration.[36] It would be contrary to the VCLT, Spain contends, to interpret the ECT's silence on the aggregation of multiple claims as acquiescence.[37] The Respondent also points to the fact that Article 26 of the ECT does not refer to "investors" as a collective, but speaks of "[i]nvestor" in the singular.[38]

64.  The Respondent further argues that no consent to aggregate proceedings may be found in the UNCITRAL Rules. The fact that, pursuant to Article 17(1) of the UNCITRAL Rules, the Tribunal has the power to "conduct the arbitration in such manner as it considers appropriate" does not evidence consent to aggregate proceedings.[39]

---

[31]  R-Reply, paras. 28-47.
[32]  Aggregation Objection, para. 17.
[33]  R-Reply, para. 17.
[34]  R-Reply, para. 25
[35]  R-Reply, para. 19.
[36]  R-Reply, para. 19.
[37]  R-Reply, para. 7.
[38]  R-Reply, para. 24.
[39]  Aggregation Objection, para. 23.

65.     Finally, the present situation is no different from the one where claims are brought in separate proceedings and then consolidated as both instances require the consent of the respondent for the "consolidation".[40]

66.     In contradistinction, the Claimants contend that Article 26 of the ECT does not provide that a respondent host state must specifically consent to aggregate proceedings. Article 26(3) sets forth that the Contracting Parties provide "unconditional consent" which is "subject only to subparagraphs (b) and (c)". Those subparagraphs in turn refer to limitations posed by certain Contracting Parties in respect of disputes previously submitted to another forum and with respect to the umbrella clause contained in Article 10(1).[41] Because the consent is expressly said to be "unconditional", the imposition by a tribunal of any additional jurisdictional requirements, such as a requirement for specific consent to aggregate proceedings, would be inconsistent with the basic rules of treaty interpretation laid down in the VCLT.[42]

67.     The Claimants do not dispute that the Tribunal must satisfy itself that the conditions for jurisdiction are met in respect of each claimant.[43] However, the inquiry is not different from any other claim under the ECT, whether it involves one or multiple claimants. If there exists mutual consent to arbitrate a particular dispute, the tribunal has jurisdiction and it does not lose it because there are multiple claimants.[44]

68.     Neither do the UNCITRAL Rules contain a requirement for specific consent to aggregate proceedings, which is not surprising because their sole function is to provide the procedural framework for the management of the arbitration.[45] If anything, the 2010 revisions of the Rules show that numerous amendments were made to the 1976 text in order to facilitate multi-party arbitration to the extent necessary.[46]

69.     In addition, the Claimants take issue with Spain's use of the term "consolidation". Consolidation has a settled meaning in arbitration, namely the joinder of two or more pending arbitrations into one.[47] While the Claimants concede that "consent is

---

[40]  R-Reply, para. 22.

[41]  C-Answer, para. 32.

[42]  C-Answer, para. 33.

[43]  SoC, para. 347. See also C-Rejoinder, para. 60 ("It is common ground that each Claimant must satisfy the conditions for jurisdiction").

[44]  SoC, para. 347.

[45]  C-Answer, para. 88.

[46]  C-Answer, paras. 91-93.

[47]  C-Answer, para. 94.

necessary to the consolidation of separate proceedings",[48] they contend that the situation is different when, as in the present case, there is an original submission of a claim by a plurality of claimants in one proceeding. In this latter scenario, there is no need for specific consent.[49]

70.    Furthermore, the Claimants submit that commercial and investment arbitration must be distinguished. While consent in commercial arbitration arises from a direct contractual agreement between specific and identifiable parties, the nature of consent in investment treaty arbitration is entirely different. A state makes a unilateral offer to arbitrate which can be accepted by any investor meeting the conditions of the treaty.[50]

71.    The Parties have discussed a number of investor-state cases which involved multiple claimants and have drawn opposite conclusions. In Spain's view, investor-state cases involving more than one claimant are irrelevant here, as in those cases the respondent did not object to jurisdiction on such ground and thus consented to multi-party arbitration.[51] With specific regard to ICSID cases with multiple claimants, the Respondent contends that they lack relevance for present purposes because they arose in a different legal framework.[52]

72.    The Claimants, on the contrary, submit that there have been over 120 multi-party investor-state arbitration cases and that aggregate proceedings are a common feature of investor-state arbitration. The fact that no respondent raised an objection on this ground only shows that such objection is without merit. Furthermore, the Claimants underscore that a tribunal presiding over an international arbitration would always be able to review its jurisdiction *sua sponte*.[53] It is thus indicative that in none of those cases the tribunal saw the number of claimants as a bar to jurisdiction.

73.    Among others, the Parties have discussed *Abaclat et al. v. Argentina*;[54] *Ambiente Ufficio et al. v. Argentina*;[55] *Funnekotter et al. v. Zimbabwe*;[56] and *Noble Energy and*

---

[48]  C-Rejoinder, para. 29.
[49]  C-Answer, para. 96; C-Rejoinder, para. 29.
[50]  C-Answer, paras. 98-99.
[51]  Aggregation Objection, paras. 18, 22.
[52]  R-Reply, para. 13.
[53]  C-Answer, paras. 36-38.
[54]  *Abaclat et al. v. The Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility, 4 August 2011 ("*Abaclat*") (**Exh. CLA-39**).
[55]  *Ambiente Ufficio S.p.A. et al. v. The Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013 ("*Ambiente*") (**Exh. CLA-121**).
[56]  *Bernardus Henricus Funnekotter et al. v. Republic of Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009 ("*Funnekotter*") (**Exh. CLA-98**).

*MachalaPower v. Ecuador*[57] arguing either for or against the relevance of these decisions. Following the Tribunal's invitation, the Parties also submitted comments on the recent award in *Rurelec*.

74.    *Abaclat* concerns a dispute between some 60,000 bondholders and Argentina which is currently pending before an ICSID tribunal. It is Spain's submission that the Decision on Jurisdiction and Admissibility issued by the majority in *Abaclat*, which found *inter alia* that Argentina's consent to the jurisdiction of ICSID covered claims by multiple claimants in one arbitration, does not support the Claimants in these proceedings for the following reasons.

75.    First, *Abaclat* is not relevant because, unlike here, the phase of the proceedings with which the decision dealt was "limited to general issues and [did] not include 'issues touching specifically upon each individual claimant'".[58] Further, *Abaclat* involved over 60,000 Italian holders of Argentine bonds, the relevant terms of which were identical (or assumed to be so). Hence, the fact that these claims could be standardized and the verification of the evidence simplified was instrumental to the decision of the majority in *Abaclat*.[59] Finally, the legal framework under which the *Abaclat* arbitration took place, i.e., the Argentina-Italy BIT and the ICSID Convention, differs from the present one.[60]

76.    Second, according to Spain, *Abaclat* was wrongly decided for a number of reasons, including the fact that the tribunal viewed aggregation as a matter of admissibility rather than one of jurisdiction;[61] that it failed to apply the standards of interpretation under international law, in particular with regard to the meaning of "silence" in the BIT and the ICSID Convention;[62] and that it did not examine each claim in sufficient depth.[63] Spain also stresses that *Abaclat* was not a unanimous decision, was the subject of a strong dissent, and was criticized by the international arbitration community generally.[64]

---

[57]    *Noble Energy, Inc. and MachalaPower Cia. Ltda. v. the Republic of Ecuador and Consejo Nacional de Electricidad*, ICSID Case No. ARB/05/12, Decision on Jurisdiction, 5 March 2008 ("*Noble Energy*") (**Exh. CLA-33**).

[58]    Aggregation Objection, para. 26, citing to *Abaclat*, para. 226.

[59]    Aggregation Objection, paras. 26-28.

[60]    Aggregation Objection, para. 29.

[61]    Aggregation Objection, paras. 30-37.

[62]    Aggregation Objection, paras. 38-47.

[63]    Aggregation Objection, para. 48.

[64]    Aggregation Objection, para. 49; R-Reply, para. 9.

77.    In any event, for Spain, the present dispute does not show the same homogeneity of claims as in *Abaclat*, where the standard bond documentation shows the value of the bond.[65] In the present proceedings, each of the 88 Claimants claims to have different and separate interests in one or more PV installations; and each of them claims to have channeled its investment through different corporate structures which involve at least 1,000 SPVs. The corporate forms are distinct for each claimant as the companies are incorporated in different states. The date when each claimant made its investment is also likely to be different, as is the amount invested and the nature of each underlying PV installation that is ultimately the object of each claimant's investment. Spain submits that these variables will impact the laws and regulations to which each PV installation or SPV is subject.[66] Each claimant will have gained different views and information that will influence its legitimate expectations.[67] In short, "no two claimants, their investments, or their histories are necessarily the same".[68]

78.    In Spain's view, *Ambiente*, which concerned 90 Italian bondholders, is similarly irrelevant because multi-party arbitration was addressed under the ICSID Convention, which does not govern here.[69] Moreover, like *Abaclat*, *Ambiente* was not a unanimous decision.

79.    By contrast, the Claimants submit that the reasoning in *Abaclat* and *Ambiente* is compelling and applies *a fortiori* to the present circumstances. Both tribunals found that jurisdiction was not vitiated when multiple claimants commenced a single proceeding, and that there was no reason why the number of claimants would deprive the tribunal of jurisdiction.[70] For the Claimants, such reasoning should apply *a fortiori* in the present arbitration for the following reasons.

80.    First, as already noted, Article 26(3) of the ECT provides that the host state's "unconditional" consent to arbitration is subject only to certain explicit exceptions, and thus lends itself more favorably than the Italy-Argentina BIT (the treaty which provided the basis for the jurisdiction of the tribunals in *Abaclat* and *Ambiente*) to the conclusion that there is no separate condition for a state to give specific consent to

---

[65]  Aggregation Objection, para. 51.

[66]  R-Reply, para. 37.

[67]  Aggregation Objection, para. 13.

[68]  Aggregation Objection, para. 11; R-Reply, para. 37. These differences between the Claimants would, in Spain's view, also raise problems as to the workability of the proceedings (see *infra*, para. 89).

[69]  R-Reply, paras. 12-13.

[70]  C-Answer, paras. 46-49, citing to *Abaclat*, para. 409, and *Ambiente*, para. 150.

aggregate proceedings.[71] Second, in this arbitration, the Claimants do not face the "additional hurdle" of Article 25 of the ICSID Convention, which applied in the two Argentine proceedings.[72] Third, the number of investors bringing a claim in *Abaclat* (180,000 later reduced to 60,000) far exceeds the number in the present dispute. Like in *Ambiente*, the Claimants in this case represent a mere one thousandth of those in *Abaclat*.[73]

81.    The Claimants also refute the further reasons adduced by Spain to consider *Abaclat* and *Ambiente* irrelevant to this dispute. They note that the parties in *Abaclat* did not agree that the Tribunal would avoid a full determination of whether it had jurisdiction to hear the dispute. Rather, the Tribunal decided that it would first consider the jurisdictional requirements that must be fulfilled for it to hear the claimants' claims.[74]

82.    Further, the Claimants posit that a sufficient connection exists among the Claimants in the present case. All of the claims are brought under the same treaty and arbitration rules. They concern very similar investments in a particular sub-sector of the Spanish economy under the same legislative framework. Most importantly, the Claimants bring complaints with respect to the same measures adopted by Spain.[75]

83.    Thus, the Claimants conclude, the reasoning in *Abaclat* and *Ambiente* is relevant to this dispute and this Tribunal should give it due consideration.

84.    The Parties also diverge on the relevance of ICSID case *Funnekotter*, in which the arbitral tribunal accepted jurisdiction over claims brought jointly by 13 Dutch owners of different large commercial farms against Zimbabwe, alleging that the latter's land acquisition program breached its obligations under the Netherlands-Zimbabwe BIT. Spain contends that this case is irrelevant for the present discussion, because there the parties agreed that the Tribunal had jurisdiction, and the respondent state did not object to jurisdiction on the ground of the number of claimants.[76] The Claimants, by contrast, note that the *Funnekotter* tribunal considered whether it had jurisdiction *sua sponte*, irrespective of any agreement between the parties, and it took no issue with the multiple number of claimants.[77]

---

[71]  C-Answer, para. 61.

[72]  C-Answer, paras. 63-64.

[73]  C-Answer, paras. 65-66.

[74]  C-Answer, para. 72.

[75]  SoC, para. 351.

[76]  R-Reply, para. 11.

[77]  C-Answer, para. 38; C-Rejoinder, para. 22.

85.    Further, the Respondent has invoked the ICSID case *Noble Energy*, where the tribunal accepted to hear three disputes (the first arising under the BIT, the second under an investment agreement and the third under a concession contract) in one arbitration. For Spain, the tribunal in that case reached its conclusion because the three claims arose out of the same economic transaction, which is not the case in these proceedings.[78] The Claimants, on the contrary, argue that *Noble Energy* fully supports their position, because the tribunal accepted jurisdiction and held that there was no need for express consent to multi-party arbitration.[79]

86.    Finally, the Respondent argues that *Rurelec* is in no way comparable to the present case and thus of no relevance.[80] *Rurelec* concerned one claim arising from one relevant event, made by *either* Guaracachi under the U.S.-Bolivia BIT *or* its 100% indirect owner Rurelec under the UK-Bolivia BIT.[81] In Spain's view, the present proceedings, to the contrary, involve an attempt to aggregate a series of separate claims arising from 88 different investments with 88 different alleged losses.[82] The Claimants, on the other hand, find *Rurelec* relevant to the issue of whether multiple investors can jointly bring claims against a state in a single arbitration. The Claimants draw analogies between Spain's Aggregation Objection and the "similar, if not identical" objection raised by Bolivia in *Rurelec*, which also hinged on the alleged "dual consent" requirement.[83] Because the *Rurelec* tribunal rejected Bolivia's objection and held that there was no requirement for express additional consent of a respondent state to aggregate proceedings, the Claimants posit that the *Rurelec* award fully supports the Claimants' submissions. Further, the Claimants contend that the reasoning of the *Rurelec* tribunal applies *a fortiori* to the PV Investors' claims as their claims have all been brought under the ECT and not under separate treaties.[84]

### b.  Integrity, workability and fairness of any aggregate arbitration

87.    It is Spain's further argument that, even if the Tribunal had jurisdiction to hear multiple claims, it would not be suitable to hear such claims together for reasons of due

---

[78]  Jurisdictional Objections, paras. 54-60.

[79]  C-Answer, paras. 80-81.

[80]  Respondent's Submission dated 28 February 2014 in relation to the award in *Rurelec*, paras. 3-25.

[81]  Respondent's Submission dated 28 February 2014 in relation to the award in *Rurelec*, para. 8.

[82]  Respondent's Submission dated 28 February 2014 in relation to the award in *Rurelec*, paras. 17-23.

[83]  Claimants' Submission dated 28 February 2014 in relation to the award in *Rurelec*, p. 2.

[84]  Claimants' Submission dated 28 February 2014 in relation to the award in *Rurelec*, p. 4.

process. In this respect, Spain maintains "profound reservations as to the integrity, workability and fairness" of these aggregate proceedings.[85]

88.    These concerns have been compounded, according to Spain, by the way in which the Claimants have sought to have the proceedings conducted to date. Spain points to the fact that the Claimants continue to insist that there are at most 14 Claimants (and not 88);[86] that one claimant seems to have withdrawn its claim without the Claimants stating so, with the result that the actual number of claimants is unclear;[87] and that the evidence initially relied upon by the Claimants was insufficient.[88]

89.    As already noted, Spain argues that the claims in these proceedings are not homogenous and thus make the case "extremely complex".[89] For these reasons, in the event that no specific consent was required for the aggregation of multiple claims, Spain urges the Tribunal to scrutinize each and every claimant in connection with jurisdiction and merits, so that its right of due process is not infringed. The Respondent requests the Tribunal to grant "appropriate safeguards"[90] and in particular to follow the following principles:

> 47. […] a) The status and position of each of the Claimants must be individually determined;
>
> b) The Tribunal should determine whether it has jurisdiction individually in respect of each of the claims advanced by each of the Claimants;
>
> c) Each Claimant must produce specific evidence in respect of the facts that [it] intends to establish; and
>
> d) The procedural schedule of these proceedings should take into account the extreme complexity of this case particularly with a view to according the Tribunal sufficient time appropriately to resolve this case and any issue thereof.
>
> [48.] In summary, fairness would require that each claim advanced by each Claimant be dealt with and resolved in an appropriate manner. Spain expects that the same degree of procedural fairness be accorded to it.[91]

---

[85]  R-Reply, section 2.2.

[86]  R-Reply, para. 32.

[87]  R-Reply, para. 33. In this respect, the Claimants have explained that the omission of Eoxis Holding S.A., one of the Claimants, from the SoC was inadvertent. Eoxis Holding S.A. was included as a Claimant in Annex A to the NoA. See C-Answer, paras. 218-220.

[88]  R-Reply, para. 34.

[89]  R-Reply, para. 44. As to the alleged non-homogeneity of the claims, see *supra*, para. 77.

[90]  R-Reply, para. 44.

[91]  R-Reply, paras. 47-48.

90.     By contrast, the Claimants highlight the considerable benefits, which would result from the claims being heard together. Aggregate proceedings would promote cost-efficiency, avoidance of unnecessary delay, and consistency of outcome.[92]

91.     If any due process concerns were to arise (which is unlikely in the Claimants' view), the Tribunal could address them using its wide-ranging management powers.[93] The Claimants submit that there can be no doubt that the Tribunal has the power it needs to ensure that Spain is afforded due process and equal treatment to the extent that any special considerations arise. The Claimants do not oppose procedural safeguards being built into this arbitration such that there is adequate time for consideration of all relevant issues, including those that Spain chooses to raise.[94]

92.     The Claimants finally submit that aggregate proceedings work also in the interest of Spain. Should the present arbitration not continue in its current form, Spain would have to defend 14 (or 88) separate arbitral proceedings. The cost would far exceed any burden that Spain may now face in the present arbitration.[95]

2.      **Analysis**

        a.   **Consent to aggregate proceedings?**

93.     Before proceeding to the interpretation of the Treaty in order to rule on this objection, the Tribunal wishes to make a terminological remark. The Parties have resorted to different terms to describe the present situation, in which one arbitration is brought collectively by multiple claimants. The Respondent has referred to the "consolidation" of claims, whereas the Claimants have spoken of "collective proceedings". The Tribunal notes that these terms have no generally agreed meaning, especially in the investment treaty arbitration field, and may have different connotations depending on the legal system in which they are used (whether domestic or international). For the purpose of this Award, the Tribunal will use "aggregate proceedings", a term it had used in PO4,[96] to describe a situation in which multiple, individual claimants bring claims in their own name *ab initio* in one single arbitration. By contrast, it will use "consolidation" to refer to the situation in which pending parallel proceedings are joined into a single one.

---

[92]  SoC, para. 351; C-Answer, paras. 107-111.
[93]  C-Answer, para. 103, referring to Art. 17(1) of the UNCITRAL Rules.
[94]  C-Answer, para. 120.
[95]  C-Answer, para. 117.
[96]  PO4, p. 2, fn. 1.

94.   The Tribunal views the objection to aggregate proceedings as one which must be dealt with when ascertaining jurisdiction. The purpose of the Tribunal's inquiry is to establish whether a claim involving multiple claimants, such as the one advanced in these proceedings, may be deemed to be covered by the Respondent's consent as expressed in the ECT and thus be within the Tribunal's jurisdiction.

95.   In examining the Aggregation Objection, the Tribunal will start by recalling the principles that govern treaty interpretation. According to Article 31 of the VCLT, a treaty "shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose". No special rule applies to the interpretation of a dispute settlement provision. Hence, such treaty provisions must be construed like any other, neither restrictively nor broadly. Or in the words of the tribunal in *Mondev v. USA*,

> there is no principle either of extensive or restrictive interpretation of jurisdictional provisions in treaties. In the end the question is what the relevant provisions mean, interpreted in accordance with the applicable rules of interpretation of treaties. These are set out in Articles 31-33 of the Vienna Convention on the Law of Treaties, which for this purpose can be taken to reflect the position under customary international law.[97]

96.   The Parties concur, and rightly so, that the starting point of the interpretation is the "ordinary meaning" of the text.[98] The latter must be ascertained in the light of the context and the treaty's object and purpose, any subsequent agreement or practice of the Contracting Parties related to the interpretation of the treaty, and any other relevant rules of international law applicable in the relations between the Contracting Parties.[99]

97.   The jurisdiction of this Tribunal derives from Article 26 of the ECT, which reads as follows:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

---

[97]   *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002 (**Exh. CLA-14**), para. 43 (internal footnotes omitted).

[98]   R-Reply, para. 20; C-Answer, para. 32.

[99]   Article 31 of the VCLT.

> (a) to the courts or administrative tribunals of the Contracting Party party to the dispute;
>
> (b) in accordance with any applicable, previously agreed dispute settlement procedure; or
>
> (c) in accordance with the following paragraphs of this Article.
>
> (3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. […]

98.     Article 26 of the ECT establishes the Contracting Parties' consent, more precisely the offer of consent to arbitrate with investors of other Contracting Parties, which qualifying investors may then elect to accept. It is significant that the Contracting Parties' consent is expressly characterized as "unconditional" (Article 26(3)) and "[s]ubject only to subparagraphs (b) and (c)" of Article 26(3) of the ECT. These two exceptions refer to states having made a declaration in respect of disputes submitted to another forum and to states having opted out from the umbrella clause in Article 10(1) of the ECT. None of these exceptions is relevant for the present purposes.[100] The ECT provides no further exception to the Contracting Parties' consent. Thus, a good faith interpretation of the ordinary meaning of Article 26 suggests that no "special" or "dual" consent is required for the institution of arbitral proceeding in aggregate form, beyond the express jurisdictional requirements contained in Article 26. Neither does the context in which the offer of consent is placed nor the object and purpose of the Treaty suggest a different conclusion. Nor has the Tribunal been referred to any subsequent agreement or practice of the Contracting Parties related to the interpretation of the Treaty and any other relevant rules of international law applicable between the Contracting Parties, which would change the Tribunal's understanding.

99.     Furthermore, the Tribunal does not see how the reference in Article 26 to "an Investor" in the singular would bar jurisdiction over a multiplicity of claimants. Quite apart from the fact that elsewhere in Part III the Treaty uses "Investors" in the plural (see, *e.g.*, Article 10 of the ECT), the Tribunal does not believe that the use of the singular in the dispute settlement clause means that the individual disputes have to be heard separately. What matters is that disputes between one of the Contracting Parties and an investor be adjudged in their individual dimension, i.e., in the same way as they would be in an ECT arbitration with a single claimant. This means in

---

[100] The first of these two conditions is relevant for the sixth jurisdictional objection, on which see *infra*, Section IV.C.5.

particular that, at the present jurisdictional stage, the Tribunal must satisfy itself that the jurisdictional requirements are satisfied in relation to each claimant. Insofar as there may be differences between the Claimants, in terms for instance of alleged legitimate expectations or losses, these differences will be examined at the merits stage of the procedure.

100.    The fact that claims are brought in one arbitration by multiple claimants without the need for a respondent's "specific" or "additional" consent is rather the natural consequence of the peculiar nature of consent in investment treaty arbitration. In the context of "arbitration without privity",[101] a standing offer to arbitrate is extended by the host state in a treaty to an indefinite number of previously unidentified investors falling within the jurisdictional requirements of the treaty. What is essential, in the Tribunal's view, is to establish that there is consent to arbitration (through a valid offer in the treaty and a valid acceptance meeting the possible conditions of such offer). The fact that the offer is then accepted by one single claimant rather than a multiple number of claimants jointly is immaterial in this respect. As rightly noted in *Abaclat* and *Ambiente*, a joint acceptance of the state's offer by a multitude of claimants cannot result in the tribunal losing jurisdiction that it would have if the claimants had commenced separate arbitrations.[102]

101.    This characteristic of consent in investment treaty arbitration further implies that analogies with multi-party arbitrations based on contract are only of limited significance. In this latter context, jurisdiction will arise from the consent given to multi-party proceedings in the contract. By contrast, in investment treaty arbitration, jurisdiction will depend on the offer of consent in the treaty, which by its very nature is directed to a multiplicity of potential claimants. Because in investment treaty arbitration a pre-existing, direct contractual relationship between the host state and the concerned investors is not needed to establish the arbitration agreement, parallels with contractual settings and commercial arbitration are unhelpful.

102.    Furthermore, as already mentioned, the present situation of *ab initio* aggregate proceedings should be distinguished from "consolidation", defined above as a situation where pending parallel proceedings are joined into a single one.[103] Both sides agree that in the latter scenario, all the parties must consent to consolidation. Spain posits that there are no reasons for making a distinction between the two

---

[101] Jan Paulsson, "Arbitration Without Privity", 10 *ICSID Review – Foreign Investment Law Journal* 232-257 (1995) (**Exh. RLA-32**).

[102] *Abaclat*, para. 490, first indent; *Ambiente*, para. 150.

[103] See *supra*, para. 93.

situations when it comes to the requirement of consent. The Tribunal cannot follow this argument. No valid analogy can be made between *ab initio* aggregate proceedings and *ex post* consolidation. In the former case, the offer is taken up jointly by the claimants, whereas in the latter, there are several separately concluded arbitration agreements leading to separate proceedings which are then sought to be joined. That joinder requires a specific consent.[104]

103.    The conclusion that the Tribunal reaches, i.e., that under the ECT there is no requirement for additional consent to aggregate proceedings, is confirmed by investment treaty jurisprudence. Indeed, the Tribunal has not been referred to, nor is it aware of, a single case where a tribunal has declined jurisdiction based on the fact that there was more than one claimant. To the contrary, investment treaty arbitration practice is replete with examples of proceedings which have involved more than one claimant. As a preliminary matter, the Tribunal considers that examples from both the ICSID and non-ICSID framework are relevant because an objection based on multiple claimants would present no meaningful difference in one or the other context.

