# EXHIBIT 56

OPINION OF ADVOCATE GENERAL

SZPUNAR

delivered on 3 March 2021 (1)

**Case C-741/19**

**Republic of Moldova**

**v**

**Komstroy, a company the successor in law to the company Energoalians**

(Request for a preliminary ruling from the Cour d'appel de Paris (Court of Appeal, Paris, France))

(Reference for a preliminary ruling – Energy Charter Treaty – Concept of investment – Disputes between an investor and a Contracting Party – Situation purely external to the EU legal order – Jurisdiction of the Court of Justice)

I.    **Introduction**

1.    The provisions of the Energy Charter Treaty ('the ECT') (2) have, since its signature by the European Union almost 30 years ago, been the subject matter of questions referred for a preliminary ruling only twice, including in the present case. (3) This case is therefore unique, first of all, in that it provides the Court with a welcome opportunity to rule on the meaning of provisions which, to date, have not been interpreted.

2.    Moreover, neither the European Union nor the Member States are involved in the dispute in which the questions referred arise: that dispute is between the Republic of Moldova and a Ukrainian company and therefore appears at first sight to be unconnected with the European Union.

3.    Finally, the present case should, according to my analysis, lead the Court to rule on an important issue, namely the compatibility with EU law of the dispute settlement mechanism established by the ECT, in the wake of the Court's judgment in *Achmea*. (4)

II.    **Legal framework**

A.    *The ECT*

4.    The ECT was signed by the European Union on 17 December 1994, and approved on behalf of the European Union by Decision 98/181. All the Member States, with the exception of the Italian Republic, are also parties to the ECT, as are 28 third countries.

5.    According to the preamble to the ECT:

'The Contracting Parties to this Treaty,

…

Having regard to the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991;

…

Wishing to implement the basic concept of the European Energy Charter initiative which is to catalyse economic growth by means of measures to liberalise investment and trade in energy;

…'

6.      The ECT consists of a preamble and eight parts. Parts I, II, III and V are entitled, respectively, 'Definitions', 'Commerce', 'Investment Promotion and Protection' and 'Dispute Settlement'.

7.      Article 1 of the ECT, entitled 'Definitions', provides:

'As used in this Treaty:

…

6.      "Investment" means every kind of asset, owned or controlled directly or indirectly by an investor and includes:

…

(c)      claims to money and claims to performance pursuant to contract having an economic value and associated with an investment;

…

(f)      any right conferred by … contract … to undertake any economic activity in the energy sector.

…

"Investment" refers to any investment associated with an economic activity in the energy sector and to investments or classes of investments designated by a Contracting Party in its area as "[European Energy] Charter efficiency projects" and so notified to the Secretariat.

7.      "Investor" means:

(a)      with respect to a Contracting Party:

(i)      a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

(ii)      a company or other organisation organised in accordance with the law applicable in that Contracting Party;

(b)      with respect to a "third State", a natural person, company or other organisation which fulfils, *mutatis mutandis*, the conditions specified in subparagraph (a) for a Contracting Party.

8.      "Make investments" or "making of investments" means establishing new investments, acquiring all or part of existing investments or moving into different fields of investment activity.

…

10.    "Area" means with respect to a State that is a Contracting Party:

    (a)    the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea;

    and

    (b)    subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.

With respect to a Regional Economic Integration Organisation which is a Contracting Party, area means the areas of the Member States of such Organisation, under the provisions contained in the agreement establishing that Organisation.

…'

8.    Article 26 of the ECT, entitled 'Settlement of disputes between an investor and a Contracting Party', states:

'1.    Disputes between a Contracting Party and an investor of another Contracting Party relating to an investment of the latter in the area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

2.    If such disputes cannot be settled according to the provisions of paragraph 1 within a period of three months from the date on which either party to the dispute requested amicable settlement, the investor party to the dispute may choose to submit it for resolution:

    (a)    to the courts or administrative tribunals of the Contracting Party to the dispute;

    (b)    in accordance with any applicable, previously agreed dispute settlement procedure; or

    (c)    in accordance with the following paragraphs of this Article.

…

6.    A tribunal established pursuant to paragraph 4 shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

…'

### B.    French law

9.    According to Article 1520 of the code de procédure civile français (French Code of Civil Procedure), an action for annulment against an arbitral award delivered in France is available only, inter alia, where the arbitral tribunal wrongly declared itself to have or not to have jurisdiction.

### III. The facts giving rise to the dispute in main proceedings, the questions referred and the procedure before the Court

10.    Under two contracts concluded on 1 and 24 February 1999, Ukrenergo, a Ukrainian electricity generator, sold electricity to Energoalians, a Ukrainian electricity distributor, which then sold it to Derimen Properties Limited ('Derimen'), a company registered in the British Virgin Islands, which in turn sold it to Moldtranselectro, a Moldovan public undertaking. The volumes of electricity to be supplied were determined

each month directly between Moldtranselectro and Ukrenergo, which supplied that electricity subject to the 'DAF Incoterms 1990', that is to say to the border between Ukraine and Moldova, on the Ukrainian side.

11.    Electricity was supplied over the course of 1999 and 2000, with the exception of May to July 1999. For each month of supply, Energoalians had to be paid by Derimen, which itself had to collect payment from Moldtranselectro. The prices applicable to the payments were fixed by amendments to the contract of 24 February 1999, under which the price paid to Derimen by Moldtranselectro was approximately twice the price paid to Energoalians by Derimen.

12.    Derimen paid Energoalians for all the electricity purchased, while Moldtranselectro paid Derimen only in part.

13.    By a contract of 30 May 2000, Derimen assigned to Energoalians the claim which it held against Moldtranselectro.

14.    Moldtranselectro partially settled its debt by assigning several claims which it held to Energoalians. Energoalians then unsuccessfully attempted to obtain payment of the remainder of its claim by bringing proceedings before the Moldovan and subsequently the Ukrainian courts.

15.    Taking the view that certain actions by the Republic of Moldova constituted serious breaches of undertakings made under the ECT, Energoalians initiated the arbitration procedure provided for in Article 26 of that Treaty.

16.    By a majority award delivered in Paris on 25 October 2013, the ad hoc arbitral tribunal declared itself to have jurisdiction and, considering that the Republic of Moldova had failed to comply with its undertakings under the ECT, ordered that State to pay a certain amount to Energoalians on the basis of that Treaty. The president of the ad hoc arbitral tribunal, for his part, expressed a dissenting opinion as regards the jurisdiction of the arbitral tribunal.

17.    The Republic of Moldova brought an action for annulment against that award, alleging infringement of a public-policy provision, namely that relating to the jurisdiction of the ad hoc arbitral tribunal, pursuant to Article 1520 of the French Code of Civil Procedure.

18.    By judgment of 12 April 2016, the cour d'appel de Paris (Court of Appeal, Paris, France) annulled the award on the ground that the arbitral tribunal had wrongly declared itself to have jurisdiction. That court held that the dispute between Energoalians and the Republic of Moldova concerned a claim, assigned by Derimen, having as its sole purpose the sale of electricity. In the absence of any contribution, such a claim could not, in its view, be regarded as an investment within the meaning of the ECT and, consequently, could not provide a basis for the jurisdiction of the arbitral tribunal.

19.    On appeal by Komstroy, which became the successor in law of Energoalians by act of transfer of 6 October 2014, the Cour de cassation (Court of Cassation, France), by judgment of 28 March 2018, set aside in its entirety the judgment of 12 April 2016 and referred the case back to the cour d'appel de Paris (Court of Appeal, Paris), sitting in a different composition.

20.    Before the latter court, the Republic of Moldova argues that the arbitral tribunal should have declined jurisdiction in the absence of an 'investment', within the meaning of the ECT, 'of' an enterprise of a Contracting Party to the ECT, 'in the area of' Moldova. It argues that the claim acquired by Energoalians from Derimen is not an 'investment' within the meaning of Article 26(1) of the ECT, read in the light of Article 1(6) of that treaty, and therefore could not be the subject of arbitration proceedings, since provision for such proceedings is made only with respect to Part III of the ECT, relating specifically to investments. Next, even if that claim could constitute an investment, it was not 'of' an undertaking of a Contracting Party, since Derimen is an undertaking of the British Virgin Islands. Finally, and in any event, that claim relates to a transaction for the sale of electricity which did not take place 'in the area' of Moldova, since the electricity was sold and transmitted only to the border between Ukraine and Moldova, on the Ukrainian side.

21.      By contrast, Komstroy takes the view that the arbitral tribunal had jurisdiction pursuant to Article 26 of the ECT, since all the conditions laid down by that provision were satisfied, because the matter at issue was an investment made in the area of Moldova.

22.      In the light of the foregoing, the cour d'appel de Paris (Court of Appeal, Paris) decided to stay the proceedings and to refer the following questions to the Court for a preliminary ruling:

'(1)      Must [Article 1(6) of the ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any contribution on the part of the investor in the host State can constitute an "investment" within the meaning of that article?

(2)      Must [Article 26(1) of the ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Parties to that Treaty constitutes an investment?

(3)      Must [Article 26(1) of the ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?'

23.      Written observations were submitted by the Republic of Moldova, the German, Spanish and Polish Governments and the European Commission.

