# EXHIBIT 7

*Transactional Environmental Law*, 8:2 (2019), pp. 279–302 © 2019 Cambridge University Press
doi:10.1017/S204710251900013X

# ARTICLE

# *The Sun Behind the Clouds? Enforcement of Renewable Energy Awards in the EU*

Ana Mercedes López-Rodríguez* ⊙

First published online 7 June 2019

**Abstract**
A number of European Union (EU) countries have undertaken thorough reforms in the renewable energy sector over the past years. The regulatory changes have triggered a wave of claims from low-carbon investors asserting that the reforms have diminished or exhausted the economic viability of their investments. Unlike local investors, who typically take legal action before domestic courts, foreign investors have filed arbitration claims in accordance with the Energy Charter Treaty, notably against Spain, Italy, Bulgaria, and the Czech Republic, resulting in several awards of damages. However, recent developments in EU state aid law seem to restrict the ability of investors to obtain compensation. This article argues that such developments may undermine renewable energy policy, because arbitration enhances the regulatory stability and predictability which low-carbon investments require only if arbitral awards can be enforced effectively. The article examines the different scenarios that may arise out of the interplay between EU law and investment arbitration in the EU and concludes that the European Commission's arguable redrawing of the boundaries of state aid rules to encompass investment arbitration, combined with the EU's general quest to replace investment arbitration with alternative mechanisms of adjudication, may jeopardize climate change mitigation policies.

**Keywords:** Renewable energy, Energy Charter Treaty, State aid, Investor-state dispute settlement (ISDS), EU law, Climate change mitigation

## 1. INTRODUCTION

The 2018 Special Report of the Intergovernmental Panel on Climate Change (IPCC) finds that global net human-caused emissions of carbon dioxide ($CO_2$) would need to fall by about 45% from 2010 levels by 2030, reaching 'net zero' around 2050, to avoid irreversible changes to life on Planet Earth.[1] To the extent that other low-carbon alternatives are not proven on a sufficient scale or remain controversial, renewable

---

*   Law Department, Loyola University Andalusia (Spain).
    Email: amlopez@uloyola.es.
    The author wishes to thank the anonymous reviewers for their time and valuable suggestions. Any errors in the final version are, of course, solely those of the author.
[1]   Intergovernmental Panel on Climate Change (IPCC), 'Special Report on Global Warming of 1.5°C', 8 Oct. 2018, available at: http://www.ipcc.ch/report/sr15.

energy plays a pivotal role in decarbonizing the energy sector.[2] Foreign direct investment (FDI) can help to induce the transfer of knowledge and technology necessary for the production of renewable energy. However, given the high investment costs for producers, it takes governmental intervention to spur the development of renewable energy sources and to achieve full potential.[3] Subsidies, incentive tariffs and, in particular, feed-in tariffs have emerged as popular renewable energy support mechanisms.[4] Renewable energy investors regard regulatory instability, including uncertainty about the policies implemented to compensate for the risk-return imbalance, as a crucial risk in the development of projects.[5] Hence, any unexpected changes in the support mechanisms can affect the profitability of the investment.

A widespread strategy to manage investment risk caused by regulatory uncertainty is the adoption of investment treaties, backed up by arbitration. In this respect, the present article argues that the tension between European Union (EU) law and investment arbitration in Europe may produce an undesirable collateral effect in climate change mitigation policies. The EU has taken on the role of world leader in climate change mitigation policies, setting very ambitious targets for energy transition.[6] To reach those targets, huge amounts of capital are required.[7] However, if EU institutions undermine investor confidence in the renewable energy sector by impairing the enforcement of damages awards, these investments are unlikely to materialize.

The article starts with a section on investment treaties and investment arbitration (Section 2), followed by the background to renewable energy claims (Section 3). Section 4 examines the clash between EU law and investment arbitration, followed by an analysis of the enforcement of damages awards (Section 5). Section 6 discusses the interaction between the different regulatory frameworks at stake and the impact on climate change mitigation policies. Section 7 summarizes and concludes.

---

[2]   A. Behrens, 'The Role of Renewables in the Interaction between Climate Change Policy and Energy Security in Europe' (2010) 1(1) *Renewable Energy Law and Policy*, pp. 5–15.

[3]   According to the International Renewable Energy Agency (IRENA), however, the costs of renewable energy will drop to meet those of fossil fuels by 2020: IRENA, *Renewable Power Generation Costs in 2017* (IRENA, 2018), available at: https://www.irena.org/publications/2018/Jan/Renewable-power-generation-costs-in-2017.

[4]   T. Couture et al., *A Policymaker's Guide to Feed-in Tariff Policy Design*, Technical Report NREL/TP-6A2-44849 (National Renewable Energy Laboratory, US Department of Energy, 2010), available at: http://www.nrel.gov/docs/fy10osti/44849.pdf; A. Held et al., 'Feed-In Systems in Germany, Spain and Slovenia: A Comparison', Oct. 2007, available at: http://www.mresearch.com/pdfs/docket4185/NG11/doc44.pdf.

[5]   Institutional Investors Group on Climate Change (IIGCC), 'Achieving the Investment Plan for Europe's Million Ambition: 12 Fixes', 2015; Norges Bank Investment Management, *Renewable Energy Investments: Discussion Note* (Norges Bank Investment Management, 2015), available at: https://www.nbim.no/contentassets/d4dc0aaf69ba4f73b9112da6bef259c0/nbim_discussionnotes_4-15.pdf.

[6]   European Commission, 'Energy Roadmap 2050', COM(2011) 0885 final, 15 Dec. 2011, available at: https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=COM:2011:0885:FIN:EN:PDF.

[7]   According to the International Energy Agency (IEA), to reach the overall 2050 targets, USD 1.6 trillion will need to be invested: IEA, 'Deep Energy Transformation Needed by 2050 to Limit Rise in Global Temperature', 20 Mar. 2017, available at: https://www.iea.org/newsroom/news/2017/march/deep-energy-transformation-needed-by-2050-to-limit-rise-in-global-temperature.html.

## 2. INVESTMENT TREATIES AND INVESTMENT ARBITRATION

As a result of the lengthy return on infrastructure development projects, renewable energy investors are particularly vulnerable to regulatory change over the lifetime of the investment.[8] To stimulate low-carbon investments, states must, therefore, provide regulatory stability, predictability and a guarantee of protection.[9] The promotion of renewable energy requires not only public support in terms of subsidies and incentives, but also adequate mechanisms to mitigate the risks of ex-post regulatory changes and interference from the state.[10]

To reduce uncertainty about policy changes in times of global connectivity and cross-border capital flows, governments can commit to international treaties. These agreements, either bilateral or multilateral investment treaties (BITs or MITs), typically include a set of principles and standards for the promotion and protection of foreign investment. The basic idea is to create a level playing field for investment and minimize non-commercial risks. In the past decades, international investment treaties have become particularly important for infrastructure assets, especially in the energy sector.[11] Indeed, they can help to reduce regulatory risk, which improves investor confidence and fosters international investment in renewable sources of energy.[12]

Investment treaties typically provide for international arbitration in the event of a dispute.[13] In fact, arbitration is the main dispute resolution mechanism in the energy sector.[14] The long-term nature of energy investments demands access to rapid and

---

[8]    C. Patrizia et al., 'Investment Disputes Involving the Renewable Energy Industry under the Energy Charter Treaty', in J.W. Rowley, D. Bishop & G. Kaiser (eds), *The Guide to Energy Arbitrations*, 2nd edn (Global Arbitration Review, 2017), blog available at: https://globalarbitrationreview.com/chapter/1142579/investment-disputes-involving-the-renewable-energy-industry-under-the-energy-charter-treaty.

[9]    A. Boute, 'A Comparative Analysis of the European and Russian Support Schemes for Renewable Energy: Return on European Experience for Russia' (2011) 4(2) *Journal of World Energy Law & Business*, pp. 157–80; European Commission, 'Energy 2020: A Strategy for Competitive, Sustainable and Secure Energy', COM(2010)639 final, 10 Nov. 2010, available at: https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=COM:2010:0639:FIN:En:PDF.

[10]   G. Bellantuono, 'The Misguided Quest for Regulatory Stability in the Renewable Energy Sector' (2017) 10(4) *Journal of World Energy Law and Business*, pp. 274–92; N. Bankes, 'Decarbonising the Economy and International Investment Law' (2012) 30(4) *Journal of Energy & Natural Resources Law*, pp. 497–510, at 502; R. Sullivan & W. Blyth, 'Climate Change Policy Uncertainty and the Electricity Industry: Implications and Unintended Consequences', Briefing Paper, Chatham House, Aug. 2006, available at: https://www.chathamhouse.org/sites/default/files/public/Research/Energy,%20Environment%20and%20Development/bp0806climatechange.pdf; A. Boute, 'The Potential Contribution of International Investment Protection Law to Combat Climate Change' (2009) 27(3) *Journal of Energy & Natural Resources Law*, pp. 333–76, at 334–5.

[11]   World Economic Forum, 'Strategic Infrastructure Mitigation of Political & Regulatory Risk in Infrastructure Projects', Feb. 2015, available at: http://www3.weforum.org/docs/WEF_Risk_Mitigation_Report_2015.pdf.

[12]   B. Condon & T. Sinha, *The Role of Climate Change in Global Economic Governance* (Oxford University Press, 2013), p. 93.

[13]   J.W. Yackee, 'Controlling the International Investment Law Agency' (2012) 53(2) *Harvard International Law Journal*, pp. 392–445 (discussing investor protection under international investment law and noting that investors are increasingly bringing bilateral and multilateral international investment agreement disputes before international arbitral tribunals).

