**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NEXTERA ENERGY GLOBAL HOLDINGS B.V. *and* NEXTERA ENERGY SPAIN HOLDINGS B.V.,<br><br>         Petitioners,<br><br>    v.<br><br>KINGDOM OF SPAIN,<br><br>         Respondent. | Civil Action No. 19-cv-01618-TSC |

**REPLY EXPERT DECLARATION OF PROF. DR. STEFFEN HINDELANG, LL.M. IN SUPPORT OF THE KINGDOM OF SPAIN'S MOTION TO DISMISS PETITION TO ENFORCE ARBITRAL AWARD**

# TABLE OF CONTENTS

I.      INTRODUCTION AND BACKGROUND ..........................................................3
II.     THE EU TREATES ARE APPLICABLE LAW UNDER ARTICLE 26(6) OF
        THE ECT .......................................................................................................3
        A.      The EU Treaties constitute rules of international law applicable between
                the EU Member States within the meaning of Article 26(6) of the ECT ...............3
        C. Contrary findings in arbitral awards do not affect the applicability of EU law as
                public international law between EU Member States under Article 26(6) of
                the ECT. ..............................................................................................11
        B.      No contracting out: EU Treaties are always applicable international law
                between the EU Member States in intra-EU relations ............................................14
        C.      Arguendo, EU law is applicable to intra-EU disputes by virtue of Article
                41(1)(b) of the VCLT................................................................................15
III.    THE PRINCIPLE OF PRIMACY IS THE SUPREME CONFLICT RULE IN
        INTERNATIONAL LAW GOVERNING THE RELATIONS BETWEEN EU
        MEMBER STATES.....................................................................................20
        A.      The principle of primacy is applicable in international law governing the
                relations between EU Member States ..................................................21
        B.      Article 16 of the ECT is no conflict rule and even if it were, it would need
                to be disapplied .......................................................................................24
        C.      The principle of primacy requires disapplication of Article 26 of the ECT
                until it has been repealed or reformed....................................................27
        D.      The operation of the principle of primacy does not violate either the ECT
                or the principle of good faith under the VCLT .......................................29
        E.      Even if the principle of primacy were not be the supreme conflict rule in
                inter se relations between the EU Member States, the EU Treaties would
                still prevail in a conflict with the ECT by way of the lex posterior rule...............32
IV.     THE ABSENCE OF A SO-CALLED DISCONNECTION CLAUSE OR
        "INTRA-EU CARVE OUT" IS IRRELEVANT FOR THE QUESTION OF
        CONFLICT BETWEEN ARTICLE 26 OF THE ECT AND THE EU TREATIES........33
V.      SPAIN WOULD BE IN VIOLATION OF EU LAW IF IT PAID ANY
        AMOUNT IN SATISFACTION OF THE AWARD ......................................34
VI.     THE UNITED STATES AND ITS COURTS HAVE NO OBLIGATION TO
        ENFORCE THE AWARD RENDERED UNDER ARTICLE 54(1) OF THE
        ICSID CONVENTION, AS THERE IS NO OBLIGATION OF SPAIN TO
        ABIDE BY AND COMPLY WITH THE AWARD ACCORDING TO ARTICLE
        53(1) OF THE ICSID CONVENTION ........................................................38

## I.     INTRODUCTION AND BACKGROUND

1.      I, Steffen Hindelang, submit this declaration in particular to address certain opinions made by my colleague Professor George A. Bermann in his declaration of 7th June 2022 ("Second Bermann Declaration") **(DE 68-1)**, submitted in the above-referenced case.[1]

2.      As before, this declaration is based upon my personal knowledge, except where stated on information and belief. The statements in this declaration, and the information upon which they are based, are true to the best of my knowledge.

3.      All authorities I have relied upon are set forth at the end of my declaration, or prior declarations, and produced as exhibits to this declaration if not already attached to my prior declarations. For ease of reference, exhibits to this reply declaration are sequentially numbered after those submitted in my Third Declaration. I do not express an opinion on any law in this declaration other than EU law and public international law relevant to the issue I have been asked to address.

## II.     THE EU TREATES ARE APPLICABLE LAW UNDER ARTICLE 26(6) OF THE ECT

### A.     The EU Treaties constitute rules of international law applicable between the EU Member States within the meaning of Article 26(6) of the ECT

4.      As explained in my First and Third Declarations, the EU Treaties establish a unique legal order which is both a highly elaborate legal regime in public international law between EU Member States, and a constitutional framework creating law applicable within Member States.[2] Since the EU Treaties thus possess character of international law, they need to be considered under

---

[1] If I do not expressly respond to a certain statement of Professor Bermann this does not necessarily mean that I agree with it.

[2] First Hindelang Declaration, ¶¶ 15 et seq **(DE 15-6)**; Third Hindelang Declaration, ¶¶ 15 et seq **(DE 62-1)**.

the applicable law clause of Article 26(6) of the ECT.

5.      In arguing that the ECT is applicable to the investment disputes in the intra-EU context, Professor Bermann relies primarily on the language of Articles 26(3)(a) and 26(8), asserting that "each Contracting Party" to the ECT, including the EU Member States, has given "unconditional consent" to submit a dispute under the ECT to investment arbitration and bears the obligation to "carry out without delay" the consequent award. These arguments have been made in complete ignorance of the obligation of tribunals under Article 26(6) of the ECT.

6.      As stated in my First Declaration[3], a tribunal purportedly constituted under Article 26 of the ECT ("ECT tribunal(s)") in relation to a dispute between an EU Member State and an investor from another EU Member State would be required to "decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[4] The EU Treaties are international treaties and satisfy the definition of a treaty set out in Article 2(1)(a) of the Vienna Convention on the Law of Treaties ("VCLT"), according to which a treaty is "[a]n international agreement concluded between [s]tates in written form and governed by international law." As such, the EU Treaties would be "relevant rules of international law applicable in the relations between" Spain and the Netherlands under Article 31(3)(c) of the VCLT and must be taken into account when interpreting and applying the ECT; something Professor Bermann already fails to consider in his analysis of Article 26 of the ECT "under public international law". More importantly, the EU Treaties form part of the mandate in Article 26(6) of the ECT that a tribunal "shall decide the issues in dispute in accordance with [. . .] applicable rules and principles of international law."  Any court or tribunal interpreting or applying the ECT must therefore apply

---

[3] First Hindelang Declaration, ¶¶ 49-50 (**DE 15-6**).

[4] ECT, Art. 26(6) (**DE 1-6**).

the EU Treaties as international law to decide all issues in dispute, including jurisdiction and merits alike.

7.    Further, since the EU Treaties, as interpreted by the Court of Justice of the European Union ("CJEU"), specifically include the principle of primacy and the principle of autonomy as reflected in Articles 267 and 344 of the Treaty on the Functioning of the European Union[5] ("TFEU")[6], the ECT tribunals, while deciding a dispute in an intra-EU context, are bound to observe, as a matter of public international law, the principles of autonomy of EU law as well as the primacy of EU law over any conflicting rule created by the EU Member States.[7] Application of these principles would require the tribunal to determine that no legally permissible offer was made by an EU Member State to arbitrate with nationals of other EU Member States any dispute under an international treaty between the EU Member States.  This holds true also in the context of the ECT because an arbitration tribunal constituted under Article 26 of the ECT, like the intra-EU investment tribunal in *Achmea*, does not qualify as a "court or tribunal of a Member State." An arbitration tribunal lacks the required "links with the judicial systems of the Member States" and follows procedures that are not "a step in the proceedings before the national courts."[8]

8.    It follows from the above, that in the absence of a legally permissible offer to arbitrate of an EU Member State and to nationals of other EU Member States under Article 26 of the ECT, the EU Member States, including Spain and the Netherlands, cannot be said to have given

---

[5]  OJ 2012 C 326, 1 (**DE 62-9**).

[6]  Third Hindelang Declaration, ¶ 52 (**DE 62-1**).

[7]  *Id*, ¶ 53.

[8]  *Achmea,* ¶ 46 (**DE 62-47**); Komstroy, ¶ 35 (**DE 62-67**).

"unconditional consent" under Article 26(3)(a) of the ECT, as Professor Bermann claims.

9.      Professor Bermann however argues that "it is highly questionable" whether EU law falls under "applicable rules and principles of international law," within the meaning of Article 26(6) of the ECT.[9] In doing so, he provides several arguments which all, however, fail to convince.

10.     First, Professor Bermann argues without any legal basis that, had the drafters of the ECT intended EU law to form a part of the law applicable under Article 26(6) of the ECT, they would have referred to it "explicitly" by using a phrasing equivalent to "the law in force of the Contracting Party concerned"[10].

11.     In making such a speculative argument, Professor Bermann relies on a phrase that is used commonly in applicable law clauses to refer to the *domestic* law of a contracting party, which conveniently ignores the above-mentioned unique dual characteristics of the EU legal order established by the EU Treaties which certainly form part of the EU Member States domestic law but at the same time constitute public international law by their very nature as treaties between the EU Member States. On several occasions, this has been confirmed by the international court charged to deliver the binding authoritative interpretation of the EU Treaties[11], the CJEU: "[EU] law must be regarded [ . . . ] as deriving from an international agreement between the Member States."[12]  Thus, under the perspective of public international law, which Professor Bermann repeatedly emphasizes,[13] the EU Treaties are to be considered what they are: international law.

---

[9]  Second Bermann Declaration, ¶ 66 (**DE 68-1**).

[10] *Id*., ¶ 66.

[11]  Cf. TEU, Article 19(1) which reads: "The Court of Justice of the European Union [ . . . ] shall ensure that in the interpretation and application of the Treaties the law is observed." (**DE +++).**

[12] *See Achmea*, ¶ 41 (**DE +++**).

[13]  Second Bermann Declaration, ¶¶ 38-39, 93 (**DE +++**).

