# Exhibit 79

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
WASHINGTON, D.C.

IN THE ARBITRATION PROCEEDINGS BETWEEN:

ELECTRABEL S.A.

*CLAIMANT*

v.

HUNGARY

*RESPONDENT*

(ICSID CASE NO. ARB/07/19)

_____

**AWARD**
_____

*Members of the Tribunal*:
Professor Gabrielle Kaufmann-Kohler, *Arbitrator;*
Professor Brigitte Stern, *Arbitrator;* and
Mr V.V. Veeder, *President*

*ICSID Secretary to the Tribunal*:
Ms Aurélia Antonietti

*Representing the Claimant*:

CLIFFORD CHANCE LLP
*(until March 2012)*
Mr Audley Sheppard
Mr Gareth Kenny
Ms Christina Schuetz

FRESHFIELDS BRUCKHAUS DERINGER LLP
*(as of March 2012)*
Mr Peter J. Turner, QC
Mr Jérôme Philippe
Ms France-Hélène Boret
Mr Baxter Roberts

ALLEN & OVERY LLP
Ms Marie Stoyanov

FALUDI WOLF THEISS
Mr Zoltán Faludi
Mr László Kenyeres

*Representing the Respondent*:

ARNOLD & PORTER LLP
Ms Jean Kalicki
Ms Mara V. J. Senn
Ms Mallory Silberman
Mr Csaba Rusznak

ARNOLD & PORTER (UK) LLP
Mr Dmitri Evseev
Ms Lisa Tomas
Mr Peter Nikitin
Mr Bart Wasiak

ARNOLD & PORTER (BRUSSELS) LLP
Mr Luc Gyselen

KENDE, MOLNÁR-BIRÓ, KATONA
Dr János Katona
Dr Gábor Puskás

Date of dispatch to the Parties: 25 November 2015

*TABLE OF CONTENTS*

PART I:   THE ARBITRATION ........................................................................................1

   (1)   THE TRIBUNAL'S DECISION OF 30 NOVEMBER 2012 ..................................1
   (2)   THE PARTIES AND OTHER PERSONS ..........................................................2
   (3)   THE ARBITRATION TRIBUNAL .....................................................................3
   (4)   THE FIRST PHASE OF THIS ARBITRATION....................................................4
   (5)   THE TRIBUNAL'S DECISION........................................................................11
   (6)   THE SECOND PHASE OF THIS ARBITRATION ............................................12
   (7)   THE PARTIES' CLAIMED RELIEF ...............................................................20
   (8)   ICSID ARBITRATION RULE 38(1) ..............................................................23


PART II: THE PRINCIPAL ISSUES ..........................................................................24

   (1)   INTRODUCTION............................................................................................24
   (2)   THE ECT'S FET STANDARD.......................................................................31
   (3)   THE PARTIES' RELEVANT CASES ..............................................................34
   (4)   THE TRIBUNAL'S ANALYSES AND DECISIONS ..........................................43


PART III: COSTS......................................................................................................68


PART IV: THE OPERATIVE PART............................................................................71

DECISION ON JURISDICTION, APPLICABLE LAW AND LIABILITY

# PART I: THE ARBITRATION

## *(1)   THE TRIBUNAL'S DECISION OF 30 NOVEMBER 2012*

1.    In its Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012 (the "Tribunal's Decision"), the Tribunal decided (inter alia) the following principal matters:[1]

   (1)    As to jurisdiction, the Tribunal declared, pursuant to Article 26 of the Energy Charter Treaty ("ECT") and Articles 25 and 41 of the ICSID Convention, that ICSID had jurisdiction and that the Tribunal was competent to decide finally the Parties' dispute in these arbitration proceedings;

   (2)    The Tribunal dismissed, as to liability, Electrabel's PPA Pricing Claim, Regulated Pricing Claim and G1 Unit Claim (as defined in the Tribunal's Decision);

   (3)    As regards Electrabel's PPA Termination Claim, the Tribunal postponed to a subsequent phase of these arbitration proceedings its final decision (as regards both liability and quantum) in regard to "net stranded costs" forming part of Electrabel's claim for compensation under Article 10(1) of the ECT (regarding Hungary's obligation to accord to Electrabel's investment fair and equitable treatment). The Tribunal otherwise dismissed as to liability all other parts of Electrabel's PPA Termination Claim;

   (4)    As to quantum generally (including interest), the Tribunal did not decide any issue (given the Parties' agreement on bifurcating quantum during the first phase of these arbitration proceedings); and

   (5)    As to the Parties' respective claims for costs, the Tribunal made no order, save to reserve in full its jurisdiction and powers to make any future order as regards all legal and arbitration costs in an award subsequent to the Tribunal's Decision.

2.    Although the Tribunal's Decision was not issued as an award under the ICSID Convention and the ICSID Arbitration Rules (nor could it be), the Tribunal declared that its several decisions and reasons were intended to be final and not to be re-visited by the Parties or the

---

[1] The Tribunal's Decision, paragraphs 11.2-11.8.

Tribunal in any later phase of these arbitration proceedings.[2] The Tribunal notes that this approach to finality in a decision by an ICSID tribunal short of an award has subsequently been followed, inter alia, by the ICSID tribunal in *ConocoPhillips v Venezuela*.[3]

3.     In this Award, as described below, the Tribunal addresses its postponed decision regarding "net stranded costs" forming part of Electrabel's PPA Termination Claim.

4.     This Award should be read with the Tribunal's earlier Decision, in full, which is hereby appended and incorporated so as to form part of this Award. The Tribunal here uses the same abbreviated descriptions of names, documentation and events. Nevertheless, for good order's sake, certain parts of the Tribunal's Decision are repeated below.

## *(2)     THE PARTIES AND OTHER PERSONS*

5.     *The Claimant:* The Claimant, Electrabel S.A., is an energy generation and sales company organised and existing under the laws of the Kingdom of Belgium, with its principal address at 8, Boulevard du Régent, 1000 Brussels, Belgium. (For ease of reference, the Claimant is hereby described as "the Claimant" or "Electrabel").

6.     The shareholding in Electrabel and Dunamenti has undergone changes since the Tribunal's Decision. In brief, in 2014, their main shareholder (the GDF Suez Group) sold its interest to the MET Group. Those changes apparently do not affect this arbitration or Award. However, the Tribunal noted the Respondent's reservation in this regard, as expressed during the arbitration.[4]

7.     *The Claimant's Legal Representatives:* In these arbitration proceedings, Electrabel was represented by Clifford Chance LLP of 10 Upper Bank Street, London E14 5JJ, United Kingdom until March 2012, and Faludi Wolf Theiss of Kálvin tér 12-13, Kálvin Center, 4th floor, 1085 Budapest, Hungary. Thereafter, in place of Clifford Chance LLP, Electrabel is represented by Freshfields Bruckhaus Deringer LLP of 2, rue Paul Cézanne, 75008

---

[2] The Tribunal's Decision, paragraphs 10.1 & 11.1.
[3] *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v Bolivarian Republic of Venezuela* (ICSID Case No. ARB/07/30), Decision on Respondent's Request for Reconsideration of 10 March 2014 (Keith, Fortier, Abi-Saab dissenting), paragraph 21.
[4] H2D1.7. References to the verbatim transcript of the Second Hearing (in this arbitration's second phase) are made to the relevant day and page: e.g. "H2D1.7" indicates page 7 of the first day (15 May 2014).

Paris, France, under a power of attorney dated 9 March 2012, and Allen & Overy LLP of 52 avenue Hoche, 75008 Paris, France.

8. *The Republic of Hungary:* The Respondent is the Republic of Hungary, acting by its Government. (For ease of reference, the Respondent is hereby described as "Hungary" or the "Respondent").

9. *The Respondent's Legal Representatives:* In these arbitration proceedings, the Respondent is represented by Arnold & Porter LLP of 601 Massachusetts Avenue NW, Washington, DC 20001-3743, USA, Tower 42, 25 Old Broad Street, London EC2N 1HQ, United Kingdom, and 1, Rue du Marquis – Markiesstraat, 1, B-1000 Brussels, Belgium, and by Kende, Molnár-Biró, Katona of Villányi út 47, 1118 Budapest, Hungary.

10. *Dunamenti:* Dunamenti Erőmű Rt ("Dunamenti"), a legal person organised under the laws of Hungary, is not a named or disputing party to these arbitration proceedings.

11. *The European Commission and European Union:* Neither the Commission of the European Communities nor the European Union are named or disputing parties to these arbitration proceedings. At its request and upon the invitation of the Tribunal, the European Commission made written representations to the Tribunal as a non-disputing party under Article 37(2) of the ICSID Arbitration Rules, during the first phase of these arbitration proceedings (as explained further below). These representations, particularly as to the Tribunal's jurisdiction, were different from those of both Electrabel and Hungary. The European Commission has not taken part in this subsequent phase of the arbitration.

12. *The European Commission's Legal Representatives:* In the first phase of these arbitration proceedings, the European Commission was represented, as agents, by Professor Dr Bernd Martenczuk, Professor Dr Frank Hoffmeister and Dr Petr Ondrusek, members of the Commission's Legal Service, 200 Rue de la Loi, 1040 Brussels, Belgium. As mentioned, the European Commission did not take part in this arbitration's second phase.

## *(3)   THE ARBITRATION TRIBUNAL*

13. Following the registration on 13 August 2007 of Electrabel's Request for Arbitration by the Centre ("ICSID") as ICSID Case No. ARB/07/19, the Tribunal was constituted on 5 December 2007, comprising of three members, as follows:

(1) Professor Gabrielle Kaufmann-Kohler, as Co-Arbitrator, a citizen of Switzerland, appointed by Electrabel's letter dated 26 September 2007, of Lévy Kaufmann-Kohler, 3-5, rue du Conseil-Général, P.O. Box 552, 1211 Geneva 4, Switzerland;

(2) Professor Brigitte Stern, as Co-Arbitrator, a citizen of France, appointed by Hungary's letter dated 12 November 2007, of the University Paris I, Panthéon-Sorbonne, 7 rue Pierre Nicole, 75005 Paris, France; and

(3) V.V. Veeder, Esq., a citizen of the United Kingdom, of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG, United Kingdom, as President, appointed by the two co-arbitrators upon their proposal to the Parties of 26 November 2007, accepted by the Claimant and the Respondent by their respective letters of 28 November 2007 and 29 November 2007.

Mr Ucheora Onwuamaegbu, Mr Marat Umerov and Ms Aurélia Antonietti, all of ICSID, served in turn as Secretary to the Tribunal.

14. *Proposal for Disqualification:* On 21 December 2007, Electrabel filed a proposal for the disqualification of Professor Stern as a member of the Tribunal. On 28 December 2007, Hungary filed observations on Electrabel's proposal. On 1 January 2008, ICSID forwarded to the Parties and the Tribunal written comments by Professor Stern made by letter dated 28 December 2007. Electrabel filed comments on Hungary's observations on 8 January 2008; and Hungary filed further observations on Electrabel's proposal on 14 January 2008. After considering these several written submissions, Electrabel's proposal was rejected by the two other members of the Tribunal on 25 February 2008 in the form of a reasoned decision sent to the Parties.

15. No further proposal was made by any Party to disqualify any member of the Tribunal.

### *(4)* ***THE FIRST PHASE OF THIS ARBITRATION***

16. *Written Submissions:* Electrabel submitted its Request for Arbitration (with accompanying materials) on 13 June 2007, its Memorial on 29 July 2008, with its Amendment to Part VII of its Memorial on 30 January 2009, and its Reply on 16 September 2009.

17.   Hungary submitted its Preliminary Objections (with accompanying materials) on 30 October 2008, its Counter-Memorial on 15 May 2009 and its Rejoinder on 22 December 2009.

18.   *Written Testimony:* Electrabel adduced signed written statements from the following factual witnesses: (i) Mr Zoltán Bodnár of 28 July 2008, 29 January 2009 and 16 September 2009; (ii) Mr Peter Csiba of 14 September 2009; (iii) Mr Alfred Hofman of 28 July 2008; and (iv) Mr Tibor Kuhl of 28 July 2008 and 16 September 2009.

19.   Electrabel also adduced signed expert reports from: (i) Professor Adnan Amkhan of 28 July 2008 and 16 September 2009; (ii) Professor Sir David Edward of 24 September 2009; (iii) Dr Katalin Grósz of 28 July 2008 and 16 September 2009; and (iv) Mr Graham Shuttleworth of 16 September 2009.

20.   Hungary adduced signed written statements from the following factual witnesses: (i) Mr Zoltán Barócsi of 12 May 2009 and 10 December 2009; (ii) Mr György Békés of 8 May 2009 and 15 December 2009; (iii) Mr Balázs Felsmann of 11 May 2009; (iv) Ms Zsuzsanna Filep of 5 May 2009; (v) Mr Péter Grabner of 21 December 2009; (vi) Mr Ferenc Horváth of 13 May 2009 and 10 December 2009; (vii) Mr Csaba Kovács of 13 May 2009 and 19 December 2009; (viii) Mr Imre Mártha of 11 December 2009; and (ix) Mr Péter Staviczky of 13 May 2009 and 14 December 2009.

21.   Hungary also adduced signed expert reports from: (i) Dr Marianna Fazekas of 11 May 2009; (ii) Mr Wynne Jones of 13 May 2009 and 17 December 2009; (iii) Mr Brent Kaczmarek of 15 May 2009 and 17 December 2009; (iv) Professor Piet Jan Slot of 14 May 2009 and 16 December 2009; and (v) Mr Imre Vörös of 14 May 2009.

22.   *Participation of a Non-Disputing Party:* On 13 August 2008, as already indicated, the European Commission applied to the Tribunal pursuant to ICSID Arbitration Rule 37(2) for permission to make a written submission as a non-disputing party. Having consulted the Parties, the Tribunal invited the European Commission to file a written submission, by letter dated 19 November 2008. This submission was filed on 12 June 2009. It is cited extensively in the Tribunal's Decision.

23. *Procedural Meetings:* The first procedural meeting with the Tribunal and the Parties took place in London on 15 May 2008 (following which the Tribunal issued written minutes of this session); the second procedural meeting took place by telephone conference-call on 17 November 2008 (following which the Tribunal issued its procedural order dated 19 November 2008); and the third procedural meeting took place by telephone conference-call on 4 December 2009 (following which the Tribunal issued its procedural order dated 10 December 2009).

24. *Procedural Rules:* The Parties and the Tribunal agreed at the first procedural meeting that these arbitration proceedings would be conducted in accordance with the ICSID Arbitration Rules in force as at 10 April 2006 (but not any amendments thereto).

25. *Procedural Orders:* In addition to the orders listed above, the Tribunal made procedural orders dated 10 March 2009 and 27 March 2009 (in regard to the procedural calendar); 28 April 2009 (in regard to the application of the European Commission to file a written submission pursuant to ICSID Arbitration Rule 37(2) as a non-disputing party); 18 August 2009, 11 November 2009 and 10 December 2009 (in regard to the production of documents); and several orders during the Hearing. These orders were recorded in writing or in the verbatim transcript of the Hearing; all are in the Parties' possession; and it serves no purpose to set them out here.

26. *Bifurcation:* Upon the initiative and agreement of the Parties, the Tribunal ordered the Parties in the first phase of these proceedings to address (as to the merits of Electrabel's claims) issues of liability only, with quantum issues to be addressed (if appropriate) in a separate second phase of these proceedings, as recorded in the Tribunal's procedural order dated 27 March 2009.

27. *First Hearing:* The Hearing on the first phase of these arbitration proceedings took place over seven days from Tuesday, 9 February to Wednesday, 17 February 2010, first (by consent of the Parties) at the offices of Arnold & Porter LLP in Washington, DC and next (following Electrabel's objection) at the Fairmont Hotel in Washington, DC. The Hearing was originally planned to be held at the offices of the World Bank in Washington, DC, but the location of the Hearing had to be changed because the offices of the World Bank remained closed for several days due to a severe winter snowstorm.

28. As already indicated above, the First Hearing was recorded by verbatim transcript.[5]

29. The First Hearing was attended, on behalf of Electrabel, by Audley Sheppard, Gareth Kenny, Christina Schuetz and Sean Peterson (all of Clifford Chance LLP), Laszlo Kenyeres (of Faludi Wolf Theiss), Jean-Marc Dethy, Eric Demuynck and Christelle Wynants (all of Electrabel).

30. It was attended, on behalf of Hungary, by Jean Kalicki, Dmitri Evseev, Mara Senn, Luc Gyselen, Suzana Medeiros Blades, Wells Bennett, Paloma Gomez, Andras Kosaras, Vanessa Mueller, Camila Valenzuela and Kelby Ballena (all of Arnold & Porter LLP), János Katona and Gábor Puskás (of Law Office of János Katona), and by Emese Szentpétery and Chistelle Wynants (of Hungary's Government).

31. Electrabel and Hungary made opening statements at the First Hearing's first day [D1.19 and D1.108, 124, 152, 187 & 208 respectively].

32. The following factual witnesses then testified orally at the First Hearing: for Electrabel, Mr Kuhl [H1D2.260x; H1D2.265 & 415xx; H1D2.395xxx], Mr Bodnár [H1D2.431x; H1D2.432xx; H1D2.530xxx] and Mr Csiba [H1D3.546x; H1D3.549xx; H1D3.585xxx]; and for Hungary, Mr Békés [H1D3.830x; H1D3.831xx …; H1D4.863 …xx; H1D4.932xxx], Mr Horváth [H1D4.944x; H1D4.947xx; H1D4.1048xxx], Mr Staviczky [H1D5.1066x; H1D5.1082 & 1168xx; H1D5.1153xxx], Mr Kovács [H1D5.1181x; H1D5.1185, 1257 & 1274xx; H1D5.1247 & 1281xxx], Mr Barócsi [H1D7.1728x; H1D7.1729xx; H1D7.1782xxx]; and Mr Mártha [H1D7.1788x; H1D7.1827xx].

33. The following expert witnesses testified orally at the Hearing: for Electrabel, Professor Sir David Edward [H1D3.591x; H1D3.615xx; H1D3.684 & 708xxx] and Mr Shuttleworth [H1D5.1287x; H1D5.1306 …xx; H1D6.1403 ...xx; H1D6.1495xxx]; and for Hungary, Professor Slot [H1D3.714x; H1D3.719 …xx; H1D3.785xxx], Mr Jones [H1D6.1504x; H1D6.1519…xx] and Mr Kaczmarek [H1D6.1581x; H1D6.1600 & 1681xx; H1D6.1663 & 1684xxx].

---

[5] References below to the verbatim transcript of the First Hearing are made to the relevant day and page: e.g. "H1D1.09" indicates page 9 of the first day (9 February 2010). "x" signifies direct examination of an oral witness; "xx" signifies cross-examination; and "xxx" signifies re-examination. The documentary references to the Parties' exhibits are self-explanatory; e.g. C-184/Tab 488.

34.    At the end of the First Hearing on 17 February 2010, the Tribunal informally closed the file to the Parties as regard this first phase, save for stated exceptions relating to transcript corrections, post-hearing submissions and submissions on costs to be made later in writing. The Tribunal also reserved the right to request the Parties to make new submissions at its discretion; and it advised the Parties that any Party wishing to introduce new evidence would need to make a prior application to the Tribunal for permission to do so [H1D7.1703-1705]. Several significant events subsequently took place which precluded the Tribunal from closing the file any further.

35.    *Compensation Decision:* The European Commission issued, on 27 April 2010, its Decision on "State aid N 691/2009: Hungarian stranded costs compensation scheme" (the "Commission Compensation Decision").[6] This important document was addressed in Electrabel's Post-Hearing Submissions of 7 May 2010 and by Hungary in its letters dated 24 May and 21 June 2010 regarding new documents.

36.    *CFI Pleadings:* By letter dated 3 May 2010, at the request of the Tribunal, the European Commission transmitted copies of its Defence dated 6 October 2009 and its Rejoinder dated 16 February 2010 in the Case T-179/09, *Dunamenti Erömü v Commission of the European Communities*, before the Court of First Instance of the European Communities in Luxembourg. (The Court of First Instance ("CFI") is now known as "the General Court"). These legal proceedings were brought by Dunamenti to annul under Article 230 EC the Commission Decision 2009/609/EC of 4 June 2008 ("the Commission's Final Decision dated 4 June 2008"): see Dunamenti's Claim dated 28 April 2009 and its Reply dated 4 December 2009 (appended to Electrabel's Response dated 1 August 2011).

37.    *Post-Hearing Submissions:* As already indicated, Electrabel submitted its Post-Hearing Submissions on 7 May 2010; and Hungary submitted its Post-Hearing Submissions also on 7 May 2010.

38.    *New Documents:* By procedural order dated 31 May 2010, in response to Hungary's application made by letter dated 24 May 2010 and the response from Electrabel made by letter dated 28 May 2010, the Tribunal (inter alia) admitted into evidence: (i) the European Commission's Compensation Decision dated 27 April 2010; and (ii) the 2009 Report on

---

[6] C-199.

Polish Stranded Costs published in March 2010 (the "2009 Polish Report"), designated as Electrabel's Exhibits C-199 and C-200 respectively.

39. In accordance also with the Tribunal's procedural order dated 31 May 2010, Hungary by letter dated 21 June 2010 submitted its written response to these new documents; and Electrabel responded thereto by letter dated 5 July 2010.

40. *Costs Submissions:* As ordered by the Tribunal at the First Hearing,[7] as later modified by procedural order dated 31 May 2010, the Parties submitted written submissions regarding their respective claims for legal and arbitration costs, by their letters dated 21 July, 28 July and 9 August 2010.

41. *The Tribunal's Three Requests:* By procedural orders dated 1 and 5 October 2010, the Tribunal requested the Parties to address three particular matters: (i) any further information then known to the Parties as to the progress, or likely progress, of the legal proceedings pending before the General Court in Luxembourg in Case T-179/09 between Dunamenti and the Commission of the European Communities; (ii) any further information then known to the Parties as to the implementation, present or future, of the draft decree on stranded costs, being the subject-matter of the European Commission's Compensation Decision dated 27 April 2010; and (iii) whether either Party wished to make any submissions to the Tribunal, and (if so) in what form, as to the then recently published award dated 23 September 2010 in ICSID Case No. ARB/07/22 *AES Summit Generation Limited and AES-TISZA Erömü Kft v Republic of Hungary* (the "*AES award*"), referring to Electrabel's reservation made in paragraph 75 of its Post-Hearing Submissions of 7 May 2010.

42. The Parties made written submissions respectively by letters dated 29 October 2010 on the Tribunal's three requests.

43. *The AES award:* In the light of the Parties' written submissions dated 29 October 2010, by procedural order dated 15 November 2010, the Tribunal permitted the Parties to comment substantively, in writing, on the *AES* award.

---

[7] H1D7.1701.

44.   The Parties accordingly made further written submissions respectively on 3 December 2010 on the *AES* award. In the circumstances then prevailing, the Tribunal did not consider that these submissions required any further response from either Party for the purpose of these arbitration proceedings or the Tribunal's Decision.

45.   *The Tribunal's Further Requests:* By letter dated 6 June 2011, the Tribunal requested further assistance from the Parties in writing arising from certain of the Parties' Submissions dated 21 June, 5 July, 29 October and 3 December 2010 and (in particular) the earlier Submission of the European Commission dated 12 June 2009, concerning principally the related questions of applicable law and jurisdiction.

46.   The Parties responded to these further requests as follows: Electrabel's Response dated 1 August 2011; Hungary's Response dated 1 August 2011; Electrabel's Reply Response dated 6 September 2011; and Hungary's Reply Response dated 6 September 2011.

47.   The Tribunal considered these written submissions; and it recorded by letter dated 17 October 2011 that: as regards the Parties' responses to the third query listed in the Tribunal's letter dated 6 June 2011, the Tribunal had decided that it was not necessary for the Tribunal (or the Parties) to re-approach the European Commission for further assistance; and as regards the Parties' responses to the ninth query in the Tribunal's letter (including the European Commission's letter dated 13 September 2011 to Electrabel), the Tribunal decided that it was not necessary for the Tribunal to request any further pleadings from the European Commission in Case T-179/09.

48.   *The General Court Judgment:* On 13 February 2012, the General Court issued its judgment in Luxembourg rejecting the challenge by Budapesti Erömü Zrt (another Hungarian generator) to the European Commission's Decisions dated 9 November 2005 and 4 June 2008 in Joined Cases T-80/06 and T-182/09 (the "*Budapesti* judgment"). Whilst it was possible for this complainant to appeal to the European Court of Justice, the effect of this judgment would not thereby be suspended pending such appeal under Article 278 of the TFEU. Given similar issues raised by Dunamenti as a like complainant in Case T-179/09 in regard to the Final Decision dated 4 June 2008, the Tribunal invited the Parties to comment on the *Budapesti* judgment (if so desired), by letter dated 27 February 2012.

49.   Electrabel responded by letter dated 9 March 2012; and Hungary by letter also dated 9 March 2012. In summary, Electrabel submitted that the *Budapesti* judgment was irrelevant to the issues in this arbitration and, in particular, that it was not final (being subject to appeal) and also not binding or otherwise determinative of Dunamenti's separate challenge still pending before the General Court because of "different factual scenarios" distinguishing the challenges made by Dunamenti and Budapesti respectively. In summary, Hungary submitted that the *Budapesti* judgment was relevant to this arbitration on several grounds.

50.   For the purpose of the Tribunal's Decision, the Tribunal took note of the *Budapesti* judgment and the Parties' different submissions. The Tribunal also took note that the disputant parties' pleadings leading to the *Budapesti* judgment were not public and therefore remained unavailable for this arbitration; that the judgment was subject to appeal; and that, in any event, the judgment did not automatically determine the final result of Dunamenti's own legal proceedings in Luxembourg in Case T-179/09. The Tribunal also noted that both Parties continued jointly to maintain that this Tribunal was not concerned with the lawfulness or unlawfulness under EU law of the Commission's Final Decision (a view not shared by the European Commission). In all these circumstances, the Tribunal decided to place no reliance on the General Court's *Budapesti* judgment of 13 February 2012. (The Tribunal returns below to Dunamenti's own legal proceedings in Luxembourg, before the General Court and the Court of Justice).

## *(5)    THE TRIBUNAL'S DECISION*

51.   On 30 November 2012, the Tribunal issued its Decision on Jurisdiction, Applicable Law and Liability (as already identified, the "Tribunal's Decision"). For the reasons there earlier set out, the Tribunal decided as follows, in its operative part:

   [11.2]   *Jurisdiction:* The Tribunal declared, pursuant to Article 26 of the Energy Charter Treaty and Articles 25 and 41 of the ICSID Convention, that the International Centre for Settlement of Investment Disputes has jurisdiction and that this Tribunal is competent to decide finally the Parties' dispute in these arbitration proceedings;

[11.3] *The PPA Termination Claim:* The Tribunal postponed to a subsequent phase of these arbitration proceedings its final decision (as regards both liability and quantum) in regard to net stranded costs forming part of Electrabel's claim for compensation pleaded as the PPA Termination Claim and made under Article 10(1) of the Energy Charter Treaty in regard to Hungary's obligation to accord to Electrabel's investments fair and equitable treatment. The Tribunal dismissed as to liability all other grounds advanced by Electrabel for this PPA Termination Claim and all other parts of its claim for compensation under this PPA Termination Claim;

[11.4] *The PPA Pricing Claim:* The Tribunal dismissed as to liability Electrabel's claim for compensation pleaded as the PPA Pricing Claim;

[11.5] *The Regulated Pricing Claim:* The Tribunal dismissed as to liability Electrabel's claim for compensation pleaded as the Regulated Pricing Claim;

[11.6] *The G1 Unit Claim:* The Tribunal dismissed as to liability Electrabel's claim for compensation pleaded as the G1 Unit Claim;

[11.7] *Costs Claims:* The Tribunal made no order as regards costs, save to reserve in full its jurisdiction and powers to make any order as regards all legal and arbitration costs in an award subsequent to the Tribunal's Decision; and

[11.8] *Quantum:* The Tribunal's Decision did not decide any issue relating to quantum (including interest).

## *(6)  THE SECOND PHASE OF THIS ARBITRATION*

52.  Pursuant to paragraph 10.9 of the Tribunal's Decision, these arbitration proceedings proceeded to a second phase. To that end, the Tribunal indicated that it intended to convene a procedural meeting with the Parties' legal representatives within 45 days of the Parties' receipt of the Tribunal's Decision.

53.  By letter dated 30 November 2012, the Parties were requested to comment in writing on the proposed second phase of the proceedings as soon as practicable, with a view to a possible procedural meeting in January 2013 (to be held by telephone conference-call), at a date and time to be specified by the Tribunal.

54.    By letter dated 22 January 2013, the Parties provided their comments with regard to the next phase of the proceedings. The Parties agreed that an in-person meeting was a preferred means over a telephone conference to discuss the scope and timing of any substantive submissions to be made by the Parties, as well as any subsequent steps in the arbitration. The Parties also listed the proposed principal issue to be addressed during the arbitration's second phase, namely: the outstanding undecided claim by the Claimant for damages in respect of net stranded costs (but not their assessment).

55.    By letter dated 23 January 2013, the Tribunal noted the Parties' mutual preference for an in-person meeting, but it requested the Parties to consider whether a meeting by video-conference might suffice at this particular stage of the proceedings. The Tribunal further suggested potential dates for such a meeting in February and March 2013. By letter dated 28 January 2013, Electrabel reiterated its request that the procedural meeting be held in person.

56.    Following several rounds of further correspondence, the Tribunal and the Parties attended an in-person meeting on 10 April 2013 in New York.

57.    *Procedural Meeting:* Following this fourth procedural meeting on 10 April 2013 in New York, the Tribunal issued its procedural order dated 23 April 2013 whereby it established the subsequent procedural steps for the second phase of this arbitration (as more fully described below). The procedural meeting was recorded by verbatim transcript.

58.    At this fourth procedural meeting, Hungary expressly reserved its position (to the extent necessary) in regard to the Tribunal's Decision.[8] It later re-stated the same reservations during the Second Hearing.[9] Given that Hungary's submissions during this arbitration's second phase included all Hungary's reservations in regard to the Tribunal's Decision, it is unnecessary for the Tribunal to recite here separately Hungary's reservations at the procedural meeting. In addition, as later confirmed in its written submissions, the Claimant reserved its position in regard to the Tribunal's Decision.[10] Similarly, it is unnecessary to record this reservation here any further. The Tribunal duly noted both Parties' reservations.

---

[8] Transcript of Procedural Meeting of 10 April 2013, pp. 35ff.
[9] H2D2.338-339.
[10] Electrabel's Post-Hearing Submissions, 7 May 2010, p. 79.

59. *PO No 12 of 23 April 2013:* By this procedural order dated 23 April 2013, the Tribunal recorded (inter alia) the Parties' agreement that their respective submissions and the proposed oral hearing for the arbitration's second phase would address "the effect of the 'Non-Payment of the Net Stranded Costs', including the standard of damages (but not their quantification)."[11] It also required the Parties to present interim written submissions as to costs regarding the Non-PPA Termination Claims by Electrabel.

60. *PO of 7 November 2013:* Following the procedural order dated 23 April 2013, the Tribunal issued its procedural order dated 7 November 2013 (in regard to the amended procedural calendar).

61. *Written Submissions:* Pursuant to the procedural order dated 23 April 2013, Electrabel filed its Submission on the Allocation and Amount of Fees and Costs for the Non-PPA Termination Claims on 5 July 2013. Following Electrabel's letter dated 8 July 2013 (in which it informed the Tribunal that the Parties had agreed to a modified procedural calendar to which Hungary confirmed its non-objection by email of the same date), the Tribunal approved the Parties' modified calendar on 10 July 2013; and Electrabel filed its Submission on the PPA Termination Claim on 30 July 2013. Pursuant to the procedural order dated 7 November 2013, Electrabel filed its Reply Submission on the PPA Termination Claim on 21 February 2014.

62. Pursuant to the procedural order dated 23 April 2013, Hungary filed its Submission on the Allocation and Amount of Fees and Costs for the Non-PPA Termination Claims on 24 May 2013. Pursuant to the procedural order dated 7 November 2013, Hungary filed its Counter-Submission on "net stranded costs" on 6 December 2013. Following Hungary's request dated 13 April 2014 for an extension of time for filing its Rejoinder to which Electrabel objected by letter dated 14 April 2014, the Tribunal granted Hungary's request on 14 April 2014; and Hungary filed its Rejoinder on "net stranded costs" on 22 April 2014.

63. *The Change in Dunamenti's Ownership:* Before the Second Hearing, by letter dated 18 March 2014, Electrabel notified Hungary that it was in the process of disposing of its shares in Dunamenti (whilst retaining an interest in the PPA Termination Claim in this

---

[11] Tribunal's Procedural Order No. 12, 23 April 2013, paragraph 3.

arbitration) and would provide further information later. At the Second Hearing, Hungary reserved its rights in full, including the right to ask for still further information and to raise any issues as to whether Electrabel remained a proper claimant for its claim and as to the quantum of its claim.[12] Later, Electrabel confirmed that the sale process remained incomplete; and that it would inform Hungary and the Tribunal as and when there were further developments.[13] If and to the extent that any such developments took place subsequently, these do not appear to have been considered material to this arbitration by either Party.

64. *Second Hearing:* The Hearing on the second phase of these arbitration proceedings took place over two days from 15 May to 16 May 2014, at the World Bank headquarters in Washington, DC, USA (the "Second Hearing"). The Second Hearing was recorded by verbatim transcript.

65. The Second Hearing was attended, on behalf of Electrabel, by Peter Turner, Jérôme Philippe, Kate Parlett, France-Hélène Boret and Baxter Roberts (all of Freshfields Bruckhaus Deringer LLP), Marie Stoyanov (of Allen & Overy LLP), László Kenyeres (of Faludi Wolf Theiss), Patrick Baeten, Zoltán Bodnár and Peter Csiba (all of GDF Suez).

66. It was attended, on behalf of Hungary, by Jean Kalicki, Dmitri Evseev, Mara Senn, Peter Nikitin, Albert Teng, Kelby Ballena, Aimee Reliert and Kately Horne (all of Arnold & Porter LLP) and János Katona (of Law Office of Dr. János Katona).

67. Electrabel and Hungary made opening statements at the Second Hearing's first day [H2D1.12, 71 & 117 and H2D1.126, 173, 195 & 242 respectively]. The Tribunal then requested the Parties to address, in particular five questions.[14] Electrabel and Hungary made closing statements and responded to the Tribunal's questions on the Second Hearing's second day.[15] There were no witnesses testifying orally at the Second Hearing.

68. *New Documents:* By communication dated 6 May 2014, before the Second Hearing, Hungary informed the Tribunal that Electrabel had agreed to Hungary's submission of two new documents: (i) the Investment Arbitration Report article "As Romania seeks

---

[12] H2D1.07.
[13] H2D2.336.
[14] H2D1.254.
[15] H2D2.271, 273, 281, 294 & 300 and H2D2.327, 358, 378 & 382 respectively.

annulment of $250 million award at ICSID, enforceability questions loom"; (ii) the General Court Judgment in Case T-179/09 *Dunamenti Erőmű Zrt. v European Commission* of 30 April 2014 (the "*Dunamenti* judgment"), designated as Hungary's Exhibits R-302 and R-303 respectively, whereby the General Court dismissed the claim by Dunamenti for (inter alia) the annulment of the Commission's Decision 2009/609/EC dated 4 June 2008 on State Aid C 41/2005 (the "Commission's Final Decision on State Aid"[16]). Electrabel confirmed its agreement to the admission of these two exhibits by communication dated 7 May 2014.

69.    By communication dated 14 May 2014, on the eve of the Second Hearing, Electrabel informed the Tribunal that the Parties had agreed to Electrabel's submission of five new documents concerning EU legal materials; namely: (i) ECJ, C-67/85 *Kwekerij Gebroeders van der Kooy BV and others v European Commission* [1988] ECR 00219; (ii) ECJ, C-303/88 *Italian Republic v European Commission* [1991] ECR I-01433; (iii) ECJ, C-305/89 *Italian Republic v European Commission* [1991] ECR I-01603; (iv) ECJ, C-482/99 *French Republic v European Commission* ("Stardust") [2002] ECR I-04397; and (v) ECJ, C-280/00 *Altmark Trans GmbH v European Commission* [2003] ECR I-07747, designated as Electrabel's Exhibits C-231 to C-235. Hungary provided its written response to Electrabel's arguments put forward on the basis of these new exhibits by letter dated 23 May 2014.

70.    By communication dated 15 May 2014, the first day of the Second Hearing, Hungary informed the Tribunal that the Parties had agreed to Hungary's submission of two new documents: (i) the Country report by Beata Radzka entitled "Liberalisation, privatisation and regulation in the Polish electricity sector"; and (ii) the report by the Polish Ministry of Treasury entitled "Privatisation Lines for Treasury Assets in 2007", designated as Hungary's Exhibits R-304 and R-305 respectively.

71.    By communication dated 16 May 2014, Hungary submitted documents which had been provided informally during the Second Hearing: (i) Case 52/84 *European Commission v Kingdom of Belgium* [1986] ECR 89; (ii) Case 94/807 *European Commission v Federal Republic of Germany* [1989] ECR-175; (iii) Case 348/93 *European Commission v Italian Republic* [1995] ECR-673; (iv) Case T-468/08 *Tisza Erőmű kft v European Commission*;

---

[16] C-106.

(v) Joined Cases T-115/09 and T-116/09 *Electrolux AB v French Republic*; and (vi) Case C-480/09 P *AceaElectrabel Produzione SpA v European Commission*, designated as Hungary's Exhibits R-306 to R-311.

72.    By letter dated 23 May 2014, Hungary requested permission to submit the judgment of the European Court of Justice in Case C-119/05, *Ministero dell'Industria, del Commercio e dell'Artigianato v Lucchini SpA* as Hungary's Exhibit RA-150. By letter dated 27 May 2014, Electrabel provided its written response on Hungary's request, including its request to the Tribunal to ignore Hungary's unsolicited submission, to which Hungary replied by letter of 30 May 2014 with Annex A.

73.    By letter dated 26 May 2014, Hungary requested permission from the Tribunal to submit the October 2014 European Commission Decision "State aid SA.38517 (2014/C) (ex 2014/NN) – Romania Implementation of Arbitral Award *Micula v Romania* of 11 December 2013" as Hungary's Exhibit RA-151. By letter dated 8 December 2014, the Claimant provided its comments on the Respondent's request. These submissions addressed the ICSID arbitration and subsequent decisions by the European Commission regarding the award of 11 December 2013 in *Micula v Romania*, ICSID Case No ARB/06/20 (the "*Micula* award").

74.    By letter dated 10 December 2014, the Tribunal referred to Hungary's applications of 23 May and 26 November 2014, to Electrabel's applications of 8 December 2014 and to the Parties' earlier correspondence of 27 and 30 May 2014. The Tribunal there recorded its decision to admit Exhibits RA-150 and RA-151, subject to the right of Electrabel to respond with a short written submission.

75.    By letter dated 29 December 2014, as earlier permitted by the Tribunal, Electrabel made its written submissions on Hungary's new Exhibits RA-150 and RA-151.

76.    By letter dated 4 March 2015, Electrabel requested permission from the Tribunal to submit the award in *E.D.F. International v Hungary* into the record as Exhibit CA-162.

77.    By letter dated 16 June 2015, the Tribunal granted Electrabel's request of 4 March 2015 to submit Exhibit CA-162 into the record, subject to the right of Hungary to respond with a short written submission.

78.  By letter of 26 June 2015, Hungary made its written submission on Electrabel's Exhibit CA-162.

79.  By letter of 3 July 2015, Electrabel confirmed that it did not wish to make any further submissions regarding its Exhibit CA-162 beyond those already made in its letter of 4 March 2015.

80.  *The Luxembourg Proceedings:* As already noted above, Hungary submitted the *Dunamenti* judgment dated 30 April 2014 of the General Court (in *Dunamenti v European Commission*),[17] whereby the General Court dismissed the claim by Dunamenti for (inter alia) the annulment of the Commission's Final Decision on State Aid dated 4 June 2008. The Tribunal subsequently noted that, on 21 July 2014, after the Second Hearing, Dunamenti (with Electrabel) lodged an appeal from that judgment to the Court of Justice (Case C-357/14 Pl) and that, on 1 July 2015, Advocate General Wathelet delivered his written opinion advising the Court of Justice to set aside the General Court's judgment and to annul the Commission's Final Decision dated 4 June 2008, insofar as it concerned Dunamenti.

81.  By letter dated 14 July 2015, the Tribunal raised two matters with the Parties. First, referring to the recent opinion of Advocate General Wathelet, the Tribunal informed the Parties that, unless the Tribunal heard from either Party otherwise, it was minded to assume that this opinion was not relevant to the decisions required of the Tribunal in the second phase of this arbitration and, moreover, that the pronouncement of the ECJ's appellate judgment in that case was not imminent. Second, the Tribunal indicated that it might wish to complete its decisions on legal and arbitration costs for both the first and second phases of this arbitration. It therefore requested the Parties to complete their submissions on costs for both phases, including (in particular) relevant summaries and figures for legal costs and expenses incurred to date by both Electrabel and Hungary.

82.  *The ECJ:* As to the first matter, Electrabel responded by letter dated 21 July 2015; and Hungary by letter dated 28 July 2015. In summary, Electrabel submitted that the Tribunal should not ignore the Advocate General's opinion, although acknowledging that the Court of Justice was not obliged to follow the Advocate General's recommendation. In summary,

---

[17] R-303.

Hungary submitted that the pending challenge to the Commission's Final Decision dated 4 June 2008, whatever its outcome before the ECJ, could have no impact on Hungary's liability under the ECT in this arbitration; the Advocate General's opinion might not be followed by the Court of Justice; and the content of the opinion was of no consequence for any issue before this Tribunal.

83.    Subsequently, by letter dated 15 September 2015, Electrabel notified the Tribunal that the judgment of the ECJ was to be issued on 1 October 2015. In the circumstances, the Tribunal decided to delay the issuance of this Award until it had an opportunity of considering the terms of that judgment, in consultation with the Parties (if appropriate).

84.    By its judgment of 1 October 2015, the ECJ dismissed (inter alia) the claims of Dunamenti and Electrabel (as appellants) that: (i) the ECJ should quash the judgment of the General Court of 30 April 2014 in Case T-179/09 (i.e. the *Dunamenti* judgment), in so far as it confirmed the Commission's Final Decision on State Aid of 4 June 2008; and (ii) the ECJ should annul the Commission's Final Decision on State Aid in so far as it found that Dunamenti's PPA constituted illegal and incompatible State aid under EU law or (in the alternative) should refer the case back to the General Court. Accordingly, the Commission's Final Decision on State Aid was finally declared valid under EU law.

85.    Having received (by Hungary's letter dated 1 October 2015) and considered the terms of that judgment, the Tribunal wrote to the Parties, by its Secretary's letter dated 5 October 2015: "… Given the significance to this arbitration borne by both the Commission Decision dated 4 June 2008 and the legal proceedings in Luxembourg over such a long period, the Tribunal thinks it appropriate to permit (but not to require) each Party, if it so wishes, to submit brief but final written comments on the relevant effect, if any, to this arbitration of the judgment dated 1 October of the European Court of Justice. Such comments should be made as soon as practicable, but not later than 20 October 2015. The Tribunal has already noted the Respondent's comments in its letter dated 1 October 2015 …"

86.    By email message dated 6 October 2015 in response to the Tribunal's letter, Hungary confirmed that it did not intend to provide any further commentary on the ECJ's judgment of 1 October 2015. By letter dated 19 October 2015, Electrabel made submissions

regarding the ECJ's judgment of 1 October 2015 and the Advocate General's opinion of 1 July 2015, contending (inter alia) that the reasoning in Advocate General Wathelet's opinion should still stand insofar as it was not rejected by the ECJ.[18]

87.    The Tribunal notes that neither Party contests the validity of the ECJ's judgment, nor the fact that this judgment has upheld the validity of the Commission's Final Decision on State Aid of 4 June 2008. Indeed, Electrabel has confirmed its position that "Hungary's conduct was in breach of the ECT and of international law, not that the Commission State Aid Decision was wrong as a matter of EU law."[19] The Tribunal thus accepts the validity of the Commission's Final Decision on State Aid. As noted below, the Tribunal has taken into account the Parties' written submissions of 1 and 19 October 2015; it has also noted that the ECJ did not accept the opinion of the Advocate General that the Commission Decision be set aside; and, in the circumstances, it does not accept that the Advocate General's opinion has any legal force as a matter of EU law.

88.    *Costs:* As to the second matter, the Parties made written submissions on costs by letters dated 28 August, 1 September and 7 September 2015 (with attachments). The Tribunal addresses these costs submissions separately below in Part III.

### (7)    THE PARTIES' CLAIMED RELIEF

89.    *Electrabel:* In the first phase of the arbitration, as pleaded in paragraph 431 of its Post-Hearing Submissions, Electrabel claimed the following principal relief from the Tribunal:

a)    A declaration that the termination of the Agreement ("PPA"):

  (i)    Constitutes unlawful expropriation in breach of Article 13(1) of the Energy Charter Treaty ("ECT") and full compensation has not been paid;

  (ii)   Alternatively, constitutes lawful expropriation pursuant to Article 13(1) of the ECT but prompt, adequate and effective compensation has not been paid;

---

[18] Electrabel contended (inter alia) that "while the Court rejected the Advocate General's opinion that the General Court's decision should be set aside as a result of the latter's mistake of law (which was expressly recognised by the Court at paragraph 107 of its judgment), it did not reject the reasoning of the Advocate General that to find that the State aid remained with the undertaking (Dunamenti) but still require it to be repaid, despite the fact that Hungary had been fully paid for that aid by the acquirer (Electrabel) on privatisation, would leave Hungary unjustly enriched." (Electrabel's letter of 19 October 2015, p. 2.)

[19] Electrabel's letter of 19 October 2015, p. 1.

b)   A declaration that termination of the PPA and/or failure to pay full/adequate compensation constitutes a breach of Articles 10(1) and 10(7) of the ECT;

c)   A declaration that HEO's letter of 10 November 2005 and the instructions of the Government (in particular Minister Kóka) demanding that Dunamenti agree to a reduction in its tariffs of 34% and MVM's implementation of that instruction constitute a breach of Articles 10(1) and 10(7) of the ECT;

d)   A declaration that the Tariff Decrees imposing a reduction in the availability fee in respect of the F and G2 Units of approximately 40% constitute a breach of Articles 10(1) and 10(7) of the ECT;

e)   A declaration that the exclusion of the G1 Unit from the Mandatory Off-Take Decree and the mandatory off-take pricing regime constitute a breach of Articles 10(1) and 10(7) of the ECT;

f)   A declaration that consequent upon one or more of the breaches of the ECT, set out above, Electrabel is entitled to compensation to be determined in a further phase of these arbitral proceedings; and

g)   An order for Electrabel's costs of the arbitration.

90.   As confirmed in Part IX of its Post-Hearing Submissions (page 85), Electrabel no longer advanced its so-called "Additional Claims"; namely: (i) the claim for the forced assignment of the PPA; and (ii) the CO2 allowance claim. It is appropriate to record the final status of these claims as described by Electrabel in its Post-Hearing Submissions:

> *"426. In its oral opening statement, Hungary suggested that Electrabel had waived its right to pursue the other claims that were raised in its Memorial [Footnote 271: T1.109 (Respondent's opening)]. Electrabel does not agree with that categorisation. However, Electrabel confirms that it no longer intends to pursue those claims for the following reasons.*
>
> *427. The claim for the forced assignment of the PPA no longer has any relevance given the fact that Hungary has terminated the PPA pursuant to the PPA Termination Act.*

> *428. The CO2 allowance claim concerned a draft allocation that was in circulation at the time of submission of Electrabel's Memorial. Hungary has since introduced a final allocation that is satisfactory to Electrabel.*
>
> *429. The requirement to nominate gas requirements in advance is no longer a part of the regulation.*
>
> *430. Dunamenti's category of gas limitation remains the least secure. However, there have been no restrictions on gas supply to date."*

91. In these circumstances, the Tribunal did not address in its Decision these Additional Claims any further, noting that they had not been "waived" but were no longer "pursued" by Electrabel in these arbitration proceedings.

92. In the second phase of this arbitration, as pleaded in paragraph 138 of its Submission on the PPA Termination Claim and paragraph 166 of its Reply Submission on the PPA Termination Claim, Electrabel requested that the Tribunal:

   (1) declare that:

       (a) the Respondent has breached Article 10(1) of the ECT; and

       (b) Electrabel is entitled to full compensation;

   (2) reserve its decision on damages until a subsequent phase of this proceeding; and

   (3) order such further relief as it deems appropriate.

93. *Hungary:* In the first phase of this arbitration, Hungary, as pleaded in paragraph 168 of its Post-Hearing Submissions, requested the following principal relief from the Tribunal:

   (a) an order rejecting Electrabel's claims in their entirety; and

   (b) an appropriate order of legal and arbitration costs in the light of such decision in favour of Hungary.

94. In the second phase of this arbitration, as pleaded in paragraph 239 of its Counter-Submission on "net stranded costs" and paragraph 249 of its Rejoinder on "net stranded costs", Hungary requested the Tribunal to:

   (a) reject Claimant's remaining claim in its entirety;

(b)     find that Hungary did not violate ECT Article 10(1), including its fair and equitable treatment obligation;

(c)     reject any and all requests for an award of damages;

(d)     reject any and all requests for an award of interest, compound or otherwise; and

(e)     award Hungary its appropriate costs and fees in light of such decision.

*(8)    ICSID ARBITRATION RULE 38(1)*

95.    By letter dated 28 October 2015, the Tribunal declared the second phase of these arbitration proceedings completed as at 30 October 2015 as regards matters to be finally determined in this Award, by reference to or by analogy with ICSID Arbitration Rule 38(1).

## PART II: THE PRINCIPAL ISSUES

### (1)    INTRODUCTION

96.    Pursuant to paragraph 6.116 of the Tribunal's Decision and paragraph 3 of the Tribunal's procedural order of 23 April 2013, this Award addresses the remaining part of Electrabel's PPA Termination Claim in regard to the non-payment of stranded costs by Hungary to Dunamenti.

97.    This remaining part of the PPA Termination Claim originates from Hungary's implementation of the methodology imposed by the Commission in regard to compensation made by an EU Member State for an electricity undertaking's stranded costs in the context of incompatible State aid under EU law. Under EU law, any aid granted by a Member State or through State resources in any form whatsoever is incompatible with the internal market if it distorts (or threatens to distort) competition by favouring certain undertakings in so far as it may affect trade between EU Member States.[20] For a relatively simple concept, it is (for this case at least) more than complicated, extending over a significant period when Hungary was undergoing a massive political and economic transition. It is necessary to recall the principal events relevant to this Award in the form of a brief chronology.

98.    In 1993, following the political changes of 1989, Hungary concluded an agreement for associate membership of the European Community (as it then existed). In 1994, Hungary applied for full membership; and in 2004, Hungary became a full member of the European Union. Also in 1994, Hungary and Belgium had signed the ECT; and it came into effect for both States in 1998. At the time when Dunamenti concluded the 1995 PPA[21] and Electrabel made its investments in Dunamenti,[22] Hungary had assumed an obligation by treaty to bring its competition rules in accord with the EC Treaty. From the outset, this obligation was well known to both Electrabel and Dunamenti. Both also knew from the outset that the long period of Dunamenti's PPA meant that the PPA would continue well into the period

---

[20] This is so unless the aid falls within one of the exceptions under EU law ("Save as otherwise provided in the Treaties"]: Article 107(1) of the TFEU (ex Article 87(1) of the ECT).
[21] C-1.
[22] On Electrabel's case, its investments were made between 1995 and 2001: *see* the Tribunal's Decision, paragraph 2.9.

of Hungary's full membership of the EU, including market liberalisation and competition required under EU law.

99.    Many of the following relevant events have already been described in the Tribunal's Decision, namely: (i) the Commission's Stranded Costs Methodology of 25 July 2001;[23] (ii) the Commission's Final Decision dated 4 June 2008;[24] (iii) Hungary's Law LXX of 10 November 2008, terminating Dunamenti's PPA with effect from 1 January 2009 and providing for the establishment of a stranded costs scheme (the "PPA Termination Act 2008");[25] and (iv) the Commission Compensation Decision dated 27 April 2010.[26]

100.    For present purposes, it suffices to say that an electricity undertaking may sustain costs for two reasons resulting from an adverse decision by the Commission on State aid. First, under EU law, the undertaking may be required to repay State aid; and, second, the undertaking may suffer losses resulting from the consequential termination of its PPA before the expiry of its full contractual term. These costs, amounting to payments and lost operating revenues (or profits), can therefore no longer contribute to the return on the undertaking's investment.

101.    The term "stranded costs" is a term of art in EU terminology. It has been defined as "costs incurred by a company operating in a sector undergoing deregulation, prior to deregulation, that could have been recovered under a regulated market, but cannot be recovered in a liberalized market."[27] More specifically, it here refers to relevant losses comprising the notional difference between (i) the electricity undertaking's relevant investment costs; and (ii) the undertaking's relevant operating revenues to be generated in the future up to its PPA's contractual expiry date, i.e. post its premature termination.[28] The term "net stranded costs" results from a calculation of these relevant losses less repayable State aid. That end-result can be a positive or negative figure for the undertaking. Given that the calculation seeks to assess future revenues on certain hypotheses post-termination, it must necessarily use estimated and not actual figures.

---

[23] Commission Communication relating to the methodology for analysing State aid linked to stranded costs; R-32.
[24] Commission Decision on the State aid awarded by Hungary through Power Purchase Agreements; C-106.
[25] Act LXX of 2008 on Certain Questions related to Electricity (translated into English); CL-30.
[26] State aid N 691/2009 Hungarian Stranded Costs Compensation Scheme; C-199.
[27] Brice Allibert, *Compensations of Stranded Costs in the European Union Electricity Sector*, p. 3; RA-141.
[28] For the definition of the terms (net) stranded costs, *see also* the Tribunal's Decision, paragraph 6.96.

102. The Tribunal's Decision also addressed net stranded costs in paragraphs 6.94 to 6.118 of the Decision. The Tribunal noted that stranded costs referred to the difference between: (i) relevant investment costs; and (ii) relevant revenues generated in the past and to be generated in the future up to the notional end of the PPA's term in the future.[29]

103. The Tribunal's Decision recorded that Hungary's compensation scheme for stranded costs was to be calculated in two stages.[30] At stage one, any stranded costs calculated as at the compensation date would be set off by the recovery of unlawful State aid. If the State aid exceeded the stranded costs as at that date, a payment would be made by the generator to the State, but the reverse would not occur. Accordingly, if the stranded costs exceeded the State aid, those losses would be borne by the generator. At stage two, also known as the "claw-back mechanism", each generator's revenues and costs would be finally calculated at the expiry of the relevant PPA's original term. If the balance of State aid and stranded costs had benefitted the generator at stage one, a final payment would be required by the generator to be made to the State; but, again, the reverse would not occur. Accordingly, no payment would be made by Hungary to the generator if at stage one the State had recovered a higher sum than it was in fact owed, or otherwise (e.g. if there remained net stranded costs).

104. As found by the Tribunal in its Decision, based on the evidence adduced by the Parties, the relevant figures regarding Dunamenti (as approved by the European Commission in its Compensation Decision of 27 April 2010) were as follows:[31]

(i)  Dunamenti was obliged to reimburse 125 billion HUF to Hungary as recoverable State aid;

(ii)  Hungary fixed Dunamenti's total eligible stranded costs (up to the PPA's notional expiry date) at 147 billion HUF;

(iii)  Hungary set-off against those 147 billion HUF in eligible stranded costs, Dunamenti's obligation to reimburse the 125 billion HUF under the first stage of Hungary's scheme, resulting in no actual repayment of State aid by Dunamenti – for the time being;

---

[29] The Tribunal's Decision, paragraph 6.96.
[30] The Tribunal's Decision, paragraphs 6.99-6.102.
[31] These figures are further explained in the Tribunal's Decision, paragraph 6.106.

(iv)   As a result, under this first stage, Dunamenti's net stranded costs (being the balance of stranded costs resulting from the total of 147 billion HUF stranded costs minus the 125 billion HUF State aid) amounted to 22 billion HUF – called by Hungary "the buffer of 22 billion HUF";

(v)    In the event that Hungary's eventual calculation of Dunamenti's stranded costs based on relevant future revenues were to be reduced by more than 22 billion HUF from the figure of 147 billion HUF (i.e. below the buffer), Dunamenti would be required to repay under the subsequent "claw-back" stage of Hungary's scheme an equivalent part of its compensation of 125 billion HUF received (by way of set-off) under the first stage;

(vi)   If the figure for stranded costs were to be increased above 147 billion HUF, Dunamenti would receive no further compensation from Hungary and would have to bear such additional net stranded costs as an uncompensated loss; and

(vii)  If the figure for stranded costs were eventually maintained at 147 billion HUF, Dunamenti would have to bear the buffer of 22 billion HUF as an uncompensated loss.

The result under Hungary's scheme is that Dunamenti has received compensation for stranded costs (in the form of a set-off) of 125 billion HUF; that no compensation for stranded costs has been or will ever be actually paid (i.e. in cash) by Hungary to Dunamenti; and that conversely, Dunamenti may have to pay (i.e. repay in cash) State aid if its stranded costs are eventually fixed at less than 125 billion HUF.

105.  Hungary's scheme was necessarily based upon the Commission's established methodology for stranded costs, namely its Stranded Costs Methodology of 25 July 2001.[32] The Commission there described its methodology, inter alia, materially as follows:[33] "[4] … The State aid corresponding to the eligible stranded costs defined in this Notice is designed to facilitate the transition for electricity undertakings to a competitive market. The Commission may take a favourable view of such aid to the extent that distortion of competition is counterbalanced by the contribution made by the aid to the attainment of a Community objective which market forces could not achieve … [4.4] The degressive

---

[32] R-32.
[33] R-32, pp. 5, 6 & 7.

nature of aid intended to offset stranded costs will be viewed favourably by the Commission when making its assessment; it will, in fact, help the undertaking concerned to speed up its preparations for a liberalised electricity market. [4.5] The maximum amount of aid that can be paid to an undertaking to offset stranded costs must be specified in advance … ." For present purposes, the "undertaking" is of course Dunamenti (not Electrabel).

106. Accordingly, the Commission's treatment of stranded costs (including net stranded costs) paid as compensation to an undertaking is viewed as a form of State aid, subject to EU law and review by the Commission. As Professor Slot testified during this arbitration's first phase, compensation for stranded costs may not exceed the amount of eligible stranded costs, i.e. non-returned investments borne by the undertaking and revenue losses from falling profitability caused by the market's liberalisation.[34] It must also be specified "in advance."

107. Subject to EU law, there is nothing in the Commission's methodology which expressly prohibits payment of eligible stranded costs to an undertaking. The decision is left to the Member State within the outer boundaries of the Commission's methodology and EU law: the Member State may compensate an undertaking for eligible stranded costs in whole or in part or not at all. Whether or not the form of such compensation involves an actual payment to an undertaking, as opposed to a set-off or any other form of non-cash compensation, it remains subject to EU law on State aid given the latter's broad definition under EU law and the Commission's Stranded Costs Methodology.

108. According to the Commission's methodology, the maximum amount of compensation "must be specified in advance", i.e. *ex ante* and not *ex post.* The methodology also includes an adaptation *ex post* which could result in that amount later being reduced (but not increased). Overall, under the Commission's methodology, the "basic principle of the methodology is that compensations should be limited in time and in extent. They should not exceed the costs actually borne by undertakings, directly caused by the liberalization, and resulting in losses."[35] This was confirmed by the testimony of Hungary's expert witness, Professor Slot,[36] and accepted by Electrabel.[37]

---

[34] Professor Slot's First Expert Report, paragraph 92.
[35] Brice Allibert, *A methodology for analysing State aid linked to stranded costs*, paragraph 2; RA-140.
[36] Professor Slot's First Expert Report, paragraph 92.

109. In paragraph 466 of the Commission's Final Decision on State Aid and paragraph 70 of the Commission Compensation Decision, there is at least an implication that, in the light of subsequent events, the Commission might look favourably upon upwardly revised figures for Dunamenti's stranded costs. In the Tribunal's Decision, this implication led the Tribunal to query whether Hungary, with the Commission's approval, might adjust, in certain circumstances, the second "claw-back" stage of its scheme on stranded costs for Dunamenti in terms favourable to Dunamenti.[38]

110. The Commission's Final Decision dated 4 June 2008 refers to two judgments of the European Court of Justice: *Case 94/87 Commission v Germany* [1989] ECR-175 and *Case C-348/93 Commission v Italy* [1995] ECR-673.[39] As both Electrabel and Hungary explained at the Second Hearing, in materially similar terms, these paragraphs refer to a general principle of EU law expressed in Article 4 of the TEU (ex Article 5 of the ECT) which imposes a duty on Member States and Community institutions to work together in good faith with a view to overcoming difficulties, whilst fully observing the treaty provisions and, in particular, the provisions on State aid.[40]

111. In these circumstances, the Commission's implicit reference to this general principle of genuine co-operation to cover future, unforeseen or unforeseeable events, does not support Electrabel's case. In the Tribunal's view, the relevant figures for Dunamenti's net stranded costs had still to be calculated and applied *ex ante* by Hungary; and there has been no unforeseen or unforeseeable event occurring to Dunamenti's advantage (unless there was to be a successful appeal by Dunamenti to the General Court or the ECJ, which is not the case). It is therefore unnecessary to consider Hungary's objections to the Tribunal's query in its Decision, were the position otherwise.[41]

112. The Commission's methodology was applied in the Commission's Compensation Decision dated 27 April 2010 for Hungary's electricity undertakings.[42] In particular, as regards Hungary's first and subsequent "claw-back" stages of compensation, the Commission

---

[37] Electrabel acknowledged that "[b]oth Parties also agree that Hungary could have provided compensation to Dunamenti up to the level approved by the Commission as the *ex ante* projected maximum of HUF 22 billion." (Electrabel's Reply Submission on the PPA Termination Claim, 21 February 2014, paragraph 14.)
[38] The Tribunal's Decision, paragraphs 6.114-6.116.
[39] The Commission Final Decision, 4 June 2008, paragraph 466, footnote 122; C-106.
[40] H2D2.274; H2D2.382ff & H2D2.391-393.
[41] H2D2.340-342.
[42] C-199.

decided that downwards adjustments could later be made by Hungary to its *ex ante* computation of eligible stranded costs, but no upwards adjustment: "… this calculation can only result in the beneficiaries having to make a payment to the State."[43]

113. As addressed in the Tribunal's Decision and also for reasons apparent below, the Tribunal does not consider the Commission's methodology or EU law as being decisive on the principal issues addressed in this arbitration. Although both form important background materials to the decisions made by Hungary as regards its scheme for net stranded costs in regard to Dunamenti, those decisions were made within a broad discretion by Hungary, alone, consistent with EU law at that time. Those decisions must therefore stand or fall by reference to Electrabel's claim that Hungary breached, by itself, its obligation under Article 10(1) of the ECT "to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment."[44] That is also Electrabel's position, as noted above.

114. In other words, as addressed in the Tribunal's Decision in regard to this FET standard, the question before the Tribunal is: did Hungary take arbitrary measures or wrongfully frustrate Electrabel's reasonable expectations with respect to the legal framework in Hungary, including EU law?[45] Electrabel makes no allegations regarding lack of transparency or due process by Hungary; and the Tribunal has rejected any alleged discriminatory measures in its Decision, which it here confirms.[46] In simple terms, the principal issues arise in regard only to unlawful 'arbitrariness' and unlawfully 'frustrated legitimate expectations', as alleged by Electrabel and denied by Hungary.

115. The Tribunal has already noted that the Commission's Final Decision on State Aid has been upheld by both the General Court and the European Court of Justice in Luxembourg. By its judgment of 30 April 2014 (i.e. the *Dunamenti* judgment), the General Court confirmed the Commission's decision that Dunamenti had received, by the PPA, incompatible State aid; and it also accepted the concept of stranded costs in the Commission's methodology, to be applied by Member States.[47] In turn, by its judgment of

---

[43] C-199, paragraphs 48 & 23-25.
[44] The wording of Article 10(1) of the ECT is set out in the Tribunal's Decision, paragraph 3.9.
[45] The Tribunal's Decision, paragraph 7.74.
[46] The Tribunal's Decision, paragraph 7.79.
[47] The Commission's Final Decision dated 4 June 2008, paragraphs 71, 148, 158; C-106.

1 October 2015, the ECJ upheld the *Dunamenti* judgment.[48] In this arbitration, Electrabel did not seek to impugn the General Court's judgment; and it cannot impugn the ECJ's judgment. Accordingly, the Commission's Final Decision on State Aid dated 4 June 2008 still stands, in full force and effect under EU law, as it has done from the time of its making.

*(2)* **THE ECT'S FET STANDARD**

116.   As already described above, the Tribunal expressly left undecided in its Decision all relevant issues arising from the application of the ECT's FET standard to Electrabel's claim for stranded costs. In Article 10(1) of the ECT, as already recorded above, this FET standard required Hungary "to accord at all times Investments of Investors of the other Contracting Parties fair and equitable treatment."

117.   In paragraph 6.118 of the Tribunal's Decision, the Tribunal concluded: "Accordingly, the Tribunal reserves in full its decision, to another decision or award in these proceedings, as to whether or not Hungary has breached or will continue to breach the FET standard in its treatment of Dunamenti's net stranded costs. It is therefore best, in all the circumstances, for the Tribunal to say little more here, save to express the Tribunal's current, provisional and tentative view that the non-payment of 22,171,991,[000] HUF or a lesser sum at the end of Hungary's legislative scheme does not strike the Tribunal as necessarily amounting to a breach of the FET standard; but that non-payment (in cash or otherwise) of a significantly higher sum for Net Stranded Costs most probably could." The Tribunal then understood liability and quantum as potentially mixed issues. Hence, the Parties' prior agreement on bifurcating liability and quantum (confirmed by the Tribunal) precluded any final decision on liability during the arbitration's first phase (inter alia) as a matter of procedural fairness to both Parties.[49]

118.   However, the Parties' submissions in this second phase have significantly narrowed the issues requiring the further decision of the Tribunal. In particular, it is now common ground between the Parties, albeit doubtless for different reasons, that loss and damages are not relevant to the issue of liability under the ECT's FET standard in regard to Electrabel's claim for net stranded costs. In paragraph 151 of its Reply, Electrabel

---

[48] R-303; and the attachment to Hungary's letter dated 1 October 2015.
[49] The Tribunal's Decision, paragraph 6.117.

concluded: "the Parties both now accept that the amount of damages is irrelevant to the question of liability." At the Second Hearing, Electrabel confirmed that: "quantum is not a relevant factor in deciding liability under the ECT."[50] In paragraph 4 of its Rejoinder, Hungary submitted that Electrabel had "fail[ed] to present a credible explanation of how 'stranded costs' are relevant to liability and quantum." At the Second Hearing, Hungary again confirmed that quantum is not relevant to the issue of stranded costs and that "liability cannot be based on the question of whether Claimant has suffered damages or on the particular amount of the loss."[51]

119.  The Tribunal acknowledges the Parties' agreement that quantum is not relevant to determine liability here and accepts that damages (or loss) are generally not necessary to a finding of liability, whilst remaining necessary to the granting of compensation, unless of course loss or damage are a constituent part of the legal wrong.[52] As Electrabel contended at paragraph 41 of its Submission on the PPA Termination Claim and confirmed at the Second Hearing: "damage is relevant to a finding of breach only if it is specifically an element of the primary obligation." According to Electrabel (and Hungary), that is not this case.[53]

120.  The Parties were nevertheless agreed (at least initially) that, in this second phase of the arbitration, the Tribunal may consider the evidence of certain figures relevant to State aid, stranded costs and net stranded costs calculated by Hungary at the time. In the Tribunal's view, these figures include those considered by Hungary in its compensation scheme and approved by the Commission in its Compensation Decision, as listed at paragraph 104 above. In addition, the Parties are agreed that all issues relating to assessment of damages,

---

[50] H2D1.15, 35 & 37.
[51] H2D1.22-29, 38 & 231.
[52] This is confirmed by the ILC's Commentary to Article 2 of the ILC's Articles on State Responsibility, paragraph 9: "Thus there is no exception to the principle stated in article 2 that there are two necessary conditions for an internationally wrongful act—conduct attributable to the State under international law and the breach by that conduct of an international obligation of the State. The question is whether those two necessary conditions are also sufficient. It is sometimes said that international responsibility is not engaged by conduct of a State in disregard of its obligations unless some further element exists, in particular, "damage" to another State. But whether such elements are required depends on the content of the primary obligation, and there is no general rule in this respect. For example, the obligation under a treaty to enact a uniform law is breached by the failure to enact the law, and it is not necessary for another State party to point to any specific damage it has suffered by reason of that failure. Whether a particular obligation is breached forthwith upon a failure to act on the part of the responsible State, or whether some further event must occur, depends on the content and interpretation of the primary obligation and cannot be determined in the abstract."
[53] Electrabel's Submission on the PPA Termination Claim, 30 July 2013, paragraph 41; and H2D2.292.

causation and mitigation are postponed, if relevant, to a third phase of this arbitration, as expressly re-confirmed by the Parties at the Second Hearing.[54]

121. *Micula v Romania:*[55] As already noted above, based on the *Micula* award and the Commission's responses to its recognition and enforcement, the Parties made several submissions before and during the Second Hearing on the question whether or not EU law on State aid would preclude an award of damages against Hungary. Electrabel saw no bar under EU law as regards its PPA Termination Claim in this arbitration.[56] This submission was disputed by Hungary.[57] The Tribunal notes that, even now, Electrabel does not seek in this arbitration compensation beyond "the level allowed by EU law"; that its actual loss (as alleged) exceeds the maximum amount of net stranded costs permitted under the Commission's methodology; that Electrabel nonetheless limits its claim to the maximum payment allowable (as it claims) under EU law;[58] and, further, as also asserted by Electrabel at the Second Hearing: "This Arbitral Tribunal need not concern itself with whether or not its Award would fall afoul of EU State aid rules."[59] The Tribunal also notes, conversely, that Hungary maintains that the Tribunal must apply EU law on State aid, as part of the applicable law (which it was not in *Micula*) and have regard to EU public policy.[60] Following these submissions, by letter dated 15 September 2015, Hungary sent to the Tribunal the European Commission's published Decision of 30 March 2015 on State aid SA 358517 (2014)/C) (ex 2014/NN). It would be possible to extend and analyse these submissions and materials at very considerable length; but it is unnecessary to do so for present purposes.

---

[54] H2D1.122 & 123.

[55] *Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v Romania* (ICSID Case No. ARB/05/20), Award of 11 December 2013 (Lévy, Alexandrov, Abi-Saab) ("*Micula* award"); CA-161.

[56] H2D1.87ff.

[57] H2D1.147ff.

[58] Invoking the international law principle of full reparation, Electrabel submits that "Hungary is […] required to restore Electrabel to the economic position it would have occupied had the wrongful act never occurred", specifying that "[t]he measure of damages is therefore the final figure of eligible Stranded Costs (after deduction of State aid), which will be significantly higher than the estimate of HUF 22 billion." According to Electrabel, "there is no EU law impediment to the Arbitral Tribunal's granting damages in an amount higher than HUF 22 billion, as long as these damages comply with the Methodology." (Electrabel's Reply Submission on the PPA Termination Claim, 21 February 2014, paragraph 144)

[59] H2D1.27 & 121 and H2D2.284ff, with Electrabel's Power Point Slides 4, 34 & 42.

[60] H2D1.147; Hungary's Rejoinder on "net stranded costs", 22 April 2014, paragraph 226.

122. In the circumstances, the Tribunal decides that it does not need to address in this Award, still less resolve, any of the issues arising from the *Micula* award[61] or its effect under EU law. Nor does it.

### (3)  THE PARTIES' RELEVANT CASES

123. It is helpful to summarise, briefly, the Parties' respective cases on the remaining relevant issues addressed in this Award. It is not necessary, for the purposes of this Award, to refer to all submissions made by the Parties. The fact that no express reference is made to any submission by a Party should not be understood as implying by itself that it has not been considered by the Tribunal. Moreover, given the Tribunal's analyses and decisions below, much of the Parties' respective cases in this second phase do not require the Tribunal's decision.

124. *Electrabel:* In summary, in this arbitration's second phase, Electrabel contends that Hungary breached Article 10(1) of the ECT, the ECT's FET standard, by its non-payment to Dunamenti of any net stranded costs. It also alleges that net stranded costs will in any event be significantly higher than 22 billion HUF, requiring further compensation to Dunamenti. More specifically, Electrabel argues that Hungary's failure to provide compensation for Dunamenti's net stranded costs is a breach of FET because (i) it is unjust, arbitrary, abusive, inconsistent and disproportionate; and (ii) it is contrary to Electrabel's legitimate expectations.

125. Electrabel accepts the interpretation of the ECT's FET standard expressed in paragraph 7.74 of the Tribunal's Decision.[62] It also cites to similar effect the awards in *Saluka v Czech Republic*;[63] *Arif v Moldova* (as to the requirement of a "balancing exercise");[64] and *Bogdanov v Moldova*.[65]

126. Electrabel disagrees with the Tribunal's "current, provisional and tentative view" in paragraph 6.118 of the Tribunal's Decision, that the non-payment of 22 billion HUF might

---

[61] *Micula* award; CA-161.
[62] H2D1.22.
[63] *Saluka Investments B.V. v Czech Republic* (UNCITRAL), Partial Award of 17 March 2006 (Watts, Fortier, Behrens) ("*Saluka* partial award"), paragraph 309; CA-21.
[64] *Franck Charles Arif v Republic of Moldova* (ICSID Case No. ARB/11/23), Award of 8 April 2013 (Cremades, Hanotiau, Knieper) ("*Arif* award"), paragraphs 537 & 547(e); CA-148.
[65] *Iurii Bogdanov, Agurdino-Invest Ltd. and Agurdino-Chimia JSC v Republic of Moldova* (SCC), Award of 22 September 2005 (Moss), paragraph 4.2.4.8; CA-123.

not be a breach of the ECT's FET standard; and Electrabel asserts that net stranded costs under the Commission's methodology could give rise to a "very much higher amount" than 22 billion HUF.[66]

127. As regards the "arbitrariness" prong of Electrabel's FET case, Electrabel argues that Hungary's failure to pay compensation is unjust, arbitrary, abusive, inconsistent and disproportionate.[67] First, Electrabel contends that EU law permitted Hungary to provide compensation exceeding the amounts of recoverable State aid, that the losses suffered by Dunamenti by far exceeded the recoverable State aid (even on Hungary's own computations), that the Commission actively encouraged Hungary to pay compensation, and that Hungary initially represented that it would do so, "apparently changing its mind only when it realised that it preferred to keep the money."[68]

128. In particular, Electrabel submits that Hungary's non-payment of compensation of any net stranded costs was, admittedly and impermissibly, motivated not by any rational regulatory purpose but only "to protect the State budget."[69] Electrabel contends that Hungary cannot under the ECT justify non-payment on the ground that it would affect adversely the State's interests, as, otherwise, any claim for damages by an investor under the ECT could always be defeated by a State.

129. Electrabel also submits that it was unjust and arbitrary for Hungary to decide not to pay anything to Dunamenti before there was any reliable assessment for its actual net stranded costs. In particular, at the time of Hungary's decision (as asserted by Hungary), Electrabel contends that Hungary had no reasonable estimate of the amount of State aid repayable by Dunamenti (or even that it was a positive figure). Electrabel disputes that Hungary could perform any balancing exercise if it did not know the true actual figures. Electrabel submits that Hungary first calculated a negative figure for State aid in January 2009;[70] but that, in November 2009, it calculated a positive figure.[71]

---

[66] H2D1.15.
[67] Electrabel's Submission on PPA Termination Claim, 30 July 2013, paragraph 92.
[68] Electrabel's Submission on PPA Termination Claim, 30 July 2013, paragraph 93.
[69] H2D1.29, citing Hungary's Rejoinder on "net stranded costs", 22 April 2013, paragraph 129.
[70] C-118.
[71] R-278.

130. Electrabel further submits that it was arbitrary for Hungary not to pay Dunamenti's net stranded costs after (according to Electrabel) Hungary had represented that it would pay such compensation. As to such representations, Electrabel cites principally the 2004 Eilmansberger opinion;[72] the 2005 minutes of the Hungarian Parliament's Economy Committee;[73] the 2006 background material for this Committee's energy sub-committee;[74] the 2006 letter from the Ministry of Finance to DG Competition;[75] and the 2006 HEO Proposal on the New Operational Model of Electricity Market.[76]

131. Electrabel also submits that the FET standard requires Hungary to act consistently, and that Hungary acted inconsistently by representing that it would pay stranded costs and then failing to do so.[77]

132. Finally (with respect to "arbitrariness"), Electrabel argues that Hungary's conduct breaches the FET standard because it was unreasonably disproportionate. Citing *EDF v Romania*, Hungary argues that the FET standard requires "a reasonable relationship of proportionality between the means employed and the aim sought to be realized" and that such proportionality would be lacking if the investor "bears an individual and excessive burden."[78] According to Electrabel, "in the context of the extensive losses suffered by Electrabel as a consequence of Hungary's terminating the PPA, and given that Hungary could have provided some compensation to mitigate those losses, Hungary's failure to do so is completely disproportionate."[79]

133. As regards Electrabel's legitimate expectations, Electrabel accepts that no expectation was founded on any specific guarantee or assurance as to Dunamenti's profitability.[80] Electrabel submits only that it had a legitimate expectation that, if Dunamenti's PPA were to be terminated prematurely by Hungary, Dunamenti would be adequately compensated

---

[72] R-59, p. 114.
[73] R-70, p. 3, vol. 3.
[74] R-94, pp. 5-6, vol. 3.
[75] R-95, p. 5, vol. 3.
[76] R-100, p. 47, vol. 4.
[77] Electrabel's Submission on PPA Termination Claim, 30 July 2013, paragraph 97.
[78] *EDF (Services) Limited v Romania* (ICSID Case No. ARB/05/13), Award of 8 October 2009 (Bernardini, Rovine, Derains) ("*EDF* award"), paragraph 293; RA-69, citing *Azurix Corp. v Argentine Republic* (ICSID Case No. ARB/01/12), Award of 14 July 2006 (Sureda, Lalonde, Martins) ("*Azurix* award"), paragraph 311; CA-13 (quoting ECtHR, *In the Case of James and Others*, Judgment of 21 February 1986, paragraphs 50 & 63).
[79] Electrabel's Submission on PPA Termination Claim, 30 July 2013, paragraph 98.
[80] H2D1.49, with Electrabel's Power Point Slide 18.

and that, if for any reason adequate compensation were precluded, Hungary would act in such a way as to minimise the harm which Electrabel would suffer by providing the maximum allowable compensation to Dunamenti.

134. As to such expectations, Electrabel cites principally the 1995 PPA;[81] the 1995 PSA;[82] the 1998 Summary of New PPA Agreements;[83] the 1997 Co-operation Agreement;[84] the 1999 Government Resolution 2206/1999;[85] the 1999 minutes of Dunamenti's board;[86] the annex to the minutes of Dunamenti's board;[87] Section 70 of the draft Act 2000 on Electricity;[88] Section 3.1 of the PPA Retrofit Amendment;[89] the 1999 draft PAA between Dunamenti and MVM;[90] the 2002 Dunamenti Business Report;[91] the 2007 minutes of a meeting between Hungary and the Commission;[92] the 2007 letter from DG Comp to the Ministry of the Economy;[93] the 2007 letter from the Prime Minister's office to DG Comp;[94] and the 2008 letter from the Commission to Hungary.[95]

135. Electrabel also refers to the different solutions adopted by Poland and Portugal as regards stranded costs following the premature termination of their PPAs required under EU law, being similar (according to Electrabel) to the PPAs of the Hungarian generators and approved, expressly or implicitly, by the Commission. In contrast to Hungary, according to Electrabel, Poland and Portugal decided, consistent with EU law, to compensate net stranded costs in full.

136. Electrabel submits that its legitimate expectations were reaffirmed in regard to the F Retrofit Agreement.[96] It contends that there was a further assurance that Dunamenti

---

[81] C-1.
[82] C-19.
[83] C-209.
[84] C-19A.
[85] R-208.
[86] C-128.
[87] R-18.
[88] R-20.
[89] C-4.
[90] R-218.
[91] R-185, p. 65.
[92] R-122, p. 2.
[93] R-165, p. 5.
[94] R-139, p. 14.
[95] R-174, p. 1.
[96] C-4.

would be able to recover its investment costs, resulting from the 2001 Electricity Act and derived from the PSA.[97]

137. Accordingly, as to liability, Electrabel concludes that Hungary breached its obligation under the ECT's FET standard by wrongfully frustrating its legitimate expectations at the time of its several investments and by wrongfully not paying any stranded costs to Dunamenti consequent upon the termination of its PPA with effect from 1 January 2009.

138. *Hungary*: In summary, Hungary submits that it committed no breach of the FET standard in Article 10(1) of the ECT. Hungary also accepts the interpretation of the ECT's FET standard expressed in paragraph 7.74 of the Tribunal's Decision, as regards "the two core prongs of that standard as involving the question of arbitrariness and the question of reasonable expectations with respect to legal framework."[98]

139. As regards the scope of its obligation under the ECT's FET standard, Hungary submits that an action cannot be arbitrary if it "bears a reasonable relationship to a rational policy", citing (inter alia) the award in *Saluka v Czech Republic*.[99] Hungary also refers to the Tribunal's Decision dismissing Electrabel's Regulated Pricing Claim; namely: "… The Tribunal's task here is not here to sit retrospectively in judgment upon Hungary's discretionary exercise of a sovereign power, not made irrationally and not exercised in bad faith towards Dunamenti at the relevant time."[100] In further support of its submission that neither rationality nor legitimate expectations may be judged in hindsight, Hungary refers to Electrabel's Reply, to the effect that Hungary's approach on stranded costs must be evaluated based on the facts at the time that Hungary's decision was made.[101]

140. Hungary submits that, under EU law and the Commission's Compensation Decision, Dunamenti was required to 'repay', under a first stage, 125 billion HUF to Hungary as unlawful State aid. Under a second stage, that figure could be higher. Hungary had no discretion to waive such repayment under EU law: Article 2 of the 2008 Commission's

---

[97] H2D2.312-313.
[98] H2D1.131. Paragraph 7.74 of the Tribunal's Decision reads, in material part: "… the obligation to provide fair and equitable treatment comprises several elements, including an obligation to act transparently and with due process, and to refrain from taking arbitrary or discriminatory measures or from frustrating the investor's reasonable expectations with respect to the legal framework adversely affecting its investment."
[99] *Saluka* partial award, *ibid*, paragraph 460; CA-21.
[100] The Tribunal's Decision, paragraph 8.35.
[101] Electrabel's Reply Submission on PPA Termination Claim, 21 February 2014, paragraph 156.

Decision's dispositif directed Hungary to "recover the aid referred to in Article 1 from the beneficiaries," including Dunamenti.[102] Hungary also submits that it had no discretion, under EU law, to compensate Dunamenti for anything more than the initially projected *ex ante* maximum stranded costs of 147 billion HUF. (The simplicity of these figures disguises their difficulties, to which the Tribunal necessarily returns below).

141. Under the Commission's Stranded Costs Methodology, Hungary could set off simultaneously such compensation of 147 billion HUF against the repayable State aid of 125 billion HUF under the first stage (leaving a notional initial difference of 22 billion HUF as net stranded costs). However, the Commission's methodology required Hungary to make this calculation in advance, *ex ante* and not *ex post*. In addition to the Commission's Compensation Decision, the Commission so informed Hungary's Permanent Representation with DG Comp's letter dated 10 August 2004: "… The actual amount of compensation [i.e. for stranded costs] can only be modified downwards, compared to the amount determined *ex ante*, considering that the *ex ante* amount determines the maximum of the later actual compensations."[103]

142. Further, Hungary submits that the ECT's FET standard does not require Hungary effectively to insure Electrabel against the impact of Hungary's membership of the European Union, EU law or the impact of competition and market liberalisation. To the contrary, Hungary would not be acting in accordance with EU law if it did so.

143. In the Commission's Submission during this arbitration's first phase, as cited by Hungary, the Commission contended: "It follows … that EC law governs the legal situations arising between a Belgian investor and the Hungarian government in all areas falling within the scope of the EC Treaty. All the EU Member States, including Belgium and Hungary, have agreed in 2004 *inter se* not to apply the conflict rule contained in Article 16 of the ECT, but the general supremacy rule of EC law in such situations. Accordingly, even if the Tribunal were to find a breach of the ECT by Hungary, Hungary's obligation to implement the EC State aid regime still prevails over any such award. In this context, it should be recalled that any payment obligation by the Hungarian State to the concerned generators based on those PPAs or on their termination, be it agreed in a

---

[102] C-106, p. 85.
[103] R-51.

transaction or based on an arbitration award, is subject to EU State aid rules. The execution of such payment can thus not take place if it would contradict the rules of EU State aid policy. In that connection the European Court of Justice established in *Eco Swiss* that the competition rules of the Treaty are part of the public order which national courts must take into account when they review the legality of arbitral awards under the public policy exception recognised by the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards."[104]

144.    In support of its factual case on the rationality of its conduct in regard to stranded costs within EU law, Hungary emphasises that, by 2008, it was known that Hungarian generators had achieved extraordinarily high returns under their PPAs; that Dunamenti was the most profitable of these Hungarian generators; that Dunamenti had received at least 125 billion HUF State aid from 2004 onwards; that Electrabel had recovered its own investments and was unlikely to have significant stranded costs (under contemporary analyses);[105] and that Dunamenti's PPA had largely run its contractual term. Hungary also submits that its own conduct was rational in seeking to balance the interests of Hungarian taxpayers and consumers, at a time of financial crisis and Hungary's scarce resources. Hungarian consumers had already shouldered the burden of subsidising Hungarian generators with above-market prices; and, in such circumstances, it would not have been rational for Hungary to make cash payments to Dunamenti. Hungary nonetheless shielded Dunamenti, by way of the set-off, from repayment of the 125 billion HUF as State aid, although such a payment by Dunamenti would have greatly assisted Hungary's budget at that time.

145.    Hungary also relies upon the terms of the Electricity Act 2001. Sections 3, 100 and 115 of the Act addressed stranded costs, expressly or by implication.[106] For present purposes, these are not directly material as regards Dunamenti. However, the 2001 Act was generally understood to advance the development of a competitive electricity market in Hungary. That necessarily meant changes for Dunamenti's PPA. However, Dunamenti, for its own

---

[104] European Commission Submission, 12 June 2009, paragraphs 135-136 (footnotes omitted). This arbitration is, of course, an international arbitration under the ICSID Convention, which contains no similar provision on public policy.

[105] Hungary has asserted (and Electrabel has not contested) that "[both parties'] experts agree that as of 2008, Claimant already had recouped all its investments, including the significant F Unit retrofit and other capital expenditures, and in addition received an 8.4% average annual return above inflation in each year since 1995." Hungary's Counter-Submission on "net stranded costs", 6 December 2013, paragraph 214, citing H1.D5.1324 (Shuttleworth); Mr Kaczmarek's Second Report, paragraph 52, Table 3.

[106] The Electricity Act 2001; C-12; R-288.

reasons, chose to resist any changes to its PPA, deciding not to re-negotiate its PPA with MVM. As explained by Electrabel, citing Mr Bodnar's testimony: with its ICSID arbitral remedy, it "could have been construed as weakening Electrabel's stance in the arbitration to appear to be 'giving up [the] contract' by engaging in contract renegotiations with MVM."[107] Hungary dismisses this attempted justification as a mere tactical manoeuvre by Dunamenti.

146. As regards its own calculations, Hungary submits that these were made on a hypothetical investment in Dunamenti in 1995 (as to 100% ownership). They were not made on Electrabel's own investments in Dunamenti. These calculations showed that such a hypothetical investor fell short of a targeted rate of return on its investment, namely 7.7% (after inflation) to 2008. With only a slightly different rate, the hypothetical investor would have had no stranded costs.

147. Before the PPA Termination Act 2008, Hungary had decided upon "a nearly zero repayable aid by taking the imputable amounts into consideration."[108] In other words, non-re-negotiated PPAs would be terminated in line with the Commission's requirements; but the zero balance concept could avoid the recovery of State aid in the form of actual repayment from the generators to Hungary. Hungary submits that this zero balance concept was intended to shield generators from State aid payments but not to operate as a sword against Hungary, as is now attempted to be deployed by Electrabel.

148. Hungary emphasises that cash compensation for stranded costs would not have facilitated the opening up of the market to competition; that such payments would only distort competition by favouring incumbent generators at the expense of new generators and investors; and, as a result, that the Commission would have been less likely to approve a more generous scheme than the zero balance scheme proposed to it by Hungary. Further, Hungary emphasises that other regulated sectors have been liberalised within the European Union with no provision for stranded costs at all, such as air transport and the telecom

---

[107] H2D1.171 & H2D2.308, citing paragraph 271 of Electrabel's Post-Hearing Submission (first phase) and paragraph 14 of Mr Bodnar's Third Witness Statement.
[108] Preparatory Material regarding the PPA Termination Act, R-262, p. 3.

industries; and that, in the United Kingdom, this was also the position for the electricity sector.[109]

149.   Hungary submits that there is no uniform EU practice for compensating stranded costs, given different PPAs, durations and circumstances for termination. As regards cases where cash payments were made by EU Member States, Hungary disputes that approved "maximum" cash payments were actually made or, if made, Hungary submits that the recipients were largely State-owned. Hungary discounts the relevance of practices in Poland and Portugal in different circumstances.[110]

150.   Hungary also submits that Electrabel's actual stranded costs (past and future) are irrelevant for an alleged breach of the ECT's FET standard. Hungary again emphasises that its calculations for stranded costs were based upon a hypothetical investor, not Electrabel (or Dunamenti). Given the use of a hypothetical investor, Hungary's calculations did not require specific evidence from Dunamenti. Hungary therefore dismisses Electrabel's criticisms in this regard. As Mr Kaczmarek testified (as an expert witness called by Hungary), the figures for such a hypothetical investor and Electrabel are different, with the former's NRI as negative 22.2 billion HUF and Electrabel's NRI a positive 13.1 billion HUF.[111] Moreover, Hungary's calculations assume a rate-of-return that does not reflect Electrabel's actual cost of capital, because the calculations assume a zero value for Dunamenti at the end of the PPA's term (which is not the actual case).[112] These factors all work in Dunamenti's favour. Conversely, stranded costs based on Dunamenti's future actual costs are driven by Dunamenti's own choices, which could significantly inflate stranded costs whilst providing increased revenues for Dunamenti.

151.   Hungary rejects the relevance of Electrabel's case based on the 2001 F Retrofit Agreement. As Dunamenti accepted at the time, by agreeing to the 2001 F Retrofit Agreement, it was waiving any rights to stranded costs from such agreement, as recorded in the proposal to Dunamenti's board dated 28 February 2001 and the board minutes.[113] Clause 3.1 of the

---

[109] Brice Allibert, *Compensations of Stranded Costs in the European Union Electricity Sector*, p. 4; RA-141.
[110] H2D1.227ff.
[111] Mr Kaczmarek's Second Report, paragraph 134, Table 8.
[112] Hungary's Rejoinder on "net stranded costs", 22 April 2014, paragraph 162, citing R-280 (spreadsheet).
[113] R-29, p. 2; C-134, p. 9.

proposed agreement precluded expenses which could not be accepted on the electricity power market price.[114]

152. For all these reasons, Hungary rejects any liability to Electrabel under the ECT's FET standard in regard to stranded costs.

### (4)   THE TRIBUNAL'S ANALYSES AND DECISIONS

153. For what appears to be, essentially, a relatively straightforward case, the issues are many and complicated, as amply confirmed by the Parties' extensive written and oral submissions in this arbitration's two successive phases.

154. *Legal Burden of Proof:* The Tribunal starts with the premise that it is Electrabel which bears the burden of proving its case under the ECT's FET standard. This premise appears uncontroversial as between the Parties, for present purposes.[115] As already noted, however, as regards certain issues relating to causation and mitigation where the Parties dispute where the burden lies, the Parties have agreed to defer these issues to a later stage of this arbitration, to the extent relevant.

155. *Legitimate Expectations:* As regards Electrabel's submissions on legitimate expectations under the ECT's FET standard, the Tribunal finds no evidence that Hungary represented to Electrabel, at the times of its investments in Dunamenti, that it would ever act differently from the way that it did act towards Dunamenti or Electrabel. In the absence of such a representation in this case, as explained below, the Tribunal considers that Electrabel's case on legitimate expectations cannot succeed.[116] The Tribunal recognises (as it did earlier in its Decision) that a specific representation is not always indispensable to a claim advanced under the ECT's FET standard: it might simply make a difference in the assessment of the investor's knowledge and of the reasonableness and legitimacy of its expectations.[117] Even in the absence of a specific representation, however, the investor must establish a relevant expectation based upon reasonable grounds, which Electrabel has failed to do.

---

[114] Clause 3.1 of the MVN-Dunamenti PPA Amendment dated 5 March 2001; C-4.
[115] The Tribunal's Decision, paragraph 3.4.
[116] H2D2.310.
[117] The Tribunal's Decision, paragraph 7.78.

156. Electrabel cannot point to EU law for its expectations, given that Hungary was seeking at all times, necessarily, to comply with EU law, as Electrabel and Dunamenti both knew; and moreover, Electrabel does not base its case on EU law. As decided in the Tribunal's Decision, Electrabel cannot found its case on Hungary's regulated or deregulated pricing, given that it was common knowledge that long-term PPAs could not co-habit, unchanged, with deregulation. Nor can Electrabel expand its understanding that Hungary would seek to 'ameliorate harm suffered by investors' in Hungary's electrical undertakings into a form of State-funded insurance protecting future revenues and profitability during those investments' lifetimes. Electrabel knew (as did Dunamenti) that Dunamenti bore the commercial risks of its operations in Hungary under the PPA in a difficult transitional period towards market liberalisation and membership of the European Union, including the application of EU law and the role of the Commission.

157. Indeed, it is evident from the PPA that Dunamenti bore the risk of a change in the applicable law. Not only did the PPA contain no stabilization clause; Article 3 of the PPA expressly allowed MVM to terminate the PPA without compensation if any obligation became unlawful to perform due to a change in law,[118] which the Tribunal understands to include EU law.

158. Nor did the PPA guarantee any particular return to Dunamenti or Electrabel. The Tribunal refers to the numerous contemporary and confirmatory statements by Electrabel and Dunamenti to such effect, including the former's comments to the Commission by letter dated 13 February 2006: "… The PPA itself does not contain any provision guaranteeing any return whatsoever … the PPA does not guarantee a return on investment without risk, does not contain a guaranteed price for a guaranteed period of time and does not fix any

---

[118] Article 3.2(b)(vi) of the PPA (C-1) provides: "Transmission Company may give the Generator a notice of intended termination of this Agreement upon the occurrence of any of the following events (each a "Generator Event of Default") unless resulting from an event of Force Majeure, a breach by Transmission Company of this Agreement or a Transmission Company Event of Default:[…] (vi) If, at any time it is, or will within 6 Months become, unlawful under the Laws or pursuant to a decision of a court or other decision-making council (the "Relevant Law") in respect of which an appeal has not been filed within the time limit specified under the Laws for the Generator to perform any obligation provided for in this Agreement or other documents related thereto, or, the performance of any obligation by the Generator is, or will within 6 Months become, under any Relevant Law, unenforceable by Transmission Company, and the Parties have not been able to agree on an alternate method of performing such obligation which would not be unlawful or unenforceable, as the case may be, through mutual discussions within 60 Days of Transmission Company becoming aware of the Relevant Law or decision." In turn, Article 3.3(b) provided that "[…] In the event of a Generator Event of Default for which a Termination Notice has been issued, then Transmission Company shall be relieved of all obligations hereunder, including, without limitation, any obligation to pay Availability Fee and Energy Fee."

profit items … To the contrary, under the PPA all operational, legal, environmental, currency, fiscal, etc. risks remain with Dunamenti … … Neither Dunamenti nor Electrabel received any Government or any other contractual guarantee."[119]

159.  It is fair to record that Electrabel has never asserted any State guarantee (or insurance) as such. In its Reply Submission, Electrabel explained that its claim was not based on any guarantee in the PPA; nor was it founded on any specific guarantees as to return of investment, or absolute protection against harmful consequences of EU accession.[120]

160.  Ultimately, Electrabel's case appeared to rest upon a simple representation from Hungary concerning pricing arrangements that Dunamenti would be entitled to a reasonable profit and Electrabel a reasonable return on its investment.[121] Specifically, to that end, Electrabel relies on the following materials:[122]

- Section 55(1) of the 1994 Electricity Act[123], which provides that "[t]he producer [sic], transfer, distribution and supply price (fee) of electricity shall include the recovery of reasonable investments and the costs of the efficiently operating licence holders, as well as the profit necessary for ongoing operation."

- Paragraph 10.2.5 of the Industry Information Memorandum of 9 October 1995[124], stating that "[t]he Act provides for the introduction by 1st January 1997 of a pricing system designed to compensate investors for reasonable capital and operating costs in generation, transmission and supply of electricity as well as to provide investors with a reasonable level of profits to ensure the long-term operation of the industry."

- Paragraph F(i) of the HEO's Stated Position of 21 November 1995[125], which states: "The post-2000 price mechanism can only be established within the framework of the Hungarian legal system (in particular, on the basis of

---

[119] R-97, paragraphs 16, 24, 25 & 29.
[120] Electrabel's Reply Submission on the PPA Termination Claim, 21 February 2014, paragraphs 16(b) & 20.
[121] Electrabel's Reply Submission on the PPA Termination Claim, 21 February 2014, paragraph 40.
[122] Electrabel's Reply Submission on the PPA Termination Claim, 21 February 2014, paragraph 40, footnote 87.
[123] CL-3.
[124] R-5, p. 116.
[125] R-6.

Section 55 of the Electricity Act); on the basis of the regulatory experiences that will have accumulated by then both in Hungary and Europe. Based on our current knowledge and experience, the HEO does not expect radical changes, although prior to the introduction of any new pricing mechanism, another overall price and cost review would be required."

- Section 3.8.1 of the Notice of Forthcoming Tenders for Shares of Companies within MVM of 31 July 1995[126], which stated that "[t]he PPAs will remunerate the Power Generation Companies through an availability fee for the capital costs and an energy fee for the operating costs."

161. In the Tribunal's view, these statements do not amount to a representation (or assurance) that Dunamenti would be entitled to a reasonable profit and Electrabel to a reasonable return on its investment. Moreover, such an alleged entitlement from Hungary would be inconsistent with the terms of the PPA itself (in particular with Article 3) and with the statements made by Electrabel and Dunamenti to the Commission (see above). In this case, the place for such an entitlement would have been in the PPA from 1995 onwards; and, in the circumstances, its omission from the PPA's outset is fatal to Electrabel's case.[127] It was equally absent from the F-Unit 2001 Retrofit Agreement, with the same result.[128]

162. Accordingly, in the Tribunal's view, Electrabel has failed to establish that Hungary made any express or implied representation (or assurance) to Electrabel or Dunamenti regarding State guarantees, guaranteed returns or freedom from regulatory or legal changes consequent upon Hungary's accession to the European Union.

163. The Tribunal has also considered whether Electrabel's case could be maintained in the absence of any specific representation or assurance by Hungary. At its most basic level, could it be decided in the circumstances of this case that Electrabel had a reasonable expectation, created by Hungary, that Electrabel or Dunamenti would be compensated by Hungary for the termination of Dunamenti's PPA at the *maximum* level permitted by EU law under the Commission's methodology for stranded costs?

---

[126] R-3, p. 23.
[127] C-1.
[128] C-4.

164. Assuming that it was in the contemplation of Electrabel, at the time of its investments in Dunamenti, that, if its PPA could constitute unlawful State aid under EU law, Hungary would be required to terminate the PPA as ordered by the European Commission, the Tribunal finds that neither Dunamenti nor Electrabel held or could reasonably have held the expectation that Hungary would provide such *maximum* compensation. Even assuming, as Electrabel claims, that "if the PPA were to be terminated, Electrabel had a legitimate expectation that it would be adequately compensated,"[129] Dunamenti has certainly received a form of partial compensation under Hungary's scheme (by way of set off against repayable State aid). The issue in this case is whether or not, on the facts of this case, such compensation, albeit short of the maximum, is a breach of the ECT's FET standard.

165. There is a related factor important for this case: the Tribunal considers that the application of the ECT's FET standard allows for a balancing exercise by the host State in appropriate circumstances. The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance. As was decided by the tribunals in *Saluka v Czech Republic* and *Arif v Moldova*, an FET standard may legitimately involve a balancing or weighing exercise by the host State. The former tribunal decided, in regard to the FET standard in Article 3.1 of the Netherlands-Czech BIT, after citing the standard definitions of FET standards:

> "[304]. This Tribunal would observe, however, that while it subscribes to the general thrust of these and similar statements, it may be that, if their terms were to be taken too literally, they would impose upon host States' obligations which would be inappropriate and unrealistic. Moreover, the scope of the Treaty's protection of foreign investment against unfair and inequitable treatment cannot exclusively be determined by foreign investors' subjective motivations and considerations. Their expectations, in order for them to be protected, must rise to the level of legitimacy and reasonableness in light of the circumstances.
>
> [305]. No investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged. In order to determine whether frustration of the foreign investor's expectations was justified and reasonable, the host State's legitimate right subsequently to regulate domestic

---

[129] Electrabel's Submission on the PPA Termination Claim, 30 July 2013, paragraph 41.

matters in the public interest must be taken into consideration as well. As the *S.D. Myers* tribunal has stated, the determination of a breach of the obligation of 'fair and equitable treatment' by the host State must be made in the light of the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders.

[306]. The determination of a breach of Article 3.1 by the Czech Republic therefore requires a weighing of the Claimant's legitimate and reasonable expectations on the one hand and the Respondent's legitimate regulatory interests on the other.

[307]. A foreign investor protected by the Treaty may in any case properly expect that the Czech Republic implements its policies *bona fide* by conduct that is, as far as it affects the investors' investment, reasonably justifiable by public policies and that such conduct does not manifestly violate the requirements of consistency, transparency, even-handedness and non-discrimination. In particular, any differential treatment of a foreign investor must not be based on unreasonable distinctions and demands, and must be justified by showing that it bears a reasonable relationship to rational policies not motivated by a preference for other investments over the foreign-owned investment.

[308]. Finally, it transpires from arbitral practice that, according to the 'fair and equitable treatment' standard, the host State must never disregard the principles of procedural propriety and due process and must grant the investor freedom from coercion or harassment by its own regulatory authorities."[130]

166. The Tribunal does not understand that the Parties disagree about the balancing exercise permissible under the ECT's FET standard. Indeed, Electrabel itself cites the *Saluka* and *Arif* awards: see paragraph 125 above. Below, the Tribunal returns to this balancing factor applied to the circumstances of this case. In the Tribunal's view, it precludes Electrabel's case for the maximum compensation permitted under EU law and the Commission's stranded costs methodology. In other words, even assuming that Electrabel had an expectation that it would be awarded the maximum compensation for stranded costs

---

[130] *Saluka* partial award, paragraphs 304-308; CA-21; and *Arif* award, paragraph 537; CA-148.

permitted under EU law, once weighed against Hungary's legitimate right to regulate in the public interest, such an expectation does not appear reasonable or legitimate.

167. *Arbitrariness:* The Tribunal and the Parties have used interchangeably, references to "arbitrariness", "irrationality", "unreasonable", "inequitable" and "disproportionate" treatment, as all amounting for present purposes to much the same concept under the ECT's FET standard, conveniently here collectively addressed as "arbitrariness".

168. As regards Electrabel's case on arbitrariness, applying an objective test in the circumstances prevailing at the relevant time (to which the Tribunal returns), the Tribunal does not find that Electrabel has proven, on the materials adduced in this arbitration, that Hungary's conduct was arbitrary or that there was no legitimate purpose for Hungary's conduct or that Hungary's conduct bore no reasonable relationship to that purpose or was, in another word, disproportionate.

169. It is appropriate to recall, in summary, the five principal arguments advanced by Electrabel in support of its case that Hungary was guilty of arbitrariness in breach of the ECT's FET standard.

170. First, Electrabel argues that Hungary's sole reason for not fully compensating Dunamenti was to reduce the burden on the Hungarian national budget. According to Electrabel, preferring to keep budgetary monies instead of compensating an investor for its losses is not a legitimate regulatory interest. Hungary does not deny that a budgetary concern (or the "protection of taxpayer funds") was one of several factors in deciding not to compensate Dunamenti for its full net stranded costs; but it argues that overall this was a legitimate regulatory interest. That said, Hungary contends that it compensated Dunamenti fairly and to the detriment of its national budget by setting up a scheme whereby Hungarian generators (including Dunamenti) had in principle to make no State aid reimbursements to the State.

171. Second, Electrabel argues that Hungary decided not to compensate Dunamenti before the extent of the actual losses resulting from its PPA's premature termination could have been known, so that Hungary never undertook any balancing of actual interests in making its decisions in regard to its scheme. By contrast, Hungary argues that it made numerous efforts before the PPA's termination to calculate Dunamenti's stranded costs.

172. In this context, it is necessary to recall that both Parties agree that the quantum of damages, i.e. Dunamenti's actual losses resulting from the PPA's termination, is legally irrelevant to the issue of liability. But for such agreement by the Parties, a question could arise as to the likely magnitude of the injury as a relevant factor in the required balancing exercise under the ECT's FET standard. However, with such agreement, the Tribunal must accept that this question does not here arise for its decision. Accordingly, Electrabel's argument that Hungary decided not to compensate Dunamenti before knowing the extent of its actual losses (as distinct from its net stranded costs) is not relevant.

173. Third, Electrabel argues that Hungary could have elected to provide compensation for Dunamenti's net stranded costs and that this would have been approved by the Commission. In this respect, Electrabel contends that compensation for stranded costs (any type of stranded costs) is not unlawful State aid. It points out that several EU Member States (in particular, Poland and Portugal) have compensated generators in similar situations with cash payments for net stranded costs with the Commission's approval. For its part, Hungary argues that the actions of third States cannot bind Hungary, and that in any event none of these cases can be compared to Hungary's case. Had Hungary decided to compensate Hungarian generators (including Dunamenti) for all of their net stranded costs, particularly involving any cash payment, Hungary submits that the evidential record does not establish that the Commission would have likely given its approval – a factual matter on which Electrabel bears the legal burden of proof. In the Tribunal's view, whether the Commission would or would not have given its approval is not decisive. The question is whether, in exercising its discretion in selecting its scheme for the compensation of stranded costs, Hungary acted in an arbitrary manner towards Electrabel.

174. Fourth, Electrabel argues that Hungary represented that it would provide Hungarian generators with compensation for net stranded costs, but then changed its mind. Hungary contends that it never made any such representation. In the Tribunal's view, Electrabel has failed to establish that Hungary made such a representation: at most, Hungary indicated that it would compensate generators in accordance with the Commission's Methodology,[131]

---

[131] R-95, p. 9.

or that it would pay some stranded costs,[132] but it did not affirmatively state that it would pay all stranded costs

175. Fifth, Electrabel argues that Hungary did provide MVM compensation for the costs of market liberalisation. Hungary argues that this decision was not arbitrary and benefited Dunamenti by perpetuating above market prices, accruing to its benefit. (It should not be forgotten that MVM was a shareholder in Dunamenti). In the Tribunal's view, a mere showing of differential treatment is not sufficient to establish unlawful discrimination or, in this context, irrationality in breach of the ECT's FET standard. For discriminatory treatment, comparators must be materially similar; and there must then be no reasonable justification for differential treatment.[133] Electrabel has not established that MVM's situation was materially similar to that of Dunamenti or Electrabel itself.

176. Of Electrabel's five arguments summarised above, it is necessary below to concentrate the Tribunal's analysis on the first and (as regard net stranded costs) part of the second.

177. *Stranded Costs:* As an objective test, it was publicly well known before 1995 that significant changes were coming with Hungary's approach towards membership of the European Union. Later, in its "Privatisation of the Power and Natural Gas Industries in Hungary and Kazakhstan" of 1999, the World Bank noted that new owners (following privatisation) "indicated that they accounted for, particularly in their mid and longer term marketing strategies and plans, the expected changes due to [Hungary's] EU accession."[134] As to such changes, the 1999 International Energy Report, "Energy Policies of IEA Countries: Hungary 1999 Review", recorded: "Since market participants already know that competition is likely to be introduced soon, they have an opportunity to avoid stranded costs by refraining from building above-market, expensive capacity or concluding contracts at excessive costs now."[135] In the Tribunal's view, there is no credible evidence adduced in this arbitration that Electrabel and Dunamenti held any different views.

178. Accordingly, from long before the PPA's termination on 1 January 2009, Electrabel and Dunamenti cannot reasonably have expected to escape the possible consequences of

---

[132] R-19, p. 19.
[133] For example, see the *Saluka* partial award, paragraph 313; CA-21.
[134] R-21, p. 75.
[135] R-16, p. 120.

Hungary's membership of the European Union, including market deregulation and liberalisation and the application of EU law on State aid and stranded costs. As was decided by the tribunal in *AES v Hungary*, "… any reasonably informed business person or investor knows that laws can evolve in accordance with the perceived political or policy dictates of the times …" and "… the fact that an issue becomes a political matter, … does not mean that the existence of a rational policy is erased."[136]

179. *Standard for "Arbitrariness":* As already indicated above, this Tribunal agrees with the *Saluka*,[137] *AES*,[138] and *Micula*[139] tribunals in that a measure will not be arbitrary if it is reasonably related to a rational policy. As the *AES* tribunal emphasised, this requires two elements: "the existence of a rational policy; and the reasonableness of the act of the state in relation to the policy. A rational policy is taken by a state following a logical (good sense) explanation and with the aim of addressing a public interest matter. Nevertheless, a rational policy is not enough to justify all the measures taken by a state in its name. A challenged measure must also be reasonable. That is, there needs to be an appropriate correlation between the state's public policy objective and the measure adopted to achieve it. This has to do with the nature of the measure and the way it is implemented."[140] In the Tribunal's view, this includes the requirement that the impact of the measure on the investor be proportional to the policy objective sought. The relevance of the proportionality of the measure has been increasingly addressed by investment tribunals[141] and other

---

[136] *AES Summit Generation Limited and AES-Tisza Erömü Kft v Hungary* (ICSID Case No. ARB/07/22), Award of 23 September 2010 (von Wobeser, Stern, Rowley) ("*AES* award"), paragraphs 9.3.34 and 10.3.23; CA-99.

[137] *Saluka* partial award, paragraph 307; CA-21 (particularly, "… A foreign investor protected by the Treaty may in any case properly expect that the Czech Republic implements its policies *bona fide* by conduct that is, as far as it affects the investors' investment, reasonably justifiable by public policies and that such conduct does not manifestly violate the requirements of consistency, transparency, even-handedness and nondiscrimination. In particular, any differential treatment of a foreign investor must not be based on unreasonable distinctions and demands, and must be justified by showing that it bears a reasonable relationship to rational policies not motivated by a preference for other investments over the foreign-owned investment ...")

[138] *AES* award, paragraphs 10.3.7-10.3.9; CA-99.

[139] *Micula* award, paragraph 525; CA-161, (citing *Saluka* and *AES*).

[140] *AES* award, paragraphs 10.3.7-10.3.9; CA-99.

[141] *See* e.g. *Técnicas Medioambientales Tecmed, S.A. v United Mexican States* (ICSID Case No. ARB (AF)/00/2), Award of 29 May 2003 (Grigera Naon, Fernandes Rozas, Bernal Verea), paragraph 122; CA-17; *Azurix* award, paragraphs 311-312; CA-13; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v Argentine Republic* (ICSID Case No. ARB/02/1), Decision on Liability of 3 October 2006 (de Maekelt, Rezek, van den Berg), paragraph 195; CA-130; *MTD* award, paragraph 109; CA-12; *EDF* award, paragraph 293; RA-69; *Continental Casualty Company v Argentine Republic* (ICSID Case No. ARB/03/9), Award of 5 September 2008 (Sacerdoti, Veeder, Nader), paragraph 232; RA-11. *See also* R. Kläger, *'Fair and Equitable Treatment' in International Investment Law* (2011, Cambridge), pp. 128 (footnote 434) and 236-245.

international tribunals, including the ECtHR.[142] The test for proportionality has been developed from certain municipal administrative laws, and requires the measure to be suitable to achieve a legitimate policy objective, necessary for that objective, and not excessive considering the relative weight of each interest involved.[143]

180. *Scope of Discretion*: Once a measure meets the test articulated above, a State has a wide scope of discretion to determine the exact contours of the measure. That requires a balancing or weighing exercise so as to ensure that the effects of the intended measure remain proportionate in regard to the affected rights and interests.[144] Provided that there is an appropriate correlation between the policy sought by the State and the measure, the decision by a State may be reasonable under the ECT's FET standard even if others can disagree with that decision. A State can thus be mistaken without being unreasonable. It is therefore no proof of unreasonableness, by itself, that other States have taken different decisions in regard to net stranded costs, as advocated by Electrabel, particularly in regard to Poland and Portugal. Moreover, the Tribunal is not convinced that the position of these two States was materially similar to Hungary so as to provide any useful benchmark of reasonableness in regard to Hungary in the present case.

181. The Tribunal also notes that Hungary's scheme was not devised by the Hungarian Parliament for Dunamenti alone, but for an industrial sector comprising other Hungarian generators. These were also turbulent economic times, with Hungary's economy facing severe financial and fiscal constraints. Hungary's negotiations with the Commission were difficult and protracted. It is all too easy, many years later with hindsight, to second-guess a State's decision and its effect on one economic actor, when the State was required at the time to consider much wider interests in awkward circumstances, balancing different and competing factors. Further, even as regards a single actor such as Dunamenti, Hungary

---

[142] *See* ECtHR, *In the Case of James and Others*, Judgment of 21 February 1986, paragraphs 50 and 63.
[143] *See* Benedict Kingsbury and Stephan W. Schill, *Public Law Concepts to Balance Investors' Rights with State Regulatory Actions in the Public Interest – The Concept of Proportionality, in International Investment Law and Comparative Public Law*, Stephan W. Schill, ed. (OUP, 2010), pp. 75-104.
[144] *See MTD Equity Sdn. Bhd. and MTD Chile S.A. v Republic of Chile* (ICSID Case No. ARB/01/7), Award of 25 May 2004 (Sureda, Lalonde, Blanco) ("*MTD* award"), paragraph 109, CA-12; *EDF* award, paragraph 293, RA-69; *Occidental Petroleum Corporation and Occidental Exploration and Production Company v Republic of Ecuador* (ICSID Case No. ARB/06/11), Award of 5 October 2012 (Fortier, Williams, Stern dissenting) ("*Occidental* award"), paragraphs 404-409 & 427; CA-160. This part of the *Occidental* award is unaffected by the decision of the ICSID annulment committee of 2 November 2015, partially annulling the award; *see also* R. Kläger, *'Fair and Equitable Treatment' in International Investment Law* (2011, Cambridge), pp. 128 (footnote 434) and 236-245.

sought to balance several factors, such as its legal duty to recover unlawful State aid from Dunamenti and its willingness to accommodate Dunamenti for its stranded costs.

182. In the Tribunal's view, this balancing exercise is aptly illustrated by the figures referred to in paragraph 104 above, as displayed by Hungary's demonstrative exhibit RD3 submitted at the beginning of the Second Hearing. In its earlier Decision, the Tribunal had noted an apparent lack of symmetry in Hungary's scheme as regards its effect on calculating compensation for Dunamenti's net stranded costs. The Tribunal there noted: "The scheme's first stage is now complete; whilst the second stage lies in the future ... On Hungary's own calculations, however, it is clearly possible that Dunamenti will not recover compensation in the sum of HUF 22,171,991[000] for its net stranded costs under the second stage of Hungary's scheme. As finally calculated by Hungary, this figure could of course be lower, non-existent or even negative; but it could also be significantly higher …"[145] If higher, there would be no payment (or other compensation) by Hungary, leaving Dunamenti with eligible stranded costs.

183. During the Second Hearing, Hungary explained its scheme further, using its demonstrative exhibit RD3 during its oral opening and later submissions (shown below).[146] Hungary asserted that there was no asymmetry but, rather, that its discretionary exercise was generous to Dunamenti. The table's base-line showed a range of "-125" to "0" and ending in "+22", signifying respectively the 125 billion HUF which Hungary could recover from Dunamenti as unlawful State aid, zero "as Hungary's choice", and the 22 billion HUF as the balance of Dunamenti's stranded costs (the "buffer"). By adding the 125 billion to the 22 billion, the resulting figure of 147 billion HUF represented the total maximum amount of eligible stranded costs for Dunamenti. Accordingly, so Hungary submitted, any asymmetry should take into account the fact that Hungary's choice of zero was much closer to the maximum positive 22 billion (i.e. 147-125 billion) than to the negative maximum 125 billion. It is necessary to emphasise that all these figures were already in evidence and that exhibit RD3 only illustrated them in a more dramatic form.

---

[145] The Tribunal's Decision, paragraph 6.109.
[146] H2D.140ff & 204ff; H2D2.342ff.



184. As Hungary concluded at the Second Hearing: "So, in understanding the scope of Hungary's discretion, it's important to dispose of some strawmen that Claimant has repeated. The first is that where Hungary actually drew its line [zero] didn't involve any compensation to Generators, and that's simply wrong. Anything other than the left-hand pole of the chart [i.e. 0 to -125], anything other than recovery of the full 125 billion HUF of State aid previously paid to Dunamenti does constitute compensation already to Dunamenti on account of Stranded costs …"[147] To the extent that there was any asymmetry at all, Hungary submitted that its origins lay with the outer boundaries imposed by the Commission and EU law, not with Hungary.

185. In the Tribunal's view, to assess whether there is a lack of symmetry in Hungary's compensation scheme, it is necessary to compare the impact of the compensation scheme on Dunamenti with the impact it had on Hungary. The Commission required Dunamenti to repay the State aid received during the life of the PPA, and this State aid was quantified at 125 billion HUF. In turn, Dunamenti's total eligible stranded costs (as calculated by Hungary and confirmed by the Commission) amounted to 147 billion HUF. The

---

[147] H2D1.143.

Commission's methodology allowed Hungary to compensate these stranded costs in whole or in part, or not at all. In other words, Hungary had a choice, at one end of the spectrum, to compensate nothing and receive a cash payment from Dunamenti in the amount of 125 billion HUF, and at the other end of the spectrum, to receive repayment of State aid in the amount 125 billion HUF (in the form of a set off) *and* a cash payment to Dunamenti for its net stranded costs of 22 billion HUF.

186. Hungary's choice was closer to the latter than the former: it chose to compensate 125 billion HUF (i.e. 85% of Dunamenti's eligible stranded costs as approved by the Commission), by setting them off against the 125 billion HUF it was entitled to receive as State aid. As a result, although Hungary had the possibility of receiving 125 billion HUF in cash, it forewent this possibility in order to compensate Dunamenti for 85% of its eligible stranded costs (subject to the claw-back). Although Dunamenti did not receive compensation for 100% of its eligible stranded costs, the Tribunal finds that Hungary's exercise of its discretion was reasonable and proportionate.

187. It is however here necessary to address a procedural quirk whereby, curiously, Hungary later objected to the Tribunal referring to its own demonstrative exhibit RD3. Unfortunately, it was not entirely clear to the Tribunal on what basis this objection was made by Hungary; and it remained unclear at the end of the Second Hearing whether Hungary still maintained its full objection to the Tribunal considering exhibit RD3, as a demonstrative of no evidential value in and of itself (given that it only recorded figures already in the evidential record). In brief, it appeared that Hungary submitted that the figures illustrated in RD3 did not yet exist in 2008, which was therefore too late (on that part of its case) for the relevant time under any test of irrationality.[148] Hungary appeared to submit that the relevant time stopped at its implementation of the Commission's Final Decision dated 4 June 2008, namely not later than the PPA Termination Act 1998.[149] Hungary also expressed its submission as both a jurisdictional objection (for the first time) and a point on the merits as to liability.[150]

---

[148] H2D2.273.
[149] H2D2.378-382.
[150] H2D2.346-351 & 378ff.

188.  Given that (i) exhibit RD3 merely illustrated figures which had long been introduced by the Parties into this case's evidential record; and (ii) exhibit RD3 had been voluntarily introduced as a demonstrative by Hungary itself and then much discussed by both Parties earlier in the Second Hearing (without any reservation by Hungary at that time), it is not appropriate for the Tribunal to treat Hungary's submission as a timely jurisdictional objection. That belated objection, if it was eventually maintained by Hungary, is therefore rejected. The Tribunal must nonetheless here address Hungary's submission as a point on the merits, given the significance which the Tribunal attaches to the figures demonstrated in exhibit RD3 for the purpose of this Award.

189.  The Tribunal has rejected, for several reasons, Hungary's submission that the test for irrationality should be frozen in 2008, without any regard for Hungary's subsequent calculations of Dunamenti's State aid, stranded costs and net stranded costs (as recorded in exhibit RD3) or other relevant events subsequent to 2008, including the Commission's Compensation Decision dated 27 April 2010.[151]

190.  First, the Tribunal rejects Electrabel's allegation that Hungary breached the ECT's FET standard in not preparing and successfully submitting to the European Commission a more generous scheme for Dunamenti. This was a scheme proposed in the PPA Termination Act 2008 for an industrial sector in Hungary; it could not be tailored to meet only Dunamenti's particular demands; and there is no cogent evidence that the Commission would have approved a more generous (or less ungenerous) scheme. In any event, as decided in paragraph 173 above, that is not the decisive issue. Hence, in the Tribunal's view, the relevant time for the correct test for irrationality must include the Commission's Compensation Decision dated 27 April 2010 and Hungary's subsequent responses.

191.  Second, as pleaded by Electrabel, its claim is made in regard to Hungary's failure to compensate it for the premature termination of Dunamenti's PPA, with only the measure of such loss constrained (by EU law) to the amount of net stranded costs. Electrabel does not plead, as such, any breach by Hungary of its obligation to pay net stranded costs.[152] Hence,

---

[151] C-199.

[152] H2D2.292 (Counsel for Electrabel]: "… We say that the obligation is not the payment of Net Stranded Costs. It is the obligation to compensate Electrabel for the loss of the PPA, and we are now restricted to the question of non-payment of Net Stranded Costs because of the Tribunal's findings about the applicable law and the applicability in particular of the European law.").

also in the Tribunal's view, the relevant time for any test for irrationality must include the time when Hungary implemented the Commission's Compensation Decision dated 27 April 2010, i.e. its attempt to compensate Dunamenti for the premature termination of its PPA.

192.    This is not a conclusion adverse to Hungary's case, given the Tribunal's decisions below as to the rational basis for the scheme's application to Dunamenti, assessed at the relevant time (without hindsight). To the contrary, in the Tribunal's view, Hungary's case would be significantly weaker if the clock were stopped in 2008. Moreover, as Hungary rightly accepted elsewhere: "To the extent later events shed light on things that are relevant to the alleged wrongful act, of course, you can always look at them …"[153] The Tribunal has decided that it is here legitimate to do so, even if (contrary to its view), the time for assessing a possible breach of the ECT's FET standard occurred in 2008. It is only necessary to add that Electrabel did not object to the introduction of exhibit RD3 as a demonstrative exhibit.

193.    *Relevant Time to Assess "Arbitrariness":* In its Decision, as regards the PPA Pricing Claim, the Tribunal decided upon the issue of the relevant timing to determine when a legitimate expectation had arisen, as follows: "As regards the relevant point in time for the assessment of legitimate and reasonable expectations, it is common ground in 'investment jurisprudence' and between the Parties that the assessment must refer to the time at which the investment is made … ."[154] The question remains, however, as what is that relevant time for assessing the alleged wrong under the FET standard on the facts of this case.

194.    In the Tribunal's view, as already indicated, it could not pre-date the Commission's Compensation Decision dated 27 April 2010 which approved (or, rather "decided not to raise any objections" to) Hungary's scheme for stranded costs as regards (inter alia) Dunamenti.[155] Accordingly, the Tribunal considers that it is appropriate for the Tribunal to take into account events subsequent to the PPA Termination Act 2008 and the Commission Compensation Decision 2010, even where both events post-date the commencement of this

---

[153] H2D2.357.
[154] The Tribunal's Decision, paragraph 7.76. To the legal materials there cited, Electrabel added the awards in *Arif v Moldova*, paragraphs 537 & 547(e); CA-148; and *Bogdanov v Moldova*, paragraph 4.2.4.8; CA-123. *See* Electrabel's Reply Memorial, 16 September 2009, paragraph 116; *see also* Hungary's Counter-Memorial, 15 May 2009, paragraphs 427-428.
[155] C-199, paragraph 71.

arbitration. In order to explain the Tribunal's approach, given the controversy raised by this issue, it is next necessary to re-examine the Parties' respective submissions made during this arbitration's first phase, read together with the Tribunal's Decision, even if it means going over several matters which have already been considered above.

195. Electrabel's submissions were summarised by the Tribunal at paragraphs 6.24 and 6.35 of the Tribunal's Decision. The Tribunal noted that Electrabel submitted that since Dunamenti had considerable stranded costs in excess of any recoverable State aid, this factor contradicted Hungary's assertion that Dunamenti's PPA had to be terminated under the 2008 Act (as of 1 January 2009), and thus supported Electrabel's case on Hungary's breach of the FET standard and its case on unlawful expropriation without compensation. Hungary's submissions were summarised by the Tribunal at paragraph 6.42 of the Tribunal's Decision. The Tribunal noted that Hungary submitted that it did not deny Electrabel the opportunity to comment on the calculations of State aid and stranded costs.

196. The Tribunal's Decision also addressed net stranded costs in paragraphs 6.94 to 6.118 of the Decision. The Tribunal noted that stranded costs referred to the difference between: (i) relevant investment costs; and (ii) relevant revenues generated in the past and to be generated in the future up to the notional end of the PPA's term in the future.[156]

197. The Tribunal's Decision recorded that Hungary's compensation scheme for stranded costs was to be calculated in two stages.[157] At stage one, any stranded costs calculated as at the compensation date would be set off by the recovery of unlawful State aid. If the State aid exceeded the stranded costs as at that date, a payment would be made by the generator to the State, but the reverse would not occur. Accordingly, if the stranded costs exceeded the State aid, those losses would be borne by the generator. At stage two, also known as the "claw-back mechanism", each generator's revenues and costs would be finally calculated at the expiry of the relevant PPA's original term. If the balance of State aid and stranded costs had benefitted the generator at stage one, a final payment would be required by the generator to be made to the State; but, again, the reverse would not occur. Accordingly, no payment would be made by Hungary to the generator if at stage one the State had

---

[156] The Tribunal's Decision, paragraph 6.96.
[157] The Tribunal's Decision, paragraphs 6.99-6.102.

recovered a higher sum than it was in fact owed, or otherwise (e.g. if there remained net stranded costs).

198. At stage one, as explained above, Dunamenti's net stranded costs were calculated to be approximately 22 billion HUF,[158] with no payment to Dunamenti. At paragraph 6.109 of the Tribunal's Decision, the Tribunal noted that at the conclusion of stage two, the amount of 22 billion HUF might not be paid to Dunamenti. The Tribunal noted that the eventual amount might be lower, non-existent, negative or indeed significantly higher than this figure. It was then impossible to quantify Dunamenti's actual net stranded costs. The Tribunal determined that because that final figure lay in the uncertain future, it was not possible for the Tribunal to predict what the final figure for net stranded costs would be.

199. The Tribunal's conclusion, reached in the Tribunal's Decision, raised the question whether as a matter of legal principle it is possible for a breach of the FET standard to be dependent upon the quantum of loss as it continues to accrue into the future, or whether the question of breach, however difficult, must be assessed as at the date of the alleged breach without any regard to the quantum of any subsequent loss. In this second phase of the arbitration, as already recorded above, Electrabel submitted that quantum was not a relevant factor for any breach of the ECT's FET standard; and that non-payment of compensation short of any net stranded costs to Dunamenti was in and of itself a breach of the FET standard.[159] Electrabel contended, correctly, that both Parties agreed upon this approach to quantum as an irrelevant factor.[160] Electrabel also argued that, if quantum was relevant, then Dunamenti's net stranded costs were significantly higher than 22 billion HUF.[161]

200. If any stranded costs were awarded to Dunamenti by Hungary, Electrabel also accepted that, in order to obtain approval from the Commission, those costs would have to have been calculated on an *ex ante* basis, not an *ex post* basis.[162] Thus, according to the methodology adopted by Hungary, 22 billion HUF was the maximum that Hungary could have paid to Dunamenti with authorisation from the Commission.[163] However, according to Electrabel, Hungary presented the relevant figures inaccurately and the correct figures

---

[158] The Tribunal's Decision, paragraph 6.106.
[159] H2D1.14-15.
[160] H2D1.35.
[161] H2D1.37.
[162] H2D1.106-9.
[163] H2D1.110.

were much higher.[164] Therefore, according to Electrabel, in order to give *effet utile* to the Commission's Decision, Electrabel's loss ought to be calculated by reference to "the maximum Stranded Costs that could have been asked for under the Commission's Methodology."[165]

201. Electrabel also argued that the Commission's ability to amend its Decision in the event that this Decision was overturned in Dunamenti's (then) pending legal proceedings in Luxembourg, as recorded in paragraph 4.70 of the Decision, was reflective of the general principle of cooperation under EU law, being now derived from Article 4 of the TEU.[166] Accordingly, so Electrabel argued, any relevant changes ought to be reassessed by Hungary with the Commission; and such reassessments would take precedence over any *ex ante* calculation, it being a principle derived from the TEU.

202. Electrabel further argued that the Tribunal could take into account the existing figures for the purpose of determining liability.[167] If the eventual result on net stranded costs turned out to be lower than these figures, there would be no claw-back.[168] Conversely, Electrabel appeared to argue that there would be no further payment of stranded costs if the eventual result were higher.

203. During the Second Hearing, the Tribunal invited Electrabel to clarify its primary case, namely whether quantum of damage could ever be relevant to a finding of breach of the FET standard under the ECT.[169] Electrabel acknowledged, as summarised above, that it could be relevant in principle, but not in this case because Electrabel's claim was made in respect of non-payment of any compensation, rather than a claim that the compensation was unfair.[170]

204. In response, Hungary submitted that a breach of the ECT's FET standard could not be evaluated with hindsight in the light of subsequent events.[171] Hungary contended that the relevant time for assessing rationality is the time at which the State acted with the

---

[164] H2D1.118-123.
[165] H2D1.123.
[166] H2D2.274-276.
[167] H2D2.281.
[168] H2D2.285.
[169] H2D2.291-293.
[170] H2D2.292-293.
[171] H2D1.131-132.

knowledge that it had at the time: "a State can't be penalized for acting rationally based on the information that it had just because events subsequently unfolded in a different way."[172] However, the Tribunal notes that such is not the issue here, where a State's conduct at the relevant time can be understood better by a subsequent event, namely the Commission's Compensation Decision dated 27 April 2010.

205. Hungary also submitted that stranded costs were awarded by Hungary to the level of the State aid, which was an exercise of discretion;[173] that this figure had to be calculated on an *ex ante* basis because that was the applicable methodology, and that the *ex ante* figure could only be revised down later, which Hungary stated (correctly) was an uncontested point as between the Parties.[174] Hungary further submitted that if the Tribunal took the view that the non-payment of net stranded costs was asymmetrical, then the complaint must lie against the Commission, since Hungary had no discretion to go beyond the *ex ante* maximum. Hungary contended that a finding of liability could not turn upon the question whether Electrabel had suffered damages or upon the quantum of any loss; and thus a finding of liability could not be reverse-engineered, particularly if the figure cannot be known for years into the future.[175]

206. Hungary addressed the possibility that the European Commission might be willing to accept an adjustment to compensation for net stranded costs.[176] It argued that this would require Hungary's notification to the Commission for approval; and that it would be limited to the *ex ante* maximum. Hungary further argued that the European Commission could not change its position on compensation unless the Commission's Final Decision on State Aid dated 4 June 2008 were annulled by the General Court or the European Court of Justice in Luxembourg.[177]

207. Hungary argued that the questions posed by the Tribunal as to timing of the payments reflected broad questions about whether it would be fair for Hungary to pay cash to Dunamenti if, after 2015, Dunamenti struggled more in the free market than was

---

[172] H2D1.131-132.
[173] H2D1.143.
[174] H2D1.145-6.
[175] H2D1.218-9.
[176] H2D1.240-241.
[177] H2D1.251.

anticipated in 2008 or 2009.[178] Hungary argued this was not permitted in principle. The threshold question is what did Hungary do wrong under the ECT at the relevant time.[179] A second question was whether the Tribunal could have any jurisdiction in respect of future acts or omissions by Hungary that might breach the ECT. In other words, if the final calculation were to require higher figures in favour of Dunamenti, then a decision at that time by Hungary not to pay might give rise to a separate and new claim under the ECT – but, as Hungary emphasised, that was not a claim before this Tribunal.[180]

208.    As to Electrabel's submission on the principle of sincere cooperation under Article 4(3) of the TEU, Hungary argued that such a principle was not relevant, as indicated above.[181] Hungary submitted that compensation was bound to the *ex ante* approach so as to ward off perverse incentives influencing Dunamenti, e.g. (as an extreme case) Dunamenti's management might otherwise buy Lamborghinis and seek to charge them to Hungary.[182]

209.    *Summary and Conclusion:* The Tribunal has set out the Parties' submissions on timing at some length because ultimately, perhaps somewhat surprisingly, they amount to a material consensus for the purpose of this Award. Taking that approach into account, the Tribunal here summarises its principal conclusions:

210.    First, in this particular case, the issue of liability under the ECT's FET standard, as now disputed between the Parties, does not raise any issue of quantum as such; and it can thus be decided by the Tribunal without any further evidence of loss by Dunamenti or Electrabel, still less the eventual calculations of Dunamenti's final net stranded costs (actual or hypothetical). The Parties are clearly agreed on this; and, in the circumstances, for the purpose of this particular case, the Tribunal must accept their joint approach.

211.    Second, the calculation of net stranded costs by Hungary could only be made upon an *ex ante* basis at the outset and not subsequently upon any *ex post* basis. This results from EU law, the Commission's Stranded Costs Methodology and the Commission's Compensation Decision. It was not open to Hungary to adopt an *ex post* approach to Dunamenti's net stranded costs into the future; but, even if it were, the Tribunal would not find in this case

---

[178] H2D2.328-329.
[179] H2D2.333.
[180] H2D2.335-342.
[181] H2D2.393.
[182] H2D2.407.

that a mere failure to adopt an *ex post* scheme could by itself amount to a breach of the ECT's FET standard. Nor was it irrational for Hungary to calculate Dunamenti's stranded costs upon a hypothetical basis: it would have been difficult to do otherwise; and, moreover, Dunamenti was afforded sufficient opportunity by Hungary (especially HEO) to comment on Hungary's methodology.[183]

212. Third, in these circumstances, the relevant time for addressing the issue of whether or not Hungary violated the ECT's FET standard is the date when Hungary implemented its scheme towards Dunamenti, namely following its receipt of the Commission's Compensation Decision dated 27 April 2010 approving that scheme. It was not 2008. Until the Commission had approved that scheme, it was effectively writ in water notwithstanding the termination of Dunamenti's PPA, with effect from 1 January 2009 under the PPA Termination Act 2008.

213. Fourth, Hungary was necessarily required to perform a difficult balancing exercise in implementing the Commission's Decision and Compensation Decision. It had of course to apply EU law; it had to consider the position of affected Hungarian generators (including Dunamenti); and it had also to consider the position of Hungarian electricity consumers who had subsidised those generators for many years with above-market prices.

214. In such circumstances, the Tribunal finds that Hungary's decision to compensate Dunamenti for 85% of its total eligible stranded costs through a set off of those costs against the State aid that Dunamenti was required to repay was reasonably related to a legitimate policy objective. The legitimate policy objective here is not, as Electrabel claims it is, Hungary's goal to protect the State budget and "keep the money." As Electrabel itself has argued, the measure in question is the termination of the PPA without payment of compensation, not Hungary's failure to pay net stranded costs as such.[184]

215. The legitimate government policy sought by Hungary was the alignment of its electricity sector with the EU market and the elimination of distortions to competition within and without Hungary. As set out by the Commission's Final Decision on State Aid, which has now been confirmed by the General Court and the ECJ, this required the termination of the PPAs. Under the Commission's Methodology, Hungary was also allowed to compensate

---

[183] R-168; *see also* the Commission's Decision of 4 June 2008, paragraphs 21-23.
[184] *See* footnote 156 above.

generators for stranded costs, but it was not required to do so. The choice fell squarely on Hungary. In deciding how much of those stranded costs it would compensate, Hungary carried out a balancing exercise between the interests of generators and those of tax-payers; and it decided to pay 85% of Dunamenti's stranded costs through a set off of those costs against the State aid that Dunamenti was required to repay. In doing so, Hungary forewent a cash payment of 125 billion HUF in State aid that it was entitled to request from Dunamenti.

216. In the Tribunal's view, this is hardly evidence of an intention to "keep the money", as Electrabel claims. It is also significant that Hungary took this decision at a time in which it was emerging from massive political and economic changes, exacerbated by budgetary constraints caused by the global economic and financial crisis.

217. Fifth, on the evidence, the Tribunal does not accept Electrabel's submission that Hungary, with the Commission's approval, could have procured under EU law at any time an upwards adjustment favouring Dunamenti as regards future events in regard to stranded costs (other than a relevant judgment from Luxembourg invalidating the Commission's Final Decision on State Aid dated 4 June 2008 – which did not occur). Moreover, under Article 4(3) of the TEU, the principle of co-operation could not be deployed to modify Hungary's scheme; and, in effect, the figure of 22 billion HUF could not be revised upwards whatever the future held for Dunamenti in Hungary.

218. Accordingly, as regards Electrabel's claim in respect of net stranded costs under the ECT's FET standard, the figures emanating from Hungary's scheme are the relevant figures applied *ex ante* in 2010, both as a matter of EU law and the ECT.

219. The Tribunal decides that the figures set out in paragraph 104 above in respect of Dunamenti (as there demonstrated from the factual evidence) have not been proven by Electrabel to be wrongfully unreasonable, irrational, arbitrary, unfair, inequitable or disproportionate in violation of the ECT's FET standard. Given the balancing exercise required of Hungary, it would be unduly simplistic to assert that Hungary should have paid the sum of 22 billion HUF in cash to Dunamenti and that a failure to do so necessarily amounted to a violation of the ECT's FET standard. The Tribunal rejects that proposition. There is no balancing exercise if the scale is pre-determined to tip completely towards the

investor. Whether the Tribunal, acting in Hungary's shoes, would have come to a different figure from Hungary is not the right question under the ECT's FET standard. The Tribunal is not a court of appeal. Rather, the question is whether Hungary, at the relevant time, acting in good faith, could have arrived at that figure in a rational manner under the ECT's FET standard, as set out in paragraph 179 above. The Tribunal answers that question in favour of Hungary.

220. In the Tribunal's view, there is a broad symmetry in the relevant figures reflecting Hungary's rational balancing exercise. Further, if there were any asymmetry, it favoured not Hungary but Dunamenti and (indirectly) Electrabel. As Hungary submitted, Hungary's choice of zero lies much closer to the positive figure of 22 billion HUF than to the negative figure of 125 billion HUF for recoverable State aid, thereby directly and immediately benefiting Dunamenti by 125 billion HUF (i.e. 147 billion − 22 billion HUF). As a balancing exercise, in the Tribunal's view, the balance was therefore tilted in Dunamenti's favour; it was certainly not tilted in favour of Hungary; and, overall, it was a rational exercise of Hungary's discretion.

221. The Tribunal rejects any bad faith and any unfair or improper motive for Hungary's scheme, as asserted by Electrabel, for want of any cogent evidence to such effect. Moreover, the direct and immediate benefit of 125 billion HUF granted by Hungary to Dunamenti (by way of set off) also contradicts Electrabel's submission: it was not, on any view, an insignificant sum.

222. Finally, as decided above, the Tribunal has dismissed Electrabel's claim based on legitimate expectations at the times of its investments.

223. For all these reasons, the Tribunal dismisses Electrabel's remaining case as to liability under the ECT's FET standard in respect of its PPA Termination Claim. As regards the Parties' respective prayers for relief set out above, the Tribunal therefore declares that Hungary has not breached Article 10(1) of the ECT; and that Electrabel's PPA Termination Claim is therefore dismissed.

224. The Tribunal notes that its decision in regard to the PPA Termination Claim might be considered to be at variance with the recent award in *E.D.F. v Hungary* ("*E.D.F.*

UNCITRAL award").[185] The Tribunal has considered the Parties' written submissions to different effects of 4 March 2015 (Electrabel) and 26 June 2015 (Hungary). By letter of 3 July 2015, Electrabel waived its right of reply to Hungary's written submissions. It would of course be inappropriate for this Tribunal to dissect the *E.D.F.* UNCITRAL award in search of the evidence and arguments addressed to that tribunal. This Tribunal is required to decide the arguments advanced by the Parties in this arbitration based on the evidence adduced by the Parties in these proceedings. It cannot be influenced therefore by the result of a different arbitration, where an investor's claim appears to have been formulated differently and decided on different arguments and evidence: the Tribunal refers, for example, to paragraphs 465-467 and 637 of the *E.D.F.* UNCITRAL award, with paragraphs A1-7 of Hungary's submission of 26 June 2015.

225. The Tribunal also notes, in particular, that the *E.D.F.* UNCITRAL award did not compensate the claimant investor for the maximum amount of net stranded costs attributed to its subsidiary (Budapesti Erömü Zrt). The *E.D.F.* tribunal awarded €107 million as compensation calculated on a different basis, whereas the total figure for net stranded costs was apparently €300 million, leaving uncompensated net stranded costs far in excess of such compensation: see paragraph 681 of the *E.D.F.* UNCITRAL award.[186] The Tribunal understood from the Parties that the *E.D.F.* UNCITRAL award was the subject of legal proceedings in Switzerland. It now understands, from public sources, that an application to annul the award was rejected by the Swiss Federal Tribunal by its judgment of 6 October 2015.

226. For all these reasons, despite its distinguished tribunal, the Tribunal could derive no material assistance from the *E.D.F.* UNCITRAL award for the purpose of its decisions in this Award.

227. It follows from this Award, read with the Tribunal's earlier Decision, that all the substantive claims made by Electrabel in this arbitration are dismissed by the Tribunal.

---

[185] *E.D.F. International v Hungary* (UNCITRAL), Award of 3 December 2014 (Böckstiegel, Dupuy, van den Berg) ("*E.D.F.* UNCITRAL award"); CA-162. (The Tribunal understands that this award, made in Zurich, currently remains confidential and unpublished.)

[186] Paragraph 681 of the *E.D.F.* UNCITRAL award (CA-162) reads: "The above amount of €107 million is below the maximum amount of eligible stranded costs as determined by the EC for the amount of compensation of stranded costs (i.e. HUF 89 billion, which is equivalent to €300 million.)" The footnote (omitted here) makes plain that the figure of €300 million is for net stranded costs, i.e. "after deduction of recoverable amounts of State Aid pursuant to the PPA Decision, which Hungary had forgiven to BERt."

## *PART III: COSTS*

228. *Introduction*: In its Decision (at paragraph 11.7), the Tribunal made no order as regards costs, save to reserve in full its jurisdiction and powers to make any order as regards all legal and arbitration costs in an award subsequent to that decision. By order of 14 July 2015, the Tribunal invited the Parties to bring up to date their several claims for costs. For the purpose of deciding costs in this Award, the Tribunal has taken into account the Parties' submissions as regards the allocation and assessment of costs made in regard to both the first and second phases of this arbitration.

229. The Parties made several written submissions on such costs, principally following the Hearing in July-August 2010, the New York Hearing in 2013 (both as to interim costs arising from this arbitration's first phase) and in August-September 2015 (as to all costs, including this arbitration's second phase). In the circumstances, it is unnecessary here to record these submissions in full.

230. As to amount, by letters dated 28 August and 1 September 2015, Electrabel claimed costs totalling for the first phase of these arbitration proceedings: US\$ 5,583,47; and for the second phase: EUR€ 1,764,732.78, UK£ 117,737.26 and US\$ 433,744.85. By letter dated 28 August 2015, Hungary claimed costs totalling US\$ 10,055,733.

231. As to allocation between the Parties, the Tribunal considers that Hungary is to be considered as the prevailing party in this arbitration overall, in both phases of these arbitration proceedings. By the Tribunal's earlier Decision and under this Award, Electrabel has not succeeded in any of its substantive claims against Hungary.

232. The ECT, the ICSID Convention and the ICSID Arbitration Rules do not mandate that the prevailing party should recover its costs from the non-prevailing party. The Tribunal considers that it has a broad discretion as to the award of costs under Article 61(2) of the ICSID Convention and ICSID Arbitration Rules 28 and 47(1)(j).

233. In the Tribunal's view, there are three particular factors in this case relevant to the exercise of such discretion. First, this arbitration was commenced, in 2007, before the Commission's Final Decision on State Aid dated 4 June 2008, the termination of

Dunamenti's PPA by Hungary on 1 January 2009 and the Commission's Compensation Decision dated 27 April 2010. Accordingly, the most important (monetarily) and complicated factual and legal issues arose one after the other during these arbitration proceedings, much akin to a Russian *matryoshka* doll. This was a major factor causing difficulties for both Parties, as to which Electrabel can bear no special responsibility.

234.  Second, the Commission's submissions to the Tribunal (as a "non-disputing party") raised important and extensive issues of jurisdiction and applicable law. These were not issues, particularly as to jurisdiction, raised by Hungary. However, Electrabel had to expend much time and cost to deal with the Commission's submissions. In effect, far from exercising the traditional role of an "amicus curiae", the Commission became a second respondent more hostile to Electrabel than Hungary itself. If accepted by the Tribunal, the Commission's submissions would have been fatal to Electrabel's case. The Tribunal was required to decide these issues at length in its Decision and there reject a material part of the Commission's submissions. Overall, the Commission's participation in this arbitration was a hugely complicating factor, as were to a lesser extent the pending legal proceedings in Luxembourg (being only concluded on 1 October 2015). For all these, Electrabel bore by far the greatest burden.

235.  Third, with hindsight, it was at least unfortunate that the Parties agreed, albeit with the Tribunal's subsequent consent, to bifurcate all issues of quantum from all issues of liability. This was also a major factor which caused difficulties for both Parties and the Tribunal. However, any responsibility should be shared by all. As between the Parties, however, Electrabel should not bear any special responsibility.

236.  *Decision:* Taking all the circumstances of this case into account, pursuant to its discretion under Article 61(2) of the ICSID Convention and ICSID Arbitration Rules 28 and 47(1)(j), the Tribunal decides that the Parties shall each bear their own legal costs and expenses, save that Electrabel shall bear and pay for all the other costs of these arbitration proceedings (without recourse to Hungary). Accordingly, Electrabel must bear in full the administrative costs of the ICSID Secretariat, together with the fees and expenses of the

Tribunal, the exact amount of which shall be subsequently notified in writing to the Parties by the Centre.[187]

---

[187] The ICSID Secretariat will provide the Parties with a detailed financial statement of the case account as soon as the account is finalised.

*PART IV: THE OPERATIVE PART*

237.  For the reasons set out above, the Tribunal decides and awards, as follows:

(1)  Save as expressly otherwise set out below, the Tribunal's Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012 is here repeated and confirmed, as if that Decision were here expressly set out and formed part of this Award;

(2)  All the Claimant's substantive claims are hereby dismissed in their entirety, together with all the Claimant's claims for interest and costs;

(3)  The Parties shall each bear their own legal costs and expenses, subject to paragraph 4 below;

(4)  As to other arbitration costs (i.e. the administrative costs of the ICSID Secretariat and the fees and expenses of the Tribunal), the Claimant shall bear (as between the Claimant and the Respondent) all such costs in full, the exact amount of which shall be subsequently notified in writing to the Parties by the Centre, and shall accordingly reimburse the Respondent its share of these costs; and

(5)  All other claims by any Party are hereby dismissed.

_____
Gabrielle Kaufmann-Kohler
Arbitrator

Date: 20 November 2015

_____
Brigitte Stern
Arbitrator

Date: 12 November 2015

_____
V.V. Veeder
President

Date: 11.xi.2015

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
WASHINGTON, D.C.

IN THE ARBITRATION PROCEEDINGS BETWEEN:

ELECTRABEL S.A.

CLAIMANT

v.

THE REPUBLIC OF HUNGARY

RESPONDENT

(ICSID CASE NO. ARB/07/19)

_____

## DECISION ON JURISDICTION, APPLICABLE LAW AND LIABILITY
_____

*Members of the Tribunal*:

Professor Gabrielle Kaufmann-Kohler, *Arbitrator*
Professor Brigitte Stern, *Arbitrator*
V.V. Veeder, *President*

*ICSID Secretary to the Tribunal*:
Ms. Aurélia Antonietti

*Representing the Claimant*:
Mr Audley Sheppard
Mr Gareth Kenny
Ms Christina Schuetz
CLIFFORD CHANCE LLP
*(until March 2012)*
Mr Peter Turner
FRESHFIELDS BRUCKHAUS DERINGER
LLP *(as of March 2012)*
and
Mr Zoltán Faludi
Mr Laszlo Kenyeres
FALUDI WOLF THEISS

*Representing the Respondent*:
Ms Jean Kalicki
Mr Dmitri Evseev
Ms Mara V. J. Senn
Mr Luc Gyselen
ARNOLD & PORTER LLP
and
Mr János Katona
LAW OFFICE OF JÁNOS KATONA

*Date of dispatch to the Parties: 30 November 2012*

*TABLE OF CONTENTS*

*PART I: THE ARBITRATION*       *I-01*

   *(01)*  *The Parties and Other Persons*    *I-01*
   *(02)*  *The Arbitration Tribunal*    *I-02*
   *(03)*  *The Arbitral Procedure*    *I-03*
   *(04)*  *The Parties' Claimed Relief*    *I-10*
   *(05)*  *ICSID Arbitration Rule 38(1)*    *I-12*


*PART II: THE PARTIES' DISPUTE*       *II-01*

   *(01)*  *Introduction*    *II-01*
   *(02)*  *The Claimant's Case*    *II-02*
   *(03)*  *The Respondent's Case*    *II-04*
   *(04)*  *The Principal Issues*    *II-07*


*PART III: THE PRINCIPAL LEGAL TEXTS*       *III-01*

   *(01)*  *Introduction*    *III-01*
   *(02)*  *The Energy Charter Treaty (ECT)*    *III-01*
   *(03)*  *Treaty on European Union (TEU)*    *III-10*
   *(04)*  *Treaty on the Functioning of the European Union (TFEU)*    *III-11*
   *(05)*  *The Vienna Convention on the Law of Treaties (VCLT)*    *III-17*
   *(06)*  *The ICSID Convention*    *III-20*
   *(07)*  *The ICSID Arbitration Rules*    *III-22*
   *(08)*  *Table TFEU - Ex EC*    *III-23*


*PART IV: APPLICABLE LAW(S)*       *IV-01*

   *(01)*  *Introduction*    *IV-01*
       *ECT*    *IV-01*
       *EU Statement*    *IV-01*

i

|  |  | *ICSID Convention* | *IV-02* |
|  |  | *New York Convention* | *IV-02* |
|  |  | *VCLT* | *IV-02* |
|  |  | *EU BITs* | *IV-02* |
|  |  | *EU Treaties* | *IV-02* |
|  |  | *EU Lisbon Treaty* | *IV-02* |
|  |  | *This Case* | *IV-04* |
| *(02)* | | *The Claimant's Case* | *IV-06* |
|  | *(i)* | *EU law is not applicable as law, but as fact* | *IV-11* |
|  | *(ii)* | *In any event, only EU Treaties are part of international law* | *IV-12* |
|  | *(iii)* | *EU Treaty law incorporates ECT* | *IV-12* |
|  | *(iv)* | *If there is inconsistency, the ECT has primacy* | *IV-12* |
|  | *(v)* | *EU law and ECT can be read in harmony* | *IV-13* |
| *(03)* | | *The Respondent's Case* | *IV-16* |
|  | *(i)* | *EU law is international law* | *IV-19* |
|  | *(ii)* | *EU law is also relevant as a fact* | *IV-20* |
|  | *(iii)* | *The Claimant's theory of the ECT's absolute dominance is unacceptable* | *IV-20* |
|  | *(iv)* | *EU law and ECT can be read in harmony* | *IV-22* |
| *(04)* | | *The European Commission's Submission* | *IV-27* |
|  | *(i)* | *State Aid* | *IV-28* |
|  | *(ii)* | *The ECT* | *IV-31* |
|  | *(iii)* | *PPA Termination Claim* | *IV-31* |
| *(05)* | | *The Tribunal's Analysis* | *IV-35* |
|  | *(i)* | *The Multiple Nature of EU Law* | *IV-37* |
|  | *(ii)* | *EU law is based on an international treaties* | *IV-37* |
|  | *(iii)* | *The Whole of EU law as an International Legal Order* | *IV-38* |
|  | *(iv)* | *EU law as National Law* | *IV-39* |
|  | *(v)* | *EU Law as Fact* | *IV-40* |
|  | *(vi)* | *The Relationship between the ECT and EU law* | *IV-40* |
|  |  | *The ECT's Genesis* | *IV-42* |
|  |  | *ECT and EU Objectives* | *IV-43* |
|  |  | *ECT and EU Decisions* | *IV-44* |
|  | *(vii)* | *Harmonious Interpretation* | *IV-45* |
|  | *(viii)* | *Possible Inconsistency between the ECT and EU law* | *IV-53* |
|  |  | *Hierarchy of Legal Orders* | *IV-56* |
|  |  | *Article 16 ECT* | *IV-56* |
|  |  | *Article 307 EC (Article 351 TFEU)* | *IV-57* |
|  |  | *Article 30 of the Vienna Convention* | *IV-62* |
| *(06)* | | *The Tribunal's Conclusions* | *IV-62* |

**PART V: JURISDICTION**                                                     **V-01**

   **(01)  Introduction**                                     **V-01**
   **(02)  The European Commission's Submission**               **V-03**
      **(i)    Jurisdiction**                     **V-03**
      **(ii)   EU Law**                          **V-04**
      **(iii)  Harmonious Interpretation**        **V-04**
      **(iv)   Unenforceable Award**             **V-05**
   **(03)  The Claimant's Observations**                        **V-12**
   **(04)  The Respondent's Observations**                      **V-13**
   **(05)  The Tribunal's Analysis and Decisions**               **V-15**
      **(i)    The Tribunal's Jurisdiction**     **V-15**
      **(ii)   Article 1(6) ECT**                **V-17**
   **(06)  Summary**                                            **V-22**


**PART VI: PPA TERMINATION CLAIM**                                           **VI-01**

   **(01)  Introduction**                                     **VI-01**
   **(02)  Electrabel's Case**                                  **VI-05**
      **(i)    FET**                             **VI-05**
      **(ii)   Expropriation**                   **VI-06**
      **(iii)  Expropriation without Compensation**   **VI-08**
      **(iv)   Other ECT Standards**             **VI-11**
   **(03)  Hungary's Case**                                     **VI-11**
      **(i)    FET**                             **VI-11**
      **(ii)   Expropriation**                   **VI-12**
      **(iii)  Expropriation without Compensation**   **VI-13**
      **(iv)   Other Treaty Standards**          **VI-14**
   **(04)  The Tribunal's Analysis and Decisions**              **VI-14**
      **(i)    Expropriation**                   **VI-14**
      **(ii)   FET**                             **VI-20**
      **(iii)  Events before the Final Decision** **VI-20**
      **(iv)   The Final Decision**              **VI-22**
      **(v)    Net Stranded Costs**              **VI-31**
      **(vi)   Other ECT Standards**             **VI-38**
   **(05)  Summary**                                            **VI-39**

**PART VII: PPA PRICING**                                                **VII-01**

  **(01)  Introduction**                                        **VII-01**
  **(02)  The Claimant's Case**                                  **VII-02**
    **(i)**    **Summary of the Claimant's Position**        **VII-02**
    **(ii)**   **Period of Regulated Pricing (1996-2003)**    **VII-02**
    **(iii)**  **Period of Deregulated Pricing (2004-2005)**  **VII-03**
    **(iv)**  **2005-2015**                              **VII-04**
    **(v)**   **Attribution**                             **VII-06**
    **(vi)**  **Breach of the ECT**                      **VII-06**
  **(03)  The Respondent's Case**                                 **VII-07**
    **(i)**    **Summary of the Respondent's Position**       **VII-07**
    **(ii)**   **PPA Pricing: 1997-2001**                 **VII-09**
    **(iii)**  **PPA Pricing: 2001**                      **VII-10**
    **(iv)**  **PPA Pricing: 2002-2004**                 **VII-10**
    **(v)**   **PPA Pricing: 2005**                      **VII-11**
    **(vi)**  **PPA Pricing: 2006**                      **VII-11**
    **(vii)**  **No Attribution**                        **VII-12**
    **(viii)** **No Breach of ECT**                      **VII-13**
  **(04)  The Tribunal's Analysis and Decisions**                **VII-15**
    **(i)**    **Applicable Rules**                          **VII-16**
    **(ii)**   **General Approach**                        **VII-16**
    **(iii)**  **Attribution**                            **VII-17**
    **(iv)**  **Fair and Equitable Treatment**           **VII-20**
    **(v)**   **Full Protection and Security**            **VII-22**
    **(vi)**  **2006 and 2008**                          **VII-23**
    **(vii)**  **Ministerial and Parliamentary Conduct**  **VII-24**
    **(viii)** **MVM**                                   **VII-26**
    **(ix)**  **HEO November 2005 Letter**               **VII-27**
    **(x)**   **The 2008 YCA**                           **VII-29**
    **(xi)**  **The 2006 YCA**                           **VII-30**
    **(xii)**  **MVM's Conduct during the Renegotiation Meetings**  **VII-32**
    **(xiii)** **The YCA Drafts**                         **VII-36**
    **(xiv)** **The FET Standard**                        **VII-42**
    **(xv)**  **The FPS Standard**                       **VII-43**
    **(xvi)** **Unreasonable or Discriminatory Measures**  **VII-44**
    **(xvii)** **International Law Standard**              **VII-46**
    **(xviii)  National Treatment and MFN Treatment**       **VII-47**
  **(05)  Summary**                                               **VII-48**


**PART VIII: REGULATED PRICING**                                         **VIII-01**

  **(01)  Introduction**                                        **VIII-01**
  **(02)  The Claimant's Case**                                  **VIII-02**
  **(03)  The Respondent's Case**                                **VIII-04**
  **(04)  The Tribunal's Analysis and Decisions**               **VIII-05**
  **(05)  Summary**                                             **VIII-11**

*PART IX: ISSUE F - THE G1 UNIT*                          *IX-01*

    *(01)*  *Introduction*                          *IX-01*
    *(02)*  *The Claimant's Case*                 *IX-02*
    *(03)*  *The Respondent's Case*              *IX-03*
    *(04)*  *The Tribunal's Analysis and Decisions*  *IX-03*
    *(05)*  *Summary*                              *IX-05*


*PART X: SUMMARY*                                         *X-01*


*PART XI: THE OPERATIVE PART*                             *XI-01*


*A: Selected List of Abbreviations*                       *(vi)*

*B: Dramatis Personae*                                    *(ix)*

*C: Selected List of Legal Materials and References*      *(xi)*

### A: List of Abbreviations

*1994 Electricity Act:*    Hungary's Electricity Act of April 1994, establishing general regulatory principles for the electricity sector.

*1995 Decree:*    Hungary's Decree 63/1995, establishing a pricing methodology for the period beginning 1 January 1997 and ending 31 December 2000.

*2001 Electricity Act:*    Hungary's Electricity Act of December 2001, establishing a "dual" market for electricity.

*2006 Act:*    Hungary's 2006 Price Regulation Act of March 2006, reintroducing administrative pricing.

*2007 Electricity Act*    Hungary's Electricity Act implementing full market liberalisation in the electricity sector.

*Act of Accession:*    Hungary's Act of Accession with the European Union, effective from 1 May 2004 as a Member State.

*AES Tisza:*    AES Tisza Erőmű Kft (company operating the Tisza plant).

*APV:*    Hungary's Privatization and State Holding Company, responsible for the management of state owned assets).

*BIT:*    The 1986 Agreement for the Promotion and Protection of Investments between the Government of Belgium and Hungary.

*CFI:*    The European Court of First Instance (now the General Court).

*Cooperation Agreement:*    The Agreement concluded between Dunamenti and MVM dated 18 March 1997.

*Commission Submission*    The European Commission's Submission dated 12 June 2009 pursuant to Article 27(2) of the ICSID Arbitration Rules in these arbitration proceedings.

*Compensation Decision:*    The European Commission's Compensation Decision of 27 April 2010.

*DG Comp:*    The Directorate General for Competition of the Commission of the European Communities.

*DSPI:*    Domestic Sale Price Index.

*Dunamenti:*    Dunamenti Erőmű Rt (owner and operator of the Dunamenti power plant from 1995).

| | |
|---|---|
| *Commission:* | The Commission of the European Communities. |
| *F Retrofit Agreement:* | The 2001 Agreement between Dunamenti and MVM amending the PPA. |
| *Generators:* | Hungarian companies generating wholesale electricity. |
| *HEO:* | The Hungarian Energy Office (Hungary's energy regulator). |
| *MAVIR:* | Magyar Villmosenergia-ipari Átviteli Rendszerirányító (Hungarian Transmission System Operator, MVM's subsidiary since 2006). |
| *MOL Duna Refinery:* | MOL Dufi (oil refinery owned by MOL serviced by the Dunamenti power plant). |
| *MVM:* | Magyar Villamos Müvek Zrt (State owned electricity supply company). |
| *MVM Trade:* | MVM Villamosenergia Kereskedelmi Zrt (MVM's subsidiary, assignee of the PPA from MVM). |
| *Net Stranded Costs:* | Stranded Costs in excess of repaid/repayable State Aid. |
| *NRI:* | Non-Returned Investment. |
| *London Economics:* | Consultants retained by Hungary to carry out a market simulation of Hungarian electricity supply. |
| *PPA:* | The Power Purchase Agreement dated 10 October 1995 concluded between Dunamenti and MVM (amended in 1996, 1997, 1998, 1999 and by the F Retrofit Agreement of 2001). |
| *PPI:* | Producer Price Index. |
| *Price Decrees:* | Hungary's Price Decrees of December 2006 and January 2007 under the 2006 Act (also called "Tariff Decrees"). |
| *PSA:* | The Purchase and Sale Agreement dated 8 December 1995 between the Hungarian Privatization and State Holding Company APV and Powerfin S.A. and Tractebel S.A. aka the Privatization Agreement. |
| *REIO*: | Regional Economic Integration Organisation. |
| *ROC:* | Return on Capital. |
| *ROCI:* | Return on Invested Capital. |
| *ROE:* | Return on Equity. |

*SAMO:*                    The Hungarian State Aid Monitoring Office of the Ministry of Finance.

*Stranded Costs Decree:*  Hungary's Stranded Costs Decree of August 2002 under the 2001 Electricity Act.

*YCA:*                     Yearly Commercial Agreement.

*B: Dramatis Personae*

*Adnan Amkhan\*:*                Legal Expert on ECT and International Law (Claimant).

*Zoltán Barócsi\*\*:*            Head of the Department of Trade Directorate of MVM after 2003. From July 2008, Commercial Director for MVM Trade (Respondent).

*György Békés\*\*:*             Head of the Pricing and Economic Analysis Department HEO from 1994, later Deputy Director for Pricing and Economic Analysis and Head of the Electricity Price Preparation Department (Respondent).

*Zoltán Bodnár\*\*:*           Legal Adviser to Dunamenti since 2002 (Claimant).

*Péter Csiba\*\*:*             Chief Executive Officer of Dunamenti - since 2008 (Claimant).

*David Edward\*\*:*            Legal Expert - EU Law (Claimant).

*Marianna Fazekas\*:*          Legal Expert - Hungarian Law (Respondent).

*Balázs Felsmann\*:*           State Secretary for Infrastructure - July 2006 to April 2008 (Respondent).

*Zsuzsanna Remetei Filep\*:*   Head- SAMO - April 2005 to July 2007 (Respondent).

*Péter Grabner\*:*             Head of the Electricity Licensing and Supervisory Department HEO from 2003 (Respondent).

*Katalin Grósz\*:*            Legal Expert Hungarian Law (Claimant).

*Alfred Hofman\*:*            General Manager, North East Europe, Electrabel - 2001 to 2008 (Claimant).

*Ferenc J. Horváth\*\*:*       President of HEO from 2003 (Respondent).

*Jámos Kóka:*                Minister of Economy and Trade – 2005.

*Brent Kaczmarek\*\*:*        Expert - Navigant Consulting (Respondent).

*Làszló Keller:*             Vice-Minister of Finance in charge of "Political Conciliation" – 2008.

*Neelie Kroes:*              EC Commissioner for Competition, 2004 to 2008.

*Csaba Kovács\*\*:*          Head of the Economic Research and Environmental Protection department - HEO - since 2003 (Respondent).

*Tibor Kuhl\*\*:*            Director and Chief Executive Officer of Dunamenti since 1998 (Claimant).

*Wynne Jones\*\*:*           Expert - Frontier Economics (Respondent).

*Imre Mártha\*\*:*          Chief Executive Officer of MVM Trade during the 2007 negotiations (Respondent).

*Gyorgy Podolát:*          Member of Hungary's Parliament – 2005.

*Graham Shuttleworth\*\*:*  Expert - NERA (Claimant).

*Piet Jan Slot\*\*:*        Legal Expert - EC Law (Respondent).

*Péter Staviczky\*\*:*      Head of SAMO - July 2007 (Respondent).

*Làszló Varro:*           Chief Economist HEO – 2004.

*Imre Vörös\*\*:*          Legal Expert - Hungarian Law (Respondent).


*Note: "\*" denotes a witness providing a written witness statement or expert report in these proceedings; and "\*\*" denotes a witness who also testified orally at the Hearing. (All titles are here omitted).*

## C: Selected List of Legal Materials and References[1]

| | |
|---|---|
| *Act of Accession:* | 2004 Act of Accession, OJ L 236, 23.7.2003. |
| *ADC v Hungary:* | Award dated 2 October 2006 in *ADC Affiliate Limited and ADC & ADMC Management Limited v Hungary* (ICSID Case No. ARB/03/16) (Tribunal: Neil Kaplan, Charles Brower and Albert Jan van den Berg). |
| *AES:* | Award dated 23 September 2010 in *AES Summit Generation Limited & AES-Tisza Erömü Kft v Hungary* (ICSID Case No. ARB/07/22) (Tribunal: Claus Werner von Wobeser, William Rowley and Brigitte Stern). |
| *AES annulment:* | *AES Summit Generation Limited & AES-Tisza Erömü Kft v Hungary* (ICSID Case No. ARB/07/22) - Annulment proceedings. |
| *Amto:* | Final Award dated 26 March 2008 in *Limited Liability Company Amto v Ukraine* (UNCITRAL arbitration administered by the Stockholm Chamber of Commerce, SCC Case No. 080/2005) (Tribunal: Bernardo Cremades, Per Runeland and Christer Soderlund). |
| *Alland:* | Denis Alland, "Le juge français et le droit d'origine international", in *Droit international et droit interne dans la jurisprudence comparée du Conseil constitutionnel et du Conseil d'Etat* (Paris, ed. Panthéon-Assas, 2001), pp. 47-59. |
| *Asteris:* | ECJ judgement dated 26 April 1988 in Joined Cases 97, 193, 99 and 215/86, *Asteris and Others and the Hellenic Republic v Commission* [1988] ECR 2181. |
| *ATA:* | Award dated 18 May 2010 in *ATA Construction, Industrial and Trading Company v Jordan*, (ICSID Case No. ARB/08/2) (Tribunal: L. Yves Fortier, Ahmed El-Kosheri and Michael Reisman). |
| *Aust:* | Anthony Aust, Modern Treaty Law and Practice (CUP, 2007). |

---

[1] Arbitration materials referred to in this list are available on the ITA or the ICSID Websites, unless otherwise indicated.

| | |
|---|---|
| *Austrian Airlines:* | Award dated 9 October 2009 in *Austrian Airlines v The Slovak Republic* (UNCITRAL arbitration) (Tribunal: Gabrielle Kaufmann-Kohler, Charles Brower and Vojtěch Trapl). |
| *Azurix:* | Award dated 14 July 2006 in *Azurix Corporation v The Argentine Republic* (ICSID Case No. ARB/01/12) (Tribunal: Andrés Rigo Sureda, Marc Lalonde and Daniel Hugo Martins). |
| *BASF:* | ECJ judgment dated 15 June 1994 in Case C-137/92 P, *Commission of the European Communities v BASF AG & Others* [1994] ECR I-2555. |
| *Bayindir:* | Decision on Jurisdiction of 14 November 2005 in *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v The Islamic Republic of Pakistan* (ICSID Case No. ARB/03/29) (Tribunal: Gabrielle Kaufmann-Kohler, Karl-Heinz Böckstiegel and Franklin Berman). |
| *Binder:* | Partial award dated 6 June 2007 in *Binder v The Czech Republic* (unreported) (Tribunal: Hans Danelius, Jurgen Creuzig and Emmanuel Gaillard). |
| *Bosphorus:* | ECtHR judgement dated 30 June 2005, Application 45306/98, *Bosphorus Hava Yolları Turizm ve Ticaret Anonim Şirketi v Ireland,* Reports of Judgements and Decisions 20005-VI. |
| *Burgstaller:* | Marcus Burgstaller, "European Law and Investment Treaties," 26 *Journal of International Arbitration* 181-216 (2009). |
| *CME:* | Partial award dated 13 September 2001 in *CME Czech Republic B.V. v The Czech Republic,* (UNCITRAL arbitration) (Tribunal: Wolfgang Kühn, Stephen Schwebel and Jaroslav Hándl). |
| *CMS:* | Award dated 12 May 2005 in *CMS Gas Transmission Company v The Argentine Republic* (ICSID Case No. ARB/01/8) (Tribunal: Francisco Orrego Vicuña, Marc Lalonde and Francisco Rezek). |
| *Commission Methodology:* | The European Commission's "Communication" relating to the methodology for analysing State aid linked to stranded costs in the electricity sector setting out conditions under which the Commission may approve such aid under Article 87(3)(c) EC. |

| | |
|---|---|
| *Commission v Austria:* | ECJ judgement dated 7 July 2005 in Case C-147/03, *Commission v Austria* [2005] ECR 1-5969. |
| *Commission v Italy:* | ECJ judgement dated 27 February 1962 in Case 10/61, *Commission v Italy* [1962] ECR 1. |
| *Commission v Slovakia:* | ECJ judgement dated 15 September 2011 in Case C-264/09, *Commission v Slovakia* [2011] ECR. |
| *Coop:* | Graham Coop, "Energy Charter Treaty and the European Union: Is Conflict inevitable?", 27 *Journal of Energy & Natural Resources Law* 404 (2009). |
| *CSOB:* | Decision on Jurisdiction dated 24 May 1999 in *Ceskoslovenska Obchodni Banka, A.S. v The Slovak Republic* (ICSID Case No. ARB/97/4) (Tribunal: Thomas Buergenthal, Andreas Bucher and Piero Bernardini). |
| *Deggendorf:* | ECJ judgement dated 15 May 1997 in Case C-355/95 P, *Textilwerke Deggendorf GmbH (TWD) v Commission* [1997] ECR I-2549. |
| *Directive 96/92/EC:* | Directive 96/92/EC concerning the common rules for the internal market in electricity, OJ L 27, 30.1.1997. |
| *Dolzer:* | Rudolf Dolzer, "Indirect Expropriations: New Developments", 11 *N.Y.U. Environmental L.J.* 64 (2002). |
| *Dolzer/Schreuer:* | Rudolf Dolzer & Christoph Schreuer, Principles of International Investment Law (OUP, 2008). |
| *Eastern Sugar:* | Partial award dated 27 March 2007 in *Eastern Sugar BV (Netherlands) v The Czech Republic* (UNCITRAL arbitration administered by the Stockholm Chamber of Commerce, SCC Case No. 088/2004) (Tribunal: Pierre Karrer, Robert Volterra and Emmanuel Gaillard). |
| *ECHR:* | The European Convention for the Protection of Human Rights and Fundamental Freedoms (signed on 21 February 1991, in force from 18 March 1992). |
| *ECT:* | The Energy Charter Treaty. |
| *Eco Swiss:* | ECJ judgement dated 1 June 1999 in Case C-126/97 *Eco Swiss China Time Ltd v Benetton International NV* [1999] ECR I-3055. |

| | |
|---|---|
| *EC Treaty:* | Treaty establishing the European Economic Community (EEC), signed in Rome on 25 March 1957, and entered into force on 1 January 1958 (also known as the Treaty of Rome and also referred to as TEC). Referred to in this Decision as the EC. |
| *Eilmansberger:* | Thomas Eilmannsberger, "Bilateral investment treaties and EU Law," *Stockholm International Arbitration Review*, 2008:3. |
| *El Paso:* | Award dated 31 October 2011 in *El Paso Energy International Company v The Argentine Republic* (ICSID Case No. ARB/03/15) (Tribunal: Lucius Caflisch, Piero Bernardini, and Brigitte Stern). |
| *EU law:* | After the Treaty of Lisbon, the term "EU law" replaced "Community law" and "EC law". |
| *Eureko:* | Award on Jurisdiction, Arbitrability and Suspension dated 26 October 2010 in *Eureko B.V. v The Slovak Republic* (UNCITRAL arbitration administered by the Permanent Court of Arbitration, PCA Case No. 2008-13) (Tribunal: Vaughan Lowe, Albert Jan van den Berg and V.V. Veeder). |
| *Europe Agreement:* | The Europe Agreement between the European Community and Hungary of 31 December 1993, 1993 OJ L 347, 31.12.1993 (with implementing rules made by the EC-Hungary Association Council on 6 November 1996 & 29 January 2002, OJ 1996, L 295/29 & OJ 2002, L 145/18). |
| *EU BIT Cases:* | ECJ decisions in cases again Austria, Sweden and Finland relating to their bilateral investment treaties: Case C-205/06, *Commission v Austria*, judgment dated 3 March 2009, [2009] ECR I-01303; Case C-249/06, *Commission v Sweden*, judgment dated 3 March 2009, and Case C-118/07, *Commission v Finland*, judgment dated 19 November 2009. |
| *Francovich:* | ECJ judgement dated 19 November 1991 in Cases C-6/90 and C-9/90, *Andrea Francovich and others, Danila Bonifaci and others v Italy* [1991] ECR I-5357. |
| *Gami:* | Final Award dated 15 November 2004 in *GAMI Investments v The Government of the United Mexican States* (UNCITRAL arbitration) (Tribunal: Jan Paulsson, Michael Reisman and Julio Lacarte Múro). |
| *Gardner:* | Richard Gardner, Treaty Interpretation (OUP, 2008). |

| | |
|---|---|
| *Haegeman v Belgium*: | ECJ judgement dated 30 April 1974 in Case 181-73, *R. & V. Haegeman v Belgian State* [1974] ECR 449. |
| *Handelsgesellschaft:* | ECJ judgement dated 17 December 1970 in Case 11-70, *Internationale Handelsgesellschaft mbH v Einfuhr- und Vorratsstelle für Getreide und Futtermittel* [1970] ECR 1125. |
| *Hartley:* | Trevor Hartley, "International Law and the Law of the European Union – A Reassessment", *British Yearbook of International Law*, 72 (2001), pp. 1-35. |
| *Helnan:* | Decision on Objection to Jurisdiction dated 17 October 2006 in *Helnan International Hotels A/S v The Arab Republic of Egypt* (ICSID Case No. ARB/05/19) (Tribunal: Yves Derains, Michael Lee and Rudolf Dolzer). |
| *Hoffmeister:* | Frank Hoffmeister, "Litigating against the European union and Its Member States – Who Responds Under the ILC's Draft Articles on International Responsibility of International Organizations", 21 *European Journal of Intl. Law* 723 (2010). |
| *Holiday Inns:* | Decision of jurisdiction dated 12 May 1974 in *Holiday Inns SA and others v Kingdom of Morocco* (ICSID Case No. ARB/72/1), reported in Pierre Lalive, "The First World Bank Arbitration (Holiday Inns v Morocco) - Some Legal Problems," *British Yearbook of International Law* 1980, p. 159 (Tribunal: Gunnar Lagergren, Paul Reuter and JS Schultsz). |
| *ILC Articles:* | International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts. See James Crawford, The International Law Commission's Articles on State Responsibility, Introduction, Text and Commentaries (Cambridge, 2002). |
| *Jan de Nul:* | Award dated 6 November 2008 in *Jan de Nul N.V. and Dredging International N.V. v The Arab Republic of Egypt*, (ICSID Case No. ARB/04/13) (Tribunal: Gabrielle Kaufmann-Kohler, Pierre Mayer and Brigitte Stern). |
| *Joy Mining*: | Award on Jurisdiction dated 6 August 2004 in *Joy Mining Machinery Limited v The Arab Republic of Egypt* (ICSID Case No. ARB/03/11) (Tribunal: Francisco Orrego Vicuña, William Laurence Graig and Christopher Weeramantry). |

| | |
|---|---|
| *Kadi:* | ECJ judgement dated 3 September 2008 in Cases C-402/05 P and C-415/05 P, *Yassin Abdullah Kadi and Al Barakaat International Foundation v Council of the European Union and Commission of the European Communities* [2005] ECR 11-3649. |
| *Klabbers:* | Jan Klabbers, Treaty Conflict and the European Union (CUP, 2009). |
| *Lauder:* | Award dated 3 September 2001 in *Ronald S. Lauder v The Czech Republic* (UNCITRAL arbitration) (Tribunal: Robert Briner, Lloyd Cutler and Bohuslav Klein). |
| *Lesi-Dipenta:* | Award dated 10 January 2005 in *Consortium Groupement L.E.S.I. - DIPENTA v The People's Democratic Republic of Algeria* (ICSID Case No. ARB/03/08) (Tribunal: Pierre Tercier, André J.E. Faurès and Emmanuel Gaillard). |
| *Lisbon Treaty:* | Treaty amending the EC Treaty and the TEU, signed on 13 December 2007, and entered into force on 1 December 2009. The EC Treaty was renamed in the process the Treaty on the Functioning of the European Union (TFEU). |
| *Maffezini:* | Award dated 13 November 2000 in *Emilio Agustín Maffezini v The Kingdom of Spain* (ICSID Case No. ARB/97/7) (Tribunal: Francisco Orrego Vicuña, Thomas Buergenthal and Maurice Wolf). |
| *Metalclad:* | Award dated 30 August 2010 in *Metalclad Corporation v The United Mexican States,* (ICSID Case No. ARB(AF)/97/1) (Tribunal: Elihu Lauterpacht, Benjamin Civiletti and José Luis Siqueiros). |
| *MOX Plant award:* | Award dated 2 July 2003 between *Ireland v United Kingdom* (PCA), ILM 42 (2003) 1118. |
| *MOX Plant Judgment:* | ECJ judgement dated 30 May 2006 in Case C-459/03, *Commission v. Ireland* [2006] ECR I-4635. |
| *MTD:* | Award dated 25 May 2004 in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v The Republic of Chile (*ICSID Case No. ARB/01/7) (Tribunal: Andrés Rigo Sureda, Marc Lalonde and Rodrigo Oreamuno Blanco). |
| *New York Convention:* | The 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 330 UNTS 3 (in force from 7 June 1959). |

| | |
|---|---|
| *Nordsee:* | ECJ judgement dated 23 March 1982 in Case 102/81 *Nordsee Deutsche Hochseefischerei GmbH v Reederei Mond Hochseefischerei Nordstern AG & Co. KG and Reederei Friedrich Busse Hochseefischerei Nordstern AG & Co. KG.* [1982] ECR 1095. |
| *Occidental:* | Final Award dated 1 July 2004 in *Occidental Exploration and Production Company v The Republic of Ecuador* (LCIA Case No. UN3467) (Tribunal: Francisco Orrego Vicuña, Charles Brower and Patrick Barrera Sweeney). |
| *Opinion 1/09:* | ECJ (full Court) Opinion dated 8 March 2011 [2011] ECR. |
| *Ostergetel:* | Decision on jurisdiction dated 30 April 2012 in *Jan Oostergetel and Theodora Laurentius v The Slovak Republic* (UNCITRAL arbitration) (Tribunal: Gabrielle Kaufmann-Kohler, Charles Brower and Vojtěch Trapl). |
| *Parkerings:* | Award dated 11 September 2007 *in Parkerings-Compagniet AS v Republic of Lithuania* (ICSID Case No. ARB/05/8) (Tribunal: Laurent Lévy, Julian Lew and Marc Lalonde). |
| *Paulsson & Douglas:* | Jan Paulsson & Zachary Douglas, "Indirect Expropriation in Investment Treaty Arbitration", in N. Horn & S. Kröll (eds), *Arbitrating Foreign Investment Disputes* 145 (2004). |
| *Pey Casado:* | Award dated 8 May 2008 in *Victor Pey Casado and President Allende Foundation v The Republic of Chile* (ICSID Case No. ARB/98/2) (Tribunal: Pierre Lalive, Mohammed Chemloul and Emmanuel Gaillard). |
| *Petrobart Limited:* | Award dated 29 March 2005 in *Petrobart Limited v The Kyrkyz Republic* (UNCITRAL arbitration administered by the Stockholm Chamber of Commerce, SCC Case No. 126/2003) (Tribunal: Hans Danielus, Ove Bring and Jeroen Smets). |
| *Phillips Petroleum:* | Award No. 425-39-2 dated 29 June 1989 in *Phillips Petroleum Company Iran v The Islamic Republic of Iran*, 21 Iran-USCTR 79. |
| *Plama:* | Award dated 27 August 2008 in *Plama Consortium Limited v The Republic of Bulgaria* (ICSID Case No. ARB/03/24) (Tribunal: Carl Salans, Albert Jan van den Berg and V.V. Veeder). |

| | |
|---|---|
| *Pope & Talbot:* | Interim Award dated 26 June 2000 in *Pope & Talbot Inc. v The Government of Canada* (UNCITRAL arbitration) (Tribunal: Lord Dervaird, Benjamin Greenberg and Murray Belman). |
| *Saba Fakes:* | Award dated 14 July 2010 in *Saba Fakes v The Republic of Turkey* (ICSID Case No. ARB/07/20) (Tribunal: Emmanuel Gaillard, Hans van Houtte and Laurent Lévy). |
| *Saipem:* | Decision on jurisdiction and recommendation on provisional measures dated 21 March 2007 in *Saipem S.p.A. v The People's Republic of Bangladesh* (ICSID Case No. ARB/05/7) (Tribunal: Gabrielle Kaufmann-Kohler, Christoph Schreuer and Philip Otton). |
| *Salini:* | Decision on jurisdiction dated 23 July 2001 in *Salini Costruttori SPA and Italstrade SPA v The Kingdom of Morocco* (ICSID Case No. ARB/00/4) (Tribunal: Robert Briner, Bernardo Cremades and Ibrahim Fadlallah). |
| *Saluka:* | Partial Award dated 17 March 2006 in *Saluka Investments B.V. v The Czech Republic* (UNCITRAL arbitration) (Tribunal: Arthur Watts, L. Yves Fortier and Peter Behrens). |
| *Santa Elena:* | Award dated 17 February 2000 in *Compañia del Desarrollo de Santa Elena, S.A. v The Republic of Costa Rica* (ICSID Case No. ARB/96/1) (Tribunal: Yves Fortier, Elihu Lauterpacht and Prosper Weil). |
| *Schreuer:* | Christoph Schreuer et al, The ICSID Convention: A Commentary (CUP, 2nd ed; 2009). |
| | "The Concept of Expropriation under the ECT and other Investment Protection Treaties", in *Investment Arbitration and the Energy Charter Treaty* (C. Ribeiro ed.), 108-159 (2006). |
| | "Fair and equitable treatment (FET): interactions with other standards", in *Investment Protection and the Energy Charter Treaty (*C. Ribeiro ed.), 63-100 (2008). |
| *SD Myers:* | Second Partial Award dated 21 October 2002 in *S.D. Myers, Inc. v The Government of Canada (*UNCITRAL arbitration) (Tribunal: J. Martin Hunter, Bryan Schwartz and Edward Chiasson). |

| | |
|---|---|
| *Siag:* | Award dated 1 June 2009 in *Waguih Elie George Siag and Clorinda Vecchi v The Arab Republic of Egypt* (ICSID Case No. ARB/05/15) (Tribunal: David Williams, Michael Pryles and Francisco Orrego Vicuña). |
| *Siemens:* | Award dated 17 January 2007 in *Siemens v The Argentine Republic* (ICSID No. ARB/02/8) (Tribunal: Andrés Rigo Sureda, Charles Brower and Domingo Bellow Janeiro). |
| *Sempra:* | Award dated 28 September 2007 in *Sempra Energy International v The Argentine Republic* (ICSID Case No. ARB/02/16) (Tribunal: Francisco Orrego Vicuña, Marc lalond and Sandra Morellu Rico). |
| *Starrett:* | Interlocutory Award No. ITL 32-24-1 dated 19 December 1983 in *Starrett Housing Corporation, Starrett Systems, Inc., Starrett Housing International, Inc. v The Government of the Islamic Republic of Iran, Bank Omran, Bank Mellat,* 4 Iran-U.S. C.T.R. 112. |
| *Tecmed:* | Award dated 23 May 2003 in *Técnicas Medioambientales Tecmed, S.A. v The United Mexican States* (ICSID Case No. ARB (AF)/00/2) (Tribunal: Horacio Grigera Naón, José Carlos Fernández Rozas and Carlos Bernal Verea). |
| *Telenor:* | Award dated 13 September 2006 in *Telenor Mobile Communications AS v Hungary* (ICSID Case No. ARB/04/15) (Tribunal: Royston Goode, Nicholas Allard and Arthur Marriot). |
| *Tietje:* | Christian Tietje, "The Applicability of the Energy Charter treaty in ICSID Arbitration of EU Nationals vs. EU Member States" 78 *Beiträge zum Transnationalen Wirtschaftsrecht* 1 (2008). |
| *Tippets:* | Award No. 141-7-2 dated 22 June 1984 in *Tippetts, Abbett, McCarthy, Stratton v TAMS-AFFA Consulting Engineers of Iran*, 6 Iran-USCTR 219. |
| *TEU:* | Treaty on the European Union signed in Maastricht on 7 February 1992, entered into force on 1 November 1993 (also known as the Maastricht Treaty). The Maastricht Treaty changed the name of the European Economic Community to "the European Community" (EC) and created the European Union (EU). |

| | |
|---|---|
| *TFEU:* | Treaty on the Functioning of the European Union entered into force on 1 December 2009 following the ratification of the Lisbon Treaty. It is an amended and renamed version of the EC Treaty. The TFEU renumbered the articles of the EC Treaty. |
| *Thunderbird:* | Award dated 26 January 2006 in *International Thunderbird Gaming Corporation v The United Mexican States* (UNCITRAL arbitration) (Tribunal: Albert Jan van den Berg, Thomas Wälde and Agustín Portal Ariosa). |
| *Van Gend en Loos:* | ECJ judgement dated 5 February 1963 in Case 26/62, *NV Algemene Transporten Expeditie Onderneming van Gend & Loos v Netherlands Inland Revenue Administration* [1963] ECR 1. |
| *VCLT:* | The Vienna Convention on the Law of Treaties 155 UNTS 331, 8 ILM 679 (1969), in force from 27 January 1980. |
| *Weiler/Wälde:* | Todd Weiler & Thomas Wälde, "Investment Arbitration under the Energy Charter Treaty in the light of new NAFTA Precedents: Towards a Global Code of Conduct for Economic Regulation," *Transnational Dispute Management* 1 (2004), 35. |
| *Wälde:* | Thomas Wälde, "Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice," *Transnational Dispute Management* 2 (2004), 4. |

## PART I: THE ARBITRATION

### (1)    THE PARTIES AND OTHER PERSONS

1.1    *The Claimant:* The Claimant, Electrabel S.A., is an energy generation and sales company organised and existing under the laws of the Kingdom of Belgium, with its principal address as 8, Boulevard du Régent, 1000 Brussels, Belgium. (For ease of reference, the Claimant is described below as "the Claimant" or "Electrabel").

1.2    *The Claimant's Legal Representatives:* In these arbitration proceedings, the Claimant was represented by Clifford Chance LLP, of 10 Upper Bank Street, London E14 5JJ, United Kingdom and Faludi Wolf Theiss, of Ügyvédi Iroda, 1054 Budapest, Kálmán Imre u.1., Regus House, Budapest, Hungary – until March 2012. Thereafter, in place of Clifford Chance LLP, the Claimant was represented by Freshfields Bruckhaus Deringer LLP, of 2 rue Paul Cézanne, 75008 Paris, France, under a power of attorney dated 9 March 2012.

1.3    *Republic of Hungary:* The Respondent is the Republic of Hungary, acting by its Government. (For ease of reference, the Respondent is here referred to as "Hungary" or "the Respondent").

1.4    *The Respondent's Legal Representatives:* In these arbitration proceedings, the Respondent was represented by Arnold & Porter LLP, of 555 Twelfth Street, NW Washington, DC 20004, USA and 11, Rue des Colonies - Koloniënstraat 11, B-1000 Brussels, Belgium, and by the Law Office of János Katona, of Csaba u. 7/b, Budapest H-1121, Hungary.

1.5    *Dunamenti:* Dunamenti Erőmű Rt ("Dunamenti"), a legal person organized under the laws of Hungary, is not a party to these arbitration proceedings.

1.6    *The European Commission and European Union:* Neither the Commission of the European Communities nor the European Union are named or disputing parties to

these arbitration proceedings. At its request and upon the invitation of the Tribunal, the European Commission made written representations to the Tribunal as a non-disputing party under Article 37(2) of the ICSID Arbitration Rules (as explained further below).

1.7     *The European Commission's Legal Representatives:* In these arbitration proceedings, the European Commission was represented, as agents, by Professor Dr Bernd Martenczuk, Professor Dr Frank Hoffmeister and Dr Petr Ondrusek, members of the Commission's Legal Service, Rue de la Loi 200, 1040 Brussels, Belgium.

## *(2)     THE ARBITRATION TRIBUNAL*

1.8     Following the registration on 13 August 2007 of the Claimant's Request for Arbitration by the Centre ("ICSID") as ICSID Case No. ARB/07/19, the Tribunal was constituted on 5 December 2007, comprising of three members, as follows:

(1)     Professor Gabrielle Kaufmann-Kohler, as Co-Arbitrator, a citizen of Switzerland, appointed by the Claimant's letter dated 26 September 2007, of Lévy Kaufmann-Kohler, 3-5, rue du Conseil-Général, P.O. Box 552, 1211 Geneva 4, Switzerland;

(2)     Professor Brigitte Stern, as Co-Arbitrator, a citizen of France, appointed by the Respondent by letter dated 12 November 2007, of the University Paris I, Panthéon-. Sorbonne, 7 rue Pierre Nicole, 75005 Paris, France; and

(3)     V.V. Veeder, Esq., a citizen of the United Kingdom, of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG, United Kingdom, as President, appointed by the two co-arbitrators upon their proposal to the Parties of 26 November 2007, accepted by the Respondent and the Claimant by their respective letters of 28 November 2007 and 29 November 2007.

Mr Ucheora Onwuamaegbu, Mr Marat Umerov and Ms Aurélia Antonietti, all of ICSID, served in turn as Secretary to the Tribunal.

1.9     *Proposal for Disqualification:* On 21 December 2007, the Claimant filed a proposal
for the disqualification of Professor Stern as a member of the Tribunal. On 28
December 2007, the Respondent filed observations on the Claimant's proposal.  On
1 January 2008, ICSID forwarded to the Parties and the Tribunal written comments
by Professor Stern made by letter dated 28 December 2007. The Claimant filed
comments on the Respondent's observations on 8 January 2008; and the Respondent
filed further observations on the Claimant's proposal on 14 January 2008.

1.10    After considering these several written submissions, the Claimant's proposal was
rejected by the two other members of the Tribunal on 25 February 2008 in the form
of a reasoned decision sent to the Parties.

1.11    No further proposal was made by any Party to disqualify any member of the
Tribunal.


*(3)*     **THE ARBITRAL PROCEDURE**


1.12    *Written Submissions:* The Claimant submitted its Request for Arbitration (with
accompanying materials) on 13 June 2007, its Memorial on 29 July 2008, with its
Amendment to Part VII of its Memorial on 30 January 2009, and its Reply on 16
September 2009.

1.13    The Respondent submitted its Preliminary Objections (with accompanying
materials) on 30 October 2008, its Counter-Memorial on 15 May 2009 and its
Rejoinder on 22 December 2009.

1.14    *Written Testimony:* The Claimant adduced signed written statements from the
following factual witnesses: (i) Mr Zoltán Bodnár of 28 July 2008, 29 January 2009
and 16 September 2009; (ii) Mr Peter Csiba of 14 September 2009; (iii) Mr Alfred
Hofman of 28 July 2008; and (iv) Mr Tibor Kuhl of 28 July 2008 and 16 September
2009.

1.15    The Claimant also adduced signed expert reports from: (i) Professor Adnan Amkhan of 28 July 2008 and 16 September 2009; (ii) Professor Sir David Edward of 24 September 2009; (iii) Dr Katalin Grósz of 28 July 2008 and 16 September 2009; and (iv) Mr Graham Shuttleworth of 16 September 2009.

1.16    The Respondent adduced signed written statements from the following factual witnesses: (i) Mr Zoltán Barócsi of 12 May 2009 and 10 December 2009; (ii) Mr. György Békés of 8 May 2009 and 15 December 2009; (iii) Mr Balázs Felsmann of 11 May 2009; (iv) Ms Zsuzsanna Filep of 5 May 2009; (v) Mr Péter Grabner of 21 December 2009; (vi) Mr Ferenc Horváth of 13 May 2009 and 10 December 2009; (vii) Mr Csaba Kovács of 13 May 2009 and 19 December 2009; (viii) Mr Imre Mártha of 11 December 2009; and (ix) Mr Péter Staviczky of 13 May 2009 and 14 December 2009.

1.17    The Respondent also adduced signed expert reports from: (i) Dr Marianna Fazekas of 11 May 2009; (ii) Mr Wynne Jones of 13 May 2009 and 17 December 2009; (iii) Mr Brent Kaczmarek of 15 May 2009 and 17 December 2009; (iv) Professor Piet Jan Slot of 14 May 2009 and 16 December 2009; and (v) Mr Imre Vörös of 14 May 2009.

1.18    *Participation of Non-Disputing Party:* On 13 August 2008, as already indicated, the European Commission applied to the Tribunal pursuant to ICSID Arbitration Rule 37(2) for permission to make a written submission as a non-disputing party. Having consulted the Parties, the Tribunal invited the European Commission to file a written submission, by letter dated 19 November 2008. This submission was filed on 12 June 2009. It is cited extensively in this Decision below.

1.19    *Procedural Meetings:* The first procedural meeting with the Tribunal and the Parties took place in London on 15 May 2008 (following which the Tribunal issued written minutes of this session); the second procedural meeting took place by telephone conference-call on 17 November 2008 (following which the Tribunal issued its procedural order dated 19 November 2008); and the third procedural meeting took place by telephone conference-call on 4 December 2009 (following which the Tribunal issued its procedural order dated 10 December 2009).

1.20    *Procedural Rules:* The Parties and the Tribunal agreed at the first procedural meeting that these arbitration proceedings would be conducted in accordance with the ICSID Arbitration Rules in force as at 10 April 2006 (but not any amendments thereto).

1.21    *Procedural Orders:* In addition to the orders listed above, the Tribunal made procedural orders dated 10 March 2009 and 27 March 2009 (in regard to the procedural calendar); 28 April 2009 (in regard to the application of the European Commission to file a written submission pursuant to ICSID Arbitration Rule 37(2) as a non-disputing party); 18 August 2009, 11 November 2009 and 10 December 2009 (in regard to the production of documents); and several orders during the Hearing. These orders were recorded in writing or in the verbatim transcript of the Hearing; all are in the Parties' possession; and it serves no purpose to set them out here.

1.22    *Bifurcation:* By agreement of the Parties, the Tribunal ordered the Parties in the first phase of these proceedings to address (as to the merits of the Claimant's claims) issues of liability only, with quantum issues to be addressed (if appropriate) in a separate second phase of these proceedings, as recorded in the Tribunal's procedural order dated 27 March 2009.

1.23    *Oral Hearing:* The Hearing on the first phase of these arbitration proceedings took place over seven days from Tuesday, 9 February to Wednesday, 17 February 2010, first (by consent of the Parties) at the offices of Arnold & Porter LLP in Washington, DC and next at the Fairmont Hotel in Washington, DC. The Hearing was originally planned to be held at the offices of the World Bank in Washington, DC, but the location of the Hearing had to be changed because the offices of the World Bank remained closed for several days due to a severe winter snowstorm.

1.24    As already indicated above, the Hearing was recorded by verbatim transcript.[1]

---

[1]   References made to the Hearing's verbatim transcript below are to the relevant day and page: e.g. "D1.09" indicates page 9 of the first day (9 February 2010). "x" signifies direct examination of an oral witness; "xx" signifies cross-examination; and "xxx" signifies re-examination. The documentary references to the Parties' common bundles are self-explanatory.

1.25    The Hearing was attended, on behalf of the Claimant, by Audley Sheppard, Gareth Kenny, Christina Schuetz and Sean Peterson (all of Clifford Chance LLP), Laszlo Kenyeres (of Faludi Wolf Theiss), Jean-Marc Dethy, Eric Demuynck and Christelle Wynants (all of Electrabel).

1.26    It was attended, on behalf of the Respondent, by Jean Kalicki, Dmitri Evseev, Mara Senn, Luc Gyselen, Suzana Medeiros Blades, Wells Bennett, Paloma Gomez, Andras Kosaras, Vanessa Mueller, Camila Valenzuela and Kelby Ballena (all of Arnold & Porter LLP), János Katona and Gábor Puskás (of Law Office of János Katona), and by Emese Szentpétery and Chistelle Wynants (of the Respondent's Government).

1.27    The Claimant and the Respondent made opening statements at the Hearing's first day [D1.19 and D1.108, 124, 152, 187 & 208 respectively].

1.28    The following factual witnesses then testified orally at the Hearing: for the Claimant, Mr Kuhl [D2.260x; D2.265 & 415xx; D2.395xxx], Mr Bodnár [D2.431x; D2.432xx; D2.530xxx] and Mr Csiba [D3.546x; D3.549xx; D3.585xxx]; and for the Respondent, Mr Békés [D3.830x; D3.831xx …; D4.863 …xx; D4.932xxx], Mr Horváth [D4.944x; D4.947xx; D4.1048xxx], Mr Staviczky [D5.1066x; D5.1082 & 1168xx; D5.1153xxx], Mr Kovács [D5.1181x; D5.1185, 1257 & 1274xx; D5.1247 & 1281xxx], Mr Barócsi [D7.1728x; D7.1729xx; D7.1782xxx]; and Mr Mártha [D7.1788x; D7.1827xx].

1.29    The following expert witnesses testified orally at the Hearing: for the Claimant, Professor Sir David Edward [D3.591x; D3.615xx; D3.684 & 708xxx] and Mr Shuttleworth [D5.1287x; D5.1306 …xx; D6.1403 ...xx; D6.1495xxx]; and for the Respondent, Professor Slot [D3.714x; D3.719 …xx; D3.785xxx], Mr Jones [D6.1504x; D6.1519…xx] and Mr Kaczmarek [D6.1581x; D6.1600 & 1681xx; D6.1663 & 1684xxx].

1.30    At the end of the Hearing, the Tribunal informally closed the file to the Parties as regard this first phase, save for stated exceptions relating to transcript corrections, post-hearing submissions and submissions on costs to be made later in writing; the Tribunal also reserved the right to ask the Parties for new submissions at its

discretion; and it advised the Parties that a party wishing to introduce new evidence would need to make a prior application to the Tribunal for permission to do so [D7.1703-1705]. Several significant events subsequently took place which precluded the Tribunal from closing the file any further.

1.31    *Compensation Decision:* The European Commission issued, on 27 April 2010, its Decision on "State aid N 691/2009: Hungarian stranded costs compensation scheme" (the "Commission Compensation Decision"). This document was addressed in the Claimant's Post-Hearing Submissions and by the Respondent in its letter dated 24 May 2010 regarding New Documents (see below).

1.32    *CFI Pleadings:* By letter dated 3 May 2010, at the request of the Tribunal, the European Commission transmitted copies of its Defence dated 6 October 2009 and its Rejoinder dated 16 February 2010 in the Case T-179/09, *Dunamenti Erömü v Commission of the European Communities*, before the Court of First Instance of the European Communities in Luxembourg. (The Court of First Instance ("CFI") is now known as "the General Court"). These legal proceedings were brought by Dunamenti to annul the Commission Decision 2009/609/EC of 4 June 2008 under Article 230 EC: see Dunamenti's Claim dated 28 April 2009 [C-184/Tab 488] and its Reply dated 4 December 2009 (appended to the Claimant's Response dated 1 August 2011). The Claimant is not a named party to these legal proceedings in Luxembourg.

1.33    *Post-Hearing Submissions:* The Claimant submitted its Post-Hearing Submissions on 7 May 2010; and the Respondent submitted its Post-Hearing Submissions also on 7 May 2010.

1.34    *New Documents:* By procedural order dated 31 May 2010, in response to the Respondent's application made by letter dated 24 May 2010 and the response from the Claimant made by letter dated 28 May 2010, the Tribunal (inter alia) admitted into evidence: (i) the European Commission's Compensation Decision dated 27 April 2010 and (ii) the 2009 Report on Polish Stranded Costs published in March 2010 (the "2009 Polish Report"), designated as the Claimant's Exhibits C-199 & C-200 respectively.

1.35    In accordance also with the Tribunal's procedural order dated 31 May 2010, the Respondent by letter dated 21 June 2010 submitted its written response to these new documents; and the Claimant responded thereto by letter dated 5 July 2010.

1.36    *Costs Submissions:* As ordered by the Tribunal at the Hearing [D7.1701], as later modified by procedural order dated 31 May 2010, the Parties submitted written submissions regarding their respective claims for legal and arbitration costs, by their letters dated 21 July, 28 July and 9 August 2010.

1.37    *The Tribunal's Three Requests:* By procedural orders dated 1 & 5 October 2010, the Tribunal requested the Parties to address three matters: (i) any further information then known to the Parties as to the progress, or likely progress, of the legal proceedings pending before the General Court in Luxembourg in Case T-179/09 between Dunamenti Erömü and the Commission of the European Communities; (ii) any further information then known to the Parties as to the implementation, present or future, of the draft decree on Stranded Costs, being the subject-matter of the European Commission's Compensation Decision of 27 April 2010; and (iii) whether any either Party wished to make any submissions to the Tribunal, and (if so) in what form, as to the then recently published award dated 23 September 2010 in ICSID Case No. ARB/07/22 *AES Summit Generation Limited and AES-TISZA Erömü Kft v Republic of Hungary* (the "AES award"), referring to the Claimant's reservation made in paragraph 75 of its Post-Hearing Submissions of 7 May 2010.

1.38    The Parties made written submissions respectively by letters dated 29 October 2010 on the Tribunal's three requests.

1.39    *The AES award:* In the light of the Parties' written submissions dated 29 October 2010, by procedural order dated 15 November 2010, the Tribunal permitted the Parties to comment substantively, in writing, on the AES award.

1.40    The Parties accordingly made further written submissions respectively on 3 December 2010 on the AES award. In the circumstances, the Tribunal did not consider that these submissions required any further response from either Party for the purpose of these arbitration proceedings or this Decision.

1.41    *The Tribunal's Further Requests:* By letter dated 6 June 2011, the Tribunal requested further assistance from the Parties arising from certain of the Parties' Submissions dated 21 June, 5 July, 29 October and 3 December 2010 and (in particular) the earlier Submission of the European Commission dated 12 June 2009, concerning principally the related questions of applicable law and jurisdiction.

1.42    The Parties responded to these further requests as follows: the Claimant's Response dated 1 August 2011; the Respondent's Response dated 1 August 2011; the Claimant's Reply Response dated 6 September 2011; and the Respondent's Reply Response dated 6 September 2011.

1.43    The Tribunal considered these written submissions; and it recorded by letter dated 17 October 2011 that: as regards the Parties' responses to the third query listed in the Tribunal's letter dated 6 June 2011, the Tribunal had decided that it was not necessary for the Tribunal (or the Parties) to re-approach the European Commission for further assistance; and as regards the Parties' responses to the ninth query in the Tribunal's letter (including the European Commission's letter dated 13 September 2011 to the Claimant), the Tribunal had decided that it was not necessary for the Tribunal to request any further pleadings from the European Commission in Case T-179/09.

1.44    *The General Court Judgment:* On 13 February 2012, the General Court issued its judgment in Luxembourg rejecting the challenge by Budapesti Erömü Zrt (a Hungarian Generator) to the European Commission's Decisions dated 9 November 2005 and 4 June 2008 in Joined Cases T-80/06 and T-182/09. Whilst it was possible for this complainant to appeal to the European Court of Justice, the effect of this Judgment would not thereby be suspended pending such appeal under Article 278 TFEU. Given similar issues raised by Dunamenti as a like complainant in Case T-179/09 in regard to the Final Decision of 4 June 2008, the Tribunal invited the Parties to comment on this Judgment (if so desired), by letter dated 27 February 2012.

1.45    The Claimant responded by letter dated 9 March 2012; and the Respondent by letter also dated 9 March 2012. In summary, the Claimant submitted that the Judgment was irrelevant to the issues in this arbitration and, in particular, that it was not final

(being subject to appeal) and also not binding or otherwise determinative of Dunamenti's separate challenge still pending before the General Court because of "different factual scenarios" distinguishing the challenges made by Dunamenti and Budapesti. In summary, the Respondent submitted that the Judgment was relevant to this arbitration on several grounds.

1.46   For the purpose of this Decision, the Tribunal has taken note of the Judgment and the Parties' different submissions. The Tribunal notes that the parties' pleadings leading to this Judgment are not public and remain unavailable for this arbitration; that the Judgment may be subject to appeal; and that, in any event, the Judgment does not automatically determine the final result of Dunamenti's own legal proceedings in Luxembourg. The Tribunal has also noted that both Parties continue jointly to maintain that this Tribunal is not concerned with the lawfulness or unlawfulness under EU law of the Final Decision dated 4 June 2008, as explained further below. In all these circumstances, the Tribunal has decided to place no reliance here on the General Court's Judgment of 13 February 2012.

## (4)   THE PARTIES' CLAIMED RELIEF

1.47   *The Claimant:* As finally pleaded (in paragraph 431 of its Post-Hearing Submissions), the Claimant claims the following principal relief from the Tribunal:

(A)   A declaration that the termination of the Agreement ("PPA"):

(i)   constitutes unlawful expropriation in breach of Article 13(1) Energy Charter Treaty ("ECT") and full compensation has not been paid;

(ii)   alternatively, constitutes lawful expropriation pursuant to Article 13(1) ECT but prompt, adequate and effective compensation has not been paid;

(B)    A declaration that termination of the PPA and/or failure to pay full/adequate compensation constitutes a breach of Articles 10(1) and 10(7) ECT;

(C)    A declaration that HEO's letter of 10 November 2005 and the instructions of the Government (in particular Minister Kóka) demanding that Dunamenti agree to a reduction in its tariffs of 34% and MVM's implementation of that instruction constitute a breach of Articles 10(1) and 10(7) ECT;

(D)    A declaration that the Tariff Decrees imposing a reduction in the availability fee in respect of the F and G2 Units of approximately 40% constitute a breach of Articles 10(1) and 10(7) ECT;

(E)    A declaration that the exclusion of the G1 Unit from the Mandatory Off-Take Decree and the mandatory off-take pricing regime constitute a breach of Articles 10(1) and 10(7) ECT;

(F)    A declaration that consequent upon one or more of the breaches of the ECT, set out above, the Claimant is entitled to compensation to be determined in a further phase of these arbitral proceedings; and

(G)    An order for the Claimant's costs of the arbitration.

1.48    As confirmed in Part IX of its Post-Hearing Submissions (page 85), the Claimant no longer advances its so-called "Additional Claims": (i) the claim for the forced assignment of the PPA; and (ii) the CO2 allowance claim. It is appropriate to record the status of these claims as described by the Claimant in its Post-Hearing Submissions:

> "426. In its oral opening statement, Hungary suggested that Electrabel had waived its right to pursue the other claims that were raised in its Memorial [Footnote 271: T1.109 (Respondent's opening)]. Electrabel does not agree with that categorisation. However, Electrabel confirms that it no longer intends to pursue those claims for the following reasons.

*427. The claim for the forced assignment of the PPA no longer has any relevance given the fact that Hungary has terminated the PPA pursuant to the PPA Termination Act.*

*428. The CO2 allowance claim concerned a draft allocation that was in circulation at the time of submission of Electrabel's Memorial. Hungary has since introduced a final allocation that is satisfactory to Electrabel.*

*429. The requirement to nominate gas requirements in advance is no longer a part of the regulation.*

*430. Dunamenti's category of gas limitation remains the least secure. However, there have been no restrictions on gas supply to date."*

1.49    In these circumstances, the Tribunal does not here address these Additional Claims any further, noting that they have not been "waived" but no longer "pursued" by the Claimant in these arbitration proceedings.

1.50    *The Respondent:* The Respondent, as finally pleaded (in paragraph 168 of its Post-Hearing Submissions), claims the following principal relief from the Tribunal:

(A)    An order rejecting the Claimant's claims in their entirety, and

(B)    An appropriate order of legal and arbitration costs in the light of such decision in favour of the Respondent.

## (5)    *ICSID ARBITRATION RULE 38(1)*

1.51    By letter dated 17 October 2011, the Tribunal declared the first phase of these arbitration proceedings completed as regards matters to be finally determined in this Decision.

1.52    Given the scope of such Decision, there is and can yet be no formal closure by the Tribunal pursuant to ICSID Arbitration Rule 38(1).

## PART II: THE PARTIES' DISPUTE

### (1)    INTRODUCTION

2.1    The Tribunal, in the course of its deliberations, has fully considered the Parties' respective cases as presented in these arbitration proceedings, orally and in writing. For present purposes, it is appropriate first to summarise briefly their different cases below in order to explain the Tribunal's several reasons later in this Decision.

2.2    It is, of course, not possible to reflect in such general summaries, here or later in this Decision, all the arguments of law and fact which were presented to the Tribunal by the Parties at great length. Moreover, it is not necessary for the Tribunal, in this Decision, expressly to address and decide all the factual and legal arguments which were made to the Tribunal. It does not follow, however, from these brief and subsequent summaries that the Tribunal has not considered these arguments during these arbitration proceedings.

2.3    Given the European Commission's Submission and significant events subsequent to the Hearing, the Tribunal found it necessary to consider certain legal materials which were not cited by the Parties themselves, particularly as regards matters relating to the Tribunal's jurisdiction (disputed by the Commission but not the Parties) and the law(s) potentially applicable to this arbitration. Where these materials were significant, the Tribunal requested and received the Parties' assistance in writing. There remain, however, references below to uncited materials which the Tribunal considered as confirmation of its decisions reached on cited materials; and, given that the former did not affect the making of such decisions but supported them, the Tribunal has thought it appropriate to refer to certain uncited materials in this Decision.

*(2)*     **THE CLAIMANT'S CASE**

2.4     In summary, the Claimant advances the following general case against the Respondent in support of its four substantive claims under Articles 10(1), 10(7) and 13 ECT: (i) the PPA Termination Claim; (ii) the PPA Pricing Claim; (iii) the Regulated Pricing Claim; and (iv) the G1 Unit Claim, of which the most significant of these four claims is the PPA Termination Claim. The Claimant makes no contractual claim against the Respondent under the PPA itself, namely the Power Purchase Agreement dated 10 October 1995 concluded between Dunamenti and Magyar Villamos Müvek Zrt ("MVM"), as later amended in 1996, 1997, 1998, 1999 and 2001.

2.5     *1995:* In 1995, according to the Claimant, the Respondent caused Dunamenti (then owned 100% by the Respondent) and MVM (the Respondent's sole wholesale electricity buyer, 99.9% owned by the Respondent) to enter into the PPA, so as to make possible the privatisation of Dunamenti by rendering this latter company attractive to international investors and to secure substantial investment to improve the Dunamenti power station and reliable long-term electricity supply in Hungary.

2.6     *PPA:* The PPA provided that the power station would make available on demand to MVM a minimum capacity from the six F Units (each 215 MW) and the G2 Unit (240 MW) in return for payment of a capacity fee. The effective term of the PPA was fifteen years, expiring in December 2010. In 1998, the PPA was extended for the G2 Unit until 31 December 2015. The law applicable to the PPA was, by its terms, Hungarian law.

2.7     *2001:* In 2001, the F Retrofit Agreement (amending the PPA) was agreed between Dunamenti and MVM. The F Retrofit Agreement together with the 2001 December Statement fixed the capacity fee for the F units until 2010 (subject to inflation).

2.8     Both the PPA and the F Retrofit Agreement, according to the Claimant, were lawful agreements when made by their contracting parties, under Hungarian law. (In 1995 and 2001, the Respondent was not a Member State of the European Union).

2.9   *The Claimant's "Investment":* Between 1995 and 2001, according to the Claimant, the Claimant (with its associated companies) invested substantial funds in Dunamenti, as a shareholder.

2.10   *2004:* The Respondent failed to protect the PPA when it acceded to the European Union in 2004, according to the Claimant.

2.11   *2006:* Starting in 2006, according to the Claimant, the Respondent caused the prices agreed and payable to Dunamenti by MVM to be reduced, for domestic political reasons.

2.12   The Respondent first instructed MVM to reduce prices paid to Dunamenti by 34%; but this price reduction was insufficient for the Respondent. The Respondent next reintroduced regulated pricing at the end of 2006, which forced a reduction in Dunamenti's prices of 40%.

2.13   *2008:* The Respondent finally terminated the PPA in December 2008, when there was no requirement for it to do so from the European Commission or otherwise, according to the Claimant.

2.14   The Respondent refused, so the Claimant contends, to pay full or adequate compensation for the PPA's termination. The Respondent refused to allow any recovery for Dunamenti's Net Stranded Costs, as allowed under the European Commission's Stranded Cost Methodology; and it refused to recognise Electrabel's entitlement to any compensation under the ECT.

2.15   As contended by the Claimant, being confirmed by the European Commission's Compensation Decision of 27 April 2010 (the "Commission Compensation Decision"), as a matter of EU law, the Respondent could have paid to Dunamenti the amount by which the Respondent itself had calculated Stranded Costs exceeded repayable State Aid, i.e. HUF 22 billion (EUR 80 million). This would have been consistent with EU law; but the Respondent chose not to do so in order to protect its domestic budget.

2.16   Additionally, the Respondent discriminated against Electrabel by excluding Dunamenti's G1 Unit from the mandatory off-take pricing regime.

2.17    According to the Claimant, such acts and omissions constitute breaches of the ECT by the Respondent, including: expropriation without full or adequate compensation; failure to afford fair and equitable treatment ("FET") to its investments; and failure to create stable, equitable, favourable and transparent conditions for the Claimant as an investor (as defined in the ECT).

2.18    The Claimant contends that the ECT is an international treaty freely agreed by the Respondent for the purpose of promoting and protecting investments, including investments by foreign investors from Belgium in Hungary; and the fact that the Respondent subsequently acceded to the European Union and assumed obligations to eliminate State Aid cannot deprive the Claimant of the protections under the ECT, including the right to compensation following the termination of the PPA.

2.19    For these reasons, in summary, Electrabel claims the final relief set out above in Part I of this Decision.


*(3)*    ***THE RESPONDENT'S CASE***


2.20    In summary, the Respondent denies all liability for all the claims advanced by the Claimant.

2.21    According to the Respondent, the Claimant's case is an inappropriate attempt to force the Respondent to insure Dunamenti against any adverse effects of market liberalization and thereby to boost Dunamenti's already-handsome profits from both regulated and market activity during the thirteen years of the PPA regime from 1995 to 2008. The Claimant also challenges the Respondent's lawful efforts to regulate prices, inappropriately, as an interference with free market principles.

2.22    The Respondent submits that the Claimant's desire to have it both ways from regulated and free market principles has been a recurring pattern in these arbitration proceedings; and it has resulted in a number of inconsistent arguments. For example, the Claimant has blamed the Respondent both for interfering in Dunamenti's contractual relations and for not interfering enough to protect Dunamenti from

MVM's actions. Moreover, in communicating with the European Commission, the Claimant has strongly denied that the PPA contained any State commitments on pricing or profitability; but to this Tribunal the Claimant has presented the PPA as an ironclad guarantee of profitability by the Respondent.

2.23    The Claimant has also insisted that its case is fundamentally about the "sanctity of contract," without establishing a single contractual provision of the PPA that has been violated by the Respondent.

2.24    The Claimant's principal claim is that the Respondent violated the ECT's provisions concerning (i) expropriation and (ii) fair and equitable treatment, by terminating the PPA following a legally binding order of the European Commission in the form of its Final Decision of 4 June 2008. In this regard, significantly, the Claimant does not dispute that the European Commission's Decision was legally binding on the Respondent under EU law; but instead the Claimant contends, wrongly, that the Decision did not actually require the termination of Dunamenti's PPA.

2.25    The Respondent contends that the Claimant's reading of the "dispositif" of the European Commission's Decision (as if it existed in a complete vacuum) is inconsistent with the applicable rules of interpretation for such decisions under EU law, clear statements of the European Commission itself and with basic common sense.

2.26    The Claimant also contends that the ECT required the Respondent to protect the "sanctity" of the PPA regardless of the Respondent's binding obligations of EU law. Yet, the very contract the Claimant describes as sacrosanct (the PPA) has been declared unlawful by the European Commission and was ordered terminated by the European Commission's Final Decision, binding under EU law.

2.27    Further, the notion of "legitimate expectations" under international investment law does not mean that, even absent any specific commitments to that effect, a State must act as the guarantor of the vitality of an investor's long-term supply contract in the face of market liberalisation and supervening events.

2.28    The Claimant also contends that the Respondent had an obligation to compensate Dunamenti for the termination of the PPA up to the amount of Dunamenti's

maximum non-returned investment ("NRI"), as calculated by HEO (the Hungarian Energy Office), based on certain assumptions regarding Dunamenti's future market performance. Whilst the Respondent acknowledges that it opted not to allow Dunamenti (or other Hungarian Generators) to receive cash compensation payments based on HEO's calculations, nothing in the ECT or EU law required the Respondent to make such payments to the Claimant.

2.29    Further, the Respondent submits that the Electrabel-specific calculations of investment returns performed by both Parties' financial experts in these arbitration proceedings demonstrate that the Claimant has already fully recovered its own investments in Dunamenti, along with an 8.4% average annual return above inflation, excluding any residual value remaining in Dunamenti (from which the Claimant will still benefit as shareholder of Dunamenti).

2.30    With regard to the specific FET standard invoked by the Claimant under the ECT, the decision by the Respondent not to pay additional compensation beyond the offset of a substantial amount of otherwise repayable State Aid did not violate the ECT's provisions on fair and equitable treatment.

2.31    The Claimant did not and could not have legitimately expected full compensation for Dunamenti's NRI when it invested in 1995 and certainly not by 2001, when it undertook the retrofit investment and the PPA's term was extended.

2.32    In the absence of any such legitimate expectations, the FET standard requires only that State action be rational and non-discriminatory. It does not require that the State subsidise foreign investors up to the maximum amount otherwise permitted under the applicable law. The balanced choice by the Respondent's policymakers of a "middle-ground" approach to compensation for PPA termination meets that rational and non-discriminatory standard.

2.33    With regard to expropriation under the ECT, the Respondent has not suggested that the PPA falls outside the ECT's definition of "investment" in Article 1(6) ECT. However, the Respondent objects to the Claimant's use the ECT's broad definition of investment to circumvent, in its submission, the accumulated jurisprudence on indirect expropriation which requires that a claimant demonstrate the magnitude of the deprivation it suffered in relation to its whole investment and not limited to

separate slices self-defined by individual assets viewed in isolation from the investment as a whole.

2.34    In this case, the Claimant's whole investment, as shareholder, was made in the Dunamenti power plant; and that investment has been (and remains) profitable, notwithstanding that the European Commission required replacement of the PPA with more market-confirming contractual arrangements.

2.35    Accordingly, the Respondent submits that (i) the PPA's termination cannot be classified as a direct expropriation because there was no appropriation or transfer of an asset by the State; (ii) it cannot amount to indirect expropriation because it did not deprive the Claimant's investment in Dunamenti of substantially all of its value; and (iii) even if theoretically the PPA's termination could be classified as an expropriation, it would have to be considered lawful, particularly given that it involved an asset (the PPA standing alone) that had questionable market value in the wake of the European Commission's Final Decision of 4 June 2008.

2.36    The Respondent accordingly denies any liability to the Claimant in respect of all its claims; and, for all these reasons, in summary, the Respondent claims the final relief set out above in Part I of this Decision.


*(4)*    *THE PRINCIPAL ISSUES*


2.37    In the light of the Parties' respective cases, as finally presented to the Tribunal, and the European Commission's Submission, it is here convenient to list the principal issues as follows, requiring the Tribunal's determination in this Decision as to the first phase of these arbitration proceedings:

2.38    *"Applicable Law(s)"*. This issue is addressed in Part IV below.

2.39    *"Jurisdiction"*. This issue is addressed in Part V below.

2.40    *"The PPA Termination Claim"*. This issue is addressed in Part VI below.

2.41    *"The PPA Pricing Claim"*. This issue is addressed in Part VII below.

2.42    *"The Regulated Pricing Claim"*. This issue is addressed in Part VIII below.

2.43    *"The G1 Unit Claim"*. This issue is addressed in Part IX below.

2.44    *Other Issues:* Other minor issues arising from the Claimant's claims are briefly addressed in Part X below, together with the Tribunal's Conclusions and Summary on the Parties' substantive claims and defences.

2.45    *Quantum and Costs:* It will be recalled that none of these issues address "quantum", given the Tribunal's procedural order dated 27 March 2009 on bifurcation of this arbitration into two separate phases as agreed by the Parties: see Part I above. Nor do these issues include the Parties' respective claims for legal or arbitration costs made during this first phase, given the Tribunal's decision to decide such issues by a later order or award with further submissions to be requested of the Parties by the Tribunal in the light of this Decision and other relevant matters.

# PART III: THE PRINCIPAL LEGAL TEXTS

## (1)     INTRODUCTION

3.1.    It is next necessary to cite in full several of the relevant legal texts at the outset of this Decision, for ease of reference below.

## (2)     THE ENERGY CHARTER TREATY (ECT)

3.2.    Article 1(3) ECT provides:

> *"'Regional Economic Integration Organization' means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters."*

3.3.    Article 1(6) ECT provides:

> *"'Investment' means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:*
>
> *(a) tangible and intangible, and movable and immovable, property and any property rights such as leases, mortgages, liens, and pledges;*
>
> *(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;*
>
> *(c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;*

*(d) Intellectual Property;*

*(e) Returns;*

*(f) any right conferred by law or contract or by virtue of any licenses and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.*

*A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.*

*"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat."*

3.4.    The Contracting Parties' "Understanding 3" to the ECT provides:

*"With respect to Article 1(6):*

*For greater clarity as to whether an Investment made in the Area of one Contracting Party is controlled, directly or indirectly, by an Investor of any other Contracting Party, control of an Investment means control in fact, determined after an examination of the actual circumstances in each situation. In any such examination, all relevant factors should be considered, including the Investors (a) financial interest, including equity interest, in the Investment; (b) ability to exercise substantial influence over the management and operation of the Investment; and (c) ability to exercise substantial influence over the selection of members of the board of directors or any other managing body. Where there is doubt as to whether an Investor controls, directly or indirectly, an Investment, an Investor claiming such control has the burden of proof that such control exists."*

3.5.   As to the definition of "Area" in the ECT, Article 1(10) ECT also provides:

> *"'Area' means with respect to a state that is a Contracting Party: (a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and (b) subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction. With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization."*

3.6.   Article 3 ECT, "International Markets" provides:

> *"The Contracting Parties shall work to promote access to international markets on commercial terms, and generally to develop an open and competitive market, for Energy Materials and Products."*

3.7.   Article 6 ECT, "Competition", provides:

> *"(1) Each Contracting Party shall work to alleviate market distortions and barriers to competition in Economic Activity in the Energy Sector.*
>
> *(2) Each Contracting Party shall ensure that within its jurisdiction it has and enforces such laws as are necessary and appropriate to address unilateral and concerted anti-competitive conduct in Economic Activity in the Energy Sector."*

3.8.    The Contracting Parties' "Understanding 7" to the ECT provides:

> *"7. With respect to Article 6:*
>
> *(a) The unilateral and concerted anti-competitive conduct referred to in Article 6(2) are to be defined by each Contracting Party in accordance with its laws and may include exploitative abuses.*
>
> *(b) "Enforcement" and "enforces" include action under the competition laws of a Contracting Party by way of investigation, legal proceedings, or administrative action as well as by way of any decision or further law granting or continuing an authorization."*

3.9.    Article 10(1) ECT provides:

> *"Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."*

3.10.    Article 10(7) ECT provides:

> *"Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or for the Investors of any other Contracting Party or any third state and their related activities including*

*management, maintenance, use, enjoyment or disposal, whichever is the most favourable."*

3.11.   Article 13(1)-(3) ECT, "Expropriation", provides:

*"(1) Investments of Investors of a Contracting Party in the Area of any other Contracting Part shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as the "Expropriation") except where such Expropriation is: (a) for a purpose which is in the public interest; (b) not discriminatory (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation. Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date"). Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.*

*(2) The Investor affected shall have a right to prompt review, under the law of the Contacting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1).*

*(3) For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares."*

3.12.   Article 16 ECT, "Relation to the Other Agreements", provides:

> *"Where two or more Contracting Parties have entered in to a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,*
>
> *(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*
>
> *(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this treaty,*
>
> *where any such provision is more favourable to the Investor or Investment."*

3.13.   Article 26 ECT (inter alia), "Settlement of Disputes Between an Investor and a Contracting Party", provides:

> *"(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*
>
> *[sub-paras (a) & (b) here omitted]*
>
> *(c) in accordance with the following paragraphs of this Article.*
>
> *(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*

*[sub-paras (b) and (c) here omitted]*

*(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph 2(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*

*(a)(i) The International Centre for Settlement of Investment Disputes, established pursuant to [the 1965 ICSID Convention], if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or*

*[sub-paras (a)(ii) to (c) here omitted]*

*(5)(a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (40 shall be considered to satisfy the requirement for:*

*(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention ...*

*[sub-paras 6(a)(ii), 6 & 7 here omitted]*

*(8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other general remedy. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards."*

3.14. The Tribunal notes the reference to the Contracting Parties' "unconditional consent" to international arbitration and the required treatment of an award as "final and binding" upon the disputing parties, with the Contracting Parties required both "to carry out without delay any such award" and to "make provision for the effective enforcement in its Area of such awards."

3.15.   The Tribunal also notes that the Introduction to the ECT, whilst expressly not an official commentary or interpretative aid to the ECT, summarises the dispute resolution procedures in Article 26 ECT as follows:

> *"The existence of the Treaty's dispute settlement procedures is of considerable value in confidence-building terms. The fact that such procedures are available, and that the Treaty's Contracting Parties have taken on the unconditional obligation to accept their application where necessary, provides reassurance for investors that, in the case of a dispute, they will be entitled to have recourse to the above mechanisms in defence of their interests."*

3.16.   Article 26(6) ECT provides:

> *"A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."*

The Tribunal notes the mandatory nature of Article 26(6) for this Tribunal.

3.17.   Article 26(3)(b)(ii) ECT provides:

> *"For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41."*

3.18.   The written statement submitted by the European Communities to the Secretariat of the Energy Charter, pursuant to Article 26(3)(b)(ii) ECT, provides:

> *"The European Communities, as Contracting Parties to the Energy Charter Treaty, make the following statement concerning their policies, practices and conditions with regard to disputes between an investor and a Contracting Parties and their submission to international arbitration or conciliation:*

*The European Communities are a regional economic integration organisation within the meaning of the Energy Charter Treaty. The Communities exercise the competences conferred on them by their Member States through autonomous decision-making and judicial institutions.*

*The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.*

*The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days.*

*The Court of Justice of the European Communities, as the judicial institution of the Communities, is competent to examine any question relating to the application and interpretation of the constituent treaties and acts adopted thereunder, including international agreements concluded by the Communities, which under certain conditions may be invoked before the Court of Justice.*

*Any case brought before the Court of Justice of the European Communities by an investor of another Contracting Party in application of the forms of action provided by the constituent treaties of the Communities falls under Article 26(2)(a) of the Energy Charter Treaty. Given that the Communities' legal system provides for means of such action, the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation.*

*As far as international arbitration is concerned, it should be stated that the provisions of the ICSID Convention do not allow the European Communities to become parties to it. The provisions of the ICSID Additional Facility also do not allow the Communities to make use of them. Any arbitral award against the European Communities will be implemented by the Communities' institutions, in accordance with their obligation under Article 26(8) of the Energy Charter Treaty." [9.3.98, OJ L 69/115]*

3.19.   This statement was cited in the European Commission's Submission (paragraph 47). The Commission also contended that, had the Claimant resorted to this procedure, "the Commission and Hungary could have jointly assisted it in the determination of the respective competences and choice of the correct respondent party" and that, in failing to do so, "the Claimant took the risk to bring a case against the wrong respondent or before the wrong forum" (paragraph 49).

3.20.   As described further below, the Parties' legal experts knew nothing about this procedure; and there were no further materials submitted to the Tribunal regarding its function or scope. Professor Slot testified that it was new to him [D3.818]; and Professor Sir David Edward testified that he was likewise unaware of it, but that he was not surprised that there should be such a procedure [D3.819].

3.21.   As to the Commission's reference to "the wrong forum", the Tribunal notes that the European Union could not be a disputing party to these arbitration proceedings (as a second respondent or otherwise) given that the European Union is not a Contracting State to the ICSID Convention, as required by Article 26(4)(a)(i) ECT. The Tribunal also notes that the European Union could have been a disputing party in these proceedings, had the Claimant chosen to submit the dispute for resolution under the UNCITRAL Arbitration Rules or before the Arbitration Institute of the Stockholm Chamber of Commerce, as also provided by Article 26(4) ECT.  That choice under Article 26 ECT was not, of course, available to the European Union, being a choice made by the Claimant alone.

*(3)*   *TREATY ON EUROPEAN UNION (TEU)*

3.22.   Article 4.3 TEU, which reflects Article 10 EC, provides:

> *"Pursuant to the principle of sincere cooperation, the Union and the Member States shall, in full mutual respect, assist each other in carrying out tasks which flow from the Treaties.*

*The Member States shall take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the Union.*

*The Member states shall facilitate the achievements of the Union's tasks and refrain from any measure which could jeopardise the attainment of the Union's objectives."*

## *(4)    TREATY ON THE FUNCTIONING OF THE EUROPEAN UNION (TFEU)*

3.23.    Article 3.2 TFEU provides that the European Union: "shall also have exclusive competence for the conclusion of an international agreement when its conclusion is provided for in a legislative act of the Union or is necessary to enable the Union to exercise its internal competence, or in so far as its conclusion may affect common rules or alter their scope."

3.24.    Article 205 TFEU and Article 21 TEU on the promotion of the rule of law provide:

*Article 205 TFEU: "The Union's action on the international scene, pursuant to this Part [Part Five External Action by the Union], shall be guided by the principles, pursue the objectives and be conducted in accordance with the general provisions laid down in Chapter 1 of Title V of the Treaty on European Union."*

*Article 21(3) TEU, second paragraph: "The Union shall ensure consistency between the different areas of its external action and between these and its other policies. The Council and the Commission, assisted by the High Representative of the Union for Foreign Affairs and Security Policy, shall ensure that consistency and shall cooperate to that effect."*

3.25.   Article 107 TFEU (ex Article 87 EC) provides:

> "1. Save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market.
>
> 2. The following shall be compatible with the internal market:
>
> (a) aid having a social character, granted to individual consumers, provided that such aid is granted without discrimination related to the origin of the products concerned;
>
> (b) aid to make good the damage caused by natural disasters or exceptional occurrences;
>
> (c) aid granted to the economy of certain areas of the Federal Republic of Germany affected by the division of Germany, in so far as such aid is required in order to compensate for the economic disadvantages caused by that division. Five years after the entry into force of the Treaty of Lisbon, the Council, acting on a proposal from the Commission, may adopt a decision repealing this point.
>
> 3. The following may be considered to be compatible with the internal market:
>
> (a) aid to promote the economic development of areas where the standard of living is abnormally low or where there is serious underemployment, and of the regions referred to in Article 349, in view of their structural, economic and social situation;
>
> (b) aid to promote the execution of an important project of common European interest or to remedy a serious disturbance in the economy of a Member State;
>
> (c) aid to facilitate the development of certain economic activities or of certain economic areas, where such aid does not adversely affect trading conditions to an extent contrary to the common interest;
>
> (d) aid to promote culture and heritage conservation where such aid does not affect trading conditions and competition in the Union to an extent that is contrary to the common interest;

*(e) such other categories of aid as may be specified by decision of the Council on a proposal from the Commission."*

3.26.   Article 108(3) TFEU (ex Article 88(3) EC) provides:

> *"The Commission shall be informed, in sufficient time to enable it to submit its comments, of any plans to grant or alter aid. If it considers that any such plan is not compatible with the internal market having regard to Article 107, it shall without delay initiate the procedure provided for in paragraph 2. The Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision."*

3.27.   Article 206 TFEU (ex Article 131 EC) provides that the European Union, by establishing a customs union in accordance with Articles 28 to 32 TFEU, "shall contribute, in the common interest, to the harmonious development of world trade, the progressive abolition of restrictions on international trade and on foreign direct investment, and the lowering of customs and other barriers."

3.28.   Article 207(1) TFEU (ex Article 133 EC) provides, as regards "foreign direct investment", as follows:

> *"The common commercial policy shall be based on uniform principles, particularly with regard to changes in tariff rates, the conclusion of tariff and trade agreements relating to trade in goods and services, and the commercial aspects of intellectual property, foreign direct investment, the achievement of uniformity in measures of liberalization, export policy and measures to protect trade such as those to be taken in the event of dumping or subsidies. The common commercial policy shall be conducted in the context of the principles and objectives of the Union's external action."*

3.29.   The TFEU does not define "foreign direct investment"; but the ECJ and the European Commission have interpreted "foreign direct investment" taking the form of a shareholding, as the shareholding investor participating effectively in the management or control of the company, in contrast to a "portfolio investment" where the investor has no intention to influence the company's management or control: see the Communication "Towards a comprehensive European international investment policy" from the Commission to the Council, the European Parliament, the EESC and the Committee of the Regions of 7 July 2010 (COM(2010)343final), paragraph 1 and the ECJ cases there cited under footnotes 4-6.

3.30.   In the present case, under this approach, the Tribunal notes that any investment by the Claimant in Dunamenti would be classified as a foreign direct investment and not as a portfolio investment under Articles 206 & 207 TFEU.

3.31.   Art. 216(2) TFEU, which reflects Article 300(7) EC, provides:

> *"Agreements concluded by the Union are binding upon the institutions of the Union and on its Member States."*

3.32.   Article 218(11) TFEU (ex Article 300(6) EC), provides:

> *"A Member State, the European Parliament, the Council or the Commission may obtain the opinion of the Court of Justice as to whether an agreement envisaged is compatible with the Treaties. Where the opinion of the Court is adverse, the agreement envisaged may not enter into force unless it is amended or the Treaties are revised."*

3.33.   Article 258 TFEU (ex Article 226 EC) provides:

> *"If the Commission considers that a Member State has failed to fulfil an obligation under the Treaties, it shall deliver a reasoned opinion on the matter after giving the State concerned the opportunity to submit its observations.*

*If the State concerned does not comply with the opinion within the period laid down by the Commission, the latter may bring the matter before the Court of Justice of the European Union."*

3.34.    Article 260 TFEU (ex Article 228 EC) provides:

*"1. If the Court of Justice of the European Union finds that a Member State has failed to fulfill an obligation under the Treaties, the State shall be required to take the necessary measures to comply with the judgment of the Court.*

*2. If the Commission considers that the Member State concerned has not taken the necessary measures to comply with the judgment of the Court, it may bring the case before the Court after giving that State the opportunity to submit its observations. It shall specify the amount of the lump sum or penalty payment to be paid by the Member State concerned which it considers appropriate in the circumstances.*

*If the Court finds that the Member State concerned has not complied with its judgment it may impose a lump sum or penalty payment on it.*

*This procedure shall be without prejudice to Article 259 [referring to remedies available to Member States, ex Article 227 EC]."*

3.35.    Article 263 TFEU (ex Article 230 EC) provides, in its first paragraph:

*"The Court of Justice of the European Union shall review the legality of legislative acts, of acts of the Council, of the Commission ..."*

3.36.    Article 267 TFEU (ex Article 234 EC) provides:

*"The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:*

*(a) the interpretation of the Treaties;*

*(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;*

*Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.*

*Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.*

*If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay."*

3.37.   Article 344 TFEU (ex Article 292 EC) provides:

*"Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties [i.e. the TFEU and the TEU, as defined in Article 1(2) TFEU] as to any method of settlement other than those provided for therein."*

3.38.   Article 351 TFEU (ex Article 307 EC) provides:

*"The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of this Treaty.*

*To the extent that such agreements are not compatible with this Treaty, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established.  Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.*

*In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under this Treaty by each Member State form an integral part of the establishment of the Community and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States."*

## (5)    THE VIENNA CONVENTION ON THE LAW OF TREATIES (VCLT)

3.39.    Article 26 VCLT ("*Pacta sunt servanda*") provides:

> *"Every treaty in force is binding upon the parties to it and must be performed by them in good faith."*

3.40.    Article 27 VCLT ("Internal law and observance of treaties") provides:

> *"Internal law and observance of treaties: A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.  This rule is without prejudice to article 46."*

3.41.    Article 30 VCLT ("Application of successive treaties relating to the same subject matter") provides:

> *"1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of states parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.*
>
> *2. When a treaty specifies that is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.*
>
> *3. When all the parties to the earlier treaty are parties also the later treaty but the earlier treaty is not terminated or suspended in operation under Art. 59, the*

*earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.*

*4. When the parties to the later treaty do not include all the parties to the earlier one: (a) as between States parties to both treaties the same rule applies as in paragraph 3; (b) as between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.*

*5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty."*

(Article 103 of the UN Charter is not here relevant: it relates to the priority of obligations under the UN Charter).

3.42.   Articles 31 and 32 VLCT need no citation here, save Article 31(3)(c):

*"3. There shall be taken into account, together with the context: ... (c) any relevant rules of international law applicable in the relations between the parties."*

3.43.   Article 41 VCLT ("Agreements to modify multilateral treaties between certain of the parties only") provides:

*"1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if: (a) the possibility of such a modification is provided for by the treaty; or (b) the modification in question is not prohibited by the treaty and: (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.*

> *2. Unless in a case falling under paragraph 1(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides."*

3.44.   Article 59 VCLT ("Termination or suspension of the operation of a treaty implied by the conclusion of a later treaty") provides:

> *"1. A Treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject matter and: (a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or (b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.*
>
> *2. The earlier treaty shall be considered as only suspended in operation if it appears from the later treaty or is otherwise established that such was the intention of the parties."*

3.45.   The Tribunal notes that, in this case, Article 59 is not invoked by either party or the European Commission. It also notes that Articles 60-63 VCLT are likewise not invoked in these proceedings, neither by the Respondent nor the European Commission to contend that the ECT has been terminated or suspended as a consequence of any breach of the ECT, or that the ECT is impossible to perform or that there has been a fundamental change of circumstances.

*(6)*    ***THE ICSID CONVENTION***

3.46.   Article 26 of the ICSID Convention provides:

> *"Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy.   A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention."*

The Tribunal notes that Article 25(1) of the ICSID Convention (last sentence) provides that when the disputing parties have given their consent, no party may withdraw its consent unilaterally.

3.47.   Article 41(2) of the ICSID Convention provides:

> *"The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such other rules of international law as may be applicable."*

The Tribunal notes the mandatory nature of Article 41(2) for this Tribunal.

3.48.   Article 53(1) of the ICSID Convention provides:

> *"The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention."*

3.49.   Article 54 of the ICSID Convention provides:

>   *"(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.*
>
>   *(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.*
>
>   *(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought."*

3.50.   As Article 54 of the ICSID Convention makes clear, the Tribunal notes that an ICSID award is final and non-reviewable by an enforcing court, as if it were a final judgment of a court in that State. It is not permissible for that court, under the ICSID Convention, to refuse enforcement on the ground of public policy or non-compliance with any national or international law (see Schreuer, pp. 1140-1141). The reference to the national laws of the enforcing State in Article 54(3), regarding execution of an ICSID award, is limited to laws of a procedural nature only, as established by its drafting history and content (see Schreuer, p. 1149).

*(7)*    ***THE ICSID ARBITRATION RULES***

3.51.   ICSID Arbitration Rule 37(2):

> *"After consulting both parties, the Tribunal may allow a person or entity that is not a party to the dispute (in this Rule called the "non-disputing party") to file a written submission with the Tribunal regarding a matter within the scope of the dispute. in determining whether to allow such a filing, the Tribunal shall consider, among other things, the extent to which: (a) the non-disputing party submission would assist the Tribunal in the determination of a factual or legal issue related to the proceeding by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties; (b) the non-disputing party submission would address a matter within the scope of the dispute; (c) the non-disputing party has a significant interest in the proceeding. The Tribunal shall ensure that the non-disputing party submission does not disrupt the proceeding or unduly burden or unfairly prejudice either party, and that both parties are given an opportunity to present their observations on the non-disputing party submission."*

*(8)*    ***TABLE TFEU EX EC (ALSO "TEC")***

- Article 107 TFEU = Article 87 EC
- Article 108(3) TFEU = Article 88(3) EC
- Article 206 TFEU = Article 131 EC
- Article 207 TFEU = Article 133 EC
- Article 216(2) TFEU = Article 300(7) EC
- Article 218 (11) TFEU = Article 300(6) EC
- Article 258 TFEU = Article 226 EC
- Article 260 TFEU = Article 228 EC
- Article 263 TFEU = Article 230 EC
- Article 267 TFEU = Article 234 EC
- Article 344 TFEU = Article 292 EC
- Article 351 TFEU = Article 307 EC

*PART IV: APPLICABLE LAW(S)*

*(1)*        *INTRODUCTION*

4.1.    In this Part of the Decision, the Tribunal addresses the law(s) potentially applicable to the Tribunal's jurisdiction and to the merits of the Claimant's claims and the Respondent's defences, as of necessity preliminary matters to the following Parts of this Decision. The Tribunal's jurisdiction over the Parties' dispute is addressed more specifically in Part V of this Decision.

4.2.    It is appropriate first to record the relevant legal instruments and then to summarise the material submissions made by the Parties and the European Commission, before analysing the relevant issues requiring the Tribunal's decisions. The submissions made by the Parties and the European Commission were significantly different; and it is necessary to set out these summaries at some length, albeit that these are here only summaries of much more extensive submissions made in these arbitration proceedings, all of which have been considered by the Tribunal. The texts of the most relevant legal provisions cited below are set out in full in Part III of this Decision.

4.3.    *ECT:* Hungary, Belgium and the European Communities (now the European Union) are all Contracting Parties to the ECT: Hungary with effect from 7 July 1998; Belgium from 6 August 1998; and the European Union from 16 April 1998. There is no question that the ECT was and remains a valid treaty binding upon Belgium, Hungary and the EU: it has not been suspended, terminated or denounced by any of these Contracting Parties; and none has sought to withdraw from the ECT. (For ease of reference below, the European Communities is described as "the European Union" although the latter was only established with the Maastricht Treaty of 7 February 1992).

4.4.    *EU Statement:* The written statement submitted by the European Union pursuant to Article 26 ECT relating to the settlement of disputes between an Investor and a

Contracting Party (cited in Part III above) recognised, inter alia, the international responsibilities of the European Union and EU Member States "for the fulfilment of the obligations contained therein, in accordance with their respective competences."

4.5.    *ICSID Convention:* Hungary and Belgium are Contracting States to the ICSID Convention: Hungary with effect from 6 March 1987 and Belgium with effect from 26 September 1970. The European Union is not a Contracting Party to the ICSID Convention.

4.6.    *New York Convention:* Both Hungary and Belgium are Contracting States to the United Nations 1958 New York Convention: Hungary with effect from 1962 and Belgium with effect from 1975. The European Union is not a Contracting Party to the New York Convention.

4.7.    *VCLT:* The Respondent and Belgium have both acceded to the Vienna Convention on the Law of Treaties (but not the European Union): Hungary with effect from 19 June 1987 and Belgium from 1 September 1992.

4.8.    *EU BITs:* Hungary and Belgium agreed a bilateral investment treaty in 1986. It is one of many BITs, said to number almost 1,200, which have been concluded by EU Member States from 1959 to 2009, both with each other and with third States, i.e. so-called "intra-EU BITs" and "extra-EU BITs" respectively. This figure of 1,200 BITs represents almost half of all investment agreements currently in force in the world; and almost 50% of these were made by 6 of the 27 EU Member States, namely: Belgium (with Luxembourg), Denmark, France, Germany, the Netherlands and the United Kingdom.

4.9.    *EU Treaties:* Belgium was a founding Member, in 1958, of what is now the European Union. Hungary concluded the Europe Agreement of 31 December 1993 (to which Belgium is also a Contracting Party); and Hungary became a Member State of the European Union on 1 May 2004.

4.10.    *EU Lisbon Treaty:* Under the Treaty of Lisbon, effective from December 2009 as regards the European Union and its Member States (including Belgium and Hungary), the European Commission has asserted the European Union's exclusive

competence over the conclusion of agreements covering all matters relating to foreign investment comprising "both foreign direct investment and portfolio investment" pursuant to Articles 3(2), 63 and 207(2) TFEU (see paragraph 1.2 of the European Commission's Explanatory Memorandum of 21 June 2012 for its "Proposal for a Regulation of the European Parliament and of the Council establishing a framework for managing financial responsibility linked to investor-state dispute settlement tribunal established by international agreements to which the European Union is a party": COM(2012) 335 final).

4.11.    Whilst the Parties' dispute in this arbitration could be described colloquially as an "intra-EU dispute", neither this dispute nor this arbitration has much to do with intra-EU BITs or extra-EU BITs or the current controversies surrounding them, including the Lisbon Treaty. The Claimant does *not* advance its claims under any treaty other than the ECT (with the ICSID Convention), as regards both substantive investor-protections and investor-state arbitration; and the Claimant does *not* advance its claims under Hungarian law or EU law. Moreover, as explained further below, the Claimant does not challenge in these arbitration proceedings the relevant decisions of the European Commission under EU law, including its Final Decision of 4 June 2008. Lastly, the European Union was and remains a Contracting Party to the ECT.

4.12.    These features distinguish the present case from other *intra-EU BIT cases* and, more particularly from the investor-state arbitrations in *Eastern Sugar v The Czech Republic* (2007), *Binder v The Czech Republic* (2007), *Austrian Airlines v The Slovak Republic* (2009), *Oostergetel & Laurentius v The Slovak Republic* (2010) and *Eureko v The Slovak Republic* (2010).

4.13.    The Tribunal notes, as regards the last of these cases (*Eureko*), that the award dated 26 October 2010 on jurisdiction, admissibility and suspension is currently being challenged in legal proceedings in Germany, being the arbitral seat of those UNCITRAL proceedings. By a judgment dated 10 May 2012, the Oberlandesgericht Frankfurt am Main rejected the respondent's challenge, declining also to make a reference for a preliminary ruling to the European Court of Justice under Article 267 TFEU (Part C of the Judgment). These legal proceedings impugning the award

continue in Germany, with an appeal pending before the Bundesgerichsthof and a possible reference to the European Court of Justice.

4.14. The Tribunal also notes that the present case raises certain legal issues arguably similar to those addressed in *AES Summit Generation Limited and AES-Tisza Erömü Kft. v Hungary*, a case brought under the ECT and the ICSID Convention. The Tribunal also notes that the award of 23 September 2010 in those ICSID proceedings was subjected by the unsuccessful claimant to a claim for annulment under the ICSID Convention, which was dismissed on 20 June 2012.

4.15. Given these several factors, the Tribunal decided ultimately for this first phase of the arbitration to approach the relevant issues regarding the law(s) applicable to jurisdiction and the merits anew, without any deferential regard to these earlier cases. As a general matter, for one reason or another, the Tribunal considers that arbitration tribunals in investor-state arbitrations should take into account earlier decisions and also should not distance themselves from an existing series of consistent decisions save for compelling reasons. However, having reviewed the earlier cases on applicable law(s) relevant to the specific issues in the present arbitration, this Tribunal concluded that they do not change the outcome of these issues for the purpose of this Decision.

4.16. *This Case:* As already indicated above, these arbitration proceedings under the ECT and the ICSID Convention were commenced by the Claimant against the Respondent on 13 June 2007. At that time, when the Claimant sought to accept the Respondent's standing offer of arbitration contained in Article 26 ECT, the Respondent was a Member State of the European Union, as was Belgium; both States were Contracting Parties to the ECT (as was the European Union); both States were Contracting States to the ICSID Convention and, if and insofar here relevant, also to the New York Convention.

4.17. Given the effect of the ECT and the ICSID Convention, it is necessary to distinguish between the law or laws applicable to (i) the Parties' arbitration agreement contained in or evidenced by Article 26 ECT (with the ICSID Convention), relevant to the existence and scope of this Tribunal's jurisdiction to decide the merits of the Parties'

dispute; and (ii) the Parties' substantive rights and obligations under the ECT relevant to those merits.

4.18.   Article 42(1) of the ICSID Convention provides that this Tribunal should decide the Parties' dispute in accordance with "such rules of law as may be agreed by the parties"; and Article 26(6) ECT defines rules of law to be applied thereunder as "this Treaty and applicable rules and principles of international law". (These provisions are cited in full in Part III above).

4.19.   As a result of Article 300(7) EC, the ECT is binding upon the institutions of the European Union and on Member States as a matter of EU law. It follows, quite apart from its effect as a multilateral treaty under international law upon its Contracting Parties that the ECT is binding under EU law both on the European Union's institutions (including the European Commission) and its Member States (including the Respondent). The Tribunal also notes that the European Commission accepts, by virtue of Article 300(7), that the ECT "has full legally binding effects upon both the Community [the European Union] and Member States alike" (paragraph 45 of the European Commission's Submission). (Article 300(7) EC = Article 216(2) TFEU is cited in full in Part III above).

4.20.   In the present case, the possible laws applying to the arbitration agreement invoked by the Claimant and to the Parties' rights and obligations under the ECT may include: international law, EU law and Hungarian law, with EU law (also called by the Parties and others "EC law" and "EEC law") operating at three possible levels: (i) as international law, (ii) as a distinct legal order within the European Union, separate both from the national laws of EU Member States, and international law and (iii) as part of Hungary's national law.

4.21.   Before developing this analysis further, it is necessary for the Tribunal to summarise the Parties' respective cases as to applicable laws, together with the European Commission's Submission. (The Tribunal continues this analysis as regards jurisdiction in Part V of this Decision, which inevitably overlaps with this Part IV to a significant extent).

*(2)*     **THE CLAIMANT'S CASE**

4.22.   *Request:* In the Claimant's Request for Arbitration, there is only a brief discussion of the applicable law and the relationship between EU law and the ECT, although there are several references to the European legal background of the Parties' dispute. There is also a reference to the general investigation launched by the European Commission after the accession of Hungary to the European Union (on 1 May 2004) into the Hungarian electricity market and the compensation paid to MVM in respect of losses incurred following market liberalisation (paragraph 7.3), as well as a specific mention of the letter to the Hungarian Generators on 10 November 2005, in which "the HEO referred to the fact that it was possible that the European Commission would establish that 'profits of a business entity achieved under non-competitive circumstances, with state contribution are only acceptable to a certain extent'..." (paragraph 7.5)

4.23.   *Memorial and Amended Memorial:* In the Claimant's Memorial and Amended Memorial, there is a succinct analysis of the relationship between the ECT and EU law, acknowledging  the link between the measures taken by the Respondent and the European Commission's investigation resulting in the Final Decision of 4 June 2008, as follows:

> *"On 4 June 2008, the European Commission announced the outcome of its investigation into the Hungarian electricity system and the PPAs. The Commission requested Hungary to end the PPAs, because it concluded that they constitute 'unlawful and incompatible state aid to the power generators.' The Commission found that the PPAs in Hungary do not constitute an appropriate tool to compensate the generators for their pre-accession investments. It stated that the PPAs should be terminated before the end of 2008 and that ROH at the same time should recover the aid granted to the generators concerned since ROH's accession to the EU." (paragraph 287)*

4.24.    In Section IX of the Memorial devoted to "Applicable Law", the Claimant submits:

>    "*Because the present claim is an international law claim and because the applicable law to the present dispute is the provisions of the ECT and the rules and principles of international law, Hungarian domestic law is essentially a matter of fact or evidence.*" (paragraph 326)

4.25.    In Part VII of the Claimant's Amended Memorial, EU law is analysed as part of the Respondent's national law:

>    "*Termination cannot be justified on the basis that the PPA allegedly violates EC law.  First, the PPA was perfectly lawful when it was entered into in 1995. Secondly, Hungary cannot rely on its internal law to justify a breach of international law.*
>
>    *The Claimant submits that it is a fundamental principle of international law that a State cannot invoke its municipal law (and in the instant case European law) to justify its breach of international obligations.*" (paragraphs 37-38)

4.26.    According to the Claimant's Amended Memorial, EU law should be analysed as an internal or municipal law; and EU law is therefore irrelevant, save as a possible factual matter, in deciding whether or not the Respondent has violated its international legal obligations under the ECT:

>    "*Accordingly, the question of whether [Hungary] is in breach of any of its obligations under either the ECT and/or international law (and, if so, what consequences follow for any such breach) is to be determined by reference to the applicable law; namely, the ECT and the rules and principles of international law. Domestic/internal law is relevant only as a question of fact.*" (paragraph 42)

4.27.    *Reply Memorial:* In the Claimant's Reply Memorial, the Claimant deals more fully – in two sections – with (i) "The relevance of EC Law" and (ii) "Jurisdiction", in

answer both to the Respondent's Counter-Memorial and to the European Commission's Submission.

4.28.    *(i) The Relevance of EU Law:* The Claimant does not consider EU law to be applicable to its claims; and it also submits that certain acts of which it complains (namely the PPA's termination and the reintroduction of regulated prices) were not a necessary consequence either of the European Commission's Final Decision of 4 June 2008 or of the Respondent's general discussions with the European Commission concerning electricity pricing under EU law:

> *"Without prejudice to its case that EC law is substantively irrelevant, the Claimant notes that the Commission Decision did not require the Respondent to terminate the PPA." (paragraph 5(j))*

> *"… the termination of the PPA was not the inevitable consequence of the Commission Decision." (paragraph 79)*

> *"The Respondent may have discussed the reintroduction of regulated pricing with the Commission, but it is clear that the Respondent was not requested to take these steps as a matter of EC law." (paragraph 291)*

4.29.    The Claimant concludes that EC Law is relevant in this arbitration only as a matter of fact or evidence. Starting from Article 26 ECT, the Claimant submits that the Tribunal has to apply the ECT and "rules and principles of international law", adding that "EC law by its very nature does not represent the type of 'rules and principles of international law' contemplated by Article 26(6) ECT … The vast majority of EC norms depart significantly from 'rules and principles of international law' both in terms of their origin and their intended effect" (paragraph 495). The Claimant also submits that even if applicable, EU law could not overrule the ECT, because Article 16 ECT provides that other international treaties between individual parties to the ECT cannot derogate from the ECT if this were to create unfavourable effects on investors.

4.30.    The Claimant considers the European Commission's Final Decision of 4 June 2008 as fact and not law: "EC law generally and the Commission Decision specifically are not determinative of the conformity of the Respondent's conduct with the ECT,

including the failure to pay compensation" (paragraph 514). For the same reason, it is the Claimant's position that EU law could not be invoked to resist the judicial enforcement under the ICSID Convention of an award providing (for example) for the payment of damages by an EU Member State where that payment could be considered as a form of State aid incompatible with EU law.

4.31.    Another submission developed by the Claimant is that "EC law is irrelevant to the interpretation of the ECT." The Claimant refers to Article 31(3)(c) of the Vienna Convention (which permits taking into account, for the purpose of interpretation, "any relevant rules of international law applicable in the relations between parties"), as requiring that such international rules "are applicable in the relations between *all* Contracting Parties to a treaty" (paragraph 501). The Claimant dismisses the relevance of Article 30 of the Vienna Convention on successive treaties relating to the same subject-matter, on the ground that the ECT and EU treaties do not have the same subject-matter.

4.32.    The Claimant submits that "EC law does not rise to the level of international public policy that would trump the application of ECT provisions in the present case" (Section V(C)). This is the Claimant's answer to the Respondent's submission that EU competition law is part of international public order and therefore that the PPA's termination, being in conformity with such public order, cannot be treated as a violation of the ECT. The Claimant disputes the mandatory character of EC competition law and submits that, even if mandatory, it could not form part of any international public order.

4.33.    *(ii) Jurisdiction:* The Claimant notes that the Respondent has not raised any jurisdictional objection equivalent to the European Commission's Submission, where the Commission contends that the Tribunal has no jurisdiction to decide the substantial part of the Parties' dispute; that the European Union is the appropriate respondent in this arbitration; and that the Parties' dispute should be decided not by arbitration at all but by the courts of the European Union; i.e. the ECJ. The Claimant rejects the Commission's jurisdictional objection: the Claimant does not in this arbitration reproach the Commission for any act under EU law (including its Final Decision of 4 June 2008), but, rather, the Claimant only presents claims against the

Respondent under the ECT relating to the way the Respondent has treated the Claimant's investment.

4.34.    The Claimant recognises, however, that it is an essential task of the Tribunal to check and confirm its own jurisdiction under the ECT and the ICSID Convention in this arbitration, whether or not any party or third person has made a jurisdictional objection. Accordingly, the Claimant, by way of precaution, presents six arguments to the effect that the Tribunal has jurisdiction to decide the Parties' dispute.

4.35.    First, the Claimant considers that the European Commission misinterprets the concept of "internal dispute" (which is how it characterises a dispute between a Community investor and an EU Member) because such a dispute arises only when the dispute is governed by EU law – which is not this case. Second, "the Contracting Parties to the ECT have expressed an unconditional consent to the jurisdiction of ICSID tribunals over disputes between an Investor and a Host State" (paragraph 523), without any restriction concerning disputes arising in the framework of a Regional Economic Integration Organisation ("REIO"), such as the European Union (including the Commission). Third, the European Union and EU Member States are independent parties to the ECT and (as regards most Member States including the Respondent) the ICSID Convention. Fourth, the Claimant does not complain in this arbitration about any acts committed by the European Commission because its claims here are addressed only to the Respondent. Fifth, "the EC and ICSID/ECT are distinct and separate legal orders conveying differing rights and obligations to their subjects" (paragraph 526): Dunamenti (but not the Claimant) started legal proceedings against the Commission before the EU courts in Luxembourg seeking the annulment of the Final Decision of 4 June 2008, but, so the Claimant submits, that litigation cannot prevent a foreign investor in Dunamenti (such as the Claimant) from bringing a different claim against an EU Member State by international arbitration under the ECT and the ICSID Convention. Sixth, "if the Commission was the [only] rightful respondent, the Claimant would be deprived of the opportunity to bring a claim under the ICSID Rules or the ICSID Convention" (paragraph 527). It will be recalled that the European Union (including the Commission) is not a party to the ICSID Convention.

4.36.   *Post-Hearing Submissions:* In its Post-Hearing Submissions, the Claimant substantially elaborated its case on applicable law and the relationship between EU law and the ECT, as follows: (i) EU law is not applicable as law, but as fact in this arbitration; (ii) in any event, only EU Treaties are part of international law; (iii) EU Treaty law incorporates the ECT; (iv) if there were any inconsistency, ECT has primacy over EU law; and (v) EU law and the ECT can be read in harmony. It is appropriate to summarise each of these submissions in turn.

4.37.   *(i) EU law is not applicable as law, but as fact:* In order to interpret the reference in Article 26 ECT to rules and principles of international law as excluding EU law, the Claimant reiterates that the reference to international law can only be to rules applicable to *all* parties to the ECT:

> *"Electrabel contends that this means the ECT together with rules and principles of international law, not including EU law.*
>
> *Because EU law is not common to all Contracting Parties to the ECT, it does not rise to the level of applicable international law for purposes of the ECT. … This would mean that an Investor from a Contracting Party within the EU would receive less favourable treatment (if Hungary could rely on EU law as overriding the ECT) than an Investor from a Contracting Party outside the EU."* *(paragraphs 71 and 73)*

4.38.   Moreover, the fact that the EU (as an REIO) can make binding decisions on EU Member States under EU law does not relieve ECT Contracting States from respecting their commitments under the ECT in implementing such decisions:

> *"Electrabel does not contest that, … 'Hungary had no discretion but to implement the Commission's binding decision', but rather focuses on the <u>manner</u> in which Hungary went about implementing the Commission Decision, in particular the decision to terminate rather than amend the PPA by force of law and the non-payment of compensation." (paragraph 409)*

4.39.  The Claimant reaffirms that the EU law is not therefore part of the applicable law in this case and that EU law cannot excuse the Respondent's terminating the PPA in violation of the protection afforded to the Claimant by the ECT:

> *"Hungary cannot rely on changes in its domestic law, including changes consequent on its accession to the EU, to justify a breach of its international law obligations."(paragraph 19)*

> *"Hungary seeks to hide behind EU competition law. Electrabel submits that the compensation payable upon the expropriation of a covered Investment should be computed without regard to EU concepts such as State Aid or Stranded Costs, because public international law and the ECT have primacy." (paragraph 32)*

4.40.  *(ii) In any event, only EU Treaties are part of international law:* The Claimant accepts that the 1958 Rome Treaty and its amendments, being treaties between States, can be considered as part of international law; but the Claimant disputes extending this analysis from the EU Treaties to the decisions of the different organs of the European Union, including the decisions of the European Commission which are qualified as mere "administrative decisions" and thus not part of international law.

4.41.  *(iii) EU Treaty law incorporates ECT:* In the event that EU law were held applicable by the Tribunal (either the EU Treaties only or even the whole body of EU legal rules), contrary to its primary submission, the Claimant contends that its application would not displace the ECT which would remain applicable to the Parties' dispute. Article 300(7) EC (Article 216(2) TFEU) provides that: "Agreements concluded under the conditions set out in this Article shall be binding on the institutions of the Community and on Member States." The ECT being such an "Agreement" concluded both by the Member States and the European Union, it follows that the ECT is binding on the European Union and thus cannot be modified by EU law.

4.42.  *(iv) If there is inconsistency, the ECT has primacy:* Contrary to the Respondent's case, the Claimant submits that the ECT, in case of inconsistency, has primacy over EU law. The Claimant does not here rely on Article 16 ECT or Articles 30 or 59 of the Vienna Convention because it considers that the ECT and the EU Treaties do not

have the same subject-matter. The primacy of the ECT is based, according to the Claimant, on the law applicable to its Request for Arbitration invoked under Article 26 ECT and Article 42 of the ICSID Convention.

4.43.  *(v) EU law and ECT can be read in harmony:* Although the Claimant asserts that there exists no legal principle of harmonious application, it nonetheless submits that "a harmonious application of the two legal systems would be a finding that EU law and practice permits compensation in the form of Stranded Costs, but Hungary has acted inconsistently with EU law and in breach of the ECT in not paying the net Stranded Costs owed to Dunamenti of HUF 22 billion (EUR 80 million) that Hungary itself had calculated" (paragraph 98).

4.44.  *Response:* In its later Response of 1 August 2011, the Claimant submits: "(t)he Claimant reiterates that the applicable law to this dispute is the ECT and applicable rules and principles of international law. EU law is relevant only as a fact" (paragraph 2). The same reasoning is repeated in paragraph 67 of its Response:

> *"The Claimant maintains that this is a claim brought under the ECT and the applicable law is the ECT and applicable rules and principles of international law. EC competition law, including the rules concerning State Aid, is relevant only as a fact. As a result, the requirements of EC competition law do not excuse a breach by Hungary of its obligations under the ECT."*

4.45.  In other words, according to the Claimant, EU law cannot be taken into account by the Tribunal in order to decide whether or not the Respondent has violated the rights of the Claimant as an investor under the ECT:

> *"Whether or not Hungary has violated the protections in Part III ECT is a matter for the merits and should be considered through the application of the ECT and applicable rules and principles of international law. Hungary's actions must be considered in light of the requirements of EU law as a matter of fact. However, compliance with EU law cannot excuse a breach of the ECT."* *(paragraph 56)*

4.46.    The Claimant supports this conclusion with the scholarly article by Professor Christian Tietje (originally cited in the European Commission's Submission on a different point):

> *"It can be concluded that with regard to the jurisdiction of an arbitral tribunal as well as the merits of a respective case, the arbitral tribunal is required to exclusively apply the ECT as a treaty of public international law and if applicable additional relevant sources of public international law. In this respect, there is no margin regarding the application of national or EC legislation." (paragraph 92)*

4.47.    As regards different legal rules for the reconciliation of international treaties, namely Article 16 ECT, Article 307 EC (Article 351 TFEU) and Article 30 of the Vienna Convention, the Claimant considers that Article 16 ECT applies to the present case:

> *"In Article 16 ECT, the Contracting Parties have agreed that the provisions of Part III and V ECT shall take precedence over a subsequent treaty. Article 16 is not a rule for successive treaties as Hungary suggests. Article 16 refers to a subsequent treaty 'whose terms concern the subject matter'. There is no requirement for those terms to be the same <u>subject</u> matter." (paragraph 70; original emphasis)*

4.48.    The Claimant submits that Article 307 is irrelevant here because it only applies in relation to treaties that Member States have entered into with third states prior to, in this case, Hungary's accession to the EU. Alternatively, the Claimant submits that, if Article 307 does apply to this case, this would still not mean that EU law would override the ECT:

> *"Alternatively, even if the EC Treaty and Article 307 do apply, the Claimant submits that: (a) as an international tribunal this tribunal is not obliged to follow the case law of the ECJ interpreting Article 307; and/or (b) the recent case law of the ECJ favours the Claimant in any event." (paragraph 71)*

4.49.   As to such "case-law", the Claimant submits that the ECJ has mainly applied Article 307 to cases where treaties comprised bilateral rights and obligations. This would not, according to the Claimant, be the same as the present case where a treaty "such as the ECT ... creates rights and guarantees for individuals (or investors)" (paragraph 75).

4.50.   The Claimant submits that Article 30(3) of the Vienna Convention does not apply in this case, because "(t)he Contracting Parties to the ECT (including the EU) agreed in the earlier treaty (ECT) that the later [EC] treaty (EC Treaty; now TFEU) will *not derogate* from the protections contained in the ECT. Article 30 is residual in nature and gives way to the specific conflict clause that was included in the ECT" (paragraph 81, original emphasis).

4.51.   Commenting on the Advocate General's Opinion of 15 March 2011 in *Commission v Slovakia* (Case C-264/09), the Claimant there finds support for its submission that the protection granted by the ECT to investors supersedes the rules on State aid of the EC Treaties and their implementation by the European Commission. The Claimant submits that: "Importantly for present purposes, the AG concluded (at paragraph 77) that under Article 307(1) EC, *the rights of private parties resulting from a pre-accession international agreement are not affected.* Thus, if (in the present case) [the Respondent] has obligations towards [the Claimant] which cannot be fulfilled if [the Respondent] applies its subsequent obligations under EU law, then those obligations should be disapplied even under the rules of EU law itself" (paragraph 85, original emphasis).

4.52.   *Reply Response:* In its Reply Response dated 6 September 2011, the Claimant concludes, as regards applicable law and jurisdiction under the ECT, that: "the key issue is whether Hungary breached the ECT when exercising the discretion afforded to it by EU law"; and that it is Hungary that has given the Claimant the right to bring an arbitration within the framework of the ICSID regime.

4.53.   In conclusion, the Tribunal notes that the Claimant's claims are advanced in this arbitration under the ECT only and that it is not part of the Claimant's pleaded case that the Respondent is liable in respect of any of the Claimant's claims because the Respondent has violated EU law. Moreover, the Claimant's claims, as pleaded, do

not seek to impugn any acts of the European Commission under EU law; and the Claimant does not assert that the Respondent is legally responsible for such acts under the ECT, including the European Commission's Final Decision of 4 June 2008.

## (3)    THE RESPONDENT'S CASE

4.54.    *Preliminary Objections:* In its Preliminary Objections, the Respondent presents little on the law applicable to the merits of the Parties' dispute or the relationship between the ECT and EU law. Moreover, the Respondent there "acknowledges that the Tribunal has jurisdiction to entertain the claims presented by Electrabel that challenge official government action of a sovereign or regulatory nature" (paragraph 4). As regards jurisdiction, as already noted above, that remains the position of the Respondent as regards the jurisdiction of this Tribunal, which is materially different from the jurisdictional objection made in the European Commission's Submission.

4.55.    *Counter-Memorial:* The Respondent's Counter-Memorial, in Section IV, is devoted to "The relevance of EC law to the price regulation and termination claims." The Respondent there addresses the dual nature of EU law, as being both internal law and international law, under four principal submissions.

4.56.    *(i) EU law is a fact, as being included in national law:* The Respondent's starting-point is materially the same as that of the Claimant, namely Article 26 ECT on applicable law:

> *"Hungary agrees that the ECT and rules and principles of international law are the applicable law in this arbitration, but Hungarian law is also relevant as a matter of fact or evidence. Hungary notes, however, that the notion of Hungarian domestic law includes EC law as well, due to Hungary's accession to the European Union in 2004. Therefore EC law is also relevant in this arbitration as a matter of fact or evidence." (paragraph 401)*

4.57.   *(ii) EU law is international law:* The Respondent submits that, because Article 26 refers to international law, EU law qualifies as international law because it derives from international treaties:

> " ... *Article 26(6) of the ECT itself provides for application not only of the ECT's own terms, but also of "applicable rules and principles of international law." This provision makes EC law directly relevant, because it derives from international obligations ..." (paragraph 402)*

4.58.   This second submission answers, according to the Respondent, the Claimant's contention that EU law is only a national or "internal" law. The Respondent accepts that EU law is part of the Respondent's national law; but it is also international law:

> *"Claimant characterizes European law (or EC law) as merely "internal" or "municipal" law. Based on this characterization, Claimant then relies on the general proposition that States cannot justify a breach of international legal obligations by retreating to the legality of their actions under "internal" law.*
>
> *Claimant's argument ignores one fundamental point. While EC law may be "internal" to the system of the European Union – and thus of no relevance to States who are not Members of the European Union – for those who are Members, it is still the result of a multinational treaty, the EC Treaty (and the various Accession Treaties by which new Member States became bound)." (paragraphs 550-551)*

4.59.   *(iii) The ECT and EU law should, to the extent possible, be read in harmony:* The Respondent refers to a general legal principle permitting the harmonious interpretation of different international treaties agreed into by the same parties:

> *"It is axiomatic that where two States have obligations to each other under two different treaties involving overlapping subject matters, those obligations should – to the extent possible – be read in harmony, not as inevitably conflicting and therefore requiring a stark choice among legal regimes." (paragraph 410)*

4.60.   According to the Respondent, this principle of interpretation is particularly relevant to the ECT and EU law. As submitted by the Claimant, "the ECT was the brainchild of the European Union" (paragraph 404); and accordingly, in applying the ECT, the Tribunal should look also at EU law in order properly to interpret the extent of the Respondent's obligations under the ECT.

4.61.   According to the Respondent, this exercise is not a difficult task in the present case: "harmonizing the ECT and the mandatory public policy reflected in EC competition law … should be relatively easy" (paragraph 412). This is so, according to the Respondent, because any legitimate expectations of the Claimant under the ECT (which refers to EU competition rules) could not entitle the Claimant to refuse to follow the legally binding decisions of the European Commission under EU law, such as the Final Decision of 4 June 2008.

4.62.   *(iv) EU law has to be taken into account both as national and supra-national law:* As a result of the Respondent's membership of the European Union, the Respondent contends that EU law has become both part of its own national legal order and also a supra-national legal order binding on the Respondent. Analysed from this dual perspective, the European Commission's Final Decision on the status of the PPA under EU law is a fact, so the Respondent submits, that the Tribunal cannot ignore when applying the ECT:

> *"The Tribunal should take the Commission's Final Decision into account – including its findings that the PPAs are illegal, and that any compensation paid by Hungary to generators in order to replicate the illegal benefits of the PPAs would itself run foul of EC law – as a critically important fact in its application of ECT standards." (paragraph 418)*

4.63.   *Rejoinder:* In its Rejoinder, the Respondent presents more fully its case on the relevance of EU law, whilst commenting also on the European Commission's Submission. In short, the Respondent rejects the Claimant's argument of absolute dominance of the ECT over EU law:

> *"The obvious question, therefore, is whether Hungary can be condemned under the ECT for doing precisely that which it was ordered to do, by a supranational*

> *authority whose decisions Claimant's own expert concedes were absolutely*
> *binding on Hungary. But according to Electrabel, this Tribunal need not even*
> *grapple with this issue, because the application of ECT principles purportedly is*
> *entirely unaffected by issues of mandatory EC law – even in a dispute involving*
> *an EU investor and an EU Member State. This is an extraordinary proposition.*
> *It rests on a number of faulty contentions." (paragraph 192)*

4.64.   Although it involves a certain amount of repetition, the Respondent's arguments can be summarised as follows: (i) EU law is international law; (ii) EU law is also relevant as a fact; (iii) the Claimant's theory of the ECT's absolute dominance is unacceptable; and (iv) EU law and ECT can be read in harmony, if necessary.

4.65.   *(i) EU law is international law:* The Respondent answers the Claimant's case that "the applicable rules and principles of international law" under Article 26 ECT can only be rules accepted by all participants to the ECT, by stating that no requirement to that effect is expressed in Article 26. In addition, so the Respondent submits, the Claimant's interpretation would render Article 26 almost meaningless "because there are few if any other treaties relevant to commercial or investment issues that have been ratified by all 53 signatories to the ECT" (paragraph 202).

4.66.   The Respondent submits that no logical reason exists to disregard the EC Treaty as an international treaty providing for rules of international law, such as (for example) Article 87 which prohibits Member States from granting aid that "distorts or threatens to distort competition by favoring certain undertakings." The same is said to be true for decisions taken by the European Commission, which EU Members signing the ECT have recognized as legally binding upon them.

4.67.   The unavoidable conclusion, according to the Respondent, is that "(f)or the purpose of this dispute, therefore, the EC Treaty – including Articles 87 and 88 on State aid – qualifies as one of the 'applicable rules and principles of international law' to be considered under ECT Article 26(6)", as well as the decisions implementing these rules and principles (paragraph 202).

4.68.   The Respondent emphasises that one of the objectives of the ECT is, as was recognised by the Claimant's expert witness, Professor Adnan Amkhan (Second

Opinion, paragraph 24), to "encourage … competition, liberalisation of energy markets, and access to energy markets" (Professor Amkhan was the Head of the Legal Affairs Department of the Energy Charter Secretariat from 1 May 2000 to 31 July 2004). The Respondent therefore asserts that "Hungary's enactment of the PPA Termination Act implementing the Commission Decision was thus in furtherance of the ECT's object and purpose, not in violation of it" (paragraphs 206-207).

4.69.    *(ii) EU law is also relevant as a fact:* According to the Respondent, in addition to being directly applicable, the EC Treaty is also relevant to this case as a matter of fact, in four different ways.

4.70.    First, as soon as EU law became part of Hungarian law, the legality or illegality of the PPA had to be evaluated with regard to EU law. Second, the legitimate expectations of the Claimant were shaped by the PPA, which included a reference as an act of force majeure to any decision by an international entity, such as the European Commission; and this reference means that the Commission's decisions can constitute force majeure and shape those expectations. Third, the fact that the PPA was considered illegal by the European Commission (by its Final Decision of 4 June 2008) is relevant in appraising the Respondent's conduct in terminating the PPA, which cannot therefore be considered arbitrary or irrational in violation of the ECT. Fourth, the same analysis applies to the appraisal of the Respondent's refusal to pay to the Claimant compensation that would be equivalent to illegal State aid because the European Commission has given "repeated warnings that providing such compensation would simply be replicating improper subsidies in another form" (paragraph 212). In short, the extent of the Claimant's property rights, the existence and scope of its legitimate expectations and the rationality of the Respondent's actions are all questions requiring a factual inquiry by the Tribunal that has to take into account EU law.

4.71.    *(iii) The Claimant's theory of the ECT's absolute dominance is unacceptable:* The Respondent refutes the Claimant's arguments that the ECT overrides EU law, by reference to both Article 16 ECT and EU law itself.

4.72.    The Respondent acknowledges that Article 16 ECT provides that, in case of conflict between two successive treaties concerning the subject matter of Part III or V of the

ECT, the more favourable provision for the investor or the investment must apply. As to the Claimant's argument that the ECT protecting investors' property is more favourable than EU law interfering with the rights of investors, the Respondent responds by pointing out that whether or not the ECT and EU law have the same subject-matter, the analysis of the Claimant does not stand:

> "... Electrabel's claim that the ECT absolutely overrides considerations of EC law is based on faulty premises. As discussed in Section II.B.3, Electrabel sources this supposed dominance to the conflict of laws principles of ECT Article 16, while ignoring the threshold inapplicability of Article 16 to the question at hand. Electrabel itself contends that that [sic] the ECT and the EC Treaty do not relate [sic: "concern" is the word used in Article 16 ECT] to the same "subject matter," which is a stated prerequisite to Article 16's application. If Electrabel is correct on this score, then Article 16 is irrelevant, and cannot support its ECT dominance theory. If Electrabel is not correct, then Article 16 still does not supply the applicable conflict of laws principle, because it was superseded at the moment of Hungary's EC accession by the very different conflict of laws principle of EC law, which provides for supremacy of the EC Treaty over earlier treaties between EU Member States." (paragraph 195)

(This is a reference to Article 307 EC, now Article 351 TFEU).

4.73.    The Respondent asserts that the supremacy of the EC Treaty was accepted by both the Respondent and Belgium when they acceded to the EU. The Respondent points to several cases decided by the ECJ implementing this principle:

> "The ECJ confirmed this in Commission v. Italy, stating that "[i]n matters governed by the [EC] Treaty, that treaty takes precedence over agreements concluded between Member States before its entry into force." Case 10/61, Commission v. Italy, [1962] ECR 1. In the Deserbais case, the ECJ subsequently observed that "a Member State cannot rely on the provisions of a pre-existing convention ... in order to justify" anti-competitive market practices that are inconsistent with the EC Treaty. Case 286/86, Ministère Public v. Deserbais, [1988] ECR 4907 ... More recently, in Commission v. Austria, the ECJ described it as "the settled case-law of the Court" that "whilst Article 307 EC allows Member States to honour obligations owed to non-member States under

> *international agreements preceding the Treaty, it does not authorise them to*
> *exercise rights under such agreements in intra-Community relations." Case*
> *147/03, Commission v. Austria, [2005] ECR I-5969, paragraph 58." (footnote*
> *484)*

4.74.    The Respondent concludes that "(i)t beggars belief that either Belgium, Hungary or the EC believed that the ECT, through Article 16, could be used as a vehicle to override otherwise mandatory provisions of EC competition law, to facilitate a claim by European investors against another European Member State" (paragraph 223).

4.75.    *(iv) EU law and ECT can be read in harmony:* Although the Respondent addresses the possible reconciliation between EU law and the ECT in case of contradiction, it submits primarily that there is no contradiction between these two legal orders because the Claimant was well aware that its rights under the ECT were subject to modification at the time of the Respondent's admission into the European Union: in its words, "(t)he Tribunal in these circumstances need not decide difficult questions about whether the ECT trumps the EC Treaty, or the EC Treaty trumps the ECT, in disputes between EU investors and EU Member States. As the Respondent emphasized in its Counter-Memorial, the two sets of norms are not in conflict on the facts of this case" (paragraph 239).

4.76.    The Respondent states that it welcomes the Tribunal's decision to allow the European Commission to be heard in this arbitration as a non-disputing party:

> *"In these circumstances, Hungary believes the Commission's Submission will*
> *assist the Tribunal by providing a unique perspective, as well as particular*
> *knowledge and insight, regarding core issues in these proceedings." (paragraph*
> *243)*

4.77.    The Respondent then indicates that there are important differences between the Respondent's case and the European Commission's Submission:

> *"The Commission has its own institutional interest not only in protecting the*
> *integrity of its Commission Decision on State aid, but also in addressing the*

> *fundamental relationship between Member States and EU institutions, which goes far beyond the circumstances of this case. Those broader institutional concerns are apparent, for example, in the Commission's introductory remarks about the Tribunal['s] jurisdiction .…" (paragraph 244)*

4.78.  *Post-Hearing Submissions:* In the Respondent's Post-Hearing Submissions, there is a lengthy discussion relating to applicable law and the relationship between EU law and ECT. The summary is best here quoted in full:

> *"To be clear, Hungary continues to believe that, while the EC law context of this dispute does not deprive the Tribunal of jurisdiction, it directly affects the manner in which the ECT standards in this case should be interpreted and applied. Claimant takes the view that the Tribunal may consider EC law and the Commission's Decision as relevant facts. Furthermore, as explained in Hungary's Rejoinder and acknowledged by Claimant's own expert, EC law operates at the international treaty level, as well as at a domestic level, and therefore the EC Treaty (and its explicit prohibition of incompatible State aid) constitutes part of the "applicable rules and principles of international law" in accordance with which the ECT itself says it should be applied. The application of EC law is not defeated by Article 16 of the ECT, which is irrelevant both because it only pertains to treaties concerning the same "subject matter," and because the conflict of law provisions of a later treaty (the EC Treaty, as applicable to Hungary upon accession) override those of an earlier treaty, even when the earlier treaty (here the ECT) purports to opt out of lex posterior principles. In Hungary's view, however, these points are largely academic on the present facts, because the ECT standards can and should be interpreted harmoniously with EC competition and State aid law, particularly given the crucial role played by the European Communities in drafting the ECT and the ECT's stated purpose of promoting greater competition. It simply strains credulity to believe that the ECT could require Hungary to compensate Claimant for the full value of its PPA, even though EC law affirmatively forbids this as a replication of an incompatible State aid benefit." (paragraph 14)*

4.79.  *Response:* In the Respondent's Response of 1 August 2011, as regards Article 307 EC, the Respondent re-states its previous case, according to which "Article 307 is

aimed solely at respecting pre-existing obligations to non-Member States and is inapplicable in an intra-EU dispute" (paragraph 23). The Respondent refers to ECJ decisions, particularly *Commission v Italy*, and to Professor Jan Klabbers' work, *Treaty Conflict and the European Union* (CUP, 2009, pp. 120-122).

4.80.   The Respondent also reiterates its position that: "as Hungary has explained at length in these proceedings, the EC Treaty operates at the level of international law and therefore forms part of the *applicable law* in an ECT dispute between Member States. Hungary's conclusion on this point is shared by Claimant's own expert, Professor Sir David Edward, who agreed on cross-examination that 'some of EC law is treaty law, and [the ECT] doesn't necessarily prevail over treaty law' ..." (paragraph 30; emphasis in the original).

4.81.   Although the Respondent does not consider that the ECT and EU law are incompatible, it refers to the rules applying in case of incompatibility, primarily to Article 30 of the Vienna Convention:

> "*First, Hungary has argued, contrary to the view expressed by Professor Tietje, that EU law is part of applicable law in this dispute, as an international agreement in force between the Contracting Parties within the meaning of ECT Article 26(6). Under Article 30 of the Vienna Convention on the Law of Treaties and the general rule of lex posterior, an earlier treaty applies "only to the extent that its provisions are compatible with those of the later treaty." In the case of two treaties with non-identical parties, "as between State Parties to both treaties the same rule applies ...." (paragraph 32)*

4.82.   The Respondent acknowledges that there would appear to be an incompatibility between the ECT and EU law if the PPA's termination in compliance with the European Commission's Final Decision could be a violation of the ECT and if a payment of compensation equivalent to State aid could be awarded by the Tribunal. This being noted, the Respondent submits that "the rules of interpretation laid down in the Vienna Convention *require* harmonious interpretation" (paragraph 37; emphasis in the original), and it refers in particular to Article 32 of the Vienna Convention:

> "*Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order*

> *to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31: (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable." (paragraph 37)*

4.83.    The Respondent contends that it would be wrong under the Vienna Convention for the Tribunal to conclude that, in complying with EU law, the Respondent could be in breach of the ECT in this case:

> *"Hungary believes it would in fact be "manifestly absurd or unreasonable" to interpret the ECT as requiring Hungary to act in breach of binding obligations under the EC Treaty, especially those designed to foster competition, which was a core purpose of the ECT itself." (paragraph 38)*

4.84.    In addition to its principal submission that EU law is part of international law, the Respondent agrees with the Claimant that EU law is also relevant as a fact, as part of the Hungarian legal order. The Respondent submits that this has far reaching consequences on the legal analysis of the Respondent's conduct towards the PPA:

> *"In reality of course, the fact of the Commission's decision is highly relevant to virtually every principal inquiry under the ECT's investment protection provisions, for instance the rationality, non-arbitrariness and good faith of Hungary's action, the existence of a compelling public objective supporting those actions, and the residual value of the PPA (having already been declared illegal by the Commission) at the time Hungary adopted the PPA Termination Act. In each case, the Commission's decision weighs decisively in favor of the conclusion that Hungary has not breached the Energy Charter Treaty in terminating Dunamenti's PPA." (paragraph 44)*

4.85.    *Reply Response:* In the Respondent's Reply Response of 6 September 2011, the Respondent submits that the Claimant is mistaken when it asserts that a multilateral treaty cannot be interpreted differently depending on the parties to the dispute. To the contrary, the Respondent argues that "Article 31(3) [of the Vienna Convention] provides for treaty interpretation in accordance with "any relevant rules of

international law applicable in the relations between the parties", which means that different rules might apply to different parties." This interpretation of Article 31(3) is supported by the work of the International Law Commission, according to the Respondent:

> *"As explained in a recent International Law Commission Study Group report on the Fragmentation of International Law, the better reading of this Article is that it provides for interpretation in accordance with the international law, including treaties, applicable between the disputing Parties rather than among all Parties to a multilateral treaty." (paragraph 5)*

4.86.  As regards Article 307 of the EC Treaty (Article 351 TFEU), the Respondent agrees with the Claimant that it does not apply to this arbitration and suggests therefore that "there is no need for the Tribunal to give the Article significant attention" (paragraph 9). However, the Respondent disagrees with the alternative argument of the Claimant that, if Article 307 were applicable, it would entail the supremacy of the ECT over EU law. The ECJ case law, which the Respondent considers should be relied upon by the Tribunal, "is consistent and unambiguous in holding Article 307(1) inapplicable in intra-EU relations" (paragraph 11).

4.87.  The Respondent also disagrees with the Claimant's submission that Article 307 has been applied by the ECJ to bilateral rights and obligations, thereby excluding an investor's rights under the ECT. According to the Respondent:

> *"... investment protection provisions of the Energy Charter Treaty can easily be conceptualized as "bundles of bilateral rights and obligations." In fact, the vast majority of investment protection treaties in the world are bilateral in nature." (paragraph 12)*

4.88.  Finally, as regards the Opinion of the Advocate General in *Commission v Slovakia*, the Respondent indicates that this was a case concerning a pre-accession treaty between an EU Member and a non-Member of the EU, which is not, of course, the present case.

*(4)*      ***THE EUROPEAN COMMISSION'S SUBMISSION***

4.89.    As already recited in Part I of this Decision, by its procedural order dated 28 April 2009, the Tribunal granted the European Commission's request to file a submission as a non-disputing party in this arbitration. The relevant part of the Tribunal's order provided as follows:

> *"22. In the exercise of its discretion under ICSID Arbitration Rule 37(2), having considered the Application of the European Commission in these arbitration proceedings, the terms of ICSID Arbitration Rule 37(2), the Parties' several observations and proposals with regard to the Application, the Tribunal hereby allows the European Commission to file a written submission as a non-disputing party in this case by 12 June 2009.*

> *23. The scope of such submission shall be as requested in the European Commission's Application dated 13 August 2008.*

> *24. More specifically, the Tribunal notes that while the European Commission is an expert commentator on European Community law and could accordingly assist the Tribunal by addressing several legal issues, the scope of its legal opinion should in principle be directed to addressing the following issues: (a) European Community Law and its connection with the Energy Charter Treaty; (b) Community Law and the State Aid investigation concerning the Power Purchase Agreements signed by Hungary; and (c) the Effect of Community Decisions on the European Union's Members States, particularly Hungary.*

> *25. As to purely factual questions, the Tribunal notes that, in principle, the European Commission is unlikely to assist the Tribunal in these arbitration proceedings."*

4.90.    The European Commission specified at the beginning of its Submission that it would not limit itself to the specific questions asked by the Tribunal in paragraph 24 of its order, but also that, relying on its Application and on paragraph 23 of the order, the Commission would raise "certain questions concerning the jurisdiction of the

Tribunal" (paragraph 3). It added also that "the Commission would clarify that it presents its views as the external representative of the European Communities as a Contracting Party to the Energy Charter Treaty" (paragraph 4).

4.91.   At the outset, the Tribunal wishes to record its thanks and appreciation to the European Commission for its Submission, as regard both applicable law and jurisdiction. It is a lengthy, scholarly and important document for these arbitration proceedings; and only part of it is cited in this Decision.

4.92.   The Tribunal (with the assistance of the Parties and their expert witnesses) has considered at length the terms and effect of the European Commission's Submission in these arbitration proceedings. Albeit with hindsight, it is unfortunate that the European Commission could not play a more active role as a non-disputing party in this arbitration, given that (as was rightly emphasised in the European Commission's Submission), the European Union is a Contracting Party to the ECT in which it played from the outset a leading role; and, moreover, that the European Commission's perspective on this case is not the same as the Respondent's and still less that of the Claimant. In short, the European Commission has much more than "a significant interest" in these arbitration proceedings. Unlike the two Parties, the Commission has made a jurisdictional objection based on EU law as the law applicable to the Parties' arbitration agreement. Whilst that objection is addressed by the Tribunal in Part V below, it is necessary to start here with the Commission's arguments on applicable law.

4.93.   Before analysing in its Submission the applicable law and the relationship between EU law and the ECT, the European Commission presented its case as to State aid under EU law.

4.94.   *(i) State Aid:* The Commission presented a brief history of the evolving relations between the Respondent and the European Union, recounting that the 1993 Europe Agreement between the European Union and the Respondent already contained specific rules on State aid similar to those later applicable to the Respondent under the EC Treaty, particularly Article 62(1)(iii) of the Europe Agreement, which provided as follows:

> *"1. The following are incompatible with the proper functioning of the Agreement, in so far as they may affect trade between the Community and Hungary: ...*
>
> *(iii) any public aid which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods."*

4.95.    The Respondent acceded to the European Union in 2004. Part 3 of Annex IV to the 2004 Act of Accession contains the following provisions:

> *"The following aid schemes and individual aid put into effect in a new Member State before the date of accession and still applicable after that date shall be regarded upon accession as existing aid within the meaning of Article 88(1) of the EC Treaty:*
>
> *(a) aid measures put into effect before 10 December 1994;*
>
> *(b) aid measures listed in the Appendix to this Annex;*
>
> *(c) aid measures which prior to the date of accession were assessed by the State aid monitoring authority of the new Member State and found to be compatible with the acquis, and to which the Commission did not raise an objection on the ground of serious doubts as to the compatibility of the measure with the common market, pursuant to the procedure set out in paragraph 2.*
>
>
> *All measures still applicable after the date of accession which constitute State aid and which do not fulfil the conditions set out above shall be considered as new aid upon accession for the purpose of the application of Article 88(3) of the EC Treaty."*

4.96.    The European Commission explained that, because it appeared that the liberalisation of the Hungarian electricity market might have negative consequences on certain incumbent operators, "in 2001, the Commission adopted a Communication relating to the methodology for analysing State aid linked to stranded costs in the electricity

sector which sets out the conditions under which the Commission may approve such aid under Art. 87 (3) (c) EC" (paragraph 13).

4.97.    The European Commission next turned to its decisions made in regard to the PPAs with Hungarian Generators, including Dunamenti's PPA:

> "... the Commission found that the PPAs were put in place after the entry into application of the Europe Agreement and Hungary's application for membership to the EU, were not included in the Appendix to Annex IV of the 2004 Act of Accession by the parties to that Act, and were not notified to the Commission pursuant to the procedure laid down in the second paragraph, Chapter 3 of Annex IV of that Act. Therefore, they had to be regarded as new unlawful aid since 1 May 2004." (paragraph 19)

> "For this reason, the Commission ordered Hungary to end the State aid contained in the PPAs. Moreover, it ordered Hungary to recover the aid received by the beneficiaries since 1 May 2004. The Commission also provided certain indications as to how the amount of aid to be recovered is to be calculated by Hungary." (paragraph 22)

4.98.    The Commission submitted, as a matter of EU law, that the decisions of the European Commission, including its Final Decision of 4 June 2008, were binding on EU Member States under EU law:

> "25. According to Article 249(4) EC, a decision from an EU institution is binding in its entirety upon those to whom it is addressed. It follows that a Commission State aid decision is legally binding on an EU Member State. The Hungarian government is hence under an obligation to recover the State aid from the generators and not to grant such aid for the future. ...

> 27. If a Member State does not comply with this obligation, the Commission can bring the matter directly before the European Court of Justice in accordance with Article 88(2) EC. If the judgment of the Court of Justice is not complied with, the Court may impose pecuniary sanctions in accordance with Article 228(2) EC."

The Tribunal notes that this particular submission is not disputed in this arbitration by the Claimant or the Respondent.

4.99.    According to the European Commission, the European Union was the driving force behind the adoption of the European Energy Charter of 17 December 1991 and "played a key role in negotiating the subsequent Energy Charter Treaty, signed in December 1994" (paragraph 32); this resulted in the European Union expressing its consent to become a party to the ECT in September 1997; and, the European Union, being legally bound by the ECT as a party, has to respect the ECT's terms by virtue of Article 300(7) EC (Article 216(2) TFEU):

> *"It follows that, within the Community's legal order, the Energy Charter Treaty is binding on the institutions of the Community and the Member States under Article 300(7) EC. In particular, any act adopted by the institutions may thus not violate the international obligations assumed by the Community." (paragraph 33)*

4.100.    *(ii) The ECT:* The European Commission submits that this history explains the substantive and institutional links between the ECT and EU law. For example, according to the Commission, Article 3 ECT includes the Community concept of an "open and competitive market"; and it is also recognised in Article 1(3) ECT that the Community is "a *Contracting Party* which has the authority to take *binding decisions* over certain *other Contracting Parties,* including with respect to *matters covered by the ECT*" (paragraph 36, original emphasis).

4.101.    *(iii) PPA Termination Claim:* According to the European Commission, this Tribunal, established under the ICSID Convention, has no jurisdiction over the Claimant's PPA Termination Claim. The European Commission's jurisdictional objection is extensively addressed in the Commission's Submission (10 of 44 pages). This objection is considered below in Part V of this Decision; but it is necessary to address here the Commission's related submissions regarding the law applicable to the PPA Termination Claim.

4.102.    According to the European Commission, Article 26(6) ECT requires the application of EU law because EU law is international law. It refers to the case law of the

European Court of Human Rights ("ECtHR"), which has recognised that EU law is a part of "the rules and principles of international law". It cites *Bosphorus v Ireland*[1], where the question was whether a decision by Ireland implementing an embargo decided by the Commission and interfering with a company's economic rights was a violation of the protection of property rights granted by Article 1 of Protocol 1 of the European Convention on Human Rights ("ECHR"):

> *"... The Convention has to be interpreted in the light of any relevant rules and principles of international law applicable in relations between the Contracting Parties... This Court has accordingly accepted that compliance with Community law by a Contracting Party constitutes a legitimate general-interest objective within the meaning of Article 1 of Protocol No. 1." (paragraph 150)*

4.103.   However, as the European Commission explains, this analysis does not mean that economic actors are left without any protection against acts of the European Commission interfering with their rights: "The court then observed that absolving Contracting States completely from their Convention responsibility [under the ECHR] in the areas covered by a transfer of competences to the EC would be incompatible with the purpose and object of the Convention" (paragraph 75). According to the Commission, an act which is in conformity with EU law will be considered in conformity with the ECHR, if the two bodies of law can be considered as equivalent in their protection "as regards both the substantive guarantees offered and the mechanisms controlling their observance …"[2] The ECtHR found that both the ECJ and the ECHR granted equivalent substantive and procedural protections to individual rights.

4.104.   The European Commission submits that the Tribunal should apply the same approach in the present case:

> *"Accordingly, compliance by an EU Member State with the legal obligations stemming from EC State aid law cannot be regarded as a violation of the Energy Charter Treaty, as long as the EC is considered to protect investor's rights, as*

---

[1]   ECtHR, Application 45036/98, *Bosphorus v Ireland*, Judgment of 30 June 2005, paragraph 150.

[2]   ECtHR, Application 45036/98, *Bosphorus v Ireland*, Judgment of 30 June 2005, paragraph 155.

*regards both the substantive guarantees offered and the mechanisms controlling their observance, in a manner which can be considered at least equivalent to that provided by the relevant ECT standards." (paragraph 77)*

4.105.  The European Commission then develops at length the equivalence in substantive protection between EU law and the ECT under different standards of treatment: fair and equitable treatment, encouragement and creation of stable, equitable, favourable and transparent conditions, constant protection and security, no impairment by unreasonable or discriminatory measures, no treatment less favourable than that required by international law, national treatment and most favoured nation treatment, and expropriation. The European Commission adds that there is also, in its submission, an equivalent procedural protection under the ECT and EU law on State aid, thereby equating what it describes as a "comprehensive EC system of judicial review" with the settlement of investor-state disputes by international arbitration (paragraph 119).

4.106.  It follows, according to the European Commission, that in applying the Commission's Final Decision of 4 June 2008 to terminate the PPA, the Respondent did not violate the ECT:

> *"In sum, since Article 10 and 13 ECT are fully respected by EC State aid law, and complemented by effective judicial review mechanisms, the presumption under the Energy Charter Treaty that compliance with EC State aid law cannot be illegal under the Energy Charter Treaty applies." (paragraph 123)*

4.107.  If the Tribunal were not to accept this interpretation of Article 26 ECT, the European Commission submits that a harmonious interpretation of ECT and EU law is required of the Tribunal and that EU law and the ECT can be read harmoniously in the present case.

4.108.  In order to interpret the ECT, the European Commission submits that, by the application of Article 31(1) of the Vienna Convention, "(t)he relevant context to be taken into account in the interpretation of the Energy Charter includes the substantive links to the European Energy Charter and the special role of the EC in the negotiation

of the Energy Charter" (paragraph 125). Moreover, "according to Article 31(3)(c) of the Vienna Convention, together with the context, it is also necessary to take into account 'any relevant rules of international law applicable in the relations between the parties.' This was recently described by the UN International Law Commission as the principle of 'systemic integration' under general international law[3] …" (paragraph 126).

4.109.  The European Commission submits that, in case of any contradiction, EU law prevails. Article 16 ECT applies only to the extent that the ECT is compatible with the Act of Accession (and thus with EU law); and according to Article 2 of the Act of Accession, "(a)ll the EU Member States, including Belgium and Hungary, have agreed in 2004 *inter se* not to apply the conflict rule contained in Article 16 ECT, but the general supremacy rule of EC law" (paragraph 135).[4]

4.110.  According to the European Commission, the pre-eminence of EU law has important consequences for the implementation of any award which contradicts EU law on State aid. According to the Commission, an award that substituted compensation for State aid unlawful under EU law would not be enforceable because it would be equivalent to a judgment of a national court of an EU Member State made in contradiction with EU law:

> *"EU Member States are obliged under EC law to carry out Commission State aid decisions. If the Tribunal rendered an award that is contrary to obligations binding on Hungary as an EU Member State, such award could not be implemented in Hungary by virtue of the supremacy of EC law, as this constitutes the applicable conflict rule, which was agreed inter se between Hungary and Belgium in accordance with Article 30 (3) and (4) of the Vienna Convention on the Law of Treaties." (paragraph 140 (4))*

---

[3]  Special Rapporteur Martti Koskenniemi, *Fragmentation of international law: difficulties arising from the diversification and expansion of international law, Report of the Study Group of the International Law Commission of 13 April 2006*, UN Doc A/CN.4/L.682, paragraphs 410-423.

[4]  The European Commission cites several ECJ cases on this principle of supremacy: Case 11/70, *Internationale Handelsgesellschaft mbH v Einfuhr- und Vorratsstelle für Getreide und Futtermittel* [1970] ECR 1125, 1134, paragraph 3; Case 149/79, *Commission v Belgium* [1980] ECR 3881, 3903, paragraph 19; Joined Cases 97-99/87, *Dow Chemical Ibérica and others v Commission* [1989] ECR 3165, 3191, paragraphs 37-38; and Case 473/93, *Commission v Luxembourg* [1996] ECR 1-3207, 3258, paragraphs 37-38.

The European Commission's Submission does not explain precisely how this defence to recognition or enforcement of an award could be made in respect of an ICSID award before the national courts of an EU Member State or, more particularly, a non-EU Member State.

## (5)    THE TRIBUNAL'S ANALYSIS

4.111.   The necessary starting-point for this arbitration is that the Tribunal has been seized as an international tribunal by a Request for Arbitration made by the Claimant against the Respondent under the ECT and the ICSID Convention. As pleaded in paragraph 1.1 of the Claimant's Request:

> "This Request for Arbitration is served pursuant to Article 26(3) of the Energy Charter Treaty (the 'ECT'), Article 36(1) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the 'ICSID Convention'), and Rule 1 of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings pursuant to the ICSID Convention (the 'ICSID Institution Rules')."

4.112.   Under Article 26 ECT and Article 42 of the ICSID Convention, the Tribunal is required to apply the ECT and "applicable rules and principles of international law." In other words, this Tribunal is placed in a public international law context and not a national or regional context. Moreover, this ICSID arbitration does not have its seat or legal place of arbitration in Hungary or elsewhere in the European Union. Such an arbitral seat could trigger the application of the lex loci arbitri and give rise to the jurisdiction of the local courts in regard to the arbitral process, including challenges to the award. This ICSID arbitration is a dispute resolution mechanism governed exclusively by international law. As a result of the Tribunal's international status under the ECT and the ICSID Convention, several of the Commission's submissions cannot be taken into account in this arbitration, because they are based on a hierarchy of legal rules seen only from the perspective of an EU legal order applying within the

EU, whereas this Tribunal is required to operate in the international legal framework of the ECT and the ICSID Convention, outside the European Union.

4.113.  Before entering any further into the analysis of the applicable law(s), the Tribunal is minded to set the stage in a general manner. Two important and potentially competing values are here at stake: the substantive and procedural protections of the rights of a foreign investor and the economic integration of EU Member States into the European Union operating under the rule of law. The task of this Tribunal is to ascertain the correct legal balance between these values, as required by the ECT, the ICSID Convention and the applicable rules and principles of international law.

4.114.  The texts of the ECT and of the ICSID Convention raise relatively little difficulty. The more difficult step is to identify the applicable rules and principles of international law and, more precisely, whether and, if so, to what extent, EU law forms part of such rules and principles. The relationship between the ECT and EU law, as was submitted by the Claimant in its Post-Hearing Submissions, is "(a) question which features prominently in this arbitration" (Claimant's Post-Hearing Submissions, paragraph 69). It is a question with potentially far reaching consequences for the present case, both on the question of jurisdiction and on the merits of the Parties' dispute.

4.115.  As far as jurisdiction is concerned, the Tribunal notes that the Respondent has not raised any like objection to jurisdiction as that made by the European Commission. It is however the Tribunal's duty independently to check whether or not it has jurisdiction to decide the Parties' dispute, particularly when such jurisdiction is contested by the European Commission based on the interpretation and application of EU law. In other words, in this case and as already indicated, the Tribunal must consider its jurisdiction under Article 26 ECT and the effect of EU law. It does so in Part V of this Decision.

4.116.  As far as the merits are concerned, it is equally important for the Tribunal to ascertain the effect of EU law, particularly as submitted by the Respondent (here supported by the European Commission), in the following words: "(i)n evaluating these legal arguments, the Tribunal should bear in mind the very real practical consequences of any ruling under the Energy Charter Treaty that requires Hungary to

act inconsistently with EC mandatory law" (Respondent's Counter-Memorial, paragraph 301).

4.117.  *(i) The Multiple Nature of EU Law:* EU law is a sui generis legal order, presenting different facets depending on the perspective from where it is analysed. It can be analysed from the perspectives of the international community, individual Member States and EU institutions.

4.118.  Given those perspectives, EU law has a multiple nature: on the one hand, it is an international legal regime; but on the other hand, once introduced in the national legal orders of EU Member States, it becomes also part of these national legal orders. It is in that latter sense that the Claimant submits that EU law has to be considered as part of the national Hungarian legal order.[5] In the *Kadi* case, Advocate General Maduro's Opinion also described EU law as a "municipal legal order of transnational dimension." It is more accurately expressed in the French version: *"un ordre juridique interne d'origine internationale."*[6]

4.119.  The Tribunal accepts that EU law forms part of the Hungarian legal order; but it considers that the Claimant is wrong to so limit its nature. In the international setting in which this Tribunal is situated and from which it necessarily derives its perspective, EU law has to be classified first as international law, as explained below.

4.120.  *(ii) EU law is based on international treaties:* EU law is international law because it is rooted in international treaties; and both Parties accepted, of course, that the EU Treaties are legal instruments under public international law.[7] EU law flows from the Treaty of Rome, as amended many times, creating the European Union, as was submitted by the Respondent:

---

[5]  Professor Denis Alland calls this *"droit interne d'origine internationale"*: see "Le juge français et le droit d'origine internationale", in *Droit international et droit interne dans la jurisprudence comparée du Conseil constitutionnel et du Conseil d'Etat* (Paris, ed. Panthéon-Assas, 2001), pp. 47-59.

[6]  Opinion of the Advocate General Maduro in Case C-402/05, paragraph 21, [2008] ECR I-6351.

[7]  This is uncontroversial. It was so stated by many scholars, including Professor Trevor Hartley, "International Law and the Law of the European Union – A Reassessment", *British Yearbook of International Law*, 72, 2001, pp. 1-35. See also Marcus Burgstaller, "European Law and Investment Treaties", 26 *Journal of International Arbitration* (2009), p. 191: "*The fact that the EC Treaty differs from ordinary international agreements is no warrant for presuming that the law it establishes is not part of, and governed by international law … Consequently, EC law is best viewed as a subsystem of public international law, though a highly developed international legal order with particular features, in particular the primacy of EC Law over national law and direct effect of EC law.*"

> *"Both Belgium and Hungary are parties to this multinational treaty and are bound by it, just as they are parties to another multinational treaty, the ECT. The intersection of these two treaties is thus not one of "international" law versus "internal" law, but rather one of two multinational treaties on the same plane in the hierarchy of international law, as between the State Parties who are bound to both." (Counter-Memorial, paragraph 551)*

4.121.   The Claimant likewise accepts that the EU Treaties are international treaties:

> *"Should the Tribunal conclude that Article 26(6) ECT may extend the applicable law to include EU law in a dispute between an Investor from one EU Member State and another Member State, Electrabel submits that only EU Treaty law is relevant." (Claimant's Post-Hearing Submissions, paragraph 81)*

4.122.   *(iii) The Whole of EU Law as an International Legal Order:* Moreover, the Tribunal considers that EU law as a whole is part of the international legal order; and it does not draw a material distinction, as proposed by the Claimant, between the EU Treaties (which the Claimant acknowledges as international law) and the *"droit dérivé"* (which the Claimant does not acknowledge as international law). In the Tribunal's view, all EU legal rules are part of a regional system of international law and therefore have an international legal character. This was stated clearly by the ECJ many years ago, in the famous case *Van Gend en Loos*:

> *"The Community constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights ..."*[8]

4.123.   In the Tribunal's view, it would be artificial to categorise, as an international legal rule, Article 87 EC (precluding "any aid granted by a Member State or through State resources…incompatible with the internal market"), and refuse that same status to the necessary implementation of that international rule by the non-national organ created by the same EU treaty. A contrary analysis would result in a situation where

---

[8]   Case 26/62, *NV Algemene Transporten Expeditie Onderneming van Gend & Loos v Netherlands Internal Revenue Administration* [1963] ECR 1, at Section B.

the international rule would remain free-floating, as a mere theoretical aspiration. For this international rule to be translated into legal obligations binding on EU Member States, decisions have to be taken by the European Commission. A typical example of such a decision is the European Commission's Final Decision of 4 June 2008 in the present case. For these reasons, the Tribunal does not accept the Claimant's proposition.

4.124.   *(iv) EU law as National Law:* In the Tribunal's view, the fact that EU law is also applied within the national legal order of an EU Member State does not deprive it of its international legal nature. EU law remains international law; EU law is not limited to a treaty but includes a body of law flowing from the EU Treaties. Legal rules created under the Treaties can apply directly within the different national legal orders, without any further procedural step taken by EU Member States.

4.125.   From the perspective of international law, it does not matter whether such application within a national legal order take effect directly or indirectly. The Tribunal recognises that international law is applied within national legal orders more or less directly in monist countries and by reception in dualist countries. As a result, in many countries, international law is considered part of national law. As regards treaties, by virtue of Article 26 of the Vienna Convention (*"Pacta sunt servanda"*), States have a duty to perform in good faith obligations binding on them under international law. This duty requires, amongst other matters, an obligation to introduce treaties into their national legal order. In France, for example, international law is part of the national legal order with a status superior to legislation under Article 55 of the 1958 Constitution, which provides that treaties or agreements duly ratified or approved "shall, upon publication, prevail over Acts of Parliament, subject, with respect to each agreement or treaty, to its application by the other party." In contrast to France, the United Kingdom introduced the Treaty of Rome into its law by the European Communities Act 1972 (as amended), but with the same result that English law includes EU law.

4.126.   Accordingly, in the Tribunal's view, there is no fundamental difference in nature between international law and EU law that could justify treating EU law, unlike other international rules, differently in an international arbitration requiring the application of relevant rules and principles of international law.

4.127.   *(v) EU Law as Fact:* In the Tribunal's view, when it is not applied as international rules under the ECT, EU law must in any event be considered as part of the Respondent's national legal order, i.e. to be treated as a "fact" before this international tribunal.

4.128.   The importance of rules contained in a national legal order, as a factual element to be taken into account, has long been acknowledged by international tribunals. For example, in *Azurix Corporation v The Argentine Republic,* the ICSID tribunal stated the following:

> *"Azurix's claim has been advanced under the BIT and, as stated by the Annulment Committee in Vivendi II, the Tribunal's inquiry is governed by the ICSID Convention, by the BIT and by applicable international law. While the Tribunal's inquiry will be guided by this statement, this does not mean that the law of Argentina should be disregarded. On the contrary, the law of Argentina should be helpful in the carrying out of the Tribunal's inquiry into the alleged breaches of the Concession Agreement to which Argentina's law applies, but it is only an element of the inquiry because of the treaty nature of the claims under consideration."* [9]

A similar approach was later taken by the ICSID tribunal in *El Paso v The Argentine Republic.* [10]

4.129.   Accordingly, where a binding decision of the European Commission is concerned, even when not applied as EU law or international law, EU law may have to be taken into account as a rule to be applied as part of a national legal order, as a fact.

4.130.   *(vi) The Relationship between the ECT and EU law:* The Tribunal does not accept that there is a general principle of international law compelling the harmonious interpretation of different treaties. This may be a desirable outcome; but the end does not establish the means to that end. However, the situation here is somewhat special, with the European Union and its Member States so closely involved in and parties to the ECT. In the Tribunal's view, the ECT's historical genesis and its text are such that the ECT should be interpreted, if possible, in harmony with EU law.

---

[9]   *Azurix Corporation v The Argentine Republic* (ICSID Case No. ARB/01/12), Award of 14 July 2006, paragraph 67.

[10]   *El Paso Energy International Company v The Argentine Republic* (ICSID Case No. ARB/03/15) (US/Argentina BIT), Award of 31 October 2011, paragraphs 135 and 141.

4.131.   The Tribunal acknowledges that, as a matter of legal, political and economic history, the European Union was the determining actor in the creation of the ECT. As noted above, the Respondent submitted that "the ECT was the brainchild of the European Union" (Counter-Memorial, paragraph 404); and, according to the European Commission, the EU "played a key role in negotiating the … Energy Charter Treaty, signed in December 1994" (European Commission's Submission, paragraph 32). The Claimant did not contradict these historical statements in its different submissions; nor could it on the materials before the Tribunal.

4.132.   This historical account has been developed by legal specialists of the ECT, including the late Professor Thomas Wälde. He noted that tribunals in ECT cases should consider an "interpretative strategy of reciprocal consistency" in circumstances where both the ECT and another international treaty apply, "i.e., to interpret the [two treaties] to minimise conflict and enhance consistency." This is particularly the case where the "other" applicable treaty involves the competition provisions of the EU Treaties, given the ECT's historic origins (at least as between EU Member States) as a vehicle to "implement the principles enunciated in the European Energy Charter," including the central principle of "promoting market-oriented reforms."[11] More precisely, the same scholar applied this interpretative approach to the relationship between the ECT and EU law:

> "The ECT is largely a product of EU external political, economic and energy policy. It is meant to integrate the formerly Communist countries, provides an ante-chamber and preparation area for EU accession for many of them; it is intended to promote EU investment in these countries and energy flows from these countries to the EU. It is therefore linked more closely to EU integration, accession to the EU and EU external relations law than the 'run-of the mill' BIT."[12]

4.133.   Taking this background into consideration, the Tribunal considers that, in the circumstances, the two texts should be reconciled if possible, for three important

---

[11]   Todd Weiler & Thomas Wälde, "Investment Arbitration under the Energy Charter Treaty in the light of new NAFTA Precedents: Towards a Global Code of Conduct for Economic Regulation," *Transnational Dispute Management* 1 February 2004, p. 35.

[12]   Thomas Wälde, "Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice," *Transnational Dispute Management* 1 May 2004, p. 4.

legal reasons. The first derives from the ECT's genesis: it would have made no sense for the European Union to promote and subscribe to the ECT if that had meant entering into obligations inconsistent with EU law. The second derives from one of the ECT's objectives: it is an instrument clearly intended to combat anti-competitive conduct, which is the same objective as the European Union's objective in combating unlawful State aid. The third derives from the ECT's implicit recognition that decisions by the European Commission are legally binding on all EU Member States which are party to the ECT. It is necessary to explain these three reasons and their effect separately below.

4.134. *The ECT's Genesis:* In the Tribunal's view, the ECT's genesis generates a presumption that no contradiction exists between the ECT and EU law. As regards the Respondent, the historical chronology indicates that the ECT entered into force for the Respondent (in 1978) before the EC Treaty (in 2004). However, the ECT was negotiated and ratified after the coming into existence of the Rome Treaty, by its Member States. The interpretation of the ECT's text should therefore take into account such circumstances, in accordance with Article 32 of the Vienna Convention (which provides that, in order to interpret a treaty "(r)ecourse may be had to supplementary means of interpretation, including … the circumstances of its conclusion"). This means, in the Tribunal's view, that the ECT's conclusion by the European Union and its Member States at that time (including Belgium) should be presumed, in the absence of clear language or cogent evidence otherwise, to have been made in conformity with EU law.

4.135. The legal basis on which the European Union became a party to the ECT is set out in Council Decision 94/998/EC (as to signature) and Council and Commission Decision 98/181/EC, ECSC, Euratom (as to ratification).[13] When treaties concern a matter for which the European Union is competent (as here, regarding the ECT), the relevant EU rule is contained in Article 133 EC (now Article 207(3) TFEU). Article 207(3) TFEU provides that "(t)he Council and the Commission shall be responsible for ensuring that the agreements negotiated are compatible with internal Union policies and rules."

---

[13] OJ 1994 L 380/1-2 and OJ 1998 69/1-3.

4.136.   This EU rule most probably does not impose an absolute obligation, i.e. it is an *"obligation de moyens"* and not an *"obligation de résultat"*. Nonetheless, its existence confirms the Tribunal's conclusion that EU law can be presumed not to conflict or otherwise be inconsistent with the ECT. It also confirms the strong legal relationship between the ECT and EU law: EU law, being based on a treaty, forms part of international law; and the ECT, being a treaty adopted by EU institutions, forms part of EU law.[14]

4.137.   *ECT and EU Objectives:* In the Tribunal's view, the ECT and the EC Treaty share the same broad objective in combating anti-competitive conduct. One of the obligations undertaken by States under the ECT was to protect investors, but another was to combat anti-competitive conduct, as provided in Article 6 ECT:

> *"Article 6 - Competition*
>
> *(1) Each Contracting Party shall work to alleviate market distortions and barriers to competition in Economic Activity in the Energy Sector.*
>
> *(2) Each Contracting Party shall ensure that within its jurisdiction it has and enforces such laws as are necessary and appropriate to address unilateral and concerted anti-competitive conduct in Economic Activity in the Energy Sector."*

4.138.   The importance of this objective was acknowledged by one of the Claimant's expert witnesses, Professor Amkhan. In his expert report, Professor Amkhan stated that one of the ECT's objectives was: "… to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation ..." (First Report, paragraph 16).

4.139.   The fact that both the ECT and EU law have common objectives was likewise emphasised in the Advocate General's Opinion of 15 March 2011 in *Commission v Slovakia*, where it was stated: "The aim of EU energy policy is the opening up of

---

[14]   See Case 181/73, *Haegeman v Belgium* [1974] ECR 449, 460, in relation to the Association Agreement between Greece and the European Union concluded by the Council of Ministers, where the ECJ stated: "*The provisions of the Agreement, from the coming into force thereof, form an integral part of Community law*" paragraph 5.

markets, increase competition and the [sic] create a level playing field by no longer giving preferential treatment to former monopolies" (paragraph 50).

4.140.  It was clear in 1993 when the Europe Agreement was signed between the European Union (then the Community) and the Respondent that "any public aid which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods" was not compatible with EU law.

4.141.  For all these reasons, the Tribunal concludes that the objectives of the ECT and EU law were and remained similar as regards anti-competitive conduct, including unlawful State aid.[15] Foreign investors in EU Member States, including Hungary, cannot have acquired any legitimate expectations that the ECT would necessarily shield their investments from the effects of EU law as regards anti-competitive conduct.

4.142.  *ECT and EU Decisions:* The framework of the ECT recognises that EU Member States will be legally bound by decisions of the European Union under EU law. Article 1(3) ECT acknowledges:

> *"A "Regional Economic Integration Organization" means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters."*

It is common ground that the European Union (including the European Commission) was and remains, of course, such a Regional Economic Integration Organisation ("REIO"). As regards protection under the ECT, investors can have had no legitimate expectations in regard to the consequences of the implementation by an EU Member State of any such decision by the European Commission. In other words, the possible interference with a foreign investment through the implementation by an EU Member State of a legally binding decision of the European Commission was and remains inherent in the framework of the ECT itself.

---

[15]  This was also acknowledged by Mr Graham Coop, as General Counsel of the Energy Charter Secretariat: "Although the nature, scope and functional mechanisms of BITs differ significantly from those of the EU treaties and institutions, there is nevertheless a significant corpus of shared common objectives." "Energy Charter Treaty and the European Union: Is Conflict Inevitable?", 27 *Journal of Energy & Natural Resources Law* (2009), p. 407.

4.143.  *(vii) Harmonious Interpretation:* It is noteworthy that both Parties (albeit to differing extents) and the European Commission have argued for a harmonious interpretation of the ECT and EU law. The Respondent considers that the Tribunal should seek to harmonise its interpretation of the ECT with EU law, in disputes between EU companies and EU Member States; and it has argued for an "axiomatic" principle of harmony (Respondent's Counter-Memorial, paragraph 410):

> *"In fact, international law suggests that where two States (such as Belgium and Hungary) have each entered into two different multinational treaties with one another, neither Treaty should be presumed to be automatically dominant over the other. Rather, the Tribunal should start from a presumption that no conflict exists, and seek to determine whether application of the treaty norms to the particular facts of the case might result in an outcome that reflects harmony."* (Respondent's Counter-Memorial, paragraph 411)

4.144.  The European Commission submits that there exists a general principle of harmonious interpretation:

> *"More generally, the principle of harmonious interpretation is based on the principles of customary law on the interpretation of international treaties, as codified in Article 31 of the Vienna Convention on the Law of Treaties (VCLT)." (European Commission's Submission, paragraph 125)*

4.145.  The Claimant conditionally acknowledged that a harmonious interpretation could be made (see for example, Claimant's Post-Hearing Submissions, paragraph 98), although the result of its harmonious interpretation was somewhat different from that advanced by the Respondent and the European Commission.

4.146.  In the Tribunal's view, there is no need to harmonise the ECT's provisions for the settlement of investor-state disputes by international arbitration with EU law because there is no inconsistency. The Tribunal understands that the main concern of the European Commission is to protect the ECJ's monopoly over the interpretation of EU law, operating as its ultimate guardian and also its gate-keeper. With this concern, so it is said, there must be a unique EU court entrusted with the final word

on what EU law means, whereas the existence of arbitral tribunals interpreting EU law could jeopardise its uniform application.

4.147. The ECJ's monopoly is said to derive from Article 292 EC (now Article 344 TFEU) which grants to the ECJ exclusive jurisdiction to decide disputes amongst EU Member States on the application of EU law. Article 292 states: "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein." However, as is well known and recognised by the ECJ, such an exclusive jurisdiction does not prevent numerous other courts and arbitral tribunals from applying EU law, both within and without the European Union.[16] Given the widespread relevance and importance of EU law to international trade, it could not be otherwise.

4.148. First, as far as the courts and tribunals of EU Member States are concerned (but not private arbitration tribunals), a certain uniformity of interpretation is made possible by their capacity (by any such court or tribunal) and their obligation (by a court or tribunal against whose decisions there is no judicial remedy under national law) to refer preliminary questions of interpretation of EU law to the ECJ under Article 234 EC (now Article 267 TFEU).[17] The Tribunal notes the fact that EU national courts retain a certain degree of discretion in their decision to refer a question of interpretation to the ECJ and that the courts of last resort may use the legal theory of *acte clair* to retain also a further element of discretion. In other words, there is no automatic reference to or seizure by the ECJ, as soon as any question of EU law arises in a dispute before an EU national court. This factor leaves open the

---

[16]   The Tribunal notes, without comment, the passage in *Eureko B.V. v The Slovak Republic*, PCA Case No. 2008-13, UNCITRAL (Netherlands/Czech and Slovak Republic BIT), Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 282: *"The argument that the ECJ has an 'interpretative monopoly' and that the Tribunal therefore cannot consider and apply EU law, is incorrect. The ECJ has no such monopoly. Courts and arbitration tribunals throughout the EU interpret and apply EU law daily. What the ECJ has is a monopoly on the final and authoritative interpretation of EU law: but that is quite different. Moreover, even final courts are not obliged to refer questions of the interpretation of EU law to the ECJ in all cases. The acte clair doctrine is well-established in EU law."*

[17]   Article 234 EC is now Article 267 TFEU: *"The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning: (a) the interpretation of the Treaties; (b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union; Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon. Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court. …"*

possibility, if not even probability, of divergent interpretations or applications of EU law to similar disputes by courts and tribunals within the European Union.

4.149.   Second, as far as the courts and tribunals of non-EU Member States are concerned, there is no possibility for them to refer to the ECJ any question of interpretation of EU law. In other words, to take only one example, a Japanese court deciding a dispute between an EU company and a Japanese company might have to interpret and apply a mandatory rule of EU law relevant to the parties' transaction: in such a case, this exercise cannot be controlled by the ECJ if there is no later enforcement of the Japanese judgment within the European Union. Only if there were such enforcement proceedings before the national court of an EU Member State could the possibility arise of a reference to the ECJ, but the same discretions would then apply as described above, meaning that control by the ECJ would remain only a possibility and not a certainty. This factor leaves open the further probability of divergent interpretations or applications of EU law to similar disputes by courts and tribunals outside the European Union.

4.150.   Third, as far as arbitration is concerned, Article 234 EC (now Article 267 TFEU) prevents arbitration between EU Member States. This was ostensibly decided in the *Mox Plant* case between the United Kingdom and the Republic of Ireland[18], where the ECJ held that EU Member States are prevented from submitting their disputes to "any other method of dispute settlement" than the method provided by EU law; and that, as a result, the ECJ has exclusive jurisdiction to resolve any dispute between two EU Member States that at least partially raises an issue of EU law. It is however doubtful whether this decision of the ECJ would prevent, for example, the International Court of Justice (ICJ) from deciding any issue of EU law, if raised in a dispute involving two or more EU Member States. It is not however necessary to interpret any further the ECJ's decision in the *Mox Plant* case, given that the Parties' dispute does not here involve two EU Member States.

4.151.   Fourth, as regards an international or national arbitration tribunal in a dispute not involving two or more EU Member States as parties, there is no provision equivalent to Article 292 EC (now Article 344 TFEU) dealing with arbitration between two or

---

[18]   Case C-459/03, *Commission v Ireland (Mox Plant)*, Judgment of 30 May 2006, [2006] ECR I-4635.

more private parties, nationals of Member States, or with mixed disputes settlement mechanisms such as investor-state arbitration between individuals, nationals of EU Member States and an EU Member State under the ICSID Convention or other international instruments. Article 292 EC is not applicable to these arbitration tribunals. If the submissions made by the European Commission were correct, this would seem to be an extraordinary omission.

4.152.   As regards arbitrations between private parties, it has long been recognised by the ECJ that such arbitrations are frequently held within the EU, interpreting and applying EU law, and do not thereby infringe the monopoly of interpretation of EU law by the ECJ, as illustrated (for example) by the *Eco Swiss* case.[19]

4.153.   However, the Tribunal recognises that one reason why the ECJ did not find such an arbitration objectionable under EU law in the *Eco Swiss* case was because the award made in that arbitration (with its arbitral seat in the Netherlands) remained subject to the control of the Dutch national courts; and these Dutch courts could seek an interpretation of EU law from the ECJ under Article 234 EC. The ECJ long ago decided that a private arbitration tribunal is not a national court or tribunal under Article 234 EC, with no capacity itself to refer any question of EU law to the ECJ.[20] This recognition necessarily extends not only to arbitration tribunals seated within the European Union but also to tribunals seated outside the European Union. The present case concerns an international arbitration between a private party -a national of an EU Member State- and an EU Member State, held outside the EU. It also concerns an arbitration subject to the ICSID Convention, as incorporated in Hungary and in the laws of almost all EU Member States. In the Tribunal's view, this arbitration does not come under Article 292 EC and cannot therefore infringe EU law. There is indeed no rule in EU law that provides, expressly or impliedly, that such an international arbitration is inconsistent with EU law. Again, if the

---

[19]   Case C-126/97, *Eco Swiss China Time Ltd v Benetton International NV*, Judgment of 1 June 1999, [1999] ECR I-3055, paragraph 40. The ECJ has repeatedly held that arbitral tribunals are under an obligation to apply mandatory rules of EU law. While the *Eco Swiss* case was decided in the context of EU competition law, the same position was adopted in the field of consumer rights, see for example, Case C-168/05, *Elisa María Mostaza Claro v Centro Móvil Milenium SL*, Judgment of 26 October 2006, [2006] ECR I-10421.

[20]   Case 102/81 *Nordsee Deutsche Hochseefischerei GmbH v Reederei Mond Hochseefischerei Nordstern AG & Co. KG and Reederei Friedrich Busse Hochseefischerei Nordstern AG & Co. KG.* [1982] ECR 1095, paragraphs 10-13; see also *Eco Swiss* [1999] ECR I-3055, paragraph 34.

submissions made by the European Commission were correct, this would also seem to be an extraordinary omission.

4.154.  The Tribunal's conclusion is confirmed by the Opinion 1/09 of the ECJ (Full Court) of 8 March 2011, delivered pursuant to Article 218(11) TFEU (formerly Article 300(6) EC).[21] The issue there was whether the creation of a Patent Court ("PC") by an international agreement to be made by the European Union infringed the exclusive status of the ECJ[22]:

> *"1. The request submitted for the Opinion of the Court by the Council of the European Union is worded as follows: 'Is the envisaged agreement creating a Unified Patent Litigation System (currently named European and Community Patents Court) compatible with the provisions of the Treaty establishing the European Community?'"*

4.155.  On the question of whether Article 292 EC (now Article 344 TFEU) applied to settlement mechanisms for disputes involving private parties, the ECJ's answered this question without ambiguity in the negative:

> *"63. Nor can the creation of the PC be in conflict with Article 344 TFEU [formerly Article 292 EC], given that that article merely prohibits Member States from submitting a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties. The jurisdiction which the draft agreement intends to grant to the PC relates only to disputes between individuals in the field of patents."*

4.156.  The Tribunal notes, of course, that the ECJ also decided that the creation of this Patent Court would violate the ECJ's monopoly of rendering judgments on significant issues of EU law, such as the interpretation of the EC Treaties and the validity of decisions made by EU institutions provided by Article 230 (now Article

---

[21]  Article 218(11) TFEU (ex Article 300(6) EC): "*A Member State, the European Parliament, the Council or the Commission may obtain the opinion of the Court of Justice as to whether an agreement envisaged is compatible with the Treaties. Where the opinion of the Court is adverse, the agreement envisaged may not enter into force unless it is amended or the Treaties are revised.*"

[22]  Opinion of the Court of 8 March 2011 [2011] ECR.

263 TFEU).[23] This was so because the Patent Court "may be called upon to determine a dispute pending before it in the light of the fundamental rights and general principles of European Union law, or even to examine the validity of an act of the European Union." (paragraph 78) In this respect, the ECJ can be understood to have been protecting its traditional roles as the ultimate guardian of EU law and as its ultimate gate-keeper. It is therefore an important decision, which has generated much interest. It is however unnecessary for the Tribunal here to address this decision any further because it is clear that the ECJ was *not* applying its decision on the proposed Patent Court to the settlement of disputes by private or mixed arbitrations.

4.157.  Moreover, as explained by the Tribunal elsewhere in this Decision, this case does not turn on the interpretation of the EC Treaties or the validity of decisions made by EU institutions. It has already been stated above that the Parties' dispute is about alleged violations of the ECT by the Respondent; it does not include any attack by the Claimant on the legal validity of any decision by the European Commission (including its Final Decision of 4 June 2008); and it does not concern any alleged violations of EU law by the Respondent or the European Union.

4.158.  Moreover, the Tribunal notes the important legal fact that the European Commission itself, in signing the ECT, accepted the possibility of international arbitrations under the ECT, both between a non-EU investor and an EU Member State or between an EU investor and a non-EU Member State, without any distinction or reservation. This factor reinforces the Tribunal's conclusion. It is also noteworthy that this acceptance applied to both ICSID and non-ICSID arbitrations, in other words (i) non-ICSID arbitration awards whose recognition or enforcement within the European Union could entail possible control by EU national courts (under the lex loci arbitri or the New York Convention) with a possible reference to the ECJ, and (ii) ICSID arbitration awards equivalent under the ICSID Convention to judgments of national courts which are not equally susceptible to like control by EU national courts, if enforced within the EU.

4.159.  The apparent absence of control by the EU national courts over ICSID awards may lie behind the concerns of the European Commission expressed in this ICSID

---

[23]    Article 263 TFEU (ex Article 230 EC): *"The Court of Justice of the European Union shall review the legality of legislative acts, of acts of the Council, of the Commission …"*

arbitration as regards applicable law and therefore jurisdiction. The Tribunal considers that such concerns lack any juridical basis under EU law because there remains the possibility to ensure a uniform application of EU law by the ECJ in proceedings involving an EU Member State, regardless of any arbitration or award under the ICSID Convention.

4.160.   This possibility was explained by Professor Thomas Eilmansberger in his scholarly article:

> *"If the fallacious application of EC law by the arbitral tribunal, or its failure to apply EC law at all, however, results in EC law being rendered ineffective in a given case, again nothing prevents the Commission from initiating proceedings against a Member State which, in execution of the award, would be acting in violation of EC law (e.g. by paying out an illegal subsidy promised to the investor)."*[24]

4.161.   It is useful to cite here Article 226 EC (now Article 258 TFEU) and Article 228 EC (now Article 260 TFEU)[25]:

> *Article 226: "If the Commission considers that a Member State has failed to fulfil an obligation under the Treaties, it shall deliver a reasoned opinion on the matter after giving the State concerned the opportunity to submit its observations.*
>
> *If the State concerned does not comply with the opinion within the period laid down by the Commission, the latter may bring the matter before the Court of Justice of the European Union."*
>
> *Article 228:*
>
> *(1) "If the Court of Justice of the European Union finds that a Member State has failed to fulfil an obligation under the Treaties, the State shall be required to take the necessary measures to comply with the judgment of the Court.*

---

[24]   Thomas Eilmansberger, "Bilateral Investment Treaties and EU Law", *Stockholm International Arbitration Review*, 2008:3, p. 49.

[25]   Article 228 EC was cited in the European Commission's Submission, at paragraph 27: *"If a Member State does not comply with this obligation, the Commission can bring the matter directly before the European Court of Justice in accordance with Article 88 (2) EC. If the judgment of the Court of Justice is not complied with, the Court may impose pecuniary sanctions in accordance with Article 228 (2) EC."*

*(2) If the Commission considers that the Member State concerned has not taken the necessary measures to comply with the judgment of the Court, it may bring the case before the Court after giving that State the opportunity to submit its observations. It shall specify the amount of the lump sum or penalty payment to be paid by the Member State concerned which it considers appropriate in the circumstances.*

*If the Court finds that the Member State concerned has not complied with its judgment it may impose a lump sum or penalty payment on it.*

*This procedure shall be without prejudice to Article 259."*

[Article 259 EC addresses remedies available to an EU Member State against another Member State].

4.162.   In other words, even when disputes raising issues of EU law are decided by international arbitration, if the resulting award is honoured voluntarily by the EU Member State or enforced judicially within the European Union against that Member State, the ECJ retains the possibility, through different mechanisms for both ICSID and non-ICSID awards under the EU Treaties, to exercise its traditional role as the ultimate guardian of EU law.

4.163.   The Tribunal notes the still more important fact that the European Union also accepted in signing the ECT to submit itself to international arbitration, thereby accepting the possibility of an arbitration between the European Union and private parties, whether nationals of EU or Non-EU Member States and whether held within or without the EU. This acceptance did not and could not include ICSID arbitrations, given the inability of the European Union (not being a State) to sign the ICSID Convention and its reservation to such effect. There is however no reason to infer that, if the European Union had been able to accede to the ICSID Convention, its acceptance of international arbitration would not have extended to arbitrations under the ICSID Convention.

4.164.   In the Tribunal's view, if the European Union has itself accepted to submit to arbitration a dispute with a private investor concerning the application of the ECT (as

it did), it cannot properly argue that such an arbitration is not similarly available to the same private investor advancing a claim under the ECT against an EU Member State, including an arbitration under the ICSID Convention.

4.165.   The Tribunal also notes that EU law has been interpreted and applied by several ICSID tribunals, without raising any insuperable problems for the European Union. By way of only one example, in the *Maffezini* case, the arbitral tribunal interpreted and applied an EEC Directive in order to analyse the extent of the investor's rights, as appears from the following extract from its award:

> "Particularly noteworthy is the legislation on EIA. Strict procedures in this respect are provided in EEC Directive 85/337 of June 27, 1985 and in Spain's Royal Legislative Decree No. 1302/1986 of June 28, 1986.24 Chemical industries are specifically required under both measures to undertake an EIA. Public information, consultation with pertinent authorities, licensing and other procedures are also a part thereof. The EEC Directive, like the one that later came to amend it, requires "that an EIA is undertaken before consent is given to certain public and private projects considered to have significant environmental implications.""[26]

4.166.   In conclusion, the Tribunal has found no legal rule or principle of EU law that would prevent this Tribunal from exercising its functions in this arbitration under Article 26 of the ECT. In the Tribunal's view, there is no inconsistency between the ECT and EU law as regards the rules and principles of international law applicable to the Parties' arbitration agreement contained in the ECT and the ICSID Convention (including the Tribunal's jurisdiction thereunder) or applicable to the merits of the Claimant's claims and the Respondent's defences under the ECT.

4.167.   *(viii) Possible Inconsistency between the ECT and EU Law:* The Tribunal has decided that there is no material inconsistency between the ECT and EU law. The Tribunal has also concluded that if there were any material inconsistency between the ECT and EU law, the ECT and EU law should, if possible, be read in harmony. It

---

[26]   *Emilio Agustín Maffezini v Kingdom of Spain* (ICSID Case No. ARB/97/7) (Argentina/Spain BIT), Award of 13 November 2000, paragraph 69.

is nonetheless appropriate to address further the Parties' submissions (with the European Commission's Submission) on the hypothesis that the Tribunal is mistaken, i.e. that there could in fact be a material inconsistency not subject to harmonisation, and whether there are international rules that can be used to clarify the relationship between the ECT and EU law. This issue arises in regard to the European Commission's Final Decision of 4 June 2008.

4.168.    The ECT acknowledges the authority of the European Union (as an REIO) to take decisions binding under EU law on EU Member States which have signed the ECT, including the Respondent. Neither Party refutes this binding character of such decisions under EU law. That is acknowledged by the Claimant's Response, confirming its earlier written and oral submissions, where the Claimant does not complain at the enforcement by the Respondent of the European Commission's Final Decision, but rather impugns the Respondent for not correctly enforcing that Decision within its permitted margin of appreciation under EU law:

> "Hungary did have a discretion, afforded to it by EU law, to decide how to respond to the Commission Decision (Exhibit C-106), i.e. whether to outright terminate the PPA and whether to compensate Electrabel and in what amount. As addressed in detail in the Claimant's Post-Hearing Brief, this case is about whether Hungary's exercise of that discretion was in conformity with its obligations towards Electrabel under the ECT. ... the key issue is whether Hungary breached the ECT when exercising the discretion afforded to it by EU law."

4.169.    In the Tribunal's view, the acts of the Respondent implementing such a binding decision under EU law have to be taken into account in the evaluation of its conduct under the ECT. This means, in the present case, that there can be no practical contradiction between the ECT and EU law in regard to the Final Decision.[27] It also means that the ECT does not protect the Claimant, as against the Respondent, from

---

[27]    The Tribunal notes, without further comment, that the same analysis was made in *AES Summit Generation Limited and AES-Tisza Erömü Kft v Hungary* (ICSID Case No. ARB/07/22) (ECT), Award of 23 September 2010, paragraph 7.6.8: "*However, the Tribunal concludes that, properly understood, the dispute under analysis in the present arbitration is not about a conflict between the EC Treaty or Community competition law and the ECT.*"

the enforcement by the Respondent of a binding decision of the European Commission under EU law.

4.170.   This analysis leaves open the responsibility of the European Union under the ECT for decisions of the European Commission which violate the rights of investors under the ECT. This factor was readily acknowledged in the European Commission's Submission:

> *"...within the Community's legal order, the Energy Charter Treaty is binding on the institutions of the Community and the Member States under Article 300(7) EC. In particular, any act adopted by the institutions may thus not violate the international obligations assumed by the Community." (paragraph 33)*

In the European Commission's Submission, the responsibility for preventing unlawful State aid lies with the European Union and not with EU Member States; and therefore the Respondent is the wrong party named by the Claimant for its PPA Termination Claim. However, as the Commission asserts, it "would trigger the [European Union's] responsibility if contrary to the ECT" (paragraph 41).

4.171.   The Tribunal considers that the Commission's analysis is correct, but only if and to the extent that the relevant dispute engages the legal responsibility of the European Union under the ECT for a decision of the European Commission.[28] However, this is manifestly not what this case is all about: the European Union is not a named party to this arbitration; the Claimant here makes no complaint against the European Union or the European Commission; it does not impugn the legal validity of the Commission's Final Decision; and its claims are not made under EU law. The Claimant's claims under the ECT relate only to certain measures taken by the Respondent, some resulting from the Final Decision under EU law and some with no link with the Commission or EU law.[29]

---

[28]   The Tribunal notes, without further comment, that the same analysis was performed in the *Eureko* award: *"On the other hand, the Tribunal notes that its jurisdiction is confined to ruling upon alleged breaches of the BIT. The Tribunal does not have jurisdiction to rule on alleged breaches of EU law as such." Eureko B.V. v The Slovak Republic*, PCA Case No. 2008-13, UNCITRAL (Netherlands/Czech and Slovak Republic BIT), Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 290.

[29]   The Tribunal notes, without further comment, the decision in *Eastern Sugar B.V. v Czech Republic*, SCC Case No. 088/2004 (Netherlands/Czech Republic BIT) Partial Award of 27 March 2007, paragraphs 169-170: *"Free movement of capital and protection of the investment are different but complementary things. If the EU Treaty gives more rights than it does the BIT, then all EU parties, including the Netherlands and*

4.172.   Accordingly, for the purposes of this case, the Tribunal concludes that the two legal orders are not in fact inconsistent or otherwise contradictory. However, as a courtesy to the elaborate and extensive arguments advanced by the Parties and the European Commission, the Tribunal next considers, assuming the two legal orders did produce different results in this case, whether there are any legal rules providing for a hierarchy between such applicable laws.

4.173.   *Hierarchy of Legal Orders:* The Tribunal has already concluded above that there is no general principle under international law compelling the harmonious interpretation of all existing legal rules. If different rules deal with the same subject-matter in a way that seems contradictory, there is no general hierarchical system, but certain tools of interpretation regarding chronology (*lex posterior derogat priori*), specificity (*lex specialis generalibus derogat*) and identity of the Parties to the agreements (same or different Parties) can assist in solving the conflict. However, these rules do not always apply or can only be applied with difficulty. For this reason, international instruments often contain their own rules concerning the relationship with other agreements, as is the case here with Article 16 ECT and Article 307 EC (Article 351 TFEU).

4.174.   *Article 16 ECT:* The Claimant submits that Article 16 ECT is applicable, whereas the Respondent submits that it is inapplicable, whether or not the ECT and the EC Treaty are considered as having the same subject-matter.

4.175.   First, it is necessary to note again that the EU law is not incompatible with the provision for investor-state arbitration contained in Part V of the ECT, including international arbitration under the ICSID Convention. The two legal orders can be applied together as regards the Parties' arbitration agreement and this arbitration, because only the ECT deals with investor-state arbitration; and nothing in EU law can be interpreted as precluding investor-state arbitration under the ECT and the ICSID Convention.

---

*Dutch investors, may claim those rights. If the BIT gives rights to the Netherlands and to Dutch investors that it does not give other EU countries and investors, it will be for those other countries and investors to claim their equal rights. But the fact that these rights are unequal does not make them incompatible."*

4.176. As regards the substantive protections in Part III of the ECT, the Tribunal does not consider that the ECT and EU law share the same subject-matter; and, accordingly, it considers that Article 16 ECT is inapplicable.[30]

4.177. However, the two legal orders share much in common: the protection of foreign investors is clearly addressed by both the ECT and EU law, although from different perspectives. There are a large number of rules in EU law which protect foreign investors, even if differently formulated from the rules in the ECT. Accordingly, the Tribunal next considers possible solutions to resolve any inconsistency, if (contrary to its decision above) the ECT and the EC Treaties concerned the same subject-matter.

4.178. *Article 307 EC (Article 351 TFEU):* Assuming the same subject-matter, the Tribunal decides that Article 16 ECT would still be inapplicable because the conflict rule of the later treaty would apply, namely Article 307 EC. Both Parties submit that Article 307 EC is inapplicable to the present case; but the Tribunal does not consider that Article 307 can so easily be dismissed.

4.179. The Tribunal notes that, as stated by Professor Jan Klabbers, "Article 307 is the only article in the entire edifice of the EU relating to the status of treaties concluded by the EU's member states vis-à-vis EU law."[31] In particular, there is no other specific article in the EU Treaties dealing with the fate of treaties concluded between EU Member States. However, the effect of Article 307 EC is not straightforward under EU law.

---

[30]  See *Eastern Sugar B.V. v Czech Republic*, SCC Case No. 088/2004 (Netherlands/Czech Republic BIT) Partial Award of 27 March 2007, paragraph 159: *"First, the Arbitral Tribunal does not accept the Czech Republic's argument that the EU treaty as the later treaty (as between the Czech Republic and the Netherlands) covers the <u>same subject matter</u> as the BIT, the earlier treaty."* (Emphasis in the original). See also, *Eureko B.V. v Slovak Republic*, PCA Case No. 2008-13, UNCITRAL (Netherlands/Czech and Slovak Republic BIT), Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 258: *"The Tribunal also considers that the question of overlap and incompatibility must, under VCLT Article 59, relate to the same legal relationship. Thus, a treaty provision guaranteeing non-discrimination does not have, even indirectly, the 'same subject-matter' as a treaty provision guaranteeing fair and equitable treatment … In this respect the notion of the same 'subject-matter' has certain common features with the notions of 'identity' that operate in the context of the doctrine of res judicata."*

[31]  Jan Klabbers, Treaty Conflict and the European Union (CUP, 2009), p. 10.

4.180.   From its wording, it is clear that Article 307 EC cannot apply to treaties made between EU Member States.[32] Article 307 deals only with relations between EU Members and Non-EU Members that survive the entry of the EU Member into the European Union; and it does not address relations between EU Member States. The Tribunal concludes that Article 307 EC, as a "survival clause", does not apply to the relations between the two EU Member States in this case, Belgium as the home-state of the Claimant and the Respondent, as the host-state of the Claimant's alleged investment.

4.181.   The meaning of Article 307 EC was considered by the ECJ in a case dealing with the protection of investments under a treaty between Switzerland (a Non-EU State) and Slovakia (an EU Member State), which had entered into force before the entry of Slovakia into the European Union. The opinion of the Advocate General dated 15 March 2011 reads as follows[33]:

> *"Under Article 307(1) EC, the rights and obligations arising from an agreement concluded before the date of accession of a Member State between it and a third country are not affected by the provisions of the Treaty. Hence that provision resolves the conflict between the two incompatible obligations in favour of the earlier obligation, and thus codifies the international law principle that a subsequent treaty that conflicts with an earlier one cannot legally affect the rights of a State that is a party only to the earlier treaty."[34]*

According to the Advocate General (as also adopted by the ECJ), Article 307 EC is only the expression in the EC Treaties of the general international rule contained in

---

[32]   The Tribunal notes, without further comment, that the same analysis was made in *AES Summit Generation Limited and AES-Tisza Erömü Kft v Hungary* (ICSID Case No. ARB/07/22) (ECT) Award of 23 September 2010, paragraph 7.6.11: *"Article 307 only applies to agreements between member states and non-member states, and Hungary and the United Kingdom are both member states."*

[33]   Opinion of the Advocate General in Case C-264/09, *Commission v Slovakia*, 15 March 2011, paragraph 73.

[34]   This position was followed by the ECJ in its Judgment of 15 September 2011 in Case C-264/09, *Commission v Slovakia*, paragraph 41: *"According to settled case-law, the purpose of the first paragraph of Article 307 EC is to make clear, in accordance with the principles of international law, as set out in, inter alia, Article 30(4)(b) of the Vienna Convention on the Law of Treaties of 23 May 1969, that the application of the EC Treaty does not affect the duty of the Member State concerned to respect the rights of non-member countries under a prior agreement and to perform its obligations thereunder (see, to that effect, Case 812/79 Burgoa [1980] ECR 2787, paragraph 8)."* This Judgment only reiterates the ECJ's analysis since *Commission v Italy* (*ibid.*).

Article 30(4)(b) of the Vienna Convention,[35] to the effect that if there are two successive treaties not having the same parties, the applicable treaty is the one (whether the first or the second one) to which both States are parties.

4.182. However, the Tribunal notes that the ECJ has interpreted Article 307 EC not only positively for what it does say, but also, 'negatively', for what it does not say. If two States are both parties to a pre-accession treaty and the EC Treaties, in case of incompatibility between the two legal orders, it is the later treaty which applies, in conformity with Article 30(3) of the Vienna Convention,[36] to which Article 30(4)(b) of the Vienna Convention refers.

4.183. Under this 'negative' interpretation, Article 307 EC means that between EU Member States, EU law prevails in case of inconsistency with another earlier treaty. Article 307 EC has been interpreted to mean that relations between EU Members differ, by a logical implication, from relations between Non-EU Members, i.e. that inconsistent earlier treaties between Member States do not survive entry into the European Union. If Article 307 EC provides that treaty rights between Non-EU Members cannot be jeopardised by the subsequent entry of a Non-EU State into the European Union, it appears logical, taking into account the integration processes of the European Union, that the opposite consequence should be implied, i.e. the non-survival of rights under an earlier treaty incompatible with EU law as between EU Member States.

4.184. It has to be stressed that these two different consequences have been considered as being applicable at the same time to the same treaty, when both EU Members and Non-EU Members were parties to the treaty. Another analysis was possible, as advanced by Professor Klabbers in his work "Treaty Conflict and the European Union" (p. 120):

> "... (o)n one reading, Article 307 EC could be interpreted as simply giving priority to anterior treaties over the later EC Treaty, even to the extent that such

---

[35] Article 30(4) of the Vienna Convention: *"When the parties to the later treaty do not include all the parties to the earlier one: (a) as between States parties to both treaties the same rule applies as in paragraph 3; (b) as between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations."*

[36] Article 30(3) of the Vienna Convention: *"When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty."*

> *anterior treaties would have to be applied between member states inter se, as long as the treaties concerned would also count non-members among their parties. This was the argument made by Italy in the first case to invoke Article 307 EC (Article 234, as it then was) before the Court of Justice."*

In *Commission v Italy*, the issue concerned treaty rights under the GATT which conflicted with EU customs rules. In its judgment, the ECJ distinguished between (i) the reciprocal rights between EU Members and Non-EU Members under the GATT that survived the entry of a State into the European Union and (ii) the reciprocal rights between EU Members that were superseded, in case of incompatibility, by EU customs rules. The ECJ decided in no uncertain terms that: "[i]n matters governed by the [EC] Treaty, that treaty takes precedence over agreements concluded between Member States before its entry into force."[37]

4.185.   In the same manner, in *Commission v Austria*, the ECJ confirmed that it is "settled case-law" that, "whilst Article 307 EC allows Member States to honour obligations owed to non-member States under international agreements preceding the Treaty, it does not authorise them to exercise rights under such agreements in intra-Community relations."[38]

4.186.   The Tribunal considers this interpretation of Article 307 to accord with international rules relating to the interpretation of successive treaties. It notes that the pre-eminence of EU law applies not only to pre-accession treaties between EU Members, but also to post-accession treaties between EU Members, as EU Members cannot derogate from EU rules as between themselves. There is therefore a significant coherence between EU law and treaties between EU Member States.

4.187.   When the Respondent and Belgium acceded to the ECT in 1998, Belgium was an EU Member State, but the Respondent was not. In 2004, the Respondent became and

---

[37]   Case 10/61, *Commission v Italy* [1962] ECR 1, 10. This solution was achieved, according to the ECJ, by the application of rules of international law, obligations under the EC Treaty (being posterior) prevailing over obligations under the GATT: *"The applicant replies that the terms 'rights and obligations' in Article 234 refer, as regards the 'rights', to the rights of third countries and, as regards the 'obligations', to the obligations of Member States and that, by virtue of the principles of international law, by assuming a new obligation which is incompatible with rights held under a prior Treaty a state ipso facto gives up the exercise of these rights to the extent necessary for the performance of its new obligations. The applicant's interpretation is well founded and the objection raised by the defence must be dismissed."*

[38]   Case C-147/03, *Commission v Austria* [2005] ECR 1-5969, I-6011, paragraph 58, referring to Case C-473/93, *Commission v Luxembourg* [1996] ECR I-3207, paragraph 40.

remains an EU Member State. Accordingly, Article 307 EC (as interpreted by the ECJ) means that, if any inconsistency existed between the ECT and EU law, the ECT would apply in relations between EU Members and Non-EU Members, but that EU law would prevail over the ECT in relations between EU Members themselves (including Belgium and the Respondent).[39] This was aptly summarized in Professor Klabbers' work on "Treaty Conflict and the European Union", already cited above (p. 122):

> *"Article 307 TEC has a limited protective role: it protects only the rights of third parties under anterior treaties; the rights of member states themselves under such treaties are to be considered renounced by virtue of concluding the EC Treaty."*

4.188. A last point should be clarified by the Tribunal. The Claimant submits that the rights of investors under the ECT are different from the rights of EU Member States; and thus that investors should be treated in a way analogous to the rights of a non-EU Member State, i.e. that those rights should survive membership of the European Union. The Claimant relies on Professor Klabbers' suggestion that Article 307(1) EC might apply to protect not only the rights of States, but also to individual rights conferred by earlier treaties. In the Tribunal's view, this analysis cannot disconnect the rights of individual investors from the rights of their home States, with the effect that all individual rights pre-dating the EU Treaties would survive, for both nationals of Non-EU States and nationals of EU States. The Tribunal agrees with the Respondent's submission in its Reply Response that the protection of the rights of individuals "must necessarily be limited to protecting individual rights of nationals of *non-Member States*" (paragraph 13, original emphasis).

4.189. Subject to the several assumptions above (being contrary to the Tribunal's own decisions), the Tribunal concludes that Article 307 EC precludes inconsistent pre-existing treaty rights of EU Member States and their own nationals against other EU

---

[39] This differential application of the ECT amongst its signatory parties has been noted by Dr Graham Coop (of the Energy Charter Secretariat): *"In relation to investment protection, therefore the ECT is: (a) an intra-EU MIT as among the 27 EU Member States; (b) and extra-EU MIT as among the 27 EU Member States and the 24 other ECT member states; and (c) an MIT wholly external to the European Union as among the 24 non-EU ECT member states."*, "Energy Charter Treaty and the European Union: Is Conflict inevitable?", 27 *Journal of Energy & Natural Resources Law* (2009), p. 416.

Member States; and it follows, if the ECT and EU law remained incompatible notwithstanding all efforts at harmonisation, that EU law would prevail over the ECT's substantive protections and that the ECT could not apply inconsistently with EU law to such a national's claim against an EU Member State.

4.190.  *Article 30 of the Vienna Convention:* The Tribunal can deal summarily with Article 30 of the Vienna Convention, because it has the same consequences as the 'negative' interpretation of Article 307 EC decided by the ECJ and Advocate General in *Commission v Slovakia* (where, as described above, Article 307 was treated as the expression under EU law of Article 30(4)(b) of the Vienna Convention). Accordingly, even in situations where Article 307 EC would not have applied, the same result would have followed under Article 30, on the hypothesis that the two treaties related to the same subject-matter.

4.191.  In summary, from whatever perspective the relationship between the ECT and EU law is examined, the Tribunal concludes that EU law would prevail over the ECT in case of any material inconsistency. That conclusion depends, however, upon the existence of a material inconsistency; and the Tribunal has concluded that none exists for the purpose of deciding the Parties' dispute in this arbitration.

*(6)*    **THE TRIBUNAL'S CONCLUSIONS**

4.192.  In summary, the Tribunal concludes that it is required to apply to the Parties' arbitration agreement and to the merits of the Parties' dispute in this case the rules of international law agreed by the Parties under Article 42(1) of the ICSID Convention; and that under Article 26(6) ECT, these rules comprise the ECT and rules and principles of international law.

4.193.  As regards the law applicable to its jurisdiction to decide the Parties' dispute, the Tribunal likewise concludes that it is required, as an international tribunal, to apply the ECT and the ICSID Convention, together with rules and principles of international law.

4.194.   The Tribunal also concludes that the ECT and the ICSID Convention were and remain valid treaties under international law legally binding upon the Respondent and validly invoked by the Claimant in this arbitration. In particular, the Tribunal decides that Article 42 of the ICSID Convention and Article 26 ECT are not in any way invalidated, suspended or terminated under international law; nor has the Respondent withdrawn from either treaty. Indeed the Claimant and the Respondent have not contended otherwise before this Tribunal.

4.195.   The Tribunal further concludes that EU law (not limited to EU Treaties) forms part of the rules and principles of international law applicable to the Parties' dispute under Article 26(6) ECT. Moreover EU law, as part of the Respondent's national law, is also to be taken into account as a fact relevant to the Parties' dispute.

4.196.   As regards the Parties' arbitration agreement and the merits of their dispute, the Tribunal concludes that there is in this case no material inconsistency between the ECT and EU law.

4.197.   The Tribunal recognises the special status of EU law operating as a body of supra-national law within the EU. It also recognises the roles undertaken by the ECJ as the arbiter and gate-keeper of EU law comprising, in the words of ECJ Opinion 1/09, "the fundamental elements of the legal order and judicial system of the EU" (paragraph 54). However, these important features do not arise in the present case.

4.198.   Although the Tribunal is required in this arbitration to interpret the European Commission's Final Decision of 4 June 2008, and in that sense, to apply EU law to the Parties' dispute, the Tribunal is not required to adjudicate here upon the validity of that decision, as the Claimant has consistently confirmed to the Tribunal during the course of these arbitration proceedings. That adjudication remains a decision for the EU courts alone, within the pending legal proceedings brought against the European Commission by Dunamenti (but not the Claimant). This Tribunal is not therefore required to review and does not here review the legality of any act of any EU institution, including the European Commission.

4.199.   Lastly, the Tribunal recognises that it is an international tribunal established under the ECT and the ICSID Convention, in an international arbitration with no seat or legal place within the European Union and with its award potentially enforceable

under the ICSID Convention both within and without the European Union. The Tribunal does not consider that any of these factors affect its conclusions as regards the law applicable to the Parties' arbitration agreement, the Tribunal's jurisdiction and the merits of their dispute.

## PART V: JURISDICTION

### (1)    INTRODUCTION

5.1    The Tribunal is required to address several challenges to its jurisdiction. By reference to Article 1(6) ECT, the Respondent has challenged the Tribunal's jurisdiction generally to decide the Parties' dispute. It is a relatively short point of interpretation under the ECT; and the Tribunal addresses this jurisdictional issue below. The Respondent has also challenged the Tribunal's jurisdiction to decide part of the Claimant's PPA Pricing Claim. This challenge is joined to the merits by agreement of the Parties; and the Tribunal addresses this jurisdictional issue in Part VII below.

5.2    Further, being a tribunal whose jurisdiction is founded on treaties, the Tribunal considers that it must verify that its jurisdiction meets the treaty requirements under the ECT and the ICSID Convention. But for one important factor, this exercise could be completed relatively shortly in this case because no Party has challenged the Tribunal's jurisdiction generally in these arbitration proceedings, beyond Article 1(6) ECT. Nonetheless, as part of its own inquiry and legal research, the Tribunal addresses this general requirement below.

5.3    That other important factor relates to the position taken by the European Commission where it disputes the jurisdiction of the Tribunal to decide the major part of the Parties' dispute in these ICSID arbitration proceedings. The European Commission's position raises potentially far-reaching issues. It is therefore necessary to address first the European Commission's jurisdictional objection below, albeit in the light of the Tribunal's decisions as regards applicable law already made above in Part IV of this Decision.

5.4    As indicated in Part I above, by procedural order dated 28 April 2009, the Tribunal accepted the European Commission as a non-disputing party and its request to file a

written submission to the Tribunal under ICSID Arbitration Rule 37(2). The Tribunal requested the European Commission to address in writing three particular matters, namely: (i) EU law and its connection with the ECT; (ii) EU law and the Commission's State aid investigation concerning the PPAs in Hungary; and (iii) the effect of EU decisions on the European Union's Member States, particularly the Respondent.

5.5     Pursuant to the Tribunal's request, the European Commission filed with the Tribunal its written submission dated 12 June 2009 (the "European Commission's Submission"). The European Commission there wished to record that, whilst the Tribunal had invited it to express views as an expert commentator on European Community law, the Commission was presenting its Submission as the external representative of the European Communities as a Contracting Party to the Energy Charter Treaty.

5.6     In accordance with ICSID Arbitration Rule 37(2), the Parties provided to the European Commission, at the Tribunal's request, redacted versions of the Memorial, the Amended Memorial and the Counter-Memorial for the preparation of the European Commission's Submission. The Parties (with their respective expert witnesses) were given and exercised several opportunities, orally at the Hearing and in writing, by their respective Reply, Rejoinder and several Post-Hearing Submissions, to present their observations on the European Commission's Submission.

5.7     It is appropriate to summarise at some length the position advanced by the European Commission as regards the Tribunal's jurisdiction in this case, before turning to the Parties' respective observations. As may be readily noted, there is a substantial overlap between the Commission's submissions regarding jurisdiction and applicable law, as already summarised in Part IV above; its submissions are closely related; and a certain repetition below is therefore inevitable.

*(2)*    ***THE EUROPEAN COMMISSION'S SUBMISSION***

5.8     In summary, the European Commission requested  the Tribunal to take account of four related matters in addressing the Parties' dispute in this arbitration, here taken from its Submission (see especially paragraph 140, at pp. 43-44):

5.9     *(i) Jurisdiction:* First, the European Commission submits that the Tribunal's jurisdiction does not extend to the Claimant's claim relating to the termination of the PPA, which the Respondent "brought about in compliance with" the Commission's Final Decision of 4 June 2008. (This submission primarily addresses the PPA Termination Claim addressed as to the merits in Part VI below).

5.10    In the European Commission's view, this is "an intra-EU dispute" between a Belgian investor and an EU Member State. The Tribunal should therefore verify under ICSID Arbitration Rule 41(2) whether it has jurisdiction over claims made by the Claimant. In particular, so the Commission submits, this Tribunal should not assume jurisdiction over claims concerning a subject-matter falling within the competence of the European Union and triggering the latter's responsibility if contrary to the ECT. Under such circumstances, there is no dispute between a Contracting Party (the Respondent) and an investor of 'another' contracting party (the EU Claimant) within the meaning of Article 26(1) ECT. The Commission submits that "the Energy Charter Treaty and general international law directs the Tribunal to attributing the measure at issue to the European Community rather than to Hungary"; the PPA Termination Claim "should have been brought against the European Community, not against Hungary"; and (being an EU investor) brought in a different forum, the "Community courts" and not arbitration under the ECT (European Commission's Submission, paragraphs 51, 56 & 67).

5.11    As indicated above, this jurisdictional submission is directed primarily at the Claimant's PPA Termination Claim. As regards jurisdiction over the PPA Pricing and Regulated Pricing Claims (called by the Commission "the renegotiation request claim" and "the tariff decrees claim"), the European Commission submits that these

fall within the Respondent's responsibility under the ECT, being "neither ordered nor determined in substance by the European Commission or Community State aid law" (European Commission's Submission, paragraphs 58 and 59). The European Commission did not wish to make submissions with regard to the G1 Unit Claim (called by the Commission "the Mandatory Off-Take Decree claim"), "given that the Community dimension of this claim only relates to a draft EC Directive, and the lack of Community influence over the measures taken by Hungary in this respect" (European Commission's Submission, paragraph 60).

5.12    *(ii) EU Law:* Second, under Article 26(6) ECT, the European Commission submits that disputes over the interpretation and application of the ECT should be decided in accordance with applicable rules and principles of international law.

5.13    Relying on: (i) the doctrine of *pacta sunt servanda* under Article 26 of the Vienna Convention; and (ii) the fact that the Contracting Parties to the ECT took account of the growing importance of European integration and did not wish to impair the proper functioning of the European Communities (including the application of the EU system of State aid), the European Commission contends that there is a presumption under the ECT that compliance with EU law on State aid cannot be a breach of the ECT, if EU law offers substantive and procedural guarantees equivalent to the protections contained in the ECT (as, according to the Commission, it does).

5.14    According to the European Commission, since Articles 10 and 13 ECT are fully respected by EU law on State aid and complemented by effective mechanisms for judicial review within the European Union, this presumption applies in the present case. As there was no manifest deficiency in any phase of the operation of the EU State aid regime with respect to the Hungarian PPAs, this presumption has not been rebutted by the Claimant in the present case.

5.15    *(iii) Harmonious Interpretation:* Third (in the alternative), the European Commission submits that the ECT must be interpreted in such a way as to avoid conflict with EU law. According to the Commission, this principle of "harmonious interpretation" can be derived from customary principles of treaty interpretation, as codified in Article 31 of the Vienna Convention on the Law of Treaties. The

application of this principle demonstrates that the Respondent's efforts to render the PPAs compatible with EU law on State aid did not breach ECT standards. Accordingly, so the Commission submits, the Claimant's "renegotiation request claim" and the "tariffs decree claim" should be rejected by the Tribunal on their merits (being references to the PPA Pricing and Regulated Pricing Claims).

5.16    *(iv) Unenforceable Award:* Fourth, the European Commission submits that EU Member States are obliged under EU law to carry out State aid decisions issued by the Commission. If the Tribunal were here to make an arbitration award that was contrary to obligations legally binding on the Respondent as an EU Member State, such an award could not be implemented by virtue of the supremacy of EU law (as EU law constitutes the applicable conflict rule), which was agreed *inter se* between the Respondent and Belgium in accordance with Article 30(3) and (4) of the Vienna Convention and Article 2 of the 2004 Act of Accession.[1] Accordingly, according to the Commission, the rules of the ECT apply to Belgium and the Respondent in their mutual relations only to the extent that they are compatible with the Act of Accession and thus with EU law.

5.17    It follows from all these factors, so the Commission contends, that EU law governs the legal situations arising between a Belgian investor and the Respondent in all areas falling within the scope of the EU Treaty. All EU Member States, including Belgium and the Respondent, agreed in 2004 *inter se* not to apply the conflict rule contained in Article 16 ECT, but the general supremacy rule of EU law in such situations. Accordingly, even if the Tribunal were to find a breach of the ECT by the Respondent, the Respondent's obligation to implement the EU State aid regime must still prevail over any such award by the Tribunal.

5.18    In this context, the European Commission reminds the Tribunal that any payment obligation by the Respondent to the Hungarian Generators based on the PPAs or their termination (be it agreed consensually or derived from an arbitration award) remains subject to EU law on State aid. Such payment can thus not take place lawfully if it would contradict the rules of EU State aid. The Commission here refers

---

[1]    Article 2 of the 2004 Act of Accession provides: *"From the date of accession, the provisions of the original Treaties and the acts adopted by the institutions and the European Central Bank before accession shall be binding on the new Member States and shall apply in those States under the conditions laid down in those Treaties and in this Act."* [OJ 2003, L 236, p.33].

to the decision of the ECJ in *Eco Swiss v Benetton* ECR [1999] I-3055, paragraphs 35-41, to the effect that the EU's competition rules are part of the "public order which national courts must take into account when they review the legality of arbitral awards under the public policy exception recognized by the 1958 New York Convention", in force in all EU Member States (including the Respondent).

5.19    The European Commission recognises that (in contrast to the New York Convention) Article 54(1) of the ICSID Convention provides for automatic recognition of an ICSID award and enforcement of the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State (the Respondent being a Contracting State to the ICSID Convention). However, so the Commission submits, if a national court in the EU were asked to enforce an ICSID award which was contrary to EU law, the proceedings would have to be stayed under Article 234 EC (now Article 267 TFEU) so that the ECJ could first decide on the application of Article 54 of the ICSID Convention, as transposed into the national law of the referring court. In this respect, the Commission notes that the ICSID Convention is not binding on the EU under Article 300(7) EC (now Article 216(2) TFEU), as the current terms of the ICSID Convention do not allow the EU to become a Contracting Party; and accordingly, the ICSID Convention does not form part of the EU legal order.

5.20    As to the first of these matters relating to "jurisdiction", it is appropriate here for the Tribunal to cite the European Commission's concluding submissions almost verbatim, including footnoted references (Part 4, pp. 13-22).

> "4.1    *The determination whether the subject matters falls into the respective competence of an EU Member State or the Community*
>
> 42.    *Where a dispute under the ECT – a multilateral treaty to which both the European Communities and its Member States are party – arises <u>inside</u> the European Communities, it needs to be determined, first of all, whether the subject matter falls under Community competence or whether the Member States retain the respective competence.*
>
> 43.    *The Commission respectfully submits that while no general declaration of competence was made at the time of ratification, the European*

*Communities have offered a special procedure in order to assist in this determination (subsection 4.1.1). As the applicant has not availed itself of this possibility, the Commission submits its view on the relevant distribution of competences between the Communities and the Member States with regard to the matters concerned in the present case (4.1.2).*

4.1.1    *The procedure to determine the respective competences:*

44.    *In certain international conventions concluded both by the European Member States and the European Communities (so-called mixed agreements) a general declaration was issued at the time of ratification in order to facilitate the determination of competences.[2] Such declarations of competence provide a degree of transparency towards the non-European parties to international agreements. However, they do not change the substantive distribution of competences between the European Communities and their Member States deriving from the Treaty establishing the European Communities. Rather, they reflect the existing distribution of competences for the sake of clarity.*

45.    *With regard to the ECT, no such declaration of competence was issued. It follows that, in international law, the ECT has fully legally binding effects upon both the Community and its Member States alike.[3]*

46.    *However, this does not mean that both the Community and its Member States have become internally competent for all matters falling under the ECT. Rather, since such a declaration on competences would only have stated the existing distribution between the two, nothing can be inferred from its absence either. Notably, the absence of such declaration does not mean that any conduct by an EU-Member State automatically and exclusively concerns matters falling under its own competence. If the Member States were competent for all matters covered by the ECT, it would have sufficed if they alone had concluded the ECT. This is not the case. Rather, in particular for intra-European disputes, it always needs to be determined whether the EC or the*

---

[2]    *See for example the declaration made by the Community upon ratification of UNCLOS, Council Decision 98/392/EC of 23 March 1998, Annex II, OJ 1998, L 179, p. 3.*

[3]    *In so far correct C. Tietje, The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States, Beiträge zum Transnationalen Wirtschaftsrecht 78, September 2008, p.9.*

*Member State is internationally responsible for a certain conduct in accordance with their respective competences.*

47. *The European Communities foresaw precisely this necessity when submitting their Statement to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the ECT, including the following passages:*

> *The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.*

> *The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days.*

48. *The statement responds to a specific feature of the so-called mixed agreements, such as the ECT: It takes into account that both the European Communities and their Member States can be internationally responsible for conduct relevant under the ECT.[4] Therefore, the Communities and the Member States decided to offer a swift procedure to investors in order to assist them in their choice of the correct respondent party to arbitration proceedings. Within only thirty days, they will make a determination to this effect, when requested by an Investor to do so.*

49. *Had the Claimant resorted to this procedure, the Commission and Hungary could have jointly assisted it in the determination of the respective competences and choice of the correct respondent party. In*

---

[4] *It should be noted that this situation is substantially different from the one in which only one Member States has incurred a bilateral treaty obligation, which might conflict with EC law. It was such an entirely different scenario, where the Community was not itself a party to the agreement in question, that gave rise to the so-called Eastern Sugar arbitration (Eastern Sugar B.V. v Czech Republic, SCC Case No. 088/2004 (Netherlands/Czech Republic BIT), Partial Award of 27 March 2007).*

*failing to do so, the Claimant took the risk to bring a cause against the wrong respondent or before the wrong forum.*

4.1.2    *The determination of the respective competences of the European Communities and their Member States in the present case:*

50.    *According to the applicant's submission,[5] the claims currently before the Tribunal relate to three main issues: first, the question of pricing for the energy produced by Dunamenti (relevant in the so-called "Renegotiation Request Claim", the "Tariffs Decree Claim" and the claim relating to the interpretation of the PPA pricing provisions with regard to the F and G2 units); second, the question of the exclusion of the G1 unit from the Hungarian Mandatory Off-Take Regime and third, the termination of the PPA in compliance with the European Commission's decision.[6]*

4.2    *The lack of ECT jurisdiction over claims against the Community brought by an EU investor*

61.    *Moreover, when bringing the termination claim against Hungary, the applicant did not only make an erroneous decision with respect to the correct respondent, it also chose the incorrect forum.*

62.    *The dispute settlement system under Part V of the ECT is designed for "Disputes between a Contracting Party and an investor of another Contracting Party." The language of Article 26(1) ECT makes it plain that, for example, a company incorporated under the laws of one Contracting Party should not be enabled to start international litigation against the measures adopted by that very Party. Rather, only the foreign investors of another Contracting Party were given such right to have access to an alternative forum of dispute settlement. By providing this alternative, foreign investors are granted the right to avoid the*

---

[5]    *Claimant's Memorial of 29 July 2008, p. 99, paragraph 427; Claimant's [Amended Memorial] of 30 January 2009, p. 8, paragraph 25.*

[6]    *The Commission notes that the Claimant had initially also raised a number of other claims, including a claim concerning the allocation of CO2 allowances under the National Allocation Plan of Hungary. However, it appears that the Claimants no longer pursue these claims (See Respondent's Counter-Memorial of 15 May 2009, paragraph 7). The Commission will therefore not comment on these claims.*

*courts of the host State, when they have a suspicion that the latter are biased towards their own government.*

63. *The dispute settlement system under Part V of the ECT was, however, not intended to grant international litigation rights for investors against measures taken by their own governments. In view of the negotiating history reported above, it was certainly not the intention of the Community and its Member States to provide for an alternative forum for EU investors against measures attributable to the Community. If that had been the case, the Community would have been put at a considerable disadvantage by comparison to other non-EU contracting parties. While, for example, Russia could turn down any international litigation requests of Russian companies against measures of the Russian government, the European Community could not do the same vis-á-vis international arbitration requests under the ECT from companies that are incorporated under the 27 national legal systems of the Community. This would have led to the absurd result to have granted to Community investors an additional international forum to attack Community measures, while all other Contracting Parties would only grant international litigation rights to foreign investors.*

64. *This interpretation of Article 26(1) ECT is further sustained by the specific characteristics of the European Community, recognized by Article 1(3) ECT. As a supra-national organisation with the force to take binding decisions over its Member States, the Community is seen by the drafters of the Energy Charter Treaty as one legal space. This is further sustained by Article 1 (10) 2nd subparagraph ECT, according to which the 'area' means the areas of the Member States of the Organization, <u>under the provisions contained in the agreement establishing this organisation</u> (emphasis added [by the Commission]). Article 1(10) ECT thus shows that the ECT has to be read in conjunction with the EC law regarding the division of competences in order to arrive at proper interpretation and allocation of rights and obligations under the ECT in disputes involving the Community and/or its Member State(s).[7] In other words, Articles 1(3) and 1(10) ECT confirm that the Community did not become a Contracting Party to the*

---

[7]    *See also discussion supra in Section 3, paras. 30-38.*

*ECT as an 'empty shell' (if that were the case, it would have been easy for the drafters to say that REIO is defined simply as a group of several Contracting Parties), but as a single actor with a single legal space for matters falling under its competence.*

65.    *In that connection it is important to note that the provisions of the EC-Treaty which are accorded significance in Article 1(10) ECT oblige Member States not to weaken the Community legal system by referring Community disputes to tribunals outside the Community system. Rather to the contrary: in the Community system there is no suspicion against a structural bias of the European Courts for Community measures, but a strong confidence therein, which is reflected in a number of Community law provisions. For example, under Article 292 EC "Member States undertake not to submit a dispute concerning the interpretation or application of this Treaty to any method of settlement other than those provided for therein." For that very reason, the European Court of Justice held that Ireland was prevented from bringing a case against the United Kingdom before dispute settlement bodies of the law of the Sea Convention, since the Community had become a party to UNCLOS next to its Member States and the case fell within the scope of Community law.[8] In the same vein, Member States cannot litigate international investment disputes that are falling within the scope of Community law against each other before an international investment tribunal, rather than before the European Court of Justice.*

66.    *Therefore, given the specific characteristics of the Community which are acknowledged by Articles 1(3) and (10) ECT, it is not reasonable to assume that the Community and its Member States granted access to international litigation against Community measures to their own investors by concluding the Energy Charter Treaty. Accordingly, Article 26(1) ECT excludes that a Community investor may bring a case against the Community before an international arbitration tribunal against a Community measure. Such rights are reserved for non-EU investors.*

---

[8]    *Case C-459/03, Commission v Ireland (Mox Plant), Judgment of 30 May 2006, [2006] ECR I-4635.*

67.     *In sum, the European Commission is of the view that the Tribunal lacks jurisdiction over the termination claim because the latter fails under the competence of the Community, but was brought by an EU investor. The proper avenue for the EU investor is to seek protection for this claim before Community courts, and this is indeed what most of the operators, including as it appears Dunamenti, have done.*

68.     *In view of this clear-cut result, the Commission does not consider it necessary to further determine the division of competences between the Community and its Member States relating to investment protection under the ECT in general, inter alia relating to the free movement of capital under Article 56 seq. of the EC Treaty and the jurisdictional implications thereof. The Commission is, however, prepared to revert to this issue if the Tribunal so requests."*

## (3)     THE CLAIMANT'S OBSERVATIONS

5.21    In summary, the Claimant submits in response to the European Commission's submissions that the Tribunal has overall jurisdiction over this dispute because the jurisdictional requirements in the ECT and ICSID Convention are satisfied in full.

5.22    With respect to ICSID jurisdiction, the Claimant submits that it is a company incorporated in Belgium and that both the Respondent and Belgium are Contracting States for the purpose of Article 25(1) of the ICSID Convention.

5.23    The Claimant also submits that there is a legal dispute concerning the rights of the Claimant under the ECT; and that such legal dispute arises directly out of an investment since it is intimately connected to the "rights and expectations arising from operation of the Claimant's assets, which are assets that qualify as an investment" (Claimant's Memorial, paragraph 297).

5.24    The Claimant contends that the Respondent's consent to ICSID jurisdiction is contained in Article 24(4)(a)(i) of the ECT and the Claimant's own consent in the

Request for Arbitration. The Claimant also alleges that the Claimant's assets in Hungary qualify as an investment under Article 25(1) of the ICSID Convention.

5.25    With respect to the ECT, the Claimant submits that Article 26 of the ECT constitutes a standing offer of arbitral jurisdiction for disputes between a Contracting Party (here the Respondent) and an investor of another Contracting Party (here the Claimant) pursuant to Article 1(7)(a)(i) ECT relating to an investment of the latter in the area of the former, which offer was accepted by the Claimant when the Claimant commenced this ICSID arbitration. The Claimant also submits that the dispute concerns acts and omissions attributable to the Respondent, which have adversely affected the use of its assets in violation of the ECT.

*(4)      THE RESPONDENT'S OBSERVATIONS*

5.26    In summary, the Respondent notes that the Tribunal's jurisdiction to decide the Claimant's PPA Termination Claim has been specifically challenged by the European Commission only. In these proceedings, the Respondent has confirmed that it does not challenge in like manner the Tribunal's jurisdiction to assess whether the Respondent's legislative termination of the PPA and related conduct were in accordance with the ECT.

5.27    In its Preliminary Objections, the Respondent acknowledged the Tribunal's jurisdiction over the claims presented by the Claimant that challenged official government action by the Respondent, namely the PPA Pricing Claim in relation to acts of HEO (but not MVM), the Regulated Pricing Claim and the Mandatory Off-Take Decree claim (also called the G1 Unit Claim). In its Counter-Memorial, the Respondent also acknowledged the Tribunal's jurisdiction to hear the Claimant's PPA Termination Claim, with the exception of the Claimant's related complaint that MVM declined to replace its PPA with a new contract on Dunamenti's preferred terms, which the Respondent considers to be a commercial decision of MVM, not attributable to the Respondent. The Respondent there again objected to the PPA Pricing Claim in relation to MVM's acts, on the ground that MVM's commercial

decisions taken in its private legal capacity are not legally attributable to the Respondent. As already indicated, since these objections comprise or are at least intertwined with the merits of these specific claims, to the extent relevant, they are addressed later in this Decision (see Parts VI and VII below).

5.28    Nevertheless, the Respondent does not concede that it can be held liable for actions by the European Commission (including its Final Decision of 4 June 2008). The Respondent submits that there can be no State responsibility by the Respondent for the conduct of the European Commission as an independent actor under applicable principles of international law.

5.29    The Respondent does not however make any jurisdictional objection to the PPA Termination Claim because the Respondent acknowledges that the Claimant's claim is narrowly limited to whether the Respondent's own actions in terminating the PPA violated the ECT, rather than attempting to hold the Respondent liable for the actions of the European Commission and the direct effects of its Final Decision. The Respondent considers that, in contrast, the European Commission's Submission treats the Claimant's PPA Termination Claim as constituting a direct challenge to European Commission's Final Decision and the Commission's legal authority to implement State aid policy within the EU. Thus, unlike the Respondent, the Commission submits that this claim should be dismissed on grounds of jurisdiction as impugning a Community measure.

5.30    Whilst the Respondent only invokes the European Commission's submissions insofar as these can apply to the merits of the Parties' dispute (i.e. not jurisdiction), the Respondent acknowledges that the Tribunal remains at liberty to make its own assessment of the European Commission's jurisdictional challenge as part of the Tribunal's own obligation to assure itself that it has jurisdiction to decide on its merits the PPA Termination Claim.

*(5)* **THE TRIBUNAL'S ANALYSIS AND DECISIONS**

5.31    Excepting the issues under EU law and Article 1(6) ECT, the Tribunal accepts the jurisdictional submissions made by the Claimant as regards the Tribunal's jurisdiction to decide the Parties' dispute under the ECT and ICSID Convention ratione personae, ratione materiae and ratione voluntatis. The Tribunal notes that these submissions are not materially challenged by the Respondent.

5.32    *(i) The Tribunal's Jurisdiction:* The Tribunal rejects the European Commission's jurisdictional submissions as regards the EU law issue on three grounds. First, the Tribunal repeats its analysis and decisions regarding applicable law in Part IV of this Decision, including its conclusion that there exists no relevant inconsistency between EU law, the ECT and the ICSID Convention in the present case, as regards both the merits of the Parties' dispute and the Tribunal's jurisdiction to decide this dispute, including (particularly) the PPA Termination Claim.

5.33    Second, the Tribunal notes that the Claimant, contrary to the submissions of the European Commission is *not*, albeit a "Community investor", bringing "a case against the Community before an international arbitration tribunal against a Community measure" (see paragraph 66 of the European Commission's Submission (cited in full above)).

5.34    As acknowledged by the Respondent itself in response to the Commission's submissions, the Claimant's claim is limited to whether the Respondent's own acts in terminating the PPA violated the ECT. As confirmed by the Claimant to the Tribunal's satisfaction on several occasions, the Claimant is not here impugning the validity of the European Commission's Final Decision of 4 June 2008 under EU law or the ECT; nor is the Claimant attacking any act of the Commission (or other EU institution), whether by alleging any liability against the European Union (including the Commission) or by seeking to attribute liability to the Respondent for any act of the European Union.

5.35    In the Tribunal's view, the Claimant's claim, being advanced only against the Respondent under the ECT, is brought against the right party; and, as pleaded, its claim could not be made against the European Union. Moreover, this ICSID arbitration is not the wrong forum for the dispute between these Parties: this is a claim by the Claimant against the Respondent referred to ICSID arbitration under Article 26(4)(a)(i) ECT. It could not be made against the European Union under Article 26 ECT and the written statement made by the European Communities under Article 26(3)(b)(iii) ECT (cited in full in Part IIII above).

5.36    By itself, this second ground is a sufficient answer to the European Commission's jurisdictional submissions, which may rest (at least in part) upon a significant misunderstanding of the scope of the Claimant's case as regards its PPA Termination Claim in this arbitration. Contrary to the European Commission's Submission, this arbitration is not "international litigation against Community measures" (see paragraph 66, cited above). In the circumstances, the Tribunal does not here address what the position might be if the Claimant were impugning a Community measure, e.g. the European Commission's Final Decision of 4 June 2008.

5.37    Third, this Tribunal is an international tribunal established under the ECT and the ICSID Convention.  From its perspective under international law, the Tribunal notes the establishment under international law of the Parties' consent to international arbitration under the ICSID Convention and also the effect of Article 26 of the ICSID Convention, providing for ICSID arbitration "to the exclusion of any other remedy". It is therefore no answer for the European Commission to submit that the "proper avenue" for the Claimant lies only in "the Community courts", whether the Respondent's own national courts or the ECJ (even assuming the Claimant's locus standi before the ECJ).

5.38    Accordingly, subject only to the remaining issues raised by the Respondent, the Tribunal concludes that it has jurisdiction to decide the entirety of the Parties' dispute, including the Claimant's PPA Termination Claim. The Tribunal considers the first of the Respondent's jurisdictional issues under Article 1(6) ECT below, with other issues later in this Decision.

5.39    *(ii) Article 1(6) ECT:* As to the jurisdictional requirement for an investment under the definition of Article 1(6) ECT and Article 25 of the ICSID Convention, the Claimant submits that the following assets located within Hungary qualify as its "investment": (i) the Dunamenti power plant (pursuant to Article 1(6)(a) ECT); (ii) the Claimant's equity participation in Dunamenti (pursuant to Article 1(6)(b) ECT); (iii) Dunamenti's contractual rights under the PPA and related rights concerning its activity in the energy sector in Hungary (pursuant to Article 1(6)(c) and (f) ECT); and (iv) the PPA and F Retrofit Agreement as they include claims to money as well as claims to performance by MVM (Article 1(6)(c) ECT) (Claimant's Memorial, paragraph 311, and Post-Hearing Brief, paragraph 107).

5.40    The Claimant also submits that its investment fulfils the requirement that it be "associated with an Economic Activity in the Energy Sector" since Dunamenti's sole business is as a generator of electricity and until recently of steam. The Claimant adds that it directly or indirectly owns or controls these assets given its direct ownership of 50.3% of Dunamenti's shares, and its indirect ownership of a further 24.5% of the remaining shares (through Electrabel Hungary Limited).

5.41    As regards the definition of "investment" in the ECT, the Respondent considers it as typical of investment treaties, its purpose being to sweep a wide range of assets within the definition of 'investment' rather than to create an endless array of separate 'investments' that a claimant could define as it pleased, depending on the particular legal argument it wanted to make. For the Respondent, the broad definition of investment in Article 1(6) ECT "does not mean that an investor can subdivide its overall investment into a series of stand-alone 'investments' for the purposes of evading the "substantial deprivation test" of an expropriation claim" (Respondent's Rejoinder, paragraph 275).

5.42    With this reservation, the Respondent nonetheless accepts the Claimant's shareholding in Dunamenti as an investment under Article 1(6) ECT, whilst the PPA constitutes "Dunamenti's putative right to a continued private law contract with particular terms" (Respondent's Rejoinder, paragraph 257).

5.43    Article 25 of the ICSID Convention requires that the dispute arises directly from an investment, but provides no definition of investment. While there is incomplete unanimity between tribunals regarding the elements of an investment, there is a general consensus that the three objective criteria of (i) a contribution, (ii) a certain duration, and (iii) an element of risk are necessary elements of an investment.[9] The so-called *Salini* test, often referred to by tribunals, adds the criterion of a contribution to the economic development of the host state.[10] The Tribunal agrees with the opinion expressed by the *Saba Fakes* tribunal that the economic development of the host State is one of the objectives of the ICSID Convention and a desirable consequence of the investment, but it is not necessarily an element of an investment. The expectation of profit and return which is sometimes viewed as a separate component of an investment must rather be considered as included in the element of risk, since every investment runs the risk of reaping no profit at all.[11] Finally, subject to the wording of the provision in the treaty for dispute resolution, the legality of the investment and the investor's good faith may be relevant as elements of the definition of an investment or as a bar to the exercise of jurisdiction or to investment protection on the merits.

5.44    The Tribunal turns first to the application of ICSID Article 25 in the present case. The Tribunal considers that all the elements of the Claimant's operation must be considered for the purpose of determining whether there is an investment under Article 25.[12]

---

[9]    *Saba Fakes v Turkey* (ICSID Case No. ARB/07/20), Award of 14 July 2010, paragraphs 101-102.

[10]    *Salini Costruttori SPA and Italstrade SPA v Kingdom of Morocco* (ICSID Case No. ARB/00/4), Decision on Jurisdiction of 23 July 2001, paragraphs 50–58; *LESI-Dipenta v Algeria* (ICSID Case No. ARB/03/08), Award of 10 January 2005, paragraph II.13(iv); *Bayindir v Pakistan* (ICSID Case No. ARB/03/29), Decision on Jurisdiction of 14 November 2005, paragraphs 131–137; *Pey Casado v Chile* (ICSID Case No. ARB/98/2), Award of 8 May 2008, paragraph 233.

[11]    *Joy Mining v Egypt* (ICSID Case No. ARB/03/11), Award on Jurisdiction of 6 August 2004, paragraph 53; see also *Helnan International Hotels v Egypt* (ICSID Case No. ARB/05/19), Decision on Objection to Jurisdiction of 17 October 2006, paragraph 77.

[12]    *Saipem SpA v Bangladesh* (ICSID Case No. ARB/05/7), Decision on jurisdiction and recommendation on provisional measures 21 March 2007, paragraph 110: *"Finally, the Tribunal wishes to emphasize that for the purpose of determining whether there is an investment under Article 25 of the ICSID Convention, it will consider the entire operation. In the present case, the entire or overall operation includes the Contract, the construction itself, the Retention Money, the warranty and the related ICC Arbitration"; ATA Construction, Industrial and Trading Company v Jordan*, (ICSID Case No. ARB/08/2), Award of 18 May 2010, paragraph 96: *"Before turning to the analysis having led to this conclusion, the Tribunal wishes to emphasize that an investment is not a single right but is, like property, correctly conceived of as a bundle of rights, some of which are inseparable from others and some of which are comparatively free-standing"; Joy*

5.45    Applying the criteria of contribution, duration and risk to the comprehensive operation of the Claimant in Hungary, the Tribunal has no hesitation in concluding that the Claimant made an investment within the meaning of Article 25 of the ICSID Convention. Hence, the PPA and the other separate assets identified by the Claimant taken by themselves represent only elements of the overall operation, which constitutes the Claimant's investment.

5.46    The Tribunal's jurisdiction under the ECT is next circumscribed by Article 26(1) and (2) ECT (cited in Part III above). The Tribunal decides that the requirements of Article 26 ECT are fulfilled by the Claimant and need no further consideration. It remains to be seen, as disputed by the Parties, whether the ECT's requirement for an investment is met under Article 1(6) ECT (also cited in Part III above).

5.47    Article 1(6) ECT, read with Understanding IV, comprises a broad definition of investment as "every kind of asset, owned or controlled directly or indirectly by an Investor". This definition is followed by an illustrative list of assets that fall within the definition of an investment.  The last paragraph of Article 1(6) provides that an investment under the ECT "refers to any investment associated with an Economic Activity in the Energy Sector". The Tribunal interprets this wording as imposing a common requirement for an asset to be regarded as an investment under the ECT. This specification is explained by the particular nature of the ECT as a treaty designed for a specific sector of the economy, which distinguishes it from other investment treaties. The notion of "Economic Activity in the Energy Sector" is defined in Article 1(5) ECT as "an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution,

---

*Mining v Egypt*, paragraph 54: *"The requirement mentioned above, that a given element of a complex operation should not be examined in isolation because what matters is to assess the operation globally or as a whole, is a perfectly reasonable one in the view of the Tribunal. Accordingly, it has undertaken an examination of the Contract as a whole in order to determine whether it could qualify as an investment under Article 25 of the Convention, although as explained the Tribunal is only called to determine the status and implications of the bank guarantees"*; *CSOB v Slovak Republic* (ICSID Case No. ARB/97/4), Decision on Jurisdiction of 24 May 1999, paragraph 72: *"An investment is frequently a rather complex operation, composed of various interrelated transactions, each element of which, standing alone, might not in all cases qualify as an investment. Hence, a dispute that is brought before the Centre must be deemed to arise directly out of an investment even when it is based on a transaction which, standing alone, would not qualify as an investment under the Convention, provided that the particular transaction forms an integral part of an overall operation that qualifies as an investment"*. See also, from the very beginning of ICSID practice, *Holiday Inns v Kingdom of Morocco* (ICSID Case No. ARB/72/1), Decision of jurisdiction of 12 May 1974, reported only in Pierre Lalive, "The First World Bank Arbitration (Holiday Inns v Morocco) - Some Legal Problems," *British Yearbook of International Law* 1980, p. 159.

trade, marketing, or sale of Energy Materials and Products except those included in Annex NI, or concerning the distribution of heat to multiple premises."

5.48    In light of the extensive concept of "investment" found in the first sub-paragraph of Article 1(6) ECT, the Tribunal decides that the Respondent owns an investment in Hungary. That investment is constituted by the project taken as a whole comprising the Respondent's interest in Dunamenti and all related assets, rights and claims directly or indirectly controlled by the Claimant, such as the power plant, Dunamenti and rights conferred by the PPA or by law. This being so, the next question arises whether the separate components of this overall investment constitute separate or stand-alone investments.

5.49    It is common ground between the Parties that the ownership of shares qualifies as an investment under subparagraph (b) of Article 1(6) ECT. The Tribunal agrees with this interpretation; and it decides that the Respondent's equity participation in Dunamenti is an investment under Article 1(6)(b) ECT.

5.50    For the investment so defined to fall within Article 1(6), the latter provision requires in its final paragraph that they be "associated with an economic activity in the energy sector". It is clear from the ordinary meaning of the term that electricity generation constitutes an economic activity in the energy sector. Furthermore, in accordance with the definition contained in Article 1(5) ECT and the provisions of Annex EM paragraph 27.16 ECT and Annex NI ECT, the activities of "production" and "sale" of "electrical energy" as "energy materials" also constitute an "economic activity in the energy sector."

5.51    Turning now to the other components of the Claimant's overall investment, the Tribunal notes that the Parties disagree on the application to the PPA of sub-paragraphs (c) and (f) of Article 1(6) ECT.

5.52    Sub-paragraph (c) of Article 1(6) treats as an "investment" contractual claims to money or performance, having an economic value and associated with an investment. The Tribunal agrees with the Claimant's submission that the PPA comprises contractual claims to money, constituted by the capacity and energy fees, as well as contractual claims to performance by MVM. It is also clear that these claims have an economic value. However, the phrase "associated with an

investment" found in subparagraph (c) constitutes a limitation on the notion of "investment". The Parties disputed to what extent this limitation gives rise to circularity in the ECT's definition of "investment" ("Investment [...] includes [...] claims [...] associated with an investment").

5.53    Under the Vienna Convention, the correct interpretation must give effect to the terms in their context and avoid obscure results. To this end, as a matter of common sense, it is necessary to understand "investment" in sub-paragraph (c) to mean an investment other than the one addressed in this same sub-paragraph. In the present case, the Tribunal considers the rights arising out of the PPA to be associated with the Claimant's overall investment described above. In other words, the Tribunal agrees with the Respondent's submission and decides that this category of investment is dependent on the overall investment.

5.54    The position of the Tribunal accords with the decision adopted by another tribunal in an ECT arbitration, *Amto v Ukraine*.[13] In that case, ZAES/Energoatom constituted the overall investment and its activity concerned the production of electrical energy. Although Ukraine argued that Amto's shareholding in another company (which provided technical services to ZAES) did not constitute an investment under the ECT since its operations were not "associated" with an economic activity in the energy sector, the tribunal concluded that the association of the technical services provider with ZAES was directly related to energy production; and Amto's shareholding in the service provider was thus considered as an "investment" under the ECT.

5.55    Additionally, the Tribunal considers that the PPA Termination Claim, being associated with an economic activity in the energy sector (namely the sale and distribution of electricity), meets the requirement under the final sub-paragraph of Art 1(6) ECT.

5.56    The Tribunal next turns to sub-paragraph (f) of Article 1(6) ECT, which refers to a right to undertake any economic activity in the energy sector, conferred by law or contract or by virtue of any licenses and permits granted pursuant to law. The Claimant submitted at the Hearing that "[i]f there was any doubt, the PPA

---

[13]    *Limited Liability Company Amto v Ukraine,* SCC Case No. 080/2005, Final Award of 26 March 2008.

constitutes a right conferred by law or contract, which is referred to in [Article] 1(6)(f). That right was the right to sell electricity which in 1995 required there to be a Power Purchase Agreement, so it's a right conferred by Hungarian law".[14]

5.57    The Tribunal decides that the PPA constitutes a commercial agreement to undertake the sale and distribution of electricity, which constitutes an economic activity in the energy sector.

5.58    Furthermore, in accordance with the final sub-paragraph of Article 1(6) ECT, all "investments" under the ECT must be "associated with an Economic Activity in the Energy Sector". In the Tribunal's view, the right to undertake electricity sales and distribution pursuant to Hungarian law (being associated with an economic activity in the energy sector) constitutes an investment under the ECT.[15]

5.59    Accordingly, as regards the issue raised under Article 1(6) ECT, the Tribunal rejects the Respondent's jurisdictional objection and concludes that it has jurisdiction over the merits of the Parties' dispute. (The Tribunal addresses separately below in Part VI the Claimant's different submission, disputed by the Respondent, that the PPA is a stand-alone investment by the Claimant for the purpose of expropriation under its PPA Termination Claim) (Claimant's Reply Memorial, paragraph 44).


*(6)*    *SUMMARY*


5.60    Save as regards the Respondent's other jurisdictional issues joined to the merits under Parts VI and VII below, the Tribunal decides, pursuant to Articles 1(6) and 26 ECT and also ICSID Convention Articles 25 and 41, that as regards jurisdiction, it is competent to decide finally the Parties' dispute in these arbitration proceedings and that ICSID also has jurisdiction over this arbitration, contrary to the different submissions made by the Respondent and the European Commission.

---

[14]    Day 1.58-59.

[15]    This conclusion accords with *Petrobart Limited v The Kyrgyz Republic*, SCC Case No. 126/2003, Award of 29 March 2005.

## *PART VI: THE PPA TERMINATION CLAIM*

### *(1)     INTRODUCTION*

6.1     It is appropriate to consider the Claimant's claims beginning with the most significant as to alleged amount, the claim for the premature termination of Dunamenti's PPA pleaded by the Claimant as "the PPA Termination Claim". This claim is denied in full by the Respondent. (In this and subsequent Parts of the Decision as to the merits, references to the Claimant and the Respondent are variably made to "Electrabel" and "Hungary" respectively; and HUF figures in Arabic numerals are given in thousands).

6.2     Dunamenti's PPA was made on 10 October 1995, one of seven PPAs concluded by Hungarian Generators with MVM then acting as a single purchaser exercising a state monopoly with regulated pricing established by Hungary. Dunamenti's PPA was agreed by its contracting parties to be subject to Hungarian law; and its original term was to expire in December 2010, later (on 5 May 1998) extended with the G2 Unit to 31 December 2015.

6.3     Upon Dunamenti's privatization by Hungary shortly thereafter, Tractabel (with an associated company, Powerfin S.A.) acquired a majority shareholding in Dunamenti on 8 December 1995, as subsequently increased on 21 October 1996 and 30 October 1997. Tractabel's shareholding, namely 74.8% of Dunamenti's shares, was subsequently acquired by Electrabel on 18 December 2001 (Tractabel and Electrabel being associated companies).

6.4     On 24 May 2005, after Hungary's accession to the European Union on 1 May 2004, the European Commission began an investigation into the Hungarian Generators' PPAs as possibly providing State aid unlawful under EU law. On 9 November 2005, with its Preliminary Decision NN/49/2005, the Commission opened a formal investigation under Article 88(2) EC into the Hungarian PPAs (including

Dunamenti's PPA) as measures by Hungary possibly forming unlawful State aid under EU law. There followed a meeting between Hungary and the European Commission on 6 December 2005, with Hungary's subsequent response on 31 January 2006 defending the PPAs under EU law. Further exchanges and meetings ensued on 13 June 2006, 20 October 2006, 11 December 2006, 6 February 2007, 8 March 2007, 4 June 2007, 10 July 2007, 24 September 2007, 18 October 2007, 23 October 2007, 20 November 2007 and 20 May 2008.

6.5    The European Commission's formal investigation eventually resulted in its Final Decision of 4 June 2008 (the "Final Decision") issued to Hungary. In this Final Decision's *dispositif* (or operative part), the European Commission determined (inter alia): that (i) MVM's purchasing obligations under the Hungarian PPAs contained State aid to the Generators under Article 87(1) EC: Article 1(1) of the *dispositif*; (ii) that such State aid was incompatible with EU law, requiring Hungary to refrain from granting such aid within six months of the Final Decision's notification: Articles 1(2) & 1(3), *ibid.*; and (iii) that Hungary should recover such unlawful State aid from the Generators (including Dunamenti), calculated as the difference between each Generator's actual revenues under their respective PPA and the revenues obtainable on the spot market, without any PPA, under a simulated counterfactual scenario from 1 May 2004 to 2008: Article 2, *ibid.*, with paragraphs 442-443 of the Final Decision. The European Commission also issued a press release briefly explaining the Final Decision on 4 June 2008.

6.6    Hungary did not challenge the European Commission's Final Decision. It communicated the Final Decision, in a redacted form, to Dunamenti later in June 2008. By letter dated 30 July 2008, MVM informed Dunamenti that the PPA could no longer be performed after 31 December 2008 as a result of the Final Decision. On 1 August 2008, the Hungarian Ministry of Finance sent a legislative proposal to Hungary's Economic Cabinet for the statutory termination of extant Hungarian PPAs (i.e. those not prematurely terminated with the Generators' consent); this proposal was approved by the Economic Cabinet on 4 August 2008; and draft legislation was presented by the Hungarian Government to Hungary's Parliament on 3 October 2008.

6.7     Under the legislation adopted by Hungary's Parliament on 10 November 2008 (Act LXX of 2008, also known as "the PPA Termination Act") mandating the early termination of extant PPAs, Hungary terminated Dunamenti's PPA as of 1 January 2009. As Hungary made clear during the Hearing, Dunamenti's PPA was terminated by Hungary by such national legislation and not by MVM under the terms of the PPA as a contracting party (see also paragraph 21 of Hungary's Post-Hearing Submissions).

6.8     The Final Decision was challenged under Article 230 EC by certain Generators (including Dunamenti) in annulment proceedings brought against the European Commission before the General Court in Luxembourg, then called the Court of First Instance of the European Communities (the "GC"or "CFI"). The CFI rejected an application for urgent interim measures by AES Tisza Erömü Kft ("AES") on 23 December 2008; and Dunamenti commenced its own legal proceedings on 28 April 2009 (Case T-179/09). These proceedings continue; and it appears unlikely that any final decision will emerge from such legal proceedings within the immediate future. Electrabel is not a party to Dunamenti's annulment proceedings; and under EU law Electrabel (in contrast to Dunamenti itself) had and has no substantive or procedural right or other locus standi to challenge the validity of the Final Decision before the CFI/GC. Hungary is not a party to any of the Generators' legal proceedings in Luxembourg.

6.9     Following the Final Decision and the PPA's premature termination, Hungary notified its scheme for compensating Dunamenti for Stranded Costs to the European Commission on 5 February 2009 (with a draft decree). After several meetings and other exchanges between the Commission and Hungary, the European Commission approved Hungary's scheme by its Compensation Decision of 27 April 2010, made by reference (inter alia) to the Commission's Methodology on Stranded Costs of 26 July 2001 and a "revenue-based" approach to State aid calculations under EU law (as opposed to a "profit-based" approach initially argued by Hungary). The Tribunal notes that Hungary's preferred "profit-based" approach was considered (by Hungary and the Commission) more favourable to the Hungarian Generators (including Dunamenti); and that the Commission rejected Hungary's arguments by its decision

of 24 September 2009, requiring Hungary to make the relevant calculations for State aid based on Generators' revenues, not profits.

6.10    Following the European Commission's Compensation Decision of 27 April 2010, Hungary adopted its draft decree in final form on 30 April 2010, as Government Decree No 149/2010. Pursuant to this Decree, on 10 May 2010, HEO issued its Resolution 343/2010 (i) determining that Dunamenti had received an amount of HUF 125,352,538 as unlawful State aid to be simultaneously set-off against a corresponding amount of eligible Stranded Costs calculated by Hungary as HUF 125,352,538 and (ii) concluding that Dunamenti was not obliged to repay such state aid under Paragraph 2(5) of the PPA Termination Act at the time of the Resolution.

6.11    Following HEO's Resolution, HEO undertook an annual recalculation of Dunamenti's Stranded Costs based on updated financial data procured from Dunamenti, an exercise which HEO will continue in order to cover a full period ending on 31 December 2015. Hungary will be regularly reporting to the European Commission on HEO's recalculations. At the time of this Decision, the final re-calculations by HEO for Dunamenti's Stranded Costs cannot, of course, be known to Hungary, Electrabel or Dunamenti; nor (as a result) Dunamenti's final position on recoverable State aid. It is virtually certain, however, that Hungary's figure HUF 125,352,538 will not be the eventual figure for Stranded Costs finally calculated by Hungary after 31 December 2015.

6.12    The Tribunal notes Hungary's submission that: "... it is theoretically possible that Dunamenti may be required to repay some quantity of State aid in the event that its actual financial performance greatly exceeds HEO projections" (Hungary's letter dated 29 October 2010); and, more recently: "It is not expected, however, that the recalculations will result in any State aid repayment obligation on the part of Dunamenti" (Hungary's letter dated 1 August 2011). Conversely, Electrabel submits that financial data submitted by Dunamenti to HEO already demonstrate that HEO's calculations of Dunamenti's Stranded Costs are significantly erroneous: "… The results for 2010 mean that it is likely that the final [net] Stranded Costs of Dunamenti will be significantly higher than the HEO's projection of HUF 22 billion" (Electrabel's letter dated 1 August 2011).

6.13    The Tribunal will return to these matters later below. First, it is appropriate briefly to summarise the Parties' respective cases on this PPA Termination Claim before analysing their respective submissions and addressing this claim as to liability. It will be recalled that all issues relating to quantum are bifurcated by agreement of the Parties, as confirmed by the Tribunal's order; and (if relevant) such issues are necessarily postponed to a subsequent phase of these arbitration proceedings: see Part I above.

## (2)    ELECTRABEL'S CASE

6.14    Electrabel's claim for compensation against Hungary regarding the PPA's termination is made under the ECT on four legal grounds: (i) the standard of fair and equitable treatment (FET) under Article 10(1) ECT; (ii) expropriation under Article 13(1)(a)&(b) ECT; (iii) expropriation without compensation under Article 13(1)(d) ECT; and (iv) other standards of protection under Article 10 ECT.

6.15    *(i) FET:* In summary, Electrabel submits that the unnecessary premature termination by Hungary of the PPA and/or termination without full or adequate compensation constitutes a breach of the FET standard under Article 10(1) ECT affecting the PPA and Electrabel's shareholding in Dunamenti; such conduct being contrary to the legitimate expectations of Electrabel as the investor, the sanctity of contract and Hungary's obligation to act in good faith under international law.

6.16    Electrabel submits that Hungary's breach of the FET standard is further evidenced by its failure to take reasonable steps to protect Electrabel as an investor, by seeking an exemption from EU law in relation to the PPAs in Hungary's EU Accession Treaty (having sought exemptions in respect of other State aid and competition matters); its failure to notify existing State aid to the European Commission; its failure to challenge the European Commission's Final Decision; and its failure to apply the "margin approach" (i.e. "profit-based") to the calculation of State aid and Stranded Costs.

6.17    *(ii) Expropriation:* In summary, Electrabel submits (primarily) that the termination of the PPA by legislation constitutes an unlawful expropriation by Hungary because: (i) the PPA was a covered investment under the ECT, being an asset owned or controlled indirectly by Electrabel within the meaning of Article 1(6) ECT and providing valuable rights and benefits to Electrabel up to 2015; (ii) the premature termination of the PPA amounted to an unlawful 'taking' or expropriation under the ECT; and (iii) accordingly, Electrabel is entitled to full compensation from Hungary in accordance with the ECT and international law (referring especially to *ADC v Hungary* and *Chorzów Factory*).

6.18    Electrabel submits that Hungary has not met the requirements for the early termination of the PPA to be characterised as lawful under the ECT. Article 13(1) ECT provides that covered investments shall not be expropriated or subjected to a measure having effect equivalent to expropriation except where the expropriation is: (a) for a purpose which is in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation; and where any of the requirements (a), (b) and (c) have not been met, so Electrabel submits, the expropriation is to be characterised as unlawful under the ECT.

6.19    According to Electrabel, both the PPA itself and the F Retrofit Agreement were made before Hungary's accession to the European Union in 2004 and were then lawful as a matter of Hungarian law; and Hungary cannot rely on changes in its domestic law (including changes consequent upon its accession to the European Union) to justify any breach of its obligations under international law.

6.20    To the extent that the Tribunal has regard to the European Commission's Final Decision, Electrabel does not request this Tribunal to make any decisions concerning the correctness of the European Commission's Final Decision as a matter of EU law: Electrabel acknowledges that this issue is currently pending before the General Court in Luxembourg to decide in the legal proceedings brought by Dunamenti against the European Commission - and not for this Tribunal.

6.21    However, Electrabel submits that Hungary, in implementing this Final Decision under EU law, was not required to terminate Dunamenti's PPA in the manner which in fact occurred, for four reasons.

6.22    First, as Professor Sir David Edward testified, as an expert on EU law called by Electrabel, the particular wording of the Final Decision's dispositif did not order Hungary to terminate the PPA [D3.604]. This wording should be contrasted, according to Electrabel, with the different wording of the European Commission's final decision on the Polish PPAs of 25 September 2007, which expressly stated that the relevant PPAs were to be terminated. Instead, so Electrabel submits, the relevant wording of the Final Decision required Hungary only to eliminate those parts of Dunamenti's PPA which contained State aid; Hungary, however, took no steps to amend Dunamenti's PPA, albeit that such a possibility had been expressly recognised by the European Commission in its earlier decision of 10 July 2007 concerning State aid to Mátrai *Erömü* Zrt Hungaryn (where the European Commission expressed its expectation that its final decision with regard to Hungarian PPAs would propose their amendment).

6.23    Second, Hungary enacted legislation terminating Dunamenti's PPA on grounds of State aid in November 2008 without having first carried out any calculation of the alleged State aid, as was required by the European Commission's Final Decision. When Hungary's economic consultants ("London Economics") later calculated Dunamenti's State aid in December 2008, the result was a negative State aid figure of HUF 32,815,963,000, i.e. demonstrating that electricity sold by Dunamenti under the PPA was made at prices less than the European Commission's counter-factual market simulation model and, therefore, that there was no State aid to be repaid by Dunamenti. Electrabel complains that Hungary did not discuss the implications of this calculation with the European Commission, in particular whether the premature termination of Dunamenti's PPA was even required in such circumstances.

6.24    Third, whilst Hungary later calculated the alleged State aid recoverable from Dunamenti under the PPA as a positive figure (ostensibly owed by Dunamenti), it remains the case that Dunamenti still has substantial Stranded Costs in excess of any recoverable State aid; i.e. so-called "Net Stranded Costs". Electrabel contends that

this factor alone contradicts Hungary's assertion that Dunamenti's PPA had to be terminated; or, at least, that it had to be terminated as of 1 January 2009.

6.25    Fourth, Hungary's calculation of State aid was wrongly based by Hungary on the "revenue-based approach", albeit at the insistence of the European Commission. If the "margin approach" (or "profit-based approach") was applied (as it should have been by Hungary), then Dunamenti would have had no recoverable State aid at all.

6.26    Electrabel concludes that the termination of the PPA in all these circumstances was a violation of Hungary's obligations towards Electrabel under Article 13(1)(a) or 13(1)(b) ECT that an expropriation must be in the public interest and in conformity with due process; and accordingly that the PPA's premature termination amounted to unlawful expropriation for which Hungary is liable to pay full compensation to Electrabel.

6.27    *(iii) Expropriation without Compensation:* Alternatively, if the Tribunal were to decide that the expropriation were lawful under Article 13(1)(a)&(b) ECT, Electrabel submits that Hungary has wrongfully not paid prompt, adequate and effective compensation as required by Article 13(1)(d) ECT. Electrabel refers, *inter alia*, to the European Commission's Compensation Decision dated 27 April 2010 as recognising (according to Electrabel) that there was a 'taking' for which compensation is due from Hungary. Electrabel contends that Hungary has wrongfully failed to pay such compensation required under the ECT and international law; and EU law cannot and does not provide any defence for Hungary's breach of Article 13(1)(c) ECT.

6.28    Electrabel submits that there are parallels between this case and the award in *Santa Elena v Costa Rica*[1] where the "taking" (albeit a direct expropriation) was for the purpose of meeting an international law obligation imposed upon Costa Rica. The arbitration tribunal there decided:

> *"71. In approaching the question of compensation for the Santa Elena Property, the Tribunal has borne in mind the following considerations:*

---

[1]    *Compañia del Desarrollo de Santa Elena, S.A. v Costa Rica* (ICSID Case No. ARB/96/1), Award of 17 February 2000.

> *- International law permits the Government of Costa Rica to expropriate foreign-owned property within its territory for a public purpose and against the prompt payment of adequate and effective compensation. This is not in dispute between the parties.*
>
> *- While an expropriation or taking for environmental reasons may be classified as a taking for a public purpose, and thus may be legitimate, the fact that the Property was taken for this reason <u>does not affect either the nature or the measure of the compensation to be paid for the taking.</u> That is, the purpose of protecting the environment for which the Property was taken does not alter the legal character of the taking <u>for which adequate compensation must be paid.</u> The international source of the obligation to protect the environment <u>makes no difference.</u>*
>
> *72. Expropriatory environmental measures – no matter how laudable and beneficial to society as a whole – are, in this respect, similar to any other expropriatory measures that a state may take in order to implement its policies: <u>where property is expropriated, even for environmental purposes,  whether domestic or international, the state's obligation to pay compensation  remains."</u> (Emphasis added by Electrabel)*

6.29   Electrabel concludes that the source of Hungary's obligation under EU law (if any) to terminate the PPA similarly makes no difference to the legal characterisation of the "taking" as an expropriation under the ECT and the consequential obligation by Hungary to pay compensation under the ECT and international law.

6.30   Electrabel submits that this conclusion is consistent with EU law and practice: the European Commission's Stranded Costs Methodology was specifically designed to compensate investors for non-returned investments resulting from early termination of their agreements; and the European Commission finally announced on 27 April 2010, with its Compensation Decision, that it had approved Hungary's Stranded Costs for Dunamenti.

6.31   Accordingly, if the expropriation were otherwise lawful (contrary to Electrabel's primary case), the question for this Tribunal, according to Electrabel, is simply whether or not Hungary has made prompt, adequate and effective compensation

pursuant to Article 13(1)(d) ECT – which, so Electrabel submits, Hungary has wrongfully failed to do.

6.32    Electrabel recognises that, in this first phase of the arbitration (pursuant to the agreed bifurcation of these proceedings), the Tribunal is not here required to decide any issues as to quantum. Nonetheless, Electrabel submits that the Tribunal should here decide that full or adequate compensation has not been made by Hungary (without here quantifying such compensation) because even applying the Commission's Stranded Costs Methodology, Hungary still refuses to compensate Dunamenti for the full amount of Net Stranded Costs which Hungary has itself calculated in favour of Dunamenti, namely (at least) HUF 22 billion.

6.33    Electrabel further submits that Hungary seeks wrongly to shelter behind EU law, on two grounds. First, Electrabel contends that the compensation payable under the ECT upon the expropriation of an Investment should be computed without regard to EU concepts such as State aid or Stranded Costs, because international law and the ECT have primacy over EU law.

6.34    Second, Electrabel submits, to the extent that the Tribunal has regard to EU law, that EU law provides for the payment of compensation through its Stranded Costs Methodology; that in the specific context of this PPA, the European Commission has stated that Dunamenti can recover its full Stranded Costs by Hungary as defined by that Methodology; and that it is therefore Hungary, not EU law or the European Commission, which is preventing any compensation in respect of Dunamenti's Stranded Costs.

6.35    In particular, again, Electrabel emphasises that Hungary itself has calculated and submitted to the European Commission that Dunamenti's Net Stranded Costs in excess of State aid are at least HUF 22 billion, applying the Commission's Stranded Costs Methodology; but that Hungary still refuses even to pay this amount, still less the greater amount likely to be the correct figure for compensation under Article 13(1)(d) ECT. Electrabel pleads its (gross) Stranded Costs variously as not less than HUF 151 billion or, more recently, HUF 147 billion.

6.36    *(iv) Other ECT Standards:* In the further and final alternative, Electrabel submits that termination of the PPA without full or adequate compensation violated other standards of protection under Article 10 ECT.

*(3)    HUNGARY'S CASE*

6.37    Hungary denies all liability to Electrabel in regard to the latter's claim for compensation regarding the early termination of Dunamenti's PPA. In summary, Hungary's defence responds to Electrabel's claim as follows (using here the same headings as used above for Electrabel's case).

6.38    *(i) FET:* Hungary submits that it has not violated its obligations of fair and equitable treatment under Article 10(1) ECT as alleged by Electrabel, namely the protection of legitimate expectations and the sanctity of contract, protection against arbitrary and unreasonable measures and the requirements of transparency and due process.

6.39    Hungary submits that Electrabel has failed to meet its burden of proving any of these essential elements during any part of Hungary's conduct during the European Commission's investigation on State aid and Hungary's implementation of the Commission's Final Decision. Hungary's necessary termination of the PPA pursuant to the Final Decision (being legally binding on Hungary under EU law), after Electrabel had already recouped its investment along with a reasonable return, did not violate Electrabel's legitimate expectations or the sanctity of contract; and it was not arbitrary or unreasonable conduct by Hungary under the ECT or otherwise.

6.40    Furthermore, so Hungary submits, its acts in shielding Dunamenti from an obligation to repay as recoverable State aid HUF 125 billion under EU law, with no additional cash payment, was consistent with any legitimate expectations of Electrabel and was neither arbitrary nor unreasonable by Hungary under the ECT or otherwise.

6.41    Hungary contends that none of its other acts or omissions before, during or after the European Commission's investigation into the Hungarian Generators' PPAs constituted a violation of the FET standard under the ECT. Hungary submits that its omission to foresee the European Commission's possible consideration of the Hungarian PPAs as State aid (and thus to notify them as such prior to Hungary's accession to the European Union in 2004) was understandable; and, in any event, that such omission did not affect the outcome of the European Commission's investigation into Dunamenti's PPA resulting in the Final Decision. Similarly, Hungary's decision not to challenge the European Commission's Final Decision before the CFI was rational; such legal proceedings would not have suspended the legal requirement for Hungary to implement the Decision under EU law; and Hungary's own challenge could have added little or nothing to the legal challenges launched by Hungarian Generators themselves against the European Commission before the CFI, including Dunamenti.

6.42    Hungary submits that Electrabel's allegations that Hungary failed to give it a proper opportunity to object to the PPA's early termination or to comment on the calculations of State aid and Stranded Costs are factually baseless and do not establish any violations of the ECT's requirements for due process or transparency; nor did MVM's entry into new multi-year commercial contracts with other Hungarian Generators (in place of their PPAs) involve unlawful discrimination by Hungary against Dunamenti in violation of the ECT's FET standard.

6.43    *(ii) Expropriation:* In summary, Hungary submits that Electrabel's claim of expropriation raises initially more legal than factual issues. Hungary does not dispute (as a theoretical matter) that contractual rights are capable of being expropriated, under the ECT and international law, where such rights are essential to the viability of the investment as a whole.

6.44    Hungary contends that the ECT requires Electrabel to establish that it (Electrabel) has been "radically deprived of the economical use and enjoyment" of its investment in Dunamenti as a whole rather than of one of its constituent parts, referring principally to the award in *Tecmed* (at paragraphs 115-116). Absent such evidence, so Hungary submits, Electrabel's claim of expropriation must fail as a matter of

legal principle under the ECT; and Hungary submits that there is in this case no such evidence.

6.45    In any event, so Hungary submits, even if Electrabel could make out an ostensible expropriation claim on the facts of this case (which Hungary denies), the PPA Termination Act complied with the ECT's requirements for lawful expropriation, as it was non-discriminatory, adopted for a public purpose and provided more than adequate compensation in the form of a credit of HUF 125 billion intended to protect Dunamenti from its obligation under EU law to repay unlawful State aid received from 2004 to 2008.

6.46    *(iii) Expropriation without Compensation:* In regard to Electrabel's alternative claim for expropriation under Article 13(1)(d) ECT, Hungary contends that fair and appropriate compensation to Electrabel for the termination of the PPA has been provided in the form of its HUF 125 billion credit (plus the "buffer" of HUF 22 billion) to offset an otherwise recoverable amount of State aid from Dunamenti. Under any applicable legal principles of compensation for expropriation, Hungary submits that Electrabel would not be entitled to any additional payment or other compensation.

6.47    Hungary further submits that expropriation generally requires the payment of compensation to be based on the fair market value of the asset immediately prior to the deprivation. However, the PPA Termination Act took nothing of remaining value from Dunamenti because the PPA had already been condemned by the European Commission as unlawful under EU law and therefore devoid of any remaining value. Consequently, so Hungary submits, it was under no legal obligation to provide any cash or other compensation under the ECT to Electrabel.

6.48    Furthermore, Hungary submits (as Professor Sir David Edward, Electrabel's own expert witness, confirmed at the Hearing) that Hungary was affirmatively prohibited by EU law from providing Electrabel with any compensation that could replicate State aid benefits under the PPA. Hungary therefore submits that the Tribunal should not interpret the ECT as creating a conflict with EU law in a dispute between an EU investor and an EU Member State, particularly one that involves matters of State aid

addressed directly by the EC Treaties and over which the EU Member States have transferred competence to the European Union, as recognized in the ECT itself.

6.49    *(iv) Other Treaty Standards:* Hungary submits that it has not violated any other ECT standards, if and to the extent still alleged by Electrabel. For the same reasons that Hungary's conduct did not violate the FET standard in Article 10(1) ECT and did not amount to unlawful expropriation under Article 13(1) ECT, Hungary contends that it did not violate any of the other ECT's standards of investment protection originally invoked by Electrabel, namely: (i) the obligation to create stable, equitable, favourable and transparent conditions (Article 10(1) ECT); (ii) the obligation to provide full protection and security (Article 10(1) ECT); (iii) the obligation not to impair the investment by  unreasonable or discriminatory measures (Article 10(1) ECT); (iv) the obligation to accord treatment no less favourable than that required by international law (Article 10(1) ECT); and (v) the obligation not to subject the investment to treatment less favorable than that accorded to national investors or investors of other States (Article 10(7) ECT).

## *(4)    THE TRIBUNAL'S ANALYSIS AND DECISIONS*

6.50    It is appropriate for the Tribunal to consider first Electrabel's case on expropriation; second its case on the FET standard; and lastly its subsidiary case under the ECT's other standards.

6.51    *(i) Expropriation:* Article 13(1) ECT provides investments of investors with protection from both direct and indirect expropriation, with the "effect" of the latter defined as "equivalent to nationalisation or expropriation".

6.52    As regards direct expropriation, the Tribunal determines that Electrabel cannot contend, on the indisputable facts of this case, that its investment, in the form of its own interests in Dunamenti or even Dunamenti itself, was directly expropriated by Hungary. There was no taking of Electrabel's investment in Dunamenti; and, as

regards the PPA, there was no taking by Hungary for itself, nor was the PPA transferred by Hungary to any third party.

6.53    As regards indirect expropriation, the Tribunal considers that the wording of Article 13(1) ECT requires Electrabel to establish that the effect of the PPA's termination by Hungary was materially the same as if its investment in Dunamenti had been nationalised or directly expropriated by Hungary. In other words, Electrabel must prove, on the facts of this case, that its investment lost all significant economic value with the PPA's early termination. As described by Professors Paulsson and Douglas in regards to the test under international law, equally applicable to the ECT, "... the analysis should focus on the nature or magnitude of the interference to the investor's property interests in its investment caused by the measures attributable to the Host State to determine whether those acts amount to a taking."[2] In terminating the PPA by legislation, the Tribunal notes that Hungary has not deprived Dunamenti of the use of its power plant, equipment or other real property; and Dunamenti's business, taken as a whole, was not rendered financially worthless by the PPA's early termination but has continued thereafter as an economic concern competing in Hungary's electricity market, with its plant still operational and operated by Dunamenti.

6.54    In its several submissions, as already summarised above, Hungary does not dispute that contractual rights are capable of being indirectly expropriated under the ECT where such rights are essential to the viability of the investor's investment as a whole. Hungary submits, however, that Electrabel has completely failed to establish that it has been radically deprived of the economic use and enjoyment of its investment in Dunamenti as a whole, as opposed to the PPA itself forming only one of that investment's constituent parts (Post-Hearing Submissions, pp. 47ff; Rejoinder, pp. 119ff; and Counter-Memorial, pp. 231ff).

6.55    Hungary cites paragraphs 115-116 of the award in *Tecmed v Mexico*, where the relevant wording in the Spain-Mexico BIT (in English translation) covered

---

[2]    J. Paulsson & Z. Douglas, "Indirect Expropriation in Investment Treaty Arbitration", in N. Horn & S. Kröll (eds), *Arbitrating Foreign Investment Disputes* 145, 148 (2004).

expropriations, nationalisations or "any other measure with similar characteristics or effects":

> "115. To establish whether the Resolution is a measure equivalent to an expropriation under the terms of section 5(1) of the Agreement [the Spain-Mexico BIT], it must first be determined if the Claimant, due to the Resolution, was radically deprived of the economical use and enjoyment of its investments, as if the rights related thereto – such as the income or benefits related to the Landfill or to its exploitation – had ceased to exist. In other words, if due to the actions of the Respondent, the assets involved have lost their value or economic use for their holder and the extent of the loss [citation to Pope & Talbot partial award here omitted] …"

> "116. In addition to the provisions of the Agreement, the Arbitral Tribunal has to resolve any dispute submitted to it by applying international law provisions … . Therefore, it is understood that the measures adopted by a State, whether regulatory or not, are an indirect de facto expropriation if they are irreversible and permanent and if the assets or rights subject to such measure have been affected in such a way that '… any form of exploitation thereof …' has disappeared; i.e. the economic value of the use, enjoyment or disposition of the assets or rights affected by the administrative action or decision have been neutralized or destroyed [citation to ECtHR here omitted]. Under international law, the owner is also deprived of property where the use or enjoyment of benefits related thereto is exacted [sic] or interfered with to a similar extent, even where legal ownership over the assets in question is not affected, and so long as the deprivation is not temporary. The government's intention is less important than the effects of the measures on the owner of the assets or on the benefits arising from such assets affected by the measures; and the form of the deprivation measure is less important than its actual effects [citation to InterAmerican CtHR here omitted] …"

Hungary also cites Professor Schreuer on the assessment of the challenged measure's severity as "… the decisive criterion when it comes to deciding whether an indirect expropriation or a measure tantamount to expropriation has taken place", being supported by "a broad consensus in academic writings that the intensity and duration of the economic deprivation is the crucial factor in identifying an indirect

expropriation or equivalent measure."[3] It also cites Professor Dolzer to similar effect: "No one will seriously doubt that the severity of the impact upon the legal status, and the practical impact on the owner's ability to use and enjoy his property, will be a central factor in determining whether a regulatory measure effects a taking."[4]

6.56    In response, Electrabel submits that the PPA constituted an investment protected by Article 13(1) ECT and that it has been entirely deprived of such investment. In support, Electrabel cites (inter alia) the *Metalclad* award (paragraph 103) to argue that indirect expropriation under international law includes: "incidental interference with the use of property which has the effect of depriving the owner, in whole or in significant part, of the use or reasonably-to-be-expected economic benefit of property even if not necessarily to the obvious benefit of the host State" (Reply, pp. 14ff).

6.57    The Tribunal notes that this passage in the *Metalclad* award was expressly considered by the tribunal in paragraph 113 of the *Tecmed* award, without attributing to it the significance here attached by Electrabel. Indeed, that tribunal could not have done so without negating the sense of the subsequent paragraphs of its award, including (especially) paragraphs 115 and 116 cited above. If it were possible so easily to parse an investment into several constituent parts each forming a separate investment (as Electrabel here contends), it would render meaningless that tribunal's approach to indirect expropriation based on 'radical deprivation' and 'deprivation of any real substance' as being similar in effect to a direct expropriation or nationalisation. It would also mean, absurdly, that an investor could always meet the test for indirect expropriation by slicing its investment as finely as the particular circumstances required, without that investment as a whole ever meeting that same test. The Tribunal also notes that the wording in the *Metalclad* award as to "significant part" qualifies the required gravity of deprivation and not the investment; and it interprets that phrase as describing in different terms the same approach later described by the *Tecmed* tribunal.

---

[3]    C. Schreuer, "The Concept of Expropriation under the ECT and other Investment Protection Treaties", in *Investment Arbitration and the Energy Charter Treaty* (C. Ribeiro ed.)*,* 144 (2006).

[4]    R. Dolzer, "Indirect Expropriations: New Developments", 11 *N.Y.U. Environmental L.J.* 64, 79 (2002).

6.58    In this Tribunal's view, it is clear that both in applying the wording of Article 13(1) ECT and under international law, the test for expropriation is applied to the relevant investment as a whole, even if different parts may separately qualify as investments for jurisdictional purposes. Here the investment held by Electrabel as a whole was its aggregate collection of interests in Dunamenti; it was thus one integral investment; and in the context of expropriation it was not a series of separate, individual investments with Dunamenti's PPA as an autonomous investment set apart from Electrabel's other interests in Dunamenti. In the Tribunal's view, Electrabel's investment was manifestly not confined to the PPA; and the PPA formed an intrinsic and inseparable part of Electrabel's investment as a whole.

6.59    Electrabel also cited several awards made by the Iran-US Claims Tribunal, including *Starrett, Tippetts* and *Phillips Petroleum*.[5] Electrabel contends that these decisions and other legal materials dispense with the need for the investor to establish for indirect expropriation any substantial deprivation equivalent to a direct expropriation; and Electrabel also contends that a sovereign's termination by force of law of a contract between two private parties (such as the PPA's termination) should be treated, without more, as an expropriation.

6.60    The Tribunal does not accept that these decisions and other materials cited by Electrabel reflect, under the ECT or international law, a different standard for direct and indirect expropriation. In *Starrett,* the tribunal stated the test under international law as requiring an interference with property rights "to such an extent that these rights are rendered so useless that they must be deemed to have been expropriated, even though the state does not purport to have expropriated them and the legal title to the property formally remains with the legal owner" (at paragraph 154). In *Tippetts*, the tribunal preferred the word "deprivation" to the more orthodox term "taking", not because a different test was there being proposed but because this wording was considered "largely synonymous" seen from the investor's perspective; and the tribunal also emphasised the need under international law for the deprivation of the investor's "fundamental rights of ownership" (at paragraph 225).

---

[5]    *Starrett Housing v Iran, 4 Iran-USCTR 122; Tippetts, Abbett, McCarthy, Stratton v TAMS-AFFA Consulting Engineers of Iran, 6 Iran-USCTR 219; and Phillips Petroleum v Iran, 21 Iran-USCTR 79.*

6.61    The Tribunal notes that "taking" had been defined by the American Law Institute (in its Second Restatement of the Foreign Relations Law of the United States of America, published in 1965) as conduct which (inter alia) effectively deprived an alien "of substantially all benefit of his interest in property … even though the state does not deprive him of his entire legal interest in the property." This restatement reflected the relevant definition under international law at the time of the decision in *Starrett* (1983) and *Tippetts* (1984).

6.62    In short, the Tribunal considers that the accumulated mass of international legal materials, comprising both arbitral decisions and doctrinal writings, describe for both direct and indirect expropriation, consistently albeit in different terms, the requirement under international law for the investor to establish the substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value or enjoyment. In addition to *Metalclad* and *Tecmed* (above), arbitral decisions and awards to such effect include *Pope & Talbot* (2000), paragraphs 102-104; *S.D. Myers* (2000), paragraphs 282-285; *Lauder* (2001); paragraphs 200-201; *CME* (2001), paragraphs 603-604; *GAMI* (2004), paragraphs 123-126; *Telenor* (2006), paragraphs 63-67; *Sempra* (2007), paragraphs 284-285; and *Parkerings-Compagniet* (2007), paragraph 455. Conversely, arbitral tribunals have rejected claims for expropriation under international law where the investor has failed to meet this test for "substantial" deprivation, including: *CMS* (2005), paragraphs 260-264; and *Azurix* (2006), paragraph 321. It is unnecessary to add to these citations here, given their consistent approach to the juridical point here at issue.

6.63    Applying this same approach, the Tribunal determines that Electrabel has failed to meet the test for indirect expropriation under international law. Moreover, the Tribunal also interprets the terms of Article 13(1) ECT as requiring Electrabel to meet the test for substantial deprivation both for direct expropriation and indirect expropriation having the equivalent effect to direct expropriation or nationalisation. On the facts of this case, the Tribunal determines that Electrabel has not met that test in regard to the PPA's early termination, even if (contrary to the Tribunal's approach) it were different from the test under international law.

6.64    Accordingly, for these reasons, whilst the Tribunal accepts that Electrabel's indirect contractual interest in Dunamenti's PPA qualifies as an investment under Article 1(6) ECT, the Tribunal nonetheless concludes that Electrabel's claim for expropriation in regard to its PPA Termination Claim, whether unlawful or lawful (subject to appropriate compensation), does not satisfy the legal threshold for "expropriation" under Article 13(1) ECT and international law because there was no sufficient deprivation of Electrabel's investment in the form of the PPA's termination as of 1 January 2009. In rejecting Electrabel's claim on this threshold issue, it is not necessary for the Tribunal to consider the Parties' other submissions on expropriation as if the Tribunal had arrived at a different conclusion.

6.65    *(ii) FET:* This issue arises under Article 10(1) ECT, whereby Hungary is required, in accordance with the ECT's provisions, to encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area, such conditions to include "a commitment to accord at all times … fair and equitable treatment."

6.66    *(iii) Events before the Final Decision:* The Tribunal does not consider that Electrabel has established its factual case that, on the evidence, one or more breaches of the FET standard, causing loss to Electrabel, were committed by Hungary in failing timeously to take reasonable steps to protect Electrabel before the European Commission's Final Decision of 4 June 2008, whether by seeking an exemption from EU law in relation to Dunamenti's PPA in Hungary's EU Accession Treaty; or in failing to notify existing State aid to the Commission. As to an alleged breach by Electrabel, the Tribunal notes that Hungary was then still undergoing an important transitional stage, with profound and drastic economic, political and legal changes; that its negotiations with the European Union were difficult, complex and wide-ranging; and that there is no evidence whatsoever adduced in these proceedings of any unfairness towards Dunamenti or Electrabel in any of Hungary's dealings with the European Commission before (or after) Hungary's accession to the European Union in 2004.

6.67    Indeed, the factual evidence points to the contrary. On 31 March 2004, before accession, Hungary notified the European Commission of several measures

potentially constituting State aid in regard to electricity generation, whilst arguing that these should be considered as existing aid compatible with EU law. On 10 August 2004, after accession, the Commission rejected Hungary's argument, remarking that the Hungarian Generators were indirect beneficiaries of State aid under the PPAs. On 31 August 2004, Hungary made known the Commission's views to the Generators. After further exchanges between Hungary and the Commission, on 23 November 2004, Hungary published a study (commissioned by HEO) on "The compatibility of the Hungarian system of long-term capacity and power purchase agreements with EU energy and competition law". Following meetings with the Commission on 30 November 2004 and 12 January 2005 (the latter attended by Dunamenti) and on the advice of the Commission, Hungary withdrew its earlier notification. As already recited above, shortly thereafter, the European Commission began its investigation into the Hungarian Generators' PPAs on 24 May 2005.

6.68    More significantly for present purposes, even if there were a breach of the FET standard, the Tribunal does not consider that Electrabel has established any sufficient causation for its alleged loss resulting from the PPA's termination by Hungary, following the Final Decision. These two subsequent events were new acts, causally unrelated to events before the Final Decision invoked by Electrabel. In the Tribunal's view, whatever Hungary did or did not do before 4 June 2008 had no material influence on the Commission's Final Decision and (as explained below) Hungary's subsequent termination of Dunamenti's PPA consequent upon that Final Decision. The Tribunal notes Electrabel's necessarily qualified allegation as regards causation in its Reply (paragraph 396): "By not notifying the PPAs as an 'existing aid' and/or withdrawing the original notification from the interim procedure, [Hungary] was not defending the interests of the generators. If either of those options had been pursued, it may have resulted in a different outcome" (footnote omitted; emphasis supplied). Such a mere possibility, even at its highest, does not establish the necessary causative link required for Electrabel's claim under the ECT.

6.69    Accordingly, for these reasons, the Tribunal dismisses this part of Electrabel's PPA Termination Claim.

6.70    *(iv) The Final Decision:* The Tribunal considers that the claim here made by Electrabel turns primarily on the legal effect the European Commision's Final Decision. In the Tribunal's view, that Final Decision required Hungary under EU law to terminate Dunamenti's PPA, as explained below. The Tribunal also draws a distinction between the Final Decision in regard to recoverable State aid and Hungary's own scheme for calculating Stranded Costs (with Net Stranded Costs).

6.71    As regards the Final Decision, the Tribunal considers that Hungary is not legally responsible for acts by the European Commission, such as the Final Decision, under the ECT or under international law. The Tribunal did not understand this latter point to be controversial as between Electrabel and Hungary in these arbitration proceedings; but it merits further explanation here.

6.72    Where Hungary is required to act in compliance with a legally binding decision of an EU institution, recognized as such under the ECT, it cannot (by itself) entail international responsibility for Hungary. Under international law, Hungary can be responsible only for its own wrongful acts. The Tribunal considers that it would be absurd if Hungary could be liable under the ECT for doing precisely that which it was ordered to do by a supranational authority whose decisions the ECT itself recognises as legally binding on Hungary.

6.73    Article 10 of the EC Treaty provides: "Member States shall take all appropriate measures, whether general or particular, to ensure fulfillment of the obligations arising out of this Treaty or resulting from action taken by the institutions of the Community. They shall facilitate the achievement of the Community's tasks. They shall abstain from any measure which could jeopardise the attainment of the objectives of this Treaty." Thus under EU law and by treaty, Hungary was legally obliged to implement the Final Decision of the European Commission.

6.74    Article 6 of the ILC Articles on State Responsibility provides: "The conduct of an organ placed at the disposal of a State by another State shall be considered an act of the former State under international law if the organ is acting in the exercise of elements of the governmental authority of the State at whose disposal it is placed". Hence, the United Kingdom is not responsible for its Privy Council sitting as the final court of appeal for independent states within the Commonwealth, as explained

in the Commentary to the ILC Articles (pages 103-105). Whilst the European Union is not a State under international law, in the Tribunal's view, it may yet by analogy be so regarded as a Contracting Party to the ECT, for the purpose of applying Article 6 of the ILC Articles in the present case.

6.75    In its letter dated 1 August 2011, Hungary cited to like effect the work of Professor F. Hoffmeister, "Litigating against the European Union and its Member States – Who Responds under the ILC's Draft Articles on International Responsibility of International Organizations?"[6] Professor Hoffmeister there concluded that the conduct of a State that executes the law or acts under the normative control of an REIO (i.e. a Regional Economic Integration Organization as defined in Article 1 ECT) may be considered an act of that organisation under international law, taking account of the nature of the organisation's external competence and its international obligations in the field where the conduct occurred; and, specifically in regard to the ECT, Professor Hoffmeister expressed the view that "liability would normally fall upon the EU if Member States' organs were simply implementing EU law."

6.76    For these reasons, the Tribunal decides that if and to the extent that the European Commission's Final Decision required Hungary, under EU law, prematurely to terminate Dunamenti's PPA, that act by the Commission cannot give rise to liability for Hungary under the ECT's FET standard. The Tribunal next considers what the Final Decision did require of Hungary under EU law.

6.77    At the outset of this analysis of the Final Decision, the Tribunal emphasises (again) that Electrabel does not seek to impugn, in these arbitration proceedings, the legal validity of the Final Decision under EU law; nor Hungary's legal obligation under EU law to implement that Decision in accordance with its terms. The crucial question before this Tribunal is more limited: what did the Final Decision require Hungary to do in regard to Dunamenti's PPA?

6.78    The text of the Final Decision, extending over 86 printed pages, can be divided into its two constituent parts: (i) the *motifs* (pp. 1-84) and (ii) the *dispositif* (pp. 84-86). Electrabel submits that only the latter is legally relevant as to what the Final

---

[6]    21 *European Journal of International Law*, 723 (2010).

Decision required of Hungary under EU law. It therefore merits citing here in full (in English version, although only the Hungarian version was "authentic"):

> *"Article 1:*
>
> *1. The purchase obligations as defined in the Power Purchase Agreements between Magyar Villamos Müvek Rt. and Budapesti Erömü Rt., Dunamenti Erömü Rt., Mátrai Erömü Rt., AES-Tisza Erömü Kft, Csepeli Aramtermelö Kft., Paksi Atomerömü Rt. and Péçsi Erömü Rt. (signatory of the initial PPA and predecessor of Pannon Höerömü Rt. [footnote omitted] contain state aids within the meaning of Article 87(1) of the EC Treaty to the electricity generators.*
> *2. The state aids referred to in Article 1(1) are incompatible with the common market.*
> *3. Hungary shall refrain from granting the state aids referred to in paragraph 1 within six months following the date of notification of the present Decision.*
>
> *Article 2:*
> *1. Hungary shall recover the aid referred to in Article 1 from the beneficiaries.*
> *2. The sums to be recovered shall bear interest from the date on which they were put at the disposal of the beneficiary until their actual recovery.*
> *3. The interest shall be calculated on a compound basis in accordance with Chapter V of Regulation (EC) No 794/2004 as amended by Regulation (EC) No 271/2008.*
>
> *Article 3:*
> *1. Within two months following notification of this Decision, Hungary shall submit to the Commission information concerning the measures already taken and planned to comply with this Decision and notably the steps taken to perform an appropriate simulation of the wholesale market in order to establish the amounts to be recovered, the detailed methodology intended to be applied and a detailed description of the set of data that it intends to use for that purpose.*
> *2. Hungary shall keep the Commission informed of the progress of the national measures taken to implement this Decision until recovery of the aid referred to in Article 1 has been completed. It shall immediately submit, on simple request by the Commission, information on the measures already taken and planned to comply with this Decision. It shall also provide detailed information concerning*

*the amounts of aid and recovery interest already recovered from the beneficiaries.*

*Article 4:*

*1. The exact amount of aid to be recovered should be calculated by Hungary on the basis of an appropriate simulation of the wholesale electricity market as it would have stood if none of the Power Purchase Agreements referred to in Article 1(1) had been in force since 1 May 2004.*

*2. Within six months following notification of this Decision, Hungary shall calculate the amounts to be recovered on the basis of the method referred to in paragraph 1 and submit to the Commission all relevant information with regard to that simulation, notably its results, a detailed description of the applied methodology and of the set of data used to carry out the simulation.*

*Article 5:*

*Hungary shall ensure that the recovery of the aid referred to in Article 1 is implemented within ten months following the date of notification of this Decision.*

*Article 6:*

*This Decision is addressed to the Republic of Hungary …"*

6.79    The text of the *motifs* is far too lengthy to reproduce in full here. In summary, the Final Decision recorded that the PPAs put the Hungarian Generators in a more advantageous economic situation than other Generators that were not covered by PPAs, including possible new entrants and other comparable sectors where such long term agreements were not proposed to market players; that the PPAs had the effect of forcing one of the parties (i.e. MVM) to purchase its electricity from the other party irrespective of the actual development of offers by competitors, not only distorting but also eliminating competition for a certain quantity of electricity supply; and that their termination would not create in itself an undue burden, but rather bring the Generators back into a normal market situation. As regards Stranded Costs, the Final Decision recorded that long term PPAs could generate Stranded Costs only where these were a burden for Generators and not a benefit; that investments in power plants could constitute a category of Stranded Costs where the

new economic conditions created by market liberalisation made it impossible for Generators to recoup investment costs; and that aid for compensating Stranded Costs should not be aimed at preserving the level of income that was assured before liberalisation, but only at compensating for actual losses due to the investment's inefficiency.

6.80    The Tribunal notes, in particular, the Commission's references to the "termination of the PPAs" (paragraphs 443, 444 & 457) and the "actual date of termination of the PPAs" (paragraph 451). It also notes the Commission's description of the PPAs as "structurally" providing more guarantees to Generators than standard commercial contracts (paragraph 217); the Commission's conclusion that the PPAs' "core principles" created an advantage to the Generators beyond normal commercial advantage; and that those main principles "cannot be isolated and assessed separately" because the existence of such an advantage lay "in the combination of these elements" (paragraph 236).

6.81    The *motifs'* "Implementation of the decision" and "Conclusion" read as follows:

> *"Implementation of the decision:*
>
> *466. As stated by the Court of Justice, a Member State encountering unforeseen or unforeseeable difficulties or perceiving consequences overlooked by the Commission may submit those problems for consideration by the Commission together with proposals for suitable amendments. In such a case, the Commission and the Member State concerned must work together in good faith with a view to overcoming the difficulties whilst fully observing the EC Treaty provisions [footnote 122 referring to Case C-94/87 Commission v Germany [1989] ECR-175, point 9; and Case C-348/93 Commission v Italy [1995] ECR-673, point 17].*
>
> *467. The Commission therefore invites Hungary to submit to the Commission for consideration any problem that it may meet in implementing this decision.*

*8. Conclusion:*

*468. The Commission concludes that the PPAs confer illegal state aid to the power generators [including Dunamenti] within the meaning of Article 87(1) of the EC Treaty; and that this state aid is incompatible with the common market.*

*469. As was explained in point 7.3 [This part recorded at length the existence of state aid within the meaning of Article 87(1) of the EC Treaty], the state aid element provided in the PPAs consists in the purchase obligation by MVM of a certain capacity and a guaranteed minimum quantity of electricity at a price covering capital, fixed and variable costs over a significant part of the lifetime of the assets, thereby guaranteeing a return on investment."*

6.82    The Tribunal notes that nowhere in the *dispositif* is there any express requirement for Hungary to terminate the PPAs, an omission which contrasts with the *dispositif* of other decisions of the Commission submitted by Electrabel. Moreover, as Professor Sir David Edward stressed in his oral testimony, the relevant wording in Article 1(1) of the Final Decision's *dispositif* states only that the PPAs' obligations "contain" State aids and not "that the PPAs constitute State aid in their totality" [D3.604]. Electrabel submits that, accordingly, there was no requirement on Hungary under the Final Decision and EU law to terminate Dunamenti's PPA in its totality.

6.83    For two related reasons, the Tribunal is unable to accept this submission for the purpose of here deciding the PPA Termination Claim.

6.84    First, under EU law, the interpretation of a decision by the European Commission is not a semantic exercise limited to the express wording of the *dispositif*. Hungary referred the Tribunal to several ECJ decisions, including *Asteris & Greece v Commission*, [1988] ECR 2181; *Commission of the European Communities v BASF AG & Others*, [1994] ECR I-2555; and *Textilwerke Deggendorf GmbH (TWD) v Commission,* [1997] ECR I-2549. Hungary submitted that these ECJ decisions emphasise the importance of taking into account the *motifs* in the decisions and judgments of EU institutions in a teleogical manner in order better to understand the *dispositif*; that, for example in *Asteris*, the ECJ noted that the institution was

required to have regard not only to the operative part of the judgment but also to the *motifs* which led to that judgment in order to determine the former's exact meaning (paragraph 27); that in *BASF,* the ECJ noted that "the operative part of such a decision can be understood, and its full effect ascertained, only in the light of the statement of reasons" where the ECJ described a decision's *dispositif* and *motifs* as constituting "an indivisible whole" (paragraph 67); and that later, in *Deggendorf*, the ECJ held that: "the operative part of an act is indissociably linked to the statement of reasons for it, so that, when it has to be interpreted, account must be taken of the reasons which led to its adoption" (paragraph  21).

6.85    The Tribunal accepts the legal force of this submission as a matter of EU law relevant to the interpretation of the Final Decision; and accordingly it interprets the Final Decision's *dispositif* in the light of its *motifs.*

6.86    Second, so read as a whole document, it is clear that the Final Decision records the Commission's determination that the PPAs "constituted" and not merely "contained" State aid (paragraph 74); and that the Final Decision refers to the PPAs' "termination" (see above) and not merely their partial modification. In short, in the Tribunal's view, the Final Decision's *dispositif*, read with the *motifs*, clearly did require Hungary to terminate Dunamenti's PPA by 31 December 2008.

6.87    There is moreover no other practical interpretation possible: the Final Decision does not suggest that Hungary should or could so modify the PPAs as to remove all the offending provisions on State aid but leaving the PPAs otherwise in force. It would have been impossible to so alter the "structure" of Dunamenti's PPA, or its "core principles" or "the combination" of elements which the European Commission found unlawful under EU law. Moreover, even if possible, such drastic surgery would have reduced the PPA to an absurd shadow of its original self, as commercially unacceptable to Dunamenti as the PPA's termination itself (if not more so).

6.88    This stark reality rebuts Electrabel's complaint that the PPA could somehow have been transmuted into another agreement with MVM acceptable to the European Commission and to like beneficial effect for Dunamenti. In the circumstances,

Hungary's jurisdictional objection regarding MVM's alleged refusal to replace the PPA with a new contract on Dunamenti's preferred terms becomes otiose.

6.89 In reaching this interpretation of the Final Decision under EU law, the Tribunal has taken no account of extraneous circumstances, including the Commission's press release on 4 June 2008 or its formal pleadings later submitted in the legal proceedings brought by Dunamenti now pending before the General Court (in particular, paragraphs 29, 47-62 & 87 of its Defence). Nonetheless, having reached its own interpretation, the Tribunal takes comfort from the fact that the European Commission has consistently maintained that the Final Decision did indeed require Hungary to terminate the PPAs, as has also Hungary to whom it was addressed by the Commission.

6.90 The Tribunal has also noted, likewise, the passage in the CFI's order of 23 December 2008 rejecting AES' application for interim measures against the European Commission in regard to the Final Decision (affecting equally AES and Dunamenti), here cited in full:

> *"57. Finally, in so far as the applicant [AES] submits that implementation of Article 1 of the contested decision [of the dispositif, cited above] would prevent it from concluding valid agreements with MVM because of the purported legal uncertainty in respect of State-aid elements, suffice it to note that the lack of precision which the applicant criticises relates only to the recovery of the State aid that has been declared incompatible with the common market and, more particularly, the parameters which the Hungarian authorities must simulate in order to establish the amounts to be recovered pursuant to Articles 2 to 4 of the contested decision. As regards Article 1 of the contested decision, which is the only article contested by the present application for interim measures, the Commission in that article essentially does no more than order the termination of long-term PPAs and does not dictate which type of contractual relationship is to be established on the market at issue following that termination." (Emphasis supplied).*

6.91    Moreover, the issue before this Tribunal does not turn precisely on whether or not the Final Decision required Hungary under EU law to terminate the PPA. The ECT's FET standard raises a different question, namely whether Hungary irrationally or arbitrarily interpreted the Final Decision as imposing such a requirement under EU law, in breach of the ECT's FET standard. Given the Tribunal's own interpretation of the Final Decision above, even assuming it to be erroneous (which the Tribunal firmly rejects), the Tribunal determines that Hungary was not unreasonable, still less acting irrationally or arbitrarily, in adopting and maintaining that same interpretation from June 2008 onwards; and that, accordingly, that conduct, by itself, could not amount, in the Tribunal's view, to any breach by Hungary of the ECT's FET standard.

6.92    Further, the Tribunal rejects Electrabel's case that Hungary should have challenged the Final Decision, either by commencing its own legal proceedings before the CFI in 2008 or joining in Dunamenti's legal proceedings in 2009. The Tribunal considers, on the facts of this case, that Hungary was entitled to a modest margin of appreciation in arriving at its own discretionary decision in regard to such proceedings, without thereby committing a breach of the ECT's FET standard. The Tribunal also notes that any such legal proceedings by Hungary would not have suspended under EU law the immediate legal effect of the Final Decision on Hungary; and it also notes the failure of another Generator (AES) to obtain interim measures from the CFI in regard to the Final Decision in 2008, as already recited above.

6.93    The Tribunal also rejects Electrabel's criticisms of Hungary's eventual acceptance of the Commission's approach to calculating unlawful State aid based on revenues, rather than a profits-based approach. That was not a decision taken lightly by Hungary; and it had argued with the Commission for a methodology more attractive to the Hungarian Generators, including Dunamenti. The Commission decided otherwise: its Final Decision required Hungary to calculate unlawful State aid based on "revenues" (paragraph 461); it confirmed to Hungary the requirement for such a revenues-based approach on 19 June 2009 and (specifically as regards Dunamenti) on 24 September 2009; and it continued thereafter to maintain that requirement. It will be recalled that Hungary's calculation of State aid and Stranded Costs

applicable to Dunamenti's PPA were and remain subject to the Commission's approval, as most recently confirmed by its Compensation Decision of 27 April 2010 (paragraph 69).

6.94 *(v) Net Stranded Costs:* As a result of several factors; namely (i) the early termination by Hungary of Dunamenti's PPA from 1 January 2009, (ii) Dunamenti's obligation to account for unlawful State aid received from 2004 to 2008 and (iii) Dunamenti's requirement from 2009 onwards to operate in a liberalised market up to the end of the PPA's notional term on 31 December 2015, Dunamenti's original investment decisions became uneconomic, i.e. not subject to recoupment with revenues anticipated for the full period of the PPA's term.

6.95 In other words, these factors left Dunamenti with Stranded Costs. As first pleaded by Electrabel, Dunamenti's Stranded Costs were estimated as HUF 151,721,754 (Electrabel's Memorial, Amendment of Part VII, paragraph 19). More recently, Electrabel estimated Dunamenti's Stranded Costs at a slightly lesser figure: HUF 147 billion (paragraph 196 of its Post-Hearing Submissions). The Tribunal recognises that these can only be estimates for the time being, given that three more years have still to run before the end of the full period of trading required to calculate the final figure for Dunamenti's Stranded Costs, namely 31 December 2015.

6.96 Simply stated, the term "Stranded Costs" here refers to the difference between (i) Dunamenti's relevant investment costs and (ii) Dunamenti's relevant operating revenues generated in the past and to be generated in the future up to the notional end of the PPA's term. This simple statement, however, disguises a mass of difficulties, in particular the true figures and correct methodology for calculating both Stranded Costs and therefore Net Stranded Costs (after allowing for recoverable State aid). As recognised by the European Commission in its Compensation Decision (see below), the investments by the Hungarian Generators (including Dunamenti) "are significant and may generate very large losses ... and were these losses [i.e. Stranded Costs] not to be compensated in any way, they significantly affect the competitiveness of the undertakings concerned and might even affect their viability" (paragraph 40). For Dunamenti, the issue of Net Stranded

Costs was and remains of great importance, as confirmed by Electrabel's pleaded figures of HUF 147-151 billion cited above.

6.97    The Final Decision did not require Hungary to pay any compensation to Dunamenti for its Stranded Costs consequent upon its PPA's premature termination. Indeed, that omission appears to be one of the principal complaints made by Dunamenti in its legal proceedings against the Commission before the CFI/GC (see its "third plea" at paragraphs 189-200 of the Claim and paragraph 81 of the European Commission's Defence). Nor did or does, in the Tribunal's view, EU law generally require such compensation. It leaves to EU Member States, here Hungary, the decision whether or not to make any compensation for such Stranded Costs, provided that, if made, such compensation is compliant with EU law, including EU law on State aid.

6.98    Under the PPA Termination Act enacted by Hungary's Parliament on 10 November 2008 mandating the early termination of the Generators' PPAs, any future amount of Stranded Costs allowed to the Generator was to be limited to the amount of State aid to be recovered from that Generator: see Section 5 of the PPA Termination Act. This legislation directly influenced the scheme developed by Hungary in regard to Stranded Costs.

6.99    On 15 December 2009, under Article 108(3) TFEU, Hungary notified the European Commission of its scheme (with draft decree) for Stranded Costs Compensation to three Generators: Budapesti Erömü ZRt; Pannon Höerömü Zrt; and Dunamenti. In brief, Hungary's scheme comprised a two-stage process as regards Stranded Costs.

6.100    Under the first stage, each Generator would be allowed notional compensation for certain eligible Stranded Costs, as calculated by Hungary. Such compensation could not produce any cash payment to the Generator by Hungary because Hungary, under the legislative scheme, would synchronise any compensation (in the form of a simultaneous set-off) with the recovery from the Generator of unlawful State aid. If such State aid from the Generator were positively to exceed the Stranded Costs to be allowed to the Generator, the Generator would be required to pay in cash the excess to Hungary. However, if such Stranded Costs were positively to exceed such State aid, the Generator would not repay any State aid to Hungary; but, critically for

present purposes, nor would Hungary make any payment in cash or otherwise to the Generator of that excess (i.e. "Net Stranded Costs").

6.101    Accordingly, at this first stage of Hungary's scheme no cash payment could be made by Hungary to any of the three Generators (including Dunamenti), even if the amount of Net Stranded Costs were calculated by Hungary to be notionally due to one or more of these Generators; i.e. because Stranded Costs were positively to exceed State aid.  As later noted by the European Commission in the Compensation Decision, "… all three companies fall within the [same] situation …: the aid amounts [i.e. notional compensation for Stranded Costs] that they will receive at the first stage of the scheme are lower than the eligible stranded costs resulting from the calculation methodology developed by Hungary" (paragraph 22).

6.102    Under the scheme's second stage, also called the "claw-back mechanism", each Generator's relevant operating costs and revenues would be monitored by Hungary up to the notional expiry of its PPA's term; and, after such date, Hungary would finally recalculate the Generator's Stranded Costs on the basis of such actual costs and revenues. Such calculations could mean that the Generator would be required by Hungary to pay in cash part of the compensation allowed to it during the first stage (by set-off), in the event that State aid was positively to exceed the finally calculated Stranded Costs. However, Hungary's scheme, with this second stage, did not provide for any payment by Hungary (in cash or otherwise) to any Generator for its Net Stranded Costs, whether as originally calculated during the scheme's first stage or as finally re-calculated at the end of this second stage, in the event that Stranded Costs were positively to exceed State aid. As later noted in the Compensation Decision, "… this mechanism cannot lead to payment from the State to [the Generators]. It can only take the form of payments from [the Generators] to the State" (paragraph 25; see also paragraph 48).

6.103    On 27 April 2010, the European Commission issued its "Compensation Decision", not raising any objections to Hungary's scheme under EU law, particularly the European Commission's "Stranded Costs Methodology".

6.104    The European Commission there determined (inter alia): that the Generators "will receive an amount of aid … which is a compensation for their eligible stranded

costs" (paragraph 10); that such compensation initially "will take the form of a reduction in the amounts recovered from [the Generators] in application of the PPA decision [i.e. the PPAs' termination by Hungary], but will never give rise to cash payments from the State budget" (paragraph 14); that Hungary had decided "not to fully compensate these eligible stranded costs in all cases: in cases where they exceed the amounts to be recovered pursuant to [the Final Decision], the State will not pay to the company the difference between these two amounts" (paragraph 20); and that Hungary's scheme would be financed through State resources with "expenses of the stranded costs compensation regime … borne by the Hungarian state which will recover less repayable State aid than it would otherwise do and thus will forego revenues" (paragraph 27).

6.105   The Commission emphasised that its approval of Hungary's scheme: "… is based on the commitment of the Hungarian authorities, as foreseen by the draft Decree attached to the notification, that the first stage of the notified scheme and the execution of the recovery requirement contained in the PPA decision will be carried out simultaneously, so that in practice, the Hungarian State will not make any payment to [the Generators] but instead will forego the amounts to be repaid to it in application of the PPA decision" (paragraph 68). If Hungary were to decide to make cash payments to a Generator for any Stranded Costs, however, the Commission would require in advance a fresh notification by Hungary with such payment subject to the Commission's approval (paragraph 70).

6.106   Table 1 of the Compensation Decision (under paragraph 21) recorded, as regards Dunamenti for the scheme's first stage, that State aid recoverable from Dunamenti was HUF 125,352,538 (approximately US$ 660 million); that eligible Stranded Costs under Hungary's scheme were HUF 147,524,529 (approximately US$ 777 million), with Stranded Costs compensation allowed under the scheme's first stage assessed at only HUF 125,352,538 (approximately US$ 660 million), i.e. the same amount as recoverable State aid but short of the full amount of  Stranded Costs of HUF 147,524,528 by the sum of HUF 22,171,991 (approximately US$ 117 million), called "the buffer of HUF 22 billion" by Hungary. At this first stage, Dunamenti would not be required to repay to Hungary any State aid; but, equally, Dunamenti

could not recover any part of its Net Stranded Costs, even as calculated by Hungary, in cash or otherwise.

6.107    These calculations also show that, without any allowance for Stranded Costs, Hungary could recover from Dunamenti in cash HUF 125, 352,538 for unlawful State aid. They show that Dunamenti, with Hungary's allowance for Stranded Costs, is currently expected by Hungary to bear (without any compensation) HUF 22,171,991 for unrecovered Net Stranded Costs. They also show that Dunamenti will not be required to repay any State aid to Hungary provided that the final calculation for Stranded Costs is not reduced by more than HUF 22,171,991, i.e. "the buffer of HUF 22 billion".

6.108    The Compensation Decision demonstrates that, as regards the calculations for the other two Generators (particularly Budapesti), Dunamenti was not subjected to unfair discrimination under Hungary's scheme. The Tribunal does not accept Electrabel's submission to the contrary.

6.109    In the Tribunal's view, there is nonetheless a manifest and significant lack of symmetry in Hungary's scheme as regards compensation for Dunamenti's Net Stranded Costs. The scheme's first stage is now complete; whilst the second stage lies in the future. The Tribunal does not accept that Hungary committed any breach of the ECT's FET standard in providing for two successive stages; nor with the principle of setting-off Stranded Costs against State aid under the first stage. On Hungary's own calculations, however, it is clearly possible that Dunamenti will not recover compensation in the sum of HUF 22,171,991 for its Net Stranded Costs under the second stage of Hungary's scheme. As finally calculated by Hungary, this figure could of course be lower, non-existent or even negative; but it could also be significantly higher, for two separate reasons.

6.110    First, Electrabel subjects to fierce criticism Hungary's calculations for Dunamenti's Stranded Costs. The Tribunal notes, however, that Electrabel's current estimates for Dunamenti's Stranded Costs appear broadly similar to Hungary's own calculations under its scheme: HUF 147/151 billion compared to HUF 147.5 billion. By reason of the Parties' agreement on bifurcating quantum and also for reasons explained

below, the Tribunal is unable to address and decide this apparent controversy in this Decision.

6.111    Second, but more importantly, the time for finally calculating the relevant figures under Hungary's scheme lies still in the future. Under the scheme's second stage, the full collation of Dunamenti's actual costs and revenues by Hungary must run to 31 December 2015. Only after that date can the final calculation of Net Stranded Costs become known under the second stage of Hungary's scheme. However, it is Hungary's position, as set out in its legislative scheme, that whatever the eventual figure calculated for Dunamenti's Net Stranded Costs after 2015, Hungary will never make any payment to Dunamenti, in cash or otherwise, even if the eventual figure for Net Stranded Costs is significantly in excess of HUF 22,171,991.

6.112    Taking into account these two factors, the question arises as to whether this final figure for Net Stranded Costs is likely to be higher than Hungary's current figure of HUF 22,171,991. The Tribunal has attempted, perhaps for too long, to address and somehow finally resolve this difficult and complicated question as an issue of liability under the ECT's FET standard. It has, of course, taken full account of Hungary's submissions that both this figure and its methodology are entirely appropriate; that, in any event, neither can justify any complaint by Electrabel under the ECT; and that EU law on State aid makes any cash payment to Dunamenti problematic for Hungary, at least if made without the prior approval of the European Commission. The Tribunal has also noted the formal submission in regard to Hungary's scheme made to the General Court (then the CFI) by the European Commission in October 2009 before the Compensation Decision that: "… the initial Commission assessment is that, after netting of the two amounts for each company, the final sum [of Stranded Costs] to be recovered will either be very limited or even non-existent" (paragraph 86 of the European Commission's Defence of 6 October 2009).

6.113    The Tribunal takes account, conversely, that Electrabel not only complains that Hungary has by itself decided not to pay its own calculated figure of HUF 22,171,000 to Dunamenti, as a decision not required under EU law or the European Commission; but that it is plain that Hungary currently intends to pay nothing to

Dunamenti whatever the eventual true figure for Net Stranded Costs might be after 31 December 2015.

6.114   If in fact the true figure were then HUF 22,171,991 or significantly higher, the question arises whether Electrabel's claim under the ECT's FET standard would be materially affected, given that Hungary remains under a continuing duty towards Electrabel under that FET standard. And if so, the question arises whether a payment in respect of Net Stranded Costs could be due and payable by Hungary to Dunamenti, in cash or otherwise, as required by the ECT's FET standard? The Tribunal notes again the potential significance of Stranded Costs for Dunamenti, possibly generating very large losses and, if uncompensated, adversely affecting its competitiveness, as emphasised by the European Commission in its Compensation Decision (*supra*).

6.115   As regards EU law and the Commission, there does not appear to be any insuperable obstacle to a cash payment for Net Stranded Costs in appropriate circumstances. Whilst the European Commission emphasised Hungary's scheme as envisaging only payment of compensation in the form of a set-off without any cash payment, yet the Commission also raised the possibility in its Compensation Decision that, in different circumstances (i.e. the annulment of the Final Decision), cash compensation by Hungary for Net Stranded Costs was not necessarily to be excluded (paragraph 70). The Compensation Decision also noted the projected nature of Hungary's scheme, whereby Stranded Costs would have to be reassessed against future actual revenues received by a Generator up to the end of its PPA's notional term (*supra*). The Tribunal cannot therefore exclude the possibility that, in new circumstances, the Commission could look again at a cash payment for Net Stranded Costs to Dunamenti, particularly if those new circumstances created "an unforeseen or unforeseeable difficulty" in implementing the Commission's decisions (as stated in paragraph 466 of the Final Decision, *supra*).

6.116   Further, the Tribunal has noted that the European Commission has apparently approved cash payments by Poland as compensation for Stranded Costs to certain Polish generators following its final decision of 25 September 2007 regarding Polish PPAs: see its Report on Polish Stranded Costs of 2009. It may be that there are

factual and chronological differences between the cases of Hungary and Poland, as the European Commission submits in Dunamenti's CFI/GC proceedings (e.g. paragraph 29 of its Defence). The Tribunal does not here discount the possibility that the two cases are materially very different, an issue not yet fully explored in these proceedings. It remains the fact, however, that Poland was apparently able to pay cash compensation for Stranded Costs under EU law to Polish generators (subject to a form of claw-back mechanism); and that, as a matter of EU law, the possibility may exist (subject to the European Commission's approval) for cash compensation to be paid by Hungary to Dunamenti for all or part of its Net Stranded Costs after 31 December 2015, as finally calculated under the second stage of Hungary's scheme.

6.117    At this point, the Tribunal is confronted by the Parties' agreement, confirmed by the Tribunal, to bifurcate these proceedings into two separate phases: liability and quantum. The Tribunal considers that issues of quantum are necessarily impermissible for final decision for this first phase of these proceedings; and that the question of Net Stranded Costs inextricably combines issues of liability and quantum. The Tribunal also considers that, given bifurcation, it has inevitably received insufficient materials from the Parties to make any final decision on the question of liability under the ECT's FET standard in regard to Net Stranded Costs and that, if it were to do so here, it would risk a grave procedural injustice to one or other Party.

6.118    Accordingly, the Tribunal reserves in full its decision, to another decision or award in these proceedings, as to whether or not Hungary has breached or will continue to breach the FET standard in its treatment of Dunamenti's Net Stranded Costs. It is therefore best, in all the circumstances, for the Tribunal to say little more here, save to express the Tribunal's current, provisional and tentative view that the non-payment of HUF 22,171,991 or a lesser sum at the end of Hungary's legislative scheme does not strike the Tribunal as necessarily amounting to a breach of the FET standard; but that non-payment (in cash or otherwise) of a significantly higher sum for Net Stranded Costs most probably could.

6.119    *(vi) Other ECT Standards:* The Tribunal considers that it can dispose succinctly of Electrabel's other claims, which were only briefly argued by the Parties, with the

Tribunal having already addressed at length Electrabel's claims for expropriation and under the FET standard. In short, the Tribunal does not accept Electrabel's case that Hungary breached any of the ECT's other standards, namely: Article 10(1) ECT on stable, equitable, favorable and transparent conditions (beyond the FET standard); Article 10(1) on full protection and security; Article 10(1) on unreasonable or discriminatory measures; Article 10(1) on treatment no less favourable than that required by international law; and Article 10(7) on treatment no less favourable than that accorded to national investors or investors of other States.

6.120   The Tribunal determines that there was no form of unlawful discrimination against Dunamenti or Electrabel by Hungary. The Tribunal addresses elsewhere the legal content of the other ECT standards invoked by Electrabel; and it is therefore unnecessary to do so here: see Part VII of this Decision below. Whilst the Tribunal recognizes that certain of these other standards overlap with the ECT's FET standard, the Tribunal does not consider that, as regards Net Stranded Costs, any of these other standards could grant to Electrabel any greater relief that which may be available to it, in this case, under the FET standard.

6.121   Accordingly, the Tribunal dismisses this last part of Electrabel's PPA Termination Claim.

## (5)   SUMMARY

6.122   For the reasons set out above, the Tribunal decides that: (i) it has jurisdiction to decide Electrabel's PPA Termination Claim; and that (ii) as  for liability, the Tribunal dismisses the PPA Termination Claim, save as to  Electrabel's claim under the FET standard in Article 10(1) ECT in regard to the issue of Net Stranded Costs, as to which the Tribunal reserves in full its jurisdiction and powers to decide such claim by one or more further decisions or award in a subsequent phase of these arbitration proceedings, i.e. necessarily after 31 December 2015.

## *PART VII: PPA PRICING*

### *(1)    INTRODUCTION*

7.1    The Claimant's second claim is for "PPA Pricing", also described as "Interference in PPA Pricing" or "Dunamenti-MVM Commercial Disputes." It concerns MVM's partial payment of Dunamenti's invoices during a period in 2006 and 2008 when those contracting parties were unable to agree on a yearly commercial agreement ("YCA") under the PPA. As already indicated, this PPA Pricing Claim is advanced by the Claimant under Articles 10(1) and 10 (7) ECT. It is denied in full by the Respondent. (As before, the Claimant and the Respondent are described below also as Electrabel and Hungary.)

7.2    In order fully to understand the pricing controversy between Dunamenti and MVM under the PPA, it is necessary to explain the two main components of its electricity price. The price comprises of two major elements under Article 8 and Schedule 6 of the PPA: (i) a capacity fee, or availability fee, which is paid in consideration of the availability of certain capacities contracted under the PPA; and (ii) an energy fee, which relates to the production cost of the electricity actually generated and sold to MVM (Memorial, paragraphs 91-97). Electrabel alleges that the formula encouraged efficiency based on a risk-sharing principle. While the capacity fee was intended to reflect Dunamenti's fixed costs and reasonable profit when operating in an efficient manner, the energy fee was intended to be a pass-through of variable costs, especially fuel costs (Claimant's Post-Hearing Submission, paragraphs 303-304; Memorial, paragraph 95). Hungary has not disputed this general description of the price structure by Electrabel.

7.3    It is next convenient to summarise the Parties' respective submissions before recording the Tribunal's analysis of those submissions and its decisions.

*(2)*    **THE CLAIMANT'S CASE**

7.4    *(i) Summary of the Claimant's Position:* In summary, Electrabel submits that Hungary's instructions to MVM, by the letter dated 10 November 2005 from the Hungarian Energy Office ("HEO"), to reduce Dunamenti's capacity fee by 34.23% was a breach of the fair and equitable treatment (FET) and other standards of protection under the ECT; and that overall MVM was acting under instructions from HEO to reduce PPA prices and conducted itself in a manner that was arbitrary, irrational and in bad faith, all violations of the ECT attributable to Hungary under international law. Electrabel contends that this "HEO November Letter" and the instructions of the Hungarian Government (particularly Minister Kóka), with MVM's implementation of those instructions, constitute a breach of Articles 10(1) and 10(7) ECT.

7.5    As regards the ECT's FET standard under Article 10(1) ECT, Electrabel submits that it had a legitimate expectation under these protections that, had regulated pricing ended, Dunamenti was entitled to negotiate Yearly Commercial Agreements without Governmental interference (as it had done in 2004 and 2005) and that the capacity fee for the F Units had been fixed up to 2010 in the 2001 December Statement.

7.6    Electrabel contends that MVM's adverse steps concerning PPA pricing in 2006, in 2008 and for the foreseeable future (Memorial, paragraphs 182-186) were taken on instructions that Hungary (as MVM's 99.9% shareholder) gave to MVM in 2005 for inappropriate political reasons; that Dunamenti and MVM had reached a consensus on the inflation rate and heat rate curve; and that, but for Hungary's unlawful interference and instructions, MVM would not have sought to renege on its agreement with Dunamenti.

7.7    *(ii) Period of Regulated Pricing (1996-2003):* At the time when Dunamenti was privatised, the official price for 1996 had already been set by ministerial decree dated 13 October 1995. From 1997 to 2003, under the principles applying under the 1994

Electricity Act and the 1990 Price Act, both price components were determined in a Price Decree issued by the competent Ministry for a four-year cycle (1997-2000) and a three-year cycle (2001-2003). The Price Decree was based on HEO's assessment of Dunamenti's justified costs. While acknowledging that the 1995 and 1999 Price Decrees recognised an 8% return on equity, later changed to 9.8% return on assets, Electrabel contends that these rates of return did not set a cap on the Generators' profits, which could realise a greater return by operating more efficiently (Memorial, paragraph 102; Reply, paragraph 188). Electrabel notes that in this period the price was set by using the Domestic Sales Price Index for Industry excluding the food industry ("DSPI") which is the inflation index provided in the PPA (Memorial, paragraph 112). Electrabel has no complaints with respect to pricing in this period.

7.8     In 2001, Dunamenti and MVM executed the F Units Retrofit Agreement. The anticipated enactment of the 2001 Electricity Act in December 2001 meant that the introduction of deregulated pricing was likely. Hence, Dunamenti could not be certain that, following completion of the retrofit for the F Units, its investment would be taken into account for the determination of the availability fee. Dunamenti and MVM thus concluded an amendment of the PPA (the "December 2001 Statement"), which set a base price for the capacity fee for the F Units until 2010 (subject to inflation) following the expiration of the price regulation (Memorial, paragraph 116).

7.9     *(iii) Period of Deregulated Pricing (2004-2005):* The 2001 Electricity Act became effective in 2003. It partially opened up the electricity market in Hungary to liberalisation, creating two parallel markets for Hungarian Generators, a market for those covered by PPAs and a market for those which elected to sell their electricity without a PPA and to purchasers other than MVM (Memorial, paragraphs 121-122). Dunamenti and MVM thus had to negotiate their prices under Yearly Commercial Agreements ("YCAs"), which operated for 2004 and 2005 (Post-Hearing Submission, paragraphs 304-305; Memorial, paragraphs 123-124).

7.10    Electrabel acknowledges that this did not come as a surprise. Electrabel (with Dunamenti) had foreseen this market liberalisation when entering into the December 2001 Statement for the F Units; and such YCAs were contemplated at the time when the PPA was concluded (a YCA template was included as Schedule 8 to the PPA). It

was agreed then that, when the time came for Dunamenti and MVM to set a deregulated price (in 2004), this base price would be applied, adjusted to take account of inflation using the DSPI index, as had been expressly agreed in the PPA. This was the pricing used for the 2004 and 2005 YCAs (Memorial, paragraphs 117-127). Electrabel makes no complaint about pricing in this period.

7.11    *(iv) 2005-2015:* A sustained increase in the regulated prices of gas had taken place in 2005, which increased the energy fee component of the price that MVM was required under the PPA to pay to Dunamenti. MVM's wholesale trading activity was also making losses. Electrabel alleges that the Hungarian Government was determined for political reasons to keep consumer electricity prices artificially low and, rather than addressing the unrealistically low end user prices, targeted largely foreign-owned Generators, such as Dunamenti, to reduce electricity pricing under the PPAs (Memorial, paragraph 129).

7.12    Electrabel contends that, on 10 November 2005, the Government, acting through HEO and its Ministry of Economy and Transport (Minister Kóka), directed that Dunamenti reduce its prices by 34.23% in the form of the HEO November 2005 Letter (Memorial, paragraphs 130-132). The HEO there stated that it found it "essential that payments made on the basis of the long-term contracts independent of the risks of a free market should not ensure unreasonably high profits for the power plants". The HEO referred also to the fact that it was possible that the European Commission's formal investigation into Hungary's electricity generation sector would establish that profits achieved by a Generator benefiting from state contribution were only acceptable to a limited extent. Implementing these instructions, according to Electrabel, MVM challenged the applicable inflation rate and heat rate curve that it had previously agreed with Dunamenti under the PPA.

7.13    According to Electrabel, these governmental instructions were repeated in meetings held with Generators (including Dunamenti) on 22 November 2005, 6 December 2005, 8 December 2005 and 19 December 2005. Minister Kóka stated that the Government had a serious problem and that strategic investors in Hungary were to make an effort to address this situation. He required a reduction in prices from Dunamenti of HUF 3 billion (about USD 14.1 million, at prevailing exchange rates).

If a reduction was not achieved, he threatened to reintroduce regulated prices. At the meetings, Dunamenti made various proposals, but no agreement was reached (Memorial, paragraphs 133-135).

7.14    To implement the Minister's instructions, MVM sent to Dunamenti three draft YCAs for 2006, all reducing prices payable under the PPA:

- The first YCA draft (January 2006) sought to reduce prices by 5%; Dunamenti rejected it because it was not based on the terms of the PPA;

- The second YCA draft (March 2006) reduced the capacity fee by 34%; and it was rejected by Dunamenti for this same reason; and

- The third YCA draft (April 2006) was also rejected by Dunamenti since it applied (i) a different inflation rate (i.e. the Producers Price Index or PPI), in such a way that the capacity fee was much reduced; and (ii) a different heat rate curve, with the purpose of reducing the energy fee.

7.15    Throughout 2006, Dunamenti submitted invoices to MVM based on the agreed 2005 YCA (adjusted for inflation). For its part, MVM made payments based on its interpretation of the PPA changes in 2006 (and again in 2008 after the reintroduction of regulated pricing came to an end).

7.16    The result was a decrease in MVM's payments for 2006, compared to the inflation-adjusted 2005 prices, of approximately US$ 40 million (Memorial, paragraph 146). The situation changed with the reintroduction in 2007 of regulated pricing by Hungary's 2006 Price Regulation Act, which amended the 2001 Electricity Act. This period was then followed by a brief return to deregulated pricing in 2008, resulting in a decrease in MVM's payments under the PPA for the first six months of 2008, compared to the inflation-adjusted 2005 prices, of approximately US$ 25 million. Electrabel contends that, should MVM continue to take the same approach from July 2008 to 2010 for the F units and to 2015 for the G2 unit, the NPV of the shortfall in payment properly due to Dunamenti under the PPA will be approximately US$ 220 million (HUF 32.5 billion).

7.17    *(v) Attribution:* Electrabel submits that the evidence establishes that the actions of MVM are legally attributable to Hungary under international law, as expressed in Article 8 of the ILC Articles on State Responsibility (Post-Hearing Submission, paragraphs 319-324; Reply, paragraphs 211-228). According to Electrabel, MVM was acting on the instructions of HEO and was under the control of Hungary because MVM is 99.9% state-owned by Hungary; as a result, Hungary had the ability to exercise control over the decisions of MVM and its management; and Hungary's control is confirmed by the close links existing between the senior management of MVM and the Government, with many CEOs and chairmen of MVM having formerly held positions within the Government.

7.18    Acting on Hungary's instructions, MVM reinterpreted the PPA in 2005 in order to achieve a reduction in price. Specifically, in MVM's own words, Minister Kóka and the HEO had "several times requested MVM and the Generators concerned to initiate discussions on the decrease of the price of electricity received as part of the long term agreements", according to MVM's letter of 29 December 2005 to Dunamenti.

7.19    According to Electrabel, the existence of instructions to reduce prices is further demonstrated by other correspondence and meetings. In particular, MVM wrote to Dunamenti on 16 December 2005 referring to the forthcoming price renegotiations to be conducted "in accordance with the expectations of the HEO and the Minister." Further, the minutes of meetings held on 8 and 19 December 2005 restated that the Minister had requested a reduction in prices. Similarly, in the minutes of another renegotiation meeting, MVM recorded that it considered it its "duty" to achieve such a reduction. Moreover, throughout the renegotiation, MVM continued to refer to the instruction of the Minister to reduce prices.

7.20    *(vi) Breach of the ECT:* In Electrabel's submission, Hungary's interference during the 2006 and 2008 YCA negotiations, causing MVM to renege on its previous agreement with Dunamenti over the applicable inflation rate and heat rate curve, constitutes a breach of the FET standard and the other protections provided in Article 10(1) and (7) ECT (Post-Hearing Submission, paragraph 325).

7.21    In essence, Electrabel contends that Hungary failed to take positive steps to protect its investment and to provide a guarantee against infringements of its rights by the operation of Hungary's laws and regulations. Rather than ensuring that MVM live up to its contractual obligation to pay the PPA price that MVM had freely negotiated with Dunamenti, Hungary, motivated by inappropriate political considerations, actively interfered in the price negotiations for 2006 and 2008. When the price negotiation failed, MVM opted to pay a price that was significantly lower than that demanded by Dunamenti. Hungary did nothing to stop such under-payments (Reply, paragraph 466).

7.22    Moreover, Hungary failed to act transparently, i.e. to be forthcoming with information about intended and realised changes in policy that would negatively affect (and indeed subsequently did affect) Electrabel's investment (Reply, paragraph 460).

7.23    For the avoidance of doubt, Electrabel confirmed to the Tribunal that it does not seek to hold Hungary legally responsible for all acts of MVM, as if MVM were a state agency. Electrabel argues only that the conduct of MVM in challenging Dunamenti over the price elements of the PPA in the 2006 and 2008 YCAs is legally attributable to Hungary because it was adopted by MVM on the instructions and under the control of Hungary (Reply, paragraph 248).


*(3)*    ***THE RESPONDENT'S CASE***


7.24    *(i) Summary of the Respondent's Position:* In summary, Hungary submits that Electrabel has failed to establish its case on the two principal issues essential to this PPA Pricing Claim, namely: (i) whether Hungary instructed, directed or controlled MVM as a matter of international law; and (ii) whether MVM so acted arbitrarily or without rational justification.

7.25    Hungary submits that the answers to both of these questions are negative; and accordingly, it contends that the PPA Pricing Claim should be dismissed by the

Tribunal. Whilst Hungary acknowledges that MVM made only partial payment of Dunamenti's invoices during a period in 2006 and 2008 (when these parties to the PPA were unable to agree on a YCA), Hungary denies this PPA Pricing Claim on the grounds that it constitutes a commercial dispute between MVM and Dunamenti for which Hungary is not legally responsible under the ECT and international law.

7.26    More specifically, Hungary submits that this claim fails on the two principal issues. The first issue is whether Hungary instructed, directed or controlled MVM within the meaning of Article 8 of the ILC Articles on State Responsibility. Hungary disputes that it gave any such instructions and contends that it cannot be held legally responsible for the acts of MVM, a private commercial actor. The second issue is whether MVM acted arbitrarily or without rational justification and whether Hungary thereby breached the ECT's FET and other standards under Articles 10(1) and 10(7) ECT, which Hungary denies.

7.27    Hungary submits that MVM's conduct regarding the applicable inflation rate and heat rate was rational and non-arbitrary (Counter-Memorial, paragraph 487). Disagreements relating to the applicable inflation rate and heat rate curve were bona fide contractual disputes. They pre-dated HEO's renegotiation request and were independent from it. Further, Hungary contends that a reduction in prices was required by Hungary's standstill obligation under EU law flowing from the European Commission's Preliminary Decision of 9 November 2005 (NN/49/2005) which, according to Hungary, concluded that the PPAs constituted unlawful State aid (Counter-Memorial, paragraph 187).

7.28    Accordingly, Hungary submits that it is not liable under the ECT for MVM's actions, even if attributable to Hungary under international law. Further, Hungary is not liable under the ECT for its efforts to encourage the PPA's renegotiation, which did not violate the ECT's FET or other standards (Rejoinder, paragraphs 522-537).

7.29    As a preliminary matter, Hungary objected to the Tribunal's jurisdiction over the PPA Pricing Claim involving MVM's decisions on the ground that MVM's commercial acts, taken in its private legal capacity, are not attributable to Hungary (Counter-Memorial, paragraph 6; Preliminary Objections, paragraphs 7, 13 and 14). Hungary recognised, however, that this jurisdictional objection was intricately

intertwined with the merits of this claim, because the Tribunal ultimately would need to examine each of MVM's allegedly wrongful acts and determine whether the circumstances of its actions were such that responsibility should be attributed to Hungary under international law. Hungary therefore consented (with Electrabel) to joining its jurisdictional objection to the merits with respect to this PPA Pricing Claim. In these circumstances, as described above, the Tribunal addresses this jurisdictional objection as part of the merits of the PPA Pricing Claim.

7.30    With respect to PPA pricing generally, Hungary claims that, although the PPA was a long term contract (originally intended run through to 2010), it was designed with a considerable degree of flexibility by means of a yearly planning procedure that would result in the execution of a YCA.

7.31    Hungary's description of the evolution of the PPA pricing regime is summarised below.

7.32    *(ii) PPA Pricing: 1997-2001:* From the earliest years of Electrabel's investment, Dunamenti, as with other Generators, understood that PPAs created difficulties for the liberalisation of Hungary's electricity market. Notably in 1998, Hungarian Generators (including Dunamenti), together with regulators, officials and industry participants, took part in working groups discussing the evolution of Hungary's electricity market in view of Hungary's accession to the European Union. That same year, in its annual financial report, Dunamenti's chairman called on the company to prepare for the changes that "the winds of liberalisation" would bring (at page 3).

7.33    Starting in 1997, Dunamenti and MVM entered into a series of agreements and PPA amendments which reflected the possibility that PPAs could become "impossible to enforce" (Counter-Memorial, paragraphs 86-96). These agreements included the 1997 Cooperation Agreement; the F Retrofit Agreement and related correspondence and documents, it being understood that the Government no longer supported the establishment of new PPAs; and the December 2001 Statement. That latter agreement was a bilateral transaction between Dunamenti and MVM in which HEO did not participate (Counter-Memorial, paragraph 93): it provided for good faith renegotiation of the PPA within one year following the expiration of regulatory

pricing "in order to be able to fulfill their obligations in the changed regulatory environment" (paragraph 5(d)).

7.34    *(iii) PPA Pricing: 2001:* A second period of administrative pricing commenced with the adoption of Decree No. 45 of 2000 (Counter-Memorial, paragraphs 97-100). This decree employed a somewhat different methodology for price setting, which resulted in a target return on assets of 9.8%. This pricing period was preceded by a detailed cost audit by the HEO.

7.35    In 2001, Hungary adopted the 2001 Electricity Act. This Act emphasised the need to conform the Hungarian electricity sector to EU requirements (paragraph 65) and created a dual market model allowing certain categories of non-residential consumers to move to a newly created free market segment (Counter-Memorial, paragraph 103). An official Government Statement in July 2001 (the "2001 Act Government Statement"), submitted in preparation for the 2001 Electricity Act, indicated that the phasing out of price regulation (to begin in 2004) assumed that PPAs would be renegotiated in order to reduce stranded costs and not to reallocate them, as well as reducing the contracted capacities or durations of PPAs (Counter-Memorial, paragraphs 112-114).

7.36    *(iv) PPA Pricing: 2002-2004:* Hungary adopted Decree No. 183/2002 implementing the two parallel "solutions" mandated by the 2001 Electricity Act (Counter-Memorial, paragraphs 117-118). For the purposes of compensating MVM for its losses at public auctions, this Decree provided for special assessment on electricity consumers. This solution was not viable in the long term, as it perpetuated an imbalance created by the non-competitive and inflexible pricing regime of the PPAs in an increasingly liberalised market. Essentially, consumers were being required to subsidise the Generators' above-market pricing for electricity destined to the free market segment but which Generators were unwilling to sell directly to it at free market prices. As a more long-term solution intended to decrease the distortive effects of the PPAs, the Decree provided for MVM to initiate annual renegotiations with each Generator, with the goal of reducing the scope of PPA obligations and encouraging the Generators to sell at least part of their electricity at market prices.

Under the terms of their operating license, Generators were required to participate in these negotiations in good faith (paragraph 17).

7.37    *(v) PPA Pricing: 2005:* By late 2005, according to Hungary, the European Commission had been declaring for more than a year that it considered PPA pricing suspect and likely to contain unlawful State aid; and the Commission issued its Preliminary Decision to that effect in November 2005. Moreover, the European Commission was urging prompt action by Hungarian authorities, consistent with Hungary's standstill obligations under EU law, even while the investigation into State aid was continuing. It was natural under these circumstances for Hungarian officials to seek to address the problem before a final decision was made by the European Commission.

7.38    At the same time, Hungary considered that the profits of Generators in the regulated market segment were excessive and that there was a need to revert back to "reasonable" profits, based on a reasonable rate of return (Counter-Memorial, paragraphs 146, 211-222). After regulated pricing for Generators was abolished in 2004, Generator profits (including Dunamenti) rose substantially above the levels originally considered reasonable by regulators for protected public utility sales, with the costs of these extra profits being increasingly borne by consumers (with the surcharge for Stranded Costs). In the case of Dunamenti, its profits increased steadily during the life of the PPA from 10.7% in 1997 to 39% in 2005, greatly exceeding regulatory targets (Navigant Report, paragraphs 56, 69, 79, Section VI (a) and (b)).

7.39    The need for some type of PPA reform was evident at this point. Meetings with Generators (including Dunamenti) took place at the end of 2005. Ultimately, after a final unsuccessful round of negotiations, the Hungarian Parliament adopted administrative pricing to reduce Generators profits to a reasonable level, in part to provide a real incentive for Generators to consider more market-based contractual arrangements.

7.40    *(vi) PPA Pricing: 2006:* On several occasions early in 2006, MVM suggested to Dunamenti price reductions based on HEO's letter of 10 November 2005. In particular, in April 2006, MVM circulated a draft YCA for 2006. Dunamenti objected to the inflation rate applied to the capacity fee and the heat rate curve used

to calculate the energy fee (Counter-Memorial, paragraphs 301). MVM argued that the parties should apply an inflation adjustment based on the December 2001 Statement; whilst Dunamenti argued that the parties should apply the index used in the 2004/2005 YCAs. Hungary submits that MVM never agreed that the YCAs would constitute binding PPA interpretations (Counter-Memorial, paragraph 302). With respect to the heat rate curve (Counter-Memorial, paragraphs 303-304), Dunamenti wanted to apply the "CCI model" used in previous years. MVM considered that the correct value was based on the reasoning of the arbitration award issued in August 2005 on the parties' prior dispute, which was critical of this "CCI model."

7.41    In the absence of an agreement for 2006, Dunamenti issued invoices on the basis of its position; and MVM paid part of them on the basis of its own contrary position, as it was entitled to do under the PPA.

7.42    *(vii) No Attribution:* Hungary considers that the parties' invoice disputes under the PPA related to purely commercial acts of MVM, not attributable to Hungary under international law.

7.43    According to Hungary, Electrabel's arguments on attribution rest on flawed assumptions. Electrabel mistakenly assumes that its burden of proof under Article 8 ILC to show instruction by the State is "almost perfunctory" (Post-Hearing Submission, paragraphs 118-121). In reality, so Hungary contends, Article 8 ILC requires affirmative proof of "specific control of the State over the act the attribution of which is at stake" (Rejoinder, paragraph 460). Hungary submits that Electrabel provides no evidence that MVM's decision to refuse to reduce the price and to pay a portion of Dunamenti's invoices was driven by instructions of HEO or the Ministry of Economy. Even though MVM is a 99% State-owned company, as a legal matter, MVM's management is independent of the Hungarian State, as Electrabel itself acknowledged at the Hearing [D1.94].

7.44    Essentially, so Hungary submits, the relationship between MVM and the HEO was that of a regulated company with its regulator. The regulated company's actions are conducted independently with its own commercial interests. For MVM and MVM Trade (MVM's subsidiary), it was in the ordinary course of their commercial

business to negotiate price reductions with its co-contractors. Therefore, in insisting upon a newly negotiated yearly commercial agreement for 2006 rather than accepting an extension of the prior year's agreement, MVM and MVM Trade were acting in their own independent commercial interests.

7.45    Further, Hungary submits that HEO's letter of 10 November 2005 was meant and understood by all parties at the time as requesting negotiations to try to reach an agreement on new terms to reduce prices and not as a direction to MVM to reduce prices unilaterally. HEO's letter did not therefore constitute any unlawful interference with Dunamenti's contractual rights (Rejoinder, paragraphs 520-531).

7.46    Moreover, MVM's position with regard to these commercial disputes predated any State pressure to negotiate new pricing terms. At the Hearing, Mr Kuhl (Dunamenti's CEO) acknowledged that the same inflation rate disagreement with MVM had already arisen in 2003 and 2004 [D2.355-358]. Mr Kuhl also acknowledged that MVM adopted its own position regarding the need to reevaluate the heat rate as early as 4 October 2005, shortly after the publication of the arbitration award relating to the parties' dispute [D2.350-351]. According to Hungary, this chronology shows that MVM was acting independently and not at the direction of HEO when MVM raised its subsequent concerns about the inflation and heat rates with Dunamenti.

7.47    *(viii) No Breach of ECT:* Hungary contends that it has not violated its FET obligations under the ECT, based on the following legal principles: (i) absent particular assurances, investors cannot legitimately expect that the legal framework existing when they invest will remain unchanged (Rejoinder, paragraphs 303-312); and the fact that an investment involves a contract does not establish a special obligation to shield that contract from supervening changes in law (Rejoinder, paragraphs 313-323); and (ii) absent special assurances, the State must simply avoid manifestly arbitrary, abusive or discriminatory acts (Rejoinder, paragraphs 324-335); and Hungary asserts that, upon the termination of regulated pricing, MVM sought to negotiate memoranda of understanding with all Generators regarding the proper manner of applying the PPAs in the absence of regulated pricing, but was unable to reach such an agreement with Dunamenti.

7.48    In these negotiations, MVM's consistent position was that the pricing terms of the YCA were subject to commercial negotiation every year. MVM's acceptance of a particular term in one year did not imply a waiver of the right to insist upon a different term in a subsequent year. The fact that the 2004 and 2005 YCAs were concluded at the same time meant that the 2006 negotiations were only the second set of YCA negotiations after the expiration of regulated pricing. Thus, Electrabel cannot argue that there existed an established practice between the parties with regard to the setting of the inflation or heat rates.

7.49    With regard to the inflation rate, MVM's position was based on a literal reading of the December 2001 Statement, which specified the application of a different inflation index (PPI rather than the DSPI) after the expiration of administrative price regulation. Since the December 2001 Statement constituted a binding and effective amendment to the PPA, Electrabel's insistence that the earlier PPA specified a different inflation index is irrelevant. Moreover, Electrabel never claimed that the pricing formula of the original PPA, which incorporated references to the DSPI, were binding upon the expiration of regulated pricing, so it is disingenuous for Electrabel to suggest that one particularly favourable element of this formula (i.e. the inflation index) had to be applied in a compulsory fashion.

7.50    With regard to the heat rate of the F Units, Dunamenti wrongly insisted that it had a right to apply the heat rate determined in 2002 by its own expert, even though the regulations providing Dunamenti with the right to fix the heat rate in this manner expired at the beginning of 2004. MVM's concern that this heat rate methodology might not comply with the pass-through principle was sound, as Dunamenti consistently made profits with the energy fee from 2002 to 2005, i.e. in every year in which it applied the heat rate disputed by MVM. In these circumstances, MVM's refusal to pay the full amount which Dunamenti insisted upon invoicing was rational and justified.

7.51    Furthermore, as regards the partial payment of invoices in the absence of a binding YCA for 2006 or 2008, the PPA grants to MVM the contractual right to pay only the undisputed portions of Dunamenti's invoices. The PPA also provides for a dispute resolution mechanism for disputed invoice disputes. For strategic reasons,

Dunamenti chose not to pursue such a remedy; and Electrabel preferred to bring its claims before ICSID. This choice cannot obscure the fact that the invoice claims relate to purely commercial disputes.

7.52    Therefore, MVM's decision to dispute Dunamenti's invoices does not constitute a violation by Hungary of Article 10(1) ECT, not only because mere contractual disputes do not meet the requirements to be elevated to treaty violations under the ECT, but also because in these contractual disputes MVM's position was not irrational or arbitrary. It was sound as a matter of both substance and procedure.

7.53    Finally, Hungary notes that MVM had no incentive to mistreat Dunamenti or to deal with it in a discriminatory fashion, as MVM owned a 25% share in Dunamenti and received considerable dividends from Dunamenti's plant, which would decrease as a result of any price reductions.

## (4)    THE TRIBUNAL'S ANALYSIS AND DECISIONS

7.54    Electrabel's principal complaint (prior to the termination of the PPA) concerns Hungary's alleged interference in the contractual relationship between Dunamenti and MVM, specifically in the pricing of electricity under its PPA as of 2006 (Post-Hearing Submission, paragraphs 54-56). This interference allegedly took place in November 2005 by way of a ministerial instruction to MVM to reduce Dunamenti's capacity fee by at least 34.23 %, as evidenced by the HEO November Letter. As a result, so Electrabel claims, MVM engaged in negotiations with Dunamenti to reach a price reduction (Reply, paragraph 225). As these negotiations failed, MVM withheld part payment of Dunamenti's invoices in an amount of approximately EUR 50 million. Electrabel claims compensation for this non-payment, calculated in accordance with its 74.8% interest in Dunamenti.

7.55    Electrabel asserts that Hungary's interference caused MVM to renege on its previous agreement with Dunamenti over the applicable inflation and heat rates, which constitutes a breach of the FET standard and other protections under Article 10(1)

and (7) ECT (Post-Hearing Submission, paragraph 325). It also alleges, necessarily, that MVM's conduct is attributable to Hungary under the ECT and international law.

7.56    In contrast, Hungary insists on the purely commercial nature of the pricing and invoice dispute between Dunamenti and MVM; and on the fact that the commercial acts of MVM linked with the negotiation of the YCA cannot be attributed to the State under Article 8 of the ILC Articles on State Responsibility. Hungary emphasises that the HEO letter of 10 November 2005 concerned only the renegotiation of the long term PPA and had nothing to do with the parameters to be used by MVM and Dunamenti in fixing yearly pricing under the YCA. Last, but not least, even if the HEO letter could be considered as a governmental instruction and even if MVM did act in compliance with such instruction, Hungary contends that there could still be no violation of the ECT standards of protection, as Hungary's policy to reduce prices in the new liberalised market was neither unreasonable, nor discriminatory.

7.57    *(i) Applicable Rules:* The Tribunal acknowledges that Articles 10(1) and 10(7) ECT (cited in Part III above) are complex provisions intended to ensure the protection of foreign investments. They embed a fair and equitable treatment standard as well as other related standards, namely constant protection and security, the prohibition of unreasonable or discriminatory measures, and treatment required by international law.  They also include an umbrella clause requiring the observance of obligations entered into with an investor; but Hungary having opted out of the umbrella clause (Annex 1A, ECT), this provision is not invoked by Electrabel in this case. Article 10(7) ECT contains an obligation of non-discrimination underlying national and most favoured nation treatment. The Tribunal will refer to each relevant standard in turn; but, before doing so, it will address the question of attribution under the ECT and international law.

7.58    *(ii) General Approach:* In order to constitute a violation of the ECT, an act has to be both attributable to the State and a violation of an international obligation under the ECT. The Tribunal must therefore first examine the question of attribution. If an act is considered attributable to Hungary, the Tribunal must then determine whether such an act entails its international responsibility under the ECT. If the Tribunal were

to find that an act is not attributable to Hungary, this should ordinarily be the end of the matter. This case is, however, somewhat different. Considering the Parties' extensive and detailed submissions on different (alleged) violations of the ECT, the Tribunal considers it appropriate to address both attribution and alleged ECT violations, whatever its decision on attribution.

7.59    This is the same approach as that taken in *Plama*, where the Tribunal helpfully explained why it had decided to proceed in this way:

> "*The Parties have extensively documented their allegations; numerous exhibits, witness statements and expert reports have been submitted by both Parties. The factual and legal arguments have been discussed in detail during the Final Hearing, in which a number of witnesses and experts were also examined by the Parties and the arbitrators. The Tribunal has therefore decided that, in acknowledgement of the Parties' efforts, it will consider their further allegations on the merits ...*"[1]

7.60    *(iii) Attribution:* The Tribunal decides the issue of attribution under international law as required by the ECT; and it refers as a codification of customary international law to the Articles on State Responsibility adopted on second reading in 2001 by the International Law Commission and commended to the attention of Governments by the UN General Assembly in Resolution 56/83 of 12 December 2001 (the "ILC Articles").

7.61    The question of "attribution" does not, by itself, dictate whether there has been a violation of international law. Rather, it is only a means to ascertain whether the State is involved. As such, the question of attribution looks more like a jurisdictional question. But in many instances, questions of attribution and questions of legality are closely intermingled; and it is then difficult to deal with the question of attribution without a full enquiry into the merits. This is the reason why, as mentioned earlier, the Parties and the Tribunal decided to deal with this issue at the merits stage.

---

[1]    *Plama Consortium Limited v Bulgaria* (ICSID Case No. ARB/03/24) (ECT), Award, 27 August 2008, paragraph 147.

7.62    Electrabel's complaint refers to the conduct of the Parliament, the Ministry of the Economy, HEO and MVM, the latter as a private company under Hungarian law owned by the Hungarian State and allegedly acting under the instruction or direction and control of the Hungarian Government. It is common ground between the Parties that the acts of the Hungarian Government, including HEO, are attributable to Hungary under Article 4 of the ILC Articles. The Parties disagree, however, as to whether the conduct of MVM can be attributed to Hungary. As for MVM's conduct in 2005-2006 and 2008, Electrabel contends that it is attributable to Hungary; and for its part, Hungary denies this allegation and has submitted, as already noted, an objection to the Tribunal's jurisdiction concerning the commercial acts of MVM (now joined to the merits).

7.63    Electrabel invokes Article 8 of the ILC Articles, which provides as follows:

> *"The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct."*

7.64    According to the Commentary to the ILC Articles (the "ILC Commentary"), attribution may occur where there exists a special factual relationship between the person or entity engaging in the conduct and the State, regardless of whether the acts or issue are commercial or contractual (CA-6, p. 110). Article 8 ILC sets out two alternative situations that give rise to such "special factual relationship": (i) first, where a non-State entity acts "under the instructions of" the State, and (ii) second, where it acts "under the direction or control of" the State.

7.65    Electrabel submits that MVM was acting both (i) "under the instructions" and "(ii) under the direction or control" of Hungary when MVM unilaterally reduced the price that it paid under the PPA to Dunamenti in 2006 and 2008. For Hungary, the actions of MVM and MVM Trade do not result, either de jure or de facto, from (i) its instructions or (ii) its direction or control.

7.66    The ILC Commentary explains that the role of the State differs for each of these two alternatives. Referring to the first alternative ("acting under the instruction of"), the ILC Commentary states:

> *"In such cases it does not matter that the person or persons involved are private individuals nor whether their conduct involves "governmental activity." Most commonly, cases of this kind will arise where State organs supplement their own action by recruiting or instigating private persons or groups who act as 'auxiliaries' while remaining outside the official structure of the State."*[2]

7.67    These "auxiliaries", although not part of the State's organisation, act under its authorisations and instructions.

7.68    Referring to the second alternative ("acting under the direction or control of"), the ILC Commentary states:

> *"More complex issues arise in determining whether conduct was carried out "under the direction or control" of a State. Such conduct will be attributable to the State only if it directed or controlled the specific operation and the conduct complained of was an integral part of that operation. The principle does not extend to conduct which was only incidentally or peripherally associated with an operation and which escaped from the State's direction or control."*[3]

7.69    The degree of control necessary and sufficient for purposes of attribution is a very demanding one, as was stated for example in *Jan de Nul* in the following terms:

> *"International jurisprudence is very demanding in order to attribute the act of a person or entity to a State, as it requires both a general control of the State over*

---

[2]    ILC Commentary. James Crawford, *The International Law Commissions Articles on State Responsibility, Introduction, Text and Commentaries* (Cambridge, 2002).

[3]    Id., paragraph 3.

*the person or entity and a specific control of the State over the act the attribution of which is at stake; this is known as the "effective control" test."*[4]

7.70     A showing that the requirement of either alternative for attribution is fulfilled will result in attribution of the acts in question to the State.

7.71     Although the conduct of private persons or entities is not attributable to the State under international law as a general principle, factual circumstances could establish a special relationship between the person engaging in the conduct and the State. In consequence, the Tribunal is required to assess for each alleged treaty breach, the possible direction or control of Hungary over the conduct of MVM in the context of events unfolding during 2005-2006 and 2008 in connection with PPA pricing and the existence of any instruction to MVM from Hungary regarding such events.

7.72     The alleged ECT breaches relate to the standards of protection in Article 10(1) ECT and Article 10(7) ECT. It is convenient to analyse here certain features of the FET and FPS standards in Article 10(1) ECT.

7.73     *(iv) Fair and Equitable Treatment:* The first part of Article 10(1) ECT refers to the encouragement and creation of "stable, equitable, favourable and transparent conditions for investors", which is said to include a commitment to accord at all times fair and equitable treatment to investments. Fair and equitable treatment is connected in the ECT to the encouragement to provide stable, equitable, favorable and transparent conditions for investors.

7.74     The Tribunal shares the well-established scholarly opinions (e.g. Dolzer and Schreuer, pp. 133-147); and decisions cited by Electrabel (*Bayindir*, paragraph 178 and footnotes therein; *Waguih Elie George Siag and Clorinda Vecchi v Egypt*, paragraph 150) that the obligation to provide fair and equitable treatment comprises several elements, including an obligation to act transparently and with due process;

---

[4]     *Jan de Nul N.V. and Dredging International N.V. v Arab Republic of Egypt* (ICSID Case No. ARB/04/13) Award, 6 November 2008, referring to *Case concerning military and paramilitary activities in and against Nicaragua*, (Nicaragua v United States of America), Merits, Judgment of 27 June 1986, *ICJ Reports* 1984, paragraphs 113 and 115.

and to refrain from taking arbitrary or discriminatory measures or from frustrating the investor's reasonable expectations with respect to the legal framework adversely affecting its investment.

7.75    It is widely accepted that the most important function of the fair and equitable treatment standard is the protection of the investor's reasonable and legitimate expectations. Hungary submits that this standard is not an absolute guarantee that shields investors from all regulatory change. Electrabel, for its part, does not contest Hungary's right to regulate Dunamenti, but maintains that investors may legitimately expect that any changes are made in a fair, equitable and transparent manner.

7.76    As regards the relevant point in time for the assessment of legitimate and reasonable expectations, it is common ground in 'investment jurisprudence' and between the Parties that the assessment must refer to the time at which the investment is made, and that expectations must be based on more than subjective beliefs (Reply, paragraph 116; Counter-Memorial, paragraphs 427-428). However, while Hungary asserts that legitimate expectations must be based on affirmative governmental representations, Electrabel argues that the investor's expectation that its contractual rights will not be affected by governmental measures without compensation is legitimate in and of itself, without further affirmative governmental representations or assurances.

7.77    While the investor is promised protection against unfair changes, it is well-established that the host State is entitled to maintain a reasonable degree of regulatory flexibility to respond to changing circumstances in the public interest. Consequently, the requirement of fairness must not be understood as the immutability of the legal framework, but as implying that subsequent changes should be made fairly, consistently and predictably, taking into account the circumstances of the investment.

7.78    Fairness and consistency must be assessed against the background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State. While specific assurances given by the host State may reinforce the investor's expectations, such an assurance is not always indispensable: *MTD v Chile* (ICSID Case No. ARB/01/7), Award, 25 May

2004; *GAMI Investments v Mexico*. UNCITRAL, Final Award, 15 November 2004; and *SD Myers v Canada,* UNCITRAL, Second Partial Award, 21 October 2002. Specific assurances will simply make a difference in the assessment of the investor's knowledge and of the reasonability and legitimacy of its expectations.

7.79    Article 10(1) ECT not only speaks of fair and equitable treatment and equitable and stable conditions, it also refers to "favourable and transparent conditions." The reference to transparency can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations. Finally, the term "favourable" suggests the creation of an investor-friendly environment. Beyond that, it does not appear to add to the FET standard as it is generally understood.

7.80    *(v) Full Protection and Security:* The second part of Article 10(1) ECT requires Hungary to ensure that all covered investments "shall also enjoy the most constant protection and security". The FET standard and this FPS standard are two distinct standards of protection under the ECT, dealing with two different types of protection for foreign investors.

7.81    Electrabel alleges that the FPS standard is different from the FET standard because the former obliges the host State to take positive steps to protect the investment of a covered investor and also to provide a guarantee against infringements of that investor's rights by the operation of law. In Electrabel's submission, the HEO November 2005 Letter and the further instructions of the Government demanding that Dunamenti agree to a price reduction of 34%, as well as MVM's implementation of those instructions, constitute a breach of this standard given that Hungary failed to take positive steps to protect Electrabel's investment and to prevent infringements of Electrabel's rights by the operation of law (Memorial, paragraphs 358-340; Reply, paragraphs 463-466).

7.82    Hungary, for its part, emphasises that this FPS standard should be understood as comprising obligations other than fair and equitable treatment. In particular, Hungary alleges that the obligation to provide constant protection and security has not been

violated by Hungary, because Hungary has not failed to protect Electrabel (or Dunamenti) from foreseeable harm from third parties; and Dunamenti has not been denied meaningful access to the Hungarian courts and other effective legal remedies (Counter-Memorial, paragraphs 497-507).

7.83    In the Tribunal's view, given that there are two distinct standards under the ECT, they must have, by application of the legal principle of "effet utile", a different scope and role. The Tribunal generally concurs with the description given by the *El Paso* award of the scope of an FPS standard, as follows:

> "The case-law and commentators generally agree that this standard imposes an obligation of vigilance and due diligence upon the government. ... The minimum standard of vigilance and care set by international law comprises a duty of prevention and a duty of repression. A well-established aspect of the international standard of treatment is that States must use "due diligence" to prevent wrongful injuries to the person or property of aliens caused by third parties within their territory, and, if they did not succeed, exercise at least "due diligence" to punish such injuries. If a State fails to exercise due diligence to prevent or punish such injuries, it is responsible for this omission and is liable for the ensuing damage. It should be emphasised that the obligation to show "due diligence" does not mean that the State has to prevent each and every injury. Rather, the obligation is generally understood as requiring that the State take reasonable actions within its power to avoid injury when it is, or should be, aware that there is a risk of injury. The precise degree of care, of what is "reasonable" or "due," depends in part on the circumstances."[5]

7.84    On these legal bases concerning the issues of jurisdiction, attribution and ECT violations, the Tribunal next addresses the alleged illegal conduct in breach of the ECT which Electrabel attributes to Hungary under international law.

7.85    *(vi) 2006 and 2008:* Electrabel contends, in essence, that Hungary instructed MVM to reduce pricing under the PPA significantly below the level that was freely

---

[5]    *El Paso Energy International Company v The Argentine Republic* (ICSID Case No. ARB/03/15) Award, 31 October 2011, paragraphs 522-523.

negotiated between the PPA's contracting parties (question of attribution). This was unjustified and inconsistent with the unregulated pricing regime, which had been introduced pursuant to the Electricity Act 2001. The situation existed in 2006, prior to the reintroduction of regulated prices, and again from 1 January 2008 with the return of contractual pricing. In doing so, as alleged by Electrabel, Hungary has violated the requirement to "create stable, equitable, favourable and transparent conditions for Investors." Hungary undermined the stability of the investment environment by introducing changes to that environment which were inconsistent with past practice and not predictable to Electrabel either at the time of the investment or at the time of the changes (questions of legality).

7.86    Hungary primarily submits that there is no State responsibility for MVM's decision to dispute Dunamenti's invoices in respect of the applicable heat and inflation rates in 2006 and 2008 because these actions of MVM, as a private company, are not attributable to Hungary (question of attribution). Hungary also submits that even if the actions of MVM with regard to the dispute concerning the price elements (the heat rate and inflation rate) were attributable to Hungary under international law, such actions did not violate Article 10(1) and (7) ECT because they were rational and non-arbitrary (questions of legality).

7.87    Electrabel contends that the State is involved through a series of acts by different entities and persons attributed to it on different bases, which the Tribunal will examine in turn. The Tribunal starts by dealing with the first and least difficult issue, i.e. the possible involvement of Ministers and the Parliament in the alleged failure by MVM to finalise the YCAs, as well as Electrabel's contention that acts of MVM were attributable to the State because it was a 99.9% State-owned company. Thereafter, the Tribunal will turn to other issues arising from instructions allegedly given by HEO to MVM concerning the YCAs; including: the HEO November 2005 Letter; the renegotiation meetings of November and December 2005; and the successive draft YCAs for 2006.

7.88    *(vii) Ministerial and Parliamentary Conduct:* In December 2005, the Hungarian Parliament launched a review of the Hungarian Generators' PPAs, in particular their level of profits (Memorial, paragraphs 139-140). In January 2006, during a

meeting attended by CEOs of Generators (including Dunamenti), the Energy Sub-Committee of the Economic Committee of Parliament expressed the view that the Generators had been making excessive profits since 2000-2001 at the expense of MVM. The Sub-Committee summarised three possible options for the PPAs: (a) maintaining the PPAs but reducing the price, using the reintroduction of regulated pricing if necessary; (b) modifying the PPAs to provide for a long-term solution; or (c) terminating the PPAs.

7.89    There is no question that the acts of the Hungarian Parliament are attributable to the Hungarian State, in accordance with Article 4 of the ILC Articles, which reads:

> *"1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.*
>
> *2. An organ includes any person or entity which has that status in accordance with the internal law of the State."*

7.90    However, an investigation by a Parliamentary sub-committee investigating the way in which the PPAs worked and setting a general policy framework for dealing with the evolution of PPAs cannot be equated with an "instruction" given by Parliament to MVM.

7.91    The same conclusion is reached by the Tribunal concerning the alleged instructions given by Ministers at different times: Ministers did not transmit any instruction to MVM; and, from the evidence adduced in these proceedings, MVM's principal interlocutor was always the HEO, acting as Hungary's energy regulator.

7.92    The Tribunal nonetheless recognises that renegotiation meetings following the HEO November Letter were convened by the Minister of Economy and Transport, including the meetings of 8 and 19 December 2005. It has however to be emphasised, first, that these meetings were focused on the PPA's renegotiation; and, second, that even if any of these meetings were considered as relating also to the

YCA, their minutes reveal a passive attitude by ministerial attendees and not any "direction or control" by the Ministry (by itself or through HEO), still less the provision of "instructions" to MVM. This much is clear from the following exchange during this meeting:

> "MVM: MVM asks whether the HEO or the Ministry of Economy and Transport has anything to add to what has been said.
>
> HEO/Ministry of Economy and Transport: They have no comment."

7.93    This is the only intervention of the Ministry's representative during this meeting, and it does not fit with the picture presented by Electrabel of an entity (MVM) controlled by Hungary and acting upon its instructions.

7.94    In short, the Tribunal has not been shown any instruction given to MVM concerning the price to be fixed in the YCA emanating from the Hungarian Parliament (the legislative branch of the State) or Ministers (the executive branch of the State) which would make the acts of MVM attributable to Hungary under international law.

7.95    *(viii) MVM:* It is common ground that MVM is a private entity, controlled by the State but having a separate legal personality. The Tribunal has already decided, above, that the degree of control required for finding attribution under international law is generally demanding. More specifically, the fact that a State acts through a State-owned or State-controlled company over which it exercises some influence is by itself insufficient for the acts of such entities to be attributed to the State. This has been expressed in the clearest possible terms in the ILC Commentary under Article 8:

> "Questions arise with respect to the conduct of companies or enterprises which are State-owned and controlled. If such corporations act inconsistently with the international obligations of the State concerned the question arises whether such conduct is attributable to the State. In discussing this issue it is necessary to recall that international law acknowledges the general separateness of corporate entities at the national level, except in those cases where the "corporate veil" is a mere device or a vehicle for fraud or evasion. **The fact that the State initially establishes a corporate entity, whether by a special law**

*or otherwise, is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity.* *Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, prima facie their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority within the meaning of article 5."*[6] *[Emphasis added]*

7.96    The acts of MVM, being a private entity, are therefore not ipso facto attributable to the State because it is owned by the State. This much appears to be common ground between the Parties, given the Claimant's confirmation that it did not seek to hold Hungary responsible for all acts of MVM, as if MVM were a state agency.

7.97    *(ix) HEO November 2005 Letter:* The HEO November Letter appears to be have been motivated by the 'unreasonably high' profits of the Generators. HEO stated that it considered it essential that the PPAs did not generate such high profits. This motivation was supported during the separate process of review that the Hungarian Parliament launched in December 2005 regarding the Generators' PPAs.

7.98    The HEO Letter indicated that HEO would regard as reasonable a profit level of 7.1%, as well as a reduction of at least 34.23% in the availability fee. As suggested by Mr Békés of the HEO [D4.893], the letter was intended to encourage MVM and the Generators to conduct their renegotiations more effectively than before. The Tribunal also notes that, in the context of a deregulated pricing regime, a reduction of 34.23% in the availability fee constituted a substantial discount on the price paid and agreed by MVM for the PPA's two previous years (2004 and 2005).

7.99    The HEO November 2005 Letter refers to the European Commission's Preliminary Decision of 9 November 2005 (announcing the start of the investigation by the European Commission into unlawful State aid under the Hungarian PPAs). The HEO Letter states that: "it can be established that profits of a business entity achieved under non-competitive circumstances, with state contribution are only acceptable to a certain extent." The reference to the European Commission's

---

[6]    ILC Commentary. James Crawford, *The International Law Commissions Articles on State Responsibility, Introduction, Text and Commentaries* (Cambridge, 2002).

investigation reflects the general concern raised by high prices under the Hungarian PPAs. It seems therefore reasonable for HEO to have considered also the Commission's own concerns at the time; and the fact that the Letter was sent one day after the announcement of the Commission's investigation indicates a factual link between these two events.

7.100    The Tribunal recognizes that the European Commission had stated that its assessment was yet to be completed; and the Commission also stated that, pending implementation of a new system, the original organisation of the Hungarian electricity sector (including the PPAs) remained in place, as it existed on the date of Hungary's accession to the European Union.  In so doing, the European Commission was repeating what it had stated in a previous communication concerning the same subject-matter:

> "The Commission notes that pending the definition and implementation of such new system the original PPAs remain in place. Such PPAs may themselves constitute illegal State aid. For this reason the Commission has decided to open an NN file in this respect in order to assess the existence of State aid in the meaning of article 87 of the Treaty and should there be any State aid involved its compatibility with article 87 of the Treaty and the secondary legislation thereof" (Communication from DG Competition, 24 May 2005).

7.101    However, it appears from the evidence that high prices were a concern for the European Commission even before the Commission's Preliminary Decision in November 2005. The Commission had already made it clear to Hungary that the PPAs raised important issues in regard to the European Union's free market policies. For example, at their meeting in Brussels on 15 July 2004, concerns were expressed by the Commission that the stranded costs mechanism of Decree 183/2002 constituted state aid to Hungarian Generators, stating that "it must be ensured that none of the power plants reaches extra profits under the PPAs."

7.102    The HEO November Letter's final section contained an indication that "should the negotiations continue to fail to bring results, the Office (HEO) will use all means provided under the law in order to ensure that the PPA renegotiations succeed." This

stark sentence at the end of the Letter conveys the clear threat of legal sanctions if the parties failed to agree on the price reduction sought by HEO. In light of the subsequent chronology of events, it is clear that "all means provided under the law" included the re-introduction of regulated pricing, which occurred in 2006. At the meeting of the Parliamentary Subcommittee of January 2006, MVM's CEO (Mr Kocsis) explained that if desired results were not reached, "Government should consider the reintroduction of administrative prices." Furthermore, Mr Horvath testified at the Hearing that "all available means" included the reintroduction of regulatory prices [D4.1046].

7.103    The issue is whether the HEO November Letter can be considered as an instruction relating to MVM's conduct in the negotiation of the YCAs, and whether, as a consequence, the acts of MVM in the alleged implementation of such an instruction can be attributed to Hungary. The Tribunal has come to the conclusion that the conduct of MVM in relation to the YCAs cannot be attributed to Hungary under international law, as explained below.

7.104    *(x) The 2008 YCA:* The Parties' submissions concentrated on the negotiations of the 2006 draft YCA between MVM and Dunamenti. However, in order fully to answer the PPA Pricing Claim, the Tribunal will first address the PPA pricing issue in 2008.

7.105    In 2007, Dunamenti and MVM held three PPA renegotiation meetings: 1 March 2007, attended by MVM, Dunamenti and the HEO; 18 June 2007, attended by MVM, Dunamenti and representatives of the Prime Minister's office, Foreign Ministry, Finance Ministry, Economy Ministry, HEO and APV; and 2 July 2007, attended by MVM and Dunamenti. Electrabel contends that these meetings were initiated by the Hungarian State and that MVM participated in these meetings as representative of the Government. On 27 June 2007, MVM sent Dunamenti a draft YCA, which Dunamenti rejected on 8 August 2007. MVM sent Dunamenti a draft YCA on 20 December 2007, which Dunamenti rejected. The parties were unable to agree on any YCA for 2008. Then, for January and February 2008, Dunamenti issued invoices in accordance with provisions that had been agreed in the 2004 and 2005 YCAs, indexed for inflation. MVM rejected these invoices, citing the fact that MVM and Dunamenti had not signed any valid and effective YCA for 2008.

7.106    Having considered the evidence adduced by the Parties, the Tribunal determines that the factual elements alleged by Electrabel in regard to the PPA Pricing Claim for the 2005-2006 period are significantly absent for the 2008 period. Electrabel did not establish any link between the HEO November Letter and the parties' failure to arrive at any agreement for the 2008 YCA. In other words, for 2008, the Tribunal considers that Electrabel did not discharge its burden of proving that MVM acted pursuant to Hungary's "instruction" in refusing to pay the full amount of Dunamenti's invoices, after the failure of their negotiations for a new 2008 YCA; that MVM's partial payment of Dunamenti's invoices under the PPA in 2008 gave rise to a purely commercial dispute; and that MVM's conduct cannot be attributed to Hungary under international law.

7.107    *(xi) The 2006 YCA:* The issues in regard to 2006 are factually more complicated. However, the conclusion reached by the Tribunal is the same. As explained below, the Tribunal considers that the HEO November Letter cannot be considered as an instruction relating to the 2006 YCA for three reasons: (i) it was a letter in a form addressed to all Generators and MVM; (ii) its purpose was to encourage Dunamenti and MVM to negotiate in the direction favoured by HEO, as opposed to instructing them to do so; and (iii) it dealt with the renegotiation of the long term PPA, rather than the YCA.

7.108    As already indicated, the HEO November 2005 Letter was sent in similar form to all Generators with a PPA; and it did not specifically address the bilateral YCA to be negotiated between MVM and Dunamenti under their PPA for 2006. The letter expressed the overall reasonable concern of HEO that PPAs should adapt to the increased liberalisation of the market, as appears from the following extract:

> *"Re-negotiations of the PPAs conducted so far – under Governmental Decree No. 183/2002 (VIII. 23.) – have failed to bring about any results, whereby the capacities released have been insufficient even for the provision of ancillary services. Based on the foregoing, the Office expects the parties involved in the renegotiation of the long-term contracts to achieve relevant results (change in the conditions of contract, (partial) liberation of contracted capacities, decrease of the profit to a justified level)."*

7.109    Even if it were acknowledged (for the sake of argument) that the HEO letter was also meant to influence the negotiation of the parties' 2006 YCA, it cannot be considered as an "instruction" by HEO to MVM. It could at most be conceived as strong advice to both parties to the PPA that they should adapt their contractual relationship to new conditions of economic liberalisation. This letter is clearly meant to encourage both parties to the PPA to negotiate in the direction favoured by governmental authorities, as shown by the following passage:

> *"In the past two years, the HEO contacted the **negotiating parties** through an **invitation** sent out by its representative, whereas such **invitation** forms integral part of the protocols made for the **negotiations**. In its **invitations**, the Office **invited the parties** to conduct **detailed negotiations**, and in 2005, it added a reference to its former message relating to the investigation performed by the Directorate General for Competition of the European Union (DG Competition), as well as the expected consequences of such investigation." [Emphasis added]*

7.110    In the Tribunal's view, this wording is not indicative of an act to be performed under the instruction of the Hungarian State by MVM, such as to attribute to the State the acts of MVM in the failed negotiations concerning the YCA. It is, by its terms, an invitation to both parties to "negotiate" effectively, a similar letter having been sent in parallel to MVM and other Generators.  Both MVM and Dunamenti had, of course, obligations to negotiate with each other in good faith; but such negotiations necessarily took place from their different perspectives: Dunamenti would not accept any significant changes to the PPA; and for MVM, economic conditions had materially changed since the PPA had been concluded and the combination of guaranteed price/guaranteed quantities made the transaction increasingly burdensome.

7.111    In other words, an invitation to negotiate cannot be assimilated to an instruction. The Tribunal therefore concludes that the HEO November 2005 Letter does not contain any instructions, in the sense of Article 8 of the ILC Articles, so that MVM's conduct supposedly following such instructions should be attributed to Hungary.

7.112   The Tribunal has noted that the European Commission's Preliminary Decision of November 2005 acknowledged the degree of influence of the Hungarian Government over MVM. It stated that:

> "... the Government Decree n183/2002 VIH.23 on stranded costs foresees an obligation for MVM to initiate the renegotiation of the PPAs in order to decrease the purchased capacities. Such governmental intervention also shows the influence of the State on MVMs behaviour."

7.113   However, just as an invitation to negotiate is not an instruction, influence is also not an instruction; and, in each case, attribution has to be established.

7.114   This is however not the end of the Tribunal's factual inquiry. Beyond the terms of the HEO November Letter, the question arises whether MVM understood the letter as an instruction from HEO and thus applied such an instruction in its negotiation of the YCA with Dunamenti. Accordingly, the Tribunal next analyses the relevant conduct of MVM during its renegotiation meetings with Dunamenti.

7.115   *(xii) MVM's Conduct during the Renegotiation Meetings:* These meetings took place after the HEO November 2005 Letter. HEO representatives attended the meetings of 22 November 2005, 8 December 2005 and 19 December 2005. Ministry of the Economy officials attended the meetings held on 8 and 19 December 2005.

7.116   The Tribunal's considers that some confusion arises from the fact that, in addition to bilateral negotiations for the YCA, there were two types of renegotiation for the PPA: (i) one general yearly renegotiation under Governmental Decree No. 183/2002, which was mainly focused on the release of capacities; and (ii) another specific renegotiation of the PPA, which was more focused on prices and which seems to have been triggered by the  European Commission's concerns over PPA pricing (with the Commission's Preliminary Decision being issued the day before the HEO November Letter). This latter renegotiation was discussed in the meeting of 22 November 2005, convened by HEO on the basis of the HEO Letter of 10 November 2005, as also in the meetings of 8 and 19 December 2005, at the invitation of the Ministry (which explains why representatives of the Ministry were present, in

contrast the meeting of 22 November 2005). The two meetings convened by the Ministry clearly indicated that it was not a renegotiation meeting for the YCA, but a supplementary step in the renegotiation of the PPA, as explained by MVM's representative:

> *"On 6 December 2005, the Minister of Economy and Transport initiated negotiations on the basis of which MVM sent an invitation to the Generators, including Dunamanti too. The goal of the negotiations is to make it possible to re-negotiate the existing agreements between the Parties – with special regard to prices and price regulations – on the basis of the invitation sent by the HEO earlier. He notes that this is not a negotiation to be conducted on the basis of Governmental Decree No. 183/2002 (VIII. 23.) (which has its own procedure and specifications). We will initiate negotiations to be conducted on the basis of the Government Decree in January 2006."*

7.117   In these factual circumstances, the presence of governmental representatives during renegotiations of the PPA is not surprising. In the Tribunal's view, it does not establish that Hungary intervened by instructions in the YCA negotiations between MVM and Dunamenti. The renegotiation of the PPAs was requested by the Government of all Generators, whilst the negotiation of the YCA was a bilateral negotiation between Dunamenti and MVM, without the involvement of official representatives from the Hungarian Government.

7.118   The negotiations for the YCA were also understood by MVM and Dunamenti to be a different exercise from the general renegotiation of the PPA. MVM's representative at one of these meetings was also recorded as saying:

> *"On the basis of the HEO invitation, MVM intends to negotiate with the generators concerned in a uniform way, requests the same from all parties and sets the same objective both in its procedure and in its method, aspiring for no discrimination."*

7.119   This was also the understanding of Dunamenti's representative who stated during this same meeting, that "(i)n his view, this is not a negotiation of the YCA …"

7.120    The Tribunal also notes the following passages in the invitation to the renegotiation meeting issued by MVM to Dunamenti on 16 December 2005:

> "With reference to the letter of the Hungarian Energy Office No. AG-262/1/2005, dated 10 November 2005, and the several negotiations held with Dr. Janos Kóka, Minister of Economy and Transport, we hereby initiate the renegotiation of the long term agreements concluded between our companies, **to be conducted in accordance with the expectations of the HEO and the Minister** ...
>
> MVM Rt., a public utility wholesaler, **meeting the request of the Minister of Economy and Transport and the Office,** hereby invites you to renegotiate the long term agreement concluded between our companies." [Emphasis added]

7.121    The minutes of the meeting of 22 November 2005 also indicate that "complying with this invitation by HEO", MVM initiated renegotiations with Dunamenti on 22 November 2005, to which it invited the representative of HEO. According to the Minutes, Mr Mártha (of MVM Trade) explained the reason for this meeting as follows:

> "He (Mr Mártha) explains that according to the position of the Public Utility Wholesaler the present meeting is aimed at modifying the price formula and certain price components used in the accounts defined in Annex 6 to the PPA along the lines of HEO's letter ...
>
> As the authority responsible for the preparation of administrative prices and a regulatory body HEO sent a notice to both Parties, and in accordance with this notice MVM would like to re-negotiate the price system of the long term agreement. This means that they would like to re-negotiate the capacity fee and the energy fee for both blocks F and block G from the following aspect:
>
> one line of investigation could be DUNAMENTI's profit level, which is excessive according to HEO;
>
> the second line of investigation: the prices based on the PPA should be examined even from the aspect of the market.

*Irrespective of the HEO notice he is aware of the goal and the conditions of the DG Comp. investigation, which is related to the proposal regarding the introduction of such a threshold price mechanism in several European countries. This is what he would not like to wait for, especially in regard to the HEO notice."*

7.122    The Tribunal observes that MVM reported to the Minister of Economy on 12 December 2005, in the following terms:

> *"As Minister of Economy and Transport, on 6 December 2005 you conducted coordination talks with the representatives of Magyar Villamos Müvek Rt. (hereinafter "MVM Rt."), AES, Budapest Erömü Rt. (hereinafter "BERT"), Csepel, DERT (Dunamenti) and MERT.*
>
> *You advised the attendees, in accordance with the written notice of the Office, to renegotiate by 12 December 2005 the Long Term Power Purchase and Capacity Contracting Agreements (hereinafter "PPAs") validly concluded between them and in force, with emphasis on the decrease of prices. In the event of the unsuccessful outcome of the negotiations, you raised the possibility of reintroducing administrative price regulation in relation to electricity generator prices.*
>
> *By fulfilling your request, MVM Rt. invited the generation license holders for negotiations.*
>
> *With the exception of (redacted) the other generation license holders, beyond their emphasis of a readiness to cooperate, have declined the substantial renegotiation of the PPAs and the provision of a specific, numerically expressed price discount, beyond making certain offers*
>
> - *of negligible substance and not measurable reduction of costs;*
>
> - *relating to technical modifications; and*
>
> - *founded on third party obligations with uncertain likelihood of performance;*

> - *not resulting in a substantial reduction of the public utility wholesale price ...*
>
> *I am sending this letter on behalf of MVM Rt.... as a summary of the series of talks initiated by you. On behalf of the public utility wholesaler, **we do not see any substantial prospects for achieving, as a company limited by shares operating in the framework of Hungarian laws in force… the reduction of generator prices set out in the PPAs** concluded with the generation license holders involved (with the exception of (deleted)).... **we request that you kindly consider and apply the legal contingencies you planned** to ensure the future operation of the public utility wholesaler." [Emphasis added]*

7.123  The Tribunal's understanding of the evidence as a whole, including these extracts from the record of the parties' meetings, confirms the conclusion initially made by the Tribunal: these were negotiations about the PPA and not of the 2006 YCA; and any interference of the HEO in the PPA general renegotiation cannot be equated to interference by HEO in the specific bilateral negotiation of the YCA between MVM and Dunamenti.

7.124  *(xiii) The YCA Drafts:* MVM submitted three YCA drafts to Dunamenti for the year 2006. The energy fees for the different units were the same in YCA 2004, YCA 2005 and all three drafts of the 2006 YCA. The only differences were in the availability or capacity fees; and in the way indexation was to be calculated.

7.125  The first draft YCA, circulated on 5 January 2006, contained a reduction of the capacity fee of 5%; and it did not apply any indexation to the previous year's price. In the earlier meeting of 19 December 2005 (for the renegotiation of the PPA), the capacity fee was briefly discussed in the following terms:

> *"... Dunamenti: Dunamenti further adds that it considers it conceivable to reduce the capacity fees by 5% for 2006 in the YCA to be concluded on the basis of the PPAs.*
>
> *MVM: MVM thanks Dunamenti for its positive and constructive attitude. MVM Rt will look into both of their offers at the expert level ..."*

7.126    As both Dunamenti and MVM considered favourably this reduction in the capacity fee, it is clear that Dunamenti refused this first draft YCA not because of this reduction, but because of other differences. The Tribunal finds that the principal reason why the 2006 YCA could not be agreed between Dunamenti and MVM was their unresolved difference over the inflation rate and the consequences of the arbitration award on the heat curve (that award pre-dating the HEO November Letter and any request of the Government to renegotiate the PPA). MVM considered these consequences applied to the future; and Dunamenti considered them to apply only for the past.

7.127    The heat curve was the topic of the letters sent by MVM on 29 December 2005 and 17 January 2006, with their subject: "Specific fuel consumption of units F of Dunamanti." In the letter of 17 January 2006, MVM stated:

> "MVM ZRt. Requested Dunamenti … that the Parties commence negotiations within the shortest possible time on the specific heat rate forming the basis for the setting of the energy fee for Unit F. …
>
> Dunamenti has not replied to our letter referred to above [the previous 29 December 2005 letter], as a result of which MVM will have to use the following polynomial deduced from the decision of the Court of Arbitration when establishing the energy fee for units F, until the negotiations on the specific heat consumption curve are closed:
>
> $Y- 0.1997X 2-445X+14201$
>
> We consider the completion of the negotiations and the required measurements highly important in order to be able to use the fee components established on the basis of the principles laid down in our letter referred to above for our accounts for 2006.
>
> We hereby ask you to issue your invoices for your generation in January on the basis of the polynomial defined in the present letter and established in accordance with the decision of the Court of Arbitration."

7.128   By its letter dated 17 January 2006, MVM sought to apply a heat rate curve based on the award. That curve was different from the one established by an independent expert in 2002, applied from 2002 to 2005 and agreed in the YCAs for 2004 and 2005. MVM's letter of 17 January 2006 and its previous letter of 29 December 2005 referred to the challenge of the heat rate curve "currently applicable" being justified by the award. It was submitted that the award decided that the heat rate curve that the parties had used since 2002 was unreliable and that the calculation decided by that award provided a good basis for a reasonable rate:

> *"The method based on the CCI model naturally results in higher heat consumption values after 2000 than the method based on the previously measured data. Moreover the values calculated based on the diagram also increasingly exceed the value determined originally by the parties in their agreement. This consideration means that the higher value received by projecting back the curve has to be adjusted with the results of the calculations based on the measured data and **the average of the two can then be considered such reasonable rate which takes account of the limited opportunities of the posterior calculations and the different results of the application of diverging methods** and receives the result through joint application of the two different methods with the effect of their reasonable correction with the other."* [Emphasis added]

7.129   The second draft YCA was communicated on 7 March 2006, proposing a reduction of 34%, a figure which coincided with the reduction contained in the HEO November 2005 Letter.

7.130   The Tribunal finds that, at this specific point in time, it is probable that MVM momentarily decided to pressure Dunamenti with reference to the HEO November Letter, by proposing an availability fee corresponding to the decrease for the renegotiation of the PPA. MVM's second draft was an attempt (but only for that second draft and not the two other drafts) to achieve the same result as would have resulted from the implementation of HEO's alleged instruction to renegotiate the PPA. However, Dunamenti clearly indicated to MVM in its answer dated 22 March 2006 – and this is again an indication that the renegotiation of the PPAs and the YCA

were two different exercises – that "your reference to the letter of HEO dated 10 November, 2005 does not have any relevance to the fees agreed by the parties previously."

7.131   In the Tribunal's view, it is important to note that, after Dunamenti's rejection of the second draft YCA, MVM quickly retracted its proposal concerning the availability fee and replaced the second draft with the third which was in line with the 2004 and 2005 YCAs, or, in other words, with the criteria existing before and independently of the HEO November Letter. In the Tribunal's view, the fact that Dunamenti rejected the three draft YCAs was not due to the availability fee in this second draft, but, rather, to the parties' continuing differences relating to the heat rate and the inflation index.

7.132   The third draft YCA, communicated on 6 April 2006, suggested a change in the inflation rate, replacing the DSPI inflation index provided in Schedule 6 to the PPA with the PPI index. Although MVM had raised the issue of the inflation rate in a 2004, the YCA for 2004 and 2005 did not amend the inflation index. The December 2001 Statement referred to the application of the PPI index to the price agreed for the F Units in the event of a deregulation of prices, but not for the G2 unit. The application of the PPI index to the G2 unit in the third draft YCA resulted overall in a much reduced capacity fee payable by MVM.

7.133   First, the Tribunal notes that the availability fee was no longer an issue in the third draft YCA. This is readily ascertainable by comparing the availability fees in the 2004 and 2005 YCAs with the three drafts of the 2006 YCA.

2004 YCA
Dunamanti II F                          tHUF          16.457
Dunamanti G                            tHUF          33.114

2005 YCA
Dunamanti II F                          tHUF          17.325
Dunamanti G                            tHUF          34.859

First draft 2006 YCA
Dunamanti II F                          tHUF          16.817
Dunamanti G                            tHUF          33.835

| | | |
|---|---|---|
| *Second draft 2006 YC**A*** | | |
| *Dunamanti II F* | *tHUF* | *11.643* |
| *Dunamanti G* | *tHUF* | *23.427* |
| | | |
| Third draft 2006 YCA | | |
| Dunamanti II F | tHUF | 16.721 |
| Dunamanti G | tHUF | 34.456 |

7.134   As appears from this table, the availability fee was materially different only in the second draft YCA. In other words, the third draft 2006 YCA had availability fees comparable to those for 2004 and 2005.

7.135   Second, the Tribunal notes that the main issue in the parties' negotiations was again the inflation index. In MVM's letter dated 6 April 2006 to Dunamenti (forwarding this third draft YCA), MVM accepted Dunamenti's suggested use of the 2001 Statement in order to calculate the availability fee:

> *"In its letter dated 22 March 2006 Dunamanti … rejected the draft version of the Yearly Commercial Agreement – for the subject year – regarding the availability fees contained therein sent by MVM Zrt in electronic format on 7 March 2006.*
>
> *In your above letter you mention that the principle of fee calculation is set forth in the "Statement" signed by our respective companies on 14 December 2001 – regarding units F.*
>
> *Attached to this letter we are sending you a new draft version of the Yearly Commercial Agreement for 2006 in which the calculation of the availability fee for units F fully complies with what is contained in the above mentioned "Statement."*
>
> *Since there is no agreement for gas turbine units G2 similar to that regarding units F, we defined the 2006 Availability Fee on the basis of the last – 2003 – administrative price and the actual inflation indices contained in the "Statement."*
>
> *We suggest that the capacity fee that has so far been calculated on the basis of an earlier calculation method should be modified in accordance with the capacity fee set forth in the YCA attached to this letter."*

7.136  From all appearances and in substance, these were commercial bilateral negotiations between Dunamenti and MVM with negotiating exchanges, back and forth, under an existing contractual relationship. Independently of any alleged instruction by any governmental authorities, MVM had its own important commercial motives to conduct itself exactly in the way in which it did, as an economic actor taking its own interests fully into account. It is not disputed that MVM was at the time losing money as it had to buy electricity at a higher price than the price it was entitled to sell to consumers: it needed and wanted for itself significant pricing reductions in the 2006 YCA.

7.137  The Tribunal concludes that the factual elements invoked to support Electrabel's case on attribution, alleging that Hungary intervened in the failed negotiations for the 2006 YCA, are linked exclusively to the renegotiation of the PPA and are not relevant to the parties' "invoice dispute" which started before the HEO November 2005 Letter. As regards the roles of the Ministry, the Parliament, HEO and MVM, the Tribunal considers that the way in which events unfolded, towards the end of 2005 and in 2006, does not establish the necessary correlation between the content of the HEO November 2005 Letter and related governmental conduct, on the one hand, and the conduct adopted by MVM, on the other. That absent correlation leads the Tribunal to decide that MVM did not act in regard to PPA pricing with Dunamenti upon the instruction of Hungary under international law within the meaning of Article 8 of the ILC Articles, i.e. Hungary did not use "its ownership interest in or control of a corporation specifically in order to achieve a particular result" (ILC Commentary, paragraph 6, p. 113).

7.138  Accordingly, the Tribunal does not consider MVM's conduct in this context as attributable to Hungary under the ECT; and further, considering this issue of attribution as part of the merits of the Parties' dispute over this PPA Pricing Claim, the Tribunal rejects the jurisdictional objection made by Hungary as regards the acts of MVM in relation to this PPA Pricing Claim. However, as indicated earlier, will next examine what would have been the outcome for the Parties, had some or all of

the impugned conduct been considered as attributable to Hungary under international law.

7.139    *(xiv) FET Standard:* At the time of privatisation, Hungary represented that PPA pricing would be: "... designed to compensate investors for reasonable capital and operating costs in generation, transmission and supply of electricity as well as to provide investors with a reasonable level of profits to ensure the long-term operation of the industry" (State Audit Office Report, 1996, page 9; Information Memorandum, 10.2.5). Section 55(1) of the Electricity Act 1994 also provided: "The producer, transfer, distribution and supply price (fee) of electricity shall include the recovery of reasonable investments and the costs of the efficiently operating license holders, as well as the profit necessary for ongoing operation" (see also the Amendment to the PPA of 1998).

7.140    From the chronology of the PPA's pricing regime, in addition to these materials, Electrabel's expectations were also based on the deregulated price regime operating in 2006 and 2008.  However, such expectations could not be isolated from the common knowledge that deregulation could not cohabit with long-term PPAs having guaranteed quantities and guaranteed prices. The Tribunal does not   accept Electrabel's argument that, even though each YCA reflected terms applicable for only that particular year, expectations for the future could be based on preceding years. In other words, the Tribunal determines that it was not reasonable for Electrabel (or Dunamenti) to expect that the YCA negotiations for 2004 and 2005 would necessarily be a reference point for the parties' negotiations in 2006. It was therefore not reasonable, or legitimate, for Electrabel (or Dunamenti) to expect that PPA pricing would be fixed in accordance with factors established at the time of privatisation; or that the YCA for 2006 would be the same as for earlier periods, before market liberalisation and economic changes consequent upon Hungary's accession to the European Union.

7.141    Hungary also relied on the European Commission's investigation into Hungarian PPAs as a justification for its demands for price reductions and a so-called "standstill obligation" not to continue providing State aid until such time as the Commission might one day "bless it as fully compatible with EC law" (Mr Staviczky's Statement,

paragraph 37). The Tribunal accepts the effect of this 'obligation' motivating Hungary at that time. It is correct, as Electrabel noted, that the Commission's investigation included no order to Hungary to reduce prices paid to Dunamenti as regards unlawful State aid; nor was Hungary in any position to suspend any alleged State aid until such aid had been identified by the Commission. However, the Commission's concerns over high prices resulting from the PPAs had been transmitted to Hungary before the HEO November 2005 Letter. This being said, whether or not Hungarian policy was backed by the Commission's concerns, the Tribunal does not consider it unreasonable for a State to try to ensure the adaptation of long term contracts to new conditions prevailing in a liberalised economy operating under EU law.

7.142    Turning next to other issues of reasonableness, the Tribunal considers that Electrabel has not established any unreasonableness in the HEO November Letter and MVM's conduct.  Indeed, even if some governmental instructions had been found to exist in relation with the negotiation of the YCA, such instructions were grounded, as far as the PPA was concerned, on reasonable considerations, as PPA pricing had to evolve in light of the significant changes in economic and legal circumstances from 1995 onwards.

7.143    Moreover, MVM acted in conformity with the PPA, which granted it the contractual right to pay only part of Dunamenti's invoices where MVM did not agree on their amount. The Tribunal notes that, according to the PPA, the undisputed amounts of Dunamenti's invoices were to be paid by MVM on the due date (Article 8.4 (c)); and that dispute settlement procedures were available to Dunamenti to determine whether the disputed balance was payable (Article 13), including an effective procedure for arbitration that could have been used by both parties without any apparent difficulty (as it had been for the parties' earlier dispute).

7.144    Accordingly, the Tribunal decides that the impugned acts – if they were attributable to Hungary – did not constitute any breach of the ECT's FET standard. Accordingly, the Tribunal rejects this part of Electrabel's PPA Pricing Claim.

7.145    *(xv) The FPS Standard:* The Tribunal considers that, by promising full protection and security, Hungary assumed an obligation actively to create and maintain

measures that promote security. The necessary measures must be capable of protecting the covered investment against adverse action by private persons.

7.146   If MVM were considered as such a private person, Hungary provided to Electrabel the tools for obtaining redress (obligation of repression). The Tribunal accepts Hungary's submission that the PPA's dispute resolution provisions included effective means for settling contractual disputes between Dunamenti and MVM. Further, in the particular case of the dispute raised by Electrabel regarding the alleged instructions of the Hungarian Government to reduce pricing under the PPA, Electrabel was entitled under the ECT to decide whether to submit its dispute to Hungary's domestic courts, arbitration under the ECT, or to whichever dispute resolution procedure that might be specified in any underlying contract or agreement (Article 26(2) ECT).

7.147   Accordingly, the Tribunal considers that the circumstances of this case do not support Electrabel's claim that Hungary violated the obligation to provide full protection and security to Electrabel's investment contained in Article 10(1) ECT; and, consequently the Tribunal also dismisses this part of the PPA Pricing Claim.

7.148   *(xvi) Unreasonable and Discriminatory Measures:* The Tribunal considers next Electrabel's allegation that Hungary violated the obligation under Article 10(1) ECT not to impair by unreasonable or discriminatory measures its investment's management, maintenance, use, enjoyment or disposal.

7.149   Electrabel submits, citing *Saluka v The Czech Republic* (paragraphs 458-459) and *CMS v The Argentine Republic* (paragraph 290) that there is a close connection between this treaty obligation involving reasonableness and the ECT's fair and equitable standard. Based on the expert report of Professor Amkhan (Electrabel's expert witness) as well as 'arbitral jurisprudence', Electrabel contends that the Tribunal enjoys a margin of appreciation in deciding whether or not a particular measure in question is unreasonable or discriminatory, impairing the investment's management, maintenance, use, enjoyment or disposal. In this assessment, the basis of comparison for discrimination should be the treatment of other Generators in Hungary; and an actual intent by HEO to discriminate is not required to establish a breach of this obligation (Memorial, paragraphs 365-376; Reply, paragraphs 467-

475). Electrabel also contends, referring to *Saluka* and *Occidental v Ecuador,* that a breach of this obligation requires a mere showing of impairment and that the impairment need not be significant.

7.150    Electrabel submits that the HEO November 2005 Letter and the instructions of the Hungarian Government 'demanding' that Dunamenti agree to a reduction of 34% in its tariffs, together with MVM's implementation of that policy, impaired its investment through unreasonable and discriminatory measures, thus breaching this ECT standard. In support of its allegation of breach, Electrabel refers essentially to the same arguments which it submitted to substantiate its claim of a violation of the ECT's standard for fair and equitable treatment.

7.151    Hungary, on the other hand, submits that there is a higher threshold to prove arbitrariness or unreasonableness under this ECT standard and that Electrabel's general allegations do not meet that high threshold. The ordinary meaning of "impair" suggests (to Hungary) that there has to be a detrimental impact on the investment (Counter-Memorial, paragraph 508); and certain arbitral tribunals (e.g. *Occidental v Ecuador*) have required the impairment to be significant. In any case, so Hungary submits, even if a State adopts measures that impair an investment, a violation of this ECT standard will not occur if the measure can be justified on rational grounds and is not discriminatory in either intent or effect. Hungary submits that its case meets this test.

7.152    The Tribunal agrees with Electrabel's submission that the basis of comparison against which the measures taken by Hungary should be compared is the treatment of other Generators in Hungary. Likewise, the Tribunal considers that discriminatory effects of the measures are sufficient to breach the prohibition. The Tribunal does not consider that that there is a separate requirement to prove discriminatory intent by Hungary (see *Siemens v The Argentine Republic* (ICSID Case No. ARB/02/8), Award, 17 January 2007, paragraph 321); or that evidence of discrimination based on nationality is required (see *Thunderbird v Mexico*, Award 26 January 2006, paragraph 177). Nevertheless, the Tribunal agrees with Hungary's submission that a breach of this standard requires the impairment caused by the discriminatory or unreasonable measure to be significant.

7.153    The Tribunal decides that Electrabel has not established any lesser treatment of Dunamenti than that accorded to other Hungarian Generators with PPAs. Letters similar to the HEO November 2005 Letter were sent to all Hungarian Generators earning profits in excess of the annual return considered reasonable by the Hungarian Government. Likewise, it appears that the 7.1% return on asset target used for the calculation by HEO of the capacity fees for Dunamenti was also used for other Generators with PPAs (Mr Békés' statement, p. 39).  In short, all Generators were 'asked' to adjust their prices in similar terms; and the difference in their adjusted capacity fees reflected only the differences in profit level amongst different Generators.

7.154    Accordingly, the Tribunal concludes that Electrabel's allegations have not met the burden of proof required for a measure to be discriminatory in its impairment of an investment under Article 10(1) ECT. Accordingly, the Tribunal also dismisses this part of Electrabel's PPA Pricing Claim.

7.155    *(xvii) International Law Standard:* The Tribunal next considers next Electrabel's allegation that Hungary violated the obligation under Article 10(1) ECT not to accord to its investment treatment less favourable than that required by international law.

7.156    Relying upon the expert report of Professor Amkhan, Electrabel submits that the content of this ECT standard is similar to those standards already expressly mentioned in Article 10(1) ECT, which also exist as standards of protection in customary international law. Electrabel generally asserts that the HEO November 2005 Letter and the instructions of the Hungarian Government, demanding that Dunamenti agree to a reduction in its tariffs of 34%, and MVM's implementation of that policy, breached this ECT standard (Memorial, paragraphs 379-383).

7.157    Hungary, for its part, submits that the minimum standard under international law constitutes a lower level of protection than the fair and equitable treatment standard under Article 10(1) of the ECT. Since Electrabel has not met its burden of establishing a violation of the fair and equitable treatment standard, according to Hungary, there can be no basis for alleging a breach of the minimum standard (Counter-Memorial, paragraphs 521-523).

7.158    In regard to the development of investment protection in treaty law and customary international law, the Tribunal considers that the content of this standard is, at the present time, similar to the other standards expressly mentioned in Article 10(1) ECT, which also exist as standards of protection in customary international law.

7.159    Therefore, considering the Tribunal's conclusion concerning the absence of any violation of the FET standard, the Tribunal concludes that Hungary's alleged intervention in the contractual relationship between MVM and Dunamenti, as well as MVM's alleged implementation of the Hungarian Government's instructions, do not constitute treatment which is less favourable than the minimum standards required by international law. Accordingly, the Tribunal also rejects this part of Electrabel's PPA Pricing Claim.

7.160    *(xviii) National Treatment and MFN Treatment:* Electrabel submits that Article 10(7) ECT constitutes a specific application of the non-discrimination standard, according to which Hungary is obliged to accord to an investment of an investor the treatment of the most favoured nation and national treatment. Electrabel alleges that the non-discrimination obligations contained in Articles 10(1) and (7) ECT comprise de jure and de facto positive and negative discrimination. With respect to national treatment, Electrabel also submits that it is sufficient to show that the foreign investor is treated less favourably than a domestic investor in like circumstances (Memorial, paragraphs 385-390).

7.161    Electrabel claims generally that the HEO November 2005 Letter and the instructions of the Government of Hungary 'demanding' that Dunamenti agree to a reduction in its tariffs of 34%, with MVM's implementation of that policy, breached this standard. Electrabel submits that Hungary accorded to other Hungarian Generators with PPAs more favourable treatment than it accorded to Electrabel and Dunamenti (Reply, paragraphs 479-485).

7.162    Hungary disputes that Electrabel has demonstrated any lesser treatment of Dunamenti than that accorded to other Hungarian Generators with PPAs, regardless of their nationality or national ownership. Electrabel, so Hungary notes, does not even attempt to identify those other Generators which it believed were treated more

favourably or even to specify the specific nature of the preference allegedly granted to them.

7.163  The Tribunal accepts Hungary's last submission. The Tribunal does not consider this standard can avail Electrabel's case on its PPA Pricing Claim. There is no factual evidence that any relevant conduct by MVM, HEO or the Hungarian Government (including its ministers) was ever motivated by national or other discrimination within the terms of Article 10(7) ECT. It will also be recalled that MVM was at all material a significant shareholder in Dunamenti.

7.164  Given the lack of any substantiation for its allegation of a breach of this standard, the Tribunal concludes that this part of Electrabel's claim must also fail. Accordingly, the Tribunal dismisses this part of Electrabel's PPA Pricing Claim under Article 10(7) ECT.

*(5)*   *SUMMARY*

7.165  For these reasons, the Tribunal decides that: (i) it has jurisdiction to decide Electrabel's PPA Pricing Claim on the merits; and that (ii) as regards liability, Electrabel does not succeed on its PPA Pricing Claim against Hungary in regard to the fair and equitable standard, the constant protection and security standards and the other standards of protection contained in Article 10(1) and Article 10 (7) ECT. Accordingly, this PPA Pricing Claim is dismissed by the Tribunal.

## PART VIII: REGULATED PRICING

### (1)     INTRODUCTION

8.1     Electrabel's third claim in respect of "Regulated Pricing" (also called the "Price Regulation Claim") alleges that Hungary breached the ECT's FET and other standards of protection in Article 10(1) ECT, when Hungary reintroduced administrative pricing for Hungarian Generators (including Dunamenti) in 2006-2007. This claim is denied in full by Hungary.

8.2     Regulated pricing as regards Generators was first terminated by Hungary in 2003. Hungary re-introduced regulated pricing for Generators for a thirteen-month period from December 2006 to December 2007, by the 2006 Price Regulation Act and the 2006 and 2007 Price Decrees (also called "Tariff Decrees"). These regulated prices for Dunamenti were lower than the prices agreed between Dunamenti and MVM in 2005 under the PPA.

8.3     In May 2006, the Coalition Government had been re-elected in the Hungarian general elections. There was then a decision, within the Hungarian Government, to consider further the re-introduction of regulated pricing for Generators under the Price Regulation Act 2006 (amending to the Electricity Act 2001). This 2006 Act had been enacted by the Hungarian Parliament on 8 February 2006 following the proposal of its Energy Sub-Committee; and it had come into force on 3 March 2006. HEO had then begun work on a draft 2006 Price Decree under the 2006 Act; and it invited the Generators' comments on that draft, including Dunamenti on 11 May 2006. Dunamenti responded on 18 May 2006, challenging HEO's proposals on several grounds. It also responded to HEO's letter of 5 December 2006, on 20 December 2006, in regard to price regulation for 2007.

8.4     The 2006 Price Decree was issued on 24 November 2006 (Decree 80/2006); and it came into force on 9 December 2006. The 2007 Price Decree (Decree 14/2007)

was issued on 26 January 2007, which was effective from 1 February 2007 to 31 December 2007.

8.5     On 2 July 2007, the Hungarian Parliament enacted the Electricity Act 2007, which came into force on 1 January 2008. It abolished (inter alia) regulated pricing for Generators (the 2007 Price Decree having expired) and implemented in full the liberalisation of the Hungarian electricity market, as from 2008 onwards.

*(2)*     ***THE CLAIMANT'S CASE***

8.6     In summary, Electrabel submits that the reintroduction of regulated pricing in December 2006 until December 2007 was a breach of the FET and other standards of protection under the ECT, causing lost revenues to Dunamenti of approximately HUF 15.5 billion (about US$ 105 million).

8.7     Electrabel submits that it enjoyed a legitimate expectation that regulated pricing had ended in 2003 and that it was entitled thereafter to negotiate PPA prices in the YCAs with MVM without ministerial interference from Hungary and had done so successfully in 2004 and 2005 – until the 2006 and 2007 Price Decrees. In any event, if prices were to be regulated by the Hungarian Government in 2006 and 2007, Electrabel submits that it had a legitimate expectation that regulated prices would be assessed fairly, without discrimination, after effective consultation with Dunamenti and under an appropriate methodology, resulting in a reasonable return on invested capital for Dunamenti.

8.8     Electrabel contends that the re-introduction of regulated pricing was made improperly to protect Hungary from MVM's continuing losses and also for inappropriate political reasons, given that the Hungarian Government and Parliament were unwilling to increase the price of electricity for end-users and were responding to populist pressures, including untrue attacks on Hungarian Generators' so-called "luxury profits".

8.9     According to Electrabel, MVM had suffered severe losses by 2005, because its prices were regulated at levels insufficient to meet the consequential effect of significant increases in the prices for natural gas. Accordingly, MVM received less from its supplies of electricity to distribution companies than it paid to purchase that same electricity from Generators; and it was also unable to increase the price received for its supplies or decrease the price paid by it to Generators. Electrabel submits that Hungary was motivated by an intent to avoid responsibility for MVM's losses by effectively transferring MVM's losses to the Generators, in particular Dunamenti.

8.10    Electrabel denies that Hungary can rely on the commencement of the European Commission's investigation into State aid under the PPAs and a purported "standstill obligation" under EU law. According to Electrabel, the Commission did not order Hungary to reduce prices received by Dunamenti; nor was Hungary in any position to suspend any alleged State aid until such unlawful State aid had been identified and calculated. Electrabel submits that, at the relevant time, Hungary carried out no investigation, even preliminarily, that identified and quantified the alleged State aid repayable by Dunamenti; and that even when Hungary carried out such a calculation after the European Commission's Final Decision (much later), it showed that Dunamenti had negative State aid or at least that Dunamenti's Stranded Costs exceeded any repayable State aid.

8.11    Accordingly, for all these reasons, Electrabel submits that Hungary's decision to force a reduction, by 40%, in Dunamenti's availability/capacity fee for the F and G2 Units during this period of re-introduced regulated pricing, without any proper methodology, consultation or detailed study of Dunamenti's actual costs, was a breach of Hungary's several obligations towards Electrabel under Article 10(1) ECT.

*(3)*     ***THE RESPONDENT'S CASE***

8.12     In summary, Hungary submits that the 2006 Price Regulation Act and the 2006 and 2007 Decrees were adopted in order to advance important and rational objectives, followed a consistent and non-discriminatory methodology and did not violate any legitimate expectations of Electrabel under the ECT; and, further, that Electrabel's only conceivable legitimate expectation, namely that administrative prices should cover Dunamenti's justified operating and investment costs along with a reasonable return on capital, was not violated by the 2006 and 2007 Decrees, neither as a matter of underlying theory nor as regards actual financial results for Dunamenti.

8.13     Hungary notes that Electrabel admits that Hungary, as a sovereign State, had a right to regulate electricity prices in Hungary. Hungary submits that this necessarily means that Electrabel could have had no legitimate expectation that Hungary would not do so; and that, moreover, Hungary's reintroduction of regulated pricing was based on legitimate and compelling facts confronting Hungarian policy-makers at the time, including: (i) the European Commission's State aid investigation into the Hungarian PPAs; (ii) HEO's estimation that Hungarian Generators' profits were excessive for electric utilities operating in the "public utility" segment of the Hungarian electricity market; and (iii) the continued failure of voluntary negotiations between MVM and the Hungarian Generators (including Dunamenti) to release significant excess PPA capacity for direct sale to the liberalised market in Hungary.

8.14     As to the particular methodology Hungary employed under the Decrees, Hungary submits that Electrabel has failed to present any coherent argument as to why its methodology was inappropriate; and that, indeed, Electrabel barely challenged the detailed explanations of the regime presented in the testimony of Mr Békés, the head of HEO's price regulation department.

8.15     As to consultations with Dunamenti, Hungary points to HEO's long process, beginning with HEO's letter dated 14 March 2006 to Dunamenti, followed by

further exchanges of correspondence on 11 May 2006, 18 May 2006 and 2 June 2006. Of all Generators, as Hungary emphasises, Dunamenti was the only Generator not to take up HEO's offer of a meeting to discuss the draft 2006 Price Decree.

8.16    As to the absence of a detailed audit of Dunamenti's costs, Hungary submits that this approach did not materially differ from HEO's practice during earlier periods of regulated pricing, which is now (in these proceedings) accepted by Electrabel without complaint. Hungary also submits that Dunamenti's complaints at that time (i.e. June 2000) raised, paradoxically, the same complaints now directed at the 2006 and 2007 Price Decrees.

8.17    As to discrimination, Hungary submits that Dunamenti was treated in the same manner as other Hungarian Generators; and that there was no unfair discrimination against Dunamenti. In particular, Hungary rejects Electrabel's allegation that Dunamenti was targeted adversely because it was foreign-owned. Hungary emphasises that about 25% of Dunamenti's shares were owned by MVM (itself owned by Hungary); and that other Generators were almost wholly owned by foreign companies.

## (4)    THE TRIBUNAL'S ANALYSIS AND DECISIONS

8.18    The Tribunal does not consider on the evidence adduced in these proceedings that Electrabel had a legitimate expectation, based on any specific governmental commitment, representation or assurance to Dunamenti or Electrabel, that Dunamenti would be able to charge prices for electricity under the PPA free from any intervention by Hungary seeking to reintroduce regulated prices by operation of law.

8.19    Electrabel's investment was made on the basis of regulated pricing, as is acknowledged by Electrabel (Reply, paragraph 191). Moreover, such an expectation would have been inconsistent with the PPA and Dunamenti's relations with MVM.

As acknowledged in Electrabel's Submission to the European Commission of 13 February 2006: "... As [a] matter of fact the PPA itself does not contain any provision guaranteeing any return whatsoever. To the contrary, under the PPA all operational, legal, environmental, currency, fiscal, etc. risks remain with Dunamenti". It is not possible for the Tribunal to square this unequivocal statement with the legitimate expectation now alleged by Electrabel in support of its claim against Hungary.

8.20    The Tribunal also notes Dunamenti's ready acceptance of price regulation, as expressed by its chief executive officer (from 1998), Mr Tibor Kuhl, at the meeting on 8 December 2005 between HEO, MVM and Dunamenti convened by the Hungarian Minister of Economy, Mr Jámos Kóka:

> "<u>MVM:</u> *Does Dunamenti have any objection to the restoration of administrative pricing?*
>
> <u>Dunamenti</u>: *If this is a decision by the Government and is done on the basis of a methodology of comparison and the revision of previous costs in a fair way, Dunamenti has no objection. Why would it have any, since the present G2 fees are based on previous regulated prices and the Capacity Fee for the unit F capacity retrofitted in 2002 is even lower than what it would have been on the basis of the previous price regulation methodology by taking the retrofit investment into consideration*" *(Minutes of Meeting of 8 December 2005).*

Dunamenti's chief executive officer was here repeating its acceptance of price regulation already made at the earlier meeting of 16 January 2005 held by the Energy Sub-Committee of the Economic Committee of the Hungarian Parliament, as recorded in its minutes.

8.21    As regards Electrabel, the Tribunal likewise notes the admissions made in Electrabel's Reply in these arbitration proceedings:

> *(i)*    "*... the Claimant ... accepts that there was regulated pricing in 1995 and that it was possible that it would not remain unchanged ...*" *(paragraph 268);*
>
> *(ii)*    "*Although the Claimant disagreed with the principle of the reintroduction of regulated prices [in 2006], it accepted the possibility of such*

> *reintroduction so long as it conformed to its reasonable expectations at the time of the investment. Dunamenti's CEO [Mr Kuhl] had noted during meetings organised by Minister Koka in November-December 2005 that he could accept the reintroduction of regulated prices so long as it was on the same basis as the previous two price cycles [which Electrabel agrees had been satisfactory]."* (paragraph 275)

8.22    Accordingly, in the Tribunal's view, the relevant question is not whether Hungary could reintroduce price regulation in 2006 by operation of law (it could, on Electrabel's own case); but, rather, whether in so doing, Hungary acted reasonably, in good faith and without improper motives towards Dunamenti in compliance with Article 10(1) ECT.

8.23    There is no doubt that by late 2005 and early 2006 there was political and public controversy in Hungary over the perceived high level of profits made by Hungarian Generators, including Dunamenti. However, politics is what democratic governments necessarily address; and it is not, ipso facto, evidence of irrational or arbitrary conduct for a government to take into account political or even populist controversies in a democracy subject to the rule of law. Moreover, the Hungarian Government did not itself resort to populist language directed at Dunamenti. In brief, the Tribunal considers that Electrabel's criticism of Hungary's political motives is factually mistaken, particularly in alleging that Hungary's conduct towards the Generators (especially Dunamenti) was induced solely by malign populist pressures, now falsely camouflaged with other ostensibly more rational factors for the purpose of Hungary's defence in these arbitration proceedings.

8.24    At the relevant time, by early 2006, there were several objective concerns expressed by HEO and the European Commission, clearly not motivated by political considerations, that the relatively high prices paid to Hungarian Generators under their PPAs dis-incentivised their supply of electricity to the liberalised market in Hungary; and that, accordingly, an adjustment downwards of PPA prices would be an appropriate mechanism to reduce wholesale and retail prices in that market towards a competitive level. In the Tribunal's view, these repeated statements, all to

like effect, were not irrational; and it was reasonable for Hungary to take them into account, in promulgating the 2006 and 2007 Price Decrees.

8.25    During much of this same period, from 9 November 2005 onwards, Hungary was confronted by the European Commission's formal investigation into unlawful State aid provided to Hungarian Generators under their PPAs, including Dunamenti. Under EU law, by Article 88(3) EC (now Article 108(3) TFEU), Hungary was required under its so-called 'standstill obligation' not to put new State aid into effect before the Commission's Final Decision (of 4 June 2008) and, in the case of continuing State aid, to suspend such aid. In its Preliminary Decision of 9 November 2005, the European Commission expressly referred Hungary to the suspensive effect of Article 88(3) EC, as a reminder to Hungary to comply with its 'standstill obligation' under EU law.

8.26    In the Tribunal's view, it was therefore not irrational for Hungary temporarily to take into account this standstill obligation in promulgating the regulatory measures (by operation of law) of which Electrabel now complains. The Tribunal acknowledges that, at this particular time, Hungary could not foresee the actual result of the European Commission's investigations (almost two years' later). Hungary's conduct was prudent; and in the circumstances, it was certainly not rendered irrational by the Commission's Final Decision. It is also significant that the European Commission's Submission confirms that Hungary's price regulation was made to bring its energy sector into line with the requirements of EU law, in particular EU law on State aid (paragraph 17).

8.27    For the purpose of price regulation by operation of law, the Tribunal therefore accepts that, at this time, it was not unreasonable for Hungary to understand (as in fact it did) and to act upon the European Commission's communications as a warning that Hungary should seek to discontinue unlawful State aid received by Generators under the PPAs, including Dunamenti.

8.28    The Tribunal has specifically considered Hungary's regulated pricing in regard to three relevant periods: (i) the first pricing period from 1997 to 2000; (ii) the second pricing period from 2001 to 2003; and (iii) the third pricing period in 2006 and 2007.

It refers to Annex 1 to Mr Békés' second witness statement for further details of these three periods, which need not be here reproduced.

8.29    Given that Dunamenti accepted regulated pricing for the earlier periods (see above), the general effect of the third period imposing regulated pricing on Dunamenti from December 2006 to 2007 does not strike the Tribunal as materially different, still less irrationally or unfairly so as regards Dunamenti. It is true that this third period's regulated pricing was made without a cost and asset audit of the Generators (including Dunamenti); but HEO relied on data from Generators which, albeit more simplistic, was probably more (and not less) favourable to them, including Dunamenti.

8.30    The Tribunal rejects Electrabel's case on non-consultation with Dunamenti: there were sufficient attempts at consultation by Hungary to negate any inference of unfairness or other misconduct by Hungary. Moreover, as described above, Hungary used Dunamenti's own costs data (derived from its financial statements) for the application of the Decrees; that practice had been similarly used by Hungary during the earlier periods of price regulation; and Hungary took account of at least one of Dunamenti's written comments on the draft 2006 Decree, relating to the requirement for profit reimbursement (which was consequentially deleted by Hungary).

8.31    The Tribunal also rejects Electrabel's allegations of unfair discrimination against Dunamenti and Electrabel: the Price Decrees were applied equally to all Generators; but, given that their individual circumstances differed, it was inevitable that the effect of the Decrees upon each of them would reflect such differences. In the Tribunal's view, there is no evidence in this case of any malign targeting of Dunamenti or Electrabel by Hungary, still less any violation of Hungarian law (as also alleged by Electrabel).

8.32    At this point, it would be possible to describe in detail the various data which Hungary took into account in its imposition of regulated pricing and their specific effect on the electricity market in Hungary. The effect of the Price Decrees on Dunamenti was also analysed at length by the Parties' expert witnesses, orally and in writing. There were sharp differences between them as regards the effect of the Price

Decrees on Dunamenti. The Tribunal considers it unnecessary to resolve these detailed differences here, for two reasons.

8.33    First, the Tribunal accepts the independent opinion finally reached by Mr Kazmarek (of Navigant), as an expert witness for Hungary; and it does not accept the different approach taken by Mr Shuttleworth, as an expert witness for Electrabel. In the Tribunal's view, Mr Shuttleworth was not as familiar as Mr Kazmarek with Hungarian accounting standards, legally applicable to Dunamenti. Mr Kazmarek concluded that Dunamenti received in 2007 a pre-tax return in excess of the profit-levels during the earlier periods of regulated pricing (albeit at a level lower than the level theoretically attainable in 2006-2007 without the Price Decrees). That conclusion, accepted by the Tribunal, is logically fatal to Electrabel's claim, given the latter's acceptance of such earlier price regulation and its profit-levels then providing a reasonable return on capital.

8.34    Second, taking into account all the general factors described above, the Tribunal determines that Hungary's re-introduction of price regulation for 2006-2007 was a rational and reasonably appropriate measure in the prevailing circumstances. The overall effect of the Price Decrees was beneficial for the electricity market in Hungary. Generators were generally able to procure a reasonable return on their invested capital, at least 7.1% return on assets (as calculated by HEO and confirmed by Mr Kazmarek); the amount of State aid under the PPAs was generally reduced; and the liberalisation of the market in Hungary was materially enhanced, as evidenced by the fact that several Generators (but not Dunamenti) became willing, voluntarily, to terminate prematurely their PPAs with MVM.

8.35    Further, the Tribunal's task is not here to sit retrospectively in judgment upon Hungary's discretionary exercise of a sovereign power, not made irrationally and not exercised in bad faith towards Dunamenti at the relevant time. Electrabel rightly conceded at the Hearing that the Hungarian Government could lawfully introduce regulated pricing [D1.44]. Regulatory pricing (by operation of law) was and remains an important measure available to State regulators in liberalised markets for electricity. It is, even at best, a difficult discretionary exercise involving many complex factors. In short, Hungary would enjoy a reasonable margin of appreciation in taking such measures before being held to account under the ECT's standards of

protection. In the present case, however, the Tribunal considers that Hungary requires no such margin in its defence to Electrabel's claim.

8.36    Finally, the Tribunal rejects Electrabel's other arguments, as briefly summarised above, which proceed from mistaken assumptions as to the effect of the European Commission's Final Decision. The Tribunal refers for the latter to its decisions in Part VI above.

(5)    *SUMMARY*

8.37    For all these reasons, the Tribunal decides to dismiss Electrabel's Regulated Pricing Claim under all the standards of protection invoked under Article 10(1) ECT.

## *PART IX: ISSUE F - THE G1 UNIT*

### *(1)    INTRODUCTION*

9.1    This fourth claim made by Electrabel concerns the G1 Unit (as a co-generation unit) and electricity production from co-generation units under Hungary's 2003 Mandatory Off-Take Decree, effective from 1 January 2003. This claim is denied in full by Hungary.

9.2    The G1 Unit produced steam (heat) and electricity (power). Its steam production was sold by Dunamenti to MOL's Duna Refinery, under a long-term contract made in 1992, with a 15-year term expiring on 31 December 2007. Its electricity production was sold by Dunamenti to MVM (as described below); but it was never included within the scope of Dunamenti's PPA with MVM.

9.3    From 1995 to 1997, under Decree 28/1995, the G1 Unit's electricity production fell within the scope of Hungary's mandatory off-take system which legally required MVM (as a single buyer) to purchase electricity production from co-generation units, including the G1 Unit, at regulated prices. In 1997, under Decree 55/1996, Hungary removed all co-generation units from its mandatory off-take system; but for five years until 2003, MVM voluntarily purchased electricity production from co-generation units, including the G1 Unit, at regulated prices.

9.4    Under Hungary's 2002 Mandatory Off-Take Decree (Decree 56/2002) and the Electricity Act 2001 (both effective from 1 January 2003), the single buyer electricity market in Hungary was terminated; but MVM and local distribution companies were nonetheless required to purchase electricity production from qualifying co-generation units at supportive prices. All co-generation units in Hungary were qualified under the 2002 Mandatory Off-Take Decree, excepting only Dunamenti's G1 Unit. Accordingly, its electricity production could only be sold in the unregulated open market, without the "safety-net" (Electrabel's phrase) enjoyed by other co-generation

units under the 2002 Decree who could choose between MVM and the open market, as desired by them from time to time.

9.5     In 2003 and 2004, Dunamenti sold electricity from the G1 Unit to MVM at unregulated prices. In 2005, Dunamenti sold all the electricity produced by its G1 Unit on the open market, to E.On. That agreement lapsed after one year; and the G1 Unit was stopped on 1 January 2006. Later in 2006, Dunamenti re-configured the G1 Unit because it could not sell its electricity production on the open market and operate the G1 Unit as a co-generation unit, operating efficiently. Thereafter, whilst the G1 Unit could still produce electricity, it did not produce co-generated electricity.

*(2)     THE CLAIMANT'S CASE*

9.6     In summary, Electrabel submits that Hungary, in its pursuit of an open electricity market, treated Dunamenti's G1 Unit in a discriminatory and arbitrary manner and also contrary to Electrabel's legitimate expectations, in breach of the ECT's standards of protection under Articles 10(1) and 10(7) ECT and causing Dunamenti to lose revenues of approximately HUF 13.2 billion (about US$ 90 million).

9.7     According to Electrabel, it is significant that the G1 Unit was the only co-generation unit in Hungary that was excluded from the 2002 Mandatory Off-Take Decree; it was also the only co-generation unit required to sell its electricity in the open market segment of the dual market that was created in 2003, a task for which the G1 Unit was ill-suited; and this discriminatory treatment had a profound impact on the G1 Unit's operation, requiring its reconfiguration, such that the G1 Unit could no longer act as an efficient co-generation unit.

*(3)*     ***THE RESPONDENT'S CASE***

9.8     In summary, Hungary denies Electrabel's allegations of "discriminatory and arbitrary" conduct, any violation of Electrabel's legitimate expectations and any violation of the ECT's FET standard or other standards of protection.

9.9     Hungary also submits that it is important to note what issues do not arise from Electrabel's claim: Electrabel has offered no evidence that Hungary's policy choices to support smaller co-generation units or those supplying district (i.e. household) heating were arbitrary; Electrabel has not alleged that the G1 Unit met the criteria set out in the Mandatory Off-Take Decree of 2002 (the G1 Unit was indisputably larger than 50 MW; and it did not supply steam (heat) for district heating); nor has Electrabel adduced any evidence that Hungary had any improper or discriminatory motive for selecting criteria which the G1 Unit could not meet (indeed, so Hungary contends, the evidence is to the contrary); and finally, as submitted by Hungary, Electrabel conceded that it received no "specific Government assurances" that the G1 Unit would enjoy mandatory off-take support indefinitely, whether de jure or de facto.

*(4)*     ***THE TRIBUNAL'S ANALYSIS AND DECISIONS***

9.10     The Tribunal notes that, significantly, the G1 Unit always fell outside Dunamenti's PPA with MVM. The Tribunal also determines that the G1 Unit was never the subject of any specific promise, assurance or representation from Hungary that its electricity production would be covered by Off-Take Decrees, effectively ensuring that Dunamenti should have available a permanent purchaser for all electricity produced by the G1 Unit at regulated prices insulated from the open market. Absent such specificity, the Tribunal cannot accept in these factual circumstances that Electrabel's alleged aspirations can amount, under the ECT and international law, to a legitimate expectation binding on Hungary, particularly where, in this case, such mere

aspirations could amount to a legal obligation ranking higher than if it were an express promise made to Dunamenti by MVM in the PPA itself.

9.11    Moreover, as already described above, the G1 Unit's electricity production was removed from the mandatory off-take legislative system in 1997 without any objection from Dunamenti (or Electrabel). If a mandatory off-take system had been the subject of any legitimate expectations or even aspirations in 1995 (on Electrabel's associated company first making its investment), it is significant that no complaint was timeously made in 1997. It is also significant that Electrabel increased its shareholding in Dunamenti in 1997 after the G1 Unit's removal from that system, without reference to any disappointed expectations.

9.12    The Tribunal also notes that Section 4(5) of the 2002 Mandatory Off-Take Decree subjected co-generated electricity to mandatory off-take by (inter alios) MVM if: (i) the unit was used for district steam-heating for Hungarian domestic homes; or (ii) the power plant capacity was 50 MW or less. As to the first criterion, other EU Member States (such as Italy) likewise distinguished between co-generation used for district heating and industrial co-generation. As to the second criterion, the 50 MW level was the statutory dividing line under Hungarian law between smaller units which do not require an operating licence from HEO and larger units (such as Dunamenti's) which do. Other EU Member States adopted a similar (if not stricter) distinction, such as France. These practices were also consistent at the time with the European Commission's 2002 Draft Co-Generation Directive. (Later, the Commission's 2004 Co-Generation Directive adopted a different approach).

9.13    Accordingly the fact, albeit striking at first sight (as stressed by Electrabel), that the G1 Unit was the only co-generation unit in Hungary not to qualify for mandatory off-take under the 2002 Decree does not signify that Dunamenti and Electrabel were subject to unfair discrimination or other unfair treatment by Hungary. There was no other similar co-generation unit in Hungary; and, even if there had been, no evidence that it would have been treated differently from the G1 Unit under the 2002 Decree. In the Tribunal's view, the 2002 Decree was based on rational objectives by Hungary; and it was applied to the G1 Unit reasonably.

9.14    In these circumstances, the Tribunal is unable to accept Electrabel's claim under the standards of protection invoked under Articles 10(1) and 10(7) ECT. Its G1 Unit did not meet the criteria imposed by the 2002 Mandatory Off-Take Decree; these criteria were not incorrectly, unreasonably or otherwise unlawfully applied by Hungary to Dunamenti's G1 Unit; and the Tribunal rejects any allegation of discriminatory, arbitrary, irrational, perverse or malign conduct by Hungary towards Dunamenti or Electrabel, as being unfounded on the factual evidence adduced in these arbitration proceedings.

*(5)*    ***SUMMARY***

9.15    For these reasons, the Tribunal dismisses Electrabel's G1 Unit Claim.

## PART X: SUMMARY

10.1.    *Introduction:* This Decision is made in regard only to the first phase of these arbitration proceedings, relating to extant issues of jurisdiction and liability; and it is not made in regard to any issue of quantum (including interest). Although necessarily described as a "Decision" and not an "Award" under the ICSID Convention and ICSID Arbitration Rules, the several decisions and reasons contained in this Decision are intended by the Tribunal to be final and not to be re-visited by the Parties or the Tribunal in any later phase of these arbitration proceedings. The summary below of the Tribunal's decisions is made for ease of reference only, taken from its full reasons and decisions in the earlier Parts of this Decision.

10.2.    *Jurisdiction:* The Tribunal has decided that it has jurisdiction under the ECT and the ICSID Convention to decide the entirety of the Parties' dispute in these arbitration proceedings, including all extant claims pleaded by Electrabel against Hungary, for the reasons set out in this Decision. In particular, the Tribunal has rejected the jurisdictional objections made by Hungary and also the submission by the European Commission, as a non-disputing party, that the Tribunal has no jurisdiction to decide Electrabel's PPA Termination Claim.

10.3.    *PPA Termination Claim:* For the reasons set out in this Decision, the Tribunal has decided in regard to this claim that it has jurisdiction to decide the claim on the merits under the ECT and ICSID Convention. On the merits, the Tribunal has decided that there was no unlawful expropriation contrary to Article 13 ECT; and the Tribunal has also decided that no other violation of the ECT was committed by Hungary, with the possible exception of the FET standard in Article 10(1) ECT in regard to the issue of Net Stranded Costs. As to Electrabel's claim under Article 10(1) ECT in regard to Net Stranded Costs, the Tribunal has deferred its decision as to both liability and quantum to a later phase of these arbitration proceedings.

10.4.    *PPA Pricing Claim:* For the reasons set out in this Decision, the Tribunal has decided in regard to this claim that it has jurisdiction to decide the claim on the

merits under the ECT and the ICSID Convention. For the reasons set out in this Decision, the Tribunal has decided on the merits to reject this claim.

10.5.    *Regulated Pricing Claim:* For the reasons set out in this Decision, the Tribunal has decided on the merits to reject this claim.

10.6.    *G1 Unit Claim:* For the reasons set out in this Decision, the Tribunal has decided on the merits to reject this claim.

10.7.    *Costs Claims:* The Tribunal makes no order as regards costs in this Decision, reserving all claims for costs by the Parties to a later phase of these arbitration proceedings.

10.8.    *The Parties' Claimed Relief:* In summary, in regard to the relief claimed by Electrabel set out in paragraph 1.47 of Part I above, the Tribunal dismisses in full the declarations pleaded under sub-paragraphs (A)(i), (A)(ii), (C), (D) and (E); it does not dismiss to the extent decided above the declarations pleaded under sub-paragraphs (B) and (F); and it makes no order here regarding the claim for costs under sub-paragraph (G). In regard to the relief claimed by Hungary set out in paragraph 1.50 of Part I above, the Tribunal accepts in full the claim pleaded under sub-paragraph (A) in regard to the PPA Pricing Claim, the Regulated Pricing Claim and the G1 Unit Claim; it partially dismisses such claim to the extent decided above in regard to the PPA Termination Claim; and it makes no order here regarding the claim for costs under sub-paragraph (B).

10.9.    *Next Phase:* In the light of the Tribunal's decisions regarding the PPA Termination Claim, these arbitration proceedings will now proceed to a second phase in accordance with the Parties' agreement on bifurcation. To that end, the Tribunal intends to convene a procedural meeting with the Parties' legal representatives within 45 day of the receipt of this Decision by the Parties.

### PART XI: THE OPERATIVE PART

11.1    For the reasons set out above, the Tribunal finally decides as regards the following matters:

11.2    ***Jurisdiction:*** The Tribunal declares, pursuant to Article 26 of the Energy Charter Treaty and Articles 25 and 41 of the ICSID Convention, that the International Centre for Settlement of Investment Disputes has jurisdiction and that this Tribunal is competent to decide finally the Parties' dispute in these arbitration proceedings;

11.3    ***The PPA Termination Claim:*** The Tribunal postpones to the next phase of these arbitration proceedings its final decision (as regards both liability and quantum) in regard to Net Stranded Costs forming part on the Claimant's claim for compensation pleaded as the PPA Termination Claim and made under Article 10(1) of the Energy Charter Treaty in regard to the Respondent's obligation to accord to the Claimant's investment fair and equitable treatment. The Tribunal dismisses as to liability all other grounds advanced by the Claimant for this PPA Termination Claim and all other parts of its claim for compensation under this PPA Termination Claim;

11.4    ***The PPA Pricing Claim:*** The Tribunal dismisses as to liability the Claimant's claim for compensation pleaded as the PPA Pricing Claim;

11.5    ***The Regulated Pricing Claim:*** The Tribunal dismisses as to liability the Claimant's claim for compensation pleaded as the Regulated Pricing Claim;

11.6    ***The G1 Unit Claim:*** The Tribunal dismisses as to liability the Claimant's claim for compensation pleaded as the G1 Unit Claim.

11.7    *Costs Claims:* The Tribunal makes no order as regards costs in this Decision, save to reserve in full its jurisdiction and powers to make any order as regards all legal and arbitration costs in an Award subsequent to this Decision; and

11.8    *Quantum:* This Decision does not finally decide any issue relating to quantum (including interest).

*Gabrielle Kaufmann-Kohler*            *V.V. Veeder*                    *Brigitte Stern*