# Exhibit 81

# THE VIENNA CONVENTIONS ON THE LAW OF TREATIES

## A COMMENTARY

### Volume II

EDITED BY

OLIVIER CORTEN

PIERRE KLEIN

OXFORD

# OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford  New York

Auckland  Cape Town  Dar es Salaam  Hong Kong  Karachi
Kuala Lumpur  Madrid  Melbourne  Mexico City  Nairobi
New Delhi  Shanghai  Taipei  Toronto

With offices in

Argentina  Austria  Brazil  Chile  Czech Republic  France  Greece
Guatemala  Hungary  Italy  Japan  Poland  Portugal  Singapore
South Korea  Switzerland  Thailand  Turkey  Ukraine  Vietnam

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© The several contributors, 2011

The moral rights of the authors have been asserted
Database right Oxford University Press (maker)

Crown copyright material is reproduced under Class Licence
Number C01P0000148 with the permission of OPSI
and the Queen's Printer for Scotland

First published 2011

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose the same condition on any acquirer

British Library Cataloguing in Publication Data
Data available

Library of Congress Cataloging in Publication Data
Data available

Typeset by SPI Publisher Services, Pondicherry, India
Printed in Great Britain
on acid-free paper by
CPI Antony Rowe, Chippenham, Wiltshire

ISBN 978-0-19-957353-0

1 3 5 7 9 10 8 6 4 2



PREUSSISCHER
STAATS-
BIBLIOTHEK
ZU BERLIN

13 140 233 - 2 : HB 10

# 1969 Vienna Convention

## Article 41
### Agreements to modify multilateral treaties between certain of the parties only

1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

(*a*) the possibility of such a modification is provided for by the treaty; or

(*b*) the modification in question is not prohibited by the treaty and:

   (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

   (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

2. Unless in a case falling under paragraph 1(*a*) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

| | |
|---|---|
| A. General characteristics | 987 |
| Object and purpose of the provision | 987 |
| Specificity of *inter se* agreements in the context of successive agreements | 987 |
| Specificity of *inter se* agreements in the context of the revision of treaties | 989 |
| Customary status | 990 |
| B. Meaning and scope of the provision | 994 |
| Conditions of admissibility of *inter se* modifications | 994 |
| Article 41(1)(a) | 995 |
| Article 41(1)(b) | 1001 |
| Conditions of procedure applicable to *inter se* modifications | 1005 |
| Sanction of the violation of Article 41 | 1008 |

## Bibliography

Giraud, E., 'Modification et terminaison des traités collectifs', *Ann IDI*, 1961-I, vol. 49, p 5

Leca, J., *Les techniques de révision des conventions internationales* (Paris: LGDJ, 1961)

Mus, J. B., 'Conflicts between Treaties in International Law', *NILR*, 1998, pp 208–32

Roucounas, E., 'Engagements parallèles et contradictoires', *RCADI*, 1987-VI, vol. 206, pp 13–287

Rousseau, Ch., 'De la compatibilité des normes juridiques contradictoires dans l'ordre international', *RGDIP*, 1932, pp 133–92

Salmon, J. (ed.), *Dictionnaire de droit international Public* (Brussels: Bruylant, 2001)

Villiger, M., *Commentary on the 1969 Vienna Convention on the Law of Treaties* (Leiden: Martinus Nijhoff, 2009), pp 528–38

Weckel, Ph., 'La concurrence des traités internationaux', thesis, Strasbourg, 1988

## A. General characteristics

### Object and purpose of the provision

1. The drafting history of Article 41, and especially the 'successive gliding' of its position in the structure of the Convention, and the 'semantic hesitations' in its formulation, testify both to the will but also to the difficulty of intellectually and legally isolating the specific issue of the status of *inter se* agreements with regard to 'bordering problems' that are the subject of Article 30 ('Application of successive treaties relating to the same subject matter'), on the one hand, and Article 40 ('Amendment of multilateral treaties'), on the other hand.[1] In spite of the efforts that were made in the course of codification, it remains necessary to state the particular function of Article 41 and to elucidate the relationships, which are subtle and sometimes obscure, that it has with the neighbouring provisions.

### *Specificity of* inter se *agreements in the context of successive agreements*

2. *A priori*, it may be thought that the conclusion by some of the parties to a multilateral treaty of a subsequent *inter se* agreement would fall under the general category contemplated by Article 30(4) of the Vienna Convention, that is to say, the issue of concurrence of successive treaties concerned with the same subject matter without identical parties. In fact, the case covered by Article 41, even if it can interfere with the applicability of the solution that results from Article 30(4), is at the same time special and distinct.

3. First, the application of Article 41 is limited to the situation where the parties to the 'restricted' agreement are a sub-group of the parties to the multilateral agreement, that is, to the case where all parties to the plurilateral or restricted agreement are parties to the multilateral or general agreement. In other words, the field of application of Article 41 excludes *a priori* the situation where some of the parties to a multilateral treaty conclude a 'restricted' agreement, including third parties which are not parties to the first agreement.[2] This latter situation is evidently covered by the provisions of Article 30(4).[3]

4. This first criterion of application of one or the other of the two provisions, due to the determination of the circle of contracting parties, is to be completed, bearing in mind the respective wording of Articles 30(4) and 41, by a necessary examination of the sequence in time of the conventional instruments at issue, and of their 'restricted' or 'general' character. Secondly, indeed the conflict between successive obligations covered by Article 30(4) does not prejudice the temporal sequence of the treaties at issue: the 'restricted' or 'plurilateral' treaty can be previous or subsequent to the 'general' or 'multilateral' treaty. For example, Article 30(4) would only be applied in the case where the provisions of the Convention of Brussels of 15 July 1921 instituting the Belgium–Luxembourg Economic Union, or of the Convention of London of 5 September 1944 instituting the Netherlands–Belgium–Luxembourg Customs Convention, would reveal

---

[1] See the commentary on these provisions in this work.

[2] One can model the scope of application of Art. 41 in this regard in the following way: it applies to the relationships between a treaty ABCDEF and an agreement ADF. It does not apply to relationships between a treaty ABCDEF and a treaty ADFXY.

[3] If we return to the previous model, Art. 30(4)(a) applies to relations between A, D, and F, parties to the two treaties, and Art. 30(4)(b) applies to the relations between A, D, or F, and B, C, E, or X, Y.

themselves to be incompatible with the Treaty of Rome of 25 March 1957 instituting the European Economic Community, to which Belgium, Luxembourg, and the Netherlands are parties. This is, of course, a theoretical example, bearing in mind the small risk of incompatibility and above all the presence of the 'compatibility clause' in the Treaty on the Functioning of the European Union (TFEU) in Article 350 (ex Art. 306) of the Treaty on European Union (TEU), according to which:

The provisions of this Treaty shall not preclude the existence or completion of regional unions between Belgium and Luxembourg, or between Belgium, Luxembourg and the Netherlands, to the extent that the objectives of these regional unions are not attained by application of this Treaty.[4]

5. On the other hand, Article 41 only envisages the case of a 'restricted' treaty— concluded, as the text of the provision states itself, between '[t]wo or more of the parties to a multilateral treaty…' which would occur, in a way by definition, subsequent to the engagement of these parties to be bound by the pre-existing multilateral treaty. Thus, to take up the example *supra*, *mutatis mutandis*, the Benelux Treaty of Economic Union concluded at The Hague on 3 February 1958 falls within the field of application of Article 41, since it was concluded by Belgium, Luxembourg, and the Netherlands, three States that were also parties to the Treaty of Rome 1957, which would be the 'anterior multilateral treaty' to the signature of the said Benelux Convention of 3 February 1958.[5]

6. It is thus only where an *inter se* agreement is concluded subsequent to a multilateral treaty, between certain parties to the latter, that, if need be, it would be possible to have a cumulative application of Article 41 and Article 30(4). But paragraph 5 of Article 30 intends to assure, in such a case, a priority in favour of Article 41 over Article 30(4), which is supposed to apply, under the wording of paragraph 5 of that Article, 'without prejudice to article 41'.

7. The result is that Article 41, by circumscribing the capability for certain parties to a multilateral treaty to conclude an *inter se* agreement, aims to reduce, in the particular case that corresponds to its purpose, the risks of incompatibility between successive conventional obligations, and thus, the necessity of resorting to Article 30(4), with a view to curbing cases of potential conflict.[6] It is only if by chance the substantive conditions posed by Article 41 were not respected that a true incompatibility could arise, which could only be resolved by returning to the provisions of Article 30(4), and as the case may be, by returning to provisions relating to the extinction and suspension of treaties, as well as by the triggering of international responsibility of the State or States that would thus have committed a violation of the initial multilateral treaty.[7]

8. Thirdly, the specificity of situations aimed at in Article 41 in comparison with the applicable principles by virtue of Article 30, which deals with the general issue of

---

[4] On this point see eg J. Vandamme, 'Article 233' in V. Constantinesco, J. P. Jacque, R. Kovar, and D. Simon (eds), *Traité instituant la CEE. Commentaire article par article* (Paris: Economica, 1992), esp. p 1491.

[5] 381 UNTS 165. This situation is also implicitly envisaged by the 'compatibility clause' of Art. 350 (ex Art. 306) TEU, cited *supra*, to the extent that it aims not only at past existence, but also at future compliance of concerned regional Unions.

[6] A/CONF.39/23/Rev., Official Documents of the Conference, p 59. See also the intervention by Mr Paredes (Ecuador), *YILC*, 1964, vol. I, p 272, paras 78–9; he illustrates his proposal with the example of an *inter se* agreement that deals with the navigation on a river or a canal which allows for ships of a deeper draught or usage at other times of the year that were not provided for in the original treaty; heavier charges or obligations could be imposed from this on parties to the original treaty which are not parties to the *inter se* agreement.

