# Exhibit 83

Oliver Dörr
Kirsten Schmalenbach

*Editors*

# Vienna Convention on the Law of Treaties

*A Commentary*

Second Edition



Springer

# Article 1
*Scope of the present Convention*

**The present Convention applies to treaties between States.**

## Contents

A. Purpose and Function ........................................................... 1
B. Historical Background and Negotiating History ............................. 4
C. Elements of Article 1 ......................................................... 7
   I. Treaties ............................................................... 7
  II. States .................................................................. 8
D. Treaties of International Organizations (VCLT II) ......................... 13

## A.   Purpose and Function

Due to their far-reaching international and national legal capacities, States are **1** capable of concluding agreements with all types of legal entities, *ie* with other States and with non-State actors (*eg* international organizations, corporations, NGOs, individuals; → Art 3 MN 19–71). Therefore, the sole purpose of Art 1 is to limit the scope of the VCLT *ratione materiae* to **interstate treaties** and—in view of the potential diversity of signatories—*ratione personae* to **States** alone.[1]

To fully appreciate the limited scope of the VCLT as a whole, other provisions of **2** the Convention have to be taken into account as well, namely, Art 1 must be read in conjunction with Art 2 para 1 lit a, which restricts the scope of the Convention *ratione materiae* to **treaties in written form** which are **governed by international law**. Constituent instruments of international organizations fulfill these prerequisites and therefore fall comfortably within the scope of the VCLT (→ Art 5 MN 5–7). However, even if the Convention applies to all international interstate treaties, it does not cover every situation. According to Art 73, the VCLT does not address the fate of treaties in the event of State succession, State responsibility and interstate hostilities. The limitation of the Convention *ratione temporis* is laid down in Art 4, which answers the question of the Convention having retroactive application in the negative. Assuming that the Convention is applicable to a particular treaty, the autonomy of its parties may nonetheless prevail in certain areas: many rules of the Convention are **residual in character**, *ie* they come into play under the condition that the particular treaty does not "otherwise provide" (*eg* Arts 22, 77), or it is not "otherwise agreed" by the parties (*eg* Art 37), or a different intention is not "otherwise established" (*eg* Arts 12, 14, 15, 16).[2] As a rule, the Convention

---

[1] But see *Rosenne* (1989), p. 22.

[2] *Sinclair* (1984), p. 6; *Haak* (1967), pp. 544–547; for detail see also → Art 5 MN 15–19.

© Springer-Verlag GmbH Germany 2018                                                     21
O. Dörr, K. Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*,
DOI 10.1007/978-3-662-55160-8_3

explicitly labels provisions as residual or the residual character can be confirmed by way of interpretation (contextual interpretation or *travaux préparatoires*, *eg* Art 30 paras 3–5). Failing this, the Convention deems its provision mandatory (*eg* Art 53).

**3**    Art 3 lit c clarifies that the Convention's application to a multilateral treaty is not to be questioned for the mere fact that—alongside at least two State Parties to the VCLT—**other subjects of international law** are also party to said treaty. Unspoken but congruously, the same is true when States not party to the VCLT participate in a multilateral treaty. From all this, it follows that one treaty concluded between different subjects of international law can be ruled by up to **three different legal regimes,** provided that the VCLT II (1986) enters into force in the near future:[3] (1) the treaty relation between parties to the VCLT (including the Holy See → MN 8), is governed by that Convention; (2) the treaty relation with and among participating international organizations are governed by the VCLT II under the condition that the parties involved are parties to that Convention; (3) treaty relations other than those mentioned, *eg* treaty relations with the Sovereign Order of Malta,[4] with the ICRC,[5] with States not parties to the VCLT,[6] or with international organizations in case the VCLT II remains inoperative are governed by customary international law (→ Art 4 MN 4–6). *Prima facie*, this potential multitude of applicable treaty law, all of which could be applied to one and the same treaty, seems to contradict any concept of uniform application. However, the **fragmentation of treaty relations** is somewhat alleviated by the congruency of most substantive rules of the aforementioned regimes.[7]

## B.   Historical Background and Negotiating History

**4**    During most stages of the negotiating process, the scope of the Convention had not been laid down in a separate article, but rather had been derived from the **definition** of 'treaty' (→ Art 2 para 1 lit a). When the ILC discussed the very first SR report on the law of treaties, prepared by SR *Brierly* in 1950,[8] it was agreed that treaties to which **international organizations** were parties would be included in its studies.[9] However, by definition, treaties to which entities other than States and international

---

[3] As of July 2017, 31 States have ratified the VCLT II which falls short of the 35 ratifications required by Art 85 VCLT II. International organizations, which are party to the Convention, are not counted for entry into force purposes, pursuant to Art 85.

[4] See *eg* the 1989 Postal Convention with Austria öBGBl No 447/1989 and the 1979 Postal Agreement between the Philippines and the Sovereign Order of Malta 1195 UNTS 411.

[5] See *eg* the 2006 Agreement between the International Criminal Court and the International Committee of the Red Cross on Visits to Persons Deprived of Liberty Pursuant to the Jurisdiction of the ICC, ICC Official Journal ICC-PRES/02-01-06.

[6] *Villiger* (2009), Art 3 MN 7; see generally *Vierdag* (1982), p. 779; *Vierdag* (1987), p. 91.

[7] For a detailed analysis, see *Vierdag* (1982), pp. 786–801.

[8] *Brierly* I 223–248.

[9] ILC Report 11th Session [1959-II] YbILC 87, 96, para 6.

Article 1.   Scope of the present Convention                                    23

organizations are parties should be excluded.[10] When proposing this demarcation, SR *Brierly* not only had clear non-State entities such as **churches**, **companies** or **cities** in mind, but also **component units of federal States**, assuming that these components do not possess the attributes of a State.[11] *Brierly*'s understanding of the term 'State', though, remained vague (Draft Art 2: "A State is a member of the community of nations").[12]

Further developing *Brierly*'s findings, his successor SR *Lauterpacht* removed     **5** the term "international organization" and replaced it with "organization of States"[13] in order to point out that "States only – acting either individually or in association – are the normal subjects of [. . .] international law".[14] With regard to **component units of federal States** or **protectorates**, SR *Lauterpacht* advocated an all-embracing understanding of the term "State" for the purpose of his definition clause (Draft Art 1), leaving it to the subsequent capacity provision[15] (Draft Art 10[16]) to pragmatically resolve "**borderline cases**".[17] It was SR *Waldock* who finally proposed in 1965 to limit the scope of the Convention to treaties concluded between States[18] It was the understanding of the ILC that the term 'State' means a 'State for the purposes of international law',[19] *ie* a **formally independent and thus sovereign State**.[20]

Some States, and most of all the United States, felt that the limitation "took into     **6** account neither the development of international law during the twentieth century nor the growth of the activities of **international organizations**".[21] India and the USSR, on the other hand, pointed out that including treaties between international organizations under the scope of the Convention would complicate and delay the drafting process.[22] By and large, it was finally agreed that treaties between

---

[10] *Brierly* I 223, Draft Art 1 lit c: "The term 'treaty' does not include an agreement to which any entity other than States or international organizations is or may be a party." The wording closely follows Art 1 lit c of the 1935 Harvard Draft Convention on the Law of Treaties.

[11] *Brierly* I 229.

[12] With regard to component units of federal States, the proposed litmus test was the existence of an "international personality" (*Brierly* I 229).

[13] *Lauterpacht* I 90.

[14] *Lauterpacht* I 94.

[15] See also *Brierly* III 50.

[16] *Lauterpacht* I 92, Draft Art 10: "An instrument is void as a treaty if concluded in disregard of the international limitations upon the capacity of the parties to conclude treaties."

[17] *Lauterpacht* I 95.

[18] *Waldock* IV 10; see the discussion and decision of the ILC [1965-I] YbILC 9–16; disagreeing: *Menon* (1992), pp. 17, 18.

[19] Final Draft, Commentary to Art 1, 187, para 4.

[20] China (Taiwan) proposed at the UN Conference to add a definition of State to mean "a sovereign State". The proposal was rejected by the Drafting Committee on the basis of the lack of necessity for such a definition (UNCLOT III 112); the proposed definition relies on Art 4 Harvard Draft.

[21] UNCLOT I 11, para 3.

[22] UNCLOT I 12, para 7, 13, para 26.

international organizations had special characteristics and therefore should be considered separately by the ILC.[23] The compromise was flanked by the understanding that the thematic limitation of the Convention does not prejudice treaty law governing treaties concluded between other subjects of international law (→ Art 3).[24] Art 1 was eventually adopted at the Vienna Conference by 98 votes to none.[25]

### C.   Elements of Article 1

### I.   Treaties

**7**    → Art 2 MN 3–34

### II.   States

**8**    By not defining 'State' in Art 2, the VCLT takes the most fundamental term for granted.[26] This approach is quite common when drafting multinational treaties,[27] since the legal problems linked to the diffuse concept of **sovereignty**[28] and the

---

[23] See the VCLT II.

[24] See the Resolution of the Vienna Conference relating to Art 1, UNCLOT II 178, annexed to the Final Act of the Conference, UNCLOT III 285:

> "*The United Nations Conference on the Law of Treaties,*
>
>     *Recalling* that the General Assembly of the United Nations, by its Resolution 2166 (XXI) of 5 December 1966, referred to the Conference the draft articles contained in chapter II of the report of the International Law Commission on the work of its eighteenth session,
>
>     *Taking note* that the Commission's draft articles deal only with treaties concluded between States,
>
>     *Recognizing* the importance of the question of treaties concluded between States and international organizations or between two or more international organizations,
>
>     *Cognizant* of the varied practices of international organizations in this respect, and
>
>     *Desirous* of ensuring that the extensive experience of international organizations in this field be utilized to the best advantage,
>
>     *Recommends* to the General Assembly of the United Nations that it refers to the International Law Commission the study, in consultation with the principal international organizations, of the question of treaties concluded between States and international organizations or between two or more international organizations." (footnote omitted)

[25] UNCLOT II 3, para 14.

[26] For a broad definition, see *Brierly* I 229 (Draft Art 2 lit a); *cf* also *Fitzmaurice* I 107 (Draft Art 3).

[27] See *eg* Arts 3 and 4 UN Charter, Art 36 para 1 ICJ Statute, Arts 1–3 Articles on State Responsibility UNGA Res 56/83, 12 December 2001, UN Doc A/RES/56/83.

[28] *Koskenniemi* (2005), pp. 240–245; *Bartelson* (2006), p. 463; *Krasner* (2004), p. 1075.

recognition of **statehood**[29] would, without doubt, needlessly burden the codification process.[30] Upon closer examination, however, the determination of sovereignty and statehood can be neglected in the context of Art 1 since the issue is actually resolved by Art 81. Accession to the VCLT is dependent upon the outcome of the **UN's admission process** (Art 4 UN Charter) or the decision on membership taken by the specialized agencies and international organizations mentioned in Art 81 (so-called '**Vienna formula**'[31]).[32] As an example in this regard, the **Holy See**—a member of various UN specialized agencies[33]—has been party to the VCLT since 1969. The Holy See is a subject of international law but does not fit comfortably within the criteria for statehood.[34] The **Byelorussian and Ukrainian Soviet Socialist Republics**, founding members of the United Nations[35] and parties to the VCLT since 1986, exemplify that even component units of federal States (→ Art 3 MN 19) may fall within the scope of Art 1 by virtue of Art 81. In the context of the VCLT II, it is remarkable that the then dependent territory of **Namibia** was expressly allowed access despite its lack of sovereignty (Art 84 VCLT II).[36]

   The cases mentioned illustrate that the VCLT consciously avoids a dogmatic view regarding the question of statehood and sovereignty. On the contrary: if the requirements of Art 81 are met, access to the Convention stipulates that all parties are *ipso iure* considered 'States' exclusively within the framework and for the purpose of the Convention. Consequently, all provisions of the Convention are     **9**

---

[29] On the difficulties of defining the term "State", see Harvard Draft 706. For an overview on statehood *Crawford* (2006); *Acquaviva* (2005), pp. 346–375; *Grant* (1999), p. 403.

[30] See the controversial debate of the ILC within the framework of the Draft Declaration on the Rights and Duties of States [1949] YbILC 61–68.

[31] In contrast to the 'all States formula', applied *eg* by the 1973 International Convention on the Suppression and Punishment of the Crime of Apartheid 1015 UNTS 243; see 1999 Summary of Practice of the Secretary-General as Depositary of Multilateral Treaties, UN Doc ST/LEG/7/Rev.1, para 79.

[32] The statement of the Final Draft, Commentary to Art 5, 192, para 4 that the term "State" is used with the same meaning as in the UN Charter, the ICJ Statute, the Geneva Convention on the Law of the Sea and the Vienna Convention on Diplomatic Relations—treaties which do not define the term—must be seen in the light of Art 81 VCLT.

[33] For example the World Intellectual Property Organization; see UNGA Res 58/314, 1 July 2004, UN Doc A/RES/58/314 for an overview of the international engagements of the Holy See.

[34] For considerations of the ILC, see ILC Report 11th Session [1959-II] YbILC 87, 96; *Araujo* (2001), p. 293, 323 *et seq; Abdullah* (1996), p. 1835.

[35] As the Ukrainian SSR lacked the characteristics of statehood in an international legal sense, it was agreed on by the UN Founding Conference that statehood (Art 4 UN Charter) was not a constitutive feature for founding members, irrespective of the wording of Art 3 UN Charter, *Fastenrath* (2012), Art 3 MN 6.

[36] Namibia was internationally represented by the UN Council for Namibia until its independence in 1990.

applicable to all parties, regardless of any doubts concerning the latter's independence, sovereignty or statehood.[37]

10          Some treaties appear in form to be concluded between natural persons, *eg* the **heads of State**. The practice of concluding treaties between heads of State is principally a historical phenomenon, with roots in monarchic traditions. To this extent, the appearance of 'His/Her Majesty' as the party to the treaty is a relic of the ancient practice of identifying the person who was the head of State and embodied the State itself.[38] Such practice does not contradict the modern concept of a State as a judicial person acting through its organs.[39]

11          Though the concept of 'State' has no constitutive function within the framework of the Convention, it can be of certain importance within the realm of **customary treaty law**. Whereas non-State Parties to the VCLT may have recourse to all provisions of the Convention in order to make visible respective rules of customary treaty law, other entities short of statehood must exercise restraint in this regard, *eg* in the context of Art 6 ("capacity to conclude treaties") or Art 7 para 2 ("representation").

12          An indication for the statehood of entities with ambiguous international status is provided by the practice of registration by the UN Secretary-General with regard to those multilateral treaties which limit the participation to "any State" (so-called '**all States formula**'[40]). Self-governing territories (or States *in statu nascendi*) such as **Somaliland** (Awdal Republic)[41] or the **Turkish Republic of Northern Cyprus**[42] cannot invoke this formula to achieve participation in multilateral treaties due to the ongoing political ambivalence within the international community as to whether these entities should be recognized as 'States'. The practice of admission of international organizations, however, can produce a domino effect with regard to treaty access on the basis of the 'all State formula' which perfectly matches the

---

[37] But see Argentina's declaration upon ratification of the VCLT 1155 UNTS 502: "The application of this Convention to territories whose sovereignty is a subject of dispute between two and more States, whether or not they are parties to it, cannot be deemed to imply a modification, renunciation or abandonment of the position heretofore maintained by each of them."

[38] *Grewe* (2000), p. 90.

[39] See *eg* the 1952 Exchange of Notes Constituting an Agreement Giving Effect to the Convention of 31 March 1931 between His Majesty, in Respect of the United Kingdom, and the Federal President of the Republic of Austria, Regarding Legal Proceedings in Civil and Commercial Matters 236 UNTS 245.

[40] For reference, see n 30.

[41] In 1960 Somaliland, a former British colony, joined the former Italian Somalia to form the Somali Republic. Somaliland declared its independence in 1991 and requested recognition by the African Union in December 2005. The subject of State secession is still a matter of ongoing conflict and hampers international recognition as an independent State.

