# Exhibit 84

## JUDGMENT OF THE COURT
### 27 September 1988 *

In Case 235/87

REFERENCE to the Court under Article 177 of the EEC Treaty by the Conseil d'État (State Council) of the Kingdom of Belgium for a preliminary ruling in the proceedings pending before that court between

**Annunziata Matteucci**, residing in Brussels,

and

**Communauté française of Belgium**

and

**Commissariat général aux relations internationales** (Foreign Relations Department) **of the Communauté française of Belgium,**

on the interpretation of the EEC Treaty, in particular Articles 7, 48, 59, 60 and 128,

THE COURT

composed of: Lord Mackenzie Stuart, President, G. Bosco, O. Due and G. C. Rodríguez Iglesias (Presidents of Chambers), T. Koopmans, C. N. Kakouris, R. Joliet, T. F. O'Higgins and F. A. Schockweiler, Judges,

Advocate General: Sir Gordon Slynn
Registrar: H. A. Rühl, Administrator

* Language of the Case: French.

5606

MATTEUCCI v COMMUNAUTÉ FRANÇAISE OF BELGIUM

after considering the observations submitted on behalf of

Annunziata Matteucci, the plaintiff in the main proceedings, by D. Rossini, Director of the service social pour travailleurs italiens, Brussels,

Commissariat général aux relations internationales of the Communauté française of Belgium, the defendant in the main proceedings, by Paul-Henry Delvaux, of the Brussels Bar, in the written proceedings, and by G. Tassin, of the Brussels Bar, in the oral proceedings,

the Government of the French Republic, by Régis de Gouttes and Claude Chavance, acting as Agents,

the Government of the Italian Republic, by Luigi Ferrari Bravo, acting as Agent, assisted by Pier Giorgio Ferri, avvocato dello Stato,

the Commission of the European Communities, by Julian Currall and Georgios Kremlis, Legal Advisers, acting as Agents,

having regard to the Report for the Hearing and further to the hearing on 17 May 1988,

after hearing the Opinion of the Advocate General delivered at the sitting on 14 July 1988,

gives the following

## Judgment

1   By order dated 16 July 1987, which was received at the Court on 31 July 1987, the Conseil d'État (State Council) of Belgium referred to the Court for a preliminary ruling under Article 177 of the EEC Treaty a question on the interpretation of Articles 7, 48, 59, 60 and 128 of the EEC Treaty with a view to determining the compatibility with those provisions of a decision by the Belgian authorities reserving certain scholarships for Belgian nationals.

JUDGMENT OF 27. 9. 1988 — CASE 235/87

2   That question was raised in proceedings between Annunziata Matteucci and the commissariat général aux relations internationales of the Communauté française of Belgium (hereinafter referred to as 'the CGRI') relating to the latter's refusal to put her name forward for a scholarship for which she had applied in order to take a specialization course at the Hochschule der Künste, Berlin, on the ground that scholarships awarded pursuant to the Cultural Agreement between Belgium and the Federal Republic of Germany were reserved exclusively for candidates of Belgian nationality.

3   Article IV of the Cultural Agreement concluded between the Kingdom of Belgium and the Federal Republic of Germany on 24 September 1956 (United Nations Treaty Series 263, No 3766) provides that each Contracting Party 'shall grant to nationals of the other party scholarships to enable them to undertake or continue studies or research in the other country or to complete their scientific, cultural, artistic or technical training'.

4   It appears from the documents before the Court that the plaintiff in the main proceedings, an Italian national, was born in Belgium, where her father settled to work as an employed person. She was educated entirely in Belgium, where she has been teaching rhythmics since 1983. She applied for a scholarship in order to study singing and voice-production in Berlin with a view to improving her teaching skills. In her application for a scholarship she stated that when she returned to Belgium she intended to teach rhythmics and physical expression.

5   The Conseil d'État took the view that an action could be brought against the CGRI's decision not to include Miss Matteucci's application among those forwarded to the German authorities. It further considered that whereas the aforementioned Cultural Agreement restricted eligibility for scholarships to German and Belgian nationals only, the question nevertheless arose as to whether the provisions of the EEC Treaty and of Regulation No 1612/68 of the Council of 15 October 1968 on freedom of movement for workers within the Community (Official Journal, English Special Edition 1968 (II) p. 475) did not require Member States to give equal treatment to their nationals and the children of migrant workers established in their territory.

