# Exhibit 85

# 7    Resolving 'conflict in the applicable law'

## One of the two norms 'prevails'

In the previous chapter, 'inherent normative conflict' was resolved rather categorically by effectively bringing to an end one of the two norms, either through invalidity or termination or through illegality. In most conflicts, however – that is, when faced with what we called 'conflicts in the applicable law' – both norms will continue to exist and international law will only offer what one could call 'priority rules'. In that event, both norms survive the conflict and are considered as valid and 'legal'. The conflict is then resolved in favour of one of the two rules because that rule has been, or can be, labelled as the more 'prominent' or 'relevant' one, or because it expresses the latest intention of the parties. The result of these 'priority rules' is that only one of the two rules applies to the particular situation at hand.

The initial question is hence not, as under the previous chapter, which of the two norms *survives*, but which of the two norms *applies*. In that sense, 'conflict in the applicable law' is a question of 'choice of law'; not one of validity or legality of one norm in the light of another norm.

In terms of state responsibility, under a conflict in the applicable law, obviously, only the rule that must finally be applied can be breached and result in responsibility. The discarded rule does not apply and can hence *a fortiori* not be breached. However, although this rule is disapplied in the particular circumstances, it is not declared invalid nor is it in any way seen as an 'illegal rule'. It is simply a rule that must give way to another one in the circumstances. In other circumstances, the discarded rule may continue to apply.

The priority rules to resolve a conflict in the applicable law are determined by three basic principles:

327

Cambridge Books Online © Cambridge University Press, 2009

   (i)  the contractual freedom of states;

  (ii)  the *pacta sunt servanda* principle;[1] and

 (iii)  the principle of *pacta tertiis nec nocent nec prosunt*.[2]

In most instances, the contractual freedom of states will be decisive. In other words, the latest expression of the states' intentions will count and prevail. This latest expression of intention may, for example, be found in explicit conflict clauses set out in a treaty provision or be activated as a result of the *lex posterior* principle.

Nonetheless, the *pacta tertiis* rule is as important. States may, by mutual consent, change their minds. But they may not do so in a way that affects the rights or obligations of other states. If, by concluding a new norm, they affect third party rights, the resulting norm will be non-opposable to those third parties. Hence, the contractual freedom of states, as well as the *pacta sunt servanda* rule, is limited by the *pacta tertiis* principle.

### *Explicit conflict clauses*

When states negotiate treaty norms they may not only express their intention as to what the content of the treaty norms should be, but also create rules as to what should happen in case of conflict with other norms. There are three types of explicit, treaty-based conflict clauses:

   (i)  those relating to *pre-existing* treaties;

  (ii)  those relating to *future* treaties; and

 (iii)  those regulating conflict of norms within the *same* treaty.

The expression of state intent in any of these conflict clauses must be accepted as valid and decisive by an international adjudicator unless

   (i)  the conflict clause results in conflicts with *jus cogens* (say, a treaty on slave trading explicitly states that it prevails over norms prohibiting the trade in slaves); or

  (ii)  the conflict clause goes against Art. 41 of the Vienna Convention, in particular, by violating third party rights (say, a plurilateral WTO agreement on the reduction of tariffs in information technology products explicitly states that the advantages accorded in it apply only *inter se* and that, in this respect, the *inter se* agreement prevails over MFN obligations in the WTO treaty); or

[1] In respect of treaty norms: 'Every treaty in force is binding upon the parties to it and must be performed by them in good faith' (Art. 26 of the Vienna Convention).

[2] In respect of treaty norms: 'A treaty does not create either obligations or rights for a third State without its consent' (Art. 34 of the Vienna Convention).

(iii)  the conflict clause is overruled by a later expression of state intent (say, if states X, Y and Z agree in treaty A that this treaty A prevails over another treaty B, nothing prevents X, Y and Z from subsequently changing their minds and from agreeing in treaty C that it should, nonetheless, be treaty B that prevails over treaty A).

In cases under (ii), the conflict clause cannot be applied because of the *pacta tertiis* principle; under (iii) it cannot be invoked because of the contractual freedom of states.

These limitations on the effect of explicit conflict clauses are a reminder also of the hierarchy of conflict rules set out earlier. When faced with a conflict of norms, one must first examine whether there is 'inherent normative conflict' as a result of which either of the two norms ceases to exist or is illegal. Only if that is not the case must one resort to the rules set out in this chapter on resolving 'conflict in the applicable law'.

Conflict clauses may be straightforward in that they provide which norm prevails in the event of conflict. In that case, an adjudicator must decide only whether there is conflict and, if so, the extent of the conflict. Once conflict is found, he or she knows exactly which norm must prevail.

Recall, however, that the very strict definition of conflict defended by some authors should not be accepted.[3] Hence, adopting a proper definition of conflict is important also in the operation of conflict clauses. If one were to reject, for example, the fact that an obligation may conflict also with an explicit right, the obligation would always prevail, not as a result of the conflict clause but as a result of a strict definition of conflict. Because of the importance of both rights and obligations under other treaties, conflict clauses ought to be drafted also with reference to 'provisions' or 'rights and obligations' under other treaties, which are, for example, 'not affected by' the new treaty. To refer only to 'obligations' under other treaties would give a wrong signal as to the definition of conflict and could, indeed, be interpreted strictly so that the explicit conflict clause applies only to a certain type of conflict, namely those affecting obligations under other treaties, not those affecting rights. Art. 104 of NAFTA and Art. 103 of the UN Charter, for example, refer to *obligations*, not to 'rights and obligations' or 'provisions'.[4] In contrast,

[3] See chapter 4 above, pp. 175–88.
[4] See the discussion below in note 13 (Art. 104 of NAFTA) and on p. 337 (Art. 103 of the UN Charter).

Cambridge Books Online © Cambridge University Press, 2009

following a proposal by Israel, Art. 30(1) of the Vienna Convention refers to both obligations *and rights*.[5]

There may also be clauses under which the adjudicator is required to decide more than the question of whether there is conflict. Under Art. 22(1) of the UN Convention on Biological Diversity, for example, the adjudicator must give way to rights and obligations under other treaties only if 'the exercise of those rights and obligations would not cause a serious damage or threat to biological diversity'. Art. 104 of NAFTA gives prominence to certain MEAs but it does so 'provided that where a Party has a choice among equally effective and reasonably available means of complying with such obligations, the Party chooses the alternative that is the least inconsistent with the other provisions of this Agreement'.

It should be recalled also that a treaty explicitly abrogating another one,[6] or a treaty provision explicitly deviating from another one (in the form of 'general rule–exception'), does not involve conflict of norms nor, *a fortiori*, the operation of conflict clauses.[7] In the event of one treaty explicitly abrogating another one, the two norms are never in operation at the same time so that there is no conflict. In case of one treaty norm explicitly carving out of the scope of application of another norm (say, GATT Art. XX carving out of all other GATT norms), the scopes of application of the two norms (mostly in a 'general rule–exception' relationship) are simply different and do not overlap. Hence, there is no conflict and the fact that the exceptional norm states that it deviates from the general rule cannot be seen as a conflict clause.

Finally, even in the absence of explicit conflict clauses, other more implicit expressions of intent on what to do in case of conflict may be found. These implicit indications as to the intentions of the parties will play a role, firstly, in the interpretation of the norms in question *so as to avoid conflict*. Here, elements such as the preambles to the treaties in question (part of the context in which interpretation must take place) and, in case of ambiguity, their *travaux préparatoires* may be important. However, these implicit elements may be influential also in the event

---

[5] See chapter 4 above, pp. 171–2.

[6] See, in this respect, Art. 20 of the 1919 Covenant of the League of Nations: '1. The Members of the League severally agree that this Covenant is accepted as abrogating all obligations or understandings *inter se* which are inconsistent with the terms thereof . . . 2. In case any Member of the League shall, before becoming a Member of the League, have undertaken any obligations inconsistent with the terms of this Covenant, it shall be the duty of such Member to take immediate steps to procure its release from such obligations.'

[7] See chapter 4 above, pp. 162–3.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

of genuine conflict, i.e., where interpretation did not lead to a harmonious reading. This will be the case, in particular, in the absence of a clear-cut solution to the conflict, say, in the event of conflicts where no explicit conflict clause is available and the *lex posterior* principle is difficult to apply (e.g., in cases of 'continuing' treaties).[8] In that event, the search for 'current state consent' may be determined by other methods such as the *lex specialis* principle or other indications as to what the states in question would have done had they been faced with the conflict. As explained below, both the *lex posterior* and the *lex specialis* principles are, in effect, but two elements or methods of one and the same legal question, namely: following the principle of contractual freedom of states, what coincides with current state consent? Under this legal test other implicit expressions of intent may be important also. If they cannot provide a predictable solution either – that is, a solution where the judge is applying the law, not making it – a situation of conflict of norms constituting a lacuna may arise (discussed below, pp. 419–22).

We next deal with the three types of conflict clauses set out above – those related to pre-existing treaties, those related to subsequent treaties and those regulating conflicts within the treaty – using the particular example of the WTO treaty.

## Conflict clauses in respect of pre-existing treaties

*The new treaty states that it prevails over pre-existing ones*
An example of a treaty providing that it is to prevail over pre-existing norms is Art. 311(1) of UNCLOS: 'This Convention shall prevail, as between States Parties, over the Geneva Convention on the Law of the Sea of 29 April 1958.' Another example is Art. 103 of NAFTA:

1. The Parties affirm their existing rights and obligations with respect to each other under the *General Agreement on Tariffs and Trade* and other agreements to which such Parties are party.
2. In the event of any inconsistency between this Agreement and such other agreements, this Agreement shall prevail to the extent of the inconsistency, except as otherwise provided in this Agreement.

A treaty clause stating that, in the event of conflict, the new treaty prevails over an earlier treaty *as between the parties to the new treaty* is simply confirming the contractual freedom of states, as it is expressed

---

[8] Discussed below, pp. 378–80.

Cambridge Books Online © Cambridge University Press, 2009

in Art. 59 and Art. 30(3) of the Vienna Convention.[9] However, while such conflict clause confirms the obvious as between the parties to the new treaty, it cannot impose the new treaty on third parties without their consent. As the ILC Commentary to Art. 30 noted:

When, on the other hand, the parties to a treaty containing a clause purporting to override an earlier treaty do not include all the parties to the earlier one, the rule *pacta tertiis non nocent* automatically restricts the legal effect of the clause. *The later treaty, clause or no clause, cannot deprive a State which is not a party thereto of its rights under the earlier treaty* [emphasis added].[10]

This would be the case, for example, in the event, referred to earlier, that a plurilateral WTO agreement on the reduction of tariffs in information technology products were to state that the advantages accorded in it apply only *inter se* and that, in this respect, the *inter se* agreement prevails over MFN obligations in the WTO treaty. Such *inter se* agreement cannot detract from the MFN rights of third parties under the WTO treaty. Equally, because of the *pacta tertiis* principle, Art. 311(1) of UNCLOS cannot lead to UNCLOS prevailing over the 1958 Convention on the Law of the Sea for states party *only to the 1958 Convention* and not party to UNCLOS. Article 311(1) makes this explicit by stating that the conflict clause applies only 'as between States Parties' to UNCLOS.

### *The new treaty states that it is subject to pre-existing ones*

A new treaty may also state that, in the event of conflict with a pre-existing treaty, the earlier treaty prevails. This type of clause is mostly expressed, not in terms of 'conflict' and 'one treaty prevailing over the other', but in terms of the later treaty not derogating from, not being incompatible with, not affecting, or being subject to, the earlier treaty.

In so far as the clause relates to pre-existing treaties *with third states*, it only confirms the obvious. Because of the *pacta tertiis* principle, the new treaty is simply not capable of derogating from the rights or obligations of third states under pre-existing treaties. Pre-existing treaties may be treaties either (i) between *one or some* of the state parties to the new treaty and third states, or (ii) between *all* of the state parties to the new treaty and third states (an example of the latter would be a clause in a plurilateral WTO agreement stating that the plurilateral agreement

---

[9] See ILC Commentary to Art. 30, in Dietrich Rauschning, *The Vienna Convention on the Law of Treaties, Travaux Préparatoires* (Frankfurt: Metzner, 1978), 233.

[10] *Ibid*.

Cambridge Books Online © Cambridge University Press, 2009

does not derogate from rights and obligations of other WTO members under the WTO treaty).

However, in so far as the clause gives priority to earlier treaties *as between the parties* to the new one, the clause deviates from the *lex posterior* principle set out in Arts. 59 and 30(3). This is why Art. 30(2) was needed. It explicitly permits conflict clauses in favour of pre-existing treaties, notwithstanding the *lex posterior* principle: 'When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier . . . treaty, the provisions of that other treaty prevail.'

Many examples of conflict clauses giving priority to earlier norms can be referred to. Article 22(1) of the UN Convention on Biological Diversity provides, for example: 'The provisions of this Convention shall not affect the rights and obligations of any Contracting Party deriving from any existing international agreement, except where the exercise of those rights or obligations would cause serious damage or threat to biological diversity.'[11]

Article 4 of the European Energy Charter Treaty, as amended, provides: 'Nothing in this Treaty shall derogate as between particular Contracting Parties which are members of the WTO, from the provisions of the WTO Agreement as they are applied between those Contracting Parties.'[12] Article 40 of the North American Agreement on Environmental Cooperation states: 'Nothing in this Agreement shall be construed to affect the existing rights and obligations of the Parties under other international environmental agreements, including conservation agreements, to which such Parties are party.' Article 104 of NAFTA provides:

1. In the event of any inconsistency between this Agreement and the specific trade obligations set out in: a) [CITES], b) [the Montreal Protocol on Substances that Deplete the Ozone Layer], c) [the Basel Convention], or d) the agreements set out in Annex 104.1, such obligations shall prevail to the extent of the inconsistency, provided that where a Party has a choice among equally effective and reasonably available means of complying with such obligations, the Party chooses the alternative that is the least inconsistent with the other provisions of this Agreement.[13]

---

[11] Done at Nairobi, 22 June 1992.
[12] Done at Lisbon, 17 December 1994, amended in 1998.
[13] Note that Art. 104 of NAFTA refers only to inconsistency with MEA trade *obligations*, not explicit rights granted therein that would allow parties to restrict trade. Nonetheless, it could be argued that for every 'explicit right' to restrict trade there is a corresponding 'trade obligation' to respect this right.

https://doi.org/10.1017/CBO9780511494536.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

Article 60 of the European Convention on Human Rights also gives priority to prior treaties, but only to the extent that they *add* human rights or fundamental freedoms in favour of the individual: 'Nothing in this Convention shall be construed as limiting or derogating from any of the human rights and fundamental freedoms which may be ensured under the laws of any High Contracting Party or under any other agreement to which it is a Party.'[14]

Finally, the preamble to the Cartagena Biosafety Protocol provides: 'this Protocol shall not be interpreted as implying a change in the rights and obligations of a Party under any existing international agreements'. This clause would make the Protocol subject to pre-existing agreements. Nonetheless, it is followed by an '[u]nderstanding that the above recital is not intended to subordinate this Protocol to other international agreements'. These two preambular paragraphs seem to neutralise each other. In the end, it is difficult to speak of any remaining conflict clause so that it would seem warranted rather to revert to the conflict rules in general international law, such as *lex posterior* or *lex specialis* (discussed below).

A conflict clause stating that a norm ought not to be interpreted or considered in conflict with another norm is, in terms of result, little different from one stating that, in the event of conflict, the other norm prevails: in both cases, the other norm must be applied. However, in terms of legal technique there is a major difference. In the first instance, the very existence of conflict is precluded. In the second instance, the existence of conflict is acknowledged but solved in a certain way.[15] In the first case, the adjudicator is precluded from adopting an interpretation that conflicts with another norm. In the second case, he or she must follow normal rules on treaty interpretation, may find a conflict and must then give preference to the other norm. To avoid all confusion, and recalling that 'interpretation' covers only the definition of terms in a treaty provision (unless, of course, the parties to a treaty say differently),

---

[14] See Evert Alkema, 'The Enigmatic No-Pretext Clause: Article 60 of the European Convention on Human Rights', in J. Klabbers and R. Lefeber (eds.), *Essays in the Law of Treaties* (The Hague: Nijhoff, 1998), 41.

[15] This point was made by the delegate of Japan at the Vienna Conference itself, commenting on the phrase 'is not to be considered as incompatible with' part of what is now Art. 30(2) of the Vienna Convention: 'the case of a treaty that was not to be considered as inconsistent with an earlier treaty was different from the case of a treaty being subject to another. In the former case, the question of one treaty prevailing over the other should not arise' (Meetings of the Committee of the Whole, 164, para. 7, *per* Mr Fujisaki).

Cambridge Books Online © Cambridge University Press, 2009

states should, however, be advised to use genuine conflict clauses in the treaties they negotiate, in the style of 'in the event of conflict between the provisions of (or rights or obligations under) treaty A and treaty B, those in treaty A shall prevail'.

## Conflict clauses relating to future treaties

*The treaty states that it will prevail over subsequent ones*
*The limited effect of clauses claiming priority over future treaties*    In so far as a clause claims priority over future treaties which would affect third party rights (say, future *inter se* agreements modifying the treaty in a way inconsistent with Arts. 41/58), such clause only confirms the principle of *pacta tertiis*. However, the few existing clauses which claim priority over future treaties are perceived as wider in scope and cover any future treaty, not just future treaties adversely affecting third parties. To that extent, the clause contradicts the contractual freedom of states pursuant to which a later treaty normally prevails over an earlier one, at least as between the parties to both treaties (Art. 30(3) of the Vienna Convention).

Generally speaking, however (and with the possible exception of Art. 103 of the UN Charter, discussed below), a conflict clause proclaiming its priority over future treaties *cannot* limit the contractual freedom of states. States can always change their minds in the future, by mutual consent (subject only to *jus cogens* and Arts. 41/58). Hence, a conflict clause claiming *ex ante* priority over all future treaties is severely limited by the continuing contractual freedom of states and the *pacta sunt servanda* principle that results from the future exercise of this contractual freedom. Article 30(2) does *not* sanction conflict clauses stating that the treaty *prevails over* future treaties. Article 30(2) only excludes from the application of Arts. 30(3) and 30(4) those cases where the treaty says that it is *subject to* other treaties. As the ILC Commentary to Art. 30 noted: 'Article 103 [of the UN Charter] apart, clauses in treaties which purport to give priority over another treaty, whether earlier or later in date, do not by themselves appear to alter the operation of the general rules of priority set out in paragraphs 3 and 4 of the article.'[16]

Put differently, with the exception of Art. 103 of the UN Charter, an explicit conflict clause claiming priority over future treaties must anyhow give way to the *lex posterior* principle (pursuant to which future treaties will anyhow prevail over the treaty containing the conflict clause). Hence, conflict clauses may well provide that the treaty prevails

---

[16] Rauschning, *Travaux*, 233.

Cambridge Books Online © Cambridge University Press, 2009

over future treaties, but nothing prevents the parties to the first treaty from changing their minds and deciding in the later treaty that, notwithstanding the earlier conflict clause, the later treaty must prevail. Crucially, even if this later treaty does not include an explicit conflict clause that deactivates the first conflict clause, in the event of conflict between the two treaties, the later treaty, as between the parties to it, would still prevail pursuant to the *lex posterior* principle in Art. 30(3). Following Art. 30(4)(a), this later treaty would then prevail *even if it were concluded only as between some of the parties to the first treaty* (of course, as long as the conditions in Arts. 41/58 are met).

Take the example of an ABCD treaty X stating that it prevails over all future treaties as between A, B, C and D. According to one author, DSU Arts. 3.2 and 19.2 constitute such a conflict clause as between WTO members vis-à-vis post-1994 non-WTO treaties.[17] A later treaty Y is subsequently concluded as between A, B, C and D and conflicts with the earlier treaty X. Treaty Y will then, notwithstanding the conflict clause in treaty X, prevail *unless treaty Y explicitly states that it is subject to treaty X* (only in that case does Art. 30(2) apply and deactivate the *lex posterior* principle). Treaty Y will so prevail even if it does not explicitly reverse the conflict clause in treaty X. The mere incompatibility with the earlier treaty X activates Art. 30(3) and calls for preference for the later treaty Y. Even if states A and B, subsequent to treaty X between A, B, C and D, conclude an *inter se* agreement deviating from treaty X, this *inter se* agreement shall, as between A and B, prevail, once again, notwithstanding the conflict clause in treaty X (assuming, of course, that the conditions in Arts. 41/58 are met). The same reasoning should apply also in respect of DSU Arts. 3.2 and 19.2 in case they were to constitute a general conflict clause in favour of the WTO treaty (*quod non*).[18] They would be subject to any subsequent change of mind, both as between all WTO members and as between some WTO members only in *inter se* agreements. Hence, their effect would be extremely limited in terms of ensuring the priority of the WTO treaty.

In sum, as Karl rightly remarked: 'Clauses which claim priority over future treaty engagements are futile: They cannot be invoked against third States; they do not render later conflicting treaties void; and they can always be overcome by the common will of the parties.'[19]

---

[17] Lorand Bartels, 'Applicable Law in WTO Dispute Settlement Proceedings' (2001) 35 JWT 499.

[18] See below, pp. 352–5.

[19] Wolfram Karl, 'Conflicts Between Treaties', in R. Bernhardt (ed.), *Encyclopedia of Public International Law* (Amsterdam: North-Holland, 1984), VII, 468 at 471.

Cambridge Books Online © Cambridge University Press, 2009

*The exceptional case of Art. 103 of the UN Charter*  The most prominent example of a conflict clause claiming priority over future treaties is Art. 103 of the UN Charter. This clause represents a special case and is, indeed, far from 'futile'.[20] This provision states: 'In the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligation under any other international agreement, their obligations under the present Charter shall prevail.'

We have already discussed the higher status of UN Charter obligations in chapter 3 above (pp. 99–100).

The term 'any other international agreement' in Art. 103 covers both past and future agreements. Hence, a conflict between a UN Charter obligation and a future agreement must be decided in favour of the UN Charter obligation. Article 30(1) of the Vienna Convention makes an explicit exception to the *lex posterior* principle for Art. 103 of the UN Charter, thereby making Art. 103 a special case among the conflict rules claiming priority in the future: '*Subject to Article 103 of the Charter of the United Nations*, the rights and obligations of States Parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs' (emphasis added).[21]

Four remarks are warranted which put the importance of Art. 103 in perspective.

First, even if Art. 103 represents a special case, it must be recalled that the contractual freedom of UN members does not prevent them from amending Art. 103, unless Art. 103 were to be seen as *jus cogens*. Thus, Art. 103 is also limited and subject to the contractual freedom of UN members. UN Charter obligations prevail over other agreements, not because they represent an inherently 'higher law', but because UN members have agreed to this priority rule in the UN Charter itself.

Second, although there has been a lot of discussion on this matter,[22] Art. 103 is not binding on states that are not UN members,[23] except

---

[20] *Ibid*. Note also in this respect Art. 20(1) of the 1919 Covenant of the League of Nations: 'The Members of the League . . . solemnly undertake that they will not hereafter enter into any engagements inconsistent with the terms thereof.'

[21] The ILC in its Commentary to Art. 30(1) explained this reference to Art. 103 as follows: 'the position of the Charter of the United Nations in modern international law is of such importance, and the States Members of the United Nations constitute so large a part of the international community, that it appeared to the Commission to be essential to give Article 103 of the Charter special attention and a special place in the present article' (Rauschning, *Travaux*, 232).

[22] For an overview, see W. Czaplinski and G. Danilenko, 'Conflict of Norms in International Law' (1990) 21 NYIL 3 at 15.

[23] In support see, for example, V. Degan, *Sources of International Law* (The Hague: Nijhoff, 1997), 428 and P. Cahier, 'Le Problème des Effets des Traités à l'Egard des Etats Tiers'

Cambridge Books Online © Cambridge University Press, 2009

338    CONFLICT OF NORMS IN PUBLIC INTERNATIONAL LAW

for that part of UN Charter obligations which is part of *jus cogens*. Non-UN members (such as, until recently, Switzerland) have not even signed up to UN Charter obligations: how could these obligations then prevail over their other obligations?[24] Even if certain provisions of the UN Charter can be said to be part of customary law binding also on non-UN members, as we saw earlier, custom does not have a legal status that is higher than other obligations. Hence, only if Art. 103 could itself be seen as custom would non-UN members be bound under customary law to give preference to UN Charter obligations *as expressed in custom*, over and above their other obligations. However, the higher standing of UN Charter obligations would then derive not from Art. 103 but from customary law.

Third, Art. 103 is phrased in terms of a priority rule. In the event of conflict, UN Charter obligations 'prevail' over other obligations. The norms setting out these other obligations do not, because of Art. 103 as such, become 'invalid'.[25] Article 103 does not speak of invalidity, nor do Vienna Convention rules on invalidity of treaties mention Art. 103 as a ground of invalidity. Invalidity because of conflict with UN Charter obligations may occur. But then it would be the result of these Charter obligations being part of *jus cogens* (not of Art. 103 as such).

Fourth, the obligations that prevail under Art. 103 are not just any UN obligations. Only obligations *under the UN Charter* are cloaked with this higher legal standing, not, for example, obligations under any agreement or act concluded *in the context of a UN body* (which would then prevail, for example, over WTO rules, the WTO not being a UN body).

With these limitations in mind, though, it must be stressed that Art. 103 does, indeed, go a step further than other conflict clauses

(1974) 143 *Recueil des Cours* 718. *Contra*: K. Dahl, 'The Application of Successive Treaties Dealing with the Same Subject-Matter' (1974) 17 *Indian Yearbook for World Affairs* 305. Some authors referred to the *travaux préparatoires* of the UN Charter which allegedly indicate that Art. 103 was intended to be applicable in relation to non-UN members (see, for example, Wilfred Jenks, 'Conflict of Law-Making Treaties' (1953) 30 BYIL 401 at 438). However, this intention would not as such seem enough to trump the *pacta tertiis* rule. It is not enough for A and B to agree in an AB treaty that the treaty must apply also to C for that to be the case. The situation may be different in respect of the UN Charter in so far as it is part of *jus cogens*. But then the priority of UN Charter obligations does not result from the UN Charter as such but from their *jus cogens* character.

[24] At the Vienna Conference on the law of treaties, Switzerland opposed the formula of Art. 30(1) which refers to Art. 103 of the UN Charter on the ground that Switzerland, being a non-UN member, could not recognize the priority of UN Charter obligations (Vienna Conference, *Official Records*, 1st Session, 31st Meeting, 165 (1986)).

[25] In support: Czaplinski and Danilenko, 'Conflict', 16. *Contra*: Karl, 'Conflicts', 470.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

claiming priority over future treaties. The breadth of Art. 103 should not be underestimated either. In this respect, four remarks are called for.

First, whereas other conflict clauses claiming priority for the future (such as, according to some authors, DSU Arts. 3.2 and 19.2) will be overruled by any subsequent contradictory treaty as between the parties to this later treaty (unless this later treaty explicitly states that it is subject to the earlier treaty),[26] an agreement concluded by some or even all UN members, *without amending Art. 103*, would not prevail over the UN Charter. This is the case because Art. 30(1) explicitly disapplies the *lex posterior* rule (in Arts. 30(3) and 30(4)) in respect of Art. 103 (but not in respect of other conflict clauses claiming priority over future treaties).

Second, the *Lockerbie* cases confirmed that Security Council resolutions (not just UN Charter provisions themselves) prevail over all other (past and future) international agreements, *in casu* the 1971 Montreal Convention. In its Order on Provisional Measures, the ICJ found as follows:

Whereas both Libya and the United States, as Members of the United Nations, are obliged to accept and carry out the decisions of the Security Council in accordance with Article 25 of the Charter; whereas the Court . . . considers that prima facie this obligation extends to the decision contained in resolution 748 (1992); and whereas, *in accordance with Article 103 of the Charter, the obligations of the Parties in that respect prevail over their obligations under any other international agreement, including the Montreal Convention* [emphasis added].[27]

Or as Sir Andrew Hardie (United Kingdom) noted at the public sitting of the ICJ:

both the sense and the literal terms of Article 103 apply its effect to binding decisions of the Security Council as well as to the provisions of the Charter itself. The syllogism is simple: Member States are under a legal obligation to 'accept and carry out' the binding decisions of the Council; that obligation is an 'obligation under the Charter'; therefore that obligation prevails over 'Member States obligations under any other international agreement'.[28]

Following this line of reasoning, it could be argued also that decisions of the ICJ, the principal judicial organ of the UN, are obligations under the UN Charter which, pursuant to Art. 103, prevail over any other international agreement (possibly including even judgments of other international tribunals taken pursuant to such other international agreements,

---

[26] See above, pp. 335–6.    [27] ICJ Reports 1992, para. 42.

[28] UK statement (Sir Andrew Hardie) at the public sitting of the ICJ on 14 October 1997, 10 a.m., referring to the UK submission, at para. 5.39, posted on the internet at http://www.icj-cij.org/icjwww/idocket.

https://doi.org/10.1017/CBO9780511494503.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

as we discussed in chapter 3 above, p. 121). Pursuant to Art. 92 of the UN Charter, the ICJ Statute forms an integral part of the UN Charter and Art. 59 of the ICJ Statute states that decisions of the ICJ have binding force as between the parties and in respect of the particular case. Hence, the obligations derived from an ICJ judgment are legally binding and could be said to be 'obligations of the Members of the United Nations under the present Charter' in the sense referred to by Art. 103 of the UN Charter.

Third, Art. 103 only gives priority to UN Charter obligations in the event of conflict with 'obligations under any other *international agreement*'. Should this mean that later acts of *international organisations* (other than those giving rise to *UN Charter* obligations) can deviate from Charter obligations? Not so, it would seem, since 'obligations under any other international agreement' could be interpreted broadly so as to include also obligations arising under an act of an international organisation, in particular one – like the WTO – not part of the UN family (say, a DSB decision to suspend concessions). Such obligations can, indeed, be said to arise, albeit indirectly only, from an 'international agreement', i.e., the agreement in which the states in question granted the authority to the international organisation to take the act in the first place. More problematic though is whether UN Charter obligations prevail also over *customary* international law: not so, it would seem, on the basis of Art. 103 which refers only to 'obligations under any other *international agreement*'.

Fourth, Art. 103 only addresses 'obligations' under both the UN Charter and other agreements. It does not explicitly refer to rights.[29] As noted earlier, however, conflict can arise also as between an obligation and an explicit right (be it a permission or an exemption).[30] Hence, Art. 103 would have been better drafted if it had referred also to rights. The drafting of Art. 103 caused discussion in the *Lockerbie* cases. Libya suggested that Art. 103, which speaks of obligations, may not extend also to rights under another treaty or under general international law.[31] In other words, in the eyes of Libya, the UN Charter prevails over other *obligations*, not over other *explicit rights*. In response, the United Kingdom (Mr Crook) stated thus:

[29] See, in contrast, Art. 30(1) of the Vienna Convention which was, following a proposal by Israel, extended so as to cover both obligations *and rights*. See above, p. 330.

[30] See chapter 4 above, pp. 175–88.

[31] UK statement (Mr Crook) at the public sitting of the ICJ on 15 October 1997, 10 a.m., para. 3.35, posted on the internet at http://www.icj-cij.org/icjwww/idocket.

Cambridge Books Online © Cambridge University Press, 2009

The obligation to comply with Security Council decisions applies fully both to decisions affecting the *rights* and those affecting the *obligations* of States. The relevant provisions of the Charter are phrased broadly and are intended to be broad in effect. They must be in order to assure the effectiveness of the régime of Chapter VII and in interpreting this aspect of the Charter this Court has not recognized any distinction between 'rights' and 'obligations'...Moreover, this suggested limitation creates serious difficulties. Suppose a bilateral treaty gives the nationals of each party the right to invest in the territory of the other. Surely the Charter gives the Security Council the power in a Chapter VII situation to require that one party prohibit investments by its nationals in the territory of the other, notwithstanding these treaty provisions.[32]

The example referred to by Mr Crook is a clear case of conflict between an *obligation* and an *explicit right* or permission from the point of view of the state victim of the boycott, namely: a UN Security Council obligation to respect the boycott imposed on it by other states versus a bilateral treaty granting it an explicit right or permission to invest in another state.

