# Exhibit 86

# FRAGMENTATION OF INTERNATIONAL LAW: DIFFICULTIES ARISING FROM THE DIVERSIFICATION AND EXPANSION OF INTERNATIONAL LAW

[Agenda item 11]

## DOCUMENT A/CN.4/L.682 and Add.1[*]

## Report of the Study Group of the International Law Commission, finalized by Mr. Martti Koskenniemi[**]

[*Original: English*]
[*13 April 2006*]

## CONTENTS

|  | | *Page* |
|---|---|---|
| Abbreviations | | 4 |
| Note concerning quotations | | 4 |
| Multilateral instruments cited in the present report | | 5 |

|  | | *Paragraphs* | *Page* |
|---|---|---|---|
| INTRODUCTION | | 1–4 | 9 |

*Chapter*

| | | | *Paragraphs* | *Page* |
|---|---|---|---|---|
| I. | FRAGMENTATION AS A PHENOMENON | | 5–45 | 10 |
| | A. | Background | 5–20 | 10 |
| | B. | What is a "conflict"? | 21–26 | 12 |
| | C. | The approach of this study: seeking relationships | 27–36 | 13 |
| | D. | Harmonization: systemic integration | 37–43 | 15 |
| | E. | Jurisdiction versus applicable law | 44–45 | 16 |
| II. | CONFLICTS BETWEEN SPECIAL LAW AND GENERAL LAW | | 46–222 | 17 |
| | A. | Introduction | 47–55 | 17 |
| | | 1. Fragmentation through conflicting interpretations of general law | 49–52 | 17 |
| | | 2. Fragmentation through the emergence of special law as an exception to general law | 53–54 | 18 |
| | | 3. Fragmentation as differentiation between types of special law | 55 | 18 |
| | B. | The function and scope of the *lex specialis* maxim | 56–122 | 19 |
| | | 1. *Lex specialis* in international law | 56–87 | 19 |
| | | (*a*) Legal doctrine | 56–67 | 19 |
| | | (*b*) Case law | 68–84 | 21 |
| | | (*c*) An informal hierarchy: the point of *lex specialis* | 85–87 | 24 |
| | | 2. The two types of *lex specialis* reference | 88–107 | 24 |
| | | (*a*) *Lex specialis* as an application or elaboration of *lex generalis* | 98–102 | 26 |
| | | (*b*) *Lex specialis* as an exception to the general rule | 103–107 | 27 |

———————

[*] Incorporating document A/CN.4/L.682/Corr.1.

[**] The Chairman gratefully acknowledges the help of a number of colleagues who have commented on the topic and provided advice and assistance on particular questions. Special mention should, among them, be made of Professor Campbell McLachlan, Dr. Anders Fischer-Lescano, Professor Gunther Teubner, Professor Emmanuelle Jouannet, Professor Pierre-Marie Dupuy and Ms. Isabelle Van Damme. Several New York University interns provided assistance during the Study Group meetings and in collecting background materials on particular items. They include Gita Kothari, Cade Mosley, Peter Prows and Olivia Maloney. Anna Huilaja, Ilona Nieminen and Varro Vooglaid at the Erik Castrén Institute of International Law and Human Rights in Helsinki provided much appreciated help in research. Last but not least, the assistance throughout the years of Ms. Anja Lindroos from the University of Helsinki needs to be recognized. Without her careful notes of the Study Group meetings and her background research, this report would never have materialized. Nevertheless, the contents of this report—including any opinions therein—remain the sole responsibility of its author.

| Chapter | | | | Paragraphs | Page |
|---|---|---|---|---|---|
| | 3. | | Prohibited *lex specialis* .................................................................................................. | 108–110 | 28 |
| | 4. | | The relational character of the general/special distinction ............................................. | 111–118 | 29 |
| | | (a) | Speciality in regard to parties ................................................................................. | 113–115 | 29 |
| | | (b) | Speciality in regard to "subject matter" .................................................................. | 116–118 | 30 |
| | 5. | | Conclusion for *lex specialis*: the omnipresence of "general law" ................................... | 119–122 | 30 |
| C. | | | Self-contained (special) regimes ............................................................................................... | 123–194 | 31 |
| | 1. | | What are self-contained regimes? ................................................................................... | 123–137 | 31 |
| | 2. | | Self-contained regimes and the work of the International Law Commission on State responsibility....... | 138–152 | 34 |
| | 3. | | The relationship between self-contained regimes outside State responsibility and general international law ........ | 153–190 | 37 |
| | | (a) | Establishment of self-contained (special) regimes ................................................... | 154–158 | 37 |
| | | (b) | The relationship between the self-contained (special) regime and general international law under normal circumstances ........ | 159–185 | 38 |
| | | | (i)    Example: human rights regimes ..................................................................... | 161–164 | 38 |
| | | | (ii)   Example: World Trade Organization law ....................................................... | 165–171 | 39 |
| | | | (iii)  Conclusions on the relationship between self-contained (special) regimes and general international law under normal circumstances ........ | 172–185 | 41 |
| | | (c) | Fall-back onto general rules owing to the failure of self-contained regimes ............ | 186–190 | 43 |
| | 4. | | Conclusions on self-contained regimes ........................................................................... | 191–194 | 44 |
| D. | | | Regionalism ................................................................................................................................ | 195–219 | 45 |
| | 1. | | What is "regionalism"? .................................................................................................... | 195–198 | 45 |
| | 2. | | "Regionalism" as a set of approaches and methods for examining international law............ | 199–204 | 45 |
| | 3. | | "Regionalism" as a technique for international law-making ............................................. | 205–210 | 46 |
| | 4. | | "Regionalism" as the pursuit of geographical exceptions to universal international law rules ............ | 211–217 | 47 |
| | 5. | | European integration......................................................................................................... | 218–219 | 49 |
| E. | | | Conclusion on conflicts between special law and general law ................................................... | 220–222 | 49 |
| III. | | | CONFLICTS BETWEEN SUCCESSIVE NORMS ....................................................................................... | 223–323 | 50 |
| A. | | | General law on conflicts between earlier and later treaties ....................................................... | 228–250 | 51 |
| | 1. | | Conflict between treaties with identical parties .............................................................. | 229–233 | 51 |
| | 2. | | Conflict between treaties with non-identical parties ....................................................... | 234–250 | 52 |
| | | (a) | *Lex prior* ................................................................................................................... | 236–242 | 52 |
| | | (b) | *Lex posterior* ............................................................................................................. | 243–250 | 53 |
| B. | | | Article 30 of the Vienna Convention on the Law of Treaties: from invalidity to responsibility......... | 251–266 | 54 |
| | 1. | | The question of "same subject-matter" ........................................................................... | 253–256 | 55 |
| | 2. | | The International Law Commission's debates.................................................................. | 257–266 | 56 |
| C. | | | Special clauses ........................................................................................................................... | 267–294 | 57 |
| | 1. | | A typology of conflict clauses ........................................................................................ | 268–271 | 57 |
| | 2. | | Relations within and across regimes: environmental treaties.......................................... | 272–282 | 58 |
| | 3. | | Conflict clause in the Treaty establishing the European Community ............................... | 283–288 | 60 |
| | 4. | | Disconnection clauses...................................................................................................... | 289–294 | 61 |
| D. | | | *Inter se* agreements .................................................................................................................... | 295–323 | 63 |
| | 1. | | The conditions applicable to the conclusion of *inter se* agreements .............................. | 304–315 | 65 |
| | | (a) | Preservation of the rights and interests of the parties to the original treaty ............ | 305–308 | 65 |
| | | (b) | Preservation of the object and purpose of the multilateral treaty ............................ | 309–313 | 66 |
| | | (c) | Other situations ....................................................................................................... | 314–315 | 67 |
| | 2. | | Notification of the other parties and their reaction ......................................................... | 316–318 | 67 |
| | 3. | | Consequences for breach of the multilateral treaty by parties to an *inter se* agreement ............ | 319 | 68 |
| | 4. | | Conclusion on successive agreements .............................................................................. | 320–323 | 68 |
| IV. | | | RELATIONS OF IMPORTANCE: ARTICLE 103 OF THE CHARTER OF THE UNITED NATIONS, *JUS COGENS* AND OBLIGATIONS *ERGA OMNES* AS CONFLICTING RULES........ | 324–409 | 69 |
| A. | | | Article 103 of the Charter of the United Nations ....................................................................... | 328–360 | 69 |
| | 1. | | What are the prevailing obligations? ............................................................................... | 331–332 | 70 |
| | 2. | | What does it mean for one obligation to prevail over another?........................................ | 333–340 | 70 |
| | 3. | | Special cases .................................................................................................................... | 341–350 | 71 |

| Chapter | | | | Paragraphs | Page |
|---|---|---|---|---|---|
| | | (*a*) | Conflicts with treaties between United Nations Member States and non-members............ | 341–343 | 71 |
| | | (*b*) | Conflicts with norms of customary international law of a non-peremptory character ......... | 344–345 | 72 |
| | | (*c*) | Conflicts with norms of *jus cogens*............................................... | 346–350 | 72 |
| | 4. | | Application ........................................................................................ | 351–360 | 73 |
| | B. | | *Jus cogens* ....................................................................................... | 361–379 | 74 |
| | | 1. | The effect of *jus cogens*: invalidity of the conflicting norm ......................... | 365–373 | 75 |
| | | 2. | The content of *jus cogens* ............................................................. | 374–376 | 77 |
| | | 3. | Case law .................................................................................... | 377–379 | 78 |
| | C. | | Obligations *erga omnes* .................................................................. | 380–409 | 78 |
| | | 1. | From bilateral obligations to obligations *erga omnes* owed to "the international community as a whole"... | 382–390 | 79 |
| | | 2. | To whom are obligations *erga omnes* owed?............................................ | 391–398 | 80 |
| | | 3. | Obligations *erga omnes partes* ...................................................... | 399–403 | 82 |
| | | 4. | The relationship between *jus cogens* and *erga omnes* obligations .................. | 404–406 | 83 |
| | | 5. | Conclusion ................................................................................. | 407–409 | 83 |
| V. | | | Systemic integration and article 31, paragraph 3 (*c*), of the Vienna Convention on the Law of Treaties | 410–480 | 84 |
| | A. | | Introduction: the "principle of systemic integration" ................................... | 410–423 | 84 |
| | B. | | Article 31, paragraph 3 (*c*), of the Vienna Convention on the Law of Treaties.......... | 424–432 | 87 |
| | | 1. | Construction ............................................................................... | 424–428 | 87 |
| | | 2. | The International Law Commission's debates ........................................... | 429–432 | 87 |
| | C. | | Case law ...................................................................................... | 433–460 | 88 |
| | | 1. | Iran–United States Claims Tribunal .................................................... | 434 | 88 |
| | | 2. | European Court of Human Rights ...................................................... | 435–438 | 89 |
| | | 3. | Arbitration in the case of a mixed oxide reprocessing plant (MOX Plant) and the OSPAR Convention .. | 439–442 | 89 |
| | | 4. | World Trade Organization .............................................................. | 443–450 | 90 |
| | | 5. | International Court of Justice ........................................................... | 451–460 | 92 |
| | D. | | Special questions .......................................................................... | 461–480 | 94 |
| | | 1. | The rules to be "taken into account" ................................................. | 462–472 | 94 |
| | | | (*a*) Customary law and general principles............................................ | 463–469 | 94 |
| | | | (*b*) Other applicable conventional international law ................................. | 470–472 | 95 |
| | | 2. | The weight of the obligations to be taken into account ............................... | 473–474 | 96 |
| | | 3. | Inter-temporality and general developments in international law ...................... | 475–478 | 96 |
| | | 4. | Conclusion ................................................................................. | 479–480 | 98 |
| VI. | | | General conclusions...................................................................... | 481–504 | 98 |
| | A. | | The nature of fragmentation ............................................................ | 481–483 | 98 |
| | B. | | The perspective of this study .......................................................... | 484–490 | 98 |
| | C. | | Between coherence and pluralism: suggestions for further work........................ | 491–504 | 100 |
| | | 1. | The Vienna Convention on the Law of Treaties as the basis for an "international law of conflicts"........ | 494–496 | 100 |
| | | 2. | Into a law of regimes .................................................................... | 497–499 | 101 |
| | | 3. | The nature and operation of "general international law"?............................. | 500–504 | 102 |
| Annex. | | | Draft conclusions of the work of the Study Group, finalized by Mr. Martti Koskenniemi | | 104 |

## ABBREVIATIONS

| | |
|---|---|
| EURATOM | European Atomic Energy Community |
| GATT | General Agreement on Tariffs and Trade |
| ICSID | International Centre for Settlement of Investment Disputes |
| MERCOSUR | Southern Common Market |
| MOX Plant | Mixed Oxide Reprocessing Plant |
| OSPAR Convention | Convention for the Protection of the Marine Environment of the North-East Atlantic |
| RTA | Regional Trade Agreement |
| UNIDROIT | International Institute for the Unification of Private Law |
| WTO | World Trade Organization |

*

\*     \*

| | |
|---|---|
| AJIL | *American Journal of International Law* |
| ECHR | European Court of Human Rights, *Reports of Judgments and Decisions*. All judgments and decisions of the Court, including those not published in the official series, can be consulted in the database of the Court (HUDOC), available from the Court's website (www.echr.coe.int). |
| EJIL | *European Journal of International Law* |
| *I.C.J. Pleadings* | International Court of Justice, *Pleadings, Oral Arguments, Documents*; available from the Court's website (www.icj-cij.org). |
| *I.C.J. Reports* | International Court of Justice, *Reports of Judgments, Advisory Opinions and Orders*. All judgments, advisory opinions and orders of the Court are available from the Court's website (www.icj-cij.org). |
| ILM | *International Legal Materials* |
| ILR | *International Law Reports* |
| IRAN–U.S. C.T.R. | *Iran–United States Claims Tribunal Reports* |
| *ITLOS Reports* | International Tribunal for the Law of the Sea, *Reports of Judgments, Advisory Opinions and Orders*. The Tribunal's case law is available on its website (www.itlos.org). |
| LGDJ | *Librairie générale de droit et de jurisprudence* |
| *P.C.I.J., Series A* | Permanent Court of International Justice, *Collection of Judgments* (Nos. 1–24, up to 1930 inclusive). |
| *P.C.I.J., Series B* | Permanent Court of International Justice, *Collection of Advisory Opinions* (Nos. 1–18, up to 1930 inclusive). |
| *P.C.I.J., Series A/B* | Permanent Court of International Justice, *Judgments, Orders and Advisory Opinions* (Nos. 40–80, from 1931). |
| RGDIP | *Revue générale de droit international public* |
| UNRIAA | United Nations, *Reports of International Arbitral Awards* |

*

\*     \*

In the present volume, "International Tribunal for the Former Yugoslavia" refers to the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991.

*

\*     \*

## NOTE CONCERNING QUOTATIONS

In quotations, words or passages in italics followed by an asterisk were not italicized in the original text.

Unless otherwise indicated, quotations from works in languages other than English have been translated by the Secretariat.

*

\*     \*

The Internet address of the International Law Commission is **http://legal.un.org/ilc/**.

## Multilateral instruments cited in the present report

|  | *Source* |
|---|---|
| Geneva Convention of 22 August 1864, for the Amelioration of the Condition of the Wounded in Armies in the Field (Geneva, 22 August 1864) | International Committee of the Red Cross, *International Red Cross Handbook*, 12th ed., Geneva, 1983, p. 19. |
| General Act of the Conference of Berlin (Berlin, 26 February 1885) | *American Journal of International Law*, vol. 3, Supp. (1909), p. 7. |
| The Hague Conventions of 1899 and 1907 respecting the Laws and Customs of War on Land: Convention IV respecting the Laws and Customs of War on Land (The Hague, 18 October 1907) | *The Hague Conventions and Declarations of 1899 and 1907*, 2nd ed., J.B. Scott (ed.), New York, Oxford University Press, 1915. |
| Convention relating to the guardianship of minors (The Hague, 12 June 1902) | F. Stoerk, *Nouveau recueil général de traités et autres actes relatifs aux rapports de droit international. Continuation du grand recueil de G. Fr. de Martens*, 2nd series, vol. XXXI, Leipzig, Theodor Weicher, 1904, p. 724. |
| Covenant of the League of Nations (Versailles, 28 June 1919) | League of Nations, *Official Journal*, No. 1, February 1920, p. 3. |
| Peace Treaty between the Allied and Associated Powers and Germany (Treaty of Versailles) (Versailles, 28 June 1919) | H. Triepel, *Nouveau recueil général de traités et autres actes relatifs aux rapports de droit international. Continuation du grand recueil de G. F. de Martens*, 3rd series, vol. XI, Leipzig, Theodor Weicher, 1922, p. 323. |
| Peace Treaty between the Allied and Associated Powers and Austria (Treaty of Saint-Germain) (Saint-Germain-en-Laye, 10 September 1919) | *Ibid.*, p. 691. |
| Reconstruction of Austria. Protocol No. 1 (Declaration) (Geneva, 4 October 1922) | League of Nations, *Treaty Series*, vol. XII, No. 334, p. 385. |
| Treaty of Peace between the British Empire, France, Italy, Japan, Greece, Romania, the Serb-Croat-Slovene State, and Turkey (Treaty of Lausanne) (Lausanne, 24 July 1923) | *Ibid.*, vol. XXVIII, No. 701, p. 11. |
| Protocol Relating to Certain Concessions Granted in the Ottoman Empire (Protocol XII) (Lausanne, 24 July 1923) | *Ibid.*, No. 707, p. 203. |
| Convention Fixing the Rules to be Observed for the Granting of Asylum (Havana, 20 February 1928) | *Ibid.*, vol. CXXXII, No. 3046, p. 323. |
| General Treaty for Renunciation of War as an Instrument of National Policy (Kellogg-Briand Pact) (Paris, 27 August 1928) | *Ibid.*, vol. XCIV, No. 2137, p. 57. |
| General Agreement on Tariffs and Trade (GATT) (Geneva, 30 October 1947) | United Nations, *Treaty Series*, vol. 55, No. 814, p. 187. |
| Convention on the Prevention and Punishment of the Crime of Genocide (Paris, 9 December 1948) | *Ibid.*, vol. 78, No. 1021, p. 277. |
| North Atlantic Treaty (Washington, D.C., 4 April 1949) | *Ibid.*, vol. 34, No. 541, p. 243. |
| Statute of the Council of Europe (London, 5 May 1949) | *Ibid.*, vol. 87, No. 1168, p. 103. |
| Geneva Conventions for the protection of war victims (1949 Geneva Conventions) (Geneva, 12 August 1949) | *Ibid.*, vol. 75, Nos. 970–973. |
| Geneva Convention relative to the Protection of Civilian Persons in Time of War (Convention IV) | *Ibid.*, vol. 75, No. 973, p. 287. |
| Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention on Human Rights) (Rome, 4 November 1950) | *Ibid.*, vol. 213, No. 2889, p. 221. |
| European Convention relating to the Formalities Required for Patent Applications (Paris, 11 December 1953) | *Ibid.*, vol. 218, No. 2952, p. 27. |
| Treaty establishing the European Economic Community (Rome, 25 March 1957) | *Ibid.*, vol. 298, No. 4300, p. 3. See also the consolidated version of the Treaty establishing the European Community, *Official Journal of the European Communities*, No. C 340, 10 November 1997, p. 173. |

|  | *Source* |
|---|---|
| Treaty establishing the European Atomic Energy Community (EURATOM) (Rome, 25 March 1957) | United Nations, *Treaty Series*, vol. 298, No. 4301, p. 167. |
| Treaty on European Union (Treaty of Maastricht) (Maastricht, 7 February 1992) | *Ibid.*, vol. 1757, No. 30615, p. 3. |
| Treaty of Amsterdam amending the Treaty on European Union, the Treaties establishing the European Communities and Certain Related Acts (Treaty of Amsterdam) (Amsterdam, 2 October 1997) | *Official Journal of the European Communities*, No. C 340, 10 November 1997, p. 1. |
| Treaty of Nice amending the Treaty on European Union, the Treaties establishing the European Communities and Certain Related Acts (Treaty of Nice) (Nice, 26 February 2001) | *Ibid.*, No. C 80, 10 March 2001, p. 1. |
| Geneva Conventions on the Law of the Sea (Geneva, 29 April 1958) | |
| Convention on the High Seas | United Nations, *Treaty Series*, vol. 450, No. 6465, p. 11. |
| Convention on the Continental Shelf | *Ibid.*, vol. 499, No. 7302, p. 311. |
| Convention on the Territorial Sea and the Contiguous Zone | *Ibid.*, vol. 516, No. 7477, p. 205. |
| Convention on Fishing and Conservation of the Living Resources of the High Seas | *Ibid.*, vol. 559, No. 8164, p. 285. |
| Vienna Convention on Diplomatic Relations (Vienna, 18 April 1961) | *Ibid.*, vol. 500, No. 7310, p. 95. |
| Vienna Convention on Consular Relations (Vienna, 24 April 1963) | *Ibid.*, vol. 596, No. 8638, p. 261. |
| Convention on the Unification of Certain Points of Substantive Law on Patents for Invention (Strasbourg, 27 November 1963) | *Ibid.*, vol. 1249, No. 20401, p. 369. |
| International Covenant on Economic, Social and Cultural Rights (New York, 16 December 1966) | *Ibid.*, 993, No. 14531, p. 3. |
| International Covenant on Civil and Political Rights (New York, 16 December 1966) | *Ibid.*, vol. 999, No. 14668, p. 171, and vol. 1057, p. 407. |
| Optional Protocol to the International Covenant on Civil and Political Rights (New York, 16 December 1966) | *Ibid.*, vol. 999, No. 14668, p. 171. |
| Second Option Protocol to the International Covenant on Civil and Political Rights aiming at the Abolition of the Death Penalty (New York, 15 December 1989) | *Ibid.*, vol. 1642, No. 14668, p. 414. |
| Paris Convention for the Protection of Industrial Property of 20 March 1883, revised at Brussels on 14 December 1900, Washington on 2 June 1911, The Hague on 6 November 1925, London on 2 June 1934, Lisbon on 31 October 1958 and Stockholm on 14 July 1967 (Stockholm, 14 July 1967) | *Ibid.*, vol. 828, No. 11851, p. 305. The text of the Convention as amended on 28 September 1979 is available from the website of the World Intellectual Property Organization: https://wipolex.wipo.int/en/text/288514. |
| European Convention on Consular Functions (Paris, 11 December 1967) | United Nations, *Treaty Series*, vol. 2757, No. 48642, p. 33. |
| Treaty on the Non-Proliferation of Nuclear Weapons (London, Moscow and Washington, D.C., 1 July 1968) | *Ibid.*, vol. 729, No. 10485, p. 161. |
| Convention concerning Judicial Competence and the Execution of Decisions in Civil and Commercial Matters (Brussels, 27 September 1968) | *Ibid.*, vol. 1262, No. 20747, p. 153. |
| Vienna Convention on the Law of Treaties (1969 Vienna Convention) (Vienna, 23 May 1969) | *Ibid.*, vol. 1155, No. 18232, p. 331. |
| American Convention on Human Rights: "Pact of San José, Costa Rica" (San José, 22 November 1969) | *Ibid.*, vol. 1144, No. 17955, p. 123. |
| Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation (Montreal, 23 September 1971) | *Ibid.*, vol. 974, No. 14118, p. 177. |
| Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction (London, Moscow and Washington, D.C., 10 April 1972) | *Ibid.*, vol. 1015, No. 14860, p. 163. |
| Convention on International Trade in Endangered Species of Wild Fauna and Flora (Washington, D.C., 3 March 1973) | *Ibid.*, vol. 993, No. 14537, p. 243. |
| Convention on the Protection of the Rhine against Pollution by Chlorides (Bonn, 3 December 1976) | *Ibid.*, vol. 1404, No. 23469, p. 59. |
| Additional Protocol to the Convention on the Protection of the Rhine against Pollution by Chlorides (Brussels, 25 September 1991) | *Ibid.*, vol. 1840, No. 23469, p. 372. |

|  | *Source* |
|---|---|
| Convention on the Conservation of Migratory Species of Wild Animals (Bonn, 23 June 1979) | *Ibid.*, vol. 1651, No. 28395, p. 333. |
| European Convention on Recognition and Enforcement of Decisions concerning Custody of Children and on Restoration of Custody of Children (Luxemburg, 20 May 1980) | *Ibid.*, vol. 1496, No. 25701, p. 37. |
| United Nations Convention on the Law of the Sea (Montego Bay, 10 December 1982) | *Ibid.*, vol. 1834, No. 31363, p. 3. |
|     Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks (New York, 4 August 1995) | *Ibid.*, vol. 2167, No. 37924, p. 3. |
| Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (New York, 10 December 1984) | *Ibid.*, vol. 1465, No. 24841, p. 85. |
| Vienna Convention for the Protection of the Ozone Layer (Vienna, 22 March 1985) | *Ibid.*, vol. 1513, No. 26164, p. 293. |
|     Montreal Protocol on Substances that Deplete the Ozone Layer (Montreal, 16 September 1987) | *Ibid.*, vol. 1522, No. 26369, p. 3. The updated and amended text of the Protocol appears in United Nations Environment Programme, *Handbook for the Montreal Protocol on Substances that Deplete the Ozone Layer*, 8th ed., 2009. |
| South Pacific Nuclear Free Zone Treaty (Rarotonga Treaty) (Rarotonga, 6 August 1985) | United Nations, *Treaty Series*, vol. 1445, No. 24592, p. 177. |
| Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations (1986 Vienna Convention) (Vienna, 21 March 1986) | A/CONF.129/15. |
| Convention on Mutual Administrative Assistance in Tax Matters (Strasbourg, 25 January 1988) | United Nations, *Treaty Series*, vol. 1966, No. 33610, p. 215. |
| United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (Vienna, 20 December 1988) | *Ibid.*, vol. 1582, No. 27627, p. 95. |
| Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and their Disposal (Basel, 22 March 1989) | *Ibid.*, vol. 1673, No. 28911, p. 57. |
| Convention on Insider Trading (Strasbourg, 20 April 1989) | *Ibid.*, vol. 1704, No. 29471, p. 133. |
|     Protocol to the Convention on Insider Trading (Strasbourg, 11 September 1989) | *Ibid.* |
| European Convention on Transfrontier Television (Strasbourg, 5 May 1989) | *Ibid.*, vol. 1966, No. 33611, p. 265. |
| European Convention on Certain International Aspects of Bankruptcy (Istanbul, 5 June 1990) | Council of Europe, *European Treaty Series*, No. 136. |
| Convention on the Protection and Use of Transboundary Watercourses and International Lakes (Helsinki, 17 March 1992) | United Nations, *Treaty Series*, vol. 1936, No. 33207, p. 269. |
| Convention on the Transboundary Effects of Industrial Accidents (Helsinki, 17 March 1992) | *Ibid.*, vol. 2105, No. 36605, p. 457. |
|     Protocol on Civil Liability and Compensation for Damage Caused by the Transboundary Effects of Industrial Accidents on Transboundary Waters, to the Convention on the Protection and Use of Transboundary Watercourses and International Lakes and the Convention on the Transboundary Effects of Industrial Accidents (Kiev, 21 May 2003) | ECE/MP.WAT/11. |
| Convention on Biological Diversity (Rio de Janeiro, 5 June 1992) | United Nations, *Treaty Series*, vol. 1760, No. 30619, p. 79. |
|     Cartagena Protocol on Biosafety to the Convention on Biological Diversity to the Convention on Biological Diversity (Montreal, 29 January 2000) | *Ibid.*, vol. 2226, No. 30619, p. 208. |
| Convention for the Protection of the Marine Environment of the North-East Atlantic (OSPAR Convention) (Paris, 22 September 1992) | *Ibid.*, vol. 2354, No. 42279, p. 67. |
| North American Free Trade Agreement (NAFTA) (Mexico City, Ottawa and Washington, D.C., 17 December 1992) | Washington, D.C., United States Government Printing Office, 1993; available from the website of the Agreement secretariat: www.nafta-sec-alena.org. |
| Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction (opened for signature at Paris on 13 January 1993) | United Nations, *Treaty Series*, vol. 1975, No. 33757, p. 3. |
| Convention for the Conservation of Southern Bluefin Tuna (Canberra, 10 May 1993) | *Ibid.*, vol. 1819, No. 31155, p. 359. |
| Convention on Civil Liability for Damage resulting from Activities Dangerous to the Environment (Lugano, 21 June 1993) | Council of Europe, *European Treaty Series*, No. 150. |

| | *Source* |
|---|---|
| Marrakesh Agreement Establishing the World Trade Organization (Marrakesh, 15 April 1994) | United Nations, *Treaty Series*, vols. 1867–1869, No. 31874. |
| General Agreement on Tariffs and Trade 1994 (GATT 1994) (annex 1A) | *Ibid.*, vol. 1867, No. 31874. |
| Agreement on the Application of Sanitary and Phytosanitary Measures (SPS Agreement) (annex 1A) | *Ibid.* |
| Understanding on Rules and Procedures Governing the Settlement of Disputes (DSU) (annex 2) | *Ibid.*, vol. 1869, No. 31874. |
| Agreement on Subsidies and Countervailing Measures | *Ibid.* |
| European Convention relating to questions on Copyright Law and Neighbouring Rights in the Framework of Transfrontier Broadcasting by Satellite (Strasbourg, 11 May 1994) | Council of Europe, *European Treaty Series*, No. 153. |
| Agreement on Illicit Traffic by Sea, implementing Article 17 of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (Strasbourg, 31 January 1995) | United Nations, *Treaty Series*, vol. 2136, No. 37251, p. 79. |
| UNIDROIT Convention on Stolen or Illegally Exported Cultural Objects (Rome, 24 June 1995) | *Ibid.*, vol. 2421, No. 43718, p. 457. |
| Treaty on the Southeast Asia Nuclear Weapon-Free Zone (Bangkok, 15 December 1995) | *Ibid.*, vol. 1981, No. 33873, p. 129. |
| African Nuclear-Weapon-Free Zone Treaty (Pelindaba Treaty) (Cairo, 11 April 1996) | A/50/426, annex. |
| Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction (Oslo, 18 September 1997) | United Nations, *Treaty Series*, vol. 2056, No. 35597, p. 211. |
| International Plant Protection Convention (Rome, 17 November 1997) | *Ibid.*, vol. 2367, No. 1963, p. 223. |
| Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters (Aarhus, Denmark, 25 June 1998) | *Ibid.*, vol. 2161, No. 37770, p. 447. |
| Rome Statute of the International Criminal Court (Rome, 17 July 1998) | *Ibid.*, vol. 2187, No. 38544, p. 3. |
| European Convention on the Promotion of a Transnational Long-Term Voluntary Service for Young People (Strasbourg, 11 May 2000) | Council of Europe, *European Treaty Series*, No. 175. |
| European Convention on the Legal Protection of Services based on, or consisting of, Conditional Access (Strasbourg, 24 January 2001) | United Nations, *Treaty Series*, vol. 2246, No. 39989, p. 29. |
| International Treaty on Plant Genetic Resources for Food and Agriculture (Rome, 3 November 2001) | *Ibid.*, vol. 2400, No. 43345, p. 303. |
| European Convention on the Protection of the Audiovisual Heritage (Strasbourg, 8 November 2001) | *Ibid.*, vol. 2569, No. 45793, p. 3. |
| Convention on Contact concerning Children (Strasbourg, 15 May 2003) | *Ibid.*, vol. 2464, No. 44266, p. 3. |
| Council of Europe Convention on the Prevention of Terrorism (Warsaw, 16 May 2005) | *Ibid.*, vol. 2488, No. 44655, p. 129. |
| Council of Europe Convention on Action against Trafficking in Human Beings (Warsaw, 16 May 2005) | *Ibid.*, vol. 2569, No. 45795, p. 33. |
| Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime and on the Financing of Terrorism (Warsaw, 16 May 2005) | *Ibid.*, vol. 2569, No. 45796, p. 91. |

# Introduction

1.   At its fifty-second session, in 2000, the International Law Commission decided to include the topic "Risks en–suing from fragmentation of international law" in its long-term programme of work.[1] The following year, the General Assembly requested the Commission to give further consideration to the topics in that long-term programme. At its fifty-fourth session, in 2002, the Commission decided to include the topic, renamed "Fragmentation of international law: difficulties arising from the diversification and expansion of international law", in its programme of work and to establish a Study Group.[2] The Study Group adopted a number of recommendations on topics to be dealt with and requested its then Chairperson, Mr. Bruno Simma, to prepare a study on the function and scope of the *lex specialis* rule and the question of "self-contained regimes".[3] At its fifty-fifth session, in 2003, the Commission appointed Mr. Martti Koskenniemi as Chairperson of the Study Group. The Study Group also set a tentative schedule for its work, distributed the studies decided upon the previous year among its members and agreed on a methodology to be adopted for that work.[4]

2.   In 2003 the Chairperson of the Study Group submitted an outline for a study on the function and scope of the *lex specialis* rule and the question of "self-contained regimes" to the Group. After a preliminary debate on that outline, concentrating on substantive and methodological issues, the definitive study on that item was distributed to the Commission the following year.[5] In addition to that study, in 2004 the Study Group also had before it the outlines produced by members of the Study Group on the four remaining items. It held an in-depth discussion of the Chairperson's report and gave some indications to the other members of the Commission in regard to the preparation of the various reports. In addition, it commenced discussion of the tentative "conclusions" it might draw on the basis of its debates.[6]

3.   In 2005 the Commission was briefed by the Chairperson of the Study Group on the status of the Study Group's work and held an exchange of views on the topic. The Study Group considered a memorandum on regionalism, prepared by its Chairperson, and received definitive reports on the interpretation of treaties in the light of "any relevant rules of international law applicable in the relations between the parties" (art. 31, para. 3 (*c*), of the 1969 Vienna Convention) and the modification of multilateral treaties between certain of the parties only (art. 41 of the 1969 Vienna Convention), as well as the final report on hierarchy in international law: *jus cogens*, obligations *erga omnes* and Article 103 of the Charter of the United Nations as conflict rules. In addition, the Study Group also received an informal paper from one of its members on the "disconnection clause". The Study Group envisaged that it would be in a position to submit a consolidated study, as well as a set of conclusions, guidelines or principles, to the Commission at its fifty-eighth session, in 2006.[7]

4.   This is the consolidated report of the Study Group. It has been prepared by its Chairperson on the basis of the outlines and reports produced in the course of four years' work by himself (on the function and scope of the *lex specialis* rule and the question of "self-contained" regimes) and by Mr. Riad Daoudi (mdification of multilateral treaties between certain of the parties only (art. 41 of the 1969 Vienna Convention)); Mr. Zdzislaw Galicki (hierarchy in international law: *jus cogens*, obligations *erga omnes* and Article 103 of the Charter of the United Nations as conflict rules); Mr. William Mansfield (interpretation of treaties in the light of "any relevant rules of international law applicable in the relations between the parties" (art. 31, para. 3 (*c*), of the 1969 Vienna Convention)); and Mr. Teodor Melescanu (application of successive treaties relating to the same subject matter). Several other Commission members took part in the deliberations of the Study Group during its sessions and their special knowledge greatly facilitated the discussion of particular topics. In addition, this report is complemented by an annex containing the proposed set of draft conclusions to be adopted by the Study Group and forwarded to the Commission in 2006 for appropriate action.

---

[1] *Yearbook … 2000*, vol. II (Part Two), para. 729. See also the study by Mr. Gerhard Hafner, "Risks ensuing from fragmentation of international law", *ibid.*, annex, p. 143.

[2] *Yearbook … 2002*, vol. II (Part Two), paras. 492–494, 511.

[3] *Ibid.*, paras. 512–513. The five topics were: (*a*) The function and scope of the *lex specialis* rule and the question of "self-contained regimes"; (*b*) The interpretation of treaties in the light of "any relevant rules of international law applicable in the relations between the parties" (art. 31, para. 3 (*c*), of the 1969 Vienna Convention), in the context of general developments in international law and concerns of the international community; (*c*) The application of successive treaties relating to the same subject matter (art. 30 of the 1969 Vienna Convention); (*d*) The modification of multilateral treaties between certain of the parties only (art. 41 of the 1969 Vienna Convention); (*e*) Hierarchy in international law: *jus cogens*, obligations *erga omnes* and Article 103 of the Charter of the United Nations as conflict rules.

[4] *Yearbook … 2003*, vol. II (Part Two), paras. 413, 424–435.

[5] *Yearbook … 2004*, vol. II (Part Two), paras. 298–358.

---

[6] *Ibid.*

[7] *Yearbook … 2005*, vol. II (Part Two), paras. 445–493.

# Chapter I

# Fragmentation as a phenomenon

## A. Background

5. The background to fragmentation was sketched half a century ago by Wilfred Jenks, who drew particular attention to two phenomena. On the one hand, the international world lacked a general legislative body; thus:

> law-making treaties are tending to develop in a number of historical, functional and regional groups which are separate from each other and whose mutual relationships are in some respects analogous to those of separate systems of municipal law.[8]

6. Very presciently, Jenks envisaged the need for a close analogy with conflict of laws to deal with this type of fragmentation. This would be a law regulating not conflicts between territorial legal systems, but conflicts between treaty regimes. A second reason for the phenomenon he found within the law itself:

> One of the most serious sources of conflict between law-making treaties is the imperfect development of the law governing the revision of multipartite instruments and defining the legal effect of revision.[9]

7. There is little to be added to that analysis today. Of course, the volume of multilateral—"legislative"—treaty activity has grown manifold in the past fifty years.[10] It has also been accompanied by various more or less formal regulatory regimes, not all of which share the public law orientation of multilateral diplomacy.[11] One of the features of late international modernity has been what sociologists have called "functional differentiation", the increasing specialization of parts of society and the related autonomization of those parts. This takes place nationally as well as internationally. It is a well-known paradox of globalization that, while it has led to increasing uniformization in the life of societies around the world, it has also led to the increasing fragmentation thereof—that is, to the emergence of specialized and relatively autonomous spheres of social action and structure.

8. The fragmentation of the international social world has attained legal significance, especially as it has been accompanied by the emergence of specialized and (relatively) autonomous rules or rule complexes, legal institutions and spheres of legal practice.[12] What once appeared to be governed by "general international law" has become the field of operation for such specialist systems as "trade law", "human rights law", "environmental law", the "law of the sea", "European law" and even such exotic and highly specialized knowledge as "investment law" or "international refugee law", etc., each possessing its own principles and institutions. The problem, as lawyers have seen it, is that such specialized law-making and institution-building tends to take place with relative ignorance of legislative and institutional activities in adjoining fields and of the general principles and practices of international law. The result is conflicts between rules or rule systems, deviating institutional practices and, possibly, the loss of an overall perspective on the law.[13]

9. While the reality and importance of fragmentation, in both its legislative and its institutional form, cannot be doubted, international lawyers have been divided in their assessment of the phenomenon. Some commentators have been highly critical of what they have seen as the erosion of general international law, the emergence of conflicting jurisprudence, forum-shopping, and loss of legal security. Others have seen here merely a technical problem that has emerged naturally with the increase of international legal activity and may be controlled by the use of technical streamlining and coordination.[14]

10. Without going into details of the sociological or political background that has led to the emergence of special

---

[8] C. W. Jenks, "The conflict of law-making treaties", *British Year Book of International Law 1953*, vol. 30, p. 401, at p. 403.

[9] *Ibid.*

[10] Over 50,000 treaties are registered in the United Nations system. See C. J. Borgen, "Resolving treaty conflicts", *George Washington International Law Review*, vol. 37, No. 3 (2005), p. 573. In the twentieth century, about 6,000 multilateral treaties were concluded, of which around 30 per cent were general treaties, open for all States to participate in (C. Ku, *Global Governance and the Changing Face of International Law,* Academic Council on the United Nations System, 2001, p. 5).

[11] Of the various collections that discuss the diversification of the sources of international regulation, particularly useful are E. Loquin and C. Kessedjian (eds.), *La mondialisation du droit,* Paris, Litec, 2000, and P. S. Berman (ed.), *The Globalization of International Law*, Aldershot, Ashgate, 2005. The activity of traditional organizations is examined in J. E. Alvarez, *International Organizations as Law-makers*, Oxford, Oxford University Press, 2005. Different perspectives on non-treaty law-making today are also presented in R. Wolfrum and V. Röben (eds.), *Developments of International Law in Treaty Making*, Berlin, Springer, 2005, pp. 417–586, and R. Lipschutz and C. Fogel, "'Regulation for the rest of us?' Global civil society and the privatization of transnational regulation", in R. B. Hall and T. J. Biersteker (eds.), *The Emergence of Private Authority in Global Governance*, Cambridge, Cambridge University Press, 2002, p. 115.

[12] See, in particular, A. Fisher-Lescano and G. Teubner, "Regime-collisions: the vain search for legal unity in the fragmentation of global law", *Michigan Law Journal of International Law*, vol. 25, No. 4 (summer 2004), pp. 999–1046. The matter has, however, already been discussed in great detail in L. A. N. M. Barnhoorn and K. C. Wellens (eds.), *Diversity in Secondary Rules and the Unity of International Law,* The Hague, Martinus Nijhoff, 1995.

[13] It should not be forgotten that the tradition of legal pluralism seeks precisely to deal with such problems. So far, however, pluralism has concentrated on studying the coexistence of indigenous and Western law in old colonial territories and the emergence of types of private law in domestic societies. For a famous statement, see S. E. Merry, "Legal pluralism", *Law and Society Review*, vol. 22, No. 5 (1988), p. 869, and, more recently (and critically), S. Roberts, "After government? On representing law without the State", *Modern Law Review*, vol. 68, No. 1 (January 2005), p. 1.

[14] "Fragmentation" is a topic very frequently covered by academic writings and conferences today. In addition to the sources in footnote 11 above, see "Symposium issue—The proliferation of international tribunals: piecing together the puzzle", *New York University Journal of International Law and Politics*, vol. 31, No. 4 (summer 1999) p. 679; A. Zimmermann and R. Hoffmann (eds.), with assistant editor H. Goeters, *Unity and Diversity in International Law: Proceedings of an International Symposium of the Kiel Walther Schücking Institute of International Law, November 4–7, 2004*, Berlin, Duncker & Humblot, 2006; and R. Huesa Vinaixa and K. Wellens (eds.), *L'influence des sources sur l'unité et la fragmentation du droit international. Travaux du séminaire tenu à Palma, les 20-21 mai 2005*, Brussels, Bruylant, 2006. A strong plea for unity is contained in P.-M. Dupuy, "L'unité de l'ordre juridique international. Cours général de droit international public (2000)", *Recueil des cours de l'Académie de droit international de La Haye, 2002*, vol. 297. For more references, see M. Koskenniemi and P. Leino, "Fragmentation of international law? Postmodern anxieties", *Leiden Journal of International law*, vol. 15, No. 3 (September 2002), p. 553.

or specialist rule systems and institutions, the nature of the legal problem may perhaps best be illustrated by reference to a practical example. The question of the possible environmental effects of the operation of the MOX Plant nuclear facility at Sellafield, United Kingdom, has recently been raised through three different institutional mechanisms: an arbitral tribunal set up under annex VII to the United Nations Convention on the Law of the Sea; the compulsory dispute settlement procedure under the Convention for the Protection of the Marine Environment of the North-East Atlantic (OSPAR Convention); and proceedings under the Treaties establishing the European Community and the European Atomic Energy Community (EURATOM) before the European Court of Justice. Three rule complexes all appear to address the same facts: the (universal) rules of the United Nations Convention on the Law of the Sea, the (regional) rules of the OSPAR Convention and the (regional) rules of the European Community and EURATOM. Which should be determinative? Is the problem principally about the law of the sea, about (possible) pollution of the North Sea, or about relationships within the European Community? The fact of posing such questions already points to the difficulty of providing an answer. How do such rule complexes link to each other, if at all? What principles should be used in order to decide a potential conflict between them?

11.    Yet the problem is even more difficult. Discussing the objection to its jurisdiction raised by the United Kingdom on account of the same matter being also pending before an OSPAR arbitral tribunal and the European Court of Justice, the arbitral tribunal set up under annex VII to the United Nations Convention on the Law of the Sea observed:

> [E]ven if the OSPAR Convention, the [Treaty establishing the European Community] and the Euratom Treaty contain rights or obligations similar to or identical with the rights or obligations set out in the [United Nations Convention on the Law of the Sea], the rights and obligations under those agreements have a separate existence from those under the Convention.[15]

12.    The tribunal held that even the application of the same rules by different institutions might be different owing to "differences in the respective contexts, objects and purposes, subsequent practice of parties and *travaux préparatoires*".[16] The tribunal recognized that the meaning of legal rules and principles is dependent on the context in which they are applied. If the context, including the normative environment, is different, then even identical provisions may appear differently. But what does this do to the objectives of legal certainty and the equality of legal subjects?

13.    The previous paragraph raises both institutional and substantive problems. The former have to do with the competence of various institutions applying international legal rules and their hierarchical relations *inter se*. The Commission decided to leave this question aside. The issue of institutional competencies is best dealt with by the institutions themselves. The Commission instead wished to focus on the substantive question—the splitting up of the law into

highly specialized "boxes" that claim relative autonomy both from one other and from the general law. What are the substantive effects of such specialization? How should the relationship between such "boxes" be conceived? In terms of the above example, what is the relationship between the United Nations Convention on the Law of the Sea, an environmental treaty and a regional integration instrument?

14.    The Commission has understood the subject to have both positive and negative sides, as attested by its reformulation of the title of the topic: "Fragmentation of international law: difficulties arising from the diversification and expansion of international law". On the one hand, fragmentation does create the danger of conflicting and incompatible rules, principles, rule systems and institutional practices. On the other, it reflects the rapid expansion of international legal activity into various new fields and the diversification of its objects and techniques. The title seems to suggest that, although there are "problems", they are neither altogether new nor of such nature that they could not be dealt with through techniques international lawyers have used to deal with normative conflicts that may have arisen in the past.

15.    The rationale for the Commission's treatment of fragmentation is that the emergence of new and special types of law, "self-contained regimes" and geographically or functionally limited treaty systems creates problems of coherence in international law. New types of specialized law do not emerge accidentally but seek to respond to new technical and functional requirements. The emergence of "environmental law" is a response to growing concern over the state of the international environment. "Trade law" develops as an instrument to regulate international economic relations. "Human rights law" aims to protect the interests of individuals and "international criminal law" gives legal expression to the "fight against impunity". Each rule complex or "regime" comes with its own principles, its own form of expertise and its own "ethos", not necessarily identical to the ethos of neighbouring specializations. "Trade law" and "environmental law", for example, have highly specific objectives and rely on principles that may often point in different directions. In order for the new law to be efficient, it often includes new types of treaty clauses or practices that may not be compatible with old general law or the law of some other specialized branch. Very often new rules or regimes develop precisely in order to deviate from what was earlier provided by the general law. When such deviations become general and frequent, the unity of the law suffers.

16.    Such deviations should not be understood as "mistakes" of legal technique. They reflect the differing pursuits and preferences that actors in a pluralistic (global) society have. In conditions of social complexity, it is pointless to insist on formal unity. A law that failed to articulate the differences experienced between factual situations or between the interests or values that appeared relevant in particular problem areas would seem altogether unacceptable, simultaneously utopian and authoritarian;[17] but if fragmentation is in this sense a "nat-

---

[15] *MOX Plant* (*Ireland v. the United Kingdom*), International Tribunal for the Law of the Sea, provisional measures, order of 3 December 2001, *ITLOS Reports 2001*, p. 95, at p. 106, para. 50; ILR, vol. 126, p. 273.

[16] *ITLOS Reports 2001*, p. 106, para. 51; ILR, vol. 126, pp. 273–274.

[17] The emergence of an international legal pluralism has been given an ambitious overview in B. de Sousa Santos, *Toward a New Common Sense: Law, Science and Politics in the Paradigmatic Transition*, New York, Routledge, 1995, especially pp. 114 *et seq.*

ural" development (indeed, international law was always relatively "fragmented" owing to the diversity of national legal systems that participated in it) then it is not obvious why the Commission should deal with it.

17.   The starting point for this report is that it is desirable to provide a conceptual framework within which what is perhaps inevitable can be grasped, assessed and managed from the point of view of the legal professional. That framework is provided by the Vienna Convention on the Law of Treaties (1969 Vienna Convention). One aspect that does seem to unite most of the new regimes is that they claim binding force from, and are understood by their practitioners to be covered by, the law of treaties. As the organ that once prepared the 1969 Vienna Convention, the Commission is in a good position to analyse international law's alleged fragmentation from that perspective. It is useful to note what is involved here: although, sociologically speaking, present fragmentation contains many new features, and its intensity differs from analogous phenomena in the past, it is nevertheless an incidence of the diversity of the international social world—a quality that has always marked the international system, contrasting it with the (relatively) more homogeneous domestic context. The fragmentation of the international legal system into technical "regimes", when examined from the point of view of the law of treaties, is not too different from its traditional fragmentation into more or less autonomous territorial regimes called "national legal systems".

18.   It is therefore useful to have regard to the wealth of techniques in traditional law for dealing with tensions or conflicts between legal rules and principles. What is common to these techniques is that they seek to establish meaningful relationships between such rules and principles so as to determine how they should be used in any particular dispute or conflict. This report discusses four types of relationships that lawyers have traditionally understood to be involved in normative conflicts:

   (a)   Relationships between special and general law (chapter II);

   (b)   Relationships between prior and subsequent law (chapter III);

   (c)   Relationships between laws at different hierarchical levels (chapter IV); and

   (d)   How law relates to its "normative environment" more generally (chapter V).

19.   Such relationships may be conceived in varying ways. At one end of the spectrum is the case where one law (norm, rule, principle, rule complex) simply invalidates another law. This takes place only in hierarchical relations involving *jus cogens*. Much more often, priority is "relative". The "other law" is set aside only temporarily and may often be allowed to influence the interpretation and application of the prioritized law "from the background". Then there is the case where two norms are held to act concurrently, mutually supporting each other. At the other end of the spectrum is the case where, finally, there appears to be no conflict or divergence at all. The laws are in harmony.

20.   This report will discuss such relationships especially by reference to the practice of international courts and tribunals. The assumption is that international law's traditional "fragmentation" has already equipped practitioners with techniques to deal with rules and rule systems that point in different directions. This does not mean cancelling out the importance of the recent push towards the functional specialization of regulatory regimes, but it does suggest that these factual developments are of relatively minor significance to the operation of legal reasoning. In an important sense, "fragmentation" and "coherence" are not aspects of the world but lie in the eye of the beholder. What is new and unfamiliar will (by definition) challenge accustomed ways of thinking and organizing the world. Novelty presents itself as "fragmentation" of the old world. In such a case, it is the task of reasoning to make the unfamiliar familiar by integrating it into received patterns of thought or by amending those patterns so that the new phenomenon can be accommodated. Of course, there will always remain some "cognitive dissonance" between the familiar conceptual system and the new information we receive from the world. The problems of coherence raised by the *MOX Plant* case, for example, have not *already* been resolved in some juristic heaven so that the only task would be to try to find that pre-existing solution. But the fact that the potential overlap or conflict between the rules of the United Nations Convention on the Law of the Sea, the OSPAR Convention and European Community law cannot be resolved immediately does not mean that it could not be framed within familiar patterns of legal reasoning. This report is about legal reasoning. Although it does not purport to give ready-made solutions to a problem such as that of the MOX Plant, it does provide a toolbox, with the help of which lawyers dealing with that problem (or any other comparable issue) may be able to proceed to a reasoned decision.

## B.   What is a "conflict"?

21.   This report examines techniques to deal with conflicts (or *prima facie* conflicts) in the substance of international law. This raises the question of what is a "conflict"? This question may be approached from two perspectives: the subject matter of the relevant rules and the legal subjects bound by them. Article 30 of the 1969 Vienna Convention, for example, appears to adopt the former perspective. It suggests techniques for dealing with successive treaties relating to the "same subject-matter". It is sometimes suggested that this removes the applicability of article 30 when a conflict emerges between, for example, a trade treaty and an environmental treaty, because they deal with *different* subjects.[18] But this cannot be so, inasmuch as these characterizations ("trade law", "environmental law") have no normative value *per se*. They are only informal labels that describe the instruments from the perspective of different interests or different policy objectives. Most international instruments may be described from various perspectives: a treaty dealing with trade may have significant human rights and environmental implications and *vice versa*. A treaty on, say, maritime transport of chemicals relates to at least the law of the sea, environmental law, trade law and the law of maritime transport. These characterizations have less to

---

[18] Borgen (see footnote 10 above), pp. 603–604.

do with the "nature" of the instrument than the interest from which it is described.

22.    If conflict were to exist only between rules that deal with the "same" subject matter, then the way a treaty is applied would become crucially dependent on how it would be classified under some (presumably) pre-existing classification scheme of different subjects. But there are no such classification schemes. Everything would in fact be dependent on argumentative success in pigeon-holing legal instruments as having to do with "trade" instead of "the environment", "refugee law" instead of "human rights law", "investment law" instead of "the law of development". Think again about the example of maritime carriage of chemical substances. If there are no definite rules on such classification, and any classification relates to the interest from which the instrument is described, then it might be possible to avoid the appearance of conflict by what seems like a wholly arbitrary choice as to what interests are relevant and what are not: from the perspective of marine insurers, say, the case would be predominantly about carriage, while, from the perspective of an environmental organization, the predominant aspect of it would be environmental. The criterion of "subject matter" leads to *reductio ad absurdum*; therefore, it cannot be decisive in the determination of whether or not there is a conflict.[19] As pointed out by Vierdag in his discussion of this criterion in regard to subsequent agreements under article 30 of the 1969 Vienna Convention:

[t]he requirement that the instruments must relate to the same subject-matter seems to raise extremely difficult problems in theory, but may turn out not to be so very difficult in practice. If an attempted simultaneous application of two rules to one set of facts or actions leads to incompatible results it can safely be assumed that the test of sameness is satisfied.[20]

23.    This seems right. The criterion of "same subject matter" already seems to be fulfilled if two different rules or sets of rules are invoked with regard to the same matter, or if, in other words, as a result of interpretation, the relevant treaties seem to point in different directions in terms of their application by a party.

24.    This is not the end of the matter, however. What does "pointing in different directions" mean? A strict notion would presume that a conflict exists if it is possible for a party to two treaties to comply with one rule only by thereby failing to comply with another rule. This is the basic situation of incompatibility. An obligation may be fulfilled only by thereby failing to fulfil another obligation. However, there are other, looser understandings of conflict as well.[21] One treaty may sometimes

frustrate the goals of another treaty without there being any strict incompatibility between their provisions. Two treaties or sets of rules may possess different background justifications or emerge from different legislative policies or aim at divergent ends. The law of State immunity and the law of human rights, for example, illustrate two sets of rules that have very different objectives. Trade law and environmental law, too, emerge from different types of policy, and that fact may have an effect on how the relevant rules are interpreted or applied. While such "policy conflicts" do not lead to logical incompatibilities between obligations upon a single party, they may nevertheless also be relevant for fragmentation.[22]

25.    This report adopts a wide notion of conflict as a situation where two rules or principles suggest different ways of dealing with a problem. Focusing on a mere logical incompatibility mischaracterizes legal reasoning as logical subsumption. In fact, any decision will involve interpretation and choice between alternative rule formulations and meanings that cannot be pressed into the model of logical reasoning.

26.    Conflicts between rules are a phenomenon in every legal order. Every legal order is also familiar with ways to deal with them. Maxims such as *lex specialis* or *lex posterior* are known to most legal systems and, as will be explained in much more detail below, to international law. Domestic legal orders also have robust hierarchical relations between rules and rule systems (in addition to hierarchical institutions to decide rule conflicts). In international law, however, as will also be discussed in chapter IV below, there are far fewer and much less robust hierarchies, and there are many types of interpretative principles that purport to help out in conflict resolution. Nevertheless, it is useful to agree with Jenks:

Assuming, as it is submitted we must, that the development of a coherent body of principles on the subject is not merely desirable but necessary, we shall be constrained to recognize that, useful and indeed essential as such principles may be to guide us to reasonable conclusions in particular cases, they have no absolute validity.[23]

### C.    The approach of this study: seeking relationships

27.    Conflict ascertainment and conflict resolution are part of *legal reasoning*, that is, of the pragmatic process by which lawyers go about interpreting and applying formal law. In this process, legal rules rarely, if ever, appear alone, without some relationship to other rules. Typically, even single (primary) rules that lay down individual rights and obligations presuppose the existence of (secondary) rules that provide for the powers of legislative agencies to enact, modify and terminate such rules and for the competence of law-applying bodies to interpret and apply them.

---

[19] This is not to say that the fact that two treaties may or may not belong to the same "regime" is irrelevant for the way their relationship is conceived. See further, in particular, chapter II, section C.1, below.

[20] E. W. Vierdag, "The time of the 'conclusion' of a multilateral treaty: article 30 of the Vienna Convention on the Law of Treaties and related provisions", *British Year Book of International Law 1988*, vol. 59, p. 75, at p. 100.

[21] The most in-depth discussion is in J. Pauwelyn, *Conflict of Norms in Public International Law: How WTO Law Relates to Other Rules of International Law*, Cambridge, Cambridge University Press, 2003, pp. 164–200 (noting the way the bodies of the World Trade Organization (WTO) have used a narrow understanding of "conflict" as incompatibility). See also the distinction made by Jenks between "conflicts" and "divergences" (Jenks (see footnote 8 above), pp. 425–427) and, for a rather strict definition of "conflict", J. B. Mus, "Conflicts between

treaties in international law", *Netherlands International Law Review*, vol. 45 (1998), p. 208, at pp. 214–217; S. A. Sadat-Akhavi, *Methods of Resolving Conflicts between Treaties*, Leiden, Martinus Nijhoff, 2003, pp. 5–7.

[22] For a discussion, see R. Wolfrum and N. Matz, *Conflicts in International Environmental Law*, Berlin, Springer, 2003, pp. 6–13, and N. Matz, *Wege zur Koordinierung völkerrechtlicher Verträge: Völkervertragsrechtliche und institutionelle Ansätze*, Berlin, Springer, 2005, pp. 8–18 (a categorization of conflict types from logical incompatibility to political conflicts and overlaps of regulatory scope).

[23] Jenks (see footnote 8 above), p. 407.

28.  But even substantive primary rules usually appear in clusters, together with exceptions, provisions for technical implementation and larger interpretative principles. The commonplace distinction between "rules" and "principles" captures one set of typical relationships: those between norms of a lower and higher degree of abstraction. A "rule" may thus sometimes be seen as a specific application of a "principle" and understood as *lex specialis* or *lex posterior* in regard to it, and become applicable in its stead. In such a case, the special/general or prior/subsequent distinction does not work as a conflict resolution technique but as an interpretative guideline indicating that one rule should be interpreted in view of the other, of which it is only an instance or an elaboration.[24]

29.  Alternatively, the general or earlier principle may be understood to articulate a rationale or a purpose to the specific (or later) rule. Thus, for instance, the fisheries provisions in the United Nations Convention on the Law of the Sea may be seen as background principles, of which any particular treaties concerning fishery resources could be seen as instances or elaborations.[25]

30.  For example, in the *Southern Bluefin Tuna* case (2000), Japan had argued *inter alia* that the 1993 Convention for the Conservation of Southern Bluefin Tuna applied to the case both as *lex specialis* and *lex posterior*, excluding the application of the 1982 United Nations Convention on the Law of the Sea.[26] The arbitration tribunal, however, held that both the 1982 and the 1993 instruments were applicable. The tribunal recognized that

it is a commonplace of international law and State practice for more than one treaty to bear upon a particular dispute. There is no reason why a given act of a State may not violate its obligations under more than one treaty. There is frequently a parallelism of treaties, both in their substantive content and in their provisions for settlement of disputes arising thereunder. The current range of international legal obligations benefits from a process of accretion and cumulation; in the practice of States, the conclusion of an implementing convention does not necessarily vacate the obligations imposed by the framework convention upon the parties to the implementing convention. The broad provisions for the promotion of universal respect for and observance of human rights, and the international obligation to co-operate for the achievement of those purposes, found in Articles 1, 55 and 56 of the Charter of the United Nations, have not been discharged for States Parties by their ratification of the Human Rights Covenants and other human rights treaties … Nor is it clear that the particular provisions of the 1993 Convention exhaust the extent of the relevant obligations of [the United Nations Convention on the Law of the Sea]. In some respects, [the United Nations Convention on the Law of the Sea] may be viewed as extending beyond the reach of the [Convention for the Conservation of Southern Bluefin Tuna].[27]

31.  This is quite an appropriate description of a number of situations that may arise between a general multilateral treaty and specific bilateral or regional treaties. In such cases, the characterization of the latter as *lex specialis* or *lex posterior* may not always lead to the setting aside of the general treaty. Instead, that earlier and general instrument remains "in the background", controlling the way the later and more specific rules are being interpreted and applied.[28] Whether this relationship is then conceived in terms of an (informal) hierarchy or a division of labour seems beside the point. However, none of this takes away the difficulty of appreciating what it means for the later or more specific instrument to involve a "development" or "application" of a more general instrument and when it is intended to be an exception or a limitation thereto. Any technical rule that purports to "develop" the freedom of the high seas is also a limitation of that freedom to the extent that it lays down specific conditions and institutional modalities that must be met in its exercise.

32.  The Commission has traditionally been aware of the difficulty of making a clear distinction between "progressive development" and "codification". An analogous difficulty affects any attempt to distinguish clearly between "application" of a general rule and "limitation" of or "deviation" from it. All this is dependent on how one interprets the general law to which the specific or later instrument seeks to add something. Care should therefore be taken not to infer that a special law need automatically be interpreted "widely" or "narrowly". How it is interpreted depends on how the relationship between the general and the special law is conceived ("application" or "exception"?). This, again, requires seeing the relationship as part of some "system".

33.  It is often said that law is a "system". By this, no more need be meant than that the various decisions, rules and principles of which the law consists do not appear randomly related to each other.[29] Although there may be disagreement among lawyers about just how the systemic relationship between the various decisions, rules and principles should be conceived, there is seldom disagreement that it is one of the tasks of legal reasoning to establish it.

34.  This cannot be understood as reaffirming something that already "exists" before the systemic effort itself. There is no single legislative will behind international law. Treaties and custom come about as a result of conflicting motives and objectives—they are "bargains" and "package deals" and often result from spontaneous reactions to events in the environment. But if legal reasoning is understood as a *purposive* activity, then it follows that it should be seen not merely as the mechanical application of apparently random rules, decisions or behavioural patterns, but as the operation of a whole that is directed toward some

---

[24] See N. MacCormick, *Legal Reasoning and Legal Theory,* Oxford, Clarendon Press, 1978, p. 156 and generally pp. 152–194. There are many understandings of the nature of the difference between "rules" and "principles". For these, see M. Koskenniemi, "General principles: reflexions on constructivist thinking in international law", in M. Koskenniemi (ed.), *Sources of International Law,* Aldershot, Ashgate, 2000, p. 359. For a recent discussion of the operation of the rule/principle dichotomy in international law (self-determination), see K. Knop, *Diversity and Self-Determination in International Law,* Cambridge, Cambridge University Press, 2002, p. 20.

[25] This also seems to be affirmed in article 87 of the United Nations Convention on the Law of the Sea.

[26] *Southern Bluefin Tuna Case between Australia and Japan and between New Zealand and Japan*, decision of 4 August 2000 (jurisdiction and admissibility), UNRIAA, vol. XXIII (Sales No. E/F.04.V.15), p. 1, at p. 23, para. 38 (*c*).

[27] *Ibid.*, pp. 40–41, para. 52.

[28] For example, article 4 of the Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks provides that the Agreement "shall be interpreted and applied in the context of and in a manner consistent with the Convention".

[29] The view that holds international law a "primitive" structure bases itself on the claim that the rules of international law do not form a "system" but merely an aggregate of (primary) rules that States have contracted. See H. L. A. Hart, *The Concept of Law,* Oxford, Oxford University Press, 1961, pp. 208–231.

human objective. Again, lawyers may disagree about what the objective of a rule or a behaviour is, but it does not follow that no such objective at all can be envisaged. Much legal interpretation is geared towards linking an unclear rule to a purpose and thus, by showing its position within some system, to providing a justification for applying it in one way rather than another. Thus, while the conclusion of a general treaty may sometimes be intended to set aside previously existing scattered provisions in some area—for example, the 1982 United Nations Convention on the Law of the Sea explicitly set aside the Geneva Conventions on the Law of the Sea of 1958[30]—sometimes no such intention can be inferred. The adoption in 1966 of the two universal human rights covenants (the International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights) did not imply any setting aside or overriding of the (more specific) provisions of the Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention on Human Rights) of 1950.[31] Whether the later regulation intends to preserve or push aside previous legislation cannot, again, be decided *in abstracto*. This can only be decided through interpretation.

35.    Legal interpretation, and therefore legal reasoning, builds systemic relationships between rules and principles by envisaging them as part of some human effort or purpose. Far from being merely an "academic" aspect of the legal craft, systemic thinking penetrates all legal reasoning, including the practice of applying the law by judges and administrators.[32] This results precisely from the "clustered" form in which legal rules and principles appear. But it may also be rationalized in terms of a *political obligation* on those who apply the law to make their decisions coherent with the preferences and expectations of the community whose law they administer.[33]

36.    It is a preliminary step to any act of applying the law that a *prima facie* view of the matter is formed. This includes, among other things, an initial assessment of what might be the applicable rules and principles. The result will often be that a number of standards may seem *prima facie* relevant. A choice is needed, along with a justification for having recourse to one instead of another. Moving from the *prima facie* view to a conclusion, legal reasoning will either have to seek to harmonize apparently conflicting standards through interpretation or, if that seems implausible, to establish definite relationships of priority

among them. Here, interpretative maxims and conflict resolution techniques such as *lex specialis*, *lex posterior* or *lex superior* become useful. They enable a systemic relationship to be seen between two or more rules and may thus justify a particular choice of applicable standard and a particular conclusion. They do not do this mechanically, however, but rather as "guidelines",[34] suggesting a pertinent relationship among the relevant rules in view of the need for the conclusion to be consistent with the perceived purposes or functions of the legal system as a whole.[35] The fact that this takes place in an indeterminate setting takes nothing away from its importance. Through it, the legal profession articulates law and gives it shape and direction. Instead of a random collection of directives, the law begins to assume the shape of a purposive (legal) system.

### D.  Harmonization: systemic integration

37.    In international law, there is a strong presumption against normative conflict. Treaty interpretation is diplomacy, and it is the business of diplomacy to avoid or mitigate conflict. This extends to adjudication as well. As Rousseau describes the duties of a judge, in one of the earlier but still more useful discussions of treaty conflict:

*lorsqu'il est en présence de deux accords de volontés divergents, il doit être tout naturellement porté à rechercher leur coordination plutôt qu'à consacrer leur antagonisme.*[36]

38.    This has emerged into a widely accepted principle of interpretation and it may be formulated in many ways. It may appear as the rule of thumb that, when creating new obligations, States are assumed not to derogate from their existing obligations. Jennings and Watts, for example, note the presence of a

presumption that the parties intend something not inconsistent with generally recognised principles of international law, or with previous treaty obligations towards third States.[37]

39.    As the International Court of Justice stated in the *Right of passage over Indian territory* case:

[i]t is a rule of interpretation that a text emanating from a Government must, in principle, be interpreted as producing and as intended to produce effects in accordance with existing law and not in violation of it.[38]

---

[30] See article 311 of the United Nations Convention on the Law of the Sea.

[31] See article 44 of the International Covenant on Civil and Political Rights and comment in K. Zemanek, "The legal foundations of the international system: general course on public international law", *Recueil des cours de l'Académie de droit international de La Haye, 1997*, vol. 266, pp. 227–228. See also Sadat-Akhavi (footnote 21 above), pp. 120–124.

[32] For "systematization"—that is, the establishment of systemic relationships between legal rules—as a key aspect of legal reasoning, see, for example, A. Aarnio, *Denkweisen der Rechtswissenschaft,* Vienna, Springer, 1979, pp. 50–77 and, generally, J. Raz, *The Concept of a Legal System: An Introduction to the Theory of Legal System*, 2nd ed., Oxford, Clarendon Press, 1980. For a treatment of international law through a sociologically oriented ("Luhmannian") systems theory, see A. Fischer-Lescano, "Die Emergenz der Globalverfassung", *Zeitschrift für ausländisches öffentliches Recht und Völkerrecht,* vol. 63 (2003), p. 717.

[33] This view is famously articulated in R. Dworkin, *Taking Rights Seriously,* Cambridge (Massachusetts), Harvard University Press, 1977.

[34] As suggested by the comments of the United States of America on the Waldock draft of what became articles 30 and 31 of the 1969 Vienna Convention. See sixth report on the law of treaties, by Sir Humphrey Waldock, Special Rapporteur, *Yearbook … 1966*, vol. II, document A/CN.4/186 and Add.1–7, p. 94.

[35] For the techniques of "second-order justification" that enable the resolution of hard cases (*i.e.* cases where no "automatic" decisions are possible) and that look either to the consequences of a decision or to the systemic coherence and consistency of the decision with the legal system (seen as a purposive system), see MacCormick (footnote 24 above), pp. 100–128.

[36] "[W]hen faced with two treaties that differ in intent, [the judge] must quite naturally be inclined to seek to reconcile them rather than entrench their divergences": C. Rousseau, "De la compatibilité des normes juridiques contradictoires dans l'ordre international", RGDIP, vol. 39 (1932), p. 133, at p. 153.

[37] R. Jennings and A. Watts (eds.), *Oppenheim's International Law*, 9th ed., Harlow, Longman, 1992, p. 1275. For the wide acceptance of the presumption against conflict—that is, the suggestion of harmony—see also Pauwelyn, *Conflict of Norms…* (footnote 21 above), pp. 240–244.

[38] *Case concerning right of passage over Indian territory,* Preliminary Objections, Judgment of 26 November 1957, *I.C.J. Reports 1957,* p.125, at p. 142.

40.  There are other reasons, too, why one might wish to avoid formal statements confirming incompatibility. As noted above, this may often be a matter of political assessment. In the controversial *Austro-German Customs Union* case[39] from 1931, for example, the Permanent Court of International Justice observed that the projected union with Germany violated the obligation Austria had undertaken in the Treaty of Peace between the Allied and Associated Powers and Germany (Treaty of Versailles) and the Treaty of Peace between the Allied and Associated Powers and Austria (Treaty of Saint-Germain) not to alienate its independence. As Judge Anzilotti pointed out, the Court was here invited to decide a wholly political question. What legal standards were there to instruct on whether a customs union between Austria and Germany, with all the history of their relationship and its linkage to European problems, would encroach on Austria's independence? In this regard, a treaty with Germany was of a completely different nature than a treaty with, say, Czechoslovakia.[40] The potential "fragmentation" at issue in the *Austro-German* case highlights the linkage of the legal problem of compatibility with the preferences of the actors and the need for some subtlety in coping with them. A straightforward statement of incompatibility might sometimes be strictly inadvisable.

41.  There is relatively little—in fact, until recently, astonishingly little—judicial or arbitral practice on normative conflicts. As Borgen suggests, this must result in part from the wish of States parties to negotiate issues of apparent conflict between themselves and not to give the power to outsiders to decide on what may appear as coordination difficulties that may have their roots in the heterogeneous interests represented in national administrations. And negotiation is rarely about the "application" of conflict rules rather than trying to find a pragmatic solution that could re-establish the disturbed harmony. Although it might be interesting to discuss the way States have resolved such problems by negotiation, the fact that any results attained have come about through contextual bargaining makes it difficult to use them as the basis for some customary rule or other.[41]

42.  However, although harmonization often provides an acceptable outcome for normative conflict, there is a definite limit to harmonization: "[it] may resolve apparent conflicts; it cannot resolve genuine conflicts".[42] This does not mean that there are normative conflicts whose intrinsic nature renders them unsuitable for harmonization. Between the parties, anything may be harmonized as long as the will to harmonize it is present. Sometimes, however, that will may not be present, perhaps because the positions of the parties are so far apart from each other—something that may ensue from the importance of the clash of interests or preferences that is expressed in the normative conflict, or from the sense that

the harmonizing solution would sacrifice the interests of the party in a weaker negotiating position. In this respect, there is a limit to how far a "coordinating" solution may be applied to resolve normative conflicts. Especially where a treaty lays out clearly formulated rights or obligations of legal subjects, care must be taken not to see these merely as negotiating chips in the process of reaching a coordinating solution.

43.  When normative conflicts come to be settled by third parties, the pull of harmonization remains strong, though perhaps not as compelling as between the parties themselves. Because ascertaining the presence of a conflict already requires interpretation, it may often be possible to deal with potential conflicts by simply ignoring them, especially if none of the parties has raised the question. But when a party raises a point about conflict and about the precedence of one obligation over another, then a stand must be taken. Of course, in such a case, it is still possible to reach the conclusion that, although the two norms seem to point in diverging directions, it is still possible, after some adjustment, to apply or understand them in such way that no overlap or conflict will remain. This may sometimes call for the application of the kinds of conflict resolution rules which the bulk of this report will deal with. But it may also take place through an attempt to reach a resolution that integrates the conflicting obligations in some optimal way into the general context of international law. Inasmuch as the question of conflict arises with regard to the fulfilment of the *objectives* (instead of the obligations) of the different instruments, little may be done by the relevant body. In any case, a third-party settlement body is always limited in its jurisdiction.

## E.  Jurisdiction versus applicable law

44.  In debates about fragmentation and normative conflict, the suggestion is sometimes made that, whatever the relationships between legal rules and principles as conceived under *general international law*, those relationships cannot be applied as such by treaty bodies or dispute settlement organs whose jurisdiction is limited to or by their constituting instruments. A human rights body, for example, should have no business applying an agreement covered by the World Trade Organization (WTO). This suggestion, which in essence is merely an argument about the self-contained nature of some regimes, will be discussed in detail in chapter II, section C, below. Thus, only a few remarks here will suffice.

45.  The jurisdiction of most international tribunals is limited to particular types of dispute or to disputes arising under particular treaties. A limited jurisdiction does not, however, imply a limitation of the scope of the law applicable in the interpretation and application of those treaties. In the WTO context, in particular, a distinction has been made between two notions: jurisdiction and applicable law.[43] While the WTO Understanding on Rules and Pro-

---

[39] *Customs Régime between Germany and Austria (Protocol of March 19th, 1931)*, Advisory Opinion of 5 September 1931, *P.C.I.J. Series A/B*, No. 41, p. 36.

[40] As pointed out in Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), pp. 187–188.

[41] Borgen (see footnote 10 above), pp. 605–606 (but see also his discussion of diplomatic practice, pp. 606–610).

[42] *Ibid.*, p. 640 (quoting Pauwelyn, *Conflict of Norms…* (see footnote 21 above), p. 272).

[43] L. Bartels, "Applicable law in WTO dispute settlement proceedings", *Journal of World Trade*, vol. 35, No. 3 (2001), p. 499, at pp. 501–502; D. Palmeter and P. C. Mavroidis, "The WTO legal system: sources of law", AJIL, vol. 92, No. 3 (July 1998), p. 398, at pp. 398–399; J. Pauwelyn, "The role of public international law in the WTO: how far can we go?", *ibid.*, vol. 95, No. 3 (July 2001), p. 535, at pp. 554–566; G. Marceau, "WTO dispute settlement and human

cedures Governing the Settlement of Disputes limits jurisdiction only to claims that arise under agreements covered by WTO, there is no explicit provision identifying the scope of applicable law.[44] By contrast, for example, Article 38 of the Statute of the International Court of Justice, by listing the sources that the Court should have recourse to in deciding cases, does identify the law to be applied by the Court.[45] Similarly, the United Nations Convention on the Law of the Sea provides that the International Tribunal on the Law of the Sea has "jurisdiction over any dispute concerning the interpretation or application of this Convention" and that, when deciding cases, it "shall apply this Convention and other rules of international law not incompatible with this Convention".[46] As no such explicit provision exists in the Understanding on Rules and Procedures Governing the Settlement of Disputes, the question of the scope of applicable law has seemed problematic. However, WTO is certainly not the only context in which a treaty body has been set up without any express mention that it should apply international law. As will be argued at length, especially in chapters II and V below, treaties covered by WTO are creations of, and constantly interact with, other norms of international law.[47] As the WTO Appellate Body stated in its very first case, the General Agreement [on Tariffs and Trade of 1994] is not to be read in clinical isolation from public international law".[48] What this means in practice is by no means straightforward, but it states what has never been seriously doubted by any international tribunal or treaty-body: that, even as the jurisdiction of a body is limited (as it always—even in the case of the International Court of Justice—is), its exercise of that jurisdiction is controlled by the normative environment.

rights", EJIL, vol. 13, No. 4 (2002), p. 753, at pp. 757–779; A. Lindroos and M. Mehling, "Dispelling the chimera of 'self-contained regimes' international law and the WTO", EJIL, vol. 16, No. 5 (2005), p. 857, at pp. 860–866.

[44] Articles 1, para. 1; 3, para. 2; 7; 11 and 19, para. 2, of the Understanding on Rules and Procedures Governing the Settlement of Disputes have been used to argue both in favour of and against a more extensive scope of applicable law in WTO dispute settlement. See, for example, Bartels, "Applicable law…" (footnote 43 above), pp. 502–509, and Lindroos and Mehling, "Dispelling the chimera of 'self-contained regimes'…" (footnote 43 above), pp. 873–875; see also WTO Panel report, *Korea—Measures Affecting Government Procurement*, WT/DS163/R, adopted 19 June 2000, para. 7.101, footnote 755.

[45] See, for example, Bartels, "Applicable law…" (footnote 43 above), pp. 501–502, and Palmeter and Mavroidis (footnote 43 above), pp. 398–399.

[46] Articles 288, para. 1, and 293, para. 1, of the United Nations Convention on the Law of the Sea.

[47] For instance, Palmeter and Mavroidis (see footnote 43 above), pp. 398–399; J. P. Trachtman, "The domain of WTO dispute resolution", *Harvard International Law Journal*, vol. 40, No. 2 (spring 1999), p. 333; Bartels, "Applicable law…" (footnote 43 above), pp. 501–502; Pauwelyn, "The role of public international law in the WTO…" (footnote 43 above), pp. 554–566; Pauwelyn, *Conflict of Norms…* (footnote 21 above); Marceau, "WTO dispute settlement and human rights" (footnote 43 above), pp. 757–779; Lindroos and Mehling, "Dispelling the chimera of 'self-contained regimes'…" (footnote 43 above), pp. 860–866.

[48] *United States—Standards for Reformulated and Conventional Gasoline*, WTO Appellate Body report, WT/DS2/AB/R, adopted 20 May 1996, p. 17. Similarly, for example, in *Korea—Measures Affecting Government Procurement* (see footnote 44 above), the Panel stated in paragraph 7.96 that "[c]ustomary international law applies generally to the economic relations between the WTO [m]embers. Such international law applies to the extent that the WTO treaty agreements do not 'contract out' from it."

## Chapter II

## Conflicts between special law and general law

46.    This chapter deals with the case where a normative conflict is characterized by a relationship of "speciality" *versus* "generality" between the conflicting norms. The chapter is in five parts. Section A provides a framework for the discussion of conflicts where the speciality or generality of conflicting norms becomes an issue. Section B outlines the role and nature of the *lex specialis* rule as a pragmatic mechanism for dealing with situations where two rules of international law that are both valid and applicable deal with the same subject matter differently.[49] Section C gives an overview of the case law and academic discussion on "self-contained regimes". Section D is a brief discussion of regionalism in international law. Section E presents conclusions on conflicts between special law and general law.

### A.    Introduction

47.    One of the most well-known techniques for analysing normative conflicts focuses on the generality *versus* the particularity of the conflicting norms. In this regard, it is possible to distinguish three types of conflict:

(*a*)    Conflicts between general law and a particular, unorthodox interpretation of general law;

(*b*)    Conflicts between general law and a particular rule that claims to exist as an exception to it; and

(*c*)    Conflicts between two types of special law.

48.    Fragmentation appears differently in each of these three types of conflict. While the first type is really about the effects of differing legal interpretations in a complex institutional environment, and therefore falls strictly speaking outside the scope of the Commission's study, the latter two denote genuine types of conflict where the law itself (in contrast to some putative interpretation of it) appears differently depending on which normative framework is used to examine it.[50] Each of the three types of conflict is illustrated briefly below.

#### 1.    Fragmentation through conflicting interpretations of general law

49.    In the *Tadić* case in 1999, the Appeals Chamber of the International Tribunal for the Former Yugoslavia

[49] To say that a rule is "valid" is to point to its being a part of the ("valid") legal order. To say it is applicable means that it provides rights, obligations or powers to a legal subject in a particular situation.

[50] See discussion of the dependence of normative conflict of different conceptual frameworks in Koskenniemi and Leino, "Fragmentation of international law? …" (footnote 14 above), pp. 553–579.

considered the responsibility of Serbia and Montenegro for the acts of the Bosnian Serb militia in the conflict in the former Yugoslavia. For this purpose it examined the jurisprudence of the International Court of Justice in the *Military and Paramilitary Activities in and against Nicaragua* case of 1986. In the latter case, the United States was not held responsible for the acts of the Nicaraguan *contras* despite organizing, financing, training and equipping them. Such involvement failed to meet the test of "effective control".[51] The International Tribunal for the Former Yugoslavia, for its part, concluded that "effective control" set too high a threshold for holding an outside power legally accountable for domestic unrest. It was sufficient for the power to have "a role in organising, coordinating or planning the military actions of the military group"—*i.e.* to exercise "overall control" over them—for the conflict to be an "international armed conflict".[52]

50.    The contrast between *Military and Paramilitary Activities in and against Nicaragua* and *Tadić* is an example of a normative conflict between an earlier and a later interpretation of a rule of general international law.[53] *Tadić* does not suggest that "overall control" exists alongside "effective control", either as an exception to the general law or as a special (local) regime governing the conflict in the former Yugoslavia. It seeks to *replace* that standard altogether.

51.    The point is not to take a stand in favour of either *Tadić* or *Military and Paramilitary Activities in and against Nicaragua*, only to illustrate the type of normative conflict where two institutions faced with analogous facts interpret the law in differing ways. This is a common occurrence in any legal system, but its consequences for the international legal system, which lacks a proper institutional hierarchy, might seem particularly problematic. Imagine, for example, a case where two institutions interpret the general (and largely uncodified) law concerning title to territory differently. For one institution, State A has validly acquired title to a piece of territory that another institution regards as part of State B. In the absence of a superior institution that could decide such a conflict, States A and B could not undertake official acts with regard to the territory in question with confidence that those acts would be given legal effect by outside powers or institutions. Similar problems would emerge in regard to any conflicting interpretations concerning a general law granting legal status.

52.    Differing views about the content of general law create two types of problem. First, they diminish legal security. Legal subjects are no longer able to predict the

reaction of official institutions to their behaviour and to plan their activity accordingly. Second, they place legal subjects in an unequal position *vis-à-vis* each other. The rights they enjoy depend on which jurisdiction is seized to enforce them. Most domestic laws deal with these problems by means of appeals. An authority (usually a court) at a higher hierarchical level will provide a formally authoritative ruling.[54] Such authority is not normally present in international law. To the extent that such conflicts emerge and are considered a problem (which need not always be the case), they can only be dealt with by legislative or administrative means. Either States adopt a *new law* that settles the conflict, or the institutions will seek to coordinate their jurisprudence in the future.

### 2.    FRAGMENTATION THROUGH THE EMERGENCE OF SPECIAL LAW AS AN EXCEPTION TO GENERAL LAW

53.    A different case is one where an institution makes a decision that deviates from how situations of a similar type have been decided in the past because the new case is held not to come under the general rule, but to form an *exception* to it. This may be illustrated by how human rights organs have dealt with reservations. In the *Belilos v. Switzerland* case (1988), the European Court of Human Rights viewed a declaration made by Switzerland in its instrument of ratification as in fact a reservation, struck it down as incompatible with the object and purpose of the European Convention on Human Rights, and held Switzerland bound by the Convention "irrespective of the validity of the declaration".[55] In subsequent cases, the European Court has pointed out that the normal rules on reservations to treaties do not as such apply to human rights law. In the Court's view:

a fundamental difference in the role and purpose of the respective tribunals [*i.e.* of the International Court of Justice and the European Court of Human Rights], coupled with the existence of a practice of unconditional acceptance … , provides a compelling basis for distinguishing Convention practice from that of the International Court.[56]

54.    Again, the point is neither to endorse nor to criticize the European Court of Human Rights but to point to a phenomenon which, whatever one may think about it, has to do with the emergence of exceptions or patterns of exception in regard to some subject matter that deviate from the general law and that are justified because of the special properties of that subject matter.

### 3.    FRAGMENTATION AS DIFFERENTIATION BETWEEN TYPES OF SPECIAL LAW

55.    Finally, a third case is a conflict between different types of special law. This may be illustrated by reference to debates on trade and the environment. In the 1998 *EC—Hormones* case, the WTO Appellate Body considered the

---

[51] *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment of 27 June 1986, *I.C.J. Reports 1986*, p. 14, at pp. 64–65, para. 115.

[52] *Prosecutor v. Duško Tadić*, Appeals Chamber, International Tribunal for the Former Yugoslavia, case No. IT-94-1-A, judgment of 15 July 1999, *Judicial Reports 1999*, p. 3, at pp. 47–62, paras. 115, 116–145; ILM, vol. 38, No. 6 (November 1999), pp. 1540–1546.

[53] This need not be the only—nor indeed the correct—interpretation of the contrast between the two cases. As some commentators have suggested, the cases can also be distinguished from each other on the basis of their facts. In this case, there would be no normative conflict. Whichever view seems better founded, the point of principle remains: it cannot be excluded that two tribunals faced with similar facts may interpret the applicable law differently.

[54] From a theoretical perspective, the position of courts is absolutely central in managing the functional differentiation—*i.e.* fragmentation—within the law. Coherence here is based on the duty to decide even "hard cases". See, in this regard, especially N. Luhmann, *Law as a Social System*, (trans. K. A. Zeigert, ed. F. Kastner and others), Oxford, Oxford University Press, 2004, in particular pp. 284–296.

[55] *Belilos v. Switzerland*, judgment of 29 April 1988, European Court of Human Rights, Series A, No. 132, p. 28, para. 60.

[56] *Loizidou v. Turkey*, preliminary objections, judgment of 23 March 1995, European Court of Human Rights, Series A, No. 310, p. 29, para. 85.

status of the so-called "precautionary principle" under treaties covered by WTO, especially the Agreement on the Application of Sanitary and Phytosanitary Measures. It concluded that, whatever the status of that principle in "international environmental law", it had not become binding for the WTO.[57] This approach suggests that "environmental law" and "trade law" might be governed by different principles. Which rule to apply would then depend on how a case would be qualified in this regard. This might seem problematic, as denominations such as "trade law" or "environmental law" have no clear boundaries. For example, maritime transport of oil has links to both trade and the environment, as well as to rules on the law of the sea. Should the obligations of a ship owner in regard to the technical particularities of a ship, for instance, be determined by reference to what is reasonable from the perspective of oil transport considered as a commercial activity or as an environmentally dangerous activity? The responses are bound to vary depending on which is chosen as the relevant frame of legal interpretation.

### B.  The function and scope of the *lex specialis* maxim

#### 1.  *Lex specialis* in international law

#### (a)  *Legal doctrine*

56.  The principle that special law derogates from general law is a widely accepted maxim of legal interpretation and technique for the resolution of normative conflicts.[58] It suggests that, if a matter is regulated by a general standard as well as by a more specific rule, then the latter should take precedence over the former. The relationship between the general standard and the specific rule may, however, be conceived in two ways. One is the case where the specific rule should be read and understood within the confines or against the background of the general standard, typically as an elaboration, updating or technical specification thereof.[59] The specific and the general both point, as it were, in the same direction.

57.  Sometimes *lex specialis* is, however, understood more narrowly to cover the case where two legal

provisions, both of which are valid and applicable, are in no express hierarchical relationship and provide incompatible direction on how to deal with the same set of facts. In such a case, *lex specialis* appears as a conflict resolution technique. It suggests that, instead of the (general) rule, one should apply the (specific) exception.[60] In both cases, however, priority falls on the provision that is "special", *i.e.* the rule with a more precisely delimited scope of application.[61]

58.  Nonetheless, the maxim does not admit of automatic application. In particular, two sets of difficulties may be highlighted. First, it is often hard to distinguish what is "general" and what is "particular", and, by focusing on the substantive coverage of a provision or the number of legal subjects to whom it is directed, one may arrive at different conclusions. An example would be provided by the relationship between a territorially limited general regime and a universal treaty on some specific subject.[62] Second, the principle also has an unclear relationship to other maxims of interpretation or conflict resolution techniques, such as the principle *lex posterior derogat legi priori* (later law overrides prior law), and may be offset by normative hierarchies or informal views about "relevance" or "importance".[63]

59.  The idea that special enjoys priority over general has a long pedigree in international jurisprudence as well. Its rationale was already being clearly expressed by Grotius:

> *What rules ought to be observed in such cases* [*i.e.* where parts of a document are in conflict]. … Among agreements which are equal … that should be given preference which is most specific and approaches most nearly to the subject in hand; for special provisions are ordinarily more effective than those that are general.[64]

60.  This passage refers to two reasons why the *lex specialis* rule is so widely accepted. A special rule is more to the point ("approaches most nearly to the subject in hand") than a general one and it regulates the matter more effectively ("are ordinarily more effective") than general rules. This could also be expressed by saying that special rules are better able to take account of particular circumstances. The need to comply with them is felt more acutely than is the case with general rules.[65] They have greater clarity and definiteness and are thus often felt to be

---

[57] *EC Measures Concerning Meat and Meat Products (Hormones)*, WTO Appellate Body report, WT/DS26/AB/R, WT/DS48/AB/R, adopted 13 February 1998, paras. 123–125.

[58] The principle *lex specialis derogat legi generali* has a long history; the principle was included in the *Corpus Iuris Civilis*. See Papinian, Dig. 48, 19, 41 and Dig. 50, 17, 80. The latter states: "*In toto iure generi per speciem derogatur et illud potissimum habetur, quod ad speciem derectum est*" ("In the whole of law, species takes precedence over genus, and anything that relates to species is regarded as most the important") (*The Digest of Justinian*, vol. IV, Philadelphia, University of Pennsylvania Press, 1985, Latin text ed. T. Mommsen and P. Krueger, trans. ed. A. Watson). Some of its alternative formulations are "*generalibus specialia derogant*", "*generi per speciem derogatur*" and "*specialia generalibus, non generalia specialibus*". This report does not deal with another close variant, namely the *ejusdem generis* rule, *i.e.* the rule of interpretation according to which special words control the meaning of general ones. For a discussion, see A. D. McNair, *The Law of Treaties*, Oxford, Clarendon Press, 1961, pp. 393–399.

[59] This understanding appears, for example, in Mus (see footnote 21 above), at p. 218. Fitzmaurice, too, thinks there is *lex specialis* when "a matter governed by a specific provision … is thereby taken out of the scope of a general provision" (G. Fitzmaurice, "The law and procedure of the International Court of Justice 1951–4: treaty interpretation and other treaty points", *British Year Book of International Law 1957*, vol. 33, p. 203, at p. 236).

[60] A. Peczenik, *Juridikens metodproblem*, Stockholm, Gebers, 1980, p. 106.

[61] That is, when the description of the scope of application in one provision contains at least one quality that is not singled out in the other. K. Larenz, *Methodenlehre der Rechtswissenschaft*, Berlin, Springer, 1975, pp. 251–252.

[62] Such conflicts, Jenks suggests, can only be decided on their merits. See Jenks (footnote 8 above), p. 447.

[63] For different possibilities, see H. T. Klami, "Legal heuristics: a theoretical skeleton", *Oikeustiede–Jurisprudentia* XV (1982), pp. 46–53. See also Sadat-Akhavi (footnote 21 above), pp. 189–191. For examples of cases where a more general treaty overrides a more specific one because of its "relevance" or "overriding character", see *ibid.*, pp. 114–125 and 125–131 and *passim*. Ian Sinclair speaks of a mixture of techniques and maxims in *The Vienna Convention on the Law of Treaties*, 2nd ed., Manchester, Manchester University Press, 1984, pp. 95–98.

[64] H. Grotius, *De Jure Belli ac Pacis: Libri Tres*, J. Brown Scott (ed.), *The Classics of International Law*, Oxford, Clarendon Press, 1925, book II, chap. XVI, sect. XXIX, p. 428.

[65] For the reasoning behind the need to prefer "special" over "general", see also Dupuy, "L'unité de l'ordre juridique international…" (footnote 14 above), pp. 428–429.

"harder" or "more binding" than general rules, which may stay in the background and be applied only rarely. Moreover, *lex specialis* may also seem useful as it may provide better access to what the parties may have willed.[66]

61.   It is therefore no wonder that the literature generally accepts *lex specialis* as a valid maxim of interpretation or conflict resolution technique in public international law, too, though it is seldom given lengthy treatment. The classical writers (Pufendorf, de Vattel) accepted it among other techniques as a matter of course.[67] Anzilotti gave it a rather absolute formulation: "*in toto iure genus per speciem derogatur; la norme de droit particulier l'emporte sur la norme générale*". As was consistent with his voluntarism, a treaty between two States would prevail over a multilateral treaty just as the latter would have priority over customary law.[68] For him, as, for example, for Charles Rousseau, the power of the *lex specialis* maxim lay in the way in which it seemed to realize party will.[69] For Georges Scelle, by contrast, a special rule would only rarely be allowed to override what he called "*l'économie d'ensemble*" of the general law. It followed from his sociological anti-voluntarism that general regulation, expressive of an objective sociological interest, would always prevent contracting out by individual States.[70]

62.   It seems clear, however, that both approaches are too absolute—either too respectful of the wills of individual States or not respectful enough of the need to deviate from abstract maxims. Later lawyers have stressed the relativity of the *lex specialis* principle, the need to balance it with *lex posterior*, and the hierarchical status that the more general provision may enjoy.[71]

63.   The Commission has outlined its application at some length in the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts:

*Article 55.*   Lex specialis

These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law.

64.   This provision establishes normative priority for any special rules in its field of application. Or, as the Commission explains in the commentary, it means "that the present articles operate in a residual way".[72] The provision clearly expresses the wish of the Commission to allow States to develop, apply and derogate from the general rules of State responsibility by agreement between themselves. Yet, of course, such power cannot be unlimited: rules that derogate must have at least the same rank as those they derogate from. It is hard to see how States could, for example, derogate from those aspects of the general law on State responsibility that define the conditions of operation of "serious breaches of obligations under peremptory norms of general international law".[73]

65.   In doctrine, *lex specialis* is usually discussed as one factor among others in treaty interpretation (arts. 31–33 of the 1969 Vienna Convention) or in dealing with the question of successive treaties (art. 30 of the 1969 Vienna Convention, especially in relation to the principle of *lex posterior*).[74] Although the principle did not find its way into the text of the Convention, it was still observed during the drafting process that, among techniques for resolving conflicts between treaties, it was useful to pay attention to the extent to which a treaty might be "special" in relation to another treaty.[75]

66.   But there is no reason to limit the operation of *lex specialis* to relationships between treaties. Jennings and Watts, for instance, indicate that the principle "has sometimes been applied in order to resolve apparent conflicts between two differing and potentially applicable

---

[66] See also Pauwelyn, *Conflict of Norms…* (footnote 21 above), p. 388. For the voluntarist understanding of *lex specialis*, rebuttable in view of other evidence, see N. Kontou, *The Termination and Revision of Treaties in the Light of New Customary International Law*, Oxford, Clarendon Press, 1994, p. 142 and references.

[67] S. Pufendorf, *Le droit de la nature et des gens, ou Système général des principes les plus importants de la morale, de la jurisprudence, et de la politique* (trans. J. Barbeyrac), Basel, Thourneisen, 1732, book V, chap. XII, pp. 138–140; E. de Vattel, *Le droit des gens, ou Principes de la loi naturelle, appliqués à la conduite et aux affaires des nations et des souverains* (London, 1758), Washington, D.C., Carnegie Institution, 1916, vol. I, book II, chap. XVII, para. 316.

[68] D. Anzilotti, *Cours de droit international*, vol. I (trans. G. Gidel), Paris, Sirey, 1929, p. 103.

[69] Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), p. 177.

[70] G. Scelle, *Manuel de droit international public*, Paris, Domat-Montchrestien, 1948, p. 642.

[71] See, for example, A. Cavaglieri, "Règles générales du droit de la paix", *Recueil des cours de l'Académie de droit international de La Haye, 1929-I*, vol. 26, p. 334; G. E. do Nascimento e Silva, "Le facteur temps et les traités", *Recueil des cours de l'Académie de droit international de La Haye, 1977-I*, vol. 154, p. 246.

[72] Para. (2) of the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 140.

[73] Commentaries to arts. 40–41 and 48, *ibid.*, pp. 112–116, 126–128.

[74] In addition to sources already cited, see, for example, Rousseau, "De la compatibilité des normes juridiques contradictoires…" (footnote 36 above), pp. 133–192, especially pp. 177–178, 188–189; Jenks (footnote 8 above), pp. 401–453, especially pp. 446–447; M. Zuleeg, "Vertragskonkurrenz im Völkerrecht. Teil I: Verträge zwischen souveränen Staaten", *German Yearbook of International Law*, vol. 20 (1977), p. 247, especially pp. 256–259; W. Czapliński and G. Danilenko, "Conflicts of norms in international law", *Netherlands Yearbook of International Law*, vol. XXI (1990), p. 3, at pp. 20–21; Kontou (footnote 66 above), pp. 141–144; M. Fitzmaurice and O. Elias, *Contemporary Issues in the Law of Treaties*, Utrecht, Eleven International Publishing, 2005, especially pp. 314–348. See also M. S. McDougal, H. D. Lasswell and J. C. Miller, *The Interpretation of International Agreements and World Public Order: Principles of Content and Procedure*, New Haven/Dordrecht, New Haven Press/Martinus Nijhoff, 1994, pp. 199–206; Sinclair (footnote 63 above), p. 98; A. Aust, *Modern Treaty Law and Practice*, Cambridge, Cambridge University Press, 2000, p. 201. See also P. Daillier and A. Pellet, *Droit international public*, 7th ed., Paris, LGDJ, 2002, p. 271 (discussing *lex specialis* in the context of art. 30, para. 3, of the 1969 Vienna Convention). Very few commentators expressly reject the principle. See, however, U. Linderfalk, *Om tolkningen av traktater*, Lund, Lunds Universitet, 2001, pp. 353–354 (viewing it as covered by some techniques but overridden by others).

[75] Statement by the Expert Consultant (Waldock), *Official Records of the United Nations Conference on the Law of Treaties, second session, Vienna, 9 April–22 May 1969, Summary records of the plenary meetings and of the meetings of the Committee of the Whole* (A/CONF.39/11/Add.1, United Nations publication, Sales No. E.68.V.7), 91st meeting of the Committee of the Whole, 16 April 1969, p. 253. See also P. Reuter, *Introduction au droit des traités*, 2nd rev. ed., Paris, Presses Universitaires de France, 1985, p. 112.

rules" and specifically point out that its scope of application is not limited to treaty law. Like many others, they stress its indicative role as a "discretionary aid" that is "expressive of common sense and of normal grammatical usage".[76] As such, it is often held to regulate the relationship between treaty (as *lex specialis*) and custom (as "general law").[77]

67.    Uncertainties about the nature of legal interpretation are equally applicable to the role of *lex specialis*. As O'Connell has put it: "Writers have divided into those who believe it is possible to formulate definite rules for interpretation and those who believe that this is a delusion."[78] This is probably why a number of manuals do not mention the principle at all. If one thinks that legal interpretation is rather an "art than a science", then, of course, there seems little point in tying it down to technical rules or maxims.[79] Nevertheless, dismissing the principle may follow from an excessive expectation of the normative power of interpretative guidelines. The merits that lead interpreters to prefer special law to general law, outlined by Grotius above, provide a reason to include it among the pragmatic considerations that lawyers should take account. With good reason, Schwarzenberger sees this whole branch of the law—namely interpretation—as an aspect of what he calls *jus aequum, i.e.* the rule that "enjoins the parties to interpret and apply each treaty in a spirit of reasonableness and good faith".[80] As an interpretative guideline, *lex specialis* does articulate important concerns: the need to ensure the practical relevance and effectiveness of the standard, as well as to preserve what is often a useful guide to party intentions. These concerns need, of course, to be balanced against countervailing ones: the hierarchical position of the relevant standard and other evidence of State intent. But, however the "balance" is conceived, all of this takes place within an argumentative practice that seeks to justify its outcomes less in terms of technical application than as contributions to a purposive system of law.

###### (b)    *Case law*

68.    International case law also appears to accept the *lex specialis* maxim, although again normally without great elaboration. Four different situations may be distinguished. The maxim may operate: (*a*) within a single instrument; (*b*) between two different instruments; (*c*) between a treaty and a non-treaty standard; and (*d*) between two non-treaty standards.

69.    The *Beagle Channel arbitration* had to do with the relationship between articles II and III of a Boundary Treaty of 1881, both of which dealt with the drawing of borders. According to the arbitral tribunal, article II did not specify in detail the delimitation of *Tierra del Fuego* or of certain disputed islands. Instead, this was left to article III. While the two articles dealt with the same territories, they did not duplicate each other or create anomalies or redundancy:[81]

all conflicts or anomalies can be disposed of by applying the rule *generalia specialibus non derogant*, on which basis Article II (*generalia*) would give way to Article III (*specialia*), the latter prevailing; …[82]

70.    This is the standard case where *lex specialis* appears within one and the same instrument, regulating the relationship between two of its provisions.[83] The rationale for its use may be derived either from the principle of "normal meaning" in article 31, paragraph 1, of the 1969 Vienna Convention or from the need to respect the intention of the parties.

71.    The European Court of Human Rights has frequently applied *lex specialis* in articulating the nature of the relationship between provisions of the European Convention on Human Rights. The Court has, for instance, considered the relationship between article 13, which provides a right of "effective remedy before a national authority", and article 5, paragraph 4, which stipulates that anyone deprived of liberty shall "be entitled to take proceedings by which the lawfulness of his detention shall be decided speedily by a court and his release ordered if the detention is not lawful". It has seemed to follow that:

Since the requirements of Article 13 … are less strict than those of Article 5 para. 4 …, [the latter] must be regarded as the *lex specialis* in respect of complaints under Article 5…[84]

72.    Likewise, the European Court of Human Rights has considered article 6 of the Convention, providing the right to a fair trial, as *lex specialis* in relation to the provision

[76] Jennings and Watts (eds.), *Oppenheim's International Law* (footnote 37 above), pp. 1270, 1280.

[77] See, for example, M. E. Villiger, *Customary International Law and Treaties: A Study of their Interactions and Interrelations with Special Consideration of the 1969 Vienna Convention on the Law of Treaties*, Dordrecht, Martinus Nijhoff, 1985, p. 161.

[78] D. P. O'Connell, *International Law*, 2nd ed., vol. I, London, Stevens and Sons, 1970, p. 253.

[79] See M. Koskenniemi, *From Apology to Utopia: The Structure of International Legal Argument* (reissue with a new epilogue), Cambridge, Cambridge University Press, 2005, pp. 338–339.

[80] G. Schwarzenberger, *International Law*, vol. I, 3rd ed., *International Law as Applied by International Courts and Tribunals: I*, London, Stevens and Sons, 1957, pp. 474, 477 *et seq*. See also Pauwelyn, *Conflict of Norms…* (footnote 21 above), p. 388.

[81] *Dispute between Argentina and Chile concerning the Beagle Channel*, 18 February 1977, UNRIAA, vol. XXI (Sales No. E/F.95.V.2), p. 53, at pp. 99–100, paras. 36, 38; ILR, vol. 52, p. 93, at p. 143. For the Boundary Treaty between the Argentine Republic and the Republic of Chile, signed at Buenos Aires on 23 July 1881, see United Nations, *Treaty Series*, vol. 2384, No. 1295, p. 205.

[82] *Dispute between Argentina and Chile concerning the Beagle Channel*, UNRIAA, vol. XXI (Sales No. E/F.95.V.2), p. 100, para. 39; ILR, vol. 52, p. 144.

[83] See also the discussion by the European Court of Justice of the relationship between article 5, paragraph 1, and article 13 of the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, 1968. As the former provision related to "contractual matters in general" and the latter "specifically cover[ed] various types of contracts concluded by consumers", the latter constituted *lex specialis* in regard to the former, and it was sufficient to apply that provision, if it was applicable. In that case it became "unnecessary to examine whether [the claim] is covered by Article 5 (1)" (European Court of Justice, case No. C-96/00, *Rudolf Gabriel*, judgment of 11 July 2002, *European Court Reports 2002*, p. 6367, at pp. 6398–6399, paras. 35–36, and p. 6404, para. 59).

[84] *Brannigan and McBride v. the United Kingdom*, 26 May 1993, European Court of Human Rights, Series A, No. 258-B, p. 57, para. 76. See also *De Jong, Baljet and Van den Brink v. the Netherlands*, 22 May 1984, European Court of Human Rights, Series A, No. 77, p. 27, para. 60; *Murray v. the United Kingdom*, 28 October 1994, European Court of Human Rights, Series A, No. 300-A, p. 37, para. 98; and *Nikolova v. Bulgaria* [GC], No. 31611/96, ECHR 1999-II, p. 225, para. 69.

for "effective remedy" in article 13.[85] It has also held that article 11, granting freedom of assembly and association, may take precedence as *lex specialis* over the freedom of expression provided for in article 10.[86]

73.   These articles are not necessarily always in strict conflict, and it might be possible to apply them concurrently. In fact, article 5, paragraph 4, may also be seen as an *application* of article 13 in a particular case. This is also true when two provisions are closely connected, as is the case of freedom of expression and freedom of assembly. Sometimes freedom of assembly may appear as *lex specialis* in relation to freedom of expression. But the relationship may also be reversed. There is no reason why article 10, providing freedom of expression, may not be seen as *lex specialis* in relation to article 11, granting freedom of peaceful assembly.

74.   A second case is where *lex specialis* regulates the relationship between *different* instruments. In the *Mavrommatis Palestine Concessions* case, the Permanent Court of International Justice was faced with two instruments that had a bearing on its jurisdiction: the 1922 Mandate for Palestine and Protocol XII to the Treaty of Lausanne of 1923. The Court concluded that "in cases of doubt, the Protocol, being a special and more recent agreement, should prevail".[87] That view seemed to endorse both the *lex posterior* and the *lex specialis* maxims without entering into the question of their relationship.

75.   This matter has been treated in a general way within WTO, where panels and the Appellate Body have occasionally resorted to *lex specialis* in the interpretation of the treaties it covers.[88] In the *Turkey—Restrictions on Imports of Textile and Clothing Products* case, the Panel emphasized that the Marrakesh Agreement establishing the World Trade Organization is a "Single Undertaking" and that the obligations of members are cumulative. Thus, a special provision may only prevail over another provision if it is impossible to apply the two provisions simultaneously.[89] In *Indonesia—Certain Measures Affect-*

*ing the Automobile Industry,* the Panel similarly explained that there is a presumption against conflicts and that, for a conflict to exist, it must be between the same parties and deal with the same subject matter and the provisions must be mutually exclusive.[90] In WTO, *lex specialis* appears to have a limited role as a subsidiary means of resolving conflicts.[91]

76.   When *lex specialis* is applied in a particular institutional context (within a "regime", in the language of chapter III below), then of course it is affected by the relevant (though not necessarily formal) institutional hierarchy. In 2000, the Court of First Instance of the European Union was called upon to determine the relationship between a regulation from 1981 that treated information obtained in customs investigations as confidential and a European Commission decision of 1994 that provided public access to Commission documents. The Court observed that the regulation,

as far as it is to be applied as a *lex specialis*, cannot be interpreted in a sense contrary to [the decision], whose fundamental objective is to give citizens the opportunity to monitor more effectively the lawfulness of the exercise of public powers…[92]

77.   The normative hierarchy between the earlier Council regulation and the later Commission decision, incorporating a Code of Conduct concerning public access to Commission and Council documents, may not have been quite clear. Nonetheless, in this case, the Court interpreted a prior *lex specialis,* which, if anything, was at least not of inferior status to the subsequent Commission decision, so as to be in conformity with the latter.[93] It is not difficult to understand why, in 1999, considerations of transparency might override a regulation from 1981. But this relationship was the "automatic" result neither of a formal hierarchy nor of *lex specialis* as a conflict resolution rule.

78.   A third case is where *lex specialis* is resorted to in order to privilege a treaty standard over a non-treaty standard. In *INA Corporation v. The Government of the*

---

[85] *Yankov v. Bulgaria*, No. 39084/97, ECHR 2003-XII (extracts), para. 150. See also *Brualla Gómez de la Torre v. Spain*, 19 December 1997, European Court of Human Rights, *Reports of Judgments and Decisions* 1997-VIII, p. 2957, para. 41; *Vasilescu v. Romania*, 22 May 1998, European Court of Human Rights, *Reports of Judgments and Decisions* 1998-III, p. 1076, para. 43. Cf. *Kudła v. Poland* [GC], No. 30210/96, ECHR 2000-XI, pp. 234–236, paras. 146–148.

[86] *Ezelin v. France*, 26 April 1991, European Court of Human Rights, Series A, No. 202, p. 20, para. 35, and *Djavit An v. Turkey*, No. 20652/92, ECHR 2003-III, p. 251, para. 39.

[87] *Mavrommatis Palestine Concessions*, Judgment, 30 August 1924, *P.C.I.J.*, *Series A*, No. 2, p. 31.

[88] These interpretations have taken place both between provisions in single instruments and between provisions in two different "covered treaties". There appear to have been no cases of reference to *lex specialis* between a WTO treaty and a non-WTO treaty. See *Brazil—Export Financing Programme for Aircraft*, WTO Panel report, WT/DS46/R, adopted 20 August 1999, para. 7.40, as modified by Appellate Body report WT/DS46/AB/R; *Turkey—Restrictions on Imports of Textile and Clothing Products*, WTO Panel report, WTO/DS34/R, adopted 19 November 1999, para. 9.92, as modified by Appellate Body report WT/DS34/AB/R; and *Indonesia—Certain Measures Affecting the Automobile Industry*, WTO Panel report, WT/DS54/R, WT/DS55/R, WT/DS59/R, WT/DS64/R, Corr.1 and Corr.2, adopted 23 July 1998, and Corr.3 and Corr.4, paras. 14.28–14.34.

[89] *Turkey—Restrictions on Imports of Textile and Clothing Products* (see footnote 88 above), para. 9.92.

[90] *Indonesia—Certain Measures Affecting the Automobile Industry* (see footnote 88 above), para. 14.28.

[91] *India—Quantitative Restrictions on Imports of Agricultural, Textile and Industrial Products*, WTO Panel report, WT/DS90/R, adopted 22 September 1999, para. 4.20, upheld by Appellate Body report WT/DS90/AB/R.

[92] *JT's Corporation Ltd. v. Commission of the European Communities*, Court of First Instance, judgment of 12 October 2000, European Court of Justice, case T-123/99, *European Court Reports 2000*, p. 3269, at p. 3292, para. 50.

[93] A similar type of argument was employed in a recent case that dealt with the relationship between two directives, one dealing with waste (Council Directive 75/442/EEC of 15 July 1975, *Official Journal of the European Communities*, L 194, vol. 18, 25 July 1975, p. 39) and the other, much more recent, with packaging and packaging waste (European Parliament and Council Directive 94/62/EC of 20 December 1994, *ibid.*, L 365, vol. 37, 31 December 1994, p. 10). The provisions of the latter were identified by the European Court of Justice as *lex specialis vis-à-vis* the former "so that its provisions prevail over" those of that earlier directive "in situations which it specifically seeks to regulate". No full setting aside was involved, however: "Nevertheless", the judgment reads, "Directive 75/442 remains very important for the interpretation and application of Directive 94/62" (European Court of Justice, case C-444/00, *The Queen, on the application of Mayer Parry Recycling Ltd., v. Environment Agency and Secretary of State for the Environment, Transport and the Regions, and Corus (UK) Ltd. and Allied Steel and Wire Ltd. (ASW)*, judgment of 19 June 2003, *European Court Reports 2003*, p. 6163, at pp. 6228–6229, paras. 53 and 57).

*Islamic Republic of Iran*, the corporation sought compensation for the expropriation of its 20-per-cent share in an Iranian insurance company. The claimant argued that, on the basis of international law and the Iran–United States Treaty of Amity of 1955, compensation should be "prompt, adequate and effective". The respondent held that compensation was to be calculated on the basis of the net book value of the nationalized shares. The Tribunal considered that in cases of large-scale lawful nationalizations general international law no longer provided for full compensation. It did not, however, attempt to establish the exact content of the customary norm, as it considered that, for the purposes of the case,

we are in the presence of a *lex specialis*, in the form of the Treaty of Amity, which in principle prevails over general rules.[94]

79.    That treaty rules enjoy priority over custom is merely incidental to the fact that most general international law is *jus dispositivum*, so that parties are entitled to derogate from it by establishing specific rights or obligations to govern their behaviour. As the International Court of Justice has pointed out, "it is well understood that, in practice, rules of [general] international law can, by agreement, be derogated from in particular cases, or as between particular parties".[95] This approach, together with the practical priority of treaty over custom, was also affirmed by the Court in *Military and Paramilitary Activities in and against Nicaragua*:

In general, treaty rules being *lex specialis*, it would not be appropriate that a State should bring a claim based on a customary-law rule if it has by treaty already provided means for settlement of a such a claim.[96]

80.    In the *Continental Shelf (Tunisia/Libyan Arab Jamahiriya)* case, the Court suggested that States might be able to opt out from the development of general law by this means. It had been authorized by the Special Agreement to take into account the "new accepted trends" at the Third United Nations Conference on the Law of the Sea. In this regard, the Court noted that

[i]t would no doubt have been possible for the Parties to have identified in the Special Agreement certain specific developments in the law of the sea ... , and to have declared that in their bilateral relations in the particular case such rules should be binding as *lex specialis*.[97]

81.    In these cases, the Court accepted that general international law may be subject to derogation by agreement and that such agreement may be rationalized as

*lex specialis*. These cases illustrate the practice of international tribunals to give precedence to treaty law in matters where there is customary law as well—a practice that highlights the dispositive nature of custom and the tribunals' deference to agreements as the "hardest" and presumably most legitimate basis on which their decisions can be based. Thirlway summarizes the jurisprudence as follows:

It is universally accepted that—consideration of *jus cogens* apart—a treaty as *lex specialis* is law between the parties to it in derogation of the general customary law which would otherwise have governed their relations.[98]

82.    None of this means that the general customary law would thereby become extinguished. It will continue to apply in the background and become fully applicable when, for instance, the treaty is no longer in force or, as in the *Military and Paramilitary Activities in and against Nicaragua* case, if the jurisdiction of the relevant law-applying organ fails to cover the treaty.[99]

83.    An atypical use of *lex specialis* may be found in a case from 1981, in which the Iran–United States Claims Tribunal concluded that "it is a well recognised and universal principle of interpretation that a special provision overrides a general provision". The Tribunal here invoked *lex specialis* so as to argue that "the terms of the Claims Settlement Declaration are so detailed and so clear that they must necessarily prevail over the purported intentions of the parties, whatever they could have been".[100] As such, the principle seems to have coalesced with the rule in favour of the "ordinary" meaning under article 31, paragraph 1, of the 1969 Vienna Convention.

84.    A fourth case is where the same reasoning—though not necessarily the expression *lex specialis*—is applied to two non-treaty standards. This was so in the *Right of Passage over Indian Territory* case. After having determined that the practice accepted by the States concerned (India and Great Britain/Portugal) established a right of transit over Indian territory, the International Court of Justice no longer felt it necessary to investigate what the content of general law on transit passage may have been, for it was evident to the Court that in any case "[s]uch a particular practice must prevail over any general rules".[101] Though express practice is not abundant, it is hard to see why *lex specialis*—or at least the reasoning behind it—would not be applicable to the relationship between general and special custom. What is interesting in *Right of Passage over Indian Territory* is the Court's use of what Thirlway calls the "perfectly recognized and respectable judicial technique" of setting aside any examination of the content of the general law, once the special custom had been

---

[94] *INA Corporation v. The Government of the Islamic Republic of Iran*, Iran–United States Claims Tribunal, case No. 161, 12 August 1985, 8 IRAN–U.S. C.T.R., p. 373, at pp. 376, 378. For the Treaty of Amity, Economic Relations, and Consular Rights between the United States of America and Iran, signed at Tehran on 15 August 1955, see United Nations, *Treaty Series*, vol. 284, No. 4132, p. 93.

[95] *North Sea Continental Shelf*, Judgment, *I.C.J. Reports 1969*, p. 3, at p. 42, para. 72. See also, however, pp. 38–40, paras. 61–65, and, in particular, para. 63 ("general or customary law rules and obligations ... , by their very nature, must have equal force for all members of the international community").

[96] *Military and Paramilitary Activities in and against Nicaragua*, Merits, Judgment of 27 June 1986 (see footnote 51 above), p. 137, para. 274.

[97] *Continental Shelf (Tunisia/Libyan Arab Jamahiriya), Judgment, I.C.J. Reports 1982*, p. 18, at p. 38, para. 24. For the Special Agreement for the submission to the International Court of Justice of the question of the continental shelf between Tunisia and the Libyan Arab Jamahiriya, signed at Tunis on 10 June 1977, see United Nations, *Treaty Series*, vol. 1120, No. 17408, p. 103.

[98] H. Thirlway, "The law and procedure of the International Court of Justice 1960–1989 (Part One)", *British Year Book of International Law 1989*, vol. 60, p. 147. Similarly, for example, A. Verdross and B. Simma, *Universelles Völkerrecht: Theorie und Praxis*, 3rd ed., Berlin, Duncker and Humblot, 1984, pp. 414–415.

[99] *Military and Paramilitary Activities in and against Nicaragua*, Merits, Judgment of 27 June 1986 (see footnote 51 above), p. 96, para. 179.

[100] Iran–United States Claims Tribunal, case No. A/2, 13 January 1982, 1 IRAN–U.S. C.T.R., p. 101, at p. 104.

[101] *Case concerning Right of Passage over Indian Territory*, Merits, Judgment of 12 April 1960, *I.C.J. Reports 1960*, p. 6, at p. 44.

found, in a way that leaves open the questions of whether the special rule was an elaboration of or an exception to that general law or whether there was any general law in the matter in the first place.[102]

### (c)  *An informal hierarchy: the point of* lex specialis

85.    There is no formal hierarchy among the sources of international law. A number of writers have—correctly, it is submitted—nonetheless suggested that there is a kind of informal hierarchy among them. Inasmuch as "general law" does not have the status of *jus cogens*, treaties generally enjoy priority over custom and particular treaties over general treaties.[103] In the same vein, it may be assumed (as is indeed suggested by the *Right of Passage over Indian Territory* case) that local customs (if proven) have primacy over general customary law and, perhaps, that the body of customary law has primacy over the general principles of law under Article 38, paragraph 1 (*c*), of the Statute of the International Court of Justice.[104] This informal hierarchy follows not from any legislative enactment, but emerges rather as a "forensic"[105] or "natural"[106] aspect of legal reasoning. Any court or lawyer will first look at treaties, then custom, and then the general principles of law for an answer to a normative problem. "Empirically," Serge Sur writes, "the Court has given precedence to rules that have the highest degree of specialty, and the clearest and most objective manifestation."[107] The secondary source is not extinguished thereby but plays a "residual part" in directing the interpretation of the special law and becoming applicable in its stead where the special law cannot, for one reason or another, be applied.[108]

86.    Such informal hierarchy is an aspect of the pragmatics of legal reasoning that differentiates between "easy"

and "hard" cases. As the special law's speciality reflects its relevance to the context and its status as evidence of party will, its application often seems self-evident. In an "easy" case, the speciality of the standard or instrument does not even emerge as an object of argument. The need to look "behind" or "around" the *prima facie* standard or instrument arises only in "hard" cases, when its application is contested and another standard or instrument is invoked in its stead. Only then does the *lex specialis* maxim become expressly relevant, but even then it does so only in relation to countervailing constructions about how the context should be understood (*e.g.* is the case one of "integral" or "interdependent" obligation?) or deviating evidence of party intention (*e.g. lex posterior*) or hierarchy (*e.g. jus cogens*).

87.    When a "hard" case does emerge, it is the role of *lex specialis* to point to a set of considerations with practical relevance: the immediate accessibility and contextual sensitivity of the standard. Now, these may not be decisive considerations. They may be outweighed by countervailing ones. Reasoning about such considerations, though impossible to condense in determining rules or techniques, should not, however, be understood as arbitrary.[109] The reasoning may be the object of criticism, and whether it prevails will depend on how it succeeds in condensing what may be called, for instance, the "genuine shared expectations of the parties, within the limits established by overriding community objectives",[110] as reflected and tested against the various sources mentioned in Article 38, paragraph 1, of the Statute of the International Court of Justice, legal precedent and doctrine. In such debates, all parties assume that the justifiability of what they say depends on how it links to such larger views about the purposes of the international legal system.

### 2.  The two types of *lex specialis* reference

88.    There are two ways in which law may take account of the relationship of a particular rule to a general one. A particular rule may be considered an *application* of a general standard in a given circumstance. The special relates to the general as administrative regulation does to law in the domestic legal order.[111] Alternatively, it may be considered as a *modification*, an *overruling* or a *setting aside* of the latter.[112] The first case is sometimes not seen as a situation of normative conflict at all, but is taken to involve the *simultaneous* application of the special and the general standard.[113] Thus, only the latter is thought to involve the application of a genuine *lex specialis*. This

---

[102] H. Thirlway, "The law and procedure of the International Court of Justice 1960–1989 (Part Two)", *British Year Book of International Law 1990*, vol. 61, p. 1, at pp. 104–106.

[103] Verdross and Simma, *Universelles Völkerrecht…* (see footnote 98 above), pp. 413–414; Thirlway, "The law and procedure of the International Court of Justice 1960–1989 (Part One)" (see footnote 98 above), pp. 143–144.

[104] In French doctrine, this result is sometimes achieved by distinguishing between *acte* and *norme*, or a formal source and the (substantive) rule encompassed by it, so that, while there may be no hierarchy between the former, there must be rules for resolving overlaps and conflicts between the latter. See, for example, Daillier and Pellet, *Droit international public* (footnote 74 above), pp. 114–116; G Abi-Saab, "Cours général de droit international public", *Recueil des cours de l'Académie de droit international de La Haye, 1987-VII*, vol. 207, p. 188.

[105] Jennings and Watts, *Oppenheim's International Law* (see footnote 37 above), p. 26, footnote 2.

[106] Villiger (see footnote 77 above), p. 161. Likewise, H. Lauterpacht, *International Law: Collected Papers of Sir Hersch Lauterpacht*, vol. I, *The General Works*, E. Lauterpacht (ed.), Cambridge, Cambridge University Press, 1970, pp. 86–88.

[107] S. Sur, *L'interprétation en droit international public*, Paris, LGDJ, 1974, p. 164. Czapliński and Danilenko speak of "priority of application": Czapliński & Danilenko (see footnote 74 above), p. 8.

[108] See, for example, the discussion by Rousseau of the *Polish Postal Service in Danzig* case (*Advisory Opinion*, 16 May 1925, *P.C.I.J., Series B*, No. 11), in which the Treaty of Versailles was to be complemented by bilateral talks between Danzig and Poland, as well as the discussion of *Jurisdiction of the European Commission of the Danube between Galatz and Braila* (*Advisory Opinion*, 8 December 1927, *P.C.I.J., Series B*, No. 14), p. 177: Rousseau, "De la compatibilité des normes juridiques contradictoires…" (footnote 36 above), pp. 177–178.

[109] *Pace* strict positivists such as Kelsen. See H. Kelsen, *Introduction to the Problems of Legal Theory* (trad. B. L. Paulson and S. L. Paulson, introduction by S. L. Paulson), Oxford, Clarendon Press, 1992 [1934], pp. 81–84.

[110] McDougal, Lasswell & Miller (see footnote 74 above), pp. 82–83.

[111] This is how Scelle describes the functioning of *lex specialis* in international law: Scelle (see footnote 70 above), p. 642.

[112] Jenks distinguishes between "conflict" and "divergence": Jenks (see footnote 8 above), pp. 425–427. Likewise, Pauwelyn, *Conflict of Norms…* (see footnote 21 above), p. 6.

[113] This appears to be the way Pauwelyn treats the matter. While he accepts that it may not be easy to appreciate whether a case belongs to one or the other of the two categories, he holds to the analytical distinction and deals with the *lex specialis* only "as a rule to resolve conflict in the applicable law" (Pauwelyn, *Conflict of Norms…* (see footnote 21 above), p. 386).

seems to be the position within the WTO Dispute Settlement Body. While there appears to be a strong emphasis on interpreting WTO obligations so that there would be no conflict between them, the *lex specialis* principle is assumed to apply if "harmonious interpretation" turns out to be impossible, that is, a general standard is overridden by a conflicting special one.[114]

89.    Something like this may have been the assumption within the Commission during the drafting of article 55 of the draft articles on responsibility of States for internationally wrongful acts. In its commentary, the Commission explained that:

> For the *lex specialis* principle to apply it is not enough that the same subject matter is dealt with by two provisions; there must be some actual inconsistency between them, or else a discernible intention that one provision is to exclude the other.[115]

90.    The Commission supported its view by reference to the *Neumeister* case from the European Court of Human Rights. In that case, the Court had observed that the provision on compensation in the event of unlawful arrest set out in article 5, paragraph 5, of the European Convention on Human Rights was not *lex specialis* in relation to the general rule on compensation in article 50. The former did not set aside the latter. Instead, the two provisions worked concurrently. The latter was to be "taken into account" when applying the former.[116] More recently, however, the Court has frequently characterized similar cases as *lex specialis*. Thus, the cases referred to in paragraph 71 above—juxtaposing the "effective remedy" rule of article 13 of the Convention with the right to have one's detention speedily dealt with by a court under article 5, paragraph 4—have been dealt with by reference to *lex specialis*:

> According to the Court's established case-law Article 5 § 4 of the Convention constitutes a *lex specialis* in relation to the more general requirements of Article 13. In the present case the facts underlying the applicant's complaint under Article 13 of the Convention are the same as those examined under Article 5 § 4. Accordingly, the Court need not examine the allegation of a violation of Article 13 in view of its finding of a violation of Article 5 § 4.[117]

91.    In these as well as in many other cases, the European Court of Human Rights has thought the *lex specialis* applicable even in the absence of direct conflict between two provisions and where it might be said that both apply concurrently.[118] This is the proper approach. There are two reasons why it is useful to consider the case of "application" in connection with the case where *lex specialis* sets up an exception or involves a "setting-aside". First, it

follows from the definition of *lex specialis* adopted above that this case is also included: the norm of application is more specific because it contains the general rule itself as one element in the definition of its scope of application. Second, and more important, though the distinction is analytically sound, it is in practice seldom clear-cut. It may often be difficult to say whether a rule "applies" a standard, "modifies" it or "derogates from" it. An "application" or "modification" also involves a degree of "derogation" and "setting aside". To decide which expression is appropriate requires an interpretation of both rules, and such interpretation, as follows from articles 31 and 32 of the 1969 Vienna Convention, may also reach beyond a scrutiny of the expressions used in those rules. This ambivalence was evident in the *Gabčíkovo-Nagymaros Project* case. Here the International Court of Justice referred to *lex specialis* in the following way:

> It is of cardinal importance that the Court has found that the 1977 Treaty is still in force and consequently governs the relationship between the Parties. That relationship is also determined by the rules of other relevant conventions to which the two States are party, by the rules of general international law and, in this particular case, by the rules of State responsibility; but it is governed, above all, by the applicable rules of the 1977 Treaty as a *lex specialis*.[119]

92.    In this case, the Court left open what the relationship between the *lex specialis*—the 1977 Treaty—and the rest of the law might have been. Whether or not that general law might have provided for a similar or a different directive was immaterial. It sufficed to apply the treaty. In the language adopted here: the informally superior position of the 1977 Treaty led to its *setting aside* every other treaty and the general law without there ever having been a determination of any "conflict". In this as well as in innumerable other cases there is no need (indeed, no possibility) to decide whether the *lex specialis* is used as an "interpretative maxim" or a "conflict resolution technique", whether it merely "applies" some more general standard or derogates from it.[120] Indeed, even to ask this question may be beside the point. In accordance with the informal hierarchy discussed above, the relevant special law applies, and that is all—unless another party raises the question of *jus cogens* or a prior obligation that might enjoy precedence, for example under articles 30 or 41 of the 1969 Vienna Convention.

93.    Sometimes a *lex specialis* relationship has been identified between two norms that, far from being in conflict with each other, point in the same direction, while the relationship "special"/"general" is associated with that of "means"/"ends". As noted above, the European Court of Human Rights has characterized the relationship between article 10 of the European Convention on Human Rights, on freedom of expression, and article 11, dealing with freedom of assembly and movement, by conceiving the latter as *lex specialis* in relation to the former:

> The Court notes that the issue of freedom of expression cannot in the present case be separated from that of freedom of assembly. The protection of personal opinions, secured by Article 10 of the Convention,

---

[114] *Turkey—Restrictions on Imports of Textile and Clothing Products* (see footnote 88 above), paras. 9.92–9.96. On the presumption against conflict in WTO law generally, see Pauwelyn, *Conflict of Norms…* (footnote 21 above), pp. 240–244.

[115] Para. (4) of the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 140.

[116] *Neumeister v. Austria (art. 50)*, judgment of 7 May 1974, European Court of Human Rights, Series A, No. 17, p. 13, para. 30.

[117] *Nikolova v. Bulgaria* [GC] (see footnote 84 above), p. 225, para. 69.

[118] See also, in this regard, H. Aufricht, "Supersession of treaties in international law", *Cornell Law Review*, vol. 37, No. 2 (winter 1952), p. 698 (special law being "supplementary" while the general law remains "controlling").

[119] *Gabčíkovo-Nagymaros Project (Hungary/Slovakia), Judgment, I.C.J. Reports 1997*, p. 7, at p. 76, para. 132. For the Treaty concerning the Construction and Operation of the Gabčíkovo–Nagymaros System of Locks, signed at Budapest on 16 September 1977, see United Nations, *Treaty Series*, vol. 1109, No. 17134, p. 211.

[120] For discussion, see Jenks (footnote 8 above), pp. 408–420.

is one of the objectives of freedom of peaceful assembly as enshrined in Article 11 of the Convention … Thus, observing that the applicant's grievances relate mainly to alleged refusals of the "TRNC" authorities to grant him permits to cross over the "green line" and meet with Greek Cypriots, the Court considers that Article 11 of the Convention takes precedence as the *lex specialis* for assemblies, so that it is unnecessary to examine the issue under Article 10 separately. The Court will, however, have regard to Article 10 when examining and interpreting Article 11.[121]

94.   Not only is there no "conflict" between articles 10 and 11, but both point in the same direction: their relationship is one of means/ends. Yet why would "expression" be the purpose of "assemblies"; might not meaningful "assemblies" (as an expression of democracy and self-government, for example) sometimes be understood rather as the purpose towards which a right of expression is only a means? The relationship between general and particular may often be complex and two-sided, so that, even as the particular sets aside the general, the latter—as the Court has noted—will continue to provide interpretative direction to the former.

95.   This example shows that fixing a definite relationship between two standards, one of which should be seen either as an application of or an exception to the other, may often be quite impossible. It might, for example, be said that the "inherent right of self-defence" in Article 51 of the Charter of the United Nations is *lex specialis* in relation to the principle of non-use of force in Article 2, paragraph 4. The two rules have a very similar (though not identical) scope of application (they apply to inter-State use of armed force). Because Article 51 is more specific than Article 2, paragraph 4, it is applicable when its conditions are fulfilled. In this sense, Article 51 may sometimes "replace" or "set aside" the prohibition in Article 2, paragraph 4. But Article 51 may also be seen as an "application" of Article 2, paragraph 4, inasmuch as self-defence covers action against a State that has *violated* Article 2, paragraph 4. In this case, Article 51 strengthens and supports Article 2, paragraph 4, and provides instructions on what to do in some cases (those involving "armed attack") in the event of a breach of Article 2, paragraph 4. Both rules are now rationalized under the same purpose—the protection of the territorial integrity and political independence of States—of which they appear as particular applications. Article 51 now appears not so much as an exception as a supplement to Article 2, paragraph 4.

96.   And what to say of the place of *lex specialis* in the *Legality of the Threat or Use of Nuclear Weapons* case (1996)? Here the International Court of Justice observed that both human rights law (specifically the International Covenant on Civil and Political Rights) and the laws of armed conflict applied "in times of war". Nevertheless, when it came to determining what constituted an "arbitrary deprivation of life" under article 6, paragraph 1 of the Covenant, this fell "to be determined by the applicable *lex specialis*, namely, the law applicable in armed conflict".[122] In this respect, the two fields of law applied concurrently, or within each other. From another perspective, however, the law of armed conflict—and in particular its more relaxed standard of killing—set aside

whatever standard might have been provided under the practice of the Covenant.

97.   It follows that whether a rule is seen as an "application" of, "modification" of or "exception" to another rule depends on how we view those rules in the environment in which they are applied, including what we see as their object and purpose. Because separating "application" from "setting aside" would be artificial and would distort the context in which the question of *lex specialis* emerges, it is proposed to include all of these questions in the *lex specialis* study.

   (a)   Lex specialis *as an application or elaboration of* lex generalis

98.   A rule may thus be *lex specialis* in regard to another rule as an application, updating or development thereof, or, which amounts to the same, as a supplement to it, providing instructions on what a general rule requires in some particular case. A regional instrument may thus be *lex specialis* in regard to a universal one, and an agreement on technical implementation *lex specialis* in regard to a general "framework" instrument.[123] Despite the way the particular rule now "applies" the general rule, it also sets aside the latter in a way that is not devoid of normative consequences.

99.   For example, many provisions in the 1987 Montreal Protocol on Substances that Deplete the Ozone Layer are special law in relation to the 1985 Vienna Convention for the Protection of the Ozone Layer.[124] When States apply the emission reduction schedule in article 2 of the Protocol, they give concrete meaning to the general principles in the Convention. Though it may be said that in this case they apply *both* the Protocol *and* the Convention, there is a sense in which the Protocol has now set aside the Convention. In the event of a dispute as to what the relevant obligations are, the starting point and focus of interpretation will now be the wording of the Protocol, and no longer of the Convention. The special rule in the Protocol has become an independent

---

[121] *Djavit An v. Turkey* (see footnote 86 above), p. 251, para. 39.

[122] *Legality of the Threat or Use of Nuclear Weapons*, Advisory Opinion, *I.C.J. Reports 1996*, p. 226, at p. 240, para. 25.

[123] Examples of such relationships are included in Jenks (see footnote 8 above), pp. 408–420, and Sadat-Akhavi (see footnote 21 above), pp. 189–191 *passim*. See also the award of the Arbitral Tribunal in the *Southern Bluefin Tuna* case, where the Tribunal noted the frequent parallelism between treaties and that "the conclusion of an implementing convention does not necessarily vacate the obligations imposed by the framework convention upon parties to the implementing convention" (*Southern Bluefin Tuna Case between Australia and Japan and between New Zealand and Japan* (see footnote 26 above), p. 40, para. 52). The Tribunal did not state whether this was a special application of the *lex specialis* or a setting aside of the *lex specialis* because Japan had argued that it fully replaced the obligations of the framework convention by those of the implementing convention.

[124] Vienna Convention for the Protection of the Ozone Layer, 22 March 1985; Montreal Protocol on Substances that Deplete the Ozone Layer, 16 September 1987; Adjustments to the Montreal Protocol on Substances that Deplete the Ozone Layer, 29 June 1990, annex I to the report of the Second Meeting of the Parties (UNEP/OzL. Pro.2/3) and depositary notification C.N.133.1991.TREATIES–3/2 of 27 August 1991 (rectification of the Spanish authentic text of the adjustments and amendment) (see also ILM, vol. 30, No. 2 (March 1991), p. 539); and Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, 29 June 1990, annex II to the report of the Second Meeting of the Parties (UNEP/OzL.Pro.2/3) and depositary notification C.N.133.1991.TREATIES–3/2 of 27 August 1991 (rectification of the Spanish authentic text of the adjustments and amendment) (see also ILM, vol. 30, No. 2 (March 1991), p. 541).

and authoritative representation of what the Convention *means* in terms of the obligations it provides. And yet, the Convention continues to express the principles and purposes that also affect the interpretation and application of the Protocol. In other words, in "easy" cases, the Protocol is applied without controversy about how this should be done, while in "hard" cases a dispute about the Protocol's interpretation and application arises and will need to be resolved by recourse to, *inter alia*, the standards of the Convention.

100.    Similar thinking applies even if the special law is intended to replace the general law completely. As the Iran–United States Claims Tribunal stated in *Amoco International Finance Corporation v. Iran*:

> As a *lex specialis* in the relations between the two countries, the Treaty supersedes the *lex generalis*, namely customary international law. This does not mean, however, that the latter is irrelevant in the instant Case. On the contrary, the rules of customary law may be useful in order to fill in possible *lacunae* of the Treaty, to ascertain the meaning of undefined terms in its text or, more generally, to aid interpretation and implementation of its provisions.[125]

101.    This is no different from the above-mentioned *Neumeister* case, where the European Court of Human Rights refused to hold article 5, paragraph 5, of the European Convention on Human Rights as *lex specialis* in regard to article 50 because of its *a priori* view that *lex specialis* must involve a conflict. The Court distinguished the two provisions by the fact that article 5, paragraph 5, was a rule of "substance", while article 50 dealt with the competence of the Court. The latter was nonetheless to be "taken into consideration" when applying the former.[126] Though the Court here refrained from invoking *lex specialis*, in its later jurisprudence it has done this.[127]

102.    In both cases—that is, either as an application of or as a derogation from the general law—the point of the *lex specialis* rule is to indicate which rule should be applied. In both cases, the special, as it were, steps in to become applicable instead of the general. Such replacement, however, always remains only partial. The more

general rule remains in the background, providing interpretative direction to the special one. Thus, in the recent *Oil Platforms* case,[128] the general law concerning the use of force was applied to give meaning to a wide standard of "necessity" in the relevant *lex specialis*, the 1955 Treaty of Amity between Iran and the United States. It was not that a particularly important *lex generalis* would have set aside *lex specialis,* but that the latter received its meaning from the former.[129]

(b)    Lex specialis *as an exception to the general rule*

103.    As pointed out above, most general international law is dispositive and can be derogated from by way of exception. But an "exception", too, works only in a relative sense, so that whatever is being "set aside" will continue to have an effect on the interpretation and application of the exception. It is often stated that the laws of war are *lex specialis* in relation to rules laying out the peace-time norms relating to the same subjects.[130] In *Legality of the Threat or Use of Nuclear Weapons*, the International Court of Justice discussed the relationship between the International Covenant on Civil and Political Rights and the laws applicable in armed conflict. Article 6, paragraph 1, of the Covenant establishes the right not to be deprived of one's life arbitrarily. This right, the Court pointed out, applies also in hostilities. However:

> The test of what is an arbitrary deprivation of life, however, then falls to be determined by the applicable *lex specialis*, namely, the law applicable in armed conflict which is designed to regulate the conduct of hostilities.[131]

104.    The example of the laws of war focuses on a case where the rule itself identifies the conditions in which it is to apply, namely the presence of an "armed conflict". Owing to that condition, the rule appears more "special" than if no such condition had been identified. To regard this as a situation of *lex specialis* draws attention to an important aspect of the operation of the principle. Even as it works so as to justify recourse to an exception, what is being set aside does not vanish altogether.[132] The Court was careful to point out that human rights law *continued to apply* within armed conflict. The exception—humanitarian law—only affected one (albeit important) aspect of it, namely the relative assessment of "arbitrariness". Humanitarian law as *lex specialis* did not suggest that human rights were abolished in war. It did not function in a formal or absolute way but as an aspect of the pragmatics of

[125] *Amoco International Finance Corporation v. The Government of the Islamic Republic of Iran* et al., Iran–United States Claims Tribunal, case No. 56, 14 July 1987, 15 IRAN–U.S. C.T.R., p. 189, at p. 222. For the Treaty of Amity, Economic Relations, and Consular Rights between the United States of America and Iran, see footnote 94 above.

[126] *Neumeister v. Austria (art. 50)* (see footnote 116 above), p. 13, para. 30.

[127] Somewhat parallel was the situation of the United Nations Tribunal in Libya, which, in 1955, faced a challenge to its jurisdiction under articles VII and X of its founding General Assembly resolution (388 (V) of 15 December 1950). It was stated by Libya that, as the question of confiscation had been dealt with under the former article and not in the latter, which provided for the Tribunal's jurisdiction, such jurisdiction did not cover it. Libya formulated this point as follows: "[I]t is a universal legal principle, when it comes to interpretation, that, in the event of a conflict between a general text and a special text, the latter shall prevail." The Tribunal rejected this objection, stating that article VII merely "specified" the fact that the Tribunal would have jurisdiction—which it exercised generally under article X—also in regard to confiscated properties. See *Décisions rendues les 3 juillet 1954 et 27 juin 1955 dans l'affaire relative aux institutions, sociétés et associations visées à l'article 5 de l'Accord conclu, en date du 28 juin 1951, entre les Gouvernements italien et libyen, concernant la disposition de certains biens italiens en Libye*, UNRIAA, vol. XII (Sales No. 63.V.3), p. 373, at p. 388. For the agreement between the United Kingdom and Italy, signed at London on 28 June 1951, see United Nations, *Treaty Series*, vol. 118, No. 1600, p. 115.

[128] *Oil Platforms (Islamic Republic of Iran v. United States of America)*, Judgment, *I.C.J. Reports 2003*, p. 161.

[129] As suggested by E. Jouannet in "Le juge international face aux problèmes d'incohérence et d'instabilité du droit international. Quelques réflexions à propos de l'arrêt CIJ du 6 novembre 2003, Affaire des Plates-formes pétrolières", RGDIP, vol. 108 (2004), p. 917, at pp. 933, 936.

[130] For example, Jenks (see footnote 8 above), p. 446; W. Karl, "Treaties, conflicts between", in R. Bernhardt (ed.), *Encyclopedia of Public International Law*, vol. 4, Amsterdam, Elsevier, 2000, p. 937.

[131] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 122 above), p. 240, para. 25.

[132] Though the marginal role left for human rights law in the Advisory Opinion is perceptively criticized in V. Gowlland-Debbas, "The right to life and genocide: the Court and an international public policy", in L. Boisson de Chazournes and P. Sands (eds.), *International Law, the International Court of Justice and Nuclear Weapons,* Cambridge, Cambridge University Press, 1999, p. 315, at pp. 321–326.

the Court's reasoning. However desirable it might be to discard the difference between peace and armed conflict, the exception that war continues to be to the normality of peace could not be simply overlooked when determining what standards should be used to judge behaviour in those (exceptional) circumstances. *Legality of the Threat or Use of Nuclear Weapons* was a "hard case" to the extent that a choice had to be made by the Court between different sets of rules, none of which could fully extinguish the others. *Lex specialis* hardly did more than to indicate that, while it might have been desirable to apply only human rights, such a solution would have been too idealistic, bearing in mind the speciality and persistence of armed conflict. So the Court created a systemic view of the law in which the two sets of rules related to each other as today's reality and tomorrow's promise, with a view to the overriding need to ensure the "survival of a State".[133]

105.   The important point to retain here is that, when *lex specialis* is invoked as an exception to the general law, what is being suggested is that the special nature of the facts justifies a deviation from what otherwise would be the "normal" course of action. This highlights again the operation of *lex specialis* as an aspect of making pragmatic judgements about relative "generality" and "speciality", about what is "normal" and what "exceptional". Sometimes these distinctions are made in an instrument itself. Thus, article 4 of the International Covenant on Civil and Political Rights provides for a right to derogate from certain clauses in the Covenant "[i]n time of public emergency which threatens the life of the nation". When that factual condition is fulfilled, a situation emerges that is not unlike the "armed conflict" that justifies the application of laws of war, as referred to by the International Court of Justice in its *Legality of the Threat or Use of Nuclear Weapons* advisory opinion. And, as in the latter, in times of public emergency, either a modicum of legality will continue to apply or what takes its place is in fact a wholly unconstitutional legal vacuum.

106.   Often the factual condition that makes a case "special" is not laid out in a treaty, however, but must be ascertained through the normal means by which the presence of a tacit agreement, estoppel, *effectivités*, historic title, *rebus sic stantibus*, or, say, local custom (*Right of Passage over Indian Territory* case) is identified. That assessment is dependent on and makes constant reference to evaluative judgements of what is central and what marginal to a case, what aspects of it should be singled out and what aspects may be glossed over. Do *effectivités* or "historical consolidation", for instance, give grounds for a kind of exception that is prior to formal "title", or *vice versa*? Sometimes (as in the *Sovereignty over Pulau Ligitan and Pulau Sipadan* case) *effectivités* may in fact ground title; sometimes a pre-existing title may turn any *effectivités* into an illegality (*Land and Maritime Boundary between Cameroon and Nigeria* case). No *a priori* solution seems available.[134]

107.   Arguments based on *effectivités*, like those based on estoppel (*Temple of Preah Vihear*) and historical title (*Fisheries*), for example, resemble *lex specialis*.[135] They, too, seek to make the law responsive to particular situations. They, too, create informal hierarchies that seek to distinguish the special case from its general (and formal) background by pointing to a relevant fact. What they leave open, like the advisory opinion in *Legality of the Threat or Use of Nuclear Weapons*, is on what basis the relevant facts are singled out—what justifies the choice of the interpretative framework. To what extent does the factual description "armed conflict" influence the sense of the expression "arbitrary deprivation of life" in article 6 of the International Covenant on Civil and Political Rights? Here there is no single formula.[136] A weighing of different considerations must take place, and, if that weighing is to be something other than the expression of a preference, it must seek reference in what may be argued to be the systemic objectives of the law to provide its interpretative basis and *milieu*.

### 3.   PROHIBITED *LEX SPECIALIS*

108.   Most general international law may be derogated from by *lex specialis*. But sometimes either a deviation is prohibited expressly or such a prohibition may be derived from the nature of the general law. The case of *jus cogens* will be dealt with in chapter IV below. In the recent dispute relating to the OSPAR Convention, for example, the Arbitral Tribunal held it self-evident that its task was to apply, alongside the OSPAR Convention itself, also international custom and general principles of law to the extent they were not overridden by the Convention as *lex specialis*, adding, however, that "[e]ven then, it must defer to a relevant *jus cogens* with which the Parties' *lex specialis* may be inconsistent".[137] But aside from *jus cogens*, there may be other types of general law that may not permit derogation. In regard to conflicts between human rights norms, for instance, the one that is more favourable to the protected interest is usually held to be overriding.[138] At any rate, derogation to the detriment of the beneficiaries would seem precluded.

109.   Whether derogation by way of *lex specialis* is permitted will remain a matter of interpreting the general law. Concerns that may seem pertinent include at least the

---

[133] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 122 above), p. 266, para. 105 (2) E.

[134] See *Sovereignty over Pulau Ligitan and Pulau Sipadan (Indonesia/Malaysia)*, Judgment, *I.C.J. Reports 2002*, p. 625, at p. 682, para. 134, and p. 684, para. 145 (*effectivités* as basis of Malaysia's title), and *Land and Maritime Boundary between Cameroon and Nigeria (Cameroon v. Nigeria: Equatorial Guinea intervening)*, Judgment,

*I.C.J. Reports 2002*, p. 303, at p. 415, para. 223 and pp. 341–344, paras. 52, 54–55 (*effectivités* illegal). See also *Frontier Dispute*, Judgment, *I.C.J. Reports 1986*, p. 554, at p. 564, para. 18 ("[i]n fact, the concept of title may also, and more generally, comprehend both any evidence that may establish the existence of a right, and the actual source of that right").

[135] *Case concerning the Temple of Preah Vihear (Cambodia v. Thailand)*, Merits, Judgment of 15 June 1962, *I.C.J. Reports 1962*, p. 6, at p. 23; *Fisheries* case, Judgment of 18 December 1951, *I.C.J. Reports 1951*, p. 116, at pp. 130–131.

[136] As stressed by, for example, McDougal, Lasswell and Miller (see footnote 74 above), p. 206.

[137] *Dispute concerning Access to Information under Article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland*, final award, 2 July 2003, UNRIAA, vol. XXIII (Sales No. E/F.04.V.15), p. 59, at p. 87, para. 84; ILR, vol. 126, p. 334, at p. 364.

[138] Karl (see footnote 130 above), p. 939; Sadat-Akhavi (see footnote 21 above), pp. 213–231. See also the separate opinions of Judges van Eysinga and Schücking in the *Oscar Chinn* case, Judgment of 12 December 1934, *P.C.I.J., Series A/B*, No. 63, pp. 132–135, 149.

following: the normative status of the general law (is it *jus cogens*?); who the beneficiaries of the obligations are (prohibition on deviating from law benefiting third parties, including individuals or non-State entities); and whether non-derogation may be otherwise inferred from the terms of the general rule (for instance its "integral" or "interdependent" nature, its *erga omnes* character, or subsequent practice creating an expectation of non-derogation).[139] Sometimes derogation—but equally application or modification—may be forbidden if it might "disrupt the balance established under the general treaty between the rights and obligations of States parties thereto".[140] Apart from treaties of a public law nature (however that category is defined), this would apply to constituent instruments of international organizations.[141]

110.   In practice, these considerations may sometimes raise a question about what is "derogation", in contrast to "application", "updating" or "modification". Views on this may differ in a way reflecting divergent understandings of the general law. Does a technical application threaten a fragile package deal, for example? Such problems cannot be resolved by looking at the special law alone but only in forming a view of the nature and reasonable purposes of the general law.

### 4.  The relational character of the general/special distinction

111.   One of the difficulties in the *lex specialis* rule follows from the absence of clarity about the distinction between "general" and "special". For every general rule is particular, too, in the sense that it deals with some particular substance, that is, includes a certain description of fact as a *general* condition of its application. For example, the Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction lays down general law on the use of landmines. Yet this is also a "special" aspect of the general rules of humanitarian law. On the other hand, all special law is general as it is a characteristic of rules that they apply to a class "generally". Every rule may be expressed in the following format: "for every *p*, it is true that the rule *q* applies". No rule applies to a single case. Even where the occasions for the application of a rule are few, in order for the standard to be a *rule* (instead of an *order* to somebody) it must be generally defined. This is reflected in the distinction made by many domestic legal systems between laws and acts, or *loi* and *acte*, *Gesetz* and *Massnahme*.

112.   Generality and speciality are thus relational. A rule is never "general" or "special" in the abstract, but always in relation to some other rule. This relationality functions in two registers. A rule may be general or special in regard to its *subject matter* (fact description) or in regard to the *number of actors* whose behaviour is regulated by it.[142] Thus, the use of anti-personnel mines is a *special subject* within the *general subject* of humanitarian law. The distinction between general and local custom, again, provides an example of the register of number of actors covered. The registers may overlap. Thus, there may be a rule that is general in subject matter (such as a good-neighbourliness treaty) but valid only for a special relationship between a limited number of States (two).

#### (a)   Speciality in regard to parties

113.   In considering *lex specialis* as a conflict resolution technique, it is necessary to distinguish between cases where differing obligations are valid and applicable between the *same States* (A/B + A/B) and cases where the fulfilment of an obligation in one relationship (A/B) makes it impossible to fulfil an obligation in another relationship (A/C). These cases are usually discussed in terms of successive treaties (art. 30 of the 1969 Vienna Convention), and, although that set of issues will be the topic of chapter III of this report, it may still be useful to say how, if at all, *lex specialis* functions in these relationships.

114.   In the first case (A/B + A/B) *lex specialis* does have a narrow field of application, A and B being entitled to amend their prior treaty or deviate from most general law as they wish. However, it cannot be automatically ruled out that, when two States conclude a generally worded treaty, for example, they thereby wish to abolish a prior, more specific treaty. In such cases, *lex specialis* may have some value as an indication of party will:[143] the *lex posterior* will not abrogate a prior treaty obligation if the speciality of that prior obligation may be taken as an indication that the parties did not envisage this outcome. The case where a limited number of parties to a multilateral treaty establish a special regime among themselves is, again, regulated as "modification" under article 41 of the 1969 Vienna Convention and cannot be discussed here in any detail.

115.   The hard case is one where a State (A) has undertaken conflicting obligations in regard to two (or more) different States (B and C) and the question arises as to which of the obligations shall prevail. Here *lex specialis* appears largely irrelevant. Each bilateral (treaty) relationship is governed by *pacta sunt servanda,* with effects towards third parties excluded. Such conflict remains unregulated by article 30 of the 1969 Vienna Convention.[144] The State

---

[139] For the distinction between normal ("reciprocal") and "integral" and "interdependent" obligations, see the third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur, *Yearbook … 1958*, vol. II, document A/CN.4/115, pp. 40–41, para. 76, commentary to draft article 17. For the treatment of the distinction at the last stages of the Commission's work on State responsibility, see the third report on State responsibility by James Crawford, Special Rapporteur, *Yearbook … 2000*, vol. II (Part One), document A/CN.4/507 and Add.1–4, pp. 33–36, paras. 99–108. See further chapter IV below.

[140] Sadat-Akhavi (see footnote 21 above), p. 131.

[141] See, for example, I. Seidl-Hohenveldern, "Hierarchy of treaties", in J. Klabbers and R. Lefeber, *Essays on the Law of Treaties: A Collection of Essays in Honour of Bert Vierdag,* The Hague, Martinus Nijhoff, 1998, p. 7, at pp. 15–16; Karl (footnote 130 above), p. 940.

[142] Villiger (see footnote 77 above), p. 36; Kontou (see footnote 66 above), pp. 19–20.

[143] As observed by Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), p. 177, and Zuleeg (see footnote 74 above), p. 256. See further McNair (footnote 58 above), pp. 219–220. This corresponds to article 30, paragraph 4, of the 1969 Vienna Convention. See also Mus (footnote 21 above), pp. 217–219.

[144] Lauterpacht originally proposed that the later treaty should be held void unless it possessed "a degree of generality which imparts to [it] the character of legislative enactment[ ]" (first report on the law of treaties by Hersch Lauterpacht, Special Rapporteur, *Yearbook … 1953*, vol. II, document A/CN.4/63, pp. 156–159). Later Special Rapporteurs (Fitzmaurice and Waldock), however, thought that this set the innocent party to the latter treaty at an unjustified disadvantage.

that is party to the conflicting instruments is in practice called upon to choose which treaty it will perform and which it will breach, with the consequence of State responsibility for the latter.[145]

### (b)    Speciality in regard to "subject matter"

116.    As pointed out above, whether a rule is "special" or "general" requires a relational assessment: special *in what sense*? General *in what regard*? Given that only those that are in some respect similar can be compared—and indeed can enter into conflict—it must be assumed, as Fitzmaurice does, that *lex specialis* "can only apply where both the specific and general provision concerned deal with the same substantive matter".[146] Moreover, the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts requires that, for *lex specialis* to apply, the rules must deal with the same subject matter.[147]

117.    However, as noted in chapter I, section B, above, the criterion of the "same subject matter" as a condition for applying a conflict rule is too unspecific to be useful. Different situations may be characterized differently depending on what regulatory purpose one has in mind. In a sense, most activities in the international world relate to the "environment"—so is every issue an "environmental" issue to be dealt with by environmental rules? But most forms of international behaviour also have some bearing on "human rights" or "security". These denominations are not about what rules should apply but how to characterize the relevant features of a state of affairs.

118.    The example given above was that of maritime carriage of hazardous substances. Depending on what the interpreter sees as the relevant considerations, the case comes under one or another set of rules as *lex specialis*: is the point of the law to advance trade, flag or coastal State jurisdiction, or environmental protection? None of these respectively enjoys intrinsic priority over the others. This is why, in a hard case, a justifiable decision would have to take all of these into account by articulating some systemic relationship among them. None can simply be brushed aside, for the same reason that the International Court of Justice, in *Legality of the Threat or Use of Nuclear Weapons*, did not brush aside human rights law or any of the other branches of law (environmental law, humanitarian law, the law on the use of force) that had been invoked. They were all in some regard *lex specialis*. This does not mean that its decision—that it "cannot conclude definitively whether the threat or use of nuclear weapons would be lawful or unlawful in an extreme circumstance of self-defence, in which the very survival of

a State would be at stake"[148]—would have been beyond reproach. Perhaps the systemic unity that the Court canvassed and that peaked in the ultimate value of the "very survival of a State" could be submitted to critique. The point is not whether this decision was correct but that, in arriving at it, none of the laws were "automatically" set aside. They all contributed to bringing relevant considerations into the advisory opinion, whose authority lies precisely in the plausibility of what it then came to suggest as the law's determining purpose.

### 5.    Conclusion for *lex specialis*: the omnipresence of "general law"

119.    *Lex specialis derogat legi generali* refers to a standard technique of legal reasoning, operative in international law as in other fields of law understood as systems. Its power is entirely dependent on the normative considerations for which it provides articulation: sensitivity to context, capacity to reflect State will, concreteness, clarity, definiteness. Its functioning cannot be assessed independently of the role of considerations of the latter type in the specific context of legal reasoning. How does a particular agreement relate to the general law around it? Does it implement or support the latter, or does it perhaps deviate from it? Is the deviation tolerable or not? *No general, context-independent answers can be given to such questions*. In this sense, the *lex specialis* maxim cannot be meaningfully codified.

120.    The role of *lex specialis* cannot be dissociated from assessments about the nature and purposes of the general law that it proposes to modify, replace, update or deviate from. This highlights the systemic nature of the reasoning of which arguments based on "special law" are an inextricable part. No rule, treaty or custom, however special its subject matter or limited the number of States concerned by it, applies in a vacuum. Its normative environment includes—as will be elaborated in more detail in chapter V below—not only whatever general law there may be on that very topic, but also principles that determine the relevant legal subjects, their basic rights and duties, and the means by which rights and duties may be supplemented, modified or extinguished. Principles such as "sovereignty", "non-intervention", "self-determination", "sovereign equality", "non-use of force", *audiatur et altera pars*, "no one may profit from his own wrong" and so on, as well as interpretative maxims such as *lex specialis* and *lex posterior*, together with a host of other techniques of legal reasoning, are all part of this framework.

121.    The relationship between general law and particular rules is ubiquitous. One can always ask of a particular rule of international law how it relates to its normative environment. This may not always be visible. States sometimes create particular rights and obligations where there appears to be no general law on the matter at all. In such cases, these rights and obligations do not seem, on the face of it, to have the character of *lex specialis*. They are not contrasted with anything more "general". The normative area "around" such rules appears to remain a zone of no-law, just as the matter they now cover used to be before the new regulations entered into force.

---

[145] Zuleeg calls this the "principle of political freedom": Zuleeg (see footnote 74 above), pp. 267–268. See also Mus (footnote 21 above), pp. 227–231. The genesis and critique of article 30 of the 1969 Vienna Convention is well expressed in Sur, *L'interprétation en droit international public* (see footnote 107 above), pp. 167–171, and Sadat-Akhavi (see footnote 21 above), pp. 59–84. The most comprehensive discussion of the matter is in G. Binder, *Treaty Conflict and Political Contradiction: The Dialectic of Duplicity,* New York, Praeger, 1988.

[146] Fitzmaurice, "The law and procedure of the International Court of Justice 1951–4…" (see footnote 59 above), p. 237.

[147] Paras. (4) and (5) of the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 140–141.

[148] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 122 above), p. 266, para. 105 (2) E (operative part).

122.    The foregoing reflections suggest, however, that, whatever logical, conceptual or political problems there are around the old problem of "gaps" in international law,[149] there is at least one sense in which the idea of a zone of no-law as regards *lex specialis* is a conceptual *impossibility*. If a legal subject invokes a right based on "special law", then the validity of that claim can only be decided by reference to the whole background of a legal system that indicates how "special laws" are enacted, what is "special" about them, and how they are implemented, modified and terminated. It is impossible to make legal claims only in a limited sense, to opt for a part of the law while leaving the rest out; for legal reason works in a closed and circular system in which every recognition or non-recognition of a legal claim can only be decided by recognizing the correctness of other legal claims. This can be illustrated in the matter of so-called "self-contained regimes".

### C.    Self-contained (special) regimes

#### 1.    What are self-contained regimes?

123.    The commentary to article 55 (*lex specialis*) of the Commission's draft articles on responsibility of States for internationally wrongful acts makes a distinction between "'weaker' forms [of *lex specialis*] such as specific treaty provisions on a single point" and "'strong' forms of *lex specialis*, including what are often referred to as self-contained regimes". Though the commentary refrains from defining what that "strong form" is, it gives two examples: the judgment by the Permanent Court of International Justice in the *S.S. "Wimbledon"* case (1923) and that of the International Court of Justice in *United States Diplomatic and Consular Staff in Tehran* (1980).[150]

124.    This approach is not free of ambiguity. The Commission recognized and defined self-contained regimes as a subcategory (*i.e.* a "strong form") of *lex specialis* within the law of State responsibility. As such, it appears to cover the case where a special set of secondary rules claims priority over the secondary rules in the general law of State responsibility. Such a definition closely follows the use of the term by the International Court of Justice in the *United States Diplomatic and Consular Staff in Tehran* case, where the Court identified diplomatic law as a self-contained regime precisely by reference to the way it had set up its own "internal" system for reacting to breaches:

The rules of diplomatic law, in short, constitute a self-contained regime which, on the one hand, lays down the receiving State's obligations regarding the facilities, privileges and immunities to be accorded to diplomatic missions and, on the other, foresees their possible abuse by members of the mission and specifies the means at the disposal of the receiving State to counter any such abuse.[151]

125.    In other words, no reciprocal breach of diplomatic immunity is permissible; the receiving State may only resort to remedies in diplomatic law, which, the Court presumed, were "entirely efficacious". In *Military and Paramilitary Activities in and against Nicaragua*, the Court viewed human rights law somewhat analogously: the relevant treaties had their own regime of accountability that made other forms of reaction inappropriate.[152]

126.    The judgment by the Permanent Court of International Justice in the *S.S. "Wimbledon"* case, however, uses a broader notion of a self-contained regime. At issue here was the status of the Kiel Canal, which was covered both by the general law on internal waterways and by the special rules on the Canal laid down in the Treaty of Versailles of 1919. Here is how the Court characterized the law applicable:

Although the Kiel Canal, having been constructed by Germany in German territory, was, until 1919, an internal waterway of the State holding both banks, the Treaty [of Versailles] has taken care not to assimilate it to the other internal navigable waterways of the German Empire. A special section has been created at the end of Part XII … and in this special section rules exclusively designed for the Kiel Canal have been inserted; these rules differ on more than one point from those to which other internal navigable waterways of the Empire are subjected … This difference appears more especially from the fact that the Kiel Canal is open to the war vessels and transit traffic of all nations at peace with Germany, whereas free access to the other German navigable waterways … is limited to the Allied and Associated Powers alone … The provisions relating to the Kiel Canal … are therefore self-contained … The idea which underlies [them] is not to be sought by drawing an analogy from [provisions on other waterways] but rather by arguing *a contrario*, a method of argument which excludes them.[153]

127.    Now here the notion of a "self-contained regime" is not limited to a special set of secondary rules. The "special" nature of the Kiel Canal regime appears instead to follow rather from the speciality of the relevant primary rules—especially obligations on Germany—laid down in the appropriate sections of the Treaty of Versailles than that of any special rules concerning their breach. Though the Court here used the expression "self-contained", it is hard to say whether it meant any more than that, where there were conventional rules on a problem, those rules would have priority over any external ones. This is clearly the sense of the expression it employed in a 1925 opinion, where it held that, in order to interpret certain expressions in a treaty, it was unnecessary to refer to external sources: "Everything therefore seems to indicate that, in regard to this point, the Convention is self-contained and that … the natural meaning of the words [should be employed]."[154]

---

[149] The present discussion is not intended to take sides in the debate about the permissibility or desirability of "*non liquet*", as discussed between Hersch Lauterpacht and Julius Stone and elaborated in the writings of Lucien Siorat, Gerald Fitzmaurice and Ulrich Fastenrath, among others.

[150] Para. (5) of the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 140–141. *S.S. "Wimbledon"*, Judgment of 17 August 1923, *P.C.I.J., Series A*, No. 1, p. 14; *United States Diplomatic and Consular Staff in Tehran*, Judgment, *I.C.J. Reports 1980*, p. 3.

[151] *United States Diplomatic and Consular Staff in Tehran* (see footnote 150 above), p. 40, para. 86.

[152] The Court noted that the use of force was not "the appropriate method" to ensure respect for human rights, for "where human rights are protected by international conventions, that protection takes the form of such arrangements for monitoring or ensuring respect for human rights as are provided in the conventions themselves" (*Military and Paramilitary Activities in and against Nicaragua*, Merits, Judgment of 27 June 1986 (see footnote 51 above), pp. 134–135, paras. 267–268).

[153] *S.S. "Wimbledon"* (see footnote 150 above), pp. 23–24.

[154] *Exchange of Greek and Turkish Populations, Advisory Opinion of 21 February 1925, P.C.I.J., Series B*, No. 10, p. 20. For the Convention concerning the Exchange of Greek and Turkish Populations, signed at Lausanne on 30 January 1923, see League of Nations, *Treaty Series*, vol. XXXII, No. 807, p. 75.

This is, of course, a very common judicial technique and corresponds to the principle, stated above, concerning the pragmatic priority of treaty rules over general law.[155]

128. Thus, provisionally, it is possible to distinguish two uses of the notion of "self-contained regime". In a narrow sense, the term is used to denote a special set of secondary rules under the law of State responsibility that claims primacy over the general rules concerning consequences of a violation. In a broader sense, the term is used to refer to interrelated wholes of primary and secondary rules, sometimes also referred to as "systems" or "subsystems" of rules, that cover some particular problem differently from the way it would be covered under general law. That set of rules may either be a very limited one—for example, the regime of judicial cooperation between the International Criminal Court and States parties to the Rome Statute of the International Criminal Court[156]—or it may be rather wide, such as, for instance, the technique of interpreting the European Convention on Human Rights as "an instrument of European public order (*ordre public*) for the protection of individual human beings".[157] In this wider sense, self-containedness fuses with international law's contractual bias: where a matter is regulated by a treaty, there is normally no reason to have recourse to other sources.

129. But an occasional use of the notion of "self-contained regime" extends it even further than the *S.S. "Wimbledon"* case. Sometimes whole fields of functional specialization, of diplomatic and academic expertise, are described as self-contained (whether or not that word is used) in the sense that special rules and techniques of interpretation and administration are thought to apply.[158] For instance, fields such as "human rights law", "WTO law", "European law/European Union law", "humanitarian law" and "space law", among others, are often identified as "special" in the sense that rules of general international law are assumed to be modified or even excluded in their administration. One often speaks of "principles of international environmental law" or "principles of international human rights law" with the assumption that in some way those principles differ from what the general law provides for in analogous situations.

130. For instance, the principle of "dynamic" or teleological interpretation is much more deeply embedded in human rights law than in general international law.[159] In the view of the European Court of Human Rights, as is well known, in applying a "normative treaty" one should look for its object and purpose, not to the interpretation that would provide the most limited understanding of the obligations of States parties.[160] Making the contrast with general law even sharper, the Court has stated that

[u]nlike international treaties of the classic kind, the [European] Convention [on Human Rights] comprises more than mere reciprocal engagements between contracting States. It creates, over and above a network of mutual, bilateral undertakings, objective obligations…[161]

131. In comparing itself to the International Court of Justice, the European Court has found "a fundamental difference in the role and purpose of the respective tribunals [which] provides a compelling basis for distinguishing Convention practice from that of the International Court".[162] That this is not an idiosyncratic aspect of the European Convention on Human Rights is suggested by the parallel attitudes within the Inter-American Court of Human Rights and the Human Rights Committee.[163]

132. A self-contained regime in this third sense has effect predominantly by providing interpretative guidance and direction that in some way deviates from the rules of general law. It covers a very wide set of differently interrelated rule systems, and the degree to which general law is assumed to be affected varies extensively. What, indeed, may be the normative sense of the division of international law into 17 different "topics" or "branches" in a report to the Commission by the United Nations Secretariat?[164] Even as it may be argued that such a classification is merely "relative" and serves principally didactic purposes, it is still common to link the branches or

[155] This is frequently seen in territorial disputes. If a treaty determines a territorial boundary, then there is no need to discuss *uti possidetis*, inter-temporal law or the relevant *effectivités*. See, for example, *Territorial Dispute (Libyan Arab Jamahiriya/Chad)*, Judgment, *I.C.J. Reports 1994*, p. 6, at pp. 38–39, paras. 75–76.

[156] For this suggestion, see G. Sluiter, "The surrender of war criminals to the International Criminal Court", *Loyola of Los Angeles International and Comparative Law Review*, vol. 25 (2003), p. 605, at p. 629.

[157] *Cyprus v. Turkey* [GC], No. 25781/94, ECHR 2001-IV, p. 25, para. 78.

[158] This is implied in many of the essays in Barnhoorn and Wellens (eds.) (see footnote 12 above).

[159] For the role of "dynamic" or "teleological" interpretation in human rights law, see P. Wachsmann, "Les méthodes d'interprétation des conventions internationales relatives à la protection des droits de l'homme", in Société française pour le droit international, *La protection des droits de l'homme et l'évolution du droit international, Colloque de Strasbourg*, Paris, Pedone, 1998, p. 157, at pp. 188–193. See also L. Caflisch and A. A. Cançado Trindade, "Les conventions américaine et européenne des droits de l'homme et le droit international général", RGDIP, vol. 108 (2004), p. 5, at pp. 11–22.

[160] *Wemhoff v. Germany*, judgment of 27 June 1968, European Court of Human Rights, Series A, No. 7, p. 23, para. 8.

[161] *Ireland v. the United Kingdom*, judgment of 18 January 1978, European Court of Human Rights, Series A, No. 25, p. 90, para. 239. Likewise, *The Effect of Reservations on the Entry into Force of the American Convention on Human Rights (Arts. 74 and 75)*, advisory opinion OC-2/82 of 24 September 1982, Inter-American Court of Human Rights, Series A, No. 2, pp. 20–23, paras. 29–33, and *Restrictions to the Death Penalty (Arts. 4(2) and 4(4) American Convention on Human Rights)*, advisory opinion OC-3/83 of 8 September 1983, Inter-American Court of Human Rights, Series A, No. 3, pp. 76–77, para. 50.

[162] *Loizidou v. Turkey*, preliminary objections, 23 March 1995 (see footnote 56 above), pp. 26–27, paras. 70–72, and p. 29, paras. 84–85.

[163] Invoking the practice of the European Court of Human Rights, the Inter-American Court of Human Rights has identified as part of the "*corpus juris* of international human rights law" the principle that "human rights treaties are living instruments whose interpretation must consider the changes over time and present-day conditions" (*The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law*, advisory opinion OC-16/99 of 1 October 1999, Inter-American Court of Human Rights, Series A, No. 16, pp. 256–257, paras. 114–115). In its controversial general comment No. 24, the United Nations Human Rights Committee stated that the provisions of the 1969 Vienna Convention were "inappropriate to address the problem of reservations to human rights treaties. Such treaties, and the Covenant specifically, are not a web of inter-State exchanges of mutual obligations. They concern the endowment of individuals with rights. The principle of inter-State reciprocity has no place…" (general comment on issues relating to reservations made upon ratification or accession to the [International] Covenant [on Civil and Political Rights] or the Optional Protocols thereto, or in relation to declarations under article 41 of the Covenant (*Official Records of the General Assembly, Fiftieth Session, Supplement No. 40* (A/50/40), vol. I, annex V, para. 17)).

[164] Survey of international law: working paper prepared by the Secretary-General, *Yearbook … 1971*, vol. II (Part Two), document A/CN.4/245, p. 1.

subsystems thus identified with special legal principles concerning the administration of the relevant rules.[165]

133.    None of this is to say that the effect of a self-contained regime in this third sense would be clear or straightforward. Indeed, writers such as Brownlie and Pellet have been quite critical of placing too much emphasis on the speciality of something like "human rights law".[166] Likewise, the question of whether "international environmental law" designates a special branch of international law within which other interpretative principles apply than apply generally, or merely an aggregate of treaty and customary rules dealing with the environment, may perhaps seem altogether too abstract to be of much relevance.[167] The standard designation of the laws of armed conflict, for instance, as *lex specialis* and a self-contained regime—or even "a 'deviant' body of rules of public international law"[168]—leaves wide open the issue of to what extent the general rules of, say, the law of treaties are affected.[169] But however doubtful international law "generalists" may be of the normative nature of such designations, specialists in such fields regularly hold them to be important. Functionally oriented as such regimes are, they also serve to identify and articulate interests that help to direct the administration of the relevant rules.[170]

134.    This may be illustrated by the debate over the role of general international law in trade law. There is no doubt that the WTO dispute settlement system is a self-contained regime in the sense that article 23 of the Understanding on Rules and Procedures Governing the Settlement of Disputes excludes unilateral determinations of breach or countermeasures outside the "specific subsystem" of the WTO regime.[171] It is sometimes argued that general international law should not be applied in the administration of WTO treaties as they differ fundamentally in their general orientation from regular public international law: where the latter is based on State sovereignty, the former derives its justification from the theory of comparative advantage. Principles of interpretation inspired by the latter may often be in complete contrast with those inspired by the former.[172] It is true that, by now, WTO dispute settlement organs have used international customary law and general principles very widely to interpret WTO treaties.[173] Few lawyers would persist in holding the treaties covered by WTO, whatever their nature, as fully closed to public international law.[174] The issue remains, however, that trade rationality may occasionally—perhaps often—be at odds with the rationality of protecting the sovereign, and that, when a choice has to be made, the general objectives and "principles" of trade law—however that is understood—will seem more plausible to trade institutions and experts than traditional interpretative techniques.

135.    The three notions of "self-contained regime" are not clearly distinguished from each other. A special system of secondary rules—the main case covered by article 55 of the draft articles on responsibility of States for internationally wrongful acts—is usually the creation of a single treaty or very closely related set of treaties. An example might be the "non-compliance system" under the 1985 Vienna Convention for the Protection of the Ozone Layer and the related 1987 Montreal Protocol on Substances that Deplete the Ozone Layer, which has priority over the standard dispute settlement clause in the 1969 Vienna Convention.[175] A special regime on some (territorial, functional) problem area—for example, the *S.S. "Wimbledon"* case—may cover several instruments and practices, united by their orientation towards a single problem: establishment of a free trade area, say, or a universal trade regime such as the one administered under WTO. It goes without saying that a treaty regime may be special in both the first and the second sense, that is as a self-contained regime of remedies (State responsibility) and a set of special rules on the adoption, modification, administration or termination of the relevant obligations.

136.    The widest notion covers a whole area of functional specialization or teleological orientation at a universal scale: the laws of armed conflict, for instance, identified as *lex specialis* by the International Court of Justice in *Legality of the Threat or Use of Nuclear Weapons*, or environmental law, often thought to be accompanied by special principles, such as the principle of precaution, "polluter pays" and "sustainable development", that seek to direct the administration of environmental matters.[176]

---

[165] See, for example, the discussion in P. Malanczuk, "Space law as a branch of international law", in Barnhoorn and Wellens (eds.) (footnote 12 above), p. 143, at pp. 144–146.

[166] See I. Brownlie, *Principles of Public International Law*, 6th ed., Oxford, Oxford University Press, 2003, pp. 529–530 (a criticism of the speciality of human rights law); see also A. Pellet, "Droits-de-l'hommisme et droit international", Gilberto Amado memorial lecture, 18 July 2000.

[167] This issue is at the heart of T. Kuokkanen, *International Law and the Environment: Variations on a Theme*, The Hague, Kluwer Law International, 2002 (tracing a history of international lawyers' treatment of environmental problems from the fairly straightforward application of traditional rules to the complex management of resource regimes).

[168] H. H. G. Post, "Some curiosities in the sources of the law of armed conflict conceived in a general international legal perspective", in Barnhoorn and Wellens (eds.) (see footnote 12 above), p. 96.

[169] The potential conflict between the need to uphold the binding force of peace treaties and the principle laid down in article 52 of the 1969 Vienna Convention (invalidity in the event of coercion of a State by the threat or use of force), for example, may not be soluble at all within the confines of the Convention.

[170] In a sociological sense, they may even be said to express different social rationalities: a clash between them would appear as a clash of rationalities—for example, environmental rationality against trade rationality, human rights rationality against the rationality of diplomatic intercourse. Thus described, fragmentation of international law would articulate a rather fundamental aspect of globalized social reality itself: the replacement of territoriality as the principle of social differentiation by (non-territorial) functionality. See further Koskenniemi and Leino, "Fragmentation of international law? …" (footnote 14 above), and A. Fischer-Lescano and G. Teubner, *Regime-Kollisionen*, forthcoming.

[171] The term "specific subsystem" is used in Marceau, "WTO dispute settlement and human rights" (see footnote 43 above), pp. 755, 766–779.

[172] J. L. Dunoff, "The WTO in transition: of constituents, competence and coherence", *George Washington International Law Review*, vol. 33, Nos. 3 and 4 (2001), pp. 991–992.

[173] See, generally, J. Cameron and K. R. Gray, "Principles of international law in the WTO Dispute Settlement Body", *International and Comparative Law Quarterly*, vol. 50 (2001), p. 248, and É. Canal-Forgues, "Sur l'interprétation dans le droit de l'OMC", RGDIP, vol. 105 (2001), p. 5.

[174] See further section C.3 (*b*) (ii) below.

[175] See article 8 of the Montreal Protocol on Substances that Deplete the Ozone Layer and comments in M. Koskenniemi, "Breach of treaty or non-compliance? Reflections on the enforcement of the Montreal Protocol", *Yearbook of International Environmental Law*, vol. 3 (1992), p. 123.

[176] See, for example, Brownlie, *Principles of Public International Law* (footnote 166 above), pp. 274–281. See also *Legality of the Threat or Use of Nuclear Weapons* (footnote 122 above), p. 226 *passim*.

We can see the significance of such speciality in situations such as the *EC—Hormones* case, where the European Community argued within WTO that the precautionary principle included in the 1992 Declaration of Rio on the Environment and Development (Rio Declaration)[177] should influence the assessment of the justifiability of the European Community prohibition on the importation of certain meat and meat products. The WTO Appellate Body, however, stated that, while it might have "crystallized into a general principle of customary international environmental law", it was not clear that it had become a part of general customary law.[178] Cantoning the principle as one of "customary environmental law" left open, of course, the question of under what circumstances it might have become applicable under "international trade law".

137.   It often seems that "much of the action in international law [has] shifted to specialized regimes".[179] At least as concerns State responsibility, this has been the price to pay for a uniform regime. To succeed in devising a single set of secondary rules (and this was the focus of some disagreement among the Special Rapporteurs), they needed to be of so general a nature that when States then adopt primary rules on some subject they are naturally tempted also to adopt secondary rules tailored precisely to the breach of those primary rules. The turn from formal dispute settlement to "softer", non-adversarial forms of accountability under environmental treaties ("non-compliance mechanisms") may serve as an example. Such variation need not be overly problematic. As Crawford has observed, there never was an assumption in the Commission that its system of responsibility would be "one size fits all". Whether States would wish to follow the general law or opt out from it was both a "political question and (in relation to existing regimes) a question of interpretation".[180] But if, instead of enhancing the effectiveness of the relevant obligations, the regime serves to dilute existing standards—a problem famously identified years ago by Prosper Weil[181]—then the need for residual application, or a "fall-back" onto the general law of State responsibility, may seem called for.

## 2. SELF-CONTAINED REGIMES AND THE WORK OF THE INTERNATIONAL LAW COMMISSION ON STATE RESPONSIBILITY

138.   Special Rapporteur Roberto Ago came to the question in connection with his discussion of the "source" and "content" of the international obligation breached.[182] Does the identity of a norm that has been breached affect the type of responsibility that follows? As is well-known, Ago discussed this question predominantly in terms of the gradation of State responsibility through the distinction between international "crimes" and "simple breaches".[183] There is no need to embark upon that question here. Nevertheless, it is useful to note that, apart from that distinction, Ago did not see a need for classifying different consequences by reference to the source or the content of the obligation breached. What he aimed at, and achieved, was a single, generally applicable set of rules about wrongfulness that could cover the breach of any primary rules. As a counterpart to that generality, he accepted that States were at liberty to provide for special consequences for the breach of particular types of primary rules:

In the text of a particular treaty concluded between them, some States may well provide for a special régime of responsibility for the breach of obligations for which the treaty makes specific provision…[184]

139.   The matter of how these special treaty regimes would relate to the general rules was not pursued by Ago but was taken up at great length by Special Rapporteur Riphagen in 1982, in connection with his discussion of what he called the "general problem underlying the drafting of part 2 of the draft articles". What for Ago had been a matter of taking note of the self-evident competence of States to establish, by treaty, special systems of State responsibility appeared to become quite central, and rather problematic, for the drafting of part 2. In Riphagen's words:

international law as it stands today is not modelled on one system only, but on a variety of interrelated subsystems, within each of which the so-called "primary rules" and the so-called "secondary rules" are closely intertwined—indeed, inseparable.[185]

140.   As Riphagen saw it, the presence of such "subsystems" (which he also sometimes termed "regimes"), that is, interrelated systems of primary and secondary rules as well as procedures for realizing responsibility,[186] was a very common occurrence: when States elaborated primary rules, the question of what to do if these were violated emerged almost automatically; and in such cases, the States would often provide for some special rules on the content, degree and forms of State responsibility. Though the main case seemed to be the one where a special regime was provided by treaty, Riphagen, in apparent contrast to Ago, also assumed that the content of a particular primary rule might justify supplementing it with special secondary rules. The attempt to construct such linkages became quite central for Riphagen, who, for this purpose, discussed aggression and other breaches of international peace and security, as well as countermeasures in connection with a wide definition of objective regimes. Apart from the question of international "crimes", the discussion did not proceed towards the identification of other specific types of relationships between particular primary rules and the consequences of their violation.[187]

---

[177] Adopted in Rio de Janeiro on 14 June 1992, *Report of the United Nations Conference on Environment and Development, Rio de Janeiro, 3–14 June 1992*, vol. I: *Resolutions Adopted by the Conference* (United Nations publication, Sales No. E.93.I.8 and corrigenda), resolution 1, annex I, p. 2.

[178] *EC Measures Concerning Meat and Meat Products (Hormones)* (see footnote 57 above), paras. 123–125. For the "precautionary principle" in environmental law, see Daillier and Pellet, *Droit international public* (footnote 74 above), pp. 1307–1310.

[179] D. Bodansky and J. R. Crook, "Symposium: The ILC's State responsibility articles: introduction and overview", AJIL, vol. 96, No. 4 (2002), p. 773, at p. 774.

[180] J. Crawford, "The ILC's articles on responsibility of States for internationally wrongful acts: a retrospect", *ibid.*, p. 874, at p. 880.

[181] P. Weil, "Towards relative normativity in international law?", *ibid.*, vol. 77 (1983), p. 413.

[182] See especially the fifth report on State responsibility by Roberto Ago, Special Rapporteur, *Yearbook … 1976*, vol. II (Part One), document A/CN.4/291 and Add.1–2, pp. 6–7, paras. 12–15.

[183] *Ibid.*, p. 26, para. 80.

[184] *Ibid.*, p. 6, para. 14. See also draft article 17 proposed by Special Rapporteur Ago in his fifth report, *ibid.*, p. 24, para. 71.

[185] Third report on State responsibility by Willem Riphagen, Special Rapporteur, *Yearbook … 1982*, vol. II (Part One), document A/CN.4/354 and Add.1–2, p. 28, para. 35.

[186] *Ibid.*, para. 38.

[187] Fourth report on State responsibility by Willem Riphagen, Special Rapporteur, *Yearbook … 1983*, vol. II (Part One), document A/CN.4/366 and Add.1, pp. 8–24, paras. 31–130.

141. Riphagen's approach was inspired by a "functional analysis" of three different types of rules of international law: those seeking to keep States separate, those that reflected what he called a "common substratum" and those that sought to organize parallel exercises of State sovereignty.[188] Whatever its sociological merits, the analysis failed to convince the Commission, which did not integrate his "systems" or "subsystems" into the draft articles. His attempt to depart from Ago by classifying the consequences of the breach of obligations by the source or content of those obligations (general custom—conventional international law—judicial, quasi-judicial and other institutional decisions) likewise never ended up in the draft.[189] This did not mean that the Commission wished to exclude the possibility of tailoring the consequences of a breach to the nature of the primary rule violated, only that it felt it sufficient to deal with this by a savings clause, the formulations of which finally ended up in what became article 55.

142. It was, in other words, accepted that the articles were of a residual nature, and that special regimes of responsibility could be adopted by States. What was the relationship of such regimes to the general law? Even though Riphagen used the term "self-contained", and foresaw a "theoretical" possibility that the relevant set of "conduct rules, procedural rules and status provisions [might form] a closed legal circuit",[190] in fact he never wanted to say they were completely isolated:

This does not necessarily mean that the existence of the subsystem excludes permanently the application of any general rules of customary international law relating to the legal consequences of wrongful acts. … [T]he subsystem itself as a whole may fail, in which case a fall-back on another subsystem may be unavoidable.[191]

143. This seems evident. Two observations are needed, however. First, though Riphagen only speaks of the "failure" of a subsystem, it must be assumed that the same consequence may also follow from the simple silence of the subsystem. Second, although Riphagen only speaks of a fall-back on other "subsystems", it is hard to see why he would wish to exclude fall-back on the general rules of State responsibility—as indeed he specifically says elsewhere:

Every one of the many different régimes (or subsystems) of State responsibility … is in present-day international law subject to the universal system of the United Nations Charter, including its elaboration in unanimously adopted declarations…[192]

144. Riphagen did not elaborate on the nature or scope of this "universal system"—apart from noting that it also included *jus cogens*. That question was in due course completely absorbed by the question of "crimes".[193]

145. Despite the terminology used by Riphagen, the substance of his arguments is relatively uncontroversial and does little other than recapitulate points made in the first part of this study concerning the relationship between special and general law and the pragmatic need to prioritize the former over the latter. The draft articles, Riphagen noted, "cannot exhaustively deal with the legal consequences of any and every breach of any and every legal obligation".[194] Thus, although he had described the question of subsystems as a "general problem underlying the drafting of part 2", Riphagen felt it could still be resolved in a relatively simple and uncontroversial way by a general savings clause.[195] The result was then that the provisions of the draft itself became "no more than rebuttable presumptions as to the legal consequences of internationally wrongful acts".[196]

146. At this stage, Riphagen noted the possibility that there might be violations of rules under two subsystems providing for parallel or differing consequences (*e.g.* countermeasures might be allowed under one subsystem but prohibited under another). While the *lex specialis* rule might resolve some such problems, it could not automatically resolve a possible conflict where the object and purpose of the subsystems might differ—an example might concern the application of principles of environmental law within the administration of a trade instrument. For this purpose Riphagen suggested that "it would still seem necessary to draw up a catalogue of possible legal consequences in a certain order of gravity, and to indicate the principal circumstances precluding one or more legal consequences in a general way".[197] This led him to a discussion of the hierarchy of legal consequences—a discussion that peaked in, and was in the end exhausted by, a discussion of international crimes.[198] In the end, the only hierarchy proposed by Riphagen was two limitations to the savings clause: a self-contained regime could deviate neither from rules of *jus cogens,* nor from "the provisions and procedures of the Charter of the United Nations relating to the maintenance of international peace and security".[199]

147. Like Riphagen, his successor, Arangio-Ruiz, accepted the "presence of those treaty-based systems or combinations of systems which tend to address, within their own contractual or special framework, the legal

[188] Third report on State responsibility by Willem Riphagen, Special Rapporteur (A/CN.4/354 and Add.1–2) (see footnote 185 above), pp. 28–30, paras. 39–53.

[189] For the proposal, see *ibid.*, pp. 40–44, paras. 106–128.

[190] Willem Riphagen, *Yearbook … 1982*, vol. I, summary record of the 1731st meeting of the Commission, p. 202, para. 16.

[191] Third report on State responsibility by Willem Riphagen, Special Rapporteur (A/CN.4/354 and Add.1–2) (see footnote 185 above), p. 30, para. 54.

[192] *Ibid.*, p. 39, para. 104.

[193] *Ibid.*, p. 39, paras. 104–105.

[194] *Ibid.*, p. 31, para. 55.

[195] The original form of that clause in 1982 was as follows: "The provisions of this part apply to every breach by a State of an international obligation, except to the extent that the legal consequences of such a breach are prescribed by the rule or rules of international law establishing the obligation or by other applicable rules of international law" (*ibid.*, p. 47, para. 147, art. 3). The effect of this was to provide for the application of the Commission's draft "*unless otherwise provided for*" (*ibid.*, para. (5) of the commentary). See also *ibid.*, p. 39, para. 103. The Commission agreed. In 1983, it adopted the following savings clause: "…the provisions of this part govern the legal consequences of any internationally wrongful act of a State, except where and to the extent that those legal consequences have been determined by other rules of international law relating specifically to the internationally wrongful act in question" (*Yearbook … 1983*, vol. II, (Part Two), p. 42, para. 133, art. 2).

[196] Third report on State responsibility by Willem Riphagen, Special Rapporteur (A/CN.4/354 and Add.1–2) (see footnote 185 above), p. 31, para. 57.

[197] *Ibid.*, p. 34, para. 77.

[198] For Willem Riphagen, "crimes" denoted one special subsystem of international law that provided a special set of consequences (*ibid.*, pp. 44–46, paras. 130–143).

[199] Willem Riphagen, with regard to draft article 2 proposed by the Special Rapporteur in his fifth report, *Yearbook … 1984*, vol. I, summary record of the 1858th meeting of the Commission, p. 261, paras. 4, 6–9.

regime governing a considerable number of relationships among the States parties, including in particular the consequences of any breaches of the obligations of States parties under the system".[200] Within such a broad, systemic view, he noted that "some legal scholars" had identified a category of "self-contained regimes" that affected "the *faculté* of States parties to resort to the remedial measures which are open to them under general international law".[201] Arangio-Ruiz made express the difference between the broader view that spoke in terms of systems or subsystems of rules in general and the narrower view that he identified with Bruno Simma's influential 1985 article, focusing on subsystems intended

to exclude more or less totally the application of the general legal consequences of wrongful acts, in particular the application of the countermeasures normally at the disposal of an injured party.[202]

148.    Arangio-Ruiz himself appeared initially to adhere to the wider notion, noting as examples of self-contained regimes the "system" set up by the treaties establishing the European Communities, the regime created by the human rights treaties, and diplomatic law, as stated by the International Court of Justice in the *United States Diplomatic and Consular Staff in Tehran* case. Developing his argument, however, he focused on the narrower problem, namely whether the remedial measures—especially countermeasures—in such regimes "affect[ed] to any degree the possibility for legal recourse by States parties to the measures provided for, or otherwise lawful, under general international law".[203] Consequently, most of Arangio-Ruiz's treatment of self-contained regimes—in particular his discussion of the relevant State practice—sought an answer to the question of whether such regimes were fully isolated from general law ("formed closed legal circuits") or, in other words, excluded future recourse to the remedies in the general law of State responsibility. His answer to that question was an emphatic no. Because he defined self-contained regimes as sets of rules that were hermetically isolated from general law, he found no such regimes in practice: "none of the supposedly self-contained regimes seems to materialize *in concreto*."[204]

149.    Arangio-Ruiz did not oppose the establishment of special treaty-based regimes. They were needed "to achieve, by means of *ad hoc* machinery, a more effective, organized monitoring of violations and responses thereto". But he rejected the conclusion that this would bar them from ever resorting to general law.[205] Fall-back to general remedies was needed at least in the event that a State failed to receive effective reparation or an unlawful act persisted while the procedures in the special

regime were in progress.[206] He admitted that derogations or "fall-backs" should only take place in "extreme cases". A special regime was, after all, a multilateral bargain from which each party received some benefits for submitting to a common procedure. Nonetheless, his main point concerned the openness of allegedly "closed" regimes. The priority of the special regime followed from the general rules of international law and treaty interpretation, but it did not entail a presumption of abandonment of the guarantees of general law—this is how Arangio-Ruiz read the clause concerning the residual nature of the draft articles in the (then) article 2. It would fail to correspond to the intent of the States wishing to strengthen (instead of to derogate from) their ordinary rules on State responsibility.[207]

150.    Special Rapporteur James Crawford came to self-contained regimes in 2000 in connection with draft articles 37 to 39, which dealt with the relationship between the Commission's draft and the law outside it. Article 37 contained a general clause on the residual role of the draft: special rules would be allowed. Crawford refrained from responding in general terms to the question of whether such special rules were also exclusive. This was "always a question of interpretation in each case".[208] As an example of the case where a self-contained regime was "exclusive", Crawford referred to the WTO remedies system. As a case where the special regime only modified some aspect of the general law, he referred to article 41 of the European Convention on Human Rights. Crawford left open, however, whether "exclusivity" here meant exclusive and *final* replacement of the general law or merely its substitution at an initial stage, with the possibility of "fall-back" if the self-contained regime had, as Riphagen had put it, "failed". The two examples survive in the commentary to the draft articles.

151.    In this connection, article 37 was moved from part 2 into part 4 (general provisions), where it became article 55, was titled *lex specialis,* and came to cover the whole draft: both the conditions of existence of a wrongful act and the content and implementation of State responsibility.[209] As pointed out at the beginning of this report, the Commission did not mean by this that every deviation under article 55 would have the nature of a "self-contained regime". It distinguished between what it called a "strong" and a "weak" form of *lex specialis* and labelled only the former "self-contained". Why it used the terminology of "strong"/"weak" is far from clear, however, and possibly a source of confusion. The operative distinction in the commentary is not between provisions that are normatively "stronger" and those that are normatively "weaker", but rather between "specific treaty provisions on a single point" (regular *lex specialis*—the Commission's "weak" form) and whatever could be

[200] Third report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur, *Yearbook ... 1991*, vol. II (Part One), document A/CN.4/440 and Add.1, p. 25, para. 84.

[201] *Ibid.*

[202] *Ibid.*, footnote 167, quoting B. Simma, "Self-contained regimes", *Netherlands Yearbook of International Law*, vol. 16 (1985), pp. 117.

[203] Third report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur (A/CN.4/440 and Add.1) (see footnote 200 above), p. 26, paras. 85–86. Likewise the fourth report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur, *Yearbook ... 1992*, vol. II (Part One), document A/CN.4/444 and Add.1–3, p. 35, para. 97.

[204] Fourth report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur (A/CN.4/444 and Add.1–3) (see footnote 203 above), p. 40, para. 112.

[205] *Ibid.*, p. 40, paras. 112 and 114.

[206] *Ibid.*, pp. 40–41, para. 115.

[207] *Ibid.*, p. 42, paras. 123–124.

[208] Third report on State responsibility by James Crawford, Special Rapporteur, *Yearbook ... 2000*, vol. II (Part One), document A/CN.4/507 and Add.1–4, p. 110, para. 420.

[209] Article 55 (*Lex specialis*) reads: "These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law" (*Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 140).

extracted from the *S.S. "Wimbledon"* and *United States Diplomatic and Consular Staff in Tehran* cases (the Commission's "strong" form). Because the Commission only defined "self-contained regimes" by reference to the examples of these two cases, it thereby imported, as we have seen, two different meanings into the draft: (*a*) the view of a self-contained regime as a special set of consequences for wrongfulness (*United States Diplomatic and Consular Staff in Tehran*); and (*b*) the view of a self-contained regime as a set of primary and secondary rules governing the administration of a problem (*S.S. "Wimbledon"*). Neither of these is necessarily any "stronger" (at least in the sense of more binding or less amenable to derogation) than a "specific treaty provision[ ] on a single point".

152.    The following conclusions may be drawn from the Commission's treatment of "self-contained regimes" in the context of State responsibility:

(*a*)    *Definition*. The concept of "self-contained regimes" was constantly used by the Special Rapporteurs in a narrow and a wide sense, and both were imported into the Commission's commentary on article 55. The following qualify as a self-contained regime: (*i*) a special set of secondary rules that determine the consequences of a breach of certain primary rules (including the procedures of such determination); and (*ii*) any interrelated cluster (set, regime, subsystem) of rules on a limited problem, together with rules for the creation, interpretation, application, modification or termination—in a word, administration—of those rules. In addition, academic commentary and practice make constant reference to a third notion—"branches of international law"—that are also assumed to function in the manner of self-contained regimes, claiming to be regulated by their own principles;

(*b*)    *Establishment*. States are entitled to set up self-contained regimes that have priority over the general rules in the draft articles. The only limits to this entitlement are the same as those that apply to *lex specialis*. This means, among other things, that "States cannot, even as between themselves, provide for legal consequences of a breach of their mutual obligations which would authorize acts contrary to peremptory norms of general international law … the special rules in question [must] have at least the same legal rank as those expressed in the articles";[210]

(*c*)    *Relationship between a self-contained regime and general law under normal circumstances*. The relationship between a self-contained regime and the general law on State responsibility should be determined principally by interpreting the instrument(s) that established the regime. However, no self-contained regime is a "closed legal circuit". While a special/treaty regime has (as *lex specialis*) priority in its sphere of application, that sphere should normally be interpreted in the way that exceptions are, that is, in a limited way. In any case, the rules of the general law on State responsibility—like the rest of general international law—supplement it to the extent that no special

derogation is provided in or can be inferred from the instrument(s) constituting the regime;

(*d*)    *Failure of a self-contained regime*. The question of residual application of the general rules in situations not expressly covered by a "self-contained regime", or possible "fall-back" to the general rules of State responsibility in case of the failure of that regime, is not expressly covered in the draft or in the commentary. However, it is dealt with by Special Rapporteurs Riphagen and Arangio-Ruiz, both of whom hold it self-evident that, once a self-contained regime fails, recourse to general law must be allowed. What such failure might consist of has not been explicitly addressed by the Commission. However, an analogy could be drawn from the conditions under which the exhaustion of local remedies rule need not be followed. These would be cases where the remedy would be manifestly unavailable or ineffective or where it would be otherwise unreasonable to expect recourse to it;

(*e*)    *Inappropriateness of the term "self-contained"*. None of the Special Rapporteurs and none of the cases discussed by them implies the idea of special systems or regimes that would be fully isolated from general international law. To this extent, the notion of a "self-contained regime" is simply misleading. Although the degree to which a regime of responsibility, a set of rules on a problem or a branch of international law needs to be supplemented by general law varies, there is no support for the view that anywhere would general law be fully excluded. As will become apparent below, such exclusion may not even be conceptually possible. Hence, it is suggested that the term "self-contained regime" be replaced by "special regime".

3.    THE RELATIONSHIP BETWEEN SELF-CONTAINED REGIMES OUTSIDE STATE RESPONSIBILITY AND GENERAL INTERNATIONAL LAW

153.    In regard to fragmentation, the main questions of interest concern the relationship between the self-contained (special) regime in each of its three meanings, as discussed above, and general law: (*a*) the conditions for the establishment of a special regime; (*b*) the scope of application of the regime *vis-à-vis* general international law under normal circumstances; and (*c*) the conditions for "fall-back" to general rules owing to the regime's failure.

(a)    *Establishment of self-contained (special) regimes*

154.    As to the first question, there is little doubt that most international law—and not only the law of State responsibility—is dispositive, and that contracting out by establishing a regime is possible, limited only to the extent that such limitation may be derived from the *jus cogens* nature or otherwise compelling character of general law. Aside from peremptory norms, at least the following limitations should be considered:

(*a*)    The regime may not deviate from the law benefiting third parties, including individuals and non-State entities;

(*b*)    The regime may not deviate from general law if the obligations of general law are of an "integral" or

---

[210] Para. (2) of the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts, *ibid.*

"interdependent" nature or have an *erga omnes* character or if practice has created a legitimate expectation of non-derogation;[211]

(*c*) The regime may not deviate from treaties that have a public law nature or which are constituent instruments of international organizations.[212]

155. However, different considerations may apply to the establishment of self-contained (special) regimes in each of the three senses of that expression.

156. Setting up a special regime of State responsibility—that is, special consequences for breach—is normally possible only by a treaty that identifies the primary rules to which it applies, the nature, content and form of the (special) responsibility, and the institutions that are to apply it. Though it is not conceptually inconceivable that such a regime might emerge tacitly, or by way of custom (*e.g.* a regime of collective countermeasures by non-injured States, as foreseen under article 54 of the draft articles on responsibility of States for internationally wrongful acts[213]), this would seem exceptional.

157. The establishment of a special regime in the wider sense (*S.S. "Wimbledon"*, any interlinked sets of rules, both primary and secondary) would also normally take place by means of one or several treaties (*e.g.* the WTO "covered treaties"). However, it may also occur that a set of treaty provisions develops over time, without conscious decision by States parties, perhaps through the activity of an implementing organ, into a regime with its own rules of administration, modification and termination. It took until 1963 before the European Court of Justice defined the (then) European Economic Community as a "new legal order of international law".[214] The development of European law into a self-contained regime—including the principles of direct effect, supremacy and the doctrine of fundamental rights—has to a very large extent taken place through the interpretative activity of the European Court of Justice, and not always with the full support of all member States. As we have seen, the same is largely (though in a much narrower sense) true of human rights law as well. Though the States parties have, of course, established implementing organs, and thereby taken the first step towards self-containedness, the extent of the autonomy of these regimes has largely been determined by those organs. The standard example here is the development of a doctrine on the separability of reservations to the European Convention on Human Rights.[215]

158. The widest of special regimes—denominations such as "international criminal law", "humanitarian law", "trade law", "environmental law" and so on—emerge from the informal activity of lawyers, diplomats and

pressure groups, more through shifts in legal culture and in response to practical needs of specialization than as conscious acts of regime creation. Such notions mirror the functional diversification of international society or, more prosaically, the activities of particular caucuses seeking to articulate or strengthen preferences and orientations that seem not to have received sufficient attention under the general law. The application of special "principles" by specialized implementation organs is a visible feature of such regimes.

(b) *The relationship between the self-contained (special) regime and general international law under normal circumstances*

159. The relationship between the special regime and the general law—that is to say, the degree to which a regime is self-contained in the first place—will be predominantly a matter of interpreting the treaties that form the regime. To what extent does a general law serve to fill gaps or to assist in the interpretation or application—that is, in the administration—of the regime? Once it is clear that no regime is completely isolated from general law, the question emerges as to their relationship *inter se*.

160. It is possible to illustrate these linkages in practice by reference to the operation of the supervisory bodies in human rights and trade law, two regimes specifically mentioned in the Commission's commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts.

(i) Example: human rights regimes

161. Human rights organs, such as the European Court of Human Rights and the Inter-American Court of Human Rights, regularly refer to rules and principles of general international law concerning not only treaty interpretation but matters such as statehood, jurisdiction and immunity, as well as a wide variety of principles of procedural propriety.[216] The Inter-American Court has used its wide advisory jurisdiction to interpret not only other human rights instruments (such as the European Convention on Human Rights or the 1966 International Covenant on Economic, Social and Cultural Rights and International Covenant on Civil and Political Rights) but also instruments such as the Vienna Convention on Consular Relations of 1963.[217] In an opinion from 1988 it expressly referred to the international law principle of continuity of the State, according to which State responsibility persists despite changes of government.[218] In a series of recent cases, the European Court of Human Rights has clarified the relationship between the rights in the European Convention on Human Rights and State immunities, recognizing the validity of the latter over, for instance, the right of access to courts

---

[211] See the discussion on *erga omnes* obligations in chapter IV below.

[212] See chapter II, section B, on *lex specialis*, above.

[213] *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 137.

[214] Case 26/62, *NV Algemene Transport—en Expeditie Onderneming van Gend & Loos v. Netherlands Inland Revenue Administration*, judgment of 5 February 1963, *European Court Reports*, English special edition 1963, p. 1, at p. 12.

[215] See *Belilos v. Switzerland* (footnote 55 above), p. 24, para. 50, and p. 28, para. 60.

[216] On this, see especially the review by Caflisch and Cançado Trindade (footnote 159 above).

[217] See *"Other Treaties" Subject to the Consultative Jurisdiction of the Court (Art. 64 American Convention on Human Rights)*, advisory opinion OC-1/82 of 24 September 1982, Inter-American Court of Human Rights, Series A, No. 1.

[218] *Velásquez Rodríguez v. Honduras*, judgment (merits), 29 July 1988, Inter-American Court of Human Rights, Series C, No. 4, para. 184; see also *Inter-American Yearbook on Human Rights* (1988), p. 914, at p. 990, para. 184.

under article 6, paragraph 1, of the Convention. In particular, it has pointed out that

[t]he Convention … cannot be interpreted in a vacuum. The Court must be mindful of the Convention's special character as a human rights treaty, and it must also take the relevant rules of international law into account … The Convention should so far as possible be interpreted in harmony with other rules of international law of which it forms part, including those relating to the grant of State immunity.[219]

162.    There was no *a priori* assumption that the rules of the Convention would override those of general law. On the contrary, the Court assumed the priority of the general law on immunity, making the point that

measures taken by a High Contracting Party which reflect recognised rules of public international law on State immunity cannot in principle be regarded as imposing a disproportionate restriction on the right of access to court as embodied in Article 6 § 1. Just as the right of access to court is an inherent part of the fair trial guarantee in that Article, so some restrictions on access must likewise be regarded as inherent, an example being those limitations generally accepted by the community of nations as part of the doctrine of State immunity.[220]

163.    That the Convention should not be treated as if it existed in a legal vacuum has also been affirmed by the Court in regard to the rules of State jurisdiction and State responsibility. In the *Banković* case (1999), it made this point:

[T]he Court reiterates that the principles underlying the Convention cannot be interpreted and applied in a vacuum. The Court must also take into account any relevant rules of international law when examining questions concerning its jurisdiction and, consequently, determine State responsibility in conformity with the governing principles of international law, although it must remain mindful of the Convention's special character as a human rights treaty. The Convention should be interpreted as far as possible in harmony with other principles of international law of which it forms part.[221]

164.    In other words, the European Convention on Human Rights is not, and has not been conceived as, a self-contained regime in the sense that recourse to general law would have been prevented. On the contrary, the Court makes constant use of general international law, with the presumption that the Convention rights should be read in harmony with that general law and without an *a priori* assumption that Convention rights would be overriding.

(ii)    Example: World Trade Organization law

165.    Though perhaps more controversial, the matter is not significantly different in the WTO system. Although, as we have seen, it has sometimes been suggested that WTO "covered treaties" form a closed system, this position has been rejected by the WTO Appellate Body in terms that resemble the language used by the European Court of Human Rights, noting that WTO agreements should not be read "in clinical isolation from public international law".[222] Since then, the Appellate Body has

frequently sought "additional interpretative guidance, as appropriate, from the general principles of international law".[223] More recently a WTO Panel has had occasion to specify this, as follows:

We take note that Article 3.2 of the [Understanding on Rules and Procedures Governing the Settlement of Disputes] requires that we seek within the context of a particular dispute to clarify the existing provisions of the WTO agreements in accordance with customary rules of interpretation of public international law. However, the relationship of the WTO Agreements to customary international law is broader than this. Customary international law applies generally to the economic relations between the WTO members. Such international law applies to the extent that the WTO treaty agreements do not "contract out" from it. To put it another way, to the extent there is no conflict or inconsistency, or an expression in a covered WTO agreement that implies differently, we are of the view that the customary rules of international law apply to the WTO treaties and to the process of treaty formation under the WTO.[224]

166.    Nonetheless, academic opinion is divided as to how far this actually goes, with focus especially on the use by WTO organs of law from other special regimes, especially environmental law, or provisions of non-WTO treaties. But whatever view one takes of the *competence* of WTO panels and the Appellate Body, that position is neither identical to nor determinative of how to view the question of whether "WTO law" (or, more precisely, "WTO covered agreements") is also *substantively* self-contained.[225]

167.    The starting point for analysis is usually articles 3, paragraph 2, and 19, paragraph 2, of the Understanding on Rules and Procedures Governing the Settlement of Disputes, according to which WTO dispute settlement is intended to preserve the rights and obligations of members under the agreements covered.[226] This has sometimes been interpreted to mean that non-WTO law cannot be used in any way to affect whatever "rights and obligations" are provided under WTO law.[227] An extreme interpretation might view this as a complete setting aside of all non-WTO law. However, this is countered by the further language of article 3, paragraph 2, of the Understanding, according to which panels and the Appellate Body are to apply the "customary rules of interpretation of public

---

[219] *McElhinney v. Ireland* [GC], No. 31253/96, ECHR 2001-XI (extracts), para. 36. Similarly, *Al-Adsani v. the United Kingdom* [GC], No. 35763/97, *ibid.*, para. 55.

[220] *Fogarty v. the United Kingdom* [GC], No. 37112/97, *ibid.* (extracts), para. 36.

[221] *Banković and Others v. Belgium and Others (dec.)* [GC], No. 52207/99, ECHR 2001-XII, p. 351, para. 57 (references omitted).

[222] *United States—Standards for Reformulated and Conventional Gasoline* (see footnote 48 above), p. 17.

[223] *United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report, WT/DS58/AB/R, adopted 6 November 1998, para. 158.

[224] *Korea—Measures Affecting Government Procurement* (see footnote 44 above), para. 7.96.

[225] This point is made with emphasis in Pauwelyn, *Conflict of Norms…* (see footnote 21 above), pp. 460–463.

[226] Article 3, paragraph 2, provides:

"Recommendations and rulings of the [dispute settlement body] cannot add to or diminish the rights and obligations provided in the covered agreements."

Article 19, paragraph 2, provides that:

"…in their findings and recommendations, the panel and Appellate Body cannot add to or diminish the rights and obligations provided in the covered agreements."

[227] Thus Joel Trachtman has argued that "WTO dispute resolution panels and the Appellate Body are limited to the application of substantive WTO law and are not authorized to apply general substantive international law or other conventional international law" (Trachtman, "The domain of WTO dispute resolution" (see footnote 47 above), p. 347–348). Trachtman allows, of course, the application of the rules of interpretation in the 1969 Vienna Convention, as well as any other rules specifically incorporated. These, he understands, would mainly deal with procedural, not substantive law.

international law"—a provision that incorporates not only the 1969 Vienna Convention but also, through articles 31 and 32 thereof, any other rules of treaty interpretation, including, for example, article 31, paragraph 3 (c), under which an interpretation should take into account "[a]ny relevant rules of international law applicable in the relations between the parties".[228]

168.    The 1969 Vienna Convention rules on treaty interpretation—articles 31 and 32—are recognized as customary law and widely applied in the WTO system.[229] But the Appellate Body has frequently discussed and applied other public international law standards as well. There has been considerable debate on the relationship between the WTO "covered treaties" and environmental agreements.[230] The Panel in *United States—Import Prohibition of Certain Shrimp and Shrimp Products* (the *"Shrimp–Turtle* case", 1998) defined the notion of "exhaustible natural resources" in article XX (g) of the General Agreement on Tariffs and Trade (GATT) so as to include only "finite resources such as minerals, rather than biological or renewable resources". The Appellate Body did not share this view. The notion needed to be interpreted in view of recent developments: "the generic term 'natural resources' in Article XX (g) is not 'static' in its content or reference but is rather 'by definition evolutionary'". In order to seek such an updated meaning, it referred, among other instruments, to the 1992 Rio Declaration[231] and Agenda 21,[232] the Convention on Biological Diversity of 1992, and the United Nations Convention on the Law of the Sea, and thereby reached the interpretation that all natural resources, both living and non-living, were included.[233]

169.    Though many views have been taken on the question of applicable law within the WTO, two major positions seem to have emerged. One holds WTO to be part of international law, operating within the general system of international law rules and principles. This position may be rationalized, for example, by presuming that, when States adopted the Marrakesh agreements, they were doing so in accordance with and under the rules and principles of international law and that there was no reason to assume—absent express agreements to the contrary—that these rules and principles would not continue to govern the administration of those agreements. The other position focuses on the provisions in the Understanding on Rules and Procedures Governing the Settlement of Disputes requiring that panels and the Appellate Body neither add to nor diminish the obligations under the "covered treaties". In practice, however, the two positions may not be altogether difficult to reconcile with almost any practice under WTO. The latter view may accept even a wide use of international customary law and other treaties by viewing them as incorporated into WTO either specifically (through art. 3, para. 2, of the Understanding) or implicitly by reference to the context in which the WTO agreements were made. In any case, both positions can accommodate a very wide-ranging practice (somewhat like the "monist" and "dualist" positions within domestic law), including statements such as that by the Panel in the 2000 *Korea—Measures Affecting Government Procurement*[234] case. There seems, therefore, little reason in principle to depart from the view that general international law supplements WTO law, unless it has been specifically excluded, and that so do other treaties, which should, preferably, be read in harmony with the treaties covered by WTO.[235]

170.    This does not exclude the emergence of a specific "WTO ethos" in the interpretation of WTO agreements, just as it is possible to discern a "human rights ethos" in the work of the human rights treaty bodies. Nor does it prevent the setting aside of normal State responsibility rules in the governance of WTO treaties. Indeed, this was the *raison d'être* of the WTO system, and it receives normative force from the *lex specialis* rules of general law itself. Even as it is clear that the competence of WTO bodies is limited to consideration of claims under the agreements covered (and not, for example, under environmental or human rights treaties), when elucidating the content of the relevant rights and obligations WTO bodies must situate those rights and obligations within the overall context of general international law (including the relevant environmental and human rights treaties).

171.    Nor is this any idiosyncrasy of WTO; it extends to practices under regional trade agreements. For example, in *Feldman v. Mexico*, an Arbitration Tribunal under the North American Free Trade Agreement needed to determine the meaning of the expression "expropriation" under article 1110 of the Agreement. The Tribunal found that the article was "of such generality as to be difficult to apply in specific cases". Accordingly, it read it against

[228] See chapter V below.

[229] In noting this, the WTO Appellate Body has used the International Court of Justice as its authority for determining the customary law nature of the rules on interpretation in the 1969 Vienna Convention. See *United States—Standards for Reformulated and Conventional Gasoline* (footnote 48 above), pp. 19–20. The customary law nature of article 32 is affirmed in *Japan—Taxes on Alcoholic Beverages*, WTO Appellate Body report, WT/DS8/AB/R, WT/DS10/AB/R, WT/DS11/AB/R, adopted 1 November 1996, p. 10. For further discussion, see Lindroos and Mehling, "Dispelling the Chimera of 'self-contained regimes'…" (footnote 43 above).

[230] See J. Cameron and J. Robinson, "The use of trade provisions in international environmental agreements and their compatibility with the GATT", *Yearbook of International Environmental Law*, vol. 2 (1991), p. 3. For a good overview of the case law until the *United States—Import Prohibition of Certain Shrimp and Shrimp Products* case (see footnote 223 above), see M. J. Trebilcock and R. Howse, *The Regulation of International Trade*, 2nd ed., London, Routledge, 1999, pp. 397–420. See further G. Marceau, "Conflicts of norms and conflicts of jurisdictions: the relationship between the WTO Agreement and MEAs and other treaties", *Journal of World Trade*, vol. 35 (2001), pp. 1081–1131.

[231] *Report of the United Nations Conference on Environment and Development…* (see footnote 177 above).

[232] Adopted in Rio de Janeiro, 14 June 1992, *ibid.*, resolution 1, annex II, p. 9.

[233] *United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Panel report, WT/DS58/R and Corr.1, adopted 6 November 1998, as modified by Appellate Body report WT/DS58/AB/R, para 3.237; *United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report (see footnote 223 above), paras. 127–131. Moreover, it viewed their exhaustibility by reference to the fact that all seven sea turtle species were listed in appendix I to the Convention on International Trade in Endangered Species of Wild Flora and Fauna, *United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report, paras. 132–133.

[234] *Korea—Measures Affecting Government Procurement* (see footnote 44 above).

[235] A recent work taking the latter position is Pauwelyn, *Conflict of Norms…* (see footnote 21 above).

the "principles of customary international law" in order to clarify whether it applied to State action against grey market cigarette exports.[236]

(iii)   Conclusions on the relationship between self-contained (special) regimes and general international law under normal circumstances

172.   None of the treaty regimes in existence today is self-contained in the sense that the application of general international law would be generally excluded. On the contrary, treaty bodies in human rights and trade law, for example, make constant use of general international law in the administration of their special regimes. Though States have the *faculté* to set aside much general law by means of special systems of responsibility or rule administration, what conclusions should be drawn from this depends somewhat on the normative coverage, or "thickness", of the regime. The scope of a special State responsibility regime is normally defined by the relevant treaty. No assumption is entailed that general law would not apply outside of these special provisions. In the case of an interlocked set of rules on regime creation, administration, amendment and termination, general law may have been excluded in a more extensive way. The very set of rules may be governed by special principles of interpretation, reflecting the object and purpose of the regime. This may affect, in particular, the competence of the interpreting organs tasked with advancing the purposes of the regime.

173.   Finally, the widest of self-contained regimes—"environmental law", "space law", etc.—interact with other such denominations or clusters, indicating special principles that should be taken into account. It is typical of this third sense that it has neither clear boundaries nor a strictly determined normative force. It brings to legal decision-making considerations and elements that claim relevance and need to be balanced against other considerations. No firm exclusion is implied, the significance of this being that it points to factors and practices that may have more or less relevance depending on how the problem at issue is described (is it a "trade law" problem; it is a problem in "humanitarian law" or in "human rights law"?).

174.   As Bruno Simma has suggested in his leading article on the question of self-contained regimes, the main question of interest here is: "*Under what circumstances, if any, can there be a fall-back on the general legal consequences of internationally wrongful acts?*"[237] As pointed out above, the Special Rapporteurs never considered self-contained regimes or subsystems as "closed legal circuits" in the sense that they would completely and finally exclude the application of general law. A minimal conclusion that one can draw from practice and the literature is that articles 31 and 32 of the 1969 Vienna Convention are always applicable, unless specifically set aside by other principles of interpretation.

This has been affirmed by practically all existing bodies applying international law.[238] Because these articles—and in particular article 31, paragraph 3 (*c*)—already situate treaty interpretation within the general context of the rights and obligations of the parties, the question of the application of general international law (that is, general customary law and general principles of law) may seem to become somewhat academic. That they are always applicable is very strongly suggested by practice and doctrine alike, but especially by the writings of public international law generalists.[239] The position recently taken by Antonio Cassese is representative. Discussing the special procedures inscribed in human rights treaties to supervise the administration of the relevant treaties and react to breaches, he points out:

It would be contrary to the spirit of the whole body of international law on human rights to suggest that the monitoring system envisaged in the [International] Covenant [ on Civil and Political Rights] and the Protocol should bar States parties from "leaving" the self-contained regime contemplated in the Covenant and falling back on the customary law system of resort to peaceful counter-measures.[240]

175.   The same position is taken in numerous academic writings in regard to human rights treaties. Pauwelyn summarizes the position succinctly:

[I]n their treaty relations States can "contract out" of one, more or, in theory, all rules of international law (other than those of *jus cogens*), but they cannot contract out of the *system* of international law.[241]

176.   There are, as Pauwelyn notes, policy reasons for this. But there is also a logical point to make. States cannot contract out from the *pacta sunt servanda* principle, unless the speciality of the regime is thought to lie in its creating no obligations at all (and even then it would seem hard to see where the binding force of such an agreement would lie). Overall, the claim (almost never heard) that

---

[236] *Feldman v. United Mexican States*, International Centre for Settlement of Investment Disputes (ICSID) case No. ARB(AF)/99/1, award of 16 December 2002, *ICSID Review–Foreign Investment Law Journal*, vol. 18, No. 2 (October 2003), p. 488, at p. 523, para. 98; ILR, vol. 126, pp. 58–65.

[237] Simma, "Self-contained regimes" (see footnote 202 above), p. 118.

[238] For some recent affirmations, see *Sovereignty over Pulau Ligitan and Pulau Sipadan* (footnote 134 above), pp. 645–646, para. 37 (with a list of references to the Court's previous affirmations of the same). For similar recent affirmations by other tribunals, see, for example: *Japan—Taxes on Alcoholic Beverages* (footnote 229 above), pp. 10–12 (sect. D); *Restrictions to the Death Penalty (Arts. 4 (2) and 4 (4) American Convention on Human Rights)* (footnote 161 above), p. 76; *Ethyl Corp. v. The Government of Canada*, 28 November 1997, Arbitral Tribunal under the North American Free Trade Agreement, ILR, vol. 122 (2002), pp. 278–279, paras. 50–52 (noting that the United States had also accepted their status as custom); *Waste Management, Inc. v. United Mexican States*, ICSID case No. ARB(AF)/98/2, 2 June 2000, *ICSID Review–Foreign Investment Law Journal*, vol. 15 (2000), p. 214, at p. 243, footnote 2 (dissenting opinion of Keith Highet) (see also ILR, vol. 121 (2002), p. 51, footnote 2). The European Court of Human Rights also stated, early on, that it was "prepared to consider … that it should be guided by Articles 31 to 33 of the [1969] Vienna Convention" (*Golder v. the United Kingdom*, 21 February 1975, European Court of Human Rights, Series A, No. 18, p. 14, para. 29). It affirmed this recently ("the Convention must be interpreted in the light of the rules set out in the 1969 Vienna Convention") in *Banković and Others v. Belgium and Others* (see footnote 221 above), pp. 350–351, para. 55. For the rather wider formulation of the Iran–United States Claims Tribunal ("the task of the Tribunal is to interpret the relevant provisions of the Algiers Accords on the basis of the Vienna Convention on the Law of Treaties") see *Sedco, Inc. v. National Iranian Oil Company*, Iran–United States Claims Tribunal, case No. 129, 9 IRAN–U.S. C.T.R., p. 249, at p. 257 (with references to earlier formulations of the same). For the Algiers Accords, and in particular the Declaration concerning the Settlement of Claims of 19 January 1981, see ILM, vol. 20 (1981), p. 230.

[239] For a review of positions, see the fourth report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur (A/CN.4/444 and Add.1–3) (footnote 203 above), pp. 36–38, paras. 99–106.

[240] A. Cassese, *International Law*, 2nd ed., Oxford, Oxford University Press, 2005, p. 276.

[241] Pauwelyn, *Conflict of Norms…* (see footnote 21 above), p. 37.

self-contained regimes are completely cocooned outside international law resembles the views held by late-nineteenth-century lawyers about the (dualist) relationship between national and international law.[242]

177.    Under this view, general international law would be applicable only if specifically incorporated as part of a special regime. Whatever the validity of this view under national law, it is very hard to see how it could be applied to relations between international legal "regimes" and general international law. In the first place, the regime undoubtedly receives—or possibly fails to receive—binding force under general international law. The conditions of validity and invalidity of regime-establishment acts are assessed by general law. But this also means that most of the 1969 Vienna Convention—at least its customary law parts, including above all articles 31 and 32—automatically, and without incorporation, *is* a part of the regime: indeed, it is only by virtue of this Convention that the regime may be identified as such and delimited against the rest of international law. Thus, in a recent case, the International Court of Justice held that a provision in a *compromis* where it was authorized to apply the "rules and principles of international law" was superfluous if principles of treaty interpretation were meant:

the Court would in any event have been entitled to apply the general rules of international treaty interpretation for the purpose of interpreting the [relevant] Treaty.[243]

178.    In fact, there is no evidence of *any* rule regime that would claim to be valid or operative independently of the 1969 Vienna Convention.

179.    In the second place, and unlike national law, international law regimes are always partial in the sense that they regulate only some aspects of State behaviour, while presuming the presence of a large number of other rules in order to function at all. They are always situated in a "systemic" environment. That, after all, is the *very meaning of the generality* of certain customary law rules or general principles of law. As the French–Mexican Claims Commission pointed out in the *Georges Pinson* case:

Toute convention internationale doit être réputée s'en référer tacitement au droit international commun, pour toutes les questions qu'elle ne résout pas elle-même en termes exprès et d'une façon différente.[244]

180.    Or, as stated more recently by the OSPAR Convention Arbitral Tribunal:

the first duty of the Tribunal is to apply the OSPAR Convention. An international Tribunal … will also apply customary international law and general principles unless and to the extent that the parties have created a *lex specialis*.[245]

181.    This is also reflected in the wide-ranging jurisprudence concerning State contracts. Initially, there may have been a sense that these existed in a legal vacuum. However, since the *Saudi Arabia v. ARAMCO* award (1958), it has become standard practice to refer to international law as the governing legal order. There, the Tribunal stated:

It is obvious that no contract can exist *in vacuo*, *i.e.*, without being based on a legal system. The conclusion of a contract is not left to the unfettered discretion of the Parties. It is necessarily related to some positive law which gives legal effects to the reciprocal and concordant manifestations of intent made by the Parties.[246]

182.    Even as the proper legal order for such contracts may remain a matter of some controversy, most lawyers would accept the statement of the sole arbitrator in *TOPCO/CALASIATIC* (1977) that this is "a particular and new branch of international law: the international law of contracts".[247] The consequences of this were also stated by the Iran–United States Claims Tribunal:

As a *lex specialis* in the relations between the two countries, the Treaty supersedes the *lex generalis*, namely customary international law … however … the rules of customary law may be useful in order to fill in possible *lacunae* of the Treaty, to ascertain the meaning of undefined terms in its text or, more generally, to aid interpretation and implementation of its provisions.[248]

183.    These rules and principles include at least those concerning statehood, jurisdiction, State representation, State succession, the creation and transfer of sovereignty, privileges and immunities of diplomats, territorial status (*e.g.* freedom of the high seas), rules on nationality, and the concept of "crimes against humanity", not to mention all the various rules that not only become applicable but are hierarchically superior to regime rules by virtue of Article 103 of the Charter of the United Nations. In their review of the practice of the European Court of Human Rights and the Inter-American Court of Human Rights, a member of the former and the President of the latter highlighted in detail the use of the international law of State responsibility, immunity, jurisdiction and the "general principles of law recognized by civilized nations" (not always distinguished from general principles of *international law*) by their treaty bodies. They concluded that

les systèmes en cause font partie intégrante du droit international général et conventionnel. Cela signifie que l'idée du fractionnement du droit international … n'a guère de pertinence pour les systèmes internationaux de protection des droits de l'homme.[249]

[242] In fact, this analogy is made in J. P. Trachtman, "Institutional linkage: transcending 'trade and…'", AJIL, vol. 96, No. 1 (January 2002), p. 77, at pp. 89–91.

[243] *Kasikili/Sedudu Island (Botswana/Namibia)*, Judgment, *I.C.J. Reports 1999*, p. 1045, at p. 1102, para. 93.

[244] "Every international convention must be deemed tacitly to refer to general principles of international law for all the questions which it does not itself resolve in express terms and in a different way": *Georges Pinson (France) v. United Mexican States*, French–Mexican Claims Commission, award No. 1, 19 October 1928, UNRIAA, vol. V (Sales No. 1952.V.3), p. 327, at p. 422.

[245] *Dispute concerning Access to Information under Article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland* (see footnote 137 above), UNRIAA, vol. XXIII, p. 87, para. 84; ILR, vol. 126, p. 364.

[246] *Saudi Arabia v. Arabian American Oil Company (ARAMCO)*, award of 23 August 1958, ILR vol. 27, p. 117, at p. 165.

[247] *Texaco Overseas Petroleum Company/California Asiatic Oil Company v. Government of the Libyan Arab Republic*, ILM, vol. 17 (1978), p. 13, para. 32. For an overview of the development and present status of the "international law of investment", see, for example, A. F. Lowenfeld, *International Economic Law*, Oxford, Oxford University Press, 2002, pp. 387–493.

[248] *Amoco International Finance Corporation v. The Government of the Islamic Republic of Iran* (see footnote 125 above), p. 222, para. 112. Many thanks are due to Carlos López Hurtado for this and some other references and arguments.

[249] "[T]he systems in question are an integral part of general and conventional international law. This means that the notion of fragmentation of international law … is entirely irrelevant for international systems of human rights protection": Caflisch and Cançado Trindade (see footnote 159 above), pp. 60–61.

184.   To press a perhaps self-evident point, there is no special "WTO rule" on statehood, or a "human rights notion" of transit passage, just as there is no special rule about State immunities within the European Court of Human Rights or a WTO-specific notion of "exhaustible resources". Moreover, the general rules operate unless their operation has been expressly excluded. This was the view of the Chamber of the International Court of Justice concerning the applicability of the local remedies rule in the *Elettronica Sicula S.p.A (ELSI)* case. It had no doubt that

the parties to a treaty can therein either agree that the local remedies rule shall not apply to claims based on alleged breaches of that treaty; or confirm that it shall apply. Yet the Chamber finds itself unable to accept that an important principle of customary international law should be held to have been tacitly dispensed with, in the absence of any words making clear an intention to do so.[250]

185.   It is in the nature of general law to apply generally, *i.e.* inasmuch as it has not been specifically excluded. It cannot plausibly be claimed that these parts of the law—"important principles" as the Court put it—have validity only insofar as they have been "incorporated" into the relevant regimes. There has never been any act of incorporation. But more relevantly, it is hard to see how regime builders would have agreed *not* to incorporate (that is, opt out from) such general principles. The debate about new States' competence to pick and choose the customary law they wish to apply ended after decolonization without there having been much "rejection" of old custom. Few actors would care to establish relations with a special regime that claimed a blanket rejection of all general international law. Why, in such a case, would anyone (including the regime's establishing members) take the regime's engagements seriously?

### (c)   Fall-back onto general rules owing to the failure of self-contained regimes

186.   The third case—the "failure" of a self-contained regime—is one that most commentators would agree brings the general law into operation. However, it is far from clear what may count as "failure". In assessing this, the nature of the regime must clearly be taken into account.[251] For most special regimes, their *raison d'être* is to strengthen the law on some particular subject matter, to provide more effective protection for certain interests or to create more context-sensitive (and in this sense more "just") regulation of a matter than what is offered under the general law. Reporting and individual applications to human rights treaty bodies, and the non-compliance mechanisms under environmental treaties, clearly seek to

attain precisely this. The same is true of the rapid and effective WTO dispute settlement system.

187.   Sometimes the risk may emerge that a special regime in fact waters down the relevant obligations. This may be caused, for instance, by the accumulation of an excessive backlog in the treatment of individual applications, a non-professional or biased discussion of national reports, or any other intentional or unintentional malfunction in the institutions of the regime. A dispute-settlement mechanism under the regime may function so slowly or so inefficiently that damage continues to be caused, without a reasonable prospect of a just settlement in sight. At some such point the regime will have "failed"—and at that point the possibility must become open for the beneficiaries of the relevant rights to turn to the institutions and mechanisms of general international law.

188.   No general criteria can be set up to determine what counts as "regime failure". The failure might be either substantive or procedural. A substantive failure takes place if the regime completely fails to attain the purpose for which it was created: members of a free trade regime persist in their protectionist practices; pollution of a watercourse continues unabated, despite pledges by riparian States parties to a local environmental treaty. Inasmuch as the failure can be articulated as a "material breach" under article 60 of the 1969 Vienna Convention, then the avenues indicated in that article should be open to the members of the regime. It cannot be excluded, either, that the facts relating to regime failure may be invoked as a "fundamental change of circumstances" under article 62 of the 1969 Vienna Convention.

189.   The other alternative is a procedural failure: the institutions of the regime fail to function in the way they should. For instance, they have provided for reparation, but that reparation is not forthcoming.[252] When it is a question of how far the States parties to a special regime must continue to have resort to the special procedures, analogous considerations would seem relevant, as in the context of the requirement of exhaustion of local remedies in the law of diplomatic protection. In this regard, the main principles are enunciated in draft articles 14 and 15 of the Commission's current draft on diplomatic protection. According to article 15, local remedies do not need to be exhausted where:

"(*a*)   there are no reasonably available local remedies to provide effective redress, or the local remedies provide no reasonable possibility of such redress;

"(*b*)   there is undue delay in the remedial process which is attributable to the State alleged to be responsible".[253]

190.   This would seem to apply when the State suffering the damage is itself a member of the regime. For those outside the regime, of course, general law continues to prevail. But what might be the situation in cases where the injury is not suffered by a formal member of the regime,

---

[250] *Elettronica Sicula S.p.A. (ELSI)*, Judgment, *I.C.J. Reports 1989*, p. 15, at p. 42, para. 50.

[251] See, for example, the fourth report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur (A/CN.4/444 and Add.1–3) (footnote 203 above), pp. 40–41, paras. 115–116; see also Simma, "Self-contained regimes" (footnote 202 above), pp. 111–131; D. Alland, *Justice privée et ordre juridique international: Étude théorique des contre-mesures en droit international public*, Paris, Pedone, 1994, pp. 278–291; C. S. Homsi, "'Self-contained regimes'—no cop-out for North Korea!", *Suffolk Transnational Law Review*, vol. 24, No. 1 (winter 2000), pp. 99–123; and the various essays in Barnhoorn and Wellens (eds.) (footnote 12 above). The idea that a special regime, such as the WTO legal order, "falls back" on general international law while the degree of "contracting out" remains a matter of interpretation is also usefully discussed in Pauwelyn, *Conflict of Norms…* (see footnote 21 above), pp. 205–236.

[252] This is the example mentioned in the fourth report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur (A/CN.4/444 and Add.1–3) (see footnote 203 above), pp. 40–41, para. 115 (*a*).

[253] *Yearbook … 2006*, vol. II (Part Two), p. 46, draft article 15.

but the regime nonetheless fails to bring about the objective set? For instance, the non-compliance mechanism under article 8 of the Montreal Protocol on Substances that Deplete the Ozone Layer is failing to bring any of the parties in routine breach of their emission reduction obligations under article 2 of the Protocol into order. A number of States parties to the 1966 International Covenant on Civil and Political Rights continue to engage in massive human rights violations, irrespective of the Human Rights Committee's opinions and conclusions. When may the other parties take countermeasures against a State in breach of its obligations under articles 49 or 54 of the draft articles on responsibility of States for internationally wrongful acts?[254] There are no clear answers to these questions, but it seems evident that at some point there must be a "fall-back" on general rules of State responsibility, including countermeasures and general mechanisms of dispute settlement (*e.g.* recourse to the International Court of Justice under a compulsory jurisdiction declaration made by two members of a special regime).[255]

### 4. Conclusions on self-contained regimes

191.    The rationale for special regimes is the same as that for *lex specialis*. They take better account of the particularities of the subject matter to which they relate; they regulate it more effectively than general law and follow closely the preferences of their members. Where the application of the general law concerning reactions to breaches (especially countermeasures) might be inappropriate or counterproductive, a self-contained regime, such as, for instance, the system of *persona non grata* under diplomatic law, may be better suited to deal with such breaches. However, as the Commission observes, it is equally clear that, if the general law has the character of *jus cogens*, then no derogation is permitted. In fact, the assumption seems to be that, in order to justify derogation, the special rules "have at least the same legal rank as those expressed in the articles".[256]

192.    But no regime is self-contained. Even in the case of well-developed regimes, general law has at least two types of function. First, it provides the normative background that comes in to fulfil aspects of the regime's operation not specifically provided by the regime. In the event of the dissolution of a State that is party to a dispute within the WTO dispute settlement system, for instance, general rules of State succession will determine the fate of any claims reciprocally made by and against the dissolved State. This report has illustrated some of the ways in which this supplementing takes place. Second, the rules of general law also come into operation if the special regime fails to function properly. Such failure might be substantive or procedural, and at least some of the avenues open to regime members in such cases are outlined

in the 1969 Vienna Convention itself. The rules on State responsibility might also be relevant in such situations.

193.    Third, the term "self-contained regime" is a misnomer. No legal regime is isolated from general international law. It is doubtful whether such isolation is even possible: a regime can receive (or fail to receive) legally binding force ("validity") only by reference to (valid and binding) rules or principles *outside itself*. In previous debates within the Commission over "self-contained regimes", "regimes" and "subsystems", there never was any assumption that they would be hermetically isolated from general law. It is useful to note that article 42 of the 1969 Vienna Convention contains a "Munchausen provision" that is directly relevant here, for it expressly situates every legal regime within its framework. According to this article:

*Validity and continuance in force of treaties*

  1.    The validity of a treaty or of the consent of a State to be bound by a treaty may be impeached only through the application of the present Convention.

194.    This, it could be said, is the "minimum level" at which the 1969 Vienna Convention regulates everything that happens in the world of regime building and regime administration. Through it, as well as through the reasoning above, every special regime links up with general international law in three ways:

(*a*)    The conditions of validity of a special regime, including the validity of its establishment, are determined by principles of general international law;

(*b*)    Because a special regime is "special", it does not provide all the conditions for its operation. General law provides resources for this purpose. This is not a matter of general law having been incorporated into the special regime but follows from the "generality" of that general law—or in other words, from international law's systemic nature. General international law influences the operation of a special regime above all in three distinct ways:

(i)    General international law (that is, general custom and general principles of law) fills gaps in the special regime and provides interpretative direction for its operation;

(ii)    Most of the 1969 Vienna Convention (including, above all, articles 31 and 32) is valid as customary law and applicable in the sense referred to in (*i*) above;

(iii)    General international law contains principles of hierarchy that control the operation of the special regime, above all in determining peremptory norms of international law but also in providing resources for determining, in the event of a conflict, which regime should be given priority or, at least, what consequences follow from the breach of the requirements of one regime by deferring to another (usually State responsibility);

(*c*)    Finally, general international law provides the consequences of the "failure" of a special regime. When a special regime "fails" cannot always be determined from within that regime, however. Inability to attain an

---

[254] *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, pp. 129, 137.

[255] See further Simma, "Self-contained regimes" (footnote 202 above), pp. 118–135, and Alland (footnote 251 above), pp. 290–291. This would also seem to apply to the failure of the special regime of the European Union. See also L. Boisson de Chazournes, *Les contremesures dans les relations internationales économiques*, Paris, Pedone, 1992, p. 185.

[256] Para. (2) of the commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 140.

authoritative determination of failure may be precisely one aspect of such failure—*e.g.* when a special dispute settlement system ceases to function.

### D.  Regionalism

#### 1.  What is "regionalism"?

195.  "Regionalism" does not figure predominantly in international law treatises and, when it does, it rarely takes the shape of a "rule" or a "principle". Neither does it denote any substantive area of the law, on a par with "human rights" or "trade law". When the question of regionalism is raised, it is usually done in order to discuss the question of the universality of international law, its historical development or the varying influences behind its substantive parts. Only rarely does it appear in an openly normative shape, as a kind of regional *lex specialis* that is intended either as an application or modification of a general rule or, perhaps in particular, as a deviation from such a rule.

196.  Regionalism is a well-established theme of foreign policy debates. Discussions about the best approaches to regulating matters of, say, economic policy or collective security habitually refer to the advantages of institutional frameworks that are narrower than the universal. As the United Nations was being debated between the Great Powers at the end of the Second World War, the choice between regionalism and universalism weighed heavily on the planning of the post-war collective security system. Churchill, for example, originally preferred a set of regional systems—"a Council of Europe and a Council of Asia under the common roof of the world organization".[257] As debates turned in favour of a single system under the supervision of the Security Council, concern was expressed in San Francisco over the way this opened the door to intervention by outside powers in the management of regional security (especially in Latin America).[258]

197.  Sometimes particular orientations of legal method—for example an "Anglo-American approach"— or policies adopted by or typical of particular groups of States—say, "Third World approaches"—also raise questions of regionalism. Debates over human rights and cultural relativism, too, occasionally highlight these tensions. In such debates, the focus is on the question of whether some rules or principles, including notions of human rights, should automatically be applied in a universal fashion. What is the scope for regional variation in a system intended as universal?

198.  The varying uses of the expression "regionalism" as part of legal and political rhetoric call for an analysis of the actual impact of that notion on the question of fragmentation of international law now being studied within the Commission. For that purpose, it is suggested that there are at least three distinct meanings for "regionalism"

that refer specifically to international law and that should be taken into account.

#### 2.  "Regionalism" as a set of approaches and methods for examining international law

199.  A first—and the most general—use of the term refers to particular orientations of legal thought and culture. It is, for example, sometimes said that there is an "Anglo-American" or a "continental" tradition of international law, although frequently the distinctiveness of such traditions is denied.[259] More recently, it has been habitual to claim that there are distinct "Soviet" doctrines or "Third World approaches" to international law.[260] To some extent, the notion of different legal cultures has been enshrined in, for example, the statute of the International Law Commission itself, as article 8 of the statute requires "that in the Commission as a whole representation of the main forms of civilization and of the principal legal systems of the world should be assured". The composition of many other international law bodies is also expected to conform to this pattern, reflected in the standard—though usually informal—practice in United Nations elections of following the principle of "equitable geographical distribution". The United Nations General Assembly has occasionally highlighted the importance of this principle, for example in 2001, when it "[*e*]*ncourage*[*d*] States parties to the United Nations human rights instruments to establish quota distribution systems by geographical region for the election of the members of the treaty bodies".[261]

200.  No doubt, there have always existed regional and local approaches to, or even "cultures" of, international law, and much of the relevant literature traces their influence on general international law. Thus, for instance, there is much talk again today about the role of a "European tradition" of international law.[262] Historical studies also canvass the "American tradition of international law"[263] and debate the role of Africa or Asia in the development of international law.[264] Since the nineteenth century, the

---

[257] W. G. Grewe, "The history of the United Nations", in B. Simma (ed.), *The Charter of the United Nations: A Commentary*, Oxford, Oxford University Press, 1994, p. 7.

[258] See, for example, R. B. Russell and J. E. Muther, *A History of the United Nations Charter: The Role of the United States 1940–1945,* Washington, D.C., Brookings, 1958, pp. 688–712. See also S. C. Schlesinger, *Act of Creation: The Founding of the United Nations*, Boulder, Westview, 2003, pp. 175–192.

[259] See, especially, H. Lauterpacht, "The so-called Anglo-American and continental schools of thought in international law", *British Year Book of International Law 1931*, vol. 12, p. 31. See also, for example, E. D. Dickinson, "L'interprétation et l'application du droit international dans les pays anglo-américains", *Recueil des cours de l'Académie de droit international de La Haye, 1932-II*, vol. 40, p. 305.

[260] A. Anghie and B. S. Chimni, "Third World approaches to international law and individual responsibility in internal conflicts", in S. R. Ratner and A.-M. Slaughter, *The Methods of International Law*, Washington, D.C., American Society of International Law, 2004, p. 185. On "Soviet" and "Russian" doctrines, see K. Grzybowski, *Soviet Public International Law: Doctrines and Diplomatic Practice*, Leiden, Sijthoff, 1970; T. Långström, *Transformation in Russia and International Law*, Leiden, Martinus Nijhoff, 2003.

[261] General Assembly resolution 56/146 of 19 December 2001, para. 1.

[262] See especially the series of symposia on the "European tradition in international law" in EJIL since 1990.

[263] See, for example, M. W. Janis, *The American Tradition of International Law: Great Expectations 1789–1914*, Oxford, Clarendon Press, 2004.

[264] See T. O. Elias, *Africa and the Development of International Law*, Leiden, Sijthoff, 1972; R. P. Anand, "The role of Asian States in the development of international law", in R.-J. Dupuy (ed.), *The Future of International Law in a Multicultural World*, The Hague, Martinus Nijhoff, 1983, p. 105. Many articles in the *Journal of the History of International Law*, published since 1999, have been geared towards examining regional influences and developments in a historical way.

special nature and influence of Latin America on international law has often been stressed.[265]

201.   It is no doubt possible to trace the sociological, cultural and political influence that particular regions have had on international law. However, these studies do not really address the issue of fragmentation. They do not claim that some rules should be read or used in a special way because of their having emerged as a result of "regional" inspiration. On the contrary, these regional influences appear significant precisely because they have lost their originally geographically limited character and have come to contribute to the development of universal international law. They remain historical and cultural sources or more or less continuous political influences behind international law.

202.   There is a very strong presumption among international lawyers that, notwithstanding such influences, the law itself should be read in a universal fashion. As Sir Robert Jennings pointed out in 1987:

the first and essential general principle of public international law is its quality of universality; that is to say, that it be recognized as a valid and applicable law in *all* countries, whatever their cultural, economic, socio-political, or religious histories and traditions.[266]

203.   And yet, as Jennings himself notes,

this is not to say, of course, that there is no room for regional variations, perhaps even in matters of principle. … Universality does not mean uniformity. It does mean, however, that such a regional international law, however variant, is a part of the system as a whole and not a separate system, and it ultimately derives its validity from the system as a whole.[267]

204.   If regionalism itself thus is not automatically of normative import, its significance is highlighted as it mixes with functional differentiation. That is to say, where previously the moving forces behind international law may have been geographical regions, today those forces are often particular interests that are globally diversified: trade interests, globalization lobbies, environmentalist or human rights groups and so on. The language of the "Third World" already reflected this change. Although the States in this group are sometimes identified in geographic terms—*e.g.* as "the South"—this is not intended to refer to a special geographical property (such as climate, for example) that they share but to a certain homogeneity based on a convergence of interests, values or political

objectives. Functional differentiation—the emergence of special types of law that seek to respond to special types of ("functional") concern, such as "human rights law" or "environmental law", etc.—is certainly at the (sociological) root of the phenomenon of fragmentation and diversification of international law. This, however, is covered in other parts of this report and need not be specifically discussed here.

### 3.   "REGIONALISM" AS A TECHNIQUE FOR INTERNATIONAL LAW-MAKING

205.   A second sense of the term "regionalism" is that of a privileged forum for international law-making. It is often assumed that international law is or should be developed in a regional context because the relative homogeneity of the interests or outlooks of actors will ensure a more efficient or equitable implementation of the relevant norms. The presence of a coherent cultural community better ensures that the regulations enjoy legitimacy and that they are understood and applied in a coherent way. This is probably the reason why human rights regimes and free trade regimes have always commenced in a regional context, despite the universalist claims of ideas about human rights or commodity markets.

206.   This is an aspect of the general argument in favour of contextualization and has already been discussed in the section on *lex specialis* above: closeness to context better reflects the interests and consent of the relevant parties. As a matter of legal policy, it may often be more efficient to proceed by way of a regional approach.[268] Both human rights and economic integration constitute examples of this type of reasoning. More broadly, regionalism emerges sometimes in connection with sociological theories about international law, especially views that emphasize a natural tendency of development from States to larger units of international government.

207.   In the sociological ("objectivist") theory of international law presented by Georges Scelle, for example, regionalism appears as an incident of what he called the "federal phenomenon", a process leading from the individual State to larger normative units gradually and in successive stages as a result of expanding circles of "solidarity". This may happen, he wrote, as a result of natural affinities between neighbouring States (common history, language, religion, *etc.*) but also through the need for division of labour (as in regional economic integration) or in view of a common threat (as through the development of systems of regional security).[269] More recently, theories of interdependence and international regimes in international relations studies, as well as the sociology of globalization, point to the advantages of governance through units wider than States, including regional units.

208.   Such studies have given rise to varying political assessments. Hedley Bull, for instance, points to the attractions of Third World regionalism: it has the

[265] See *Asylum Case (Colombia/Peru)*, Judgment, *I.C.J. Reports 1950*, p. 266, at pp. 293–294 (dissenting opinion of Judge Álvarez). For an overview of the nineteenth-century debates, see H. Gros Espiell, "La doctrine du droit international en Amérique Latine avant la première conférence panaméricaine", *Journal of the History of International Law*, vol. 3 (2001), p. 1. See also L. Obregón, *Completing Civilization: Nineteenth Century Criollo Interventions in International Law*, unedited doctoral thesis, Harvard University, 2002. The main advocate of this idea in the twentieth century was undoubtedly Alejandro Álvarez. See, for example, his "Latin America and international law", AJIL, vol. 3, No. 2 (April 1909), p. 269.

[266] R. Y. Jennings, "Universal international law in a multicultural world", in M. Bos and I. Brownlie (eds.), *Liber Amicorum for the Rt. Hon. Lord Wilberforce*, Oxford, Clarendon Press, 1987, p. 39, at pp. 40–41; also published in *Collected Writings of Sir Robert Jennings*, vol. 1, The Hague, Kluwer Law International, 1998, p. 341.

[267] Jennings, "Universal international law in a multicultural world", in *Liber Amicorum…* (see footnote 266 above), p. 41; see also *Collected Writings…*, p. 342.

[268] For one rather thorough overview of regional cooperation between African, American, former socialist and Western European States, together with a discussion of the regional commissions of the United Nations and regional development banks, see Bernhardt (ed.), *Encyclopedia of Public International Law*, vol. 4 (footnote 130 above), pp. 100–161.

[269] Scelle (see footnote 70 above), p. 253.

advantages of functionality and solidarity for weak States and it may be used to avoid the danger of great Power domination that may result from participating in global or otherwise wider spheres of cooperation.[270] Other theorists, for their part, have taken exactly the opposite view and have seen regionalism as an instrument of hegemony. In this view, regionalism would often signify the creation of large spaces or hegemonic "blocs"—the Monroe doctrine might perhaps serve as an example—by a great Power in order to ensure supremacy or to redress the balance of power disturbed by the activities of another Power elsewhere in the world.[271]

209.    There is of course an enormous amount of writing on the nature, advantages and disadvantages of regionalism as an instrument of the politics of cooperation and hegemony.[272] It is, however, doubtful whether such sociological views and historical speculations—whatever their merits—have much to contribute to an examination of the fragmentation of international law. They, too, tend to see regional cooperation from a functional perspective, as a particular case of the more general need for States either to collaborate for the attainment of common aims or to enlist partners so as to create, maintain or oppose hegemony. As an incident of theories about the logic of cooperation and rational choice, regionalism loses its specificity as a problem and should be dealt with rather in connection with the functional diversification of international society in general, in particular the problem of special regimes covered in the previous section of this report.

210.    Nevertheless, one aspect deserves mention here: regionalism in regard to trade law. Despite the strong pull for a global trade regime within the GATT/WTO system, the conclusion of regional trade agreements (RTAs) has not diminished—on the contrary. During the last stages of the Uruguay Round, in 1990–1994, for example, the GATT secretariat was notified of 33 RTAs, while in the period between January 2004 and February 2005 the total was no less than 43 RTAs, "making it the most prolific RTA period in recorded history".[273] Technically speaking, while such agreements obviously liberate trade

between their partners, they also limit trade with the outside world. The specific justification for RTAs is found in article XXIV of GATT, and, although there has been endemic controversy about the scope of this provision, the (understandable) view within the WTO system, as articulated by the WTO Appellate Body, has been to interpret it restrictively.[274] Nevertheless, in view of the difficulties and controversies in developing a universal trade system, there appears presently to be no end in sight to the conclusion of RTAs.

### 4.    "REGIONALISM" AS THE PURSUIT OF GEOGRAPHICAL EXCEPTIONS TO UNIVERSAL INTERNATIONAL LAW RULES

211.    But regionalism may have a stronger sense if it is meant to connote a rule or a principle with a regional sphere of validity, or a regional *limitation* to the sphere of validity of a universal rule or principle. In the former (positive) sense, the rule or principle would be binding only on States identified as members of a particular region.[275] In the latter (negative) sense, regionalism would exempt States within a certain geographical area from the binding force of an otherwise universal rule or principle.

212.    There are many problems in such suggestions, not least of which is the identification of the relevant "region" and especially the imposition of that identification on a State not sharing it. For *normative* regionalism must be clearly distinguished from the regular case of a multilateral treaty between States in a region or a set of converging practices among States that amount to a regional custom. In the latter two cases the conventional or customary rule becomes binding on the relevant States on the basis of their consent to it. The fact that the States come from the same region is only a factual ingredient of their relationship and of no greater consequence to the binding force or interpretation of that rule than their ethnic composition or economic system.[276] Instead of illustrating the independently normative power of regional linkages, these cases come under the discussion of *lex specialis* above.[277]

213.    A separate, much more difficult case is the one where it is alleged that a regional rule (either on the basis of treaty practice or custom) is binding on a State even when the State has not specifically adopted or accepted it. This is the claim dealt with (albeit inconclusively) by the International Court of Justice in the *Asylum* (1950) and *Haya de la Torre* (1951) cases. Here, Colombia argued *inter alia* that there had emerged an "American" or a "Latin American" law concerning the matter of

[270] H. Bull, *The Anarchical Society: A Study of Order in World Politics*, London, Macmillan, 1977, pp. 305–306. For a consideration of the advantages and disadvantages of regional security "complexes", situated in a mid-level between States and global security systems, see, for example, B. Buzan, *People, States and Fear: An Agenda for International Security Studies in the Post-Cold War Era*, 2nd ed., New York, Harvester, 1991, pp. 186–229. For the mutually reinforcing but also challenging forces of economic globalization and regionalization, see, for example, C. Oman, "Globalization, regionalization and inequality", in A. Hurrell and N. Woods (eds.), *Inequality, Globalization, and World Politics*, Oxford, Oxford University Press, 1999, p. 36.

[271] See, in particular, C. Schmitt, *Der Nomos der Erde im Völkerrecht des Jus Publicum Europaeum*, Cologne, Greven, 1950. To the same effect, see W. G. Grewe, *The Epochs of International Law*, Berlin, Walter de Gruyter, 2000, pp. 458 *et seq.*

[272] See, for example, R. A. Falk and S. H. Mendlowitz (eds.), *Regional Politics and World Order,* San Francisco, Freeman, 1973; W. Lang, *Der internationale Regionalismus: Integration und Desintegration von Staatenbeziehungen in weltweiter Verflechtung*, Springer, Vienna, 1982; and the essays collected in J. S. Nye, *International Regionalism: Readings*, Boston, Little, Brown and Company, 1968.

[273] F. Weiss, "Coalitions of the willing: the case for multilateralism *vs.* regional and bi-lateral arrangements in world trade", in C. Calliess, G. Nolte and P.-T. Stoll (eds.), *Coalitions of the Willing: Avant-garde or Threat?*, Cologne, Carl Heymanns, 2007, p. 65 (forthcoming). See also chapter III, section D.1 (*a*), below.

[274] See *Turkey—Restrictions on Imports of Textile and Clothing Products* (footnote 88 above), para. 9.92.

[275] This is the understanding in, for example, D. Schindler, "Regional international law", in Bernhardt (ed.), *Encyclopedia of International Law*, vol. 4 (see footnote 130 above), pp. 161–165.

[276] This does not of course mean that it would be of no consequence at all. In the *Haya de la Torre* case, for instance, the International Court of Justice felt entitled to interpret article 2 of the Convention Fixing the Rules to be Observed for the Granting of Asylum "in conformity with the Latin-American tradition in regard to asylum" (*Haya de la Torre Case*, Judgment of 13 June 1951, *I.C.J. Reports 1951*, p. 71, at p. 83).

[277] Many regional organizations are like this. Their "regional" character does not distinguish them from other multilateral organizations. This means, for instance, that not all States of the relevant region always participate in them and that their competence does not even, in such a case, extend to the non-participating ones. See Schindler (footnote 275 above), p. 161.

diplomatic asylum.[278] According to Judge Álvarez, this had been based on the "wish" of Latin American States "since their independence" to "modify [international] law so as to bring it into harmony with the interests and aspirations of their continent".[279] Here, both the purpose of and the justification for regionalism are clearly outlined: the purpose is to *deviate* from the general law, while the justification for this is derived in part from consent ("wish") and in part from a sociological argument about regional appropriateness. The normative force of this law was as clear to Colombia as it was to Álvarez. A regional law was applicable, in the Colombian view, even to States of the region that did not accept it.[280] Álvarez, too, argued not only that it was "binding upon all the States of the New World", as well as on all other States, "in matters affecting America",[281] but also that it was "binding upon all the States of the New World" though it "need not be accepted by all [of them]".[282]

214.   The question of regionalism has often arisen in connection with rules alleged to have a specifically South American origin or sphere of applicability, such as the famous Calvo, Drago and Tobar doctrines.[283] Nevertheless, none of these doctrines has ever received general endorsement, and their importance today seems doubtful. In the *Asylum* case, the Court itself did not specifically pronounce on the conceptual possibility of there being specifically regional rules of international law in the above, strong sense (*i.e.* rules binding automatically on States of a region and binding others in their relationship with those States).[284] It merely stated that the cases cited by Colombia in favour of the existence of a regional rule of diplomatic asylum may have been prompted by considerations of convenience or political expediency. No evidence had been produced that they would have arisen out of a feeling of legal obligation.[285] The more important point, however, is perhaps that the Court treated the Colombian claim as a claim about customary law and dismissed it in view of Colombia's failure to produce the required evidence. There was, in other words, no express discussion of "regionalism" in the judgment, much less an endorsement of regionalism in the "strong" sense outlined above.

215.   In fact, there is very little support for the suggestion that regionalism would have a normative basis in anything apart from regional customary behaviour, accompanied, of course, by the required *opinio juris* on the part of the relevant States. In such a case, States outside the region would not be automatically bound by the relevant regional custom unless there were a specific indication that they might have accepted this either expressly or tacitly (or perhaps by way of absence of protest). This would also render any specific normative (in contrast to historical, sociological or technico-legislative) debate about regionalism superfluous. However, two specific issues might still need to be singled out.

216.   One is the question of the universalism *versus* regionalism opposition in human rights law. Although this goes deep into the philosophical question of cultural relativism—and as such falls outside the scope of the Commission's project on fragmentation—one approach to it might be noted. This is to think of "regionalist challenges" not in terms of exceptions to universal norms but, as Andrew Hurrell has put it, "principally in terms of implementation".[286] This would mean understanding regional variation in terms not of exceptions but of the varying, context-sensitive implementation and application of shared standards. If so, then this matter, too, would fall under the more general question of the relationship between general and special law, no different from the general problem of the applicability and limits of *lex specialis*.

217.   Another instance concerns the question of the relationship between universalism and regionalism within the collective United Nations security system or, in other words, the relationship between Chapters VII and VIII of the Charter of the United Nations. Here, open questions have included the definition of what may count as regional "arrangements" or "agencies", as well as when may action be "appropriate" under Article 52, paragraph 1. The most important question, however, appears to concern the priority of competence between regional

[278] See, in particular, *Asylum Case (Colombia–Peru)*, "Réplique du gouvernement de la République de Colombie (20 IV 50): Observations sur l'existence du droit international américain", *I.C.J. Pleadings 1950*, vol. I, pp. 330–334, paras. 25–32.

[279] *Asylum Case (Colombia–Peru)*, Judgment of 20 November 1950 (see footnote 265 above), p. 293 (dissenting opinion of Judge Álvarez). Likewise, Judge Read, in his dissenting opinion, pointed to the existence of a "body of conventional and customary law, complementary to universal international law, and governing inter-State relations in the Pan American world" (*ibid.*, p. 316).

[280] *Haya de la Torre Case*, "Mémoire présenté au nom du Gouvernement de la République de Colombie (7 II 51)", *I.C.J. Pleadings 1951*, pp. 25–27.

[281] "Universal international law thus finds itself today within the framework of continental and regional law; and all such legal systems adopt new trends in accordance with those indicated in the preamble and Chapter I of the United Nations Charter; such trends reflect entirely American, international spirit" (*Asylum Case (Colombia–Peru)*, Judgment of 20 November 1950 (see footnote 265 above), p. 294 (dissenting opinion of Judge Álvarez)).

[282] *Ibid.*

[283] Under one version of the Calvo doctrine, international liability with respect to contracts entered into with alien private contractors by the State party is excluded. Another formulation describes it as a stipulation in a contract in which "an alien agrees not to call upon his State of nationality in any issues arising out of the contract". This used to be inserted (or suggested) as a clause in investment contracts, but it has also been argued as a specific rule of South American regional law. See, for example, O'Connell, *International Law* (footnote 78 above), vol. II, pp. 1059–1066, and E. Jiménez de Aréchaga, "International responsibility", in M. Sørensen (ed.), *Manual of Public International Law*, London, Macmillan, 1968, pp. 590–593. For its (contested) relevance today, see C. K. Dalrymple, "Politics and foreign direct investment: the Multilateral Investment Guarantee Agency and the Calvo clause", *Cornell International Law Journal*, vol. 29, No. 1 (1996), p. 161, and D. Manning-Cabrol, "The imminent death of the Calvo clause and the rebirth of the Calvo principle: equality of foreign and national investors", *Law and Policy in International Business*, vol. 26 (1995), p. 1169. The Drago doctrine sought to exempt State loans from general rules of State responsibility: O'Connell, *International Law* (see footnote 78 above), vol. II, pp. 1003–1004. The Tobar doctrine, again, has to do with the alleged duty of non-recognition of governments that have arisen to power by non-constitutional means: *ibid.*, vol. I, p. 137.

[284] Though it did hint in this direction by referring to "one of the most firmly established traditions of Latin America, namely, non-intervention" (*Asylum Case (Colombia–Peru)*, Judgment of 20 November 1950 (see footnote 265 above), p. 285).

[285] *Ibid.*, pp. 276–277.

[286] A. Hurrell, "Power, principles and prudence: protecting human rights in a deeply divided world", in T. Dunne and N. J. Wheeler (eds.), *Human Rights in Global Politics*, Cambridge, Cambridge University Press, 1999, p. 277, at pp. 294–297.

agencies or arrangements and the Security Council to take enforcement action.[287] Under Article 52, paragraph 2, the members of regional agencies or arrangements must make every effort to settle their disputes before submitting them to the Security Council. Whatever the disagreements over the right marching order here, it seems evident that action by a regional agency or arrangement cannot be considered an "exception" to the competence of the Security Council, which at all times may be seized of an issue if it feels it appropriate to do so because, for example, regional action has not been or is not likely to be "appropriate" or effective. In this regard, Chapter VIII should be seen as a set of functional provisions that seek the most appropriate level for dealing with particular matters, with due regard to issues of "subsidiarity".[288]

## 5. EUROPEAN INTEGRATION

218.   Finally, a brief mention should be made of the European Union. As is well known, the European Union began as a customs union with the conclusion, in 1957, of the Treaty establishing the European Economic Community. Since then, the founding treaties have been amended several times, so that the instrument presently in force—the Treaty on European Union (done at Maastricht in 1992 and amended in Amsterdam in 1997 and Nice in 2001)—goes way beyond an economic arrangement. The Union's activities are said to consist of three "pillars", one dealing with the most heavily supranational rules on "Community" activities and the other two with the more "intergovernmental" fields of common foreign and security policy and cooperation in justice and internal affairs. European integration has profoundly transformed the nature of the legal relations between European Union members. As the European Court of Justice famously pointed out, the founding treaties are more than international agreements—they are a kind of "constitutional charter" of the European Union.[289] They have set up a special kind of legal order between the member States, and thus they are interpreted and applied in a manner that does not necessarily correspond to the way "ordinary" agreements are interpreted and applied.

219.   There is no reason to dwell on the special nature of the legal relations between European Union members. One phenomenon that does contribute to fragmentation is the way the Union as an international actor is present in a number of different roles on the international scene. First, the European Community, acting under the "first pillar" of European Union competences, is a subject of international law and for practical purposes may be treated by the outside world as an intergovernmental organization, with whatever modification its specific nature brings to that characterization.[290] At the same time, especially when

dealing with foreign policy matters, as well as cooperation in justice and home affairs, the European Community acts alongside its member States. The distinction between matters of exclusive European Community competence and shared competences between the European Union and member States is an intricate part of European Community law that is often very difficult to grasp. This is particularly so in regard to "mixed agreements", to which both the Community and the member States are parties but under which their respective competences develop as a function of the development of (internal) European Community law.[291] It has, of course, been stressed on the part of the European Union that none of this will have any effect on the rights of third States—and indeed, no such effect could ensue from legal developments that, from the perspective of the latter, are strictly *inter alios acta*. Nevertheless, the question of divided competences remains a matter of some concern from the perspective of the coherence of treaty rights and obligations, including responsibility for any breach that may occur. One particular aspect of European Community action—the so-called "disconnection clauses"—bears a direct linkage to the 1969 Vienna Convention and will therefore be discussed separately in chapter III below.

## E.  Conclusion on conflicts between special law and general law

220.   All legal systems are composed of rules and principles with greater and lesser generality and speciality in regard to their subject matter and sphere of applicability. Sometimes they will point in different directions, and if they do it is the task of legal reasoning to establish meaningful relationships between them so as to determine whether they could be applied in a mutually supportive way or whether one rule or principle should have definite priority over the other. This is what in chapter V below will be called "systemic integration".

221.   In addition to special primary rules, many rule systems also contain special secondary rules having to do with responsibility or settlement of disputes. Although these institutions are sometimes called "self-contained", they are never "clinically isolated" from the rest of the law. In fact, as we have seen, they owe their validity to, derive their limits from and are constantly complemented by legal rules and principles neither established by them nor incorporated into them by any specific act. Nor has the sociological phenomenon of "regionalism" meant the emergence of isolated legal systems on a regional basis. What role specialized or regional rule complexes enjoy is a factual and historical matter that can only be ascertained on a case-by-case basis, again by bearing in mind the "systemic" nature of the law of which they all form part.

222.   This section has highlighted the pragmatic role of the "speciality" and the "generality" of normative standards in the process of legal reasoning. It has stressed the *relational* character of these attributes and the way in which their specific operation is always dependent on the context in which they are applied. *To make or defend a*

---

[287] For a useful overview, see W. Hummer and M. Schweitzer, "Article 52", in Simma (ed.), *The Charter of the United Nations…* (footnote 257 above), pp. 683–722.

[288] *Ibid.*, pp. 709–710.

[289] Case 294/83, *Parti écologiste "Les Verts" v. European Parliament*, judgment of 23 April 1986, *European Court Reports 1986*, p. 1339, at p. 1365, para. 23.

[290] See J. Klabbers, "Presumptive personality: the European Union in international law", in M. Koskenniemi (ed.), *International Law Aspects of the European Union*, The Hague, Kluwer Law International, 1998, p. 231.

[291] For a useful analysis, see J. Heliskoski, *Mixed Agreements as a Technique for Organizing the International Relations of the European Community and its Member States*, The Hague, Kluwer Law International, 2001.

*claim of "speciality" is only possible in "general" terms.* In this regard, the fragmentation of the substance of international law—the object of this study—does not pose any very serious danger to legal practice. It is as normal a part of legal reasoning to link rules and rule systems with each other as it is to separate them and to establish relationships of priority and hierarchy among them. The emergence of new "branches" of law or novel types of treaties or clusters of treaties is a feature of the social complexity of a globalizing world. If lawyers feel unable to deal with this complexity, this is not a reflection of problems in their "tool box" but in their imagination about how to use it.

## Chapter III

## Conflicts between successive norms

223. The relationship between special law and general law is often transected by another relationship, namely that between prior and subsequent law, and it may in such cases be hard to say whether this modifies the operation of the *lex specialis* principle in any of its many permutations. Generally speaking, it may often be the case that, when States enact a subsequent general law, this is intended to set aside the prior law, even if the prior law were in some sense more "special". Again, it seems inadvisable to lay down any general rule in regard to how to manage the two types of relationship.

224. The most basic case is the adoption of a treaty in an area that was previously covered by customary law: "it is well understood that, in practice, rules of [general] international law can, by agreement, be derogated from in particular cases or as between particular parties".[292] However, as explained in chapter II above, this does not automatically mean the full extinction of that prior customary law.[293] It will normally remain valid for those States that have not become parties to the (codifying) treaty and may occasionally be applicable also between treaty partners if, for one reason or another, the treaty remains inapplicable or covers the subject matter only partially.[294] Nor does the fact that agreements often set aside prior customary law translate into any automatic presumption in favour of later law. In fact it would be wrong to assume that there is a stark opposition between custom and treaty. On the one hand, treaties may be part of the process of the creation of customary law.[295] On the other hand, customary behaviour undoubtedly affects the interpretation and application of treaties and may, in some cases, modify treaty law.[296]

Because, as explained above, there is no general hierarchy of sources in international law, the relationship between a particular treaty and a particular customary norm will always remain to be decided on a case-by-case basis.[297]

225. Nevertheless, alongside the *lex specialis* maxim, the principle that "later law supersedes earlier law", or *lex posterior derogat legi priori*, has been often listed as a principle of interpretation or conflict resolution in international law.[298] The maxim has its roots in Roman law and is recognized by various early writers (*e.g.* Grotius and de Vattel).[299] It has sometimes been regarded as a "general principle of law recognized by civilized nations" under Article 38, paragraph 1 (*c*), of the Statute of the International Court of Justice[300] and sometimes as a customary law principle of interpretation.[301] Occasionally it has been envisaged as a technique that the legal mind is drawn to in its search for domestic analogies in legal procedure.[302] Yet often, as with *lex specialis*, caution has been voiced against any assumption that it could be applied in an automatic way. Schwarzenberger describes it as a non-normative "maxim" that points to one result achieved through

---

[292] *North Sea Continental Shelf* (see footnote 95 above), p. 42, para. 72. See also *Continental Shelf (Tunisia/Libyan Arab Jamahiriya)* (footnote 97 above), p. 38, para. 24.

[293] See, especially, H. Thirlway, *International Customary Law and Codification: An Examination of the Continuing Role of Custom in the Present Period of Codification of International Law*, Leiden, Sijthoff, 1972, pp. 95–108. See also Zemanek, "The legal foundations of the international system…" (footnote 31 above), pp. 220–221.

[294] In the words of the International Court of Justice, "customary international law continues to exist and to apply, separately from international treaty law, even where the two categories of law have an identical content" (*Military and Paramilitary Activities in and against Nicaragua*, Merits, Judgment of 27 June 1986 (see footnote 51 above), p. 96, para. 179). This situation is also presupposed by article 43 of the 1969 Vienna Convention, which provides that denouncing a treaty has no effect on an obligation that is binding on the State "independently of the treaty". Again, however, it is dangerous to generalize. The situation cannot be excluded *a priori* where it is the intention of the parties to a convention specifically to abrogate the prior custom in their relations *inter se*.

[295] *North Sea Continental Shelf* (see footnote 95 above), p. 41, para. 71.

[296] This case is presumed in a minimal way by article 31, paragraph 3 (*b*), which obliges the interpreter to have regard to the

subsequent practice of treaty parties. Another case is that of intertemporal law (see chap. V, sect. D.3, below), in which subsequent custom affects the interpretation of the open-ended or "mobile" terms of the treaty. See further M. Byers, *Custom, Power and the Power of Rules: International Relations and Customary International Law*, Cambridge, Cambridge University Press, 1999, pp. 172–180; Villiger (footnote 77 above), pp. 295–297.

[297] This means, among other things, that although treaty and custom may often link to each other as "special" and "general", this may not always be so. A particular (or bilateral) custom may of course be *in that respect* more particular than a multilateral treaty. See M. Akehurst, "The hierarchy of the sources of international law", *British Year Book of International Law 1974–1975*, vol. 47, No. 1, p. 273, at p. 275.

[298] Q. Wright, "Conflicts between international law and treaties", AJIL, vol. 11, No. 3 (July 1917), p. 579; Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), p. 150; Jenks (see footnote 8 above), pp. 445–446; Akehurst (see footnote 297 above), p. 273; Czaplinski and Danilenko (see footnote 74 above), pp. 19–22; Sinclair (see footnote 63 above), p. 98; Karl (see footnote 130 above), pp. 937–938; Aust, *Modern Treaty Law…* (see footnote 74 above), p. 201; Pauwelyn, *Conflict of Norms…* (see footnote 21 above), pp. 335–363; Daillier and Pellet, *Droit international public* (see footnote 74 above), p. 270; Wolfrum and Matz, *Conflicts in International Environmental Law* (see footnote 22 above), pp. 152–158.

[299] Papinian, Dig. 50, 17, 80; Paul, Dig. 32, 66, 5 and Dig. 1, 4, 1, *The Digest of Justinian*, vol. IV (see footnote 58 above); Grotius (see footnote 64 above), book II, chap. XVI, sect. XXIX, p. 428; de Vattel (see footnote 67 above), book II, chap. XVII, para. 315.

[300] See, for example, Aufricht (footnote 118 above), p. 655.

[301] Fitzmaurice and Elias, *Contemporary Issues…* (see footnote 74 above), p. 322.

[302] The domestic analogy is expressly drawn in, for example, S. Bastid, *Les traités dans la vie internationale: Conclusion et effets*, Paris, Économica, 1985, p. 161. Likewise, Czaplinski and Danilenko (see footnote 74 above), p. 21.

the normal interpretation of two treaties, in particular that the subsequent (or prior) treaty is held to prevail over its rival because that is what the parties had intended.[303]

226.    As with *lex specialis*, it is easy to accept the pragmatic rationale of *lex posterior*, irrespective of its formal status. Preferring today over yesterday, it reflects more concretely present circumstances and the present will of the relevant actors. And yet, of course, it cannot claim absolute priority. Notwithstanding any issue of *jus cogens*, it may often seem unacceptable to allow later commitments to override earlier ones—especially if those later commitments are to different parties or have different beneficiaries than the early commitments.[304] Here, as elsewhere, the tendency to pragmatism, *ad hoc* decisions and harmonization prevails.[305]

227.    Perhaps this is why abstract or doctrinal treatments of successive treaties tend to regard it as a "particularly obscure aspect of the law of treaties".[306] The problems are not diminished by the scarcity of judicial or arbitral practice and the tendency to resolve treaty conflicts by diplomatic negotiation.[307] The obscurities relate both to the normative import of the principle—how powerful is it?—and to its consequences—what happens when it purports to override another rule? Sometimes it may be frankly overridden by its opposite, *lex prior*. As will be seen below, these obscurities did not disappear with the adoption of article 30 of the 1969 Vienna Convention. Trying to clarify the matter is important, as conflicts between earlier and later treaties gain importance with the constant increase in multilateral treaty law, which is often of a quasi-legislative character, for example in the environmental sphere.[308]

### A.    General law on conflicts between earlier and later treaties

228.    Today, the question of conflicts between earlier and later treaties is covered by articles 30 and 41 of the 1969 Vienna Convention. However, as will be seen later, the Convention leaves many questions open and frequently only refers to the general law. In any case, the rules now enshrined in the Convention largely codify the general law approaches that existed prior to its conclusion and that continue to provide both the rationale for those conventional provisions and the perspective from which they are applied. It is therefore useful to deal with the general law of conflict between earlier and

subsequent treaties separately. Here, two basic situations should be distinguished: the one in which the parties to the two treaties are identical and the one where there are non-identical parties.

#### 1.    CONFLICT BETWEEN TREATIES WITH IDENTICAL PARTIES

229.    When two States have concluded two treaties on the same subject matter, but have said nothing of their mutual relationship, it is usual to first try to read the two treaties as compatible (the principle of harmonization).[309] This may often be undertaken by a simple examination of party intent, drawn from the various available readings of the treaty texts.[310]

230.    If no such harmonizing intent may be gleaned from the texts, the *lex posterior* maxim may be turned to as a presumption of intent to derogate from the earlier agreement.[311] This may be the case, for example, when the treaties deal with wholly different topics and were negotiated by officials from different administrations.[312] Yet of course, the presumption is rebuttable, so that, if interpretation really indicates that the parties did not wish to derogate from the earlier agreement, then that intent should prevail over the maxim. In the treatment of the matter by the Commission in the context of its debates on the law of treaties, for example, it was clear that, in the absence of a conflict clause, the issue of priority was to be resolved by interpreting the will of the parties: had they intended that the latter treaty should supplement or derogate from the earlier?[313]

231.    The same considerations also apply to the relationship between multilateral treaties with identical parties. That is to say, there is an effort at harmonization through interpretation, unless it appears that the parties wanted to replace the earlier treaty by the later. Article 59 of the 1969 Vienna Convention expressly provides that:

> A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject-matter and:
>
> (*a*)    It appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or
>
> (*b*)    The provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

232.    However, though the case of two treaties with identical parties is in principle easy, there might still be complications. For instance, there is the question of which of the agreements is the earlier one. Many authors, including the Expert Consultant at the United Nations Conference on the Law of Treaties, Sir Humphrey Waldock,

[303] Schwarzenberger (see footnote 80 above), p. 473.

[304] The concurrent pragmatic validity of both the *lex posterior* and the *lex prior* maxims may follow from the way the two derive from different domestic analogies. Where *lex posterior* projects international rules as analogous to domestic legislation (later laws regularly overruling earlier ones), the *lex prior* suggests an analogy to domestic contracts (as expressly suggested by Lauterpacht). See also Borgen (footnote 10 above), pp. 620–639.

[305] Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), p. 153.

[306] Sinclair (see footnote 63 above), p. 93.

[307] Binder (see footnote 145 above), p. 17; Borgen (see footnote 10 above), pp. 591–600, 609–620.

[308] See, especially, Wolfrum and Matz, *Conflicts in International Environmental Law* (footnote 22 above), pp. 1–13; Matz, *Wege zur Koordinierung völkerrechtlicher Verträge…* (footnote 22 above), pp. 53–73; Fitzmaurice and Elias, *Contemporary Issues…* (footnote 74 above), pp. 321–348.

[309] Czaplíński and Danilenko (see footnote 74 above), p. 13; Schwarzenberger (see footnote 80 above), p. 474; Aust, *Modern Treaty Law…* (see footnote 74 above), p. 174; Pauwelyn, *Conflict of Norms…* (see footnote 21 above), pp. 240–244. See also Jenks (footnote 8 above), pp. 427–429.

[310] See also Borgen (footnote 10 above), p. 583.

[311] Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), pp. 188–190; Aufricht (see footnote 118 above), p. 657; Mus (see footnote 21 above), p. 220; Aust, *Modern Treaty Law…* (see footnote 74 above), p. 174.

[312] Borgen (see footnote 10 above), p. 583.

[313] See the discussion in Mus (footnote 21 above), pp. 217–218; Fitzmaurice and Elias, *Contemporary Issues…* (footnote 74 above), pp. 321–322.

have argued that the critical date in determining the time-line (earlier/subsequent) is that of the date of the adoption of the treaty and not, for example, its ratification or entry into force, at least unless nothing else appears from the context.[314] Minority opinions support either the date of entry into force or discerning the intention of the parties.[315] A further complication is caused by the possibility that the matter is resolved differently in regard to different States. For instance, State A might have concluded treaty X before treaty Y, while State B, for its part, might have become party to Y only after having ratified X.[316]

233. Also, there is the question of the relationship between *lex posterior* and *lex specialis*. Jenks has pointed out that neither of these principles "can be regarded as of absolute validity. There are a number of principles and rules which must be weighed and reconciled in the light of the circumstances of the particular case."[317] In the *Mavrommatis Palestine Concessions* case (1924), the Permanent Court of International Justice applied both *lex specialis* and *lex posterior* together, without establishing a hierarchy between them. On the issue of the relationship between the Mandate for Palestine of 1922 and Protocol XII to the Treaty of Lausanne of 1923, the Court merely stated that "in cases of doubt, the Protocol, being a special and more recent agreement, should prevail".[318] The question boils down to an assessment of which aspect—"speciality" or "temporality"—seems more important in this connection. Sometimes it may not be necessary to take a stand on this at all, and tribunals have occasionally ignored both principles.[319]

2. CONFLICT BETWEEN TREATIES WITH NON-IDENTICAL PARTIES

234. This is the really problematic aspect of this matter, not least because it often involves matters of great importance—the breaking of political or military alliances, the conclusion of separate peace treaties, *etc*.[320] Rousseau, for example, begins his 1932 discussion of treaty conflict by noting that there was no more pressing legal question at that time. He was thinking about the relationship between the Covenant of the League of Nations and the 1928 General Treaty for Renunciation of War as an Instrument of National Policy (the Kellogg–Briand Pact or Pact of Paris), the neutrality agreements of League of Nations members, and the then recent decision by the Permanent Court of International Justice in the controversial *Austro-German Customs Union* case, where the Court

had, by a narrow margin, concluded that the projected union was incompatible with Austria's obligations under the 1922 Geneva Protocol No. 1.[321] The textbook example discussed by classical lawyers (Gentili, Grotius, de Vattel) was that of a war between two parties in a three-party alliance—which of the two belligerents should the third assist? During the Cold War, members of the two blocs occasionally accused each other of such violations.[322]

235. More recently, the question of the relationship between earlier and later treaties has arisen in the context of what Sir Humphrey Waldock called "chains of multilateral treaties dealing with the same subject-matter".[323] The very wide scope of legislative activity by global and regional organizations has led to the emergence of clusters of treaty law on particular topics, with complex relationships between particular treaties within the clusters and beyond such clusters (or "regimes"). Only with difficulty could these relationships be treated in terms of clear-cut rules. This is why "modern international law … does not approach the problem from the point of view of the validity of treaties".[324] Instead, as we will see, the matter has been addressed from the perspective of relative "priority" between treaties, with the sanction of responsibility for any obligation breached.

(a) *Lex prior*

236. Nevertheless, it has sometimes been suggested that, even without going into the question of *jus cogens,* either the earlier or the later treaty might enjoy some kind of general superiority. The superiority of the *earlier* treaty was often suggested by early natural lawyers. If a treaty was understood to have alienated the power of the State to dispose of something, then the later, inconsistent treaty became automatically void owing to lack of competence. In the matter of military alliances, Grotius, Pufendorf and de Vattel all preferred to give precedence to the most ancient ally. This seems natural in a system in which no obligation is "merely" a matter of reciprocal will; rather, it is sanctioned by an overriding objective legal system.[325]

237. More recently, the *a priori* superiority of an earlier treaty was hinted at by the International Court of Justice in the *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide* case (1951), as it stated that:

It is … a generally recognized principle that a multilateral convention is the result of an agreement freely concluded upon its clauses and that consequently none of the contracting parties is entitled to frustrate or impair, by means of unilateral decisions or particular agreements, the purpose and *raison d'être* of the convention.[326]

---

[314] Mus (see footnote 21 above), pp. 220–222; Aust, *Modern Treaty Law…* (see footnote 74 above), p. 183; Sadat-Akhavi (see footnote 21 above), pp. 75–78, and for special cases pp. 78–82.

[315] For the former, see M. Sorensen, "Le problème dit du droit intertemporel dans l'ordre international", *Annuaire de l'Institut de droit international*, vol. 55 (Session of Rome, 1973), p. 54. For the latter, see Czapliński and Danilenko (footnote 74 above), p. 19.

[316] Vierdag (see footnote 20 above), p. 102; Sadat-Akhavi (see footnote 21 above), pp. 75–82.

[317] Jenks (see footnote 8 above), p. 407; Sinclair (see footnote 63 above), p. 96.

[318] *Mavrommatis Palestine Concessions* (see footnote 87 above), p. 31.

[319] See, for example, discussion of the *Gorham* claim (1930) before the United States–Mexican General Claims Commission in Schwarzenberger (footnote 80 above), pp. 479–480. See also UNRIAA, vol. IV (Sales No. 1951.V.1), p. 640.

[320] This is the perspective in Binder (see footnote 145 above).

[321] Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), pp. 133–134, 178–187. See also *Customs Régime between Germany and Austria* (footnote 39 above), p. 36.

[322] See, in particular, Binder (footnote 145 above), pp. 24–25, 40–42. See also the examples in Bastid (footnote 302 above), pp. 162, 164.

[323] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur, *Yearbook … 1964*, vol. II, document A/CN.4/167 and Add.1–3, p. 43, para. (32) of the commentary to draft article 65.

[324] Czapliński and Danilenko (see footnote 74 above), p. 20.

[325] See Binder (footnote 145 above), pp. 40–42.

[326] *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide*, Advisory Opinion, *I.C.J. Reports 1951*, p. 15, at p. 21.

238.    It is somewhat difficult to interpret the meaning of this passage. To the extent that it deals with the permissibility of *inter se* agreements, the matter will be discussed in section D below. In general terms, it seems to indicate nothing more than the self-evident notion captured by *pacta sunt servanda*. It certainly implies nothing about the validity of either the Convention on the Prevention and Punishment of the Crime of Genocide or incompatible "particular agreements". Two considerations may perhaps be offered here. First, the statement may simply be a reminder to parties that breach will be followed by State responsibility. Second, especially in the context in which it was made, it may be intended to underline the exceptional importance of the subject matter of the Convention and the seriousness of the duty to comply.[327] In that case, the argument would go some way towards suggesting the *jus cogens* or otherwise "objective" nature of the Convention.

239.    The cases often mentioned in support of *lex prior* come from the beginning of the twentieth century and from the Central American Court of Justice. Costa Rica and El Salvador complained that, by concluding a treaty with the United States relating to the Panama Canal, Nicaragua had breached treaties it had earlier made with them on the same subject. The Court noted the incompatibility of the treaties and the fact that Nicaragua had violated its obligations but refrained from declaring the later treaty between Nicaragua and the United States void because the United States was not a party to the cases before it and it could not pronounce on its rights.[328]

240.    Another case of apparent application of *lex prior* might relate to objective territorial regimes. This is suggested by, for example, the Permanent Court of International Justice's treatment of the *Austro-German Customs Union* case (1931), in which the Court determined—by an 8–7 vote—that the planned customs union treaty would have been incompatible with Austria's obligation under the Treaties of Versailles and Saint-Germain of 1919, as well as a related Protocol of 1922, "to abstain from any act which might directly or indirectly or by any means whatever compromise her independence".[329] Nevertheless, the Court did not spell out the consequences that might have followed from the conclusion of the planned customs union. Another case sometimes cited in this connection is the *Oscar Chinn* case (1934), in which two of the dissenting judges (van Eysinga and Schücking) suggested that the Peace Treaty of Saint-Germain of 1919 or the 1922 Protocol might be void to the extent that some of their provisions deviated from the General Act of the Conference of Berlin of 1885, as the latter had set up something like an objective regime.[330] This was a minority opinion, however. The question of the validity of the 1919 Treaty and the 1922 Protocol had not been raised by the parties, and by remaining silent on the issue the Court seemed to accept that the Berlin Act could be subjected to *inter se* modification.[331]

241.    The *lex prior* principle is supported in particular by analogy with domestic contract law ("illegality of a contract to break a contract").[332] Hersch Lauterpacht, in his first report on the law of treaties, started from this position. Nevertheless, he accepted that it might in some cases lead to absurd results, especially when the later law would pertain to general application.[333] But if *lex prior* has general application in contract law, *lex posterior* has general application in public law and legislative enactments. So the relationship between the two laws reflects the way one views the nature of treaties. Both analogies, however, have their problems. As will be stressed frequently in the course of this report, the fact that the 1969 Vienna Convention treats all treaties alike obscures the many differences that actual treaties have.[334]

242.    There may also be cases where a subsequent treaty affects the provisions of an earlier treaty by increasing the rights or benefits of a party thereto, typically through a most-favoured-nation clause. In the case of such clauses, subsequent treaties under which one party promises a benefit to another party to that subsequent treaty will also be extended of parties to the earlier treaty.[335]

(b)    *Lex posterior*

243.    As observed above, the principle that *lex posterior derogat legi priori* is well embedded in domestic jurisprudence and often cited in an international law context as well. Nevertheless, there are few cases where it would have been applied as such. It may often be more useful to refer directly to the will of the parties than to the *lex posterior* principle, to which, as also noted above, it may simply give expression. Inasmuch as it is a question of parties to a later treaty being *different* from parties to an earlier treaty, it is doubtful whether any meaningful role is left to *lex posterior*.

244.    There may, however, be rare cases in which a later treaty concluded by parties different from those to

[327] See also the discussion in Schwarzenberger (footnote 80 above), pp. 483–484.

[328] *Costa Rica v. Nicaragua*, decision of the Central American Court of Justice of 30 September 1916, AJIL, vol. 11, No. 1 (January 1917), p. 181, at p. 228. See also *El Salvador v. Nicaragua*, decision of the Central American Court of Justice of 9 March 1917, AJIL, vol. 11, No. 3 (July 1917), p. 674. For a detailed discussion, see, for example, Borgen (footnote 10 above), pp. 591–594. For the Interoceanic Canal (Bryan–Chamorro) Treaty, signed at Washington, D.C., on 5 August 1914 between Nicaragua and the United States, see, C. I. Bevans (ed.), *Treaties and Other International Agreements of the United States of America, 1776–1949*, vol. 10, Washington, D.C., United States Government Printing Office, 1972, p. 379.

[329] *Customs Régime between Germany and Austria* (see footnote 39 above), p. 42, article 88 of the Treaty of Saint-Germain.

[330] See Aufricht (footnote 118 above), p. 672. *Oscar Chinn* case (see footnote 138 above), separate opinion of Judge van Eysinga, p. 131, and separate opinion of Judge Schücking, p. 148.

[331] *Oscar Chinn* case (see footnote 138 above). See also the discussion in Schwarzenberger (footnote 80 above), p. 485, and in the second report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur, *Yearbook … 1963*, vol. II, document A/CN.4/156 and Add.1–3, pp. 56–57, para. (15) of the commentary to draft article 14. See also *Jurisdiction of the European Commission of the Danube between Galatz and Braila* (footnote 108 above), p. 23 (*inter se* agreement).

[332] Jenks (see footnote 8 above), p. 442.

[333] First report on the law of treaties by Hersch Lauterpacht, Special Rapporteur (document A/CN.4/63) (see footnote 144 above), pp. 156–159.

[334] Rousseau, "De la compatibilité des normes juridiques contradictoires…" (see footnote 36 above), pp. 150–151; Borgen (see footnote 10 above), p. 599.

[335] Aufricht (see footnote 118 above), pp. 679–682.

an earlier treaty abrogates the earlier treaty. This is of course a violation of the principle that third States are not affected by something that remains *res inter alios acta*. As Aufricht points out, this is a case of an unequal (subsequent) treaty in which the inequality might relate, for example, to the great Power status of the parties to the later treaty.[336]

245. Might there be legislative treaties of this type, overriding previous treaties irrespective of any question of *jus cogens*? The *lex posterior* principle is clearly applicable in the case of instruments of revision. This is also the case for *inter se* agreements, as provided under article 41 of the 1969 Vienna Convention, of which more in section D below. But what about the case where the parties to the two treaties are different? Wilfred Jenks suggests that: "There may be great advantages in providing for the fuller application of the principle in certain fields of legislative action by conferring the necessary powers on the appropriate international bodies…".[337]

246. This matter links again to the special character of certain multilateral treaties. In an important case, the European Court of Human Rights held that the European Convention on Human Rights controlled the content and/or application of an earlier bilateral treaty, or at least determined how the latter was to be interpreted and applied by the national authorities. The issue here concerned the application of a Russian–Latvian Treaty of 1994 insofar as it concerned the deportation of certain former members of the Soviet army and their families from Latvian territory. The court examined the rights of the individuals concerned on the basis of the European Convention, to which Latvia had acceded at a later date, and concluded that

the [Russian–Latvian] treaty cannot serve as a valid basis for depriving the Court of its power to review whether there was an interference with the applicants' rights and freedoms … and, if so, whether such interference was justified…[338]

247. That view was based on an earlier admissibility decision in which the Court had specifically noted the following:

It follows from the text of Article 57 § 1 of the [European] Convention [on Human Rights], read in conjunction with Article 1, that ratification of the Convention by a State presupposes that any law then in force in its territory should be in conformity with the Convention…

In the Court's opinion the same principles must apply as regards any provisions of international treaties which a Contracting State has concluded prior to the ratification of the Convention and which might be at variance with certain of its provisions.[339]

248. This is an important statement of principle. Under it, it seems difficult to deny that, if *lex posterior* should be read in favour of the European Convention on Human Rights, it should also favour any other later human rights treaties, if not any other later multilateral legislative treaties. Again, we are in the presence of a hierarchy that seems best dealt with by the notion of special "integral" obligations—such as obligations in human rights treaties—that enjoy some kind of precedence over merely transactional, bilateral instruments. It is hard to say, however, if this is a case of *lex specialis*, *lex posterior* or *lex superior*, and also to an extent irrelevant. The important point is that the bilateral treaty did not have a life that would be independent from its normative environment at the time of its application. The construction of the bilateral treaty by reference to the later multilateral treaty was reasonable, and little else seems pertinent.

249. Yet it is hard to generalize from this case. It highlights the normative force of human rights treaties (perhaps as "integral" or "absolute" treaties) but probably does not resolve the general question of primacy, and certainly cannot be cited as a blanket endorsement of *lex posterior*. Also, the fact that the case comes from the European Court of Human Rights, specifically assigned to apply the European Convention on Human Rights, is not irrelevant—even as it may be hard to square with the Court's willingness to yield in favour of an earlier customary rule of State immunity in the *Al-Adsani* case.[340]

250. In fact, irrespective of whatever normative power the *lex posterior* rule may enjoy (as pointed out above, that power is much greater in a legislative than in a contractual system), just like the *lex specialis*, it fails to render itself applicable in any mechanical way. Depending on the case, many other considerations may be relevant as well, including the simultaneous applicability of the "special law"/"general law" and "superior law"/"inferior law" distinctions. It is best to discuss these problems in connection with the Commission's debates on article 30 of the 1969 Vienna Convention.

## B. Article 30 of the Vienna Convention on the Law of Treaties: from invalidity to responsibility

251. The general law on conflict of successive treaties fails, as we have seen, to provide definite resolution to the most important problems—at least the most important problems of *theory*—regarding the case where the parties to a later treaty are not identical with parties to an earlier one. It was clear that something needed to be said about the matter in the 1969 Vienna Convention. The matter is dealt with in article 30 of the Convention which, however, is only residual.[341]

*Article 30. Application of successive treaties relating to the same subject-matter*

1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.

2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

---

[336] *Ibid.*, pp. 673–674.

[337] Jenks (see footnote 8 above), p. 446.

[338] *Slivenko v. Latvia* [GC], No. 48321/99, ECHR 2003-X, p. 265, para. 120. The Agreement on the withdrawal of the armed forces of the Russian Federation from the territory of the Republic of Latvia was signed in Moscow on 30 April 1994.

[339] *Slivenko and Others v. Latvia* (dec.) [GC], No. 48321/99, decision on admissibility of 23 January 2002, ECHR 2002-II (extracts), pp. 482–483, paras. 60–61. For a critical discussion, see also I. Ziemele, "Case-law of the European Court of Human Rights and integrity of international law", in Huesa Vinaixa and Wellens (eds.) (footnote 14 above), p. 201.

[340] *Al-Adsani v. the United Kingdom* (see footnote 219 above), p. 79.

[341] Sinclair (see footnote 63 above), p. 97; Aust, *Modern Treaty Law…* (see footnote 74 above), p. 174.

3.    When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty.

4.    When the parties to the later treaty do not include all the parties to the earlier one:

(a)    As between States parties to both treaties the same rule applies as in paragraph 3;

(b)    As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

5.    Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.

252.    Much of this text is relatively uncontroversial and/ or captures the state of general law as represented above. This is especially so as regards the reference to Article 103 of the Charter in paragraph 1 and to the conflict clauses in paragraph 2. Paragraph 3 "effectively codifies the *lex posterior* rule".[342] This concerns the situation where either the parties to the later treaty are identical or, in addition to all the parties to the earlier treaty, some new parties are also present. As under the traditional standard, too, *lex posterior* applies only if nothing else follows from party intent.

### 1.    THE QUESTION OF "SAME SUBJECT-MATTER"

253.    Article 30 deals with the issue of conflict between prior and subsequent treaties. As many commentators have noted, however, it does not appear to do so very successfully.[343] One of the problems is that the title of the article (and paragraph 1) seems to limit it to a conflict between treaties "relating to the same subject-matter". If that limitation is interpreted strictly, then it seems to leave most of the important cases—for example conflicts between environmental and trade treaties, or conflicts between human rights and humanitarian law treaties—outside its scope.[344] However, as pointed out in the previous section, this is neither a necessary nor a reasonable interpretation of the expression "same subject-matter".

254.    Terms such as "human rights law", "trade law", "environmental law" and so on are arbitrary labels for forms of professional specialization. There are no rules on how to qualify particular treaty regimes, and most regimes could be qualified from a number of such perspectives. Human rights treaties, for example, are often used to further environmental objectives, while trade regimes presuppose and are built upon the protection of human rights (in particular the right to property). The qualifications do not link to the *nature of the instrument* but to the *interest* from the perspective of which the instrument is assessed by the observer. To limit the application of article 30 to treaties "dealing with the same subject" would allow States to deviate from their obligations simply by qualifying a novel treaty in terms of a novel "subject". They might, for example, derogate from their obligations under refugee instruments simply by concluding an instrument on an allegedly novel subject of "the law of human movement".[345] As pointed out above, the test of whether two treaties deal with the "same subject-matter" is resolved by assessing whether fulfilment of an obligation under one treaty affects the fulfilment of obligations under another. This "affecting" might then take the form either of strictly preventing the fulfilment of the other obligation or of undermining its object and purpose in one way or another.

255.    Nevertheless, it will also be argued below that the question of the relationship between two treaties cannot be resolved completely in abstraction from any institutional relationship between them. The way a WTO treaty links with a human rights treaty, for example, is not identical to the way a framework treaty on an environmental matter relates to a regional implementation instrument. It may not be possible to determine, in an abstract way, when two instruments deal with the "same subject-matter". But this does not mean that it would be impossible to establish an institutional connection between "chains" or clusters of treaties that are linked institutionally and that States parties envisage as part of the same concerted effort. The significance of identifying such "treaty regimes" lies in the way it seems relatively less complicated to establish a relationship between two instruments *within* one such regime than between two instruments *across* different regimes. For example, the *lex posterior* or *lex specialis* arguments clearly seem more powerful between treaties within a regime than between treaties from different regimes. In the former case, the legislative analogy seems less improper than in the case of two treaties concluded with no conscious sense that they are part of the "same project".

256.    The distinction between treaties dealing with the "same subject-matter" and treaties within the same "regime" may appear slight, but it constitutes an important practical shift of perspective. In the former case, focus is on the object that is being regulated, while in the latter case focus is on the intent of the States parties and the institutions they have established. The former is dependent on an abstract characterization of an issue as a "human rights issue", an "environmental problem" or a "trade question", and meets with the difficulty that often many characterizations may be applied to a single problem and different actors may have an interest in characterizing the problem in different ways so as ensure that their preferred rule systems will be applied. By contrast, the notion of a "regime" points to the institutional arrangements that may have been established to link sets of treaties to each other. Treaties may of course end up in conflict both within and across regimes. To make that distinction is merely to point out that the task of settling the conflict—for example, by seeking a "mutually supportive solution"—may be much easier or more straightforward in the former than in the latter situation, where a conflict of wider objectives or values underlying the very regimes themselves is often at issue.

---

[342] Borgen (see footnote 10 above), p. 603; Mus (see footnote 21 above), pp. 219–220.

[343] Vierdag (see footnote 20 above), pp. 92–108; Sadat-Akhavi (see footnote 21 above), pp. 70–84; Borgen (see footnote 10 above), p. 603; Fitzmaurice amd Elias, *Contemporary Issues...* (see footnote 74 above), pp. 314–331; Sinclair (see footnote 63 above), p. 98.

[344] This has been suggested most recently by Borgen (see footnote 10 above), pp. 611–615. Cf. Sinclair (footnote 63 above), p. 98.

[345] Some of the debate about a new "terrorism law" exemplifies this concern.

## 2. The International Law Commission's debates

257. If much of article 30 was uncontroversial, this was not so in regard to paragraph 4, that is to say, the situation where the later treaty does not include as parties all the States that are parties to the earlier treaty. Unsurprisingly, this was the question on which most of the debates in the Commission focused. Two questions were highlighted: whether the relationship between incompatible treaties should be thought of in terms of "validity" or "priority" between them; and whether there was reason to single out special groups of treaties for separate treatment. There was general agreement (and therefore less discussion) on the fact that the provisions would need to reflect the priority to be accorded to *jus cogens* and to the Charter of the United Nations, as provided under Article 103 thereof.[346] There was also no disagreement that, in cases of subsequent bilateral or multilateral treaties with identical membership, the later treaty would generally prevail—the parties being always entitled to terminate the prior treaty by a subsequent one (apart from the question of peremptory norms). The most important question was how to deal with a situation where not all of the parties to the prior treaty were parties to the later treaty and where there were States that were parties to the later but not to the prior treaty. The discussions have frequently been summarized in the literature so a brief exposé will be sufficient.[347]

258. The first Special Rapporteur on the law of treaties, Lauterpacht, conceived of treaty conflict in terms of validity and advocated the *lex prior* rule—the invalidity of the later treaty.[348] It was qualified by two conditions, however. First, invalidity (of the later treaty) would follow only "if the departure from the terms of the prior treaty is such as to interfere seriously with the interests of the other parties to that treaty or seriously impair the original purpose of the treaty".[349]

259. The second exception concerned "multilateral treaties, such as the Charter of the United Nations, partaking of a degree of generality which imparts to them the character of legislative enactments properly affecting all members of the international community or which must be deemed to have been concluded in the international interest."[350]

260. In this latter case, the subsequent treaty would override the prior treaty. These provisions express Lauterpacht's effort to think of treaties in the image of domestic law, and especially to view multilateral treaties as functional equivalents to domestic legislation within a robust system of international legality. While he thought of the first qualification as already *de lege lata*, he felt the latter would involve progressive development.[351]

261. The second Special Rapporteur on the law of treaties, Fitzmaurice, rejected invalidity as the proper consequence of treaty conflict. There were so many treaties, and States were generally so ignorant of each other's commitments, that it would be unfair to the innocent party if conflict were to occasion automatic invalidity.[352] Besides, Fitzmaurice held, there was practically no support from international practice for such a drastic consequence. Therefore, he preferred the solution already proposed in the Harvard research on the law of treaties in 1935 that would provide, as the main rule, for the "priority" of the earlier—a position that would not invalidate the later treaty, nor even prohibit States from entering into incompatible treaties.[353] The practical problem would be resolved by liability to the innocent party. It remained in practice (although Fitzmaurice was clearly unhappy about this) for the State having undertaken the incompatible obligations to choose which of the agreements it would fulfil.[354]

262. Like Lauterpacht, Fitzmaurice felt the need to qualify the priority of the earlier treaty by taking into account the case of treaties that involved "a more absolute type of obligation" than ordinary treaties building on reciprocal promises or benefits between parties. He defined two types of such treaties: "integral" and "interdependent" ones. Treaties of the former group were such that the performance of the obligation by one party was altogether independent of the performance of that obligation by others, such as with humanitarian or human rights conventions. In the second case—typically disarmament treaties—the obligation of each party was "dependent on a corresponding performance of the same thing by *all*\* the parties". Treaties conflicting with these would be sanctioned by invalidity. In other words, Fitzmaurice preserved Lauterpacht's solution for this special type of ("objective", "legislative") treaties.[355]

263. The third Special Rapporteur on the law of treaties, Waldock, maintained and extended the move from invalidity to priority. He stressed the need to treat with extreme caution suggestions that treaties among sovereign States could face the sanction of invalidity. Potential conflicts needed to be dealt with first by interpretation and by seeking to make them coherent. If it were impossible to reconcile the treaties, then the States would have to agree on priority, with liability to the innocent party.

---

[346] Third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur (A/CN.4/115) (see footnote 139 above), pp. 27, 41, draft article 18, para. 1, and commentary, para. 77; and second report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/156 and Add.1–3) (see footnote 331 above), pp. 54, 61, draft article 14, paras. 3, and 4, and paras. (32)–(35) of commentary. The question of whether conflict with *jus cogens* or Article 103 of the Charter leads invariably to the invalidity of the conflicting rule will be discussed in chapter IV below.

[347] See, for example, Binder (footnote 145 above), pp. 49–65, and Mus (footnote 21 above), pp. 222–227.

[348] See the first report on the law of treaties by Hersch Lauterpacht, Special Rapporteur (A/CN.4/63) (footnote 144 above), pp. 156–159. In accordance with his consistent application of the domestic analogy, he insisted that international tribunals should have jurisdiction to declare the nullity of the later treaty and to provide for damages for any resulting loss to a party to the later treaty that had been unaware of the prior treaty (*ibid.*, p. 156).

[349] *Ibid.*, draft article 16, para. 3.

[350] *Ibid.*, para. 4.

[351] *Ibid.*, p. 157, paras. (5) and (6) of the commentary to draft article 16.

[352] Third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur (A/CN.4/115) (see footnote 139 above), pp. 41–42, para. 83, commentary to draft article 18.

[353] Draft convention on the law of treaties, Harvard Research in International Law, AJIL, vol. 29, supplement (1935), pp. 1024–1025.

[354] He conceded that, although there was no "right of election", there was nonetheless a "power of election" (third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur (A/CN.4/115) (see footnote 139 above), p. 42, para. 85).

[355] Second report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur, *Yearbook … 1957*, vol. II, document A/CN.4/107, p. 54, paras. 124–126; see also third report on the law of treaties (A/CN.4/115) (footnote 139 above), p. 49, para. 91.

264.    Unlike his predecessors, Waldock did not reserve special treatment for legislative or "objective" treaties. There was, he felt, no support for this in international practice.[356] The nature and importance of the provisions in such treaties were in any case so heterogeneous that a general rule was out of place. If some treaties—such as those on the laws of war—contained especially important provisions, they were protected by their *jus cogens* character. But because the treaties preserved the right of unilateral denunciation, it seemed illogical to exclude the possibility of giving effect to subsequent treaties that in fact implied such a denunciation.[357]

265.    Waldock's solution was to relativize the problem. For States that were parties to the first but not the second treaty, the first enjoyed priority. If all parties to the second were also parties to the first treaty, then this was an *inter se* agreement whose permissibility would have to be resolved by interpreting the first treaty.[358]

266.    In the course of the discussion, an important distinction emerged between two types of cases where the group of parties to the later multilateral treaty was not identical with the group of parties to the earlier treaty: (*a*) cases where some States were parties to the later treaty but not parties to the earlier one; and (*b*) cases where *all* parties to the later treaty were also parties to the earlier treaty. The latter case covered what was subsequently called *inter se* modification of the treaty, which was dealt with separately under article 41 (see section D below).

## C.    Special clauses

267.    Owing to the inconclusive nature of the general law on conflicts between successive norms, as well as the generally open-ended formulations of article 30 of the 1969 Vienna Convention, it seems important that States include some direction in treaties themselves as to what to do with subsequent or prior conflicting treaties. The following sections will contain: (*a*) a brief typology of conflict clauses; (*b*) a discussion of conflict clauses between and across "regimes"; (*c*) the conflict clauses incorporated in the Treaty establishing the European Community; and (*d*) the practice of the so-called "disconnection clause".

### 1.    A TYPOLOGY OF CONFLICT CLAUSES

268.    Among the various categories of conflict clauses, at least the following may be distinguished:[359]

    (*a*)    *Clauses that prohibit the conclusion of incompatible subsequent treaties.* This is an express exception to the *lex posterior* rule, designed to guarantee the normative

power of the earlier treaty. For example, under article 8 of the North Atlantic Treaty: "Each Party declares that none of the international engagements now in force between it and any other of the Parties or any third State is in conflict with the provisions of this Treaty, and undertakes not to enter into any international engagement in conflict with this Treaty".[360]

    (*b*)    *Clauses that expressly permit subsequent "compatible" treaties.* One example might be article 311, paragraph 3, of the United Nations Convention on the Law of the Sea, which provides as follows:

Two or more States Parties may conclude agreements modifying or suspending the operation of provisions of this Convention, applicable solely to the relations between them, provided that such agreements do not relate to a provision derogation from which is incompatible with the effective execution of the object and purpose of this Convention, and provided further that such agreements shall not affect the application of the basic principles embodied herein, and that the provisions of such agreements do not affect the enjoyment by other States Parties of their rights or the performance of their obligations under this Convention.

    (*c*)    *Clauses in the subsequent treaty providing that it "shall not affect" the earlier treaty.* One example would be article 30 of the 1958 Geneva Convention on the High Seas, according to which:

The provisions of this Convention shall not affect conventions or other international agreements already in force, as between States Parties to them.

This provides for a presumption of harmony, also rebuttable, between the earlier and the subsequent treaty.[361]

    (*d*)    *Clauses in the subsequent treaty which provide that, among the parties, it overrides the earlier treaty.* This is really one case of "modification" of an agreement by an *inter se* agreement and will be covered at more length in section D below.

    (*e*)    *Clauses in the subsequent treaty that expressly abrogate the earlier treaty.*[362] An example would be article 311, paragraph 1, of the United Nations Convention on the Law of the Sea, according to which between parties to it and to the 1958 Geneva Conventions on the Law of the Sea, the former shall prevail.

    (*f*)    *Clauses in subsequent treaties that expressly maintain earlier compatible treaties.* One example would be article 311, paragraph 2, of the United Nations Convention on the Law of the Sea, according to which:

This convention shall not alter the rights and obligations of States parties which arise from other agreements compatible with this Convention and which do not affect the enjoyment by other States parties of their rights or the performance of their obligations under this Convention.

    (*g*)    *Clauses promising that future agreements will abrogate earlier treaties.* This is a kind of *pactum de contrahendo*. One example is article 307 (formerly article 234) of the Treaty establishing the European Community, which provides that the rights and obligations

---

[356] Second report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/156 and Add.1–3 (see footnote 331 above), p. 58, para. (20) of the commentary to draft article 14.

[357] *Ibid.*, pp. 59–60, paras. 25–30.

[358] *Ibid.*, p. 60, para. 31.

[359] See Rousseau, "De la compatibilité des normes juridiques contradictoires…" (footnote 36 above), pp. 154–164; Czapliński and Danilenko (footnote 74 above), p. 14; Mus (footnote 21 above), pp. 214–217; Aust, *Modern Treaty Law…* (footnote 74 above), pp. 174–181; Sadat-Akhavi (footnote 21 above), pp. 86–97; Fitzmaurice and Elias, *Contemporary Issues…* (footnote 74 above), pp. 323–325; Daillier and Pellet, *Droit international public* (footnote 74 above), pp. 268–271; and Borgen (footnote 10 above), pp. 584–587.

[360] See Aufricht (footnote 118 above), pp. 666–667.

[361] See Borgen (footnote 10 above), p. 586, and Aufricht (footnote 118 above), p. 669.

[362] Aufricht (see footnote 118 above), pp. 661–663.

of members ensuing from treaties concluded before membership are not affected. The members, however, commit to take action so as to abrogate those treaties (see further subsection C.3 below).

269.    Although such clauses are undoubtedly useful, there is a limit to what they can achieve. They cannot, for instance, affect the rights of third parties or interfere with the operation of *jus cogens* or other hierarchical principles (such as those having to do with integral or interdependent obligations).[363]

270.    But even though there are conflict clauses, their meaning or effect may sometimes be obscure. An example is provided by article 22 of the 1992 Convention on Biological Diversity:

   1.    The provisions of this Convention shall not affect the rights and obligations of any Contracting Party deriving from any existing international agreement, except when the exercise of those rights and obligations would cause serious damage or threat to biological diversity.

   2.    Contracting Parties shall implement this Convention with respect to the marine environment consistently with the rights and obligations of States under the law of the sea.

271.    It seems unclear what is in fact being overridden by what in these formulations. Of course, the provision may be read as an exhortation that the relevant instruments should always be read as compatible with each other (*i.e.* the principle of systemic integration—see chapter V below) within an overall obligation to cooperate.[364] Sometimes this objective is actually written into the relevant conflict clause.[365] But where a party claims a right on the basis of the Convention on Biological Diversity or some other treaty, it would seem difficult to *deny* such a right by interpretation or "coordination". Besides, sometimes conflict clauses may themselves conflict or cancel each other out.[366] In such cases, recourse must be had to general principles of conflict resolution.

### 2.    RELATIONS WITHIN AND ACROSS REGIMES: ENVIRONMENTAL TREATIES

272.    As the previous considerations have shown, article 30 of the 1969 Vienna Convention has its limits. It works best when dealing with a relationship between two treaties on a related topic that have identical parties. It is then fair to assume that the later treaty expresses a more recent party will, and should therefore be given effect. When the parties are non-identical, article 30 allows the State having concluded incompatible obligations to choose which of them it will observe. Confronted with relations *between* treaty regimes, such as those habitually understood to exist in trade law, human rights law or environmental law, article 30 remains equally disappointing. The straightforward priority of one treaty over another (that is, in fact, of one regime over another) cannot be reasonably assumed on a merely chronological basis. There is a need for a more nuanced approach. It is unlikely, however, that such an approach might be developed within dispute settlement, which will perforce be limited to *ad hoc* considerations. Instead, it might be facilitated through the adoption of appropriate conflict clauses. Two types of such clauses may be distinguished. A first type might follow article 30 of the Convention and seek resolution by establishing firm priority between two treaties. A second type, discussed in this section, avoids straightforward priority and seeks instead to coordinate the simultaneous application of the two treaties as far as possible.

273.    The relationship between treaties that belong to different regimes is a general problem. Its most acute manifestation has concerned relations between instruments forming part of trade and environmental regimes.[367] Although negotiators appear increasingly aware of the problem, practice has so far developed in an incoherent manner. For instance, in the negotiations on the Cartagena Protocol on Biosafety to the Convention on Biological Diversity (2000), the relationship of the Protocol to the obligations of the parties under agreements covered by WTO was extensively debated. As a result, the Protocol includes provisions concerning its relationship with trade instruments, but leaves many other important treaty relations unaddressed. These include its relationship to, for example, the International Plant Protection Convention, the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction and the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.[368]

---

[363] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (see footnote 323 above), p. 38, para. (15) of the commentary to draft article 65.

[364] As suggested in Wolfrum and Matz, *Conflicts in International Environmental Law* (see footnote 22 above), p. 125; Matz, *Wege zur Koordinierung völkerrechtlicher Verträge...* (see footnote 22 above), pp. 191–194 *et seq.*; and Fitzmaurice and Elias, *Contemporary Issues...* (see footnote 74 above), p. 333. For a useful discussion of the ambiguities of the conflict clause in the Cartagena Protocol on the Safety of Biotechnology to the Convention on Biological Diversity, see S. Safrin, "Treaties in collision? The Biosafety Protocol and the World Trade Organization agreements", AJIL, vol. 96, No. 3 (July 2002), p. 606.

[365] Article 237, paragraph 2, of the United Nations Convention on the Law of the Sea, for example, yields to specific environmental treaties, provided these are implemented "in a manner consistent with the general principles and objectives of this Convention". See further Fitzmaurice and Elias, *Contemporary Issues...* (footnote 74 above), pp. 334–336.

[366] This is the case of article 311, paragraph 3, of the United Nations Convention on the Law of the Sea and article 22, paragraph 1, of the Convention on Biological Diversity. For a discussion, see Fitzmaurice and Elias, *Contemporary Issues...* (footnote 74 above), p. 334.

[367] For instance, Sadat-Akhavi (see footnote 21 above), pp. 213–247, has dealt with specific conflict resolution techniques for different types of treaties, *e.g.* human rights treaties and the principle of "more favourable provision"; Pauwelyn, *Conflict of Norms...* (see footnote 21 above), pp. 345–361, has dealt with the conflict clauses in the WTO treaty; D. E. Siegel, "Legal aspects of the IMF/WTO relationship: the Fund's articles of agreement and the WTO agreements", AJIL, vol. 96, No. 3 (July 2002), p. 561; A. Lindroos, "Addressing norm conflicts in a fragmented legal system: the doctrine of *lex specialis*", *Nordic Journal of International Law*, vol. 74, No. 1 (2005), p. 27, at pp. 30–34, 60–64; Wolfrum and Matz, *Conflicts in International Environmental Law* (see footnote 22 above) have extensively dealt with conflicts between environmental and other treaties. The fact that environmental treaties have particularly wide potential for conflict with other treaties, as most matters bear a relationship to the environment, is stressed in Matz, *Wege zur Koordinierung völkerrechtliche Verträge...* (see footnote 22 above), pp. 53–73. The World Health Organization has considered the issue in the context of the International Health Regulations: "*Review and approval of proposed amendments to the International Health Regulations: relations with other international instruments*"(A/IHR/IGWG/INF.DOC./1), 30 September 2004.

[368] Safrin (see footnote 364 above), p. 617.

274.   The final wording of the relevant preambular passages in the Cartagena Protocol on Biosafety to the Convention on Biological Diversity illustrates current problems:

> *Recognizing* that trade and environment agreements should be mutually supportive with a view to achieving sustainable development,
>
> *Emphasizing* that this Protocol shall not be interpreted as implying a change in the rights and obligations of a Party under any existing international agreements,
>
> *Understanding* that the above recital is not intended to subordinate this Protocol to other international agreements…[369]

275.   The negotiators have been reluctant to decide how, exactly, environmental and trade agreements should be related to each other or to any other further agreement.[370] The only thing they appear to have agreed is that the Cartagena Protocol on Biosafety to the Convention on Biological Diversity should be seen as no less important than any other agreement. Similar clauses may be found in other treaties. For example, the preamble to the International Treaty on Plant Genetic Resources for Food and Agriculture (2001) provides that it should not be interpreted as "implying in any way a change in the rights and obligations of the Contracting Parties under other international agreements". It then expresses the understanding that this principle "is not intended to create a hierarchy between this Treaty and other international agreements".

276.   Such formulations do imply a willingness to acknowledge the existence of parallel and potentially conflicting treaty obligations. But they fall short of indicating clearly what should be done in the event that conflicts emerge. Instead, recourse is had to compromise formulas that, as it were, push the resolution of problems to the future. The first paragraph of the conflict clause in the preamble to the Cartagena Protocol on Biosafety to the Convention on Biological Diversity, for example, provides that "trade and environment agreements should be mutually supportive with a view to achieving sustainable development". The assumption is that conflicts may and should be resolved between treaty partners as they arise and with a view to mutual accommodation.[371] Likewise, the International Treaty on Plant Genetic Resources for Food and Agriculture, mentioned above, recognizes "that this Treaty and other international agreements relevant to this Treaty should be mutually supportive with a view to sustainable agriculture and food security". Other treaties include conditional conflict clauses that also leave much room for appreciation and negotiation. For instance, the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and their Disposal (1989) allows parties to enter into other agreements

"provided that such agreements or arrangements do not derogate from the environmentally sound management of hazardous wastes and other wastes as required by this Convention".[372] And the 1992 Convention on Biological Diversity states that "[t]he provisions of this Convention shall not affect the rights and obligations of any Contracting Party deriving from any existing international agreement, except where the exercise of those rights and obligations would cause serious damage or threat to biological diversity."[373]

277.   Such clauses give recognition to the fact that that it seems inadvisable to produce a general rule on treaty priority. For this, the treaties and the situations that may arise are too heterogeneous. Instead, the parties appeal to each other's sense of accommodation and willingness to envisage "mutually supportive" roles for their instruments. This is simply another way to emphasize the importance of harmonizing interpretation. This may work well between treaties that are part of the same regime and share a similar object and purpose or carry a parallel "ethos", for example between several environmental or trade instruments *inter se*. But it cannot be assumed *a priori* that a similar readiness exists between parties to treaties across regimes, treaties that seek to achieve physically incompatible solutions, or treaties inspired by very different (perhaps opposite) objectives in situations experienced as zero-sum games. In such cases, at the end of the day, one treaty must be preferred over the other. At that point, focus shifts from coordination to rights and obligations. While open-ended or programmatic provisions are easily amenable to accommodation, this cannot be said of provisions laying out (subjective) rights or obligations. In giving effect to them, it remains important to provide for the possibility of recourse to regime-independent dispute settlement.

278.   Mutual accommodation is easiest between two instruments within a regime, especially between a framework agreement and a more specific (implementation) agreement.[374] For example, many of the conflict clauses in the United Nations Convention on the Law of the Sea are quite open-ended and refrain from setting up neat priorities. This is understandable. There is often reason to encourage further specific regulation. The implementation agreement will then prevail as *lex specialis*, while the framework instrument remains "in the background" as *lex generalis*, as pointed out in chapter II above. Article 311, paragraph 3, of the United Nations Convention on the Law of the Sea allows States to conclude modifying agreements

provided that such agreements do not relate to a provision derogation from which is incompatible with the effective execution of the object and purpose of this Convention, and provided further that such agreements shall not affect the application of the basic principles embodied

[369] Cartagena Protocol on the Safety of Biotechnology to the Convention on Biological Diversity, depositary notification C.N.251.2000.TREATIES-1 of 27 April 2000; C.N.1471.2003.TREATIES-41 of 22 December 2003 (proposal of corrections to the Arabic text of the Protocol) and C.N.291.2004.TREATIES-11 of 26 March 2004 (rectification of the Arabic text of the Protocol and transmission of the relevant *procès-verbal*). See also ILM, vol. 39, No. 5 (September 2000), p. 1027.

[370] Safrin (see footnote 364 above), pp. 618–621, and Borgen (see footnote 10 above), p. 614.

[371] The content and form of this "obligation to coordinate" is discussed at length in Matz, *Wege zur Koordinierung völkerrechtlicher Verträge…* (see footnote 22 above), pp. 233–390.

[372] Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and their Disposal, art. 11, para. 1.

[373] Convention on Biological Diversity, art. 22, para. 1.

[374] Wolfrum and Matz, *Conflicts in International Environmental Law* (see footnote 22 above), p. 121. The relationship between the United Nations Convention on the Law of the Sea as an umbrella convention and an implementing agreement, in relation to a dispute settlement system, was raised in the *Southern Bluefin Tuna Case between Australia and Japan and between New Zealand and Japan* (see footnote 26 above).

herein, and that the provisions of such agreements do not affect the enjoyment by other States Parties of their rights or the performance of their obligations under this Convention.

279. Here "compatibility" has been formulated rather loosely. Parties are given wide latitude to conclude agreements on topics dealt with by the Convention, with the sole caveat that this should not "affect the application of the basic principles" or the "rights" and "obligations" of the parties. Although there is room to interpret the expressions "rights" and "obligations" either more or less strictly, the thrust of the provision lies in a search for reasonable accommodation. Like the environmental treaties discussed above, it seems to look for "mutually supportive" roles for the Convention and those particular instruments. What this means if an agreement seems to be in outright conflict with the Convention remains unclear.[375]

280. The weakness of the strategy of seeking a "mutually supportive" interpretation lies in its open-endedness. By following this type of conflict clause, States parties transfer their competence to decide on what should be done if conflicts arise to those who apply the law. This may work well if the two treaties are part of the same regime. But if the conflict is between treaties across two regimes, then the solution works only if the law-applier is an impartial third party that approaches the conflicting instruments from beyond the regimes of which the treaties are part. It might happen, however, that the law-applier will be a body or an administrator closely linked to one or other of the (conflicting) regimes. In such a case, an open-ended conflict clause will come to support the primacy of the treaty that is part of the law-applier's regime.

281. Conflict clauses referring to the fundamental purpose of the treaty are in line with the language of article 41, paragraph 1 (*b*) (ii), of the 1969 Vienna Convention, which requires that *inter se* agreements should not frustrate the object and purpose of the original treaty. Often such clauses also support the idea of interpreting treaties in a manner which preserves the rights and obligations under both treaties in a maximal way. A harmonizing approach ("mutually supportive") fits best with the aim of efficient management.

282. Nevertheless, the resulting interpretative openness creates a danger of "structural bias", *i.e.* that what is understood as a "mutually supportive" solution is determined in accordance with the priorities of the body whose task it is to interpret the conflict clause. To prevent this, it is still advisable to write the key provisions in multilateral treaties—and especially provisions that have to do with the substantive rights and obligations of the parties—with sufficient clarity so that they are not compromised at the stage of application.

3.  CONFLICT CLAUSE IN THE TREATY
ESTABLISHING THE EUROPEAN COMMUNITY

283. Agreements establishing international organizations often contain a conflict clause. The best-known example is Article 103 of the Charter of the United Nations (see further chapter IV below). Likewise, article 307

(previously article 234) of the Treaty establishing the European Community sets up a conflict rule for agreements between member States and third parties.[376] The Treaty establishing the European Community takes absolute precedence over agreements that member States have concluded between themselves. In relation to third States, however, article 307 stipulates:

The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more [m]ember States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of this Treaty.

To the extent that such agreements are not compatible with this Treaty, the [m]ember State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.

In applying the agreements referred to in the first paragraph, [m]ember States shall take into account the fact that the advantages accorded under this Treaty by each [m]ember State form an integral part of the establishment of the Community and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all other [m]ember States.

284. This article gives priority to treaties that a member State has concluded with third States before the entry into force of European Community treaties in regard to it.[377] The European Court of Justice has frequently clarified the scope of article 307.[378] In the *Burgoa* case, the Court confirmed that article 307 "is of general scope and it applies to any international agreement, irrespective of subject-matter, which is capable of affecting the application of the Treaty".[379] Neither the wording of the article nor subsequent case law accepts the extension of the provision to agreements concluded by member States after accession.[380] According to the leading case, the provision covers the rights of third parties and the obligations of member States:

The applicant replies that the terms "rights and obligations" in Article 234 refer, as regards the "rights", to the rights of third countries and, as regards the "obligations", to the obligations of [m]ember States and that, by virtue of the principles of international law, by assuming a new obligation which is incompatible with rights held under a prior

---

[375] Fitzmaurice and Elias, *Contemporary Issues…* (see footnote 74 above), p. 335, and Wolfrum and Matz, *Conflicts in International Environmental Law* (see footnote 22 above), pp. 15–31.

[376] I. MacLeod, I. D. Hendry and S. Hyett, *The External Relations of the European Communities: A Manual of Law and Practice,* Oxford, Clarendon Press, 1996, p. 229, and P. Eeckhout, *External Relations of the European Union: Legal and Constitutional Foundations*, Oxford, Oxford University Press, 2004, p. 334. See also, for example, J. Klabbers, "Re-inventing the law of treaties: the contribution of the EC courts", *Netherlands Yearbook of International Law*, vol. 30 (1999), p. 45; J. Klabbers, "Moribund on the fourth of July? The Court of Justice on prior agreements of the member States", *European Law Review*, vol. 26 (2001), pp. 187–197; C. N. K. Franklin, "Flexibility vs. legal certainty: article 307 EC and other issues in the aftermath of the Open Skies cases", *European Foreign Affairs Review*, vol. 10 (2005), p. 79; P. J. Kuijper, "The Court and the Tribunal of the EC and the Vienna Convention on the Law of Treaties 1969", *Legal Issues of European Integration*, vol. 25, No. 1 (1998), p. 1; F. E. Dowrick, "Overlapping European laws", *International and Comparative Law Quarterly*, vol. 27, No. 3 (July 1978), pp. 629–660.

[377] Klabbers, "Moribund on the fourth of July?…" (see footnote 376 above), pp. 187–188.

[378] Eeckhout (see footnote 376 above), p. 334.

[379] Case 812/79, *Attorney General v. Juan C. Burgoa*, judgment of 14 October 1980, *European Court Reports 1980*, p. 2787, at p. 2802, para. 6.

[380] Eeckhout (see footnote 376 above), p. 335.

treaty a State *ipso facto* gives up the exercise of these rights to the extent necessary for the performance of its new obligations.[381]

The applicant's interpretation is well founded and the objection raised by the defence must be dismissed.[382]

285.   The distinction between the *rights* of third States and the *obligations* of member States relates to the question of whether a member State can claim that it cannot fulfil its obligations under Community law towards other member States owing to a treaty it has made with third States. In the aforementioned case the Italian Government had argued that it could not fulfil its obligations of intra-Community trade owing to its GATT commitments. This was quickly dispelled by the Court: "in matters governed by the [Treaty establishing the European Community], that Treaty takes precedence over agreements concluded between [m]ember States before its entry into force, including agreements made within the framework of GATT."[383] Article 307 cannot therefore be relied upon in relations between members to justify trade restrictions within the European Community.[384] Yet the division of rights and obligations is not unproblematic.[385] As pointed out by Klabbers, article 307 is clearly applicable to bilateral treaties, as well as to "bilateralizable" multilateral treaties. In respect of other kinds of multilateral treaties, article 307 has only limited applicability.[386]

286.   Article 307 places no obligation on the European Community itself. However, as stated by the European Court of Justice in the *Burgoa* case:

Although the first paragraph of Article 234 makes mention only of the obligations of the [m]ember States, it would not achieve its purpose if it did not imply a duty on the part of the institutions of the Community not to impede the performance of the obligations of [m]ember States which stem from a prior agreement. However, that duty of the Community institutions is directed only to permitting the [m]ember State concerned to perform its obligations under the prior agreement and does not bind the Community as regards the non-member country in question.[387]

287.   Under article 307 of the Treaty establishing the European Community, member States are allowed to carry out their earlier agreements with third States, and the European Community is under an obligation not to impede this. Nevertheless, member States are also obliged to take all appropriate steps to eliminate the incompatibilities between their European Community obligations and these previous treaties.[388] As the European Court of Justice has pointed out, this involves a duty to work actively so as to bring external obligations into line with European Community obligations:

Although, in the context of Article 234 of the Treaty, the [m]ember States have a choice as to the appropriate steps to be taken, they are nevertheless under an obligation to eliminate any incompatibilities existing between a pre-Community convention and the EC Treaty. If a [m]ember State encounters difficulties which make adjustment of an agreement impossible, an obligation to denounce that agreement cannot therefore be excluded.[389]

As regards the argument that such denunciation would involve a disproportionate disregard of foreign-policy interests … as compared with the Community interest, it must pointed out that the balance between the foreign-policy interests of a [m]ember State and the Community interest is already incorporated in Article 234 of the Treaty, in that it allows a [m]ember State not to apply a Community provision in order to respect the rights of third countries deriving from a prior agreement and to perform its obligations thereunder. That article also allows them to choose the appropriate means of rendering the agreement concerned compatible with Community law.[390]

288.   The position of the European Court of Justice is that the requirement under article 307 "to eliminate any incompatibilities" is rather strict.[391] The Court appears willing to accept that a member State may face difficulties in bringing its external commitments into line with European Community law. This may sometimes involve a duty to denounce such commitments. In other words, as pointed out by Eeckhout, "[f]oreign-policy interests of the [m]ember States cannot override that obligation, and a [m]ember State cannot in principle argue that denunciation would be too harmful to those interests".[392] He also remarks that "[t]here is no suggestion that there may ever be cases where the [European] Community itself is required to act so as to remove incompatibilities, for example by amending Community law".[393]

### 4.   DISCONNECTION CLAUSES

289.   One practice that it may be appropriate to discuss here is the expansion of the so-called "disconnection clause" in multilateral agreements to which the European Community is a party. There are presently at least 17 multilateral treaties, having as parties both members and non-members of the European Community (and, in some cases, also the European Community itself), that contain this clause.[394] The purpose of the clause is, according

---

[381] Case 10/61, *Commission of the European Economic Community v. Government of the Italian Republic*, judgment of 27 February 1962, *European Court Reports 1962*, English special edition, p. 1, at p. 10. See also MacLeod, Hendry and Hyett (footnote 376 above), p. 230, and Eeckhout (footnote 376 above), pp. 337–338.

[382] *Commission of the European Economic Community Government of the Italian Republic* (see footnote 381 above), p. 132.

[383] *Ibid.*

[384] MacLeod, Hendry and Hyett (see footnote 376 above), p. 230. This was confirmed by the European Court of Justice in case 121/85, *Conegate Limited v. HM Customs & Excise*, judgment of 11 March 1986, *European Court Reports 1986*, p. 1007, at p. 1024.

[385] Klabbers, "Re-inventing the law of treaties…" (see footnote 376 above), p. 63.

[386] *Ibid.*, pp. 64–65.

[387] *Attorney General v. Juan C. Burgoa* (see footnote 379 above), p. 2803, para. 9.

[388] *Ibid.*, pp. 2807–2809, paras. 23–26, and Klabbers, "Moribund on the fourth of July?…" (see footnote 376 above), pp. 188–189.

[389] Case 62/98, *Commission of the European Communities v. Portuguese Republic*, judgment of 4 July 2000, *European Court Reports 2000*, p. 5171, at pp. 5211–5212, para. 49.

[390] *Ibid.*, p. 5212, para. 50.

[391] Klabbers, "Moribund on the fourth of July?…" (see footnote 376 above), pp. 195–196.

[392] Eeckhout (see footnote 376 above), p. 342.

[393] *Ibid.*

[394] Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime and on the Financing of Terrorism, 2005, art. 52, para. 4; Council of Europe Convention on Action against Trafficking in Human Beings, 2005, art. 40, para. 3; Council of Europe Convention on the Prevention of Terrorism, 2005, art. 26, para. 3; Convention on Contact concerning Children, 2003, art. 20, para. 3; Protocol on Civil Liability and Compensation for Damage Caused by the Transboundary Effects of Industrial Accidents on Transboundary Waters, 2003, art. 20, para. 2; European Convention for the Protection of the Audiovisual Heritage, 2001, art. 21; European Convention on the Legal Protection of Services based on, or consisting of, Conditional Access, 2001, art. 11, para. 4; European Convention on the Promotion of a Transnational Long-Term Voluntary Service for Young People, 2000, art. 19, para. 2; UNIDROIT Convention on Stolen or Illegally Exported Cultural Objects, 1995, art. 13, para. 3; Agreement on Illicit Traffic by Sea, implementing Article 17 of the United Nations Convention against Illicit Traffic in Narcotic Drugs

(Continued on next page.)

to the European Commission, to ensure the continuing application of Community rules between European Community member States, without any intent to affect obligations between member States and other parties to treaties.[395] The exact formulation of these clauses differs from one convention to another, but the core substance is captured in article 27, paragraph 2, of the Convention on Mutual Administrative Assistance in Tax Matters of 1988:

> Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.

290.    Some disconnection clauses are general and cover the whole of a treaty. Other clauses are only partial or qualified.[396] The clause in article 20, paragraph 2, of the Protocol on Civil Liability and Compensation for Damage Caused by the Transboundary Effects of Industrial Accidents on Transboundary Waters is an example of a partial disconnection clause, aiming to replace only certain articles of the original treaty.[397] As an example of a conditional disconnection clause, mention could be made

of article 26, paragraph 3, of the Council of Europe Convention on the Prevention of Terrorism, which refers to European Community rules "without prejudice to the object and purpose of the present Convention and without prejudice to its full application with other Parties". Another, perhaps equally ambiguous, condition is written into article 30, paragraph 3, of the Agreement on Illicit Traffic by Sea, implementing Article 17 of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, which stipulates: "If two or more Parties have already concluded an agreement or treaty in respect of a subject dealt with in this Agreement or have otherwise established their relations in respect of that subject, they may agree to apply that agreement or treaty or to regulate those relations accordingly, in lieu of the present Agreement, if it facilitates international co-operation."[398]

291.    In all cases, the rules of the treaty are replaced, in whole or in part, by European Community rules in relations between European Community members. The obligations between European Community members and other treaty parties remain, however, fully governed by the treaty. The inclusion of such clauses in multilateral treaties has given some cause for concern. It has seemed difficult to classify them by reference to provisions in the 1969 Vienna Convention, and the effect of the proliferation of such clauses on the coherence of the original treaty has seemed problematic.[399]

292.    Article 30, paragraph 2, of the 1969 Vienna Convention provides that: "[w]hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail." This formulation also covers disconnection clauses. They are thus best analysed as conflict clauses added to treaties with a view to regulating potential conflicts between European Community law and the treaty. What may seem disturbing about such clauses is that they are open only to some parties to the original treaty, and the content of the European Community law to which they refer may be both uncertain and subject to change. Nevertheless, this is scarcely different from regular *inter se* amendments that also apply only between some parties and that may be subject to future modification.

293.    Under what conditions is this type of clause permissible? The starting point is, of course, that the clause is agreed to by all the parties, so that no question of validity will arise. Nevertheless, the possibility cannot be excluded that the other parties might not know of the real import of the disconnection clause because the rules referred to therein (the relevant European Community rules) are obscure, or have been modified or interpreted in a new way. In this case, the European Community rules begin to resemble a new, successive treaty, covered by article 30, paragraph 4, of the 1969 Vienna Convention. According to article 30, paragraph 5, of this Convention, "[p]aragraph 4 [of article 30] is without prejudice to article 41".[400] Through this means, an open-ended discon-

---

(*Footnote 394 continued.*)

and Psychotropic Substances, 1995, art. 30, para. 3; European Convention relating to questions on Copyright Law and Neighbouring Rights in the Framework of Transfrontier Broadcasting by Satellite, 1994, art. 9, para. 1; Convention on Civil Liability for Damage resulting from Activities Dangerous to the Environment, 1993, art. 25, para. 2; European Convention on Certain International Aspects of Bankruptcy, 1990, art. 38, para. 2; Protocol to the Convention on Insider Trading, 1989, art. 1; European Convention on Transfrontier Television, 1989, art. 27, para. 1; Convention on Insider Trading, 1989, art. 16 *bis*; Convention on Mutual Administrative Assistance in Tax Matters, 1988, art. 27, para. 2.

[395] The European Community/European Union and its [m]ember States have also included the following declaration in the Explanatory Report to the Council of Europe Convention on the Prevention of Terrorism: "'The European Community/European Union and its [m]ember States reaffirm that their objective in requesting the inclusion of a "disconnection clause" is to take account of the institutional structure of the Union when acceding to international conventions, in particular in case of transfer of sovereign powers from the [m]ember States to the Community. This clause is not aimed at reducing the rights or increasing the obligations of a non-European Union Party *vis-à-vis* the European Community/European Union and its [m]ember States, inasmuch as the latter are also parties to this Convention. The disconnection clause is necessary for those parts of the Convention which fall within the competence of the Community/Union, in order to indicate that European Union [m]ember States cannot invoke and apply the rights and obligations deriving from the Convention directly among themselves (or between themselves and the European Community/Union). This does not detract from the fact that the Convention applies fully between the European Community/European Union and its [m]ember States on the one hand, and the other Parties to the Convention, on the other; the Community and the European Union [m]embers States will be bound by the Convention and will apply it like any Party to the Convention, if necessary, through Community/Union legislation. They will thus guarantee the full respect of the Convention's provisions *vis-à-vis* non-European Union Parties.' As an instrument made in connection with the conclusion of a treaty, within the meaning of Article 31, para. 2(*b*) of the Vienna Convention on the Law of Treaties, this declaration forms part of the 'context' of the Convention" (Council of Europe, *Council of Europe Treaty Series*, No. 196, para. 272); see also L. Azoulai, "The acquis of the European Union and international organizations", *European Law Journal*, vol. 11 (2005), especially p. 211, and A. Schulz, "The relationship between the judgments project and other international instruments", preliminary document No. 24 of December 2003, Hague Conference on Private International Law, available from https://assets.hcch.net/upload/wop/genaff_pd19e.pdf.

[396] For a typology, see C. P. Economides and A. G. Kolliopoulos, "La clause de déconnexion en faveur du droit communautaire: une pratique critiquable", RGDIP, vol. 110 (2006), p. 273.

[397] *Ibid.*

[398] *Ibid.*

[399] *Ibid.*

[400] The drafting processes for the two articles overlapped considerably. See sections B.2, above, and D.4, below, of this chapter.

nection clause would *also* become conditioned by the requirements of article 41. During the preparatory work for the 1969 Vienna Convention, Mustafa Kamil Yasseen confirmed that a right to *inter se* modification should not be unlimited, but that any modification would need to respect the object and purpose of the treaty.[401] A similar position was taken by Alain Pellet in the context of reservations, as he explained that an expressly authorized, unspecified reservation must also fulfil the object and purpose test.[402] Thus, while the scope and content of the disconnection clause is normally covered by the original consent, if the regulation referred to in that clause will be modified, such modification may only be allowed to the extent that it does not "affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations [or] relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole", as stipulated in article 41, paragraph 1 (*b*), of the Convention.

294.   Like *inter se* modification, a disconnection clause makes it possible for a limited group of parties to enhance the objectives of the treaty by taking measures that correspond to their special circumstances. But just like *inter se* agreements, this practice creates the possibility of undermining the original treaty regime. The actual effect of a disconnection clause depends on its specific wording. Their common point, however, is that they seek to replace a treaty in whole or in part with a different regime that should be applicable only between certain parties. The real substance of the clause is not apparent on its surface but lies in the regime referred to in the clause. It is the conformity of the substance of that regime with the treaty itself where the real point of concern lies. From the perspective of other treaty parties, the use of a disconnection clause might create double standards, be politically incorrect or just cause confusion.[403] To alleviate such concerns, some disconnection clauses are worded so as to be "without prejudice to the object and purpose of the present Convention". Nevertheless, even if they did not contain such a reference, the condition of conformity with object and purpose may, as pointed out above, derive from the conditions laid down for *inter se* modification. In assessing such conformity, two concerns seem relevant. First, a disconnection clause is agreed to by all the parties to a treaty. From this perspective, the practice seems unproblematic. The validity of a disconnection clause flows from party consent. On the other hand, it is not obvious that

parties are always well informed of the content of the regime to which the clause refers, and that regime may change independently of the will or even knowledge of the other parties. In such cases, the criterion concerning conformity with object and purpose will provide the relevant standard for assessing the practice of the treaty parties. As elsewhere, the consideration of whether the provisions to which the treaty refers are what Fitzmaurice called "integral" or "interdependent" provisions—that cannot be separated from the treaty—seems relevant.

### D.   *Inter se* agreements

295.   As pointed out above, during debates in the Commission on treaty conflict a distinction was constantly made between subsequent agreements among some treaty parties to *modify* the application of a treaty in their relations *inter se* and subsequent treaties in which, in addition to parties to the earlier treaty, also other States participated. The former situation (*inter se* agreements) is now covered in article 41 of the 1969 Vienna Convention.

296.   The Commission's Special Rapporteurs emphasized the practical importance of *inter se* modifications to multilateral treaties. Lauterpacht pointed out that these were a much used technique whereby treaties could be developed so as to apply better in the relations between some parties, the only question being whether such an agreement might affect the rights of the other parties to the treaty to the extent of invalidating it.[404] Fitzmaurice described the *inter se* treaty as "one of the chief instruments, increasingly in use today, whereby a given treaty situation can be changed in a desirable and perhaps necessary manner".[405] Waldock agreed that practice confirmed *inter se* agreements as "a normal method of revising general multilateral treaties".[406] Thus,

in 1906 the Geneva Convention of 1864 for the Amelioration of the Condition of Wounded in Armies in the Field was revised by a new Convention which expressly provided that, when duly ratified, it should supersede the 1864 Convention in the relations between the contracting States, but that the 1864 Convention should remain in force in the relations of parties to that Convention who did not ratify the new Convention. A similar provision was inserted in the Hague Convention of 1907 on the Laws and Customs of War on Land, which revised the earlier Convention of 1899.[407]

297.   Indeed, the conclusion of agreements between a limited number of parties to a multilateral treaty is an old practice, often provided for by the final clauses of a treaty itself.[408] Such *inter se* agreements do not necessarily derogate from the treaty. Instead, they serve to implement, update and strengthen the treaty in the relations between the parties to the modifying treaty. There is no reason in such cases not to allow them full effect.

[401] *Yearbook … 1966*, vol. I (Part Two), p. 219, summary record of the Commission's 876th meeting, held on 23 June 1966, para. 4.

[402] Tenth report on reservations to treaties by Alain Pellet, Special Rapporteur, *Yearbook … 2005*, vol. II (Part One), document A/CN.4/558 and Add.1–2, p. 141.

[403] See, for example: the speech by Serhiy Holovaty, Chairperson of the Committee on Legal Affairs and Human Rights of the Parliamentary Assembly of the Council of Europe, 7 April 2005, at the 26th Conference of European Ministers of Justice in Helsinki (available from www .coe.int/en/web/human-rights-rule-of-law/mju26-2005-helsinki); report for debate in the Standing Committee under urgent procedure, submitted by Rapporteuse Mrs. Ruth-Gaby Vermot-Mangold, concerning draft Council of Europe convention on action against trafficking in human beings, 15 March 2005 (available from http://assembly.coe.int/nw /xml/XRef/X2H-Xref-ViewHTML.asp?FileID=10806&lang=EN); P.J. Kuijper, "The conclusion and implementation of the Uruguay Round results by the European Community", EJIL, vol. 6 (1995), pp. 223–224; interim Health Protection Agency operational statement on the International Health Regulations, 12 May 2004.

[404] Second report on the law of treaties by Hersch Lauterpacht, Special Rapporteur, *Yearbook … 1954*, vol. II, document A/CN.4/87, p. 136.

[405] Third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur (A/CN.4/115) (see footnote 139 above), p. 43, para. 89 (*b*), commentary to paragraph 8 of draft article 18.

[406] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.167 and Add.1–3) (see footnote 323 above), p. 49, para. (7) of the commentary to draft article 69.

[407] *Ibid.*

[408] For a discussion of typical cases where multilateral treaties have been updated and improved by later "special" (*inter se*) agreements, see Sadat-Akhavi (footnote 21 above), pp. 114–119.

298.   For example, the 1961 Vienna Convention on Diplomatic Relations and the 1963 Vienna Convention on Consular Relations both allow the conclusion of agreements on their respective subject matters that provide more favourable treatment or confirm, supplement, extend or amplify their relevant provisions.[409] An example relating to the latter would be the agreement concluded between Czechoslovakia and Austria in 1979, in which the two States wished "to confirm, supplement and amplify the provisions of [the Vienna] Convention [on Consular Relations] in accordance with its article 73, paragraph 2, and thereby also contribute to the further development of friendly relations between the two States in conformity with the provisions of the Final Act of the Conference on Security and Co-operation in Europe".[410] Another example would be the European Convention on Consular Functions of 11 December 1967, in which member States of the Council of Europe that were parties to the Vienna Convention on Consular Relations extended the relevant privileges beyond what had been granted by that Convention, noting that these special rules had been established by virtue of the close cooperation among them.[411]

299.   An example of a treaty expressly encouraging parties to conclude agreements that implement or extend its provisions further is provided by the Treaty on the Non-Proliferation of Nuclear Weapons of 1 July 1968, article VII of which provides that "[n]othing in this Treaty affects the right of any group of States to conclude regional treaties in order to assure the total absence of nuclear weapons in their respective territories". As a consequence, several regional agreements reinforcing the prohibition of nuclear weapons at the regional level have in fact been concluded.[412]

300.   Although all the Special Rapporteurs agreed that the faculty to conclude *inter se* agreements could not be unlimited, the emphasis was initially on the need to act in good faith in consultation with other parties.[413] The Commission focused on the process of notifying the other parties of an intended *inter se* agreement.[414] A separate draft (draft article 69) on this issue emerged from the Commission's debates in 1964.[415] Much of the debate was still about notification, although Bartoš paid attention to the case where *inter se* agreements "might also have an indirect effect on the interests of the parties to the original treaty".[416] In his sixth report, Waldock presented revised draft article 67, which dealt with agreements to modify multilateral treaties between certain parties only.[417] This article was generally accepted by Governments, and in discussion within the Commission in 1966 Reuter observed that it constituted "an ingenious compromise between two needs: the need to recognize the rights of the parties to a treaty in its initial form and the need to permit the modification of the treaty in order to take account of certain international requirements".[418] This was the basis on which the United Nations Conference on the Law of Treaties adopted what became article 41 of the 1969 Vienna Convention.

*Article 41.   Agreements to modify multilateral treaties between certain of the parties only*

1.   Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

(*a*)   The possibility of such a modification is provided for by the treaty; or

(*b*)   The modification in question is not prohibited by the treaty and:

(i)   Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

(ii)   Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

2.   Unless in a case falling under paragraph 1 (*a*) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.[419]

---

[409] Article 47 of the Vienna Convention on Diplomatic Relations, and article 72 and article 73, para. 2, of the Vienna Convention on Consular Relations.

[410] Agreement on Consular Relations, signed at Prague on 14 March 1979, United Nations, *Treaty Series*, vol. 1224, No. 19752, p. 3. This agreement adds, *inter alia*, "member of the family" to the categories of persons defined in article 1 of the Vienna Convention on Consular Relations and expands the consular functions defined in the various paragraphs of article 5 of the Convention.

[411] Preamble. States members of the Council of Europe have concluded many *inter se* agreements that introduce more advanced special regimes into their relations than the general regimes of multilateral treaties that have their basis in the aim of the Council of Europe, which is "to achieve a greater unity between its members … [with a view to] facilitating their economic and social progress … by agreements and common action in economic, social, cultural, scientific, legal and administrative matters" (Statute of the Council of Europe, art. 1). See, for example, the European Convention relating to the Formalities required for Patent Applications of 11 December 1953 and the Convention on the Unification of Certain Points of Substantive Law on Patents for Invention of 27 November 1963, concluded on the basis of article 15 of the Paris Convention for the Protection of Industrial Property of 20 March 1883, as revised in 1934.

[412] See, for example, the Treaty on the Southeast Asia Nuclear Weapon-Free Zone of 15 December 1995 between the States of Southeast Asia, the South Pacific Nuclear Free Zone Treaty (Rarotonga Treaty) of 6 August 1985 between the States of the South Pacific (Australia, New Zealand and the island States of the region) and the African Nuclear-Weapon-Free Zone Treaty (Pelindaba Treaty) of 11 April 1996, establishing nuclear-weapon-free zones in, respectively, South-East Asia, the Pacific (where a protocol expressly prohibits nuclear testing) and Africa.

[413] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (see footnote 323 above), p. 47.

[414] *Yearbook … 1964*, vol. I, p. 140, summary record of the Commission's 745th meeting, held on 15 June 1964.

[415] *Ibid.*, p. 143; see also pp. 140–152.

[416] *Ibid.*, p. 272, summary record of the Commission's 764th meeting, held on 13 July 1964, para. 84.

[417] Sixth report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/186 and Add.1–7) (see footnote 34 above), pp. 86–87, 119. Paragraph 1 of draft article 67 (Agreements to modify multilateral treaties between certain of the parties only) read: "Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if: (*a*) The possibility of such modification is provided for by the treaty; or (*b*) The modification in question: (i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; (ii) Does not relate to a provision derogation from which is incompatible with the effective execution of the objects and purposes of the treaty as a whole; and (iii) Is not prohibited by the treaty."

[418] *Yearbook … 1966*, vol. I (Part II), p. 219, summary record of the Commission's 876th meeting, held on 23 June 1966, para. 9.

[419] A similar provision is also included in article 41 of the Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations (1986 Vienna Convention). They deal with the case of agreement between two or more parties to a multilateral treaty to modify the treaty as between

301.    *Inter se* agreements give rise to two types of legal relations: the "general" relations that apply between all the parties to the original treaty and the "special" relations that apply between the States parties to the *inter se* agreement. Situations of this kind are not, however, peculiar to *inter se* agreements. For example, the option to object to or accept reservations can lead to a multilateral treaty having, on the one hand, comprehensive validity among the parties at large and, on the other, restricted validity between them and the States making reservations.[420]

302.    An analogous situation may also arise in the process of treaty amendment when some of the parties undertake to revise the treaty but not all parties agree to the revision. In such a case, the treaty remains in force in its original form for the parties that do not participate in the amendment.[421] The same is true in regard to parties that do not ratify amendments: the original treaty remains in force between them, while the amended treaty enters into force for the others.[422] The difference between "amendment" and *inter se* agreements under article 41 is that the purpose of the latter is not to revise the original treaty, merely to modify its application in relations between certain parties.[423] Article 41 is intended to cover only the latter case.[424]

303.    Article 41 seeks a compromise between two requirements: that of meeting the needs of a limited number of parties wishing to regulate their relations by *inter se* rules and that of allowing the other parties to continue applying the treaty regime in its initial form. It recognizes the right of parties to a multilateral treaty to create a special regime through an *inter se* agreement but, by placing strict conditions on the exercise of that right, seeks to protect the general regime of the treaty.

### 1.  The conditions applicable to the conclusion of *inter se* agreements

304.    A treaty may of course either expressly allow or expressly prohibit the conclusion of *inter se* agreements,

either wholly or in part. When a treaty is silent, or to the extent that it is so, the question of their permissibility emerges. There may be cases where a modification might affect the interests or rights of the other parties to the treaty or the execution of the object and purpose of the treaty. For those reasons, article 41 of the 1969 Vienna Convention subjects the conclusion of *inter se* agreements to strict conditions.[425] An *inter se* agreement is permissible when it:

> (i)  Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

> (ii)  Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

#### (a)  *Preservation of the rights and interests of the parties to the original treaty*

305.    Article 41, paragraph (1) (*b*) (i), sets out the first of the conditions that an *inter se* agreement must satisfy, namely that the agreement must not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations. This seems natural.[426] The legal effects of an *inter se* agreement are limited to its parties. They remain bound by the original treaty and must continue to observe it in their relations with the other parties as if the *inter se* agreement did not exist. However, in some cases the drafters of the original treaty may have expressly foreseen and permitted particular types of *inter se* deviation. For example, article XXIV of GATT provides for the formation and maintenance of "customs unions" and "free-trade areas" on condition that the conditions of commerce under them "on the whole [must not] be higher or more restrictive than the general incidence" of such duties and regulations before the formation of the union. The assumption here is, clearly, that RTAs do not generally undermine the multilateral free trade system. Nonetheless, they may also create vested interests and counteract any wider trade harmonization. In any case, such agreements have frequently been referred to in the WTO dispute settlement system, and there has certainly

---

themselves only. Such *inter se* agreements may be rationalized as a case of either *lex posterior* or *lex specialis*. Whichever rationale is used, however, the provision operates similarly.

[420] See P. Reuter, *Introduction au droit des traités*, 3rd ed. revised by P. Cahier, Paris, Presses Universitaires de France, 1995, p. 76.

[421] See the statement by Mr. Yasseen at the Commission's 746th meeting, held on 16 May 1964, *Yearbook … 1964*, vol. I, pp. 151–152, para. 51.

[422] See the statement by Mr. Castrén at the Commission's 752nd meeting, held on 26 June 1964, *ibid.*, p. 190, para. 67.

[423] The Commission has rejected the use of the term "revision" because of its political connotation, opting for the term "amendment" to denote alteration of a multilateral treaty by all the parties and "modification" to denote alteration of a multilateral treaty by an *inter se* agreement, an event dealt with in a separate article. See the discussion at the Commission's 747th meeting, held on 17 May 1964, *ibid.*, pp. 152–157.

[424] The Commission nonetheless felt it necessary to spell out the distinction in its report to the General Assembly by saying: "there is an essential difference between amending agreements designed to amend a treaty between the parties generally and agreements designed *ab initio* to modify the operation of the treaty as between certain of the parties only, that is, as *inter se* agreements. Although an amending instrument may equally turn out to operate only between certain of the parties, the Commission considered that a clear-cut distinction must be made between the amendment process *stricto sensu* and *inter se* agreements modifying the operation of the treaty between a restricted circle of the parties" (*ibid.*, vol. II, pp. 195–196, para. (9), commentary to article 66).

[425] See the statement by Sir Humphrey Waldock at the Commission's 860th meeting, held on 27 May 1966: "However, the Commission attached importance to article 67 and by specifying fairly strict conditions in paragraph 1, had recognized that *inter se* agreements could represent a potential threat to the interests of the other parties to the original agreement" (*Yearbook … 1966*, vol. I (Part II), p. 128, para. 88). Article 22 (*b*) of the draft convention on the law of treaties in the Harvard Research in International Law (see footnote 353 above), pp. 1016–1024, laid down similar conditions for *inter se* agreements. See also F. Capotorti, "L'extinction et la suspension des traités", *Recueil des cours de l'Académie de droit international de La Haye, 1971-III*, vol. 134, p. 509, and Sadat-Akhavi (footnote 21 above), pp. 57–59.

[426] That the *inter se* agreement must not add to ("affect") the performance of their obligations by the other parties was incorporated in article 41 in response to a statement by Mr. Paredes. Mr. Paredes remarked that it was essential that an *inter se* agreement should not impose greater obligations or burdens on them. He gave the example that an *inter se* agreement might make provision for navigation by vessels of deeper draught or for navigation at other periods of the year than those specified in the original treaty and so impose greater obligations or burdens on other parties to the original treaty that were not parties to the *inter se* agreement. See summary record of the Commission's 764th meeting, *Yearbook … 1964*, vol. I, p. 272, para. 79. See also the commentary to article 22 (*b*) of the draft convention on the law of treaties in the Harvard Research in International Law (footnote 353 above), pp. 1016–1024.

not been any suggestion that they have been made *a priori* in violation of GATT.[427]

306. On the other hand, GATT contains no rules that would apply should two or more members wish to conclude an *inter se* agreement to *restrict* trade between themselves. In the absence of such rules, there appears to be nothing to prevent members from concluding an *inter se* agreement to the effect that in their dealings with each other they will not invoke, say, articles III and XI of GATT[428] with respect to what they feel to be justified trade restrictions. Such an agreement would affect the rights and obligations of the other members of WTO but, as it would do so beneficially, the condition set in article 41 would be satisfied.[429]

307. Sometimes an *inter se* agreement might not directly infringe the rights of the other parties, though it may nevertheless have the potential to damage their interests.[430] It is generally assumed, however, that participation in a multilateral treaty creates a community of interests and a solidarity implying an entitlement for the parties to express their views on the compatibility of special arrangements concluded between some of them with the overall regime of the treaty. This is particularly the case for treaties aimed at unifying the rules of law in specific domains. This idea is reflected in article 311, paragraph 3, of the United Nations Convention on the Law of the Sea, which provides that *inter se* agreements applicable to relations between parties to the Convention must not affect the "*application of the [Convention's] basic principles\**" or the other States parties' "enjoyment … of their rights or the performance of their obligations under [the] Convention".

308. What the "obligation of solidarity" amounts to is, of course, difficult to say *in abstracto*. In most cases, this is likely to be covered by the second condition laid out in article 41, according to which an *inter se* agreement may not "relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole".

   (b)  *Preservation of the object and purpose of the multilateral treaty*

309. The concept of incompatibility with the object and purpose of a treaty was first set forth by the International Court of Justice in the *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide* case (1951)[431] and has been increasingly accepted and applied, in particular to reservations. The same concept also has a prominent place in several articles of the 1969 Vienna Convention: articles 18 (obligation not to defeat the object and purpose), 19 (reservations), 31 (interpretation), 41 (*inter se* agreements), 58 (termination and suspension by *inter se* agreement) and 60 (material breach). The concept of object and purpose had received little systematic treatment in the literature until the Commission's reports on reservations addressed these questions in depth.[432] The concerns expressed in those debates are not essentially different from concerns that also seem relevant for determining the permissibility of *inter se* agreements under article 41, as well as under article 58, paragraph (1) (*b*) (ii), which deals with the suspension of the operation of a multilateral treaty.[433]

310. During preparatory work for the 1969 Vienna Convention, debate in the Commission focused on the distinction between treaties containing (merely) reciprocal obligations and treaties whose obligations were non-reciprocal—that is to say, of a "more absolute type". In the former case, *inter se* agreements did not pose any grave problems. Their permissibility followed from the fact that they normally only affected bilateral relationships or, if their effects went further, were positive from the perspective of the other parties.[434] The *inter se* agreement could be seen as a development of the treaty, fully in line with its ethos and its object and purpose.

311. However, in the case of obligations that could not be broken down into bilateral relationships, an *inter se* agreement might more easily be understood to be contrary to the object and purpose of a treaty. During the Commission's discussions, non-reciprocal treaties were characterized in terms of the "absolute", "integral" or "interdependent" nature of their obligations.[435] Although none of this language ("absolute", "integral", "interdependent") found its way into article 41, there has been wide agreement that not all treaties have the same character in this regard. Thus, for example, article 60, paragraph 2 (*c*), of the 1969 Vienna Convention provides a special rule on invoking breach where "the treaty is of such a character that a material breach of its provisions by one party radically changes the position of every party

---

[427] See, for example, *Turkey—Restrictions on Imports of Textile and Clothing Products* (footnote 88 above), para. 9.97 ("we are well aware that regional trade agreements have greatly increased in number and importance since the establishment of GATT 1947 and today cover a significant proportion of world trade"). As of January 2005, WTO had been notified of 312 RTAs, 170 of which remained in force. See I. van Damme, "What role is there for regional international law in the interpretation of the WTO agreements?", in L. Bartels and F. Ortino (eds.), *Regional Trade Agreements and the WTO Legal System*, Oxford, Oxford University Press, 2006, p. 553.

[428] These articles respectively proscribe discrimination against imported products in favour of domestic products and the application of quantitative restrictions at frontiers.

[429] See Pauwelyn, "The role of public international law in the WTO…" (footnote 43 above), pp. 548–549.

[430] See the statements by Mr. Verdross and Mr. Castrén at the Commission's 860th meeting, *Yearbook … 1966*, vol. I (Part II), p. 126, paras. 58–59.

[431] *Reservations to the Convention on Genocide* (see footnote 326 above).

[432] For a recent exposé and discussion, see the tenth report on reservations to treaties by Alain Pellet, Special Rapporteur (A/CN.4/558 and Add.1–2) (footnote 402 above). See also I. Buffard and K. Zemanek, "The 'object and purpose' of a treaty: an enigma?", *Austrian Review of International and European Law*, vol. 3, No. 3 (1998), p. 311, and J. Klabbers, "Some problems regarding the object and purpose of treaties", *The Finnish Yearbook of International Law*, vol. 8 (1997), p. 138.

[433] See article 55 (art. 58 of the 1969 Vienna Convention) of the draft articles on the law of treaties with commentaries, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, part II, pp. 252.

[434] See, for example, the third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur (A/CN.4/115) (footnote 139 above), pp. 43–44, paras. 88–89.

[435] See, generally, *ibid.*, pp. 41–45, paras. 77–94; *Yearbook … 1964*, vol. II, document A/5809, p. 188, para. (10); third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (footnote 323 above), p. 39, para. (17). See also paras. 109 and 262 above.

with respect to the further performance of its obligations under the treaty". Likewise, article 42 (*b*) (ii) of the Commission's draft articles on responsibility of States for internationally wrongful acts (2001) makes reference to what the commentary calls "interdependent obligations"—that is, obligations the breach of which "is of such a character as radically to change the position of all the other States to which the obligation is owed".[436]

312.   There is no doubt about the relevance of the distinction between the two groups of treaties. The 1961 Vienna Convention on Diplomatic Relations and the 1963 Vienna Convention on Consular Relations are examples of treaties containing essentially reciprocal obligations. The parties may derogate at will from those obligations in their relations *inter se*. This is not so in regard to a disarmament treaty, for example, where the performance by one party of its obligations is a prerequisite for the performance by the other parties of theirs. A breach by one party is in effect a breach *vis-à-vis* all the other parties.[437] A human rights convention, for its part, is an absolute or "integral" treaty. The obligations it imposes are independent of any expectation of reciprocity or performance on the part of other parties of their obligations.

313.   It is above all *inter se* agreements modifying treaties containing such non-reciprocal (*i.e.* "integral", "interdependent" or "absolute") obligations that are likely to affect the execution of the object and purpose of the treaties and that are, therefore, prohibited under article 41, paragraph 1 (*b*) (ii), of the 1969 Vienna Convention. Nevertheless, the question of the procedure through which "incompatibility" is determined will remain. According to the main rule set out by the International Court of Justice in its advisory opinion concerning *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide*, each State will appraise for itself whether or not a reservation made by a State is compatible with the object and purpose of a treaty and decide what action it should take regarding that reservation.[438] The matter is left to the discretion of the parties—although the use of that discretion is, of course, subjected to the duty of good faith.[439] There is no evidence that the situation as regards *inter se* agreements is any different: it is open to any party to a multilateral treaty to object to the conclusion of an *inter se* agreement on the ground that the agreement is likely to frustrate execution of the object and purpose of the treaty.[440]

(c)   *Other situations*

314.   There may of course be situations where the drafters of a multilateral treaty, motivated by a desire to uphold and consolidate its rules, insert clauses that prohibit the parties from concluding agreements that derogate from those rules or insert clauses guaranteeing the primacy of a rule contained in the multilateral treaty over a rule contained in a special agreement, thereby establishing a hierarchy of treaty rules. The 1982 United Nations Convention on the Law of the Sea is an example of this. Its article 311, paragraph 6, provides that "States Parties agree that there shall be no amendments to the basic principle relating to the common heritage of mankind set forth in article 136 and that they shall not be party to any agreement in derogation thereof".[441]

315.   Another conflict clause might allow the parties to conclude *inter se* agreements provided that they do not contravene the rules established by the original treaty. This is the case, for example, with article 19 of the Paris Convention for the Protection of Industrial Property, amended in 1979. However, in most cases treaties do not contain clauses permitting or prohibiting *inter se* agreements. In this case, the faculty of the parties to conclude *inter se* agreements will have to be determined in accordance with the criteria in article 41, the point of which is to allow modification when and to the extent that it does not undermine the unity or effectiveness of the treaty regime.

### 2.   Notification of the other parties and their reaction

316.   According to article 41, paragraph 2, of the 1969 Vienna Convention, the other parties must be notified of an *inter se* agreement and notification must be given in time for those parties to react.[442] In 1964, the Commission was of the view that notification should be given of every proposal to conclude an *inter se* agreement, but subsequently, following comments from the Government of the Netherlands, it decided that the requirement should be to notify the other parties of every intention to conclude an *inter se* agreement except when the treaty itself made provision for the conclusion of such agreements.[443] In the latter instance, the treaty may require notification both of an *inter se* agreement and of the termination of such an agreement. For example, the European Convention on Recognition and Enforcement of Decisions concerning Custody of Children and on Restoration of Custody of

---

[436] See the commentary to article 42 of the draft articles on responsibility of States for internationally wrongful acts (especially para. (13)), *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 119. The examples mentioned are those of "a disarmament treaty, a nuclear-free zone treaty, or any other treaty where each party's performance is effectively conditioned upon and requires the performance of each of the others".

[437] For an example, see *Yearbook ... 1966*, vol. II, document A/6309/Rev.1, part II, p. 255, para. (8). See also the commentary to article 42 (*b*) (ii) of the Commission's draft articles on responsibility of States for internationally wrongful acts (especially para. (13)), *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 117.

[438] *Reservations to the Convention on Genocide* (see footnote 326 above), p. 26.

[439] See Reuter, *Introduction au droit des traités*, 2nd rev. ed. (footnote 75 above), pp. 74–75.

[440] See D. N. Hutchinson, "Solidarity and breaches of multilateral treaties", *British Year Book of International Law 1988*, vol. 59, p. 190.

[441] See also the commentary to article 311, para. 6, in M. H. Nordquist (ed.), *United Nations Convention on the Law of the Sea 1982: A Commentary*, vol. V, Dordrecht, Martinus Nijhoff, 1989, pp. 241 *et seq.*

[442] This provision was, at the time of its adoption, an example of the progressive development of international law rather than of codification. See the statement by Sir Humphrey Waldock at the Commission's 764th meeting, *Yearbook ... 1964*, vol. I, pp. 273–274, para. 102. This view is borne out by the fact that, when the Commission discussed notification, some members opined that notification was necessary only in the case of *inter se* agreements not provided for in multilateral treaties, while others considered it necessary only in the case of a multilateral treaty concluded between a small number of States. See the statements by Mr. Ago at the Commission's 754th meeting, held on 29 June 1964, *ibid.*, p. 203, para. 85, and by Mr. Tunkin at the Commission's 764th meeting, *ibid.*, p. 273, para. 97.

[443] See the sixth report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/186 and Add.1–7) (footnote 34 above), p. 87, para. 3.

Children, of 20 May 1980, provides, in article 20, paragraph 2, that when two or more contracting States have by some means, including an agreement between themselves, created a special system of recognition or enforcement, they may apply that system in place of the Convention or of any part of it. Parties to the Convention wishing to take that step must "notify their decision to the Secretary General of the Council of Europe" and "[a]ny alteration or revocation of [their] decision must also be notified".

317.    Article 41, paragraph 2, provides that parties wishing to conclude an *inter se* agreement ("the parties in question") must notify the other parties of their intention. While notification may be given by one of the "parties in question", a treaty may provide that it be given through the medium of the depositary of the treaty.[444] Although notification is usually given by States or the depositaries of treaties, cases have arisen in practice where notification can be considered to have been given because the intention to modify is universally apparent from the object of the *inter se* agreement.

318.    If a notification is to protect the interests of the other parties, it must reach them in time. Some Commission members were of the opinion that the other parties should be informed immediately of the intention to conclude an *inter se* agreement.[445] Others felt that, quite apart from the difficulty of communicating an intention, information should be provided once the agreement had been concluded and published.[446] The Commission decided that the parties should be given time to react and that that could only be done if concrete proposals were communicated to them, whence the wording in paragraph 2 to the effect that the other parties must be informed of the "modification to the treaty for which [the agreement] provides". In other words, notification must be given at a relatively advanced stage in the negotiation of the *inter se* agreement but nevertheless sufficiently prior to its conclusion so as to enable a meaningful reaction.

3.    CONSEQUENCES FOR BREACH OF THE MULTILATERAL TREATY BY PARTIES TO AN *INTER SE* AGREEMENT

319.    The text of article 41 leaves two questions open. The first is that of the legal effect of the conclusion of an *inter se* agreement in violation of article 41, paragraph 1, that constitutes a material breach of the treaty; the second is that of the legal effect of an objection made after notification has been given under article 41, paragraph 2.[447] However, it seems clear that an *inter se* agreement concluded in deviation from the original agreement is not thereby invalidated. It would seem to follow from the considerations set out above regarding a conflict of treaties with non-identical parties that it should depend on the interpretation of the original treaty as to what consequences

should follow. In addition, the consequences of breach of treaty are dealt with in article 60 of the 1969 Vienna Convention and through the regime of State responsibility. This is not the place to deal with these issues. Nevertheless, two comments may be in order. First, the collective termination or suspension of the original treaty make take place through the unanimous agreement of those parties to the original treaty that are not parties to the modification if the latter constitutes a material breach—*i.e.* relates to a provision that is essential to its execution. Second, individual decisions to suspend the operation of a treaty in whole or in part are permitted in two cases. A party that is especially affected by an (illegal) modification may suspend the operation of the treaty in relations between itself and the parties to the offending *inter se* agreement. And when a material breach constituted by a modification radically changes the position of every other party with respect to the performance of their obligations under the treaty, any of the affected parties may similarly suspend the operation of the treaty with respect to itself.[448]

4.    CONCLUSION ON SUCCESSIVE AGREEMENTS

320.    The law on conflicts between successive agreements is largely based on presumptions about party intent and the object and purpose of treaties. Conflict resolution here is inextricable from treaty interpretation. Neither the earlier nor the later treaty enjoys automatic preference. It is by now well settled that in cases of conflict, the issue is not with invalidity but with relative priority between treaties. That approach is also reflected in article 30 of the 1969 Vienna Convention, which, while largely codifying an open-ended earlier practice, leaves some of the most difficult questions open. For example, it is clearly unsatisfactory that a party that has concluded incompatible agreements will have the right of election as to which agreement it will fulfil and which parties will have to satisfy themselves with State responsibility.

321.    The question of special types of treaties that might enjoy priority owing to their nature was also left open by the 1969 Vienna Convention. While Lauterpacht and Fitzmaurice both felt that there was reason to assume the existence of such categories—those labelled by the latter "integral" or "interdependent" treaties—article 30 refrains from mentioning them, perhaps because Waldock assumed (wrongly) that the problem would be taken care of by the provision on *jus cogens*. In any case, this does not accord with some of the practice in regard to human rights treaties. However, something of this debate was reflected in the limits that article 41 places on *inter se* modification—limits which, by virtue of article 30, paragraph 5, also apply to other subsequent treaties and which might also have some relevance (as suggested above) in the discussion of disconnection clauses.

322.    The faculty to conclude *inter se* agreements is an important and widely accepted instrument through which a limited number of parties to a treaty may seek to guarantee the most appropriate and effective implementation of the original treaty between themselves. Nevertheless, article 41 of the 1969 Vienna Convention also limits the

---

[444] See the commentary to article 311, para. 4, of the United Nations Convention on the Law of the Sea in Nordquist (ed.) (footnote 441 above), p. 240.

[445] See the version of draft article 67 (the future article 41) proposed by Sir Humphrey Waldock at the Commission's 860th meeting, *Yearbook ... 1966*, vol. I (Part II), p. 123.

[446] See the statement by Mr. Reuter at the Commission's 754th meeting, *Yearbook ... 1964*, vol. I, p. 201, para. 51.

[447] See the statement by Mr. Briggs at the Commission's 860th meeting, *Yearbook ... 1966*, vol. I (Part II), p. 126, paras. 71 *et seq.*

[448] Article 60, paragraph 2, of the 1969 Vienna Convention. See also, for example, Reuter, *Introduction au droit des traités*, 2nd rev. ed. (footnote 75 above), pp. 161–162.

faculty to conclude *inter se* agreements, especially if they would go too firmly against the object and purpose of the original treaty.

323.    Much of the law is open to *ad hoc* regulation by the adoption of specific conflict clauses. In practice, however, States have often been reluctant to establish clear hierarchies in this way. The turn to "coordination" in the application of several treaties may seem a practical way to proceed, especially when the treaties form part of what has been called a "regime"—that is, are institutionally linked and intended to achieve parallel objectives. However, such coordination is problematic across regimes,

that is to say, where a "legislative" approach to treaty conflict seems least pertinent. Those are also the situations in which the *lex posterior* rule has least application. In such situations, the emphasis should be on guaranteeing the rights established in the relevant conventions. If a right should be overruled because of its incompatibility with another treaty, then State responsibility should follow. It is uncertain whether this is a realistic expectation within regime-specific treaty "management". For the settlement of conflicts across regimes and even *inside* regimes when the treaties have established clearly specified (subjective) rights, recourse to general dispute settlement organs would seem the best alternative.

CHAPTER IV

## Relations of importance: Article 103 of the Charter of the United Nations, *jus cogens* and obligations *erga omnes* as conflicting rules

324.    Much of the concern over the fragmentation of international law emerges from awareness of the "horizontal" nature of the international legal system. The rules and principles of international law are not in a hierarchical relationship with each other. Nor are the different sources (treaty, custom, general principles of law) ranked in any general order of priority. This is a key difference between the international and domestic legal systems. Whereas domestic law is organized in a strictly hierarchical way, with the constitution regulating the operation of the system at the highest level, there is no such formal constitution in international law and, consequently, no *general* order of precedence among international legal rules.

325.    Nevertheless, this has never meant that one could not, in particular cases, decide on an order of precedence among conflicting rules. In the previous chapters we have seen how relations of speciality *versus* generality or those of temporal succession are sometimes used as criteria on the basis of which one rule may be preferred over another. Nevertheless, we also saw how the operation of those relationships cannot be determined abstractly. The applicability of *lex specialis* or *lex posterior* depended on a prior assessment of the relevance of a particular criterion. This reflected the pragmatic sense that some criteria are, in particular contexts, more important than others, for example because they better secure important interests or protect important values.

326.    There has never been any doubt about the fact that some considerations in the international world are more important than others and must be legally recognized as such—although how that sense of importance could be articulated has been the subject of lasting academic controversy. Here there is no suggestion that a position be taken on that controversy—for example, on the role of natural law or political justice in international law or on whether or to what extent international law might be in a process of "constitutionalization". Irrespective of the difficulty of finding a general vocabulary that would express the role of the sense of importance of particular norms, the practice of international law has always recognized the presence of some norms that are superior to other norms and must therefore be given effect. It is not

without significance that the International Court of Justice could, in the *Corfu Channel* case (1949), limit State sovereignty by what it called "elementary considerations of humanity"[449] and, in *Legality of the Threat or Use of Nuclear Weapons*, presume the existence of "intransgressible principles of international customary law",[450] without this having raised fundamental objections.

327.    There is an important practice that gives effect to the informal sense that some norms are more important than others and that, in cases of conflict, those important norms should be given effect. In the absence of a general theory about where to derive this sense of importance from, practice has developed a vocabulary that gives expression to something like an informal hierarchy in international law. This chapter deals with three aspects of that vocabulary: Article 103 of the Charter of the United Nations and the concepts of peremptory norms (*jus cogens*) and obligations *erga omnes*.

### A.    Article 103 of the Charter of the United Nations

328.    The Covenant of the League of Nations contained a provision suggesting that the Covenant itself was "higher law" in respect to other international obligations.[451] Article 20 of the Covenant was drafted as follows:

> The Members of the League severally agree that this Covenant is accepted as abrogating all obligations or understandings *inter se* which are inconsistent with the terms thereof, and solemnly undertake that they will not hereafter enter into any engagements inconsistent with the terms thereof.

> In case any Member of the League shall, before becoming a Member of the League, have undertaken any obligations inconsistent with the terms of this Covenant, it shall be the duty of such Member to take immediate steps to procure its release from such obligations.

329.    This provision was the starting point for drafting Article 103 of the Charter of the United Nations. At San

---

[449] *Corfu Channel case*, Judgment of 9 April 1949, *I.C.J. Reports 1949*, p. 4, at p. 22.

[450] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 122 above), p. 257, para. 79.

[451] See especially H, Lauterpacht, "The Covenant as the 'higher law'", *British Year Book of International Law 1936*, vol. 17, p. 54.

Francisco there was already a general understanding that obligations under the Charter should prevail over Members' other treaty commitments.[452] After minor disagreements over the formulation of this principle, the present text was adopted unanimously and reads as follows:

> In the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail.

330. Unlike the Covenant, Article 103 also extends the priority of Charter provisions to Members' future agreements, as well as to their agreements with non-members of the United Nations.

### 1. What are the prevailing obligations?

331. Article 103 does not say that the *Charter* prevails, but refers to *obligations under the Charter*. Apart from the rights and obligations in the Charter itself, this also covers duties based on binding decisions by United Nations bodies. The most important case is that of Article 25, which obliges Member States to accept and carry out resolutions of the Security Council that have been adopted under Chapter VII of the Charter. Even if the primacy of Security Council decisions under Article 103 is not expressly spelled out in the Charter, it has been widely accepted in practice as well as in doctrine.[453] The question has sometimes been raised of whether Security Council resolutions adopted *ultra vires* also prevail by virtue of Article 103.[454] Since obligations for Member States of the United Nations can only derive from resolutions that are taken within the limits of its powers, decisions *ultra vires* do not give rise to any obligations to begin with. Hence, no conflict exists. The issue is similar with regard to non-binding resolutions adopted by United Nations organs, including the Security Council. These are not covered by Article 103.[455]

332. Finally, the Security Council often suggests that its resolutions prevail not only over other international obligations but also over private law contracts, licences, permits and the like.[456] In principle, there is nothing troubling in viewing agreements between States subjected to municipal law as international agreements for present purposes. But as regards the effect of Security Council resolutions on pure private law instruments, the assumption must be that they are not automatically invalidated but that the obligation is on States not to give effect to such contracts. This may give rise to difficult issues of liability and compensation for non-performance, but here it is not necessary to enter into that set of problems.

### 2. What does it mean for one obligation to prevail over another?

333. What happens to an obligation over which Article 103 establishes precedence? Most commentators agree that the question here is not of validity but of priority. The lower-ranking rule is merely set aside to the extent that it conflicts with the obligation under Article 103.[457] This was how Waldock saw the matter during the Commission's debates on article 30 of the 1969 Vienna Convention: "[T]he very language of Article 103 makes it clear that it prescribes the *priority* of the Charter, not the *invalidity* of treaties conflicting with it."[458]

334. A small number of authors have developed a more extensive view of the effects of Article 103—that is, the invalidity of the conflicting treaty or obligation—on the basis of a view of the Charter as a "constitution".[459] A clear-cut answer to this question (priority or invalidity?) cannot be deduced from the text of Article 103. Yet the word "prevail" does not grammatically imply that the lower-ranking provision would become automatically null and void, nor even suspended. The State is merely prohibited from fulfilling an obligation arising under that other norm. Article 103 says literally that in the event of a conflict, the State in question should fulfil its obligation under the Charter and perform its duties under other agreements in as far as compatible with obligations under the Charter.[460] This also accords with the drafting materials for the Charter, which state that

---

[452] R. Bernhardt, "Article 103", in B. Simma (ed.), *The Charter of the United Nations: A Commentary*, 2nd ed., vol. II, New York, Oxford University Press, 2002, p. 1292.

[453] To use the words of Bernhardt, "[a]s far as [M]embers of the [United Nations] are bound by Art. 25 'to accept and carry out the decisions of the Security Council in accordance with the present Charter', they are also bound, according to Art. 103, to give these obligations priority over any other commitments" (*ibid.*, pp. 1295–1296). See further, for example, Dupuy, "L'unité de l'ordre juridique international…" (footnote 14 above), p. 240, and Zemanek, "The legal foundations of the international system…" (footnote 31 above), p. 230. For an alternative view, see D. Bowett, "The impact of Security Council decisions on dispute settlement procedures", EJIL, vol. 5 (1994), p. 89, at p. 92: "A Council decision is *not* a treaty obligation. The obligation to comply may be, but the decision *per se* is not."

[454] S. Lamb, "Legal limits to United Nations Security Council powers", in G.S. Goodwin-Gill and S. Talmon (eds.), *The Reality of International Law: Essays in Honour of Ian Brownlie*, Oxford, Clarendon Press, 1999, p. 361; E. De Wet, *The Chapter VII Powers of the United Nations Security Council*, Oxford, Hart, 2005; N. Blokker, "Is the authorization authorized? Powers and practice of the UN Security Council to authorize the use of force by 'coalitions of the able and willing'", EJIL, vol. 11, No. 3 (2000), p. 541; G. Nolte, "The limits of the Security Council's powers and its functions in the international legal system: some reflections", in M. Byers (ed.), *The Role of Law in International Politics: Essays in International Relations and International Law*, Oxford, Oxford University Press, 2000, p. 315.

[455] For a discussion, see R. Kolb, "Does Article 103 of the Charter of the United Nations apply only to decisions or also to authorizations adopted by the Security Council?", *Zeitschrift für ausländisches öffentliches Recht und Völkerrecht*, vol. 64 (2004), p. 21.

[456] See, for example, Security Council resolutions 1160 (1998), 1127 (1997), 1173 (1998), 1267 (1999) and 1298 (2000).

[457] See, for example, Dupuy, "L'unité de l'ordre juridique international…" (footnote 14 above), p. 243; Zemanek, "The legal foundations of the international system…" (footnote 31 above), p. 230.

[458] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (see footnote 323 above), p. 36, para. (8) of the commentary to draft article 65.

[459] See Bernhardt, "Article 103" (footnote 452 above), p. 1297. Another commentator has argued that conflicts between obligations under treaties and obligations under the Charter lead to the same result as conflicts with *jus cogens*—invalidity. See B. Fassbender, "The United Nations Charter as constitution of the international community", *Columbia Journal of Transnational Law*, vol. 36 (1998), p. 590. See also McNair (footnote 58 above), p. 217.

[460] See further E. Sciso, "On Article 103 of the Charter of the United Nations in the light of the Vienna Convention on the Law of Treaties", *Österreichische Zeitschrift für öffentliches Recht und Völkerrecht*, vol. 38 (1987), p. 161, at pp. 169–170, and P.-M. Dupuy, "The constitutional dimension of the Charter of the United Nations revisited", *Max Planck Yearbook of United Nations Law*, vol. 1 (1997), p. 1, at pp. 13–15. Goodrich and Hambro conclude that "[i]t is to be noted that this Article [103] does not provide for the automatic

it would be enough that a conflict should arise from the carrying out of an obligation of the Charter. It is immaterial whether the conflict arise because of intrinsic inconsistency between the two categories of obligations or as the result of the application of the provisions of the Charter under given circumstances…[461]

335.   A conflict between an obligation under the Charter and some other obligation may arise in a purely *ad hoc* manner. This is what happened with the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation in the *Lockerbie* case, for example.[462] It is hard to see how the drafters could have intended that such a conflict would render null and void the conflicting treaty—in the *Lockerbie* case, the whole of the Convention. This would be senseless. From a teleological perspective, a better view is to see Article 103 as a means of ensuring that Charter obligations can be performed effectively, not abolishing other treaty regimes, however incidental the conflict might be.

336.   In another recent case, the High Court of Justice in the United Kingdom delivered its judgment affirming the superiority of Security Council resolutions over the human rights obligations of the United Kingdom.[463] The claimant—a dual citizen of Iraq and the United Kingdom—had been detained by British forces in Iraq for 10 months without being charged. He contended that the detention was in breach of his rights under the Human Rights Act 1998. From the viewpoint of normative conflicts, the judgment is particularly relevant in two regards. First, the Court tested the legality of the claimant's detention against what it called "the context of international human rights law".[464] However, the Court read the detention itself as a human rights measure in a way that enabled it to bypass the question of conflict:

The Security Council, charged as it is with primary responsibility for maintaining international peace and security, has itself determined that a multinational force is required. Its objective is to restore such security as will provide effective protection for human rights for those within Iraq. Those who choose to assist the Security Council in that purpose are authorised to take those steps, which include detention, necessary for its achievement.[465]

337.   The Court added, nevertheless, that a hierarchy was also implied:

For the purposes of restoring and maintaining that peace and security without which there can be no human rights within Iraq, the Security Council has authorised such detention as is necessary for imperative reasons of security in accordance with Article 78 of Geneva IV.[466]

It may be noteworthy that in "testing the legality of the detention", the Court never took up the question of possible *jus cogens*.[467]

338.   Second, the Court, discussing the relationship between the Charter of the United Nations and all other treaty obligations, concluded that Article 103 of the Charter also embraces resolutions of the Security Council and that actions taken in pursuance of them prevail over other treaty obligations—even of a human rights character—such as those deriving from the European Convention on Human Rights.[468] Thus, the Court did not find a violation of the claimant's rights.

339.   Finally, the primacy of Article 103 is expressly mentioned in article 30, paragraph 1, of the 1969 Vienna Convention:

Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.

340.   The context of this provision is informative. As discussed in chapter III above, article 30—which deals with the application of "successive treaties relating to the same subject-matter"—does not presume that the treaty being set aside under it would be invalid, but merely set aside in order to apply the higher-ranking treaty and to the extent necessary. In fact, to say this is simply to point to the manner in which the hierarchical effect of obligations under the Charter differs from *jus cogens*, conflict with which renders other norms invalid or terminates them.[469]

3.   SPECIAL CASES

(a)   *Conflicts with treaties between United Nations Member States and non-members*

341.   Conflicts between obligations under the Charter and treaties concluded between Member States and non-member States of the United Nations give rise to difficult legal questions.[470] To use the words of the Commission itself, "[t]he precise effect of the provision in the relations between Members of the United Nations and non-member States may not be entirely clear".[471] Indeed, the text of Article 103 does not differentiate between obligations incurred among United Nations Member States and obligations of and towards non-member States. Inasmuch as

---

abrogation of obligations inconsistent with the terms of the Charter. The rule is put in such form as to be operative only when there is an actual conflict" (L.M. Goodrich and E. Hambro, *Charter of the United Nations: Commentary and Documents*, 2nd rev. ed., London, Stevens and Sons, 1949, p. 519).

[461] United Nations Conference on International Organization, Report of the Rapporteur of Committee IV/2, document 933, IV/2/42 (2) (*Documents of the United Nations Conference on International Organization*, San Francisco, 1945, vol. XIII, p. 703, at pp. 707–708), as quoted in Goodrich and Hambro (see footnote 460 above), p. 519.

[462] See section A.4 below, especially the *Lockerbie* case.

[463] *The Queen (on the application of Hilal Abdul-Razzaq Ali Al-Jedda) v. Secretary of State for Defence*, judgment of 12 August 2005, No. CO/3673/2005, [2005] EWHC 1809 (Admin).

[464] *Ibid.*, see paras. 94 *et seq.* of the judgment.

[465] *Ibid.*, para. 104.

[466] *Ibid.*, para. 108.

[467] Nevertheless, Mr. Al-Jedda was granted permission to appeal and the case was heard by the Court of Appeal in January 2006.

[468] Para. 112 of the judgment in *The Queen (on the application of Hilal Abdul-Razzaq Ali Al-Jedda) v. Secretary of State for Defence* (see footnote 463 above).

[469] It has also been argued that "[a] clear solution to the problem of conflicting obligations appears possible where a Charter provision reflects a norm of *ius cogens*. In this case, conflicting obligations are and remain invalid" (Bernhardt, "Article 103" (see footnote 452 above), p. 1298). Nevertheless, the source of invalidity in such a situation is not the Charter of the United Nations, but the rule which states that all agreements incompatible with *jus cogens* are invalid.

[470] Admittedly, owing to the fact that very few States remain outside the circle of Members of the United Nations, these questions are more theoretical than practical.

[471] Draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, part II, p. 214, para. (3) of the commentary to draft article 26.

one reads the Charter as a "constitutional" document, then there is of course no problem. For example, Bernhardt solves the question in a straightforward manner:

[T]here are good reasons for assuming that treaties concluded with third States that are in clear or at least apparent contradiction to the Charter are not only unenforceable but also invalid with respect to such States. The Charter has become the "constitution" of the international community, and third States must, in their treaty relations and otherwise, respect the obligations arising under the Charter for UN [M]embers.[472]

342.   In the same vein, Goodrich and Hambro wrote in their early commentary to the Charter:

The Charter … assumes the character of basic law of the international community. Non-[m]embers, while they have not formally accepted it, are nevertheless expected to recognize this law as one of the facts of international life and to adjust themselves to it.[473]

343.   Yet it remains the case that non-members are not formally bound by the Charter, which for them remains *res inter alios acta*.[474] In the normal course of events, Member States should not be able to rid themselves of the duty to perform their treaty obligations towards non-member States by reliance on Article 103.[475] Nevertheless, a strong doctrinal opinion tends to affirm, at least for United Nations Members, the absolute primacy of Charter obligations over conflicting obligations with non-members of the United Nations.[476] This may perhaps be rationalized by reference to article 30, paragraph 1, of the 1969 Vienna Convention, which may be read as acceptance by parties to the Convention of the Charter's pre-eminence.[477] In any case, this leaves open any responsibility that will arise towards non-members as a result of the application of Article 103.

(b)   *Conflicts with norms of customary international law of a non-peremptory character*

344.   The wording of Article 103, reading "obligations under any other international agreement", implies that only conventional obligations are targeted by that provision. Opinions on whether customary law is also covered are split, however. During the drafting of the Charter, a

formula according to which *all* other commitments, including those arising under customary law, were to be superseded by the Charter was ultimately omitted from the final text.[478] This suggests the conclusion that, at least for the drafters, Article 103 covered only other treaties. This does not, however, exclude the possibility of later developments in the law. Indeed, at least those who uphold the "constitutional" vision claim that Article 103 extends to conflicting customary law as well:

[I]t would not be correct to assume that obligations under the Charter do not also prevail in relation to these other [including customary-law-based] obligations. Article 103 must be seen in connection with Art. 25 and with the character of the Charter as the basic document and "constitution" of the international community. Therefore, the ideas underlying Art. 103 are also valid in case of conflict between Charter obligations and obligations other than those contained in treaties.[479]

345.   While some have supported this view[480], others have doubted whether Article 103 elevates the Charter above customary law.[481] Two considerations might perhaps be relevant here. First, a literal interpretation renders a clear result. However expansively one interprets "international agreements", it does not cover international custom. Second, however, and as pointed out in chapter II above, as *lex generalis*, customary law normally yields to treaties as *lex specialis*—including, one would suppose, treaties establishing an international organization such as the United Nations. In any case, the practice of the Security Council has continuously been grounded in the understanding that Security Council resolutions override conflicting customary law. As the Security Council is a creation of the Charter, it would be odd if the prevailing effect of Security Council resolutions did not extend to the Charter itself. It therefore seems sound to join the prevailing opinion that Article 103 should be read extensively, so as to affirm that Charter obligations also prevail over the customary law obligations of United Nations Member States.[482]

(c)   *Conflicts with norms of* jus cogens

346.   If United Nations Member States are unable to draw up valid agreements in dissonance with *jus cogens*, they must also be unable to vest an international organization with the power to go against peremptory norms.

[472] Bernhardt, "Article 103" (see footnote 452 above), p. 1298. See also, for example, Fassbender (footnote 459 above), p. 532; but for an alternative view see also J.-M. Thouvenin, "Article 103", in J.-P. Cot and A. Pellet (eds.), *La Charte des Nations Unies: Commentaire article par article*, 3rd rev. ed., Paris, Economica, 2005, p. 2133, at pp. 2136–2139 and especially p. 2146: "Il ne saurait alors être considéré, en lui-même, comme l'élément clé permettant de reconnaître à la Charte des Nations Unies les qualités d'une constitution de la communauté internationale" ("It cannot be regarded in itself as the crucial element that imbues the Charter of the United Nations with the character of a constitution for the international community").

[473] Goodrich and Hambro (see footnote 460 above), p. 519.

[474] See article 34 of the 1969 Vienna Convention. Lord McNair also confirms that even the Charter of the United Nations does not have the power to make the rules contained therein binding upon non-members. See McNair (footnote 58 above), p. 218.

[475] For further discussion see Sciso (footnote 460 above), pp. 167 *et seq.*

[476] See, for example, Daillier and Pellet, *Droit international public* (footnote 74 above); Dupuy, "L'unité de l'ordre juridique international…" (footnote 14 above), p. 241; A. L. Paulus, *Die internationale Gemeinschaft im Völkerrecht: Eine Untersuchung zur Entwicklung des Völkerrechts im Zeitalter der Globalisierung*, Munich, Beck, 2001, p. 113.

[477] The extent to which the 1969 Vienna Convention codifies customary international law is also relevant for present purposes.

[478] J. Combacau, *Le pouvoir de sanction de l'ONU: étude théorique de la coercition non militaire*, Paris, Pedone, 1974, p. 282. An early commentary on the Charter also confirms that the possibility of Charter obligations' pre-eminence over customary law obligations was not even considered as a question to be answered. See Goodrich and Hambro (footnote 460 above), pp. 517–518.

[479] Bernhardt, "Article 103" (see footnote 452 above), pp. 1298–1299.

[480] See, for example, A. Kaczorowska, *Public International Law,* London, Old Bailey Press, 2002, p. 21, where she states that "[a] number of commentators have suggested that this provision would apply equally to inconsistent customary law". Unfortunately, no references are provided.

[481] See, for example, N. D. White and A. Abass, "Countermeasures and sanctions", in M. D. Evans (ed.), *International Law,* Oxford, Oxford University Press, 2003, p. 505, at p. 518, arguing that "Article 103 gives obligations arising out of the [Charter of the United Nations] pre-eminence over obligations arising under any other international treaty, though it is not clear that this affects [M]ember States' customary rights".

[482] See, for example, *Application of the Convention on the Prevention and Punishment of the Crime of Genocide*, Provisional Measures, Order of 13 September 1993, *I.C.J. Reports 1993*, p. 325, at p. 440, para. 100 (separate opinion of Judge Lauterpacht).

Indeed, both doctrine and practice unequivocally confirm that conflicts between the Charter of the United Nations and norms of *jus cogens* result not in the Charter obligations' pre-eminence, but in their invalidity.[483] In this sense, the Charter is an international agreement like any other treaty. This is particularly relevant in relation to resolutions of the Security Council, which has more than once been accused of going against peremptory norms.[484]

347.    This matter came up in September 2005 before the Court of First Instance of the European Communities.[485] The cases concerned the freezing of assets of individuals and entities suspected of having links to terrorists by the Council of the European Union on the basis of resolutions adopted by the Security Council. The Court decided that the European Community was competent to order the measures. For the most part, they also fell outside the scope of judicial review. The judgment is noteworthy in two aspects.

348.    First, the Court found that, according to international law, the obligations of United Nations Member States under the Charter prevail over any other obligation, including those under the European Convention on Human Rights and the Treaty establishing the European Community. This paramountcy extended to decisions of the Security Council:

> [T]he resolutions of the Security Council at issue fall, in principle, outside the ambit of the Court's judicial review and … the Court has no authority to call in question, even indirectly, their lawfulness in the light of Community law. On the contrary, the Court is bound, so far as possible, to interpret and apply that law in a manner compatible with the obligations of the Member States under the Charter of the United Nations.[486]

349.    Second, however, this paramountcy was not absolute. In the words of the Court:

> International law … permits the inference that there exists one limit to the principle that resolutions of the Security Council have binding effect: namely, that they must observe the fundamental peremptory provisions of *jus cogens*. If they fail to do so, however improbable that may be, they would bind neither the Member States of the United Nations nor, in consequence, the Community.[487]

350.    In its subsequent analysis of the question of whether freezing applicants' rights constituted a breach of *jus cogens*, the Court found in the negative.

### 4.    Application

351.    Not surprisingly, Article 103 has most frequently been invoked in the practice of United Nations organs, especially in connection with binding decisions of the Security Council taken under Chapter VII. Although direct references to Article 103 are not very frequent, its substance appears more often.

352.    Since the beginning of the 1990s, many Security Council resolutions made under Chapter VII (*i.e.* resolutions creating obligations) have underlined their priority in relation to any other obligations. A famous reference to Article 103 is to be found in resolution 670 (1990), in which the Council decided on measures against Iraq. The resolution reads:

> *Recalling* the provisions of Article 103 of the Charter,
>
> *Acting* under Chapter VII of the Charter,
>
> … *Calls upon* all States to carry out their obligations to ensure strict and complete compliance with resolution 661 (1990) …

353.    Only a year later, the crisis on the territory of the former Yugoslavia led to numerous Security Council resolutions imposing an embargo, many of which emphasize, expressly or implicitly, their and prior resolutions' priority in relation to any other commitments.[488] Resolution 748 (1992) concerning Libya—to which the International Court of Justice referred in its order of 14 April 1992 (see below)—stated in paragraph 7:

> *Calls upon* all States, including States not members of the United Nations, and all international organizations, to act strictly in accordance with the provisions of the present resolution, notwithstanding the existence of any rights or obligations conferred or imposed by any international agreement…[489]

354.    In its subsequent practice the Security Council has started using a standard clause, which can be found, with minor modifications, in a number of resolutions adopted under Chapter VII. For example, paragraph 7 of resolution 1267 (1999) states the following:

> [The Security Council] *Calls upon* all States to act strictly in accordance with the provisions of this resolution, notwithstanding the existence of any rights or obligations conferred or imposed by any international agreement or any contract entered into or any licence or permit granted prior to the date of coming into force of the measures imposed [by the Council]…[490]

355.    Although this clause does not expressly mention Article 103, it receives its legal force from that provision. Hence it does not address only United Nations Members, but all States, as well as international and regional organizations. It covers rights and obligations based not only on treaties, but also on private contracts, licences and permits. This is natural, as it is the very rationale of sanctions regimes to influence private transactions between entities in the target State and the outside world. As pointed out above, however, this leaves the issue of private liability unanswered.

---

[483] See, for example, Fassbender (footnote 459 above), pp. 590 *et seq.*

[484] See, for example, Zemanek, "The legal foundations of the international system…" (footnote 31 above), p. 231 and the chapter on *jus cogens*.

[485] Judgments in two cases: judgments of the Court of First Instance of 21 September 2005 in case T-306/01, *Ahmed Ali Yusuf and Al Barakaat International Foundation v. Council of the European Union and Commission of the European Communities,* and case T-315/01, *Yassin Abdullah Kadi v. Council of the European Union and Commission of the European Communities, Digest of case-law 2005*, pp. 3533 and 3649, respectively.

[486] Case T-306/01, *Ahmed Ali Yusuf and Al Barakaat International Foundation v. Council of the European Union and Commission of the European Communities, ibid.*, p. 3626, para. 276. The Court also added that although it is not a member of the United Nations, the Community must also be considered to be bound by the obligations flowing from the Charter of the United Nations, in the same way as are its Member States, by virtue of the Treaty establishing it. See paragraph 210 of the judgment.

[487] *Ibid.*, p. 3627, para. 281.

[488] See Security Council resolutions 713 (1991), 724 (1991), 727 (1992), 743 (1992), 757 (1992), 787 (1992) and 820 (1993).

[489] See also similar decisions in respect of Somalia (Security Council resolution 733 (1992)) and Liberia (Security Council resolution 788 (1992)).

[490] See also, for example, Security Council resolutions 1127 (1997), 1173 (1998), 1132 (1997) and 1298 (2000).

356. In separate opinions, members of the International Court of Justice have occasionally mentioned Article 103.[491] Before 1992, however, the Court itself had discussed it in only one decision. Yet already then, in the *Military and Paramilitary Activities in and against Nicaragua* case in 1984, the Court underlined the priority of obligations under the Charter over other treaty obligations.[492] Article 103 was given full attention in the *Lockerbie* case (1992).[493] The Governments of the United Kingdom and the United States had requested Libya to surrender certain individuals in connection with investigations into the destruction of an aeroplane over the village of Lockerbie in Scotland. The Security Council, acting under Chapter VII of the Charter, supported the measures to be taken against Libya, which in turn considered the requests of the two above-mentioned Governments incompatible with the Montreal Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation and submitted the dispute to the International Court of Justice.

357. At first, Libya asked the Court to indicate provisional measures, whereas the respondents argued that a binding decision of the Security Council did not permit such an indication. In its order of 14 April 1992 the Court stated:

39. Whereas both Libya and the United Kingdom, as Members of the United Nations, are obliged to accept and carry out the decisions of the Security Council in accordance with Article 25 of the Charter; whereas the Court, which is at the stage of proceedings on provisional measures, considers that *prima facie* this obligation extends to the decision contained in resolution 748 (1992); and whereas, in accordance with Article 103 of the Charter, the obligations of the Parties in that respect prevail over their obligations under any other international agreement, including the Montreal Convention;

40. Whereas the Court, while thus not at this stage called upon to determine definitively the legal effect of Security Council resolution 748 (1992), considers that, whatever the situation previous to the adoption of that resolution, the rights claimed by Libya under the Montreal Convention cannot now be regarded as appropriate for protection by the indication of provisional measures…[494]

358. Several judges confirmed the same line of argumentation in their separate and dissenting opinions.[495] It is noteworthy that the Court, as well as individual judges, referred merely to the enforceability, not the invalidity or suspension, of conflicting treaty obligations.

359. Judge Lauterpacht, in his separate opinion appended to the order of the International Court of Justice in the *Application of the Convention on the Prevention and Punishment of the Crime of Genocide* case, discussed the relationship between Article 103 and *jus cogens*:

The concept of *jus cogens* operates as a concept superior to both customary international law and treaty. The relief which Article 103 of the Charter may give the Security Council in case of conflict between one of its decisions and an operative treaty obligation cannot—as a matter of simple hierarchy of norms—extend to a conflict between a Security Council resolution and *jus cogens*. Indeed, one only has to state the opposite proposition thus—that a Security Council resolution may even require participation in genocide—for its unacceptability to be apparent.[496]

360. This seems natural. If (as pointed out above) the Charter of the United Nations is not above *jus cogens*, then it also cannot transfer a power to contradict *jus cogens* to bodies that receive their jurisdiction from the Charter.

## B. *Jus cogens*

361. The view that some norms are of a higher legal rank than others has found its expression in one way or another in all legal systems.[497] In international law, propositions have consistently been made that there is a category of norms that are so fundamental that derogation from them can never be allowed. No doubt the idea of peremptory norms (*jus cogens*) is older than modern international law itself. Commentators often point to the Roman law distinction between *jus strictum* and *jus dispositivum*,[498] and to the maxim *jus publicum privatorum pactis mutari non potest*.[499] Seventeenth- and eighteenth-century natural lawyers had no doubt whatsoever that certain norms existed timelessly and above the will of States, limiting what could lawfully be agreed by secular rulers or their communities.[500] In addition, the development of the inter-

---

[491] See, for example, *Case concerning the Application of the Convention of 1902 governing the Guardianship of Infants (Netherlands v. Sweden)*, Judgment of 28 November 1958, *I.C.J. Reports 1958*, p. 55, at p. 107 (separate opinion of Judge Moreno Quintana); *South West Africa Cases (Ethiopia v. South Africa; Liberia v. South Africa)*, Preliminary Objections, Judgment of 21 December 1962, *I.C.J. Reports 1962*, p. 319, at p. 407 (separate opinion of Judge Jessup); *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, Advisory Opinion, *I.C.J. Reports 1971*, p. 16, at p. 99 (separate opinion of Judge Ammoun); *Application for Revision and Interpretation of the Judgment of 24 February 1982 in the Case concerning the Continental Shelf (Tunisia/Libyan Arab Jamahiriya) (Tunisia v. Libyan Arab Jamahiriya)*, Judgment, *I.C.J. Reports 1985*, p. 192, at pp. 232–233 (separate opinion of Judge Ruda).

[492] See *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America), Jurisdiction and Admissibility*, Judgment, *I.C.J. Reports 1984*, p. 392, at p. 440, para. 107.

[493] *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United States of America)*, Preliminary Objections, Judgment, *I.C.J. Reports 1998*, p. 115.

[494] *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom)*, Provisional Measures, Order of 14 April 1992, *I.C.J. Reports 1992*, p. 3, at p. 15, paras. 39–40. See also *ibid.*, pp. 114 *et seq.*, especially pp. 126–127, paras. 42–43.

[495] For example, Judge Shahabuddeen wrote in his separate opinion that "Article 25 of the Charter of the United Nations obliges Libya to comply with the decision set out in [resolution 748 (1992)]. By virtue of Article 103 of the Charter, that obligation prevails over any conflicting treaty obligation which Libya may have … Treaty obligations can be overridden by a decision of the Security Council imposing sanctions … Hence, assuming that Libya has the rights which it claims, *prima facie* they could not be enforced during the life of the resolution" (*Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom)*, Provisional Measures, Order of 14 April 1992, *ibid.*, p. 28 (separate opinion of Judge Shahabuddeen).

[496] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide* (see footnote 482 above), p. 440, para. 100 (separate opinion of Judge Lauterpacht).

[497] "It is difficult to imagine any society, whether of individuals or of States, whose law sets no limit whatever to freedom of contract" (McNair (see footnote 58 above), pp. 213–214).

[498] J. A. Frowein, "*Jus cogens*", in R. Bernhardt (ed.), *Encyclopedia of Public International Law*, vol. 3, Amsterdam, Elsevier, 1997, p. 65.

[499] Sinclair (see footnote 63 above), p. 203. See also D. Shelton, "International law and relative normativity", in Evans (ed.) (footnote 481 above), p. 151. Nevertheless, the term *jus cogens* itself is said not to have been used in ancient law. See M. Lachs, "The development and general trends of international law in our time", *Recueil des cours de l'Académie de droit international de La Haye, 1980-IV*, vol. 169, p. 202.

[500] Emmerich de Vattel provided what has become a classic formulation, as follows: "Since … the necessary Law of Nations consists in applying the natural law to States, and since the natural law is not subject to change, being founded on the nature of things and particularly

national law notion of *jus cogens* has undoubtedly been influenced by domestic laws that provide for the nullity of agreements conflicting with *ordre public* or public policy objectives.[501] The background, nature and effects of *jus cogens* were summarized by the International Tribunal for the Former Yugoslavia:

> Because of the importance of the values [the prohibition of torture] protects, this principle has evolved into a peremptory norm or *jus cogens*, that is, a norm that enjoys a higher rank in the international hierarchy than treaty law and even "ordinary" customary rules. The most conspicuous consequence of this higher rank is that the principle at issue cannot be derogated from by States through international treaties or local or special customs or even general customary rules not endowed with the same normative force.[502]

362.   *Jus cogens* found its way into positive international law during preparations for the 1969 Vienna Convention. The Commission presented it in articles 50 and 61 of its final draft articles on the law of treaties in 1966.[503] At the United Nations Conference on the Law of Treaties, the concept was moulded into articles 53 and 64 in the following format:

> *Article 53*
>
> A treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law. For the purposes of the present Convention, a peremptory norm of general international law is a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.
>
> *Article 64*
>
> If a new peremptory norm of general international law emerges, any existing treaty which is in conflict with that norm becomes void and terminates.

363.   In academic literature, the concept has been the object of a sizeable volume of attention—especially since its incorporation into the 1969 Vienna Convention.[504] Over the years, most of the initial scepticism around the

notion itself has tended to vanish. As the Commission has recently remarked, "[t]he concept of peremptory norms of general international law is recognized in international practice, in the jurisprudence of international and national courts and tribunals and in legal doctrine".[505] However, disagreement about its theoretical underpinnings, scope of application and content remains as rife as ever. As Anthony Aust has put it: "The concept *was once controversial\**. Now it is more its scope and applicability that is unclear."[506]

364.   Two aspects require discussion: the effects of *jus cogens* and its content.

### 1.   THE EFFECT OF *JUS COGENS*: INVALIDITY OF THE CONFLICTING NORM

365.   Article 53 of the 1969 Vienna Convention provides for the invalidity of treaties which, at the time of their conclusion, are in conflict with a peremptory norm of general international law. Thus, unlike the mere "priority" provided under article 31 of the Convention, what the concept of *jus cogens* encapsulates is a rule of hierarchy *sensu stricto*, not simply a rule of precedence.[507] Hence, the result of conflicts between treaties and *jus cogens* is that the former are not only non-applicable, but wholly void, giving rise to no legal consequences whatsoever.[508] This entails a further consequence written into article 71, paragraph 1, of the Convention:

> In the case of a treaty which is void under article 53 the parties shall: (*a*) Eliminate as far as possible the consequences of any act performed in reliance on any provision which conflicts with the peremptory norm of general international law; and (*b*) Bring their mutual relations into conformity with the peremptory norm of general international law.

366.   This has to be understood in context with article 64 of the Convention, making it clear that the hierarchically higher status of *jus cogens* norms does not have a retroactive character.[509] If the coming into being of a peremp-

---

[footnote] upon the nature of man, it follows that the *necessary* Law of Nations is *not subject to change*. Since this law is not subject to change and the obligations which it imposes are necessary and indispensable, Nations can not alter it by agreement, nor individually or mutually release themselves from it. It is by the application of this principle that a distinction can be made between lawful and unlawful treaties or conventions and between customs which are innocent and reasonable and those which are unjust and deserving of condemnation" (de Vattel (see footnote 67 above), vol. I, introduction, p. 4).

[501] Article 6 of the Napoleonic Code provides a good example: "On ne peut déroger, par des conventions particulières, aux lois qui intéressent l'ordre public et les bonnes mœurs" ("Laws concerning public order or social mores are not susceptible to derogation by private agreement").

[502] *Prosecutor v. Anto Furundžija*, Trial Chamber, International Tribunal for the Former Yugoslavia, case No. IT-95-17/1, judgement, 10 December 1998, *Judicial Reports 1998*, p. 467, at p. 569, para. 153 (footnote omitted); ILR, vol. 121 (2002), p. 260.

[503] Article 50: "A treaty is void if it conflicts with a peremptory norm of general international law from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character"; article 61: "If a new peremptory norm of general international law of the kind referred to in article 50 is established, any existing treaty which is in conflict with that norm becomes void and terminates" (*Yearbook ... 1966*, vol. II, document A/6309/Rev.1, part II, pp. 247, 261).

[504] Nevertheless, the term *jus cogens* was already used, although not extensively, prior to its adoption by the Commission. See generally J. Sztucki, *Jus cogens and the Vienna Convention on the Law of Treaties: A Critical Appraisal,* Vienna, Springer-Verlag, 1974. Cassese

[footnote right column] views it as being especially a result of developments in the 1960s. See Cassese (footnote 240 above), pp. 199–200.

[505] Para. (2) of the commentary to article 40 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 112.

[506] A. Aust, *Handbook of International Law,* Cambridge, Cambridge University Press, 2005, p. 11. Likewise, *Sosa v. Alvarez-Machain et al.*, United States District Court of Appeals, 3 June 2003, ILR, vol. 127 (2005), p. 705. Michael Byers, for example, has written that "[t]oday, there is widespread acceptance among international lawyers of the concept of *jus cogens*" (Byers, *Custom, Power and the Power of Rules: International Relations and Customary International Law* (see footnote 296 above), p. 184). For a famous sceptical appraisal, see Weil (footnote 181 above), p. 413, who believes that any trend toward recognition of the distinction between peremptory norms and "merely binding norms" contributes to a "dilution" of normativity itself and fosters the development of pathology in the international system.

[507] There is wide agreement on this. See, for example, J. Combacau and S. Sur, *Droit international public*, 6th ed., Paris, Montchrestien, 2004, p. 157.

[508] It is not necessary, however, for this to lead to the invalidation of the whole treaty. Clauses that do not conflict with *jus cogens* are separable from those that do may remain valid. Cassese (see footnote 240 above), p. 206.

[509] In the words of the Commission itself, there was no question of what was to become article 53 of the 1969 Vienna Convention having retroactive effect. See the draft articles on the law of treaties, *Yearbook ... 1966*, vol. II, document A/6309/Rev.1, part II, p. 248, para. (6) of the commentary to draft article 50.

tory norm of general international law is subsequent to the conclusion of a treaty, the treaty itself terminates but the rights and obligations based on it only become void inasmuch as they are themselves contrary to the (new) *jus cogens*. This structure is written in article 71, paragraph 2, of the Convention, which states that:

> In the case of a treaty which becomes void and terminates under article 64, the termination of the treaty: (*a*) Releases the parties from any obligation further to perform the treaty; (*b*) Does not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to its termination, provided that those rights, obligations or situations may thereafter be maintained only to the extent that their maintenance is not in itself in conflict with the new peremptory norm of general international law.

367.    Three types of conflict situation may be envisaged. A norm of *jus cogens* might conflict with a regular treaty, with a rule of (general) customary international law or with another norm of *jus cogens*. The first situation is the simplest. Conflict of a treaty with *jus cogens* renders the treaty—or a separable provision thereof—invalid. It makes no difference whether the treaty is bilateral or multilateral. As pointed out above, the Charter of the United Nations constitutes no exception.[510] The same goes for resolutions of international organizations. The same logic applies to a conflict between *jus cogens* and (general) customary law. A conflict between them renders the latter invalid. The question concerning the relationships between conflicting *jus cogens* norms—for example the question of the right to use force in order to realize the right of self-determination—is much more difficult. At this stage, it cannot be presumed that the doctrine of *jus cogens* could itself resolve such conflicts: there is no hierarchy among *jus cogens* norms *inter se*.

368.    Already during discussions in the Commission, and also at the United Nations Conference on the Law of Treaties, several delegates expressed their concern that introducing the concept of *jus cogens* into positive law might result in the destabilization of treaty relations. It was feared that States might start using arguments based on *jus cogens* to justify non-performance of treaty obligations.[511] To prevent or minimize such occasions, a mechanism was written into the 1969 Vienna Convention, according to which parties to a dispute concerning the validity of a treaty need to seek a solution through the peaceful means listed in the Charter of the United Nations; if they fail to reach one, then

> [a]ny one of the parties to a dispute concerning the application or the interpretation of article 53 or 64 may, by a written application, submit it to the International Court of Justice for a decision unless the parties by common consent agree to submit the dispute to arbitration.[512]

369.    No cases have been brought to the International Court of Justice under this article to date.

370.    The most significant use of *jus cogens* as a conflict norm has been by the British House of Lords in the *Pinochet* case.[513] Here, as is well known, the question arose of whether immunity of a former Head of State could be upheld against an accusation of his having committed torture while in office. Referring to relevant passages in the *Furundžija* case,[514] the Lords held that "[t]he *jus cogens* nature of the international crime of torture justifies [S]tates in taking universal jurisdiction over torture wherever committed".[515] As the condition of "double criminality" was fulfilled, Pinochet could not plead immunity against a request for extradition to Spain. To use the words of Lord Millett:

> International law cannot be supposed to have established a crime having the character of a *jus cogens* and at the same time to have provided an immunity which is coextensive with the obligation it seeks to impose.[516]

371.    The Pinochet litigation turned out to have historic consequences, not so much for Senator Pinochet personally, but rather in the sense that, for the first time, a local domestic court denied immunity to a former Head of State on the grounds that there cannot be any immunity against prosecution for breach of *jus cogens*.

372.    That it is the point of *jus cogens* to invalidate inferior norms does not mean that *jus cogens* would provide automatic access to justice, irrespective of procedural obstacles, to punish individuals or, for example, concerning relief in civil matters. In *Al-Adsani*, the European Court of Human Rights was called upon to adjudge whether the United Kingdom had violated the European Convention on Human Rights, as British courts had upheld the immunity of the State of Kuwait in a civil matter that concerned liability that it was alleged to owe to a person (Al-Adsani) who had been tortured by Kuwaiti agents.[517] The court held the prohibition of torture to be part of *jus cogens* but did not find a violation of articles 1 and 3 of the European Convention on Human Rights in the way United Kingdom courts had been applying the State Immunity Act 1978. The court stated:

> While the Court accepts … that the prohibition of torture has achieved the status of a peremptory norm in international law, it observes that the present case concerns not, as in *Furundžija* and *Pinochet*, the criminal liability of an individual for alleged acts of torture, but the immunity of a State in a civil suit for damages in respect of acts of torture within the territory of that State. Notwithstanding the special character of the prohibition of torture in international law, the Court is unable to discern in the international instruments, judicial authorities or other materials before it any firm basis for concluding that, as a matter of international law, a State no longer enjoys immunity from civil suit in the courts of another State where acts of torture are alleged.[518]

373.    Thus, the court, while noting the growing recognition of the prohibition of torture as part of *jus cogens*,

---

[510] Since the Charter was adopted years before the entry into force of the 1969 Vienna Convention, the relationship between the Charter and *jus cogens* cannot be dealt with on the basis of the latter, but instead under the framework of customary international law.

[511] For a famous sceptical appraisal, see Weil (footnote 181 above), p. 413, arguing that any distinction between peremptory norms and "ordinary" norms contributes to a "dilution" of normativity itself and fosters the erosion of the international system.

[512] See articles 65, paragraph 3, and 66 (*a*) of the 1969 Vienna Convention.

[513] *Regina v. Bow Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)*, House of Lords, 24 March 1999, [1999] UKHL 17, [2000] 1 AC 147, reproduced in ILR, vol. 119, p. 135.

[514] *Prosecutor v. Anto Furundžija* (see footnote 502 above), *Judicial Reports 1998*, p. 569, para. 153; ILR, vol. 121 (2002), p. 260.

[515] *Regina v. Bow Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)* (see footnote 513 above), ILR, vol. 119, p. 149.

[516] *Ibid.*, p. 232.

[517] *Al-Adsani v. the United Kingdom* (see footnote 219 above), p. 79.

[518] *Ibid.*, p. 101, para. 61.

did not find it established that there was yet acceptance in international law of the proposition that States are not entitled to immunity in respect of civil claims for damages for alleged torture committed outside the forum State. By finding as it did, the court did not afford a norm of *jus cogens* an effect which would override the rights of States under customary international law.[519]

## 2. THE CONTENT OF *JUS COGENS*

374.    In the final text of its draft articles on the law of treaties, the Commission deliberately dispensed with listing concrete examples of *jus cogens* norms.[520] It did so because, as it put the matter, "there is no simple criterion by which to identify a general rule of international law as having the character of *jus cogens*".[521] The adoption of the 1969 Vienna Convention was then predictably followed by an extensive debate about precisely this matter. There are today a number of pronouncements from various judicial or diplomatic organs that give an idea of what might count as *jus cogens* norms. In its commentary to the draft articles on responsibility of States for internationally wrongful acts of 2001, the Commission gave as examples of *jus cogens* the prohibitions on aggression, slavery and the slave trade, genocide, racial discrimination and apartheid, and torture (as defined in the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1984); the basic rules of international humanitarian law applicable in armed conflict; and the right to self-determination.[522] In the *Furundžija* case, the International Tribunal for the Former Yugoslavia defined torture as both a peremptory norm and an obligation *erga omnes*.[523] Overall, the most frequently cited candidates for the status of *jus cogens* include: (*a*) the prohibition of aggressive use of force; (*b*) the right to self-defence; (*c*) the prohibition of genocide; (*d*) the prohibition of torture; (*e*) crimes against humanity; (*f*) the prohibition of slavery and the slave trade; (*g*) the

prohibition of piracy; (*h*) the prohibition of racial discrimination and *apartheid*; and (*i*) the prohibition of hostilities directed at civilian populations ("basic rules of international humanitarian law").[524]

375.    The problem of how to identify *jus cogens* is not easy to resolve *in abstracto*. As most commentators point out, it is not only that there is no single authoritative list of *jus cogens* norms; there is also no agreement about the criteria for inclusion on that list. The starting point must be the formulation of article 53 itself, identifying *jus cogens* by reference to what is "accepted and recognized by the international community of States as a whole". Although that formulation itself is not free from controversy (especially references to a community of "*States*" and to the meaning of the requirement "*as a whole*"),[525] there is also a disturbing circularity about it. If the point of *jus cogens* is to limit what may be lawfully agreed by States, can its content simultaneously be made dependent on what is agreed between States?[526] The historical background of *jus cogens* lies in an anti-voluntarist, often religiously inclined natural law—the presumption of the

---

[519] In his dissenting opinion in the *Al-Adsani* case, which began with the words "What a pity!", Judge Ferrari Bravo expressed deep disappointment in the outcome of the case: "The Court … had a golden opportunity to issue a clear and forceful condemnation of all acts of torture. To do so, it need only have upheld the thrust of the House of Lords' judgment in *Regina v. Bow Street Metropolitan Stipendiary and Others, ex parte Pinochet Ugarte (No. 3)* … to the effect that the prohibition of torture is now *jus cogens*, so that torture is a crime under international law. It follows that every State has a duty to *contribute* to the punishment of torture and cannot hide behind formalist arguments to avoid having to give judgment. … But it is precisely one of those old formalist arguments which the Court endorsed when it said … that it was unable to discern any rules of international law requiring it not to apply the rule of immunity from civil suit where acts of torture were alleged. … There will be other such cases, but the Court has unfortunately missed a very good opportunity to deliver a courageous judgment" (*ibid.*, p. 114, dissenting opinion of Judge Ferrari Bravo).

[520] *Yearbook … 1966*, vol. II, document A/6309/Rev.1, part II, p. 248, para. (3) of the commentary to draft article 50.

[521] *Ibid.*, pp. 247–248, para. (2). Lord McNair has elegantly expressed the same idea by writing that "it is easier to illustrate these rules [*jus cogens*] than to define them" (see McNair (footnote 58 above), p. 215). Likewise, for example, Aust, *Handbook of International Law* (see footnote 506 above), p. 11, and Shelton (see footnote 499 above), p. 151.

[522] Paras. (4)–(6) of the commentary to article 40 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 112–113.

[523] *Prosecutor v. Anto Furundžija* (see footnote 502 above), *Judicial Reports 1998*, pp. 567–573, paras. 151–157; ILR, vol. 121 (2002), pp. 260–262.

[524] Brownlie lists, as the least controversial examples of the class, the prohibition of the use of force, the law of genocide, the principle of racial non-discrimination, crimes against humanity, and the rules prohibiting trade in slaves and piracy (Brownlie, *Principles of Public International Law* (see footnote 166 above)); Aust sees the prohibitions on the use of force (as laid down in the Charter of the United Nations) and on genocide, slavery and torture as perhaps the only generally accepted examples (Aust, *Handbook of International Law* (see footnote 506 above), p. 11); Rosalyn Higgins mentions as examples the prohibitions on genocide, torture and the killing of prisoners of war (R. Higgins, *Problems and Process: International Law and How We Use It*, Oxford, Oxford University Press, 1994, pp. 21–22). The examples of obligations articulated by the International Court of Justice in the *Barcelona Traction* case—prohibition of aggression, genocide, breaches of rules concerning the basic rights of the human person, including protection from slavery and racial discrimination—are also often cited as examples of *jus cogens* (*Barcelona Traction, Light and Power Company, Limited*, Judgment, *I.C.J. Reports 1970*, p. 3, at p. 32, para. 34). For rules described as "fundamental" in the practice of the International Court of Justice, see V. Gowlland-Debbas, "Judicial insights into fundamental values and interests of the international community", in A. S. Muller and others (eds.), *The International Court of Justice: Its Future Role after Fifty Years*, The Hague, Kluwer Law International, 1997, p. 327, at pp. 335–342. For lists, see also J. Petman, "Panglossian views to the new world order: review of Cassese, *International Law* (2001)", *Finnish Yearbook of International Law*, vol. 13 (2002), pp. 337–338; see also Daillier and Pellet, *Droit international public* (footnote 74 above), pp. 206–207. Some commentators have proposed that *jus cogens* also encompasses the freedom of the high seas (see Frowein, "*Jus cogens*" (footnote 498 above), p. 67), yet the view of the Commission seems always to have been different. The Commission has stated continuously that it is not universal acceptance that elevates a norm to the status of *jus cogens*, but its content. In the words of the Commission, "[i]t is not the form of a general rule of international law but the particular nature of the subject-matter with which it deals that may, in the opinion of the Commission, give it the character of *jus cogens*" (*Yearbook … 1966*, vol. II, document A/6309/Rev.1, part II, p. 248, para. (2) of the commentary to draft article 50). Following the same line, the Commission has added only recently that obligations under peremptory norms of international law "arise from those substantive rules of conduct that prohibit what has come to be seen as intolerable because of the threat it presents to the survival of States and their peoples and the most basic human values" (*Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 112, para. (3) of the commentary to article 40 of the draft articles on responsibility of States for internationally wrongful acts).

[525] See, for example, Cassese (footnote 240 above), p. 201 ("most important and representative States"), and the discussion in Combacau and Sur, *Droit international public* (footnote 507 above), pp. 158–160.

[526] See Koskenniemi, *From Apology to Utopia…* (footnote 79 above), pp. 323–325.

existence of "absolute" norms for human conduct. While most people (and States) still hold it important—indeed very important—that such norms exist, the vocabularies of present-day diplomacy and law seem unable to produce a plausible justification for them. Any "criterion" that one might wish to invoke in support of the status of any particular norm as *jus cogens* would seem to infect that putative norm with all the uncertainties and vulnerabilities that relate to that criterion.

376. Instead of trying to determine the content of *jus cogens* through abstract definitions, it is better to follow the path chosen by the Commission in 1966 as it "considered the right course to be to provide in general terms that a treaty is void if it conflicts with a rule of *jus cogens* and to leave the full content of this rule to be worked out in State practice and in the jurisprudence of international tribunals".[527] That still seems the right way to proceed.

### 3. CASE LAW

377. The extent of case law on *jus cogens* is vast. Many courts and tribunals, both international and domestic, have used arguments based on *jus cogens* to substantiate their decisions and judgments.[528] Yet the number of cases in which *jus cogens* has appeared from the viewpoint of norm conflict is considerably more limited. As noted by Antonio Cassese:

> no dispute has arisen between States as to the *jus cogens* nature of a specific rule. Nor have one or more States insisted on the peremptory nature of a rule in a dispute with other States, accompanied by either acquiescence by other States or contestation by them. Nor has any international tribunal, let alone the [International Court of Justice], settled any dispute revolving around the question of whether or not a specific rule must be regarded as belonging to the corpus of norms under discussion.[529]

378. The International Court of Justice has been reluctant to refer to *jus cogens* in its decisions. An explicit mention of the term can be found only in very few cases. An example may be given by the decision of the Court most often referred to in relation to *jus cogens*, in the *Military and Paramilitary Activities in and against Nicaragua* case in 1986.[530] Nevertheless, more has perhaps been read into this decision than is warranted: the Court only mentions the words *jus cogens* by quoting (although apparently with approval) the Commission and the

representatives of both parties to the dispute—it never picked up the vocabulary as part of its own language.[531]

379. Yet the fact that the Court has repeatedly referred to general and fundamental principles that lie beyond contractual treaty relations allows for the assumption that the Court has, in substance, affirmed the concept. In its very first case, it pointed out that the obligations of States do not necessarily have to have a conventional nature, but instead may also be founded on certain general and well-recognized principles, among which are "elementary considerations of humanity".[532] Just a year later the Court gave one of its most famous advisory opinions, in which it stated that "the principles underlying the Convention [on Genocide] are principles which are recognized by civilized nations as binding on States, even without any conventional obligation".[533] In the same vein, an advisory opinion of 1996 contained a reference to "intransgressible principles of international customary law".[534] These lines, and also the reasoning in the *Barcelona Traction* case, show that the Court has, from the very beginning, deemed it necessary to highlight the existence of particularly important norms in international law, although it has been less than clear about their status or operation.[535]

### C. Obligations *erga omnes*

380. Obligations *erga omnes* are different from Article 103 of the Charter of the United Nations and *jus cogens*. Whereas the latter are distinguished by their normative power—their ability to override a conflicting

---

[527] Draft articles on the law of treaties, *Yearbook ... 1966*, vol. II, document A/6309/Rev.1, part II, p. 248, para. (3) of the commentary to article 50.

[528] For an overview of references to fundamental norms in the judicial pronouncements of the International Court of Justice and its predecessor, see Gowlland-Debbas, "Judicial insights into fundamental values and interests…"(footnote 524 above), pp. 332–342. For other bodies, see, for example, *Prosecutor v. Kupreškić and others*, Trial Chamber, International Tribunal for the Former Yugoslavia, case No. IT-95-16-T, Judgment of 14 January 2000, *Judicial Reports 2000*, vol. II, para. 520, which states that "most norms of international humanitarian law, in particular those prohibiting war crimes, crimes against humanity and genocide, are also peremptory norms of international law or *jus cogens*, i.e. of a non-derogable and overriding character". See the case law section for further examples of occasions where the concept has been endorsed by various judicial authorities.

[529] Cassese (see footnote 240 above), p. 202.

[530] *Military and Paramilitary Activities in and against Nicaragua*, Merits, Judgment of 27 June 1986 (see footnote 51 above), pp. 100–101, para. 190.

[531] The only format in which the term *jus cogens* has really been put to use by the International Court of Justice comprises separate and dissenting opinions of individual judges of the Court. In fact, back in 1934, Judge Schücking of the Permanent Court of International Justice referred in his separate opinion to the possibility of creating *jus cogens* in the form of agreements between States. See the *Oscar Chinn* case (footnote 138 above), p. 149 (separate opinion of Judge Schücking). Throughout the following years, numerous references have been made to peremptory norms in this format. See, for example, *Case concerning the Application of the Convention of 1902 governing the Guardianship of Infants* (footnote 491 above), pp. 106 *et seq.* (separate opinion of Judge Moreno Quintana); *North Sea Continental Shelf* (footnote 95 above), pp. 97, 248 (separate opinion of Judges Padilla Nervo and Sörensen), and p. 182 (dissenting opinion of Judge Tanaka); *Barcelona Traction, Light and Power Company, Limited* (footnote 524 above), p. 304 (separate opinion of Judge Ammoun); *Military and Paramilitary Activities in and against Nicaragua*, Merits, Judgment of 27 June 1986 (footnote 51 above), p. 153 (separate opinion of President Nagendra Singh), and pp. 199 *et seq.* (separate opinion of Judge Sette-Camara); *Application of the Convention on the Prevention and Punishment of the Crime of Genocide* (footnote 482 above), p. 440 (separate opinion of Judge Lauterpacht); *Legality of Use of Force (Yugoslavia v. United States of America)*, Provisional Measures, Order of 2 June 1999, *I.C.J. Reports 1999*, p. 916, at pp. 965–973, paras. 10–17 (dissenting opinion of judge *ad hoc* Kreća); *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, *I.C.J. Reports 2002*, p. 3, at p. 96, para. 3 (dissenting opinion of Judge Al-Khasawneh); *Oil Platforms (Islamic Republic of Iran v. United States of America)* (footnote 128 above), p. 279, para. 23 (separate opinion of Judge Buergenthal).

[532] *Corfu Channel* (see footnote 449 above), p. 22.

[533] *Reservations to the Convention on Genocide* (see footnote 326 above), p. 23.

[534] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 122 above), p. 257, para. 79. The same was confirmed by the Court in its latest advisory opinion to date, *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, *I.C.J. Reports 2004*, p. 136.

[535] *Barcelona Traction, Light and Power Company, Limited* (see footnote 524 above), p. 32.

norm—obligations *erga omnes* designate the *scope of application* of the relevant law and the procedural consequences that follow from this. The duty to comply with a norm that creates obligations *erga omnes* is owed to the "international community as a whole", and all States—irrespective of their particular interest in the matter—are entitled to invoke State responsibility in case of breach. The *erga omnes* nature of an obligation, however, indicates no clear superiority of that obligation over other obligations. Although in practice norms recognized as having an *erga omnes* validity set up undoubtedly important obligations, this importance does not translate into a hierarchical superiority similar to that of Article 103 and *jus cogens*.

381.    It may be true that "[t]he question as to the legal significance of the category of State obligations *erga omnes* has been hotly contested among scholars and lawyers and remains stubbornly unsettled within international legal literature and practice".[536] Yet although this may apply to particular understandings (and listings) of *erga omnes* obligations, the concept itself—the idea of the *erga omnes* applicability of certain rules of international law—is deeply rooted in international practice.

1.    FROM BILATERAL OBLIGATIONS TO OBLIGATIONS *ERGA OMNES* OWED TO "THE INTERNATIONAL COMMUNITY AS A WHOLE"

382.    The bulk of international law emerges from contractual relations between individual States and remains in this sense "bilateralist".[537] Obligations are owed by States to each other, and each State is only individually entitled to invoke a breach as a basis for State responsibility. International law's special nature is well captured by Professor Allott, who has described it as "the minimal law necessary to enable State-societies to act as closed systems internally and to act as territory-owners in relation to each other".[538] Or, in the words of Simma:

[T]raditional international law was left entirely in the hands of sovereign States, predicated on their bilateral legal relations, on the intrinsically bilateral character of legal accountability … As to the substance built upon such a bilateralist grounding, international law had, in the course of centuries, developed into a system of rules delimiting the spheres of sovereignty of States in space and time, as well as with regard to persons and certain jurisdictional matters respectively. In essence, these rules obliged States to abstain from interfering in the areas so demarcated. In addition, international law provided a reciprocity-based framework for … legal transactions in the form of treaties…[539]

383.    The bilateralism of international law means that international law obliges States reciprocally in their relations *inter se* and not towards each other as members of some more or less general idea of an international public realm. The bilateralist mode of operation is particularly important in the law of State responsibility, which may be characterized in terms of "private justice" or an "every-man-for-himself doctrine":

For a [S]tate to enjoy a right implies its possession of legal standing to claim performance of the corresponding obligation and, in default, to bring to book the person or persons owing that obligation. … In sum, no international obligations *erga omnes*, traditionally, exist: it is up to each [S]tate to protect its own rights; it is up to none to champion the rights of others.[540]

384.    This view was expressed by the International Court of Justice in its advisory opinion concerning *Reparation for injuries suffered in the service of the United Nations*, when it held that "only the party to whom an international obligation is due can bring a claim in respect of its breach".[541]

385.    Contemporary international law has, however, moved well beyond bilateralism. In the Commission's debates on what would become the 1969 Vienna Convention, the Special Rapporteurs were already making a distinction between treaties creating obligations that were owed by States to each other in a network of reciprocal relationships and treaties creating what Fitzmaurice called "a more absolute type of obligation"—that is, an obligation of an "integral" or "interdependent" character. As examples of these categories he gave disarmament and humanitarian law conventions. The obligations in such conventions could not be meaningfully reduced into reciprocal State-to-State relationships.[542] In that context, the interest of the distinction lay in the manner in which conflicts between treaties were to be dealt with, the "more absolute" type of obligation being less easily derogated from by "modification" or *lex posterior*.

386.    The case most frequently mentioned in the early debates concerned the prohibition of genocide. According to the reasoning of the International Court of Justice in the *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide* case, classical treaties were about individual advantages and disadvantages to States, or about the maintenance of a contractual balance.[543] Yet under conventions such as the Convention on the Prevention and Punishment of the Crime of Genocide, States were not pursuing their national, individual interests. Instead, they had a "common interest, namely, the accomplishment of those high purposes which are the *raison d'être* of the convention" and "[c]onsequently, in a convention of this type one cannot speak of individual advantages or disadvantages to States, or of the

---

[536] I.D. Seiderman, *Hierarchy in International Law: The Human Rights Dimension,* Antwerp, Intersentia, 2001, p. 123.

[537] See especially B. Simma, "From bilateralism to community interest in international law", *Recueil des cours de l'Académie de droit international de La Haye, 1994-VI*, vol. 250, pp. 230 *et seq.* This notion was first used by Special Rapporteur Willem Riphagen in his third report on the State responsibility (A/CN.4/354 and Add.1–2) (see footnote 185 above), p. 36, para. 91. As pointed out by Simma, the term "bilateralist" grasps the essence of international law more precisely and is less prone to misunderstandings than the adjectives "relative" or "relational" (Simma, "From bilateralism to community interest in international law", p. 230).

[538] P. Allott, *Eunomia: New Order for a New World*, Oxford, Oxford University Press, 1990, p. 324.

[539] Simma, "From bilateralism to community interest in international law" (see footnote 537 above), p. 229.

[540] Weil (see footnote 181 above), p. 431. Likewise, Alland (see footnote 251 above). For another argument, suggesting that the concept of obligations *erga omnes* is not viable as a matter of law, see J. Klabbers, "The scope of international law: *erga omnes* obligations and the turn to morality", in M. Tupamäki (ed.), *Liber Amicorum Bengt Broms: Celebrating His 70th Birthday 16 October 1999,* Helsinki, Finnish Branch of the International Law Association, 1999, p. 177.

[541] *Reparation for injuries suffered in the service of the United Nations*, Advisory Opinion, *I.C.J. Reports 1949*, p. 174, at pp. 181–182.

[542] Third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur (A/CN.4/115) (see footnote 139 above), p. 44, para. 91.

[543] *Reservations to the Convention on Genocide* (see footnote 326 above), p. 23.

maintenance of a perfect contractual balance between rights and duties".[544] Since that case, it has become common for scholars—but also tribunals, both international and domestic—to refer to "certain overriding universal values"[545] and shared interests or preferences upon which a distinction is made between contract-type norms and those of a more public law character.

387.   The *locus classicus* here is, of course, the statement by the Court in the *Barcelona Traction* case, which may have received inspiration from the debates under way since the adoption of the 1969 Vienna Convention concerning the nature and role of "fundamental norms" that could not be reduced to the regulation of bilateral State-to-State relations.[546] Here the term "*erga omnes*" (which is a Latin equivalent for "towards everyone/all") received major public attention for the first time.[547] As is well known, the Court held that Belgium did not possess legal standing to act against Spain on behalf of Belgian shareholders in a Canadian company. In a famous *obiter dictum*, the Court stated the following:

an essential distinction should be drawn between the obligations of a State towards the international community as a whole, and those arising *vis-à-vis* another State in the field of diplomatic protection. By their very nature the former are the concern of all States. In view of the importance of the rights involved, all States can be held to have a legal interest in their protection; they are obligations *erga omnes*.

   Such obligations derive, for example, in contemporary international law, from the outlawing of acts of aggression, and of genocide, as also from the principles and rules concerning the basic rights of the human person, including protection from slavery and racial discrimination. Some of the corresponding rights of protection have entered into the body of general international law … ; others are conferred by international instruments of a universal or quasi-universal character.[548]

388.   The significance of these passages lies foremost in outlining that there are indeed different types of obligations in international law. On the one hand there are obligations of a traditional type, which exist towards another particular State or States on a bilateralist basis; then there are obligations that are the concern of all States and in the protection of which all States have a legal interest.

389.   Although the examples given by the International Court of Justice of obligations *erga omnes* may also have the nature of *jus cogens*, the Court did not seek to emphasize their non-derogability. Instead, it wanted to point to the fact that there were some rules that gave rise to

a generality of standing to make claims in the event of a violation.[549] *Erga omnes* norms were not necessarily distinguished by the importance of their substance. They were norms with certain procedural features—specifically the feature that a breach of them can be invoked by any State and not just by individual beneficiaries. These were obligations that were about secondary, not primary rules.[550] The Commission itself has confirmed the doctrine of obligations *erga omnes*. Even though the idea of some violations constituting such grave offences against the international public order as a whole as to be labelled "crimes" was in the end omitted from the Commission's draft articles on responsibility of States for internationally wrongful acts of 2001, draft article 48 of the final text was, as part of the resulting compromise, drafted so as to recognize the possibility of an invocation of responsibility by a State other than an injured State:

   1.   Any State other than an injured State is entitled to invoke the responsibility of another … if:

   (*a*)   the obligation breached is owed to a group of States including that State, and is established for the protection of a collective interest of the group; or

   (*b*)   the obligation breached is owed to the international community as a whole.[551]

390.   In its commentary, the Commission makes it clear that this provision is intended to deal with obligations of the kind referred to in the *Barcelona Traction* case. And, although the language is different, the provision also takes up the cases that Fitzmaurice dealt with under the vocabulary of treaties establishing "integral" and "interdependent" obligations. Paragraph 1 (*a*), in particular, deals with what the commentary addresses as "obligations *erga omnes partes*"—that is to say, obligations arising out of a treaty and designed to protect the "collective interests" of the treaty parties.[552] Paragraph 1 (*b*) deals with obligations *erga omnes* proper, that is, obligations in the general law whose implementation is the concern of "the international community as a whole".

2.   To whom are obligations *erga omnes* owed?

391.   Most (though not all) *erga omnes* obligations have emerged in the field of human rights and humanitarian law. In these fields, the law does not create reciprocal

---

[544] *Ibid.*

[545] Gowlland-Debbas, "Judicial insights into fundamental values and interests…" (see footnote 524 above), p. 328. See further C. J. Tams, *Enforcing Obligations Erga omnes in International Law,* Cambridge, Cambridge University Press, 2005, pp. 2–3 and *passim*.

[546] J. A. Frowein, "Obligations *erga omnes*", in Bernhardt (ed.), *Encyclopedia of Public International Law*, vol. 3 (see footnote 498 above), p. 757.

[547] *Barcelona Traction, Light and Power Company, Limited* (see footnote 524 above), p. 32, para. 33. For support for the concept of obligations *erga omnes*, see O. Schachter, *International Law in Theory and Practice,* Dordrecht, Martinus Nijhoff, 1991, pp. 343–345; C. Annacker, "The legal régime of *erga omnes* obligations in international law", *Österreichische Zeitschrift für öffentliches Recht und Völkerrecht*, vol. 46, No. 2 (1994), p. 131. For criticism, see Weil (footnote 181 above), p. 413.

[548] *Barcelona Traction, Light and Power Company, Limited* (see footnote 524 above), p. 32, paras. 33–34.

[549] See M. Byers, "Conceptualising the relationship between *jus cogens* and *erga omnes* rules", *Nordic Journal of International Law*, vol. 66 (1997), p. 211, at p. 230.

[550] See also the fourth report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur (A/CN.4/444 and Add.1–3) (footnote 203 above), p. 34, para. 92: "the concept of *erga omnes* obligations is not characterized by the importance of the interest protected by the norm (as is typical of *jus cogens*) but rather by the 'legal indivisibility' of the content of the obligation, namely by the fact that the rule in question provides for obligations which bind simultaneously each and every State concerned with respect to all others. This legal structure is typical not only of peremptory norms, but also of other norms of general international law and of a number of multilateral treaty rules (*erga omnes partes* obligations)."

[551] Art. 48 of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 126.

[552] *Ibid.*, pp. 126–128, commentary to draft article 48. The examples given by the Commission concern treaties that have to do with the environment, or the security of a region, or a regional system of human rights protection.

obligations between States in the bilateralist manner. An obligation to respect the right to freedom of speech in a State's territory, for example, is not directed towards any particular States or the citizens of particular States. Rather, under such a norm a State assumes a responsibility in relation to all persons under its jurisdiction. There is no *quid pro quo* in such relations. A State is obliged to respect that right irrespective of how other States may have behaved.[553]

392.    This raises the question of who the beneficiaries of *erga omnes* obligations are and whether one's status as an immediate beneficiary has any bearing on the capacity to react to violations. It may, from an academic perspective, be quite correct to state that *erga omnes* obligations "are grounded not in an exchange of rights and duties but in an adherence to a normative system".[554] Yet it is far from clear what this means in terms of the procedural rights triggered by any actual violation.

393.    If a State is responsible for torturing its own citizens, no single State suffers any direct harm. Apart from the individual or individuals directly concerned, any harm attributed to anyone else is purely notional, that is, constructed on the basis of the assumption that such action violates some values or interests of "all", or in the vocabulary of the *Barcelona Traction* case, the "international community as a whole". Although the State committing torture has breached its obligations, under bilateralism, there would be no injured State and thus no State in possession of a claim right.[555] But of course, the Commission has now accepted that there may be situations where non-injured States may also be entitled to invoke breaches and that those are precisely the kinds of situations where the violations concern the "international community as a whole" and where all States have a legal interest.[556] The case of *erga omnes partes* dealt with in draft article 48, paragraph 1 (*a*), covers the situation where a collective interest of treaty parties has been violated and where, consequently, it is reasonable to entitle all the parties to invoke the breach. Draft article 48, paragraph 1 (*b*), deals with general *erga omnes* obligations that establish a right for all States—that is to say, in their capacity as members of the "international community"—to invoke the breach.[557]

394.    Again, a good summary can be found in the *Furundžija* judgment of the International Tribunal for the Former Yugoslavia. Having stated that the prohibition of torture was a *jus cogens* norm, the Tribunal also defined it as establishing an *erga omnes* obligation, as follows:

> Furthermore, the prohibition of torture imposes upon States obligations *erga omnes*, that is, obligations owed towards all the other members of the international community, each of which then has a correlative right. In addition, the violation of such an obligation simultaneously constitutes a breach of the correlative right of all members of the international community and gives rise to a claim for compliance accruing to each and every member, which then has the right to insist on fulfilment of the obligation or in any case to call for the breach to be discontinued.[558]

395.    The distinction between "bilateral" and *erga omnes* obligations seems analogous to the domestic distinction between contracts and public law obligations. In the latter, the relationship is between the legal subject and the public power. Even if a breach of such an obligation may violate an individual interest, the capacity to react (as in most criminal law) lies in the hands of the public power.

396.    This does not, however, mean that States could react only through a collective process. Indeed, if that were the case, the absence of general collective reaction procedures—apart from those under Chapter VII of the Charter of the United Nations—would render the provision on *erga omnes* practically meaningless. As pointed out by Gaja in his report to the Institute of International Law, a collective reaction involving all States "is in practice impossible". Therefore it must be concluded that an obligation owed to the "international community as a whole" is also owed to each State individually and without any specific interest on that State's part, and that each of them has the capacity to react in case of breach. Whether other subjects—individuals, groups of individuals or organizations—might also be entitled to react depends on the content of the relevant norm and whether suitable avenues for such reaction are present.[559]

397.    It has also been suggested that the fact that an obligation is owed *erga omnes* is relevant to determining the consequences of its breach. In particular, it may involve the obligation of non-recognition. Considering the legality of the security barrier built by Israel partly on the

---

[553] As noted by Simma, human rights treaties are among those agreements in regard to which "obligations do not run between the States parties at all but rather oblige the contracting States to adopt a certain 'parallel' conduct within their jurisdiction which does not manifest itself as any tangible exchange or interaction *between* the parties" (B. Simma, "Bilateralism and community interest in the law of State responsibility", in Y. Dinstein (ed.), *International Law at a Time of Perplexity: Essays in Honour of Shabtai Rosenne,* Dordrecht, Martinus Nijhoff, 1988, p. 821, at p. 823).

[554] See R. Provost, "Reciprocity in human rights and humanitarian law", *British Year Book of International Law 1994*, vol. 65, p. 383, at p. 386.

[555] Seiderman goes so far as to assert that "it is inappropriate to divide human rights norms into those which entail obligations *erga omnes* and those which do not" (Seiderman (see footnote 536 above), p. 124). For an alternative view, see Byers, "Conceptualising the relationship between *jus cogens* and *erga omnes* rules" (footnote 549 above), p. 232. Byers sees obligations *erga omnes* as still being within the bilateralist paradigm, suggesting that "an *erga omnes* rule might be considered to involve a series of identical bilateral relationships between every possible pair of States", plus having the characteristic that every State has the right to present a claim, whoever suffers the direct loss from a breach of such obligations. Inspiration for such treatment of the doctrine might be based on what the International Court of Justice stated in 1974 in the *Nuclear Tests* case. In its decision, the Court held that "[t]he unilateral statements of the French authorities were made outside the Court, publicly and *erga omnes* … The objects of these statements are clear and they were addressed to the international community as a whole, and the Court holds that they constitute an undertaking possessing legal effect" (*Nuclear Tests (Australia v. France)*, Judgment, *I.C.J. Reports 1974*, p. 269, at p. 269, paras. 50–51). According to the argumentation in this early opinion, obligations *erga omnes* would really be no more than obligations a State has taken in relation to all the States of the international community.

[556] Art. 42 (*b*) of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 117.

[557] *Ibid.*, pp. 126–128, commentary to draft article 48.

[558] *Prosecutor v. Anto Furundžija* (see footnote 502 above), *Judicial Reports 1998*, p. 567, para. 151; ILR, vol. 121 (2002), p. 260.

[559] G. Gaja, "Obligations and rights *erga omnes* in international law", *Annuaire de l'Institut de droit international*, vol. 71-I (Session of Krakow, 2005—First Part), p. 117, at p. 126.

occupied territory of Palestine, the International Court of Justice stated the following:

> The obligations *erga omnes* violated by Israel are the obligation to respect the right of the Palestinian people to self-determination, and certain of its obligations under international humanitarian law.
>
> …
>
> Given the character and the importance of the rights and obligations involved, the Court is of the view that all States are under an obligation not to recognize the illegal situation resulting from the construction of the wall…[560]

398. The Court specified this by holding:

> They are also under an obligation not to render aid or assistance in maintaining the situation created by such construction. It is also for all States, while respecting the United Nations Charter and international law, to see to it that any impediment, resulting from the construction of the wall, to the exercise by the Palestinian people of its right to self-determination is brought to an end. In addition, all the States parties to the Geneva Convention relative to the Protection of Civilian Persons in Time of War of 12 August 1949 are under an obligation, while respecting the United Nations Charter and international law, to ensure compliance by Israel with international humanitarian law as embodied in that Convention.[561]

### 3. OBLIGATIONS *ERGA OMNES PARTES*

399. The judgment of the International Court of Justice in the *Barcelona Traction* case contains a statement to the effect that "the instruments which embody human rights do not confer on States the capacity to protect the victims of infringements of such rights irrespective of their nationality".[562] These lines may be taken to mean that obligations *erga omnes* cannot be based on treaty law. This, however, cannot have been the Court's meaning. A better view seems to be that the Court wished to say that specific agreements may channel legal standing into appropriate procedures. In other words, the statement would not relate to the sources of obligations *erga omnes*, but to the technical particularities of human rights treaties. As Ian Seiderman has stated, "in order to institute an *actio popularis*, a State or other subject of international law would need both standing and a forum. *Erga omnes* addresses itself only to the former requirement."[563]

400. Yet not too much should be made of the distinction (standing and jurisdiction). In the case of State responsibility—the principal field of *erga omnes* obligations—the absence of jurisdiction does not extinguish the claim. In the human rights field, for instance, the general law of State responsibility becomes fully available for actors representing the "international community as a whole", even where an "*actio popularis*" might remain beyond the possibilities offered by the particular forum.[564]

401. This logic was long ago expressed in regard to the European Convention on Human Rights. In the *Pfunders* case, in 1961,[565] the Austrian Government alleged that criminal proceedings in Italian courts had been carried out in conflict with article 6 of the Convention. The Italian Government objected that the treaty bodies lacked competence *ratione temporis* to entertain the case, as Austria had not ratified the Convention at the time of the disputed events and was thus not empowered to bring the claim. However, the European Commission of Human Rights rejected this argument with the famous statement that

> the purpose of the High Contracting Parties in concluding the Convention was not to concede to each other reciprocal rights and obligations in pursuance of their individual national interests but to realise the aims and ideals of the Council of Europe, as expressed in its Statute, and to establish a common public order of the free democracies of Europe with the object of safeguarding their common heritage of political traditions, ideals, freedom and the rule of law;
>
> …
>
> [T]he obligations undertaken by the High Contracting Parties in the Convention are essentially of an objective character, being designed rather to protect the fundamental rights of individual human beings from infringement by any of the High Contracting Parties than to create subjective and reciprocal rights for the High Contracting Parties themselves…[566]

402. Hence it has to be concluded that the source of a norm cannot be said to be decisive as to whether that norm gives rise to obligations *erga omnes* or not.[567] It is rather the character of primary norms that determines the nature of secondary rules.

403. That obligations *erga omnes* can indeed be based on treaty norms has also been confirmed by the Institute of International Law. Its resolution entitled "Obligations

---

[560] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 534 above), pp. 199–200, paras. 155 and 159.

[561] *Ibid.*, p. 200, para. 159. This did not, however, go uncontested by the other judges. Thus, Judge Higgins in her separate opinion stated that, "unlike the Court", she did not think that "the identified consequence of the identified violations of international law ha[d] anything to do with the concept of *erga omnes*", continuing: "The Court's celebrated dictum in *Barcelona Traction* … is frequently invoked for more than it can bear. Regrettably, this is now done also in this Opinion … That dictum was directed to a very specific issue of jurisdictional *locus standi*. … It has nothing to do with imposing substantive obligations on third parties to a case." She added: "That an illegal situation is not to be recognized or assisted by third parties is self-evident, requiring no invocation of the uncertain concept of '*erga omnes*'. … The obligation upon United Nations Members not to recognize … and not to lend support or assistance relie[s] in no way whatever on '*erga omnes*'" (*ibid.*, p. 216, paras. 37–38, separate opinion of Judge Higgins).

[562] *Barcelona Traction, Light and Power Company, Limited* (see footnote 524 above), p. 47, para. 91.

[563] Seiderman (see footnote 536 above), pp. 136–137. Likewise, in the *East Timor* case, the International Court of Justice held that "the *erga omnes* character of a norm and the rule of consent to jurisdiction are two different things. Whatever the nature of the obligations invoked, the Court could not rule on the lawfulness of the conduct of a State when its judgment would imply an evaluation of the lawfulness

of the conduct of another State which is not a party to the case. Where this is so, the Court cannot act, even if the right in question is a right *erga omnes*" (*East Timor (Portugal v. Australia)*, Judgment, *I.C.J. Reports 1995*, p. 90, at p. 102, para. 29). See also *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 534 above), p. 216, para. 37 (separate opinion of Judge Higgins), where she states that the *dictum* in *Barcelona Traction* was directed to a very specific issue of jurisdictional *locus standi*.

[564] For the suggestion of using the *erga omnes* concept to empower non-State actors, see, for example, H. Charlesworth and C. Chinkin, *The Boundaries of International Law: A Feminist Analysis*, Manchester, Manchester University Press, 2000, pp. 94–95.

[565] Decision of the Commission as to the admissibility of application No. 788/60 lodged by the Government of the Federal Republic of Austria against the Government of the Republic of Italy, 11 January 1961, *Yearbook of the European Convention on Human Rights 1961*, vol. 4, p. 116.

[566] *Ibid.*, pp. 138, 140.

[567] See also Annacker (footnote 547 above), p. 136, who argues that "[t]he source of a norm by itself does not allow any conclusions regarding the structure of the obligations imposed and of the rights conceded by the primary norm or the régime of responsibility (secondary norms)."

*erga omnes* in international law", adopted in 2005, defines an obligation *erga omnes* as:

(*a*)  an obligation under general international law that a State owes in any given case to the international community, in view of its common values and its concern for compliance, so that a breach of that obligation enables all States to take action; or

(*b*)  an obligation *under a multilateral treaty** that a State party to the treaty owes in any given case to all the other States parties to the same treaty, in view of their common values and concern for compliance, so that a breach of that obligation enables all these States to take action.[568]

### 4.  THE RELATIONSHIP BETWEEN *JUS COGENS* AND *ERGA OMNES* OBLIGATIONS

404.  The close relationship between *jus cogens* and the notion of *erga omnes* obligations is a constant source of confusion. *Jus cogens* norms are particularly important norms that are distinguished by their non-derogability. A norm that conflicts with them is, as we have seen, null and void. Obligations *erga omnes* are obligations in the fulfilment of which every State ("the international community as a whole") has a legal interest. It is likely that all States have a legal interest in the observance of rules from which no derogation is permitted. In this sense, it is plausible to assume that all *jus cogens* norms constitute *erga omnes* obligations. But the equation does not work the other way around. From the fact that all States have an interest in the fulfilment of an obligation it does not necessarily follow that those norms are peremptory—that is to say, they do not necessarily render conflicting obligations null and void.

405.  In its commentary to the draft articles on responsibility of States for internationally wrongful acts, the Commission elaborated the relationship between *jus cogens* and obligations *erga omnes* as follows:

While peremptory norms of general international law focus on the scope and priority to be given to a certain number of fundamental obligations, the focus of obligations to the international community as a whole is essentially on the legal interest of all States in compliance—i.e. in terms of the present articles, in being entitled to invoke the responsibility of any State in breach. Consistently with the difference in their focus, it is appropriate to reflect the consequences of the two concepts in two distinct ways. First, serious breaches of obligations arising under peremptory norms of general international law can attract additional consequences, not only for the responsible State but for all other States. Secondly, all States are entitled to invoke responsibility for breaches of obligations to the international community as a whole.[569]

---

[568] *Annuaire de l'Institut de Droit international*, vol. 71-II (Session of Krakow, 2005—Second Part), p. 287, art. 1. See also the fourth report on State responsibility by Gaetano Arangio-Ruiz, Special Rapporteur (A/CN.4/444 and Add.1–3) (footnote 203 above), p. 34, para. 92, stating that "[t]his legal structure [obligations *erga omnes*] is typical not only of peremptory norms, but also of other norms of general international law and of a number of multilateral treaty rules (*erga omnes partes* obligations)".

[569] Para. (7) of the general commentary to part II, chap. III, of the draft articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 111–112. Michael Byers has depicted the same relationship in the following terms: "*Jus cogens* rules, otherwise known as 'peremptory rules', are non-derogable rules of international 'public policy'. They render void other, non-peremptory rules which are in conflict with them. *Erga omnes* rules, on the other hand, are rules which, if violated, give rise to a general right of standing—amongst all States subject to those rules—to make claims" (Byers, "Conceptualising the relationship between *jus cogens* and *erga omnes* rules" (see footnote 549 above), p. 211).

406.  In the *Furundžija* case, the International Tribunal for the Former Yugoslavia made clear the relationship between the procedural thrust of *erga omnes* obligations and the linkage of *jus cogens* to normative hierarchy:

While the *erga omnes* nature just mentioned appertains to the area of international enforcement (*lato sensu*), the other major feature of the principle proscribing torture relates to the hierarchy of rules in the international normative order.[570]

### 5.  CONCLUSION

407.  The discussion of hierarchy confirms the conclusions already reached at the end of the foregoing chapters. Although there is no single, fixed set of hierarchical relationships among the rules, principles and obligations of international law, this does not mean that relations of superiority and inferiority are non-existent, only that what they are cannot be determined in an abstract way, irrespective of the contexts in which some norms (rules, principles) are invoked against countervailing considerations. Although it is customary to deal with hierarchy in international law in terms of *jus cogens* norms and *erga omnes* obligations, it is not clear that these are the only—or indeed the most practically relevant—cases. As we saw in chapters II and III above, there are other important rules—for example treaty rules of an "integral" and "interdependent" nature, "intransgressible principles", "elementary considerations of humanity" and treaty clauses that cannot be violated without simultaneously undermining the object and purpose of the treaty—that play a more significant role in the practice of legal reasoning. It may be that focus on the well-known Latin maxims has diverted attention from these more mundane types of relationships of importance.

408.  However, this section has emphasized the clear difference that exists between *jus cogens* norms and obligations *erga omnes*. The former have to do with the normative "weight" of a norm, the latter with its procedural "scope". While a *jus cogens* norm necessarily has an *erga omnes* scope, not all *erga omnes* obligations have weight as *jus cogens*. And while it is true that which norms belong to these classes remains to be argued separately every time, a solid professional consensus has been building through the 1990s on the nature of at least some prohibitions as being that of *jus cogens* and the violation of some obligations as providing a standing for non-injured States. Though the categories nevertheless remain fluid, this does not mean that they are meaningless. On the contrary, their relative openness allows their reasonable use in particular situations of normative conflict (*jus cogens*) or when having to decide on standing in regard to some obligations (obligations *erga omnes*).

409.  But law is a systematic craft, and debates on superior and inferior norms remain a fertile ground for deliberating "constitutionalization" and fragmentation. Article 103 of the Charter of the United Nations certainly suggests the hierarchically higher status of the Charter over other parts of international law, while the very idea of *jus cogens* suggests that even United Nations policies may meet with a "constitutional" limit. Of course, there no longer persists a meaningful challenge to the notion of

---

[570] *Prosecutor v. Anto Furundžija* (see footnote 502 above), *Judicial Reports 1998*, p. 569, para. 153; ILR, vol. 121 (2002), p. 260.

*jus cogens*. Any actual disputes relate to the determination of its content, in particular with respect to the characterization of some action or event. Here, everything depends on the development of political preferences.[571] Neverthe-

___

[571] In this regard, particularly important are the deliberations of the Court of First Instance of the European Communities in case T-306/01, *Ahmed Ali Yusuf and Al Barakaat International Foundation v. Council of the European Union and Commission of the European Communities* (see footnote 485 above). As pointed out above, the Court stated that it had the competence to examine the conformity of United Nations Security Council decisions with *jus cogens*. At one point it speculated about "fundamental rights of the human person falling within the ambit of *jus cogens*" (para. 286), indicating that not all "fundamental rights" were by the same token *jus cogens*. However, in a later passage the Court went on to assess "whether the freezing of funds … infringes the applicants' fundamental rights" (para. 288), thereby in fact conflating

less, the importance of the notion—like the importance of *erga omnes* obligations—may lie less in the way the concept is actually "applied" than as a signal of argumentative possibilities and boundaries for institutional decision-making. To that extent, these notions alleviate the extent to which international law's fragmentation may seem problematic.

___

the two categories—"fundamental rights" and "*jus cogens*". This wide understanding of *jus cogens* also surfaces in the Court's view that an "arbitrary deprivation" of the right to property "might, in any case, be regarded as contrary to *jus cogens*" (para. 293). Also of interest is the Court's view that while the right of access to the courts did possess *jus cogens* status, this did not mean that it was unlimited. On the contrary, its limitation by action taken in pursuit of Article 103 of the Charter appeared to be "inherent in that right as it is guaranteed by *jus cogens*" (para. 343).

## CHAPTER V

# Systemic integration and article 31, paragraph 3 (*c*), of the Vienna Convention on the Law of Treaties

### A.  Introduction: the "principle of systemic integration"

410.  The previous chapters dealt with three types of relationship between rules and principles (norms) of international law: relations between special and general norms, between prior and subsequent norms, and between rules and principles with different normative power. In each chapter, the argument was that legal technique was perfectly capable of resolving normative conflicts or overlaps by putting these rules and principles in a determinate relationship with each other. The chapters highlighted that there was nothing automatic or mechanical about this process. The way the relevant techniques (*lex specialis*, *lex posterior* and *lex superior*) operated was dependent on what should be considered the relevant aspects of each case. Whether a rule's speciality or generality should be decisive, or whether priority should be given to the earlier or to the later rule, depended on such aspects as the will of the parties, the nature of the instruments and their object and purpose, as well as what would be a reasonable way to apply them with minimal disturbance to the operation of the legal system.

411.  Alongside contextuality, another conspicuous feature in the preceding surveys of international practice has been the effort to avoid invalidating the norm that will be set aside, with only the abstract and so far substantially quite thin doctrine of *jus cogens* as an exception. In other words, care has been taken not to suggest that a treaty duly adopted or a custom followed by States would become, in some respect, altogether without legal effect. This has been achieved in particular through two techniques. First is the effort to harmonize apparently conflicting norms by interpreting them so as to render them compatible. Second is the technique whereby the question of validity has been replaced by a question of priority. The norm that will be set aside will remain as it were "in the background", continuing to influence the interpretation and application of the norm to which priority has been given.

412.  It follows that, contrary to what is sometimes suggested, conflict resolution and interpretation cannot be distinguished from each other. Whether there is a conflict and what can be done with *prima facie* conflicts depends on the way the relevant rules are interpreted. This cannot be stressed too much. Interpretation does not intervene only once it has already been ascertained that there is a conflict. Rules appear to be compatible or in conflict *as a result of interpretation*. Sometimes it may be useful to stress the conflicting nature of two rules or sets of rules so as to point to the need for legislative intervention. Often, however, it seems more appropriate to play down that sense of conflict and to read the relevant materials from the perspective of their contribution to some generally shared—"systemic"—objective. The technique of "mutual supportiveness" provided an example of this. But whichever way one goes, the process of reasoning follows well-worn legal pathways: references to normal meaning, party will, legitimate expectations, good faith and subsequent practice, as well as the "object and purpose" and the principle of effectiveness. And finally, if a definite priority must be established, this may, as we have seen above, be achieved through three criteria: (*a*) specificity (*lex specialis*); (*b*) temporality (*lex posterior*); and (*c*) status (*jus cogens*, obligations *erga omnes* and Article 103 of the Charter of the United Nations).

413.  It is therefore not a surprise that the 1969 Vienna Convention deals with the plurality of rules and principles in the context of treaty interpretation. In particular, article 31, paragraph 3 (*c*), may be taken to express what may be called the principle of "systemic integration"[572]—the process surveyed all through this report—whereby international obligations are interpreted by reference to their normative environment ("system"). Article 31, paragraph 3 (*c*), of the Convention provides:

___

[572] Combacau and Sur, *Droit international public* (footnote 507 above), p. 175, and, in much more detail, C. McLachlan, "The principle of systemic integration and article 31 (3) (*c*) of the Vienna Convention", *International and Comparative Law Quarterly*, vol. 54, No. 2 (April 2005), p. 279.

There shall be taken into account, together with the context:

…

    (c)  Any relevant rules of international law applicable in the relations between the parties.

414.   The rationale for such a principle is understandable. All treaty provisions receive their force and validity from general law and set up rights and obligations that exist alongside rights and obligations established by other treaty provisions and rules of customary international law. None of these rights and obligations has any *intrinsic* priority over the others. The question of their relationship can only be approached through a process of reasoning that makes them appear as parts of some coherent and meaningful whole. This is why, as pointed out by McNair, they must also be "applied and interpreted against the background of the general principles of international law".[573] Or, as the Arbitral Tribunal in the *Georges Pinson* case noted, a treaty must be deemed to refer to such principles for all questions which it does not itself resolve expressly and in a different way.[574] Reference to general rules of international law in the course of interpreting a treaty is an everyday, often unconscious part of the interpretation process. We have surveyed how this takes place in connection with the operation of special (and not "self-contained") regimes in chapter II above. In the activity of specialized treaty bodies, a solid legal background is constantly presumed in a non-controversial way. No tribunal will ask for evidence of the rule of *audiatur et altera pars* or call into question the nature of a United Nations Member as a "State". These matters are taken as given, and if a party challenges the relevance of any such procedural standard or public law status, then it is up to that party to justify its (unorthodox) case.

415.   But the principle of systemic integration goes further than merely restating the applicability of general international law in the operation of particular treaties. It points to a need to take into account the normative environment more widely. Nor is this anything new. Thus, for example, the Arbitral Tribunal in a Franco-Belgian case from 1937 was able to hold as follows, without any further explanation:

    [A]bstraction faite de cette interprétation grammaticale et logique, il faut tenir compte du fait qu'il faut placer et interpréter l'accord Tardieu-Jaspar dans le cadre des accords de La Haye de janvier 1930, c'est-à-dire dans le cadre du Plan Young qui détermine soigneusement par quelle méthode les "paiements allemands" et les "transferts allemands" s'effectueront…[575]

416.   In this case, one treaty was interpreted by reference to another treaty. It was obvious that the Franco-Belgian issue had a relationship to the overall effort to settle the German reparations problem and that this fact—the linkage of the treaty to that general settlement—could not be ignored in the interpretation of the agreement. More generally, if it is indeed the point of international law to coordinate relations between States, then it follows that specific norms must be read against other norms bearing upon the same facts as the treaty under interpretation. A case in point is what Fitzmaurice called "chains" of treaties that grapple with the same type of problem at different levels or from particular (technical, geographical) points of view.[576] As the Arbitral Tribunal in the *Southern Bluefin Tuna* case (2000) put the point:

it is a commonplace of international law and State practice for more than one treaty to bear upon a particular dispute. … There is frequently a parallelism of treaties … The current range of international legal obligations benefits from a process of accretion and cumulation …[577]

417.   In the era of framework treaties and implementation treaties, this seems self-evident. The doctrine of "treaty parallelism" addresses precisely the need to coordinate the reading of particular instruments or to see them in a "mutually supportive" light. At issue in the *Southern Bluefin Tuna* case was the relationship between the 1982 United Nations Convention on the Law of the Sea and a fisheries treaty concluded for the implementation of the former. It would have been awkward, and certainly not in accord with the intent of the parties, to read those instruments independently from each other. Although how that relationship should be conceived—were they part of what in chapter III, section B.1, above was called a "regime" or were they not?—may remain the subject of some debate (particularly in view of the overlapping provisions on dispute settlement), the Tribunal itself fully realized that it could not ignore the fact that the problem arose under both treaties.[578]

418.   Yet the problem is not limited to relationships between framework treaties and implementation treaties (after all, these characterizations have no determined content). Surely deciding which treaty is applicable or how a tribunal's jurisdiction is delimited cannot be dependent on how a State chooses to characterize a problem? Daillier and Pellet make the general point clearly:

    *Un traité ne peut être considéré isolément. Non seulement il est ancré dans les réalités sociales, mais encore ses dispositions doivent être confrontées avec d'autres normes juridiques avec lesquelles elles peuvent entrer en concurrence.*[579]

---

[573] McNair (see footnote 58 above), p. 466.

[574] *Georges Pinson (France) v. United Mexican States* (see footnote 244 above), p. 422.

[575] "Based on this grammatical and logical interpretation, it must be borne in mind that the Tardieu–Jaspar Agreement must be situated and interpreted in the context of the Hague Agreements of January 1930, *i.e.* within the framework of the Young Plan, which meticulously defines the methods by which the 'German payments' and 'German transfers' are to be made": *Différend concernant l'Accord Tardieu-Jaspar (Belgium/France),* Award of 1 March 1937, UNRIAA, vol. III (Sales No. 1949.V.2), p. 1701, at p. 1713.

[576] Third report on the law of treaties by Gerald Fitzmaurice, Special Rapporteur (A/CN.4/115) (see footnote 139 above), p. 44, para. 89 (*b*).

[577] *Southern Bluefin Tuna Case between Australia and Japan and between New Zealand and Japan* (see footnote 26 above), p. 40, para. 52.

[578] For the debate concerning the problems that emerge as a result of the Tribunal's preferring the dispute settlement provisions of the regional treaty (Convention for the Conservation of Southern Bluefin Tuna) to the (compulsory) provisions of Part XV of the United Nations Convention on the Law of the Sea, see J. Peel, "A paper umbrella which dissolves in the rain? The future for resolving fisheries disputes under UNCLOS in the aftermath of the *Southern Bluefin Tuna* arbitration", *Melbourne Journal of International Law*, vol. 3, No. 1 (May 2002), p. 53, and B. Kwiatkowska, "*The Ireland v. United Kingdom (MOX Plant)* case: applying the doctrine of treaty parallelism", *International Journal of Marine and Coastal Law*, vol. 18, No. 1 (March 2003), p. 1, at p. 52 and footnotes.

[579] "A treaty cannot be considered in isolation. Not only is it anchored in social realities; its provisions must also be confronted with other, potentially competing, legal rules": Daillier and Pellet (see footnote 74 above), p. 266.

419. None of this predetermines what it means to "confront" a norm with another or how they might enter into "competition". These matters must be left to the interpreter to decide in view of the situation. The point—but it is a key point—is simply that the normative environment cannot be ignored and that, when interpreting treaties, the principle of integration should be borne in mind. This points to the need to carry out interpretation such that the rules are seen in the light of some comprehensible and coherent objective, so as to prioritize concerns that are more important at the cost of less important objectives. This is all that article 31, paragraph 3 (*c*), requires: the integration into the process of legal reasoning—including reasoning by courts and tribunals—of a sense of coherence and meaningfulness. Success or failure here is measured by how the legal world views the outcome.

420. This chapter may be understood as an elucidation of the place and operation of article 31, paragraph 3 (*c*), of the 1969 Vienna Convention, but also as a summary of much of what has been said in previous chapters. The systemic nature of international law has received its clearest formal expression in that provision. As was suggested by Ms. Hanqin Xue during debates in the Commission on the significance of article 31, paragraph 3 (*c*), this provision operates like a "master key" to the house of international law.[580] If there is a systemic problem—an inconsistency, a conflict, an overlap between two or more norms—and no other interpretative means provides a resolution, then recourse may always be had to that provision in order to proceed in a reasoned way.

421. It may of course often be the case that no formal reference to article 31, paragraph 3 (*c*), is needed because other techniques sufficiently cover the need to take into account the normative environment. As we have seen, customary law, general principles of law and general treaty provisions form the interpretative background for specific treaty provisions, and it often suffices to refer to them to attain systemic integration. Sometimes article 31, paragraph 3 (*c*), is taken as merely confirming this. For example, in the recent arbitration between France and the Netherlands concerning the application of the Convention on the Protection of the Rhine against Pollution from Chlorides (2004), the Tribunal was requested to apply article 31, paragraph 3 (*c*), by one of the parties in support of its contention that the "polluter-pays" principle might be applicable in the affair. The Tribunal examined this contention, noting as follows:

*ce principe figure dans certains instruments internationaux, tant bilatéraux que multilatéraux, et se situe à des niveaux d'effectivité variables. Sans nier son importance en droit conventionnel, le Tribunal ne pense pas que ce principe fasse partie du droit international général.[581]*

422. But if that were all article 31, paragraph 3 (*c*), covered, it would have been unnecessary. Its wording,

however, is not restricted to "general international law" but extends to "[a]ny relevant rules of international law applicable in the relations between the parties". Adding the word "general" was proposed in the Commission, but it was not included. The predominant, though not exclusive, references in the Commission were to other treaty rules. Whether, in the case of multilateral treaties, this requires that all parties to a treaty to be interpreted are also parties to the other treaties "to be taken into account" will be discussed below.[582]

423. It is sometimes suggested that international tribunals or law-applying (treaty) bodies are not entitled to apply law that goes "beyond" the four corners of the constituting instrument or that, when arbitral bodies deliberate an award, they ought not to take into account rules or principles that are not incorporated in the treaty under dispute or the relevant *compromis*. But if, as discussed in chapter I, section E, above, all international law exists in a systemic relationship with other law, no such application can take place without situating the relevant jurisdiction-endowing instrument in its normative environment.[583] This means that, although a tribunal may only have jurisdiction in regard to a particular instrument, it must always *interpret* and *apply* that instrument in the context of its relationship to its normative environment—that is to say "other" international law.[584] This is the principle of systemic integration to which article 31, paragraph 3 (*c*), of the 1969 Vienna Convention gives expression. It is true that the formulation of article 31, paragraph 3 (*c*), has been criticized as unclear, both in its substantive and temporal scope and in its normative force. To what extent should "other law" be taken into account? What about prior or later law? And what does "taking into account" really mean? As Judge Weeramantry noted in the *Gabčíkovo-Nagymaros* case, the provision "scarcely covers this aspect with the degree of clarity requisite to so important a matter".[585] Thirlway even doubts "whether this sub-paragraph will be of any assistance in the task of treaty interpretation".[586] But if the provision is merely the expression of a larger principle—that of "systemic integration"—and if that principle, again, expresses a reasonable or even necessary aspect of the practice of legal reasoning, then a discussion of its actual and potential uses would constitute a useful contribution to the study of the alleged fragmentation (or diversification) of international law.

---

[581] "[T]his principle appears in some international treaties, both bilateral and multilateral, and is applicable at different levels. Without denying its importance in treaty law, the Tribunal does not consider it part of general international law": *Case concerning the audit of accounts between the Netherlands and France in application of the Protocol of 25 September 1991 Additional to the Convention for the Protection of the Rhine from Pollution by Chlorides of 3 December 1976 (the Netherlands/France)*, award of 12 March 2004, UNRIAA, vol. XXV (Sales No. E/F.05.V.5), p. 267, at p. 312, para. 103.

[582] The (very limitative) suggestion that they should be was recently made by a WTO Panel in *European Communities—Measures Affecting the Approval and Marketing of Biotech Products*, WTO Panel reports, WT/DS291/R and Add.1–9 and Corr.1, WT/DS292/R and Add.1–9 and Corr.1, WT/DS293/R and Add.1–9 and Corr.1, adopted 21 November 2006, paras. 7.70–7.72.

[583] In this regard, see also Pauwelyn, *Conflict of Norms…* (footnote 21 above), pp. 460–463 and *passim*.

[584] This is not to say that it would in practice be easy—or even possible—to distinguish these aspects from each other. Indeed, the impossibility of doing so was a key reason why the Commission refrained from adopting any rule on inter-temporal law (see section D.3 below). The point is conceptual and refers to the way any right or obligation is double-sided—a creation of a treaty that is "applicable" and in substance determined through "interpretation".

[585] *Gabčíkovo-Nagymaros Project* (see footnote 119 above), p. 114 (separate opinion of Judge Weeramantry).

[586] H. Thirlway, "The law and procedure of the International Court of Justice 1960–1989 (Part Three)", *British Year Book of International Law 1991*, vol. 62, p. 1, at p. 58.

## B. Article 31, paragraph 3 (*c*), of the Vienna Convention on the Law of Treaties

### 1. Construction

424.    Article 31, paragraph 3 (*c*), is placed within part III, section 3, of the 1969 Vienna Convention, which deals with the interpretation of treaties. Article 31 provides the "general rule of interpretation" in the following terms:

1.    A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2.    The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(*a*)    Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

(*b*)    Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.    There shall be taken into account, together with the context:

(*a*)    Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(*b*)    Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(*c*)    Any relevant rules of international law applicable in the relations between the parties.

4.    A special meaning shall be given to a term if it is established that the parties so intended.

425.    According to paragraph 3, three matters, not ranked in any particular order of priority, should be taken into account in treaty interpretation in addition to the context. The third of them is "any relevant rules of international law applicable in the relations between the parties". These provisions form a mandatory part of the interpretation process. Unlike the provision in article 32, on *travaux préparatoires* as a "supplementary means of interpretation", they are to be referred where the meaning of treaty terms is ambiguous, obscure, absurd or unreasonable.[587]

426.    Textual analysis of article 31, paragraph 3 (*c*), reveals a number of aspects of the rule which deserve emphasis:

(*a*)    It refers to "rules of international law", thus emphasizing that the reference for interpretation purposes must be to rules of law, and not to broader principles or considerations that may not be firmly established as rules;

(*b*)    The formulation refers to rules of international law in general. The words cover all the sources of international law, including custom, general principles and, where applicable, other treaties;

(*c*)    Those rules must be both relevant and "applicable in the relations between the parties". The sub-paragraph does not specify whether, in determining relevance and applicability, one must have regard to all parties to the treaty in question, or merely to those in dispute;

(*d*)    The sub-paragraph contains no temporal provision. It does not state whether the applicable rules of international law are to be determined as at the date on which the treaty was concluded, or at the date on which the dispute arises.

427.    Articles 31 and 32 of the 1969 Vienna Convention are, of course, widely assumed to reflect customary international law.[588] Their appeal may be attributable to the fact that they adopt a set of practical considerations that are familiar from the national context and at the same time general and flexible enough to provide a reasonable response to most interpretative problems. The Convention avoids taking a stand on any of the great doctrinal debates on interpretation. The articles adopt both an "ordinary meaning" and a "purposive" approach; they look for party consent, as well as what is in accordance with good faith. It is in fact hard to think of any approach to interpretation that would be excluded from articles 31 and 32.[589] Yet the Convention does not purport to be an exhaustive statement of interpretive techniques—there is no mention, for example, of *lex specialis* or *lex posterior*.

428.    In State practice and the practice of international tribunals, particular approaches to interpretation have of course developed. It has become a practice of human rights bodies to adopt readings of human rights conventions that look for their *effet utile* (practical effect) in a context perhaps wider than for regular treaties. Certain treaties establishing international institutions have become interpreted in "constitutional" terms. Recent experience in WTO, where the Appellate Body has been insisting that panels take the Convention's rules seriously, shows just how exacting a proper application of its principles may be.[590] Although the Convention does not require the interpreter to apply the process in the order listed in articles 31 and 32, that order is in fact intuitively likely to represent an effective sequence in which to approach the task. But there is no reason to separate these techniques too sharply from each other. As will be seen below, sometimes external sources may usefully clarify the ordinary meaning of treaty words, or a treaty's object and purpose.

### 2. The International Law Commission's debates

429.    The text of what now is article 31, paragraph 3 (*c*), of the 1969 Vienna Convention arose in the Commission from draft articles dealing with the interpretation of treaties. Paragraph 1 (*b*) of draft article 70, proposed by Waldock to the Commission in 1964, suggested that:

---

[587] This was also confirmed by the WTO Panel in *European Communities—Measures Affecting the Approval and Marketing of Biotech Products* (see footnote 582 above), para. 7.69.

[588] See the summary of State practice, jurisprudence and doctrinal writings in Villiger (footnote 77 above), pp. 334–343. Of the more recent practice, see *Territorial Dispute (Libyan Arab Jamahiriya/Chad)* (footnote 155 above); *Kasikili/Sedudu Island (Botswana/Namibia)* (footnote 243 above), p. 1059, para. 18; *LaGrand (Germany v. United States of America)*, Judgment, *I.C.J. Reports 2001*, p. 466, at p. 501, para. 99. See also *Golder v. United Kingdom*, European Court of Human Rights (footnote 238 above), p. 14, para. 29; *Restrictions to the Death Penalty (Arts. 4(2) and 4(4) American Convention on Human Rights)*, Inter-American Court of Human Rights (footnote 161 above); and, for example, *United States—Standards for Reformulated and Conventional Gasoline*, WTO Appellate Body report (footnote 48 above), pp. 19 *et seq.*

[589] That the interpretive techniques cannot be firmly prioritized is discussed in Koskenniemi, *From Apology to Utopia…* (see footnote 79 above), pp. 333–345.

[590] See the cases discussed below and, more generally, Cameron and Gray, "Principles of international law…" (footnote 173 above), p. 248.

The terms of a treaty shall be interpreted in good faith in accordance with the natural and ordinary meaning to be given to each term— [and]…

(*b*) in the context of the rules of international law in force at the time of the conclusion of the treaty.[591]

430. The provision had two parts. One was the expression of the principle of systemic integration—namely that treaties should be interpreted "in the context of the rules of international law". Throughout the ensuing discussion, this principle was taken for granted. Nobody challenged the idea that treaties were to be read in the context of their normative environment. Some members did suggest that the reference therein might be to "principles" rather than "rules" or speculated about the addition of the word "general" ("general rules" or "general principles").[592] In the end, however, none of these suggestions found their way into the text.

431. All the discussion and controversy in the Commission was addressed to the second part of the provision: the suggestion that the normative environment should be constructed on the basis of the law in force at the moment of the conclusion of the treaty. This was the problem of inter-temporal law. In this regard, the provision was a synthesis of a resolution of the Institute of International Law, calling for interpretation "in the light of the principles of international law",[593] and a formulation by Fitzmaurice that emphasized the principle of contemporaneity.[594] In Waldock's original proposal, an additional rule (draft article 56, ultimately omitted from the Convention) dealt specifically with inter-temporal law as follows:

1. A treaty is to be interpreted in the light of the law in force at the time when the treaty was drawn up.

2. Subject to paragraph 1, the application of a treaty shall be governed by the rules of international law in force at the time when the treaty is applied.[595]

432. Although the proposal to incorporate a provision on inter-temporal law did not find favour with the Commission in 1964, the issue continued to provoke controversy in the context of the provision on treaty interpretation. As a result, the Commission's commentary confines its discussion on the meaning and application of what is now article 31, paragraph 3 (*c*), on account of the discussion on inter-temporality.[596] Nevertheless, it is useful to note here what is presumed in this discussion, as well as in the whole doctrine of inter-temporality. This is the view that the interpretation and application of a treaty always takes place by reference to other rules of international law and that the only question is whether these "other rules" should be conceived in terms of the normative situation at the conclusion of the treaty or at the moment of its application.[597] As some Commission members observed, this followed from the very objective of tracing party intent, for that intent was certainly influenced by the rules in force at the time when the treaty was negotiated and adopted but developed over the course of the treaty's lifespan.[598]

## C. Case law

433. Until recently, there were few references to article 31, paragraph 3 (*c*), in judicial or State practice.

### 1. IRAN–UNITED STATES CLAIMS TRIBUNAL

434. The Tribunal has always found customary international law applicable. In an early case, it expressly confirmed that "the rules of customary law may be useful in order to fill in possible *lacunae* of the Treaty [of Amity between Iran and the United States of 1955], to ascertain the meaning of undefined terms in its text or, more generally, to aid interpretation and implementation of its provisions".[599] The issue which prompted a specific reference to article 31, paragraph 3 (*c*), was the determination of the nationality requirements imposed by the Algiers Accords in order to establish who might bring a claim before the Tribunal. Thus, in *Esphahanian v. Bank Tejarat,* the question arose of whether a claimant who had dual Iran/United States nationality might bring a claim before the Tribunal.[600] The Tribunal expressly deployed article 31, paragraph 3 (*c*), of the 1969 Vienna Convention in order to justify reference to a wide range of materials on the law of diplomatic protection in international law.[601] These materials supported the Tribunal's conclusion that "the applicable rule of international law [was] that of dominant and effective nationality".[602]

---

[591] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (see footnote 323 above), p. 52.

[592] See especially the statement by Mr. Tunkin at the Commission's 765th meeting, held on 14 July 1964, *Yearbook … 1964*, vol. I, pp. 278–279, para. 49.

[593] Resolution of the Institute of International Law on the interpretation of treaties, *Annuaire de l'Institut de droit international*, vol. 46 (Session of Granada, 1956), pp. 364–365. Inclusion of this reference in the Institute's resolution had had a controversial history. It did not appear in Lauterpacht's original scheme in 1950 (*ibid.*, vol. 43-I (Session of Bath, 1950), p. 433). A reference to the interpretative role of general principles of customary international law was subsequently added by him in 1952 (*ibid.*, vol. 44-I (Session of Sienna, 1952), p. 223). It faced considerable opposition on grounds of uncertainty and inconsistency with the Institute's codification role (*ibid.*, vol. 44-II, pp. 384–6, remarks by Guggenheim and Rolin; see also *ibid.*, vol. 45-I (Session of Aix-en-Provence, 1954), p. 228). When Fitzmaurice was appointed to replace Lauterpacht as Rapporteur, there was no reference of this kind in his draft (*ibid.*, vol. 46, pp. 337–338). It was only added in the course of the debate, following an intervention by Basdevant (*ibid.*, p. 344).

[594] Sir Gerald Fitzmaurice, *The Law and Procedure of the International Court of Justice*, vol. I, Cambridge, Grotius, 1986, p. 369.

[595] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (see footnote 323 above), pp. 8–9.

[596] Draft articles on the law of treaties with commentaries adopted by the International Law Commission at its eighteenth session, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, part II, p. 222, para. (16) of the commentary to draft article 27.

[597] See the third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (footnote 323 above), pp. 8–10; see also the debate within the Commission in *Yearbook … 1964*, vol. I, pp. 33–40, summary records of the Commission's 728th and 729th meetings, held on 21 and 22 May 1964, respectively.

[598] See, for example, the statement by Mr. Paredes at the Commission's 728th meeting, *Yearbook … 1964*, vol. I, p. 34, para. 12.

[599] *Amoco International Finance Corporation v. The Government of the Islamic Republic of Iran* (see footnote 125 above), p. 222, para. 112.

[600] *Nasser Esphahanian v. Bank Tejarat*, Iran–United States Claims Tribunal, case No. 157, 29 March 1983, 2 IRAN–U.S. C.T.R., p. 157.

[601] *Ibid.*, p. 161.

[602] *Ibid.* See also, to like effect, Iran–United States Claims Tribunal, case No. A/18, 6 April 1984, 5 IRAN–U.S. C.T.R., p. 251, at p. 260. The provision was also relied upon in a dissent in *Grimm v. Iran*, case No. 71, 18 February 1983, 2 IRAN–U.S. C.T.R., p. 78, at p. 82 (dissenting opinion of Howard M. Holtzmann, on the question of whether

## 2. EUROPEAN COURT OF HUMAN RIGHTS

435.   As pointed out in chapter II above, the European Court of Human Rights has routinely applied general international law. It has made specific reference to article 31, paragraph 3 (*c*), however, in construing the scope of the right to a fair trial protected by article 6 of the European Convention on Human Rights. In *Golder v. the United Kingdom,* the Court referred to article 31, paragraph 3 (*c*), when it had to determine whether article 6 guaranteed a right of access to the courts for every person wishing to commence an action to have his civil rights and obligations determined.[603] Through that route, the Court referred in turn to Article 38, paragraph 1 (*c*), of the Statute of the International Court of Justice as recognizing that the rules of international law included "general principles of law recognized by civilized nations".[604] It found that a right of access to the civil courts was one such general principle of law, and that this could be relied upon in interpreting the meaning of article 6.

436.   In *Loizidou v. Turkey,* the Court had to decide whether to recognize as valid certain acts of the Turkish Republic of Northern Cyprus.[605] It invoked article 31, paragraph 3 (*c*), as a basis for referring to United Nations Security Council resolutions and evidence of State practice supporting the proposition that the Turkish Republic of Northern Cyprus was not regarded as a State under international law.[606] The Republic of Cyprus remained the sole legitimate Government in Cyprus and acts of the Turkish Republic of Northern Cyprus were not to be treated as valid.

437.   In a trio of landmark decisions in 2001, the European Court of Human Rights utilized article 31, paragraph 3 (*c*), in order to decide whether the rules of State immunity might conflict with the right of access to court under article 6, paragraph 1, of the European Convention on Human Rights.[607] In each case, the Court decided by majority to give effect to State immunity. The right of access to the courts was not absolute. It could be subject to restrictions, provided that they were proportionate and pursued a legitimate aim. In making that assessment, the Court reasoned as follows:

the Convention has to be interpreted in the light of the rules set out in the [1969] Vienna Convention … and … Article 31 § 3 (*c*) … indicates that account is to be taken of "any relevant rules of international law applicable in the relations between the parties". The Convention,

including Article 6, cannot be interpreted in a vacuum. The Court must be mindful of the Convention's special character as a human rights treaty, and it must also take the relevant rules of international law into account … The Convention should so far as possible be interpreted in harmony with other rules of international law of which it forms part, including those relating to the grant of State immunity.

It follows that measures taken by a High Contracting Party which reflect generally recognised rules of public international law on State immunity cannot in principle be regarded as imposing a disproportionate restriction on the right of access to a court as embodied in Article 6 § 1.[608]

438.   It is useful to note that here the Court might have simply brushed aside State immunity as not relevant to the application of the Convention. But it did not do so. The conflict between article 6 and rules of customary international law on State immunity emerged only because the Court decided to integrate article 6 into its normative environment (doubtless because that is what was claimed by the respondent). The right provided under the Convention was weighed against the general interest in the maintenance of the system of State immunity. In the end, the Court used article 31, paragraph 3 (*c*), to set aside, in this case, the rules of the Convention.[609]

## 3. ARBITRATION IN THE CASE OF A MIXED OXIDE REPROCESSING PLANT (MOX PLANT) AND THE OSPAR CONVENTION

439.   As noted in chapter I above, this was part of the series of cases brought by Ireland against the United Kingdom concerning the operation of a nuclear reprocessing plant at Sellafield.[610] The award was rendered under the 1992 Convention for the Protection of the Marine Environment of the North-East Atlantic (OSPAR Convention) in proceedings dealing with access to information concerning the operation of a mixed oxide (MOX) reprocessing plant. Ireland contended that a reference to other rules of international law would affect the construction of the parties' obligations under the Convention in two ways.

440.   First, Ireland submitted that the provision in article 9, paragraph 3 (*d*), of the Convention, concerning the right to refuse a request for information if commercial confidentiality is involved, which referred to "applicable international regulations", entailed a reference to

a failure by Iran to protect an individual could constitute a measure "affecting [the] property rights" of his wife).

[603] *Golder v. the United Kingdom* (see footnote 238 above), pp. 13–14, paras. 27–31.

[604] *Ibid.*, pp. 17–18, para. 35.

[605] *Loizidou v. Turkey,* merits, judgment of 18 December 1996, European Court of Human Rights, *Reports of Judgments and Decisions* 1996-VI, p. 2231, para. 44.

[606] *Ibid.*

[607] *Al-Adsani v. the United Kingdom* (see footnote 219 above), para. 55, *Fogarty v. the United Kingdom* (see footnote 220 above), para. 35, and *McElhinney v. Ireland* (see footnote 219 above), para. 36. The European Court of Human Rights also referred to article 31, paragraph 3 (*c*), in *Banković and Others v. Belgium and Others* (see footnote 221 above), para. 57. For a critique of the Court's approach, see A. Orakhelashvili, "Restrictive interpretation of human rights treaties in the recent jurisprudence of the European Court of Human Rights", EJIL, vol. 14, No. 3 (2003), p. 529.

[608] *Al-Adsani v. the United Kingdom* (see footnote 219 above), paras. 55–56; see also *Fogarty v. the United Kingdom* (footnote 220 above), paras. 35–36, and *McElhinney v. Ireland* (footnote 219 above), paras. 36–37.

[609] The decision did not go unchallenged. The dissenting judges did not claim that State immunity was irrelevant or should be excluded from consideration in what was a "pure article 6 matter". Rather, they found that State immunity should, as a matter of international law, cede precedence to what they saw as a peremptory rule of international law (*jus cogens*) prohibiting torture. *Al-Adsani v. the United Kingdom* (see footnote 219 above), pp. 111–113, joint dissenting opinion of Judges Rozakis and Caflisch, joined by Judges Wildhaber, Costa, Cabral Barreto and Vajić. Other dissenters wished to admit of an exception for torts committed on the territory of the State. *McElhinney v. Ireland* (see footnote 219 above), pp. 51–54, joint dissenting opinion of Judges Caflisch, Cabral Barreto and Vajić.

[610] *Dispute concerning Access to Information under Article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland* (see footnote 137 above). The other cases are: *MOX Plant (Ireland v. United Kingdom)*, International Tribunal for the Law of the Sea, provisional measures, order of 3 December 2001 (see footnote 15 above); *MOX Plant (Ireland v. United Kingdom)*, Permanent Court of Arbitration, order No. 3 of 24 June 2003, ILM, vol. 42 (2003), p. 1187.

international law and practice. This, Ireland alleged, included the Rio Declaration[611] and the 1998 Aarhus Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters. The United Kingdom replied that the Rio Declaration was not a treaty and that the Aarhus Convention had not yet been ratified by either Ireland or the United Kingdom.

441. The Tribunal accepted that it was entitled to draw upon current international law and practice in construing this treaty obligation and in so doing made an express reference to article 31, paragraph 3 (*c*), of the 1969 Vienna Convention. However, it held that neither of the instruments referred to by Ireland were in fact "rules of law applicable between the parties". They were only "evolving international law" that, absent a specific authorization, a tribunal could not apply.[612] One of the arbitrators, Gavan Griffith, dissented on this point.[613] He pointed out that the Aarhus Convention was in force and that it had been signed by both Ireland and the United Kingdom. The latter had publicly stated its intention to ratify the Convention as soon as possible. At the least, this entitled the Tribunal to treat the Convention as evidence of the common views of the two parties on the definition of environmental information.

442. Second, the United Kingdom had submitted that its only obligation under the OSPAR Convention had been discharged by its application of European Community Directive 90/313[614] having to do with the same subject matter. The Tribunal did not, however, consider that following the European Community regulation would have constituted a bar to the procedure under the OSPAR Convention. Both regimes could coexist, even if they were enforcing identical legal obligations.[615] It observed:

> The primary purpose of employing the similar language is to create uniform and consistent legal standards in the field of the protection of the marine environment, and not to create precedence of one set of legal remedies over the other.[616]

### 4. World Trade Organization

443. As explained in detail in chapter II above, several decisions of the Appellate Body of WTO have considered the application of principles of customary and general international law in the interpretation of agreements covered by WTO. In *United States—Import Prohibition of Certain Shrimp and Shrimp Products* (the "*Shrimp–Turtle* case"), for example, the Appellate Body made extensive reference to international environmental law texts.[617] It found that the terms "natural resources" and "exhaustible" in article XX (*g*) were "by definition evolutionary" and took account, therefore, of article 56 of the United Nations Convention on the Law of the Sea in support of the proposition that natural resources could include both living and non-living resources.[618] The Appellate Body also referred, in support of this construction, to Agenda 21[619] and to the resolution on assistance to developing countries adopted in conjunction with the Convention on the Conservation of Migratory Species of Wild Animals.[620] In so doing, it emphasized that the chapeau of article XX was "but one expression of the principle of good faith", which it found to be a "general principle of international law".[621] "[O]ur task here," said the Tribunal, expressly relying on article 31, paragraph 3 (*c*), "is to interpret the language of the chapeau, seeking additional interpretative guidance, as appropriate, from the general principles of international law."[622] In deciding the question of whether sea turtles were "exhaustible", the Appellate Body referred to the fact that all seven of the recognized species of sea turtle were listed in appendix 1 to the Convention on International Trade in Endangered Species of Wild Fauna and Flora.[623]

444. The relations between the treaties covered by WTO and multilateral environmental agreements and human rights instruments are now the subject of a growing body of scholarly literature.[624] The WTO Appellate Body has always accepted that the requirement in article 3, paragraph 2, of the Understanding on Rules and Procedures Governing the Settlement of Disputes that panels apply "customary rules of interpretation of public international law" requires rigorous application of articles 31 and 32 of the 1969 Vienna Convention to the issues before them. It has not hesitated to reverse panel decisions on the ground

[611] *Report of the United Nations Conference on Environment and Development...* (see footnote 177 above).

[612] *Dispute concerning Access to Information under Article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland* (see footnote 137 above), UNRIAA, vol. XXIII, pp. 90–92, paras. 99, 101–105; ILR, vol. 126, pp. 367–369.

[613] *Dispute concerning Access to Information under Article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland* (see footnote 137 above), UNRIAA, vol. XXIII, pp. 119–126; ILR, vol. 126, pp. 397–405.

[614] Council Directive 90/313/EEC, of 7 June 1990, on the freedom of access to information on the environment, *Official Journal of the European Communities*, L 158, 23 June 1990, p. 56.

[615] The President of the Tribunal, Professor Michael Reisman, dissented on this issue: *Dispute concerning Access to Information under Article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland* (see footnote 137 above), UNRIAA, vol. XXIII, pp. 113–118; ILR, vol. 126, pp. 390–397.

[616] *Dispute concerning Access to Information under Article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland* (see footnote 137 above), UNRIAA, vol. XXIII, p. 100, para. 143; ILR, vol. 126, p. 378.

[617] *United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report (see footnote 223 above), paras. 129–134.

[618] *Ibid.*, para. 130, citing the 1971 advisory opinion of the International Court of Justice concerning *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (see footnote 491 above), p. 31. The Tribunal noted that, although the complainant States had ratified the United Nations Convention on the Law of the Sea, the United States had not done so but had accepted, during the course of the hearing, that the fisheries law provisions of that Convention for the most part reflected international customary law.

[619] *Report of the United Nations Conference on Environment and Development...* (see footnote 177 above).

[620] Final Act of the Conference to Conclude a Convention on the Conservation of Migratory Species of Wild Animals, ILM, vol. 19, No. 1 (January 1980), p. 11, at p. 15.

[621] *United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report (see footnote 223 above), para. 158.

[622] *Ibid.*

[623] *Ibid.*, para. 25.

[624] See, for example, Pauwelyn, "The role of public international law in the WTO..." (footnote 43 above), p. 535; Marceau, "WTO dispute settlement and human rights" (footnote 43 above); Lowenfeld (footnote 247 above), pp. 314–339; and Pauwelyn, *Conflict of Norms...* (footnote 21 above).

that they have failed to do so.[625] In carrying out its interpretative function it has made extensive reference to other rules of international law, but it has never found that those other rules would have overridden anything under agreements covered by WTO—although they have influenced the interpretation and application of those agreements.

445.    For example, WTO bodies have frequently taken account of regional and bilateral trade agreements. In the *United States—FSC (Article 21.5—EC)* case (2002), the Appellate Body referred to a wide range of regional and bilateral trade agreements and found that they shared what it chose to call a "widely accepted common element" in their definition of the term "foreign-source income", which it then used to interpret that expression in the context of the Subsidies and Countervailing Measures Agreement.[626] In *EC—Poultry* (1998), the Appellate Body explained its recourse to the 1994 Oilseeds Agreement as a "*supplementary means* of interpretation [of the relevant WTO commitment] pursuant to article 32 of the *Vienna Convention*, as it is part of the historical background of the concessions of the European Communities…"[627] In the *Korea—Various Measures on Beef* case (2001), the Panel likewise made reference to various bilateral trade agreements entered into by Korea, "not with a view to 'enforcing' the content of these bilateral agreements, but strictly for the purpose of interpreting an ambiguous WTO provision".[628] It may be argued that these agreements have been used only as a "supplementary means of interpretation" and not by virtue of article 31, paragraph 3 (*c*).[629] Such recourse has often been rationalized as providing evidence of the intent of the parties or of the "ordinary meaning" of the treaty words.

446.    Yet there is no reason not to seek the legal basis for "taking account" of such extraneous agreements precisely in that article, especially when such "taking account" reaches beyond a mere footnote reference. This would appear to be reasonable in cases such as the *Chile—Price Band System* case (2002), for example, where the Panel both interpreted and *applied* Economic Complementarity Agreement No. 35 between Chile and the Southern Common Market (MERCOSUR) in a way that excluded its consideration in the case in question. The Panel referred to the preamble and article 24 of that instrument (referred to as ECA 35), noting that it suggested that the parties (Chile and MERCOSUR) had not intended to exclude

the possibility that different rules might be applicable in other international agreements, *i.e.* WTO agreements. The Panel, in other words, applied a non-WTO treaty in order to operate a *renvoi*, by interpreting it so as to allow a treatment in the WTO context that would not have been allowed under the treaty itself (thereby creating the presumption that, had ECA 35 not been interpreted in such a way, the WTO standard would have been inapplicable).[630]

447.    One sometimes hears the claim that this might not even be permissible in view of the express prohibition in the Understanding on Rules and Procedures for the Settlement of Disputes according to which the "[r]ecommendations and rulings of the [Dispute Settlement Body] cannot add to or diminish the rights and obligations provided in the covered agreements" (art. 3, para. 2 *in fine*). Such a view would, however, presume that the agreements covered are "clinically isolated" in precisely the way the Appellate Body has denied. Two considerations are relevant here. First, when article 31, paragraph 3 (*c*), of the 1969 Vienna Convention is used, it is used with the specific authorization of the Understanding itself. But second, and more important, interpretation does not "add" anything to the instrument that is being interpreted. It constructs the meaning of the instrument by means of a legal technique (a technique specifically approved by the Understanding) that involves taking account of its normative environment. Here it appears immaterial whether recourse to other agreements is had under article 31, paragraph 3 (*c*), as supplementary means of interpretation or as evidence of party intent or of ordinary meaning or good faith (the presumption that States do not enter into agreements with the intention of breaching their obligations). The rationale remains that of seeing States, when acting within the WTO system, as identical with themselves as they act in other institutional and normative contexts. Interpretation *does not add or diminish rights or obligations* that would exist in some lawyers' heaven where they could be ascertained "automatically" and independently of interpretation. All instruments receive meaning through interpretation—even the conclusion that a meaning is "ordinary" is an effect of interpretation that cannot have *a priori* precedence over other interpretations.

448.    Finally, significant, though limited, use of article 31, paragraph 3 (*c*), was made by a WTO Panel in the recent *European Communities—Measures Affecting the Approval and Marketing of Biotech Products* case (2006). Here the European Community had argued that its ban on the importation of genetically modified organisms could be justified, *inter alia*, by certain non-WTO rules. It had argued, in particular, that account should be taken of the 1992 Convention on Biological Diversity and the related Cartagena Protocol on Biosafety of 2000. Having first determined that the two instruments indeed established "rules of international law", the Panel then considered whether they were also "applicable in the

---

[625] *United States—Standards for Reformulated and Conventional Gasoline*, WTO Appellate Body report (see footnote 48 above), pp. 15–17.

[626] *United States—Tax Treatment for "Foreign Sales Corporations"—Recourse to Article 21.5 of the DSU by the European Communities*, WTO Appellate Body report, WT/DS108/AB/RW, adopted 29 January 2002, paras. 141–145 (especially footnote 123).

[627] *European Communities—Measures Affecting the Importation of Certain Poultry Products*, WTO Appellate Body report, WT/DS69/AB/R, adopted 23 July 1998, para. 83 and generally paras. 77–85. For the Agreement in the form of Agreed Minutes on certain oil seeds between the European Community and Brazil pursuant to Article XXVIII of the General Agreement on Tariffs and Trade, see *Official Journal of the European Communities*, L 47, 18 February 1994, p. 8.

[628] *Korea—Measures Affecting Imports of Fresh, Chilled and Frozen Beef*, WTO Panel report, WT/DS161/R, WT/DS169/R, adopted 10 January 2001, as modified by Appellate Body report WT/DS161/AB/R, WT/DS169/AB/R, para. 539.

[629] Van Damme (footnote 427 above), p. 569.

[630] *Chile—Price Band System and Safeguard Measures Relating to Certain Agricultural Products*, WTO Panel report, WT/DS207/R, adopted 23 October 2002, as modified by Appellate Body report, WT/DS207/AB/R, paras. 7.81–7.86. For Economic Complementarity Agreement No. 35 between Chile and MERCOSUR, signed at San Luis (Argentina) on 25 June 1996, see Chile, *Official Gazette*, 4 October 1996. Likewise in *European Communities—Regime for the Importation, Sale and Distribution of Bananas*, WTO Appellate Body report, WT/DS27/AB/R, adopted 25 September 1997, para. 167.

relations between the parties". It found the expression "party" there to mean "a State which has consented to be bound by the treaty and for which the treaty is in force".[631] It dismissed the view that the reference to "parties" in article 31, paragraph 3 (*c*), would have meant (merely) parties to a dispute. All the parties to a treaty to be interpreted needed to have become parties to the other treaty. The Panel, in other words, read the WTO treaty in a *non-bilateral* way so as to "ensure[ ] or enhance[ ] the consistency of the rules of international law applicable to these States and thus contribute[ ] to avoiding conflicts between the relevant rules".[632] Because the United States had not become a party to either one of these treaties (although it had signed the Convention on Biological Diversity), they could not be "taken into account".

449.    The Panel also considered the argument made by the European Community that the precautionary principle might, since 1998 when the argument had been made in the *EC Measures Concerning Meat and Meat Products (Hormones)* case, have been established as a general principle of international law (the Panel's language here is slightly unclear, however, occasional reference being made to "general principles of law"). The Panel agreed that, were this to be the case, then it would become relevant under article 31, paragraph 3 (*c*). It found, however, though in a somewhat obscure way, both that "the legal status of the precautionary principle remains unsettled" and that it "need not take a position on whether or not the precautionary principle is a recognized principle of general or customary international law".[633]

450.    Two aspects of this case are important. First, the Panel accepted that article 31, paragraph 3 (*c*), applied to general international law and other treaties. Second, it interpreted article 31, paragraph 3 (*c*), so that the treaty to be taken account of must be one to which all parties to the relevant WTO treaty are parties. This latter contention makes it practically impossible ever to find a multilateral context where reference to other multilateral treaties as aids to interpretation under article 31, paragraph 3 (*c*), would be allowed. The Panel buys what it calls the "consistency" of its interpretation of the WTO treaty at the cost of the consistency of the multilateral treaty system as a whole. It aims to mitigate this consequence by accepting that other treaties may nevertheless be taken into account as facts elucidating the ordinary meaning of certain terms in the relevant WTO treaty. This is, of course, always possible and, as pointed out above, has been done in the past as well. However, taking "other treaties" into account as evidence of "ordinary meaning" appears a rather contrived way of preventing the "clinical isolation" emphasized by the Appellate Body.

### 5.    International Court of Justice

451.    Very significant use of article 31, paragraph (3) (*c*), was made by the International Court of Justice in the *Oil Platforms* case.[634] Here the Court was called upon to interpret two provisions of the 1955 Treaty of Amity, Economic Relations, and Consular Rights between the United States and Iran. It was requested to determine whether actions by Iran that were alleged to imperil neutral commercial shipping in the Iran–Iraq war, and the subsequent destruction by the United States Navy of three Iranian oil platforms in the Persian Gulf, were breaches of the Treaty. The Court's jurisdiction was limited to disputes arising as to the interpretation or application of the Treaty. It had no other basis for jurisdiction that might have provided an independent ground for the application of customary international law.[635] One of the operative provisions of the Treaty stipulated that:

> The present Treaty shall not preclude the application of measures:
>
> …
>
> (*d*)    necessary to fulfill the obligations of a High Contracting Party for the maintenance or restoration of international peace and security, or necessary to protect its essential security interests.[636]

452.    According to the United States, this provision was intended simply to exclude all such measures from the scope of the Treaty. It should be interpreted in accordance with its ordinary meaning, leaving a wide margin of appreciation for each State to determine its essential security interests.[637] It submitted that there was no place to read into the Treaty rules derived from customary international law on the use of force (as Iran had argued) and that to do so would violate the limits on the Court's jurisdiction.

453.    The Court approached the question of interpretation rather differently. It first asked whether such necessary measures could include the use of armed force and, if so, whether the conditions under which such force could be used under international law (including any conditions of legitimate self-defence) applied.[638] Having referred to other aids to interpretation, the Court then reasoned:

> Moreover, under the general rules of treaty interpretation, as reflected in the 1969 Vienna Convention on the Law of Treaties, interpretation must take into account "any relevant rules of international law applicable in the relations between the parties" (Art. 31, para. 3 (*c*)). The Court cannot accept that Article XX, paragraph 1 (*d*), of the 1955 Treaty was intended to operate wholly independently of the relevant rules of international law on the use of force, so as to be capable of being successfully invoked, even in the limited context of a claim for breach of the Treaty, in relation to an unlawful use of force. The application of the relevant rules of international law relating to this question thus forms an integral part of the task of interpretation entrusted to the Court by … the 1955 Treaty.[639]

---

[631] *European Communities—Measures Affecting the Approval and Marketing of Biotech Products* (see footnote 582 above), para. 7.68.

[632] *Ibid.*, para. 7.70.

[633] *Ibid.*, para. 7.89.

[634] *Oil Platforms (Islamic Republic of Iran v. United States of America)* (see footnote 128 above), p. 182, para. 41.

[635] Cf. the position in *Military and Paramilitary Activities in and against Nicaragua*, Merits, Judgment of 27 June 1986 (footnote 51 above), in which the Court was asked to interpret very similar treaty language but also had an additional basis for its jurisdiction as a result of unilateral declarations made by both parties under Article 36, paragraph 2, of its Statute.

[636] Treaty of Amity, Economic Relations, and Consular Rights (see footnote 94 above), art. XX, para. 1 (*d*); see also *Oil Platforms (Islamic Republic of Iran v. United States of America)* (footnote 128 above), pp. 178–179, para. 32.

[637] *Oil Platforms (Islamic Republic of Iran v. United States of America)*, rejoinder of the United States, 23 March 2001, part IV, pp. 132–133, available from www.icj-cij.org/en/case/90/written-proceedings.

[638] *Oil Platforms (Islamic Republic of Iran v. United States of America)* (see footnote 128 above), pp. 181–182, para. 40.

[639] *Ibid.*, p. 182, para. 41.

454.    The Court then proceeded to apply those general rules of international law to the conduct of the United States. It concluded that the measures could not be justified as necessary under the Treaty "since those actions constituted recourse to armed force not qualifying, under international law on the question, as acts of self-defence, and thus did not fall within the category of measures contemplated, upon its correct interpretation, by that provision of the Treaty".[640]

455.    The Court's judgment on the merits was supported by a large majority of the judges. Different views on the question of the proper approach to interpretation were, however, expressed in separate opinions.[641] The narrowest view on article 31, paragraph 3 (*c*), was taken by Judge Buergenthal, according to whom the Court's jurisdiction was limited to only those matters which the parties had agreed to entrust to it; he opined that this also limited the extent to which the Court could refer to other sources of law in interpreting the treaty before it. In his view, this limitation excluded reliance on other rules of international law, whether customary or conventional, even if found in the Charter of the United Nations.[642] This would in practice nullify the meaning of article 31, paragraph 3 (*c*), and go against wide international judicial and arbitral practice. Moreover, it would suggest arbitrarily that a treaty's meaning to its parties is independent of the normative environment in which the parties have agreed to conclude it.

456.    The opposite position was taken by Judge Simma, who considered that the Court might have taken the opportunity to declare the customary international law on the use of force and the importance of the Charter of the United Nations even more firmly than it had.[643] Following a position earlier taken by Lauterpacht and others, he advocated a wide use of general international law and other treaty rules applicable to the parties and held that this could be justified under article 31, paragraph 3 (*c*).[644] Judge Higgins was much more critical of the Court's use of article 31, paragraph 3 (*c*).[645] She pointed to the need to interpret article XX, paragraph 1 (*d*), in accordance with the ordinary meaning of its terms and in its context, as part of an economic treaty. She considered that the provision was not one that "on the face of it envisages incorporating the entire substance of international law on a topic not mentioned in the clause—at least not without more explanation than the Court provides".[646]

457.    The position of Judge Kooijmans was situated somewhere in the middle. He suggested that the Court should have begun with an analysis of the text of the 1955

Treaty itself. But in order to determine whether a particular measure involving the use of force was "necessary" under that Treaty, the Court had "no choice but to rely for this purpose on the body of general international law".[647] Even as the Court had no jurisdiction under the Charter, recourse to the concept of self-defence under "general international law" could not be avoided in order to give a meaning to the treaty over which it did have jurisdiction.[648] This is, in fact, to say no more than what has been affirmed throughout this report: general international law provides the background for all application of special law. At the same time, a large number of rules about statehood, maritime passage, representation and responsibility underlay the *Oil Platforms* case and were unproblematically presumed to be applicable by all parties.

458.    The *Oil Platforms* case represents a bold application of article 31, paragraph 3 (*c*), by the International Court of Justice in order to move from a technical treaty provision to what it saw as the real heart of the matter—the use of force.[649] The Court imports into its treaty analysis a substantial body of general international law, including the Charter of the United Nations. The conduct of the State in question was then assessed by reference to the position under general international law, which in turn was applied to assess its position under the treaty. For the first time, the Court acknowledged the pivotal role of article 31, paragraph 3 (*c*), in this process, but it did not give further guidance as to when and how it should be applied.

459.    Recourse by the Court to article 31, paragraph 3 (*c*), of the 1969 Vienna Convention inasmuch as it was to *general international law* may in fact have been unnecessary. The treaty provision at issue contained the open-ended term "necessary", which required interpretation. Absent the possibility of using a documented party intent to elucidate it, the Court could simply have turned to what "general international law" said on the content of that standard. The rationale for this was stated by the Court in the *North Sea Continental Shelf* cases (1969). General customary law,

by [its] very nature, must have equal force for all members of the international community, and cannot therefore be the subject of any right of unilateral exclusion…[650]

460.    To assume that a tribunal may not be entitled to apply general international law in the interpretation of a treaty is to hold that, once States conclude a bilateral treaty, they create a vacuum that consists precisely of this type of exclusion. As we saw in chapter II above, no support may be found from international practice for such a contention. On the contrary, an enormous amount of material supports the applicability of general international law in order to interpret any particular legal relationship, whether also addressed by a bilateral treaty, a local custom or a series of informal exchanges amounting to binding rules through acquiescence or estoppel.

---

[640] *Ibid.*, p. 199, para. 78.

[641] The Court entered judgment, declining by 14 votes to 2 to uphold Iran's claim (Judges Al-Khasawneh and Elaraby dissenting) and declining by 15 votes to 1 to uphold the United States' counterclaim (Judge Simma dissenting).

[642] *Oil Platforms (Iran v. United States of America)* (see footnote 128 above), pp. 278–279 (separate opinion of Judge Buergenthal), paras. 22–23.

[643] *Ibid.*, pp. 326–334 (separate opinion of Judge Simma), paras. 5–16.

[644] *Ibid.*, pp. 329–330, para. 9.

[645] *Ibid.*, pp. 236–240 (separate opinion of Judge Higgins), paras. 40–54.

[646] *Ibid.*, p. 237, para. 46.

[647] *Ibid.*, p. 261 (separate opinion of Judge Kooijmans), para. 48.

[648] *Ibid.*, p. 262, para. 52.

[649] As highlighted in Jouannet (see footnote 126 above). The case has inspired varied reactions. For those who celebrate the Court's bold view of article 31, paragraph 3 (*c*), see P.-M. Dupuy, *Droit international public*, 7th ed., Paris, Dalloz, 2004, pp. 314–315.

[650] *North Sea Continental Shelf* (see footnote 95 above), p. 38, para. 63.

## D. Special questions

461.    Three special questions relate to the application of article 31, paragraph 3 (*c*). One concerns the extent of the reference therein. What are the "rules of international law applicable in the relations between the parties" to which the provision refers? The second problem concerns the normative weight of the reference. What does it mean that those rules "shall be taken into account, together with the context"? The third is the question of inter-temporality: what is critical for the rules to be taken into account—the date of the conclusion of a treaty or the law in force at the moment of its application?

### 1.    THE RULES TO BE "TAKEN INTO ACCOUNT"

462.    That international tribunals have, until recently, rarely made any specific use of article 31, paragraph 3 (*c*), is not to say that they would not have referred to law external to the treaty to be applied. By their very nature, customary law and general principles of law (and general principles of *international* law) exist as *lex generalis* in relation to any particular agreement. They are fully applicable and often applied alongside particular treaties. Reference to article 31, paragraph 3 (*c*), has normally concerned the possibility and extent of recourse to rules that exist at the same level of generality and binding force as the treaty to be interpreted (usually other treaties), but where they might seem to conflict with it or put forward considerations that otherwise seem unorthodox in the context.

### (a)    Customary law and general principles

463.    As explained in chapter II above, although there is no official hierarchy between the sources of international law, there is, nonetheless, an informal hierarchy that results from the procedure through which lawyers approach applicable law, proceeding from the *lex specialis* to the *lex generalis*, or from the more specific to the more general—that is to say, usually from the treaty text to customary law and general principles of law. Max Huber once put this illuminatingly in terms of a progression of legal reasoning through concentric circles, each one constituting a field of reference of potential assistance in treaty interpretation:

> *Il faut donc chercher la volonté des parties dans le texte conventionnel, d'abord dans les clauses relatives à la contestation, ensuite dans l'ensemble de la convention, ensuite dans le droit international général, et enfin dans les principes généraux de droit reconnus par les nations civilisées. C'est par cet encirclement concentrique que le juge arrivera dans beaucoup de cas à établir la volonté présumptive des parties "conformément aux exigences fondamentales de la plénitude du droit et de la justice internationale", ainsi que le rapporteur formule admirablement la tâche du juge.[651]*

464.    Article 31, paragraph 3 (*c*), is only part of the larger interpretation process, in which the interpreter must first consider the plain meaning of the words in a treaty, if any,

proceeding therefrom to the context and to considerations relating to object and purpose, subsequent practice and, eventually, *travaux préparatoires*. This is not meant as an actual description of a psychological process. The practice of interpretation cannot be captured in such neatly rational terms.[652] As Waldock himself noted, in characteristically careful fashion: "the interpretation of documents is to some extent an art, not an exact science".[653] But it is an apt account of competent public reasoning by lawyers and tribunals. In the *Oil Platforms* case, for example, the Court started with an analysis of the text of article XX, paragraph 1 (*d*), of the 1955 Treaty of Amity and proceeded from there to the intention of the parties, which, again, pointed to the need to consider the state of the general law on the use of force. The starting point is the treaty itself, with interpretation proceeding from the more concrete and obvious (dictionary, context) to the less tangible and less obvious (object and purpose, analogous treaties, *etc.*) in order to give the text a justifiable meaning.

465.    To examine the interpretative process not as a psychological (thought) process but as an exercise in competent legal argument inevitably portrays it as an effort at "systemic integration", *i.e.* integration within the system of principles and presumptions that underlie the idea of an inter-State legal order and provide its argumentative materials. Among them, mention should be made of two presumptions, one positive, the other negative:

(*a*)    According to the *positive presumption*, parties are taken to refer to general principles of international law for all questions which the treaty does not itself resolve in express terms or in a different way;[654]

(*b*)    According to the *negative presumption*, in entering into treaty obligations, the parties intend not to act inconsistently with generally recognized principles of international law or with previous treaty obligations towards third States.[655]

466.    In accordance with these presumptions, an especially significant role for customary international law and general principles of law opens up. As a WTO Panel recently put it:

> the relationship of the WTO Agreements to customary international law is broader than [the reference in article 3, paragraph 2, concerning customary rules of interpretation]. Customary international law applies generally to the economic relations between the WTO [m]embers. Such international law applies to the extent that the WTO treaty agreements do not "contract out" from it. To put it another way, to the extent there is no conflict or inconsistency, or an expression in a covered WTO agreement that implies differently, we are of the view that the customary

___

[651] "The will of the parties must therefore be sought in the text of the treaty, first in the dispute provisions, then in the treaty as a whole, then in general international law, and lastly in the general principles of law recognized by civilized nations. It is by progressing through these concentric circles that a judge will, in many cases, be able to determine the presumed will of the parties 'in accordance with the fundamental requirements of international law and justice as a whole', as the rapporteur admirably describes the judge's task": *Annuaire de l'Institut de droit international*, vol. 44-I (Session of Sienna), pp. 200–201.

[652] One of the best analyses of the interpretative process in an international law context remains M. Sørensen, *Les sources du droit international: Étude sur la jurisprudence de la Cour permanente de justice internationale*, Copenhagen, Munksgaard, 1946, especially pp. 210–236.

[653] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (see footnote 323 above), p. 54, para. (6) of the commentary to draft article 73.

[654] *Georges Pinson (France)* v. *United Mexican States* (see footnote 244 above), p. 422.

[655] *Case concerning right of passage over Indian territory*, Preliminary Objections, Judgment of 26 November 1957 (see footnote 38 above), p. 142; Jennings and Watts (eds.), *Oppenheim's International Law* (see footnote 37 above), p. 1275.

rules of international law apply to the WTO treaties and to the process of treaty formation under the WTO.[656]

467.    Most of the cases considered above have involved the assertion and application of principles of customary international law. This has typically been done where a treaty rule is unclear or open-textured and its meaning is determined by reference to a developed body of international law (as in the issue of dual nationality dealt with by the Iran–United States Claims Tribunal in *Esphahanian v. Bank Tejarat* or in the construction of article XX of GATT discussed in connection with the *Shrimp–Turtle case*), or where the terms used in the treaty have a recognized meaning in customary international law, to which the parties can therefore be taken to have intended to refer. This was found to be the case, for example, in the construction of the terms "fair and equitable treatment" and "full protection and security", interpreted by the North American Free Trade Agreement Free Trade Commission in *Pope and Talbot Inc. v. Canada*.[657]

468.    Here is really immaterial whether or not a tribunal expressly chooses to invoke article 31, paragraph 3 (*c*). These general rules and principles are applicable as a function of their mere "generality", and their validity is based on nothing grander than their having passed what Thomas Franck calls the "'but of course' test"—a more or less unstable "common sense of the interpretative community (governments, judges, scholars)".[658] No special reference was needed by the Permanent Court of International Justice, for example, when in the *Chorzów Factory* case it made the point that

it is a principle of international law, and even a general conception of law, that any breach of an engagement involves an obligation to make reparation.[659]

469.    The same concerns many principles identified by the International Court of Justice, such as freedom of maritime communication,[660] "good faith",[661] "estoppel",[662] *ex injuria jus non oritur*[663] and so on. Further examples include the criteria for statehood (*Loizidou*); the law of State responsibility (which has influenced both the reach of human rights obligations[664] and the law of economic counter-measures in WTO); the law of State immunity;

the use of force; and the principle of good faith.[665] The general principles of law recognized by civilized nations perform a rather similar task in locating a treaty provision within a principled framework (as was done in determining the scope of the fair trial right in *Golder*). Pauwelyn lists among procedural principles regularly used by the Appellate Body of WTO those of "burden of proof, standing (*jus standi*), due process, good faith, representation before panels, the retroactive force of treaties or error in treaty formation".[666] These are not "enacted" by positive acts of States (although they may well be traceable back to State will) but are parts of the general framework of international law, or—which amounts to the same—aspects of the legal craft of justifying decisions in legal disputes.[667]

(b)    *Other applicable conventional international law*

470.    As pointed out above, article 31, paragraph 3 (*c*), goes beyond the truism that "general international law" is applied generally to foresee the eventuality that another rule of *conventional* international law is applicable in the relations between the parties. The main problem is this: is it necessary that *all* the parties to the treaty being interpreted are also parties to the treaty relied upon as the other source of international law for interpretation purposes?

471.    The problem is particularly acute where the treaty under interpretation is a multilateral treaty of very general acceptance (such as agreements covered by WTO). As we saw, the Panel in *European Communities—Measures Affecting the Approval and Marketing of Biotech Products* concluded that only agreements to which *all* WTO members were parties could be taken into account under article 31, paragraph 3 (*c*), in the interpretation of WTO agreements.[668] Bearing in mind the unlikeliness of a precise congruence in the membership of most important multilateral conventions, it would become unlikely that *any* use of conventional international law could be made in the interpretation of such conventions. This would have the ironic effect that the more the membership of a multilateral treaty, such as the agreements covered by WTO, expanded, the more those treaties would be cut off from the rest of international law.[669] In practice, the result would be the isolation of multilateral agreements as "islands" permitting no references *inter se* in their application. It would also prohibit any use of regional or other particular implementation agreements—including *inter se* agreements—that may have been concluded under a framework treaty as interpretative aids to the latter. This would seem contrary to the legislative ethos behind most multilateral treaty-making and, presumably, the intent of most treaty-makers. Of course, some of this might be mitigated by requiring a finding that, if a treaty is not in force

[656] *Korea—Measures Affecting Government Procurement* (see footnote 44 above), para. 7.96.

[657] *Pope and Talbot Inc. v. Government of Canada,* decision of 31 May 2002, *ICSID Reports*, vol. 7 (2005), p. 148, citing the interpretation of the Free Trade Commission; see also ILM, vol. 41, No. 6 (November 2002), p. 1347.

[658] T. M. Franck, "Non-treaty law-making: when, where and how?", in Wolfrum Röben (eds.), *Developments of International Law in Treaty Making* (see footnote 11 above), p. 417, at p. 423.

[659] *Factory at Chorzów*, Merits, Judgment, 13 September 1928, *P.C.I.J., Series A*, No. 17, p. 29.

[660] *Corfu Channel* (see footnote 449 above), p. 22.

[661] *Nuclear Tests* (see footnote 555 above), p. 268, para. 46.

[662] *Case concerning the Temple of Preah Vihear* (see footnote 135 above), pp. 31–32.

[663] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (see footnote 491 above).

[664] See, for example, *Loizidou v. Turkey*, preliminary objections, 23 March 1995 (footnote 56 above), pp. 22–24, paras. 57–64. See also the reliance on the public international law rules of jurisdiction in *Banković and Others v. Belgium and Others* (footnote 221 above), pp. 351–352, paras. 59–60.

[665] Pauwelyn, *Conflict of Norms…* (see footnote 21 above), pp. 270–271.

[666] J. Pauwelyn, "The World Trade Organization", in Huesa Vinaixa and Wellens (eds.) (see footnote 14 above), p. 211, at pp. 225–226 and footnotes.

[667] See further Koskenniemi, "General principles: reflexions on constructivist thinking in international law" (footnote 24 above).

[668] *European Communities—Measures Affecting the Approval and Marketing of Biotech Products* (see footnote 582 above), paras. 7.68–7.70.

[669] Marceau, "WTO dispute settlement and human rights" (see footnote 43 above), p. 781.

between all members to the treaty under interpretation, a rule contained in it be treated as customary international law.[670] This approach would maintain the "generality" of at least some multilateral treaties. But it would have an inappropriately restrictive effect in two situations:

(*a*)   It could preclude reference to treaties that have very wide acceptance within the international community (including by the disputing States) but which are nevertheless not universally ratified and are not accepted in all respects as stating customary international law (such as the United Nations Convention on the Law of the Sea);

(*b*)   It could also preclude reference to treaties which represent the most important elaboration of the content of international law on specialist subject matter, on the basis that they have not been ratified by all parties to the treaty under interpretation.

472.   A better solution is to permit reference to another treaty provided that the *parties in dispute* are also parties to that other treaty. Although this creates the possibility of divergent interpretations arising (depending on which States parties are also parties to the dispute), it would simply reflect the need to respect (inherently divergent) party will, as elucidated by reference to those other treaties, as well as the bilateralist character of most treaties underpinned by practices regarding reservations, *inter se* modification and successive treaties, for example.[671] The risk of divergence—a commonplace in treaty law—would be mitigated by making the distinction between "reciprocal" or "synallagmatic" treaties (in which case mere "divergence" in interpretation creates no problem) and "integral" or "interdependent" treaties (or treaties concluded *erga omnes partes*), where the use of another treaty in interpretation should not be allowed to threaten the coherence of the treaty to be interpreted.[672] This would also respond to the precise concern of the WTO Panel in *European Communities—Measures Affecting the Approval and Marketing of Biotech Products* about consistency in treaty interpretation.[673] In addition, it might also be useful to take into account the extent to which the other treaty relied upon can be said to have been "implicitly" accepted, or at least tolerated, by the other parties "in the sense that the rule can reasonably be said to express the common intentions or understanding of all members as to what the … term means".[674] This approach has in fact been adopted in some decisions of the WTO Appellate Body.[675] It gives effect to the sense in which certain multilateral treaty notions or concepts, though perhaps not found in treaties with identical membership, are nevertheless adopted widely enough to give a good sense of a "common understanding" or the "state of the art" in a particular technical field, without necessarily reflecting formal customary law.

## 2.   THE WEIGHT OF THE OBLIGATIONS TO BE TAKEN INTO ACCOUNT

473.   The above considerations have also answered the question of the *weight* to be given to the law—the rights and obligations—to be taken account of under article 31, paragraph 3 (*c*). The importance of those rights and obligations does not reside in their overriding character. As we have seen, international law reserves this function for *jus cogens*. An approach that gave excessive weight to the normative environment over particular treaties would—like a generalized presumption about the precedence of *lex generalis* over *lex specialis*—stifle treaty-making: the need to react to new circumstances and to give effect to interests or needs that, for one reason or another, have been underrepresented in traditional law. Rather, the significance of the need to "take into account" lies in its performance of a systemic function in the international legal order, linking specialized parts to each other and to universal principles.[676]

474.   The question of the normative weight to be given to particular rights and obligations at the moment when they appear to clash with other rights and obligations can only be argued on a case-by-case basis. There is little to be added in this regard to what Judges Higgins, Buergenthal and Kooijmans observed in considering the balance to be struck between the conflicting dictates of the rule of State immunity, on the one hand, and liability for international crimes, on the other:

International law seeks the accommodation of this value [the prevention of unwarranted outside interference in the domestic affairs of States] with the fight against impunity, and not the triumph of one norm over another.[677]

## 3.   INTER-TEMPORALITY AND GENERAL DEVELOPMENTS IN INTERNATIONAL LAW

475.   The third general issue—and the one that raised most discussion in the Commission itself—is the question of inter-temporal law, or, in other words, the question of what should be the right moment in time (critical date) for the assessment of the rules that should be "taken into account" under article 31, paragraph 3 (*c*). The traditional rule,[678] and the one proposed to the Commission by Wal-

---

[670] See, for example, the emphasis placed in the *Shrimp–Turtle* case on the fact that, although the United States had not ratified the United Nations Convention on the Law of the Sea, it had accepted during the course of the argument that the relevant provisions for the most part reflected international customary law (*United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report (see footnote 223 above), para. 171, note 174).

[671] It cannot be emphasized too much that this risk of "divergence" is no greater than in *any* interpretation of a multilateral treaty by reference to party will.

[672] For a recent exploration of this idea in the context of agreements covered by WTO, see Pauwelyn, *Conflict of Norms…* (footnote 21 above), pp. 440–486, and J. Pauwelyn, "A typology of multilateral treaty obligations: are WTO obligations bilateral or collective in nature?", EJIL, vol. 14, No. 5 (2003), p. 907.

[673] *European Communities—Measures Affecting the Approval and Marketing of Biotech Products* (see footnote 582 above), para. 7.70.

[674] Pauwelyn supports this approach in the case of agreements covered by WTO (Pauwelyn, *Conflict of Norms…* (see footnote 21 above), pp. 257–263, especially p. 261).

[675] See, for example, the sources relied upon by the Appellate Body in *United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report (footnote 223 above), para. 130.

[676] For an early elaboration, see especially H. Lauterpacht, *Private Law Sources and Analogies of International Law,* London, Longman, 1927 (highlighting the role of principles of private law in the construction of international legal relationships).

[677] *Arrest Warrant of 11 April 2000* (see footnote 531 above), pp. 86–87 (joint separate opinion of Judges Higgins, Kooijmans and Buergenthal), para. 79.

[678] That rule was stated by Judge Huber in the context of territorial claims, and its two parts are as follows: "a juridical fact must be

dock, consisted of two parts: one affirming "contemporaneity", the other allowing changes in the law to be taken into account. According to the former aspect, a treaty was to be interpreted "in the light of the law in force at the time when the treaty was drawn up".[679] The latter aspect required, however, that "the application of a treaty … be governed by the rules of international law in force at the time when the treaty is applied".[680]

476.   The rationale of the two parts of the principle is clear, and difficult to contest. On the one hand, when States create a legal relationship, they undoubtedly do this bearing in mind the normative environment as it exists at the moment when the relationship is formed. Or, in other words, deference to the law in force at the time when a treaty is concluded best takes account of the intent of the parties. Nevertheless, no legal relationship can remain unaffected by time. This is already confirmed by the need to take into account the subsequent practice of the parties. In a similar way, the views of the parties about the meaning and application of the treaty develop in accordance with the passing of time, the accumulation of experience, and new information and novel circumstances.

477.   The doctrine of inter-temporal law is essentially a reminder of these two rationales, one pointing to the past as a guide for finding party intent, the other pointing to the present for exactly the same reason. As pointed out by Jiménez de Aréchaga in the Commission in 1964:

The intention of the parties should be controlling, and there seemed to be two possibilities so far as that intention was concerned: either they had meant to incorporate in the treaty some legal concepts that would remain unchanged, or, if they had had no such intention, the legal concepts might be subject to change and would then have to be interpreted not only in the context of the instrument, but also within the framework of the entire legal order to which they belonged. The free operation of the will of the parties should not be prevented by crystallizing every concept as it had been at the time when the treaty was drawn up…[681]

478.   Because it seems pointless to try to set any general and abstract preference between the past and the present,[682] it is best, once again, to merely single out some

considerations that may be relevant when deciding whether to apply article 31, paragraph 3 (c), so as to "take account" of the "other obligations" as they existed when the treaty was concluded or as they exist when it is being applied. The starting point must be, again, the fact that deciding this issue is a matter of interpreting the treaty itself. Does the language used give any indication? The starting point of the argument might plausibly be the "principle of contemporaneity"—with regard to the normative environment as it existed at the moment when the obligation entered into force for a relevant party.[683] When might the treaty language itself, in its context, provide for taking account of future developments? Examples of when this might be a reasonable assumption include, at least:

(a)   Use of a term in the treaty which is "not static but evolutionary".[684] This is the case where the parties, by their choice of language, intend to key into that evolving meaning without adopting their own idiosyncratic definition (for example, use of terms such as "expropriation" or "continental shelf" in the relevant treaty).[685] This may also be the case where, by reading that language against its object and purpose, it appears that the parties have committed themselves to a programme of progressive development;[686]

(b)   The description of obligations in very general terms, thus operating a kind of renvoi to the state of the law at the time of its application. Thus, the general exceptions in article XX of GATT, discussed in the Shrimp–Turtle case, in permitting measures "necessary to protect human, animal or plant life or health" or "relating to the conservation of exhaustible natural resources" are intended to adjust to the situation as it develops over

appreciated in the light of the law contemporary with it, and not of the law in force at the time when a dispute … arises" ("contemporaneity"); and "[t]he same principle which subjects the act creative of a right to the law in force at the time the right arises, demands that the existence of the right, in other words its continued manifestation, shall follow the conditions required by the evolution of law" (Island of Palmas (Netherlands/United States of America), award of 4 April 1928, UNRIAA, vol. II (Sales No. 1949.V.1), p. 829, at p. 845).

[679] Third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur (A/CN.4/167 and Add.1–3) (see footnote 323 above), p. 8, draft article 56, para. 1.

[680] Ibid., p. 9, draft article 56, para. 2.

[681] Yearbook … 1964, vol. I, p. 34, summary record of the Commission's 728th meeting, held on 21 May 1964, para. 10. Thirlway suggests a rather qualified version of the doctrine: "Provided that, where it can be established that it was the intention of the parties that the meaning or scope of a term or expression used in the treaty should follow the development of the law, the treaty must be interpreted so as to give effect to that intention" (Thirlway, "The law and procedure of the International Court of Justice 1960–1989 (Part Three)" (see footnote 586 above), p. 57). See also Thirlway, "The law and procedure of the International Court of Justice 1960–1989 (Part One)" (footnote 98 above), pp. 135–143, and R. Higgins, "Time and the law: international perspectives on an old problem", International and Comparative Law Quarterly, vol. 46, No. 3 (July 1997), p. 501, at pp. 515–519.

[682] This was, after all, the very reason why the Commission failed to come up with an article on this question.

[683] This expresses the "primary necessity of interpreting an instrument in accordance with the intentions of the parties at the time of its conclusion" (Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970) (see footnote 491 above), p. 31, para. 53).

[684] Jennings and Watts (eds.), Oppenheim's International Law (see footnote 37 above), p. 1282. The standard example is the use of the notion of "sacred trust of civilization" as part of the mandate regime of the League of Nations. See Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970) (footnote 491 above), p. 31, para. 53.

[685] Thus, in the Aegean Sea Continental Shelf case, the International Court of Justice applied the presumption according to which a generic term is "intended to follow the evolution of the law and to correspond with the meaning attached to the expression by the law in force at any given time" (Aegean Sea Continental Shelf, Judgment, I.C.J. Reports 1978, p. 3, at p. 32, para. 77).

[686] This was the situation in the Gabčíkovo-Nagymaros case before the International Court of Justice. "[T]he Court wishes to point out that newly developed norms of environmental law are relevant for the implementation of the Treaty and that the parties could, by agreement, incorporate them [into] the Treaty. [Articles 15, 19 and 20] do not contain specific obligations of performance but require the parties, in carrying out their obligations to ensure that the quality of water in the Danube is not impaired and that nature is protected, to take new environmental norms into consideration when agreeing upon the means to be specified in the Joint Contractual Plan. By inserting these evolving provisions in the Treaty, the parties recognized the potential necessity to adapt the Project. Consequently, the Treaty is not static, and is open to adapt to emerging norms of international law" (Gabčíkovo-Nagymaros Project (see footnote 119 above), pp. 67–68, para. 112). See also the separate opinion of Judge Weeramantry, ibid., pp. 113–115.

time.[687] For example, the measures necessary to protect shrimp evolve depending upon the extent to which the survival of the shrimp population is threatened. Although the broad meaning of article XX may remain the same, its actual content will change over time. In that context, reference to "other rules of international law", such as multilateral environment treaties, becomes a form of secondary evidence supporting the enquiry into science and community values and expectations that the ordinary meaning of the words, and their object and purpose, invites.

### 4. Conclusion

479. Article 31, paragraph 3 (*c*), of the 1969 Vienna Convention and the "principle of systemic integration" to which it gives expression summarize the results of the previous sections. They call upon a dispute settlement body—or a lawyer seeking to find out "what the law is"—to situate the rules being invoked by those concerned in the context of other rules and principles that might have a bearing upon the case. In this process, the more concrete or immediately available sources are read against each other and against the general law "in the background". What this reading of rules "against each other" might mean cannot be stated in the abstract. But what the outcome of that specific reading is may in fact,

___

[687] "From the perspective embodied in the preamble of the WTO Agreement, we note that the generic term 'natural resources' in Article XX (g) is not 'static' in its content or reference but is rather 'by definition, evolutionary'" (*United States—Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Appellate Body report (see footnote 223 above), para. 130).

from the perspective of article 31, paragraph 3 (*c*), be less important than the fact that, whatever the outcome, the justification for that outcome refers back to the wider legal environment, indeed the "system" of international law as a whole.

480. The way in which "other law" is "taken into account" is quite crucial to the parties and to the outcome of any single case. The principle of systemic integration, however, looks beyond individual cases. By making sure that the outcome is linked to the legal environment, and that adjoining rules are considered—perhaps applied, perhaps invalidated, perhaps momentarily set aside—any decision also articulates the legal and institutional environment with regard to substantive preferences, distributionary choices and political objectives. This articulation is quite important in a decentralized and spontaneous institutional world, the priorities and objectives of which are often poorly expressed. It is also important for the critical and constructive development of international institutions, especially institutions with law-applying tasks. To hold those institutions as fully isolated from each other and as only paying attention to their own objectives and preferences is to think of law only as an instrument for attaining regime objectives. But law is also about protecting rights and enforcing obligations, above all rights and obligations that have a backing in something like a general, public interest. Without the principle of "systemic integration" it would be impossible to give expression to and keep alive any sense of the common good of humankind, not reducible to the good of any particular institution or "regime".

## Chapter VI

# General conclusions

## A. The nature of fragmentation

481. One aspect of globalization is the emergence of technically specialized cooperation networks with a global scope: trade, the environment, human rights, diplomacy, communications, medicine, crime prevention, energy production, security, indigenous cooperation and so on—spheres of life and expert cooperation that transcend national boundaries and are difficult to regulate through traditional international law. National laws seem insufficient owing to the transnational nature of the networks, while international law but inadequately takes account of their specialized objectives and needs.

482. As a result, such networks tend to develop their own rules and rule systems. Sometimes this takes place informally, through the adoption by leading actors of forms of behaviour or standardized solutions that create expectations or are copied by others. Sometimes coordination is achieved through the harmonization of national or regional laws and regulations, for example through increasing standardization of contract forms or liability rules. But frequently specialized rules and rule systems also emerge through intergovernmental cooperation, and in particular with the assistance of (specialized) intergovernmental organizations. The result is the emergence of regimes of international law that have their basis in

multilateral treaties and acts of international organizations, specialized treaties and customary patterns that are tailored to the needs and interests of each network but rarely take account of the outside world.

483. This is the background to the concern about fragmentation of international law: the rise of specialized rules and rule systems that have no clear relationship to each other. Answers to legal questions become dependent on whom you ask, what rule system your focus is on. Accordingly, this study has sought answers to questions that, though they seem quite elementary, have not often been addressed: what is the nature of specialized rule systems? How should their relations *inter se* be conceived? Which rules should govern their conflicts?

## B. The perspective of this study

484. This study has not aimed to set up definite relationships of priority between international law's different rules or rule systems. To that extent, its results may seem unsatisfactory or at least inconclusive. However, such priorities cannot be justifiably attained by what is merely an elucidation of the process of legal reasoning. They should reflect the (political) preferences of international actors, above all States. Normative conflicts do not arise as technical "mistakes" that could be "avoided"

by a more sophisticated method of legal reasoning. New rules and legal regimes emerge as responses to new preferences, and sometimes out of a conscious effort to deviate from preferences as they existed under old regimes. They require a legislative response, not a response of legal technique.

485.    But the absence of general hierarchies in international law does not mean that normative conflicts would lead to legal paralysis. The relevant hierarchies must only be established *ad hoc* and with a view to resolving particular problems as they arise. This is where the articles of the 1969 Vienna Convention have their relevance and where a study conducted within the confines of the Commission can make a constructive contribution. The idea has been to illustrate, by examples drawn from the practice of international courts and tribunals, techniques available to lawyers as they approach problems that appear to involve conflicts between rules or rule systems.

486.    A key point made in this study is that normative conflict is endemic to international law. Because of the spontaneous, decentralized and non-hierarchical nature of international law-making—law-making by custom and by treaty—lawyers have always had to deal with heterogeneous materials at different levels of generality and with different normative force. In its very first case, the Permanent Court of International Justice was, as we have seen, faced with having to resolve the question of the conflict or overlap between two sets of rules: the Treaty of Versailles and the right of a neutral power in time of war to control access to belligerent territory. Nevertheless, by an interpretation of German sovereignty and the invocation of precedent (the Panama and Suez canals), the Court was able to establish the priority of the Treaty of Versailles.[688] Since then, it has been routine for international tribunals to establish the rights and duties of States or of other subjects by reference to many types of legal materials that are applicable, as part of the work that they are called upon to do.

487.    But addressing problems at this level—conflicts as they arise—will mean that they are addressed in a formal and open-ended way, as matters of legal technique rather than substantive (politico-legal) preference. This report has, in a way, bought its acceptability by its substantive emptiness. Yet this "formalism" is not without its own agenda. The very effort to canvass coherent legal technique in a fragmented world expresses the conviction that conflicts between specialized regimes may be overcome by law, even though the law may not go much further than requiring a willingness to listen to others, take their points of view into account and find a reasoned resolution at the end. Yet this may simply express the very point for which international law has always existed. The move from a world fragmented into sovereign States to a world fragmented into specialized "regimes" may not, in fact, require a fundamental transformation of public international law at all—though it may call for imaginative uses of traditional techniques. There were always States that regarded international law as incompatible with their sovereignty. Similarly, there may today exist global regimes or rule complexes that feel international law to be an alien intrusion. There is as little reason to concede the logic of

"clinical isolation" in the latter case as there was in the former. If the view of a State cannot be the last word on the international lawfulness of its activities, then neither can the viewpoint of a rule or a regime alone determine what its international legal implications are. If international law is needed as a structure for coordination and cooperation among (sovereign) States, it is no less needed in order to coordinate and organize cooperation among (autonomous) rule complexes and institutions.

488.    Special rules and rule complexes are undoubtedly necessary, somewhat in the sense that different sovereignties are. The world is irreducibly pluralistic. The law cannot resolve in an abstract way any possible conflict that may arise between economic and environmental regimes, between human rights and diplomatic immunity or between a universal law of the sea regime and a regional fisheries treaty. Each has its experts and its ethos, its priorities and preferences, its structural bias. Such regimes are institutionally "programmed" to prioritize particular concerns over others. The concern over fragmentation has been about the continued viability of traditional international law—including the techniques of legal reasoning that it imports—under conditions of specialization. Do Latin maxims (*lex specialis*, *lex posterior*, *lex superior*) still have relevance in the resolution of conflicts produced in a situation of economic and technological complexity? Although this report answers this question in the positive, it also highlights the limits of the response. Public international law does not contain rules in which a global society's problems are, as it were, already resolved. Developing these is a political task.

489.    Concern over the fragmentation of international law has an institutional and a substantive aspect. At an institutional level, the proliferation of implementation organs—often courts and tribunals—for specific treaty regimes has given rise to concern over deviating jurisprudence and "forum-shopping". The rights and obligations of legal subjects may depend on which body is seized to recognize them. Following decisions by the Commission in 2002 and 2003, this report set aside the institutional aspects of fragmentation. Instead, it focused on substantive problems: the emergence of "special laws", treaty regimes and functional clusters of rules and specialized branches of international law and their relationship *inter se* and to general international law. Particular attention has been given to the application of the *lex specialis* and *lex posterior* maxims and to relationships of importance and the notion of "system" in international law. The focus throughout has been provided by the 1969 Vienna Convention, with a conscious effort, nonetheless, to read that treaty itself in its systemic environment, consisting in part of the practices of international tribunals and other law-applying bodies and in part of the general international law of which it forms part. The draft operative conclusions of the work of the Study Group are set out in detail in the annex to this report.

490.    Not all substantive problems have been dealt with. For example, questions about "soft law", as a special type of law with its own idiosyncratic ("soft") enforcement and dispute settlement mechanisms, have not been subjected to discussion. Nevertheless, to the extent that soft law claims to exist "in clinical isolation" from "hard

---

[688] *S.S. "Wimbledon"* (see footnote 150 above), pp. 25, 28–30.

law", much of what has been said about the relationships between special and general law in chapter II applies to it. Likewise, questions having to do with the emergence of patterns of constraint out of private or combined public–private activities—including *lex mercatoria* or other types of informal regulation of transnational activities—and their effects on traditional law-making have been left outside this study. A discussion of the extent to which new types of "global law" might be emerging outside the scope of traditional, State-centric international law would require quite a different type of exercise. This is not to say, however, that the 1969 Vienna Convention or indeed general international law could not be used to channel and control these patterns of informal, often private-interest-based types of regulation as well. The more complex and flexible the ways in which treaty law allows the use of framework treaties, of clusters of treaties and of regimes consisting of many types of normative materials, the more such decentralized, private regulation may be encompassed within the scope of international law.

### C. Between coherence and pluralism: suggestions for further work

491.  Fragmentation calls into question the coherence of international law. Coherence is valued positively owing to the connection it has with predictability and legal security. Moreover, only a coherent legal system treats legal subjects equally. Coherence is, however, a formal and abstract virtue. For a legal system that is regarded in some respects as unjust or unworkable, no added value is brought by the fact of its being coherently so. Therefore, alongside coherence, pluralism should be understood as a constitutive value of the system. Indeed, in a world of plural sovereignties, this has always been the case.

492.  Even as international law's diversification may threaten its coherence, it does this by increasing its responsiveness to the regulatory context. Fragmentation moves international law in the direction of legal pluralism but does this, as the present report has sought to emphasize, by constantly using the resources of general international law, especially the rules of the 1969 Vienna Convention, customary law and "general principles of law recognized by civilized nations". *One principal conclusion of this report has been that the emergence of special treaty regimes (which should not be called "self-contained") has not seriously undermined legal security, predictability or the equality of legal subjects.* The techniques of *lex specialis* and *lex posterior*, of *inter se* agreements and of the superior position given to peremptory norms and the (so far under-elaborated) notion of "obligations owed to the international community as a whole" provide a basic professional toolbox that is able to respond in a flexible way to most substantive fragmentation problems. They can be used to give expression to concerns (*e.g.* economic development, human rights, environmental protection, security) that are legitimate and strongly felt.

493.  The international legal system has never enjoyed the kind of coherence that may have characterized the legal orders of States. Nonetheless, the deepening complexity of late modern societies, tolerance and encouragement of conflicting traditions and social objectives within national societies, and the needs of technical specialization have

all also undermined the homogeneity of the nation State. Today, the law of late modern States emerges from several quasi-autonomous normative sources, both internal and external. While this may have undermined the constitutional coherence of national law, it has been counterbalanced by the contextual responsiveness and functionality of the emerging (moderate) pluralism. In an analogous fashion, the emergence of conflicting rules and overlapping legal regimes will undoubtedly create problems of coordination at the international level. But—and this is the second main conclusion of this report—*no homogenous, hierarchical meta-system is realistically available to do away with such problems.* International law will need to operate within an area where the demands of coherence and reasonable pluralism will point in different directions. In order for it to do this successfully, *increasing attention will have to be given to the collision of norms and regimes and the rules, methods and techniques for dealing with such collisions.* How this might be done is explained in detail in the proposal for the conclusions of the Study Group set out in the annex. In addition, this might require at least three efforts:

(*a*)  Focus on the role of the 1969 Vienna Convention as the basis for an "international law of conflicts";

(*b*)  Focus on the notion and operation of "regimes";

(*c*)  Examination of the notion of "general international law".

#### 1.  THE VIENNA CONVENTION ON THE LAW OF TREATIES AS THE BASIS FOR AN "INTERNATIONAL LAW OF CONFLICTS"

494.  The Commission decided to situate its work on this matter within the confines of the 1969 Vienna Convention. This report suggests that this decision was well-founded. As has been explained in detail, the Convention provides the normative basis—the "toolbox"—for dealing with fragmentation. There is no reason why it should not also provide the basis for the further development of an "international law of conflicts". Conflicts between treaties, treaty regimes and treaties and other legal sources will inevitably also emerge in the future, perhaps increasingly. In the absence of fixed hierarchies, such conflicts can only be resolved by "collision rules" that take account both of the need for coherence and contextual sensitivity. When developing such collision rules, several aspects of the 1969 Vienna Convention might be subjected to closer scrutiny.

495.  For example, the Convention's treatment of bilateral and multilateral treaties by means of identical rules seems unsatisfactory. The problems that emerge are different and should be dealt with through different techniques. In the interpretation of bilateral treaties, for example, party intent is relatively easy to identify, whereas multilateral treaties emerge as package deals or bargains and seldom have a single, clearly defined party intent. Furthermore, there is presently no recognition of the special nature of "framework treaties" and "implementation treaties", while much of this report has suggested that such treaties have special types of relations that cannot be identified with relations between just any treaties. Moreover, nothing has undermined Fitzmaurice's original

Case 1:19-cv-01618-TSC    Document 74-10    Filed 06/29/22    Page 102 of 109

Fragmentation of international law: difficulties arising from the diversification and expansion of international law    101

point that human rights and humanitarian law treaties, for example (as well as, for instance, environmental treaties), form a special class of non-bilateral ("integral" or "interdependent") instruments that cannot be operated through the same techniques as "ordinary" treaties creating bilateral relationships. Throughout this report we have seen how the nature of a treaty—including its object and purpose—has limited the freedom of treaty parties to deviate by way of *lex specialis* or *inter se* agreement. But in fact the conventional priority accorded to special law over general law, and the equally conventional techniques for overruling that priority, are already aspects of an informal treaty hierarchy that has often been overshadowed by the focus on the formal hierarchy expressed in the language of *jus cogens* or Article 103 of the Charter of the United Nations.

496.   In general, the 1969 Vienna Convention gives insufficient recognition to special types of treaties and the special rules that might serve to interpret and apply them. More work here seems necessary. *It is proposed to develop guidelines on how the 1969 Vienna Convention provisions might give recognition to the wide variation of treaty types and normative implications of such types and whether it might be possible to set up informal guidelines on how to deal with treaty conflicts. The following themes, at least, might be part of such an effort*:

(*a*)   The difference between bilateral and multilateral treaty relations should be given greater recognition;

(*b*)   The process of international "legislation" through multilateral treaties adopted in order to realize specific, technical rules should be further examined. This could involve establishing a typology of treaty provisions amenable to different treatment. These typologies might, for example, contrast "programmatic" provisions with provisions that set up subjective rights and "hard law" provisions associated with formal responsibility with "soft law" provisions under special "soft responsibility" regimes;

(*c*)   The notions of a "framework treaty" and an "implementation treaty" should be further elaborated, especially with a view to highlighting the special (hierarchical) relationships between them and between the institutions they set up;

(*d*)   Greater recognition should be given to the distinction between multilateral conventions whose provisions are "bilateralizable" and those that are not (*i.e.* "integral" treaties or treaties setting out "interdependent" or otherwise "absolute" obligations);

(*e*)   What it means for obligations to be owed "to the international community as a whole" (*erga omnes* obligations) or to the "community of States parties as a whole" (obligations *erga omnes partes*) should be further elaborated;

(*f*)   Recent practice has developed a wide range of models for "conflict clauses" that seek to eliminate or deal with potential conflicts between treaties. Often, however, these clauses are unclear or ambivalent. What does it mean, for example, for two treaties to be understood in a "mutually supportive" way?

## 2.   INTO A LAW OF REGIMES

497.   Much of this study has pointed to the increasing importance of chains or clusters of treaties, including relationships between framework treaties and implementation treaties. In practice, fragmentation takes place through the development of networks of international rules and instruments that for all practical purposes—including the purpose of interpretation—are treated as single "wholes" or "regimes". This study has identified three types of special regime:

(*a*)   Special sets of secondary rules of State responsibility;

(*b*)   Special sets of rules and principles on the administration of a determined problem;

(*c*)   Special branches of international law with their own principles, institutions and teleology.

498.   Neither the 1969 Vienna Convention nor international arbitral and judicial practice has so far given any developed articulation to these special kinds of wholes. From this study it transpires, however, that a "regime" may function within a formal treaty, within a set of formal treaties and institutions, or in more broadly "cultural" ways. Conflicts between rules *within* a regime appear differently and should probably be treated differently from conflicts *across* regimes. "Regimes" may also have non-governmental participants and represent non-governmental interests in a fashion that might influence their interpretation and operation. Often regimes operate on the basis of administrative coordination and "mutual supportiveness", the point of which is to seek regime-optimal outcomes. While this is clearly appropriate in regard to treaty provisions that are framed in general or "programmatory" terms, it seems less proper in regard to provisions establishing subjective rights, or obligations whose purpose it is to guarantee such rights. Disputes concerning the operation of regimes may not always be properly dealt with by the same organs that have to deal with the recognition of claims of rights. Likewise, when conflicts emerge between treaty provisions that have their home in different regimes, care should be taken to guarantee that any settlement is not dictated by organs exclusively linked with one or other of the conflicting regimes.

499.   It is suggested that the Commission could outline the roles of special regimes in some or several of the three senses. For this purpose, it could examine the following areas:

(*a*)   The types of international and transnational regimes that have come to exist as a result of the process of globalization;

(*b*)   The manner of the autonomous operation of regimes. This could involve questions such as the formation and operation of internal regime hierarchies, the principles of interpretation applicable to regime instruments, the specific types of rules or institutions needed to enable the coherent operation of regimes, and so on;

(*c*)   The role of general (public) international law in regimes, including in resolving interpretative conflicts and

providing for responsibility for any violation of regime rules. The relations of public and private law, including soft law and other non-binding instruments, within such regimes could be examined;

(*d*)  Many provisions in technical treaty regimes have an exhortatory, procedural or "programmatic" character. Such provisions contrast sharply with provisions providing subjective rights or obligations. While the former may easily be adjusted in the event of conflicts (or, for example, lack of resources), the latter are not so easily "balanced" or "coordinated". Any study of regime rules should take into account such contrasts in the normative power of particular regime rules;

(*e*)  The conditions and consequences of regime failure. What counts as "regime failure" in the first place? When do the procedural means of redress of general law, normally suspended, become applicable?

(*f*)  The whole complex of inter-regime relations is presently a legal black hole. What principles of conflict resolution might be used to deal with conflicts between two regimes or between instruments across regimes?

(*g*)  The settlement of disputes within regimes may not be subject to the same rules or procedures as settlement of disputes across regimes. For the latter case, there is a particular need to ensure that impartial settlement mechanisms are available.

### 3.  The nature and operation of "general international law"?

500.  As we have seen throughout this study, fragmentation takes place against the background of and often by express reference to not only the 1969 Vienna Convention but also something called "general international law". However, there is no well-articulated or uniform understanding of what this might mean. "General international law" clearly refers to general customary law, as well as to the "general principles of law recognized by civilized nations" under Article 38, paragraph 1 (*c*), of the Statute of the International Court of Justice. But it might also refer to principles of international law proper and to analogies from domestic laws, especially principles of the legal process (*audiatur et altera pars*, *in dubio mitius*, estoppel and so on). In the practice of international tribunals, including the WTO Appellate Body, the European Court of Human Rights and the Inter-American Court of Human Rights, reference is constantly made to various kinds of "principles", sometimes drawn from domestic law, sometimes from international practice, but often in a way that leaves their authority unspecified.

501.  Much of the substance of "general international law" was canvassed in the study commissioned by the Secretary-General of the United Nations in 1948 from Hersch Lauterpacht so as to start off the work of the Commission in the codification and progressive development of international law.[689] In 1996, the Commission analysed

the scope for progressive development and codification after nearly fifty years of work and, in order to provide a global review of the main fields of general public international law, set up a general scheme of topics of international law classified under thirteen main fields.[690] Whatever the prospects for "codification and progressive development" today, it seems clear that most of the development of international law will take place within specialized law-making conferences and organizations on the basis of specialist preparatory work and will lead to complex treaty regimes with their own institutional provisions and procedures. This is indeed part of the background from which the concern about fragmentation once arose.

502.  In an increasingly specialized legal environment, few institutions are left to speak the language of general international law, with the aim of regulating, at a universal level, relationships that cannot be reduced to the realization of special interests and that go further than technical coordination. The Commission is one such institution. The codification and development work it has carried out has been precisely about elucidating the content of "general international law" as an aspect of what can only be understood as a kind of an international public realm. The fact that in this study it has been possible to develop an overarching standpoint by taking the perspective of the 1969 Vienna Convention has shown that general international law speaks to present concerns not so much in terms of substantive rules and principles—after all, a large part thereof has already been codified—but as a formal argumentative technique. In an important sense, it is that technique which represents what is "general" in a world of proliferating technical particularisms.

503.  The turn to specialized treaty-making and the diminishing subjects on the Commission's agenda demonstrate that there is a limit to what can be attained in terms of codification and progressive development of universal rules. At some point, the threshold is crossed at which the necessary generality and abstraction that is the price to be paid for the universal scope of treaty law becomes unnecessarily high. Under the frame of "universal" rules, what in fact often takes place is specialist rule-making through what formally appears as only the implementation of general (but completely indeterminate) standards at a local or technically specialized level. At that point, it becomes useful to draw attention to the way "general international law" appears constantly in the practice of regional and specialized institutions. It is this general international law that provides the rudiments of an international public realm, from the perspective of which the specialized pursuits and technical operations carried out under specific treaty regimes may be evaluated.

504.  Thus, it is proposed that the Commission should increasingly pursue the avenue of "restatement" of general international law in forms other than codification and progressive development—not as a substitute for but as a supplement to them. Such restatement work might focus, for example, on the following:

(*a*)  What sources are covered by references to "general international law"?

[689] Survey of International Law in Relation to the Work of Codification of the International Law Commission, memorandum submitted by the Secretary-General (A/CN.4/1/Rev.1, United Nations publication, Sales No. 48.V.1(1)), also published in Lauterpacht, *International Law: Collected Papers*, vol. I (footnote 106 above), pp. 445–530.

[690] *Yearbook ... 1996*, vol. II (Part Two), paras. 246–248 and annex II.

Case 1:19-cv-01618-TSC    Document 74-10    Filed 06/29/22    Page 104 of 109

Fragmentation of international law: difficulties arising from the diversification and expansion of international law    **103**

(*b*)   How does "general international law" appear in international treaty law and in the practice of international and domestic courts and tribunals, as well as of other international law-applying bodies?

(*c*)   To what extent might successful "codification and progressive development" today in fact necessitate studies—properly carried out by the Commission—on the emergence and spontaneous operation of general international law?

Annex

# DRAFT CONCLUSIONS OF THE WORK OF THE STUDY GROUP, FINALIZED BY MR. MARTTI KOSKENNIEMI

## A.    Introduction

1.   At its fifty-fourth session (2002), the International Law Commission established a Study Group to examine the topic "Fragmentation of international law: difficulties arising from the diversification and expansion of international law".[1] At its fifty-fifth session (2003), the Commission adopted a tentative schedule for work to be carried out during the remaining part of the quinquennium (2003–2006) and allocated to five of its members the task of preparing outlines on the following topics:

(a)   The function and scope of the *lex specialis* rule and the question of self-contained regimes (Mr. Martti Koskenniemi);

(b)   The interpretation of treaties in the light of "any relevant rules of international law applicable in the relations between the parties" (art. 31, para. 3 (c), of the 1969 Vienna Convention), in the context of general developments in international law and concerns of the international community (Mr. William Mansfield);

(c)   The application of successive treaties relating to the same subject matter (art. 30 of the 1969 Vienna Convention) (Mr. Teodor Melescanu);

(d)   The modification of multilateral treaties between certain of the parties only (art. 41 of the 1969 Vienna Convention) (Mr. Riad Daoudi); and

(e)   Hierarchy in international law: *jus cogens*, obligations *erga omnes* and Article 103 of the Charter of the United Nations as conflict rules (Mr. Zdzislaw Galicki).[2]

2.   During its fifty-sixth (2004) and fifty-seventh (2005) sessions, the Study Group received a number of outlines and studies on these topics. It affirmed that it was its intention to prepare, as the substantive outcome of its work, a single collective document consisting of two parts. One would be a "relatively large analytical study" that would summarize the content of the various individual reports and the discussions of the Study Group. This forms the bulk of the report prepared by the Chairperson of the Study Group in 2006. The other part would be "a condensed set of conclusions, guidelines or principles emerging from the studies and the discussions in the Study Group".[3] As the Study Group itself held, and the Commission endorsed, these should be "a concrete, practice-oriented set of brief statements that would work, on the one hand, as the summary and conclusions of the Study Group's work and, on the other hand, as a set of practical guidelines to help in thinking about and dealing with the issue of fragmentation in legal practice".[4]

3.   This annex sets out a draft for those "conclusions, guidelines or principles". The draft reproduces the result of the extensive deliberations the Study Group had undertaken in 2004 and 2005. They are a collective product by the members of the Study Group.

4.   It should be noted, however, that:

(a)   Only the formulation of conclusions 1 to 23, based on the studies referred to in paragraphs 1 (a)–(c) above, have so far been provisionally agreed to by the Study Group;

(b)   Draft conclusions 24 to 32, dealing with the topic referred to in paragraph 1 (d) above under the general title of "Conflicts between successive norms", have been neither presented to nor discussed in the Study Group. They have been formulated by the Chairperson of the Study Group as a proposal to be discussed during the fifty-eighth session (2006);

(c)   Draft conclusions 33 to 43 are based on the report referred to in paragraph 1 (e) above. They were distributed to the Study Group in 2005 but have not been subjected to in-depth discussion. It is proposed that they be discussed and adopted in the course of the finalization of the Study Group's work during the Commission's fifty-eighth session in 2006.

5.   The Chairperson of the Study Group wishes to reproduce all the draft conclusions below. The suggestion is that the conclusions would be adopted by the Study Group and submitted to the Commission for appropriate action.

## B.    Draft conclusions of the work of the Study Group on "Fragmentation of international law: difficulties arising from the diversification and expansion of international law"

### (a)    General

(1)   *International law as a legal system*. International law is a legal system. Its rules and principles (*i.e.* its norms) act in relation to and should be interpreted against the background of other rules and principles. As a legal system, international law is not a random collection of such norms. There are meaningful relationships between them. Norms may thus exist at higher and lower hierarchical levels, their formulation may involve greater or lesser generality and specificity, and their validity may date back to earlier or later moments in time.

(2)   In applying international law, it is often necessary to determine the precise relationship between two or more rules and principles that are both valid and applicable in respect of a situation.[5] For that purpose, the relevant relationships fall into two general types:

---

[1] *Yearbook … 2002*, vol. II (Part Two), paras. 492–494.

[2] *Yearbook … 2003*, vol. II (Part Two), paras. 424–428.

[3] *Yearbook … 2005*, vol. II (Part Two), para. 448.

[4] *Ibid.*

[5] That two norms are valid in regard to a situation means that they each cover the facts of which the situation consists. That two norms are applicable in a situation means that they have binding force in respect to the legal subjects finding themselves in the relevant situation.

Case 1:19-cv-01618-TSC    Document 74-10    Filed 06/29/22    Page 106 of 109

Fragmentation of international law: difficulties arising from the diversification and expansion of international law    105

– *Relationships of interpretation*. This is the case where one norm assists in the interpretation of another. A norm may assist in the interpretation of another norm for example as an application, clarification, updating or modification of the latter. In such situation, both norms are applied in conjunction.

– *Relationships of conflict*. This is the case where two norms that are both valid and applicable point to incompatible decisions so that a choice must be made between them. The basic rules concerning the resolution of normative conflicts are to be found in the 1969 Vienna Convention.

(3) *The Vienna Convention on the Law of Treaties*. When seeking to determine the relationship of two of more norms to each other, the norms should be interpreted in accordance with or analogously to the 1969 Vienna Convention and especially the provisions in its articles 31 to 33 having to do with the interpretation of treaties.

(4) *The principle of harmonization*. It is a generally accepted principle that when several norms bear on a single issue they should, to the extent possible, be interpreted so as giving rise to a single set of compatible obligations.

(b) *The maxim "lex specialis derogat legi generali"*

(5) *General principle*. The maxim *lex specialis derogat legi generali* is a generally accepted technique of interpretation and conflict resolution in international law. It suggests that, whenever two or more norms deal with the same subject matter, priority should be given to the norm that is more specific. The principle may be applicable in several contexts: between provisions within a single treaty, between provisions within two or more treaties, between a treaty and a non-treaty standard, as well as between two non-treaty standards. The source of the norm (whether treaty, custom or general principle of law) is not decisive for the determination of the more specific standard. However, in practice treaties often act as *lex specialis* by reference to the relevant customary law and general principles.

(6) *Contextual appreciation*. The relationship between the *lex specialis* maxim and other norms of interpretation or conflict solution cannot be determined in a general way. Which consideration should be predominant—*i.e.* whether it is the speciality or the time of emergence of the norm—should be decided contextually.

(7) *Rationale for the principle*. That special law has priority over general law is justified by the fact that such special law, being more concrete, often takes better account of the particular features of the context in which it is to be applied than any applicable general law. Its application may also often create a more equitable result and it may often better reflect the intent of the legal subjects.

(8) *Dispositive nature of most international law*. Most international law is dispositive. This means both that it may be applied, clarified, updated or modified as well as be set aside by special law.

(9) *The effect of* lex specialis *on general law*. The application of the special law does not normally extinguish the relevant general law. That general law will remain valid and applicable and will, in accordance with the principle of harmonization under paragraph (4) above, continue to give direction for the interpretation and application of the relevant special law and will become fully applicable in situations not provided for by the latter.

(10) *Non-derogability*. Certain types of general law[6] may not, however, be derogated from by special law. *Jus cogens* is expressly non-derogable. Other considerations that may provide a reason for concluding that a general law is non-derogable include the following:

– Whether the general law was intended to be non-derogable;

– Whether non-derogability may be inferred from the form or the nature of the general law;

– Whether derogation might frustrate the *purpose* of the general law;

– Whether third party beneficiaries may be negatively affected by derogation; and

– Whether the balance of rights and obligations established in the general law would be negatively affected by derogation.

A norm that purports to set aside or derogate from a norm that is non-derogable will be invalid.

(c) *Special ("self-contained") regimes*

(11) *Special ("self-contained") regimes as* lex specialis. A group of rules and principles concerned with a particular subject matter may form a special regime ("self-contained regime") and be applicable as *lex specialis*. Such special regimes often have their own institutions to administer the relevant rules.

(12) Three types of special regime may be distinguished:

– Sometimes violation of a particular group of (primary) rules is accompanied by a special set of (secondary) rules concerning breach and reactions to breach. This is the main case provided for under article 55 of the Commission's draft articles on responsibility of States for internationally wrongful acts.[7]

– Sometimes, however, a special regime is formed by a set of special rules, including rights and obligations, relating to a special subject matter. Such rules may concern a geographical area (*e.g.* a treaty on the protection of a particular river) or some substantive matter (*e.g.* a treaty on the regulation of the uses of a particular weapon). Such a special regime may emerge on the basis of a single treaty, several treaties, or treaty and treaties plus non-treaty developments (subsequent practice or customary law).

---

[6] [The notion of "general law" may yet need to be clarified.]

[7] *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, pp. 140–141.

– Finally, sometimes all the rules and principles that regulate a certain problem area are collected together so as to express a "special regime". Expressions such as "law of the sea", "humanitarian law", "human rights law", "environmental law" and "trade law", *etc.*, give expression to some such regimes. For interpretative purposes, such regimes may often be considered as wholes.

(13)  *Effect of the "speciality" of a regime*. The significance of a special regime lies in the way its norms express a unified object and purpose. Thus, their interpretation and application should, to the extent possible, reflect that object and purpose.

(14)  *The relationship between special regimes and general international law*. A special regime may derogate from general law under the same conditions as *lex specialis* generally (see paras. (6) and (8) above).

(15)  *The role of general law in special regimes I: gap-filling*. The scope of special laws is by definition narrower than that of general laws. It will thus frequently be the case that a matter not regulated by special law will arise in the institutions charged to administer it. In such cases, the relevant general law will be applicable.

(16)  *The role of general law in special regimes II: failure of special regimes*. Special regimes or the institutions set up by them may fail to operate as intended. In such case, the relevant general law becomes applicable. Failure should be inferred when the special laws have no reasonable prospect of appropriately addressing the objectives for which they were enacted. It could be manifested, for example, by the failure of the regime's institutions to fulfil the purposes allotted to them, endemic non-compliance by one or several of the parties, desuetude, withdrawal by parties instrumental for the regime, among other causes. Whether a regime has "failed" in this sense, however, needs to be decided above all by an interpretation of its constitutional instruments.

(d)  *Article 31, paragraph 3 (c), of the Vienna Convention on the Law of Treaties*

(17)  *Systemic integration*. Article 31, paragraph 3 (*c*), of the 1969 Vienna Convention provides one means, within the framework of the Convention, through which relationships of interpretation (referred to in para. (2) above) may be applied. It requires the interpreter of a treaty to take into account "[a]ny relevant rules of international law applicable in the relations between the parties". The article gives expression to the objective of "systemic integration", according to which, whatever their subject matter, treaties are a creation of the international legal system and their operation is predicated upon that fact.

(18)  *Interpretation as integration in the system*. Systemic integration governs all treaty interpretation, the other relevant aspects of which are set out in the other paragraphs of articles 31 and 32 of the 1969 Vienna Convention. These paragraphs describe a process of legal reasoning, in which particular elements will have greater or less relevance depending upon the nature of the treaty provisions in the context of interpretation. In many cases, the issue of interpretation will be capable of resolution within the framework of the treaty itself. Article 31, paragraph 3 (*c*), deals with the case where material sources external to the treaty are relevant in its interpretation. These may include other treaties, customary rules or general principles of law.

(19)  *Application of systemic integration*. Where a treaty functions in the context of other agreements, the objective of systemic integration will apply as a presumption with both positive and negative aspects:

(*a*)  *Positive presumption*: The parties are taken to refer to customary international law and general principles of law for all questions which the treaty does not itself resolve in express terms.

(*b*)  *Negative presumption*: In entering into treaty obligations, the parties do not intend to act inconsistently with [generally recognized] principles of international law.

Of course, if any other result is indicated by ordinary methods of treaty interpretation, that should be given effect, unless the relevant principle were part of *jus cogens.*

(20)  *Application of custom and general principles of law*. Customary international law and general principles of law are of particular relevance to the interpretation of a treaty under article 31, paragraph 3 (*c*), especially where:

(*a*)  The treaty rule is unclear or open-textured;

(*b*)  The terms used in the treaty have a recognized meaning in customary international law or under general principles of law;

(*c*)  The treaty is silent on the applicable law and it is necessary for the interpreter, applying the positive presumption in paragraph (19) (*b*) above, to look for rules developed in another part of international law to resolve the point.

(21)  *Application of other treaty rules*. Article 31, paragraph 3 (*c*), also requires the interpreter to consider other treaty-based rules so as to arrive at a consistent meaning. Such other rules are of particular relevance where parties to the treaty under interpretation are also parties to the other treaty, where the treaty rule has passed into or expresses customary international law or where they provide evidence of the common understanding of the parties as to the object and purpose of the treaty under interpretation or as to the meaning of a particular term.

(22)  *Inter-temporality*. International law is a dynamic legal system. Whether in applying article 31, paragraph 3 (*c*), the interpreter should refer to rules of international law in force at the time of the conclusion of the treaty or may also take into account subsequent changes in the law depends generally on the meaning of the treaty, as ascertained on the basis of articles 31 and 32 of the 1969 Vienna Convention. However, the meaning of a treaty provision may also be affected by subsequent developments irrespective of the original will of the parties, especially where these subsequent developments are reflected in customary law and general principles of law.

Case 1:19-cv-01618-TSC    Document 74-10    Filed 06/29/22    Page 108 of 109

Fragmentation of international law: difficulties arising from the diversification and expansion of international law    107

(23)  *Open or evolving concepts*. Rules of international law subsequent to the treaty to be interpreted may be taken into account particularly where the concepts used in the treaty are open or evolving. This is the case, in particular, where (*a*) the concept is one which implies taking into account subsequent technical, economic or legal developments; (*b*) the concept sets up an obligation for further progressive development for the parties; or (*c*) the concept has a very general nature or is expressed in such general terms that it must take into account changing circumstances.

### (e)  *Conflicts between successive norms*

(24)  *The basic rule*. The question of successive treaty norms covering the same subject matter is dealt with by article 30 of the 1969 Vienna Convention.

(25)  *Lex posterior derogat legi priori*. According to article 30, paragraph 3, of the 1969 Vienna Convention, when all the parties to the later treaty are also parties to the earlier treaty, and the earlier treaty is not suspended or terminated, then it applies only to the extent its provisions are compatible with those of the later treaty. This is an expression of the principle according to which "later law supersedes earlier law". The same principle is also expressed in the way treaties generally speaking enjoy priority over earlier customary law.

(26)  *Limits of the "lex posterior" principle*. The applicability of the *lex posterior* principle is, however, limited. It cannot, for example, be automatically extended to the case where the parties to the subsequent treaty are not identical to the parties to the earlier treaty. In such cases, as provided in article 30, paragraph 4, of the 1969 Vienna Convention, the State that is party to two incompatible treaties is bound *vis-à-vis* each of its treaty parties separately. In case it cannot fulfil its obligations under both treaties, it will remain responsible for its violation of one of them. In such case, article 60 of the 1969 Vienna Convention may also become applicable. The question of which of the incompatible treaties should be implemented and the breach of which should be sanctioned by State responsibility cannot be answered by a general rule.

(27)  *The distinction between treaty provisions that belong to the same "regime" and provisions in different "regimes"*. The *lex posterior* principle is at its strongest in regard to conflicting or overlapping provisions that are part of treaties that are institutionally linked or otherwise intended to advance similar objectives. This is typically the case of the relationship between "framework treaties" and "implementation treaties". In case of conflicts or overlaps between treaties in different regimes, the question of which of them is later in time cannot be taken to express any intrinsic priority between them.

(28)  *Mutual accommodation and protection of rights*. In case of conflicting or overlapping treaties within different "regimes", both of the treaties should be implemented as far as possible with a view to mutual accommodation and in accordance with the principle of harmonization. This applies above all to the procedural provisions in such treaties and to provisions set up in implementation programmes and schedules. However, this may not lead to undermining the substantive rights of treaty parties or third-party beneficiaries. The violation of rights entails State responsibility.

(29)  *The case of special treaties*. Some treaty provisions enjoy a special normative character so that they shall prevail irrespective of whether they are earlier or later in time. These include:

(*a*)  Provisions of the Charter of the United Nations;

(*b*)  Provisions embodying *jus cogens*;

(*c*)  Provisions that otherwise might be understood as non-derogable because they were so intended, because non-derogability may be inferred from their nature or from the object and purpose of the treaty or for any other reason referred to in paragraph (10) above.

(30)  *Settlement of disputes within and across regimes*. Questions regarding priority between conflicting treaty provisions should be resolved by negotiation between parties to the relevant treaties. However, when no negotiated solution is available, recourse ought to be had to mechanisms of dispute settlement. When the conflict concerns provisions within a single regime (as defined in para. (4) above), then its resolution may be appropriate in the regime-specific mechanism. However, when the conflict concerns provisions in treaties that are not part of the same regime, then care should be taken to guarantee that the dispute settlement body is independent from both of the regimes.

(31)  *Inter se agreements*. The case of agreements to modify multilateral treaties by certain of the parties only (*inter se* agreements) is covered by article 41 of the 1969 Vienna Convention. Such agreements are an often-used technique for the more effective implementation of the original treaty between a limited number of treaty parties that are willing to take more effective or more far-reaching measures for the realization of the object and purpose of the original treaty. *Inter se* agreements may be concluded if this is provided for by the original treaty or it is not specifically prohibited and it "(i) [d]oes not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; (ii) [d]oes not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole" (art. 41, para. 1 (*b*), of the 1969 Vienna Convention).

(32)  *Conflict clauses*. It is advisable that, when States enter into treaties that might conflict with other treaties, they settle the relationship between such treaties by adopting appropriate clauses in the treaties themselves. When adopting such clauses, it should be borne in mind that:

(*a*)  They may not affect the rights of third parties;

(*b*)  They should be as clear and specific as possible. In particular, they should be directed to specific provisions of the treaty and they should not undermine the object and purpose of the treaty;

(*c*)  For this purpose, they should not be open-ended or otherwise such that it is unclear what, in fact, the obligations parties have undertaken are;

(*d*)  They should be linked with appropriate dispute settlement mechanisms.

(*f*)  *Hierarchy in international law:* jus cogens, *obligations* erga omnes *and Article 103 of the Charter of the United Nations as conflict rules*

(33)  *Hierarchical relations between norms of international law.* The sources of international law (treaties, custom, general principles of law) are not in a hierarchical relationship *inter se.* Drawing analogies from the hierarchical nature of domestic legal systems is not generally appropriate owing to the absence of a well-developed or authoritative hierarchy of values in international law. Nevertheless, some rules of international law are more important than other rules and for this reason enjoy a superior position or special status in the international legal system. This is sometimes expressed by the designation of some norms as "fundamental" or some breaches as "grave". What effect such designations may have is usually determined by the relevant instrument in which that designation appears.

(34)  *Recognized hierarchical relations by the substance of the rules I:* jus cogens. A rule of international law may be superior to other rules on account of its content. This is the case of peremptory norms of international law (*jus cogens*, art. 53 of the 1969 Vienna Convention), that is, norms "accepted and recognized by the international community as a whole from which no derogation is permitted".

(35)  *The content of* jus cogens. Accepted rules of *jus cogens* include rules prohibiting genocide and torture as well as rules protecting the basic rights of the human person. The right of self-determination as well as the prohibition of the use of force are likewise rules of *jus cogens*. Also other rules may have a *jus cogens* character inasmuch as they are "accepted and recognized by the international community … as a whole".

(36)  *Recognized hierarchical relations II: Article 103 of the Charter of the United Nations.* A rule of international law may also be superior to other rules by virtue of a treaty provision. This is the case of Article 103 of the Charter of the United Nations, by virtue of which "[i]n the event of a conflict between the obligations of the Members of the United Nations under the … Charter and their obligations under any other international agreement, their obligations under the … Charter shall prevail."

(37)  *Rules recognized by their scope of application: obligations* erga omnes *and the Charter of the United Nations.* Some norms enjoy a special status owing to their scope of applicability. This is the case of obligations *erga omnes*, that is, obligations of a State towards the international community as a whole. These rules concern all States and all States can be held to have a legal interest in their protection. Every State may invoke the responsibility of the State violating such norms. It is also recognized that the Charter of the United Nations itself enjoys special status owing to its virtually universal acceptance.

(38)  *The content of obligations* erga omnes. Accepted *erga omnes* norms include rules concerning diplomatic relations. [See State responsibility.] Likewise the right of peoples to self-determination and the rights and duties enshrined in the Convention on the Prevention and Punishment of the Crime of Genocide.

(39)  *The relationship between* jus cogens *norms and obligations* erga omnes. It is recognized that while all *jus cogens* norms also have the character of *erga omnes* obligations, the reverse is not necessarily true. Not all *erga omnes* obligations have the character of peremptory rules of international law.

(40)  *The scope of Article 103 of the Charter of the United Nations.* Article 103 of the Charter provides for the priority of the obligations under the Charter *vis-à-vis* not only "any other international agreement" but also customary international law. The scope of Article 103 reaches not only to the Articles of the Charter but also to binding decisions by United Nations bodies such as the Security Council or the International Court of Justice.

(41)  *The relationship between hierarchy and fragmentation.* The purpose of normative hierarchies is to resolve conflicts between rules of international law by indicating which rule is to prevail in case of conflict. A hierarchy between two rules or norms operates in a relational and not fixed fashion. If there is a conflict between two hierarchically superior norms such as *jus cogens* and Article 103 of the Charter, their relationship can only be determined in a contextual fashion, bearing in mind, *inter alia*, the principle of harmonization, that is, that in the event of a *prima facie* conflict, the two norms should be interpreted as compatible.

(42)  *The operation and effect of* jus cogens *norms and Article 103 of the Charter of the United Nations.*

(*a*)  A rule conflicting with a norm of *jus cogens* becomes thereby *ipso facto* invalid;

(*b*)  A rule conflicting with Article 103 of the Charter becomes inapplicable as a result of such conflict.

(43)  *The principle of harmonization.* Irrespective of the special status or the designation ("fundamental") enjoyed by some norms, conflicts between rules of international law should be resolved in accordance with the principle of harmonization, that is, by bearing in mind that, in the event of a conflict, the norms should be interpreted as compatible to the extent possible. Hierarchical relations appear often in the context of other conflict resolution rules, such as those in article 30, paragraph 1, article 31, paragraph 3 (*c*), and article 41 of the 1969 Vienna Convention, or in applying the *lex specialis* or *lex posterior* principles.