# Exhibit 88

# JUDGMENT OF THE COURT
## 16 May 2002 *

In Case C-482/99,

**French Republic,** represented by G. de Bergues and F. Million, acting as Agents, with an address for service in Luxembourg,

applicant,

v

**Commission of the European Communities,** represented by G. Rozet and J. Flett, acting as Agents, with an address for service in Luxembourg,

defendant,

APPLICATION for the annulment of Commission Decision 2000/513/EC of 8 September 1999 on aid granted by France to Stardust Marine (OJ 2000 L 206, p. 6),

* Language of the case: French.

THE COURT,

composed of: G.C. Rodríguez Iglesias, President, P. Jann, F. Macken, N. Colneric and S. von Bahr (Presidents of Chambers), C. Gulmann, D.A.O. Edward, A. La Pergola, J.-P. Puissochet, J.N. Cunha Rodrigues and C.W.A. Timmermans (Rapporteur), Judges,

Advocate General: F.G. Jacobs,

Registrar: L. Hewlett, Administrator,

having regard to the Report for the Hearing,

after hearing oral argument from the parties at the hearing on 10 July 2001,

after hearing the Opinion of the Advocate General at the sitting on 13 December 2001,

gives the following

## Judgment

1    By application lodged at the Court Registry on 20 December 1999, the French Republic brought an action under Article 230 EC for the annulment of

Commission Decision 2000/513/EC of 8 September 1999 on aid granted by France to Stardust Marine (OJ 2000 L 206, p. 6; 'the contested decision').

## Background

2    Stardust Marine ('Stardust'), a company whose main business developed in the pleasure-boat market, was set up in 1989. The bank SBT-Batif ('SBT'), a subsidiary of Altus Finance ('Altus'), which was itself part of the Crédit Lyonnais group, initially undertook to finance Stardust by loans and guarantees.

3    After five years of rapid growth, Crédit Lyonnais made losses in 1992 (FRF 1.8 billion) and 1993 (FRF 6.9 billion). In 1994, at the request of the supervisory authority of the French banking system, the French authorities took decisions to support it financially. The decisions included, first, an increase in capital of FRF 4.9 billion and, second, the assuming of the risks and costs connected with the commitments, which were then transferred to a separate structure, the Consortium de Réalisations ('CDR'), a 100% subsidiary of Crédit Lyonnais, which was created in 1995 as part of a 'hiving-off' operation. CDR purchased nearly FRF 190 billion of assets from Crédit Lyonnais. Under the restructuring plan, all the assets concerned were to be transferred or sold.

4    Stardust, controlled since 1994 by Crédit Lyonnais through the intermediary of Altus following an increase in capital of FRF 44.3 million, which had been subscribed by Altus in October 1994 through conversion of debts, was part of the Crédit Lyonnais assets transferred to CDR under the 1995 hiving-off plan in view

of their poor results and expected losses. As a subsidiary of CDR, Stardust was part of the Crédit Lyonnais group after 1995 and until the latter's privatisation, since until the end of 1998 CDR remained a 100%, unconsolidated, subsidiary of Crédit Lyonnais. The Crédit Lyonnais management, however, ceased to play any direct part in the management of Stardust after its transfer to CDR because of the total separation of management between CDR and Crédit Lyonnais, in accordance with Commission Decision 95/547/EC of 26 July 1995 giving conditional approval to the aid granted by France to the bank Crédit Lyonnais (OJ 1995 L 308, p. 92).

5    CDR increased Stardust's capital in three stages. A first increase of capital, totalling FRF 112 million, took place in April 1995. A second increase, of FRF 250.5 million, was decided upon following an extraordinary general meeting held on 26 June 1996 and was effected in two payments made, respectively, in June 1996 (as to two thirds of that sum) and March 1997 (as to the remaining third). Finally, a third increase in capital was effected following the extraordinary general meeting of 5 June 1997, in the amount of FRF 89 million.

6    Following the last recapitalisation operation in June 1997, CDR sold its holding in Stardust (which was 99.90% of its capital) to FG Marine for FRF 2 million.

**The procedure before the Commission and the contested decision**

7    On 20 June 1997, the Commission received a complaint against the French Republic, concerning several recapitalisations of Stardust by the State and the conditions in which the latter had been transferred by CDR to FG Marine.

FRANCE v COMMISSION

8    On 2 July 1997, the Commission sent a letter to the French authorities, asking them to supply full information on the financial position of Stardust, the capital operations which had taken place and, where appropriate, the transfer or planned transfers of those assets of CDR and the precise arrangements for the sale procedure which had been entered into.

