# Exhibit 89



EUROPEAN COMMISSION

Brussels, 10.11.2017
C(2017) 7384 final

| PUBLIC VERSION |
| --- |
| This document is made available for information purposes only. |

**Subject:** **State aid SA.40348 (2015/NN) — Spain**
**Support for electricity generation from renewable energy sources, cogeneration and waste**

Sir,

## 1. PROCEDURE

(1) On 22 December 2014, the Spanish authorities notified the Commission, pursuant to Article 108(3) of the Treaty on the Functioning of the European Union (TFEU), about its specific remuneration scheme ('*regimen retributivo específico*', hereinafter referred to as 'the scheme') to support electricity generation from renewable energy sources, cogeneration and waste. As Spain implemented the scheme before it notified the Commission, the case was transferred to the register of unlawful aid. Subsequently, a number of exchanges took place between the Commission and the Spanish authorities.

(2) In the course of the investigation, the Commission received submissions from investors that had made investments in electricity generation from renewable energy sources in Spain in the years 2007 to 2012. The Commission also received a submission from an association of producers of electricity from renewable energy sources.

(3) On 25 September 2017, Spain waived its right under Article 342 TFEU in conjunction with Article 3 of Regulation (EEC) No 1/1958 to have the decision in this procedure adopted in Spanish and agreed that the decision be adopted and notified in English.

His Excellency Mr. Alfonso María Dastis Quecedo
Minister for Foreign Affairs and Cooperation
Plaza de la Provincia 1
28012 Madrid
Spain

2.    **DETAILED DESCRIPTION OF THE MEASURE**

### 2.1.    Background, objectives of the scheme, legal basis and granting authority

(4)    The scheme replaces and supersedes the *premium* economic scheme ('*régimen económico primado*'), which was governed by Royal Decrees 661/2007[1] and 1578/2008.[2] Payments under the premium economic scheme are covered by the decision in order to assess proportionality, *i.e.* the absence of overcompensation.

(5)    The scheme aims to support the development of technologies that offer environmental benefits, but would not be economically viable without State support. It helps Spain to achieve its target of at least 20% of renewable energy in gross final consumption of energy by 2020 laid down in Directive 2009/28/EC of the European Parliament and of the Council. [3]

(6)    The following legislation forms the legal basis of the scheme:

(a)    Royal Decree-Law 9/2013 of 12 July 2013[4], which repealed the laws applicable to the premium economic scheme and set out the principles for the new one.

(b)    Law 24/2013 of 26 December 2013 on the electricity sector[5], which confirms those principles.

(c)    Royal Decree 413/2014 of 6 June 2014[6], which regulates the production of electricity from renewable energy sources, cogeneration and waste[7] and further develops the principles set out in the electricity sector law. It entered into force on 11 June 2014.

---

[1]    Royal Decree 661/2007 of 25 May 2007 regulating the production of electricity under the special regime. Boletín Oficial del Estado (BOE) 126 if 26 May 2007. https://www.boe.es/buscar/act.php?id=BOE-A-2007-10556

[2]    Royal Decree 1578/2008 of 26 September 2008 on the remuneration of electricity production using solar photovoltaic technology for plants having missed the remuneration maintenance deadline for such technology pursuant to Royal Decree 661/2007 of 25 May 2007. BOE 234 of 27 September 2008, https://www.boe.es/buscar/doc.php?id=BOE-A-2008-15595.

[3]    Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC (OJ L 140, 5.6.2009, p. 16).

[4]    Royal Decree-law 9/2013 of 12 July 2013, adopting urgent measures to ensure the financial stability of the electricity system (BOE 167 of 13 July 2013, https://www.boe.es/buscar/doc.php?id=BOE-A-2013-7705). This law established the principles for the new scheme and that a Royal Decree would be adopted to develop those principles. It also repealed the laws applicable to the previous scheme but established that the compensation to existing beneficiaries would still be paid on a transitional basis on account of the new scheme payments, and would be settled by the regulator once the new regulations would be in place. Prior to the Royal Decree-Law 9/2013, Royal Decree 1/2012 of 27 January 2012 had abolished the entry of new facilities into the scheme, meaning that no new aid was granted between 8 January de 2012 and 8 July 2014.

[5]    BOE 310 of 27 December 2013, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2013-13645.

[6]    BOE 140 of 10 June 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-6123.

[7]    The scope of this decision includes waste as covered by the definition of renewable energy source in Directive 2009/28/EC.

(d)     Order IET/1045/2014 of 16 June 2014[8], which regulates the standard plant remuneration parameters applicable to certain renewable energy, cogeneration and waste-to-energy power facilities.

(e)     Order IET/1459/2014 of 1 August 2014[9], which regulates the remuneration for new wind and photovoltaic facilities in the non-peninsular territories.

(7)     The granting authority is the Ministry of Energy, Tourism and Digital Agenda by way of its Directorate-General for Energy and Mining Policy. The National Commission for Markets and Competition (CNMC) is the body responsible for managing the settlement system and administering the payments.

### 2.2.    Financing of the scheme

(8)     The scheme is partly financed from the general State budget and partly from the network access tariffs and charges imposed on electricity consumers, also called 'electricity system revenues'. These revenues finance several schemes. In 2017, 38.29 % of the revenues serve to finance the specific remuneration scheme.

(9)     In 2015, the total cost of the scheme amounted to EUR 6 666.3 million. 46.88 % (EUR 3 125.8 million) was financed from the State budget and 53.11 % (EUR 3 540.6 million) from charges, of which 33 % were imposed on electricity consumption and 67 % on the connection capacity.

(10)    The supplier collects the charges together with the network access tariffs from consumers and transfers them to the relevant distributor, who in turn declares these amounts to CNMC. CNMC carries out monthly settlements on the costs and revenues declared by beneficiaries and the energy they have actually sold in the market. A final subsequent settlement may be carried out pursuant to the electricity sector legislation.

**Figure 1 — Financing method — outline**

---

[8]    BOE 150 of 20 June 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-6495.

[9]    BOE 189 of 5 August 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-8447.



Source: Spanish authorities

(11)     The table below contains a breakdown of aid by technology for the year 2016:

| Technology | Installed capacity (MW) | Energy sold (GWh) | Energy eligible for premium (GWh) | Number of facilities | Total remuneration (EUR 000) | Average price of total remuneration (cent€/kWh) | Compensation for investments (EUR 000) | Compensation for operations (EUR 000) | Specific compensation (EUR 000) |
|---|---|---|---|---|---|---|---|---|---|
| Cogeneration | 5 997 | 23 981 | 23 793 | 1 056 | 1 859 083 | 7.752 | 58 606 | 826 612 | 885 218 |
| Solar PV | 4 674 | 7 942 | 7 871 | 61 386 | 2 739 437 | 34.493 | 2 284 847 | 147 238 | 2 432 085 |
| Thermo solar | 2 300 | 5 071 | 5 071 | 51 | 1 472 531 | 29.040 | 1 082 349 | 193 948 | 1 276 298 |
| Wind | 23 049 | 47 598 | 34 921 | 1 359 | 2 856 614 | 6.002 | 1 254 456 | 0 | 1 254 456 |
| Hydro | 2 102 | 5 814 | 2 412 | 1 093 | 285 403 | 4.909 | 77 242 | 0 | 77 242 |
| Biomass | 744 | 3 435 | 3 394 | 214 | 419 662 | 12.218 | 141 185 | 137 821 | 279 006 |
| Waste | 754 | 3 358 | 3 137 | 40 | 240 810 | 7.170 | 80 394 | 24 031 | 104 425 |
| Waste treatment | 628 | 1 636 | 1 633 | 51 | 152 776 | 9.341 | 888 | 85 469 | 86 357 |
| Other renewable technologies | 5 | 0 | 0 | 2 | 239 | 136.174 | 233 | 0 | 233 |
| Total | 40 253 | 98 834 | 82 232 | 65 252 | 10 026 554 | 10.145 | 4 980 201 | 1 415 119 | 6 395 320 |

Source: CNMC[10]

## 2.3.   Beneficiaries

### 2.3.1.   Eligible facilities

(12)   Royal Decree 413/2014 distinguishes between two facility types:

(a)     Facilities that are awarded the specific remuneration scheme following the entry into force of Royal Decree 413/2014 on 11 June 2014. In this decision these facilities are referred to as '*new* facilities'.

---

[10]   CNMC     monthly     statistics     on     special     regime     sales,     published     on     4 April     2017,
https://www.cnmc.es/en/node/361698.

(b)     Facilities that were already entitled to or were already receiving support from the premium economic scheme when Royal Decree-Law 9/2013 entered into force on 14 July 2013[11]. In this decision these facilities are referred to as '*existing* (supported) facilities'.

(13)   The actual beneficiaries are the entities owning and operating the facilities.

(14)   As regards the eligible technologies, the classification of facilities can be summarised as follows:[12]

(a)     Facilities that include a cogeneration plant,[13] including cogeneration from biomass and waste, natural gas, coal or oil products; facilities that use waste energy derived from any facility, machine or industrial process whose purpose is not the production of electricity.

(b)     Facilities that use renewable energy sources: solar thermal and photovoltaic, wind (onshore and offshore), geothermal, aerothermal, hydrothermal, wave, tidal, hot dry rock, ocean thermal and tidal energy; hydroelectric power plants; biomass;[14] bioliquids[15] produced from biomass; biogas[16,17].

(c)     Facilities that use at least 70 % of a waste-to-energy source not covered above (e.g. household and similar waste, other waste, facilities that use non-commercial grade products from mining operations as fuel for generating electricity due to their high sulphur or ash content) and facilities using black liquor.

(15)   The scheme only applies to the facilities where the feedstock meets the minimum requirements as mentioned in footnotes 13, 15, 17 and paragraph (14)(c) above. If a

---

[11]  See footnote 4.

[12]  Article 2 of Royal Decree 413/2014 contains the detailed classification of eligible facilities.

[13]  Most of the fuels mentioned must represent at least 90 % or 95 % of the primary energy used, measured according to the lower calorific value. Cogeneration facilities that use natural gas as fuel can use a lower percentage of this fuel as primary energy (at least 65 %) when the rest is obtained from biomass or biogas.