104.    The analysis of the investment treaty cases involving multiple claimants (more than 120, according to the PV Investors) clearly evinces that the multiple number of claimants has never been an issue. The fact that respondents may have omitted to raise an aggregation objection does not change that observation. Both within the ICSID framework and in non-ICSID investment treaty arbitration, a tribunal has the power to deal with jurisdictional questions of its own motion.[105] If the multiplicity of claimants required a special consent from the respondent, this would mean that numerous investment treaty tribunals have failed to consider this issue and to inquire from the respondent whether it had granted such additional consent. The Tribunal appreciates that the reasons why until recently this objection was almost never raised by respondents,[106] nor ever considered *proprio motu* by a tribunal, may lie in the fact

---

[104] As held by the *Rurelec* tribunal, "in cases of consolidation of proceedings, the matching of consents with respect to each of the arbitrations has already occurred", which is what would require consent of all Parties to the consolidation of the separate arbitrations into one. *Rurelec*, para. 338. See also *Ambiente*, paras 123-125 (distinguishing "*ex post* joinder or consolidation of proceedings" from "the original submission of a claim by a plurality of Claimants in one single ICSID proceeding").

[105] See Art. 41(2) ICSID (Arbitration) Rules ("The Tribunal may on its own initiative consider, at any stage of the proceeding, whether the dispute or any ancillary claim before it is within the jurisdiction of the Centre and within its own competence"); Art. 45(3) ICSID Arbitration (Additional Facility) Rules ("The Tribunal may on its own initiative consider, at any stage of the proceeding, whether the dispute before it is within its competence"). For non-ICSID treaty arbitrations, see Zachary Douglas, *The International Law of Investment Claims* (Cambridge, 2009), p. 141, para. 292.

[106] In addition to the cases discussed later by the Tribunal, it would seem that in *Klöckner et al. v. Cameroon* the respondent initially objected to multi-party proceedings, but later abandoned this objection. See Christoph Schreuer, Loretta Malintoppi, August Reinisch and Antony Sinclair, *The ICSID Convention. A Commentary* (Cambridge, 2009), p. 163 ("The argument that the use of the

that those cases often concerned, on the one hand, a limited number of claimants, and, on the other, companies belonging to the same corporate group, or individuals sharing a family relation. However, in the Tribunal's view, an equally reasonable explanation may be that multi-party proceedings of this kind were not regarded as raising a jurisdictional issue.

105. As aptly noted by the tribunal in *Ambiente* after reviewing the many arbitrations (under the ICSID Convention and beyond) involving more than one claimant,

> it is evident that multi-party arbitration is a generally accepted practice in ICSID arbitration, and in the arbitral practice beyond that, and that the institution of multi-party proceedings therefore does not require any consent on the part of the respondent Government beyond the general requirements of consent to arbitration.[107]

106. Without prejudice to all the cases to which the Parties have referred and which the Tribunal has considered, the Tribunal now turns to the discussion of those which it has found most helpful to reach its conclusion that no additional consent is required from a respondent in respect of aggregate proceedings under the ECT.

107. The Tribunal finds the *Funnekotter* case to be of valuable importance. The case was brought before an ICSID tribunal by 13 claimants who owned different commercial farms in Zimbabwe. The claimants alleged that they had been deprived of their property through measures taken as part of the state's land acquisition program. The claimants thus complained of the same state measures which affected their individual investments. The respondent at first objected to the Tribunal's jurisdiction based on the alleged lack of Dutch nationality of the claimants.[108] In the subsequent course of the proceedings, however, it abandoned this objection and confirmed that it did not object to the jurisdiction of the Centre.[109] Nonetheless, the tribunal considered jurisdiction of its own motion.[110] It reviewed whether it possessed jurisdiction *ratione personae*, *ratione materiae* and *ratione temporis*, and affirmed jurisdiction under the BIT and the ICSID Convention.[111] If there had been an additional consent requirement relating to the number of claimants, the *Funnekotter* tribunal would likely have

---

singular for "national" in Art. 25(1) [of the ICSID Convention] barred multipartite arbitration was raised in *Klöckner v. Cameroon* but was not taken up by the Tribunal and was apparently dropped subsequently by the Government").

[107] *Ambiente*, para. 141.

[108] *Funnekotter*, para. 59.

[109] *Funnekotter*, paras. 82, 93.

[110] *Funnekotter*, para. 94.

[111] *Funnekotter*, paras. 94-95.

considered it, even in the absence of an objection by Zimbabwe.[112] As rightly observed in *Ambiente*, "[t]he silence of the Tribunal [in *Funnekotter*] carries more weight, in this case, than that of the respondent State".[113]

108.    Objections to the multi-party nature of the arbitration were more recently considered and denied in two ICSID arbitrations arising under the Argentina-Italy BIT. In *Abaclat*, an ICSID tribunal upheld jurisdiction over claims by some 60,000 bondholders, rejecting an objection by Argentina that its consent under the ICSID Convention and the applicable BIT did not cover this sort of "mass proceedings" (as the *Abaclat* tribunal called them). The present Tribunal notes that the number of claimants in the present case represents a fraction of merely a thousandth of the number of the claimants in *Abaclat*. The conclusion in *Abaclat* on the multiplicity of claimants would thus apply *a fortiori* when a tribunal, such as the present one, is faced with a much smaller number of claimants.

109.    *Ambiente*, to the contrary, dealt with a comparable number of claimants (90). Faced with a jurisdictional objection similar to the Aggregation Objection in this arbitration, the Tribunal characterized the situation before it as "the original submission of a claim by a plurality of Claimants in one single ICSID proceeding", and distinguished it from the scenario of "the initial submission of a certain number of separate individual arbitrations which are subsequently consolidated and joined with each other".[114] Only with regard to the latter, but not the former, did the tribunal find that a "specific consent of the Parties" was needed.[115] The tribunal thus went on to reject Argentina's aggregation objection.

110.    Of note, in *Funnekotter* (arising under the Zimbabwe-Netherlands BIT), *Abaclat* and *Ambiente* (the latter two arising under the Argentina-Italy BIT), the applicable BIT dispute resolution clauses all referred to disputes between the host state and "a national"[116] or "an investor"[117] in the singular. In none of the three cases did this wording prevent the tribunal from asserting jurisdiction over multiple claimants.

111.    The most recent example of denial of an aggregation objection is found in *Rurelec*, an UNCITRAL case brought under two different BITs. The tribunal characterized Bolivia's argument that there had to be a specific consent in each of the BITs to

---

[112] See also *Ambiente*, para. 139.

[113] *Ambiente*, para. 158.

[114] *Ambiente*, paras. 123-124.

[115] *Ambiente*, para. 123.

[116] See *Funnekotter*, para. 91 (referring to Art. 9(1) of the Netherlands-Zimbabwe BIT).

[117] See *Abaclat*, paras. 268-270 (referring to Art. 8 of the Argentina-Italy BIT).

aggregating claims in one arbitration as "ultimately go[ing] too far".[118] It noted that "were such specific consent necessary, it would be impossible to accept, as the Respondent has argued, that all prior multi-party arbitrations that were allowed to proceed were based on implicit consent by the respondent States through their failure to raise any jurisdictional objection in this regard".[119] The present Tribunal finds the conclusions drawn in *Rurelec* to apply *a fortiori* in the present scenario, because all of the PV Investors have initiated this arbitration under the same treaty, the ECT, whereas in *Rurelec* the claimants had invoked two different BITs providing for two non-identical dispute settlement clauses.

112. Finally, the Tribunal considers that the reference to *Noble Energy* is unhelpful. The latter case concerned the aggregation of claims brought before an ICSID tribunal under three different legal instruments (the applicable investment treaty, an investment agreement, and a concession contract). The scenario was thus different from the present one, where all claims are brought under the same investment treaty. In any event, in that case the tribunal rejected the two Respondents' objection that the three disputes could not be resolved in one single arbitration.

113. The Tribunal thus finds support in investment treaty jurisprudence to date for its conclusion that there is no requirement for a respondent state under the ECT to provide an additional consent to a dispute involving a multiple number of claimants.

114. For the foregoing reasons, the Tribunal decides that it has jurisdiction to hear multiple arbitral claims in one proceeding. Spain's Aggregation Objection is therefore rejected.

### b. Due process and case management

115. Having found that no specific consent is required for the aggregation of multiple claims, the Tribunal now addresses the other objections raised by Spain, notably those relating to due process and the "workability" of these proceedings.

116. The Tribunal does not see how any issue of due process can arise from the sole fact that these proceedings are conducted in aggregate form. It goes without saying that the arbitration will be conducted in such a fashion as to safeguard the due process rights of every Party, and in particular of the Respondent in respect of each individual claim.

117. With regard to the submission that the proceedings would be unworkable due to the diversity between the Claimants, the Tribunal is satisfied that a sufficient connection

---

[118] *Rurelec*, para. 342.

[119] *Rurelec*, para. 342.

exists between them to justify hearing the Claimants' claims in one single arbitration. The Claimants complain of the same measures taken by Spain in relation to the PV sector, which they allege have negatively affected their investments. In addition, they invoke the same Treaty provisions and claim the same type of relief. Thus, the Tribunal does not believe that any diversities in the Claimants' situations would make the proceedings unmanageable or unworkable.

118.    Further, the Tribunal agrees in principle with the "appropriate safeguards" invoked by Spain for the event that these proceedings are continued in aggregate form.

119.    *First*, with regard to the concerns that "[t]he status and position of each of the Claimants must be individually determined" and that "[t]he Tribunal should determine whether it has jurisdiction individually in respect of each of the claims advanced by each of the Claimants", it is clear that the aggregate nature of the proceedings does not dispense the Tribunal from establishing the jurisdictional requirements with regard to each and every claimant, a proposition that the Claimants do not dispute, and rightly so. The same principle applies to the merits stage: The Tribunal will carry out any individual examination required to resolve this dispute.

120.    *Second*, with regard to the Respondent's concern that each Claimant "produce specific evidence in respect of the facts that [it] intends to establish", the Tribunal is of the view that this is certainly the case with regard to the facts which are specific to its claim, as opposed to those common to all of the Claimants.

121.    *Third*, the Tribunal takes note of Spain's concerns about the calendar for the further course of these proceedings. It also notes that the Claimants have not objected to procedural arrangements allowing for appropriate time to brief all the relevant issues. Pursuant to Article 17(1) of the UNCITRAL Rules, the Tribunal has the necessary powers to ensure that the proceedings are managed both efficiently and fairly. The Tribunal further appreciates the Respondent's readiness "to be pragmatic in terms of how any proceedings should be managed".[120]

122.    The Tribunal adds that, as a result of the conclusion which it will reach later in respect of the fifth jurisdictional objection, the proceedings will continue only with 26 out of the original 88 Claimants. As a result, it will be easier to deal with any concerns which Spain may have harbored about the complexity of the proceedings.

123.    In conclusion, the Tribunal does not consider that its aggregate nature makes this arbitration unworkable or results in a violation of due process or in unfairness towards

---

[120] Aggregation Objection, paras. 3, 65.

the Respondent, be it in the present jurisdictional phase or in the subsequent merits phase.

124.    The Tribunal finally wishes to make a last remark. In advocating in favor or against aggregate proceedings, the Parties have discussed issues such as procedural efficiency, costs and time of the proceedings, the potential to avoid contradictory decisions and a waste of resources. Whatever the merit of these considerations, they could not justify the admission of aggregate proceedings if it were not permitted under the framework of the ECT as a matter of law.[121] The paramount question for a tribunal of limited and consensual jurisdiction is whether the Respondent's consent is affected by the number of potential claimants. Once the answer is given that under the ECT the Respondent's consent is not limited by the multiplicity of claimants, those policy considerations add nothing to the answer.

## C.    THE OTHER OBJECTIONS TO JURISDICTION

## 1.    Second objection: Claimants have not proven that they are "Investors" with "Investments"

125.    In its Jurisdictional Objections, Spain submitted that the Claimants failed to prove that they are "Investors" pursuant to Article 1(7) of the ECT with qualifying "Investments" pursuant to Article 1(6) of the ECT.[122] According to Spain, the existence of an "Investor" with an "Investment" needs to be demonstrated by documentary evidence. To that purpose, the Claimants should, in the Respondent's view, have produced certificates of incorporation, relevant certificates issued by the Spanish Commercial Registry, copies of the registrations of the relevant PV installations with the Administrative Registry for Production Installations under the Special Regime (*Registro Administrativo de Instalaciones de Producción en Régimen Especial*, "RAIPRE") and copies of the resolutions of the Ministry of Industry, Energy and Tourism granting a PV installation a specific FIT.[123] Instead, according to the Respondent, the Claimants have relied upon the testimony of individuals who are personally interested in the outcome of these proceedings[124] or on a number of "organograms" prepared for these proceedings and thus without probative value.[125]

---

[121] See, for a similar consideration, *Ambiente*, para. 172.

[122] Jurisdictional Objections, paras. 12-129.

[123] Jurisdictional Objections, para. 68.

[124] Jurisdictional Objections, paras. 40, 118-119.

[125] Jurisdictional Objections, paras. 67-68.

126.    In their Answer on Jurisdiction, the Claimants submitted some 6,000 additional documents (about 3,920 documents and approximately 2,000 translations collated in Annexes A to O, referred to as the "Evidentiary Annexes"), in order to prove that they are "Investors" with "Investments" under the ECT.

127.    The additional evidence submitted by the Claimants with the Answer on Jurisdiction prompted the Admissibility Objection by Spain, which is recounted in paragraph 22 above. The positions of the Parties concerning the admissibility of such evidence are described in detail in PO6.[126] In PO6, the Tribunal admitted the Evidentiary Annexes.

128.    In its Reply and in light of PO6 admitting the Claimants' new evidence, the Respondent requested that "the Tribunal decide whether it is satisfied that sufficient evidence has been provided to prove that each of the Claimants has the requisite standing, and specifically determines [sic] whether each of the Claimants is an "Investor" with "Investments" under the ECT".[127]

129.    In its Rejoinder, the Claimants noted that Spain did not identify any shortcomings in the evidence they submitted, nor query the veracity or probative value of any of its content.[128] Therefore, according to the Claimants, the Respondent has accepted that the Claimants have established that they are "Investors" with "Investments" under the ECT. As a result, this objection by Spain "has been dropped" and it is therefore no longer an issue before the Tribunal.[129]

130.    At the Hearing, the Respondent clarified that, after having reviewed the approximately 6,000 documents, it did not intend to pursue this jurisdictional objection further.[130] It stressed, however, that "it ha[d] taken quite some effort to get to that point" and that such result was achieved thanks to "Spain's efforts to police precisely this process" which led to the introduction of the 6,000 documents into the record.[131]

131.    The Tribunal thus takes note that the Respondent has abandoned the objection that the Claimants (other than the Spanish entities, for which the Respondent has

---

[126] PO6, paras. 4-25.

[127] R-Reply, para. 54.

[128] C-Rejoinder, para. 63.

[129] C-Rejoinder, paras. 6, 64.

[130] Hearing Tr. [English version] (Leathley), at 148: 19-25; 149: 1-9 ("it is now the case, after the submission of about 6,000 documents, that we have now seen an establishment of a prima facie case of standing by the Claimants, and we do not intend to pursue this as a jurisdictional issue at any further point in the proceedings today. [...] But as an issue in and of itself of 'Is there an investment and are there investors?'", we would now withdraw that jurisdictional challenge").

[131] Hearing Tr. [English version] (Leathley), at 149: 1-6.

maintained its objection) are not "Investors" with qualifying "Investments". It will thus not discuss this objection further, except when dealing with the allocation of costs.

## 2. Third objection: The Tribunal has no jurisdiction to deal with an intra-EU dispute

### a. The positions of the Parties

132. Spain submits that, because all Claimants are nationals of states that were members of the EU when the ECT was signed in 1994 (Spain, Luxembourg, The Netherlands and Germany), because Spain has been an EU member since 1986, and because all of the alleged investments have taken place within the EU, this is an intra-EU dispute which can not be resolved within the framework of the ECT. For the Respondent, at the time of conclusion of the ECT, intra-EU investment disputes fell within the preserve of the EU internal dispute resolution mechanisms. Hence, the dispute resolution provisions of the ECT do not apply to intra-EU investment disputes.[132]

133. For Spain, the existence of EU law, as a specific, fully-developed legal system, binding on the investors, who are nationals of an EU member state, and on Spain prohibits recourse to arbitration under the ECT.[133] Member states and EU citizens or businesses cannot opt out of EU law, which includes the control by national judges and, as required and appropriate, the intervention of the Court of Justice of the European Union ("CJEU").[134] According to the Respondent, the protection of investors' rights in this case is governed by EU law and disputes relating to this protection must be resolved within the judicial system of the EU and not by an international arbitral tribunal founded on the ECT.[135] An international treaty to which the EU is a party cannot be construed as preventing the application of the EU judicial system (CJEU and national courts).[136]

134. Furthermore, the application of the ECT at the intra-EU level would result in severe discrimination in the internal market in breach of EU law. This would be so, the Respondent contends, if an investor from one member state could bring an action against a member state before an arbitral tribunal rather than before the ordinary

---

[132] Jurisdictional Objections, paras. 130-133.
[133] R-Reply, para. 60.
[134] R-Reply, para. 74.
[135] R-Reply, para. 79.
[136] R-Reply, para. 81.

courts in accordance with EU law.[137] The discrimination would arise from the fact that arbitral tribunals do not necessarily apply EU law in a uniform manner.[138]

135.   According to the Respondent, previous arbitral decisions dealing with intra-EU investment treaties are irrelevant, because they addressed situations where the respondent states (the Czech Republic, the Slovak Republic, Hungary, Romania and Poland) were not EU member states at the time when the relevant investment treaty was concluded. The issue there was thus the effect of the *accession* to the EU of states which had investment treaties with members of the EU.[139]

136.   The Claimants object, and affirm that this intra-EU defense is without merit. According to them, there is no reason to distinguish the present situation from the other arbitrations in which the intra-EU issue was addressed on the ground that Spain was already part of the EU when it ratified the ECT. The ECT applies *a fortiori* between an investor from an EU member state and an EU member state where both states were part of the EU at the time the ECT was signed. Spain was fully aware of both its EU law obligations and its ECT obligations at the time it acceded to the ECT, yet made no reservations or exclusions to its unconditional consent.[140] The Claimants finally posit that Spain's argument, if accepted, would create two classes of investors or two classes of Contracting Parties, depending upon the date when they became part of the EU, which would amount to discrimination under both the ECT and EU law.[141]

137.   Therefore, according to the Claimants, previous investment arbitration (and court) decisions regarding intra-EU investment disputes are highly relevant to the issues before this Tribunal. In every single one of these cases, tribunals and courts have decided that a BIT or ECT-based tribunal does have jurisdiction over an intra-EU dispute.[142]

138.   The Parties have made a number of arguments relating to the interpretation of the ECT by reference to the VCLT, deriving different conclusions therefrom.

---

[137] R-Reply, para. 109.

[138] R-Reply, para. 109.

[139] R-Reply, paras. 62-65, 100.

[140] C-Answer, para. 235.

[141] C-Answer, para. 238; C-Rejoinder, para. 82.

[142] C-Answer, paras. 234-236.

###### i.    Ordinary meaning of the terms of the ECT, in their context and in light of the treaty's object and purpose (Article 31(1) VCLT)

139.    For Spain, interpreting the ECT according to the rules of interpretation contained in the VCLT leads unequivocally to the conclusion that the ECT's dispute resolution provisions were never intended to apply to intra-EU disputes.

140.    In particular, Spain notes that the ECT is a "mixed agreement", i.e., a treaty to which both the EU and its member states are parties. Article 1(2) of the ECT defines "Contracting Party" as "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force" and Article 1(3) defines "Regional Economic Integration Organization" ("REIO") as

> an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.

141.    For the Respondent, the ECT not only recognizes a REIO as a Contracting Party but also accepts that the REIO is the holder of part of the sovereign competence of its member states including the authority to take decisions binding on them. The fact that both the EU and its member states signed the ECT including its Article 1(3) means that the system of transfer of competences between the EU and its member states became part of the framework of the ECT. It was thus not necessary that the ECT set out explicitly the division of competences between the EU and its member states, as the ECT itself recognizes the supremacy of EU law over the law of the member states within the areas of its competence.[143]

142.    The Respondent further emphasizes the fundamental role played by the EU in the formation of the ECT and cites to a passage in *Electrabel S.A. v. Hungary*[144] and to writings of late Professor Thomas Wälde. The object and purpose of the ECT was to create a new regime under public international law that filled a gap in the protection of investments in the energy sector in the countries of the former Communist bloc and not to change the rules for cross-border investments within the EU.[145]

143.    Furthermore, the Respondent invokes a number of principles of EU law opposing the conclusion that the ECT's dispute resolution provisions apply in intra-EU arbitrations. First, EU law prevents arbitration between EU member states, as confirmed in the

---

[143] Jurisdictional Objections, paras. 142-151.

[144] Jurisdictional Objections, paras. 152-155, quoting *Electrabel S.A. (Belgium) v. Hungary*, ICSID Case No. ARB/07/19, Award, 30 November 2011 ("*Electrabel*") (**Exh. RLA-78**), para. 4.131.

[145] R-Reply, para. 90.

European Court of Justice ("ECJ") *Mox Plant* decision between the United Kingdom and Ireland.[146] Thus, the inter-state dispute settlement provision in Article 27 of the ECT cannot provide the basis for an intra-EU state-to-state arbitration.[147] For reasons of consistency, Article 26 of the ECT must be interpreted in the same fashion. Second, to allow nationals of member states to bring arbitration proceedings against each other rather than seek redress in court would be contrary to the principle of mutual trust in the judicial system of the EU member states.[148]

144.  This is the context, Spain contends, in which Article 26 of the ECT should be interpreted. Article 26(1) of the ECT reads as follows:

> Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

145.  The term "Investor" is defined in Article 1(7) of the ECT as follows:

> (a) with respect to a Contracting Party:
>
> (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;
>
> (ii) a company or other organization organized in accordance with the law applicable in that Contracting Party;
>
> (b) with respect to a "third state", a natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph (a) for a Contracting Party.

146.  The term "Area" is defined by Article 1(10) of the ECT as follows:

> "Area" means with respect to a state that is a Contracting Party:
>
> (a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and
>
> (b) subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.
>
> With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization.

---

[146] Case No. 459/03, *Commission v. Ireland*, Judgement of the ECJ, 30 May 2006 ("*Mox Plant*") (**Exh. RLA-91**).

[147] Jurisdictional Objections, paras. 157-158.

[148] Jurisdictional Objections, paras. 159-160.

147.    Spain submits that, within the internal market, the Areas of each member state are amalgamated into a single Area for the purposes of the ECT.[149] When an investor from an EU member state is involved in a dispute with another EU member state, the dispute relates to an investment in the EU Area. In that case, no diversity is recognized by the ECT, because the investor and the host state are deemed to be from the same Area. Article 1(7)(a) on the definition of "Investor" should be construed so that the investors of an EU member state are investors of both the EU and the relevant EU member states. In this manner, Article 26 on investor-state arbitration would be consistent with Article 27 on state-to-state arbitration, which due to overriding considerations of EU law cannot be construed to include arbitration between EU states.[150]

148.    The Claimants rebut Spain's intra-EU objection with a number of arguments. First, they argue that what matters in treaty interpretation is the intention of the parties as *expressed in the text*.[151] The ordinary meaning of Article 26 of the ECT in its context, taking into account the object and purpose of the treaty, is clear: investors from one Contracting Party may bring arbitration against another Contracting Party concerning a dispute arising out of an investment in the territory of that Contracting Party. The ECT contains no text that deprives investors from certain Contracting Parties of the right to bring claims against certain other Contracting Parties.[152]

149.    The Claimants disagree with what they call Spain's "convoluted interpretation" of the definition of "Area" in Art. 1(10) of the ECT in relation to a REIO. The purpose of this definition is simply to identify the area of a REIO. The clarity provided by this definition ensures that a claim can be brought against a REIO regarding a dispute arising out of an investment made in that defined area. It also ensures that a REIO cannot be sued in respect of an investment made outside that area. It does not deprive certain investors of the right to bring claims against certain Contracting Parties.[153]

150.    The Claimants also insist that resort to supplementary means of interpretation should be limited to cases where the general rule of interpretation leaves the meaning ambiguous or obscure, or leads to a result which is manifestly absurd or

---

[149] Jurisdictional Objections, para. 168.
[150] Jurisdictional Objections, para. 169.
[151] C-Answer, para. 241.
[152] C-Answer, para. 240; C-Rejoinder, para. 73.
[153] C-Rejoinder, para. 75.

unreasonable.[154] Spain has failed to point to ambiguous provisions of the ECT which would justify resort to supplementary means of interpretation under Article 32 of the VCLT. Therefore, recourse to such means is unnecessary and irrelevant.[155]

151.   In any event, the Claimants argue that the ECT was not solely, or even primarily, a European initiative, because Russia, Canada and, most of all, the United States, were each heavily involved in its inception.[156] As such, the supposed importance of EU law to the history of the ECT has no basis in fact. The ECT is a multilateral treaty with 53 signatories, 29 of whom are not members of the EU, including countries that could not be further away geographically (Australia) or culturally (Japan) from Europe.[157]

152.   Furthermore, as a matter of public international law, the simple reference in a multilateral treaty to the existence of a REIO that is a party to that treaty is not sufficient to establish that the treaty does not apply within the regional organization. According to the Claimants, unless there is a disconnection clause (or a declaration of competences), a multilateral treaty cannot be interpreted differently depending on the parties to the dispute.[158]

153.   The Claimants also take issue with the "principles of EU law" invoked by Spain allegedly militating against the application of the ECT in intra-EU disputes. First, the analogy between Article 26 and Article 27 of the ECT is inapposite, as is the reference to *Mox Plant*, which concerns inter-state arbitration and does not prevent investor-state arbitration.[159] Second, arbitral tribunals have dismissed the argument that the principle of mutual trust in the judicial system prevents investor-state arbitration in an intra-EU context.[160]

### ii.     Instruments made by one or more parties in connection with the conclusion of the treaty (Article 31(2)(b) VCLT)

154.   According to Article 31(2)(b) of the VCLT,

[t]he context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

---

[154] C-Answer. para. 244.