24.      At the hearing on 17 November 2020, oral argument was presented on behalf of the Republic of Moldova, Komstroy, the French, German, Spanish, Italian, Hungarian, Netherlands, Polish, Finnish and Swedish Governments, as well as the Council of the European Union and the Commission.

## IV.   Analysis

25.      This case is unprecedented. First, the questions raised by the referring court are concerned with the interpretation of certain provisions of the ECT which the Court has not yet had to adjudicate upon. Secondly, the dispute in the main proceedings is between a non-EU country, the Republic of Moldova, and an undertaking from another third country, Ukraine.

26.      Accordingly, the Court's jurisdiction to answer the questions raised could be the subject of debate, since this case is concerned with the interpretation of an international convention, in a dispute which, at least at first sight, appears to be what might be called a 'purely external' situation.

27.      I must therefore examine whether the jurisdiction of the Court is established (A), before dealing with the substance of the questions referred (B).

### A.   The jurisdiction of the Court

28.      At the outset, I would recall that Article 267 TFEU provides that the Court is to have jurisdiction to give preliminary rulings concerning the interpretation of acts of the institutions of the European Union, it being understood that an international agreement concluded by the Council, in accordance with Articles 217 and 218 TFEU, constitutes such an act. In view of the fact that, as from its entry into force, the provisions of such an agreement form an integral part of the EU legal system, the Court has jurisdiction to give preliminary rulings concerning the interpretation of such an agreement. (5)

29.      Since the ECT was signed by and approved on behalf of the European Union, that agreement must be regarded as an act of the institutions of the European Union for the purposes of Article 267 TFEU. On the face of it, the Court therefore has jurisdiction to rule on the provisions of the ECT.

30.    However, such a finding is not sufficient to establish that the Court has jurisdiction. The case in the main proceedings involves neither the European Union nor the Member States. It is therefore necessary to examine whether that factor is likely to affect the Court's jurisdiction to answer the questions referred for a preliminary ruling.

### 1.    *The case-law on the interpretation of the provisions of an international agreement as regards their application outside the EU legal order*

31.    The case-law has provided some clarification as to the Court's jurisdiction to interpret an international agreement. In particular, the Court has held, in the judgments in *Andersson and Wåkerås-Andersson* (6) and *Salzmann,* (7) in relation to the provisions of the agreement on the European Economic Area of 2 May 1992 (OJ 1994 L 1, p. 3) ('the EEA agreement'), that the Court has no jurisdiction to rule on the interpretation of an agreement as regards its application in third countries.

32.    Applied to the main proceedings, that case-law would lead the Court to decline jurisdiction to rule on the interpretation of the ECT in a dispute between a company from one third country and another third country. However, I do not believe that, in the present case, such a solution is necessary.

33.    The conclusion reached by the Court in the judgments in *Andersson and Wåkerås-Andersson* (8) and *Salzmann,* (9) that is to say that the Court did not have jurisdiction to interpret the provisions of the EEA Agreement, cannot be understood in isolation, without an examination of the reasons for that conclusion. The Court's reasoning is based on two elements.

34.    First, the Court stated that its jurisdiction to interpret provisions of EU law applies only to the European Union. (10) In other words, the Court does not assume jurisdiction to interpret provisions which are intended to apply outside the EU legal order.

35.    Secondly, the Court's lack of jurisdiction is also established by the fact that the actual wording of the EEA Agreement confers jurisdiction to interpret the provisions of that agreement on the European Free Trade Agreement (EFTA) Court, (11) as regards its application outside the EU legal order, while ensuring that such an interpretation is in conformity with the case-law of the Court. It follows from the provisions of the EEA Agreement, by reason of the close links of that agreement with the EU legal order, that they must, in so far as they are identical in substance to the corresponding rules of the Treaties and the acts adopted in application thereof, be interpreted in conformity with the rulings of the Court. (12)

36.    The reasoning followed by the Court in the judgments in *Andersson and Wåkerås-Andersson* (13) and *Salzmann* (14) therefore seems to me to be guided by the objective of the preliminary ruling mechanism provided for in Article 267 TFEU, which is specifically to avoid divergences in the interpretation of EU law within the EU legal order. (15)

37.    However, that objective has also made it possible to establish the Court's jurisdiction to interpret provisions of EU law in disputes which do not fall strictly within the EU legal order. In particular, the Court held in the judgment in *Hermès* that, where a provision can apply both to situations falling within the scope of EU law and to situations not falling within that scope, it is clearly in the EU interest that, in order to forestall future differences of interpretation, that provision should be interpreted uniformly, whatever the circumstances in which it is to apply. It has thus assumed jurisdiction to interpret a provision of an international agreement to which the European Union is a party in a situation not falling within the scope of EU law. (16)

38.    In those circumstances, the judgments in *Andersson and Wåkerås-Andersson* (17) and *Salzmann* (18) cannot be understood as systematically excluding the Court's jurisdiction to interpret provisions of EU law in disputes which fall outside the EU legal order. That jurisdiction is generally assumed where the provision for which interpretation has been sought is intended apply both to situations which fall within the scope of EU law and to situations which do not.

**2.      The specific features of the ECT and their impact on the application of the related case-law to the present case**

39.      The ECT also has certain specific features in two respects, so that it cannot simply be treated in the same way as the EEA Agreement under examination in the case-law to which I have referred.

40.      In the first place, the ECT does not establish any court or tribunal responsible for ensuring the uniform interpretation of its provisions, in a manner consistent with the Court's interpretation within its legal order. The ECT is intended to be interpreted only in the course of the settlement of disputes by various arbitral or State tribunals in the Contracting Parties, which therefore cannot avoid divergences in interpretation. ([19](#))

41.      In the second place, as noted by the German Government in its written observations and by the Commission at the hearing, the ECT, although a multilateral agreement, consists of a set of bilateral obligations between the Contracting Parties, including the European Union and the Member States. ([20](#)) The obligations established by the ECT essentially allow the protection of investments made by investors from one Contracting Party in another Contracting Party. ([21](#)) The infringement of one of those obligations therefore does not mean that all the Contracting Parties are always able to claim compensation, as those obligations apply only bilaterally, between two Contracting Parties. ([22](#))

42.      The ECT thus establishes a set of bilateral obligations intended to govern, in the area which it covers, first, relations between the Contracting Parties and, secondly, relations between investors from a Contracting Party and the Contracting Party in whose area the investments have been made. It follows that, in theory, those obligations could also govern, within the European Union itself, relations between Member States and therefore apply within the EU legal order.

43.      Those two specific features of the ECT, as compared with the EEA Agreement, thus limit the possibility of applying the solution reached in the judgments in *Andersson and Wåkerås-Andersson* ([23](#)) *and Salzmann,* ([24](#)) in relation to the Court's lack of jurisdiction to interpret an international agreement, in situations external to the EU legal order.

44.      In the present case, the referring court is asking the Court to interpret provisions of an international agreement which are not interpreted uniformly, and in accordance with the case-law of the Court, in disputes outside the European Union and which could, in principle, also be applied to situations internal to the EU legal order.

45.      In those circumstances, I am of the view that the EU interest in the uniform interpretation of the provisions of the ECT cannot be excluded. I therefore conclude that the Court should, on that basis, assume jurisdiction to answer the questions referred for a preliminary ruling.

**3.      Doubts as to the applicability of the provisions of the ECT in the EU legal order**

46.      I must qualify that statement, however. That conclusion follows only if the provisions for which interpretation has been sought are indeed applicable in the EU legal order. If that is not the case, there is no EU interest in their uniform interpretation and the Court has no jurisdiction to interpret them.

47.      First, Article 26 of the ECT establishes a mechanism for settling disputes between investors from a Contracting Party and a Contracting Party, permitting recourse to an arbitral tribunal. In that regard, the Court ruled in the judgment in *Achmea* ([25](#)) that recourse to an arbitral tribunal established on the basis of an investment protection and promotion Treaty concluded between two Member States is not permitted within the EU legal order. In those circumstances, that judgment seems to me to suggest that Article 26 of the ECT would never be applicable within the EU legal order, with the result that the Court has no jurisdiction to interpret that provision.

48.      However, the ECT is not fully comparable to the Bilateral Investment Treaty ('the BIT') under examination in the judgment in *Achmea* and has certain specific features which must be taken into account in

order to provide a complete answer to the question of the compatibility with EU law of the dispute settlement mechanism which it establishes. I therefore invite the Court to take this opportunity to examine the implications of that judgment on the applicability of Article 26 of the ECT, since such an analysis is necessary to establish whether the Court has jurisdiction to answer the questions referred on the interpretation of that provision.

49.    Secondly, it is true that the judgment in *Achmea* has not settled the more general question of the compatibility with EU law of the substantive provisions of investment protection and promotion Treaties, where they are intended to govern relations between Member States. However, that judgment highlighted the difficulties related to the existence of such agreements when they apply in the European Union. (26) The question arises as to whether substantive provisions can be relied upon in a dispute between an investor from one Member State and another Member State before the courts of the latter. It is therefore necessary to examine whether the substantive provisions of the ECT may, in the wake of the judgment in *Achmea,* be held to be incompatible with EU law and thus inapplicable within the EU legal order.

50.    An examination of those matters will make it possible to identify whether the EU has an interest in the uniform interpretation of the provisions of the ECT and whether the Court has jurisdiction to answer the questions referred in the present case.