[14]   A.T. Martin, 'Dispute Resolution in the International Energy Sector: An Overview' (2011) 4(4) *Journal of World Energy Law and Business*, pp. 332–68, at 339.

efficient dispute resolution without damaging the long-term relationship between the parties, which court adjudication can hardly provide. Furthermore, arbitration protects foreign investors against possible judicial bias in the courts of the host state. Yet, a balance needs to be struck between investor protection and the right of the state to regulate. Indeed, the fear of having to face arbitration proceedings may 'chill' initiatives for regulatory change, which might affect the economic schemes that support investment in renewable energies.[15] The substantial financial risk involved may further constrain the ability of governments to adopt climate change measures.[16]

Investment arbitration provides the conceptual framework necessary to enhance the regulatory stability and predictability that is required for low-carbon investments.[17] If justice is done in a predictable, efficient and timely way, the risk of unfair, unexpected regulatory changes impacting on investors in renewable energy sources diminishes.[18] Of course, the same logic inevitably applies to investments in less clean sources of energy, as arbitral claims may be also filed against a host country's pivot towards a pro-renewables policy. However, higher construction costs make investments in renewables more risky, dependent on support schemes and, consequently, more vulnerable to regulatory change than investments in coal, natural gas, and nuclear power. The existence of a neutral and efficient dispute resolution mechanism is therefore crucial for maintaining the confidence of private investors in renewable energy's policies and commitments.

The importance of investment arbitration to de-risk green investments depends on the effective enforcement of investment awards, as a negative relation has been documented between refusals to comply with investment treaty obligations and FDI.[19] However, recent developments in EU law pose serious obstacles to the enforcement of investment awards. Specifically, Member State compensation to investors as a result of an investment tribunal award is considered to be illegal state aid.[20] Moreover, the

---

[15] K. Tienhaara, 'Regulatory Chill in a Warming World: The Threat to Climate Policy Posed by Investor-State Dispute Settlement' (2018) 7(2) *Transnational Environmental Law*, pp. 229–50; S.W. Schill, 'Do Investment Treaties Chill Unilateral State Regulation to Mitigate Climate Change?' (2007) 24(5) *Journal of International Arbitration*, pp. 469–77; B.W. Jenkins, 'The Next Generation of Chilling Uncertainty: Indirect Expropriation under CAFTA and Its Potential Impact on Environmental Protection' (2007) 12(2) *Ocean and Coastal Law Journal*, pp. 269–304.

[16] B.J. Condon, 'Climate Change and International Investment Agreements' (2015) 14(2) *Chinese Journal of International Law*, pp. 309–35; J. Werksman, K.A. Baumert & N.K. Dubash, 'Will International Investment Rules Obstruct Climate Protection Policies? An Examination of the Clean Development Mechanism' (2003) 3(1) *International Environmental Agreements: Politics, Law and Economics*, pp. 59–83.

[17] A. Boute, 'Combating Climate Change through Investment Arbitration' (2012) 35(3) *Fordham International Law Journal*, pp. 613–64, at 617; V. Vadi, 'Beyond Known Worlds: Climate Change Governance by Arbitral Tribunals? (2015) 48(5) *Vanderbilt Journal of Transnational Law*, pp. 1285–351.

[18] World Economic Forum, n. 11 above.

[19] T. Allee & C. Peinhardt, 'Contingent Credibility: The Impact of Investment Treaty Violations on Foreign Direct Investment' (2011) 65(3) *International Organization*, pp. 401–32; United Nations Conference on Trade and Development (UNCTAD), 'Pink Series Sequel: Investor-State Dispute Settlement', 24 July 2014, available at: http://investmentpolicyhub.unctad.org/Publications/Details/120.

[20] E.g., in European Commission Decision, 'State Aid SA.38517(2014/C) (ex 2014/NN): Romania – Implementation of Arbitral Award *Micula* v *Romania* of 11 December 2013', C(2014) 3192 final, 1 Oct. 2014, available at: http://ec.europa.eu/competition/state_aid/cases/254586/254586_1595781_31_11.pdf. For further detail, see Section 4 below.

compatibility of investment arbitration with the autonomy of the EU legal order is being called into question.[21] These challenges particularly affect the large number of arbitration claims decided or pending in the sector of renewable energy.

## 3. RENEWABLE ENERGY CLAIMS

In the mid-2000s, following a series of EU proposals setting ambitious greenhouse gas (GHG) reduction targets, many EU countries sought to attract investment in the renewable energy sector by enacting legislation which offered incentives such as feed-in tariffs for lengthy periods and without limitations on energy generation and distribution.[22] However, the advent of the global financial crisis in 2008 made such incentives unsustainable and states derogated from or amended the relevant legislation. These interventions affected the profitability of low-carbon investments undertaken under the prior legislative framework and originated a wave of claims against Member States.[23] With the exception of a few cases, the claims brought before domestic courts failed.[24] Foreign investors, in turn, filed for arbitration under BITs and on the basis of the Energy Charter Treaty (ECT),[25] which provides protection against unfair treatment and expropriation from signatory states.[26]

Among the procedural remedies available to investors, Article 26(4) ECT allows the submission of disputes for resolution to the International Centre for Settlement of Investment Disputes (ICSID), to a sole arbitrator or ad hoc arbitration under the

---

[21] Case C-284/16, *Slowakische Republik (Slovak Republic)* v. *Achmea*, Judgment of the Court (Grand Chamber), 6 Mar. 2018, ECLI:EU:C:2018:158. For further detail, see Section 4 below.

[22] European Commisson, Commission Staff Working Document, 'European Commission Guidance for the Design of Renewables Support Schemes', SWD(2013) 439 final, 5 Nov. 2013, available at: https://ec.europa.eu/energy/sites/ener/files/documents/com_2013_public_intervention_swd04_en.pdf; European Commission, 'Renewable Energy: Progressing towards the 2020 Target', COM(2011) 31 final, 31 Jan. 2011, available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52011DC0031&from=EN; J. Tirado & J. Bloom, 'Renewable Energy Reforms in Europe: Growing Threats to International Investors' (2014) *Lexology* online articles, available at: http://cdn2.winston.com/images/content/8/4/v2/84476/IA-RenewableEnergyReformEurope-6-9-2014.pdf.

[23] Vadi, n. 17 above; F. Dias Simoes, 'When Green Incentives Go Pale: Investment Arbitration and Renewable Energy Policymaking' (2017) 45(2) *Denver Journal of International Law and Policy*, pp. 251–85; Patrizia et al., n. 8 above.

[24] *Infinis Plc Infinis (Re-Gen) Ltd, R (on the application of)* v. *Gas & Electricity Markets Authority & Anor* [2011] EWHC 1873 (Admin) (10 Aug. 2011), confirmed by the Court of Appeal in *Ofgem (Gas & Electricity Markets Authority)* v. *Infinis* [2013] EWCA Civ 70, Court of Appeal, 13 Feb. 2013; *Breyer Group Plc & Ors* v. *Department of Energy and Climate Change* [2014] EWHC 2257 (QB) (9 July 2014), confirmed by the Court of Appeal in *Department for Energy and Climate Change* v. *Breyer Group Plc and Others* [2015] EWCA Civ 408, Court of Appeal, 28 Apr. 2015; Constitutional Court of Bulgaria, Resolution N13/31.07.2014. The cases brought to national courts in the Czech Republic, Italy, and Spain have been all unsuccessful: see M. Alessi, J.N. Ferrer & C. Egenhofer, 'Suspended in Legal Limbo: Protecting Investment in Renewable Energy in the EU', *CEPS Policy Insights*, No. 2018/03, 23 Jan. 18, available at: https://www.ceps.eu/publi cations/suspended-legal-limbo-protecting-investment-renewable-energy-eu.

[25] The Hague (The Netherlands), 17 Dec. 1994, in force 16 Apr. 1998, available at: https://energycharter.org/process/energy-charter-treaty-1994.

[26] E.g., ECT, Art. 10. See C.H. Schreuer, 'Selected Standards of Treatment Available under the Energy Charter Treaty', in G. Coop & C. Ribeiro (eds), *Investment Protection and the Energy Charter Treaty* (Juris Publishing, 2008), pp. 63–99.

284    *Transnational Environmental Law*, 8:2 (2019), pp. 279–302

Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), or to the Arbitration Institute of the Chamber of Commerce of Stockholm (SCC). Most arbitral claims in renewables cases have been lodged with the ICSID, but there are also ad hoc claims conducted under the UNCITRAL Arbitration Rules, the Permanent Court of Arbitration (PCA), and the SCC.[27] Bulgaria, the Czech Republic, Italy, and Spain are involved in a considerable number of claims.[28] Spain alone is facing arbitration claims amounting to a total of €7,566 million.[29] In fact, because of the number of claims against Spain, Western Europe is the most litigated region before the ICSID.[30]

Although most renewable energy cases are still pending and this is a fast developing area, in the first quarter of 2019 some tribunals gave awards on claims brought against Spain, Italy, and the Czech Republic: *Charanne* (SCC, January 2016);[31] *Isolux* (SCC, July 2016);[32] *Blusun* (ICSID, December 2016);[33] *Eiser* (ICSID, May 2017);[34] *Wirtgen* (PCA, October 2017);[35] *NovEnergia* (SCC, February 2018),[36] *Masdar Solar* (ICSID, May 2018);[37] *Antaris* (PCA, May 2018),[38] *Antin* (ICSID, June 2018),[39] *Greentech* (SCC, November 2018),[40] *RREEF* (ICSID, December 2018),[41] and *NextEra* (ICSID,

[27] Y.S. Selivanova, 'Changes in Renewables Support Policy and Investment Protection under the Energy Charter Treaty: Analysis of Jurisprudence and Outlook for the Current Arbitration Cases' (2018) 33(2) *ICSID Review*, pp. 1–23.

[28] Out of a total of 41 claims, 30 are pending, according to the ICSID Database, available at: https://icsid.worldbank.org/en/Pages/cases/searchcases.aspx.

[29] 'El nuevo Gobierno "se come" su primer laudo contra España por los recortes renovables', *El Confidencial*, 18 June 2018, available at: https://www.elconfidencial.com/empresas/2018-06-18/laudo-antin-arbitraje-ciadi-renovables-primas-termosolar_1580658 (in Spanish).