They are, thus, applicable law under Article 26(6) of the ECT between Spain and Netherlands. This echoes in the award passed in Green Power Partners K/S SCE Solar Don Benito APS v. Kingdom of Spain, SCC Arbitration V (2016/135) ("*Green Power v. Spain*"). The Tribunal held that it "considers that the distinction made between separate planes [i.e. ECT and public international law, on the one hand, and EU law, on the other] is artificial and obscures the issues that must be decided.".[14]

12.      Second, Professor Bermann argues that, if EU law, being established by the EU Treaties, is considered to be international law under the auspices of Article 26(6) of the ECT, "then the meaning and effect of the ECT would be subject to *all* international treaties, not just the treaties establishing the EU", which would allow the contracting State parties to the ECT "to lessen or otherwise alter their obligations under the ECT by entering into other international agreements among themselves purporting to amend such obligations."[15]

13.      Such an argument not only lacks substantiation, but also errs in three ways: (i) it misses the fact that Article 26(6) of the ECT includes the applicability of only such international law, including treaties, necessary to decide the issues between the disputing parties and not *all* international treaties; (ii) it also disregards the inherent right of States as the masters of their treaties, resting in their sovereignty, to enter into *inter se* treaties. While in no way limited to the ways provided in the VCLT, such powers are, for example, reflected in its Article 41(1)(b), providing for *inter se* treaty modification[16]; (iii) assuming that Contracting Parties to the ECT enter

---

[14]   *Green Power Partners K/S SCE Solar Don Benito APS v. Kingdom of Spain*, SCC Arbitration V (2016/135) – Award, ¶ 332 (Exhibit 78 filed herewith).

[15]   Second Bermann Declaration, ¶ 67 (**DE 68-1**).

[16]   Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if: […] (b) the modification in question is not prohibited by the treaty and: (i)

into international treaties among themselves purporting to "lessen" or "amend" their *inter se* obligations under the ECT, it is their sovereign prerogative as masters of their treaties to "lessen", to "strengthen", to "alter", to "amend", or to "disapply" treaties *inter se* – essentially to do what they deem fit in their *inter se* relations – as long as rights and obligations of third parties are respected. Furthermore, the tribunal in *Greenpower v. Spain*, resonates in holding that "the distinction made between separate planes [i.e., ECT and public international, on the one hand, and EU law on the other] is artificial and obscures the issues that must be decided"[17] and that "interpreting Article 26 [of the] ECT without resorting to EU law is inconclusive"[18] while applying "EU law together with the ECT to resolve the issues raised by the jurisdiction *ratione voluntatis*."[19], along with the rationale of the CJEU's *Komstroy* judgment.[20]

14.    Third, Professor Bermann misconstrues the meaning and object of the CJEU's Opinion 1/17[21] in posing an rhetorical question, "Why, if CETA tribunals treat EU law as fact only and therefore pose no threat to the primacy or autonomy of EU law, do ECT tribunals – which likewise treat EU law as fact only – pose a threat to the primacy and autonomy of EU law?"[22]

15.    This rhetorical question is misleading – comparing apples and oranges, so to say –

---

does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

[17] *Greenpower v. Spain* – Award, ¶ 332 (Exhibit 78).

[18] *Id.,* ¶ 412.

[19] *Id.*, ¶ 446.

[20] *Komstroy*, ¶ 66 (**DE 62-67**).

[21] CJEU, Opinion 1/17, ECLI:EU:C:2019:341 – *CETA* ("Opinion 1/17") (**DE 62-68**).

[22] Second Bermann Declaration, ¶ 68 (**DE 68-1**).

and the answer Professor Bermann provides is simply erroneous. CETA's Chapter Eight on investment does not govern investment relations between EU Member States. Intra-EU investment claims are not within the scope of the CETA as the agreement is intended to apply only between Canada, *on the one hand*, and the European Union and its Member States, *on the other*.[23] The EU Treaties are not applicable law to Canada and, thus, the question of applying the EU Treaties as law between the EU and its Member States, on the one hand, and Canada, on the other, can simply not arise. However, the EU Treaties are undoubtedly applicable international law between the EU Member States.[24] Since Spain and the Netherlands, the two Contracting Parties to the ECT in this case, are both EU Member States, the ECT tribunals cannot treat EU law, due to its established character as international law between the EU Member States, as a fact. Hence, the alleged "inconsistency"[25] between the CETA and the ECT, which Professor Bermann thought he had detected, does not exist.

16.    Fourth, Professor Bermann makes stark generalisations in arguing that "that EU law does not supersede "*all*[26] the rest of international law, including the duty of [EU Member][27]

---

[23] *See* the Parties mentioned in the Title of the CETA. The same can be also drawn from Article 8.1 in conjunction with Article 8.25.1 of the CETA. Article 8.1 of the CETA defines the respondent as "Canada or, in the case of the European Union, either the Member State of the European Union or the European Union pursuant to Article 8.21." And Article 8.25.1 of the CETA pro-vides that "[t]he respondent consents to the settlement of the dispute by the Tribunal in accordance with the procedures set out in this Section." Thus, an EU Member States does not extent an offer to arbitrate to an investor of another EU Member State.

[24] *See Achmea*, ¶ 41 (**DE 62-47**); CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – *Budějovický Budvar ("Budějovický Budvar")* (**DE 62-38**).

[25] Second Bermann Declaration, ¶ 68 (**DE** 68-1).

[26] (emphasis added).

[27] Square brackets added.

States to abide by the international treaties into which they have entered"[28]

17.     He only can do so by misrepresenting the all-encompassing conflict rule in international law established by the EU Treaties[29] governing an elaborate regime in public international law *between* the EU Member States: The principle of primacy of EU law grants in the individual case, a *certain* provision of the EU Treaties (or law established on that basis) primacy over a *certain* provision in another international treaty between the EU Member States if both provisions are, as such, applicable to a *certain* situation *only* at the time of conflict. The application of the conflict rule does not lead to invalidation of the latter provision. It only disapplies it in the concrete conflict situation.[30] Further, the EU Member States had exercised their sovereign choice to enter into the EU Treaties. Hence, applicability of the EU law as public international law between the EU Member States, albeit with a superior rank, is merely the consequence of the sovereign choice of the EU Member States, which includes Spain and the Netherlands.

18.     Professor Bermann cites the EU's self-imposed commitment to "respect [..] international law"[31] and Article 3(5) consider international agreements "binding upon the institutions of the Union and on its Member States"[32] to argue that "[t]he notion that an EU Member State can invoke EU law to defeat its international treaty obligations is therefore

---

[28] Second Bermann Declaration, ¶ 72 (**DE 68-1**).

[29] First Hindelang Declaration, ¶ 30 (**DE 15-6**).

[30] CJEU, Case 10/61, ECLI:EU:C:1962:2 – *Commission v. Government of Italian Republic ("Commission v. Government of Italian Republic")* (**DE 62-15**); CJEU, Case C-3/91, ECLI:EU:C:1992:420, ¶ 8 – *Exportur* (**DE 62-26**); CJEU, Case C-469/00, ECLI:EU:C:2003:295, ¶ 37 – *Ravil* (**DE 62-33**); *Budějovický Budvar* ¶ 98 (**DE 62-38**); CJEU, Case C-546/07, ECLI:EU:C:2010:25, ¶ 44 – *Commission v. Germany* (**DE 62-39**).

[31] TEU Article 21(1) (**DE 62-10**).

[32] *Id*. Article 3(5).

antithetical to a fundamental principle that the EU itself professes."[33] In doing so, he conveniently misses that such commitments in the referred treaty provisions concern the EU's position as regards its international relations with *third* countries, which in no way runs contrary to the application EU law to intra-EU disputes under the ECT between two EU Member States.

19.     Hence, none of Professor Bermann's aforementioned arguments succeeds in any way in disproving the fact that EU law constitutes "applicable rules and principle of international law" between EU Member States under the meaning of Article 26(6) of the ECT.

**C. Contrary findings in arbitral awards do not affect the applicability of EU law as public international law between EU Member States under Article 26(6) of the ECT.**

20.     Professor Bermann, while relying solely on arbitral awards, argues that the authoritative interpretation delivered by the CJEU in *Achmea*[34] and *Komstroy*[35] as regards the inapplicability of Article 26 of the ECT to disputes between an EU Member State and an investor of another EU Member State, "may be valid within the EU legal order" but "they cannot govern interpretation of Article 26 ECT under public international law."[36] These arguments have been made in complete ignorance of the public international law nature of the EU legal order as established by the EU treaties and are hence unsustainable.[37]

21.     Professor Bermann, continuing to place heavy reliance on arbitral awards as if it were binding precedents, contends that the CJEU in *Komstroy* had "failed to adopt the perspective

---

[33] Second Bermann Declaration, ¶ 74 (**DE 68-1**).

[34] *Achmea,* ¶ 56 (**DE** 62-47).

[35] *Komstroy,* ¶ 64 (**DE** 62-67).

[36] Second Bermann Declaration, ¶ 39 (**DE 68-1**).

[37] *See* above.

of international law"[38] and that "[e]very arbitral tribunal analysing *Komstroy* has, however, rightly found that the CJEU's interpretation of the ECT was 'clearly inappropriate' and 'not supported by the provisions of the ECT, nor in the objectives of the ECT'",[39] and goes on to state that he finds it "telling that not a single ECT tribunal considering the question of intra-EU jurisdiction has followed *Komstroy.*"[40]

22.    However, the recent award passed in "*Greenpower v. Spain*"[41] while noting that "the CJEU's judgements are to be generally qualified as interpretations of the law"[42] specifically held that, in the context of intra-EU disputes, "the CJEU Grand Chamber's *Achmea Judgment* is fully relevant for the question raised [..] in [..] [the][43] jurisdictional objection *ratione voluntatis*, and that it leads to a clear answer to such question, as further confirmed in the CJEU Grand Chamber's *Komstroy Judgment*. This answer is that Spain's offer to arbitrate under the ECT is not applicable in intra-EU relations and hence there is no offer of arbitration that the Claimants could accept."[44] Also earlier, for example, in *Isolux v. Spain,* the Tribunal found that the EU Treaties formed part of the "applicable rules and principles of international law" within Article 26(6) of the ECT and concluded that "[i]t is admitted today, *in a general manner*, that arbitral tribunals not

---

[38]  Second Bermann Declaration, ¶ 40 (**DE** 68-1).