[7] The government of the United Kingdom also considered the first para. of Art. 41 as 'demonstrating the need to provide for independent adjudication of disputes in the operation of the draft articles' (*YILC*, 1966, vol. II, p 86).

successive conventional obligations, is a result of the fact that *inter se* agreements do not aim for an overall modification of the initial multilateral treaty between all the parties, but are concluded between certain parties with a view to 'modify the treaty as between themselves alone'. This last specificity explains why Article 41 is integrated not into Part III of the Vienna Convention, which is concerned with the application and interpretation of treaties, as is Article 30, but into Part IV, titled 'Amendment and Modification of Treaties'.

Fourthly and lastly, it should be noted that Article 30(4) can by definition only intervene *a posteriori*, once the treaty is concluded. By comparison, in the light of the stability of the international system, Article 41 plays a major role: it averts normative conflicts by imposing *a minima* rules that States must respect before they modify *inter se* a multilateral treaty. Once the conditions of substance and form that are required by the Vienna Convention are met, Article 30(4) will apply fully if a conflict occurs between the *inter se* agreement thus validated and the treaty.[8]

## *Specificity of* inter se *agreements in the context of the revision of treaties*

9. At first sight, in the Vienna Convention the distinction seems clear between 'amendments of multilateral treaties' that formally relate to Article 40,[9] and the 'modifications', corresponding to the practice of *inter se* agreements, that are the subject of Article 41. Nevertheless, these two methods are one part of what may suitably be called a process of 'revision'[10] of international conventions.[11] Futhermore, some authors consider that 'les trois termes "modification", "amendement" et "révision" sont juridiquement equivalents',[12] and international practice often utilizes these terms as synonyms.[13] The semantic choice retained by the Vienna Convention is nevertheless based on the concern of making clear the difference that the ILC had intended to highlight between the procedure of amending multilateral treaties 'as between all the parties' (Art. 40(2)), on the one hand, and the

---

[8] Ali Sadat-Akhavi, *Methods of resolving conflicts between treaties* (Leiden: Martinus Nijhoff, 2003), p 59.

[9] See *supra* the commentary on this provision in this work.

[10] The *Dictionnaire de droit international public* defines revision as a

procédure par laquelle les parties contractantes apportent des modifications à une ou plusieurs clauses d'un accord, d'un traité ou à des dispositions qui régissent leurs relations, les modifications envisagées étant susceptibles de toucher, en principe, l'économie générale du traité. La révision se distingue généralement de l'amendement par l'ampleur des modifications possibles; cette distinction terminologique n'est pas toujours respectée dans la pratique. (J. Salmon (ed.), *Dictionnaire de droit international public* (Brussels: Bruylant/AUF, 2001), p 1011)

('procedure by which the contracting parties make changes to one or several clauses of an agreement, treaty or to provisions that govern their relations, the contemplated changes being susceptible to touching, in principle, the general body of the treaty. Revision can generally be distinguished from an amendment because of the extent of possible changes; this terminological distinction is not always respected in practice. (translation by the editor))

[11] It is known that the term 'revision' was discarded by the ILC because of political connotations linked to Art. 19 of the Pact of the League of Nations, which provided that:

The Assembly may from time to time advise the reconsideration by Members of the League of treaties which have become inapplicable and the consideration of international conditions whose continuance might endanger the peace of the world.

Cf *YILC*, 1964, vol II, pp 43–4; Lord A. McNair, *Law of Treaties* (Oxford: Clarendon Press, 1961), p 534.

[12] '[T]he three terms "modification", "amendment" and "revision" are legally equivalent' (translation by the editor), P. Daillier, A. Pellet, M. Forteau, and D. Müller, *Droit international public* (8th edn, Paris: LGDJ, 2009), esp. p 323, fn 186.

[13] See eg the wording, characteristic on this point, of Art. 48 (ex Art. N) TEU.

process of modification by some parties 'as between themselves alone' (Art. 41(1)), on the other hand. As Special Rapporteur Sir H. Waldock noted in his Third Report:

> there is a considerable difference between the use of the *inter se* technique in cases where all the parties to the original treaty take part in the adoption of a new treaty providing for amendments to come into force *inter se* and its use in cases where some of the parties have no part in the drawing up of the amending treaty.[14]

In principle, indeed, in the first case, all the parties have consented to the revision, even if they subsequently do not ratify all the adopted amendments, while in the second case, the modification only occurs at the initiative of a 'restricted circle'.[15] Of course, international practice is not as uniform[16] but the ILC has nevertheless confirmed that:

> Clearly, a transaction in which two or a small group of parties set out to modify the treaty between themselves alone without giving the other parties the option of participating in it is on a somewhat different footing from an amending agreement drawn up between the parties generally, even if ultimately they do not all ratify it.[17]

This latter formulation allows a more clear identification of the reasons justifying a differentiated treatment for the two situations and their autonomization into distinct Articles: in the first case, the intention of the States is in principle to revise the multilateral treaty between all parties, even if only some of them will be bound in the end by the amending treaty, in conformity with the mechanism provided by paragraphs 4 and 5 of Article 40. In the second case, the authors of the modification intend to affect only the application of the treaty in their mutual relations. Thus, as the ILC noted, 'an *inter se* agreement is more likely to have an aim and effect incompatible with the object and purpose of the treaty',[18] which implies that the conclusion of *inter se* agreements is subject to more rigorous conditions of admissibility.

## Customary status

10.  The problem of agreements concluded *inter se* by certain parties to a multilateral treaty is generally considered, as several representatives of governments recalled at the Conference of Vienna, as an 'extremely complex problem',[19] while paradoxically the issue

---

[14]  See Third Report by Sir H. Waldock of 3 March, 9 and 12 June, and 7 July 1964, A/CN.4/167 and Add.1–3, *YILC*, 1964, vol. II, p 49.

[15]  T. O. Elias, *The Modern Law of Treaties* (Leiden: Sijthoff; New York: Oceana, 1974), p 95.

[16]  As the representative of the British government rightly observed at the 1st session of the Committee of the Whole at the Vienna Conference:

> An operation which began as an attempt to amend the treaty for all the parties could easily end as a modification between some of them *inter se*. On the other hand, an *inter se* modification agreed upon as between some of the parties only might appeal to the others and lead ultimately to the amendment of the treaty for all the parties to it.

> (Official Records, 1st session, Summary Records of the plenary meetings and of the meetings of the Committee of the Whole, 24 April 1968, 37th meeting, p 206, para. 39.)

Sir H. Waldock, intervening in his capacity as expert counsel (ibid, p 207, para. 52), responded in substance with the arguments developed in his report, cited *supra* n 14. See further I. Sinclair, *The Vienna Convention on the Law of Treaties* (2nd edn, Manchester: Manchester University Press, 1984), pp 106–7.

[17]  Report of the ILC to the General Assembly, A/5809, *YILC*, 1964, vol. II, p 197. This observation was maintained in the report of 1966: Report of the ILC to the General Assembly, *YILC*, 1966, vol. II, p 235.

[18]  Id.

[19]  See eg J. Zourek (Czechoslovakia) Official Records, 37th meeting, 24 April 1968, p 205. See in the same vein, P. Daillier, A. Pellet, M. Forteau, and D. Müller, *supra* n 11, p 297, fn 173.

had not given rise to significant difficulties in international practice before the *travaux préparatoires* of the Vienna Conference, nor had it generated specific jurisprudence[20] in significant quantities. In the same way, it cannot be said that classic doctrine[21] had given a special and particular position to the status of agreements concluded by certain parties to a previous multilateral treaty, between themselves alone, and with a view to governing their mutual relations.

11. A first explanation can be found in the fact that this problem has not surfaced in all its acuteness, and above all has only reached major proportions with the development of multilateral conventions. The intensification of conventional activity during the last century has indeed inevitably multiplied the risk for conflict between treaties dealing with the same subject matter.[22] Simultaneously, the proliferation of universal multilateral treaties has had the effect of causing tensions between universalism and regionalism[23] that have become characteristic of contemporary international society, and thus of encouraging attempts by groups of States, especially based on geographic proximity, to aim at 'autonomizing' their reciprocal relations.

12. Curiously, this issue was not immediately perceived, and has in any case not translated straight away into a body of specific rules in the customary law of treaties. This is without doubt the second explanation for the belated apparition of the question of a particular regime for *inter se* agreements, including during the drafting of the Vienna Convention on the Law of Treaties.

13. Indeed, up until then, the problem was only dealt with from the perspective of the concurrence of successive conventional obligations. This problem—a particularly complex one—was treated in a progressive, or contradictory, way in the work of the ILC.[24] At first, especially for the second Special Rapporteur, Sir H. Lauterpacht, the potential conflict between successive treaties was to be analysed in terms of validity, from the moment when States that are parties to a treaty subsequently concluded a second treaty that was incompatible with the earlier one. This solution inescapably implies, according to the Special Rapporteur, the nullity of an agreement through which some parties intend to avoid conventional obligations that bind them to other parties to the initial treaty, by virtue of the principle *pacta sunt servanda* and the principle of good faith.[25] The initial conventional commitments were reputed to have the effect of depriving the parties of the capacity to conclude a new treaty that would put in question the rights of a party to the earlier treaty: the result was necessarily that the conclusion of a new incompatible agreement constituted, to use the words of the Special Rapporteur, 'a legal wrong which taints

---

[20] One might cite the famous *Oscar Chinn* case (*Belgium v United Kingdom*) (PCIJ, 12 December 1934, Series A/B, no. 63), which concerned the problem of the Convention of Saint-Germain of 10 September 1919 concluded between certain parties to the General Act of Berlin 1855, and which modified the latter.

[21] Cf the Harvard Draft ('The Draft Convention on the Law of Treaties'), Art. 22(b):

Two or more of the States parties to a treaty to which other States are parties may make a later treaty which will supersede the earlier treaty in their relations inter se, only if this is not forbidden by the provisions of the earlier treaty and if the later treaty is not so inconsistent with the general purpose of the earlier treaty as to be likely to frustrate that purpose. (*AJIL*, Suppl. 1935, pp 1016–24)

[22] See the intervention by Mr Lachs, *YILC*, 1963, vol. I, 687th meeting, p 86; G. Tunkin, ibid, pp 88–9.