[42] See the Declaration of Independence of Turkish Cypriot Authorities, 15 November 1983, UN Doc A/38/586-S/16148. UNSC Res 541, 18 November 1983, UN Doc S/RES/541 (1983) considered the attempt to create and present the TRNC as being "legally invalid": it called for the withdrawal of the declaration of independence and asked all countries not to recognize the new republic.

effects of the 'Vienna formula' (→ MN 8). In 1965, the Secretary-General refused the Cook Islands' application for access to certain multilateral treaties containing 'all States clauses' by referring to the non-sovereign status of the islands.[43] However, after the WHO approved the islands' membership in 1984 following Art 6 of its Constitution ("States"), the Secretary-General considered that the Cook Islands could henceforth be included in the 'all State formula' of other multilateral treaties.[44] The controversial admission of Palestine to UNESCO in 2011 provides the latest example for such a dynamic.[45]

## D.   Treaties of International Organizations (VCLT II)[46]

For a definition of the term "international organization" → Art 2 MN 51–53          **13**

Art 1 VCLT II (1986) follows the VCLT I (1969) template by clarifying that the **14** 1986 Convention applies only to treaties between States and international organizations (Art 1 lit a) and treaties between international organizations (Art 1 lit b). The distinction of contractual relationships between States (VCLT I) and those with or between international organizations (VCLT II) may lead to the application of both Conventions to one multilateral agreement to which States and International Organizations are parties, *eg* the 1982 UN Convention of the Law of the Sea (UNCLOS), see → MN 3 and Art 73 MN 73. However, the technical fragmentation of one and the same treaty regime will have little consequences in practice, not only because the VCLT II is closely modeled after the VCLT I[47] but also because the long-standing failure of the VCLT II to enter into force has given rise to treaty practice of international organizations that use the VCLT I as a source for determining customary rules of the law of treaties.[48]

Even though international organizations increasingly conclude international **15** treaties, the subject-matter of these treaties are rather limited compared to those concluded by States. Most treaties to which one or more International Organizations are parties concern their status and relationship to Member States and host States, respectively, as well as the details of their cooperation and mandate.[49] Due to its extensive competences in fields originally covered by its Member States, the

---

[43] *Cf* UNGA Res 2064 (XX), 16 December 1965, UN Doc A/RES/2064 (XX) on the not-yet-sovereign status of the Cook Islands; see also [1979] UNJYB 172.

[44] For reference see n 30.

[45] (2012) 51 ILM 606–629.

[46] For the treaty text see p. 1486 *et seq.*

[47] *Gaja* (1987), p. 259: "strong feeling of déjà vu".

[48] ECJ *Racke* C-162/96 [1998] ECR I-3655, para 19, 45 *et seq.*

[49] By way of example, see the 1947 UN Convention on the Privileges and Immunities of the Specialized Agencies 33 UNTS 261; Under-Secretary for Administration and Management, Guidelines for the Preparation of Host Government Agreements, Annex: Model Agreement, Art X, UN-Doc ST/AI/342, 8 May 1987; Standard Agreement on Operational Assistance, concluded between the United Nations and Panama 774 UNTS 142.

treaty practice of the EU stands out in this regard.[50] Being party to more than 2000 international treaties means that the EU is party to environmental treaties, trade and investment agreements, as well as human rights treaties such as the 2006 Convention on the Rights of Persons with Disabilities to recount but a few.[51]

## References

*Abdullah Y* (1996) The Holy See at United Nations Conferences: State or Church ColLR 96 (7):1835–1875

*Acquaviva G* (2005) Subjects of International Law: A Power-Based Analysis. VandJTL 38 (2):345–396

*Araujo RJ* (2001) The International Personality and Sovereignty of the Holy See. CathULR 50 (2):291–360

*Bartelson J* (2006) The Concept of Sovereignty Revisited. EJIL 17(2):463–474

*Crawford J* (2006) The Creation of States in International Law. OUP, Oxford

*Fastenrath U* (2012) Article 3. In: *Simma B, Khan D-E, Nolte G, Paulus A* (eds) The Charter of the United Nations: A Commentary, 3rd edn. OUP, Oxford, pp 335–340

*Gaja G* (1987) A "new" Vienna Convention on Treaties between States and International Organizations or between International Organizations: A Critical Commentary. BYIL 58(1):253–269

*Grant TD* (1999) Defining Statehood: The Montevideo Convention and its Discontents. ColJTL 37 (2):403–457

*Grewe WG* (2000) The Epochs of International Law. De Gruyter, Berlin

*Haak V* (1967) "Unless the Treaty otherwise provides" and Similar Clauses in the International Law Commission's 1966 Draft Articles on the Law of Treaties. ZaöRV 25(3):540–561

*Koskenniemi M* (2005) From Apology to Utopia: The Structure of International Legal Argument. CUP, Cambridge

*Krasner SD* (2004) The Hole in the Whole: Sovereignty, Shared Sovereignty, and International Law. MichJIL 25(4):1075–1102

*Menon PK* (1992) The Law of Treaties between States and International Organizations. Edwin Mellen Press, Lewiston, New York

*Rosenne S* (1989) Developments in the Law of Treaties 1945–1986. CUP, Cambridge

*Sinclair I* (1984) The Vienna Convention on the Law of Treaties, 2nd edn. University Press, Manchester

*Verwey DR* (2004) The European Community, the European Union and the International Law of Treaties: A Comparative Legal Analysis of the Community and Union's External Treaty Making Practice. The Hague, T.M.C. Asser Press

*Vierdag EW* (1982) The Law Governing Treaty Relations between Parties to the VCLT and States not Party to the Convention. AJIL 76(4):779–801

*Vierdag EW* (1987) Some Remarks on the Relationship between the 1969 and the 1986 Vienna Convention on the Law of Treaties. AVR 25(1):82–91

*Villiger M* (2009) Commentary on the 1969 Vienna Convention on the Law of Treaties. Nijhoff, Leiden

---

[50] See generally *Verwey* (2004).

[51] 2006 Convention on the Rights of Persons with Disabilities 2515 UNTS 3.

# Article 26
## *Pacta sunt servanda*

**Every treaty in force is binding upon the parties to it and must be performed by them in good faith.**

## Contents

A. Purpose and Function .............................................................. 1
B. Historical Background and Negotiating History ................................. 4
  I. Historical Background ......................................................... 4
  II. Negotiating History .......................................................... 6
C. Will, Consent and Obligation ..................................................... 11
D. Foundation ........................................................................ 13
  I. Naturalism and Cognate Schools ............................................... 14
  II. Good Faith ................................................................... 15
  III. Basic Norm, Rule of Recognition ............................................ 18
  IV. International Customary Law .................................................. 20
  V. General Principle of Law ...................................................... 21
E. Elements of Article 26 ............................................................ 23
  I. Every Treaty .................................................................. 23
    1. Treaties (Art 2) ............................................................ 23
    2. International Agreements (Art 3) ............................................ 24
    3. Internationalized Contracts ................................................ 25
    4. Interstate Agreements Governed by Domestic Law ............................. 28
  II. In Force ..................................................................... 29
  III. Legally Binding Force (Obligations) ........................................ 33
    1. Reciprocal Obligations ...................................................... 34
    2. Non-reciprocal Obligations .................................................. 37
    3. Obligations *erga omnes partes* ............................................. 43
  IV. Duty to Perform .............................................................. 46
    1. Good Faith Performance of the Treaty ........................................ 46
    2. Duty Not to Defeat Object and Purpose of the Treaty ......................... 49
  V. Compliance (International Relations Theories) ................................. 51
F. The Rule *pacta sunt servanda* Within Domestic Law ............................ 52
G. Treaties of International Organizations (VCLT II) .............................. 55

## A.   Purpose and Function

Art 26 restates the pillar of treaty law[1] and the pivotal key to international law: *pacta sunt servanda*. Considering its significance, the provision is not too prominently placed in Part III of the Convention (→ MN 8). The Preamble, after all, highlights *pacta sunt servanda* by aligning the principle with two others basic corner stones of    **1**

---

[1] *Binder* (2008), pp. 317, 321.

© Springer-Verlag GmbH Germany 2018
O. Dörr, K. Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*,
DOI 10.1007/978-3-662-55160-8_29

treaty law: free consent and good faith (3rd recital, → Preamble MN 7). Rephrasing the principle *pacta sunt servanda* in Art 26 is first and foremost of **symbolic significance**. As *Verdross* rightly stresses, the binding force of international treaties has logical priority to any particular treaty and thus cannot itself be the legal consequence of a treaty such as the VCLT.[2]

**2**  In essence, it is the proclamation of the **binding force in international law** that gives Art 26 its decisive character. The binding force qualifies the treaty to establish a **legal relationship** between the parties (→ Art 2 MN 30–34); it requires the parties not only to comply with the treaty provisions (→ MN 33) but also to give them effect as a matter of **good faith** (→ MN 46). Finally and perhaps most importantly, the binding force of a treaty clarifies that treaty rights and obligations are not just pawns to be used by only one party alone (→ MN 11–12).

**3**  The weight and clarity of the language used in Art 26 is interwoven with those of other provisions of the VCLT.[3] The phrase "in force" has to be assessed in the light of Art 42; the phrase "upon parties" is revisited in Art 34 and "performed [. . .] in good faith" has close ties to Art 31. Consequently, Art 26 cannot be applied in clinical isolation but is supplemented by the provisions on **interpretation** as well as **invalidity**, **termination** and **suspension** (Arts 43–64). With this in mind, one can translate *pacta sunt servanda* into 'agreements regarded by both the contracting states and the law as binding (pacta), are binding in law (servanda)', to slightly modify the known dictum coined by Thirlway.[4]

## B.   Historical Background and Negotiating History

### I.   Historical Background

**4**  *Pacta sunt servanda* is one of the long-standing principles of international law which has its roots in private law relations.[5] The phrase *pacta sunt servanda* was probably coined by medieval canonists,[6] but its actual normative content is as old as the concept of 'treaty' itself. With some caveats, the civil law principle can be

---

[2] *Verdross* (1926), pp. 28–33; see also *Fitzmaurice* IV 53.

[3] On the tension between *pacta sunt servanda* and the VCLT rules on termination, withdrawal and suspension see *Binder* (2012), p. 912 *et seq; Lekkas and Tzanakopoulos* (2014), p. 312 *et seq.*

[4] *Thirlway* (1972), p. 38: "agreements regarded by the law as binding (*pacta*) are binding in law (*servanda*)", criticized by *Niedobitek* (2001), p. 145 n 12 as tautological.

[5] *Cf Ripert* (1933), p. 589.

[6] *Collinet* (1932), p. 494; one of the oldest traces of the *pacta sunt servanda* maxim can be found in the *Liber Extra*, decrees by Pope *Gregory IX* from the year 1234, a restatement of holdings of the Council of Carthage (around 348 AD) presided by *Gratus*, Decretales 1, 35, 1: "pacta quantum-cumque nuda servanda sunt" ("pacts, however naked, must be kept"). For the history of *pacta sunt servanda cf Redslob* (1923), pp. 47–57, 122–128.

Article 26.   Pacta sunt servanda                                                469

traced back to Roman times, namely Justinian's Digest,[7] but it is in fact of much
greater antiquity.[8]

As a norm of paramount importance in international relations, *pacta sunt*                **5**
*servanda* found its way into early treatises by *Grotius*[9] and *de Vattel*[10] as well as
nineteenth century codifications of international law, *eg* those of *Bluntschli*[11] and
*Fiore*.[12] The League of Nations Covenant emphasized *pacta sunt servanda* in its
Preamble[13] but heavily restricted 'servanda' in its Art 18.[14] In 1928, a clear
restatement of *pacta sunt servanda* was introduced by Art 10 Havana Convention
on Treaties: "No state can relieve itself of the obligations of a treaty or modify its
stipulations except by the agreement, secured through peaceful means, of the other
contracting parties."[15] The provision was later reiterated in Art 3 lit b and Art 18
OAS Charter.[16] The Harvard Research in International Law Project introduced
*pacta sunt servanda* as Art 20 in its Draft Convention on the Law of Treaties.[17]


## II.  Negotiating History

By and large, the negotiations on *pacta sunt servanda* were not overly controver-            **6**
sial, as the principle itself was undisputed. In SR *Fitzmaurice*'s first report (1956),
*pacta sunt servanda* appeared in the introductory part of his draft code (Draft Art
5).[18] It was a vast article, expressly addressing, *inter alia*, changes of government
within the State (para 3), territorial changes (para 4), internal law (para 5) and the
*clausula rebus sic stantibus* (para 7). SR *Waldock*'s third report (1964) contained a
similarly voluminous Draft Art 55:

---

[7] Dig 2.14.7.7 (*Ulpian*): "The praetor says: I will enforce agreements in the form of a pact (...)";
but see *Hyland* (1994), p. 412 who concludes that the pacta maxim is not Roman, given that Ulpian
wrote earlier: "a naked agreement gives not rise to an obligation but to a defense" (Dig 2.14.7.4),
translated by *Monro* (1904), pp. 108–111.

[8] *Lachs* (1997), p. 847.

[9] See *eg Grotius* (1646/1964 II), p. 329, paraphrasing *Ulpian* (Dig 2.14.1); still, *Grotius* himself
never formulated the rule *pacta sunt servanda*, see *Hyland* (1994), p. 425.

[10] *de Vattel* (1758/1916), pp. 162–163.

[11] *Bluntschli* (1881), Art 410.

[12] *Fiore* (1890), Arts 735, 769–772.

[13] Preamble para 5 Covenant of the League of Nations 225 CTS 188: "by the maintenance of
justice and a scrupulous respect for all treaty obligations in the dealings of organised peoples with
one another".

[14] Art 18: "No such treaty or international engagement shall be binding until so registered."

[15] Adopted at the 6th International Conference of American States, 20 February 1928 (1928) 22
AJIL Supp 138.

[16] 1948 Charter of the Organization of American States 119 UNTS 3.

[17] Art 20 Harvard Draft: "A State is bound to carry out in good faith the obligations which it has
assumed by a treaty."

[18] *Fitzmaurice* I 108.

1. "1. A treaty in force is binding upon the parties and must be applied by them in good faith in accordance with its terms and in the light of the general rules of international law governing the interpretation of treaties.
2. Good faith, *inter alia*, requires that a party to a treaty shall refrain from any acts calculated to prevent the due execution of the treaty or otherwise to frustrate its objects.
3. The obligations in paragraph 1 and 2 apply also –
   (a) to any State to the territory of which a treaty extends under article 59[19]; and
   (b) to any State to which the provision of a treaty may be applicable under articles 62[20] and 63,[21] to the extent of such provisions.
4. The failure of any State to comply with its obligations under the preceding paragraphs engages its international responsibility, unless such failure is justifiable or excusable under the general rules of international law regarding State responsibility."[22]

**7**    Even though Draft Art 55 was subsequently reduced to the present concise sentence of Art 26, *Waldock*'s original draft is still the key to understanding Art 26.[23] The reduced wording of Draft Art 55 was adopted by the ILC in 1964.[24] Without being altered at the Vienna Conference, Art 26 passed with 96 votes, no abstentions and no dissents.[25]

**8**    In the course of the drafting process, some discussion developed about the article's **suitable position** within the Draft Convention.[26] Some ILC members and a few States wanted to affirm the special prominence of the rule by inserting it at the beginning of the Convention.[27] Eventually, it was deemed to be more appropriate to aim for the systematic coherence of the text and to reiterate the norm by its inclusion in the Preamble.[28]

**9**    The only substantial issue connected with *pacta sunt servanda* was the question of the validity of **'unequal' treaties** (→ Art 52 MN 16).[29] Representatives from some States, particularly from the now defunct Eastern bloc and newly independent post-colonial nations,[30] wanted an explicit exclusion of these treaties from *pacta*

---

[19] *Waldock* III 15 (Draft Art 59): extension of a treaty to the territory of a State with its authorization.