6   Consequently, the Conseil d'État suspended the proceedings and referred the following question to the Court for a preliminary ruling:

5608

'Must the provisions of the Treaty of Rome of 25 March 1957, in particular Articles 7, 48, 59, 60 and 128, be interpreted as meaning that scholarships granted by a Member State cannot be reserved for nationals of one other Member State, as is done by Article IV of the Cultural Agreement entered into on 24 September 1956 by the Federal Republic of Germany and Belgium?'

7   Reference is made to the Report for the Hearing for a fuller account of the relevant legal provisions, the facts and the written observations submitted to the Court, which are mentioned or discussed hereinafter only in so far as is necessary for the reasoning of the Court.

8   It must be emphasized, *in limine*, that under Article 11 of Regulation No 1612/68 where a national of a Member State is pursuing an activity as an employed person in the territory of another Member State, his child has the right to take up any activity as an employed person in the territory of that State. Once he has engaged in such activities as an employed person the migrant worker's child may, as a Community worker, rely on the provisions of the Treaty and of Regulation No 1612/68 relating to equality of treatment between national workers and workers who are nationals of other Member States.

9   In its order requesting a preliminary ruling the national court did not specify whether Miss Matteucci's teaching of rhythmics was a genuine and effective activity within the meaning of the case-law of the Court (in particular the judgment of 23 March 1982 in Case 53/81 *Levin* v *Staatssecretaris van Justitie* [1982] ECR 1035). It is for the national court to make the necessary findings of fact in order to establish whether the plaintiff in the main proceedings may be regarded as being a worker for the purposes of that case-law and, consequently, to establish whether the provisions relating to Community workers are applicable to her.

10   The Court will assume that that is the case and therefore that the object of the question put to it by the national court is to establish whether it is consistent with Community law for the authorities of a Member State to refuse the benefit of a scholarship to study in another Member State to a Community worker who is residing and pursuing an activity as an employed person in the first Member State, solely because the worker in question is not a national of that Member State.

11  It must be observed that Article 7 (2) of Regulation No 1612/68 provides that a worker who is a national of a Member State is to enjoy, in the territory of the other Member States, the same social advantages as national workers. That provision means in particular that such a worker is entitled in the same way as national workers to all the advantages facilitating the acquisition of professional qualifications and social advancement. The Court held in its judgment of 21 June 1988 in Case 39/86 (*Lair* v *Universität Hannover* [1988] ECR 3161) that a grant awarded for maintenance and vocational training with a view to the pursuit of studies in the field of further vocational training constituted a social advantage within the meaning of Article 7 (2) of Regulation No 1612/68.

12  Viewed in that light the question before the Court raises the problem as to whether the right to equality of treatment may also be relied on by a Community worker in connection with the award of scholarships pursuant to a bilateral agreement between two Member States which limits eligibility for such scholarships to nationals of those two States.

13  In that regard, the French Government argues that bilateral cultural agreements such as the agreement between Belgium and Germany at issue in the main proceedings aim at developing cultural exchanges between the two Contracting States; such exchanges fall within the cultural sphere, to which the Treaty does not apply. In particular the pursuit of legitimate objectives of bilateral cooperation in that sphere may not be frustrated by the development of Community law.

14  It is appropriate to observe in that connection that, as the order from the national court makes clear, the bilateral agreement in question organizes a system of scholarships whereby nationals of the two countries concerned may study in each other's country. However, in so far as refusal to grant access to the benefit of such scholarships may jeopardize the right of Community workers to equal treatment, the application of Community law cannot be precluded on the ground that it would affect the implementation of a cultural agreement between two Member States.

15  In their observations, the CGRI, the defendant in the main proceedings, and the French Government submitted that Article 7 of Regulation No 1612/68 imposes obligations on the host Member State only in respect of training provided in its

own territory. Article 7 is not binding on the host Member State where the training in question is provided in the territory of another Member State.

16   That argument cannot be accepted. By providing that a worker who is a national of a Member State is to enjoy, in the territory of other Member States, the same social advantages as national workers, Article 7 (2) of Regulation No 1612/68 lays down a general rule which imposes responsibility in the social sphere on each Member State with regard to every worker who is a national of another Member State and established in its territory as far as equality of treatment with national workers is concerned. Consequently, where a Member State gives its national workers the opportunity of pursuing training provided in another Member State, that opportunity must be extended to Community workers established in its territory.