Moreover, when viewed from the standpoint of *two parties*, one can always point to *two obligations*, even if the conflict, in the eyes of the party facing it, is one of an obligation versus an explicit right. The explicit right corresponds then to an obligation on the other party to respect the explicit right. Thus, looked at from this angle, there will always be opposing *obligations* involved. Article 103 itself seems to allow for an examination of conflict looked at from the angle of *several parties* (not only from the viewpoint of one UN member facing conflict, i.e., the way we have addressed conflict above). Article 103 refers, indeed, to 'conflict between the obligations of the *members* of the United Nations under the present Charter and *their* obligations under any other international

---

[32] *Ibid.* Note that the United Kingdom never argued that a UN Charter obligation versus an explicit (investment) right does *not* constitute conflict on the ground, for example, that the right could simply not be exercised so as to comply with the obligation. The United Kingdom implicitly recognised that there was conflict, explaining why Art. 103 should also apply to this type of conflict, even though strictly speaking it could be said not to apply on the ground that Art. 103 does not refer to 'rights'. Libya's argument implied, *a fortiori*, that an explicit right may constitute a conflict with an obligation and that it should not always be the obligation that prevails: in Libya's opinion, its explicit right in the Montreal Convention should even prevail over UN Charter obligations. The United States also recognised the existence of conflict between a Montreal Convention right and a UN Security Council obligation. As Prof. Schachter noted: 'it is more precisely and correctly a collision between rights that the State may have under treaties and the obligations imposed by the mandatory measures of the Council' (public sitting held on 15 October 1997, at 10 a.m., para. 4.4, referring to a statement by Judge Shahabuddeen).

Cambridge Books Online © Cambridge University Press, 2009

agreement' (emphasis added). Thus, as the UK argued, the priority given to the UN Charter should apply in respect of both obligations and *explicit rights*. Moreover, the priority from which UN Charter provisions benefit should, in turn, cover UN Charter obligations as well as UN Charter *explicit rights*, at least in so far as these explicit rights correspond to obligations on behalf of other UN members.

*The treaty states that it is subject to subsequent treaties*

For a treaty to provide that it must give way to subsequent treaties as between its parties amounts to confirming the obvious. By mutual consent, states can change their mind and, as between parties to two treaties, the latest one prevails (Art. 30(3) of the Vienna Convention). Still, it may be useful for a treaty to clarify that it may be supplemented by other more specific treaties, in particular if these other treaties are *inter se* agreements. Arts. 41 and 30(4)(b) of the Vienna Convention permit that such *inter se* agreements change the legal relationship between the parties, as long as certain conditions are met and this even without any specific reference in the treaty to *inter se* agreements. But it does no harm to confirm or specify this possibility to conclude *inter se* agreements in the treaty itself, and/or the conditions that such *inter se* agreements must meet in order for them to be permissible. A good example is Art. 311(3) of UNCLOS (which is largely taken from Art. 41 of the Vienna Convention itself):

Two or more States Parties may conclude agreements modifying or suspending the operation of provisions of this Convention, applicable solely to the relations between them, provided that such agreements do not relate to a provision derogation from which is incompatible with the effective execution of the object and purpose of this Convention, and provided further that such agreements shall not affect the application of the basic principles embodied herein, and that the provisions of such agreements do not affect the enjoyment by other States Parties of their rights or the performance of their obligations under this Convention.

Another example of a conflict clause giving priority to future treaties is Art. 73(2) of the 1963 Vienna Convention on Consular Relations which explicitly recognises the right to *supplement* its provisions by bilateral agreements.[33] One could refer also to Art. 60 of the European

---

[33] This is the example referred to in the ILC Commentary to Art. 30(2) (Rauschning, *Travaux*, 232).

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

Convention on Human Rights which makes it explicit that it must not be 'construed as limiting or derogating from any of the human rights and fundamental freedoms which may be ensured…under any other agreement to which it [a High Contracting Party] is a Party', including future agreements. Much like Art. 60, Art. 19(8) of the Statute of the ILO and Art. 20 of the Berne Convention for the Protection of Literary and Artistic Works allow for future treaties to prevail but only in case they are more favourable to the rightholders (respectively, workers and copyright owners). Finally, Art. 52 of the UN Charter also explicitly allows for the conclusion of future regional arrangements.[34]

Although such conflict clauses confirm general rules (in particular, the *lex posterior* principle, but also the principle of *lex specialis*), Art. 30(2) nonetheless explicitly confirms their validity: 'When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, a…*later* treaty, the provisions of that other treaty prevail' (emphasis added).'

## Conflict clauses in the WTO treaty on the relationship between WTO law and other norms of international law

Having set out the two types of conflict clauses that a treaty may contain to regulate its relationship with other norms of international law, we next examine how the WTO treaty has dealt with its relationship to other treaties.

The WTO treaty itself contains very little in terms of how it relates to other rules of international law. This is surprising, given the vast potential for interplay between WTO norms and other norms (discussed in chapter 1 above). It is probably explained because of (i) a lack of preoccupation with (and, for many, expertise in) public international law on behalf of the negotiators of the WTO treaty (recall that trade negotiators are often employed by a ministry of trade or the economy, delinked from that of foreign affairs); and (ii) political deadlock for those rules of international law WTO negotiators did have in mind (in particular, MEAs). Unlike, for example, UNCLOS, the WTO treaty does *not* include a general conflict clause setting out its relationship with pre-existing

---

[34] Art. 52 provides: 'Nothing in the present Charter precludes the existence of regional arrangements or agencies for dealing with such matters relating to the maintenance of international peace and security as are appropriate for regional action, provided that such arrangements or agencies and their activities are consistent with the Purposes and Principles of the United Nations.'

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

international law. The WTO treaty does not explicitly provide that it is to prevail over pre-existing law, nor does it state that it is without derogation from pre-existing law.[35] The WTO treaty does not include a general conflict clause in respect of future treaties either. One author has argued that DSU Arts. 3.2 and 19.2 – stating that 'the panel and Appellate Body' and '[r]ecommendations and rulings of the DSB cannot add to or diminish the rights and obligations provided in the [WTO] covered agreements' – constitute a general conflict clause in favour of WTO rules in all situations of conflict between WTO norms and other norms.[36] We refute this contention below in this section and have already pointed out the very limited effect such clause would have as against future conflicting treaties (see above, pp. 335–6).

WTO members could, of course, always clarify or change the relationship between WTO rules and other rules of international law. This could be done, for example, by providing authoritative interpretations of WTO rules, by granting certain waivers or by amending WTO rules (respectively, under Arts. IX:2, IX:3 or X of the Marrakesh Agreement). WTO organs, such as the Ministerial Council or General Council, on the advice of, for example, the Committee on Trade and Development, could also adopt certain guidelines. Several WTO rules explicitly allow for WTO organs to define more clearly the relationship between the WTO and other international organisations.

Art. V.1 of the Marrakesh Agreement on 'Relations with Other Organizations' provides: 'The General Council shall make appropriate arrangements for effective cooperation with other intergovernmental organizations that have responsibilities related to those of the WTO.' GATS Art. XXVI on 'Relationship with Other International Organizations' provides, in turn: 'The General Council shall make appropriate arrangements for consultations and cooperation with the United Nations and its specialized agencies as well as with other intergovernmental organizations concerned with services.'[37]

---

[35] Note, in contrast, the very elaborate Art. 311 of UNCLOS on 'Relation to Other Conventions and International Agreements'. See, in this respect, Emmanuel Roucounas, 'Engagements Parallèles et Contradictoires' (1987-VI) 206 *Recueil des Cours* 9.

[36] Bartels, 'Applicable Law'.

[37] From the other side of the spectrum, recall the powers of the UN Economic and Social Council to 'co-ordinate the activities of the specialised agencies through consultation with and recommendations to such agencies and through recommendations to the General Assembly and to the Members of the United Nations' (Art. 63(2) of the UN Charter: see chapter 5 above). Note, however, that the WTO is not part of the UN family.

Cambridge Books Online © Cambridge University Press, 2009

Recall also the Declaration on the Contribution of the WTO to Achieving Greater Coherence in Global Economic Policymaking, part of the 1994 Final Act, discussed earlier in chapter 5.

Hence, further conflict rules may derive from WTO members as states (taking the form of treaty language) or from WTO organs acting as international organisations. In the former case, the conflict rule is likely to become a full part of WTO covered agreements. In the latter case, it would not, although it would clearly be part of WTO law in the wider sense used here, as well as part of the applicable law before a WTO panel.

As the WTO treaty stands today, there are, however, relatively limited exceptions where the WTO treaty does provide some rules on how to resolve conflict between the WTO treaty and certain other norms of international law. We examine them in turn.

*GATT 1947 and related instruments*

With reference to paragraph 1 of GATT 1994 – which sums up the legal instruments that are to be part of GATT 1994 – it can be presumed that all pre-1994 GATT related instruments that were *not* incorporated into the WTO treaty (in particular, into GATT 1994) have been terminated or at least have been superseded by the WTO treaty.

In *EC – Poultry*, the Appellate Body found that the so-called Oilseeds agreement concluded bilaterally between the EC and Brazil in the framework of GATT Art. XXVIII renegotiations (as part of the resolution of a previous 1990 oilseeds dispute) was *not* a 'covered agreement' subject to the DSU, nor part of the multilateral obligations accepted by Brazil and the EC pursuant to the WTO agreement. As a result, the Appellate Body concluded that 'it is Schedule LXXX [the relevant 1995 EC schedule of concessions attached to the WTO agreement into which only parts of the Oilseeds agreement had been incorporated], rather than the Oilseeds Agreement, which forms the legal basis for this dispute'.[38] The Appellate Body added that, in its view, 'it is not necessary to have recourse to either Article 59.1 [termination of a treaty by conclusion of a later treaty] or Article 30.3 [application of successive treaties] of the *Vienna Convention*, because the text of the *WTO Agreement* and the legal arrangements governing the transition from the GATT 1947 to the WTO resolve the issue of the relationship between Schedule LXXX and the Oilseeds Agreement in this case'.[39]

---

[38] Appellate Body report on *EC – Poultry*, para. 81.     [39] *Ibid*.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

*The WIPO conventions incorporated into the TRIPS agreement*

Article 2.2 of the TRIPS agreement provides that '[n]othing in Parts I to IV of this Agreement shall derogate from existing obligations that Members may have to each other under the Paris Convention, the Berne Convention, the Rome Convention and the Treaty on Intellectual Property in Respect of Integrated Circuits'.

The arbitrators in *EC – Bananas*, assessing the request by Ecuador to suspend obligations vis-à-vis the EC under the TRIPS agreement, noted the following in respect of Art. 2.2:

This provision can be understood to refer to the obligations that the contracting parties of the Paris, Berne and Rome Conventions and the IPIC Treaty, who are also WTO Members, have between themselves under these four treaties. This would mean that, by virtue of the conclusion of the WTO Agreement, e.g. Berne Union members cannot derogate from existing obligations between each other under the Berne Convention. For example, the fact that Article 9.1 of the TRIPS Agreement incorporates into that Agreement Articles 1–21 of the Berne Convention with the exception of Article 6*bis* does not mean that Berne Union members would henceforth be exonerated from this obligation to guarantee moral rights under the Berne Convention.[40]

It must be stressed, however, that the priority rule in Art. 2.2 only extends to *Parts I to IV* of the TRIPS agreement. Any rights or obligations that WTO members may obtain under *Parts V to VII* do not necessarily have to give way to WIPO conventions, at least not pursuant to Art. 2.2.[41] Importantly, Part V sets out the dispute settlement provisions that apply to the TRIPS agreement. Hence, any obligations or suspensions of rights that are imposed on a WTO member as a result of WTO dispute settlement, including as a result of DSB authorisations to suspend TRIPS obligations because of non-compliance with dispute settlement recommendations, may prevail over WIPO conventions. Indeed, as between state parties to the relevant WIPO convention that are also WTO members, the DSB authorisation, constituting an act of a WTO organ, should then normally prevail over the earlier WIPO convention as the *lex posterior*.[42] The conflict clause in Art. 2.2 of the TRIPS agreement – which covers only Parts I to IV of the TRIPS agreement – does not prevent this from happening. Recall that there is no inherent hierarchy between the

---

[40] Report of the arbitrators under DSU Art. 22.6 (Ecuador's request for suspension), para. 149. See also Art. 20 of the Berne Convention, referred to above, p. 343.

[41] Report of the arbitrators, para. 150.

[42] See the discussion in chapter 6 above, p. 326; chapter 3 above, pp. 146–7; and below, pp. 384–5.

Cambridge Books Online © Cambridge University Press, 2009

sources of international law, *in casu*, between a treaty norm and an act of an international organisation. As a result, the latest expression of state intent, *in casu*, the DSB authorisation, must prevail. For treaty norms this is confirmed in Art. 30. For acts of international organisations, it must be seen as part of customary international law.

That Art. 2.2 does not prevent the suspension of TRIPS obligations, even if such suspension constitutes a suspension of WIPO obligations also, was confirmed by the same arbitrators in *EC – Bananas*:

nothing in Article 64 or other Articles of the TRIPS Agreement provides specifically that Article 22 of the DSU does not apply to the TRIPS Agreement . . . Provided that Ecuador's request for the suspension of certain TRIPS obligations is consistent with all the requirements of Article 22 of the DSU, including paragraphs 3 and 4 thereof, neither Article 2.2 read in context with Article 64 of the TRIPS Agreement, nor any other provision of the WTO agreements indicate that an authorization by the DSB of that request would in theory be prohibited under WTO law.[43]

*IMF rules*

In respect of the relationship between the WTO treaty and IMF rules, the Declaration on the Relationship of the WTO with the IMF[44] states, in essence, that GATT 1994 and other Annex 1A agreements prevail over IMF rules unless otherwise provided for in these agreements:

[u]nless otherwise provided for in the Final Act, the relationship of the WTO with the International Monetary Fund, with regard to the areas covered by the Multilateral Trade Agreements in Annex 1A of the WTO Agreement, will be based on the provisions that have governed the relationship of the CONTRACTING PARTIES to the GATT 1947 with the International Monetary Fund.

In *Argentina – Footwear*, the Appellate Body examined whether a 3 per cent statistical tax found by the panel to be in violation of GATT Art. VIII could be excused by means of an allegedly conflicting obligation imposed on Argentina in a Memorandum of Understanding between Argentina and the IMF. In this IMF Memorandum it was set out that the fiscal

---

[43] Report of the arbitrators under DSU Art. 22.6 (Ecuador's request for suspension), paras. 150–1. The arbitrators claimed not to have jurisdiction 'to pass judgment on whether Ecuador, by suspending, once authorized by the DSB, certain TRIPS obligations, would act inconsistently with its international obligations arising from treaties other than the agreements covered by the WTO (e.g. the Paris, Berne and Rome Conventions which Ecuador has ratified)' (*ibid*., para. 152). See chapter 8 below, pp. 445–7.

[44] WTO Secretariat, *The Result of the Uruguay Round of Multilateral Trade Negotiations, The Legal Texts* (Geneva, 1995), 447.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

measures to be adopted by Argentina included 'increases in import duties, including a temporary 3 per cent surcharge on imports'. Referring to the Declaration on the Relationship of the WTO with the IMF, the Appellate Body found, however, that since no IMF-related exceptions under GATT Art. VIII were to be found in GATT itself, independent IMF rules, such as the IMF Memorandum, could not justify Argentina's violation of GATT Art. VIII.[45]

In this respect, mention could also be made of the 1996 Agreement between the IMF and the WTO as well as the Declaration on the Contribution of the WTO to Achieving Greater Coherence in Global Economic Policymaking. Both were discussed earlier, in chapter 5. However, none of these instruments set out explicit conflict clauses.

*OECD arrangements on export credits*

Although not strictly speaking a conflict clause, reference could be made here also to the Subsidies agreement which provides that an export credit practice shall not be considered an export subsidy prohibited by the Subsidies agreement if it is in conformity with the interest rate provisions of 'an international undertaking on official export credits to which at least twelve original Members to this Agreement are parties as of 1 January 1979 (or a successor undertaking which has been adopted by those original Members)'.[46] Though not explicitly referred to, the 'undertaking' in mind is the OECD Arrangement on Guidelines for Officially Supported Export Credits (the 'OECD Arrangement'). This provision, in effect a 'safe-harbour' clause, explicitly permits certain export credit practices under conditions which conform to the OECD Arrangement. It thereby gives preference to certain rights under the OECD Arrangement, over and above certain obligations in the WTO Subsidies agreement. As noted earlier, the panel on *Brazil – Aircraft (Article 21.5 – Canada II)* found that the relevant OECD Arrangement is not limited to the one that existed when the WTO treaty was concluded, but is 'the most recent successor undertaking which has been adopted prior to the time that the second paragraph [providing for the 'safe harbour'] is considered'.[47] In that particular case, the most recent successor undertaking was the 1998 OECD Arrangement. Nonetheless, as the panel in *Canada – Aircraft (Article 21.5)* remarked:

---

[45] Appellate Body report on *Argentina – Footwear*, paras. 69–74.
[46] Second paragraph of item (k) in Annex I to the Subsidies agreement.
[47] Panel report on *Brazil – Aircraft (Article 21.5 – Canada II)*, para. 5.83.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

the second paragraph of item (k) is quite unique in the sense that it creates an exemption from a prohibition in a WTO Agreement, the scope of which exemption is left in the hands of a certain *subgroup* of WTO Members – the Participants, all of which as of today are OECD Members – to define, and to change as and when they see fit.[48]

*International standards referred to in the SPS and TBT agreements*
Both the SPS and TBT agreements make reference to 'standards' adopted in other international organisations. In essence, they provide a general obligation for WTO members to base their own national measures on these international standards, unless they can provide a valid justification to deviate from those standards.[49] In addition – and this is where a certain hierarchy has been built in – if WTO members impose national measures that conform to those international standards, their national measures shall be presumed to be consistent also with the obligations set out in the SPS or TBT agreements.[50] The international standards referred to in the SPS agreement are, to date, limited to those established by the Codex Alimentarius Commission (for food safety), the International Office of Epizootics (for animal health and zoonoses) and the Secretariat of the International Plant Protection Convention (for plant health).[51] The international standards referred to in the TBT agreement are not as clearly defined. It suffices that they were established by an 'international body or system', defined, in turn, to mean a 'body or system whose membership is open to the relevant bodies of at least all Members'.[52]

Although most of these international standards are not legally binding within the organisation where they were created, they have gained prominence through this 'soft' incorporation into the WTO treaty. Although this 'soft' incorporation does not give absolute preference to

[48] Panel report on *Canada – Aircraft (Article 21.5)*, para. 5.132.
[49] SPS Art. 3 and TBT Art. 2.4. For case law on these provisions see, respectively, the Appellate Body report on *EC – Hormones* and the panel report on *EC – Sardines*.
[50] SPS Art. 3.2 (which includes, in addition, a presumption of consistency with GATT) and TBT Art. 2.5 (where the presumption is somewhat weaker since TBT Art. 2.2 must anyhow be complied with, even if one's measure is 'in accordance with' relevant international standards).
[51] Annex A, paragraph 3, to the SPS agreement, which adds that 'for matters not covered by the above organizations; appropriate standards, guidelines and recommendations promulgated by other relevant organizations open for membership to all Members, *as identified by the [SPS] Committee*' (emphasis added). So far, however, the SPS Committee has not identified any organisation other than the three explicitly mentioned in Annex A.
[52] Annex 1, paragraph 4, to the TBT agreement.

https://doi.org/10.1017/CBO9780511494536.009 Published online by Cambridge University Press
Cambridge Books Online © Cambridge University Press, 2009

international standards over and above WTO rules, it does provide for a degree of deference to non-WTO rules through the presumption of consistency with certain WTO rules in case international standards are complied with.

*Multilateral environmental agreements*

As far as the relationship between the WTO treaty and MEAs is concerned, reference can be made to the Declaration on Trade and Environment, part of the 1994 Final Act.[53] However, rather than setting out a conflict clause itself, the merit of this declaration is that it establishes the WTO Committee on Trade and Environment (CTE). One of the major tasks of this Committee is to examine the relationship between the WTO treaty and MEAs. This mandate has, so far, not resulted in any explicit conflict rules. Importantly, the CTE did, however, endorse 'multilateral solutions based on international cooperation and consensus as the best and most effective way for governments to tackle environmental problems of a transboundary or global nature' and expressed a preference for trade disputes that arise in connection with a multilateral environmental agreement to be resolved through the mechanisms established by such agreement.[54]

Additional guidance for the resolution of conflict between the WTO treaty and MEAs – though, once again, not in the form of an 'explicit conflict clause' – can be found in the preamble to GATT 1994. This preamble provides guidance, both for interpretative purposes and in terms of what WTO members had in mind when concluding the WTO treaty. It explicitly calls for 'the optimal use of the world's resources in accordance with the objective of sustainable development, seeking both to protect and preserve the environment and to enhance the means for doing so in a manner consistent with their respective needs and concerns at different levels of economic development'. One could refer also to the *travaux préparatoires* of certain MEAs, where GATT officials had expressed the opinion that the draft MEAs were in conformity with GATT rules.[55] As a result, it seems, the drafters of the MEAs did not include a

---

[53] WTO Secretariat, *Legal Texts*, 469.

[54] WTO doc. WT/CTE/1, para. 171 (1996). For an interesting, though inconclusive, evaluation of the relationship between the WTO treaty and earlier MEAs, see Robert Housman and Don Goldberg, 'Legal Principles in Resolving Conflicts Between Multilateral Agreements and the GATT/WTO', in Robert Housman et al. (eds.), *The Use of Trade Measures in Select Multilateral Environmental Agreements* (Nairobi: UNEP, 1995), 297.

[55] For references, see Housman and Goldberg, 'Legal Principles', 303.

Cambridge Books Online © Cambridge University Press, 2009

conflict clause. But this could be interpreted both ways: (i) the drafters wanted to make sure that the GATT was left unaffected, GATT officials confirmed that this was so: as a result, there was no need to include a savings clause for the GATT; or, in contrast, (ii) the drafters wanted to make sure that the new MEA would be effective and not be nullified by the earlier GATT: they heard a GATT opinion that this was so; as a result, they did not have to confirm that the later MEA prevails over the earlier GATT in the event of conflict. However, given the presumption that the later treaty in time prevails, it would seem that, in the absence of a conflict clause, the intention was to let Art. 30 and the *lex posterior* principle (to the extent it can be applied)[56] play their role. Hence, the most logical conclusion to be derived from the absence of a conflict clause in these MEAs is that, in case there is a conflict, these MEAs must prevail over earlier treaties (but see the concept of 'continuing' treaties below).[57]

*UN Charter obligations for the maintenance of international peace and security*
GATT Art. XXI(c) (entitled 'Security Exceptions') sets out an explicit conflict clause giving preference to certain obligations of WTO members under the UN Charter, over and above the WTO treaty. It provides as follows: 'Nothing in this Agreement shall be construed . . . to prevent any contracting party from taking any action in pursuance of its obligations under the United Nations Charter for the maintenance of international peace and security.'

GATS Art. XIV*bis*(c) sets out the exact same conflict clause in respect of GATS. These GATT/GATS clauses are a partial reflection of Art. 103 of the UN Charter. They are limited, indeed, to UN Charter obligations 'for the maintenance of international peace and security'. In practice, they make clear that whenever UN members are under an obligation to impose economic sanctions on another state (pursuant to a UN Security Council resolution), their WTO trade obligations vis-à-vis that state should not prevent them from doing so.

GATT Art. XXI(c) and GATS Art. XIV*bis*(c), as important as they are in terms of linking WTO law to UN law, only confirm a pre-existing conflict rule that already applied to WTO members that are also UN members. Indeed, even without these WTO clauses, WTO members should have given preference to their UN Charter obligations over and above those in the WTO treaty and this on the basis of Art. 103 of the UN Charter.

---

[56] See below, pp. 378–80.    [57] *Ibid.*

Cambridge Books Online © Cambridge University Press, 2009

GATT Art. XXI(c) and GATS Art. XIV*bis*(c) merely confirm part of this rule. In this respect as well, it is crucial that before a WTO panel all relevant international law, including UN Charter law, must apply (even if the jurisdiction of WTO panels is limited to claims under WTO covered agreements: see chapter 8 below).

*Consultation and dispute settlement provisions in the area of health*
Article 11.3 of the SPS agreement provides that '[n]othing in this Agreement shall impair the rights of Members under other international agreements, including the right to resort to the good offices or dispute settlement mechanisms of other international organizations or established under any international agreement'.

One author submitted that this SPS provision should extend to other rules of international law *not related to consultations and dispute settlement*.[58] However, although the word 'including' is used, it seems to refer to a non-exhaustive list of *consultation and dispute settlement* provisions in other international agreements ('including the right to resort to the good offices or dispute settlement mechanisms'), not to any other type of provisions. This is confirmed by the context of Art. 11.2. Article 11 is entitled 'Consultations and Dispute Settlement'. It would hence be surprising to find that WTO members had subjected the SPS agreement to all other international agreements in this article dealing only with consultations and dispute settlement.

*DSU Arts. 3.2 and 19.2 do not constitute a conflict clause*
It has been submitted that DSU Art. 3.2, as confirmed in DSU Art. 19.2, is another, more general, conflict clause addressing the relationship between WTO law and other norms of international law.[59] The last sentence of Art. 3.2 provides: 'Recommendations and rulings of the DSB cannot add to or diminish the rights and obligations provided in the covered agreements.' Article 19.2 states: 'In accordance with paragraph 2 of Article 3, in their findings and recommendations, the panel and Appellate Body cannot add to or diminish the rights and obligations provided in the covered agreements.'

Should these provisions be read to mean that WTO panels and the Appellate Body as well as the DSB cannot ever add to, or diminish,

---

[58] Marc Iynedjian, 'L'Accord de l'Organisation Mondiale du Commerce sur l'Application des Mesures Sanitaires et Phytosanitaires, Une Analyse Juridique', doctoral thesis (University of Lausanne, 2000), 351–2.
[59] See Bartels, 'Applicable Law'.

Cambridge Books Online © Cambridge University Press, 2009

the rights and obligations explicitly set out in WTO covered agreements? In other words, should these provisions be interpreted to mean that no other law, be it pre- or post-1994, can ever influence WTO covered agreements and that, in the event of conflict between WTO covered agreements and another rule of international law, the WTO rule must *always* prevail?

In my view, they cannot. DSU Arts. 3.2 and 19.2 do not address the *jurisdiction* of panels nor the *applicable law* that a panel can apply to a particular dispute. Nor do they proclaim that WTO covered agreements must necessarily and always prevail over all past and future law. These provisions deal rather with the inherent limits of a WTO panel as a judicial organ in *interpreting* WTO covered agreements.[60] In the exercise of this judicial function of interpretation, WTO panels may clarify and interpret what WTO covered agreements mean, but they may not 'add to or diminish the rights and obligations provided in the covered agreements'. The immediate context of this passage in Art. 3.2 confirms this reading. The sentence follows directly the instruction for panels to clarify WTO covered agreements 'in accordance with customary rules of interpretation of public international law'. This is a clear indication that also the last sentence of Art. 3.2 – the one scrutinised here – deals with the interpretative function of panels, not with the applicable law before a panel, nor with conflict of norms.

To put it differently, as judicial organs WTO panels may not create new rights and obligations, they must apply those that WTO members agreed to. This limitation on the interpretative function of WTO panels was made *ex abundante cautela*. Even without it, it would have applied to WTO panels as an inherent limitation of the judicial function prescribed in general international law. As the ICJ noted in the *Interpretation of Peace Treaties* Advisory Opinion: 'to adopt an interpretation which ran counter to the clear meaning of the terms would not be to interpret but to revise the treaty'.[61]

As for DSU Arts. 3.2 and 19.2 being a conflict clause automatically deciding all conflicts of norms in favour of WTO rules, there is a major difference between stating what the *judiciary* can do with the law and stating what the *legislature* (i.e., WTO *members*) have done, or can do with, the law. DSU Arts. 3.2 and 19.2 direct that the WTO *judiciary*, like any

[60] On the crucial distinction between jurisdiction, applicable law and interpretation, see chapter 8 below, pp. 476–8.

[61] ICJ Reports 1950, 229. On the inherent limits of treaty interpretation see chapter 5 above, pp. 244–7.

Cambridge Books Online © Cambridge University Press, 2009

other judiciary, cannot 'change' the WTO treaty at the time they are asked to apply that treaty. A conflict clause, in contrast, would

(i) tell us that WTO *members*, when negotiating the treaty, did not want *any other* existing rules of international law to prevail over the WTO treaty, as well as

(ii) direct WTO *members* that in their future dealings they *cannot* change or overrule the rights and obligations set out in the WTO treaty (except pursuant to the amendment and other provisions in the WTO treaty itself).

To interpret DSU Arts. 3.2 and 19.2 in this way would be erroneous. To make an analogy with the ICJ, the fact that the ICJ Statute prescribed in 1945 that the Court must 'decide in accordance with international law' – a phrase interpreted in the *South West Africa* cases to mean that the ICJ's 'duty is to apply the law as it finds it, not to make it'[62] – can hardly be interpreted to mean that the law the ICJ may look at is limited to that of 1945 nor can it mean that international law as it existed in 1945 must always and necessarily prevail over all subsequent rules of international law.

The drafters of the WTO treaty *could have* inserted a conflict clause stating that the WTO treaty is to prevail over *all past and future* international law, similar to the one in Art. 103 of the UN Charter.[63] Although such would have been with limited effect only,[64] the contractual freedom of WTO members would have allowed them to do so (within the limits of *jus cogens* and the principle of *pacta tertiis*). But in the event that the drafters of the WTO treaty had really wanted the WTO treaty to play this role of a second UN Charter, prevailing over all other law – something that is not only in legal terms questionable, but also in political terms highly unlikely – would they not have explicitly said so? Would they, for example, not have put a non-derogation clause in the Marrakesh Agreement itself, instead of twice inserting a sentence at the end of a provision on the function of WTO panels in the, after all, technical DSU?

Finally, even if DSU Arts. 3.2 and 19.2 were to amount to a conflict clause claiming priority for the WTO treaty over all other norms of international law (*quod non*), when it comes to *future* treaties in conflict with the WTO treaty, this conflict clause would have little effect. As

---

[62] ICJ Reports 1966, 48.
[63] See also, but in a much more limited way, Article 311(6) of UNCLOS.
[64] See above, pp. 335–6.

Cambridge Books Online © Cambridge University Press, 2009

noted earlier,[65] the contractual freedom of WTO members allows them to deviate from the WTO treaty, *including the alleged conflict clause*. All WTO members could conclude a new treaty and, even without explicitly amending DSU Arts. 3.2 and 19.2, such new treaty would then, as the later in time, prevail over the old WTO treaty, notwithstanding the conflict clause. This would occur pursuant to Art. 30(3) of the Vienna Convention, unless the later treaty is explicitly made subject to the earlier WTO treaty (so that Art. 30(2) applies). As pointed out before, Art. 30 gives effect to only one conflict clause claiming priority over future treaties and this is Art. 103 of the UN Charter. For all other conflict clauses of the same type, the *lex posterior* principle is *not* deactivated. Also a *limited number* of WTO members could then conclude an *inter se* agreement that meets the conditions of Arts. 41/58 of the Vienna Convention. If they do so and thereby derogate from certain WTO rules, as between themselves, the later *inter se* agreement prevails pursuant to Art. 30(3)(a) and this notwithstanding the alleged conflict clause in DSU Arts. 3.2 and 19.2 (in that event Art. 30(2) does not apply, nor does the exception provided for in Art. 30(1) in respect of Art. 103 of the UN Charter).