9    On 5 November 1997, the Commission decided to initiate the procedure under Article 93(2) of the EC Treaty (now Article 88(2) EC) in relation to the support measures in favour of Stardust and informed the French Government of that fact by letter of 8 December 1997, requesting it to supply all the information necessary for the investigation of the matter.

10   The initiation of that procedure formed the subject-matter of Commission communication 98/C 111/07 of 9 April 1998, sent pursuant to Article 93(2) of the EC Treaty to the other Member States and other interested parties on the recapitalisation of Stardust Marine (OJ 1998 C 111, p. 9).

11   After the initiation of the abovementioned procedure, further exchanges of information took place between the Commission and the French Government.

12   The Commission adopted the contested decision on 8 September 1999, and notified it to the French authorities on 13 October 1999.

13    The operative part of the contested decision is worded as follows:

'*Article 1*

The capital increases of FRF 44.3 million injected into Stardust Marine in October 1994 by Altus Finance and FRF 112 million injected by CDR in April 1995, the advance on current account of FRF 127.5 million granted by CDR from July 1995 to June 1996, the recapitalisations of FRF 250.5 million in June 1996 and of FRF 89 million in June 1997 by CDR constitute State aid within the meaning of Article 87(1) of the Treaty. The aid, amounting to a discounted value at 31 October 1994 of FRF 450.4 million, cannot be declared compatible with the common market under Article 87(2) and (3) of the Treaty and with Article 61(2) and [(3)] of the EEA Agreement.

*Article 2*

France shall require Stardust to repay to the State or to CDR the sum of FRF 450.4 million corresponding to the State aid content of the measures in question, discounted to 31 October 1994. The amount to be repaid shall bear interest from that date, at the reference rate established by the Commission for the calculation of the net grant equivalent of aid in France.

*Article 3*

France shall inform the Commission, within two months of notification of this Decision, of the measures taken to comply with it.

*Article 4*

This Decision is addressed to the French Republic.'

**Substance**

14    In support of its action for annulment of the contested decision the French Government puts forward five pleas in law.

15    First, the French Government disputes the State origin of the funds supporting Stardust, its plea in this respect being composed of two parts. Second, it maintains that the Commission made an obvious error of assessment in holding the conduct of SBT and Altus with respect to Stardust to have been imprudent. Third, the contested decision reveals internal contradictions, particularly in relation to the identification of the person dispensing the aid. Fourth, the decision infringes the principle of legal certainty by going back upon previous decisions of the Commission. Finally, the Commission infringed the French Government's rights of defence in the procedure which led to the adoption of the contested decision.

*General preliminary observations*

16    The contested decision shows that the Commission's analysis of the measures in question as State aid relates, first, to financial support granted to Stardust before it was hived off to CDR.

17    The Commission acknowledges in the contested decision that, 'if viewed as an isolated act, the measures taken by the State through CDR could, as soon as Stardust was hived off in 1995, to some extent be regarded as constituting sound management, aimed at minimising losses and safeguarding the interests of the State.... However, even if that hypothesis were to prove the case, proper management of the business by CDR as a prudent investor would not rule out the State aid content of the Stardust measures' (paragraph 50). 'In its assessment of the measures, the Commission takes account of the continuous nature of the State's assistance to Stardust..., which the hiving-off of Stardust to CDR cannot interrupt as though nothing had happened before 1995' (paragraph 51).

18    In addition, although the Commission held, in the contested decision, that the recapitalisations of Stardust by Altus, in October 1994, and by CDR, in April 1995, June 1996, and June 1997, were aid measures within the meaning of Article 87(1) EC, it should be noted that the Commission itself recognises that they are merely the implementation of the aid granted to Stardust before October 1994.

19    As paragraph 95 of the contested decision puts it: 'the aid actually preceded the recapitalisations from 1994 to 1997, which in effect constitute the deferred payment of the aid elements they contained, and... it essentially takes the form of the imprudent financing of Stardust by Crédit Lyonnais during its period of accelerated growth in 1992 to 1994'. Moreover, in the words of paragraph 103 of that decision, 'the steps taken... to recapitalise Stardust' should be assessed 'in the context in which the aid was in fact initially granted to Stardust, in particular in 1992, 1993 and 1994'. (Further wording to the same effect can be found in paragraphs 48, 51, 53, 100, 101, 102, 106 and 114 of the contested decision.)

20    Since the Commission thus regarded the financial aid granted to Stardust by Altus and SBT in 1992, 1993 and 1994 as being at the root of the State aid impugned

I - 4434

by the contested decision, the Court's examination of the issue of classification as State aid, which is called for by both the first and the second of the applicant's pleas in law, must relate first and foremost to those measures.