[14]  Biomass produced from: energy crops, farming, livestock or gardening activities; forest management and other forestry activities in forests and green areas; industrial facilities in the agricultural or forestry sector. Royal Decree 413/2014 defines biomass in the same terms as the Environmental and Energy State Aid Guidelines (EEAG) and requires that any biomass to be used as fuel must comply with the applicable legislation on biomass sustainability.

[15]  Liquid fuel used for energy purposes other than transportation, including use for the production of electrical energy, heating or cooling.

[16]  Biogas from anaerobic digestion of energy crops, agricultural waste, livestock excrement, biodegradable waste from industrial facilities, household waste and the like, or from sludge from wastewater treatment facilities or any other anaerobic digestion process; biogas recovered from controlled landfills. Biogas generated in digestion facilities may supply these facilities with up to 50 % of their primary energy.

[17]  Biomass, bioliquids and biogas plants must be at least 90 % of the primary energy used in the plant. This category excludes a number of fuels: fossil fuels (including peat and its by-products); wood or wood waste chemically treated or mixed with chemical products of inorganic origin; biomass, biogas or bioliquids polluted by toxic substances or heavy metals; paper and cardboard, textiles, animal corpses or parts thereof, when the law only provides for non-waste-to-energy disposal; and the biodegradable portion of industrial and municipal waste, except when derived from the forestry or livestock sectors.

facility does not meet such feedstock requirements in any given year, it receives the scheme payments only for the eligible portion. A second instance of non-compliance triggers a procedure to reclassify the facility under the group or subgroup that applies to the actual fuel consumption.

(16) To be eligible, cogeneration facilities must meet the definition of high efficiency cogeneration facility set out in Article 2 of Royal Decree 616/2007 on the promotion of cogeneration[18] and provide evidence of the useful heat produced and used by the facility's system. Existing cogeneration facilities that have not been substantially refurbished and receive compensation for investments must also comply with similar energy efficiency requirements to be eligible under the scheme.[19]

(17) The scheme only applies to two types of hybrid facilities: solar thermal facilities that also use biomass, bioliquids or biofuels; and facilities that use two or more types of biomass and/or black liquor where these, as a whole, represent at least 90 % of the aggregate annual amount of primary energy used, measured in accordance with the lower calorific value.

(18) The scheme applies since 11 June 2014 throughout the Spanish territory to the technologies listed in paragraph (14). In the non-peninsular territories[20], the scheme coexists with another scheme, the '*additional* remuneration scheme' established by Royal Decree 738/2015[21], which applies only to these territories and is not assessed in this decision.[22] From the entry into force of Royal Decree 738/2015 (1 September 2015), new facilities are eligible under one or the other scheme according to their flexibility. Wind facilities, photovoltaic facilities, and cogeneration facilities below 15 MW are considered as non-dispatchable and are therefore eligible for support under the *specific* remuneration scheme. Other renewable facilities[23] and larger cogeneration facilities are considered as dispatchable and are therefore eligible for support under the *additional* remuneration scheme. However, all renewable, cogeneration or waste

---

[18] Royal Decree 616/2007 of 11 May 2007 on the promotion of cogeneration transposed Directive 2004/8/EC into the Spanish legal system. The requirements set in the Royal Decree for high efficiency cogeneration mirror those in Annex II of Directive 2012/27/EU of the European Parliament and the Council of 25 October 2012 on energy efficiency, amending Directives 2009/125/EC and 2010/30/EU and repealing Directives 2004/8/EC and 2006/32/EC (OJ L 315, 14.11.2012, p. 1).

[19] These plants must have an equivalent electrical performance above a threshold, which varies between 49 % and 59 % depending on the technology. The equivalent electrical performance is an indicator of a plant's energy efficiency. According to the Spanish authorities, if a cogeneration facility meets the minimum equivalent electrical performance, it also meets in general the high efficiency requirements laid down in Directive 2012/27/EU. The Spanish authorities have provided aggregated data on the primary energy savings (PES) for all cogeneration plant types in Spain in 2014 and 2015. According to the data provided, the weighted PES was 21.3 % in 2015 for CHP facilities with a capacity of more than 1 MW, and 23.4 % for facilities with a capacity of less than 1 MW.

[20] The Canary Islands, the Balearic Islands, and the cities of Ceuta and Melilla on the North-African coast.

[21] Royal Decree 738/2015, of July 31 2015 regulates electricity production and the generation dispatch procedures in the electrical systems of non-peninsular territories. BOE 83 of 1 August 2015 https://www.boe.es/diario_boe/txt.php?id=BOE-A-2015-8646

[22] This scheme is being assessed separately under case SA.42270 *Electricity production in Spanish non-peninsular territories.*

[23] Such as non-run-of-the-river hydroelectric facilities and facilities that use biomass, biogas, geothermal sources and waste as their primary source of energy.

installations which as at 1 September 2015 were already receiving support under the *specific* remuneration scheme in the non-peninsular territories will continue to do so under the same scheme.

(19)    Spain has confirmed that Directive 2000/60/EC of the European Parliament and of the Council (Water Framework Directive)[24], in particular Article 4(7), applies with regard to the support provided to hydropower plants under the notified scheme[25].

(20)    Spain has confirmed that the waste hierarchy as set out in Directive 2008/98/EC of the European Parliament and of the Council (Waste Framework Directive)[26] is respected in terms of the support provided under the notified scheme to plants using waste.

(21)    In March 2016, the scheme applied to over 60 000 facilities, owned by 44 292 natural or legal persons. The Spanish authorities have confirmed that no beneficiary facility exceeds the limits established in the Guidelines on State aid for environmental protection and energy 2014-2020[27] (EEAG) for individual aid to be notified to the Commission.

(22)    The Spanish electricity sector law[28] requires promoters to provide evidence of their legal, technical and financial capacity before they can implement a project. Notwithstanding this requirement, Spain has committed to explicitly include in the rules on scheme tenders that no aid will be granted to firms in difficulty within the meaning of point 16 EEAG.

(23)    Spanish law does not allow aid to be granted to any undertaking that is subject to an outstanding recovery order following a previous Commission decision that declared aid illegal and incompatible with the internal market.[29]

(24)    Spain has set up a register of beneficiaries to monitor the application of the scheme (the 'specific remuneration scheme register'). A facility that meets the requirements

---

[24]    Directive 2000/60/EC of the European Parliament and of the Council of 23 October 2000 establishing a framework for Community action in the field of water policy (OJ L327, 22.12.2000, p. 1).

[25]    To receive the specific remuneration regime, hydroelectric facilities have to obtain several administrative authorizations and comply with Spanish water legislation: Article 7 of Royal Decree 413/2014 requires beneficiaries to comply with the conditions, requirements and procedures established by general legislation applicable to electricity production facilities. Among these obligations, article 53 of Law 24/2013 requires an administrative authorization to set up new facilities or modify existing ones, which will be reviewed together with other permits, including the evaluation of environmental impact. Article 22 of Law 24/2013 stipulates that hydraulic facilities that produce electricity must comply with the provisions of Royal Legislative Decree 1/2001, which approves the consolidated text of the Spanish Water Law. This law was modified to transpose Directive 2000/60/EC.

[26]    Directive 2008/98/EC of the European Parliament and of the Council of 19 November 2008 on waste and repealing certain Directives (OJ L312, 22.11.2008, p. 3).

[27]    Guidelines on State aid for environmental protection and energy 2014-2020 (OJ C 200, 28.06.2014, p. 1) and corrigendum to points 51, 52 and 151 of the Guidelines (OJ C 290 of 10.8.2016, p. 11). The Guidelines started being applicable on 1 July 2014.

[28]    Article 53 of Law 24/2013.

[29]    Artícle 13 of Law 38/2003 of 17 November 2003 (General Law on Subsidies). BOE 276 of 18 November 2013. https://www.boe.es/buscar/act.php?id=BOE-A-2003-20977

established in Royal Decree 413/2014 is registered in *pre-allocation* status, which grants the holder the right to participate in the scheme. As a second step, once a facility is finally registered in the administrative register of electricity production facilities,[30] it is connected to the grid and starts operation, it is registered in *operating* status in the specific remuneration scheme register. This entitles the installation to start receiving payments under the scheme.

### 2.3.2.    Obligations on beneficiaries

(25)    Beneficiaries are subject to the general legislation governing the electricity production market. Accordingly, all facilities must submit sales bids to the market operator for each programming period (1 hour) either directly or through a representative, unless an exception provided by law applies.[31] Electricity sales offers in the Iberian Electricity Market (Mercado Ibérico de la Electricidad, MIBEL) currently have a minimum price of 0 EUR/MWh. As a result, negative prices are not possible.

(26)    The Spanish authorities explained that as of 31 May 2015, all facilities that generate electricity from renewable sources, cogeneration and waste, regardless of their size, must cover the costs of any deviations in production (unbalance of payments). In addition, they may participate in any ancillary services markets provided that they comply with the general technical requirements and obtain authorisation from the system operator. They must present bids of at least 10 MW in these markets.

(27)    Beneficiaries must provide the Ministry of Energy, Tourism and Digital Agenda or CNMC with additional information, including where appropriate: the electricity actually generated, compliance with the requirements of primary energy savings for cogeneration installations, volumes of fuel used and other information related to their eligibility to the scheme.

### 2.4.    Duration of the scheme

(28)    The scheme is organised in six-year regulatory periods. Each regulatory period is divided into two half-periods of three years each. However, the first regulatory period runs from 14 July 2013[32] to 31 December 2019. The first half-period ended on 31 December 2016.[33]

(29)    The duration of the notified scheme is not limited in time. However, the Spanish authorities have committed not to apply the scheme beyond 10 June 2024 without any Commission decision approving the measure.

---

[30]   This register includes all electricity generation facilities, whether they are eligible for the specific remuneration or not.

[31]   For example, facilities located in the non-peninsular territories may be excluded from the market as long as those electricity systems are not effectively integrated into the peninsular system.

[32]   This is when Royal Decree-Law 9/2013 of 12 July 2013 entered into force.

[33]   The notified Order IET/1045/2014 laid down the remuneration parameters for the first regulatory half-period, i.e. from 14 July 2013 until 31 December 2016.