[155] C-Answer. paras. 244-246.

[156] C-Answer, paras. 247-251 citing, *inter alia*, to writings by Thomas Wälde.

[157] C-Answer, para. 252.

[158] C-Answer, paras. 263-266.

[159] C-Answer, paras. 270-275.

[160] C-Answer, paras. 276-282.

> […] any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

155. The Respondent points to the 9 March 1998 Statement submitted by the European Communities ("EC") to the Secretariat of the Energy Charter "concerning the policies, practices and conditions with regard to disputes between an investor and a Contracting Parties [sic] and their submission to international arbitration or conciliation" ("EC Statement").[161] The EC Statement contains a declaration that:

> The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.[162]

156. Since the EC Statement contains no reference to intra-EU disputes, so says Spain, the EU and their member states could not have contemplated Article 26 of the ECT applying to intra-EU disputes.[163]

157. Neither does the Council and Commission Decision of 23 September 1997, approving the ECT ("Council and Commission Decision"),[164] make any reference to intra-EU disputes. Again, this silence constitutes evidence that the ECT was not intended to apply to intra-EU disputes.[165]

158. The Claimants, on the other hand, consider that neither the EC Statement nor the Council and Commission Decision support the conclusion that intra-EU disputes are excluded from the scope of the ECT. The EC Statement was made in connection with the fork-in-the-road clause in Article 26(3)(b)(i) and intended to address situations where an investor tried to resubmit the same dispute to international arbitration at a later stage under Article 26. It confirms that a case submitted to the CJEU by an investor of another Contracting Party in application of the forms of action provided by the constituent treaties of the Communities falls within Article 26(2)(a) of the ECT.[166]

---

[161] Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty, 9 March 1998, L69/115 (**Exh. RLA-37**).

[162] EC Statement, third paragraph.

[163] Jurisdictional Objections, paras. 176-179.

[164] 98/181/EC, ECSC, Euratom: Council and Commission Decision of 23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects, Official Journal, 9 March 1998, L69/1 (**Exh. RLA-35**).

[165] Jurisdictional Objections, paras. 180-182.

[166] C-Answer, paras. 284-286.

The Council and Commission Decision is equally unavailing because it is silent about the alleged inapplicability of the ECT in intra-EU disputes.[167]

> ### iii.    Subsequent    agreements    between    the    parties regarding the application of the treaty's provisions (Article 31(3)(a) VCLT)

159.    Spain argues that in interpreting the ECT, the Tribunal should have regard to subsequent agreements between the EU and/or its member states "which cover the same ground as the ECT".[168] It relies on Article 31(3)(a) of the VCLT, which reads as follows:

> There shall be taken into account, together with the context:
>
> (a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions [….].

160.    According to Spain, one subsequent treaty is the Lisbon Treaty which entered into force in 2009 and under which the EU has acquired exclusive competence in respect of "foreign direct investment" (Article 207 TFUE). It would follow that "all that is not foreign direct investment, i.e., investments that take place within the EU internal market by EU investors, do not fall within the scope of the common commercial policy".[169] The same conclusion would be evidenced by the Proposal for a Regulation of the European Parliament and of the Council which provides a framework to deal with the financial responsibility regarding investment disputes arising from investment treaties to which the EU is a party ("EU draft Regulation on financial responsibility"),[170] and by EU Regulation No. 1219/2012 of 12 December 2012 which contains interim provisions in respect of BITs between EU member states and non-EU countries ("EU Regulation No. 1219/2012").[171]

---

[167] C-Answer, paras. 287-288.

[168] Jurisdictional Objections, para. 183.

[169] Jurisdictional Objections, para. 184.

[170] COM (2012) 335 Final, Proposal for a Regulation of the European Parliament and of the Council establishing a framework for managing financial responsibility linked to investor-state dispute settlement tribunals established by international agreements to which the European Union is party, 21 June 2012 (**Exh. RLA-75**). The Tribunal notes that  "Regulation (EU) No. 912/2014 establishing a framework for managing financial responsibility linked to investor-to-state dispute settlement tribunals established by international agreements to which the European Union is party" was adopted on 23 July 2014 and published in the Official Journal of the European Union on 28 August 2014. By that time, the Tribunal had already finalized the Award. Neither Party has requested leave to submit comments on such Regulation, as a result of which it is not discussed in the Award.

[171] Regulation (EU) No. 1219/2012 of the European Parliament and of the Council establishing transitional arrangements for bilateral investment agreements between Member States and third countries, 12 December 2012 (**Exh. RLA-79**).

161.   The Claimants contend that the instruments invoked by Spain under Article 31(3)(a) of the ECT are unavailing because this provision requires that a subsequent agreement be "between the parties" to the original agreement and "regarding the interpretation of the treaty or the application of its provisions". Neither the Lisbon Treaty, nor the 2012 Proposal for a Regulation, nor the EU Regulation No 1219/2012 meet these criteria. None of them is an agreement between all the parties to the ECT, and none of them purports to interpret the ECT. These instruments are *res inter alios acta* for the non-EU Contracting Parties, and thus have no bearing on the ECT, including with respect to the EU member states' *inter se* relationships.[172]

### iv.    Subsequent practice in the application of the treaty (Article 31(3)(b) VCLT)

162.   The VCLT also requires treaty interpreters to take into account, together with the context, "any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation" (Article 31(3)(b) of the VCLT).

163.   Spain submits that, in the event that the Lisbon Treaty and the subsequent EU Regulations previously referred to are not considered as "subsequent agreements between the parties", they should be considered subsequent practice.[173]

164.   In this context, Spain also cites to the European Commission's submissions in *Electrabel* as evidence of the EU's approach to dispute resolution under the ECT. The European Commission argued that in circumstances where the EU is the respondent, an EU claimant could not sue the EU under the ECT. According to the Commission, this flows from the application of the notion of Area as defined in the ECT, which ousts the jurisdiction of an arbitral tribunal under the ECT in respect of intra-EU disputes.[174] Although the tribunal in *Electrabel* dismissed the Commission's reasoning, Spain contends that it did not address the question whether a measure taken by an EU member state without being directed to do so by EU bodies would preclude a tribunal's jurisdiction in respect of an EU investor. Spain has also noted the European Commission's submission in *Eureko (now Achmea) v. Slovak Republic*[175] (the latter being a dispute not under the ECT, but under an intra-EU BIT)

---

[172] C-Answer, paras. 290-291.

[173] Jurisdictional Objections, paras. 187-188; R-Reply, paras. 103-104.

[174] Jurisdictional Objections, para. 189.

[175] *Eureko B.V. v. The Slovak Republic*, UNCITRAL, PCA Case No. 2008-13 ("*Eureko*").

as reinforcing the thesis that in a dispute involving nationals of EU member states, investor-state arbitration is incompatible with EU law.[176]

165.  The Claimants submit that, under Article 31(3)(b) of the VCLT, subsequent practice may be that of one party alone, but the agreement that it establishes needs to be that of all the parties. The Commission's position is simply the Commission's position; it does not represent the position of the EU member states. In any event, the Claimants note that the Commission's position with respect to the fate of both intra-EU BITs and the applicability of mixed agreements in the member states' *inter se* relationship does not reflect the view of the majority of its member states.[177]

166.  The Claimants further stress that the Commission in *Electrabel* did not object to the tribunal's jurisdiction over the claims which were not based on measures taken by Hungary with reference to EU law or a Commission decision. Thus, the practice of the Commission supports the Claimants' position regarding the unrestricted application of the ECT in this case, which includes no allegations that the measures complained of were taken to comply with EU law.[178]

### v.    The preparatory work of the treaty as a supplementary means of interpretation (Article 32 VCLT)

167.  Article 32 of the VCLT permits the Tribunal to consider the *travaux préparatoires* of the treaty *inter alia* in order to confirm the meaning resulting from the application of Article 31. Spain invokes drafts of the ECT. While in the final text the term "competence" is only contained in the definition of REIO and not in that of Area, the *travaux* nonetheless evince that the notions of "competences" and "Area" (referred to as "Territory" at a previous drafting stage) are linked and thus "support the contention that the term 'Area' was the way in which the notion of internal market is channelled into the language of the ECT".[179]

168.  The Claimants argue that Spain's reliance on the *travaux* is misplaced. In any event, the preparatory works submitted by Spain are anything but clear. There is little to gain from the observation that the term competences at one point appeared in what would

---

[176] R-Reply, paras. 105-106.

[177] C-Answer, paras. 295-297, esp. 297 ("For example, the Commission's "*invitation*" that Member States terminate their intra-EU BITs has been largely ignored").

[178] C-Answer, para. 299.

[179] Jurisdictional Objections, paras. 193-203, esp. 203.

become the definition of Area, and was then introduced in the definition of REIO. The conclusions that Spain derives from those preparatory works are thus unavailing.[180]

### vi.    The need for a "disconnection clause" in the ECT

169.    The Parties disagree as to the consequences to be drawn from the fact that the ECT does not contain a "disconnection clause". Disconnection clauses ensure that between parties to a multilateral treaty which are also parties to a regional organization, the rules of the regional organization prevail over the treaty.

170.    According to the Claimants, there is no disconnection clause or declaration of competences in the ECT (or in any later instrument) allowing the Tribunal to disregard the ECT in an intra-EU dispute. The Claimants contend that disconnection clauses have been widely used by the EU, including at the time when the ECT was negotiated.[181] In the absence of such a clause, the ECT also applies to intra-EU disputes.[182] Nor does the ECT contain any declaration regarding the precise allocation of internal competences between the EU and its member states.[183]

171.    For the Respondent, on the contrary, it would have been unnecessary to insert a disconnection clause into the ECT in favor of the preferential application of EU law between member states. Such disconnection clause would have been "superfluous" as the constitutive instruments of the EU exclude the application of the ECT among EU member states[184] and such intention would result from the EC Statement and the Council and Commission Decision referenced above.[185] Furthermore, the question of the allocation of competences between the EU and its member states is determined under EU law.[186]

### vii.    Are the substantive protections of the ECT and EU law in conflict?

172.    Finally, Spain contends that it does not seek to set up a conflict between the ECT and EU law which it then asks the Tribunal to resolve by assigning supremacy of one over the other. The ECT and EU law must be reconciled as it is not possible to imagine

---

[180] C-Answer, paras. 300-306.
[181] C-Answer, para. 254.
[182] C-Answer, paras. 258-259.
[183] C-Answer, para. 263.
[184] R-Reply, para. 119.
[185] R-Reply, para. 122.
[186] R-Reply, para. 123.

that the EU and its member states intended to derogate from fundamental principles of EU law when entering into the ECT.[187]

173.    The Claimants on their part do not consider that there is a conflict between the provisions of the ECT and EU law whether with respect to procedural provisions or substantive provisions. However, if the ECT was considered to overlap with EU law, then Article 16 of the ECT would apply. Article 16 provides that, if a Contracting Party to the ECT has entered into an agreement prior to the ECT concerning the same subject matter, the provisions of the prior agreement cannot derogate from the provisions of the ECT where a provision of the ECT is more favorable to the investor. For the Claimants, Article 26 of the ECT is more favorable to them than the provisions of the EC Treaty.[188] With regard to possible conflicts between the substantive provisions of the ECT and EU law, these could only affect the merits of the Claimants' claim, not the jurisdiction of the Tribunal.[189]

### b.  Analysis

#### i.    Interpretation of the treaty, its terms, and their ordinary meaning in context

174.    According to the Respondent, the Tribunal lacks jurisdiction because this dispute is entirely intra-EU, i.e., the Claimants are all EU nationals, the Respondent is an EU member state, and the investments have been carried out in the territory of the EU. The Respondent contends that it has not consented to such intra-EU disputes being resolved by means of international arbitration within the framework of the ECT.

175.    The main question before the Tribunal is thus whether the ECT framework allows the present intra-EU dispute to be heard by the Tribunal. The starting point for the jurisdictional analysis is, once more, Article 26 of the ECT, which sets out the parameters of the Tribunal's jurisdiction.[190]

---

[187] Jurisdictional Objections, para. 204. See also the remarks made at the Hearing by Spain: Hearing Tr. [English version] (Leathley), at 152: 1-4 ("I'd like to answer the President's question, which is: is there any incompatibility between EU law and the ECT? In this respect we believe there is no incompatibility").

[188] C-Rejoinder, paras. 95-96. For the Respondent, on the contrary, "Article 16 of the ECT, to which the Claimants refer, is irrelevant for the simple reason that, similar to the other ECT rules, it was not designed to be applied to Member States in their relations within the internal market" (R-Reply, para. 64, internal footnote omitted).

[189] C-Answer, paras. 307-310.

[190] See also Hearing Tr. [English version] (Leathley), at 17: 8-9 ("Article 26(1) is the jurisdictional entry point to the investor-state dispute resolution mechanism in the ECT").

176.    The Tribunal has already recalled the rules that apply to treaty interpretation.[191] For the purposes of this objection, it need only be added that the primacy of the text of the Treaty viewed in its context, and bearing in mind the Treaty's object and purpose (Article 31 of the VCLT), implies that recourse to supplementary means (including both the *travaux préparatoires* and the circumstances of the Treaty's conclusion) is only allowed in limited circumstances. Pursuant to Article 32, one may resort to supplementary means of interpretation (i) to confirm the meaning resulting from the application of Article 31, or (ii) to determine the meaning when the interpretation according to Article 31 "leaves the meaning ambiguous or obscure", or (iii) "leads to a result which is manifestly absurd or unreasonable".

177.    The Tribunal begins with elucidating the ordinary meaning of the terms of Article 26, in their context and in light of the Treaty's object and purpose. The Tribunal's jurisdiction is limited to "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter *in the Area of the former*" (emphasis added). The Respondent points to the fact that the Treaty's dispute settlement clause requires a diversity of areas between the territory from which the investor originates and the territory of the Respondent party to the dispute. Because "Area" is defined with respect to a REIO (in this case, the EU) as "the Areas of the member states of such Organization", and because, in Spain's view, the investors and Spain are from the same Area (the EU Area), the diversity of Area requirement is not met.

178.    The Tribunal is unable to follow this view. While it is true that the second sentence of Article 1(10) of the ECT defines Area *with respect to a REIO* as "the Areas of the member states of such Organization", the first sentence of Article 1(10) of the ECT defines Area *with respect to a state that is a Contracting Party* as the territory under the state's sovereignty. In the Tribunal's view, the two components of the definition must be clearly distinguished and correctly related to the notion of Area that is referred to in Article 26.

179.    The phrase "in the Area of the former [Contracting Party]" in Article 26(1) of the ECT refers to the particular dispute initiated by the investor. If the investor commences arbitration against a member state of the EU (rather than against the EU itself), then "Area" means "with respect to a state that is a Contracting Party" the territory of that particular member state, in accordance with the first sentence of Article 1(10). In other words, the relevant area is that of the Contracting Party *that is party to the dispute*. In

---

[191] See *supra*, paras. 95-96.

this case, the relevant Area is the territory of Spain (not of the EU), and thus the diversity of area requirement is complied with where the investors are of a Contracting Party other than Spain and the investment has been carried out in the territory of Spain.

180.  The situation may be different where the EU itself is a Respondent. In that case, "with respect to a [REIO]" (Article 1(10), second sentence), the relevant Area would be the entire EU Area and the diversity of area requirement would have to be satisfied with respect to that territory. This is, however, not the scenario before the Tribunal.

181.  The Tribunal further notes that there is no indication in the text of the Treaty that the Contracting Parties have limited their consent to arbitration on the basis that some of the Contracting Parties belong to the same REIO. In this respect, the consent of EU member states (as of all ECT Contracting Parties) is "unconditional" and subject only to two clearly defined exceptions set forth in Article 26(3) of the Treaty, neither of which is relevant for the present purposes.[192]

182.  In this context, the Tribunal notes that the ECT contains no disconnection clause in respect of intra-EU disputes. When discussing disconnection clauses in multilateral treaties to which EU member states (and in some cases, also the EU) are parties, the International Law Commission stated in its Report on Fragmentation that "[t]he purpose of the [disconnection] clause is, according to the European Commission, to ensure the continuing application of Community rules between EC member States without any intent to affect the obligations between member States and other parties to treaties".[193] By the time the ECT was concluded, the EU and its member states already had prior experience of disconnection clauses inserted in treaties to which they were parties. For example, the 1988 Council of Europe / OECD Convention on Mutual Administrative Assistance in Tax Matters provides that:

> Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.[194]

---

[192] The first of these two exceptions (Article 26(3)(b)) is relevant for the sixth jurisdictional objection, on which see *infra*, Section IV.C.5.

[193] *Fragmentation of International Law: difficulties arising from the diversification and expansion of international law*, Report of the Study Group of the International Law Commission, finalised by Martti Koskenniemi, International Law Commission, fifty-eighth session, Geneva, 1 May-9 June and 3 July-11 August 2006, U.N. Doc. A/CN.4/L.682, 13 April 2006 (**Exh. CLA-72**), para. 289.

[194] 1988 Council of Europe/OECD Convention on Mutual Administrative Assistance in Tax Matters, Article 27, quoted in *Fragmentation of International Law: difficulties arising from the diversification and expansion of international law*, Report of the Study Group of the International Law Commission, finalised by M. Koskenniemi, International Law Commission, fifty-eighth session,

183.   No similar clause is contained in the ECT. To the contrary, the ECT shows that where the Contracting Parties deemed it necessary to address the relationship with other treaty regimes, they did so expressly. One example is contained in Annex 2 to the Final Act of the European Energy Charter Conference which provides that in the event of a conflict between the Svalbard Treaty and the ECT, the former shall prevail.[195] It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute settlement system did not apply in all of the EU member states' relations. Compared to the Svalbard Treaty exception, an exception with regard to the intra-EU relations would be of much greater significance. It would be extraordinary that an essential component of the Treaty, such as investor-state arbitration, would not apply among a significant number of Contracting Parties without the Treaty drafters addressing this exception. In the Tribunal's view, it is irreconcilable with the ordinary meaning of the Treaty to read into it an implicit intra-EU disconnection clause.

184.   Furthermore, the EU itself, as a Contracting Party to the Treaty, has accepted the possibility of investor-state arbitration, without any distinction or reservation. In this respect, the Tribunal is unable to see how the Council and Commission Decision or the EC Statement could be read as evincing an intention that the ECT or its investor-state dispute settlement mechanism do not apply in the relations among EU member states. The Council and Commission Decision approving the ECT on behalf of the then European Communities is silent about any special rule applicable in the intra-EU context. The EC Statement, on its part, was submitted by the then European Communities to the ECT Secretariat "pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty", as the title of the EC Statement makes clear. It thus relates to the possibility for a Contracting Party to provide a "statement of its policies, practices and conditions" in respect of the application of the fork-in-the-road clause. The EC Statement also provides for a procedure to determine who, among the EU or its member states, should be the respondent to a particular dispute. It clarifies that there may be instances in which both the EU and one or more member states may be respondents in investment arbitrations initiated pursuant to the ECT. The EC

Geneva, 1 May-9 June and 3 July-11 August 2006, U.N. Doc. A/CN.4/L.682, 13 April 2006 (**Exh. CLA-72**), para. 289.

[195] *Annex 2 to the Final Act of the European Energy Charter Conference*, in The Energy Charter Secretariat, *The Energy Charter Treaty and Related Documents* (2004) (**Exh. CLA-18**), p. 135 ("In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty").

Statement, however, in no way lends itself to an interpretation whereby intra-EU disputes would be carved out from the ECT dispute settlement framework.

185.    The Tribunal is further unconvinced by the Respondent's argument about the harmonious reading of the investor-state and state-to-state arbitration provisions in the Treaty. Spain invokes *Mox Plant* for the proposition that no intra-EU dispute between EU member states can be resolved by an *ad hoc* tribunal under Article 27. For Spain, such a dispute must be left to the CJEU, which has exclusive jurisdiction under Article 344 of the TFEU.[196] The investor-state provision in Article 26 should then be understood in conformity with this interpretation of Article 27.

186.    Article 344 of the TFEU (ex Article 292 of the EC Treaty) provides as follows:

> Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.[197]

187.    In *Mox Plant,* the ECJ held the following:

> an international agreement such as the [United Nations Convention on the Law of the Sea] cannot affect the exclusive jurisdiction of the [CJEU] in regard to the resolution of disputes between Member States concerning the interpretation and application of Community law.[198]

188.    As a first matter, in the Tribunal's view, it is doubtful whether Article 344 TFEU, as interpreted by the ECJ in *Mox Plant*, would bar an inter-state arbitration between EU member states under all circumstances. At least for questions falling within the scope of the ECT that do not concern "the interpretation and application of [EU] law",[199] there may still be room for the Treaty's inter-state dispute settlement clause. This first observation would be sufficient to dismiss the Respondent's reasoning based on the allegedly harmonious reading of the state-to-state and investor-state clauses as a consequence of *Mox Plant*.

189.    In any event, whatever the implications of Article 344 TFEU and of the *Mox Plant* ruling might be for inter-state arbitration under Article 27 of the ECT, that TFEU provision and that ECJ ruling are not applicable to disputes under Article 26. Upon a plain reading of Article 344 TFEU, it is clear that such provision applies only to disputes involving two or more EU member states but does not prohibit the

---

[196] Hearing Tr. [English version] (Leathley), at 21: 21-25; 22: 1-7 (referring to Article 292 of the EC Treaty (now Article 344 of the TFEU)).

[197] Consolidated Version of the Treaty on the Functioning of the European Union (**Exh. RLA-63**), Art. 344.

[198] *Mox Plant*, para. 132.

[199] *Mox Plant*, para. 132.

submission of disputes between other actors to a different method of settlement not contemplated in the EU Treaties. Because there is no provision in the EU Treaties dealing with investor-state arbitration, the principle set out in Article 344 TFEU is not applicable to that mechanism.[200] Thus, whatever interpretation of Article 27 of the ECT results from *Mox Plant*, it cannot affect the operation of Article 26 of the ECT.

190.    The Respondent also argues that in an intra-EU context, "it would be incompatible with EU law to implement an 'investor-State' arbitration mechanism for its resolution".[201] Spain contends that if intra-EU investor-state arbitration were allowed, "the uniform application of EU law would be jeopardised", because arbitral tribunals do not have the possibility to seek a preliminary ruling on the interpretation of EU law from the CJEU.[202]

191.    The Tribunal disagrees with these arguments. It is clear that the EU Treaties do not provide for an absolute monopoly of the CJEU over the interpretation and application of EU law.[203] There are numerous instances where EU law is applied outside of the judicial framework of the EU. A non-EU court may, for instance, have to apply EU law, when the law of an EU member state applies under the relevant conflict of law rule, without the possibility to seek a preliminary ruling from the CJEU. The same applies in commercial arbitrations between private parties. Furthermore, Spain does not deny

---

[200] The Tribunal finds support for this finding in previous arbitral rulings, in particular in: *Electrabel*, para. 4.151 ("as regards an international or national arbitration tribunal in a dispute not involving two or more EU Member States as parties, there is no provision equivalent to Article 292 EC [Treaty] (now Article 344 TFEU) dealing with arbitration between two or more private parties, nationals of Member States, or with mixed disputes settlement mechanisms such as investor-state arbitration between individuals, nationals of EU Member States and an EU Member State under the ICSID Convention or other international instruments. Article 292 EC [Treaty] is not applicable to these arbitration tribunals"); *Eureko*, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 (**Exh. RLA-69**) ("*Eureko* Award"), para. 276 ("Reference was made to the ruling of the ECJ in the *MOX Plant* case, that by virtue of Article 344 TFEU (ex Article 292 TEC) and the principle of loyalty the ECJ had exclusive jurisdiction over disputes between two Member States. Whatever the implications of that ruling might be for Article 10 of the BIT, which is concerned with disputes between the BIT Contracting Parties, the ruling is not applicable to disputes under Article 8, which are not disputes between Contracting Parties but investor-State disputes. There is no suggestion here that every dispute that arises between a Member State and an individual must be put before the ECJ; nor would the ECJ have the jurisdiction (let alone the capacity) to decide all such cases"). The Frankfurt Higher Regional Court also came to the same conclusion. See *Slovak Republic v. Eureko B.V.*, Higher Regional Court of Frankfurt am Main, Judgment, 10 May 2012, (**Exh. CLA-46** [English translation]) ("*Eureko* Oberlandesgericht"), paras. 80, 90 ("The prevailing view in scholarly commentary and literature interprets this to mean that Art. 344 TFEU only covers disputes between the Member States […], for which reason the underlying set-up in this case (investor-state level) is already not covered in principle by Art. 344 TFEU." "The judicature of the ECJ does not contain any indications […] that Art. 344 TFEU applies directly to disputes between a Member State and an investor of another Member State or that the general competence of investment arbitral tribunals is in doubt").