### (a)    The applicability in the EU legal order of the dispute settlement mechanism established by Article 26(1) of the ECT

51.    The question of the compatibility with EU law of dispute settlement mechanisms contained in Treaties which are binding on EU Member States has for several years been the subject of lively debate, both in the legal literature (27) and in practice. (28)

52.    The case which gave rise to the judgment in *Achmea* reflected this, and illustrates, if illustration is needed, the conflicting relationship between EU law and investment arbitration law. (29)

### (1)    The judgment in Achmea

53.    In the judgment in *Achmea,* (30)the Court held that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between two Member States under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

54.    In other words, the Court ruled that a dispute settlement clause contained in a BIT concluded between two Member States was incompatible with EU law.

55.    In that judgment, the Court based its reasoning on fundamental and indisputable principles of EU law. It pointed out, first of all, that an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system. (31) It recalled that the autonomy of EU law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law, (32) characterised, in particular, by its independent source, namely the Treaties, its primacy and its direct effect. (33)

56.    The Court went on to state that EU law is thus based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded. It also notes that that premiss implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. (34)

57.    Finally, the Court recalled that, in order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law. (35) It also stated that that system has as its keystone the preliminary

ruling procedure provided for in Article 267 TFEU, which has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties. (36)

58.    On the basis of those principles, the Court noted, first, that the arbitral tribunal established on the basis of the provisions of the BIT at issue could be called on to interpret or indeed to apply EU law. (37) Secondly, the Court held that the arbitral tribunal in question was outside the EU judicial system, so that the mechanism for settling disputes set up by the BIT could prevent disputes from being resolved in a manner which ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law. (38)

59.    The Court noted that this was the case even if the law of the Member States provides for the possibility for national courts to review the arbitral award, since such a review is limited and can take place only to the extent permitted by national law. To that effect, in the judgment in *Achmea,* the Court drew a distinction between a dispute settlement mechanism contained in an agreement between two Member States and commercial arbitration, which was actually held to be compatible with EU law since fundamental provisions of EU law can be examined in the context of the review of arbitral awards by national courts and, if necessary, be referred to the Court for a preliminary ruling. (39)

60.    I would point out that there is a fundamental difference between those two mechanisms. Commercial arbitration proceedings presuppose the exercise by each party of its autonomy. They entail the conclusion of an arbitration agreement, either at the same time as the conclusion the contract in respect of which related disputes will be subject to arbitration or once the dispute has arisen. In other words, the jurisdiction of a court or tribunal, in commercial arbitration, always derives from an arbitration agreement concerning a dispute specifically defined therein. The jurisdiction of such an arbitral tribunal cannot be regarded as falling within the system of jurisdictional protection established by the State. Rather, it derives from the autonomy of each of the parties involved in a commercial activity. (40) Indeed, it is from that autonomy that the possibility arises for the parties to decide to settle disputes by recourse to commercial arbitration.

61.    By contrast, the dispute settlement mechanism contained in an international agreement reflects a different logic. (41) In such circumstances, that mechanism constitutes an offer of general and permanent arbitration, which it will be for the other party to accept or reject. In other words, by means of that mechanism, the State waives the possibility that a dispute between it and an investor from another Member State falling within the scope of that agreement may be settled by the national courts. That waiver is systemic in nature, in that it may relate to all disputes falling within the scope of that agreement. Accordingly, the State creates a judicial protection mechanism, external to the judicial system established by it.

62.    It is precisely that aspect of the investment arbitration mechanisms provided for by agreements between Member States that the Court refers to in the judgment in *Achmea:* it is unacceptable for Member States, through an international commitment, systematically to exclude from the EU judicial system a number of disputes relating to the interpretation or application of EU law.

63.    In those circumstances, the Court ruled that the dispute settlement mechanism in question is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation. (42) According to the Court, it follows that the dispute settlement mechanism contained in the BIT at issue, under which any investor from one Member State may bring proceedings before an arbitral tribunal against a second Member State, has an adverse effect on the autonomy of EU law. (43)

64.    That solution is ultimately the precise expression of the autonomy of EU law, (44) itself based on the existence of mutual trust between the Member States, which share a set of values and recognise the effective sharing of those values. Thus, Member States are obliged to consider, other than in exceptional circumstances, that all the other EU Member States comply with EU law, including fundamental rights, inter alia the right to an effective remedy before an independent tribunal laid down in Article 47 of the Charter of Fundamental Rights of the European Union. (45)

65.     In other words, it is precisely because it is accepted and recognised, in the EU legal order, that Member States observe a set of values and rights, including the rule of law and the right to an effective remedy referred to above, that investors from Member States are also unequivocally guaranteed sufficient protection (46) in the EU legal order, with the result that there is no need to have recourse to a system outside the judicial systems of the Member States. (47)

66.     The importance of those values, in particular that of the rule of law, has also been recalled by the Court in various cases, (48) highlighting the role of the EU institutions, in particular that of the Commission, responsible for ensuring observance of them.

67.     The judgment in *Achmea* thus ended the uncertainties surrounding the relationship between EU law and the dispute settlement mechanisms contained in BITs concluded between two Member States.

68.     Moreover, almost all Member States have subsequently taken note of that decision, making various declarations (49) of their intention to denounce BITs between Member States. Those declarations were followed, on 5 May 2020, by the conclusion by 23 Member States of an agreement on the termination of BITs between EU Member States. (50)

69.     I should also point out that the incompatibility with EU law of an investment arbitration mechanism provided for by an international agreement arises directly from the principle of the primacy of EU law. From this follows their inapplicability in the EU legal order, without temporal limitation, with the result that an arbitral tribunal cannot, on that basis, be recognised as having jurisdiction.

   *(2)   The scope of the judgment in Achmea as regards the ECT*

70.     Nevertheless, the judgment in *Achmea* does not resolve all matters relating to the relationship between investment arbitration and EU law. In particular, that case involved a bilateral treaty to which two Member States were parties. The ECT, although providing for a dispute settlement mechanism similar to the one at issue in the judgment in *Achmea,* in that it allows recourse to an arbitral tribunal, is for its part a multilateral treaty to which the European Union and the Member States are parties.

71.     Those differences have limited the automatic application of the solution reached concerning BITs to the dispute settlement mechanism provided for in Article 26 of the ECT. The successive declarations of the Member States in that regard rightly illustrate existing divergences as regards the possibility of extending the scope of the judgment in *Achmea* to the dispute settlement mechanism provided for by the ECT (51) and, more fundamentally, as regards the compatibility of Article 26 of the ECT with EU law.

72.     It is therefore important to determine whether the Court's reasoning in the judgment in *Achmea* can apply as regards the compatibility of the dispute settlement mechanism provided for in Article 26 of the ECT. In that regard, the French, German, Spanish, Italian, Netherlands and Polish Governments and the Commission have argued that such a solution should be adopted and that the incompatibility of Article 26 of the ECT with EU law entails its inapplicability within the EU legal order. For their part, the Hungarian, Finnish and Swedish Governments argued at the hearing that the solution reached in the judgment in *Achmea* could not be applied to the dispute settlement mechanism established by Article 26 of the ECT.

73.     I am of the view that the dispute settlement mechanism provided for in Article 26 of the ECT, in so far as it allows recourse to an arbitral tribunal, undoubtedly leads to a similar result to the dispute settlement mechanism at issue in the judgment in *Achmea,* which was held to be incompatible with EU law.

74.     In the first place, I would point out that, like the dispute settlement mechanism at issue in the judgment in *Achmea,* Article 26 of the ECT allows disputes which may involve the interpretation of EU law to be brought before an investment arbitral tribunal.

75.     Article 26(6) of the ECT provides that the arbitral tribunal is to decide the issues in dispute in accordance with the ECT and 'applicable rules and principles of international law'. However, contrary to what is maintained

by the Finnish and Swedish Governments, and as the Court held in the judgment in *Achmea,* (52) given the nature and characteristics of EU law, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States. On that basis, the arbitral tribunal established under Article 26 of the ECT may, where necessary, be obliged to interpret or even apply EU law.

76.     In the second place, I am of the view that the arbitral tribunal established under Article 26 of the ECT, even in a dispute brought by an investor from one Member State against another Member State, falls outside the EU judicial system. (53)

77.     That arbitral tribunal is not a part of the judicial system of the Member States and it is precisely that exceptional nature which justifies the existence of such a dispute settlement mechanism. Nor does it constitute a court or tribunal common to several Member States, since it has no connection with the judicial systems of the Member States.

78.     In those circumstances, the arbitral tribunal established under Article 26 of the ECT cannot be regarded as a 'court or tribunal of a Member State', within the meaning of Article 267 TFEU, and is not entitled to make a reference to the Court for a preliminary ruling. The decisions of such a tribunal are therefore not subject to mechanisms capable of ensuring the full effectiveness of the rules of the EU. (54)

79.     It follows that, like the dispute settlement mechanism found to be incompatible with EU law in the judgment in *Achmea,* Article 26 of the ECT, in that it allows recourse to an arbitral tribunal, has, in my view, an adverse effect on the autonomy of EU law and is, on that basis, also incompatible with EU law.

80.     Such a conclusion is not called into question either by the specific features of the ECT, which led to uncertainties as to the application of the judgment in *Achmea* to the dispute settlement mechanism that the ECT establishes, or by the more recent case-law of the Court, invoked in particular by the Hungarian, Finnish and Swedish Governments at the hearing.