[30] ICSID Database, n. 28 above.

[31] *Charanne and Construction Investments* v. *Spain*, SCC Case No. V 062/2012, IIC 758 (2016), available at: https://www.italaw.com/cases/2082.

[32] *Isolux Infrastructure Netherlands BV* v. *Kingdom of Spain*, Award, SCC Case No. V 2013/153, IIC 979 (2016), available at: https://www.italaw.com/cases/5893.

[33] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein* v. *Italian Republic*, ICSID Case No. ARB/14/3, available at: https://www.italaw.com/cases/5739.

[34] *Eiser Infrastructure Ltd and Energía Solar Luxembourg S.à.r.l.* v. *Kingdom of Spain*, Award, ICSID Case No. ARB/13/36, IIC 950 (2017), available at: https://www.italaw.com/cases/5721.

[35] *Jürgen Wirtgen et al.* v. *Czech Republic*, Final Award, PCA Case No. 2014-03, 11 Oct. 2017, available at: https://www.italaw.com/cases/6428.

[36] *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR* v. *Kingdom of Spain*, Award SCC Case No. 063/2015 (2018), available at: https://www.italaw.com/cases/6613.

[37] *Masdar Solar & Wind Cooperatief U.A.* v. *Kingdom of Spain*, Award, ICSID Case No. ARB/14/1 (2018), available at: https://www.italaw.com/cases/6608.

[38] *Antaris Solar GmbH and Dr Michael Göde* v. *Czech Republic*, PCA Case No. 2014-01, available at: https://www.italaw.com/cases/2080.

[39] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.* v. *Kingdom of Spain*, ICSID Case No. ARB/13/31, available at: https://www.italaw.com/cases/2319.

[40] *Greentech Energy System A/S, Foresight Luxembourg Solar 1 S.à.r.l., Foresight Luxembourg Solar 2 S.à.r.l., GWM Renewable Energy I S.P.A, GWM Renewable Energy II S.P.A* v. *Kingdom of Spain* (SCC Case No. 2015/50) – final award – Athena Investments AS Company Announcement No. 17-2018 – 14 Nov. 2018 (unpublished).

[41] *RREEF Infrastructure (GP) Ltd and RREEF Pan-European Infrastructure Two Lux S.à.r.l.* v. *Kingdom of Spain*, ICSID Case No. ARB/13/30, notice of the decision available at: https://www.italaw.com/cases/2317.

March 2019).[42] In these cases – and most likely in those still pending – the key issue on the merits involves the application of the concept of 'fair and equitable treatment' and its essential component of 'legitimate expectations' under Article 10(1) ECT.[43]

*Eiser, NovEnergia, Masdar Solar, Antin*, and *Greentech* were decided in favour of the investors,[44] with a total of €368 million in damages awarded.

## 4. THE CLASH BETWEEN INVESTMENT ARBITRATION AND EU LAW

Just when arbitral claims are being decided and investors in renewable energy are starting to see the sun behind the clouds, EU institutions have thrown a spanner in the works, preventing the enforcement of damages awards on the basis of EU law. In particular, EU competition rules have been deemed to prevail over conflicting investment awards if a petition to enforce is filed within the EU. To complicate matters further, the Court of Justice of the EU (CJEU) has recently ruled that arbitral decisions undermine the autonomy of the EU legal order. Post-2008 policy reversals to renewable energies support in the Member States had already compromised the reputation of the EU as an attractive place for investing in renewables. The prevailing state of legal uncertainty following these recent EU regulatory and judicial decisions threatens to aggravate the situation considerably.

### 4.1. *Arbitral Awards and State Aid*

In recent years, the European Commission has deployed state aid rules to make an unprecedented incursion into the realm of investment arbitration. According to the Commission, compensation given to investors by Member States as a result of an investment tribunal award is considered illegal state aid.[45] Within this context, in a Decision of 10 November 2017[46] the Commission announced that the Spanish legislative

---

[42] *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, notice of the decision is available at: https://icsid.worldbank.org/en/Pages/cases/casedetail.aspx?CaseNo=ARB/14/11.

[43] Selivanova, n. 27 above.

[44] C. Hendel, 'The Past, Present and Possible Future of the Spanish Renewable Energy Arbitration Saga' (2018) 31(1) *International Law Practicum*, pp. 96–101, available at: https://www.araozyrueda.com/en/publicaciones/the-past-present-and-possible-future-of-the-spanish-renewable-energy-arbitration-saga; D. Behn, 'Spain Wins First PV Solar Arbitration: A Word of Caution in Using this Case to Predict Outcome in the more than Three Dozen Cases to Come,' *Pluricourts*, University of Oslo blog, 27 Jan. 2016, available at: http://www.jus.uio.no/pluricourts/english/blog/daniel-friedrich-behn/2016-01-26-arbitration-spain.html; T. Restrepo, 'Modification of Renewable Energy Support Schemes under the Energy Charter Treaty: *Eiser* and *Charanne* in the Context of Climate Change' (2017) 8(1) *Goettingen Journal of International Law*, pp. 101–37.

[45] A. Bakos, 'The Relationship between EU State Aid Law and Obligations Arising under Investment Treaties', *EFILA Blog*, 3 Apr. 2018, available at: https://efilablog.org/2018/04/03/the-relationship-between-eu-state-aid-law-and-obligations-arising-under-investment-treaties; T. Kende, 'Arbitral Awards Classified as State Aid under European Union Law' (2015) 1 *ELTE Law Journal*, pp. 37–56, available at: http://eltelawjournal.hu/arbitral-awards-classified-state-aid-european-union-law.

[46] European Commission Decision, 'State Aid SA.40348 (2015/NN): Spain – Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste', C(2017) 7384 final, 10 Nov. 2017, available at: http://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf.

286    *Transnational Environmental Law*, 8:2 (2019), pp. 279–302

reforms that replaced and superseded the premium economic scheme for renewables from 2007 to 2008 did not constitute illegal state aid under EU law. However, any compensation which an arbitration tribunal were to grant to an investor on the basis that Spain modified the premium economic scheme by the notified scheme would constitute in and of itself state aid, which arbitration tribunals are not competent to authorize. The Commission warns arbitration tribunals, in consequence, that 'if they award compensation, such as in *Eiser* v. *Spain*,[47] or were to do so in the future, this compensation would be notifiable state aid pursuant to Article 108(3) TFEU [Treaty on the Functioning of the EU[48]] and be subject to the standstill obligation'.[49] In the absence of such notification, damages awarded amount to unlawful state aid and would be unenforceable.

This is not the only time the Commission has made inroads into the realm of investment arbitration. The clash between state aid rules and investor protection has been exposed in a number of cases,[50] attracting a great deal of attention in the case of *Micula*. In this widely reported case,[51] the Commission took the position that enforcement of an ICSID award was illegal. This award aimed to reinstate the status quo with regard to an EU decision declaring aid illegal and ordering such aid to be recovered. During the arbitral proceedings, the Commission, acting as *amicus curiae*, alleged that the actual payment of damages for Romania's repeal of incentives under the BIT between Sweden and Romania would be economically equivalent to specific performance and undermine the functioning of the internal market. Then, when the final award was given in December 2013, the Commission ordered Romania to suspend any action leading to the execution or implementation of the award until it had reached a final decision on the compatibility of such payment with the internal market.[52] The Final Decision, of March 2015,[53] concluded that enforcement of the ICSID award amounted

---

[47] *Eiser* v. *Spain*, n. 34 above.

[48] Lisbon (Portugal), 13 Dec. 2007, in force 1 Dec. 2009 [2012] OJ C 326/47, available at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2012:326:FULL:EN:PDF.

[49] *Eiser* v. *Spain*, n. 34 above, para 165.

[50] *Electrabel S.A.* v. *Republic of Hungary*, ICSID Case No. ARB 07/19, available at: https://www.italaw.com/cases/380; *AES Summit Generation Ltd and AES-Tisza Erőmű Kft* v. *Republic of Hungary*, ICSID Case No. ARB 07/22, available at: https://www.italaw.com/cases/193; and *EDF International* v. *Hungary*, PCA Case 2009-13.

[51] *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L.* v. *Romania*, ICSID Case No. ARB/05/20, available at: http://www.italaw.com/cases/697; J. Chevry, 'Micula v. Romania' (2015) 14(3) *World Trade Review*, pp. 540–42; H. Wehland, 'The Enforcement of Intra-EU BIT Awards: *Micula v Romania* and Beyond' (2016) 17(6) *The Journal of World Investment & Trade*, pp. 942–63; E. Matei, 'SA.38517 – Commission Decision of 30 March 2015 on State Aid Granted by Romania to Micula' (2016) 15(1) *European State Aid Law Quarterly: EStAL*, pp. 134–41; K. Struckmann et al., 'Micula and Others v Romania – Annotation of [2017] EWHC 31 (Comm)' (2017) 16(2) *European State Aid Law Quarterly*, pp. 316–21.

[52] European Commission, Press Release, 'State Aid: Commission Orders Romania to Recover Incompatible State Aid Granted in Compensation for Abolished Investment Aid Scheme', 30 Mar. 2015, available at: http://www.europa.eu/rapid/press-release_IP-15-4725_en.htm.

[53] Commission Decision (EU) 2015/1470 of 30 Mar. 2015 on State Aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral Award Micula v Romania of 11 December 2013 (notified under document C(2015) 2112).

to state aid under Article 107 TFEU. It is currently under review before the General Court of the EU (GCEU).[54]

The Commission's equation between damages awards and state aid is debatable. Although both the CJEU and the GCEU have established that state aid rules cannot be circumvented by bringing a claim for breach of a benefit which an undertaking was entitled to have, in the absence of state aid approval,[55] awarding damages does not constitute state aid *per se*.[56] A number of reasons militate against classifying the payment of compensation following the enforcement of an arbitral award as state aid under Article 107 TFEU.