[39]  *Id*., ¶ 37.

[40]  *Id.*, ¶ 38.

[41]  *Green Power v. Spain* – Award **(Exhibit 78)**.

[42]  *Id.*, ¶ 440.

[43]  Square brackets added.

[44]  *Greenpower v. Spain* - Award, ¶ 445 (**Exhibit 78).**

only have the power, but rather the obligation to apply EU law."[45]

23.      It is evident from the above, that the ECT tribunals in their awards have conflicting findings as regards the applicability of EU law including the CJEU jurisprudence in *Achmea* and *Komstroy.* Professor Bermann's assertion that "[e]very ICSID tribunal and ad hoc annulment committee" presented with this issue of applicability of EU law in intra-EU investment disputes under the ECT has rejected such claim[46] is of no consequence to the case at hand as these decisions do not form binding precedent. If anything, the prolonged history of rejection of the so-called "intra-EU objection" by arbitration tribunals – in blatant disregard, indeed violation of EU law as applicable public international law between the EU Member States – evinces the propensity of such tribunals to preserve their jurisdiction to the detriment of the international legal order.

24.      It flows therefrom that Professor Bermann's contention that the CJEU's reasoning in *Komstroy* "ignores the fact that numerous ECT tribunals have assessed intra-EU disputes without needing to apply, much less interpret, EU law" – is of no consequence either. The awards rendered by ECT tribunals in the intra-EU context do not constitute any authoritative interpretation of the ECT or the EU Treaties. Instead, it is the CJEU that bears the exclusive authority to interpret in a binding fashion the EU Treaties and their relationship to other commitments of the EU Member States applied in public international law *inter se*. This jurisprudence is to be followed by any adjudicative authority, including ECT tribunals, when in an intra-EU context called upon to apply EU law.

---

[45]  (emphasis added) The original text in Spanish reads "Además, se admite hoy, de modo general, que los tribunales arbitrales no solamente tienen el poder sino también el deber de aplicar el derecho europeo." *See Isolux Netherlands, BV v. Kingdom of Spain,* SCC Case V2013/153, ¶ 654 **(68-52)**. *See* also *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, ¶¶ 4.151-4.160 (25 November 2015) **(Exhibit 78** filed herewith**)**.

[46]  (emphasis omitted) Second Bermann Declaration, ¶ 115 **(DE 68-1)**.

**B.    No contracting out: EU Treaties are always applicable international law between the EU Member States in intra-EU relations**

25.        Even if, *arguendo,* Professor Bermann's statements[47] were assumed to be true and the "applicable rules and principles of international law" in Article 26(6) of the ECT were not to refer to the EU Treaties (which it surely does), EU law would still be applicable law in an intra-EU investment arbitration, such as the one at issue.  The EU Treaties do not allow the EU Member States to contract out of or simply disapply EU law.  It is, thus, always applicable when they act *inter se*.

26.        The CJEU, being *the* international court charged with setting the content and meaning of the EU Treaties in an binding fashion for the EU Member States, made the point abundantly clear that "the very nature of EU law [ . . . ] requires that relations *between* the Member States be governed by EU law to the exclusion, if EU law so requires, of *any* other law."[48]  Put differently, the EU Treaties are the *supreme* international law applicable between the EU Member States, derogating – by virtue of the principle of primacy – any other choice of law in case of conflict.  In intra-EU matters, every judicial authority created by the EU Member States – such as the Tribunal in *NextEra Energy v. Spain* – must therefore apply EU law – no matter whether there was no explicit reference to EU law or even if explicitly excluded in an international agreement to which the Member States are a party to – and is responsible that EU law is fully respected.[49]

---

[47]  Second Bermann Declaration, ¶¶ 66-75 (**DE 68-1**).

[48]  CJEU, Opinion 2/13, ECLI:EU:C:2014:2454, ¶ 212 – *ECHR* ("Opinion 2/13") (**DE 62-43**) (emphasis added).

[49]  *See* CJEU, Case 106/77, ECLI:EU:C:1978:49, ¶ 21 – *Simmenthal II* ("*Simmenthal II*") (emphasis added) (**DE 62-18**); CJEU, Case C-2/88-IMM, ECLI:EU:C:1990:315, ¶¶ 16, 18 – *Zwartveld* (Exhibit 80 filed herewith).

**C.    Arguendo, EU law is applicable to intra-EU disputes by virtue of Article 41(1)(b) of the VCLT**

27.    As just explained, the EU Treaties contain a specific rule, developed in case law, on the applicable law between EU Member States.  If Member States should deviate from this specific applicable law rule in their *inter se* dealings, such other rule would have to be disapplied according to the principle of primacy. The same result, *arguendo*, in the case at hand can be reached with reference to Article 41(1)(b) of the VCLT which provides for a default rule on *inter se* modification of a multilateral agreement. It reads in the relevant part:

> Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
> [ . . . ]
> (b) the modification in question is not prohibited by the treaty and:
> (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
> (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

28.    Applying Article 41(1)(b) of the VCLT to the situation at hand, by concluding the EU Treaties, the EU Member States that are also Members of the ECT, such as Spain and the Netherlands, have modified the relevant provision on applicable law, i.e. Articles 26(6) of the ECT, in a way that, in matters *inter se*, the EU Treaties, including the principles of autonomy and primacy, are always applicable law in intra-EU investment disputes.  Thus, even if, *arguendo*, Article 26(6) of the ECT, at the starting point, was not referring to the EU Treaties, the ECT provision was modified by the EU Treaties containing the rule, firmly established in case law, that EU law is always applicable between the EU Member States in an intra-EU context.[50]

29.    Professor Bermann seeks to avoid this consequence of an *inter se* modification of

---

[50]  Opinion 2/13, ¶ 212 (**DE 62-43**) (emphasis added).

the ECT by already erroneously assuming that Article 42 of the ECT – which, according to its clear title and wording, applies *only* to treaty *amendments,*[51] is the only way to introduce a "disconnection clause" into the ECT and effect an "intra-EU carve out" that allows for application of EU law in intra-EU disputes under the ECT.[52] This ignores the paramount distinction in the international law of treaties, between treaty *amendment* that affects *all* contracting parties, addressed in Article 40 of the VCLT, and *modification* between *some* contracting parties, which is dealt with in Article 41 of the VCLT.[53]  As Special Rapporteur Sir Waldock noted in his Third Report on the Law of Treaties:

> [ . . . ] there is a considerable difference between the use of the *inter se* technique in cases where *all* the parties to the original treaty take part in the adoption of a new treaty providing for amendments to come into force *inter se* [amendment] and its use in cases where some of the parties have no part in the drawing up of the amending treaty [modification]. In the former case the *inter se*

---

[51]  Article 42 of the ECT is entitled "Amendments" and read in its relevant parts as follows:

> (1) Any Contracting Party may propose *amendments* to this Treaty.

> (2) The text of any proposed *amendment* to this Treaty shall be communicated to the Contracting Parties by the Secretariat at least three months before the date on which it is proposed for adoption by the Charter Conference.

> (3) *Amendments* to this Treaty, texts of which have been *adopted by the Charter Conference* [which acts in *unanimity* according to Article 36(1)(a) of the ECT], shall be communicated by the Secretariat to the Depository which shall submit them to *all* Contracting Parties for ratification, acceptance or approval.

> [ . . . ]

[52]  Second Bermann Declaration, ¶¶ 48, 49 (**DE 68-1**).

[53]  *See* Rigaux, Anne and Simon, Denys in: Corten/Klein (eds), The Vienna Conventions on the Law of Treaties: A Commentary (OUP 2011), Article 41, ¶ 9 (**Exhibit 81** filed herewith).

revision takes place by consent, even if not all the parties ratify the new treaty; in the latter case it does not.[54]

30.     Since Article 42 of the ECT, by its title and wording, concerns treaty *amendment,* and treaty amendment by all parties is with Special Rapporteur Sir Waldock not an "*inter se* modification plus*" but an *aliud*, the provision does not regulate *inter se* modification by *some* parties to the ECT, like in the case at hand.  To put it in Professor Bermann's ductus, the plain language of the ECT does not allow for a reading that includes *inter se* modifications into the scope of Article 42 of the ECT.

31.     Thus, since the ECT does not address *inter se* modification, recourse can be taken to the default rule in Article 41 of the VCLT.  A modification of Article 26(6) of the ECT through conclusion of the EU Treaties by the EU Member States also fulfils all requirements stipulated in Article 41(1)(b) of the VCLT:

32.     First, the ECT does not contain an explicit prohibition on *inter se* modification[55], as shown above. Hence, Professor Bermann's contention that "there is not the slightest textual basis for reading the ECT" to provide for an "intra-EU carve out" is of no effect whatsoever.

33.     Second, due to the bilateral or reciprocal nature of the obligations in the ECT, a modification by EU Member States of the rule on applicable law (and others relating to dispute settlement) does neither affect the rights of contracting third parties nor the effective performance of their obligations.

34.     Third, since the obligations in the ECT are reciprocal and not of an absolute

---

[54]  Yearbook of the International Law Commission, 1964, Vol. II, A/CN.4/SER.A/1964/ADD.1, 49, ¶ 8 (Exhibit 82 filed herewith) (emphasis added).