[23] See Société Française pour le Droit International, Colloque de Bordeaux, *Régionalisme et universalisme dans le droit international contemporain* (Paris: Pedone, 1977).

[24] On this point see *supra* the commentary on Art. 30.

[25] Report by Sir H. Lauterpacht of 24 March 1953, A/CN.4/63, *YILC*, 1953, vol. II, p 156.

the subsequent treaty with illegality.'[26] On the other hand, for G. Fitzmaurice, the third Special Rapporteur, the issue seemed to be more nuanced and further had to be dealt with in terms of a conflict of obligations and of applicability of successive provisions; furthermore Fitzmaurice suggested in this regard that a regime should be implemented that carried a fundamental distinction between the different types of treaties, and especially between 'reciprocal' and 'interdependent' or 'integral' treaties.[27] In the end, Sir Humphrey Waldock, the fourth Special Rapporteur, deliberately had to guide the debate towards the area of the priority of application, together with, should it so happen, the triggering of State responsibility, rather than moving towards the validity of subsequent engagements.[28] No distinction was made between the different categories of treaties.

14.  The evolution of the positions of the Special Rapporteurs on the question of the relationships between successive conventional obligations, which principally concerns the drafting of Article 30 of the Vienna Convention,[29] determined the solutions that were retained for particular problems of subsequent agreements concluded *inter se* by certain parties to a previous multilateral treaty. Indeed, the tension between considerations concerned with the validity of treaties and considerations relating to the successive application of obligations is at the heart of the problem of the modification of multilateral treaties by certain parties in their mutual relations.

15.  As proof one can take the evolution of the position that has been given in successive versions of the draft Articles proposed by the ILC on this issue, which ultimately became the subject of Article 41 of the Vienna Convention. Initially, the fate of 'an amendment by which certain of the parties propose to modify the application of the treaty as between themselves alone' had been envisaged by Article 68(2) of the draft Articles, as they feature in the Third Report of Sir H. Waldock, as relating to the '[r]ight of a party to be consulted in regard to the amendment or revision of a treaty' and as constituting, if certain conditions are fulfilled, an exception to the obligation to make a notification concerning any proposition intending to revise the treaty, and to the obligation to consult on the conclusion of any instrument having the purpose of modifying or revising the treaty.[30] Furthermore, the case of a modification or revision of a treaty in the relationships between certain parties alone, in the case where it constitutes a violation of the treaty with regard to the other parties, was the subject of Article 69(3)(b), which provided for resort to the possibility of extinction or suspension of the treaty by the other

---

[26] Id. Sir Lauterpacht did not hesitate to maintain that the validity of the subsequent treaty in practice tends to weaken the position of the countries that are parties to the first treaty but that do not take part in the subsequent treaty, and harms them indirectly. (Note on the *Oscar Chinn* case, PCIJ judgment, *BYBIL*, 1935, p 165.) See also J. Leca, *Les techniques de révision des conventions internationales* (Paris: LGDJ, 1961), p 227.

[27] See esp. the Third Report of G. Fitzmaurice, 18 March 1958, A/CN.4/115, *YILC*, 1958, vol. II, pp 27 and 28.

[28] See Third Report of Sir H. Waldock, *supra* n 14, pp 35 ff. The position of the Special Rapporteur, outlined in his Second Report (*YILC*, 1963, vol. II, p 36) had been approved by the majority of the ILC at the 685th, 687th, and 703rd meetings (*YILC*, 1963, vol. I). To use a characteristic formulation by the Special Rapporteur:

An undertaking in a treaty not to enter into a conflicting treaty does not, it is thought, normally affect the treaty-making capacity of the States concerned, but merely places them under a contractual obligation not to exercise their treaty-making powers in a particular way. A breach of this obligation engages their responsibility; but the later treaty which they conclude is not a nullity. (*loc. cit.*, p 58)

[29] On this point see the commentary on Art. 30 in this work.

[30] See Third Report of Sir H. Waldock, *supra* n 14, pp 47 ff.

parties.[31] Both the numbering and the wording of these provisions were changed several times, especially after relatively confused debates[32] that were held at the 16th session of the ILC, particularly during its 754th meeting.[33]

16. In the end, these provisions were reformulated by the ILC in its report to the General Assembly on the work of its 16th session[34] and were merged in the new draft Article 67. On the one hand, the ILC confirmed the necessity to raise the question of 'Agreements to modify multilateral treaties between certain of the parties only' in an autonomous provision. On the other hand, this new provision did not limit itself to tackling the problems merely from the perspective of procedural obligations of notification and consultation, but also intended to express a position on the conditions of lawfulness of the conclusion of an *inter se* agreement.

17. Article 67 of the draft was rediscussed on the basis of the Sixth Report of Sir H. Waldock.[35] The revised draft Article 67[36] became Article 37, in the report of the Commission to the General Assembly, after the restructure of the draft Convention.[37] At the Conference of Vienna, the draft Article was discussed at length, especially because of its complexity,[38] and then sent back to the Drafting Committee at the same time as certain amendments, to be ultimately adopted by the Committee of the Whole on 8 May 1969, by 91 votes to 0.[39] It is this version that was definitively confirmed, after a change in numbering, as Article 41 of the Vienna Convention.

More recently, *inter se* agreements have reappeared in the work of the Commission, during the debates on the fragmentation of international law. These agreements were referred to among the 'Difficulties arising from the Diversification and Expansion of International Law' and were one of the five topics that the Commission felt should make the object of an indepth study.[40] In the opinion of the ILC in 2006:

such agreements are an often used technique for the more effective implementation of the original treaty between a limited number of treaty parties that are willing to take more effective or more far-reaching measures for the realization of the object and purpose of the original treaty.[41]

---

[31] Draft Art. 69 in the Third Report of Sir H. Waldock was titled 'Effect of an amending or revising instrument on the rights and obligations of the parties'.

[32] At the reading of the work of the ILC, one cannot but observe that (following S. Rosenne on this point) 'the many difficulties which had arisen, in a matter admittedly of some delicacy, were largely questions of drafting', *YILC*, 1964, vol. I, esp. p 202, para. 66.

[33] 29 June 1964, vol. I, pp 197 ff.

[34] Report of the ILC to the General Assembly, A/5809, *ACDI*, p 197; M. Villiger, *Commentary on the 1969 Vienna Convention on the Law of Treaties* (Leiden: Martinus Nijhoff, 2009), p 532.

[35] A/CN.4/186, and Add.1–7, 11 and 25 March, 12 April, 11, 17, and 24 May, 1 and 14 June 1966, *YILC*, 1966, vol. II, pp 51 ff, 86 ff.

[36] A/CN.4/L.117, and Add.1, 13 and 14 July 1966, *YILC*, 1966, vol. II, p 119.

[37] *YILC*, 1966, vol. II, p 235.

[38] See esp. Mr de Bresson on behalf of France, Committee of the Whole, 24 April 1968, Official Records, Summary Records of the plenary meetings and of the meetings of the Committee of the Whole, 1st session, 37th meeting, p 206, para. 35.

[39] Committee of the Whole, Official Records, Summary Records of the plenary meetings and of the meetings of the Committee of the Whole, 1st session, 16th meeting, pp 85 ff.

[40] Study completed by Mr Riad Daoudi, Doc. ILC(LVI)/SG/FIL/CRD.4, see Report of the Study Group of the ILC—Addendum—Appendix—Draft Conclusions of the Study Group finalized by Martti Koskenniemi, A/CN.4/L.682/Add.1, 2 May 2006, p 2.

[41] Conclusions of the work of the Study Group on the Fragmentation of International Law: Difficulties arising from the Diversification and Expansion of International Law, Adopted by the ILC at its 58th session and submitted to the General Assembly, *YILC*, 2006, vol. II, para. 29.

Beyond this empirical definition given by the Commission, it is interesting to note that, more than 50 years after the first works on the issue of *inter se* agreements, the conclusion is still the same and the questions remain: 'The law on conflicts between successive agreements is largely based on presumptions about party intent and the object and purpose of treaties. Conflict-solution here is inextricable from treaty interpretation'.[42] Even if no tribunal and no State has formally pronounced on the customary character of Article 41, constant practice resolutely points in favour of the recognition of such character.

## B.  Meaning and scope of the provision

### Conditions of admissibility for *inter se* modifications

18. The indication of substantive requirements that determine the admissibility of an *inter se* modification of a multilateral treaty has undergone significant alterations in the course of the process of codification, before the definitive version of the provisions of the Vienna Convention was adopted. In the version of Article 68 contained in the Third Report of Sir H. Waldock, the situation of modification was admitted:

if such amendment of the treaty as between the parties in question—

*(a)* does not affect the enjoyment by the other parties of their rights under the treaty;

*(b)* does not relate to a provision derogation from which is incompatible with the effective execution of the objects and purposes of the treaty as a whole; and

(c) is not prohibited by the treaty.[43]

19. A new wording was proposed at the 16th session of the ILC, which mainly had the effect of introducing the possibility of modification *inter se*, in some way admissible *a priori*, in the case where the conclusion of such an *inter se* agreement was expressly provided for by the original multilateral treaty.[44] It was this version that would be taken up with some editorial changes,[45] in the report of the Commission to the General Assembly.[46] Apart from the case where the possibility of modification is itself provided for in the treaty, the three initial conditions had been retained at this stage, in spite of the fact that the redundant character of the last two could be questioned. As the ILC had already noted in its report to the General Assembly:

the second and third conditions, it is true, overlap to some extent since an *inter se* agreement incompatible with the objects and purposes of the treaty may be said to be impliedly prohibited by the treaty.[47]

Maintaining these three cumulative conditions was justified by the concern to keep in consideration the situation where parties to the initial treaty themselves would be willing explicitly to prohibit any *inter se* modification, including minor modifications that would

---

[42] 'Fragmentation of International Law: difficulties arising from the Diversification and Expansion of International Law: Report of the Study Group of the International Law Commission—Finalized by Martti Koskenniemi', A/CN.4/L.682, para. 320.