[20] *Waldock* III 19 (Draft Art 62): treaties providing for obligations or rights of third States.

[21] *Waldock* III 26 (Draft Art 63): treaties providing for objective régimes.

[22] *Waldock* III 7–8.

[23] See particularly [1964] YbILC I 165, para 8.

[24] [1964] YbILC I 232, para 3 (*Paredes* and *Bartoš* abstained).

[25] UNCLOT II 49, para 67.

[26] For an early instance, see *eg Fitzmaurice* I 118; *Waldock* VI 60 noted that "to precede [Part I] with a staccato statement of the *pacta sunt servanda* rule might not seem very satisfactory from a scientific point of view".

[27] See *eg* the comments of Israel, *Waldock* VI 59, 298; *cf* also the remarks of *El-Erian* and *Rosenne* [1966-I/2] YbILC 32, para 9, 33, para 20, 34, para 28; *cf* also *Fitzmaurice* I 108, Draft Art 5.

[28] SR *Waldock* had proposed to include the rule in the Preamble so as to demonstrate its importance, [1966-I/2] YbILC 37, para 71; *cf* Final Draft, Commentary to Art 23, para 5.

[29] Occasionally dubbed 'inequitable' or 'leonine treaties'. That issue made Part V the most highly contested piece of the Convention at the Vienna Conference, see *Rosenne* (1970), pp. 75–77.

[30] See *eg* the comment of Czechoslovakia, *Waldock* VI 59, see also *Gormley* (1970), p. 381.

*sunt servanda*. This demand was abandoned with reference to the phrase "treaty in force", which was regarded as sufficiently clear in this respect.[31]

The phrase "**treaty in force**" was however subject to further discussions: some ILC members objected to the inclusion of the element "in force", arguing that such qualification might lead to unnecessary ambiguities and thus weaken the rule.[32] Others wanted to further qualify the element ("in force and valid"), so as to emphasize the substantive aspects of validity and not merely the formal ones, as well as to distinguish between the operation and validity of a treaty.[33] These demands were all ultimately dismissed, for, as *Ago* noted at the Vienna Conference, "[i]t should be borne in mind [. . .] that [Art 26] was of a declaratory nature which would be somewhat impaired if it included points of detail, as proposed in the amendments in question".[34]

**10**

### C. Will, Consent and Obligation

The PCIJ put the still prevailing rationale for the binding character of international law into these famous but somewhat ambiguous words:

**11**

> "The rules of law binding upon States [. . .] emanate from their own free will as expressed in conventions or by usages generally accepted as expressing principles of law and established in order to regulate the relations between these co-existing independent communities or with a view to the achievement of common aims."[35]

Given that consensus demands the corresponding will of at least two actors (*consensus ad idem*), the crucial question remains: what prevents States from changing their sovereign will that was once aimed at self-limitation but is now considered inconvenient?

---

[31] See *eg* the observations of the representatives of Cuba and Czechoslovakia UNCLOT II 45–46, paras 4 and 22; see in this context the 'Declaration on the Prohibition of Military, Political or Economic Coercion in the Conclusion of Treaties' annexed to the Final Act, UN Doc A/CONF.39/26, UNCLOT III 285.

[32] *Cf* ILC Report 16th Session [1964-II] YbILC 177, para 3; ILC Report 17th Session Part II [1966-II] YbILC 211, para 3; *Briggs, Elias, Verdross, Tabibi, Tsuruoka, Amado, Liang, Yasseen* and again *Elias* in [1964-I] YbILC 24, para 44, 24, para 51, 24, para 57, 27, para 11, 28, para 22, 30, para 45, 30, para 46, 30, para 50, 31, para 57; the comment of Cyprus, *Waldock* VI 59; *Verdross, Briggs* in [1966-I/2] YbILC 32, para 7, 35, para 44. For the opposite view, see ILC Report 16th Session [1964-II] YbILC 177, para 3; ILC Report 17th Session Part II [1966-II] YbILC 211, para 3; *Bartoš, Rosenne* in [1964] YbILC I 25, para 66, 26, para 75; *Tunkin*, Chairman *Ago, de Luna, El-Erian, Pessou,* SR *Waldock* in [1964-I] YbILC 28, para 15, 29, para 30, 29, para 35, 30, para 41, 30, para 43, 32, para 69; *Lachs, Rosenne, Ago, Jiménez de Aréchaga* in [1966-I/2] YbILC 33, para 15, 34, para 27, 34, para 36, 36, para 56.

[33] *Cf* the amendment proposed at the Vienna Conference by Bolivia, Czechoslovakia, Ecuador, Spain and Tanzania UN Doc A/CONF.39/C.1/L.118, UNCLOT III 145, para 233.

[34] UNCLOT II 49, para 63.

[35] PCIJ *'Lotus'* PCIJ Ser A No 10, 18.

**12**    The "**self-limitation theory**"[36] (*Staatswillenstheorie*), which can be traced to *Hegel*'s teachings,[37] was chiefly developed by German writers of the nineteenth century.[38] Stressing the sovereign will of States, this school of thought hazards the logical consequence that the unilateral withdrawal of consent, motivated by a change of governmental aims, ends treaty relations.[39] Unsurprisingly, international legal scholarship rejects the self-limitation theory as a total negation of international law. Most commonly it is argued that the freely given **consent to be bound** generates **legal obligations** independent of any future changes in the sovereign will (*ex consensu advenit vinculum*).[40] However, the prevailing **consent-based theory** (Preamble, 3rd recital) requires a preconditioned, legally binding rule that commands that once consent has been given, the treaty is to be observed: *pactum est servanda*.[41]

### D.    Foundation

**13**    One finds as much unanimity on the existence of the rule *pacta sunt servanda* as there is dissent regarding its philosophical, theoretical and normative foundations.[42] In order to exhibit a strong mainstay for the principle *pacta sunt servanda*, most authors vindicate more than one approach. Indeed, considered in isolation, each single hypothesis is definitely debatable. On the whole, the validity of the principle *pacta sunt servanda* is generally accepted as independent of the fundamental questions associated with it.[43] As *Schachter* put it, the discourse on foundation achieves nothing more than a chaplain's opening prayer at public meetings: it has little effect on what is said afterwards.[44]

### I.    Naturalism and Cognate Schools

**14**    Some doctrines take the position that *pacta sunt servanda* exists independent of the will of States because it emanates from non-consensual precepts; such precepts

---

[36] See *eg* Harvard Draft 987. *Lauterpacht* (1933), p. 411 calls it "doctrine of self-limitation".

[37] *Hegel* (1820), §§ 330–340.

[38] See *eg Heffter* (1844), § 81; *Jellinek* (1880), particularly at p. 40; *Jellinek* (1887), p. 197; *Nippold* (1894), pp. 19–22.

[39] *Jellinek* (1880), pp. 40–42.

[40] *Fitzmaurice* I 108 (Draft Art 4 para 1): "The foundation of treaty obligation is consent, coupled with the fundamental principle of law that consent gives rise to obligation." See also *Lauterpacht* (1933), p. 411; *cf* also *Borchard* (1926), p. 1086; critics include *Triepel* (1899), p. 79; *Duguit* (1917), pp. 139–144; *Verdross* (1927), pp. 265–266; *Brierly* (1928); *Chailley* (1932), p. 102.

[41] *Dahm et al* (1989), p. 37; see also *Franck* (1990), p. 187.

[42] For an overview, see *Schachter* (1968), p. 301.

[43] *Radoikovitch* (1930), p. 19.

[44] *Schachter* (1968), p. 302.

could be **divine**, or could be mandated by **reason**, the **necessities of international life**, **justice** or **morality**.[45] Even if the naturalist school, in its purest sense, lost its dominance in the nineteenth century, however many scholars with a consistently positivist sentiment have recourse to pre-legal considerations when *pacta sunt servanda* is discussed. *Dahm*, for example, calls *pacta sunt servanda* a rule not of logic but of practical reason, whose legal validity stems from its character as *ius necessitum* for the international community.[46] *Lauterpacht* specifies the rule as an objective principle that confronts States independently of their will.[47] According to *Wehberg*, "[i]nternational law, and with it also the sanctity of contracts, results by a natural necessity from the inevitability of social intercourse".[48] The doctrine of **necessity of law** grows out of the Latin maxim *ubi societas ibi ius*, which proceeds from the assumption that the need of the international society is the same as the need of human society: the prevention of chaos and anarchy by law.[49]

## II.   Good Faith

The principle of good faith permeates the international legal order in many ways (→ Art 31 MN 59–60). Its importance for the intercourse of States has been stressed by several authorities, including *Suárez*,[50] *Gentili*[51] and *de Vattel*.[52] *Grotius* emphasized that good faith demands that even *pacta* with enemies, pirates, rebels and infidels should be diligently kept.[53] Modern scholars have also embraced the idea that *pacta sunt servanda* emanates from good faith,[54] *eg Cheng*[55] and *Chailley*.[56]

**15**

In its famous *Nuclear Tests* judgment, the ICJ elevates good faith to the very foundation of the *pacta sunt servanda* principle:

**16**

> "One of the basic principles governing the creation and performance of legal obligations, whatever their source, is the principle of good faith. Trust and confidence are inherent in

---

[45] *Cf Boyle* (1985), p. 337; *Brierly* (1963), pp. 54–56.

[46] *Dahm* (1958), p. 12; *Dahm et al* (2002), p. 600; *Basdevant* (1936), p. 642.

[47] *Lauterpacht* (1932), pp. 301, 304; equally *Jennings and Watts* (1992), p. 1206: "fundamental assumption, which is neither consensual nor necessarily legal, of the objectively binding force of international law".

[48] *Wehberg* (1959), p. 782.

[49] *Shen* (1999), p. 307.

[50] On the good faith element of *Suárez'* system of jurisprudence see *Scott* (1939), p. 566.

[51] *Gentili* (1612) Book III Chapter 14, *cf Lesaffer* (2010), p. 227.

[52] *de Vattel* (1758/ 1916), pp. 188–189.

[53] *Grotius* (1646/1964 III), pp. 792–803.

[54] See *eg de Luna* [1964-I] YbILC 29, para 34; *Waldock* III 8. On the fundamental importance see also *Lukashuk* (1989), p. 513; *Zoller* (1977), p. 47; *Kolb* (2000), p. 179.

[55] *Cheng* (1953), p. 113.

[56] *Chailley* (1932), p. 79 *et seq*.

474                                 Part III.   Observance, Application and Interpretation of Treaties

international co-operation, in particular in an age when this co-operation in many fields is becoming increasingly essential. Just as the very rule of *pacta sunt servanda* in the law of treaties is based on good faith, so also is the binding character of an international obligation assumed by unilateral declaration."[57]

**17**         Despite this accentuation of the good faith principle, the ICJ understands the concept as a **background principle** informing and shaping the observance of existing rules of international law but being not in itself a source of obligation where none would otherwise exist.[58]


### III.   Basic Norm, Rule of Recognition

**18**      The adherents of the basic norm approach, particularly *Anzilotti* (*norma fondamentale*)[59] and *Kelsen* (*Grundnorm*),[60] assert that *pacta sunt servanda* is a fundamental axiom or hypothesis incapable of juridical demonstration. In the monistic view of *Kelsen*, it is the 'first foundation' of his pyramid of norms (and thus itself not a part of the system of positive law).[61] *Anzilotti*, consistent with his *norma fondamentale* theory, extends the scope of *pacta sunt servanda* beyond the law of treaties to obligations arising from customary law.[62]

**19**      *Hart* challenges the need for a basic norm of international law, arguing that international law is but a mere set of primary rules that lack a generally accepted secondary **'rule of recognition'** and thus do not constitute a complete legal system. However, he concedes that at the time of his writing (1961) international law was "perhaps in a stage of transition" and that a rule of recognition might yet emerge, mentioning *pacta sunt servanda* as one of the potential candidates.[63]

---

[57] ICJ *Nuclear Tests (New Zealand v France)* [1974] ICJ Rep 457, para 49.

[58] ICJ *Border and Transborder Armed Actions* [1988] ICJ Rep 69, para 94; see generally on good faith the separate opinion of Judge *Ajibola* in *Territorial Dispute (Libya v Chad)* [1994] ICJ Rep 6, 71–74; see also *Shaw* (2014), p. 74; in the same sense *Hector* (1992), pp. 144–145.

[59] *Anzilotti* (1928), pp. 43–45.

[60] See *eg Kelsen* (1920), p. 106 (*Kelsen* later joined the adherents of the customary law doctrine; see *Kelsen* (1945), p. 369; *Kelsen* (1957), pp. 257, 263).

[61] *Kelsen* (1966), p. 26; Kelsen (1953), p. 131; Kelsen (1926), p. 303; very much in the same sense *Hostie* (1932), p. 479.

[62] *Anzilotti* (1928), pp. 72–73; *cf* also *Bourquin* (1931), p. 80 ("principe plus vaste"); *Tunkin* [1964] YbILC I 27, para 14 ("rule [. . .] of much wider application than the law of treaties"); *Ago* [1964] YbILC I 28, para 26 ("basis of the binding force of any rule of international law"); *Bastid* (1985), p. 115; *Lachs* (1997), p. 370; *Salmon* (2011), Art 26 MN 11.

[63] See particularly *Hart* (1961), pp. 230–231.

Article 26.   Pacta sunt servanda                                                    475

## IV.   International Customary Law

Many writers conceive *pacta sunt servanda* as a generally recognized rule of     **20**
customary international law (Art 38 para 1 lit b ICJ Statute).[64] Starting from that
perspective, *Kunz* qualifies *pacta sunt servanda* as a **constitutional norm of
superior rank**, established by custom and instituting a particular procedure for
the creation of international law, namely treaty procedure.[65] On this footing, *pacta
sunt servanda* can be labeled as a **fundamental principle of international law**
derived from custom and now mirrored in Art 26.[66]

## V.   General Principle of Law

Years before the sources of international law had been codified in Art 38 PCIJ      **21**
Statute,[67] *Mérignhac*[68] proposed an analogy from private law as the proper legal
foundation of the international rule *pacta sunt servanda* to the effect that interna-
tional treaties are as binding on States as contracts are binding on individuals. This
early perception is reflected in numerous arbitral awards of the nineteenth century.

> See *eg* the arbitral award rendered by *AP Morse* in the case of *Van Bokkelen v Haiti* (1888):
> "Treaties of every kind, when made by the competent authority, are as obligatory upon
> nations as private contracts are binding upon individuals, and these are to receive a fair and
> liberal interpretation, according to the intention of the contracting parties, and to be kept
> with the most scrupulous good faith."[69] In the same sense is the arbitral award rendered by
> *WR Day* in the case of *Metzger & Co v Haiti* (1900): "It need hardly be stated that the
> obligations of a treaty are as binding upon nations as are private contracts upon individuals.
> The principle has been too often cited by publicists and enforced by international decisions

---

[64] *de Louter* (1920), p. 471; *Oppenheim* (1905), § 493 p. 519; *Basdevant* (1936), p. 642; *Whitton* (1935), p. 404; *Guggenheim* (1967), p. 57; *Wehberg* (1959), pp. 782–783; *Salmon* (2011), Art 26 MN 43; for earlier references see Harvard Draft 989; for a different view see *Lavalle* (1982), p. 28. See also *'Rainbow Warrior' Affair* (New Zealand v France) (1990) 20 RIAA 217, para 75. *Kelsen* later also joined this school of thought, see *Kelsen* (1945), p. 369, stating that the basic norm of international law is the principle *consuetudo est servanda*, establishing custom as a 'norm-creating fact', and that customary international law, including *pacta sunt servanda*, developed on the basis of this norm; *Kelsen* (1957), pp. 257, 263.

[65] *Kunz* (1945), p. 181; see also *Henkin* (1995), pp. 31–32, who emphasizes, however, that this 'ur' conception of interstate constitutional law is not "customary law" in the sense of Art 38 ICJ Statute because it did not result from practice.