17   The CGRI points out that in this case the scholarships are not awarded by the Belgian authorities but by the authorities of the Federal Republic of Germany on the basis of a list of candidates which the CGRI draws up. To impose obligations on the host Member State (in this case, Belgium) would therefore be otiose, in so far as the authorities of the country where the training is given (in this case, Germany) are in any event bound by the provisions of the bilateral agreement, under which only nationals of the two countries are eligible for scholarships, and Miss Matteucci is not a national of either country.

18   That argument was challenged by the Italian Government. It considers that the authorities of the country where the training is given cannot refuse to respect the choice made by the authorities of the host country where the latter have opted, pursuant to Article 7 of Regulation No 1612/68, for a Community worker who is not a national of the host country. Since Article 7 of Regulation No 1612/68 requires the host Member State to grant the same social advantages to Community workers as to its own nationals, another Member State may not prevent the host Member State from fulfilling the obligations imposed on it by Community law.

19   The Italian Government's argument must be accepted. Article 5 of the Treaty provides that the Member States must take all appropriate measures, whether general or particular, to ensure fulfilment of the obligations arising out of the

Treaty. If, therefore, the application of a provision of Community law is liable to be impeded by a measure adopted pursuant to the implementation of a bilateral agreement, even where the agreement falls outside the field of application of the Treaty, every Member State is under a duty to facilitate the application of the provision and, to that end, to assist every other Member State which is under an obligation under Community law.

20  The French Government further submitted that the bilateral agreement in question was concluded before the entry into force of the EEC Treaty and that Member States are not bound to amend such an agreement pursuant to Article 234 of the Treaty, since its field of application falls outside the Community's jurisdiction.

21  It must be observed in that connection that Article 234 of the Treaty relates to agreements concluded between one or more Member States on the one hand, and one or more third countries on the other; therefore it is not concerned with agreements concluded solely between Member States.

22  Moreover, the Court has consistently held (see in particular the judgment of 27 February 1962 in Case 10/61 *Commission* v *Italy* [1962] ECR 1) that, in matters governed by the EEC Treaty, that Treaty takes precedence over agreements concluded between Member States before its entry into force.

23  The answer to the question put by the national court must therefore be that Article 7 of Regulation No 1612/68 must be interpreted as meaning that it does not allow the authorities of a Member State to refuse to award a scholarship to study in another Member State to a worker residing and pursuing an activity as an employed person in the territory of the first Member State but having the nationality of a third Member State on the ground that the worker does not have the nationality of the Member State of residence. A bilateral agreement which reserves the scholarships in question for nationals of the two Member States which are the parties to the agreement cannot prevent the application of the principle of equality of treatment between national and Community workers established in the territory of one of those two Member States.

**Costs**

24   The costs incurred by the French and Italian Governments and by the Commission of the European Communities, which have submitted observations to the Court, are not recoverable. As these proceedings are, in so far as the parties to the main proceedings are concerned, in the nature of a step in the proceedings pending before the national court, the decision on costs is a matter for that court.

On those grounds,

## THE COURT,

in reply to the question referred to it by the Conseil d'État of Belgium, by order of 16 July 1987, hereby rules:

**Article 7 of Regulation No 1612/68 on freedom of movement for workers within the Community must be interpreted as meaning that it does not allow the authorities of a Member State to refuse to award a scholarship to study in another Member State to a worker residing and pursuing an activity as an employed person in the territory of the first Member State but having the nationality of a third Member State on the ground that the worker does not have the nationality of the Member State of residence. A bilateral agreement which reserves the scholarships in question for nationals of the two Member States which are the parties to the agreement cannot prevent the application of the principle of equality of treatment between national and Community workers established in the territory of one of those two Member States.**

| Mackenzie Stuart | | Bosco | Due | Rodríguez Iglesias |
|---|---|---|---|---|
| Koopmans | Kakouris | Joliet | O'Higgins | Schockweiler |

Delivered in open court in Luxembourg on 27 September 1988.

J.-G. Giraud                                                               A. J. Mackenzie Stuart

Registrar                                                                                  President