In sum, even if DSU Arts. 3.2 and 19.2 were to constitute a conflict clause calling for automatic preference to be given to WTO rules over other rules (*quod non*), this conflict clause would have no effect in respect of post-1994 treaty norms as between the WTO members party to these norms. As conflict clauses related to future norms, DSU Arts. 3.2 and 19.2 would then be subject to any subsequent change of mind, both as between all WTO members and as between some WTO members only in *inter se* agreements. To that extent, DSU Arts. 3.2 and 19.2 would be an example of 'futile' conflict clauses referred to by Karl.[66]

## Conflict clauses resolving conflict within a treaty: the example of the WTO treaty

As noted in the introduction to this section on 'Explicit conflict clauses', apart from conflicts clauses that regulate the relationship of a treaty to other pre-existing or future treaties, a conflict clause may also address potential conflicts as between norms *within* the treaty in which it is set out. We next examine the example of conflicts of norms within the WTO treaty and how these may have been regulated by explicit conflict clauses.

---

[65] *Ibid*.    [66] Karl, 'Conflicts', 471.

 Cambridge Books Online © Cambridge University Press, 2009
Cambridge Books Online © Cambridge University Press, 2009

The WTO treaty includes a series of conflict clauses that address internal WTO conflicts, that is, conflicts between two norms both of which are part of WTO covered agreements.[67] Obviously, in the event that no explicit conflict clause can be found to resolve an internal WTO conflict, in the WTO treaty itself, the conflict rules which are part of general international law, discussed in this work, must be reverted to.

*The Marrakesh Agreement prevails over all other multilateral trade agreements*
In the event of conflict between a rule in the Marrakesh Agreement and another rule in any of the multilateral trade agreements (such as the GATT, GATS, TRIPS or DSU), the rule of the Marrakesh Agreement must prevail. Article XVI.3 of the Marrakesh Agreement provides: 'In the event of a conflict between a provision of this Agreement and a provision of any of the Multilateral Trade Agreements, the provision of this Agreement shall prevail to the extent of the conflict.'

*GATT 1994 is subject to all other Annex 1A agreements on trade in goods*
In the event of conflict between a provision of GATT 1994 and a provision of another agreement on trade in goods part of Annex 1A to the Marrakesh Agreement, the provision of the other Annex 1A agreement prevails. The General Interpretative Note to Annex 1A provides: 'In the event of conflict between a provision of the [GATT 1994] and a provision of another agreement in Annex 1A [to the Marrakesh Agreement]... the provision of the other agreement shall prevail to the extent of the conflict.'[68]

*Schedules of concessions must give way to WTO treaty provisions as such*
Article II:7 of GATT provides that '[t]he Schedules annexed to this Agreement are hereby made an integral part of Part I of this Agreement'. Member-specific commitments under the Agreement on Agriculture are also an integral part of the GATT. Article 3.1 of the Agreement on Agriculture provides: 'The domestic support and export subsidy commitments in Part IV of each Member's Schedule constitute commitments limiting subsidization and are hereby made an integral part of GATT

---

[67] On intra-WTO conflict more generally, see Elisabetta Montaguti and Maurits Lugard, 'The GATT 1994 and Other Annex 1A Agreements: Four Different Relationships?' (2000) 3 JIEL 473.

[68] For the case law on this provision, see chapter 4 above, pp. 188–94, and Joost Pauwelyn, 'Cross-agreement Complaints before the Appellate Body: A Case Study of the *EC – Asbestos* Dispute' (2002) / 1 *World Trade Review* 63. See also the discussion below, pp. 397–9.

 Cambridge Books Online © Cambridge University Press, 2009
Published online by Cambridge University Press

1994.' Finally, specific commitments under the GATS set out in the GATS schedule of WTO members are an integral part also of the GATS pursuant to GATS Art. XX.3. On that basis, the Appellate Body found in *EC – Computer Equipment* that 'the concessions provided in that Schedule are part of the terms of the treaty. As such, the only rules which may be applied in interpreting the meaning of a concession are the general rules of treaty interpretation set out in the *Vienna Convention*.'[69]

However, even though the norms set out in WTO members' schedules are treaty language and an integral part of the WTO treaty, they do have an inherently lower legal standing than the provisions in the WTO treaty *stricto sensu*, i.e., those binding equally on all WTO members. In respect of concessions contained in the schedules annexed to GATT 1947, the panel on *US – Sugar Headnote* found that 'Article II permits contracting parties to incorporate into their Schedules acts yielding rights under the General Agreement but not acts diminishing obligations under that Agreement.'[70]

This approach was confirmed in respect of market access concessions and commitments for agricultural products contained in the schedules annexed to GATT 1994 by the Appellate Body in *EC – Bananas*:[71] 'The ordinary meaning of the term "concessions" suggests that a Member may yield rights and grant benefits, but it cannot diminish its obligations.'[72]

As the Appellate Body pointed out, this interpretation is supported by paragraph 3 of the Marrakesh Protocol (itself an integral part of GATT 1994 pursuant to paragraph 1(d) of GATT 1994), which provides: 'The implementation of the concessions and commitments contained in the schedules annexed to this Protocol shall, upon request, be subject to multilateral examination by the Members. This would be *without prejudice to the rights and obligations of members under Agreements in Annex 1A of the WTO Agreement*.'[73]

---

[69] Appellate Body report on *EC – Computer Equipment*, para. 84.

[70] GATT panel report on *United States – Restrictions on Importation of Sugar*, adopted on 22 June 1989, BISD 36S/331, at para. 5.2.

[71] In that case, the EC had argued that even if its tariff quota share allocation as a result of the Framework Agreement on Bananas (concluded by the EC with Colombia, Costa Rica, Venezuela and Nicaragua) were inconsistent with GATT Art. XIII, the fact that this quota allocation is included in the EC's schedule on agricultural products, an integral part of the WTO treaty, constitutes a valid defence against breach of GATT Art. XIII. In the EC's view, the schedule should then, as the more specific commitment, prevail over GATT Art. XIII (Appellate Body report on *EC – Bananas*, paras. 19–21).

[72] *Ibid.*, para. 154.

[73] *Ibid.*, emphasis added. The Marrakesh Protocol to the GATT 1994 is reprinted in WTO Secretariat, *Legal Texts*, 37.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

The Appellate Body found that nothing in the Agreement on Agriculture allows market access concessions on agricultural products to deviate from GATT provisions, *in casu*, GATT Art. XIII.[74] It confirmed that a schedule must be consistent with the GATT itself in *EC – Poultry*, finding that 'the concessions contained in Schedule LXXX pertaining to the tariff-rate quota for frozen poultry must be consistent with Articles I and XIII of the GATT 1994'.[75]

In sum, in the event of conflict between a GATT schedule, on the one hand, and the provisions of GATT 1994, on the other, the provisions of GATT 1994 prevail. Pursuant to paragraph 3 of the Marrakesh Protocol, the same applies in respect of conflict between a GATT schedule, on the one hand, and any treaty provision in Annex 1A to the WTO treaty, that is, any treaty provision on trade in goods binding on all WTO members (such as the Agreement on Agriculture or the SPS agreement), on the other hand. This is supported by the ordinary meaning given to the words 'concessions' or 'commitments' in GATT Art. II and Arts. 3 and 4 of the Agreement on Agriculture.

The Marrakesh Protocol does not apply, however, in respect of conflicts between GATS schedules and provisions of the GATS as such. Here, the remaining reason for giving preference to the provisions in the GATS itself, over and above GATS schedules, is the ordinary meaning to be given to the terms 'concessions' and 'specific commitments' in Parts III and IV of GATS. Even though no conflict clause similar to that in the Marrakesh Protocol is provided for, it would seem inconsistent to let GATS schedules prevail over GATS, whereas GATT schedules must give way to GATT. Note, indeed, that in the *US – Sugar Headnote* case no conflict clause similar to paragraph 3 of the Marrakesh Protocol was available either, but this panel, on the basis of the ordinary meaning of the word 'concessions' in GATT Art. II, still came to the conclusion that GATT schedules must give way to provisions in GATT 1947 itself. On that basis, the priority of treaty provisions over schedules (including GATS schedules) could be said to be part of the 'customary practices followed by CONTRACTING PARTIES to the GATT 1947' by which the WTO

---

[74] Appellate Body report on *EC – Bananas*, paras. 155–8. The Appellate Body thereby overruled the EC argument (at paras. 19–21) that concessions on agricultural products are part of the Agreement on Agriculture and should hence, pursuant to Art. 21 of that Agreement (discussed above), prevail over GATT provisions. In support of the Appellate Body finding, it must be pointed out that Art. 3.1 incorporates agriculture schedules *into GATT 1994*, not into the Agreement on Agriculture as such (which pursuant to Art. 21 prevails over GATT 1994).

[75] Appellate Body report on *EC – Poultry*, para. 99.

Cambridge Books Online © Cambridge University Press, 2009

must be guided (pursuant to Art. XVI.1 of the Marrakesh Agreement). It must be acknowledged, however, that, in the absence of this practice and the words 'concessions' or 'commitments' and, for GATT schedules, the Marrakesh Protocol, strong arguments would have been available to let WTO schedules *prevail* as *lex specialis* over other treaty provisions.[76] Schedules are an integral part of the WTO treaty, accepted as such *by all WTO members*, and address certain trade matters more specifically than other treaty provisions, both in terms of subject matter (e.g., tariff concessions for a particular product) and membership (that is, obligations applying to one WTO member only).[77]

*The Agreement on Agriculture prevails over GATT 1994 and all other Annex 1A agreements*
In the event of conflict between the Agreement on Agriculture, on the one hand, and GATT 1994 or any other Annex 1A agreement, on the other, the Agreement on Agriculture prevails. Art. 21 of the Agreement on Agriculture states: 'The provisions of GATT 1994 and of other Multilateral Trade Agreements in Annex 1A to the WTO Agreement shall apply subject to the provisions of this Agreement.'

*Special or additional rules and procedures on dispute settlement prevail over the DSU*
The special or additional rules and procedures on dispute settlement set out in Appendix 2 to the DSU prevail over the more general rules and procedures in the DSU itself, to the extent of the difference. Article 1.2 of the DSU states:

The rules and procedures of this Understanding shall apply subject to such special or additional rules and procedures on dispute settlement contained in the covered agreements as are identified in Appendix 2 to this Understanding. To the extent that there is a difference between the rules and procedures of this Understanding and the special or additional rules and procedures set forth in Appendix 2, the special or additional rules and procedures in Annex 2 shall prevail.

Article 1.2 also provides for a special procedure in case of 'disputes involving rules and procedures under more than one covered agreement,

---

[76] See the EC argument paraphrased above in note 71. On *lex specialis*, see below, pp. 385–418.
[77] In respect of post-1994 commitments in WTO schedules this *lex specialis* argument would find support also in the *lex posterior* principle.

Cambridge Books Online © Cambridge University Press, 2009

if there is a conflict between special or additional rules and procedures of such agreements under review'; 'where the parties to the dispute cannot agree on rules and procedures within 20 days of the establishment of the panel, the Chairman of the [DSB]..., in consultation with the parties to the dispute, shall determine the rules and procedures to be followed within 10 days after a request by either Member'. In making such decision, 'the Chairman shall be guided by the principle that special or additional rules and procedures should be used where possible, and the rules and procedures set out in this Understanding should be used to the extent necessary to avoid conflict'.

Note that in the first part of Art. 1.2 there is talk of 'difference' (between DSU rules and special or additional rules), whereas in the second part reference is made to 'conflict' (between special or additional rules under different agreements). However, recalling the definition of conflict set out above, both notions ('difference' and 'conflict') should, in this context, be given the same meaning.

### If the SPS agreement applies, the TBT agreement cannot apply

Although not strictly speaking a conflict clause but a rule defining the respective scope of application of two agreements, in case a measure falls under the SPS agreement, the TBT agreement does not apply. Article 1.5 of the TBT agreement provides: 'The provisions of this Agreement do not apply to sanitary and phytosanitary measures as defined in Annex A of the Agreement on the Application of Sanitary and Phytosanitary Measures.'

To put it differently, for those measures that, absent TBT Art. 1.5, would have fallen under both the SPS and the TBT agreements, the SPS agreement 'prevails' (pursuant to Art. 1.5 it is actually the only applicable agreement in the first place). Article 1.4 of the SPS agreement, *ex abundante cautela*, states that: 'Nothing in this Agreement shall affect the rights of Members under the Agreement on Technical Barriers to Trade with respect to measures not within the scope of this Agreement.' Obviously, an agreement (*in casu*, the SPS agreement) cannot affect measures not falling under its scope of application.

Note, however, the exclusive reference in SPS Art. 1.4 to 'rights' of WTO members under the TBT agreement, seemingly implying that the SPS agreement imposes more obligations than the TBT agreement does (the TBT agreement thus retaining more 'rights' to restrict trade). Nonetheless, it goes without saying that the SPS agreement cannot affect the

Cambridge Books Online © Cambridge University Press, 2009

*obligations* under the TBT agreement with respect to measures that do not even fall within the scope of the SPS agreement.

### The DSU 'prevails over' panel and Appellate Body working procedures as well as the Rules of Conduct

Although not related to conflict clauses as such, it may be recalled here that the working procedures of both panels and the Appellate Body must be consistent with the DSU itself. WTO members may deviate from the DSU, including by means of *inter se* agreements that apply to one dispute only (as long as the conditions in Arts. 41/58 of the Vienna Convention, discussed in chapter 6 above, are met). Nonetheless, procedural decisions taken by WTO panels and the Appellate Body, being organs with a limited competence, are invalid if they are inconsistent with their constituent instrument, i.e., the DSU.[78]

The same applies in respect of the Rules of Conduct for the DSU.[79] These rules were adopted by the WTO's Dispute Settlement Body in 1996. Rule II explicitly provides: 'These Rules shall in no way modify the rights and obligations of Members under the DSU nor the rules and procedures therein.' In this sense, the DSU 'prevails' over the Rules of Conduct.

### No conflict clauses for the relationship GATT–GATS–TRIPS

Surprisingly enough, however, the WTO treaty does not include conflict clauses to resolve contradictions between provisions in GATT, GATS or TRIPS. The GATT–GATS overlap is discussed below in the section on '*Lex specialis*'.

The conflict clauses referred to above to resolve internal WTO conflicts can be summarised in the table on the following page.

### Lex posterior

### Preliminaries

Article 30 of the Vienna Convention provides for the following conflict rules in respect of 'Application of successive treaties relating to the same subject-matter':

1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States Parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.

---

[78] See chapter 6 above, pp. 289–90.
[79] Rules of Conduct for the Understanding on Rules and Procedures Governing the Settlement of Disputes, WT/DSB/RC/1, adopted by the DSB on 11 December 1996.

Cambridge Books Online © Cambridge University Press, 2009

*Internal hierarchy as between WTO norms*

| Marrakesh Agreement | | | | |
|---|---|---|---|---|
| Agreement on Agriculture | | | Special and additional rules and procedures on dispute settlement (App. 2 to DSU) | |
| GATT 1994 | GATS | TRIPS | DSU | … |
| Specific Annex 1A agreements on trade in goods | | | Rules of conduct/working procedures of panels and the Appellate Body | |
| SPS agreement | | | | |
| TBT agreement | | | | |
| Member-specific schedules of concessions | | | | |

2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier treaty or later treaty, the provisions of that other treaty prevail.
3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, *the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty*.
4. When the parties to the later treaty do not include all the parties to the earlier one:
   (a) as between States Parties to both treaties the same rule applies as in paragraph 3;
   (b) as between a State Party to both treaties and a State Party to only one of the treaties, *the treaty to which both States are parties governs* their mutual rights and obligations.
5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty, the provisions of which are incompatible with its obligations towards another State under another treaty [emphasis added].

Articles 30(3) and 30(4)(a) are a confirmation in the law of treaties of the adage *lex posterior derogat legi priori*, that is, the contractual freedom of states according to which their latest expression of intent prevails.

Cambridge Books Online © Cambridge University Press, 2009

This principle not only applies in respect of successive treaty norms (as Art. 30 does). As noted before in chapter 3 (pp. 96–7), it applies also in respect of other norms of international law, in particular custom and acts of international organisations. Nonetheless, whereas treaties and acts of international organisations may have a precise date on which they were concluded, it is virtually impossible to pinpoint the precise date on which a general principle of law or custom emerged.

Article 30(4)(b) confirms the *pacta tertiis* rule pursuant to which states can only be held by treaty norms they agreed to.

Resort may be had to Art. 30 only in case Art. 59 – on 'Termination or suspension of the operation of a treaty implied by conclusion of a later treaty' – has *not* led to the termination or suspension of the earlier treaty. Article 30(3) explicitly refers to Art. 59. More generally, as pointed out before, the conflict rules provided in Art. 30 are subject to those set out in earlier sections. To that extent, Art. 30 is of a residual nature only, subject to explicit conflict clauses in either treaty, *jus cogens*, termination or suspension pursuant to Arts. 59 or 60 as well as – crucially – illegality under Arts. 41/58. Article 30 makes explicit caveats for Arts. 41 and 60 as well as Art. 103 of the UN Charter.

The ILC Commentary on Art. 30 further clarified that the ILC wanted to 'avoid the risk of paragraph 4(c) [now Art. 30(4)(b)] being interpreted as sanctioning the conclusion of a treaty incompatible with obligations undertaken towards another State under another treaty'.[80] This reservation is important both for Arts. 41/58 illegality (vis-à-vis third parties not bound by an *inter se* agreement) and conflicts of the AB/AC type discussed below (A being a state with conflicting obligations vis-à-vis B and C).

Article 30(5) specifies further that Art. 30(4) is 'without prejudice . . . to any question of responsibility which may arise for a State from the conclusion or application of a treaty, the provisions of which are incompatible with its obligations towards another State under another treaty'. Note also that special rules applicable in the context of an international organisation may apply. These rules prevail over Art. 30(4)(b) pursuant to Art. 5 of the Vienna Convention.

As a last preliminary remark, it should be recalled that Art. 30 provides for *priority* rules as between specific *provisions* of successive treaties. It does not *invalidate* or *terminate* norms, nor does it give priority to (let alone does it invalidate or terminate) *entire treaties*. Consequently, if

---

[80] Rauschning, *Travaux*, 232; see also 235.

Cambridge Books Online © Cambridge University Press, 2009

under Art. 30 the later treaty provision ceases to exist, the earlier pro-
vision with which it was in conflict will be reactivated. In contrast, if,
under Art. 59, the later treaty is ended, the earlier treaty which was
terminated by the later one does not revive.

We next examine the two conditions for Art. 30 to apply: (i) the treaties
must be 'relating to the same subject-matter'; (ii) the treaties must be
'successive treaties'. Both conditions are set out in the title of Art. 30:
'Application of successive treaties relating to the same subject-matter'.

## The treaties must be 'relating to the same subject-matter'

The conflict rules in Art. 30 apply only in the event that successive
treaties relate to 'the same subject-matter'. This is made clear in the
title of Art. 30 as well as in Art. 30(1).

*If there is conflict, the two treaties necessarily relate to 'the same subject-matter'*
At the Vienna Conference, Sir Ian Sinclair expressed doubts about the
meaning of the phrase 'the same subject-matter': 'Did the United Na-
tions Covenants on Human Rights relate to the same subject-matter as
the European Convention on Human Rights or the ILO and UNESCO
Conventions on certain specific aspects of human rights?'[81]

According to Sinclair, the phrase 'same subject-matter', 'should be con-
strued strictly'.[82] The Expert Consultant agreed, saying 'that those words
should not be held to cover cases where a general treaty impinged in-
directly on the content of a particular provision of an earlier treaty; in
such cases the question involved such principles as *generalia specialibus
non derogat*'.[83]

As noted below, and further elaborated in the section on '*Lex specialis*',
there should, indeed, be room to apply the *lex specialis* principle over and
above the *lex posterior* rule in Art. 30. However, to base this priority rule
on the requirement in Art. 30 that the two treaties must relate to 'the
same subject-matter' is not convincing. To let *lex specialis* prevail over *lex
posterior*, it is better to refer, for example, to the absence of 'successive
treaties' (the second condition for Art. 30 to apply) with reference, in
particular, to the notion of 'continuing treaties' developed below.

Indeed, if there is a genuine conflict between two treaty norms, the
two treaty norms must necessarily deal with the same subject matter.
If not, there would be no conflict in the first place since there would

[81] Meetings of the Committee of the Whole, 165, para. 13.
[82] *Official Records of the Vienna Conference*, vol. 2, 222.    [83] *Ibid*., 253.

Cambridge Books Online © Cambridge University Press, 2009

be no overlap *ratione materiae* (that is, one of the three preconditions for there to be conflict set out in chapter 4). As Vierdag pointed out:

> The requirement that the instruments must relate to the same subject-matter seems to raise extremely difficult problems in theory, but may turn out not to be so very difficult in practice. If an attempted simultaneous application of two rules to one set of facts or actions leads to incompatible results it can be safely assumed that the test of sameness is satisfied.[84]

Does this mean that the words 'relating to the same subject-matter' have no meaning (against the principle of effective treaty interpretation)? No. The words impose a requirement that there be a conflict or incompatibility. They limit the scope of application of Art. 30 to situations of conflict, thereby referring explicitly to one of the three overlaps required for there to be conflict (overlap *ratione personae*, *ratione temporis* and *ratione materiae*). In the two sentences where the phrase 'relating to the same subject-matter' is used, it constitutes the only reference to the existence of conflict or incompatibility as between the two successive treaties: in the title ('Application of successive treaties relating to the same subject-matter'); and in Art. 30(1) ('the rights and obligations of States Parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs'). In subsequent provisions, the phrase is no longer used. Instead, reference is made to 'incompatible' (Arts. 30(2) and 30(5)) and 'compatible' (Art. 30(3)). Hence, the words 'relating to the same subject-matter' are important in that they require the existence of a conflict. That is their ordinary meaning. They do not inject the *lex specialis* principle into Art. 30, nor, *a fortiori*, should they be read as implying an absolute preference for the *lex specialis* principle over and above the *lex posterior* rule.[85]

---

[84] E. W. Vierdag, 'The Time of the "Conclusion" of a Multilateral Treaty' (1989) 60 BYIL 75 at 100. Or, as noted in *Oppenheim's*: 'Article 30 of the Vienna Convention deals with successive treaties relating to "the same subject-matter": it is not clear what limitation this involves, since in a sense if a course of conduct is such as to attract the application of two different treaties they can be said to be related to the same subject matter' (R. Jennings and A. Watts, *Oppenheim's International Law* (London: Longmans, 1992), I, 1212, note 2). See also Philippe Sands, 'Treaty, Custom and the Cross-fertilization of International Law' (1998) / 10 *Yale Human Rights and Development Law Journal* 3 at 8, para. 22 ('Presumably, when two treaty rules do not address the same subject matter, no dispute is likely to arise regarding which prevails').

[85] Some authors nonetheless posit that the *lex posterior* rule in Art. 30 is subject, and must always give way, to the *lex specialis* principle. See Jan Neumann, 'Die Koordination des WTO-Rechts mit anderen völkerrechtlichen Ordnungen – Konflikte des materiellen Rechts und Konkurrenzen der Streitbeilegung', unpublished doctoral

Cambridge Books Online © Cambridge University Press, 2009

Nonetheless, the statements by Sinclair and the Special Rapporteur on the existence of a *lex specialis* principle (made, without objection, at the Vienna Conference itself) remain important elements in support of *lex specialis* being either an element to be looked at in determining the 'current expression of state consent' or a principle of customary international law in its own right. These statements are crucial also as a form of recognition that in certain cases the *lex posterior* principle must, indeed, give way to the *lex specialis* rule (a proposition defended below).

*'Same subject-matter' and the WTO panel on* Indonesia – Autos

Another example of unjustified reliance on the phrase 'relating to the same subject-matter' can be found in the WTO panel report on *Indonesia – Autos*. This panel did not invoke 'same subject-matter' as a ground for applying the *lex specialis* principle, nor did it actually refer to Art. 30. It made reference to 'same subject-matter' in support of a strict definition of conflict.[86] The alleged conflict at issue was one between the Subsidies agreement and the TRIMS agreement (the latter confirming GATT Art. III in respect of certain investment measures). We noted earlier that the panel, in our view incorrectly, only accepted situations of 'mutually exclusive obligations' as situations constituting conflict.[87] To make its definition of conflict even stricter, the two provisions alleged to be in conflict ought, according to the panel, also to 'cover the same type of subject matter'.

Instead of looking at the particular provisions at issue and examining whether, *as invoked in the particular circumstances*, they would have led to conflicting results – i.e., under GATT Art. III/TRIMS the measure is a domestic content requirement in breach of national treatment, whereas under the Subsidies agreement it constitutes a subsidy which developing countries might grant up to the year 2000 – the panel examined 'same type of subject matter' *in the abstract*. On that ground, it refused to consider the situation as one of conflict:

> With respect to the nature of obligations, we consider that, with regard to local content requirements, the SCM Agreement and the TRIMs Agreement are concerned with *different types of obligations and cover different subject matters*. In the

thesis (Münster, 2001), 35 (referring in support to Theodor Schilling, *Rang und Geltung von Normen in gestuften Rechtsordnungen* (Berlin: Nomos, 1994), 455–8); and Rüdiger Wolfrum and Nele Matz, 'The Interplay of the United Nations Convention on the Law of the Sea and the Convention on Biological Diversity' (2000) 4 *Max Planck Yearbook on United Nations Law* 445.

[86] Discussed in chapter 4 above, pp. 193–4.    [87] *Ibid.*

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

case of the SCM Agreement, what is prohibited is the grant of a subsidy contingent on use of domestic goods, not the requirement to use domestic goods as such. In the case of the TRIMs Agreement, what is prohibited are TRIMs in the form of local content requirements, not the grant of an advantage, such as a subsidy.[88]

But, of course, if *the grant* of a subsidy contingent on a domestic content requirement were *permitted* under the Subsidies agreement, would then not also, *a fortiori*, the *domestic content requirement* which is implied in this subsidy be allowed? As a result, would there then not be a conflict between the Subsidies agreement, *explicitly permitting* the grant of the subsidy, and the TRIMS agreement which *prohibits* the domestic content requirement? Obviously, norms that are in conflict are 'different' (if not, there would be no conflict) and may approach a subject matter from a different angle (subsidy contingent on a requirement versus the requirement as such). But this 'difference' between provisions does not mean that there can be no conflict. On the contrary, it is this very difference that leads to the conflict.[89]

In sum, the first condition for Art. 30 to apply – the treaties must relate to 'the same subject-matter' – cannot be used as an abstract criterion on which to base either a *lex specialis* principle that was supposedly injected into Art. 30 or a general decision as to whether there is conflict between two treaties. The requirement of 'same subject-matter' relates rather to whether there is a genuine conflict (i.e., a material overlap) *as between two specific treaty provisions in the particular circumstances of each case*.

## The treaties must be 'successive'

The second condition for Art. 30 to apply – according to the title of Art. 30 itself – is that the treaties must be 'successive treaties', that is, successive in time.

---

[88] Panel report on *Indonesia – Autos*, para. 14.50, emphasis added.

[89] Hence, the three requirements for there to be conflict summed up by the *Indonesia – Autos* panel in footnote 649 of the report are all mistaken or at least erroneously interpreted. The panel stated: 'In international law for a conflict to exist between two treaties, three conditions have to be satisfied. First, the treaties concerned must have the same parties.' This is incorrect since it overlooks conflicts of type AB/AC (A being a state with conflicting obligations vis-à-vis B and C) discussed below. The panel continued: 'Second, the treaties must cover the same substantive subject matter.' Again, the way the panel interpreted this requirement, that is, *in the abstract*, not as a requirement of material overlap depending on the circumstances, was flawed (see this section). The panel then stated: 'Third, the provisions must conflict, in the sense that the provisions must impose mutually exclusive obligations.' We discarded this strict definition of conflict in chapter 4 above.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

*Treaties as instruments with a time-label*

As Rosenne pointed out, the focus of the Vienna Convention is treaties as *instruments*, not *obligations* deriving from treaties. It is 'the instrument in which an international obligation is expressed not the obligation itself'.[90] The Vienna Convention addresses, indeed, issues such as the conclusion and validity *of treaties*, the application and interpretation *of treaties* and the modification, amendment and termination *of treaties*. Article 30, as well, deals with the application of 'successive treaties' and 'an earlier treaty' as opposed to 'a later treaty'. This seems to imply that the timing of treaties under Art. 30 is a question of putting a date on the treaty *as an abstract instrument*, not a question of defining when the treaty imposes a particular obligation as between two given states.

This approach of putting a time-label on treaties as instruments makes sense in case one is faced with a treaty that is clearly concluded in order to amend an earlier one and where the parties to both treaties are exactly the same. One may think here of a 1990 bilateral investment treaty between A and B which is subsequently amended in 2000 by a treaty between A and B; or a 1994 WTO agreement which is subsequently amended in 2000 by a treaty between all WTO members, pursuant to Art. X of the Marrakesh Agreement.

In those instances, the domestic law analogy with 'legislative intent' and 'the legislator' being able to change earlier legislation by later legislation may make sense. In those cases, one is, indeed, faced with one homogenous bloc of states, acting, arguably, as some kind of legislator in a particular field (albeit legislation applicable only as between the parties to the treaty).

*The fiction of 'legislative intent' unfolded*

However, the fiction of later 'legislative intent' overruling earlier 'legislative intent' loses its attraction as soon as the 'same context – same parties' constellation changes. Indeed, even in respect of two AB treaties, it becomes hard to refer to one and the same 'legislature' in case the earlier bilateral treaty was concluded in the context of an MEA and the later one in the context of, for example, the WTO. A state's consent must be seen as one and indivisible, irrespective of who negotiated the treaty, but the reality remains that in the context of an MEA a very different set of people and values are at work than those active in, for example,

---

[90] Shabtai Rosenne, *Breach of Treaty* (Cambridge: Grotius, 1985), 3–4. On that basis, Rosenne distinguishes 'the law of the instrument' from 'the law of the obligation'.

Cambridge Books Online © Cambridge University Press, 2009
https://doi.org/10.1017/CBO9780511494529.009 Published online by Cambridge University Press

the WTO context. Hence, the position of one state in one context may, indeed, be diametrically opposed to that same state's position in another context.[91]

But it is not only the difference in context that may make the analogy with 'legislative intent' unworkable. In many instances – and especially in respect of the great regulatory treaties of modern times, such as certain MEAs, UNCLOS and the WTO – the two treaties will have a different membership. The two treaties are then clearly the result of a *different* 'legislature', i.e., a different composition of states. They will hence be the reflection of a different balance of interests and one state may well have been able to push through its interests more under one treaty than under another. This difference will be accentuated in case a norm in one treaty context is adopted by unanimity and a norm in another treaty context is adopted by majority voting, even as between states that are parties to both treaties. In that case, it may well be that one of the parties accepted the first norm but explicitly voted against adoption of the second norm. Such objection cannot mean that the state in question is not bound by the second norm since it agreed to the majority voting procedure in the first place. But it would make the comparison with one and the same 'legislator' simply changing its mind over time more difficult.

The above considerations highlight the diversity as between different treaties and the difficulty of making a domestic law analogy based on changing 'legislative intent'. Nonetheless, these difficulties must, as a general rule, be accepted as a reality of international law. Adopting a *lex posterior* rule in this context may, indeed, provide a strong incentive for states to streamline their positions across international organisations and irrespective of the membership of particular treaties. States must realise that, in principle, whatever they consent to now prevails over what they agreed on earlier, irrespective of the context in which the obligations were entered into.