*The first plea in law*

21    In this plea, the French Government denies, first, that the funds used by Altus and SBT, subsidiaries of Crédit Lyonnais, to finance Stardust may be classified as 'State resources' within the meaning of Article 87(1) EC (first part of the plea) and, second, that the support measures taken in favour of Stardust may be regarded as imputable to the French State (second part of the plea).

*Preliminary observations on the first plea*

22    It should be recalled, at the outset, that Article 87(1) EC provides that any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain under-takings or the production of certain goods is, in so far as it affects trade between Member States, incompatible with the common market.

23    It is settled case-law that no distinction is to be drawn between cases where the aid is granted directly by the State and those where it is granted by public or private bodies which the State establishes or designates with a view to administering the aid (see, in particular, Case 78/76 *Steinike & Weinlig* v *Germany* [1977] ECR 595, paragraph 21; Case 290/83 *Commission* v *France*

[1985] ECR 439, paragraph 14; Joined Cases 67/85, 68/85 and 70/85 *Van der Kooy and Others* v *Commission* [1988] ECR 219, paragraph 35; and Case C-305/89 *Italy* v *Commission* [1991] ECR I-1603, paragraph 13). Community law cannot permit the rules on State aid to be circumvented merely through the creation of autonomous institutions charged with allocating aid.

24    However, for advantages to be capable of being categorised as aid within the meaning of Article 87(1) EC, they must, first, be granted directly or indirectly through State resources (see Joined Cases C-72/91 and C-73/91 *Sloman Neptun* v *Bodo Ziesemer* [1993] ECR I-887, paragraph 19; Case C-189/91 *Kirsammer-Hack* v *Sidal* [1993] ECR I-6185, paragraph 16; Joined Cases C-52/97 to C-54/97 *Viscido and Others* v *Ente Poste Italiane* [1998] ECR I-2629, paragraph 13; Case C-200/97 *Ecotrade* v *Altiformi e Ferriere di Servola* [1998] ECR I-7907, paragraph 35; Case C-295/97 *Piaggio* v *International Factors Italia (Ifitalia), Dornier Luftfahrt, Ministero della Difesa* [1999] ECR I-3735, paragraph 35; and Case C-379/98 *PreussenElektra* v *Schleswag* [2001] ECR I-2099, paragraph 58) and, second, be imputable to the State (*Van der Kooy*, paragraph 35; Case C-303/88 *Italy* v *Commission* [1991] ECR I-1433, paragraph 11; Case C-305/89 *Italy* v *Commission*, cited above, paragraph 13).

The first part of the first plea in law

Arguments of the parties

25    In the first part of the plea, the French Government argues that the Commission misconstrued the term 'State resources' as it appears in Article 87(1) EC.

I - 4436

FRANCE v COMMISSION

26  First, it argues that, for it to be possible to classify aid as State aid, the wording of the Treaty requires it to be established that the body dispensing the aid used public resources. In its submission, the Commission cannot infer from the mere fact that an undertaking belongs to the public sector that the resources used by the latter are necessarily and systematically State resources. Such a purely organic classification of the nature of the funds is too extensive. Moreover, applying such an organic criterion involves unequal treatment of public undertakings in comparison with private ones, inasmuch as their mere belonging to the public sector is penalised, contrary to the principle, laid down in Article 295 EC, that the Treaty is neutral in relation to the system of ownership of undertakings. Private undertakings, like public ones, may take risks which may result in a setback.

27  The French Government then argues that, in this case, the resources of Crédit Lyonnais and its subsidiaries do not come directly or indirectly, even in part, from State resources. First, the banking aid initially allocated to Stardust was granted by SBT, a subsidiary of Altus and thus a 'sub-subsidiary' of Crédit Lyonnais, which was financed on the private capital market, without specific intervention by the public authorities. Second, Altus and SBT did not receive any public funds before their interventions to support Stardust, and Crédit Lyonnais, for its part, did not receive public funds before 30 June 1994, by which date most of the contested financing had already been granted to Stardust.

28  Finally, the French Government argues that the Commission failed to fulfil its obligation to state reasons for a Community measure by not explaining the reasons for which it considered that the funds mobilised for the increases in Stardust's capital constituted State resources within the meaning of Article 87(1) EC.

29  The Commission replies by recalling that, in paragraph 37 of the contested decision, it considered that '[t]he resources granted by Crédit Lyonnais, a public

undertaking, through its subsidiaries SBT and Altus are State resources within the meaning of Article 87(1) of the Treaty'. It also points that, in paragraph 39 of that decision, it recalled that, in Commission Decision 98/490/EC of 20 May 1998 concerning aid granted by France to the Crédit Lyonnais group (OJ 1998 L 221, p. 28; 'the decision on aid granted to Crédit Lyonnais'), it had stated that the resources of CDR were State resources 'not only because CDR is the wholly-owned subsidiary of a public undertaking but also because it is financed by a participating loan guaranteed by the State and because its losses are borne by the State'.