### 2.5.    Form and amount of the support

#### 2.5.1.    Elements of the compensation

(30)    Facilities are classified under one of the various types of standard facilities on the basis of their individual characteristics. The compensation benchmarks applicable to each standard facility are established by ministerial order and include: type of technology, power generation capacity, start date of operation, lifetime, electricity system/location of the facility, standard revenue generated by selling the electricity in the market, standard operating costs required to carry out the activity and hours of operation (with a minimum and maximum value). The compensation to which an individual facility is entitled is calculated on the basis of the standard facility's compensation benchmarks and the features of the individual facility itself (e.g. the real number of running hours). Spain has submitted detailed information for each technology on the criteria, data and hypothesis used to define the standard facilities.

(31)    The specific remuneration is paid as a premium in addition to income generated from the market. It aims at helping the technologies supported to compete on an equal footing with other technologies on the market at a reasonable rate of return. The premium is made up of two components: compensation for investments and, if applicable, compensation for operations.

(32)    **Compensation for investments** (expressed in EUR/MW) applies to all facilities and offsets the investment costs which cannot be recovered by selling electricity in the market. To calculate the annual amount payable to a given facility as compensation for investment, the compensation for investment of the relevant standard facility is multiplied by the individual facility's generation capacity. Further adjustments are then made (e.g. on the basis of the number of equivalent operating hours, the net investment value and the adjustment coefficient 'C', which are described further below).

(33)    Facilities whose operating costs are higher than the market price also receive a **compensation for operations** (expressed in EUR/MWh) which compensates for the difference between the operating costs and the revenue obtained in the market. To calculate the annual amount payable to a given facility as compensation for operations, for each settlement period, the compensation for operations of the relevant standard facility is multiplied by the energy sold in that period by the individual facility.

(34)    Facilities in the electricity systems of non-peninsular territories may also be entitled to an additional **investment incentive to reduce generation costs** (expressed in EUR/MWh). In the non-peninsular territories, electricity demand is mainly met using conventional electricity plants, with renewable energy sources contributing only little to the energy mix.[34] Spain aims to reduce system costs by promoting wind and solar energy in these territories. The investment incentive therefore rewards renewable investments in these territories for their potential to reduce system costs. This incentive is applied when the savings generated by the standard facility exceed 45 % of the

---

[34]    2.3 % of demand in the Balearic Islands, 8.3 % in the Canary Islands, and very low percentages in Ceuta and Melilla according to data from 2016 (REE, El sistema eléctrico español, Avance 2016).

generation costs and when the facility is operational after a short lead time.[35] In the years 2017-2019, this incentive varies between 5.04 and 10.94 EUR/MWh depending on the type of standard facility. The right to receive this incentive applies throughout the lifetime of the facility.

### 2.5.2.    Parameters used to calculate compensation

(35)    To determine the compensation applicable to each standard facility, several parameters are used. These include:

(a)    The **initial investment value** of the standard facility. It is calculated taking into account new main construction equipment as well as any other electromechanical equipment, control and regulation systems, measuring equipment, connecting lines, including transport, installation and start-up, together with associated engineering and project management.

(b)    The **net asset value** per unit of capacity is recalculated every three years. For existing facilities, the net asset value was calculated as at 1 January 2014 as the value of the investment that had not been recovered with past income up to that date.

(c)    The legal **lifetime** ('the lifetime') determines the period over which each facility receives compensation. Once it ends, the facility may remain in operation but will only receive the revenues from selling electricity in the market. The lifetime applicable to new facilities is set in the rules governing the relevant competitive selection process. For existing facilities, it is as follows:

| Facility | Lifetime (years) |
|---|---|
| Photovoltaic | 30 |
| Cogeneration, hydroelectric, biomass, biogas, waste, thermosolar | 25 |
| Wind, geothermal, hydrothermal, tidal | 20 |

Source: Orden IET/1045/2014 of 16 June, Article 5.5

(d)    The compensation applicable to an individual facility is adjusted according to its actual annual **running hours.**[36] It must first operate above the relevant standard facility's *operating threshold*. Above this threshold, it receives only a proportion of the compensation until it has reached the standard facility's *minimum annual operating hours*. From this point onwards, it will receive full compensation for that year, up to the *maximum operating hours*. The Spanish authorities have undertaken to amend Article 21.2 of Royal Decree 413/2014 within seven months of the adoption of this decision in order to subtract from the operating hours eligible for support the hours during which the electricity day-ahead market prices are zero for six consecutive hours or more.

---

[35]    24 months in the case of wind technologies, and 12 months in the case of photovoltaic facilities, as opposed to the usual lead times of 36 months and 18 months respectively.

[36]    The operating hours of each individual facility are calculated as the ratio of the energy sold in the market to the installed power. For cogeneration facilities, the net electrical output will be considered.

(e)  The **estimated average day-ahead and intraday market prices** are calculated for each upcoming regulatory half-period (three years).[37] This estimated price is limited by two upper and two lower market price limits (LS1, LS2, LI1 and LI2) to reduce the uncertainty surrounding the estimated market price. The estimated prices and the upper and lower limits in force during the second regulatory half-period and for the period from 2020 until the end of the installations' lifetime are shown below.

| Estimated market price and limits (EUR/MWh) | 2017 | 2018 | 2019 | 2020 onwards |
|---|---|---|---|---|
| Upper limit 2 (LS2) | 49.81 | 48.30 | 48.68 | 60.00 |
| Upper limit 1 (LS1) | 46.33 | 44.92 | 45.28 | 56.00 |
| Estimated market price | 42.84 | 41.54 | 41.87 | 52.00 |
| Lower limit 1 (LI1) | 39.35 | 38.16 | 38.46 | 48.00 |
| Lower limit 2 (LI2) | 35.87 | 34.78 | 35.06 | 44.00 |

Source: Order ETU/130/2017, of 17 February 2017

When the average annual price on the intraday or daily markets falls below or exceeds the limits, a positive or negative balance known as the 'adjustment for changes in market price' is taken into account in the aggregate annual compensation due to beneficiaries. This balance is offset over the course of the facility's lifetime when calculating the net asset value for the following period. The greater the difference between the real and the estimated price, the greater the required adjustment. If the real price falls within the LS1-LI1 band, the facility runs the market risk; if the price falls within the LS1-LS2 or LI1-LI2 band, the plant runs only at 50 % of the price risk (either it bears only half of the resulting lower income, or retains only half of the resulting higher income). If the price exceeds the LS2 or LI2 limits, the facility does not run any price risk.

The estimated market prices apply to all facilities, but are corrected by a coefficient per technology that reflects the difference between the average market price and the hourly prices actually charged by the facilities.[38]

(f)  The estimated operating costs:

–  **Variable operating costs** include insurance costs, administrative expenses and other general costs, representation costs, transmission costs and distribution network access tariffs, operations and maintenance, electricity production tax, consumption (water, gas, etc.) and fuel costs associated with the operation of each standard facility. For cogeneration installations, the cost of $CO_2$ emission rights not obtained from free allocations is also considered.

---

[37]  They are calculated as the arithmetic mean of the listed prices of the relevant annual futures contracts traded on the electricity futures market run by the Iberian Energy Derivatives Exchange (OMIP) over the six-month period prior to the regulatory half-period for which the market price is estimated.

[38]  These coefficients were calculated by CNMC on the basis of real market prices in 2014 and 2015. For example, the coefficient is 0.9997 for cogeneration facilities, 1.0207 for solar PV and 0.8889 for onshore wind.

    –    **Fixed operating costs** include the cost of renting land and, costs associated with the safety of installations and applicable taxes, such as the tax on immovable property and the tax on electricity generated. The scheme considers that these costs increase yearly by 1% (except regulated costs like taxes).

(g)    The pre-tax **reasonable rate of return** is calculated and set by law every six years based on the average secondary market yield of the ten-year Treasury bonds, plus a spread. In the first regulatory period it was calculated as follows:

    –    For existing facilities, it was calculated as the average secondary market yield of the ten-year Treasury bonds during the ten years prior to the entry into force of Royal Decree-Law 9/2013 (14 July 2013) plus 300 basis points, i.e. 7.398 % before tax. The revenue obtained prior to the adoption of Royal Decree 413/2014 was taken into consideration to calculate the profitability over their lifetime.

    –    For new facilities, it was the secondary market yield of the ten-year Treasury bonds for the months of April, May and June 2013 plus 300 basis points, i.e. 7.503 % before tax.

    –    Facilities that attain the reasonable rate of return before the end of their lifetime are not entitled to receive compensation for investments and only receive (if applicable) compensation for operations.

(h)    **Adjustment coefficient** 'C' for the standard facility affects the value of compensation for investments. This coefficient has a value between zero and one and represents the investment costs of a standard facility that cannot be recovered from the sale of energy on the market. To calculate the adjustment coefficient, several parameters are taken into account: the net asset value of the standard facility at the start of the regulatory period, its estimated revenue and operating costs for the remainder of its lifetime and the discount rate that takes the reasonable rate of return as its value.

(36)    The eligible costs are only those related to electricity production. There is no compensation for any other costs caused by regulations or administrative acts that do not apply in the whole territory of Spain. If a facility is modified, new investments are not eligible for any additional compensation. Its remuneration is also decreased if the modifications result in a reduced installation capacity or generation volume.

(37)    The lifetime of the facility and the initial investment value of a standard facility are fixed for the entire lifetime of the facility. The remaining compensation benchmarks may be revised as follows:

    •    Compensation for operations applicable to technologies whose operating costs depend mainly on fuel prices is updated at least annually.

    •    Every three years, the estimated market prices are adjusted in line with real market prices. The estimated revenues from energy sales are also revised accordingly.

- Any compensation parameters may be reviewed every six years (each regulatory period), including the reasonable return for the remaining lifetime of the standard facilities. The parameters that are not reviewed before the beginning of the following regulatory period are extended for the following regulatory period.

(38) The compensation for cogeneration facilities takes into account the revenue indirectly derived from the generation of useful heat. The revenue is calculated by valuing the useful heat based on the alternative cost of generating it using conventional equipment that uses the same type of fuel as the cogeneration facility.

(39) The compensation for standard facilities that generate electricity from bioliquids or biogas (including cogeneration facilities) and those using waste other than household waste, biomass (where the biomass is less than 90 % of the primary energy used) and black liquors takes into account the standard revenue or costs avoided for energy recovery and waste disposal.