[201] R-Reply, para. 106.

[202] R-Reply, para. 109.

[203] See *Electrabel*, para. 4.147; *Eureko* Award, para. 282.

that investor-state arbitration under the ECT would at least be possible between an EU member state and a non-EU investor. However, even in the latter case a question of EU law could arise which could potentially escape an interpretation by the CJEU. It follows that there is no incompatibility between investor-state arbitration under Article 26 of the ECT and the role of the CJEU in interpreting and applying EU law.[204] Also the principle of mutual trust in the court system of the EU member states is unable to override the investor-state mechanism explicitly agreed to by the EU member states and the EU itself. The principle of mutual trust does not prohibit private parties, wishing to settle their disputes outside of the court system, from choosing arbitration. There is no reason for holding otherwise when one disputing party is a state. The same argument has been previously rejected by arbitral tribunals and domestic courts dealing with similar objections.[205]

### ii.    Subsequent agreements and subsequent practice

192.    The Tribunal turns now to the arguments made by the Respondent by reference to other instruments under Article 31(3)(a) or Article 31(3)(b) of the VCLT. These provisions allow the interpreter to take account of "any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions" (a) and "any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation" (b).

193.    The subsequent agreement referred to in Article 31(3)(a) of the VCLT must "regard" the interpretation of the treaty under examination. Through such agreement, the parties must have purported to clarify the meaning of the treaty.[206] Furthermore, the subsequent agreement must be made between "the parties", that is between all the parties to the treaty.[207]

---

[204] See also *Electrabel*, para. 4.146.

[205] *Eastern Sugar v. The Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007 ("*Eastern Sugar*") (**Exh. RLA-55**), para. 171; *Eureko* Oberlandesgericht, paras. 117-124 (holding that the principle of mutual trust is not violated because arbitration is a widely recognized mechanism for dispute resolution and therefore implies no disrespect for state courts).

[206] See Georg Nolte, *First report on subsequent agreements and subsequent practice in relation to treaty interpretation*, International Law Commission, Sixty-fifth session, 6 May-7 June and 8 July-9 August 2013, U.N. Doc. A/CN.4/660, para. 76.

[207] Georg Nolte, *First report on subsequent agreements and subsequent practice in relation to treaty interpretation*, International Law Commission, Sixty-fifth session, 6 May-7 June and 8 July-9 August 2013, U.N. Doc. A/CN.4/660, para. 79. See also recently, in relation to both Article 31(3)(a) and (b) of the VCLT, International Court of Justice, *Whaling in the Antarctic* (Australia v. Japan: New Zealand intervening), Judgment, 31 March 2014, para. 83: "many IWC resolutions were adopted *without the support of all States parties to the Convention* and, in particular, without the concurrence of Japan. Thus, such instruments cannot be regarded as subsequent agreement to an interpretation of Article VIII, nor as subsequent practice establishing an agreement of the parties

194. Similarly, according to Article 31(3)(b) of the VCLT, the practice of the parties is only relevant if it occurs "in the application" of the treaty. In addition, while not every party must have individually engaged in the relevant practice, Article 31(3)(b) requires the practice "to establish the agreement of the parties", again meaning all the parties.[208] If only some parties participated in the practice, all of them must have at least acquiesced in the respective interpretation of the treaty.[209]

195. For the purposes of the interpretation of the ECT, it is clear that none of the instruments invoked by the Respondent qualifies as subsequent agreement (Article 31(3)(a) of the VCLT) or subsequent practice (Article 31(3)(b) of the VCLT).

196. First, the Lisbon Treaty cannot be considered as a relevant instrument under Article 31(3)(a) of the VCLT, as it is plainly not an agreement regarding the interpretation of the ECT or the application of its provisions. Likewise, it cannot serve as subsequent practice under Article 31(3)(b) of the VCLT: it is no practice "in the application" of the ECT, nor does it establish the consent of all of the ECT contracting states regarding the ECT's interpretation.

197. The EU draft Regulation on financial responsibility and EU Regulation No. 1219/2012 are equally unavailing when it comes to the interpretation of the ECT. Neither qualifies as a subsequent agreement or subsequent practice under the VCLT. The first instrument is a proposal for a Regulation which addresses the financial

---

regarding the interpretation of the treaty within the meaning of subparagraphs (a) and (b), respectively, of paragraph (3) of Article 31 of the Vienna Convention on the Law of Treaties" (emphasis added).

[208] See the commentary of the International Law Commission ("ILC") to Draft Art. 27(3)(b), which later became Art. 31(3)(b) of the VCLT:

> The text provisionally adopted in 1964 spoke of a practice which 'establishes the understanding of all the parties'. By omitting the word 'all' the Commission did not intend to change the rule. It considered that the phrase 'the understanding of the parties' necessarily means 'the parties as a whole'. It omitted the word 'all' merely to avoid any possible misconception that every party must individually have engaged in the practice where it suffices that it should have accepted the practice.

*Draft Articles on the Law of Treaties with commentaries*, International Law Commission, *Yearbook of the International Law Commission*, 1966, vol. II, *sub* Art. 27, p. 222, para. 15.

[209] See *Draft Articles on the Law of Treaties with commentaries*, International Law Commission, *Yearbook of the International Law Commission*, 1966, vol. II, *sub* Art. 27, p. 222, para. 15. See also Oliver Dörr, Kirsten Schmalenbach, *Vienna Convention on the Law of Treaties. A Commentary* (Springer, 2012), p. 559, para. 86 ("if not every party has participated in the practice, there must be at least good evidence that the other, inactive parties have endorsed it"); Georg Nolte, *Subsequent Agreements and Subsequent Practice of States Outside of Judicial or Quasi-judicial Proceedings. Third Report for the ILC Study Group on Treaties over Time*, in *Treaties and Subsequent Practice* (ed. Georg Nolte, 2013, Oxford University Press), p. 310 ("[Article 31(3)(b) does not require that the practice must originate from all parties, but rather that all parties must have at least acquiesced in the respective interpretation of the treaty").

consequences arising from investor-state disputes and sets out the "central organising principle" that "financial responsibility flowing from investor-state dispute settlement cases should be attributed to the actor [EU or member state] which afforded the treatment in dispute".[210] The proposal also determines who amongst the EU and its member states must act as respondent in investment disputes. While the ECT is mentioned once in the preamble,[211] the draft Regulation is not sufficiently related to the interpretation or application of the ECT to be taken into account under Article 31(3)(a) or (b). The second instrument, EU Regulation No. 1219/2012, confirms the validity of existing extra-EU BITs until the EU decides to replace them.[212] It never refers to the ECT or to multilateral investment agreements more generally.[213] On its face, it is thus not related to the interpretation or the application of the ECT. In addition, both EU draft Regulation on financial responsibility and EU Regulation No. 1219/2012 fail to meet the requirement involving all the parties to the treaty under interpretation, as does the Lisbon Treaty.

198.   The Respondent has further relied on the European Commission's position on intra-EU investment treaties,[214] and especially on the European Commission's *amicus* brief in *Electrabel*, a dispute under the ECT. The Commission's position in that case, howsoever important, cannot constitute subsequent practice evidencing an agreement of all the Contracting Parties on the interpretation of the ECT. As an organ of the EU, the Commission may represent the position of the EU, which is only one of the Parties to the ECT. It also bears noting that, while the Commission objected to the jurisdiction of the *Electrabel* tribunal in respect of certain claims (those which, in the Commission's words, "the Respondent 'brought about in compliance with' the Commission's Final Decision of 4 June 2008"[215]), it took no issue with the tribunal's jurisdiction over claims based on measures taken by Hungary without reference to EU law or a Commission decision.[216] That submission is thus ultimately of no help to the Respondent in the present circumstances, as this case, as pleaded by the Claimants,

---

[210] EU draft Regulation on financial responsibility, Explanatory Memorandum, p. 2.

[211] See EU draft Regulation on financial responsibility, Whereas No. 1. See also the accompanying Explanatory Memorandum, p. 2.

[212] See Regulation No. 1219/2012, Art. 3.

[213] Regulation No. 1219/2012 always refers to "bilateral" investment agreements (and makes no mention to multilateral investment agreements). It also provides that "[i]nvestment agreements between Member States should not be covered by this Regulation", *ibid.*, Whereas no. 15.

[214] The Tribunal notes that the European Commission has not sought leave to submit an *amicus curiae* brief in this case, and neither Party has requested the Tribunal to invite such submission from the Commission.

[215] *Electrabel*, para. 5.9.

[216] *Electrabel*, paras. 5.10-5.11.

concerns domestic measures adopted by Spain in the energy sector. The Claimants have argued that Spain is not suggesting that it bears no responsibility for its actions because it was directed to take those actions by the EU,[217] and the Respondent has not contradicted the Claimants on this point.

199.    The Respondent has also invoked the Commission's *amicus* brief in *Eureko.* This was not a dispute under the ECT, but under the Netherlands-Slovak Republic BIT. It is difficult to see how a position on the Netherlands-Slovak Republic BIT could establish a practice in the interpretation of the ECT. Such position cannot qualify as practice "in the application" of the ECT. What is more, the views expressed by the European Commission are not shared by the majority of EU member states, who in fact have expressed different views on this matter. Suffice it to cite the stance taken by the Dutch Government in the same *Eureko* case, in which the Dutch Government, taking a diametrically opposed position as the one held by the Commission, supported the jurisdiction of the tribunal.[218] If anything, there would rather appear to be divergent practices, which by definition cannot reflect an agreement between the parties on the interpretation of a treaty.

### iii.    Supplementary means of interpretation

200.    Lastly, the Tribunal addresses arguments raised by Spain which may be viewed as relating to supplementary means of interpretation under Article 32 of the VCLT. In support of its intra-EU objection, the Respondent has relied on the allegedly pivotal role of the EU in conceiving and negotiating the ECT. While the Tribunal has no difficulty in noting that the EU played an important role in achieving the conclusion of the ECT, this observation cannot change the interpretive result to which the Tribunal has arrived by resorting to the general rule of interpretation laid down in Article 31 of the VCLT.

201.    The same is true of the Respondent's argument that "there have never been any BITs between EU Member States"[219] and that "[a]ll intra-EU BITs are the result of circumstances of accession by former Eastern Bloc countries to the EU"[220]. The Tribunal cannot see how this argument could assist in the interpretation of the ECT. The very existence of the ECT somehow defeats this argument, because the ECT is

---

[217] C-Answer, para. 231; Hearing Tr. [English version] (Sullivan), pp. 96-97.

[218] *Eureko* Award, paras. 154-166, esp. 161.

[219] R-Reply, para. 101. See also Hearing Tr. [English version] (Leathley), at 36-37 (referring to a "chart" on BITs concluded by "old" EU member states).

[220] R-Reply, p. 32, fn. 88.

precisely a treaty to which "old" EU member states were parties from the beginning, and prior to the EU accession waves.

202.    Finally, the Tribunal notes that the *travaux préparatoires* submitted by the Respondent in support of its objection cannot change the meaning at which the Tribunal has arrived by applying the general rules of interpretation. Nothing can in fact be drawn from the term "competences" appearing at one point in what would become the definition of "Area", and being introduced in the definition of "REIO" at a later stage of the negotiations. The Tribunal finds these elements of the *travaux* unclear and inconclusive.

### iv.    Conclusion

203.    The Tribunal thus concludes that intra-EU disputes are not excluded from the jurisdiction of an arbitral tribunal constituted under Article 26 of the ECT.

204.    The Tribunal has reached this conclusion by way of an independent analysis on the basis of the Treaty and the Parties' arguments. Having done so, it finds support for its conclusions in earlier decisions. It is true that the particular facets of the intra-EU objections in these earlier cases were not identical to the ones presented here. For example, some of the earlier intra-EU cases involved arguments of inapplicability or termination of the investment treaty under Articles 30 or 59 of the VCLT, which the Respondent did not advance in this case. Irrespective of these differences, the common conclusion reached by all the arbitral tribunals and courts having considered intra-EU objections, without exception, has been that EU law does not preclude jurisdiction of an arbitral tribunal where an investor of an EU member state brings an investment treaty claim against another EU member state.[221]

205.    As the Tribunal has explained above, the same conclusion applies in respect of the ECT, which is also an intra-EU treaty from the standpoint of the 27 EU member states in their relations *inter se*. In addition, the Tribunal fails to see why the outcome should be different because in this case "all old" EU member states are involved, as opposed to cases brought under BITs between an "old" member state and a state having acceded to the EU at a later stage. The analysis of the jurisdiction of the Tribunal in an intra-EU dispute is the same whether it involves an old or new EU member state. States that were already members of the EU were aware of the obligations arising from their membership when they decided to enter into a treaty providing for a binding

---

[221] See, in chronological order, *Eastern Sugar*; *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010 (**Exh. RLA-74**); *Eureko* Award; *Eureko* Oberlandesgericht; and *Electrabel*.

investor-state arbitration mechanism such as the ECT. The logic of the argument that investor-state arbitration is not an available remedy in their intra-EU relations is thus difficult to understand.

206.    The Tribunal finally takes note that neither Party has claimed that there is a conflict between the substantive provisions of the ECT and EU law.[222] In any event, such a conflict would only affect the merits, not the jurisdiction of the Tribunal.

207.    For the foregoing reasons, the Respondent's intra-EU objection is rejected.

## 3.    Fourth objection: the Claimants have failed to make a *prima facie* showing that they have suffered financial harm

### a.    The Respondent's position

208.    Spain contends that the Tribunal also lacks jurisdiction because the Claimants have failed to make a *prima facie* showing that there is a dispute and "an alleged breach of an obligation […] under Part III" of the ECT.[223]

209.    The dispute resolution provision of Article 26(1) of the ECT refers to "[d]isputes between a Contracting Party and an Investor […] which concern an alleged breach of an obligation of the former under Part III […]". According to Spain, at the jurisdictional stage, a tribunal must be satisfied that the facts relied upon by the Claimants – when tested on a *prima facie* basis – could amount to a breach of a treaty obligation.[224] Spain also contends that a *prima facie* showing of a breach of the fair and equitable treatment standard under Article 10(1) of the ECT requires a showing of financial harm,[225] as the sole metric for the evaluation of any "treatment" and legitimate expectations is financial. To establish jurisdiction, the Claimants must thus demonstrate that a particular piece of legislation has caused them a loss.[226] Even if all the facts pleaded in the Statement of Claim were established, Spain argues, no loss would be proven and no breach of either FET or legitimate expectations would be established.[227]

210.    The Respondent further argues that the need to make reference to financial harm in determining state responsibility for an internationally wrongful act depends on the

---

[222] See *supra*, paras. 172-173.

[223] Jurisdictional Objections, para. 213.

[224] Jurisdictional Objections, para. 216.

[225] Jurisdictional Objections, para. 227.

[226] Jurisdictional Objections, para. 232, citing to *CMS v. Argentina*, ICSID Case No. ARB/01/8, Decision on Jurisdiction, 17 July 2003 (**Exh. RLA-44**), paras. 33-35.

[227] Jurisdictional Objections, para. 239.

content and interpretation of the obligation allegedly breached. Spain cites to the Commentary to Article 2 of the ILC Draft Articles on State Responsibility for Internationally Wrongful Acts (2001) (the "ILC Articles") for the proposition that it is unclear whether the two elements of breach of obligation and causation are sufficient to assess whether an internationally wrongful act has been committed. With reference to such Commentary, the Respondent contends that the need for harm as an additional element cannot be analyzed in the abstract as it depends on the content of the obligation at stake.[228] For Spain, the FET standard includes the element of harm.[229]

211.    Spain further submits that the fact that the claims are aimed at restitution as well as compensation does not change the fact that both remedies are rooted in the existence of harm.[230]

212.    Because the Claimants base their allegations of breach of the FET standard primarily on the financial harm suffered, Spain posits that they should have stated the amount of their loss.[231] While it is true that at the first procedural hearing, the Tribunal ordered that proceedings be bifurcated between liability and quantum, the Presiding Arbitrator noted Spain's concern as to the need to quantify losses and allegedly stated that when presenting their Statement of Claim, the Claimants "must show reference to the numbers".[232]

213.    According to Spain, none of the documents submitted by the Claimants to date contain even a mere indication of the amount of damage allegedly caused.[233] The figures referring to the reductions in electricity production contained in the Statement of Claim do not meet the *prima facie* test, as they do not convey the degree of harm the Claimants would have suffered.[234] The witness statements provided by the Claimants only reflect percentages of reductions in energy generation, but give no estimate of the reduction in profits.[235] Similarly, the expert report submitted by the Claimants offers no valuation of damage.[236]

---

[228] R-Reply, para. 146.
[229] R-Reply, paras. 148, 155.
[230] R-Reply, paras. 151-152.
[231] R-Reply, paras. 132-140.
[232] Jurisdictional Objections, para. 245; R-Reply, para. 140.
[233] R-Reply, para. 182.
[234] R-Reply, paras. 185-190.
[235] R-Reply, paras. 191-192.
[236] R-Reply, paras. 193-199.

214.    Spain cites to *Telenor v. Hungary* as a relevant precedent. In that case, the tribunal declared that it had no jurisdiction over a claim of expropriation where the claimant had failed to show the impact of the alleged expropriatory act.[237] Spain concludes that in the absence of any allegation or evidence of loss, the dispute is hypothetical: "If there is no loss, there is no dispute".[238]

215.    Finally, the Respondent contends that the failure to specify the harm caused represents a breach of the procedural obligations to "set forth all the allegations of facts and law and legal arguments on which they intend to rely"[239] and to "submit their allegations of facts and law in a detailed, specified and comprehensive manner".[240] The Respondent also relies on Article 17(1) of the UNCITRAL Rules which obliges the Tribunal to conduct the proceedings "so as to avoid unnecessary delay and expense", which according to Spain is intended to confer upon arbitral tribunals the flexibility required to deal with "unfounded" or "frivolous" cases.[241]

### b. The Claimants' position

216.    The Claimants submit that this objection is entirely without merit for several reasons. First, this objection should be considered against the backdrop of the present stage of the arbitration, in which the Tribunal has bifurcated the proceedings on liability and quantum. For the Claimants, the very purpose of bifurcating liability and quantum is to avoid lengthy submissions on quantum in the event that there is no liability. The Claimants should thus not be required to prove their loss, unless and until the Tribunal holds that Spain is liable.[242]

217.    Second, nothing in the ECT requires that, for this Tribunal to have jurisdiction, "the Claimants were required to allege that they have suffered financial harm".[243] Citing to *Plama v. Bulgaria*[244] and the test proposed by Judge Higgins in *Oil Platforms*,[245] the Claimants agree with the Respondent that "in order to invoke the ECT's dispute resolution provision, the investor must show 'an alleged breach of an obligation'", and

---

[237] Jurisdiction Objections, para. 240.

[238] Jurisdictional Objections, para. 250.

[239] PO1, para. 9.

[240] Procedural Rules, para. 3.3.

[241] R-Reply, para. 209.

[242] C-Answer, para. 314.

[243] C-Answer, para. 317.

[244] *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 ("*Plama*") (**Exh. RLA-47**).

[245] *Oil Platforms* (Islamic Republic of Iran v. United States of America), Preliminary Objection, Judgment, ICJ Report 1996, pp. 847-861, Separate Opinion of Judge Higgins ("*Oil Platforms* - Judge Higgins' Opinion") (**Exh. RLA-98**).

that "a tribunal...must be satisfied that the facts relied upon by the Claimants when tested on a *prima facie* basis could amount to a breach of an obligation".[246] Yet, "the demonstration of a breach of a treaty obligation does not also require the demonstration of the resulting damages".[247]

218.    Third, there is no requirement in the ECT or under general international law that a state must cause financial harm in order to breach the FET obligation. As a matter of general international law, according to the Claimants, breach of an international obligation, causation, and damages are distinct issues.[248] This is clear from the ILC Articles, which provide that an internationally wrongful act engages the responsibility of a state if the two elements of breach and attribution are present.[249] Furthermore, a claimant could bring a claim for breach of FET seeking satisfaction pursuant to ILC Article 34 or cessation, but not necessarily damages.[250] Thus, the Claimants conclude that they are "only required to establish, *prima facie*, that the allegations (which must be taken as true for purposes of jurisdiction) give rise to a claim which falls within the ECT".[251]

219.    Finally, the Claimants contend that "[e]ven assuming, *arguendo*, that the Claimants must make a *prima facie* showing of financial harm, the allegations that are currently on the record with respect to the harm suffered by the Claimants are extensive".[252] In their view, the SoC, witness statements and the expert report all demonstrate the harm suffered by each Claimant as a result of Spain's measures. For example, the SoC provides figures representing the approximate reduction in electricity production eligible for the RD 661/2007 FIT (which equates to a corresponding reduction in revenues).[253] The same type of harm is also evidenced in the 14 witness statements submitted by the Claimants.[254] Similarly, the expert report provides a comprehensive statistically based analysis of the impact of Spain's measures on the value of the Claimants' investment.[255]

---

[246] C-Answer, para. 318.
[247] C-Answer, para. 320.
[248] C-Answer, para. 324.
[249] C-Answer, paras. 325-326, referring to Articles 1 and 2 of the ILC Articles.
[250] C-Answer, para. 328.
[251] C-Answer, para. 354.
[252] C-Answer, para. 355.
[253] C-Answer, paras. 367-374.
[254] C-Answer, paras. 375-380.
[255] C-Answer, paras. 381-386.

### c. Analysis

220.    The Tribunal starts by recalling that under Article 26(1) of the ECT, its jurisdiction *ratione materiae* is limited to "[d]isputes […] which concern an alleged breach of an obligation of the [Respondent] under Part III […]".

221.    The first condition requires that there be a "dispute". According to the oft-quoted definition given by the Permanent Court of International Justice ("PCIJ"), a dispute is a "disagreement on a point of law or fact, a conflict of legal views or of interests between two persons".[256] In this case, there is clearly a disagreement on points of fact and law between the Parties, which originates from the Respondent's measures in the PV sector.

222.    Second, the dispute must concern an alleged breach of an obligation under Part III of the ECT. Entitled "Investment Promotion and Protection", Part III of the ECT contains the substantive standards of protection of investments, including, *inter alia*, "Promotion, Protection and Treatment of Investments" (Article 10); "Compensation for Losses" (Article 12); "Expropriation" (Article 13). It is clear from the Statement of Claim that the Claimants allege breaches of its obligations by the Respondent under Part III of the ECT, in particular FET under Article 10(1) of the ECT;[257] non-impairment of the investments by "unreasonable and discriminatory measures" under Article 10(1) of the ECT;[258] and full protection and security under Article 10(1) of the ECT.[259]

223.    However, it is equally clear that the mere labeling of breaches is not enough for the purposes of the analysis under Article 26. The dispute settlement clause mandates the Tribunal to satisfy itself that there is a dispute "which concerns" an alleged breach. Thus, as part of its assessment of its jurisdiction *ratione materiae,* the Tribunal must satisfy itself that it is in presence of a dispute which *objectively* concerns such alleged breaches.

224.    In this respect, the Parties disagree on what precisely the Claimants must show at this stage of the arbitration. While both Parties accept the application of the so-called *prima facie* test in principle,[260] they disagree on its exact scope.

---

[256] *The Mavrommatis Palestine Concessions* (Greece v. Great Britain), PCIJ, Series A, No. 2, Judgment, 30 August 1924 ("*Mavrommatis Palestine Concessions*"), p. 11.

[257] SoC, paras. 358-396.

[258] SoC, paras. 397-403.

[259] SoC, paras. 404-408.

[260] Jurisdictional Objections, paras. 215-218; C-Answer, para. 320.

225.    The *prima facie* test has its origin in decisions of the PCIJ and the International Court of Justice ("ICJ"). In *Mavrommatis Palestine Concessions*, the PCIJ held that, prior to reviewing the merits of the case, it had to ascertain whether the claim was capable of coming within the reach of the provision of the Mandate of Palestine of 1922:

> The Court, before giving judgment on the merits of the case, will satisfy itself that the suit before it, in the form in which it has been submitted and on the basis of the facts hitherto established, falls to be decided by application of the clauses of the Mandate.[261]

226.    The Court also noted that:

> At the present stage of the proceedings the question whether there really has been a breach of these obligations can clearly not be gone into; to do so would involve a decision as to the responsibility of the respondent, a thing which the two Governments concerned do not at the moment ask the Court to do. But, in accordance with the principles set out above, the Court is constrained at once to ascertain whether the international obligations mentioned in Article II affect the merits of the case and whether any breach of them would involve a breach of the provisions of this article.[262]

227.    In *Ambatielos*, the ICJ held that:

> The Court must determine, however, whether the arguments advanced by the Hellenic Government in respect of the treaty provisions on which the Ambatielos claim is said to be based, are of a sufficiently plausible character to warrant a conclusion that the claim is based on the Treaty. It is not enough for the claimant Government to establish a remote connection between the facts of the claim and the Treaty of 1886.[263]

228.    In *Oil Platforms*, the Court had to examine whether the dispute between Iran and the United States with respect to the actions carried out by the United States against the Iranian oil platforms was a dispute "as to the interpretation or application" of the Treaty of Amity, Economic Relations and Consular Rights of 1955. The Court defined its task at the jurisdictional level in the following terms:

> In order to answer that question, the Court cannot limit itself to noting that one of the Parties maintains that such a dispute exists, and the other denies it. It must ascertain whether the violations of the Treaty of 1955 pleaded by Iran do or do not fall within the provisions of the Treaty and whether, as a consequence, the dispute is one which the Court has jurisdiction *ratione materiae* to entertain, pursuant to Article XXI, paragraph 2.[264]

---

[261] *Mavrommatis Palestine Concessions*, p. 16.