*(i)     The irrelevance of the specific features of the ECT as compared with a BIT*

81.     It is true that, unlike in the case of a BIT such as that with which the judgment in *Achmea was concerned,* the European Union is itself a party to the ECT and is therefore bound by it. Moreover, I note that the Court in that judgment expressly pointed out that the dispute settlement mechanism was provided for by an agreement concluded 'not by the EU but by Member States'. (55) Does this necessarily mean that the same solution could not apply in the case of an international agreement concluded by the Member States *and* the European Union? I do not think so.

82.     In that regard, I note that it is common ground that an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not, in principle, incompatible with EU law. The European Union's competence in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such an agreement as regards the interpretation and application of its provisions. (56)

83.     However, such a power may be accepted only provided that the autonomy of the EU and its legal order is respected. (57) As I have stated in points 78 and 79 of this Opinion, the dispute settlement mechanism provided for in Article 26 of the ECT, in that it allows recourse to arbitration, actually has an adverse effect on the autonomy of EU law. In those circumstances, the fact that the European Union is also a party to the ECT cannot affect that finding.

*(ii)   The distinction from Opinion 1/17*

84.     Lastly, the Hungarian, Finnish and Swedish Governments argued at the hearing that Opinion 1/17 (EU-Canada CET Agreement) (58) had introduced a new analytical approach for dispute settlement mechanisms

external to the EU judicial system. Such a mechanism is not in itself incompatible with EU law, provided that it does not permit the interpretation or application of the provisions of EU law by a court outside the EU judicial system and ensures that the awards made by that court cannot have the effect of preventing the EU institutions from functioning in accordance with the EU constitutional framework.

85.    However, that line of argument is not convincing. On the one hand, as set out in points 74 and 75 of this Opinion, I take the view that Article 26 of the ECT in fact permits the interpretation or application of provisions of EU law by an arbitral tribunal outside the EU judicial system. Moreover, Article 26 of the ECT differs from the dispute settlement mechanism provided for in the Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part ('the CETA'), in that the latter mechanism contains an express reservation with regard to the interpretation of EU law, (59) while there is no such reservation under Article 26 of the ECT.

86.    On the other hand, and more importantly, I note that, in Opinion 1/17 (EU-Canada CET Agreement), (60) the Court's reasoning with respect to the dispute settlement mechanism contained in the CETA cannot influence the analysis of Article 26 of the ECT. As the Court noted in that Opinion, the question of the compatibility, with EU law, of the creation or preservation of an investment tribunal by means of an agreement binding the Member States with regard to each other must be distinguished from the question of the compatibility, with EU law, of the creation of such a tribunal by means of an agreement between the Union and non-Member States. (61) The line of argument of the Hungarian, Finnish and Swedish Governments could therefore succeed only if the ECT governed relations between the European Union and non-Member States.

87.    Although Member States are bound by the principle of mutual trust, that principle in no way applies in relations between the European Union and non-Member States. More specifically, relations with non-Member States are not based on the fundamental premiss that each Member State shares with all the other Member States and recognises that they share with it a set of common values and therefore respect the EU law implementing those values. As Advocate General Bot has pointed out, in the context of an agreement with non-Member States, neither of the Parties necessarily trusts the judicial system of the other Party to ensure that the rules contained in the agreement are observed. (62) The lack of mutual trust, as it exists within the European Union, is precisely why Contracting Parties decide to agree on a neutral dispute settlement mechanism. (63) Such a mechanism, unconnected with the two Parties, makes it possible to ensure the trust of the Contracting Parties as regards application of the agreement, but that trust cannot be confused with the mutual trust which frames relationships within the EU legal order.

88.    In those circumstances, Opinion 1/17 (EU-Canada CET Agreement) (64) has no effect on the analysis, in the light of the principles set out in the judgment in *Achmea,* of the dispute settlement mechanism provided for in Article 26 of the ECT, in that it allows recourse to an arbitral tribunal, since that agreement governs relationships between Member States.

*(3)    Conclusion on the applicability of Article 26 of the ECT in the EU legal order*

89.    It follows from all the foregoing that the dispute settlement mechanism provided for in Article 26 of the ECT is, in my view, incompatible with EU law, in that it allows an arbitral tribunal located outside the EU judicial system, in the event of a dispute between an investor from one Member State and another Member State, to interpret or apply EU law and thereby calls into question the principle of mutual trust between the Member States and the preservation of the particular nature of the law established by the Treaties, while at the same time having an adverse effect on the autonomy of EU law. To that extent, therefore, Article 26 of the ECT is not intended to apply within the EU legal order.

90.    That said, the fact that it is impossible for an investor from one Member State to have recourse to arbitration in a dispute between it and another Member State does not imply that Article 26 of the ECT is never applicable within the EU legal order. Investors from one Member State might still, in principle, bring proceedings against another Member State before its courts in a dispute covered by that provision. (65) Such a possibility depends, however, on whether the substantive provisions of the ECT can form the basis of such

claims and, therefore, whether they are, in turn, applicable in the EU legal order. I shall now examine that question.

### (b)    The applicability of Article 1(6) of the ECT in the EU legal order

91.    Article 1(6) of the ECT defines the concept of 'investment', as used in the provisions of the ECT, and is contained in the first part of the ECT, entitled 'Definitions and Purpose'. That provision is therefore one of the introductory provisions of the ECT, which are intended more generally to establish the scope and purpose of that treaty and to define the terms used in its provisions.

92.    In other words, Article 1(6) of the ECT, in so far as it determines the material scope of the ECT, also has the effect of triggering the application of the substantive protective provisions of the ECT.

93.    In those circumstances, the applicability in the EU legal order of that provision depends essentially on whether the substantive rules to which it gives effect are themselves applicable in the EU legal order, so that investors from one Member State can rely on them in proceedings against another Member State before the courts of that State.

94.    While the judgment in *Achmea* has not settled that issue, it did reveal certain doubts as to the possibility of applying, within the European Union, the substantive provisions of investment promotion and protection treaties in general and of the ECT in particular. (66)

95.    I do not believe, however, that it is possible in the present case, and in purely theoretical terms, to answer that question with any certainty. To do so would require an abstract and exhaustive analysis of all the possible overlaps between EU law and the ECT. (67) I do not think it is appropriate to carry out such an analysis at the stage of examining whether the Court has jurisdiction to answer questions referred for a preliminary ruling and in the context of the present case. It should also be pointed out that that issue has not been the subject of debate between the parties. (68)

96.    Moreover, I would point out that the only argument relating to the incompatibility of the substantive provisions of the ECT with EU law, briefly expressed in the present case, was made by the Italian Government and the Commission, on the ground that EU law provides for investment protection instruments equivalent to the investment protection instruments of the ECT. At first sight, however, it is not clear to me why that equivalent protection would in itself imply incompatibility with EU law.

97.    In those circumstances, I am of the view that the incompatibility with EU law of the substantive provisions of the ECT, including Article 1(6) of the ECT, cannot, at this stage and with certainty, be either excluded or accepted. It must therefore be presumed that those provisions are intended to apply within the EU legal order.

### 4.    Conclusion on the jurisdiction of the Court

98.    Article 26 of the ECT is, in my view, not compatible with EU law in that it provides for recourse to an arbitral tribunal, with the result that such a dispute settlement mechanism cannot apply within the EU legal order.

99.    However, in so far as it cannot be excluded at this stage that the substantive provisions of the ECT, including Article 1(6) of the ECT, may be applicable in the EU legal order, it must also be presumed that those provisions may be relied on by investors from a Member State in a dispute against another Member State before the courts of the latter State, as referred to in Article 26 of the ECT. In those circumstances, both Article 1(6) and Article 26 of the ECT must be considered as being applicable within the EU legal order.

100. It follows that it is clearly in the interest of the European Union that those provisions should be interpreted uniformly, so that the Court should have jurisdiction to answer all the questions referred for a preliminary ruling.

### B.    Substance

### 1.    The first question referred: the concept of 'investment' within the meaning of Article 1(6) of the ECT

101. By its first question, the referring court seeks to ascertain, in essence, whether Article 1(6) of the ECT must be interpreted as meaning that a claim which arose from an electricity contract and which did not involve any contribution on the part of the investor in the host State can constitute an investment.

102. At the hearing, Komstroy argued that the concept of 'investment' is defined by the ECT and that that definition is, in itself, sufficient, although it is supported by a non-exhaustive list of examples of assets constituting an investment within the meaning of the ECT. Komstroy also argued that the proper meaning of the terms in Article 1(6) of the ECT is clear, so that there is no need to interpret them or to refer to criteria outside the given definition. Finally, Komstroy maintains that Article 1(6) of the ECT itself provides that a contractual claim may be regarded as an investment because reference is made in Article 1(6)(c) and (f) of the ECT, respectively, to 'claims to money' and to 'any right conferred by … contract'.

103. The Republic of Moldova, the Spanish, Netherlands and Polish Governments and the Commission argue that a claim arising from a contract of sale cannot constitute an investment within the meaning of Article 1(6) of the ECT. They maintain that although Article 1(6)(c) of the ECT provides that a claim to money constitutes an investment, it is only provided that the claim is 'associated with an investment'. However, a claim arising from a contract of sale cannot be regarded as being 'associated with an investment'. The Republic of Moldova further states that reference should be made to the ordinary meaning of the term 'investment', thus implying a capital contribution, which is absent in the case of a contractual claim. Finally, the Republic of Moldova and the Commission emphasise the importance of distinguishing between what constitutes trade and what constitutes an investment, as only investments are protected by Part III of the ECT.