Firstly, the element of imputability is missing because the enforcement of a damages award is part of a judicial proceeding and not a *unilateral* and *autonomous* decision by a Member State,[57] as required by the CJEU in *Denkavit*[58] and later confirmed in *Deutsche Bahn*.[59] Although Member States have agreed to investment arbitration,[60] once a state has given up part of its sovereignty under an investment agreement, implementing an award is no longer a unilateral and autonomous decision and the payment of damages is not voluntary.

Secondly, the payment of damages is not selective. Arbitral awards benefit only a limited number of persons. However, at least in the case of ICSID awards, which have a status equivalent to final judgments, the obligation to enforce an award would be selective only if the Member State in question did not generally satisfy its judgment debts.[61] Hence, when judgment debts are satisfied generally, there is no difference in honouring payments stemming from ICSID awards from those arising out of other final judgments. In such a case, the state would be choosing to honour debts stemming from ICSID awards, while refusing to satisfy other judgment debts.

Thirdly, enforcement of damages awards would constitute state aid if it granted an economic advantage – namely, preferential treatment favouring certain undertakings. As held by the CJEU, state aid is 'fundamentally different in its legal nature from [compensation for] damage they [Member States] have caused to individuals'.[62] According to the

---

[54]   Case T-694/15, *Micula* v. *Commission*.

[55]   Case C-672/13, *OTP Bank Nyrt.* v. *Magyar Állam and Magyar Államkincstár*, Judgment of the Court (Sixth Chamber), 19 Mar. 2015, ECLI:EU:C:2015:185; Case T-15/14, *Simet SpA* v. *European Commission*, Judgment of the General Court (Eighth Chamber), 3 Mar. 2016, ECLI:EU:T:2016:124.

[56]   Joint Cases 106 to 120/87, *Asteris AE and Others* v. *Hellenic Republic and European Economic Community*, Judgment of the Court (Fifth Chamber), 27 Sept. 1988, ECLI:EU:C:1988:457.

[57]   C. Tietje & C. Wackenmagel, 'Outlawing Compliance? The Enforcement of Intra-EU Investment Awards and EU State Aid Law', *Policy Papers on Transnational Economic Law*, No. 41, June 2014, p. 7, available at: http://telc.jura.uni-halle.de/sites/default/files/PolicyPaper/PolicyPaper_No41.pdf; Bakos, n. 45 above.

[58]   Case 61/79, *Amministrazione delle finanze dello Stato* v. *Denkavit italiana Srl*, Judgment of the Court, 27 Mar. 1980, ECLI:EU:C:1980:100.

[59]   Case T-351/02, *Deutsche Bahn AG* v. *Commission*, Judgment of the Court of First Instance (First Chamber, extended composition), 5 Apr. 2006, ECLI:EU:T:2006:104.

[60]   Kende, n. 45 above.

[61]   K. Struckmann, G. Forwood & A. Kadri, 'Investor-State Arbitrations and EU State Aid Rules: Conflict or Co-existence? (2016) 15(2) *European State Aid Quarterly*, pp. 258–69, at 266.

[62]   *Asteris*, n. 56 above, para. 23.

Commission, this fundamental difference applies only with reference to compensation under the rules of civil liability, and not to arbitral awards.[63] Yet, it is hard to see why damages awards aimed at compensating investors for the wrongful conduct of the defendant state should be any different from compensation under the rules of civil liability.[64]

Finally, the Commission condemns damages awards which could be said to covertly reinstate unlawful state aid.[65] This approach follows the opinion of Advocate General Ruiz-Jarabo Colomer in Joined Cases C-346/03 and C-529/03, emphasizing that damages cannot be regarded as equal to the sum of amounts to be repaid, since this would constitute an indirect grant of the aid found to be illegal and incompatible with the common market.[66] Indeed, in that case recipients of illegal and later withdrawn state aid would be repaid. However, at least in *Micula*, the arbitral tribunal expressly found that Romania's withdrawal of the incentives was reasonable.[67] Compensation was granted, but only on the basis that Romania had misrepresented its intention to withdraw the referred incentives.[68] The wrongful act was not the withdrawal but the manner of withdrawal. The equivalence between the amount of withdrawn incentives and the damages awarded for the wrongful conduct of the state was coincidental. Conceivably, the amount of damages could have been greater.[69]

Furthermore, the 2017 Commission Decision does not even concern the enforcement of awards of compensation for the removal of state aid declared incompatible with EU law. In fact, it refers to arbitral proceedings initiated following legislative reforms on solar energy subsidies, which the Commission has declared to be compatible with EU law, even though they had not been notified in accordance with the requirements of EU state aid law under Article 108(3) TFEU. In the Decision, the Commission recalls that any compensation granted to an investor in relation to the premium scheme 'would constitute in and of itself State aid' and that, in consequence, it is notifiable under Article 108(3) TFEU. However, this approach, which thwarts the hopes of renewable energy investors, is manifestly wrong. Indeed, it cannot be seriously argued that compensation itself would constitute state aid, given that arbitral awards are not rendered by organs of any state. Consequently, damages awards should be neither notifiable aid nor subject to a standstill obligation, as required by the Commission.

### 4.2. *Investor-State Dispute Settlement and the Autonomy of EU Law*

The relationship between state aid policies and investor protection is only one aspect of the much broader, complex, and complicated relationship between the EU legal order on one side, and international investment arbitration on the other.

---

63  Ibid., para. 101.
64  Struckmann, Forwood & Kadri, n. 61 above, p. 266.
65  Tietje & Wackenmagel, n. 57 above, p. 7.
66  Opinion of Mr Advocate General Ruiz-Jarabo Colomer in Joined Cases C-346/03 and C-529/03, *Giuseppe Atzeni and Others* (C-346/03), *Marco Scalas and Renato Lilliu* (C-529/03) v. *Regione autonoma della Sardegna*, delivered on 28 Apr. 2005, ECLI:EU:C:2005:256, para. 198.
67  *Micula et al.* v. *Romania*, n. 51 above, para. 825.
68  Ibid., para. 827.
69  Struckmann, Forwood & Kadri, n. 61 above, p. 267.

On 6 March 2018, the CJEU delivered its landmark judgment in the *Achmea* case.[70] This case reviews the compatibility of an UNCITRAL award, rendered on the basis of Article 8 of the Netherlands-Slovakia BIT,[71] with EU law. The investor claimed damages following Slovakia's 2006 measures, which partly reversed the liberalization of the health insurance market. Slovakia objected to the jurisdiction of the arbitral tribunal, arguing that following Slovakia's accession to the EU, the Netherlands-Slovakia BIT had become incompatible with EU law. However, the objection was dismissed by the arbitral tribunal, which awarded €22.1 million in damages to the investor. Subsequently, Slovakia applied for annulment of the award in Germany, which annulment was later appealed against before the German Federal Court of Justice. The latter then referred various questions concerning the interpretation of Articles 18, 267 and 344 TFEU to the CJEU under the preliminary reference procedure provided in Article 267 TFEU.

Contrary to the opinion of the EU Advocate General,[72] the CJEU embraced the Commission's position and the views expressed by a majority of Member States, many of which were affected by arbitration claims. According to the CJEU, the BIT is contrary to Articles 344 and 267 TFEU[73] because investor-state arbitration, as referred to in Article 8 of the Netherlands-Slovakia BIT, affects the allocation of powers fixed by the EU Treaties and, consequently, the autonomy of the EU legal system. By referring to investment arbitration, the BIT prevents courts within the judicial system of the EU from deciding questions of EU law and from referring preliminary questions of EU law to the CJEU.[74] Hence, investor-state arbitration mechanisms in intra-EU BITs, such as the Netherlands-Slovakia BIT, are not in conformity with EU law.

It is arguable whether *Achmea* also applies to extra-EU arbitration.[75] Technically, the judgment has a limited reach and should apply only to BITs concluded between EU Member States. It should not include ICSID arbitration, which is delocalized, or multilateral treaties of which the EU itself is a signatory, such as the ECT. This is because the EU has agreed to resolve claims under the ECT by the arbitration mechanisms provided for in Article 26 ECT. By doing so, it has accepted submitting to institutions which apply international law rather than EU law as their primary source, and which have a different understanding of the principle of the primacy of EU law than that held by the CJEU. Furthermore, there is no basis in the 1969 Vienna

---

[70] C-284/16, *Slowakische Republik (Slovak Republic)* v. *Achmea*, Judgment of the Court (Grand Chamber), 6 Mar. 2018, ECLI:EU:C:2018:158.

[71] Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic, 29 Apr. 1991, in force 1 Oct. 1992, available at: https://investmentpolicyhub.unctad.org/Download/TreatyFile/2080.

[72] Opinion of Advocate General Wathelet delivered on 19 Sept. 2017, ECLI:EU:C:2017:699.

[73] The Court did not answer the question regarding the compatibility of the BIT with Art. 18 TFEU.

[74] *Achmea*, n. 70 above, para. 50.

[75] P. Pinsolle & I. Michou, 'Arbitration: The Achmea v Slovakia Judgment of the CJEU, Is It Really the End of Intra-EU Investment Treaties?', 7 Mar. 2018, available at: https://www.quinnemanuel.com/the-firm/news-events/the-achmea-v-slovakia-judgment-of-the-cjeu-is-it-really-the-end-of-intra-eu-investment-treaties.