[55]  Any implicit prohibition on modification contained in the ECT would be irrelevant as the wording "explicitly or impliedly prohibited" - contained in an earlier draft of the VCLT - was abandoned in favour of the current wording requiring an explicit prohibition. *See* Yearbook of the International Law Commission, 1964, Vol. I, A/CN.4/SER.A/1964, 271-272, ¶ 73 (Exhibit 82 filed herewith).

character, such modification does also not relate to a provision from which derogation is incompatible with the effective execution of the object and purpose of the ECT.

35.    When it comes to the fulfilment of the criteria in Article 41(1)(b)(i) and (ii) of the VCLT, the nature of an agreement and the obligations contained therein are decisive.[56]   In this respect, multilateral treaties and their underlying obligations are divided into two groups: those of an interdependent (*erga omnes partes*) or integral nature (*erga omnes*), and those of a reciprocal one.[57]   In case the obligations of the underlying treaty to be modified are of an interdependent or integral nature, an *inter se* modification will most likely not be permissible.[58]   Such obligations require the compliance with the obligations contained therein by each contracting party with regard to all other contracting parties or in general.   In contrast, in case of reciprocal obligations, *inter se* modification is usually possible.[59]   Reciprocal obligations are obligations consisting in a synallagmatic grant or interchange between two parties.[60] Thus, the respect of the latter obligations is due only with regard to the respective other party.

36.    The obligations under the ECT, including those concerning applicable law under

---

[56] Rigaux, Anne and Simon, Denys in: Corten/Klein (eds), The Vienna Conventions on the Law of Treaties: A Commentary (OUP 2011), Article 41, ¶ 35 (Exhibit 81 filed herewith).

[57] Rigaux, Anne and Simon, Denys in: Corten/Klein (eds), The Vienna Conventions on the Law of Treaties: A Commentary (OUP 2011), Article 41, ¶ 35 (Exhibit 81 filed herewith); *see also* von der Decken, Kerstin in: Dörr/Schmalenbach, Vienna Convention on the law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 41, ¶ 18 (Exhibit 83 filed herewith**)**.

[58] von der Decken, Kerstin in: Dörr/Schmalenbach, Vienna Convention on the law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 41, ¶ 18 (Exhibit 83 filed herewith)**;** *see also* Rigaux, Anne and Simon, Denys in: Corten/Klein (eds), The Vienna Conventions on the Law of Treaties: A Commentary (OUP 2011), Article 41, ¶ 37 (Exhibit 81 filed herewith).

[59] *See* von der Decken, Kerstin in: Dörr/Schmalenbach, Vienna Convention on the law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 41, ¶ 18 (Exhibit 83 filed herewith)**;** *see also* Rigaux, Anne and Simon, Denys in: Corten/Klein (eds), The Vienna Conventions on the Law of Treaties: A Commentary (OUP 2011), Article 41, ¶ 36 (Exhibit 81 filed herewith).

[60] Schmalenbach, Kirsten in: Dörr/Schmalenbach, Vienna Convention on the law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 26, ¶¶ 34, 36-38 (Exhibit 83 filed herewith).

Articles 26(6) of the ECT, are bilateral in nature.[61]  They are founded on reciprocity amongst concerned parties only.  A third party to the ECT has no right, interest, or is in any way affected in the performance of its obligations[62] by the law applicable between Spain and the Netherlands in this case.  None of its consequential effects would affect matters which are not between the EU Member States only.

37.      Further, the said *inter se* modification would also not relate to a provision, a derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole pursuant to Article 41(1)(b)(ii) of the VCLT.  The purpose of the ECT is, according to Article 2 of the ECT, "to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter".  This purpose is not affected by a modification of the applicable law as it might even contribute to a wider acceptance of the ECT.

38.      Moreover, Article 41(2) of the VCLT provides that "the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides."  No particular form is required.  The notification serves the

---

[61] *Komstroy*, ¶ 64 (**DE 62-67**). *See also* CJEU, Case C-741/19, ECLI:EU:C:2021:164, Opinion of Advocate General *Maciej Szpunar*, ¶ 41 – *Komstroy, the successor in law to the company Energoalians v. Republic of Moldova* (**DE 62-76**): "[T]he ECT, although a multilateral agreement, consists of a set of bilateral obligations between the Contracting Parties, including the European Union and the Member States. The obligations established by the ECT essentially allow the protection of investments made by investors from one Contracting Party in another Contracting Party. The infringement of one of those obligations therefore does not mean that all the Contracting Parties are always able to claim compensation, as those obligations apply only bilaterally, between two Contracting Parties."  Moreover, the CJEU addressed the situation where a multilateral treaty contains bilateral relationships whereby Member States make certain undertakings inter se also, e.g., in– *Commission v. Government of the Italian Republic* (**DE 62-15**) (addressing the situation of bilateral rights and obligations in a multilateral treaty in respect of the General Agreement on Tariffs and Trade (GATT); holding that GATT tariffs rules cannot be applied between the EU Member States to the extend they contradict obligations in EU law).

[62] Cf. in general, von der Decken, Kerstin in: Dörr/Schmalenbach, Vienna Convention on the law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 41, ¶ 18 (Exhibit 83 filed herewith).

preservation of third parties rights and interests. In the case at hand, even if assumed that there is a lack of notification, no such rights and interested are affected and thus an assumed lack of notification would not change the result reached.

39.     Thus, the EU Treaties would also be applicable law in intra-EU disputes on the basis of the ECT by the way of *inter se* modification according to Article 41(1)(b) of the VCLT.

## III.    THE PRINCIPLE OF PRIMACY IS THE SUPREME CONFLICT RULE IN INTERNATIONAL LAW GOVERNING THE RELATIONS BETWEEN EU MEMBER STATES

40.     As I explained in my First Declaration, the EU Treaties establish an all-encompassing *conflict rule*, the principle of primacy of EU law.[63] This rule means that in the international law relationships between EU Member States, the EU Treaties and the legal order created by them prevail over any inconsistent treaty provision entered into by the Member States.[64]

41.     A conflict between Article 26 of the ECT and the EU Treaties exists because, under *Achmea* as confirmed by *Komstroy,* Article 26, when applied to intra-EU investment disputes, conflicts with Articles 267 and 344 of the TFEU.[65] Thus, as in *Komstroy,* where Article 26 of the ECT was in conflict with the principle of autonomy of EU law, the conflict in *NextEra Energy v. Spain* between Article 26 of the ECT and the EU Treaties must be resolved by giving priority to the provisions of Articles 267 and 344 of the TFEU.  In consequence, the Tribunal in *NextEra Energy v. Spain* lacks jurisdiction, as Spain has never given its consent to arbitrate.[66]

---

[63]  First Hindelang Declaration, ¶¶ 17-18 (**DE 15-6).**

[64]  This is of course because the EU is comprised of 27 Member States that have ceded to the EU aspects of sovereignty to establish one integrated Europe characterized by a common law, values, and a single market. The EU Treaties have limited the Member States' sovereignty more significantly than "typical" founding instruments of international organisations.

[65]  First Hindelang Declaration, ¶¶ 47-48 (**DE 15-6).**

[66]  *See Greenpower v. Spain* – Award, ¶¶ 170, 172, 335, 412 (**Exhibit 78** filed herewith**).**

A.    **The principle of primacy is applicable in international law governing the relations between EU Member States**

42.    Professor Bermann attempts to challenge the above by misstating the scope of application of the principles of autonomy and primacy of EU law. On the principle of autonomy, he argues that "[h]owever powerful the notion of the 'autonomy of the EU legal order' may appear to be, it is nothing more than a legal principle *internal*[67] to the EU and to the EU Member States."[68] Further, in addition to suggesting that "the same may be said" of the principle of the primacy of EU law, he suggests that the principle states "that EU law prevails over any inconsistent EU Member State law, even its constitutional law" and hence it "is essentially a federalism principle" that "has nothing to do with the relationship between EU law and international law, which is the issue at hand here."[69] This line of arguments is flawed in several ways.

43.    First, as demonstrated above, the EU Treaties and the legal order they create also constitute public international law; albeit of *superior rank* between the EU Member States.[70]  If the EU Treaties are public international law, so are the principles of primacy and autonomy contained therein. Professor Bermann's reading of the principles is in direct opposition with jurisprudence of the international court charged to set out the content and meaning the EU Treaties in a binding fashion for its Member States, i.e., the CJEU, which constitutes the final arbiter of questions related to the interpretation and application of the EU Treaties and the legal order based

---

[67]  (emphasis added).

[68]  Second Bermann Declaration, ¶ 92 (**DE 68-1**).

[69]  *Id.*, ¶ 92.

[70]  *See Achmea*, ¶ 41 (**DE 62-47**); *Budějovický Budvar* (**DE 62-38**).

on them.[71]  Once again, the CJEU made the point abundantly clear, when in *Achmea* it held:

> Given the nature and characteristics of EU law [ . . . EU] law must
> be regarded both as forming part of the law in force in every Member
> State and *as deriving from an international agreement* between the
> Member States.[72]

Further, the tribunal in *Greenpower v. Spain,* resonating with the findings in *Achmea* in light of

*Komstroy*, applied "EU law together with the ECT to resolve the issues raised by the jurisdiction

*ratione voluntatis*"[73] and specifically held that "there cannot be any doubt that the rationale of

the *Achmea Judgement* is relevant, indeed decisive, for the analysis of investor-State arbitration

clauses in general, whether these are included in intra-EU BITs or in a multilateral treaty such as

the ECT."[74]

44.     Second, Professor Bermann also ignores the "settled case-law of the [CJEU that]

an international agreement [such as the ECT] cannot affect the allocation of powers fixed by the

Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured

by the Court."[75]

45.     The CJEU's case law contradicts Professor Bermann's somewhat surprising view

that I and Spain "have in effect transposed the principle of EU primacy from the internal

constitutional sphere, where it originated, to the international plane, where it does not belong", and

---

[71]  Cf. TEU, Art. 19(1) (**DE 62-10**).