[43] See Third Report of Sir H. Waldock, *supra* n 14, p 47.

[44] 754th meeting, 29 June 1964, *YILC*, 1964, vol. I, p 197.

[45] In particular, under the proposition of the Special Rapporteur, discussed at the 754th meeting, the text read: 'such agreements are expressly contemplated by the treaty'. The version presented by the ILC in the end provides in a clearly more judicious manner 'if the possibility of such a modification is provided for by the treaty'.

[46] Report of the ILC to the General Assembly, A/5809, *YILC*, 1964, vol. II, p 197.    [47] Ibid, p 197.

not be incompatible with the object and purpose of the conventional instrument. A second reason may also be stated: as the Special Rapporteur observed in his Sixth Report, in response to an observation of the Finnish government, the ILC

> thought it essential that the limits within which *inter se* agreements are permissible should be formulated with all the necessary strictness and clarity.[48]

This priority given to precision over conciseness certainly is to be commended. In light of the foregoing considerations, Article 41(1) can thus be interpreted in the following manner.

### Article 41(1)(a)

20.  First, the capacity to conclude an *inter se* agreement is recognized in Article 41(1)(a) if 'the possibility of such a modification is provided for by the treaty'. It is clear that this condition is self-sufficient: if the modification is provided for in the treaty, it will be by definition compatible with the object and purpose of the treaty as a whole and will not affect the rights and obligations of the parties, since they have consented to the modification. It nevertheless occurs that the parties to the multilateral treaty will regard it necessary to state that the potential *inter se* modification will have to comply with the object and purpose of the treaty, but in such a case this provision has of course only a purely declaratory function.[49]

21.  In spite of its apparent clarity, the formulation of Article 41(1)(a) nevertheless calls for two observations:

- on the one hand, Article 41 does not state whether the modification has to be provided for in an express manner, or whether it can be implicit. Nevertheless, the interpretation of the provision 'in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose' leads to a univocal result: to the extent that Article 41(1)(b) envisages the case where 'the modification in question is not prohibited by the treaty', the silence of the treaty undoubtedly comes within the ambit of this provision; consequently, Article 41(1)(a) implies the presence of an express provision;
- on the other hand, it suffices that the original multilateral treaty allows for the principle of a potential modification between certain parties alone in their mutual relations, without it being prejudiced in any way with regard to the content of the envisaged agreement, in order for the conclusion of an *inter se* agreement to be lawful.

22.  It is quite frequently the case that stipulations of multilateral treaties provide for the possibility for States parties to resort to dispute-resolution mechanisms that have been agreed upon bilaterally or multilaterally.[50] One can compare to this situation the case of multilateral treaties that only attribute to their provisions an auxiliary function, that is to

---

[48] A/CN.4/186 and Add.1–7, *YILC*, 1966, vol. II, p 87.

[49] Thus, eg, Art. 41 of the International Coffee Agreement of 31 March 1968 (647 UNTS 4) provides that 'Regional and inter-regional price arrangements among exporting Members shall be consistent with the general objectives of the Agreement'.

[50] See eg Art. 16 of the International Convention on the Elimination of All Forms of Racial Discrimination of 7 March 1966 (New York):

> The provisions of this Convention concerning the settlement of disputes or complaints shall be applied without prejudice to other procedures for settling disputes or complaints in the field of discrimination laid down in the constituent instruments of, or in conventions adopted by, the United Nations and its specialized agencies,

say, they assure the priority of the stipulations in the subsequent bilateral or plurilateral agreements. In this regard mention may be made of the Geneva Conventions 1958 on the high seas[51] or on the territorial sea and the contiguous zone.[52] The principle is also evidently valid for the Vienna Conventions on treaties themselves, with the exception of the clauses concerned with *ius cogens*. One will recall in particular the possibility for States parties to the Vienna Convention 1969 to conclude between them constituent treaties of international organizations or with international organizations, to which the Convention will only apply in a subsidiary way 'without prejudice to any relevant rules of the organization', according to Article 5 of the Convention.[53]

23.   Nevertheless, nothing prohibits the parties to the multilateral convention from delimiting *a priori* the object and extent of the authorized modification. First of all it can occur—and this is the most restrictive scenario—that the clause in the multilateral treaty requires compatibility with the whole of the provisions of the initial treaty.[54] One would accept nevertheless that this first hypothesis is rather ambiguous, in the sense that it is evidently on the borderline between a conditional authorization and an implicit prohibition.

24.   Secondly, the multilateral treaty can, while providing for the possibility of *inter se* agreements, enclose the content of potential modifications in a relatively strict frame. So, for example, Article XXIV of the GATT[55] authorizes the contracting parties to conclude between them agreements establishing a free trade zone or a customs union, while restricting their conventional autonomy within relatively strictly defined limits. Further, paragraph 5 of this provision states that the implementation of such forms of regional integration and *inter se* agreements leading to them may not render more restrictive the pre-existing obligations and regulations of commerce; under paragraph 8, the customs union or free trade zone are very precisely defined; finally, in the case where the agreements at issue do not completely fulfil the requirements posed by GATT, the draft agreement

---

and shall not prevent the States Parties from having recourse to other procedures for settling a dispute in accordance with general or special international agreements in force between them. (660 UNTS 235)

An analogous provision was already contained in Art. 29 of the Geneva General Act for the Settlement of Disputes of 26 September 1928:

1. Disputes for the settlement of which a special procedure is laid down in other conventions in force between the parties to the dispute shall be settled in conformity with the provisions of those conventions. 2. The present General Act shall not affect any agreements in force by which conciliation procedure is established between the Parties or they are bound by obligations to resort to arbitration or judicial settlement which ensure the settlement of the dispute. (43 UNTS 343)

[51] As an example, Art. 25(2) of the Convention should be mentioned:

All States shall cooperate with the competent international organizations in taking measures for the prevention of pollution of the seas or air space above, resulting from any activities with radioactive materials or other harmful agents. (450 UNTS 97)

[52] As an example one could cite Art. 17 of the Convention:

Foreign ships exercising the right of innocent passage shall comply with the laws and regulations enacted by the coastal State in conformity with these articles and other rules of international law. (516 UNTS 217)

[53] See *supra* the commentary on this provision.

[54] See eg Art. 83 of the Chicago Convention on International Civil Aviation of 7 December 1944:

Subject to the provisions of the preceding Article, any contracting State may make arrangements not inconsistent with the provisions of this Convention. Any such arrangement shall be forthwith registered with the Council, which shall make it public as soon as possible. (15 UNTS 353)

[55] 55 UNTS 187.

must, by virtue of paragraph 10, be submitted to the contracting parties for approval, with a two-thirds majority. The multiplicity of successive agreements, general or plurilateral, concluded under the auspices of GATT has made a simple and univocal solution necessary through an interpretive note to Annex 1A of the Marrakesh Agreement of 1994, creating the World Trade Organization (WTO):[56] this includes the GATT of 1947 and the modifications that had been made, but, in case of conflict, it prevails over pre-existing provisions.[57]

25.  Likewise, the authorization given in a multilateral treaty to conclude specific subsequent agreements can be dependent on the fact that these are limited to complementing or facilitating the application of the previous treaty. This is the case for the provision contained in the European Convention on Extradition concluded under the auspices of the Council of Europe, which provides:

The Contracting Parties may conclude between themselves bilateral or multilateral agreements only in order to supplement the provisions of this Convention or to facilitate the application of the principles contained therein.[58]

This is also the case for the Vienna Convention on consular relations:

Nothing in the present Convention shall preclude States from concluding international agreements confirming or supplementing or extending or amplifying the provisions thereof.[59]

This particular provision of the Vienna Convention on consular relations was used many times through the conclusion of 'consular agreements', made in the application of this Article of the Convention.[60] This situation is similar to the consistent everyday conventional practice of authorizing certain parties to substitute provisions of the multilateral treaty in their mutual relations or to establish between them a bilateral or plurilateral regime that is more favourable. The most common case in this context is probably the recognition of particular facilities in border zones.[61] Likewise, many treaties that have

---

[56] Available at: <http://www.wto.org/english/docs_e/legal_e/04-wto.pdf>.

[57] P. Daillier, A. Pellet, M. Forteau, and D. Müller, *supra* n 11, p 295, fn 172. As a matter of example, cf D. Luff, *Le droit de l'Organisation mondiale du commerce. Analyse critique* (Brussels: Bruylant; Paris: LGDJ, 2004), pp 22–4 and 146–8. For an illustration in the area of human rights law, one should refer to the work of Cl. Sciotti, *La concurrence des traités relatifs aux droits de l'homme devant le juge national* (Brussels: Bruylant/ Nemesis, 1997), esp. pp 31–4, which mentions the case of Ukraine, Moldova, and Russia, parties to the European Convention of Human Rights, and then to the Convention on Human Rights and Fundamental Freedoms of the Commonwealth of Independent States, signed in Minsk on 26 May 1995.

[58] Article 28(2) of the European Convention on Extradition, 1957, Council of Europe, ETS 24. For an identical formulation, that can also be found in a number of conventions concluded under the auspices of the Council of Europe, see also Art. 16(1) of the European Convention on the Control of the Acquisition and Possession of Firearms by Individuals, 1978, Council of Europe, ETS, 101. For other examples, see esp. Ph. Weckel, 'La concurrence des traités internationaux', PhD thesis, Strasbourg, 1988, pp 357 ff.

[59] Article 73(2) of the Vienna Convention on Consular Relations, Vienna, 24 April 1963 (596 UNTS 261); see also the Convention on International Liability for Damage Caused by Space Object, London, Moscow, 29 March 1972 (961 UNTS 187); United Nations Convention on the Law of the Non-Navigational Uses of International Watercourses, New York, 21 May 1997 (GA Res. 51/229, annex, Official Records of the General Assembly, 51st session, Supplement No. 49; *ILM*, vol. 36, p 700).

[60] Esp. between Canada and China, 28 November 1997; Australia and China, 8 September 1999; Austria and Czechoslovia, 14 March 1979.