[66] Sole arbitrator *Dupuy* in *Texaco v Libya* (1977) 53 ILR 389, p. 19 para 51; see also ECJ *Racke* C-162/96 [1998] ECR I-3655, para 49.

[67] 1920 Statute of the PCIJ 6 LNTS 380.

[68] *Mérignhac* (1907), p. 634. See also *Lauterpacht* (1927), p. 156.

[69] *Van Bokkelen v Haiti (United States v Haiti)* [1886-I] US Foreign Relations 1034–1035.

to need amplification here."[70] See also the decision of the Franco-Venezuelan Mixed Commission of 1905 in the *Maninat* case: "A treaty is a solemn compact between nations. It possesses in ordinary the same essential qualities as a contract between individuals, enhanced by the weightier quality of the parties and by the greater magnitude of the subject-matter."[71]

**22**    With Art 38 para 1 lit c ICJ Statute in mind, the classification of the principle *pacta sunt servanda* as a general principle of law has its contemporary adherents as well.[72] The important advantage of this foundation—compared to international customary law—is its non-consensual legal nature[73]: recognized *in foro domestico* and elevated to a proper source of international law, the principle *pacta sunt servanda* is hedged against the unlikely event of consensual revocation.

### E.    Elements of Article 26

### I.    Every Treaty

#### 1.    Treaties (Art 2)

**23**    → Art 2 MN 3–34

#### 2.    International Agreements (Art 3)

**24**    → Art 3 MN 3; on their binding force, see → Art 3 MN 16

#### 3.    Internationalized Contracts

**25**    Despite the apodictic statement of the PCIJ in the *Serbian Loans* case that contracts with non-State entities are exclusively governed by municipal law,[74] scattered voices proposed the converse: the international principle *pacta sunt servanda* should be applied to **any contract between a State and an alien** by reason of the 'international character' of the contractual relation.[75] The motive behind this

---

[70] *Metzger & Co v Haiti (United States v Haiti)* [1901] US Foreign Relations 262, 276. See also *Metzger & Co v Haiti (United States v Haiti)* [1901] US Foreign Relations 262, 271: "It cannot be that good faith is less obligatory upon nations than upon individuals in carrying out agreements."

[71] *Heirs of Jean Maninat (France v Venezuela)* (1905) 10 RIAA 55, 78.

[72] *Fitzmaurice and Elias* (2005), p. 3; IACtHR *Reintroduction of the Death Penalty in Peru* (Advisory Opinion) Case OC-14/94 (1995) 16 Human Rights LJ 9, 13; *Dupuy* in *Texaco v Libya* (1977) 53 ILR 389, p. 19 para 51, citing *Jessup*.

[73] *Elias and Lim* (1998), p. 208.

[74] PCIJ *Payment of Various Serbian Loans Issued in France* PCIJ Ser A No 20, 41 (1929); *Payment in Gold of Brazilian Federal Loans Issued in France* PCIJ Ser A No 21, 141 (1929).

[75] For references, see SR *Garcia-Amador* 4th Report on State Responsibility [1959-II] YbILC 1, para 119.

perception was to enable the alien's State of nationality to internationally resist the non-performance of the contract by diplomatic protection.

> See the written statement of the Swiss government to the PCIJ in the Losinger & Co Case of 1936: "The principle pacta sunt servanda [...] must be applied not only to agreements directly concluded between States, but also to agreements between a State and an alien; precisely by reason of their international character, such agreements may become the subject of a dispute in which a State takes the place of its nationals for the purpose of securing the observance of contractual obligations existing in their favour."[76]

The prevailing view, however, does not consider the mere non-performance of a **domestic law contract** an 'internationally wrongful act'; the arbitrary consequences of the non-performance, however, such as the denial of justice or expropriation without adequate compensation, may result in international consequences for the contract-breaching State.[77] **26**

If a contract between a State and an alien or a foreign corporation expressly or implicitly provides for the application of international law or general principles of law (Art 38 para 1 lit c ICJ Statute) as the **proper and primary law** of the contract,[78] this choice of law embraces the principle *pacta sunt servanda* without changing the legal nature of the contractual relationship (→ Art 3 MN 71).[79] The application of the principle simply constrains the competence of the State Party to unilaterally terminate the contract according to its domestic laws.[80] This proposition was adopted by numerous arbitrators.[81] As for the basis of validity of contracts not providing for a proper law clause, it is up to the arbitral tribunal to decide on the issue by following one of the numerous doctrines (→ Art 3 MN 65–70), by applying *lex fori* (eg Art 42 ICSID Convention[82]) or by falling back to the law which the tribunal considers as best corresponding to the nature of the legal relationships between the parties.[83] **27**

---

[76] PCIJ *Losinger & Co Case* PCIJ Pleadings, Oral Statements and Documents Ser C No 78, 32 (1936), English translation in SR *Garcia-Amador* 4th Report on State Responsibility [1959-II] YbILC 1, para 116.

[77] SR *Garcia-Amador* 4th Report on State Responsibility [1959-II] YbILC 1, paras 121–123. This is the prevailing view even if the contracting parties have chosen international law as the proper law of the contract, see *Marboe and Reinisch* (2011), MN 32–35.

[78] *Cf Schreuer* (2009), Art 42 MN 21.

[79] *Kischel* (1992), p. 343.

[80] Against *pacta sunt servanda* as the basis of validity of State contracts *Lankarani El-Zein* (2001), pp. 139–158; a critique of this view is given by *Leben* (2003), pp. 349–358.

[81] Sole arbitrator *Mahmassani* in *Liamco v Libya* (1977) 62 ILR 140, 175–176 ("sanctity of property and contracts"), 190–193; sole arbitrator *Dupuy* in *Texaco v Libya* (1977) ILR 389, 462; sole arbitrator *Lagergren* in *BP v Libya* (1979) 53 ILR 297, 332.

[82] Convention on the Settlement of Investment Disputes between States and Nationals of Other States 575 UNTS 159.

[83] Arbitrators *Badawi, Hassan* and *Habachy* in *Saudi Arabia v Aramco* (1958) 27 ILR 117, 167: "The Concession Agreement [...] derives therefore its judicial force from the legal system of Saudi Arabia, The Shari'a, the Divine law of Islam supplemented by Royal Decree [...]".

### 4.   Interstate Agreements Governed by Domestic Law

**28**   Neither international nor national jurisprudence supports the view that *pacta sunt servanda* is a general behavioral rule obliging States to comply with their contractual obligations irrespective of the legal nature of the respective obligation (→ Art 2 MN 23–29). Whereas the international principle exclusively calls for good faith performance of international treaties, its equivalent *in foro domestico* (→ MN 21) demands the same for interstate agreements subjected to domestic law.

### II.   In Force

**29**   What appears to be a tautology at first sight—**treaties in force have binding force**—is an imperative qualification of the principle *pacta sunt servanda*[84]: only treaties regarded by international law as binding are binding in international law.[85]

**30**   Whether a treaty is in force has to be decided exclusively on the basis of the respective treaty provisions (*eg* expiring date) and the VCLT.[86] Consequently, Part V (Arts 42–72) of the Convention is of crucial importance due to its exhaustive reasons for a treaty's **invalidity**, its **termination** and the **suspension** of the operation of a treaty.

> See the arbitral award Chile v Peru of 1875 rendered by the US Ambassador in Santiago: "It is a well established principle of international law that after a treaty possessing all of the elements of validity [. . .] has been formally executed, it can only be altered or amended before its proper expiration by the same authority, and under the same formality of procedure as the original".[87] In the Land and Maritime Boundary between Cameroon and Nigeria case, the ICJ clarified: "Nigeria is not justified in relying on the principle of good faith and the rule pacta sunt servanda, both of which relate only to the fulfilment of existing obligations."[88]

**31**   Even though it is not reflected in the provision's wording, the ILC and the Vienna Conference considered it self-evident that Art 26 is applicable to a treaty **provisionally applied** pending its entry into force under Art 25.[89]

**32**   **Derogation rules on the conflict of treaties** (*lex posterior derogat legi priori etc*) do not affect the legal force of the derogated treaty; they exclusively concern the **application of treaty provisions** by the State Party (see Art 30 para 3).[90] In this

---

[84] *Cf Ago* [1964-I] YbILC 28, para 26; [1966-I/2] YbILC 35, para 47; see also *Whitton* (1934), p. 159.

[85] *Thirlway* (1972), p. 38.

[86] UNCLOT I 158, para 71.

[87] *La Fontaine* (1902), pp. 157, 165.

[88] ICJ *Boundary between Cameroon and Nigeria* (Preliminary Objections) [1998] ICJ Rep 275, para 59.

[89] UNCLOT II 47, para 33, 49, para 63, 157, para 47; Final Draft, Commentary to Art 23, 211, para 3.

[90] *Matz-Lück* (2010), MN 18.

light, Art 26 appears to be ill-defined: not every treaty in force has to be performed in good faith. To the contrary: established derogation rules and a good faith interpretation of a treaty (Art 31) may entail that the conflicting treaty provision must not be performed (→ Art 30 MN 35).

### III.  Legally Binding Force (Obligations)

Valid treaties in force are legally binding upon the parties, *ie* all obligations imposed by treaties are **legal obligations**. Consequently, State Parties have the **legal right** to demand compliance and the **legal duty** to comply with the obligations imposed by the treaty. The question remains, however, as to who may demand treaty compliance from whom. Within the scope of multilateral treaties, the answer depends on the **compliance structure** of the respective legal obligation. (→ Art 60 MN 52–63).[91] ILC member *de Luna* did not consider the **principle of reciprocity** embodied in Art 60 paras 1–4 VCLT an exception of *pacta sunt servanda* but rather a corollary of the principle of the sanctity of treaties in the light of the Roman maxim *frangenti fidem fides non est servanda* (faith need not be kept with one who breaks faith).[92]

**33**

### 1.  Reciprocal Obligations

**Reciprocal** (or **mutual**[93]) **obligations** are contractual obligations consisting in a synallagmatic grant or interchange between the parties ('positive'[94] or 'first-order reciprocity'[95]), *ie* the giving and receiving of rights, benefits, concessions or advantages in some fields with respect to a particular matter (→ Art 2 MN 31).[96]

**34**

> Art 2 para 3 Geneva Convention III clothes positive complementarity in words: "Although one of the Powers in conflict may not be a party to the present Convention, the Powers who are parties thereto shall remain bound by it in their mutual relations. They shall furthermore be bound by the Convention in relation to the said Power, if the latter accepts and applies the provisions thereof."[97]

---

[91] The classification of international law obligations has been discussed in the context of Art 40 ILC Articles on State Responsibility as well, *cf Sicilianos* (2002).

[92] [1963-I] YbILC 128, para 3.

[93] On the differences between the English and the French usage of the terms, see *Simma* (1972), pp. 44–45.

[94] *Schneeberger* (1948); for a more limited perception of the positive complementarity concept, see *Watts* (2009), p. 376: extension of reciprocal compliance to non-State Parties on the condition that they comply freely without being legally obliged.

[95] *Jinks* (2005), p. 192; 'obligational reciprocity' according to *Watts* (2009), p. 372.

[96] *Fitzmaurice* II 31; see also *Provost* (2002), p. 121.

[97] 1949 Geneva Convention Relative to the Treatment of Prisoners of War 75 UNTS 135.

Within the realm of reciprocal obligations, State Parties have a **reciprocal interest** in the observance of the provisions imposing reciprocal obligations, making the compliance by the other party the measure of one's own compliance ('negative[98] or 'second-order reciprocity'[99]).[100]

**35**    Not only bilateral but also several multilateral treaties provide for corresponding rights and duties that are to be performed reciprocally between pairs of States or pairs of State groups (**multilateral treaties of bilateral compliance structure**).[101]

> The 1961 Vienna Convention on Diplomatic Relations[102] and the 1963 Vienna Convention on Consular Relations[103] give examples for multilateral treaties having bilateral compliance structures.

**36**    Most multilateral treaties consist of reciprocal obligations *inter omnes*[104] (**integral** or **interdependent obligations**[105]). According to the compliance structure of these treaties, each State Party has a legal interest of its own, that all State Parties perform the reciprocal obligations in good faith.[106] Consequently, the performance of the treaty obligations by any party is necessarily dependent on an equal or corresponding performance by all other parties.[107] According to SR *Lauterpacht*, it is the essence of multilateral treaties to have an *inter omnes* compliance structure.[108] The non-compliance of one State Party calls into question the purpose for which the multilateral treaty was concluded.[109]

> The Partial Test Ban Treaty[110] and disarmament treaties,[111] the 1959 Antarctic Treaty[112] and the Outer Space Treaty[113] are examples for multilateral treaties of *inter omnes* application.

---

[98] *Schneeberger* (1948), p. 30.

[99] *Osiel* (2009), p. 79: 'observational reciprocity'.

[100] *Simma* (2008), MN 11.

[101] *Tams* (2005), p. 54; *Simma* (1972), pp. 80, 152; *Chaumont* (1970).

[102] 500 UNTS 95.

[103] 596 UNTS 261.

[104] *Simma* (1972), p. 153.

[105] *Sicilianos* (2002), p. 1134.

[106] *Simma* (1994), pp. 338, 351–352.

[107] *Fitzmaurice* II 31 (Draft Art 19 para 1 lit b): multilateral treaties of an 'integral type', *cf* *Fitzmaurice* IV 46; *Simma* (1972), p. 155.

[108] *Lauterpacht* II 135.

[109] *Tams* (2005), p. 57.

[110] 1963 Treaty Banning Nuclear Weapon Tests in the Atmosphere, in Outer Space and Under Water 480 UNTS 43.

[111] See *Simma* (1972), p. 156, whereas, according to *Simma*, treaties on the prohibition to use certain weapons may also fall within the category of multilateral treaties bilateral in application.

[112] UNTS 71.

[113] 1967 Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies 610 UNTS 205.

## 2.    Non-reciprocal Obligations

Non-reciprocal obligations—also referred to as **objective**, **absolute**, **self-existing**, or **inherent obligations**[114]—do not result in the exchange of direct, reciprocal benefits owed to the other State Parties but in the performance of the treaty for a benefit of a community good, which is tantamount to an 'immaterial' benefit of each State Party.[115]

> In its advisory opinion on Reservations to the Genocide Convention, the ICJ emphasized: "The Convention was manifestly adopted for a purely humanitarian and civilizing purpose. [. . .] In such a convention the contracting States do not have any interests of their own; they merely have, one and all, a common interest, namely, the accomplishment of those high purposes which are the raison d'être of the convention. Consequently, in a convention of this type one cannot speak of individual advantages or disadvantages to States, or of the maintenance of a perfect contractual balance between rights and duties."[116]

Because the duty to comply is not dependent on the corresponding performance by other State Parties, recourse to Art 60 paras 1–4 is precluded.[117]

There is a broad consensus in the academic debate, evidenced in international practice, that **human rights obligations** are never reciprocal.[118] Today, the reciprocity clauses of early treaties on **minority rights** (eg Art 45 of the 1923 Treaty of Lausanne[119]) are criticized as 'anachronistic' and contrary to modern human rights law which "transcends the framework of mere reciprocity between the contracting States".[120]

The non-reciprocity of provisions relating to the protection of humans in **treaties of a humanitarian character** is provided for in Art 60 para 5 (→ Art 60 MN 81–86). The extent of non-reciprocal obligations imposed by modern humanitarian law such as the four 1949 Geneva Conventions and the two 1977 Protocols is far from

37

38

39

40

---

[114] *Fitzmaurice* IV 46; *Simma* (1972), p. 181; 'global' reciprocity according to *Sicilianos* (2002), p. 1135.

[115] According to *Simma* (1972), p. 314, these obligations are nonetheless reciprocal although in a form which does not imply the synallagmatic interdependence of treaty performance. See also *Simma* (2008), MN 6.