Hence, the *lex posterior* rule may be an important instrument that creates some order in the chaos of international law. However, given its

---

[91] The example of the position of some developing countries in respect of genetically modified organisms (GMOs) is telling. In the WTO, they are very much opposed to trade restrictions in respect of GMOs (thus safeguarding trade rights in a WTO trade context). In contrast, during the negotiations of the Cartagena Biosafety Protocol they pleaded very much in favour of granting as much leeway as possible to states wanting to protect themselves against GMO imports (thus safeguarding environmental protection rights in the biosafety, environmental context).

shaky foundation of changing 'legislative intent', it cannot be seen as an absolute rule the way it is regarded, for example, in domestic law for interacting statutes. Exceptions to it must be allowed for in case the analogy with 'latest legislative intent' loses touch with reality.

The ambiguity inherent in any conflict rule of international law based purely on timing was aptly worded by Jenks as follows:

Nor, unhappily, is it always reasonable, in view of the complexity of governmental organization in the modern State and the wide variations in the procedures whereby international obligations are now contracted, to assume, when conflicting networks of obligations have developed simultaneously or almost simultaneously, that the parties concerned knew, or must be deemed to have known, when undertaking an obligation of a specialized character, of the existence of a prior obligation of a similar character which may be inconsistent with it. In these circumstances one of the essential elements in the *lex prior* principle, the principle of good faith [and, one may add, in the *lex posterior* principle, the principle of subsequent legislative intent], ceases to be at issue. The principle may still be a reasonable and convenient one in so far as some rule for resolving the conflict is necessary; and priority of obligation, when it can be determined, is an intelligible criterion which tends to discourage the irresponsible conclusion of new law-making instruments with insufficient regard for their effect on other instruments, but it loses the absolute quality attributed to it when it is thought of as a necessary consequence of the principle of good faith [subsequent legislative intent] and it has to be weighed against, and reconciled with, other principles which may be relevant.[92]

#### *The difficulty of putting a time-label on a treaty as 'instrument'*
The *lex posterior* rule in Art. 30 may not only be put in doubt because of the shaky analogy it makes with changing 'legislative intent'. From a more practical point of view, it will in many cases also be difficult to 'put a time-label' on a treaty.

To begin with, it is generally accepted that the timing of a treaty is determined by the *date of its conclusion or adoption*. In the case of the WTO treaty, for example, this is 15 April 1994. It is *not* the date of entry into force that determines the timing of a treaty under Art. 30. This was made explicit by the Expert Consultant at the Vienna Conference: 'for purposes of determining which of two treaties was the later one, the relevant date should be that of the adoption of the treaty and not that

92 Jenks, 'Conflict', 444–5.

Cambridge Books Online © Cambridge University Press, 2009

of its entry into force. His own understanding of the intentions of the [ILC] confirmed that assumption.'[93]

The fact that the date of conclusion is decisive was explained with reference to the concept of 'legislative intent' elaborated earlier: 'when the second treaty was adopted, there was a new legislative intention; that intention, as expressed in the later instrument, should therefore be taken as intended to prevail over the intention expressed in the earlier instrument. That being so, it was inevitable that the date of the adoption should be the relevant one.'[94] That the date of conclusion counts to define a 'later treaty' under Art. 30 finds support also in Art. 59 where reference is made to 'conclusion of a later treaty' and 'conclude a later treaty'.[95]

Hence, it is not the difficulty of deciding between the date of conclusion, opening for signature, ratification or entry into force that makes it difficult to put a time-label on treaties. What counts is the date of conclusion, *irrespective of the fact that the treaty may have been ratified by, or entered into force for, different parties at different times.*

Utilising the date of conclusion does, indeed, make logical sense when faced with a conflict between two treaties *to which no parties acceded subsequently*: for example, as between a 1990 bilateral investment treaty between A and B and a subsequent 2000 bilateral investment treaty between the same states A and B. The situation is more complicated in the context of treaties to which additional states have acceded. This is the case in respect of all regulatory treaties with a universal calling (such as the WTO treaty, UNCLOS, most MEAs and most human rights treaties) as well as many regional arrangements (such as the EC, ECHR and NAFTA).

---

[93] *Official Records of the Vienna Conference*, vol. 2, 253, para. 39. The Expert Consultant was confirming an earlier statement to that effect by Sir Ian Sinclair, the UK representative: 'the decisive date should be that of the adoption of the treaty; it is based on paragraph 1 of Article 56 [now Art. 59], which referred to the conclusion of a later treaty' (*ibid*., vol. 2, 222). Before the vote on what is now Art. 30 was taken, the Ceylonese delegation once again confirmed this approach as follows: 'the crucial date . . . should be the date when the text of the new treaty had been finally and formally established' (*ibid*., vol. 2, 56, para. 50).

[94] *Ibid*., vol. 2, 253, para. 39.

[95] See note 93 above. Consequently, one of the problems put forward by Sir Ian Sinclair at the Vienna Conference can be easily resolved. The problem was the following: 'Supposing that Convention A was signed in 1964 and came into force in 1966, whereas Convention B was signed and entered into force in 1965, which of them would be earlier?' (*Official Records of the Vienna Conference*, vol. 1, 165). The answer must be: Convention A since A was concluded in 1964 and B only later in 1965.

Cambridge Books Online © Cambridge University Press, 2009

The underlying objective of these treaties is that an increasing number of states accede to them (with or without regional restrictions). When faced with such 'expanding' treaties, it often becomes untenable to stick to the date of original conclusion of the treaty as defining the time at which state consent was expressed. This problem had already been pointed out by Sir Ian Sinclair at the Vienna Conference itself:

supposing a multilateral convention was opened for signature in 1960, State A ratified it in 1961, and the convention entered into force in 1962. Then State A and State B concluded a bilateral treaty on the same subject in 1963 which entered into force in 1964, after which State B acceded to the multilateral convention in 1965. Which of the treaties was the earlier and which was the later? In State A's view, the multilateral convention was the earlier [1960] but in State B's view it was the later [1965].[96]

The fact that the parties to a treaty did not 'conclude' the treaty at the same point in time makes it impossible to put a single time-label on the treaty in question. It necessitates a shift away from the treaty as *abstract instrument* to an assessment of the treaty as source of rights and obligations *resting on particular states*.[97] This fact is, moreover, a death blow to the fiction of each treaty being concluded by one and the same 'legislative intent', expressed at one point in time. This fiction must, in turn, be brought back to a genuine principle of international law, namely the contractual freedom of states. We next examine Art. 30 from this perspective of treaty provisions binding *on particular states* and contractual freedom *as between the two states in question*.

*Treaties as a source of rights and obligations as between particular parties*
Although the crucial date under Art. 30 is the *date of conclusion* of the treaty, Art. 30 can be activated only as between two parties for which the treaty has *entered into force*. If not, there could not be conflict.[98] This obvious importance of entry into force was highlighted by the Expert Consultant as follows:

---

[96] *Ibid.*, vol. 1, 165.
[97] In this respect, Vierdag refers to 'the distinction between abstract norms and concrete rights and obligations . . . "Abstract norms" refers here to treaty rules as such, irrespective of the legal position of signatories or States bound by the rules. "Concrete rights and obligations" refers to the specific position of a particular State with respect to one or more treaties' (Vierdag, 'Conclusion', 94).
[98] But note, however, Art. 18 of the Vienna Convention on 'Obligation not to defeat the object and purpose of a treaty prior to its entry into force'.

Cambridge Books Online © Cambridge University Press, 2009

Another question, however, arose: that of the date at which the rules contained in article 26 [now 30] would have effect for each individual party. In that connexion, the date of entry into force of a treaty for a particular party was relevant for purposes of determining the moment at which that party would be bound by the obligations arising under article 26 [now 30]. The provisions of that article referred to 'States parties'; they therefore applied only when States had become parties to the two treaties.[99]

However, once the treaty has entered into force for the two states in question, i.e., once a conflict may arise, in order to put a time-label on the treaty it is not the date of entry into force that counts – that date may well be different for the parties involved – but the date of conclusion of the treaty.

But this leaves us with the situation referred to by Sinclair – that is, the situation that prompted us to examine Art. 30 in terms of *rights and obligations resting on particular states* – namely: treaty 1 to which state A is an *original member* and state B *acceded* at a later point in time, in conflict with a bilateral treaty 2 that was concluded by A and B *in between these two points of time*. One may think here of a conflict between a WTO rule and a provision in a bilateral treaty concluded in 2000 between two parties, one of which is an *original* WTO member (1994), the other being a state that *acceded* to the WTO only in 2001. For the original (WTO) member (state A) treaty 1 (the WTO treaty) is 'concluded' at the time of the treaty's original conclusion (15 April 1994). Hence, for A treaty 1 is the 'earlier treaty'. In contrast, for the acceding member (state B), treaty 1 (the WTO treaty) is 'concluded' at the time its accession was adopted (*in casu*, 2001).[100] Hence, for B the same treaty 1 is the 'later treaty'. The same situation would arise in case A and B are original WTO members, A concludes and becomes bound by a WTO amendment in 2000, whereas

---

[99] *Official Records of the Vienna Conference*, vol. 2, 253, para. 40. This is not entirely correct since Art. 30(4)(b) also covers situations where a party is bound by only one of the two treaties. See also Sir Ian Sinclair, *The Vienna Convention on the Law of Treaties* (Manchester: Manchester University Press, 2nd edn, 1984), 98.

[100] In the WTO, for example, this would be the date at which the Ministerial Conference approves 'the agreement on the terms of accession' pursuant to Art. XII:2 of the Marrakesh Agreement. Note that such approval can be adopted by a two-thirds majority of WTO members. Hence, here as well, the situation may arise that a WTO member does not agree to another state's accession but nonetheless that state can accede. As a result, earlier treaties between these two parties would, without the consent of the original WTO member, be overruled by the later WTO agreement. Art. XIII of the Marrakesh Agreement allows, however, for existing WTO members to decide not to apply the WTO treaty in their relationship with an acceding state. Moreover, the WTO practice is to approve accession only by consensus.

Cambridge Books Online © Cambridge University Press, 2009

B only does so in 2002, and in 2001 A and B conclude a treaty in conflict with the WTO amendment. For A, the 2001 treaty is the later in time; for B the WTO amendment is the later in time. In those cases, as Vierdag pointed out,

[p]aradoxically, as a result of the *lex posterior* rule laid down in paragraph 3 of Article 30, a treaty [or amendment] to which a State was quick to become a party will be set aside by an incompatible treaty to which it became a party at a later date, perhaps reluctantly. For States that were slow in adhering to a treaty [or amendment] the effect of paragraph 3 will be that this treaty will supersede an incompatible treaty they were quick to enter into at an earlier date.[101]

At this juncture, two approaches are possible. First, in application of Art. 30 one could search for the time of 'convergence of state consent' in respect of the particular treaty provision. Second, one could disapply Art. 30 altogether on the ground that the two treaties are not 'successive'. We next deal with these two alternatives in turn.

### *Look for the 'time of convergence of state consent' in respect of the treaty provision concerned*

*Cases where for one party the treaty is 'earlier in time', for the other it is 'later in time'*  First, one could submit that in circumstances where for one state a treaty is 'earlier' and for the other that same treaty is 'later', one ought to focus, not so much on the timing of the treaty as abstract instrument, but *on the date at which the consent of the two states in question converged*. Hence, instead of focusing on the date of 'legislative intent' underlying the treaty as abstract instrument, one would then focus on the date when the expression of contractual freedom of the particular states in question met. Under this first approach, the hypothetical conflict outlined above between the WTO treaty and a bilateral treaty (concluded *subsequently* in 2000 but *before* the second state acceded to the WTO in 2001) would then be resolved in favour of the WTO rule *since the consent of both parties to the WTO treaty arose subsequently to that underlying the bilateral agreement* (i.e., 2001, date of accession of the second state to the WTO, as opposed to 2000, date of conclusion of the bilateral treaty). In other words, when faced with two parties for which a treaty has different dates, the latest date should be adopted as the date reflecting the time at which both parties' consent around the treaty emerged.

[101] Vierdag, 'Conclusion', 101. He adds that in those cases '[t]he dates of adoption (or opening for signature) or entry into force of a treaty are of limited relevance in this connection, and the relevance of Article 30 is limited accordingly'.

Cambridge Books Online © Cambridge University Press, 2009

In the context of a multilateral treaty in conflict with a bilateral treaty this approach may work. But if one applies it also to a similar type of conflict between *two multilateral* treaties, the solution may be problematic for it becomes difficult to talk of an earlier versus a later convergence of state consent. Take the example of the WTO treaty (1994) in conflict with the Cartagena Biosafety Protocol (1999). States A and B are original WTO members which adopted the Protocol in 1999. State C acceded to the WTO in 2000 after it had adopted the Protocol in 1999. State D acceded to the WTO in 2001 and subsequently adopted the Protocol. In that situation (and making abstraction of any conflict clauses that may be found in the Cartagena Protocol)[102] our first approach offers the following outcome:

- as between states A and B, the *Protocol prevails* as the later treaty;
- as between states A and B, on the one hand, and state C, on the other, the *WTO prevails* as the later treaty;
- as between states A, B and C, on the one hand, and state D, on the other, the *Protocol prevails* as the later treaty.

This differential approach would thus mean that for some states WTO rules prevail, for others the Protocol. Depending on the circumstances – i.e., is the Protocol obligation one of an integral nature? – the WTO rule may be 'illegal' pursuant to Art. 41 of the Vienna Convention as an *inter se* deviation from an integral obligation (see the discussion in chapter 6 above). But if no integral obligations are involved, can this 'balkanisation' of multilateral treaties be tolerated?

As between states that both participated in the conclusion of the two treaties (*in casu*, states A and B), to say that the 'later treaty' prevails as between them – *even if for other states this treaty may not be the later one* – seems to make sense. However, as soon as one of the treaties is the 'later' in time for one party and the 'earlier' in time for another party, the solution offered becomes shaky. Indeed, in terms of state practice, would states A and B (original parties to both the WTO and the Protocol) realise that when they let C accede to the WTO in 2000 *in their relationship with C, WTO rules prevail*; but when they subsequently let D accede to the WTO in 2001 *in their relationship with D, the Protocol prevails*?

*Conflict involving treaties that are reconcluded, amended or regularly revised*
The problem of whether the *lex posterior* rule in Art. 30 still reflects

---

[102] See above, p. 334.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press
Cambridge Books Online © Cambridge University Press, 2009

'the later expression of state consent to prevail over earlier expressions' arises not only in case the treaty has a different date for the two parties involved. It may emerge also in the event of amendments to either treaty where the treaty as amended is 'concluded' once again *in its entirety*. The conclusion of the WTO treaty offers a good example. GATT 1947 was concluded in 1947 and continued to exist up to 1995. In 1994, however, GATT 1947 was incorporated into the WTO agreement (as part of GATT 1994) under whose umbrella also a number of new treaties were put. As a result, when the WTO agreement was concluded on 15 April 1994, also the provisions of GATT 1947 *as incorporated into the WTO agreement* were 'reconcluded'. The Appellate Body confirmed in, for example, *Argentina – Footwear* that all provisions of the WTO agreement 'entered into force … at the same time'.[103] However, as against treaties concluded between 1947 and 1994, did this reconclusion of GATT result in a complete *tabula rasa* in the sense that *whereas before 1994, these other treaties prevailed, as of 1994, it was again GATT that must prevail as the 'later treaty'*?[104]

Vierdag refers to another example of conflict involving 'amended treaties', namely alleged conflict between the Covenant on Civil and Political Rights (1966) and certain International Telecommunications Union Radio Regulations (1982):

the Radio Regulations are subject to regular revisions, and they are adopted and become binding again on member States in the revised form. The regular conclusion of revised Regulations means that in the end the Regulations will always become the later treaty *vis-à-vis* every other treaty that is not likewise regularly revised, such as the Covenant on Civil and Political Rights.[105]

In other words, treaties subject to regular revision, that is, in particular *technical treaties*, would then, through Art. 30, always prevail over

---

[103] Appellate Body report on *Argentina – Footwear*, para. 81: 'the provisions of Article XIX of the GATT 1994 *and* the provisions of the *Agreement on Safeguards* are *all* provisions of one treaty, the *WTO Agreement*. They entered into force as part of that treaty at the same time.'

[104] In contrast, if one were to take the singular *act of conclusion* of a multilateral treaty seriously, it could be argued that GATT 1947 (as incorporated without any change in GATT 1994) remains, pursuant to Article II:4 of the WTO agreement, a 'legally distinct' instrument *concluded* not in 1994, but in 1947. In terms of timing, *GATT would then remain the earlier treaty* vis-à-vis, for example, pre-1994 environmental treaties. At the same time, new WTO agreements (such as the 1994 SPS agreement) would then, however, be *later in time*. Thus, having to make a distinction between GATT and SPS rules demonstrates the sometimes absurd results obtained under the 'guillotine' rule of time of conclusion in respect of 'continuing treaties' (a notion discussed below).

[105] Vierdag, 'Conclusion', 101.

https://doi.org/10.1017/CBO9780511494582.009 Published online by Cambridge University Press
Cambridge Books Online © Cambridge University Press, 2009

treaties not subject to revision (i.e., treaties of a more immutable or regulatory type such as GATT articles). It is highly questionable whether this result is still in line with the 'latest expression of state consent'.

*Conflict between treaties with universal calling and regional treaties*    Another case where the principle of *lex posterior* may lead to an absurd outcome is that of conflict between a regional treaty (say, the ECHR or EC treaties) and a subsequent multilateral treaty with universal calling (say, a UN treaty on human rights or the WTO treaty) binding on all regional partners. Even if, for the two parties involved (say, two member states of the EC), the respective dates of the two treaties are the same (1991 for the Maastricht Treaty and 1994 for the WTO treaty), should *the later multilateral treaty prevail over the earlier regional one*, pursuant to Art. 30(3) providing that '[w]hen all the parties to the earlier [EC] treaty are parties also to the later [WTO] treaty...the earlier [EC] treaty applies only to the extent that its provisions are compatible with those of the later [WTO] treaty'? In the case of conflict between human rights treaties, explicit conflict clauses in either treaty may resolve the conflict. However, no such clauses can be found for conflict between an EC treaty and the WTO treaty. Nor could one invoke, in that instance, the fact that the EC treaty is of an objective or integral nature under Art. 41 so that no deviations from it are allowed. Article 41 applies only in the event of *inter se* modifications to the integral (EC) treaty, *not in case all EC member states have signed up to the later WTO treaty*.

More absurd still, did WTO rules, as between EC member states, prevail over the 1991 Maastricht Treaty simply because they were concluded later in time, and was this situation reversed again in 1997 with the conclusion of the Amsterdam Treaty, once again, simply because that treaty succeeded WTO rules *ratione temporis*?

Under the examples cited above – of conflict between multilateral treaties where a treaty has different dates for each of the parties, has been reconcluded or revised or comes subsequently to a regional treaty – it can be questioned whether Art. 30 still finds application. To use the words of Jenks, could it, in these circumstances, not be said that '[w]hen matters reach this degree of intricacy the *lex prior* [and *lex posterior*] principle ceases to have any rational bearing on the real questions at issue'?[106] Or, in the words of Vierdag: 'Article 30 rests on an assumption that will often appear not to be correct, as it fails to take account

---

[106] Jenks, 'Conflict', 444.

Cambridge Books Online © Cambridge University Press, 2009

of the complication in time of multilateral treaty-making through com-
plex procedures.'[107]

*Disapply Art. 30 – the notion of 'continuing' or 'living' treaties*
This brings us to a second approach. One could submit, indeed, that
in situations where for one state a conflicting treaty is the earlier one,
whereas for the other state it is the later one, it is impossible to define
the treaty as either 'earlier' or 'later' in time as required in Art. 30 (for A
it is 'earlier' and for B it is 'later'). Consequently, the conflict in question
is not one of 'successive treaties'. Hence, Art. 30 does not apply and
one must have resort to other conflict rules (in particular, *lex specialis*
developed in the next section below).

A strong argument in support of this second approach can be made
when faced with a multilateral treaty of what I term a 'continuing'
or 'living' nature. Such multilateral treaty norms are part of a regula-
tory framework or legal system that was created at one point in time
but continues to exist and evolve over a mostly indefinite period. Most
rules of modern multilateral conventions are of this nature, including
EC treaties, WTO rules, UNCLOS and many environmental conventions
and human rights treaties. They are rules part of a framework or system
which is continuously confirmed, implemented, adapted and expanded,
for example, by means of judicial decisions, interpretations, new norms
or the accession of new state parties (for which not only the consent of
the new party is required, but also the reciprocal acceptance of all, or
a majority of, existing parties). Such treaty norms were not only con-
sented to when they originally emerged, but continue to be confirmed,
either directly or indirectly, throughout their existence, in particular
when monitored and evolving within the context of an international or-
ganisation (such as the WTO).[108] It would arguably be inconsistent with
the genuine will of states to 'freeze' this type of rules into the mould

---

[107] Vierdag, 'Conclusion', 98. He explains elsewhere: 'there is an inadequacy and
inconsistency in Article 30 with regard to the time of treaties and the time of rights
and obligations: the occurrence of treaties (legal rules) in time does not necessarily
correspond at all with the actual acquisition of rights and the incidence of
obligations under treaties in force by particular States parties to them. It is one thing
to adopt the text of a multilateral treaty, and to adopt the text of another treaty at a
later moment of time; it is another thing to identify at a given moment the concrete
rights and obligations of two or more States under two or more treaties in force'
(*ibid*., 97).

[108] See, for example, Denys Simon, *L'Interprétation Judiciaire des Traités d'Organisations
Internationales* (Paris: Pedone, 1981), 372: 'l'accord de volontés qui a présidé à la
conclusion de la convention ne s'est pas épuisé dans la rédaction d'un texte;

Cambridge Books Online © Cambridge University Press, 2009

of time at which they were originally created and to label them as an expression of state consent limited to, say, 15 April 1994. This type of treaty norm derives from what I term 'continuing' or 'living' treaties, not reflections of a 'one-shot-end-all' expression of state consent.[109] As a result, when such a treaty norm conflicts with another treaty norm, in particular another continuing treaty norm, the 'guillotine' approach of time of conclusion (the later in time prevailing) may not make sense and may lead to arbitrary solutions.

This theory of 'continuing' or 'living' treaties is a logical consequence also of the obligation to interpret certain treaties in an 'evolutive' manner (discussed in chapter 5 above, pp. 264–8). Evolutive interpretation of a treaty and the difficulty of putting a single time-label on that treaty go hand in hand. Thus, in respect of the WTO treaty, for example, the Appellate Body's evolutive approach to interpreting certain WTO terms could arguably be matched with an acknowledgement that the WTO treaty is a 'continuing' or 'living' treaty in respect of which an application of the *lex posterior* principle in Art. 30 may not always be warranted.

Nonetheless, even 'continuing' or 'living' treaties do have a starting point, even if this starting point is not the beginning and the end of state consent to the treaty. As a result, there may be treaties that were concluded *before the starting point* of a continuing treaty. Consequently, there may still be conflicts involving a continuing treaty where the two treaties are 'successive' and the continuing treaty prevails as *later in time* under Art. 30. For example, the starting point of GATT is 1947, that of new WTO agreements, 1994. Thus, in case of a conflict between a GATT 1947/WTO norm and another norm (*not* of a continuing nature) which clearly predates the GATT 1947/WTO norm (say, a bilateral agreement concluded in, respectively, 1930 or 1980), Art. 30 should still find application given that the two treaties are then, indeed, 'successive' in time.

Especially in the event of conflict between *two* norms of the 'continuing' or 'living' type, it seems difficult to apply Art. 30 (except in case one norm is an explicit amendment of the other in the sense of Art. 40 of

l'application d'une telle convention suppose nécessairement le renouvellement permanent de l'adhésion des Etats membres au contenu de normes juridiques dont l'instrument signé ne constitue qu'une expression solennelle, mais, par essence, éphémère'. See also chapter 5 above, pp. 264–8.

[109] Such 'continuing treaties' are, indeed, 'continuing acts', as referred to in Art. 14(2) of the 2001 Draft Articles on State Responsibility. On this notion, see Joost Pauwelyn, 'The Concept of a "Continuing Violation" of an International Obligation: Selected Problems' (1995) 66 BYIL 415.

 Cambridge Books Online © Cambridge University Press, 2009
Published online by Cambridge University Press

the Vienna Convention).[110] Even if the starting point of one of the two treaties may then predate that of the other, given that the norms are in conflict, at the time of the conflict both exist and 'continue' *at the same time*. Hence, it may be difficult to define the two treaties as 'successive' in time. They are rather 'parallel' in time. If so, Art. 30 cannot be applied and, most probably, the *lex specialis* principle should resolve the conflict.

In sum, the argument made here is that in certain situations, given the complexities of modern treaty-making, it will be difficult to define two conflicting treaties as 'successive in time'. If so, Art. 30 should not find application and resort should be had rather to other conflict rules which more appropriately reflect the principle that 'the current expression of state consent' ought to prevail. Whether and when Art. 30 and the *lex posterior* rule should thus be disapplied will depend on the particular conflict, as well as the norms and states involved. It requires a case-by-case examination.

*Conclusion on the timing of treaties*

The above examination shows that the analogy with 'latest legislative intent' underlying the *lex posterior* rule in Art. 30 may not always be convincing, in particular if the two norms stem from a different context or were created by a different set of states. Nonetheless, as a starting point, the *lex posterior* principle must be accepted in international law as the 'best available solution' that may well create order in the chaos of interplay between norms. The principle is confirmed in the Vienna Convention and is based on an objective criterion (time). Its outcome should, in most cases, be predictable. However, already at this stage it was noted that, given the sometimes shaky analogy with 'latest legislative intent', *lex posterior* in international law cannot be the absolute legal principle which it is in domestic law.

Having set out the two conditions for Art. 30 to apply – 'successive treaties', 'relating to the same subject-matter' – we next assess the substantive solutions offered by Art. 30. Two types of situations must be distinguished: (i) those where all the parties to the earlier treaty are party also to the later one (Art. 30(3)); and (ii) those where *not* all the parties to the earlier treaty are party also to the later one (Art. 30(4)).

---

[110]  Art. 30 should continue to apply in case of amendments to a continuing treaty norm. There as well, there can be no doubt that the two norms are 'successive': the amendment comes later in time than the provision of the continuing treaty which is then no longer confirmed as of the date of the amendment. Hence the amendment must prevail as the later rule in time under Art. 30.

Cambridge Books Online © Cambridge University Press, 2009

## All the parties to the earlier treaty are party also to the later one (Art. 30(3))

Article 30(3) deals with conflicts where '*all the parties* to the earlier treaty are parties also to the later treaty', but where the later treaty was not terminated or suspended pursuant to Art. 59. Two conflict situations are covered by Art. 30(3):

  (i)  conflicts where the parties to the two treaties are *exactly the same* (conflicts of type ABC/ABC);
  (ii) conflicts where the second treaty is binding on all parties to the first treaty, *plus a number of additional states*[111] (conflicts of type ABC/ABCD).

The solution offered in Art. 30(3) is straightforward: 'the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty'. To put it differently, *to the extent of the conflict, the later treaty prevails*. As the ILC noted in its Commentary, this is 'no more than an application of the general principle that a later expression of intention is to be presumed to prevail over an earlier one'.[112] In other words, the *lex posterior* rule in Art. 30(3) is nothing more than a logical consequence of states being their own law-makers, possessing the contractual freedom to 'change their minds': a later expression of consent prevails over an earlier one.

Obviously, in the second type of conflict covered by Art. 30(3) – conflicts of type ABC/ABCD – this solution applies only to the relationship between parties bound by both treaties, that is, as between states A, B and C. As far as the relationship with parties bound only by the later treaty is concerned (*in casu*, state D), the *pacta tertiis* rule expressed in Art. 34 applies: 'a treaty [*in casu*, the earlier treaty ABC] does not create either obligations or rights for a third State [*in casu*, state D] without its consent'.

## *Not* all the parties to the earlier treaty are party also to the later one (Art. 30(4))

In contrast to Art. 30(3), Art. 30(4) covers conflicts where 'the parties to the later treaty do *not* include all the parties to the earlier one'. Three types of conflict fall under Art. 30(4):

---

[111] The ILC Commentary states explicitly that Art. 30(3) applies 'for cases where all the parties to a treaty (*whether without or with additional States*) conclude a later treaty relating to the same subject matter', Rauschning, *Travaux*, 234 (ILC Commentary to Art. 30, para. (9), emphasis added).

[112] Rauschning, *Travaux*, 234, para. (10).

Cambridge Books Online © Cambridge University Press, 2009

   (i)  a later *inter se* agreement deviates from an earlier multilateral
        treaty (conflicts of type ABC/AB) – this is the first type of *inter se*
        agreement referred to in the section on Arts. 41/58 (see chapter 6
        above, p. 305);

  (ii)  a later *inter se* agreement concluded *with a number of third parties*
        deviates from an earlier multilateral treaty (conflicts of type
        ABC/ABD) – this is the second type of *inter se* agreement referred to in
        the section on Arts. 41/58 (see chapter 6 above, p. 305);

 (iii)  a later agreement concluded by *only one of the parties to the earlier treaty*
        conflicts with the obligations of that party under the earlier treaty
        (conflicts of type AB/AC or ABC/AD).

In respect of the first two conflict situations (ABC/AB and ABC/ABD),
resort must be had first to Art. 41. As noted before, the conflict rules
in Art. 41 prevail over those in Art. 30(4) (Art. 30(5) makes this explicit).
Hence, only in the event that the later *inter se* agreement is permissible
under Art. 41 – that is, only if it is a 'legal' agreement – should Art. 30(4)
be applied.[113] If the *inter se* agreement is illegal, it cannot be opposed as
against third parties, nor, as we saw earlier, should it be opposable vis-à-
vis states bound by the *inter se* agreement. As between parties to both the
earlier and the later agreements, Art. 41 thus provides for an exception
to the principle of contractual freedom. If the later *inter se* agreement is
not permissible under Art. 41, it cannot prevail as the latest expression
of state intent *even as between the parties to both treaties*.

If the later *inter se* agreement *is* permissible under Art. 41, the solutions
offered by Art. 30(4) are, once again, straightforward:

   (1)  As between *parties bound by both* the earlier and the later treaty, the
        later treaty prevails to the extent of the conflict.

Art. 30(4)(a) states that in this situation the rules in Art. 30(3) apply.
Hence 'the earlier treaty applies only to the extent that its provisions are
compatible with those of the later treaty'. Or, to put it differently, the
later treaty prevails to the extent of the conflict. Much like Art. 30(3), this
first solution set out in Art. 30(4)(a) is 'no more than an application of the
general principle that a later expression of intention is to be presumed
to prevail over an earlier one'.[114] It finds application only under the

---

[113]  It is interesting to note that at the Vienna Conference France proposed an
       amendment to what is now Art. 30(4)(a). France wanted to add an explicit reference
       to what it called 'restricted multilateral treaties', a notion that comes close to that of
       'integral treaties', in respect of which it wanted to limit the application of the *lex
       posterior* principle. See chapter 6 above, note 78.

[114]  Rauschning, *Travaux*, 234, para. (10).

Cambridge Books Online © Cambridge University Press, 2009

first and second conflict situations set out above, that is, those of the ABC/AB and ABC/ABD types. Only in these instances is there a double overlap *ratione personae* (that is, only there are both A and B bound by the two treaties). In the third conflict situation (of the AB/AC type), only one of the parties is bound by both rules so that Art. 30(4)(a) does not find application.