30    The Commission states, moreover, that measures financed by State resources do not *ipso facto* constitute State aid. On the contrary, it also has to be established that those measures do not accord with the conduct of a prudent investor operating in a market economy. It follows in particular from the judgment in Case T-123/97 *Salomon* v *Commission* [1999] ECR II-2925, paragraphs 68 and 69, that, where a public bank mobilises its resources to carry out an operation which a private bank would have carried out in the same circumstances, that operation cannot constitute State aid. Thus, the Commission cannot be accused of any discrimination against public undertakings, contrary to Article 295 EC.

31    The Commission further argues that the French Government cannot validly maintain that the contested decision is unlawful for failing to state reasons for the classification as State resources. The reasons for which the Commission considered that the measures in question fell within the scope of Article 87(1) EC were clearly indicated in the decision.

Findings of the Court

32    As a preliminary point, it should be observed that the French Government does not deny that the resources used by CDR to finance Stardust are State resources

within the meaning of Article 87(1) EC. It therefore only needs to be examined whether the loans, guarantees and recapitalisation granted by Altus and SBT in favour of Stardust, before it was hived off to CDR, must be regarded as coming from State resources.

33    On that point, the documents before the Court show that, on 31 December 1994, the State held about 80% of the shares in Crédit Lyonnais and nearly 100% of its voting rights. Crédit Lyonnais held 100% of the shares in Altus and the latter owned 97% of those of SBT, the remaining 3% being held by Crédit Lyonnais. In addition, the chairman of Crédit Lyonnais and two thirds of the members of its administrative board were appointed by the State. The chairman of Crédit Lyonnais also chaired the administrative board of Altus, the members of which were appointed by the administrative board of Crédit Lyonnais.

34    In those circumstances, it has to be concluded that Crédit Lyonnais, Altus and SBT were under the control of the State and had to be regarded as public undertakings within the meaning of the second indent of the first subparagraph of Article 2 of Commission Directive 80/723/EEC of 25 June 1980 on the transparency of financial relations between Member States and public undertakings (OJ 1980 L 195, p. 35), as amended by Commission Directive 93/84/EEC of 30 September 1993 (OJ 1993 L 254, p. 16; 'Directive 80/723'). The French authorities were indeed able, directly or indirectly, to exercise a dominant influence over those undertakings within the meaning of that provision of Directive 80/723.

35    It therefore needs to be examined whether such a situation of State control allows the financial resources of the undertakings subject to that control to be regarded as 'State resources', within the meaning of Article 87(1) EC, in a case such as the present, in which it is undisputed between the parties that the undertakings in

question did not receive financial support from the French authorities before 30 June 1994, such as a guarantee or a specific transfer of funds.

36    In that respect, it should first be noted that, according to settled case-law, it is not necessary to establish in every case that there has been a transfer of State resources for the advantage granted to one or more undertakings to be capable of being regarded as a State aid within the meaning of Article 87(1) EC (see, in particular, Case C-387/92 *Banco Exterior de España* v *Ayuntamiento de Valencia* [1994] ECR I-877, paragraph 14; Case C-6/97 *Italy* v *Commission* [1999] ECR I-2981, paragraph 16).

37    Second, it should be recalled that it has already been established in the case-law of the Court that Article 87(1) EC covers all the financial means by which the public authorities may actually support undertakings, irrespective of whether or not those means are permanent assets of the public sector. Therefore, even if the sums corresponding to the measure in question are not permanently held by the Treasury, the fact that they constantly remain under public control, and therefore available to the competent national authorities, is sufficient for them to be categorised as State resources (see the judgment in Case C-83/98 P *France* v *Ladbroke Racing and Commission* [2000] ECR I-3271, paragraph 50).

38    It follows that, by holding in the contested decision that the resources of public undertakings, such as those of Crédit Lyonnais and its subsidiaries, fell within the control of the State and were therefore at its disposal, the Commission did not misinterpret the term 'State resources' in Article 87(1) EC. The State is perfectly capable, by exercising its dominant influence over such undertakings, of directing the use of their resources in order, as occasion arises, to finance specific advantages in favour of other undertakings.

I - 4440

39    Moreover, such an interpretation cannot be regarded, as the French Government argues, as a possible source of discrimination against public undertakings as compared with private undertakings. In a context such as that in point here, the position of a public undertaking cannot be compared with that of a private undertaking. Through its public undertakings, the State may pursue objectives other than commercial ones, as is pointed out in the 11th recital in the preamble to Directive 80/723.