(40) The compensation for standard facilities that use domestic waste takes into account the standard revenue obtained from waste disposal fees.

(41) The Spanish authorities explained that the scheme intends to provide a reasonable profitability to beneficiaries, see paragraph (35)(g), i.e. that is proportionate and does not distort competition, and has a positive impact that outweigh its potential negative effects. According to the scheme's methodology, facilities that are not managed properly will obtain a lower than expected return, and vice versa.

### 2.5.3.    Cumulation of aid

(42) The specific remuneration can be cumulated with other support. Beneficiaries have to declare any subsidy received before or after the specific remuneration is granted. If beneficiaries do not provide this information or provide erroneous information, they will lose the right to receive the specific remuneration and, if necessary, have to return any sums received.

(43) Article 24 of Royal Decree 413/2014 establishes that if a facility receives other State aid, the specific remuneration could be reduced by up to 90 % of the amount of the subsidy received. The Spanish authorities have undertaken to amend this article and remove this limitation of 90 % to ensure that in the presence of other aid, the specific remuneration is reduced so as to meet the State aid cumulation rules.

### 2.5.4.    Competitive bidding processes

(44) Aid granted to new installations is generally granted by means of a competitive bidding process (auction). The laws governing the scheme provide exceptions in the form of two administrative procedures, which are described in section 2.6.1.

(45) On the competitive selection of new beneficiaries, Royal Decree 413/2014 establishes that the Government must specify the facilities or technologies that are eligible, the selection criteria and the compensation benchmarks applicable to the relevant standard facilities in advance of each auction.

(46)   The auction is designed as a descending clock auction. The starting price is the initial investment value of the standard facility. The bids need to be formulated as percentage reductions from the initial investment value. The bidders with the highest percentage reductions are selected.

(47)   The auction operates as a pay-as-clear auction. The last winning bid determines the remuneration parameters of the standard facility, which are then used to calculate the specific remuneration of the individual successful facilities. The competitive bidding process concludes with a decision that allows the successful facilities with *pre-allocation* status to be registered in the specific remuneration registry.

(48)   Spain has confirmed that as of 1 January 2017, all auctions are open to all producers in accordance with the terms laid down in point 126 of the EEAG.

### 2.6.   Aid awarded under the scheme

(49)   The Spanish authorities have confirmed that no aid was granted under the scheme between 11 June and 30 June 2014.

(50)   Existing facilities were automatically registered under the scheme on 9 July 2014, with pre-allocation status or operating status depending on their specific situation on that date.[39] If a facility had obtained the *premium* remuneration for part of its capacity under the previous scheme, only this part would be entitled to the *specific* remuneration covered by this decision.

(51)   Since 11 June 2014 (when the Royal Decree 413/2014 entered into force), the Spanish authorities have organised two administrative procedures (in 2014 and 2015) and three auctions (one in 2016 and two in 2017).

### 2.6.1.   Administrative procedures

#### 2.6.1.1.   120 MW for cogeneration, biomass, biogas, hydroelectric and waste facilities (2014)

(52)   This call was aimed at new facilities or modifications to existing ones that had already applied to join the premium economic scheme or had received a start-up certificate within 30 days of Law 24/2013 on the electricity sector entering into force.

(53)   To be eligible, modifications to existing installations must have been authorised prior to Royal Decree-Law 1/2012 or otherwise comply with certain requirements such as replacing existing equipment with new equipment; in the case of cogeneration, this had to be highly efficient.[40]

(54)   The Spanish authorities explained that eligible facilities had already started construction under the premium economic scheme regulated by Royal Decree

---

[39]   Order IET/1168/2014 of 3 July 2014, which determines the date of automatic registration of certain installations in the register of the specific remuneration regime provided for in Title V of Royal Decree 413/2014 of 6 June 2014. BOE 164 of 7 July 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-7113.

[40]   See requirements for cogeneration facilities in paragraph (16).

661/2007[41] and Royal Decree-Law 6/2009[42], at a time when the capacity objectives assigned to each technology were still some way off being achieved. Promoters logically expected to have access to the premium economic scheme. However, Royal Decree-Law 1/2012[43] removed the economic incentives for new facilities before those expectations could materialise. To restore the continuity of support, Law 24/2013 provided for a quota of 120 MW for certain facilities, which was subsequently established by Royal Decree 413/2014. The objective of this call was therefore to increase the generation of electricity from renewable energy sources and high efficiency cogeneration facilities, allowing the facilities whose construction had already started under the previous scheme to access the specific remuneration scheme. In fact, the call establishes as a prioritisation criterion the fact that installations had applied to join the economic scheme before 28 January 2012 (date of entry into force of Royal Decree-Law 1/2012).

(55)    The Spanish authorities explained that the variable costs borne by these installations are higher than the revenues from the sale of energy in the market. In the absence of compensation, they would therefore bear losses and would stop generating electricity.

### 2.6.1.2.    450 MW of wind facilities on the Canary Islands (2015)

(56)    In 2015, the Ministry of Energy, Tourism and Digital Agenda organised a call to speed up the installation of up to 450 MW of wind power on the Canary Islands by means of an administrative procedure. The facilities had to commit to being operational within 36 months, and in any case at the latest by 31 December 2018.[44]

(57)    Eligible facilities were those that had not been registered in the administrative register of electricity production facilities by 8 August 2014 and that had not been registered in the former scheme's register.[45]

(58)    To justify the choice of technology and specific location of the Canary Islands, Spain argued that wind and photovoltaic energy are cheaper than conventional generation in the non-peninsular territories (conventional generation is also subsidised to maintain wholesale prices equivalent to those on the mainland[46]). Spain has provided data on the average variable generation costs and the estimated savings in the cost of support of

---

[41]  Royal Decree 661/2007 of 25 May 2007, which regulates the production of electrical energy under the special regime.

[42]  Royal Decree-law 6/2009 of 30 April 2009, which adopts certain measures in the energy sector and approves the social bonus.

[43]  Royal Decree-law 1/2012 of 27 January 2012, which suspends the pre-allocation of remuneration procedures and removes the economic incentives for new installations for the production of electricity from cogeneration, renewable energy and waste.

[44]  This call follows another call launched in 2014 that received applications from wind projects for a reduced capacity. In fact, Order IET/1459/2014 established that facilities had to enter into operation by 31 December 2016. Order IET/1953/2015 modified the 2014 Order by simplifying the selection criteria, establishing a new call for applications and extending the deadline for completion of projects to 31 December 2018. The 2015 Order also allows applicants from the first call to reapply under the simplified conditions.

[45]  Royal Decree-Law 1/2012 had suspended the procedures to register electricity production facilities in the previous scheme.

[46]  By way of the additional remuneration scheme. See paragraph (6).

wind and photovoltaic technologies. Once operational, the new wind power capacity attributed in the call will save the electricity system around EUR 120 million a year.

(59) The Canary Islands alone make up more than two-thirds of the total generation costs in non-peninsular systems, and these costs are increasing. In addition, 41 % of its capacity is more than 20 years old, and its abundant wind resources have not yet been fully exploited. The size of the Canary Islands' systems also allows greater integration of intermittent renewable technologies compared to smaller systems like Ceuta and Melilla.

(60) The Spanish authorities explained that the aim of this procedure was therefore to ensure that wind power plants were installed and replaced on the Canary Islands in order to improve the generation efficiency and to reduce the generation costs in the system in the shortest possible time.

### 2.6.2.    Competitive bidding procedures

#### 2.6.2.1.    First auctions for biomass and wind in 2016

(61) In January 2016, Spain organised two simultaneous auctions: one for 200 MW of capacity for biomass facilities (including cogeneration facilities) on the Spanish mainland, and one for 500 MW of capacity for wind facilities open to the entire Spanish territory.[47]

(62) The call was open to both new installations and to the repowering of older wind facilities provided they were not already receiving any aid under the specific remuneration scheme or another scheme. On biomass, the call aimed to increase existing capacity by 39 % to take advantage of the dispatchable nature of this technology.

(63) Companies holding more than 40 % of the market share in any given Spanish electricity system were not allowed to participate in the auction. The remuneration parameters were published in the ministerial order that regulated the call. All parameters are subject to the reviews set out in Royal Decree 413/2014.

(64) Bids were sealed and consisted of a percentage reduction on the initial investment value of the applicable standard facility for a capacity of at least 1 kW. Bids offering the highest reduction percentage were selected first, and the auction cleared at the marginal percentage of reduction once the capacity quota was exhausted. Penalties for non-delivery were set at 20 EUR/kW. The successful bidders had to finalise their projects within 48 months.

#### 2.6.2.2.    Auctions organised in 2017

(65) Spain's renewable energy consumption reached 16.14% of final energy consumption in 2014. According to the Spanish authorities, the projected growth in electricity

---

[47] Royal Decree 947/2015 adopted on 16 October 2015 announced the call. Order IET/2212/2015 adopted on 23 October 2015 regulated the allocation procedure and the remuneration parameters. A resolution issued by the Secretary of State for Energy on 30 November 2015 convened the auction and established the auction rules.

consumption up to 2020 (around 0.8 % per year) justified a greater deployment of new renewable capacity to meet the target of 20 % renewable energy of final energy consumption by 2020. To this end, the Spanish authorities carried out two auctions in May 2017[48] and in July 2017[49] in which 8 037 MW of renewable energy generation capacity were allocated .

(66)   In both auctions, eligible projects were new installations in mainland Spain that did not lead to the replacement of existing capacity. In the May auction, all renewable technologies competed for the 3 000 MW auction volume. However, offers were differentiated according to three different types of reference facilities: for wind, photovoltaic (PV) and other technologies. In the July auction, wind and PV were the only eligible technologies, with both competing for the same auction volume. The initial investment values and other remuneration parameters such as operating costs per MWh, number of operating hours, lifetime[50] and compensation for investments were published in a Ministerial Order in advance of the auction. The guaranteed return on investment costs established in Royal Decree 413/2014 for new facilities (7.503 %) applied. Both auctions had a tighter schedule for completion of projects, as winning projects would have to be operational by 31 December 2019. Penalties for non-delivery were increased to 60 EUR/kW.