[262] *Mavrommatis Palestine Concessions*, p. 23.

[263] *Ambatielos case (merits: obligation to arbitrate)* (Greece v. United Kingdom), Judgment, 19 May 1953, I.C.J. Reports 1953, p. 18.

[264] *Oil Platforms* (Islamic Republic of Iran v. United States of America), Preliminary Objection, Judgment, I.C.J. Reports 1996, para. 16.

229.    In her Separate Opinion in this case, Judge Rosalyn Higgins further spelled out the test for determining whether a particular claim falls within the compromissory clause of a given treaty. In a well-known passage of her Opinion, she explained that:

> The only way in which, in the present case, it can be determined whether the claims of Iran are sufficiently plausibly based upon the 1955 Treaty is to accept *pro tem* the facts as alleged by Iran to be true and in that light to interpret Articles 1, IV and X for jurisdictional purposes – that is to say, to see if on the basis of Iran's claims of fact there could occur a violation of one or more of them.[265]

230.    The "Higgins test" has often been referred to, with approval, by investment treaty tribunals.[266] In this context, arbitral tribunals have sought to establish at the jurisdictional stage whether the "facts alleged [by the claimant] may be capable, if proved, of constituting breaches of the [investment treaty]".[267] Other tribunals have used similar formulations.[268] The test as circumscribed by Judge Higgins appears uncontroversial between the Parties.[269]

231.    The Parties, however, disagree on whether the test extends to financial harm and, if so, whether it is met in this respect. In the Tribunal's view, at the present jurisdictional stage, the Tribunal must be satisfied that the facts alleged by the Claimants if later

---

[265] *Oil Platforms* - Judge Higgins' Opinion, para. 32.

[266] Amongst many, see, *e.g.*, *Plama*, an ICSID case under the ECT, in which the tribunal referred to Judge Higgins' approach as "in [no] sense controversial, either at large or as between the parties to these proceedings". See *Plama*, para. 119.

[267] *Noble Energy*, para. 153.

[268] See, *e.g.*, *Burlington Resources, Inc. v. Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, para. 110 ("Claimant's allegations of fact are subject to a *prima facie* standard according to which the alleged facts should be susceptible of constituting a breach of the Treaty if they were ultimately proven"); *Canfor Corporation v. United States*, NAFTA/UNCITRAL, Decision on Preliminary Question, 6 June 2006, para. 117 ("the tribunal must determine whether the facts as alleged by the claimant, if eventually proven, are *prima facie* capable of constituting a violation of the relevant substantive obligations of the respondent State Party under the NAFTA"); *Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Decision on Jurisdiction and Admissibility, 24 September 2008, para. 66 ("a tribunal will only make a *prima facie* determination as to whether the facts are capable of constituting violations of the provisions that are invoked"); *Saipem SpA v. Bangladesh*, ICSID Case No ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, para. 86 ("the Tribunal should be satisfied that, if the facts alleged by Saipem ultimately prove true, they would be capable of constituting a violation of Article 5 of the BIT"); *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC BV v. Paraguay*, ICSID Case No. ARB/07/9, Decision on Objection to Jurisdiction, 29 May 2009, para. 112 ("Our task is limited to an assessment of whether [claimant] has pleaded a factual and legal case which, if established, would be capable of giving rise to a violation of the relevant BIT provision"); *Continental Casualty Company v. Argentina*, ICSID Case No. ARB/03/9, Decision on Jurisdiction, 22 February 2006, para. 63 ("the Tribunal must evaluate whether those facts, when established, could possibly give rise to the Treaty breaches that the Claimant alleges, and which the Tribunal is competent to pass upon").

[269] The Respondent agrees that "[a]t the jurisdiction stage, a tribunal does not have to be satisfied that there has been a breach of an obligation, but it must be satisfied that the facts relied upon by the Claimants when tested on a *prima facie* basis could amount to a breach of an obligation" (Jurisdictional Objections, para. 216).

proven could amount to a breach of an obligation of Part III of the ECT, without need to identify precisely any financial harm suffered. The Tribunal notes that as a general matter damages are not considered as a pre-requisite for state responsibility, except if the obligation not to cause damage is part of the content of the primary obligation breached. This is made clear in the ILC Articles and its commentaries.[270] In this particular instance, the Respondent has directed its *prima facie* objection at FET and legitimate expectations (which, in turn, are generally understood to be a component of FET).[271] The Tribunal is of the view that the Respondent has not offered sufficient elements to establish that the primary obligation to provide FET requires financial harm as a constituent element. Therefore, the Tribunal concludes that no such showing is required from the Claimants at this stage.

232. In light of the foregoing principles, the Tribunal has reviewed the Claimants' Statement of Claim, and is satisfied that the facts as alleged by the Claimants and taken as true for jurisdictional purposes could, if established, constitute breaches of the FET standard.

233. The Claimants have contended that RD 661/2007 provided certain investment incentives to qualifying PV installations and, in particular, a fixed, lifetime FIT for all electricity generated. According to the Claimants, RD 661/2007 also provided that any future changes to the FIT would not affect existing investors.[272] The Claimants submit that they made their investments relying on these incentives and that they would not have made their investments without them.

234. According to the Claimants, once the investment was made and Spain was receiving the benefits of that investment, it withdrew the incentives.[273] In particular, they contend that, between late 2008 and early 2011, Spain took a series of actions which fundamentally altered the legal framework of the Claimants' investment. RD 1565/2010 allegedly first limited the right of PV installations to receive the FIT to the first 25 years of the installations' existence. The subsequent RDL 14/2010 allegedly cut the FIT by limiting the number of operating hours in which the FIT was available to installations registered under RD 661/2007.[274] The Claimants argue that the Spanish

---

[270] See ILC Articles, with Commentaries, *sub* Art. 2, para. 9; Art. 31, para. 6.

[271] The Respondent has not taken issue with an alleged lack of showing of financial harm in respect of the other standards invoked by the Claimants, such as non-impairment of the investments by unreasonable and discriminatory measures and full protection and security.

[272] NoA, para. 43; SoC, paras. 10, 155-157.

[273] NoA, para. 10.

[274] NoA, paras. 69-77.

authorities have subjected the Claimants to a "rollercoaster ride" of changes to the framework of their investment, thereby frustrating their legitimate expectations.[275]

235.    The Tribunal finds that, taking the facts as alleged by the Claimants as *pro tem* true for the purposes of the present jurisdictional analysis, Spain's measures *could*, if proven, constitute breaches of the FET pursuant to Article 10(1) of the ECT.

236.    It goes without saying that it is only at the merits stage that the Tribunal will assess whether the facts alleged are established and whether the claims are well-founded in law, i.e., whether Spain's acts constitute breaches of the ECT.[276] At this stage, the Tribunal does not make – nor is in the position to make – any findings in this respect.

237.    Even if, contrary to what the Tribunal has held, the Respondent had proven that financial harm is a constituent element of the FET standard, the Tribunal is of the view that at this stage the Claimants would merely be required to make an *allegation* of harm, without having to set out comprehensively, let alone prove, their entire case on damages. In the Tribunal's view, this burden of allegation would have been met by the Claimants which, in both their pleadings and the accompanying expert report, have made sufficient allegations of harm. The indication of a precise numerical figure is immaterial in this respect.

238.    For the foregoing reasons, the Tribunal rejects the Respondent's fourth jurisdictional objection.

**4.    Fifth objection: entities organized under the laws of Spain have no standing to bring ECT claims under the UNCITRAL Rules**

**a.    The positions of the Parties**

239.    Spain contends that the Tribunal has no jurisdiction in respect of 62 of the 88 Claimants on the ground that those Claimants are entities incorporated in Spain and, as such, have no standing to bring claims in an UNCITRAL arbitration under Article 26 of the ECT. These 62 Claimants are the following:

(i) AES Solar España Finance S.L. (belonging to the AES Solar corporate group) (one entity);

---

[275] SoC, para. 382.

[276] To quote again Judge Higgins' Separate Opinion, "[w]hat is for the merits – and which remains pristine and untouched by this approach to the jurisdictional issue – is to determine what exactly the facts are, whether as finally determined they do sustain a violation of [the relevant treaty provision] […]. In short, it is at the merits that one sees 'whether there really has been a breach'" (citing to *Mavrommatis Palestine Concessions*, p. 23). See *Oil Platforms* - Judge Higgins Opinion, para. 34.

(ii) AES Solar España I B.V. y CIA S.C. (also belonging to the AES Solar corporate group) (one entity);

(iii) La Solana S.L. 1 to La Solana S.L. 60 (belonging to the KGAL corporate group) (60 entities).

240.   According to the Respondent, a combined reading of Articles 26(1) and Article 1(7)(a) of the ECT requires that, as a general rule, only a non-national of the host state may commence proceedings under the ECT against that state.[277] Article 26(1) of the ECT provides for investor-state arbitration in relation to disputes "between a Contracting Party and an Investor of *another* Contracting Party".[278] In turn, Article 1(7)(a) defines "Investor" as:

> […] (a) with respect to a Contracting Party:
>
> [….] a company or other organization organized in accordance with the law applicable in that Contracting Party; […].

241.   According to the Respondent, the only exception to the general rule requiring diversity of nationality is set out in Article 26(7) of the ECT, which reads as follows:

> An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".

242.   Spain submits that the exception in Article 26(7), allowing locally incorporated companies under foreign control to bring an arbitral claim against the host state, applies only in respect of arbitrations brought under the ICSID Convention or the ICSID Additional Facility Rules. Conversely, Article 26(7) does not apply to arbitrations brought under the UNCITRAL Rules or the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce ("SCC"), which are the other two options available to qualifying investors under Article 26(4) of the ECT.[279] According to Spain, the ordinary meaning of Article 26(7), which only refers to ICSID arbitration and does not refer to UNCITRAL arbitration, confines that provision to ICSID arbitrations.[280]

---

[277] R-Reply, paras. 218-219.

[278] R-Reply, para. 218 (emphasis added by the Respondent).

[279] Jurisdictional Objections, para. 256.

[280] Jurisdictional Objections, paras. 257-258.

243.    The Respondent adds that this interpretation is confirmed by the *travaux préparatoires* of the ECT. The Report by the Legal Sub-Group of the Energy Charter conference refers to the following question asked by the Japanese delegation with regard to an early draft of Article 26: "Why are only the ICSID Convention and Additional Facility Rules referred to in [Article 26(7)]?", to which the Legal Sub-Group gave the following answer:

> As recognised, the issue pertains only to the ICSID and Additional Facility (AF) rules. Articles 25(2) of the ICSID and 1(6) of the AF rules are special cases and paragraph (7) is specific to those Articles only. Paragraph (7) does not differ in any substantive way from the wording of either Article 25(2) of ICSID or 1(6) of the AF.[281]

244.    According to the Respondent, if a dispute arising from the ECT gives rise to an arbitration under the UNCITRAL Rules, jurisdiction is determined *solely* on the basis of the ECT. Thus, the fact that the UNCITRAL Rules contain no specific jurisdictional requirements in respect of investment arbitration cannot be read as meaning that the diversity of nationality requirement under the ECT is dispensed with when the investor chooses UNCITRAL arbitration.[282]

245.    Finally, Spain submits that interpreting Article 26(7) of the ECT as confined to ICSID arbitrations would not create different classes of investors. Article 26 of the ECT gives investors various procedural options, some of which may be more and others less attractive depending on the specific case. The 62 Spanish Claimants could have commenced an ICSID arbitration, but chose not to do so and must thus assume the consequences of such choice.[283]

246.    In contradistinction, the Claimants argue that Article 26 does not prohibit entities organized under the laws of the host Contracting Party (in this case, Spain) from bringing claims under the UNCITRAL Rules against that host Contracting Party where those entities are controlled by separate entities organized in *other* Contracting Parties (in this case, Germany and The Netherlands).[284]

247.    While Article 26(7) only mentions ICSID arbitration, it is to be "intuited" from this provision that the drafters of the ECT envisaged more generally the need of entities organized in this manner to serve as claimants in an ECT arbitration using all sets of

---

[281] Report of the Legal Sub-Group of the Energy Charter Conference, 2 May 1994 (**Exh. RLA-30**), pp. 3-4.
[282] R-Reply, para. 224.
[283] R-Reply, paras. 232-235.
[284] C-Answer, paras. 390-391.

rules provided in Article 26 of the ECT.[285] The silence of Article 26 on the ability of locally incorporated companies subject to foreign control to submit claims through the SCC or UNCITRAL Rules is due to the fact that there are no additional jurisdictional requirements in those rules. Article 26(7) is thus not an exception but an "inclusionary provision", which is necessary because the ICSID Convention contains its own jurisdictional provisions that must be met in addition to the ECT jurisdictional requirements.[286] Article 25(2)(b) of the ICSID Convention requires an "agreement" between the parties to treat a locally incorporated company as foreign because of foreign control.[287] Article 26(7) of the ECT supplies precisely that agreement.[288] It is tailored to deal with the hurdles presented by a particular set of arbitration rules, hurdles that do not exist in the UNCITRAL and SCC Rules. That is why, the Claimants submit, there is no need for a similar provision relating to the UNCITRAL or SCC arbitration rules in the ECT.[289]

248.  According to the Claimants, their argument is supported by the *travaux préparatoires* upon which Spain relies. With regard to the response given by the Legal Sub-Group to the Japanese delegate,[290] the Claimants point to the use of the word "issue", which must be understood as the issue created by the special case of the additional jurisdictional "agreement" requirement of Article 25(2)(b), which is not raised by the other arbitration rules listed in Article 26.[291] The Claimants refer to further examples from the *travaux* which would show that the ECT drafters chose not to explicitly carve out the UNCITRAL Rules also on other matters where it was not necessary.[292]

249.  Finally, only the reading of Article 26(7) as propounded by the Claimants would ensure internal consistency and be in accordance with the object and purpose of the ECT.[293] Otherwise the ECT would create different classes of investors, dependent on the arbitration rules chosen, some with stronger jurisdictional rights than others. This

---

[285] C-Answer, para. 399.

[286] C-Answer, para. 404; C-Rejoinder, paras. 118-119.

[287] Art. 25(2)(b) reads:

> (2) "National of another Contracting State" means: […] (b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.

[288] C-Answer, paras. 405-406.

[289] C-Rejoinder, para. 122.

[290] See *supra*, para. 243.

[291] C-Answer, para. 409.

[292] C-Answer, paras. 411-413.

[293] C-Answer, paras. 419-428; C-Rejoinder, paras. 123-125.

would amount to discrimination and cannot reflect the drafters' intent.[294] In addition, Spain's interpretation would encourage parallel proceedings, because the foreign controlled Spanish entities could only have recourse to ICSID proceedings which would run parallel to the arbitration under different rules which the foreign entities within the investor's corporate unit may have started.[295]

250.   Given today's business reality, where companies are often required to do business in the host state through a locally incorporated entity,[296] and given the frequent need for such entities to serve as the claimant in an investment treaty arbitration, Spain's reading of Article 26 would completely marginalize the UNCITRAL and SCC arbitration options, if not render them useless.[297]

251.   In the Rejoinder, the Claimants made a final alternative argument for the event that the Tribunal were to consider that Article 26 does not allow foreign controlled local entities to start arbitration under the UNCITRAL Rules. The Claimants argue that the MFN clause in the ECT allows them to invoke the more favorable treatment contained in the Spain-Colombia BIT, which contains no restriction on foreign controlled local companies bringing claims under ICSID or UNCITRAL Rules.[298] Therefore, the Claimants would be entitled to bring an ECT claim against Spain under the UNCITRAL Rules.[299]

### b.   Analysis

#### i.   The interpretation of Article 26(7) of the ECT

252.   The Tribunal has already recalled the principles that govern treaty interpretation.[300] For the purposes of this objection, it again notes that the starting point of treaty interpretation is the text of the Treaty.[301] The primacy of the text viewed in its context and bearing in mind the treaty's object and purpose implies that recourse to other means of interpretation is only allowed in limited circumstances. Pursuant to Article 32 of the VCLT, one may resort to supplementary means of interpretation (i) to

---

[294] C-Answer, paras. 400, 415, 419-428.

[295] C-Rejoinder, paras. 114, 123.

[296] C-Answer, para. 402.

[297] C-Answer, para. 417.

[298] C-Rejoinder, paras. 126-128, referring to the Agreement for the promotion and reciprocal protection of investments between Spain and Colombia, made in Bogota on 31 March 2005 (**Exh. CLA-135**).

[299] C-Rejoinder, para. 128.

[300] See *supra*, paras. 95-96.

[301] As the ICJ stated in *Libya v. Chad*, "[i]nterpretation must be based above all upon the text of the treaty" (*Territorial Dispute* (Libyan Arab Jamahiriya v. Chad), Judgment, ICJ Reports 1994, p. 6, para. 41).

confirm the meaning resulting from the application of Article 31 of the VCLT, or (ii) to determine the meaning when the interpretation according to Article 31 "leaves the meaning ambiguous or obscure", or (iii) "leads to a result which is manifestly absurd or unreasonable".

253. Bearing these principles in mind, the Tribunal first observes that, pursuant to Article 26(1), the Tribunal's jurisdiction is limited to "[d]isputes between a Contracting Party and an *Investor of another Contracting Party* relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III of the ECT" (emphasis added).

254. The capitalized term "Investor", which appears in Article 26(1) as well as in the subsequent paragraphs of the same Article, is defined in Article 1(7) of the ECT as follows:

> (a) with respect to a Contracting Party:
>
> (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;
>
> (ii) a *company* or other organization *organized in accordance with the law applicable in that Contracting Party*;
>
> (b) with respect to a "third state", a natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph (a) for a Contracting Party. (emphasis added)

255. The words used in subparagraph (a)(ii) of Article 1(7) of the ECT clearly show that the place of incorporation is the relevant criterion for the definition of "Investor" with regard to juridical persons. While definitions of "investors" or "nationals" in other investment treaties may take into consideration additional criteria, such as control, this is not the case of the ECT's definition of "Investor".

256. It is equally beyond peradventure that, according to the ordinary meaning of the word, the term "another" employed in Article 26(1) requires diversity of nationality, citizenship, or permanent residence between a putative claimant and the respondent state.

257. Thus, the plain meaning of Article 26(1) read in combination with Article 1(7)(a)(ii) requires that a putative corporate claimant be incorporated in a Contracting Party other than the respondent state. This is indeed the general rule under the overwhelming majority of investment treaties, where nationals of the host state are normally not allowed to bring investment treaty claims against their home state.

258.  The following provisions in Article 26 set out a range of possible dispute settlement *fora* which are available to a qualifying investor. These include (i) the domestic courts of the host state; (ii) "any applicable, previously agreed dispute settlement procedure"; and (iii) international arbitration (Article 26 (2)-(4)). If an investor elects to resort to international arbitration, the ECT provides four possible avenues: (i) arbitration under the ICSID Convention (if both the Contracting Party of the investor and the Contracting Party party to the dispute are parties to the ICSID Convention); (ii) arbitration under the ICSID Additional Facility Rules (if either the Contracting Party of the investor or the State party to the dispute, but not both, are a party to the ICSID Convention); (iii) arbitration under the UNCITRAL Rules; (iv) arbitration under the SCC Rules (Article 26(4)).

259.  At the core of the dispute between the Parties lies a further provision of Article 26, i.e., subparagraph 7, which reads as follows:

> An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".

260.  For the Respondent, Article 26(7) of the ECT constitutes an exception – made only for arbitration under the ICSID Convention and the Additional Facility Rules – to the requirement of diversity of nationality between a claimant and a respondent state. By contrast, the Claimants understand Article 26(7) as an "inclusionary rule" meant to cater for the peculiarity of the ICSID setting, which requires an "agreement" for a foreign controlled, locally incorporated company to be treated as a "national of another Contracting State" (ICSID Convention) or as a "national of another State" (ICSID Additional Facility Rules).

261.  Once again, the Tribunal starts from the ordinary meaning of the treaty provision. It notes that Article 26(7) provides that a locally incorporated company, controlled by investors of another Contracting Party, shall "*for the purpose of article 25(2)(b) of the ICSID Convention* be treated as a 'national of another Contracting State' and shall *for the purpose of article 1(6) of the Additional Facility Rules* be treated as a 'national of another State'" (emphasis added). No mention is made in this article of the UNCITRAL Rules or the SCC Rules. A good faith interpretation of the ordinary meaning of the terms of Article 26(7) leads the Tribunal to conclude that this provision grants a foreign controlled, locally incorporated company the possibility to resort only

to ICSID arbitration or ICSID Additional Facility arbitration (as applicable), but not to arbitration under the UNCITRAL or SCC Rules.

262.    The review of the Treaty's object and purpose does not lead to a different result. In this respect, the Claimants have argued that it would be incompatible with the Treaty's object and purpose (which they say includes the creation of a level-playing field for investments and the pursuit of non-discrimination) to interpret Article 26(7) so as to create "different classes of investors", each with different "jurisdictional rights". The Tribunal is not convinced by this line of reasoning.

263.    First, the Tribunal notes that the ECT leaves a putative claimant, falling within the definition of "Investor" set out in Article 1(7), a range of choices between several arbitration mechanisms. These mechanisms vary in many respects. For example, unlike the others, the ICSID Convention system is not subject to the *lex arbitri* at the seat nor to the supervision of the courts at the seat and has a special regime for the annulment and enforcement of awards. In contrast, an ECT investment arbitration under the other rules (ICSID Additional Facility, UNCITRAL and SCC) is akin to an "ordinary" commercial arbitration with regard to its legal regime, i.e., it is subject to the international arbitration law of the seat and to the jurisdiction of the courts at the seat in aid and control of the arbitration (including annulment of awards), and the recognition and enforcement of awards is governed by the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Each system may have its advantages and disadvantages. The Tribunal agrees with Spain that "[t]o select a specific option is to lose some of the potential advantages that another may offer".[302]

264.    The four available arbitral systems are also different in terms of jurisdictional requirements. The ICSID Convention and ICSID Additional Facility Rules require respectively that either both or one of the investor's home state or the respondent state be party to the ICSID Convention. In addition, the ICSID Convention requires that there be a "legal dispute arising directly out of an investment" (Article 25(1) of the ICSID Convention); it also provides for particular rules on jurisdiction *ratione personae*, including certain critical dates that have to be met by a claimant in order to qualify as national of an ICSID Contracting State (see Article 25(2) of the ICSID Convention). The other arbitration rules offered in Article 26 of the ECT contain no similar requirements.

265.    It is for a prospective claimant to evaluate which of the available arbitration systems best suits its needs, taking into account the possible jurisdictional hurdles that one

---

[302] R-Reply, para. 234.

system may present. The Tribunal does not consider it "discriminatory" that a claimant can avail itself of a certain arbitral system and not of others. This difference is not contrary to the object and purpose of the Treaty. To the contrary, the ECT itself allows for different "jurisdictional rights" (to use the expression adopted by the Claimants) in relation to the different sets of arbitral rules which it offers.

266. This is evident if one looks at the ECT's definition of "Investor" which includes "a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law".[303] Because the ICSID Convention limits the Centre's jurisdiction to "nationals",[304] "nationals" of ICSID Convention Contracting States who are also nationals of ECT Contracting Parties would have access to all sets of rules provided in Article 26. By contrast, a permanent resident, despite fulfilling the ECT's *ratione personae* definition, would only be able to claim under UNCITRAL or SCC, but not under ICSID. It is thus the ECT itself that creates investors with different "jurisdictional rights" in relation to the arbitration options it offers.

267. In reverse, a foreign controlled, locally incorporated company would be able to pursue arbitration proceedings under the ICSID Convention and the ICSID Additional Facility Rules, due to the express provision in Article 26(7), but would not be able to bring an arbitration under the UNCITRAL or SCC Rules. In other words, the ICSID requirements may sometimes play to the disadvantage of certain claimants (e.g., permanent residents) and sometimes to their advantage (e.g., locally incorporated companies under foreign control). It is precisely the interplay between the jurisdictional requirements in the ECT and the instruments governing the arbitration proceedings which determines the "jurisdictional rights" to which a prospective claimant is entitled under the ECT regime.

268. The Tribunal further notes that, to the extent that the foreign companies or individuals owning or controlling the Spanish entities fulfill the definition of "Investor" pursuant to Article 1(7), they could have brought UNCITRAL proceedings in their own name, relying on the provision of Article 1(6) on the definition of "Investment" (which includes "a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise"). At the Hearing, the Claimants

---

[303] Art. 1(7)(a)(i) of the ECT.

[304] See Christoph Schreuer, Loretta Malintoppi, August Reinisch and Antony Sinclair, *The ICSID Convention. A Commentary* (Cambridge, 2009), p. 270, para. 659 ("An extension of treaty rights to permanent residents cannot extend ICSID's jurisdiction beyond nationals of Contracting States to the ICSID Convention", citing to ECT Article 1(7)(a)(i) as an example).

have explained the reason why they have not thus proceeded. With respect to the 60 KGAL Spanish entities, the Claimants have explained that:

> [t]he alternative to those Spanish Claimants would be claims by hundreds of individual German investors, German nationals. So the rationale, if you will, for the corporate entities I think is clear: there would be that way rather fewer Claimants that are forming part of the group.[305]

269. The Tribunal is not convinced that reasons of practical efficiency (such as a reduction in the number of claimants, or the avoidance of parallel proceedings, as argued elsewhere by the Claimants[306]) can justify a departure from the Treaty terms.