104. Article 1(6) of the ECT defines investment as 'every kind of asset, owned or controlled directly or indirectly by an investor'. In so doing, the ECT provides an imprecise definition which seems, at first sight, to be limited only by the purpose of the activity with which that investment is associated. That provision adds that an investment within the meaning of the ECT must be associated with an economic activity in the energy sector.

105. That definition is supplemented by a non-exhaustive list of specific examples of investments within the meaning of that provision. It follows, as Komstroy argues, that where the asset in question clearly comprises one of the investments expressly referred to in Article 1(6) of the ECT, there is in principle no need to interpret that provision. ([69](#))

106. As regards contractual claims, they are likely to fall within the definition in Article 1(6) of the ECT, both under Article 1(6)(c) and Article 1(6)(f) of the ECT. Those provisions refer to 'claims to money … pursuant to contract having an economic value and associated with an investment' ([70](#)) and 'any right conferred by … contract … to undertake any economic activity in the energy sector'. ([71](#))

107. I note, however, that while those two provisions provide examples of investments within the meaning of the ECT, they also add further requirements for classification as an investment. First, Article 1(6)(c) of the ECT provides that a claim to money is an investment provided that it arises from a contract which is itself associated with an investment. Secondly, Article 1(6)(f) of the ECT provides that a right conferred by a contract is an investment provided that it was conferred to undertake an economic activity in the energy sector. In other words, a claim arising from a contract is not automatically an investment within the meaning of the ECT, and certain limitations are imposed by its wording.

108. However, the addition of those requirements makes it difficult, if not impossible, unambiguously to link any contractual claim to one or other form of investment within the meaning of Article 1(6) of the ECT. A contractual claim, in particular where it arises from a contract for the sale of electricity, cannot be covered with certainty by Article 1(6)(c) or (f) of the ECT, without it having been determined beforehand what the additional requirements laid down in those provisions entail.

109. It is therefore necessary to provide an interpretation of those two provisions, which, in accordance with Article 31(1) of the Vienna Convention, (72) must be interpreted 'in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose'.

### (a)  Article 1(6)(c) of the ECT

110. With regard to Article 1(6)(c) of the ECT, which provides that a claim must arise out of a contract associated with an investment, I note therein a certain ambiguity. That provision defines the claims to money which can be regarded as an investment by reference to the concept of investment. In other words, the concept of investment is both the defined concept and the concept used to define it. Article 1(6)(c) of the ECT is, in that regard, circular in nature. (73)

111. In those circumstances, and in order to avoid that circularity, the term 'investment' referred to in Article 1(6)(c) of the ECT can only be understood as having a meaning other than that specifically referred to in that provision. As the Polish Government points out, a claim to money is an investment only if it is established pursuant to a contract that is itself associated with another investment within the meaning of the ECT which does not fall within the scope of Article 1(6)(c) of the ECT.

112. However, none of the other investments referred to in Article 1(6) of the ECT can be understood as covering the supply of electricity, which is the subject matter of the contract from which arose the claim to money under consideration. None of the subparagraphs of that provision refers to a simple commercial transaction. (74) It therefore follows from a literal interpretation of Article 1(6) of the ECT that a claim arising from an electricity supply contract and not involving any contribution is not a claim to money pursuant to a contract having an economic value associated with an investment.

113. The literal interpretation of Article 1(6)(c) of the ECT is next borne out by the use of the ordinary meaning of the term 'investment', as referred to in that provision. (75)

114. In ordinary usage, as the Republic of Moldova and the Commission argue, that term generally refers to a transaction consisting of a financial contribution made over a certain period of time and involving some risk. (76)

115. In the same vein, arbitral case-law has, moreover, gradually developed an objective definition of the concept of 'investment', according to which an investment presupposes the combination of three elements: a contribution by the investor, a certain duration of performance and a participation in the risks of the transaction. (77)

116. Although that definition was developed in relation to the concept of 'investment' in the Convention on the Settlement of Investment Disputes between States and Nationals of other States, signed in Washington on 18 March 1965, it seems to me that it nonetheless contains the essential elements of what may constitute an investment and is, to that effect, often referred to in the legal literature when proposing a general definition of that concept. (78)

117. According to that meaning of the term 'investment', a claim to money is therefore an investment within the meaning of Article 1(6) of the ECT, provided that it has arisen from a contract which involved a contribution on the part of the presumed investor and the expectation of a gain, which is not guaranteed. That meaning of the term 'investment', as set out in Article 1(6)(c) of the ECT, is also found in both arbitral case-law (79) and the legal literature. (80)

118. However, an electricity supply contract is a simple commercial transaction which cannot be covered by the concept of investment, since it entails neither a contribution (81) nor an expectation of income dependent on the contribution. I am therefore of the view that a claim arising from an electricity supply contract is not associated with an investment and does not fulfil the requirement laid down in Article 1(6)(c) of the ECT.

119. Finally, such an interpretation of the concept of 'investment', within the meaning of Article 1(6)(c) of the ECT, is supported by an examination of the overall logic of the ECT and of the investment protection system established. As pointed out by the Commission, the ECT distinguishes between rules on trade, contained in Part II of the ECT, and rules on investment promotion and protection, contained in Part III. A simple commercial transaction therefore cannot, in itself, be treated in the same way as an investment, without rendering meaningless the distinction between what constitutes trade and what constitutes an investment and requires, on that basis, special protection. ([82](#))

120. The concept of 'investment' within the meaning of Article 1(6)(c) of the ECT therefore cannot be confused with a mere commercial activity, with the result that a claim arising from an electricity supply contract, which does not involve a contribution and the expectation of a gain dependent on that contribution, cannot fall within its scope.

### (b)   Article 1(6)(f) of the ECT

121. Article 1(6)(f) of the ECT refers to 'any right conferred by … contract … to undertake any economic activity in the energy sector'. I would point out in that regard that Article 1(6) of the ECT already provides, in general terms, that an investment within the meaning of the ECT must be associated with an economic activity in the energy sector. Thus, the requirement laid down by Article 1(6)(f) of the ECT cannot be understood in the same way, otherwise that specific information would be rendered meaningless.

122. Article 1(6)(f) of the ECT therefore does not cover any contractual right associated with an economic activity in the energy sector, but adds an additional requirement for a contractual right to be regarded as a protected investment within the meaning of the ECT. This is apparent from the actual wording of that provision. Thus, the use of the words 'to undertake' indicates that the contractual right in question must have been conferred for the *purposes* of undertaking an economic activity in the energy sector. ([83](#)) The contractual right must allow a beneficiary to undertake an economic activity in the energy sector which he would otherwise be unable to undertake. In other words, the contractual right must allow that activity to be undertaken and create the conditions for it to be undertaken. ([84](#))

123. However, although a contractual claim is actually a right conferred by contract, it cannot be regarded as permitting an economic activity in the energy sector to be undertaken when that claim is acquired *after* its creation by the original holder. In those circumstances, the claim gives its holder not the right to undertake an economic activity in the energy sector, but only the right to claim payment for it.

124. Moreover, even if it were necessary to take into account the origin of the claim, *quod non*, that is to say the electricity supply contract, I am of the view that the same result would be reached. Although a contract for the sale of electricity between two companies indeed allows one of them to supply electricity to the other, it is not the contract which authorises the exercise of an economic activity in the energy sector. The company supplying the electricity is already in a position to supply the electricity in question to the other Contracting Party, so that the contract in no way contains an authorisation or a right to undertake an economic activity in the energy sector in the host country.

125. Accordingly, such a claim is not, in my view, covered by Article 1(6)(f) of the ECT.

126. It follows from the foregoing that neither Article 1(6)(c) nor Article 1(6)(f) of the ECT can be interpreted as meaning that a claim arising from an electricity supply contract and involving no contribution is an investment within the meaning of those provisions.

### (c)   The general definition of the concept of 'investment' in Article 1(6) of the ECT

127. The fact remains that Article 1(6) of the ECT also provides a general, albeit vague, definition of 'investment' and that the list of investments which it provides is not exhaustive. It could therefore be argued that a claim which is not covered by Article 1(6)(c) or (f) of the ECT could nevertheless constitute an investment

within the meaning of Article 1(6) of the ECT, in that it constitutes an 'asset, owned or controlled directly or indirectly by an investor'.

128. That line of argument is not convincing. As I have pointed out, (85) contractual claims are the only assets for which Article 1(6) of the ECT lays down express limitations as to their permissibility as investments. It is therefore not possible to refer to the general definition of the concept of 'investment' for the sole purpose of avoiding the limitations provided for in Article 1(6)(c) and (f) of the ECT, short of denying the existence of those specific provisions and giving a *contra legem* interpretation of the concept of 'investment' within the meaning of the ECT.

129. Accordingly, I propose that the answer to the first question referred should be that Article 1(6) of the ECT must be interpreted as meaning that a claim arising from an electricity supply contract which did not involve any contribution is not an investment within the meaning of that provision.