Convention on the Law of Treaties (VCLT)[76] to understand the ECT as including an implicit disconnection clause which would bar EU Member States from applying the ECT *inter se*, as Spain has argued.[77] Arbitral tribunals have rejected the incompatibility between investor-state dispute settlement (ISDS) mechanisms and EU law – for instance, in *NovEnergia*, and in *Masdar* v. *Spain*, where the tribunal held that:

> the Achmea judgment has no bearing upon the present case and … cannot be applied to multilateral treaties, such as the ECT, to which the EU itself is a party. … Had the CJEU seen it necessary to address the distinction … between the ISDS provisions of the ECT and the investment protection mechanisms to be found in bilateral investment treaties made between Member States [it would have done so].[78]

The doubts raised in *Achmea* have not been allayed in the recently issued Opinion 1/17 on the compatibility with EU law of the Investor Court System in the Comprehensive Economic and Trade Agreement (CETA)[79] between Canada and the EU. According to the CJEU, a distinction must be made between the ruling in *Achmea*, which refers to a bilateral agreement between Member States, and Opinion 1/17, which relates to an agreement between the EU and a non-Member State. Furthermore, *Achmea* concerns the compatibility with EU law of a tribunal which may be called upon to give rulings on the interpretation and application of EU law, whereas in CETA the investment tribunal may only consider the domestic law of a party, including EU law, as a matter of fact.[80] Meanwhile, in a Decision of July 2018[81] the Commission has declared that EU investors may not resort to arbitration tribunals established under Article 26 ECT. According to the Commission, given the principle of primacy, the application of Article 26 ECT intra-EU is incompatible with EU law. This is because, just like the clauses of intra-EU BITs, Article 26 ECT opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU. This extension of *Achmea* to the ECT by the Commission has caused a great deal of perplexity, as the Commission is not empowered to make any finding as to the validity or otherwise of Member States' international agreements.

Undoubtedly, the Commission's Decisions of November 2017 and July 2018 are a godsend for Member States facing damages claims for renewable energy support cuts. Indeed, it is no secret that the 2017 Decision was issued after Spain had called the

---

[76]  Vienna (Austria), 23 May 1969, in force 27 Jan. 1980, available at: https://treaties.un.org/doc/Publication/UNTS/Volume%201155/volume-1155-I-18232-English.pdf.

[77]  As highlighted by the arbitral tribunal in *NovEnergia* v. *Spain*, n. 36 above, para. 454.

[78]  *Masdar Solar & Wind Cooperatief U.A.* v. *Spain*, n. 37 above, paras 678–82.

[79]  Brussels (Belgium), 30 Oct. 2016, partially in force 21 Sept. 2017, [2017] OJ L 11, pp. 23–1079, available at: http://data.consilium.europa.eu/doc/document/ST-10973-2016-INIT/en/pdf.

[80]  Opinion of the Court (Full Court) of 30 April 2019 on Case C-1/17, Request for an Opinion by the Kingdom of Belgium on the Compatibility with the Treaties of the Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part, ECLI:EU:C:2019:341, paras 126 and 127; L. Ankersmit, 'Investment Court System in CETA to be Judged by the ECJ', *European Law Blog*, 31 Oct. 2016, available at: http://europeanlawblog.eu/2016/10/31/investment-court-system-in-ceta-to-be-judged-by-the-ecj.

[81]  Communication from the Commission, 'Protection of Intra-EU Investment', COM(2018) 547 final, 19 July 2018, available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52018DC0547&rid=8.

Ana Mercedes López-Rodríguez    291

Commission in to help.[82] The 2018 Decision also came right after Spain had challenged the *NovEnergia* award, relying on *Achmea* and, on 16 May 2018, the Swedish Court of Appeals issued a Decision suspending the enforcement of the award in Sweden until further notice.[83] Furthermore, 22 Member States (including Belgium, Croatia, France, Germany, Italy, the Netherlands, Romania, Slovakia, Spain, and the United Kingdom (UK)) have recently signed a joint declaration proclaiming that arbitral tribunals have no jurisdiction to decide investor claims based on intra-EU bilateral investment treaties.[84] However, while being favourable to Member States and the achievement of other EU policies, these views on investment arbitration have created a legal limbo in which investors are experiencing a great deal of uncertainty regarding their legal rights. This situation may ultimately lead to a decrease in private investment in renewable energies in the EU.

## 5. THE ENFORCEMENT OF DAMAGES AWARDS

Investment arbitration has proved to be the most effective way for foreign investors to obtain compensation for the violation of their rights by host states, partly because the overwhelming majority of states honour their obligations and pay awards voluntarily (though there are several known cases of non-payment).[85] Securing an effective resolution of investment disputes is a key factor influencing the investment climate in any market.[86] Hence, a reputation for non-compliance with awards can have a serious impact on inward foreign investment.[87]

The recent developments in EU law may cause investors to face significant obstacles to the enforcement of damages awards in the Member States. The situation is not much different from that of a state that repeatedly refuses to fulfil its international obligations on the basis of domestic law. If investors in renewables cannot obtain effective relief for the harm suffered by unexpected policy changes, they might consider restructuring their investments through companies incorporated outside the EU, or even invest elsewhere.[88] The present legal context may in the end harm the reputation of the EU as an attractive place for investment in renewables and have a negative impact on climate

---

[82] Hendel, n. 44 above; J.C. Peña, 'Bruselas abre la puerta a que España evite el pago de 7.565M por el recorte a las renovables', *El Confidencial*, 26 Dec. 2017, available at: https://www.elconfidencial.com/economia/2017-12-26/arbitrajes-espana-renovables-bruselas-ayudas-de-estado_1498030 (in Spanish).

[83] Decision T 4658-18, 16 May 2018, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9746.pdf (in Swedish).

[84] Declaration of the Member States of 15 Jan. 2019 on the Legal Consequences of the Achmea Judgment and on Investment Protection, available at: https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf.

[85] UNCTAD, n. 19 above.

[86] M.P. Ramaswamy, 'Enforcement of ICSID and Non-ICSID Arbitration Awards and the Enforcement Environment in BRICS' (2018) 15(2) *International Journal of Business, Economics and Law*, pp. 73–81.

[87] E. Reinstein, 'Finding a Happy Ending for Foreign Investors: The Enforcement of Arbitration Awards in the People's Republic of China' (2005) 16(1) *Indiana International and Comparative Law Review*, pp. 37–72. It remains unclear, though, whether commitment to ISDS actually results in greater FDI inflows: S. Jandhyala & R.J. Weiner, 'Institutions sans Frontières: International Agreements and Foreign Investment' (2014) 45(6) *Journal of International Business Studies*, pp. 649–69.

[88] R.G. Volterra & Á. Nistal, 'Enforcing Investment Treaty Awards', *Financier Worldwide*, July 2018, available at: https://www.financierworldwide.com/enforcing-investment-treaty-awards/#.W9GBeHszbIU.

change mitigation. Indeed, because a considerable capital flow and transfer of technology are necessary to reduce GHG emissions, experts have established a negative correlation between a difficult investment climate and climate change mitigation.[89]

To accurately assess the impact of the EU institutions' approach to investment arbitration on climate change mitigation, it is necessary to examine the limits to the enforcement of winning awards. For this purpose, a distinction must be made between non-ICSID awards on one side and ICSID awards on the other, as courts in the Member States take different views depending on the nature of the arbitration.[90] Furthermore, it is relevant to examine central principles of EU and international law that may ultimately have a bearing on the payment of compensation to successful claimants.

### 5.1. *The Legal Framework for Enforcement*

UNCITRAL and SCC awards are subject to the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention).[91] Courts in the Member States may refuse to implement the awards on the basis of Article V(2) of the New York Convention, which concerns disputes not capable of settlement by arbitration or contrary to public policy. According to the CJEU, EU competition rules are part of EU public policy. Subject to the principle of equivalence, national courts are obliged to give them effect as they give effect to rules of domestic public policy.[92] It follows that Member State courts may not uphold renewable energy awards which the Commission considers to be illegal state aid by applying Article V(2)(b) of the New York Convention, which allows domestic courts to refuse recognition and enforcement if the award is contrary to the public policy of the state in which recognition and enforcement are sought.[93] Similarly, a broad interpretation of *Achmea* may lead courts in the EU to refuse enforcement based on the inability to arbitrate the dispute under Article V(2)(a) of the New York Convention.

---

[89] S. Fankhauser & L. Lavric, 'The Investment Climate for Climate Investment: Joint Implementation in Transition Countries', *European Bank for Reconstruction and Development*, Working Paper No. 77, Jan. 2003, available at: http://www.ebrd.com/downloads/research/economics/workingpapers/wp0077.pdf; Boute, n. 17 above.

[90] Hendel, n. 44 above.

[91] New York (USA), 10 June 1958, in force 7 June 1959, available at: http://www.uncitral.org/pdf/english/texts/arbitration/NY-conv/New-York-Convention-E.pdf.

[92] Case C-126/97, *Eco Swiss China Time Ltd* v. *Benetton Int'l NV*, Judgment of the Court, 1 June 1999, ECLI:EU:C:1999:269; confirmed in Case C-168/05, *Elisa María Mostaza Claro* v. *Centro Móvil Milenium*, Judgment of the Court (First Chamber), 26 Oct. 2006, ECLI:EU:C:2006:675; Case C-473/00, *Cofidis SA* v. *Jean-Louis Fredout*, Judgment of the Court (Fifth Chamber), 21 Nov. 2002, ECLI:EU:C:2002:705; Joined Cases C-240/98 to C-244/98, *Océano Grupo Editorial SA* v. *Rocío Murciano Quintero* (C-240/98) & *Salvat Editores SA* v. *José M. Sánchez Alcón Prades* (C-241/98), *Jost Luis Copano Badillo* (C-242/98), *Mohammed Berroane* (C-243/9), Judgment of the Court, 27 June 2000, ECLI:EU:C:2000:346. See S. Prechal & N. Shelkoplyas, 'National Procedures, Public Policy and EC Law: From Van Schijndel to Eco Swiss and Beyond' (2004) 12(5) *European Review of Private Law*, pp. 589–611; G. Berman, 'Navigating EU Law and the Law of International Arbitration' (2012) 28(3) *Arbitration International*, pp. 397–445, at 418.

[93] Berman, ibid.