[72]  *Achmea,* ¶ 41 (**DE 62-47**) (emphasis added). *See also Id.,* ¶ 33, where the CJEU states that "[a]ccording to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States *and to international law* is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law." (emphasis added).

[73]  *Greenpower v. Spain* – Award, ¶ 446 (Exhibit 78 filed herewith).

[74]  *Id*, ¶ 436.

[75]  *Achmea*, ¶ 32 (**DE 62-47**). *See also, Greenpower v. Spain* – Award, ¶ 440 (Exhibit 78 filed herewith where "the tribunal [in disagreeing with contrary findings of other tribunals] has already noted that the CJEU's judgements are to be generally qualified as interpretations of the law."

that EU law "does not and cannot trump public international law."[76]  As early as in 1962, the CJEU stated that

> a Member State which by virtue of the entry into force of the EEC Treaty [a predecessor to the EU Treaties], assumes new obligations which conflict with rights held under an earlier agreement, refrains from exercising such rights to the extent necessary for the performance of its new obligations; Article 234 of the EEC Treaty [now Article 351 of the TFEU] only guarantees the rights held by third countries under earlier agreements.[77]

46.    The Court made clear that

> in matters governed by the EEC Treaty [a predecessor to the EU Treaties,] that Treaty takes precedence over agreements concluded between Member States before its entry into force, including agreements made within the framework of GATT [General Agreement on Tariffs and Trade of 1947].[78]

47.    In this respect, it is worth pointing out that GATT of 1947 is a multilateral agreement to which, in 1962, the EU Member States and third countries were parties to. The EU joined in 1995.

48.    While the above judgement dealt with treaties in force prior to the entry into force of the EEC Treaty, since then, the Court has developed as a bedrock principle of EU law that

> the provisions of a convention concluded [ . . . ] by a Member State with another Member State could not apply [ . . . ] in the relations between those States if they were found to be contrary to the rules of the Treat[ies].[79]

---

[76]  Second Bermann Declaration, ¶ 93 (**DE 68-1**).

[77]  *Commission v. Government of the Italian Republic*, Summary Point 1 **(DE 62-15)**.

[78]  *Commission v. Government of the Italian Republic* **(DE 62-15)**.

[79]  CJEU, Case C-3/91, ECLI:EU:C:1992:420, ¶ 8 – *Exportur* ("*Exportur*") **(DE 62-26)** (emphasis added). *See also* CJEU, Case 235/87, ECLI:EU:C:1988:460, ¶ 23 – *Matteucci* **(**Exhibit 84 filed herewi**th)** ("A bilateral agreement which reserves the scholarships in question for nationals of the two Member States which are the parties to the agreement cannot prevent the application of the principle of equality of treatment between national and Community workers established in the territory of one of those two Member States."); CJEU, Case C-469/00, ECLI:EU:C:2003:295, ¶ 37 – *Ravil* ("*Ravil*") **(DE 62-33)** ("It should be observed, first, that the provisions of a convention between two Member States *cannot apply* in the relations between

This applies whether the offending treaty was concluded before or after the Member State's accession to the EU Treaties.

49.    As a result, the principles of autonomy and primacy of EU law are also such of public international law. The principle of the primacy of EU law does not only apply with regards to domestic law of the EU Member States but with equal force to the obligations of the Member States in public international law when acting *inter se*.  The principle obliges *any authority,* such as the Tribunal in *NextEra Energy  v. Spain*, tasked with applying the incompatible act, namely Article 26 of the ECT, *to disregard it.*

**B.    Article 16 of the ECT is no conflict rule and even if it were, it would need to be disapplied**

50.    Professor Bermann's refusal to acknowledge the all-encompassing conflict rule established by the EU Treaties, the principle of primacy, leads him to opine that if there was a conflict between the ECT and EU law, the former would prevail. To reach such conclusion, Professor Bermann turns to Article 16 of the ECT which he believes to be a conflict rule.[80] Such argumentation is flawed in two ways.  First, it already rests on an erroneous premise, i.e., that Article 16 of the ECT constitutes a conflict of law.  Second, even if, *arguendo*, this premise was as assumed to be correct, the EU Treaties would still prevail.

51.    Article 16 of the ECT provides:

---

those States *if* they are *found to be contrary to the rules of the Treaty*, in particular the rules on the free movement of goods [ . . . ]") (emphasis added); *Budějovický Budvar* **(DE 62-38)** ("It follows that, since the bilateral instruments at issue now concern two Member States, their provisions cannot apply in the relations between those States if they are found to be contrary to the rules of the Treaty, in particular the rules on the free movement of goods".); CJEU, Case C-546/07, ECLI:EU:C:2010:25, ¶ 44 – *Commission v. Germany* ("*Commission v. Germany*") **(DE 62-39)** ("Nevertheless, [ . . . ] application of the German-Polish Agreement concerns, since the accession of the Republic of Poland to the Union, two Member States, with the result that the provisions of that agreement can apply to relations between those Member States only in compliance with Community law, in particular with the Treaty rules on the free provision of services.").

[80]  Second Bermann Declaration, ¶ 94 (**DE 68-1**).

> Where two or more Contracting Parties have entered into a prior
> international agreement, or enter into a subsequent international
> agreement, whose terms in either case concern the subject matter
> of Part III [Investment Promotion and Protection] or V [Dispute
> Settlement] of this Treaty,
> (1) nothing in Part III or V of this Treaty shall be *construed* to
> derogate from any provision of such terms of the other agreement
> or from any right to dispute resolution with respect thereto under
> that agreement; and
> (2) nothing in such terms of the other agreement shall be *construed*
> to derogate from any provision of Part III or V of this Treaty or
> from any right to dispute resolution with respect thereto under this
> Treaty,
> where any such provision is more favourable to the Investor or
> Investment.[81]

52.    Article 16 of the ECT, by its plain language, speaks of "construing" rather than "derogating" or similar wording typical for a conflict clause.  This, in turn suggests that Article 16 of ECT is a rule of interpretation rather than conflict.

53.    However, even if, *arguendo,* Professor Bermann's assertion were to be correct and Article 16 of the ECT would constitute a conflict rule, the EU Treaties would nonetheless take precedence over any conflicting rule in the ECT.

54.    If Article 16 of the ECT were to be applicable to a conflict between the ECT and the EU Treaties, it is already questionable whether the ECT constitutes the more favourable regime since the EU Treaties constitute by far the more developed and articulated legal order, providing for legal safeguards in all sorts of investment-related cross-border activities, in any phase from market access, to treatment, to de-investment. A key feature of the EU legal order is, that an aggrieved investor can regularly seek *annulment* of an act violating its rights[82]; something difficult

---

[81]  (emphasis added).

[82]  Cf. TFEU, Art. 263(1) (**DE 62-10**).

to achieve under the ECT.[83] The fact that under the ECT the investor might have recourse to investor-State arbitration does not change that conclusion as – as demonstrated above – the ECT itself puts the different dispute settlement procedures under Article 26(2) of the ECT at par; hence the ECT would not be the more favourable treatment. Thus, Article 16 of the ECT cannot serve to justify priority to be given to the ECT in case of conflict with the EU Treaties.

55.    Even if the EU Treaties were not to be the more favourable regime compared to the ECT, Article 16 of the ECT would need to be disapplied in an intra-EU investment dispute, such as the one in *NextEra Energy  v. Spain*. Professor Bermann's assertion that Article 16 of the ECT "makes clear that none of the rights granted to EU nationals under the EU Treaties (or any other agreement that an ECT Contracting Party has entered into) can deprive them of their rights under the ECT" "[84] rests upon the false presumption that EU Member States can circumvent the EU Treaties by concluding international treaties between them.

56.    EU Member States are not permitted to derogate from or contract around the primacy of EU law (or any other rule established by the EU Treaties) by concluding other international agreements between them. The CJEU made the point abundantly clear when it held that "the obligations imposed by an international agreement cannot have the effect of prejudicing

---

[83]  Professor Bermann's statement that "[t]he import of ECT Article 16 is clear. The ECT prevails over all other treaties between or among the Contracting Parties to the extent that it affords greater investment protection than they do." However, the European Commission has rightly pointed out: "[EU investors] cannot have recourse to arbitration tribunals established by such intra-EU BITs or, for intra-EU litigation, to arbitration tribunals established under the Energy Charter Treaty. *However, the EU legal system offers adequate and effective protection for cross-border investors in the single market, while ensuring that other legitimate interests are duly and lawfully taken into account.*" (emphasis added) European Commission, Communication from the Commission to the European Parliament and the Council, Protection of intra-EU investment, COM(2018) 547 final (**DE 62-51**).  Thus, the EU legal order offers at least the same, if not better protection to EU investors compared to the ECT.

[84]  Second Bermann Declaration, ¶ 46 (**DE 68-1**).

the [ . . . ] principles of the [EU Treaties]."[85]

57.    The EU Member States cannot escape their obligations flowing from the EU Treaties by resorting to international law in their *inter se* dealings. The all-encompassing conflict rule of primacy of EU law provides that the EU Treaties cannot be overwritten by domestic or international law created by the EU Member States alone or *inter se* respectively. Thus, the EU Treaties in an intra-EU context prevail over conflicting commitments of the EU Member States *inter se* contained in international agreements, irrespective of whether these agreements are earlier or later in time.[86] In sum and as already outlined above, the principle of primacy enshrined in the EU Treaties is applicable to any international agreement between EU Member States, including the ECT. It takes precedence over any other conflict rule in an intra-EU context. Assuming that Article 16 of the ECT is relevant in relation to the provisions of the EU Treaties, the principle of primacy takes precedence over it. The EU Member States cannot create any other "special" rules, such as the purported conflict rule in Article 16 of the ECT, to derogate from their obligations under the EU Treaties.