[61] See eg Art. 2 of the European Agreement on the Transfer of Corpses, 1973, ETS 80, which provides in para. 1 that 'The provisions of this Agreement embody the maximum requirements which may be stipulated in connection with the despatch of corpses…' and in para. 2 that 'The Contracting Parties remain free to grant *greater facilities* either by means of bilateral agreements or by decisions arrived at by common accord in special cases and in particular in the case of transfer between *frontier regions*' (emphasis added). See in the same sense

the aim of harmonizing legislation generally accept *a priori* that certain parties adopt between them a more advanced harmonization. Many final clauses of conventions concluded under the aegis of the Council of Europe thus provide in substance:

When two or more Contracting States have enacted uniform laws…or created a special system…, they shall be free to apply, between themselves, those laws or that system in place of this Convention or any part of it.[62]

This is also the case for conventions aimed at protecting individuals, for example the Social Charter of Strasbourg, which provides:

The provisions of this Charter shall not prejudice the provisions of domestic law or of any bilateral or multilateral treaties, conventions or agreements which are already in force, or may come into force, under which more favourable treatment would be accorded to the persons protected.[63]

26. The Schengen Acquis (1990) on the gradual abolition of controls at the common borders between Germany, the Benelux States, and France[64] states in Articles 28 to 38 the rules applicable to asylum seekers. It must be observed that it would be difficult to imagine that the States parties to this Convention modify the basic rules of the 1951 Geneva Convention[65] and its 1967 protocol[66] on the status of refugees without creating the incompatibility envisaged in the first paragraph of Article 41. In fact, Article 28 of the 1990 Convention provides that the contracting parties reaffirm their obligations towards these earlier instruments. The same applies for Article 2 of the Convention of Dublin, Rome and Luxembourg,[67] which provides that:

The Member States reaffirm their obligations under the Geneva Convention, as amended by the New York Protocol, with no geographic restriction of the scope of these instruments, and their commitment to co-operating with the services of the United Nations High Commissioner for Refugees in applying these instruments.

---

Art. 9 of the Convention on Transit Trade of Land-locked States, New York, 8 July 1965, which is titled 'Provision of greater facilities' (597 UNTS 51), or Art. 49 of the TIR Convention, signed in Geneva 14 November 1975 (1079 UNTS 89).

[62] See eg Art. 20(2) of the European Convention on Recognition and Enforcement of Decisions Concerning Custody of Children and on Restoration of Custody of Children 1980, ETS 105, or Art. 14(1) and (2) of the European Convention on the International Effects of Deprivation of the Right to Drive a Motor Vehicle, ETS 88.

[63] European Social Charter (Revised), Strasbourg, 3 May 1996, Art. H (2151 UNTS 277); see also the Convention on Reduction of Cases of Multiple Nationality and Military Obligations in Cases of Multiple Nationality, Strasbourg, 5 May 1963, Art. 4 (634 UNTS 221); Interim Agreement on Social Security Schemes Relating to Old Age, Invalidity and Survivors, and Protocol Thereto, 11 December 1953, Art. 5 (218 UNTS 211); Vienna Convention on Diplomatic Relations 1961, Art. 47(2)(b) (500 UNTS 95); Cartagena Protocol on Biosafety, Art. 14 (2226 UNTS 208).

[64] Available at: <http://eur-lex.europa.eu/LexUriServ/site/en/oj/2000/l_239/l_23920000922en00010473.pdf>.

[65] 189 UNTS 137.

[66] 606 UNTS 267.

[67] Available at: <http://eur-lex.europa.eu/LexUriServ/site/en/oj/2000/l_239/l_23920000922en00010473.pdf>. Asylum politics (more specifically the determination of the State responsible for the examination of an asylum request made in one of the member States of the European Communities by a national of a third party State) has given rise to an agreement between the States of the Union: the Dublin Convention signed at Dublin on 15 June 1990, at Rome on 7 December 1990, and in Luxembourg on 13 June 1991. This replaces Ch. 7*ter*, Title II of the Schengen Agreement. Cf H. Meijers (ed.), Schengen, *Internationalisation of Central Chapters of the Law on Aliens, Refugees, Privacy, Security and the Police* (Zwolle: Kluwer, 1991); F. Julien-Laferriere, 'De l'application des accords de Schengen au statut des "zones d'attente": chronique d'une loi annoncée', *Actualité juridique droit administratif*, 1992, pp 656–71.

27. Finally, certain clauses limit themselves to imposing respect for the object and purpose, or even the fundamental principles, of the initial multilateral convention, through the restricted agreement the conclusion of which is explicitly provided for. This situation can be illustrated by the practice of regional agreements authorized by Article 52 of the United Nations Charter.[68]

28. Nevertheless in spite of their diversity, these '*a priori* compatibility clauses' that can be read in conjunction with Article 30(2) of the Vienna Convention have in common that they authorize the conclusion of *inter se* agreements in a preventative way in perfect conformity with Article 41(1)(a). Even more clearly, international practice subsequent to the Vienna Convention shows that some multilateral treaties faithfully take up the spirit and *quasi* the wording of Article 41. An emblematic illustration is provided by the wording of Article 311 of the United Nations Convention on the Law of the Sea, which bear reproducing here:

Two or more States Parties may conclude agreements modifying or suspending the operation of provisions of this Convention, applicable solely to the relations between them, provided that such agreements do not relate to a provision derogation from which is incompatible with the effective execution of the object and purpose of this Convention, and provided further that such agreements shall not affect the application of the basic principles embodied herein, and that the provisions of such agreements do not affect the enjoyment by other States Parties of their rights or the performance of their obligations under this Convention.[69]

This formulation of the Montego Bay Convention reflects in a particularly significant way the tensions that are present between the concern to safeguard the integrity of conventional engagements initially subscribed to by all of the parties and the desirable 'controlled alienability' of such commitments in the special process of *inter se* agreements: in the end, for the original parties it is a case of, as has been said, 'de trouver une solution au double impératif de stabilité et de mouvement'.[70]

29. It is in the context of the European Community that the system which has developed around Article 41 is most clearly institutionalized. In this regard, the debate that opposed the supporters of the intangibility of the communitarian acquis to the advocates of flexibility in the context of the treaties instituting the European Community, is particularly significant:[71] while the Treaties of Paris and Rome excluded in principle (and on

---

[68] It will be recalled that under para. 1 of this provision:

Nothing in the present Charter precludes the existence of regional arrangements or agencies for dealing with such matters relating to the maintenance of international peace and security as are appropriate for regional action provided that such arrangements or agencies and their activities are consistent with the Purposes and Principles of the United Nations.

It should nevertheless be added that these regional agreements, even though encouraged by the Charter (Art. 52(3)), must respect the priority mission of maintaining the peace that is attributed to the Security Council under Chs VI and VII of the Charter (Art. 52(4)). On Art. 52, see eg the commentary by E. Kodjo, edited by H. Gherari, in J.-P. Cot, A. Pellet, and M. Forteau (eds), *La Charte des Nations Unies, Commentaire article par article* (3rd edn, Paris: Economica, 2005), vol. II, pp 1367ff.

[69] Article 311(3). It will be noted that para. 6 of the same Article adds in a way that may be regarded as redundant, but which marks the importance attached to this principle by the parties, that States Parties agree that there shall be no amendments to the basic principle relating to the common heritage of mankind set forth in article 136 and that they shall not be party to any agreement in derogation thereof.

See also to a certain extent, Cartagena Protocol on Biosafety, Art. 14 (2226 UNTS 208).

[70] '[O]f finding a solution to the double imperative of stability and movement' (translation by the editor), S. Bastid, *Les traités dans la vie internationale* (Paris: Economica, 1985), esp. p 179.

principle) any practice of *inter se* modification of the original body of Community law, the Treaty of Amsterdam introduced such a possibility, which was made concrete through the so-called 'enhanced cooperation' mechanism.[72] But the clauses authorizing modifications between certain parties alone of the treaties instituting the Community and the European Union pose particularly rigorous conditions. Under former Article 43(1) TEU, the envisaged cooperation in the area of justice and police:

(a) ....aim[s] at furthering the objectives of the Union and of the Community, at protecting and serving their interests and at reinforcing their process of integration;
(b) respects the said Treaties and the single institutional framework of the Union;
(c) respects the *acquis communautaire* and the measures adopted under the other provisions of the said Treaties;
(d) remains within the limits of the powers of the Union or of the Community and does not concern the areas which fall within the exclusive competence of the Community;
(e) does not undermine the internal market as defined in Article 14(2) of the Treaty establishing the European Community, or the economic and social cohesion established in accordance with Title XVII of that Treaty;
(f) does not constitute a barrier to or discrimination in trade between the Member States and does not distort competition between them;
(g) involves a minimum of eight Member States;
(h) respects the competences, rights and obligations of those Member States which do not participate therein;
(i) does not affect the provisions of the Protocol integrating the Schengen *acquis* into the framework of the European Union;
(j) is open to all the Member States, in accordance with Article 43b.

Further, the requirements were even more drastic where the modifications concerned were susceptible to affect the communitarian pillar itself, since under Article 11 EC Treaty it was required that the envisaged cooperation:

(a) does not concern areas which fall within the exclusive competence of the Community;
(b) does not affect Community policies, actions or programmes;
(c) does not concern the citizenship of the Union or discriminate between nationals of Member States;
(d) remains within the limits of the powers conferred upon the Community by this Treaty; and
(e) does not constitute a discrimination or a restriction of trade between Member States and does not distort the conditions of competition between the latter.

---

[71] On this problem, see especially C. de la Malene, 'Les coopérations renforcées dans l'UE', Rapport de la délégation du Sénat pour l'Union Européenne no. 531, 22 April 1997; Ph. Manin, 'Le problème de la géométrie variable' in *La révision du traité sur l'Union européenne, perspectives et réalités* (Paris: Pedone, 1996), pp 27ff; Ph. Manin and J.-V. Louis (eds), *Vers une Europe différenciée? Possibilités et limites* (Paris: Pedone, 1996); H. Pazarci, 'Problèmes d'incompatibilité des accords conclu par la CEE' in *Le droit international: unité et diversité. Mélanges offerts à Paul Reuter* (Paris: Pedone, 1981), pp 391–405.