[116] ICJ *Genocide Convention Opinion* [1951] ICJ Rep 15, 23.

[117] *Fitzmaurice* II 31 (Draft Art 19 para 1).

[118] ECommHR *Decision of the Commission as to the Admissibility of Application No 788/60*, 11 January 1961, 4 YbECHR 116, 140; ECtHR *Ireland v United Kingdom* App No 5310/71, 18 January 1978, Ser A No 25, para 239; IACtHR *Effect of Reservations on the Entry into Force of the American Convention* (Advisory Opinion) Case OC-2/82, 24 September 1982, Ser A No 2, para 29; Human Rights Committee, General Comment 24 (52), Reservations to the ICCPR, 4 November 1994, UN Doc CCPR/C/21/Rev.1/Add.6, para 17.

[119] 28 LNTS 11.

[120] Report of the Committee for Legal Affairs and Human Rights of the Parliamentary Assembly of the Council of Europe 'Freedom of Religion and Other Human Rights for Non-Muslim Minorities in Turkey and for the Muslim Minority in Thrace (Eastern Greece)', 21 April 2009, CoE Doc 11860, paras 32–33.

clear, as the numerous declarations of State Parties on the occasion of the ratification of Protocol I exemplify.

> See the declaration of the United Kingdom: "The obligations of Articles 51 and 55 are accepted on the basis that any adverse party against which the United Kingdom might be engaged will itself scrupulously observe those obligations. If an adverse party makes serious and deliberate attacks, in violation of Article 51 or Article 52 against the civilian population or civilians or against civilian objects, or, in violation of Articles 53, 54 and 55, on objects or items protected by those Articles, the United Kingdom will regard itself as entitled to take measures otherwise prohibited by the Articles in question".[121] Similar views were taken by Egypt, France, Germany and Italy.

**41**    Quite contrary to State practice, the ICTY favors a much broader, entirely human-centered approach in its *Kupreškić* judgment:

> "The absolute nature of most obligations imposed by rules of international humanitarian law reflects the progressive trend towards the so-called 'humanization' of international legal obligations, which refers to the general erosion of the role of reciprocity in the application of humanitarian law over the last century. [. . .] Unlike other international norms, such as those of commercial treaties which can legitimately be based on the protection of reciprocal interests of States, compliance with humanitarian rules could not be made dependent on a reciprocal or corresponding performance of these obligations by other States. This trend marks the translation into legal norms of the 'categorical imperative' formulated by Kant in the field of morals: one ought to fulfil an obligation regardless of whether others comply with it or disregard it."[122]

**42**    Apart from obligations aimed at protecting individuals and groups, the non-reciprocity of treaty obligations is commonly accepted in the field of **international environmental law**.[123]

### 3.  Obligations *erga omnes partes*

**43**    The diffuse concept of obligations *erga omnes* is subject to extensive scholarly writing.[124] In the light of jurisprudence and academic treatises, *erga omnes* has become a legal umbrella term covering various legal effects.[125] In the context of treaty law, the notion **erga omnes partes** or **erga omnes contractantes** is used to describe treaty-based obligations, the good faith performance of which all State Parties have a legal interest in.[126]

---

[121] Reservation letter of 28 January 1998 sent to the Swiss government by UK Ambassador Hulse.

[122] ICTY *Prosecutor v Kupreškić et al* (Trial Chamber) IT-95-16-T, 14 January 2000, para 517.

[123] *Tams* (2005), pp. 57–58 who furthermore expands the circle of non-reciprocal treaties to all treaties that require the harmonization of national laws.

[124] See *eg Ragazzi* (1997); *Zemanek* (2000); *Frowein* (2008).

[125] *Cf Tams* (2005), pp. 99, 155 ("legal vademecum").

[126] Whereas *erga omnes partes* obligations stem from an international treaty, the term *erga omnes* obligations is employed to denote universally recognized obligations of international customary law, owed to the international community as a whole, *cf* SR *Crawford* 3rd Report on the Law of State Responsibility (2000) UN Doc A/CN.4/507, para 106 n 195; *Sicilianos* (2002), p. 1136.

Article 26.    Pacta sunt servanda                                                          483

> See the ICTY Judgment in the Blaskić case: "The nature and content of this obligation, as well as the source from which it originates, make it clear that Article 29 [ICTY Statute] does not create bilateral relations. Article 29 imposes an obligation on Member States towards all other Members or, in other words, an 'obligation *erga omnes partes*'. By the same token, Article 29 posits a community interest in its observance. In other words, every Member State of the United Nations has a legal interest in the fulfilment of the obligation laid down in Article 29 [. . .]. As for States which are not Members of the United Nations, in accordance with the general principle embodied in Article 35 of the Vienna Convention on the Law of Treaties, they may undertake to comply with the obligation laid down in Article 29 by expressly accepting the obligation in writing. [. . .] [I] n the case of Switzerland, the passing in 1995 of a law implementing the Statute of the International Tribunal clearly implies acceptance of Article 29."[127]

Coming under the categories of treaty compliance, *erga omnes partes* obliga-   **44** tions owed to the community of State Parties are either reciprocal obligations *inter omnes* (→ MN 36) or non-reciprocal obligations (→ MN 37).[128] Accordingly, the spectrum of treaties imposing *erga omnes partes* obligations is broad, ranging from human rights treaties to the WTO agreements.[129]

The concept of obligations *erga omnes partes* is reflected in Art 48 para 1 ILC   **45** Articles on State Responsibility,[130] which has no counterpart in the VCLT.[131]


### IV.    Duty to Perform


### 1.    Good Faith Performance of the Treaty

The ways and means of treaty performance are the outcome of a multifaceted   **46** political decision-making process that involves *inter alia* the interpretation of the respective treaty provision.[132] Thus, the legal duty of parties to do what is required under the treaty in good faith necessarily includes the **good faith interpretation** of the respective treaty obligations (→ Art 31 MN 60).

> In the Gabčíkovo-Nagymaros Project case the ICJ emphasized that good faith performance implies that "it is the purpose of the treaty, and the intentions of the parties in concluding it, which should prevail over its literal application".[133]

---

[127] ICTY *Prosecutor v Blaškić* (Appeals Chamber) (Judgment on the Request of the Republic of Croatia for Review of the Decision of Trial Chamber II of 18 July 1997) IT-95-14 AR, 29 October 1997, para 26.

[128] SR *Crawford* 3rd Report on the Law of State Responsibility UN Doc A/CN.4/507 (2000), paras 106–107.

[129] For examples, see the ILC Final Draft on State Responsibility UN Doc A/56/10 (2001), Commentary to Art 48, para 7; *Tams* (2005), pp. 120–121.

[130] UNGA Res 56/83, 12 December 2001, UN Doc A/RES/56/83.

[131] *Sicilianos* (2002), p. 1135.

[132] *Rosenne* (1989), p. 62.

[133] ICJ *Gabčíkovo-Nagymaros* [1997] ICJ Rep 7, para 142.

**47**     Considering the interdependence between treaty compliance on the international plane and the **national legal situation** in most fields of international law (→ Art 27 MN 10–15), numerous treaties explicitly address the duty to take measures of **domestic implementation** (*eg* Art 2 para 2 ICCPR) without constraining the party's freedom of choice with respect to the manner of domestic implementation.[134] Increasingly, treaties establish treaty-based **mechanisms to induce compliance** with its substantive obligations, above all in the field of human rights, environmental law and disarmament.[135]

**48**     **Non-compliance**, *ie* the breach of the legal obligation, entails the international responsibility of the defaulting party according to the law of State responsibility (*cf* Art 2 lit b ILC Articles on State Responsibility).

## 2.  Duty Not to Defeat Object and Purpose of the Treaty

**49**     In a narrow sense, the good faith performance of a treaty requires the party's compliance with the letters of the legal obligations outlined in respective treaty provisions.[136] However, a party may act in a manner that is **inimical to the object and purpose of the treaty** even though the act itself is not expressly prohibited by its provisions. It was the ILC's understanding that Art 26 includes the party's duty not to defeat the object and purpose of a treaty.[137]

> In the Nicaragua case, the ICJ accepted Nicaragua's perception that the principle *pacta sunt servanda* can be violated without the direct breach of a treaty provision.[138] In the given case, the Court found that the United States were in breach of the duty not to deprive the treaty of friendship of its object and purpose because of certain hostile activities undermining the spirit of the bilateral agreement, ie the effective implementation of friendship in the fields provided for in the treaty.[139] In the *Gabčíkovo-Nagymaros Project* case, the Court kept loyal to this reading of Art 26 by stating that "[t]he principle of good faith obliges the Parties to apply [the treaty] in a reasonable way and in such a manner that its purpose can be realized".[140]

---

[134] See furthermore Art 1 para 2 of the 1958 UN Convention on Fishing and Conservation of the Living Resources of the High Seas 559 UNTS 285; Art 3 para 1 of the 2005 Council of Europe Convention on the Prevention of Terrorism ETS 196; Art 6 of the 1992 UN Convention on Biological Diversity 1760 UNTS 79.

[135] For details, see *Ulfstein et al* (2007).

[136] Dissenting opinion by Judge *Oda* in ICJ *Nicaragua* (Merits) [1986] ICJ Rep 212, 250.

[137] Final Draft, Commentary to Art 23, 211, para 4; see already *Waldock* III 7 (Draft Art 55 para 2): "Good faith, *inter alia*, requires that a party to a treaty shall refrain from any act calculated to prevent the due execution of the treaty or otherwise to frustrate its objects." According to the Commentary, the ILC considered *Waldock*'s para 2 "clearly implicit in the obligation to perform the treaty in good faith".

[138] ICJ *Nicaragua* (Merits) [1986] ICJ Rep 14, para 270; see also *Thirlway* (1992), pp. 50–51; *Binder* (2008), p. 322.

[139] ICJ *Nicaragua* (Merits) [1986] ICJ Rep 14, para 273; this part of the judgment is not uncontested, see the dissenting opinions of Judge *Oda* at 250 and of Judge *Jennings* at 540–542.

[140] ICJ *Gabčíkovo-Nagymaros* [1997] ICJ Rep 7, para 142.

    The ICJ's judgment in the *Gabčíkovo-Nagymaros Project* case makes it clear **50**
that the violation of the duty to perform a treaty in good faith does not necessarily
entail the simultaneous breach of that treaty as long as the **bad faith conduct** will
unavoidably result in future non-compliance.[141] In this regard, Art 26 carries on the
idea previously expressed in Art 18[142]: that the early protection of the object and
purpose of a treaty serves the ultimate goal of the VCLT—the stability and the
reliability of treaty relations.


### V.   Compliance (International Relations Theories)

Conceptually, Art 26 differentiates between the issue of **obligation** ("Every treaty **51**
in force is binding upon the parties to it…") and the issue of **fulfillment** ("…and
must be performed by them in good faith."). The legal command of Art 26,
however, leaves the question unanswered as to *whether* State actions are guided
by international law. If so, it does not explain *why* States follow that path.[143]
Several **compliance theories** are dealing with these two issues, most of them
developed by political scientists, some of them advanced by international legal
scholars with interdisciplinary interest in international relations and economics.
With the caveat that some approaches elude classification,[144] the **international
relations theories** can be grouped into normative theories,[145] (neo)realism,[146]
institutionalist theories,[147] (new) liberal theories[148] and constructivism.[149] Espe-
cially but not exclusively, the (neo)realist school assumes that States are solely
driven by self-interest, being rational unitary agents in an anarchical world. Conse-
quently, compliance with treaties has the same driving reasons as compliance with
non-legal agreements: fear of retaliation, fear of reputational loss or fear of failure
of coordination. This rational model of State behavior ultimately leads to the
conclusion that international law does not matter. Not all too remote from the
classic self-limitation theories (→ MN 12), the (neo)realist theories consider *pacta
sunt servanda* an empty phrase with no impact on the course of world affairs.

---

[141] ICJ *Gabčíkovo-Nagymaros* [1997] ICJ Rep 7, para 142; the detachment of the defeat of the
object and purpose from the breach of the treaty gave rise to criticism by Judge *Fleischhauer*, see
his dissenting opinion at 205–206.

[142] ICJ *Gabčíkovo-Nagymaros* (dissenting opinion *Fleischhauer*) [1997] ICJ Rep 7, para 206.

[143] *Peñalver* (2000), pp. 273–274.

[144] See *eg* the classification in *Armstrong et al* (2012), p. 69; *Burgstaller* (2005), p. 95.

[145] *Franck* (1990); *Franck* (1988); *Kho* (1997).

[146] *Waltz* (1979); *Goldsmith and Posner* (2003); *Neuhold* (1999).

[147] See *eg Abbott* (1999); *Chayes and Handler Chayes* (1995), pp. 25–26, often referred to as the
"managerial model".

[148] In particular, adherents of the New Haven School (*eg Lasswell and MacDougal* (1959)), of
legal process theories (*eg Falk* (1967)) and new liberal theory (*eg Slaughter* (1993); *Moravcsik*
(1997)).

[149] See *eg Kennedy* (1988).

Part III.  Observance, Application and Interpretation of Treaties

## F.  The Rule *pacta sunt servanda* Within Domestic Law

**52**   Being a rule of customary international law ($\rightarrow$ MN 20), the principle *pacta sunt servanda* is usually **incorporated** into the domestic legal order in one way or another.

> A notable example for an explicit incorporation of the international *pacta sunt servanda* principle is the Constitution of Japan, which in its Art 98 para 2 stipulates that "[t]he treaties concluded by Japan and established laws of nations shall be faithfully observed".[150] The USSR had introduced a similar rule into its national legislation in 1978.[151] Most constitutions contain a general clause on international customary law, eg according to Art 10 Italian Constitution, "Italy's legal system conforms with the generally recognized principles of international law".

**53**   Within the national legal order, even though the principle *pacta sunt servanda* is a **valid rule** *via* incorporation, its **applicability** is another issue. The problem of application is relevant for national courts if the constitution ranks international customary law (including the principle *pacta sunt servanda*) higher than incorporated treaties. Under this condition, national jurisprudence commonly refuses to apply the rule *pacta sunt servanda* to the dispute so as to prevent that any breach of any international treaty incorporated into the national legal order is *per se* unlawful under the incorporated rule *pacta sunt servanda*, which, in fact, would limit the State's scope of external action, *eg* recourse to reprisal.

> Before the German Federal Constitutional Court, individual applicants have argued that German courts violate Art 25 German Constitution ("The general rules of international law shall be an integral part of federal law") by not applying a treaty to which Germany is a party (eg the GATT). The Constitutional Court dismissed the plea: the rule *pacta sunt servanda* indeed falls within the scope of Art 25 German Constitution and thus takes precedence over statutory law; however, this does not mean that the treaty itself, as a result of *pacta sunt servanda*, comes under Art 25 to the effect that the treaty is binding upon the German legislator.[152] Consequently, individuals cannot enforce the observance of treaties before German courts by pointing at the high-ranking principle *pacta sunt servanda*.[153] A similar legal situation exists in Italy.[154]

---

[150] See *eg Hirobe* (1993).

[151] See Art 19 USSR Law No 7770-IX 'On the Procedure for Conclusion, Performance and Denunciation of International Treaties of the USSR', 6 July 1978 [1978] VVS SSSR No 28, item 439. See also the present Art 31 Federal Law No 101-FZ 'On International Treaties of the Russian Federation', 15 July 1995 [1995] SZ RF (Collection of Legislation of the Russian Federation) No 29, item 2757, and the Resolution No 5 of 10 October 2003 adopted by the Plenum of the Supreme Court of the Russian Federation.

[152] Federal Constitutional Court (Germany) 31 BVerfGE 145, 178 (1971), with reference to 6 BVerfGE 309, 363 (1957). Earlier however, other German courts had accepted this implication of *pacta sunt servanda*: Federal Court of Justice (Germany) 5 BGHSt 396, 402 (1954); Court of Appeal of Hamm (Germany) [1956] NJW 307, 309 (1955).