> (2) As between a *party to both* treaties and a *party to one* of the treaties only (be it the earlier or the later one), 'the treaty to which both States are parties [respectively, the earlier and the later one] governs their mutual rights and obligations' (Art. 30(4)(b)).

In the first conflict situation (of the type ABC/AB), this means that A and B's relationship with C is governed only by the earlier ABC treaty. In the second conflict situation (of the type ABC/ABD), it means that (i) A and B's relationship with C is governed only by the earlier ABC treaty; and (ii) A and B's relationship with D is governed only by the later ABD treaty. In the third conflict situation (of the type AB/AC), the solution offered in Art. 30(4)(b) means that (i) A's relationship with B is governed only by the earlier AB treaty; and (ii) A's relationship with C is governed only by the later AC treaty.

Article 30(4)(b) is, in other words, a simple confirmation of the *pacta tertiis* rule in Art. 34. Indeed, as far as the first and second conflict situations are concerned, *Art. 30(4)(b) does not provide a solution to conflict* since the legal relationships it addresses are free of conflict: in the first situation, the relationship between AB and C; in the second, the relationship between AB and C and that between AB and D.[115]

Nonetheless, Art. 30(4)(b) is crucial as a conflict rule in the third type of conflict (of the type AB/AC). This conflict is one that arises for A which has obligations towards B (under an AB norm) that are contradictory with its obligations towards C (under an AC norm). Crucially, in this event, Art. 30(4)(b), *instead of giving priority to either of the two norms, simply confirms the validity of both of them.*

Recall, however, that in earlier ILC reports (especially that by Lauterpacht), a later treaty (AC) in conflict with an earlier one (AB) was said to be invalid.[116] Article 30(4)(b) does away with this theory. It confirms the

---

[115] As Vierdag noted: 'Paradoxically, [Art. 30(4)(b)], which can be regarded as crucial in terms of the subject-matter of Article 30, does not deal with "application of successive treaties" at all. This provision concerns only one treaty, namely the treaty to which both States are parties, only one of these States being party to two "successive" treaties' (Vierdag, 'Conclusion', 96).

[116] See chapter 6 above, pp. 279–81.

Cambridge Books Online © Cambridge University Press, 2009

validity of both treaties but limits this validity as between the parties to
those treaties. However, the fact that both treaties are hence valid does
not mean that they are necessarily legal under Arts. 41/58. Here again,
the conflict rules in Arts. 41/58 prevail over those in Art. 30(4)(b).

## The situation of treaty norms in conflict with later acts of international organisations

Article 30 applies only in respect of successive *treaty norms*. However, as
we noted above, Art. 30 is essentially but the logical consequence of a
broader principle, namely that 'a later expression of intention is to be
presumed to prevail over an earlier one' (already discussed in chapter 3
above).[117] This general principle applies also in respect of a treaty norm
in conflict with supervening custom. It should apply, moreover, in re-
spect of a treaty norm in conflict with a later act of an international
organisation. A good example is the potential conflict between, on the
one hand, WIPO conventions (setting out positive obligations to pro-
tect intellectual property rights) and, on the other hand, a subsequent
DSB authorisation to suspend concessions under the TRIPS agreement
(granting an explicit exemption not to protect certain intellectual prop-
erty rights). In that event, which of the two norms should prevail, the
earlier WIPO treaty norm or the later act of the DSB, being an organ of
an international organisation other than WIPO?

As the *lex posterior*, the DSB authorisation ought to prevail (at least as
between those states bound by both the relevant WIPO *and* WTO norms).
In chapter 3, we noted that no *a priori* hierarchy exists as between the
sources of international law, including as between treaties and acts of in-
ternational organisations. We pointed out also that the fact that norms
have been created in different contexts (WIPO or the WTO) does not nor-
mally say anything about their hierarchical relationship. Hence, as the
latest expression of state intent, the later DSB authorisation must pre-
vail. That is, of course, only as between states that are both WTO mem-
bers and bound by the relevant WIPO convention, and only to the extent
that the DSB authorisation is legal under both WTO rules (Arts. 41 and
58 of the Vienna Convention and in particular the DSU) and other ap-
plicable international law norms (e.g., Art. 51(1)(b) of the ILC Draft 2000,
precluding countermeasures under obligations for the protection of fun-
damental human rights).[118] We noted earlier that the conflict clause in

---

[117] ILC Commentary on Art. 30, in Rauschning, *Travaux*, 234, para. (10).
[118] See chapter 3 above, p. 107.

Cambridge Books Online © Cambridge University Press, 2009

TRIPS Art. 2.2 does not affect this solution.[119] If the suspension of TRIPS obligations meets these conditions of legality under WTO and other international law norms, the DSB decision authorising this suspension must prevail over the WIPO convention to the extent of the conflict. Of course, the relevant WIPO rule is not thereby rendered illegal. As soon as the DSB authorisation expires, the WIPO rule will be reactivated.

### Lex specialis

In the event that the conflict rules set out earlier do not find application, or are unable to resolve the conflict of norms, resort must be had to the *lex specialis* principle. The principle of *lex specialis* is often referred to by authors, litigators and international tribunals alike. Nonetheless, many have expressed doubts as to the status of this principle under international law. Is it, for example, part of customary law? Any useful discussion of the principle of *lex specialis* must acknowledge, up front, that the principle is referred to in different contexts and may have a different meaning depending on its context. What is of interest to this study is, of course, the principle *lex specialis derogat legi generali*, that is, the principle of *lex specialis* as a rule to resolve a genuine conflict between two norms. Pursuant to this principle, in the event of conflict, the more special norm prevails over the more general norm.

It may not always be easy to determine whether a reference to *lex specialis* is meant to be one to *lex specialis* as a conflict rule. For example, in the *Case Concerning the Gabcíkovo–Nagymaros Project (Hungary v. Slovakia)*, the ICJ confirmed the notion of *lex specialis* as follows:

> it is of cardinal importance that the Court has found that the 1977 Treaty is still in force and consequently governs the relationship between the Parties. That relationship is also determined by the rules of other relevant conventions to which the two States are party, by the rules of general international law and, in this particular case, by the rules of State responsibility; but it is governed, *above all*, by the applicable rules of the 1977 Treaty as a *lex specialis* [emphasis added].[120]

It is unclear from this statement whether the ICJ considered the 1977 treaty as a *lex specialis* simply in terms of more specific law supplementing other law or whether the ICJ intended to go further, implying also that 'above all' means that, in the event of conflict, the 1977 treaty must prevail.

---

[119] See above, pp. 346–7.    [120] ICJ Reports 1997, para. 132.

Cambridge Books Online © Cambridge University Press, 2009

In the following subsections we examine *lex specialis* as a rule to resolve conflict in the applicable law. We then end this section on *lex specialis* with an assessment of certain other functions of the *lex specialis* principle.

It must be recalled, once again, that the conflict rules supplied below are subject to those set out in earlier sections of this chapter and in chapter 6, in particular *jus cogens*, Arts. 41/58 of the Vienna Convention and explicit conflict clauses. The relationship between the *lex posterior* and the *lex specialis* principle is further discussed below.

An interesting example of interplay between (i) the rules on validity of acts of international organisations (*in casu*, UN Security Council resolutions); (ii) an explicit conflict clause (*in casu*, Art. 103 of the UN Charter); (iii) the *lex posterior* principle; and (iv) the *lex specialis* rule, can be found in the *Lockerbie* cases. There, a conflict arose as between the rights of Libya under the 1971 Montreal Convention (i.e., Libya's right to keep and try the two suspects in Libya), on the one hand, and the obligations of Libya under a UN Security Council resolution (i.e., Libya's obligation to surrender the two suspects to the UK and the US), on the other. Libya, claiming that its Montreal Convention *right* ought to prevail, (i) relied on the invalidity of the Security Council resolution, claiming that it was taken in disregard of the UN Charter; (ii) submitted that because this resolution was invalid, Art. 103 did not find application;[121] and (iii) argued that the 1971 Montreal Convention as both *lex specialis* and *lex posterior* ought to prevail over the UN Charter system.[122] In defence, the UK and the US relied on the explicit conflict clause in Art. 103. In their view, any rights that Libya might have had under the Montreal Convention were now superseded by Libya's UN Charter obligations under the Security Council resolution. In its judgment on Provisional Measures, the ICJ seemed to support the UK and US positions, finding (i) that the obligation resting

---

[121] See Libya's Oral Statement, *per* Prof. Suy, public sitting held on 22 October 1997 (posted on the internet at http://www.icj-cij.org/icjwww/idocket): 'La primauté établie par cet article 103 *présuppose* une obligation établie conformément à la Charte. Il présuppose donc, dans la présente espèce, une décision du Conseil de sécurité respectant les limites que la Charte lui impose.'

[122] See Libya's Oral Statement, *per* Prof. David, public sitting held on 17 October 1997 (posted on the internet at http://www.icj-cij.org/icjwww/idocket): 'très naturellement le système de la convention de Montréal apparaît, par rapport au système de la Charte des Nations Unies, à la fois comme une *lex posterior* et comme une *lex specialis*; c'est pour cela aussi que dans les domaines qui relèvent de cette convention, celle-ci doit à priori l'emporter sur les systèmes prévus par la Charte, sauf application de l'article 103' (at para. 4.20).

Cambridge Books Online © Cambridge University Press, 2009

on all UN members to accept and carry out the decisions of the UN Security Council in accordance with Article 25 of the Charter extended *prima facie* to the decision contained in resolution 748 (1992); and (ii) that 'in accordance with Article 103 of the Charter, the obligations of the Parties in that respect prevail over their obligations under any other international agreement, including the Montreal Convention'.[123]

## Why should *lex specialis* prevail, and when is a norm more special than another?

An early reference to *lex specialis* as a conflict rule can be found in the writings of Grotius: 'Parmi les conventions…que l'on préfère ce qui est le plus particulier, et ce qui approche le plus de la chose! Car ce qui est spécial est ordinairement plus efficace que ce qui est général.'[124]

In the same sense, de Vattel stated: 'De deux Loix, ou de deux Conventions, toutes choses d'ailleurs égales, on doit préférer celle qui est la moins générale, & qui approche le plus de l'affaire dont il s'agit. Parce que ce qui est spécial souffre moins d'exceptions que ce qui est général; il est ordonné plus précisément, & il paraît qu'on l'a voulu plus fortement.'[125]

Pufendorf gave the following example in support: 'Une loi défend de paraître en public avec des armes, pendant les jours de fête, une autre Loi ordonne, de sortir en armes pour se rendre à son poste, dès qu'on entendra sonner le tocsin. On sonne le tocsin un jour de fête. Il faut obéir à la dernière Loi, qui forme une exception à la première.'[126]

Based, *inter alia*, on the rather prosaic references to *lex specialis* in the writings of Grotius, de Vattel and Pufendorf, the following two reasons for letting a more specific norm prevail over a more general norm can be given:

   (i) the special norm is the more effective or precise norm, allowing for fewer exceptions (the *lex specialis*, if it prevails, is, indeed, already an exception to the *lex generalis*); and

   (ii) because of this, the special norm reflects most closely, precisely and/or strongly the consent or expression of will of the states in question.

[123] ICJ Reports 1992, para. 42.

[124] Hugo Grotius, *Le Droit de la Guerre et de la Paix* (D. Alland and S. Goyard-Fabre, eds.) (Paris: Presses Universitaires de France, 1999), 413.

[125] Emer de Vattel, *Les Droit des Gens ou Principes de la Loi Naturelle* (Lyons: Gauthier, 1802), 511.

[126] Samuel von Pufendorf, *Droit de la Nation et des Gens*, book V, chapters XII–XXIII (quoted in de Vattel, *Droit des Gens*, 511).

Consequently, much like *lex posterior* – which is based on the view that the 'latest expression of state consent' ought to prevail – the principle of *lex specialis* is but a consequence of the contractual freedom of states, grounded in the idea that the 'most closest, detailed, precise or strongest expression of state consent', as it relates to a particular factual circumstance, ought to prevail. Both Art. 30 and the *lex specialis* principle thus attempt to answer one and the same question, namely: which of the two norms in conflict is the 'current expression of state consent'? Since both *lex posterior* and *lex specialis* derive from the principle of contractual freedom of states, both principles are 'subjective' conflict rules in the sense that it is the intention of the parties that counts, not some formal criterion such as source.

Looked at from this angle, it would be unwise to portray the *lex posterior* and *lex specialis* principles as absolute and self-standing legal norms. They are rather practical methods in the search for the 'current expression of state consent'. They deduce logical consequences from the fact that a norm is later in time or more specific so as to determine the 'current expression of state consent'.[127] In sum, they are more factual/subjective elements in the assessment of contractual freedom and state consent than absolute legal norms in their own right. Thus, if we suggest in this book that Art. 30 may not apply to certain conflicts and the *lex specialis* principle ought to be resorted to instead, this shift from Art. 30 to *lex specialis* is a shift in the methods used to assess one and the same question, namely what is the 'current expression of state consent'? It is not a shift in the underlying legal norm applied to resolve conflict. This norm remains the principle of contractual freedom of states.

Nonetheless, in terms of detecting a *lex posterior* and *lex specialis*, a major difference does persist. In the former case, the decisive element is *time*. In the latter, it is *speciality*. Now, time is generally seen as a criterion to be applied more easily than speciality and, in that sense, it is considered to be more explicit or objective than the sometimes implicit and subjective determination of what is more special. This appearance may, however, be misleading. First, as we saw above,[128] determining the relevant date of a treaty is often *not* as straightforward as noting that, for example, the WTO treaty was concluded on 15 April 1994. Second, a decision on which norm is more special or specific may be easier

---

[127] In that sense they are rather 'principles of legal logic', as we defined them in chapter 3 above, p. 126.
[128] See above, pp. 367–80.

Cambridge Books Online © Cambridge University Press, 2009

than first thought. A norm may be *lex specialis* on one of two grounds: (i) subject matter; or (ii) membership.

Recall, in this respect, Art. 38(1)(a) of the ICJ Statute which refers also to 'international conventions, *whether general or particular*' and the broader discussion in chapter 3 above, where we rephrased international law in terms of general versus particular norms of international law.

### Subject matter

A norm may, first of all, be more special than another one based on its more specific subject matter. Although necessarily dealing with the '*same* subject-matter' – if not, there would be no conflict[129] – one norm may then be *lex specialis* because it addresses the particular subject matter that a general law also addresses more directly or precisely. In that sense, the material scope of one norm can be more precise or limited than another. On that basis, a WTO rule dealing with countermeasures for *breach of WTO obligations* is *lex specialis* as opposed to general international law dealing with countermeasures generally, for *any breach* of international law. Equally, an obligation to do something *in events A to Z* is *less specific* than an obligation not to do this something *in the specific events A and B*. Or a WTO obligation *not* to restrict trade, *irrespective of the product involved*, must be seen as *less specific* than an obligation (or permission) to restrict trade *in the specific products A and B* (which are, for example, labelled as harmful).[130] In that sense, the WTO's SPS agreement, dealing generally with all sanitary and phytosanitary measures, *irrespective of the product or health concern*, could be seen as less specific than, for example, the Cartagena Protocol on Biosafety which addresses certain specific products, such as 'living modified organisms', and deals with a specific health concern, namely risks related to certain genetically modified organisms. NAFTA confirms the specificity of MEA trade provisions as compared to WTO/NAFTA rules when, in its Art. 104, it addresses 'inconsistency between this Agreement and the *specific* trade

---

[129] See chapter 4 above, p. 165, and this chapter, pp. 364–7.

[130] In a recent submission, the European Communities noted that to resolve conflict in the applicable law 'an important consideration could be not so much the application of the lex specialis test but which of the two sets of rules provides for a more specific regulation of the issue under dispute' (*Multilateral Environmental Agreements (MEAS): Implementation of the Doha Development Agenda*, Submission by the European Communities, paragraph 31(i), 21 March 2002, TN/TE/W/1, p. 7). However, the latter is exactly what is understood here as an application of the *lex specialis* principle. It is unclear on what basis the European Communities distinguish these two tests.

Cambridge Books Online © Cambridge University Press, 2009

obligations set out in', *inter alia*, CITES, the Montreal Protocol and the Basel Convention.

*Membership*

A norm may also be more specific than another norm with reference to its membership. By this we do not mean that a treaty with fewer parties generally prevails over a treaty with more parties or that an *inter se* agreement always prevails over an earlier multilateral agreement.[131] Rather, some treaty norms must be seen as *lex specialis* because they deal with the same subject matter as the opposing *lex generalis* does, but in a way that goes further, *either in terms of detail or in terms of the objectives pursued under both treaties*.

As an example one could refer here to the WTO treaty (a treaty with universal calling) as opposed to EC treaties (of a regional nature). Both address trade matters and aim at trade liberalisation. However, the EC treaty does so in more detail and in a way that goes further in terms of trade liberalisation. On that basis, and depending on the particular provisions at issue, it should, therefore, be seen as *lex specialis* as between EC member states.[132] Hence, it should, for example, not be possible for an EC member in its relationship to other EC members to rely on an explicit WTO right (to restrict trade) that contradicts an EC treaty obligation (to free trade), even if the EC treaty is the earlier in time. The same could be said about *multilateral* trade agreements in the WTO (binding on all WTO members) as opposed to WTO *plurilateral* agreements, binding only on some WTO members, and intended to take trade liberalisation a step further. The same applies also in respect of regional human rights conventions (such as the ECHR) as opposed to universal human rights conventions (such as those concluded in the UN). In many respects, the regional human rights treaty will deal with the protection of human rights in more detail and go further in the shared aim of human rights protection. To that extent, these regional conventions ought to be seen as *lex specialis* that prevails over more general norms.[133] Another example

---

[131] See Arts. 41/58 of the Vienna Convention (discussed in chapter 6 above, pp. 304–15) for proof to the contrary.

[132] That is, of course, to the extent EC rules are not *explicitly prohibited* by WTO rules (such as GATT Art. XXIV, discussed in chapter 6 above, pp. 317–18, in which case it must be clear, at least under international law, that WTO rules 'prevail' over EC rules (the latter are then even 'illegal')).

[133] This is the example Sinclair referred to at the Vienna Conference: see above, p. 364. Note also that regional conventions themselves may include explicit conflict clauses to this effect.

 Cambridge Books Online © Cambridge University Press, 2009
Published online by Cambridge University Press

can be found in the preference given by the ICJ to special customary international law binding as between some states only over and above general customary international law which is, in principle, binding on all states.[134]

Now that we have provided some clarifications as to how a *lex specialis* can be identified, in the four subsections below we examine when and to what extent the *lex specialis* principle applies, as a conflict rule, under current international law. We begin with the instance where it applies beyond doubt, namely: treaty provisions contracting out of general international law. We next examine cases where the prominence of *lex specialis* was accepted, but where the decision in favour of the *lex specialis* was made partly (if not largely) because it was at the same time the *lex posterior*. We then assess the 'hard cases' of conflict between provisions in the same treaty (should either of them prevail as *lex specialis*?) and conflict involving a *lex specialis* which is at the same time the *lex prior*.

## Particular international law prevails over general international law

As hinted at in chapter 3 (pp. 155–7), in the event of conflict between, on the one hand, *particular* international law (say, a specific treaty norm or special customary international law) and, on the other hand, *general* international law (general customary international law or general principles of law), particular international law prevails (subject, of course, to *jus cogens*).

### Treaties contracting out of general international law

As we explained earlier (in chapter 4, pp. 212–44), it is perfectly possible for a treaty norm to 'contract out' of general international law. In that event, the conflict between the treaty norm and the norm of general international law must be decided in favour of the treaty norm. It is then the treaty norm which prevails, although the norm of general international law continues to exist. This solution is based on the principle of *lex specialis*. As the Iran–US Claims Tribunal found:

As a *lex specialis* in the relations between the two countries, the Treaty supersedes the *lex generalis*, namely customary international law. This does not mean, however, that the latter is irrelevant in the instant Case. On the contrary, the

---

[134] *Right of Passage* case (*Portugal v. India*), ICJ Reports 1960, 6, quoted below on p. 394.

Cambridge Books Online © Cambridge University Press, 2009

rules of customary law may be useful in order to fill in possible lacunae of the law of the Treaty, to ascertain the meaning of undefined terms in its text or, more generally, to aid interpretation and implementation of its provisions.[135]

This approach of allowing more specific treaty norms to prevail over general international law is explicitly confirmed in both the law of treaties and the 2001 Draft Articles on State Responsibility. Article 5 of the Vienna Convention states that it is 'without prejudice to any relevant rules of [international] organisations'. Moreover, on several occasions, Vienna Convention provisions are explicitly made subject to *lex specialis* that may be set out in particular treaties, using phrases such as 'unless the treaty so (or otherwise) provides' or 'unless it is prohibited by the treaty' (e.g., in Arts. 19(a), 20(1), 28, 29, 30(2), 40(1), etc.). In turn, Art. 55 of the 2001 Draft Articles, entitled '*Lex specialis*', states the following: 'These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law.'

In these instances, the treaty norm is mostly also the *lex posterior*. Even if, for example, the Vienna Convention was concluded only in 1969, it largely codified customary law predating 1969. As a result, there is a double reason to let the treaty norm prevail: it is at the same time *lex posterior* and *lex specialis*.

*Supervening custom in conflict with an earlier treaty*
Nonetheless, as explained in chapter 3 (pp. 137–43), in cases where it is established that the custom is later in time (something that may be difficult to prove), the custom must, in principle, prevail over the earlier treaty norm as *lex posterior unless it can be shown that the treaty norm continues applying as lex specialis*. Hence, in respect of conflict between a treaty norm and supervening custom, one first applies the *lex posterior* rule, which is then subject, however, to the principle of *lex specialis*. In other words, if it can be shown that the treaty norm still exists as particular international law (that is, it was intended to continue to exist as a *lex specialis*), the new general international custom must give way.

An example can be found in the *INA Corp. v. Iran* case, decided by the Iran–US Claims Tribunal, where INA Corp. had filed a compensation claim for the expropriation of certain shareholdings. It invoked the 1955

---

[135] *Amoco Int. Finance Corp. v. Iran* (1987) 15 IRAN–US CTR 189, para. 112.

Cambridge Books Online © Cambridge University Press, 2009

Treaty of Amity concluded between the United States and Iran imposing a compensation standard of prompt, adequate and effective compensation. Iran claimed, however, that this treaty had been superseded by developments in general international law which, in its view, imposed less stringent compensation requirements. The Tribunal held that both norms prescribe the same standard and that, in any case, in the circumstances, the treaty had priority over the custom: 'for the purpose of this case we are in the presence of a *lex specialis*, in the form of the Treaty of Amity, which in principle prevails over general rules'.[136]

Another example is the WTO treaty contracting out of certain general customary international law rules on countermeasures.[137] In this respect, WTO rules prevail over general custom. If, over time, this general custom were to change, however, the general custom as amended would become the *lex posterior* prevailing over the WTO treaty. This would be the case unless it could be shown that the specific WTO treaty rules on countermeasures continue applying as *lex specialis*. It may also occur that the WTO treaty specifically addresses an issue (say, national treatment) which was, at the time of conclusion of the WTO treaty, not regulated in general custom. There is then, at the time of conclusion of the WTO treaty, no conflict or contracting out. However, if such general custom were, nonetheless, to develop subsequently and it conflicts with the earlier WTO rules, this general custom should, in principle, prevail over the earlier WTO treaty as *lex posterior*. But this again is subject to rebuttal in case it can be proven that the specific WTO rules on, say, national treatment continue applying as *lex specialis*.

These two situations of supervening custom in conflict with pre-existing treaty norms – i.e., treaty 'contracting out' of custom which then changes, or treaty regulating a matter dealt with in custom only subsequent to the treaty – must be distinguished from cases where (i) the treaty is silent on a matter (say, in respect of rules on burden of proof), (ii) there is general custom or a general principle of law at the time the treaty is concluded, but (iii) this custom or principle changes subsequently. In those cases, *there is no conflict* since the treaty is silent on the matter and the general custom or principle *as it evolves over time* continues to apply to the treaty pursuant to the process of 'fall-back' on general international law described in chapter 4.

---

[136] Award of 12 August 1985, 8 IRAN–US CTR 373 at 379. This was confirmed in *Phillips v. NIOC and Iran*, Case No. 39, Chamber Two, Award no. 425-39-2, 29 June 1989, para. 107.

[137] See chapter 4 above, pp. 228–36.

 Cambridge Books Online © Cambridge University Press, 2009
Published online by Cambridge University Press

*Treaties and custom as* lex specialis *prevailing over general principles of law*
Earlier, in chapter 3, it was explained also that general principles of law, from an operational perspective, are only a 'secondary source of law'. As noted there, this is based partly on the principle of *lex specialis*. In particular *treaty norms* are most likely to be more specific than general principles of law. The same applies, but to a lesser extent, in respect of custom versus general principles of law. In both cases, the general principle of law is most likely also the *lex prior*. Hence, it will have to give way to, for example, a conflicting treaty norm on the ground of both the *lex specialis* and the *lex posterior* principles. It is most unlikely that a conflict would arise as between an existing treaty norm and a later general principle of law: either the treaty norm will have been terminated or have fallen into desuetude or the general principle will not have developed in the light of a conflicting treaty. Moreover, given the very function of general principles of law (fall-back in case there is no treaty or custom), any conflict between an existing treaty and a general principle of law should, indeed, be decided in favour of the treaty (with the exception of *jus cogens*).

*Special customary law prevailing as* lex specialis *over general customary law*
Finally, based also on the principle of *lex specialis*, we saw earlier that special customary international law (in terms of either subject matter or membership) prevails over general customary international law. This was confirmed in the *Right of Passage* case. There, the ICJ established the right of transit through Indian territory of private persons, civil officials and goods, on the basis of 'a constant and uniform practice' which 'was accepted as law by the Parties'.[138] Portugal had also invoked general international custom as well as general principles of law in support of its claim of a right of passage. The Court did not consider it necessary to examine whether these more general rules lead to the same result as that set out in the special custom. It simply observed: 'Where therefore the Court finds a practice clearly established between two States which was accepted by the Parties as governing the relations between them, the Court must attribute decisive effect to that practice for the purpose of determining their specific rights and obligations. Such a particular practice must prevail over any general rules.'[139]

It should be noted, however, that special custom can only prevail over general custom in case the general custom is not part of *jus cogens*. In

---

[138] ICJ Reports 1960, 40.    [139] *Ibid.*, 44.

Cambridge Books Online © Cambridge University Press, 2009

addition, strong arguments exist in support of making an analogy with Arts. 41/58 of the Vienna Convention.[140] Special custom (much like an *inter se* agreement deviating from an earlier multilateral treaty) should then be allowed to prevail over general custom only in case it does not contract out of an integral obligation, i.e., in case the special custom does not affect third party rights under the general custom.

### Cases where the *lex specialis* prevailed but where it was at the same time *lex posterior*

In the previous subsection, we addressed conflict between particular and general international law, the latter being either general customary international law or general principles of law. In what follows we shall focus mainly on conflict as between *two treaty norms*. Has the principle of *lex specialis* been applied so as to let a special treaty norm prevail over a conflicting, general treaty norm? In most cases where *lex specialis* was referred to as a rule to resolve conflict, the *lex specialis* was, at the same time, the *lex posterior*. Hence, on the ground of that case law it is difficult to conclude that the *lex specialis* principle prevails over the *lex posterior* rule. It is nonetheless useful to refer to some of these cases.

In the *Mavrommatis Palestine Concessions* (Jurisdiction) case, the PCIJ examined the relationship between Great Britain's 1922 Mandate over Palestine and a subsequent 1923 Protocol. The Court held that if there were a conflict between these two agreements (something that turned out not to be the case), the Protocol, being the special and more recent agreement, would prevail over the Mandate:

> It is certain that Protocol XII is an international instrument, quite distinct from and independent of the Mandate for Palestine. It deals specifically and in explicit terms with concessions such as those of M. Mavrommatis, whereas Article 11 of the Mandate deals with them only implicitly. Furthermore it is more recent in date than the Mandate. *All the conditions therefore are fulfilled which might make the clauses of the Protocol overrule those of the Mandate . . . in cases of doubt, the Protocol, being a special and more recent agreement, should prevail* [emphasis added].[141]

In the *Polish Postal Service in Danzig* case, the parties invoked the 1919 Treaty of Versailles and two bilateral treaties concluded between Poland and Danzig, one in 1920, the other in 1921. The PCIJ confirmed the *lex specialis* principle, stating that the more specific bilateral treaty prevails over the more general Treaty of Versailles pursuant to which the

---

[140] See chapter 6 above.    [141] PCIJ, Series A, No. 2, at 30, 31 (1924).

Cambridge Books Online © Cambridge University Press, 2009

bilateral treaty was concluded.[142] In *Jurisdiction of the European Commission of the Danube*, the PCIJ was faced with two legal instruments regulating the regime of the Danube, one general instrument, the 1919 Treaty of Versailles, and another more specific one, the 1923 Statute of the Danube. The Court applied the more specific treaty, which was at the same time the *lex posterior*.[143]

### *Lex specialis* as amongst provisions of the same treaty (or same date)

The widely acclaimed *lex specialis* principle is only really put to the test in case it is not at the same time the *lex posterior*. This may be the case, firstly, if both conflicting norms are set out in the same treaty (or, in the rather exceptional case of two norms deriving from different instruments concluded *at the same point in time*). This is what we examine in this subsection. In the next subsection we examine a second set of 'hard cases', namely where the *lex specialis* is also the *lex prior*. Importantly, whereas in the second type of cases, the *lex specialis* principle enters into conflict with Art. 30's *lex posterior* rule, in the first type of cases we discuss here (norms with the same date) there is no such conflict since Art. 30 does not apply in the first place (it applies only to 'successive treaties').

As far as conflict between treaty norms with the same date is concerned, *Case A/2* of the Iran–United States Claims Tribunal confirmed the *lex specialis* principle. There, the Tribunal examined the relationship between a 1981 Declaration referred to as 'the General Declaration' and another 1981 Declaration, of the same date, referred to as 'the Claims Settlement Declaration'. The Tribunal found as follows: 'if there were any inconsistency, it is a well recognised and universal principle of interpretation that a special provision overrides a general provision . . . Moreover, the terms of the Claims Settlement Declaration are so detailed and so clear that they must necessarily prevail over the purported intentions of the parties, whatever they could have been.'[144]

That the *lex specialis* principle applies as between two instruments of the same date was also confirmed, albeit implicitly, by the ICJ in the

---

[142] PCIJ, Series B, No. 11 (1925).

[143] PCIJ, Series B, No. 14, 24 (1927). For another example, see *Chemin de Fer Zeltweg* (*Austria v. Yugoslavia*) (1934) 3 RIAA 1795, 1803.

[144] *Iran–United States, Case A/2*, (1981) 1 IRAN–US CTR 101, at 104. Note, however, that *lex specialis* as referred to here by the Tribunal is not a rule of *interpretation*, but a rule on *how to resolve conflict* in case treaty interpretation does not do away with an apparent conflict.

Cambridge Books Online © Cambridge University Press, 2009

*Ambatielos* case (Preliminary Objection) where the Court addressed the relationship between a 1926 treaty and an accompanying declaration of the same date. The Court held that the declaration formed an integral part of the treaty so that it had jurisdiction to decide any dispute as to the interpretation or application of the declaration pursuant to Art. 29 of the treaty. More particularly, it found that on that basis it had jurisdiction to decide whether there was a difference between the parties within the meaning of the declaration that must be referred to a Commission of Arbitration. If so, the Commission of Arbitration would decide on the merits of the difference. The Court then noted the following, and this is where the *lex specialis* principle comes into play:

It may be contended that *because a special provision overrides a general provision*, the Declaration should override Article 29 of the Treaty . . . and, as it lays down a special arbitral procedure, it excludes the jurisdiction of the Court under Article 29. While it is true that the Declaration excludes the Court from functioning as the Commission of Arbitration, it is equally true that it lies with the Court to decide precisely whether there should be a reference to a Commission of Arbitration [emphasis added].[145]

Conflict between WTO treaty rules offers another example. The WTO treaty, including its approximately sixty different agreements, understandings and other legal instruments, was concluded as a 'single package' at one point in time.[146] Even GATT 1947 was reconcluded as part of GATT 1994, in turn an integral component of the Marrakesh Agreement. We saw earlier that a number of explicit conflict clauses are provided for in the WTO treaty itself, resolving conflict, for example, as between the Marrakesh Agreement and other multilateral WTO agreements.[147] For those internal WTO conflicts not resolved by explicit conflict clauses, resort must be had to the *lex specialis* principle (knowing that the *lex posterior* principle does not apply to treaty norms of the same date).