40    Nor can the French Government validly argue that the contested decision infringes Article 253 EC, in that the Commission did not indicate the reasons for which the measures in favour of Stardust were granted by means of State resources.

41    According to settled case-law, the statement of reasons required by Article 253 EC must disclose in a clear and unequivocal fashion the reasoning followed by the institution which adopted the measure in question in such a way as to enable the persons concerned to ascertain the reasons for the measure in order to defend their rights and to enable the Community judicature to exercise its power of review (Joined Cases 43/82 and 63/82 *VBVB and VBBB* v *Commission* [1984] ECR 19, paragraph 22; Case C-156/98 *Germany* v *Commission* [2000] ECR I-6857, paragraph 96).

42    In that regard, it is sufficient to note that the contested decision mentions several times, in particular in paragraphs 27, 37 and 83, that the Commission considers that the resources of public undertakings, such as those of Crédit Lyonnais and its subsidiaries, are State resources within the meaning of Article 87(1) EC. That enabled the French Government and the Community judicature to know the reasons for which the Commission considered that, in this case, State resources were involved.

43  It follows from all the foregoing that the first part of the first plea in law must be rejected.


The second part of the first plea


Arguments of the parties


44  In the second part of the first plea, the French Government maintains that the Commission misinterpreted the concept of 'imputability to the State' and contends that the financial aid granted to Stardust by SBT and Altus are not imputable to the State.


45  In its submission, the case-law of the Court shows that the criterion of imputability to the State must be the subject of an examination on a case-by-case basis and that it cannot be presumed to be fulfilled merely on the basis that, organically, an undertaking belongs to the public sector. The French Government argues that the criterion of control of an undertaking by the State is not, purely on its own, sufficient to establish that the conduct of that undertaking is imputable to the State.


46  The French Government further maintains that the Commission cannot, without disregarding its own decision on the aid granted to Crédit Lyonnais, impute to the State responsibility for financing granted by a 'sub-subsidiary' of that bank,

considerable deficiencies in control, both at parent-company level and within the group, having been identified in that same decision.

47    The French Government also points out that, in France, public undertakings constituted in the form of commercial companies function in accordance with the same rules as private companies and benefit from the autonomy principle. In this case, SBT and Altus took their decisions wholly independently from Crédit Lyonnais, and *a fortiori* from the State.

48    The Commission points out that the State held the majority of the capital and the voting rights of Crédit Lyonnais and appointed its chairman and most of the members of its administrative board. In those circumstances, it contends that it is impossible to deny either the control exercised by the State over Crédit Lyonnais and, through the latter, over Altus, or, because of that control, the imputability to the State of the investments made by Altus, notwithstanding the malfunctioning of the control exercised by Crédit Lyonnais over the activities of its subsidiary.

49    The Commission further argues that the French Government cannot validly claim that the conduct of Altus was unknown to it, given that the latter is a 100% subsidiary of Crédit Lyonnais and 80.70% of the shares in that company and almost 100% of the voting rights belonged to the State. For example, a document sent by the French authorities to the Commission on 5 January 1998 showed that, in 1991, 'concerned, like the Minister of the Economy and Finance, by developments at the bank, the Banking Commission began to carry out investigations into the most vulnerable subsidiaries of the group. The investigations concerned Altus in the second half of 1991'. Thus, in 1992, the State representatives on the administrative board of Crédit Lyonnais 'expressed their concern, more particularly concerning the internal management of risks and the situation of Altus Finance'. The investigations undertaken in 1993 by the new

managers of Crédit Lyonnais and by the Banking Commission revealed 'the taking of new risks, particularly by Altus Finance, in the first half of 1993'.

Findings of the Court

50    There is no dispute that, in the contested decision, the Commission inferred the imputability of the financial assistance granted to Stardust by Altus and SBT to the State simply from the fact that those two companies, as subsidiaries of Crédit Lyonnais, were indirectly controlled by the State.

51    Such an interpretation of the condition that, for a measure to be capable of being classified as 'State aid' within the meaning of Article 87(1) EC, it must be imputable to the State, which infers such imputability from the mere fact that that measure was taken by a public undertaking, cannot be accepted.

52    Even if the State is in a position to control a public undertaking and to exercise a dominant influence over its operations, actual exercise of that control in a particular case cannot be automatically presumed. A public undertaking may act with more or less independence, according to the degree of autonomy left to it by the State. That might be the situation in the case of public undertakings such as Altus and SBT. Therefore, the mere fact that a public undertaking is under State control is not sufficient for measures taken by that undertaking, such as the financial support measures in question here, to be imputed to the State. It is also necessary to examine whether the public authorities must be regarded as having been involved, in one way or another, in the adoption of those measures.