(67)   The Spanish authorities explained that the reference compensation parameters applicable in the auctions were benchmarked against recently commissioned renewable energy source (RES) facilities to encourage efficient projects. In particular, the operating hours for photovoltaic facilities (2 367 hours) and wind facilities (3 000 hours) were set according to the top performing facilities in Spain (around 4-5 % of the total installed photovoltaic/wind capacity). The Spanish authorities clarified that facilities that would not achieve these operating hours could still take part in the auction. However, if selected their payments under the scheme would be reduced proportionally according to the rules explained in paragraph (35)(d).

(68)   Bids were sealed and consisted of a percentage reduction on the initial investment value of the applicable standard facility. The discounted investment costs were used to calculate the applicable compensation for investments for each bid in EUR/MW. This value was divided by the reference operating hours of the technology, resulting in a compensation amount in EUR/MWh. This value can be described as the bid's unit costs for the electricity system. All bids were then ranked according to this value, regardless of technology. Successful bids were those that required the lowest unit costs up to the total capacity auctioned. In the event of a tie in unit costs, projects with the higher number of operating hours would be selected first, and if projects were still ranked equally, larger projects would be favoured.

---

[48]   Royal Decree 3529/2017 adopted on 31 March 2017 announced the call. Order ETU/315/2017 of 6 April 2017 established the parameters for each reference facility and the methodology to calculate the investment compensation. Two Ministerial resolutions dated 10 April 2017 established the auction procedures and rules.

[49]   Royal Decree 650/2017 adopted on 16 June 2017 announced the call. Ministerial Order ETU/315/2017 of 6 April 2017 also applied to this auction, with some modifications introduced by Order ETU/615/2017 of 27 June 2017. The Ministerial resolution of 10 April 2017 established the auction procedures. A Ministerial resolution of 30 June 2017 completed the auction parameters and established the timetable for the auction.

[50]   25 years for all technologies.

(69)    The auctions were cleared at the unit costs of the last bid. From this value, the initial investment value of each standard facility was calculated per technology and applied to all winning projects.

(70)    In the May auction, the offers were capped at a possible maximum discount of 63.43 % on the initial investment value for wind facilities, 51.22 % for PV and 99.99 % for other technologies. The maximum discounts were set at a level that allowed all technologies to compete on an equal footing – at those levels, they would entail the same costs for the system in EUR/MWh. At the maximum discount levels, the investment value was considered so low that the facility is expected to achieve the target rate of return only from market revenues, and will therefore not need investment compensation. The payments would therefore be zero until at least 2020, which is when the scheme's compensation parameters are due to be revised. Even in the absence of investment compensation, the scheme would still offer protection against wide fluctuations in the market price, as explained in paragraph (35)(e).

(71)    The May auction cleared at a level so that the income of the winning projects is likely to be limited to market revenue. However, in any event the projects will have guaranteed returns if the market prices were to fall below 39.89 EUR/MWh for wind, 42.16 EUR/MWh for PV and 41.57 EUR/MWh for other technologies. Based on the second selection criterion for the auction on running hours, almost all selected bids involved wind projects.

(72)    The July auction was open only to wind and PV projects as the authorities considered that the May auction had shown little potential for the other technologies, in particular also due to the short completion time (by December 2019). The authorities increased the maximum discounts further to 87.08 % for wind and 69.88 % for PV, which in practice would guarantee a reasonable rate of return at a lower floor price of 28.20 EUR/MWh and 32.67 EUR/MWh respectively. As the July auction cleared at the maximum discount, the authorities decided to award aid to all projects that had bid at this level. The original 3 000 MW auction volume was therefore exceeded (5 036 MW were awarded) and included both wind and PV projects.

### 2.7.    Evaluation of the scheme

(73)    Spain has submitted an evaluation plan for the measure. The main elements of the evaluation plan are described below.

(74)    The evaluation plan notified by Spain includes 28 evaluation questions in order to assess the scheme's outputs, its direct effects, its indirect effects as well as the proportionality of the aid and the appropriateness of the chosen aid instrument.

(75)    The evaluation will provide general information, including the total amount of aid granted by technology, the number and type of beneficiaries, the estimated investment cost of the facilities that received aid, and the auctions that have and will be organised.

(76)    The direct effects of the scheme will be evaluated, for example by assessing developments in the production of energy from renewable energy sources, installed capacity, the amounts of funds invested and the effects of the different auctions. The evaluation will also consider what impact alternative levels of clearing prices would have had in the auctions.

(77) The main indirect effects of the scheme that will be evaluated are its contribution to the reduction of $CO_2$ emissions, the effects of the scheme on the electricity system (for instance, on grid stability) and the effects on electricity prices, on market behaviours and on the market share of conventional electricity producers.

(78) The appropriateness of the aid instrument will be evaluated by comparing the scheme with similar schemes in other EU Member States and by considering the effectiveness of measures that prevent delays or inconsistencies in the implementation of projects receiving support.

(79) The proportionality of the aid will be evaluated, in particular by assessing the evolution of auction results and by analysing whether there was enough competitive pressure in the different auctions.

(80) Evaluation questions related to the general outputs of the scheme will be mostly answered by providing quantitative statistical evidence. Other questions may require qualitative assessment. To evaluate the direct effects of the scheme, Spain plans to employ counterfactual impact evaluation methods in line with the Commission Staff Working Document on Common methodology for State aid evaluation.[51] In particular, where appropriate, the evaluation will include a comparison of projects that were awarded the aid via the auctions with projects that did not receive support as their bids failed.

(81) The evaluation will be carried out by an independent evaluator. This could be either an organisation selected by means of a competitive bidding procedure or the national energy regulator (CNMC). The Spanish authorities explained how it will guarantee the independence and experience of the evaluator as well as protect trade secrets and personal data.

(82) The evaluation report will be subject to public consultation. Spain will submit the final evaluation report to the Commission by the end of 2020. The final report will be published on the Ministry of Energy, Tourism and Digital Agenda's website.[52]

## 3.  ASSESSMENT OF THE MEASURE

### 3.1.  Existence of aid within the meaning of Article 107(1) of the Treaty on the Functioning of the European Union (TFEU)

(83) A measure constitutes State aid within the meaning of Article 107 (1) TFEU if it is '*granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods […] in so far as it affects trade between Member States*.'

(84) Support under the notified scheme is attributable to the State as it has been established by law and its implementing decrees and ministerial orders. In addition, beneficiaries receive support sourced from the Spanish treasury budget and from a charge collected from electricity consumers managed by CNMC, which the Court of Justice of the

---

[51] SWD(2014) 179 final.

[52] Currently www.minetad.gob.es.

European Union (CJEU) has declared as a State resource within the meaning of Article 107 (1) TFEU.[53]

(85) The notified scheme favours the generation of electricity from renewable sources, high efficiency cogeneration and waste by the selected beneficiaries. The measure is therefore selective.

(86) Beneficiaries are compensated at a rate exceeding the returns that they would normally have received from the market in the absence of aid. The measure therefore provides an advantage.

(87) Electricity is widely traded between Member States. The notified scheme is therefore likely to distort competition on the electricity market and affect trade between Member States.

(88) As the result, the notified measure constitutes State aid within the meaning of Article 107(1) TFEU. In its notification, Spain has also acknowledged that the measure constitutes State aid.

### 3.2.  Legality of the aid

(89) The notified scheme is applicable from 11 June 2014. The Spanish authorities notified the Commission about the aid after they had started implementing the scheme and before a Commission decision. Spain has therefore breached the stand-still obligation provided for in Article 108(3) TFEU. The aid granted until the adoption of this decision is unlawful aid.

### 3.3.  Legal basis for the assessment

(90) The Commission has assessed the compatibility of the notified aid scheme on the basis of Article 107(3)(c) TFEU.

(91) The notified scheme aims to promote the generation of electricity from renewable sources. As a result, it falls within the scope of the EEAG.

(92) In line with point 248 EEAG, unlawful environmental aid or energy aid will be assessed in accordance with the rules in force on the date on which the aid was granted. As mentioned in paragraph (49), Spain has confirmed that there was no aid granted under the scheme between 11 June 2014 and 30 June 2014. Awards to new beneficiaries have only taken place after 1 July 2014. Existing beneficiaries were officially registered in the modified scheme on 9 July 2014. This registration is considered to constitute the award act for all aid granted to these existing facilities during their entire lifetime as it takes into account the amounts received under the previous scheme in the calculation of future compensation. In other words, the scheme supersedes and fully replaces the premium economic scheme whose awards are absorbed.

(93) The Commission has therefore assessed the compatibility of the aid under EEAG.

---

[53]  Case C-275/13, *Elcogás*, ECLI:EU:C:2014:2314; *Association Vent De Colère and Others, EU*: C: 2013: 851.

### 3.4.    Compatibility with the internal market under EEAG

(94)    Given that the support is granted as a premium on top of the market price during the lifetime of the facility, the Commission has assessed the notified measures on the basis of the general compatibility provisions set out in chapter 3.2 EEAG. and the specific compatibility criteria for operating aid granted for electricity from renewable energy sources set out in chapter 3.3.2.1 EEAG.

(95)    According to point 151 EEAG, operating aid for high efficiency cogeneration plants may be granted on the basis of the conditions applying to operating aid for electricity from renewable energy sources when the costs for producing a unit of energy in cogeneration plants is higher than its market price.

#### 3.4.1.    Contribution to an objective of common interest

(96)    The aim of the notified aid measure is to help Spain achieve the renewable energy and energy efficiency targets set by the EU as part of its 2020 strategy by supporting electricity generation from renewable energy sources and high efficiency cogeneration of heat, power and waste. The scheme will help Spain to reduce its greenhouse gas emissions and $CO_2$ emissions.

(97)    The scheme provides support to electricity from cogeneration installations that meet the definition of high efficiency cogeneration as set out in Article 2(34) of Directive 2012/27/EU of the European Parliament and of the Council[54] and in line with point 139 EEAG. According to point 140 EEAG, State aid for cogeneration using waste as input fuel can make a positive contribution to environmental protection, provided that it does not circumvent the waste hierarchy principle. This has been confirmed by Spain, as mentioned in paragraph (19).

(98)    The notified scheme is of unlimited duration. However, in line with point 121 EEAG, Spain has committed not to apply the scheme beyond 10 June 2024 without any Commission decision approving the measure, as mentioned in paragraph (29).