270. The Tribunal thus concludes that the only reading of Article 26(7) of the ECT viewed in its context which comports with Article 31 of the VCLT is the one that limits Article 26(7) to the arbitration mechanisms explicitly mentioned therein, i.e., arbitration under the ICSID Convention and under the ICSID Additional Facility Rules.[307]

271. The Tribunal does not find it necessary to refer to supplementary means of interpretation and in particular to the *travaux préparatoires* of the Treaty to elucidate the meaning of Article 26(7) of the ECT. The meaning that arises from the application of Article 31 of the VCLT is neither ambiguous nor obscure, nor is the result absurd or unreasonable, let alone manifestly so. However, because the Parties have both referred to the *travaux* in their written and oral submissions, the Tribunal will nonetheless address them.

272. The Parties have referred to the following excerpts from the drafting history of the ECT, which records an exchange between the Japanese Delegation and the Legal Sub-Group. It is useful to quote the exchange relating to what then became Article 26(7) in full:

---

[305] Hearing Tr. [English version] (Gill), at 180: 16-22.

[306] C-Rejoinder, paras. 114, 123.

[307] The majority of the Tribunal is struck by the fact that Judge Brower's Concurring and Dissenting Opinion (the "Dissent") merely pays lip service to the ordinary meaning of the terms of Articles 1(7)(a)(ii), 26(1) and 26(7) of the ECT. Indeed, the first two provisions are not discussed at all. Instead, the Dissent places great emphasis on Understanding No. 3 of the Final Act of the European Energy Charter Conference as part of the "context" of the ECT. The Parties have not referred to such Understanding and, in the majority's opinion, rightly so. As its title shows, Understanding No. 3 was made "[w]ith respect to Article 1(6)" of the ECT. Such provision deals with the notion of "Investment", defined as "every kind of *asset*, owned or *controlled* directly or indirectly by an Investor and includes [list follows]" (emphasis added). Understanding No. 3 clarifies the meaning of "control" of an asset by an "Investor" as defined in Article 1(7) of the ECT and identifies factors to be considered when examining whether such control exists. Understanding No. 3 does not address the definition of "Investor" under Article 1(7)(a)(ii); it is not concerned with the particular rule provided under Article 26(7) of the ECT; and it contains no language that makes it "of general application to the ECT" (Dissent, para. 5). In the majority's view, Understanding No. 3 is not intended to, nor could it, modify the clear text of Articles 1(7), 26(1) and 26(7) of the ECT.

This report responds to questions from the Japanese Delegation concerning Article [26]. The questions are set out separately below, followed by our answers.

[…]

1. Why are only the ICSID Convention and Additional Facility Rules referred to in this paragraph?

2. Interpretation and application of ICSID Convention, which is independent from the Treaty, cannot be decided unilaterally by the Treaty. Therefore, even if this paragraph (7) provides for definition of "National of another Contracting State", the content of which is slightly different from that of Article 25(2) of ICSID Convention, it does not make sense legally.

3. However, we consider that the content of this provision is important for the protection and promotion of investment. Therefore, we would like to propose the following text:

> "In case an Investor other than natural person which has made Investment in a Contracting Party is controlled by Investors of another Contracting Party on the date on which the former Investor makes a request to the former Contracting Party to submit the dispute to the conciliation or arbitration in accordance with the provisions of this Article, the former Investor shall be treated for the purpose of the provisions of this Article as an Investor of another Contracting Party."

*Comments:*

As recognized, the issue pertains only to the ICSID and Additional Facility (AF) rules. Articles 25(2) of ICSID and 1(6) of the AF rules are special cases and paragraph (7) is specific to those Articles only. Paragraph (7) does not differ in any substantive way from the wording of either Article 25(2) of ICSID or Article 1(6) of the AF. We do not believe that the proposed language is needed.

273. The Japanese Delegation was raising the question why Article 26(7) was confined to the ICSID Convention and the ICSID Additional Facility Rules and proposing broader language. The Legal Sub-Group answered in no uncertain terms that Article 26(7) was "specific to [Articles 25(2) of ICSID and 1(6) of the Additional Facility rules] only" and rejected the Japanese proposal.

274. The Tribunal does not view the reference to "the issue" and to "special cases" in the Legal Sub-Group's response to imply that the provision was meant to be "inclusionary". To the contrary, the *travaux* "confirm the meaning resulting from the application of [A]rticle 31" of the VCLT, namely, that Article 26(7) was meant to only address the ICSID context. To this effect, it would be sufficient to compare the language finally found in Article 26(7) ("for the purpose of article 25(2)(b) […] for the

purpose of article 1(6)") with the text of the *travaux* ("paragraph (7) is specific to those Articles only").[308]

275.    In any event, one should not lose sight of the fact that, even if Article 26(7) was only intended to accommodate the "ICSID restrictions", the general rule resulting from the combined reading of Articles 26(1) and 1(7) would remain unaffected. In other words, if Article 26(7) was lacking, foreign controlled, locally incorporated companies would *not* be able to bring claims against their home state under any of the arbitration systems, due to the diversity of nationality required in Article 26(1).

276.    If the drafters had wished to provide that locally incorporated companies under foreign control be able to bring arbitration proceedings under any of the four arbitral *fora*, they could easily have done so. They have not and the Tribunal is faced with the clear wording of Articles 26(1) (requiring diversity of nationality), 1(7) (making incorporation the sole test for corporate nationality) and 26(7) (expressly limited to the ICSID context). The Tribunal is bound to interpret the Treaty terms as they are written, and not as they might have been written.

277.    Before closing the analysis of this objection, the members of the Tribunal who form the majority stress that they have studied the Dissent carefully with all the respect and collegial feelings they have for Judge Brower. As a result, they wish to make the following observations in addition to the comments set out in footnote 307.

278.    While it does not discuss the ordinary meaning of the Treaty terms in their context, the Dissent invokes scholarly writings as part of "supplementary means" under Article 32 of the VCLT[309] and claims that "[t]here is unanimity among the experts closest to the ECT that the interpretation given to ECT Article 26(7) is untenable".[310] Yet, none of the writings referred to, save for one, contradicts the majority's interpretation of Article 26(7) of the ECT. These writings either do not deal with Article 26(7)[311] or suggest or explicitly state that the possibility granted to locally incorporated

---

[308] The Tribunal has examined the other questions posed by the Japanese delegation *on different provisions of the ECT*. See Report of the Legal Sub-Group of the Energy Charter Conference, 2 May 1994 (**Exh. RLA-30**). See also C-Answer, paras. 411-413; Dissent, para. 9. The Tribunal majority has arrived at the conclusion that the meaning of Article 26(7) of the ECT is clear as interpreted under Article 31 of the VCLT and that the *travaux* relating to that specific ECT provision, with which it was presented, confirm such meaning. It is thus unable to see how it could reach a different interpretive result based on the *travaux* concerning *different Treaty provisions*. In any event, in the majority's view, such other preparatory works are, on their merits, incapable of proving that *Article 26(7)* was meant to be an inclusionary provision applicable beyond the arbitral rules referred to therein.

[309] See Dissent, paras. 10-18.

[310] *Ibid.*, para. 11.

[311] See *e.g.* the two publications by Craig Bamberger (Dissent, paras. 17-18), which, in the Dissent's own words, "include[] no commentary on paragraph (7) [of Article 26] specifically".

companies pursuant to Article 26(7) only concerns the ICSID context.[312] The Dissent further refers to scholarly opinions (amongst others by Thomas Wälde and Craig Bamberger) who emphasize that Article 26 of the ECT grants investors a "choice" among different dispute settlement mechanisms.[313] As was noted above,[314] Article 26(4) of the ECT does indeed grant a choice of *fora*, but only to "Investors" which qualify under the definition set out in Article 1(7) of the ECT. In the majority's view, this is not the case of foreign controlled Spanish companies resorting to arbitration other than under the ICSID Convention and Additional Facility Rules.

279.    The one author in support of the Dissent,[315] Adnan Amkhan, was not invoked by either Party and, more importantly, gives no reasons for his opinion other than "indications in the negotiation history", without providing a source. In any event, reliance on a scholarly opinion cannot lead the Tribunal to disregard the ordinary meaning of the Treaty terms in their context and in light of the Treaty's object and purpose.

280.    Lastly, the majority does not consider that its conclusions are "in conflict with the interpretive process applied in relation to the 'Svalbard exception'".[316] In connection with the intra-EU objection, the Tribunal noted that, in light of the Treaty's silence about an intra-EU exception, it would be "irreconcilable with the ordinary meaning of the Treaty to read into it an implicit intra-EU disconnection clause".[317] The situation at

---

[312]    See *e.g.* Emmanuel Gaillard in the excerpt quoted in the Dissent, para. 14  ("*In the event that such entity decides to bring a claim under the Washington Convention [ICSID]*, it needs [to] meet the requirement of Article 25(2)(b) of the Washington Convention that it be considered as a national of another Contracting State. This situation is resolved under the ECT by Article 26(7), which provides that a legal entity that is incorporated in the host State will be treated as a national of another Contracting State *for the purposes of Article 25(2)(b) of the Washington Convention* if it is controlled by investors of another Contracting State", emphasis added) (Emmanuel Gaillard, "Investments and Investors Covered by the Energy Charter Treaty", in *Investment Arbitration and the Energy Charter Treaty* (Clarisse Ribeiro ed., 2006), pp. 54, 69). See *e.g.* further Kaj Hobér (Dissent, para. 15), who states that the significance of Article 26(7) lies in the fact that a locally incorporated company under foreign control will be "viewed as an investor of another contracting party for purposes of establishing 'diversity' jurisdiction *for an arbitral tribunal constituted under the ICSID Rules or the ICSID Additional Facility Rules*" (emphasis added) (Kaj Hobér, "Investment Arbitration and the Energy Charter Treaty", 1(1) *Journal of International Dispute Settlement* (2010), pp. 153, 164). See also Crina Baltag (Dissent, para. 15), who discusses Article 26(7) of the ECT solely in relation to the ICSID framework and adds that "[a]s to the relevance of Article 26(7) of the ECT when Investors opt for arbitrations under the SCC or UNCITRAL Rules, this provision appears to be inapplicable" (Crina Baltag, *The Energy Charter Treaty: The Notion of Investor* (Kluwer, 2012), p. 116, also pp. 108-115).

[313]    See Dissent, paras. 16-19.

[314]    See *supra*, paras. 263-267.

[315]    See Dissent, paras. 12-13, discussing Adnan Amkhan, "Consent to Submit Investment Disputes to Arbitration Under Article 26 of the Energy Charter Treaty", 10 *International Arbitration Law Review* (2007), pp. 65, 70.

[316]    Dissent, para. 20. See also *ibid.*, para. 7.

[317]    See *supra*, para. 183.

issue here is, however, precisely the opposite, as the Tribunal is faced with an explicit provision which by its own terms is restricted to the ICSID dispute settlement mechanism.

### ii.    The Claimants' reliance on the MFN clause

281.    As an alternative position on jurisdiction, the Claimants have invoked the MFN clause in the ECT to allow them to benefit from the Spain-Colombia BIT, and in particular from the second sentence of its Article 1(2), which reads as follows in its original Spanish version:

> Las inversiones realizadas en el territorio de una Parte Contratante por una sociedad de esa misma Parte Contratante que sea propiedad o esté efectivamente controlada, de conformidad con la legislación de la Parte que recibe la inversión, por inversionistas de la otra Parte Contratante, se considerarán igualmente inversiones realizadas por estos últimos inversionistas siempre que se hayan efectuado conforme a las disposiciones legales de la primera Parte Contratante.[318]

282.    The English translation provided by the Claimants reads as follows:

> Investments made in the territory of one Contracting Party by any company of the same Contracting Party that is the property or effectively controlled, in accordance with the laws of the Party that receives the investment, by investors of the other Contracting Party, investment undertaken by these latter investors will also be considered provided that it has been made in accordance with the legal provisions of the first Contracting Party.[319]

283.    Further, the Claimants have invoked Article 10 of the Spain-Colombia BIT, which provides both UNCITRAL and ICSID arbitration as possible *fora* for the settlement of disputes between a Contracting Party and an investor of the other Contracting Party. The Claimants argue that because Colombian-controlled Spanish entities would be able to bring claims under both UNCITRAL and ICSID arbitration under the Spain-Colombia BIT,[320] the Claimants in this arbitration are entitled to be treated no less

---

[318] Agreement for the promotion and reciprocal protection of investments between Spain and Colombia, made in Bogota on 31 March 2005 (**Exh. CLA-135**).

[319] Agreement for the promotion and reciprocal protection of investments between Spain and Colombia, made in Bogota on 31 March 2005 (**Exh. CLA-135** [English Translation]).

[320] See R-Rejoinder, para. 126 ("The Spain-Colombia BIT contains no restriction on foreign controlled, locally incorporated companies bringing claims under either the ICSID or UNCITRAL Rules") and para. 127 ("a locally incorporated entity, controlled by Colombian investors, would have an unrestricted choice to commence proceedings under either the ICSID Convention or the UNCITRAL Rules"); Hearing Tr. [English version] (Gill), at 131: 2-12 ("we have referred in our submissions to the Spain-Colombia BIT, *which includes a definition of "protected investor"* which would cover entities incorporated in the contracting party state but controlled by nationals of the other contracting party. We say *that the effect of this provision*, particularly when you combine it with the BIT's dispute resolution provisions, *permits claims under either UNCITRAL or ICSID arbitration by Colombian-controlled Spanish entities*", emphasis added).

favorably than those Colombian-controlled Spanish entities.[321] At the Hearing, the Claimants have taken the view that the Spain-Colombia BIT

> includes a definition of "protected investor" which would cover entities incorporated in the contracting party state but controlled by nationals of the other contracting party.[322]

284.    The Tribunal notes that Article 1(2), last sentence, of the Spain-Colombia BIT is included in the provision dealing with the definition of "investments", although the provision then closely links the notions of "investments" and "investors". The purpose of this particular provision (on which the Parties have only provided brief comments) would seem to extend BIT protection to "*investments*" made by a locally incorporated company controlled by investors of the other BIT Contracting Party.

285.    Even if the Claimants' reading of Article 1(2) were correct, the Tribunal is unable to accept that the MFN clause in the ECT can be used to import provisions from a third treaty, here the Spain-Colombia BIT, to re-define the *ratione personae* requirements in the basic treaty, here the ECT. The MFN clause in Article 10(7) of the ECT reads as follows:

> (7) Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable.

286.    A plain reading of the text of this provision evinces that, under the ECT, MFN treatment is accorded to "Investments…of Investors of other Contracting Parties". Because the Spanish entities are not "Investors of other Contracting Parties" in respect to Spain (for the reasons explained above), they cannot benefit from the MFN treatment in the first place. In other words, the application of the MFN clause in the ECT is predicated upon a requirement of diversity of nationality ("of *other* Contracting Parties").[323]

---

[321] Hearing Tr. [English version] (Gill), at 131: 8-16.

[322] Hearing Tr. [English version] (Gill), at 131: 3-7.

[323] The Claimants have also invoked Articles 10(2) and 10(3) in support of their MFN argument. In the Tribunal's view, Article 10(2) is a best efforts clause ("shall endeavour"), which concerns the pre-establishment phase ("as regards the Making of Investments"), and is explicitly made subject to a future treaty in Article 10(4) of the ECT. In any event, the MFN treatment in that clause is also accorded to "Investors of other Contracting Parties", and is thus equally inapplicable to the Spanish entities for the same reasons as Article 10(7).

287.    This conclusion is in line with arbitral jurisprudence, which has refused to extend the definition of "investor" or "investment" by means of the basic treaty's MFN clause. As stated in *Metal-Tech v. Uzbekistan*,

> As a general matter, the Tribunal notes that, ordinarily, an MFN clause cannot be used to import a more favorable definition of investment contained in another BIT. The reason is that the defined terms "investments" and "investors" are used in the MFN clause itself, so that the treatment assured to investments and investors by Article 3 necessarily refers to investments and investors as defined in Article 1 of the BIT. In other words, one must fall within the scope of the treaty, which is in particular circumscribed by the definition of investment and investors, to be entitled to invoke the treaty protections, of which MFN treatment forms part. Or, in fewer words, one must be *under* the treaty to claim *through* the treaty.[324]

288.    For these reasons, the Tribunal concludes that the Spanish Claimants cannot rely on the MFN clause in Article 10 of the ECT, in order to import a different definition of "investor" or "investment" from a third party treaty.

\* \* \*

289.    In conclusion, the Tribunal lacks jurisdiction over the following entities:

- AES Solar España Finance S.L.;

- AES Solar España I B.V. y CIA S.C.;

- La Solana S.L. 1 to La Solana S.L. 60 (60 entities).

**5.    Sixth objection: Ceconat Germany has no standing to bring an ECT claim since it has triggered the "fork-in-the-road" clause in Article 26(3)(b)(i) of the ECT**

### a.    The positions of the Parties

290.    Spain finally argues that one of the Claimants, Ceconat Germany, has no standing to bring an ECT claim, because it has already pursued dispute resolution in the Spanish courts, thus triggering the "fork-in-the-road" clause in Article 26(3)(b)(i) of the ECT.

---

[324] *Metal-Tech Ltd. v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, para. 145 (emphasis in the original). See also *HICEE B.V. v. Slovak Republic*, UNCITRAL, Partial Award, 23 May 2011, para. 149 ("[The MFN clause] cannot be used to broaden the definition of the investors or the investments themselves"); *Société Générale In respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad del Este, SA v. Dominican Republic*, LCIA Case No. UN 7927, Award on Preliminary Objections to Jurisdiction, 19 September 2008, paras. 40-41 ("Each treaty defines what it considers a protected investment and who is entitled to that protection, and definitions can change from treaty to treaty. In this situation, resort to the specific text of the MFN Clause is unnecessary because it applies only to the treatment accorded to such defined investment, but not to the definition of 'investment' itself"). See also *Berschader et al. v. Russian Federation*, SCC Case No. 080/2004, Award, 21 April 2006, para. 188; and, with regard to the definition of "investment", *Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/04/6, Award, 16 January 2013, para. 133.

291.    Article 26 in relevant parts reads:

> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
> (a) to the courts or administrative tribunals of the Contracting Party party to the dispute;
>
> (b) in accordance with any applicable, previously agreed dispute settlement procedure; or
>
> (c) in accordance with the following paragraphs of this Article.
>
> (3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.
>
> (b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).
>
> (ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

292.    Spain is listed in Annex ID of the ECT and has thus opted into the fork-in-the-road provision of Article 26(3)(b)(i). It has provided the following statement pursuant to Article 26(3)(b)(ii) of the ECT, which is contained in the so-called "Transparency Document" kept by the Energy Charter Secretariat ("Spain's Transparency Document"):

> El consentimiento otorgado por España al sometimiento de la controversia a un procedimiento de arbitraje internacional se aplica con la condición de que el inversor renuncie a sus derechos a iniciar cualquier otro procedimiento de resolución de diferencias en relación con la misma disputa o controversia y desista de cualquier otro procedimiento iniciado antes de que el órgano competente dicte sentencia.[325]

293.    Spain's Transparency Document is accompanied by an "[u]nofficial translation provided by the Ministry" into English, which reads:

> Spain gives its consent to the submission of a dispute to international arbitration if the following condition is satisfied:

---

[325] See Energy Charter Secretariat, Transparency Document. Policies, Practices and Conditions of Contracting Parties Listed in Annex ID, not Allowing an Investor to Resubmit the Same Dispute to International Arbitration at a Later Stage as Provided by Contracting Parties (in accordance with Article 26(3)(b)(ii) of the Energy Charter Treaty), Section 23 "Spain" (**Exh. CLA-99**).

> The concerned investor renounces to submit the same dispute to any other procedure of dispute settlement, and withdraws from any other previous procedure, before the responsible Authority issues a decision.[326]

294. In the English version of its Reply, the Respondent provided a free translation, which reads somewhat differently and which the Claimants accepted as "more accurate":[327]

> The consent given by Spain to the submission of a dispute to international arbitration is applied with the condition that the investor waives its right to initiate any other dispute resolution procedure in relation to the same dispute and withdraws from any other procedure commenced prior to the issue of a judgment by the competent authority.[328]

295. According to the Respondent, Ceconat Germany triggered the fork-in-the-road clause when Roger Scherer, the owner of 50% of Ceconat Germany, and 34 Spanish SPVs which are indirectly owned and controlled by Ceconat Germany,[329] filed a petition before the Supreme Court of Spain seeking the reinstatement of benefits abrogated by RD 1565/2010. The petition expressly referred to the ECT.[330]

296. For the Respondent, although the proceedings in the Spanish courts were instituted by the 34 SPVs and Mr. Scherer, the latter acted in accordance with the primary and independent interests of Ceconat Germany, and thus all of the Ceconat Germany claimants have lost the right to pursue ECT arbitration.[331] Because the object and purpose of Article 26(3)(b)(i) of the ECT is precisely to avoid the duplication of proceedings, Ceconat Germany cannot have "two bites of the apple".[332]

---

[326] *Ibid.*

[327] See Hearing Tr. [English version] (Sullivan) at 183: 20-25 and 184: 1-4 ("the ECT transparency document itself contains its own unofficial translation in addition to the Spanish original. The Respondent has included at paragraph 242 of its reply a different translation. I think we can all agree […] that the Respondent's translation at 242 is more accurate. We accept that. Our point of view on that, though, is it makes no difference").

[328] R-Reply, para. 242 (emphasis omitted).

[329] In his witness statement (Claimants' Witness Statement ("CWS") No. 12), Roger Scherer alleges that the ownership structure of Ceconat Germany's investment in Spain is as follows:

  a) Roger Scherer and Luis Delclaux each own 50% of Ceconat Germany (see CWS No. 12, para. 23);

  b) Ceconat Germany owns 95%, and Roger Scherer and Luis Delclaux own 5%, of each of Ceconat Point S.L and Ceconat Gestión S.L. (together "Ceconat España") (see CWS No. 12, paras. 9, 26);

  c) Ceconat España owns 34 Spanish SPVs (see CWS No. 12, para. 19);

  d) Each SPV individually owns one independent PV installation in Spain (see CWS No. 12, para. 26). See also Jurisdictional Objections, para. 263.

[330] See Petitum filed by Ceconat entities before the Spanish Supreme Court ("Contentious-Administrative" Chamber, 3rd Section), Petitum No. 19/2011, 29 September 2011 (**Exh. R-1**), pp. 18-20.

[331] Jurisdictional Objections, para. 271.

[332] Jurisdictional Objections, para. 275; R-Reply, paras. 262-265.

297.  By contrast, it is the Claimants' contention that the fork-in-the-road clause in Article 26(3)(b)(i) of the ECT does not bar Ceconat Germany's treaty claims. The Claimants argue that Ceconat Germany did not bring any claims (let alone an ECT claim) in the Spanish courts, that the petition was withdrawn by the 34 SPVs, and that the present arbitration proceedings do not primarily relate to RD 1565/2010 (which was at issue in the Spanish proceedings) but rather to RDL 14/2010.

298.  The Parties have further addressed the following issues when discussing why Ceconat Germany should or should not be precluded from pursuing these arbitration proceedings on the grounds of the fork-in-the-road clause.

### i.    The timing of the withdrawal of the Spanish courts claims

299.  A first issue is the effect of the withdrawal of the claims filed in the Spanish Courts on the fork-in-the-road clause. Mr. Scherer and the 34 Ceconat SPVs filed their petition seeking the annulment of RD 1565/2010 before the Supreme Court of Spain on 14 January 2011.[333] The PV Investors (including Ceconat Germany) commenced the present arbitration on 16 November 2011. The 34 Ceconat SPVs (but not Mr. Scherer) withdrew their claims in the Spanish Supreme Court on 19 December 2011.[334] The Supreme Court confirmed the withdrawal on 24 January 2012[335] and issued a decision on the merits in respect of Roger Scherer's claims on 18 July 2012.[336]

300.  For the Claimants, the fork-in-the-road clause does not apply where previous attempts to resolve the dispute have been withdrawn, as is the case here. The Claimants refer to Spain's Transparency Document, according to which the fork-in-the-road provision does not apply when the previous dispute resolution procedure is withdrawn *before the responsible authority issues a decision.* As there is no doubt that the dispute has been withdrawn from the Spanish courts before the time specified in Spain's Transparency Document, the Spanish companies owned by

---

[333] Appeal filed on 14 January 2011 by Mr. Scherer and the Spanish petitioners before the Supreme Court of Spain, seeking the annulment of RD 1565/2010 of 19 November (**Exh. C-293**).

[334] C-Answer, para. 432; Decision of the Spanish Supreme Court (Administrative Division), Appeal No. 1/19/2011, 24 January 2012 (confirming the petitioners' withdrawal from the Supreme Court proceedings) (**Exh. C-295**).

[335] Decision of the Spanish Supreme Court (Administrative Division), Appeal No. 1/19/2011, 24 January 2012 (confirming the petitioners' withdrawal from the Supreme Court proceedings) (**Exh. C-295**).

[336] C-Rejoinder, para. 134.