## 2. *The second question referred*

130. By its second question, the referring court seeks to ascertain, in essence, whether Article 26(1) of the ECT must be interpreted as meaning that the acquisition, by an undertaking of a Contracting Party, of a claim established by an economic operator from a third State not party to the ECT constitutes an investment.

131. In that regard, I would recall that the claim in question arises from a contractual relationship between Moldtranselectro and Derimen, the latter company being registered in the British Virgin Islands, that is to say a third State not party to the ECT.

132. Article 26(1) of the ECT allows for the settlement of disputes between one Contracting Party and an investor from another Contracting Party where the dispute relates to an investment *made by that investor*. The referring court asks whether the origin of the claim, where that claim was originally established by an economic operator from a third State not party to the ECT, has any effect on its classification as an 'investment' within the meaning of Article 26(1) of the ECT, which requires that such an investment be made by an investor from a Contracting Party.

133. At the outset, I would point out that, in view of my proposed answer to the first question, it is not necessary to answer the second question, since, by answering the first question in the negative, it is not necessary to determine whether the origin of the claim has an impact on its permissibility as an investment made by an investor from a Contracting Party for the purposes of Article 26(1) of the ECT.

134. For the sake of completeness, I shall nevertheless examine the second question referred, in the event that the Court does not agree with my analysis of the first question, assuming that such a claim may constitute an investment within the meaning of Article 1(6) of the ECT.

135. As the referring court points out, and as the Republic of Moldova notes, in order to determine whether an investment has been 'made by an investor from a Contracting Party', reference should be made to Article 1(8) of the ECT, which defines the term 'making of investments'. That provision provides in particular that an investment may be made by the acquisition of all or part of existing investments. It does not, however, require that the existing investment in question was originally made in a State party to the ECT.

136. The Republic of Moldova nevertheless maintains that such a requirement exists. In its view, the term 'existing investment' must be understood according to the definition of 'investment' in Article 1(6) of the ECT, which provides that an investment must be 'owned or controlled directly or indirectly by an investor'. However, it notes that Article 1(7) of the ECT in turn defines the term 'investor' as, 'a company or other organisation organised in accordance with the law applicable in [a] Contracting Party'. Thus, the Republic of Moldova argues that, since the economic operator, the original holder of the claim at issue, is an operator from a third State not party to the ECT, it cannot be regarded as an investor within the meaning of Article 1(7) of the ECT, so that the claim at issue cannot constitute an 'existing investment' made by a company of a Contracting Party for the purposes of Article 1(8) and Article 26(1) of the ECT.

137. That line of argument is not convincing. While the Republic of Moldova's reasoning on the need to refer to Article 1(6) to (8) of the ECT to define what is covered by the term 'investment of' is to be endorsed, the conclusion reached by it is nevertheless based on a partial reading of those articles.

138. Not only, as I have pointed out, (86) does Article 1(8) of the ECT not impose any requirement relating to the geographical origin of the existing investment, but the provisions under consideration expressly provide that such an investment may be made by an economic operator from a third State not party to the ECT. Indeed, Article 1(7) of the ECT defines the concept of 'investor' with respect both to Contracting Parties and to third States. It is therefore clearly accepted that an investor may be from a third State not party to the ECT, without this implying that the investments he makes are not existing investments within the meaning of the ECT. (87)

139. In those circumstances, the fact that the claim was established by an economic operator from a third State not party to the ECT has no bearing on its classification as an 'existing investment', since that operator must also be regarded, according to the ECT, as an investor.

140. It follows that the acquisition, by an operator from a Contracting Party, of a claim established by an economic operator from a third State not party to the ECT must be regarded as the acquisition of an existing investment and therefore as constituting an investment made by an investor from a Contracting Party for the purposes of the ECT.

141. However, the Republic of Moldova, Komstroy and the Commission expressed a reservation as to the possibility of an abuse of rights in those circumstances. Indeed, it cannot be excluded that an investment made by an operator from a third State not party to the ECT may be acquired by an investor from a Contracting Party solely for the purpose of benefiting from the protection afforded by the ECT, in particular to implement Article 26(1) of the ECT in order to bring an action against a Contracting Party, which otherwise would not have been possible.

142. Although it is true that such a possibility exists, it is nevertheless not sufficient automatically to exclude, from the benefit of the investment protection conferred by recourse to dispute settlement, an investment acquired from an operator from a third State not party to the ECT. Not only does such an interpretation not seem to me to be compatible with the previously examined provisions of the ECT, but it would imply that no investment acquired from a foreign investor would ever be protected under the ECT.

143. In those circumstances, the existence of an abuse of rights can be taken into account only on a case-by-case basis and cannot justify a principle according to which an investment acquired by an investor of a Contracting Party from an investor of a third State not party to the ECT must not to be regarded as an investment made by the former for the purposes of Article 26(1) of the ECT. It will therefore be for the referring court to ascertain Komstroy's reasons for acquiring the claim at issue, in order to determine whether that acquisition was made for the sole purpose of bringing an action against the Republic of Moldova under the ECT.

144. Therefore, in the event that the Court does not agree with my analysis of the first question referred, I propose that the answer to the second question referred should be that Article 26(1) of the ECT must be interpreted as meaning that the acquisition of a claim established by an investor from a third State not party to the ECT is an investment within the meaning of that provision, unless the sole purpose of such an acquisition was to benefit from the protection afforded by the provisions of the ECT and, in particular, to enable an action to be brought before an arbitral tribunal against a Contracting Party, which it will be for the referring court to ascertain.

### 3.   *The third question referred*

145. By its third question, the referring court seeks to ascertain, in essence, whether Article 26(1) of the ECT must be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that State.

146. Again, I note that the third question is of a subsidiary nature. If the answer to the first question referred is that a claim arising from an electricity supply contract is not an investment, it is not necessary to determine whether that claim was established in *the area of* another Contracting Party.

147. For the sake of completeness, I shall nevertheless examine the third question referred, in the event that the Court does not agree with my analysis of the first two questions, assuming, *quod non*, that a claim arising from an electricity supply contract is an investment within the meaning of the ECT.

148. The Republic of Moldova, supported in that regard by the Spanish Government and the Commission, argues that no investment was made on its territory, since the electricity supplied under the contract from which the claim arose was supplied only to the border between Ukraine and Moldova, on the Ukrainian side.

149. That line of argument is based on a reading of Article 1(6)(c) of the ECT, which provides that a claim to money is an investment if it has been established under a contract which is itself associated with an investment. It seems to me, however, to disregard an essential element. If it is relevant to examine the investment with which the contract giving rise to the claim at issue is associated in order to classify that claim as an 'investment', once this has been established, the investment covered is the claim alone, and there is subsequently no need to refer again to the associated investment.

150. The investment which forms the subject matter of the dispute and must, on that basis, be examined in the light of Article 26(1) of the ECT is therefore not the supply of electricity provided for by the contract giving rise to the claim, but the claim itself. It is therefore necessary only to determine whether the acquisition of such a claim can be regarded as an investment in the area of Moldova, without it being necessary to identify whether the contract under which that claim was established is associated with an investment which was itself made in that area.

151. The investment at issue, that is to say the claim, is in the present case held by a Ukrainian investor, against a company established in Moldova. Article 1(10) of the ECT simply defines the term 'area' as 'the territory under its sovereignty'. It follows that a claim held against a company established on Moldovan territory can be regarded as an investment made in the area of that Contracting Party, since the location of the debtor of the claim is sufficient to establish this.

152. In any event, the same result would be achieved if the Court upheld the Republic of Moldova's argument that it is necessary also to ascertain the area where the investment with which the contract giving rise to the claim is associated was made.

153. Formally, electricity is actually supplied up to the border with Moldova. However, and short of adopting an excessively formalistic solution, it nevertheless remains the case that the electricity is ultimately fed into the Moldovan network and that that fact is at the heart of the matter. The fact that it was supplied by the operator on one or the other side of the border cannot affect that outcome. (88) In fact, the electricity supplied is still intended for distribution on Moldovan territory and, therefore, in the area of that Contracting Party. (89)

154. Therefore, in the event that the Court does not agree with my analysis of the first and second questions referred, I propose that the answer to the third question referred should be that Article 26(1) of the ECT must be interpreted as meaning that a claim held by an investor of one Contracting Party against an operator of another Contracting Party is an investment of the former in the area of the latter.

## V.    Conclusion

155. In the light of the foregoing considerations, I propose that the Court should answer as follows the questions referred by the cour d'appel de Paris (Court of Appeal, Paris, France):

Article 1(6) of the Energy Charter Treaty, signed in Lisbon on 17 December 1994 and approved on behalf of the European Union by Council and Commission Decision 98/181/EC, ECSC, Euratom of

23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects, must be interpreted as meaning that a claim arising from an electricity supply contract which did not involve any contribution is not an investment within the meaning of that provision.

---

1    Original language: French.

---

2    Signed in Lisbon on 17 December 1994 (OJ 1994 L 380, p. 24) and approved on behalf of the European Union by Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects (OJ 1998 L 69, p. 1).

---

3    The other cases relating to the interpretation of the ECT are Joined Cases *Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie) and Others* (C-798/18 and C-799/18), which are pending before the Court.

---

4    Judgment of 6 March 2018 (C-284/16, EU:C:2018:158; 'the judgment in *Achmea*').

---

5    Judgments of 30 April 1974, *Haegeman* (181/73, EU:C:1974:41, paragraphs 2 and 4); of 15 June 1999, *Andersson and Wåkerås-Andersson* (C-321/97, EU:C:1999:307, paragraph 26); and of 7 June 2018, *KP* (C-83/17, EU:C:2018:408, paragraph 24).