ICSID awards, however, are not subject to the New York Convention. These awards are binding on all parties to the proceedings and each party must comply pursuant to the terms of the award (Article 53(1) of the Convention for the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention)).[94] Furthermore, Article 54(1) of the ICSID Convention provides that if a party fails to comply with the award, the other party can seek to have the pecuniary obligations recognized and enforced in any ICSID member state court as though it were a final judgment of that state's court. This provision thus prevents national courts from refusing enforcement of pecuniary obligations based on domestic laws, inability to arbitrate, or public policy.[95]

No attempts have been made so far to enforce damages awards that are favourable to renewable energy investors in the EU. Should that happen, enforcement of non-ICSID awards could be refused on the basis of Article V(2) of the New York Convention. ICSID awards, on the contrary, are self-executing and are exempted from considerations of inability to arbitrate or public policy. However, EU courts would be most likely to prevent enforcement based on the primacy of EU law. In *Micula*, for instance, the UK High Court of Justice granted a stay of enforcement of the award until the GCEU has ruled on the claimants' annulment application, based on two major principles: the duty of sincere cooperation contained in Article 4(3) of the Treaty on European Union (TEU)[96] and the principle of legal certainty, which requires national courts to avoid the risk of conflicting decisions with EU institutions.[97] Its decision was confirmed recently by the Court of Appeal.[98] Similarly, a Belgian judge has unfrozen assets which had been seized in Belgium in support of ICSID enforcement proceedings against Romania, holding that the investors lacked a 'current' enforceable title because of the European Commission's findings that their ICSID award amounted to illegal state aid.[99]

It is likely that Member State courts will proceed as in *Micula* when asked to enforce renewable energy awards because they are bound by the principle of primacy of EU law. However, even if courts refuse to award compensation to investors, the arbitral awards are still binding and enforceable. From a legal viewpoint, a clash arises between two parallel jurisdictions: international law and EU law, which apparently are incompatible with each other.

---

[94] Washington DC (US), 18 Mar. 1965, in force 14 Oct. 1966, available at: http://icsidfiles.worldbank.org/icsid/ICSID/StaticFiles/basicdoc/partA.htm.

[95] B. Demirkol, 'Enforcement of International Commercial Arbitration Agreements and Awards in Investment Treaty Arbitration' (2015) 30(1) *ICSID Review – Foreign Investment Law Journal*, pp. 56–77; C.H. Schreuer et al., 'Article 54: Enforcement', in *The ICSID Convention: A Commentary*, 2nd edn (Cambridge University Press, 2009), p. 1115–50.

[96] Lisbon (Portugal), 13 Dec. 2007, in force 1 Dec. 2009, available at: http://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX%3A12012M%2FTXT.

[97] *Micula & Ors v. Romania & Anor* [2017] EWHC 31 (Comm) (20 Jan. 2017), para. 64.

[98] *Micula & Ors v. Romania* [2018] EWCA Civ 1801 (27 July 2018).

[99] Decision of 25 Jan. 2016. The decision is currently on appeal before the Brussels Court of Appeal, available at: http://www.globalarbitrationreview.com/digital_assets/46aa46ba-9228-4118-a74f-1a452dcd4198/micula-belgium.pdf.

### 5.2. *The Primacy of EU Law*

Nothing in the EU Treaties determines the place of international law within the hierarchy of sources of EU law, or in relation to its particular effects.[100] Some public international lawyers consider EU law as simply regional international law, the status and effects of which are to be determined on the basis of international rules on the conflict of treaties and by the principles governing the internal law of international organizations.[101] However, the EU institutions and the CJEU, in particular, consider the EU as a subject of international law with its own, independent and autonomous legal order.[102]

Fair and equitable treatment is a central principle in international investment law and features in the vast majority of international investment treaties.[103] In this regard, the infringement of legitimate expectation is one of the most debated issues in international investment arbitration.[104] It was indeed brought up successfully in relation to the obligation to accord fair and equitable treatment under Article 10(1) ECT in *Eiser*, *NovEnergia*, *Masdar Solar*, and *Antin*.[105] It appears, however, that investors cannot rely on legitimate expectations created by EU Member States or any of their institutions, even though the protection of legitimate expectations is one of the general principles of EU law.[106] Based on existing cases, it seems that the Commission gives priority to the application of state aid rules, where the principle of legitimate expectation is rarely applied.[107] This approach ignores the obligation arising from the ECT to compensate for breach of legitimate expectation and the obligation arising from the ICSID Convention to abide by any arbitral award in the context of an investor-state dispute.

---

[100] P. Gragl, 'The Silence of the Treaties: General International Law and the European Union' (2015) 57 *German Yearbook of International Law*, pp. 375–409.

[101] I. Pernice, 'Multilevel Constitutionalism and the Treaty of Amsterdam: European Constitution-Making Revisited?' (1999) 36(4) *Common Market Law Review*, pp. 703–50, at 711; T. Schilling, 'The Autonomy of the Community Legal Order: An Analysis of Possible Foundations' (1996) 37(2) *Harvard International Law Journal*, pp. 389–409.

[102] Case 6-64, *Flaminio Costa* v. *ENEL*, Judgment of the Court, 15 July 1964, ECLI:EU:C:1964:66. B. Simma & D. Pulkowski, 'Of Planets and the Universe: Self-Contained Regimes in International Law' (2006) 17(3) *European Journal of International Law*, pp. 483–529. V. Moreno-Lax & P. Gragl, 'The Quest for a (Fully Fledged) Theoretical Framework: Co-Implication, Embeddedness, and Interdependency between Public International Law and EU Law' (2016) 35(1) *Yearbook of European Law*, pp. 455–70, at 457.

[103] L. Reed & S. Consedine, 'Fair and Equitable Treatment: Legitimate Expectations and Transparency', in M. Kinnear et al. (eds), *Building International Investment Law: The First 50 Years of ICSID* (Kluwer Law International, 2015), pp. 283–94. W.M. Reisman et al., 'Violation of Investor Rights under Investment Treaties', in D.R. Bishop, J.R. Crawford & W.M. Reisman (eds), *Foreign Investment Disputes: Cases, Materials and Commentary*, 2nd edn (Kluwer Law International, 2014), pp. 753–896; P. Dumberry, 'The Protection of Investors' Legitimate Expectations and the Fair and Equitable Treatment Standard under NAFTA Article 1105' (2014) 31(1) *Journal of International Arbitration*, pp. 47–74.

[104] Reed & Consedine, ibid.

[105] Selivanova, n. 27 above.

[106] Case C-369/09 P, *ISD Polska and Ors* v. *Commission*, Judgment of the Court (First Chamber), 24 Mar. 2011, ECLI:EU:C:2011:175, para. 122.

[107] A. Giraud, 'A Study of the Notion of Legitimate Expectations in State Aid Recovery Proceedings: "Abandon All Hope, Ye Who Enter Here"'? (2008) 45(5) *Common Market Law Review*, pp. 1399–431.

The supremacy of EU law over obligations arising from investment treaties, however, is effective only within the EU's self-contained regime. EU law has limited effects outside the EU judicial system, as is acknowledged by the Commission.[108] Clearly, in investment treaty arbitration the role of the tribunal is restricted to controlling that the host state has respected the legal standards laid down to protect foreign investors under international law, and not to monitor compliance with EU law. Moreover, courts outside the EU are not compelled to refuse to enforce awards that conflict with EU public policy. In *Micula*, for instance, when the claimants sought to have the award enforced in the United States (US), the Court of the Southern District of New York rejected Romania's argument that it could not pay the damages awarded because the European Commission had forbidden it from doing so. According to the Court, 'there can be no substantive review of an ICSID award in this court. ... To do otherwise would undermine the ICSID Convention's expansive spirit on which many American investors rely when they seek to confirm awards in the national courts of the Convention's other member states'.[109] Consequently, the application of EU rules on state aid was denied, considering that it would amount to a breach of international law obligations as determined by the ICSID tribunal. It is no surprise, then, that the claimants in *Eiser*, *Antin*, and *Masdar Solar* have filed for enforcement in US courts.[110]

### 5.3. Pacta sunt servanda

Despite the questionable merits of the Commission's stance on the lack of enforceability of damages awards, if EU law is treated as a subsystem of public international law, the primacy of one system over the other should be determined on the basis of general principles of public international law.[111] This logic implicitly resonates in Article 351 TFEU, which, in applying the principle of *pacta sunt servanda*,[112] provides that '[t]he rights

---

[108] European Commission, Decision of 10 Nov. 2017, n. 46 above, para. 161.

[109] *Micula et al.* v. *Government of Romania*, US District Court, Southern District of New York, No. 15 Misc. 107 (SDNY 5 Aug. 2015).

[110] Petition for Recognition and Enforcement of an Arbitration Award, filed 19 May 2017 by Eiser Infrastructure Ltd and Energia Solar Luxembourg S.à.r.l. against the Kingdom of Spain, US District Court for the Southern District of New York, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9186.pdf; Petition for Recognition and Enforcement of an Arbitration Award, filed 27 July 2018 by Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar BV against the Kingdom of Spain, US District Court for the District of Columbia, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9983.pdf; Petition for Enforcement of an Arbitration Award, filed 28 Sept. 2018 by Masdar Solar & Wind Cooperatief UA against the Kingdom of Spain. US District Court for the District of Columbia, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9983.pdf.

[111] Struckmann, Forwood & Kadri, n. 61 above, p. 260. However, this is a highly controversial debate. Whereas public international lawyers consider EU law as mere regional international law, the status and effects of which are to be determined on the basis of international rules on conflict of treaties and by the principles governing the internal law of international organizations, EU institutions and the CJEU, in particular, consider the EU as a subject of international law with its own independent and autonomous legal order since Case 26-62, *NV Algemene Transport – en Expeditie Onderneming van Gend & Loos* v. *Netherlands Inland Revenue Administration*, Judgment of the Court, 5 Feb. 1963, ECLI:EU:C:1963:1, and Case 6-64, *Flaminio Costa v ENEL*, n. 102 above: Simma & Pulkowski, n. 102 above. See also Moreno-Lax & Gragl, n. 102 above, p. 457.