### C.    The principle of primacy requires disapplication of Article 26 of the ECT until it has been repealed or reformed

58.    In an attempt to avoid the legal consequences flowing from the principle of primacy of EU law to the case at hand, i.e., the disapplication of any provision of the ECT (or other international agreements) conflicting with the EU Treaties in an intra-EU context, Professor

---

[85] CJEU, Joined Cases C-402/05 P and C-415/05 P, ECLI:EU:C:2008:461, ¶ 285 – *Yassin Abdullah Kadi, Al Barakaat International Foundation* ("*Kadi*") (**DE 68-14**); *See* CJEU, Case C-266/16, ECLI:EU:C:2018:118, ¶ 46 – *Western Sahara Campaign UK* (**DE 62-48**) (concluding in the context of an international agreement concluded by the EU, its Member States and third countries, that "[t]he provisions of such agreements must therefore be entirely compatible with the Treaties and with the constitutional principles stemming therefrom.").

[86] *See Exportur,* ¶ 8 (**DE 62-26**). *See also Commission v. Government of the Italian Republic* (**DE 62-30**); *Ravil*, ¶ 37 (**DE 62-33**); *Budějovický Budvar*, ¶ 98 (**DE 62-38**); *Commission v. Germany*, ¶ 44 (**DE 62-39**).

Bermann opines that the recent developments as regards termination of intra-EU BITs in pursuance of the CJEU jurisprudence in *Achmea* and *Komstroy* are "not material" to the case at hand and goes on to since the EU Member States' Declarations do not terminate the ECT and even if it did, NextEra would have still had accepted "the ECT standing offer of arbitration prior to this attempted termination" [87] – consent to which cannot be withdrawn "unilaterally".[88] Also this argument is flawed.

59.    According to established case law, the legal consequences resulting from the principle of primacy in case of conflict between the EU Treaties and other international obligations of the EU Member States *inter se* are manifold. First, the application of the principle of primacy of EU law – as stated in my First Declaration[89] and further above[90] – results in a disapplication of the provision being in conflict with the EU Treaties. Disapplication of the conflicting rule secures the effectiveness of EU Law and prevents circumvention of the EU Treaties by the EU Member States. Second, the principle or primacy, in conjunction with the principles of legal certainty and clarity, require the EU Member States to remove, or at least reform the conflicting inapplicable treaty norm.  As the CJEU clearly stated that if a rule

> "that is incompatible with a provision of the Treaty, [ . . . ], is retained unchanged, [ . . . ] amounts to a failure by the State in question to comply with its obligations under the Treaty."[91]

---

[87]  Second Bermann Declaration, ¶ 96 (**DE 68-1**).

[88]  Article 25(1) ICSID Convention (**DE 1-5**).

[89]  First Hindelang Declaration, ¶¶ 47, 56 (**DE 15-6**).

[90]  *See* above.

[91]  CJEU, Case 168/85, ECLI:EU:C:1986:381, ¶ 11 – *Commission v Italian Republic* (**DE 62-30**).

So-called infringement proceedings[92] may be initiated by the Commission against an EU

Member State failing to do so.[93]

60.     Thus, the termination or reformation of intra-EU BITs is (another) duty flowing

from the principle of primacy as showed above and obviously also quite apt because – as evidenced

by the present enforcement proceedings – tribunals keep assuming jurisdiction *contra legem,*

wilfully ignoring the proper, i.e., the CJEU's binding interpretation of the EU Treaties and their

impact on intra-EU BITs as well as on the ECT.

61.     However, the duty to terminate or reform conflicting law is independent from the

disapplication of Article 26 of the ECT.  Hence, Professor Bermann's statements with regard to a

termination of the ECT and its timing are irrelevant. His contestations cannot change the fact that

the principle of primacy of EU law requires intra-EU investment tribunals, such as the one in the

case at hand, to disapply Article 26 of the ECT.

**D.     The operation of the principle of primacy does not violate either the ECT or
the principle of good faith under the VCLT**

62.     Professor Bermann's attempts to 'scandalise' the operation of the conflict rule

governing the relationship between the EU Treaties and other *inter se* agreements of the EU

Member States by labelling the CJEU's interpretation of Article 26 of the ECT in *Komstroy* as

"irreconcilable with the principles of treaty interpretation" are to no avail. The application of the

principle of primacy of EU law in an intra-EU context is quite the opposite: it is a legal matter of

course and the lawful course of action. In Professor Bermann's view, the disapplication of Article

26 of the ECT due to its incompatibility with the EU Treaties, as firmly established in the CJEU's

---

[92]  TFEU, Art. 258 (**DE 62-9**).

[93]  Cf. TFEU, Arts. 258 et seq. (**DE 62-9**).

case law and put beyond any hint of a doubt in *Achmea* and *Komstroy*, through the operation of the principle of primacy, would ignore "the fact that numerous ECT tribunals have assessed intra-EU disputes without needing to apply, much less interpret, EU law."[94]  Furthermore, by disapplying Article 26 of the ECT, the EU and its Member States would violate principles of interpretation under the VCLT, such as the principle of interpretation in good faith.[95]  All these arguments are unsustainable due to flawed premises.

63.     Contrary to the assertions of Professor Bermann, the disapplication of Article 26 of the ECT through the principle of primacy is permissible in law.  It is the result of an operation of a conflict rule, something that is a legal matter of course and found in most if not any legal order. By the very nature of such operation, the conflict between two or more provisions "is resolved in favour of one of the two rules because that rule has been, or can be, labelled as the more 'prominent' or 'relevant' one. The result of these 'priority rules' is that only one of the two rules applies to the particular situation at hand."[96]  In other words, one of the rules, in this case Article 26 of the ECT, is "ignored" and others are applied, namely Articles 267 and 344 of the TFEU.

64.     The fundamental difference between Professor Bermann's assertions and the actual legal situation at hand is that the EU Member States, in their *inter se* relations, agreed to interpret and apply international agreements in conformity with the rules and principles arising out of the EU Treaties.  This means that the Member States deviated from the default conflict rules contained in the VCLT – something sovereigns can readily do[97] – and chose to apply a specific conflict rule

---

[94]  Second Bermann Declaration, ¶ 70 (**DE 68-1**).

[95]  *Id*., ¶¶ 47-48.

[96]  Pauwelyn, Joost, Conflict of Norms in Public International Law: How WTO Law Relates to other Rules of International Law (Cambridge University Press 2003), 327 **(Exhibit 85 filed herewith).**

[97]  *See*, e.g., Int'l Law Comm'n, Rep. of the Study Group of the Int'l Law Comm'n, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law,

contained in the EU Treaties, namely the principle of primacy.  Thus, the operation of the principle

of primacy of EU law does not "ignore" the terms of the ECT or disregards the VCLT, it simply

creates a situation which is the normal result of an operation of a conflict rule, the application of

one instead of the other rule.

65.      In addition, Professor Bermann assumes incorrectly that if the EU law does not

accommodate Article 16 of the ECT by making clear that "none of the rights granted to EU

nationals under the EU Treaties (or any other agreement that an ECT Contracting Party has entered

into) can deprive them of their rights under the ECT," it causes a violation of the principle of

interpretation in good faith as stated by Article 31(1) of the VCLT.[98]  The assumption is based on

the premise that we are dealing with a situation of noncompliance, or put differently, breach.

However, there is no such situation in the first place.  Rather, the EU Member States agreed among

each other in the EU Treaties, by virtue of the principle of primacy, to *not apply* any rule contained

in an *inter se* agreement, such as Article 16 and 26 of the ECT, conflicting with the EU Treaties.

It is difficult to comprehend how the EU Member States can possibly act in bad faith when entering

into the ECT in an understanding that any conflicting rule therein would be disapplied among each

other by virtue of the principle of primacy. Thus, since third countries do not have any interest in

*inter se* deviations between the EU Member States, and since the EU Member States among each

other agreed to disapply any rule conflicting with the EU Treaties, they could have never violated

the principle of good faith under the VCLT with regard to themselves or any other party.

66.      As a result, the operation of the principle of primacy, and the consequential

---

A/CN.4/L.682 (2006), ¶ 470 (Exhibit 86 filed herewith); Schmalenbach, Kirsten, in: Dörr/Schmalenbach, Vienna Convention on the law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 1, ¶ 2 (**Exhibit 83 filed herewith**).

[98]  Second Bermann Declaration, ¶¶ 46-48 (**DE 68-1**).

disapplication of Article 26 of the ECT, does neither violate the terms of the ECT, nor does it violate the principle of good faith under the VCLT.

**E.     Even if the principle of primacy were not be the supreme conflict rule in inter se relations between the EU Member States, the EU Treaties would still prevail in a conflict with the ECT by way of the lex posterior rule**

67.     Professor Bermann also opines that under the *lex posterior* rule, the ECT were to take precedence over the EU Treaties as the treaty later in time.[99]  However, as already stated in my Third Declaration and further above, the EU Member States derogated from any default conflict rule in the VCLT by concluding the EU Treaties containing the principle of primacy which itself applies irrespective of whether the incompatible agreement has been concluded earlier or later in time.  Thus, in accordance with the CJEU, there is no room for a *lex posterior* rule in relation to law created by the EU Member States.[100]  Moreover, no derogation is allowed from the principle of primacy.[101]

68.     Even if the principle of primacy of EU law were not to apply and, assumed for the sake of the argument, the ECT and the EU Treaties related to the same subject matter, as provided by Article 30 of the VCLT, the *lex posterior* rule would support the opposite of what Professor Bermann suggests. In fact, the EU Treaties prevail over the ECT.

69.     As *not* all of the 27 EU Member States are also parties to the ECT, the situation would be governed by Article 30(4)(a) of the VCLT in connection with Article 30(3) of the VCLT. The latter reads as follows:

---

[99]  Second Bermann Declaration, ¶ 81 (**DE 68-1**).