[72] On the subject of the mechanism introduced by the Treaty of Amsterdam, see eg H. Bribosia, 'De la subsidiarité à la coopération renforcée' in Y. Lejeune (ed.), *Le traité d'Amsterdam, espoirs et déceptions* (Brussels: Bruylant, 1999); F. Chaltiel, 'Le traité d'Amsterdam et la coopération renforcée', *RMC*, 1998, p 289; V. Constantinesco, 'Les clauses de "coopération renforcée", le protocole sur l'application des principes de subsidiarité et de proportionnalité', *RTDE*, 1997, esp. p 751; C. D. Ehlermann, 'Différenciation, flexibilité, coopération renforcée: les nouvelles dispositions du traité d'Amsterdam', *RMUE*, 1997, p 53; G. Gaja, 'How flexible is flexibility under the Amsterdam Treaty', *CMLRev*, 1988, p 855; H. Kortenberg, 'Closer cooperation in the Treaty of Amsterdam', *CMLRev*, 1998, p 833; H. Labayle, 'Amsterdam, ou l'Europe des coopérations renforcées', *Europe*, 1998; Ph. Manin, 'La "coopération renforcée"' in *Le traité d'Amsterdam, réalités et perspectives* (Paris: Pedone, 1999), p 137.

It may be questioned whether the degree of precision of the conditions thus posed by the Treaty of Amsterdam of 2 October 1997[73] for potential *inter se* modifications has had, at the end of the day, a counter-productive effect, by nearly rendering these a dead letter—a situation which induced to a large extent the mechanism introduced by the Treaty of Nice.[74] The rigorous conditions imposed on any *inter se* modification in this context undoubtedly reflect the particular character of the communitarian construction. This is evidenced by the fact that the provisions on enhanced cooperation that were inserted in the new Treaty on European Union and in the Treaty on the Functioning of the European Union do not fundamentally modify the system and frame the process in a way that the content of both treaties cannot be threatened by an enhanced cooperation *inter se*.[75] In the end, in comparison with the requirements of certain multilateral treaties that explicitly provide for the possibility of *inter se* modification, the restrictions imposed by the Vienna Convention can be considered as leaving space for a more flexible adaptation of multilateral treaties, especially when this occurs through the conclusion of *inter se* agreements that are not envisaged by the initial treaty.

## Article 41(1)(b)

30.  The second aspect of the option opened up by Article 41(1) requires as a precondition that the modification *inter partes* should not be prohibited by the basic multilateral treaty.[76] It is in fact clear that if the parties have expressed without ambiguity their opposition in principle to such a modification, then it cannot be lawfully permitted. The conclusion of a restricted agreement in these conditions could only be analysed as a violation of the initial commitment and, as such, could authorize the other parties, in conformity with Article 60 of the Vienna Convention, to proceed with the total or partial suspension of the application of the treaty with regard to the parties to the unlawful modifying treaty, or to terminate it. Further, the latter could have their international responsibility engaged as a consequence. As an example of a treaty which formally prohibits the conclusion of incompatible bilateral and plurilateral agreements, the ILC[77] cited Article 20 of the Berlin Convention of 1908 for the Protection of Literary Property.[78] One could also mention Article 20 of the Covenant of the League of Nations,[79] according to which:

---

[73] Text available at: <http://eur-lex.europa.eu/en/treaties/dat/11997D/htm/11997D.html>.

[74] For the contribution of the treaty of Nice on this subject, see eg V. Constantinesco, 'Le processus décisionnel et l'assouplissement des coopérations renforcées' in V. Constantinesco, Y. Gautier, and D. Simon (eds), *Le traité de Nice, premières analyses* (Strasbourg: PUS, 2001), p 117; S. Rodrigues, 'Le traité de Nice et les coopérations renforcées', *RMC*, 2001, p 11.

[75] See Art. 20 TEU and Arts 326–34 TFEU. On the contribution of the constitutional treaty to enhanced cooperations, see esp. J.-P. Jacque, *Droit institutionnel de l'Union européenne* (3rd edn, Paris: Dalloz, 2004), paras 232 ff; J. V. Louis and T. Ronse, *L'ordre juridique de l'union européenne* (Geneva, Basle, Munich: Helbing & Lichtenhahn; Brussels: Bruylant; Paris: LGDJ, 2005), paras 96 ff.

[76] T. O. Elias, *supra* n 15, pp 97–8. The Treaty of Washington of 6 February 1922, relating to principles and politics concerning China (the Nine Power Act), is an example of a convention that does not authorize the conclusion of a 'restrictive' subsequent agreement; Art. 2 provides that:

The Contracting Powers agree not to enter into any treaty, agreement, arrangement, or understanding, either with one another, or, individually or collectively, with any Power or Powers, which would infringe or impair the principles stated in Article I. (LNTS, vol. 38, p 281)

[77] Report of the ILC to the General Assembly, A/5809, *YILC*, 1964, vol. II, p 197.

[78] LNTS, vol. 1, p 218.

[79] *International Legislation*, vol. I, Washington, 1931, pp 2 ff.

The Members of the League severally agree that this Covenant is accepted as abrogating all obliga-
tions or understandings *inter se* which are inconsistent with the terms thereof, and solemnly under-
take that they will not hereafter enter into any engagements inconsistent with the terms thereof.[80]

Likewise, Articles 87 of the Treaty establishing the European Coal and Steel Community,
344 TFEU (ex Art. 292 EC Treaty), and 103 of the Euratom Treaty, can be analysed as
prohibitions of *inter se* agreements aiming at constituting an arbitral tribunal; they pro-
vide that:

Member States undertake not to submit a dispute concerning the interpretation or application of
this Treaty to any method of settlement other than those provided for therein.[81]

Indeed, if States choose to submit their dispute to the International Court of Justice
(ICJ), there is no agreement and therefore there cannot be any prohibited *inter se* agree-
ment. On the other hand, if the original multilateral treaty does not prohibit the envis-
aged modification, then the latter is nevertheless only lawful if the two conditions of
Article 41(1)(b) are cumulatively fulfilled.

31.  First, the modification may not affect 'the enjoyment by the other parties of their
rights under the treaty or the performance of their obligations', that is to say, to use the
words of the ILC, 'it must not prejudice their rights or add to their burdens'.[82] This obvi-
ously relates to the application of the principle of the relative effect of treaties: the *inter se*
agreement is *res inter alios acta* for the parties to the original multilateral treaty who are
not parties to the modifying treaty. They cannot have their rights affected or their obliga-
tions transformed without their consent. This provision has not raised any particular
difficulties of interpretation, and has not posed specific problems in practice, since its
economy stems from the intrinsic logic of the international law of treaties.

32.  Secondly, the modification may not affect a provision 'derogation from which is
incompatible with the effective execution of the objects and purposes of the treaty'.[83] This
formulation confirms the importance that has been accorded to the concept of 'object
and purpose' of treaties throughout the Vienna Convention. The last part of the phrase
(treaties 'as a whole') leaves open the possibility for minor modifications, which would in
a way have the character of a simple 'adjustment of what exists', detachable from the
treaty as a whole, the object and purpose of which would not be compromised by this
*aggiornamento*, which is implemented by some of the original parties in their mutual
relations. The requirement made by the Vienna Convention is actually nothing more
than the implementation of a *dictum* of the ICJ, according to which:

It is also a generally recognized principle that a multilateral convention is the result of an agreement
freely concluded upon its clauses and that consequently none of the contracting parties is entitled

---

[80]  Emphasis added; on the scope of this provision see eg. A. D. McNair, 'La terminaison et la dissolution des
traités', *RCADI*, 1928-II, vol. 22, pp 513–14; Ch. Rousseau, 'De la compatibilité des normes juridiques con-
tradictoires dans l'ordre international', *RGDIP*, 1932, pp 133 ff, 161 ff.
[81]  The interpretation of this clause can nevertheless give rise to surprising solutions: see Permanent Court of
Arbitration, award of 24 May 2005, *Iron Rhine Arbitration* (*The Kingdom of Belgium v The Kingdom of the
Netherlands*), available at: <http://www.pca-cpa.org>. For a critical comment to this award, see P. Cassia and
F. Mariatte, 'Le Tribunal arbitral a-t-il déraillé? A propos de la sentence rendue le 24 mai 2005 dans l'affaire du
"Rhin de fer"', *Europe*, August–September, 2005, focus. See the issue settled by the Court of Justice of the
European Communities in the *Mox* case, Case C-459/03 *Commission v Ireland*.
[82]  Report of the ILC to the General Assembly, A/5809, *YILC*, 1964, vol. II, p 197.
[83]  *YILC*, 1964, vol. II, p 197.

to frustrate or impair, by means of unilateral decisions or particular agreements, the purpose and raison d'être of the convention.[84]

33.  Two judgments from very different tribunals should be mentioned: first of all, the judgment in *Slivenko and others v Latvia* of 23 January 2002,[85] where the European Court of Human Rights prioritized the text of the European Convention over the Russian-Latvian agreement of 30 April 1994 on the withdrawal of Russian armed forces, which had been concluded by the defendant before its accession to the Convention, conferring on the latter a 'supra-conventional' value that was not envisaged in the text.[86] On the other hand, there is the decision made by the Dispute Settlement Body of the WTO in the case of 'Turkey—Restrictions on Imports of Textile and Clothing Products', which dealt with the customs union established between Turkey and the EEC through the Ankara Agreement, which came into force in 1964.[87] The Panel, relying on Article 41(1) (b)(i) which it quoted,[88] declared that:

In our view…a bilateral agreement between two Members, such as that between the European Communities and Turkey, does not alter the legal nature of the measures at issue or the applicability of the relevant GATT/WTO provisions.[89]

34.  In the silence of the text, the customs union had to respect the object and purpose of the whole of the obligations of the WTO system, other than those from which it derogated on the basis of Article XXIV of the WTO Agreements. The Dispute Settlement Body therefore applied Article 41(1)(b)(i) in a perfectly classic fashion in the area of international economic law.