[153] Federal Constitutional Court (Germany) 31 BVerfGE 145, 178 (1971); recently: 141 BVerfGE 1, 20 (2015).

[154] For references, see *Mosler* (1957), p. 701.

Academic writers have put some creativity in their reasoning as to why *pacta sunt servanda* is rather toothless within the boundaries of national law.[155] The most conclusive rationale is that the incorporation of international treaties into the national legal order is subject to special constitutional rules on parliamentary approval that take precedence over constitutional provisions incorporating rules of customary law (including *pacta sunt servanda*).[156] In addition, it has been argued that the rule *pacta sunt servanda* lacks domestic significance because its legal command—essentially procedural in nature—is solely addressed to States as subjects of international law, not to individuals or State organs operating on the national plane.[157] Others assert that the application of *pacta sunt servanda* to any municipal law contravening international treaty obligations would undermine the constitutional guarantees of the democracy principle.[158]

**54**

### G.   Treaties of International Organizations (VCLT II)[159]

Unsurprisingly, the time-honored principle of *pacta sunt servanda* was introduced into the VCLT II (Art 26) without further discussion.[160] The only noteworthy alteration was made by ILC Member *Calle y Calle*, who emphasized the exemplary readiness of international organizations to faithfully perform their treaty obligations in contrast to (some) States,[161] which is a yet unproven assumption.

**55**

Without their consent,[162] **Member States** cannot be legally bound by an international treaty concluded between their international organizations and third

**56**

---

[155] For arguments to the contrary see *Doehring* (2004), MN 741.

[156] *Seidl-Hohenveldern* (1963), p. 97.

[157] *Rudolf* (1967), pp. 260–261. Similarly, *Mosler* (1957), pp. 701–702 argues that *pacta sunt servanda* aims solely at those State organs which are in charge of external relations, *ie* not at the courts.

[158] This seems to be the underlying rationale of the long-standing US constitutional doctrine since at least the Supreme Court's decision in the *Head Money Cases* of 8 December 1884, 112 US 580 (1884), according to which treaties can be overridden by a subsequent Act of Congress; see generally on the potential conflicts between *pacta sunt servanda* and the democracy principle *Fulda* (2002), who argues (at pp. 197–198) that a unilateral application of the democracy principle by one treaty partner would not bring any gains in legitimacy, proposing furthermore (at p. 217) a right to revision under the good faith principle of Art 26; *cf* also *Seidl-Hohenveldern* (1963), p. 110.

[159] For the treaty text see p. 1486 *et seq*.

[160] [1977-I] YbILC 107, para 68.

[161] [1977-I] YbILC 106, para 67.

[162] See the highly disputed Draft Art 36 *bis* in *Reuter* X 69: "The assent of States of an international organization to obligations arising from a treaty concluded by that organization shall derive from (a) the relevant rules of the organization [. . .] which provide that States members of the organization are bound by such a treaty; or (b) the acknowledgement by the States and the organization participating in the negotiation of the treaty as well as the States members of the organizations that the application of the treaty necessarily entails such effects." The provision was deleted due to

488                    Part III.   Observance, Application and Interpretation of Treaties

parties.[163] An international organization's separate legal personality established by
international law bars third parties from piercing the corporate veil for the purpose
of obtaining an additional obligation. If the treaty to which the organization is a
party contains provisions which impose certain obligations on a Member State not
party to the treaty, **Art 35 VCLT** protects the latter's interests.[164] The rule is
without prejudice to any possible (subsidiary) **liability of Member States** for a
breach of a treaty obligation derived from other rules of international law.[165]

**57**     Rarely does the **constituent instrument** of an international organization explic-
itly state that treaties concluded by the organization be binding for all Member
States (*eg* Art 216 para 2 TFEU). If it is not intended to grant legal rights to third
parties which enter into treaty relations with the organization (Art 36 VCLT), they
cannot rely on this internal provision (***res inter alios acta***).[166] In contrast, Member
States are legally obliged under that provision of the constituent instrument to
observe and implement the international organization's treaty obligations. Even
without such explicit provisions, Member States are bound to respect and to support
the organization's efforts to comply with its treaty obligations. It is the implicit and
fundamental idea of every constituent instrument that Member States shall refrain
from frustrating the exercise of the organization's functions (**principle of mutual
loyalty**).

**58**     Within the realm of EU treaty practice, many treaties concluded between the
European Union and third parties are so-called **mixed agreements**, *ie* all Member
States are parties to the treaty as well.[167] If no understanding between the parties to
the agreement indicates the opposite,[168] the EU and each of its Member States are
legally bound to the entire agreement, regardless of the internal division of compe-
tences.[169]

---

substantial criticism, *eg* by Bulgaria and Hungary in [1981-II/2] YbILC 184, 188; for the opposite
view, see Germany [1981-II/2] YbILC 184, 187.

[163] *Reuter* II 91; for an opposite view, see *Schermers and Blokker* (2003), § 1787.

[164] For an opposite view, see Germany in [1981-II/2] YbILC 186–187.

[165] For a detailed analysis of the famous International Tin Council case, see *Amerashinge* (1991);
*Hartwig* (1993), p. 56; *Schermers* (1996).

[166] *Reuter* [1973-I] YbILC 188–189, para 73 *et seq;* Canada [1981-II/2] YbILC 183; *Köck* (1977),
pp. 125–130; for a different approach, see *Pescatore* (1961), p. 134; *Dupuy* (1973), p. 316 (Art 10).

[167] See *eg* the 2000 Cotonou Agreement [2000] OJ L 317, 3 (amended in 2005 [2005] OJ L 209,
27) between the European Community and its Member States on the one hand and African,
Caribbean and Pacific States on the other hand.

[168] See *eg* Annex IX Art 4 UNCLOS 1833 UNTS 397.

[169] *Eeckhout* (2004), p. 222; *Gaja* (1983), p. 135; for an opposite view see *Kaddous* (1998), p. 173.

## References

*Abbott KW* (1999) International Relations Theory, International Law, and the Regime Governing Atrocities in Internal Conflicts. AJIL 93(2):361–379

*Amerashinge CF* (1991) Liability to Third Parties of Member States of International Organizations: Practice, Principle and Judicial Precedent. AJIL 85(2):259–280

*Anzilotti D* (1928) Corso di diritto internazionale, 3rd edn. Atheneum, Rome

*Armstrong D*, *Farrell T*, *Lambert H* (2012) International Law and International Relations. CUP, Cambridge

*Basdevant J* (1936) Règles générales du droit de la paix. RdC 58(3):471–715

*Bastid S* (1985) Les traités dans la vie internationale. Economica, Paris

*Binder C* (2008) The pacta sunt servanda rule in the Vienna Convention on the Law of Treaties: A Pillar and Its Safeguards. In: *Buffard I, Crawford J, Pellet A, Wittich S* (eds) International Law between Universalism and Fragmentation: Festschrift in Honour of Gerhard Hafner. Martinus Nijhoff, Leiden, pp 317–341

*Binder C* (2012) Stability and Change in Times of Fragementation: The Limits of pacta sunt servanda Revisited. LJIL 25:909–934

*Bluntschli JC* (1881) Le droit international codifié. Guillamin, Paris

*Borchard EM* (1926) Governmental Responsibility in Tort, VI. Yale LJ 36(1):1–41

*Bourquin M* (1931) Règles générales du droit de la paix. RdC 35(1):1–232

*Boyle J* (1985) Ideals and Things: International Legal Scholarship and the Prison-House of Language. HarvILJ 26(2):327–360

*Brierly JL* (1928) Le fondement du caractère obligatoire du droit international. RdC 23(4):463–592

*Brierly JL* (1963) The Law of Nations: An Introduction to the International Law of Peace, 6th edn. Clarendon Press, Oxford

*Burgstaller M* (2005) Theories of Compliance with International Law. Nijhoff, Leiden

*Chailley P* (1932) La nature juridique des traités internationaux selon le droit contemporain. Sirey, Paris

*Chaumont C* (1970) Cours général de droit international public. RdC 129(5):333–546

*Chayes A*, *Handler Chayes A* (1995) The New Sovereignty: Compliance with International Regulatory Agreements. Harvard University Press, Cambridge

*Cheng B* (1953) General Principles of Law as Applied by International Courts and Tribunals. Stevens, London

*Collinet P* (1932) The Evolution of Contract as Illustrating the General Evolution of Roman Law. LQR 48(4):488–494

*Dahm G* (1958) Völkerrecht, Vol 1. Kohlhammer, Stuttgart

*Dahm G*, *Delbrück J*, *Wolfrum R* (1989) Völkerrecht Band I/1, 2nd edn. De Gruyter, Berlin

*Dahm G*, *Delbrück J*, *Wolfrum R* (2002) Völkerrecht Band I/3, 2nd edn. De Gruyter, Berlin

*Doehring K* (2004) Völkerrecht: Ein Lehrbuch, 2nd edn. Müller, Heidelberg

*Duguit L* (1917) The Law and the State. HarvLR 31(1):1–185

*Dupuy RJ* (1973) L'application des règles du droit international général des traités aux accords conclus par les organisations internationales, Rapport provisoire et projet d'articles. AnnIDI 55:214–415

*Eeckhout P* (2004) External Relations of the European Union: Legal and Constitutional Foundations. OUP, Oxford

*Elias OA*, *Lim CL* (1998) The Paradox of Consensualism in International Law. Kluwer Law International, The Hague

*Falk RA* (1967) New Approaches to the Study of International Law. AJIL 61(2):477–495

*Fiore P* (1890) Il diritto internazionale codificato e la sua sanzione giuridica. Unione Tipografico Editrice, Rome

*Fitzmaurice M*, *Elias O* (2005) Contemporary Issues in the Law of Treaties. Eleven, Utrecht

*Franck TM* (1988) Legitimacy in the International System. AJIL 82(4):705–759

*Franck TM* (1990) The Power of Legitimacy Among Nations. OUP, Oxford

*Frowein JA* (2008) Obligations erga omnes. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1400. Accessed 29 November 2017

*Fulda CB* (2002) Demokratie und pacta sunt servanda. Books on Demand, Norderstedt

*Gaja G* (1983) The European Community's Rights and Obligations under Mixed Agreements. In: *O'Keeffe D, Schermers HG* (eds) Mixed Agreements. Kluwer, Deventer, pp 133–140

*Gentili A* (1612) De jure belli libri tres. In: *Holland TE* (ed) Clarendon Press, Oxford

*Goldsmith JL, Posner EA* (2003) International Agreements: A Rational Choice Approach. VaJIL 44(1):113–144

*Gormley WP* (1970) The Codification of pacta sunt servanda by the International Law Commission: The Preservation of Classical Norms of Moral Force and Good Faith. SLULJ 14(3):367–428

*Grotius H* (1646/1964 II) De jure belli ac pacis libri tres. *Scott JB* (ed) The Law of War and Peace, Vol 2, book II. Oceana Publications, New York

*Guggenheim P* (1967) Traité de droit international public: Avec mention de la pratique internationale et suisse, Vol 1. Librairie de l'Université, Geneva

*Hart HLA* (1961) The Concept of Law. Clarendon Press, Oxford

*Hartwig M* (1993) Die Haftung der Mitgliedstaaten für Internationale Organisationen. Springer, Berlin

*Hector P* (1992) Das völkerrechtliche Abwägungsgebot. Duncker & Humblot, Berlin

*Heffter AW* (1844) Das europäische Völkerrecht der Gegenwart: Auf den bisherigen Grundlagen. Schröder, Berlin

*Hegel GWF* (1820) Grundlinien der Philosophie des Rechts. Nicolai, Berlin

*Henkin L* (1995) International Law: Politics and Values. Nijhoff, Dordrecht

*Hirobe K* (1993) Article 98 Paragraph 2 of the Constitution of Japan and the Domestic Effects of Resolutions of the United Nations Security Council. JAIL 36:17–32

*Hostie J* (1932) Examen de quelques règles du droit international dans le domaine des communications et du transit. RdC 40(6):397–524

*Hyland R* (1994) Pacta sunt servanda: A Mediation. VaJIL 34:405–433

*Jellinek G* (1880) Die rechtliche Natur der Staatsverträge. Hölder, Wien

*Jellinek G* (1887) Gesetz und Verordnung: Staatsrechtliche Untersuchungen auf rechtsgeschichtlicher und rechtsvergleichender Grundlage. Mohr, Tübingen

*Jennings R, Watts A* (eds) (1992) Oppenheim's International Law, Vol I. Longman, London

*Jinks D* (2005) The Applicability of the Geneva Convention to the "global war on terrorism". VaJIL 46(1):165–196

*Kaddous C* (1998) Le droit des relations extérieures dans la jurisprudence de la Cour de Justice des Communautés européennes. Schulthess, Zurich

*Kelsen H* (1920) Das Problem der Souveränität und die Theorie des Völkerrechts: Beitrag zu einer reinen Rechtslehre. Mohr, Tübingen

*Kelsen H* (1926) Les rapports de système entre le droit interne et le droit international public. RdC 14(3):227–331

*Kelsen H* (1945) General Theory of Law and State. Harvard University Press, Cambridge, MA

*Kelsen H* (1953) Théorie du droit international public. RdC 84(1):1–203

*Kelsen H* (1957) What Is the Reason for the Validity of Law? In: *Constantopoulos DS, Eustathiades CT, Fragistas CN* (eds) Grundprobleme des internationalen Rechts: Festschrift für Jean Spiropoulos. Schimmelbusch, Bonn, pp 257–263

*Kelsen H* (1966) Principles of International Law. Holt, Rinehart and Winston, New York

*Kennedy D* (1988–1989) A New Stream of International Law Scholarship. WisILJ 7(1):1–50

*Kho HH* (1997) Why Do Nations Obey International Law? Yale LJ 106(8):2599–2660

*Kischel U* (1992) State Contracts, Völker-, schieds- und internationalprivatrechtliche Aspekte des anwendbaren Rechts. Boorberg, Stuttgart

*Köck H* (1977) Völkerrechtliche Verträge im Recht der Europäischen Gemeinschaften: Abschlußkompetenzen, Bindungswirkung, Kollisionen. Springer, Berlin

*Kolb R* (2000) La bonne foi en droit international public: contribution à l'étude des principes généraux de droit. Graduate Institute Publications, Geneva

*Kunz JL* (1945) The Meaning and the Range of the Norm pacta sunt servanda. AJIL 39(2):180–197

*Lachs M* (1997) Pacta sunt servanda. In: *Bernhardt R* (ed) EPIL, Vol III. North-Holland, Amsterdam, pp 847–854

*Lankarani El-Zein L* (2001) Les contrats d'État à l'épreuve du droit international. Bruylant, Bruxelles

*Lasswell HD, MacDougal MS* (1959) The Identification and Appraisal of Diverse Systems of Public Order. AJIL 53(1):1–29

*Lauterpacht H* (1927) Private Law Sources and Analogies of International Law. Longmans, Green and Co, London

*Lauterpacht H* (1932) The Nature of International Law and General Jurisprudence. Economica 12:301–320

*Lauterpacht H* (1933) The Function of Law in the International Community. Clarendon Press, Oxford

*Lavalle R* (1982) About the Alleged Customary Law Nature of the Rule pacta sunt servanda. ZÖR 33:9–28

*La Fontaine H* (ed) (1902) Pasicrisie internationale: historie documentaire des arbitrages internationaux. Stämpfli, Bern

*Leben C* (2003) La théorie du contrat d'Etat et l'évolution du droit international des investissements. RdC 302(2):197–386

*Lekkas S, Tzanakopoulos A* (2014) *Pacta sunt servanda* versus Flexibility in the Suspension and Termination of Treaties. In: *Tams CJ, Tzanakopoulos A, Zimmermann A* (eds) Research Handbook on the Law of Treaties. Edward Elgar, Cheltenham, pp 312–340