Lex specialis *and the General Interpretative Note to Annex 1A*
One of the explicit conflict clauses in the WTO treaty – the General Interpretative Note to Annex 1A – can, indeed, be seen as a confirmation of the *lex specialis* principle. This note prescribes that '[i]n the event of conflict between a provision of the [GATT] and a provision of another agreement in Annex 1A [e.g., the TBT or SPS agreement or the Agriculture or

---

[145] ICJ Reports 1952, 28 at 44.    [146] See above, p. 376.
[147] See above, pp. 355–61.

Cambridge Books Online © Cambridge University Press, 2009

Subsidy agreement] . . . the provision of the other agreement shall prevail to the extent of the conflict'.

The note thereby gives a preference to *the more specific agreement*: GATT can be said to deal with trade in goods generally; the agreements in Annex 1A ('Multilateral Agreements on Trade in Goods') can be considered as dealing with particular issues or sectors of trade in goods (such as sanitary measures or textiles).

Note, however, that the General Interpretative Note gives preference to other Annex 1A agreements *as agreements*, i.e., irrespective of whether the particular provision in those agreements is actually more specific than the conflicting GATT provision. It is, indeed, not precluded that a conflict may arise with an Annex 1A provision that is *less specific* than the contradictory GATT provision. However, even in that case the Annex 1A provision must prevail. Consequently, the General Interpretative Note to Annex 1A does to a large extent confirm the *lex specialis* principle, but in certain circumstances it may contradict this principle.

Moreover, it should be recalled that the General Interpretative Note must not always result in giving preference to the most stringent obligation in terms of trade liberalisation.[148] Other Annex 1A agreements, such as the TBT agreement, may largely be more specific and place additional obligations on WTO members. But this is not *necessarily* so. They may also detract from GATT obligations in that they can provide for explicit rights or permissions to restrict trade, whereas GATT would have prohibited such restrictions. As noted before, the WTO is not the proverbial cyclist who needs to move on (i.e., further liberalise) in order to survive. New WTO rules, such as the other Annex 1A agreements, may not only further liberalise trade, they may also allow for certain instances where trade restrictions are permitted. This is why the following statement by the Appellate Body in *EC – Asbestos* is far too categorical: 'the *TBT Agreement* imposes obligations on Members that seem to be *different* from, and *additional* to, the obligations imposed on Members under the GATT 1994'.

It may be the case that the TBT agreement only adds obligations to those in GATT, but this is not necessarily so. Nothing precludes the TBT agreement from detracting from previous GATT obligations. For example, GATT Art. XX provides for an exhaustive list of justifications, whereas TBT Art. 2.2 refers to *any* 'legitimate objective'. In that event as well, the TBT explicit rights or permissions to restrict trade must, pursuant to the

---

[148] See chapter 4 above, pp. 197–9.

https://doi.org/10.1017/CBO9780511494260.009 Published online by Cambridge University Press
Cambridge Books Online © Cambridge University Press, 2009

conflict clause in the General Interpretative Note to Annex 1A, prevail over GATT obligations to liberalise trade.

*The GATT–GATS overlap: no explicit conflict clause, but* lex specialis *may resolve the conflict*

WTO treaty provisions have the same date and many internal conflicts are resolved by explicit conflict clauses. But what happens in case there is a conflict between two WTO rules and no such treaty-based conflict clause can be found? This may be the case in respect of a GATT rule in conflict with a GATS provision or a GATT/TRIPS or GATS/TRIPS conflict. *In respect of none of these conflicts does the WTO treaty provide for explicit conflict clauses*.[149] Hence, the conflict rules in general international law must be applied and resort may be had, in particular, to the *lex specialis* principle.

Let us take the GATT/GATS conflict as an example. It is the only conflict as between the three WTO pillars (GATT/GATS/TRIPS) that has received attention in WTO jurisprudence.[150]

*GATT and GATS are not 'mutually exclusive'*    The GATT does not include a general provision that defines the material scope of application of the GATT agreement. To find out whether a GATT provision, such as GATT Art. III on national treatment, applies one must focus on the language of that particular provision. Although GATT is generally recognised to apply to trade *in goods* and is listed in Annex 1A entitled 'Multilateral Agreements on Trade *in Goods*', nowhere is the scope of GATT explicitly limited to trade in goods. On the contrary, many GATT provisions seem to have a rather broader scope. GATT Art. III:4, for example, explicitly provides that it applies to 'all laws, regulations and requirements *affecting* [the] internal sale, offering for sale, purchase, transportation, distribution or use [of products]' (emphasis added).

Hence, GATT Art. III, with its broad 'affecting' requirement and reference to 'offering for sale', 'transportation' and 'distribution', does seem to cover also elements of trade in services, in particular in the sectors of wholesale, transportation and distribution services *as long as the services measure has an effect on goods*.

---

[149] See above, p. 361.

[150] On the GATT/GATS overlap see John Gaffney, 'The GATT and the GATS: Should they be Mutually Exclusive Agreements?' (1999) 12 *Leiden Journal of International Law* 135, and, more generally, Werner Zdouc, 'The Triangle of GATT/GATS and TRIPS', in Thomas Cottier, Petros C. Mavroidis and Marion Panizzon (eds.), *Intellectual Property: Trade, Competition, and Sustainable Development: The World Trade Forum*, vol. III (University of Michigan Press, forthcoming).

Cambridge Books Online © Cambridge University Press, 2009

The material scope of GATS, in contrast, is generally defined up front in GATS Art. I. GATS 'applies to measures…affecting trade in services' (GATS Art. I:1). Pursuant to GATS Art. XXVIII(c), such measures

include measures in respect of (i) the purchase, payment or use of a service; (ii) the access to and use of, in connection with the supply of a service, services which are required by those Members to be offered to the public generally; (iii) the presence, including commercial presence, of persons of a Member for the supply of a service in the territory of another Member.

GATS Art. I:2 defines 'trade in services' as the supply of a service in one of four modes (cross-border supply, consumption abroad, commercial presence and movement of natural persons). Hence, although GATS (unlike GATT) does define its general scope of application, it does so in a very broad manner, using, in particular, a rather vague 'effects' criterion ('measures…*affecting* trade in services'), very much like, for example, GATT Art. III.

There is, of course, nothing wrong with broadly defining the scope of an agreement. It means only that many measures may fall under it. But if two equally broadly defined agreements deal with subject matters as closely related as measures 'affecting trade in goods' and measures 'affecting trade in services', the potential for overlap is vast. Indeed, whenever a measure restricts the supply of, for example, foreign distribution *services*, the measure will most likely 'affect' also the trade in the foreign *goods* normally supplied by these foreign distributors. Or, conversely, whenever a measure restricts the importation of particular *goods*, such restriction is very likely to lead also to less demand for, and hence a restriction in, the foreign *services* that may be needed to distribute and sell these imported goods. Where there is potential for overlap, there is, of course, potential for conflict, especially if the two regimes set out a number of substantially different obligations as GATT and GATS do[151] (unlike, for example, the goods versus services regime under the EC treaty).

When they overlap, GATT and GATS rules may simply accumulate (i.e., either confirm or complement each other), but they may also conflict. GATT and GATS may, first of all, set out mutually exclusive obligations (most of conflict situations 1 and 2 referred to in chapter 4

[151] In particular, the national treatment obligation in GATT Art. III applies across the board, whereas national treatment under GATS Art. XVI applies only in service sectors where explicit commitments by the member in question were made.

Cambridge Books Online © Cambridge University Press, 2009

above). But they may also (and more likely) raise conflicts of the obligation versus explicit-right type (conflict situations 3 and 4 set out in chapter 4):

(i) a GATT norm may prohibit something which a GATS norm permits (say, a GATT Art. III prohibition on discriminating periodicals on the ground that they include certain advertising versus no national treatment commitments in the advertising sector under GATS Art. XVII);[152]

(ii) a GATT norm may permit something which a GATS norm prohibits (say, an anti-dumping duty on steel justified under the Anti-Dumping agreement versus the MFN obligation in GATS Art. II in respect of the distribution and wholesale of steel, not providing for exceptions in case of dumping).[153]

If any of these conflict situations arise, in favour of which norm must they be decided? WTO jurisprudence has, first of all, acknowledged the potential for *overlap* between GATT and GATS, thereby rejecting the argument that GATT and GATS are mutually exclusive. In *EC – Bananas* the Appellate Body found as follows:

Given the respective scope of application of the two agreements [GATT and GATS], they may or may not overlap, depending on the nature of the measures at issue. Certain measures could be found to fall exclusively within the scope of the GATT 1994, when they affect trade in goods as goods. Certain measures could be found to fall exclusively within the scope of the GATS, when they affect the supply of services as services. There is yet a third category of measures that could be found to fall within the scope of both the GATT 1994 and the GATS. These are measures that involve a service relating to a particular good or a service supplied in conjunction with a particular good. In all such cases in this third category, the measure in question could be scrutinized under both

---

[152] This was the situation in *Canada – Periodicals*, where the United States had invoked violations of GATT and Canada argued, in defence, that GATT did not apply since the measure was a GATS measure. The panel and the Appellate Body rejected Canada's argument on the rather narrow ground that the measure did fall under GATT, leaving it open as to whether it fell also under GATS. Instead, the panel should have examined whether both agreements applied, and, if so, whether a conflict between the two arose in the particular case. If there was such a conflict, it should then have decided which provision must prevail. This would have been most likely the GATT prohibition as *lex specialis*. See below, pp. 404–5.

[153] The anti-dumping duty on steel from one particular company or country could then be argued to violate the MFN rights of that country in particular service sectors. Indeed, if it can no longer export its steel because of the higher duties, that country's distributors as service suppliers may also be affected and thus be discriminated against in comparison to other foreign distributors whose steel is not subject to anti-dumping duties.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

402    CONFLICT OF NORMS IN PUBLIC INTERNATIONAL LAW

the GATT 1994 and the GATS. However, while the same measure could be scrutinized under both agreements, the specific aspects of that measure examined under each agreement could be different. Under the GATT 1994, the focus is on how the measure affects the goods involved. Under the GATS, the focus is on how the measure affects the supply of the service or the service suppliers involved. Whether a certain measure affecting the supply of a service related to a particular good is scrutinized under the GATT 1994 or the GATS, or both, is a matter that can only be determined on a case-by-case basis.

This conclusion that there are measures (i) falling only under GATT, (ii) falling only under GATS, and (iii) falling under both GATT and GATS, was unavoidable given the broadly defined scope of application of both GATT and GATS, referred to earlier. One could even go as far as saying that it will be difficult to find a measure that falls *only* under GATT or *only* under GATS (that is, measures of type (i) or (ii)), since, as noted above, most goods measures are likely to have some effect also on services, and vice versa.

In any event, it would have been legally unsound to 'interpret' the respective scopes of application of GATT and GATS in such a way as to *exclude* overlaps. If the measure at issue, on the basis of the 'clear meaning' of the two agreements, does, indeed, fall within the scope of both agreements, 'interpretation' cannot change this without effectively changing the content of the agreements.[154] In these circumstances, to 'interpret' the scope of application of one agreement narrowly so as to conclude that only the other applies would, indeed, go against the principle of 'effective treaty interpretation'. We are faced here with a situation, referred to earlier,[155] where 'effective treaty interpretation' works both ways. To find that only GATT applies – because, for example, the measure is 'essentially' a goods measure – would disregard the *effet utile* of GATS. To say that only GATS applies – because, for example, the measure is 'predominantly' a services measure – would disregard the *effet utile* of GATT.

*GATT and GATS may accumulate*   As noted before, in the event of overlap between GATS and GATT, the provisions may, firstly, be *cumulative* in nature (discussed in chapter 4 above, pp. 161–2). This will be the case, for example, when a GATT obligation is simply *confirmed* from another (services) angle by a similar GATS obligation in respect of the same

---

[154] See chapter 5 above, pp. 245–6.    [155] See chapter 5 above, pp. 250–1.

measure. In case a breach is then found under these two obligations, bringing the measure in conformity with GATT will most likely imply also conformity with GATS. In other words, in case of GATT/GATS obligations which essentially confirm each other (albeit from a different perspective), it may not be of much use to find the additional GATS or GATT breach. The panel or Appellate Body could then even not examine the second agreement on the grounds of judicial economy.[156] This was arguably the case in the *EC – Bananas* dispute where the Appellate Body found that the EC import licensing regime for bananas violated MFN and national treatment under both GATT and GATS. This would arguably have been the case also had the Appellate Body confirmed the panel's finding in *Canada – Autos* that Canada's import duty exemption for certain motor vehicles violated the MFN obligation under both GATT and GATS.[157]

However, GATT and GATS may also accumulate in that the obligation under one agreement *adds to or complements* the obligation under the other (without contradiction). In that case, a panel *must* examine both agreements. Bringing the measure into compliance with, for example, GATT will then normally not mean compliance also with GATS.

*GATT and GATS may conflict*    Instead of accumulating – in the sense of either confirming or complementing each other – a GATT/GATS overlap may also constitute conflict, as noted before, especially of the type obligation versus explicit right (conflict situations 3 and 4 in chapter 4). One and the same measure may fall under both GATT and GATS, but the solution offered by each agreement may be different. As noted by the Appellate Body in *Canada – Autos*: 'In cases where the same measure can be scrutinized under *both* the GATT 1994 and the GATS . . . the focus of the inquiry, and the specific aspects of the measure to be scrutinized,

---

[156] To find an additional breach under the other agreement may, indeed, not further 'solve the dispute' since it would, in terms of the implementation required, not have added value (see the criterion for exercise of judicial economy in the Appellate Body report on *Australia – Salmon*).

[157] The Appellate Body reversed the panel's finding of violation under GATS on the ground that the panel had not sufficiently explained why GATS applied in the first place (Appellate Body report on *Canada – Autos*, para. 167: 'The Panel did not show that the measure at issue affects wholesale trade services of motor vehicles, as services, or wholesale trade service suppliers of motor vehicles, *in their capacity as service suppliers*', emphasis in original).

Cambridge Books Online © Cambridge University Press, 2009

under each agreement, will be different because the subjects of the two agreements are different.'[158]

Nonetheless both agreements apply to one and the same measure and may lead to a contradictory result (under one agreement the measure may be permitted, under the other it may be prohibited). If so, they deal with the 'same subject-matter' but differently.

In case of a GATT/GATS conflict, as noted before, 'interpretation' cannot resolve the conflict.[159] To resolve genuine conflict one must choose sides based on conflict rules, not interpretation. In GATT/GATS conflicts as well one must first acknowledge the existence of a conflict and then apply general international law rules on how to resolve conflict.

In *Canada – Periodicals*, for example, the potential for conflict was not even acknowledged. Canada's defence that under GATS it did not have obligations (amounting, allegedly, to an explicit right or permission to impose the measure at issue) was examined only in terms of an argument to interpret GATT in such a way that it would not apply in the first place. Of course, the measure *did* fall within the scope of GATT. But it arguably fell also within the scope of GATS. And if that were the case, there may have been a conflict and the GATS rule may have prevailed so that the GATT provision that must give way did, upon closer examination, *not* apply. If so, this would have been the result *not* of the *wording* of GATT Art. III but of *the conflict with GATS*. This aspect was not examined by the Appellate Body. Instead, it presumed that once a measure falls within the scope of GATT, GATT must necessarily apply irrespective of there being a conflicting GATS provision. Hence, in the view of the Appellate Body, *any GATT/GATS conflict of the type GATT prohibition/GATS explicit right must be decided in favour of GATT*. It noted, indeed, that '[t]he entry into force of the GATS . . . does not diminish the scope of application of the GATT 1994'.

But it gave this general preference to GATT without any textual reference, nor reference to any conflict rule. In the absence of an explicit conflict clause in favour of GATT and given that GATT and GATS are part of the same treaty (so that their date is the same), such *a priori* preference for GATT is not justified. It flows from a general misunderstanding that new WTO rules can only further liberalise trade. The WTO provides for a set of international law norms which may, like any other norms, be adapted or supplemented *either way*: towards further liberalisation or

---

[158] Appellate Body report on *Canada – Autos*, para. 160. See also, but less categorically, its report on *EC – Bananas*, para. 221: 'the specific aspects of [the] measure examined under each agreement could be different'.

[159] See chapter 5 above, pp. 250–1.

Cambridge Books Online © Cambridge University Press, 2009

taking a step backwards, allowing for certain additional instances where trade restrictions may be imposed. Unlike the EC, the WTO's objective is not a 'single world market'.

Lex specialis *may resolve the conflict*  Given that the conflict rules set out in previous sections and in chapter 6 do not resolve GATT/GATS conflicts – there is, for example, no conflict clause and both GATT and GATS have the same date – in order to resolve GATT/GATS conflicts resort must be had to the *lex specialis* principle. The decisive question should then be: which of the two legal provisions covers the factual circumstances more closely and precisely? The detail in the respective GATT/GATS provision will count, but so too will the focus of the measure in question: is it 'essentially' or 'predominantly' a measure regulating goods or services (e.g., in terms of its structure and scope or economic effect)?

Under the examples of potential conflicts given above,[160] such examination should lead to the conclusion that (i) in the example of *Canada – Periodicals*, the GATT provision was the more specific one;[161] and (ii) in the example of anti-dumping duties permitted under GATT but prohibited under GATS, it is the anti-dumping agreement that deals more specifically with the measure at issue so that, there as well, GATT must prevail over GATS.

## Does the *lex specialis* principle prevail over the *lex posterior* principle?

If the *lex specialis* norm is the later in time, should it still prevail? In other words, must the *lex posterior* principle give way to that of *lex specialis*? Some authors answer this question in the affirmative based solely on the adage *generalia specialibus non derogant*.[162] They do not refer to case

---

[160] See above, p. 401.

[161] See, for example, the Appellate Body report on *Canada – Periodicals* (at 17), explaining why the measure at issue (a provision in the Canadian Excise Tax Act) is a 'goods measure': 'First of all, the measure is an excise tax imposed on split-run editions of periodicals. We note that the title to Part V.1 of the Excise Tax Act reads, "TAX ON SPLIT-RUN PERIODICALS", not "tax on advertising"…Secondly, a periodical is a good comprised of two components: editorial content and advertising content. Both components can be viewed as having services attributes, but they combine to form a physical product – the periodical itself.'

[162] See, for example, Hans Aufricht, 'Supersession of Treaties in International Law' (1952) 37 *Cornell Law Quarterly* 655 at 698: 'if the scope of the later treaty provisions is broader than that of the earlier ones the maxim *lex posterior generalis non derogat priori specialis* applies'. See also Neumann, 'Die Koordination', 35 (referring in support to Schilling, *Rang*, 455–8) and Wolfrum and Matz, 'Interplay', 445–80.

Cambridge Books Online © Cambridge University Press, 2009

law nor, more importantly, do they explain on what legal basis Art. 30 of the Vienna Convention can be set aside.

Earlier, we set out the difficulties that may arise in applying the *lex posterior* rule in Art. 30,[163] especially when it comes to multilateral treaties to which states may accede, which may be amended or regularly 'reconcluded'. In that respect, we noted also that it is difficult to identify many of today's regulatory treaties with one particular moment in time. These treaties could be seen rather as 'continuing treaties', to which the state parties regularly and on a continuous basis reaffirm their consent. In those 'hard cases' it may no longer be consonant with the intent of the parties in question to define either treaty as earlier or later. Looked at from the angle of the underlying rationale of Art. 30 (that is, preference must be given to the latest expression of state consent), it could then be concluded, on a case-by-case basis, that Art. 30 should not apply.

But, apart from the fact that Art. 30's objective would no longer be met, how can one legally justify this setting aside of Art. 30? There seem to be two ways.

First, as hinted at earlier, in those 'hard cases' one could conclude that there are no 'successive treaties' and hence decide that Art. 30 does *not* apply in the first place. One could then simply apply the *lex specialis* principle, even if from certain points of view the *lex specialis* is the earlier norm. There would then be no conflict between the *lex posterior* and the *lex specialis* rule since the former does not apply. The *lex specialis* principle would then offer the solution, either as a self-standing principle of customary law or a general principle of law, or as a particularly useful method to detect the 'current expression of state consent'. That Art. 30 of the Vienna Convention left room for application of the *lex specialis* principle, even if the more specific norm was the earlier in time, was confirmed in the *travaux préparatoires* of Art. 30, discussed above (p. 364) The 'residual nature' of Art. 30 is confirmed also in Art. 30(2) and the ILC Commentary, although the focus of those is on *explicit* conflict clauses.[164]

Second, it could be submitted that the adage *generalia specialibus non derogat* is part of customary international law or a general principle of law, pursuant to which the more specific law must *always* prevail over the more general law *even if the more general law is later in time*. Note that this would go a step further than claiming that customary law or general principles of law prescribe that a special law prevails over a more general

---

[163] See above, pp. 367–81.    [164] See above, p. 363.

Cambridge Books Online © Cambridge University Press, 2009

one. It would go as far as saying that even if the *lex posterior* principle in Art. 30 would apply and favour the later, more general law, the earlier *lex specialis* nonetheless prevails.[165] Paragraph 8 of the preamble to the Vienna Convention includes a safeguards clause in which it is affirmed 'that the rules of customary international law will continue to govern questions not regulated by the provisions of the present Convention'. But is not the question of successive treaties regulated in Art. 30 *without* mentioning the *lex specialis* principle so that if a norm is, indeed, later in time it prevails *even if the other norm is more special*? Or could it be said that the *lex specialis* principle continued to exist as custom (or a general principle of law) alongside the *lex posterior* rule and that, in the event of conflict between the two, the Vienna Convention does not 'govern the question' so that resort must be had to another custom (or general principle of law) – namely, *generalia specialibus non derogat* – to resolve that conflict? Some support for the latter proposition may be found in the *travaux préparatoires* of Art. 30,[166] but, as noted earlier, it is very difficult to find state practice or case law that supports the adage *generalia specialibus non derogat*. Hence, its value as a custom can be questioned.

The first of these two grounds for letting the *lex specialis* prevail – i.e., in certain circumstances Art. 30 does not apply in the first place – is the most convincing one. It is also the one that would protect legal security and predictability the most. An established *lex specialis* ought then to prevail over another norm, alleged to be *lex posterior*, only in case it is impossible or would be absurd to put one single or definite time-label on either of the two norms: that is, in the event that the two treaties in question, as between the states concerned, cannot be seen as 'successive' so that Art. 30 does not apply in the first place. Such examination must be made on a case-by-case basis, so that sometimes the *lex posterior* principle will prevail, other times, that of *lex specialis*.

As noted already, the second ground – based on the adage *generalia specialibus non derogant* being part of customary law or a general principle of law – is difficult to establish: if support can be found in state practice that a special law prevails over a more general one, it is hard to find instances where states acknowledged that a treaty which is clearly later in time must give way to an earlier one on the ground that the

---

[165] As is argued by the authors referred to in note 162 above.
[166] In support see the statements made by Sinclair and the Expert Consultant at the Vienna Conference, referred to in notes 81–3 above.

Cambridge Books Online © Cambridge University Press, 2009

earlier treaty is more special. Moreover, under this second ground the *lex specialis* would *always* prevail over the other norm, even if it is perfectly possible (and would make logical sense) to determine their respective dates of conclusion. This would grant the *lex specialis* principle an absolute higher legal standing than the *lex posterior* rule and this *even though only the latter was codified in the Vienna Convention*. The absence of the *lex specialis* principle in the Vienna Convention must be given meaning and makes it very difficult, if not impossible, to justify the position that a *lex specialis* must *always* prevail over another norm validly identified under Art. 30 as the *lex posterior*.

In sum, the *lex posterior* rule in Art. 30 is and should remain the rule of first resort. It is for the party making the claim to prove that, although it could be said that one of the norms is, from certain viewpoints, later in time, this norm should nonetheless give way, essentially because Art. 30 does not apply. To give wider credence to the *lex specialis* principle (without further codification) would threaten legal security and predictability in the field of conflict of norms.

This being said, our examination above does attribute great importance to the *lex specialis* rule in case, for example, 'continuing treaties' are involved. In a number of cases involving multilateral treaties it will, indeed, be difficult to apply Art. 30 since there are no 'successive treaties' so that the conflict must be decided in favour of the more specific norm. This seems to be what the ICJ did in one of the few cases where an allegedly 'later norm' (environmental conventions) had to give way to a seemingly 'earlier', more specific norm (law on the use of force). Given the 'continuing' nature of the norms involved, it would have been difficult to put a single time-label on either of these norms and to define one of them as the 'later in time'. In respect of environmental norms that would allegedly be violated by the use of nuclear weapons, the Court did 'not consider that the treaties in question could have intended to deprive a State of the exercise of its right of self-defence under international law because of its obligations to protect the environment. Nonetheless, States must take environmental considerations into account when assessing what is necessary and proportionate in the pursuit of legitimate military objectives.'[167]

Here, we have an example of an earlier *lex specialis* (law on self-defence and armed conflict) contradicting a later, more general norm (environmental rules). In this instance, there is, indeed, a conflict since nowhere

---

[167] Advisory Opinion on *Threat or Use of Nuclear Weapons*, ICJ Reports 1996, para. 30.

Cambridge Books Online © Cambridge University Press, 2009

does the environmental norm itself provide for an exception in armed conflict. Given the special character of the law on self-defence and armed conflict, it is this *lex specialis* that prevails. Nonetheless, this *lex specialis* (necessity and proportionality of use of force) must be *interpreted* with reference to the *lex generalis* (environmental norms).[168] The ICJ did not explicitly acknowledge conflict but did apply only the law on self-defence and armed conflict.

## Conclusion on the principle of *lex specialis* as a conflict rule

In sum, the principle that the more specific norm prevails over the more general one must be accepted as a solution to conflict where none of the other conflict rules set out earlier applies and in case:

  (i)   the *lex specialis* is contracting out of general international law (hence Art. 30 on conflict between *treaty norms* does not apply);

 (ii)   the *lex specialis* is, at the same time, the *lex posterior* (hence, in the event of conflict between treaties, the principle *confirms* the result reached under Art. 30);

(iii)   both treaty norms in question have the same date, e.g. because they are set out in one and the same treaty (hence Art. 30 on *successive* treaties does not apply); or

(iv)   given, for example, the 'continuing' or 'living' nature of the treaties involved, the two conflicting treaties cannot be said to be 'successive' in time (hence Art. 30 on *successive* treaties does not apply).

However, in the event that Art. 30 on 'successive treaties' does apply, the fact that the earlier norm is *lex specialis* should not prevent the later *lex generalis* from prevailing.[169]

Thus, the *lex specialis* principle as conflict rule is both limited and broad. It is limited in the sense that it cannot, in my view, overrule the *lex posterior* principle in Art. 30. It is broad to the extent that it will, nonetheless, be the decisive criterion in many cases (especially where Art. 30 does not apply).

---

[168] *Ibid.*: 'Respect for the environment is one of the elements that go to assessing whether an action is in conformity with the principles of necessity and proportionality.'

[169] This is the conclusion reached also in Nguyen Quoc Dinh, P. Daillier and A. Pellet, *Droit International Public* (1999) Montreal: Wilson & Lafleur, para. 173, at 270: 'Si par contre le traité restreint est antérieur, et dans le silence du traité postérieur, le principe *lex posterior* l'emporte sur le principe *in toto jure* ... [that is, *lex specialis*] (superiorité du traité postérieur), conformément à la volonté implicite des Etats.'

Cambridge Books Online © Cambridge University Press, 2009

*Lex specialis* in forms other than as a rule to resolve conflict

Above, we examined the content and consequences of the *lex specialis* principle as a rule to resolve conflict in the applicable law. Nonetheless, *lex specialis* is often also referred to in different contexts, not involving conflict.

In those other cases, *lex specialis* is invoked as the more specific norm which supplements the more general one without contradiction. The *lex specialis* and the *lex generalis* then simply accumulate. This is often the case, for example, in respect of treaty or custom supplementing general principles of law (discussed in chapter 3). One could refer also to more specific treaties supplementing so-called framework treaties or *traités-cadres*, without conflict between the two.

A *lex specialis* supplementing a *lex generalis* must always be interpreted in the light of the *lex generalis*, and vice versa.[170] This interpretation may result in an apparent conflict being 'interpreted away' (discussed in chapter 5). For example, in its Advisory Opinion on *Threat or Use of Nuclear Weapons*, the ICJ, invoking elements of *lex specialis*, found that 'the most directly relevant applicable law ... is that relating to the use of force enshrined in the United Nations Charter and the law applicable in armed conflict which regulates the conduct of hostilities, together with any specific treaties on nuclear weapons the Court might determine to be relevant'.[171] The Court considered that the right not to be arbitrarily deprived of one's life – guaranteed in Art. 6 of the International Covenant on Civil and Political Rights (in this case, the *lex generalis*) – applies also in hostilities. It noted, nonetheless, that '[t]he test of what is an arbitrary deprivation of life ... then falls to be determined by the applicable *lex specialis*, namely, the law applicable in armed conflict'.

This is an instance where *lex specialis* is used to *interpret* the terms of another, more general norm (*in casu*, the words 'arbitrarily deprived'). It does not conflict with nor, *a fortiori*, overrule the other norm. Thus, in this case both the *lex specialis* and the *lex generalis* could be applied side by side, the *lex specialis* playing the greater role of the two.

In the first two subsections below we focus on two specific arguments based on *lex specialis* (other than *lex specialis* as a conflict rule): first, *lex specialis* as an argument for an adjudicator to examine a more specific norm *before* he or she examines a more general norm; second, *lex specialis*

---

[170] This is the case even if the *lex specialis* contracts out of the *lex generalis*. See chapter 4 above.

[171] ICJ Reports 1996, para. 34.

Cambridge Books Online © Cambridge University Press, 2009

as an argument for an adjudicator to examine and apply *only* the more specific norm. The first argument is correct, the second one is difficult to sustain. Thereafter, we examine the use made of *lex specialis* as a rule of treaty interpretation, although there it largely coincides with the principle of effectiveness. In a last subsection we examine *lex specialis* elements that are at play in the principle of speciality that applies to the powers of international organisations.

Lex specialis *as a reason to examine the more specific norm first*
In the WTO context, *lex specialis* has been referred to on several occasions as a reason to *examine* the most specific WTO agreement *first*. Under this approach, a WTO panel should normally start its examination by assessing those claims under the WTO agreement or provision that is established as *lex specialis*. As the Appellate Body noted in *EC – Bananas*, after finding that both the GATT and the Licensing Agreement applied to the measure at issue: 'the Panel, in our view, should have applied the *Licensing Agreement* first, since this agreement deals specifically, and in detail, with the administration of import licensing procedures'.[172]

In *EC – Hormones* too, where claims of violation under both GATT and the SPS agreement were made, Canada argued that 'the SPS Agreement is the *lex specialis* for a review of sanitary measures and should, therefore, be addressed first'.[173] The panel followed this suggestion by first examining the complainants' SPS claims, *inter alia*, on the ground that '[t]he SPS Agreement specifically addresses the type of measure in dispute'.[174] In *Argentina – Footwear* as well, the Appellate Body, when faced with Arts. II:1(a) and II:1(b) of GATT, noted: 'Paragraph (b) prohibits a specific kind of practice that will always be inconsistent with paragraph (a)...Because the language of Article II:1(b), first sentence, is more specific and germane to the case at hand, our interpretative analysis begins with, and focuses on, that provision.'[175]

In *US – Shrimp*, the Appellate Body stressed that under GATT Art. XX a panel must first examine 'the specific exemptions provided for in Article XX' and only thereafter assess whether also the standards in the *chapeau*

---

[172] Appellate Body report on *EC – Bananas*, para. 204. For an example where the Appellate Body itself failed first to examine the most specific agreement (*in casu*, the TBT agreement) without apparent justification (other than a statement that it felt insecure about making findings under the TBT agreement for the very first time), see *EC – Asbestos* (discussed in Pauwelyn, 'Cross-agreement').