I - 4444

FRANCE v COMMISSION

53    On that point, it cannot be demanded that it be demonstrated, on the basis of a precise inquiry, that in the particular case the public authorities specifically incited the public undertaking to take the aid measures in question. In the first place, having regard to the fact that relations between the State and public undertakings are close, there is a real risk that State aid may be granted through the intermediary of those undertakings in a non-transparent way and in breach of the rules on State aid laid down by the Treaty.

54    Moreover, it will, as a general rule, be very difficult for a third party, precisely because of the privileged relations existing between the State and a public undertaking, to demonstrate in a particular case that aid measures taken by such an undertaking were in fact adopted on the instructions of the public authorities.

55    For those reasons, it must be accepted that the imputability to the State of an aid measure taken by a public undertaking may be inferred from a set of indicators arising from the circumstances of the case and the context in which that measure was taken. In that respect, the Court has already taken into consideration the fact that the body in question could not take the contested decision without taking account of the requirements of the public authorities (see, in particular, *Van der Kooy*, paragraph 37) or the fact that, apart from factors of an organic nature which linked the public undertakings to the State, those undertakings, through the intermediary of which aid had been granted, had to take account of directives issued by a Comitato Interministeriale per la Programmazione Economica (CIPE) (Case C-303/88 *Italy v Commission*, cited above, paragraphs 11 and 12; Case C-305/89 *Italy v Commission*, cited above, paragraphs 13 and 14).

56    Other indicators might, in certain circumstances, be relevant in concluding that an aid measure taken by a public undertaking is imputable to the State, such as, in particular, its integration into the structures of the public administration, the nature of its activities and the exercise of the latter on the market in normal conditions of competition with private operators, the legal status of the

undertaking (in the sense of its being subject to public law or ordinary company law), the intensity of the supervision exercised by the public authorities over the management of the undertaking, or any other indicator showing, in the particular case, an involvement by the public authorities in the adoption of a measure or the unlikelihood of their not being involved, having regard also to the compass of the measure, its content or the conditions which it contains.

57    However, the mere fact that a public undertaking has been constituted in the form of a capital company under ordinary law cannot, having regard to the autonomy which that legal form is capable of conferring upon it, be regarded as sufficient to exclude the possibility of an aid measure taken by such a company being imputable to the State (Case C-305/89 *Italy* v *Commission*, cited above, paragraph 13). The existence of a situation of control and the real possibilities of exercising a dominant influence which that situation involves in practice makes it impossible to exclude from the outset any imputability to the State of a measure taken by such a company, and hence the risk of an infringement of the Treaty rules on State aid, notwithstanding the relevance, as such, of the legal form of the public undertaking as one indicator, amongst others, enabling it to be determined in a given case whether or not the State is involved.

58    In this case, the Commission adopted in the contested decision, as the sole criterion, the organic criterion according to which Crédit Lyonnais, Altus and SBT, as public undertakings, were under the control of the State. In those circumstances, it must be held that that interpretation of the criterion of imputability to the State is erroneous.

59    The second part of the French Government's first plea in law is therefore well founded.

*The second plea in law*

Arguments of the parties

60  Under its second plea, the French Government argues that, contrary to what the Commission claims in the contested decision, the financial aid granted by the subsidiaries of Crédit Lyonnais to Stardust formed part of a prudent line of conduct in the context of the time when it was dispensed.

61  The French Government submits, first, that the granting of a loan must be assessed by considering the attitude which, at the date on which the disputed loan was granted, a private investor in normal market conditions would have had, having regard to the available information and foreseeable market developments at that date. The Commission should therefore have placed itself in the context of the relevant time in assessing whether the conduct of the State was prudent and refrained from any assessment based on a later situation. The Government contends that there is nothing in the contested decision to support the argument that, at the time when the financial aid was granted, the obligations assumed by SBT and Altus were not those of a prudent investor operating in a market economy.

62  In that respect, the Commission points out that it stated, in paragraph 22 of the contested decision, that 'the measures in question must be analysed in the context in which they were granted and not ex post' and, in paragraph 25 of that decision, that 'in order to determine whether the financing received by Stardust comprises aid elements, the Commission does not examine the current position, where it is very clear that the result of the financing is negative, but rather the context in which the financing was granted by Crédit Lyonnais before 1995'.