(99)    The Commission considers that the notified scheme is aimed at an objective of common interest in accordance with Article 107(3) TFEU.

#### 3.4.2.    Need for State intervention and appropriate instrument

(100)    According to chapter 3.2.2 EEAG, the Member State has to demonstrate that there is a need for State intervention and in particular that the aid is necessary to remedy a market failure that otherwise would remain unaddressed. In the case of production of renewable electricity, the Commission presumes that there is still residual market failure, which can be addressed through aid for renewable energy for the reasons set out in point 115 EEAG.

---

[54] Directive 2012/27/EU of the European Parliament and of the Council of 25 October 2012 on energy efficiency, amending Directives 2009/125/EC and 2010/30/EU and repealing Directives 2004/8/EC and 2006/32/EC (OJ L 315, 14.11.2012, p. 1).

(101) Under point 107 EEAG, the Commission acknowledges that '*under certain conditions State aid can be an appropriate instrument to contribute to the achievement of the EU objectives and related national targets.*'

(102) The electricity sector law (Law 24/2013) authorises the Government to set up the specific remuneration scheme to promote electricity from renewable energy sources, high efficiency cogeneration and waste in exceptional cases where there is an obligation to meet energy objectives derived from Directives or other EU law, or when their deployment reduces energy costs and dependence on external energy. As mentioned in paragraph (5), the aim of the scheme is to support the development of technologies that offer environmental benefits, which would not be economically viable without support, and to help Spain to meet the target of 20 % renewable energy of final energy consumption by 2020. Spain has acknowledged that it needs to increase the deployment of new renewable capacity to meet this target, and has found that renewable capacity auctions are the most cost-efficient alternative to achieve it.

(103) Point 27(c) EEAG stipulates that in order to be deemed compatible, State aid measures must be an appropriate policy instrument to address the objective of common interest. Point 116 EEAG states that in order to help Member States to achieve their national energy and climate change targets, the Commission presumes aid to energy from renewable sources to be appropriate and have limited distortive effects provided all other compatibility conditions are met. Point 145 EEAG provides that State aid may be considered an appropriate instrument to finance energy efficiency measures, such as cogeneration, independently of the form in which it is granted.

(104) Based on these considerations, the Commission considers that the aid is necessary and is an appropriate instrument to address the objective of common interest.

### *3.4.3.    Incentive effect*

(105) In line with point 49 EEAG, an incentive effect is present if the aid induces the beneficiaries to change their behaviour so that they achieve the objective of common interest, which they would not do without the aid.

(106) According to point 51 EEAG, Member States must introduce and use an application form for aid, which contains certain information on the project. The granting authority also must carry out a credibility check of the counterfactual scenario.

#### *(i) Existing installations*

(107) Existing facilities had already applied for aid under the premium economic scheme. The cash flows of standard facilities provided by the Spanish authorities show that the production costs of electricity from renewable energy sources and cogeneration are higher than the revenues that these facilities can obtain from the market. Without the scheme, there would therefore have been an insufficient incentive to operate the RES installations as such activity would have been unlikely to be economically viable.

#### *(ii) Administrative procedures*

(108) The Commission has examined the administrative procedures involved in selecting up to 120 MW capacity of certain technologies in 2014 and 450 MW capacity of wind facilities on the Canary Islands in 2015 (see section 2.6.1).

(109) In the first call, applicants had to have already applied for aid under the premium economic scheme. The call was specifically meant to allow complete projects that had been planned in the hope of receiving aid under the premium economic scheme, but did not receive it because the scheme was interrupted by Royal Decree-Law 1/2012. The registration of a facility in *pre-allocation* status ensures that the holder is entitled to receive the aid if it meets the requirements and builds the facility. As a result, applicants who applied for registration in *pre-allocation* status under the previous scheme would have been confident that their project would meet the requirements for entering the scheme.

(110) In the second call, the selection criteria were intended to quickly deploy and renovate wind capacity that would otherwise not have been deployed at the same pace. Beneficiaries had an incentive to invest thanks to the aid because the wholesale market prices in the non-peninsular territories, which are aligned with the prices on the mainland, are lower than the generation costs of new RES installations.

*(111)* In both situations, the Commission therefore considers that the aid granted by the two calls has an incentive effect.

### (iii) Competitive bidding processes

(112) The general conditions relating to the use of an application form for aid in point 51 EEAG do not apply when the aid is awarded on the basis of a competitive bidding process (point 52 EEAG). In addition, market participants are not willing to invest in RES projects as the investment and operating costs of such projects are still generally higher than what can be earned from electricity sales revenue in the market. This is also evidenced by the lack of market-based investment in RES projects from 2012[55] to the end of 2015 in the absence of generally open RES auctions. The Commission therefore considers that the aid awarded under the notified measure in competitive bidding processes has an incentive effect.

### 3.4.4.    Proportionality of the aid

(113) According to point 69 EEAG, aid is considered to be proportionate if the aid amount per beneficiary is limited to the minimum needed to achieve the objective. The Commission has assessed proportionality of the aid under the provisions of chapter 3.3.2.1 EEAG on operating aid granted to energy from renewable sources. The same provisions apply to operating aid for high efficiency cogeneration plants according to point 151 EEAG when the costs for producing a unit of energy in cogeneration plants are higher than its market price. Spain has provided examples of standard cogeneration facilities and has demonstrated that the production costs per unit of energy are higher than the market price.

(114) The conditions of point 124 EEAG apply to all beneficiaries of the notified measure regardless of the procedure used to award the aid. In the absence of a competitive bidding process, point 128 EEAG stipulates that the conditions of point 131 EEAG are also applicable.

---

[55]  When the previous scheme was stopped for new entrants in 2012 and later repealed in 2013. See also footnote 4.

(115) As described in paragraph (25), all facilities are subject to the electricity market rules and must participate in the market directly or through a representative. In addition, as indicated in paragraph (31), aid is granted in the form of a premium that compensates facilities for the costs that cannot be recovered by selling electricity. This is in line with the requirements of point 124(a) EEAG.

(116) Beneficiaries are subject to the same standard balancing responsibilities as other technologies as mentioned in paragraph (25), which is in line with point 124(b) EEAG.

(117) In the Spanish market, electricity prices cannot become negative and in cases of oversupply of electricity in the market the price is fixed at zero. As indicated in paragraph (35)(d), the Spanish authorities have undertaken to amend the legislation in order to subtract from the operating hours eligible for support the hours during which the electricity day-ahead market prices are zero for six consecutive hours or more. Payments of the premium will therefore be suspended in case the day-ahead market price falls to zero for at least six consecutive hours (or below zero, should the Spanish regulation allow this eventually). This is in line with point 124(c) EEAG.[56]

(118) Based on the above, the Commission considers that the conditions of point 124 EEAG have been met.

*(i) Existing facilities and facilities selected through administrative procedures*

(119) Point 131(a) EEAG applies to the compensation of existing facilities and the administrative allocation procedures applied in 2014 and 2015, and states that the aid per unit of energy must not exceed the difference between the levelised costs of energy (LCOE) and the market price of the relevant technology. Point 131(b) EEAG allows a normal return on capital to be included in the LCOE.

(120) Spain has submitted cash flow calculations of 21 standard facilities. These are representative of the various technologies and installation types supported by the scheme. The data show the past sales income (including those deriving from the premium economic scheme for existing facilities), the expected future sales income, the initial investment costs, the operating costs and the compensation to be granted to each facility both for operations and for investments. For all examples provided, the Commission has verified that the aid does not exceed what is required to recover the initial investment costs and the relevant operational costs, plus a margin of reasonable return, based on the past and estimated costs and market prices (7.503 % before tax for new facilities and 7.398 % for existing facilities). These rates appear to be in line with the rates of return of renewable energy and high efficiency cogeneration projects recently approved by the Commission and does not lead to overcompensation.[57] During the regular revisions of the compensation parameters, the payments to which each beneficiary is entitled in the future are calculated to ensure a reasonable rate of return: future payments are calculated to keep the net present value of the investment at zero

---

[56] See SA.43756 *Support to electricity for renewable sources* (Italy).

[57] See for example the decisions in cases SA.47205 *Complément de rémunération pour l'éolien terrestre à partir de 2017* (France), SA.43756 *Support to electricity for renewable sources* (Italy), SA.36023 *Support scheme for electricity produced from renewable sources and efficient cogeneration* (Estonia), SA.43140 *Support to renewable energy and CHP* (Latvia), SA.43719 *Système d'aides aux cogénérations au gaz naturel à haute efficacité énergétique* (France).

when the reasonable rate of return (ten-year Treasury bond plus a spread) is used as the discount rate. If an existing facility had reached its reasonable return by 2013, compensation for investments would end and the facility would continue to receive only compensation for operations to cover its operational costs, as described in paragraph (35)(f), in order to ensure that the rate of return is constant over the entire lifetime of the facility.

(121) Point 131(c) EEAG states that the production costs are to be updated regularly, at least every year.

(122) Beneficiaries have to submit information on various aspects of their activity related to compensation on a yearly basis. This includes, for example, proof that they fulfil the equivalent electrical performance requirements, the percentage of primary energy savings, the fuel mix and volumes used, and information on other costs. As indicated in paragraph (37), Spain revises compensation for operations applicable to technologies whose operating costs depend mainly on fuel prices at least once a year. Fixed operating costs are also adapted yearly as mentioned in paragraph (35)(f).

(123) Point 131(d) EEAG states that aid is only granted until the plant has been fully depreciated.

(124) As indicated in paragraph (35)(a), aid is only granted during the lifetime of the facility, which is calculated based on the depreciation period of the equipment and installations in each of the technologies, assuming they are properly maintained.

### (ii) Competitive bidding processes

(125) According to point 126 EEAG, aid granted by means of non-discriminatory competitive bidding processes is presumed to be proportionate.

(126) On the requirement under point 126 EEAG to organise 'pilot tenders' for at least 5 % of the planned new electricity capacity from RES for 2015 and 2016, Spain carried out two competitive auctions for a total capacity of 700 MW (see section 2.6.2) in 2016, which far exceeds the requirement of 5 % of the total new RES capacity for 2015 and 2016. The latter was 1150 MW and included, in addition to the two auctions, only the capacity of 450 MW on the Canary Islands in 2015 (see section 2.6.1.2). As indicated in paragraph (48), Spain has confirmed that as of 1 January 2017, all aid is granted in competitive bidding processes.