Ceconat Germany complied with the condition upon which Spain's ECT consent is contingent.[337]

301.  The Claimants agree with Spain that the fork-in-the-road seeks to avoid duplication of proceedings and recovery when the party starting the arbitration has previously brought the same dispute in the national courts or another forum. Yet, the Claimants submit that this is not the case here because the Spanish entities discontinued their petition on 19 December 2011 in relation to all PV installation to which the treaty claim refers.[338]

302.  The Respondent has a different view on the timing element which underlies this objection. For Spain, the Spanish Supreme Court proceedings and the present arbitration proceedings remained open and ran in parallel for more than one month.[339] Thus, with reference to Spain's Transparency Document which contains the condition to its consent and which makes reference to the withdrawal from local proceedings, Spain contends that the Ceconat SPVs withdrew from the local proceedings too late. Because a party must have withdrawn its judicial action as a condition precedent to the commencement of arbitration (i.e., by the date of the notice of arbitration), Spain's consent never became effective with regard to such claims.[340] In this respect, Spain draws a parallel with *Waste Management v. Mexico*, where the tribunal analyzed the withdrawal of certain domestic litigations for the purpose of the waiver provision contained in Article 1121 of the North American Free Trade Agreement ("NAFTA").[341]

303.  In addition, Spain contends, the withdrawal by the 34 Ceconat SPVs of their claim before the Spanish courts does not "deactivate" the fork-in-the-road clause because the claim before the Spanish Supreme Court continued with Roger Scherer who sought to obtain a declaration that would be binding on the parties and third parties (i.e., *erga omnes*). Spain notes that Roger Scherer did not withdraw his claim before the Spanish courts and continued the proceedings aimed at obtaining the annulment of various provisions of RD 1565/2010 (which was the same relief claimed by the Ceconat SPVs). The Supreme Court eventually dismissed the claim. Yet, if the annulment sought by Mr. Scherer had been granted, it would have had *erga omnes* and *ex tunc* effects, which would have directly benefited the Ceconat SPVs.

---

[337] C-Answer, paras. 432-438.

[338] C-Answer, para. 439.

[339] R-Reply, para. 247.

[340] R-Reply, para. 252.

[341] R-Reply, paras. 244-246.

According to Spain, the Ceconat SPVs' claims would thus have been upheld as well, although indirectly, despite their withdrawal from the proceedings.[342]

304.    With regard to the continuation of the claim in respect of Mr. Scherer, the Claimants submit that the latter is not a party to these proceedings and his conduct should not deprive Ceconat of his rights under the ECT. Furthermore, the Spanish court proceedings continued by Mr. Scherer relate to his ownership of a private PV installation and not to Ceconat's installations.[343] With regard to the *erga omnes* effect of a favorable court decision, the Claimants submit that it is obvious that any annulment proceeding that overturns a law unfavorable to a class of persons may benefit persons within that class who were not parties to the proceeding. Yet, this does not mean that these persons would be deprived of their rights under the ECT as a result of those proceedings.[344]

### ii.    The triple identity test

305.    The Parties agree that the so-called "triple identity test" must be met for the fork-in-the-road to apply. The dispute submitted in the local courts and in this arbitration must be the same by reference to (i) the parties, (ii) the dispute's "object" and (iii) its "cause of action". The Parties, however, disagree as to the precise content of the triple identity test.

306.    For Spain, the triple identity test should not be applied in a strict and rigid manner, which would deprive the fork-in-the-road clause of any possible application. Such an application cannot have been the intention of the drafters of the ECT, nor would such an interpretation be in accordance with the international principles on treaty interpretation.[345] More specifically, Spain has adopted the following position on the triple identity.

307.    First, with respect to the identity of the parties, the Ceconat SPVs, Ceconat Germany and Roger Scherer all belong to the same group of companies.[346] In particular, the 34 Spanish SPVs that initiated proceedings before the Spanish courts are merely investment vehicles of Ceconat Germany, as Ceconat Germany holds a 95% indirect shareholding in the 34 Ceconat SPVs. Roger Scherer has a 50% shareholding in Ceconat Germany. Thus, it was Ceconat Germany which effectively litigated in the

---

[342] R-Reply, paras. 254-262.

[343] C-Rejoinder, para. 141.

[344] C-Rejoinder, para. 142.

[345] R-Reply, paras. 318-329 (discussing esp. *Pantechniki S.A Contractors & Engineers (Greece) v. The Republic of Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009 (**Exh. RLA-112**)).

[346] R-Reply, para. 271.

Spanish courts. One of the parties to the Spanish Supreme Court proceedings (the SPVs) withdrew from the proceedings while the other (Mr. Scherer) continued the action. Given the *erga omnes* effect of the judgment, both parties would have been bound by the judgment. As the judgment was ultimately not favorable to the plaintiffs, the latter sought a "second bite of the apple" at the international level. This, for Spain, is impermissible.[347]

308.    Second, it is Spain's submission that the "object" of the claims raised by Ceconat in the national and international proceedings is the same. Absolute identity is not necessary. What matters is that "in essence" the relief sought is the same.[348] Spain argues that the first relief sought by the Claimants in these proceedings is a declaration that Spain has violated the ECT. Likewise, the relief sought by the Ceconat SPVs and Roger Scherer in the Spanish Supreme Court consisted of a finding that Spain was in breach of the ECT, as evidenced by a section of the claim submitted before the courts which deals with such alleged breaches.[349] Furthermore, in the Spanish court proceedings the plaintiffs also sought to adduce evidence of the economic damages allegedly suffered. Thus, the relief sought in the two *fora* is in essence identical. Spain also points to the Claimants' request for relief in this arbitration seeking "the reinstat[ement] [of] the legal framework in place at the time the Claimants made their investments in [Spain's] territory".[350] For the Respondent, such request is in essence the same as the one made before the Spanish Supreme Court, i.e., that RD 1565/2010 be declared null under Spanish law.

309.    Third, with regard to the identity of cause of action, Spain first argues that in both proceedings the "legal basis" for the claim is the same, i.e., the ECT.[351] Spain points to the Ceconat SPVs' and Roger Scherer's request in the Spanish Supreme Court, that a certain provision of RD 1565/2010 "should be annulled as it is contrary to article 10.1 of the Energy Charter Treaty".[352] A further passage from the submissions explicitly refers to Article 26(2)(a) of the ECT (allowing resorting to domestic courts in case of disputes arising out of the ECT).[353] The fact that the claim before the Spanish

---

[347] R-Reply, paras. 270-272.

[348] R-Reply, para. 273.

[349] R-Reply, paras. 274-275.

[350] R-Reply, paras. 279-280.

[351] R-Reply, paras. 283-296.

[352] R-Reply, para. 287.

[353] R-Reply, para. 288, referring to the Petitum filed by Ceconat entities before the Spanish Supreme Court ("Contentious-Administrative" Chamber, 3rd Section), Petitum No. 19/2011, 29 September 2011 (**Exh. R-1**), p. 20.

courts included causes of actions beyond the ECT is immaterial.[354] In the alternative, Spain argues that even if the legal bases in the two *fora* were deemed different, the cause of action would nonetheless be the same, because it consists in Spain's enactment of RD 1565/2010.[355]

310. The Claimants have taken a different view on the fulfillment of the triple identity test. First, they underline that the parties in the Spanish court proceedings and in this arbitration are distinct. Ceconat Germany has filed no claim in the Spanish courts, and neither Mr. Scherer nor the 34 Ceconat SPVs are parties to this arbitration. For the Claimants, there is no support for Spain's argument that what matters is the "real party in interest". According to well-established arbitral jurisprudence, a parent company bringing investment treaty claims is not the same party as its subsidiary that started proceedings in national courts. The Claimants cite to *Genin v. Estonia*, *Lauder v. The Czech Republic* and *Azurix Corp. Argentina* in support of their contention that the action of a subsidiary or an affiliated entity cannot preclude a suit by a parent or a related claimant.[356]

311. Second, with respect to the object, the Claimants submit that the condition is met when the claimant seeks the same relief in two *fora* in respect of the same "investment dispute". Two disputes are not considered identical merely because they arise from facts that affect both sets of claimants. There must be the "same claim for relief" in both settings. In this case, the relief sought before the Spanish courts was the "annulment" of RD 1565/2010 under Spanish law. This Tribunal, in contrast, does not have the authority to annul RD 1565/2010. In this arbitration, the Claimants seek restitution and compensation for Spain's alleged breach of international law. Thus, even if certain facts that gave rise to the present dispute were also before the Spanish courts, the investment dispute itself was not.[357]

312. Third, there is no identity of cause of action. The cause of action in the domestic court proceedings is the breach of Spanish law caused by RD 1565/2010, whereas Ceconat Germany's cause of action in this arbitration is the breach of international law. Further, the breaches of which Ceconat Germany complains here are

---

[354] R-Reply, para. 289.

[355] R-Reply, paras. 293-296, esp. 293 ("Given that for the Claimants the claims regarding Spain's alleged breach of its own law and the claims regarding Spain's alleged breach of the ECT have their cause in the "conduct" of Spain (that is, RD 1565/2010) it is clear that the requisite of identity of cause of action is fulfilled in the present case. […] Taking into account that "the conduct of Spain" consists of the passing of RD 1565/2010, the cause of action in the two proceedings is the same.").

[356] C-Answer, paras. 445-455; C-Rejoinder, paras. 144-146.

[357] C-Answer, paras. 456-465; C-Rejoinder, paras. 147-149.

substantively different from those in the Supreme Court proceedings, which were exclusively based on the Government's misapplication of Spanish law on the ground that RD 1565/2010 had not been passed in accordance with national law requirements. For the Claimants, the present treaty claims are not based exclusively, or even primarily, on the effects of RD 1565/2010. In the present context, "the basis […] is Spain's multiple attacks on the PV energy sector that frustrated the Claimants' reasonable and legitimate expectations", which included *inter alia*, "RD 1565/2010 and RDL 14/2010".[358] The latter RDL was not at all at issue in the Supreme Court proceedings.[359]

313.    Therefore, according to the Claimants, even if the fork-in-the-road clause were to apply, it would not be triggered in this instance, because the triple identity test is not met.

### iii.    Use of the MFN clause to avoid the fork-in-the-road

314.    The Claimants argue that, in the event that the Tribunal were to consider that the fork-in-the-road clause applies with respect to Ceconat Germany, the MFN clause in Articles 10(2), 10(3) and 10(7) of the ECT would allow Ceconat Germany to circumvent the fork-in-the-road provision.

315.    The Claimants argue that the majority of tribunals having considered MFN clauses have determined that they apply to dispute settlement. While the Claimants concede that arbitral practice in this respect is "not entirely consistent",[360] they submit that the decisions opposed to the application of an MFN clause for the purpose of dispute settlement overwhelmingly deal with such clauses as a means to expand the jurisdiction of a tribunal. In this context, arbitral practice demonstrates "a broad consensus" accepting the application of an MFN clause to procedural obstacles in dispute settlement.[361]

316.    The Claimants see the fork-in-the-road hurdle as a matter of admissibility rather than jurisdiction.[362] Hence, the MFN clause at Articles 10(2), 10(3) and 10(7) of the ECT may operate within the jurisdiction of the Tribunal as set by the ECT to modify the procedures applicable to seize the Tribunal.[363] Consequently, through the MFN

---

[358] C-Answer, para. 471.

[359] C-Answer, paras. 466-471; C-Rejoinder, paras. 151-155.

[360] C-Answer, para. 480; R-Rejoinder, para. 159.

[361] C-Answer, para. 481.

[362] C-Answer, para. 483-484.

[363] C-Answer, para. 484.

clause, the Claimants are entitled to invoke the BIT between Spain and Albania, which contains no fork-in-the-road clause and is thus more favorable than the ECT.[364]

317.    By contrast, the Respondent submits that the MFN clause in the ECT cannot be used to circumvent the application of the fork-in-the-road clause. First, the MFN clause in the ECT refers to "treatment", a term which does not extend to dispute settlement. For Spain, it is clear that the intention of the contracting parties to the ECT was not to extend the MFN clause to dispute settlement provisions. Otherwise, they would have needed to include clear wording in this respect (as for example was done in the United Kingdom Model BIT).[365] The Respondent asserts that state consent to submit a dispute to arbitration must be interpreted restrictively,[366] and cites to *Plama* and *Wintershall v. Argentina* for the proposition that an MFN clause cannot be applied to jurisdiction.[367]

318.    Second, according to Spain, the MFN clause cannot be used to "pervert" provisions of a treaty that have been carefully drafted by agreement of the parties. The ECT and the Spain-Albania BIT (the third-party treaty invoked by the Claimants) are fundamentally different in that the former precisely contains a fork-in-the-road clause and the latter does not.[368] The fact that, in Spain's Transparency Document, the Respondent made an express statement with respect to the fork-in-the-road clause imposing a condition to its consent to arbitration should offer sufficient proof that such clause was carefully drafted and not meant to be circumvented by the MFN clause.[369]

319.    Finally, the Respondent submits that, because the Claimants have insisted on being treated as a collective for the purposes of these aggregate proceedings, the fact that Ceconat Germany falls foul of Article 26(3)(b)(i) of the ECT must apply to all others. According to the Respondent, this would be an application of the "much-cited maxim" "the benefit must be accompanied by the burden".[370] In its Reply, Spain stated that it "did not allege that in the event the [fork-in-the-road] clause is deemed to have been triggered by Ceconat Germany that all of the other claimants be precluded from bringing the ECT claim".[371] Yet, in the same Reply it concluded that "if the Claimants

---

[364] C-Answer, para. 479, referring to Art. 11 of the Agreement between the Kingdom of Spain and the Republic of Albania on the promotion and reciprocal protection of investments, 5 June 2003 (**Exh. CLA-1**).

[365] R-Reply, para. 307.

[366] R-Reply, para. 302.

[367] R-Reply, paras. 304-306.

[368] R-Reply, para. 312.

[369] R-Reply, para. 313.

[370] Jurisdictional Objections, para. 276.

[371] R-Reply, para. 317.

are indeed to be treated as a collective group as they so request, [...] such request should have consequences".[372] At the Hearing, the Respondent repeated that, if the fork-in-the-road clause were considered to apply in respect of Ceconat Germany, its effect should be extended to the other Claimants.[373]

320.    For the Claimants, the argument that the fork-in-the-road objection affects all the Claimants in the present arbitration is baseless and should consequently be dismissed.[374]

### b.  Analysis

321.    This objection revolves around the interpretation of Article 26(3) of the ECT and of Spain's Transparency Document, i.e., the statement submitted by Spain pursuant to Article 26(3)(b)(ii). The Tribunal will start by analyzing the relevant terms of the Treaty according to the rules of interpretation laid down by the VCLT to which it has already referred to several times in this Award.[375]

322.    Article 26(3) of the ECT provides each Contracting Party's "unconditional consent" to the submission of disputes to international arbitration. Such unconditional consent is made "subject only to subparagraphs (b) and (c)" of Article 26(3). For the purposes of this objection, it is relevant to set out subparagraph (b) in full:

> (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).
>
> (ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

323.    The Tribunal first notes that Article 26(3)(b)(i) refers to "the Investor" in capitalized terms, which is consistent with the other paragraphs in Article 26 where the term is also used in capitalized terms. It is important to read Article 26(3)(b)(i) in the context of the whole of Article 26 and in particular of its first two paragraphs. Article 26(1)-(3) may be broken down as follows:

- The fork-in-road clause of Article 26(3)(b)(i) is triggered "where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b)";

---

[372] R-Reply, para. 317.

[373] Hearing Tr. [Spanish version] (Soler Tappa), at 31: 21-14; 76: 1-2.

[374] C-Answer, paras. 472-475.

[375] See *supra*, paras. 95-96, 252.

- Subparagraph (2) of Article 26, in turn, offers a choice of *fora* to a qualifying investor. The text of this provision sets forth that "*the Investor party to the dispute* may choose to submit" the dispute to one of the dispute settlement options, including domestic courts (a) and any previously agreed dispute settlement procedure (b).

- The dispute that "the Investor party to the dispute may choose to submit" to either option is a dispute pursuant to Article 26(1) of the ECT, i.e., a dispute "which concern[s] an alleged breach of an obligation [...] under Part III" of the ECT.[376]

324.  From the combined reading of the first three paragraphs of Article 26 it is clear that for the fork-in-the-road clause in Article 26(3)(b)(i) of the ECT to apply:

- The investor having previously submitted the dispute to domestic courts (or other previously agreed dispute settlement procedure) must be "the Investor party to the dispute";

- The dispute brought to arbitration and to one of the two options under subparagraph (2)(a) or (b), must concern an alleged breach of Part III the ECT.

325.  Accordingly, the ordinary meaning of the provision mandates that the investor be the same in the two proceedings for the fork-in-the-road to apply. In other words, for purposes of the fork-in-the-road clause, the claimant in the arbitration must have previously submitted the dispute to a domestic court or a previously agreed dispute settlement procedure.[377] The rule does not apply to non-parties to the arbitration. The fact that a non-party is a shareholder or a subsidiary of the investor does not change this conclusion.

326.  The fork-in-the-road clause of the ECT may be distinguished from "waiver clauses" in other treaties, such as NAFTA or the Central America Free Trade Agreement ("CAFTA"), which provide that a waiver to initiate or continue domestic proceedings

---

[376] This is made clear by Article 26(2) which in its *incipit* speaks of "such disputes", thus referring to disputes under Article 26(1) of the ECT.

[377] See also Emmanuel Gaillard, "How Does the So-Called "Fork-In-The-Road" Provision in Article 26(3)(b)(i) of the Energy Charter Treaty work? Why Did the United States Decline to Sign the Energy Charter Treaty?", in *Investment Protection and the Energy Charter Treaty* (G. Coop and C. Ribeiro, eds., 2008) p. 219, at 222-223 (noting that "[the ECT's fork-in-the-road] has no effect on an arbitral claim, for instance, where the prior dispute was submitted by a locally incorporated subsidiary of the Investor, but not the Investor itself").

must in certain circumstances be given by both the investor and the enterprise that the investor owns or controls directly or indirectly.[378]

327. In the present ECT proceedings, it is undisputed that neither Mr. Scherer nor the 34 SPVs are claimants in this arbitration and conversely that Ceconat Germany was not a petitioner before the Spanish courts. For this reason, the application of the fork-in-the-road in Article 26(3)(b) is not triggered. As a consequence, Spain's consent is not conditional and in no way limited by the domestic proceedings initiated by Mr. Schrerer and the 34 SPVs.

328. The conclusion just reached is confirmed if one analyzes Spain's Transparency Document, which purports to set out the "policies, practices and conditions" in respect of Spain's application of the fork-in-the-road clause.

329. At the Hearing, the Parties debated how Spain's Transparency Document should be characterized and what rules of interpretation should govern. According to the Claimants:

> Our view is that [Spain's Transparency Document] is part of the treaty. It was a requirement of the treaty, it was submitted with the instrument of ratification, and it is best considered in that respect. It could, of course, also be considered an unilateral act; I don't actually think, again, it makes much of a difference. The real point is it is binding upon Spain […].[379]

330. In contradistinction, the Respondent contends that Spain's Transparency Document should be interpreted as a unilateral declaration, which, it submits, would require the relevant words to be interpreted in a natural and reasonable way, having due regard to the intention of the state.[380]

331. The Tribunal agrees with Spain that the statements made by the ECT Contracting Parties under Article 26(3)(b)(ii), including Spain's Transparency Document, must be deemed unilateral acts. The tribunal in *Tidewater v. Venezuela* differentiated between different types of unilateral declarations:

---

[378] See Article 1121 of the NAFTA ("1. A disputing investor may submit a claim under Article 1116 to arbitration only if: […] (b) the investor and, where the claim is for loss or damage to an interest in an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, the enterprise, waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116 […]"). See also Article 10(18)(2)(b)(ii) of the CAFTA. In light of the differences between the ECT fork-in-the-road and these so-called "waiver clauses", the Tribunal finds that the decision in *Waste Management*, invoked by the Respondent, which deals with NAFTA Article 1121, is not a helpful precedent for the present purposes.

[379] Hearing Tr. [English version] (Sullivan) at 185: 14-20.

[380] Hearing Tr. [Spanish version] (Soler Tappa) at 75: 18-26 (referring to the Decisions on Jurisdiction in *Mobil v. Venezuela* and *Cemex v. Venezuela*).

different kinds of unilateral acts have to be distinguished, i.e. purely unilateral acts, called in the work of the ILC unilateral acts *stricto sensu*, to which the [ILC] Guiding Principles [applicable to unilateral declarations of States capable of creating legal obligations] apply; unilateral acts which are a cause or a consequence of a treaty – like acts implicated in the formation or the execution of the treaty – to which apply the rules of interpretation of the VCLT; and finally unilateral acts which are adopted freely but in the framework of a treaty which recognizes this freedom of action, to which apply some specific rules […].[381]

332.   In the Tribunal's view, statements made by ECT Contracting Parties under Article 26(3)(b)(ii) are unilateral acts of the third kind. That is to say, Spain's Transparency Document is a unilateral statement, which is formulated in the framework of a treaty by an organ of the state (here, the executive acting through the Ministry of Industry and Energy), and which, according to its interpretation, produces legal effects on the international plane *vis-à-vis* the other ECT Contracting Parties and their investors.

333.   The rules of interpretation applicable to unilateral acts formulated in the framework of a treaty have been recalled by a number of investment tribunals, including the tribunals in *Mobil v. Venezuela*, *Cemex v. Venezuela*, *Tidewater* and *Pac Rim v. El Salvador*.[382] Drawing largely from analogies with the ICJ's interpretation of unilateral declarations of states accepting the compulsory jurisdiction of the Court under Article 36(2) of the ICJ Statute,[383] these ICSID tribunals clarified that a unilateral declaration made in the framework of a treaty must be interpreted according to the following rules:

- A unilateral declaration must be interpreted in good faith "as it stands, having regard to the words actually used";[384]

- The relevant words must be interpreted "in a natural and reasonable way, having due regard to the intention of the State concerned";[385]

---

[381] *Tidewater Inc. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Jurisdiction, 8 February 2013 ("*Tidewater*"), para. 92.

[382] See *Mobil Corporation et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Jurisdiction, 10 June 2010 ("*Mobil*"), paras 71-96; *CEMEX Caracas Investments B.V. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/08/15, Decision on Jurisdiction, 30 December 2010 ("*Cemex*"), paras. 67-89; *Tidewater*, paras. 79-102; *Pac Rim Cayman LLC v. Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, 1 June 2012 ("*Pac Rim*"), paras. 5.27-5.35. All these tribunals were presented with the question of the interpretation of a state's domestic law allegedly providing for consent pursuant to the ICSID Convention.

[383] *Mobil*, paras. 91-95; *Cemex*, paras. 84-87; *Tidewater*, paras. 93-94, 102; *Pac Rim*, para. 5.33.

[384] *Mobil*, para. 92; *Cemex*, para. 85; *Tidewater*, para. 102; *Pac Rim*, para. 5.35 (all citing to *Anglo-Iranian Oil Co.* (United Kingdom v. Iran), ICJ Reports 1952, p. 9, at 105).

[385] *Mobil*, para. 94; *Cemex*, para. 87; *Tidewater*, para. 102 (all citing to *Fisheries Jurisdiction* (Spain v. Canada), Jurisdiction of the Court, Judgment, ICJ Reports 1998 ("*Fisheries Jurisdiction*"), p. 432, para. 49). See also *Pac Rim*, para. 5.35.

- That intention can be deduced from the text, but also from the context, the circumstances of its preparation and the purposes intended to be served;[386]

- No rule of restrictive interpretation applies;[387]

- The regime applying to these unilateral acts is "not identical with that established for the interpretation of treaties by the Vienna Convention on the Law of Treaties"; however, the rules of the VCLT may "apply analogously to the extent compatible with the *sui generis* character" of unilateral acts.[388]

334.   In the application of those rules of interpretation, a certain emphasis is placed on the state's intention.[389] However, such intention should be seen as chiefly reflected in the text of the statement. In other words, it is the text of the statement that is the primary indicator of the state's intention. This is particularly so where the Tribunal has not been provided with any evidence of the state's "intention" other than the text of the statement, as in the present case.

335.   That said, the Tribunal now turns to the wording of Spain's Transparency Document, which provides that Spain's consent pursuant to Article 26(3) of the ECT is subject to "the condition that the investor [...] withdraws from any other procedure commenced prior to the issue of a judgment by the competent authority".

336.   Because the statement is made "in application of" ("*en aplicación del*") Article 26(3)(b)(ii) (as the title of the statement indicates), the term "investor", even if not capitalized, must be understood to have the same meaning as elsewhere in Article 26.[390] In this sense, the treaty is the "context" that must be taken into account when interpreting Spain's Transparency Document. Thus, for Spain's Transparency Document to be consistent with the Treaty in the framework of which it is formulated, it is "the Investor party to the dispute" who must withdraw from any other procedure. Because Ceconat Germany was not a party to the domestic dispute, Spain's Transparency Document does not come into play as a limitation to the Respondent's consent.

337.   In light of the foregoing, the Tribunal concludes that the conditions for the application of the Treaty's fork-in-the-road clause and of Spain's Transparency Document have

---

[386] *Mobil*, para. 94; *Cemex*, para. 87; *Tidewater*, para. 102; *Pac Rim*, para. 5.35. See also *Fisheries Jurisdiction*, p. 432, para. 49.

[387] *Tidewater*, paras. 89-91, 99; *Pac Rim*, para. 5.34.

[388] *Mobil*, paras. 92, 96, *Cemex*, paras. 85, 89 (both citing to *Fisheries Jurisdiction*, p. 432, para. 46).

[389] See *Fisheries Jurisdiction*, p. 432, para. 46, cited in *Mobil*, para. 93; *Cemex*, para. 86.