---

6    Judgment of 15 June 1999 (C-321/97, EU:C:1999:307, paragraph 28).

---

7    Judgment of 15 May 2003 (C-300/01, EU:C:2003:283, paragraph 66).

---

8    Judgment of 15 June 1999 (C-321/97, EU:C:1999:307).

---

9    Judgment of 15 May 2003 (C-300/01, EU:C:2003:283).

---

10    Judgments of 15 June 1999, *Andersson and Wåkerås-Andersson* (C-321/97, EU:C:1999:307, paragraph 28), and of 15 May 2003, *Salzmann* (C-300/01, EU:C:2003:283, paragraph 66).

---

11    Judgments of 15 June 1999, *Andersson and Wåkerås-Andersson* (C-321/97, EU:C:1999:307, paragraph 29), and of 15 May 2003, *Salzmann* (C-300/01, EU:C:2003:283, paragraph 67).

---

12    See Article 6 of the EEA Agreement and the fifteenth recital in the preamble to that agreement. In that respect, see also, Baudenbacher, C., 'The Relationship Between the EFTA Court and the Court of Justice of the European Union', in Baudenbacher, C. (ed.), *The Handbook of EEA Law*, Springer, 2016, pp. 179-194.

---

13    Judgment of 15 June 1999 (C-321/97, EU:C:1999:307).

14      Judgment of 15 May 2003 (C-300/01, EU:C:2003:283).

---

15      Judgments of 12 June 2008, *Gourmet Classic* (C-458/06, EU:C:2008:338, paragraph 20), and of 21 July 2011, *Kelly* (C-104/10, EU:C:2011:506, paragraph 60), as well as Opinion 1/09 of 8 March 2011 (EU:C:2011:123, paragraph 83).

---

16      Judgment of 16 June 1998, *Hermès* (C-53/96, EU:C:1998:292, paragraph 32).

---

17      Judgment of 15 June 1999 (C-321/97, EU:C:1999:307).

---

18      Judgment of 15 May 2003 (C-300/01, EU:C:2003:283).

---

19      This is evidenced by the divergences in the arbitral case-law as to the interpretation of the concept of 'investment', the subject of the questions referred in the present case.

---

20      Parties to the ECT, with the exception of the Italian Republic.

---

21      See, by way of example, Article 10(1) of the ECT: 'Each Contracting Party shall … encourage and create stable, equitable, favourable and transparent conditions for investors of other Contracting Parties to make investments in its area.'

---

22      Concerning the existence of bilateral obligations within multilateral conventions, see judgment of the International Court of Justice of 5 February 1970, *Barcelona Traction, Light and Power Company, Limited* (*Belgium* v. *Spain*), ICJ Reports 1970, p. 3, paragraphs 33 and 35.

---

23      Judgment of 15 June 1999 (C-321/97, EU:C:1999:307, paragraph 28).

---

24      Judgment of 15 May 2003 (C-300/01, EU:C:2003:283, paragraph 66).

---

25      Paragraph 60 and operative part.

---

26      See, in that regard, Communication from the Commission to the European Parliament and the Council of 19 July 2018 on the protection of intra-EU investment, COM(2018) 547 final.

---

27      See, in particular, as regards the legal literature prior to the judgment in *Achmea*, Eilmansberger, T., 'Bilateral investment Treaties and EU Law', *Common Market Law Review*, 2009, vol. 46(2), pp. 383-429; Hindelang, S., 'Circumventing Primacy of EU Law and the CJEU's Judicial Monopoly by Resorting to Dispute Resolution Mechanisms Provided for in Inter-se Treaties? The Case of Intra-EU Investment Arbitration', *Legal Issues of Economic Integration*, 2012, vol. 39(2), pp. 179-206; and Miron, S., 'The Last Bite of the BITs – Supremacy of EU Law versus Investment Treaty Arbitration', *European Law Journal*, 2013, vol. 20(3), pp. 332-345.

---

28    See, by way of illustration, *Vattenfall AB and Others* v. *Germany*, (ICSID Case No ARB/12/12), decision on *Achmea* of 31 August 2018; *Masdar Solar & Wind Cooperatief U.A.* v. *Kingdom of Spain*, (ICSID Case No ARB/14/1), Award of 16 May 2018, and Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), *SICAR* v. *Kingdom of Spain*, (SCC Case No 2015/063), Award of 15 February 2018.

29    See, in particular, Gaillard, E., 'L'affaire Achmea ou les conflits de logiques', *Revue critique de droit international privé*, 2018, No 3, p. 616; Hess, B., 'The Fate of Investment Dispute Resolution after the Achmea Decision of the European Court of Justice', *Max Planck Institute Luxembourg for Procedural Law Research Paper Series*, 2018, No 3, p. 8, and Basedow, J., 'Achmea judgment and the applicability of the Energy Charter Treaty in Intra-EU Investment Arbitration', *Journal of international economic Law*, 2020, vol. 23(1), pp. 271-292.

30    Paragraph 60 and operative part.

31    Judgment in *Achmea*, paragraph 32. See, also, Opinion 2/13 of 18 December 2014 (EU:C:2014:2454, paragraph 201 and the case-law cited).

32    Judgment in *Achmea*, paragraph 33.

33    Judgment in *Achmea*, paragraph 33.

34    Judgment in *Achmea*, paragraph 34. See, also, Opinion 2/13 of 18 December 2014 (EU:C:2014:2454, paragraphs 168 and 173 and the case-law cited).

35    Judgment in *Achmea*, paragraph 35. See also Opinion 2/13 of 18 December 2014 (EU:C:2014:2454, paragraph 174 and the case-law cited).

36    Judgment in *Achmea*, paragraph 37. See also Opinion 2/13 of 18 December 2014 (EU:C:2014:2454, paragraph 176 and the case-law cited).

37    Judgment in *Achmea*, paragraphs 39 to 42.

38    Judgment in *Achmea*, paragraphs 42 to 56.

39    Judgment in *Achmea*, paragraphs 45 and 55.

40    See, to that effect, Basedow, J., 'EU Law in International Arbitration: Referrals to the European Court of Justice', *Journal of International Arbitration*, 2015, vol. 32(4), pp. 367-386, in particular p. 370.

41    On the originality of the mechanism, see Kessedjian, C. and Pironon, V., *Droit du commerce international*, 2nd ed., Thémis, PUF, 2020, p. 209.

42    Judgment in *Achmea*, paragraph 58.

---

43    Judgment in *Achmea*, paragraph 59.

---

44    Hess, B., op. cit., p. 8.

---

45    Opinion 1/17 (EU-Canada CET Agreement) of 30 April 2019 (EU:C:2019:341, paragraph 128 and the case-law cited).

---

46    Communication from the Commission to the European Parliament and the Council of 19 July 2018 on the protection of intra-EU investment, COM(2018) 547 final.

---

47    This is not to deny that arbitral tribunals in the field of investment law have contributed to respect for the rule of law., See, Sadowski, W., 'Protection of the rule of law in the European Union through investment treaty arbitration: is judicial monopolism the right response to illiberal tendencies in Europe?', *Common Market Law Review*, 2018, No 55, pp. 1025-1060. However, such a contribution is not comparable to ensuring between the EU Member States that the fundamental values on which the European Union is founded, including respect for the rule of law and the right to an effective remedy before an independent court or tribunal, are recognised and respected.

---

48    I am referring in particular to the judgments of 27 February 2018, *Associação Sindical dos Juízes Portugueses* (C-64/16, EU:C:2018:117, paragraphs 32 and 33); of 24 June 2019, *Commission* v *Poland (Independence of the Supreme Court)* (C-619/18, EU:C:2019:531, paragraphs 43 and 47); and of 5 November 2019, *Commission* v *Poland (Independence of the ordinary courts)* (C-192/18, EU:C:2019:924, paragraph 98).

---

49    Declarations of the Representatives of the Governments of the Member States of 15 and 16 January 2019 on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union, https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf; https://2015-2019.kormany.hu/download/5/1b/81000/Hungarys%20Declaration%20on%20Achmea.pdf; and https://www.regeringen.se/48ee19/contentassets/d759689c0c804a9ea7af6b2de7327320/achmea-declaration.pdf.

---

50    Agreement for the termination of Bilateral Investment Treaties between the Member States of the European Union (OJ 2020 L 169, p. 1). The agreement was concluded by all Member States except Ireland, the Republic of Austria, the Republic of Finland and the Kingdom of Sweden.

---

51    While the Kingdom of Belgium, the Republic of Bulgaria, the Czech Republic, the Kingdom of Denmark, the Federal Republic of Germany, the Republic of Estonia, Ireland, the Hellenic Republic, the Kingdom of Spain, the French Republic, the Republic of Croatia, the Italian Republic, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Kingdom of the Netherlands, the Republic of Austria, the Republic of Poland, the Republic of Portugal, Romania, the Slovak Republic and the United Kingdom of Great Britain and Northern Ireland have all declared that they consider that the dispute settlement clause of the ECT is incompatible with EU law, the Grand Duchy of Luxembourg, the Republic of Malta, the Republic of Slovenia, the Republic of Finland and the Kingdom of Sweden have expressed reservations as to the possibility of applying the solution reached in that judgment to the dispute settlement mechanism of the ECT. Hungary, for its

part, stated that it considered that that solution could not apply to the dispute settlement mechanism of Article 26 of the ECT. See Declarations of the Representatives of the Governments of the Member States of 15 and 16 January 2019 on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union, https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf; https://2015-2019.kormany.hu/download/5/1b/81000/Hungarys%20Declaration%20on%20Achmea.pdf; and https://www.regeringen.se/48ee19/contentassets/d759689c0c804a9ea7af6b2de7327320/achmea-declaration.pdf.