[112] Struckmann, Forwood & Kadri, ibid.; I.I. Lukashuk, 'The Principle *Pacta Sunt Servanda* and the Nature of Obligation under International Law' (1989) 83(3) *American Journal of International Law*, pp. 513–18;

and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties'. In consequence, also as a matter of EU law, obligations arising from international agreements concluded prior to EU membership have prevalence over any obligations arising under the EU Treaties, including Articles 107 and 108 TFEU on state aid.[113] That would be the case for obligations arising under the ICSID Convention for most EU Member States except for the six 'founding states' (Belgium, France, Germany, Italy, Luxembourg, and the Netherlands), Spain, which signed and ratified the ICSID Convention after its accession to the EU, and Poland, which is not party to the ICSID Convention.[114] The application of Article 351 TFEU is, indeed, a central issue in the pending GCEU proceedings brought by *Micula*,[115] and also in the decision of the England and Wales Court of Appeal in *Micula & Ors* v. *Romania*.[116]

The Commission insists that Article 351 TFEU does not apply to prior multilateral international agreements in cases involving intra-EU relations.[117] However, in most renewable energy cases this argument is not pertinent, since enforcement of winning awards also concerns extra-EU relations. For instance, non-EU states which are ICSID parties may also have an interest in an EU Member State's compliance with its obligations under Articles 53 and 54 of the ICSID Convention because if enforcement of renewable energy awards becomes impossible in the EU, the practical burden of enforcement would be passed onto the courts of non-EU Member States parties to the ICSID Convention.[118] Indeed, as already seen in *Eiser*, *Masdar Solar* and *Antin*, petitions to enforce the awards have been exclusively filed with US courts.[119]

The much awaited decision of the GCEU in *Micula* hopefully will shed some light on the application of Article 351 TFEU but, as it stands, enforcement of damages awards is likely to be restricted to courts outside the EU, where EU law does not prevail and no mechanisms are available for the EU eventually to recover sums that have been lawfully and successfully paid to foreign investors under international law.

---

J.W. Yackee, 'Pacta Sunt Servanda and State Promises to Foreign Investors before Bilateral Investment Treaties: Myth and Reality' (2009) 32(5) *Fordham International Law Journal*, pp. 1550–613.

[113] Struckmann, Forwood & Kadri, ibid.

[114] Database of ICSID Member States, available at: https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx.

[115] *Micula* v. *Commission*, n. 54 above.

[116] *Micula & Ors* v. *Romania & Anor*, n. 97 above.

[117] As ruled by the Court of Justice in, e.g., Case T-69/89, *RTE* v. *Commission*, Judgment of the Court of First Instance (Second Chamber), 10 July 1991, ECLI:EU:T:1991:39.

[118] In the same sense, see Struckmann, Forwood & Kadri, n. 61 above, p. 262.

[119] See n. 110 above.

## 6. THE SYNERGY BETWEEN INVESTOR PROTECTION AND CLIMATE CHANGE MITIGATION POLICIES IN A CONTEXT OF EUROPEAN HOSTILITY TOWARDS ISDS

The promotion of energy from renewable sources is an essential part of EU energy policy.[120] Much has changed since the EU adopted its first package of climate and energy measures in 2008. The need for substantial and sustained reductions of GHGs is imperative and the EU is ready to take a global leadership in renewable energies.[121] On 30 November 2016, the Commission launched the Clean Energy Package,[122] which includes, inter alia, a recast of the Directive on the Promotion of Renewable Energy Sources (RES).[123] The recast seeks to advance towards compliance with the goals of the 2030 EU Climate and Energy Framework,[124] and sets a binding target of a 27% EU share of RES in final energy consumption by 2030. The Council and the European Parliament adopted their positions in December 2017 and January 2018, respectively.[125] On 14 June 2018, negotiators from the European Commission, the European Parliament and the Council of Ministers reached an agreement.[126] The final text was formally adopted by Parliament (13 November 2018) and the Council (4 December 2018).[127]

European institutions are aware that the EU will have to step up its efforts on research and innovation policy to support the 2030 EU climate goals. In this regard it is acknowledged that:

> [a] particular emphasis should be on accelerating cost reductions and market uptake of low-carbon technologies (renewables, energy efficiency, and low-carbon industrial processes across a range of sectors). This should focus on scaling up investments in large scale demonstrators, stimulating the demand for innovative technologies, and ensuring appropriate regulatory frameworks across the single market.[128]

---

[120] P. Prisecaru & P. Calanter, 'Governance of Renewable Energies in the EU' (2017) 5(2) *Global Economic Observer*, pp. 31–38.

[121] Communication from the Commission, 'A Clean Planet For All: A European Strategic Long-term Vision for a Prosperous, Modern, Competitive and Climate Neutral Economy', COM(2018) 773 final, 28 Nov. 2018, available at: https://ec.europa.eu/clima/sites/clima/files/docs/pages/com_2018_733_en.pdf.

[122] European Commission, 'Clean Energy for all Europeans', available at: https://ec.europa.eu/energy/en/topics/energy-strategy-and-energy-union/clean-energy-all-europeans.

[123] Proposal for a Directive of the European Parliament and of the Council on the Promotion of the Use of Energy from Renewable Sources (Recast), COM/2016/0767 final, 30 Nov. 2016, 2016/0382 (COD).

[124] Communication from the Commission, 'A Policy Framework for Climate and Energy in the Period from 2020 to 2030', COM/2014/015 final, 22 Jan. 2014, available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52014DC0015&from=EN.

[125] European Parliament, Amendments adopted on the Proposal for a Directive on the Promotion of the Use of Energy from Renewable Sources (Recast), (COM/2016/0767 – C8-0500/2016 – 2016/0382(COD), 17 Jan. 2018, available at: http://www.europarl.europa.eu/sides/getDoc.do?pubRef=-//EP//TEXT%20TA%20P8-TA-2018-0009%200%20DOC%20XML%20V0//EN.

[126] Council of the EU, 'Analysis of the Final Compromise Text with a View to Agreement', 21 June 2018, available at: http://data.consilium.europa.eu/doc/document/ST-10308-2018-INIT/en/pdf.

[127] Directive (EU) 2018/2001 of 11 December 2018 on the Promotion of the Use of Energy from Renewable Sources [2018] OJ L 328/82.

[128] COM/2014/015 final, n. 124 above.

Not surprisingly, one of the guiding principles for RES-generated electricity set out in the recast RES Directive is the need to ensure that investors have sufficient predictability of the planned support for energy from renewable sources.[129] This was reinforced by the European Parliament in its position in plenary of January 2018,[130] and has been introduced in recital 29 of the recast RES Directive:

> Without prejudice to Articles 107 and 108 TFEU, policies supporting renewable energy should be predictable and stable and should avoid frequent or retroactive changes. Policy unpredictability and instability have a direct impact on capital financing costs, on the costs of project development and therefore on the overall cost of deploying renewable energy in the Union. Member States should prevent the revision of any support granted to renewable energy projects from having a negative impact on their economic viability.[131]

It is, therefore, clear that EU institutions acknowledge the synergy between setting the right conditions for investors and the promotion of renewables in the EU. Indeed, the relationship between legal certainty and renewable energy policies has long been established in the literature.[132] However, as shown in the preceding sections, other EU policies seem to interfere with this view.

The *Achmea* ruling and the Commission Decisions on state aid are just new bricks in the wall of hostility which the EU is building around investment arbitration. Originally, the EU supported the inclusion of ISDS in post-Lisbon Agreements, stating that '[i]nvestor-state [arbitration] is such an established feature of investment agreements that its absence would in fact discourage investors and make a host economy less attractive than others. For these reasons, future EU agreements including investment protection should include investor-state dispute settlement'.[133]

However, following fierce opposition to ISDS in certain Member States and sectors of European public opinion, the EU has now retracted its original support of ISDS and introduced a new approach based on the creation of a Permanent International Investment Tribunal to replace traditional ISDS mechanisms. CETA is the first trade agreement in which the new vision has been realized,[134] followed by the EU draft on the Transatlantic Trade and Investment Partnership between the EU and the US

---

[129] COM/2016/0767 final, n. 123 above, Art. 15(3).

[130] European Parliament, n. 125 above.

[131] Directive (EU) 2018/2001, n. 127 above.

[132] R. Dolzer & C. Schreuer, *Principles of International Investment Law* (Oxford University Press, 2008), pp. 145–49; Bellantuono, n. 10 above; D. Schiereck & J. Trillig, 'Regulatory Changes and the Volatility of Stock Returns: The German Solar Energy Sector' (2014) 8(2) *International Journal of Energy Sector Management*, pp. 160–77; N. Gatzert & T. Kosub, 'Determinants of Policy Risks of Renewable Energy Investments' (2017) 11(1) *International Journal of Energy Sector Management*, pp. 28–45; Dias Simões, n. 23 above, pp. 251–71.

[133] Communication from the Commission, 'Towards a Comprehensive European International Investment Policy', COM(2010) 343 final, 7 July 2010, p. 10, available at: http://ec.europa.eu/transparency/regdoc/rep/1/2010/EN/1-2010-343-EN-F1-1.Pdf.

[134] N. 79 above, Arts 8.27–29. See also Commission Concept Paper, 'Investment in TTIP and Beyond: The Path for Reform', p. 3, available at: http://trade.ec.europa.eu/doclib/docs/2015/may/tradoc_153408.PDF ('CETA is the first agreement to which the U.S. is not a party which contains a clear commitment to the possible creation of an appeal mechanism').