[100]   CJEU, Case 6/64, ECLI:EU:C:1964:66 – *Costa v ENEL* (**DE 62-17**). While the case was on the relationship of the EU Treaties and domestic law, the principle of primacy was later  extended to international agreements of the EU Member States inter se and with it, implicitly, also the non-applicability of the *lex posterior* rule. *See* CJEU, Case C-3/91, ECLI:EU:C:1992:420, ¶ 8 – *Exportur* (**DE 62-26**). *See also Commission v. Italian Republic* (**DE 62-15**); *Ravil*, ¶ 37 (**DE 62-33**); *Budějovický Budvar*, ¶ 98 (**DE 62-38+++**); *Commission v. Germany*, ¶ 44 (**DE 62-39**).

[101]  First Hindelang Declaration, ¶¶ 28, 30 (**DE 15-6**).

> [in case that] the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty.

70.     The most recent treaty the EU Member States signed with regards to the European Union was the so-called Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community[102] in 2007, which entered into force 2009.  As the treaty title suggests, the TEU and the TFEU were amended. The ECT was signed in 1994 entered into force in April 1998.  Thus, the EU Treaties constitute the later in time treaties and qualify as *lex posterior*.

71.     As a result, even if the principle of primacy would not be the supreme conflict rule, the EU Treaties would still prevail over the ECT, in case of a conflict through the *lex posterior* rule.

## IV.   THE ABSENCE OF A SO-CALLED DISCONNECTION CLAUSE OR "INTRA-EU CARVE OUT" IS IRRELEVANT FOR THE QUESTION OF CONFLICT BETWEEN ARTICLE 26 OF THE ECT AND THE EU TREATIES

72.     Professor Bermann argues that "there is not the slightest textual basis for reading the ECT" that indicated an "intra-EU carve out."[103]  Further, Professor Bermann goes on to state that "[t]he only way a disconnection clause could be introduced into the ECT is through amendment of the ECT".[104] Such assertions are incorrect and legally irrelevant.

73.     The EU's and its Member States' ratification of the ECT without a disconnection clause would not cure the incompatibility of Article 26 of the ECT with the EU Treaties. The CJEU has authoritatively determined that the EU Treaties prohibit investor-State arbitration clauses

---

[102]  OJ 2007 C 306, 1 (Exhibit 87 filed herewith).

[103]  Second Bermann Declaration, ¶ 48 (**DE 68-1**).

[104]  Second Bermann Declaration, ¶ 49 (**DE 68-1**).

agreed to between Member States, such as the one in the Article 26 of the ECT. As noted above, the EU and/or its Member States cannot by its "agreement" override the EU Treaties, except for by the amendment procedure provided in Article 48 of the TEU.

74. Moreover, the absence of a disconnection clause in the ECT does not save Article 26 of the ECT from violating Articles 267 and 344 of the TFEU. To the contrary, only the inclusion of such clause might have cured the defect and remedied the incompatibility of Article 26 of the ECT with Articles 267 and 344 of the TFEU. This follows from settled case law of the CJEU. For example, the absence of a "disconnection clause" in the draft accession agreement of the EU to the ECHR did not cure the breach of EU law. Rather, it rendered the agreement irreconcilable with Article 344 TFEU. In Opinion 2/13 the CJEU held:

> "the procedure for the resolution of disputes provided for in Article 33 of the ECHR could apply to any Contracting Party and, therefore, also to disputes between the Member States, or between those Member States and the EU, even though it is EU law that is in issue [ . . . ]. The very existence of such a possibility undermines the requirement set out in Article 344 TFEU[105] [ . . . ] In those circumstances, only the express exclusion of the ECtHR's [106] jurisdiction under Article 33 of the ECHR over disputes between Member States or between Member States and the EU in relation to the application of the ECHR within the scope ratione materiae of EU law would be compatible with Article 344 TFEU."[107]

75. Similarly, in the present context, the non-existence of a disconnection clause supplements the incompatibility of Article 26 of the ECT with EU law.

## V.    SPAIN WOULD BE IN VIOLATION OF EU LAW IF IT PAID ANY AMOUNT IN SATISFACTION OF THE AWARD

76. In my First Declaration, I demonstrated that the Award in *NextEra Energy v. Spain*

---

[105] Opinion 2/13, ¶ 208 **(DE 62-43)**.

[106] Opinion 2/13, ¶ 205 **(DE 62-43)**.

[107] Opinion 2/13, ¶¶ 205-13 **(DE 62-43)**.

seeks to compensate the Respondent for the changes in the premium economic scheme brought about by the revised scheme without prior review and approval of this State aid measure by the Commission.[108] However, under the TFEU, only the EU Commission has the authority and power to investigate State aid measures and to make decisions on whether such measures can be implemented.[109] EU Member States may not implement State aid measures without the Commission's approval.

77.    Professor Bermann, primarily relying on his "overriding theme", states that "[t]he EU's prohibition on the payment of unnotified or unauthorized State aid is a norm entirely internal to the EU"[110]. His contestation, however, as shown earlier, does not have any bearing in the case at hand as EU law is (also) public international law, and due to the principle of primacy of EU law precludes the application of rules created by the EU Member States which conflict with EU law.

78.    Additionally, as explained in my First Declaration[111], the enforcement of an Award that violates EU law would also be illegal in any EU jurisdiction. Hence, Spain would be in violation of EU State Aid law if made to pay the concerned amount stipulated in award rendered in *NextEra Energy v. Spain* under the garb of "carrying out an obligation imposed by its own international commitments"[112], as Professor Bermann suggests.

79.    Further, upon making a distinction between "enforcement and voluntary

---

[108]  First Hindelang Declaration, ¶¶ 57-60 (**DE 15-6**).

[109]  *See* TFEU, Arts. 107, 108 (**DE 62-9**).

[110]  Second Bermann Declaration, ¶ 104 (**DE 68-1**).

[111]  First Hindelang Declaration, ¶ 63 (**DE 15-6**).

[112]  Second Bermann Declaration, ¶ 107 (**DE 68-1**).

payment"[113], Professor Bermann contends that "[i]n the circumstances where Spain has refused to pay and has objected to enforcement" – the Award would not be an action imputable to Spain.[114] This, however, is not convincing.

80.    Attribution, according to the CJEU's caselaw, is a broad concept guided by the idea to mitigate the "real risk that State aid may be granted through the intermediary . . . and in breach of the rules on State aid laid down by the Treaty."[115]   Therefore, "it must be accepted that the imputability to the State of an aid measure . . . may be *inferred* from a set of *indicators* arising from the *circumstances* of the case and the *context* in which that measure was taken."[116]   It therefore suffices that there are indications that an EU Member State contributed to the relevant aid measure.  Spain created the "real risk that State aid may be granted through the intermediary . . . and in breach of the rules on State aid laid down by the Treaty"[117] by ratifying the ECT and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("ICSID Convention"), and, thus, Spain contributed to the situation in which it is facing enforcement of an award in a foreign court in contravention of its obligations under Article 108(3) of the TFEU.  Thus, under EU law, the enforcement actions undertaken in a foreign jurisdiction can be attributed to Spain.

---

[113] *Id.,* ¶ 107.

[114] *Id.*, ¶ 106.

[115] CJEU, Case C-482/99, ECLI:EU:C:2002:294, ¶ 53 – *French Republic v. Commission* (Exhibit 88 filed herewith).

[116] CJEU, Case C-482/99, ECLI:EU:C:2002:294, ¶ 55 – *French Republic v. Commission* (emphasis added) (Exhibit 88 filed herewith).

[117] CJEU, Case C-482/99, ECLI:EU:C:2002:294, ¶ 53 – *French Republic v. Commission* (Exhibit 88 filed herewith).

81.    Furthermore, and as stated in my First Declaration, the European Commission (EC) in EC Decision 7384 of 10 November 2017 on State aid SA.40348(2015/NN)[118] concluded that "Arbitration Tribunals are not competent to authorise the granting of State aid … [i]f they award compensation, … this compensation would be notifiable State aid". Further, I am not aware of any decision by the Commission allowing Spain to implement the said State aid measure. Moreover, anything in Professor Bermann's Declaration that suggests that the EU Commission has erred in its State Aid Decision 7384[119], does not change this fact.[120] Contrary to what Professor Bermann indicates[121], the standstill obligation contained in Article 108(3) of the TFEU is triggered independently of the Commission's statements or assessments.

82.    The findings of the Commission support my independent assessment that the award in the case at hand indeed constitutes notifiable State aid, and that payment would violate the EU Treaties if not approved by the Commission.  Spain requested the Commission's confirmation that payment of a similar Award issued in another arbitration matter, involving the same regulatory scheme addressed in State Aid Decision 7384, would be unlawful under the EU law.[122]   The

---

[118]   European Commission, Decision 7384 on State Aid, Case No. SA.40348 (2015/NN) (10 November 2017) ¶ 165 – Spain's support for electricity generation from renewable energy sources, cogeneration and waste (Exhibit 89 filed herewith).

[119]   European Commission, Decision 7384 on State Aid, Case No. SA.40348 (2015/NN) (10 November 2017), ¶ 165 – Spain's support for electricity generation from renewable energy sources, cogeneration and waste (Exhibit 89 filed herewith).

[120]   I am also not aware that the Petitioners have challenged the State Aid Decision 7384, and I note that they do not claim to be challenging it.

[121]   Second Bermann Declaration, ¶ 106 (**DE 68-1**).

[122]   *See* Communication from the Legal Service of the European Commission to the Attorney General of the Kingdom of Spain 2-3 (October 26, 2018) [hereinafter "EC Legal Service Communication"] (Exhibit 90 filed herewith).

Commission confirmed that it would, in fact, be unlawful.[123]  The Commission also recalled that "the payment of compensation before the Commission rules on its compatibility would be contrary to Union Law, in particular to Article 108(3) TFEU."[124]

83.    Just recently the European Commission opened an in-depth investigation into the arbitration award in favour of *Antin*[125] to be paid by Spain.[126]  That means that the European Commission, at this stage of the proceedings on a preliminary basis, perceives the payment of the award to constitute State aid.