35.  Without the distinction appearing as such in the Vienna Convention,[90] the examination to be made to assess the conformity of an *inter se* agreement with the two conditions posed in Article 41(1)(b) will be largely influenced by the type of treaty that the *inter se* agreement is supposed to modify, which can be separated into two categories: 'reciprocal' treaties and 'absolute' treaties.[91] This distinction does not quite cover the old classification of 'traités-lois' and 'traités-contrats'[92] that are distinguished by the type of rules that they contain rather than by the type of relations that they organize between States.

36.  'Reciprocal' treaties are those in which States parties engage in a reciprocal way, where they grant each other advantages and subscribe to obligations between one another, in a quasi-bilateral fashion. This is typically the case for conventions on consular

---

[84]  Advisory Opinion of 28 May 1951, *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide, ICJ Reports 1951*, p 21. See also Order of 18 August 1929, *Case of the Free Zones of Upper Savoy and the District of Gex* (PCIJ, Series A, no. 22, p 12) where the Court did not accept that individual agreements, *in casu* special agreements between States, derogated from its own Statute, a general treaty.

[85]  ECtHR, 23 January 2002, note by G. Cohen Jonathan and J. F. Flauss, *AFDI*, 2002, pp 679 ff.

[86]  P. Daillier, A. Pellet, M. Forteau, and D. Müller, *supra* n 12, p 297, fn 173.

[87]  Panel Report, *Turkey–Restrictions on Imports of Textile and Clothing Products*, WT/DS34/R, 31 May 1999, para. 2.10.

[88]  Ibid, para. 9.178.

[89]  Ibid, para. 9.181.

[90]  Even though it is directly implemented in Art. 60(2), on the suspension of the operation of a treaty as a consequence of its breach. See also Art. 42(b)(ii) of the ILC Draft Articles on Responsibility of States for Internationally Wrongful Acts (2001).

[91]  Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law. Report of the Study Group of the International Law Commission, Finalized by M. Koskenniemi, A/CN.4/L.682, paras 309–013.

[92]  J. Salmon (ed.), *Dictionnaire de droit international Public* (Brussels: Bruylant, 2001), pp 1090 and 1092.

relations, diplomatic relations, or even on the law of treaties. In this type of treaty, States engage vis-à-vis others, but a derogation between two or several of them will not necessarily entail a restriction of rights granted to other States and will not affect the realization of the object and purpose of the treaty. Compatibility with the object and purpose of the treaty or conformity with the rights and obligations of other States parties will thus, in this scenario, only rarely be an obstacle to the conclusion of *inter se* agreements.

37. 'Absolute' treaties cannot be reduced to a super-position of bilateral relations, that are malleable à la carte. They oblige States parties in an interdependent fashion, the effectiveness of the treaty being dependent on compliance with all its provisions. A derogation to these treaties between two or several parties actually constitutes a derogation to the treaty itself and affects all the parties. As a consequence, a derogation made to this type of treaty will much more quickly be incompatible with the realization of the object and purpose of the treaty. It is the

case of important multilateral treaties, such as those of a legislative or administrative character to which there are numerous parties, perhaps the great majority of the States of the world, the utility and effectiveness of which depend upon uniform application by all the parties. Manifestly, the purpose of such treaties might, and normally would, be defeated if some of the parties to them were to enter into separate agreements among themselves which would be inconsistent with the main object of the general treaty, and it is such action that paragraph (b) is intended to forbid.[93]

Such is, for example, the case for conventions that protect human rights, the environment, or even those concerned with disarmament or the constitution of nuclear weapon-free zones.[94] More precisely, the Treaty on the Non-Proliferation of Nuclear Weapons could not allow for certain States parties to conclude between them agreements which allow them to use nuclear arms in their reciprocal relations. This would both endanger the object and purpose of the treaty and the obligations of the other parties. On the other hand, the Treaty itself concedes that:

Nothing in this Treaty affects the right of any group of States to conclude regional treaties in order to assure the total absence of nuclear weapons in their respective territories.[95]

38. This last provision has also been used several times, especially for the creation of nuclear weapon-free zones in the South Pacific, South Asia, and Africa. Thus, while the preamble to the African Nuclear-Weapon-Free Zone Treaty[96] refers to the Articles of the Nuclear Non-Proliferation Treaty in a general manner, the preambles to the South Pacific Nuclear Free Zone Treaty[97] and the Treaty on the Southeast Asia Nuclear Weapon-Free Zone[98] in contrast refer directly to Article 7 of the Treaty, expressly authorizing the conclusion of this type of *inter se* agreement.

39. This distinction between reciprocal and absolute treaties is not new and was echoed by judges at the Permanent Court of International Justice, as for example reflected in

---

[93] Draft Convention on the Law of Treaties, Research in International Law Under the Auspices of the Faculty of the Harvard Law School, *AJIL*, Suppl. 1935, vol. 29(4), p 1018.

[94] Ali Sadat-Akhavi, *Methods of resolving conflicts between treaties* (Leiden: Martinus Nijhoff, 2003), p 58. See Sir Waldock's intervention, *YILC*, 1966, vol. I, p 274, para. 112.

[95] Treaty on the Non-Proliferation of Nuclear Weapons, 1 July 1968 (729 UNTS 161).

[96] African Nuclear-Weapon-Free Zone Treaty, Pelindaba, 11 April 1996, *ILM*, vol. 35, p 706.

[97] South Pacific Nuclear Free Zone Treaty, Raratonga, 6 August 1985, *ILM*, vol. 24, p 1443.

[98] Treaty on the Southeast Asia Nuclear Weapon-Free Zone, Bangkok, 15 December 1995, *ILM*, vol. 35, p 639.

the Dissenting Opinion of Judge van Eysinga in the *Oscar Chinn* case. In this case, while the Court held the Convention of Saint-Germain to be applicable, which was an *inter se* agreement which modified the General Act of Berlin, Judge van Eysinga considered that:

> The General Act of Berlin does not create a number of contractual relations between a number of States, relations which may be replaced as regards some of these States by other contractual relations; it does not constitute *jus dispositivum*, but it provides the Congo Basin with a regime, a statute, a constitution. This regime which forms an indivisible whole may be modified, but for this the agreement of all contracting Powers is required. An inextricable legal tangle would result if, for instance, it were held that the regime of neutralisation provided for in Article 11 of the General Act of Berlin might be in force for some contracting Powers while it had ceased to operate for certain others.[99]

## Conditions of procedure applicable to *inter se* modifications

40. The scope of the obligation of notification in Article 41(2) has been modified progressively with successive versions of this provision. Initially, the obligation of notification was not supposed to apply in the case where the conclusion of an *inter se* agreement was provided for in the original multilateral treaty.[100] In 1964, the ILC was of the opinion that:

> if the parties had themselves provided for the possibility of *inter se* agreement and had not at the same time laid down any conditions regarding notification, it might be going too far to add that condition by a provision in the present articles.[101]

It was only at the request of certain governments[102] and in the revised draft Articles of 1966 that the definitive version was introduced which only excludes the obligation of notification in situations where the initial treaty explicitly rules out such an obligation.[103] In the end, the concern of the ILC was thus to generalize, apart from the case where there is express exclusion by the initial treaty, the obligation of notification, which permits informing all parties with regard to the envisaged *inter se* modification.[104] In fact, the Commission considered that '[e]ven in such cases…the other parties ought to have a reasonable opportunity of satisfying themselves that the *inter se* agreement does not exceed what is contemplated by the treaty'.[105] We share the opinion of Special Rapporteur

---

[99] *Oscar Chinn* case, 12 December 1934, PCIJ, Series A/B, no. 63. See in the same sense the Dissenting Opinion of Judge Schücking.

[100] Article 67(2) was worded in the following way: 'Except in a case falling under paragraph 1(a), the conclusion of any such agreement shall be notified to the other parties to the treaty' (A/5809, *YILC*, 1964, vol. II, p 197).

[101] *YILC*, 1966, vol. II, p 87.

[102] In particular the governments of Finland, Israel, and the Netherlands. See in particular the reaction of the Netherlands, *YILC*, 1966, vol. II, Comments by governments on the draft Articles on the law of treaties drawn up by the Commission at its 14th, 15th, and 16th sessions, p 322:

The Netherlands Government considers that notification should be given in good time. In many instances it will be virtually impossible to notify the other States parties when the first proposals for the agreement are tabled. But when the States concerned have reached an accord in substance on the proposed *inter se* agreement and when its conclusion is only a question of making that accord definitive, there would seem to be nothing to prevent the other States parties from being informed at once.

[103] A/CN.4/L.117 and Add.1, *YILC*, 1966, vol. II, p 119.

[104] *YILC*, 1964, vol. I, p 199, para. 9.

[105] Report of the ILC to the General Assembly, *YILC*, 1966, vol. II, pp 235–6.