*Lesaffer R* (2010) Alberico Gentili's ius post bellum and Early Modern Peace Treaties. In: *Kingsbury B, Straumann B* (eds) The Roman Foundations of the Law of Nations: Alberico Gentili and the Justice of Empire. OUP, Oxford, pp 210–240

*de Louter J* (1920) Le droit international public positif, Vol 1. Imprimerie de l'Université, London

*Lukashuk II* (1989) The Principle pacta sunt servanda and the Nature of Obligation Under International Law. AJIL 83(3):513–518

*Marboe I, Reinisch A* (2011) Contracts between States and Foreign Private Law Persons. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1391. Accessed 29 November 2017

*Matz-Lück N* (2010) Treaties, Conflicts between. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1485. Accessed 29 November 2017

*Mérignhac A* (1907) Traité de droit public international, Vol 2. LGDJ, Paris

*Monro CH* (1904) The Digest of Justinian. CUP, Cambridge

*Moravcsik A* (1997) Taking Preference Seriously: A Liberal Theory of International Politics. IO 51 (4):513–553

*Mosler H* (1957) L'application du droit international public par les tribunaux nationaux. RdC 91 (7):619–731

*Neuhold H* (1999) The Foreign-Policy "Cost-Benefit-Analysis" Revisited. GYIL 24:84–124

*Niedobitek M* (2001) Das Recht der grenzüberschreitenden Verträge. Mohr Siebeck, Tübingen

*Nippold O* (1894) Der völkerrechtliche Vertrag, seine Stellung im Rechtssystem und seine Bedeutung für das internationale Recht. Wyss, Bern

*Oppenheim L* (1905) International Law, Vol 1 Peace. Longsmans, Green and Co, New York

*Osiel M* (2009) The End of Reciprocity: Terror, Torture, and the Law of War. CUP, Cambridge

*Peñalver EM* (2000) The Persistent Problem of Obligation in International Law. StanJIL 36 (2):271–302

*Pescatore P* (1961) Les relations extérieures des communautés européennes: contribution à la doctrine de la personnalité des organisations internationales. RdC 103(1):1–244

*Provost R* (2002) International Human Rights and Humanitarian Law. CUP, Cambridge

*Radoikovitch MM* (1930) La révision des traités et le Pacte de la Société des Nations. Pedone, Paris

*Ragazzi M* (1997) The Concept of International Obligations erga omnes. Clarendon Press, Oxford

*Redslob R* (1923) Histoire des grands principes du droit des gens. Rousseau, Paris

*Ripert G* (1933) Les règles du droit civil applicables aux rapports internationaux. RdC 44(2):569–660

*Rosenne S* (1970) The Law of Treaties. Sijthoff, Leiden

*Rosenne S* (1989) Developments in the Law of Treaties 1945–1986. CUP, Cambridge

*Rudolf W* (1967) Völkerrecht und deutsches Recht: Theoretische und dogmatische Untersuchungen über die Anwendung völkerrechtlicher Normen in der Bundesrepublik Deutschland. Mohr, Tübingen

*Salmon J* (2011) Article 26. In: *Corten O*, *Klein P* (eds) The Vienna Conventions on the Law of Treaties. OUP, Oxford, pp 659–685

*Schachter O* (1968) Towards a Theory of International Obligation. VaJIL 8(2):300–322

*Schermers HG* (1996) The Liability of the Member States for the Debts of International Organizations. LIEI 23(1):15–22

*Schermers HG*, *Blokker NM* (2003) International Institutional Law, 4th edn. Martinus Nijhoff, Leiden

*Schneeberger E* (1948) Reciprocity as a Maxim of International Law. GeoLJ 37(1):29–41

*Schreuer CH* (2009) The ICSID Convention: A Commentary. CUP, Cambridge

*Scott JB* (1939) Law, the State, and the International Community. Columbia University Press, New York

*Seidl-Hohenveldern I* (1963) Transformation or Adoption of International Law into Municipal Law. ICLQ 12(1):88–124

*Shaw MN* (2014) International Law, 7th edn. CUP, Cambridge

*Shen J* (1999) The Basis of International Law: Why Nations Observe. DickJIL 17:287–355

*Sicilianos LA* (2002) The Classification of Obligations and the Multilateral Dimension of the Relations of International Responsibility. EJIL 13(5):1127–1146

*Simma B* (1972) Das Reziprozitätselement im Zustandekommen völkerrechtlicher Verträge: Gedanken zu einem Bauprinzip der internationalen Rechtsbeziehungen. Duncker & Humblot, Berlin

*Simma B* (1994) From Bilateralism to Community Interest in International Law. RdC 250(2):217–384

*Simma B* (2008) Reciprocity. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1461. Accessed 29 November 2017

*Slaughter AM* (1993) International Law and International Relations Theory: A Dual Agenda. AJIL 87(2):205–239

*Tams CJ* (2005) Enforcing Obligations erga omnes in International Law. CUP, Cambridge

*Thirlway HWA* (1972) International Customary Law and Codification. Sijthoff, Leiden

*Thirlway HWA* (1992) The Law and Procedure of the International Court of Justice 1960–1989, Part 4. BYIL 63(1):50–51

*Triepel H* (1899) Völkerrecht und Landesrecht. Hirschfeld, Leipzig

*Ulfstein G*, *Marauhn T*, *Zimmermann A* (2007) Making Treaties Work: Human Rights, Environment and Arms Control. CUP, Cambridge

*de Vattel E* (1758/1916) Le droit des gens, ou principes de la loi naturelle, appliqués à la conduite et aux affaires des nations et des souverains. In: *Fenwick CG* (ed) Oceana Publications, New York

*Verdross A* (1926) Die Verfassung der Völkerrechtsgemeinschaft. Springer, Wien

*Verdross A* (1927) Le fondement du droit international. RdC 16(3):247–323

*Waltz K* (1979) Theory of International Politics. Addison-Wesley Pub, Boston

*Watts S* (2009) Reciprocity and the Law of War. HarvILJ 50(2):365–434

*Wehberg H* (1959) Pacta sunt servanda. AJIL 53(4):775–786

*Whitton JB* (1934) La règle pacta sunt servanda. RdC 49(2):147–276

*Whitton JB* (1935) The Sanctity of Treaties: pacta sunt servanda. International Conciliation 16:395–430

*Zemanek K* (2000) New Trends in the Enforcement of erga omnes Obligations. MPYUNL 4:1–52

*Zoller E* (1977) La bonne foi en droit international public. Pedone, Paris

## Article 41

*Agreements to modify multilateral treaties between certain of the parties only*

**1.** Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

(a) the possibility of such a modification is provided for by the treaty; or
(b) the modification in question is not prohibited by the treaty and:

    (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
    (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

**2.** Unless in a case falling under paragraph 1 (a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

### Contents

A. Purpose and Function ................................................................. 1
B. Historical Background and Negotiating History ........................................ 6
C. Elements of Article 41 ................................................................ 9
    I. Modification Provided for by the Treaty (para 1 lit a) ........................... 11
    II. Modification Not Prohibited by the Treaty (para 1 lit b) ........................ 13
    III. Notification (para 2) ........................................................ 19
D. Treaties of International Organizations (VCLT II) ..................................... 23

### A. Purpose and Function

Due to the conflicting interests prevailing at an international level, amendments of multilateral treaties ($\rightarrow$ Art 40), especially amendments of treaties with a large number of parties, prove to be an extremely difficult and cumbersome process; sometimes, an amendment even seems impossible. It may thus happen that some of the **States Parties wish to modify the treaty as between themselves alone**. The reasons for such a step may be manifold[1]: States may share common interests or want to reinforce their mutual relationship. Another reason might be that States aim at ensuring higher standards of treaty obligations and decide to lead the way in this respect. **1**

---

[1] See *Villiger* (2009), Art 41 MN 1, 3.

© Springer-Verlag GmbH Germany 2018
O. Dörr, K. Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*,
DOI 10.1007/978-3-662-55160-8_44

**2**    Such a 'contracting-out',[2] however, creates a special regime under the same treaty and collides with the principle of consensus as well as with the integrity of the treaty.[3] Furthermore, it increases the already existing fragmentation caused by the large number of multilateral rights and obligations (→ Art 40 MN 1). Finally, an agreement between certain States Parties only is more likely to be incompatible with the object and purpose of a treaty.[4] Therefore, the ILC deemed it necessary to specify whether and under what circumstances such an *inter se* agreement is admissible. Consequently, Art 41 specifies the **conditions under which modifications may be regarded as permissible**.[5]

**3**    Art 41 is closely connected with **Art 39** and **Art 40** VCLT.[6] In theory, their respective scope is clearly defined. In practice, however, an overlapping of the cases covered by Art 40 and Art 41 is possible, since the differentiation between those two provisions only refers to the intention of the States but not to the outcome of their actions (→ Art 39 MN 1). Contrary to Art 40, Art 41 does not contain any procedural rules, apart from the obligation to notify in para 2. Its rules are substantive, not procedural in nature. The use of the term "agreement", however, corresponds to the terminology of Art 39 and thus lays down the rule that the modification agreement does not need to be in writing (→ Art 39 MN 10 *et seq*).

**4**    Of a more complicated nature is the relationship between Art 40 and **Art 30 para 4**.[7] At first glance, the conclusion of a modification agreement between some States Parties only and the application of successive treaties relating to the same subject matter, where the parties to the later treaty do not comprise all the parties to the earlier one, appear to be the same. There are, however, two main differences,[8] the first of which concerns the States Parties. In Art 41, the States Parties to the later treaty are necessarily a sub-group of the States Parties to the earlier treaty. Art 30 para 4, in contrast, has a larger scope. It also includes cases where the States Parties to conflicting treaties are not completely identical (→ Art 30 MN 24). The second difference refers to the date of conclusion of the treaty with the smaller number of States Parties. Since in Art 41 the States Parties to the later treaty are a sub-group of the States Parties to the earlier treaty, its provisions only apply to cases with a decreasing membership.[9] Art 30 para 4, however, lays down rules for both decreasing and increasing membership of the later treaty (→ Art 30 MN 25, 26). Therefore, not all cases falling under Art 30 para 4 are also covered by Art 41. All cases falling

---

[2] Final Draft, Commentary to Art 37, 235, para 2.

[3] *Dahm et al* (2002), p. 668.

[4] Final Draft, Commentary to Art 37, 235, para 1.

[5] Final Draft, Commentary to Art 37, 235, para 1.

[6] *Villiger* (2009), Art 41 MN 14 *et seq*.

[7] Surprisingly, the ILC did not consider this close relationship. Only a few delegations pointed out the problem, see *Reuter* [1966-I/2] YbILC 97, para 30; *Tunkin* [1966-I/2] YbILC 126, para 65; *Waldock* VI 76, para 4.

[8] *Rigaux et al* (2011), Art 41 MN 2 *et seq*.

[9] *Zuleeg* (1977), p. 261.

Article 41.   Agreements to modify multilateral treaties between certain of the parties only   779

under Art 41, however, theoretically fall within the scope of Art 30 para 4. The question as to which of the two provisions has to be applied is answered by Art 30 para 5: Art 30 para 4 is without prejudice to Art 41, *ie* Art 41 prevails.[10] In other words: The legitimacy of the modification agreement depends on the criteria set out in Art 41. If a modification agreement meets the criteria, Art 30 para 4 is of no relevance.[11] The modification agreement is valid for the States Parties to it, and no international responsibility follows.[12] If the modification agreement does not meet the criteria set out in Art 41 and is thus illegitimate, the customary principles embodied in Art 30 para 4 on the *lex posterior* rule or the *pacta tertiis* rule (→ Art 30 MN 9) apply.[13] In such a case, the illegitimate, but valid[14] modification agreement has priority (Art 30 para 4 lit a) but the States Parties to it are internationally responsible towards the States Parties to the original treaty.[15]

There exists a certain parallelism between Art 41, **Art 58** and **Art 25**.[16] All three   **5** provisions regulate cases where a new legal situation evolves between certain States Parties only. Art 41 deals with the modification, Art 58 with the suspension of a treaty and Art 25 with its provisional application. Art 41 and Art 58 both use almost the same wording when referring to an agreement between certain States Parties only. Art 25 does not explicitly mention such a constellation, but it does not preclude that a multilateral treaty may be provisionally applied between certain States Parties only (→ Art 25).

## B.   Historical Background and Negotiating History

At the Vienna Conference, the modification of multilateral treaties was regarded as   **6** a situation "not uncommon in practice".[17] Examples of treaty clauses providing for the possibility of modifications date back to the nineteenth century.[18] There were,

---

[10] Final Draft, Commentary to Art 26, 217, para 11; *Villiger* (2009), Art 41 MN 14; *Rigaux et al* (2011), Art 41 MN 6.

[11] *Mus* (1998), p. 226; *Aust* (2013), p. 242.

[12] *Mus* (1998), p. 225.

[13] *Mus* (1998), p. 226; *Rigaux et al* (2011), Art 41 MN 7.

[14] PCIJ *Oscar Chinn* PCIJ Ser A/B No 63, 65, 80 (1934); *Matz-Lück* (2010), MN 25; *Heintschel von Heinegg* (2014), p. 430; *Dahm et al* (2002), p. 668; *Mus* (1998), p. 225; *Capotorti* (1971), p. 509.

[15] Final Draft, Commentary to Art 37, 235, para 1; *Mus* (1998), p. 226 *et seq; Heintschel von Heinegg* (2014), p. 430; *Dahm et al* (2002), p. 668; *Rigaux et al* (2011), Art 41 MN 7; *Capotorti* (1971), p. 509.

[16] *Villiger* (2009), Art 41 MN 15.

[17] See the statement by the representative of Uruguay UNCLOT I 206.

[18] *Klabbers* (2006), MN 11. See *eg* Art 19 of the 1883 Paris Convention for the Protection of Industrial Property 828 UNTS 305: "It is understood that the countries of the Union reserve the right to make separately between themselves special agreements for the protection of industrial property, in so far as these agreements do not contravene the provisions of this Convention."

however, no common rules and almost no jurisprudence on the subject.[19] Due to the scarcity of examples and the diversity of cases, the issue of treaty modification was considered an "extremely complex problem".[20] Thus, Art 41 did **not codify an already existing rule of customary law**.[21] Particularly the detailed conditions under which a modification is to be regarded as permissible have to be regarded as innovative at the time.[22]

7      When SR *Waldock* presented the first draft of articles dealing with the amendment of multilateral treaties in 1964[23] (→ Art 39 MN 4), he did not include a provision on modification. Later, he presented a new draft which contained an article (Draft Art 69) regulating the modification of multilateral treaties.[24] This original provision underwent **some minor changes** during the negotiation process, the most important of which concerned the moment of notification. According to the original draft, the other States Parties had to be notified of the conclusion of a modification agreement. Many delegations, however, considered a notification at that stage as being too late.[25] Their doubts were taken into account in the revised draft of 1966.[26] Draft Art 67 established that States Parties seeking to modify a treaty had to notify the other parties of their intention to conclude such an agreement. This version became Draft Art 37 of the Final Draft[27] and was almost identical with today's Art 41. It did not give rise to many comments at the Vienna Conference.[28] Only the proposal according to which the content of para 1 lit b cl iii should be integrated into the wording of para 1 lit b[29] was accepted. The slightly amended version of Draft Art 37 was adopted by 91 votes to none[30] and became today's Art 41.

8      According to one scholar, the content of Art 41 may nowadays be considered as having come to reflect customary law.[31] The argument provided is that the provision has not been called into question by States since the conclusion of the VCLT. However, even though *inter se* agreements in order to modify a treaty are likely to become much more common owing to the increasing number of multilateral treaties, it is difficult to determine whether Art 41 in its entirety has become part

---

[19] *Rigaux et al* (2011), Art 41 MN 10.

[20] See the statement by the representative of Czechoslovakia UNCLOT I 205.

[21] *Sinclair* (1984), p. 14.

[22] *Villiger* (2009), Art 41 MN 18.