[173] Panel report on *EC – Hormones* (Canadian complaint), para. 8.37.

[174] *Ibid*., para. 8.45.

[175] Appellate Body report on *Argentina – Footwear*, para. 45.

Cambridge Books Online © Cambridge University Press, 2009
https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

of Art. XX are met, standards that are 'necessarily broad in scope and reach'.[176]

Lex specialis *as a reason to examine only the more specific norm*
However, in a situation where *lex specialis* supplements the *lex generalis* (without conflict), to say that the *lex specialis* must be examined first does not amount to saying that the *lex generalis* no longer applies. Both norms apply and it makes logical sense to examine first the *lex specialis*. But nothing precludes that the *lex generalis* is still relevant and adds certain rights or obligations. Moroever, in case there is conflict between the two, the fact that a norm is *lex specialis* is not a guarantee that it will prevail. As pointed out earlier, the *lex specialis* may, for example, be the earlier in time that must, pursuant to Art. 30, give way to a later *lex generalis*.

The erroneous position that a *lex specialis* necessarily disapplies and eclipses the *lex generalis* has nonetheless been adopted by a number of states in recent disputes. In the WTO context, for example, Indonesia (in *Indonesia – Autos*)[177] submitted that GATT and the Subsidies agreement are mutually exclusive and that, as soon as the Subsidies agreement applies (the Subsidies agreement being *lex specialis*), GATT (as *lex generalis*) no longer applies. The argument was rejected by the panel. Indeed, assuming that agreements like the TBT or Subsidies agreements are *lex specialis* as opposed to the GATT, this does not mean that a given measure, once found to be subject to the TBT or Subsidies agreement, no longer falls under the GATT. To the contrary, both agreements continue to apply and, in the event of conflict, this conflict must be solved by the conflict rules set out above (such as the General Interpretative Note to Annex 1A).

In *Argentina – Safeguards*, the Appellate Body explicitly confirmed that a *lex specialis* does not vacate or subsume a *lex generalis*. The case involved the relationship between GATT Art. XIX and the more specific Safeguards agreement. The Appellate Body found as follows: 'We see nothing . . . that suggests an intention by the Uruguay Round negotiators to *subsume* the requirements of Article XIX of the GATT 1994 within the

---

[176] Appellate Body report on *US – Shrimp*, para. 120. See, in contrast, and against its normal line of reasoning first to examine the *lex specialis*, the Appellate Body finding in *EC – Hormones*, at para. 250: 'We are, of course, surprised by the fact that the Panel did not begin its analysis of this whole case by focusing on Article 2 that is captioned "Basic Rights and Obligations", an approach that appears logically attractive.'

[177] Panel report on *Indonesia – Autos*, paras. 5.129 ff.

Cambridge Books Online © Cambridge University Press, 2009

*Agreement of Safeguards* and thus to render those requirements no longer applicable.'[178]

A similar submission to that made by Indonesia in *Indonesia – Autos* was made by Japan in the *Southern Bluefin Tuna* case.[179] There, Japan argued as follows: 'In accordance with generally accepted principles, the provisions of a *lex specialis* not only specify and implement the principles of an anterior framework agreement; they exhaust and supplant those principles as long as the implementing agreement remains in force.'[180] In response, New Zealand and Australia argued the following:

The contention that the 1993 Convention [allegedly a *lex specialis*] 'covers' and thus eclipses the obligations in respect of . . . UNCLOS [allegedly the *lex generalis*] is wrong in fact, and the principle of 'coverage' is unknown to international law. The array of modern standards of international law has been achieved by a process of accretion and cumulation, not by erosion and reduction. Only where there is actual inconsistency between two treaties do questions of exclusion arise.[181]

The arbitrators sided with New Zealand and Australia, rejecting the Japanese argument that *lex specialis* eclipses *lex generalis* on the following grounds:

[I]t is a commonplace of international law and State practice for more than one treaty to bear upon a particular dispute . . . [T]here is frequently a parallelism of treaties, both in their substantive content and in their provisions for settlement of disputes arising thereunder. The current range of international legal obligations benefits from a process of accretion and cumulation; in the practice of States, the conclusion of an implementing convention does not necessarily vacate the obligations imposed by the framework convention.[182]

This generally confirmed refusal to regard *lex specialis* as 'eclipsing' *lex generalis* is an element in support also of the thesis defended across this work, namely that WTO law (as a *lex specialis*) must be applied in the context of public international law more generally. WTO law does not 'eclipse' that other law.[183]

---

[178] Appellate Body report on *Argentina – Safeguards*, para. 83. Recall that in this situation the Safeguards agreement explicitly refers back to GATT Art. XIX, so that there is no conflict between the two (see chapter 4 above, pp. 163–4).

[179] *Australia and New Zealand v. Japan*, Award of 4 August 2000, posted on the internet at www.worldbank.org/icsid/bluefintuna/main.htm.

[180] *Ibid*., para. 38, point (c).      [181] *Ibid*., para. 41, point (g).

[182] *Ibid*., para. 52.      [183] See chapter 2 above.

 Cambridge Books Online © Cambridge University Press, 2009

Lex specialis *as a rule of treaty interpretation*

*Lex specialis* considerations may play a role also when interpreting different treaty provisions. Nonetheless, when limiting treaty interpretation to its true sense, that is, giving meaning to terms in a treaty pursuant to Arts. 31 and 32 of the Vienna Convention, *lex specialis* offers little help. At best, it coincides with the principle of effectiveness. For example, if one treaty norm states that it is an exception to another norm, i.e., that it is a specific carve-out from this other norm, this first treaty norm or *lex specialis* must be given effect and 'prevail' over the general rule (the way GATT Art. XX 'prevails' over GATT Art. III in respect of measures 'necessary to protect human health').[184] In that case, as we saw earlier,[185] there is, however, no conflict of norms, since one norm explicitly delimits the scope of application of the other and in one given circumstance only one of two norms finds application (either the general rule or the exception, if the conditions for the latter are met). Based on the presumption against conflict and applying the conflict-avoidance techniques set out earlier, *lex specialis* may also be resorted to so as to give full effect to more special treaty provisions, notwithstanding other, more general ones.[186] Nonetheless, in the event that a genuine conflict arises between these two norms, the conflict rules set out earlier must apply and *lex specialis as a rule of treaty interpretation* cannot resolve the conflict. As pointed out above, the principle of effectiveness can then work both ways.[187] To give too much effect to the *lex specialis* risks reducing the *lex generalis* to a

---

[184] In the same sense, see the PCIJ *Case Concerning the Payment of Various Serbian Loans Issued in France*, PCIJ, Series A, Nos. 20/21, 30 (1929): 'The coupons in each of these issues either provide for payment in gold . . . or carry the words " . . . % *Gold loan*" . . . It is argued that there is ambiguity because in other parts of the bonds, respectively, and in the documents preceding the several issues, mention is made of francs without specification of gold. As to this, it is sufficient to say that the mention of francs generally cannot be considered as detracting from the force of the specific provision for gold francs. The special words, according to elementary principles of interpretation, control the general expressions. The bond must be taken as a whole, and it cannot be so taken if the stipulation as to gold francs is disregarded.'

[185] See chapter 4 above, pp. 162–3.

[186] In this sense, see Peter Maxwell, *The Interpretation of Statutes* (Helsinki: Finnish Lawyers' Publishing Company, 1946), 183: 'where general words in a later Act are capable of reasonable and sensible application without extending them to subjects specially dealt with by earlier legislation . . . that earlier and special legislation is not to be held indirectly repealed, altered or derogated from merely by force of such general words, without any indication of a particular intention to do so'. Nonetheless, if a genuine conflict arises, the later more general act will *not* be 'capable of reasonable and sensible application without extending them to subjects specially dealt with' in the earlier act. At that point, conflict rules must be applied, not rules of interpretation.

[187] See chapter 5 above, pp. 250–1.

Cambridge Books Online © Cambridge University Press, 2009

nullity. In contrast, to focus too much on the *lex generalis* risks not giving the intended effect to the *lex specialis*. The PCIJ case on *Upper Silesia Minorities* illustrates that in some cases of treaty interpretation the focus must be on the *lex generalis*, rather than the *lex specialis*.[188]

*The principle of 'speciality' governing international organisations*
In chapter 6, we referred to the so-called 'principle of speciality' governing the competence of international organisations. As the ICJ put it in its Advisory Opinion on *Use of Nuclear Weapons* (at the request of the WHO):

> international organizations are subjects of international law which do not, unlike States, possess a general competence. International organizations are governed by the 'principle of speciality', that is to say, they are invested by the States which create them with powers, the limits of which are a function of the common interests whose promotion those States entrust to them.[189]

This principle of 'limited' or 'special' competence of international organisations must be played out against the theory of 'implied powers' to be attributed to these organisations so as to enable them effectively to achieve their objectives.[190] In the *Use of Nuclear Weapons* case, this interplay led the Court to reject the WHO's request for an advisory opinion on the legality of the use of nuclear weapons for lack of jurisdiction under Art. 96(2) of the UN Charter. Pursuant to this provision, specialised UN agencies are only allowed to request an advisory opinion 'on legal questions arising *within the scope of their activities*'. The Court concluded that 'none of [the WHO's] functions has a sufficient connection with the question before it for that question to be capable of being considered as arising "within the scope of [the] activities" of the WHO'.[191] In the opinion of the ICJ:

---

[188] In that case, the Court found that a general clause whose overriding character is beyond dispute cannot validly be modified by a *lex specialis*: 'The Court in this respect recalls the fact that the provisions of Division I [of the third Part of the Geneva Convention] are provisions the terms of which were settled beforehand by the Conference of Ambassadors. They had to be accepted such as they were and subject to no modifications...These provisions constitute a separate category among the provisions relating to the protection of minorities, *and subsequent provisions entered into between the contracting parties* [*in casu*, the more specific Division II of the third Part of the Geneva Convention] *cannot modify them or be construed as being contradictory and thus diminishing the extent of the protection provided*' (PCIJ, Series A, No. 15 at 30, 31 (1928), emphasis added).

[189] ICJ Reports 1996, para. 25.    [190] See chapter 6 above, pp. 286–8.
[191] ICJ Reports 1996, para. 22.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press
Cambridge Books Online © Cambridge University Press, 2009

to ascribe to the WHO the competence to address the legality of the use of nuclear weapons – even in view of their health and environmental effects – would be tantamount to disregarding the principle of speciality; for such competence could not be deemed a necessary implication of the Constitution of the Organization in the light of the purposes assigned to it by its member States.[192]

Could this principle of 'speciality' be used as an argument to let, for example, a UNEP rule prevail over a WTO rule in case of a conflict of norms involving *environmental* issues *on the ground that the competence of UNEP covers environment, that of the WTO, trade*? To answer this question, a distinction must be made between (i) norms created by the state parties to either of these conventions *as states*; and (ii) norms created by the WTO or UNEP *as international organisations*. The principle of 'speciality' applies only in respect of the latter norms. Only these norms are acts taken by the WTO or UNEP as an international organisation for which it must have the necessary competence. Norms created by the states themselves, irrespective of the context in which these norms emerged (be it under the auspices of the WTO or UNEP), are not restricted by the principle of 'speciality'. The competence of *states* to conclude norms is a general one.

## Acts of the international organisation

Only if, for example, the WTO norm in conflict with a UNEP norm were to be an act of the WTO (or any of its organs) as an international organisation would the principle of 'speciality' apply. However, given the broadly defined functions of the WTO (e.g., 'the forum for negotiations among its Members concerning their multilateral trade relations in matters dealt with under the agreements'),[193] it may be difficult to convince a judge that the WTO does *not* have competence to address certain environmental matters. Such argument may be successful, nonetheless, if the WTO *as an organisation* (say, the SPS or TBT Committee) were to start adopting decisions, not so much related to *trade* in allegedly harmful products, but addressing the very substantive environmental question of whether or not a particular product is harmful, or decisions in which specific maximum residue levels are specified or commitments are made to reduce emissions in certain harmful substances. These types of WTO decisions may then be 'invalid' for lack of competence on behalf of the WTO as an international organisation (see above, pp. 286–90) – and this even if these

---

[192] *Ibid.*, para. 25.    [193] Art. III.2 of the Marrakesh Agreement.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

decisions were later confirmed by the General Council or the Ministerial Conference, since these organs *remain WTO organs*.

The allocation of competence within the UN system was illustrated by the ICJ in the *Use of Nuclear Weapons* case as follows:

the Charter of the United Nations laid the basis of a 'system' designed to organize international co-operation in a coherent fashion by bringing the United Nations, invested with powers of general scope, into relationship with various autonomous and complementary organizations, invested with sectorial powers. The exercise of these powers by the organizations belonging to the 'United Nations system' is co-ordinated, notably, by the relationship agreements concluded between the United Nations and each of the specialized agencies.[194]

On that basis, the Court noted that the powers of specialised agencies must be interpreted taking account of 'the logic of the overall system contemplated by the Charter'. It even seemed to go as far as saying that the competence of the UN and those of particular specialised agencies are *mutually exclusive* when noting that WHO responsibilities 'are necessarily restricted to the sphere of public "health" and cannot encroach on the responsibilities of other parts of the United Nations system. And there is no doubt that questions concerning the use of force, the regulation of armaments and disarmament are within the competence of the United Nations and lie outside that of specialized agencies.'

In his Dissenting Opinion Judge Weeramantry warned about the dangers of such approach:

The Court is of course anxious to ensure that there should not be an unnecessary confusion or overlapping of functions between the different organs and agencies of the United Nations. However, the principle of speciality does not mean that there can be no overlap. It is in the nature of a complex organization like the United Nations that there will be, owing to the multiplicity and complexity of its functions, some areas of overlap between the legitimate spheres of authority of its constituent entities.[195]

Referring to the example of overlap between the ICJ itself and the Security Council, Weeramantry referred instead to the 'principle of complementarity'. He rightly concluded as follows:

The family of United Nations organizations was not set up in a fretwork pattern of neatly dovetailing components, each with a precisely carved outline of its own. These organizations deal with human activities and human interrelationships and it is of their very nature that they should have overlapping areas of concern.

[194] ICJ Reports 1996, para. 25.    [195] *Ibid*., 150.

Cambridge Books Online © Cambridge University Press, 2009

Their broad contours are of course defined, but different aspects of the self-same question may well fall within the ambit of two or more organizations.[196]

It must, in this context, be recalled that the WTO is not a specialised UN agency. Nonetheless, the principle of 'speciality' also applies to it, although not, perhaps, to the extent that account must be had of 'the logic of the overall [UN] system contemplated by the Charter'. Thus, whereas it may be so that no overlaps of competence are tolerated *within* the UN system (something which is, for the reasons set out by Weeramantry, highly questionable), overlaps could be acceptable as between a UN organisation (say, UNCTAD) and the WTO.

### Acts of states

The situation is entirely different for WTO/UNEP norms created *by states themselves*. Here, no principle of 'speciality' applies in terms of competence. Thus, the fact that states adopt an agreement on substantive environmental matters (say, an agreement on GMOs) *in the context of the WTO* (but not acting in the form of a WTO organ) cannot be objected to on the ground of 'speciality' of the WTO *as an international organisation*. Such WTO norms are then of inherently equal value to UNEP norms, be the latter enacted by states as states in the context of UNEP or by UNEP organs pursuant to UNEP powers. However, even though 'speciality' in terms of WTO competence could then not be used as an argument to let UNEP rules prevail, UNEP rules may still cover the subject matter at issue more directly and precisely and on that ground prevail as the *lex specialis*.[197] But then the UNEP norm prevails, not on the ground of *lack of WTO competence*, but on the ground of a *substantive conflict rule* given preference to the more specific norm.

### Both norms are 'equal'

There are, finally, cases where the conflict rules set out above do not provide a solution. A particular type of conflict for which international law generally does not provide a solution is that of the AB/AC type (that is, state A promising one thing to B, but another contradictory thing to C). This is essentially so because of the *pacta tertiis* principle. These conflicts are discussed in the second subsection. In addition, there may, in exceptional cases, be conflicts of the more traditional AB/AB type (that

---

[196] *Ibid.*, 151.    [197] See above, pp. 387–90.

Cambridge Books Online © Cambridge University Press, 2009

is, where the norms in conflict are binding on both parties) where none of the conflict rules in the previous sections lead to a clear result. These are discussed next.

### Conflict of norms binding on both parties that cannot be resolved: conflict in the applicable law constituting a lacuna

Can there be conflicts of the traditional AB/AB type where none of the conflict rules above offer a solution? That is, can there be conflicts between treaty norms where Arts. 41/58 are irrelevant, no explicit conflict clauses are set out, the *lex posterior* principle does not apply and where the *lex specialis* principle does not make it possible to detect the 'more specific norm'? In very exceptional cases, this possibility must be acknowledged. Whatever the exact nature and source of conflict rules (be they derived from an explicit conflict clause or the general principle of contractual freedom of states), they must derive from norms of international law that are legally binding when the conditions for their application are fulfilled. A solution to conflict of norms must be found in the law. It is not for an adjudicator to decide arbitrarily which of two conflicting norms ought to apply. This means that in exceptional cases, where no conflict rule is available or where none of the applicable conflict rules leads to a result, an adjudicator may have to pronounce a *non liquet*, based on the absence of conflict rules.

An international adjudicator is assumed to know the law (*jura novit curia*) and, if two conflicting norms apply to the same situation, his or her function will be to apply conflict rules so as to enable only one of the two norms to apply. But if the law itself fails to offer the solution as to which of the two norms applies, it should not, normally, be for the judge him/herself to make that decision. In effect, and although there would then be a problem of 'too much law' (two norms apply and one cannot decide which one ought to prevail), one is faced with a lacuna in the law: international law offers no solution as to which norm must prevail. As a result, one may have to declare a *non liquet*.[198] This possibility is envisaged, for example, by Fastenrath who refers to 'Kollisionslücken'[199] and Salmon who speaks of 'lacune de règle de solution d'antinomie'.[200]

[198] On the question of *non liquet*, see chapter 3 above, pp. 150–4, and Pauwelyn, 'Cross-agreement'.

[199] Ulrich Fastenrath, *Lücken im Völkerrecht: zu Rechtscharakter, Quellen, Systemzusammenhang, Methodenlehre und Funktionen des Völkerrechts* (Berlin: Duncker & Humblot, 1991), 227.

[200] J.-A. Salmon, 'Les Antinomies en Droit International Public', in Chaim Perelman (ed.), *Les Antinomies en Droit* (Brussels: Bruylant, 1965), 449.

Cambridge Books Online © Cambridge University Press, 2009

There may be contexts where the judge will take up a more proactive role and decide for him/herself which rule ought to prevail (as, for example, in the ECJ). But this should not be the general rule under public international law where it is generally acknowledged that the judge applies the law (and may thereby further develop the law), but does not create new law. If the judge decides nonetheless to create his or her own conflict rule, he or she is, moreover, unlikely to do so openly. A judge would then rather cover this solution under the all-embracing approach of, for example, 'teleological interpretation'.

This exceptional situation is most likely to arise as between two contradictory provisions in the same treaty. A potential example can be found in DSU Art. 21.5 versus DSU Art. 22.6. Article 21.5 provides, without time limitation, that '[w]here there is disagreement as to the existence or consistency with a covered agreement of measures taken to comply with the recommendations and rulings such dispute *shall be decided through recourse to these dispute settlement procedures*'. Article 22.6, in contrast, and without cross-reference to the Art. 21.5 panel procedure, states that 'the DSB, upon request, *shall grant authorization* to suspend consessions or other obligations *within 30 days* of the expiry of the reasonable period of time unless the DSB decides by consensus to reject the request'. In *US – Certain Products*, the Appellate Body seemed to realise the unavoidable contradiction between these two provisions, noting the following:

we are cognizant of the important systematic issue of the relationship between Articles 21.5 and 22 of the DSU. As the United States correctly points out in its appellee's submission, the terms of Articles 21.5 and 22 are not a 'model of clarity' and the relationship between these two provisions of the DSU has been the subject of intensive and extensive discussion among Members of the WTO. We note that, on 10 October 2000, eleven Members of the WTO presented a proposal in the General Council to amend, *inter alia*, Articles 21 and 22 of the DSU. In so noting, we observe that it is certainly not the task of either panels or the Appellate Body to amend the DSU or to adopt interpretations within the meaning of Article IX:2 of the *WTO Agreement*. Only WTO Members have the authority to amend the DSU or to adopt such interpretations. Pursuant to Article 3.2 of the DSU, the task of panels and the Appellate Body in the dispute settlement system of the WTO is 'to preserve the rights and obligations of Members under the covered agreements, and to *clarify existing provisions* of those agreements in accordance with customary rules of interpretation of public international law' (emphasis added). Determining what the rules and procedures of the DSU ought to be is not our responsibility nor the responsibility of panels; it is clearly the responsibility solely of the Members of the WTO.[201]

---

[201] Appellate Body report on *US – Certain Products*, paras. 91–2.

Cambridge Books Online © Cambridge University Press, 2009

In not less than three bananas-related disputes, the WTO judiciary has managed to avoid solving the Art. 21.5–Art. 22 dilemma (*EC – Bananas*, US request for suspension; *US – Section 301*; *US – Certain Products*). This sent a clear signal to the WTO membership that it was for them to resolve the conflict. The rather passive role taken by the WTO judiciary seems justified, in particular in the context of its rather strict 'interpretative mandate' under DSU Art. 3.2 ('not [to] add to or diminish from' WTO covered agreements). As noted before, in other contexts where the judiciary is granted a more creative role (as in the ECJ), the judge may have reacted differently and resolved the question him/herself.

There is, finally, one important benefit linked to declaring a *non liquet* in case of 'non-resolvable' conflict. States should then realise that it will not suffice to let potential conflicts linger without political solution. For negotiators to leave the interaction between treaty provisions ambiguous would hence imply a serious risk: if the conflict turns out to be an 'unresolvable' one, the international judge may declare a *non liquet* and simply apply neither of the two rules, thereby nullifying the effect of both treaties or both treaty provisions. For states in the position of defendant this may be the ideal solution. But in a context of compulsory dispute settlement, as in the WTO, one day a state is the defendant, another day it is the complainant. Hence, the risk of not seeing any law applied should constitute a serious incentive for states to provide more explicit solutions to potential conflicts, in the form, for example, of more clearly phrased provisions or explicit treaty-based conflict clauses.

The occurrence of 'unresolvable' conflicts of the traditional AB/AB type is not limited to two provisions in the same treaty. Two norms deriving from different treaties may raise the same problem, especially if either of the two is of a 'continuing' nature and the *lex posterior* principle cannot be applied. If it is, in these circumstances, not possible to determine which of the two is *lex specialis*, one may then be faced with a lacuna and be forced to declare a *non liquet*.

It is not inconceivable that such a lacuna might arise in the event of a conflict between a WTO rule and a rule under another multilateral agreement, say, an MEA. If the MEA were to set out general trade clauses (not limited to specific, harmful products), or the WTO rule were to include product-specific environmental exceptions (in open conflict with MEA rules), a conflict between these two 'continuing' norms might not be resolvable under the *lex specialis* principle. One might then again be forced to declare a *non liquet*. The likelihood of the WTO and MEAs regulating matters at this same level of specificity is small (after all, the WTO is about trade, MEAs about environment). But the possibility

Cambridge Books Online © Cambridge University Press, 2009

of such openly conflicting norms arising ought not to be precluded. Recall, in this respect, the often diametrically opposed positions adopted by states in different contexts (say, in the WTO as opposed to the bio-diversity context).[202] If the same states were, indeed, to conclude in one context (say, the WTO) that genetically modified organisms (GMOs) are *not* harmful (e.g., in a new WTO agreement on GMOs) and, at the same time, to adopt the position that GMOs *are* harmful in another context (say, under the Cartagena Biosafety Protocol), the conflict would be one of two equally specific provisions. Such conflict, essentially the result of the schizophrenic behaviour of *states*, ought not to be resolved by an international *adjudicator*. It would be for the states themselves to bring their act together and solve the conflict at a law-making level. If not, some states (especially the most powerful ones) could well regard the potential for judges to decide difficult political questions as an incentive to leave these questions open, in the hope that they could then convince the judge, at the time of a dispute, of their position.[203]

## Conflict of norms where only one party is bound by both rules: conflicts of the AB/AC type

As pointed out earlier, a conflict of norms may also arise even if the two states concerned are not both bound by the two conflicting norms in question, that is, from the point of view of state A in case it first promises one thing to state B in one norm (AB) and thereafter promises another, contradictory thing to state C in another norm (AC).

In the past, especially in the days of Grotius and de Vattel, but actually up to the end of the Second World War (i.e., up to the boom in so-called law-making treaties), AB/AC conflicts were of the greatest concern in international law, in particular in the field of the law of war and neutrality (for example, state A promising intervention to state B, but neutrality to state C for exactly the same situation). As of 1947, however, the risk and importance of AB/AB conflicts rose dramatically, not because of an increase in bilateral treaties reviewing earlier ones, but as a result of

---

[202] See note 91 above.

[203] Recall, in this respect, the two irreconcilable conflict clauses in the preamble to the Cartagena Biosafety Protocol (quoted above, p. 334). It provides an example of a treaty in respect of which the parties could not agree on whether the new norms ought to prevail over, or be subject to, WTO rules. Each side obtained its preambular paragraph but the result seems to be that they neutralise each other. In the end, an adjudicator would not have any guidance based on this preambular language. Nonetheless, in this case, it would seem that the *lex specialis* principle should work in favour of the Protocol (it being more specific in terms of subject matter than, for example, the SPS Agreement). See above, pp. 387–90.

Cambridge Books Online © Cambridge University Press, 2009

a growing number of multilateral treaties being concluded in different contexts by the same states.

## Inherent normative conflict of the AB/AC type versus conflict in the applicable law of the AB/AC type

We saw above that the very conclusion by A of a later norm AC may constitute breach of an earlier norm AB.[204] Such an event raises an 'inherent normative conflict' where one norm is, in and of itself, a breach of the other (not a conflict in the applicable law). Recall, in this respect, the *Customs Regime Between Germany and Austria* case and the *Costa Rica v. Nicaragua* (pp. 300–3) case involving the Bryan–Chamorro Treaty, discussed in chapter 6 above. If the later norm AC does, in and of itself, constitute breach of the earlier norm AB, then state B can challenge the legality of norm AC and obtain a ruling as against state A that the AC norm is illegal. From the point of view of state C, however, the AC norm is not illegal (C is not bound by the earlier norm AB) and C may then claim compensation from A for not implementing the AC norm.

In contrast, the conclusion of norm AB – being the earlier in time – cannot constitute breach of the later norm AC even if the two are in an inherent normative conflict. At the time of conclusion of norm AB, norm AC was not yet in existence.

A conflict of the AB/AC type may also give rise to conflict in the applicable law. This will be the case in the event that norm AC does not, in and of itself, constitute breach of the earlier norm AB (hence there is no inherent normative conflict), but compliance with either norm would constitute breach of the other. That is, in one set of circumstances state A is bound to do one thing under norm AB, but another, contradictory thing under norm AC. If A complies with the first norm vis-à-vis B it will necessarily breach the second norm vis-à-vis C. If A complies with the second norm vis-à-vis C it will necessarily breach the first norm vis-à-vis B.

This is the situation we shall examine further in this subsection. It may arise at two points in time:

(i)   *after* A elects to comply with either norm (say, A decides to implement norm AC and B subsequently challenges this implementation as a breach of the AB norm); or

(ii)  as a more abstract question *before* A decides to comply with either norm (say, A, B and C ask an adjudicator to determine which norm A should comply with).

---

[204] See chapter 6 above, pp. 300–3.

## Conflict in the applicable law of the AB/AC type arises only in the event of mutually exclusive obligations imposed on A

From the above description, it is apparent that in respect of conflicts in the applicable law of the type AB/AC, conflict situations 3 and 4 outlined in chapter 4 (those involving explicit rights) do not find application. Indeed, where A has an explicit right (be it an exemption or a permission) to do X under the AB norm vis-à-vis B, but an obligation *not* to do X under the AC norm vis-à-vis C, *there is no conflict*. In that instance, the explicit right (vis-à-vis B) must always give way to the obligation (vis-à-vis C). Here, the right was granted *by B*, the obligation imposed *by C*. It is, therefore, impossible that the right (in AB) overrules the obligation (in AC). An AB right cannot replace an AC obligation. For C – the beneficiary of the obligation – the AB norm is *res inter alios acta*. Hence, C cannot see its right to compliance by A affected by this AB norm. B, in contrast, the state which gave the explicit right to A (and which is a third party to the AC norm), is *not* affected by state A not exercising the explicit right under the AB norm.

The same applies in case the later AC norm grants an explicit right to do something that is prohibited in the earlier AB norm. There is then no conflict and A is fully capable of complying with both norms, namely by not exercising its explicit right vis-à-vis C in a way that would breach its obligations towards B under the other norm. In sum, conflict in the applicable law of the AB/AC type arises only in case of mutually exclusive obligations imposed on A under the two norms in question.[205]

## Conflict resolution in the law of treaties

*The evolution from 'invalidity' of the later AC norm to no solution at all in the law of treaties*

In doctrine a tendency has long prevailed in support of declaring the later AC norm *invalid* (on the ground that the earlier AB norm detracted from A's very 'legal capacity' to conclude the later AC norm) or, at least, to let, in these circumstances, the earlier AB norm *prevail* over the later, conflicting AC norm (*lex prior* principle or *prior in tempore potior in jus*). Witness, for example, the draft convention on the law of treaties of the Harvard Research in International Law: 'If a State assumes by a Treaty

---

[205] Conflict situation 1, in so far as it relates to conflicting positive obligations that are merely different but not mutually exclusive (see chapter 4 above), does not give rise to conflict either in an AB/AC constellation. A can then avoid breaching its obligations towards both B and C by simply complying with the stricter norm.

Cambridge Books Online © Cambridge University Press, 2009

with another State an obligation which is in conflict with an obligation which it has assumed by an earlier treaty with a third State, the obligation assumed by the *earlier treaty takes priority* over the obligation assumed by the later treaty.'[206]

Lauterpacht, in Art. 16 of each of his Reports on the Law of Treaties prepared for the ILC went even a step further and started from the principle that a treaty is *void* if its performance involves a breach of a treaty obligation previously undertaken by one or more of the parties, subject to the right of an innocent party (*in casu*, state C) to damages for resulting loss.[207] We discussed earlier how this principle of invalidity of one of the two conflicting norms evolved into rules on priority of application (with reports by Fitzmaurice and Waldock).[208] For AB/AC conflicts, this culminated even in a complete absence of priority rules and an exclusive reliance on state responsibility in the Vienna Convention.