JUDGMENT OF 16. 5. 2002 — CASE C-482/99

63 The Commission further points out that the information which appears in Table 2, which constitutes paragraph 93 of the contested decision, reveals that the net result of Stardust on 31 December 1993 was - FRF 15.9 million. The total of the balance sheet being unknown on 31 December 1994, since the business year did not close until 30 June 1995, with a net result of - FRF 361.2 million, the Commission nevertheless indicated that, according to the national authorities, an audit revealed that, at the date on which Altus took control of Stardust, Altus needed financial provision of around FRF 203 million (paragraph 31 of the decision), while its turnover as at 31 December 1993 amounted to FRF 117.5 million. According to the Commission, it therefore appears that the situation of Stardust was already critical well before June 1995 and even before 31 December 1994, the date of the transfer of Stardust to CDR.

64 Second, the French Government maintains that the criterion of the exposure of the lender in relation to the balance sheet of the undertaking, which was the only criterion used by the Commission, cannot be regarded as relevant for the purposes of characterising a bank loan as prudent or otherwise.

65 The Commission argues that, in this case, the exposure of Crédit Lyonnais, which was far greater than the balance sheet total of Stardust, was principally in the form of products ill-suited to bearing high risks. That exposure in financial products, such as loans and guarantees, designed to take a lower level of risk than investments in shares, in fact presented a level of risk very much higher than what was acceptable, even for a very high-risk financial product like shares, since it exceeded the maximum exposure of a shareholder in the most extreme case, namely a call to make up the difference on the balance sheet. In its submission, such conduct cannot be that of a prudent investor.

66 Third, the French Government contends that the sole-banker argument used in the contested decision might, at the limit, constitute one factor, amongst other relevant criteria, capable of corroborating the imprudent character of a financing arrangement. However, in the case of a small undertaking like Stardust, the

Government maintains that it is irrelevant. It is extremely common for small and medium-sized undertakings like Stardust to have only one banker. That situation is, moreover, to be found in other Member States, in which certain banks specialise in the financing of small and medium-sized undertakings.

67    The Commission acknowledges that a banker may indeed find itself in a situation where it is the sole financier of an undertaking. In such a case, however, the sole banker would seek to adapt its offer of products to the level of risk taken, to limit its exposure by reference to the balance sheet total and to surround itself with securities taken on the assets of the undertaking, thereby enabling it to limit its losses in the event of the situation deteriorating. In the Commission's submission, it is the opposite that occurred in the present case.

Findings of the Court

68    It should be noted as a preliminary observation that investment by the public authorities in the capital of an undertaking, in whatever form, may constitute State aid only where all the conditions set out in Article 87(1) EC are fulfilled (see, in particular, Case C-142/87 *Belgium* v *Commission* ('*Tubemeuse*') [1990] ECR I-959, paragraph 25; Joined Cases C-278/92 to C-280/92 *Spain* v *Commission* [1994] ECR I-4103, paragraph 20).

69    It should also be noted that, pursuant to the principle that the public and private sectors are to be treated equally, capital placed directly or indirectly at the disposal of an undertaking by the State in circumstances which correspond to normal market conditions cannot be regarded as State aid (Case C-303/88 *Italy* v *Commission*, cited above, paragraph 20).

I - 4449

70    Therefore, in accordance with equally settled case-law, it is necessary to assess whether, in similar circumstances, a private investor of a dimension comparable to that of the bodies managing the public sector could have been prevailed upon to make capital contributions of the same size (Case C-261/89 *Italy* v *Commission* [1991] ECR I-4437, paragraph 8; Joined Cases C-278/92 to C-280/92 *Spain* v *Commission*, cited above, paragraph 21; Case C-42/93 *Spain* v *Commission* [1994] ECR I-4175, paragraph 13), having regard in particular to the information available and foreseeable developments at the date of those contributions.

71    In this case, it is undisputed between the parties that, in order to examine whether or not the State has adopted the conduct of a prudent investor operating in a market economy, it is necessary to place oneself in the context of the period during which the financial support measures were taken in order to assess the economic rationality of the State's conduct, and thus to refrain from any assessment based on a later situation.

72    In those circumstances, and having regard to paragraphs 16 to 20 of the present judgment, it has to be examined whether, as the contested decision states several times (see, in particular, paragraph 25), the Commission did indeed view matters from the standpoint of 1992, 1993 and 1994 when holding that the loans and guarantees granted to Stardust by Altus and SBT did not reflect prudent conduct in a market economy, taking account of the available information and foreseeable developments at the time when they were actually granted. Should that not be the case, the Commission has misapplied the criterion of the private investor operating in a market economy, which also concerns the recapitalisations of Stardust by Altus in October 1994 and by CDR in April 1995, June 1996 and June 1997.