(127) On the general requirement of openness to all types of generation, the two auctions organised in May 2017 and July 2017 pitted different technologies against each other. The May auction was open to all types of generation including 'other technologies' apart from wind and PV installations. As for the July auction, Spain has argued that based on the market information from the May auction, keeping the third category for other technologies in the auction would lead to suboptimal results. The results of the May auction showed that other technologies would not be able to compete with wind and PV on cost and would not be able to help achieve the 2020 RES targets in time. As a result, a process open to all generators would have led to a suboptimal result in line with point (126) EEAG.

(128) The Spanish authorities explained that the cap on discounts referred to in paragraph (70) is a way of striking the right balance between the objectives of minimising the

overall costs for the electricity system and guaranteeing a level playing field for the different technologies. It should be recalled that at the respective maximum discounts, the extra costs for the electricity system (which is the relevant parameter to determine the winning bids) are equal for all technologies. Based on the results of the May auction, the Spanish authorities increased the maximum discounts and therefore reduced the potential aid amounts further.

(129) The maximum discounts in the May auction already imply that beneficiaries are highly unlikely to receive aid since their investment compensation is zero and they will only be protected against drops in the market price to levels that are unlikely to be observed in the years to come.[58] The higher maximum discounts in the July auction in practice reduced protection against a drop in the market price even further, i.e. to an even lower guaranteed price level. At the same time, this protection against an unexpectedly sharp fall in the market price helps to ensure that projects that are granted aid have a reasonable chance of securing project financing, and therefore of being completed on time to help achieve the 2020 RES targets.

(130) The Commission considers that the support levels at the maximum discounts minimise aid with regard to the objectives pursued, in particular to allow different technologies to compete against each other and to ensure a reasonable rate of return in the event of very bleak market conditions. This therefore ensures the bankability and completion of projects.

(131) Based on the above considerations, the Commission concludes that the aid granted under the scheme is proportionate within the meaning of point (69) EEAG.

### 3.4.5.    *Avoidance of undue negative effects on competition and trade*

(132) Aid for environmental purposes will, by its very nature, tend to favour environmentally friendly products and technologies at the expense of other, more polluting ones. According to point 90 EEAG, the Commission considers that this effect of the aid will in principle not be viewed as an undue distortion of competition since it is inherently linked to the very objective of the aid.

(133) According to point 116 EEAG, the Commission presumes aid granted to energy from renewable sources to have limited distortive effects provided all other compatibility conditions are met.

(134) In addition, as set out in paragraphs (22) and (23), Spain has committed not to grant any aid to firms in difficulty or to those subject to an outstanding recovery order following a previous Commission decision that declared an aid measure illegal and incompatible with the internal market. This is in line with points 16 and 17 EEAG.

(135) As a result, the Commission concludes that the distortion of competition caused by the notified scheme is balanced by the positive contribution to common policy objectives.

---

[58]   The price forecasts for the Spanish electricity market by international organisations expect electricity prices to increase in the coming years, while the guaranteed price level corresponding to the maximum discounts of both the May and July auctions is significantly below current price levels.

### *3.4.6.    Transparency of aid*

(136) According to point 104 EEAG, Member States must ensure the transparency of aid granted by publishing certain information on a comprehensive State aid website. In line with point 106 EEAG, Member States must comply with this obligation as of 1 July 2016.

(137) The Spanish authorities have confirmed that they will comply with the transparency requirements set out in points 104-106 EEAG.

### *3.4.7.    Articles 30 and 110 TFEU*

(138) In accordance with point 29 EEAG, as the support for RES is partly financed by a charge levied on all electricity consumption, the Commission has examined its compliance with Articles 30 and 110 TFEU.

(139) According to the case-law, a charge that is imposed on domestic and imported products based on the same criteria may nevertheless be prohibited by the Treaty if the revenue from such a charge is intended to support activities that specifically benefit the taxed domestic products. If the advantages that those products enjoy wholly offset the burden imposed on them, the effects of that charge are apparent only with regard to imported products, and that charge constitutes a charge with an effect equivalent to custom duties, which is contrary to Article 30 of the Treaty. If, on the other hand, those advantages only partly offset the burden borne by domestic products, the charge in question constitutes discriminatory taxation for the purposes of Article 110 of the Treaty and will be contrary to that provision in terms of the proportion used to offset the burden borne by the domestic products.[59]

(140) If domestic electricity production is supported by aid that is financed by a charge on all electricity consumption (including consumption of imported electricity), then the method of financing — which imposes a burden on imported electricity that does not benefit from this financing — risks having a discriminatory effect on imported electricity from renewable energy sources and thereby violating Article 30 and/or 110 TFEU.[60] A similar issue would arise between any neighbouring country that has signed a free trade agreement with the EU that contains provisions similar to Articles 30 and 110 TFEU.

(141) As described in section 2.2, the scheme is partly financed by a charge imposed on electricity consumed in Spain, irrespective of whether it is produced domestically or imported, and this charge is partly calculated on the amount of electricity consumed and thereby imposed on the product itself. As indicated in paragraphs (8) and (9), the charge imposed on electricity consumed in Spain amounted to EUR 1 168.4 million, or 17.5 % of the financing of the specific remuneration scheme in 2015.

---

[59] Joined Cases C-128/03 and C-129/03 AEM, EU:C:2005:224; Case C-206/06 Essent, EU:C:2008:413, paragraph 42.

[60] Case 47/69 *France v Commission*, EU:C:1970:60, paragraph 20. See also Case SA.38 632 (2014/N) Germany — *EEG 2014 — Reform of the Renewable Energy Law*.

(142) Where a Member State uses a charge that is levied on imported and domestic products alike to finance aid for domestic producers, the charge may have the effect of further exacerbating the distortion on the product market caused by the aid as such.

(143) In order to remedy any possible past discrimination under Articles 30 or 110 TFEU, Spain has undertaken to reinvest the share of the charges collected on imported renewable and CHP electricity from 2007 to 2017 in projects and infrastructure that specifically benefit imports.

(144) In particular, Spain plans to allocate EUR 220 million to ongoing interconnection projects included in the Madrid Declaration signed between Portugal, France and Spain, or to similar projects that may be agreed by 2025.

(145) The choice of project will depend on its financing needs, its timetable and specific milestones according to the agreed roadmap. Depending on these criteria, it would be possible to allocate the amount proposed to one or several projects.

(146) The Spanish authorities explained that the 2025 deadline will allow it to include projects that are mature enough. It also gives the Spanish transmission system operator REE time to carry out the preparatory work required to include another project in the list.

(147) If this commitment is not feasible, as an alternative Spain undertakes to open future tenders to producers of renewable energy sources established in neighbouring countries with which it has bilateral agreements in this area for a capacity of 86.45 MW,[61] with the aim of remedying the discrimination caused in the period 2007-2017.

(148) Reinvesting the share of revenue generated by a parafiscal charge levied on imports in projects and infrastructure that specifically benefit imports has been recognised by the Commission as an appropriate means of correcting potential historical discrimination arising from Articles 30 and 110 of the Treaty.[62]

(149) In order to alleviate any concern regarding future compliance with Articles 30 and 110 TFEU, Spain has committed to opening up all future competitive bidding processes to producers of renewable energy sources established in neighbouring countries with which it has bilateral agreements in this area.

(150) The share to be opened up to the producers concerned will be calculated by multiplying Spain's gross electricity imports by the share of RES and highly efficient CHP electricity (using the previous year, or the last year available) for each of the neighbouring countries from which electricity is imported, divided by Spain's total electricity consumption and taking into account the share of the financing of the

---

[61] Compensation for the period 2007-2017, including the power auctioned in 2017.

[62] SA.15 876 (N49 0/200) — Italy — *Stranded costs of the electricity sector* (OJ C 250,8. 10.2005, p. 10); SA.33 995 (2013/C) (ex 2013/NN) — Germany — *Support of renewable electricity and reduced EEG surcharge for energy-intensive users* (OJ L 250, 25.09.2015); SA.46 898 (2016/N) — France — *Mécanisme de soutien aux installations de production d'électricité utilisant le biogaz produit par la méthanisation et aux installations de production d'électricité utilisant l'énergie extraite de gîtes géothermiques*.

scheme that is levied on the electricity consumed. The resulting percentage will be applied to the total capacity available in the tender.

(151) The Commission considers Spain's proposals to alleviate all concerns of discrimination against renewable electricity producers in other Member States under Articles 30 and 110 TFEU.

### 3.4.8.    Compliance with environmental legislation

(152) As outlined in paragraph (19) Spain has confirmed that it complies with Directive 2000/60/EC of the European Parliament and the Council of 23 October 2000 establishing a framework for Community action in the field of water policy with regard to the support provided to hydropower plants under the notified scheme, in line with point 117 EEAG.

(153) As indicated in paragraph (20), Spain has confirmed that the waste hierarchy as set out in Directive 2008/98/EC (Waste Framework Directive) is respected in terms of the support provided under the notified scheme to plants using waste. This is in line with point 118 EEAG.

## 3.5.    Comments of third parties and compliance with other EU law

### 3.5.1.    Assessment of State aid to existing installations

(154) The investors have made submissions on the application of the scheme to existing installations claiming that the previous scheme would not constitute State aid, or would in any event be compatible with the internal market.

(155) As a general comment, the Commission recalls that there is 'no right to State aid'.[63] A Member State may always decide not to grant an aid, or to put an end to an aid scheme. Where the aid has not been authorized by the Commission, the Member State is obliged to suspend the scheme until the Commission has declared it compatible with the internal market pursuant to Article 108(3) TFEU.

(156) In the present decision, the Commission has assessed the measure notified by Spain (see section 2.1). It has therefore assessed whether existing installations receive overcompensation for their entire period of life, and has found that on the basis of the total payments received under both schemes (the specific remuneration scheme and the premium economic scheme), that is not the case, as explained above in section 3.4.4. As Spain has decided to replace the premium economic scheme with the notified aid measure it is not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not.