[390] In perhaps even clearer terms, the "unofficial translation" of Spain's Transparency Document (on which see *supra*, para. 293) speaks of "the concerned investor".

not been fulfilled, because the entity who has initiated the court proceedings is not the investor party to the present dispute.

338.  The Tribunal is convinced that its analysis could end here. For the sake of completeness, it notes that to accept the identity of parties based on "the real party in interest" or like theories would be difficult to square with the plain meaning of the Treaty and of Spain's Transparency Document which the Tribunal is bound to apply. In particular, the Tribunal cannot follow the argument that Mr. Scherer and Ceconat Germany must be considered as one and the same investor pursuant to the Treaty and Spain's Transparency Document. 50% of the capital of Ceconat Germany is held by Mr. Scherer and the rest by Mr. Delclaux. The latter is neither a party to these proceedings nor a party to the domestic proceedings. If Mr. Scherer and Ceconat Germany were deemed to be one and the same investor, the rights of Mr. Delclaux as a shareholder of Ceconat Germany would be seriously curtailed as a result of Mr. Schrerer's conduct in the domestic proceedings. Thus, the fact that Mr. Scherer decided to continue the proceedings in his own name cannot have an impact on Ceconat Germany's jurisdictional fate in these arbitral proceedings.

339.  The question is somewhat different for the 34 Spanish SPVs, which are situated below Ceconat Germany in the corporate chain and are indirectly controlled to 95% by the latter. However, even if, for the sake of argument, the Spanish SPVs and Ceconat Germany were considered to be the same investor under the Treaty and Spain's Transparency Document, the fork-in-the-road argument would still fail because the conditions to the Respondent's consent in Spain's Transparency Document are met. Indeed, the only temporal limitation imposed by Spain in its Transparency Document is that the investor withdraws from court proceedings "prior to the issue of a judgment by the competent authority" ("*el inversor [...] desista de cualquier otro procedimiento iniciado antes de que el órgano competente dicte sentencia*"). No other condition, such as for example that the withdrawal occur before the request for arbitration is filed, is set in Spain's Transparency Document.

340.  In this case, it is undisputed that the 34 Spanish SPVs have withdrawn from the Spanish court proceedings before the Supreme Court issued its decision. Thus, even if Ceconat Germany and the 34 SPVs were to be considered one and the same "Investor" (which the Tribunal finds hard to reconcile with the ordinary meaning of the Treaty, as explained above), the condition to consent as expressed in Spain's Transparency Document would be fulfilled.

341. The Tribunal reaches the foregoing conclusions strictly based on the text of the ECT's fork-in-the-road clause and of Spain's Transparency Document. It does not purport to make any findings on fork-in-the-road clauses in other investment treaties or on the so-called "triple identity test" generally. As a result of these conclusions, the Tribunal can dispense with entering into the Parties' further arguments, such as the alleged *erga omnes* effect of the domestic court proceedings or whether the fork-in-the-road clause extends to one or to all Claimants. There is also no need to analyze the Claimant's alternative argument based on the MFN clause.

342. For the foregoing reasons, the Tribunal finds that Ceconat Germany's claims are not precluded by Article 26(3)(b)(i) of the ECT or by Spain's Transparency Document. The Tribunal thus rejects the Respondent's sixth jurisdictional objection.

## V.    COSTS

### A.    THE CLAIMANTS' POSITION

343. The Claimants request that the costs they have incurred in this jurisdictional phase be borne by the Respondent. They point to the amendments made to the last version of the UNCITRAL Rules with the purpose of accommodating the apportionment of costs in decisions separate from the final award.[391] For the Claimants, to the extent that the Tribunal decides that Spain's objections should be dismissed, the Claimants should be entitled to recover the costs that they incurred in order to address those objections pursuant to the "loser pays" principle enshrined in the first sentence of Article 42(1) of the UNCITRAL Rules.

344. According to the Claimants, Spain should bear all costs because it has raised a number of jurisdictional objections that are unsupported by any relevant authority and have no merits, only in order to delay proceedings and substantially increase the Parties' costs.[392] In particular, the Claimants refer to Spain's objection that they were not "investors" with "investments" under the ECT, which obliged them to file extensive additional evidence at substantial costs. In the Claimants' view, this was primarily a dilatory tactic, as is evidenced by the fact that Spain did not refer to such evidence[393] and formally withdrew the objection at the Hearing.[394] Furthermore, so the Claimants

---

[391] C-Answer, paras. 487-492, referring to UNCITRAL Rules, Arts 40(1) and 42(2); C-Rejoinder, para. 164; Claimants' Submission on Costs, 21 February 2014 ("Claimants' Submission on Costs"), paras. 4-11.

[392] C-Rejoinder, para. 164.

[393] C-Rejoinder, paras. 167-168.

[394] Claimants' Submission on Costs, paras. 13-28.

argue, "certain of Spain's other Jurisdictional Objections are entirely without merit".[395] The Claimants take particular issue with the intra-EU objection, the *prima facie* objection, and the fork-in-the-road objection.[396]

345.    Therefore, the Claimants request "that the Tribunal renders an award pursuant to Article 40(1) and (2) of the UNCITRAL Rules: (i) ordering that Spain bear the costs of the jurisdictional phase of the arbitration, as well as the PV Investors' costs for legal representation and assistance in the amount of £1,552,129.23 […]; and (ii) ordering Spain to pay interest thereon at such reasonable commercial rate as the Tribunal thinks appropriate, compounded monthly".[397]

## B.    THE RESPONDENT'S POSITION

346.    The Respondent submits that the full costs and expenses of the proceedings should be awarded against the Claimants.[398] More specifically, if the Tribunal declines jurisdiction, then it would be appropriate and indeed necessary for the Tribunal to award costs against the Claimants at this stage.[399] However, if the Tribunal were to accept jurisdiction, then it should not rule on costs at this stage for a number of reasons. First, the decision as to whether the loser should pay is something that pertains more appropriately to the determination of the merits than the jurisdictional phase.[400] Second, the Spanish State Legal Service has an obligation to exercise such actions as it considers necessary to protect the interests of the State, which includes raising jurisdictional objections.[401] Third, the "circumstances of the case" to be taken into account in the allocation of costs pursuant to Article 42(1) of the UNCITRAL Rules include the fact that it would be disproportionate and unreasonable that the Respondent bear the Claimants' costs for the jurisdictional phase in the event that the underlying claim is ultimately dismissed.[402]

347.    The Respondent rejects the Claimants' suggestion that by raising its jurisdictional objections Spain was seeking to delay the proceedings.[403] With particular regard to

---

[395] Claimants' Submission on Costs, para. 29.

[396] Claimants' Submission on Costs, paras. 29-34.

[397] Claimants' Submission on Costs, para. 38. The Claimants have set out their costs in three schedules setting out the various categories of costs incurred from the date on which Spain raised the objections to jurisdiction (11 January 2013).

[398] See Respondent's Costs Submission, 7 March 2014 ("Respondent's Costs Submission").

[399] Respondent's Costs Submission, para. 7.

[400] Respondent's Costs Submission, para. 9.

[401] Respondent's Costs Submission, para. 10.

[402] Respondent's Costs Submission, para. 11.

[403] Respondent's Costs Submission, paras. 4-15.

the objection that the Claimants were not investors with qualifying investments under the ECT, the Respondent recalls that it is for a claimant to prove its case.[404] Thus, to require the Claimants to produce documents that were vital to proving their investments was not intended to delay the proceedings, but rather a basic requirement for the proceedings to continue.[405] Furthermore, the Respondent rejects the Claimants' contention that certain jurisdictional objections were unfounded,[406] and notes that in their costs submission the Claimants have been silent on the fifth jurisdictional objection (the one concerning the Spanish entities), which shows that this objection has merit.[407]

348.    Therefore, the Respondent requests that all the costs of the jurisdictional phase, including all the costs of the Arbitral Tribunal and the PCA, and all the costs incurred by the State's Attorney's Office and legal counsel fees, equivalent to €1,260,660.81, be awarded against the Claimants.[408]

## C.    THE COSTS OF THE PROCEEDINGS

349.    At the beginning of the arbitration, the Parties paid a first advance of EUR 100,000 each, i.e., a total of EUR 200,000, in accordance with paragraph 7.1 of the Terms of Appointment. Subsequently, the Parties paid a second advance of EUR 200,000 each, i.e., a total of EUR 400,000. Thus, the total of the advance paid by the Parties amounts to EUR 600,000 (EUR 300,000 each).

## 1.    Costs of the proceedings up to 11 January 2013

350.    From the beginning of the case until 11 January 2013, i.e., the date on which the Respondent raised its Jurisdictional Objections, the members of the Tribunal collectively spent a total of 243.1 hours as follows: The Hon. Charles N. Brower, 55.8 hours; Judge Bernardo Sepúlveda-Amor, 65 hours; and Prof. Kaufmann-Kohler, 122.3 hours. It was agreed that the Tribunal's time would be compensated at an hourly rate of EUR 500 exclusive of VAT, where applicable.

351.    In the same period of time, the Secretary of the Tribunal has spent a total of 75.2 hours. It was agreed that the Secretary would be compensated at an hourly rate of EUR 280 exclusive of VAT, where applicable.

---

[404] Respondent's Costs Submission, para. 20.

[405] Respondent's Costs Submission, para. 34.

[406] Respondent's Costs Submissions, paras. 59-67 (discussing the intra-EU, the *prima facie*, and the fork-in-the-road objections).

[407] Respondent's Costs Submission, paras. 68-69.

[408] Respondent's Costs Submission, para. 70, and Annex I.

352.    The total fees of the Tribunal and the Secretary (excluding VAT) amount to EUR 142,606.

353.    The Tribunal and the Secretary incurred expenses in the amount of EUR 7,706.17.

354.    The PCA has charged fees in the amount of EUR 1,820 for the administration of the case and its registry services. Other costs, in particular those relating to the first procedural hearing, amount to EUR 5,641.19.

355.    The total costs of the proceedings up to 11 January 2013 are thus EUR 157,773.36.

**2.    Costs of the proceedings from 11 January 2013 until completion of the jurisdictional phase**

356.    From 11 January 2013 until the completion of the jurisdictional phase (the "Jurisdictional Phase"), the members of the Tribunal collectively spent a total of 613.6 hours as follows: The Hon. Charles N. Brower, 167.4 hours; Judge Bernardo Sepúlveda-Amor, 103 hours; and Prof. Kaufmann-Kohler, 343.2 hours.

357.    The Secretary of the Tribunal has spent a total of 277.8 hours.

358.    The total fees of the Tribunal and the Secretary (excluding VAT) amount to EUR 384,584.

359.    The Tribunal and the Secretary incurred expenses in the amount of EUR 4,034.69

360.    The PCA has charged fees in the amount of EUR 18,180 for the administration of the case and its registry services.

361.    Other costs, relating in particular to the Hearing (including interpretation, court reporters, IT/AV support, catering, etc.), as well as to the translation of the Award, were incurred in the amount of EUR 35,353.53.

362.    The total costs of the proceedings of the Jurisdictional Phase are thus EUR 442,152.22 detailed as follows:

| | | |
|---|---|---|
| Tribunal and Secretary fees | EUR | 384,584.00 |
| Tribunal and Secretary expenses | EUR | 4,034.69 |
| Administrative costs | EUR | 53,533.53 |
| Total | EUR | 442,152.22 |

**D.    THE ALLOCATION OF COSTS**

363.    Article 40 of the UNCITRAL Rules provides:

> 1. The arbitral tribunal shall fix the costs of arbitration in the final award and, if it deems appropriate, in another decision. [...]

364.   Article 42 of the UNCITRAL Rules provides:

> 1. The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2. The arbitral tribunal shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to pay to another party as a result of the decision on allocation of costs.

365.   The Tribunal deems it appropriate to proceed with the allocation of the costs relating to the Jurisdictional Phase in this Award, rather than in the final Award, a possibility that is indeed envisaged in Articles 40(1) and 42(2) of the UNCITRAL Rules. Because the proceedings will continue with a different number of Claimants, an apportionment of costs relating to the Jurisdictional Phase is preferable and, indeed, necessary at this stage.

366.   With regard to the manner in which the costs relating to the Jurisdictional Phase should be allocated between the Parties, the Tribunal notes that while the first sentence of Article 42(1) of the UNCITRAL Rules provides that the unsuccessful party shall "in principle"[409] bear all of the arbitration costs, its second sentence grants the Arbitral Tribunal authority to apportion any such costs among the Parties if, in light of the "circumstances of the case", it decides that apportionment is "reasonable".

367.   In this case, the Respondent initially presented six jurisdictional objections, one of which it then abandoned at the Hearing. Out of the five remaining jurisdictional objections, the Claimants were successful in four (the Aggregation Objection, the intra-EU objection, the *prima facie* objection, and the fork-in-the-road objection). Spain, in turn, prevailed with the objection concerning the Spanish entities.

368.   While the Claimants have succeeded in a higher number of objections than the Respondent, the Tribunal considers nonetheless that it is reasonable that the arbitration costs be divided equally between the Parties, and that each Party shall bear its own costs. The reason for this is that the four objections raised by Spain, while the Tribunal rejected them, were nonetheless serious. Furthermore, the

---

[409] See the English version of the first sentence of Article 42(1) of the UNCITRAL Rules, which provides: "[t]he costs of the arbitration shall *in principle* be borne by the unsuccessful party or parties" (emphasis added), while the Spanish version reads: "[l]as costas del arbitraje serán a cargo de la parte vencida o las partes vencidas", without including the equivalent of the words "in principle".

objection on which Spain succeeded results in the Tribunal declining jurisdiction over more than two thirds of the Claimants (62 out of 88).

369. With regard to Spain's objection that the Claimants were not investors with qualifying investments under the ECT, the Tribunal does not consider that the withdrawal of such objection justifies reversing its conclusion that the arbitration costs should be equally borne by the Parties. The Tribunal recalls that it was the Claimants' burden to prove that they were investors with qualifying investments. The fact that they had to produce 6,000 documents to discharge that burden cannot be held against the Respondent. In addition, the fact that, after the production of the 6,000 documents, Spain decided to withdraw the objection may well suggest that those documents were necessary to the Claimants' fulfillment of the Treaty's jurisdictional requirements.

370. In the circumstances of this case, the Tribunal thus believes that each Party should bear its own costs, and the Parties should share, in equal amounts, the costs of the proceedings (including the Tribunal and PCA costs) of the Jurisdictional Phase described in Section V.C.2. *supra*.

371. In light of its determination on allocation of costs, the Tribunal need not further specify which of the Claimants should bear which costs. As may be understood from Schedule 1 of the Claimants' Submission on Costs, the Claimants may have internal arrangements as to how these costs are divided. However, the Tribunal notes that the payment percentages set out in Schedule 1 only concern counsel fees.[410] The advances paid by the Claimants to the PCA are set out in Schedule 2, which however does not specify the amount which each of the Claimants has contributed for such advances. In any event, as the Claimants have brought the case in aggregate form, and in light of its determination that each Party (i.e., the Claimants and the Respondent) bear their own costs, the Tribunal believes that it should leave it to the Claimants' internal arrangements to decide the extent to which each of them should bear their own counsel fees and their shares of the costs of the proceedings for the Jurisdictional Phase (described in Section V.C.2. *supra*).

372. With respect to the costs of the first phase of the proceedings (up to 11 January 2013), described in Section V.C.1. *supra*, the Tribunal reserves the decision on such costs for subsequent decision.[411]

---

[410] See Claimants' Submission on Costs, Schedule 1 ("Legal fees of Allen & Overy LLP").

[411] The Tribunal notes that the Parties have not submitted cost statements other than those in respect of the Jurisdictional Phase. With regard to the Tribunal and PCA costs relating to the first phase up to 11 January 2013, the Tribunal notes that – as far as the Claimants are concerned – some of the Claimants' costs may have been borne by the 62 entities on which the Tribunal lacks jurisdiction.

373.   The total of the costs of the proceedings, including the fees and expenses of the Tribunal, the Secretary and the PCA, counting both the first phase of the arbitration and the Jurisdictional Phase, being EUR 599,925.58 (EUR 157,773.36 plus EUR 442,152.22), and the advances deposited by the Parties being equal to EUR 600,000 in total, there is a total of EUR 74.42 remaining, which will be credited to the subsequent phase of the arbitration.[412]

## VI.   LANGUAGE OF THE AWARD

374.   This Award is made in both English and Spanish. There is no agreement between the Parties as to which of the two language versions should prevail.[413] In accordance with PO2, the Tribunal decides that the English version of this Award shall prevail.

## VII.   DECISION

375.   For the reasons set forth above, the Tribunal makes the following decision:

a.   The Tribunal has jurisdiction over the present dispute involving the Respondent and the following of the Claimants:

- Mercurio Solar S.à.r.l

- Tyche Solar S.à.r.l

- Ampere Equity Fund B.V.

- Element Power Holdings B.V.

- MEIF Luxembourg Renewables S.à.r.l

- Impax Solar Investment S.à.r.l

- Impax New Energy Investors S.C.A

- WOC Photovoltaik Portfolio GmbH &Co KG

---

The Tribunal however has no element to determine the extent of the contributions made by the 62 entities to such advances, if any. As already explained, because the Claimants have brought the case in aggregate form, it will be up to them to effect any internal allocation in respect of these costs, should such issue arise at all.

[412]  With regard to the advances paid by the Claimants, part of these remaining advances credited to the subsequent phase may have been paid by the 62 entities on which the Tribunal lacks jurisdiction, and, if so, they should thus be returned to them. As already explained, because the Tribunal has no element to determine the internal allocation between the Claimants with regard to those advances and because the Claimants have brought the case in aggregate form, the Tribunal believes that it should leave such matter to the Claimants' internal allocation.

[413]  See letters from the Parties of 19 September 2014, in response to the Tribunal's letter of 12 September 2014. See also PO2, pp. 5-6.

- NIBC European Infrastructure Fund I C.V.

- NEIF Infrastructure Investments Holding I B.V.

- Werec I & Christiansund S.à.r.l. S.C.A.

- Werec II & Trier SG S.à.r.l. S.C.A.

- ASE C.V.

- AES Solar Energy Cooperatif U.A.

- AES Solar Energy Holdings B.V.

- AES Solar Energy B.V.

- AES Solar España I B.V.

- AES Solar España II B.V.

- Eoxis B.V.

- Eoxis Holding S.A.

- MPC Solarpark GmbH &Co KG

- Ceconat Energy GmBH

- REI Renewable Energy International S.à.r.l

- Roland Schumann

- Infraclass Energie 4 GmbH & Co KG

- ESPF Beteiligungs GmbH

b.   The Tribunal lacks jurisdiction over the dispute involving the Respondent and the following of the Claimants:

- AES Solar España Finance S.L.

- AES Solar España I B.V. y CIA S.C.

- La Solana S.L. 1 to La Solana S.L. 60 (60 entities)

c.   The Tribunal will take the necessary steps for the continuation of the proceedings toward the liability phase;

d.   The costs of the proceedings of the Jurisdictional Phase described in Section V.C.2. *supra* and amounting to EUR 442,152.22 shall be borne by the Claimants and by the Respondent in equal shares;

e.  Each Party shall bear the legal fees and other expenses which it incurred in connection with the Jurisdictional Phase described in Section V.C.2. *supra*;

f.  The Tribunal reserves the decision on the costs of the first phase of the proceedings (up to 11 January 2013), described in Section V.C.1. *supra.*

Date: 13 October 2014

Place of arbitration: Geneva, Switzerland


_____
The Hon. Charles N. Brower
Arbitrator
Subject to the attached Concurring and
Dissenting Opinion

_____
Judge Bernardo Sepúlveda-Amor
Arbitrator


_____
Prof. Gabrielle Kaufmann-Kohler
Presiding Arbitrator

## ANNEX A TO THE NOTICE OF ARBITRATION- INFORMATION ON THE CLAIMANTS

| Investor Group | Full name of the Claimant | Registered address of the Claimant | Nationality of Claimant | Total installed peak capacity of the Claimant's PV installations | Date on which the Claimant sent notice to Government of Spain requesting an amicable settlement of the dispute pursuant to Article 26(1) of the ECT |
|---|---|---|---|---|---|
| 1. HG Capital | 1. Mercurio Solar S.à.r.l<br>2. Tyche Solar S.à.r.l | 7a rue Robert Stumper, L-2557 Luxembourg | Luxembourg | 54.95 MWp | 08/03/2011 |
| 2. Ampere | Ampere Equity Fund B.V. | Nieuweroordweg 1, 3704 EC Zeist, The Netherlands | The Netherlands | 18.61MWp | 08/03/2011 |
| 3. Element Power | Element Power Holdings B.V. | Weena 327, 3013 AL Rotterdam, The Netherlands | The Netherlands | 14.86 MWp | 08/03/2011 |
| 4. MEIF | MEIF Luxembourg Renewables S.à.r.l | Level 3, 46 Place Guillaume II, L-1648 Luxembourg | Luxembourg | 18.5 MWp | 26/07/2011 |
| 5. Impax | 1. Impax Solar Investment S.à.r.l<br>2. Impax New Energy Investors S.C.A | 67 Rue Ermesinde, L-1469 Luxembourg | Luxembourg | 35 MWp | 08/03/2011 |
| 6. Whiteowl | WOC Photovoltaik Portfolio GmbH &Co KG | Saarbrücker Str. 37b, 10405 Berlin, Germany | Germany | 4.4 MWp | 08/03/2011 |
| 7. NIBC | 1. NIBC European Infrastructure Fund I C.V.<br>2. NEIF Infrastructure Investments Holding I B.V. | Carnegieplein 4, 2517 KJ The Hague, The Netherlands | The Netherlands | 11 MWp | 08/03/2011 |
| 8. Werec | 1. Werec I & Christiansund S.à.r.l. S.C.A.<br>2. Werec II & Trier SG S.à.r.l. S.C.A. | 1.  74 rue de Merl, L-2146 Luxembourg<br>2.  74 rue de Merl, L-2146 Luxembourg | Luxembourg | 12MWp | 10/06/2011 |

## ANNEX A TO THE NOTICE OF ARBITRATION- INFORMATION ON THE CLAIMANTS

| Investor Group | Full name of the Claimant | Registered address of the Claimant | Nationality of Claimant | Total installed peak capacity of the Claimant's PV installations | Date on which the Claimant sent notice to Government of Spain requesting an amicable settlement of the dispute pursuant to Article 26(1) of the ECT |
|---|---|---|---|---|---|
| 9.  AES | 1.  ASE C.V.<br><br>2.  AES Solar Energy Cooperatif U.A.<br><br>3.  AES Solar Energy Holdings B.V.<br><br>4.  AES Solar Energy B.V.<br><br>5.  AES Solar España I B.V.<br><br>6.  AES Solar España II B.V.<br><br>7.  AES Solar España Finance S.L.<br><br>8.  AES Solar España I B.V. y CIA S.C | 1.  Parklaan 32, 3016 BC Rotterdam, The Netherlands<br>2.  Parklaan 32, 3016 BC Rotterdam, The Netherlands<br>3.  Parklaan 32, 3016 BC Rotterdam, The Netherlands<br>4.  Parklaan 32, 3016 BC Rotterdam, The Netherlands<br>5.  Parklaan 32, 3016 BC Rotterdam, The Netherlands<br>6.  Parklaan 32, 3016 BC Rotterdam, The Netherlands<br>7.  Calle Monte Esquinza n28, Etlo. Derecha, Madrid Spain<br>8.  Calle Monte Esquinza n28, Etlo. Derecha, Madrid Spain | 1.  The Netherlands<br><br>2.  The Netherlands<br><br>3.  The Netherlands<br><br>4.  The Netherlands<br><br>5.  The Netherlands<br><br>6.  The Netherlands<br><br>7.  Spain<br><br>8.  Spain | 31.6MWp | 23/01/2011 and 24/02/2011 |
| 10. Eoxis | 1.  Eoxis B.V.<br><br>2.  Eoxis Holding S.A. | 1.  1118 BG, Luchthaven Schiphol, Schiphol Boulevard 179, B-Toren 5 De Verdieping, Amsterdam, The Netherlands<br>2.  38 Boulevard Joseph II, L-1840 Luxembourg | 1.  The Netherlands<br><br>2.  Luxembourg | 23.4MWp | 08/03/2011 |
| 11. MPC Capital | MPC Solarpark GmbH &Co KG | Palmaille 67, 22676 Hamburg, Germany | Germany | 9.62 MWp | 08/07/2011 |
| 12. Ceconat | Ceconat Energy GmBH | Europaallee 3, D-22850 Norderstedt, Germany | Germany | 4.3 MWp | 12/08/2011 |
| 13. Arisol | 1.  REI Renewable Energy International S.à.r.l<br>2.  Roland Schumann | 1.  65 Boulevard Grande- Duchess Charlotte, L-1331, Luxembourg<br>2.  Calle Enrique Wolfson 1, 20, PISO PO5, Puerta A, Santa Cruz de Tenerife, Spain | 1.  Luxembourg<br><br>2.  Germany | 1.4MWp | 02/08/2011 |
| 14. KGAL | Infraclass Energie 4 GmbH & Co KG | Toelzer Str. 15, D-82031 Gruenwald, Germany | Germany | 10.6MWp | 08/03/2011 |
| | ESPF Beteiligungs GmbH | Toelzer Str. 15, D-82031 Gruenwald, Germany | Germany | 10.9MWp | 08/03/2011 |
| | 60 La Solana S.L. entities numbered 1-60 | c/ Velázquez 57, 3º izda. 28001 Madrid, Spain | Spain | 6.5MWp | 08/03/2011 |