---

52     Paragraph 41.

---

53     Although I did not rule out the contrary view prior to the judgment in *Achmea* in the context of my academic activities, I now defer to the Court's reasoning in that regard. See Szpunar, M., 'Referrals of Preliminary Questions by Arbitral Tribunals to the ECJ', in Ferrari, F. (ed.), *The Impact of EU Law on International Commercial Arbitration*, Juris, 2017, pp. 85-124.

---

54     Judgment in *Achmea*, paragraph 43 and the case-law cited.

---

55     Judgment in *Achmea*, paragraph 58.

---

56     Opinion 1/91 (EEA Agreement – I) of 14 December 1991 (EU:C:1991:490, paragraphs 40 and 70); Opinion 1/09 of 8 March 2011 (EU:C:2011:123, paragraphs 74 and 76); and Opinion 2/13 of 18 December 2014 (EU:C:2014:2454, paragraphs 182 and 183).

---

57     Opinion 2/13 of 18 December 2014 (EU:C:2014:2454, paragraph 183), and judgment in *Achmea*, paragraph 57.

---

58     Opinion of 30 April 2019 (EU:C:2019:341).

---

59     Opinion 1/17 (EU-Canada CET Agreement) of 30 April 2019 (EU:C:2019:341, paragraph 131).

---

60     Opinion of 30 April 2019 (EU:C:2019:341).

---

61     Opinion 1/17 (EU-Canada CET Agreement) of 30 April 2019 (EU:C:2019:341, paragraph 127).

---

62     Opinion of Advocate General Bot in Opinion 1/17 (EU-Canada CET Agreement) (EU:C:2019:72, point 82).

---

63     Opinion of Advocate General Bot in Opinion 1/17 (EU-Canada CET Agreement) (EU:C:2019:72, point 84). In that respect, see also, Lenaerts, K., 'Upholding the Rule of Law through Judicial Dialogue', *Yearbook of European Law*, 2019, vol. 38, p. 12.

---

64     Opinion of 30 April 2019 (EU:C:2019:341).

65     Moreover, it cannot be excluded that the interpretation of Article 26 of the ECT by the Court could be necessary in the context of a review, by the national courts of the Member States, of an arbitral award delivered in a dispute between an investor from a third state and a Member State, which may involve the interpretation of EU law by arbitrators.

66     See, in that regard, Communication from the Commission to the European Parliament and the Council of 19 July 2018 on the protection of intra-EU investment, COM(2018) 547 final.

67     For an example of the conceivable overlaps between an investment protection and promotion treaty concluded between two Member States and EU law, see Opinion of Advocate General Wathelet in the judgment in *Achmea* (C-284/16, EU:C:2017:699).

68     Although the parties were questioned at the hearing on the effects of the judgment in *Achmea*, the discussion concerned only the impact of that judgment on the compatibility with EU law of the dispute settlement mechanism provided for by Article 26 of the ECT. I would point out that that judgment concerns not the compatibility of substantive rules but only the compatibility with EU law of a similar mechanism established by a BIT.

69     See, in that respect, in the arbitral case-law, *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd* v. *Kazakhstan* (Stockholm Chamber of Commerce (SCC) Case No V 116/2010), Award of 19 December 2013, paragraph 806, and, in the legal literature, Gaillard, E., *Journal du droit international (Clunet)*, 2019, No 6, p. 160.

70     Article 1(6)(c) of the ECT.

71     Article 1(6)(f) of the ECT.

72     Vienna Convention on the law of treaties, concluded at Vienna on 23 May 1969 (United Nations Treaty Series, vol. 1155, p. 353) https://treaties.un.org/doc/Publication/UNTS/Volume%201155/volume-1155-I-18232-english.pdf.

73     On the circular nature of the definition of investment, see, Pyka, M., *Pojęcie inwestycji w międzynarodowym arbitrażu inwestycyjnym*, C.H. Beck, Warsaw, 2018, pp. 43 and 44.

74     Doubts might exist as to the possibility of regarding the supply of electricity as being covered by Article 1(6)(f) of the ECT, which refers to 'any right conferred by … contract … to undertake any economic activity in the energy sector'. Such reasoning was also adopted in the arbitral case-law: see, in that regard, *Petrobart Limited* v. *Kyrgyz Republic* (SCC Case No 126/2003), Award of 29 March 2005, p. 72. Nevertheless, in view of the interpretation I propose to give to Article 1(6)(f) of the ECT, that possibility should be excluded. See point 121 et seq. of this Opinion.

75    With regard to the definition of the term 'investment' contained in Article 1(6)(c) of the ECT, the legal literature supports the view that reference should be made only to the ordinary meaning of that term. Indeed, and as the Polish Government argues in its written observations, the English-language version of the ECT draws a distinction between the English term 'Investment', within the meaning of the ECT, with a capitalised letter, and the English term 'investment', in the ordinary meaning of the term this time, without capitalisation. Accordingly, 'investments', which differ from the 'Investments' protected by the ECT, has an objective meaning, as noted in points 114, 115 and 116 of this Opinion. However, since Article 1(6)(c) of the ECT states that a claim must arise from a contract 'associated with an investment', it follows that the term 'investment' should, in that case, only be understood objectively, by reference to the ordinary meaning of the term. In relation to that matter, see, Baltag, C., *The Energy Charter Treaty: The Notion of Investor*, Kluwer Law International, Alphen-on-the-Rhine, 2012, p. 174. Nevertheless, I am not entirely persuaded by that argument, which is based solely on the typography used in the text, which is not reproduced in all the language versions of the ECT.

76    The term 'investment' is defined in French as 'placement de fonds en vue d'obtenir des revenus', *Dictionnaire de l'Académie française*, 9th ed. In English, 'investment' is defined as 'the act of putting money … into something to make a profit'. On the development of the definition of that term, see, Gilles, A., *La définition de l'investissement international*, Larcier, Brussels, 2012, p. 16 et seq.

77    See *Salini Costruttori S.p.A. and Italstrade S.p.A.* v. *Kingdom of Morocco* (ICSID Case No ARB/00/4), Award of 23 July 2001, 129 Journal du droit international 196 (2002), paragraph 52. On the analysis of that case-law, see Pyka, M., op. cit. pp. 63-111, and Jeżewski, M., *Międzynarodowe prawo inwestycyjne*, C.H. Beck, Warsaw, 2019, pp. 127-134.

78    See, Baltag, C., op. cit., pp. 167-183, and Kessedjian, C. and Pironon, V., op. cit., p. 206.

79    See, inter alia, *Masdar Solar & Wind Cooperatief U.A.* v. *Kingdom of Spain* (ICSID Case No ARB/14/1), Award of 16 May 2018, paragraph 195 et seq., and *Isolux Netherlands, BV* v. *Kingdom of Spain* (SCC Case No V 2013/153), Award of 17 July 2016, paragraph 683 et seq.

80    See, Baltag, C., op. cit. p. 178 et seq., and Audit, M, *Journal of International Law (Clunet)*,2020, No 3, p. 16.

81    Komstroy argued at the hearing that the contribution consisted in the supply of electricity. However, such an argument cannot suffice to characterise the electricity supply contract as a 'contract … associated with an investment', since this does not entail the existence of any risk as to the expected returns from such a contribution.

82    In particular by means of the dispute settlement mechanism provided for in Article 26 of the ECT. Although certain commercial transactions sometimes have characteristics which justify their classification as 'investments', see, in that respect, Pyka, M., op. cit. pp. 175-181, I do not believe that such an analysis can be applied here.

83    Moreover, such an interpretation is more evident from the English language version of the ECT: 'any right conferred … by contract … *to undertake* any economic activity in the energy sector' (emphasis added).

84    A typical example of such a contractual right would be a concession to operate infrastructure on the territory of the Contracting Party.

85    See point 107 of this Opinion.

86    See point 135 of this Opinion.

87    I would point out that if an investment made by an investor from a third State not party to the ECT is indeed an investment within the meaning of the ECT, it is not an investment *protected* by that Treaty, since the substantive provisions for the promotion and protection of investments expressly and exclusively cover investments of investors of the Contracting Parties. See, in particular, Article 10 of the ECT: 'Each Contracting Party shall … encourage and create stable, equitable, favourable and transparent conditions for *investors of other Contracting Parties* to make investments in its area. Such conditions shall include a commitment to accord at all times *to investments of investors of other Contracting Parties* fair and equitable treatment.' Emphasis added.

88    Audit, M., op. cit.

89    All the more so since, with regard to electricity, it is entirely artificial to imagine a supply at the border. As is clear from the order for reference, the electricity networks of Ukraine and Moldova are interconnected and it is unreasonable to consider that electricity is supplied to a point A and stored pending its retrieval by the recipient at the same point.