(TTIP),[135] the EU-Vietnam Trade Agreement,[136] the EU-Singapore trade and investment agreements,[137] and the new EU-Mexico Trade Agreement.[138] These developments put an end to the traditional approach to ISDS in the EU. In the long term, the idea is to replace bilateral arrangements with a Multilateral Investment Court (MIC) for the settlement of investment disputes. The initiative is part of the EU's new approach to investment dispute resolution, which moves away from the traditional arbitration framework towards a court system. In March 2018, the Council of the EU adopted and published the negotiating directives for the MIC.[139] More broadly, initial talks on the possible creation of an MIC started in late 2017 under the auspices of UNCITRAL, which has given its Working Group III a mandate to work on multilateral reform of investor-state dispute settlement.[140]

The creation of an MIC pursues the noble cause of responding to some of the legitimate public concerns raised in the context of traditional investor-to-state dispute settlement,[141] but its conformity with EU law is far from clear.[142] Indeed, in relation to the European Patent Court[143] and accession to the European Convention on Human Rights and Fundamental Freedoms (ECHR)[144] (Opinion 2/13),[145] the CJEU has

[135] European Union's Proposal for Investment Protection and Resolution of Investment Disputes, Transatlantic Trade and Investment Partnership (TTIP), 12 Nov. 2015, Arts 9–10, 12, available at: http://trade.ec.europa.eu/doclib/docs/2015/november/tradoc_153955.pdf. See also Commission Concept Paper, ibid. (remarking that the TTIP contains the first EU negotiating directives that explicitly mention an appellate mechanism).

[136] EU-Vietnam Trade and Investment Agreement, authentic text as of Aug. 2018, not yet binding under international law, available at: http://trade.ec.europa.eu/doclib/press/index.cfm?id=1437.

[137] Investment Protection Agreement between the European Union and its Member States, of the one part, and the Republic of Singapore, of the other part, Brussels (Belgium), 19 Oct. 2018, available at: http://trade.ec.europa.eu/doclib/press/index.cfm?id=961.

[138] New EU-Mexico Agreement, agreement in principle, Brussels (Belgium), 23 Apr. 2018, available at: http://trade.ec.europa.eu/doclib/press/index.cfm?id=1833.

[139] Council of the EU, 'Negotiating Directives for a Convention establishing a Multilateral Court for the Settlement of Investment Disputes', Document/ST-12981-2017-ADD-1-DCL-1, 20 Mar. 2018, available at: http://data.consilium.europa.eu/doc/document/ST-12981-2017-ADD-1-DCL-1/en/pdf.

[140] UNCITRAL, 'Possible Reform of Investor-State Dispute Settlement (ISDS)' (5 Sept. 2018), UN Doc. A/CN.9/WG.III/WP.149, available at: http://www.uncitral.org/uncitral/en/commission/working_groups/3Investor_State.html.

[141] S.D. Franck, 'The Legitimacy Crisis in Investment Treaty Arbitration: Privatizing Public International Law through Inconsistent Decisions' (2005) 73(4) Fordham Law Review, pp. 1521–625; G. van Harten, 'A Case for an International Investment Court', Society for International Economic Law, Online Proceedings, Working Paper No. 22/08, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1153424; S.W. Schill, 'Crafting the International Economic Order: The Public Function of Investment Treaty Arbitration and Its Significance for the Role of the Arbitrator' (2010) 23(2) Leiden Journal of International Law, pp. 401–30, at 412.

[142] S. Schill, 'Editorial: Opinion 2/13: The End for Dispute Settlement in EU Trade and Investment Agreements?' (2015) 16(3) The Journal of World Investment & Trade, pp. 379–88; L. Woods, 'Fit for Purpose? The EU's Investment Court System', Kluwer Arbitration Blog, 23 Mar. 2016, available at: http://arbitrationblog.kluwerarbitration.com/2016/03/23/to-be-decided.

[143] Case C-1/09, Opinion delivered pursuant to Art. 218(11) TFEU, Opinion of the Court (Full Court), 8 Mar. 2011, ECLI:EU:C:2011:123.

[144] Rome (Italy), 4 Nov. 1950, in force 3 Sept. 1953, available at: http://www.echr.coe.int/pages/home.aspx?p=basictexts.

[145] Case C-2/13, Draft International Agreement: Accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms, Compatibility of the

persistently declared the incompatibility with EU law of any judicial body or international tribunal that jeopardizes the principles of autonomy and primacy of EU law and the exclusive competence of the CJEU in its interpretation and application. Presumably, the issue of the material compatibility of investment tribunals with EU law has now been defined for the future in the recently issued Opinion 1/17.[146] In line with the conclusions of Advocate General Bot, the CJEU has ruled that the Investment Court System established under CETA is compatible with EU law,[147] looking more favourably upon a permanent investment court than on the European Court of Human Rights (ECtHR) or other international courts and tribunals.

The recently adopted recast RES Directive clearly states that retroactive changes must be avoided and enables the European Commission to launch infringement proceedings against Member States which retroactively adopt significant policy reversals. However, this possibility will apply once the new Directive is transposed into national law by 30 June 2021 and, in consequence, will only cover future cases. Furthermore, infringement proceedings deal only with disputes between the European Commission and national governments regarding the implementation of EU law, and not with the protection of investors' rights. Accordingly, the recast RES Directive neither addresses specific violations of investors' rights nor contemplates the awarding of compensation for loss suffered. If the EU insists on replacing ISDS altogether, investors are left without a dispute settlement mechanism, with provisions on fairness, legitimate expectations, equitable treatment and expropriation (as enshrined in Articles 10 and 13 ECT).

Of course, one may reject the legitimacy and utility of direct international claims by foreign investors against states, regardless of whether they are heard by arbitral tribunals or an investment court. Indeed, it may be argued that in the field of renewable energy policies, which is subject to intense public debate, public policy issues should matter, and proceedings should permit much broader stakeholder participation, including by recognizing standing for actors other than investors and states. Various proposals to reform ISDS are on the table, but different major states favour different options, from minor reforms of ISDS to the creation of an investment court, or the rejection of international investment claims altogether.[148] For this reason, states and international institutions should not concentrate on just one reform approach, but instead develop multiple and flexible reform options.[149] The present article does not intend to discuss the pros and cons of replacing ISDS by more democratic mechanisms of

---

Draft Agreement with the EU and FEU Treaties, Opinion of the Court (Full Court), 18 Dec. 2014, ECLI: EU:C:2014:2454.

[146] Opinion C-1/17, n. 80 above. See further, G. Kübek, 'CETA's Investment Court System and the Autonomy of EU Law: Insights from the Hearing in Opinion 1/17', *VerfBlog*, 4 July 2018, available at: https://verfassungsblog.de/cetas-investment-court-system-and-the-autonomy-of-eu-law-insights-from-the-hearing-in-opinion-1-17.

[147] Opinion of Advocate General Bot, delivered 29 Jan. 2019, ECLI:EU:C:2019:72; Opinion of the Court (Full Court) of 30 April 2019 on Case C-1/17, n. 80 above.

[148] S. Puig & G. Shaffer, 'Imperfect Alternatives: Institutional Choice and the Reform of Investment Law' (2018) 112(3) *American Journal of International Law*, pp. 361–409.

[149] In the same sense, A. Roberts, 'Incremental, Systemic, and Paradigmatic Reform of Investor-State Arbitration' (2018) 112(3) *American Journal of International Law*, pp. 410–32.

dispute resolution but does draw attention to the synergy between arbitration and climate change mitigation policies. It is an undeniable fact that, to date, investors in the energy sector, including renewable energies, prefer arbitration and that the number of new investor-state dispute settlement claims remains high.[150] Accordingly, reforms are welcome but compliance with signed investment treaties that provide for arbitration is crucial for generating investor confidence and, therewith, stimulate the substantial investments that are necessary to achieve the EU's ambitious climate objectives.

## 7. CONCLUSIONS

Recent studies in policy coherence show that, even in an institutional context that is formally favourable to policy coordination, policy coherence may fail in highly politicized contexts.[151] This seems to be happening in the EU with regard to climate change, competition, and foreign investment policies. On the one side, European institutions wish to step up their efforts on research and innovation policy to support the 2030 EU climate goals. They are aware of the synergy between setting the right conditions for investors and the promotion of renewables in the EU. On the other side, the European Commission's untested extension of the boundaries of state aid law to the realm of investment arbitration may be turning the EU into a territory where the implementation of damages awards is problematic, while casting serious doubts on the neutrality of EU competition policy. The EU's position against investment arbitration reflects a desire to achieve the political goal of moving away from traditional ISDS mechanisms. Yet, given the legal and political uncertainties surrounding the creation of a permanent investment court, the growing attempts of the EU to torpedo ISDS might have the side effect of weakening the overall credibility of investment arbitration as a mechanism for investor protection and, thereby, diminish its potential as a tool to reinforce the credibility of climate change mitigation policies.

At first, following the series of EU proposals that openly promote the development of clean energy in Europe, legislation favoured investment in renewables. No government ever considered that renewables investment support might be incompatible with state aid law, thus the economic schemes were never notified to the Commission. Then, rapid legislative change in various Member States impacted upon investments in renewables in almost a punitive way. However, instead of strengthening the legal mechanisms that protect investors against such retroactive regulatory changes at the level of the Member States, the Commission's crusade against investment arbitration added more instability and unpredictability to the investment climate.

The current tension between EU law and investment arbitration damages the EU's reputation as an investor-friendly destination and may dissuade investment in renewable energy. To avoid this undesirable collateral effect on climate change mitigation, the EU

[150] UN Conference on Trade and Development, *World Investment Report 2018*, available at: https://unctad.org/en/PublicationChapters/wir2018ch3_en.pdf.

[151] I. Selianko & A. Lenschow, 'Energy Policy Coherence from an Intra-Institutional Perspective: Energy Security and Environmental Policy Coordination within the European Commission' (2015) 19(1) *European Integration online Papers*, pp. 1–29, available at: http://eiop.or.at/eiop/pdf/2015-002.pdf.

institutions should work towards greater policy coherence. The Commission, in particular, should review its policy on state aid rules and avoid untested extensions to the realm of arbitration. It should monitor the proper functioning of the internal market, while avoiding any unnecessary infliction of further damage on investor confidence.[152] Only then will the EU and its Member States have a fighting chance of meeting the 2030 renewables target.

---

[152] Similarly, Alessi, Ferrer & Egenhofer, n. 24 above.