## VI.    THE UNITED STATES AND ITS COURTS HAVE NO OBLIGATION TO ENFORCE THE AWARD RENDERED UNDER ARTICLE 54(1) OF THE ICSID CONVENTION, AS THERE IS NO OBLIGATION OF SPAIN TO ABIDE BY AND COMPLY WITH THE AWARD ACCORDING TO ARTICLE 53(1) OF THE ICSID CONVENTION

84.    Professor Bermann oversimplifies the meaning of Article 54 of the ICSID Convention in contending that enforcement of ICSID awards by a contracting State party becomes "obligatory", "subject to two simple conditions" i.e., (1) it requires contracting State parties of the Convention to enforce ICSID awards in a manner in which they enforce judgements of their own courts; and (2) it requires that a party seeking enforcement produce a copy of the ICSID award certified by the Secretary-General. He then continues to do so by asserting that Articles 53 of the Convention lays down only "two principles"[127] i.e., (1) finality of ICSID awards; and (2) an

---

[123]  *Id.* ("[Under Article 108(3) of the Treaty on the Functioning of the European Union (TFEU), Member States cannot put the State aid measures into effect without prior approval by the Commission of the State aid in question as aid compatible with the internal market.").

[124]  *Id.*, 2.

[125]  *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, dated 15 June 2018 ("*Antin*") (**DE 62-77**).

[126]  European Commission, Case No. SA.54155 (2021/C) (19 July 2021) – *Arbitration award to Antin – Spain* (**DE 62-73**), *see also* European Commission, Press Release IP/21/3783 (19 July 2021) (**DE 62-73**).

[127] Second Bermann Declaration, ¶ 31 (**68-1**).

unconditional obligation of Contracting States to comply with ICSID awards.

85.     Professor Bermann further argues that Spain, in accordance with the ICSID Convention, "not only affirmed that it would consider itself bound by an ICSID award rendered against it, but also recognized that, pursuant to Article 54(1) of the [..] Convention, *all*[128] other Contracting States – including the United States – are *required* to enforce any such awards in the same manner in which they enforce judgments of their own courts [...]"[129].

86.     This argument is fundamentally flawed. Professor Bermann fails to recognise that there is no obligation of Spain according to Article 53(1) of the ICSID Convention to begin with and where there is no obligation under Article 53(1) of the ICSID Convention, there is none under its Article 54(1). Hence, regardless of whether Article 54(1) of the ICSID Convention constitutes an "absolute enforcement obligation"[130] on the part of a contracting State party to the ICSID Convention – any perceivable obligation thereunder cannot be triggered if there is no obligation of the award debtor to voluntarily comply with the ICSID award under Article 53(1) of the ICSID Convention.

87.     Article 53(1) of the ICSID Convention states that the parties to a dispute "shall abide by and comply" with the terms of an arbitral award issued pursuant to the ICSID Convention. In this context it is important to recall that "the legal basis for the Award's binding force is not entirely symmetrical. ICSID proceedings, by necessity, involve a State party and a non-State party.

---

[128] (emphasis added).

[129] Second Bermann Declaration, ¶ 24 (**68-1**).

[130] Second Bermann Declaration, ¶ 23 (**68-1**).

Both are parties to the agreement to arbitrate"[131]. In the case at hand, such agreement is allegedly based on the offer to arbitrate by Spain pursuant to Article 26 of the ECT and NextEra's acceptance. Article 53(1) of the ICSID Convention establishes an obligation which is to be differentiated from the one flowing from the aforesaid alleged agreement to arbitrate. Article 53(1) creates an *obligation vis-à-vis the other State parties to the ICSID Convention* "to abide by the award under the ICSID Convention to which it is a party."[132] The provision envisages that the award debtor is voluntarily complying with the ICSID award. If an award debtor voluntarily complies with an ICSID award, any further procedure to force such compliance would be rendered needless.

88.     Article 54(1) of the ICSID Convention states that "[e]ach Contracting State shall recognize an award rendered pursuant to this ICSID Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State." The provision stipulates a duty of cooperation of the contracting State parties to the ICSID Convention in case the Award is not voluntarily complied with.[133]

89.     Reading Articles 53(1) and 54(1) of the ICSID Convention together, it is clear that *only*[134] in the event of a failure of the Award debtor to voluntarily comply with an ICSID award would a contracting State party to the ICSID Convention be called upon to recognise and enforce

---

[131] Schreuer, The ICSID Convention: A Commentary, 2nd ed. 2009, Article 53, ¶ 13 (Exhibit 91 filed herewith**)**.

[132] Schreuer, The ICSID Convention: A Commentary (Cambridge University Press, 2nd ed. 2009), Article 53, ¶ 13 (Exhibit 91 filed herewith**)**.

[133] Schreuer, The ICSID Convention: A Commentary (Cambridge University Press,2nd ed. 2009), Article 53, ¶ 12 (Exhibit 91 filed herewith**)**.

[134] Schreuer, The ICSID Convention: A Commentary (Cambridge University Press, 2nd ed. 2009), Article 53, ¶ 29 (Exhibit 91 filed herewith**)**.

such award, i.e., "converting" an ICSID Award into a court judgement ordering the Award debtor to comply with the said Award and to provide for coercive measures that the Award creditor can request the enforcing court to implement. In a nutshell: "The need to resort to enforcement would be a *consequence of noncompliance in violation of Art. 53* [of the ICSID Convention]."[135] This, however, also means that if there is no obligation under Article 53(1) of the ICSID Convention in the first place, *none* of the contracting State parties to the ICSID Convention are under *any* obligation to 'recognize' or 'enforce' such Award according to Article 54(1) of the ICSID Convention.

90.      This is precisely the situation in the case at hand. Spain does not bear any obligation to comply with the ICSID Award rendered in *NextEra Energy v. Spain* allegedly flowing from Article 53(1) of the ICSID Convention. This is due to the fact that Article 53(1) of the ICSID Convention violates the EU Treaties and, thus, must me disapplied in an intra-EU context, where no third country rights or obligations are affected.

91.      First, Article 53(1) of the ICSID Convention violates the principles of autonomy of EU law in the same way as does Article 26 of the ECT, purportedly providing a standing offer to arbitrate by Spain in an intra-EU context. The application of Article 53(1) of the ICSID Convention in an intra-EU context would perpetuate and deepen the results illegally gained through a tribunal which assumed jurisdiction and issued an award in flagrant violation of the EU Treaties.

92.      Second, due to the operation of the principle of primacy of EU law, an *inter-se* obligation between EU Member States contained in an international agreement, such as the ICSID

---

[135] (emphasis added) Schreuer, The ICSID Convention: A Commentary (Cambridge University Press, 2nd ed. 2009), Article 53, ¶ 29 (Exhibit 91 filed herewith).

Convention, violating the EU Treaties, cannot be applied between them.[136] Hence, Professor Bermann's assertion that Spain by acceding to the Convention has "affirmed" to be bound by it and "necessarily consented to the jurisdiction of a court of any Contracting State over an action to enforce an ICSID award rendered against it […]"[137] is not sustainable as Spain's accession to the ICSID Convention may not result in a violation of the EU Treaties in an intra-EU context.

93.    Third, such non-application of Article 53 of the ICSID Convention in an intra-EU context does also not interfere with third parties' rights and obligations. Rights and obligations of contracting State parties under Article 53(1) of the ICSID Convention are owed *bilaterally* between the respondent State, here Spain, and the home State of the investor – the Netherlands in the present case – rather than to *all* contracting State parties as a group (*erga omnes partes*).[138] Spain and the Netherlands, having both ratified the ICSID Convention, are also parties to the EU Treaties. These two EU Member States, as explained earlier,[139] have chosen to exercise their sovereign rights in a way to give priority to the EU Treaties in their *inter se* relations. In concrete terms, this means that these two States, Spain and the Netherlands, have agreed in public

---

[136] *See* above, ¶ 43.

[137] Second Bermann Declaration, ¶ 24.

[138] The obligations under the Convention are bilateral in nature because they are founded on reciprocity amongst concerned parties only, i.e., Spain and the Netherlands in this case. Any modification would not affect the rights of contracting third parties or the effective performance of their obligations. (*See in general on inter se modification* von der Decken, Kerstin in: Dörr/Schmalenbach, Vienna Convention on the law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 41, ¶ 18 (Exhibit 83 filed herewith) Furthermore, inter se modification would neither create any burden for the other parties to the Convention nor affect the effective performance of their obligations as none of its consequential effects would affect matters which are not inter se the EU Member States. The said modification would also not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole. The object and purpose of the ICSID Convention is, according to Article 1(2), "to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States". This purpose is not affected by an inter se modification.

[139] *See* above, ¶ 13.

international law that their other *inter se* commitments are to be interpreted and applied in the light and in conformity with the EU Treaties. This sovereign choice of Spain and the Netherlands, with regard to their *inter se* relations, can be expected to be respected by other sovereigns, including their domestic courts in which recognition and enforcement is sought, as Spain's and the Netherland's very choice has no impact, in any manner whatsoever, on the rights and obligations of the contracting State parties to the ICSID Convention which are not parties to the EU Treaties. In contrast, disregarding the sovereign choice of Spain and the Netherlands would mean negating and pushing them towards violating the *erga omnes partes* obligations flowing from the EU Treaties which are "based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU"[140]

94.    Hence, due to disapplication of Article 53(1) of the ICSID Convention in an intra-EU context and a consequential lack of an obligation flowing from the said provision, the contracting State parties to the ICSID Convention, here the United States ("US"), are under no obligation to 'recognize' or 'enforce' the award rendered in *NextEra Energy v. Spain* based on Article 54(1) of the ICSID Convention.

*        *        *

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 29 June 2022, in Berlin, Germany.

Steffen Hindelang

---

[140] *Achmea*, ¶ 34 **(62-47).**