Waldock, which was expressed at the beginning of the negotiations on Article 41: notification of the conclusion of the agreement is a matter of substance.[106]

41.  The second difficulty concerned the issue whether the notification had to deal with the conclusion of the *inter se* agreement or had to occur earlier, in order to inform the parties to the multilateral treaty of the intention to conclude such an agreement. At the 764th meeting of the ILC, the Drafting Committee presented an amended version of the text[107] in which the obligation of notification became exclusively subsequent to the conclusion of the agreement. This amendment radically modified the underlying philosophy of the obligation of notification. It can only be one of two things. Either the stance is taken that the notification only fulfils the purpose of informing States and in such a case, it can be subsequent, or may not even occur at all, since States are also obliged to deposit their treaties with the Secretary-General, which ensures a certain degree of publicity. This position was defended by certain members of the ILC[108] but has not built a consensus for a mainly pragmatic reason: the publication of treaties by the United Nations takes a long time, which de facto prevents any potential timely and useful reaction by States.[109] Or, the stance is taken that notification is an opportunity for third States to enter a dialogue with the States in the process of concluding a collateral agreement with such content. In such a case, the notification must of course occur before the agreement is definitively concluded. It was this perception that ultimately prevailed, while the amendment was not adopted. The ILC re-examined the draft Articles and introduced the rule under which notification had to occur before the conclusion proper of the *inter se* agreement. Admittedly, the Commission thought it 'unnecessary and even inadvisable to require notice to be given while a proposal is merely germinating and still at an exploratory stage', and this is the reason why the expression 'intention to conclude the agreement and…the modifications to the treaty for which it provides' was eventually maintained.[110] The parties to the *inter se* modification are thus bound to warn the other parties from the moment that the conclusion is about to happen, and of course to communicate to them the content of the envisaged modifications.[111] This does not eliminate all difficulties of interpretation with regard to the precise moment when the notifications must occur. One may think that in any case, Article 41(2) requires that the notification take place before the definitive conclusion. The *ratio legis* of the provision is in fact to allow the other parties to manifest their potential opposition before the consent of the parties to be bound to the modification is expressed, not to demand an adhesion that they have no right to require.[112] One may thus think that the

---

[106]  *YILC*, 1964, vol. I, 764th meeting, p 273, para. 102.

[107]  Ibid, p 272, para. 73.

[108]  See amongst others the intervention of Mr Tounkine, *YILC*, 1964, vol. I, 764th meeting, p 273, para. 97; of Mr Verdross, ibid, para. 101.

[109]  *YILC*, 1966, vol. I, Part Two, 860th meeting, p 128, para. 88.

[110]  *YILC*, 1966, vol. II, p 235.

[111]  See the opinion of Messrs Yasseen and Rosenne: 'If the notification was to serve a useful purpose, it must be made before the *inter se* agreement was concluded.….[F]or notification to have any real value, it should come as early as was consistent with practical exigencies', *YILC*, 1966, vol. I, Part Two, 860th meeting, p 127, paras 80 and 82.

[112]  See the opinion of Sir Humphrey Waldock on that particular subject: 'it appeared to be the general view that all the parties should be notified of an *inter se* agreement deliberately intended as such from the beginning, in case there might be grounds for questioning it, *but of course other parties would not be able to insist on participating in the inter se instrument*', *YILC*, 1964, vol. I, 754th meeting, p 199, para. 9, emphasis added. See also the reactions of States to the Diplomatic Conference: amongst others the intervention of Mr Sinclair (United Kingdom): 'An operation which began as an attempt to amend the treaty for all the parties could easily end as

modification must occur 'dans un délai raisonnable avant la conclusion'.[113] The result is *a contrario* that the critical date is not necessarily the date of the signature, in the sense of the authentication of the text of the agreement, unless, in the case of agreements in simplified form, this is valid as an engagement to be bound. This interpretation is corroborated by the fact that the modifications made to the original treaty will often only be definitively finalized at the time of signature. In other words, a notification at the beginning of negotiations and before the text of the *inter se* agreement has come to a quasi definitive draft would be, without doubt, premature; conversely, a notification on the eve of the expression of consent to be bound by the parties to the *inter se* agreement would be, without doubt, too late. Ultimately, the fixing of the date of notification should be made by the parties to the *inter se* agreement with a view to the concern of loyally informing the parties to the initial treaty and to allow them, in good faith,[114] to take advantage of a reasonable time period in which to express their opinions vis-à-vis the envisaged modification.[115]

42. Even if the Vienna Convention is silent on this point, one can imagine that the effect of notification is to open up a 'period of protest' for the benefit of the parties to the multilateral treaty which contest the validity of the envisaged *inter se* modification.[116] The absence of protest in a reasonable time period would amount to an implicit acceptance of the *inter se* agreement.[117]

a modification between some of them *inter se*. On the other hand, an *inter se* modification agreed upon as between some of the parties only might appeal to the others and lead ultimately to the amendment of the treaty for all the parties to it' (Official Records, Summary Records, 1st session, 37th meeting, p 206, para. 39; E. Jiménez de Aréchaga (Uruguay), ibid, para. 43; M. Sørensen, ibid, para. 47).

[113] '[I]n a reasonable time period before the conclusion' (editor's translation). In this sense, see esp. Ph. Weckel, *supra* n 58, p 88.

[114] See the optimistic opinion of Mr Bartoš declaring at the 860th meeting that '[t]he proper solution lay in a general system of law. If States applied the principle of good faith, they had no need to conceal any *inter se* agreements they concluded', *YILC*, 1966, vol. I, Part Two, 860th meeting, para. 46.

[115] The moment that was effectively retained by Special Rapporteur Waldock on completion of the discussions at the ILC is interpreted as being 'a time when the negotiations and drafting of the *inter se* agreement had reached a fairly advanced stage', *YILC*, 1966, vol. I, Part Two, 860th meeting, p 128, para. 90. This position was confirmed during a subsequent meeting of the ILC:

Paragraph 2 had been discussed at length by the Drafting Committee and the text now proposed included two important changes: first, the parties to the *inter se* agreement were required to notify the other parties of their intention to conclude the amending agreement, instead of making the notification after the conclusion of such agreement; secondly, it was laid down that the notification must not only indicate the intention to enter into an amending agreement but must also specify 'the modifications to the treaty for which it provides'. (*YILC*, 1966, vol. I, Part Two, 875th meeting, p 217, para. 81)

[116] By taking an example, Mr Ago explained:

that the members of the Organization of American States might wish to conclude among themselves a special convention derogating from a treaty which did not provide for *inter se* agreements. Would they have to notify their intention to all the other parties to the treaty?…Such notification would be pointless: it would be neither a request for authorization—since the proposed modification would be in no way unlawful—nor an invitation—since the American States had decided to conclude the new instrument among themselves. He agreed that when it has been concluded the instrument would have to be published, but he doubted whether all the parties need be notified of the proposal. (*YILC*, 1964, vol. I, 754th meeting, pp 203–4, para. 85)

See also the intervention of Mr Tounkine in 1966: 'Notification of *inter se* agreements was necessary in order to enable the other parties to the original agreement to ascertain whether the conditions specified in paragraphs 1(a) and 1(b) were fulfilled. Paragraph 2 thus supplemented the safeguards provided in paragraph 1…', *YILC*, 1966, vol. I, 860th meeting, p 126, para. 67 and the position of Briggs supporting Yasseen's intervention, *YILC*, 1964, vol.I, 754th meeting, p 203, para. 74.

[117] It is well established that an absence of protest that is not equivocal is equivalent to recognizing the rights of other States or the validity of a situation that was initially disputed (*Temple of Preah-Vihear*, Judgment of 15 June 1962, *ICJ Reports 1962*, p 23).

### Sanction of the violation of Article 41

43. Article 41 does not state what the sanction could be for an *inter se* agreement that does not comply with the conditions it establishes.[118] The ILC rejected the sanction of nullity[119] on completion of heated discussions following a proposition by Mr Pal and Mr Jiménez de Aréchaga. In 1963, these two members of the ILC suggested a modification of the Article relating to conflicts with a previous treaty (Art. 30(4)) which touches directly on the problem of *inter se* agreements and which reads:

> Provided, however, that if the later treaty necessarily involves for the parties to it action in direct breach of their obligations under the earlier treaty, of such a kind as to frustrate the object and purpose of the earlier treaty, then *any party to it whose interests are seriously affected shall be entitled to invoke the nullity of the second treaty*.[120]

These few lines caused a sharp reaction from Special Rapporteur, Sir Humphrey Waldock, in respect of the sanction of nullity that was envisaged. The authors of the proposal attempted, in vain, to justify this proposition with the concern of protecting previous obligations from grave subsequent violations through the implementation of the *inter se* agreement,[121] but the sanction was too extreme to be received favourably by the ILC.

44. In the course of its work the ILC also rejected the earlier position of Special Rapporteur Brierly who had proposed solving the problem of abusive *inter se* agreements by arguing the incompetence of States to conclude them.[122] These agreements were not from that moment on a nullity, they were simply non-existent, since competence is a condition for validity. Ultimately, the ILC left this question unanswered, abandoning it in the classic regime of State responsibility,[123] and it is without doubt better to leave the interpreters to do their work[124] than to attempt the impossible task of an exhaustive regulation.

ANNE RIGAUX*    DENYS SIMON**

UPDATED AND EDITED BY JOANNA SPANOUDIS† AND EDITH WEEMAELS††

---

[118]  *YILC*, 2004, p 297, para. 341.

[119]  *YILC*, 1966, vol. I, Part Two, 860th meeting, p 126, paras 71 ff; Vesna Crnic-Grotic, 'Object and Purpose of Treaties in Vienna Convention', *Asian Yearbook of Int'l L*, 1991, vol. 7, pp 141–74, 150.

[120]  *YILC*, 1963, vol. I, 703rd meeting, p 195, para. 4 (emphasis added).

[121]  Ibid, p 197, para. 9.

[122]  Taking into account the practices of the League of Nations and of the UN, *YILC*, 1951, vol. I, 98th meeting, para. 26c.

[123]  *YILC*, 2004, p 298, para. 341.

[124]  This position was also in 1954 Lauterpacht's opinion: 'Very often, an inconsistency—a conflict—will, upon closer scrutiny, prove to be no more than a divergence or variation with regard to the scope of the treaty and the method of its application. Often the departure, though apparent, is not such as to affect the true purpose of the prior treaty', *YILC*, 1954, vol . II, Second Report on the Law of Treaties by Mr. H. Lauterpacht, Special Rapporteur, A/CN.4/87 and Corr.1, p 136, para. 7.

*  Maître de conférences, Université de la Réunion, France.

**  Professor, Université de Paris I Panthéon Sorbonne, France.

†  Assistant at the International Law Centre, Université Libre de Bruxelles, Brussels, Belgium.

††  Researcher at the International Law Centre, Université Libre de Bruxelles, Brussels, Belgium.