[23] *Waldock* III 47 *et seq*.

[24] *Waldock* [1964-I] YbILC 189.

[25] *Waldock* VI 86 *et seq* (comments of Finland, Israel and the Netherlands), statement of *Waldock* 87, paras 1 and 3.

[26] Revised Draft Articles [1966-II] YbILC 112, 119.

[27] Final Draft 182.

[28] UNCLOT I 205 *et seq*.

[29] UNCLOT I 205 MN 33 *et seq*. The proposal was introduced by Bulgaria, Romania and Syria.

[30] UNCLOT II 72.

[31] *Villiger* (2009), Art 41 MN 18.

Article 41.   Agreements to modify multilateral treaties between certain of the parties only   781

of customary law. The cases where multilateral treaties have been modified even though this was not provided for in the treaty remain exceptional.[32] It is more likely that the **principle embodied in Art 41 reflects customary law**: unless a multilateral treaty so provides or unless the modification does not violate the main content of the treaty, there is a possibility but not a general right to change its provisions between certain States Parties only.[33]

## C.   Elements of Article 41

Art 41 regulates two different issues. All in all, however, **three situations** have to be distinguished: If the treaty provides for its modification, such an *inter se* agreement is possible (para 1 lit a). If the treaty does not prohibit its modification, the treaty may be modified if certain conditions are met (para 1 lit b). If the treaty prohibits its modification, the States Parties are not allowed to 'contract out', and Art 41 does not apply (third implicit situation).

**9**

The rules laid down in Art 41 are of a **residual character**.[34] This is of special importance for Art 41 para 1 lit b which sets out the conditions which have to be met if the treaty provides no specification concerning the permissibility of a modification. The conditions refer to the content of the original treaty and aim at preserving its functioning. The only procedural requirement, *ie* notification, is laid down in para 2.

**10**

## I.   Modification Provided for by the Treaty (para 1 lit a)

Art 41 para 1 lit a recognizes the obvious possibility to modify a treaty if the treaty itself so provides. There are many examples to be found in State practice.[35] The **most common type** of such modification clauses consists of treaty provisions allowing modifications that enhance the duties laid down in the treaty.[36]

**11**

One example for such a treaty provision is Art 73 para 2 of the 1963 Vienna Convention on Consular Relations[37] according to which "[n]othing in the present Convention shall preclude States from concluding international agreements confirming or supplementing or extending or amplifying the provisions thereof". Another example is Art 28 para 2 of the 1957 European Convention on Extradition[38]: "The Contracting Parties may conclude between themselves bilateral or multilateral agreements only in order to supplement the

---

[32] *Klabbers* (2006), MN 11; *Brunnée* (2012), p. 364.

[33] Similarly *Dahm et al* (2002), p. 668.

[34] *Aust* (2013), p. 241; *Klabbers* (2006), MN 2; *Villiger* (2009), Art 41 MN 3.

[35] Examples are provided by the *United Nations* (2003), p. 107 *et seq*; *Rigaux et al* (2011), Art 41 MN 20 *et seq*.

[36] *Rigaux et al* (2011), Art 41 MN 25.

[37] 1963 Vienna Convention on Consular Relations 596 UNTS 261.

[38] 1957 European Convention on Extradition ETS 24.

provisions of this Convention or to facilitate the application of the principles contained therein." The TEU also allows for modifications. The instrument used is the so-called 'enhanced cooperation' laid down in Arts 20 *et seq* TEU and Arts 326 *et seq* TFEU.

**12**    The examples mentioned raise the question of whether **modifications not covered by the respective treaty provision** (in these cases: all modifications reducing the obligations laid down in the treaty) fall under the scope of para 1 lit b. Such a result, however, would not only contradict the treaty in question but also the wording of Art 41. If the treaty in question explicitly allows certain kinds of modifications only, all other modifications shall be deemed to be prohibited; Art 41 does not apply. The wording of Art 41 confirms this result: The term "or" at the end of para 1 lit a and the introductory words of para 2 show that para 1 lit b does not supplement para 1 lit a, but that both paragraphs preclude each other.[39] Either a modification is covered by para 1 lit a or it falls under the scope of para 1 lit b.

## II.   Modification Not Prohibited by the Treaty (para 1 lit b)

**13**    Compared to the possibilities of modification provided for by many treaties (→ MN 11), the rules laid down in para 1 lit b remain quite general and provide further possibilities to modify a multilateral treaty.[40] They apply if the modification is not prohibited by the treaty. In some cases, the prohibition to modify a treaty may be explicit. Implicit prohibitions, however, *ie* cases in which a treaty allows certain modifications only and, therefore, implicitly prohibits all other modifications (→ MN 12), are possible as well. Therefore, para 1 lit b is only applicable if the treaty in question **remains silent** on the question of modification.[41]

**14**    In such a case, a modification is permissible if the two[42] substantive conditions specified in the two paragraphs are met: (i) the modification does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; and (ii) the modification does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole. The **two conditions apply cumulatively**[43] and may overlap.

---

[39] *Villiger* (2009), Art 41 MN 6 n 22.

[40] *Rigaux et al* (2011), Art 41 MN 29.

[41] *Rigaux et al* (2011), Art 41 MN 21.

[42] Sometimes, it is indicated that three requirements are to be met (Final Draft, Commentary to Art 37, 235, para 2; *Sinclair* 1984, p. 108 *et seq*). The fact that the modification is not prohibited by the treaty is regarded as one of the three conditions. This view might be due to the fact that Art 37 para 1 lit b Final Draft, which became today's Art 41, contained three subparagraphs. At the Vienna Conference, however, para 1 lit b cl iii was integrated into the introductory words of para 1 lit b (→ MN 7).

[43] *Villiger* (2009), Art 41 MN 7; *Rigaux et al* (2011), Art 41 MN 30; *Dahm et al* (2002), p. 668; *Aust* (2013), p. 242.

Article 41.   Agreements to modify multilateral treaties between certain of the parties only   783

According to the ILC, the **first condition (para 1 lit b cl i)** is met if the modification does not prejudice the rights of the other States Parties and does not add to their obligations.[44] The condition is an application of the principle laid down in Art 34[45]: The modifying treaty does not create either obligations or rights for the other States Parties. The modification thus remains *res inter alios acta* for the others.[46]   **15**

The **second condition (para 1 lit b cl ii)** focuses on the object and purpose of the respective treaty. If they can no longer be executed effectively, the modification is not allowed. This restriction resembles the requirements established for the formulation of reservations[47]: according to Art 19 lit c reservations are prohibited if they are incompatible with the object and purpose of the treaty.   **16**

> In the *Genocide* case of 1951, the ICJ argued quite similarly to the provision found today in Art 41 para 1 lit b cl ii. It stated that it is "a generally recognized principle that a multilateral convention is the result of an agreement freely concluded upon its clauses and that consequently none of the contracting parties is entitled to frustrate or impair, by means of unilateral decisions or particular agreements, the purpose and *raison d'être* of the convention."[48]

The ILC referred to the example of disarmament or a treaty of neutralization. If its main provisions were altered for certain States Parties, its object and purpose could no longer be fulfilled.[49] Modifications of environmental treaties aiming at enforcing higher standards than those required by the original treaty, on the contrary, are usually compatible with the object and purpose of the treaty.[50] It needs to be emphasized, however, that para 1 lit b cl ii explicitly refers to the object and purpose of the treaty "as a whole". Therefore, modifications relating to single and less important aspects of the object and purpose of the treaty are to be considered as permissible.[51]   **17**

In order to assess whether a modification meets the two conditions set out in para 1 lit b, it might be helpful to rely on the **distinction between treaties imposing obligations of a reciprocal, an interdependent or an integral nature**.[52] While modifications of interdependent treaties (like disarmament conventions) and of integral treaties (like human rights conventions) most likely affect the rights and obligations of other States Parties and/or are incompatible with the object and   **18**

---

[44] Final Draft, Commentary to Art 37, 235, para 2.

[45] *Rigaux et al* (2011), Art 41 MN 31.

[46] *Villiger* (2009), Art 41 MN 5.

[47] *Fitzmaurice and Merkouris* (2012), p 24.

[48] ICJ *Genocide Convention Opinion* [1951] ICJ Rep 15, 21.

[49] Final Draft, Commentary to Art 37, 235, para 2. See also *Fitzmaurice and Merkouris* (2012), p. 25.

[50] *Aust* (2013), p. 242.

[51] *Rigaux et al* (2011), Art 41 MN 32.

[52] *Pauwelyn* (2001), p. 549 with reference to *Fitzmaurice* III 27 *et seq*, 41 *et seq*. Similarly *Capotorti* (1971), p. 509.

von der Decken

purpose of the treaty, modifications of reciprocal treaties (like the 1961 Vienna Convention on Diplomatic Relations or the 1994 WTO Agreement) often comply with the conditions set out in para 1 lit b.[53]

### III.  Notification (para 2)

**19**    The obligation to notify the other States Parties exists in **all cases of modifications**. If the treaty remains silent about the possibility of modifying it (para 1 lit b), the application of para 2 is obvious. If the possibility of modification is provided for by the treaty (para 1 lit a), the intention to conclude an *inter se* agreement has to be notified as well,[54] unless the treaty itself dispenses with such a duty.[55]

**20**    The formal procedure of notification is regulated by Arts 77 and 78. The States to be notified are the **other States Parties**, *ie* those States that have signed and ratified the original treaty. The obligation of notification laid down in Art 41 para 2 thus has a more limited scope than the similar duty set out by Art 40 para 2. In the case of an amendment, all contracting States, *ie* not only the States Parties but also those States that have signed but not yet ratified the original treaty, have to be notified (→ Art 40 MN 13).

**21**    The notification has to be made at **the moment** when the negotiation process of the *inter se* agreement has "reached a mature stage",[56] *ie* when the States Parties concerned have reached a consensus on the content of the modification, and no relevant obstacles to the conclusion of the agreement remain.[57] The notification of a modification proposal, at a time when the negotiations are still at an exploratory stage, was considered as "unnecessary and even inadvisable" by the ILC.[58] The notification of the effective conclusion of the modification agreement, on the contrary, was considered as being too late by the delegations at the Vienna Conference (→ MN 7). Hence, the aim of the notification becomes visible: the other States Parties shall be given the opportunity to verify whether the modification is in conformity with the original treaty and shall be protected against a *fait accompli* that might affect their rights.[59]

**22**    Consequently, the **content of the notification** covers two aspects, namely the intention as such to conclude an *inter se* agreement, and the content of the intended modification. Hence, the other States Parties are given the opportunity to verify if

---

[53] *Pauwelyn* (2001), p. 535; *Pauwelyn* (2002), p. 26 *et seq.*

[54] See *Rigaux et al* (2011), Art 41 MN 40 with reference to former versions of today's Art 41 para 2 and the history of negotiations.

[55] Final Draft, Commentary to Art 37, 235, para 3.

[56] Final Draft, Commentary to Art 37, 235, para 3.

[57] *Rigaux et al* (2011), Art 41 MN 41.

[58] Final Draft, Commentary to Art 37, 235, para 3.

[59] *Villiger* (2009), Art 41 MN 10; *Rigaux et al* (2011), Art 41 MN 41; *Bastid* (1985), p. 179.

Article 41.   Agreements to modify multilateral treaties between certain of the parties only   785

the modification does not violate the basic rights, obligations, or object and purpose of the treaty. It is not necessary, however, to submit the text of the modification agreement.[60] The principle of giving all other States Parties the opportunity to examine the modification corresponds to the principle of notifying and consulting all contracting States when amending a treaty (→ Art 40 MN 12 *et seq*). This general principle of involving all States concerned was considered by the ILC as flowing directly from the obligation to perform a treaty in good faith.[61] Unlike in the case of an amendment, the other States Parties do not have the right to participate in the process of modification. The right to become a party to the modifying agreement depends on the *inter se* agreement.[62]

### D.   Treaties of International Organizations (VCLT II)[63]

The wording of Art 41 VCLT II is **identical** to the one of Art 41 VCLT I. Unlike Art 40 where the terms "every/any State" had to be supplemented by the terms "or international organization" in order to make the article applicable to international organizations (→ Art 40 MN 24), Art 41 could be left unchanged. The term "parties" encompasses both States and international organizations.[64] Therefore, the rules for modifying multilateral treaties between certain of the parties only are the same for treaties concluded between States, and for treaties concluded between States and international organizations or between international organizations. The ILC saw no need for making a commentary on Art 41 VCLT II.[65]    **23**

### References

*Aust A* (2013) Modern Treaty Law and Practice, 3rd edn. CUP, Cambridge
*Bastid S* (1985) Les traités dans la vie internationale. Economica, Paris
*Brunnée J* (2012) Treaty Amendments. In: *Hollis DB* (ed) The Oxford Guide to Treaties. OUP, Oxford, pp 347–366
*Capotorti F* (1971) L'extinction et la suspension des traités. RdC 134:417–588
*Dahm G*, *Delbrück J*, *Wolfrum R* (2002) Völkerrecht Band I/3, 2nd edn. De Gruyter, Berlin
*Fitzmaurice M*, *Merkouris P* (2012) Amendment and Modification of Non-Proliferation Treaties. In: *Joyner DH*, *Roscini M* (eds) Non-Proliferation Law as a Special Regime. A Contribution to Fragmentation Theory in International Law. CUP, Cambridge, pp 17–54

---

[60] *Villiger* (2009), Art 41 MN 11. For a different view, see *Reuter* (1995), MN 209, according to whom the notification of the modification agreement is also necessary.

[61] Final Draft, Commentary to Art 36, 233, para 9.

[62] *Villiger* (2009), Art 41 MN 12.

[63] For the treaty text see p. 1486 *et seq*.

[64] *Spanoudis and Weemaels* (2011), Art 41 VCLT II MN 1. During the negotiation process, however, two different drafts were presented. For more details see *Spanoudis and Weemaels* (2011), Art 41 VCLT II MN 2 *et seq*.

[65] Final Draft VCLT II, General comment to part IV.

*Heintschel von Heinegg W* (2014) Die völkerrechtlichen Verträge als Hauptrechtsquelle des Völkerrechts. In: *Ipsen K* (ed) Völkerrecht, 6th edn. C.H. Beck, Munich, pp 390–470

*Klabbers J* (2006) Treaties, Amendment and Revision. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1483. Accessed 29 November 2017

*Matz-Lück N* (2010) Treaties, Conflicts between. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1485. Accessed 29 November 2017

*Mus JB* (1998) Conflicts between Treaties in International Law. NILR 45:208–232

*Pauwelyn J* (2001) The Role of Public International Law in the WTO: How Far Can We Go? AJIL 95:535–578

*Pauwelyn J* (2002) The Nature of WTO Obligations, Jean Monnet Working Paper 1/02

*Reuter P* (1995) Introduction to the Law of Treaties, 2nd edn. Kegan Paul International, London

*Rigaux A, Simon D, Spanoudis J, Weemaels E* (2011) Article 41. In: *Corten O, Klein P* (eds) The Vienna Conventions on the Law of Treaties. OUP, Oxford, pp 986–1008

*Sinclair I* (1984) The Vienna Convention on the Law of Treaties, 2nd edn. University Press, Manchester

*Spanoudis J, Weemaels E* (2011) Article 41 VCLT II. In: *Corten O, Klein P* (eds) The Vienna Conventions on the Law of Treaties. OUP, Oxford, pp 1009–1011

*United Nations* (2003) Final Clauses of Multilateral Treaties: Handbook. United Nations Publication, Sales No. E.04.V.3

*Villiger M* (2009) Commentary on the 1969 Vienna Convention on the Law of Treaties. Nijhoff, Leiden

*Zuleeg M* (1977) Vertragskonkurrenz im Völkerrecht, Teil I: Verträge zwischen souveränen Staaten. GYIL 20:246–276

**Part V**
**Invalidity, Termination and Suspension**
**of the Operation of Treaties**

# Section 1
# General Provisions