We saw earlier that in the *Costa Rica v. Nicaragua* case, the later Bryan–Chamorro Treaty was not invalidated for cause of breach with the earlier Canas–Jerez Treaty.[209] In a more recent dispute, the *Case Concerning East Timor* (*Portugal v. Australia*), the ICJ was even more reticent to declare a treaty invalid on the ground that it violated an earlier one with another party. In that case, Portugal argued that Australia's entry into a treaty with Indonesia conflicted, *inter alia*, with the rights of Portugal under the UN Charter and gave rise to the international responsibility of Australia. Unlike Costa Rica in the Bryan–Chamorro dispute, Portugal expressly did not seek a determination that the later treaty which Australia had concluded with Indonesia was void. Rather, Portugal restricted itself to a claim of state responsibility. In this dispute, the ICJ declined to decide the case at all, on the ground that it could not do so without first pronouncing on the illegality of the conduct of Indonesia, a state not party to the proceeding. In these circumstances,

[206] Reprinted in (1935) 29 AJIL 1024, supplement.

[207] UN documents A/CN.4/63 of 24 March 1953, 198–208 and A/CN.4/87. This invalidity was conditional on whether the departure from the terms of the prior treaty was such as to interfere seriously with the interests of the other parties to that treaty, or seriously impair the original purpose of the treaty. In his second report this was slightly revised to refer specifically to a bilateral or a multilateral treaty or any provision thereof, while the last phrase of the condition was reworded to read 'to impair an essential aspect of [the prior treaty's] original purpose'. See also Hersch Lauterpacht, 'The Covenant as the "Higher Law"' (1936) 17 BYIL 54, and 'Contracts to Break a Contract', in E. Lauterpacht (ed.), *International Law, Being the Collected Papers of Hersch Lauterpacht* (Cambridge: Cambridge University Press, 1978), 341 at 374–5.

[208] See chapter 6 above, pp. 279–81.    [209] See chapter 6 above, pp. 300–1.

https://doi.org/10.1017/CBO9780511494550.009 Published online by Cambridge University Press

Cambridge Books Online © Cambridge University Press, 2009

the ICJ concluded, it was not competent to determine Portugal's claim of state responsibility against Australia.[210]

*The resolution provided for in the Vienna Convention*
In order to resolve AB/AC conflicts under present international law, the three principles set out earlier (contractual freedom of states, *pacta sunt servanda* and *pacta tertiis*) must be resorted to.

Pursuant to the *pacta sunt servanda* principle, **A** is bound by the first norm vis-à-vis B, but at the same time A is bound also by the second, contradictory norm vis-à-vis state C.[211]

Moreover, pursuant to the *pacta tertiis* principle, **C** cannot be held by the earlier AB norm. Neither can it see its AC rights detracted from because of conflict with this AB norm to which it did not consent. The same applies for state **B** in respect of the AC norm to which state B did not consent.

Finally, the contractual freedom of state A allowed it to conclude the contradictory AC norm (assuming that the AB norm is not of *jus cogens*). International law does *not invalidate* the AC norm because it conflicts with the earlier AB norm. From the viewpoint of A, the AC norm can be *illegal* if it constitutes, in and of itself, breach of the earlier AB norm, but it cannot be *invalid*.

Crucially, in case the AC norm does *not*, in and of itself, constitute breach of the AB norm, international law does *not* offer a *priority* rule obliging A to comply with the AB norm over and above the AC norm or vice versa. Both norms are then valid and legal and can be invoked by A's contractual partners. This is the solution explicitly provided by Art. 30(4)(b) of the Vienna Convention (discussed above, pp. 383–4): 'When the parties to the later treaty [AC norm] do not include all the parties to the earlier one [AB norm]...as between a State Party to both

---

[210] Note that in the *Costa Rica v. Nicaragua* case, the Central American Court did declare the responsibility of Nicaragua (notwithstanding the absence of the United States), but that in that case it could do so without having to decide first on the legality of US conduct (whereas in the *East Timor* case both Australia and Indonesia were bound by the UN Charter, under which Portugal invoked the breach; in the *Costa Rica v. Nicaragua* case, the treaty invoked by Costa Rica (the Canas–Jerez Treaty) was binding only on Nicaragua, not on the United States).

[211] Or, as Crawford noted: 'if any of the parties to two inconsistent treaties is different, both treaties are considered to remain in force, with the consequence that State A (a party to both) may have one set of obligations to one group of States and another set of obligations to another...The Vienna Convention...does not contemplate that a treaty will be void for inconsistency with another treaty' (James Crawford, Second Report, UN doc. A/CN.4/498 (1999), para. 9, (c) and (d)).

Cambridge Books Online © Cambridge University Press, 2009

treaties [A] and a State Party to only one of the treaties [B and C], the treaty to which both States are parties governs their mutual rights and obligations.' In other words, in case of conflict in the applicable law of the AB/AC type, A is bound towards B by the AB norm as much as it is bound towards C by the contradictory AC norm.

Hence, if an adjudicator were faced *ex ante* by a request of, for example, A, B and C to decide which norm A must comply with, the adjudicator would not be able to decide either way.[212] It is then up to A to make a political choice as to whether it will comply with the AB norm or with the AC norm. The law of treaties does not direct A either way. Or, as Karl put it: 'With the law stepping back, a principle of political decision takes its place whereby it is left to the party to the conflicting obligations to decide which treaty it prefers to fulfil.'[213]

It is interesting to note that an earlier version of what is now Art. 30(4)(b) made a reservation for conflicts of the AB/AC type. It provided for a priority rule in favour of the *earlier treaty* for cases where C 'was aware of the existence of the earlier treaty [AB norm] and that it was still in force with respect to the first State [A]'.[214] This proviso was later dropped.

## Conflict resolution in the law of state responsibility

In sum, the law of treaties does not provide a solution for AB/AC conflicts in the sense that it does not direct state A to give preference to either one of the two norms. However, this lack of conflict rules in the law of treaties has left untouched normal international law rules on state responsibility.[215] This is, again, what Art. 30(5) of the Vienna Convention provides: 'Paragraph 4 is without prejudice to . . . any question of responsibility which may arise for a State from the *conclusion* or *application* of a treaty, the provisions of which are incompatible with its obligations towards another State under another treaty.'

---

[212] Unless, of course, the AC norm constitutes, in and of itself, breach of the earlier AB norm, but then we no longer have a conflict in the applicable law, but an inherent normative conflict (discussed above, pp. 300–3).

[213] Karl, 'Conflicts', 470–1. That this solution is 'sans doute guère satisfaisante', see Quoc Dinh, *Droit*, para. 175 at 274.

[214] Third Report on the Law of Treaties by Sir Humphrey Waldock, YBILC 1964, vol. 2, 5–65 (UN doc. A/CN.4/156 and Add. 1–3), Art. 65.4(c). Discussed, *inter alia*, at the 742nd Meeting of the ILC, YBILC 1964, vol. 1, 119 at 120 (where it is stated in para. 11 that the proviso had been suggested by McNair with reference to the principle of good faith).

[215] See Crawford, Second Report, para. 9.

Cambridge Books Online © Cambridge University Press, 2009

As Crawford noted, the Vienna Convention 'seeks to resolve the difficulties of conflicting treaty obligations by expressly reserving [the rules of state responsibility]…Thus it is no excuse under international law for non-compliance with a subsisting treaty obligation to State A that the State was simultaneously complying with a treaty obligation to State B.'[216] This means also, as another author put it, that the conflict is not actually resolved: 'Il ne s'agit donc plus de résoudre un conflit de normes (problème objectif de compatibilité), mais de sanctionner (subjectivement) un comportement internationalement illicite.'[217]

We have already examined the instance of the later AC norm constituting, in and of itself, breach of the earlier AB norm.[218] To use the words of Art. 30(5), this relates to the 'question of responsibility which may arise for a State [A] from the *conclusion*…of a treaty [*in casu*, the AC norm], the provisions of which are incompatible with its obligations towards another State [B] under another treaty [*in casu*, the AB norm]'. In case of such inherent normative conflict, the law of state responsibility directs state A to stop the breach, i.e., *to cease the existence of the AC norm*. This, in turn, will activate state A's responsibility vis-à-vis state C.

In case of conflict in the applicable law of the type AB/AC (that is, two norms impose mutually exclusive obligations on state A, but one norm is not, in and of itself, breach under the other norm), as soon as state A executes either of the two norms it will engage its state responsibility. To use the words of Art. 30(5), this raises the 'question of responsibility which may arise for a State [A] from the *application*…of a treaty [*in casu*, either the AB or the AC norm], the provisions of which are incompatible with its obligations towards another State [respectively, C or B] under another treaty [respectively, the AC or the AB norm]'. If A complies with norm AB, it will engage its responsibility vis-à-vis state C. If it complies with norm AC, it will engage its responsibility vis-à-vis state B. Since not to execute either of the two norms is, in the event of mutually exclusive obligations, not an option that would avoid breach, for state A to sit still and not to execute either of the two norms would mean that it breaches at least one of them, perhaps even both. In the latter event, state A would engage its responsibility vis-à-vis both state B and state C. In sum, under the law of treaties state A is free to comply with either norm. Nonetheless, doing so will necessarily activate state A's responsibility under the other norm. It is then that the application of

---

[216] *Ibid.*, para. 9, (c) and (d).    [217] Quoc Dinh, *Droit*, para. 175 at 274.
[218] See chapter 6 above, pp. 300–3.

Cambridge Books Online © Cambridge University Press, 2009

either norm (not the conclusion of the second norm as such) may lead to adjudication. If so, the adjudicator will have to find breach of the opposing norm which A did not implement and grant damages to the state wanting to rely on that opposing norm. Or, as Jiménez de Aréchaga phrased it at an ILC meeting:

According to the principle of nullity, a treaty which conflicted with a prior treaty was void. According to the principle of State responsibility, it was valid, but the State which had assumed conflicting obligations was free to choose which of the treaties it would fulfil; so far as the unfulfilled treaty was concerned, it was required to pay an indemnity. The State which had assumed conflicting obligations thus 'bought' its choice.[219]

The problem then is, of course, that although A can pay *compensation* to its contracting partner towards whom it did not comply, it cannot *cease* the breach towards that state without in turn breaching the other norm. As we discuss below, this is why the only long-term solution to a conflict of the type AB/AC is to renegotiate either norm so as to end the conflict.

Nonetheless, in case of breach of either norm by state A, and in the event such breach constitutes a 'material breach', the state subject to the breach may then be allowed to invoke the termination or suspension of the treaty breached by state A pursuant to Art. 60 of the Vienna Convention. Article 30(5) explicitly reserves the operation of Art. 60. In most cases, however, the subject of the breach will be interested more in performance of the treaty rather than in its suspension or termination. The latter may well benefit more state A which would then be freed of its contradictory obligations.

## Can state C be held responsible for breach by state A of the AB norm?

However, does this almost exclusive reliance on state responsibility in the Vienna Convention for AB/AC conflicts mean that states B and C are put in exactly the same position? Not necessarily so. Conclusion or implementation of the later AC norm, in conflict with the earlier AB norm, may not only engage the responsibility of state A. It could be

---

[219] YBILC 1964, vol. 1, 123, 742nd Meeting, para. 44. Degan (*Sources*, 435) criticised the Art. 30 solution to conflicts of the AB/AC type as follows: 'The solution from paragraph 5 of Article 30 seems to be insufficient, especially because it considers both incompatible treaties as equal. It does not protect the rights of the injured party from the earlier treaty', *in casu* state B. Nonetheless, as explained below, in some cases B should be able to claim compensation from both A and C.

argued that state C, by concluding the later AC norm, aided or assisted state A in the commission of the breach of norm AB. In other words, in the event state A decides to comply with the later AC norm, state B could invoke, not only the responsibility of state A, but also that of state C. Or, looked at from a different angle, state A could, in its defence, refer to the responsibility of state C, for example in order to reduce the amount of damages to be paid by state A to state B.

### The ILC Draft 1996 on State Responsibility

Article 27 of the ILC Draft 1996, entitled 'Aid or assistance by a State to another State for the commission of an internationally wrongful act', addresses the issue of aid or assistance in breach as follows: 'Aid or assistance by a State to another State, if it is established that it is *rendered for the commission of an internationally wrongful act* carried out by the latter, itself constitutes an internationally wrongful act, *even if, taken alone*, such aid or assistance *would not constitute the breach* of an international obligation' (emphasis added).

As James Crawford remarked, 'article 27 posits a rather extensive principle of responsibility of one State for the acts of another'.[220] Three requirements for Art. 27 to be activated should be pointed at.

First, for present purposes, the exact degree of 'aid or assistance' required, i.e., the question of whether there is actual or material assistance by state C or only advice, encouragement or incitement, is not that important. For state C to conclude a treaty with state A which breaches another international obligation of state A (under norm AB), or will necessarily lead to such breach if complied with, undoubtedly amounts to actual and material aid and assistance. It could even be said that state C thereby 'becomes a co-perpetrator of an internationally wrongful act'.[221] Indeed, without state C, the treaty and hence the breach would not have materialised.

Second, the 'mental element' required for there to be liability of state C, i.e., the fact that the assistance must be given 'with the *intent* to facilitate the commission'[222] of the breach, does, in the circumstances, not raise serious difficulties either. As Crawford noted, '[i]gnorance of international law is not generally an excuse for wrongful conduct by States'. Thus, state C, when concluding the conflicting norm AC, must

---

[220] Crawford, Second Report, Add. 1, para. 167.
[221] ILC Commentary to Art. 27, para. (2).   [222] *Ibid.*, para. (16), emphasis in original.

Cambridge Books Online © Cambridge University Press, 2009

normally have been aware that this new norm would breach or lead to breach of other obligations of state A. By effectively concluding the new norm, state C must, moreover, be presumed to have intended to facilitate the occurrence of this breach.

A potential third requirement is more problematic in the circumstances, that is, the question as to whether or not the assisting state, *in casu* state C, must also be bound by the obligation that state A breaches by concluding the norm AC. In other words, for state C to be responsible must it also be bound by the AB norm? Article 27 of the ILC Draft 1996 did not seem to impose this requirement. Nonetheless, most of the examples given in the Commentary to Art. 27 involve assistance by one state in the use of armed force by another, e.g., through allowing overflight or landing rights in the course of a military operation by another state which is said to constitute aggression or intervention. Indeed, all of the examples given involve breaches of obligations arising under rules by which the assisting state was itself bound.

### The Reports of James Crawford and the ILC Draft 2001

The fact that the text of Art. 27 of the 1996 ILC Draft could, nonetheless, be read as including also breaches of rules *not* binding on the assisting state (that is, situations where state C was *not* itself bound also by the AB norm) was criticised by Crawford, who rightly remarked:

> Take the case of a bilateral treaty between State [A] and State [B] under which the two States agree not to export certain materials or technology to, or not to trade with, State [C]...State [C], the target State, is of course not bound by the treaty. Why should it be legally responsible if, knowing of the treaty, it assists State [A] in breaching? Article 27 could thereby become a vehicle by which the effect of well-published bilateral obligations was extended to the rest of the world.[223]

In support of his position, Crawford, in Addendum 3 to his Second Report, provided a comparative analysis of the concept of 'interference with contractual rights' in domestic law.[224] He concluded that while English, US, French and German law recognise that knowingly and intentionally inducing a breach of contract – even if the inducing party is not bound by the contract – is a civil wrong, they approach the matter in different ways. These differences are accentuated if one brings into

---

[223] Second Report, Add. 1, para. 184. The denomination of states in the example has been adapted to conform to the hypotheses used here.

[224] UN document A/CN.4/498/Add. 3.

Cambridge Books Online © Cambridge University Press, 2009

account a wider range of comparisons, such as, for example, Islamic or Russian law. Under Islamic law, for example, no such liability seems to be recognised. He concluded that the statement of a general principle that any knowing interference with the performance of any contract constitutes a delict or tort is an oversimplification of a more complex situation.[225]

In his remarks under Art. 27, Crawford then continues as follows:

> even if the support to be drawn from the domestic analogies such as inducing breach of contract were less equivocal than it is, there are difficulties in applying such a general principle to international relations. Treaties reflect the particular policies of the States entering into them, and international law has a strict doctrine of privity in relation to treaties. Moreover, treaties have proliferated, and many obligations to provide finance, materials or technology are incorporated in treaties. National legal systems have more rigorous controls on the legality of contracts than international law currently has for treaties, and there are ways under national law by which third parties can challenge the legality of contracts adversely affecting them which do not yet exist for treaties.

On that basis, Crawford proposed to replace Art. 27 by the following (now Art. 16 of the 2001 Draft Articles):

> A State which aids or assists another State in the commission of an internationally wrongful act by the latter is internationally responsible for doing so if:
>
> (a) That State does so with knowledge of the circumstances of the internationally wrongful act; and
> (b) *The act would be internationally wrongful if committed by that State* [emphasis added].

Hence, under the third point discussed earlier, it is now made clear that the assisting state (*in casu*, state C) can only be held liable for assisting state A in its breach of norm AB if state C itself is bound by the

---

[225] French law is the most open in principle to such liability (but subject to limitations in practice such as a strict burden of proof), German law least so, since it requires something over and above knowing assistance or inducement, amounting to improper conduct. English and United States law take an intermediate position; there is liability in principle for deliberate and knowing inducement, but this is subject to the defence of justification and the proof of actual damage arising from the breach. Whether there is sufficient justification depends on a number of factors but, in English law, for example, to justify an inducement it is not enough to show that one was acting in good faith in the pursuit of a legitimate interest, there has to be something in the nature of a moral duty, or a distinct legal right to act.

https://doi.org/10.1017/CBO9780511494536.009 Published online by Cambridge University Press
Cambridge Books Online © Cambridge University Press, 2009

obligation set out in norm AB. Moreover, under the second point discussed earlier, the 'mental element' required in the 1996 Draft for there to be liability of state C, i.e., the fact that the assistance must be given 'with the *intent* to facilitate the commission', has now been deleted.

*Some examples: WTO obligations (AB norm) versus MEA obligations imposed in respect of non-parties (AC norm)*

Where does this leave us under the example of the 1914 Bryan–Chamorro Treaty concluded by Nicaragua and the United States in breach of Nicaragua's earlier obligations vis-à-vis Costa Rica under the 1858 Canas–Jerez Treaty (the *Costa Rica v. Nicaragua* case)? Under Art. 16 of the 2001 Draft Articles, with its requirement that the assisting state must be bound also by the norm breached, the United States (allegedly the state which assisted Nicaragua in its breach of the earlier treaty with Costa Rica) could not be held responsible for its assistance provided to Nicaragua in the form of concluding the Bryan–Chamorro Treaty. The United States was, indeed, not itself bound by the Canas–Jerez Treaty.

But what in respect of other examples? Take a WTO rule between state A and state B, obliging state A not to restrict trade from state B in conflict with a subsequent MEA rule concluded by state A with state C under which state A is obliged to restrict trade of certain products *even if these products come from non-parties*, including state B (not bound by the MEA). Many MEAs include such obligations in respect of non-parties.[226]

Under the law of treaties, the AB/AC conflict (the earlier AB norm being a WTO rule; the later AC norm an MEA rule obliging state A to restrict trade with state B) would not result in the invalidity of the later MEA norm, nor does the law of treaties provide for a priority rule. The obligation of state A vis-à-vis state B not to restrict trade is of equal standing with the obligation of state A vis-à-vis state C to restrict trade. But what about state responsibility? If state A executes the WTO norm (norm AB), it breaches the MEA norm and engages its responsibility vis-à-vis state C in the MEA. If state A executes the MEA norm (norm AC),

[226] For an overview, see *Matrix on Trade Measures Pursuant to Selected MEAs*, WTO doc. WT/CTE/W/160/Rev.1, dated 14 June 2001. See, *inter alia*, Art. X of CITES, Art. 4(8) of the Montreal Protocol, Art. 11 of the Basel Convention, Art. 24(1) of the Cartagena Protocol on Biosafety, Arts. 8(4), 17 and 33 of the UN Fish Stocks Agreement, Art. 10(9)(a) of the Rotterdam Convention and Art. 3(2)(b)(i) of the Stockholm Convention.

Cambridge Books Online © Cambridge University Press, 2009

it breaches the WTO norm and engages its responsibility vis-à-vis state B in the WTO.

However, in the second instance (compliance with the MEA, breach of the WTO), would state B (or for that matter state A) be able to invoke also the responsibility of state C and this *on the ground that state C assisted state A in committing the breach*, i.e., in concluding the MEA? If state C is, like states A and B, a WTO member the answer should be yes (at least under Art. 16 of the 2001 Draft Articles). In that event, state C has, indeed, assisted in the commission of wrongful conduct by state A vis-à-vis state B and this wrongful conduct, in case it had been committed by state C, would also have constituted a breach of the WTO obligations of state C. If, on the other hand, state C is only a party to the MEA and not a WTO member, it cannot be held responsible pursuant to Art. 16 for assistance to breach since state C is not itself bound by the WTO norm breached by state A.

Importantly, although the legal value of the WTO and the MEA norms are then equal from the point of view of A, the compulsory dispute settlement system available for breach of WTO norms may provide an incentive for state A to comply with the WTO norm, rather than the MEA norm.

On the other hand, the fact that all MEA parties that are also WTO members could be held 'co-responsible' for the breach of WTO norms by any of these MEA parties vis-à-vis a third party to the MEA which is nonetheless a WTO member could provide a strong enough safety net for WTO members (not party to the MEA) who see their trade restricted by the implementation of MEA norms they did not consent to in the first place. Such WTO members may then see their trade restricted, but they would be allowed to claim compensation for such restrictions in breach of WTO rules from all WTO members that are party also to the MEA.

## The only long-term solution: renegotiate either norm so as to end the conflict

In the end, the optimal (and actually, the only genuine) resolution of AB/AC conflicts ought to be found in a renegotiation of either of the two norms. Also from a democratic legitimacy point of view, this makes sense: it should not be for a judge to decide such conflicts 'among equals', but for the states involved themselves. Such renegotiation could take the form of

Cambridge Books Online © Cambridge University Press, 2009

(i)   the termination of either norm by common consent and compensation (say, the termination of norm AC by agreement between A and C, with C being compensated); or

(ii)  making the two norms binding on all three parties involved, e.g., by means of the accession of B to the AC norm (*in casu*, the MEA) with B being compensated for it in the context of the AB norm (say, by means of the original MEA parties granting increased market access to B in the WTO).[227]

Invoking the responsibility of C for the breach by A of the earlier AB norm (*in casu*, the WTO rule) may provide some pressure either to change the AC norm (*in casu*, the MEA rule) or to offer compensation to B on condition that B joins the AC norm.

If neither of the two norms is changed, there is an impasse. As noted earlier, the responsibility of A is necessarily incurred, whatever A does. Moreover, restitution under the violated norm is materially impossible. It requires the co-operation of the state not party to the norm breached. In addition, cessation of the norm breached is not an option either since it would necessarily lead to a violation of the other norm. To put it differently, without renegotiating either norm, state A would be in a continuing situation of breach, for which it would need to pay compensation, without being able to stop the breach. If it were to do so, it would engage in another breach.

The fact that renegotiation of either norm will be required in the long term leads to another consideration. Measures taken by WTO members under the AC norm (be it an MEA or a labour standards agreement), to which B is not bound, should not be too easily accepted under WTO exceptions (say, GATT Art. XX). Often it is mistakenly thought that not to offer such exception under explicit WTO rules necessarily condemns the measure in question. As explained below (pp. 456–72), the defendant should be allowed also to invoke defences or exceptions under non-WTO rules. If both parties are bound by these rules, defendants should be able to justify breach of WTO rules, depending on the applicable conflict rules. If the complainant is *not* bound by these non-WTO rules, such rules should not be invocable[228] and cannot justify an established breach of WTO law. However, to find on that basis that the measure is WTO

---

[227] Along these lines, see Kyle Bagwell, Petros Mavroidis and Robert Staiger, 'It's a Question of Market Access' (2002) 96 AJIL 56.

[228] Except perhaps for purposes of *interpretation* of WTO rules if these non-WTO rules reflect a 'common understanding' of all WTO members. See chapter 5 above, p. 273.

Cambridge Books Online © Cambridge University Press, 2009

inconsistent is not necessarily the end of the matter. B should not be held bound by rules it did not agree to, but once the WTO inconsistency is established, states A and C would do well in renegotiating their WTO relationship with B so as to induce B to sign up to the MEA or labour standards agreement. In short, WTO dispute settlement should not be used as a fall-back in case B refuses to sign an MEA so as to get B bound by that MEA anyhow. B should be offered equal opportunities to negotiate its entry (and related benefits) to the MEA.

## Conclusion on conflict resolution

To sum up chapters 6 and 7 on how to resolve conflict of norms, the starting point for resolving any conflict of norms must be the 'holy trinity' of (i) contractual freedom of states; (ii) *pacta sunt servanda*; and (iii) *pacta tertiis*. States are, indeed, free to change their legal relationship with other states (contractual freedom), as long as these other states consent. When they do not consent, these other states cannot be bound (*pacta tertiis*) and any earlier treaty must be complied with (*pacta sunt servanda*), otherwise state responsibility will be incurred. Conflict of norms in international law is governed essentially by priority rules and state responsibility, not by rules invalidating either of the two conflicting norms.

When concluding new norms, or assessing the hierarchy as between existing norms, states ought to be aware of the following eight steps:

(1) Norms cannot deviate from *jus cogens* (Arts. 53 and 64 of the Vienna Convention). Any new norm in conflict with *jus cogens* will be void. The same happens to existing norms contradicting supervening *jus cogens*. The one other instance of 'invalidity' occurs when acts of an international organisation are taken *ultra vires*, i.e., outside the limited competence of the organisation in question.

(2) One norm may constitute in and of itself breach of another, earlier norm. In that event, the later norm is 'illegal'. Also, an *inter se* agreement deviating from a pre-existing multilateral treaty may be 'illegal'. This will be the case not only if the multilateral treaty explicitly prohibits the later treaty, but also in the event that the multilateral obligation derogated from *inter se* is of an 'integral nature'. *Inter se* deviations from 'integral obligations' are not permitted (Arts. 41/58 of the Vienna Convention), essentially because they necessarily affect also third states (against the *pacta tertiis* principle). The very idea of concluding 'integral obligations' is that they continue to apply to all parties to the multilateral treaty (until amended by, in

Cambridge Books Online © Cambridge University Press, 2009

most cases, consensus). Many environmental and human rights obligations are of an 'integral nature'. Hence, when concluding, for example, new trade agreements states ought to be aware of the limits imposed by Arts. 41/58. Nonetheless, when all parties to the 'integral obligation' agree to change it, Art. 30(3) (*lex posterior*) applies. Then, the only limit is *jus cogens*. Similar limits of 'illegality' must apply in respect of acts of international organisations that constitute a breach of the law that applies to them (to be distinguished from acts that are 'invalid' on the ground that they were taken *ultra vires*).

(3)  Treaty norms cannot affect the rights and obligations of third parties and this even if these third party rights and obligations do not derive from 'integral treaties'. An *inter se* agreement deviating from a 'reciprocal obligation' set out in a multilateral treaty will also be illegal to the extent it breaches the rights of third parties (Arts. 41/58 of the Vienna Convention). Moreover, a later agreement as between A and C cannot alter the rights and obligations of B under an earlier AB agreement (*pacta tertiis*).

(4)  Account must be had to explicit conflict clauses in existing treaties (especially Art. 103 of the UN Charter). Also, when creating new treaties conflict clauses may be inserted so as to safeguard pre-existing treaties, to make sure that the new treaty prevails over earlier ones, or to regulate the relationship between the new treaty and future treaties, in particular *inter se* deviations from the new treaty. Apart from Art. 103, conflict clauses claiming priority over future treaties are, however, subject to the contractual freedom of states, both as expressed in a new treaty as between all parties to the earlier one and in *inter se* agreements. Such conflict clauses are, in other words, without much practical effect.

Moreover, conflict clauses cannot alter the operation of the first three steps set out above: (i) a slave trade agreement, even if it includes a conflict clause stating that it prevails over the prohibition on the slave trade, remains void; (ii) a conflict clause in an 'illegal' *inter se* agreement stating that it prevails over the earlier multilateral treaty does not deactivate Art. 41 nor the *pacta tertiis* principle; (iii) the same applies in respect of an AC treaty explicitly stating that it prevails over an earlier AB treaty (*pacta tertiis*) or in respect of an act of an international organisation in which it is explicitly set out that the act prevails over any limitations as to the competence of the organ taking the act (such competence could be extended only by changing the constituent instrument of the organ).

(5)  In case the previous four steps do not solve the conflict, one must fall back on the contractual freedom of states and look for the 'current expression of state intent'. In many cases, this search will be determined under Art. 30's *lex posterior* rule, applicable to 'successive treaties'. The *latest* expression of state intent is presumed to coincide

Cambridge Books Online © Cambridge University Press, 2009

with the *current* expression of state intent. Even if an earlier treaty is *lex specialis* vis-à-vis this latest expression, this latest expression should still prevail. Article 30 does not provide for an exception in this regard. Nonetheless, there may be cases where different treaties cannot be seen as 'successive treaties', either because they were concluded at the same time or because they were concluded at different times for different parties or are of a 'continuing' or 'living' nature so that they must be seen as 'parallel' treaties rather than 'successive' treaties. In those cases where it is difficult to apply Art. 30, resort must be had to step 6.

(6) In case the search for the 'current expression of state intent' cannot be resolved by the *lex posterior* principle, other indications as to state consent must be looked to. Here, the *lex specialis* principle plays a pivotal role. The more precise and specific expression of state consent is then considered as coinciding with the strongest and current expression of state intent (overruling a more general norm, even if this norm is, from certain points of view, later in time). *Lex specialis* cannot, however, overrule a *lex posterior* in case Art. 30 finds application. It can only prevail in cases where treaties cannot be said to be 'successive' (e.g., conflicts involving 'continuing treaties'). Other indications as to state intent may also play a role, in particular implicit statements in, for example, the preamble or *travaux préparatoires* as to what the drafters had in mind in terms of the interplay between the treaties in question.

(7) Once the earlier six steps have been exhausted, there may be exceptional cases where an adjudicator would no longer be applying the law but creating it: that is, situations where none of the first five steps above offer a solution and where under the sixth step (*lex specialis*) the search for 'current expression of state consent' cannot be conclusively determined either. In that event, the adjudicator is faced with a lacuna in the field of conflict rules. He or she must then declare a *non liquet*.

(8) Under all seven steps above questions of state responsibility may arise. One norm may, in and of itself, constitute breach of the other and thereby become 'illegal' under the law of state responsibility (see step 2). But the 'illegality' may also be limited to the application or implementation of either norm. State responsibility is of great importance, especially in conflicts of the type AB/AC. It is, in that event, the only solution to conflict given that the *pacta tertiis* principle precludes an adjudicator from letting one rule prevail over the other.

In sum, when concluding new treaties states ought to keep in mind the limits under steps 1 (*jus cogens*), 2 (illegalities) and 3 (*pacta tertiis*). If at all possible, they should include explicit conflict clauses in their new treaties (step 4). Doing so cannot neutralise the limits in steps 1–3, but it

will avoid the inherent uncertainties present in steps 5–7. If, for whatever reason, an explicit conflict clause is not set out, states must remember that the rule of first resort is and remains the *lex posterior* principle. Their latest expression of consent will prevail (step 5). Nonetheless, states must be aware of the fact that the *lex posterior* rule has its limits in that it applies only to 'successive treaties'. If, *but only if*, the treaties are, for whatever reason, not 'successive' (but, for example, 'parallel'), the search for 'current expression of state consent' must be widened so as to include also the *lex specialis* principle and any other implicit statements of preference for either norm (step 6). If these additional elements leave the question of 'current state consent' indecisive, the conflict of norms cannot be resolved. States must be cognisant of this risk of *non liquet*. This risk ought to be an incentive for states to provide for explicit conflict clauses under step 4.

Cambridge Books Online © Cambridge University Press, 2009