73    On that point, the contested decision states, in paragraph 25, that 'the bank [SBT] became the [company's] sole banker' and that its financial support 'took a number of forms, including direct and indirect loans, in particular financing granted by SBT to investors wishing to acquire shares in boats managed by Altus,

or in the form of guarantees for those investments. That practice entailed a considerable amount of risk, as SBT bore all the banking exposures and a large part of the firm's off balance-sheet exposures'.

74    The Commission continues, in paragraph 26 of that decision, by stating that '[s]uch behaviour is not consistent with the normal prudential practice of a banker.... The continual and unfailing nature of the support it gave indicates that it is not a case of an isolated error of management on the part of the bank but of a consistent and deliberate policy of boosting Stardust's growth on more favourable financial terms than it would have obtained from private banks in the market'.

75    On the basis of those factors, the Commission took the view, in paragraph 27 of the contested decision, that '[i]t must be concluded that the continual assistance provided by Crédit Lyonnais to Stardust, even before the 1994 recapitalisation, was not consistent with the financing which would have been granted by a private bank operating in a market economy'.

76    It must be noted, however, first, that the Commission did not identify the amount of the loans and guarantees granted to Stardust in 1992, 1993 and 1994 respectively. Such detail is indispensable in order to assess whether or not the financing measures in question were prudent and to enable the Court to exercise its power of review. Nor, moreover, has the Commission in any way indicated the reasons for which those various financing measures appeared imprudent in the context of the period. The contested decision contains no indications in that regard on the basis of the information available in each of those years, taking account, in particular, of the financial position of Stardust, its position on the market as a start-up company, and the prospects of that market.

77   Moreover, the contested decision shows that the Commission took as its point of reference the end of 1994 in applying the criterion of the prudent investor operating in a market economy, that is to say in a context later than that of the period during which the aid was actually granted.

78   First, the Commission held several times (notably in paragraphs 29, 33 and 38 of the contested decision) that, at the end of 1994, the level of risks taken by SBT and Altus in relation to Stardust was at least double the value of that company's balance sheet. According to paragraph 33 of that decision, 'no private banker or any risk capital company acting in [a rational] manner... would have taken risks in respect of a single company which were more than double its balance sheet total, even if the firm had been profitable and well run'.

79   Second, it is stated in paragraph 38 of the contested decision that '[i]n view of Stardust's financial position at the end of 1994, the financial risks taken by Crédit Lyonnais and the estimated losses reported following the audit at the end of 1994 justifying fresh provisions of over FRF 200 million, it could already be predicted at the end of 1994 that the deferred cost of such aid would total hundreds of millions of francs'.

80   Third, the Commission concludes, in paragraph 83 of the contested decision, that '[t]he failure of the financing to comply with the market economy investor principle prior to the hive-off lies in the extraordinarily high level of exposure incurred by Crédit Lyonnais, and then by CDR, in respect of Stardust, in the form of claims and off balance-sheet commitments exceeding FRF 1 billion, taking account of the financing granted to Stardust customers, i.e. about three times the total assets of the firm at the end of 1996'.

FRANCE v COMMISSION

81    It is thus apparent from the wording of the contested decision itself that the Commission misapplied the criterion of the private investor operating in a market economy in that it did not examine the loans and guarantees granted to Stardust in the context of the period in which they were granted. That misapplication concerns not only those loans and guarantees but also the recapitalisations by Altus in 1994 and by CDR in April 1995, June 1996 and June 1997 which the Commission regarded as the implementation of the aid granted to Stardust before October 1994, as has been mentioned in paragraphs 16 to 19 of this judgment.

82    Therefore, the second plea in law of the French Government is also well founded.

83    Since the two pleas alleging misinterpretation of the criterion of imputability to the State of the financial support measures taken in favour of Stardust by Altus and SBT and misapplication of the criterion of the private investor in a market economy are well founded, the contested decision must be annulled without there being any need to examine the other pleas in law raised by the French Government.

Costs

84    Under Article 69(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the French Government has applied for costs and the Commission has been unsuccessful, the latter must be ordered to pay the costs.

JUDGMENT OF 16. 5. 2002 — CASE C-482/99

On those grounds,

THE COURT

hereby:

1.  **Annuls Commission Decision 2000/513/EC of 8 September 1999 on aid granted by France to Stardust Marine;**

2.  **Orders the Commission to pay the costs.**

| | | | |
|---|---|---|---|
| Rodríguez Iglesias | Jann | Macken | Colneric |
| von Bahr | Gulmann | Edward | La Pergola |
| Puissochet | Cunha Rodrigues | Timmermans | |

Delivered in open court in Luxembourg on 16 May 2002.

R. Grass                                          G.C. Rodríguez Iglesias

Registrar                                                    President

I - 4454