---

[63] Opinion of Advocate General Wahl in *Kotnik*, paragraph 79: "*[...] under EU State aid rules, no undertaking can claim a right to receive State aid; or, to put it differently, no Member State can be considered obliged, as a matter of EU law, to grant State aid to a company.*" See also to that effect Order in *Milchindustrie-Verband e.V. und Deutscher Raiffeisenverband e.V. v Commission*, T-670/14, EU:T:2015:906, paragraph 29.

### 3.5.2.    General principles of Union law of legal certainty and legitimate expectations

(157) The investors argue, both before investor-State arbitration tribunals and in their submissions to the Commission, that by modifying the support scheme with regard to existing installations, Spain has violated the general principles of Union law of legal certainty and legitimate expectations.

(158) In the very specific situation of the present case, where a Member State grants State aid to investors, without respecting the notification and stand-still obligation of Article 108(3) TFEU, legitimate expectations with regard to those State aid payments are excluded. That is because according to the case-law of the Court of Justice, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission.[64]

### 3.5.3.    Alleged violation of the provisions of the Energy Charter Treaty

(159) A number of investors have initiated investor-State arbitration against Spain on the basis of the Energy Charter Treaty against the changes brought by the Royal Decree 413/2014 to beneficiaries of the premium remuneration scheme it replaces.

(160) As a preliminary point, the Commission observes that most of the investors that have brought cases against Spain are based in other Member States of the Union. The Commission considers that any provision that provides for investor-State arbitration between two Member States is contrary to Union law; in particular, this concerns Article 19(1) TEU, the principles of the freedom of establishment, the freedom to provide services and the free movement of capital, as established by the Treaties (in particular Articles 49, 52, 56, and 63 TFEU), as well as Articles 64(2), 65(1), 66, 75, 107, 108,[65] 215, 267 and Article 344 TFEU, and the general principles of Union law of primacy, unity and effectiveness of Union law, of mutual trust[66] and of legal certainty.

(161) The conflict concerns both substance and enforcement. On substance, Union law provides for a complete set of rules on investment protection (in particular in Articles 49, 52, 56, and 63 TFEU, as well as Articles 64(2), 65(1), 66, 75 and 215 TFEU). Member States are hence not competent to conclude bilateral or multilateral agreements

---

[64]    Case C-24/95 *Land Rheinland-Pfalz v Alcan Deutschland*, EU:C:1997:163, paragraph 25, in which the Court of Justice has concluded that "In view of the mandatory nature of the supervision of State aid by the Commission under Article [108] of the Treaty, undertakings to which aid has been granted may not, in principles, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in that article. A diligent businessman should normally be able to determine whether that procedure has been followed." (paragraphs 13 and 14); see also the judgment in case C-169/95 *Spain v Commission* EU:C:1997:10.

[65]    See on Articles 107 and 108 TFEU Decision (EU) 2015/1470 of the Commission of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania — arbitral award of 11 December 2013 in *Micula v Romania* (OJ L 232 of 4.9.2015, p. 43).

[66]    Opinion 2/13, paragraphs 168, 191, 194 and 258 first indent; Case C-536/13 *Gazprom* EU:C:2015:316; Cases C-411/10 and C-493/10 *N.S. a.o.* EU:C:2011:865, paragraph 83; Case C-195/08 *PPU, Rinau* EU:C:2008:406, paragraph 50; Case C-185/07, *Allianz SpA and Generali Assicurazioni Generali SpA* v *West Tankers* EU:C:2009:69; Case C-159/02, *Turner* EU:C:2004:228, paragraph 24, and Cases C-187/01 and C-385/01, *Gözütok und Brügge* EU:C:2003:87, paragraph 33.

between themselves, because by doing so, they may affect common rules or alter their scope.[67] As the two sets of rules on investment protection potentially applicable between an EU Member State and an investor of another State (i.e. the Treaties and intra-EU bilateral investment treaties (BITs) or the ECT in an intra-EU setting) are not identical in content and are applied by different adjudicators, there is also a risk of conflicts between the international investment treaty and Union law.[68]

(162) On enforcement, an Arbitration Tribunal created on the basis of the Energy Charter Treaty in a dispute between an investor of one Member State and another Member State or an intra-EU BIT has to apply Union law as applicable law (both as international law applicable between the parties and, where relevant, as domestic law of the host State). However, according to the case-law, it is not a court or tribunal of a Member State, and hence cannot make references to the ECJ, because in particular the requirements of permanence, of a State nature, and mandatory competence are not met.[69]

(163) The resulting treaty conflict is to be solved, in line with the case-law of the Court, on the basis of the principle of primacy in favour of Union law. For those reasons, ECT does not apply to investors from other Member States initiating disputes against another Member States.

(164) In any event, there is also on substance no violation of the fair and equitable treatment provisions. As explained above at section 3.5.2, in the specific situation of the present case Spain has not violated the principles of legal certainty and legitimate expectations under Union law. In an intra-EU situation, Union law is part of the applicable law, as it constitutes international law applicable between the parties to the dispute. As a result, based on the principle of interpretation in conformity, the principle of fair and equitable treatment cannot have a broader scope than the Union law notions of legal certainty and legitimate expectations in the context of a State aid scheme. In an extra-EU situation, the fair and equitable treatment provision of the ECT is respected since no investor could have, as a matter of fact, a legitimate expectation stemming from illegal State aid. This has been expressly recognised by Arbitration Tribunals.[70] It is in any event settled case-law[71] that a measure that does not violate domestic provisions on legitimate expectation generally does not violate the fair and equitable treatment provision.

---

[67] Case C-370/12, *Pringle* EU:C:2012:756, paragraphs 100 and 101.

[68] See Cases C-249/06, *Commission* v *Sweden* EU:C:2009:119, paragraph 42; C-205/06, *Commission* v *Austria* EU:C:2009:118, paragraph 42; and Case C-118/07, *Commission* v *Finland* EU:C:2009:715, paragraph 33. On the fact that the risk of conflict is sufficient to trigger incompatibility, see also Case C-471/98, *Commission* v *Belgium* ("*Open Skies*") EU:C:2002:628, paragraphs 137 to 142; and Opinion 2/13, paragraphs 198, 199 and 208.

[69] See, on the requirements in general, Case C-54/96 *Dorsch Consult* EU:C:1997:413, paragraphs 22 to 37, and Case C-377/13 *Ascendi Beiras Litoral e Alta* EU:C:2014:1754, paragraphs 23 to 34. For their application to commercial arbitration, see for example Case 102/81 *Nordsee v Reederei Mond* EU:C:1982:107, paragraphs 11 and 12.

[70] *Electrabel S.A. v. Republic of Hungary, ICSID Case No. ARB/07/19.*

[71] *EDF v Romania*, ARB/05/13, paragraphs 279 to 283; *Al Bahloul v Tajikistan*, SCC/64/2008, paragraphs 221 to 225; see also in that sense *ADF Group v United States of America*, ARB(AF)/00/1, para 189

(165) The Commission recalls that any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the *premium* economic scheme by the notified scheme would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorise the granting of State aid. That is an exclusive competence of the Commission. If they award compensation, such as in *Eiser* v *Spain*, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.

(166) Finally, the Commission recalls that this Decision is part of Union law, and as such also binding on Arbitration Tribunals, where they apply Union law. The exclusive forum for challenging its validity are the European Courts.

### 3.6.  Evaluation

(167) The EEAG (point 28 and Chapter 4) state that the Commission may make certain aid schemes subject to an evaluation where the potential distortion of competition is particularly high, i.e. when the measure may risk significantly restricting or distorting competition if their implementation is not reviewed in due time. Given its objectives, evaluation only applies to aid schemes with large aid budgets, containing novel characteristics or when significant market, technology or regulatory changes are scheduled.

(168) The scheme fulfils the criteria of being a scheme with a large aid budget and containing novel characteristics; it will therefore be subject to an evaluation.

(169) Spain has notified the Commission about an evaluation plan together with the aid scheme. The main elements are described in section 2.7 above. The plan defines the scope and methods to be used in the evaluation. These take into account the Commission Staff Working Document on Common methodology for State aid evaluation.[72]

(170) The Commission considers that the notified evaluation plan contains the necessary elements: the objectives of the aid scheme to be evaluated, the evaluation questions, the result indicators, the proposed methodology to conduct the evaluation, the data collection requirements, the proposed timing of the evaluation including the date of submission of the final evaluation report, the description of the independent body conducting the evaluation or the criteria that will be used for its selection and how the evaluation will be published.

(171) The Commission notes that the scope of the evaluation is suitably defined. It comprises a list of evaluation questions with matched result indicators. Data sources are defined for each question. The evaluation plan also sets out and explains the main methods that will be used to identify the impact of the scheme, and discusses why these methods are likely to be appropriate for the scheme in question.

(172) The Commission acknowledges the commitments made by Spain on ensuring that the evaluation is conducted by an independent evaluation body in accordance with the notified evaluation plan. The procedures identified for selecting such an evaluation

---

[72] SWD(2014) 179 final

body are appropriate in terms of independence and skills. In addition, the proposed publication of the evaluation results should ensure transparency.

(173) The Commission notes the commitment made by Spain to submit the final evaluation report by the end of 2020.

**4.    AUTHENTIC LANGUAGE**

(174) As mentioned under section 1 above, Spain has accepted to have the decision adopted and notified in English. The authentic language will therefore be English.

5.  CONCLUSION

The Commission laments the fact that Spain implemented the aid measure in breach of Article 108(3) TFEU.

The Commission has assessed the compensation that facilities receive under the scheme over their entire lifetime. For existing facilities, this includes the payments received under the premium economic scheme. On the basis of the aforementioned assessment, it has decided not to raise objections to the aid on the grounds that it is compatible with the internal market pursuant to Article 107(3)(c) TFEU.

If this letter contains confidential information that should not be disclosed to third parties, please inform the Commission within 15 working days of the date of receipt.

If the Commission does not receive a reasoned request by that date, it will assume that you agree to the disclosure to third parties and to the publication of the full text of the letter in the authentic language on the Internet site:
http://ec.europa.eu/competition/elojade/isef/index.cfm.

You should send your request electronically to the following address:

European Commission
Directorate-General Competition
State Aid Greffe
B-1049 Brussels
Stateaidgreffe@ec.europa.eu

Yours faithfully,
For the Commission

Margrethe VESTAGER
Member of the Commission