# Exhibit 91



THE
ICSID
CONVENTION
A Commentary

SECOND EDITION

Christoph H. Schreuer,
Loretta Malintoppi,
August Reinisch and
Anthony Sinclair

CAMBRIDGE     www.cambridge.org/9780521885591

This page intentionally left blank

*The ICSID Convention: A Commentary*

This unique compendium offers an article-by-article commentary to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States. Providing a comprehensive explanation of the functioning of this important mechanism for the settlement of investor–host State disputes, it incorporates the preparatory work, the Convention's text, various rules and regulations adopted under the Convention, the practice of arbitral tribunals under the Convention and academic writings on the subject.

The first edition of this work has been relied upon by numerous arbitral tribunals. This second edition follows the same system and approach, but extensive updates reflect the vast increase in arbitral practice since the publication of the first edition. A number of novel issues that have emerged through this practice are now addressed, making this practice-oriented guide an indispensable tool for anyone dealing with the ICSID Convention.

# THE ICSID CONVENTION:
## A COMMENTARY

A Commentary on the Convention on the Settlement of Investment
Disputes between States and Nationals of Other States

SECOND EDITION

CHRISTOPH H. SCHREUER

with

LORETTA MALINTOPPI
AUGUST REINISCH
ANTHONY SINCLAIR



CAMBRIDGE UNIVERSITY PRESS
Cambridge, New York, Melbourne, Madrid, Cape Town, Singapore,
São Paulo, Delhi, Dubai, Tokyo

Cambridge University Press
The Edinburgh Building, Cambridge CB2 8RU, UK

Published in the United States of America by Cambridge University Press, New York

www.cambridge.org
Information on this title: www.cambridge.org/9780521885591

© Christoph H. Schreuer, Loretta Malintoppi, August Reinisch and Anthony Sinclair
2009

This publication is in copyright. Subject to statutory exception and to the
provision of relevant collective licensing agreements, no reproduction of any part
may take place without the written permission of Cambridge University Press.

First published in print format  2009


ISBN-13   978-0-511-59649-0     eBook (NetLibrary)

ISBN-13   978-0-521-88559-1     Hardback

Cambridge University Press has no responsibility for the persistence or accuracy
of urls for external or third-party internet websites referred to in this publication,
and does not guarantee that any content on such websites is, or will remain,
accurate or appropriate.

# CONTENTS

*Foreword by Professor Sir Elihu Lauterpacht, CBE, QC*        *page* ix
*Authors' preface to the second edition*        xi
*Table of cases*        xiii
    *ICSID cases*        xiii
    *National cases*        xliii
*List of abbreviations*        xlvi
*Text of the ICSID Convention*        xlix
*Procedural calendar*        lxviii

***Commentary on the ICSID Convention***

## PREAMBLE
1

## CHAPTER I
### International Centre for Settlement of Investment Disputes

#### SECTION 1
#### Establishment and Organization

Article 1 – Establishment of Centre        10
Article 2 – Seat of Centre        13
Article 3 – Organization of Centre        15

#### SECTION 2
#### The Administrative Council

Article 4 – Composition of Administrative Council        16
Article 5 – Chairman of Administrative Council        18
Article 6 – Functions of Administrative Council        20
Article 7 – Decisions of Administrative Council        28
Article 8 – No Remuneration for Members        31

#### SECTION 3
#### The Secretariat

Article 9 – Composition of Secretariat        32
Article 10 – Secretary-General and Deputy Secretary-General        34
Article 11 – Functions of Secretary-General        37

*Contents*

SECTION 4
**The Panels**

Article 12 – Panels of Conciliators and Arbitrators    43
Article 13 – Designation to Panels                      45
Article 14 – Qualities of Panel Members                 48
Article 15 – Periods of Office of Panel Members         52
Article 16 – Multiple Designations                      54

SECTION 5
**Financing the Centre**

Article 17 – Financing                                  56

SECTION 6
**Status, Immunities and Privileges**

Article 18 – Legal Personality of Centre                58
Article 19 – Immunities and Privileges of Centre        60
Article 20 – Immunity from Legal Process                61
Article 21 – Personal Immunities                        62
Article 22 – Immunities of Parties and Witnesses        65
Article 23 – Archives and Communications                67
Article 24 – Tax Exemptions                             69

**CHAPTER II**
**Jurisdiction of the Centre**

Article 25 – Jurisdiction             71
Article 26 – Exclusive Remedy         348
Article 27 – Diplomatic Protection    414

**CHAPTER III**
**Conciliation**

SECTION 1
**Request for Conciliation**

Article 28 – Request for Conciliation    431

SECTION 2
**Constitution of the Conciliation Commission**

Article 29 – Composition of Commission    433
Article 30 – Appointment by Chairman      436
Article 31 – Qualities of Conciliators    438

SECTION 3
**Conciliation Proceedings**

Article 32 – Decision on Jurisdiction    439
Article 33 – Rules on Procedure          441

Article 34 – Conciliation Proceedings and Report                           443
Article 35 – Non-Invocation in Subsequent Proceedings                      453

# CHAPTER IV
## Arbitration

### SECTION 1
### Request for Arbitration

Article 36 – Request for Arbitration                                       455

### SECTION 2
### Constitution of the Tribunal

Article 37 – Composition of Tribunal                                       475
Article 38 – Appointment by Chairman                                       490
Article 39 – Nationality of Arbitrators                                    498
Article 40 – Qualities of Arbitrators                                      507

### SECTION 3
### Powers and Functions of the Tribunal

Article 41 – Decision on Jurisdiction                                      516
Article 42 – Applicable Law                                                545
Article 43 – Evidence                                                      640
Article 44 – Rules on Procedure                                            672
Article 45 – Default of a Party                                            708
Article 46 – Ancillary Claims                                              731
Article 47 – Provisional Measures                                          757

### SECTION 4
### The Award

Article 48 – Award                                                         805
Article 49 – Dispatch, Supplementation and Rectification                   840

### SECTION 5
### Interpretation, Revision and Annulment of the Award

Article 50 – Interpretation                                                866
Article 51 – Revision                                                      878
Article 52 – Annulment                                                     890

### SECTION 6
### Recognition and Enforcement of the Award

Article 53 – Binding Force                                                1096
Article 54 – Enforcement                                                  1115
Article 55 – State Immunity                                               1151

## CHAPTER V
### Replacement and Disqualification of Conciliators and Arbitrators

Article 56 – Replacement                                        1186
Article 57 – Proposal to Disqualify                             1197
Article 58 – Decision to Disqualify                             1209

## CHAPTER VI
### Cost of Proceedings

Article 59 – Charges of the Centre                              1214
Article 60 – Fees and Expenses                                  1218
Article 61 – Apportionment of Expenses                          1223

## CHAPTER VII
### Place of Proceedings

Article 62 – Proceedings at Seat of Centre                      1244
Article 63 – Proceedings at Another Place                       1250

## CHAPTER VIII
### Disputes between Contracting States

Article 64 – International Court of Justice                      1258

## CHAPTER IX
### Amendment

Article 65 – Proposal to Amend Convention                       1263
Article 66 – Decision on Amendment                              1264

## CHAPTER X
### Final Provisions

Article 67 – Signature                                          1267
Article 68 – Ratification and Entry into Force                  1269
Article 69 – Implementing Legislation                           1273
Article 70 – Territorial Application                            1276
Article 71 – Denunciation                                       1278
Article 72 – Continuing Effect of Consent                       1279
Article 73 – Depositary                                         1283
Article 74 – Registration                                       1284
Article 75 – Notifications by Depositary                        1285
Final Clause                                                    1286

*Consolidated bibliography*                                     1287
*Index by article*                                              1327
*Index by subject*                                              1394

# FOREWORD

by Professor Sir Elihu Lauterpacht, CBE, QC

The idea for the International Convention on the Settlement of Investment Disputes ("the Convention") was first conceived in 1961 by Aron Broches, then the General Counsel of the World Bank. This initiative carried forward a more general one for the protection of international investment that had begun in the Organisation for European Economic Co-operation (now the Organisation for Economic Co-operation and Development) in the late 1950s and that ended in the production in 1962 of the OECD Draft Convention on the Protection of Foreign Property. The idea prevailed that in the then divided state of opinion the best way to provide satisfactory legal infrastructure for the promotion of international private investment flows would be by providing effective procedures for impartial settlement of disputes rather than by seeking multilateral agreement on the establishment of general substantive standards.

The negotiating procedure initiated by Mr Broches was a novel one aimed at the avoidance of direct confrontation between opposing views in a large-scale international conference. Instead, he submitted the evolving text to a series of regional conferences in Africa, the Americas, Asia and Europe, inviting comments and proposals, but retaining in his own hands the preparation of a final text for submission to the Executive Directors of the Bank.

In 1965 the Convention was opened for signature and ratification. The 20 ratifications required for its entry into force were rapidly achieved and the Convention became operational on 14 October 1966. It soon secured broad support from States in all parts of the world including States newly emerging into independence.

At the time the Convention was concluded, some of its most important features represented significant new developments, though in the light of subsequent advances in international law they now appear almost commonplace. For the first time a system was instituted under which non-State entities – corporations or individuals – could sue States directly; in which State immunity was much restricted; under which international law could be applied directly to the relationship between the investor and the host State; in which the operation of the local remedies rule was excluded; and in which the tribunal's award would be directly enforceable within the territories of the States parties.

The system was first limited to cases where both the national State of the investor and the State Party to the case were Parties to the Convention. This meant

ix

that if one party to the dispute did not meet this requirement, the matter could not be submitted to ICSID, even if both parties so wished. This problem was solved in 1978 by the creation by the Bank of the "Additional Facility" which permits recourse – albeit imperfect – to the main elements of the ICSID system even if only one party meets the requirement, provided that both have given their consent.

Consent to jurisdiction under the system was originally foreseen as deriving principally from express references to it in the arbitration clauses of investment contracts. However, the sources of consent have been significantly widened by the development of recourse to ICSID on the basis of legislation and provisions in inter-State bilateral investment treaties as well as by multilateral arrangements such as the North American Free Trade Agreement and the Energy Charter Treaty. Nowadays the vast majority of cases are brought to ICSID on the basis of offers of consent in treaties which are accepted by investors, typically at the time of the institution of proceedings.

The development of the ICSID system has generated a significant number of studies and articles. These are amply represented in the bibliography of the present work. For some time that literature did not include a dedicated series of reports of decisions nor a systematic and comprehensive analysis of the Convention making full use of the *travaux préparatoires*. In 1993 the Research Centre for International Law in the University of Cambridge (as it was then called) introduced the *ICSID Reports* which seek to publish all available reports of ICSID decisions, together with a detailed and valuable index.

Soon after the work on the *Reports* was begun, the Research Centre was fortunate in persuading Professor Schreuer to undertake the complementary task of preparing this much-needed systematic Commentary, the first edition of which was published in 2001. This ground-breaking and exemplary effort has since received much acclaim by academic international lawyers and by arbitration professionals.

The time since the publication of the first edition of this work has seen an enormous increase in the number of cases before ICSID tribunals. This Commentary has become a daily staple for all those who work on these cases and who write about them. This work has become the most widely quoted source of reference on the ICSID Convention for academics and professionals alike.

The rapidly increasing practice has necessitated a second edition to keep pace with the ever-growing jurisprudence emanating from numerous tribunals and *ad hoc* committees operating under the Convention. The community of lawyers who work with the ICSID Convention is much indebted to Professor Schreuer and to his associates who have worked on this new edition.

Elihu Lauterpacht

Lauterpacht Centre for International Law
University of Cambridge
October 2008

# AUTHORS' PREFACE
## TO THE SECOND EDITION

The Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the ICSID Convention) entered into force on 14 October 1966. It provides for the settlement of disputes between host States and foreign investors through arbitration or conciliation. These procedures are administered through the International Centre for Settlement of Investment Disputes (ICSID, or the Centre).

The ICSID Convention was conceived by the Directors of the World Bank as an instrument of international economic development. Dispute settlement under the Convention offers advantages to the host State as well as to the investor.

By offering arbitration, the host State improves its investment climate and is likely to attract more international investment. In addition, by consenting to ICSID arbitration the host State protects itself against other forms of foreign or international litigation. The host State also effectively shields itself against diplomatic protection by the State of the investor's nationality.

The investor gains direct access to an effective international forum should a dispute arise. Thus, the possibility of going to arbitration is an important element of the legal security required for an investment decision.

During its early years the use of the dispute settlement procedure created by the ICSID Convention remained scant. Yet, over the years ICSID's case load has increased dramatically. This has been due particularly to consent to arbitration based on treaties. At the time of writing, ICSID's website listed 153 concluded and 120 pending cases.

More significant than the number of cases is the amount of investment covered. The mere availability of a mechanism for the orderly settlement of disputes is likely to improve a country's investment climate and to have a moderating influence on the parties' conduct. Numerous investment agreements between States and foreign investors contain consent clauses submitting disputes between the parties to the Centre. Hundreds of bilateral investment treaties offer binding dispute settlement under the ICSID Convention to investors from the respective countries. A number of multilateral treaties also offer ICSID dispute settlement to investors. In addition, legislation on foreign investments in a number of countries offers ICSID arbitration and conciliation to foreign investors. In this way, a large portion of world-wide private foreign investment is protected through the Convention's mechanisms.

xi

The material covered by this Commentary covers the *travaux préparatoires* to the Convention, the case law to the extent that it is accessible, the rules and regulations adopted by the Centre's Administrative Council, Model Clauses published by the Centre, treaty practice and national legislation relevant to the Convention, agreements between host States and investors and a wealth of scholarly writings relating to the Convention.

The idea for this Commentary was first conceived by Professor Sir Elihu Lauterpacht, CBE, QC, the former director of the Research Centre for International Law at the University of Cambridge (now the Lauterpacht Centre for International Law). Professor Schreuer gratefully accepted the invitation to write such a commentary under the auspices of the Research Centre. The current director of the Lauterpacht Centre, Professor James Crawford, has continued to support the project vigorously. He has made numerous helpful suggestions and has played an important role in paving the way for its publication.

The first edition of this Commentary was published in 2001. An earlier version of large portions was published in 8 instalments in the *ICSID Review – Foreign Investment Law Journal* stretching from Volume 11 in 1996 to Volume 15 in 2000. The first edition was well received and has been quoted in numerous decisions of ICSID tribunals and *ad hoc* committees.

After only a few years it became clear that the rapidly growing number of decisions would necessitate a second edition to capture novel developments in both the case law and the scholarly debate surrounding it. It was felt that this task would be best tackled by a small team of experienced experts in the field. Hence, the present edition is the joint product of four authors coordinated by the author of the first edition.

The wealth of ever increasing case law and doctrine, especially in the form of new decisions issued on an almost weekly basis, has necessitated a cut-off point for the inclusion of new material. The authors have endeavoured to cover developments until the beginning of 2008 comprehensively and have selectively included some decisions issued after that date.

Considerable assistance was received from the ICSID Secretariat in preparing the first edition of this work. In this second edition, the authors wish to record that the analysis given and opinions advanced are theirs alone and that they do not reflect the position of ICSID and its staff. All the Commentary's shortcomings are the authors' sole responsibility.

In preparing the first edition the author received much support from Susanne Klozenbücher, Isabelle Talpain-Long, Christian Campbell, Christian Ebner and Daria Maca. In preparing the second edition the authors were greatly assisted by Clara Reiner who gave support in numerous ways and without whose help this endeavour would hardly have been possible. Maureen McGlashan contributed her valuable expertise in preparing the indexes. Johanna Willmann and Nadia Kalb helped with the proofreading.

Vienna, London and Paris
October 2008

# TABLE OF CASES

### Electronic sources

**ICSID homepage:** Homepage of the International Centre for Settlement of Investment Disputes: http://icsid.worldbank.org/ICSID/Index.jsp
**ITA:** Investment Treaty Arbitration homepage: http://ita.law.uvic.ca/
**IC:** Investment Claims homepage: http://www.investmentclaims.com/

NOTE: Bold numbers refer to Articles of the ICSID Convention. Lean numbers refer to paragraphs.

### ICSID and Additional Facility cases

## *AAPL* v. *Sri Lanka*
*Asian Agricultural Products Limited* v. *Democratic Socialist Republic of Sri Lanka* (Case No. ARB/87/3)

**Award and Dissenting Opinion, 27 June 1990.** Reported: 6 ICSID Review – FILJ (1991); 30 ILM 577 (1991); 6 International Arbitration Report, No. 5, at Sec. A (May 1991); 17 Y.B. Com. Arb. 106 (1992) (excerpts); 4 ICSID Reports 250; 119 Journal du droit international 217 (1992) (excerpts); ICSID homepage; ITA; IC.
**25**, 24, 43, 70, 432; **42**, 60, 61, 70–76, 99, 172; **44**, 52; **46**, 37; **49**, 21.

## *ADC* v. *Hungary*
*ADC Affiliate Limited and ADC & ADMC Management Limited* v. *Republic of Hungary* (Case No. ARB/03/16)

**Award, 2 October 2006.** Reported: ICSID homepage; ITA; IC.
**25**, 736; **42**, 93, 186; **43**, 114; **44**, 110; **46**, 50; **56**, 25; **61**, 20.

## *ADF* v. *United States* (AF)
*ADF Group Inc.* v. *United States* (Case No. ARB(AF)/00/1)

**Procedural Order No. 2, 11 July 2001.** Reported: 6 ICSID Reports 453; ICSID homepage; ITA; IC.

**Procedural Order No. 3, 4 October 2001.** Reported: 6 ICSID Reports 461; ITA.

**Award, 9 January 2003.** Reported: 18 ICSID Review – FILJ 195 (2003); 6 ICSID Reports 470; ICSID homepage; ITA; IC.
**43**, 17, 74; **46**, 32, 81.

### *Adriano Gardella* **v.** *Côte d'Ivoire*
*Adriano Gardella S.p.A.* v. *Côte d'Ivoire* (Case No. ARB/74/1)

**Award, 29 August 1977.** Reported: 1 ICSID Reports 287 (excerpts).
**42**, 57, 100, 207; **56**, 30.

### *AES* **v.** *Argentina*
*AES Corporation* v. *Argentine Republic* (Case No. ARB/02/17)

**Decision on Jurisdiction, 26 April 2005.** Reported: 12 ICSID Reports 312; ITA; IC.
**25**, 109; **26**, 101, 217; **42**, 10, 184.

### *AES Summit Generation* **v.** *Hungary*
*AES Summit Generation Limited* v. *Republic of Hungary* (Case No. ARB/01/4)

**Order Noting Discontinuance, 3 January 2002.**

### *African Holding* **v.** *DR Congo*
*African Holding Company of America, Inc. and Société Africaine de Construction au Congo S.A.R.L.* v. *Democratic Republic of the Congo* (ICSID Case No. ARB/05/21)

**Award and Dissenting Opinion, 29 July 2008.** Reported: ICSID homepage; ITA; IC.

### *AGIP* **v.** *Congo*
*AGIP S.p.A.* v. *People's Republic of the Congo* (Case No. ARB/77/1)

**Award, 30 November 1979.** Reported: 1 ICSID Reports 309; 64 Rivista di diritto internazionale 863 (1981); 71 Revue critique de droit international privé 92 (1982); 21 ILM 726 (1982); 8 Y.B. Com. Arb. 133 (1983) (excerpts); 67 ILR 318 (1984).
**25**, 47, 75, 328, 517; **42**, 33, 97, 98, 120, 220, 258; **43**, 31, 61, 66; **45**, 50; **47**, 34, 40, 81.

### *Aguas del Tunari* **v.** *Bolivia*
*Aguas del Tunari S.A.* v. *Republic of Bolivia* (Case No. ARB/02/3)

**Decision on Jurisdiction, 21 October 2005.** Reported: ICSID homepage; ITA; IC.
**25**, 765, 773, 831, 847, 859–863; **27**, 47; **43**, 15–16, 79, 102; **44**, 124.

**Order Noting Discontinuance, 28 March 2006.**

### *Ahmonseto* **v.** *Egypt*
*Ahmonseto, Inc. and others* v. *Arab Republic of Egypt* (Case No. ARB/02/15)

**Award, 18 June 2007.**

### *AIG* v. *Kazakhstan*
*AIG Capital Partners, Inc. and CJSC Tema Real Estate Company* v. *Republic of Kazakhstan* (Case No. ARB/01/6)

**Award, 7 October 2003.** Reported: 11 ICSID Reports 3.
**41**, 41; **54**, 61, 62; **55**, 38, 70, 118.

### *Alcoa Minerals* v. *Jamaica*
*Alcoa Minerals of Jamaica, Inc.* v. *Jamaica* (Case No. ARB/74/2)

**Decision on Jurisdiction, 6 July 1975.** Reported: 4 Y.B. Com. Arb. 206 (1979) (excerpts).
**25**, 607–608, 938; **42**, 14, 49, 80.

**Order Noting Discontinuance, 27 February 1997.**
**25**, 608.

### *Amco* v. *Indonesia*
*Amco Asia Corporation and others* v. *Republic of Indonesia* (Case No. ARB/81/1)

**Decision on Disqualification, 24 June 1982.** Reported: *Reisman W.M./Craig W.L./Park W./Paulsson J.*, International Commercial Arbitration 624–631 (1997).

**Decision on Jurisdiction, 25 September 1983.** Reported: 1 ICSID Reports 389; 23 ILM 351 (1984); 10 Y.B. Com. Arb. 61 (1985) (excerpts); 89 ILR 379 (1992); 1985 Revue de l'arbitrage 259 (excerpts); 113 Journal du droit international 202 (1986).
Preamble, 13; **25**, 217, 264, 324, 339, 340, 389, 414, 468, 581, 587, 703, 765, 780, 799, 816, 833, 841, 842, 875; **26**, 137; **52**, 67; **57**, 21.

**Decision on Provisional Measures, 9 December 1983.** Reported: 1 ICSID Reports 410; 24 ILM 365 (1985); 11 Y.B. Com. Arb. 159 (1986) (excerpts); 89 ILR 402 (1992).
**26**, 184; **44**, 114; **47**, 40, 137, 149, 160.

**Award, 20 November 1984.** Reported: 1 ICSID Reports 413; 24 ILM 1022 (1985) (excerpts); 1 International Arbitration Report 601 (1986); 89 ILR 405 (1992); 114 Journal du droit international 145 (1987) (excerpts).
**26**, 138; **42**, 16, 77, 144, 163, 210, 261; **46**, 26, 80; **49**, 21; **52**, 67, 227, 239, 240, 252, 506; **61**, 33.

**Decision on Annulment, 16 May 1986.** Reported: 1 ICSID Reports 509; 25 ILM 1439 (1986); 1 International Arbitration Report 649 (1986); 12 Y.B. Com. Arb. 129 (1987); 89 ILR 514 (1992); 114 Journal du droit international 175 (1987) (excerpts).
**25**, 71, 341, 490; **26**, 209; **42**, 16, 152, 194, 212, 216, 261, 269; **46**, 27; **48**, 62; **49**, 71; **52**, 13, 17, 23, 67, 88, 90, 97, 152, 198, 212, 227, 228, 241, 252, 253, 267–269, 324, 351, 369, 392, 405, 408, 415, 423, 442, 469, 488, 493, 498, 506, 520, 526, 555, 597, 629, 652, 658, 675; **61**, 39.

**Resubmitted Case: Decision on Jurisdiction, 10 May 1988.** Reported: 1 ICSID Reports 543; 3 ICSID Review – FILJ 166 (1988); 27 ILM 1281 (1988); 3 International Arbitration Report, No. 6, at Sec. A (June 1988); 14 Y.B. Com. Arb. 92 (1989) (excerpts); 89 ILR 552 (1992); 116 Journal du droit international 143 (1989) (excerpts); ICSID homepage.

**25**, 97, 341; **42**, 158; **46**, 27, 66, 91; **52**, 658, 664, 671, 673, 690, 694.

**Resubmitted Case: Award, 5 June 1990.** Reported: 1 ICSID Reports 569; 5 International Arbitration Report, No. 11, at Sec. D (November 1990); 17 Y.B. Com. Arb. 73 (1992) (excerpts); 89 ILR 580 (1992); 118 Journal du droit international 172 (1991) (excerpts).

**26**, 139; **42**, 235; **49**, 42; **52**, 306, 687, 694; **61**, 24.

**Resubmitted Case: Decision on Supplementation and Rectification, 17 October 1990.** Reported: 1 ICSID Reports 638; 89 ILR 658 (1992).

**49**, 42, 43, 85; **52**, 78, 303, 306.

**Interim Order No. 1 on Stay of Enforcement, 2 March 1991.** Reported: 9 ICSID Reports 59.

**Resubmitted Case: Decision on Annulment, 3 December 1992.** Reported: 9 ICSID Reports 9.

**48**, 65; **49**, 42; **52**, 18, 19, 24, 29, 42, 44, 47, 78, 165, 200, 270, 292, 303, 306, 307, 353, 370, 470, 496, 600, 615, 631, 658, 675, 676.

### *AMT* v. *Zaire*
*American Manufacturing & Trading, Inc.* v. *Republic of Zaire* (Case No. ARB/93/1)

**Award and Individual Opinions, 21 February 1997.** Reported: 36 ILM 1534 (1997); 12 International Arbitration Reports No. 4, at Sec. A (Apr. 1997); 5 ICSID Reports 14; 22 Y.B. Com. Arb. 60 (1997) (excerpts); 125 Journal du droit international 243 (1998); ITA; IC.

**25**, 452; **45**, 37, 53, 60, 64, 75, 89; **49**, 21; **51**, 3, 29, 32; **61**, 29, 56.

### *Archer Daniels* v. *Mexico* (AF)
*Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc.* v. *United Mexican States* (Case No. ARB(AF)/04/5)

**Order of the Consolidation Tribunal, 20 May 2005.** Reported: ICSID homepage; ITA; IC.

**Award, 21 November 2007.** Reported: ITA.

**Decision on Rectification, 8 January 2008.**

### *Astaldi* v. *Honduras*
*Astaldi S.p.a. & Columbus Latinoamericana de Construcciones S.A.* v. *Republic of Honduras* (Case No. ARB/99/8)

**Award, 19 October 2000.**

### *Atlantic Triton* v. *Guinea*

*Atlantic Triton Company Limited* v. *People's Revolutionary Republic of Guinea* (Case No. ARB/84/1)

**Award, 21 April 1986.** Reported: 115 Journal du droit international 181 (1988) (excerpts); 3 ICSID Reports 13.
**26**, 170, 171; **41**, 37; **42**, 26, 255, 268, 278; **46**, 19, 48, 63, 69, 93; **47**, 28, 40, 103–105, 162; **49**, 19.

### *Autopista* v. *Venezuela*

*Autopista Concesionada de Venezuela, C.A.* v. *Bolivarian Republic of Venezuela* (Case No. ARB/00/5)

**Decision on Jurisdiction, 27 September 2001.** Reported: ICSID Review – FILJ 469 (2001); 6 ICSID Reports 419; ICSID homepage; IC.
**25**, 474, 747, 765, 771, 804, 805, 824, 845, 848, 881; **27**, 8, 45.

**Award, 23 September 2003.** Reported: 10 ICSID Reports 314; ICSID homepage; IC.
**26**, 142, 143; **42**, 39, 68, 110, 134, 156, 224; **46**, 46.

### *Azinian* v. *Mexico* (AF)

*Robert Azinian and others* v. *United Mexican States* (Case No. ARB(AF)/97/2)

**Award, 1 November 1999.** Reported: 14 ICSID Review – FILJ 538 (1999); 39 ILM 537 (2000); 121 ILR 2 (2002); 5 ICSID Reports 272; ICSID homepage; ITA; IC.
**43**, 93, 111; **61**, 35.

### *Azurix* v. *Argentina*

*Azurix Corp.* v. *Argentine Republic* (Case No. ARB/01/12)

**Decision on Provisional Measures, 6 August 2003.**
**47**, 44, 54, 66, 77, 83, 144, 164, 175.

**Decision on Jurisdiction, 8 December 2003.** Reported: 43 ILM 262 (2004); 10 ICSID Reports 416; 131 Journal du droit international 275 (2004) (excerpts); ICSID homepage; ITA; IC.
**26**, 69, 89.

**Award, 14 July 2006.** Reported: ICSID homepage; ITA; IC.
**42**, 196, 242; **43**, 41; **49**, 20.

**Decision on Continued Stay of Enforcement, 28 December 2007.** Reported: ICSID homepage; ITA; IC.
**52**, 120, 580, 607, 623, 643–646.

### Banro **v.** *DR Congo*

*Banro American Resources, Inc. and Société Aurifère du Kivu et du Maniema S.A.R.L.* v. *Democratic Republic of the Congo* (Case No. ARB/98/7)

**Award and Dissenting Opinion, 1 September 2000.** Reported: 17 ICSID Review – FILJ 382 (2002) (excerpts); ICSID homepage (excerpts); IC (excerpts).
**25**, 351, 355, 748; **27**, 7, 12.

### Bayindir **v.** *Pakistan*

*Bayindir Insaat Turizm Ticaret Ve Sanayi A.S.* v. *Islamic Republic of Pakistan* (Case No. ARB/03/29)

**Decision on Jurisdiction, 14 November 2005.** Reported: ICSID homepage; ITA; IC.
**26**, 104, 119; **41**, 89; **43**, 118; **47**, 44, 55, 97.

### Bayview **v.** *Mexico* **(AF)**

*Bayview Irrigation District et al.* v. *United Mexican States* (Case No. ARB(AF)/05/1)

**Award, 19 June 2007.** Reported: ICSID homepage; ITA; IC.
**25**, 196.

### Benvenuti & Bonfant **v.** *Congo*

*S.A.R.L. Benvenuti & Bonfant* v. *People's Republic of the Congo* (Case No. ARB/77/2)

**Award, 15 August 1980.** Reported: 21 ILM 740 (1982), with correction at 21 ILM 1478 (1982); 8 Y.B. Com. Arb. 144 (1983); 67 ILR 345 (1984); 1 ICSID Reports 335.
**25**, 70; **26**, 133, 208; **42**, 59, 133, 143, 149, 208, 259, 267, 277, 279; **43**, 39; **45**, 26, 51, 60, 62, 63, 73, 84, 87; **46**, 24, 48, 89; **54**, 50; **55**, 43, 117; **61**, 13.

### Biwater Gauff **v.** *Tanzania*

*Biwater Gauff (Tanzania) Ltd.* v. *United Republic of Tanzania* (Case No. ARB/05/22)

**Procedural Order No. 1, 31 March 2006.** Reported: 22 ICSID Review – FILJ 155 (2007); ICSID homepage; ITA; IC.
**43**, 62, 80; **47**, 22, 44, 56, 68, 78, 85–89.

**Procedural Order No. 2, 24 May 2006.** Reported: ITA.
**43**, 72.

**Procedural Order No. 3, 29 September 2006.** Reported: 22 ICSID Review – FILJ 181 (2007); ICSID homepage; ITA; IC.
**44**, 116–120.

**Procedural Order No. 5, 2 February 2007.** Reported: 22 ICSID Review – FILJ 217 (2007); ICSID homepage; ITA; IC.
**44**, 106, 119, 127.

**Procedural Order No. 6, 25 April 2007.** Reported: ITA; IC.

**Award, Concurring and Dissenting Opinion, 24 July 2008.** Reported: ICSID homepage; ITA; IC.

### *BP America* v. *Argentina*
*BP America Production Co. & others* v. *Argentine Republic* (Case No. ARB/04/8)

**Decision on Preliminary Objections, 27 July 2006.** Reported: ITA; IC.

### *Cable TV* v. *St. Kitts and Nevis*
*Cable Television of Nevis, Ltd. and Cable Television of Nevis Holdings, Ltd.* v. *Federation of St. Kitts and Nevis* (Case No. ARB/95/2)

**Award, 13 January 1997.** Reported: 13 ICSID Review – FILJ 328 (1998); 5 ICSID Reports 108; ICSID homepage.
**25**, 219, 249, 381, 765, 786, 822, 858, 906; **26**, 173; **36**, 39, 40; **49**, 21; **61**, 12.

### *Camuzzi* v. *Argentina I*
*Camuzzi International S.A.* v. *Argentine Republic* (Case No. ARB/03/2)

**Decision on Jurisdiction, 11 May 2005.** Reported: ICSID homepage; ITA; IC.
**25**, 297, 706, 835–837; **26**, 129; **27**, 9.

### *Camuzzi* v. *Argentina II*
*Camuzzi International S.A.* v. *Argentine Republic* (Case No. ARB/03/7)

**Decision on Jurisdiction, 10 June 2005.** Reported: ICSID homepage; IC.

### *Casado* v. *Chile* see *Pey Casado* v. *Chile*

### *CDC* v. *Seychelles*
*CDC Group plc* v. *Republic of Seychelles* (Case No. ARB/02/14)

**Award, 17 December 2003.** Reported: 11 ICSID Reports 211; ICSID homepage; IC.
**25**, 273, 715; **42**, 29.

**Decision on Continued Stay of Enforcement, 14 July 2004.** Reported: 11 ICSID Reports 225.
**52**, 602, 611, 618, 625, 636.

**Decision on Annulment, 29 June 2005.** Reported: 11 ICSID Reports 237; IC.
**43**, 21; **48**, 53; **49**, 23; **52**, 19, 33, 38, 104, 136, 138, 219, 286, 288, 304, 322, 330, 337, 356, 378, 397, 411, 416, 425, 454, 475, 484, 523; **57**, 13; **61**, 40.

### *Cemex* v. *Indonesia*
*Cemex Asia Holdings Ltd.* v. *Republic of Indonesia* (Case No. ARB/04/3)

**Award, 23 February 2007.**

### Champion Trading v. Egypt

*Champion Trading Company, Ameritrade International, Inc., James T. Wahba, John B. Wahba, Timothy T. Wahba* v. *Arab Republic of Egypt* (Case No. ARB/02/9)

**Decision on Jurisdiction, 21 October 2003.** Reported: 19 ICSID Review – FILJ 275 (2004); 10 ICSID Reports 400; ICSID homepage; ITA; IC.
**25**, 669–671, 673; **26**, 68.

**Award, 27 October 2006.** Reported: ITA; IC.
**43**, 33; **44**, 69; **49**, 19.

### City Oriente v. Ecuador

*City Oriente Limited* v. *Republic of Ecuador and Empresa Estatal Petróleos del Ecuador (Petroecuador)* (Case No. ARB/06/21)

**Interim Protection Orders, 24 October 2007.** Reported: IC.

**Decision on Provisional Measures, 19 November 2007.** Reported: IC.

**Decision on Revocation of Provisional Measures, 13 May 2008.** Reported: IC.
**47**, 62.

### CMS v. Argentina

*CMS Gas Transmission Company* v. *Argentine Republic* (Case No. ARB/01/8)

**Decision on Jurisdiction, 17 July 2003.** Reported: 42 ILM 788 (2003); 7 ICSID Reports 494; 131 Journal du droit international 236 (2004) (excerpts); ICSID homepage; ITA; IC.
**25**, 91, 107, 578, 704, 706, 792; **26**, 65, 66, 86; **42**, 7, 12; **46**, 83.

**Award, 12 May 2005.** Reported: 44 ILM 1205 (2005); ICSID homepage; ITA; IC.
**42**, 127, 197, 240; **43**, 54; **46**, 55; **52**, 360; **53**, 17.

**Decision on Continued Stay of Enforcement, 1 September 2006.** Reported: ICSID homepage; ITA; IC.
**52**, 584, 588, 606, 611, 620, 642, 651.

**Decision on Annulment, 25 September 2007.** Reported: ICSID homepage; ITA; IC.
**52**, 15, 40, 44, 185, 225, 231, 360, 361, 385–387, 454, 490, 491, 504, 529, 606, 655, 684.

### Colt Industries v. Korea

*Colt Industries Operating Corporation* v. *Republic of Korea* (Case No. ARB/84/2)

**Order Noting Discontinuance, 3 August 1990.**

### Compagnie Française v. Côte d'Ivoire

*Compagnie Française pour le Développement des Fibres Textiles* v. *Côte d'Ivoire* (Case No. ARB/97/8)

**Award, 4 April 2000.**

***Compañía de Aguas del Aconquija*** see ***Vivendi* v. *Argentina***

***Compañía del Desarrollo de Santa Elena*** see ***Santa Elena* v. *Costa Rica***

***Consortium R.F.C.C.*** see ***RFCC* v. *Morocco***

***Continental Casualty* v. *Argentina***
*Continental Casualty Company* v. *Argentine Republic* (Case No. ARB/03/9)

**Decision on Jurisdiction, 22 February 2006.** Reported: ITA; IC.
**25**, 65, 110; **26**, 70.

**Award, 5 September 2008.** Reported: ITA; IC.

***Corn Products* v. *Mexico* (AF)**
*Corn Products International, Inc.* v. *United Mexican States* (Case No. ARB(AF)/04/1)

**Order of the Consolidation Tribunal, 20 May 2005.** Reported: ICSID homepage; ITA; IC.

***CSOB* v. *Slovakia***
*Ceskoslovenska obchodni banka, a.s.* v. *Slovak Republic* (Case No. ARB/97/4)

**Procedural Order No. 2, 9 September 1998.** Reported: ICSID homepage; IC.
**47**, 13, 111.

**Procedural Order No. 3, 5 November 1998.** Reported: ICSID homepage; IC.
**47**, 141.

**Procedural Order No. 4, 11 January 1999.** Reported: ICSID homepage; IC.
**26**, 141; **47**, 29, 113.

**Decision on Jurisdiction, 24 May 1999.** Reported: 14 ICSID Review – FILJ 251 (1999); 5 ICSID Reports 335; ICSID homepage; ITA; IC.
Preamble, 14; **25**, 39, 72, 100, 125, 131, 149, 164, 192, 272, 373, 390, 429, 435, 562, 582, 619, 936; **41**, 35; **42**, 5; **47**, 40, 51.

**Procedural Order No. 5, 1 March 2000.** Reported: ICSID homepage; IC.
**47**, 29, 51, 114, 156.

**Decision on Further and Partial Objection to Jurisdiction, 1 December 2000.** Reported: 15 ICSID Review – FILJ 544 (2000); 26 Y.B. Com. Arb. 87 (2001) (excerpts); 5 ICSID Reports 358; ICSID homepage; ITA; IC.
**25**, 563; **41**, 35.

**Award, 29 December 2004.** Reported: 13 ICSID Reports 181; ITA; IC.
**25**, 801, 805; **41**, 35; **42**, 35, 92.

### Desert Line v. Yemen
*Desert Line Projects LLC* v. *Republic of Yemen* (Case No. ARB/05/17)

**Award, 6 February 2008.** Reported: ITA.
**41**, 33.


### Duke Energy v. Ecuador
*Duke Energy Electroquil Partners & Electroquil S.A.* v. *Republic of Ecuador* (Case No. ARB/04/19)

**Award, 18 August 2008.** Reported: ICSID homepage; ITA; IC.

### Duke Energy v. Peru
*Duke Energy International Peru Investments No. 1 Ltd.* v. *Republic of Peru* (Case No. ARB/03/28)

**Decision on Jurisdiction, 1 February 2006.** Reported: ITA; IC.
**25**, 564; **26**, 15, 16; **42**, 111, 128; **43**, 57, 82; **47**, 134.

**Award and Partial Dissenting Opinion, 18 August 2008.** Reported: ITA; IC.

### El Paso v. Argentina
*El Paso Energy International Company* v. *Argentine Republic* (Case No. ARB/03/15)

**Decision on Jurisdiction, 27 April 2006.** Reported: 21 ICSID Review – FILJ 488 (2006); ICSID homepage; ITA; IC.
**25**, 358, 449.


### Enron v. Argentina
*Enron Corporation and Ponderosa Assets, L.P.* v. *Argentine Republic* (Case No. ARB/01/3)

**Decision on Jurisdiction, 14 January 2004.** Reported: 11 ICSID Reports 273; ITA; IC.
**25**, 45; **46**, 29; **54**, 78.

**Decision on Jurisdiction (Ancillary Claim), 2 August 2004.** Reported: 11 ICSID Reports 295; ICSID homepage; ITA; IC.
**25**, 546, 706; **26**, 70; **46**, 29.

**Award, 22 May 2007.** Reported: ITA; IC.
**25**, 359; **42**, 79, 197; **43**, 88; **46**, 29; **56**, 44.

**Decision on Rectification, 25 October 2007.** Reported: ITA.


### Fedax v. Venezuela
*Fedax N.V.* v. *Republic of Venezuela* (Case No. ARB/96/3)

**Decision on Jurisdiction, 11 July 1997.** Reported: 37 ILM 1378 (1998); 5 ICSID Reports 186; 24a Y.B. Com. Arb. 24 (1999) (excerpts); 126 Journal du droit international 276 (1999) (excerpts); ITA; IC.
**25**, 88, 149, 154, 191, 349, 935; **37**, 33.

**Award, 9 March 1998.** Reported: 37 ILM 1391 (1998); 5 ICSID Reports 200; 24a Y.B. Com. Arb. 39 (1999) (excerpts); 126 Journal du droit international 294 (1999) (excerpts); ITA; IC.
**44**, 67; **46**, 44; **48**, 76; **49**, 19.

### *Feldman* v. *Mexico* **(AF)**
*Feldman* v. *United Mexican States* (Case No. ARB(AF)/99/1)

**Decision on Jurisdiction, 6 December 2000.** Reported: 18 ICSID Review – FILJ 469 (2003); 7 ICSID Reports 327; 40 ILM 615 (2001); ICSID homepage; ITA; IC.

**Award and Dissenting Opinion, 16 December 2002.** Reported: 18 ICSID Review – FILJ 488 (2003); 42 ILM 625 (2003); 7 ICSID Reports 341; ICSID homepage; ITA; IC.
**26**, 221; **43**, 46.

**Decision on Correction and Interpretation, 13 June 2003.** Reported: 18 ICSID Review – FILJ 595 (2003); 7 ICSID Reports 418; ICSID homepage; ITA; IC.

### *Fireman's Fund* v. *Mexico* **(AF)**
*Fireman's Fund Insurance Company* v. *United Mexican States* (Case No. ARB (AF)/02/1)

**Decision on Jurisdiction, 17 July 2003.** Reported: 10 ICSID Reports 214; ICSID homepage; ITA; IC.

**Award, 17 July 2006.** Reported: ICSID homepage (redacted version); ITA (redacted version); IC.
**43**, 76, 92; **48**, 117; **61**, 37.

### *Fraport* v. *Philippines*
*Fraport AG Frankfurt Airport Services Worldwide* v. *Republic of the Philippines* (Case No. ARB/03/25)

**Award, 16 August 2007.** Reported: ITA; IC.
**26**, 122, 148; **41**, 85; **43**, 34, 48, 67; **44**, 96; **61**, 38.

### *F-W Oil Interests* v. *Trinidad & Tobago*
*F-W Oil Interests, Inc.* v. *Republic of Trinidad & Tobago* (Case No. ARB/01/14)

**Award, 3 March 2006.**

### *Gabon* v. *Société Serete S.A.*
*Republic of Gabon v. Société Serete S.A.* (Case No. ARB/76/1)

**Order Noting Discontinuance, 27 February 1978.**

### *Gas Natural* v. *Argentina*
*Gas Natural SDG, S.A.* v. *Argentine Republic* (Case No. ARB/03/10)

*Table of cases*

**Decision on Jurisdiction, 17 June 2005.** Reported: ITA; IC.
**25**, 570; **42**, 185.


### *Generation Ukraine* **v.** *Ukraine*
*Generation Ukraine, Inc.* v. *Ukraine* (Case No. ARB/00/9)

**Award, 16 September 2003.** Reported: 44 ILM 404 (2005); 10 ICSID Reports 240;
ITA; IC.
**25**, 220, 448, 473; **26**, 214, 223; **43**, 56, 107; **44**, 78; **56**, 25; **58**, 13; **61**, 26.


### *Genin* **v.** *Estonia*
*Genin, Eastern Credit Limited, Inc. and A.S. Baltoil* v. *Republic of Estonia*
(Case No. ARB/99/2)

**Award, 25 June 2001.** Reported: 17 ICSID Review – FILJ 395 (2002); 6 ICSID Reports
241; ICSID homepage; ITA; IC.
**25**, 773; **26**, 59, 60; **42**, 147; **46**, 70.

**Decision on Supplementation and Rectification, 4 April 2002.** Reported: 17 ICSID
Review – FILJ 493 (2002); 6 ICSID Reports 304; ICSID homepage; ITA; IC.
**49**, 51, 52.


### *Goetz* **v.** *Burundi*
*Goetz and others* v. *Republic of Burundi* (Case No. ARB/95/3)

**Award, 10 February 1999.** Reported: 15 ICSID Review – FILJ 457 (2000); 6 ICSID
Reports 5; 26 Y.B. Com. Arb. 24 (2001) (excerpts); ICSID homepage; ITA; IC.
**25**, 280; **41**, 55; **42**, 82, 228; **43**, 25; **45**, 16, 20, 31–36, 54, 60, 75, 81, 90; **48**, 77; **54**,
77–79.


### *Gruslin* **v.** *Malaysia*
*Gruslin* v. *Malaysia* (Case No. ARB/99/3)

**Award, 27 November 2000.** Reported: 5 ICSID Reports 484; ITA; IC.
**25**, 487, 604.


### *Guadalupe Gas* **v.** *Nigeria*
*Guadalupe Gas Products Corporation* v. *Nigeria* (Case No. ARB/78/1)

**Award, 22 July 1980.**


### *Helnan* **v.** *Egypt*
*Helnan International Hotels A/S* v. *Arab Republic of Egypt* (Case No. ARB/05/19)

**Decision on Jurisdiction, 17 October 2006.** Reported: ICSID homepage; ITA; IC.
**25**, 56, 505.

**Award, 3 July 2008.** Reported: ICSID homepage; ITA.

### *Holiday Inns* **v.** *Morocco*
*Holiday Inns S.A. and others* v. *Kingdom of Morocco* (Case No. ARB/72/1)

**Decision on Provisional Measures, 2 July 1972.** Unpublished. For a detailed description see *Lalive, P.*, The First 'World Bank' Arbitration (Holiday Inns v. Morocco) – Some Legal Problems, 51 British Year Book of International Law 123, 132–137 (1980) and 1 ICSID Reports 645, pp. 653–659.
**47**, 101, 136, 159.

**Decision on Jurisdiction, 12 May 1974.** Unpublished. For a detailed description see *Lalive, P.*, The First 'World Bank' Arbitration (Holiday Inns v. Morocco) – Some Legal Problems, 51 British Year Book of International Law 123 (1980) and 1 ICSID Reports 645.
**25**, 95, 216, 288, 320–323, 337, 380, 472, 552, 586, 601, 778, 779, 798; **26**, 49, 135, 166; **41**, 13; **46**, 76; **47**, 33, 40, 49, 100; **52**, 65; **56**, 29, 43; **57**, 36.

**Order Noting Discontinuance, 17 October 1978.**

### *Houston Industries* **v.** *Argentina*
*Houston Industries Energy, Inc. and others* v. *Argentine Republic* (Case No. ARB/98/1)

**Award and Separate Opinion, 24 August 2001.**

### *IBM* **v.** *Ecuador*
*IBM World Trade Corporation* v. *Republic of Ecuador* (Case No. ARB/02/10)

**Decision on Jurisdiction and Dissenting Opinion, 22 December 2003.** Reported: 13 ICSID Reports 105; ITA; IC.
**25**, 629; **26**, 216; **39**, 31.

**Award, 22 July 2004.**

### *Impregilo* **v.** *Pakistan*
*Impregilo S.p.A.* v. *Islamic Republic of Pakistan* (Case No. ARB/03/3)

**Decision on Jurisdiction, 22 April 2005.** Reported: 12 ICSID Reports 245; ICSID homepage; ITA; IC.
**25**, 334, 506, 692; **26**, 102, 103; **36**, 41; **41**, 88; **43**, 47.

**Order Noting Discontinuance, 26 September 2005.**

### *Inceysa* **v.** *El Salvador*
*Inceysa Vallisoletana S.L.* v. *Republic of El Salvador* (Case No. ARB/03/26)

**Award, 2 August 2006.** Reported: ITA; IC.
**25**, 391, 396, 397, 415, 521, 534; **41**, 7; **42**, 179.

**Decision on Rectification, 16 November 2006.**

*Industria Nacional de Alimentos* see *Lucchetti* **v.** *Peru*

*Jan de Nul* **v.** *Egypt*
*Jan de Nul N.V. and Dredging International N.V.* v. *Arab Republic of Egypt* (Case No. ARB/04/13)

**Decision on Jurisdiction, 16 June 2006.** Reported: ITA; IC.
**25**, 54, 504; **26**, 226; **44**, 68.

**Award, 6 November 2008.** Reported: ITA; IC.

*Joy Mining* **v.** *Egypt*
*Joy Mining Machinery Limited* v. *Arab Republic of Egypt* (Case No. ARB/03/11)

**Award, 6 August 2004.** Reported: 19 ICSID Review – FILJ 486 (2004); 44 ILM 73 (2005); 13 ICSID Reports 123; 132 Journal du droit international 163 (2005) (excerpts); ICSID homepage; ITA; IC.
**25**, 103, 126, 160; **26**, 41; **37**, 22.

**Order Noting Discontinuance, 16 December 2005.**
**52**, 26.

*Kaiser Bauxite* **v.** *Jamaica*
*Kaiser Bauxite Company* v. *Jamaica* (Case No. ARB/74/3)

**Decision on Jurisdiction, 6 July 1975.** Reported: 1 ICSID Reports 298; 114 ILR 144 (1999).
**25**, 99, 132, 699, 938; **40**, 9; **41**, 53; **42**, 34, 46, 119; **45**, 14, 25, 49, 60, 80.

**Order Noting Discontinuance, 27 February 1977.**

*Kardassopoulos* **v.** *Georgia*
*Ioannis Kardassopoulos* v. *Republic of Georgia* (Case No. ARB/05/18)

**Decision on Jurisdiction, 6 July 2007.** Reported: IC.
**25**, 536; **41**, 83; **42**, 87.

*Klöckner* **v.** *Cameroon*
*Klöckner Industrie-Anlagen GmbH and others* v. *United Republic of Cameroon and Société Camerounaise des Engrais* (Case No. ARB/81/2)

**Award and Dissenting Opinion, 21 October 1983.** Reported: 1984 Revue de l'arbitrage 19 (excerpts); 111 Journal du droit international 409 (1984) (excerpts); 10 Y.B. Com. Arb. 71 (1985) (excerpts); 2 ICSID Reports 9 (excerpts); 114 ILR 157 (1999) (excerpts).
**25**, 260, 279, 317, 327, 492–497, 553–557, 765, 783, 817, 853, 854, 884; **26**, 25–29; **41**, 84; **42**, 15, 18–19, 150, 165, 181, 209, 262, 263; **43**, 37; **46**, 77, 90; **52**, 163, 175, 234, 249.

**Decision on Annulment, 3 May 1985.** Reported: 114 Journal du droit international 163 (1987) (excerpts); 1 ICSID Review – FILJ 89 (1986); 11 Y.B. Com. Arb. 162 (1986) (excerpts); 2 ICSID Reports 95; 114 ILR 243 (1999); ICSID homepage.

**26**, 30; **42**, 15, 18–19, 150, 165, 168, 181, 214, 262, 263; **48**, 50, 59, 103; **49**, 70; **52**, 13, 17, 21–23, 29, 108, 143, 152, 157, 177–180, 197, 211, 214, 237, 245, 248, 266, 290, 294, 310, 319, 350, 364, 368, 390, 407, 414, 420, 428, 467, 470, 492, 495, 514, 517, 525, 585; **61**, 39.

**Resubmitted Case: Award, 26 January 1988.**
**52**, 375.

**Resubmitted Case: Decision on Annulment, 17 May 1990.**
**52**, 23, 24, 31, 42, 92, 321, 326, 336, 374, 375, 659.

### *Lanco* v. *Argentina*
*Lanco International Inc.* v. *Argentine Republic* (Case No. ARB/97/6)

**Decision on Jurisdiction, 8 December 1998.** Reported: 40 ILM 457 (2001); 5 ICSID Reports 369; ITA; IC.
**26**, 75, 192, 210.

**Order Noting Discontinuance, 17 October 2000.**

### *Lemire* v. *Ukraine* (AF)
*Lemire* v. *Ukraine* (Case No. ARB(AF)/98/1)

**Award, 18 September 2000.** Reported: 15 ICSID Review – FILJ 530 (2000); 6 ICSID Reports 60; ICSID homepage; ITA; IC.

### *LESI & Astaldi* v. *Algeria*
*LESI, S.p.A. and Astaldi, S.p.A.* v. *People's Democratic Republic of Algeria* (Case No. ARB/05/3)

**Decision on Jurisdiction, 12 July 2006.** Reported: ICSID homepage; ITA; IC.
**25**, 195.

### *LESI-DIPENTA* v. *Algeria*
*Consortium Groupement L.E.S.I.-DIPENTA* v. *People's Democratic Republic of Algeria* (Case No. ARB/03/8)

**Award, 10 January 2005.** Reported: 19 ICSID Review – FILJ 426 (2004); ICSID homepage; ITA; IC.
**25**, 195, 691.

### *LETCO* v. *Liberia*
*Liberian Eastern Timber Corporation* v. *Republic of Liberia* (Case No. ARB/83/2)

**Decision on Jurisdiction, 24 October 1984.** Reported: 2 ICSID Reports 349.
**25**, 133, 218, 265, 342, 765, 784, 819, 855, 876; **45**, 15.

**Award, 31 March 1986.** Reported: 2 ICSID Reports 346; 26 ILM 647 (1987); 13 Y.B. Com. Arb. 35 (1988) (excerpts); 89 ILR 313 (1992); 115 Journal du droit international 167 (1988) (excerpts).

**25**, 342; **26**, 134; **41**, 54; **42**, 64, 76, 100, 106, 122, 134, 215; **43**, 24; **45**, 18–19, 25, 44, 52, 60, 74, 84, 88; **46**, 92; **48**, 118; **49**, 19; **54**, 56; **55**, 35, 65; **61**, 22.

**Decision on Rectification, 10 June 1986.** Reported: 2 ICSID Reports 380; 26 ILM 677 (1987); 89 ILR 352.
**49**, 44; **61**, 69.

### LG&E v. *Argentina*
*LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc.* v. *Argentine Republic* (Case No. ARB/02/1)

**Decision on Jurisdiction, 30 April 2004.** Reported: 11 ICSID Reports 414; 21 ICSID Review – FILJ 155 (2006); ICSID homepage; ITA; IC.
**26**, 70; **46**, 85; **48**, 27.

**Decision on Liability, 3 October 2006.** Reported: 21 ICSID Review – FILJ 203 (2006); ICSID homepage; ITA; IC.
**42**, 94, 197, 203, 226, 238; **53**, 17.

**Award, 25 July 2007.** Reported: ITA; IC.
**49**, 66, 67.

**Decision on Supplementation, 8 July 2008.** Reported: ITA.
**49**, 67.

### Libananco v. *Turkey*
*Libananco Holdings Co. Limited* v. *Republic of Turkey* (Case No. ARB/06/8)

**Decision on Preliminary Issues, 23 June 2008.** Reported: ITA; IC.
**22**, 10.

### Loewen v. *United States* (AF)
*Loewen Group, Inc. and Raymond L. Loewen* v. *United States of America* (Case No. ARB(AF)/98/3)

**Decision on Jurisdiction, 9 January 2001.** Reported: 7 ICSID Reports 425; 129 Journal du droit international 217 (2002); ITA; IC.
**44**, 109.

**Award, 26 June 2003.** Reported: 42 ILM 811 (2003); 7 ICSID Reports 442; 131 Journal du droit international 219 (2004) (excerpts); ITA; IC.
**25**, 756; **26**, 222.

**Decision on Supplementation, 13 September 2004.** Reported: 44 ILM 836 (2005); 10 ICSID Reports 444; ITA; IC.

### Lucchetti v. *Peru*
*Empresas Lucchetti, S.A. and Lucchetti Peru, S.A.* v. *Republic of Peru* (Case No. ARB/03/4)

**Award, 7 February 2005.** Reported: 19 ICSID Review – FILJ 359 (2004); 12 ICSID Reports 219; ICSID homepage; ITA; IC.
**25**, 53, 502, 773, 793; **26**, 118.

**Decision on Annulment and Dissenting Opinion, 5 September 2007.** Reported: ICSID homepage; ITA; IC.
**52**, 114, 151, 170, 202, 316, 332, 384, 454, 564, 585.

**Decision on Rectification, 30 November 2007.** Reported: ICSID homepage; ITA.

### *Maffezini* **v.** *Spain*
*Emilio Augustín Maffezini* v. *Kingdom of Spain* (Case No. ARB/97/7)

**Decision on Provisional Measures, 28 October 1999.** Reported: 16 ICSID Review – FILJ 207 (2001); 5 ICSID Reports 393; 124 ILR 6 (2003); ICSID homepage; ITA; IC.
**47**, 18, 41, 64, 94, 161, 169.

**Decision on Jurisdiction, 25 January 2000.** Reported: 16 ICSID Review – FILJ 212 (2001); 5 ICSID Reports 396; 124 ILR 9 (2003); 40 ILM 1129 (2001); ICSID homepage; ITA; IC.
**25**, 51, 500, 568, 569; **26**, 211–213.

**Award, 13 November 2000.** Reported: 16 ICSID Review – FILJ 248 (2001); 5 ICSID Reports 419; 124 ILR 35 (2003); 40 ILM 1148 (2001); ICSID homepage; ITA; IC.

**Decision on Rectification, 31 January 2001.** Reported: 16 ICSID Review – FILJ 279 (2001); 5 ICSID Reports 440; 124 ILR 58 (2003); ICSID homepage; ITA; IC.
**49**, 49.

### *Malaysian Historical Salvors* **v.** *Malaysia*
*Malaysian Historical Salvors, SDN, BHD* v. *Malaysia* (Case No. ARB/05/10)

**Award, 17 May 2007.** Reported: ICSID homepage; ITA; IC.
**25**, 157, 167; **44**, 108.

### *Manufacturers Hanover Trust* **v.** *Egypt*
*Manufacturers Hanover Trust Company* v. *Arab Republic of Egypt and General Authority for Investment and Free Zones* (Case No. ARB/89/1)

**Order Noting Discontinuance, 24 June 1993.**
**25**, 405.

### *MCI* **v.** *Ecuador*
*MCI Power Group L.C. and New Turbine, Inc.* v. *Republic of Ecuador* (Case No. ARB/03/6)

**Award, 31 July 2007.** Reported: ITA; IC.
**42**, 148, 227.

*Table of cases*

## Metalclad **v.** *Mexico* **(AF)**
*Metalclad Corporation* v. *United Mexican States* (Case No. ARB(AF)/97/1)

**Award, 30 August 2000.** Reported: 16 ICSID Review – FILJ 168 (2001); 40 ILM 36 (2001); 26 Y.B. Com. Arb. 99 (2001) (excerpts); 119 ILR 618 (2002); 5 ICSID Reports 212; 129 Journal du droit international 233 (2002) (excerpts); ICSID homepage; ITA; IC.
**44**, 115; **46**, 23; **53**, 9.

## Metalpar **v.** *Argentina*
*Metalpar S.A. and Buen Aire S.A.* v. *Argentine Republic* (Case No. ARB/03/5)

**Decision on Jurisdiction, 27 April 2006.** Reported: ITA; IC.

**Award, 6 June 2008.** Reported: ITA; IC.

## Micula **v.** *Romania*
*Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L.* v. *Romania* (Case No. ARB/05/20)

**Decision on Jurisdiction, 24 September 2008.** Reported: ITA.
**25**, 645.

## Middle East Cement **v.** *Egypt*
*Middle East Cement Shipping and Handling Co. S.A.* v. *Arab Republic of Egypt* (Case No. ARB/99/6)

**Award, 12 April 2002.** Reported: 18 ICSID Review – FILJ 602 (2003); 7 ICSID Reports 178; ICSID homepage; ITA; IC.
**26**, 61; **42**, 83, 90; **43**, 101, 106; **46**, 20, 39.

## Mihaly **v.** *Sri Lanka*
*Mihaly International Corporation* v. *Democratic Republic of Sri Lanka* (Case No. ARB/00/2)

**Award and Concurring Opinion, 15 March 2002.** Reported: 17 ICSID Review – FILJ 142 (2002); 41 ILM 867 (2002); 6 ICSID Reports 310; ICSID homepage; IC.
**25**, 176, 352, 361, 749; **41**, 14.

## MINE **v.** *Guinea*
*Maritime International Nominees Establishment* v. *Republic of Guinea* (Case No. ARB/84/4)

**Award, 6 January 1988.** Reported: 4 ICSID Reports 61; 3 International Arbitration Report, No. 1, Sec. A (Jan. 1988); 14 Y.B. Com. Arb. 82 (1989) (excerpts).
**26**, 9, 115, 149–153, 167, 168; **37**, 32; **41**, 46; **42**, 17; **46**, 62; **47**, 27, 35, 40, 106–109, 171; **52**, 242, 393; **61**, 23, 42, 72.

**Procedural Order No. 1, 17 May 1988.** Reported: 4 ICSID Reports 110.

**Interim Order No. 1, 12 August 1988.** Reported: 4 ICSID Reports 111.
**52**, 579, 598, 610, 611, 614, 624, 632; **53**, 37, 49; **54**, 38.

**Decision on Annulment, 22 December 1989.** Reported: 4 ICSID Reports 79; 5 ICSID Review – FILJ 95 (1990); 5 International Arbitration Report, No. 2, at Sec. E (February 1990); 16 Y.B. Com. Arb. 40 (1991) (excerpts); 118 Journal du droit international 166 (1991) (excerpts); ICSID homepage.
**25**, 711–714; **41**, 46; **42**, 17, 26, 37, 124, 264; **44**, 23; **48**, 63; **49**, 21, 72; **52**, 13, 18, 23, 31, 71, 108, 154, 199, 213, 220, 242, 245, 282, 292, 312, 340, 352, 372, 373, 379, 388, 393–395, 409, 412, 417, 424, 431, 472, 481, 489, 501, 507, 527, 533, 654, 660; **53**, 21; **61**, 42, 72.

**Order Noting Discontinuance, 20 November 1990.**

### *Misima Mines* **v.** *Papua New Guinea*
*Misima Mines Pty. Ltd.* v. *Independent State of Papua New Guinea* (Case No. ARB/96/2)

**Order Noting Discontinuance, 14 May 2001.**

### *Mitchell* **v.** *DR Congo*
*Patrick Mitchell* v. *Democratic Republic of the Congo* (Case No. ARB/99/7)

**Award and Dissenting Opinion, 9 February 2004.**
**25**, 166.

**Decision on Stay of Enforcement, 30 November 2004.** Reported: 20 ICSID Review – FILJ 587 (2005); ICSID homepage; ITA; IC.
**52**, 603, 617, 626, 640; **53**, 38.

**Decision on Annulment, 1 November 2006.** Reported: ITA; IC.
**25**, 166, 937; **44**, 71; **52**, 12, 19, 39, 40, 115, 146, 159, 203, 357, 380, 454, 476, 530.

### *Mobil Oil* **v.** *New Zealand*
*Mobil Oil Corporation and others* v. *New Zealand* (Case No. ARB/87/2)

**Findings on Liability, Interpretation and Allied Issues, 4 May 1989.** Reported: 4 ICSID Reports 140.
**38**, 26; **41**, 17, 47; **42**, 212; **44**, 49; **63**, 11, 25.

**Order Noting Discontinuance, 26 November 1990.**

### *Mondev* **v.** *United States* **(AF)**
*Mondev International Ltd.* v. *United States of America* (Case No. ARB(AF)/99/2)

**Miscellaneous Procedural Orders.** Reported: 6 ICSID Reports 186.

**Award, 11 October 2002.** Reported: 42 ILM 85 (2003); 6 ICSID Reports 192; 125 ILR 110 (2004); ITA; IC.
**25**, 591.

### MTD v. Chile
*MTD Equity Sdn. Bhd. and MTD Chile S.A.* v. *Republic of Chile* (Case No. ARB/01/7)

**Award, 25 May 2004.** Reported: 44 ILM 91 (2005); 12 ICSID Reports 6; ITA; IC.
**25**, 773, 793; **42**, 91; **56**, 13, 27.

**Decision on Continued Stay of Execution, 1 June 2005.** Reported: 13 ICSID Reports 493; 20 ICSID Review – FILJ 615 (2005); ICSID homepage; ITA; IC.
**52**, 588, 611, 619, 641; **60**, 11.

**Decision on Annulment, 21 March 2007.** Reported: 13 ICSID Report 500; ITA; IC.
**42**, 271; **43**, 22; **52**, 12, 24, 35, 149, 220, 247, 315, 359, 382, 398, 454, 604, 619; **61**, 39.

### Noble Energy v. Ecuador
*Noble Energy Inc. and MachalaPower Cía. Ltd.* v. *Republic of Ecuador and Consejo Nacional de Electricidad* (Case No. ARB/05/12)

**Decision on Jurisdiction, 5 March 2008.** Reported: ITA; IC.
**25**, 244, 251, 263, 343, 907, 912, 914; **43**, 34.

### Noble Ventures v. Romania
*Noble Ventures, Inc.* v. *Romania* (Case No. ARB/01/11)

**Award, 12 October 2005.** Reported: ITA; IC.
**43**, 8, 32, 71, 78, 113; **49**, 18; **61**, 36.

**Decision on Rectification, 19 May 2006.** Reported: ITA; IC.
**49**, 64.

### Occidental v. Ecuador
*Occidental Petroleum Corporation and Occidental Exploration and Production Company* v. *Republic of Ecuador* (Case No. ARB/06/11)

**Decision on Provisional Measures, 17 August 2007.** Reported: ICSID homepage; ITA; IC.
**47**, 21, 45, 57, 70, 71, 147, 167.

### OKO v. Estonia
*OKO Pankki Oyj and others* v. *Republic of Estonia* (Case No. ARB/04/6)

**Award, 19 November 2007.**

### Olguín v. Paraguay
*Olguín* v. *Paraguay* (Case No. ARB/98/5)

**Decision on Jurisdiction, 8 August 2000.** Reported: 18 ICSID Review – FILJ 133 (2003); 6 ICSID Reports 156; ICSID homepage; ITA; IC.
**39**, 21, 22; **57**, 46.

**Award, 26 July 2001.** Reported: 18 ICSID Review – FILJ 143 (2003); 6 ICSID Reports 164; ICSID homepage; ITA; IC.
**25**, 646; **49**, 17.

### *Pan American* **v.** *Argentina*
*Pan American Energy LLC and BP Argentina Exploration Company* v. *Argentine Republic* (Case No. ARB/03/13) and
*BP America Production Co. and others* v. *Argentine Republic* (Case No. ARB/04/8)

**Decision on Preliminary Objections, 27 July 2006.** Reported: ITA; IC.
**25**, 46; **26**, 70, 127; **41**, 90; **42**, 11.

### *Parkerings* **v.** *Lithuania*
*Parkerings-Compagniet AS* v. *Republic of Lithuania* (Case No. ARB/05/8)

**Award, 11 September 2007.** Reported: ICSID homepage; ITA; IC.
**26**, 228.

### *Pey Casado* **v.** *Chile*
*Victor Pey Casado and President Allende Foundation* v. *Republic of Chile* (Case No. ARB/98/2)

**Decision on Provisional Measures, 25 September 2001.** Reported: 16 ICSID Review – FILJ 567 (2001); 6 ICSID Reports 375; ICSID homepage; ITA; IC.
**47**, 19, 42, 52, 95, 117, 142, 163, 169, 174.

**Decision on Jurisdiction, 8 May 2002.** Reported: ITA; IC.

**Procedural Order No. 13, 24 October 2006.** Reported: ITA; IC.

**Procedural Order No. 14, 22 November 2006.** Reported: ITA; IC.

**Decision on Arbitration Expenses, 14 March 2008.** Reported: ITA.

**Award, 8 May 2008.** Reported: ITA.
**25**, 656, 677.

**Decision on Stay of Execution, 5 August 2008**. Reported: ITA.

### *Plama* **v.** *Bulgaria*
*Plama Consortium Limited* v. *Bulgaria* (Case No. ARB/03/24)

**Decision on Jurisdiction, 8 February 2005.** Reported: 20 ICSID Review – FILJ 262 (2005); 44 ILM 721 (2005); 13 ICSID Reports 272; ICSID homepage; ITA; IC.
**25**, 573; **26**, 204; **41**, 15; **43**, 29, 112.

**Order on Provisional Measures, 6 September 2005.** Reported: 13 ICSID Reports 324; ICSID homepage; ITA; IC.
**47**, 44, 67, 130, 146, 165, 166, 176.

**Award, 27 August 2008.** Reported: ITA; IC.

### PSEG v. Turkey

*PSEG Global Inc., The North American Coal Corporation, and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi* v. *Republic of Turkey* (Case No. ARB/02/5)

**Decision on Jurisdiction, 4 June 2004.** Reported: 44 ILM 465 (2005); 11 ICSID Reports 434; ICSID homepage; ITA; IC.
**25**, 179, 932.

**Award, 19 January 2007.** Reported: ICSID homepage; ITA; IC.
**25**, 179; **43**, 100.

### Repsol v. Petroecuador

*Repsol YPF Ecuador S.A.* v. *Empresa Estatal Petroleos del Ecuador (Petroecuador)* (Case No. ARB/01/10)

**Award, 20 February 2004.**
**25**, 250, 318.

**Procedural Order No. 1, 22 December 2005.** Reported: 20 ICSID Review – FILJ 626 (2005); ICSID homepage; IC.
**52**, 605, 613, 637.

**Procedural Order No. 4, 22 February 2006.** Reported: 20 ICSID Review – FILJ 632 (2005); ICSID homepage; IC.
**52**, 637.

**Decision on Annulment, 8 January 2007.** Reported: ICSID homepage; IC.
**52**, 45, 104, 136, 147, 182, 222, 281, 303, 454, 605; **61**, 40.

### RFCC v. Morocco

*Consortium R.F.C.C.* v. *Kingdom of Morocco* (Case No. ARB/00/6)

**Decision on Jurisdiction, 16 July 2001.** Reported: ICSID homepage; ITA; IC.
**26**, 128.

**Award, 22 December 2003.** Reported: 20 ICSID Review – FILJ 391 (2005); ICSID homepage; ITA; IC.

**Decision on Annulment, 18 January 2006.**
**52**, 34, 569.

### Rompetrol v. Romania

*The Rompetrol Group N.V.* v. *Romania* (Case No. ARB/06/3)

**Decision on Jurisdiction, 18 April 2008.** Reported: ICSID homepage; ITA; IC.
**25**, 737, 754.

### *Rumeli Telekom* v. *Kazakhstan*
*Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S.* v. *Republic of Kazakhstan* (Case No. ARB/05/16)

**Award, 29 July 2008.** Reported: ITA.
**25**, 275.

### *Saipem* v. *Bangladesh*
*Saipem S.p.A.* v. *People's Republic of Bangladesh* (Case No. ARB/05/7)

**Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007.** Reported: 22 ICSID Review – FILJ 100 (2007); ICSID homepage; ITA; IC.
**25**, 186; **26**, 121, 227; **41**, 91; **42**, 187; **47**, 45, 69; **57**, 32.

### *Salini* v. *Jordan*
*Salini Construttori S.p.A. and Italstrade S.p.A.* v. *Hashemite Kingdom of Jordan* (Case No. ARB/02/13)

**Decision on Jurisdiction, 29 November 2004.** Reported: 20 ICSID Review – FILJ 148 (2005); 44 ILM 573 (2005); 132 Journal du droit international 182 (2005) (excerpts); ICSID homepage; ITA; IC.
**25**, 572; **57**, 27.

**Award, 31 January 2006.** Reported: ICSID homepage; ITA; IC.

### *Salini* v. *Morocco*
*Salini Construttori S.p.A. and Italstrade S.p.A.* v. *Kingdom of Morocco* (Case No. ARB/00/4)

**Decision on Jurisdiction, 23 July 2001.** Reported: 16 ICSID Review – FILJ 469 (2001); 6 ICSID Reports 400; 42 ILM 609 (2003); ITA.
**25**, 154, 200, 235, 527; **26**, 76, 128.

**Order Noting Discontinuance, 4 February 2004.**

### *Santa Elena* v. *Costa Rica*
*Compañía del Desarrollo de Santa Elena S.A.* v. *Republic of Costa Rica* (Case No. ARB/96/1)

**Award, 17 February 2000.** Reported: 15 ICSID Review – FILJ 169 (2000); 5 ICSID Reports 157; 39 ILM 1317 (2000); ICSID homepage; IC.
**25**, 75; **27**, 46; **42**, 22, 222; **43**, 123; **46**, 56.

**Decision on Rectification, 8 June 2000.** Reported: 15 ICSID Review – FILJ 205 (2000); 5 ICSID Reports 180; 26 Y.B. Com. Arb. 47 (2001) (excerpts); 128 Journal du droit international 150 (2001) (excerpts); ICSID homepage; IC.
**49**, 46.

*Table of cases*

### *Scimitar* v. *Bangladesh*

*Scimitar Exploration Limited* v. *Bangladesh and Bangladesh Oil, Gas and Mineral Corporation* (Case No. ARB/92/2)

**Award, 4 May 1994.** Reported: 5 ICSID Reports 4.
**42**, 159; **44**, 79; **45**, 23.


### *SEMOS* v. *Mali*

*Société d'Exploitation des Mines d'Or de Sadiola S.A.* v. *Republic of Mali* (Case No. ARB/01/5)

**Award, 25 February 2003.** Reported: 10 ICSID Reports 116.
**42**, 126; **61**, 14.


### *Sempra* v. *Argentina*

*Sempra Energy International* v. *Argentine Republic* (Case No. ARB/02/16)

**Decision on Jurisdiction, 11 May 2005.** Reported: ICSID homepage; ITA; IC.
**25**, 706, 792, 835–837, 865; **26**, 70, 129.

**Award and Partial Dissenting Opinion, 28 September 2007.** Reported: ICSID homepage; ITA; IC.
**25**, 149, 297; **27**, 9; **42**, 197, 243; **46**, 14; **47**, 84; **49**, 19; **57**, 39; **58**, 15.


### *SGS* v. *Pakistan*

*SGS Société Générale de Surveillance S.A.* v. *Islamic Republic of Pakistan* (Case No. ARB/01/13)

**Procedural Order No. 2, 16 October 2002.** Reported: 18 ICSID Review – FILJ 293 (2003); 8 ICSID Reports 388; ICSID homepage; ITA; IC.
**26**, 158–161; **47**, 43, 53, 61, 119, 143.

**Decision on Challenge, 19 December 2002.** Reported: 8 ICSID Reports 398.
**57**, 28–29.

**Decision on Jurisdiction, 6 August 2003.** Reported: 18 ICSID Review – FILJ 307 (2003); 42 ILM 1290 (2003); 8 ICSID Reports 406; 131 Journal du droit international 257 (2004) (excerpts); ICSID homepage; ITA; IC.
**25**, 193, 529, 545; **26**, 67, 87, 116; **27**, 49; **41**, 18.

**Order Noting Settlement, 23 May 2004.** Reported: 8 ICSID Reports 451.


### *SGS* v. *Philippines*

*SGS Société Générale de Surveillance S.A.* v. *Republic of the Philippines* (Case No. ARB/02/6)

**Decision on Jurisdiction and Separate Declaration, 29 January 2004.** Reported: 8 ICSID Reports 518; ICSID homepage; ITA; IC.
**25**, 194, 511, 530; **26**, 93–98; **42**, 184; **44**, 57; **53**, 17.

**Order on Further Proceedings, 17 December 2007.** Reported: ITA.
**26**, 99.

### *Siag* v. *Egypt*
*Waguih Elie George Siag and Clorinda Vecchi* v. *Arab Republic of Egypt* (Case No. ARB/05/15)

**Decision on Jurisdiction, 11 April 2007.** Reported: ITA; IC.
**25**, 672, 673, 683, 754.

### *Siemens* v. *Argentina*
*Siemens A.G.* v. *Argentine Republic* (Case No. ARB/02/08)

**Decision on Jurisdiction, 3 August 2004.** Reported: 12 ICSID Reports 174; 44 ILM 138 (2005); 132 Journal du droit international 142 (2005) (excerpts); ICSID homepage; ITA; IC.
**25**, 92; **41**, 87; **42**, 6.

**Award and Separate Opinion, 6 February 2007.** Reported: ITA; IC.
**42**, 84; **43**, 42; **46**, 42; **49**, 22; **51**, 12, 29, 32; **57**, 30–31; **58**, 14.

### *SIREXM* v. *Burkina Faso*
*Société d'Investigation de Recherche et d'Exploitation Minière* v. *Burkina Faso* (Case No. ARB/97/1)

**Award, 19 January 2000.** Reported: ICSID homepage (excerpts); IC (excerpts).

### *SOABI* v. *Senegal*
*Société Ouest Africaine des Bétons Industriels* v. *Senegal* (Case No. ARB/82/1)

**Decision on Jurisdiction, 1 August 1984.** Reported: 2 ICSID Reports 175; 6 ICSID Review – FILJ 217 (1991); 113 Journal du droit international 221 (1986) (excerpts); ICSID homepage.
**25**, 558, 559, 700, 703, 765, 818, 830, 843, 848, 854, 877, 898; **39**, 27; **41**, 82.

**Declaration of the President of the Tribunal, 1 August 1984.** Reported: 2 ICSID Reports 333; 6 ICSID Review – FILJ 289 (1991); ICSID homepage.

**Award and Dissenting Opinion, 25 February 1988.** Reported: 2 ICSID Reports 190; 117 Journal du droit international 192 (1990) (excerpts); 6 ICSID Review – FILJ 15 (1991); Y.B. Com. Arb. 42 (1992) (excerpts); ICSID homepage.
**25**, 96, 801–802, 805; **26**, 53; **37**, 34; **38**, 7; **41**, 82; **42**, 58, 213; **43**, 28, 35, 49, 99, 123; **46**, 21, 36, 50; **49**, 21; **54**, 53; **55**, 45; **61**, 30.

### *Soufraki* v. *UAE*
*Hussein Nuaman Soufraki* v. *United Arab Emirates* (Case No. ARB/02/7)

**Award, 7 July 2004.** Reported: 12 ICSID Reports 158; ITA; IC.
**25**, 643, 644, 650–653, 715; **42**, 9; **43**, 105, 115; **52**, 169.

**Decision on Annulment and Dissenting Opinion, 5 June 2007.** Reported: ITA; IC.
**25**, 644, 654–655; **49**, 65; **52**, 17, 19–22, 36, 38, 140, 150, 169, 183, 204, 223, 243, 358, 383, 446, 454, 477, 564, 585.

**Rectification of the Annulment Decision, 13 August 2007.** Reported: ITA.

### *SPP* v. *Egypt*
*Southern Pacific Properties (Middle East) Limited* v. *Arab Republic of Egypt* (Case No. ARB/84/3)

**Decision on Jurisdiction I, 27 November 1985.** Reported: 3 ICSID Reports 112; 16 Y.B. Com. Arb. 19 (1991) (excerpts); 121 Journal du droit international 218 (1994) (excerpts).
**25**, 26, 345, 400–403, 421, 491, 519, 615, 699; **26**, 37; **36**, 53; **39**, 20; **41**, 19, 66; **52**, 66; **70**, 10.

**Decision on Jurisdiction II and Dissenting Opinion, 14 April 1988.** Reported: 3 ICSID Reports 131; 16 Y.B. Com. Arb. 28 (1991) (excerpts); 121 Journal du droit international 220 (1994) (excerpts).
**25**, 26, 583, 590, 699, 929; **26**, 39; **36**, 53; **41**, 19; **42**, 4; **48**, 104.

**Award and Dissenting Opinion, 20 May 1992.** Reported: 3 ICSID Reports 189; 8 ICSID Review – FILJ 328 (1993); 32 ILM 933 (1993), with correction at 32 ILM 1470 (1993); 8 International Arbitration Report, No. 8, Sec. A (August 1993); 19 Y.B. Com. Arb. 51 (1994) (excerpts); 121 Journal du droit international 229 (1994) (excerpts); ICSID homepage.
**25**, 348, 491; **41**, 26, 66; **42**, 28, 65–67, 76, 107, 134, 174, 219; **43**, 13, 49; **44**, 51; **46**, 25, 38, 45, 54; **61**, 21.

### *Suez et al.* v. *Argentina*
*Suez, Sociedad General de Aguas de Barcelona S.A., and InterAguas Servicios Integrales del Agua S.A.* v. *Argentine Republic* (Case No. ARB/03/17)

**Order in Response to *Amicus Curiae* Petition, 17 March 2006.** Reported: ICSID homepage; ITA; IC.
**44**, 125.

**Procedural Order No. 1, 14 April 2006.** Reported: ICSID homepage; ITA; IC.

**Decision on Jurisdiction, 16 May 2006.** Reported: ICSID homepage; ITA; IC.
**25**, 66.

**Decision on Challenge, 22 October 2007.** Reported: ICSID homepage; ITA; IC.

**Decision on Second Challenge, 12 May 2008.** Reported: ITA.

### *Suez and AWG* v. *Argentina*
*Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A.* v. *Argentine Republic* (Case No. ARB/03/19)

**Order in Response to Transparency and *Amicus Curiae* Petition, 19 May 2005.** Reported: 21 ICSID Review – FILJ 342 (2006); ICSID homepage; ITA; IC.
**44**, 58, 125.

**Procedural Order No. 1, 14 April 2006.** Reported: ICSID homepage; ITA; IC.

**Decision on Jurisdiction, 3 August 2006.** Reported: ICSID homepage; ITA; IC.
**26**, 130.

**Procedural Order No. 2, 3 August 2006.** Reported: ITA; IC.

**Order in Response to *Amicus Curiae* Petition, 12 February 2007.** Reported: ICSID homepage; ITA; IC.

**Decision on Challenge, 22 October 2007.** Reported: ICSID homepage; ITA; IC.
**57**, 14, 41.

**Decision on Second Challenge, 12 May 2008.** Reported: ITA.

### *Swiss Aluminium* v. *Iceland*
*Swiss Aluminium Limited and Icelandic Aluminium Company Limited* v. *Iceland* (Case No. ARB/83/1)

**Order Noting Discontinuance, 6 March 1985.**

### *Tanzania Electric* v. *IPTL*
*Tanzania Electric Supply Company Limited* v. *Independent Power Tanzania Limited* (Case No. ARB/98/8)

**Decision on Provisional Measures, 20 December 1999.** Reported: 8 ICSID Reports 239; ICSID homepage; IC.
**47**, 41, 65, 115, 169.

**Decision on Preliminary Issues, 22 May 2000.** Reported: 8 ICSID Reports 243; ICSID homepage; IC.

**Decision on Tariff and Other Remaining Issues, 9 February 2001.** Reported: 8 ICSID Reports 272; ICSID homepage; IC.

**Decision on All Further Remaining Issues, 24 May 2001.** Reported: 8 ICSID Reports 309; ICSID homepage; IC.

**Award, 12 July 2001.** Reported: 8 ICSID Reports 226; ICSID homepage; IC.
**25**, 262, 770, 803, 823; **26**, 144; **42**, 25; **43**, 50; **46**, 22; **47**, 162; **48**, 74.

### *Tecmed* v. *Mexico* (AF)
*Técnicas Medioambientales Tecmed, S.A.* v. *United Mexican States* (Case No. ARB(AF)/00/2)

**Award, 29 May 2003.** Reported: 19 ICSID Review – FILJ 158 (2004); 43 ILM 133 (2004); 10 ICSID Reports 134; ICSID homepage; ITA; IC.
**25**, 512; **40**, 24; **42**, 270.

### Telenor **v.** *Hungary*
*Telenor Mobile Communications A.S.* v. *Republic of Hungary* (Case No. ARB/04/15)

**Award, 13 September 2006.** Reported: 21 ICSID Review – FILJ 603 (2006); ICSID homepage; ITA; IC.
**25**, 274, 574; **41**, 92.


### Tokios Tokelės **v.** *Ukraine*
*Tokios Tokelės* v. *Ukraine* (Case No. ARB/02/18)

**Procedural Order No. 1, 1 July 2003.** Reported: 11 ICSID Reports 310; ICSID homepage; ITA; IC.
**47**, 20, 44, 128.

**Decision on Jurisdiction and Dissenting Opinion, 29 April 2004.** Reported: 20 ICSID Review – FILJ 205 (2005); 11 ICSID Reports 313; ICSID homepage; ITA; IC.
**25**, 101, 185, 701, 705, 723, 725–735, 739; **41**, 39; **47**, 128; **48**, 104.

**Procedural Order No. 3, 18 January 2005.** Reported: 11 ICSID Reports 352; ICSID homepage; ITA; IC.

**Award and Separate Opinion, 26 July 2007.** Reported: ITA; IC.
**36**, 66; **41**, 39.


### Total **v.** *Argentina*
*Total S.A.* v. *Argentine Republic* (Case No. ARB/04/1)

**Decision on Jurisdiction, 25 August 2006.** Reported: IC.
**44**, 70.


### Tradex **v.** *Albania*
*Tradex Hellas S.A.* v. *Republic of Albania* (Case No. ARB/94/2)

**Decision on Jurisdiction, 24 December 1996.** Reported: 14 ICSID Review – FILJ 161 (1999); 5 ICSID Reports 47; 127 Journal du droit international 151 (2000) (excerpts); ICSID homepage; ITA; IC.
**25**, 395, 417, 429, 480, 508, 525, 593; **26**, 43; **41**, 81.

**Award, 29 April 1999.** Reported: 14 ICSID Review – FILJ 197 (1999); 5 ICSID Reports 70; 127 Journal du droit international 161 (2000) (excerpts); ICSID homepage; ITA; IC.
**22**, 6; **25**, 135; **41**, 81; **42**, 221; **43**, 14, 40, 87, 110.


### Vacuum Salt **v.** *Ghana*
*Vacuum Salt Products Ltd.* v. *Republic of Ghana* (Case No. ARB/92/1)

**Decision on Provisional Measures, 14 June 1993.** Reported: 4 ICSID Reports 323.
**47**, 17, 50, 110.

**Award, 16 February 1994.** Reported: 4 ICSID Reports 329; 9 ICSID Review – FILJ 72 (1994); International Arbitration Report, No. 4, at Sec. B (April 1994); 20 Y.B. Com. Arb. 11 (1995) (excerpts); 122 Journal du droit international 162 (1995) (excerpts); ICSID homepage.
**25**, 765, 785, 820, 821, 825, 827, 856, 865, 878, 890; **43**, 12, 108; **47**, 82; **48**, 13; **49**, 21.

### *Vanessa Ventures* v. *Venezuela* (AF)
*Vanessa Ventures Ltd.* v. *Bolivarian Republic of Venezuela* (Case No. ARB(AF)04/6)

**Decision on Jurisdiction, 22 August 2008.** Reported: ITA.

### *Victor Pey Casado* see *Pey Casado* v. *Chile*

### *Vieira* v. *Chile*
*Sociedad Anónima Eduardo Vieira* v. *Republic of Chile* (Case No. ARB/04/7)

**Award and Dissenting Opinion, 21 August 2007.** Reported: ICSID homepage; ITA; IC.

### *Vivendi* v. *Argentina*
*Compañía de Aguas del Aconquija S.A. and Vivendi Universal* v. *Argentine Republic* (Case No. ARB/97/3)

**Award, 21 November 2000.** Reported: 16 ICSID Review – FILJ 641 (2001); 40 ILM 426 (2001); 125 ILR 1 (2004); 26 Y.B. Com. Arb. 61 (2001) (excerpts); 5 ICSID Reports 299; ICSID homepage; ITA.
**25**, 236, 765, 773, 793, 882; **26**, 78, 219; **52**, 508, 679.

**Decision on Challenge, 3 October 2001.** Reported: 17 ICSID Review – FILJ 168 (2002); 6 ICSID Reports 330; 125 ILR 46 (2004); ICSID homepage; ITA; IC.
**44**, 7; **52**, 552; **57**, 5, 23; **58**, 3.

**Decision on Annulment, 3 July 2002.** Reported: 19 ICSID Review – FILJ 89 (2004); 41 ILM 1135 (2002); 6 ICSID Reports 340; 125 ILR 58 (2004); 130 Journal du droit international 195 (2003); ICSID homepage; ITA; IC.
**25**, 528, 882; **26**, 62, 63, 78–85, 219, 220; **52**, 19, 32, 38, 40, 72, 139, 168, 314, 355, 377, 388, 396, 444, 474, 503, 508, 528, 585, 679; **57**, 5; **61**, 39.

**Decision on Supplementation and Rectification of Annulment Decision, 28 May 2003**. Reported: 19 ICSID Review – FILJ 139 (2004); 8 ICSID Reports 489; ICSID homepage; ITA; IC.
**49**, 54, 73; **61**, 31, 32.

**Resubmitted Case: Decision on Jurisdiction, 14 November 2005.** Reported: ITA; IC.
**25**, 40, 357, 755, 882; **36**, 43; **52**, 661, 672, 680, 696.

**Resubmitted Case: Award, 20 August 2007.** Reported: ITA; IC.
**43**, 43, 89, 90; **46**, 59; **57**, 41.

### *Waste Management* v. *Mexico I* (AF)
*Waste Management, Inc.* v. *United Mexican States* (Case No. ARB(AF)/98/2)

**Award and Dissenting Opinion, 2 June 2000.** Reported: 15 ICSID Review – FILJ 214 (2000); 40 ILM 56 (2001); 121 ILR 30 (2002); 5 ICSID Reports 445; ICSID homepage; ITA; IC.
**26**, 113.

### *Waste Management* v. *Mexico II* (AF)
*Waste Management, Inc.* v. *United Mexican States* (Case No. ARB(AF)/00/3)

**Decision on Venue of the Arbitration, 26 September 2001.** Reported: 6 ICSID Reports 541; ICSID homepage; ITA; IC.

**Decision on Jurisdiction, 26 June 2002.** Reported: 6 ICSID Reports 549; 41 ILM 1315 (2002); ICSID homepage; ITA; IC.

**Award, 30 April 2004.** Reported: 43 ILM 967 (2004); 11 ICSID Reports 362; ITA; IC.
**26**, 225; **43**, 59.

### *Wena Hotels* v. *Egypt*
*Wena Hotels Limited* v. *Arab Republic of Egypt* (Case No. ARB/98/4)

**Decision on Jurisdiction, 29 June 1999.** Reported: 41 ILM 881 (2002); 6 ICSID Reports 74; ITA.
**25**, 704.

**Award, 8 December 2000.** Reported: 41 ILM 896 (2002); 6 ICSID Reports 89; ITA; IC.
**25**, 184; **26**, 145, 146; **42**, 78, 136, 223; **46**, 58; **52**, 313.

**Decision on Annulment, 5 February 2002.** Reported: 6 ICSID Reports 129; 41 ILM 933 (2002); 130 Journal du droit international 167 (2003); ITA; IC.
**25**, 184; **26**, 220; **42**, 101, 229, 236, 241, 242; **43**, 20; **48**, 49, 52, 66; **49**, 77; **52**, 19, 32, 38, 215, 284, 285, 313, 328, 329, 341, 354, 376, 410, 417, 432, 443, 473, 601, 635; **61**, 39.

**Decision on Interpretation, 31 October 2005.** Reported: ITA; IC.
**26**, 145, 146; **50**, 4, 7–17, 20, 24, 37, 40; **52**, 93, 136, 137, 145.

### *Western NIS* v. *Ukraine*
*Western NIS Enterprise Fund* v. *Ukraine* (Case No. ARB/04/2)

**Order, 16 March 2006.** Reported: ICSID homepage; ITA; IC.

**Order Noting Discontinuance, 1 June 2006.**

### *World Duty Free* v. *Kenya*
*World Duty Free Company Limited* v. *Republic of Kenya* (Case No. ARB/00/7)

**Award, 4 October 2006.** Reported: ITA; IC.
**42**, 31, 51; **43**, 103; **44**, 121; **47**, 150, 151.

### WRB v. *Grenada*

*WRB Enterprises and Grenada Private Power Limited* v. *Grenada* (Case No. ARB/97/5)

**Award, 21 December 1998.**

### Zhinvali v. *Georgia*

*Zhinvali Development Ltd.* v. *Republic of Georgia* (Case No. ARB/00/1)

**Award and Separate Opinion, 24 January 2003.** Reported: 10 ICSID Reports 6.
**25**, 137, 178, 330–332, 406, 418, 520, 584; **26**, 47; **41**, 8; **42**, 265; **43**, 75; **46**, 40; **47**, 30, 43, 126, 177; **57**, 26; **61**, 25.


## National cases

### BELGIUM

*Guinea* v. *Maritime International Nominees Establishment*, Court of First Instance of Antwerp, 27 September 1985. Reported: 4 ICSID Reports 32; 24 ILM 1639 (1985); 1 ICSID Review – FILJ 380 (1986); 12 Y.B. Com. Arb. 181 (1987).
**26**, 149, 167; **46**, 62; **47**, 36, 106, 108.


### ENGLAND

*AIG Capital Partners Inc. and another* v. *Republic of Kazakhstan (National Bank of Kazakhstan Intervening)*, High Court, Queen's Bench Division (Commercial Court), 20 October 2005. Reported: [2005] EWHC 2239 (Comm), 11 ICSID Reports 118.
**54**, 61–63; **55**, 38–39, 70–71, 118.


### FRANCE

*Benvenuti et Bonfant SARL* v. *Government of the People's Republic of the Congo*, Tribunal de grande instance, Paris, 23 December 1980, 13 January 1981; Cour d'appel, Paris, 26 June 1981. Reported: 1 ICSID Reports 368; 20 ILM 877 (1981); 65 ILR 88, 91 (1984); 7 Y.B. Com. Arb. 159 (1982); 108 Journal du droit international 365, 843 (1981).
**54**, 50–52, 86, 109; **55**, 43–44.

*Benvenuti et Bonfant SARL* v. *Banque Commercial Congolaise and others*, Cour de cassation, 21 July 1987. Reported: 1 ICSID Reports 373; 82 ILR 91 (1990); 115 Journal du droit international 108 (1988).
**54**, 52, 86; **55**, 117.

*Arab Republic of Egypt* v. *Southern Pacific Properties Ltd. and Southern Pacific Properties (Middle East) Ltd.*, Cour d'appel, Paris, 12 July 1984; Cour de cassation, 6 January 1987. Reported: 3 ICSID Reports 79, 96; 23 ILM 1048 (1984); 26 ILM 1004 (1987); 86 ILR 475, 490 (1991); 112 Journal du droit international 130 (1985).
**26**, 35–36, 40; **41**, 19.

*Guinea* v. *Atlantic Triton Co.*, Cour d'appel, Rennes, 26 October 1984; Cour de cassation, 18 November 1986. Reported: 3 ICSID Reports 3, 10; 24 ILM 340 (1985); 26 ILM 373 (1987); 82 ILR 76, 83 (1990); 2 ICSID Review – FILJ 182 (1987); 11 Y.B. Com. Arb. 215 (1986); 12 Y.B. Com. Arb. 103 (1987); 112 Journal du droit international 925 (1985); 114 Journal du droit international 125 (1987).
**26**, 169, 172, 174; **46**, 63; **47**, 28, 103–104.

*SOABI* v. *Senegal*, Tribunal de grande instance, Paris, 14 November 1988; Cour d'appel, Paris, 5 December 1989; Cour de cassation, 11 June 1991. Reported: 2 ICSID Reports 337, 341; 29 ILM 1341 (1990); 30 ILM 1167 (1991); 5 ICSID Review – FILJ 135 (1990); 6 ICSID Review – FILJ 598 (1991); 117 Journal du droit international 141 (1990); 118 Journal du droit international 1005 (1991).
**54**, 53–55, 68, 86; **55**, 45–46.

## NEW ZEALAND

*Attorney-General* v. *Mobil Oil NZ Ltd.*, High Court, Wellington, 1 July 1987. Reported: 4 ICSID Reports 117; 2 ICSID Review – FILJ 497 (1987).
**26**, 155–157; **38**, 26; **41**, 17, 47; **42**, 24; **69**, 7.

## PAKISTAN

*SGS* v. *Pakistan*, Supreme Court of Pakistan, 3 July 2002. Reported: 8 ICSID Reports 352.
**26**, 158–161; **41**, 18.

## SLOVAKIA

*CSOB* v. *Slovakia*, Supreme Court of Slovakia, 23 September 1999, unreported.
**47**, 29.

## SWITZERLAND

*Republic of Guinea* v. *Maritime International Nominees Establishment*, Tribunal fédéral, 4 December 1985; Tribunal de première instance, Genève, 13 March 1986; Autorité de surveillance des offices de poursuite pour dettes et de faillite, Genève, 7 October 1986. Reported: 4 ICSID Reports 35; 26 ILM 382 (1987); 1 ICSID Review – FILJ 383 (1986); 2 ICSID Review – FILJ 170 (1987).
**26**, 150–152, 167–168; **46**, 62; **47**, 27, 36, 106–108.

## UNITED STATES

*Liberian Eastern Timber Corp. [LETCO]* v. *The Government of the Republic of Liberia*, U.S. District Court, Southern District, New York, 5 September 1986, 12 December 1986; U.S. District Court, District of Columbia, 16 April 1987. Reported: 2 ICSID Reports

383, 390; 26 ILM 695 (1987); 89 ILR 355, 360 (1992); 2 ICSID Review – FILJ 187 (1987); 3 ICSID Review – FILJ 161 (1988).
**48**, 118; **54**, 56–60, 67, 96, 105; **55**, 35–36, 65–67, 75.

*Maritime International Nominees Establishment* v. *Republic of Guinea*, District Court, District of Columbia, 12 January 1981; Court of Appeals, District of Columbia Circuit, 12 November 1982. Reported: 4 ICSID Reports 3, 8; 20 ILM 666, 1436, 1480 (1981); 21 ILM 1355 (1982); 22 ILM 86 (1983); 63 ILR 535 (1982); 72 ILR 152 (1987).
**25**, 712; **26**, 9–13, 153; **46**, 62; **47**, 36; **62**, 5.

# ABBREVIATIONS

| | |
|---|---|
| AAA | American Arbitration Association |
| AF | Additional Facility |
| AFR | Administrative and Financial Regulations |
| AJIL | American Journal of International Law |
| Annuaire | Institut de Droit International Annuaire |
| AR | Arbitration Rules |
| ARE | Arab Republic of Egypt |
| Art(s). | Article(s) (of the ICSID Convention, unless otherwise indicated) |
| ASEAN | Association of South East Asian Nations |
| BGBl | Bundesgesetzblatt |
| BGE | Entscheidungen des Bundesgerichts (Switzerland) |
| BIICL | British Institute of International and Comparative Law |
| BIRD | Bank for International Reconstruction and Development |
| BIT(s) | Bilateral Investment Treaty(ies) |
| BVerfGE | Entscheidungen des Bundesverfassungsgerichts (Germany) |
| BYIL | British Year Book of International Law |
| *c.* | *contre* (against) |
| CAMCA | Commercial Arbitration and Mediation Center for the Americas |
| Centre | see ICSID |
| *Cf.* | *Confer* (compare) |
| Ch. | Chapter |
| CIRDI | Centre International pour le Règlement des Différends relatifs aux Investissements |
| Conf. Rep. | Conference Report |
| Convention | ICSID Convention |
| CR | Conciliaton Rules |
| D.C. | District of Columbia |
| Doc. | Document |
| ECT | Energy Charter Treaty |
| *e.g.* | *exempli gratia* (for example) |
| Ed(s). | Editor(s), Edition |

xlvi

| | |
|---|---|
| Esp. | Especially |
| *Et al.* | *Et alii* (and others) |
| *Et seq.* | *Et sequens* (and the following) |
| Exh. | Exhibit |
| F. | Federal Reporter |
| F. Supp. | Federal Supplement |
| Fed. Reg. | Federal Register |
| FILJ | Foreign Investment Law Journal |
| FN | Footnote |
| FSIA | Foreign Sovereign Immunities Act of the United States of 1976 |
| History, Vol. I | Analysis of Documents Concerning the Origin and the Formulation of the [ICSID] Convention (1970) |
| History, Vol. II | Documents Concerning the Origin and the Formulation of the [ICSID] Convention (1968) |
| *Ibid.* | *Ibidem* (the same) |
| *i.e.* | *id est* (that is) |
| ICC | International Chamber of Commerce |
| ICJ | International Court of Justice |
| ICLQ | International and Comparative Law Quarterly |
| ICSID | International Centre for Settlement of Investment Disputes |
| IDI | Institut de Droit International |
| ILC | International Law Commission |
| ILM | International Legal Materials |
| ILR | International Law Reports |
| *Infra* | Below |
| IR | Institution Rules |
| J. | Journal |
| JDI | Journal de Droit International |
| J.O. | Journal Officiel |
| LNTS | League of Nations Treaty Series |
| *Loc. cit.* | *Loco citato* (in the place cited) |
| Ltd. | Limited |
| Mercosur | Mercado Común del Sur |
| MFN | Most Favoured Nation |
| MIGA | Multilateral Investment Guarantee Agency |
| NAFTA | North American Free Trade Agreement |
| New York Convention | Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 |
| No. | Number |
| Off. Gaz. | Official Gazette |
| *Op. cit.* | *Opere citato* (in the work cited) |
| p., pp. | Page(s) |
| Para(s). | Paragraph(s) |

xlviii                          *List of abbreviations*

| | |
|---|---|
| PCIJ | Permanent Court of International Justice |
| P.L. | Public Law |
| RC | Recueil des Cours |
| Res | Resolution |
| Rule | Arbitration Rule |
| SCC | Arbitration Institute of the Stockholm Chamber of Commerce |
| S.D.N.Y. | Southern District of New York |
| Sec. | Section |
| SIA | United Kingdom State Immunity Act of 1978 |
| Stat. | Statute |
| Stockholm CC | Stockholm Chamber of Commerce |
| Suppl. | Supplement |
| *Supra* | Above |
| TDM | Transnational Dispute Management |
| UK | United Kingdom |
| UNCITRAL | United Nations Commission on International Trade Law |
| UNESCO | United Nations Educational, Scientific and Cultural Organization |
| UNIDROIT | International Institute for the Unification of Private Law |
| UNTS | United Nations Treaty Series |
| US | United States |
| U.S. | United States (Reports) |
| USC | United States Code |
| v. | *versus* (against) |
| *Viz.* | *Videlicet* (namely) |
| Vol. | Volume |
| YBILC | Yearbook of the International Law Commission |
| ZaöRV | Zeitschrift für ausländisches öffentliches Recht und Völkerrecht |

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

## PREAMBLE

### The Contracting States

*Considering* the need for international cooperation for economic development, and the role of private international investment therein;

*Bearing in mind* the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States;

*Recognizing* that while such disputes would usually be subject to national legal processes, international methods of settlement may be appropriate in certain cases;

*Attaching particular importance* to the availability of facilities for international conciliation or arbitration to which Contracting States and nationals of other Contracting States may submit such disputes if they so desire;

*Desiring* to establish such facilities under the auspices of the International Bank for Reconstruction and Development;

*Recognizing* that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with; and

*Declaring* that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration,

*Have agreed* as follows:

## CHAPTER I
### International Centre for Settlement of Investment Disputes

#### Section 1
#### Establishment and Organization

*Article 1*

(1) There is hereby established the International Centre for Settlement of Investment Disputes (hereinafter called the Centre).

(2) The purpose of the Centre shall be to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States in accordance with the provisions of this Convention.

### Article 2

The seat of the Centre shall be at the principal office of the International Bank for Reconstruction and Development (hereinafter called the Bank). The seat may be moved to another place by decision of the Administrative Council adopted by a majority of two-thirds of its members.

### Article 3

The Centre shall have an Administrative Council and a Secretariat and shall maintain a Panel of Conciliators and a Panel of Arbitrators.

## Section 2
## The Administrative Council

### Article 4

(1) The Administrative Council shall be composed of one representative of each Contracting State. An alternate may act as representative in case of his principal's absence from a meeting or inability to act.

(2) In the absence of a contrary designation, each governor and alternate governor of the Bank appointed by a Contracting State shall be *ex officio* its representative and its alternate respectively.

### Article 5

The President of the Bank shall be *ex officio* Chairman of the Administrative Council (hereinafter called the Chairman) but shall have no vote. During his absence or inability to act and during any vacancy in the office of President of the Bank, the person for the time being acting as President shall act as Chairman of the Administrative Council.

### Article 6

(1) Without prejudice to the powers and functions vested in it by other provisions of this Convention, the Administrative Council shall:

  (a) adopt the administrative and financial regulations of the Centre;
  (b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings;
  (c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules);
  (d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services;

    (e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General;

    (f) adopt the annual budget of revenues and expenditures of the Centre;

    (g) approve the annual report on the operation of the Centre.

The decisions referred to in sub-paragraphs (a), (b), (c) and (f) above shall be adopted by a majority of two-thirds of the members of the Administrative Council.

(2) The Administrative Council may appoint such committees as it considers necessary.

(3) The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of this Convention.

## *Article 7*

(1) The Administrative Council shall hold an annual meeting and such other meetings as may be determined by the Council, or convened by the Chairman, or convened by the Secretary-General at the request of not less than five members of the Council.

(2) Each member of the Administrative Council shall have one vote and, except as otherwise herein provided, all matters before the Council shall be decided by a majority of the votes cast.

(3) A quorum for any meeting of the Administrative Council shall be a majority of its members.

(4) The Administrative Council may establish, by a majority of two-thirds of its members, a procedure whereby the Chairman may seek a vote of the Council without convening a meeting of the Council. The vote shall be considered valid only if the majority of the members of the Council cast their votes within the time limit fixed by the said procedure.

## *Article 8*

Members of the Administrative Council and the Chairman shall serve without remuneration from the Centre.

### Section 3
### The Secretariat

## *Article 9*

The Secretariat shall consist of a Secretary-General, one or more Deputy Secretaries-General and staff.

## *Article 10*

(1) The Secretary-General and any Deputy Secretary-General shall be elected by the Administrative Council by a majority of two-thirds of its members upon the nomination of the Chairman for a term of service not exceeding six years and

shall be eligible for re-election. After consulting the members of the Administrative Council, the Chairman shall propose one or more candidates for each such office.

(2) The offices of Secretary-General and Deputy Secretary-General shall be incompatible with the exercise of any political function. Neither the Secretary-General nor any Deputy Secretary-General may hold any other employment or engage in any other occupation except with the approval of the Administrative Council.

(3) During the Secretary-General's absence or inability to act, and during any vacancy of the office of Secretary-General, the Deputy Secretary-General shall act as Secretary-General. If there shall be more than one Deputy Secretary-General, the Administrative Council shall determine in advance the order in which they shall act as Secretary-General.

### *Article 11*

The Secretary-General shall be the legal representative and the principal officer of the Centre and shall be responsible for its administration, including the appointment of staff, in accordance with the provisions of this Convention and the rules adopted by the Administrative Council. He shall perform the function of registrar and shall have the power to authenticate arbitral awards rendered pursuant to this Convention, and to certify copies thereof.

### Section 4
### The Panels

### *Article 12*

The Panel of Conciliators and the Panel of Arbitrators shall each consist of qualified persons, designated as hereinafter provided, who are willing to serve thereon.

### *Article 13*

(1) Each Contracting State may designate to each Panel four persons who may but need not be its nationals.

(2) The Chairman may designate ten persons to each Panel. The persons so designated to a Panel shall each have a different nationality.

### *Article 14*

(1) Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the fields of law, commerce, industry or finance, who may be relied upon to exercise independent judgment. Competence in the field of law shall be of particular importance in the case of persons on the Panel of Arbitrators.

(2) The Chairman, in designating persons to serve on the Panels, shall in addition pay due regard to the importance of assuring representation on the Panels of the principal legal systems of the world and of the main forms of economic activity.

### *Article 15*

(1) Panel members shall serve for renewable periods of six years.

(2) In case of death or resignation of a member of a Panel, the authority which designated the member shall have the right to designate another person to serve for the remainder of that member's term.

(3) Panel members shall continue in office until their successors have been designated.

### *Article 16*

(1) A person may serve on both Panels.

(2) If a person shall have been designated to serve on the same Panel by more than one Contracting State, or by one or more Contracting States and the Chairman, he shall be deemed to have been designated by the authority which first designated him or, if one such authority is the State of which he is a national, by that State.

(3) All designations shall be notified to the Secretary-General and shall take effect from the date on which the notification is received.

### Section 5
### Financing the Centre

### *Article 17*

If the expenditure of the Centre cannot be met out of charges for the use of its facilities, or out of other receipts, the excess shall be borne by Contracting States which are members of the Bank in proportion to their respective subscriptions to the capital stock of the Bank, and by Contracting States which are not members of the Bank in accordance with rules adopted by the Administrative Council.

### Section 6
### Status, Immunities and Privileges

### *Article 18*

The Centre shall have full international legal personality. The legal capacity of the Centre shall include the capacity:

(a) to contract;
(b) to acquire and dispose of movable and immovable property;
(c) to institute legal proceedings.

### *Article 19*

To enable the Centre to fulfil its functions, it shall enjoy in the territories of each Contracting State the immunities and privileges set forth in this Section.

### *Article 20*

The Centre, its property and assets shall enjoy immunity from all legal process, except when the Centre waives this immunity.

*Article 21*

The Chairman, the members of the Administrative Council, persons acting as conciliators or arbitrators or members of a Committee appointed pursuant to paragraph (3) of Article 52, and the officers and employees of the Secretariat:

    (a) shall enjoy immunity from legal process with respect to acts performed by them in the exercise of their functions, except when the Centre waives this immunity;

    (b) not being local nationals, shall enjoy the same immunities from immigration restrictions, alien registration requirements and national service obligations, the same facilities as regards exchange restrictions and the same treatment in respect of travelling facilities as are accorded by Contracting States to the representatives, officials and employees of comparable rank of other Contracting States.

*Article 22*

The provisions of Article 21 shall apply to persons appearing in proceedings under this Convention as parties, agents, counsel, advocates, witnesses or experts; provided, however, that sub-paragraph (b) thereof shall apply only in connection with their travel to and from, and their stay at, the place where the proceedings are held.

*Article 23*

(1) The archives of the Centre shall be inviolable, wherever they may be.

(2) With regard to its official communications, the Centre shall be accorded by each Contracting State treatment not less favourable than that accorded to other international organizations.

*Article 24*

(1) The Centre, its assets, property and income, and its operations and transactions authorized by this Convention shall be exempt from all taxation and customs duties. The Centre shall also be exempt from liability for the collection or payment of any taxes or customs duties.

(2) Except in the case of local nationals, no tax shall be levied on or in respect of expense allowances paid by the Centre to the Chairman or members of the Administrative Council, or on or in respect of salaries, expense allowances or other emoluments paid by the Centre to officials or employees of the Secretariat.

(3) No tax shall be levied on or in respect of fees or expense allowances received by persons acting as conciliators, or arbitrators, or members of a Committee appointed pursuant to paragraph (3) of Article 52, in proceedings under this Convention, if the sole jurisdictional basis for such tax is the location of the Centre or the place where such proceedings are conducted or the place where such fees or allowances are paid.

## CHAPTER II
### Jurisdiction of the Centre

*Article 25*

(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.

(2) "National of another Contracting State" means:

    (a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and

    (b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.

(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required.

(4) Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General shall forthwith transmit such notification to all Contracting States. Such notification shall not constitute the consent required by paragraph (1).

*Article 26*

Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention.

*Article 27*

(1) No Contracting State shall give diplomatic protection, or bring an international claim, in respect of a dispute which one of its nationals and another

Contracting State shall have consented to submit or shall have submitted to arbitration under this Convention, unless such other Contracting State shall have failed to abide by and comply with the award rendered in such dispute.

(2) Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplomatic exchanges for the sole purpose of facilitating a settlement of the dispute.

# CHAPTER III
## Conciliation

### Section 1
### Request for Conciliation

*Article 28*

(1) Any Contracting State or any national of a Contracting State wishing to institute conciliation proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to conciliation in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

### Section 2
### Constitution of the Conciliation Commission

*Article 29*

(1) The Conciliation Commission (hereinafter called the Commission) shall be constituted as soon as possible after registration of a request pursuant to Article 28.

(2)(a) The Commission shall consist of a sole conciliator or any uneven number of conciliators appointed as the parties shall agree.

(b) Where the parties do not agree upon the number of conciliators and the method of their appointment, the Commission shall consist of three conciliators, one conciliator appointed by each party and the third, who shall be the president of the Commission, appointed by agreement of the parties.

*Article 30*

If the Commission shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in

accordance with paragraph (3) of Article 28, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the conciliator or conciliators not yet appointed.

### *Article 31*

(1) Conciliators may be appointed from outside the Panel of Conciliators, except in the case of appointments by the Chairman pursuant to Article 30.

(2) Conciliators appointed from outside the Panel of Conciliators shall possess the qualities stated in paragraph (1) of Article 14.

### Section 3
### Conciliation Proceedings

### *Article 32*

(1) The Commission shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Commission, shall be considered by the Commission which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

### *Article 33*

Any conciliation proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Conciliation Rules in effect on the date on which the parties consented to conciliation. If any question of procedure arises which is not covered by this Section or the Conciliation Rules or any rules agreed by the parties, the Commission shall decide the question.

### *Article 34*

(1) It shall be the duty of the Commission to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms. To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties. The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, and shall give their most serious consideration to its recommendations.

(2) If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement. If, at any stage of the proceedings, it appears to the Commission that there is no likelihood of agreement between the parties, it shall close the proceedings and shall draw up a report noting the submission of the dispute and recording the failure of the parties to reach agreement. If one party fails to appear or participate

in the proceedings, the Commission shall close the proceedings and shall draw up a report noting that party's failure to appear or participate.

### Article 35

Except as the parties to the dispute shall otherwise agree, neither party to a conciliation proceeding shall be entitled in any other proceeding, whether before arbitrators or in a court of law or otherwise, to invoke or rely on any views expressed or statements or admissions or offers of settlement made by the other party in the conciliation proceedings, or the report or any recommendations made by the Commission.

# CHAPTER IV
## Arbitration

### Section 1
### Request for Arbitration

### Article 36

(1) Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

### Section 2
### Constitution of the Tribunal

### Article 37

(1) The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36.

(2)(a) The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators appointed as the parties shall agree.

(b) Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties.

*Article 38*

If the Tribunal shall not have been constituted within 90 days after notice of regis-
tration of the request has been dispatched by the Secretary-General in accordance
with paragraph (3) of Article 36, or such other period as the parties may agree, the
Chairman shall, at the request of either party and after consulting both parties as
far as possible, appoint the arbitrator or arbitrators not yet appointed. Arbitrators
appointed by the Chairman pursuant to this Article shall not be nationals of the
Contracting State party to the dispute or of the Contracting State whose national
is a party to the dispute.

*Article 39*

The majority of the arbitrators shall be nationals of States other than the Contract-
ing State party to the dispute and the Contracting State whose national is a party to
the dispute; provided, however, that the foregoing provisions of this Article shall
not apply if the sole arbitrator or each individual member of the Tribunal has been
appointed by agreement of the parties.

*Article 40*

(1) Arbitrators may be appointed from outside the Panel of Arbitrators, except
in the case of appointments by the Chairman pursuant to Article 38.

(2) Arbitrators appointed from outside the Panel of Arbitrators shall possess the
qualities stated in paragraph (1) of Article 14.

**Section 3**
**Powers and Functions of the Tribunal**

*Article 41*

(1) The Tribunal shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the
jurisdiction of the Centre, or for other reasons is not within the competence of the
Tribunal, shall be considered by the Tribunal which shall determine whether to
deal with it as a preliminary question or to join it to the merits of the dispute.

*Article 42*

(1) The Tribunal shall decide a dispute in accordance with such rules of law as
may be agreed by the parties. In the absence of such agreement, the Tribunal shall
apply the law of the Contracting State party to the dispute (including its rules on
the conflict of laws) and such rules of international law as may be applicable.

(2) The Tribunal may not bring in a finding of *non liquet* on the ground of
silence or obscurity of the law.

(3) The provisions of paragraphs (1) and (2) shall not prejudice the power of
the Tribunal to decide a dispute *ex aequo et bono* if the parties so agree.

### Article 43

Except as the parties otherwise agree, the Tribunal may, if it deems it necessary at any stage of the proceedings,

    (a)  call upon the parties to produce documents or other evidence, and

    (b)  visit the scene connected with the dispute, and conduct such inquiries there as it may deem appropriate.

### Article 44

Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.

### Article 45

(1) Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions.

(2) If a party fails to appear or to present his case at any stage of the proceedings the other party may request the Tribunal to deal with the questions submitted to it and to render an award. Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so.

### Article 46

Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.

### Article 47

Except as the parties otherwise agree, the Tribunal may, if it considers that the circumstances so require, recommend any provisional measures which should be taken to preserve the respective rights of either party.

### Section 4
### The Award

### Article 48

(1) The Tribunal shall decide questions by a majority of the votes of all its members.

(2) The award of the Tribunal shall be in writing and shall be signed by the members of the Tribunal who voted for it.

(3) The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based.

(4) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent.

(5) The Centre shall not publish the award without the consent of the parties.

### Article 49

(1) The Secretary-General shall promptly dispatch certified copies of the award to the parties. The award shall be deemed to have been rendered on the date on which the certified copies were dispatched.

(2) The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award. The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered.

### Section 5
### Interpretation, Revision and Annulment of the Award

### Article 50

(1) If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General.

(2) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter. The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision.

### Article 51

(1) Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence.

(2) The application shall be made within 90 days after the discovery of such fact and in any event within three years after the date on which the award was rendered.

(3) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter.

(4) The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of

enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request.

### *Article 52*

(1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:

    (a) that the Tribunal was not properly constituted;

    (b) that the Tribunal has manifestly exceeded its powers;

    (c) that there was corruption on the part of a member of the Tribunal;

    (d) that there has been a serious departure from a fundamental rule of procedure; or

    (e) that the award has failed to state the reasons on which it is based.

(2) The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered.

(3) On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an *ad hoc* Committee of three persons. None of the members of the Committee shall have been a member of the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute. The Committee shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1).

(4) The provisions of Articles 41–45, 48, 49, 53 and 54, and of Chapters VI and VII shall apply *mutatis mutandis* to proceedings before the Committee.

(5) The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.

(6) If the award is annulled the dispute shall, at the request of either party, be submitted to a new Tribunal constituted in accordance with Section 2 of this Chapter.

### Section 6
### Recognition and Enforcement of the Award

### *Article 53*

(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent

that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

### *Article 54*

(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

### *Article 55*

Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

## CHAPTER V
### Replacement and Disqualification of Conciliators and Arbitrators

### *Article 56*

(1) After a Commission or a Tribunal has been constituted and proceedings have begun, its composition shall remain unchanged; provided, however, that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

(2) A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel.

(3) If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy.

*Article 57*

A party may propose to a Commission or Tribunal the disqualification of any of its members on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14. A party to arbitration proceedings may, in addition, propose the disqualification of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV.

*Article 58*

The decision on any proposal to disqualify a conciliator or arbitrator shall be taken by the other members of the Commission or Tribunal as the case may be, provided that where those members are equally divided, or in the case of a proposal to disqualify a sole conciliator or arbitrator, or a majority of the conciliators or arbitrators, the Chairman shall take that decision. If it is decided that the proposal is well-founded the conciliator or arbitrator to whom the decision relates shall be replaced in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

# CHAPTER VI
## Cost of Proceedings

*Article 59*

The charges payable by the parties for the use of the facilities of the Centre shall be determined by the Secretary-General in accordance with the regulations adopted by the Administrative Council.

*Article 60*

(1) Each Commission and each Tribunal shall determine the fees and expenses of its members within limits established from time to time by the Administrative Council and after consultation with the Secretary-General.

(2) Nothing in paragraph (1) of this Article shall preclude the parties from agreeing in advance with the Commission or Tribunal concerned upon the fees and expenses of its members.

*Article 61*

(1) In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings.

(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

# CHAPTER VII
## Place of Proceedings

*Article 62*

Conciliation and arbitration proceedings shall be held at the seat of the Centre except as hereinafter provided.

*Article 63*

Conciliation and arbitration proceedings may be held, if the parties so agree,

- (a) at the seat of the Permanent Court of Arbitration or of any other appropriate institution, whether private or public, with which the Centre may make arrangements for that purpose; or
- (b) at any other place approved by the Commission or Tribunal after consultation with the Secretary-General.

# CHAPTER VIII
## Disputes between Contracting States

*Article 64*

Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement.

# CHAPTER IX
## Amendment

*Article 65*

Any Contracting State may propose amendment of this Convention. The text of a proposed amendment shall be communicated to the Secretary-General not less than 90 days prior to the meeting of the Administrative Council at which such amendment is to be considered and shall forthwith be transmitted by him to all the members of the Administrative Council.

*Article 66*

(1) If the Administrative Council shall so decide by a majority of two-thirds of its members, the proposed amendment shall be circulated to all Contracting States for ratification, acceptance or approval. Each amendment shall enter into force 30 days after dispatch by the depositary of this Convention of a notification to Contracting States that all Contracting States have ratified, accepted or approved the amendment.

(2) No amendment shall affect the rights and obligations under this Convention of any Contracting State or of any of its constituent subdivisions or agencies, or of

any national of such State arising out of consent to the jurisdiction of the Centre given before the date of entry into force of the amendment.

# CHAPTER X
## Final Provisions

*Article 67*

This Convention shall be open for signature on behalf of States members of the Bank. It shall also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign the Convention.

*Article 68*

(1) This Convention shall be subject to ratification, acceptance or approval by the signatory States in accordance with their respective constitutional procedures.

(2) This Convention shall enter into force 30 days after the date of deposit of the twentieth instrument of ratification, acceptance or approval. It shall enter into force for each State which subsequently deposits its instrument of ratification, acceptance or approval 30 days after the date of such deposit.

*Article 69*

Each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of this Convention effective in its territories.

*Article 70*

This Convention shall apply to all territories for whose international relations a Contracting State is responsible, except those which are excluded by such State by written notice to the depositary of this Convention either at the time of ratification, acceptance or approval or subsequently.

*Article 71*

Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice.

*Article 72*

Notice by a Contracting State pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary.

*Article 73*

Instruments of ratification, acceptance or approval of this Convention and of amendments thereto shall be deposited with the Bank which shall act as the depositary of this Convention. The depositary shall transmit certified copies of this Convention to States members of the Bank and to any other State invited to sign the Convention.

*Article 74*

The depositary shall register this Convention with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations and the Regulations thereunder adopted by the General Assembly.

*Article 75*

The depositary shall notify all signatory States of the following:

   (a) signatures in accordance with Article 67;
   (b) deposits of instruments of ratification, acceptance and approval in accordance with Article 73;
   (c) the date on which this Convention enters into force in accordance with Article 68;
   (d) exclusions from territorial application pursuant to Article 70;
   (e) the date on which any amendment of this Convention enters into force in accordance with Article 66; and
   (f) denunciations in accordance with Article 71.

DONE at Washington, in the English, French and Spanish languages, all three texts being equally authentic, in a single copy which shall remain deposited in the archives of the International Bank for Reconstruction and Development, which has indicated by its signature below its agreement to fulfil the functions with which it is charged under this Convention.

## PROCEDURAL CALENDAR: CASES YIELDING AWARDS, TO 1 JANUARY 2008

| | Name | Request for Arbitration | Registration of Request | Constitution of Tribunal | First Session | Jurisdiction Memorial | Jurisdiction Counter-Memorial | Jurisdiction Reply | Jurisdiction Rejoinder | Hearing on Jurisdiction | Decision on Jurisdiction | Memorial | Counter-Memorial | Reply | Rejoinder | Hearing Merits | Post-Hearing Briefs | Last Communication | Closure of Proceeding | Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Holiday Inns v. Morocco | 22.12.71 | 13.01.72 | 28.3.72 Reconstituted: 28.10.76 14.04.77 | – | – | – | 14.9.73 | 14.12.73 | – | 01.07.73 12.05.74 | – | – | – | – | – | – | – | 22.08.78 | 17.10.78 (Order taking note of discontinuance) |
| 2. | Adriano Gardella v. Ivory Coast | 26.02.74 | 06.03.74 | 07.10.74 Reconstituted: 07.08.75 28.04.76 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 29.08.77 |
| 3. | AGIP v. Congo | 07.10.77 | 04.11.77 | 18.07.78 | 20–21.11.78 | – | – | – | – | – | – | 19.01.79 | 21.03.79 | 30.04.79 | – | 30-31.08.79 | – | – | 01.09.79 | 30.11.79 |
| 4. | Benvenuti & Bonfant v. Congo | 12.12.77 | 15.12.77 | 09.05.78 Reconstituted: 06.06.78 | 14–15.06.78 | 20.10.78 | 14.11.78 | 26.12.78 | – | – | 19.01.79 | 21.08.78 | 21.12.79 | – | – | – | 06-07.06.79 12-13.11.79 | 07.02.80 | 07.08.80 | 08.08.80 |
| 5. | Amco v. Indonesia | 15.01.81 | 27.02.81 | 31.03.82 | 23–24.06.82 | 25.04.83 | 23.05.83 | – | – | 28–29.06.83 | 25.09.83 | 21.06.82 | 30.12.82 | 28.02.83 | 31.10.83 | 19-23.12.83 19-23.03.84 | – | – | – | 20.11.84 |
| 6. | Amco II v. Indonesia | 12.05.87 (Claimant's request for resubmission) 12.06.87 (Respondent's request for resubmission) | 24.06.87 | 20.10.87 | – | 13.01.88 | 14.01.88 | – | – | 30.01.88-01.02.88 | 10.05.88 | 11.07.88 | 12.09.88 | 17.10.88 | 14.11.88 | 18-29.09.89 | – | – | – | 05.06.90 |
| 7. | Klöckner v. Cameroon | 10.04.81 | 14.04.81 | 26.10.81 | 23.11.81 | – | – | – | – | – | – | 11.12.81 | 25.06.82 | 30.10.82 | 23.03.82 | 18-22.07.83 | – | – | – | 21.10.83 |
| 8. | Klöckner II v. Cameroon | 06.06.85 | 03.07.85 | 03.03.86 | 18.04.86 | – | – | – | – | – | – | 12.09.86 | 15.12.86 | 01.05.87 | 06.08.87 | 28.09.87-06.10.87 | – | – | 13.11.87 | 26.01.88 |
| 9. | SOABI v. Senegal | 05.11.82 | 08.11.82 | 15.09.83 | 21.01.84 | 08.03.84 | 03.04.84 | 16.04.84 | 14.05.84 | 17–19.07.84 | 01.08.84 | 01.02.84 | 05.11.82 | 24.12.84 | 05.02.85 | 29-30.07.85 | – | – | – | 25.02.88 |
| 10. | LETCO v. Liberia | 16.06.83 | 21.06.83 | 15.11.83 Reconstituted: 02.03.84 | 21.05.84 | – | 11.07.84 | – | – | – | 24.10.84 | 28.02.85 | – | – | – | – | – | 30.05.85 09–10.12.85 | 10.02.86 | 31.03.86 Rectification: 10.06.86 |

| | Name | Request for Arbitration | Registration of Request | Constitution of Tribunal | First Session | Jurisdiction Memorial | Jurisdiction Counter-Memorial | Jurisdiction Reply | Jurisdiction Rejoinder | Hearing on Jurisdiction | Decision on Jurisdiction | Memorial | Counter-Memorial | Reply | Rejoinder | Hearing Merits | Post-Hearing Briefs | Last Communication | Closure of Proceeding | Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11. | Atlantic Triton v. Guinea | 06.01.84 | 19.01.84 | 01.08.84 | 24.08.84 | – | – | – | – | – | – | unspecified | 01.85 | 06.03.85 Sur-reply: 13.08.85 | 29.04.85 | 11–13.09.85 | 02.86 | – | 25.02.86 | 21.04.86 |
| 12. | SPP v. Egypt | 24.08.84 | 28.08.84 | 18.12.84 | 08.02.85 | 08.05.85 30.04.87 | 19.06.85 20.05.87 | 08.07.85 25.09.87 | 25.09.87 | 10–11.07.85 08.09.87 | 27.11.85 14.04.88 | 16.02.89 | 18.09.89 | 28.12.89 | 22.02.90 | 03–11.09.90 | 21.09.90 25.09.90 22.04.91 23.04.91 26.06.91 09.07.91 18.09.91 | 18.09.91 | 18.02.92 | 20.05.92 |
| 13. | MINE v. Guinea | 07.05.84 | 18.09.84 | 17.06.85 | 03.07.85 | – | – | – | – | – | – | – | – | – | – | 06.09.85 10.03.86 30.06.86 09–10.07.86 14–15.07.86 17–19.09.86 22–23.09.86 03–04.11.86 | – | – | 10.08.87 | 06.01.88 |
| 14. | AAPL v. Sri Lanka | 08.07.87 | 20.07.87 | 05.01.88 | 23.02.88 | – | – | – | – | – | – | 13.04.88 | 18.06.88 | 18.08.88 | 20.10.88 | 17–20.04.89 | 15.09.89 27.10.89 26.01.90 29.01.90 | 27.01.90 | – | 27.06.90 |
| 15. | Vacuum Salt v. Ghana | 28.05.92 | 11.06.92 | 15.10.92 | 01–03.12.92 | 27.11.92 | 24.12.92 | 07.01.93 Sur-reply: 01.03.93 | 01.02.93 | 07–10.06.93 | – | – | – | – | – | – | – | – | – | 16.02.94 |
| 16. | Scimitar v. Bangladesh | 19.10.92 | 03.11.92 | 16.02.93 | 06.04.93 | 21.06.93 | 21.06.93 | 20.07.93 | 18.08.93 | 15–16.11.93 | – | – | – | – | – | – | – | – | – | 05.04.94 |
| 17. | AMT v. Zaire | 25.01.93 | 02.02.93 | 04.08.93 | 01.10.93 | – | – | – | – | – | – | 09.12.93 | 30.05.94 | 17.06.94 | 19.07.94 | 05–06.12.94 | – | – | – | 21.02.97 |
| 18. | Tradex v. Albania | 02.11.94 | 08.12.94 | 03.01.96 | 10.04.96 | 15.04.96 | 31.05.96 | 10.06.96 Sur-reply: 09.08.96 | 30.07.96 | 10.09.96 | 24.12.96 | – | 28.12.97 | 08.07.98 27.01.98 | 02.03.98 | 05–08.10.98 | 04.12.98 08.12.98 | – | 02.03.99 | 29.04.99 |
| 19. | Cable TV v. St. Kitts and Nevis | 23.10.95 | 14.11.95 | 16.02.96 | 12.03.96 | 12.03.96 | 30.04.96 | – | – | 01–02.07.96 | – | – | – | – | – | – | – | – | – | 13.01.97 |
| 20. | Goetz v. Burundi | 29.11.95 | 18.12.95 | 26.06.96 | 04.12.96 | – | – | – | – | – | – | 25.02.97 | – | – | – | 01.12.97 | 30.01.98 | – | – | 02.09.98 10.02.99 |
| 21. | CDSE v. Costa Rica | 19.03.96 | 22.03.96 | 28.05.97 | 21.07.97 | – | – | – | – | – | – | 15.01.98 | 15.06.98 | 21.08.98 | 23.10.98 | 10–14.05.99 | 12.07.99 | – | – | 17.02.00 Rectification: 08.06.00 |
| 22. | Fedax v. Venezuela | 17.06.96 | 26.06.96 | 27.11.96 | 17–18.01.97 | 17.01.97 | 26.02.97 | – | – | 16–17.05.97 | 11.07.97 | 17.06.97 | 04.09.97 | 07.10.97 | 06.11.97 | – | – | 20.12.97 | 13.01.98 | 09.03.98 |
| 23. | Metalclad v. Mexico | 02.01.97 | 13.01.97 | 19.05.97 | 15.07.97 | – | – | – | – | – | – | 14.10.97 | 17.02.98 | 21.08.98 | 03.05.99 | 30.08.99 09.09.99 | 9.11.99 | – | – | 30.08.00 |

*(cont.)*

*PROCEDURAL CALENDAR (cont.)*

| | Name | Request for Arbitration | Registration of Request | Constitution of Tribunal | First Session | Jurisdiction Memorial | Jurisdiction Counter-Memorial | Jurisdiction Reply | Jurisdiction Rejoinder | Hearing on Jurisdiction | Decision on Jurisdiction | Memorial | Counter-Memorial | Reply | Rejoinder | Hearing Merits | Post-Hearing Briefs | Last Communication | Closure of Proceeding | Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24. | SIREXM v. Burkina Faso | – | 27.01.97 | 30.05.97 | – | – | – | – | – | – | – | – | – | – | – | | | – | – | 19.01.00 |
| 25. | Azinian v. Mexico | 10.03.97 | 24.03.97 | 09.07.97 | 26.09.97 | 06.10.97 | 05.11.97 | 12.12.97 | – | – | 22.01.98 | 28.01.98 | 05.10.98 (partial) 23.10.98 (full) | 20.01.99 | 17.05.99 | 21-25.06.99 | 16.07.99 | – | – | 01.11.99 |
| 26. | Vivendi v. Argentina | 26.12.96 | 19.02.97 | 01.12.97 | 20.01.98 | 14.01.98 | 23.01.98 | 20.04.98 11.05.98 | 20.04.98 11.05.98 | 26-27.05.98 | – | 02.11.98 | 01.02.99 | – | – | 11-13.08.99 | 30.09.99 12.10.99 | – | 21.11.00 | 21.11.00 |
| 27. | CSOB v. Slovakia | 18.04.97 | 25.04.97 | 20.08.97 Reconstituted: 11.12.01 | 06.11.97 | 30.01.98 Further Objections: 23.12.99 | 30.04.98 07.02.00 | 31.07.98 07.03.00 | 30.10.98 21.03.00 | 05-07.01.99 Hearing on Further Objections: 21.03.00 | 24.05.99 Further Decision: 01.12.00 | 15.11.99 | 19.04.01 | 31.08.01 | 28.02.02 | 08-12.11.02 14-18.04.03 | 31.01.03 20.06.03 18.07.03 | 29.10.04 | 19.11.04 | 29.12.04 |
| 28. | Maffezini v. Spain | 18.07.97 | 30.10.97 | 24.06.98 | 21.08.98 | 20.08.98 | 19.11.98 | 09.04.99 Sur-reply: 18.06.99 | 03.06.99 | 09.08.99 | 25.01.00 | 19.11.98 | 09.04.99 | 21.03.00 | 03.05.00 | 10-12.07.00 | – | – | 02.11.00 | 13.11.00 Rectification: 31.01.01 |
| 29. | Compagnie Française v. Ivory Coast | – | 04.11.97 | 20.01.98 | – | – | – | – | – | – | – | – | – | – | – | | | – | – | 04.04.00 |
| 30. | Lemire v. Ukraine | 14.11.97 | 16.01.98 | 13.08.98 | 11.11.98 | 06.10.98 | – | – | – | – | 24.09.99 | – | – | – | – | | | – | – | 18.09.00 |
| 31. | Houston Industries v. Argentina | – | 25.02.98 | 03.08.98 | – | – | – | – | – | – | – | – | – | – | – | | | – | – | 24.08.01 |
| 32. | Wena Hotels v. Egypt | 10.07.98 | 31.07.98 | 18.12.98 Reconstituted: 14.09.99 09.12.99 | 11.02.99 | 04.03.99 | 25.03.99 | 08.04.99 | 22.04.99 | 25.05.99 | 29.06.99 | 26.07.99 | 06.09.99 | 27.09.99 | 18.10.99 | 25-29.04.00 | 30.05.00 15.06.00 | 13.07.00 | 01.11.00 | 08.12.00 |
| 33. | Olguin v. Paraguay | 27.10.97 | 26.08.98 | 12.02.99 | 16.04.99 | 02.08.99 | 31.08.99 | 18.12.99 | 02.02.00 | – | 08.08.00 | 27.05.99 | 05.10.00 | 09.11.00 | 18.12.00 | 11-13.03.01 | – | – | 08.05.01 | 26.07.01 |
| 34. | Waste Management v. Mexico | 29.09.98 | 18.11.98 | 03.06.99 Reconstituted: 10.01.00 | 16.07.99 | 29.09.99 | 05.11.99 | 09.11.99 | 16.11.99 | 31.01.00 | – | – | – | – | – | | | – | – | 02.06.00 |
| 35. | Banro v. DR Congo | – | 28.10.98 | 15.03.99 | – | – | – | – | – | – | – | – | – | – | – | | | – | – | 01.09.00 |

| | Name | Request for Arbitration | Registration of Request | Constitution of Tribunal | First Session | Jurisdiction Memorial | Jurisdiction Counter-Memorial | Jurisdiction Reply | Jurisdiction Rejoinder | Hearing on Jurisdiction | Decision on Jurisdiction | Memorial | Counter-Memorial | Reply | Rejoinder | Hearing Merits | Post-Hearing Briefs | Last Communication | Closure of Proceeding | Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36. | Loewen v. USA | 29.07.98 | 19.11.98 | 17.03.99 Reconstituted: 19.09.01 | 18.05.99 | 18.02.00 | – | – | – | 20–22.09.00 | 05.01.01 | 18.10.99 | 30.03.01 | 08.06.01 | 27.08.01 | 15–19.10.01 | 07.12.01 | 25.01.02 | – | 26.06.03 Supplementary Decision: 13.09.04 |
| 37. | Tanzania Electric v. IPTL | 25.11.98 | 07.12.98 | 24.03.99 | 14.06.99 | – | – | – | – | – | – | 26.01.00 | 20.04.00 | 26.05.00 | 29.06.00 | 20–26.07.00 29.04.01 | 18.08.00 12.09.00 | – | – | 12.07.01 |
| 38. | Genin v. Estonia | 02.02.99 | 12.05.99 | 21.09.99 | 12.10.99 | 12.11.99 | 13.12.99 | – | – | 08.01.00 | – | 24.03.00 | 19.06.00 | 18.07.00 | 18.08.00 | 02–06.10.00 | 19.12.00 | 10.12.00 | – | 25.06.01 Supplementary Decision: 04.04.02 |
| 39. | Gruslin v. Malaysia | 16.03.99 | 12.05.99 | 09.06.99 | 09.08.99 | 16.11.99 | 27.12.99 | 09.03.00 | 27.03.00 | 22–24.08.00 | – | 16.06.99 | – | – | – | – | – | – | – | 27.11.00 |
| 40. | Feldman v. Mexico | 30.04.99 | 27.05.99 | 18.01.00 | 10.03.00 | 21.08.00 | 08.09.00 | – | – | – | 06.12.00 | 30.03.01 | 24.05.01 | 11.06.01 | 25.06.01 | 09–13.07.01 | – | – | – | 16.12.02 Decision on Interpretation: 13.06.03 |
| 41. | Mondev v. USA | 01.09.99 | 20.09.99 | 12.01.00 | 20.04.00 | – | – | – | – | – | – | 01.02.01 | 01.06.01 | 01.08.01 | 01.10.01 | 20–24.05.02 | 08.07.02 15.07.02 29.07.02 | 30.07.02 | – | 11.10.02 |
| 42. | Middle East Cement v. Egypt | 29.03.99 | 19.11.99 | 28.01.00 | 24.02.00 | 28.03.00 | 26.04.00 | 14.05.00 | 30.05.00 | 12.07.00 | 28.11.00 | 15.01.01 | 28.02.01 | 29.03.01 | 08.05.01 | 17–18.07.01 | 02.10.01 | – | – | 12.04.02 |
| 43. | Mitchell v. DR Congo | – | 10.12.99 | 21.11.00 Reconstituted: 13.02.02 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 09.02.04 |
| 44. | Astaldi v. Honduras | – | 29.12.99 | 18.01.00 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 19.10.00 |
| 45. | Zhinvali v. Georgia | 03.12.99 | 07.01.00 | 09.06.00 | 19.12.00 | – | – | – | – | – | – | 01.06.01 | 31.07.01 | 31.08.01 | 15.01.02 | 11–15.02.02 | 26.03.02 24.05.02 | – | – | 24.01.03 |
| 46. | Mihaly v. Sri Lanka | 22.07.99 | 11.01.00 | 05.06.00 | 19.07.00 | 16.11.00 | 16.02.01 | 28.02.01 | 28.03.01 | 30.04–01.05.01 | – | 31.07.01 | – | – | – | – | 08.05.01 18.05.01 01.06.01 | – | – | 15.03.02 |
| 47. | Autopista v. Venezuela | 01.06.00 | 23.06.00 | 16.01.01 | 19.02.01 | 05.04.01 | 07.05.01 | 22.05.01 | 06.06.01 | 28.06.01 | 27.09.01 | 21.12.01 | 31.05.02 | 05.08.02 | 30.09.02 | 28.10–1.11.02 | 07.02.03 21.03.03 | 21.03.03 | 01.08.03 | 23.09.03 |
| 48. | RFCC v. Morocco | 06.06.00 | 28.06.00 | 25.09.00 | 27.10.00 | 22.12.00 | 17.02.01 | 23.03.01 | 23.04.01 | 04.05.01 | 16.07.01 | 20.02.02 | 17.06.02 | 03.10.02 | 02.12.02 | 15–17.03.03 | 16.05.03 09.07.03 | 14.07.03 | 06.08.03 | 22.12.03 |
| 49. | World Duty Free v. Kenya | 16.06.00 | 07.07.00 | 29.11.00 Reconstituted: 02.02.01 | 15.01.01 | 31.10.01 18.04.05 | 11.01.02 31.05.05 | – | – | – | 18.01.06 | 01.12.01 | 18.04.03 | 15.05.03 | 18.08.04 | 30.06–01.07.04 | – | 21.02.06 | – | 04.10.06 |

(cont.)

## PROCEDURAL CALENDAR (cont.)

| | Name | Request for Arbitration | Registration of Request | Constitution of Tribunal | First Session | Jurisdiction Memorial | Jurisdiction Counter-Memorial | Jurisdiction Reply | Jurisdiction Rejoinder | Hearing on Jurisdiction | Decision on Jurisdiction | Memorial | Counter-Memorial | Reply | Rejoinder | Hearing Merits | Post-Hearing Briefs | Last Communication | Closure of Proceeding | Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50. | ADF v. USA | 19.07.00 | 25.08.00 | 11.01.01 | 29.01.01 | 26.02.01 | 19.03.01 | 02.04.01 | 16.04.01 | – | 11.07.01 | 01.08.01 | 29.11.01 | 29.01.02 | 29.03.02 | 15–18.04.02 | 27.06.02; 11.07.02; 01.08.02 | – | – | 09.01.03 |
| 51. | Tecmed v. Mexico | 28.07.00 | 28.08.00 | 13.03.01 Reconstituted: 17.12.01 | 07.05.01 | – | – | – | – | – | – | 04.09.01 | 11.02.02 | – | – | 20–24.05.02 | 01.08.02 | 12.08.02 | 09.04.03 | 29.05.03 |
| 52. | Waste Management II v. Mexico | 19.06.00 | 27.09.00 | 30.04.01 Reconstituted: 14.12.01 | 08.06.01 | 08.08.01 | 09.10.01 | – | – | 02.02.02 | 26.06.02 | 19.06.00 | 06.12.02 | 06.12.02 | 22.01.03 | 07.03.03 | 07–10.04.03 | – | – | 30.04.04 |
| 53. | Generation Ukraine v. Ukraine | 21.07.00 | 20.10.00 | 15.02.01 Reconstituted: 24.04.01 | 26.09.01 | 20.03.01 | 13.09.01 | – | – | – | 16.09.03 | 05.04.00 | 26.02.02 | 06.05.02 | 12.07.02 | 17–21.02.03; 17–20.03.03 | – | 18.04.03 | 18.07.03 | 16.09.03 |
| 54. | Enron v. Argentina | 26.02.01 New request: 25.03.03 | 11.04.01 | 01.11.01 Reconstituted: 11.07.06 | 05.12.01 | 15.01.03; 20.08.03 | 31.03.03; 17.10.03 | 20.05.03; 19.11.03 | 26.06.03; 22.12.03 | 03–04.09.03; 01–02.04.04 | 14.01.04 Ancillary Claim: 02.08.04 | 01.08.02; 17.11.04 | 17.05.04; 07.03.05 | 06.05.05 | 07.07.05 | 28.11–08.12.05 | 28.02.06 | – | 22.03.07 | 22.05.07 Rectification: 25.10.07 |
| 55. | SEMOS v. Mali | – | 24.05.01 | 21.09.01 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 25.02.03 |
| 56. | AIG v. Kazakhstan | 03.05.01 | 04.06.01 | 05.10.01 | 15.11.01 | 31.07.02 | 02.08.02 | – | – | – | – | 15.02.02 | 19.08.02 | – | – | 28–31.08.02 | 18.10.02 | – | – | 07.10.03 |
| 57. | MTD v. Chile | 26.06.01 | 06.08.01 | 05.03.02 Reconstituted: 29.01.03 | 29.05.02 | – | – | – | – | – | – | 01.10.02 | 09.06.03 | 15.09.03 | 21.11.03 | 09–19.12.03 | – | 01.12.03 | 26.03.04 | 25.05.04 |
| 58. | CMS v. Argentina | 26.07.01 | 24.08.01 | 11.01.02 | 04.02.02 | 07.10.02 | 17.12.02 | 13.02.03 | 25.03.03 | 07–08.04.03 | 17.07.03 | 05.07.02 | 22.12.03 | 22.03.04 | 28.06.04 | 09–20.08.04 | 20.09.04 | 05.01.05 | 08.04.05 | 12.05.05 |
| 59. | Repsol v. Petroecuador | – | 05.10.01 | 22.05.02 Reconstituted: 15.08.02 | – | – | – | – | – | – | 23.07.03 | – | – | – | – | – | – | – | – | 20.02.04 |
| 60. | Noble Ventures v. Romania | 21.08.01 | 17.10.01 | 16.01.03 | 10.03.03 | – | – | – | – | – | – | 10.07.03 | 10.01.04 | 07.05.04 | 30.08.04 | 05–09.10.04 | 24.11.04; 21.12.04 | 21.12.04 | 15.08.05 | 12.10.05 Rectification: 19.05.06 |
| 61. | Azurix v. Argentina | 19.09.01 | 23.10.01 | 08.04.02 Reconstituted: 10.08.04 | 16.05.02 | 07.03.03 | 13.05.03 | 04.08.03 | 29.08.03 | 09–10.09.03 | 08.12.03 | 15.10.02 | 09.02.04 | 07.05.04 | 17.08.04 | 04–13.10.04 | 29.11.04 | 14.10.05 | 17.04.06 | 14.07.06 |
| 62. | F-W Oil Interests v. Trinidad & Tobago | – | 29.11.01 | 19.06.02 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 03.05.06 |

| | Name | Request for Arbitration | Registration of Request | Constitution of Tribunal | First Session | Jurisdiction Memorial | Jurisdiction Counter-Memorial | Jurisdiction Reply | Jurisdiction Rejoinder | Hearing on Jurisdiction | Decision on Jurisdiction | Memorial | Counter-Memorial | Reply | Rejoinder | Hearing Merits | Post-Hearing Briefs | Last Communication | Closure of Proceeding | Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 63. | LG&E v. Argentina | 21.12.01 | 31.01.02 | 13.11.02 | 19.12.02 | 21.07.03 | 18.06.04 | 06.08.04 | 27.09.04 | 20–21.11.03 | 30.04.04 | 31.03.03 | 18.06.04 | 06.08.04 | 27.09.04 | 23–29.01.05 | 28.02.05 | 05.12.06 | 12.04.07 | Decision on Liability: 03.10.06; Award: 25.07.07 |
| 64. | Fireman's Fund v. Mexico | 30.10.01 | 15.01.02 | 17.05.02 Reconstituted: 26.04.05 | 22.07.02 | 22.10.02 | 20.12.02 | – | – | 06–07.02.03 | 17.07.03 | 25.06.04 | 31.01.05 | 31.05.05 | 05.08.05 | 27.09–01.10.05 | – | 17.05.06 | 07.01.06 | 17.07.06 |
| 65. | PSEG v. Turkey | 02.05.02 | 02.05.02 | 25.10.02 | 08.01.03 | 03.04.03 | 27.06.03 | 10.09.03 | 24.11.03 | 22–25.02.04 | 04.06.04 | 22.02.05 | 19.09.05 | 12.12.05 | 17.03.06 | 03–12.04.06 | unspecified | – | – | 19.01.07 |
| 66. | Soufraki v. UAE | 16.05.02 | 18.06.02 | 23.10.02 | 20.12.02 | 31.01.03 | 03.03.03 | – | – | – | 07.05.03 12.03.04 | – | – | – | – | – | – | 03.05.04 | – | 07.07.04 |
| 67. | Siemens v. Argentina | 23.05.02 | 17.07.02 | 19.12.02 | 13.02.03 | 04.08.03 | 16.10.03 | 17.11.03 | 24.12.03 | 03–04.02.04 | 03.08.04 | 13.03.03 | 19.10.04 | 27.12.04 | 29.03.05 | 10–17.10.05 | 23.11.05 | 13.04.06 | 15.12.06 | 06.02.07 |
| 68. | Champion Trading v. Egypt | 29.05.02 | 08.08.02 | 31.01.03 | 07.03.03 | 18.04.03 | 30.05.03 | 19.06.03 | | 27.06.03 | 21.10.03 | 30.04.04 30.05.05 | 30.09.05 | 30.10.05 | 30.11.05 | 13.12.04 05–06.06.06 | – | 24.07.06 | 26.09.06 | 27.10.06 |
| 69. | IBM v. Ecuador | – | 06.09.02 | 15.04.03 | 05.06.03 | 07.06.03 | 21.07.03 | – | – | 11.09.03 | 22.12.03 | – | – | – | – | – | – | – | – | 22.07.04 |
| 70. | Salini v. Jordan | 08.08.02 | 07.11.02 | 18.03.03 Reconstituted: 03.06.03 | – | 08.09.03 | unspecified | 11.03.04 | unspecified | 01–02.04.04 | 29.11.04 | 09.05.05 | 13.06.05 | 05.07.05 | 01.08.05 | 20.09.05 | – | 21.09.05 | 10.01.06 | 31.01.06 |
| 71. | CDC v. Seychelles | 22.08.02 | 07.11.02 | 19.12.02 | 10.02.03 | – | – | – | – | – | – | – | 17.03.03 | 17.04.03 | 13.05.03 | 22–23.07.03 | – | – | – | 17.12.03 |
| 72. | Ahmonseto v. Egypt | – | 18.11.02 | 29.01.03 | 04.03.03 | 17.03.04 | – | 17.01.05 | 08.03.05 | 18–21.09.05 | – | 27.10.03 | 17.03.04 | – | 17.01.05 | 18–21.09.05 | 23.01.06 20.03.06 | – | 05.04.07 | 18.06.07 |
| 73. | Sempra v. Argentina | 11.09.02 | 06.12.02 | 05.05.03 | 03.07.03 | 31.12.03 | 04.03.04 | 19.04.04 | 01.06.04 | 29–30.11.04 | 11.05.05 | 03.09.03 | 01.08.05 | 28.09.05 | 05.12.05 | 06–14.02.06 | 03.04.06 | 19.07.07 | 19.07.07 | 28.09.07 |
| 74. | Tokios Tokeles v. Ukraine | 14.08.02 Resubmitted: 22.11.02 | 20.12.02 | 29.04.03 Reconstituted: 23.08.04 | 03.06.03 | 29.07.03 | 25.08.03 | 09.09.03 | 24.09.03 | 10.12.03 | 29.04.04 | 21.03.05 | 20.05.05 | 20.06.05 | 20.07.05 | 16–19.01.06 | – | 27.06.06 | 27.06.06 | 26.07.07 |
| 75. | Lucchetti v. Peru | 24.12.02 | 23.03.03 | 01.08.03 | 15.09.03 | 15.12.03 | 15.03.04 | 17.05.04 | 16.07.04 | 02–03.09.04 | 07.02.05 | – | – | – | – | – | – | 16.11.04 | – | 07.02.05 |
| 76. | MCI v. Ecuador | 16.12.02 | 08.04.03 | 11.09.03 | 07.11.03 | 26.07.04 | 23.08.04 | 14.09.04 | 01.10.04 | 13–14.12.04 | – | 20.02.04 | 03.06.05 | 22.07.05 | 31.08.05 | 20–24.03.06 | 19.04.06 | 31.05.07 | 31.05.07 | 31.07.07 |
| 77. | LESI v. Algeria | 03.02.03 | 20.05.03 | 03.09.03 | 30.10.03 | 27.01.04 | 03.04.04 | 05.05.04 | 03.06.04 | 21.06.04 | – | – | – | – | – | – | – | – | – | 10.01.05 |
| 78. | Joy Mining v. Egypt | 26.02.03 | 02.06.03 | 04.09.03 | 04.11.03 | 04.11.03 | 05.01.04 | 26.01.04 | 17.02.04 | 29–30.03.04 | – | – | – | – | – | – | – | 19.05.06 | – | 06.08.04 |
| 79. | ADC v. Hungary | 07.05.03 | 17.07.03 | 26.01.04 Reconstituted: 28.09.04 | 08.03.04 | – | – | – | – | – | – | 30.07.04 | 17.01.05 | 22.07.05 11.12.05 | 04.11.05 | 17–25.01.06 | 10.03.06 24.03.06 | 19.05.06 | – | 02.10.06 |

*(cont.)*

*PROCEDURAL CALENDAR (cont.)*

| | Name | Request for Arbitration | Registration of Request | Constitution of Tribunal | First Session | Jurisdiction Memorial | Jurisdiction Counter-Memorial | Jurisdiction Reply | Jurisdiction Rejoinder | Hearing on Jurisdiction | Decision on Jurisdiction | Memorial | Counter-Memorial | Reply | Rejoinder | Hearing Merits | Post-Hearing Briefs | Last Communication | Closure of Proceeding | Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80. | Fraport v. Philippines | 17.09.03 | 09.10.03 | 11.02.04 | 20.04.04 | – | – | – | – | – | – | 10.08.04 | 21.12.04 | 08.04.05 23.11.05 | 10.07.05 | 29–30.08.05 06–17.01.06 | 15.08.06 15.09.06 | 26.03.07 | 13.06.07 | 16.08.07 |
| 81. | Inceysa v. El Salvador | 21.07.03 | 10.10.03 | 23.03.04 | 21.05.04 | 15.09.04 | 04.11.04 | 29.11.04 | 22.12.04 | 02–05.05.05 | – | 08.06.04 | – | – | – | – | – | – | – | 02.08.06 Rectified: 16.11.06 |
| 82. | Vieira v. Chile | 30.10.03 | 27.02.04 | 24.09.04 | 15.12.04 | 26.09.05 | 20.12.05 | 13.02.06 | 14.04.06 | 20.07.06 | – | 15.03.05 | – | – | – | – | – | – | – | 21.08.07 |
| 83. | OKO v. Estonia | – | 20.02.04 | 08.03.04 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 19.11.07 |
| 84. | Telenor v. Hungary | 11.12.03 | 02.08.04 | 22.04.05 | 08.06.05 | 11.10.05 | 09.11.05 | 09.12.05 | – | 28.04.06 | – | 08.08.05 | – | – | – | – | – | – | – | 13.09.06 |
| 85. | Archer Daniels v. Mexico | 04.08.04 | 29.09.04 | 11.08.05 | 07.10.05 | – | – | – | – | – | – | 21.12.05 | 15.05.06 | 10.07.07 | 01.09.06 | 19–24.03.07 | – | | – | 21.11.07 Supple-mentary Decision: 08.01.08 |
| 86. | Parkerings v. Lithuania | 11.03.05 | 16.05.05 | 12.10.05 | 25.11.05 | – | – | – | – | – | – | 24.02.06 | 25.07.06 | – | – | 06–10.11.06 | 08.12.06 | 09.05.07 | 25.05.07 | 11.09.07 |
| 87. | Bayview v. Mexico | 19.01.05 | 01.07.05 | 12.12.05 | 14.02.06 | 19.04.06 | 23.06.06 | 26.07.06 | 28.08.06 | 14–15.11.06 | – | – | – | – | – | – | 15.12.06 | – | – | 19.06.07 |
| 88. | Malaysian Historical Salvors v. Malaysia | 30.09.04 | 14.06.05 | 01.11.05 | 29.12.05 | 16.03.06 | 16.03.06 | 17.04.06 | 17.04.06 | 25.05.06 | – | – | – | – | – | – | 22.03.06 26.06.06 12.12.06 19.12.06 | – | – | 17.05.07 |

# Preamble

**The Contracting States**

*Considering* the need for international cooperation for economic development, and the role of private international investment therein;

*Bearing in mind* the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States;

*Recognizing* that while such disputes would usually be subject to national legal processes, international methods of settlement may be appropriate in certain cases;

*Attaching particular importance* to the availability of facilities for international conciliation or arbitration to which Contracting States and nationals of other Contracting States may submit such disputes if they so desire;

*Desiring* to establish such facilities under the auspices of the International Bank for Reconstruction and Development;

*Recognizing* that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with; and

*Declaring* that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration,

*Have agreed* as follows:

## A. "The Contracting States . . . *Have agreed* as follows:"

The Convention's preparation took place in the years 1961 to 1965.[1] The drafting **1** history is fully documented in a four-volume collection:[2]

Vol. I: Analysis of Documents Concerning the Origin and the Formulation of the Convention (1970);

---

1 For descriptions of the Convention's drafting history see: History, Vol. I, pp. 2–10; Report of the Executive Directors on the Convention, paras. 6–8, 1 ICSID Reports 24/5; *Broches, A.*, Development of International Law by the International Bank for Reconstruction and Development, 59 American Society of International Law Proceedings 33 (1965); *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 342–347 (1972-II); *Sutherland, P. F.*, The World Bank Convention on the Settlement of Investment Disputes, 28 International and Comparative Law Quarterly 367, 374–378 (1979).

2 Reprinted in 2001.

Vol. II (in two parts): Documents Concerning the Origin and the Formulation of the Convention (in English) (1968);

Vol. III: Documents Relatifs à l'Origine et à l'Elaboration de la Convention (in French) (1968);

Vol. IV: Documentos Relativos al Origen y a la Formulación del Convenio (in Spanish) (1969).

In this Commentary reference to that collection is made as: History, Vol. number and page.

**2**    The initiative for the Convention came from the staff of the World Bank, notably its General Counsel, *A. Broches*, who can be described as the ICSID Convention's principal architect. On 28 August 1961, Mr. *Broches* sent a note to the World Bank's Executive Directors setting out the basic idea for the Convention (History, Vol. II, pp. 1 *et seq.*). The idea was taken up by the World Bank's President in his address to the Bank's Annual Meeting in Vienna on 19 September 1961 (at p. 3). This was followed by Notes from the President and from Mr. *Broches* to the Executive Directors (at pp. 4, 6). A meeting of the Executive Directors on 10 April 1962 led to a request for a more detailed proposal (at p. 13).

**3**    On 5 June 1962 Mr. *Broches* presented a Working Paper, the first draft to the Convention (History, Vol. II, p. 19). This draft was considered by the Executive Directors, meeting as a special Committee of the Whole on Settlement of Investment Disputes, from December 1962 to June 1963. Following these considerations, the staff of the Bank submitted an annotated First Preliminary Draft on 9 August 1963 (at p. 133) and an annotated Preliminary Draft on 15 October 1963 (at p. 184).

**4**    In view of the highly technical nature of the questions involved, the next step was a series of regional consultative meetings of legal experts chaired by Mr. *Broches*. These meetings took place in Addis Ababa (16–20 December 1963), in Santiago de Chile (3–7 February 1964), in Geneva (17–21 February 1964) and in Bangkok (27 April–1 May 1964). The basis for the deliberations at these meetings was the Preliminary Draft. The meetings were attended by legal experts from 86 countries. The debate was mainly on an article-by-article basis. No votes or formal decisions were taken. Rather, detailed summary records were prepared. These were submitted to the Executive Directors together with a detailed summary of collective conclusions prepared by Mr. *Broches*.

**5**    The Executive Directors considered these documents in July and August 1964. On 6 August 1964, the Executive Directors submitted a Report to the World Bank's Board of Governors concluding that it would be advisable for the Executive Directors to undertake the formulation of a convention on the settlement of investment disputes between States and nationals of other States (History, Vol. II, p. 606).[3] The Board of Governors considered this Report at its Annual Meeting in

---

3   3 ILM 1172 (1964).

Tokyo in September 1964. Despite some dissent from Latin American countries (see Art. 68, para. 9), it adopted a Resolution on 10 September 1964 requesting the Executive Directors to formulate such a convention and to submit it directly to member governments (History, Vol. II, p. 608).[4]

**6**    In the meantime, the staff of the World Bank had prepared, in the light of the discussions at the regional consultative meetings, a new draft convention called the First Draft (History, Vol. II, p. 610). This draft formed the basis for deliberations in the Legal Committee on Settlement of Investment Disputes convened in Washington from 23 November to 11 December 1964. The Legal Committee consisted of government experts and acted as an advisory organ of the Executive Directors. Representatives of 61 governments participated in its work. The Legal Committee was chaired by Mr. *Broches*. It acted mostly through consensus. The Legal Committee used English, French and Spanish. It adopted a decision to use British rather than American spelling for the English version (at p. 749).

**7**    The Legal Committee considered the draft convention on an article-by-article basis. Working groups considered certain specific issues. A Drafting Sub-Committee went over the text after consensus on substance had been reached. On 11 December 1964 the Legal Committee adopted the Revised Draft of the Convention (History, Vol. II, p. 911).

**8**    The Executive Directors considered this draft in a series of meetings from 16 February to 4 March 1965. They made a number of changes. The most important of these concerned the issue of subrogation (see Art. 25, para. 366) and the standing of a foreign controlled company that is incorporated in the host State (see Art. 25, para. 762). The Executive Directors also considered their draft report on the Convention.

**9**    On 18 March 1965 the Executive Directors adopted a resolution approving the final text of the Convention (History, Vol. II, p. 1039). At the same time they approved the Report of the Executive Directors on the Convention. The President of the World Bank was instructed to transmit the text of the Convention and the Report to all member governments of the Bank. The Executive Directors also instructed the President and the General Counsel of the Bank to sign a copy of the Convention (see Final Clause, para. 1). This was designed to indicate the Bank's agreement to fulfil the functions, principally those of depositary, with which it is charged under the Convention.

**10**    The Convention entered into force on 14 October 1966 in accordance with its Art. 68(2) (see Art. 68, para. 7). On 1 January 2008 the Convention had 143 Parties. A further 12 States had signed but not yet ratified the Convention (see Art. 68, para. 8).

---

4   3 ILM 1171 (1964).

**B.  "*Considering* the need for international cooperation for economic development, and the role of private international investment therein;"**

**11**    The Convention's primary aim is the promotion of economic development. Economic development depends in large measure on private international investment. The Convention is designed to facilitate private international investment through the creation of a favourable investment climate.[5]

**12**    The link between an orderly settlement of investment disputes, the stimulation of private international investments and economic development is explained in the Report of the Executive Directors on the Convention in the following terms:

> 9. In submitting the attached Convention to governments, the Executive Directors are prompted by the desire to strengthen the partnership between countries in the cause of economic development. The creation of an institution designed to facilitate the settlement of disputes between States and foreign investors can be a major step toward promoting an atmosphere of mutual confidence and thus stimulating a larger flow of private international capital into those countries which wish to attract it.
>
> . . .
>
> 12. . . . adherence to the Convention by a country would provide additional inducement and stimulate a larger flow of private international investment into its territories, which is the primary purpose of the Convention.[6]

**13**    The Tribunal in *Amco* v. *Indonesia* explained that ICSID arbitration is in the interest not only of investors but also of host States. It concluded:

> Thus, the Convention is aimed to protect, to the same extent and with the same vigour the investor and the host State, not forgetting that to protect investments is to protect the general interest of development and of developing countries.[7]

**14**    Several tribunals have quoted this passage of the Preamble in support of the conclusion that an "investment" in the sense of Article 25(1) would have to contribute to the host State's economic development.[8] The Tribunal in *CSOB* v. *Slovakia* said:

> This language permits an inference that an international transaction which contributes to cooperation designed to promote the economic development of a

---

5  *Amerasinghe, C. F.*, The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt Journal of Transnational Law 793, 794/5 (1976); *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 342/3 (1972-II); *Kahn, P.*, The Law Applicable to Foreign Investments: The Contribution of the World Bank Convention on the Settlement of Investment Disputes, 44 Indiana Law Journal 1 *et seq.* (1968); *Shihata, I. F. I.*, Promotion of Foreign Direct Investment – A General Account, with Particular Reference to the Role of the World Bank Group, 6 ICSID Review – FILJ 484 *et seq.* (1991).

6  1 ICSID Reports 25.

7  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 23. See also Award, 20 November 1984, para. 249.

8  *Mitchell* v. *Congo*, Decision on Annulment, 1 November 2006, para. 28; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 66. See also *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 38.

Contracting State may be deemed to be an investment as that term is understood in the Convention.[9]

## C. "*Bearing in mind* the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States;"

The Convention does not attempt to develop substantive rules for the protection **15** of private international investments (see Art. 42, para. 1).[10] It contributes to the improvement of the investment climate by offering a procedural framework for the settlement of disputes. The substantive rules to be applied are left to the agreement of the parties. In the absence of such an agreement, Art. 42 provides that a tribunal will apply the law of the host State and applicable rules of international law.

The disputes in question must arise in connection with an investment (see **16** Art. 25, paras. 113–210). One party to the dispute must be a host State that has ratified the Convention (see Art. 25, paras. 211–229). The other party must be an investor who is a national of another State that has ratified the Convention (see Art. 25, paras. 268–302, 635–902). Certain disputes that do not meet all of these requirements may be settled by means of the Additional Facility created in 1978 (see Art. 6, paras. 25, 26; Art. 25, paras. 9–13).

## D. "*Recognizing* that while such disputes would usually be subject to national legal processes, international methods of settlement may be appropriate in certain cases;"

Under general principles of the conflict of laws, jurisdiction over disputes **17** between a State and a foreign investor would normally be with the courts and tribunals of the host State. Subjection of such disputes to the local legal process increases the host State's control over foreign investors. Therefore, capital importing States have traditionally favoured this method of dispute settlement.[11]

From the investor's perspective, the settlement of disputes through the host **18** State's court system is not attractive. Rightly or wrongly, the national courts of one of the disputing parties are not perceived as sufficiently impartial. Even in the absence of overt prejudice, these courts may be subject to outside pressures. Moreover, the courts will usually be bound by the local law even if it is at odds with the host State's international obligations. In addition, the regular courts will often lack the technical expertise required to resolve complex international investment disputes. An excessive case load of courts in many countries leading to long delays compounds the misgivings that many investors have about this form of settlement.

---

9   *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 64.

10   The Development Committee of the World Bank and of the International Monetary Fund has since adopted non-binding Guidelines on the Treatment of Foreign Direct Investments, 7 ICSID Review – FILJ 295 (1992).

11   This preference found its expression in Resolution 3281(XXIX) of the General Assembly of the United Nations of 12 December 1974, termed the Charter of Economic Rights and Duties of States, Art. 2, para. 2(c).

**19**     Domestic courts of other countries, notably those of the investor's home State, are usually not a viable alternative. In most cases, they will lack territorial jurisdiction over investment operations taking place in another country. An agreement to submit to these courts, while theoretically possible, is usually unacceptable to the host State as a matter of principle. In addition, sovereign immunity will be a formidable obstacle to suing the host State in the courts of another country, at any rate where acts of official authority are involved.[12]

**20**     The Report of the Executive Directors on the Convention addresses this issue in the following terms:

> 10. The Executive Directors recognize that investment disputes are as a rule settled through administrative, judicial or arbitral procedures available under the laws of the country in which the investment concerned is made. However, experience shows that disputes may arise which the parties wish to settle by other methods; and investment agreements entered into in recent years show that both States and investors frequently consider that it is in their mutual interest to agree to resort to international methods of settlement.[13]

**21**     Traditionally, private investors did not have access to international methods of dispute settlement. The International Court of Justice is open only to States in contentious proceedings. The classical method for the international settlement of investment disputes was diplomatic protection by the investor's home State. But diplomatic protection has serious disadvantages. The investor must have exhausted all local remedies in the host State. The investor depends entirely on its national government which may be unwilling to pursue the claim for political reasons (see Art. 27, paras. 1–4).

**22**     The Convention does not eliminate access to the national legal process for investment disputes. It merely opens an option to the host State and to the investor to utilize international conciliation and arbitration. Once arbitration under the Convention has been agreed to, this choice operates to the exclusion of other remedies, notably domestic courts, unless the parties agree otherwise (see Art. 26, paras. 44–54, 132–148). Exhaustion of local remedies is not a condition for arbitration under the Convention unless this is specifically required by the host State (see Art. 26, paras. 187–231).

**E.   "*Attaching particular importance* to the availability of facilities for international conciliation or arbitration to which Contracting States and nationals of other Contracting States may submit such disputes if they so desire;"**

**23**     The Convention provides for conciliation and arbitration on an equal footing. In actual practice, resort to conciliation has been minimal (see Art. 28, para. 6; Art. 34, para. 5). Arbitration is by far the more significant method of dispute settlement under the Convention.

---

12   For a description of unsuccessful proceedings in the domestic courts of the investor's home State see *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 20–25.

13   1 ICSID Reports 25.

International arbitration provides an attractive alternative to the settlement of investment disputes by national courts or through diplomatic protection. Arbitration is usually less costly and more efficient than litigation through regular courts. It offers the parties the opportunity to select arbitrators who enjoy their confidence and who have the necessary expertise in the field. Moreover, the private nature of arbitration, assuring the confidentiality of proceedings, is often valued by parties to major economic development projects. More recently, the principle of confidentiality has become subject to demands for more procedural transparency (see Art. 44, paras. 97–128).     **24**

Arbitration agreements may be negotiated *ad hoc* between host States and foreign investors. Standard rules and procedures such as those offered by the UNCITRAL Rules[14] are useful in drafting such *ad hoc* agreements. The ICSID Convention goes one step further: it offers a system for dispute settlement that contains not only standard clauses and rules of procedure but also institutional support for the conduct of proceedings (see Art. 1, para. 4). It assures the non-frustration of proceedings and provides for an award's recognition and enforcement (paras. 32, 33 *infra*).     **25**

The parties to ICSID arbitration retain a large degree of autonomy. They may attach conditions and limitations to their consent to the Centre's jurisdiction (see Art. 25, paras. 513–550). They have much latitude in shaping the composition of an arbitral tribunal (see Art. 37, paras. 15–35). They may choose the substantive rules of law to be applied by a tribunal (see Art. 42, para. 21). They may shape the procedural rules to be applied in proceedings (see Art. 44, paras. 11–19).     **26**

ICSID arbitration offers advantages to the investor as well as to the host State. Proceedings may be instituted by either side but in the majority of cases the investor is in the position of claimant. The Report of the Executive Directors on the Convention describes this balance of interests in the following terms:     **27**

> 13. While the broad objective of the Convention is to encourage a larger flow of private international investment, the provisions of the Convention maintain a careful balance between the interests of investors and those of host States. Moreover, the Convention permits the institution of proceedings by host States as well as by investors and the Executive Directors have constantly had in mind that the provisions of the Convention should be equally adapted to the requirements of both cases.[15]

The advantage for the investor is obvious: it gains direct access to an effective international forum should a dispute arise. The possibility of going to arbitration is an important element of the legal security required for an investment decision.     **28**

---

14   United Nations Commission on International Trade Law Arbitration Rules, 15 ILM 701 (1976).
15   1 ICSID Reports 25.

The advantage for the host State is twofold: by offering arbitration it improves its investment climate and is likely to attract more international investments. In addition, by consenting to ICSID arbitration the host State protects itself from other forms of foreign or international litigation (Art. 26). Also, the host State effectively shields itself against diplomatic protection by the State of the investor's nationality (Art. 27).[16]

29    The Convention's success cannot be measured in terms of the cases actually decided. A large number of cases submitted to ICSID arbitration were at some stage settled by agreement of the parties (see Art. 48, para. 86). It is safe to assume that the proceedings pending before ICSID were decisive in achieving these settlements.

30    The system is likely to be effective even without its actual use. The mere availability of an effective remedy tends to affect the behaviour of parties to potential disputes. It is likely to have a restraining influence on investors as well as on host States. Both sides will try to avoid actions that might involve them in arbitration that they are likely to lose. The prospect of litigation will strengthen the parties' willingness to settle a dispute amicably. Thus, the preventive effect of the Convention may be more important than its actual application.[17]

### F.    *"Desiring* to establish such facilities under the auspices of the International Bank for Reconstruction and Development;"

31    The establishment of a system for the settlement of investment disputes under the auspices of an international lending institution may not appear obvious at first sight. The reason for the World Bank's initiative (see para. 2 *supra*) can be found in the fact that the Bank is an international development agency.[18] In fact, the World Bank's Articles of Agreement list the promotion of private foreign investment among the Bank's purposes.[19]

32    The Convention establishes the Centre (Art. 1) with close administrative ties to the World Bank. These ties were not undisputed during the Convention's preparation but have since proven to be extremely useful (see Art. 2, paras. 4, 5).

---

16    *Delaume, G. R.*, ICSID Arbitration, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 23, 24 (1987); *Shihata, I. F. I.*, The Role of ICSID and the Projected Multilateral Investment Guarantee Agency (MIGA), 41 Außenwirtschaft 105, 110/11 (1986); but see *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 219 *et seq.* (1990).

17    *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 83 (1985); *Delaume, G. R.*, ICSID Arbitration, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 23, 25 (1987); *Lalive, P.*, Some Threats to International Investment Arbitration, 1 ICSID Review – FILJ 26 (1986); *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 384 (1991).

18    *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 342 (1972-II).

19    Art. I(ii).

**G.  "*Recognizing* that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with;"**

Consent by the parties to conciliation or arbitration under the Convention is binding. Once given, it may not be withdrawn unilaterally (see Art. 25, paras. 596–634). Recommendations of conciliators must be considered in good faith (see Art. 34, paras. 26–27). Awards are binding and enforceable (Arts. 53, 54). The Convention effectively forestalls any attempt to deny the validity of the arbitration agreement unilaterally or to terminate it. Similarly, an award may not be repudiated based on the allegation of its nullity. The Convention's provision on annulment (Art. 52) is the only avenue to attack an award.    **33**

The Convention provides a watertight system against the frustration of proceedings by a recalcitrant party. Arbitrators not appointed by the parties will be appointed by the Centre (Art. 38). The decision on whether there is jurisdiction in a particular case is with the tribunal (Art. 41). Non-cooperation of a party will not stall the proceedings (Art. 45).    **34**

**H.  ". . . and *Declaring* that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration,"**

The Convention offers a regulatory and institutional framework for the settlement of disputes. But participation in the Convention does not, by itself, constitute a submission to the Centre's jurisdiction. For jurisdiction to exist, the Convention requires separate consent in writing by both parties (see Art. 25, paras. 374–381).    **35**

Consent to the Centre's jurisdiction may be given in one of several ways. Consent may be contained in a direct agreement between the investor and the host State (see Art. 25, paras. 382–391). Alternatively, consent may be contained in a standing offer by the host State which may be accepted by the investor in appropriate form. Such a standing offer may be contained in the host State's legislation (see Art. 25, paras. 392–426). A standing offer may also be contained in a treaty to which the host State and the investor's State of nationality are parties (see Art. 25, paras. 427–467). More recently, the vast majority of cases that have come before ICSID were not based on consent through direct agreement between the parties but on consent through a general offer by the host State which is later accepted by the investor most often simply through instituting proceedings.    **36**

# Article 1

**(1) There is hereby established the International Centre for Settlement of Investment Disputes (hereinafter called the Centre).**

**(2) The purpose of the Centre shall be to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States in accordance with the provisions of this Convention.**

## OUTLINE

*Paragraphs*

1. Establishment and Name of the Centre     2
2. Purpose of the Centre     3–7

**1**    Art. 1 is part of the Convention's Chapter I dealing with the organizational structure of the International Centre for Settlement of Investment Disputes (ICSID, the Centre). Subsequent Articles deal with the Centre's seat, its organs, its financing and its status, immunities and privileges.

### 1. Establishment and Name of the Centre

**2**    During the Convention's drafting, there was never any doubt that there would be a permanent administrative entity to facilitate the Convention's application (History, Vol. I, pp. 22, 24). There was some debate about the name of this entity (History, Vol. II, pp. 55, 76, 97, 111, 247, 381, 677, 681). Earlier drafts foresaw "International Conciliation and Arbitration Center". This was changed into "International Center for the Settlement of Investment Disputes" (History, Vol. I, pp. 22, 24; Vol. II, p. 750). Eventually, the word "the" was removed from the name and the spelling "Centre" was adopted (at p. 943).

### 2. Purpose of the Centre

**3**    During the Convention's drafting, it was repeatedly emphasized that the Centre's purpose would be to facilitate conciliation and arbitration but that it would not undertake these activities itself. In other words, the Centre's task would be administrative rather than judicial (History, Vol. II, pp. 103, 104/5, 109–111, 113, 121, 129, 241, 953).[1] There were suggestions to add an advisory function to the purpose of the Centre (at pp. 472/3, 541, 544, 656). The First Draft contained

---

1  See also Report of the Executive Directors on the Convention, para. 15, 1 ICSID Reports 26.

a reference to additional activities including research and the collection and dissemination of information in the field of international investment (History, Vol. I, p. 26). The issue of the additional activities led to extensive debate and even to the creation of a special working group. Eventually, it was decided to delete the reference to additional activities (History, Vol. II, pp. 660, 676–678, 681, 687/8, 691, 750, 934).

The Centre's activities in facilitating conciliation and arbitration of investment **4** disputes are extensive. They include:
- the adoption of detailed rules and regulations;
- the drafting of model clauses for use in contracts between governments and investors;
- the keeping of a panel of conciliators and a panel of arbitrators;
- the screening and registration of requests for conciliation and requests for arbitration;
- assistance in the constitution of conciliation commissions and arbitral tribunals;
- provision of services and facilities for the conduct of proceedings; and
- communication of relevant documents and information to the parties.

The Centre has, in fact, undertaken research and the collection and dissemination **5** of information. These activities include the following publications:
- ICSID Convention, Regulations and Rules;
- ICSID Basic Documents;
- ICSID Additional Facility Rules;
- ICSID Additional Facility Rules for the Administration of Conciliation, Arbitration and Fact-Finding Proceedings;
- Documents Concerning the Origin and Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (a 4-volume history of the Convention, reprinted in 2001);
- List of Contracting States and Other Signatories of the Convention (periodic updates);
- Contracting States and Measures Taken by Them for the Purpose of the Convention (periodic updates);
- ICSID Model Clauses;
- Memorandum on the Fees and Expenses of ICSID Arbitrators;
- Schedule of Fees (periodic updates);
- Members of the Panels of Conciliators and of Arbitrators (periodic updates);
- List of Pending ICSID Cases (periodic updates);
- List of Concluded ICSID Cases (periodic updates);
- Online Decisions and Awards (periodic updates);
- ICSID Review – FILJ (a biannual publication);
- News from ICSID (a biannual news bulletin with shorter contributions);
- Investment Laws of the World (a loose-leaf collection, 1973–, of national investment legislation);

- Investment Treaties (a loose-leaf collection, 1983–, of bilateral investment treaties);
- Bilateral Investment Treaties: Bibliography;
- Bilateral Investment Treaties 1959–1996, Chronological and Country Data;
- ICSID Bibliography;
- ICSID Annual Report;
- Occasional publication of books.

The underlined items are accessible through ICSID's website: http://www.worldbank.org/icsid.

**6**     Publications with material on ICSID but not published by ICSID include:

- ICSID Reports (Cambridge University Press). 13 volumes by 2008;
- ita Investment Treaty Arbitration: http://ita.law.uvic.ca/;
- Investment Claims: http://www.investmentclaims.com/.

**7**     The Centre's Secretariat sponsors conferences. Its legal staff give occasional lectures and publish papers on subjects related to the Centre's work. In addition, they give advice to States on the drafting of arbitration laws and investment laws.

# Article 2

**The seat of the Centre shall be at the principal office of the International Bank for Reconstruction and Development (hereinafter called the Bank). The seat may be moved to another place by decision of the Administrative Council adopted by a majority of two-thirds of its members.**

The Working Paper to the Convention simply foresaw that the seat of the Centre should be at the World Bank's headquarters (History, Vol. I, p. 26). This led to a debate on the desirability of some flexibility in moving the seat and on the best way in which this might be achieved. The possibility of a relocation upon a decision of the Administrative Council was the outcome of this debate (History, Vol. II, pp. 55, 100, 101–103, 113, 115, 118, 121, 122, 127, 248, 250, 297, 313/4, 381/2, 477/8, 544, 559/60, 583, 680–683, 750, 953). The idea to create regional centres was briefly discussed but not pursued (at pp. 248, 379, 680, 683). **1**

The principal office of the International Bank for Reconstruction and Development (the World Bank, the Bank) and hence the seat of the Centre is Washington, D.C. The street address is: 1818 H Street, N.W., Washington, D.C., 20433, U.S.A. No attempt to move the Centre's seat to another place has ever been made. **2**

The seat of the Centre does not necessarily determine the place of conciliation and arbitration proceedings. The parties may, subject to certain limitations and procedures, decide on another place (Art. 63). They have frequently done so in practice. In the absence of other arrangements, proceedings will be held at the seat of the Centre (Art. 62). **3**

The legal ties between the Centre and the World Bank are much closer than the identity of their location. During the Convention's drafting the relationship between the Centre and the World Bank was discussed extensively. Arguments in favour of a close association of the Centre with the Bank were administrative expediency and the Bank's prestige and reputation. Arguments against a close link of the Centre to the Bank were the possibility of extra-legal influence on the parties by the Bank and a perceived conflict of interest between judicial activities and the Bank's lending activities. These misgivings were countered by reference to the Centre's purely administrative functions (History, Vol. II, pp. 67/8, 77, 90–94, 99–132, 248, 313, 382, 453, 456, 472, 476–478, 544/5, 559, 583/4). **4**

The most important legal ties between the Centre and the World Bank, apart from the location of their seats, are: **5**

- The President of the World Bank is *ex officio* the Chairman of ICSID's Administrative Council (Art. 5).
- The Governors of the World Bank are *ex officio* members of ICSID's Administrative Council in the absence of a contrary designation by States parties to the Convention (Art. 4).
- The World Bank provides ICSID with offices, services and facilities on the basis of a 1967 agreement between the two institutions (see Art. 6, para. 16).
- On the basis of this agreement, the administrative budget of the Centre's Secretariat is met in full by the World Bank (see also Art. 17).

# Article 3

**The Centre shall have an Administrative Council and a Secretariat and shall maintain a Panel of Conciliators and a Panel of Arbitrators.**

The Centre's basic administrative structure gave rise to relatively little discussion during the Convention's drafting (History, Vol. I, pp. 28, 30; Vol. II, pp. 55/6, 76, 94, 107, 685, 690, 750, 954). The idea of creating a smaller Executive Committee in addition to the Administrative Council did not prevail (at pp. 121, 481/2, 560/1, 685, 688/9, 716–718, 966). **1**

The Report of the Executive Directors on the Convention states that simplicity and economy consistent with the efficient discharge of its functions characterize the Centre's structure. **2**

Details concerning the Administrative Council, the Secretariat and the two Panels are contained in Arts. 4–8, 9–11 and 12–16. **3**

# Article 4

**(1) The Administrative Council shall be composed of one representative of each Contracting State. An alternate may act as representative in case of his principal's absence from a meeting or inability to act.**

**(2) In the absence of a contrary designation, each governor and alternate governor of the Bank appointed by a Contracting State shall be *ex officio* its representative and its alternate respectively.**

1    The Administrative Council is the Centre's plenary organ. Each State party to the Convention is represented in it. During the Convention's drafting, the idea to limit the size of the Administrative Council did not prevail (History, Vol. II, p. 132). A suggestion to restrict membership of the Administrative Council to member States of the World Bank also did not succeed (at pp. 660, 685/6). The Convention's text, as eventually adopted, makes it clear that alternate representatives will be entitled to participate and to act only in case where the principal representative is absent or unable to act (History, Vol. I, pp. 30, 32; Vol. II, pp. 132, 314, 685/6, 690, 713, 750).

2    Art. 4(2) provides that, in principle, the Administrative Council is composed of the same persons as the World Bank's Board of Governors. These are generally the ministers responsible for finance of the countries concerned. States parties to the Convention may make a different designation if they wish. States parties to the Convention that are not members of the World Bank (see Art. 67, paras. 3–8) will have to make designations to the Administrative Council.

3    During the Convention's drafting, the simplicity and convenience of this arrangement were emphasized (History, Vol. II, pp. 94, 122, 127). The Administrative Council's Annual Meeting could be held during the same period as the Bank's Annual Meeting thereby saving costs (at pp. 128, 249/50). The largely identical membership of the two bodies would also underline the close link between the Centre and the World Bank (at pp. 100, 544). The provision was opposed by those who objected to this close link or found the Administrative Council in this composition too large (at pp. 123, 132, 690). An element of flexibility was introduced by allowing non-members of the World Bank to make *ad hoc* appointments (at pp. 122, 123, 128) and by giving Members of the World Bank the possibility to appoint a person other than its governor and alternate governor (at pp. 123, 128, 444, 713). The possibility of designating the World Bank's Executive Directors rather than its Governors as members of ICSID's Administrative Council was discussed but not pursued in view of the problems that would have arisen from

the representation of several States by an Executive Director (at pp. 94, 128, 393).

In actual practice, the Administrative Council has nearly always been composed **4** of those governors that represented parties to the Convention plus, occasionally, representatives of non-Members of the World Bank (see Art. 67, para. 8).

# Article 5

**The President of the Bank shall be *ex officio* Chairman of the Administrative Council (hereinafter called the Chairman) but shall have no vote. During his absence or inability to act and during any vacancy in the office of President of the Bank, the person for the time being acting as President shall act as Chairman of the Administrative Council.**

1    The Working Paper, the earliest draft to the Convention, provided that the World Bank's President would be the President of the Centre. After some debate, this position was changed to Chairman of the Administrative Council (History, Vol. I, pp. 34, 36; Vol. II, pp. 55/6, 118/9, 122/3). There was some opposition to linking the two offices and suggestions were made to provide for the separate election of the Chairman (at pp. 55/6, 315/6, 381, 482, 560, 691). But the majority of delegates supported the solution whereby the World Bank's President would be *ex officio* Chairman of the Administrative Council (at pp. 101, 127, 382, 560, 691). There was also some concern about the extent of powers that the Chairman would wield (at pp. 111, 119, 122, 123, 248, 294, 316, 382).

2    A debate on the Chairman's right to vote led to the solution eventually adopted (History, Vol. I, pp. 34, 36; Vol. II, pp. 249, 250, 315, 383, 484, 691/2). Under this solution, the Chairman presides over the Administrative Council's meetings but does not participate in the voting.

3    The provision in the second sentence on absence, inability and vacancy led to some debate in view of the fact the World Bank's Articles of Agreement do not contain a clear provision on an acting President (History, Vol. II, pp. 315/6, 480–482, 691). In actual practice, the President appoints an acting President on an *ad hoc* basis. Rather incongruously, Administrative and Financial Regulation 4(2) provides that if the Chairman is unable to preside over a meeting of the Administrative Council, one of the members of the Council shall act as temporary presiding officer. The point of this Regulation was to enable the President not to attend a meeting of the Administrative Council in case it is held separately from the Annual Meeting of the World Bank's Board of Governors (see Art. 7, paras. 2–4).

4    The functions of the Chairman are much broader than a reading of Art. 5 would suggest (History, Vol. II, pp. 544/5, 584). Apart from presiding over meetings of the Administrative Council (Art. 7), the Chairman has the following powers:
- to nominate the Secretary-General and Deputy Secretary-General of ICSID for election by the Administrative Council (Art. 10(1));
- to designate up to ten persons each to the Panels of Conciliators and Arbitrators (Art. 13(2));

- to appoint conciliator(s) or arbitrator(s) in the case of failure by the parties to do so (Arts. 30, 38);
- to appoint members of *ad hoc* committees (Art. 52(3));
- to appoint a conciliator or arbitrator in case of a resignation of a party-appointed conciliator or arbitrator without the consent of the commission or tribunal (Art. 56(3));
- to decide on a proposal to disqualify a conciliator or arbitrator under certain defined circumstances (Art. 58).

# Article 6

(1) Without prejudice to the powers and functions vested in it by other provisions of this Convention, the Administrative Council shall:

    (a) adopt the administrative and financial regulations of the Centre;

    (b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings;

    (c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules);

    (d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services;

    (e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General;

    (f) adopt the annual budget of revenues and expenditures of the Centre;

    (g) approve the annual report on the operation of the Centre.

The decisions referred to in sub-paragraphs (a), (b), (c) and (f) above shall be adopted by a majority of two-thirds of the members of the Administrative Council.

(2) The Administrative Council may appoint such committees as it considers necessary.

(3) The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of this Convention.

## OUTLINE

| | | Paragraphs |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | INTERPRETATION | 2–26 |
| | A. "(1) Without prejudice to the powers and functions vested in it by other provisions of this Convention, . . ." | 2 |
| | B. ". . . the Administrative Council shall:" | 3 |
| | C. "(a) adopt the administrative and financial regulations of the Centre;" | 4–6 |
| | D. "(b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings;" | 7–9 |
| | E. "(c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules);" | 10–13 |

20

F.    **"(d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services;"**    14–16

G.    **"(e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General;"**    17

H.    **"(f) adopt the annual budget of revenues and expenditures of the Centre;"**    18–19

I.    **"(g) approve the annual report on the operation of the Centre."**    20

J.    **"The decisions referred to in sub-paragraphs (a), (b), (c) and (f) above shall be adopted by a majority of two-thirds of the members of the Administrative Council."**    21

K.    **"(2) The Administrative Council may appoint such committees as it considers necessary."**    22

L.    **"(3) The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of this Convention."**    23–26

## I. INTRODUCTION

Art. 6 deals with the powers and functions of the Administrative Council. It refers to three categories of such powers and functions:    **1**
- powers and functions listed in Art. 6(1),
- powers and functions under other provisions of the Convention and
- other powers and functions necessary for the Convention's implementation (Art. 6(3)).

## II. INTERPRETATION

### A.  **"(1) Without prejudice to the powers and functions vested in it by other provisions of this Convention, . . ."**

The powers and functions enumerated in Art. 6(1) are not exhaustive. Other    **2**
provisions of the Convention contain additional functions of the Administrative Council:
- moving the seat of the Centre (Art. 2);
- election of the Secretary-General and Deputy Secretary-General (Art. 10(1));
- adoption of rules for the apportionment of the Centre's expenditures (Art. 17);
- decision on a proposal to amend the Convention (Art. 66(1));
- invitation to non-Members of the World Bank to sign the Convention (Art. 67);
- appointment of committees (Art. 6(2));

- establishment of a simplified voting procedure (Art. 7(4)); and
- other powers and functions necessary for the Convention's implementation (Art. 6(3)).

### B.  ". . . the Administrative Council shall:"

**3**    During the early stages of the Convention's drafting, there was a broad and unspecific reference to the powers of the Administrative Council. The Working Paper, the earliest draft of the Convention, still referred in general terms to the adoption of rules and regulations as may be necessary or useful (History, Vol. I, p. 38; Vol. II, pp. 64, 102, 109, 122). Subsequent drafts break these powers down into specific categories.

### C.  "(a) adopt the administrative and financial regulations of the Centre;"

**4**    During the Convention's drafting, it was uncontested that the Administrative Council would adopt administrative and financial regulations governing the internal functioning of the Centre. It was pointed out that this function included the power to amend these regulations (History, Vol. I, pp. 38, 40; Vol. II, pp. 249, 288, 356, 444).

**5**    Provisional Administrative and Financial Regulations were adopted by the Administrative Council on 2 February 1967.[1] They were replaced by Administrative and Financial Regulations adopted on 25 September 1967.[2] These have been revised periodically.[3] The current version has been in force since 10 April 2006.

**6**    The Administrative and Financial Regulations deal with the procedures of the Administrative Council, the organization and functions of the Secretariat, financial provisions, certain provisions relating to individual proceedings and immunities and privileges. They are not subject to modification or derogation by the parties to proceedings except in accordance with their own terms (see Art. 44, paras. 13, 41).

### D.  "(b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings;"

**7**    During the Convention's drafting, there was some debate on whether the institution rules and the rules of procedure should be merged. It was pointed out that they dealt with different stages of the proceedings and that the institution rules, unlike the conciliation and arbitration rules, would not be subject to modification by the parties (History, Vol. I, pp. 38, 40; Vol. II, pp. 693–695).

**8**    Provisional Institution Rules were adopted by the Administrative Council on 2 February 1967.[4] They were replaced by the Rules of Procedure for the Institution

---

1   6 ILM 225 (1967).                    2   7 ILM 351 (1968).
3   1 ICSID Reports 35. *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 4 (1985).
4   6 ILM 225, 241 (1967).

of Conciliation and Arbitration Proceedings (Institution Rules, IR) on 25 September 1967.[5] These were revised on 26 September 1984[6] and on 1 January 2003. The Institution Rules are not subject to modification or derogation by the parties, except in accordance with their own terms (see Art. 44, paras. 13, 40).

The Institution Rules deal with the contents and registration of a request for conciliation or arbitration. The Convention's basic provisions on this procedure are Arts. 28 and 36. This Commentary deals with some of the details of the Institution Rules in the context of Art. 36.    **9**

### E.  "(c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules);"

During the Convention's drafting, there was considerable debate on whether the Administrative Council should be given the power to adopt the rules of procedure for conciliation and arbitration. Some delegates felt that the rules of procedure should be part of the Convention, while Mr. *Broches* emphasized the flexibility of separate rules that might be amended, if necessary (History, Vol. II, pp. 79, 288, 327/8, 382/3, 479/80, 515, 560, 572). There were also suggestions to have rules of procedure adopted not by the Administrative Council but by the Panels of Conciliators and Arbitrators or by the commissions or tribunals (at pp. 382, 480, 693–695). These suggestions were defeated in a vote (at p. 695).    **10**

Mr. *Broches* emphasized that the rules to be adopted would be optional in the sense that they are subject to modification or exclusion by the parties (History, Vol. II, pp. 76, 79, 107, 110, 249, 357, 383, 479, 481, 692, 693/4). This idea is reflected in Arts. 33 and 44 which provide that the respective rules apply "except as the parties otherwise agree" (see Art. 44, paras. 10–31). It is clear that the rules of procedure merely supplement the Convention and that they may not be contrary to it (see Art. 44, paras. 32, 33).    **11**

Provisional Conciliation Rules and Provisional Arbitration Rules were adopted by the Administrative Council on 2 February 1967.[7] They were replaced by Conciliation Rules (CR) and Arbitration Rules (AR) on 25 September 1967.[8] Revised Rules were adopted on 26 September 1984.[9] Further revisions came into effect on 1 January 2003 and on 10 April 2006. In accordance with Arts. 33 and 44, the Rules in effect on the date of consent by the parties will apply unless the parties agree otherwise (see Art. 44, paras. 34–36, 42–52).    **12**

The Rules are described in this Commentary in the context of the Convention's Articles to which they relate (see also Art. 44, paras. 37, 38).    **13**

---

5  7 ILM 351, 363 (1968); 1 ICSID Reports 51.    6  1 ICSID Reports 153.

7  6 ILM 225, 246, 260 (1967).

8  7 ILM 351, 365, 376 (1968); 1 ICSID Reports 63, 119.

9  1 ICSID Reports 157, 181. See also *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 4 (1985).

## F.  "(d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services;"

**14**     An arrangement with the World Bank on the use of administrative facilities and services was foreseen in all drafts to the Convention (History, Vol. I, pp. 38, 40). The discussion of this technical aspect (History, Vol. II, pp. 55, 77, 103, 110, 115, 131, 313/4, 476–478, 679, 680, 681, 953) was closely linked to the broader question of the Centre's relationship to the Bank (see Art. 2, para. 4).

**15**     The Report of the Executive Directors on the Convention contains the following paragraph:

> 16. As sponsor of the establishment of the institution the Bank will provide the Centre with premises for its seat (Article 2) and, pursuant to arrangements between the two institutions, with other administrative facilities and services (Article 6(d)).[10]

**16**     On 13 February 1967 the two institutions entered into a Memorandum of Administrative Arrangements.[11] Under this agreement, the World Bank bears the

---

10   1 ICSID Reports 26.
11   See ICSID First Annual Report 1966/67, pp. 15/16:
>     MEMORANDUM OF ADMINISTRATIVE ARRANGEMENTS AGREED BETWEEN THE INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT AND THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
>     1. The Bank shall provide, within reasonable limits, the following services and facilities to the Centre:
>     (a) The services of staff members of and consultants to the Bank, on a full or part-time basis as agreed between the President of the Bank and the Secretary-General of the Centre, who shall act solely under the direction of the Secretary-General in the performance of their functions for the Centre;
>     (b) other administrative services and facilities, such as: travel, communication facilities, office accommodations, furniture, equipment, supplies and printing.
>     2. The Bank shall not charge the Centre for the services and facilities referred to in paragraph 1, except to the extent that the Centre may receive funds from the parties to proceedings pursuant to its Administrative and Financial Regulations to cover such costs. However, to enable the cost of items for which no payment will be received by the Centre to be reflected in the budgets and accounts of the Bank and of the Centre:
>     (a) The Centre shall in advance of each of its fiscal years (which coincide with those of the Bank) inform the Bank of the estimated type and quantity of the services and facilities that will be required and the Bank shall, after receiving the request of the Centre and in time to enable the Administrative Council of the Centre to adopt its budget before the beginning of the fiscal year, inform the Centre of the amount which the Executive Directors of the Bank have approved for the provision of such services and facilities;
>     (b) after the end of each fiscal year the Bank shall inform the Centre of the actual expenses incurred.
>     3. The Centre shall pay the Bank for those services and facilities referred to in paragraph 1 which are directly attributable to a particular proceeding and for which the Centre therefore requires the parties to reimburse it pursuant to its Administrative and Financial Regulations. The Centre shall indicate to the Bank from time to time those services and facilities provided to the Centre for which it will require reimbursement, and the Bank shall thereupon charge the Centre for the actual cost of such services and facilities. The Centre shall pay these charges promptly.

costs of the Centre's staff as well as its entire administrative costs. Any income of the Centre from charges payable by parties to proceedings for the use of the facilities of the Centre under Art. 59 will be used towards reimbursing the Bank (see Art. 17, paras. 5–9).

### G.  "(e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General;"

The determination of the conditions of service of the Secretary-General and of the Deputy Secretary-General is part of the internal administrative tasks of the Administrative Council. This provision did not elicit any comment during the Convention's drafting history (History, Vol. II, p. 696). The Administrative Council determines the conditions of service of the Secretary-General and of the Deputy Secretary-General on the occasion of their election.

**17**

### H.  "(f) adopt the annual budget of revenues and expenditures of the Centre;"

During the Convention's preparation, the discussion on the Administrative Council's power to adopt the budget was uncontroversial. As a result of this discussion, the words "of revenues and expenditures" were inserted (History, Vol. I, pp. 38, 40, 42; Vol. II, pp. 132, 696, 967/8, 975).

**18**

The detailed rules for the budget are contained in Administrative and Financial Regulation 17. The Centre's financial statements include the value of the services and facilities provided by the World Bank (see para. 16 *supra*; Art. 17, para. 7), revenues from the sale of publications and lodging fees (see Art. 59, paras. 7–9), as well as the receipts and expenditures related to particular proceedings (see Art. 59, paras. 10–12; Art. 60, para. 15; Art. 61, paras. 46–61). The total budget for the year ending 30 June 2006 amounted to US $16,667,305.[12]

**19**

_____

4. No account shall be taken in the estimates, accounts and charges referred to in paragraphs 2 and 3 of any indirect or overhead costs incurred by the Bank.

5. The Bank is not required to pay or contribute to the fees or expenses of the members of Conciliation Commissions, Arbitration Tribunals or Committees of arbitrators.

6. This arrangement shall enter into force as of October 14, 1966. It shall remain in force until June 30, 1968, and shall thereafter be renewed automatically from year to year unless either party denounces it not less than six months prior to the end of any annual period of extension.

<div align="center">

INTERNATIONAL BANK FOR
RECONSTRUCTION AND DEVELOPMENT

</div>

By——————————— /s/ J. Burke Knapp ———————————

<div align="center">

INTERNATIONAL CENTRE FOR SETTLEMENT OF
INVESTMENT DISPUTES

</div>

By——————————— /s/ A. Broches ———————————

<div align="right">

Signed on February 13, 1967

</div>

12  ICSID Annual Report 2006, p. 48.

### I. "(g) approve the annual report on the operation of the Centre."

**20**    The Centre's Annual Report is prepared by the Centre's Secretariat and approved by the Administrative Council. It contains information on the composition of the Secretariat, on the participation in the Convention, on disputes before the Centre, on the Panels of Conciliators and Arbitrators, on ICSID documents and publications, on conferences, on meetings and resolutions of the Administrative Council and on the Centre's finances.

### J. "The decisions referred to in sub-paragraphs (a), (b), (c) and (f) above shall be adopted by a majority of two-thirds of the members of the Administrative Council."

**21**    A two-thirds majority of the Council's membership is required for the adoption of the Administrative and Financial Regulations, the Institution Rules, the Conciliation Rules and the Arbitration Rules. The adoption of the budget also requires a two-thirds majority. The more general question of voting by the Administrative Council is dealt with in Art. 7(2) (see Art. 7, paras. 6–8).

### K. "(2) The Administrative Council may appoint such committees as it considers necessary."

**22**    Art. 6(2) is the outcome of the unsuccessful attempt to create a smaller Executive Committee in addition to the Administrative Council (see Art. 3, para. 1). A compromise solution was adopted that foresees the possibility to create committees at the Administrative Council's discretion (History, Vol. II, pp. 731, 751, 966). In actual practice, this possibility is not used.

### L. "(3) The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of this Convention."

**23**    The Working Paper, the earliest draft to the Convention, contained a broad residual clause providing for "other powers as may be necessary or useful for the operation of the Centre and the achievement of the purposes of the Convention" (History, Vol. I, p. 44). After criticism about the open-ended nature of this formula, the words "or useful" and "the achievement of the purposes" were taken out (History, Vol. II, pp. 482, 659, 697/8, 716, 751, 1014). As eventually adopted, the Convention restricts the Administrative Council's residual powers to functions which are necessary for the Convention's implementation.

**24**    Art. 6(3) does not relate to the powers vested in the Administrative Council by other Articles of the Convention. These are covered by the first phrase of Art. 6(1) (see para. 2 *supra*). The systematic context of Art. 6 makes it clear that the "other powers and . . . functions" of Art. 6(3) are in addition to those covered explicitly by the Convention.

In 1978, the Administrative Council adopted the Additional Facility.[13] It autho-    **25**
rizes the ICSID Secretariat to administer certain proceedings which fall outside
the scope of the Convention. The Additional Facility Rules cover proceedings
which, by their own terms, are outside the Centre's jurisdiction[14] (see Art. 25,
paras. 9–13). These Rules also specifically state that the Convention is not appli-
cable to Additional Facility proceedings.[15] In this Commentary reference is made
to various aspects of the Additional Facility in the context of the Convention's
parallel provisions (see esp. Art. 11, para. 15; Art. 25, paras. 9–13, 30–34, 87,
202–210, 300–301, 409, 443–446, 457–463, 623; Art. 26, paras. 22, 113, 179,
180; Art. 36, paras. 7, 47, 61; Art. 42, paras. 142, 275; Art. 43, para. 3; Art. 47,
para. 7; Art. 52, para. 5; Art. 53, paras. 5–9; Art. 54, paras. 12–22; Art. 62,
paras. 7–10).

There is no doubt that the Additional Facility is "useful for . . . the achievement    **26**
of the purposes of the Convention" (see para. 23 *supra*). But that is not the text as
eventually adopted. Since the Additional Facility operates outside the Convention,
it is difficult to argue that it is "necessary for the implementation of the provisions
of [the] Convention"[16] (see Art. 66, para. 6).

---

13  1 ICSID Reports 213–280.                    14    Additional Facility Rules, Art. 2.

15  Art. 3. For detailed treatment of the Additional Facility see *Broches, A.*, The "Additional
Facility" of the International Centre for Settlement of Investment Disputes (ICSID), 4 Yearbook
Commercial Arbitration 373 (1979); *Toriello, P.*, The Additional Facility of the International
Centre for Settlement of Investment Disputes, 4 Italian Yearbook of International Law 59
(1978/79).

16  At one point this led to questions about the propriety of the Administrative Council's decision
in adopting the Additional Facility. But the Additional Facility has long since been generally
accepted as an integral part of the ICSID machinery. *Toriello*, *op. cit*., pp. 65 *et seq*.; *Broches,
A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other
States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial
Arbitration 627, 633 (1993).

# Article 7

**(1) The Administrative Council shall hold an annual meeting and such other meetings as may be determined by the Council, or convened by the Chairman, or convened by the Secretary-General at the request of not less than five members of the Council.**

**(2) Each member of the Administrative Council shall have one vote and, except as otherwise herein provided, all matters before the Council shall be decided by a majority of the votes cast.**

**(3) A quorum for any meeting of the Administrative Council shall be a majority of its members.**

**(4) The Administrative Council may establish, by a majority of two-thirds of its members, a procedure whereby the Chairman may seek a vote of the Council without convening a meeting of the Council. The vote shall be considered valid only if the majority of the members of the Council cast their votes within the time limit fixed by the said procedure.**

### OUTLINE

*Paragraphs*

1. Meetings                           2–5
2. Voting                             6–8
3. Quorum                               9
4. Simplified Voting Procedure      10–12

**1**     Art. 7 contains a number of procedural rules governing the activities of the Administrative Council. They concern the Administrative Council's meetings, voting, the quorum for meetings, and a simplified procedure for making decisions without a meeting. More detailed rules on these issues are contained in the Administrative and Financial Regulations 1–7.

### *1. Meetings*

**2**     The earlier drafts to the Convention specifically provided that the Administrative Council's annual meeting would be held in conjunction with the annual meeting of the World Bank's Board of Governors (History, Vol. I, p. 46). The idea was administrative expediency and economy since the members of the two bodies would be largely identical (see Art. 4, paras. 2–4) (History, Vol. II, pp. 77, 249/50, 251, 317, 477, 713). Eventually, this provision was taken out of the Convention's text as superfluous (at p. 713). Administrative and Financial Regulation 1(1) now contains a rule to this effect.

All drafts foresaw additional meetings upon a decision of the Administrative **3**
Council or if called by the Chairman (History, Vol. I, pp. 46, 48). Suggestions that
a certain number of the Council's members should be able to request a meeting
(History, Vol. II, pp. 316, 482) led to the provision under which the Secretary-
General may convene a meeting at the request of at least five members.

In actual practice, the meetings of the Administrative Council are always held **4**
in conjunction with the Annual Meeting of the World Bank's Board of Governors.
Only the Inaugural Meeting of the Administrative Council on 2 February 1967
was held separately.

The Administrative and Financial Regulations provide details on the notice of **5**
meetings (Regulation 2), the agenda for meetings (Regulation 3), the presiding
officer of meetings (Regulation 4), the secretary of the Administrative Council
and records of the proceedings (Regulation 5).

## 2. Voting

All drafts leading to the Convention provided for a formula of one vote per **6**
member of the Administrative Council. Weighted voting was not contemplated
(History, Vol. I, pp. 48, 50; Vol. II, pp. 56, 111, 113, 115, 122, 127/8, 316, 752).
The idea to form two voting groups, of capital importing and capital exporting
countries respectively, and to require a majority in both groups for important
issues, was not pursued (at pp. 384, 560). There was considerable debate on which
issues were important enough to require a two-thirds majority (at pp. 250, 381,
383, 480, 572, 692/3, 696, 698, 714, 733, 934). Suggestions to require larger
majorities or even unanimity did not succeed (at pp. 382/3, 482).

The basic rule is that decisions will be taken by a simple majority of the votes **7**
cast unless the Convention provides otherwise.[1] Administrative and Financial
Regulation 7 provides additional detail on the voting procedure.

The Convention requires that certain matters are to be decided by a two-thirds **8**
majority of the members of the Administrative Council. For decisions on these
matters the threshold is higher in two respects: the majority is two-thirds rather
than the simple majority of the residual rule of Art. 7(2). In addition, this majority
is not calculated on the basis of the votes cast but on the basis of the Administrative
Council's entire membership. These matters are:
- moving the seat of the Centre (Art. 2);
- adoption of the Administrative and Financial Regulations (Art. 6(1));
- adoption of the Institution Rules (Art. 6(1));
- adoption of the Conciliation Rules and the Arbitration Rules (Art. 6(1));
- adoption of the annual budget (Art. 6(1));
- adoption of a simplified voting procedure (Art. 7(4));
- election of the Secretary-General and Deputy Secretary-General (Art. 10(1));

---

1   See also para. 18 of the Report of the Executive Directors on the Convention, 1 ICSID
    Reports 26.

- decision on an amendment of the Convention (Art. 66(1));
- invitation to non-Members of the World Bank to sign the Convention (Art. 67).

### 3. *Quorum*

**9**    The requirement that more than half of the members of the Administrative Council must be present when the Council makes a decision was contained in all drafts leading to the Convention. It was never debated (History, Vol. I, p. 50; Vol. II, pp. 316, 752, 1014, 1033).

### 4. *Simplified Voting Procedure*

**10**    All drafts to the Convention foresaw the possibility of a vote by the Administrative Council without a meeting (History, Vol. I, p. 52). This seemed necessary in view of the difficulty of convening meetings in between annual meetings (History, Vol. II, p. 316). Suggestions to restrict this procedure to matters of minor importance did not prevail (at pp. 482/3, 662, 712). The idea to deem proposals accepted if they were not rejected by a majority did not succeed either (at pp. 662, 712, 722). It was decided that the simplified decision procedure would be subject to a time limit during which votes must be cast (at pp. 662, 712, 714, 752, 1014, 1033). Mr. *Broches* explained that the majority referred to in the provision's text only related to the necessary participation in the voting or "quorum" (at pp. 686, 712/3). The actual decision may be subject to a simple majority or to a two-thirds majority (see paras. 7, 8 *supra*).

**11**    The procedure, envisaged in Art. 7(4), was established through Administrative and Financial Regulation 7(3). Votes must normally be cast within 21 days. If the replies received during this period do not include a majority of the members, the motion is lost.

**12**    A similar procedure is provided for in Administrative and Financial Regulation 7(4): if at a meeting of the Administrative Council a necessary majority of two-thirds of the members is not reached and some States parties are not represented, the votes of the absent members may be solicited afterwards.

# Article 8

**Members of the Administrative Council and the Chairman shall serve without remuneration from the Centre.**

In accordance with Art. 4(2), the members of the Administrative Council are normally the governors of the World Bank. As such they are in the service of their respective governments. In accordance with Art. 5, the Chairman is the President of the World Bank. Neither the members of the Administrative Council nor the Chairman are entitled to an additional remuneration from the Centre. **1**

During the Convention's drafting, this provision was not cast into doubt (History, Vol. I, p. 54).[1] At the same time it was made clear that this would not affect the reimbursement of actual expenses of the members of the Administrative Council and of the Chairman incurred in the course of service for the Centre (History, Vol. II, pp. 251, 319, 389, 481, 482, 491, 715/6). Art. 24(2) provides for tax privileges in respect of expense allowances paid by the Centre to the Chairman or members of the Administrative Council. **2**

---

1   See also para. 18 of the Report of the Executive Directors on the Convention.

# **Article 9**

---

**The Secretariat shall consist of a Secretary-General, one or more Deputy Secretaries-General and staff.**

**1**  Art. 9 remained unchanged in all drafts to the Convention (History, Vol. I, p. 56). There was never any doubt that the Centre would have a chief administrative officer (History, Vol. II, pp. 56, 101). The creation of Deputy Secretaries-General led to some debate. There was a fear that the provision, as drafted, might lead to a proliferation of high officials. It was pointed out that this position should be filled only if warranted by the Centre's volume of business, possibly on a part-time basis (at pp. 117, 127, 384/5, 718). There was some discussion about the appointment of several Deputy Secretaries-General on a regional basis (at pp. 252, 718). A suggestion to limit the number of Deputy Secretaries-General in the text of the Convention did not prevail but in a vote it was decided to recommend language for the Report of the Executive Directors to the effect that at that time no more than one Deputy Secretary-General was foreseen (at pp. 718/9, 954, 968).

**2**  The Report of the Executive Directors on the Convention says in its para. 18:

> . . . The Secretariat will consist of a Secretary-General, one or more Deputy Secretaries-General and staff. In the interest of flexibility the Convention provides for the possibility of there being more than one Deputy Secretary-General, but the Executive Directors do not now foresee a need for more than one or two full time high officials of the Centre.

**3**  The following persons have served or are serving in the capacity of Secretary-General of ICSID:

- Aron Broches, 2 February 1967–2 October 1980.
- Heribert Golsong, 3 October 1980–30 September 1983.
- Ibrahim F. I. Shihata, 1 October 1983–24 July 2000.
- Ko-Yung Tung, 25 July 2000–2003.
- Roberto Danino, November 2003–January 2006.
- Ana Palacio, 20 September 2006–15 April 2008.
- Meg Kinnear, 22 June 2009–

**4**  No Deputy Secretary-General was elected until 1999. Antonio R. Parra was elected to this office on 30 September 1999. He retired in September 2005. Nassib G. Ziadé was elected Deputy Secretary-General on 22 October 2007 for a term of six years.

The Secretariat consists of a staff of about 14 lawyers as well as paralegal staff and support staff. **5**

Administrative and Financial Regulation 13 provides that the Secretary-General, the Deputy Secretary-General and the Secretariat's staff may not serve on the Panel of Conciliators, on the Panel of Arbitrators or as members of any commission or tribunal. **6**

# Article 10

**(1) The Secretary-General and any Deputy Secretary-General shall be elected by the Administrative Council by a majority of two-thirds of its members upon the nomination of the Chairman for a term of service not exceeding six years and shall be eligible for re-election. After consulting the members of the Administrative Council, the Chairman shall propose one or more candidates for each such office.**

**(2) The offices of Secretary-General and Deputy Secretary-General shall be incompatible with the exercise of any political function. Neither the Secretary-General nor any Deputy Secretary-General may hold any other employment or engage in any other occupation except with the approval of the Administrative Council.**

**(3) During the Secretary-General's absence or inability to act, and during any vacancy of the office of Secretary-General, the Deputy Secretary-General shall act as Secretary-General. If there shall be more than one Deputy Secretary-General, the Administrative Council shall determine in advance the order in which they shall act as Secretary-General.**

## OUTLINE

*Paragraphs*

1. Election                                    1–3
2. Incompatibility of Office                   4–6
3. Acting Secretary-General                    7–9

### *1. Election*

**1**  All drafts leading to the Convention provided for the appointment of the Secretary-General and any Deputy Secretaries-General by the Administrative Council upon nomination by the Chairman (History, Vol. I, pp. 56, 58; Vol. II, pp. 56, 77, 101, 108, 118, 477, 545, 752, 954, 1014). There was some opposition against the Chairman's power to nominate candidates, based on the concern that this power would affect the Secretary-General's independence or unduly restrict the Administrative Council's freedom of action (at pp. 127, 130/1, 248, 252, 317, 481, 484/5, 561, 720). There was also some debate on whether the Chairman should be required to nominate several candidates (at pp. 318, 485, 561, 656, 719–721). A discussion on the period of service led to the insertion of a maximum period of six years with the possibility of re-election (at pp. 318, 561, 722, 726, 967, 968/9, 975, 1027). Suggestions to state the candidates' required qualifications and grounds for a possible dismissal are not reflected in the Convention (at pp. 318,

34

483/4, 561, 969). The idea to involve governments in the nominating process led to the clause on prior consultation of the members of the Administrative Council (at pp. 719–721, 935). Transition arrangements dealing with the problem that the first Secretary-General would only be elected by the representatives of few States were relegated to the Report of the Executive Directors on the Convention (at pp. 969, 1024–1027, 1075).

Administrative and Financial Regulation 8 provides that the Chairman may propose one or more candidates for the offices of Secretary-General and Deputy Secretary-General. In doing so, he or she should also make proposals with respect to the length of the term of service, any approval for any of the candidates to engage, if elected, in another occupation (see para. 6 *infra*) and the conditions of service.    **2**

In practice, the Chairman has always suggested one candidate for each election, who has been duly elected. At the Inaugural Meeting of the Administrative Council, the Secretary-General was elected for a period of twenty months only. At subsequent elections, the term of service has not always been fixed at six years.[1] The consultation of the members of the Administrative Council consists of a letter informing them of the candidate and inviting comment.    **3**

### 2. Incompatibility of Office

The early drafts to the Convention provided for the incompatibility of the office of Secretary-General or Deputy Secretary-General with the exercise of any political function and with any employment except by the World Bank or the Permanent Court of Arbitration. A waiver by the Administrative Council was to be possible with the Chairman's concurrence (History, Vol. I, p. 60). This led to an extensive discussion on whether the concurrent employment of the Secretary-General by the Bank should be allowed. One group, including Mr. *Broches*, expressed the view that this would be a practical and economical solution, at least for an initial transition period (History, Vol. II, pp. 101, 112, 113, 115, 127, 317, 384, 472, 478, 483/4, 544, 561, 725). Another group was strongly opposed to such a solution. This opposition was based on doubts whether simultaneous employment by the Bank would leave the Secretary-General with the necessary freedom and on the belief that the position of Secretary-General should be full time (at pp. 117/8, 122, 127, 130/1, 251/2, 297, 317, 384, 472, 561, 583). The possibility of simultaneous employment by the Permanent Court of Arbitration attracted less attention (at pp. 113/4, 116, 297, 384, 483, 561). Eventually, the reference to both institutions was removed from the text (at pp. 752, 954, 1026). The possibility of an approval by the Administrative Council of another employment or occupation was retained but the need for the Chairman's concurrence in this decision was removed (at pp. 253, 317, 318, 483, 561).    **4**

---

1   See ICSID News, Vol. 17, No. 2, p. 1.

**5**  The incompatibility with the exercise of a political function was contained in all drafts. The earlier drafts subjected this incompatibility to a possible waiver by the Administrative Council with the concurrence of the Chairman. After brief discussion, the clause dealing with a political function was severed from the sentence dealing with employment or occupation which is subject to waiver (History, Vol. I, pp. 60, 62; Vol. II, pp. 483, 725/6). As a consequence, the incompatibility of the offices of Secretary-General and Deputy Secretary-General with the exercise of any political function is absolute.

**6**  Administrative and Financial Regulation 8(b) provides that the Chairman, in making a proposal to the Administrative Council of candidates for the office of Secretary-General or Deputy Secretary-General, shall also make proposals with respect to the approval of any other employment or occupation. Until 2008 all Secretaries-General of ICSID simultaneously held the office of General Counsel of the World Bank. In 2008 it was decided to separate the two positions. The Deputy Secretary-General is a senior legal officer of the Centre.

### 3. Acting Secretary-General

**7**  All drafts leading to the Convention provided that the Deputy Secretary-General would act in place of the Secretary-General in case of the latter's absence or inability to act or in case of a vacancy of the office. If there is more than one Deputy Secretary-General, the earlier drafts foresaw a determination by the Secretary-General in what order these would act. After some brief discussion, it was decided that this order should be determined in advance by the Administrative Council (History, Vol. I, pp. 62, 64; Vol. II, pp. 252/3, 317, 318, 385, 484, 719, 723, 752).

**8**  Under Administrative and Financial Regulation 9(1), the Chairman shall propose to the Administrative Council the order in which Deputy Secretaries-General are to act. In the absence of a decision by the Administrative Council, the order is that of seniority in the post. To date, there has never been more than one Deputy Secretary-General. Therefore, no occasion for a determination under the second sentence of Art. 10(3) has arisen.

**9**  Administrative and Financial Regulation 9(2) provides for the designation of senior members of the staff of the Centre to act in case of vacancy, absence or inability to act of the Secretary-General and any Deputy Secretaries-General.[2]

_____
2  See ICSID Fifteenth Annual Report, 1980/81, p. 3; ICSID Annual Report, 2006, p. 4.

# Article 11

**The Secretary-General shall be the legal representative and the principal officer of the Centre and shall be responsible for its administration, including the appointment of staff, in accordance with the provisions of this Convention and the rules adopted by the Administrative Council. He shall perform the function of registrar and shall have the power to authenticate arbitral awards rendered pursuant to this Convention, and to certify copies thereof.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| 1. | Representation and Administration of the Centre | 3–6 |
| 2. | Keeping of Records | 7–8 |
| 3. | Registrar in Proceedings | 9 |
| 4. | Administrative Support in Proceedings | 10–13 |
| 5. | Public Information | 14 |
| 6. | The Additional Facility | 15 |
| 7. | Appointing Authority for Non-ICSID Arbitration | 16–19 |

## BIBLIOGRAPHY

*Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85 (1998).

During the Convention's drafting, there was relatively little general discussion **1** of the Secretary-General's overall powers and functions. All drafts refer to his administrative role and his power to appoint staff (History, Vol. I, pp. 64, 66). His role was described as administrative and advisory rather than judicial (History, Vol. II, pp. 107, 108, 249, 312, 484, 678). His various functions are scattered throughout the Convention and were rarely discussed in concentrated form (at pp. 545, 584). An explicit reference to his power to represent the Centre was added after a short debate (at pp. 697, 724, 753). The Report of the Executive Directors states that the Convention requires the Secretary-General to perform a variety of administrative functions as legal representative, registrar and principal officer of the Centre.[1]

The text of Art. 11 mentions some of the Secretary-General's powers. But it does **2** not exhaust the full range of his or her functions. These functions are regulated

---

1  Paragraph 20, 1 ICSID Reports 27.

in the Convention, in the Administrative and Financial Regulations (AFR), in the Institution Rules (IR), in the Conciliation Rules (CR) and in the Arbitration Rules (AR). These functions may be conveniently described in terms of representation and administration of the Centre, the keeping of records, the function of registrar in proceedings, administrative support in proceedings and public information. In addition, the Secretary-General performs certain functions under the Additional Facility and as appointing authority in non-ICSID arbitration.

### 1. Representation and Administration of the Centre

**3**    The Secretary-General represents the Centre in its external relations. He or she signs agreements on the Centre's behalf. Examples for such agreements are the Memorandum of Administrative Arrangements with the World Bank of 1967 (see Art. 6, para. 16) and the arrangements with a number of institutions to provide facilities for proceedings in accordance with Art. 63(a) (see Art. 63, paras. 16, 17).

**4**    The Secretary-General exercises certain functions with regard to the other organs of the Centre. He or she may convene the Administrative Council under the unusual circumstances of Art. 7(1) (see Art. 7, para. 3). He or she will also communicate the text of a proposed amendment of the Convention to the members of the Administrative Council in accordance with Art. 65 (see Art. 65, para. 3). In addition, the Secretary-General advises the Chairman in the exercise of his or her power to designate persons to the Panels of Conciliators and Arbitrators under Art. 13(2), to appoint conciliators, arbitrators and members of *ad hoc* committees under Arts. 30, 38, 52(3) and 56(3) and to decide on the disqualification of conciliators and arbitrators under Art. 58.

**5**    The Secretary-General is responsible for the Centre's internal administration. He or she appoints staff members (AFR 10) and coordinates their conditions of employment with the World Bank (AFR 11). He or she directs the Centre's staff and has the authority to dismiss staff members and to impose disciplinary measures (AFR 12).

**6**    The Secretary-General is responsible for the preparation and submission to the Administrative Council of the Centre's budget. He or she is also responsible for the budget's execution (AFR 17). In addition, the Secretary-General has to calculate any assessment on the States parties to the Convention (Art. 17; AFR 18) and arranges for an audit of the Centre's accounts on the basis of which a financial statement is submitted to the Administrative Council (AFR 19).

### 2. Keeping of Records

**7**    The Secretary-General keeps a list of Contracting States containing information on the dates of their signature, the dates of ratification, the dates of the Convention's entry into force for each State and the dates of notices of denunciation (Arts. 67, 68, 71, 73; AFR 20). In connection with this list, the Secretary-General also keeps lists containing the following information for each Contracting State:

- exclusion of territories under Art. 70;
- designations of constituent subdivisions or agencies under Art. 25(1) and (3);
- notification concerning classes of disputes considered suitable or unsuitable for submission to the Centre under Art. 25(4);
- designations of courts or other authorities competent for the recognition and enforcement of awards under Art. 54(2);
- legislative and other measures relating to the Convention under Art. 69.

These lists are regularly updated and published on ICSID's homepage: http://www.worldbank.org/icsid/.

In addition, the Secretary-General maintains and administers the following lists, **8** registers and archives:

- lists of members of the Panels of Conciliators and Arbitrators (Art. 16(3); AFR 21);
- registers for requests for arbitration and conciliation containing all significant procedural developments (Arts. 28, 36; AFR 23);[2]
- archives containing the original texts of requests, of all instruments and documents in connection with any proceeding and of any reports, awards or decisions by a commission, tribunal or *ad hoc* committee (AFR 28).[3]

### 3. Registrar in Proceedings

The function of registrar is specifically mentioned in Art. 11. It involves a **9** number of activities. Most of these include a duty to notify the parties and the commission or tribunal as the case may be. They are:

- receiving and registering requests for conciliation and arbitration subject to prior screening (Arts. 28, 36; IR 1, 5, 6, 7, 8);
- authentication of awards, certification of copies and dispatch to the parties (Art. 49(1); AR 48);
- receiving and registering requests for the supplementation and rectification, interpretation, revision and annulment of awards (Arts. 49(2), 50, 51, 52; AR 49, 50, 51, 52);
- receiving and registering requests for the resubmission of a dispute after annulment (Art. 52(6); AR 55).

### 4. Administrative Support in Proceedings

The Secretary-General and the staff of the Secretariat provide administrative **10** support in conciliation and arbitration proceedings. This support includes provision of a venue for proceedings whether at the Centre or elsewhere (Arts. 62, 63; AFR 26; CR 13; AR 13). The Secretary-General appoints a Secretary for each

---

2  *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 86/7 (1998).

3  *Ibid.*, p. 98.

commission, tribunal or *ad hoc* committee (AFR 25).[4] He or she also provides other assistance such as translations, interpretations and duplication (AFR 27).[5] In a particular proceeding, the Secretary of the tribunal makes the necessary arrangements for hearings, keeps minutes of hearings and prepares drafts of procedural orders.[6]

**11**    The Secretary-General is the official channel of communication between the parties, commissions, tribunals, *ad hoc* committees and the Chairman (AFR 24).[7] The Conciliation Rules and Arbitration Rules contain numerous provisions to the effect that notifications be transmitted by or through the Secretary-General (see *e.g.*, AR 1–6, 8–11, 18, 30, 33, 41, 49–52, 54, 55). In a particular proceeding, the Secretary of the commission or tribunal serves as the channel of communication between the parties and the conciliators or arbitrators.

**12**    With respect to the cost of proceedings, the Secretary-General determines the charges payable to the Centre and consults with the commission or tribunal on fees and expenses (Arts. 59, 60; AR 28); determines the fees of conciliators, arbitrators and members of *ad hoc* committees with the Chairman's approval; and receives advance payments from the parties and makes the payments necessary for the conduct of proceedings (AFR 14). He or she determines and receives the fees for lodging requests and the charges for specific services (AFR 15, 16). In a particular proceeding, the Secretary of the tribunal administers this system on behalf of the Secretary-General.[8]

**13**    The Secretary-General may request a pre-hearing conference (AR 21). He or she has certain powers of decision on the discontinuance of proceedings (AR 43, 44, 45; AFR 14) and must be consulted by the commission or tribunal on sessions (CR 13; AR 13), on a procedural language that is not an official language of the Centre (CR 21; AR 22), on copies of instruments (AR 23) and on the holding of proceedings away from the Centre at a place where the Centre has not made previous arrangements (Art. 63(b); AR 13; CR 13).

### 5. Public Information

**14**    The publication of information about the Centre's operations is part of the Secretary-General's duties (AFR 22). This duty is subject to the provisions of Art. 48(5), CR 33(3) and AR 48(4).[9] In actual fact, the Secretariat engages in the publication of relevant material and the dissemination of information in a variety of ways (see Art. 1, para. 5).

### 6. The Additional Facility

**15**    The Secretary-General performs a number of functions under the Additional Facility (see Art. 6, para. 25; Art. 25, paras. 9–13). The Additional Facility Rules and the Schedules attached thereto regulate these functions in some detail. Most of

---

4  *Ibid*., p. 89.                           5  *Ibid*., pp. 96/7.
6  *Ibid*., pp. 91, 95.                       7  *Ibid.*, pp. 88/9.
8  *Ibid*., p. 89.                            9  *Ibid*., p. 87.

these functions are analogous to those performed in respect of proceedings under the Convention (see paras. 9–13 *supra*). An important additional function is the approval of any agreement providing for conciliation or arbitration proceedings under the Additional Facility in accordance with Art. 4 of the Additional Facility Rules.[10]

### 7. Appointing Authority for Non-ICSID Arbitration

Parties to existing or potential disputes that fall neither under the ICSID Convention nor the Additional Facility may seek the assistance of the Secretary-General in constituting arbitral tribunals. They may designate him or her as appointing authority for some or all arbitrators under certain circumstances (see also Art. 37, paras. 18, 19, 22). This may be done, for instance, in agreements providing for arbitration under the UNCITRAL Rules.[11] Some bilateral investment treaties, the NAFTA and the Cartagena Free Trade Agreement (see Art. 25, paras. 427–459, 463) designate the Secretary-General as appointing authority for arbitrations that are outside the Convention and the Additional Facility and are governed by the UNCITRAL Rules.   **16**

The Secretary-General is under no obligation to accept such a designation but has often done so in fact. It is advisable to seek his or her advance consent, preferably before the agreement containing the designation is concluded. In seeking this consent, the parties should submit the provision in draft form. The relevant provision should clearly refer to the Secretary-General and not just to ICSID. The circumstances under which he or she is to exercise this function should be clearly spelt out. An example would be failure to appoint an arbitrator by a party or inability of the parties or of the party-appointed arbitrators to agree on a third arbitrator within a stated period of time.[12]   **17**

In practice, the arrangements under which the Secretary-General is requested to perform this function are international, involving at least one State or State entity. They typically concern transactions in the economic or financial fields.[13] It is clear that the designation of the Secretary-General as appointing authority will not make the Convention or the rules and regulations adopted under it applicable to the dispute. Neither will the Centre's administrative facilities be available in these proceedings.   **18**

The Model Clauses (see Art. 25, para. 385) contain the following formula that may be used by parties for this purpose:   **19**

---

10   See *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 344 *et seq.* (1999).

11   United Nations Commission on International Trade Law Arbitration Rules, 1976, 15 ILM 701 (1976).

12   See The ICSID Secretary-General as Appointing Authority in *Ad Hoc* Proceedings, News from ICSID, Vol. 6/2, p. 6 (1989).

13   For examples see News from ICSID, Vol. 1/1, pp. 3/4 (1984); Vol. 1/2, p. 13 (1984); Vol. 4/2, p. 8 (1987); 2 ICSID Review – FILJ 531, 533 (1987); ICSID Annual Report 1992, p. 4.

THE ICSID CONVENTION: A COMMENTARY

**Clause 22**

> Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules as at present in force. The appointing authority shall be the Secretary-General of the International Centre for Settlement of Investment Disputes. [The number of arbitrators shall be [one]/[three]. The place of arbitration shall be <u>name of town or country</u>. The language[s] to be used in the arbitral proceedings shall be <u>name of language(s)</u>.][14]

This clause referring to the UNCITRAL Arbitration Rules may be appropriately adapted for other arbitration rules.

_____

14   4 ICSID Reports 370. This clause is based on the model text published with the UNCITRAL Rules, to which the designation of the ICSID Secretary-General is added.

# Article 12

**The Panel of Conciliators and the Panel of Arbitrators shall each consist of qualified persons, designated as hereinafter provided, who are willing to serve thereon.**

Art. 3 of the Convention states that the Centre shall maintain a Panel of Conciliators and a Panel of Arbitrators. Section 4 of the Convention's Chapter I is headed "The Panels". It consists of Arts. 12–16 and deals with the designation of Panel members, their qualities, their periods of service, the relationship of the two Panels to each other and notification requirements. **1**

The drafts leading to the Convention all contained provisions substantively similar to what eventually became Art. 12 (History, Vol. I, pp. 66, 68). The idea was based on Art. 44 of the Hague Convention for the Pacific Settlement of International Disputes of 1907 establishing the Permanent Court of Arbitration[1] (History, Vol. II, p. 145). Arts. 12–16 of the Convention bear some resemblance to that provision.[2] During the Convention's drafting, the creation of Panels of Conciliators and Arbitrators was never cast into doubt (History, Vol. II, pp. 107, 110, 143, 145, 486/7, 753). But there were extensive debates on the Chairman's right to designate members of Panels (see Art. 13, para. 4), the number of persons to be designated (see Art. 13, paras. 1, 4), the qualifications of Panel members (see Art. 14, paras. 2, 3, 5, 9–11), the periods of service on the Panels (see Art. 15, paras. 2, 3, 5, 6) and some modalities of appointment (see Art. 16, paras. 2, 3, 5). **2**

The Report of the Executive Directors on the Convention summarizes the relevant provisions as follows: **3**

> *The Panels*
>
> 21. Article 3 requires the Centre to maintain a Panel of Conciliators and a Panel of Arbitrators, while Articles 12–16 outline the manner and terms of designation of Panel members. In particular, Article 14(1) seeks to ensure that Panel members will possess a high degree of competence and be capable of exercising independent judgment. In keeping with the essentially flexible character of the proceedings, the Convention permits the parties to appoint conciliators and arbitrators from outside the Panels but requires (Articles 31(2) and 40(2)) that such appointees possess the qualities stated in Article 14(1). The Chairman, when called upon to appoint a conciliator or arbitrator pursuant to Article 30 or 38, is restricted in his choice to Panel members.[3]

---

1   2 AJIL Supp. 43, 60 (1908).
2   For other systems offering panels of arbitrators see Art. 5 of the CAMCA Arbitration Rules, 35 ILM 1541, 1551 (1996) and Art. 1124(4) of the NAFTA (roster of presiding arbitrators), 32 ILM 605, 644 (1993).
3   1 ICSID Reports 27.

**4**      The Panels are lists of persons who may act as conciliators or arbitrators. These lists are designed to help the parties to proceedings to find appropriate conciliators and arbitrators. In selecting conciliators and arbitrators, the parties are not restricted to the Panels. Arts. 31 and 40 give the parties the freedom to appoint conciliators and arbitrators from outside the Panels, provided these persons have the qualities required of Panel members by Art. 14. But under Arts. 31(1) and 40(1), the Chairman, when making appointments pursuant to Arts. 30 and 38, is restricted to the Panels. The same restriction applies to appointments by the Chairman under Art. 56(3) and Conciliation and Arbitration Rules 11(2). Similarly, under Art. 52(3), the Chairman, when making appointments to an *ad hoc* committee, is restricted to the Panel of Arbitrators. These limitations on the Chairman's choice are somewhat mitigated by his or her power to designate up to ten persons to each Panel under Art. 13(2).

**5**      Art. 12 provides that Panel members must be qualified and willing to serve. Qualifications are dealt with in Art. 14. Under Administrative and Financial Regulation 21(3) (see Art. 16, para. 4), the Secretary-General requests a confirmation of the designee's willingness to serve. Willingness should not be restricted to serving on the Panel but should extend, in principle, to being appointed as conciliator or arbitrator. In a number of cases, Panel members have refused appointments. The official functions of Panel members sometimes do not permit them to find the time to serve on a commission or tribunal.[4]

**6**      The wording of Art. 12 provides for two separate Panels. In view of the considerable overlap in membership (see Art. 16, para. 2), the Centre keeps a consolidated list of members of both Panels. Membership in the Panel of Conciliators, the Panel of Arbitrators or both is indicated with each name. The list of members of the Panels of Conciliators and of Arbitrators is published by the Centre in periodically updated form. It is accessible through the Centre's website: http://www.worldbank.org/icsid/. The Centre's Annual Reports list new designations for the period covered.

**7**      Membership in a Panel does not entail any remuneration unless and until the person is actually appointed to a conciliation commission or an arbitral tribunal (see Art. 60, paras. 7, 8).

---

4    *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 93 (1985); *O'Keefe, P. J.*, The International Centre for Settlement of Investment Disputes, 34 The Yearbook of World Affairs 286, 295 (1980).

# Article 13

**(1) Each Contracting State may designate to each Panel four persons who may but need not be its nationals.**

**(2) The Chairman may designate ten persons to each Panel. The persons so designated to a Panel shall each have a different nationality.**

### OUTLINE

|   |   | *Paragraphs* |
|---|---|---|
| 1. | Designation by Contracting States | 1–3 |
| 2. | Designation by the Chairman | 4–6 |
| 3. | Nationality of Panel Members | 7–11 |

### *1. Designation by Contracting States*

All drafts leading to the Convention provided for the designation of Panel members by States parties to the Convention (History, Vol. I, pp. 68, 70; Vol. II, pp. 143, 753). Other more complicated models, such as the election of Panel members, were not pursued (History, Vol. II, pp. 145, 386). A discussion about the number of persons to be designated resulted in a compromise of four per State (at pp. 253, 318, 387, 561, 727). **1**

Designations are to be notified to the Secretary-General. The exact details of the designation process are set out in Administrative and Financial Regulation 21 (see Art. 16, para. 4). **2**

The wording of Art. 13(1) indicates that the designation of Panel members is a right rather than a duty. But a workable Panel depends on States exercising this right.[1] The Secretariat reminds States party to the Convention of this right before a designation falls due and at periodic intervals thereafter if no designation has been made. The list of members of the Panels (see Art. 12, para. 6) in its version of August 2008 indicates that of 143 States parties to the Convention, 98 had availed themselves of the right to make designations. But not all of these States have exhausted all four slots for each Panel. Many designees serve on both Panels (see Art. 16, para. 2). **3**

### *2. Designation by the Chairman*

The Chairman's (Art. 5) right to designate Panel members was contained in all drafts to the Convention (History, Vol. I, pp. 70, 72) but led to considerable debate. **4**

---

1  See *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 309 *et seq.* (1999).

Opinions were divided as to whether this right was useful or should be removed (History, Vol. II, pp. 113, 253, 315, 316, 319, 382, 385–388, 560, 562, 662). There were also different opinions as to how many Panel members the Chairman should be allowed to designate (at pp. 143–145, 253, 318, 385, 489, 562). Eventually, it was decided in two votes to leave the Chairman's power to designate Panel members intact and to fix the number of potential designees at ten (at p. 727).

5     The Chairman exercises his or her right to designate persons to the Panels on the advice of the Secretary-General. The Chairman's right to add names to the Panels has turned out to be extremely valuable, especially in view of the sometimes limited usefulness of Panel members appointed by States (see Art. 12, para. 5; Art. 14, para. 6).[2] Designations by the Chairman are made to add eminent persons to the Panels who have not been designated by States, but also to meet the requirements of a particular proceeding (see Art. 40, para. 11). The Chairman, in making appointments to commissions, tribunals and *ad hoc* committees, is usually restricted to Panel members (see Art. 12, para. 4).

6     Initially, the Chairman used his power to designate persons to the Panels sparingly. However, the Chairman's List in its version of August 2008 shows nine designations to the Panel of Conciliators and Arbitrators. Once designated, Panel members will serve for six years. Therefore, filling all ten slots would deprive the Chairman of the possibility to make a designation that appears necessary in view of a particular proceeding. Article 15(3) gives the Chairman additional flexibility. Since a Panel member continues in office until a successor has been designated, the Chairman may replace a Panel member designated by him, whose term of office has expired, at any time.

### 3. Nationality of Panel Members

7     All drafts leading to the Convention left it open to States to designate nationals or non-nationals (History, Vol. I, pp. 68, 70; Vol. II, pp. 387, 487/8). Mr. *Broches* explained that "some countries might not be able at the outset to find sufficiently eminent people willing to serve on the Panels and should be allowed to draw on nationals of other States with which they had some affinity" (History, Vol. II, p. 970). A suggestion to exclude nationals of non-member States of the World Bank did not succeed (at pp. 484, 486, 654, 726).

8     In actual practice, the vast majority of Panel members are nationals of the States designating them. In the few instances of designations of non-nationals, the designee's nationality is indicated in the list of Members of Panels (see Art. 12, para. 6).

---

2   *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 93 (1985); *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 638 (1993).

The designation by States of their own nationals to the Panel of Arbitrators **9** is not designed to lead to the appointment of national arbitrators to particular tribunals. Art. 39 and the relevant Arbitration Rules make the appointment of nationals or co-nationals of the parties as arbitrators unlikely (see Art. 39, paras. 12–22). The appointment of nationals or co-nationals of parties as members of an *ad hoc* committee is absolutely impermissible under Art. 52(3) (see Art. 52, para. 462). The Convention's Chapter on Conciliation does not contain a parallel provision (see Art. 29, paras. 4, 5; Art. 39, para. 4). There are no restrictions on the appointment of nationals and co-nationals of parties as members of a conciliation commission.

The requirement that persons designated to a Panel by the Chairman shall each **10** have a different nationality was not contained in the early drafts to the Convention (History, Vol. I, pp. 70, 72; Vol. II, p. 562). It is linked to Art. 14(2) which requires the Chairman to assure the representation of the principal legal systems of the world in making designations (see Art. 14, paras. 10, 12).

The term "nationals" in Art. 13 is restricted to natural persons. By contrast, in **11** Art. 25(2) the term "national" extends to natural as well as to juridical persons.

# Article 14

**(1) Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the fields of law, commerce, industry or finance, who may be relied upon to exercise independent judgment. Competence in the field of law shall be of particular importance in the case of persons on the Panel of Arbitrators.**

**(2) The Chairman, in designating persons to serve on the Panels, shall in addition pay due regard to the importance of assuring representation on the Panels of the principal legal systems of the world and of the main forms of economic activity.**

## OUTLINE

|   |   | *Paragraphs* |
|---|---|---|
| 1. | General Qualities of Panel Members | 2–8 |
| 2. | The Chairman's List | 9–12 |

## BIBLIOGRAPHY

*Guillaume, G.*, Some Thoughts on the Independence of International Judges Vis-à-Vis States, 2 The Law and Practice of International Courts and Tribunals 163 (2003);

*Malintoppi, L.*, Independence, Impartiality, and Duty of Disclosure of Arbitrators, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 789 (2008);

*Olbourne, B.*, Independence and Impartiality: International Standards for National Judges and Courts, 2 The Law and Practice of International Courts and Tribunals 97 (2003);

*Shelton, D.*, Legal Norms to Promote the Independence and Accountability of International Tribunals, 2 The Law and Practice of International Courts and Tribunals 27 (2003);

*Veeder, V. V.*, L'indépendance et l'impartialité de l'arbitre dans l'arbitrage international, Draft General Report of the Congrès de L'Association Internationale De Droit Judiciaire, Paris-Dijon (2004).

**1**    Art. 14 deals with the qualities of Panel members. The first paragraph lists the qualities all designees must possess. The second paragraph states additional requirements with respect to Panel members designated by the Chairman (Art. 5).

### *1. General Qualities of Panel Members*

**2**    The Working Paper and the Preliminary Draft to the Convention referred to high moral character and recognized competence in the fields of law, commerce, industry or finance as required qualities. Before making designations, States were

to seek advice from appropriate institutions in their countries (History, Vol. I, pp. 72, 74). The obligation to seek advice was dropped after a brief discussion (History, Vol. II, pp. 144, 385/6, 486/7, 562). The requirement of high moral character led to a number of questions. Mr. *Broches* explained that the phrase had been taken from the Statute of the International Court of Justice[1] (at pp. 144, 728/9, 753, 969, 970). There was also some debate about the competence and qualifications of Panel members. Suggestions to spell these out in more detail or to introduce a screening process did not succeed (at pp. 253, 254, 318, 385, 386, 485, 487, 489, 562, 727, 728, 753).

The legal qualifications of persons on the Panel of Arbitrators received special attention. As a result, a second sentence was added to Art. 14(1) emphasizing the importance of legal competence for persons on the Panel of Arbitrators (History, Vol. I, p. 74; Vol. II, pp. 489, 729/30, 753, 935). This provision does not make non-lawyers ineligible as members of the Panel of Arbitrators or of an arbitral tribunal. But the absence of qualified lawyers on a tribunal will make it more difficult to draft an award in accordance with Art. 48 and may increase the risk of annulment under Art. 52(1).[2]    **3**

Under Administrative and Financial Regulation 21(2), each designation must include a statement of qualifications with particular reference to any competence in the fields of law, commerce, industry and finance (see Art. 16, para. 4).    **4**

The earlier drafts to the Convention did not address the independence or impartiality of conciliators or arbitrators. The debates that led to the insertion of the words concerning the ability "to exercise independent judgment" show that the delegates were actually concerned with the impartiality of members of individual conciliation commissions or arbitral tribunals and not so much with the qualities of Panel members in general (History, Vol. I, p. 74; Vol. II, pp. 56, 386–388, 485).[3] It is clear that every Panel member should possess the general capability to exercise independent judgment. But the issue of independence and impartiality, typically, arises in relation to a particular party or dispute.[4] A person who is perfectly capable of exercising independent judgment in general will still be ineligible if there is a conflict of interests in a particular case. Therefore, the issue of independence and impartiality is prominent in the appointment of conciliators and arbitrators to particular commissions or tribunals.[5] The issue of the independence of arbitrators is discussed in more detail in this Commentary at Art. 40, paras. 17–24.    **5**

---

1  Statute of the ICJ, Art. 2.
2  *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 638 (1993).
3  *Loc. cit.*
4  See *Eisemann, F.*, La double sanction prévue par la Convention de la B.I.R.D. en cas de collusion ou d'ententes similaires entre un arbitre et la partie qui l'a désigné, 23 Annuaire Français de Droit International 436, 442 *et seq.* (1977).
5  See *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the *Ad Hoc* Committee, 3 October 2001, at paras. 14, 18.

**6**    The designation of individuals to the Panels is not subject to any challenge or scrutiny in light of the requirements of Art. 14(1). Therefore, designations are within the discretion of the States concerned (History, Vol. II, p. 728).[6] There have been complaints that not all members of the Panels had the necessary qualifications or were available for appointments.[7]

**7**    The situation is different when it comes to an actual appointment to a conciliation commission or arbitral tribunal (History, Vol. II, p. 970). Under Art. 57, a member of a commission or of a tribunal may be challenged and disqualified in case of a manifest lack of the qualities required by Art. 14(1) (see Art. 57, paras. 15–42). Under Arts. 31(2) and 40(2) conciliators and arbitrators appointed from outside the Panels must also possess the qualities stated in Art. 14(1) (see Art. 40, paras. 14–16) and may be challenged under the same conditions.

**8**    Annulment of an award under Art. 52(1)(a), due to the improper constitution of the tribunal on account of the absence of the qualities required by Art. 14(1), is possible but unlikely. Failure to propose the disqualification of an arbitrator in a timely manner leads to the loss of the right to request annulment on this ground (see Art. 52, paras. 60, 119, 124–129; Art. 57, paras. 3, 10, 11).

### 2. The Chairman's List

**9**    Art. 14(2) adds two further requirements that apply only to Panel members designated by the Chairman. These requirements do not relate to the qualities of individual designees but to the composition of the list as a whole. The Panels must represent the world's principal legal systems and the main forms of economic activity. The words "in addition" make it clear that the persons designated by the Chairman must also possess the qualities stated in Art. 14(1) (History, Vol. II, p. 486).

**10**    During the Convention's drafting, the provision that eventually became Art. 14(2) underwent little change (History, Vol. I, pp. 74, 76). There was general agreement that this provision should be used to assure a balanced representation of different legal systems supplementing the designations by States in this respect (History, Vol. II, pp. 127, 144, 145, 253, 318, 319, 386, 387, 488, 662). Mr. *Broches* explained that the idea was derived from the International Court of Justice[8] and that it was important in view of choice of law clauses referring to principles of law common to a certain group of countries (at p. 728).

**11**    The Chairman's power to designate Panel members was also seen as desirable to ensure the "fair representation on the Panels of qualified persons from both investing and receiving countries" (History, Vol. II, p. 382) (see also Art. 39,

---

6    *Broches, loc. cit.*
7    *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 820/1 (1982); *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 394 (1991); *O'Keefe, P. J.*, The International Centre for Settlement of Investment Disputes, 34 The Yearbook of World Affairs 286, 295 (1980); ICSID Twelfth Annual Report, p. 4 (1977/78).
8    Statute of the ICJ, Art. 9.

para. 11). In response to a question, Mr. *Broches* explained that the expression
"the main forms of economic activity" covered such sectors as banking, industry,
agriculture and the like (at p. 487).

A look at the Chairman's List of August 2008 reveals the following national-    **12**
ities: Australia, Benin, Canada, Chile, Egypt, France, India, Switzerland, United
States.

# Article 15

**(1) Panel members shall serve for renewable periods of six years.**

**(2) In case of death or resignation of a member of a Panel, the authority which designated the member shall have the right to designate another person to serve for the remainder of that member's term.**

**(3) Panel members shall continue in office until their successors have been designated.**

1    Art. 15 deals with the duration of service and consequences of a vacancy on the Panels.

2    The earlier drafts provided for four years of service on the Panels (History, Vol. I, pp. 76, 78). There were several suggestions that this term be extended. Eventually, it was fixed at six years with a possibility of renewal (History, Vol. II, pp. 144, 385, 386, 489, 562, 662, 722, 730, 731, 753, 935).

3    The Convention does not explicitly address the possibility of a removal or replacement of a Panel member before the expiry of the six years of service. During the Convention's drafting, there was a suggestion that Panel members should only serve "subject to the pleasure" of the designating authority; in other words, that the designation could be terminated at any time. Other delegates saw a danger to the independence of Panel members in this proposal. The idea to allow the removal of Panel members during their period of service was defeated in two votes (History, Vol. II, pp. 487–489, 562, 730–732). The peremptory language of Art. 15(1) ("shall serve for . . . six years") also supports the interpretation that, once designated, a Panel member may not be withdrawn by the designating authority (see Art. 16, para. 6). Designations for shorter periods than six years would also be impermissible.[1]

4    Art. 56(2) makes it clear that a Panel member who has been appointed to a conciliation commission or arbitral tribunal will continue to serve in that capacity even after the expiry of the membership on the Panel (see Art. 56, paras. 31–34).

5    The expiry of the six years of service on a Panel will not terminate the membership automatically. It merely opens the possibility for the designating authority to make another designation, thereby replacing the current member, or to redesignate the current member (History, Vol. II, pp. 730, 732, 754). This has the effect of keeping a larger number of persons on the Panels even in case of States' failure to make designations to which they are entitled. A look at the list of Members of the

---

1    *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 639 (1993).

Panels (see Art. 12, para. 6) reveals that a considerable number of Panel members continue to serve beyond their original six years of service.

The provision on the replacement of Panel members in case of death or resig-  **6** nation was contained in all drafts to the Convention and evoked little substantive comment (History, Vol. I, pp. 78, 80; Vol. II, pp. 144, 318, 487, 488, 723/4, 730, 753). A replacement is to be made by the authority that made the original designation, *i.e.* the State concerned or the Chairman. Designations under Art. 15(2) are not for a full six years but only for the balance of the previous member's term of office.

# Article 16

**(1) A person may serve on both Panels.**

**(2) If a person shall have been designated to serve on the same Panel by more than one Contracting State, or by one or more Contracting States and the Chairman, he shall be deemed to have been designated by the authority which first designated him or, if one such authority is the State of which he is a national, by that State.**

**(3) All designations shall be notified to the Secretary-General and shall take effect from the date on which the notification is received.**

1    Art. 16 deals with designations of one person to both Panels, with designations of one person by more than one designating authority and with the notification of designations.

2    The possibility of one person being designated to both Panels was foreseen in all drafts to the Convention and evoked little comment (History, Vol. I, pp. 80, 82; Vol. II, pp. 144, 726, 754). The qualifications required by Art. 14(1) for Panel membership are largely identical, although legal competence is emphasized for designations to the Panel of Arbitrators (see Art. 14, para. 3). In actual practice, the same persons are frequently designated to both Panels. The Centre keeps a consolidated list of members of both Panels (see Art. 12, para. 6).

3    Multiple designations of one person were the subject of some discussion during the Convention's drafting. The initial drafts simply provided that the earlier designation should be decisive. Later, a clause was added to the effect that designation by the State of the designee's nationality would prevail (History, Vol. I, pp. 82, 84; Vol. II, pp. 144, 145, 253, 318, 488, 489, 732/3, 754). The latter provision has the effect of freeing a position on the Chairman's List (see Art. 13, paras. 4–6) if a person on that List were to be designated by the State of her/his nationality. In actual practice, designations of one person by more than one designating authority are unlikely since designating States and the Chairman are fully informed of the existing Panel membership.

4    All designations are notified to the Secretary-General. The technical details of the notification process are contained in the Administrative and Financial Regulations:

### Regulation 21

*Establishment of Panels*

(1) Whenever a Contracting State has the right to make one or more designations to the Panel of Conciliators or of Arbitrators, the Secretary-General shall invite the State to make such designations.

(2) Each designation made by a Contracting State or by the Chairman shall indicate the name, address and nationality of the designee, and include a statement of his qualifications, with particular reference to his competence in the fields of law, commerce, industry and finance.

(3) As soon as the Secretary-General is notified of a designation, he shall inform the designee thereof, indicating to him the designating authority and the terminal date of the period of designation, and requesting confirmation that the designee is willing to serve.

(4) The Secretary-General shall maintain lists, which he shall transmit from time to time to all Contracting States and on request to any State or person, of the members of the Panels of Conciliators and of Arbitrators, indicating for each member:

    (a) his address;

    (b) his nationality;

    (c) the terminal date of the current designation;

    (d) the designating authority;

    (e) his qualifications.

During the Convention's drafting, a debate on the Secretary-General's duty to keep the States party to the Convention informed of the status of the List of Members of the Panels resulted in a decision to regulate this duty in the rules of procedure (History, Vol. II, pp. 732, 735, 768/9). It is reflected in Administrative and Financial Regulation 21(4). **5**

The rule in Art. 16(3), namely that the designation shall take effect upon receipt of the notification by the Secretary-General, is subject to Art. 15(1): if the designee is to replace a serving Panel Member, the designation will be effective from the date of the expiry of the previous Panel member's term of office. **6**

# Article 17

**If the expenditure of the Centre cannot be met out of charges for the use of its facilities, or out of other receipts, the excess shall be borne by Contracting States which are members of the Bank in proportion to their respective subscriptions to the capital stock of the Bank, and by Contracting States which are not members of the Bank in accordance with rules adopted by the Administrative Council.**

1    Art. 17 deals with the Centre's administrative expenditures. The cost of individual conciliation and arbitration proceedings are to be borne by the parties to these proceedings in accordance with Arts. 60 and 61.

2    All drafts leading to the Convention reflected the basic concept for the Centre's financing contained in Art. 17 (History, Vol. I, pp. 86, 88). In the deliberations on what became Art. 17, the overwhelming majority of opinions favoured a financing of the Centre's administrative costs by the World Bank (History, Vol. II, pp. 90, 92, 114, 116, 121, 128, 146, 254, 319, 381/2, 388, 483, 490, 544, 562, 651/2, 660, 733, 735/6). But a preference for the expenses to be borne at least partially by Contracting States to the Convention was expressed by other delegates. This was also designed to assure the financial participation of non-Members of the Bank who might ratify the Convention (at pp. 56, 100, 115, 122, 123, 128, 176/7, 722).

3    The phrase "or out of other receipts" was contained in all drafts to the Convention (History, Vol. I, pp. 86, 88). This was meant as a reference to the possibility that the World Bank might finance the costs of the Centre (History, Vol. II, pp. 146, 254, 319, 733, 971). Mr. *Broches* explained that the purpose of having the World Bank underwrite the Centre's administrative costs was "to avoid excessive administrative complexity while insulating the Center from the effects of delay by Contracting States in paying their contributions" (at p. 490). In response to suggestions that the Bank's financial sponsorship should be made explicit (at pp. 382, 651/2), Mr. *Broches* explained that it would be unsound to include in the Convention an unlimited and perpetual obligation for another institution to cover the Centre's expenses (at pp. 735/6). An undertaking, in limited terms, by the Bank's Executive Directors to underwrite the Centre's expenditures (see para. 4 *infra*) was obtained before the Convention's adoption (at pp. 935, 953/4, 970/1).

4    The Report of the Executive Directors on the Convention defines the Bank's financial undertaking towards the Centre in the following Terms:

> 17. With respect to the financing of the Centre (Article 17), the Executive Directors have decided that the Bank should be prepared to provide the Centre with office accommodation free of charge as long as the Centre has its seat at the Bank's headquarters and to underwrite, within reasonable limits, the basic

56

overhead expenditure of the Centre for a period of years to be determined after the Centre is established.

Para. 16 of the Report states that the Bank will provide the Centre with premises for its seat and with other administrative facilities and services (see Art. 6, para. 15).

The Bank's financial undertaking towards the Centre is set out in more detail in a Memorandum of Administrative Arrangements of 13 February 1967 between the two institutions[1] (see Art. 6, para. 16). Under this agreement, the World Bank bears the costs of the Centre's staff as well as its entire administrative costs.    **5**

In actual fact, the World Bank covers the Centre's administrative costs entirely. The Annual Reports explain this situation in the following terms:    **6**

> The administrative expenditures were, again, covered by the World Bank pursuant to the Memorandum of Administrative Arrangements concluded between the Bank and ICSID in February 1967, and by fee income and income from the sale of publications.
>
> It is therefore not necessary to assess any excess expenditures on Contracting States pursuant to Article 17 of the Convention.
>
> Expenditures relating to pending arbitration proceedings are borne by the parties in accordance with ICSID's Administrative and Financial Regulations.[2]

The Financial Statements for the financial year 2006 indicate that the value of services provided by the Bank as in-kind contributions amounted to US $2,136,222 net. This sum includes staff services, travel, contractual services, administrative services, communications and information technology and office accommodations. Revenues earned by the Centre from fees (see Art. 59, paras. 8–10) and the sale of publications is remitted to the Bank in partial reimbursement for the services by the Bank. During the same period these revenues amounted to US $1,624,569 and 54,552 respectively[3] (see also Art. 6, para. 19).    **7**

Payment of the Centre's administrative costs by the World Bank amounts to a subsidy to the Centre's activities. It contributes to the relatively low costs in ICSID proceedings (see Art. 59, paras. 3, 13).    **8**

Assessment of the Centre's expenditures on Contracting States is foreseen only if and to the extent that these expenses cannot be met out of charges under Art. 59 and out of other receipts. So far, this has never been necessary. If this should ever become necessary, assessment would take place in proportion to these States' subscriptions in the World Bank. Under Art. 67, non-Members of the World Bank may become parties to the Convention under conditions stated there. The Administrative and Financial Regulations contain precise rules for the assessment of the Centre's expenditures also on these States.[4]    **9**

---

1  ICSID First Annual Report 1966/67, pp. 15/16.    2  ICSID Annual Report 2006, p. 11.
3  *Op. cit.*, p. 54.    4  Regulation 18.

# Article 18

**The Centre shall have full international legal personality. The legal capacity of the Centre shall include the capacity:**
**(a) to contract;**
**(b) to acquire and dispose of movable and immovable property;**
**(c) to institute legal proceedings.**

**1**    Art. 18 is the first of seven Articles in the Convention's Section on Status, Immunities and Privileges. For other international institutions, the issues covered by this Section are often dealt with in separate treaties. These treaties are multilateral conventions on privileges and immunities as well as bilateral headquarters agreements. None of these treaties cover the Centre. The Centre is not a specialized agency in the sense of Art. 57 of the United Nations Charter.[1] Therefore, the 1947 Convention on the Privileges and Immunities of the Specialized Agencies[2] is not applicable to it. Neither is there a headquarters agreement between ICSID and the United States.[3] Since the Centre has separate international legal personality, the treaties covering the status, immunities and privileges of the World Bank do not apply to it. It follows that Arts. 18–24 of the ICSID Convention are the only treaty provisions covering the status, immunities and privileges of the Centre.[4]

**2**    A clause providing for legal personality was contained in all drafts to the Convention (History, Vol. I, p. 90). This clause was not uncontested and led to some debate (History, Vol. II, pp. 55, 101, 113, 246, 248/9, 312/3, 670, 697, 724). Mr. *Broches* explained that the clause was designed to distinguish the Centre from the World Bank (at pp. 312, 380). Requests to add more elaboration to the simple statement of legal personality led to the addition of a separate Article containing the list that is now in the Article's second sentence (at pp. 312, 314, 662/3). There was a lengthy debate on the meaning of "international" legal personality and its distinction from personality under domestic law (at pp. 380, 737–740, 971). The efforts of a working group resulted in the merger of the two separate Articles and the adoption of the final text (at pp. 747/8).

---

1   *Broches, A.*, On the Finality of Awards: A Reply to Michael Reisman, 8 ICSID Review – FILJ 92, 98 *et seq.* (1993).
2   Annex to General Assembly Resolution 179(II), 33 UNTS 261.
3   Executive Order 11966 of January 19, 1977, 42 Federal Register 4331 (1977) designates ICSID as a public international organization entitled to enjoy the privileges, exemptions and immunities conferred by the United States International Organizations Immunities Act (59 Stat. 669, 22 U.S.C. 288).
4   See also *Parra, A. R.*, The International Centre for Settlement of Investment Disputes and Immunity of Arbitrators, *in*: The Immunity of Arbitrators (*Lew, J.* ed.) 105 (1990).

The wording of Art. 18 is closely analogous to Sec. 1 of the 1946 Convention on the Privileges and Immunities of the United Nations[5] (History, Vol. II, p. 737) and to Sec. 3 of the Convention on the Privileges and Immunities of the Specialized Agencies (para. 1 *supra*). Art. 18 also corresponds to the provision on personality in Art. VII, Sec. 2 of the Articles of Agreement of the World Bank.[6]     **3**

The Report of the Executive Directors states:     **4**

> 15. The Convention establishes the International Centre for Settlement of Investment Disputes as an autonomous international institution (Articles 18–24).[7]

The Centre enters into publishing contracts. It does not own property and has no financial resources of its own. There is no publicly available information indicating that the Centre has ever been party to legal proceedings before national courts.     **5**

Reportedly, an unsuccessful ICSID claimant has tried to sue the World Bank before Belgian courts in 2005. The case was dismissed for lack of jurisdiction. The decision has not been published.     **6**

Despite close legal ties between the Centre and the World Bank (see Art. 2, para. 5), the Centre is an autonomous international organization, enjoying its own international legal personality. Therefore, lawsuits against the World Bank relating to activities by or under the auspices of ICSID would be directed against the wrong defendant. Because of the Centre's broad immunity from legal process under Art. 20, actions against it are unlikely to succeed.     **7**

---

5   1 UNTS 16.
6   Articles of Agreement of the International Bank for Reconstruction and Development, 2 UNTS 134.
7   1 ICSID Reports 26.

# Article 19

**To enable the Centre to fulfil its functions, it shall enjoy in the territories of each Contracting State the immunities and privileges set forth in this Section.**

**1** In the First Draft, the text of what later became Art. 19 was still attached to the general statement that the Centre shall have international legal personality (History, Vol. II, p. 619) and was evidently meant as an explanation and elaboration of the general statement on legal personality. Later, a list of specific legal capacities, previously contained in a separate Article, was attached to the general statement on legal personality and capacity (see Art. 18, para. 2) to form what subsequently became Art. 18. As a consequence, the text of what became Art. 19 was put into a separate Article (History, Vol. I, p. 92). The legal relevance of this Article was not clarified in the discussions which barely touched upon it (History, Vol. II, pp. 739, 740, 743).

**2** As it stands, Art. 19 is no more than a general introduction to the subsequent Articles. The Section referred to covers Arts. 18–24. The statement "to enable the Centre to fulfil its functions" may help to establish the exact extent of the immunities and privileges set out in the Convention. But the *travaux préparatoires* contain no indication that immunities and privileges that do not serve the Centre's functions should be denied or interpreted restrictively.

**3** The reference to the territories of Contracting States merely restates the general principle that a treaty will not bind States that are not parties to it.

# Article 20

**The Centre, its property and assets shall enjoy immunity from all legal process, except when the Centre waives this immunity.**

All drafts of the Convention provided for the Centre's immunity from all legal process (History, Vol. I, pp. 92, 94). It was explained that the immunity of other international organizations served as a model and that the slightly different situation of the World Bank[1] was due to the Bank's international borrowing activities (History, Vol. II, pp. 147, 391, 491, 741). **1**

Because of the Centre's broad jurisdictional immunity any lawsuits by disappointed parties to ICSID arbitration are ineffective. This may have been the reason why an unsuccessful claimant in an ICSID case tried to sue the World Bank which does not enjoy an equally broad immunity from legal process (see Art. 18, para. 6). **2**

The possibility of a waiver of the Centre's immunity was added to the text after a brief discussion (History, Vol. II, pp. 724, 741). There was a formal declaration to the effect that the Centre would not invoke its immunity in the case of counterclaims directly connected with the principal claim in proceedings instituted by the Centre (at pp. 741, 748, 935). **3**

Art. 20 is analogous to Sec. 2 of the Convention on the Privileges and Immunities of the United Nations[2] and Sec. 4 of the Convention on the Privileges and Immunities of the Specialized Agencies.[3] **4**

Under Administrative and Financial Regulation 32(1)(a) and (3)(c), the Secretary-General or the Administrative Council may waive the immunity of the Centre. **5**

---

1   See Art. VII(3) of the Articles of Agreement of the International Bank for Reconstruction and Development; Convention on the Privileges and Immunities of the Specialized Agencies, Annex VI. These provisions allow actions against the World Bank in a court of competent jurisdiction under defined circumstances.

2   1 UNTS 16.                              3   33 UNTS 261.

# Article 21

**The Chairman, the members of the Administrative Council, persons acting as conciliators or arbitrators or members of a Committee appointed pursuant to paragraph (3) of Article 52, and the officers and employees of the Secretariat:**

**(a) shall enjoy immunity from legal process with respect to acts performed by them in the exercise of their functions, except when the Centre waives this immunity;**

**(b) not being local nationals, shall enjoy the same immunities from immigration restrictions, alien registration requirements and national service obligations, the same facilities as regards exchange restrictions and the same treatment in respect of travelling facilities as are accorded by Contracting States to the representatives, officials and employees of comparable rank of other Contracting States.**

## OUTLINE

*Paragraphs*

1. Immunity from Legal Process      3–9
2. Other Immunities and Privileges      10–11

## BIBLIOGRAPHY

*Parra, A. R.*, The International Centre for Settlement of Investment Disputes and Immunity of Arbitrators, *in*: The Immunity of Arbitrators (*Lew, J.* ed.) 105 (1990)

**1**    Art. 21 deals with the personal immunities and privileges of individuals associated with the Centre's work. It covers the members of the Administrative Council and its Chairman (Art. 5), the Secretary-General, Deputy Secretary-General and other officers and employees of the Centre as well as conciliators, arbitrators and members of *ad hoc* committees.

**2**    The drafting of what became Art. 21 was based on the parallel provisions governing persons associated with the World Bank's work (History, Vol. II, pp. 255, 388, 391/2, 490/1, 563). It underwent relatively little change during the Convention's drafting (History, Vol. I, pp. 94, 96, 98). Art. 21 bears strong similarities to Art. VII, Sec. 8 of the World Bank's Articles of Agreement. Discussion on the drafts turned mainly on immunities for conciliators and arbitrators (para. 4 *infra*), on the question of waiver of immunity (para. 5 *infra*) and the criterion of officials of comparable rank used at the end of the Article (para. 10 *infra*).

### 1. Immunity from Legal Process

The persons listed in Art. 21 are immune from lawsuits or criminal prosecution **3** as well as administrative proceedings. But this immunity only extends to acts performed by them in the exercise of their functions for the Centre. It does not extend to private acts unconnected to the Centre's activities such as car accidents. This functional immunity is in line with the position of officers of other international institutions.[1]

The Working Paper for the Convention included conciliators and arbitrators **4** among the individuals who would enjoy immunity from legal process. But the subsequent Preliminary Draft did not. Suggestions to restore the immunity of conciliators and arbitrators are reflected in the subsequent drafts and in the Convention. Members of *ad hoc* committees were added at a later stage (History, Vol. I, pp. 94, 96, 98; Vol. II, pp. 389–392, 486, 490/1, 562, 741, 755, 944). A suggestion to grant full diplomatic immunity to conciliators and arbitrators did not succeed (at pp. 123, 319).

The possibility of a waiver of immunity from legal process was not contained **5** in the earlier drafts but was included at a later stage (History, Vol. I, pp. 94, 96, 98; Vol. II, pp. 391, 724, 741, 935). There was a formal declaration to the effect that the Centre should waive any immunity in case of counterclaims directly connected with the principal claim in proceedings instituted by persons who enjoy immunity under Art. 21 (at pp. 748, 935).

Under Administrative and Financial Regulation 32(1) the Secretary-General **6** may waive the immunity of the members of the Centre's staff. Under Regulation 32(2) the Chairman of the Administrative Council may waive the immunity of the Secretary-General and Deputy Secretary-General and of members of a conciliation commission, arbitral tribunal or *ad hoc* committee. Under Regulation 32(3) the Administrative Council may waive the immunity of the Chairman and of members of the Council as well as of any person listed in Regulation 32(1) and (2).

Neither the Convention nor the Regulations offer an indication of the cir- **7** cumstances under which the immunity from legal process should be waived. A suggestion to add a specification to the Convention that the jurisdictional immunity should only apply "in the interest of the Center" was not successful (History, Vol. II, p. 657). Such a specification would have been in line with conventions on the privileges and immunities of other international institutions (see para. 3 *supra*). Despite the absence of such a specification in the Convention, it can be expected that an immunity that impedes the course of justice would be waived if such waiver would not prejudice the interests of the Centre.[2]

---

1  See Convention on the Privileges and Immunities of the United Nations, Secs. 18, 20; Convention on the Privileges and Immunities of the Specialized Agencies, Secs. 19, 22.

2  *Parra, A. R.*, The International Centre for Settlement of Investment Disputes and Immunity of Arbitrators, *in*: The Immunity of Arbitrators (*Lew, J.* ed.) 105, 109/10 (1990).

**8**     In the unlikely case of corruption of an arbitrator, there is a possibility of parallel proceedings for the arbitrator's prosecution and for the resulting award's annulment under Art. 52(1)(c) (see Art. 52, paras. 271–277). Such parallel proceedings could lead to conflicting decisions. It has been suggested that in such a situation the Chairman of the Administrative Council might defer consideration of a waiver of an arbitrator's immunity until the *ad hoc* committee has ruled on the existence of corruption.[3] It should be added that the criteria for a decision by a domestic court and by an *ad hoc* committee may be different. For instance, an *ad hoc* committee is unlikely to annul an award adopted by a majority of the tribunal if the arbitrator who is accused of corruption has voted against it (see Art. 52, para. 482). A domestic court may still find such an arbitrator guilty of corruption.

**9**     There is no known instance of a case involving the immunity from legal process of a person listed in Art. 21.

### 2. Other Immunities and Privileges

**10**    The text of what eventually became Art. 21(b) underwent little change during the Convention's drafting (History, Vol. I, pp. 94, 96, 98). A suggestion to introduce a distinction between high officials and other officials was not adopted (History, Vol. II, pp. 724/5, 742). The final phrase referring to representatives, officials and employees of comparable rank of other Contracting States gave rise to some debate. The point was made that this criterion would be difficult to apply since the rank of individuals working on behalf of the Centre could hardly be compared with State officials (at pp. 254/5, 319, 388/9, 391, 490, 562, 971). In the end this phrase was nevertheless maintained.

**11**    In order to facilitate the application of Arts. 21(b) and 22, the Administrative and Financial Regulations provide for certificates of official travel:

> **Regulation 31**
> *Certificates of Official Travel*
> The Secretary-General may issue certificates to members of Commissions, Tribunals or Committees, to officers and employees of the Secretariat and to the parties, agents, counsel, advocates, witnesses and experts appearing in proceedings, indicating that they are traveling in connection with a proceeding under the Convention.[4]

---

3   *Parra*, The International Centre, p. 110.
4   See also *Parra*, The International Centre, pp. 108/9.

# Article 22

**The provisions of Article 21 shall apply to persons appearing in proceedings under this Convention as parties, agents, counsel, advocates, witnesses or experts; provided, however, that sub-paragraph (b) thereof shall apply only in connection with their travel to and from, and their stay at, the place where the proceedings are held.**

Art. 22 extends the privileges and immunities granted by Art. 21 to parties and their representatives as well as to witnesses and experts. **1**

The essence of what eventually became Art. 22 was contained in all drafts leading to the Convention (History, Vol. I, pp. 98, 100). The provision was explained as being designed to ensure the proper functioning of proceedings (History, Vol. II, pp. 146/7). The term "representatives of parties", contained in the earlier drafts, was deleted as superfluous in view of the references to "parties" and "agents" (at pp. 389/90, 392/3, 742, 748, 755). Parties were not included in the First Draft but after careful consideration they were reinstated in the list "thereby offering them a measure of protection if they had to appear in a country in which the atmosphere was unfriendly" (at p. 971). Immunities for witnesses and experts were not uncontested but were retained in all drafts (at pp. 490/1, 563). **2**

A general reference to "immunities and facilities . . . as may be necessary for the independent exercise of their functions" in the First Draft was replaced by the more precise reference to Art. 21 (at pp. 659, 666). A suggestion to grant communication privileges to parties, agents, counsel, advocates, witnesses and experts in analogy to Art. 23(2) was not successful (at p. 972). **3**

The provisions of Art. 21(b), which relate to immunities in connection with travel, apply to parties, agents, counsel, advocates, witnesses and experts but only in connection with their travel to and from the place of proceedings and their stay there. In order to facilitate the recognition of these privileges and immunities in States parties to the Convention, the Secretary-General will issue certificates of official travel to these persons under Administrative and Financial Regulation 31[1] (see Art. 21, para. 11). **4**

Apparently, practical problems in connection with travel arrangements for parties, agents, counsel, advocates, witnesses or experts in ICSID proceedings are not infrequent. It is not clear whether persons encountering such difficulties expressly invoke Art. 22 and use certificates of official travel issued by ICSID's Secretary-General in accordance with Administrative and Financial Regulation 31. **5**

---

1 See also *Parra, A. R.*, The International Centre for Settlement of Investment Disputes and Immunity of Arbitrators, *in*: The Immunity of Arbitrators (*Lew, J.* ed.) 105, 108/9 (1990).

**6**    In *Tradex* v. *Albania*, the witnesses of Albanian nationality were not, at first, granted visas to enter the United Kingdom for the purpose of giving evidence at the hearing to be held in London. As a consequence, the Tribunal had to postpone the hearing for over six months. The problems were subsequently resolved.[2]

**7**    According to a press report, French authorities denied a visa to the Attorney-General of Zimbabwe as a result of targeted EU travel sanctions in late 2006. He was thus unable to attend hearings in *Funnekotter* v. *Zimbabwe*[3] before an ICSID tribunal in Paris and had to be replaced by another state official.[4]

**8**    Special problems are likely to occur if persons who are subject to targeted travel sanctions imposed by the UN Security Council intend to rely upon Art. 22. According to Art. 103 of the UN Charter obligations under the Charter shall prevail in the event of a conflict with obligations under any other international agreement. Obligations under the UN Charter include the obligation to carry out binding decisions of the UN Security Council.[5]

**9**    The reference to Art. 21 includes the provision on waiver of immunity in Art. 21(a) (see also History, Vol. II, p. 935). Under Administrative and Financial Regulation 32(2)(c), the Chairman of the Administrative Council may waive the immunity of the parties, agents, counsel, advocates, witnesses or experts appearing in a proceeding if a recommendation for such waiver is made by the commission, tribunal or *ad hoc* committee concerned. Even without such a recommendation, the Administrative Council may waive the immunity of any such person under Regulation 32(3)(b).

**10**    In *Libananco* v. *Turkey*, the Claimant complained that the Turkish authorities were holding Libananco's legal representative and potential witnesses under surveillance and that there had been interception of the e-mail communications of Libananco's counsel in the arbitration.[6] The Tribunal recognized that the allegations affected the immunities accorded to parties, their counsel and witnesses under Arts. 21 and 22. The Tribunal pointed out that respect for the Tribunal itself was also affected.[7] In order to facilitate the application of Arts. 21 and 22 the Tribunal called upon the Claimant to provide the Respondent with a list of persons to whom the Claimant considered that Art. 22 applied.[8]

---

2    *Tradex* v. *Albania*, Award, 29 April 1999, para. 26.

3    *Funnekotter* v. *Zimbabwe*, Case No. ARB/05/6.

4    "France denies visa to Zim's Attorney-General", Tuesday 19 December 2006, ZimOnline – Zimbabwe's Independent News Agency, available at http://www.zimonline.co.za/Article. aspx?ArticleId=649.

5    *Bernhardt, R*., Article 103, *in*: The Charter of the United Nations. A Commentary (*Simma, B*. ed.) 1292, 1295 (2nd ed., 2002).

6    *Libananco* v. *Turkey*, Decision on Preliminary Issues, 23 June 2008, para. 72.

7    At para. 78.                                    8    At para. 82, sec. 1.1.5.

# Article 23

**(1) The archives of the Centre shall be inviolable, wherever they may be.**

**(2) With regard to its official communications, the Centre shall be accorded by each Contracting State treatment not less favourable than that accorded to other international organizations.**

## OUTLINE

| | | *Paragraphs* |
|---|---|---|
| 1. | Archives | 1–4 |
| 2. | Official Communications | 5–6 |

### *1. Archives*

All drafts leading to the Convention provided for the inviolability of the Centre's archives (History, Vol. I, pp. 100, 102). The provision elicited little discussion (History, Vol. II, p. 391). The phrase "wherever they may be" was added at a later stage (at pp. 743/4). Mr. *Broches* explained that the inviolability of archives was entirely separate from the question of information and publication (at p. 743). **1**

Art 23(1) is closely parallel to Sec. 4 of the Convention on the Privileges and Immunities of the United Nations[1] and to Sec. 6 of the Convention on the Privileges and Immunities of the Specialized Agencies.[2] **2**

Art. 23(1) does not provide for a waiver of immunity but neither does it impose an obligation of secrecy. The Centre keeps lists, registers and archives (see Art. 11, paras. 7, 8). It disseminates information in a variety of ways (see Art. 1, para. 5). It publishes awards, other decisions and information about cases within the confines of Art. 48(5) and of the Arbitration Rules (see Art. 48, paras. 107–129). **3**

There are no known problems concerning the inviolability of the Centre's archives. **4**

### *2. Official Communications*

The earlier drafts to the Convention provided that the official communications of the Centre would be accorded the same treatment by each Contracting State as the official communications of other Contracting States (History, Vol. I, p. 102). This is also the solution adopted in Sec. 9 of the Convention on the Privileges and Immunities of the United Nations and in Sec. 11 of the Convention on the Privileges and Immunities of the Specialized Agencies (para. 2 *supra*). After little **5**

---

1   1 UNTS 16.
2   33 UNTS 261.

debate, the reference to official communications of other States was changed to those of other international organizations (History, Vol. II, pp. 389/90, 391, 666, 743, 755, 936). A suggestion to include a reference to documents in transit or to the transfer of documents was not successful (at p. 744).

**6**    Art. 23(2) covers such issues as priority of transmission, transmission rates and taxes as well as freedom from censorship and interception. It was drafted before the invention of facsimile transmission and electronic mail.

# Article 24

**(1) The Centre, its assets, property and income, and its operations and transactions authorized by this Convention shall be exempt from all taxation and customs duties. The Centre shall also be exempt from liability for the collection or payment of any taxes or customs duties.**

**(2) Except in the case of local nationals, no tax shall be levied on or in respect of expense allowances paid by the Centre to the Chairman or members of the Administrative Council, or on or in respect of salaries, expense allowances or other emoluments paid by the Centre to officials or employees of the Secretariat.**

**(3) No tax shall be levied on or in respect of fees or expense allowances received by persons acting as conciliators, or arbitrators, or members of a Committee appointed pursuant to paragraph (3) of Article 52, in proceedings under this Convention, if the sole jurisdictional basis for such tax is the location of the Centre or the place where such proceedings are conducted or the place where such fees or allowances are paid.**

## OUTLINE

*Paragraphs*

1. The Centre — 2
2. Persons Permanently Associated with the Centre's Work — 3–4
3. Conciliators, Arbitrators and Members of *Ad Hoc* Committees — 5–6

Art. 24 deals with the freedom from taxation. Para. 1 covers the Centre itself. Para. 2 covers persons who are permanently associated with the Centre's work. These are the Chairman, the members of the Administrative Council and officials and employees of the Secretariat. Para. 3 covers conciliators, arbitrators and members of *ad hoc* committees. Parties, agents, counsel, advocates, witnesses and experts enjoy no exemption from taxation. **1**

### *1. The Centre*

The text of Art. 24(1) was contained in all drafts to the Convention and underwent almost no change (History, Vol. I, p. 104). It was copied from the parallel provisions of the World Bank's and International Monetary Fund's Articles of Agreement[1] (History, Vol. II, pp. 389, 744/5). There was some debate about local **2**

---

1  Art. VII, Sec. 9(a) of the Articles of Agreement of the International Bank for Reconstruction and Development, 2 UNTS 134; Art. IX, Sec. 9(a) of the Articles of Agreement of the International Monetary Fund, 2 UNTS 40. The provisions on tax exemptions in the Convention on the Privileges

taxes or rates which cover actual services (at pp. 390, 666/7, 744). The reference to "operations and transactions" was explained by the fact that the Centre might want to enter into various contracts (pp. 392, 744/5). The exemption from the collection of taxes was explained by the practice of countries to impose the liability for withholding and paying taxes on employers (at pp. 745/6).

### 2. Persons Permanently Associated with the Centre's Work

**3**    A tax exemption for persons associated with the Centre's work on a permanent basis was contained in all drafts to the Convention (History, Vol. I, p. 106). The earlier drafts still referred to salaries and emoluments of the Chairman, the members of the Administrative Council and officials or employees of the Secretariat. This led to queries concerning an apparent contradiction with the provision excluding a remuneration from the Centre for the Chairman and members of the Administrative Council (Art. 8) (History, Vol. II, pp. 254, 319/20, 389, 481/2, 491, 715). As a consequence, the tax exemption of these persons was restricted to expense allowances. There was also debate about taxation in the countries of the nationality of the persons concerned. It was pointed out that the provision should be interpreted in the same way as the corresponding Articles in the Articles of Agreement of the World Bank[2] and the International Monetary Fund[3] (para. 2 *supra*) (at pp. 390–392, 667, 746, 755).

**4**    The "officials or employees of the Secretariat" include the Secretary-General and the Deputy Secretary-General.

### 3. Conciliators, Arbitrators and Members of Ad Hoc Committees

**5**    The essence of what later became Art. 24(3) was contained in all drafts to the Convention (History, Vol. I, pp. 108, 110). It was repeatedly emphasized that this provision does not confer a tax exemption but merely seeks to avoid taxation based solely on the location of the Centre, the place of proceedings or the place of payment. Liability for taxation in the country of the person's regular fiscal domicile would not be affected (History, Vol. II, pp. 147/8, 389–392, 652, 746, 756).

**6**    Only conciliators, arbitrators and members of *ad hoc* committees are covered by Art. 24(3). Counsel to parties, witnesses and experts appearing in proceedings do not benefit from this provision. Art. 24(3) only extends to fees and expense allowances under Art. 60. The provision does not affect the tax liability of conciliators, arbitrators and members of *ad hoc* committees in their countries of residence. Therefore, Art. 24(3) does not create a tax exemption but merely restricts the geographical basis for taxation.

---

and Immunities of the United Nations (Sec. 7), 1 UNTS 16, and in the Convention on the Privileges and Immunities of the Specialized Agencies (Sec. 9), 33 UNTS 261, are drafted differently.

2   Art. VII, Sec. 9(b).                    3   Art. IX, Sec. 9(b).

# Article 25

**(1)** The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.

**(2)** "National of another Contracting State" means:

    **(a)** any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and

    **(b)** any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.

**(3)** Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required.

**(4)** Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General shall forthwith transmit such notification to all Contracting States. Such notification shall not constitute the consent required by paragraph (1).

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–13 |
|  | **A. General** | 1–8 |
|  | **B. The Additional Facility** | 9–13 |

71

II.  INTERPRETATION                                              14–941
   A.  **"(1) The jurisdiction of the Centre . . ."**              14–40
      1.  Jurisdiction, Competence and Admissibility               14–18
      2.  Scope of Jurisdiction                                    19–34
         a)  Conciliation or Arbitration                           19–28
         b)  Fact-Finding                                          29–34
      3.  The Relevant Date for the Determination of
          Jurisdiction                                             35–40
   B.  **". . . shall extend to any legal dispute . . ."**         41–82
      1.  The Existence of a Dispute                               41–47
      2.  The Time of the Dispute                                  48–56
      3.  The Legal Nature of the Dispute                          57–82
         a)  Legal and Non-Legal Disputes                          57–67
         b)  The Justiciability of Disputes                        68–73
         c)  Questions of Fact                                     74–75
         d)  Non-Legal Means of Dispute Settlement                 76–82
   C.  **". . . arising directly . . ."**                          83–112
      1.  General Meaning under the Convention                     83–87
      2.  Direct Disputes or Direct Investments                    88–92
      3.  The General Unity of an Investment Operation             93–105
      4.  General Measures affecting Investments                   106–112
   D.  **". . . out of an investment, . . ."**                     113–210
      1.  General Meaning under the Convention                     113–121
      2.  The Dual Test for the Existence of an Investment         122–128
      3.  Contracts Relating to Investments                        129–133
      4.  Definitions of Investment in National Legislation        134–138
      5.  Definitions of Investment in Treaties                    139–147
      6.  Types of Investments                                     148–151
      7.  A Test for the Existence of an Investment?               152–174
      8.  Investments: Special Issues                              175–201
         a)  Pre-Investment Activities                             175–181
         b)  Origin of the Investment                              182–187
         c)  Investment in the Host State's Territory              188–198
         d)  Investment and Host State Law                         199–201
      9.  Use of the Additional Facility in the Absence of
          an Investment                                            202–210
         a)  Conciliation and Arbitration                          202–209
         b)  Fact-Finding                                          210
   E.  **". . . between a Contracting State . . ."**               211–229
      1.  Participation in the Convention                          211–220
      2.  Contingent Submission                                    221–223
      3.  The Additional Facility                                  224–226
      4.  *Ad Hoc* Arbitration                                     227–229

F.   **". . . (or any constituent subdivision or agency
     of a Contracting State designated to the Centre
     by that State) . . ."**                                       230–267
     1.   General Meaning                                          230–239
          a)   Designation Distinguished from Attribution          233–237
          b)   Negotiating History                                 238–239
     2.   Constituent Subdivision or Agency                        240–246
     3.   Designation to the Centre                                247–267
          a)   Form of Designation                                 252–257
          b)   Time of Designation                                 258–267
G.   **". . . and a national of another Contracting State, . . ."**   268–302
     1.   General Significance                                     268–269
     2.   The Private Character of the Investor                    270–276
     3.   Multipartite Arbitration                                 277–282
     4.   The Nationality of the Investor                          283
     5.   Participation of the Investor's State of Nationality in
          the Convention                                           284–288
     6.   Identification of the Investor's State of Nationality    289–298
     7.   Contingent Submission                                    299
     8.   The Additional Facility                                  300–301
     9.   *Ad Hoc* Arbitration                                     302
H.   **". . . which the parties to the dispute . . ."**           303–373
     1.   Identity of Consenting and Litigating Parties?           303–305
     2.   The Identification of the Party on the Host State's Side   306–318
          a)   State Succession                                    306–310
          b)   Constituent Subdivisions or Agencies                311–318
     3.   The Identification of the Party on the Investor's Side   319–363
          a)   Designation and Representation                      319–335
          b)   Assignment and Succession                           336–363
     4.   Subrogation                                              364–373
I.   **". . . consent in writing to submit to the Centre."**     374–595
     1.   General Significance                                     374–378
     2.   Consent in Writing                                       379–381
     3.   Consent through Direct Agreement between the Parties     382–391
          a)   Consent Recorded in a Single Instrument             382–387
          b)   Consent Based on an Investment Application          388–389
          c)   Consent by Reference to Another Legal Instrument    390–391
     4.   Consent through Host State Legislation                   392–426
          a)   Binding Offer of Consent by the Host State          395–409
          b)   Prospect of Future Consent                          410–415
          c)   Acceptance by the Investor                          416–426
     5.   Consent through Bilateral Investment Treaties            427–455
          a)   Binding Offer of Consent by the Host State          431–435

|     |     |     |     |
|-----|-----|-----|-----|
|     | b)  | Prospect of Future Consent | 436–440 |
|     | c)  | Consent to Different Forms of Arbitration | 441–446 |
|     | d)  | Acceptance by the Investor | 447–455 |
|  6. | Consent through Multilateral Treaties | | 456–467 |
|     | a)  | NAFTA | 457–459 |
|     | b)  | Energy Charter Treaty | 460–461 |
|     | c)  | Regional Treaties in Latin America | 462–463 |
|     | d)  | Non-Binding References to ICSID | 464–467 |
|  7. | The Temporal Elements of Consent | | 468–512 |
|     | a)  | Time of Consent | 468–469 |
|     | b)  | Contingent Expression of Consent | 470–474 |
|     | c)  | Relevance of the Time of Consent | 475–478 |
|     | d)  | Consent at the Time of the Institution of Proceedings | 479–480 |
|     | e)  | Consent After the Institution of Proceedings: *Forum Prorogatum* | 481–498 |
|     | f)  | Applicability of Consent *Ratione Temporis* | 499–512 |
|  8. | Limitations on Consent | | 513–539 |
|     | a)  | Limitations on Consent in Direct Agreements | 515–517 |
|     | b)  | Limitations on Consent in Legislation | 518–525 |
|     | c)  | Limitations on Consent in Treaties | 526–539 |
|  9. | Procedural Conditions to Consent | | 540–550 |
|     | a)  | Waiting Periods for Amicable Settlement | 541–547 |
|     | b)  | Attempt at Settlement in Domestic Courts | 548–550 |
| 10. | Applicability of Consent to Successive Instruments | | 551–566 |
| 11. | The Applicability of MFN Clauses to Consent | | 567–577 |
| 12. | The Interpretation of Consent | | 578–595 |
|     | a)  | The Law Applicable to the Interpretation of Consent | 578–585 |
|     | b)  | Restrictive or Extensive Interpretation of Consent | 586–595 |
| J.  | **"When the parties have given their consent, no party may withdraw its consent unilaterally."** | | 596–634 |
|  1. | The Irrevocability of Consent | | 596–606 |
|  2. | Prohibition of Indirect Withdrawal of Consent | | 607–634 |
|     | a)  | Notification under Art. 25(4) | 607–608 |
|     | b)  | Denunciation of the Convention | 609–611 |
|     | c)  | Withdrawal of Designation or Approval in Respect of a Constituent Subdivision or Agency | 612–613 |
|     | d)  | Withdrawal of Investment Authorization | 614–617 |
|     | e)  | Repeal of National Legislation providing for Consent | 618 |
|     | f)  | Termination of a Treaty providing for Consent | 619 |
|     | g)  | Invalidity or Termination of the Investment Agreement containing Consent | 620–624 |
|     | h)  | Incapacity to Give Consent | 625–632 |
|     | i)  | Conferral of Host State Nationality | 633–634 |

| | | |
|---|---|---|
| K. | **"(2) 'National of another Contracting State' means:"** | 635–639 |
| L. | **"(a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute;"** | 640–687 |
| | 1. Determination of Nationality | 641–659 |
| |    a) Applicable Law | 641–647 |
| |    b) Certificate of Nationality | 648–656 |
| |    c) Agreement on Nationality | 657–659 |
| | 2. Nationality of a Contracting State | 660–663 |
| | 3. No Nationality of the Host State | 664–678 |
| | 4. Critical Dates | 679–687 |
| M. | **"and (b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration . . ."** | 688–759 |
| | 1. Juridical Persons | 689–693 |
| | 2. Determination of Corporate Nationality | 694–740 |
| |    a) Incorporation, Seat or Control | 694–707 |
| |    b) Agreement on Nationality | 708–717 |
| |    c) Legislation and Treaties | 718–740 |
| | 3. Nationality of a Contracting State | 741–751 |
| | 4. Critical Date | 752–759 |
| N. | **". . . and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention."** | 760–902 |
| | 1. General Significance | 760–763 |
| | 2. Host State Nationality | 764–767 |
| | 3. Agreement to Treat the Investor as a National of Another Contracting State | 768–812 |
| |    a) Form of Agreement | 768–774 |
| |    b) Implicit Agreement | 775–794 |
| |    c) Identification of the Other Contracting State | 795–805 |
| |    d) Legislation and Treaties | 806–812 |
| | 4. Foreign Control | 813–870 |
| |    a) Objective Requirement of Foreign Control | 813–825 |
| |    b) Nationality of Foreign Control | 826–839 |

|  |  |  |
|---|---|---|
| | c) Indirect Control | 840–849 |
| | d) Form and Extent of Control | 850–870 |
| 5. | Critical Dates | 871–895 |
| 6. | Consequences of Agreement on Nationality | 896–902 |
| O. | **"(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required."** | 903–920 |
| | 1. Approval of Consent | 903–915 |
| | a) Need for Approval | 903–908 |
| | b) Form of Approval | 909–912 |
| | c) Time of Approval | 913–915 |
| | 2. Waiver of Approval | 916–918 |
| | 3. Consequences of Approval for the Host State | 919–920 |
| P. | **"(4) Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General shall forthwith transmit such notification to all Contracting States. Such notification shall not constitute the consent required by paragraph (1)."** | 921–941 |
| | 1. Notification of Intent Concerning Classes of Disputes | 921–927 |
| | 2. Consent and the Notification of Intent | 928–941 |

# BIBLIOGRAPHY

*Acconci, P.*, Determining the Internationally Relevant Link between State and Corporate Investor, 5 The Journal of World Investment & Trade 139 (2004);

Most-Favoured-Nation Treatment, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 363 (2008);

*Alexandrov, S. A.*, The "Baby Boom" of Treaty-Based Arbitrations and the Jurisdiction of ICSID Tribunals: Shareholders as "Investors" and Jurisdiction *Ratione Temporis*, 4 The Law and Practice of International Courts and Tribunals 19 (2005);

*Amerasinghe, C. F.*, How to Use the International Centre for Settlement of Investment Disputes by Reference to its Model Clauses, 13 Indian Journal of International Law 530 (1973);

Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211 (1973/74);

Jurisdiction *Ratione Personae* under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 47 British Year Book of International Law 227 (1974/75);

The Jurisdiction of the International Centre for the Settlement of Investment Disputes, 19 Indian Journal of International Law 166 (1979);

Interpretation of Article 25(2)(b) of the ICSID Convention, *in*: International Arbitration in the 21st Century: Towards Judicialization and Uniformity? (*Lillich, R. B./Brower, Ch. N.* eds.) 223 (1994);

*Asouzu, A. A.*, A Review and Critique of Arbitral Awards on Articles 25(2)(b) of the ICSID Convention, 3 The Journal of World Investment 397 (2002);

*Ben Hamida, W.*, The *Mihaly v. Sri Lanka* case: Some Thoughts relating to the Status of Pre-Investment Expenditures, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 47 (2005);

Two Nebulous ICSID Features: The Notion of Investment and the Scope of Annulment Control: *Ad Hoc* Committee's Decision in *Patrick Mitchell v. Democratic Republic of Congo*, 24 Journal of International Arbitration 287 (2007);

MFN and Procedural Rights: Solutions from WTO Experience?, *in*: Investment Treaty Arbitration and International Law (*Weiler, T. J.* ed.) 231 (2008);

*Berman, F.*, The Relevance of the Law on Diplomatic Protection in Investment Arbitration, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 67 (BIICL 2007);

*Bernardini, P.*, Nationality Requirements under BITs and Related Case Law, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 17 (BIICL 2007);

*Bliesener, D. H.*, La compétence du CIRDI dans la pratique arbitrale, 68 Revue de Droit International et du Droit Comparé 95 (1991);

*Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 351–364 (1972-II);

The "Additional Facility" of the International Centre for Settlement of Investment Disputes (ICSID), 4 Yearbook Commercial Arbitration 373 (1979);

Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 641–647 (1993);

*Brower, C. N./Wong, J.*, General Valuation Principles: The Case of *Santa Elena*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Investment Treaties and Customary International Law (*Weiler, T. J.* ed.) 747 (2005);

*Burgstaller, M.*, Nationality of Corporate Investors and International Claims against the Investor's Own State, 7 The Journal of World Investment & Trade 857 (2006);

*Castro de Figueiredo, R.*, ICSID and Non-Foreign Investment Disputes, 4(5) TDM (2007);

*Chatterjee, C.*, Investment-Related Promissory Notes Are Investment Under the ICSID Convention: *Fedax N.V. v. The Republic of Venezuela*, 3 The Journal of World Investment 147 (2002);

When Pre-Investment or Development Costs May or May Not Be Regarded as Part of Investment under Article 25(1) of the ICSID Convention, 4 The Journal of World Investment & Trade 909 (2003);

*Cheng, T.-H.*, State Succession and Commercial Obligations (2006);

*Crawford, J.*, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002);

*Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775 (1982);

ICSID Arbitration: Practical Considerations, 1 Journal of International Arbitration 101 (1984);

Transnational Contracts, Applicable Law and Settlement of Disputes (1990) Ch. XV;

How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168 (1992);

*Dolzer, R.*, The Notion of Investment in Recent Practice, *in*: Law in the Service of Human Dignity: Essays in Honour of Florentino Feliciano (*Charnovitz, S./Steger, D. P./van den Bossche, P.* eds.) 261 (2005);

*Dolzer, R., Stevens, M.*, Bilateral Investment Treaties (1995);

*Duchesne, M. S.*, The Continuous-Nationality-of-Claims Principle: Its Historical Development and Current Relevance to Investor-State Investment Disputes, 36 Geo. Wash. Intl. L. Rev. 783 (2004);

*Fadlallah, I.*, La notion d'investissement: vers une restriction à la compétence du CIRDI?, *in*: Global Reflections on International Law, Commerce and Dispute Resolution: Liber Amicorum in Honour of Robert Briner (*Aksen, G.* ed.) (2005);

Are State Entities Liable for the Conduct of their Instrumentalities? ICSID Case Law, *in*: State Entities in International Arbitration (*Gaillard, E./Younan, J.* eds.) 19 (2008);

*Gaillard, E.*, Some Notes on the Drafting of ICSID Arbitration Clauses, 3 ICSID Review – FILJ 136 (1988);

Investments and Investors Covered by the Energy Charter Treaty, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 54 (2006);

*Gaillard, E./Younan, J.* (eds.), State Entities in International Arbitration (2008);

*Gallagher, N.*, The Requirement for Substantive Nationality, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 27 (BIICL 2007);

*Gallus, N.*, State Enterprises as Organs of the State and BIT Claims, 7 The Journal of World Investment & Trade 761 (2006);

*Gallus N./Peterson, L. E.*, International Investment Treaty Protection of NGOs, 22 Arbitration International 527 (2006);

*Happ, R.*, The "Foreign Nationality"-Requirement and the "Exhaustion of Local Remedies" in Recent ICSID Jurisprudence, *in*: The International Convention on the Settlement of Investment Disputes (ICSID): Taking Stock After 40 Years (*Hofmann, R./Tams, C.* eds.) 103 (2007);

*Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes, 41–107 (1993);

*Hobér, K.*, State Responsibility and Investment Arbitration, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 261 (2006);

State Responsibility and Attribution, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 549 (2008);

*Hornick, R. N.*, The Mihaly Arbitration – Pre-Investment Expenditure as a Basis for ICSID Jurisdiction, 20 Journal of International Arbitration 189 (2003);

*Jagusch, S./Sinclair, A.*, The Limits of Protection for Investments and Investors under the Energy Charter Treaty, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 73 (2006);

*Knahr, C.*, Investments "in Accordance with Host State Law", *in*: International Investment Law in Context (*Reinisch, A./Knahr, C.* ed.) 27 (2008);

*Kovar, R.*, La compétence du Centre International pour le règlement des différends relatifs aux investissements, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées,

La Convention B.I.R.D. (*Centre de Recherche sur le Droit des Marchés et des Investissements internationaux de la Faculté de Droit de Paris* ed.) 25 (1969);

*Krishan, D.*, *Impregilo S.p.A.* v. *The Islamic Republic of Pakistan* – A Case Comment, 2(3) TDM (2005);

Nationality of Physical Persons, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 57 (BIICL 2007);

A Notion of ICSID Investment, *in*: Investment Treaty Arbitration and International Law (*Weiler, T. J.* ed.) 61 (2008);

*Kröll, S./Griebel, J.*, Protecting Shareholders in Investment Law: To Pierce or Not to Pierce the Veil, That is the Question!, 2 Stockholm International Arbitration Review 93 (2005);

*Kurtz, J.*, The Delicate Extension of MFN Treatment to Foreign Investors: *Maffezini* v. *Kingdom of Spain*, *in*: International Investment Law and Arbitration – Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 523 (2005);

*Laird, I.*, A Distinction Without a Difference? An Examination of the Concepts of Admissibility and Jurisdiction in *Salini* v *Jordan* and *Methanex* v *USA*, *in*: International Investment Law and Arbitration: Leading Cases (*Weiler, T.* ed.) 201 (2005);

A Community of Destiny – The *Barcelona Traction* case and the Development of Shareholder Rights to Bring Investment Claims, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 77 (2005);

*Lalive, P.*, The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 British Year Book of International Law 123 (1980);

*Lamm, C. B.*, Jurisdiction of the International Centre for Settlement of Investment Disputes, 6 ICSID Review – FILJ 462 (1991);

*Lamm, C. B./Cohen Smutny, A.*, The Implementation of ICSID Arbitration Agreements, 11 ICSID Review – FILJ 64 (1996);

*Larsen, C.*, ICSID Jurisdiction: The Relationship of Contracting States to Sub-States Entities, *in*: Arbitrating Foreign Investment Disputes (*Horn, N./Kröll, S.* eds.) 353 (2004);

*Laviec, J.-P.*, Protection et promotion des investissements, 269–286 (1985);

*Legum, B.*, Defining Investment and Investor: Who is entitled to Claim?, 22 Arbitration International 521 (2006);

*Loncle, J.-M.*, La qualité investisseur dans les décisions CIRDI, 6 Revue de droit des affaires internationales 729 (2005);

La notion d'investissement dans les décisions du CIRDI, 3 Affaires Internationales 3 (2006);

*Manciaux, S.*, The Relationships between States and their Instrumentalities in Investment Arbitration, *in*: State Entities in International Arbitration (*Gaillard, E./Younan, J.* eds.) 195 (2008);

*Masood, A.*, Jurisdiction of International Centre for Settlement of Investment Disputes, 14 Journal of the Indian Law Institute 119 (1972);

*Mendelson, M.*, Runaway Train: The "Continuous Nationality" Rule from the *Panavezys-Saldutiskis Railway* case to *Loewen*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 97 (2005);

The Requirement for Continuous Nationality, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 41 (BIICL 2007);

*Mengel, H.-J.*, Probleme der Zuständigkeit des International Centre for Settlement of Investment Disputes (ICSID), 32 Recht der Internationalen Wirtschaft 941 (1986);

*Niggemann, F.*, Zuständigkeitsprobleme der Weltbankschiedsgerichtsbarkeit im Licht der bisherigen Schiedsverfahren, 5 Praxis des Internationalen Privat- und Verfahrensrechts (IPRax) 185 (1985);

*Orrego Vicuña, F.*, Changing Approaches to the Nationality of Claims in the Context of Diplomatic Protection and International Dispute Settlement, 15 ICSID Review – FILJ 340 (2000);

*Pannier, M.*, Nationality of Corporations under Domestic Law: A Comparative Perspective, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 11 (BIICL 2007);

*Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287 (1997);

*Perera, S. M.*, State Responsibility – Ascertaining the Liability of States in Foreign Investment Disputes, 6 The Journal of World Investment & Trade 499 (2005);

*Perkams, M.*, Piercing the Corporate Veil in International Investment Agreements, *in*: International Investment Law in Context (*Reinisch, A./Knahr, C.* ed.) 93 (2008);

*Peters, P.*, Dispute Settlement Arrangements in Investment Treaties, 22 Netherlands Yearbook of International Law 91 (1991);

*Rand, W./Hornick, R. N./Friedland, P.*, ICSID's Emerging Jurisprudence: The Scope of ICSID's Jurisdiction, 19 New York University Journal of International Law and Politics 33 (1986);

*Rubins, N.*, The Notion of "Investment" in International Investment Arbitration, *in*: Arbitrating Foreign Investment Disputes (*Horn, N./Kröll, S.* eds.) 283 (2004);

MFN Clauses, Procedural Rights and a Return to the Treaty Text, *in*: Investment Treaty Arbitration and International Law (*Weiler, T. J.* ed.) 213 (2008);

*Savarese, E.*, La nazionalità delle società commerciali e la funzione del controllo: alcune riflessioni in margine alla decisione ICSID Tokios Tokeles v. Ukraine, 15 Rivista dell'Arbitrato 369 (2005);

Investment Treaties and the Investor's Right to Arbitration Between Broadening and Limiting ICSID Jurisdiction, 7 The Journal of World Investment & Trade 407 (2006);

*Schlemmer, E. C.*, Investment, Investor, Nationality, and Shareholders, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 49 (2008);

*Schreuer, C.*, The Interpretation of ICSID Arbitration Agreements, *in*: International Law: Theory and Practice, Essays in Honour of Eric Suy (*Wellens, K.* ed.) 719 (1998);

Access to ICSID Dispute Settlement for Locally Incorporated Companies, *in*: International Economic Law with a Human Face (*Weiss, F.* ed.) 497 (1998);

Travelling the BIT Route: Of Waiting Periods, Umbrella Clauses and Forks in the Road, 5 The Journal of World Investment & Trade 231 (2004);

Investment Treaty Arbitration and Jurisdiction Over Contract Claims – The *Vivendi I* Case Considered, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 281 (2005);

Shareholder Protection in International Investment Law, *in*: Common Values in International Law, Essays in Honour of Christian Tomuschat (*Dupuy, P.-M./Fassbender, B./Shaw, M.N./Sommermann, K.-P.* eds.) 601–619 (2006); also in: 2(3) TDM (2005);

Consent to Arbitration, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 830 (2008);

*Schreuer, C./Kriebaum, U.*, The Concept of Property in Human Rights Law and International Investment Law, *in*: Human Rights, Democracy and the Rule of Law, Liber Amicorum Luzius Wildhaber (*Breitenmoser, S.* ed.) 743 (2007);

*Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299 (1999);

*Sinclair, A. C.*, Nationality of Individual Investors in ICSID Arbitration, 7 International Arbitration Law Review 191 (2004);

The Substance of Nationality Requirements in Investment Treaty Arbitration, 20 ICSID Review – FILJ 357 (2005);

The "Foreign Nationality"-Requirements in ICSID Arbitration, *in*: The International Convention on the Settlement of Investment Disputes (ICSID): Taking Stock After 40 Years (*Hofmann, R./Tams, C.* eds.) 129 (2007);

ICSID's Nationality Requirement, *in*: Investment Treaty Arbitration and International Law (*Weiler, T. J.* ed.) 85 (2008);

*Smutny, A. C.*, State Responsibility and Attribution: When Is a State Responsible for the Acts of State Enterprises? *Emilio Agustín Maffezini* v. *The Kingdom of Spain*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 17 (2005);

*Szasz, P. C.*, A Practical Guide to the Convention on Settlement of Investment Disputes, 1 Cornell International Law Journal 1 (1968);

The Investment Disputes Convention – Opportunities and Pitfalls (How to Submit Disputes to ICSID), 5 Journal of Law and Economic Development 23 (1970);

*Toriello, P.*, The Additional Facility of the International Centre for Settlement of Investment Disputes, 4 Italian Yearbook of International Law 59 (1978/79);

*Tupman, W. M.*, Case Studies in the Jurisdiction of the International Centre for Settlement of Investment Disputes, 35 International and Comparative Law Quarterly 813 (1986);

*Turner, P.*, Treaties as Agreements to Arbitrate: Issues of Scope – Parties, Ownership and Control, ICCA Annual Congress, Montreal (2006);

*Vandevelde, K. J.*, Arbitration Provisions in the BITs and the Energy Charter Treaty, *in*: The Energy Charter Treaty (*Wälde, T. W.* ed.) 409 (1996);

*Williams, D. A. R.*, Jurisdiction and Admissibility, *in*: The Oxford Handbook of International Investment Law *(Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 868 (2008);

*Wisner, R.*, Derivative Actions and Indirect Claims, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 73 (BIICL 2007);

*Wisner, R./Gallus, N.*, Nationality Requirements in Investor-State Arbitration, 5 The Journal of World Investment & Trade 927 (2004);

*Yala, F.*, The Notion of "Investment" in ICSID Case Law: A Drifting Jurisdictional Requirement? Some "Unconventional" Thoughts on Salini, SGS and Mihaly, 22 Journal of International Arbitration 105 (2005);

*Ziadé, N. G.*, Introductory Note to the *SOABI* v. *Senegal* Award, 6 ICSID Review – FILJ 119 (1991).

# I. INTRODUCTION

## A. General

**1**    Art. 25 lays down the general parameters for ICSID's activity. It is the first of three articles in Chapter II, which is headed "Jurisdiction of the Centre". The other two articles deal with the much narrower questions of excluding other remedies (Art. 26) and diplomatic protection (Art. 27). Unlike Arts. 26 and 27, Art. 25 is not restricted to arbitration but refers to "The jurisdiction of the Centre" thereby also encompassing conciliation (see also paras. 19–28 *infra*). Art. 25 sets out the preconditions for the operation of Chapter III (Conciliation) and Chapter IV (Arbitration).

**2**    Art. 25 only deals with the substantive questions of jurisdiction. The procedure for the determination of the Centre's jurisdiction is regulated in Arts. 28(3) and 36(3), dealing with the Secretary-General's screening power, and in Arts. 32 and 41 which make the conciliation commission or the arbitral tribunal the judges of their own competence.

**3**    Art. 25 contains requirements relating to the nature of the dispute (*ratione materiae*) and to the parties (*ratione personae*). In addition, the parties must have given their consent. The requirements relating to the nature of the dispute are that it must arise directly from an investment and that it must be of a legal nature. Those relating to the parties specify that one side must be a Contracting State and the other a national of another Contracting State. All other parts of Art. 25 either define or otherwise specify these essential requirements.

**4**    The mixed nature of the dispute, that is the limitation to cases arising between a State and a foreign national, is in keeping with one of the Convention's purposes, to close a perceived procedural gap. Legal disputes between individuals or corporations are normally settled before domestic courts. States may settle their legal disputes before the International Court of Justice. However, in mixed disputes, especially arising from international investment relationships, no appropriate forum was seen to exist.

**5**    The requirements, as set out above, are in part regulated by the Convention – the nature of the dispute and of the parties – and in part left to the parties' disposition in framing their consent. The relationship between the objective and consensual sides of jurisdiction has given rise to some debate. In the course of the Convention's drafting, there were extensive discussions as to whether the objective criteria, notably "investment", "legal dispute" and the investor's nationality, required precise definition (see esp. History, Vol. II, pp. 491, 826, 831, 936, 956/7). Especially Mr. *Broches* explained that, since jurisdiction was optional in character, there was no need to give precise definitions. It was always up to the parties to give or withhold consent (at pp. 83, 258, 267, 268, 397, 491, 497, 499, 505, 540, 563, 566, 567, 700, 702, 707, 710, 972). He was joined by a number of delegates who felt that the parties' consent in a particular case implied their recognition that the objective criteria had been met. In other words, it should be the terms

of consent that ultimately defined the Centre's jurisdiction (at pp. 286, 450, 659, 701, 702, 706, 831, 972). Another group of delegates objected to an imprecise or open-ended description of the Centre's scope of activities. They feared that the mere participation in a convention which opens the door to a far-reaching jurisdiction would create expectations that would make it difficult for host States to resist pressure to give their consent. This, in turn, was liable to lead to friction and embarrassment (at pp. 259, 260, 285, 471, 494, 499, 501, 566, 653, 660, 700, 703, 704, 822). A Brazilian member of the Legal Committee summarized this position by saying that "the more the jurisdiction of the Centre is restricted, the closer we shall be to a satisfactory result" (at p. 838).

The fact that most of the proposed definitions for the objective criteria for jurisdiction were not adopted was motivated less by the view that they were redundant than by an inability to agree on them. It would be inaccurate to assume that the general phrasing of these objective criteria in Art. 25 gives the parties complete freedom to determine, by the terms of their consent, which disputes they wish to submit to the Centre. This fact is borne out by the Report of the Executive Directors: **6**

> 25. While consent of the parties is an essential prerequisite for the jurisdiction of the Centre, consent alone will not suffice to bring a dispute within its jurisdiction. In keeping with the purpose of the Convention, the jurisdiction of the Centre is further limited by reference to the nature of the dispute and the parties thereto.[1]

Consequently, it is necessary to take a closer look at the meaning of the objective jurisdictional requirements set out in Art. 25. The interpretation by the parties of these objective requirements carries great weight. Nevertheless, there are outer limits to the Centre's jurisdiction that are not subject to the parties' disposition (see paras. 62, 63, 80, 84, 85, 122–128, 515, 638, 639 *infra*). This conclusion is borne out by Rule 41(2) of the Arbitration Rules and Rule 29(2) of the Conciliation Rules: a conciliation commission or an arbitral tribunal will not only take note of an objection to jurisdiction filed by a party but may also consider on its own initiative whether the dispute before it is within the Centre's jurisdiction. **7**

Jurisdictional questions under Art. 25 may arise at different stages in the proceedings: at the stage of instituting proceedings, especially in connection with the Secretary-General's screening power under Arts. 28(3) and 36(3), at a preliminary stage before the conciliation commission or arbitral tribunal if the commission or tribunal decides to deal with some or all of them as preliminary questions, and at any time in the course of the proceedings if the commission or tribunal decides to join all or some of them to the merits of the dispute in accordance with Arts. 32(2) and 41(2). In the case of an arbitral award, questions of jurisdiction may also be raised in the context of a request for annulment: a violation of Art. 25 may have the consequence that the tribunal has manifestly exceeded its powers in accordance with Art. 52(1)(b) of the Convention (see Art. 52, paras. 155–166). **8**

---

1   1 ICSID Reports 28.

## B. The Additional Facility

**9**  Certain investors and capital exporting States regarded some of Art. 25's jurisdictional requirements as too restrictive. The requirement that both the host State and the investor's State of nationality must be Contracting States excluded access to the Centre in many situations. In addition, doubts persisted as to the precise meaning of "dispute arising directly out of an investment". In response to these concerns, the Administrative Council of the Centre on 27 September 1978 adopted Additional Facility Rules.[2] These rules are designed to open access to the Centre in certain situations where the Convention's jurisdictional requirements *ratione personae* and *ratione materiae* have not been met.

**10**  The conditions for access to the Centre under the Additional Facility are described in Art. 2 of its Rules:

<div align="center">

**Article 2**

*Additional Facility Rules*
</div>

The Secretariat of the Centre is hereby authorized to administer, subject to and in accordance with these Rules, proceedings between a State (or a constituent subdivision or agency of a State) and a national of another State, falling within the following categories:

(a) conciliation and arbitration proceedings for the settlement of legal disputes arising directly out of an investment which are not within the jurisdiction of the Centre because either the State party to the dispute or the State whose national is a party to the dispute is not a Contracting State;

(b) conciliation and arbitration proceedings for the settlement of legal disputes which are not within the jurisdiction of the Centre because they do not arise directly out of an investment, provided that either the State party to the dispute or the State whose national is a party to the dispute is a Contracting State; and

(c) fact-finding proceedings.

The administration of proceedings authorized by these Rules is hereinafter referred to as the Additional Facility.

**11**  Therefore, the Additional Facility created three new types of proceedings:

1. Conciliation or arbitration for the settlement of investment disputes where only one side is a party to the Convention or a national of a party to the Convention;

2. Conciliation or arbitration for the settlement of disputes that do not arise directly from an investment, provided that at least one side is a party to the Convention or a national of a party to the Convention;

3. Fact-finding proceedings.

---

2  The Additional Facility was initially approved for a five-year term. It was continued indefinitely by decision of the Administrative Council on 26 September 1984. See News from ICSID, Vol. 2/1, pp. 6/7 (1985). Generally on the Additional Facility see *Broches*, The "Additional Facility"; *Delaume*, Transnational Contracts, pp. 79–83; *Toriello*, The Additional Facility.

In all three cases, proceedings must arise from a mixed dispute; that is, between a State and a foreign national. In the case of 1. and 2. at least one side must be either a Contracting State or a national of another Contracting State of the Convention.[3] In the case of fact-finding no further jurisdictional requirements *ratione personae* or *ratione materiae* are indicated (see paras. 30–34 *infra*).

Art. 3 of the Additional Facility Rules points out that the Convention is not applicable to Additional Facility proceedings. This means, in particular, that arbitration proceedings are not insulated from national law and that the recognition and enforcement of awards is not subject to Arts. 53 and 54 of the Convention but is governed by the law of the forum and any applicable treaties (see Art. 53, paras. 5–9; Art. 54, paras. 12–22).    **12**

The Additional Facility is reflected in a considerable number of investment agreements, bilateral investment treaties, multilateral treaties and national investment legislation. Many of these documents offer consent to jurisdiction under the Additional Facility. Since 1997 the Additional Facility has generated a considerable number of proceedings. It is especially significant in the framework of the NAFTA, since neither Canada nor Mexico are parties to the ICSID Convention (see para. 458 *infra*). Some of the more detailed questions arising in relation to the Additional Facility are discussed below in the context of the concept of investment (paras. 202–210 *infra*), Contracting States (paras. 224–226, 300–301 *infra*) and fact-finding (paras. 30–34 *infra*) (see also Art. 6, para. 25).    **13**

## II. INTERPRETATION

### A. "(1) The jurisdiction of the Centre . . ."

#### 1. Jurisdiction, Competence and Admissibility

Art. 1 of the Convention makes clear that the use of the term "the Centre" refers to the International Centre for Settlement of Investment Disputes. No similar clarification is offered for the term "jurisdiction". The concept may be defined generally as "the power of a court or judge to entertain an action, petition or other proceeding".[4]    **14**

The term "jurisdiction of the Centre" was used throughout the Convention's drafting history (History, Vol. I, pp. 110–118). There were some queries as to the appropriateness of the word jurisdiction seeing that the Centre only exercises    **15**

---

3   One author has surmised that a literal reading of the French version of Art. 2 of the Additional Facility Rules might be read in the sense that the Additional Facility is also open to parties both of which are foreign to the Convention: *Toriello*, The Additional Facility, p. 73. This interpretation does not appear to be supported by the French text and is flatly contradicted by the Introductory Notes to the Additional Facility Rules and the Comments to their Art. 2 prepared by the Centre. See 1 ICSID Reports 213, 218.

4   Jowitt's Dictionary of English Law, Vol. 1, p. 1034 (1977). See also Black's Law Dictionary (7th ed.), p. 855 (1999).

administrative functions (History, Vol. II, p. 830). Also, there was some feeling that the term might not reflect the purely voluntary nature of the Centre's activity and might indicate an element of compulsion (at pp. 491, 700). At times, the word "competence" was suggested (at pp. 396, 409, 451). The retention of "jurisdiction" was justified by reference to its use in Art. 47 of the 1907 Hague Convention for the Pacific Settlement of International Disputes dealing with the Permanent Court of Arbitration (at pp. 203, 255, 320, 491).[5]

**16**    The Report of the Executive Directors to the Convention gives a broad interpretation to the term:

> 22. The term "jurisdiction of the Centre" is used in the Convention as a convenient expression to mean the limits within which the provisions of the Convention will apply and the facilities of the Centre will be available for conciliation and arbitration proceedings.[6]

**17**    A look at the English text of the Convention shows that the terms "jurisdiction" and "competence" are used in slightly different ways. Arts. 32(2) and 41(2) speak of the "jurisdiction of the Centre" and of the "competence of the Commission" or "Tribunal" respectively.[7] Arts. 28(3) and 36(3) also refer to the "jurisdiction of the Centre" in the context of the Secretary-General's screening power. Arbitration Rule 41 adopts the same distinction (see Art. 41, paras. 56, 57). ICSID tribunals generally follow this terminology in referring to the "jurisdiction of the Centre" and the "competence of the Tribunal".[8]

**18**    The term "admissibility" does not appear in the Convention.[9] Some tribunals have questioned the usefulness of the term in the framework of ICSID.[10] Other

---

5  See also *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 265/6 (1966).

6  1 ICSID Reports 28.

7  The equally authentic Spanish and French texts use the terms "jurisdicción" and "compétence" in Art. 25(1). The Spanish text, like the English text, in Arts. 32 and 41 distinguishes between "jurisdicción" and "competencia". The French text uses "compétence" for both purposes.

8  See *e.g. Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 6; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.13; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 131; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 161; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 68; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 21. Some tribunals have consciously used the terms "jurisdiction" and "competence" interchangeably: *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 54; *ADC* v. *Hungary*, Award, 2 October 2006, para. 294.

9  See *Laird, I.*, A Distinction Without a Difference? An Examination of the Concepts of Admissibility and Jurisdiction in *Salini* v *Jordan* and *Methanex* v *USA*, *in*: International Investment Law and Arbitration: Leading Cases (*Weiler, T.* ed.) 201 (2005); *Williams, D. A. R.*, Jurisdiction and Admissibility, *in*: The Oxford Handbook of International Investment Law *(Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 868 (2008).

10  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 41; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 33; *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. 2; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 85–87; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 54; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, para. 7.2.4.

tribunals have used the term in various contexts,[11] including the effect of domestic forum selection clauses in contracts.[12]

## 2. Scope of Jurisdiction

### a) Conciliation or Arbitration

Under the Convention's system, jurisdiction encompasses conciliation and arbitration. Art. 25 does not differentiate between these two methods of dispute settlement. Earlier drafts to the Convention referred to conciliation and arbitration separately but the word "jurisdiction" was used in later versions (History, Vol. I, pp. 110, 112, 116, 118; Vol. II, p. 836). Some delegates felt that arbitration was appropriate only for legal disputes whereas conciliation was useful also for non-legal disputes (History, Vol. II, pp. 322, 396, 467, 508, 699, 702). Another idea was that conciliation should precede arbitration and that this should be reflected in the Convention's text (at pp. 65, 203, 255, 263, 265, 275, 320, 404, 413, 564). Neither suggestion found its way into the Convention's text nor into the Executive Directors' Report. **19**

Rule 1 of the Institution Rules states in relevant part: **20**

> The request shall indicate whether it relates to a conciliation or an arbitration proceeding.[13]

It is advisable to make an explicit choice between conciliation or arbitration prior to the request. This can be done in several ways. A consent clause may refer to one method of settlement only, that is either to conciliation or to arbitration. Alternatively, it may provide for conciliation followed by arbitration if the former method turns out to be unsuccessful. In this case a time limit may be included for conciliation.

The 1993 ICSID Model Clauses[14] 1 and 2 suggest that the parties specify whether their consent relates to conciliation or to arbitration. Alternatively, they suggest that the parties consent to "... conciliation followed, if the dispute remains unresolved within [a stated time limit] of the communication of the report of the Conciliation Commission to the parties, by arbitration . . ." (see paras. 386, 387 *infra*). References to "conciliation or arbitration" or to "conciliation and arbitration" are less clear, although, presumably, the choice between the two methods is left to the party instituting proceedings. Mere references to the "jurisdiction of **21**

---

11  *Goetz* v. *Burundi*, Award, 10 February 1999, before para. 86; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 7.1, 15.7, 15.8; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 98; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 109; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 152–161, 166–167; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 150–158; *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, paras. 58, 63–64.

12  *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, paras. 94, 154, 155, 169(4), 170.

13  On conciliation, see *Ziadé, N. G.*, ICSID Conciliation, News from ICSID, vol. 13/2, p. 3 (1996); *Onwuamaegbu, U.*, The Role of ADR in Investor-State Dispute Settlement: The ICSID Experience, News from ICSID, vol. 22/2, p. 12 (2005).

14  4 ICSID Reports 357. For an explanation of the Model Clauses see para. 385 *infra*.

the Centre", to "dispute settlement by the Centre" or to the Convention in general terms are not desirable since they may lead to disagreements between the parties if they insist on different procedures.[15]

**22**      The practice of ICSID shows a variety of consent clauses dealing with this question with different degrees of precision. Some investment agreements specify that consent refers to arbitration only.[16] Another model provides for conciliation, failing which the dispute is to be settled by arbitration.[17] In other cases, the agreements provide for "conciliation and arbitration" or "conciliation or arbitration".[18] In yet other agreements between the parties the dispute settlement clause merely provides for submission to the Centre without any reference to conciliation or arbitration.[19] In none of these cases did the choice of arbitration rather than conciliation lead to any difficulties.

**23**      Clauses in treaties referring to the jurisdiction of ICSID are similarly diverse.[20] Some of these clauses refer to arbitration only.[21] Other clauses provide for settlement by "conciliation or arbitration" under the Convention.[22] Another type refers to "conciliation or arbitration", adding that "[i]n the event of disagreement as to whether conciliation or arbitration is the more appropriate procedure, the national or company affected shall have the right to choose".[23] Finally, a number of BITs simply provide for the reference of disputes to the Centre without mention of conciliation or arbitration.[24]

**24**      In *AAPL* v. *Sri Lanka*, the first ICSID case based on a jurisdictional clause in a BIT, the 1980 Treaty between the United Kingdom and Sri Lanka in its Art. 8

---

15  See also *Amerasinghe*, How to Use the International Centre, p. 533; *Amerasinghe*, Submissions to the Jurisdiction, pp. 216/7.

16  See *e.g.*, *AGIP* v. *Congo*, Award, 30 November 1979, para. 18; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.15.

17  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 67; Decision on Annulment, 22 December 1989, para. 1.04. It appears that the original clause was seriously flawed. It was replaced subsequently by a clause referring to arbitration only. *Loc. cit.* See also *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 344 (1986).

18  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 12; *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 350.

19  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 10.

20  *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 323 (1997); *Reif, L. C.*, Conciliation as a Mechanism for the Resolution of International Economic and Business Disputes, 14 Fordham International Law Journal 578, 607 *et seq*. (1991).

21  See *e.g.*, NAFTA Arts. 1116, 1120; France Model BIT 2006 Art. 8; Germany Model BIT 2005 Art. 11(2); UK Model BIT 2005 Art. 8 (Alternative II); US Model BIT 2004 Art. 25; Denmark-Turkey BIT (1990) Art. 8; Bangladesh-Italy BIT (1990) Art. 9(2); US-Argentina BIT (1991) Art. 7(3).

22  See *e.g.*, Energy Charter Treaty, Art. 26(3)(a); Netherlands-Nigeria BIT (1992) Art. 9; Brazil-Netherlands BIT (1998) Art. 9(2); Denmark-Hungary BIT (1988) Art. 9(2).

23  UK Model BIT 2005 Art. 8 (Alternative I); United Kingdom-Bangladesh BIT (1980) Art. 8.

24  See *e.g.*, China Model BIT 2003 Art. 9(2)(b); Lithuania-Poland BIT (1992) Art. 7; Denmark-Estonia BIT (1991) Art. 9(2).

provided for ". . . settlement by conciliation or arbitration under the Convention . . .".[25] There is no indication that AAPL's right to choose arbitration was ever challenged.

Provisions in national investment legislation, referring to the settlement of investment disputes by ICSID, also show a certain range of variation. Some refer to arbitration under the Convention,[26] others to "conciliation or arbitration",[27] and some to arbitration preceded by conciliation.[28] **25**

In *SPP* v. *Egypt*, jurisdiction was based on Art. 8 of Egypt's Law No. 43 of 1974, which provided, in relevant part, for the settlement of disputes "within the framework of the Convention".[29] Egypt argued that this phrase was insufficient to express consent to arbitration since it did not refer expressly to arbitration but embraced both arbitration and conciliation. The Tribunal rejected this argument: **26**

> Nowhere . . . does the Washington Convention say that consent to the Centre's jurisdiction must specify whether the consent is for purposes of arbitration or conciliation. Once consent has been given "to the jurisdiction of the Centre", the Convention and its implementing regulations afford the means for making the choice between the two methods of dispute settlement. The Convention leaves that choice to the party instituting the proceedings.[30]

The position taken by the Tribunal is convincing and is supported by a considerable number of consent clauses that fail to distinguish between conciliation and arbitration. Any other solution would deprive general references to dispute settlement under the ICSID Convention of their value as bases for consent to arbitration. **27**

Therefore, undifferentiated references to the Centre's jurisdiction provide the party instituting proceedings with a choice between the two methods. A choice once made can only be changed by agreement between the parties. Nevertheless, it is advisable to specify in advance which of the two methods is to be used, possibly providing for conciliation followed by arbitration, if necessary. If both methods are offered, it is desirable to indicate which party has the choice between them. Failure to clarify these points in advance may lead to surprising results. For instance, a host State that is aware of an investor's intention to institute arbitration may rush to initiate conciliation, thereby blocking access to arbitration. **28**

---

25  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 2. See *Ziadé, N. G.*, Some Recent Decisions in ICSID Cases, 6 ICSID Review – FILJ 515 (1991). See also *AMT* v. *Zaire*, Award, 21 February 1997, paras. 5.19, 5.22.

26  See *e.g.*, Uganda, Investment Code, 1991, Art. 30(2). For a collection of national investment legislation see: Investment Laws of the World, loose-leaf collection (OUP, since 1973).

27  See *e.g.*, Central African Republic, Code of Investments, 1988, Art. 30.

28  See *e.g.*, Madagascar, Investment Code, 1989, Art. 34.

29  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 70.

30  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 102. The Dissenting Opinion to this decision takes the opposite position: 3 ICSID Reports 168–170, 171/2, 185/6.

*b) Fact-Finding*

**29**    Unlike conciliation and arbitration, fact-finding is not specifically mentioned in the Convention although Art. 43 refers to several methods of gathering factual information. During the Convention's preparation, there was some concern whether the reference to a "dispute of a legal character" in the Preliminary Draft might not exclude questions of fact that are essential to the dispute's resolution (History, Vol. II, pp. 399, 411, 565). As a result, it was suggested to mention questions of fact explicitly in the Convention (at pp. 493, 502). These suggestions found their expression in the First Draft. Its definition of "legal dispute" included disputes "concerning a fact relevant to the determination of a legal right or obligation" (History, Vol. I, p. 116). This raised concerns that the establishment of facts might become an independent issue in conciliation or arbitration proceedings (History, Vol. II, pp. 655, 700, 703, 709). The reference to questions of fact was dropped in the Revised Draft and does not appear in the Convention. No independent fact-finding function in addition to conciliation and arbitration was ever suggested in the course of the Convention's drafting. But it is clear that points of fact that are incidental to the legal questions to be decided must be clarified by the commission or tribunal (see paras. 74, 75 *infra*).

**30**    While fact-finding does not have an independent role under the Convention, a separate fact-finding function was introduced in 1978 by way of the Additional Facility (paras. 9–13 *supra*). The Introductory Notes to the Additional Facility Rules point out that fact-finding was seen as a process of preventing rather than settling legal disputes and that this procedure is therefore fundamentally different from conciliation and arbitration. It is designed for the "pre-dispute" stage and aims to prevent diverging views on factual issues from escalating to legal disputes. The Introductory Notes point out that this may be useful in a contractual framework as well as in contexts such as national or international guidelines or codes of conduct relating to foreign investment.[31]

**31**    This purpose may explain, in part, why the provision on fact-finding in Art. 2(c) of the Additional Facility Rules is devoid of any jurisdictional requirements except that it take place between a State and a national of another State (see paras. 10, 11 *supra*). Paragraphs (a) and (b) repeat or modify the jurisdictional requirements *ratione personae* and *ratione materiae* of Art. 25 of the Convention by providing that conciliation and arbitration may be available even where only one side is a Contracting State or a national of a Contracting State or where the dispute does not arise directly out of an investment. These requirements are to be monitored by the Secretary-General who, moreover, must ensure that the dispute does not arise from an ordinary commercial transaction (see paras. 202–210 *infra*).[32] By contrast, paragraph (c) of Art. 2 of the Additional Facility Rules, dealing with

---

31   See ICSID Additional Facility, Introductory Notes, 1 ICSID Reports 215. See also *Broches*, The "Additional Facility", p. 379.

32   Art. 4(3) Additional Facility Rules.

fact-finding, contains none of these limitations. There is no requirement *ratione personae*, nor any indication of the types of facts that may be clarified. Neither do the Fact-Finding (Additional Facility) Rules, which are attached to the Additional Facility Rules as Schedule A, provide for any jurisdictional requirements other than consent.

It follows that any State and a national of any other State, irrespective of whether these are Contracting States, may utilize fact-finding under the Additional Facility. An agreement to do so does not require the Secretary-General's approval.[33] This means that fact-finding under the Additional Facility is available regardless of either party's link to the Convention.[34] **32**

The scope of fact-finding *ratione materiae* under the Additional Facility is less obvious. But it is reasonable to assume that the facts to be investigated must be of a nature that may lead to a dispute that is subject to settlement under the Convention or the Additional Facility (see para. 210 *infra*). **33**

Clause 21 of the 1993 Model Clauses offers the following formula for an agreement to resort to fact-finding under the Additional Facility: **34**

**Clause 21**

The parties hereto hereby agree to submit to the International Centre for Settlement of Investment Disputes (hereinafter "the Centre") for an inquiry under the Additional Facility (Fact-Finding) Rules of the Centre [the following questions of fact: . . . ]/[any questions of fact related to the following matters: . . . ].[35]

## *3. The Relevant Date for the Determination of Jurisdiction*

The Convention designates certain critical dates at which requirements, such as the nationality requirements contained in Art. 25(2), must be fulfilled. In other contexts, the Convention itself does not specify the temporal requirements: e.g. the time of the investment (see para. 117 *infra*), the date of consent (see paras. 468–469 *infra*), the date at which the State party must have become a Contracting State (see paras. 214–219 *infra*), the date at which a Contracting State's constituent subdivision or agency must have been designated to the Centre (see paras. 258–267 *infra*), the date at which the State of the investor's nationality must have become a Contracting State (see paras. 287–288 *infra*), and the date at which the approval or notification under Art. 25(3) relating to the consent of a constituent subdivision or agency must have been given (see paras. 913–915 *infra*). Institution Rule 2 attempts to clarify some of these questions to some extent. **35**

---

33   See introductory comment to Clause 21 of the 1993 ICSID Model Clauses, 4 ICSID Reports 369.

34   *Rambaud, P.*, Note sur l'extension du système CIRDI, 29 Annuaire Français de Droit International 290, 297 (1983). For a different view see *Toriello*, The Additional Facility, pp. 77/8, who holds that at least one side must be either a Contracting State or a national of a Contracting State.

35   4 ICSID Reports 369.

**36**    Apart from specific rules about critical dates, the date of the commencement of the proceedings is decisive. It is an accepted principle of international adjudication that jurisdiction will be determined by reference to the date on which judicial proceedings are instituted. This means that on that date all jurisdictional requirements must be met. It also means that events taking place after that date will not affect jurisdiction.

**37**    The International Court of Justice (ICJ) has developed a *jurisprudence constante* to this effect.[36] In the *Arrest Warrant Case*[37] the ICJ said:

> The Court recalls that, according to its settled jurisprudence, its jurisdiction must be determined at the time that the act instituting proceedings was filed. Thus, if the Court has jurisdiction on the date the case is referred to it, it continues to do so regardless of subsequent events.[38]

**38**    ICSID Tribunals have applied this principle consistently.[39] In some cases the claimants had divested themselves of or had transferred the rights that had given rise to the dispute after the institution of proceedings. Tribunals have rejected the argument that, as a consequence, the claimants in the proceedings were no longer the real parties in interest.[40]

**39**    In *CSOB* v. *Slovakia*, the Claimant had agreed to assign its claims against the Respondent to the Czech Republic. The Respondent argued that these assignments had transformed the Czech Republic into the real party in interest and that the Tribunal should dismiss the case for lack of jurisdiction because the Claimant no longer had the requisite standing under Article 25(1) of the ICSID Convention. The Tribunal rejected this argument since the assignments had taken place after the institution of the ICSID proceedings:

> 31. In assessing the effect of the June 25, 1998 assignment (and of the April 24, 1998 assignment it superseded) on the Centre's jurisdiction to hear this dispute, the Tribunal notes, in the first place, that the Request for Arbitration in the instant case was filed on April 17, 1997 and that the case was registered on April 25, 1997. Hence, at the time when these proceedings were instituted, neither of these assignments had been concluded. Second, it is generally recognized that the determination whether a party has standing in an international judicial forum for purposes of jurisdiction to institute proceedings is made by reference to the date on

---

36    International Court of Justice, *Case Concerning Questions of Interpretation and Application of the 1971 Montreal Convention Arising from the Aerial Incident at Lockerbie* (*Libyan Arab Jamahiriya* v. *United States of America*), Preliminary Objections, Judgment, 27 February 1998, I.C.J. Reports 1998, p. 115, at para. 37, referring back to *Nottebohm*, Preliminary Objection, Judgment, I.C.J. Reports 1953, p. 122; *Right of Passage over Indian Territory*, Preliminary Objections, Judgment, I.C.J. Reports 1957, p. 142.

37    *Case Concerning the Arrest Warrant of 11 April 2000* (*Democratic Republic of Congo* v. *Belgium*), Judgment, 14 February 2002, I.C.J. Reports 2002, p. 1.

38    At para. 26.

39    See also *Goetz* v. *Burundi*, Award, 10 February 1999, para. 72; *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 407; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 178.

40    *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 135, 136; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 196–198, 396.

which such proceedings are deemed to have been instituted. Since the Claimant instituted these proceedings prior to the time when the two assignments were concluded, it follows that the Tribunal has jurisdiction to hear this case regardless of the legal effect, if any, the assignments might have had on Claimant's standing had they preceded the filing of the case.[41]

In *Vivendi* v. *Argentina* the original claimant had been CGE which subsequently changed its name to Vivendi S.A. while the ICSID proceedings were pending. Vivendi S.A. then merged with several other companies to form the company Vivendi Universal. Vivendi Universal continued to hold the majority stake in CAA, the company incorporated in Argentina. Argentina's allegation that there had been a change in CAA's corporate ownership was rejected by the Tribunal.[42] One of the reasons for this decision was as follows:   **40**

> . . . it is generally recognized that the determination of whether a party has stand-ing in an international judicial forum, for purposes of jurisdiction to institute proceedings, is made by reference to the date on which such proceedings are deemed to have been instituted. ICSID Tribunals have consistently applied this Rule. . . . The consequence of this rule is that, once established, jurisdiction can-not be defeated. It simply is not affected by subsequent events. Events occurring after the institution of proceedings . . . cannot withdraw the Tribunal's jurisdic-tion over the dispute.[43]

### B.  "...shall extend to any legal dispute ..."

### *1. The Existence of a Dispute*

The existence of a dispute may be in doubt in several ways. An open question may not have matured into a dispute between the parties. Or a difference of opinion may not be sufficiently concrete to amount to a dispute that is susceptible of conciliation or arbitration. There may have been a dispute that has since become moot.   **41**

The International Court of Justice has defined a dispute as "a disagreement on a point of law or fact, a conflict of legal views or interests between parties".[44] ICSID Tribunals have adopted similar descriptions of "disputes", often relying on the ICJ's definition.[45]   **42**

---

41  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 31.
42  *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 82. See also the Award of 20 August 2007, para. 2.6.8. FN 24.
43  At paras. 60, 63. Footnotes omitted.
44  See *Mavrommatis Palestine Concessions*, Judgment No. 2, 1924, P.C.I.J., Series A, No. 2, p. 11; *Interpretation of the Peace Treaties with Bulgaria, Hungary and Romania* (first phase), I.C.J. Reports 1950, pp. 65, 74; *South West Africa*, Preliminary Objections, Judgment, I.C.J. Reports 1962, p. 328; *Northern Cameroons*, Judgment, I.C.J. Reports 1963, p. 27; *Applicability of the Obligation to Arbitrate under Section 21 of the United Nations Headquarters Agreement of 26 June 1947*, Advisory Opinion, I.C.J. Reports 1988, p. 27, para. 35; *Case concerning East Timor*, I.C.J. Reports 1995, pp. 89, 99.
45  *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 93, 94; *Tokios Tokelès* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 106, 107; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 159; *Lucchetti* v. *Peru*, Award, 7 February 2005,

**43**    The existence of a dispute presupposes a minimum of communication between the parties. The matter must have been taken up with the other party, which must have opposed the claimant's position if only indirectly. Thus, failure to respond to a specific demand within a reasonable time would be sufficient to establish the existence of a dispute. In *AAPL* v. *Sri Lanka*, the Tribunal noted that the claim remained outstanding without a reply for more than the three months' negotiation period provided for in the Bilateral Investment Treaty and that hence AAPL had become entitled to institute the proceedings.[46] On the other hand, it is not necessary that other means of settlement, notably negotiations, have been utilized unsuccessfully before the Centre is seized of a dispute unless the terms of the consent provide for the prior use of other means of settlement (see paras. 540–550 *infra*).[47]

**44**    The disagreement between the parties must also have some practical relevance to their relationship and must not be purely theoretical. It is not the task of the Centre to clarify legal questions *in abstracto*. The dispute must relate to clearly identified issues between the parties and must not be merely academic. This is not to say that a specific action must have been taken by one side or that the dispute must have escalated to a certain level of confrontation, but merely that it must be of immediate interest to the parties. The dispute must go beyond general grievances and must be susceptible of being stated in terms of a concrete claim.[48]

**45**    In some cases the respondents contended that the claims were hypothetical and hence there was no dispute.[49] In *Enron* v. *Argentina*[50] some provinces of Argentina had assessed taxes that the Claimants described as exorbitant and enough to wipe out the entire value of their investment. Argentina argued that the claim was hypothetical since the taxes had been assessed but not collected. Claimants pointed out that the taxes had not been collected only because there was a temporary injunction ordered by the Supreme Court. The Tribunal refused to accept that under these circumstances the dispute was merely hypothetical. It said:

> The Tribunal is mindful of the fact that once the taxes have been assessed and the payment ordered there is a liability of the investor irrespective of the actual collection of those amounts. This means that a claim seeking protection under the Treaty is not hypothetical but relates to a very specific dispute between the parties.[51]

---

para. 48; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 302, 303; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 43; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 61; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, para. 29; *MCI* v. *Ecuador*, Award, 31 July 2007, para. 63.

46    *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 3.

47    See *Amerasinghe*, The Jurisdiction of the International Centre, pp. 170–172.

48    See *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, para. 94; *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 106; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 43, all referring to the First Edition of this Commentary.

49    *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, paras. 135–141.

50    *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004.

51    At para. 74. See also *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 92.

*Article 25 – Jurisdiction* 95

In some cases the allegedly hypothetical nature of the claims related to the **46** quantum of damages. In *Pan American* v. *Argentina*[52] the Respondent complained that the damages claimed were hypothetical, conjectural and speculative. The Tribunal found that a certain degree of uncertainty about the quantum of damages was inevitable at the jurisdictional stage. This did not affect its jurisdiction provided the Claimants were able *prima facie* to demonstrate that some damage had occurred.[53] In several decisions tribunals rejected the argument that negotiations pending between the parties or proceedings pending in domestic courts made their claims premature or hypothetical.[54]

A dispute may clearly have existed, but one party may feel that it has taken steps **47** to satisfy any claims that the other party may have had. In *AGIP* v. *Congo*, the Government had expropriated the Claimant's assets without compensation in violation of a prior agreement. Before the ICSID Tribunal, the Government declared that there was no longer any dispute since it had recognized the principle of compensation.[55] The Tribunal found that the declarations made by the Government were so lacking in precision that the continuing existence of the dispute was not in doubt. It noted that the Claimant had not, in fact, received any compensation. In addition, the claim was directed not only at compensation for the nationalization but also at damages for losses resulting from the Government's violations of its contractual obligations.[56]

## 2. The Time of the Dispute

The Convention does not indicate at what time a dispute must have arisen. The **48** answer to this question will ultimately depend on the terms of the consent to the Centre's jurisdiction. Consent may relate to a specific dispute already existing between the parties, it may relate to future disputes only or it may relate to any dispute; that is, embracing existing as well as future disputes (see paras. 382–387 *infra*). The Convention itself does not impose jurisdictional requirements *ratione temporis* relating to the dispute.[57]

Some BITs limit consent to arbitration to disputes arising after their entry into **49** force.[58] For instance, the Argentina-Spain BIT of 1991 provides:

. . . this agreement shall not apply to disputes or claims originating before its entry into force.

---

52  *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006.
53  At paras. 162–168, 177, 178.
54  *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, paras. 158–162; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 62–71; *Camuzzi I* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 92, 94, 97; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 108; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 93.
55  *AGIP* v. *Congo*, Award, 30 November 1979, paras. 38, 39.
56  At paras. 42, 95–97.
57  See also *Amerasinghe*, The Jurisdiction of the International Centre, p. 171.
58  The Tribunal in *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 170, found that the phrase "any dispute which may arise" did not cover disputes that had arisen before the BIT's entry into force. See also *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 297–304.

**50**    Under a provision of this kind the time at which the dispute has arisen will be of decisive importance for the applicability of the consent to arbitration. The time of the dispute is not identical with the time of the events leading to the dispute. By definition, the incriminated acts must have occurred some time before the dispute. Therefore, the exclusion of disputes occurring before a certain date should not be read as excluding jurisdiction over events occurring before that date.[59] A dispute requires not only that the events have developed to a degree where a difference of legal positions can become apparent but also communication between the parties demonstrating that difference.

**51**    In *Maffezini* v. *Spain*, the Respondent challenged ICSID's jurisdiction alleging that the dispute originated before the entry into force of the Argentina-Spain BIT. The Claimant relied on facts and events that antedated the BIT's entry into force but argued that a "dispute" arises only when it is formally presented as such. This, according to the Claimant, had occurred only after the BIT's entry into force.[60] The Tribunal distinguished between the events giving rise to the dispute and the dispute itself. After noting that the events on which the parties disagreed began years before the BIT's entry into force it said:

> But this does not mean that a legal dispute as defined by the International Court of Justice can be said to have existed at the time.[61]

**52**    The Tribunal described the development towards a dispute in the following terms:

> . . . there tends to be a natural sequence of events that leads to a dispute. It begins with the expression of a disagreement and the statement of a difference of views. In time these events acquire a precise legal meaning through the formulation of legal claims, their discussion and eventual rejection or lack of response by the other party. The conflict of legal views and interests will only be present in the latter stage, even though the underlying facts predate them. It has also been rightly commented that the existence of the dispute presupposes a minimum of communications between the parties, one party taking up the matter with the other, with the latter opposing the Claimant's position directly or indirectly. This sequence of events has to be taken into account in establishing the critical date for determining when under the BIT a dispute qualifies as one covered by the consent necessary to establish ICSID's jurisdiction.[62]

On that basis, the Tribunal reached the conclusion that the dispute in its technical and legal sense had begun to take shape after the BIT's entry into force:

> At that point, the conflict of legal views and interests came to be clearly established, leading not long thereafter to the presentation of various claims that eventually came to this Tribunal.[63]

It followed that ICSID had jurisdiction and that the Tribunal was competent to consider the dispute.

---

59   *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, paras. 153–157. For a case that fails to make this distinction see *MCI* v. *Ecuador*, Award, 31 July 2007.
60   *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 92, 93.
61   At para. 95.                              62    Para. 96. Footnote omitted.
63   At para. 98.

In *Lucchetti* v. *Peru*, the BIT between Chile and Peru similarly provided that **53**
it would not apply to disputes that arose prior to its entry into force. A series of
administrative measures by local authorities had denied or withdrawn construction and operating licences from the investors. The investors had successfully
challenged the earlier administrative acts through court proceedings that took
place entirely before the BIT's entry into force. A few days after the BIT's entry
into force, the municipality issued further adverse decrees. The Tribunal found
that the dispute had already arisen before the BIT's entry into force and declined
jurisdiction.[64]

In *Jan de Nul* v. *Egypt*, the BIT between the BLEU[65] and Egypt also provided **54**
that it would not apply to disputes that had arisen prior to its entry into force. A
dispute already existed when in 2002 the BIT replaced an earlier BIT of 1977.
At that time the dispute was pending before the Administrative Court of Ismaïlia
which eventually rendered an adverse decision in 2003, approximately one year
after the new BIT's entry into force. The Tribunal accepted the Claimants' contention that the dispute before it was different from the one that had been brought
to the Egyptian court:

> . . . while the dispute which gave rise to the proceedings before the Egyptian
> courts and authorities related to questions of contract interpretation and of Egyptian law, the dispute before this ICSID Tribunal deals with alleged violations of
> the two BITs . . .[66]

This conclusion was confirmed by the fact that the court decision was a major **55**
element of the complaint. The Tribunal said:

> The intervention of a new actor, the Ismaïlia Court, appears here as a decisive
> factor to determine whether the dispute is a new dispute. As the Claimants' case
> is directly based on the alleged wrongdoing of the Ismaïlia Court, the Tribunal
> considers that the original dispute has (re)crystallized into a new dispute when
> the Ismaïlia Court rendered its decision.[67]

It followed that the Tribunal had jurisdiction over the claim.

*Helnan* v. *Egypt* concerned a clause in the BIT between Denmark and Egypt **56**
which excluded its applicability to divergences or disputes that had arisen prior to
its entry into force. The Tribunal distinguished between divergences and disputes
in the following terms:

> Although, the terms "*divergence*" and "*dispute*" both require the existence of a
> disagreement between the parties on specific points and their respective knowledge of such disagreement, there is an important distinction to make between
> them as they do not imply the same degree of animosity. Indeed, in the case of
> a divergence, the parties hold different views but without necessarily pursuing
> the difference in an active manner. On the other hand, in case of a dispute, the

---

64  *Lucchetti* v. *Peru*, Award, 7 February 2005, paras. 48–59. An application for the annulment of
    the Award was not successful: *Lucchetti* v. *Peru*, Decision on Annulment, 5 September 2007.
65  Belgo-Luxembourg Economic Union.
66  *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 117.
67  At para. 128.

> difference of views forms the subject of an active exchange between the parties
> under circumstances which indicate that the parties wish to resolve the difference,
> be it before a third party or otherwise. Consequently, different views of parties
> in respect of certain facts and situations become a "*divergence*" when they are
> mutually aware of their disagreement. It crystallises as a "*dispute*" as soon as one
> of the parties decides to have it solved, whether or not by a third party.[68]

On that basis, the Tribunal found that, even though a divergence had existed before
the BIT's entry into force, that divergence was of a nature different from the dispute
that had arisen subsequently. It followed that the Tribunal had jurisdiction over
the dispute.[69]

### 3. The Legal Nature of the Dispute

### a) Legal and Non-Legal Disputes

**57**    The requirement that a dispute must be "legal" in order to qualify for settlement
by the Centre gave rise to much debate during the Convention's preparation. The
Working Paper contained no reference to the dispute's legal nature, but it was
pointed out that a clarification should be added to exclude political or commercial
disputes (History, Vol. II, pp. 54, 83, 96). The Preliminary Draft referred to a
"dispute of a legal character" (Vol. I, p. 112). These words were explained as
excluding moral, political or commercial claims (Vol. II, pp. 203, 259, 267, 322,
397) or as expressing the requirement that a legal right or obligation had to be
involved (at pp. 267, 285, 322, 565). A number of delegates from capital-exporting
countries found the reference to legal disputes too limiting or too confusing and
suggested its deletion (at pp. 88, 322, 396, 411, 412, 565) or found a definition
unnecessary (at pp. 395, 401). Others asked for more clarification (at pp. 376,
395, 493, 495). The subsequent First Draft not only retained the reference to legal
disputes but added the following definition:

> "legal dispute" means any dispute concerning a legal right or obligation or con-
> cerning a fact relevant to the determination of a legal right or obligation;[70]

**58**    In reaction to this draft, some delegates stated that they did not find this definition
useful and that it should be deleted (at pp. 701, 707). Others offered alternative
definitions (at pp. 707, 833, 835). Yet another group suggested the deletion of the
limitation to legal disputes altogether (at pp. 702, 831). Eventually, it was decided
by a large majority to retain the qualification "of a legal character" but without any
further definition (at p. 826). The change from "dispute of a legal character" to
"legal dispute" in the Convention's final version appears to be one of pure drafting
convenience.

**59**    The Report of the Executive Directors adds the following clarification:

> 26. . . . The expression "legal dispute" has been used to make clear that while
> conflicts of rights are within the jurisdiction of the Centre, mere conflicts of

---

68    *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 52.
69    At paras. 53–57.                    70    History, Vol. I, p. 116.

interests are not. The dispute must concern the existence or scope of a legal right or obligation, or the nature or extent of the reparation to be made for breach of a legal obligation.[71]

Commentators on the ICSID Convention have endeavoured to come to terms **60** with the concept of legal dispute by listing typical factual situations and the questions that they entail.[72] These include expropriation, breach or termination of an agreement or the application of tax and customs provisions. While these descriptions are undoubtedly useful, it must be borne in mind that fact patterns alone do not determine the legal character of a dispute. Rather, it is the type of claim that is put forward and the prescription or policy that is invoked that decides whether a dispute is legal or not. Thus, it is entirely possible to react to a breach of agreement by relying on moral standards, by invoking concepts of justice or by pointing to the lack of political and economic wisdom of such a course of action. The dispute will only qualify as legal if legal remedies such as restitution or damages are sought and if legal rights based on, for example, contracts, treaties or legislation are claimed. Consequently, it is largely in the hands of the claimant to present the dispute in legal terms.

Institution Rule 2(1)(e) makes it incumbent upon the claimant to demonstrate **61** the legal nature of the dispute by directing:

> (1) The request shall: . . .
>> (e) contain information concerning the issues in dispute indicating that there is, between the parties, a legal dispute arising directly out of an investment.

In accordance with Institution Rule 2(2), no documentation on this point is required at the time of the institution of proceedings and it would appear that a plausible assertion on the part of the claimant suffices for purposes of the Secretary-General's screening power under Arts. 28(3) and 36(3).

It has been suggested that the parties should make express advance provision **62** to clarify the legal nature of their dispute.[73] The 1981 Model Clauses for use in agreements between the parties contained the following Clause IV:

> The parties hereto hereby agree that, for the purposes of Article 25(1) of the Convention, [the dispute] [any dispute in relation to or arising out of this Agreement] is a legal dispute arising directly out of an investment.[74]

An agreement between the parties on this point is of limited use. It is perfectly **63** feasible for an *ad hoc* submission where the dispute has already arisen and its nature is known, although submission itself would probably imply that the parties see the dispute as legal. But it seems futile to characterize disputes as legal before

---

71   1 ICSID Reports 28.
72   See *e.g.*, *Amerasinghe*, The Jurisdiction of the International Centre, p. 173; *Delaume*, How to Draft, p. 181; *Szasz*, The Investment Disputes Convention, p. 37.
73   *Gaillard*, Some Notes on the Drafting, pp. 139/40; *Masood*, Jurisdiction of International Centre, p. 131; *Amerasinghe*, Submissions to the Jurisdiction, p. 220.
74   1 ICSID Reports 201.

they have arisen unless the relevant words are read not as part of a jurisdictional clause but as an undertaking between the parties to refrain from making non-legal claims and from using non-legal arguments. It is for this reason that neither the 1993 Model Clauses nor the old 1968 version contain language purporting to characterize future disputes as legal.

**64**    Tribunals have at times mentioned in passing that the dispute before them was a legal dispute since it concerned legal rights and obligations.[75] More recently, tribunals addressing the issue of the existence of a legal dispute have pointed out that the claimants had asserted rights, had relied on legal arguments and had sought legal remedies. It followed that the disputes were legal in nature.[76]

**65**    In *Continental Casualty* v. *Argentina*, the Claimant had invested in the insurance business in Argentina. It claimed that Argentina had enacted a series of decrees and resolutions that destroyed the legal security of the assets held by the investor. Argentina submitted that in order to meet the requirement of a legal dispute, the dispute must concern rights, obligations and legal titles and not some undesirable consequences that have not as the proximate cause the host State's conduct in respect of its investment.[77] The Tribunal found that the Claimant had made legal claims. It said:

> 67. In this case, the Claimant invokes specific legal acts and provisions as the foundation of its claim: it indicates that certain measures by Argentina have affected its legal rights stemming from contracts, legislation and the BIT. The Claimant further indicates specific provisions of the BIT granting various types of legal protection to its investments in Argentina, that in its view have been breached by those measures.[78]

**66**    In *Suez* v. *Argentina* the Claimants had invested in water distribution and waste water services in Argentina. When the Argentine economy experienced a severe crisis, the government enacted measures that resulted in a significant depreciation of the Argentine Peso. Claiming that these measures injured their investments

---

75  *Alcoa Minerals* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975 – see: *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 98/9 (1976); *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 16; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 5.03; *AMT* v. *Zaire*, Award, 21 February 1997, para. 5.06; *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, paras. 15, 16; *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 290.

76  *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 47; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 40–47; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 55; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 67, 68; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 20–23; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 125, 126; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 47–62; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 74; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 71–91; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 93–97; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 121–124.

77  *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 37.

78  At para. 67.

in violation of the commitments made to them, the Claimants sought to obtain adjustments in the tariffs as well as modifications in their operating conditions.[79] Argentina argued that there was no legal dispute but rather a business or commercial dispute. The dispute over the effects of the devaluation measures was one over policy and fairness and hence not legal in nature. The Tribunal rejected this objection and said:

> A legal dispute, in the ordinary meaning of the term, is a disagreement about legal rights or obligations. . . . In the present case, the Claimants clearly base their case on legal rights which they allege have been granted to them under the bilateral investment treaties that Argentina has concluded with France and Spain. In their written pleadings and oral arguments, the Claimants have consistently presented their case in legal terms. . . the dispute as presented by the Claimants is legal in nature.[80]

It follows from the practice of tribunals that the legal nature of a dispute is determined by the way the claimant presents its claim. If the claim is couched in terms of violation of legal rights, is based on legal arguments and seeks legal remedies there is a legal dispute.

**67**

### b) The Justiciability of Disputes

Even a dispute that gives rise to legal questions is sometimes said to be inappropriate for arbitration if it affects sovereign powers or questions of political significance. In fact, in the course of the Convention's drafting, most of the discussion about the types of disputes that should be made subject to the Centre's jurisdiction did not turn on their legal or non-legal nature but on whether it was acceptable to expose a State to arbitration in respect of activities within its sovereign prerogative.[81] Especially delegates from capital-importing countries expressed the opinion that questions of a political nature that affected governmental functions, vital interests, security, national policy or sovereign powers were non-justiciable (History, Vol. II, pp. 257, 466, 468, 470, 500/1, 548, 565, 699/700, 708, 830). In particular, it was argued that questions arising from the validity and application of domestic legislation should be excluded from the Centre's jurisdiction (at pp. 498, 504, 550, 703, 706, 708, 838). A similar demand was that the legality of expropriations should be excluded from the Centre's jurisdiction (at pp. 258, 267, 550, 709, 829) or at least confined to matters of compensation (at pp. 259, 498, 504, 669, 703).

**68**

Conversely, it was suggested that only disputes in connection with a specific contract between the host State and the investor and, possibly, in connection with the host State's investment legislation should be considered arbitrable disputes (at pp. 471, 494, 497, 498, 504, 505, 514, 543, 653, 702, 707, 708, 830, 832). These ideas were opposed by Mr. *Broches* (at pp. 495, 540, 707). He pointed out

**69**

---

79   *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, para. 24.
80   At paras. 34, 37.
81   See also *Amerasinghe*, The Jurisdiction of the International Centre, pp. 173/4, 176.

that it was always open to the parties to define the disputes that they regarded as justiciable in their consent agreement (at p. 566).[82] Eventually, none of the proposed limitations relating to justiciability found entry into the Convention and there is nothing to suggest that they are included by implication.

**70**    The question of justiciability and sovereign prerogative has not posed any major problems in the practice of ICSID tribunals. Tribunals have examined the legality of expropriations and of other typical governmental actions without hesitation.[83] For instance, in *Benvenuti & Bonfant* v. *Congo*, the Tribunal saw no difficulty in examining the legality of government action that consisted in the dissolution of a local company set up by the Claimant followed by the seizure of its assets. Likewise, the Tribunal examined the legality of the military occupation and nationalization of another company jointly owned by the Claimant and the Respondent.[84] In *AAPL* v. *Sri Lanka*, the Tribunal saw no difficulty in examining the conduct of the host State's security forces resulting in the destruction of the investment.[85] In the cases involving the state of emergency that unfolded in Argentina in the late 1990s, the issue of justiciability was not an issue.[86]

**71**    In *Amco* v. *Indonesia*, the Claimants' complaint arose from the forcible seizure of a hotel, involving the army and the police, and the revocation of an investment authorization. In the annulment proceedings, Indonesia argued that the Tribunal had manifestly exceeded its powers by assuming jurisdiction over the legality of the acts of the army and police personnel. Indonesia did not rely on sovereign prerogative and justiciability but argued that the acts of the army and police personnel, if illegal under international law, constituted an international tort which was quite different from an investment dispute. The argument was rejected:

> 68. The *ad hoc* Committee is unable to accept the above submission of Indonesia's counsel for it does not think of "international tort" and "investment dispute" as comprising mutually exclusive categories . . . the Tribunal did not manifestly exceed its powers when it considered the question of the legality of the acts of the army and police personnel as an integral part of the investment dispute between Amco and Indonesia. The jurisdiction of the Tribunal is not successfully avoided by applying a different formal characterization to the operative facts of the dispute.[87]

**72**    In *CSOB* v. *Slovakia* the Respondent did not question the legal nature of the dispute. But it stressed its political nature and its close link with the dissolution

---

82   See also *Amerasinghe*, Submissions to the Jurisdiction, pp. 221/2.
83   See *e.g.*, *SPP* v. *Egypt*, Award, 20 May 1992; *Goetz* v. *Burundi*, Award, 10 February 1999; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000; *Wena Hotels* v. *Egypt*, Award, 8 December 2000, and Decision on Interpretation, 31 October 2005; *Middle East Cement* v. *Egypt*, Award, 12 April 2002; *ADC* v. *Hungary*, Award, 2 October 2006; *Siemens* v. *Argentina*, Award, 6 February 2007; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007.
84   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.47–4.65.
85   *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 79–86.
86   *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005.
87   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 68.

of the former Czech and Slovak Federal Republic (see also paras. 100, 272 *infra*). The Tribunal pointed out that the claim was based on an agreement between the parties to the dispute. It said:

> While it is true that investment disputes to which a State is a party frequently have political elements or involve governmental actions, such disputes do not lose their legal character as long as they concern legal rights or obligations or the consequences of their breach.[88]

It is open to States to exclude categories of disputes that they consider inappropriate for arbitration from the terms of their consent (see paras. 513–539 *infra*). In addition, under Art. 25(4) States may notify the Centre of categories of disputes which they would or would not consider submitting to ICSID's jurisdiction (see paras. 921–941 *infra*). **73**

### c) Questions of Fact

There was some argument in the course of the Convention's drafting about the role of fact-finding (see para. 29 *supra*). Fact-finding has no independent role under the Convention but was added by means of the Additional Facility (see paras. 30–31 *supra*). Nevertheless, it is clear from the Convention's history (see para. 29 *supra*) and its general context that issues of fact that are incidental to the legal questions to be decided must be ascertained by the tribunal or commission.[89] This conclusion is warranted not only by the *travaux préparatoires* and the practical requirements of arbitration but also by the Convention's wording. Art. 43 refers to several methods of obtaining evidence such as relevant documents, visits to the scene connected with the dispute or appropriate enquiries. It is obvious that all this is designed to equip the tribunal with the required factual information to make a rational decision. **74**

There has been some debate as to whether pure questions of fact would qualify as legal disputes for purposes of the Convention.[90] It would seem that where the existence or not of these facts results in legal consequences between the parties, the answer must be in the affirmative. The nature of the dispute is determined not by the facts leading to it but by the legal claims they trigger. Claims for damages or other legal remedies are sufficient to establish jurisdiction even if both parties accept that the alleged facts, if proven, would justify the claims. In *AGIP* v. *Congo* (see para. 47 *supra*)[91] and in *Santa Elena* v. *Costa Rica*[92] the parties were agreed, in principle, on the legal duty to pay compensation for the expropriations. But the claimants had not received any compensation and the amount of compensation due **75**

---

88  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 60.
89  *Amerasinghe*, The Jurisdiction of the International Centre, p. 174; *Szasz*, The Investment Disputes Convention, p. 37.
90  *Delaume, G. R.*, La Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, 93 Journal du Droit International 26, 35 (1966); *Kovar*, La compétence du Centre, p. 29.
91  *AGIP* v. *Congo*, Award, 30 November 1979.
92  *Santa Elena* v. *Costa Rica*, Award, 17 February 2000.

had not been determined. This was sufficient ground for the Tribunals to entertain the claims.

### d) Non-Legal Means of Dispute Settlement

**76**     The Convention provides not only for arbitration but also for conciliation (Chapter III, Arts. 28–35). Conciliation, by definition, is not judicial but is directed towards an agreed settlement. Art. 34 provides that it is the conciliation commission's duty "to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms". By contrast, Art. 42 directs that an arbitral tribunal shall decide a dispute in accordance with "rules of law". But even in arbitration proceedings, Art. 42(3) gives the parties the possibility to authorize the tribunal "to decide a dispute *ex aequo et bono*" rather than in accordance with legal rules (see Art. 42, paras. 249–279).

**77**     It may, therefore, seem odd that Art. 25 requires that there must be a legal dispute even if the parties wish to utilize conciliation or agree that the tribunal may decide in accordance with equitable principles. Mr. *Broches* has explained para. 26 of the Executive Directors' Report, which emphasizes that conflicts of rights are within the jurisdiction of the Centre while mere conflicts of interests are not (see para. 59 *supra*), in the following terms:

> The purpose of this sentence was to dispel the fears of some developing countries that investors might request a host State to consent to *conciliation* proceedings with respect to disputes in which the investor did not even claim that any of his legal rights had been impaired. This fear was based on another fear, namely that a refusal to consent to conciliation proceedings would lead to what these delegations called "adverse inferences" as to their treatment of foreign investment. It was for that reason that even for conciliation proceedings, the Convention requires that the dispute be a legal one and the quoted sentence was addressed to that point.[93]

**78**     The problem has been discussed most frequently in the context of a wish by one or both parties to re-negotiate a long-standing agreement because it no longer appears equitable or because the underlying circumstances have changed. Renegotiation of investment agreements is useful and common.[94] Yet, the limitation to legal disputes would seem to bar access to conciliation under the ICSID Convention for the purpose of facilitating renegotiation (see also History, Vol. II, p. 701). Where the agreement between the parties itself provides for its adjustment under

---

93   *Broches*, The Convention, p. 363. Emphasis original, footnote omitted. See also *Szasz*, The Investment Disputes Convention, pp. 36/7.

94   *Peter, W.*, Arbitration and Renegotiation of International Investment Agreements, 2nd ed., esp. 231–258 (1995); *Rodley, N. S.*, Some Aspects of the World Bank Convention on the Settlement of Investment Disputes, 4 Canadian Yearbook of International Law 43, 55–57 (1966); *Bernardini, P.*, The Renegotiation of the Investment Contract, 13 ICSID Review – FILJ 411 (1998); *Kröll, S.*, The Renegotiation and Adaptation of Investment Contracts, *in*: Arbitrating Foreign Investment Disputes (*Horn, N./Kröll, S.* eds.) 425 (2004).

certain circumstances, either in the form of a hardship clause or of a clause for its equitable modification in specific situations,[95] the problem can be overcome. A claim would have to be presented as arising from the original agreement and in terms of whether the conditions for renegotiation have been met.[96]

**79**  Even without a clause in the agreement providing for modification, a demand for renegotiation may be supported by legal arguments. A party may claim that a fundamental change of circumstance gives it a right to renegotiation.[97] What matters in this context is not whether such a claim will be upheld ultimately. For purposes of jurisdiction, it is sufficient that a claim phrased in legal terms can be put forward in good faith. The nature of the claim and not its ultimate success determines whether the dispute is of a legal nature.

**80**  Much will depend on whether the parties agree to seek help in revising their agreement through conciliation or an award *ex aequo et bono*. Where they agree, it would appear rather unlikely that the Secretary-General in his or her screening capacity (Arts. 28(3) and 36(3)), the conciliation commission (Art. 32(1)) or the arbitral tribunal (Art. 41(1)) will find that there is no jurisdiction. Nevertheless, the objective requirement of a legal dispute remains. The parties' agreement cannot replace the limitation as contained in the Convention entirely (see paras. 5–7 *supra*). Where the parties do not agree on the wish to revise the agreement, the claimant would have to present a convincing claim, couched in legal terms, that it has a right to *bona fide* negotiations and that the conditions for such renegotiations have been met.[98]

**81**  Even if no right to renegotiation can be established, conciliation and arbitration *ex aequo et bono* are by no means ruled out. A claimant who has characterized its claim in legal terms and has invoked legal rules may still choose a method of settlement resulting in "mutually acceptable terms" (Art. 34(1)) or may agree that not only rules of law but also principles of equity are to be applied. In other words, the utilization of non-judicial methods of settlement, as in conciliation and the application of standards other than legal rules, does not necessarily deprive the dispute of its legal nature. All that is necessary is that the claimant convincingly presents a legal claim at the outset. The method of settlement chosen and the remedy sought will not affect the requirement under the ICSID Convention that there must be a legal dispute.

---

95  *Peter*, Arbitration and Renegotiation, pp. 231 *et seq.*
96  See *Delaume*, Le Centre International, pp. 799/800; *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 242 (1986); *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642, 644 (1968).
97  *Kovar*, La compétence du Centre, p. 31.
98  See *Rodley*, p. 57. In *Adriano Gardella* v. *Ivory Coast*, Award, 29 August 1977, para. 4.7, there was some discussion on whether a clause in the agreement providing for its "updating" could justify an essential modification of the fundamental basis of the agreement. But the question did not arise as a jurisdictional issue and was not presented in terms of the legal nature of the dispute.

**82**     This conclusion is supported by Arbitration Rule 43:

**Rule 43**
*Settlement and Discontinuance*

(1) If, before the award is rendered, the parties agree on a settlement of the dispute or otherwise to discontinue the proceeding, the Tribunal, or the Secretary-General if the Tribunal has not yet been constituted, shall, at their written request, in an order take note of the discontinuance of the proceeding.

(2) If the parties file with the Secretary-General the full and signed text of their settlement and in writing request the Tribunal to embody such settlement in an award, the Tribunal may record the settlement in the form of its award.

Thus, even in the course of arbitration proceedings it is always open to the parties to resort to non-judicial methods to settle their legal dispute. If the tribunal records the settlement in its award, the parties' agreement will acquire the full authority of an ICSID award for purposes of recognition and enforcement. It follows that the existence of a legal dispute and the employment of a judicial or non-judicial method for its settlement are two distinct questions.

## C.  ". . . arising directly . . ."

### 1. General Meaning under the Convention

**83**     The First Draft foresaw the Centre's jurisdiction for all legal disputes "arising out of or in connection with any investment" (History, Vol. I, p. 116). These words were criticized as giving a tribunal wide and indefinite authority (History, Vol. II, p. 700), and it was suggested that only disputes directly relating to an investment should be included (at pp. 707, 708, 830). A motion to insert the word "directly" as an additional qualification to the word "investment" was adopted by 26 to 8 votes (at p. 826). No definition or explanation of the word "directly" was ever offered.

**84**     Art. 46 of the Convention provides for the tribunal's competence to determine incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute. But under the terms of Art. 46, these claims too must be within the scope of the parties' consent and otherwise within the Centre's jurisdiction. Therefore, Art. 46 does not add to the scope of ICSID's jurisdiction but adopts the "arising directly" requirement by reference.

**85**     The requirement of directness is one of the objective criteria for jurisdiction and is, therefore, independent of the parties' consent. This means that, no matter what the parties have agreed, the dispute must not only be connected to an investment but must also be reasonably closely connected. In practical terms, the objective and the subjective elements may be related. Disputes arising from ancillary or peripheral aspects of the investment operation are likely to give rise to the objection that they do not arise directly from the investment and that they are not covered by the consent agreement. Nevertheless, the two objections are analytically distinct.[99]

---

99   The question of the scope of consent is examined below at paras. 513–539.

*Article 25 – Jurisdiction* 107

A stipulation by the parties that an existing dispute has arisen directly out of an investment would be strong authority for a commission or a tribunal but would not pre-empt its power to determine its own competence in this respect. On the other hand, a stipulation between the parties, such as the one suggested by the 1981 Model Clause IV[100] (see para. 62 *supra*), that any future dispute relating to their agreement arises directly out of an investment does not appear meaningful. Not only is it futile to characterize disputes that may arise in the future, but in addition the commission or tribunal would not be bound by such a clause since it relates to the Convention's objective requirements for jurisdiction.

Institution Rule 2(1)(e) indicates that a request to institute conciliation or arbitration proceedings should also contain information on the directness of the dispute in relation to an investment (see para. 61 *supra*). No documentation on this point is required at the time of instituting proceedings[101] (see Art. 36, paras. 24–27). **86**

Art. 2(b) of the Additional Facility Rules authorizes proceedings for the settlement of disputes that are not within the Centre's jurisdiction because they do not arise directly out of an investment (see para. 10 *supra*). This is usually read to refer to disputes that arise from transactions other than investments (see paras. 202–209 *infra*).[102] But a dispute that arises from an investment, though only indirectly, would also be covered by the wording of this provision. Therefore, where the connection between the investment and the dispute appears too remote to satisfy the Convention's requirement of directness, the Additional Facility could serve as an alternative method of dispute settlement.[103] The ICSID Secretariat has suggested yet another way to deal with arrangements that are related to investments covered by an ICSID consent clause yet fall outside the scope of the Convention. The parties are advised to provide for *ad hoc* arbitration, incorporating the ICSID Rules by reference and designating the Secretary-General as appointing authority. This might lead to parallel ICSID and non-ICSID proceedings, possibly administered by the same arbitrators.[104] **87**

### 2. Direct Disputes or Direct Investments

The requirement of directness refers to the relation of the dispute to the investment. It does not refer to the investment as such. In *Fedax* v. *Venezuela*, the Respondent argued that the disputed transaction involving debt instruments issued by the Republic of Venezuela was not a "direct foreign investment" and therefore could not qualify as an investment under the Convention. The Tribunal rejected this argument: **88**

> It is apparent that the term "directly" relates in this Article to the "dispute" and not to the "investment". It follows that jurisdiction can exist even in respect of

---

100   1 ICSID Reports 201. This clause was omitted from the 1993 Model Clauses.
101   Institution Rule 2(2).
102   *Broches*, The "Additional Facility", p. 377; *Toriello*, The Additional Facility, pp. 73/4.
103   See *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 28.
104   *Delaume, G. R.*, ICSID Arbitration, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 23, 37 (1987). See also News from ICSID, Vol. 1/2, p. 14 (1984).

investments that are not direct, so long as the dispute arises directly from such transaction.[105]

**89**    Other tribunals have taken the same position and have quoted the above passage from *Fedax*.[106]

**90**    In a number of cases Argentina argued that the dispute did not arise directly from an investment since the investor had made its investment by way of a company incorporated in Argentina.[107] Tribunals have rejected this argument.[108]

**91**    In *CMS* v. *Argentina*,[109] the Respondent argued that neither TGN, a company incorporated in Argentina in which the Claimant held shares, nor the licence held by TGN, qualified as an investment. Since these assets did not constitute an investment under the applicable BIT, CMS's claims, based on the alleged breach of TGN's rights under the licence, could not be considered as arising directly from an investment.[110] The Tribunal rejected that argument. It said:

> . . . the rights of the Claimant can be asserted independently from the rights of TGN and those relating to the License, and because the Claimant has a separate cause of action under the Treaty [the BIT] in connection with the protected investment, the Tribunal concludes that the present dispute arises directly from the investment made and that therefore there is no bar to the exercise of jurisdiction on this count.[111]

**92**    In *Siemens* v. *Argentina*, the Tribunal said in response to a similar argument:

> There is no doubt that the dispute with Argentina under the Treaty is a dispute which arises directly from the investment as defined by Siemens. The quality of a direct dispute is not affected by Siemens not being the direct shareholder of the local company. This is a separate question. For purposes of Article 25(1), a dispute may arise directly out of an investment made directly or indirectly by an investor. Whether in that situation the investor qualifies as such will depend on the definition of investor in the treaty or the terms of the investment contract. The direct requirement under the ICSID Convention is related to the investment dispute, not to whether the investor [investment] is direct or indirect.[112]

### 3. The General Unity of an Investment Operation

**93**    An investment operation typically involves a number of ancillary transactions. They may include financing, the acquisition of property, purchase of various goods, marketing of produced goods and tax liabilities. In economic terms, these

---

105    *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 24.
106    *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 71, 72; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 52. See, however, *ADC* v. *Hungary*, Award, 2 October 2006, para. 331, which is ambivalent on this point.
107    See also *Alexandrov, S. A.*, The "Baby Boom" of Treaty-Based Arbitrations and the Jurisdiction of ICSID Tribunals: Shareholders as "Investors" and Jurisdiction *Ratione Temporis*, 4 The Law and Practice of International Courts and Tribunals 19, 40–45 (2005).
108    *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, paras. 58–60; *Enron* v. *Argentina*, Decision on Jurisdiction (Ancillary Claim), 2 August 2004, para. 22; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 40.
109    *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003.
110    At para. 66.                              111    At para. 68.
112    *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 150.

transactions and contacts are all more or less linked to the investment. But whether these peripheral activities and disputes relating to them arise directly out of the investment for purposes of ICSID's jurisdiction may be subject to doubt.

An examination of ICSID practice on the directness of disputes in relation to **94** the investment is complicated by several factors. Transactions that are ancillary to the investment operation are often carried out by means of separate contracts (see paras. 551–566 *infra*) and through distinct juridical persons both on the side of the Contracting State[113] (see paras. 230–267 *infra*) and on the side of the investor (see paras. 319–335 *infra*). These separate contracts, though clearly related to the investment, may even contain their own dispute settlement provisions, usually referring to domestic courts (see Art. 26, paras. 44–54, 109). These questions of legal form may obfuscate the issue of directness in relation to ICSID jurisdiction.

In *Holiday Inns* v. *Morocco*, the agreement for the establishment and operation **95** of hotels had also provided for financing by the Government. This was done by means of separate loan contracts between C.I.H., a Moroccan specialized agency, and four wholly owned subsidiaries created by the Claimants (the H.M.S. companies). The contracts contained choice of forum clauses in favour of the Moroccan courts.[114] These facts led the Respondent to object to the jurisdiction of ICSID over the claims connected with the loan contracts. The Tribunal rejected these contentions and asserted its jurisdiction over the loan contracts. It emphasized "the general unity of an investment operation". The Tribunal said:

> It is well known, and it is being particularly shown in the present case, that investment is accomplished by a number of juridical acts of all sorts. It would not be consonant either with economic reality or with the intention of the parties to consider each of these acts in complete isolation from the others. It is particularly important to ascertain which is the act which is the basis of the investment and which entails as measures of execution the other acts which have been concluded in order to carry it out.[115]

In *SOABI* v. *Senegal*, the Government was found liable for the termination of **96** an investment operation committed to the construction of housing units. Among the claims for compensation were architects' fees under a contract between the investor and a firm of architects. As a consequence of the project's termination, the Claimant was unable to fulfil the contract with the architects. The Tribunal found that only the Senegalese courts had jurisdiction to rule on the dispute between the investor and the architects. But the Tribunal did have jurisdiction over the dispute between the Claimant and the Government concerning the latter's obligation to indemnify the former for its losses arising from the architectural contract.[116]

---

113  See *e.g.*, *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, paras. 35–40; *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 58–59.

114  *Lalive*, The First "World Bank" Arbitration, p. 156.

115  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974; *Lalive*, The First "World Bank" Arbitration, p. 159.

116  *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 8.01–8.23. See also the Dissenting Opinion at paras. 281–288.

**97**      In the resubmitted case in *Amco* v. *Indonesia*, Indonesia alleged tax fraud and sought to recover unpaid corporate taxes by way of a counterclaim.[117] Amco contended that tax fraud was beyond the jurisdiction *ratione materiae* of the new Tribunal. Amco argued that the tax dispute was only related in the most indirect way to the investment. The Tribunal noted that tax claims may well be within ICSID's jurisdiction. But it found that in the particular case the issue of tax fraud did not arise directly out of the investment:

> . . . it is correct to distinguish between rights and obligations that are applicable to legal or natural persons who are within the reach of a host State's jurisdiction, as a matter of general law; and rights and obligations that are applicable to an investor as a consequence of an investment agreement entered into with that host state. Legal disputes relating to the latter will fall under Article 25(1) of the Convention. Legal disputes concerning the former in principle fall to be decided by the appropriate procedures in the relevant jurisdiction unless the general law generates an investment dispute under the Convention.
>
> The obligation not to engage in tax fraud is clearly a general obligation of law in Indonesia. It was not specially contracted for in the investment agreement and does not arise directly out of the investment.
>
> For these reasons the Tribunal finds the claim of tax fraud beyond its competence *ratione materiae*.[118]

**98**      The Tribunal's distinction between rights and obligations of general application and those applicable to an investor as a consequence of the special investment relationship is a useful criterion. However, the description of the investment relationship in terms of an investment agreement between the investor and the host State appears too narrow. This special relationship may also be grounded on the host State's investment legislation or on a bilateral investment treaty.

**99**      The Tribunal's observation in *Amco* that tax matters may well be covered by ICSID's jurisdiction is important. This is illustrated by *Kaiser Bauxite* v. *Jamaica*, where the Government had made a "no further tax" commitment to the investor. There, the Tribunal had no doubt that a dispute arising from the imposition of additional taxes in violation of the agreement between the parties arose directly from the investment and was within the Centre's jurisdiction.[119] Unlike in *Amco*, in *Kaiser Bauxite* the tax issue was a central element of the investment relationship between the parties.

**100**     In *CSOB* v. *Slovakia*, the Claimant had granted a loan to a Slovak Collection Company that was secured by a guarantee of the Slovak Ministry of Finance.[120]

---

117   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 543, 562–565.

118   At p. 565.

119   *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 15–25. See also *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 93–95, 98/9 (1976).

120   *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 1–3.

When the Slovak Collection Company defaulted in its payment, CSOB instituted ICSID proceedings against Slovakia. Slovakia argued that the claims against it did not arise directly out of the loan and were, therefore, outside the Tribunal's jurisdiction. The Tribunal rejected this argument. After citing from the *Fedax* case it said:

> An investment is frequently a rather complex operation, composed of various interrelated transactions, each element of which, standing alone, might not in all cases qualify as an investment. Hence, a dispute that is brought before the Centre must be deemed to arise directly out of an investment even when it is based on a transaction which, standing alone, would not qualify as an investment under the Convention, provided that the particular transaction forms an integral part of an overall operation that qualifies as an investment.[121]

The Tribunal added that the term "directly" in Art. 25(1) should not lead to a restrictive interpretation merely because the claim was based on an obligation which, standing alone, did not qualify as an investment. The Slovak Republic's obligation was closely related to the loan made by CSOB. The loan, in turn, was part of the overall operation of consolidating CSOB and developing its banking activity in the Slovak Republic. Therefore, the dispute arose directly out of the investment.[122]

In *Tokios Tokelės* v. *Ukraine*, the Respondent argued that the dispute did not arise   **101**
directly out of an investment because the allegedly wrongful acts by Ukrainian governmental authorities were not directed against the Claimant's physical assets.[123] The Tribunal rejected this argument:

> For a dispute to arise directly out of an investment, the allegedly wrongful conduct of the government need not be directed against the physical property of the investor. The requirement of directness is met if the dispute arises from the investment itself or the operations of its investment, as in the present case.[124]

Other tribunals have also adopted the doctrine of the general unity of the   **102**
investment operation. They have accepted that disputes arising from activities that would not necessarily constitute investments by themselves, but that were linked to an investment, were covered by the requirement of "arising directly".[125]

*Joy Mining* v. *Egypt* seems to be at variance with this principle. The Claimant   **103**
had delivered and installed mining equipment. The transaction was secured by a bank guarantee. The claim before the Tribunal was for the return of the guarantee. The Tribunal did refer to the unity of the investment operation, saying that "a given element of a complex operation should not be examined in isolation because what

---

121   At para. 72 (footnote omitted).          122   At paras. 12, 70–75, 82, 91.
123   *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 90.
124   At para. 91.
125   *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 70; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 106–124; *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 54 (but see the apparent contradiction with the Tribunal's statement at paras. 42, 44); *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 92, 100–102; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 38; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 112–114.

matters is to assess the operation globally or as a whole".[126] Yet elsewhere the Tribunal denied the existence of an investment "as a bank guarantee is simply a contingent liability".[127] In other words, the Tribunal, rather than examining the entire transaction, looked at the bank guarantee, which was but one aspect of the operation, and examined whether it was an investment.[128]

**104**    It is impossible to draw a precise line in general terms between disputes arising directly and those arising only indirectly out of investments. Nevertheless, ICSID practice yields certain indications for the distinction: the fact that transactions that are ancillary but vital to the investment are made in separate form and even through separate entities does not deprive a dispute relating to them of its direct character. The fact that a dispute with the government has important repercussions on relationships with private entities in the host State does not negate its character as arising directly out of an investment. In order to be "arising directly", disputes must have distinctive features linking them to the investment that are not shared by disputes unrelated to investments.

**105**    One State party to the Convention is evidently of the opinion that the "arising directly" clause in the Convention is not sufficiently rigorous. Papua New Guinea has made a notification under Art. 25(4) of the Convention to the effect that "it will only consider submitting those disputes to the Centre which are fundamental to the investment itself".[129] It is unclear what, if anything, the words "fundamental to" add to "arising directly". Possibly, "fundamental to" refers to all the conditions and circumstances without which the investment would not have been made.

### 4. General Measures affecting Investments

**106**    In a number of cases Argentina argued that the measures it had taken were of a general nature, were designed to serve the national welfare and were not specifically directed at the particular investment. Therefore, in Argentina's view, the dispute about these measures did not arise directly out of the investment. The tribunals did not accept this argument.

**107**    In *CMS* v. *Argentina*, the Respondent argued that general measures dealing with a public economic emergency that are not directed towards investors but affect the country and its population as a whole cannot be said to lead to a dispute arising directly out of an investment. The Tribunal distinguished between measures of a general economic nature and measures specifically directed to the investment's operation.[130] The Tribunal found that questions of general economic policy not directly related to the investment, as opposed to measures specifically addressed to the operations of the business concerned, would normally fall outside ICSID's jurisdiction. The Tribunal added that a direct relationship can, however, be

126  *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 54.
127  At para. 44.
128  The Tribunal also found that the overall transaction was an ordinary sales contract rather than an investment.
129  http://www.worldbank.org/icsid/pubs/icsid-8/icsid-8-d.htm (see also para. 926 *infra*).
130  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 25.

established if the general measures are adopted in violation of specific commitments given to the investor in treaties, legislation or contracts. What is then brought under ICSID's jurisdiction is not the general measures in themselves but the extent to which they may violate those specific commitments.[131] The Tribunal said:

> . . . the Tribunal concludes on this point that it does not have jurisdiction over measures of general economic policy adopted by the Republic of Argentina and cannot pass judgment on whether they are right or wrong. The Tribunal also concludes, however, that it has jurisdiction to examine whether specific measures affecting the Claimant's investment or measures of general economic policy having a direct bearing on such investment have been adopted in violation of legally binding commitments made to the investor in treaties, legislation or contracts.[132]

The Tribunal found it sufficient that the Claimant had demonstrated *prima facie*   **108** that it had been adversely affected by Argentina's measures to consider the claim admissible and within its jurisdiction.[133]

In *AES* v. *Argentina*, the Respondent similarly argued that the measures under   **109** dispute were not specifically related to or targeted at the Claimant's investment. Rather, they were measures of general bearing aimed at restoring the economy. Therefore, the dispute did not arise directly out of the investment.[134] The Tribunal did not accept this argument. It said:

> What is at stake in the present case, as it was in the *CMS* one, are not the measures of a general economic nature taken by Argentina in 2001 and 2002 but their specific negative impact on the investments made by AES. As a sovereign State, the Argentine Republic had a right to adopt its economic policies; but this does not mean that the foreign investors under a system of guarantee and protection could be deprived of their respective rights under the instruments providing them with these guarantees and protection. . . . Under this provision, directness has to do with the relationship between the dispute and the investment rather than between the measure and the investment.[135]

In *Continental Casualty* v. *Argentina*, the Respondent based its objection on   **110** the argument that "arising directly" meant that the measure had to be specifically addressed to the particular investment. This would exclude general measures taken in case of emergency and affecting all sectors of the economy.[136] The Tribunal did not accept that "specific" was a synonym of "directly". A breach of international standards may well arise from general measures. The Tribunal said:

> International practice indeed shows that many, if not most, disputes based on an alleged breach of international standards concerning the treatment of the property of aliens, settled either by means of diplomatic protection or of direct arbitration, have arisen from general measures taken by host States, that affected directly those investments, without necessarily being specifically aimed at them.

---

131  At para. 27.                          132  At para. 33.
133  At para. 35.
134  *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 48, 49.
135  At paras. 57, 60.
136  *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, paras. 38, 39, 46, 47, 70–75.

> Were this not the case, nationalization measures, either aimed at the property of both nationals and foreigners, or just at foreign property, which have been the subject matter of a substantial portion of those disputes, would have escaped any international litigation and dispute settlement mechanisms.[137]

**111**    Other tribunals have followed this line of argument.[138] It follows that a host State cannot rely on the general policy nature of measures taken by it if these measures had a concrete effect on the investment and violated specific commitments and obligations. These commitments may arise from legislation, a treaty or a contract.

**112**    Article 1101(1) of the NAFTA refers to "measures . . . relating to" investors and investments. In a number of ICSID cases Argentina relied on the interpretation of that provision in *Methanex* v. *United States*.[139] The *Methanex* Tribunal had decided that the phrase "relating to" required a legally significant connection. ICSID tribunals have pointed to the difference between "relating to" in the NAFTA and "arising directly" in the ICSID Convention and have distinguished *Methanex*.[140]

### D.   ". . . out of an investment, . . ."

### 1. General Meaning under the Convention

**113**    The concept of investment is central to the Convention. Yet, the Convention does not offer any definition or even description of this basic term. The Working Paper's draft on jurisdiction did not even contain a reference to "investments" (History, Vol. II, p. 22). Mr. *Broches* advised against limiting or defining disputes since it would be difficult to find a satisfactory definition and since any definition was likely to lead to jurisdictional controversies (at pp. 22, 54, 59). On the other hand, a number of delegates found more precision desirable (at pp. 57, 66, 67). The Preliminary Draft included the requirement of the existence of an investment dispute but failed to offer a definition (at pp. 202–204). The subsequent discussions showed a widely held opinion that a definition of the term "investment" was necessary (at pp. 182, 261, 293, 297, 450, 468, 470, 474, 492, 493, 496, 499/500, 501, 502, 504). At the same time some suggestions as to possible definitions were put forward (at pp. 285, 493, 537, 564). But Mr. *Broches* continued to oppose a definition (at pp. 203/4, 395, 451, 497).

**114**    The First Draft introduced a definition in the following terms:

---

137  At para. 72.

138  *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, paras. 67, 68; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 71; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 59; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 21, 37–40; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, at paras. 89–100; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 27–30; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 55–70.

139  *Methanex* v. *United States*, Preliminary Award on Jurisdiction, 7 August 2002, paras. 127–147. *Methanex* is not an ICSID case but was conducted under the UNCITRAL Arbitration Rules.

140  *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 58, 59; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 75; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 92–97; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 27–30; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 58–63.

**Article 30**

For the purposes of this Chapter (i) "investment" means any contribution of money or other assets of economic value for an indefinite period or, if the period be defined, for not less than five years;[141]

This draft led to a broad critical discussion and a flurry of counterproposals. Some delegates found the draft unsatisfactory (at pp. 661, 699), especially since it was too imprecise (at pp. 652, 668, 700, 703, 707). There was considerable opposition to the word "contribution" (at pp. 702, 703, 708, 709, 710) but also to the introduction of a specific time element (at pp. 705, 707). Some alternative proposals emphasized aspects of money and profit (at pp. 704, 837), property rights (at p. 704) or the host State's interest in development (at pp. 705, 839). The various suggested definitions of "investment" prompted Mr. *Broches* to remark that they were, in fact, definitions of what the delegates believed their governments would wish to submit to the Centre (at pp. 704, 707). Some definitions in bilateral investment treaties (at p. 843) and domestic statutes (at pp. 843/4) were also quoted but were not acceptable (at p. 972). An attempted definition by the Secretariat was presented in the following terms:

The term "investment" means the acquisition of (i) property rights or contractual rights (including rights under a concession) for the establishment or in the conduct of an industrial, commercial, agricultural, financial or service enterprise; (ii) participations or shares in any such enterprise; or (iii) financial obligations of a public or private entity other than obligations arising out of short-term banking or credit facilities.[142]

Mr. *Broches* insisted that the precise delimitation of the Centre's jurisdiction was best left to the parties (at pp. 707, 710). He found support with the United Kingdom delegate who agreed that a definition would only create jurisdictional difficulties (at pp. 668, 702, 822). This view was endorsed by a number of other delegates (at pp. 703, 706/7, 823, 844). Yet another group advocated the inclusion of a descriptive list only (at pp. 707, 709, 824, 825). Eventually, a British proposal that omitted any definition of the term "investment" (at p. 821) was adopted by a large majority in the Legal Committee (at p. 826). Consequently, neither the Revised Draft nor the Convention itself contains a definition.

**115**

A number of specific points were discussed during the debate on the term investment but were either not adopted or left open. It was felt by many that the Centre should only be concerned with investments of a certain magnitude. In fact, the Working Paper provided that, subject to special agreement by the parties, the Centre would not exercise jurisdiction in respect of disputes involving claims of less than US $100,000 (History, Vol. II, p. 34). Although this clause was eliminated from the Preliminary Draft, it continued to attract the delegates' attention. There was considerable support for introducing a minimum limit in order to exclude insignificant claims (at pp. 257/8, 260, 498, 502, 547, 660, 669, 710). In objection

**116**

---

141   History, Vol. I, p. 116.
142   History, Vol. II, p. 844.

to these various suggestions it was argued that not all claims would be presented in terms of money and that smaller claims could lead to important test cases (at pp. 204, 260, 432, 497, 567, 660). Some delegates felt that the total value of the investment and not the claim under dispute should be determinative (at pp. 497, 706). Yet another proposal envisaged the involvement of the investor's Government (at pp. 498, 503) or the Secretary-General's screening power (at p. 258) to shield the Centre from insignificant claims. Mr. *Broches* opposed inflexible limits and pointed to the parties' autonomy also in this matter (at pp. 497, 499). No quantitative limit was included in any of the subsequent drafts or in the Convention.

117    Another topic of discussion was the exclusion of "old investments" from the Convention's application. The aim was to limit the Centre's jurisdiction to disputes arising from investments made after the Convention's entry into force: since the Convention's purpose was to create a favourable investment climate in the future, it should not be applied to older investments, especially those made when the countries concerned had not yet gained control over the conditions for admission (History, Vol. II, pp. 320, 468, 500, 503, 504, 548, 565, 669). Mr. *Broches* opposed this suggestion, pointing out that the desired exclusion could be achieved by a refusal of consent in respect of old investments (at p. 566). The idea was not pursued further.

118    Other questions that were left open concerned jurisdiction over loans (History, Vol. II, pp. 261, 474, 668, 709), suppliers' credits (at p. 451), outstanding payments (at p. 542), ownership of shares (at p. 661) and construction contracts (at p. 500).

119    In the debate over the draft for the Executive Directors' Report, Mr. *Broches* recalled that none of the suggested definitions for the word "investment" had proved acceptable. He suggested that while it might be difficult to define the term, an investment was in fact readily recognizable. He proposed that the Report should say that the Executive Directors did not think it necessary or desirable to attempt a definition (History, Vol. II, pp. 957, 972). After some further debate about the desirability of a definition, the more neutral statement was adopted that no attempt had been made to define the term "investment" (at pp. 972, 1027). Historically, this is, of course, incorrect. There were a number of attempts but they all failed.

120    The relevant portion of the Report of the Executive Directors, as adopted, says:

> 27. No attempt was made to define the term "investment" given the essential requirement of consent by the parties, and the mechanism through which Contracting States can make known in advance, if they so desire, the classes of disputes which they would or would not consider submitting to the Centre (Article 25(4)).[143]

121    Therefore, the Convention offers no explanation of the concept of investment. It is left to the parties what kinds of investments they wish to bring to ICSID. The only possible indication of an objective meaning that can be gleaned from the Convention is contained in the Preamble's first sentence, which speaks of

---

143    1 ICSID Reports 28.

"the need for international co-operation for economic development and the role of private international investment therein". This declared purpose of the Convention is confirmed by the Report of the Executive Directors which points out that the Convention was "prompted by the desire to strengthen the partnership between countries in the cause of economic development".[144] Therefore, it is arguable that the Convention's object and purpose indicate that there should be some positive impact on development.[145] But it does not necessarily follow that an activity that does not contribute to the host State's development cannot be an investment in the sense of Art. 25 and is hence outside the Centre's jurisdiction (see also paras. 164–170 *infra*).

### 2. The Dual Test for the Existence of an Investment

The reference to the essential requirement of consent in the Report of the Executive Directors (see para. 120 *supra*) does not imply unlimited freedom for the parties. The drafting history leaves no doubt that the Centre's services would not be available for just any dispute that the parties may wish to submit. In particular, it was always clear that ordinary commercial transactions would not be covered by the Centre's jurisdiction no matter how far-reaching the parties' consent might be. This interpretation is supported by subsequent practice (see paras. 129–133 *infra*) and by the terms of the Additional Facility (see paras. 9–13 *supra* and 202–209 *infra*). **122**

The conclusion that the term "investment" has an objective meaning independent of the parties' disposition is confirmed by Rule 2 of the Institution Rules. It mandates that a request for conciliation or arbitration must indicate not only particulars concerning the parties' consent (Rule 2(1)(c)) but also, as a separate requirement, information concerning the issue in dispute indicating that there is a legal dispute arising directly out of an investment (Rule 2(1)(e)). Therefore, while it is clear that the parties have much freedom in describing their transaction as an investment, they cannot designate an activity as an investment that is squarely outside the objective meaning of that concept. **123**

In examining whether the requirements for an "investment" have been met, most tribunals apply a dual test: whether the activity in question is covered by the parties' consent and whether it meets the Convention's requirements.[146] If jurisdiction is to be based on a treaty containing an offer of consent, the treaty's definition of investment will be relevant. In addition, the tribunal will have to establish that the activity is an investment in the sense of the Convention. This dual test has at times been referred to as the "double keyhole" approach[147] or as a "double barrelled" test.[148] **124**

---

144   Para. 9.
145   In this sense: *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 64, 73, 76, 88; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 28–33; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, paras. 66–68.
146   *Rubins*, The Notion of "Investment", pp. 289–290.
147   *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 278.
148   *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 55.

**125**    Tribunals have generally followed this methodology.[149] In *CSOB* v. *Slovakia*, the existence of an investment was disputed. The agreement between the parties referred to the BIT, thereby incorporating the BIT's reference to ICSID arbitration.[150] This, in the Tribunal's view, created a strong presumption that the parties considered their transaction as an investment within the meaning of the Convention.[151] But the Tribunal did not accept that this disposed of the question whether there was an investment. It said:

> 68. The Slovak Republic is correct in pointing out, however, that an agreement of the parties describing their transaction as an investment is not, as such, conclusive in resolving the question whether the dispute involves an investment under Article 25(1) of the Convention. The concept of an investment as spelled out in that provision is objective in nature in that the parties may agree on a more precise or restrictive definition of their acceptance of the Centre's jurisdiction, but they may not choose to submit disputes to the Centre that are not related to an investment. A two-fold test must therefore be applied in determining whether this Tribunal has the competence to consider the merits of the claim: whether the dispute arises out of an investment within the meaning of the Convention and, if so, whether the dispute relates to an investment as defined in the Parties' consent to ICSID arbitration, in their reference to the BIT and the pertinent definitions contained in Article 1 of the BIT.[152]

**126**    In *Joy Mining* v. *Egypt*, the Claimant argued that the transaction in question, a bank guarantee, fell within the broad definition of "investment" contained in the BIT between Egypt and the United Kingdom.[153] The Tribunal found that there is a limit to the freedom with which the parties may define an investment for purposes of ICSID's jurisdiction. It said:

> 50. The parties to a dispute cannot by contract or treaty define as investment, for the purpose of ICSID jurisdiction, something which does not satisfy the objective requirements of Article 25 of the Convention. Otherwise Article 25 and its reliance on the concept of investment, even if not specifically defined, would be turned into a meaningless provision.[154]

**127**    Other tribunals have endorsed this approach[155] or have simply undertaken separate examinations of the existence of an investment under the parties' consent to jurisdiction and under Art. 25(1).[156]

---

149    For examples to the contrary see *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 48; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 157–160.
150    *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 55.
151    At para. 66.                              152   At para. 68.
153    *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 42–50.
154    At para. 50.
155    *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, paras. 36, 44; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 278; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 90; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 80; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 31; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 55; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 113.
156    *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, paras. 20, 21–30; *Genin* v. *Estonia*, Award, 25 June 2001, para. 324; *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001,

Strictly speaking, the meaning of "investment" as reflected in the parties' con-  **128**
sent agreement is a matter of the scope of consent and ought to be discussed in that
context (see paras. 513–539 *infra*). For the sake of convenience it is discussed here
in the context of the concept of "investment". Consent may be given in three ways:
through a contract between the host State and the investor, through a provision
in the host State's investment legislation that has been accepted by the investor,
or through a clause in a treaty that has been accepted by the investor (see paras.
382–463 *infra*). Indications of the meaning of "investment" may be contained in
any of these bases of consent.

### 3. Contracts Relating to Investments

A clause in an agreement by which the parties consent to submit disputes to the  **129**
Centre is a strong indication that they consider their transaction an investment.
The classification of the proposed operation as an investment arises by neces-
sary implication from the ICSID clause.[157] Nevertheless, the 1993 ICSID Model
Clauses suggest a specific clarification on this point:

<div align="center">

**Clause 3**

</div>

> It is hereby stipulated that the transaction to which this agreement relates is an
> investment.[158]

The earlier versions of the Model Clauses offered formulae to the same
effect.[159] The comment to the 1993 Model Clause 3 states that it is designed
to strengthen the presumption in favour of the existence of an investment which
arises from the parties' consent to submit a dispute to the Centre.

A specific statement in an investment agreement containing an ICSID clause  **130**
that the planned transaction is an investment may not be necessary but is advisable.
It precludes a party from later challenging ICSID's jurisdiction on the ground that
the dispute did not really arise from an investment. It demonstrates that the parties
have given careful thought to the nature of the project and that, when adopting the
ICSID clause, they were aware of the Convention's jurisdictional requirements.
*Delaume* has recommended that such a specific statement be supplemented with a
description of the particular features of the transaction such as its nature, size and

---

paras. 50–66; *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 133 FN 113,
140; *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 73–86; *Saipem*
v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 98, 119.

157  See also *Amerasinghe*, Submissions to the Jurisdiction, p. 223; *Broches, A.*, The Convention
on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia
Journal of Transnational Law 263, 268 (1966); *Golsong, H.*, A Guide to Procedural Issues in
International Arbitration, 18 The International Lawyer 633, 634/5 (1984).

158  4 ICSID Reports 360.

159  See the 1981 Model Clauses, Clause IV, 1 ICSID Reports 201; 1968 Model Clauses, Clause
IX, 7 ILM 1169 (1968).

duration.[160] This is particularly advisable in order to strengthen the credibility of the transaction's classification as an investment in borderline situations.

**131**    Parties to agreements containing ICSID clauses have sometimes specified that the intended transaction is indeed an investment[161] or to describe the features that would make this characterization plausible. In most contract-based cases before ICSID the question whether the dispute at hand did, in fact, arise from an investment did not create problems.[162] The facts appeared to squarely fit the concept of investment, and this classification was not challenged.[163] In *CSOB* v. *Slovakia*, the Tribunal concluded that a reference in a contract between the parties to a bilateral investment treaty containing an ICSID arbitration clause expressed their view that their transaction was an investment within the meaning of the Convention.[164]

**132**    In a number of cases, the Tribunals examined the question of the existence of an investment on their own motion but reached affirmative results. In *Kaiser Bauxite* v. *Jamaica*, the Tribunal noted the essential requirement of consent as mentioned in para. 27 of the Executive Directors' Report (see para. 120 *supra*) and concluded that the consent of the parties should be entitled to great weight in any determination of the Centre's jurisdiction. Turning to the objective requirement of an investment it said:

> Moreover, it seems clear to the Tribunal that a case like the present, in which a mining company has invested substantial amounts in a foreign State in reliance upon an agreement with that State, is among those contemplated by the Convention.[165]

**133**    In *LETCO* v. *Liberia*, the Tribunal took it upon itself to examine all requirements for jurisdiction under Art. 25(1).[166] It gave a brief description of the activities under the Concession Agreement, the harvesting and processing of forest products in Liberia, putting special emphasis on the extensive amounts that LETCO had paid out for the development of the concession. It concluded:

> There is, therefore, no doubt that, based on the Concession Agreement, amounts paid out to develop the concession, as well as other undertakings, this legal dispute has arisen directly from an "investment" as that term is used in the Convention.[167]

---

160  *Delaume*, How to Draft, p. 182; see also Comment 9 to the 1981 Model Clauses, 1 ICSID Reports 201.

161  *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 6. The contractual clause containing consent to ICSID arbitration contained the following proviso: "It is hereby stipulated . . . (b) that the transaction to which this Agreement relates is an 'investment' within the meaning of the Convention;" See also *Semos* v. *Mali*, Award, 25 February 2003, 10 ICSID Reports 117.

162  But see the somewhat unclear treatment of a contractual clause expressing consent to ICSID's jurisdiction in *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 171, 172, 407.

163  *Broches*, Convention, Explanatory Notes and Survey, p. 643.

164  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, at paras. 66, 67, 89.

165  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 17. See also *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 99/100 (1976).

166  *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, reproduced in the Award, 31 March 1986, 2 ICSID Reports 349.

167  At p. 350.

### *4. Definitions of Investment in National Legislation*

National legislation offering consent to ICSID's jurisdiction[168] often contains **134** definitions or descriptions of investments to which it relates.[169] Some of these definitions are quite terse. The definition in Art. 3 of the Tanzania Investment Act 1997 is typical of this:

> "investment" means the creation or acquisition of new business assets and includes the expansion, restructuring or rehabilitation of an existing business enterprise;

Other definitions are more elaborate and follow the pattern of modern BITs. Art. 1 of the Albania Law on Foreign Investments of 1993 provides:

> "Foreign investment" means every kind of investment in the territory of the Republic of Albania owned directly or indirectly by a foreign investor, consisting of:
> (a) moveable and immoveable, tangible and intangible property and any other property rights;
> (b) a company, shares in stock of a company and any form of participation in a company;
> (c) loans, claim to money or claim to performance having economic value;
> (d) intellectual property, including literary and artistic works, sound recordings, inventions, industrial designs, semiconductor mask works, know how, trademarks, service marks and trade names; and
> (e) any right conferred by law or contract, and any license or permit pursuant to law.[170]

In *Tradex* v. *Albania*, the Tribunal undertook a detailed interpretation of this **135** provision.[171] It held, *inter alia*, that the sources from which the investor financed the foreign investment in Albania were not relevant.[172] It also held that even without ownership by the Claimant of the land in question its right to use the land could have been expropriated.[173]

The Georgia Investment Law of 1996, which offers ICSID arbitration, contains **136** the following definition of "investment":

> ### Article 1. Investment
>
> (1) Investment is any kind of property or intellectual value or right to be contributed and used in the entrepreneurial activity carried out on the territory of Georgia for earning of possible income.
> (2) Such value or right may be:

---

168  For a collection of national investment legislation see: Investment Laws of the World, loose-leaf collection (OUP, since 1973).

169  *Delaume*, Le Centre International, pp. 802/3; *Parra, A. R.*, The Scope of New Investment Laws and International Investments, *in*: Economic Development, Foreign Investment and the Law (*Pritchard, R.* ed.) 27 (1996); *Rubins*, The Notion of "Investment", pp. 295–296.

170  See *Tradex* v. *Albania*, Award, 29 April 1999, para. 105.

171  At paras. 88, 106, 126–128.          172   At paras. 108–111.

173  At paras. 126–131.

     (a) funds, shares, stocks and other securities;
     (b) movable and immovable property – land, buildings, equipment and wealth;
     (c) land tenure or right to use other natural resources (concessions, as well), patent, license, "know-how", experience and other intellectual value;
     (d) other legally recognized property and intellectual value or right.[174]

**137**    In *Zhinvali* v. *Georgia*, the Claimant had conducted lengthy negotiations with the authorities of Georgia. These negotiations ultimately failed. Zhinvali claimed "development costs" and damages. The Tribunal found that there had been no investment in the sense of the Investment Law.[175] It said:

> . . . the law of Georgia contemplates the core expenditures to be "realized" as an "investment" on the "territory" of Georgia. To conclude that a given "legal person" can qualify as an "investor" for purposes of . . . the Georgia Investment Law, without having realized investments on the territory of Georgia, is, in the Tribunal's opinion, *not* in keeping with the definition of that term.[176]

**138**    Some codes exclude investment from certain areas of economic activity such as banking or insurance and subject foreign investment to conditions and admission procedures (see paras. 411, 422, 423, 425, 524 *infra*). It is clear that the diverse definitions of investment and the various restrictions contained in national legislation do not necessarily reflect the term as used in Art. 25(1) of the Convention. But they form part of the conditions of consent and should be respected in a particular case.

### 5. Definitions of Investment in Treaties

**139**    In recent years the vast majority of cases have been brought to ICSID under the provisions of investment treaties containing consent to jurisdiction. In most cases jurisdiction is based on a bilateral investment treaty (BIT). The treaty clauses providing for ICSID's jurisdiction are drafted in general terms referring to future investment disputes. Consent is normally completed by the investor's acceptance of such an offer (see paras. 427–455 *infra*). In such a case, no inferences can be drawn as to the existence of an investment in a particular case from the mere existence of the parties' consent. An ICSID conciliation commission or arbitral tribunal will have to carefully examine whether the transaction out of which the dispute arises meets the criteria of an investment under the Convention and under the BIT.

**140**    Almost all BITs contain definitions of the term investment. In most modern BITs these definitions have similar features.[177] They are usually introduced by a broad, general description followed by a non-exhaustive list of typical rights. The

---

174   *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 377.
175   At paras. 1–4.          176   At para. 381. Italics original.
177   For a more thorough analysis of definitions of the term "investment" in treaties see *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 25–31; *Delaume, G. R.*, ICSID and Bilateral Investment Treaties, News from ICSID, Vol. 2/1, pp. 12, 19/20 (1985); *Rubins*, The Notion of "Investment", pp. 292–295; *Dolzer*, The Notion of Investment, pp. 263–266; *Legum*, Defining Investment and Investor, pp. 522–524.

general description frequently refers to "every kind of asset". The list of typical rights usually includes:

- traditional property rights;
- participation in companies;
- money claims and rights to performance;
- intellectual and industrial property rights;
- concession or similar rights.

Art. 1 of the United Kingdom's Model Agreement is typical in this regard. It **141** provides:

> For the purposes of this Agreement:
> (a) "investment" means every kind of asset and in particular, though not exclusively, includes:
>   (i) movable and immovable property and any other property rights such as mortgages, liens or pledges;
>   (ii) shares in and stock and debentures of a company and any other form of participation in a company;
>   (iii) claims to money or to any performance under contract having a financial value;
>   (iv) intellectual property rights, goodwill, technical processes and know-how;
>   (v) business concessions conferred by law or under contract, including concessions to search for, cultivate, extract or exploit natural resources.[178]

The definition in the United States Model BIT of 2004 is as follows:               **142**

> **"investment"** means every asset that an investor owns or controls, directly or indirectly, that has the characteristics of an investment, including such characteristics as the commitment of capital or other resources, the expectation of gain or profit, or the assumption of risk. Forms that an investment may take include:
> (a) an enterprise;
> (b) shares, stock, and other forms of equity participation in an enterprise;
> (c) bonds, debentures, other debt instruments, and loans;
> (d) futures, options, and other derivatives;
> (e) turnkey, construction, management, production, concession, revenue-sharing, and other similar contracts;
> (f) intellectual property rights;
> (g) licenses, authorizations, permits, and similar rights conferred pursuant to domestic law; and
> (h) other tangible or intangible, movable or immovable property, and related property rights, such as leases, mortgages, liens, and pledges.[179]

---

178  The Model BIT of the People's Republic of China of 2003, the Model BIT of Germany of 2005 and the Model BIT of France of 2006 contain similar but not identical definitions.

179  Footnotes omitted. The full text of the 2004 US Model BIT is available at http://www.ustr.gov/assets/Trade_Sectors/Investment/Model_BIT/asset_upload_file847_6897.pdf.

**143**    BIT practice is far too extensive to permit a fuller analysis in the framework of this Commentary.[180] By and large definitions of "investment" in actual BITs are along the lines described above.

**144**    The broad similarity of definitions in BITs does not mean that they reflect a general definition for the Convention's concept of investment. Rather, these definitions are part of the specific conditions of consent governing individual relationships. Generalizations drawn from these definitions should be treated with caution especially where jurisdiction is not based on a BIT. In a case not based on a BIT, jurisdiction should not be denied just because the dispute arises from an operation that does not fit the typical definition of investments adopted by BITs. Conversely, if a BIT's definition of investment goes beyond the requirements of the ICSID Convention there will be no jurisdiction. For instance, clauses in BITs that cover disputes concerning the admission or establishment of investments cannot create a basis for ICSID's jurisdiction since there is no investment[181] (see paras. 175–181 *infra*).

**145**    ICSID tribunals have examined whether the activities underlying the claims before them were covered by the definitions of "investment" in the applicable treaties. In the vast majority of cases they found that the disputes before them did indeed concern investments as defined in the respective BITs.[182] Participation in locally incorporated companies is a particularly important part of this practice[183] (see para. 150 *infra*). In a much smaller number of cases the tribunals found that the claimants' activities fell outside the definitions contained in BITs.[184] A number of

---

180   For a broad survey of BITs and their definitions of "investment" see UNCTAD's searchable database at: http://www.unctadxi.org/templates/DocSearch_779.aspx. See also: UNCTAD, Bilateral Investment Treaties 1995–2006: Trends in Investment Rulemaking 7–13 (2007); UNCTAD, Investment Provisions in Economic Integration Agreements 59–64 (2006).

181   *Parra*, Provisions on the Settlement, pp. 291, 325, 329.

182   *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, paras. 19, 30–38; *Goetz* v. *Burundi*, Award, 10 February 1999, para. 83; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 77, 91; *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, para. 28; *Genin* v. *Estonia*, Award, 25 June 2001, paras. 324, 325; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, paras. 36–49; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 97– 103, 134–138; *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 133–140; *Tokios Tokelès* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 74–78; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 66–105; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 97–106; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, paras. 78, 79; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 118–128; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 136–142.

183   *AMT* v. *Zaire*, Award, 21 February 1997, paras. 3.13–3.15, 4.05, 5.07–5.16, 5.24, 5.25; *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, paras. 10–16; *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 66–68; *Genin* v. *Estonia*, Award, 25 June 2001, para. 324; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 46–50; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 57–65; *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, paras. 39–49; *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, paras. 88–94; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 207; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 152–156, 161, 164.

184   *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 25.1–25.7, 26.1; *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, para. 61; *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 43–47.

special issues arising from the definition of BITs are described below in separate sections (see paras. 175–201 *infra*).

Some multilateral treaties also provide for dispute settlement by ICSID accompanied by a definition of the term "investment" (see paras. 456–463 *infra*). Art. 1139 of the NAFTA[185] (see paras. 457–459 *infra*) contains an elaborate definition of "investment" which is narrower than the typical BIT definition. It covers an enterprise, equity or debt securities of an enterprise, interests that entitle an owner to a share in the income or profits of an enterprise, tangible and intangible assets acquired for business purposes, interests arising from the commitment of capital and other resources such as under turnkey or construction contracts, and contracts where remuneration depends substantially on the production, revenues or profits of an enterprise. The definition specifically excludes claims to money that arise solely from commercial contracts for the sale of goods or services or short-term credit in connection with a commercial transaction such as trade financing.   **146**

The Energy Charter Treaty of 1994 (see paras. 460, 461 *infra*) in its Art. 1(6)[186] and the MERCOSUR Protocol of 1994 (see para. 462 *infra*) in its Art. 1(1) offer definitions that are closely modelled on the definitions in modern BITs as described in paras. 140–142 above. The Mexico-Colombia-Venezuela Free Trade Agreement of 1994 (see para. 463 *infra*) in its Art. 17–01 offers yet another definition of investment. It covers goods and rights for the purpose of producing economic benefits, share capital, companies owned or effectively controlled by the investor and any other rights considered investments under national legislation. Money claims arising from commercial contracts for the sale of goods or services as well as commercial credits are specifically excluded.   **147**

### *6. Types of Investments*

A perusal of cases that come before ICSID tribunals demonstrates the diversity of matters covered by the concept of investment.[187] Investment in the sense of Art. 25 of the Convention may cover almost any area of economic activity.[188] Not surprisingly, the concept of investment includes immovable and movable   **148**

---

185   32 ILM 605, 647 (1993).                    186   34 ILM 360, 383 (1995).

187   A survey of subject matters in ICSID cases is offered on ICSID's homepage: http://www.worldbank.org/icsid/cases/cases.htm.

188   See also *Delaume, G. R.*, ICSID Clauses: Some Drafting Problems, News from ICSID, Vol. 1/2, pp. 16, 18 (1984); *Koa, C. M.*, The International Bank for Reconstruction and Development and Dispute Resolution: Conciliating and Arbitrating with China through the International Centre for Settlement of Investment Disputes, 24 New York University Journal of International Law and Politics 439, 448–450 (1991); *Shihata, I. F. I.*, Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1, 7/8 (1986); *Shihata/Parra*, The Experience, p. 318; *Amerasinghe*, The Jurisdiction of the International Centre, p. 181; *Szasz*, The Investment Disputes Convention, p. 36; *Rubins*, The Notion of "Investment", pp. 304–313.

property.[189] It is also well established that rights arising from contracts may amount to investments.[190]

**149**    Financial instruments such as loans or the purchase of bonds may qualify as investments.[191] In *Fedax* v. *Venezuela*, Venezuela argued that the purchase of promissory notes issued by the government did not qualify as an investment since they involved neither a long-term transfer of financial resources in order to acquire interests in a corporation nor a portfolio investment.[192] The Tribunal concluded that loans and other credit facilities were within the jurisdiction of the Centre and that the purchase of the promissory notes constituted an investment.[193] Similarly, in *CSOB* v. *Slovakia*, the Tribunal held that the broad meaning which must be given to the notion of an investment may include a loan, especially if it contributes substantially to a State's economic development.[194] In *Sempra* v. *Argentina*, the Tribunal also accepted loans as an investment, noting that they were part of the overall investment's continuing financing arrangements.[195] On the other hand, tribunals have found that a bank guarantee[196] and an option[197] were not covered by the concept of an investment.

**150**    Participation in companies or shareholding constitutes a frequently invoked form of investment. This is important in view of the common requirement that the investment be made through a company incorporated in the host State. The number of cases that have accepted shareholding as a form of investment is considerable.[198] The locally incorporated company is treated not as the foreign investor but as the

---

189   *Santa Elena* v. *Costa Rica*, Award, 17 February 2000; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 131–151; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003.

190   *SPP* v. *Egypt*, Award, 20 May 1992, paras. 164, 165; *Tokios Tokelés* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 90, 92; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 274; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 255.

191   See also *Broches, A.*, Choice-of-Law Provisions in Contracts with Governments, 26 The Record of the Association of the Bar of the City of New York 42, 50 (1971); *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 241/2 (1986); *Alexandrov*, The "Baby Boom", pp. 45–49; *Wälde, T.*, The Serbian Loans Case – A Precedent for Investment Treaty Protection of Foreign Debt?, *in*: International Investment Law and Arbitration: Leading Cases (*Weiler, T.* ed.) 383 (2005).

192   *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 19.

193   At paras. 18–43.

194   *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 76–91.

195   *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 214–216. See also *CDC* v. *Seychelles*, Award, 17 December 2003, paras. 6, 8, 18, 21, where the objection against the nature of the loan as an investment had been dropped.

196   *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 42–50.

197   *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, para. 189.

198   See Appendix 1 to *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005 listing 18 cases to this effect. In addition see: *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, paras. 44, 48; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, paras. 51–54, 76–89; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 46–51; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 209–222; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 46–51; *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 19, 27, 60; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 250–254.

investment.[199] This form of investment includes minority shareholding.[200] It also includes indirect shareholding through an intermediate company.[201]

Another sizeable group of cases concerns civil engineering and construction **151** projects. Tribunals have not entertained doubts that these were investments.[202] Similarly, infrastructure projects are the basis of numerous investment disputes.[203] The provision of services has been accepted as an investment in some cases[204] but not in others.[205] Investment operations have extended, *inter alia*, to mining

---

199   See *Alexandrov*, The "Baby Boom", pp. 27–45; *Schreuer, C.*, Shareholder Protection in International Investment Law, *in*: Common Values in International Law, Essays in Honour of Christian Tomuschat (*Dupuy, P.-M./Fassbender, B./Shaw, M. N./Sommermann, K.-P.* eds.) 601 (2006).

200   *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 95; *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 10; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 50; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 36–65; *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, para. 3.4.2; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, paras. 39, 44, 49; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, paras. 50–63; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 92–94; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 138; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 58–76.

201   *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, paras. 42–57; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, paras. 123–144; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 9, 19–44; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 9, 10, 32–35; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 121–124; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 70–83.

202   *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001, paras. 50–66; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, paras. 36–40, 43–49, 52–58; *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 101; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, paras. 67, 92; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 111–121, 127–129; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 90–106; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 99–111. But see also *Nathan, K. V. S. K.*, Submissions to the International Centre for the Settlement of Investment Disputes in Breach of the Convention, 12 Journal of International Arbitration 27 (1995).

203   *Tanzania Electric* v. *IPTL*, Decision on Preliminary Issues, 22 May 2000; *Vivendi* v. *Argentina*, Award, 21 November 2000; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004; *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005; *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006; *ADC* v. *Hungary*, Award, 2 October 2006; *Fraport* v. *Philippines*, Award, 16 August 2007.

204   *Atlantic Triton* v. *Guinea*, Award, 21 April 1986 (conversion and management of ships); *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 75–78, 123–129, 133–140 (pre-shipment inspection).

205   *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 34–39 (law firm); *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, paras. 48–148 (marine salvage operation).

operations,[206] the construction and operation of hotels,[207] banking[208] and agriculture.[209]

### 7. A Test for the Existence of an Investment?

**152**     There have been repeated attempts to define the concept of investment in general terms.[210] As set out above (paras. 113–121 *supra*), all attempts to reach agreement on a definition to be inserted into the Convention failed.

**153**     It would not be realistic to attempt yet another definition of "investment" on the basis of ICSID's experience. But it seems possible to identify certain features that are typical to most of the operations in question: the first such feature is that the projects have a certain *duration*. Even though some break down at an early stage, the expectation of a long-term relationship is clearly there. The second feature is a certain *regularity of profit and return*. A one-time lump-sum agreement, while not impossible, would be untypical. Even where no profits are ever made, the expectation of return is present. The third feature is the assumption of *risk* usually by both sides. Risk is in part a function of duration and expectation of profit. The fourth typical feature is that the commitment is *substantial*. This aspect was very much on the drafters' minds although it did not find entry into the Convention (see para. 116 *supra*). A contract with an individual consultant would be untypical. The fifth feature is the operation's significance for the host State's *development*. This is not necessarily characteristic of investments in general. But the wording of the Preamble and the Executive Directors' Report (see para. 121 *supra*) suggest that development is part of the Convention's object and purpose.[211] These features should not necessarily be understood as jurisdictional requirements but merely as typical characteristics of investments under the Convention.[212]

---

206  *Alcoa Minerals* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975; *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994; *Goetz* v. *Burundi*, Award, 10 February 1999; *SIREXM* v. *Burkina Faso*, Award, 19 January 2000; *Semos* v. *Mali*, Award, 25 February 2003; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006. But see *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 41–63, where the delivery and installation of mining equipment was found not to be an investment.

207  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974; *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983; *Wena Hotels* v. *Egypt*, Decision on Jurisdiction, 29 June 1999; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007.

208  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999; *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000; *Genin* v. *Estonia*, Award, 25 June 2001.

209  *AAPL* v. *Sri Lanka*, Award, 27 June 1990; *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996.

210  For a survey of definitions see *Amerasinghe*, The Jurisdiction of the International Centre, pp. 177–181.

211  *Delaume*, Le Centre International, pp. 801, 805.

212  This paragraph is substantively identical with para. 122 at p. 140 of the First Edition of this Commentary.

*Article 25 – Jurisdiction* 129

Starting with *Fedax*,[213] Tribunals have used these criteria, subject to variations, **154**
to determine the existence of an investment in cases before them.[214] In *Salini* v.
*Morocco*, the Respondent contended that the contract for the construction of a road
did not constitute an investment in the sense of the Convention.[215] The Tribunal
noted that the existence of an investment under the Convention was an objective
condition of jurisdiction in addition to consent. It said:

> The doctrine generally considers that investment infers: contributions, a certain
> duration of performance of the contract and a participation in the risks of the
> transaction (*cf. commentary by E. Gaillard*, . . .). In reading the Convention's
> preamble, one may add the contribution to the economic development of the host
> State of the investment as an additional condition.[216]

The Tribunal proceeded to examine the existence of contributions by the **155**
investors, the risks incurred by them and the contribution to Morocco's devel-
opment. On that basis it concluded that the contract constituted an investment.[217]

The use of these criteria to determine whether the activities under dispute **156**
constitute an investment has since become known as the "*Salini* test".

The element of regularity of profits and return has found little attention.[218] It **157**
has not been adopted by most tribunals.[219] The Tribunal in *Malaysian Historical
Salvors* v. *Malaysia* said:

> the Tribunal agrees that this criterion [regularity of profits and return] is not
> always critical. Further, this has not been held to be an essential characteristic or
> criterion in any other case cited in this Award, and its presence or otherwise may
> therefore not be determinative of the question of "investment".[220]

This leaves the following four criteria: **158**
- a (substantial) contribution;
- a certain duration of the operation;
- risk;
- contribution to the host State's development.

---

213 *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 43. The Tribunal adopted
these criteria from the preliminary publication of this Commentary in 11 ICSID Review – FILJ
372 (1996).
214 *Rubins*, The Notion of "Investment", pp. 297–300; *Dolzer*, The Notion of Investment,
pp. 267–270.
215 *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, para. 39.
216 At para. 52.                    217  At paras. 53–58.
218 Whether the activity must be profitable or at least designed to yield profit has not been clarified.
Some authors have argued that activities of charitable NGOs are investments in the sense of
Art. 25. See *MacKenzie, G. W.*, ICSID Arbitration as a Strategy for Levelling the Playing Field
between International Non-Governmental Organizations and Host States, 19 Syracuse Journal
of International Law and Commerce 197, 223 *et seq.* (1993); *Gallus, N./Peterson, L. E.*,
International Investment Treaty Protection of NGOs, 22 Arbitration International 527, 538
(2006).
219 But see *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 133 FN 113, citing
*Fedax*; *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 53; *Helnan* v. *Egypt*, Decision on
Jurisdiction, 17 October 2006, para. 59.
220 *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 108.

**159**    Tribunals have applied these criteria in a number of cases.[221] In the majority of cases tribunals were satisfied that the facts before them actually met these criteria.[222] In these cases it is not entirely clear whether the tribunals regarded the criteria as essential requirements for the existence of investments or merely as typical characteristics or indicators. It would seem that the repeated application of these criteria has strengthened the perception of tribunals that they were not merely features indicative of investments but mandatory standards.

**160**    In a smaller group of cases tribunals found that the facts before them did not pass the test. In *Joy Mining* v. *Egypt*, this result is based on the Tribunal's overall impression of the facts.[223] In two other cases the non-fulfilment of one of the requirements (contribution to the host State's development) led to the conclusion that there was no investment in the sense of the Convention.[224]

**161**    The available case law makes it possible to look at the four criteria in more detail. The requirement of a *substantial contribution* did not, in general, pose any problems.[225] In some cases, the tribunals pointed out that the contribution or commitment should not only be looked at in financial terms but also in terms of know-how, equipment, personnel and services.[226]

**162**    The *duration* of the project has led to some discussion. Tribunals seem to have regarded a period of two to five years as sufficient.[227] In some cases this criterion was met easily.[228] Tribunals pointed out that the element of duration referred not

---

221  But see some cases in which tribunals have resisted generalized definitions of investment: *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 78, 90; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 138, 139, 150, 165.

222  *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001, paras. 58–66; *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, paras. 13, 14; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 88; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 130–138; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 91–96; *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, paras. 72, 73; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 77; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 99–102, 109–111; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 116; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 125–135.

223  *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 53–63.

224  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 23–48; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, paras. 44, 48–148.

225  *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 57; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 92; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 77.

226  *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001, para. 61; *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. 14(i); *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 131; *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 73(i); *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 109.

227  *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001, para. 62; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, para. 54; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 93; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, paras. 110, 111.

228  *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 77; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 117.

merely to the actual period of the core activity but also to the time taken for tender, work interruption, renegotiation, extension and contractor's guarantee.[229]

The existence of a *risk* was always confirmed by tribunals. The very existence of the dispute was seen as an indication of risk.[230] Also, tribunals found that risk was inherent in any long-term commercial contract.[231] The host State's political and economic climate[232] and the need to rely on national courts were also seen as risk factors.[233]                                                                                    **163**

Contribution to the host State's *development* has turned out to be the most controversial indicator of an investment. In *CSOB* v. *Slovakia*, the Tribunal pointed to the Convention's Preamble and its reference to economic development. It concluded that this permitted an inference that an international transaction that is designed to promote a State's economic development may be deemed to be an investment in the sense of the Convention.[234]                                                          **164**

In some cases tribunals examined and confirmed the project's contribution to the host State's development as part of their application of the test.[235] In *Bayindir* v. *Pakistan*, the Tribunal added that this condition was often already included in the other three conditions of the "*Salini* test".[236] In the two closely related *LESI* cases the Tribunals rejected the relevance of a contribution to the host State's development as a separate criterion. The Tribunals said:                                              **165**

> . . . it is not necessary that the investment contribute more specifically to the host country's economic development, something that is difficult to ascertain and that is implicitly covered by the other three criteria.[237]

In *Mitchell* v. *DR Congo*, the Claimant had obtained an award[238] in his favour. The Award had found that action against the Claimant's law firm in the DR Congo                                                                                    **166**

---

229  *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. 14(ii); *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 132, 133; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 94, 95; *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 73(ii); *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 101, 102.

230  *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 40.

231  *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001, paras. 63, 64; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, paras. 55, 56; *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 57; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 134–136; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 109; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 112.

232  *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 117.

233  *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. 14(iii); *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 73(iii).

234  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 64. See also paras. 88, 91.

235  *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 43; *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001, paras. 65, 66; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, para. 57; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 77; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 117. Unclear: *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 57.

236  *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 137.

237  *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. II. 13(iv) *in fine*.; *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 72(iv) *in fine*.

238  *Mitchell* v. *DR Congo*, Award, 9 February 2004. Unpublished.

amounted to an expropriation. In annulment proceedings against this Award, the DR Congo argued that the law firm was no investment since it did not contribute to the host State's economic and social development.[239] The *ad hoc* Committee accepted this contention.[240] It relied on the Convention's Preamble with its reference to economic development, on previous cases and on the First Edition of this Commentary.[241] In the *ad hoc* Committee's view, in order to show a contribution to the host State's development:

> it would be necessary for the Award to indicate that, through his know-how, the Claimant had concretely assisted the DRC, for example by providing it with legal services in a regular manner or by specifically bringing investors.[242]

In addition, the *ad hoc* Committee noted that returns collected by the investor were not reinvested in the host State but transferred to the United States.[243] The Committee found that the Award's reasoning was incoherent since:

> . . . it boils down to granting the qualification as investor to any legal counseling firm or law firm established in a foreign country, thereby enabling it to take advantage of the special arbitration system of ICSID.[244]

It followed that the Tribunal's acceptance of jurisdiction on the basis of an investment within the meaning of the Convention had to be annulled on the grounds of manifest excess of powers and failure to state reasons.[245]

**167**    In *Malaysian Historical Salvors* v. *Malaysia*, the dispute arose from a contract for the salvage of historical objects from an ancient shipwreck. The Tribunal quoted the paragraph setting out the list of typical features of investment from the First Edition of this Commentary[246] (see para. 153 *supra*). It also quoted from the Convention's Preamble and the Executive Directors' Report, both of which refer to economic development.

**168**    The Tribunal distinguished between a typical characteristics approach and a jurisdictional approach. Under the former an investment may be present even if one or more of the typical characteristics is missing. Under the latter all hallmarks must be present otherwise there is no investment.[247] After examining the decisions in *Salini*, *Joy Mining*, *LESI-DIPENTA*, *Mitchell*, *CSOB, Bayindir* and *Jan de Nul* in some detail, the Tribunal concluded:

> The classical *Salini* hallmarks are not a punch list of items which, if completely checked off, will automatically lead to a conclusion that there is an "investment". If any of these hallmarks are absent, the tribunal will hesitate (and probably decline) to make a finding of "investment". However, even if they are all present,

---

239  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 23.
240  For commentary on the annulment decision see *Ben Hamida, W.*, Two Nebulous ICSID Features: The Notion of Investment and the Scope of Annulment Control. *Ad Hoc* Committee's Decision in *Patrick Mitchell* v. *Democratic Republic of Congo*, 24 Journal of International Arbitration 287 (2007).
241  At paras. 28–31.                     242  At para. 39.
243  At paras. 42–46.                     244  At para. 40.
245  At para. 67.
246  *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 44.
247  At paras. 70–72.

a tribunal will still examine the nature and degree of their presence in order to determine whether, on a holistic assessment, it is satisfied that there is an ICSID "investment".[248]

The Tribunal found that the weight of authorities was in favour of requiring **169** a significant contribution to the host State's economy.[249] Upon the facts it found that this was not the case:

> ... the Tribunal finds that the Contract did not benefit the Malaysian public interest in a material way or serve to benefit the Malaysian economy in the sense developed by ICSID jurisprudence, namely that the contributions were significant.... The benefits which the Contract brought to the Respondent are largely cultural and historical. These benefits, and any other direct financial benefits to the Respondent, have not been shown to have led to significant contributions to the Respondent's economy in the sense envisaged in ICSID jurisprudence.[250]

The Tribunal specifically rejected any "perceived political or cultural benefits" **170** except where these would have a significant impact on the State's economic development.[251] A possible contribution of the salvage contract to the tourism industry was dismissed as speculative.[252] It followed that in the absence of an investment in the sense of Art. 25(1) of the Convention there was no jurisdiction.

The development in practice from a descriptive list of typical features towards **171** a set of mandatory legal requirements is unfortunate. The First Edition of this Commentary cannot serve as authority for this development. To the extent that the "*Salini* test" is applied to determine the existence of an investment, its criteria should not be seen as distinct jurisdictional requirements each of which must be met separately. In fact, tribunals have pointed out repeatedly that the criteria that they applied were interrelated and should be looked at not in isolation but in conjunction.[253] The *Salini* Tribunal said:

> In reality, these various elements may be interdependent. Thus, the risks of the transaction may depend on the contributions and the duration of performance of the contract. As a result, these various criteria should be assessed globally even if, for the sake of reasoning, the Tribunal considers them individually here.[254]

A rigid list of criteria that must be met in every case is not likely to facilitate **172** the task of tribunals or to make decisions more predictable. The individual criteria

---

248  At para. 106 (e). In a similar sense see: *Biwater Gauff* v. *Tanzania*, Award, 24 July 2008, paras. 310–318.

249  At para. 123. The Tribunal says at para. 125: "As stated by *Schreuer*, there must be positive impact on a host State's development." In fact, the First Edition of this Commentary stated more tentatively at para. 88: "... it may be argued that the Convention's object and purpose indicate that there should be some positive impact on development."

250  At paras. 131, 132.                    251  At para. 138.

252  At para. 144.

253  *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001, para. 60; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 130; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 91; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, paras. 72, 106, 124, 130; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 116.

254  *Salini* v. *Morocco*, Decision on Jurisdiction – 23 July 2001, para. 52.

carry a considerable margin of appreciation that may be applied at the tribunal's discretion.

**173**    A test that turns on the contribution to the host State's development should be treated with particular care. The reference in the Convention's Preamble indicates that economic development is among the Convention's object and purpose. This would support the proposition that an international transaction that is designed to promote the host State's development enjoys the presumption of being an investment. But it does not follow that an activity that does not obviously contribute to economic development must be excluded from the Convention's protection.

**174**    Any concept of economic development, if it were to serve as a yardstick for the existence of an investment and hence for protection under ICSID, should be treated with some flexibility.[255] It should not be restricted to measurable contributions to GDP but should include development of human potential, political and social development and the protection of the local and the global environment.

### 8. Investments: Special Issues

### a) Pre-Investment Activities

**175**    The Convention states that the dispute must arise out of an investment. Tribunals have interpreted this to mean that an existing investment is a requirement for jurisdiction *ratione materiae*. Steps preparatory to an investment will not by themselves be accepted as an investment.

**176**    In *Mihaly* v. *Sri Lanka*, the parties had engaged in extensive negotiations on the construction and operation of a power station. They had exchanged various documents but never reached the stage of signing a contract. The Claimant sought to recover its development costs. The Tribunal rejected the claim in the absence of an investment. It found that the documents did not contain any binding obligations[256] and said:

> The Claimant has not succeeded in furnishing any evidence of treaty interpretation or practice of States, let alone that of developing countries or Sri Lanka for that matter, to the effect that pre-investment and development expenditures in the circumstances of the present case could automatically be admitted as "investment" in the absence of the consent of the host State to the implementation of the project. . . . The Tribunal is consequently unable to accept as a valid denomination of "investment", the unilateral or internal characterization of certain expenditures by the Claimant in preparation for a project of investment.[257]

---

255   For further detail see *Ben Hamida, W.*, Two Nebulous ICSID Features: The Notion of Investment and the Scope of Annulment Control. *Ad Hoc* Committee's Decision in *Patrick Mitchell* v. *Democratic Republic of Congo*, 24 Journal of International Arbitration 287, 296–297 (2007).

256   *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, paras. 47, 59.

257   At paras. 60, 61.

The Tribunal added that if the negotiations had come to fruition, the preparatory expenses might have become part of the costs of the project and thereby part of the investment.[258]    **177**

In *Zhinvali* v. *Georgia*, the parties had engaged in negotiations about the rehabilitation of a power plant. The negotiations failed. The claim was directed at the recovery of development costs in the form of expenses incurred during the negotiations. Jurisdiction was based on Georgia's Investment Law which referred to "entrepreneurial activity carried out on the territory of Georgia".[259] The Tribunal, relying heavily on *Mihaly*, rejected the claim and said:    **178**

> . . . the Claimant's "investment" case then rises or falls depending on whether the category of "development costs" in a failed transaction is eligible for "investment" treatment under the 1996 Georgia Investment Law.[260]

The Tribunal concluded that there was no "investment" under the Georgia Investment Law or under Art. 25(1) of the ICSID Convention.[261]

By contrast, in *PSEG* v. *Turkey* the parties had signed a concession contract for a power plant but the project was not carried out. The Respondent argued that there was no investment since the project had never moved beyond the drawing board and essential terms were still missing from the contract.[262] The Tribunal noted that the concession contract existed, was valid and legally binding. Therefore there was jurisdiction on the basis of an investment made in the form of a concession contract.[263] The Tribunal said:    **179**

> An investment can take many forms before actually reaching the construction stage, including most notably the cost of negotiations and other preparatory work leading to the materialization of the Project, even in connection with pre-investment expenditures, particularly when, like in this case, there is a valid and binding Contract duly executed between the parties.[264]

These cases suggest that costs incurred in the course of preparing or developing a project will not, by themselves, amount to an investment for purposes of ICSID's jurisdiction.[265] If the project materializes, development costs may well become part of the overall investment, and will hence be protected. The material step at which a project moves beyond the stage of preparation and becomes an actual investment is the conclusion of a binding contract. In certain circumstances the contract itself constitutes the investment. Where investments are made without a contract with the host State or one of its authorized entities, the decisive stage will usually be the making of definite commitments with partners, suppliers, subcontractors or similar legally binding steps.    **180**

---

258  At para. 50. See also *Hornick, R. N.*, The *Mihaly* Arbitration: Pre-Investment Expenditure as a Basis for ICSID Jurisdiction, 20 Journal of International Arbitration 189 (2003); *Rubins*, The Notion of "Investment", pp. 300–304; *Dolzer*, The Notion of Investment, pp. 270–271.
259  *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 377.
260  At para. 388.                              261   At paras. 415, 417.
262  *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 66–73.
263  At paras. 79–104.
264  *PSEG* v. *Turkey*, Award, 19 January 2007, para. 304.
265  See also *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 8.6, 18.5–18.9.

**181**    The requirement of an existing investment under Art. 25(1) of the Convention applies even if another treaty, such as a BIT, grants rights at the pre-investment stage, for instance in the form of a right to be admitted.[266] The wording of Art. 25(1) suggests that the Convention requires an actual investment. Therefore, disputes arising from investments that are merely planned, intended or attempted will not be covered.

### b) Origin of the Investment

**182**    At times respondents have argued that there was no foreign investment in the absence of fresh capital imported into the host country. This issue played a role during the Convention's drafting. One delegate pointed out that the nationality of the investment was more important than that of the investor. Since the Convention's aim was to encourage the international flow of capital, the Convention should apply to cases where the funds invested came from outside rather than from foreigners. In response, Mr. *Broches* said that he did not see how the Convention could make a distinction based on the origin of funds (History, Vol. II, pp. 261, 397/8). The idea was not pursued.

**183**    The host State may impose the requirement that a certain amount of fresh capital in foreign currency be imported into the country.[267] In the absence of such a requirement, investments may be made by foreign investors with capital raised locally. In the same vein, the origin of capital from persons who are not entitled to benefit from the ICSID Convention or from an applicable BIT is not decisive.

**184**    Tribunals have generally found the origin of capital used in investments immaterial.[268] In *Wena Hotels* v. *Egypt*, both the Tribunal and the *ad hoc* Committee found the alleged origin of the funds from other investors who were not entitled to benefit from the applicable BIT irrelevant.[269]

**185**    In *Tokios Tokelės* v. *Ukraine*, the Claimant company had its registered seat in Lithuania. The Respondent argued that there was no protected investment, since the capital invested did not originate outside the Ukraine. The Tribunal noted that neither the ICSID Convention nor the Ukraine-Lithuania BIT contained a requirement that capital used by an investor should originate in its State of nationality or indeed originate outside the host State.[270] The Tribunal said:

---

266   See *e.g.* Arts. 3 and 4 of the US Model BIT 2004 granting national treatment and most-favoured-nation treatment also with respect to the establishment and acquisition of investments. Similar provisions are contained in Arts. 1102 and 1103 of the NAFTA. For detailed treatment see *Pollan, T.*, Legal Framework for the Admission of FDI (2006).

267   See *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 220–242.

268   See also *Tradex* v. *Albania*, Award, 29 April 1999, paras. 108–111; *Olguín* v. *Paraguay*, Award, 26 July 2001, para. 66, FN 9; *ADC* v. *Hungary*, Award, 2 October 2006, paras. 310–325, 342, 343, 346, 347, 355, 356, 358, 360; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, paras. 37–40, 62–66, 86, 100, 110, 122, 208–210. But see an ambivalent statement in *SOABI* v. *Senegal*, Award, 25 February 1988, at para. 4.50.

269   *Wena Hotels* v. *Egypt*, Award, 8 December 2000, at para. 126; Decision on Annulment, 5 February 2002, at para. 54.

270   *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 74–82.

> The Respondent alleges that the Claimant has not proved that the capital used to invest in Ukraine originated from non-Ukrainian sources, and, thus, the Claimant has not made a direct, or cross-border, investment. Even assuming, *arguendo*, that all of the capital used by the Claimant to invest in Ukraine had its ultimate origin in Ukraine, the resulting investment would not be outside the scope of the Convention. The Claimant made an investment for the purposes of the Convention when it decided to deploy capital under its control in the territory of Ukraine instead of investing it elsewhere. The origin of the capital is not relevant to the existence of an investment. . . . The origin of the capital used to acquire these assets is not relevant to the question of jurisdiction under the Convention.[271]

In *Saipem* v. *Bangladesh*, the Claimant had entered into a contract to build a **186** pipeline. The Respondent disputed the existence of an investment on the ground that the Claimant had not put its own money into the project.[272] The Tribunal rejected this argument and said:

> . . . it is true that the host State may impose a requirement that an amount of capital in foreign currency be imported into the country. However, in the absence of such a requirement, investments made by foreign investors from local funds or from loans raised in the host State are treated in the same manner as investments funded with imported capital. In other words, the origin of the funds is irrelevant. This results from the drafting history of the ICSID Convention and is confirmed by several arbitral decisions relating to BITs.[273]

It follows that the origin of the funds is irrelevant for purposes of jurisdiction. **187** Whether investments are made from imported capital, from profits made locally, from payments received locally or from loans raised locally makes no difference to the degree of protection enjoyed. The decisive criterion for the existence of a foreign investment is the nationality of the investor. An investment is a foreign investment if it is owned or controlled by a foreign investor. There is no additional requirement of foreignness for the investment in terms of its origin. In the same way, the origin of capital from persons who are foreigners but do not enjoy protection under the Convention because they do not meet the nationality requirements is immaterial.

## c) Investment in the Host State's Territory

The Convention does not contain an indication that the investment must be **188** located physically in the host State. But the Report of the Executive Directors refers to a larger flow of private international investment into the territories of participating countries as the Convention's primary purpose.[274]

---

271  At paras. 80, 81. But see also the reasoning to the contrary in the Dissenting Opinion by arbitrator Prosper Weil at paras. 19, 20.

272  *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 103.

273  At para. 106. Footnote omitted.

274  Report of the Executive Directors, 1 ICSID Reports 25, para. 12.

**189**    Some treaties, in their definitions of "investment", refer to the territory of the parties. For instance, the Argentina-US BIT states that

> "investment" means every kind of investment *in the territory* of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, . . .[275]

**190**    Similarly, Article 1101(1) of the NAFTA speaks of "investments in the territory" of a Party. Article 26(1) of the Energy Charter Treaty refers to investments "in the Area" of a Party.

**191**    In some cases respondents have argued that the requirement of territoriality for investments was not met since the would-be investor had not established a significant physical presence in the host State. In *Fedax* v. *Venezuela*, the investor had acquired promissory notes issued by the host country. The Tribunal rejected the Respondent's argument that the Claimant had not invested "in the territory" of Venezuela. It said:

> While it is true that in some kinds of investments . . . such as the acquisition of interests in immovable property, companies and the like, a transfer of funds or value will be made into the territory of the host country, this does not necessarily happen in a number of other types of investments, particularly those of a financial nature. It is a standard feature of many international financial transactions that the funds involved are not physically transferred to the territory of the beneficiary, but put at its disposal elsewhere. In fact, many loans and credits do not leave the country of origin at all, but are made available to suppliers or other entities. . . . The important question is whether the funds made available are utilized by the beneficiary of the credit, . . .[276]

**192**    In *CSOB* v. *Slovakia*, the Claimant bank had transferred non-performing receivables to a Collection Company (CC) in Slovakia. The CC was to pay CSOB for the assigned receivables. To enable the CC to do so it received the necessary funds from CSOB under the terms of a loan agreement. The repayment of the loan was secured by a guarantee of the Slovak Ministry of Finance. The Respondent argued that there was no expenditure of resources in the territory of a foreign country. The Tribunal noted that the loan did not involve any spending or outlay of resources in the territory of the Slovak Republic.[277] Nevertheless, it held:

> The Tribunal notes, in this connection, that while it is undisputed that CSOB's loan did not cause any funds to be moved or transferred from CSOB to the Slovak Collection Company in the territory of the Slovak Republic, a transaction can qualify as an investment even in the absence of a physical transfer of funds.[278]

**193**    The two *SGS* cases concerned pre-shipment inspections that were essentially carried out outside the territory of the host country. The Tribunal in *SGS* v. *Pakistan* relied on the fact that expenditures had been made, even though in a relatively

---

275  Argentina-US BIT, 1991, Art. I(1)(a). Emphasis added.
276  *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 41.
277  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 78, 79.
278  At para. 78.

small amount, by the investor in connexion with its activity in the territory of Pakistan.[279]

In *SGS* v. *Philippines*, the Respondent objected that the pre-shipment inspection services were not performed "in the territory" of the Philippines as required by the BIT.[280] The Tribunal dealt with this issue in some detail.[281] It found that: **194**

> In accordance with normal principles of treaty interpretation, investments made outside the territory of the Respondent State, however beneficial to it, would not be covered by the BIT.[282]

The Tribunal rejected a subdivision of activities inside and outside the host country. It found that a substantial and non-severable aspect of the overall service was provided in the Philippines.[283] This and the location of a liaison office in Manila were sufficient to support the finding that there had been an investment in the territory of the Philippines.[284]

Other cases have addressed this issue only peripherally.[285] In *LESI-DIPENTA* v. *Algeria* and in *LESI & Astaldi* v. *Algeria* the Tribunals discussed the issue in the context of its discussion of a contribution in the host country. The Tribunals said: **195**

> It is often the case that these investments are made in the country concerned, but that again is not an absolute condition. Nothing prevents investments from being committed, in part at least, from the contractor's home country, as long as they are allocated to the project to be carried out abroad.[286]

In *Bayview* v. *Mexico*, a case that was decided not under the ICSID Convention but under the Additional Facility, the Tribunal found that farmers in Texas who claimed water from Mexico were not investors in the territory of Mexico for purposes of Art. 1101(1) NAFTA.[287] **196**

These case authorities do not yield an entirely clear picture concerning a requirement of territoriality. No such additional requirement should be read into the ICSID Convention. Where the document providing the basis of consent refers to investment in the territory of the State, a certain degree of flexibility is appropriate. Not all investment activities are physically located on the host State. This is particularly true of financial instruments (see para. 149 *supra*). If a treaty includes loans and claims to money in its definition of investment, it would be unrealistic to require **197**

---

279   *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, at paras. 46, 136.
280   *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, at paras. 57, 70, 80–82, 89.
281   At paras. 99–112.
282   At para. 99. Footnotes omitted. The Tribunal mentioned the construction of an embassy in a third State as an example.
283   At para. 102.                            284   At paras. 104, 111, 112.
285   In *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 10.3, 13.1–15.9, the issue was discussed extensively but not decided – see para. 26.2; see also *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 377, 381.
286   *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. II. 14(i); *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 73(i).
287   *Bayview* v. *Mexico* (AF), Award, 19 June 2007, paras. 105–124.

a physical presence in or a transfer of funds into the host State. Similar considerations apply to intellectual property which is typically included in definitions of investment.

**198**    Therefore, the interpretation of a territorial requirement will to a large extent depend on the type of investment. Investment in movable and particularly immovable property will require a territorial nexus. In cases involving financial obligations the *locus* of the investment can often be determined by reference to the debtor and its location. In this way financial instruments issued by States have their *situs* in that State. Investment through shareholding may be seen to take place at the company's place of registration or main place of activity. Services may be seen to be located in a State if their chief impact is in that State.

### d) Investment and Host State Law

**199**    Some treaties require that in order to qualify as an investment, the operation must be in accordance with the host State's law. BITs frequently include the formula "in accordance with host State law" or a similar phrase in their definitions of the term "investment".[288]

**200**    Host States have sometimes argued that this meant that the concept of "investment", and hence the reach of the protection under the treaty, had to be determined by reference to their own domestic law. Tribunals have rejected this approach. In *Salini* v. *Morocco*, the Tribunal said in response to this argument:

> The Tribunal cannot follow the Kingdom of Morocco in its view that paragraph 1 of Article 1 [of the BIT] refers to the law of the host State for the definition of "investment". In focusing on "*the categories of invested assets (. . .) in accordance with the laws and regulations of the aforementioned party*", this provision refers to the validity of the investment and not to its definition. More specifically, it seeks to prevent the Bilateral Treaty from protecting investments that should not be protected, particularly because they would be illegal.[289]

**201**    Other tribunals have also held consistently that the reference to the host State's domestic law concerned not the definition of the term "investment" but solely the legality of the investment.[290] In a number of cases tribunals examined whether investments complied with host State law including whether they constituted an "approved project".[291] In the majority of cases they concluded that the investments

---

288  For detailed discussion see *Knahr, C.*, Investments "in Accordance with Host State Law", 4 TDM No. 5.

289  *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, para. 46.

290  *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. II. 24(iii); *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 33, 34; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 105–110; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 79–82, 120–124. In *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 139–155, the reference to host State law was not contained in the BIT's definition of "investment" but in its provision on admission.

291  *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 9.2, 10.7, 17.1, 21.1–25.7.

were legal under host State law.[292] In other cases they found that the investment was in violation of host State law and declined jurisdiction.[293]

### 9. Use of the Additional Facility in the Absence of an Investment

### a) Conciliation and Arbitration

The Additional Facility offers conciliation and arbitration proceedings for the settlement of legal disputes that are not within the jurisdiction of the Centre because they do not arise directly out of an investment[294] (see paras. 9–13 *supra*). It was explained:

> . . . among the reasons for the proposal to establish the Additional Facility was the concern that a conciliation or arbitration agreement might be frustrated if a Commission or Tribunal declared itself incompetent on the ground that it considered the underlying transaction not to be an "investment".[295]

**202**

Therefore, the Additional Facility may be used if a transaction does not meet the requirements of an "investment" under the Convention. This does not mean that proceedings under the Additional Facility are open for any type of dispute. An agreement providing for conciliation or arbitration proceedings under the Additional Facility requires the approval of the Secretary-General.[296] The Secretary-General may give approval only if he or she is satisfied that the underlying transaction has features that distinguish it from an ordinary commercial transaction.[297] In other words, the transaction, even if it falls short of the requirement of an investment, must still be more than an ordinary commercial transaction.

The Administrative Council in approving these provisions attempted to describe the concept of a transaction that is distinguishable from an ordinary commercial transaction:

**203**

> Economic transactions which (a) may or may not, depending on their terms, be regarded by the parties as investments for the purposes of the Convention, which (b) involve long-term relationships or the commitment of substantial resources on the part of either party, and which (c) are of special importance to the economy of the State party, can be clearly distinguished from ordinary commercial

---

292  *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 83–86; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 109, 116–120; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 126–131; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 174–184; *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, para. 97. See also the non-ICSID case *Saluka* v. *Czech Republic*, Partial Award, 17 March 2006, paras. 183, 202–221.

293  *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 184–244; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 300, 306–307, 319, 323, 332, 335, 350, 383, 385, 396–398, 401–404. See also *World Duty Free* v. *Kenya*, Award, 4 October 2006 and *Plama* v. *Bulgaria*, Award, 27 August 2008, paras. 130–146, where the Tribunals dismissed the claims on the ground of illegality not as a matter of jurisdiction but on the merits.

294  Art. 2(b) Additional Facility Rules. The Additional Facility Rules are available at: http://www.worldbank.org/icsid/facility/facility.htm.

295  Comment (iv) to Art. 4 of the Additional Facility Rules, 1 ICSID Reports 220. See also *Broches*, The "Additional Facility", pp. 377/8.

296  Art. 4(1) Additional Facility Rules.

297  Art. 4(3) Additional Facility Rules. See also *Shihata/Parra*, The Experience, pp. 344 *et seq.*

transactions. Examples of such transactions may be found in various forms of industrial cooperation agreements and major civil works contracts.[298]

204    This description makes the classification independent of whether the parties thought their transaction was an investment. It presents a long-term relationship or the commitment of substantial resources as possible alternatives. A commitment of substantial resources need not be made by the investor but may be made by the host State. Most significant is the element that the transaction is of special importance to the economy of the host State. This description has certain similarities to the "*Salini*-test" discussed above (see paras. 152–174 *supra*) but appears to be somewhat wider.

205    The Additional Facility is not designed as a means to avoid the application of the Convention where access to the Centre is available. Also, there may be genuine borderline cases where it is unclear whether the transaction meets the requirements of an "investment" under the Convention or has to be brought under the Additional Facility. In a situation of this kind, proceedings under the Convention must be tried first. If the Secretary-General is of the opinion that it is likely that an ICSID conciliation commission or arbitral tribunal will hold that the dispute arises directly out of an investment, he or she may make approval of the agreement providing for proceedings under the Additional Facility conditional upon consent by both parties to submit any dispute in the first instance to the jurisdiction of the Centre.[299]

206    In actual practice, submissions to the Additional Facility are made to overcome non-participation in the Convention of either the host State or the investor's State of nationality. The Model Clauses offer ways to submit to the Additional Facility where the jurisdictional requirements *ratione personae* have not been met (paras. 224–226, 300–301 *infra*) and for fact-finding (para. 34 *supra*) but not for disputes that do not arise directly out of an investment.

207    Decisions in some cases, in which tribunals decided that there was no investment and that hence there was no jurisdiction, underscore the potential of the Additional Facility for this type of situation. If the parties have doubts as to whether their transaction amounts to an investment, they may draft a combined submission clause, which after submitting to the jurisdiction of the Centre makes the following addition:

> In case the [Conciliation Commission]/[Arbitral Tribunal] decides that the jurisdictional requirements *ratione materiae* of Art. 25 of the Convention are not fulfilled because the dispute does not arise directly out of an investment, the Parties hereby consent to [conciliation]/[arbitration] under the Additional Facility [Conciliation]/[Arbitration] Rules of the Centre.

208    Many bilateral investment treaties provide for proceedings under the Additional Facility. But they also contemplate the lack of participation in the Convention by either of the parties (see paras. 226, 301 *infra*) and not the submission of disputes that do not arise directly out of investments. Nevertheless, even where

---

298   Comment (iii) to Art. 4 of the Additional Facility Rules, 1 ICSID Reports 220.
299   Art. 4(4) Additional Facility Rules.

the Additional Facility is used to remedy the lack of participation by one side in the Convention, it also opens the door for the settlement of disputes that are covered by the BIT but excluded from the Convention *ratione materiae*.[300] A possible example would be disputes relating not to an existing investment but to pre-investment activities.[301]

Where the parties to an agreement entertain doubts as to whether their transac-        **209**
tion qualifies as an investment and whether a submission clause to ICSID would therefore be appropriate, they have several possibilities. They may make a special statement in their contract designating their project as an investment, possibly adding a brief description of those features that support this characterization (see paras. 129, 130 *supra*). They may draft a combined jurisdictional clause submitting to the Additional Facility in case the competent ICSID organs determine that the Convention's requirements *ratione materiae* have not been met (see para. 206 *supra*). Finally, they may combine such an ICSID/Additional Facility Clause with a clause referring to another arbitral institution or submitting to *ad hoc* arbitration.

### b) Fact-Finding

Unlike conciliation and arbitration, fact-finding under the Additional Facility[302]        **210**
is not subject to any jurisdictional requirements *ratione materiae*. The requirement that the underlying transaction have features distinguishing it from an ordinary commercial transaction (see para. 202 *supra*) does not apply to fact-finding. The Secretary-General has no power to approve or disapprove arrangements for fact-finding proceedings.[303] The omission of any indication of the type of facts to be clarified is somewhat surprising at first sight. It may be due to the circumstance that both in the Convention and in the Additional Facility, jurisdiction *ratione materiae* is always described in terms of a dispute. Fact-finding is designed to be preventive and hence, by definition, does not require a dispute. The Introductory Notes to the Fact-Finding (Additional Facility) Rules contain a reference to a long-term relationship and to national or international guidelines or codes of conduct relating to foreign investment.[304] This would indicate that there must be some relationship to an investment. A contextual reading of the relevant provisions would also suggest that there should be at least some connection with the Centre's or the ICSID Convention's general scope of activities. But it is also arguable that the lack of restrictions *ratione materiae* should be taken at face value and that, hence, fact-finding under the Additional Facility is available for any question in proceedings between a State and a national of another State.

---

300    See also *Golsong, H.*, Dispute Settlement in Recently Negotiated Bilateral Investment
       Treaties – The Reference to the ICSID Additional Facility, *in*: Realism in Law-Making:
       Essays on International Law in Honour of Willem Riphagen 35 (1986); *Shihata/Parra*, The
       Experience, p. 358.
301    See *Parra*, Provisions on the Settlement, pp. 325, 329.
302    Generally see *Shihata/Parra*, The Experience, p. 357.
303    Art. 4(1) of the Additional Facility Rules.        304    1 ICSID Reports 215.

### E.  ". . . between a Contracting State . . ."

### 1. Participation in the Convention

**211**    The concept of a Contracting State is clearly determined by the Convention. Contracting States are States that have deposited their instrument of ratification, acceptance or approval. In accordance with Art. 68 they become Contracting States 30 days after such deposit. The status as a Contracting State may be terminated by a written notice whereby the State denounces the Convention (Art. 71). Such a denunciation is subject to two limitations: it only becomes effective after six months and it does not affect consent to the jurisdiction of the Centre given prior to the denunciation (Arts. 71, 72).

**212**    The requirement that the State party to ICSID proceedings must be a Contracting State was contained in all drafts leading to what eventually became Art. 25 of the Convention (History, Vol. I, pp. 110–118). This was explained by reference to the principle of reciprocity (History, Vol. II, pp. 22, 150, 204). At an early stage of the Convention's drafting the idea to open the machinery of the Centre to non-Contracting States on an *ad hoc* basis was aired (at pp. 82, 95, 96, 255, 294). It was treated with scepticism by Mr. *Broches*, who pointed out that the Convention contained a number of rules of law binding only the States parties to the Convention (at p. 255). The idea was not pursued.

**213**    Participation in the Convention of the State party to proceedings is an absolute requirement, which is not subject to waiver by agreement between the parties. Therefore, *ad hoc* use of the Convention procedures by States that have not ratified the ICSID Convention is not possible.[305] A List of Contracting States and Other Signatories of the Convention is maintained and regularly updated by the Centre. It is readily available as document ICSID/3 and on the Centre's website: http://icsid.worldbank.org. Mere signatories are not Contracting States.

**214**    Arts. 28(2) and 36(2) provide that a request for conciliation or arbitration must contain information concerning the identity of the parties. Institution Rule 2(1)(a) requires that the request designate precisely each party to the dispute. The Secretary-General, in the exercise of his or her screening powers under Arts. 28(3) and 36(3), will determine whether the condition that the State party is a Contracting State is fulfilled. If the State party named in the request is not a Contracting State, he or she will refuse to register the request since the dispute is manifestly outside the jurisdiction of the Centre. It follows that the critical time for the status of a Contracting State is the date the Secretary-General takes up the request for consideration. Presumably if by that time an instrument of ratification has been deposited but the 30-day period under Art. 68(2) has not yet been completed, the Secretary-General will not refuse registration but will wait for the completion of the period.

---

305    See also *Szasz*, The Investment Disputes Convention, p. 30.

*Article 25 – Jurisdiction*                                                                145

Since the critical date for the status of Contracting State is the institution of ICSID proceedings and not the time of consent to jurisdiction, it is possible for a host State to consent to ICSID's jurisdiction before it becomes a Contracting State. If the Convention is in force for the State party by the time proceedings are instituted, the requirement is fulfilled.[306] The converse situation arises in case of a denunciation of the Convention. Under Art. 72 an offer to arbitrate disputes contained in an investment treaty or law, that is not accepted whilst a State is a Contracting State thus perfecting consent, may not be accepted after a State has given a notice of denunciation under Article 71. **215**

In *Holiday Inns* v. *Morocco*, neither the host State nor Switzerland, the State of which the investor was a national, had ratified the Convention when the agreement containing consent to the Centre's jurisdiction was made. Both States ratified the Convention subsequently before the institution of the proceedings. Before the Tribunal, Morocco argued that the Claimant's consent was defective because Switzerland was not a Contracting State at the time of consent (see para. 288 *infra*) but did not press the argument that by the same logic Morocco would not be a Contracting State for purposes of jurisdiction.[307] The Tribunal noted the dates at which the two States became Contracting Parties and concluded that it was on the last of those dates that the consent to submit the dispute to arbitration became effective and irrevocable. **216**

In *Amco* v. *Indonesia*, consent to ICSID arbitration was given in July 1968, but Indonesia only became a party to the Convention on 28 October 1968. The Tribunal simply stated that jurisdiction over the Respondent could not be denied since it was a Contracting State.[308] **217**

Similarly, in *LETCO* v. *Liberia*, the submission to ICSID's jurisdiction was made on 12 May 1970 but Liberia only became a party to the Convention on 16 July 1970. This was not raised as a problem and the Tribunal simply noted that "[s]ince Liberia has signed and ratified the Convention, it qualifies as a 'Contracting State'".[309] **218**

In *Cable TV* v. *St. Kitts and Nevis* the contract containing an ICSID clause was signed on 18 September 1986 but the Respondent became a party to the ICSID Convention only on 3 September 1995. The Tribunal, relying on *Holiday Inns*, confirmed that: **219**

> the critical date for determining the status of a contracting state is the date of submission of the dispute to ICSID, rather [than] the date of the agreement containing the ICSID Arbitral Clause.[310]

In *Generation Ukraine* v. *Ukraine*, the Tribunal rejected Ukraine's argument that its unilateral consent to submit disputes to ICSID in the US-Ukraine BIT was **220**

---

306  *Amerasinghe*, The Jurisdiction of the International Centre, pp. 182/184; *Broches*, Convention, Explanatory Notes and Survey, p. 642.
307  *Lalive*, The First "World Bank" Arbitration, pp. 142/3.
308  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 34.
309  *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 351.
310  *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 4.09.

in some way "preliminary" and subject to later confirmation, in part because it was given at a time when Ukraine was yet to ratify the ICSID Convention. The language of the BIT was unequivocal and final, and did not open the door for further modification or refinement.[311]

### 2. Contingent Submission

221    At times, explicit provision is made for a possible future ratification of the Convention by the host State. This may take place either through an investment agreement with the investor or in a bilateral investment treaty (BIT). The 1968 and 1981 Model Clauses, providing for reference of disputes to ICSID by the parties, contained special clauses in anticipation of subsequent ratification of the Convention by a Non-Contracting State. Under these clauses, the parties prospectively submit to the jurisdiction of ICSID with the proviso that the consent becomes effective when the Convention enters into force for the State. For the intervening period, an arrangement for an alternative mode of dispute settlement was suggested.[312] The 1968 Clauses even provided for an undertaking by the host State to arrange for the Convention's speedy ratification.[313] The 1968 and 1981 Model Clauses contain no reference to the Additional Facility. In 1968 the Additional Facility did not exist. In 1981 it had only been approved on a temporary basis (see para. 9 *supra*). The current 1993 version of the Model Clauses envisages a contingent submission clause in anticipation of the Convention's ratification combined with a submission to the Arbitration (Additional Facility) Rules for as long as the requirements *ratione personae* remain unfulfilled (see para. 225 *infra*).

222    Similarly, BITs may contain ICSID clauses even before one or both of the parties to the BIT become Contracting States to the Convention. In some cases, BITs simply contain ICSID consent clauses without reference to the fact that one of the parties to the BIT is not a Contracting State of the Convention.[314] It is clear that these clauses have no effect until both parties to the BIT are Contracting States of the Convention. In other BITs, the fact that the Convention has not yet been ratified by one or both parties is acknowledged. These provide for submission to the Centre in the event that both parties have become Contracting States of the Convention.[315] Yet another group of BITs combine a contingent submission to jurisdiction under the Convention in anticipation of its ratification by both parties with a submission to the Additional Facility Rules (see para. 226 *infra*).

---

311  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 12.4.
312  See Clauses X and XII of the 1968 Model Clauses, 7 ILM 1159, 1170/71 (1968); Clause III of the 1981 Model Clauses, 1 ICSID Reports 197, 200.
313  Clause XI, *loc. cit.*
314  *E.g.*, France-Laos BIT (1989) Art. 8; France-Yemen BIT (1984) Art. 8; US-Turkey BIT (1985) Art. 6(3). See also *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 136–138; *Ziadé, N. G.*, ICSID and Arab Countries, News from ICSID, Vol. 5/2, p. 7 (1988).
315  *E.g.*, Germany-Israel BIT (1976) Art. 10(8); Switzerland-Lithuania BIT (1992) Art. 9(3). See also *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 138/9, 150, 152/3; *Parra*, Provisions on the Settlement, pp. 326 *et seq.*; *Ziadé, N. G., op. cit.*

Consent clauses in national legislation of countries that are not yet Contracting **223** States of the Convention are possible but not likely. They would attain their effect once the State is a party to the Convention. A reference to ICSID arbitration was included in Art. 70 of the Republic of Yemen's Law of 1991 Concerning Investment despite the fact that Yemen was not a Contracting Party in 1991 and did not become one until 2004.

### 3. The Additional Facility

One of the purposes of the Additional Facility is to fill a jurisdictional gap **224** where either the host State or the State of the investor's nationality is not a Contracting State (see paras. 9–13 *supra*). Even under the Additional Facility, conciliation and arbitration can be undertaken only if either the host State or the investor's State of nationality is a Contracting State. An agreement to submit to conciliation or arbitration under the Additional Facility is subject to approval by the Secretary-General of ICSID. Where the State party is a Non-Contracting State, the Secretary-General may approve the agreement only if satisfied that the State of the investor's nationality is a Contracting State. Since the Additional Facility is not intended as an alternative to the Convention, the Secretary-General will give approval only if the agreement providing for conciliation or arbitration under the Additional Facility also contains a contingent clause by which the parties consent to the jurisdiction of the Centre under Art. 25 of the Convention if by the time proceedings are instituted both the State party and the State of the investor's nationality are Contracting States to the Convention. In other words, conciliation and arbitration under the Additional Facility is not open to parties both of which meet the requirements *ratione personae* under the Convention. One – but only one – of the two States must be a Contracting State. The purpose of this condition is to promote use of the Convention whenever possible.[316]

The 1993 Model Clauses offer a combined contingent submission to settle- **225** ment under the Convention and to settlement under the Additional Facility in the following terms:

<div align="center">

**Clause 20**

</div>

The Government of <u>name of host State</u> (hereinafter the "Host State") and <u>name of investor</u> (hereinafter the "Investor"), a national of <u>name of home State</u> (hereinafter the "Home State"), hereby consent to submit to the International Centre for Settlement of Investment Disputes (hereinafter the "Centre") any dispute arising out of or relating to this agreement for settlement by arbitration pursuant to:

(a) the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (hereinafter the "Convention") if the Host State and the Home State have both become parties to the Convention at the time when any proceeding hereunder is instituted, or

---

316   Additional Facility Rules, Art. 4(1), (2). See also Notes (i) and (ii) at 1 ICSID Reports 220.

> (b) the Arbitration (Additional Facility) Rules of the Centre if the jurisdictional requirements *ratione personae* of Article 25 of the Convention remain unfulfilled at the time specified in (a) above.[317]

The decisive criterion for the operation of one of the two alternatives is whether both States have become parties to the Convention at the time the proceedings are instituted.

**226**    Bilateral, regional or multilateral investment treaties and trade agreements such as the North American Free Trade Agreement (NAFTA) and the Energy Charter Treaty (ECT) have made similar use of the Additional Facility. If one of the parties to the treaty is not yet a Contracting State of the Convention, the treaty may simply provide for settlement under the Additional Facility.[318] A wiser solution is the combination of a submission to settlement under the Convention contingent upon its ratification by both parties to the treaty together with a reference to the Additional Facility in case one of the parties to the treaty is not yet a Contracting State when the dispute is ready for settlement.[319] The United Kingdom and the United States Model Agreements provide for such combined submission clauses.[320]

### 4. Ad Hoc *Arbitration*

**227**    Even if both the host State and the investor's State of nationality are not Contracting States, ICSID may play a role in dispute settlement. The parties may request the Chairman of the Administrative Council of ICSID or the Secretary-General of ICSID to appoint conciliators or arbitrators. The Secretary-General has often undertaken to appoint arbitrators on an *ad hoc* basis but is not obliged to do so.[321] Therefore, it is advisable to obtain his or her consent in advance.[322] The 1993 Model Clauses suggest the combination of such an arrangement with the adoption of the UNCITRAL Arbitration Rules in the following terms:

---

317  4 ICSID Reports 368/9.
318  *E.g.*, US-Panama BIT (1982) Art. VII(3), 21 ILM 1227, 1234 (1982). After Panama's ratification of the Convention in May 1996 the two governments had to amend this treaty. See also *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 139/40; *Delaume, G. R.*, ICSID and Bilateral Investment Treaties, News from ICSID, Vol. 2/1, pp. 12, 15 (1985); *Golsong, H.*, Dispute Settlement in Recently Negotiated Bilateral Investment Treaties – The Reference to the ICSID Additional Facility, *in*: Realism in Law-Making: Essays on International Law in Honour of Willem Riphagen 35 (1986).
319  *E.g.*, Art. 1120 NAFTA; Art. 26(4) ECT; UK-Santa Lucia BIT (1983) Art. 8(2); US-Bulgaria BIT (1992) Art. VI(3)(b). See also *Dolzer/Stevens*, Bilateral Investment Treaties, p. 140; *Golsong, H.*, Note, 25 ILM 85 (1986); *Shihata/Parra*, The Experience, p. 346.
320  Art. 8(2)(a) UK Model BIT 2005; Art. 24(3)(a),(b) US Model BIT 2004. See *Dolzer/Schreuer*, Principles of International Investment Law at pp. 381, 406.
321  See *Delaume*, Transnational Contracts, pp. 83–88.
322  See introductory note to Model Clause 22. See also: The ICSID Secretary-General as Appointing Authority in Ad Hoc Proceedings, News from ICSID, Vol. 6/2, p. 6 (1989).

**Clause 22**

Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules as at present in force. The appointing authority shall be the Secretary-General of the International Centre for Settlement of Investment Disputes. [The number of arbitrators shall be [one]/[three]. The place of arbitration shall be <u>name of town or country</u>. The language[s] to be used in the arbitral proceedings shall be <u>name of language(s)</u>.][323]

The earlier versions of the Model Clauses also suggested the possibility of **228** adopting the Convention and its Rules and Regulations by reference into an *ad hoc* arbitration agreement. The dispute settlement would then take place through procedures similar to those provided by the Convention.[324] This procedure is subject to some of the same limitations as the Additional Facility: while the parties may agree on rules analogous to those under the Convention, the Convention itself is not applicable. This aspect is particularly important in the context of enforcement (Art. 54) but also for the exclusion of other remedies (Art. 26) and of diplomatic protection (Art. 27).[325] Moreover, the parties to such an *ad hoc* arrangement will not have access to the Centre's administrative facilities.

Some bilateral investment treaties contain provisions for *ad hoc* arbitration with **229** a reference to the Secretary-General of ICSID as appointing authority.[326]

## F. ". . . (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) . . ."

### 1. General Meaning

In many States investment agreements are entered into not by the government **230** itself but by statutory corporations or agencies and public companies that exercise public functions but are legally distinct from the State. Also, in some States it is not the central government but another entity, such as a province or even a municipality, that deals with foreign investors. The words in parentheses in Art. 25(1) open the possibility for such entities to become parties in ICSID proceedings instead of or in addition to the host State itself.[327]

Constituent subdivions or agencies may not only be respondent but may also **231** commence ICSID proceedings provided, of course, that the formalities of designation and consent required by Art. 25(1) and (3) are met.[328]

---

323   4 ICSID Reports 370.
324   Clause XII of the 1968 Model Clauses, 7 ILM 1159, 1171 (1968); Clause III of the 1981 Model Clauses, 1 ICSID Reports 200.
325   *Gaillard*, Some Notes on the Drafting, p. 142.
326   *Dolzer/Stevens*, Bilateral Investment Treaties, p. 146.
327   This explanation contained in the First Edition of this Commentary is cited in *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 52.
328   *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 13; *cf. East Kalimantan* v. *PT Kaltim Prima Coal* (ARB/07/3).

**232**    This extension of party status on the host State's side should be read in close conjunction with Art. 25(3), which introduces special formalities for consent by constituent subdivisions or agencies (see paras. 903–920 *infra*). While the two provisions are closely related, they have different functions, which should not be confused. The parenthetical clause in Art. 25(1) relates to jurisdiction *ratione personae*. It gives the entities described *locus standi*, in principle, if the Convention's requirements have been met. Art. 25(3) relates to the modalities of consent. For a conciliation commission or arbitral tribunal to exercise jurisdiction, both conditions must have been met. That both requirements are sometimes addressed in the same document does not alter the fact that they are analytically distinct and must be examined separately.

### a) Designation Distinguished from Attribution

**233**    The mechanism in Art. 25(1) by which constituent subdivisions or agencies may become party to ICSID proceedings must be distinguished from the principles of attribution to a State of the conduct of such entities under the rules of State responsibility. Under certain circumstances States are responsible, in respect of alleged violations of international law, for the conduct of persons or entities beyond the core organs of State or government.[329] The applicable rules are codified in the International Law Commission's Articles on State Responsibility.[330] The rules of attribution, found in Articles 4–11, are generally accepted to be a codification of applicable customary international law rules.[331]

**234**    ICSID tribunals have recognized that there is a distinction between state responsibility for the conduct of a constituent subdivision or agency, and the possibility that a subdivision or agency may actually be party to proceedings.[332] The issue of attribution of acts of State entities to the respective States has been addressed in numerous decisions.[333]

---

329    For an overview see *Dolzer/Schreuer*, Principles of International Investment Law 195–206 (2008).

330    ILC, Annual Report of the International Law Commission on its Fifty-third Session (23 April−1 June and 2 July−10 August 2001), A/56/10, ch. IV, and Resolution 56/83. Adopted by the General Assembly on 12 December 2001, by which the General Assembly took note of the *ILC Articles* and recommended them to the attention of governments. And see *Crawford, J.*, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002).

331    *Bodansky, D./Crook, J. R.*, "Introduction and Overview" to "Symposium: The ILC's State Responsibility Articles", 96 AJIL 773, 783 (2002). Also *Brownlie, I.*, System of the Law of Nations: State Responsibility, Part I, Chapter VII (1983); *Eagleton, C.*, The Responsibility of States in International Law 44–75 (1928).

332    Amongst many possible examples, see *e.g.*, *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 96; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 10.2–10.7; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 107.

333    *E.g.*, *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 71–89; *Maffezini* v. *Spain*, Award, 13 November 2000, paras. 44–64, 72–83; *Wena Hotels* v. *Egypt*, Award, 8 December 2000, paras. 65–69, 82, 84, 110; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 30, 33, 35; *Genin* v. *Estonia*, Award, 25 June 2001, para. 327; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 13; *Salini* v. *Morocco*, Decision on Jurisdiction,

*Article 25 – Jurisdiction*                                                                            151

In *Salini* v. *Morocco*[334] the investor/State dispute settlement provision in Article    **235**
8 of the applicable BIT between Italy and Morocco referred to "all disputes or
differences . . . concerning an investment". The Tribunal distinguished between
breaches of contract committed by the State itself and breaches committed by a
distinct entity. It held that ICSID's jurisdiction extended to BIT violations and
to breaches of a contract that binds the State directly. ICSID jurisdiction did not
extend to breaches of a contract with an entity of the State unless these breaches
also amounted to a violation of the BIT. Therefore, contract claims that related to
a contract with an entity of the State and which did not amount to violations of
the BIT were outside ICSID's jurisdiction.

In *Vivendi* v. *Argentina*, the claimants brought a claim against Argentina invok-    **236**
ing the Argentina-France bilateral investment treaty. Argentina asserted that the
investors' dispute was with the Province of Tucumán, with which the investors
had a contractual relationship, and not the Argentine Republic. Argentina added
that it had not designated the Province of Tucumán to the Centre, as required by
Art. 25(1), or given its consent to it being party to ICSID proceedings, as required
by Art. 25(3).[335] The Tribunal properly dismissed this objection to its jurisdic-
tion. Since the claimant had characterized its case as a breach of the BIT, the
dispute was indeed between the investors and a Contracting State, albeit that the
investors sought to hold Argentina responsible for the conduct of its Province.[336]
The Tribunal said:

> 51. Moreover, the Tribunal cannot accept the position of Respondent that its
> failure to designate or consent to the application of the ICSID Convention to
> the Province of Tucumán under Article 25 of that treaty deprives the Tribunal
> of jurisdiction to hear the claims of CGE against the Argentine Republic. The
> designation and consent provisions of paragraphs (1) and (3) of Article 25 stipu-
> late that a subdivision or agency of a Contracting State may, with the permission
> of that State, submit itself to the jurisdiction of ICSID for purposes of resolving
> a legal dispute arising out of an investment dispute between that subdivision or
> agency and a national of another Contracting State. Those optional provisions
> do not apply to disputes between the Contracting State itself (in this instance
> the Argentine Republic) and a national of another Contracting State that may be
> related to an investment contract between a subdivision or agency of that State
> and the national. In other words, Article 25(3) does not restrict the subject matter
> jurisdiction of the Tribunal; rather, it creates potential efficiencies in operations
> of ICSID by establishing, with approval of the central government, the right

_____
       23 July 2001, paras. 28–35; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003,
    paras. 8.12, 10.1–10.7; *Autopista* v. *Venezuela*, Award, 23 September 2003, paras. 125–128;
    *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, paras. 80–92, 157; *Impregilo* v.
    *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 210; *Jan de Nul* v. *Egypt*, Decision on
    Jurisdiction, 16 June 2006, paras. 83–89; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October
    2006, paras. 82–95; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras.
    146–149; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 189–191.
334  *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, paras. 60–62.
335  *Vivendi* v. *Argentina*, Award, 21 November 2000, paras. 41, 46.
336  At para. 50.

of such agencies or subdivisions to be parties in their own right to an ICSID proceeding.[337]

**237**    Therefore, designations of constituent subdivisions or agencies serve procedural convenience but do not affect questions of State responsibility. The State entity's party status is independent of the issue of the attribution of its actions to the State. In some instances the State entity may be the only potential respondent under the rules of State responsibility. In other cases, where attribution can be established, the State is an alternative or additional respondent despite the designation.

### b) Negotiating History

**238**    Neither the Working Paper nor the Preliminary Draft contained any reference to entities of the Contracting State (History, Vol. I, pp. 110, 112). When enquiries were first made whether public and political entities should be included, Mr. *Broches* reacted with reserve in view of "enormous difficulties, constitutional and otherwise" (History, Vol. II, pp. 65/6). Later on, a delegate from Tanganyika pointed out that in many countries investment agreements were concluded by quasi-governmental institutions such as statutory corporations or public companies (at p. 258). After some further discussion (at pp. 297, 321, 366, 393), a new draft provision was circulated, which was designed to give political subdivisions and instrumentalities standing before the Centre (at pp. 288/9, 396, 492). Reactions were mostly positive (at pp. 396, 398, 446, 500, 502, 507, 551, 564) although there was also a critical voice (at pp. 400, 410).

**239**    The First Draft contained the clause "(or one of its political subdivisions or agencies)" (History, Vol. I, p. 116). At this point, there was a good deal of criticism and a number of delegates suggested the deletion of the clause (History, Vol. II, pp. 657, 701, 702, 705, 708, 709, 838/9). As a result, a Working Group was formed to discuss a number of open questions (at pp. 866/7). After another extensive discussion in the Legal Committee (at pp. 856–860), which clarified a number of issues concerning the definition of the entities (see paras. 240–243 *infra*), the entities' designation to the Centre (see paras. 247 *infra*) and the approval by the Contracting State of their consent (see para. 904 *infra*), the final version was adopted (at p. 879).

### 2. Constituent Subdivision or Agency

**240**    During the Convention's drafting, there were lengthy discussions concerning the general description of the entities to be included and the precise meaning of the terms chosen. Two main groups of entities were debated. One group consisted of constituent or component parts of States, such as states, provinces, cantons and municipalities. The other group consisted of public agencies performing governmental functions, such as development corporations or investment boards (History, Vol. II, pp. 288/9, 321, 366, 393, 396/7, 446/7). The wording suggested initially

---

337    At para. 51.

*Article 25 – Jurisdiction*                              153

was "political subdivision or instrumentality" (at pp. 288, 396, 492). Both parts of the phrase came under criticism. It was suggested that the first part did not adequately express the idea of a State's component part (at pp. 502, 507) and that the second might include mere government-owned companies (at p. 507). Mr. *Broches* explained that the word "instrumentality" was only intended to include governmental agencies. While these were normally part of and indistinguishable from the government, they were legally separate entities in some countries, although entrusted with government functions (at p. 507).

The First Draft adopted "political subdivisions" but replaced "instrumentality"     **241**
by "agencies" (History, Vol. I, p. 116). The United States representative wanted the re-introduction of "instrumentalities" (History, Vol. II, pp. 703, 837). The British delegate thought that "political subdivisions or agencies" really meant parts of a State and that these would be acting on behalf and in the name of the State (at p. 702). In the Working Group (see para. 239 *supra*) the suggestion was made simply to refer to "any body" (at p. 867) but this raised questions whether constituent subdivisions of States were still included and whether the phrase "such as a State, Republic or Province" should be added (at p. 856). Eventually, the phrase "or any constituent subdivision or agency of a Contracting State" was adopted (at p. 879).

The precise domestic status of the entities in question was not clarified. There     **242**
was no agreement whether they needed to have juridical personality distinct from the Contracting State (History, Vol. II, p. 867). On the other hand, it was emphasized that an agency would be acting on behalf of the Contracting State though acting in its own name (at pp. 857, 858). There was some disagreement as to whether subdivisions of a lower level, such as municipalities, would be included (at pp. 856, 857). Another point that was left open was the question whether agencies of political subdivisions should be included. The idea of including them expressly was dropped "for the sake of simplicity" (at pp. 859/60).[338]

The clause as adopted was designed to cover a very wide range of entities.     **243**
It is intended to create maximum flexibility in order to take account of national peculiarities. Therefore, it may be concluded that "constituent subdivision" covers any territorial entity below the level of the State itself. The concept of "agency" should be read not in structural terms but functionally. This means that whether the "agency" is a corporation, whether and to what extent it is government-owned and whether it has separate legal personality are of secondary importance. What matters is that it performs public functions on behalf of the Contracting State or one of its constituent subdivisions.[339] This interpretation would lend support to extending the concept to agencies of constituent subdivisions.[340]

---

338  This omission has since been perceived as a problem for Australia. See *Buckley, R. P.*, Some Jurisdictional Difficulties with Australia's Ratification of the ICSID Convention, 2 Asia Pacific Law Review 92, 93 (1993); *Moti, J. R.*, Australia to Ratify the ICSID Convention, 17 Australian Construction Law Newsletter 26 (April 1991), 27.

339  *Amerasinghe*, Jurisdiction Ratione Personae, pp. 233/4; *Amerasinghe*, The Jurisdiction of the International Centre, pp. 185/6.

340  See also *Amerasinghe, loc. cit.*

**244**     It has been pointed out that a precise definition of the term "constituent subdivision or agency" is of subordinate importance in view of the requirement that the Contracting State must designate any such entity to the Centre. Designation would create a very strong presumption that the entity in question is indeed a "constituent subdivision or agency". Designation would almost certainly preclude the Contracting State or the designated entity from arguing that the Convention's requirements were not fulfilled because the entity was not a "constituent subdivision or agency".[341] In *Noble Energy* v. *Ecuador*, the Tribunal said:

> Ecuador designated CONELEC to the Centre on 21 August 2002 for purposes of Article 25 of the ICSID Convention and CONELEC is thus to be considered as an agency of the Republic of Ecuador.[342]

**245**     Nevertheless, the existence of a "constituent subdivision or agency" is ultimately for the conciliation commission or arbitral tribunal to decide. It is part of the Convention's objective criteria and must be determined, if necessary, in the framework of the commission's or tribunal's power to rule on matters of jurisdiction and competence in accordance with Arts. 32 and 41.

**246**     In practice, the entities in question have included political subdivisions,[343] state corporations having separate legal personality,[344] and agencies of the host State's government.[345]

### 3. Designation to the Centre

**247**     In addition to the objective criteria outlined above, there must also be a designation to the Centre. The First Draft, which already contained a reference to political subdivisions or agencies, did not mention any process for their official accreditation. The idea of a designation arose from a British proposal to create some machinery for enabling investors to identify political subdivisions or agencies (History, Vol. II, pp. 667, 702). It was supported by the New Zealand and Australian delegates (at pp. 703, 704) and later incorporated into several working drafts (at p. 867). After some debate on the practicability of the idea (at pp. 856, 857), a vote was taken on whether "the Contracting State must designate a body of a lower order before the latter can be a party to proceedings under the Convention". The proposal was adopted by a large majority (at pp. 859/60). After a short debate as to whether the designation requirement should refer only to agencies

---

341   *Broches*, The Convention, p. 354; *Delaume*, ICSID Arbitration, p. 109; *Delaume*, How to Draft, pp. 179/80; *Szasz*, The Investment Disputes Convention, p. 31.

342   *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 63.

343   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997; *Government of the Province of East Kalimantan* v. *PT Kaltim Prima Coal* (ARB/07/3).

344   *Klöckner* v. *Cameroon*, Award, 21 October 1983; *Scimitar* v. *Bangladesh*, Award, 4 May 1994; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001; *Repsol* v. *Petroecuador*, Award, 20 February 2004 (unpublished); *City Oriente* v. *Ecuador and Petroecuador*, Award, 20 February 2004; *Burlington Resources and others* v. *Ecuador and Petroecuador* (ARB/08/5); *Perenco Ecuador* v. *Ecuador and Petroecuador* (ARB/08/6); *Repsol* v. *Ecuador and Petroecuador* (ARB/08/10).

345   *Manufacturers Hanover Trust* v. *Arab Republic of Egypt General Authority for Investment and Free Zones* (ARB/89/1); *Noble Energy* v. *Ecuador and Consejo Nacional de Electricidad*, Decision on Jurisdiction, 5 March 2008, para. 63.

or to constituent subdivisions as well, a vote resulted in a decision that it would apply to both (at p. 857). The question was also raised whether the designations should be made for a particular purpose or in general. Mr. *Broches* responded that this should be left to the State concerned (at p. 858). The proposal as adopted (at p. 879) was incorporated into the Revised Draft (at p. 918) and remains unchanged in the Convention.

The primary purpose of the requirement to designate entities that might become **248** parties in ICSID proceedings to the Centre is to give an investor an assurance that he or she is dealing with an authorized entity. In other words, investors are given advance notice of with whom they may deal. Curiously, the Convention does not tell investors who may commit the State directly.[346] If a person or office is part of the normal State bureaucracy, the investor may rely on an ostensible power to commit the State (see paras. 627–631 *infra*). If a person or office acts independently of the State's regular administrative hierarchy, it is wise to look into whether one is dealing with an immediate representative of the State or whether a designation has been made to the Centre. A secondary purpose of designation may be a desire on the part of the State to preserve control over semi-autonomous entities in their dealings with foreign investors. But this purpose is more readily achieved by withholding approval of consent to jurisdiction under Art. 25(3) (see paras. 903–920 *infra*).

The crucial importance of a designation to the Centre is well illustrated by *Cable* **249** *TV* v. *St. Kitts and Nevis*.[347] This case arose from an agreement of September 1986 containing an ICSID arbitration clause between the Claimants and the Nevis Island Administration (NIA). Under the Constitution of St. Kitts and Nevis the country is organized as a Federation with the Island of Nevis as an autonomous entity within that Federation.[348] The Request for Arbitration named the Federation as respondent. The Tribunal noted that the Federation was not a party to the agreement containing consent to ICSID jurisdiction and that the NIA had not been designated as a constituent subdivision or agency. The Tribunal held that in the absence of a designation of the NIA under Art. 25(1) it had no jurisdiction. It was not possible to substitute the Federation for the NIA.[349]

Other cases have proceeded without difficulty against duly designated sub- **250** divisions or agencies. The case of *Repsol* v. *Petroecuador* proceeded against Petroecuador and led to an Award, rendered on 20 February 2004.[350] Ecuador had designated Corporacíon Estatal Petrolera Ecuatoriana, of which Petroecuador is the successor, to the Centre on 19 April 1988.

In *Noble Energy* v. *Ecuador*, it was not disputed that the proper Respondents **251** were both Ecuador and the Consejo Nacional de Electricidad ("CONELEC"), the

---

346   See *Szasz*, The Investment Disputes Convention, p. 39.
347   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, 13 ICSID Review – FILJ 328 (1998). See also *Government of the Province of East Kalimantan* v. *PT Kaltim Prima Coal* (ARB/07/3).
348   At pp. 334–343.                    349    At pp. 345–352, 363–365, 391.
350   Unpublished.

latter being an agency designated to the Centre by Ecuador on 21 August 2002.[351] Therefore, claims may be brought simultaneously against both a State and one of its designated constituent subdivisions or state entities.[352]

### a) Form of Designation

252    The designation must be made to the Centre. Therefore, designation in an agreement with the investor is not enough. It is clear that the entity concerned cannot designate itself. But even an agreement of the Contracting State with the investor or a promise to make the designation to the Centre will not suffice. There must be some communication by the host State to the Centre.[353] The designation is not subject to any formal requirements. It need not be made in a separate document. The notification to the Centre of an agreement with the investor containing the designation is enough. It has been argued that where there is a clear intention to designate, it does not matter how and through whom the communication reaches the Centre.[354] *Broches* has said that failure of a formal designation should not defeat jurisdiction if the entity concerned is proved or conceded to be a constituent subdivision or agency of a Contracting State.[355] It seems that this goes too far. Designation cannot be dispensed with altogether. But it is submitted that designation by a Contracting State can take any form that gives it general notoriety and comes to the Centre's attention. Legislation by the Contracting State that clearly includes a designation in the sense of Art. 25 should suffice.[356] This would also apply to a designation contained in a bilateral investment treaty.[357] Despite all this, it is advisable that the Contracting State sends a clear and separate notification of the designation to the Centre in order to avoid any misunderstandings and jurisdictional difficulties.

253    The Centre keeps a register of designations. The list is published as document ICSID/8-C. The list is also available on the Centre's website: http://icsid. worldbank.org. An examination of this list shows that the designations fall into two categories. Australia and the United Kingdom have designated territorial entities,

351  *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 6.
352  See also *Occidental* v. *Ecuador II* (ARB/06/11). The ICSID website reports that, on 29 September 2006, the Claimants withdrew all claims advanced against Petroecuador in the request for arbitration.
353  *Amerasinghe*, The Jurisdiction of the International Centre, pp. 187/9.
354  See *Amerasinghe*, *op. cit.*, p. 188. See also *Lamm*, Jurisdiction of the International Centre, p. 469; *Szasz*, The Investment Disputes Convention, p. 31.
355  *Broches*, Convention, Explanatory Notes and Survey, p. 642. *Broches* relies on the unpublished jurisdictional decision in *Manufacturers Hanover Trust* v. *Egypt*.
356  See Sri Lanka, Greater Colombo Economic Commission Law, 1978, sec. 26(2)(a).
357  Many United States BITs contain an Article which provides: "This Treaty shall apply to the political subdivisions of the Parties." It is doubtful whether such a treaty provision could form the basis of a designation under Art. 25 of the Convention. The general reference to political subdivisions is too unspecific. Moreover, it is not specially linked to the Clause providing for ICSID jurisdiction in the BIT. See also Clause VI of the Model Clauses Relating to the Convention on the Settlement of Investment Disputes Designed for Use in Bilateral Investment Treaties, 8 ILM 1341, 1348 (1969).

in other words constituent subdivisions. Ecuador, Guinea, Kenya, Madagascar, Nigeria, Peru, Portugal, Sudan and Turkey have designated entities of a non-territorial nature, in other words agencies.

The designation under Art. 25 should not be confused with the written notice **254** concerning excluded territories under Art. 70 of the Convention. Art. 70 deals with the territorial application of the Convention, which may be varied by special notice. By contrast, the parenthetical clause of Art. 25 deals with a special juris-dictional status that may be granted to territorial entities that are clearly within the Convention's territorial reach.

The list of designated constituent subdivisions or agencies has a note attached **255** to it saying that *ad hoc* designations and notifications made by Contracting States pursuant to Art. 25(1) and (3) are excluded from this listing. This means that it is open to States to make designations not only in general terms but also on the occasion of specific investment projects.[358] Such an *ad hoc* designation too must be communicated to the Centre.

The designation may also be limited in other ways. Both a general and an *ad* **256** *hoc* designation may be made subject to conditions, limitations or time limits. The same effect may be achieved by the State by withholding approval of consent under Art. 25(3) selectively.[359]

Although the designation itself may only be made directly to the Centre (see **257** para. 252 *supra*), it is useful for an investor to obtain confirmation from the State or the entity that a designation has, in fact, been made. The Model Clauses of 1993 provide the following formula for this purpose:

<div align="center">

**Clause 5**

</div>

The <u>name of constituent subdivision or agency</u> is [a constituent subdivision]/ [an agency] of the Host State, which has been designated to the Centre by the Government of that State in accordance with Article 25(1) of the Convention . . .[360]

If no designation has been made at the time the agreement is made, the State or the entity may give an undertaking that the designation will be made in due course.[361] In either case, the entity's consent to ICSID's jurisdiction becomes effective only after the designation has actually been made.

### b) *Time of Designation*

There is no particular time limit for the designation of an entity to the Centre. **258** It appears logical and desirable that the designation be in place by the time the entity signs an agreement that contains a consent clause with the investor. But

---

358   See *Attorney-General* v. *Mobil Oil NZ Ltd.*, High Court Wellington, 1 July 1987, [1989] 2 NZLR 649, 655; 4 ICSID Reports 123/4.

359   *Amerasinghe*, The Jurisdiction of the International Centre, p. 187.

360   4 ICSID Reports 361. See also Clause IV of the 1968 Model Clauses, 7 ILM 1159, 1165 (1968) and Clause VI of the 1981 Model Clauses, 1 ICSID Reports 201/2.

361   See *Delaume*, Le Centre International, pp. 795/6; *Delaume, G. R.*, ICSID Arbitration in Practice, 2 International Tax and Business Lawyer 58, 62 (1984).

it is entirely possible for the designation to be made after consent is given or even after a dispute has arisen. In order to institute proceedings against a constituent subdivision or agency, the designation must have been made. Therefore, the day on which the request for conciliation or arbitration is made is normally the critical date for the existence of a designation. Rule 2 of the Institution Rules provides:

> (1) The request shall:
>> (a) designate precisely each party to the dispute and state the address of each;
>> (b) state, if one of the parties is a constituent subdivision or agency of a Contracting State, that it has been designated to the Centre by that State pursuant to Article 25(1) of the Convention; . . .[362]

**259**    A request for conciliation or arbitration against a constituent subdivision or agency that is unsupported by evidence of a designation of that entity may be rejected by the Secretary-General as manifestly outside the jurisdiction of the Centre by virtue of his or her screening power under Arts. 28(3) and 36(3). The same would apply where such a constituent subdivision or agency wishes to initiate proceedings against an investor.[363]

**260**    The proceedings in *Klöckner* v. *Cameroon* show that in exceptional circumstances a designation may be made after the institution of proceedings before the arbitral tribunal.[364] In this case, the 1971 Protocol of Agreement between the investor and the Government provided for the establishment of a joint venture company, SOCAME. 51% of its shares were held by the European investors, 49% by the Cameroonian Government. The agreement contained an ICSID arbitration clause. Subsequently, a 1972 Supply Contract, also containing an ICSID arbitration clause, was signed between the same parties. Upon the establishment of SOCAME in 1973, the Government transferred all its rights and obligations under the Supply Contract to SOCAME. A third contract, the 1973 Establishment Agreement, was signed by the Government and SOCAME. It also contained an ICSID arbitration clause. After a capital increase in SOCAME, Klöckner and its European partners lost majority control of the company in 1978.[365] In 1981, Klöckner submitted a request for arbitration against Cameroon and against SOCAME accompanied by a copy of the Supply Contract. The Tribunal later stated that this request was in conformity with, *inter alia*, Art. 36 of the Convention and Art. 2 of the Institution Rules.[366] At the Tribunal's first session the procedural status of SOCAME was discussed and the Government promised to make an early decision

---

362    On the approval of consent by a constituent subdivision or agency see paras. 903–920 *infra*.
363    *Amerasinghe*, Jurisdiction Ratione Personae, pp. 234–236.
364    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 9.
365    At p. 58.                              366    At p. 10.

> . . . as to whether it would voluntarily make an *ad hoc* designation of SOCAME as a party to the proceedings, as required with respect to state or parastatal entities under Article 25 of the Convention.[367]

On 7 December 1981

> The Government designated SOCAME as a constituent subdivision of the State of Cameroon as understood by Article 25(1) of the Convention, and approved its participation in the arbitration.[368]

**261** This part of the case is interesting in more than one respect. There is no indication in the report that the Secretary-General refused to register the request against SOCAME for lack of its designation at the time. Moreover, the case shows that an entity that at one stage was an instrument of the investor, and that was even regarded as capable of contracting an ICSID arbitration clause with the Government, subsequently became an agency of the Government which was capable of being designated to ICSID in that capacity.

**262** In *Tanzania Electric* v. *IPTL*, the Claimant was a state-owned Tanzanian corporation and the respondent was also a Tanzanian corporation but owned by foreign, Malaysian, investors. The parties' consent to submit disputes to ICSID was contained in a contract dated 8 June 1995 but the Claimant was only designated by Tanzania as an agency of the State on 24 September 1998. Shortly thereafter, on 25 November 1998, it transmitted its Request for Arbitration to the Centre. The Secretary-General registered the Request on 7 December 1998. No issue of jurisdiction arose in the proceedings.[369]

**263** Similarly, in *Noble Energy* v. *Ecuador*, one of the bases of consent was a Concession Contract of 15 October 2001 between the Claimant and the Ecuadorian Government, "represented by CONELEC". Ecuador subsequently designated CONELEC for purposes of Article 25(1) on 21 August 2002. CONELEC was named as a respondent in the Request for Arbitration. No issue arose from the fact that consent had been given before the designation.[370]

**264** In other cases, the issue of the designation of a constituent subdivision or agency only arose peripherally. In essence, the Tribunals found that no designation had occurred and that, consequently, the entities in question could not be parties to the proceedings. In *Amco* v. *Indonesia*, the respondent Government argued that the claim really related to a lease agreement with PT Wisma, an entity indirectly controlled by the Indonesian army. Since PT Wisma was not a Contracting State nor an agency designated to the Centre, the Tribunal should have, in Indonesia's opinion, decided that the dispute was outside the jurisdiction of the Centre.[371] The Tribunal refused, finding that the dispute was not on the lease agreement and that the Respondent was not PT Wisma but the Republic of Indonesia.[372]

---

367  At p. 11.
368  *Loc. cit.* See also News from ICSID, Vol. 1/2, pp. 9/10 (1984).
369  *Tanzania Electric* v. *IPTL*, Award, 22 June 2001, para. 13.
370  *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 6, 11, 55, 63.
371  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 35.
372  At paras. 38/9.

265    In *LETCO* v. *Liberia*, the Tribunal rejected the Claimant's attempt to join a Government agency to the proceedings not on the basis of the absence of its designation to the Centre but for lack of consent.[373]

266    A number of cases involved government entities as parties although there is no evidence of their designation to the Centre. However, these cases did not yield any decision on the issue.[374]

267    The Convention is silent on whether a designation, once made, may be withdrawn. Such a withdrawal is probably possible subject to the last sentence of Art. 25(1). That provision precludes the unilateral withdrawal of consent. Once consent has been given by a constituent subdivision or agency, such consent may not be vitiated by the withdrawal of its *locus standi* (see paras. 612, 613 *infra*). This rule should apply irrespective of whether the entity's designation as a constituent subdivision or agency preceded its consent or not. To date, there are no recorded withdrawals of designations to the Centre.

### G.  ". . . and a national of another Contracting State, . . ."

### *1. General Significance*

268    The basic idea of the Convention, as expressed in its title, is to provide for dispute settlement between States and foreign investors. In doing so, it was to fill a particular procedural gap. Disputes between governments may be taken to the International Court of Justice or the Permanent Court of Arbitration. Disputes between individuals or corporations can be settled either by domestic courts or through one of the established institutions for the arbitration of commercial disputes. Disputes between a State and its own nationals are settled by that State's domestic courts. The purpose of the Convention was to deal with the peculiar situation of a dispute between a State and a foreign national arising from an investment relationship (History, Vol. II, pp. 78, 150, 205).[375]

269    The idea of granting direct access to an international forum to a non-State party was one of the Convention's avowed purposes. This was said to be in harmony with the growing recognition of the individual as a subject of international law and was designed to obviate the espousal of individuals' claims by their respective governments (History, Vol. II, pp. 303, 394, 464). Some delegates had difficulties with this departure from accepted concepts and wanted to bring the investor's

---

373  *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 354.

374  In *Scimitar* v. *Bangladesh* the participation of Bangladesh Oil, Gas and Mineral Corporation as party to the proceedings was not tested due to the successful objection that commencement of the proceedings by the Claimant had not been duly authorized: Award, 4 May 1994. In *Manufacturers Hanover Trust* v. *Arab Republic of Egypt General Authority for Investment and Free Zones* (ARB/89/1), the ICSID website reports that a settlement was "agreed by the Claimant and one of the Respondents" and proceeding discontinued at their request. See also *Government of the Province of East Kalimantan* v. *PT Kaltim Prima Coal and others* (ARB/07/3). Neither the Arab Republic of Egypt General Authority for Investment and Free Zones nor the Government of the Province of East Kalimantan are listed as designated constituent subdivisions or agencies in ICSID Document ICSID/8-C.

375  *Szasz*, The Investment Disputes Convention, p. 25.

*Article 25 – Jurisdiction*                                161

home State into the picture (at pp. 493, 494, 501). In response, Mr. *Broches* pointed to the advantages of direct dealings between States and investors for both sides (at pp. 495/6, 499, 502). The reference to "a national of another Contracting State" remained unchanged throughout the Convention's drafting history (History, Vol. I, pp. 110–118).

### 2. The Private Character of the Investor

**270** The Convention's Preamble speaks of the role of private international investment. This would indicate that the investor must be a private individual or corporation. Therefore, States acting as investors have no access to the Centre in that capacity. The idea to give party status also to investor States was raised at one point during the Convention's preparation but was quickly put to rest (History, Vol. II, p. 401).[376] At one point during the preparatory work it was suggested that international organizations should be admitted as parties to ICSID proceedings if they acted as investors (at pp. 307, 324, 564). Mr. *Broches* pointed out that there were perfectly satisfactory arbitration arrangements for international bodies (at p. 307). The idea was not pursued.

**271** The situation is less clear when it comes to wholly or partly government-controlled companies (or other entities, such as funds responsible for investing sovereign wealth). The Comment to the Preliminary Draft stated:

> It will be noted that the term "national" is not restricted to privately-owned companies, thus permitting a wholly or partially government-owned company to be a party to proceedings brought by or against a foreign State.[377]

This statement was never contradicted in the course of the subsequent deliberations on the Convention (see also History, Vol. II, p. 580). But neither is it repeated in the Executive Directors' Report. The criteria suggested for the admission of government-controlled entities as investors under the Convention have varied somewhat between more structural or more functional tests.[378] The best guideline is probably still the one formulated by *Broches* in 1972:

> [I]n today's world the classical distinction between private and public investment, based on the source of the capital, is no longer meaningful, if not outdated. There are many companies which combine capital from private and governmental sources and corporations all of whose shares are owned by the government, but who are practically indistinguishable from the completely privately owned enterprise both in their legal characteristics and in their activities. It would seem, therefore, that for purposes of the Convention a mixed economy company or government-owned corporation should not be disqualified as a "national of another Contracting State" unless it is acting as an agent for the government or is discharging an essentially governmental function.[379]

---

376   *Amerasinghe*, Jurisdiction Ratione Personae, p. 241.
377   History, Vol. II, p. 230. See already at p. 170.
378   See *Hirsch*, The Arbitration Mechanism, pp. 64–66.
379   *Broches*, The Convention, pp. 354/5. See also *Amerasinghe*, The Jurisdiction of the International Centre, p. 196; *Sutherland, P. F.*, The World Bank Convention on the Settlement

272    In *CSOB* v. *Slovakia*, the Respondent contested the Tribunal's competence, arguing that the Claimant was a State agency of the Czech Republic rather than an independent commercial entity and that it was discharging essentially governmental activities. The Tribunal rejected this contention. Relying on the Convention's legislative history and on the passage by *Broches* cited above, it held that the concept of "national" under the Convention was not limited to privately owned companies and did not depend upon whether or not the company was partially or wholly owned by the Government. The decisive test was whether the company was discharging an essentially governmental function. CSOB's activities in executing international banking transactions under the State's control had to be judged by their nature and not by their purpose and were hence commercial. With regard to CSOB's activities in the context of its privatization and restructuring, these also had to be judged by their nature and were commercial rather than governmental acts.[380]

273    In *CDC* v. *Seychelles*, the Claimant was a company with a separate legal personality but was 100% owned by the British Government. The Respondent initially raised, but did not pursue, an objection that the Claimant was not a "national of another Contracting State". As the Claimant's investment related to a commercial loan, it could not be said it was fulfilling a governmental function.[381]

274    In *Telenor* v. *Hungary*, the Claimant was 75% owned by the State of Norway. No issue was raised as to whether the Claimant qualified as a "national of another Contracting State".[382]

275    In *Rumeli Telekom* v. *Kazakhstan*, it was held that the Claimants were independent commercial entities and qualified as nationals of another Contracting State. The Respondent's argument that the State of Turkey was the real party in interest was rejected. The extent of any control over the Claimants by the Turkish Government and the possibility that the proceeds of any award might be remitted to the Turkish Treasury did not deprive them of this status.[383]

276    These cases confirm that claimants may have significant State ownership interests, but still qualify as a "national of another Contracting State" for the purposes of Art. 25(1).

### 3. Multipartite Arbitration

277    The Convention speaks of "a national of another Contracting State" in the singular. But it would be wrong to conclude that only one party may be admitted

---

of Investment Disputes, 28 International and Comparative Law Quarterly 367, 385 (1979); *Kovar*, La compétence du Centre, pp. 25, 36; *MacKenzie, G. W.*, ICSID Arbitration as a Strategy for Levelling the Playing Field between International Non-Governmental Organizations and Host States, 19 Syracuse Journal of International Law and Commerce 197, 230 (1993); *Shihata/Parra*, The Experience, pp. 315/6.

380   *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 16–27.
381   *CDC* v. *Seychelles*, Award, 17 December 2003, paras. 6, 19, 34.
382   *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 16, 18.
383   *Rumeli Telekom* v. *Kazakhstan*, Award, 29 July 2008, paras. 325–328.

to ICSID proceedings on the investor's side.[384] During the Convention's drafting the British expert mentioned that there might well be more than just two parties to a dispute and that he assumed that this was implicit in the draft (History, Vol. II, pp. 400, 413).

There are multiple examples in ICSID's case list of cases involving several or even multiple claimants. Where closely related claims are filed separately, there may be a possibility to consolidate proceedings or to appoint identical tribunals (see Art. 26, paras. 124–131). **278**

The argument that the use of the singular for "national" in Art. 25(1) barred multipartite arbitration was raised in *Klöckner* v. *Cameroon* but was not taken up by the Tribunal and was apparently dropped subsequently by the Government.[385] Subsequent cases show that having more than one party on the investor's side in one set of proceedings is perfectly possible. The appearance of more than one party on the investor's side is normally the consequence of companies claiming jointly with their parent companies or their subsidiaries and the assignment, in part, of the investor's rights to an additional investor. **279**

In *Goetz and others* v. *Burundi* six shareholders instituted proceedings jointly. The Tribunal saw no problem in the fact that there were multiple claimants.[386] **280**

Once the principle of multipartite arbitration is accepted, no question should arise by virtue only of the number of co-claimants. In some pending cases, many thousands of individual investors holding bonds issued by Argentina or Argentine entities have collectively commenced proceedings against Argentina.[387] **281**

Future cases might equally involve several host States for large scale or transboundary investments. **282**

### 4. The Nationality of the Investor

Art. 25(2) provides a detailed definition of "national of another Contracting State" dealing with the nationality of natural persons and of juridical persons separately. Therefore, the question of the investor's nationality is discussed below at paras. 635–902. **283**

### 5. Participation of the Investor's State of Nationality in the Convention

Much of what has been said about the host State's participation in the Convention (paras. 211–220 *supra*) applies equally to the investor's State of nationality. The rules on ratification, acceptance or approval of the Convention as well as on renunciation are the same (see para. 211 *supra*). **284**

---

384  See also *Szasz*, The Investment Disputes Convention, p. 28.

385  See *Delaume, G. R.*, ICSID Arbitration, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 23, 36, 37 (1987).

386  *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 84–89.

387  *Giovanna A. Beccara and others* v. *Argentine Republic* (ARB/07/5); *Giovanni Alemanni and others* v. *Argentine Republic* (ARB/07/8); and *Giordano Alpi and others* v. *Argentine Republic* (ARB/08/9).

**285**     The requirement that the investor be a national of a Contracting State was contained in all drafts leading to the Convention (History, Vol. I, pp. 110–118). A suggestion to grant party status to investors whose home States are not parties to the Convention was put forward but not accepted (History, Vol. II, pp. 82, 255, 260, 406). Mr. *Broches* pointed out that there were essential reciprocal obligations between the host State and the investor's home State under the Convention. In particular, the investor's State of nationality would renounce its normal right to diplomatic protection and would assume the obligation to enforce awards against its national (at pp. 22, 82, 150, 204, 406, 495, 564, 579). Since the investor's principal assets were likely to be under his or her national State's jurisdiction, the enforcement of awards against the investor might be frustrated if his or her home State was not a Contracting State.[388] A suggestion to exclude juridical persons that do not have the nationality of any Contracting State was adopted by a large majority (at p. 868).

**286**     Once the investor's nationality has been established, it is simple to determine whether its state of nationality is a Contracting State by referring to a list regularly updated by the ICSID Secretariat.[389] Complications may arise with regard to the exact territorial application of the Convention. Art. 70 provides that, subject to an explicit exclusion, the Convention shall apply to all territories for whose international relations a Contracting State is responsible. Therefore, corporations having their seat or registration in such territories will be considered nationals of Contracting States[390] (see Art. 70, para. 10).

**287**     The critical date for the status of Contracting State is the time of the institution of proceedings. This applies to the investor's State of nationality in the same way as for the host State (see paras. 214–220 *supra*). This date should be distinguished clearly from the date at which the investor must possess the nationality of the States in question under Art. 25(2) (see paras. 679–687, 752–759, 871–895 *infra*). It is entirely possible for an investor to give valid consent to the jurisdiction of the Centre even if his or her home State is not yet a Contracting State, provided that this State subsequently ratifies the Convention before the institution of proceedings.[391]

**288**     In *Holiday Inns* v. *Morocco* (see also para. 216 *supra*), the Parties had signed a Basic Agreement on 5 December 1966 containing an ICSID arbitration clause. Switzerland, the Claimant's State of nationality, became a Contracting State to the Convention only on 14 June 1968. Before the Tribunal, Morocco contended that consent to the jurisdiction of the Centre could be given only by the national

---

388   See also *Broches*, The Convention, p. 356; *Hirsch*, The Arbitration Mechanism, pp. 73/4; *Gaillard*, Some Notes on the Drafting, p. 140; *Kovar*, La compétence du Centre, pp. 25, 39.

389   ICSID/3. List of Contracting States and Other Signatories of the Convention.

390   *SPP* v. *Egypt*, Decisions on Jurisdiction, 27 November 1985, 14 April 1988, para. 54.

391   *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 75 (1974). In *Duke Energy* v. *Peru*, the Tribunal expressly noted that by the time of the institution of proceedings the State of the claimant's nationality was a party to the ICSID Convention: Decision on Jurisdiction, 1 February 2006, para. 140.

of a State that had previously ratified the Convention. The Claimants contended that the critical date for the status of the "other Contracting State" was the date of filing the request for arbitration. This argument was strengthened by the fact that when contracting the ICSID arbitration clause with the investor, Morocco was fully aware of the fact that Switzerland had not yet ratified the Convention.[392] The Tribunal rejected the Moroccan objection to its jurisdiction and said:

> The Tribunal is of the opinion that the Convention allows parties to subordinate the entry into force of an arbitration clause to the subsequent fulfilment of certain conditions, such as the adherence of the States concerned to the Convention, or the incorporation of the company envisaged by the agreement. On this assumption, it is the date when the conditions are definitely satisfied, as regards one of the Parties involved, which constitutes in the sense of the Convention the date of consent by that Party . . . the only reasonable interpretation of the Basic Agreement is to hold that the Parties when signing the Agreement envisaged that all necessary conditions for jurisdiction of the Centre would be fulfilled and their consent would at that time become fully effective.[393]

### 6. Identification of the Investor's State of Nationality

**289**    The Convention provides that to become a party to ICSID proceedings, the investor must be a national of another Contracting State. The exact dates at which this nationality must exist are specified in Art. 25(2) (see paras. 679–687, 752–759 *infra*). But the Convention is silent on whether this other Contracting State must be identified. The fact that the investor is indeed a national of another Contracting State may be uncontested between the parties. Alternatively, there may be doubt which of several possible nationalities the investor has but all States in question are Contracting States.

**290**    In situations of this kind, is it necessary to identify the "other Contracting State"? Must the investor's nationality be specified either when consent to ICSID's jurisdiction is given or when proceedings are instituted? It would appear that the identification of the "other Contracting State" at the time of consent is a matter of prudence. At the time of the institution of proceedings it becomes a necessity.

**291**    It is not advisable to ignore the question of the investor's nationality at the time of the consent agreement between the parties. Nor is it advisable simply to agree that "the investor is a national of another Contracting State". Similarly, the parties should not just agree that "because of foreign control the investor shall be treated as a national of another Contracting State". Agreements of this kind are not invalid but are prone to lead to difficulties (see paras. 795–805 *infra*). The assumption or even agreement that the investor is a national of another Contracting State may be challenged later and this may cause problems if the nationality is not specified.[394]

---

392  *Lalive*, The First "World Bank" Arbitration, pp. 142–144.
393  At p. 146.
394  *Amerasinghe*, Submissions to the Jurisdiction, p. 227; *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 76 *et seq.* (1974); *Gaillard*, Some Notes on the Drafting, p. 140.

**292**     Consent to the jurisdiction of the Centre has some effects for the investor's State of nationality even before the institution of proceedings: the suspension of the right to diplomatic protection under Art. 27(1) operates from the moment consent is given. But the specification of the investor's nationality at the time of consent is not necessary for the operation of Art. 27(1). Before a Contracting State can exercise diplomatic protection, it must claim the investor as its national. This, in turn, would lead to the automatic operation of the prohibition of diplomatic protection under Art. 27(1)[395] (see Art. 27, paras. 30–37).

**293**     The 1993 Model Clauses suggest a clear identification of the other Contracting State:

### Clause 6

It is hereby stipulated by the parties that the Investor is a national of <u>name of another Contracting State</u>.[396]

**294**     At the time of the institution of proceedings, the identification of the "other Contracting State" becomes inevitable. Institution Rule 2(1)(d) provides that the request must indicate the investor's nationality on the day of consent and, if the party is a natural person, also his or her nationality on the date of the request. A mere statement that "the investor is a national of a Contracting State" will not suffice at this stage. Failure to divulge the investor's nationality at the relevant times may lead to a refusal by the Secretary-General to register the request in accordance with Arts. 28(3) and 36(3).

**295**     There are good reasons for this formal requirement. The Convention attaches certain consequences to the nationality of an investor once he or she becomes a party to ICSID proceedings. There are exclusionary clauses that are linked to the investor's nationality: under Arts. 38, 39 and 52(3) nationals of the same State as the investor may be debarred from appointments as arbitrators or members of an *ad hoc* Committee (see also paras. 896–902 *infra*).

**296**     The situation is somewhat more complicated where there is an agreement between the parties under Art. 25(2)(b) to treat a host State company as a national of another Contracting State because of foreign control (see paras. 760–902 *infra*). Institution Rule 2(1)(d) does not require the identification of the nationality that was agreed upon (see para. 795 *infra*). ICSID tribunals have confirmed that there is no need to identify the controlling nationality in the arbitration agreement (see paras. 798–805 *infra*).

**297**     The question may be more difficult in the context of investment treaty arbitration, as noted in *Camuzzi* v. *Argentina I* and *Sempra* v. *Argentina* (see paras. 835–837 *infra*). It is possible to consolidate the interests of two or more entities to establish foreign control. However, if they do not all have the nationality of the same State party to a BIT, it may be in doubt as to whether a claimant having the

---

395   See also *Szasz*, The Investment Disputes Convention, p. 35.
396   4 ICSID Reports 362. See also Clause V of the 1968 Model Clauses, 7 ILM 1159, 1166 (1968) and Clause VII of the 1981 Model Clauses, 1 ICSID Reports 197, 202.

nationality of the host State qualifies for protection on grounds that it is controlled by one or more nationals of the other State party to the BIT.

It may be possible to consolidate the interests of two or more entities to establish **298** foreign control, but if they do not all have the nationality of a Contracting Party to a BIT, it may be in doubt as to whether a claimant having the nationality of the Contracting Party to the dispute qualifies for protection because it is controlled by a national of the other Contracting Party.[397]

### 7. Contingent Submission

If the investor's State of nationality is not a Contracting State, it is still possible **299** to consent to the Centre's jurisdiction in anticipation of the Convention's future ratification. This may be done either through an investment agreement between the host State and the investor or in a bilateral investment treaty. These arrangements are described above at paras. 221–223 in the context of situations where the host State is not yet a Contracting State. They are drafted to apply equally where the investor's state of nationality has not yet become a Contracting State.

### 8. The Additional Facility

One of the purposes of the Additional Facility is to provide for dispute settlement **300** where either the host State or the State of the investor's nationality is not a Contracting State (see paras. 9–13 *supra*). If the Additional Facility is to be used because the investor's home State is not a Contracting State, the host State must be a Contracting State. The situation has been described above at paras. 224–226 with respect to situations where the host State is not a Contracting State but the investor's State of nationality is. The same considerations apply *mutatis mutandis* to the reverse situation where the host State is a Contracting State but the investor's home State is not.

Potential host countries that are Contracting States may provide in their national **301** legislation for dispute settlement through ICSID conciliation or arbitration with nationals of other Contracting States (see paras. 392–426 *infra*). The relevant national legislation may also provide for settlement under the Additional Facility if and as long as the investor's State of nationality is not yet another Contracting State (see para. 409 *infra*).[398] Similarly, some treaties provide for a submission to the Additional Facility if and as long as not all parties to the treaty are Contracting States of the ICSID Convention (see paras. 443, 445, 457, 458, 460–463 *infra*). The non-Contracting State may be the host State (see para. 226 *supra*) but it may also be the State of the investor's nationality.

### 9. Ad Hoc *Arbitration*

It is possible that neither the host country nor the investor's home country are **302** Contracting States. In this situation, not even the Additional Facility would be

---

397  See *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 48.
398  See *e.g.*, Art. 33 of the 1989 Madagascar Investment Code, 5 ICSID Review – FILJ 151 (1990).

available for conciliation or arbitration. But the Secretary-General may act as appointing authority in an *ad hoc* arbitration (see paras. 227–229 *supra*).

## H. ". . . which the parties to the dispute . . ."

### 1. Identity of Consenting and Litigating Parties?

303    The text of the Convention requires that the parties to the dispute themselves must have given consent to the Centre's jurisdiction. This would indeed be the normal case. It cannot be assumed lightly that consent is given on behalf of someone other than the party named in the consent agreement or that consent may be transferred to other parties without the approval of the partner to the original consent agreement. Nevertheless, situations do arise where, due to special circumstances, parties appear before ICSID, either as respondents but more likely as claimants, who were not named in the original consent agreement.

304    This is less likely to occur on the host State's side. But questions of State succession may arise (see paras. 306–310 *infra*). Moreover, a host State's agency (see paras. 230–267 *supra*) may have consented to the Centre's jurisdiction and the investor may later try to institute proceedings against the State itself (paras. 311–317 *infra*). Problems with the identification of the proper party are more likely to occur on the investor's side. Most investors are corporations and not individuals. These corporations frequently work through complicated structures involving parent companies, subsidiaries or affiliates. Consent given in the name of one part in such a corporate structure may or may not extend to other parts. Rights and obligations arising from an investment relationship may subsequently be transferred to other companies either within or outside the same corporate framework. In these situations it will have to be decided whether a consent to the Centre's jurisdiction extends to these entities and whether they are proper parties to the dispute in the sense of Art. 25 (see paras. 319–363 *infra*).

305    A rather special case arises where the investor's home State has provided investment insurance. Once an insurance claim has been settled, the investor may no longer be an injured party and may hence have no claim against the host State. In this situation, the question arises whether the investor's home State, having indemnified the investor, may be subrogated in the investor's position also in ICSID proceedings or whether special arrangements will have to be made to permit or compel the investor to pursue the claim through the Centre (see paras. 364–373 *infra*).

### 2. The Identification of the Party on the Host State's Side

#### a) State Succession

306    State succession occurs when changes in the condition of States lead to the replacement of States by other States. This may arise from the creation of a new State as a consequence of secession from another State. Or it may arise from the break-up of an old State and the creation of several new States on its territory.

A State may also become united with another State and lose its identity as a consequence. In situations of this kind, it may be subject to doubt whether a successor State is still a Contracting State to the Convention and whether any consent to the jurisdiction of the Centre given by its predecessor binds the new State.

State succession to treaties has been the object of numerous studies[399] and of a major attempt at codification.[400] There is also a rich practice, but much of it is determined by special circumstances. As regards multilateral treaties, like the ICSID Convention, there is a widespread practice for a new State to make a unilateral declaration indicating its willingness to continue its predecessor's status as a Contracting State.[401]                    **307**

It is also possible to make a case that a new State emerging from dependent status remains bound by treaties specifically extended to it under a territorial application clause.[402] This would mean succession to Contracting State status for all territories upon their independence for whose international relations a Contracting State was responsible except where notice had been made under Art. 70 that they were excluded. Designation as a constituent subdivision in accordance with Art. 25(1) (see paras. 247–267 *supra*) would further strengthen this argument.    **308**

Consent to jurisdiction under the ICSID Convention is intimately linked to the host State's status as a Contracting State. Where the State continues its predecessor's treaty relationships by virtue of a universal succession, any agreements of consent to the Centre's jurisdiction contracted by the predecessor State would seem to become automatically applicable to the successor State. It would be difficult to argue universal succession and continuity with regard to the Convention and other treaties and at the same time discontinuity with regard to agreements under the Convention. If the new State continues its status as a Contracting State under the Convention on the basis of a selective declaration of continuation without universal succession, the situation is not so clear. But the better view would still be that a continuing participation in the Convention also implies continuity with regard to consent agreements. If the investment in question relates to a particular part of the predecessor State's territory, this would only apply if the new State succeeds the old one with respect to that territory.[403]    **309**

---

399  See *e.g.*, Oppenheim's International Law, 9th ed., Vol. I, pp. 208–240 and the literature cited there. See also *Cheng, T.-H.*, State Succession and Commercial Obligations (2006).
400  Vienna Convention on Succession of States in respect of Treaties, 1978, 17 ILM 1488 (1978).
401  Practice under the ICSID Convention is scant. The Soviet Union never was a Contracting State. Czechoslovakia became a Contracting State in August 1992. After its disappearance, both the Czech (1993) and the Slovak Republics (1994) ratified the Convention as new parties. Yugoslavia had been a Contracting State since 1967. Bosnia and Herzegovina (1997), Croatia (1998), the Former Yugoslav Republic of Macedonia (1998) and Slovenia (1994) became parties after their independence. Serbia ratified the Convention in 2007. Indonesia has been a Contracting State since 1968. After its independence from Indonesia Timor-Leste became a Contracting State in 2002.
402  Oppenheim's International Law, 9th ed., p. 229.
403  See also Oppenheim's International Law, 9th ed., pp. 212, 217.

**310**    The situation is less clear where the new State ratifies the ICSID Convention subsequent to its independence or its merger with another State. Since consent to the Centre's jurisdiction may be given before the host State becomes a Contracting State (see paras. 214–223 *supra*), such a situation would not automatically invalidate consent. Consent to jurisdiction may be passed on to the new State regardless of whether it has succeeded the old State as a Contracting State to the Convention and indeed regardless of whether the predecessor State ever was a Contracting State.[404] It is suggested that in this case too the solution must lie in the question of territorial nexus. If the investment is linked to territory that is part of the new State, the presumption is that rights and duties arising from the investment relationship, including the consent to the Centre's jurisdiction, will pass to the successor State. Even where the agreement containing the consent clause is terminated, the consent clause may be severable from the agreement and may survive (see paras. 620–624 *infra*). This does not protect the investor entirely against the risk of losing access to ICSID. The continuing validity of consent cannot replace the requirement that the successor State be a Contracting State at the time proceedings are instituted.

### b) Constituent Subdivisions or Agencies

**311**    The Convention opens the possibility that a constituent subdivision or agency of the host State rather than the host State itself becomes a party to ICSID proceedings (see paras. 230–267 *supra*). During the Convention's drafting the question was raised whether Contracting States could be made parties to ICSID proceedings if one of their constituent subdivisions or agencies had consented to jurisdiction. In particular, the concern was voiced that the host State might interfere with the investment activity through acts of public authority such as legislation and that the constituent subdivision or agency might then disclaim responsibility in ICSID proceedings. Mr. *Broches* denied that an action could be brought against the host State directly under these circumstances (History, Vol. II, pp. 410, 411, 564, 704, 858).

**312**    Therefore, consent to the Centre's jurisdiction given by a constituent subdivision or agency cannot simply be extended to the host State.[405] It would seem wise on the part of the investor to secure separate consent to ICSID's jurisdiction from the host State to cover the contingency of State interference in the investment relationship and to guard against the argument of *force majeure* by the constituent subdivision or agency. If this is not possible, the subdivision or agency may be persuaded to assume responsibility for acts of the host State that damage the investor.

**313**    The argument in favour of obtaining a separate consent to jurisdiction from the host State itself is strengthened by the possibility that the administrative structure, of which the subdivision or agency is a part, may easily be changed. What happens

---

404    See the *obiter* remark in *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 2.27.
405    See also *Amerasinghe*, Jurisdiction Ratione Personae, p. 238. See also Institut de Droit International, Resolution on Arbitration between States, State Enterprises or State Entities, and Foreign Enterprises, Art. 7, 63 Annuaire II 324, 330 (1989).

if responsibilities are shifted to other entities or if the original subdivision or agency is simply abolished or privatized? The idea that the host State should succeed to the jurisdictional obligations of a designated agency if the latter is abolished was brought up during the Convention's drafting but was not pursued (History, Vol. II, p. 867).

One way of dealing with the matter might simply be to leave it to the domestic law of the host State. But questions of the Centre's jurisdiction are not governed by the domestic law that may otherwise be applicable by virtue of Art. 42(1) of the Convention (see Art. 42, paras. 4–8). Even if the investment agreement is otherwise subject to the host State's domestic law, the consent agreement remains to be interpreted in the light of the Convention and of international law in general.[406] **314**

Three arguments speak in favour of the assumption of jurisdictional rights and responsibilities by the host State if it abolishes its subdivisions or agencies or otherwise eliminates their procedural capacity under the ICSID Convention.[407] First, the subdivision or agency has acted on behalf of the host State. Designation is a matter of administrative convenience but is not designed to free the host State from its responsibilities. Second, the host State itself has brought about the change that has deprived the entity of its procedural capacity. It is the State that terminated the party status under the Convention to the possible detriment of the investor. Third, the last sentence of Art. 25(1) prohibits the unilateral withdrawal of consent (see paras. 596–634 *infra*). Withdrawal of consent may not be achieved through indirect means by dissolving the entity that has given consent without replacing it (see also para. 267 *supra*; paras. 612, 613 *infra*). **315**

Nevertheless, it would be difficult to argue that if the host State abolishes or privatizes a constituent subdivision or agency, it automatically succeeds in that entity's jurisdictional position under the Convention. Therefore, it seems wise to address the problem at the time of drafting the ICSID clause. The Contracting State may be induced to undertake that it would designate any future subdivision or agency that may replace the old one in its capacity as party to the investment agreement.[408] At the same time, provision must be made to transfer consent to the Centre's jurisdiction to the successor constituent subdivision or agency.[409] Better still would be an undertaking that the host State would substitute itself for the entity in case the latter is abolished or otherwise procedurally incapacitated. Ideally, the host State should be nominated in the consent agreement from the outset to avoid any problems of succession. **316**

In *Klöckner* v. *Cameroon* (see paras. 260–261 *supra*), an agency of the host State had changed its legal character during the course of the investment. But the situation was entirely different from the one discussed here. The entity in question, SOCAME, had started out as a joint venture company with the majority **317**

---

406   *Op. cit.*, p. 239.
407   See a similar line of argument by *Amerasinghe, op. cit.*, pp. 239/40.
408   *Delaume*, ICSID Arbitration, pp. 109/10; *Delaume*, How to Draft, p. 180.
409   See Clause VII of the 1968 Model Clauses, 7 ILM 1159, 1167/8 (1968).

of its shares in the hands of the investor. Later it came under the majority control of the Government. It was named as a co-respondent in the request for arbitration. Eventually, the Respondent host State agreed to designate it as a government agency in the sense of Art. 25(1) in the course of the proceedings.[410]

**318**    In *Repsol* v. *Petroecuador* the respondent was the successor of the entity originally designated to the Centre. Ecuador had in 1988 designated Corporacíon Estatal Petrolera Ecuatoriana, of which "Petroecuador" is the successor. The case proceeded against Petroecuador on the basis of that earlier designation.[411]

### 3. The Identification of the Party on the Investor's Side

### a) Designation and Representation

**319**    As a consequence of the often complicated corporate structure of investors, parties that are not expressly named in an agreement containing the consent to the Centre's jurisdiction may seek access to ICSID proceedings. At times these agreements nominate companies that are subsidiaries of the true investors in the economic sense. In these and similar situations, ICSID tribunals are confronted with the problem of whether to restrict standing to the parties specifically named in the consent agreement or to extend it to companies controlling or associated with the designated parties.[412]

**320**    In *Holiday Inns* v. *Morocco*, the two American investors, Holiday Inns Inc. and Occidental Petroleum Corporation (O.P.C.), had decided to undertake a joint investment through two separate wholly-owned subsidiaries that were to be created for that purpose. When the Basic Agreement was signed with Morocco in December 1966, one of the subsidiaries was in the process of being established in Switzerland and the other one did not exist at all. The Government was fully aware of this situation. Nevertheless, the formal signatories to the Agreement, which contained the ICSID clause, were named as Holiday Inns S.A., Glarus, Switzerland (H.I. Glarus) and "a subsidiary of O.P.C.".[413] The creation of H.I. Glarus was eventually completed in February 1967.[414] A request for arbitration was brought to ICSID in December 1971, submitted jointly by H.I. Glarus and by O.P.C. According to the terms of the request, the two companies were acting in their own name and in the name and on behalf of several other companies.[415] Before the Tribunal, Morocco contested the jurisdiction with respect to H.I. Glarus

_____

410  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 10, 11, 58.

411  *Repsol* v. *Petroecuador*, Award, 20 February 2004. Unpublished. See also *Burlington Resources, Inc. and others* v. *Republic of Ecuador and Petroecuador* (ICSID Case No. ARB/08/5); *Perenco Ecuador Limited* v. *Republic of Ecuador and Petroecuador* (ICSID Case No. ARB/08/6); *Repsol YPF Ecuador, S.A. and others* v. *Republic of Ecuador and Petroecuador* (ICSID Case No. ARB/08/10); *City Oriente Limited* v. *Republic of Ecuador and Petroecuador* (ICSID Case No. ARB/06/21).

412  See also *Niggemann*, Zuständigkeitsprobleme, pp. 189/90; *Rand/Hornick/Friedland*, ICSID's Emerging Jurisprudence, p. 57.

413  *Lalive, P.*, The First "World Bank" Arbitration (Holiday Inns v. Morocco) – Some Legal Problems, 51 British Year Book of International Law 123 at 128 (1980). Reproduced in 1 ICSID Reports 645.

414  At p. 142.                              415  At p. 123.

on the ground that it did not yet exist on the date of the consent agreement.[416] In respect of the parent companies, Holiday Inns Inc. and O.P.C., jurisdiction was contested because they were not named as signatories in the agreement containing the arbitration clause.[417]

The Tribunal categorically rejected the Moroccan argument with respect to H.I. Glarus. It found that it is perfectly possible to make the entry into force of an arbitration clause dependent on the subsequent fulfilment of certain conditions such as the incorporation of the company named in the agreement. The date of consent was the day on which the conditions were definitely satisfied (see paras. 288 *supra*, 471, 472 *infra*).[418]    **321**

The question whether the parent companies enjoyed access to the Centre as unnamed parties to the agreement caused more difficulty and was discussed extensively.[419] The Government simply contended that there had been no consent in writing with regard to the parent companies and that consequently the arbitration clause was *res inter alios acta* for them.[420] The Claimants countered with a variety of arguments including the fact that the parent companies had acted as guarantors for their subsidiaries, that they had, in fact, performed several of their obligations under the Basic Agreement, had been assigned rights and duties under the contract and that the principles of good faith and effective interpretation led to the status of the parent companies as parties to the ICSID proceedings.[421]    **322**

The Tribunal rejected Morocco's objections and recognized that Holiday Inns Inc. and O.P.C. were parties even though they had not been named as such in the Basic Agreement. The Tribunal relied specifically on the fact that the parent companies had participated in the carrying out of the contract.[422] Therefore, they were entitled to invoke the arbitration clause. It also emphasized the flexibility of the contractual set-up in the designation of the various companies concerned and the need to consider the contractual relations between the parties as a whole.[423] The Tribunal said:    **323**

> 27. . . . to the extent that they [O.P.C. and H.I. Inc.] have carried out obligations contemplated by the Basic Agreement they are entitled to invoke the arbitration clause.
>
> 28. This conclusion is perfectly in keeping with the spirit of the Basic Agreement which obviously wanted to give the contracting companies a great amount of flexibility in the designation of the companies which would assume responsibility, . . .
>
> 30. In the opinion of the Tribunal the arbitration clause must be considered an inseparable part of the Basic Agreement. It follows, therefore, that any Party on whom rights and obligations under the Agreement have devolved is entitled to the benefits and subject to the burdens of the arbitration clause.[424]

---

416  At pp. 142, 144.
418  At p. 146.
420  At pp. 148, 150.
422  At p. 151.
417  At pp. 147/8.
419  At pp. 147–155.
421  At pp. 148–154.
423  At pp. 154/5.
424  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 1 July 1973. *Lalive*, The First "World Bank" Arbitration, pp. 149, 151.

**324**    In *Amco* v. *Indonesia*, a similar question arose with respect to standing before ICSID of a parent company that was not named in the consent agreement. In April 1968, Amco Asia, a company incorporated in Delaware (USA), signed a Lease and Management Agreement with an Indonesian company relating to the development of a hotel and office block in Indonesia. Indonesia had enacted a Foreign Capital Investment Law in 1967 offering tax concessions to foreign investors operating through corporations organized under Indonesian law and domiciled in Indonesia. In May 1968, Amco Asia applied for permission to establish an Indonesian company, PT Amco. The application contained a clause providing for ICSID arbitration of disputes between PT Amco and the Government of Indonesia. The application was approved in July 1968. The application and its approval constituted an agreement containing consent to the jurisdiction of the Centre. PT Amco was established in January 1969 whereupon Amco Asia's rights under the Lease and Management Contract were transferred to PT Amco.

**325**    In January 1981, Amco Asia, PT Amco and a third company (see paras. 339, 340 *infra*) filed a request for arbitration with the Centre. The Government argued that it had never consented to ICSID arbitration with respect to Amco Asia.[425] The Claimants contended that the wording of the ICSID clause in the application, which referred to "the company", also covered Amco Asia. The Tribunal did not accept this argument.[426] But it still found that it had jurisdiction with respect to Amco Asia. The Tribunal looked at the arbitration clause's object and purpose and said:

> The foreign investor was Amco Asia; PT Amco was but an instrumentality through which Amco Asia was to realize the investment.
>     Now, the goal of the arbitration clause was to protect the investor. How could such protection be ensured, if Amco Asia would be refused the benefit of the clause? Moreover, the Tribunal did find that PT Amco had this benefit, because of the foreign control under which it is placed: would it not be fully illogical to grant this protection to the controlled entity, but not to the controlling one?[427]

**326**    The Tribunal referred to the decision in *Holiday Inns* (paras. 320–323 *supra*) but played down its authority, saying that the facts were largely different. The Tribunal did admit that it was not contrary to that precedent to apply an arbitration clause to a foreign investor who had filed and signed the application for investment containing the arbitration clause, even if in the literal formulation of that clause the foreign investor is not mentioned expressly. Whether Amco Asia itself had taken part in the investment operation was found to be irrelevant.[428]

**327**    *Klöckner* v. *Cameroon* involved a series of three contracts all containing ICSID clauses (see paras. 260–261, 317 *supra*). The first two were concluded by the foreign investor, *i.e.* Klöckner and the Government. The third, the Establishment Agreement of 1973, was concluded by SOCAME, a joint venture company, and the Government. At the time, Klöckner owned 51% of SOCAME's shares. When the arbitration was instituted in April 1981, control over SOCAME had passed from

425  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 4.
426  At paras. 10, 19/20.              427   At para. 24.
428  At para. 25.

the investor to the host State. In fact, SOCAME was subsequently designated as an agency of the Government and joined the proceedings in that capacity (see paras. 260, 317 *supra*).[429] Before the Tribunal, the question arose whether Klöckner, SOCAME's majority shareholder at the time of consent, could be substituted for SOCAME with respect to the Establishment Agreement. This time, it was the Government that sought to extend the jurisdiction over the investor in order to press its counterclaim.[430] Klöckner contested jurisdiction with respect to the Establishment Agreement arguing that, after all, it was an agreement between the two Respondents.[431] The Tribunal found that it had jurisdiction over Klöckner also in respect of the Establishment Agreement. It said:

> This Agreement, although formally signed by the Government and SOCAME, was in fact negotiated between the Government and Klöckner, . . . Moreover, it is undeniable that it was manifestly concluded in the interest of Klöckner, at a time when Klöckner was SOCAME's majority shareholder. The Establishment Agreement reflected the contractual relationship between a foreign investor, acting through a local company, and the host country of this foreign investment.[432]

Klöckner's request for arbitration was submitted not only on its own behalf but also on behalf of its Belgian and Netherlands subsidiaries.[433] Initially, Cameroon contested the participation of the subsidiaries. Eventually, the Tribunal and the parties agreed that the Applicant could act on behalf of its affiliates if it produced proper powers from them.[434]

In *AGIP* v. *Congo*, there was a 1974 agreement between the investor, AGIP **328** SpA of Italy, and the Government governing their joint ownership of a locally incorporated company, AGIP (Brazzaville) SA. Each side was to own 50%. The agreement contained an ICSID arbitration clause. Arbitration was instituted in October 1977 by AGIP SpA. The Claimant purported to act also on behalf of another company, Hydrocarbons of Switzerland, since 10% of the investor's shares belonged to that company. Hydrocarbons was not a party to the 1974 agreement but AGIP SpA invoked a tacit mandate given to it by Hydrocarbons at the time of the agreement of which the Government would have been aware. The Tribunal rejected the idea of a tacit mandate, holding that it could not give rise to a direct obligation owed by the Government towards Hydrocarbons. But the Tribunal found that Hydrocarbons, though not a party to the proceedings, was a third party beneficiary of the agreement in the sense of Art. 1121 of the French Civil Code[435] which was applicable by virtue of a choice of law clause in the agreement[436] (see Art. 42, para. 33). Therefore, AGIP SpA had the capacity "both as a matter of substance and as regards competence to bring an action before the Tribunal in favour of Hydrocarbons".[437]

---

429  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 9, 11.
430  At p. 14.                                              431  At p. 15.
432  At p. 17.                                              433  At p. 10.
434  News from ICSID, Vol. 1/2, p. 9 (1984).
435  *AGIP* v. *Congo*, Award, 30 November 1979, para. 93.
436  At para. 45.                                           437  At para. 94.

**329**    These cases show that the tribunals take a realistic attitude when identifying the party on the investor's side.[438] They look for the actual foreign investor and are unimpressed by the fact that the consent agreement only names a subsidiary. The operation of ICSID clauses will not be frustrated through a narrow interpretation of the investor's identity. What matters is that the parent company acts in the preparation and possibly the implementation of the investment operation and that the ICSID clause is designed to work for its benefit.[439] This may work to the investor's advantage and detriment. Where companies other than those named in the consent agreement are not necessarily parties but are merely economically associated with the investment or the investor, they will not be given standing in ICSID proceedings. But the parties before the tribunal may be given the right to represent their interests and to claim on their behalf.

**330**    In *Zhinvali* v. *Georgia* the Tribunal reached a different conclusion. In that case consent to ICSID's jurisdiction was based neither on a direct agreement between the parties nor on an applicable BIT. Rather, jurisdiction rested on Article 16(2) of Georgia's Investment Law of 1996. The Request for Arbitration had been filed solely by the Claimant but it was said to be also "submitted on behalf of" the Claimant's three shareholders. The Claimant described itself as a "consortium" of the three shareholding companies. The Tribunal had to decide whether the Claimant, a corporation established in Ireland, was entitled to assert claims on behalf of its shareholders for the purposes of Art. 25(1) of the Convention. The Respondent objected to the claims on their behalf "without those shareholders assuming the risk of becoming parties to this arbitration". The Tribunal found that there was no consortium agreement. The three companies were just shareholders in the Claimant.[440] Turning to the ICSID case law, the Tribunal distinguished the case before it from the cases discussed in this section above. After listing *Holiday Inns*, *AGIP*, *Amco* and *Klöckner* it said:

> The facts of these cases are different from those before this Tribunal because all four involved more than start-up costs in a failed transaction and because all four involved additional "consent" of the host Contracting State beyond that found in Article 16(2) of the 1996 Georgia Investment Law. Also, in three of the four cases, the question related to what entity or entities were proper *party* claimants under the relevant investment or consent agreement, and, in the fourth (the *AGIP* case), there was a combination of an investment agreement and an internal law provision that are *not* present in this case.[441]

**331**    The Tribunal found that the case before it did not lend itself to the conclusion expressed in the First Edition of this Commentary (see para. 329 *supra*).[442] The Tribunal said:

---

438  The analysis of this issue in *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 6.01–6.34, is unclear and inconclusive.

439  For a critical evaluation of the "group enterprise" theory see *Tupman*, Case Studies, pp. 836–838.

440  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 392–395.

441  At para. 401. Italics original.                442  At para. 402.

> In this case, there is only one "precisely designated" Claimant Party and that is ZDL. There are no "Others" as co-claimant parties as was so in three of the referenced cases cited above in the Schreuer Commentary. And neither the ICSID Convention nor the ICSID Arbitration Rules contain any express provision permitting parties to assert claims on behalf of non-parties. This omission, and the case precedents previously cited, therefore, support the proposition that any such right of a complaining company requires the agreement or "consent" of the respondent Contracting State.[443]

**332** The Tribunal found added authority in the fact that two of the three shareholders were incorporated in the United States and were thus covered by the US-Georgia BIT.[444]

**333** The position can be different again in investment treaty arbitration. A national of one State party to a BIT generally may not bring claims on behalf of nationals of non-parties.[445]

**334** This point was upheld in *Impregilo* v. *Pakistan*. The case was based on the BIT between Italy and Pakistan. The Claimant sought to advance claims also on behalf of its partners in an unincorporated joint venture, who did not have Italian nationality. The Tribunal rejected this attempt.[446] The Claimant was not permitted to bring a claim under the Italy-Pakistan BIT on behalf of its non-Italian partners in the joint venture. The fact that the Claimant was authorized by the joint venture agreement to represent them was irrelevant as "the scope of the BIT cannot be expanded by a municipal law contract to which Pakistan is not a party".[447] The Tribunal said:

> The fact that Impregilo may be empowered to advance claims on behalf of its partners is an internal contractual matter between the participants of the Joint Venture. It cannot, of itself, impact upon the scope of Pakistan's consent as expressed in the BIT.... If this were not so, any party would be at liberty to conclude a variety of private contracts with third parties, and thereby unilaterally expand the ambit of a BIT.[448]

**335** The diverse solutions adopted by tribunals indicate that it may be wise to take the precaution of drafting consent clauses appropriately. Whenever possible, parent companies, holders of controlling interests or partners should be included among those who are granted party status. In doing so, it should be borne in mind that the extension of jurisdiction *ratione personae* will only be effective if the parties in question fulfil the Convention's consent and nationality requirements.

### b) Assignment and Succession

**336** A somewhat different situation arises where, in the course of the investment operation, parts or all of the investor's rights and duties are transferred to an entity that was not a party to the original agreement with the host State. This new investor

---

443   At para. 403.                          444   At para. 404.
445   See also *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2006, paras. 138–140.
446   *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 114–155.
447   At para. 136.                          448   At para. 151.

may, but need not, be affiliated with the original party. The question arises whether the successor to the original investor's rights and duties will also succeed to the status under an ICSID consent clause and may become a party to proceedings before the Centre.[449]

**337**    In *Holiday Inns* v. *Morocco*, the problem of identifying the proper parties on the investor's side was not restricted to the parent companies and the subsidiaries at the time of consent (see paras. 320–323 *supra*). The Basic Agreement of December 1966 contained a provision that reserved the right of the foreign partners to assign at any time "to any affiliated corporation they may jointly own or designate" or "to separate corporations or affiliates" their rights and duties under the contract.[450] In order to facilitate the project and upon the Government's specific requests, four local companies (the H.I.S.A. companies) were established and incorporated.[451] No attempt was made to confirm, extend or modify the original consent to ICSID arbitration with respect to the four new companies.[452]

**338**    The request for arbitration was made also in the name of the four H.I.S.A. companies.[453] The Government objected to the Tribunal's jurisdiction with regard to the H.I.S.A. companies on a number of grounds: it had never agreed to treat them as "nationals of another Contracting State" in the sense of Art. 25(2)(b); at the time of the execution of the Basic Agreement, the four companies were not yet in existence and could, consequently, not rely on its arbitration clause; the rights under the Basic Agreement had never been assigned to them.[454] The Claimants contended that the Government's agreement to treat the four H.I.S.A. companies as nationals of another Contracting State and the extension of the Centre's jurisdiction to them had been given implicitly. The Tribunal held that "the H.I.S.A. companies cannot be parties to the present proceedings before ICSID". It found that the four companies did not meet the Convention's nationality requirements under Art. 25(2)(b) since the Government had not agreed to treat them as nationals of another Contracting State. An implied agreement would only be acceptable in very specific circumstances, which were not present[455] (see also paras. 778, 779 *infra*).

**339**    In *Amco* v. *Indonesia* too, the problem of identifying the proper parties on the investor's side was not confined to the relationship between parent and subsidiary at the time of consent (see paras. 324–326 *supra*). Some years after the original consent agreement and after the establishment of the local subsidiary, PT Amco, a written application was made in April 1972 by PT Amco to the Indonesian authorities requesting permission for the transfer of a portion of the shares held by Amco Asia to Pan American Development Ltd., a Hong Kong corporation. Written permission was given by the Government but the question of ICSID's

449    See *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 77/8 (1974); *Delaume*, Le Centre International, pp. 796/7; *Delaume*, Transnational Contracts, Ch. XV, pp. 24–26.
450    *Lalive*, The First "World Bank" Arbitration, p. 127.
451    At pp. 129, 140/1.                    452    At p. 138.
453    At pp. 123, 137.                       454    At p. 139.
455    At pp. 141/2.

jurisdiction was not mentioned at the time. The request for arbitration in January 1981 was also made by Pan American. The Government contested jurisdiction with respect to Pan American arguing that there was no consent to the jurisdiction of the Centre.[456] In the Government's view, the permission to the transfer of shares did not amount to an express consent to ICSID arbitration with Pan American.[457] The Tribunal found otherwise:

> . . . the right acquired by Amco Asia to invoke the arbitration clause is attached to its investment, represented by its shares in PT Amco, and *may* be transferred with those shares. To be sure, for such a transfer to be effective, the government of the host country must approve it, which approval has as its consequence that said government agrees to the transferee acquiring all rights attached to the shares, including the right to arbitrate, unless this latter right would be expressly excluded in the approval decision.
>
> Such approval having been given in the instant case, it constitutes, together with Amco Asia's Request to transfer the shares, the agreement in writing to submit to ICSID arbitration the disputes with the transferee, requested by the Convention (Article 25).[458]

The Tribunal added that the partial transfer of shares and the consequent acqui-  **340**
sition of party status by Pan American did not alter Amco Asia's right to invoke the arbitration clause. Whether or not the block of shares transferred to Pan American was a controlling one was irrelevant:

> . . . the right to invoke the arbitration clause is transferred with the transferred shares, whether or not the same constitute a controlling block, being it understood, once again, that for such transfer of the right to take place, the government's approval is indispensable.[459]

The question of jurisdiction over the Claimant re-emerged in *Amco* v. *Indone-*  **341**
*sia* at a much later stage and under entirely different circumstances. After the first award in the case had been partly annulled,[460] the case was resubmitted to a new Tribunal in May 1987. Before the new Tribunal, Indonesia objected to the jurisdiction *ratione personae* over Amco Asia since the company had been dissolved under the laws of Delaware in December 1984, approximately one month after the rendering of the original Award. A different company, bearing the name Amco Asia Corporation, was then incorporated allegedly "for the sole purpose of creating the semblance of its status on a claimant".[461] Amco responded that it was not suggested that the newly incorporated corporation was a claimant. Rather, the old company, Amco Asia, continued to exist under the law of Delaware for purposes of the arbitration. The Tribunal found that the legal status and capacity

456  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 4.
457  At para. 27.                                    458  At para. 31. Emphasis original.
459  At para. 32. See also *Delaume*, ICSID Arbitration, pp. 115/6; *Bliesener*, La compétence du CIRDI, pp. 125/6; *Sornarajah, M.*, ICSID Involvement in Asian Foreign Investment Disputes: The AMCO and AAPL Cases, 4 Asian Yearbook of International Law 69, 75/6 (1994).
460  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986.
461  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 561.

of a company was determined by the law of the State of incorporation (see Art. 42, para. 158). It determined that Delaware corporation law allows the continuation in existence of a dissolved corporation in respect of a proceeding begun by or against it prior to or within three years of its dissolution. Therefore, the arbitration was within the time limits of Delaware law whether the proceedings were deemed to have started with the original request for arbitration in January 1981 or with the request for resubmission in May 1987.[462]

**342**    In *LETCO* v. *Liberia*, a 1970 Concession Agreement between LETCO, a Liberian incorporated company controlled by French nationals, and the Government provided for ICSID arbitration. When a request for arbitration was submitted by LETCO in 1983, it was made in its own name and in the name of its subsidiary LLIC. The Tribunal declined jurisdiction over LLIC, noting its separate juridical personality and the absence of an ICSID arbitration agreement between LLIC and Liberia.[463] Nevertheless, the Award on the merits included as damages amounts related to the investment made by LETCO in its subsidiary LLIC. This resulted from the fact that LETCO created and capitalized LLIC pursuant to the requirements of the 1970 Concession Agreement. Whether these requirements were carried out directly by LETCO or by means of the creation of a separate subsidiary was irrelevant.[464] The report fails to indicate whether the Government had played any part in the subsidiary's establishment that could have been interpreted as an implicit extension of consent to jurisdiction. Nor is there any indication as to whether the nationality requirements under Art. 25(2)(b) were satisfied with respect to LLIC.

**343**    Succession to rights as a consequence of corporate restructuring that does not affect the nationality of the investor has not led to difficulties with the standing of the investor in ICSID proceedings.[465] In *Noble Energy* v. *Ecuador*, an Investment Agreement containing an ICSID arbitration clause was concluded between Samedan and Ecuador. Samedan was a wholly owned subsidiary of Noble Energy. Samedan was subsequently absorbed by Noble Energy which succeeded to all its rights and obligations. Under the terms of the Investment Agreement, it applied to "successors, assigns and designees".[466] The record did not show an authorization, registration or notification of the merger. The Tribunal held that Noble Energy was allowed to rely on the Investment Agreement to establish ICSID's jurisdiction.[467] It said:

---

462  At pp. 561/2.
463  *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 349, 353/4.
464  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 346, 348, 374.
465  In *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 93, the Tribunal found that the absorbing company was entitled to file the claim in its own name even though the host State did not consent to the absorption. In *Tokios Tokelés* v. *Ukraine*, Award, 26 July 2007, para. 111, the Tribunal found that the transfer of assets from one subsidiary of the investor to another did not affect jurisdiction.
466  *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 12, 99.
467  At paras. 105, 109.

> When a parent absorbs its subsidiary and thus becomes formally the investor in the latter's place, there is no real change in the "investor" from the State's perspective. No previously unknown entity has entered into the contractual relationship. The only real change is a shortening of the corporate chain of ownership, which should not impact the State in any way. This is especially true here where the nationality of the parent and subsidiary is the same.[468]

A contractual solution to the problem of a transfer of consent to an assignee is more difficult in situations where there are no direct contractual arrangements between the investor and the host State. This is likely where consent is based on legislation or on a treaty (see paras. 390–463 *infra*). The institution of ICSID proceedings may well be the investor's first direct contact with the host State. **344**

In *SPP* v. *Egypt*, jurisdiction was not based on an agreement between the investor and the host State but on Egyptian legislation (see paras. 400–404 *infra*). Therefore, the question was not whether a party to an agreement containing consent to jurisdiction could be substituted by another party. Rather, the question was whether a subsidiary of the foreign investor enjoyed the status of an authorized investor under the domestic legislation offering consent to the Centre's jurisdiction. In 1974, agreements were drawn up between SPP, a Hong Kong company, and Egypt under which a joint venture company was to be established for the purpose of carrying out the investment project. One of the agreements provided that SPP would incorporate a holding company to own its shareholding in the joint venture and that SPP had the right to assign its rights and obligations to the new company.[469] Thereupon, SPP incorporated a subsidiary company, SPP(ME), which held SPP's shares in the joint venture. **345**

In August 1984, SPP(ME) filed a request for arbitration with ICSID. The Tribunal was constituted in December 1984. During the hearings on jurisdiction, the Parties advised the Centre in July 1985 that SPP, the parent of SPP(ME), had been joined as claimant in the proceedings.[470] This notification was accepted by the Tribunal but the Dissenting Opinion criticized it as being at odds with the formalities for the institution of proceedings.[471] **346**

In the proceedings on the merits, Egypt raised the objection that SPP(ME) did not have the status of an approved investor under the Egyptian law providing for ICSID arbitration. The authorization granted to the parent company, SPP, was never extended or transferred to SPP(ME). The Claimants argued that the Egyptian authorities had, in fact, approved the substitution of SPP(ME) for SPP and that it was SPP(ME) that made the investment and implemented the joint venture.[472] The Tribunal examined the details of SPP(ME)'s incorporation and the establishment **347**

---

468  At para. 107. *Cf.* also *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, para. 111, where the Tribunal found that the transfer of assets from one subsidiary of the investor to another did not affect jurisdiction.

469  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 23.

470  At para. 14.

471  Dissenting Opinion, 14 April 1988, para. 3.

472  *SPP* v. *Egypt*, Award, 20 May 1992, paras. 134–136.

of the joint venture and concluded that the substitution of SPP(ME) for SPP was not only known to, but had also been approved by, the Egyptian authorities. Therefore, SPP(ME) was an investor entitled to avail itself of the ICSID clause in the Egyptian law.[473]

**348**    The Claimants took the view that if SPP(ME)'s status as a party was contested, then SPP could advance the claim in its own name since it had been joined to the proceedings by agreement of the parties (see para. 346 *supra*). This met with another objection: SPP had not presented any claims in its own name in the written memorials. Rule 40(2) of the Arbitration Rules provides that, in principle, an incidental or additional claim may be presented not later than in the reply. Therefore, the Tribunal should find SPP's claims, put forward in subsequent oral arguments, belated and inadmissible. The Tribunal refused to accept this argument. SPP's claim was neither "incidental" nor "additional". There was nothing in the record to suggest that SPP had ever claimed anything different from SPP(ME). Rather, SPP(ME) and SPP had claimed jointly ever since SPP was joined in the proceedings.[474]

**349**    In *Fedax* v. *Venezuela* (see paras. 88, 149, 191 *supra*), the Government had in 1988 issued promissory notes to a third party. The third party subsequently transferred these promissory notes by way of endorsements to the Claimant. The promissory notes explicitly allowed their endorsement to subsequent holders. The Claimant, a company of Netherlands nationality, instituted proceedings on the basis of the bilateral investment treaty between the Netherlands and Venezuela. The Tribunal, confirming its competence, noted that the promissory notes were negotiable instruments and that the Respondent foresaw the possibility that they would be transferred. The investor would change with every endorsement but the investment itself would remain constant.[475]

**350**    It is neither illegal nor improper for an investor of one nationality to establish a new entity in a jurisdiction perceived to provide a beneficial regulatory and legal environment, including the availability of an investment treaty, and assign to it the benefit of a foreign investment.[476] It is rather common for investors to structure their investments in ways that benefit from treaty and ICSID protection, thereby making use of the relative flexibility of nationality requirements in the ICSID Convention and the breadth of coverage in investment treaties. But the readiness of tribunals to accept arrangements designed to attract ICSID's jurisdiction is not unlimited. In particular, tribunals have looked with disfavour upon situations in which the investor sought to transfer an existing claim from a claimant that did not fulfil the Convention's nationality requirements to another who did.

**351**    One example is *Banro* v. *DR Congo*, which arose out of an investment agreement concluded between a Canadian company, Banro Resource, and the Democratic

473    At paras. 138–144. See also the Dissenting Opinion at para. 2.
474    *SPP* v. *Egypt*, Award, 20 May 1992, para. 149.
475    *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, paras. 18–19, 37–40.
476    *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 330.

Republic of Congo and containing an ICSID consent clause. When a dispute arose, Banro Resource transferred the investment to Banro American, its US affiliate. Banro American was not party to the investment agreement. Nine days after the transfer, Banro American instituted ICSID arbitration. Canada, unlike the United States, was not a party to the Convention either at the date of the consent to arbitration or at the time of the Request for Arbitration. The Tribunal found that Banro Resource was not a "national of another Contracting State". There was therefore never a valid agreement to submit a dispute to ICSID arbitration. As a consequence, the Tribunal held that Banro Resource could not effectively assign its claim to an American subsidiary that had not entered into an arbitration agreement with the respondent State in order to bypass this fundamental defect of jurisdiction.[477]

A similar example is *Mihaly* v. *Sri Lanka*, a case brought on the basis of the United States-Sri Lanka BIT. The case concerned, in the words of the Respondent:      **352**

> . . . a claim by a Canadian Company, allegedly assigned to this US Claimant but without Sri Lanka's consent, for reimbursement of expenditures made pursuing a possible investment in a proposed power project in Sri Lanka that never happened.[478]

The Tribunal noted that the investor behind the project was a Canadian corporation, yet the designated Claimant was a United States corporation to which the former had purported to assign its claim. In the alternative, the Claimant said there was a partnership agreement between it and the Canadian company. The Tribunal did not find any evidence of a legal partnership.      **353**

The Tribunal held that the Claimant could not bring a claim in respect of a right allegedly assigned to it by its Canadian affiliate. To allow such an assignment to operate in favour of creating ICSID jurisdiction where it would not otherwise exist would defeat the object and purpose of the Convention, as well as the sanctity of the privity of international agreements not intended to create rights and obligations for non-Convention States or their nationals. As the Tribunal explained:      **354**

> It follows that as neither Canada nor Mihaly (Canada) could bring any claim under the ICSID Convention, whatever rights Mihaly (Canada) had or did not have against Sri Lanka could not have been improved by the process of assignment with or without, and especially without, the express consent of Sri Lanka, on the ground that *nemo dat quod non habet* or *nemo potiorem potest transfere quam ipse habet.* That is, no one could transfer a better title than what he really has. Thus, if Mihaly (Canada) had a claim which was procedurally defective against Sri Lanka before ICSID because of Mihaly (Canada)'s inability to invoke the ICSID Convention, Canada not being a Party thereto, this defect could not be perfected vis-à-vis ICSID by its assignment to Mihaly (USA). To allow such an assignment

---

477   *Banro* v. *DR Congo*, Award, 1 September 2000. Only excerpts of the Award have been published: 17 ICSID Review – FILJ 380 (2002). The case is discussed in *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 58–61. See also the discussion in *Cremades, B. M./Cairns, D. J. A.*, The Brave New World of Global Arbitration, 3 The Journal of World Investment 173, 200 (2002).

478   *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, para. 11.

to operate in favour of Mihaly (Canada) would defeat the object and purpose of the ICSID Convention and the sanctity of the privity of international agreements not intended to create rights and obligations for non-Parties. Accordingly, a Canadian claim which was not recoverable, nor compensable or indeed capable of being invoked before ICSID could not have been admissible or able to be entertained under the guise of its assignment to the US Claimant. A claim under the ICSID Convention with its carefully structured system is not a readily assignable chose in action . . .[479]

**355**    *Banro* and *Mihaly* suggest that an investor of a non-Contracting State is not capable of assigning an existing claim to an entity having the nationality of a Contracting State in order to attract ICSID jurisdiction.

**356**    Changes in the ownership of the investment, with or without a change of nationality, after the institution of proceedings are immaterial for ICSID jurisdiction[480] (see paras. 35–40 *supra*; para. 373 *infra*).

**357**    In *Vivendi* v. *Argentina*, the original Claimant had been CGE, which subsequently changed its name to Vivendi S.A. during the course of the ICSID proceedings. Vivendi S.A. then merged with several other companies to form Vivendi Universal. Vivendi Universal continued to hold the majority stake in the second named Claimant, CAA. The Tribunal rejected Argentina's argument that there was a change of corporate ownership of CAA, and confirmed Vivendi Universal's standing. The Tribunal also accepted that Vivendi Universal was the successor to CGE and as such a proper Claimant.[481]

**358**    In *El Paso* v. *Argentina* the Claimant sold its shares in the local companies shortly after the institution of proceedings.[482] Argentina argued that, as a consequence, El Paso had lost its *ius standi*.[483] The Tribunal found that an examination of the BIT, of the ICSID Convention and of the case-law revealed that there is no rule of continuous ownership of the investment. The decisive point was that by the time the claim was registered El Paso still owned the investment.[484]

**359**    In *Enron* v. *Argentina*, long after the institution of the proceedings, the Claimants sold most of their holding in the local company to another investor together with a right to a further purchase of the balance, thus effectively withdrawing from their investment.[485] The Tribunal held that jurisdictional standing was determined by reference to the date on which the proceedings were instituted and that jurisdiction was not altered by later transactions. It also noted that the sales transaction expressly safeguarded the Claimants' rights in the litigation.[486] The Tribunal said:

---

479    At para. 24.
480    See also *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 31; *EnCana* v. *Ecuador* (UNCITRAL), Award, 3 February 2006, 45 ILM 901 (2006), paras. 123, 126; *National Grid* v. *Argentina* (UNCITRAL), Decision on Jurisdiction, 20 June 2006, paras. 95–100.
481    *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, paras. 82, 85, 86.
482    *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 130.
483    *Ibid.*, para. 117.                        484    *Ibid.*, paras. 135/6.
485    *Enron* v. *Argentina*, Award, 22 May 2007, para. 192.
486    *Ibid.*, paras. 196–198.

. . . the Tribunal wishes to recall that the disposal of Enron's participation in TGS does not affect its jurisdiction to decide in this case. As discussed above, ICSID jurisdiction is determined on the date the arbitration is instituted and subsequent changes in their ownership of TGS does not affect jurisdiction.[487]

**360** It follows from this consistent line of cases that a disposal or transfer of assets that form the basis of a claim in investment arbitration subsequent to the institution of proceedings does not affect the standing of the original claimant.

**361** These cases indicate that ICSID tribunals have been flexible in extending or preserving party status to successors in interest. At the same time there is also a certain caution against an uncontrolled extension of jurisdiction evident in *Banro* v. *DR Congo* and *Mihaly* v. *Sri Lanka*. Opportunistic assignments designed to bring an existing dispute within the scope of ICSID's jurisdiction will not be accepted.

**362** If the host State is aware of and agrees to the assignment of rights and duties, the approval of the extension of jurisdiction *ratione personae* to the successor will be assumed. If the host State is unaware of an assignment or has resisted succession, it is less likely that a tribunal will decide that party status under the Convention has been transferred. If the successor to rights and obligations is closely affiliated to the party named in the consent agreement, either as a parent company or as a subsidiary, the standards will be less stringent.

**363** It seems wise to make early provision for the contingency of a later succession.[488] In doing so, it should be kept in mind that any successor must satisfy the Convention's nationality requirements if the transfer of standing is to be valid. The 1968 Model Clauses offered a clause for the transfer of jurisdictional rights on both the investor's side and in respect of the host State's constituent subdivisions or agencies.[489] *Delaume* has suggested a simpler clause in the following terms:

> It is hereby agreed that the consent to the jurisdiction of the Centre shall equally bind any assignee to . . . to the extent that the Centre can assume jurisdiction over a dispute between such assignee and the other party, and that neither party to this Agreement shall, without the written consent of the other, transfer its interest in this Agreement to an assignee with respect to whom the Centre could not exercise such jurisdiction.[490]

Even if no advance arrangements for the succession to jurisdictional rights have been made, it is still possible to clarify the situation at the time of the assignment. The authorization by the host State of a transfer of interests arising from the investment should specifically include the arbitration clause. At that point, the assignee's nationality under the Convention can be determined and possibly rectified by way of an agreement under Art. 25(2)(b).

---

487  *Ibid.*, para. 396.
488  *Amerasinghe*, Submissions to the Jurisdiction, pp. 230/1.
489  Clause VII, 7 ILM 1159, 1167/8 (1968). The current Model Clauses do not provide for this contingency. See also the 1982 Participation Agreement between New Zealand and Mobil Oil NZ Ltd., Art. 7.4, 4 ICSID Reports 123.
490  *Delaume*, ICSID Arbitration, p. 116.

### 4. Subrogation

**364**    A special case of assignment and succession arises where the investor has received an indemnity under an insurance claim. Most industrialized countries and some developing countries operate investment insurance schemes protecting their nationals against political risks such as expropriation, currency exchange restrictions and civil strife. In addition, there are multilateral investment programmes such as the Multilateral Investment Guarantee Agency (MIGA)[491] and the Inter-Arab Investment Guarantee Corporation. Under these national and international investment insurance systems the insured investor's claim against the host State is assigned to the insurer upon payment of the claim arising from the insurance. This process is called subrogation and is an accepted principle of insurance law in general. The insurer succeeds to all the rights of the beneficiary who has received compensation under the insurance contract. This result is achieved either under the terms of the insurance contract or by virtue of the operation of law. In the context of investment, it is important that the host State agrees to the subrogation. This is most readily achieved through a BIT between the host State and the investor's State of nationality. Many BITs contain subrogation clauses of this kind.[492]

**365**    If the insurer succeeds to all of the investor's rights upon compensating him or her, the question arises whether the succession extends to access to dispute settlement by the Centre. In other words, can a State, a State agency administering the investment programme, or an international investment insurance organization become party to ICSID proceedings after having compensated the investor? The answer is clearly no.[493] There are three main reasons for this denial of party status: 1. The Convention provides for the settlement of disputes between States and nationals of other States. The clear wording of Art. 25(1) cannot be re-interpreted to cover disputes involving States, State agencies or international organizations on the investor's side.[494]

---

491    See Convention on the Establishment of the Multilateral Investment Guarantee Agency, 11 October 1985, 1 ICSID Review – FILJ 145 (1986). See also *Shihata, I. F. I.*, MIGA and Foreign Investments: Origins, Operations, Policies and Basic Documents of the Multilateral Investment Guarantee Agency (1988); *Ziegler, A. R./Gratton, L.-P.*, Investment Insurance, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 524 (2008).

492    See *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 156–160; *Parra*, Provisions on the Settlement, p. 342.

493    See also *Albrecht, W. E.*, Some Legal Questions Concerning the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 12 St. Louis University Law Journal 679, 683 (1968); *Amerasinghe*, The Jurisdiction of the International Centre, pp. 194–196; *Broches, A.*, La Convention et L'Assurance-Investissement: Le Problème dit de la Subrogation, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées: La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements internationaux de la Faculté de Droit* ed.) 161, 166 (1969); *Delaume*, Le Centre International, p. 798; *Rodley, N. S.*, Some Aspects of the World Bank Convention on the Settlement of Investment Disputes, 4 Canadian Yearbook of International Law 43, 53/4 (1966); *Ziadé, N. G.*, ICSID Clauses in the Subrogation Context, News from ICSID, Vol. 7/2, p. 4 (1990).

494    See *Gallus, N./Peterson, L. E.*, International Investment Treaty Protection of NGOs, 22 Arbitration International 527 (2006).

2. One of the Convention's objectives is to depoliticize disputes. This objective is expressed most clearly in Art. 27 prohibiting diplomatic protection in favour of the investor.[495] This purpose would be defeated if the investor's State of nationality were to be given standing before the Centre.

3. The Convention's *travaux préparatoires* show unambiguously that a conscious decision was made to exclude States, State agencies or international organizations from access to ICSID proceedings on the investor's side.

The question of whether an investor's State of nationality should be given **366** standing before the Centre after subrogation was discussed extensively in the course of the Convention's preparation. A provision to this effect was deleted at the last stage of the drafting and, consequently, does not appear in the Convention (History, Vol. I, p. 14). Therefore, the history of these discussions may be dealt with rather briefly here.[496] The Preliminary Draft contained a clause after the words "a national of another Contracting State" which added "(or that State when subrogated to the rights of its national)" (at p. 130). The First Draft contained a more elaborate clause that would have included subrogation by a "public international institution" (at pp. 130/2). After much debate and controversy, the Revised Draft offered an even more complicated formula for subrogation requiring the host State's separate consent to the substitution of the investor's home State for the investor and allowing the withdrawal of such consent in principle (at p. 132). After more lively debate, this draft was put before the Executive Directors of the World Bank. There, Mr. *Broches* explained that the deletion of the clause would only make it impossible for the investor's national State to appear before the Centre but would not affect the question of subrogation *per se*. Moreover, it would not prevent the indemnifying State from requiring that the investor pursue his remedies under the Convention even after he had been indemnified (History, Vol. II, p. 1017). Thereupon, a vote was taken. This revealed a large majority in favour of deleting the clause that would have allowed States to succeed in their nationals' procedural rights upon their indemnification under an investment insurance scheme (at p. 1018). All of this shows that the Convention's silence on this point, far from implying procedural standing for a State in case of subrogation, is actually the result of a conscious decision to deny party status to the national's home State.

The exclusion of an insurer that has been subrogated to the investor's rights **367** from party status in ICSID proceedings applies only to public entities but not to private insurers. There is nothing to stop a private insurer from succeeding to the investor's procedural rights, provided the host State has consented to the

---

495    See also *Shihata, I. F. I.*, Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1 (1986).

496    For detailed accounts of subrogation in the Convention's drafting history see *Amerasinghe*, Jurisdiction Ratione Personae, pp. 241/2; *Broches, A.*, La Convention et L'Assurance-Investissement: Le Problème dit de la Subrogation, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées: La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements internationaux de la Faculté de Droit* ed.) 161, 162–166 (1969); *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 161/2; *Masood*, Jurisdiction of International Centre, pp. 134–136.

assignment[497] (History, Vol. II, p. 404). The decisive criterion for distinguishing public entities from private insurance would not be their separate legal personality but whether they administer a public investment insurance system on behalf of and financially dependent on the investor's home State.

**368**    The denial of standing to the investor's home State and its agencies does not mean that ICSID is worthless in cases where the investor receives compensation under a national investment insurance scheme. It merely means that the claimant in ICSID proceedings would have to be the investor despite the insurance. One way to achieve this result would be to require the investor first to exhaust the remedies under ICSID before being eligible under the terms of the investment insurance. However, having to undertake lengthy arbitration proceedings first would dramatically reduce the attractiveness of the investment insurance to the investor.

**369**    A preferable alternative is to make payments under the insurance contract conditional on the subsequent pursuit of the claim before ICSID by the investor. Any proceeds from the proceedings before ICSID would then go towards reimbursing the national investment insurance system.[498] This arrangement may run into the problem that many legal systems will not allow the pursuit of claims by parties who are not the real parties in interest. Much would then depend on whether the question of subrogation and representation of the claim before ICSID is classified as a substantive question, to which the normal choice of law rules under Art. 42 would apply, or whether it is classified as a jurisdictional question, to which the Convention and international law in general would apply[499] (see also Art. 42, paras. 4–8).

**370**    This problem may be eliminated by an appropriate agreement with the host State permitting the pursuit of the claim by the investor even after he or she has received the indemnity from the insurance.[500] ICSID's Model Clauses suggest a formula for insertion into an agreement between the investor and the host State for this purpose.[501]

**371**    Since the investor's home State has the primary interest in such an arrangement, BITs are the obvious place for such a clause.[502] Under one version they provide

---

497  *Broches, op. cit.* at p. 167; *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 78 (1974); *Ziadé, N. G.*, ICSID Clauses in the Subrogation Context, News from ICSID, Vol. 7/2, p. 4 (1990).

498  This is also the approach taken by MIGA. See *Ziadé, N. G., op. cit.*, p. 6.

499  See also *Broches, A.*, La Convention et L'Assurance-Investissement: Le Problème dit de la Subrogation, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées: La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements internationaux de la Faculté de Droit* ed.) 161, 168 (1969).

500  *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 78 (1974); *Langer, G.*, Das Weltbankübereinkommen zur Beilegung von Investitionsstreitigkeiten, 18 Recht der Internationalen Wirtschaft/Außenwirtschaftsdienst des Betriebs-Beraters 321, 324 (1972).

501  See Clause 8 of the 1993 Model Clauses, 4 ICSID Reports 363. See also Clause VIII of the 1968 Model Clauses, 7 ILM 1159, 1168 (1968); Clause IX of the 1981 Model Clauses, 1 ICSID Reports 203.

502  *Parra*, Provisions on the Settlement, p. 343; *Peters*, Dispute Settlement Arrangements, pp. 142/3.

that payment to the insured investor shall not affect his right to pursue ICSID proceedings.[503] Another version provides that the host State shall not raise the fact that the investor has been compensated as a defence.[504] The United Kingdom Model Agreement contains the following clause in Art. 8(3):

> The Contracting Party which is a party to the dispute shall not raise as an objection at any stage of the proceedings or enforcement of an award the fact that the national or company which is the other party to the dispute has received in pursuance of an insurance contract an indemnity in respect of some or all of his or its losses.[505]

This is not the only possible approach to the procedural problem arising from subrogation. Some BITs provide for inter-state arbitration.[506] MIGA provides for *ad hoc* arbitration "guided" by the ICSID Arbitration Rules.[507] **372**

In *CSOB* v. *Slovakia*, the assignment to the Claimant's home State was not on the basis of an insurance contract but the economic consequences were similar.[508] CSOB had agreed to assign its claims against the Respondent to the Czech Republic against a monetary consideration. Thereupon, the Slovak Republic argued that these assignments had transformed the Czech Republic rather than CSOB into the real party in interest. Since the Czech Republic could not step into the investor's shoes in ICSID arbitration (see para. 270 *supra*), the Respondent moved to have the claim dismissed. The Tribunal noted that the assignments had taken place after the registration of the Request for Arbitration. It rejected the Respondent's argument since standing in an international judicial forum for purposes of jurisdiction is determined by reference to the date on which the proceedings are instituted. The Tribunal added that even if it were to accept the contention that the Czech Republic had become the real party in interest it would not follow that there was no jurisdiction. It said: **373**

> This conclusion is compelled by the consideration that absence of beneficial ownership by a claimant in a claim or the transfer of the economic risk in the outcome of a dispute should not and has not been deemed to affect the standing of a claimant in an ICSID proceeding, regardless whether or not the beneficial owner is a State Party or a private party.[509]

In addition, the Claimant had not been deprived of an interest in the outcome of the case since the assignment was to become effective only after the conclusion

---

503  See *e.g.*, the France-Tunisia BIT (1972) Art. 3; the Benelux-Sri Lanka BIT (1982) Art. 8(2); and the France-Nigeria BIT (1990) Art. 9.

504  See *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 163/4; *Ziadé, N. G.*, ICSID Clauses in the Subrogation Context, News from ICSID, Vol. 7/2, pp. 5/6 (1990).

505  *Dolzer/Schreuer*, Principles of International Investment Law, pp. 380/1. See also Art. 11(3) of the German Model Agreement of 2005, *op. cit.*, p. 373; Art. 28(7) of the US Model Agreement of 2004, *op. cit.*, p. 410. See also the Paraguay-UK BIT (1981) Art. 8(1); the Bangladesh-US BIT (1986) Art. VII(4); the Barbados-UK BIT (1993) Art. 8(3); and the Armenia-US BIT (1992) Art. VI(7).

506  *Ziadé, op. cit.* at p. 6.          507  *Loc. cit.*

508  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 28–32.

509  At para. 32.

of the ICSID proceedings and the assignor remained entitled to a portion of the amount received by the assignee.[510]

## I. ". . . consent in writing to submit to the Centre."

### 1. General Significance

374    Consent by both or all parties is an indispensable condition for the jurisdiction of the Centre. The fact that the host State and the investor's State of nationality have ratified the Convention will not suffice. The last paragraph of the Preamble to the Convention makes this quite clear (see Preamble, paras. 35, 36).

375    During the Convention's drafting Mr. *Broches* was tireless in emphasizing that the use of the Centre's facilities would be voluntary and that participation in the Convention would not compel any State to submit disputes to the Centre (History, Vol. II, pp. 68, 69, 74, 77, 79, 82/3, 135/6, 241, 257, 258, 303, 334, 335, 464, 492, 563, 566). He had to overcome apprehensions of some developing countries' representatives who feared that the Convention's mere existence might lead to pressure on host States to give consent or that refusal to give consent might lead to "adverse inferences" (at pp. 259, 261, 470, 499, 501, 540, 541, 566). These fears were accommodated in part through the insertion of Art. 25(4) allowing States to state in advance which classes of disputes they would not consider submitting to the Centre (see paras. 921–941 *infra*).

376    The Report of the Executive Directors to the Convention describes consent as "the cornerstone of the jurisdiction of the Centre". *Delaume* has summarized the situation as follows:

> The scope of such a consent is within the discretion of the parties. In this connection, it should be noted that ratification of the ICSID Convention is, on the part of a Contracting State, only an expression of its willingness to make use of the ICSID machinery. As such, ratification does not constitute an obligation to use that machinery. That obligation can arise only after the State concerned has specifically agreed to submit to ICSID arbitration a particular dispute or classes of disputes. In other words, the decision of a State to consent to ICSID arbitration is a matter of pure policy and it is within the sole discretion of each Contracting State to determine the type of investment disputes that it considers arbitrable in the context of ICSID.[511]

377    Participation in the Convention alone does not carry any obligation or even expectation that there will be consent to jurisdiction. A Contracting State remains free as to whether or not, and if so to what extent, it wishes to give consent.

378    Consent must be obtained from both or all parties. Traditionally this would take place by way of a direct agreement between the host State and the investor (see paras. 382–389 *infra*). Consent may also result from a unilateral offer by the host State, expressed in its legislation or in a treaty, which is subsequently accepted

---

510    *Loc. cit.*
511    *Delaume*, ICSID Arbitration, pp. 104/5.

by the investor (see paras. 392–463 *infra*). Nowadays the vast majority of cases are based on consent given in this indirect way. This phenomenon has been called arbitration without privity.[512] Here too the result is an agreement, although it is achieved indirectly and often without direct contact between the parties prior to the institution of proceedings. A unilateral act is insufficient (see paras. 416–426, 447–455 *infra*). Consent will be valid according to its own terms; that is, to the extent that disputes are covered by its scope (see paras. 513–539 *infra*). Consent to the jurisdiction of the Centre implies a submission to all relevant rules of the Convention, including the obligation to abide by an award, and to the Centre's rules and regulations.

## 2. *Consent in Writing*

The Convention's only formal requirement for consent is that it must be in writing. This condition was contained in all the Convention's drafts except the Preliminary Draft (History, Vol. I, pp. 110, 112, 116, 118). It was never the object of any controversy and was reiterated a number of times (History, Vol. II, pp. 402, 828, 833, 835, 836, 842, 879). Consent in writing will normally be communicated between the parties but there is no need to notify the Centre at the time of consent. A suggestion to this effect, made during the Convention's drafting (at p. 402), was not pursued. In fact, the Centre has no precise knowledge of the number and the contents of various consent clauses covering investments. But proof of consent in writing will be required at the time a request for conciliation or arbitration is made. Rule 2(2) of the Institution Rules provides that a request must be supported by documentation concerning the instruments recording consent and their dates. **379**

The need to put consent into writing has not led to difficulties in practice, though ICSID tribunals have at times noted specifically that consent to the Centre's jurisdiction had been given in writing.[513] In *Holiday Inns* v. *Morocco*, the Government argued that there had been no consent in writing with the mother companies of the parties to the contract containing the consent clause (see paras. 320–323 *supra*). The argument was not accepted. There had been consent in writing, but the investor had not been identified in writing at the outset.[514] Also, in cases of succession, consent would be binding without the need for a renewed consent in writing (see paras. 336–363 *supra*). **380**

Consent in writing must be explicit and not merely construed. In *Cable TV* v. *St. Kitts and Nevis*, the Respondent was not a party to the agreement containing the consent clause (see para. 249 *supra*). The Claimant argued that consent by **381**

512  *Paulsson, J.*, Arbitration Without Privity, 10 ICSID Review – FILJ 232 (1995).
513  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 21; *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 23; *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 350/1; *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, paras. 98, 100, 101; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 26.
514  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 671.

the Respondent could be construed from the institution of proceedings by the Attorney-General of St. Kitts and Nevis against the Claimant in a domestic court of the Respondent. The purpose of the domestic court proceedings was to obtain an injunction to restrain the Claimant from raising its rates prior to the resolution of the dispute through ICSID arbitration (see Art. 26, para. 173). The Tribunal held that the references in the court documentation to the ICSID clause in the agreement were merely statements of fact and did not amount to consent by any person to ICSID jurisdiction.[515]

### 3. Consent through Direct Agreement between the Parties

### a) Consent Recorded in a Single Instrument

**382**     The Convention leaves the parties a large measure of freedom in expressing their consent. An agreement between the parties recorded in a single instrument is the traditional way of expressing consent. More recently, this form of consent has been largely displaced by consent expressed through treaties and legislation. Consent through a direct agreement may be achieved through a compromissory clause in an investment agreement between the host State and the investor submitting future disputes arising from the investment operation to ICSID jurisdiction. It is also possible to submit a dispute that has already arisen between the parties through consent expressed in a *compromis*. Therefore, consent may be given with respect to existing or future disputes (see para. 48 *supra*).

**383**     This principle was not uncontested during the Convention's drafting. The Working Paper and the Preliminary Draft contained a reference to "any existing or future dispute" (History, Vol. I, pp. 110, 112). The Preliminary Draft also referred to "a prior written undertaking" and "*ad hoc* submission of a dispute" as alternative forms of consent (at p. 112). The First Draft stated that consent "may be given either before or after the dispute has arisen" (at p. 116). Mr. *Broches* maintained throughout the drafting process that both forms of consent should be admissible (History, Vol. II, pp. 59, 77/8, 323, 336, 493, 506, 511, 566, 836) and was supported by some delegations (at pp. 833, 842). However, a number of delegates insisted that the only acceptable form of consent would be in respect of a dispute that had already arisen and that advance consent for future disputes should be excluded (at pp. 69, 334, 499, 501, 541, 829, 834, 836, 838, 839). No formal decision appears to have been taken on this point but the reference to consent before or after the emergence of the dispute disappeared from subsequent drafts (at p. 879) including the Revised Draft (History, Vol. I, p. 118) and does not appear in the Convention.

**384**     Nevertheless, it is clear that both forms of consent are covered by the Convention. The Report of the Executive Directors mentions both possibilities:

---

[515]   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 4.02–4.17.

> 24. . . . Consent may be given, for example, in a clause included in an investment agreement, providing for the submission to the Centre of future disputes arising out of that agreement, or in a *compromis* regarding a dispute which has already arisen . . .[516]

This view is supported by writers on the Convention[517] and by the practice under the Convention.[518] In fact, the majority of cases brought to ICSID arbitration under direct agreements between the parties are based on agreements containing a consent clause for future disputes.[519] Agreements to submit existing disputes to the Centre are rare.[520]

It is obvious that consent by both parties is much easier to obtain before the outbreak of a disagreement. Therefore, it is important to give careful attention to the drafting of consent clauses when negotiating investment agreements. The Centre has developed a set of Model Clauses for the convenience of the parties to facilitate the drafting of consent clauses between them.[521] Apart from two basic submission clauses to cover consent in respect of future and existing disputes, the Model Clauses also offer clauses relating to the subject-matter of the dispute (see para. 129 *supra*; para. 515 *infra*), clauses relating to the parties (see paras. 257, 293 *supra*), clauses concerning the method of the tribunal's constitution, applicable law, other remedies, waiver of immunity from the execution of the

**385**

---

516  1 ICSID Reports 28. See also *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 21, where the Tribunal explicitly approves this interpretation in the Executive Directors' Report.

517  *Amerasinghe*, The Jurisdiction of the International Centre, p. 171; *Broches*, The Convention, pp. 353/4; *Szasz*, The Investment Disputes Convention, p. 28.

518  For an early example see Art. 50 of the Long Term Convention of Establishment and Implementation between the Islamic Republic of Mauritania and Société des Mines de Mauritanie (S.O.M.I.N.A.) of 19 July 1967, 6 ILM 1085 (1967).

519  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 650; *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 12, 21; *Alcoa Minerals* v. *Jamaica*, Decision on Jurisdiction and Competence, 6 July 1975 – see: *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals v. Government of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 93/4, 101 (1976); *Adriano Gardella* v. *Ivory Coast*, Award, 29 August 1977, para. 4.1; *AGIP* v. *Congo*, Award, 30 November 1979, para. 18; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.15; *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 10; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 10, 13; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 23, Award, 25 February 1988, para. 4.02; *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 347, 350/1; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, para. 1; *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, paras. 2.1.10, 2.7.6; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 2; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 10; *CDC* v. *Seychelles*, Award, 17 December 2003, para. 4; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 2, 49, 58; *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 6; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 22, 23, 54, 55, 150.

520  See *Swiss Aluminium* v. *Iceland*, Order taking note of Discontinuance, 6 March 1985; *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 67; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 26.

521  Doc. ICSID/5/Rev. 2. The Model Clauses can be viewed at: http://icsid.worldbank.org/ICSID/FrontServlet?actionVal=ModelClauses&requestType=ICSIDDocRH.

award, procedural questions, division of costs and place of proceedings. There are also model clauses referring to the Additional Facility and to the designation of the Secretary-General as appointing authority of *ad hoc* arbitrators. The Model Clauses, as published, are merely offered as examples and the parties are free to adapt them to the specific circumstances of their relationship. They are useful not only as blueprints for actual contracts but also as a checklist for the various questions to be considered when submitting to ICSID.[522] The Model Clauses have undergone several revisions.[523]

386    The current Model Clauses suggest the following basic submission clause in respect of future disputes for insertion in investment agreements between host States and foreign investors:

> **Clause 1**
>
> The [Government]/[name of constituent subdivision or agency] of name of Contracting State (hereinafter the "Host State") and name of investor (hereinafter the "Investor") hereby consent to submit to the International Centre for Settlement of Investment Disputes (hereinafter the "Centre") any dispute arising out of or relating to this agreement for settlement by [conciliation]/[arbitration]/ [conciliation followed, if the dispute remains unresolved within time limit of the communication of the report of the Conciliation Commission to the parties, by arbitration] pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (hereinafter the "Convention").

387    If the parties have not given their consent in respect of future disputes, the Model Clauses offer the following formula for the submission of an existing dispute:

> **Clause 2**
>
> The [Government]/[name of constituent subdivision or agency] of name of Contracting State (hereinafter the "Host State") and name of investor (hereinafter the "Investor") hereby consent to submit to the International Centre for Settlement of Investment Disputes (hereinafter the "Centre") for settlement by [conciliation]/[arbitration]/[conciliation followed, if the dispute remains unresolved within time limit of the communication of the report of the Conciliation Commission to the parties, by arbitration] pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, the following dispute arising out of the investment described below: . . .

### b) Consent Based on an Investment Application

388    The agreement on consent between the parties need not be recorded in a single instrument. An investment application made by the investor may provide for arbitration. If the application is approved by the competent authority of the host State, there is consent to arbitration by both parties.

---

522   See esp. *Gaillard*, Some Notes on the Drafting; *Delaume*, How to Draft.
523   Earlier versions were published in 7 ILM 1159 (1968) and 1 ICSID Reports 197. The 1993 version is published in 4 ICSID Reports 357.

In *Amco* v. *Indonesia*, the investor had submitted an application to the Indonesian **389**
Foreign Investment Board to establish a locally incorporated company for the
purpose of carrying out the investment operation. The application provided that
later disagreements would be put before ICSID. The application was approved.
Before the Tribunal, the Government accepted the validity of the consent clause
in principle while disputing its applicability to the parties to the dispute and to the
subject-matter.[524] The Tribunal said:

> . . . while a consent in writing to ICSID arbitration is indispensable, since it is
> required by Article 25(1) of the Convention, such consent in writing is not to be
> expressed in a solemn, ritual and unique formulation. The investment agreement
> being in writing, it suffices to establish that its interpretation in good faith shows
> that the parties agreed to ICSID arbitration, in order for the ICSID Tribunal to
> have jurisdiction over them.[525]

### c) Consent by Reference to Another Legal Instrument

An agreement between the parties may record their consent to ICSID jurisdic-   **390**
tion by reference to another legal instrument. In *CSOB* v. *Slovakia*, an agreement
entered into between the parties to the dispute contained the clause "this agreement
shall be governed by the laws of the Czech Republic and the [BIT between the
Czech and Slovak Republics]". The Claimant contended that this constituted an
incorporation by reference of consent to ICSID arbitration as provided for in the
BIT. The Respondent argued that the clause was merely a choice-of-law provision.
Moreover, the BIT had never entered into force (see para. 429 *infra*). The Tribunal
carefully examined the drafting history of the agreement between the parties. It
noted that the clause in question had replaced a clause in an earlier draft providing
for domestic arbitration. In addition, the reference to the BIT had included the
words "after it is ratified" in a later draft but these words were deleted in the final
agreement. The Tribunal concluded that under these circumstances the parties by
referring to the BIT had intended to incorporate the ICSID clause in the BIT into
their agreement.[526]

In *Inceysa* v. *El Salvador* one of several bases of consent invoked by the   **391**
Claimant was a clause in the contract between the parties submitting disputes
arising under the contract to arbitration "in accordance with Salvadoran Law".[527]
The Tribunal examined several pieces of legislation cited by the Claimant. It found
that some of these, while referring to arbitration, contained no express reference
to ICSID and could consequently not meet the requirement of consent under
Article 25 of the Convention.[528] On the other hand, El Salvador's Investment
Law provided for ICSID's jurisdiction for "controversies arising between foreign
investors and the State regarding their investments in El Salvador". But the Tribunal

---

524  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, paras. 10, 11, 25.
525  At para. 23.
526  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 49–55.
527  *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 266–301.
528  At paras. 309–330.

denied jurisdiction because the Claimant did not enjoy the rights granted by the Investment Law since its "investment" did not meet the condition of legality[529] (see paras. 201 *supra*, 396, 397, 415, 521, 534 *infra*).

### 4. Consent through Host State Legislation

**392**    The possibility that a host State might express its consent to the Centre's jurisdiction through a provision in its national legislation or through some other form of unilateral declaration was discussed repeatedly during the Convention's preparation. In response to several questions, Mr. *Broches* pointed out that unilateral acceptance of the Centre's jurisdiction constituted an offer that could be accepted by a foreign investor and so become binding on both parties (History, Vol. II, pp. 274/5). There was some concern that in view of a State's undisputed right to change its legislation this form of consent would be revocable at any time. Mr. *Broches* responded that this would depend upon the terms of the State's offer (at pp. 405/6). The investor's acceptance could be linked to the granting of an investment licence. But in the absence of a provision to this effect in the national legislation, it was arguable that until the investor had actually availed himself of the offer contained in the law, there would be no agreement to accept the Centre's jurisdiction (at pp. 410, 527). Also, in making a unilateral statement in an investment law, the host State could limit its undertaking to certain specified issues in connection with approved investments (at p. 506).

**393**    At one point, an Italian proposal was put forward to include a specific provision in the Convention to the effect that a State may make a declaration, contained in its legislation and officially notified to the Centre, whereby it submits to the Centre's jurisdiction (History, Vol. II, at p. 402). Mr. *Broches* was of the opinion that unilateral consent given through investment legislation was covered by the general provision on consent. This form of giving consent should not be singled out in order to avoid the impression that it would be the normal means of dealing with foreign investors (at pp. 405/6). Eventually, it was decided to explicitly mention in the comment to the Convention that a State may give its undertaking to have recourse to the Centre in legislation for the promotion of foreign investment (at p. 406). The Report of the Executive Directors to the Convention, after dealing with consent through a direct agreement between the parties (see para. 384 *supra*), says:

> 24. . . . Nor does the Convention require that the consent of both parties be expressed in a single instrument. Thus, a host State might in its investment promotion legislation offer to submit disputes arising out of certain classes of investments to the jurisdiction of the Centre, and the investor might give his consent by accepting the offer in writing.[530]

---

529   At paras. 258–264, 332.
530   1 ICSID Reports 28. The 1968 Model Clauses offer a formula for inclusion in national investment legislation and one for acceptance by the investor, 7 ILM 1163/4 (1968).

*Article 25 – Jurisdiction* 197

References to dispute settlement by the Centre in national investment legislation **394** show a considerable measure of diversity.[531] Not all references amount to consent to jurisdiction or an offer to the investor to accept ICSID's jurisdiction. Therefore, the respective provisions in national laws must be studied carefully. Even then, their meaning is not always entirely clear.[532]

### a) Binding Offer of Consent by the Host State

Some national investment laws provide unequivocally for dispute settlement **395** by ICSID. For instance, Art. 8(2) of the Albanian Law on Foreign Investment of 1993 states in part:

> . . . the foreign investor may submit the dispute for resolution and the Republic of Albania hereby consents to the submission thereof, to the International Centre for Settlement of Investment Disputes . . .[533]

The Tribunal in *Tradex* v. *Albania* found this formulation unambiguous.[534] But the limitation of the consent to matters relating to expropriation turned out to be decisive in that case (see paras. 524, 525, 538 *infra*).

In *Inceysa* v. *El Salvador* the Claimant relied, *inter alia*, on Article 15 of the El **396** Salvador Investment Law which provides in relevant part:

> In the case of controversies arising between foreign investors and the State regarding their investment in El Salvador, the investors may submit the controversy to:
> (a) . . . ICSID . . .
> (b) . . . the Additional Facility of ICSID; in those cases in which the foreign investor involved in the controversy is a national of a State that is not a contracting party to the ICSID Convention.[535]

The Tribunal concluded that this provision constituted a unilateral offer of **397** consent to submit to the jurisdiction of the Centre to hear disputes regarding investments arising between El Salvador and an investor. However, in the particular case the Claimant was not entitled to the rights granted in the Investment Law because its "investment" did not meet the condition of legality[536] (see paras. 201, 391 *supra*, 415, 521, 534 *infra*).

---

531  For a bibliography on national investment codes, see 7 ICSID Review – FILJ 512 (1992). See also *Parra*, Provisions on the Settlement, pp. 290, 314 *et seq.*

532  See also *Delaume*, How to Draft, pp. 172/3; *Delaume*, Transnational Contracts, Ch. XV, pp. 10–12.

533  See *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 47, 54. Similar provisions may be found in the legislation of Guinea, Article 28 of Ordinance No. 001/PRG/87 of 3 January 1987, which sets forth the Investment Code; Botswana, Sec. 11 of The Settlement of Investment Disputes (Convention) Act, 1970; Sri Lanka, Sec. 26(1) of the Greater Colombo Economic Commission Law, 1978; Togo, Art. 4 of Law No. 85–3 of 29 January 1985, which provides for readjustment of the Investment Code – see also News from ICSID, Vol. 3/2, p. 8 (1986); D.R. Congo, Art. 36 of the Investment Code, 2002. See also *Mitchell, P. H./Gittleman*, *R. M.*, The 1986 Zairian Investment Code: Analysis and Commentary, 2 ICSID Review – FILJ 122, 137 (1987).

534  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 63.

535  *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 331.

536  At para. 332.

**398**     A more common method to provide for settlement by the Centre is to include a reference to the Convention as one of several possible means of dispute settlement. The alternatives offered may include procedures expressly agreed to by the parties, procedures provided by bilateral investment treaties, the host State's domestic courts and non-ICSID arbitration. Some laws of this type specifically state that the State consents to ICSID's jurisdiction. Provisions to this effect may be found in the legislation of the Central African Republic[537] and of Côte d'Ivoire.[538]

**399**     Other provisions are not so clear, but it may still be inferred from them that they express the State's consent to ICSID's jurisdiction. Thus, national laws state that the foreign investor "shall be entitled to request" that the dispute be conclusively settled by one of several methods including the ICSID Convention,[539] or that the dispute "shall be settled" ("sera réglé") by one of these methods.[540]

**400**     A legislative provision of this kind was at the centre of the discussion on jurisdiction in *SPP* v. *Egypt*.[541] The Request for Arbitration was based on Art. 8 of Egypt's Law No. 43 of 1974 Concerning the Investment of Arab and Foreign Funds and the Free Zone. Art. 8 provided in relevant part:

> Investment disputes in respect of the implementation of the provisions of this Law shall be settled in a manner to be agreed upon with the investor, or within the framework of the agreements in force between the Arab Republic of Egypt and the investor's home country, or within the framework of the Convention for the Settlement of Investment Disputes between the State and the nationals of other countries to which Egypt has adhered by virtue of Law No. 90 of 1971, where such Convention applies.[542]

**401**     Egypt, while admitting the theoretical possibility of advance consent through investment legislation, denied that it had done so in the particular piece of legislation.[543] Specifically, Egypt claimed that the clause referring to ICSID was not self-executing and required a separate implementing agreement with the investor. Also, the law offered several alternative methods of dispute settlement among which the parties had to choose in advance. Moreover, the Convention itself offers conciliation or arbitration as two possible alternatives (see paras. 26, 27 *supra*). Therefore, in Egypt's view, Law No. 43 was too ambiguous and equivocal to establish consent to ICSID arbitration.[544] Rather, it was intended only to

---

537    Art. 30 of the Investment Code, 1988. See also 4 ICSID Review – FILJ 167 (1989).

538    Art. 24 of the Investment Code, 1995.

539    Art. 45(1) of the Cameroon Investment Code, 1990.

540    Somalia, Art. 19 of the Foreign Investment Law, 1987; Tunisia, Art. 28 of the Law on the Encouragement of Investment in Tourism, 1986; Tunisia, Art. 41 of the Code of Industrial Investment, 1987; Chad, Art. 17(4) of the Décret No. 446/PR/MCI/87 fixant la procédure d'octroi des avantages du Code des Investissements, 1987; Georgia, Art. 16 of the Law on Promotion and Guarantees of Investment Activity, 1996; Kyrgyz Republic, Art. 18(2) of the Law on Investments, 2003; Benin, Art. 74 of the Code of Investments, 1990; Yemen, Art. 61 of the Investment Law, 2002; Burkina Faso, Art. 30 of the Investment Code, 1995.

541    *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985.

542    At para. 70. See also 16 ILM 1476, 1479. The provision continues by providing that disputes may also be settled by *ad hoc* arbitration under Egyptian law. Law No. 43 of 1974 has since been replaced. See para. 410 *infra*.

543    At paras. 51, 52.                    544    At paras. 70–73.

inform potential investors that ICSID arbitration was one of a variety of dispute settlement methods that investors may seek to negotiate with Egyptian authorities in appropriate circumstances.[545]

The Tribunal embarked upon a detailed grammatical analysis of the relevant text, including the Arabic original. This led it to conclude that the Arabic text mandated the submission of disputes to the various methods prescribed therein to the extent that such methods were applicable.[546] With respect to the question of priority among the various methods of dispute settlement, the Tribunal agreed with the Claimants' contention that there was a hierarchical relationship indicated by a movement from the more specific to the more general. Settlement under a bilateral investment treaty would be available only in the absence of an agreement between the parties, the most specific method. Settlement under the Convention, the most general method, would be available only in the absence of both other methods.[547]    **402**

The Tribunal also rejected Egypt's contention that the words "within the framework of the Convention" and "where such Convention applies" reserve the condition of a specific consent. If a special agreement was required, ICSID arbitration would be subsumed under the primary method of settlement listed there, namely "in a manner to be agreed upon with the investor". The Tribunal also rejected the idea that Art. 8 had the consequence only of informing potential investors of Egypt's willingness, in principle, to negotiate a consent agreement. There was nothing in the legislation requiring a further *ad hoc* manifestation of consent to the Centre's jurisdiction.[548] Similarly, the Tribunal was unconvinced by the argument that a State's entry into a bilateral investment treaty containing an ICSID clause implied that the ICSID remedy was not already available under domestic legislation.[549] The mandatory nature of the legislative provision was further confirmed by Egypt's official investment promotion literature.[550]    **403**

The Tribunal's conclusion was as follows:    **404**

> 116. On the basis of the foregoing considerations, the Tribunal finds that Article 8 of Law No. 43 establishes a mandatory and hierarchic sequence of dispute settlement procedures, and constitutes an express "consent in writing" to the Centre's jurisdiction within the meaning of Article 25(1) of the Washington Convention in those cases where there is no other agreed-upon method of dispute settlement and no applicable bilateral treaty.[551]

Since the parties had not agreed on another method of dispute resolution and since there was no applicable bilateral treaty in force, the Tribunal found "that Article 8 of Law No. 43 operates to confer jurisdiction upon the Centre with respect to the Parties' dispute".[552]

---

545   Decision on Jurisdiction II, 14 April 1988, paras. 53, 73.
546   At paras. 74–82. See also the Dissenting Opinion at paras. 22–26.
547   At paras. 83–88.
548   At paras. 89–101. See also the Dissenting Opinion at para. 21.
549   At para. 110.
550   At paras. 112–115. See also the Dissenting Opinion at para. 29.
551   At para. 116.                    552   At para. 117.

**405**     In a subsequent case, *Manufacturers Hanover Trust* v. *Egypt*,[553] jurisdiction was also based on Egypt's Law No. 43 of 1974. Although there is no published decision, it is known that the case had progressed beyond a jurisdictional decision before it was settled. It may be concluded that this Tribunal also found that Law No. 43 amounted to Egypt's consent to ICSID's jurisdiction.[554]

**406**     In *Zhinvali* v. *Georgia*, the Claimant relied on Article 16(2) of the Georgia Investment Law of 1996 which provides:

> 2. Disputes between a foreign investor and [a] governmental body, if the order of its resolution is not agreed between them, shall be settled at the court of Georgia or at . . . [ICSID]. Should [the] dispute not be considered in the . . . [ICSID] the foreign investor is entitled to refer a dispute to the . . . [Additional Facility] or to any international arbitration established in accordance with regulations provided by . . . UNCITRAL.[555]

**407**     The Respondent denied the existence of an expression of consent under this provision and relied on an earlier statute, the Concession Law of 1994, which refers disputes to domestic courts.[556]

**408**     The Tribunal accepted the Claimant's position that "the election between recourse to the Georgia courts or to an ICSID tribunal is solely for the Claimant to make".[557] The Tribunal concluded that the Investment Law, being later in time, took precedence over the Concession Law. Therefore, the reference to ICSID in Article 16(2) of the Investment Law constituted consent in writing by Georgia to the jurisdiction of ICSID.[558]

**409**     A number of legislative provisions providing for consent to ICSID's jurisdiction contain a separate clause referring to the Additional Facility (see paras. 9–13, 202–210, 224–226, 301 *supra*).[559] In all these legislative provisions, the Additional Facility is foreseen only if the investor does not meet the nationality requirements of Art. 25 of the Convention. Therefore, these provisions are designed to open access to the Centre for foreign investors whose home States are not yet Contracting States to the Convention (see paras. 10, 11, 300, 301 *supra*).

### b) Prospect of Future Consent

**410**     Another type of legislative provision referring to the settlement of disputes by ICSID makes it clear that further action on the part of the host State is necessary to establish consent. For instance, the Egyptian Investment Law of 1989[560] provided

---

553   Case No. ARB/89/1.

554   *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 270/1 (1993).

555   *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 337.

556   At para. 329.                         557   At para. 335.

558   At para. 342.

559   See Article 16(2) of the Georgia Investment Law of 1996 quoted in *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 337; Article 15 of the El Salvador Investment Law quoted in *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 331. References to the Additional Facility may also be found in the legislation of Cameroon, the Central African Republic, Côte d'Ivoire, Guinea and Madagascar. See also *Shihata/Parra*, The Experience, p. 346.

560   The Law was replaced in 1997 by the Law on Investment Guarantees and Incentives.

in Art. 55, after a reference to the role of domestic courts in the settlement of disputes under that law:

> The parties concerned may also agree to settle such disputes within the framework of the agreements in force between the Arab Republic of Egypt and the investor's home country or within the framework of the [ICSID] Convention ..., subject to the terms and conditions, and in the instances where such agreements do apply.[561]

Similar clauses, providing for further agreement between the host State and the foreign investor, may be found in the investment legislation of Madagascar,[562] Malawi,[563] Mozambique,[564] Mauritania,[565] Tanzania[566] and Comoros.[567]

The legislation of some countries provides for the determination of one of sev-   **411** eral methods of dispute settlement by way of an investment licence. For instance, Art. 30 of the Uganda Investment Code, 1991, provides:

> (2) A dispute between a foreign investor and the Authority or the Government in respect of a licensed business enterprise which is not settled through negotiations may be submitted to arbitration in accordance with the following methods as may be mutually agreed by the parties
> > (a) in accordance with the rules of procedure for arbitration of the International Centre for the Settlement of Investment Disputes, or
> > (b) within the framework of any bilateral or multilateral agreement on investment protection to which the Government and the country of which the investor is a national are parties; or
> > (c) in accordance with any other international machinery for the settlement of investment disputes.
> (3) The licence in respect of an enterprise may specify the particular mode of arbitration to be resorted to in the case of a dispute relating to that enterprise and that specification shall constitute the consent of the Government, the Authority or their respective agents and the investor to submit to that mode and forum of arbitration.

A similar clause may be found in the investment legislation of Niger.[568]

In these types of clauses referring to ICSID, the legislative provisions as such   **412** do not amount to consent to ICSID's jurisdiction. They do not constitute an offer by the host State that may be accepted by the investor through a unilateral act. Rather, they require a specific agreement between the host State and the investor contained in an investment agreement, an investment licence or another document. Such an agreement may be withheld at the host State's discretion.[568a]

---

561   See also *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231, 257/8 (1993); *Marchais, B. P.*, The New Investment Law of the Arab Republic of Egypt, 4 ICSID Review – FILJ 305/6 (1989).

562   Art. 33 of the Investment Code, 1989, 5 ICSID Review – FILJ 151 (1990).

563   Sched. 18 of the Investment Promotion Act 1991.

564   Art. 25 of the Law of Investment, 1993.

565   Art. 7.2 of the Investment Code, 2002.       566   Art. 23(2) of the Investment Act 1997.

567   Art. 23 of the Investment Code, 1990.         568   Art. 6 of the Investment Code, 1989.

568a  See *Biwater Gauff* v. *Tanzania*, Award, 24 July 2008, paras. 326–337.

**413**      Yet another group of legislative provisions making reference to ICSID does not deal with consent. For instance, Moroccan legislation provides that the ICSID Convention is applicable to disputes between the investor and the Administration under the conditions and in the cases defined in the Convention.[569] Other laws address the question of recognition and enforcement of ICSID awards.[570]

**414**      In *Amco* v. *Indonesia*, the consent to ICSID's jurisdiction was contained in an agreement between the parties (see para. 389 *supra*). Before the Tribunal, Amco additionally relied on Indonesia's foreign investment law and on investment promotion literature as containing Indonesia's written consent to ICSID arbitration.[571] The Tribunal noted that the Act of 1967 in question merely referred to arbitration in general terms without any mention of ICSID. Moreover, the law had been enacted before the Convention had entered into force for Indonesia. Therefore, there was no commitment under the Act to submit investment disputes to ICSID arbitration. As to the investment promotion literature, it could not contain a direct commitment but could be taken into account in the interpretation of the investment agreement.[572]

**415**      In *Inceysa* v. *El Salvador*, the Claimant relied on several pieces of legislation as a basis for ICSID's jurisdiction. The Tribunal examined the statutory provisions cited by the Claimant in some detail and found that some of these, while referring to arbitration, contained no express reference to ICSID. Consequently, they could not meet the requirement of consent under Article 25 of the Convention.[573] On the other hand, El Salvador's Investment Law provided for ICSID's jurisdiction[574] (see paras. 201, 391, 396, 397 *supra* and 521, 534 *infra*).

### c) Acceptance by the Investor

**416**      While a host State may express its consent to ICSID's jurisdiction through legislation, the investor must perform some reciprocal act to perfect consent. Even where consent is based on the host State's legislation, it can only come into existence through an agreement between the parties. The provision in the host State's legislation can amount to no more than an offer that may be accepted by the investor.[575] The Convention requires consent in writing (see paras. 379–381 *supra*). This would indicate a minimum of formality in accepting the host State's offer.[576]

---

569  Law on Industrial Investments, 1983, Art. 39; Law on Maritime Investments, 1982, Art. 29; Law on Mining Investments, 1984, Art. 35.
570  Singapore Arbitration (International Investment Disputes) Act, 1968.
571  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, paras. 5, 17.
572  At paras. 21–22.
573  *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 309–330.
574  At para. 331.
575  *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 269 (1966); *Delaume*, How to Draft, p. 172.
576  *Amerasinghe*, Submissions to the Jurisdiction, p. 217; *Amerasinghe, C. F.*, The International Centre for Settlement of Investment Disputes and Development through the Multinational

*Article 25 – Jurisdiction* 203

Consent must be perfected at the time of the institution of proceedings (see paras. 479–480 *infra*). The investor may accept the host State's offer by submitting a request for conciliation or arbitration to the Centre[577] (see para. 469 *infra*). This is illustrated by *Tradex* v. *Albania*. The Albanian Law of 1993 contained an offer of consent by the host State (see para. 395 *supra*). The Tribunal said: **417**

> . . . it can now be considered as established and not requiring further reasoning that such consent can also be effected unilaterally by a Contracting State in its national laws, the consent becoming effective at the latest if and when the foreign investor files its claim with ICSID making use of the respective national law.[578]

Similarly, the Tribunal in *Zhinvali* v. *Georgia* found that the host State's offer of consent, contained in its Investment Law, was later accepted in writing by the Claimant when it filed its Request for Arbitration.[579] **418**

While it is possible to perfect consent through the institution of proceedings, it may not be wise for the investor to rely on the host State's offer contained in its legislation without accepting it at an early stage. Consent will be perfected only upon the acceptance of the offer. Also, the time of consent triggers a number of legal consequences under the Convention (see paras. 475–478 *infra*), the most important of which is that consent becomes irrevocable (see paras. 596–634 *infra*). Therefore, once the investor has accepted consent based on legislation, the agreement on consent will stay in effect even if the legislation is repealed (see para. 618 *infra*). **419**

The investor may express its acceptance in a variety of ways other than instituting proceedings. These include a simple written communication to the host State to the effect that consent to ICSID's jurisdiction in accordance with the legislation is accepted, a statement contained in an application for an investment licence or a mere application if under the law in question the successful applicant automatically gets specified benefits including access to ICSID.[580] The investor's acceptance of consent can be given only to the extent of the offer made in the legislation (see paras. 518–539 *infra*). But it is entirely possible for the investor's acceptance to be narrower than the offer and to extend only to certain matters or only to a particular investment operation.[581] **420**

In *SPP* v. *Egypt* (see paras. 400–404 *supra*), the Claimants had sent a letter to Egypt's Minister of Tourism on 15 August 1983, about one year before the institution of arbitration, which said in relevant part: **421**

> . . . we hereby notify you that we accept and reserve the opportunity of availing ourselves of the uncontestable jurisdiction of the International Centre for the

---

Corporation, 9 Vanderbilt Journal of Transnational Law 793, 810 (1976); *Amerasinghe*, The Jurisdiction of the International Centre, p. 224; *Szasz*, The Investment Disputes Convention, p. 27.

577  *Broches*, Convention, Explanatory Notes and Survey, p. 643; *Amerasinghe*, Submissions to the Jurisdiction, p. 217.
578  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 63.
579  *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 342.
580  See also News from ICSID, Vol. 3/2, p. 8 (1986).
581  *Amerasinghe*, The Jurisdiction of the International Centre, pp. 224/5; *Szasz*, The Investment Disputes Convention, p. 29.

> Settlement of Investment Disputes, under the auspices of the World Bank, which is open to us as a result of Law No. 43 of 1974, Article 8 of which provides that investment disputes may be settled by ICSID arbitration.[582]

Before the Tribunal, the Claimants contended successfully that their own consent was expressed in the letter and again by the act of filing their request for arbitration with the Centre.[583]

**422**    The host State's legislation containing the offer of consent may prescribe certain conditions, time limits or formalities for the acceptance by the investor. In a number of investment laws, the investor's consent is linked to the process of obtaining an investment authorization. The choice of one of several methods for dispute settlement offered by the legislation (see para. 398 *supra*) may have to be stated expressly in the application for the investment authorization. Provisions of this kind may be found in the respective legislation of Côte d'Ivoire,[584] Cameroon[585] and the Central African Republic.[586] They require an express choice of method by the investor. This would indicate that the mere submission of an application for an investment licence without any reference to the ICSID Convention would not suffice. In order to perfect consent to ICSID's jurisdiction, the investor must explicitly select the Centre.

**423**    Consent to jurisdiction may be contained in an investment licence also where the legislation does not already amount to the host State's consent to jurisdiction (see para. 411 *supra*). The licence, which is issued upon the investor's application, may specify that ICSID is the chosen method of dispute settlement. This specification may constitute the consent of the government as well as of the investor.[587]

**424**    Some investment laws require written consent by the investor independently of an investment authorization procedure. Thus, section 11 of the Botswana Settlement of Investment Disputes (Convention) Act, 1970, provides:

> *Submission to Jurisdiction of Centre*
>
> 11. Any national of any other State which is a party to the Convention may submit to the Centre for settlement by conciliation or arbitration in pursuance of the Convention, any legal dispute with Botswana arising directly out of an investment by such foreign national in Botswana, provided that such foreign national has within one year after the commencement of this Act or within one year after the making of the investment, whichever is the later, filed with the Minister a consent in writing to the like submission to the Centre by Botswana of any such legal dispute.

**425**    An example for a provision allowing the investor's consent, either in connection with an authorization or independently of it, is offered by Art. 45(3) of the Cameroon Investment Code, 1990. After listing several possible methods of

---

582    *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 40.
583    At para. 48.                        584    Art. 24 of the Investment Code, 1995.
585    Art. 45(1) of the Investment Code, 1990.        586    Art. 30 of the Investment Code, 1988.
587    See sec. 30(3) of the Uganda Investment Code, 1991.

settlement, including ICSID and the Additional Facility (see paras. 398, 399 *supra*), it provides:

> (3) The choice of one of the above procedures must be expressly stated, either at the time of the legal formation of the enterprise or in the application for the approval of the enterprise concerned. In the latter case, the arbitration or conciliation procedure shall be mentioned in the approval document.

In the absence of formal requirements in the host State's legislation for the **426** investor's consent, a maximum of flexibility should be allowed. Any indication of acceptance on the part of the investor should be permissible. This may be accomplished by any written instrument by which the investor signifies its submission to the legal framework provided in the host State's legislation, including settlement under the Convention. Nevertheless, it is advisable to make an acceptance as clear as possible. Implicit acceptance, while not impossible, is liable to lead to jurisdictional disputes, to uncertainties concerning the exact date of consent (see para. 417 *supra*) and to difficulties once the host State changes its legislation.

### 5. Consent through Bilateral Investment Treaties

There is little reference to bilateral investment treaties (BITs) in the *travaux* **427** *préparatoires* to the Convention (History, Vol. II, p. 400). This is hardly surprising considering that at the time of the Convention's drafting BITs had only just started to appear in State practice. The Report of the Executive Directors to the Convention does not mention the possibility of consent being expressed by way of treaties. But it does refer to the possibility of a unilateral offer of consent by the host State through its legislation and the acceptance of that offer by the investor (see para. 393 *supra*). The same principle is applied to treaties to which the host State is a party. While the treaty on its own cannot amount to consent to the Centre's jurisdiction by the parties to the dispute, it may constitute the host State's offer to do so. This offer may then be taken up by a national of the other State party to the treaty.

Consent through BITs has become accepted practice. In 1969, the Centre published a set of "Model Clauses Designed for Use in Bilateral Investment Agreements",[588] but it does not seem that these have been used widely. Rather, ICSID clauses in BITs have evolved in a haphazard way and display a large variety of form and substance.[589] Many States, including some developing countries, have developed their own national practice in this regard, usually through the use of

---

588   8 ILM 1341 (1969).
589   For broad overviews see *Broches, A.*, Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration, Liber Amicorum Pieter Sanders (*Schultz, J./van den Berg, A.* eds.) 63 (1982); *Burdeau, G.*, Nouvelles perspectives pour l'arbitrage dans le contentieux économique intéressant les états, Revue de l'arbitrage 11–16 (1995); *Delaume*, Le Centre International, p. 783; *Delaume, G. R.*, ICSID and Bilateral Investment Treaties, News from ICSID, Vol. 2/1, pp. 13/4 (1985); *Delaume*, Transnational Contracts, Ch. XV, pp. 12–14; *Laviec*, Protection et promotion, pp. 278/9; *Parra*, Provisions on the Settlement, pp. 290/1, 322 *et seq.*; *Peters*, Dispute Settlement Arrangements, pp. 121 *et seq.*, 141; *United Nations Centre on Transnational Corporations*, Bilateral Investment Treaties 96 *et seq.* (1988).

model BITs.[590] Over the years, ICSID clauses have been incorporated into many hundreds of BITs. Today, they can be found in the overwhelming majority of new BITs.

**429**    It is clear that a BIT, in order to provide a basis for ICSID jurisdiction, must be in force at the relevant time. In *Tradex* v. *Albania*, the Tribunal found that the Request for Arbitration had been submitted before the entry into force of the BIT between Albania and Greece. Therefore, it was not possible to establish jurisdiction on the basis of that treaty.[591] In *CSOB* v. *Slovakia*, the Tribunal, while confirming the principle of consent to ICSID jurisdiction by way of a BIT, found that the BIT between the Czech and Slovak Republics had not entered into force.[592] A notice of the Ministry of Foreign Affairs in the Official Gazette of the Slovak Republic that the BIT had entered into force was not accepted by the Tribunal as an independent basis for jurisdiction. The notice neither reflected an intention of the State to become bound nor had it led to an estoppel[593] (see also paras. 390 *supra*, 619 *infra*).

**430**    Not every reference to the Convention in a BIT constitutes an offer of consent by the host State. While some clauses amount to an unequivocal commitment, others contain promises of future consent or hold out a general prospect of sympathetic consideration. Still others simply state that consent may be given by way of agreements with the investor.[594]

### a) Binding Offer of Consent by the Host State

**431**    The majority of ICSID clauses in modern BITs express consent on the part of the two Contracting States to submit to ICSID's jurisdiction, for the benefit of

---

590    The most comprehensive study is *Dolzer/Stevens*, Bilateral Investment Treaties (1995). For detailed descriptions of the practice of individual countries see for Switzerland *Dominicé, Ch.*, La clause CIRDI dans les traités bilatéraux suisses de protection des investissements, *in*: Im Dienst an der Gemeinschaft, Festschrift für Dietrich Schindler zum 65. Geburtstag 457 (1989) and *Kraft, M.-C.*, Les accords bilatéraux sur la protection des investissements conclus par la Suisse, *in*: Foreign Investment in the Present and a New Economic Order (*Dicke, D.* ed.) 83 (1987). For the United States see *Gann, P. B.*, The U.S. Bilateral Investment Treaty Program, 21 Stanford Journal of International Law 373, 415 *et seq.* (1985); *Gudgeon, K. S.*, Arbitration Provisions of U.S. Bilateral Investment Treaties, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S. J./Nelson, R. W.* eds.) 41 (1985); *Vandevelde, K. J.*, The Bilateral Investment Treaty Program of the United States, 21 Cornell International Law Journal 201, 256 *et seq.* (1988); *Vandevelde, K. J.*, U.S. Bilateral Investment Treaties – The Second Wave, 14 Michigan Journal of International Law 621, 655 *et seq.* (1993); *Schwebel*, The Reshaping of the International Law of Foreign Investment by Concordant Bilateral Investment Treaties, *in*: Law in the Service of Human Dignity, Essays in Honour of Florentino Feliciano (*Charnovitz, S./Steger, D.P./van den Bossche, P.*, eds.) 241 (2005); *Schwebel, S. M.*, The United States 2004 Model Bilateral Investment Treaty: An Exercise in the Regressive Development of International Law, 3 TDM No. 2 (2006).

591    *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 58.

592    *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 37–43.

593    At paras. 44–47.

594    For a survey of clauses in BITs referring to investor-State arbitration see Bilateral Investment Treaties 1995–2006: Trends in Investment Rulemaking (*UNCTAD* ed.) 100–126 (2007).

nationals of the other State party to the treaty.[595] The treaty between the United Kingdom and Sri Lanka of 1980 offers an example of a simple ICSID clause in Art. 8:

> (1) Each Contracting Party hereby consents to submit to the International Centre for the Settlement of Investment Disputes (herein referred to as "the Centre") for settlement by conciliation or arbitration under the Convention . . . any legal disputes arising between that Contracting Party and a national or company of the other Contracting Party concerning an investment of the latter in the territory of the former.[596]

This clause was the basis for the Centre's jurisdiction in the first case brought under a BIT, *AAPL* v. *Sri Lanka*.[597] Similar clauses in BITs have formed the basis for jurisdiction in a large number of other cases.[598] In all these cases the Claimants' reliance on the ICSID clauses in the BITs as a basis for the Centre's jurisdiction was not questioned.   **432**

Many BITs contain similar clauses. The Model Agreements of China of 2003, of France of 2006, of Germany of 2005, of the United Kingdom of 2005 and of the United States of 2004 all provide for definite consent to ICSID's jurisdiction by the host State.[599]   **433**

Some BITs do not specifically mention consent. But formulations to the effect that a dispute "shall be submitted" to the Centre or that the parties have the right to initiate proceedings leave no doubt as to the binding character of these clauses. For instance, the German Model Agreement in its Art. 11 (Model I) provides:   **434**

---

595   See *Broches, A.*, Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration, Liber Amicorum Pieter Sanders (*Schultz, J./van den Berg, A.* eds.) 63, 66 (1982); *Delaume, G. R.*, ICSID and Bilateral Investment Treaties, News from ICSID, Vol. 2/1, pp. 12, 13 (1985); *Peters*, Dispute Settlement Arrangements, pp. 121 *et seq.*

596   19 ILM 886, 888 (1980).

597   *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 2. See also *Amerasinghe, C. F.*, The Prawn Farm (AAPL) Arbitration, 4 Sri Lanka Journal of International Law 155 (June 1992); *Rambaud, P.*, Des obligations de l'Etat vis-à-vis de l'investisseur étranger (Sentence AAPL c. Sri Lanka), 38 Annuaire Français de Droit International 501 (1992); *Ziadé, N. G.*, Some Recent Decisions in ICSID Cases, 6 ICSID Review – FILJ 514 (1991).

598   *AMT* v. *Zaire*, Award, 21 February 1997, para. 5.19; *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 30; *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, paras. 28–30, 44; *Wena Hotels* v. *Egypt*, Decision on Jurisdiction, 29 June 1999, 6 ICSID Reports 87; *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, para. 19; *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 26, 27; *Gruslin* v. *Malaysia*, Award, 27 November 2000, para. 2.3; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, para. 27; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 12.4–12.5; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, para. 56; *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, paras. 25, 26; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 34; *Tokios Tokelès* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 94; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, para. 73; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 66; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 109; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 36; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 35.

599   These Model Agreements are reproduced in *Dolzer, R./Schreuer, C.*, Principles of International Investment Law 352 *et seq.* (2008).

(2) If the divergency cannot be settled within six months of the date when it has been raised by one of the parties in dispute, it shall, at the request of the investor of the other Contracting State, be submitted for arbitration. Unless the parties in dispute agree otherwise, the divergency shall be submitted for arbitration under the Convention of 18 March 1965 on the Settlement of Investment Disputes between States and Nationals of Other States.

**435**    In *CSOB* v. *Slovakia*, the Respondent contended that the dispute settlement clause in the BIT (see paras. 390, 429 *supra*), which stated that the investor and the host State had the right to submit disputes to ICSID, meant that any submission had to be made jointly by both parties. The Tribunal rejected this interpretation. It pointed out that a holding that the parties must submit their dispute jointly would mean that the ICSID clause in the BIT was subject to an agreement by the parties after the dispute had arisen. The fact that some BITs contained provisions for joint submission of disputes to arbitration did not compel the conclusion that provisions whose wording is at best ambiguous should be interpreted in this way. Moreover, the Tribunal noted that the BIT offered a choice between ICSID and UNCITRAL arbitration and that any dispute was to be resolved by the method that was chosen first. The Tribunal concluded that this provision made sense only on the assumption that each party to a dispute had the right to institute the arbitration proceedings separately.[600]

### b) Prospect of Future Consent

**436**    Other clauses in BITs referring to ICSID's jurisdiction amount to an undertaking by the host State to give consent in the future. This may be achieved by providing that a future investment agreement between the host State and the investor shall, upon the investor's request, include a provision for the submission of disputes to ICSID.[601] More simply, the BIT may contain an undertaking to assent to any demand by the investor to submit to dispute settlement by the Centre. For instance, the Netherlands-Pakistan BIT of 1988 provides in its Art. 10:

The Contracting Party in the territory of which a national of the other Contracting Party makes or intends to make an investment, shall assent to any demand on the part of such national to submit, for arbitration or conciliation, to the Centre . . . , any dispute that may arise in connection with the investment.[602]

**437**    Clauses of this kind do not give the investor an immediate right of access to the Centre. If the host State refuses to give its consent, it would be in breach of its obligation under the BIT. But the Secretary-General of ICSID will in all likelihood reject a request for conciliation or arbitration under these circumstances in accordance with his or her screening powers under Arts. 28(3) or 36(3). A request

---

600    *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 56–58.
601    See France-Malaysia BIT (1975) Art. 5.
602    See also Japan-Egypt BIT (1977) Art. 11; UK-Philippines BIT (1980) Art. X; Australia-Czech Republic BIT (1993) Art. 11; Japan-Pakistan BIT (1998) Art. 10. For further examples see *Dolzer/Stevens*, Bilateral Investment Treaties, p. 133; *Broches, A.*, Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration, Liber Amicorum Pieter Sanders (*Schultz, J./van den Berg, A.* eds.) 63, 65/6 (1982).

must contain information concerning the consent of the parties to conciliation or arbitration (Arts. 28(2) and 36(2)). It is unlikely that a promise to give consent will be accepted as amounting to consent. Therefore, any remedy must, in the first place, lie with the treaty partner to the BIT. The investor's home State can demand that the host State give its consent and, if necessary, resort to such procedures as are available between the States parties to the BIT.[603]

An even weaker reference to ICSID is contained in some BITs that provide **438** for the host State's sympathetic consideration of a request for ICSID dispute settlement. For instance, the Netherlands-Kenya BIT of 1970 provides in Art. 11:

> The Contracting Party in the territory of which a national of the other Contracting Party makes or intends to make an investment, shall give sympathetic consideration to a request on the part of such national to submit for conciliation or arbitration, to the Centre established by the Convention of Washington of 18 March 1965, any dispute that may arise in connection with the investment.

It is obvious that a clause of this kind does not amount to consent by the host State. The most that can be read into it is that consent may not be withheld arbitrarily and that the States parties to the BIT must consider ICSID in good faith.

Some BITs contemplate a future agreement between the host State and the **439** investor containing consent to ICSID's jurisdiction. An example is Art. 6 of the Sweden-Malaysia BIT of 1979:

> In the event of a dispute arising between a national or a company of one Contracting Party and the other Contracting Party in connection with an investment on the territory of that other Contracting Party, it shall upon the agreement by both parties to the dispute be submitted for arbitration to the International Centre for Settlement of Investment Disputes . . .[604]

Some BITs refer to ICSID but state specifically that the reference does not **440** constitute the consent required by Art. 25(1) of the Convention. Art. 12 of the BIT between Argentina and New Zealand states in relevant part:

> (3) In the case of international arbitration, unless the parties to the dispute agree otherwise, the dispute shall be submitted to either:
> > (a) The International Centre for the Settlement of Investment Disputes (ICSID) . . . ; or,
> > (b) If both parties to the dispute agree, arbitration under the [UNCITRAL] Arbitration Rules . . . as then in force.
> (4) Paragraph (3) of this Article shall not constitute, by itself, the consent of the Contracting Party required in Article 25(1) of the [ICSID] Convention. . . .

### c) Consent to Different Forms of Arbitration

The dispute settlement clauses in many BITs refer to ICSID as one of several **441** possibilities. The alternatives contemplated may include the domestic courts of the host State, procedures agreed to by the parties to the dispute, ICC arbitration, the Arbitration Institute of the Chamber of Commerce of Stockholm, arbitration

---

603  *Broches*, *loc. cit.*
604  See also Sweden-Egypt BIT (1978) Art. 6; Sri Lanka-Switzerland BIT (1981) Art. 9.

under the UNCITRAL rules, and other forms of *ad hoc* arbitration.[605] While some of these composite settlement clauses contemplate a subsequent agreement of the parties to select one of these procedures (see para. 446 *infra*), others contain the State's advance consent to all of them, thereby leaving the choice with the party instituting the proceedings.

**442**    An example for this technique may be found in some Swiss BITs.[606] For instance, the Lebanon-Switzerland BIT of 2000 provides in its Art. 7:

> 2. If these consultations do not result in a solution within six months from the date of the written request for consultations, the investor may submit the dispute, at his choice, for settlement to:
>> (a) the competent court of the Contracting Party in the territory of which the investment has been made; or
>> (b) the International Center for Settlement of Investment Disputes (ICSID) . . . , once both Contracting Parties have become members of this Convention; or
>> (c) an ad hoc arbitral tribunal which, unless otherwise agreed upon by the parties to the dispute, shall be established under the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

**443**    As the above example demonstrates, some BITs offering several methods of settlement specify that the choice among them is with the investor.[607] These clauses should be distinguished from contingent submissions where one of the parties to the BIT is not yet a Contracting State to the ICSID Convention. In these cases, the Additional Facility and non-ICSID procedures are envisaged for cases that might arise before both the host State and the investor's State of nationality have become Contracting States[608] (see paras. 221, 222, 226, 229, 299–302 *supra*).

**444**    A comprehensive menu of dispute settlement procedures is typically offered in BITs concluded by the United States.[609] Art. 24 of the Model Agreement of 2004 provides in relevant part:

> 3. Provided that six months have elapsed since the events giving rise to the claim, a claimant may submit a claim referred to in paragraph 1:
>> (a) under the ICSID Convention and the ICSID Rules of Procedure for Arbitration Proceedings, provided that both the respondent and the non-disputing Party are parties to the ICSID Convention;
>> (b) under the ICSID Additional Facility Rules, provided that either the respondent or the non-disputing Party is a party to the ICSID Convention;

---

605  See *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 147 *et seq.*; *Parra*, Provisions on the Settlement, pp. 325 *et seq.*; *Peters*, Dispute Settlement Arrangements, pp. 122 *et seq.*
606  See also *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 34.
607  See Switzerland-Paraguay BIT (1992) Art. 9; Lithuania-Poland BIT (1992) Art. 7. See also *Peters*, Dispute Settlement Arrangements, pp. 122 *et seq.*
608  See Art. VI of the Ukraine-US BIT (1994) and *Lemire* v. *Ukraine* (AF), Award, 18 September 2000, para. 4. See also *Shihata/Parra*, The Experience, pp. 347, 351/2.
609  See *e.g.* Argentina-US BIT (1991) Art. VII(3). On the choice under the latter provision see *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, para. 73.

    (c) under the UNCITRAL Arbitration Rules; or

    (d) if the claimant and respondent agree, to any other arbitration institution or under any other arbitration rules.

Art. 25 of the US Model BIT adds that each Party to the treaty consents to arbitration and that this consent and the submission of a claim to arbitration will satisfy the requirements for consent of the Convention and of the Additional Facility.

Under this provision the alternative between ICSID and Additional Facility **445** depends not on the claimant's choice but on whether the treaty partner of the United States is a Party to the Convention. But the possibility of UNCITRAL arbitration is open not only if ICSID is not available but also if the investor, for whatever reason, prefers a dispute settlement method other than ICSID.[610]

Some BITs of the United Kingdom provide for a choice by agreement of the **446** parties to the dispute among several methods of dispute settlement. Thus, the parties may agree to ICSID, ICC or UNCITRAL arbitration. If no agreement can be reached on one of these procedures, UNCITRAL arbitration shall be used.[611] The UK Model BIT of 2005 provides to this effect in Art. 8 (second alternative):

> (2) Where the dispute is referred to international arbitration, the national or company and the Contracting Party concerned in the dispute may agree to refer the dispute either to:
>
>     (a) the International Centre for the Settlement of Investment Disputes (having regard to the provisions, where applicable, of the Convention . . . and the Additional Facility . . .); or
>
>     (b) the Court of Arbitration of the International Chamber of Commerce; or
>
>     (c) an international arbitrator or ad hoc arbitration tribunal to be appointed by a special agreement or established under the Arbitration Rules of . . . [UNCITRAL].

If after a period of three months from written notification of the claim there is no agreement to one of the above alternative procedures, the dispute shall at the request in writing of the national or company concerned be submitted to arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law as then in force. The parties to the dispute may agree in writing to modify these Rules.

## d) Acceptance by the Investor

The Convention requires consent in writing by both parties to the dispute. Just **447** as in the case of legislative provisions for the settlement of disputes by ICSID, a provision on consent in a BIT can be no more than an offer that needs to be accepted in order to amount to a consent agreement. The treaty provision cannot

---

610  See also *Vandevelde, K. J.*, U.S. Bilateral Investment Treaties – The Second Wave, 14 Michigan Journal of International Law 621, 655–659, 664–667, 684/5, 691/2 (1993).

611  See UK-Santa Lucia BIT (1983) Art. 8.

replace the need for consent by the foreign investor.[612] The observations made in the context of national legislation concerning the timing, form and scope of an acceptance by the investor (paras. 416–420 *supra*) apply equally to BITs. An additional requirement is that the BIT must be between the host State and the State of the investor's nationality.

**448**    An investor may accept an offer of consent contained in a BIT simply by instituting ICSID proceedings. Tribunals have accepted this form of expressing consent in numerous cases. Most investment arbitration cases in recent years are based on consent established in this way. Some tribunals have simply applied this principle without discussing its rationale.[613] Other tribunals have explained the combination of the offer given by the host State through the BIT and the acceptance by the investor through the request for arbitration.[614] In *Generation Ukraine* v. *Ukraine*, the Tribunal said:

> . . . it is firmly established that an investor can accept a State's offer of ICSID arbitration contained in a bilateral investment treaty by instituting ICSID proceedings. There is nothing in the BIT to suggest that the investor must communicate its consent in a different form directly to the State; . . . It follows that the Claimant validly consented to ICSID arbitration by filing its Notice of Arbitration at the ICSID Centre.[615]

**449**    Similarly, the Tribunal in *El Paso* v. *Argentina* said:

> It is now established beyond doubt that a general reference to ICSID arbitration in a BIT can be considered as being the written consent of the State, required by

---

612  See paras. 7, 20, 21 and 22 of the notes to the Model Clauses Relating to the Convention on the Settlement of Investment Disputes Designed for Use in Bilateral Investment Agreements, 8 ILM 1341 (1969). See also *Laviec*, Protection et promotion, pp. 279/80; *Parra*, Provisions on the Settlement, pp. 339 *et seq.*

613  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 2–4; *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 30; *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, para. 19; *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 26, 27; *Gruslin* v. *Malaysia*, Award, 27 November 2000, para. 2.3.

614  *AMT* v. *Zaire*, Award, 21 February 1997, paras. 5.17–5.23; *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, paras. 8, 28–33, 43, 44; *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 67, 81; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 37, 38; *Wena Hotels* v. *Egypt*, Decision on Jurisdiction, 29 June 1999, 6 ICSID Reports 87; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, para. 27; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 12.1–12.8; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, para. 56; *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, paras. 24–30; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, paras. 30–31; *Tokios Tokelés* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 94–100; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, paras. 69–74; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 65; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 198; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 108; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 130–132; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 140; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 35–37; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 33–37; *ADC* v. *Hungary*, Award, 2 October 2006, para. 363; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 74; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 118; *Tokios Tokelés* v. *Ukraine*, Award, 26 July 2007, para. 104.

615  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 12.2, 12.3.

Article 25 to give jurisdiction to the Centre, and that the filing of a request by the investor is considered to be the latter's consent.[616]

Withdrawal of an offer of consent contained in a treaty, before its acceptance, **450** is less likely than in the case of national legislation (see para. 419 *supra*). Consent offered through a treaty is more difficult to withdraw than consent contained in national legislation. A State's attempt to withdraw its consent contained in a BIT would normally be a breach of the treaty and would presumably trigger some adverse reaction on the part of the other party to the treaty. An ICSID clause in a treaty remains valid notwithstanding an attempt by a party to terminate it, unless there is objectively a basis for termination under the law of treaties. Nevertheless, the irrevocability of consent provided for in the last sentence of Art. 25(1) operates only after the consent has been perfected through its acceptance by the investor (see paras. 598, 599, 619 *infra*). Therefore, in order to avoid complications, early acceptance is advisable.[617] In a number of cases investors had, in fact, expressed their consent before submitting their request for arbitration.[618]

Some BITs containing binding consent clauses ignore the fact that consent by **451** the investor is an indispensable requirement to complete consent. Some French BITs provide that a dispute "est soumis à la demande de l'une ou l'autre de ces Parties [au différend] à l'arbitrage du Centre . . ." purely on the basis of the BIT.[619]

It appears that a consent clause thus formulated is flawed. While the investor **452** may institute proceedings against the host State on the basis of the BIT, thereby signifying its consent, the host State cannot do so without a prior expression of consent on the part of the investor. The Tribunal in *AMT* v. *Zaire* emphasized the need for the expression of consent by the investor:

> The requirement of the consent of the parties does not disappear with the existence of the Treaty. The Convention envisages an exchange of consents between the Parties. When Article 25 states in paragraph 1 that "the parties" must have consented in writing to submit the dispute to the Centre, it does not speak of the States or more precisely, it speaks of a State and a national of another State. It appears therefore that the two States cannot, by virtue of Article 25 of the Convention, compel any of their nationals to appear before the Centre; this is a power that the Convention has not granted to the States.[620]

616  *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 35.
617  *Broches, A.*, Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration, Liber Amicorum Pieter Sanders (*Schultz, J./van den Berg, A.* eds.) 63, 68/9 (1982).
618  *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 44; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, para. 56; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 36; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 37; *ADC* v. *Hungary*, Award, 2 October 2006, para. 363.
619  France-Nigeria BIT (1990) Art. 8; *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 134/5. See also Art. 8 of the Austria-Morocco BIT (1992). Art. 10 of the Asian-African Legal Consultative Committee's Model Bilateral Agreements on Promotion and Protection of Investments, 23 ILM 237, 250, 264 (1984), also provides for the institution of ICSID arbitration "at the instance of either party" without reference to the need for consent by the investor.
620  *AMT* v. *Zaire*, Award, 21 February 1997, para. 5.18.

**453**    Some BITs recognize the need for mutual consent by stating that only the investor is entitled to institute proceedings. The clause in German BITs, cited above (para. 434), is an example. While such a one-sided approach to ICSID's jurisdiction is technically possible, it is not in the interest of the host State to grant access to the Centre to investors without obtaining reciprocal rights.

**454**    Some BITs specifically provide for the giving of consent by the investor. Under these clauses, once the investor has accepted the offer contained in the BIT, either party may start proceedings.[621] British treaties provide for the reciprocal expression of consent and for access by both parties to the Centre. Art. 8 (first alternative) of the United Kingdom Model Agreement of 2005 provides in relevant part:

> (3) If any such dispute should arise and agreement cannot be reached within three months between the parties to this dispute through pursuit of local remedies or otherwise, then, if the national or company affected also consents in writing to submit the dispute to the Centre for settlement by conciliation or arbitration under the Convention, either party may institute proceedings by addressing a request to that effect to the Secretary-General of the Centre as provided in Articles 28 and 36 of the Convention. . . .

**455**    Consent by the investor must be expressed in some positive way and cannot be substituted by the BIT or simply assumed. But there are ways by which an investor may be induced to give consent. Submission to ICSID or other methods of settlement may be made a condition for admission of investments in the host State and may form part of the licensing process. BITs may provide specifically that their benefits will extend only to investors that have consented to ICSID's jurisdiction. They may also provide that diplomatic protection will not be available to an investor that has declined to accept an offer of consent contained in a BIT. Suggestions to incorporate clauses to this effect in BITs have found little or no manifestation in practice[622] (see Art. 27, paras. 33–37).

### 6. Consent through Multilateral Treaties

**456**    A number of multilateral treaties also provide for ICSID's jurisdiction. The underlying mechanism is similar to that in the BITs discussed above. The treaties contain offers by the States parties to them to consent to ICSID's jurisdiction. These offers may be taken up by investors who are nationals of the other States parties to the treaties.[623]

### a) NAFTA

**457**    The North American Free Trade Agreement of 1992 between Canada, Mexico and the United States[624] contains a Chapter Eleven on Investments. Its Section A

---

621   See *AMT* v. *Zaire*, Award, 21 February 1997, para. 5.21.
622   See Clauses VII, VIII and IX of the Model Clauses for Use in Bilateral Investment Agreements, 8 ILM 1341, 1349–1351 (1969); *Laviec*, Protection et promotion, p. 280.
623   See *Parra*, Provisions on the Settlement, pp. 344 *et seq*., 356.
624   32 ILM 605 (1993).

offers a set of substantive rules on investment (Arts. 1101–1114). Section B deals with the "Settlement of Disputes between a Party and an Investor of Another Party".[625] Art. 1122 bears the title "Consent to Arbitration" and provides in relevant part:

> 1. Each Party consents to the submission of a claim to arbitration in accordance with the procedures set out in this Agreement.
> 2. The consent given by paragraph 1 and the submission by a disputing investor of a claim to arbitration shall satisfy the requirement of:
>> (a) Chapter II of the ICSID Convention (Jurisdiction of the Centre) and the Additional Facility Rules for written consent of the parties;

**458** Art. 1120 provides that after a waiting period of six months, a disputing investor may submit a claim to arbitration under the ICSID Convention, the Additional Facility of ICSID or under the UNCITRAL Arbitration Rules. As long as Canada and Mexico are not parties to the ICSID Convention, the NAFTA will not operate to confer jurisdiction under the Convention. But ICSID Additional Facility arbitration is available between US investors and Canada or Mexico and between Canadian or Mexican investors and the US. In disputes between Canadian investors and Mexico or Mexican investors and Canada not even the ICSID Additional Facility may be used (see paras. 9–13, 224–226, 300–301 *supra*). In disputes of the latter kind only UNCITRAL arbitration is available.[626] But even in UNCITRAL arbitration, the Secretary-General of ICSID may serve as the appointing authority for arbitrators under Arts. 1124 and 1126 of the NAFTA. Therefore, access to ICSID arbitration, Additional Facility arbitration and UNCITRAL arbitration is largely dictated by the state of ratification of the ICSID Convention and not a matter of choice. Even where ICSID arbitration or Additional Facility arbitration is available, the investor may eschew the Centre and opt for UNCITRAL arbitration.

**459** The NAFTA specifically provides that the investor must consent to arbitration (Art. 1121), thereby emphasizing the reciprocal nature of consent to arbitration. However, under the NAFTA, submission of a claim to arbitration is open only to an investor and not to a host State.

### b) Energy Charter Treaty

**460** The Energy Charter Treaty (ECT) of 1994 between the European Communities and 51, mostly European, States also provides consent to ICSID's jurisdiction

---

625 Generally see: *Alvarez, G. A./Park, W. W.*, The New Face of Investment Arbitration: NAFTA Chapter 11, 28 The Yale Journal of International Law 365 (2003); *Holbein, J. R./Ranieri, N.*, North American Free-Trade Agreements: Chapter 11 Investor-State Arbitration (2007); *Bjorklund, A./Hannaford, J./Kinnear, M.*, Investment Disputes under NAFTA (2006); *Legum, B.*, The Innovation of Investor-State Arbitration under NAFTA, 43 Harvard International Law Journal 531 (2002); *Weiler, T.* (ed.), NAFTA Investment Law and Arbitration: Past Issues, Current Practice, Future Prospects (2004).
626 See *Shihata/Parra*, The Experience, pp. 347/8, 351/2.

by the Contracting Parties in relation to investors of all other Contracting Parties (Art. 26).[627] The Treaty contains an unconditional consent to ICSID and to the Additional Facility, whichever may be available. The Article specifically requires consent in writing also on the part of the investor. Apart from the ICSID Convention or the Additional Facility, the investor is given the choice of the courts and administrative tribunals of the host State, previously agreed procedures, UNCITRAL arbitration and arbitration in the framework of the Arbitration Institute of the Stockholm Chamber of Commerce. The Article only envisages the submission of a claim by the investor but not by the host State.

**461**    A number of ICSID cases have been instituted under the ECT. Only some of these have yielded published decisions.[628] Some have been settled without a published record[629] while others are still at an early stage of the proceedings at the time of writing.[630]

### c) Regional Treaties in Latin America

**462**    The 1994 Colonia and Buenos Aires Investment Protocols of the Common Market of the Southern Cone (MERCOSUR) contain similar provisions. Art. 9 of the Colonia Protocol gives the investor the option to institute one of several procedures. These include arbitration under the ICSID Convention or the Additional Facility, the courts of the host State, an as yet to be established permanent dispute settlement system and UNCITRAL arbitration. Consent by the investor is not mentioned specifically.

**463**    The 1994 Free Trade Agreement between Mexico, Colombia and Venezuela (Cartagena FTA) also offers consent to ICSID arbitration. Under Arts. 17–18, the investor is given the option to institute ICSID arbitration, Additional Facility arbitration or UNCITRAL arbitration, depending on the ICSID Convention's state of ratification by the three States. The three methods are not offered by way of a choice. UNCITRAL arbitration is only offered if both ICSID arbitration and Additional Facility arbitration are unavailable. The investor must communicate its

---

627   34 ILM 360, 399 (1995); *Wälde, T. W.*, International Investment under the 1994 Energy Charter Treaty, 29 Journal of World Trade 5, 56–63 (1995); *Vandevelde, K. J.*, Arbitration Provisions in the BITs and the Energy Charter Treaty, *in*: The Energy Charter Treaty (*Wälde, T. W.* ed.) 409, 413 (1996); *Happ, R.*, Dispute Settlement Under the Energy Charter Treaty, 45 German Yearbook of International Law 331 (2002); *Wälde, T. W.*, Energy Charter Treaty-based Investment Arbitration Controversial Issues, 5 The Journal of World Investment & Trade 373 (2004); *Hobér, K.*, The Energy Charter Treaty: An Overview, 8 The Journal of World Investment & Trade 323 (2007).

628   *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 179; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 118.

629   *AES Summit Generation* v. *Hungary* (no published decision); *Alstom Power Italia* v. *Mongolia* (no published decision).

630   *Hrvatska Elektropriveda* v. *Slovenia*, registered 28 December 2005; *Libananco* v. *Turkey*, registered 19 April 2006; *Azpetrol* v. *Azerbaijan*, registered 30 August 2006; *Cementownia "Nowa Huta"* v. *Turkey*, registered 16 November 2006; *Europe Cement* v. *Turkey*, registered 6 March 2007; *Liman Caspian Oil* v. *Kazakhstan*, registered 16 July 2007; *Electrabel* v. *Hungary*, registered 13 August 2007; *AES Summit Generation* v. *Hungary II*, registered 13 August 2007.

consent in writing to the other party and include it in the request for arbitration (Annex to Arts. 17–16, Rule 2).

### d) Non-Binding References to ICSID

**464**  Some multilateral instruments contain reference to ICSID dispute settlement without offering consent on the part of the participating States. In this regard, they are similar to some provisions in national legislation and in BITs (see paras. 410–412, 438–446 *supra*).

**465**  Art. X of the 1987 ASEAN Agreement for the Promotion and Protection of Investments[631] foresees several methods of dispute settlement, including ICSID. However, the choice is subject to an agreement between the parties to the dispute. If no agreement can be reached, the dispute is to go to *ad hoc* arbitration. Therefore, this clause cannot be seen as consent to jurisdiction under the ICSID Convention.

**466**  The 1992 World Bank Guidelines on the Treatment of Foreign Direct Investment[632] are not a binding instrument and as such incapable of forming the basis of consent by States. They encourage States to submit disputes with investors to arbitration under the ICSID Convention or the ICSID Additional Facility Rules.[633]

**467**  Similarly, the 1992 European Community Statement on Investment Protection Principles[634] recommends ICSID arbitration as the primary choice while also mentioning ICC as well as UNCITRAL arbitration.

### 7. The Temporal Elements of Consent

### a) Time of Consent

**468**  Rule 2 of the Institution Rules provides:

> (3) "Date of consent" means the date on which the parties to the dispute consented in writing to submit it to the Centre; if both parties did not act on the same day, it means the date on which the second party acted.

The possibility that the parties did not act on the same day covers two situations. A single instrument may be signed on different days. Alternatively, the consent may be expressed not in one but in two or several instruments. If the consent clause is contained in an offer by one party, its acceptance by the other party will determine the time of consent. For instance, the offer may be made in an investment application by the investor that is subsequently approved by the host State. This was the situation in *Amco* v. *Indonesia* (see para. 389 *supra*).[635]

**469**  The date of acceptance is particularly important if the host State makes a general offer to accept ICSID's jurisdiction in its legislation or in treaties. In these cases, the time of consent is determined by the investor's acceptance of the offer. At the latest, this offer may be accepted through bringing a request for conciliation

---

631  27 ILM 612 (1988).                          632  31 ILM 1363, 1379 (1992).
633  Guideline V at p. 1384.
634  Doc. ACP-CEE 2172/92, 4 October 1992.
635  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, paras. 10, 25.

or arbitration to the Centre[636] (paras. 416–426, 447–455 *supra*). The investor is under no time constraints to accept the offer and thus to complete the consent unless the offer, by its own terms, provides for acceptance within a certain period of time. But it should be borne in mind that consent, once completed, has several legal consequences and its timing is relevant for a number of questions under the Convention such as withdrawal of consent, nationality of the investor, exclusion of other remedies, diplomatic protection and for various intertemporal rules (see paras. 475–478 *infra*).[637] Therefore, care should be taken to perfect consent at the appropriate time and not to rely on a standing offer without actually taking it up.

### b) Contingent Expression of Consent

**470**     Some expressions of consent are contingent upon the fulfilment of a future condition for jurisdiction. Contingent submissions to the Centre are expressions of consent based on the expectation that the conditions will be met in the future (see paras. 221–223, 299 *supra*). They become effective upon the fulfilment of the outstanding conditions.

**471**     In some cases the conditions *ratione personae* for the Centre's jurisdiction have not yet been met when the document containing the consent clause is signed. For instance, the host State or the State of the investor's nationality may not yet have ratified the Convention. In such a case, the date of consent will be the date on which all the conditions have been met.[638] If the host State ratifies the Convention after the signature of the consent agreement, the time of consent will be the entry into force of the Convention for the host State in accordance with Art. 68(2) (see paras. 215–223 *supra*). The same applies to a ratification by the State of the investor's nationality subsequent to the signature of the agreement containing the consent clause (see paras. 287–288 *supra*). If the consent agreement is made with a constituent subdivision or agency that has not yet been designated by the host State, the date of consent will be the date of designation (see paras. 258, 259 *supra*). Effective consent by a constituent subdivision or agency may also be delayed until it is approved by the host State or notification that no such approval is necessary has been made (see paras. 903–920 *infra*).

**472**     In *Holiday Inns* v. *Morocco*, no fewer than three conditions for the full validity of consent were lacking at the time the agreement containing the consent clause was signed: (i) the host State had not yet ratified the Convention (see para. 216 *supra*); (ii) the investor's home State had not yet ratified the Convention (see para. 288 *supra*); and (iii) one of the corporate parties to the dispute had not yet been created (see paras. 320–321 *supra*). The Tribunal noted that all these defects had

---

636  *Amerasinghe*, Submissions to the Jurisdiction, p. 217; *Broches*, Convention, Explanatory Notes and Survey, p. 643.

637  For a different view see the Partial Dissenting Opinion of Professor Francisco Orrego Vicuña to *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007.

638  *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 75 (1974); *Delaume*, Le Centre International, p. 781.

*Article 25 – Jurisdiction*                                               219

been cured before the institution of proceedings and stated that "... it is the date when the conditions are definitely satisfied... which constitutes in the sense of the Convention the date of consent..." (see para. 288 *supra*).[639]

In *Generation Ukraine* v. *Ukraine* the entry into force of the BIT between **473** Ukraine and the United States on 16 November 1996 antedated the entry into force of the ICSID Convention for Ukraine on 7 July 2000. The Respondent argued that its consent, expressed in the BIT, was only "preliminary" and subject to "final" consent once the Convention came into force for Ukraine.[640] The Tribunal rejected this argument. It noted that there was nothing in the BIT that suggested that its consent was only preliminary. The Tribunal said:

> 12.6 Ukraine's consent to ICSID arbitration in Article VI(3) of the BIT was naturally conditional upon a future event, *viz.* Ukraine's ratification of the ICSID Convention. This no doubt explains the proviso to the consent in Article 3(a)(i) which states: "provided that the Party is a party to [the ICSID] Convention". But Ukraine's free standing consent to ICSID arbitration was perfected as soon as the ICSID Convention entered into force for Ukraine on 7 July 2000. Ukraine did not make any reservation to the BIT whereby it could reassess the status of its consent once the condition precedent for its full validity had been fulfilled.[641]

The Tribunal concluded that Ukraine's consent was valid since the condition precedent to the Ukraine's offer to arbitrate had been fulfilled by the date of the institution of proceedings.[642]

In *Autopista* v. *Venezuela*, the contract clause expressing the parties' consent **474** was subject to a condition: the transfer of the company's majority share to a national of another Contracting State. The Tribunal found that the consent had become effective on the date of the share transfer.[643]

## c) Relevance of the Time of Consent

Consent to the jurisdiction of the Centre triggers a number of legal conse-  **475** quences under the Convention. Perhaps the most important one is that consent, once perfected, becomes irrevocable under the last sentence of Art. 25(1) (see paras. 596–634 *infra*). The nationality of the foreign investor under Art. 25(2) is determined by reference to the date of consent. Natural and juridical persons must be nationals of another Contracting State on the date of consent (see paras. 679–687, 752–759, 871–895 *infra*).

Consent to the jurisdiction of the Centre will, unless otherwise stated, exclude  **476** other remedies pursuant to Art. 26 of the Convention. Therefore, resort to domestic courts or to other forms of arbitration becomes unavailable, in principle, from the date of consent. Similarly, under Art. 27(1) diplomatic protection by the investor's

---

639  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 667/8. See also *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 2.18, 4.09, 5.24.
640  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 12.1.
641  At para. 12.6.                         642   At para. 12.8.
643  *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 89–91.

State of nationality is no longer permitted once the parties have consented to the jurisdiction of the Centre (see Art. 27, paras. 30–37).

**477**    The parties' rights and duties under the Convention are frozen from the date of consent. Under Art. 66(2), an amendment to the Convention will not apply with respect to consent given before the amendment's entry into force. Similarly, under Art. 72 a denunciation of the Convention by a State in accordance with Art. 71 will not affect a consent given before the date of the denunciation. By the same token, declarations by States excluding certain territories from the application of the Convention under Art. 70 will not affect a consent once it is given.

**478**    Arts. 33 and 44 of the Convention provide that proceedings will be conducted in accordance with the Conciliation Rules and Arbitration Rules in effect on the date on which the parties have given their consent. The parties may agree otherwise. But if they do not, it is not the Rules in their latest version that apply but those in force on the date of consent. The idea is to protect the parties against amendments that might not suit them.[644]

### d) Consent at the Time of the Institution of Proceedings

**479**    The jurisdictional requirements under the Convention must be met on the date of the institution of proceedings (see paras. 35–40 *supra*). The opening sentence of para. 24 of the Executive Directors' Report states that:

> 24. Consent of the parties must exist when the Centre is seized (Articles 28(3) and 36(3)) but the Convention does not otherwise specify the time at which consent should be given.[645]

Rule 2(1)(c) of the Institution Rules directs that a request for conciliation or arbitration must:

> (c) indicate the date of consent and the instruments in which it is recorded, including, if one party is a constituent subdivision or agency of a Contracting State, similar data on the approval of such consent by that State unless it had notified the Centre that no such approval is required;[646]

Rule 2(2) requires that this information must be supported by documentation. If the party wishing to institute proceedings cannot supply documentation of written consent to the jurisdiction of the Centre, the Secretary-General will find that the dispute is manifestly outside the jurisdiction of the Centre and will refuse to register it in accordance with Arts. 28(3) and 36(3) of the Convention. But a decision on the validity and scope of consent is left to the conciliation commission or arbitration tribunal in accordance with Arts. 32 and 41.

**480**    In *Tradex* v. *Albania*, the Claimants relied on the bilateral investment treaty between Albania and Greece as one of two bases for jurisdiction (see paras. 395, 417, 429 *supra*). The Tribunal noted that the Request for Arbitration was dated

---

644    See Introductory Note D to the Arbitration Rules of 1968, 1 ICSID Reports 65.
645    1 ICSID Reports 28.
646    See also *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 5.08.

17 October 1994 but that the BIT had come into force only on 4 January 1995. It found that jurisdiction must be established on the date of the filing of the claim and rejected the BIT as a basis for jurisdiction.[647]

### e) *Consent After the Institution of Proceedings:* Forum Prorogatum

Both the Working Paper and the Preliminary Draft foresaw consent not only by way of an agreement prior to the institution of proceedings but also by the "acceptance . . . of jurisdiction in respect of a dispute submitted to the Center by another party" (History, Vol. I, p. 112). The idea is based on a practice of the International Court of Justice whereby failure to contest jurisdiction by the respondent State is deemed to be consent to the Court's jurisdiction.[648] This would have allowed a claimant to bring a claim to the Centre even without previous consent. The decision on jurisdiction would have depended on whether the respondent contests or accepts the jurisdiction in the particular case. After relatively little debate (History, Vol. II, pp. 323, 402, 403, 470, 706), Mr. *Broches* retracted the suggestion since he recognized that the host State's refusal of consent under these circumstances might do damage to its reputation (at pp. 499, 509, 540, 566, 711). Subsequent drafts and the Convention make no reference to this possibility and the Secretary-General's screening power with respect to consent would appear to make this method of obtaining consent impossible.[649] **481**

There are also good practical reasons for not proceeding with a request that is unsupported by any documentation of consent by the other party. It does not make much sense to go through the procedure of constituting a commission or tribunal if it is likely that it will find that there is no jurisdiction. Therefore, manifest absence of consent is an absolute bar against registration of a request. **482**

The situation is somewhat different if the existence of a valid consent is unclear or if the precise scope of the consent (see paras. 513–539 *infra*) is subject to doubt. These are questions that are to be decided by the commission or tribunal under Arts. 32 and 41, and it is in these proceedings that the position taken by the respondent may become relevant. **483**

A respondent's failure to appear before the commission or tribunal cannot be interpreted as an admission of jurisdiction. Logic militates against interpreting absence from the proceedings as implicit consent to jurisdiction. Moreover, Art. 45 expressly states that failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions. **484**

What if the respondent does appear and fails to raise objections to the tribunal's jurisdiction, proceeds to plead on the merits concerning matters that are beyond the scope of its original consent, or even explicitly states that it wishes to confirm **485**

---

647 *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 58.
648 *Rosenne*, The World Court, 6th ed., 73 (2003).
649 *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 270 *et seq.* (1966); *Masood*, Jurisdiction of International Centre, pp. 123/4; *Kovar*, La compétence du Centre, p. 49.

222                THE ICSID CONVENTION: A COMMENTARY

or extend its earlier consent? Is the tribunal under an obligation to examine the question of jurisdiction from the perspective of consent as it existed at the time of the registration of the request and must it decline jurisdiction if consent was absent or incomplete at that time? One Tribunal seems to have thought so,[650] relying on the Report of the Executive Directors who stated that "[c]onsent of the parties must exist when the Centre is seized".[651]

486    The Convention does not give a clear answer to this question. Arts. 32 and 41 merely provide that the respondent may raise an objection to jurisdiction or competence, that the commission or tribunal must consider the objection and that it is the commission or tribunal which decides on its competence. The Convention does not say whether the commission or tribunal must examine the Centre's jurisdiction and, if necessary, decline its competence if the matter is uncontested. But Arbitration Rule 41(2) and Conciliation Rule 29(2) state that the tribunal or commission may at any stage of the proceedings consider the question of its jurisdiction on its own initiative.

487    A mere delay in the raising of a jurisdictional objection will not be interpreted as implied consent given in the course of proceedings. (See also Art. 41, paras. 40–42.) In *Gruslin* v. *Malaysia* the Respondent had not, at first, raised the objection that the investment did not comply with the condition that it had to be an "approved project" as required by the applicable BIT. The Tribunal found that the host State's initial failure to insist on that condition did not extend its consent as expressed in the BIT. Therefore, the host State was not precluded from raising non-compliance with that condition later on.[652]

488    On the other hand, there are good reasons to assume that defects of jurisdiction through lack of consent may be cured after the institution of proceedings. If there is no disagreement on consent between the parties, it does not make sense for the commission or tribunal to decide that it lacks competence. This would force the parties to record their consent in writing before resubmitting the request to the Centre, which, in turn, would then have to repeat the process of constituting the commission or tribunal.[653]

489    There is an even more serious argument. If the defect in the consent cannot be cured implicitly or even explicitly by the parties during the proceedings but remains an objective bar to the Centre's jurisdiction, it may be raised at any time especially as a ground for annulment. Under these circumstances, a party might be tempted not to raise an objection to jurisdiction while it is still optimistic about the outcome of the case. Once it becomes clear to a party that it has lost the case on the merits, lack of consent might be brought forward to argue that the tribunal has manifestly exceeded its powers. Even if one takes the strict attitude

---

650  *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 407. See also paras. 313–327.
651  Para. 24, 1 ICSID Reports 28.
652  *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 18.1–18.4, 19.3.
653  *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 277/8 (1966).

that consent must have been fully perfected before the institution of proceedings, it is impossible to deny that a party must be estopped from arguing lack of consent after not raising it as a jurisdictional objection at an early stage in the proceedings and after pleading on the merits.[654] This conclusion is supported by Rule 41(1) of the Arbitration Rules and Rule 29(1) of the Conciliation Rules: a jurisdictional objection must be made as early as possible and, in principle, no later than at the end of the time limit for the counter-memorial.

ICSID practice on this point is scant and somewhat circumstantial. In *Amco* v. *Indonesia*, it was argued on behalf of Indonesia in the annulment proceedings that the acts of the army and police personnel in seizing the hotel, if illegal under international law, constituted an international tort and not an investment dispute. The Tribunal's jurisdiction, as accepted by the Parties' consent, only extended to investment disputes and not to torts. Therefore, Indonesia argued, the Tribunal had manifestly exceeded its powers. The *ad hoc* Committee, apart from rejecting the distinction between international torts and investment disputes (see para. 71 *supra*), found that Indonesia was precluded from challenging the jurisdiction of the Tribunal since it had, in the course of the annulment proceedings, expressly waived the claims of nullity relating to the Tribunal's jurisdiction.[655] The question at issue was not so much the scope of consent but rather the nature of the dispute. But the *ad hoc* Committee did accept the principle that jurisdictional objections, once they have been waived, cannot be reintroduced. **490**

In *SPP* v. *Egypt*, the question of consent after the institution of proceedings also arose in a somewhat peripheral way. The original request for arbitration had been made by SPP(ME). During the hearings on jurisdiction, SPP(ME) was joined on the Claimant's side by SPP, the parent company. The parties agreed on this move, which was accepted by the Tribunal (see paras. 345, 346 *supra*).[656] This procedure was criticized in the Dissenting Opinion on the ground that under Art. 36(2) the consent to arbitration had to precede the request for arbitration and that there was nothing to show that SPP had consented to the jurisdiction of the Centre before its intervention.[657] **491**

In the one case where an ICSID tribunal held that *forum prorogatum* was admissible, the finding was probably based on a misunderstanding. In *Klöckner* v. *Cameroon*, there was a series of successive agreements between the parties. A Protocol of Agreement of December 1971 laid down the general outline of the investment operation. It contained an ICSID arbitration clause. It was followed by a Supply Contract in March 1972 also containing an ICSID arbitration clause. In 1977, a Management Contract was concluded between Klöckner and SOCAME, a company owned jointly by the Government and by Klöckner. This contract contained not an ICSID clause but an ICC arbitration clause. **492**

---

654    See also *Szasz*, The Investment Disputes Convention, p. 26.
655    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 67–69.
656    *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 14.
657    *SPP* v. *Egypt*, Dissenting Opinion, 20 May 1992, 3 ICSID Reports 184.

**493**    ICSID arbitration was initiated in 1981 by Klöckner on the basis of the ICSID clause in the Supply Contract.[658] Before the Tribunal, the respondent Government not only accepted ICSID jurisdiction on that basis but actually broadened it by invoking the ICSID clause in the Protocol of Agreement. In turn, this extension of jurisdiction was accepted by the Claimant. The Respondent then brought a counter-claim arising from the Claimant's management of the operation. The Claimant opposed the counter-claim arguing that it was governed by the Management Contract which was subject to ICC and not to ICSID arbitration. The Tribunal accepted its competence over the counter-claim saying that the initial Protocol of Agreement had already provided, in principle, for the technical and commercial management of the operation by Klöckner "ensured by a Management Contract".

**494**    After restating the Claimant's position with regard to the Management Contract and its acceptance of the Protocol of Agreement as an additional basis for jurisdiction, the Tribunal said:

> Once the Centre has been validly seized (as it was in this case by Klöckner's Request), consent as to the "*ratione materiae*" extent of the Tribunal's jurisdiction may be expressed at any time, even in written submissions to the Tribunal ("*forum prorogatum*"). On this score, the Report of the Executive Directors of the World Bank indicates at paragraph 24 that "the Convention does not . . . specify the time at which consent should be given".[659]

**495**    The quotation from the Report of the Executive Directors misrepresents its contents. The original says that consent must exist when the Centre is seized, but the Convention does not *otherwise* specify the time at which consent should be given (para. 479 *supra*).[660] More importantly, consent with regard to the Protocol of Agreement existed when the original request for arbitration was made but was merely not invoked in the request. Therefore, the question of *forum prorogatum* never arose.

**496**    The *ad hoc* Committee criticized the Tribunal's interpretation of the Claimant's acceptance of the Protocol of Agreement as a basis of jurisdiction. The Claimant had never admitted that the reference to management in the Protocol of Agreement conferred jurisdiction upon ICSID with regard to management. The *ad hoc* Committee concluded that it was:

> . . . superfluous for the Award to add that consent to ICSID's jurisdiction may be expressed at any time, under the principle of "*forum prorogatum*".[661]

**497**    Therefore, the quotation from the Award in para. 494 above carries somewhat less authority than would appear at first sight. The acceptance by the Claimant of ICSID's jurisdiction over the Protocol of Agreement did not amount to consent given after the institution of proceedings. A valid consent clause was already contained in the Protocol of Agreement. The Respondent had merely brought a

---

658    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13.
659    At p. 14.
660    *Cf.* also the Dissenting Opinion at 2 ICSID Reports 91.
661    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 5–11, at para. 9.

counter-claim arguing that it was within the scope of the consent of the parties in accordance with Art. 46. The Claimant, in turn, accepted the existence of the additional base for jurisdiction while denying that it covered the counter-claim.

The correct answer to the problem of *forum prorogatum* in the ICSID context **498** would appear to be as follows: a conciliation commission or arbitral tribunal must examine its competence carefully on the basis of any objections to the Centre's jurisdiction but also *motu proprio*. If the commission or tribunal finds that there is agreement between the parties to the proceedings on the existence, validity and scope of their consent at the time of its decision on jurisdiction, it may proceed on the basis of that agreement. In other words, agreement between the parties before the commission or tribunal would cure any defects concerning consent that may have existed at the time proceedings were instituted. A mere delay in raising a jurisdictional objection would not support the existence of an agreement of this kind. But a party that has indicated its consent during the proceedings either explicitly or by pleading on the merits of the case without objecting that consent was lacking, defective or too narrow is precluded from raising such an objection later on. This preclusion would apply to the original proceedings as well as to any annulment proceedings.

### f) Applicability of Consent Ratione Temporis

Bilateral investment treaties frequently provide that they shall also apply to **499** investments made before their entry into force.[662] Some BITs state, however, that they shall not apply to disputes that have arisen before that date. For instance, the Argentina-Spain BIT provides in Article II(2):

> This agreement shall apply also to capital investments made before its entry into force by investors of one Party in accordance with the laws of the other Party in the territory of the latter. However, this agreement shall not apply to disputes or claims originating before its entry into force.

Under provisions of this kind the decisive time for the applicability of the consent to arbitration is the time at which the dispute has arisen. The time of the dispute is not identical with the time of the events leading to the dispute. By definition, the incriminated acts must have occurred some time before the dispute. Therefore, the exclusion of disputes occurring before a certain date cannot be read as excluding jurisdiction over events occurring before that date. A dispute requires not only the development of the events to a degree where a difference of legal positions can become apparent but also the existence of communication between the parties that demonstrates that difference.

---

662  In *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 153, the Tribunal noted that the BIT (in force 6 May 1996) by its express terms was applicable to investments made since 1954. It concluded that pre-BIT disputes may be brought before an ICSID tribunal pursuant to the BIT.

**500**    In *Maffezini* v. *Spain*, the Respondent challenged the tribunal's jurisdiction alleging that the dispute originated before the entry into force of the Argentina-Spain BIT. The Claimant relied on facts and events that antedated the BIT's entry into force, but argued that a "dispute" arises only when it is formally presented as such. This, according to the Claimant, had occurred only after the BIT's entry into force.[663]

**501**    The Tribunal distinguished between the events giving rise to the dispute and the dispute itself. It found that the events on which the parties disagreed began years before the BIT's entry into force, but this did not mean that a legal dispute can be said to have existed at the time.[664] The Tribunal said:

> . . . there tends to be a natural sequence of events that leads to a dispute. It begins with the expression of a disagreement and the statement of a difference of views. In time these events acquire a precise legal meaning through the formulation of legal claims, their discussion and eventual rejection or lack of response by the other party. The conflict of legal views and interests will only be present in the latter stage, even though the underlying facts predate them. It has also been rightly commented that the existence of the dispute presupposes a minimum of communications between the parties, one party taking up the matter with the other, with the latter opposing the Claimant's position directly or indirectly.[665] This sequence of events has to be taken into account in establishing the critical date for determining when under the BIT a dispute qualifies as one covered by the consent necessary to establish ICSID's jurisdiction.[666]

On that basis, the Tribunal reached the conclusion that the dispute in its technical and legal sense had begun to take shape after the BIT's entry into force. It followed that the Tribunal was competent to consider the dispute.[667]

**502**    In *Lucchetti* v. *Peru*, the applicable BIT also provided that it would not apply to disputes that arose prior to its entry into force. In 1997 and 1998 the investor had been involved in a dispute about licensing with the competent municipal authorities leading to proceedings in the domestic courts. These proceedings ended with judgments in favour of the investor and were implemented through the issuing of the required construction and operating licences. The BIT entered into force on 3 August 2001. Shortly thereafter, the municipality issued Decrees 258 and 259 resulting in the cancellation of the production licence and an order for the removal of the plant.[668]

**503**    The Tribunal rejected the Claimant's argument that the earlier dispute of 1997/98 had been definitively resolved and that the Decrees of 2001 had triggered a new dispute. Rather, in the Tribunal's view the subject matter of the dispute before it was the same as in 1997/98. The disputes had the same origin or source. The dispute that was now before the Tribunal had already crystallized by 1998. The adoption of

---

663    *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 90–98.
664    At para. 95.
665    The Tribunal's reference is to an early version of this Commentary.
666    At para. 96.
667    At para. 98. See also *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 146–150, where the Tribunal applied the same principle to consent expressed through a contract.
668    *Lucchetti* v. *Peru*, Award, 7 February 2005, paras. 27–47.

Decrees 258 and 259 and their challenge by Claimants merely continued the earlier dispute. It followed that the Tribunal lacked jurisdiction *ratione temporis*.[669]

In *Jan de Nul* v. *Egypt*, the BIT between the Belgo-Luxembourg Economic **504** Union and Egypt also provided that it would not apply to disputes that had arisen before its entry into force. A dispute already existed when in 2002 the BIT replaced an earlier BIT of 1977. At that time the dispute was pending before the Administrative Court of Ismaïlia which eventually rendered an adverse decision in 2003, approximately one year after the new BIT's entry into force. The Tribunal accepted the Claimants' contention that the dispute before it was different from the one that had been brought to the Egyptian court:

> . . . while the dispute which gave rise to the proceedings before the Egyptian courts and authorities related to questions of contract interpretation and of Egyptian law, the dispute before this ICSID Tribunal deals with alleged violations of the two BITs . . .[670]

This conclusion was confirmed by the fact that the court decision was a major element of the complaint. The Tribunal said:

> The intervention of a new actor, the Ismaïlia Court, appears here as a decisive factor to determine whether the dispute is a new dispute. As the Claimants' case is directly based on the alleged wrongdoing of the Ismaïlia Court, the Tribunal considers that the original dispute has (re)crystallized into a new dispute when the Ismaïlia Court rendered its decision.[671]

It followed that the Tribunal had jurisdiction over the claim.[672]

*Helnan* v. *Egypt* concerned a clause in the BIT between Denmark and Egypt **505** which excluded its applicability to divergences or disputes that had arisen prior to its entry into force. The Tribunal distinguished between divergences and disputes in the following terms:

> Although the terms "*divergence*" and "*dispute*" both require the existence of a disagreement between the parties on specific points and their respective knowledge of such disagreement, there is an important distinction to make between them as they do not imply the same degree of animosity. Indeed, in the case of a divergence, the parties hold different views but without necessarily pursuing the difference in an active manner. On the other hand, in case of a dispute, the difference of views forms the subject of an active exchange between the parties under circumstances which indicate that the parties wish to resolve the difference, be it before a third party or otherwise. Consequently, different views of parties in respect of certain facts and situations become a "*divergence*" when they are mutually aware of their disagreement. It crystallises as a "*dispute*" as soon as one of the parties decides to have it solved, whether or not by a third party.[673]

On that basis, the Tribunal found that, even though a divergence had existed before the BIT's entry into force, that divergence was of a different nature from

---

669  At paras. 48–56.
670  *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 117.
671  At para. 128.                                   672   At paras. 110–131.
673  *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 52.

the dispute that had arisen subsequently. Hence, the Tribunal had jurisdiction over the dispute.[674]

**506**     It follows from the above that consent expressed in a treaty may well cover events that took place before the treaty's entry into force. The question whether acts and events that occurred prior to an expression of consent to arbitration are covered by the latter should be distinguished from the issue of the applicable substantive law.[675] The Tribunal in *Impregilo* v. *Pakistan* said:

> . . . care must be taken to distinguish between (1) the jurisdiction *ratione temporis* of an ICSID tribunal and (2) the applicability *ratione temporis* of the substantive obligations contained in a BIT.[676]

**507**     The fact that jurisdiction is established under a treaty does not mean that the treaty's substantive provisions are necessarily applicable to all aspects of the case. The general rule is that the law applicable to acts and events will normally be the law in force at the time they occurred.[677] Therefore, it is entirely possible that a tribunal exercising jurisdiction on the basis of consent expressed in a treaty will apply customary international law to events that occurred before the treaty's entry into force.

**508**     A similar situation can arise where consent to jurisdiction by the State is expressed in national legislation. In *Tradex* v. *Albania* a domestic statute, the "1993 Law", was the basis for ICSID's jurisdiction. Art. 8 of that statute provided for ICSID jurisdiction "if a foreign investment dispute arises". The dispute had arisen before the statute's entry into force. The Tribunal examined the contention that the words "dispute arises" indicated a limitation of consent to disputes arising after the entry into force of the Albanian Law. After a careful examination of the text and the history of the Law it rejected this contention.[678] It concluded that "a dispute which started before the coming into force of the 1993 Law can be covered by the submission to ICSID jurisdiction".[679] The Tribunal also rejected the argument that a submission to arbitration must be presumed to be only meant for future disputes unless otherwise expressed.[680]

**509**     The Tribunal also dealt with the distinction between jurisdiction *ratione temporis* and the substantive law applicable to the facts of the case. The Tribunal said:

---

674  At paras. 53–57.
675  But see *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 45–136, 167, 168, which fails to make the necessary distinctions between jurisdiction and substantive law.
676  *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 309.
677  See especially Article 28 of the Vienna Convention on the Law of Treaties providing for non-retroactivity of treaties. See also ILC Draft Article on the Law of Treaties with Commentaries, Yearbook of the International Law Commission 1966-II, p. 212, para. 2; Article 13 of the ILC's Articles on State Responsibility. For discussions of this issue see *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 8.13, 11.1–11.4, 17.1, 17.5; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, paras. 166, 167; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, paras. 167–178; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 253–258.
678  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 62–69.
679  5 ICSID Reports 65.          680  5 ICSID Reports 68.

> . . . it occurs frequently that courts and arbitral tribunals have to apply certain substantive rules of law which were in force during the relevant period though they have been replaced by new rules as from a certain date. Accepting ICSID jurisdiction for the present dispute under Art. 8, therefore, by no means implies that the substantive protection rules of the 1993 Law would be applicable in the consideration of the merits of this case.[681]

A clause in a treaty or in legislation providing for consent may be broad and **510** refer to investment disputes in general terms. Or it may be restricted to disputes concerning alleged violations of the document containing the consent. If consent to arbitration contained in a treaty is limited to violations of that treaty, the date of the treaty's entry into force is also necessarily the date from which acts and events are covered by consent to jurisdiction. For instance, under the NAFTA[682] and under the ECT[683] the scope of the consent to arbitration is limited to claims arising from alleged breaches of the respective treaties. In that case the entry into force of the substantive law also determines the tribunal's jurisdiction *ratione temporis* since the tribunal may only hear claims for violation of that law.

Some tribunals have applied the concept of a continuing breach to deal with this **511** situation. An act that commenced before the treaty's entry into force may persist thereafter. This would suffice to give the tribunal jurisdiction.[684] The Tribunal in *SGS* v. *Philippines* applied the concept of a continuing breach in the following terms:

> It is not, however, necessary for the Tribunal to consider whether Article VIII of the BIT applies to disputes concerning breaches of investment contracts which occurred and were completed before its entry into force. At least it is clear that it applies to breaches which are continuing at that date, and the failure to pay sums due under a contract is an example of a continuing breach.[685]

A variant of the theory of continuing breach was applied in *Tecmed* v. *Mexico*. **512** The Tribunal held that, in principle, a treaty does not bind a party in relation to acts which took place before its entry into force.[686] Also, the BIT's language appeared to be directed at the future.[687] However, it did not follow that events prior to the BIT's entry into force were irrelevant. If there was still a breach after the treaty's entry into force, acts or omissions occurring before that date might play a role. The Tribunal said:

> . . . conduct, acts or omissions of the Respondent which, though they happened before the entry into force, may be considered a constituting part, concurrent factor or aggravating or mitigating element of conduct or acts or omissions of the Respondent which took place after such date do fall within the scope of this Arbitral Tribunal's jurisdiction. This is so, provided such conduct or acts, upon

---

681  5 ICSID Reports 66.                          682    Article 1116 NAFTA.
683  Article 26(1) of the ECT.
684  See especially *Mondev* v. *United States* (AF), Award, 11 October 2002, paras. 57–75; *Feldman* v. *Mexico* (AF), Decision on Jurisdiction, 6 December 2000, para. 62.
685  *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 167.
686  *Tecmed* v. *Mexico* (AF), Award, 29 May 2003, para. 63.
687  At paras. 64, 65.

consummation or completion of their consummation after the entry into force of the Agreement constitute a breach of the Agreement, . . .[688]

### 8. Limitations on Consent

**513**    During the Convention's drafting there was never any doubt that the parties had the right to limit the scope of their consent. The Working Paper contained a somewhat sweeping clause to the effect that either party had the right to stipulate in their consent ". . . that one or more of the provisions of this Convention shall not apply . . ." (History, Vol. I, p. 110). This clause was criticized as going too far (History, Vol. II, pp. 55, 57, 65) and does not appear in subsequent drafts. All later drafts as well as the Convention just refer to "any dispute" or "all disputes" subject to the Convention's objective requirements (History, Vol. I, pp. 112, 116, 118). The Comment to the Preliminary Draft contains the following observation:

> 9. When entering into any undertaking pursuant to Section 2 a party would, of course, be free to include such limitations on the scope of the particular undertaking as may seem to it appropriate provided that those limitations were not inconsistent with its obligations deriving from the Convention as a whole.[689]

The principle of the parties' freedom to limit the extent of their consent remained uncontroverted (History, Vol. II, pp. 268, 336, 505, 566, 706). Mr. *Broches* explained that the parties' freedom in shaping their consent was merely limited by such principles as the non-revocability of consent or the binding nature of awards (at p. 505).

**514**    Where ICSID's jurisdiction is based on an offer made by one party, subsequently accepted by the other, the parties' consent exists only to the extent that offer and acceptance coincide. For instance, the host State's investment legislation or its BIT with the investor's home State may provide for the Centre's jurisdiction in the most general terms. If the investor accepts ICSID jurisdiction only with regard to a particular dispute or in respect of certain investment operations, the consent between the parties will be thus limited.[690] It is evident that the investor's acceptance may not validly go beyond the limits of the host State's offer. Therefore, any limitations contained in the legislation or treaty would apply irrespective of the terms of the investor's acceptance. If the terms of acceptance do not coincide with the terms of the offer there is no perfected consent.

### a) Limitations on Consent in Direct Agreements

**515**    Art. 25 merely defines the outer limits of the consent that the parties may give. There is nothing to stop them from circumscribing it in a narrower way. The parties are free to delimit their consent by defining it in abstract terms, by excluding certain types of disputes or by listing the questions they are submitting

---

688   Para. 68. See also paras. 172, 178, 179, 181.    689   History, Vol. II, p. 205.
690   *Amerasinghe*, The Jurisdiction of the International Centre, pp. 224/5; *Szasz*, The Investment Disputes Convention, p. 29.

*Article 25 – Jurisdiction*                                     231

to ICSID's jurisdiction.[691] The 1993 Model Clauses offer the following formula for this purpose:

**Clause 4**

The consent to the jurisdiction of the Centre recorded in <u>citation of basic clause above</u> shall [only]/[not] extend to disputes related to the following matters: . . . [692]

These limitations to a specific consent agreement must be distinguished from the notifications that may be given under Art. 25(4). Art. 25(4) allows Contracting States to state in advance and in general terms which classes of disputes they would not consider submitting to the Centre's jurisdiction (see paras. 921–941 *infra*).

In practice, broad inclusive consent clauses are the norm. They are also gener-   **516** ally preferable. Narrow clauses, listing only certain questions or excluding certain questions, are liable to lead to difficulties in determining the commission's or tribunal's precise competence. Moreover, narrow clauses may inadvertently exclude essential aspects of the dispute.

Consent clauses contained in investment agreements typically refer to "any   **517** dispute" or to "all disputes" under the respective agreements. The consent clause in *AGIP* v. *Congo* is characteristic of this:

All disputes that may arise with respect to the application or interpretation of the present Protocol of Agreement will be finally settled in accordance with the [ICSID] Convention . . .[693]

But there are also occasional counter-examples such as exceptions relating to the proper application or interpretation of the host State's law.[694]

### b) Limitations on Consent in Legislation

References to ICSID contained in national investment legislation typically relate   **518** to the application and interpretation of the piece of legislation in question. For instance, the 1987 Investment Code of Guinea provides:

---

691   *Amerasinghe*, Submissions to the Jurisdiction, pp. 220–222.

692   4 ICSID Reports 361. See also Clauses XIV and XV of the 1968 Model Clauses, 7 ILM 1159, 1173 (1968) and Clause V of the 1981 Model Clauses, 1 ICSID Reports 201.

693   *AGIP* v. *Congo*, Award, 30 November 1979, para. 18. See also *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 12; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.15; *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 10; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 23; *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 350; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 17; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 2; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 10; *CDC* v. *Seychelles*, Award, 17 December 2003, para. 4; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 49, 58; *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 6.

694   *Delaume, G. R.*, ICSID Clauses: Some Drafting Problems, News from ICSID, Vol. 1/2, p. 16 (1984); *Delaume*, Transnational Contracts, Ch. XV, p. 7.

> 28–2 . . . unless otherwise agreed by the parties concerned, disputes between the Guinean state and foreign nationals relating to the application or interpretation of this code shall be settled definitively in arbitration conducted:
> – In accordance with the provisions of the [ICSID Convention] . . .[695]

**519**     In *SPP* v. *Egypt*, the Centre's jurisdiction was based on Art. 8 of Egypt's Law No. 43 of 1974.[696] That provision offered several forms of dispute settlement, including the ICSID Convention, "in respect of the implementation of the provisions of this Law".[697] Before the Tribunal, Egypt argued that Art. 8 of the Law was not applicable to disputes involving the non-performance of obligations under contracts. Rather, Art. 8 should be restricted to disputes concerning the non-performance of obligations under the Law itself.[698] The Tribunal remarked that it had some difficulty in accepting the above distinction as applying to all contracts and agreements, even those entered into by the Government itself. At the same time, the Tribunal found it unnecessary to address this question since, in the particular case, the alleged breach by Egypt of an agreement with one of the Claimants also constituted a breach of the Law. The alleged breach of the agreement would also violate the prohibition of nationalization or confiscation in Law No. 43.[699]

**520**     Some national laws are more sweeping and simply refer to disputes concerning foreign investments.[700] In *Zhinvali* v. *Georgia* the Tribunal accepted an ICSID consent clause in the Georgia Investment Law of 1996 which simply referred to "disputes between a foreign investor and a government body".[701]

**521**     In *Inceysa* v. *El Salvador*, Art. 15 of the El Salvador Investment Law provided as follows:

> In the case of controversies arising between foreign investors and the State regarding their investments in El Salvador, the investors may submit the controversy to:
> (a) [ICSID] . . .
> (b) [the Additional Facility] . . .[702]

---

695   See also the Madagascar Investment Code, 1989, Art. 33. See also *Parra*, Provisions on the Settlement, pp. 320/1.

696   This Law was subsequently replaced by Law No. 230 of 1989 which, in turn, was replaced by Law No. 8 of 1997. See *Marchais, B. P.,* The New Investment Law of the Arab Republic of Egypt, 4 ICSID Review – FILJ 297 (1989).

697   *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 70.

698   At para. 67.

699   At paras. 68–69. See also the Dissenting Opinion to the Decision on Jurisdiction of 14 April 1988 at 3 ICSID Reports 182/3 and the Dissenting Opinion to the Award of 20 May 1992 at 3 ICSID Reports 315–318.

700   El Salvador, Law on Investments, 1999, Art. 15; Botswana, Settlement of Investment Disputes (Convention) Act, 1970, sec. 11.

701   *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 328.

702   *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 331.

The Tribunal found that this clearly constituted an offer of consent concerning all disputes referring to investments. But the Tribunal denied the rights granted by the Investment Law since the investment was tainted by illegality.[703]

The Tribunal added an *obiter dictum* to the effect that in order to invoke the arbitration provision in the Investment Law there had to be a claim with substantive grounds in that law. This excluded contract claims.[704] This latter reasoning is surprising in view of the fact that the Investment Law refers to ICSID jurisdiction in general terms for controversies regarding investments of foreign investors. A limitation to claims arising from the statute's substantive provisions or an exclusion of contract claims is not apparent from the Investment Law as quoted by the Tribunal. **522**

Other national laws describe the questions covered by consent clauses in narrower terms. These may include the requirement that the dispute must be "in respect of a licensed business enterprise".[705] More elaborate descriptions concern disputes "related to the authenticity, interpretation or enforcement of the Approval Decree . . .".[706] **523**

Some national laws circumscribe the issues that are subject to ICSID's jurisdiction narrowly. Art. 8 of the Albanian Law on Foreign Investment of 1993 offers unconditional consent to ICSID's jurisdiction (see para. 395 *supra*) but limits this consent in the following terms: **524**

> . . . if the dispute arises out of or relates to expropriation, compensation for expropriation, or discrimination and also for the transfers in accordance with Article 7, . . .[707]

In *Tradex* v. *Albania*, the Tribunal held that it had jurisdiction, subject to the existence of an expropriation, an issue which was to be examined in the merits phase.[708] In its Award it found, after a detailed examination of the facts, that the Claimant had not been able to prove that an expropriation had occurred.[709] **525**

### c) Limitations on Consent in Treaties

The scope of consent to arbitration offered in BITs varies. Some clauses providing consent are wide and unlimited. Many BITs in their consent clauses contain phrases such as "all disputes concerning investments" or "any legal dispute concerning an investment". For instance, the United Kingdom Model BIT of 2005 refers to "any legal dispute . . . concerning an investment . . .".[710] These provisions **526**

---

703  At para. 332.  704  At para. 333.

705  Uganda Investment Code, 1991, sec. 30(2). See also Mozambique Law of Investment, 1993, Art. 25(2).

706  Benin Code of Investments, 1990, Art. 57. See also Cameroon Investment Code, 1990, Art. 45(1); Niger Investment Code, 1989, Art. 6.

707  See *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 54. Article 7 deals with the investor's right to transfer funds abroad.

708  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 61/2.

709  *Tradex* v. *Albania*, Award, 29 April 1999, paras. 92, 132, 203–205.

710  United Kingdom Model BIT 2005, Art. 8.

do not restrict a tribunal's jurisdiction to claims arising from the BIT's substantive standards. By their own terms, these consent clauses encompass disputes that go beyond the interpretation and application of the BIT itself and would include disputes that arise from a contract in connexion with the investment.[711]

**527**    In *Salini* v. *Morocco*, Article 8 of the applicable BIT defined ICSID's jurisdiction in terms of "[t]ous les différends ou divergences . . . concernant un investissement".[712] The Tribunal noted that the terms of this provision were very general and included not only a claim for violation of the BIT but also a claim based on contract:

> . . . Article 8 obliges the State to respect the jurisdictional choice arising by reason of breaches of the bilateral Agreement and of any breach of a contract which binds it directly.[713]

**528**    In *Vivendi* v. *Argentina*, Article 8 of the BIT between France and Argentina, applicable in that case, offered consent for "[a]ny dispute relating to investments". In its discussion of the BIT's fork in the road clause, the *ad hoc* Committee said:

> . . . Article 8 deals generally with disputes "relating to investments made under this Agreement between one Contracting Party and an investor of the other Contracting Party". It is those disputes which may be submitted, at the investor's option, either to national or international adjudication. Article 8 does not use a narrower formulation, requiring that the investor's claim allege a breach of the BIT itself. Read literally, the requirements for arbitral jurisdiction in Article 8 do not necessitate that the Claimant allege a breach of the BIT itself: it is sufficient that the dispute relate to an investment made under the BIT. This may be contrasted, for example, with Article 11 of the BIT [dealing with State/State dispute settlement], which refers to disputes "concerning the interpretation or application of this Agreement", or with Article 1116 of the NAFTA, which provides that an investor may submit to arbitration under Chapter 11 "a claim that another Party has breached an obligation under" specified provisions of that Chapter.[714]

**529**    The Tribunal in *SGS* v. *Pakistan* reached a different conclusion. Article 9 of the applicable BIT between Switzerland and Pakistan referred to "disputes with respect to investments". The Tribunal found that the phrase was merely descriptive of the factual subject matter of the disputes and did not relate to the legal basis of the claims or cause of action asserted in the claims. The Tribunal said:

---

711  For discussion of this issue see *Alexandrov, S.*, Breaches of Contract and Breaches of Treaty, 5 The Journal of World Investment & Trade 555, 572 (2004); *Griebel, J.*, Jurisdiction over "Contract Claims" in Treaty-Based Investment Arbitration on the Basis of Wide Dispute Settlement Clauses in Investment Agreements, TDM 2007; *van Haersolte-van Hof, J. J./Hoffmann, A. K.*, The Relationship between International Tribunals and Domestic Courts, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 962 (2008).

712  Italy-Morocco BIT, Art. 8.

713  *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, para. 61.

714  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 55.

> ... from that description alone, without more, we believe that no implication
> necessarily arises that both BIT and purely contract claims are intended to be
> covered by the Contracting Parties in Article 9.[715]

Therefore, the Tribunal held that it had no jurisdiction with respect to contract claims which did not also constitute breaches of the substantive standards of the BIT.[716]

Other tribunals have declined to follow that decision.[717] In *SGS* v. *Philippines* **530** Article VIII(2) of the Switzerland-Philippines BIT offered consent to arbitration for "disputes with respect to investments". The Tribunal found that the clause in question was entirely general, allowing for the submission of all investment disputes. Therefore, the Tribunal found that the term included a dispute arising from an investment contract.[718]

The view that a jurisdiction clause referring all investment disputes to inter- **531** national arbitration vests the tribunal with competence over contract claims is preferable. There is no reason in law or policy why this should not be possible or desirable. The distinction between contract claims and BIT claims does not mean that these claims must be presented in different forums. An arrangement that leads to the adjudication of all claims arising from an investment dispute in one forum is clearly the better solution.

Other BIT clauses offering consent to arbitration circumscribe the scope of **532** consent to arbitration in narrower terms. A provision that is typical for United States BITs is contained in Article VII of the Argentina-US BIT of 1991. It offers consent for investment disputes which are defined as follows:

> a dispute between a Party and a national or company of the other Party arising
> out of or relating to (a) an investment agreement between that Party and such
> national or company; (b) an investment authorization granted by that Party's
> foreign investment authority (if any such authorization exists) to such national or
> company; or (c) an alleged breach of any right conferred or created by this Treaty
> with respect to an investment.[719]

The consent clause in Article 24 of the 2004 US Model BIT is similar. It covers breaches of the classical substantive standards in Articles 3–10, of an investment authorization, or of an investment agreement.

---

715  *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 161.

716  *Loc. cit.* For a case with a similar result see *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. 25.

717  *Tokios Tokelés* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 52, note 42; *Siemens* v. *Argentina*, Award, 6 February 2007, para. 205. See also the discussions in *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, paras. 97–101; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 57, 82, 102, 188; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 261–266.

718  *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, paras. 131–135.

719  For comment see *Gudgeon, K. S.*, Arbitration Provisions of U.S. Bilateral Investment Treaties, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S. J./Nelson, R. W.* eds.) 41, 45–47 (1985); *Peters*, Dispute Settlement Arrangements, p. 138; *Vandevelde, K. J.*, U.S. Bilateral Investment Treaties – The Second Wave, 14 Michigan Journal of International Law 621, 655 (1993).

236                    THE ICSID CONVENTION: A COMMENTARY

**533**    Other treaties restrict consent to disputes involving their substantive provisions. For instance, the BIT between El Salvador and the Netherlands of 1999 contains a submission to arbitration in Article 9 for:

> . . . disputes which arise within the scope of this agreement between one Contracting Party and an investor of the other Contracting Party concerning an investment . . .

**534**    In *Inceysa* v. *El Salvador*, consent in Article XI of the El Salvador-Spain BIT extended to "any dispute . . . concerning matters regulated by this Agreement". The Tribunal found that this clause was not a manifestation of unrestricted consent for any dispute claimed to be based on the BIT.[720]

**535**    Under Article 1116 of the NAFTA the scope of the consent to arbitration is limited to claims arising from alleged breaches of the NAFTA itself. Also, under Article 26(1) of the ECT the scope of the consent is limited to disputes "which concern an alleged breach of an obligation . . . under Part III [of the ECT]".

**536**    In *Kardassopoulos* v. *Georgia*, the claims concerned an alleged breach of an obligation under Part III of the ECT. Therefore, the requirements for jurisdiction under Article 26(1) were satisfied.[721]

**537**    The limitation of consent to violations of the treaty may be offset by an "umbrella clause" contained in the treaty. Under such a clause the States parties to the treaty undertake to observe any obligations they may have entered into with respect to investments. A violation of such an obligation may then amount to a violation of a treaty obligation. An umbrella clause is not jurisdictional in nature but contains a substantive obligation. However, it can have jurisdictional consequences. The exact meaning and effect of umbrella clauses has been the subject of much debate and disagreement in arbitral practice.

**538**    The scope for the jurisdiction of tribunals is even narrower where consent is limited to one or some of the rights granted under the Treaty. Some BITs restrict consent to jurisdiction to expropriation or to the amount of compensation due after an expropriation.[722] For instance, the Cyprus-Hungary BIT provides in Article 7 for submission to arbitration, including ICSID, of:

> Any dispute between either Contracting Party and the investor of the other Contracting Party concerning expropriation of an investment . . .

In order to establish jurisdiction under a consent clause of this kind, a tribunal must first establish the existence of an expropriation. (See also paras. 524, 525 *supra*, 574 *infra*.)

**539**    Tribunals applying consent clauses of this type were restricted to finding whether an expropriation had occurred and, if so, to awarding compensation.[723]

---

720    *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 163, 164.
721    *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 249–252.
722    See *Peters*, Dispute Settlement Arrangements, pp. 129 *et seq*.
723    *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 18(2), 25, 57, 81–83; *ADC* v. *Hungary*, Award, 2 October 2006, para. 12 (surprisingly, in this case the Tribunal made a finding of breach of other standards that were outside its jurisdiction: see para. 445); *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 70, 129–133.

### 9. Procedural Conditions to Consent

Even if a dispute is clearly covered by the parties' consent to ICSID's jurisdiction, access to the Centre may be subject to conditions. The parties are free to add such conditions to their consent, provided they are not contrary to the Convention's mandatory provisions and are in compliance with the Centre's Rules and Regulations.[724] In practice, such conditions typically concern certain procedural steps that must be taken before proceedings can be instituted.[725] Under Art. 26, a State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under the Convention. Some States have expressed such a requirement either in their investment legislation or in bilateral investment treaties (see Art. 26, paras. 192–206). **540**

### a) Waiting Periods for Amicable Settlement

A common condition for the institution of proceedings before ICSID is that an amicable settlement has been attempted through consultations or negotiations. Where this is the case, negotiations must be undertaken in good faith.[726] Some national investment laws[727] and numerous BITs contain the condition that a negotiated settlement must be attempted before resort can be had to the Centre. If no settlement is reached the claimant may proceed to arbitration. The German Model Agreement of 2005 is characteristic of this: **541**

> *Article 11*
>
> (1) Divergencies concerning investments between a Contracting Party and an investor of the other Contracting Party should as far as possible be settled amicably between the parties in dispute.
>
> (2) If the divergency cannot be settled within six months of the date when it has been raised by one of the parties in dispute, it shall, at the request of the investor of the other Contracting Party, be submitted for arbitration. Unless the parties in dispute agree otherwise, the divergency shall be submitted for arbitration under the [ICSID] Convention . . .

Most other Model Agreements and numerous BITs contain similar clauses. The NAFTA contains a comparable provision in Articles 1118 to 1120.[728] The ECT in Article 26(1) and (2) also provides for a mandatory period for amicable settlement before submission to arbitration. In order to forestall dilatory tactics and in order **542**

---

724  Clause XIII of the 1968 Model Clauses contained a general formula for subjecting consent to unspecified conditions. 7 ILM 1159, 1172 (1968).

725  *Delaume, G. R.*, ICSID and Bilateral Investment Treaties, News from ICSID, Vol. 1/2, pp. 12, 17 (1985).

726  *Amerasinghe*, Submissions to the Jurisdiction, p. 219.

727  Albania, Law on Foreign Investments, 1993, Art. 8(2); Cameroon, Investment Code, 1990, Art. 45; Tanzania, Investment Act, 1997, Art. 23(2); Togo, Investment Code, 1985, Art. 4; Uganda, Investment Code, 1991, Art. 30(2); Jordan, Investment Promotion Law, 1995, Art. 33; DR Congo, Investment Code, 2002, Art. 38; Kyrgyz Republic, Law on Investments, 2003, Art. 18(2).

728  See *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, paras. 64–67.

to make it clear when the condition precedent for settlement under the Convention has been satisfied, the treaties typically lay down time limits for negotiations. If no settlement is reached within a certain period of time, access to ICSID is open. Typical time periods foreseen for this purpose are three months, six months or twelve months.

**543**    If these waiting periods were to be seen as jurisdictional requirements, they would have to be complied with by the time of the institution of proceedings (see paras. 35–40 *supra*). As a consequence, if the request for arbitration is submitted before the expiry of the time period foreseen for a settlement, a tribunal would have to decline jurisdiction. On the other hand, by the time a decision on jurisdiction is rendered, the period for a settlement will typically have expired. Therefore, it would be possible for the claimant to re-commence proceedings immediately. The International Court of Justice has found that non-compliance with a requirement to engage in negotiations did not debar a State from invoking a compromissory clause in a treaty providing for the Court's jurisdiction.[729]

**544**    In the majority of cases tribunals found that the claimants had complied with waiting periods before proceeding to arbitration.[730] In cases where the claimants had not complied with the requirement to first attempt an amicable settlement, the reaction of tribunals has not been uniform.[731]

**545**    In a number of cases the tribunals found that non-compliance with the waiting periods did not affect their jurisdiction.[732] In *SGS* v. *Pakistan*, the Pakistan-Switzerland BIT provided for a 12-month consultation period before permitting the investor to go to ICSID arbitration. SGS had filed its request for arbitration only two days after notifying Pakistan of the existence of the dispute. The Tribunal

---

729   *Military and Paramilitary Activities in and against Nicaragua (Nicaragua* v. *United States of America)*, Judgment (Jurisdiction and Admissibility), 26 November 1984, 1984 ICJ Reports 427–429.

730   *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 54, 60–61; *AMT* v. *Zaire*, Award, 21 February 1997, paras. 5.40–5.45; *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, paras. 64–69; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001, paras. 15–23; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 121–123; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 14.1–14.6; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, para. 55; *Tokios Tokelès* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 101–107; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, para. 80; *MTD* v. *Chile*, Award, 25 May 2004, para. 96; *Occidental* v. *Ecuador* (UNCITRAL), Award, 1 July 2004, para. 7; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, paras. 163–173; *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, paras. 32, 33; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 62–71; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 6; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 38; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 39, 41; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 212–217.

731   For more detailed treatment see *Schreuer, C.*, Travelling the BIT Route: Of Waiting Periods, Umbrella Clauses and Forks in the Road, 5 Journal of World Investment & Trade 231, 232 (2004).

732   Several decisions to this effect were in non-ICSID cases: *Ethyl Corp.* v. *Canada* (UNCITRAL), Decision on Jurisdiction, 24 June 1998, 7 ICSID Reports 12, at paras. 76–88; *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, paras. 64–67; *Ronald S. Lauder* v. *The Czech Republic* (UNCITRAL), Final Award, 3 September 2001, 9 ICSID Reports 66, paras. 181–191.

accepted the Claimant's argument that the waiting period was procedural rather than jurisdictional and that negotiations would have been futile.[733] It said:

> Tribunals have generally tended to treat consultation periods as directory and procedural rather than as mandatory and jurisdictional in nature.[734] Compliance with such a requirement is, accordingly, not seen as amounting to a condition precedent for the vesting of jurisdiction … there was little indication of any inclination on the part of either party to enter into negotiations or consultations in respect of the unfolding dispute. Finally, it does not appear consistent with the need for orderly and cost-effective procedure to halt this arbitration at this juncture and require the Claimant first to consult with the Respondent before re-submitting the Claimant's BIT claims to this Tribunal.[735]

Other ICSID tribunals have endorsed this position, holding that waiting periods were not jurisdictional requirements.[736]

Some tribunals did not share this view.[737] *Enron* v. *Argentina* involved the Argentina-US BIT which provided for a six-month period for consultation between the parties to the dispute. The Tribunal found that the waiting period had been complied with in the particular case. But it added the following *obiter dictum*:

> … the conclusion reached is not because the six-month negotiation period could be a procedural and not a jurisdictional requirement as has been argued by the Claimants and affirmed by other tribunals.[738] Such requirement is in the view of the Tribunal very much a jurisdictional one. A failure to comply with that requirement would result in a determination of lack of jurisdiction.[739]

**546**

It would seem that the decisive question is whether or not there was a promising opportunity for a settlement. There is little point in declining jurisdiction and sending the parties back to the negotiating table if negotiations are obviously futile. Negotiations remain possible while the arbitration proceedings are pending. Even if the institution of arbitration was premature, the waiting period will often have expired by the time a decision on jurisdiction is rendered. Under these circumstances, compelling the claimant to start the proceedings anew would be uneconomical. A better way to deal with non-compliance with a waiting period is a suspension of proceedings to allow additional time for negotiations if these appear promising.[740]

**547**

## b) Attempt at Settlement in Domestic Courts

Art. 26 specifically excludes the requirement to exhaust local remedies in the host State unless otherwise stated (see Art. 26, paras. 187–231). Some consent

**548**

---

733    *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 80, 183–184.
734    Footnote omitted. The Tribunal cited the Decision in *Ethyl*.
735    At para. 184.
736    *Wena Hotels* v. *Egypt*, Decision on Jurisdiction, 29 June 1999, 6 ICSID Reports 87; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 88–103.
737    *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 90–93.
738    Footnote omitted: the Tribunal cited *Lauder* and *Ethyl*.
739    *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 88.
740    This was the solution chosen in *Western NIS* v. *Ukraine*, Order, 16 March 2006.

clauses in BITs provide for a mandatory attempt at settling the dispute in the host State's domestic courts for a certain period of time.[741] The investor may proceed to international arbitration if the domestic proceedings do not result in the dispute's settlement during that period or if the dispute persists after the domestic decision. Tribunals have held that this was not an application of the exhaustion of local remedies rule.[742]

549    The Argentina-Germany BIT provides in Article 10(2) that any investment dispute shall first be submitted to the host State's competent tribunals. The provision continues:

> (3) The dispute may be submitted to an international arbitration tribunal in any of the following circumstances:
> > (a) at the request of one of the parties to the dispute if no decision on the merits of the claim has been rendered after the expiration of a period of eighteen months from the date in which the court proceedings referred to in para. 2 of this Article have been initiated, or if such decision has been rendered, but the dispute between the parties persist;

550    A requirement of this kind as a condition for consent to arbitration creates a considerable burden to the party seeking arbitration with little chance of advancing the settlement of the dispute. A substantive decision by the domestic courts in a complex investment dispute is unlikely within eighteen months, certainly if one includes the possibility of appeals. Even if such a decision should have been rendered, the dispute is likely to persist if the investor is dissatisfied with the decision's outcome. Therefore, arbitration remains an option after the expiry of the period of eighteen months. It follows that the most likely effect of a clause of this kind is delay and additional cost. One tribunal has called a provision of this kind "nonsensical from a practical point of view".[743] In a number of cases in which clauses of this kind were invoked, the claimants were able to avoid their effect by relying on most-favoured-nation (MFN) clauses which allowed them to rely on other BITs of the host State that did not contain that requirement (see paras. 567–577 infra).[744]

---

741  For more detail see *Schreuer, C.*, Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, 4 The Law and Practice of International Courts and Tribunals 1, 3–5 (2005).

742  *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 19–37; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 104; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, para. 30.

743  *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 224.

744  *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 38–64; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, paras. 32–110; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 24–31; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 52–66; *National Grid* v. *Argentina* (UNCITRAL), Decision on Jurisdiction, 20 June 2006, paras. 80–93; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 52–68.

*Article 25 – Jurisdiction*                                         241

**10. *Applicability of Consent to Successive Instruments***

Investment operations often involve complex arrangements expressed in a num- **551**
ber of successive agreements. These agreements may be concluded in stages and
over a period of time. Though economically interrelated, the agreements are legally
distinct and often have different features. At times, ICSID clauses are included in
some of these agreements but not in others. If ICSID clauses are neither repeated
nor incorporated by reference in related agreements, the question arises whether
the parties' consent to ICSID's jurisdiction extends to matters regulated by these
related agreements.[745]

Some such related agreements concern peripheral operations such as financing **552**
or arrangements with subcontractors. In these situations, it may even be doubtful
whether disputes relating to them can be described as "arising directly" out of the
investment (see paras. 83–112 *supra*). In *Holiday Inns* v. *Morocco*, the Tribunal
found that it also had jurisdiction over peripheral transactions regulated in separate
contracts not containing an ICSID clause (see para. 95 *supra*).

In other cases, the successive instruments, only some of which contained ICSID **553**
clauses, all related directly to the core elements of the investment. In *Klöckner* v.
*Cameroon*, the parties had first signed a Protocol of Agreement in 1971 outlining
the general framework of their relationship. This agreement contained an ICSID
arbitration clause. Two subsequent contracts, a Supply Contract of 1972 and
an Establishment Agreement of 1973, also contained ICSID arbitration clauses.
However, a 1977 Management Contract did not contain an ICSID clause but
referred to ICC arbitration. The parties to the agreements were, in changing
combinations, Klöckner, Cameroon and SOCAME, a joint venture company. The
parties to the Protocol of Agreement and to the Supply Contract were Klöckner
and Cameroon. The parties to the Establishment Agreement were Cameroon and
SOCAME. The parties to the Management Contract were Klöckner and SOCAME
(see also paras. 492–497 *supra*).

Before the Tribunal, Cameroon brought a counter-claim relating to Klöckner's **554**
allegedly defective performance of its management duties. Klöckner sought to
exclude questions relating to its management from the Tribunal's jurisdiction
by arguing that these matters were governed exclusively by the Management
Contract, which was subject to the ICC clause. This argument was countered by
reference to Art. 9 of the Protocol of Agreement, which had already provided that
Klöckner would "be responsible for the technical and commercial management of
the Company, ensured by a Management Contract".[746]

The Tribunal rejected Klöckner's suggestion that ICSID's jurisdiction over the **555**
entire investment relationship, including management, had been restricted through
the operation of the ICC clause in the Management Contract. It found that all
disputes arising from the investment operation were subject to the ICSID clause in

---

745  *Delaume*, How to Draft, pp. 171/2; *Niggemann*, Zuständigkeitsprobleme, pp. 190–192.
746  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13.

the original Protocol of Agreement. The commercial management of the factory was an essential precondition of the investment.[747] The Tribunal, though holding that it did not have jurisdiction to evaluate the Management Contract or to interpret it,[748] found that it did have jurisdiction with respect to the counter-claim, given the direct connection between the different instruments and the parties' claims.[749] The Tribunal said:

> This case involves one and the same bilateral relationship, because the three instruments are bound together by a close connecting factor: agreement was reached for the supply of a fertilizer factory, and its technical and commercial management, in return for payment of a price and for certain investment guarantees. The reciprocal obligations had a common origin, identical sources, and an operational unity. They were assumed for the accomplishment of a single goal, and are thus interdependent.[750]

After citing from the Award in *Holiday Inns* v. *Morocco* (see para. 95 *supra*), the Tribunal continued:

> There is consequently a single legal relationship, even if three successive instruments were concluded. This is so because the first, the Protocol of Agreement, encompasses and contains all three.[751]

**556**    The Dissenting Opinion to the Award rejected the extension of jurisdiction to management.[752] The Decision of the *ad hoc* Committee, which annulled the Award for other reasons, undertook a lengthy and critical evaluation of the Tribunal's reasoning on this point.[753] But it ultimately found tenable the Tribunal's refusal to accept the ICC clause in the Management Contract as derogating from the ICSID clause in the Protocol of Agreement. It recognized that the Tribunal may have regarded the ICSID clause as an "essential jurisdictional guarantee" for the parties. For the *ad hoc* Committee, this interpretation, whether correct or not, did not constitute a manifest excess of powers.[754]

**557**    Curiously, neither the Award, nor the Dissenting Opinion, nor the Decision on Annulment discusses the reason for the absence of an ICSID clause in the Management Contract. The parties to the Management Contract were Klöckner and SOCAME, which at the time was under the majority control of the foreign investor. Since neither of the parties qualified as a Contracting State, the insertion of an ICSID clause would not have made any sense. It was only later that SOCAME passed under Government control and was ultimately designated as an agency of Cameroon (see para. 260 *supra*). A proper assessment of the reasons for the absence of the ICSID clause in the Management Contract might have shed a different light on the parties' motives for inserting the ICC clause.

**558**    In *SOABI* v. *Senegal*, three successive contracts were directly relevant to the question of jurisdiction but only one contained an ICSID clause. In July 1975,

---

747   At pp. 13/14.                              748   At p. 69.
749   At pp. 17/18.                              750   At p. 65.
751   At p. 66. See also pp. 68/9.               752   At pp. 89–93.
753   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 4–56.
754   At para. 52.

Senegal and Naikida entered into an agreement for the construction in Senegal of 15,000 low-income housing units including the establishment of a plant for the prefabrication of reinforced concrete elements to be used in the construction. In September 1975, the Government and SOABI, a locally incorporated but foreign controlled company, entered into an agreement providing more detail to the arrangement to construct the 15,000 housing units. In November 1975, the Government and SOABI concluded an Establishment Agreement for the setting up of the prefabricated industrial concrete plant. Only the last agreement contained an ICSID clause.

In November 1982, SOABI instituted ICSID proceedings seeking compensation for the alleged breach of the construction contract by relying on the arbitration clause in the Establishment Agreement. The Government objected to the Centre's jurisdiction and argued that the ICSID clause in the Establishment Agreement only concerned the construction of the plant, whereas the dispute related to the second phase of the project, the construction of the 15,000 units. SOABI argued that there was one overall project and that the Establishment Agreement, including its arbitration clause, covered all aspects of SOABI's activities.[755] The Tribunal, after joining the jurisdictional question to the merits, reached the conclusion that the prior agreements regarding the construction of the plant and of the 15,000 units were implicitly embraced in the Establishment Agreement and, therefore, fell within the scope of its ICSID clause.[756]

In the conciliation case (see paras. 19–27 *supra*) *Tesoro* v. *Trinidad and Tobago*,[757] jurisdiction was based on the Heads of Agreement signed in 1968, a comprehensive document setting out the terms of a joint venture between the parties. The Heads of Agreement contained a combined ICSID conciliation/arbitration clause. On the same date as the Heads of Agreement, the same parties also signed ten "side letters" touching on a number of matters also covered in the Heads of Agreement. The side letters did not contain ICSID clauses. The side letters referred to the Heads of Agreement but the Heads of Agreement did not refer to the side letters.[758] In its Counter-Memorial, the Government made an objection to jurisdiction. The Government argued that Tesoro's claim was based on one of the side letters which did not contain an ICSID clause. The sole Conciliator, Lord Wilberforce, found that ICSID had jurisdiction over the dispute since the side letter and the Heads of Agreement constituted one agreement and the Heads of Agreement clearly contained an ICSID clause.[759]

**559**

**560**

---

755  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 47–58.
756  *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 4.01–4.17. See *Ziadé, N. G.*, Introductory Note to the SOABI v. Senegal Award, 6 ICSID Review – FILJ 123 (1991).
757  *Tesoro* v. *Trinidad and Tobago*, Report, 27 November 1985. See *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340 (1986).
758  At pp. 343/4.                              759   At pp. 347/8.

**561**    These cases suggest that ICSID tribunals are inclined to take a broad view of consent clauses where the agreement between the parties is reflected in several successive instruments. Expressions of consent are not applied narrowly to the specific document in which they appear but are read in the context of the parties' overall relationship. Therefore, a series of interrelated contracts may be regarded, in functional terms, as representing the legal framework for one investment operation. ICSID clauses contained in some, though not all, of the different contracts may be interpreted to apply to the entire operation.[760] This practice is based on the concept of the general unity of the investment operation (see paras. 93–105 *supra*).

**562**    Other tribunals have adopted a more differentiated approach to ICSID clauses contained in only one of several related instruments. *CSOB* v. *Slovakia* involved a Consolidation Agreement between the Claimant and the Ministry of the Slovak Republic designed to deal with the issue of non-performing receivables (see para. 100 *supra*). The Consolidation Agreement contained a reference to a projected BIT which the Tribunal accepted as incorporating its ICSID clause (see para. 390 *supra*). Subsequent Loan Agreements with the Slovak Collection Company did not include an ICSID clause.

**563**    The Tribunal adopted the doctrine of the unity of the investment operation.[761] It found that the loan to the Collection Company was closely related to and could not be disassociated from the other transactions and that the Slovak Republic's undertaking and the loan formed an integrated whole.[762] Yet, in a supplementary decision on jurisdiction, the Tribunal found that it was not granted jurisdiction with respect to the Loan Agreements. The unity of the investment operation did not mean that the Tribunal automatically acquired jurisdiction with regard to each agreement concluded to implement the investment operation. This result was based in part on the somewhat indirect incorporation by reference of the consent to ICSID arbitration contained in the projected BIT that the Tribunal found had not entered into force. It was also based on the fact that the respective agreements were between different parties. Therefore the Tribunal's competence was confined to the Consolidation Agreement.[763]

**564**    In *Duke Energy* v. *Peru*, the investor and Peru had entered into a series of contracts called Legal Stability Agreements ("LSAs"). Only one of these (the DEI Bermuda LSA) contained an ICSID clause.[764] The Tribunal embraced the principle of the unity of the investment and analysed the decisions in *Holiday Inns*, *CSOB* and *SOABI*.[765] It said:

760    This passage, contained in the 1st edition of this Commentary, is quoted in *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 130.
761    *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 72.
762    At paras. 80, 82.
763    *CSOB* v. *Slovakia*, Decision on Further and Partial Objection to Jurisdiction, 1 December 2000, paras. 26–32.
764    *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 80–82, 89, 90.
765    At paras. 119–131.

> The reality of the overall investment, which is clear from the record, overcomes Respondent's objection that it could never have consented to arbitration of a dispute related to the broader investment . . .[766]

But the Tribunal immediately added language that seems to severely limit this principle:

> 132. However, the Tribunal also acknowledges the corollary finding in the CSOB case, namely that Claimant will need to substantiate its claims, during the merits phase, by reference solely to the guarantees contained in the DEI Bermuda LSA, and not those contained in any of the other LSAs. . . .
>
> 133. While the Tribunal's lack of jurisdiction over the other LSAs will not prevent it from taking them into consideration for the purposes of the interpretation and application of the DEI Bermuda LSA . . ., it will not be in a position to "give effect" to the protections in those LSAs. In other words, in the peculiar circumstances of this case (successive agreements *for the protection* of the investment), the unity of the investment does not necessarily imply the unity of the protection of the investment.[767]

The goal of settling investment disputes finally and comprehensively supports the generous application of the principle of the unity of the investment also for purposes of interpreting consent to jurisdiction. A situation in which an ICSID tribunal addresses some of the issues between the parties but leaves other closely related ones to be litigated elsewhere is unsatisfactory. Partial decisions are uneconomical and not conducive to the settlement of disputes. But this approach can be maintained only to the extent that it reflects the parties' presumed intentions. Where it is clear that the parties wished to exclude certain matters from ICSID's jurisdiction, this intention must be respected.[768]                                        **565**

Similar questions have arisen in the relationship of treaty clauses providing for international arbitration and contract clauses providing for other forms of litigation, notably before domestic courts. The resulting issues are discussed in the context of Art. 26 (see Art. 26, paras. 73–109).                                        **566**

### 11. The Applicability of MFN Clauses to Consent

A most favoured nation (MFN) clause contained in a treaty extends the better treatment granted to a third State or its nationals to a beneficiary of the treaty.[769] Most BITs, the NAFTA (Article 1103) and the ECT (Article 10(7)) contain MFN clauses. Some of these MFN clauses specify whether they cover dispute settlement. But most MFN clauses were worded in general terms and typically just refer to the treatment of investments. This has led to the question whether the effect of MFN clauses extends to the provisions on dispute settlement in these treaties.[770] Is it                                        **567**

---

766  At para. 131.
767  At paras. 132, 133. Footnotes omitted. Italics original.
768  See also *Tupman*, Case Studies, p. 834.
769  See also *Dolzer, R./Myers, T.*, After *Tecmed*: Most-Favored-Nation Clauses in Investment Protection Agreements, 19 ICSID Review – FILJ 49 (2004).
770  See *Gaillard, E.*, Establishing Jurisdiction Through a Most-Favored-Nation Clause, New York Law Journal, 2 June 2005; *Freyer, D. H./Herlihy, D.*, Most-Favored-Nation Treatment and

possible to avoid the limitations and conditions attached to consent, or even to overcome the absence of consent to arbitration by relying on the treaty's MFN clause?

**568**    In a number of cases tribunals have admitted the applicability of MFN clauses to dispute settlement. These cases involved procedural obstacles to arbitration. In *Maffezini* v. *Spain* the consent clause in the Argentina-Spain BIT required resort to the host State's domestic courts for eighteen months before the institution of arbitration. That BIT contained the following MFN clause:

> In all matters subject to this Agreement, this treatment shall not be less favorable than that extended by each Party to the investments made in its territory by investors of a third country.

**569**    On the basis of that clause, the Argentinian Claimant relied on the Chile-Spain BIT which does not contain the requirement to try the host State's courts for eighteen months. The Tribunal undertook a detailed analysis of the applicability of MFN clauses to dispute settlement arrangements[771] and concluded:

> In light of the above considerations, the Tribunal is satisfied that the Claimant has convincingly demonstrated that the most favored nation clause included in the Argentine-Spain BIT embraces the dispute settlement provisions of this treaty. Therefore, relying on the more favourable arrangements contained in the Chile-Spain BIT and the legal policy adopted by Spain with regard to the treatment of its own investors abroad, the Tribunal concludes that Claimant had the right to submit the instant dispute to arbitration without first accessing the Spanish courts.[772]

However, the *Maffezini* Tribunal warned against exaggerated expectations attached to the operation of MFN clauses and distinguished between the legitimate extension of rights and benefits and disruptive treaty-shopping. In particular, the MFN clause should not override public policy considerations that the contracting parties had in mind as fundamental conditions for their acceptance of the agreement.[773]

**570**    Subsequent decisions have adopted the same solution. The tribunals confirmed that the claimants were entitled to rely on the MFN clause in the applicable treaty to invoke the more favourable dispute settlement clause of another treaty that did not contain the eighteen months rule.[774] These tribunals pointed out that arbitration

---

Dispute Settlement in Investment Arbitration: Just How "Favored" is "Most-Favored"?, 20 ICSID Review – FILJ 58 (2005); *Fietta, S.*, Most Favoured Nation Treatment and Dispute Resolution under Bilateral Investment Treaties: A Turning Point?, 2 TDM 3 (2005); *Gallus, N.*, *Plama* v. *Bulgaria* and the Scope of Investment Treaty MFN Clauses, 2 TDM 3 (2005); *Ben Hamida, W.*, Clause de la nation la plus favorisée et mécanismes de règlement des différends: que dit l'histoire?, Revue trimestrielle LexisNexis JurisClasseur – J.D.I. 1127 (2007); *Ben Hamida, W.*, MFN Clause and Procedural Rights: Seeking Solutions from WTO Experiences, TDM February 2008.

771   *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 38–64.
772   At para. 64.                              773   At paras. 62, 63.
774   *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, paras. 32–110; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 24–31, 41–49; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 52–66; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 52–68. But see *Wintershall* v. *Argentina*, Award, 8 December 2008.

was an important part of the protection of foreign investors and that MFN clauses should consequently apply to dispute settlement. For instance, the Tribunal in *Gas Natural* v. *Argentina* said:

> . . . assurance of independent international arbitration is an important – perhaps the most important – element in investor protection. Unless it appears clearly that the state parties to a BIT or the parties to a particular investment agreement settled on a different method for resolution of disputes that may arise, most-favored-nation provisions in BITs should be understood to be applicable to dispute settlement.[775]

In another group of cases the tribunals displayed a restrictive attitude towards the applicability of MFN clauses to dispute settlement. These cases did not concern procedural obstacles to the institution of arbitration proceedings but the existence of consent to arbitration. **571**

In *Salini* v. *Jordan*, the dispute concentrated on whether the consent to arbitration contained in the Italy-Jordan BIT extended to contract claims as well as to treaty claims. The Tribunal refused to apply the MFN clause to this question. It concluded that the MFN clause "does not apply insofar as dispute settlement clauses are concerned".[776] **572**

In *Plama* v. *Bulgaria*, the Tribunal found that it had jurisdiction on the basis of Article 26 of the Energy Charter Treaty.[777] The claimant additionally attempted to base the Tribunal's jurisdiction on the BIT between Bulgaria and Cyprus. That BIT does not provide for investor-State arbitration. The Claimant sought to use an MFN clause in that BIT to avail itself of the Bulgaria-Finland BIT which does. Therefore, the reliance on the MFN clause was not just directed at overcoming a procedural obstacle but was an attempt to import consent from another treaty. The Tribunal rejected this attempt stating that any intention to incorporate dispute settlement provisions from another treaty by way of an MFN clause would have to be expressed clearly and unambiguously. It said: **573**

> an MFN provision in a basic treaty does not incorporate by reference dispute settlement provisions in whole or in part set forth in another treaty, unless the MFN provision in the basic treaty leaves no doubt that the Contracting Parties intended to incorporate them.[778]

In *Telenor* v. *Hungary*, consent to investor-State arbitration under the BIT between Hungary and Norway was limited to the consequences of expropriation. The Claimant sought to rely on the MFN clause in the BIT to benefit from wider dispute resolution provisions in BITs between Hungary and other countries. However, the Tribunal found that the term "treatment" contained in the MFN clause referred to substantive but not to procedural rights. Deciding otherwise would lead to undesirable treaty-shopping creating uncertainty and instability. Also, the jurisdiction of an arbitral tribunal, as determined by a BIT, was not to **574**

---

775  *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, para. 49.
776  *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, paras. 102–119.
777  *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 179.
778  At para. 223.

be inferentially extended by an MFN clause seeing that Hungary and Norway had made a deliberate choice to limit arbitration.[779] The Tribunal said:

> The Tribunal therefore concludes that in the present case the MFN clause cannot be used to extend the Tribunal's jurisdiction to categories of claim other than expropriation, for this would subvert the common intention of Hungary and Norway in entering into the BIT in question.[780]

**575**    The two sets of cases are distinguishable on factual grounds. The cases in which the tribunals accepted the applicability of the MFN clauses concerned procedural conditions to consent. The cases in which the effect of the MFN clauses was denied concerned attempts to extend jurisdiction to issues not covered by consent clauses in the basic treaties.[781] Nevertheless, there is substantial contradiction in the reasoning of the tribunals. The tribunals made conflicting statements as to the applicability, or otherwise, of MFN clauses to dispute settlement in general.

**576**    Much depends on the wording of the particular MFN clause. Some BITs indicate whether an MFN clause applies to dispute settlement or not. In the absence of such an indication, there is no convincing reason for distinguishing between substantive standards and dispute settlement. As a matter of treaty interpretation, it is difficult to understand why a broadly formulated MFN clause that refers to "treatment" should apply only to issues of substance, but not to questions of dispute settlement.

**577**    The argument that the MFN clause is inapplicable in cases where the basic treaty limits or refrains from granting consent, since the parties' intention in that respect is clear, is not convincing. An MFN clause is not a rule of interpretation that comes into play only where the wording of the basic treaty leaves room for doubt. It is intended to endow its beneficiary with rights that are additional to the rights contained in the basic treaty. The meaning of an MFN clause is that whoever is entitled to rely on it be granted rights accruing from a third party treaty even if these rights clearly go beyond the basic treaty.[782]

### 12. The Interpretation of Consent

### a) The Law Applicable to the Interpretation of Consent

**578**    The exact scope of consent to ICSID's jurisdiction may be unclear and may require interpretation. This raises the question of the appropriate methods for the interpretation of an expression of consent. The first step in such an inquiry is the identification of the law applicable to this issue. Tribunals have held consistently that questions of jurisdiction are not subject to Art. 42 which governs the law applicable to the merits of the case.[783] Rather, questions of jurisdiction are governed

---

779    *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 90–97.
780    At para. 100.
781    The non-ICSID case *RosInvest* v. *Russia*, SCC Award on Jurisdiction, October 2007, paras. 124–139, does not fit this scheme: the Tribunal applied the MFN clause in the UK-Soviet Union BIT to import the wider jurisdictional clause from the Denmark-Russia BIT.
782    See *RosInvest* v. *Russia*, Award on Jurisdiction, October 2007, para. 131.
783    *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, paras. 48–50; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 38; *Siemens* v. *Argentina*, Decision

*Article 25 – Jurisdiction*                                                    249

by Art. 25 of the Convention and by the instruments expressing consent. These instruments amount to an agreement between the State and the foreign investor. In the words of the Tribunal in *CMS* v. *Argentina*:

> Article 42 is mainly designed for the resolution of disputes on the merits and, as such, it is in principle independent from the decisions on jurisdiction, governed solely by Article 25 of the Convention and those other provisions of the consent instrument which might be applicable, in the instant case the Treaty provisions.[784]

Where consent is based on a treaty it would seem obvious to apply principles of treaty interpretation.[785] Reliance on domestic law principles of interpretation appears attractive where consent is based on a clause in domestic legislation. But it must be kept in mind that an ICSID clause in a treaty or in legislation is only the first step towards agreed consent. The offer must be accepted in writing by the investor (see paras. 447–455 *supra*). The perfected consent is neither a treaty nor simply a contract under domestic law, but an agreement between the host State and the investor based on a treaty. **579**

In cases involving consent expressed in direct agreements between the host State and the investor, the parties repeatedly relied on alleged principles resulting from the international nature of the consent clauses. These included the argument that there was a presumption against the limitation of a State's sovereignty[786] or against derogation from general principles of law concerning dispute settlement.[787] Arguments inspired by international law but seeking to uphold jurisdiction relied on the principle of effective interpretation[788] and *pacta sunt servanda*.[789] There was also a suggestion that ICSID jurisdiction was in derogation from general rules of municipal law and had to be interpreted strictly.[790] The Tribunals have adopted a reserved attitude towards these various arguments. **580**

In *Amco* v. *Indonesia*, consent was based on an investment application providing for ICSID arbitration that had been accepted by the host State. The Tribunal said that it would determine the true common will and intention of the parties **581**

> . . . from the normal expectations of the parties, as they may be established in view of the agreement as a whole, and of the aim and the spirit of the Washington Convention as well as of the Indonesian legislation and behaviour.[791]

In *CSOB* v. *Slovakia*, consent to arbitration was based on a contract between the parties that referred to a BIT. Although the BIT had never entered into force, **582**

---

    on Jurisdiction, 3 August 2004, paras. 29–31; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 34–39; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 15–17, 57; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 65–68.

784  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 88.
785  See *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 20.
786  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 674, 679; *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 16.
787  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 48.
788  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 674.
789  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14.
790  *SOABI* v. *Senegal*, Award, 25 February 1988, para. 4.08.
791  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 18. See also paras. 21–23.

the Tribunal concluded that by referring to the BIT the parties had intended to incorporate the arbitration clause in the BIT into their contract[792] (see paras. 390, 429 *supra*). With respect to the interpretation of the consent agreement the Tribunal had no doubt that it was governed by international law:

> The question of whether the parties have effectively expressed their consent to ICSID jurisdiction is not to be answered by reference to national law. It is governed by international law as set out in Article 25(1) of the ICSID Convention.[793]

**583**    In *SPP* v. *Egypt*, jurisdiction was based on a provision in Egyptian legislation (see paras. 400–404 *supra*). The Tribunal refused to accept Egypt's argument that the parties' consent to arbitration should therefore be interpreted in accordance with Egyptian law. Neither did it accept the Claimant's argument that the arbitration clause was subject to the rules of treaty interpretation.[794] The issue was whether certain unilaterally enacted legislation had created an international obligation under a multilateral treaty (the ICSID Convention). This involved statutory and treaty interpretation as well as certain aspects of international law governing unilateral juridical acts. The Tribunal said:

> . . . in deciding whether in the circumstances of the present case Law No. 43 constitutes consent to the Centre's jurisdiction, the Tribunal will apply general principles of statutory interpretation taking into consideration, where appropriate, relevant rules of treaty interpretation and principles of international law applicable to unilateral declarations.[795]

**584**    In *Zhinvali* v. *Georgia*, consent was based on an offer of ICSID arbitration in the host State's Investment Law.[796] The Tribunal found that its interpretation of consent was primarily governed by the law of Georgia subject to the control of international law. The Tribunal quoted *CSOB* and *SPP*. It said:

> . . . we are dealing with an internal statute rather than a bilateral agreement and hence the Tribunal believes that, if the national law of Georgia addresses this question of "consent", which the Tribunal finds that it does, then the Tribunal must follow that national law guidance but always subject to ultimate governance by international law. . . . the 1996 Georgia Investment Law, the Tribunal believes, is completely in keeping with any international law principles that may be applicable. Thus, we have reached our conclusion on the basis of our reading of Georgia's own law, which, in this case, we see no reason to view as in any way divergent from international law.[797]

**585**    The available practice, as set out above, varies in its emphasis on domestic and on international law. Some of this variation is due to the different ways in which consent is expressed by way of contracts, on the basis of treaties or on the basis of legislation. The end result is always an agreement between a State and a

---

792  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 49–55.
793  At para. 35.
794  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, paras. 55–60.
795  At para. 61.
796  *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 229.
797  At paras. 339, 340.

foreign investor. This leads to a methodological mix involving treaty interpretation, statutory interpretation and general principles of contract law. The framework for this process is always Art. 25 of the Convention.

### b) Restrictive or Extensive Interpretation of Consent

A recurrent theme in pleadings before ICSID tribunals is the argument that consent by the host State to the Centre's jurisdiction should be construed restrictively. For instance, in *Holiday Inns* v. *Morocco*, the respondent Government insisted on the need for a restrictive interpretation of a State's undertaking to arbitrate since it was in derogation from the State's sovereignty.[798] The Claimants attempted to invoke an alleged principle of interpretation in the opposite sense: that of effective interpretation epitomized in the Latin phrase *ut res magis valeat quam pereat*.[799] ICSID tribunals have been disinclined to embrace either of the two principles.[800]     **586**

In *Amco* v. *Indonesia*, the Tribunal was confronted with the argument that consent given by a sovereign State to an arbitration convention amounting to a limitation of its sovereignty should be construed restrictively.[801] The Tribunal rejected this contention categorically. It said:     **587**

> . . . like any other conventions, a convention to arbitrate is not to be construed *restrictively*, nor, as a matter of fact, *broadly* or *liberally*. It is to be construed in a way which leads to find out and to respect the common will of the parties: such a method of interpretation is but the application of the fundamental principle *pacta sunt servanda*, a principle common, indeed, to all systems of internal law and to international law.
>
> Moreover – and this is again a general principle of law – any convention, including conventions to arbitrate, should be construed in good faith, that is to say by taking into account the consequences of their commitments the parties may be considered as having reasonably and legitimately envisaged.[802]

In the Tribunal's view, the proper method for the interpretation of the consent agreement was to read it in the spirit of the ICSID Convention and in the light of its objectives. ICSID arbitration was in the interest of both parties, a thought that was expressed in the first paragraph of the Convention's Preamble. The investor's interest in submitting investment disputes to international arbitration was matched by a parallel interest of the host State: to protect investments is to protect the general interest of development and of developing countries.[803]

---

798   *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 674, 679.
799   1 ICSID Reports 674. The Tribunal's reaction to these arguments is not clear from the only published record of the case.
800   See also *Schreuer, C.*, Diversity and Harmonization of Treaty Interpretation in Investment Arbitration, 3 TDM 2, at p. 4 (2006).
801   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, paras. 12, 16.
802   At para. 14. Emphases original. See also to the same effect paras. 18 and 29. This passage was quoted with approval in *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, at para. 6.27; *Ethyl Corp.* v. *Canada* (UNCITRAL), Decision on Jurisdiction, 24 June 1998, at para. 55; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, at para. 34; *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 177.
803   At para. 23.

**588**    This teleological method of interpreting consent[804] does not embrace the extensive or effective method of interpretation explicitly. But it is liable to lean towards a result that upholds jurisdiction and will create a presumption in favour of the validity or applicability of consent.[805]

**589**    In *SOABI* v. *Senegal*, the Government's argument was that Art. 25 of the Convention must be given a strict interpretation "as with any provision derogating from general rules of municipal law".[806] The Tribunal noted that consent to arbitral proceedings was in derogation from the right to have recourse to national courts. Such consent should not be presumed. But it refused to accept the consequence that the interpretation of an expression of consent should be stricter with regard to the consent of a State than with regard to that of an investor.[807] In the Tribunal's view, the correct approach, as with any other agreement, was an interpretation consistent with the principle of good faith:

> In other words, the interpretation must take into account the consequences which the parties must reasonably and legitimately be considered to have envisaged as flowing from their undertakings. It is this principle of interpretation, rather than one of *a priori* strict, or, for that matter, broad and liberal construction, that the Tribunal has chosen to apply.[808]

**590**    In *SPP* v. *Egypt*, the argument of the restrictive interpretation of jurisdictional instruments was raised in relation to an ICSID clause in national legislation. The Tribunal found that there was no presumption of jurisdiction, particularly where a sovereign State was involved, and that jurisdiction only existed insofar as consent thereto had been given by the parties. Equally, there was no presumption against the conferment of jurisdiction with respect to a sovereign State. After referring to a number of international judgments and awards, the Tribunal said:

> Thus, jurisdictional instruments are to be interpreted neither restrictively nor expansively, but rather objectively and in good faith, and jurisdiction will be found to exist if – but only if – the force of the arguments militating in favor of it is preponderant.[809]

**591**    In *Mondev* v. *United States*, decided under the Additional Facility, the Respondent argued that its consent to arbitration under the NAFTA was given only subject to the conditions set out in that treaty, "which conditions should be strictly and narrowly construed".[810] The Tribunal rejected this contention. It said:

> In the Tribunal's view, there is no principle either of extensive or restrictive interpretation of jurisdictional provisions in treaties. In the end the question is what the relevant provisions mean, interpreted in accordance with the applicable

---

804    A teleological approach to interpretation is also apparent in *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 107.
805    See also *Rand/Hornick/Friedland*, ICSID's Emerging Jurisprudence, p. 58, and more generally *Amerasinghe*, Interpretation of Article 25(2)(b), pp. 231/2; *Amerasinghe*, The Jurisdiction of the International Centre, pp. 214, 216, 222.
806    *SOABI* v. *Senegal*, Award, 25 February 1988, para. 4.08.
807    At para. 4.09.                              808    At para. 4.10.
809    *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 63.
810    *Mondev* v. *United States* (AF), Award, 11 October 2002, para. 42.

rules of interpretation of treaties. These are set out in Articles 31–33 of the Vienna Convention on the Law of Treaties, which for this purpose can be taken to reflect the position under customary international law.[811]

A number of other tribunals have also endorsed a balanced approach to the interpretation of consent clauses. Such an approach rejects both a presumption against and in favour of jurisdiction.[812]    **592**

In *Tradex* v. *Albania*, the Tribunal appears to have embraced, although with some qualifications, a doctrine of effective interpretation. After finding that the Albanian Investment Law was an expression of Albania's commitment to the full protection of foreign investment, the Tribunal said:    **593**

> It would, therefore, seem appropriate to at least take into account, though not as a decisive factor by itself but rather as a confirming factor, that in case of doubt the 1993 Law should rather be interpreted in favour of investor protection and in favour of ICSID jurisdiction in particular.[813]

To put this statement into perspective it should be remembered that the Tribunal ultimately found that it lacked jurisdiction (see para. 525 *supra*).

The above examples would indicate that neither of the alleged principles carries much weight when applied to expressions of consent to the jurisdiction of ICSID. The issue of a restrictive or extensive interpretation of treaty clauses has also arisen in other contexts in investment arbitration.[814]    **594**

More important than theoretical considerations or general doctrines on the interpretation of consent agreements is the practice of tribunals on specific issues arising from the application of these agreements. These issues involve the various elements that are required for a finding of jurisdiction such as the interpretation of the concept of an investment, treatment of questions of nationality, application of MFN clauses and umbrella clauses and a number of other questions.    **595**

---

811  At para. 43. Footnotes omitted. The Tribunal cited several decisions by the International Court of Justice and by other tribunals.

812  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, at para. 34; *Methanex* v. *United States* (UNCITRAL), Preliminary Award on Jurisdiction, 7 August 2002, 7 ICSID Reports 239, paras. 103–105; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 91; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 76–78; *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 176–181; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 195–197.

813  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 68.

814  *Loewen* v. *United States* (AF), Decision on Jurisdiction, 9 January 2001, para. 51; *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 171; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 116; *Eureko* v. *Poland* (non-ICSID), Partial Award, 19 August 2005, 12 ICSID Reports 335, paras. 248, 258; *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 52; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 68–70; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 59, 64; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 307; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 97–99, 132; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 60, 61, 66; *Enron* v. *Argentina*, Award, 22 May 2007, para. 331. See also *Ecuador* v. *Occidental*, Court of Appeal (England), 4 July 2007, para. 28.

### J. "When the parties have given their consent, no party may withdraw its consent unilaterally."

#### 1. The Irrevocability of Consent

**596**    The Working Paper, the Preliminary Draft and the First Draft did not contain express statements to the effect that consent, once given, was irrevocable (History, Vol. I, pp. 110–116). But it does not appear that the principle was ever cast into doubt. Mr. *Broches* explained tirelessly that while there was no obligation to give consent, once such an undertaking was voluntarily made, no subsequent withdrawal should be possible (History, Vol. II, pp. 68, 70, 241, 303, 334, 335, 402, 403, 405, 406, 464, 503). He was joined by a number of delegates, mainly from developed countries (at pp. 305, 402, 403, 405, 701). Eventually, Italian and British proposals suggested that this principle should be stated explicitly in the Convention (at p. 757). After some further deliberation (at p. 836), it was adopted in the Revised Draft in its final form.

**597**    The principle of irrevocability of consent is confirmed by the Convention's Preamble, which states:

> *Recognizing* that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with;

It is reiterated in the Report of the Executive Directors, which points out that "[c]onsent to jurisdiction . . . once given cannot be withdrawn unilaterally".[815]

**598**    The binding and irrevocable nature of consent to the jurisdiction of ICSID is a manifestation of the maxim *pacta sunt servanda* and applies to undertakings to arbitrate in general.[816] The principle's aptness is obvious where the consent is expressed in a compromissory clause contained in an agreement.[817] It applies equally where an offer of consent is contained in national legislation or a treaty which has been accepted by the investor (see paras. 392–463 *supra*). Consent to ICSID's jurisdiction is always by agreement even if the elements of agreement are expressed in separate documents (see paras. 388, 416, 447, 468 *supra*).

**599**    The irrevocability of consent operates only after the consent has been perfected. A mere offer of consent to ICSID's jurisdiction may be withdrawn at any time unless, of course, it is irrevocable by its own terms. In the case of national legislation and treaty clauses providing for ICSID jurisdiction, the investor must have accepted the consent in writing to make it irrevocable. Therefore, it is inadvisable for an investor to rely on an ICSID consent clause contained in the host State's domestic law or in a treaty without making a reciprocal declaration of consent. The investor may accept the offer of consent simply by instituting proceedings

---

815    Para. 23, 1 ICSID Reports 28.
816    See *Delaume, G. R.*, The Finality of Arbitrations Involving States: Recent Developments, 5 Arbitration International 21, 24 *et seq.* (1989).
817    See the *obiter dictum* in *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 43.

before the Centre (see paras. 417, 469 *supra*) but in doing so he or she runs the risk that the offer may be withdrawn at any time before then.[818]

**600** The perfection of consent may also be delayed by other circumstances. If either the host State or the State of the investor's nationality has not yet ratified the Convention at the time consent is given by the parties, the consent will only be perfected and hence become irrevocable once these objective conditions for jurisdiction have been met (see para. 471 *supra*).

**601** In *Holiday Inns* v. *Morocco*, neither the host State nor the State of the investor's nationality were parties to the Convention on the date the agreement containing the consent clause was signed. The Tribunal noted the dates of the subsequent ratifications by the two States and concluded:

> . . . it is on the last of those dates, . . . , that the Parties "have consented to submit the dispute to arbitration" within the meaning of Article 25(2)(b) of the Convention. From that date neither Party could unilaterally withdraw its consent as provided in Article 25(1).[819]

**602** Similar considerations must apply to consent given by a constituent subdivision or agency of the host State. Such consent is subject to the condition that the constituent subdivision or agency has been designated to the Centre (see paras. 247–267 *supra*) and that its consent has been approved by the State or that the State has notified the Centre that no such approval is required (see paras. 903–920 *infra*). It is not before these conditions are met that the consent becomes effective and hence irrevocable.

**603** The irrevocability of consent only applies to unilateral attempts at withdrawal. It is clear that the parties may terminate consent to jurisdiction by mutual agreement either before or after the institution of proceedings. In particular, the parties may reach a settlement and discontinue proceedings (see Art. 48, paras. 69–87).

**604** In *Gruslin* v. *Malaysia*, the Respondent had failed to raise a particular objection to jurisdiction in an earlier pleading. The Tribunal held that this did not mean that the raising of that objection in a subsequent pleading constituted an impermissible derogation from a prior consent to jurisdiction.[820]

**605** The Convention not only declares the unilateral withdrawal of consent inadmissible but also makes provision for the institution and continuance of proceedings despite the refusal of a party to cooperate. The provisions on the constitution of conciliation commissions and arbitral tribunals (Arts. 29–30, 37–38), on *ex parte* procedure (Arts. 34(2), 45) and on the enforcement of awards (Art. 54) are designed to secure the successful conclusion of proceedings even in the face of a recalcitrant party.

**606** The parties are free to subject their consent to limitations and conditions (see paras. 513–550 *supra*). However, once consent has been given, its irrevocability

---

818   See also *Hirsch*, The Arbitration Mechanism, p. 50.
819   *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 668. See also paras. 287, 288, 472 *supra*.
820   *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 18.1–18.4.

extends to the introduction of new limitations and conditions. In other words, the prohibition of withdrawal covers the full extent of the consent to jurisdiction.

### 2. Prohibition of Indirect Withdrawal of Consent

### a) Notification under Art. 25(4)

**607**    Contracting States may notify the Centre of classes of disputes that they would not consider submitting to the jurisdiction of the Centre (see paras. 921–941 *infra*). A notification of this kind may not be used to withdraw or limit a consent given previously. The point is well illustrated by three related cases instituted against Jamaica.[821] In all three cases, the Government had entered into agreements with the foreign investor containing "no further tax" clauses and clauses containing consent to ICSID's jurisdiction.[822] All three cases involved bauxite mining. On 8 May 1974, Jamaica sent the following communication to the Centre:

> In accordance with Article 25 of the Convention establishing the International Centre for the Settlement of Investment Disputes, the Government of Jamaica hereby notifies the Centre that the following class of dispute at any time arising shall not be subject to the jurisdiction of the Centre.
>
> *Class of Dispute*
> Legal Dispute arising directly out of an investment relating to minerals or other natural resources.[823]

This notification was phrased to match the wording of Art. 25(4) of the Convention but was evidently designed to withdraw consent with respect to the three investors. Exactly one month later, Jamaica enacted new legislation that effected a ninefold increase in the taxes on the mining operations.[824]

**608**    The three Tribunals found that the Government could not limit or withdraw its consent to jurisdiction by way of a notification under Art. 25(4):

> 23. In the present case the written consent was contained in the arbitration clauses between the Government and Kaiser . . . This consent having been given could not be withdrawn. The notification under Article 25 only operates for the future by way of information to the Centre and potential future investors in undertakings concerning minerals and other natural resources of Jamaica.[825]

---

821    *Alcoa Minerals* v. *Jamaica*; *Kaiser Bauxite* v. *Jamaica*; *Reynolds* v. *Jamaica*. The *Alcoa* case is described by *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90 (1976).

822    *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 12. See also *Schmidt*, Arbitration, pp. 93/4.

823    *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 14; *Schmidt*, Arbitration, p. 102. See also: Notification concerning Classes of Disputes Considered Suitable or Unsuitable for Submission to the Centre, ICSID/8-D, p. 3.

824    *Schmidt*, Arbitration, p. 94.

825    *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 23; *Schmidt*, Arbitration, p. 103.

The Tribunals added that any other interpretation would very largely, if not wholly, deprive the Convention of any practical value for Contracting States and investors.[826] The cases were subsequently discontinued after settlements agreed by the Parties.

### b) Denunciation of the Convention

Under Art. 71, a Contracting State may denounce the Convention at six months' notice. Since participation by the host State and the investor's State of nationality are conditions for the validity of consent (see paras. 471, 600 *supra*), the termination of either State's participation in the Convention could vitiate consent. Art. 72 blocks this indirect way of withdrawing consent. It provides that the Convention's denunciation by the host State or the investor's home State shall not affect consent to jurisdiction given previously. **609**

On 2 May 2007 the Republic of Bolivia submitted a written notice of denunciation. The Secretary-General registered a case against Bolivia on 31 October 2007.[827] **610**

The same principle applies if a State party to the Convention excludes the application of the Convention to any territory for which it is responsible under Art. 70. In accordance with Art. 72, such a notice of exclusion will not affect any consent to jurisdiction given previously. **611**

### c) Withdrawal of Designation or Approval in Respect of a Constituent Subdivision or Agency

Valid consent to jurisdiction by a constituent subdivision or agency of the host State depends on two additional requirements: 1. The host State must have designated the constituent subdivision or agency to the Centre (see paras. 230–267 *supra*). 2. The host State must either have approved the consent given by its constituent subdivision or agency or notified the Centre that no such approval is required (see paras. 903–920 *infra*). Only after these conditions are met does the consent become effective and irrevocable. **612**

Once consent to the jurisdiction by a constituent subdivision or agency has become effective, it may not be vitiated by a repeal of the designation (see para. 267 *supra*) or by the withdrawal of the approval of consent (see para. 908 *infra*).[828] Similar considerations must apply if the host State abolishes the constituent subdivision or agency for the purpose of defeating consent. This is not to say that every abolition or privatization of a constituent subdivision or agency would automatically lead to the host State assuming its rights and duties under an agreement on **613**

---

826  At para. 24.                              827  *E.T.I. Euro Telecom* v. *Bolivia*.

828  See, however, *Amerasinghe*, Jurisdiction Ratione Personae, p. 237 and *Amerasinghe*, The Jurisdiction of the International Centre, pp. 190/1, who is of the opinion that the approval of the consent would become binding on the host State and therefore irrevocable only when one or both parties to the investment agreement have acted or changed their position in reliance on it. See also *Delaume*, ICSID Arbitration, p. 111.

jurisdiction (see paras. 313–316 *supra*). But it follows from the prohibition of a unilateral withdrawal of consent that a host State may not nullify the consent given by one of its constituent subdivisions or agencies by removing or restructuring it.

### d) Withdrawal of Investment Authorization

**614**   Consent to jurisdiction is sometimes limited to investments approved or authorized by the host State (see para. 422 *supra*). Consent would then become effective and irrevocable only after the approval or authorization of the investment by the host State. A subsequent revocation of the investment licence might serve to withdraw consent to ICSID's jurisdiction indirectly.

**615**   In *SPP* v. *Egypt*, jurisdiction was based on Art. 8 of Egypt's Law No. 43 of 1974 (see paras. 400–404 *supra*). Art. 1 of that Law made the application of the jurisdictional clause conditional upon the approval of the project by the Egyptian authorities. Before the Tribunal, Egypt argued that any rights conferred upon the Claimants by Law No. 43 were extinguished when the approval of their project was withdrawn on 28 May 1978. This withdrawal took place before SPP(ME) had accepted the Centre's jurisdiction in a letter of 15 August 1983.[829] The Tribunal examined the situation under Egyptian law and found that under the prevailing circumstances the withdrawal of the approval had exceeded the capacity of the acting authority and, therefore, had no juridical effect. The Tribunal added the following observations:

> 66. In any event, the same conclusion results from general principles of law. Even without going into the question of the autonomy of an arbitration clause, the Tribunal notes that Egypt did not repeal Law No. 43 before the Claimants formally invoked ICSID jurisdiction, and indeed has still not repealed it. If Law No. 43 contained an offer by Egypt to accept ICSID jurisdiction prior to cancellation of the Pyramids Oasis project, that offer did not terminate as a result of the withdrawal of the approval of the project. For cancellation of the project did not alter the fact that an investment had been made under Law 43. Accordingly, the Tribunal finds that Law No. 43 is applicable to the investment dispute in the present case.[830]

**616**   In the particular case, the attempted withdrawal of the investment authorization had taken place before the offer of consent contained in Law No. 43 was accepted by the investor. Therefore, consent had not yet become effective. Nevertheless, the Tribunal found that even the unilateral offer contained in Law No. 43 was not terminated by the cancellation of the project. However, it indicated that if Law No. 43 had been repealed before the Claimants had invoked ICSID's jurisdiction, the offer would have lapsed.

**617**   The Convention's prohibition of unilateral withdrawal of consent means that acceptance of the offer by the investor would be an absolute bar to measures by the host State to defeat ICSID's jurisdiction. Therefore, even if a valid investment

---

829   *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 64.
830   At para. 66.

authorization is a condition for obtaining the host State's consent to jurisdiction, a subsequent withdrawal of the authorization cannot nullify consent after acceptance by the investor.

### e) Repeal of National Legislation providing for Consent

A host State is free to change its investment legislation including the provision concerning consent to ICSID's jurisdiction. An offer of consent contained in national legislation (see paras. 392–426 *supra*) that has not been taken up by the investor will lapse when the legislation is repealed.[831] The situation is different if the investor has accepted the offer in writing while the legislation was still in force. The consent agreed to by the parties then becomes insulated from the validity of the legislation containing the offer. It assumes a contractual existence independent of the legislative instrument that helped to bring it about. Therefore, repeal of investment legislation providing for ICSID's jurisdiction will not effect a withdrawal of consent if the investor has accepted the offer during the legislation's lifetime. **618**

### f) Termination of a Treaty providing for Consent

Bilateral investment treaties (BITs) and multilateral international instruments providing for consent to ICSID's jurisdiction (see paras. 427–463 *supra*) are more difficult to terminate or amend than national legislation. Yet the fact remains that consent based on treaties is only perfected once it is accepted by the investor (see para. 447 *supra*). It is only after its acceptance by the investor that an offer of consent contained in a BIT or other international instrument becomes irrevocable and hence insulated from attempts by the host State to terminate the treaty or instrument. In *CSOB* v. *Slovakia*, the Tribunal found that the BIT had never entered into force despite the fact that it was published in Slovakia's Official Gazette together with a notice announcing its entry into force (see para. 429 *supra*). After the institution of ICSID proceedings, Slovakia published a corrective notice in its Official Gazette asserting the BIT's invalidity. The Tribunal said: **619**

> In this connection, it should be noted that if the Notice were to be held to constitute a valid offer by the Slovak State to submit to international arbitration, the corrective notice published by the Slovak Ministry of Foreign Affairs in the Official Gazette on November 20, 1997, asserting the invalidity of the BIT, would be of no avail to Respondent, since Claimant accepted the offer in the Request for Arbitration filed prior to the publication of the corrective notice.[832]

### g) Invalidity or Termination of the Investment Agreement containing Consent

If an investment agreement between the host State and the investor containing a clause providing for ICSID's jurisdiction is alleged to be invalid or has been terminated, it may be argued that the consent clause is also invalidated or ceases **620**

---

831   For an argument to the contrary see *Hirsch*, The Arbitration Mechanism, pp. 53/4.
832   *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 45.

to operate. A party contending that the investment agreement is not in force may deny the power of an ICSID commission or tribunal even to determine its own competence: if there is no legal basis for the Centre's jurisdiction, no commission or tribunal may be constituted; if constituted it has no power to decide anything, including the question of jurisdiction.

**621**     It is evident that the assertion that an investment agreement, including the ICSID clause contained therein, is void cannot be the end of the matter. A unilateral invocation of invalidity or termination of the investment agreement will not defeat the consent clause. Any other result would be contrary not only to the prohibition of unilateral withdrawal of consent, as contained in Art. 25(1), but also to the principle that the commission or tribunal shall be the judge of its own competence (Arts. 32 and 41). In other words, the commission or tribunal must have the power to decide on disputes concerning the alleged invalidity of investment agreements even if the commission's or tribunal's very existence depends on the agreement's validity (see Art. 41, paras. 5, 6). Despite some problems of formal logic, this is the only practical way to deal with attempts to defeat consent clauses in investment agreements by asserting their invalidity.

**622**     International arbitral practice has developed a general legal principle that supports this result. It is the doctrine of the severability or separability of the arbitration agreement. Under this doctrine, the agreement providing for arbitration assumes a separate existence, which is autonomous and legally independent of the agreement containing it.[833] The most important argument in favour of this doctrine is the assumption that the parties, in providing for the arbitration of disputes relating to the agreement, intended *all* disputes, including disputes about the agreement's validity, to be resolved through arbitration.[834] Otherwise, a party could at any time defeat its obligation to arbitrate simply by declaring the agreement void or terminated. Therefore, the "intention of the parties and the requirements of effective arbitration combine to give rise to the concept of severability".[835] This principle of severability of the arbitration agreement is supported by the weight of international arbitral codifications[836] and cases as well as by national arbitral practice.[837]

**623**     The Arbitration (Additional Facility) Rules (see paras. 9–13 *supra*) expressly provide for the separability of the arbitration agreement from the underlying contract. Their Art. 45(1) provides:

---

833   For an extensive analysis see *Schwebel, S. M.*, International Arbitration: Three Salient Problems, 1–60 (1987). See also *Hirsch*, The Arbitration Mechanism, pp. 50/1; *Langkeit, J.*, Staatenimmunität und Schiedsgerichtsbarkeit. Verzichtet ein Staat durch Unterzeichnung einer Schiedsgerichtsvereinbarung auf seine Immunität?, 72/3 (1989).

834   *Schwebel*, International Arbitration, at p. 3.     835   *Ibid.* at p. 4.

836   See ICC Rules of Arbitration (1998), Art. 6(4), 36 ILM 1604, 1609 (1997); UNCITRAL Arbitration Rules (1976), Art. 21(2), 15 ILM 701, 709 (1976); UNCITRAL Model Law on International Commercial Arbitration (1985), Art. 16(1), 24 ILM 1302, 1306 (1985); Institut de Droit International, Resolution on Arbitration between States, State Enterprises or State Entities, and Foreign Enterprises, Art. 3(a), 63 Annuaire II 324, 326 (1989).

837   *Schwebel*, International Arbitration, at pp. 24–59.

(1) The Tribunal shall have the power to rule on its competence. For the purposes of this Article, an agreement providing for arbitration under the Additional Facility shall be separable from the other terms of the contract in which it may have been included.

Despite the weight of authority against a unilateral withdrawal of consent by way of asserting the invalidity of the underlying agreement, *Delaume* would recommend a clarification of this point in the agreement. He has suggested that no harm will be done and something might be gained by including a proviso in the consent clause that would specify its applicability to disputes arising "at any time during the duration of this contract or thereafter".[838] This formula addresses the problem of the agreement's termination but not the allegation of its nullity *ab initio*. To dispel any doubts as to the severability of the agreement to arbitrate and as to the intention of the parties in this regard, the consent clause may be further specified as applying not only to the construction, application and effect of the agreement but also to its validity. **624**

### h) Incapacity to Give Consent

A special form of arguing the invalidity of an arbitration agreement is a State's contention that under its own law it lacks the capacity to make such a submission. If the rule providing for the incapacity to arbitrate is introduced after the consent has been given, it is clear that this unilateral measure by the State cannot affect its prior consent.[839] The situation is not so obvious if the rule providing for incapacity was in force at the time of consent. Technically, this is not a withdrawal of consent since the State's position is that consent was never validly given. But from the investor's perspective, who has relied on the State's undertaking to arbitrate, a subsequent claim of incapacity amounts to a withdrawal of consent (see also Art. 42, paras. 46, 47, 154–156). **625**

No problems are likely to arise with regard to constituent subdivisions and agencies under the Convention. The dual requirement of a designation to the Centre of any such entity possessing the authority to give consent (see paras. 230–267 *supra*) and of approval of consent (or notification to the Centre that no approval is required) (see paras. 903–920 *infra*) makes it unlikely that consent will be challenged on the ground of incapacity. **626**

But even the argument that a State's own expression of consent was defective under its law and hence invalid is unlikely to succeed. The State's argument can take two forms: it may argue that its substantive law restricts or excludes its capacity to submit to arbitration. Such prohibitions are not uncommon.[840] Alternatively, it may argue that the commitment to arbitrate was not given by the right organ or in violation of prescribed procedures. **627**

---

838    *Delaume*, How to Draft, p. 174.
839    *Audit, B.*, Transnational Arbitration and State Contracts, pp. 91/2 (1987).
840    See *Parra, A. R.*, Principles Governing Foreign Investment, as Reflected in National Investment Codes, 7 ICSID Review – FILJ 428, 447 (1992).

262                    THE ICSID CONVENTION: A COMMENTARY

**628**     In either case, there are weighty arguments to dismiss a plea of incapacity as vitiating a State's consent. It is the primary duty of the Contracting State to ensure the observance of its own law. Alternatively, good faith requires that any incapacities or procedural requirements must be divulged to the other side. A party may not avail itself of its own violation of legal rules.[841] The weight of practice in international arbitration is squarely against allowing States to invoke their incapacity to arbitrate to the detriment of the other party.[842]

**629**     In *IBM* v. *Ecuador*, jurisdiction was based on the BIT between Ecuador and the United States. The Respondent argued that the dispute was incapable of being settled by arbitration since there was no constitutional or legal provision that empowered the Ecuadorean Government to do so.[843] The Tribunal rejected this argument and found that Ecuador was bound by its international obligations.[844]

**630**     The observations made above are predicated on the good faith or "legitimate ignorance" of the non-State partner. If an investor is grossly negligent or fully aware of the host State's incapacity or non-compliance with procedural requirements, it will not be able to rely on the consent clause. An appropriate standard might be gleaned by analogy from Art. 46 of the Vienna Convention on the Law of Treaties, which provides:

> *Provisions of internal law regarding competence to conclude treaties*
>
> 1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.
>
> 2. A violation is manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith.

Therefore, it is wise to take legal advice as to the requirements for consent in the State concerned. As a general rule, it may be expected that the government minister in charge of economic matters has authority to give consent to arbitration. But such an expression of consent may be subject to the approval of other organs of the State.

**631**     An investor may reduce its risk drastically if it can obtain a written assurance, possibly in the agreement itself, which sets out the legal requirements for consent

---

841  *Audit*, Transnational Arbitration and State Contracts, pp. 92–96. See also Institut de Droit International, Resolution on Arbitration between States, State Enterprises or State Entities, and Foreign Enterprises, Art. 5, 63 Annuaire II 324, 328 (1989).

842  See *Audit, loc. cit.*; *Delaume*, ICSID Arbitration, pp. 105–107; *Delaume, G. R.*, The Finality of Arbitrations Involving States: Recent Developments, 5 Arbitration International 21, 26 (1989); *Langkeit, J.*, Staatenimmunität und Schiedsgerichtsbarkeit. Verzichtet ein Staat durch Unterzeichnung einer Schiedsgerichtsvereinbarung auf seine Immunität?, 74 *et seq.* (1989); *Paulsson, J.*, May a State Invoke its Internal Law to Repudiate Consent to Arbitration?, 2 Arbitration International 90 (1986). See especially, *Benteler* v. *Belgian State*, Award of *Ad Hoc* Tribunal, 18 November 1983, 1 Journal of International Arbitration 184–190 (1984).

843  *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, heading 2.5.

844  At paras. 71, 85.

under the host State's domestic law and declares that they have been met. This may be supplemented by a statement on the part of the investor that it will not be responsible for any irregularity.[845]

**632**     Problems concerning the validity of consent can also arise on the investor's side. A corporation may plead lack of authority on the part of a person representing it or non-observance of proper corporate procedure. Therefore, it is advisable to obtain evidence of authority from whoever purports to give consent to the jurisdiction of ICSID on behalf of the investor.[846]

### i) Conferral of Host State Nationality

**633**     In the case of natural persons, the investor must not possess the host State's nationality either at the time of consent or at the time a request for conciliation or arbitration is registered (Art. 25(2)(a)) (see paras. 664–678 *infra*). Therefore, acquisition of the host State's nationality after the date of consent would destroy the basis for jurisdiction *ratione personae*. The prohibition of unilateral withdrawal of consent protects the investor from the jurisdictional consequences of an involuntary acquisition of host State nationality after the date of consent if the compulsory grant of nationality is designed to defeat jurisdiction or is otherwise contrary to international law.

**634**     In the same vein, a host State cannot destroy an essential jurisdictional requirement by depriving a local company of its foreign control, as required by Article 25(2)(b), through an act of expropriation (see para. 895 *infra*).

### K.  "(2) 'National of another Contracting State' means:"

**635**     Art. 25(2) undertakes to give a definition of the words "national of another Contracting State" contained in Art. 25(1). What follows is not a definition of the concept of nationality. Art. 25(2) merely offers some clarifications on eligible and non-eligible nationalities at certain dates.

**636**     The investor's party status in ICSID proceedings is subject to a positive and to a negative nationality requirement. The investor must possess the nationality of a Contracting State. Therefore, investors who only have the nationality of a non-Contracting State are excluded (see paras. 284–288 *supra*). On the other hand, the investor must not, in principle, be a national of the host State. Therefore, nationals of the host State are also excluded, subject to an important exception for certain juridical persons, contained in Art. 25(2)(b).

**637**     Art. 25(2) distinguishes between natural persons or individuals on one side and juridical persons, such as corporations, on the other. The rule on nationality for natural persons is stricter than for juridical persons. For natural persons the

---

845  *Audit*, Transnational Arbitration and State Contracts, p. 97.
846  Institution Rule 2(1)(f) states that a request for arbitration, made by a juridical person, must state that all internal action to authorize the request has been taken. The request must be supported by documentation to this effect. This rule refers not to the giving of consent but to the institution of proceedings. See also *Delaume*, How to Draft, p. 170.

nationality requirement must be met at two distinct dates. For juridical persons it exists only with regard to one date. For natural persons possession of the host State's nationality is an absolute bar to becoming a party to ICSID proceedings. For juridical persons an exception is possible.

**638**    Much of the debate during the preparatory works on the investor's nationality turned on the question of whether it was necessary to set out objective requirements. Mr. *Broches*, in particular, emphasized the optional character of ICSID's jurisdiction and pointed out that it was up to the host State to decide whom it wished to regard as a foreign investor (History, Vol. II, pp. 256, 284, 287, 360, 397, 450, 539, 540, 580, 581/2). Nevertheless, the view prevailed that the Convention should contain objective criteria also in this respect (see para. 5 *supra*). A consensual element was preserved in the second clause of Art. 25(2)(b) in relation to a juridical person possessing the nationality of the host State. But even an agreement to treat such a juridical person as a national of another Contracting State is subject to the objective requirement that it must be under foreign control (paras. 813–825 *infra*).

**639**    Therefore, the existence of a consent agreement between a host State and an investor cannot be taken as an automatic recognition that the investor has met the Convention's nationality requirements. This holds true also for the satisfaction of the nationality conditions to qualify for protection under investment protection treaties. The nationality requirements are part of the Convention's objective criteria that must be ascertained in addition to the existence of consent.

**L. "(a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute;"**

**640**    The nationality of individual investors received considerable attention in the deliberations surrounding the Convention's drafting. In actual practice, most cases that have reached ICSID have involved juridical persons. But at the time of writing at least thirty ICSID and Additional Facility cases, past and present, have involved investors who were natural persons.[847]

---

847  *Pharaon* v. *Tunisia* (ARB/86/1) settled; *Gruslin* v. *Malaysia* (ARB/94/1) settled; *Goetz* v. *Burundi*, Award, 10 February 1999; *Azinian* v. *Mexico* (AF), Award, 1 November 1999; *Lemire* v. *Ukraine* (AF), Award, 18 September 2000; *Maffezini* v. *Spain*, Award, 13 November 2000; *Gruslin* v. *Malaysia*, Award, 27 November 2000; *Feldman* v. *Mexico* (AF), Decision on Jurisdiction, 6 December 2000, *Feldman* v. *Mexico* (AF), Award, 16 December 2002; *Genin* v. *Estonia*, Award, 25 June 2001; *Olguín* v. *Paraguay*, Award, 26 July 2001; *Loewen* v. *United States* (AF), Award, 26 June 2003, *Loewen* v. *United States* (AF), Decision on Request for Supplementation, 13 September 2004; *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003; *Mitchell* v. *DR Congo*, Award, 9 February 2004; *Soufraki* v. *UAE*, Award,

*Article 25 – Jurisdiction* 265

## 1. Determination of Nationality

### a) Applicable Law

During the Convention's preparatory work, it was generally acknowledged that **641** nationality would be determined by reference to the law of the State whose nationality is claimed subject, where appropriate, to the applicable rules of international law (History, Vol. II, pp. 67, 286, 321, 448, 580, 705, 839).[848] In particular, it was pointed out that the commission or tribunal would have to deal appropriately with cases where a host State imposed its nationality upon an investor[849] (at pp. 582, 658, 705, 868, 874, 876/7) (see also para. 678 *infra*).

Whether a person is a national of a particular State is determined, in the first **642** place, by the law of the State whose nationality is claimed. Indeed, in determining whether the individual holds a particular nationality, tribunals are entitled, and may be required, to apply that law.[850] Questions of nationality are not governed by the law applicable to the dispute in accordance with Art. 42 unless, of course, that law also happens to be the law of the State whose nationality is at issue. But an international tribunal is not bound by the national law in question under all circumstances.[851]

In *Soufraki* v. *UAE* the Tribunal explained that: **643**

> 55. It is accepted in international law that nationality is within the domestic jurisdiction of the State, which settles, by its own legislation, the rules relating to the acquisition (and loss) of its nationality. Article 1(3) of the BIT reflects this rule. But it is no less accepted that when, in international arbitral or judicial proceedings, the nationality of a person is challenged, the international tribunal is competent to pass upon that challenge. It will accord great weight to the nationality law of the State in question and to the interpretation and application of that law by its authorities. But it will in the end decide for itself whether, on the facts and law before it, the person whose nationality is at issue was or was not

---

7 July 2004, *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 June 2007; *Ahmonseto* v. *Egypt*, Award, 18 June 2007 (unpublished); *Pey Casado* v. *Chile*, Award, 8 May 2008; *Goetz* v. *Burundi* (ARB/01/2); *Funnekotter* v. *Zimbabwe* (ARB/05/6); *Micula* v. *Romania* (ARB/05/20); *Roussalis* v. *Romania* (ARB/06/1); *Lemire* v. *Ukraine* (ARB/06/18); *Foresti* v. *South Africa* (ARB(AF)/07/1); *Anderson* v. *Costa Rica* (ARB(AF)/07/3); *Beccara* v. *Argentina* (ARB/07/5); *Alemanni* v. *Argentina* (ARB/07/8); *Fuchs* v. *Georgia* (ARB/07/15); *Unglaube* v. *Costa Rica* (ARB/08/1); *Alpi* v. *Argentina* (ARB/08/9). See also *Broches, A.*, A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 5 (1991); *Sinclair, A. C.*, Nationality of Individual Investors in ICSID Arbitration, 7(6) International Arbitration Law Review 191 (2004).

848  See also *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 79.
849  This passage contained in the first edition of this Commentary was endorsed in *Pey Casado* v. *Chile*, Award, 8 May 2008, para. 320.
850  *E.g.*, *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, p. 11; *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 55, 81, upheld by the *ad hoc* Committee, Decision on Annulment, 5 June 2007, para. 60; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, paras. 152, 171/2, 193; *Pey Casado* v. *Chile*, Award, 8 May 2008, paras. 275–323; *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, para. 86.
851  See also *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 145.

> a national of the State in question and when, and what follows from that finding. Where, as in the instant case, the jurisdiction of an international tribunal turns on an issue of nationality, the international tribunal is empowered, indeed bound, to decide that issue.[852]

Soufraki sought to annul the Award in part because the Tribunal was required to *apply* Italian law, not merely to give it "great weight". The *ad hoc* Committee dismissed this complaint, explaining that whatever ambiguity may have existed in the Award, it was clear "that the Tribunal did *in reality* apply Italian law".[853] The Committee explained that the Tribunal's statement should more properly be that the Tribunal "will apply the nationality law of the State in question and accord great weight to the interpretation and application of that law by its authorities".[854] The case did not turn on any decision of the Italian courts, but in other cases it would be incumbent upon Tribunals to apply decisions of higher judicial bodies. The Committee stated that "when applying national law, an international tribunal must strive to apply the legal provisions as interpreted by the competent judicial authorities and as informed by the State's 'interpretative authorities'".[855]

**644**     Parties have argued repeatedly that nationality provisions of national law may be disregarded in cases of ineffective nationality lacking a genuine link between the State and the individual.[856] There is no published decision upholding this doctrine.[857] National rules on nationality need not be followed in certain situations of involuntary acquisition of nationality in violation of international law or cases of withdrawal of nationality that are contrary to international law.[858] A further category, recognized by the *ad hoc* Committee in *Soufraki* v. *UAE*, may be nationality asserted on the basis of fraud or mistake.[859]

**645**     In *Micula* v. *Romania*, the Respondent argued that the Claimants' Swedish nationality was not "opposable" to Romania in view of a genuine connection with Romania and the lack of effective ties with Sweden.[860] The Tribunal noted that the Claimants had only one nationality, namely that of Sweden. It found that there

---

852  *Soufraki* v. *UAE*, Award, 7 July 2004, para. 55.

853  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 93.

854  *Ibid.*

855  *Ibid.*, para. 96, citing *Case Concerning the Payment of Various Serbian Loans Issued in France*, Permanent Court of International Justice, 12 July 1929, PCIJ Reports, Ser. A., No. 20 (1929), p. 36.

856  See the *Nottebohm* case, in which the International Court of Justice ruled: ". . . nationality is a legal bond having as its basis a social fact of attachment, a genuine connection of existence, interests and sentiments, together with the existence of reciprocal rights and duties." 1955 ICJ Reports 23.

857  Tribunals have considered whether ICSID jurisdiction requires a genuine link, but have not been required to decide the issue, in *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, para. 18, *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 60–62; *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 42–46. It is clear that the test of "real and effective" nationality cannot apply in order to avoid the consequences of Art. 25(2)(a) if the investor also has the nationality of the host State: *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, p. 16; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 198.

858  Oppenheim's International Law, 9th ed., Vol. I, pp. 852–856.

859  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 71. See also *Amerasinghe*, Jurisdiction Ratione Personae, p. 249.

860  *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, para. 89.

is a clear reluctance in international law to apply the test of a genuine or effective link where only a single nationality is at issue and that there is in any event little support for that test in ICSID proceedings. The Tribunal held that the *Nottebohm* case does not allow disregarding an individual's single nationality on the basis that the individual has not resided in the country of his nationality for a period of time.[861]

International legal practice on questions of nationality has developed primarily in the context of diplomatic protection. Some tribunals and commentators have suggested that the principles developed in that context need not be followed for purposes of ICSID's jurisdiction. The function of nationality for diplomatic protection is said to be different from its function for bringing the private party within the jurisdictional pale of the Centre.[862] In *Olguín* v. *Paraguay* the Tribunal explained in *obiter* remarks that: **646**

> . . . internal rules of this nature, pertaining to the grant of diplomatic protection to individuals, and therefore, to something that under international law is a prerogative of the mother country, could not, by analogy, be applied to the case of access to the ICSID forum, one of whose most important and unique objectives is to effectively give the individual the right of action, excluding the mother country's endorsement of his claim or any other initiatives from the mother country, the only requirement being that it be a party to the 1965 Convention and the relevant BIT.[863]

Unfortunately, no criteria are offered for such an alternative approach. Until international practice develops new criteria for purposes of access to institutions like the Centre, the rules as developed in the context of diplomatic protection remain the only reliable guidance. If there is an agreement on nationality between the parties, a commission or tribunal may be expected to be more flexible in the application of the traditional standards. Such an agreement would create a strong presumption (see paras. 657–659 *infra*). **647**

b) *Certificate of Nationality*

The Working Paper for the Convention foresaw a complicated preliminary procedure to determine the nationality of the non-State party (History, Vol. I, p. 120). The subsequent Preliminary Draft provided for "a written affirmation of nationality signed by or on behalf of the Minister of Foreign Affairs of the State whose nationality is claimed". The affirmation was to be accepted as "conclusive proof" (at p. 122). This procedure received only scant support (History, Vol. II, p. 295) and ran into overwhelming opposition (at p. 582).[864] In particular, there were doubts as to whether the Minister of Foreign Affairs would be the appropriate authority to issue such a certificate (at pp. 259, 323, 325, 396, 397, 400, 503, 507/8, 538). There were also concerns that this procedure might lead to nationalities of **648**

---

861  *Ibid.*, paras. 98–103.
862  *Amerasinghe*, The Jurisdiction of the International Centre, pp. 198–203. See also *Hirsch*, The Arbitration Mechanism, pp. 76/7.
863  *Olguín* v. *Paraguay*, Award, 26 July 2001, para. 62 (unofficial translation).
864  *Amerasinghe*, The Jurisdiction of the International Centre, pp. 198/9.

convenience (at p. 323) or that an investor might be unable to obtain the required certificate (at p. 539). There was broad consensus that any certificate should not be treated as conclusive proof but only as *prima facie* evidence (at pp. 256, 394/5, 504, 508, 543, 582).

**649**    The procedure for the certification of nationality was dropped from subsequent drafts and does not appear in the Convention. Therefore, the decision as to whether the investor meets the Convention's nationality requirements is incumbent upon the commission or tribunal in the same way as with the other objective requirements for ICSID's jurisdiction. A certificate of nationality will be treated as part of the "documents or other evidence" to be examined by the tribunal in accordance with Art. 43. Such a certificate will be given its appropriate weight but does not preclude a decision at variance with its contents.[865]

**650**    In *Soufraki* v. *UAE* the Claimant relied on the Italy-United Arab Emirates BIT. The UAE challenged his assertion that he qualified as an Italian national under the BIT, on grounds that his dominant or effective nationality was not Italian. In the course of the jurisdiction proceedings, Soufraki disclosed facts that led the Tribunal to conclude that he had automatically lost his Italian nationality by operation of the applicable Italian law when, in 1991, he voluntarily acquired Canadian citizenship.[866] The issue of genuine and effective nationality was therefore superfluous and the question became whether Soufraki had ever reacquired Italian nationality. The facts as found by the Tribunal led it to conclude that at no point after 1991 had Soufraki taken steps to reacquire Italian nationality as provided for by Italian law.[867]

**651**    Soufraki nevertheless insisted that Italian officials continued to treat him as Italian. In support of his claim, Soufraki produced two Italian passports, five certificates of Italian nationality (three of which predated the acquisition of Canadian nationality) and a letter from the Italian Ministry of Foreign Affairs.[868] The UAE disputed the relevance and reliability of the certificates and the letter.

**652**    Relying on the principle in Art. 41 that an ICSID tribunal is "the judge of its own competence", the Tribunal held that it was entitled to look behind the documentation and investigate matters in order to satisfy itself of its jurisdiction (see para. 643 *supra*).

**653**    The Tribunal agreed with the UAE that the passports and certificates were not reliable for ICSID's jurisdictional purposes since they had been issued by Italian authorities who were not apprised of the relevant details by which they could have determined that Soufraki was no longer an Italian national. The key details were the date and fact of his acquisition of Canadian nationality. The Tribunal issued an award declining jurisdiction.

---

865   In *Soufraki* both the Tribunal and the *ad hoc* Committee endorsed this passage from the First Edition of this Commentary: *Soufraki* v. *UAE*, Award, 7 July 2004, para. 63; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 74. Also: *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 151.

866   *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 66–68.

867   *Ibid.*, para. 81.                    868   *Ibid.*, para. 14.

Soufraki applied for the annulment of the Award arguing, *inter alia*, that the **654** Tribunal exceeded its powers by not accepting the certificates of nationality at face value as determinative of the question of his nationality. Soufraki argued that an ICSID tribunal's power to scrutinize official certificates was limited only to cases of alleged fraud. The UAE argued that inquiry was also called for where there was evidence of error or mistake.[869] The *ad hoc* Committee agreed with the UAE. The Committee insisted that the power of ICSID tribunals to scrutinize certificates of nationality or passports is "well established" in international law generally.[870] The Committee did observe that "[i]t is only in exceptional cases – like the case under scrutiny – that ICSID tribunals have to review nationality documentation issued by state officials".[871]

The *ad hoc* Committee rejected the application for annulment. It held that **655** in the particular circumstances the Tribunal did not commit any error, much less one justifying annulment, in "not considering the national documentation on nationality as conclusive and in ascertaining on its own the nationality of the Claimant".[872] The *ad hoc* Committee said:

> . . . the principle is in fact well established that international tribunals are empowered to determine whether a party has the alleged nationality in order to ascertain their own jurisdiction, and are not bound by national certificates of nationality or passports or other documentation in making that determination and ascertainment.[873]

The Tribunal in *Pey Casado* v. *Chile* endorsed the approach of the *Soufraki* v. **656** *UAE* Tribunal in agreeing that it was for the Tribunal itself to decide, applying Chilean law, whether Pey Casado remained a Chilean national or had validly renounced this nationality (see para. 677 *infra*).[874]

### c) Agreement on Nationality

The Model Clauses published by the Centre suggest an express clarification of **657** the investor's nationality in an agreement between the host State and the investor (see para. 293 *supra*). A stipulation concerning the investor's nationality in an investment agreement is not necessary but useful. It may forestall a dispute at a later stage. At the same time, an agreement of this kind cannot create a nationality that does not exist. If under the law of the State in question and on the facts the investor does not have the alleged nationality, the agreement will be of no avail. But an agreement on nationality will create a strong presumption in favour of

---

869   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 49, 70, 71.
870   At para. 64. See also *Medina & Sons* v. *Costa Rica*, 3 RIAA 2483; *Flutie Cases*, 9 RIAA 148; *Flegenheimer Case* 25 ILR 91 (1958); *Sandifer, D.*, Evidence before International Tribunals (rev. ed., Charlottesville, 1975) 222/3; Oppenheim's International Law, 9th ed., Vol. I, p. 855.
871   *Ibid.*, para. 28.
872   *Ibid.*, paras. 75/6, 132, 134.          873   *Ibid.*, para. 64.
874   *Pey Casado* v. *Chile*, Award, 8 May 2008, paras. 319/20. See also *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, paras. 91–97.

the existence of the stipulated nationality. This would be otherwise if there was deception on the part of the investor as to its true nationality.[875]

**658**    Model Clause 6 (see para. 293 *supra*) suggests that the investor's State of nationality be named in an agreement on nationality. A mere stipulation that the Convention's nationality requirements have been met is possible but would not have the same value (see paras. 289–296 *supra*).

**659**    Bilateral investment treaties usually refer to the nationals of the respective States Parties. Subject to small variations, nationals are defined by reference to the Parties' domestic laws on citizenship.[876] This example is followed by the 1994 Mexico-Colombia-Venezuela Free Trade Agreement (see para. 463 *supra*) in Art. 17–01. An extension of treaty rights to permanent residents[877] cannot extend ICSID's jurisdiction beyond nationals of Contracting States to the ICSID Convention. But the exclusion of foreign investors who are permanent residents in the host States[878] would make an ICSID consent clause inapplicable to such investors.

### 2. Nationality of a Contracting State

**660**    The investor must have the nationality of a Contracting State. Therefore, an investor who only has the nationality of a non-Contracting State is excluded (see para. 285 *supra*). Stateless persons are also debarred from access to the Centre.[879]

**661**    There was considerable debate during the Convention's preparation on the question of dual or multiple nationality. No particular problem arises if an investor has the nationality of more than one Contracting State. The possession of the nationality of a non-Contracting State in addition to that of a Contracting State would not be a bar to becoming a party to ICSID proceedings.[880] The Preliminary Draft specifically provided that a national of a Contracting State "may possess concurrently the nationality of a State not party to this Convention" (History, Vol. I, p. 122; Vol. II, p. 170). Although the provision does not appear in later drafts, no concern was expressed about situations of this kind[881] (see Art. 27, paras. 10, 11).

**662**    If the nationality of the non-Contracting State is the effective nationality and the nationality of the Contracting State is merely one of convenience, the host State may wish to challenge the investor's standing. But it will be estopped from doing so if it has recognized the nationality of the Contracting State in full awareness of

---

875    *Amerasinghe*, The Jurisdiction of the International Centre, p. 204.
876    *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 31–33.
877    *E.g.*, in the Energy Charter Treaty 1994, Art. 1(7)(a)(i), 34 ILM 360, 383 (1995); also Arts. 201, 1111 of NAFTA, 32 ILM 605 (1993), on which see also *Feldman* v. *Mexico* (AF), Decision on Jurisdiction, 6 December 2000, paras. 24–38; *Feldman* v. *Mexico* (AF), Award, 16 December 2002, para. 48.
878    MERCOSUR Investment Protocol of Colonia 1994, Arts. 1(2), 9.
879    *Hirsch*, The Arbitration Mechanism, p. 77; *Kovar*, La compétence du Centre, p. 40; *Nathan, K. V. S. K.*, ICSID Convention, p. 84.
880    *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 60–62.
881    *Broches*, The Convention, p. 357.

the facts (see para. 657 *supra*). If the investor has the nationality of the host State, Art. 25(2)(a) presents an absolute bar to jurisdiction. In such a situation there is no room for an argument based on effective nationality (see paras. 664–678 *infra*).

A host State that does not insist on the effectiveness of the nationality of the **663** Contracting State may be faced with a diplomatic claim by the non-Contracting State. Art. 27(1) of the Convention prohibits diplomatic protection in respect of claims that the parties have consented to submit to arbitration. But this prohibition would not apply to a non-Contracting State[882] (see Art. 27, paras. 10–12).

### 3. No Nationality of the Host State

The Convention states categorically that the individual investor, to be eligible **664** for party status, must not be a national of the host State. Thus, even persons who possess the nationality of another Contracting State are excluded if they possess the host State's nationality concurrently.

This principle was not contained in the early drafts of the Convention. In fact, **665** the Preliminary Draft provided exactly the opposite by stating that the national of the other Contracting State "may possess concurrently the nationality . . . of the State party to the dispute" (History, Vol. I, p. 122; Vol. II, pp. 170/1). This idea received only qualified support (History, Vol. II, pp. 259, 445, 538, 540) and ran into overwhelming opposition (at pp. 256, 258, 260, 285, 325). Mr. *Broches* emphasized that this was merely designed to allow a host State to regard the dual national as a foreign investor if it wished to do so (at pp. 257, 284, 324, 359, 395, 398, 445, 580). But there was a widespread opinion that it was unrealistic to expect a State to submit to an international jurisdiction with respect to its own national (at pp. 325, 394, 396, 397, 398, 445, 581). The provision was deleted and the First Draft was silent on the dual nationality of individual investors (History, Vol. I, p. 124).

The debate on dual nationality continued and the idea to exclude dual nationals, **666** if one of the nationalities was that of the host State, gained strength (History, Vol. II, pp. 707, 708, 709, 840, 869, 877). Suggestions to admit dual nationals if the host State's nationality was not effective (at pp. 400, 708) or if the host State had recognized the foreign nationality specifically (at pp. 708, 868, 878/9) failed. Eventually, a proposal was adopted unanimously to exclude dual nationals explicitly if one of their nationalities was that of the host State (at pp. 868, 874, 876, 878, 880/1, 937).[883]

The Report of the Executive Directors explains the provision on dual nationality **667** in the following terms:

> 29. It should be noted that under clause (a) of Article 25(2) a natural person who was a national of the State party to the dispute would not be eligible to be a party in proceedings under the auspices of the Centre, even if at the same time

---

882  *Amerasinghe*, The Jurisdiction of the International Centre, p. 206.
883  See also *Amerasinghe*, The Jurisdiction of the International Centre, p. 205.

he had the nationality of another State. This ineligibility is absolute and cannot be cured even if the State party to the dispute had given its consent.[884]

**668**    The ineligibility of an investor who also possesses the host State's nationality applies irrespective of which of the several nationalities is the effective one. This disqualification may not even be cured by agreement between the parties. This bar would also apply if consent is based on a treaty. If an investor possesses the nationalities of both States parties to a bilateral investment treaty (BIT), he or she may enjoy the benefits of the BIT for other purposes. But the dual national would be disqualified from invoking the ICSID clause in the BIT.[885] The ICSID Secretariat has declined to register requests for arbitration presented by individuals having the nationality of the host State and another Contracting State on grounds that such disputes are manifestly outside the jurisdiction of the Centre. This is notwithstanding that the instrument of consent – whether contract, law or treaty – may purport to afford protection to such persons.[886]

**669**    *Champion Trading* v. *Egypt* concerned claims under the Egypt-United States BIT brought by both corporate and natural persons who were shareholders in an Egyptian company. The natural persons were three brothers born in the United States to an Egyptian father. They were found to be nationals of the United States by birth and residence, but also Egyptian nationals on account of the nationality of their father at the time of their birth.[887] The Tribunal found that as dual nationals, possessing the nationality of the host State to the dispute, they had no access to ICSID by application of the rule in Art. 25(2)(a).[888] The Tribunal volunteered the view that the application of the *jus sanguinis* principle over multiple generations to persons having no contact with their ancestral country of origin might raise a question about the appropriateness of the blanket exclusion expressed in Article 25(2)(a).[889] However, in the circumstances of the case, the Tribunal considered there to be no unfairness since the brothers had relied upon their Egyptian nationality at the time they set up the investment.[890]

**670**    The rule that the investor may not have the nationality of the Contracting State to the dispute applies irrespective of which of two or more nationalities is more effective. This has been confirmed in at least two published decisions.

**671**    In *Champion Trading* v. *Egypt* the Claimants argued that even if the three brothers were found to be Egyptian nationals, this was not their "effective nationality" as they had no ties with Egypt. They contended that their non-effective Egyptian nationality should be disregarded when considering the application of Art. 25(2)(a) since their dominant and effective nationality was that of the United States. This argument was unsuccessful. The Tribunal ruled that the dominant and effective

---

884    1 ICSID Reports 29.
885    *Dolzer/Stevens*, Bilateral Investment Treaties, p. 141; *Shihata/Parra*, The Experience, p. 308.
886    *Parra, A.*, The Institution of ICSID Arbitration Proceedings, 20(2) News from ICSID, p. 13 (2003).
887    *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, p. 11.
888    *Ibid.*, pp. 16/7.          889    *Ibid.*, p. 17.
890    *Ibid.*, pp. 16–17.

nationality test had no application in the case of dual nationals who possess the nationality of the Contracting State to the dispute in the light of the "clear and specific rule" in Art. 25(2)(a) of the Convention.[891]

In *Siag* v. *Egypt*, the two Claimants were both natural persons. They invoked the **672** Egypt-Italy BIT in bringing claims against Egypt for harm done to an investment in the Gulf of Aqaba. It was not disputed that both were Italian nationals,[892] but Egypt argued that jurisdiction should be denied, in the light of Art. 25(2)(a), because all of the Claimants' substantial connections were with Egypt, not Italy. Whilst the Tribunal acknowledged these connections, the majority found them not to be relevant to the question of jurisdiction. This was because the Claimants were found not to have been nationals of Egypt at the relevant times, nor indeed dual nationals at all.[893]

The Tribunal went on to offer the further conclusion that "the regime established **673** under Article 25 of the ICSID Tribunal does not leave room for a test of dominant or effective nationality".[894] Strictly speaking, that conclusion went beyond what was necessary to dispose of the dispute and is not directly supported by authority, including the Decision on Jurisdiction in *Champion Trading* v. *Egypt* upon which the Tribunal purported to rely.[895] The latter decision was restricted to the application of the particular rule in Art. 25(2)(a), but in *Siag* v. *Egypt* neither Claimant had the nationality of the host State.

The dissenting arbitrator would have applied the doctrine of effective nation- **674** ality to deny jurisdiction given the Claimants' extensive connections with Egypt, albeit not formal nationality, especially at the time they made or acquired their investment.[896] Whilst he admitted that the question of dominant and effective nationality predominantly arises in situations of dual nationality, he did not agree with the majority that the doctrine could not be applied in relation to a person who was not a dual national.[897] The dissenting arbitrator's proposed application of the doctrine of effectiveness apparently reflected the difficulty he had with uphold-ing jurisdiction in respect of the claims of formerly Egyptian nationals, whose investment had benefited from that status.[898]

The Convention speaks of the nationality of the Contracting State party to the **675** dispute. If the party to the dispute is not the host State itself but one of its constituent subdivisions or agencies (see paras. 230–267 *supra*) a literal interpretation may reach the result that the rule excluding host State nationals does not apply. But

---

891  *Ibid.*, p. 16. The Iran-United States Claims Tribunal in the "*Dual Nationality Case, A/18*", upon which the Claimants relied for the application of an effective nationality test, also observed that the real and effective nationality principle may be excluded if "an exception is clearly stated": Decision No. Dec 32-A18-FT dated 6 April 1984, reprinted in (1984) 5 Iran-US C.T.R. 251, 263.

892  *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 142.

893  *Ibid.*, paras. 159, 162, 171–173, 196. See also *Siag* v. *Egypt*, Decision on Jurisdiction, Dissent-ing Opinion of Orrego Vicuña, p. 6.

894  *Ibid.*, para. 198.          895  *Ibid.*, para. 197.

896  *Siag* v. *Egypt*, Dissenting Opinion of Orrego Vicuña, pp. 1/2, 4/5.

897  *Ibid.*, p. 2.          898  *Ibid.*, pp. 2, 4–5.

this result would be contrary to the idea underlying that rule. There is no evident reason why a host State national should be able to take a constituent subdivision or agency before ICSID any more than the host State itself.

676    The individual investor's only chance to gain access to the Centre may be to relinquish the host State's nationality before consent to ICSID's jurisdiction is perfected. Obviously, the benefits from such a step would have to be weighed against any costs arising from the surrender of the host State's nationality. Also, the investor would have to ensure that the renunciation of the nationality is valid under the host State's law. A written affirmation to this effect is advisable.

677    *Pey Casado* v. *Chile* concerned the question whether Pey Casado had duly renounced his Chilean nationality. Applying Chilean law, the Tribunal first found that renunciation of Chilean nationality was possible and consistent with the Chilean Constitution. It then found that Pey Casado had taken a number of acts intended to renounce his Chilean nationality and that the Chilean officials had acknowledged these and acted consistent with them having due effect. The Tribunal concluded that Pey Casado was no longer a Chilean national for purposes of ICSID's jurisdiction.[899]

678    There is one situation in which the host State's nationality may be disregarded. An involuntary acquisition of nationality after consent to jurisdiction has been given should not deprive the investor of access to the Centre if the compulsory grant of nationality is intended to defeat jurisdiction or is otherwise contrary to international law. The host State may not impose its nationality on a foreign investor for the purpose of withdrawing its consent (see para. 633 *supra*). During the Convention's drafting, the problem of compulsory granting of nationality was discussed and the opinion was expressed that this would not be a permissible way for a State to evade its obligation to submit a dispute to the Centre (History, Vol. II, pp. 658, 705, 876). But it was decided that this question could be left to the decision of the conciliation commission or arbitral tribunal (at pp. 868, 874, 877).[900]

### 4. Critical Dates

679    Both the positive and the negative nationality requirements must be met at the time of consent as well as at the time the request for conciliation or arbitration is registered. The nationality of the other Contracting State must exist at both dates and the nationality of the host State must not exist at either date.

680    There was much debate and uncertainty on the critical dates for the investor's nationality during the Convention's drafting.[901] The Working Paper referred to the date when the dispute is submitted to the Centre (History, Vol. I, p. 120), the Preliminary Draft to the date of consent (at p. 122; Vol. II, p. 171). The subsequent

---

899  *Pey Casado* v. *Chile*, Award, 8 May 2008, paras. 314–322.
900  This passage from the First Edition of this Commentary was noted to be of "particular significance" in *Pey Casado* v. *Chile*, Award, 8 May 2008, para. 321.
901  See also *Amerasinghe*, The Jurisdiction of the International Centre, pp. 206/7.

discussions showed a wide spectrum of opinions. Some supported the date of consent (pp. 446, 539), others the time of investment (pp. 398, 708) and yet others the time of the institution of proceedings (pp. 446, 658). Some suggested that proof of nationality should be maintained throughout the proceedings up to the time of an award (pp. 395, 538, 583), while Mr. *Broches* favoured nationality at the time of consent as well as at the institution of proceedings (pp. 260, 445, 538, 582/3).

The First Draft provided that the positive nationality requirement must be met **681** on the date of consent and on the date of the institution of proceedings (History, Vol. I, p. 124). The double test of time was later extended to the negative nationality requirement, that is the absence of the host State's nationality (History, Vol. II, pp. 874, 878, 880/1). This was explained by the possibility that the individual investor might change his or her nationality between the two dates (at p. 869). The Revised Draft retained the double test of time but changed the second date to that of registration (History, Vol. I, p. 124). This is also the rule that is reflected in the Convention.

The critical dates for the possession of the nationality of another Contracting **682** State and the non-possession of the host State's nationality should be distinguished from the dates at which these States become Contracting Parties to the Convention (see paras. 215–223, 287–288 *supra*). In particular, it is not necessary that the investor's home State or the host State are Contracting States on the date that consent to ICSID's jurisdiction is given. But consent becomes effective only upon the fulfilment of all the requirements for its validity. It is the date at which all these requirements are met, including the Convention's entry into force for the host State and for the investor's home State, that constitutes the date of consent (see paras. 468–471 *supra*).

In *Siag* v. *Egypt*, the dissenting arbitrator expressed the view that Art. 25(2)(a) **683** should be read to exclude claims by individual investors who were nationals of the host State at the time of the host State's "consent" to submit disputes to ICSID. He read the date of consent broadly to mean not only the date when consent was perfected (typically, in investment treaty arbitration, the date of the request for arbitration) but also at the time of entry of an investment. In his view, it was at the date of entry that the Contracting Parties incurred "specific legal effects, including obligations of the host State under the treaty and the prohibition to exercise diplomatic protection by the other Contracting Party".[902] The dissenting arbitrator apparently would have disregarded the Claimants' subsequent loss of Egyptian nationality and found them to be caught by the barrier to jurisdiction in Art. 25(2)(a), since they were both Egyptian at the time they made or acquired their investment.[903] This view appears to be more a call for reform than a construction of the applicable text. The dissenting arbitrator himself recognized that there was

---

902  *Siag* v. *Egypt*, Decision on Jurisdiction (Dissenting Opinion), 11 April 2007, p. 4.
903  *Ibid.*

no support for such a reading in the Convention and that the parties had not raised such arguments themselves. He acknowledged that ICSID's rules on the institution of proceedings would need to be clarified if his view were to prevail.

**684**    The Convention only states that the positive and negative nationality requirements must be met at two discrete dates, that of consent and that of registration. It is silent on the intervening period. In the traditional law of diplomatic protection, a requirement of continuous nationality is often asserted from the time the claim arises up to the date it is taken up by the State of the injured person's nationality or even up to the date of a decision.[904] The Convention does not require continuity of nationality. Its wording is directed at distinct points in time and not at a continuous period of time, which could have been expressed quite easily by "from" and "to", or "continuously until", rather than by "as well as" and "on either date".[905]

**685**    It follows that it is possible that the investor will have different nationalities on the two dates. The individual investor may change his or her nationality between the two critical dates, without affecting jurisdiction, as long as he or she has the nationality of some Contracting State other than the host State at both dates.[906] The Convention would even permit the rather unlikely situation that the investor acquires the host State's nationality after the date of consent and loses it before the date of registration.

**686**    Institution Rule 2 provides:

> (1) The request shall:
>     . . .
>     (d) indicate with respect to the party that is a national of a Contracting State:
>         (i)  its nationality on the date of consent; and
>         (ii) if the party is a natural person:
>             (A) his nationality on the date of the request; and
>             (B) that he did not have the nationality of the Contracting State party to the dispute either on the date of consent or on the date of the request;

The Secretary-General will decide, *inter alia*, on the basis of this information whether or not the request is manifestly outside the jurisdiction of the Centre under Arts. 28(3) and 36(3). Institution Rule 2 does not require that the assertions

---

904  *Loewen* v. *United States* (AF), Award, 26 June 2003, paras. 220 *et seq.*
905  This passage, contained in the First Edition of this Commentary, was quoted with approval in *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 205. See, however, an *obiter dictum* in a footnote to the Award in *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, footnote 9, where the Tribunal asserts that a "plausible justification exists for requiring continuous nationality (at least to the date of registration of a request for arbitration) of an individual but not of a juridical person: An individual has substantial control over his nationality, and thus an involuntary change of it, with consequent loss of a right to ICSID arbitration, is improbable."
906  See *Amerasinghe*, The Jurisdiction of the International Centre, pp. 207/8; *Hirsch*, The Arbitration Mechanism, pp. 79/80; *Kovar*, La compétence du Centre, pp. 40/1. See also History, Vol. II, p. 538. *Contra*: *Laviec*, Protection et promotion, p. 281.

as to nationality are substantiated by documentary evidence at the stage of the request. Such evidence may have to be produced at a later stage.[907]

The date of the request may be identical with the date of consent if the investor **687** takes up an offer by the host State to submit to ICSID's jurisdiction (see paras. 417, 469 *supra*). But the date of the request will almost certainly precede that of its registration. Theoretically, a change of nationality may occur in the short period between the date of the request and the date of its registration. Since it is the date of the registration and not that of the request that is the second critical date, such a change of nationality would be relevant but would have to be raised as an issue of jurisdiction or admissibility before the tribunal.[908] Under Arts. 32 and 41 of the Convention, it is ultimately up to the commission or tribunal to decide whether all jurisdictional requirements, including those of nationality, have been met at the relevant dates.

### M.  "and (b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration . . ."

Art. 25(2)(b) defines "national of another Contracting State" with respect to **688** juridical persons. It consists of two clauses. The first, reproduced above, contains the general rule. The second (see text before para. 760 *infra*) provides an important exception to that rule. The first clause of Art. 25(2)(b) is almost identical to the first part of Art. 25(2)(a) dealing with natural persons. Both provide that the investor, in order to have access to the Centre, must have had the nationality of a Contracting State other than the host State on the date of consent. But Art. 25(2)(a) continues by providing for a second critical date, the date of registration, and by expressly excluding investors with multiple nationalities if one of them is that of the host State. By contrast, Art. 25(2)(b) in its second clause provides a special exception from the exclusion of host State nationals if they are foreign controlled and it is agreed to treat them as such. It is clear that the exception in Art. 25(2)(b) does not import an additional requirement of "control" into the first clause (see paras. 694–707 *infra*).

### 1. Juridical Persons

The Convention does not define the concept of a juridical person. The Working **689** Paper was silent on juridical persons but the Preliminary Draft referred to a "company", which was described as including "any association of natural or juridical persons, whether or not such association is recognized by the domestic law of the Contracting State concerned as having juridical personality" (History, Vol. I, p. 122; Vol. II, p. 170). It was pointed out that countries might differ in their treatment of partnerships, associations or companies (at pp. 284, 359, 360, 661)

---

907   See Note D to Institution Rule 2, 1 ICSID Reports 53/4.
908   See Notes H and I to Institution Rule 2, 1 ICSID Reports 54. See also *Amerasinghe*, The Jurisdiction of the International Centre, p. 208; *Szasz*, A Practical Guide, p. 19.

and Mr. *Broches* suggested that for purposes of the Convention the matter might be left to the host State (at p. 284). But there was also some opposition to extending the definition of the term "company" to a mere association of natural persons or to an unincorporated partnership. Mr. *Broches* suggested that the matter might be left to be worked out by a tribunal in practice (at p. 538).[909] The subsequent drafts and the Convention refer to "juridical person" without a definition.

**690**     This indicates that legal personality is a requirement for the application of Art. 25(2)(b) and that a mere association of individuals or of juridical persons would not qualify. In such a situation, the individuals' case might be brought under Art. 25(2)(a) or the juridical persons' case forming the association would have to be brought separately under Art. 25(2)(b).[910]

**691**     This has been confirmed by ICSID tribunals. In *LESI-DIPENTA* v. *Algeria*, the Tribunal declined jurisdiction to hear a claim brought by a consortium of companies.[911]

**692**     The Tribunal in *Impregilo* v. *Pakistan* also held that the Claimant was not permitted to submit a BIT claim to ICSID on behalf of all of its partners in an unincorporated joint venture. The unincorporated consortium did not qualify as a legal person for ICSID purposes.[912] The Tribunal added that it was not permissible for the Claimant alone to bring claims on behalf of partners that did not have the nationality of a Contracting State to the BIT, notwithstanding the companies' agreement that the Claimant could represent the group. It was not permissible to expand the scope of consent set out in the BIT by way of private contract (see para. 334 *supra*).[913]

**693**     It would thus appear that the entity appearing as claimant must have legal personality under some legal system. Normally this would be the law of the State whose nationality is claimed (see Art. 42, paras. 157–159).[914] The idea that "the term may encompass juridical persons which do not have that status under the law of either the host State or the other Contracting State"[915] would seem to go too far. Some bilateral investment treaties include associations without legal personality in their definitions of "investor".[916] But for purposes of the Convention the quality of legal personality is inherent in the concept of "juridical person" and is part of the objective requirements for jurisdiction.[917]

---

909  See also *Amerasinghe*, Interpretation of Article 25(2)(b), pp. 242/3.
910  This passage from the First Edition of this Commentary was quoted in *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 133.
911  *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, paras. 37–41.
912  *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 131–139.
913  *Ibid.*, para. 151.
914  See also *Amerasinghe*, The Jurisdiction of the International Centre, p. 209.
915  *Amerasinghe*, Interpretation of Article 25(2)(b), p. 244.
916  *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 37, 38. See especially the German Model BIT of 2005, Article 1(3), *Dolzer/Schreuer*, Principles of International Investment Law, at p. 369.
917  The final sentence of this paragraph contained in the First Edition of this Commentary was quoted in *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 133.

## 2. Determination of Corporate Nationality

### a) Incorporation, Seat or Control

Under traditional international law, there are several possible criteria for the **694** determination of a juridical person's nationality.[918] The most widely used test looks at the place of incorporation or registered office. Alternatively, the place of the central administration or effective seat (*siège social*) is considered decisive. Incorporation or seat have become the accepted tests in the area of diplomatic protection. This excludes the possibility of piercing the corporate veil and looking at the nationality of the controlling interest, notably that of the shareholders.[919] On the other hand, a control test has been accepted for other purposes, notably for the treatment of enemy aliens in time of war.[920]

The Preliminary Draft to the Convention offered two possible criteria for the **695** nationality of a company: nationality under the domestic law of a Contracting State or a "controlling interest" of the nationals of such a State (History, Vol. I, p. 122; Vol. II, pp. 170, 260, 537). Nationality under a State's domestic law was later explained to mean that the company either had its seat in that country or was incorporated under the law of that country (at p. 446). In the subsequent debates, there was much doubt on the feasibility of a control test (at pp. 286, 287, 359, 360, 446, 448). It was suggested that it might be more reasonable to afford protection directly to the individual shareholders (at pp. 446, 447, 538, 581). Some delegates pointed out that the search for a controlling interest would be extremely difficult (at pp. 361, 447/8, 538, 581). On the other hand, it was felt that companies of a non-Contracting State should be covered by the Convention if nationals of a Contracting State had a majority holding of their capital (at p. 447).

The subsequent First Draft is silent on the possible criteria for corporate nation- **696** ality and merely refers to a possible agreement on nationality between the parties (History, Vol. I, p. 124). Although there was some reference to the fact that the criteria for the nationality of a juridical person remained to be determined (History, Vol. II, pp. 669, 671), no serious effort to do so was made. A United States attempt to reintroduce the criterion of a "controlling interest" in the definition of "national of another Contracting State" was defeated by a large majority (at pp. 837, 871). The Revised Draft and the Convention are silent on the method to be employed for the determination of a juridical person's nationality.

A systematic interpretation of Art. 25(2)(b) would militate against the use of **697** the control test for a corporation's nationality. The second clause of Art. 25(2)(b)

---

918   See *Acconci, P.*, Determining the Internationally Relevant Link between State and Corporate Investor, 5 Journal of World Investment & Trade 139 (2004).

919   See especially the decision of the International Court of Justice in the *Barcelona Traction* case, 1970 ICJ Reports 3, 42.

920   More generally see *Sacerdoti, G.*, Barcelona Traction Revisited: Foreign-Owned and Controlled Companies in International Law, *in*: International Law in a Time of Perplexity – Essays in Honour of Shabtai Rosenne (*Dinstein, Y.* ed.) 699 (1989).

provides that a juridical person, even though it possesses the nationality of the host State, may be treated as a foreign investor by way of a special agreement "because of foreign control". By relying on control for the exception to host State nationality, the provision implies that host State nationality is not based on control. Therefore, it is clear that the control test cannot be applied to explain the word "nationality" in the second clause of Art. 25(2)(b). It is unlikely that the word "nationality" used earlier on in the same sentence in a more general context has a different meaning. It is improbable that the nationality of a Contracting State other than the host State should be determined differently from nationality of the host State. Practice does not demonstrate any convincing reasons to the contrary. Therefore it must be assumed that the word appearing twice in the same sentence has the same meaning in both instances.

**698**    Scholarly opinion is divided on whether incorporation or seat are the only permissible criteria for the determination of nationality under Art. 25(2)(b). According to *Delaume*, it is generally agreed that, within the framework of the ICSID Convention, the nationality of a corporation is determined on the basis of its *siège social* or place of incorporation.[921] He is supported by a number of other authors.[922] By contrast, *Amerasinghe* has questioned the relevance of the criteria for corporate nationality, as developed in the context of diplomatic protection, for purposes of ICSID's jurisdiction. He pleads in favour of an extremely flexible approach that would merely require some adequate connection between the juridical person and the State, including control by nationals of that State.[923] *Broches* has adopted a more cautious approach. In his view, the Convention clearly assumes that the company's place of establishment will or may be held to determine its nationality.[924] But he warns against a mechanical application of the criteria developed for diplomatic protection. An agreement to submit to ICSID's jurisdiction should be upheld unless it would lead to a use of the Convention for purposes for which it was clearly not intended.[925] In giving effect to such an agreement,

---

921    *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 AJIL 784, 793/4 (1983); *Delaume, G. R.*, ICSID Arbitration in Practice, 2 International Tax and Business Lawyer 58, 62 (1984); *Delaume*, ICSID Arbitration, p. 111.

922    *E.g.*, *Hirsch*, The Arbitration Mechanism, p. 85; *Laviec*, Protection et promotion, p. 282; *Sutherland, P. F.*, The World Bank Convention on the Settlement of Investment Disputes, 28 International and Comparative Law Quarterly 367, 384/5 (1979); *Alexandrov, S.*, The "Baby Boom" of Treaty-Based Arbitrations and the Jurisdiction of ICSID Tribunals: Shareholders as "Investors" and Jurisdiction Ratione Temporis, 4 The Law and Practice of International Courts and Tribunals 19, 36/7 (2005).

923    *Amerasinghe, C. F.*, The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt Journal of Transnational Law 793, 807/8 (1976); *Amerasinghe*, The Jurisdiction of the International Centre, pp. 212–214, 222; *Amerasinghe*, Interpretation of Article 25(2)(b), p. 241. See also *Szasz*, The Investment Disputes Convention, p. 33, and *Vuylsteke, C.*, Foreign Investment Protection and ICSID Arbitration, 4 Georgia Journal of International and Comparative Law 343, 356 (1974).

924    *Broches, A.*, Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration, Liber Amicorum Pieter Sanders (*Schultz, J./van den Berg, A.* eds.) 63, 70 (1982).

925    See also *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 109.

a commission or tribunal should take account not only of formal criteria such as incorporation but also of economic realities such as ownership and control[926] (see also para. 716 *infra*).

ICSID tribunals have uniformly adopted the test of incorporation or seat rather than control when determining the nationality of claimants that are juridical persons. In *Kaiser Bauxite* v. *Jamaica*, the Tribunal held that the Claimant was a national of another Contracting State on the basis of the finding that "Kaiser is a private corporation organized under the laws of the State of Nevada in the United States of America."[927] In *SPP* v. *Egypt*, the Tribunal consistently referred to both Claimants as Hong Kong corporations.[928] Documents filed by the Claimants satisfied the Tribunal that they were, in fact, "Hong Kong corporations domiciled in Hong Kong".[929] **699**

Findings that a juridical person had the nationality of the host State, for the purposes of the second clause of Art. 25(2)(b), were also based on the corporations' head offices or places of incorporation (see para. 765 *infra*).[930] In *SOABI* v. *Senegal*, the Tribunal said: **700**

> As a general rule, States apply either the head office or the place of incorporation criteria in order to determine nationality. By contrast, neither the nationality of the company's shareholders nor foreign control, other than over capital, normally govern the nationality of a company, although a legislature may invoke these criteria in exceptional circumstances. Thus, a "juridical person which had the nationality of the Contracting State party to the dispute", the phrase used in Article 25(2)(b) of the Convention, is a juridical person which, in accordance with the laws of the State in question, has its head office or has been incorporated in that State.[931]

In *Tokios Tokelės* v. *Ukraine* the majority observed that ICSID tribunals have consistently applied a test of incorporation or seat, when determining the nationality of a corporate person, and, of these, "reference to the state of incorporation is the most common method of defining the nationality of business entities under modern BITs and traditional international law".[932] **701**

At times, tribunals will determine corporate nationality by reference to both the place of incorporation and effective seat.[933] **702**

---

926  *Broches*, The Convention, pp. 360/1.
927  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 19.
928  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 46.
929  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 54. See also the Dissenting Opinion at para. 3.
930  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(ii); *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 351–354.
931  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 29. See also *e.g.*, *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 108, citing the quoted passage from *SOABI*.
932  *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 63, and see para. 42; also *Rompetrol* v. *Romania*, Decision on Jurisdiction, 18 April 2008, para. 83.
933  *E.g.*, *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 46; *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 43.

**703**    Yet another context in which tribunals apply the traditional test is the nationality of the foreign control under the second clause of Art. 25(2)(b). In *Amco* v. *Indonesia*, the Tribunal simply relied on the classical concept of nationality based on incorporation and the social seat (see para. 841 *infra*).[934] In *SOABI* v. *Senegal*, the Tribunal examined the nationality of the controlling company by looking at its place of incorporation and at the location of its head office. But it found that for the special purposes of the exception contained in the second clause of Art. 25(2)(b), control could be traced beyond the first controlling corporation (see paras. 843, 844 *infra*).[935]

**704**    Tribunals have denied that the Convention requires any investigation into a Claimant company's controllers for purposes of establishing nationality.[936] The reference to foreign control in Art. 25(2)(b) does not change this basic conclusion. This provision, and provisions like it in treaties and legislation, are intended to expand ICSID jurisdiction, not limit jurisdiction where a foreign company is controlled by nationals of the host State. This has been confirmed in several cases. It was said in *Wena Hotels* v. *Egypt* to be "rather convincingly" established.[937] In *CMS* v. *Argentina*, the Tribunal said that "the Convention does not really make such a requirement [*i.e.* control] a central tenet of jurisdiction but only an alternative for very specific purposes".[938]

**705**    In *Tokios Tokelės* v. *Ukraine*, the Tribunal held, by a majority, that the second clause of Art. 25(2)(b), referring to control, applies only in the context of an agreement of the parties. Its effect is to extend the scope of ICSID jurisdiction to companies incorporated in the host State that are controlled by nationals of another Contracting State. It does not apply to limit ICSID jurisdiction.[939]

**706**    The same point was expressed in similar terms in *Enron* v. *Argentina*[940] and in *CMS* v. *Argentina*.[941] It was also explained clearly in the Decisions on Jurisdiction in *Sempra* v. *Argentina* and *Camuzzi* v. *Argentina I*:

> 40. The structure of the provision leaves no room for doubt. The first situation is that of a company having the nationality of a contracting State different from the one that is a party to the dispute. To the extent that it meets the requirements of the Convention and of the respective Treaty, that company is eligible to resort to ICSID on the basis of its nationality.
>
> 41. The second situation is different. It relates to a company which has the nationality of the State that is a party to the dispute and which, for that reason, could be prevented from claiming against its own State; in such a case, the foreign

---

934  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(iii).

935  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 35/6. See also Dissenting Opinion to the Award of 25 February 1988, at paras. 61/2. See also *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, denying jurisdiction because behind the Claimant's immediate Dutch owner was a natural person having the nationality of the host State.

936  *E.g.*, *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 28; *ADC* v. *Hungary*, Award, 2 October 2006, paras. 358/9.

937  *Wena Hotels* v. *Egypt*, Decision on Jurisdiction, 29 June 1999, 6 ICSID Reports 82.

938  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 58.

939  *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 45/6.

940  *Enron* v. *Argentina*, Decision on Jurisdiction (Ancillary Claim), 2 August 2004, paras. 40–46.

941  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 51, 58.

control criterion enables it to complain as if it were a company of the nationality of the other contracting Party . . .[942]

**707** The overwhelming weight of the authority, outlined above, points towards the traditional criteria of incorporation or seat for the determination of corporate nationality of claimants under Art. 25(2)(b). It follows that the reference to foreign control in Art. 25(2)(b) does not impose a further general requirement upon investors having the requisite foreign nationality in order for them to submit a dispute to ICSID.

### b) Agreement on Nationality

**708** The question of the corporate investor's nationality may be clarified through an agreement between the host State and the investor. The First Draft contained a clause whereby the parties could have agreed freely to treat any juridical person as a "national of another Contracting State" (History, Vol. I, p. 124). Although designed mainly to deal with companies incorporated in the host State, this provision was drafted in broad terms and would have applied to agreements on corporate nationality in general. It was criticized in subsequent discussions (History, Vol. II, pp. 658, 840) and dropped. The Revised Draft and the Convention refer to an agreement between the parties only in the context of the exception to host State nationality contained in the second clause of Art. 25(2)(b).

**709** Model Clause 6 (see para. 293 *supra*) suggests that the host State and the investor clarify the investor's nationality through a special stipulation in the investment agreement. Such a stipulation should be distinguished from the agreement under the second clause of Art. 25(2)(b) concerning host State nationals (see paras. 768–812 *infra*). The Model Clause suggests that the particular nationality be specified in an agreement on nationality. Such a specification is advisable though not necessary (see paras. 289–296 *supra*).

**710** An agreement between the parties on the investor's nationality will carry much weight, but it cannot create a nationality that does not exist. For instance, a corporation that clearly has only the nationality of a non-Contracting State, cannot be made a national of a Contracting State by agreement. On the other hand, it has been suggested convincingly that any reasonable criterion supporting the agreement should be accepted.[943] In particular, mere control of the corporation should be sufficient in such a case.[944] (On the form and extent of control see paras. 850–870 *infra*.)

---

942  *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 40, 41; also *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 30/1.

943  *Amerasinghe*, Submissions to the Jurisdiction, p. 228; *Amerasinghe*, The Jurisdiction of the International Centre, pp. 217 *et seq.*, 222/3; and see *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 120.

944  *Broches*, The Convention, p. 361; *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 77 (1974); *Delaume*, Le Centre International, pp. 790/1; *Sutherland, P. F.*, The World Bank Convention on the Settlement of Investment Disputes, 28 International and Comparative Law Quarterly 367, 385 (1979).

**711**     An agreement on nationality became relevant in *MINE* v. *Guinea*. A 1975 agreement between the parties provided for the settlement of their dispute by ICSID arbitration. The ICSID consent clause stated that "[t]he parties hereby precise [*sic*] that the investor is Swiss".[945] In fact, MINE was incorporated in Liechtenstein but was apparently under Swiss control. Since Switzerland had ratified the Convention but Liechtenstein had not, MINE's nationality was decisive for ICSID's jurisdiction.

**712**     MINE did not, at first, pursue proceedings before ICSID but obtained an *ex parte* award under the auspices of the American Arbitration Association (AAA). In proceedings to confirm that award before US Federal Courts, Guinea filed a motion to dismiss for lack of jurisdiction arguing that ICSID had exclusive jurisdiction.[946] In appeal from the District Court,[947] MINE argued that the 1975 agreement was inadequate to confer jurisdiction on ICSID since MINE was incorporated in Liechtenstein, a non-Contracting State, and that the nationality of a juridical person was to be determined exclusively by its place of incorporation. In opposition, Guinea argued for a more flexible approach, permitting agreement on a nationality based on substantial contacts.[948] A brief submitted on behalf of the United States suggested that an ICSID tribunal would not necessarily be precluded from taking jurisdiction over the dispute between MINE and Guinea under these circumstances and suggested that the Court should withhold its decision pending a ruling by an ICSID tribunal.[949] The Court of Appeals found for Guinea but based its decision on considerations of sovereign immunity[950] (see also Art. 26, paras. 9–11, 115, 149–153, 167, 168).

**713**     MINE's next step was to institute ICSID proceedings in September 1984. At the time of registration, MINE argued that the real interest in the company was Swiss and the Secretary-General registered the application "without prejudice to the question whether the condition of nationality is satisfied".[951] Before the Tribunal, neither party raised jurisdictional objections and the Tribunal did not issue a formal decision on the question of MINE's nationality.[952] But by assuming

945   *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 American Journal of International Law 784, 786/7 (1983); *Shifman, B. E.*, Maritime International Nominees Establishment v. Republic of Guinea: Effect on U.S. Jurisidiction of an Agreement by a Foreign Sovereign to Arbitrate before the International Centre for Settlement of Investment Disputes, 16 George Washington Journal of International Law and Economics 451, 461/2 (1982).
946   *Delaume, loc. cit.*, pp. 787–789.
947   505 F. Supp. 141 (1981), 20 ILM 666 (1981), 4 ICSID Reports 3.
948   See Brief for the United States of America as Intervenor and Suggestion of Interest, 20 ILM 1436, 1480 (1981). See also *Delaume, loc. cit.*, p. 794.
949   At p. 1481.
950   693 F. 2nd 1094 (1982), 72 ILR 152 (1987), 21 ILM 1355 (1982), 4 ICSID Reports 9.
951   News from ICSID, Vol. 2/1, p. 3 (1985). See also *Hirsch*, The Arbitration Mechanism, p. 88.
952   The Tribunal makes reference to MINE's justification for going to the US courts to compel AAA arbitration in the context of a claim for reimbursement of legal fees. But the denial of this claim is inconclusive for the question of nationality. *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76.

jurisdiction, the Tribunal implicitly accepted MINE's Swiss nationality. A subsequent application for annulment did not raise the issue.[953]

The Tribunal appears to have accepted the view that an agreement on nationality **714** based on actual control is decisive. The fact that the parties raised no objections to the Centre's jurisdiction constituted no obstacle to a finding on this issue. Under Arbitration Rule 41(2) the tribunal may consider questions of jurisdiction on its own initiative. The circumstances of the case make it obvious that the Tribunal could not have been ignorant of the questions surrounding the claimant's nationality.[954]

The loan and sovereign guarantee agreements at issue in *CDC* v. *Seychelles* **715** contained an agreement that CDC was a national of another Contracting State for the purposes of Art. 25 of the Convention.[955] The Concession Agreement in *Soufraki* v. *UAE* described Mr. Soufraki as a Canadian national.[956] In neither case did the agreement on nationality play a decisive role in the tribunals' reasoning.

An agreement on the investor's nationality need not be made in the form of an **716** express stipulation. Consent to ICSID's jurisdiction expressed in a direct agreement between the parties implies an understanding that the investor fulfils the Convention's nationality requirements.[957] This would hold true only if two conditions are fulfilled: the host State must have expressed its consent specifically with respect to the particular investor. Normally, this would be the case only if the consent is expressed in a single instrument. A general offer of consent contained in national legislation or a treaty that is taken up by the investor would not carry this implication. Additionally, the parties must have been fully aware of the circumstances surrounding the investor's nationality. In particular, if mistake, deception or misrepresentation can be shown to have existed, no inferences as to an agreement on nationality can be drawn from the fact of consent.

The consequence of such an implicit agreement on nationality would be the **717** easing of the criteria for the existence of nationality (see para. 710 *supra*). Any reasonable connection to a Contracting State, including control, would be acceptable. For instance, if the host State entered into a consent agreement with an investor that is incorporated in a non-Contracting State but is controlled by nationals of a Contracting State, the host State could not subsequently challenge jurisdiction on the ground that the nationality requirements of Art. 25(2)(b) were not met, provided the circumstances surrounding the investor's nationality were fully known. By contrast, if consent is based on an offer, contained in host State legislation or in a treaty, which is simply taken up by the investor, no inferences as to agreed nationality can be drawn. Unless provided otherwise by the legislation or treaty, the

953   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, footnote 1 to para. 1.02.
954   For a critical evaluation see *Hirsch*, The Arbitration Mechanism, pp. 88–91.
955   *CDC* v. *Seychelles*, Award, 17 December 2003, para. 4.
956   *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 3, 41.
957   *Broches*, The Convention, p. 361; *Szasz*, The Investment Disputes Convention, p. 34.

host State may insist that the investor demonstrate its nationality of a Contracting State based on incorporation or *siège social*.

## c) Legislation and Treaties

**718**    In the case of consent based on national legislation or treaties (see paras. 392–463 *supra*), the respective instruments often contain definitions or descriptions of foreign investors. Definitions in national investment legislation containing ICSID clauses are by no means uniform. Some national laws refer to a corporate foreign investor as a juridical person "incorporated or constituted under the law of a foreign country"[958] or as "incorporated outside the . . . Republic".[959] Other laws refer to corporations in which more than half of the registered capital is held by foreign persons or foreign corporations.[960]

**719**    Bilateral investment treaties (BITs) use a variety of criteria to determine the nationality of a company.[961] Many BITs use the traditional criteria of incorporation and/or seat.[962] For instance, the Chinese Model BIT of 2003 defines corporate investors in the following terms:

> legal entities, including companies, associations, partnerships and other organizations, incorporated or constituted under the laws and regulations of either Contracting Party and have their seats in that Contracting Party.[963]

**720**    Some Swiss treaties use the concept of a controlling interest.[964] BITs of other States such as the Netherlands,[965] the United States,[966] France[967] and Sweden[968] use a combination of the traditional criteria and of control.[969]

---

958    Albania, Law on Foreign Investments, 1993, Art. 1 – see *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 14 ICSID Review – FILJ 161, 171/2, 181/2 (1999); Kazakhstan, Law on Foreign Investments, 1995, Art. 1; Mozambique, Law of Investments, 1993, Art. 1(1)(q).

959    Tanzania, National Investment (Promotion and Protection) Act, 1990, sec. 2.

960    Uganda, Investment Code, 1991, sec. 10(1)(b); Zaire, Investment Code, 1986, Art. 1(c).

961    See *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 34–42.

962    See *e.g.*, Italy-Korea BIT (1989) Art. 2(3); Italy-Poland BIT (1989) Art. 1(4); Italy-Argentina BIT (1990) Art. 1(2); Italy-Algeria BIT (1991) Art. 1(3); Italy-Albania BIT (1991) Art. 1(2); Argentina-China BIT (1992) Art. 1(2); Chile-Norway BIT (1993) Art. 1(1).

963    China Model BIT 2003, *in: Dolzer/Schreuer*, Principles of International Investment Law, at p. 353.

964    See Article 1(b) of the Swiss Model Agreement, *Dolzer/Stevens*, Bilateral Investment Treaties, p. 219. See also, Switzerland-Poland BIT (1989) Art. 1(1); Switzerland-Jamaica BIT (1990) Art. 1(b); Switzerland-Chile BIT (1991) Art. 1(1).

965    *Dolzer/Stevens*, Bilateral Investment Treaties, p. 210. See also, Netherlands-Cape Verde BIT (1991) Art. 1(b); Netherlands-Argentina BIT (1992) Art. 1(b); Netherlands-Lithuania BIT (1994) Art. 1(b).

966    See *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 241/2; US-Bulgaria BIT (1992); US-Ecuador BIT (1993); US-Moldova BIT (1993).

967    See France Model BIT 2006, Art. 1(2)(b), *in: Dolzer/Schreuer*, Principles, p. 361. See also France-Kuwait BIT (1989) Art. 1(4); France-Nigeria BIT (1990) Art. 1(3); France-Chile BIT (1992) Art. 1(3).

968    See *e.g.*, Sweden-Tunisia BIT (1984) Art. 1(3); Sweden-Morocco BIT (1990) Art. 1(3).

969    *Parra, A. R.*, The Scope of New Investment Laws and International Instruments, *in*: Economic Development, Foreign Investment and the Law (*Pritchard, R.* ed.) 27 *et seq.* (1996).

More recent BITs combine incorporation with the exercise of substantial business activity in the country concerned.[970] The Norway Model BIT of 2007 defines a corporate investor as: **721**

> any entity established in accordance with, and recognised as a legal person by the law of a Party, and engaged in substantive business operations in the territory of that Party, such as companies, firms, associations, development finance institutions, foundations or similar entities irrespective of whether their liabilities are limited and whether or not their activities are directed at profit.

Some multilateral instruments containing ICSID consent clauses (see paras. 456–463 *supra*) follow the traditional criteria. For instance, the Energy Charter Treaty of 1994 in Art. 1(7)(a)(ii) describes a corporate investor as "a company or other organization organized in accordance with the law applicable in that Contracting Party".[971] Similarly, the 1994 Mexico-Colombia-Venezuela Free Trade Agreement in Art. 17–01 refers to a company constituted, organized or registered in conformity with the law of a Party. The NAFTA defines an "enterprise of a Party" as "an enterprise constituted or organized under the law of a Party, and a branch located in the territory of a Party and carrying out business activities there".[972] **722**

Definitions of corporate nationality in national legislation or in treaties providing for ICSID's jurisdiction are directly relevant to the determination of whether the nationality requirements of Art. 25(2)(b) have been met. They are part of the legal framework for the host State's submission to the Centre. Upon acceptance in writing by the investor (see paras. 416–426, 447–455 *supra*), they become part of the agreement on consent between the parties. Therefore, any reasonable determination of the nationality of juridical persons contained in national legislation or in a treaty should be accepted by an ICSID commission or tribunal (see also paras. 811, 812 *infra*). This conclusion was expressly confirmed in *Tokios Tokelės* v. *Ukraine*.[973] **723**

Host States have at times argued that the ICSID Convention implies additional conditions for the determination of an investor's nationality, besides the requirements set out in applicable investment treaties. **724**

In *Tokios Tokelės* v. *Ukraine*, Ukraine argued that whilst Tokios Tokelės was lawfully incorporated in Lithuania, it was not a "genuine entity" of Lithuania for the purposes of the Lithuania-Ukraine BIT and the Convention. Ukraine argued that the Tribunal should adopt either a "control test", and look to the company's ultimate owners, or determine its *siège social*, both of which, it said, pointed to Ukrainian, not Lithuanian, nationality. Ukraine emphasized that Tokios Tokelės **725**

---

970    See Article 1 of the 2004 US Model Agreement, defining "enterprise of a Party", *in*: *Dolzer/Schreuer*, Principles, p. 386.
971    34 ILM 360, 384 (1995). See also MERCOSUR Protocol of Colonia for the Reciprocal Protection of Investments, 1994, Art. 1(2)(b).
972    Art. 1139 NAFTA, 32 ILM 605, 647; *Dolzer/Schreuer*, Principles, p. 348.
973    *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 26, quoting the corresponding passage in the First Edition of this Commentary.

was 99% owned by Ukrainian nationals, who also comprised two-thirds of its management. Ukraine also argued that Tokios Tokelės conducted no substantial business activities in Lithuania, and that its administrative headquarters were based in Ukraine, although these allegations were disputed.

726    Ukraine argued that the Tribunal ought not to uphold its jurisdiction for policy reasons. It said that the object and purpose of the Lithuania-Ukraine BIT and the Convention did not permit nationals of the host State to submit claims against their own State to international arbitration, albeit through a foreign-incorporated entity. Ukraine argued that the Lithuania-Ukraine BIT and the Convention both contemplated only the settlement of international investment disputes involving a Contracting State and a foreign investor.[974]

727    The Tribunal held, by a majority, that the Convention leaves the task of choosing the applicable test by which to determine whether a legal person qualifies as a national of a Contracting State to the "reasonable discretion of the Contracting Parties".[975] Article 1(2)(b) of the BIT defined Lithuanian "investors" to mean "any entity established in the territory of the Republic of Lithuania in conformity with its laws and regulations".[976] The Tribunal further held that the legal place of incorporation was the only relevant consideration to determine whether the Tribunal had jurisdiction *ratione personae.* Nothing in the Convention or the BIT required any further or substantial connection between Tokios Tokelės and Lithuania, including the locus of the underlying controllers, in order for it to qualify for protection under the treaty and to submit a claim to ICSID.[977] As it was not disputed that Tokios Tokelės was a legal entity duly established under the laws of Lithuania, the majority concluded that Tokios Tokelės qualified as a Lithuanian "investor" for the purposes of the BIT and a "national of another Contracting State" for the purposes of the Convention.[978] The majority explained the rationale for its approach as follows:

> We emphasize here that Contracting Parties are free to define their consent to jurisdiction in terms that are broad or narrow; they may employ a control-test or reserve the right to deny treaty protection to claimants who otherwise would have recourse under the BIT. Once that consent is defined, however, tribunals should give effect to it, unless doing so would allow the Convention to be used for purposes for which it clearly was not intended.[979]

728    Some States require a further bond between a company and their territory if the company is to be entitled to benefit from treaty protection. They express qualifications on the standing of companies or reserve the right to deny protection to entities that lack a substantial connection to the State in which they are incorporated if

---

974    Ukraine further argued that Tokios Tokelės did not make an investment in Ukraine as defined by the BIT. Ukraine argued that both the Lithuania-Ukraine BIT and the Convention protected only international, cross-border investments and asserted that Tokios Tokelės had failed to prove that its capital investment originated from outside Ukraine. On the issue of the origin of the investment see paras. 182–187 *supra.*

975    *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 24.

976    *Ibid.*, para. 28.                    977    *Ibid.*

978    *Ibid.*, paras. 29, 38.               979    *Ibid.*, para. 39.

they are controlled by nationals of a third State.[980] The majority in *Tokios Tokelės* v. *Ukraine* regarded the absence of such qualifications as "a deliberate choice of the Contracting Parties".[981]

**729** The Tribunal also appears to have been persuaded by the fact that there was no evidence that Tokios Tokelės had been established for the very purpose of attracting the protection of the Lithuania-Ukraine BIT and obtaining access to ICSID. As with the cases that have queried the "effective" nationality of natural persons, the majority held that this was not a case involving a nationality of convenience.[982]

**730** The President of the Tribunal dissented from the majority decision, stating that he disagreed with the very "philosophy of the decision".[983] In the President's opinion the Convention imposes certain objective jurisdictional requirements on the Centre. These requirements form the "outer limits" of ICSID's jurisdiction, which the parties to a dispute may not "dispose at will".[984] It followed that:

> while the Contracting Parties to the BIT are free to confer to the ICSID tribunal a jurisdiction narrower than that provided for by the Convention, it is not for them to extend the jurisdiction of the ICSID tribunal beyond its determination in the Convention.[985]

**731** The President observed, relying in part on the Preamble, that the Convention was established as a mechanism for arbitrating "international investment disputes, that is to say, for disputes between States and foreign investors", not for "investment disputes between states and their own nationals".[986] According to the President,

> . . . the ICSID mechanism and remedy are not meant for, and are not to be construed as, allowing – even less encouraging – nationals of a State party to the ICSID Convention to use a foreign corporation, whether preexistent or created for that purpose, as a means of evading the jurisdiction of their domestic courts and the application of their national law. It is meant to protect – and thus *encourage* – *international* investment.[987]

**732** Although the President acknowledged that it would be necessary to establish criteria to identify the controllers of a corporate entity, in the instant case it was clear to his mind that in effect Tokios Tokelės was a Ukrainian entity. The President observed that "[i]n the present case . . . where Tokios Tokelės is indisputably and totally in the hands of, and controlled by, Ukrainian citizens and interests, there is no evading the issue of principle".[988] Thus, in his view, Tokios Tokelės was not a

---

980 On the interpretation and application of "denial of benefits" clauses, see *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 15.1–15.9; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 143–178; *Petrobart* v. *Kyrgyz Republic* (SCC), Award, 29 March 2005, p. 63. See also *Sinclair, A. C.*, The Substance of Nationality Requirements in Investment Treaty Arbitration, 20 ICSID Review – FILJ 357, 378–387 (2005). On the substance of criteria that exist in some treaties to qualify for protection, see also *Yaung Chi Oo* v. *Myanmar* (ASEAN), Award, 31 March 2003, 42 ILM 540 (2003).
981 *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 36.
982 *Ibid.*, paras. 53–56.
983 Dissenting Opinion, para. 1.
984 *Ibid.*, para. 28.
985 *Ibid.*, para. 13.
986 *Ibid.*, para. 5.
987 *Ibid.*, para. 30 (emphasis original).
988 *Ibid.*, para. 10.

"national of another Contracting State", it was a national and investor of Ukraine, and he would have declined to uphold jurisdiction accordingly.[989] The President felt moved to express his dissenting view, and subsequently resign from the case, out of concern for "the future of the institution".[990]

**733**    The President's Dissenting Opinion reflects a particular appreciation of the ICSID Convention's object and purpose. But it is not supported by the text of Art. 25. The majority decision, on the other hand, is respectful of the clear terms of the parties' consent to use ICSID as expressed in the Lithuania-Ukraine BIT. The majority declared that they would be loath to undermine the basic principle that the cornerstone of ICSID's jurisdiction is party consent.

**734**    For the most part, commentators have sided with the majority.[991] They disagree with the President and see no risk of "unwarranted encroachment" on domestic jurisdiction since both Ukraine and Lithuania had agreed to ICSID jurisdiction and had not specified a control test for nationality.[992]

**735**    But there are some critics of the majority decision and voices in support of the President's approach. They have described the majority decision as illogical[993] and have pointed to the Convention's apparent object and purpose.[994] They have described the majority decision in *Tokios Tokelės* as "flawed, both in terms of law and policy",[995] and have described it as an unwarranted extension of jurisdiction opening the door to treaty shopping.[996]

**736**    Subsequent tribunals have followed the majority decision in *Tokios Tokelės* rather than the approach of the President. *ADC* v. *Hungary* concerned a claim, brought by two companies incorporated in Cyprus, pursuant to the Cyprus-Hungary BIT. The Respondent objected to jurisdiction, alleging that the Claimants were shell companies controlled by Canadians, which it said were the true investors.[997] It also said that the Claimants lacked a "genuine link" with Cyprus.

989    *Ibid.*, para. 21.                    990    *Ibid.*, para. 1.

991    *E.g., Alexandrov, S.*, The "Baby Boom" of Treaty-Based Arbitrations and the Jurisdiction of ICSID Tribunals: Shareholders as "Investors" and Jurisdiction Ratione Temporis, 4 The Law and Practice of International Courts and Tribunals 19, 36/7 (2005); *Kjos, H. E., Tokios Tokelės v. Ukraine*, Decision on Jurisdiction of April 29, 2004, 1(3) TDM (2004); *Fouret, J./Khayat, D.*, Chronique de Règlement Pacifique des Différends Internationaux (2004–1) 3(5) TDM (2006); *Mouawad, C./Karam, L., Tokios Tokelės*: Home Is Where Control Is? *in*: American Arbitration Association (ed.), ADR and the Law 259 (New York, 2007).

992    *Wisner, R./Gallus, N.*, Nationality Requirements in Investor-State Arbitration, 5 The Journal of World Investment & Trade 927, 943 (2004).

993    *Schlemmer, E. C.*, Investment, Investor, Nationality, and Shareholders, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 49, 79 (2008).

994    *Kröll, S./Griebel, J.*, Protecting Shareholders in Investment Law: To Pierce or Not to Pierce the Veil, That is the Question!, 2 Stockholm International Arbitration Review 93, 113 (2005).

995    *Burgstaller, M.*, Nationality of Corporate Investors and International Claims against the Investor's Own State, 7 The Journal of World Investment & Trade 857, 860 (2006).

996    *Prujiner, A.*, L'arbitrage unilatéral: un coucou dans le nid de l'arbitrage conventionnel?, 1 Revue de l'arbitrage 63, 80 (2005).

997    *ADC* v. *Hungary*, Award, 2 October 2006, para. 335.

*Article 25 – Jurisdiction*                                                    291

The Tribunal dismissed these objections.[998] The Cyprus-Hungary BIT, which contained the relevant definition of nationality, did not require a "genuine link" or require that the Claimants' controllers should also be Cypriot.[999] In doing so, the Tribunal expressly disagreed with the Dissenting Opinion in *Tokios Tokelės* v. *Ukraine* and referred to the majority decision as "good law".[1000]

In *Rompetrol* v. *Romania*, Romania objected to the jurisdiction of the Centre,    **737** alleging that the investment was in reality domestic in nature, since it was owned by a Romanian national and since the source of the funds was also domestic and not foreign. Romania argued that the Request for Arbitration was really an inappropriate attempt to clothe a domestic investment with Dutch nationality.[1001] Romania conceded that the Claimant satisfied the formal requirements of Dutch nationality for the purposes of ICSID and the Netherlands-Romania BIT, but alleged that, based on ownership and control, effective seat and source of funds, the Claimant's "real and effective" nationality was that of Romania.[1002]

The Tribunal rejected these objections. Its starting premise was that the Conven-    **738** tion left it to the Contracting States to define the conditions for nationality. The Tribunal was guided by the definition of nationality in the Netherlands-Romania BIT:

> 81. In the Tribunal's view, the latitude granted to define nationality for purposes of Article 25 must be at its greatest in the context of corporate nationality under a BIT, where, by definition, it is the Contracting Parties to the BIT themselves, having under international law the sole power to determine national status under their own law, who decide by mutual and reciprocal agreement which persons or entities will be treated as their "nationals" for the purposes of enjoying the benefits the BIT is intended to confer.[1003]

The Tribunal noted that the Contracting Parties to the BIT were entitled to adopt    **739** incorporation under their own law as a "necessary and also sufficient criterion of nationality for purposes of ICSID jurisdiction", and that they had done so. This was sufficient for the purposes of Art. 25(2)(b). The Contracting Parties had not stipulated any further examination of ownership and control, of the source of investment funds, or of the corporate body's effective seat. The Tribunal held that the definition of national status given in the Netherlands-Romania BIT was decisive for the purpose of establishing its jurisdiction.[1004] The parties had specifically consented to ICSID jurisdiction brought by Dutch companies, "without regard to the incidents of control or source of capital".[1005] The Tribunal was unable to accept Romania's argument drawing upon the President's Dissenting Opinion in *Tokios Tokelės* v. *Ukraine*, the effect of which would be "tantamount to setting aside the clear language agreed upon by the treaty Parties in favour of a wideranging policy discussion".[1006] Where the Tribunal's jurisdiction was governed by

---

  998  *Ibid.*, paras. 336–341.                    999  *Ibid.*, paras. 358/9.
1000  *Ibid.*, para. 360.
1001  *Rompetrol* v. *Romania*, Decision on Jurisdiction, 18 April 2008, para. 71.
1002  *Ibid.*, para. 78.                          1003  *Ibid.*, para. 81.
1004  *Ibid.*, para. 83.                          1005  *Ibid.*, para. 101.
1006  *Ibid.*, para. 85.

292          THE ICSID CONVENTION: A COMMENTARY

the ICSID Convention and the BIT, there was no basis to import alleged international law rules of "real and effective nationality" or "non-opposability" to defeat jurisdiction:

> . . . the Tribunal is clear in its mind that there is simply no room for an argument that a supposed rule of "real and effective nationality" should override either the permissive terms of Article 25 of the ICSID Convention or the prescriptive definitions incorporated in the BIT.[1007]

**740**    Therefore, ICSID practice repeatedly confirms that in the absence of a definition of nationality in a treaty or law imposing further, more substantial connections than mere incorporation or seat, it is both permissible and to be expected that investors will structure their investments in order to avail themselves of treaty protection and, thus, the right to submit disputes to ICSID.[1008]

### 3. Nationality of a Contracting State

**741**    The juridical person must have the nationality of a Contracting State other than the host State. Therefore, a corporation that only has the nationality of a non-Contracting State is excluded. A proposal to exclude juridical persons that do not have the nationality of any Contracting State was put to the vote in the Legal Committee and adopted with a large majority (History, Vol. II, p. 868) (see also para. 285 *supra*).

**742**    Juridical persons may be treated as having multiple nationalities where the criteria of incorporation, seat and control do not coincide. A company may be incorporated in State A, have its main seat of business in State A or B and may be controlled by nationals of State C. Additionally, if control is an admissible criterion for nationality, it may be shared by nationals of several States.

**743**    If all possible nationalities linked the juridical person to Contracting States, no problem would arise. The Convention's phrasing in the singular ("a Contracting State") would not preclude two or several nationalities of Contracting States even if no clear decision can be made between or among them. At the time of a request for conciliation or arbitration a specific nationality must be stated (see para. 294 *supra*). Rule 2(1)(d)(i) of the Institution Rules requires that the request shall indicate the investor's "nationality on the date of consent". No problem is likely to arise if a nationality of a Contracting State based on one of the accepted criteria is indicated or even if several nationalities, all of Contracting States, are indicated.

**744**    The situation is more complicated if one of the possible nationalities is that of a non-Contracting State. The possession of the nationality of a non-Contracting State in addition to that of a Contracting State would not as such be a bar to becoming a party to ICSID proceedings (see para. 661 *supra*). The decisive test would then be whether the nationality of a Contracting State, other than the host State, can be

---

1007   *Ibid.*, para. 93.
1008   *E.g.*, *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, sec. 3.4.2; *Soufraki* v. *UAE*, Award, 7 July 2004, para. 83; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 330.

*Article 25 – Jurisdiction*                                          293

established with the help of the accepted criteria described above (paras. 694–707 *supra*). The concurrent possession of the nationality of a non-Contracting State, established on the basis of these same criteria, would not exclude jurisdiction.[1009]

It has even been suggested that, in a situation of this kind, a commission or tri-   **745**
bunal would not have to search for the dominant or most effective nationality. The simple existence of the nationality of a Contracting State based on acceptable crite-ria would suffice. For instance, if the investor is incorporated in a non-Contracting State but controlled by nationals of Contracting States, jurisdiction should be upheld if the host State, in full knowledge of the relevant facts, has consented to jurisdiction and has thereby implicitly agreed that the investor possesses the required nationality (see para. 716 *supra*). If control is exercised by nationals of Contracting States as well as of non-Contracting States, the question of form and extent of control should be treated with flexibility (see paras. 850–870 *infra*). In view of the agreement on nationality, any reasonable degree of control by nationals of Contracting States should be accepted under this theory.[1010]

The above solution incurs the risk of diplomatic protection on behalf of the   **746**
investor by a non-Contracting State. A non-Contracting State is not bound by the prohibition of diplomatic protection under Art. 27(1) of the Convention (see Art. 27, paras. 10–12). This is the inevitable consequence of accepting criteria for corporate nationality for purposes of ICSID's jurisdiction that differ from those used for diplomatic protection. A juridical person that has access to the Centre on the basis of incorporation or seat may be protected by a non-Contracting State whose nationality it has on the basis of control.

In *Autopista* v. *Venezuela*, Mexico, the State of the Claimant's ultimate con-   **747**
trollers, sought to facilitate a settlement between the Claimant and Venezuela. Mexico is not a Contracting State. The Tribunal found Mexico's interest in the outcome of the case "somewhat disturbing" but held that it did not affect its jurisdiction.[1011]

Investors may be precluded from adopting tactics that will enable them to benefit   **748**
from ICSID jurisdiction and from diplomatic protection. In *Banro* v. *DR Congo* the Tribunal found that an investor cannot manipulate its investments through subsidiaries incorporated in different jurisdictions so as to be able simultaneously to invoke ICSID arbitration as a national of a Contracting State and benefit from the diplomatic protection of another Contracting State in respect of the same dispute.[1012]

---

1009  *Amerasinghe*, The Jurisdiction of the International Centre, pp. 213–216; *Amerasinghe*, Inter-pretation of Article 25(2)(b), pp. 241/2.
1010  *Amerasinghe*, The Jurisdiction of the International Centre, p. 222.
1011  *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 135–140.
1012  *Banro* v. *DR Congo*, Award, 1 September 2000, para. 103; and see *Lalive, P.*, Some Objections to Jurisdiction in Investor-State Arbitration, ICCA (2002); *Cremades, B. M./Cairns, D. J. A.*, The Brave New World of Global Arbitration, 3 Jurnal of World Investment 173, 200–201 (2002).

749     In *Mihaly* v. *Sri Lanka*, the Tribunal also referred to the harm that would be done to the scheme of the Convention if investors, not having the nationality of a Contracting State, were permitted to assign a claim to an affiliated company incorporated in another State which was a party to the ICSID Convention and so facilitate ICSID jurisdiction, but at the same time not exclude the right of the State of the assignor from espousing a claim in diplomatic protection.[1013]

750     The likelihood of complications arising from the nationality of non-Contracting States depends on the degree to which the Convention is ratified by more and more States. To the extent that the list of ratifications approaches universality, the entire problem of the investor's nationality becomes increasingly insignificant.

751     All the above considerations concerning multiple nationalities are premised on the assumption that the juridical person does not have the nationality of the host State. Nationality of the host State leads to the applicability of the second clause of Art. 25(2)(b) requiring a special agreement based on foreign control (see paras. 760–902 *infra*).

### 4. Critical Date

752     The requirement that the juridical person must have the nationality of a Contracting State other than the host State only applies at the date of consent. The double test of time, which is valid for natural persons (see paras. 679–687 *supra*), does not apply to juridical persons.

753     The Working Paper for the Convention linked the nationality requirement to the date of the submission of the dispute to the Centre without distinguishing between natural and juridical persons (History, Vol. I, p. 120). The Preliminary Draft took the date of consent as the critical date, also without distinguishing between the two types of investors (at p. 122). In the subsequent discussion, there was some concern that the investor might change its nationality subsequently (History, Vol. II, pp. 287, 395) (see also para. 680 *supra*). Mr. *Broches* favoured a double test of time for natural persons but did not think it necessary to apply this principle to companies since he thought it unlikely that a company could become incorporated in another country without being dissolved (at pp. 538, 869). Consequently, the First Draft retained the single test at the date of consent for juridical persons (History, Vol. I, p. 124). This solution was confirmed in subsequent debates (History, Vol. II, pp. 837, 868, 881) and found entry into the Revised Draft and into the Convention.

754     The effective date of consent is the day on which all the conditions for a valid consent have been met (see paras. 468–474 *supra*). This day may be the date on which the Convention entered into force for the investor's State of nationality but it will normally be a later date (see para. 682 *supra*). It may be the date on which proceedings are instituted if the investor takes up a general offer by the host State in legislation or a treaty to submit to ICSID jurisdiction (see paras. 417, 469 *supra*). The Tribunal in *Rompetrol* v. *Romania* rightly observed that the "critical

---

1013    *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, para. 24.

*Article 25 – Jurisdiction*                                                    295

date" in investment treaty arbitration is the date of the Request for Arbitration,[1014] or more precisely, the date it is transmitted to the Centre. There is no support in the text of the Convention for the critical date to be the acquisition or making of an investment, as suggested by the dissenting arbitrator in *Siag* v. *Egypt*.[1015]

Any change in the juridical person's nationality after the date of consent is immaterial for jurisdiction.[1016] Subsequent to consent, a juridical person may lose the nationality of the original Contracting State and may acquire the nationality of a non-Contracting State or that of the host State without losing access to ICSID.[1017] As the Tribunal in *Vivendi* v. *Argentina II* observed: "once established, jurisdiction cannot be defeated. It simply is not affected by subsequent events."[1018] **755**

This may not be the case in respect of specific investment treaties, such as the NAFTA. In *Loewen* v. *United States*, the Tribunal held that, under NAFTA Chapter 11, a claimant must demonstrate its continuous nationality until the date of any award, and must not acquire the nationality of the host State.[1019] The correctness of that conclusion as a matter of general international law has been questioned by commentators.[1020] It is certainly not a requirement of the ICSID Convention. Art. 25 spells out the applicable rules on nationality for the purposes of ICSID's jurisdiction. **756**

Some have cast doubt on this conclusion where the later nationality is that of a non-Contracting State. It is argued that the enforcement of an arbitral award against the investor might be jeopardized if the investor is not a national of a Contracting State. In addition, the prohibition of diplomatic protection would not apply to the investor's new home State.[1021] **757**

Both arguments are unconvincing. Under Art. 54, recognition and enforcement are obligations that are incumbent on all Contracting States. There is no particular obligation of the investor's home State. The change of nationality of a corporation does not necessarily go hand in hand with a relocation of assets. The problem of concurrent diplomatic protection may arise even if no change of nationality has occurred (see paras. 746–749 *supra*). Most importantly, the Convention's **758**

---

1014  *Rompetrol* v. *Romania*, Decision on Jurisdiction, 18 April 2008, para. 79.
1015  *Siag* v. *Egypt*, Decision on Jurisdiction, Dissenting Opinion, 11 April 2007, p. 4 (see paras. 674, 683 *supra*).
1016  *Amerasinghe*, The Jurisdiction of the International Centre, p. 223.
1017  This passage, contained in the First Edition of this Commentary, was endorsed in *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 64.
1018  *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 63.
1019  *Loewen* v. *United States* (AF), Award, 26 June 2003, para. 220.
1020  *E.g.*, *Paulsson, J.*, Continuous Nationality in *Loewen*, 20 Arbitration International 213 (2004); *Duchesne, M. S.*, The Continuous-Nationality-of-Claims Principle: Its Historical Development and Current Relevance to Investor-State Investment Disputes, 36 Geo. Wash. Intl. L. Rev. 783 (2004); *Mendelson, M.*, The Runaway Train: The "Continuous Nationality Rule" from the *Panavezys-Saldutiskis Railway* case to *Loewen*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Investment Treaties and Customary International Law (*Weiler, T. J.* ed.) 97 (2005); *Rubins, N.*, The Burial of an Investor-State Arbitration Claim, 21 Arbitration International 1 (2005).
1021  *Hirsch*, The Arbitration Mechanism, pp. 95/6.

wording is quite unambiguous on this point. The contrast between the provisions on critical dates in Arts. 25(2)(a) and 25(2)(b) makes it abundantly clear that different solutions are intended for natural and for juridical persons. The double test of time was chosen for individuals and a single test at the time of consent was chosen for corporations.

759    Institution Rule 2(1)(d)(i) provides that the request for conciliation or arbitration shall indicate the investor's nationality on the date of consent (see para. 686 *supra*). The Secretary-General will decide *inter alia* on the basis of this information whether or not the request is manifestly outside the jurisdiction of the Centre in accordance with Arts. 28(3) and 36(3) of the Convention. No documentation of the investor's nationality is required at that time (Institution Rule 2(2)) but evidence to this effect may have to be produced at a later stage.[1022]

### N.   "... and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention."

### 1. General Significance

760    The Convention is designed to facilitate the settlement of investment disputes between States and nationals of other States. It is not meant for disputes between States and their own nationals. The latter type of dispute is to be settled by domestic procedures, notably before domestic courts. On the other hand, host States frequently require that investment operations are carried out through companies organized under local law. The purpose of this requirement is a better supervision of the investors' activities. Incorporation in the host State makes the investor technically a national of that State according to the most common test for nationality of juridical persons (see paras. 694–740 *supra*). This would exclude all investors that operate through local companies from the ambit of the ICSID Convention. A large and important part of foreign investment would then be outside the Convention's scope. The second clause of Art. 25(2)(b) is designed to accommodate this problem by creating an exception to the diversity of nationality requirement.[1023]

761    The Preliminary Draft specifically foresaw standing for investors who had the nationality of the host State in addition to that of another Contracting State. The nationality of companies was defined not only through establishment under national law but also by way of a controlling interest (History, Vol. I, p. 122). The idea of giving host State nationals standing if they have the concurrent nationality of another Contracting State soon ran into strong opposition and was abandoned

---

1022   See Note D to Rule 2 of the 1968 Institution Rules, 1 ICSID Reports 53/4.
1023   For discussion see *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 102; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 31; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 41; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 213. And see *Broches*, The Convention, pp. 358/9; *Delaume*, ICSID Arbitration, p. 112.

(see para. 665 *supra*). Similarly, "controlling interest" as a criterion for corporate nationality was cast into doubt and later dropped (see para. 695 *supra*). While there was some resistance to the idea of giving locally incorporated companies the possibility to sue the host State (History, Vol. II, pp. 449, 580, 581), a majority of delegates found that it would be unwise to exclude locally incorporated but foreign controlled companies (at pp. 287, 325, 359, 360, 361, 394, 397, 400, 449, 581). A suggested solution to give access to dispute settlement not to the locally incorporated company but directly to its foreign owners (at pp. 360, 396, 397, 446, 447, 449, 538, 705, 709, 871) was discarded. It was soon realized that this would not be feasible where shares are widely scattered and their owners are insufficiently organized (at pp. 449, 539, 581). Mr. *Broches* maintained throughout that in view of the Convention's optional character it should be left to the host State whom it wished to treat as a foreign national (at pp. 256, 284, 287, 359, 360, 361, 450, 539, 580) (see also para. 638 *supra*).

**762**  The First Draft provided that the parties could agree to treat a juridical person as a "national of another Contracting State". There was no reference to the objective requirement of control (History, Vol. I, p. 124). Delegates from developing countries strongly opposed this purely consensual solution (History, Vol. II, pp. 658, 706, 709, 710, 840, 869, 870). At the same time, the representatives of the United States expressed their preference for the reintroduction of the criterion of control (at pp. 703, 837, 871). Intensive deliberations in a Working Group produced no clear decision in favour of a solution based either on agreement or on control (at pp. 874/5). Two votes in the Legal Committee did not yield a majority for the restrictive view to prevent access to juridical persons that are nationals of the host State under any circumstances (at pp. 869, 870). Eventually, Mr. *Broches* introduced a draft that combined the elements of agreement and foreign control by permitting agreement to treat a corporation of host State nationality as a national of another Contracting State because of foreign control. This solution was adopted by a narrow majority (at pp. 871, 881, 937/8). In view of the continuing divergence of opinion evidenced by these votes, Mr. *Broches* stated that he would report the views expressed to the Executive Directors (at pp. 938, 957/8). The draft, as adopted, was accepted without discussion at a meeting of the Executive Directors (at p. 1027).[1024]

**763**  The Report of the Executive Directors, after referring to the provision in Art. 25(2)(a) on natural persons (para. 667 *supra*), offers the following comment:

> 30. Clause (b) of Article 25(2), which deals with juridical persons, is more flexible. A juridical person which had the nationality of the State party to the dispute would be eligible to be a party to proceedings under the auspices of the Centre if that State had agreed to treat it as a national of another Contracting State because of foreign control.

---

1024    See also *Broches, A.*, Development of International Law by the International Bank for Reconstruction and Development, 59 American Society of International Law Proceedings 33, 37 (1965).

### 2. Host State Nationality

**764**    For purposes of finding that the corporate investor has the host State's nationality, the criterion of control cannot be applied. The exception for juridical persons under foreign control only makes sense if the initial test is based on the traditional criteria of incorporation or *siège social* (see para. 697 *supra*).[1025] The drafting history also indicates clearly that the second clause of Art. 25(2)(b) was designed for situations in which the foreign investor had established a corporation under the host State's law (see paras. 761, 762 *supra*).

**765**    This conclusion is confirmed by the cases in which ICSID tribunals have applied the second clause of Art. 25(2)(b).[1026] In *Amco* v. *Indonesia*, the Tribunal found that PT Amco had the nationality of Indonesia due to its place of incorporation and the place of its registered seat as well as of its actual seat.[1027] In *Klöckner* v. *Cameroon*, SOCAME was established as a Cameroonian limited liability company.[1028] In *SOABI* v. *Senegal*, the Claimant was a joint stock company with its head offices in Dakar, which under the local law made it a national of Senegal.[1029] In that case, the Tribunal confirmed in general terms that the criteria of the location of the head office or the place of incorporation were decisive for corporate nationality (see para. 700 *supra*). In *LETCO* v. *Liberia*, the Claimant was found to be a juridical person with Liberian nationality because it was incorporated and registered in Liberia.[1030] In *Vacuum Salt* v. *Ghana*, the Claimant was a corporation organized under the 1963 Companies Code of Ghana.[1031] In *Cable TV* v. *St. Kitts and Nevis*, the parties requesting arbitration were corporations under the Companies Act of St. Kitts and Nevis.[1032] In *Autopista* v. *Venezuela*, the Claimant was a corporation incorporated under the laws of Venezuela.[1033] In *Aguas del Tunari* v. *Bolivia*, the Claimant was incorporated in Bolivia.[1034] In *Vivendi* v. *Argentina*, the second Claimant was incorporated in Argentina.[1035]

**766**    A concurrent nationality of another State would not detract from a finding of host State nationality. Therefore, even if the host State's nationality is one of several nationalities, the second clause of Art. 25(2)(b) would come into operation requiring an agreement on nationality based on foreign control.[1036]

---

1025    See also *Amerasinghe*, The Jurisdiction of the International Centre, p. 211; *Hirsch*, The Arbitration Mechanism, p. 84.
1026    See also *Holiday Inns* v. *Morocco*, *Lalive*, The First "World Bank" Arbitration, p. 138 note 1.
1027    *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(ii). See also the reference to the terms of the Indonesian Foreign Investment Law, 1967, in the Award of 20 November 1984, para. 14.
1028    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 15, 18.
1029    *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 30.
1030    *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 351.
1031    *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 28.
1032    *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 5.13.
1033    *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 1.
1034    *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 1.
1035    *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 1.
1036    See, however, *Amerasinghe*, The Jurisdiction of the International Centre, p. 213.

The Convention speaks of the nationality of the Contracting State party to the dispute. If the party to the dispute is not the host State itself but one of its constituent subdivisions or agencies (see paras. 230–267 *supra*), a literal interpretation may lead to the result that the rule concerning host State nationals does not apply. But this result would be contrary to the idea underlying that rule. There is no evident reason why a host State national should be able to take a constituent subdivision or agency before ICSID more easily than the host State itself. **767**

### 3. Agreement to Treat the Investor as a National of Another Contracting State

### a) Form of Agreement

The Convention does not require any specific form for an agreement to treat a juridical person that has the host State's nationality as a national of another Contracting State because of foreign control. An agreement is essential, however. Without it, the Centre will not have jurisdiction. The Secretariat has declined to register requests for arbitration by parties that could not identify an agreement to treat a locally incorporated company as foreign. In some cases parties withdrew voluntarily.[1037] **768**

Since such an agreement is closely linked to consent, it will normally be recorded in the consent agreement.[1038] The Model Clauses offer the following formula for this purpose: **769**

**Clause 7**

It is hereby agreed that, although the Investor is a national of the Host State, it is controlled by nationals of <u>name(s) of other Contracting State(s)</u> and shall be treated as a national of [that]/[those] State[s] for the purposes of the Convention.[1039]

Clauses of this kind are used in actual practice.[1040]

Contracts may contain more complex provisions. In *Tanzania Electric* v. *IPTL*, the clause stated that for the purposes of consenting to the jurisdiction of the Centre it was agreed that IPTL was a foreign-controlled entity, unless the amount of the voting stock in IPTL held by non-Tanzanian investors should decrease to less than 50% of its voting stock.[1041] **770**

In *Autopista* v. *Venezuela*, the Tribunal accepted that the parties may conclude a conditional agreement for the purposes of Art. 25(2)(b). At the time the relevant agreement was signed, the Claimant was a Venezuelan company controlled by **771**

---

1037   *E.g.*, *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 8; *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, para. 19; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, para. 40.

1038   This was the case in *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 30/1; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 1, 16, 26; *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 133/4.

1039   4 ICSID Reports 362. See also Clause VI of the 1968 Model Clauses, 7 ILM 1159, 1167 (1968) and Clause VIII of the 1981 Model Clauses, 1 ICSID Reports 197, 202.

1040   For examples see *Delaume*, How to Draft, p. 176.

1041   *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 10.

Mexicans. Mexico is not a Contracting State. By the time a dispute arose, the Claimant was directly controlled by investors of the United States, which is a Contracting State. The nationality of the Claimant's immediate shareholders satisfied the parties' conditional agreement to treat the Claimant as a foreign national because of foreign control as of such time as it came to be controlled by nationals of another Contracting State.[1042] That agreement provided:

> Both The Republic of Venezuela, acting by means of the MINISTRY, and THE CONCESSIONAIRE, agree to attribute to THE CONCESSIONAIRE, a legal person of Venezuela subject to foreign control for the date when this clause enters into force, the character of "National of another Contracting state" for the purpose of applying this Clause and the provisions of the Convention.[1043]

**772**    Alternatively, the agreement on nationality may be made independently of a consent agreement, such as in a *compromis* or a joint request under Institution Rule 1(2).

**773**    National legislation and treaties providing for ICSID's jurisdiction may grant access to locally established but foreign controlled corporations (see paras. 806–812 *infra*). If the investor takes up the offer contained in the legislation or treaty, the provisions on access to locally established but foreign controlled companies become part of the agreement between the parties (see paras. 811, 812 *infra*). This was the form of agreement found in cases such as *Vivendi* v. *Argentina*,[1044] *Genin* v. *Estonia*,[1045] *MTD* v. *Chile*,[1046] *Lucchetti* v. *Peru*[1047] and *Aguas del Tunari* v. *Bolivia*.[1048]

**774**    The Institution Rules require that the agreement on nationality is to be "indicated" at the time of the request (Rule 2(1)(d)(iii)). This information must be supported by documentation (Rule 2(2)). This need to supply documentation at the time of the request is stricter than the requirement for showing the investor's nationality. Evidence of nationality may be developed at a later stage (see paras. 759 *supra*, 795 *infra*). Failure to produce documentation concerning the agreement on nationality may lead to the Secretary-General's refusal to register the request based on a finding that the dispute is manifestly outside the jurisdiction of the Centre in accordance with Arts. 28(3) and 36(3). But once the request is registered, any lack of appropriate documentation at the time of filing is not fatal and the documentation may be provided to the Tribunal.[1049]

### b) Implicit Agreement

**775**    The agreement to treat a juridical person with the host State's nationality as a national of another Contracting State because of foreign control should normally

---

1042   *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 83, 89–91, 117, 142.
1043   At para. 83.
1044   *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 24.
1045   *Genin* v. *Estonia*, Award, 25 June 2001, para. 328.
1046   *MTD* v. *Chile*, Award, 25 May 2004, paras. 93/4.
1047   *Lucchetti* v. *Peru*, Award, 7 February 2005, para. 15.
1048   *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 280/1.
1049   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 5.15.

be explicit. The Model Clauses recommend an unambiguous stipulation to this effect (see para. 769 *supra*) and it seems generally prudent to be as clear as possible also on this point.

During the Convention's drafting the expectation seems to have been that the agreement on nationality would be expressed in a separate clause. But at one point it was also suggested that consent to proceed under the Convention implied recognition by the host State of the foreign nationality of the other party (History, Vol. II, pp. 450, 582). A comparison of Art. 25(1) with Art. 25(2) of the Convention shows that while consent to the Centre's jurisdiction must be "in writing" (see paras. 379–381 *supra*), there is no such requirement for the agreement on nationality. This would indicate that the standard of formality is somewhat lower for the agreement on nationality than for consent.[1050] On the other hand, the need to submit documentation on the agreement to the Centre at the time of the request (see para. 774 *supra*) would not support the idea that the agreement can be inferred from the general circumstances.    **776**

Writers on the ICSID Convention have argued that an agreement under Art. 25(2)(b) constitutes an exception to the general rule that a State cannot be brought before an international forum by its own nationals. They assert that such an exception should be admitted only if it is expressed in the most unambiguous terms.[1051]    **777**

The practice of ICSID tribunals shows an increasing readiness to accept an implicit agreement to treat a juridical person as a foreign national because of foreign control. In *Holiday Inns* v. *Morocco*, the request for arbitration was made also on behalf of four locally organized subsidiaries of the foreign investors, the H.I.S.A. Companies. The local subsidiaries had not been parties to the original agreement containing consent to arbitration. In fact, they had not yet existed at the time. Nor had the rights arising from the original agreement ever been assigned to them (see paras. 337, 338 *supra*).[1052] It was undisputed that there was no express consent to treat them as foreign nationals.[1053] The Moroccan Government insisted that "clear and express consensus was essential".[1054] The Claimants argued that the four local companies had been set up in the interest and upon the request of the Government. Moreover, the Government had always considered the H.I.S.A. Companies as totally foreign controlled and had treated them as such. It followed that the Government had "agreed" to treat them as nationals of another Contracting State.[1055]    **778**

---

[1050] See also *Lalive*, The First "World Bank" Arbitration, p. 140; *Hirsch*, The Arbitration Mechanism, p. 99.

[1051] *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 76 (1974); *Lalive*, The First "World Bank" Arbitration, pp. 139/40; *Amerasinghe*, The Jurisdiction of the International Centre, p. 220; *Amerasinghe*, Interpretation of Article 25(2)(b), pp. 233–235; *Delaume, G. R.*, ICSID Arbitration in Practice, 2 International Tax and Business Lawyer 58, 63 (1984).

[1052] *Lalive*, The First "World Bank" Arbitration, pp. 137 *et seq.*

[1053] At p. 139.                              [1054] At p. 140.

[1055] At p. 141.

**779**    The Tribunal found that an implied agreement could only be accepted in very special circumstances, which were not present in the case before it. It said:

> 33. The question arises, however, whether such an agreement must be expressed or whether it may be implied. The solution which such an agreement is intended to achieve constitutes an exception to the general rule established by the Convention, and one would expect that parties should express themselves clearly and explicitly with respect to such a derogation. Such an agreement should therefore normally be explicit. An implied agreement would only be acceptable in the event that the specific circumstances would exclude any other interpretation of the intention of the parties, which is not the case here.[1056]

In the particular situation of this case, the parties had no intention at all in this respect. Therefore, the Tribunal held that "the H.I.S.A. Companies cannot be Parties to the present proceedings before ICSID".[1057] In addition, the Tribunal cited the Model Clauses as indicating that the host State's willingness to treat a local company as a national of another Contracting State should generally be expressed in the form of a "subsidiary agreement".[1058]

**780**    In *Amco* v. *Indonesia*, the arbitration clause named the local subsidiary, PT Amco, as a potential party to ICSID proceedings. Also, Amco Asia, the party to the original consent agreement, had transferred its contractual rights to PT Amco (see paras. 324–326 *supra*). But the Respondent still argued that there was no jurisdiction with respect to PT Amco since Indonesia had not expressed its agreement to treat it as a national of another Contracting State.[1059] The Claimants argued that there was no formal requirement on the way in which such an agreement should be expressed.[1060]

**781**    The Tribunal found that there was indeed no formal requirement as long as the agreement was expressed clearly:

> 14. . . . (ii) Nothing in the Convention, and in particular in Article 25, provides for a formal requisite of an express clause stating that the parties have decided to treat a company having legally the nationality of the Contracting State, which is a party to the dispute, as a foreign company of another Contracting State, because of the control to which it is submitted.
>
> What is needed, for the final provision of Article 25(2)(b) to be applicable, is (1) that the juridical person, party to the dispute be legally a national of the Contracting State which is the other party and (2) that this juridical person being under foreign control, to the knowledge of the Contracting State, the parties agree to treat it as a foreign juridical person.[1061]

In this particular case, the Tribunal held that the documents containing consent had indicated in several ways that PT Amco was an Indonesian company under

---

1056    *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 1 July 1973; *Lalive*, The First "World Bank" Arbitration, p. 141; 1 ICSID Reports 663. The passage is quoted in *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 5.24.
1057    *Lalive*, The First "World Bank" Arbitration, p. 142.
1058    *Tupman*, Case Studies, p. 819.
1059    *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 12.
1060    At para. 13.                              1061    At para. 14.

foreign control: PT Amco was referred to as a "foreign business". There was provision that all of the capital would represent "foreign capital". There was to be a gradual transfer of shares to Indonesian citizens or businesses. Therefore, the Government had agreed to the arbitration clause in full knowledge of PT Amco's foreign control. It followed that the Government had agreed to treat PT Amco as a national of another Contracting State for purposes of the Convention.[1062]

The Tribunal countered Indonesia's reference to *Holiday Inns* by declaring that its own conclusions were actually based on an explicit agreement:  **782**

> To refer to the *Holiday Inns* award – in spite of the same not being a bind-ing precedent in this case – here, this agreement is by no means *implied*; it is expressed, and clearly expressed, no formal or ritual clause being provided for in the Convention, nor needed in order for such an agreement to be binding on the parties.[1063]

In *Klöckner* v. *Cameroon*, the foreign investor had participated in the estab-lishment of a joint venture company, SOCAME, in Cameroon. An Establishment Agreement of 1973 between SOCAME and Cameroon contained an ICSID clause. At the time, Klöckner owned 51% of SOCAME's shares and Cameroon 49% (see para. 327 *supra*). The validity of the ICSID clause was challenged, *inter alia*, because SOCAME was a Cameroonian company. The Tribunal reinforced the approach expressed in *Amco* by holding that the mere existence of an ICSID arbitration clause indicated an agreement on foreign nationality:  **783**

> The insertion of an ICSID arbitration clause by itself presupposes and implies that the parties were agreed to consider SOCAME at the time to be a company under foreign control, thus having the capacity to act in ICSID arbitration. This is an acknowledgment which completely excludes a different interpretation of the parties' intent. Inserting this clause in the Establishment Agreement would be nonsense if the parties had not agreed that, by reason of the control then exercised by foreign interests over SOCAME, said Agreement could be made subject to ICSID jurisdiction.[1064]

In *LETCO* v. *Liberia*, the French investors had incorporated the company in Liberia. They owned 100% of its capital stock. A Concession Agreement between LETCO and the Government of Liberia provided for dispute settlement by ICSID but did not record an agreement to treat LETCO as a foreign national.[1065] The Tribunal confirmed the reasoning of the previous cases by holding that the mere fact of an ICSID clause constituted an agreement to treat LETCO as a national of another Contracting State. To conclude otherwise would have amounted to imputing bad faith to Liberia in that it had never intended to honour the ICSID clause. The Tribunal said:  **784**

---

1062  At para. 14(ii).

1063  At para. 14(ii). Emphasis original. See also *Lamm*, Jurisdiction of the International Centre, pp. 471/2; *Rand/Hornick/Friedland*, ICSID's Emerging Jurisprudence, pp. 48/9; *Sornarajah, M.*, ICSID Involvement in Asian Foreign Investment Disputes: The AMCO and AAPL Cases, 4 Asian Yearbook of International Law 69, 74/5 (1994).

1064  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 16.

1065  *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 349, 350.

> When a Contracting State signs an investment agreement, containing an ICSID arbitration clause, with a foreign controlled juridical person with the same nationality as the Contracting State and it does so with the knowledge that it will only be subject to ICSID jurisdiction if it has agreed to treat that company as a juridical person of another Contracting State, the Contracting State could be deemed to have agreed to such treatment by having agreed to the ICSID arbitration clause. This is especially the case when the Contracting State's laws require the foreign investor to establish itself locally as a juridical person in order to carry out an investment.[1066]

This approach, based purely on logical reasoning, is somewhat mitigated by a subsequent reference to factual evidence. The Tribunal found that Liberia had actually treated LETCO as a foreign national in several contexts. This indicated that, even if there was no express agreement, there was at least an implied agreement.[1067]

**785**     In *Vacuum Salt* v. *Ghana*, there was also no agreement to treat the locally incorporated company as a foreign national. The Tribunal, citing Model Clause 7 (see para. 769 *supra*), suggested that the better practice would be for the parties to at least make some reference to foreign control. But it admitted that the reported cases suggest that such has not been the practice.[1068] Ultimately, the Tribunal found the previous cases distinguishable since in none of them was the issue of the agreement on foreign nationality separated from that of control (see also paras. 820, 821 *infra*).[1069]

**786**     In *Cable TV* v. *St. Kitts and Nevis*, the Tribunal found that there was no expressed or implied agreement on consent with the Respondent (see paras. 249, 381 *supra*). But it indicated that recognition as a national of another State could be inferred from the granting of privileges that are reserved to foreign investors. These were currency convertibility, a tax holiday, recruitment of foreign nationals as well as customs and duty exemptions.[1070]

**787**     The tribunals' flexibility should not induce drafters of ICSID clauses to be careless about the investors' nationality requirements. Imprecise clauses are liable to lead to complications and additional costs. A clear and unambiguous stipulation on nationality along the lines of Model Clause 7 (see para. 769 *supra*) must be recommended strongly.

**788**     Even so, the cases on the second clause of Art. 25(2)(b) demonstrate that the tribunals have been generous in construing an agreement on foreign nationality. Basically, all that is needed is an agreement to consent to ICSID's jurisdiction concluded with a national of the host State. Since the consent clause is only valid if the Convention's nationality requirements are met, the necessary agreement on nationality was inferred. The effect of this practice is that the standards for an implicit agreement on nationality are no stricter for corporations with the host State's nationality than for other corporations (see paras. 716, 717 *supra*).

---

1066   At p. 352.                                   1067   At p. 353.
1068   *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 31.
1069   At para. 31.
1070   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 5.17, 5.18.

This result has drawn criticism from authors who insist that the agreement on nationality under Art. 25(2)(b) is designed as a distinct requirement in addition to the consent needed under Art. 25(1). Therefore, according to these authors, the satisfaction of the second requirement should not simply be inferred from the satisfaction of the first.[1071] **789**

Not every expression of consent to jurisdiction can serve as a basis for the conclusion that the host State has acknowledged the investor's foreign nationality. This conclusion only makes sense where the investor and the host State have been in immediate contact and have entered into a direct agreement. The conclusion that there is an implied agreement on nationality is impossible where consent to jurisdiction is based on the host State's legislation or on a treaty. If the investor simply accepts a standing offer by the host State to submit to jurisdiction, no agreement to treat that particular investor as a foreign national can be imputed to the host State.[1072] A company incorporated in the host State will not qualify as an investor entitled to protection under investment treaties or laws and will not be able to bring a claim unless there is clear evidence of an agreement to treat it as a foreign national.[1073] **790**

The question of a need for an agreement on nationality for local subsidiaries should also be seen from another perspective. ICSID tribunals have developed a practice of looking beyond the investors' subsidiaries and of granting party status to parent companies even if the latter are not named in the consent agreement. In a number of cases the controlling foreign owners were given standing despite the fact that they were not the formal parties to the ICSID clauses (see paras. 319–335 *supra*). This practice reduces the significance of an agreement to treat the local subsidiary as a foreign national. If the foreign investors controlling the local company are given direct access, ICSID's jurisdiction no longer depends on the existence of an agreement to treat the subsidiary as a foreign national. **791**

Recognition of shareholding as investments in most investment protection treaties has led many parent companies to bring claims in their own names, as shareholders (see para. 150 *supra*). This course of action is usually preferred over proceedings brought by a locally incorporated company under Art. 25(2)(b). Indeed, the Tribunal in *CMS* v. *Argentina* observed that the offer of treaty protection for non-controlling or minority shareholders can achieve a similar result to the mechanism in Art. 25(2)(b).[1074] In *Sempra* v. *Argentina*, the alternative of claiming as a US company and shareholder was said to have been preferred **792**

1071 *Hirsch*, The Arbitration Mechanism, pp. 99/100. See also *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons, 228 (1990); *Tupman*, Case Studies, pp. 834/5.
1072 See also *Amerasinghe*, Interpretation of Article 25(2)(b), p. 235.
1073 *E.g.*, *Tokios Tokelès* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 8.
1074 *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 51. See also *Sinclair, A. C.*, ICSID's Nationality Requirement, *in*: Investment Treaty Arbitration and International Law (*Grierson-Weiler, T. J.* ed.) (2008).

because it was thought to simplify the requirements for registration of the request for arbitration.[1075]

**793**    Occasionally, cases also involve claims brought by joint claimants: the locally incorporated company having standing based on an agreement to treat it as foreign because it is foreign controlled, and the foreign shareholders themselves pursuant to an applicable treaty's provisions for the protection of shareholders as investors. Thus, in *Vivendi* v. *Argentina*, *MTD* v. *Chile* and *Lucchetti* v. *Peru*, the first claimants had standing under the respective BITs as foreign investors by virtue of their shareholdings, while the second claimants did so as a company incorporated locally but controlled by the former.[1076] The situation involves no contradiction. As the *Sempra* Tribunal explained:

> It is conceivable that where various investor companies resort to arbitration, some can do so as shareholders and others as companies of the nationality of the State that is a party to the dispute, on the basis of the various corporate arrangements and control structures.[1077]

**794**    The conferral upon the foreign shareholders in local companies of both substantive protection and a direct access to arbitration for harm suffered by the local companies (see para. 150 *supra*) may lead to the relative disuse of the mechanism under Art. 25(2)(b).

### c) Identification of the Other Contracting State

**795**    Art. 25(2)(b) does not indicate whether the agreement on nationality must relate to a particular foreign State. Institution Rule 2(1)(d) would suggest that the agreed nationality need not be specified. Whereas the investor's primary nationality under Art. 25(2)(a) and under the first clause of Art. 25(2)(b) must be indicated in the request (see paras. 289–296 *supra*), the nationality to which the host State has agreed with respect to a juridical person of its own nationality need not be identified. Institution Rule 2 provides in relevant part:

> (1) The request shall:
>     . . .
>         (d) indicate with respect to the party that is a national
>              of a Contracting State:
>              (i)  its nationality on the date of consent; and
>              (ii) if the party is a natural person:
>                    (A) his nationality on the date of the request;
>                         and
>                    (B) that he did not have the nationality of the
>                         Contracting State party to the dispute
>                         either on the date of consent or on the
>                         date of the request; or

---

1075  *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 43.
1076  *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 24; *MTD* v. *Chile*, Award, 25 May 2004, paras. 93/4; *Lucchetti* v. *Peru*, Award, 7 February 2005, para. 15.
1077  *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 44.

> (iii) if the party is a juridical person which on the date of consent had the nationality of the Contracting State party to the dispute, the agreement of the parties that it should be treated as a national of another Contracting State for the purposes of the Convention;

It will be noted that whereas Institution Rule 2(1)(d)(i) and (ii) refer to "its nationality" and "his nationality" respectively, Rule 2(1)(d)(iii) speaks of "a national of another Contracting State" in more general terms. However, if the nationality(ies) of the foreign controller(s) is (are) not specified in the request for arbitration, the ICSID Secretariat will require the requesting party to provide this information before registering the request.

**796**  Model Clause 7 (see para. 769 *supra*) suggests that the State in question should be actually named in the agreement. This is clearly preferable and is more likely to forestall subsequent uncertainties and challenges. Therefore, the foreign State should be clearly identified. There should be a statement that the local company is controlled by nationals of that State and that, consequently, the local company shall be treated as a national of that State. If the local company is jointly controlled by nationals of several Contracting States, the controlling nationalities may be listed and the agreement may specify that the local company is to be regarded as a national of these States.[1078] Model Clause 7 is designed to accommodate controllers of several nationalities and treatment as a national of several States.

**797**  Some agreements on nationality contain all the relevant details.[1079] Others merely state an agreement that the Convention's nationality requirements are fulfilled (see para. 801 *infra*). An even less precise formula states that the investor "shall be deemed to be a national of that state of which it or its respective controlling shareholder is a national".[1080] Clauses thus lacking in precision may lead to complications. The identity of the controlling interest, the nationality of the controllers and the status of their home States as Contracting States may all have to be determined before jurisdiction *ratione personae* can be established.

**798**  ICSID tribunals have also shown flexibility on this point. In *Holiday Inns* v. *Morocco*, the Government argued that an agreement on nationality had to be not only clear and express (see para. 778 *supra*) but that it also had to be specific as to the local company's other nationality.[1081] In that case, the Tribunal does not appear to have reached this question.

---

1078   See *Amerasinghe*, Submissions to the Jurisdiction, p. 228; *Amerasinghe*, The Jurisdiction of the International Centre, pp. 219/20; *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 76/7 (1974); *Delaume*, How to Draft, p. 176; *Szasz*, A Practical Guide, p. 20.
1079   For examples see *Delaume*, How to Draft, pp. 176/7.
1080   See Article 7.3 of the Participation Agreement of 12 February 1982 between New Zealand and Mobil Oil NZ Ltd., cited in *Attorney-General* v. *Mobil Oil NZ Ltd.*, New Zealand High Court, 1 July 1987, 4 ICSID Reports 123.
1081   *Lalive*, The First "World Bank" Arbitration, p. 140.

**799**      In *Amco* v. *Indonesia* (see paras. 780–782 *supra*), the Respondent also argued
that there was no formal and express indication as to the Contracting State in
respect of which the parties would have agreed to treat PT Amco as a national. In
Indonesia's view such an indication was indispensable for a valid agreement under
Art. 25(2)(b). The Government also claimed that this lack of a clear and formal
indication resulted in ignorance by Indonesia of the nationality of the persons
who controlled PT Amco. The Claimants opposed this argument by saying that a
formal indication of the nationality based on control in the arbitration clause itself
was not needed. In addition, the Respondent knew PT Amco's situation in this
respect.[1082]

**800**      The Tribunal rejected Indonesia's argument:

> . . . the Tribunal does not think that an objection to the binding character of the
> arbitration clause can be drawn, in the circumstances of the case, from the fact
> that the country of which the controlling shareholders of PT Amco were the
> nationals was not expressly mentioned in said clause, nor from the fact, alleged
> by the Respondent, that it did effectively not know which this country was.
>
>   Taking first the legal point of view, and the contents of the agreement itself,
> the Tribunal will state, here again, that there is no provision in the Convention
> imposing a formal indication, in the arbitration clause itself, of the nationality of
> the foreign juridical or natural persons who control the juridical person having
> the nationality of the Contracting State, party to the dispute.
>
>   On the other hand, in the instance case, that nationality was clearly indicated
> in the Application.[1083]

After citing several sentences from the investment application, which all pointed
towards United States control, the Tribunal concluded:

> It thus appears that the nationality of the controller of PT Amco, the Indone-
> sian juridical person to be established, was repeatedly and expressly stated in
> the Application to which the Indonesian Government agreed; under the circum-
> stances, lacking any formal requirement in this respect in the Convention, there
> was no need for a particular statement of said nationality in the arbitration clause
> itself.[1084]

The Tribunal added, by way of a caveat, that the case "could have been different
if there would have been fraud or misrepresentation on this issue" but found that
this was not the case.[1085]

**801**      In *SOABI* v. *Senegal*, a Belgian national, acting on behalf of a corporation named
Flexa, incorporated SOABI in Senegal in September 1975. All of the shares in
SOABI were owned by Flexa, which was itself controlled by a Belgian national.
In the papers filed for the incorporation, the head office of Flexa was stated to be
in Geneva, although Flexa was, in fact, a Panamanian company.[1086] Switzerland

1082   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, paras. 12/3.
1083   At para. 14(iii).                          1084   At para. 14(iii).
1085   At para. 14(iii). See also *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September
       2001, paras. 127–132.
1086   *SOABI* v. *Senegal*, Award, 25 February 1988, footnote 1 to para. 2.13.

was a party to the ICSID Convention, but Panama was not.[1087] In November 1975, SOABI and Senegal entered into an Establishment Agreement containing an ICSID clause. The ICSID clause contained the following sentence:

> To this end, the Government agrees that the requirements of nationality set out in Article 25 of the IBRD Convention shall be deemed to be fulfilled.[1088]

The Tribunal found this sentence somewhat laconic but perfectly clear in its meaning. It meant that, notwithstanding its Senegalese nationality, SOABI could be deemed to be a national of another Contracting State by reason of its being controlled by foreign interests.[1089] It reached the result that SOABI was indirectly controlled by nationals of Belgium, a Contracting State (see paras. 818, 830, 843, 854 *infra*).

**802**     The Government argued that it had been misled by the description of Flexa as a company with its head office in Geneva. This misrepresentation had induced the Government to take positions it would not have taken had Flexa's Panamanian nationality been known to it. The Tribunal rejected this argument. It found that it had been evident that Flexa was merely a corporation of convenience. SOABI's capital could not possibly have come from Flexa's funds. Therefore, the Tribunal could not accept that Flexa's nationality could have affected the Government's consent to ICSID's jurisdiction.[1090] A declaration by the Tribunal's President (*A. Broches*) confirmed the position that it is not necessary to identify the agreed nationality of the locally incorporated company:

> Nor is it necessary that the compromissory clause indicate the nationality that is ascribed to the locally incorporated company. It is up to the party who contests the effect of its intention "to deem the requirement of nationality set out in Article 25 as fulfilled" to prove that that requirement could not be considered as having been fulfilled in accordance with the Convention.[1091]

**803**     In *Tanzania Electric* v. *IPTL*, it was sufficient that the parties had agreed to treat IPTL as a foreign-controlled entity, unless the amount of the voting stock in IPTL held by non-Tanzanian investors should decrease to less than 50%.[1092]

**804**     *Autopista* v. *Venezuela* was concerned with a claim brought by a Venezuelan company, which was immediately owned by Icatech, a corporation having United States nationality, which in turn was owned by ICA Holding, a Mexican company. The parties' agreement to treat the Claimant as a foreign national was conditional upon it becoming controlled by a national of a Contracting State. The Tribunal found this conditional agreement sufficiently certain to meet the requirements of Art. 25(2)(b).[1093]

---

1087   Panama has since become a Contracting State to the Convention in May 1996.
1088   *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 23.
1089   At paras. 30, 31.
1090   At paras. 44–46. See also the Dissenting Opinion to the Award of 25 February 1988 at paras. 60–65, 74–77.
1091   *SOABI* v. *Senegal*, President's Declaration to Decision on Jurisdiction, para. 6. Footnote omitted.
1092   *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 10.
1093   *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 83, 89–91, 117, 142.

**805**    It follows from the decisions in *Amco* and in *SOABI* that an identification of the nationality of the controlling interest in the arbitration clause is not necessary. In *Amco*, the Tribunal found that the Government had been informed of that nationality and that this knowledge was sufficient. *Tanzania Electric* and *Autopista* confirm that a conditional agreement will suffice. But *SOABI* went further in holding that even incorrect information on nationality did not affect the validity of the consent clause as long as it could not be shown that the false information had influenced the Government's decision to give its consent to ICSID's jurisdiction.

### d) Legislation and Treaties

**806**    Some national investment laws providing for ICSID's jurisdiction extend access to the Centre to local companies that are under foreign control. The legislative techniques employed for this purpose are quite diverse. Some laws simply grant the right to require ICSID settlement to corporations with a majority of foreign capital.[1094] A more elaborate clause is contained in the Investment Code of Zaire, 1986, which provides in Art. 46 after referring to the ICSID Convention:

> In its request for admission to the General or Conventional Regime or Free Zone, or later by a separate instrument, the investor gives its consent to such arbitration pursuant to the said agreement, not only in its own name but in that of any Zairean company which it controls and by whose intermediary the investment is made. It accepts, moreover, that any such company shall be considered a "National of another Contracting State".[1095]

Other investment laws do not open access to ICSID for foreign controlled local companies directly but offer definitions of foreign investors in their definitions section that include locally established legal persons that are controlled by a majority of foreign capital.[1096]

**807**    A number of bilateral investment treaties provide that companies constituted in one State but controlled by nationals of the other State shall be treated as nationals of the other State for purposes of Art. 25(2)(b).[1097] For instance, Art. 8(2) of the United Kingdom Model Agreement runs as follows:

> A company which is incorporated or constituted under the law in force in the territory of one Contracting Party and in which before such a dispute arises the majority of shares are owned by nationals or companies of the other Contracting Party shall in accordance with Article 25(2)(b) of the Convention be treated for the purposes of the Convention as a company of the other Contracting Party.[1098]

---

1094    See Central African Republic, Code of Investments, 1988, Art. 30; Chad, Décret N° 446/PR/MCI/87 fixant la procédure d'octroi des avantages du Code des Investissements, 1987.

1095    See also Sri Lanka, Greater Colombo Economic Commission Law, 1978, sec. 26(2)(b); Senegal, Law Establishing the Industrial Free Zone of Dakar, 1974, Art. 31.

1096    Tanzania, National Investment (Promotion and Protection) Act, 1990, sec. 2; Mozambique, Law of Investment, 1993, Art. 1(1)(q); Uganda, Investment Code, 1991, sec. 10(1)(b).

1097    *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 142–144; *Parra*, Provisions on the Settlement, p. 324; *Peters*, Dispute Settlement Arrangements, p. 144. See also *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, paras. 107–115.

1098    *Dolzer/Schreuer*, Principles of International Investment Law, at p. 380. See also UK-Turkey BIT (1991) Art. 8(2); UK-Nepal BIT (1993) Art. 8(1); UK-Estonia BIT (1994) Art. 8(2). For

The Argentina-US BIT uses the following formula in Art. VII(8):                **808**

> For purposes of an arbitration held under paragraph 3 of this Article, any company legally constituted under the applicable laws and regulations of a Party or a political subdivision thereof but that, immediately before the occurrence of the event or events giving rise to the dispute, was an investment of nationals or companies of the other Party, shall be treated as a national or company of such other Party in accordance with Article 25(2)(b) of the ICSID Convention.[1099]

Dutch[1100] and Swiss[1101] BITs also provide that a legal person that is a national    **809**
of one State but is controlled by nationals of the other State shall be treated as a national of the latter in accordance with Art. 25(2)(b). Article 1(2)(c) of the Argentina-France BIT refers to a legal person "effectively controlled" by nationals of the other State. It applies to:

> (c) Any body corporate effectively controlled, directly or indirectly, by nationals of one Contracting Party, or by bodies corporate having their registered office in the territory of one Contracting Party and constituted in accordance with that Party's legislation.[1102]

Multilateral instruments containing ICSID consent clauses (see paras. 456–463    **810**
*supra*) also deal with the problem of locally incorporated but foreign controlled companies. One solution is to give standing not to the company established in the host State but to the controlling investor on behalf of the company. Art. 1117 of the NAFTA[1103] provides that an investor may submit to arbitration a claim against the host State on behalf of an enterprise constituted or organized under the host State's law, which the investor owns or controls directly or indirectly.[1104] The Mexico-Colombia-Venezuela Free Trade Agreement of 1994 contains a similar rule in its Art. 17–17. By contrast, the Energy Charter Treaty of 1994 adopts the ICSID Convention's classical solution in Art. 26(7):

> (7) An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party,

---

analysis, see *Wena Hotels* v. *Egypt*, Decision on Jurisdiction, 29 June 1999, 41 ILM 881, 888 (2002).

1099   See also US-Czechoslovakia BIT (1991) Art. VI(5); US-Romania BIT (1992) Art. VI(8). See also *Gann, P. B.*, The U.S. Bilateral Investment Treaty Program, 21 Stanford Journal of International Law 373, 419, 452 (1985). See also *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 213, applying the clause in the Argentina-United States BIT.

1100   *Dolzer/Stevens*, Bilateral Investment Treaties, p. 214. See also, Netherlands-Argentina BIT (1992) Art. 10(6); Netherlands-Lithuania BIT (1994) Art. 9. On the interpretation of this aspect of the Netherlands-Argentina BIT, see *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, paras. 155–162.

1101   *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 224/5. See also, Switzerland-Jamaica BIT (1990) Art. 9(7).

1102   A side letter to the BIT specifies several forms of control. See also *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 24, note 6; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 47–50.

1103   32 ILM 605, 643 (1993). See also US Model BIT 2004, Art. 24(1)(b).

1104   See also *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 77–85.

shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".[1105]

The MERCOSUR Protocol of Colonia for the Reciprocal Promotion and Protection of Investments of 1994 in Art. 1(2)(c) employs a slightly different technique. It extends the definition of investors, which are entitled to submit disputes to arbitration, to juridical persons constituted under the host State's law that are effectively controlled, directly or indirectly, by nationals of other Contracting States.

**811**     The second clause of Art. 25(2)(b) requires an agreement between the parties to the dispute; that is, the host State and the foreign investor. A provision in a treaty or in national legislation does not amount to an agreement between the parties to the dispute.[1106] A clause in a treaty or in national legislation providing for ICSID's jurisdiction is no more than an offer to the investor, which may be accepted by the latter (see paras. 416–426, 447–455 *supra*). The proviso that a local company, because of foreign control, would be treated as a national of another Contracting State is part of the terms of the offer made by the host State. When the offer to submit disputes to ICSID is accepted by the investor, that proviso becomes part of the consent agreement between the parties to the dispute (see also para. 723 *supra*), although it will not displace a tribunal's duty to confirm to its own satisfaction that foreign control in fact exists.

**812**     An additional clarification between the parties to the effect that the investor fulfils the conditions under the second clause of Art. 25(2)(b) therefore may not be amiss. If a dispute should arise over whether the condition of foreign control has, in fact, been met, a specific admission by the parties would strengthen the case in favour of foreign control and would, at the least, create a presumption to that effect (see paras. 815, 821 *infra*).

### 4. Foreign Control

### a) Objective Requirement of Foreign Control

**813**     The Convention states that the agreement on nationality shall be "because of foreign control". These words indicate a causal connection between control and the agreement and suggest that control is an objective requirement that cannot be replaced by an agreement.

**814**     During the Convention's drafting, the emphasis shifted from the purely objective criterion of control in the Preliminary Draft to a purely consensual element of agreement on nationality in the First Draft (History, Vol. I, pp. 122, 124). Eventually, the objective requirement of control and the consensual requirement of an agreement were combined into the composite formula of "because of foreign control, the parties have agreed" (see paras. 761, 762 *supra*). The history of this provision would suggest that the existence of foreign control is a necessary element, which must exist independently of the terms of any agreement.

---

1105   34 ILM 360, 400 (1995).
1106   See also *Delaume*, Le Centre International, pp. 792/3; *Laviec*, Protection et promotion, p. 283.

Commentators on the Convention vary as to the emphasis they put on the objective requirement of foreign control. But there seems to be consensus that control is a factual element that may be examined by a tribunal independently of the agreement on nationality.[1107] On the other hand, it has been argued that an agreement on nationality would create a strong presumption in favour of foreign control that should be discarded only if it amounts to an unreasonable selection of nationality that cannot be sustained by any rational interpretation of the facts.[1108] Agreement to treat a local company as foreign may be conditional upon foreign control arising at some point in the future,[1109] or foreign control being vested in a national of another Contracting State.[1110]

**815**

ICSID tribunals have invariably examined the actual existence of foreign control over the local company and the nationality of that controller.[1111] In *Amco* v. *Indonesia*, the Tribunal, after considering the parties' agreement on nationality (see paras. 780–782, 799–800 *supra*), proceeded to examine the foreign control over PT Amco. By looking at the nationality of the immediate controller, Amco Asia (see paras. 841–842 *infra*), it came to the conclusion that the locally incorporated company was under United States control.[1112]

**816**

In *Klöckner* v. *Cameroon* (see para. 783 *supra*), the Tribunal pointed out that when the agreement containing the ICSID clause was concluded between the local joint venture company, SOCAME, and the host State, "SOCAME was a Cameroonian company, but subject to the majority control of foreign interests." This, to the Tribunal, was clear from another agreement that stipulated that Klöckner and its European partners would subscribe to 51% of SOCAME's capital.[1113]

**817**

In *SOABI* v. *Senegal*, much of the debate on jurisdiction turned on whether the local company was actually controlled by Panamanian, by Swiss or by Belgian interests. Flexa, a Panamanian company, was the immediate owner of all of SOABI's shares. But Panama was not a Contracting State. Flexa's nationality was stated as Swiss, but this statement appears to have been incorrect (see paras. 801, 802 *supra*). Eventually, the Tribunal found that control over Flexa was exercised

**818**

---

1107   *Gaillard*, Some Notes on the Drafting, p. 140; *Hirsch*, The Arbitration Mechanism, p. 102. See also *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, para. 142. In this case the majority declined to be bound by a protocol to the Netherlands-Argentina BIT indicating the facts that should be accepted as evidence of foreign control.

1108   *Amerasinghe*, Interpretation of Article 25(2)(b), pp. 232/3, 235, 237/8, 240; *Broches*, The Convention, p. 361; *Szasz*, A Practical Guide, p. 20, cited with approval in *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 114.

1109   *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 10.

1110   *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 83, 89–91, 117, 142. The Tribunal in *TSA Spectrum* v. *Argentina* declined jurisdiction where control was ultimately vested in a natural person having the nationality of the host State, Award, 19 December 2008, para. 162.

1111   For a discussion of whether the Claimant in *Santa Elena* v. *Costa Rica* was in fact controlled by US nationals, see *Brower, C. N./Wong, J.*, General Valuation Principles: The Case of *Santa Elena*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Investment Treaties and Customary International Law (*Weiler, T. J.* ed.) 754 (2005). The Award dated 17 February 2000 does not explore these facts.

1112   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(iii).

1113   *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 15/16.

by nationals of Belgium, a Contracting State, and that, consequently, SOABI was under the indirect foreign control of nationals of a Contracting State (see para. 843 *infra*).[1114] A Declaration of the Tribunal's President (Mr. *Broches*) pointed out that where there was an agreement that the nationality requirements were fulfilled, the party that contested the effect of this agreement had the burden of proving that the requirement of control was not, in fact, fulfilled (see para. 802 *supra*).[1115]

**819**    In *LETCO* v. *Liberia*, the Tribunal had no problem in establishing that the locally incorporated company was under French control at the time of consent to ICSID's jurisdiction (see para. 855 *infra*). The Tribunal also went into the question of the relationship between foreign control and the agreement on nationality (see para. 784 *supra*). It said:

> Clearly the Convention's use of the word "because" in Article 25(2)(b) establishes a need to show that the agreement to treat LETCO as a French national was motivated by the fact that it was under French control. However, in most instances the virtually insurmountable burden of proof in showing what motivated a government's actions might well frustrate the purpose of the Convention. Therefore, unless circumstances clearly indicate otherwise, it must be presumed that where there exists foreign control, the agreement to treat the company in question as a foreign national is "because" of this foreign control.
>
> In the case at hand, there is no indication whatsoever that an agreement to treat LETCO as a French national resulted from anything other than the fact that it was under French control and we must therefore conclude that the necessary causal relationship exists.[1116]

Read together with the Tribunal's reasoning on an implicit agreement on nationality (see para. 784 *supra*), this means that all that is required for purposes of Art. 25(2)(b) is the objective fact of foreign control over the local company, the host State's awareness of this objective fact and an otherwise valid consent to ICSID's jurisdiction. The host State's agreement to treat the local company as a national of another Contracting State and the causal nexus expressed in the word "because" may then be construed from these elements.

**820**    In *Vacuum Salt* v. *Ghana*, the factual question of foreign control turned out to be decisive. In this case, there had been a Lease Agreement containing an ICSID clause.[1117] Vacuum Salt was a corporation organized under the 1963 Companies Code of Ghana.[1118] Ghana objected to ICSID's jurisdiction on the ground that the Claimant "essentially is a Ghanaian Company" that "is not foreign controlled and there has been no agreement between the parties that it should be treated as a national of another contracting state".[1119]

**821**    The Tribunal noted the practice of previous tribunals to infer an agreement on nationality from the very existence of an ICSID arbitration clause (see

---

1114   *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 35–38.
1115   President's Declaration, 25 February 1988, para. 6.
1116   *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 352.
1117   *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 2.
1118   At para. 28.                          1119   At para. 12.

paras. 775–794 *supra*).[1120] But it found that these cases were distinguishable from the case before it since in each of them "the objective existence of foreign control was presumed".[1121] The Tribunal's decision had to turn on whether or not "foreign control" existed as a matter of fact on the date of consent:

> . . . the parties' agreement to treat Claimant as a foreign national "because of foreign control" does not *ipso jure* confer jurisdiction. The reference in Article 25(2)(b) to "foreign control" necessarily sets an objective Convention limit beyond which ICSID jurisdiction cannot exist and parties therefore lack power to invoke same no matter how devoutly they may have desired to do so.[1122]

After citing authors to the effect that the parties' agreement on foreign nationality raised a strong presumption that there was adequate foreign control (see para. 815 *supra*), the Tribunal continued:

> 38. Nevertheless the words "because of foreign control" have to be given some meaning and effect. These words are clearly intended to qualify an agreement to arbitrate and the parties are not at liberty to agree to treat any company of the host State as a foreign national: They may only do so "because of foreign control". The Tribunal concludes that the existence of consent to an arbitration clause such as paragraph 36(a) of the 1988 Lease Agreement in circumstances such that jurisdiction could be premised only on the second clause of Article 25(2)(b) raises a rebuttable presumption that the "foreign control" criterion of the second clause of Article 25(2)(b) has been satisfied on the date of consent.[1123]

A review of the relevant facts and circumstances (see paras. 856–857 *infra*) led the Tribunal to conclude that this presumption was rebutted. The factual requirements of the second clause of Art. 25(2)(b) were not satisfied on the date of consent. The Tribunal concluded that it did "not find here indications of foreign control of Vacuum Salt such as to justify regarding it as a national of an ICSID Contracting State other than Ghana". To assume jurisdiction under these circumstances would have been contrary to the purpose of the Convention, which was designed for the settlement of disputes between States and nationals of other States.

In *Cable TV* v. *St. Kitts and Nevis*, the Tribunal declined jurisdiction since the Respondent had not consented to jurisdiction (see paras. 249, 381, 786 *supra*). But it still examined the question of control over the locally incorporated companies concluding that ownership of the Claimant companies by nationals of the United States had been established for purposes of Art. 25(2)(b).[1124]    **822**

Although the parties in *Tanzania Electric* v. *IPTL* at no stage contested jurisdiction, the Tribunal nevertheless independently observed that at all times IPTL, a national of the Contracting State to the dispute, had been 70% owned and controlled by nationals of Malaysia.[1125]    **823**

---

1120   At para. 31.
1121   At para. 31. See also *Broches, A.*, Denying ICSID's Jurisdiction: The ICSID Award in Vacuum Salt Products Limited, 13 Journal of International Arbitration 21, 25/6 (1996).
1122   At para. 36.                        1123   At para. 38.
1124   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 5.16–5.22.
1125   *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 13.

**824**    In *Autopista* v. *Venezuela*, the immediate controller of the Claimant was a US company which was controlled by a Mexican company. Venezuela argued that the Claimant was not, in fact, controlled by nationals of the United States, a Contracting State, but was in fact controlled by nationals of Mexico, which is not a Contracting State. The Tribunal did not accept the premise that Art. 25(2)(b) of the Convention requires *effective* control. It said that Art. 25(2)(b) "does not specify the nature, direct, indirect, ultimate or effective, of the foreign control".[1126] It also noted that the parties had agreed in their contract that direct shareholding would suffice as evidence of control.[1127]

**825**    These cases, especially *Vacuum Salt*, make it abundantly clear that foreign control at the time of consent is an objective requirement which must be examined by the tribunal in order to establish jurisdiction. Whereas an agreement on foreign nationality may be readily inferred from a consent agreement, no such inference is possible with regard to foreign control. An agreement on foreign nationality will create a presumption that its factual condition of foreign control exists, but no more. This presumption is rebuttable. Foreign control must actually exist and cannot be construed by the parties or implied from an agreement between the parties.

### b) Nationality of Foreign Control

**826**    The second clause of Art. 25(2)(b) refers to "foreign control" without specifying any nationality requirements in this respect. It is clear from the wording and from the context that control exercised by nationals of the host State is not "foreign control" and that juridical persons controlled by such nationals are excluded from ICSID's jurisdiction.

**827**    The lack of "foreign control" was the decisive element in *Vacuum Salt* v. *Ghana*. The Tribunal found that at the relevant time only 20% of the company's shares were in Greek hands, whereas 80% were in Ghanaian hands.[1128] An examination of other possible elements of control, notably management, failed to dispel the impression that the company was under Ghanaian control[1129] (see also paras. 856–857 *infra*). This evident absence of foreign control led the Tribunal to find that it lacked jurisdiction.[1130]

**828**    The question whether "foreign control" means control by nationals of another Contracting State or control by nationals of any State other than the host State is not so clear at first sight. A literal interpretation could suggest that "foreign" has a different and wider meaning than "of another Contracting State". But a number of considerations strongly suggest that control by nationals of non-Contracting States would not qualify for purposes of Art. 25(2)(b). The drafting history of the

---

1126    *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 110. The Tribunal in *TSA Spectrum* v. *Argentina* took a different approach, finding by a majority that it was appropriate to pierce the corporate veil of the immediate controlling entity: Award, 19 December 2008, paras. 152/3.

1127    At para. 117.

1128    *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 41. See also *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, para. 162.

1129    At paras. 42–55.            1130    At paras. 54/5.

second clause of Art. 25(2)(b) suggests that what the delegates had in mind was control by nationals of other Contracting States (see paras. 761, 762 *supra*). In addition, a conscious decision was made to exclude nationals of non-Contracting States, including juridical persons, from access to the Centre (see paras. 285, 741 *supra*).

This result is also borne out by a more careful interpretation of the second clause **829** of Art. 25(2)(b) itself. The fact of foreign control is linked to the agreement to treat the investor as a national of another Contracting State by the word "because". This causal connection suggests that the foreign control must correspond to the agreed nationality. It would be illogical to accept an agreement to treat the investor as a national of another Contracting State because of foreign control by a national of a non-Contracting State.

In *SOABI* v. *Senegal*, jurisdiction turned on whether the foreign control over **830** the local company was exercised by Flexa, a Panamanian company, or, indirectly, by Flexa's Belgian owner (see paras. 801, 818 *supra*). Belgium was a Contracting State but Panama was not. The Tribunal had no doubts that the "foreign control" had to be exercised by nationals of Contracting States:

> 33. The Tribunal is of the opinion that it follows from the structure and purpose of the Convention that the foreign interests which might serve as a basis for according "foreign status" to a company established under local law, should be those of nationals of Contracting States.[1131]

The Tribunal was able to uphold jurisdiction only by finding that control, in the sense of the second clause of Art. 25(2)(b), was exercised indirectly by the Belgian controller of Flexa (see para. 843 *infra*). Therefore, it is clear that control must be exercised by nationals of Contracting States other than the host State. The Award of 19 December 2008 in *TSA Spectrum* v. *Argentina* takes this proposition further by insisting that control through an intermediate holding company is insufficient for Art. 25(2)(b) if ultimate control is vested in a person having the nationality of the host State.

The nationality of foreign controllers is relevant not only to ensure that they are **831** nationals of a Contracting State but also to ensure that a local company is entitled to avail itself of the protection of an investment treaty. In *Aguas del Tunari* v. *Bolivia*, a claim was brought by a Bolivian company under the Bolivia-Netherlands BIT. Article 1(b)(iii) of that treaty defines investors of a Contracting Party to mean "legal persons controlled directly or indirectly, by nationals of that Contracting Party, but constituted in accordance with the law of the other Contracting Party". There was no dispute that the Claimant was foreign controlled. The question was whether it was controlled by Dutch investors such that the Claimant qualified for the protection of the BIT.

The Tribunal found control to be vested in the hands of one or more tiers of **832** Dutch holding companies, which held 55% of the shares in the Claimant via a

---

1131  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 33. This view is shared by the Dissenting Opinion to the Award of 25 February 1988, paras. 61–63, 76/7. See also the President's Declaration at paras. 2–4.

Luxembourg company, which was its immediate shareholder. The Tribunal did not pierce the corporate veil of these Dutch companies, as Bolivia argued it should, to attribute control to their ultimate US or Italian parent companies, neither of which could have benefited from the protection of the BIT in question.

**833**    Complications may arise if control is exercised by investors of different nationalities. This is not liable to lead to difficulties if all possible controllers are nationals of Contracting States. Thus, in *Amco* v. *Indonesia*, the debate on whether the true controller of PT Amco was an American company, a Dutch individual or a Hong Kong company[1132] was ultimately moot since all nationalities concerned were those of Contracting States at the time of consent.

**834**    If control is exercised jointly by shareholders of several Contracting States it is still possible to regard the local company as being under foreign control for purposes of the second clause of Art. 25(2)(b). Even if the nationals of one Contracting State cannot be said to be in a position of control, it would be sufficient if they can exercise control together with nationals of other Contracting States. The agreement on nationality may take this situation into account (see para. 796 *supra*). The mere existence among the shareholders of nationals of non-Contracting States or of nationals of the host State would not by itself oust the Centre's jurisdiction. But it must be shown that the combined influence of the nationals of Contracting States other than the host State can be described as controlling.[1133]

**835**    Again, investment treaty arbitration can present particular difficulties. The Tribunals in the related cases of *Camuzzi* v. *Argentina I* and *Sempra* v. *Argentina* discussed, *obiter*, the circumstances in which a company incorporated in the host State might be considered to be foreign controlled, and especially the possibility of foreign control deriving from the joint interests of multiple parties of different foreign nationalities. In the case of an agreement on foreign control deriving from an investment treaty, it seems unobjectionable that such control be vested in more than one national of the other Contracting Party to a bilateral treaty.[1134] The same cannot be said if a Claimant sought to argue that it was foreign controlled by reference to underlying investors of different nationalities some of whom may be entitled to protection under separate BITs or no treaty protection at all. The problem was explained in *Camuzzi* v. *Argentina I* and *Sempra* v. *Argentina* in the following (identical) terms:

> The problem arises in the case of foreign investors of different nationalities acting, as in this case, under different treaties. The Argentine Republic is right when it argues that the consent is expressed in each treaty individually, with a different personal and normative import, in such a way that the combination of various participations could result in situations that that consent did not have in mind and might not have intended to include. In such an alternative the control could not be exercised jointly for the purposes of the Convention and of the Treaty and would have to be measured on the basis of the individual intents.

---

1132   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(iii).
1133   See also *Broches, A.*, Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69, 77 (1974).
1134   *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 38.

The assertion of the Claimant to the effect that the shareholders' nationality is not relevant inasmuch as they are nationals of a State that is a contracting party to the Convention is not convincing. It could, for instance, result in a shareholder protected by a treaty adding his participation to that of another shareholder who is a national of a State that is a party to the Convention but does not have a bilateral treaty with the host State that would protect him.[1135]

At the same time, the *Camuzzi* v. *Argentina I* and *Sempra* v. *Argentina* Tribunals **836** recognized that in the particular circumstances of a case it may be shown that different shareholders having different nationalities had collaborated together from the outset in making and operating their investment, to the knowledge of the host State. On this basis it was possible to find that the locally incorporated claimant was foreign controlled, and thus a "national of another Contracting State", by reference to the consolidated interests of its shareholders, notwithstanding their different nationalities. The Tribunals said that:

> . . . if the context of the initial investment or other subsequent acquisitions results in certain foreign investors operating jointly, it is then presumable that their participation has been viewed as a whole, even though they are of different nationalities and are protected by different treaties. In such a case, it would be perfectly feasible for these participations to be combined for purposes of control or to make the whole the beneficiary [*sic*].[1136]

Camuzzi and Sempra had entered into their investment together, pursuant to **837** a shareholders' agreement that reflected their joint venture and assigned to them both managerial responsibilities in relation to the operating companies, such that "when the dispute arose it was already a reality that could not be ignored for jurisdictional purposes".[1137] In such circumstances, the Tribunals held that it was possible to consider two foreign nationalities together to establish foreign control in a company incorporated in the host State, without identifying one or the other nationality as controlling.

*Amerasinghe* has argued that Art. 25(2)(b) does not refer to effective control **838** but simply to control so that any reasonable amount of control should be accepted. Therefore, even though nationals of non-Contracting States or of the host State may have greater control, there would be good reasons for not rejecting an agreement on nationality as long as there is an adequate control by nationals of Contracting States.[1138] It does not seem likely that ICSID tribunals will follow this course. The cases thus far decided show a clear tendency to ascertain control independently of an agreement on nationality (see paras. 813–825 *supra*). The *Vacuum Salt* case, in particular, suggests that control means effective control or a dominant position and not merely a degree of participation (see paras. 820–822, 827 *supra*; paras. 856–857 *infra*).

---

1135 *Ibid.*, paras. 39–40; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 52–53.

1136 *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 41; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 54.

1137 *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 43.

1138 *Amerasinghe*, The Jurisdiction of the International Centre, pp. 219, 221; *Amerasinghe,* Interpretation of Article 25(2)(b), pp. 236–240.

**839**   Joint venture corporations in which the foreign investor as well as the host Government or a local investor participate may be designed specifically to exclude foreign control over the enterprise. In a situation of this kind it is advisable to make the foreign shareholder and not just the joint venture corporation the party to the agreement containing the ICSID clause.

*c) Indirect Control*

**840**   A foreign corporate investor controlling a company in the host State may, in turn, be controlled by nationals of other States. ICSID tribunals have reached conflicting answers to the question of whether only immediate control or also indirect control should be taken into consideration to determine the nationality of the foreign controller.

**841**   In *Amco* v. *Indonesia*, the Respondent contended that the true controller of the local company, PT Amco, was not Amco Asia, a United States national, as had been indicated by the Claimant (see paras. 799, 800 *supra*). Rather, it was alleged that Amco Asia itself was controlled by a Dutch citizen, Mr. Tan, residing in Hong Kong, through a Hong Kong company of which Mr. Tan was the sole or the main shareholder. The Tribunal refused to go beyond the first level of control:

> To take this argument into consideration, the Tribunal would have to admit first that for the purpose of Article 25(2)(b) of the Convention, one should not take into account the legal nationality of the foreign juridical person which controls the local one, but the nationality of the juridical or natural persons who control the controlling juridical person itself: in other words, to take care of a control at the second, and possibly third, fourth or xth degree.
>
> Such a reasoning is, in law, not in accord with the Convention. Indeed, the concept of nationality is there a classical one, based on the law under which the juridical person has been incorporated, the place of incorporation and the place of the social seat. An exception is brought to this concept in respect of juridical persons having the nationality, thus defined, of the Contracting State Party to the dispute, where said juridical persons are under foreign control. But no exception to the classical concept is provided for when it comes to the nationality of the foreign controller, even supposing – which is not at all clearly stated in the Convention – that the fact that the controller is the national of one or another foreign State is to be taken into account . . .[1139]

**842**   In this particular case, a determination of the controlling nationality was of no immediate interest since all the countries concerned, the United States, the Netherlands and the United Kingdom, were Contracting States at the relevant date (see paras. 826–839 *supra*). But the Tribunal added a remark that gives some relevance to the controller's nationality in addition to its status as a national of a Contracting State: the true nationality of the controller would have to be taken into account where, for political or economic reasons, it matters for the host State to know the nationality of the controller and where the host State, had it known

---

1139   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(iii).

this nationality, would not have agreed to the arbitration clause. This, however, was neither alleged nor proven in the instant case.[1140]

In *SOABI* v. *Senegal*, the local company's immediate owner was a Panamanian **843** company, Flexa, which itself was controlled by Belgian nationals. Since Belgium was a Contracting State but Panama was not, the issue of direct or indirect control was decisive (see paras. 801, 818, 830 *supra*). The Government argued that SOABI did not meet the requirements of Art. 25 since its sole shareholder, at the relevant time, had Panamanian nationality. The Tribunal rejected this argument:

> 35. . . . The nationality of this company, which held in 1975 all of SOABI's subscribed capital shares, could only be determinative of the nationality of the foreign interests if the Convention were concerned only with direct control of the company. However, the Tribunal cannot accept such an interpretation, which would be contrary to the purpose of Article 25(2)(b) *in fine*. This purpose, it is hardly necessary to observe, is to reconcile, on the one hand, the desire of States hosting foreign investments to see those investments managed by companies established under local law and, on the other hand, their desire to give those companies standing in ICSID proceedings. . . .

> 37. It is obvious that, just as a host State may prefer that investments be channelled through a company incorporated under domestic law, investors may be led for reasons of their own to invest their funds through intermediary entities while retaining the same degree of control over the national company as they would have exercised as direct shareholders of the latter.

> 38. For the above reasons, the Tribunal concludes that, at the date of the conclusion of the Establishment Agreement, control over Flexa was exercised by nationals of Contracting States, notably the Kingdom of Belgium.[1141]

The solution adopted in *SOABI* has found support among commentators.[1142] **844** But it leaves a number of questions unanswered. Was the Tribunal's objective to be realistic by piercing the veil of the first controller's corporate identity? Could this search for the true controller go on indefinitely beyond the first controller? Or was it the Tribunal's intention to search until it could find a foreign control that had the nationality of a Contracting State? Put differently, how would a tribunal decide if the situation in *SOABI* were to be reversed? If the immediate controller is a national of a Contracting State which is, in turn, controlled by nationals of non-Contracting States or even by nationals of the host State? Realism would militate against jurisdiction in such a case. On the other hand, the endeavour to find control of a nationality that is favourable to ICSID's jurisdiction would exclude the second level of control.

---

1140  *Loc. cit.*
1141  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 35–38. For the contrary view see the Dissenting Opinion to the Award of 25 February 1988 at paras. 62–64, 74–77. See also the Declaration of the Tribunal's President (Mr. *Broches*) in support of the Tribunal's decision, describing the finding on this point in *Amco* v. *Indonesia* as an *obiter dictum*, paras. 2–5.
1142  *Amerasinghe*, Interpretation of Article 25(2)(b), p. 236; *Delaume*, How to Draft, p. 178; *Hirsch*, The Arbitration Mechanism, p. 104.

**845**  The issue also arose in *Autopista* v. *Venezuela*. The parties had entered into a contract which provided that they agreed to attribute to the Claimant "the character of 'national of another Contracting State'" for the purposes of the parties' ICSID arbitration agreement and for the application of the Convention, if the Claimant's majority shareholders came to be nationals of a Contracting State.[1143] The same clause went on to refer to the "country of citizenship of the majority shareholder or shareholders of the Concessionaire".[1144]

**846**  The Claimant argued that the criterion of foreign control was satisfied because its immediate shareholder was a US company and the US is a Contracting State. Venezuela objected to the jurisdiction of the Centre because the Claimant's "ultimate and actual" controller was a Mexican company, Mexico not being a Contracting State.[1145] The Tribunal held that the parties' agreement to submit disputes to ICSID was not subject to the Claimant's "ultimate" controller or parent being a national of a Contracting State. To the contrary, the agreement had referred to the "majority shareholder . . . of the Concessionaire", meaning its direct shareholder.[1146] The Tribunal concluded that the parties had consented to ICSID jurisdiction in the event that the Claimant's majority shareholder or shareholders came to be a national of another Contracting State.[1147] As a result of an internal corporate restructuring, 75% of the Claimant's shares came to be held by a US company. This was done in an orderly fashion and with Venezuela's knowledge and approval.[1148] As the Convention does not define foreign control as used in Art. 25(2)(b),[1149] the Tribunal held that "given the autonomy granted to the parties by the ICSID Convention, an Arbitral Tribunal may not adopt a more restrictive definition of foreign control, unless the parties have exercised their discretion in a way inconsistent with the purposes of the Convention".[1150] The parties' agreement to define the term "foreign control" only by reference to the Claimant's direct shareholding, and not for example by more sensitive economic criteria, was "certainly a reasonable test for control", and not inconsistent with the Convention. The Tribunal therefore found the Claimant to be controlled by a national of another Contracting State by virtue of its shares being held by a US company, notwithstanding that the latter was in turn owned by a national of a non-Contracting State.[1151]

**847**  The issue in *Aguas del Tunari* v. *Bolivia* was slightly different. The identity of the controllers was relevant primarily for the question of whether the Netherlands-BIT applied, not whether the Claimant was controlled by a national of another Contracting State (see paras. 831, 832 *supra*, 859–863 *infra*). Ownership by intermediate holding companies, albeit active in the management of the project, was

---

1143  *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 83.
1144  *Ibid.*, para. 84.       1145  *Ibid.*, para. 85.
1146  *Ibid.*, para. 86.       1147  *Ibid.*, para. 87.
1148  *Ibid.*, paras. 93, 124.  1149  *Ibid.*, para. 105.
1150  *Ibid.*, para. 114.      1151  *Ibid.*, paras. 117–121, 133/4.

held to be sufficient for these purposes.[1152] But this conclusion was also determinative of the question of jurisdiction under Art. 25(2)(b).[1153]

**848**   *Amco* and *SOABI* may be reconciled by adopting *Amerasinghe*'s suggestion that the search should be pursued until foreign control by nationals of a Contracting State can be established. Once the appropriate foreign control has been found, the search should end.[1154] In other words, the method that works best in favour of ICSID's jurisdiction is to be adopted in the particular case. *Autopista* is also in line with this method. But the Tribunal in that case stressed that its decision was dictated by the parties' own agreement as to the criteria for foreign control and, as such, that it did not purport to lay down a test of general application for the purposes of Art. 25(2)(b).[1155]

**849**   The idea of adopting the solution that works best in favour of ICSID's jurisdiction has a certain degree of attractiveness but leads to further questions. Is it sufficient for nationals of non-Contracting States or even of the host State to set up a company of convenience in a Contracting State to create the semblance of appropriate foreign control? The flexibility in the application of the first part of Art. 25(2)(b), as exemplified by the majority decision in *Tokios Tokelės* (paras. 701, 705, 725–735 *supra*), might suggest a similar approach for the determination of the nationality of the controllers of locally incorporated companies. But there are weighty arguments against such an approach. Whereas the first part of Art. 25(2)(b) merely refers to the investor's nationality, the second part specifically refers to control. This would indicate an approach that is governed less by formal aspects of corporate nationality than by economic realities. Therefore, on balance, the better approach would appear to be a realistic look at the true controllers thereby blocking access to the Centre for juridical persons that are controlled directly or indirectly by nationals of non-Contracting States or nationals of the host State.[1155a]

### d) Form and Extent of Control

**850**   Control over a juridical person is not a simple phenomenon. Participation in the company's capital stock or share ownership, while relatively simple to ascertain, is not necessarily a reliable indicator of control.[1156] Different voting rights attached to different types of shares, decision-making procedures and the exercise of management all contribute to a complex picture of control.[1157] For instance, a joint venture in which the foreign investor and local interests hold equal shares may be

---

1152   *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 319/20. For the question of interpretation arising under the terms of the BIT, the Tribunal distinguished ICSID jurisprudence on the meaning of "control" for the purposes of Art. 25(2)(b): at paras. 275–286.

1153   *Ibid.*, paras. 280/1.

1154   *Amerasinghe*, Interpretation of Article 25(2)(b), p. 236.

1155   *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 142.

1155a   In this sense: *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, paras. 114–162.

1156   See also *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 119.

1157   See also *Amerasinghe*, Interpretation of Article 25(2)(b), p. 240; *Masood*, Jurisdiction of International Centre, p. 139.

under the effective control of the foreign partner due to the latter's management and know-how.

**851**    During the Convention's drafting there was some debate on the meaning of "control" after its first introduction (see paras. 761, 762 *supra*). It was pointed out that a mere majority holding of shares would not necessarily be decisive (History, Vol. II, pp. 359, 360, 396, 447, 447/8, 538), that actual holdings would be difficult to trace in the case of bearer shares (at pp. 361, 539, 581) and that even a minority holding of as little as 25% or even 15% might amount to control through a capacity to block major changes or otherwise (at pp. 447, 448, 538). Mr. *Broches* stated that there was no uniform view of what constituted "foreign control" but that the matter could be left to the appreciation of each State (at p. 870).

**852**    ICSID tribunals have developed an increasing awareness of the necessity to take a differentiated approach when examining actual control. In *Amco* v. *Indonesia*, Amco Asia's control over PT Amco was simply accepted as a fact although there was some reference to a sole or main shareholding in the context of PT Amco's indirect control (see para. 841 *supra*).[1158]

**853**    In *Klöckner* v. *Cameroon*, the Tribunal pointed out that on the critical date SOCAME, the local company, was subject to the majority control of foreign interests by virtue of the fact that Klöckner and its European partners had subscribed to 51% of SOCAME's capital (see also paras. 783, 817 *supra*). The Tribunal also mentioned that a change occurred subsequently when the foreign investors lost majority control over the Company because they refused to subscribe to a capital increase.[1159] There is no reference to any element of control other than shareholding in these cases.

**854**    In *SOABI* v. *Senegal*, the immediate controller, Flexa, was the sole shareholder of the local corporation. But the Tribunal found that Flexa was, in turn, controlled by nationals of Belgium (see paras. 801, 818, 830, 843 *supra*). It reached this result primarily by establishing that a Belgian national owned all of Flexa's shares but also by reference to the fact that at least one of the three members of Flexa's Board of Directors was of Belgian nationality.[1160]

**855**    In *LETCO* v. *Liberia*, the question of control over the locally incorporated company did not raise any factual problems in view of its 100% French ownership (see paras. 784, 819 *supra*). But the Tribunal still found it appropriate to base its finding also on the company's decision-making structure and management:

> The evidence provided by LETCO clearly indicates that it was under French control at the time the Concession Agreement was signed. This control is not only a result of the fact that LETCO's capital stock was 100% owned by French nationals as indicated by both LETCO and official documents of the Liberian Government, it also results from what appears to be effective control by French nationals; effective control in the sense that, apart from French shareholdings, French nationals dominated the company decision-making structure. It appears

---

1158    *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(iii).
1159    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 15/16.
1160    *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 38–41.

*Article 25 – Jurisdiction* 325

from the evidence presented that a majority, if not all, of LETCO's directors, as well as the General Manager, were at all times French nationals.[1161]

In *Vacuum Salt* v. *Ghana*, foreign control over the locally incorporated company **856** was the central issue in the Tribunal's decision. After dismissing the idea that foreign control could be inferred from the existence of an ICSID clause (see paras. 820–821 *supra*), the Tribunal undertook a detailed examination of control over the company. The request for arbitration had contended that Vacuum Salt was controlled by a Greek national, Mr. Panagiotopulos, who at the relevant date held 20% of its shares.[1162] The Tribunal noted that while 20% of the shares were in the hands of the Greek national, Ghanaian nationals held the remaining 80%.[1163] In addition, the Greek national and his wife were directors of Vacuum Salt. The Tribunal prefaced its investigation with the following general observation:

> 43. The Tribunal notes, and itself confirms, that "foreign control" within the meaning of the second clause of Article 25(2)(b) does not require, or imply, any particular percentage of share ownership. Each case arising under that clause must be viewed in its own particular context, on the basis of all of the facts and circumstances. There is no "formula". It stands to reason, of course, that 100 percent foreign ownership almost certainly would result in foreign control, by whatever standard, and that a total absence of foreign shareholding would virtually preclude the existence of such control. How much is "enough", however, cannot be determined abstractly.[1164]

The Tribunal added that reasonable criteria other than shareholding, such as voting rights or management, may be considered but that "it must be true that the smaller . . . the percentage of voting shares held by the asserted source of foreign control, the more one must look to other elements". Therefore, it was necessary to examine Mr. Panagiotopulos' personal role in Vacuum Salt at the critical date.[1165]

This examination[1166] led the Tribunal to conclude that Mr. Panagiotopulos **857** served in a significant technical capacity, there was no evidence that he had acted or was materially influential in a truly managerial function:

> Nowhere in these proceedings is it suggested that Mr Panagiotopulos, as holder of 20 percent of Vacuum Salt's shares, either through an alliance with other shareholders, through securing a significant power of decision or managerial influence, or otherwise, was in a position to steer, through either positive or negative action, the fortunes of Vacuum Salt.[1167]

It followed that there was no foreign control in the sense of Art. 25(2)(b). Therefore, jurisdiction had to be declined.[1168]

In *Cable TV* v. *St. Kitts and Nevis* (see also paras. 249, 381, 786, 822 *supra*), **858** the Tribunal noted that the Claimants were 99.9% owned and therefore controlled by nationals of the United States. Nevertheless, it also noted that the directors and

---

1161  *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 349, 351.
1162  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, footnote 22 to para. 35.
1163  At para. 41.                    1164   At para. 43.
1165  At para. 44.                    1166   At paras. 47–53.
1167  At para. 53. Footnotes omitted.
1168  At paras. 54/5. See also *Broches, A.*, Denying ICSID's Jurisdiction: The ICSID Award in Vacuum Salt Products Limited, 13 Journal of International Arbitration 21, 27/8 (1996).

other persons acting on behalf of the Claimant companies were nationals of the United States.[1169]

**859**    In *Aguas del Tunari* v. *Bolivia*, the Tribunal noted in the context of interpreting the provisions of the Bolivia-Netherlands BIT that the ordinary meaning of "control" can "encompass both actual exercise of powers or direction and the rights arising from the ownership of shares".[1170] As to the legal meaning, the Tribunal concluded that this refers to the power to control and not the actual exercise of control.[1171] The Tribunal was satisfied that where there is 100% ownership, or a majority of voting rights, there is almost inevitably control. Thus, the Tribunal concluded that the phrase in the BIT "directly or indirectly controlled"

> ...means that one entity may be said to control another entity (either directly...or indirectly) if that entity possesses the legal capacity to control the other entity. Subject to evidence of particular restrictions on the exercise of voting rights, such legal capacity is to be ascertained with reference to the percentage of shares held.[1172]

**860**    Boliva argued that control could not be established purely through evidence of ownership but required proof of actual control,[1173] but it could not articulate a workable test. The Tribunal thought that it is almost impossible to discern precisely at what stage mere formal control through ownership might transform and become actual or effective control. It thought any such test would be impracticable,[1174] and would engender uncertainty contrary to the object and purpose of investment promotion and protection treaties.[1175]

**861**    The Tribunal concluded that control is a quality that accompanies ownership, and can exist in the absence of its overt exercise.[1176] Aguas del Tunari was held to be controlled, for the purpose of the BIT, by the Dutch holding companies, the topmost of which, far from being a "mere shell", was the joint venture company through which the ultimate US and Italian investors worked together to manage their project.[1177]

**862**    The Tribunal nevertheless dealt with Bolivia's argument that the BIT required proof of "actual control" at some length. This objection was rejected by a majority of the Tribunal.[1178] Instead, the majority held that an entity may be said to control another entity if it possesses the legal capacity to control it. The percentage of voting shares was a reliable test to identify control in the absence of evidence of particular restrictions on the exercise of the rights attaching to them.[1179]

---

1169   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 5.13–5.22.
1170   *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 227.
1171   *Ibid.*, para. 232.                    1172   *Ibid.*, para. 264.
1173   *Ibid.*, para. 223.
1174   *Ibid.*, para. 246 citing in support the Claimant's argument in *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 69 (see paras. 824, 845–846 *supra*).
1175   *Ibid.*, para. 247.                    1176   *Ibid.*, para. 242.
1177   *Ibid.*, paras. 319–320.
1178   Arbitrator José Luis Alberto-Semerena issued a dissenting opinion, arguing that proof of actual control was required by the BIT and concluding that the Claimant had not satisfied this test.
1179   *Ibid.*, para. 264.

The Tribunal concluded by considering whether this definition of control was **863** compatible with the objective jurisdictional requirements in Art. 25(2)(b). In the absence of a definition of control in the Convention, and the importance attributed to party autonomy, the Tribunal noted that it is not at all surprising that the drafting history, commentary and arbitral awards all point to "foreign control" being "flexible" so that reasonable definitions in referring instruments may pass through the jurisdictional keyhole.[1180] It was clear to the Tribunal that the definition of control as used in the BIT was an agreement as to "foreign control" that satisfied "the flexible and deferential requirement of Article 25(2)".[1181]

On the basis of the Convention's preparatory works as well as the published **864** cases, it is possible to conclude that the existence of foreign control is a complex question requiring the examination of several factors such as equity participation, voting rights and management. In order to obtain a reliable picture, all these aspects must be looked at in conjunction. There is no simple mathematical formula based on shareholding or votes alone.

An argument has been made that what matters in terms of control is not absolute **865** control but merely a reasonable amount of control. Therefore, a controller might be said to exercise foreign control despite the fact that another controller exercises an even higher degree of control.[1182] The Tribunal in *Vacuum Salt* mentioned the problem of whether control in Art. 25(2)(b) means exclusive control or whether more than one shareholder or group of shareholders may enjoy control, but finds that it need not address the problem.[1183] Admittedly, for purposes of ICSID's jurisdiction, the concept of control should be treated with some flexibility. Thus, joint control by different shareholders from different Contracting States should be admitted in principle (see paras. 796, 833, 834 *supra*). The *Sempra* v. *Argentina* and *Camuzzi* v. *Argentina I* cases confirm this possibility, but note the problem that may arise in treaty arbitrations if not all shareholders are nationals of a Contracting Party to the treaty (see paras. 297, 835–837 *supra*).[1184] On the other hand, not every substantial minority participation should be accepted as control (see para. 838 *supra*). The combined control of nationals of Contracting States other than the host State should, at least, outweigh the combined control of nationals of non-Contracting States and of the host State.

A number of national investment laws containing ICSID clauses extend access **866** to the Centre to host State corporations that are under foreign control (see para. 806 *supra*). Where an explanation of foreign control is offered, it is nearly always in terms of a majority interest in the local company's share capital.[1185]

---

1180  *Ibid.*, paras. 280, 283.                    1181  *Ibid.*, para. 285.
1182  *Amerasinghe*, Interpretation of Article 25(2)(b), p. 240.
1183  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 43.
1184  *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 52–53; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 39–40.
1185  See Central African Republic, Code of Investments, 1988, Art. 30; Chad, Décret N° 446/PR/MCI/87 fixant la prodédure d'octroi des avantages du Code des Investissements, 1987, Art. 17(4); Mozambique, Law of Investment, 1993, Art. 1(1)(q)(2); Uganda, Investment Code, 1991, sec. 10(1)(b); Zaire, Investment Code, 1986, Art. 1(c).

**867**     Bilateral investment treaties that address the second clause of Art. 25(2)(b)
(see paras. 807–809 *supra*) refer to foreign control in varying terms.[1186] The
Netherlands and Swiss BITs merely reiterate the Convention's terminology by
referring to control by nationals of the other Contracting Party.[1187] By contrast,
United Kingdom agreements refer to majority share ownership (see para. 807
*supra*). The provisions in these BITs and most of the provisions in national
legislation are narrower than the Convention would permit. Their effect is to
restrict the parties' agreement on nationality (see para. 811 *supra*) to cases of
majority equity ownership.[1188]

**868**     United States BITs refer to a local company that is "an investment of nationals
or companies of the other Party" (see para. 808 *supra*). This formula is open to
conflicting interpretations. The phrase "investment of" may be read as including
a minority participation in the local company. This would probably go beyond the
concept of foreign control as used in the Convention.[1189] The formula in the United
States BITs may also be interpreted in the opposite way. A local company that is
an investment of nationals of the other Party may be seen to require close to 100%
ownership. Obviously this would be narrower than required by the Convention.

**869**     Multilateral instruments containing ICSID consent clauses (see paras. 456–463
*supra*) deal with the question of foreign control over host State companies in
several ways (see para. 810 *supra*). Art. 1117 of the NAFTA refers to direct or
indirect control by an investor of a Party, which can exist even in the case of a
minority shareholding provided that the shareholder can demonstrate effective or
"de facto" control over the local company.[1190] The Mexico-Colombia-Venezuela
Free Trade Agreement of 1994 in Art. 17–17 speaks of a company owned or under
the effective control of an investor.

**870**     The Energy Charter Treaty of 1994 in Art. 26(7) simply speaks of control
by investors of another Contracting Party (see para. 810 *supra*). But an "under-
standing", adopted together with the Energy Charter Treaty, offers the following
definition of control:

> For greater clarity as to whether an Investment made in the Area of one Con-
> tracting Party is controlled, directly or indirectly, by an Investor of any other
> Contracting Party, control of an Investment means control in fact, determined
> after an examination of the actual circumstances in each situation. In any such
> examination, all relevant factors should be considered, including the Investor's
> (a) financial interest, including equity interest, in the
>     Investment;
> (b) ability to exercise substantial influence over the
>     management and operation of the Investment; and

1186  *Peters*, Dispute Settlement Arrangements, p. 144.
1187  *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 214, 224/5. See also *Aguas del Tunari* v.
      *Bolivia*, Decision on Jurisdiction, 21 October 2005 (paras. 831–832, 847, 859–863 *supra*);
      *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, paras. 155–162.
1188  *Dolzer/Stevens*, Bilateral Investment Treaties, p. 143.
1189  *Ibid.*, p. 144.
1190  *Thunderbird* v. *Mexico* (UNCITRAL), Award, 26 January 2006, paras. 96–110.

    (c) ability to exercise substantial influence over the
        selection of members of the board of directors or any
        other managing body.
Where there is doubt as to whether an Investor controls, directly or indirectly, an
Investment, an Investor claiming such control has the burden of proof that such
control exists.[1191]

The MERCOSUR Protocol of Colonia for the Reciprocal Promotion and Pro-
tection of Investments of 1994 in Art. 1(2)(c) covers juridical persons that are
effectively controlled, directly or indirectly, by nationals of other Contracting
States.

### 5. Critical Dates

The second clause of Art. 25(2)(b) refers back to the first clause as far as the **871**
critical date is concerned. "On that date" means "the date on which the parties
consented to submit such dispute to conciliation or arbitration" (see paras. 752–759
*supra*). The conclusion that the critical date is the date of consent is irrefutable
as far as the relevant date for the host State's nationality is concerned. ICSID
tribunals applying the second clause of Art. 25(2)(b) have never cast this principle
into doubt and have in some cases specifically pointed out that the host State's
nationality of the foreign controlled corporation existed on the date of consent.[1192]

The situation is less clear when it comes to the critical date for the foreign **872**
control. During the Convention's drafting, there was some concern about a change
of control over the locally established company (History, Vol. II, pp. 287, 445)
but no definite solution was offered. The Convention's wording is not without
ambiguity on this point. The words "on that date" relate to "the nationality of the
Contracting State party to the dispute". But they do not relate to the subsequent
words dealing with foreign control. To express this meaning the words "on that
date" would have to be repeated after the words "because of foreign control".
Therefore, a strictly grammatical interpretation leaves open the question at what
time foreign control over the local company must have existed. On the other hand,
the agreement to treat the local company as a national of another Contracting State
must be "because of foreign control". Therefore, foreign control must have existed
at the time of the agreement. Since the agreement to treat the local company as
a national of another Contracting State is closely linked to consent between the
parties (see paras. 768–771 *supra*), the foreign control must have existed at the
time of consent.

This conclusion does not answer the question as to the effect of subsequent **873**
changes in control. In other words, does the disappearance of foreign control after
the date of consent affect jurisdiction? The simpler answer would be to adopt a
uniform test for all of Art. 25(2)(b) taking the time of consent as the only critical

---

1191   Understanding with respect to Article 1(6), 34 ILM 375 (1995).
1192   *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 15; *SOABI* v. *Senegal*,
       Decision on Jurisdiction, 1 August 1984, para. 29; *LETCO* v. *Liberia*, Decision on Jurisdiction,
       24 October 1984, 2 ICSID Reports 349, 351.

date. This would also be in line with the different rules on relevant dates in Art. 25(2)(a) and (b). Whereas the first provision, dealing with natural persons, looks at two distinct critical dates (see paras. 679–687 *supra*), the second provision, dealing with juridical persons, only looks at the time of consent (see paras. 752–759 *supra*). This would mean that the company's situation would be fixed at the time of consent and subsequent changes in control would be irrelevant for purposes of ICSID's jurisdiction.[1193]

874    On the other hand, it would seem somewhat anomalous to maintain ICSID's jurisdiction if all objective elements for the investor's foreign nationality have disappeared by the time the proceedings are instituted. A strict adherence to the time of consent as the only critical date would mean that a locally incorporated company which is entirely controlled by local interests could avail itself of an ICSID clause on the basis of previous foreign control that has since disappeared. Since many host States require a transfer of ownership to their own nationals over a stated period of time, this situation is quite likely to occur. Less likely but still possible is a situation where control over the local company passes from nationals of Contracting States to nationals of non-Contracting States after the date of consent. It has been argued with some persuasiveness that upholding ICSID's jurisdiction under these circumstances would be contrary to the purposes of the Convention.[1194]

875    ICSID tribunals dealing with the critical date for foreign control have generally favoured the date of consent but have also shown some concern for subsequent developments.[1195] In *Amco* v. *Indonesia*, the Tribunal, after recalling the two elements for the application of the second clause of Art. 25(2)(b), namely nationality of the host State and agreement to treat the company as a national of another Contracting State because of foreign control, stated:

> Now, in the Tribunal's view, these two conditions were fulfilled in the instance case, at the date on which the parties consented to submit possible future disputes to arbitration (which date is relevant, according to Article 25(2)(b)), and as a matter of fact, are still fulfilled today.[1196]

876    In *LETCO* v. *Liberia*, the Tribunal first confirmed French control at the time the Concession Agreement was signed, but shortly thereafter emphasized the fact of French management "at all times"[1197] (see para. 855 *supra*).

877    The ambivalence towards the critical date for control is also evident in *SOABI* v. *Senegal*. The Tribunal first determined that at the date of the agreement containing consent to ICSID's jurisdiction, control over Flexa, the company controlling

---

1193   *Amerasinghe*, How to Use the International Centre, p. 541; *Amerasinghe*, Jurisdiction Ratione Personae, pp. 266/7.
1194   *Tupman*, Case Studies, p. 836.
1195   This observation contained in the First Edition of this Commentary is echoed in *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 65. See also *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, para. 160.
1196   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14(ii).
1197   *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 349, 351.

the local company (see paras. 843, 854 *supra*), was exercised by nationals of a Contracting State, notably of Belgium. It added:

> 41. As has been observed above, the "national of another Contracting State" criterion must be fulfilled as of the date on which the parties agree to submit the dispute to the Centre. Changes or modifications after this date thus have no effect on whether the condition is satisfied.[1198]

Having made this categorical statement, the Tribunal continued that "it is nevertheless of some interest" to look into the question of shareholding immediately before the institution of the ICSID proceedings. It proceeded to a detailed analysis of the nationality of the shareholders on the day before the submission of the application for arbitration, which led to the result that over 99% of the shares were still in Belgian hands at that date.[1199]

In *Vacuum Salt* v. *Ghana*, the Tribunal declined jurisdiction because there was    **878** no foreign control over the local company in the sense of Art. 25(2)(b) (see paras. 856–857 *supra*). It made this finding on the basis of the premise that "the conditions of the second clause of Article 25(2)(b) must be fulfilled, at least initially, on the date of consent, in this case 22 January 1988".[1200] Nevertheless, the Tribunal in a lengthy footnote dealt with the Respondent's argument that the requirements of Art. 25(2)(b) must be satisfied also on the date of registration. The Tribunal looked at the available evidence, including previous ICSID decisions, and reached the result that only the date of consent is relevant for the fulfilment of the corporation's nationality requirements. In doing so, the Tribunal did not differentiate between continued control and the possession of the host State's nationality. It added the following argument in favour of looking at foreign control only at the time of consent:

> [A] municipal corporation of the host State which is granted foreign status under the second clause of Article 25(2)(b) of the Convention, however, could be deprived involuntarily of all foreign ownership through expropriation, and thus, were there a requirement of continuous nationality, could be deprived of its right to ICSID arbitration by the very act which it presumptively would wish to challenge in such a proceeding. *See* Convention, History, Vol. II, 400–01.[1201]

Having said all this, the Tribunal admitted that a change of control after the date    **879** of consent could have a profound impact on ICSID's jurisdiction after all:

> It cannot be denied, on the other hand, that the prospect would be deeply unsettling, for example, of a State being required to submit to international arbitration under the auspices of ICSID a dispute with a municipal corporation all of whose shares had been freely transferred from aliens to nationals of that State in the interim between the conclusion of an investment agreement including an ICSID clause premised on the second clause of Article 25(2)(b) and the registration of a request for arbitration. In that circumstance the issue is raised as to whether in

---

1198   *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 41.
1199   At para. 41.
1200   *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 29.
1201   *Ibid.*, footnote to para. 29.

light of the object and purpose of the Convention an interpretation of the second clause of Article 25(2)(b) permitting the Centre to exercise jurisdiction would lead to a result which is "manifestly absurd or unreasonable". *See* Art. 31(1) and 32(b) of the Vienna Convention on the Law of Treaties, . . .

The Tribunal need not resolve this troubling issue, however, given the further terms of this Award.[1202]

**880**    In later passages of the Award, the Tribunal repeatedly referred to developments concerning control over the Claimant subsequent to consent without reaching a clear result.[1203] After examining a shareholders' meeting on 14 May 1992, two weeks before the institution of ICSID arbitration, in which the alleged foreign controller did not even participate, the Tribunal made the following statement:

The Tribunal is conscious, of course, that the date as of which the existence or absence of "foreign control" initially is to be determined is 22 January 1988 and not 14 May 1992. Nonetheless, in the context of the entire record in this case the Tribunal finds the events of 14 May 1992 pertinent.[1204]

**881**    In *Autopista* v. *Venezuela*, the relevant change in the nationality of control occurred after the conclusion of the contract that contained the parties' consent to ICSID jurisdiction. This was not an obstacle to the Tribunal's jurisdiction, since the parties' consent was expressly conditional upon the Claimant coming to be controlled by a national of a Contracting State (see paras. 474, 771, 804, 805, 845, 846 *supra*).[1205]

**882**    In the *Vivendi* case, Argentina had objected to jurisdiction in respect of the first Claimant, CAA, which was an Argentinian company. Argentina alleged that at the date the parties concluded a concession contract CAA was an Argentine company and that it did not become controlled by French investors until after the dispute had arisen. As such, it would be a "fraud on the treaty" if CAA was entitled to claim under the Argentina-France BIT.[1206] In the original proceedings, the Tribunal had held that CAA was controlled by the second Claimant, CGE, a national of France, from the effective date of the contract.[1207] The *ad hoc* Committee found that CGE controlled CAA at the date of the commencement of proceedings under the BIT; in other words, on the date of consent. It followed that there was no question that the Tribunal lacked jurisdiction over CAA as one of the Claimants in the arbitration.[1208] In the resubmitted proceedings, the Tribunal accepted that this conclusion was *res judicata*.[1209] In any event, there had not been any change in control of CAA from the date of the contract through to the date of consent.[1210]

---

1202    *Ibid*. See also *Broches, A.*, Denying ICSID's Jurisdiction: The ICSID Award in Vacuum Salt Products Limited, 13 Journal of International Arbitration 21, 24/5 (1996).
1203    At paras. 43–44, 51–53.            1204    At footnote 31 to para. 53.
1205    *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 83, 89–91, 117, 142.
1206    *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 21.
1207    *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 24 note 6.
1208    *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 48, 50.
1209    *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, paras. 71, 97.
1210    *Ibid.*, para. 65.

None of the above cases involved a decisive change of control after the date of consent. Therefore, the Tribunals' comments on the relevant dates for control are of somewhat limited authority. It is still worth noting that the statements to the effect that the only relevant time is the date of consent are disaffirmed by a concern for subsequent developments and an unease towards the idea of opening ICSID jurisdiction to juridical persons that have since come under the control of host State nationals.   **883**

In *Klöckner* v. *Cameroon* a change of control occurred between the date of consent and the institution of the arbitration. In 1973, an Establishment Agreement, containing an ICSID clause, was concluded between SOCAME, a joint venture company of Cameroonian nationality, and the Government. At the time, 51% of SOCAME's shares were in the hands of the European investors, whereas 49% were held by the host State. In 1978, the European partners lost majority control over SOCAME after a capital increase. When ICSID proceedings were instituted in 1989 by the foreign investor on the basis of an ICSID clause in another contract, SOCAME was named as a co-respondent with the Government and was designated as a constituent subdivision of the State of Cameroon in the course of the proceedings (see paras. 260, 317 *supra*).   **884**

Before the Tribunal, the Government relied on the Establishment Agreement of 1973 between itself and SOCAME to press its counterclaim against Klöckner. Klöckner contested jurisdiction based on the Establishment Agreement since it was, after all, an agreement between the two Respondents. Moreover, SOCAME should not be accepted as a national of another Contracting State but simply as a Cameroonian company.[1211]   **885**

The Tribunal held that the relevant question was not whether it had jurisdiction *ratione personae* as regards SOCAME but whether it had jurisdiction *ratione materiae* to rule on the application and interpretation of the Establishment Agreement. It found that it had jurisdiction over Klöckner also in respect of the Establishment Agreement, which "reflected the contractual relationship between a foreign investor, acting through a local company, and the host country"[1212] (see para. 327 *supra*). The Tribunal concluded that:   **886**

> In these conditions, it would be inequitable to accept that Klöckner, having benefited from 1973 to 1978 from the existence of the ICSID arbitral clause, underlying the legal, economic, financial, and fiscal advantages and guarantees granted in the Establishment Agreement, be allowed today to contest ICSID jurisdiction with respect to questions relating to the application of the same Agreement, at least during the 1973–1978 period, when the arbitration clause is invoked by the Government which consented to it.[1213]

By substituting the foreign controller for the local company, the Tribunal bypassed the entire question of nationality and hence of foreign control. A tendency of tribunals to look beyond the identity of the company named in the   **887**

---

1211   *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 15.
1212   At p. 17.                              1213   *Loc. cit.*

consent agreement and to accept jurisdiction in respect of unnamed parent companies (see paras. 319–335 *supra*) could make the question of control over a local company at a particular time largely irrelevant. In view of the Tribunal's technique of piercing the veil of the local company, it would be misleading to conclude that ICSID's jurisdiction over SOCAME survived the change of control after the date of consent. The Tribunal's reasoning was not based on the situation as it existed at the time of consent. Rather, it assumed jurisdiction directly in relation to the foreign controller in respect of the period during which control did, in fact, exist.

**888**     Some BITs provide that companies constituted in one State but controlled by nationals of the other State shall be treated as nationals of the other State for purposes of Art. 25(2)(b) (see paras. 807–809 *supra*). Interestingly enough, these BITs specify a relevant time for control other than the date of consent. Thus, the United Kingdom Model Agreement provides that foreign control must be exercised through majority ownership of shares "before such a dispute arises"[1214] (see para. 807 *supra*). Netherlands and Swiss BITs are similar in this respect in that they refer to foreign control "before such a dispute arises" and "prior to the origin of the dispute" respectively.[1215] The Argentina-United States BIT, in line with other current US BITs, is even more specific. It refers to a company constituted in one State that was an investment of nationals of the other State "immediately before the occurrence of the event or events giving rise to the dispute"[1216] (see also para. 808 *supra*). The choice of these dates was made with a view to compulsory changes of control by the host State, *i.e.* expropriations. It is not clear who would bring a claim to ICSID after such an event. It must be expected that the host State would exercise its newly acquired control to prevent this. But the tendency of ICSID tribunals to admit unnamed parent companies (see paras. 319–335 *supra*) and to admit shareholders as claimants (see para. 150 *supra*) would appear to make this problem surmountable.

**889**     The multilateral instruments containing ICSID clauses (see paras. 456–463 *supra*) also deal with the problem of host State companies under foreign control (paras. 810, 870 *supra*). Of these, only the Energy Charter Treaty addresses the time of control. Its Art. 26(7) extends the status of a "national of another Contracting State" under Art. 25(2)(b) of the ICSID Convention to companies that have the host State's nationality on the date of consent and that are controlled by the foreign investor "before a dispute . . . arises" (see para. 810 *supra*).

**890**     The solution chosen in these treaties appears to be rational and is clearly preferable to a rigid adherence to the date of consent only. If the locally incorporated investor expresses its consent by taking up a standing offer contained in host State legislation or a treaty, the date of consent is the date at which the request for conciliation or arbitration is submitted to the Centre (see paras. 417, 447, 469 *supra*).

---

1214   *Dolzer/Schreuer*, Principles of International Investment Law, at p. 380.
1215   *Dolzer/Stevens*, Bilateral Investment Treaties, pp. 214, 224.
1216   Argentina-US BIT, Art. VII(8).

In a situation of this kind the selection of a critical date for control before the outbreak of the dispute may be valuable if the dispute arises from a compulsory change of control. But even if consent was perfected before the events giving rise to the dispute, there is no convincing reason why the situation with regard to control over the locally constituted company must be frozen at the date of consent for purposes of ICSID's jurisdiction. Successive tribunals, while choosing the date of consent as the critical date, have expressed their unease about the rigidity of this rule and about its possible consequences. This is most evident in *Vacuum Salt* where the Tribunal, after adopting the date of consent as the only relevant date, admits that this may lead to a result that is manifestly absurd or unreasonable (see para. 879 *supra*).

The adoption by agreement of the parties (see para. 811 *supra*) of an additional **891** date at which the requirement of foreign control must be fulfilled is perfectly admissible under the Convention. The parties are free to agree on conditions to their consent to ICSID's jurisdiction, in addition to those provided by the Convention, as long as these conditions are not contrary to the Convention's mandatory rules (see paras. 540–550 *supra*). The adoption of the requirement that "foreign control" in the sense of Art. 25(2)(b) must have existed immediately before the outbreak of the dispute is not only permissible but highly advisable. It can be recommended for incorporation in investment agreements between the parties.

Even without such an explicit clause naming a second relevant date for the **892** existence of foreign control, ICSID tribunals will have to come to terms with the possibility of a decisive change of control after the date of consent. The starting point should remain the date of consent. An agreement to treat the local company as a national of another Contracting State should be accepted only if the local company was indeed under such foreign control at the time the agreement was made. But the investigation should not stop there. Subsequent changes in control should be taken into account under certain circumstances. A change of control should not be considered relevant if it takes place among nationals or groups of nationals of Contracting States other than the host State. The exact nationality of the foreign controlling interest is not material as long as there is control by nationals of "another Contracting State" or even of several Contracting States (see paras. 833, 834 *supra*). Even if the originally controlling nationality has been named in the agreement between the parties (see paras. 795–805 *supra*), such a change should not affect jurisdiction.

The situation is different if there is a voluntary change of control into the hands **893** of nationals of the host State. The title of the Convention itself, the history of the Convention (see paras. 664–678 *supra*), the Preamble and the wording of Art. 25 all make it clear that the Centre will not be available for disputes between States and their own nationals. The exception for locally established corporations is conditioned on the existence of foreign control. As soon as the condition for the exception disappears, jurisdiction can no longer be sustained.

**894**    Similarly, a specific decision was made in the course of the Convention's preparation to exclude nationals of non-Contracting States from access to the Centre (History, Vol. II, p. 868) (see paras. 285, 741 *supra*). Therefore, foreign control in the sense of Art. 25(2)(b) means control by nationals of another Contracting State. Control by nationals of non-Contracting States does not qualify (see paras. 826–839 *supra*). It follows that a change of control to nationals of non-Contracting States would terminate ICSID's jurisdiction.

**895**    Despite the choice made in the treaties cited above (paras. 888–889 *supra*), the more logical date for the examination of foreign control would be the date of registration of the request for conciliation or arbitration. This is the last practical date for the commission or tribunal to examine the factual conditions for jurisdiction. Even if the company was still under foreign control until just before the dispute arose, there is no convincing reason to give it access to the Centre if control has since changed into the hands of host State or non-Contracting State nationals. But it must be understood clearly that forcible acquisition of control over the local company by the host State through expropriation or similar measures would not affect jurisdiction. This eventuality is covered by the last sentence of Art. 25(1), which prohibits direct as well as indirect withdrawal of consent (see para. 634 *supra*).

### 6. Consequences of Agreement on Nationality

**896**    The last part of Art. 25(2)(b) provides for treatment of the local company as a national of another Contracting State "for the purposes of this Convention". This phrase was not contained in the First Draft, which first provided for the possibility of an agreed foreign nationality for companies established in the host State (History, Vol. I, p. 124). It was added upon the suggestion of Mr. *Broches* "as a matter of drafting" without any further explanation or discussion (History, Vol. II, p. 869). The Executive Directors' Report refers to the second clause of Art. 25(2)(b) only in the context of eligibility to become a party to ICSID proceedings (see para. 763 *supra*).

**897**    Nevertheless, the words "for the purposes of this Convention" indicate that the consequences of the agreement on nationality based on foreign control extend beyond the confines of jurisdiction, as defined in Art. 25, to all provisions of the Convention in which nationality is relevant. Arts. 38, 39 and 52(3) exclude nationals and co-nationals of parties to the dispute from appointments as arbitrators or members of an *ad hoc* committee under certain circumstances.

**898**    In *SOABI* v. *Senegal*, the Tribunal clearly assumed that the nationality of the controllers was relevant for the constitution of the tribunal. The parties had appointed by agreement a Belgian, a Senegalese and a Swiss national as arbitrators. The Tribunal noted that, under Art. 39 of the Convention, an agreement on each individual member of a tribunal is only necessary if the majority of the arbitrators are nationals or co-nationals of the parties to the dispute. From the designation by mutual consent, it followed that the parties had recognized SOABI, a company

established in Senegal, as a national of Belgium due to its control by Belgian nationals.[1217]

The logic of this reasoning was the subject of some debate in the Dissenting Opinion and a Declaration of the Tribunal's President.[1218] But the underlying assumption of the relevance of the controller's nationality for the rules restricting or excluding certain nationals from appointment to tribunals or *ad hoc* committees was never cast into doubt. **899**

The application of the exclusionary rules for appointments based on nationality also to co-nationals of controllers under Art. 25(2)(b) seems perfectly reasonable and in line with the spirit of these rules. Unfortunately, there are some practical problems. The nationality of the controllers may not be known with certainty at the time of the tribunal's constitution. There is no need to specify the controlling nationality in the agreement to treat the company established in the host State as a national of another Contracting Party (see paras. 795–805 *supra*). The parties frequently do not specify the controlling nationality and ICSID tribunals have held that there is no need to do so (see paras. 798–805 *supra*). The ICSID Secretariat will require the requesting party to specify the nationality(ies) of the foreign controller(s) before registering the request (see para. 795 *supra*). But registration is based on the submissions of the requesting party which may turn out to be incorrect. Tribunals have investigated the precise circumstances of control (see paras. 816–863 *supra*) but, obviously, this is possible only after a tribunal has been constituted. **900**

The situation is further complicated by the fact that the local company may be controlled jointly by nationals of several States (see paras. 796, 833, 834, 865 *supra*). In addition, there may be several layers of control whereby the immediate controller is controlled by nationals of other States (see paras. 840–849 *supra*). Finally, control may have shifted from nationals of one State to nationals of another State between the date of consent and the institution of ICSID proceedings (see paras. 872–895 *supra*). All these factors make it impossible to determine the nationality of the controllers with absolute certainty at the time of the tribunal's constitution. **901**

The only practical suggestion that can be made is to steer clear of co-nationals of possible controllers in the appointment of arbitrators when applying Arts. 38 and 39. The information available at the time of the tribunal's constitution may not permit an accurate determination of the controllers' nationality but will most probably offer some clues as to possible nationalities. These should be avoided as far as possible. The appointment of members of an *ad hoc* committee under Art. 52(3) would appear to be less problematical. By the time a case is ready for a request for annulment, the nationality of any foreign controllers should have been clarified. **902**

---

1217   *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 42.
1218   At paras. 67–73, 8–10.

O.  **"(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required."**

### *1. Approval of Consent*

### *a) Need for Approval*

903    ICSID's jurisdiction in respect of a constituent subdivision or agency of the host State is subject to two requirements in addition to consent: the subdivision or agency must have been designated to the Centre in accordance with Art. 25(1) (see paras. 230–267 *supra*) and the consent to jurisdiction given by the subdivision or agency must have been specifically approved by the host State. The host State may waive the approval of consent by notifying the Centre to this effect.

904    The need to have the subdivision or agency's consent approved by the host State was perceived early on in the debate on the admission of government entities to party status (History, Vol. II, pp. 258, 288, 321, 396, 492, 502) (see paras. 238–239 *supra*). This was intended as "a screening process, so that governments could withhold their approval where the 'instrumentality' should really not be considered as a governmental agency but an ordinary company" (at p. 503). When access to the Centre by political subdivisions or agencies was included in the First Draft, there was no mention of a designation procedure (History, Vol. I, pp. 116, 126). After the adoption of the requirement for the designation to the Centre of a constituent subdivision or agency (see para. 247 *supra*), the question arose whether an additional approval of consent by a designated entity might not be dispensed with (History, Vol. II, pp. 657, 667, 859, 860, 867). In a show of hands, the view prevailed that approval would still be necessary since a designation would not necessarily imply approval in specific cases (at p. 858).

905    Therefore, it is clear that designation and approval are two distinct acts with different functions (see para. 230 *supra*). The existence of an approval cannot be inferred from the existence of a designation, although it is arguable that the approval of consent that is notified to the Centre may be interpreted as *ad hoc* designation of the constituent subdivision or agency (see para. 252 *supra*).

906    Practice on the approval of consent by a constituent subdivision or agency is scant. In *Cable TV* v. *St. Kitts and Nevis*, jurisdiction was denied because the constituent subdivision or agency had not been designated under Art. 25(1) (see para. 249 *supra*). The Tribunal added that there was also no approval of the constituent subdivision or agency's consent.[1219]

907    In *Noble Energy* v. *Ecuador*, CONELEC had been designated to the Centre as an agency of the State for purposes of Art. 25(1) (see paras. 244, 251, 263 *supra*).

---

1219   *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 2.33.

The Tribunal noted that CONELEC's consent to ICSID arbitration, contained in a concession contract, had also been approved by the State.[1220]

Once approval of consent by a constituent subdivision or agency has been given, **908** such approval is protected by the prohibition to withdraw consent contained in the last sentence of Art. 25(1). In other words, consent, once approved, may not be invalidated through a retraction of the approval (see paras. 267, 612, 613 *supra*).

### b) Form of Approval

The Convention does not require any particular form for the approval of consent. **909** In particular, unlike designation of the constituent subdivision or agency (see para. 252 *supra*) and unlike waiver of approval (see paras. 916–918 *infra*), the approval need not be communicated to the Centre. In principle, approval is a unilateral act of the host State that need not be formally communicated to anyone. For practical reasons, it is desirable that the foreign investor and the constituent subdivision or agency are informed of the approval so that they may rely on the validity of consent.[1221] An investor will be well-advised to insist on approval by the State prior to or simultaneously with the consent agreement.

Approval may be contained in a separate agreement between the host State and **910** the investor. Or the approval may be contained in an instrument of designation communicated to the Centre.[1222] It may be practical to obtain approval by way of making the host State a party to the consent agreement.[1223] Alternatively, written approval by the host State may be affixed directly to the agreement between the constituent subdivision or agency and the investor. In addition, the consent clause may confirm that the investor's partner is indeed a designated subdivision or agency. The Model Clauses of 1993 offer the following choices in regard to a constituent subdivision or agency:

> **Clause 5**
> The <u>name of constituent subdivision or agency</u> is [a constituent subdivision]/[an agency] of the Host State, which has been designated to the Centre by the Government of that State in accordance with Article 25(1) of the Convention. In accordance with Article 25(3) of the Convention, the Host State [hereby gives its approval to this consent agreement]/[has given its approval to this consent agreement in <u>citation of instrument in which approval is expressed</u>]/[has notified the Centre that no approval [of this type of consent agreement]/[of consent agreements by the <u>name of constituent subdivision or agency</u>] is required].[1224]

---

1220  *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 179–182.
1221  *Amerasinghe*, Submissions to the Jurisdiction, pp. 224 *et seq.*
1222  For a combined designation and approval clause see Art. 7.10 of the 1982 participation agreement between New Zealand and Mobil Oil NZ Ltd., cited in *Attorney General* v. *Mobil Oil NZ Ltd.*, New Zealand High Court, 1 July 1987, 4 ICSID Reports 123/4.
1223  *Delaume*, Le Centre International, p. 795; *Amerasinghe*, Jurisdiction Ratione Personae, pp. 236 *et seq.*
1224  4 ICSID Reports 361. See also Clause IV of the 1968 Model Clauses, 7 ILM 1159, 1165/6 (1968) and Clause VI of the 1981 Model Clauses, 1 ICSID Reports 197, 201/2.

911    As noted in the Model Clauses, it is clear that the direct expression of approval of consent can only be used if the Government is also a party to the agreement.

912    In *Noble Energy* v. *Ecuador*, the Tribunal noted that the designated agency's director was entitled and authorized by Law to consent to arbitration. In addition, the concession contract containing the agency's consent to ICSID arbitration was signed by the President of Ecuador as a "witness of honour" thereby approving the agency's consent.[1225]

### c) Time of Approval

913    The Convention does not specify at what time the host State's approval of consent, given by one of its constituent subdivisions or agencies, must be obtained. Approval may be given in advance of consent or thereafter. But it should be kept in mind that the validity of consent by a constituent subdivision or agency depends on its approval. Therefore, the actual date of consent is not before its approval (see para. 471 *supra*). The date of consent triggers a number of consequences under the Convention (see paras. 475–478 *supra*).

914    In *Noble Energy* v. *Ecuador*, approval of consent was given simultaneously with the consent. Both were contained in the same concession contract to which the State was also a party.[1226]

915    It is imperative that approval of consent has been given by the time ICSID proceedings are instituted. Institution Rule 2(1) requires that a request for conciliation or arbitration shall not only state that a constituent subdivision or agency has been designated to the Centre (see para. 258 *supra*) but shall also indicate information on the approval of consent (see para. 479 *supra*). Under Institution Rule 2(2), this information must be supported by documentation. Failure to provide this information in the request will lead to its rejection by the Secretary-General in accordance with his or her screening power under Arts. 28(3) and 36(3) of the Convention.

### 2. Waiver of Approval

916    The possibility of a notification to the Centre that no approval of consent to jurisdiction by a constituent subdivision or agency is required arose not from a feeling that such an approval might be unnecessary but rather from the perception that under some constitutions approval would be impossible. Several delegates pointed out that if matters are within the exclusive competence of a constituent subdivision, it would be unconstitutional to require the approval by the central government (History, Vol. II, pp. 289, 858, 859). In reaction to these misgivings, Mr. *Broches* suggested that the approval should be required except where the Contracting State notifies the Centre that no approval is required (at pp. 859,

---

1225   *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 179–182.
1226   *Ibid.*, paras. 178–182.

860). This solution was adopted in the Revised Draft (History, Vol. I, p. 126) and remained unchanged in the Convention.

The notification that no approval is required would normally be made in general terms for the future in respect of a particular constituent subdivision or agency. It may be limited to certain types of consent agreements. A notification by the host State that no approval of a particular consent agreement is required is barely distinguishable from actual approval. But it may satisfy constitutional requirements in the host State if the subdivision or agency has exclusive competence under domestic law and if no advance notice has been given that approval is not required. Sometimes notifications that no approval is required are also used in respect of draft contracts. **917**

The Centre has published a list of designated constituent subdivisions and agencies as document ICSID/8-C (see para. 253 *supra*). This document also indicates in respect of which subdivisions or agencies Contracting States have notified the Centre that approval of consent is not required. These notifications were made on the occasion of the designation of the respective subdivisions or agencies. The notifications were made by Australia, Peru, Portugal and the United Kingdom. In the case of Australia and the United Kingdom the notifications concern constituent subdivisions; that is, territorial units. In the case of Peru and Portugal the notifications concern agencies. The four countries have made the notifications with respect to all subdivisions or agencies designated by them. The countries that have not given notification that no approval of consent is necessary (Ecuador, Guinea, Kenya, Madagascar, Nigeria, Sudan and Turkey) have all designated agencies and not constituent subdivisions. **918**

### 3. Consequences of Approval for the Host State

There was some debate during the Convention's drafting on whether the host State itself would assume responsibilities as a consequence of approving the consent by one of its constituent subdivisions or agencies (History, Vol. II, pp. 288, 289, 321). It was made clear that approval of consent would not amount to consent to jurisdiction by the host State itself. Therefore, even if the host State had interfered in the investment activity, it would be impossible to bring it before the Centre without independent consent (at pp. 410, 411, 564, 704). The host State's obligation would be limited to ensuring the enforcement of an award against its constituent subdivision or agency (at pp. 858, 859, 990) (see paras. 311, 312 *supra*). **919**

The situation may be different if the host State abolishes or otherwise eliminates the procedural capacity under the ICSID Convention of a constituent subdivision or agency after having given approval of consent. In such a case an argument may be made that the host State is substituted for its constituent subdivision or agency for purposes of ICSID's jurisdiction (see paras. 313–316, 612, 613 *supra*). **920**

P. **"(4) Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General shall forthwith transmit such notification to all Contracting States. Such notification shall not constitute the consent required by paragraph (1)."**

### 1. Notification of Intent Concerning Classes of Disputes

921    The possibility for States to make known in advance which classes of disputes they would or would not consider submitting to ICSID's jurisdiction arose from the more general debate about the scope of the Centre's jurisdiction. Especially representatives of capital importing countries were in favour of a strict limitation of the types of disputes that the Centre might be allowed to take up (see para. 68 *supra*). Despite the insistence of Mr. *Broches* that States are entirely free to shape their consent to jurisdiction according to their own wishes and to withhold consent from matters they considered inappropriate (see paras. 5, 375 *supra*), there was a widespread feeling that participation in the Convention as such would suffice to create expectations and pressure on host States to give consent (History, Vol. II, pp. 57/8, 82, 83, 259, 260, 285, 471, 494, 499, 501, 540, 541, 548, 566, 653, 660, 700, 703, 704, 822). In response to these fears, Mr. *Broches* suggested that the States might make announcements in general terms as to the types of disputes in respect of which they would consider giving consent (at pp. 54, 59, 377, 497, 499, 541, 567, 711, 822; see also pp. 412, 665, 973). This suggestion found expression in the First Draft in the following terms:

> *Article 29*
>
> Any Contracting State may at any time transmit to the Secretary-General for purposes of information a statement indicating in general or specific terms the class or classes of dispute within the jurisdiction of the Center which it would in principle consider submitting to conciliation or arbitration pursuant to this Convention. Such statement shall not constitute, or be deemed to constitute, the consent required by Article 26.[1227]

922    This proposal did not meet with unqualified support. Some delegates felt that a general statement of this kind was superfluous in view of the necessity of consent in a particular case (History, Vol. II, pp. 69, 659, 710, 839). Others expressed the concern that general announcements might unnecessarily discourage foreign investments since they could adversely affect the investors' confidence (at pp. 504, 660, 704, 822, 824, 825). On the other hand, it was suggested successfully that States should be allowed to declare not only classes of disputes they were willing to submit but also the classes of disputes they would not consider submitting (at p. 830). A number of drafting proposals were submitted on the basis of these debates (at pp. 828, 831, 832, 833, 834, 835, 836, 840). Eventually, a British

---

1227    History, Vol. I, p. 128. In the First Draft the article dealing with consent had the number 26.

proposal was adopted (at pp. 821, 826, 880) subject to a number of minor modifications (at pp. 824, 825, 826). The Revised Draft comes close to the final version of the Convention. The only substantive addition after that stage was the Secretary-General's responsibility to transmit notifications to all Contracting States (at pp. 945, 973).

There was some debate in the Executive Directors' Committee of the Whole on whether the Report of the Executive Directors should expressly refer to the misgivings of some governments as to creating expectations of consent by adhering to the Convention (History, Vol. II, pp. 958, 1027/8). Eventually, the Report on Art. 25(4) was adopted in the following terms: **923**

*Notifications by Contracting States*

> 31. While no conciliation or arbitration proceedings could be brought against a Contracting State without its consent and while no Contracting State is under any obligation to give its consent to such proceedings, it was nevertheless felt that adherence to the Convention might be interpreted as holding out an expectation that Contracting States would give favorable consideration to requests by investors for the submission of a dispute to the Centre. It was pointed out in that connection that there might be classes of investment disputes which governments would consider unsuitable for submission to the Centre or which, under their own law, they were not permitted to submit to the Centre. In order to avoid any risk of misunderstanding on this score, Article 25(4) expressly permits Contracting States to make known to the Centre in advance, if they so desire, the classes of disputes which they would or would not consider submitting to the Centre. The provision makes clear that a statement by a Contracting State that it would consider submitting a certain class of dispute to the Centre would serve for purposes of information only and would not constitute the consent required to give the Centre jurisdiction. Of course, a statement excluding certain classes of disputes from consideration would not constitute a reservation to the Convention.[1228]

In addition, the section of the Report dealing with the term "investment" refers to the notification under Art. 25(4) as one of the reasons why a definition was ultimately found unnecessary (see para. 120 *supra*).

It is clear that a notification under Art. 25(4) does not amount to a reservation to the Convention. In fact, the debates leading to Art. 25(4) indicate that one of the purposes of this provision was to avoid reservations (History, Vol. II, pp. 57/8, 59, 377, 822). This conclusion is confirmed by the last sentence of the Executive Directors' Report on Art. 25(4), quoted above. A notification under Art. 25(4) does not exclude or modify the legal effect of a provision in the Convention.[1229] Moreover, Art. 25(4) permits notifications at any time after ratification, acceptance or approval of the Convention, whereas reservations are only permissible up to the moment of ratification, acceptance or approval but not thereafter.[1230] **924**

---

1228   1 ICSID Reports 29.
1229   See Art. 2(1)(d) of the 1969 Vienna Convention on the Law of Treaties, 8 ILM 679 (1969).
1230   See Art. 19, Vienna Convention on the Law of Treaties. See also *Amerasinghe*, The Jurisdiction of the International Centre, pp. 225/6.

925     Therefore, notifications under Art. 25(4) are for purposes of information only and are designed to avoid misunderstandings.[1231] They do not have any direct legal consequences (see para. 934 *infra*). In particular, they do not bind the Contracting State making the notification, which may withdraw or modify its notification at any time.

926     A number of States have availed themselves of the opportunity to make notifications under Art. 25(4):[1232]

- *Jamaica* through its notification of 1974 intends to exclude legal disputes "arising directly out of an investment relating to minerals or other natural resources".
- *Papua New Guinea* made a notification in 1978 "that it will only consider submitting those disputes to the Centre which are fundamental to the investment itself" (see para. 105 *supra*).
- *Saudi Arabia* through a notification of 1980 "reserves the right of not submitting all questions pertaining to oil and pertaining to acts of sovereignty".
- *Turkey* in 1989 notified the Centre that "only the disputes arising directly out of investment activities which have obtained necessary permission, in conformity with the relevant legislation of the Republic of Turkey on foreign capital, and that have effectively started" would be subject to the Centre's jurisdiction. At the same time, Turkey announced its intention to exclude "disputes, related to the property and real rights upon the real estates", which are to remain "totally under the jurisdiction of the Turkish courts".
- *China* has declared in 1993 that it "would only consider submitting . . . disputes over compensation resulting from expropriation and nationalisation".
- *Guatemala* submitted a notification in 2003 to the effect that it "does not accept submitting to the Centre's jurisdiction any dispute which arises from a compensation claim against the State for damages due to armed conflicts or civil disturbances".
- *Ecuador* sent a notification to the Centre on 4 December 2007 in the following terms:

  > The Republic of Ecuador will not consent to submit to . . . ICSID the disputes that arise in matters concerning the treatment of an investment in economic activities related to the exploitation of natural resources, such as oil, gas, minerals or others. Any instrument containing the Republic of Ecuador's previously expressed will to submit that class of disputes to the jurisdiction of the Centre, which has not been perfected by the express and explicit consent of the other party given prior to the date of submission of the present notification, is hereby withdrawn by the Republic of Ecuador with immediate effect as of this date.

927     Guyana and Israel have notified the Centre of classes of disputes they would or would not consider submitting but have since withdrawn these notifications.

---

1231  *Broches*, Convention, Explanatory Notes and Survey, pp. 646/7.
1232  For a full list see Notifications Concerning Classes of Disputes Considered Suitable or Unsuitable for Submission to the Centre (Art. 25(4) of the Convention), Document ICSID/8-D: http://icsid.worldbank.org/ICSID/FrontServlet.

*Article 25 – Jurisdiction*                                                345

Costa Rica and Guatemala have notified the Centre that they would require the exhaustion of local remedies before the commencement of ICSID arbitration.

## 2. Consent and the Notification of Intent

Art. 25(4), last sentence, states explicitly that notifications given under its terms do not constitute the consent required under Art. 25(1). In the course of the drafting of what eventually became Art. 25(4), there was an Italian proposal to combine consent with the notification of classes of disputes that might be within the Centre's jurisdiction (History, Vol. II, pp. 823, 840). But this proposal was not accepted. The Executive Directors' Report reiterates the position that notifications under Art. 25(4) do not constitute consent. **928**

The statement, contained in Art. 25(4), which affirms that a notification of classes of disputes considered suitable for submission to jurisdiction does not constitute consent, is cited as evidence in *SPP* v. *Egypt* for the indispensability of consent for the competence of an ICSID tribunal.[1233] **929**

At the same time, a notification under Art. 25(4) does not stand in the way of consent.[1234] A host State may give consent in respect of a dispute even though the dispute does not fit into a class that was listed as one it would consider submitting. It may even give consent in respect of a dispute that belongs to a class that was listed as one it would not consider submitting. In fact, several countries that have made notifications under Art. 25(4) have concluded BITs that go beyond the limits indicated in their notifications.[1235] Control over consent remains entirely at the host State's discretion. Consent may be subjected to limitations (see paras. 513–539 *supra*) but the terms of consent are not restricted by the terms of a notification under Art. 25(4). **930**

During the drafting of Art. 25(4), it was made clear that in case of a conflict between specific consent and a notification to exclude the type of dispute covered by the consent, the specific consent would govern (History, Vol. II, p. 824). Proposals to subject jurisdiction to the cumulative requirements of a general notification and of a specific consent failed (at pp. 831, 832). **931**

In *PSEG* v. *Turkey*, the Respondent based a jurisdictional objection on its notification under Art. 25(4). In particular, Turkey relied on the requirement, expressed in its notification, that the investment activities must "have effectively started". The US-Turkey BIT, applicable in that case, does not reflect that requirement. The BIT was signed in 1985; the notification was made in 1989 when Turkey deposited its instrument of ratification of the ICSID Convention; the BIT entered into force in 1990.[1236] **932**

---

1233  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 62.
1234  *Amerasinghe*, The Jurisdiction of the International Centre, p. 226; *Delaume*, How to Draft, p. 170.
1235  See *e.g.*, Jamaica-US BIT (1994) Arts. I, VI; Turkey-UK BIT (1991) Art. 1(a)(i); Papua New Guinea-Australia BIT (1990) Art. 14; China-Germany BIT (2003) Art. 9.
1236  *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 125–130.

**933**    The Tribunal found that the purpose of notifications under Art. 25(4) was to give advance information on the types of disputes to which consent to arbitration might or might not be expected. It held that the notifications do not have an autonomous legal operation but express questions of policy as a matter of information. In order to be effective, the contents of a notification would have to be embodied in the consent, otherwise the consent stands unqualified by the notification.[1237] The Tribunal said:

> . . . States making notifications will always wish to remain free to either follow or not follow the terms of the notification when expressing their consent. No State would believe that by making a notification it has become bound by its terms as in that case there would be no difference between notification and consent, thus contradicting specific provisions of the Convention. In this context, the Contracting State is in fact claiming a right to later exclude certain disputes from consent, if it so wishes, and it is always free not to adhere to the terms of its notification.[1238]

**934**    While jurisdiction must thus be determined independently of the notifications under Art. 25(4), these notifications may have an indirect bearing on jurisdiction. A consent clause that is not entirely clear may be interpreted by reference to a prior notification of classes of disputes in respect of which the host State has expressed its intentions. In the absence of contrary evidence, it may be assumed that a State intended to remain within the limits of its notification when entering into the consent agreement.

**935**    Some tribunals have referred to the absence of notifications under Art. 25(4) when determining the meaning of "investment" in the cases before them. The Tribunal in *Fedax* v. *Venezuela* reached the conclusion that loans were covered by the term "titles to money" in the definition of investments under the Netherlands-Venezuela BIT. It added the following observation:

> It must also be noted that the Republic of Venezuela has not exercised its right under Article 25(4) of the ICSID Convention to notify the Centre of any class or classes of disputes it would or would not consider submitting to the jurisdiction of the Centre. This provision allows Contracting States to put investors on notice as to what class of disputes they would or would not consider consenting to within the broad meaning of investment under the Convention.[1239]

**936**    *CSOB* v. *Slovakia* also concerned the issue whether a loan constituted an investment. The Tribunal found that investment, as a concept under the Convention, should be interpreted broadly. In support of this conclusion it added:

> 65. It is worth noting, in this connection, that a Contracting State that wishes to limit the scope of the Centre's jurisdiction can do so by making the declaration provided for in Article 25(4) of the Convention. The Slovak Republic has not made such a declaration and has, therefore, submitted itself broadly to the full scope of the subject matter jurisdiction governed by the Convention.[1240]

---

1237  At paras. 135–147.                    1238  At para. 143.
1239  *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 33.
1240  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 65.

*Article 25 – Jurisdiction*                347

In *Mitchell* v. *DR Congo*, the *ad hoc* Committee noted that the concept of invest-  **937**
ment was to be looked for in the parties' agreement or the applicable investment
treaty. It added:

> In doing so, the fact that a State has not made use of the notification option
> provided for under Article 25(4) of the Convention may not be understood to
> mean that that State has taken a certain position regarding the very concept of
> investment.[1241]

Consent, once validly given, may not be defeated by a subsequent notification  **938**
under Art. 25(4). This is what the Government attempted in the three parallel
cases against Jamaica[1242] (see para. 607 *supra*). The three Tribunals refused
to accept the Government's notification under Art. 25(4) as a valid withdrawal of
consent. They pointed out that the notification only operates for the future by way
of information to the Centre and potential future investors[1243] (at para. 608 *supra*).

Whether an offer of consent may be withdrawn or limited by way of a notifi-  **939**
cation under Art. 25(4) depends on the instrument containing the offer. Ecuador's
notification of 4 December 2007 seeks to withdraw its offer of consent, not yet
accepted by an investor and contained in any instrument, to the extent that it relates
to the exploitation of natural resources (see para. 926 *supra*).

The effect of this declaration is subject to doubt. To start with, it is not in  **940**
accord with the text of Art. 25(4). The terms of Art. 25(4) allow States to make
notifications as to which disputes they "would or would not consider submitting" to
ICSID's jurisdiction. The provision is not designed to withdraw offers of consent
already made, even if these have not yet been accepted.

A mere offer of consent, that has not been accepted, is not irrevocable under  **941**
Art. 25(1), last sentence (see paras. 596–606 *supra*). But the instrument containing
the offer of consent may be difficult or impossible to withdraw or to modify. Offers
of consent contained in Ecuador's BITs are protected by the law of treaties. They
cannot be withdrawn by a unilateral declaration.[1244]

---

1241  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 25.
1242  *Alcoa Minerals* v. *Jamaica*, *Kaiser Bauxite* v. *Jamaica, Reynolds* v. *Jamaica*. The *Alcoa* case
      is described by *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for
      Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in
      Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law
      Journal 90 (1976).
1243  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 23, 24.
1244  Article 26 of the Vienna Convention of the Law of Treaties (VCLT) reflects the traditional
      principle *pacta sunt servanda*. Under Article 39 VCLT a treaty may be amended by agreement
      between the parties. The possibilities for the termination and suspension of the operation of
      treaties under Articles 54–64 VCLT are limited.

# Article 26

**Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention.**

## OUTLINE

| | | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–5 |
| II. | INTERPRETATION | 6–231 |
| | A.  **"Consent of the parties to arbitration under this Convention . . ."** | 6–16 |
| | B.  **". . . unless otherwise stated, . . ."** | 17–109 |
| |    1.  Concurrent Arbitration Clauses | 20–43 |
| |      a)  Form of Concurrent Arbitration Clauses | 20–32 |
| |      b)  Validity of Concurrent Arbitration Clauses | 33–43 |
| |    2.  Concurrent Reference to Domestic Courts | 44–54 |
| |    3.  "Fork in the Road" Clauses | 55–72 |
| |    4.  Jurisdiction for Treaty Claims and Contract Claims | 73–109 |
| | C.  **". . . shall, . . . be deemed consent to such arbitration to the exclusion of any other remedy."** | 110–186 |
| |    1.  Non-ICSID Arbitration | 114–123 |
| |    2.  Consolidation and Identical Tribunals | 124–131 |
| |    3.  Domestic Proceedings | 132–148 |
| |    4.  Enforcement of Non-ICSID Awards by Domestic Courts | 149–153 |
| |    5.  Intervention by Domestic Courts to Stay ICSID Arbitration | 154–161 |
| |    6.  Provisional Measures by Domestic Courts in ICSID Arbitration | 162–183 |
| |      a)  Judicial Practice | 166–173 |
| |      b)  The Scholarly Debate | 174–175 |
| |      c)  ICSID Arbitration Rule 39(6) | 176–178 |
| |      d)  Provisional Measures under the Additional Facility | 179–180 |
| |      e)  Clauses Permitting Provisional Measures by Domestic Courts | 181–183 |
| |    7.  Non-Judicial Remedies | 184–186 |

D.  **"A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention."**          187–231
  1.  The Basic Rule of Non-Exhaustion                       188–191
  2.  Exhaustion of Local Remedies as a Condition of Consent  192–207
      a)  Bilateral Investment Treaties                       199–205
      b)  National Legislation                                206
      c)  Investment Contracts                                207
  3.  Practice of Tribunals                                   208–228
      a)  Exhaustion of Local Remedies and Jurisdiction       208–217
      b)  The Use of Local Remedies as a Substantive
          Requirement                                         218–228
  4.  General Considerations                                  229–231

# BIBLIOGRAPHY

*Alexandrov, S.*, Breaches of Contract and Breaches of Treaty, The Jurisdiction of Treaty-based Arbitration Tribunals to Decide Breach of Contract Claims in *SGS v. Pakistan* and *SGS v. Philippines*, 5 The Journal of World Investment and Trade 555 (2004);

*Ben Hamida, W.*, La consolidation des procédures arbitrales, Les Cahiers de l'Arbitrage, N° 2006/3, 30–35;

*Broches, A.*, A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 5 (1991);

*Brower, Ch. N./Goodman, R. E. M.*, Provisional Measures and the Protection of ICSID Jurisdictional Exclusivity Against Municipal Proceedings, 6 ICSID Review – FILJ 431 (1991);

*Collins, L.*, Provisional and Protective Measures in International Litigation, 234 Recueil des Cours 98–105 (1992-III);

Colloquium on Consolidation of Proceedings in Investment Arbitration, Geneva, April 22, 2006, *in*: 21 ICSID Review – FILJ 59–149 (2006);

*Crawford, J.*, Treaty and Contract in Investment Arbitration, The 22nd Freshfields Lecture on International Arbitration, 29 November 2007;

*Cremades, B. M.*, Parallel Arbitration Tribunals and Awards, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 304 (2006);

*Cremades, B. M./Cairns, D. J. A.*, Contract and Treaty Claims and Choice of Forum in Foreign Investment Disputes, *in*: Arbitrating Foreign Investment Disputes – Procedural and Substantive Legal Aspects (*Horn, N./Kröll, S.* eds.) 325 (2004);

*Crivellaro, A.*, Consolidation of Arbitral and Court Proceedings in Investment Disputes, 4 The Law and Practice of International Courts and Tribunals 371 (2005);

*Delaume, G. R.*, ICSID Arbitration and the Courts, 77 American Journal of International Law 784 (1983);

*Dominicé, Ch.*, Quelques observations sur la question des mesures conservatoires dans les arbitrages CIRDI, 112 La Semaine Judiciaire 327 (1990);

*Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335 (1986);

ICSID and Court-Ordered Provisional Measures: An Update, 4 Arbitration International 161 (1988);

*Gaillard, E.*, Investment Treaty Arbitration and Jurisdiction Over Contract Claims – The *SGS* Cases Considered, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 325 (2005);

*Gaillard, E.* (ed.), Anti-Suit Injunctions in International Arbitration (2005);

*Greenwood, C. J.*, Anti-Suit Injunctions in International Arbitration: A Public International Lawyer's Perspective, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 147 (2005);

*Happ, R.*, The "Foreign Nationality"-Requirement and the "Exhaustion of Local Remedies" in Recent ICSID Jurisprudence, *in*: The International Convention on the Settlement of Investment Disputes (ICSID) (*Hofmann, R./Tams, C.* eds.) 103 (2007);

*Hoffmann, A. K.*, The Investor's Right to Waive Access to Protection under a Bilateral Investment Treaty, 22 ICSID Review – FILJ 69 (2007);

*Hoffmann, A. K./van Haersolte-van Hof, J. J.*, The Relationship Between International Tribunals and Domestic Courts, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 962 (2008);

Investor-State Dispute Settlement and Impact on Investment Rulemaking, UNCTAD Series on International Investment Policies for Development, 2007, pp. 83–84. UNCTAD/ITE/IIA/2007/3;

*Kaufmann-Kohler, G./Boisson de Chazournes, L./Bonnin, V./Moïse Mbengue, M.*, Consolidation of Proceedings in Investment Arbitration: How Can Multiple Proceedings Arising from the Same or Related Situations Be Handled Effectively?, Final Report on the Geneva Colloquium on Consolidation of Proceedings in Investment Arbitration, April 22, 2006, 21 ICSID Review – FILJ 59 (2006);

*Kerameus, K. D.*, Anti-Suit Injunctions in ICSID Arbitration, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 131 (2005);

*Marchais, B. P.*, ICSID and the Courts, News from ICSID, Vol. 3/2, p. 4 (1986);

ICSID Tribunals and Provisional Measures – Introductory Note to Decisions of the Tribunals of Antwerp and Geneva in MINE v. Guinea, 1 ICSID Review – FILJ 372 (1986);

Mesures provisoires et autonomie du système d'arbitrage CIRDI, 14 Droit et Pratique du Commerce International 275 (1988);

*Parra, A. R.*, The Practices and Experience of ICSID, *in*: Conservatory and Provisional Measures in International Arbitration (ICC Publication No. 519) 37 (1993);

Desirability and Feasibility of Consolidation – Introductory Remarks, 21 ICSID Review – FILJ 132 (2006);

*Schramke, H.-J.*, The Interpretation of Umbrella Clauses in Bilateral Investment Treaties, TDM, May 2007.

*Schreuer, C.*, Travelling the BIT Route. Of Waiting Periods, Umbrella Clauses and Forks in the Road, 5 The Journal of World Investment & Trade 231 (2004).

Investment Treaty Arbitration and Jurisdiction over Contract Claims – The *Vivendi I* Case Considered, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 281 (2005);

Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, 4 The Law and Practice of International Courts and Tribunals 1 (2005);

*Schwebel, S. M.*, On Whether the Breach by a State of a Contract with an Alien is a Breach of International Law, *in*: International Law at the Time of its Codification, Essays in Honour of Roberto Ago, III, 401 (1987);

Arbitration and the Exhaustion of Local Remedies, *in*: Justice in International Law, Selected Writings 171 (1994);

Anti-Suit Injunctions in International Arbitration: An Overview, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 5 (2005);

*Shany, Y.*, Contract Claims vs. Treaty Claims: Mapping Conflicts between ICSID Decisions on Multisourced Investment Claims, 99 AJIL 835 (2005);

*Sheppard, A./Hunter, M.*, An Overview of the Relationship between Courts and Investment Treaty Arbitration, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 153 (BIICL 2006);

*Söderlund, C.*, Multiple Judicial Proceedings and the Energy Charter Treaty, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 237 (2006);

*Spiermann, O.*, Individual Rights, State Interests and the Power to Waive ICSID Jurisdiction under Bilateral Investment Treaties, 20 Arbitration International 179 (2004);

*Suarez Anzorena, C. I.*, Multiplicity of Claims under BITs and the Argentine Case, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 37 (BIICL 2006);

*van Haersolte-van Hof, J. J./Hoffmann, A. K.*, The Relationship between International Tribunals and Domestic Courts, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 962 (2008);

*Yannaca-Small, K.*, Consolidation of Claims: A Promising Avenue for Investment Arbitration? Note by the OECD Secretariat, DAF/INV/WP 2 (2006);

Parallel Proceedings, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1008 (2008).

## I. INTRODUCTION

Art. 26 is the clearest expression of the self-contained and autonomous nature of the arbitration procedure provided for by the Convention. Unlike Art. 25, it only applies to arbitration but not to conciliation.  **1**

The first sentence of Art. 26 has two main features. The first is that, once consent to ICSID arbitration has been given, the parties have lost their right to seek relief in another forum, national or international, and are restricted to pursuing their claim through ICSID. This principle operates from the moment of valid consent. This exclusive remedy rule of Art. 26 is subject to modification by the parties. The phrase "unless otherwise stated" in the first sentence gives the parties the option to deviate from it by agreement.  **2**

The second feature of Art. 26, first sentence, is that of non-interference with the ICSID arbitration process once it has been instituted. The principle of non-interference is a consequence of the self-contained nature of proceedings under the Convention. The Convention provides for an elaborate process designed to make arbitration independent of domestic courts. Even in the face of an uncooperative  **3**

party, ICSID arbitration is designed to proceed independently without the support of domestic courts. This is evidenced by the provisions on the constitution of the tribunal (Arts. 37–40), on proceedings in the absence of a party (Art. 45(2)), on autonomous arbitration rules (Art. 44), on applicable law (Art. 42(1)), and on provisional measures (Art. 47). It is only in the context of enforcement that domestic courts may enter the picture (Arts. 54–55). In addition, the arbitration process is also insulated from inter-State claims, by the exclusion of diplomatic protection (Art. 27).

4    The underlying idea of the exclusive remedy rule and of the principle of non-interference is to provide an effective forum and to dispense with other proceedings which for a variety of reasons appear unattractive to the parties. Investors often do not perceive litigation in the courts of host States as a reliable way of protecting their interests. In turn, host States dislike getting involved in litigation abroad. This applies not only to proceedings on the merits but also to those ancillary to arbitration. In addition, State immunity tends to have a distorting effect on litigation between States and non-State parties before domestic courts. The principle of autonomy for ICSID arbitration, as expressed in Art. 26, therefore, meets a number of needs of the host States and of the foreign investors.

5    The second sentence of Art. 26 deals with a traditional concept of international law, the exhaustion of local remedies before resort can be had to an international remedy. The exclusive remedy rule of the first sentence implies that there is no need to exhaust local remedies before initiating ICSID arbitration "unless otherwise stated". The second sentence reiterates and specifies the host State's right to insist on the exhaustion of local remedies as a condition of its consent to arbitration. In fact, the drafting history of Art. 26 was dominated almost entirely by the relationship of ICSID arbitration with domestic courts, especially with the exhaustion of local remedies rule (see paras. 188–191 *infra*). A possible competition of ICSID arbitration with other international judicial proceedings was barely discussed.

## II. INTERPRETATION

### A. "Consent of the parties to arbitration under this Convention . . . "

6    Art. 26 applies from the moment of consent (see Art. 25, paras. 468–478). Therefore, it is not necessary for the operation of this provision that ICSID arbitration proceedings have been instituted. If ICSID arbitration has been instituted, there will be a finding by the Secretary-General in accordance with his or her screening power under Art. 36(3) or a decision on jurisdiction by the tribunal under Art. 41. If the Secretary-General has found that, because of a lack of consent, the dispute is manifestly outside the jurisdiction of the Centre or if the tribunal has determined that the Centre does not have jurisdiction because there is no valid consent, Art. 26 does not apply and other remedies may be pursued. Prior to the determination by the Secretary-General and by the ICSID tribunal, it will be incumbent upon the

non-ICSID forum seized of the same claim to stay the proceedings and to await the ICSID decision as to jurisdiction (see Art. 41, paras. 16–20). If no ICSID arbitration has been instituted and if there is no immediate prospect that this will be done, the non-ICSID forum must decide itself whether there is consent to ICSID arbitration which would be a bar to its own jurisdiction under Art. 26 (see para. 132 *infra*).

The exclusive remedies rule applies regardless of whether consent is based on a direct agreement between the host State and the investor or an offer of consent contained in a treaty or legislation. However, Art. 26 operates only once the offer of consent in the treaty or legislation has been perfected through acceptance by the investor.    **7**

Practical problems may arise where the drafting of clauses mentioning ICSID is so poor that it is not clear whether there is a valid consent. These problems may be exacerbated if the respondent fails to appear in order to contest the jurisdiction of a non-ICSID forum.    **8**

In *MINE* v. *Guinea*[1] the parties had entered into a contract in 1971, which contained a provision on the settlement of disputes to the effect that, failing informal conciliation, the parties were to submit the conflict to arbitration by a panel of three arbitrators "selected by the President of CIRDI[2] at the joint request of the parties or, failing this, at the request of the most diligent party".[3] When a dispute developed, the parties in 1975 jointly executed a document of Consent to Arbitrate all existing disputes pursuant to the ICSID Convention. However, the Consent to Arbitrate was not at the time filed with ICSID, nor did MINE submit a formal request for arbitration to ICSID. When MINE requested Guinea to execute a revised Consent to Arbitrate, Guinea failed to respond.[4] In 1978, MINE filed a petition in a US Federal District Court to compel arbitration under Section 4 of the Federal Arbitration Act (FAA), claiming that it could not initiate ICSID arbitration due to Guinea's lack of cooperation. Guinea did not appear and the Court, without attempting to verify MINE's assertions, ordered arbitration before the American Arbitration Association (AAA). Guinea did not respond and an *ex parte* award was rendered in MINE's favour by an AAA tribunal in 1980. MINE then returned to the District Court and moved to have the award confirmed under Section 9 of the FAA. At this point, Guinea for the first time entered the proceedings and moved to dismiss MINE's motion, claiming that the Court lacked subject matter jurisdiction both in respect of the earlier order to compel arbitration and of the motion to confirm the award. The District Court for the District of Columbia complied with MINE's motion and confirmed the    **9**

---

1   Generally see *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 AJIL 786 (1983); *Broches, A.*, A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 5 at 8 (1991); *Marchais, B. P.*, ICSID and the Courts, News from ICSID, Vol. 3/2, p. 4 (1986).
2   CIRDI is the French acronym for ICSID.
3   Cited from 693 F. 2d 1096 (1982), 4 ICSID Reports 10.
4   *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 67.

AAA award.[5] The Court held the order compelling arbitration to be proper and found that it had authority to confirm the award since it had jurisdiction under the Foreign Sovereign Immunities Act (FSIA). It noted that ICSID is located in Washington, D.C. and that under its Arbitration Rules tribunals are to meet at the seat of the Centre, unless otherwise agreed (see Art. 62). Therefore, by agreeing to arbitration that could be expected to take place in the United States, Guinea had waived its immunity under Section 1605(a)(1) of the FSIA. Guinea's commercial activities in the United States were accepted as an additional ground for asserting jurisdiction under Section 1605(a)(2) of the FSIA.

**10**     Guinea appealed to the Court of Appeals disputing the District Court's subject matter jurisdiction under the FSIA. The United States submitted a lengthy brief[6] which relied extensively on Art. 26 of the Convention. It argued for the exclusive nature of ICSID arbitration and pointed out that a case brought in a US court which arguably falls within ICSID's jurisdiction should be stayed to permit ICSID to determine whether it has jurisdiction.[7] In addition, consent to ICSID jurisdiction could not be interpreted as a waiver of sovereign immunity other than for purposes of enforcing an ICSID award.[8] In this context, ICSID's location in the US was irrelevant.[9]

**11**     The Court of Appeals reversed the decision of the District Court.[10] It held that under the FSIA the Court had no jurisdiction to order Guinea to arbitrate. It did cite Art. 26[11] but only for the purpose of reaching the conclusion that the parties' ICSID agreement was not an agreement to "arbitration in another country" that waives sovereign immunity under Section 1605(a)(1) of the FSIA, since no role for the US courts was foreseen.[12] In addition, the Court of Appeals found that Guinea had not lost its immunity under the FSIA's commercial activity clause (Section 1605(a)(2)) since any such activity did not have a sufficiently close connection to the United States.

**12**     The outcome of this decision met the requirements of Art. 26 in that it blocked resort to an "other remedy". But the Court's reliance on sovereign immunity rather than on Art. 26 has been criticized by several commentators.[13] The Court's

---

5   *MINE* v. *Guinea*, US District Court, D.C., 12 January 1981, 4 ICSID Reports 3; 505 F. Supp. 141 (1981); 63 ILR 535 (1982). See also 20 ILM 666 (1981) and the introductory note by *Gordon*.

6   Brief for the United States of America as Intervenor and Suggestion of Intent, 20 ILM 1436 (1981).

7   At pp. 1472 *et seq.*                    8   At pp. 1482 *et seq.*

9   At pp. 1484 *et seq.*

10  *MINE* v. *Guinea*, US Court of Appeals, D.C. Cir., 12 November 1982, 4 ICSID Reports 8; 693 F. 2d 1094 (1982), cert. denied 464 U.S. 815 (1983); 72 ILR 152 (1987); 21 ILM 1355 (1982); 22 ILM 86 (1983).

11  At 4 ICSID Reports 20.

12  At pp. 19/20. See also *Sullivan, G. B.*, Implicit Waiver of Sovereign Immunity by Consent to Arbitration: Territorial Scope and Procedural Limits, 18 Texas Int. LJ 329 (1983).

13  See *e.g.*, *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 AJIL 789 *et seq.* (1983); *Kemby, K. H.*, Note, 24 VaJIL 217 (1983); *Shifman, B. E.*, Note, 16 George Washington J. Intl. L. & Econ. 451 (1982); *Chukwumerije, O.*, ICSID Arbitration and Sovereign Immunity, 19 Anglo-American Law Review 166 at 176 (1990).

reasoning left open the question whether ICSID's exclusive jurisdiction would be respected if sufficiently close commercial ties to the United States could be demonstrated to satisfy the FSIA's commercial activities provision.

MINE's attempt to seek redress in another forum led to considerable delay and **13** additional legal costs. It is to be hoped that the US courts will acknowledge the fact that the FSIA is "subject to existing international agreements to which the United States is a party"[14] and that, consequently, Art. 26 must take precedence over considerations of sovereign immunity.

European courts in which MINE attempted to enforce the AAA award and the **14** ICSID Tribunal before which the case was subsequently brought confirmed ICSID arbitration as the exclusive remedy (see paras. 149–153, 167–168 *infra*).

A different question is whether a party can, on the one hand, rely on its right **15** to the exclusivity of the ICSID proceedings and at the same time argue that it did not consent to ICSID arbitration. This question arose in the jurisdictional phase of *Duke Energy* v. *Peru*. In that case, Peru filed a request for provisional measures asking the Tribunal that Duke be enjoined to withdraw a petition it had filed before the US Trade Representative ("USTR") to revoke or suspend Peru's beneficiary status under the Andean Trade Preference Act.[15] Peru also requested a provisional measure from the Tribunal to the effect that Duke Energy seek no new remedy in any non-ICSID proceeding.

At the same time Peru was disputing the Tribunal's jurisdiction on several **16** grounds. The Tribunal invited the parties to exchange submissions in response to the following question:

> Can a party claim lack of consent on the one hand (for purposes of Articles 25 and 41 of the ICSID Convention) and, on the other, its right to the exclusivity of ICSID proceedings (including preclusion of the other party's right to seek diplomatic protection) based on the existence of consent (for purposes of Articles 26, 27 and 47 of the ICSID Convention)?[16]

Following a decision by the USTR to suspend its review of Duke Energy's petition pending the ICSID proceedings, Peru withdrew the request for provisional measures and thus the Tribunal's question remained unanswered.

## B.  ". . . unless otherwise stated, . . ."

The exclusive remedy rule of Art. 26 is subject to modification by agreement of **17** the parties. The parties are free to provide for other dispute settlement procedures in addition to ICSID arbitration or to subject certain parts of their relationship to procedures other than ICSID arbitration. Consent to remedies other than ICSID arbitration does not necessarily exclude ICSID arbitration. The exclusive remedy rule of Art. 26 is not a requirement of consent to ICSID arbitration, but merely a rule of interpretation, which operates to exclude other remedies "unless otherwise stated". Therefore, submission to other dispute settlement procedures cannot be

---

14   28 USC 1604; 15 ILM 1389 (1976).
15   *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 15.
16   *Ibid.*, para. 16.

interpreted as invalidating consent to ICSID arbitration. Even if the parties have created an exception to the exclusive remedy rule by agreeing on another forum, this does not mean that they have invalidated consent to ICSID jurisdiction. In other words, the exclusive remedy rule of Art. 26 does not work in reverse: non-exclusivity of ICSID does not exclude ICSID's jurisdiction.

**18**    The 1993 Model Clauses (see Art. 25, para. 385) offer a formula to clarify the relationship to other remedies under these circumstances:

> **Clause 12**
> The consent to the jurisdiction of the Centre recorded in <u>citation of basic clause above</u> shall not preclude either party hereto from resorting to the following alternative remedy: <u>identification of other type of proceeding</u>. While such other proceeding is pending, no arbitration proceeding pursuant to the Convention shall be instituted.[17]

**19**    Unclear drafting of submission clauses or multiple acceptances of jurisdiction in respect of the same dispute have repeatedly led to practical problems. At times, national legislation, bilateral investment treaties and agreements between host States and investors contain cumulative references to different types of dispute settlement including ICSID arbitration.

### 1. Concurrent Arbitration Clauses

### a) Form of Concurrent Arbitration Clauses

**20**    In many bilateral investment treaties (BITs) ICSID clauses are combined with references to other arbitration systems such as arbitration under the auspices of the International Chamber of Commerce (ICC), the Stockholm Chamber of Commerce (SCC), the London Court of International Arbitration (LCIA) or *ad hoc* arbitration under the 1976 Arbitration Rules adopted by the United Nations Commission for International Trade Law (UNCITRAL). In some BITs non-ICSID arbitration is only foreseen if ICSID arbitration is not available.[18] A number of British BITs list several arbitration systems, including ICSID, ICC and UNCITRAL, from which the investor and host State may choose by agreement. If there is no agreement, UNCITRAL arbitration will be available to the investor[19] (see Art. 25, para. 446). Under these types of clauses no problems of concurrence will arise.

**21**    Other ICSID clauses in BITs offer genuine choices among several arbitration systems. These may be found especially in BITs concluded by Switzerland and the United States. These clauses are described at some length in the context of

---

17   4 ICSID Reports 365. See also Clause XV of the 1981 Model Clauses, 1 ICSID Reports 205 and Clause XVI of the 1968 Model Clauses, 7 ILM 1173 (1968).
18   See *e.g.*, Denmark-Latvia BIT (1992) Art. 2(2); Switzerland-Vietnam BIT (1992) Art. 9(2); France-Hungary BIT (1986) Art. 9; Germany-St. Vincent and the Grenadines BIT (1986) Art. 10. Unless otherwise stated, all references to BITs are taken from Investment Treaties, loose-leaf collection (ICSID ed.).
19   See UK Model Agreement 2005, Art. 8, *Dolzer, R./Schreuer, C.*, Principles of International Investment Law 381 (2008); UK-Santa Lucia BIT (1983) Art. 8; UK-Malta BIT (1986) Art. 8; UK-Mongolia BIT (1991) Art. 8.

consent to ICSID arbitration (see Art. 25, paras. 441–445). Under these clauses, the party entitled to choose has a genuine alternative between ICSID and non-ICSID arbitration.[20] In other words, the exclusive remedy rule of Art. 26 will only apply once the investor has accepted the State's offer in the treaty to arbitrate under the ICSID Convention.

The North American Free Trade Agreement (NAFTA) between Canada, Mexico **22** and the United States also provides for several forms of arbitration:

> *Article 1120: Submission of a Claim to Arbitration*
>     1. Except as provided in Annex 1120.1, and provided that six months have elapsed since the events giving rise to a claim, a disputing investor may submit the claim to arbitration under:
>         (a) the ICSID Convention, provided that both the disputing Party and the Party of the investor are parties to the Convention;
>         (b) the Additional Facility Rules of ICSID, provided that either the disputing Party or the Party of the investor, but not both, is a party to the ICSID Convention; or
>         (c) the UNCITRAL Arbitration Rules.[21]

Access to these three possibilities is determined primarily by the state of ratifications of the ICSID Convention by the three countries (see Art. 25, para. 458). But under this provision the investor may opt for UNCITRAL arbitration even if ICSID arbitration or arbitration under the Additional Facility is available. Similar alternatives are offered under the Energy Charter Treaty (see Art. 25, paras. 460, 461) and under the MERCOSUR Protocols (see Art. 25, para. 462).

National legislation offering access to ICSID arbitration (see Art. 25, **23** paras. 392–426) may also provide for several alternative arbitration procedures. Specification of the arbitral system in an agreement between the host State and the investor may be a condition of consent (see Art. 25, paras. 411, 422, 423). In this case, the problem of concurrent arbitration clauses will not arise. But arbitration clauses in national investment laws may offer a genuine choice among several possibilities. The investor may exercise this choice by accepting the host State's offer in writing prior to the institution of proceedings (see Art. 25, paras. 421–426). Such an acceptance may contain a selection of one of the several options open to it. But the investor may also accept the host State's offer by instituting proceedings, thereby leaving its options open up to the moment the forum is selected in a particular dispute.

Direct agreements between host States and investors may also contain con- **24** current arbitration arrangements. These are less likely to arise from single clauses offering a choice of several arbitration systems than from contractual

---

20    See *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 56–58.
21    32 ILM 605, 643 (1993).

arrangements consisting of consecutive documents spread over a period of time. These documents may contain different arbitration clauses, the relationship of which is not clear (see Art. 25, paras. 551–566).

**25**    In *Klöckner* v. *Cameroon*, the problems as to ICSID's jurisdiction arose from a sequence of contracts between the host country and the investor which contained arbitration clauses referring to ICSID as well as to the International Chamber of Commerce (ICC) (see also Art. 25, paras. 553–557). The parties had in 1971 entered into a general "Protocol of Agreement" providing for the construction and operation of a fertilizer factory. The agreement contained an ICSID arbitration clause. This general agreement was followed by a series of more specific agreements dealing with particular aspects of the overall relationship. One of these more specific agreements was a "Supply Contract" for the fertilizer factory of 1972 containing an ICSID clause identical to the one in the Protocol of Agreement. Another was a "Management Contract" of 1977 which contained an ICC arbitration clause.[22]

**26**    The parties to the Management Contract of 1977 were Klöckner and SOCAME, a joint venture company which, at the time, was under the majority control of the foreign investor. Therefore, an ICSID clause in this contract was impossible (see Art. 25, para. 557). It was only later that SOCAME became an agency of Cameroon (see Art. 25, para. 260). The situation was further complicated by the fact that the original Protocol of Agreement already provided for the management of the project by Klöckner "under a Management Contract" and that Klöckner had actually started exercising this function some time before the conclusion of the Management Contract.

**27**    After the collapse of the operation, Klöckner instituted ICSID arbitration proceedings in 1981.[23] The Claimant seized the Tribunal on the basis of the ICSID clause in the 1972 Supply Contract but did not contest the extension of the Tribunal's jurisdiction based on the ICSID clause in the more general Protocol of Agreement. When Cameroon made counterclaims for losses arising from Klöckner's performance, Klöckner sought to exclude questions arising from its management of the enterprise from the purview of ICSID's jurisdiction by relying on the ICC clause in the 1977 Management Contract.

**28**    The Tribunal found that it had jurisdiction to rule on all aspects of the original undertaking.[24] It conceded that there might be disputes arising exclusively from the Management Contract which would be beyond the jurisdiction of ICSID and subject to the ICC clause. However, Klöckner's performance of its management obligations were and remained subject to ICSID jurisdiction by virtue of the undertaking to be responsible for management in the original Protocol of Agreement

---

22    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 9.

23    For a general description see *Paulsson, J.*, The ICSID *Klöckner v. Cameroon* Award: The Duties of Partners in North-South Economic Development Agreements, 1 J. Int. Arb. 145 (1984).

24    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 9.

and the ICSID clause contained therein. In the Tribunal's view, the subsequent Management Contract did not withdraw ICSID's jurisdiction from that part of the overall relationship.[25] The Tribunal found additional support for this interpretation in the fact that Klöckner itself had acknowledged the ICSID Tribunal's jurisdiction with respect to the entire Protocol of Agreement without excepting the provision on management. Even if there had been doubt about the relationship of the two arbitration clauses, Klöckner's submissions before the Tribunal would have constituted consent to ICSID's jurisdiction in this respect as well[26] (see Art. 25, paras. 492–497).

The Dissenting Opinion to the award[27] reached the conclusion that the ICSID    **29**
Tribunal had no jurisdiction to evaluate Klöckner's possible responsibility resulting from the management of the enterprise. It concluded that the Management Contract was the single source of all the responsibilities arising from this part of the relationship. The parties had consciously chosen to depart from the original arbitration clause in the implementing agreement.[28]

The entire award was subsequently annulled for different reasons.[29] However,    **30**
the *ad hoc* Committee was critical of the Tribunal's reasoning in this regard as well. It found the Tribunal's argument that Klöckner had submitted to ICSID arbitration in respect of its management by admitting jurisdiction over the entire Protocol of Agreement, including the provision on management, unconvincing. Klöckner had always contested this part of the Tribunal's jurisdiction and had interpreted the references to management in the Protocol of Agreement as a mere obligation to conclude a management contract.[30] On the decisive question of whether or not the later ICC clause had implicitly limited the earlier ICSID clause, the *ad hoc* Committee came to the conclusion that both interpretations were possible:

> There may of course be differences on the correct interpretation of the Protocol of Agreement and . . . its relationship to a subsequent agreement like the Management Contract. The inclusion of an ICC arbitration clause in this latter contract may also be interpreted in opposing ways. In this case, the Tribunal refused to accept, in the absence of completely precise and unequivocal contractual provisions, that the parties to the Management Contract wanted to "derogate" from the Protocol's ICSID clause. The Tribunal may have implicitly accepted that the ICSID clause constituted for both parties an "essential jurisdictional guarantee", the relinquishment of which could neither be presumed nor accepted in the absence of clear evidence.

---

25  At pp. 13/14, 17/18, 68–70.    26  At p. 14.
27  See *Niggemann, F.*, The ICSID *Klöckner* v. *Cameroon* Award: The Dissenting Opinion, 1 J. Int. Arb. 331 (1984). See also *Niggemann, F.*, Zuständigkeitsprobleme der Weltbankschiedsgerichtsbarkeit im Licht der bisherigen Schiedsverfahren, 5 Praxis des Internationalen Privat- und Verfahrensrechts (IPRax) 185, 191/2 (1985).
28  *Klöckner* v. *Cameroon*, Dissenting Opinion, 21 October 1983, 2 ICSID Reports, 77, 89–93.
29  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985.
30  *Ibid.*, paras. 4–10.

> Such an interpretation of the agreements and especially of the two arbitration clauses, whether correct or not, is tenable and does not in any event constitute a manifest excess of powers. . . .[31]

**31**    It is clear that the exclusive remedy rule of Art. 26 was not as such applicable in view of the parties' consent to ICC arbitration. Art. 26 only applies "unless otherwise stated". On the other hand, the competing jurisdiction of another system of arbitration, such as the ICC, does not necessarily exclude ICSID. Overlapping consent clauses referring to different types of arbitration within the same overall relationship are undesirable and should be avoided. Once a dispute arises, it is often not practical to dissect the relationship into different segments and to pursue remedies simultaneously in separate fora. If competing consent clauses exist nevertheless, it makes more sense to have the entire dispute heard by one tribunal, preferably the one with the most comprehensive jurisdiction. In the *Klöckner* case, this was clearly ICSID. A provision derogating from ICSID's exclusivity by adding another remedy does not, unless clearly so intended, rule out ICSID arbitration. Providing for additional procedures should be interpreted as giving the claimant a choice of remedies. However, once this choice has been made, the parties must be bound by it. The principles of *ne bis in idem* and *res judicata* would clearly preclude any attempt by a party to one set of arbitration proceedings to seek another remedy in the same matter.

**32**    In a number of instances, ICSID tribunals were confronted with non-ICSID arbitration proceedings relating to the same disputes. The issue of concurrent ICSID and non-ICSID proceedings is discussed below (see paras. 114–123 *infra*).

### b) Validity of Concurrent Arbitration Clauses

**33**    The applicability of the exception to the exclusive remedy rule under Art. 26 depends on the validity of the alternative consent to arbitration. If the consent to non-ICSID arbitration is void or inapplicable to the dispute, the phrase "unless otherwise stated" does not apply.

**34**    In *SPP* v. *Egypt* there was no completed consent to ICSID arbitration at the outset. Egypt had, it was argued, merely offered to consent to ICSID dispute settlement in general terms in its legislation. This offer was subject to the investor's acceptance (see Art. 25, paras. 400–404, 421). Therefore, the exclusive remedy rule of Art. 26 was not applicable.

**35**    SPP first instituted ICC proceedings in 1978 against Egypt and EGOTH, an Egyptian public sector enterprise, for breach of a 1974 agreement for the development of two international tourist complexes in Egypt between SPP and EGOTH, which contained an ICC arbitration clause. An award was rendered against Egypt in the ICC proceedings in 1983.[32] Egypt applied for annulment of the ICC award to the French courts claiming that there had been no valid arbitration agreement

---

31    *Ibid.*, para. 52(b). See also *Thompson, D.*, The *Klöckner* v. *Cameroon* Appeal. A Note on Jurisdiction, 3 J. Int. Arb. 93 (1986).

32    *SPP* v. *Egypt*, ICC Award, 11 March 1983, 3 ICSID Reports 46.

*Article 26 – Exclusive Remedy*                    361

with Egypt because the signature of the Egyptian minister on the contract merely signalled his approval of the contract but not submission of the Egyptian State to arbitration.

The Paris Court of Appeals on 12 July 1984 annulled the ICC award on the ground that Egypt had not been a party to the 1974 Agreement and, therefore, was not bound by the ICC clause therein.[33] Shortly thereafter SPP initiated ICSID arbitration against Egypt. SPP also appealed the Paris Court of Appeals' decision to the French Cour de cassation.                    **36**

Before the ICSID Tribunal, Egypt attempted to rely on Art. 26 to show that SPP's submission to ICSID arbitration was invalid. Egypt's position was that, by reserving its rights under the ICC award, SPP had not accepted the exclusive remedy requirement of Art. 26.[34] The Tribunal rejected this argument and pointed out that the exclusive remedy rule of Art. 26 did not mean that failure to waive other remedies impairs consent to ICSID jurisdiction. This was underlined by the words "unless otherwise stated" in Art. 26.[35] Whether the parties had indeed agreed on another remedy depended on the validity of the ICC arbitration. The Tribunal also rejected Egypt's argument that the Claimants' pursuit of remedies before ICC and ICSID should be barred by the principle of estoppel. The Tribunal found no inconsistency or bad faith in pursuing alternative remedies.[36]                    **37**

On the possibility of concurrent jurisdiction the Tribunal said:                    **38**

> 84. When the jurisdictions of two unrelated and independent tribunals extend to the same dispute, there is no rule of international law which prevents either tribunal from exercising its jurisdiction. However, in the interest of international judicial order, either of the tribunals may, in its discretion and as a matter of comity, decide to stay the exercise of its jurisdiction pending a decision by the other tribunal.[37]

Therefore, the Tribunal rejected Art. 26 as a bar to its jurisdiction but ordered a stay of the proceedings until the French courts had finally decided whether the parties had agreed to submit to ICC arbitration.[38]                    **39**

After the French Cour de cassation had confirmed the nullity of the ICC award,[39] the ICSID Tribunal resumed its proceedings and found that it had now been established that the parties before it had not agreed on a method of dispute resolution which would have constituted a bar to the application of the ICSID clause in the Egyptian legislation. SPP attempted to preserve some benefit from the abortive                    **40**

---

33  *Egypt* v. *SPP*, Cour d'appel, Paris, 12 July 1984, 3 ICSID Reports 79. See the case notes by *Goldman, B.*, 112 Journal du Droit International 129 (1985) and *Leboulanger, P. H.*, Revue de l'Arbitrage 11 (1986). See also *Rambaud, P.*, L'affaire des pyramides, 31 Annuaire Français de Droit International 508 (1985); *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231 (1993); *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 266 (1993).
34  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, paras. 53–56.
35  At para. 58.                    36  At paras. 60–63.
37  At para. 84.                    38  At para. 88.
39  *Egypt* v. *SPP*, France, Cour de cassation, 6 January 1987, 3 ICSID Reports 96.

ICC arbitration by suggesting that the ICSID Tribunal "adopt and incorporate as its own the pertinent findings of fact made by the ICC Arbitral Tribunal". This the Tribunal found unacceptable both in principle and under the Centre's Arbitration Rules requiring tribunals to make their own findings of fact[40] (Arbitration Rule 47(1)(g)).

**41**    In *Joy Mining* v. *Egypt*, the jurisdiction of ICSID was based on the BIT between Egypt and the United Kingdom. A contract for the provision of mining equipment between the Claimant and IMC, an Egyptian State entity, contained a forum selection clause which, in addition to reference to domestic courts, provided for UNCITRAL arbitration. Before the ICSID Tribunal, the Claimant expressed the concern that in view of the requirements that had led to the annulment of the ICC Award in *SPP* v. *Egypt*, the UNCITRAL clause might not be honoured.[41]

**42**    The ICSID Tribunal found that, in the absence of an investment, it lacked jurisdiction but that resort to UNCITRAL arbitration remained open to the Claimant. It noted that at the hearing Egypt had given the assurance and formal commitment that it would abide by the UNCITRAL clause. The Tribunal noted that the solemn declaration had been made on behalf of both the Egyptian State and IMC and that this constituted an international legal obligation.[42]

**43**    In *Tradex* v. *Albania*, there were consecutive pieces of legislation providing for different forms of arbitration. A law of 1992 contained an UNCITRAL arbitration clause. A subsequent law of 1993 provided for ICSID arbitration.[43] The more recent law explicitly abrogated the earlier one. The Request for Arbitration was registered after the entry into force of the 1993 Law but Albania contested ICSID jurisdiction, *inter alia*, since the investments had been made before the entry into force of the 1993 Law. The Tribunal came to the conclusion that it was more plausible to interpret the 1993 Law to the effect that ICSID arbitration should also cover disputes that had started before its entry into force.[44] The Tribunal found confirmation for this result in the fact that Albanian investment legislation showed a continuous evolution towards more advanced and efficient dispute settlement mechanisms.[45] Moreover, Albania had refused to give a clear response to the question of whether it would accept UNCITRAL arbitration should the ICSID Tribunal make a finding that ICSID jurisdiction did not exist.[46]

### 2. Concurrent Reference to Domestic Courts

**44**    The parties may agree on the utilization of domestic judicial remedies even if there is consent to ICSID arbitration. Exhaustion of local remedies is not a requirement under the ICSID Convention but may be required by the host State

---

40  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, paras. 120, 121.
41  *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 92–93.
42  *Ibid.*, paras. 95–98.
43  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 53–55.
44  At pp. 66–68.                                   45   At p. 67.
46  At pp. 48/9, 68/9. See also Award, 29 April 1999, paras. 13–17.

(see paras. 188–231 *infra*). Explicit reference to domestic courts means that the exclusive remedy rule of Art. 26 does not apply since the parties have stated otherwise. Whether domestic court proceedings are offered as an alternative to ICSID arbitration, as a preliminary remedy before the institution of ICSID proceedings or as a remedy replacing ICSID arbitration depends on the terms of the particular consent agreement. But the traditional relationship between domestic and international adjudication creates a strong presumption that concurrent reference to domestic courts and to ICSID arbitration means that resort to domestic remedies does not preclude resort to ICSID and that decisions of domestic courts are subject to the review of ICSID tribunals.

Bilateral investment treaties (BITs) containing ICSID clauses sometimes also **45** provide for settlement by domestic courts. Some of these provide that resort may be had to domestic courts, often for a certain period of time, but that domestic remedies need not be exhausted before the institution of ICSID proceedings. Others provide that local remedies must be exhausted before ICSID arbitration (see paras. 201–205 *infra*). In either case, the exclusive remedy rule of Art. 26 does not apply and proceedings may be instituted before domestic courts. In either case it is also clear that the option of ICSID arbitration remains open after the proceedings before domestic courts. Another recurrent clause in BITs gives the investor a choice between domestic proceedings and international arbitration, including ICSID. Under these so-called "fork in the road" clauses, opting for domestic courts would preclude ICSID arbitration and vice versa (see paras. 55–72 *infra*).[47]

Some national investment laws also contain references to ICSID as well as to **46** domestic courts. In some cases, it is obvious that the attempt to utilize domestic remedies will not preclude subsequent resort to ICSID adjudication. For instance, the Investment Law of Yemen of 2002 in Art. 61 provides that the investor may select one of several arbitration mechanisms, including ICSID, "[w]ithout prejudice to the right to resort to Yemeni courts".[48] Art. 22 of the Venezuelan Law for the Promotion and Protection of Investments of 1999 is drafted in ambiguous terms and is likely to give rise to difficulties of interpretation, notably as to whether it contains an expression of Venezuela's consent to ICSID arbitration or not.[49]

---

47  See US Model Agreement, Art. VI, *Dolzer, R./Stevens, M.*, Bilateral Investment Treaties, p. 247. See also the US-Estonia BIT (1994) Art. VI; Estonia-Poland BIT (1993) Art. 7(2); Argentina-Venezuela BIT (1993) Art. 11. See also *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 334, 351/2 (1997).

48  See also Art. 8 of the Albania Law on Foreign Investment, 1993, Investment Laws of the World, ICSID ed.

49  Decreto con Rango y Fuerza de Ley de Promoción y Protección de Inversiones, dictado bajo el Decreto/Ley N° 356 del 3 de octubre de 1999, Gaceta Oficial de la República de Venezuela N. 5.390 Extraordinario del 22 de octubre 1999. Art. 22 of this Decree has been the object of requests for interpretation filed by Venezuelan lawyers before the Venezuelan courts. The Venezuelan Supreme Court rejected the request as inadmissible. For the text of the Venezuelan decisions, see www.t-d-m.com, June 2007.

**47**    In *Zhinvali* v. *Georgia*, the Claimant argued that the Respondent's consent was contained in Art. 16(2) of the Georgian Investment Law which provided for a choice of dispute resolution forum between the Georgian courts and ICSID proceedings. The Claimant further contended that the choice of forum was to be made solely by the investor.[50] The Tribunal reviewed the purpose and context of the Georgian Law and agreed with the Claimant that the choice of forum was for the benefit of the investor and should be made at the latter's choice.[51]

**48**    If consent to ICSID arbitration is based on a direct agreement between the host State and the investor, any competing references to domestic courts are less likely to arise from a desire to create alternatives[52] than from the existence of several documents designed to cover different aspects of the contractual relationship.

**49**    The situation in *Holiday Inns* v. *Morocco*[53] bears a certain resemblance to the *Klöckner* case, described above (paras. 25–31 *supra*), in that there were several contracts containing different jurisdiction clauses (see also Art. 25, para. 95). After the execution of a basic agreement between the Government and the investor containing an ICSID arbitration clause, there were several subsidiary contracts, including loan contracts, between the local subsidiaries of Holiday Inns and a government agency, C.I.H. These contracts provided for dispute settlement before the courts of Morocco. Here too, the basic agreement had already contained a general clause providing for the loans (see Art. 25, para. 95).

**50**    The Government argued that the ICSID Tribunal should stay the proceedings and await the decision of the Moroccan courts on the loan contracts. Even then, the Government argued, the Tribunal should only examine the possible effects of such Moroccan decisions on the rights and obligations of the parties to the international arbitration.

**51**    The Tribunal squarely rejected these contentions. It emphasized the general unity of the investment operation and the principle that "international proceedings in principle have primacy over purely internal proceedings". Where an investment is accomplished by a number of juridical acts, it was important not to consider these in complete isolation. While questions affecting the indirect or secondary aspects of the investment could properly fall within the jurisdiction of the local courts, a conflict of jurisdiction would have to be resolved in favour of ICSID arbitration. The Tribunal said:

---

50    *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 328–332.

51    *Ibid.*, paras. 335–337.

52    But see *Vacuum Salt* v. *Ghana*, where the ICSID consent clause was qualified by the phrase "unless the parties agree to submit to any procedures available in Ghana". *Vacuum Salt* v. *Ghana,* Award, 16 February 1994, para. 2.

53    The Award is unpublished. For a detailed report see *Lalive, P.*, The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 BYIL 123 (1980), reproduced in 1 ICSID Reports 645. See also *Tupman, W. M.*, Case Studies in the Jurisdiction of the International Centre for Settlement of Investment Disputes, 35 ICLQ 813, 819 *et seq.* (1986); *Niggemann, F.,* Zuständigkeitsprobleme der Weltbankschiedsgerichtsbarkeit im Licht der bisherigen Schiedsverfahren, 5 Praxis des Internationalen Privat- und Verfahrensrechts (IPRax) 185, 190/1 (1985).

> . . . the Moroccan tribunals should refrain from making decisions until the Arbitral Tribunal has decided these questions or, if the Tribunal had already decided them, the Moroccan tribunals should follow its opinion. Any other solution would, or might, put in issue the responsibility of the Moroccan State and would endanger the rule that international proceedings prevail over internal proceedings.[54]

This decision appears convincing. In addition, the considerations outlined above in the context of competing ICSID and ICC clauses (para. 31 *supra*) apply here with equal force. **52**

In *SOABI* v. *Senegal*, the request for arbitration had been introduced on the basis of an ICSID clause contained in an agreement for the establishment of a prefabricated industrial concrete plant ("the Establishment Agreement").[55] Senegal objected to the Tribunal's jurisdiction arguing that the investment operation was also regulated by a subsequent agreement, the General Undertaking, which provided for dispute settlement by the municipal courts. The Tribunal rejected Senegal's contentions as it found that the dispute settlement clause contained in the General Undertaking concerned only a very particular type of disputes, *i.e.* disputes between the engineer and the contractor during the construction work, and did not apply after completion of the work. The Tribunal further noted that the General Undertaking applied to the construction of a building and was not an agreement concerning investments. Consequently, disputes arising under this agreement were not investment disputes under Art. 25 of the Convention.[56] **53**

Consent to the jurisdiction of domestic courts in derogation of the exclusive remedy rule of Art. 26 need not be given explicitly. Tacit consent may be seen in pleading on the merits before the non-ICSID forum without invoking ICSID's exclusive jurisdiction. **54**

### 3. "Fork in the Road" Clauses

"Fork in the road" provisions are attached to the consent clauses of some BITs. They offer the investor a choice between the host State's domestic courts and international arbitration. The choice, once made, is final. If the investor resorts to the host State's domestic courts to have the dispute settled, it loses the right to international arbitration.[57] In terms of the ICSID Convention, a clause of this kind not only creates an exception to the exclusivity provided by Art. 26. It also excludes access to ICSID arbitration once the alternative – litigation in domestic courts – has been chosen. **55**

An example of a fork in the road provision is contained in Article VI of the Estonia-US BIT: **56**

---

54  *Lalive*, *op. cit.*, p. 160; 1 ICSID Reports 681.
55  *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 4.44–4.52.
56  *Ibid*., paras. 4.48–4.50.
57  For more detailed treatment see *Schreuer, C.*, Travelling the BIT Route. Of Waiting Periods, Umbrella Clauses and Forks in the Road, 5 The Journal of World Investment & Trade 231, 239 (2004).

2. . . . If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute for resolution:

(a) to the courts or administrative tribunals of the Party that is a party to the dispute; or

(b) in accordance with any applicable, previously agreed dispute-settlement procedures; or

(c) in accordance with the terms of paragraph 3.

3. (a) Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) . . . the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration: (i) to [ICSID] . . .

**57**    Under provisions of this kind, the loss of access to international arbitration applies only if the same dispute was submitted to the domestic courts. Investors are often drawn into legal disputes of one sort or another in the course of their investment activities. These disputes may relate in some way to the investment, but they are not necessarily identical to the dispute covered by the BIT's provisions on consent to arbitration.

**58**    In order to determine whether the choice under a fork in the road clause has been made, it is necessary to establish if the parties and the causes of action in the two sets of lawsuits are identical. The loss of access to international arbitration applies only if the same dispute between the same parties has previously been submitted to the domestic courts. This principle is now well established and has been confirmed in a number of decisions.[58]

**59**    For instance, in *Genin* v. *Estonia* jurisdiction was based on the Estonia-US BIT. The Claimants, United States nationals, were the principal shareholders of EIB, a bank incorporated under the law of Estonia. The claims arose, principally, from the purchase of a branch of "Social Bank" and from the revocation of EIB's license by the Estonian authorities. EIB sued the "Social Bank" in a local court for losses from the purchase. EIB also instituted proceedings before the Administrative Court challenging the revocation of the licence.[59] In the ICSID proceedings Estonia argued that "by choosing to litigate their disputes with Estonia in the Estonian courts, . . . , Claimants have exhausted their right to choose another forum to relitigate those same disputes".[60]

**60**    The Tribunal found that the lawsuits undertaken by EIB in Estonia were not the same as the "investment dispute" that was the subject matter of the ICSID proceedings. Both the causes of action and the parties were different in the national

---

58    *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 20–23, 30; *Vivendi* v. *Argentina*, Award, 21 November 2000, paras. 40, 42, 53–55, 81; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 38, 42, 55; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 71; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 77–82; *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, para. 3.4.3; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, paras. 37–41, 86–92; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, paras. 95–98; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, paras. 75, 76; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 155–157.

59    *Genin* v. *Estonia*, Award, 25 June 2001, paras. 47, 58.

60    At para. 321.

and in the international proceedings. Therefore, the domestic lawsuits did not constitute the choice under the BIT's "fork in the road" provision. The Tribunal said:

> . . . the lawsuits in Estonia relating to the purchase by EIB of the Koidu branch of Social Bank and to the revocation of EIB's license are not identical to Claimants' cause of action in the "investment dispute" that they seek to arbitrate in the present proceedings. The actions instituted by EIB in Estonia . . . certainly affected the interests of the Claimants, but this in itself did not make them parties to these proceedings.[61]

In *Middle East Cement* v. *Egypt*, Art. 10.2 of the relevant BIT provided that **61** investment disputes between the Contracting Parties may be brought either to the competent local courts or "to an international arbitral tribunal".[62] The Respondent argued that the Claimant had waived its right to go to international arbitration by resorting to the Egyptian courts to contest the validity of the auctioning procedure for a ship belonging to the Claimant. The Tribunal held that – while the BIT referred to investment disputes between an investor and the host State – the case before the Egyptian courts did not and could not concern Egypt's obligations under the BIT but only the validity of the auction under Egyptian law.[63] Accordingly, the Claimant's conduct in the proceedings could not be considered a waiver under Art. 10.1 of the BIT.[64]

One of the questions examined by the *ad hoc* Committee in *Vivendi* v. *Argentina* **62** was the Tribunal's reasoning that recourse by the Claimants to the Argentine administrative courts would not have precluded recourse to ICSID arbitration under the "fork in the road" provision contained in the France-Argentina BIT, Art. 8(2).[65] The Tribunal had interpreted that provision as being limited exclusively to claims alleging a violation of the treaty, *e.g.* as being restricted to treaty claims as such and not extending to claims based on the contract.[66]

In carrying out its own analysis of Art. 8(2), the *ad hoc* Committee found as **63** follows:

> . . . Article 8 deals generally with disputes "relating to investments made under this Agreement between one Contracting Party and an investor of the other Contracting Party". It is those disputes which may be submitted, at the investor's option, either to national or international adjudication. Article 8 does not use a narrower formulation, requiring that the investor's claim allege a breach of the BIT itself. Read literally, the requirements for arbitral jurisdiction in Article 8 do not necessitate that the Claimant allege a breach of the BIT itself; it is sufficient that the dispute relate to an investment made under the BIT. ( . . . )

---

61  At para. 331.

62  Art. 10.2 of the BIT between Egypt and Greece, *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 71.

63  *Ibid*.                    64  *Ibid*., para. 72.

65  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 36. The relevant portion of Art. 8(2) of the Argentina-France BIT provided: "Once an investor has submitted the dispute either to the jurisdictions of the Contracting Party involved or to international arbitration, the choice of one or the other of these procedures shall be final."

66  *Ibid*., para. 38.

In the Committee's view, a claim by CAA against the Province of Tucumán for breach of the Concession Contract, brought before the contentious administrative courts of Tucumán, would *prima facie* fall within Article 8(2) and constitute a "final" choice of forum and jurisdiction, if that claim was coextensive with a dispute relating to investments made under the BIT.[67]

**64**    For the *ad hoc* Committee, when the Claimants started ICSID arbitration and took the "fork in the road" under Art. 8(2), they took the risk of the ICSID Tribunal rejecting their claims as not amounting to treaty violations, with the result that they would have lost both their treaty claims and contract claims.[68]

**65**    In *CMS* v. *Argentina*, Argentina argued that the investor had triggered the "fork in the road" provision of the BIT because the investment vehicle, the Argentine company TGN, appealed a decision to the Federal Supreme Court and sought other administrative remedies in Argentina.[69]

**66**    The Tribunal recalled the decisions of other ICSID tribunals on the separation of treaty claims and contract claims and held that submission of a claim for breach of contract to local courts did not prevent resort to arbitration for the treaty claims. The Tribunal further noted that this was particularly apposite in the circumstances of that case, since CMS had not resorted to the local courts and the parties and causes of actions in the two sets of proceedings were different. The Tribunal concluded:

> 80. Decisions of several ICSID tribunals have held that as contractual claims are different from treaty claims even if there had been or there currently was a recourse to the local courts for breach of contract, this would not have prevented submission of the treaty claims to arbitration. This Tribunal is persuaded that with even more reason this view applies to the instant dispute, since no submission has been made by CMS to local courts and since, even if TGN had done so – which is not the case –, this would not result in triggering the "fork in the road" provision against CMS. Both the parties and the causes of action under separate instruments are different.[70]

**67**    The treaty between Switzerland and Pakistan which applied in *SGS* v. *Pakistan* did not contain a "fork in the road" provision nor a requirement of prior exhaustion of local remedies before a dispute could be submitted to ICSID arbitration. SGS contended that – in the absence of a "fork in the road" provision in the relevant BIT – a party could not be held to have waived its right to ICSID arbitration if it had pursued domestic proceedings, as SGS had done in that case.[71] The Tribunal confirmed that the only recourse available to investors under the treaty was ICSID arbitration and that there was no fork in the road provision, nor any requirement of prior recourse to the municipal courts.[72] In the circumstances, the Tribunal did not feel free to read into the BIT a requirement that prevented the Claimant from

---

67  *Ibid.*, para. 55.                           68  *Ibid.*, para. 113.
69  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 77.
70  *Ibid.*, para. 80. Footnotes omitted.
71  *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 121.
72  *Ibid.*, para. 151.

seeking other remedies with regard to its contract claims before it pursued the dispute resolution avenues available under the treaty for its BIT claims.[73]

In *Champion Trading* v. *Egypt*, the Respondent argued that a claim brought by **68** the Egyptian company NCC before the Egyptian Conseil d'Etat concerned the same dispute and the same claimants as the ICSID proceedings. The Tribunal analysed the terms of the fork in the road clause in the Egypt-US BIT and concluded that the treaty "excludes from ICSID arbitration only those disputes where the ICSID claimant is also the claimant in the national proceedings". Since the claimants were not the same, the Tribunal rejected the Respondent's objection to its jurisdiction.[74]

Objections to the Tribunal's jurisdiction based on the "fork in the road" provision **69** of the Argentina-United States BIT were also raised in *Azurix* v. *Argentina*. In that case ABA, the local company in which Azurix had invested, had lodged administrative appeals. Also, the dispute between ABA and the Province of Buenos Aires over the termination of a concession agreement had been submitted to a court.[75] The Tribunal stressed that submission of a claim for breach of contract to the local courts did not preclude submission of a treaty claim to arbitration under a BIT, particularly when the parties and causes of actions under the separate instruments are different.[76]

Argentina raised similarly unsuccessful objections to the jurisdiction of ICSID **70** tribunals on the basis of "fork in the road" provisions in a number of subsequent cases:[77] *Enron* v. *Argentina*,[78] *LG&E* v. *Argentina*,[79] *Sempra* v. *Argentina*,[80] *Continental Casualty* v. *Argentina*[81] and *Pan American* v. *Argentina*.[82] In all these instances, the tribunals rejected Argentina's jurisdictional objections based on these grounds and found that the "fork in the road" mechanism of the BIT had not been triggered.

Several cases against Ecuador also raised questions relating to "fork in the road" **71** provisions.[83] In these cases too, the application of these provisions was declined since the requirements of identity of cause of action and/or identity of parties had not been met.

---

73  *Ibid*., paras. 176–177.
74  *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, sec. 3.4.3.
75  *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, paras. 37–41, 86.
76  *Ibid.*, paras. 89, 90, quoting from para. 80 of *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003.
77  The BIT applicable in *Camuzzi* v. *Argentina I* contained no "fork in the road" clause strictly speaking but simply a provision that, upon initiating international arbitration, each party should take "the measures required to discontinue the court action in progress". *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 117, 118.
78  *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, paras. 95–98.
79  *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, paras. 75–76.
80  *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 116, 127.
81  *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 5.
82  *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 155–157.
83  *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, paras. 58 *et seq*., 82–84; *Occidental* v. *Ecuador*, UNCITRAL Award, 1 July 2004, paras. 37(a), 38–63; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 36–38, 171–191.

**72**    The practice on fork in the road clauses shows that they have had little, if any, practical impact on the jurisdiction of ICSID tribunals. The submission of a dispute to domestic courts does not necessarily reflect an exclusive choice precluding ICSID arbitration. Tribunals have held consistently that a fork in the road clause will prevent access to international arbitration only if the same dispute involving the same parties and cause of action had been submitted to the courts of the host State. The jurisdiction of an ICSID tribunal is not affected by the submission of a related but not identical dispute to domestic courts.

### 4. Jurisdiction for Treaty Claims and Contract Claims

**73**    The most difficult problems in the relationship between ICSID tribunals and domestic courts have arisen from competing jurisdictional clauses in treaties and contracts. Contracts between investors and host States frequently contain forum selection clauses that refer disputes arising from the application of these contracts to the host State's domestic courts. When disputes arise in connexion with the investments, investors will typically invoke provisions in treaties, most often BITs, to gain access to international arbitration, including ICSID arbitration. The host States typically respond by insisting on the contractual forum selection, arguing that by signing the contracts the investors had opted for domestic courts rather than ICSID arbitration.

**74**    ICSID tribunals have insisted on their jurisdiction in disputes of this nature. In cases where ICSID jurisdiction was based on an offer contained in a treaty and subsequently accepted by the investor, the tribunals have uniformly upheld their jurisdiction despite the presence of contractual dispute settlement clauses pointing to domestic courts.[84]

**75**    In *Lanco* v. *Argentina*,[85] jurisdiction was based on an offer of ICSID arbitration, accepted by the investor, contained in the BIT between Argentina and the United States. A contractual choice of forum clause in a concession contract referred disputes to the Federal Contentious-Administrative Tribunals of Buenos Aires. The Tribunal rejected the Respondent's objection to its jurisdiction based on the choice of forum clause in the contract. The Tribunal held that the clause did not constitute a "previously agreed dispute settlement procedure" under the terms of the BIT. It found that the Contentious-Administrative Tribunals had jurisdiction under domestic law and that this jurisdiction was not subject to agreement or waiver.[86] Therefore, the BIT procedure referring the dispute to ICSID prevailed over the purported contractual forum selection clause.

**76**    In *Salini* v. *Morocco*,[87] ICSID jurisdiction was based on an offer of consent, accepted by the investor, in the BIT between Italy and Morocco. A contract

---

84    See also *Spiermann, O.*, Individual Rights, State Interests and the Power to Waive ICSID Jurisdiction under Bilateral Investment Treaties, 20 Arbitration International 179 (2004).
85    *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998.
86    *Ibid.*, para. 26.
87    *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001.

*Article 26 – Exclusive Remedy*                                          371

between the investors and ADM, a State entity, contained a clause referring disputes to the administrative courts of Rabat. Morocco relied on that clause and objected to the ICSID Tribunal's jurisdiction.[88] The Claimants argued that the consent to ICSID's jurisdiction contained in the BIT should prevail over the contractual acceptance of another forum.

The *Salini* Tribunal too found that, since the competence of the administra-   **77**
tive courts could not be opted for, consent to ICSID jurisdiction under the BIT should prevail over the contractual dispute settlement clause.[89] It followed that the contractual forum selection clause did not oust ICSID jurisdiction. The Tribunal found that its jurisdiction extended to all claims based on a violation of the BIT, to contractual breaches that amounted at the same time to BIT violations and to breaches of contract binding the State directly.[90] The Tribunal however specified that its jurisdiction did not cover breaches of a contract concluded with an entity other than the State and that did not also constitute a violation of the BIT.[91]

An important decision on the relationship between ICSID jurisdiction based   **78**
on a BIT and a contractual forum selection clause is the Award in *Vivendi* v. *Argentina*,[92] together with the subsequent Decision partly annulling it.[93] In *Vivendi*, ICSID's jurisdiction was based on Article 8(2) of the BIT between Argentina and France. Argentina made an unsuccessful challenge to jurisdiction by relying on a forum selection clause in a Concession Contract with the Argentinian province of Tucumán. The clause, Article 16.4 of the Concession Contract, provided as follows:

> For purposes of interpretation and application of this Contract the parties submit themselves to the exclusive jurisdiction of the Contentious Administrative Tribunals of Tucumán.[94]

The Tribunal joined Argentina's objections to jurisdiction to the merits of the   **79**
case and dealt first with jurisdiction, holding that Article 16.4 of the Concession Contract did not represent a waiver of the Claimant's rights to file claims under the France-Argentina BIT. The decisive passage in this respect reads as follows:

> 53. . . . In this case the claims filed by CGE [*i.e.* the Claimant] against Respondent are based on violation by the Argentine Republic of the BIT through acts or omissions of that government and acts of the Tucumán authorities that Claimants assert should be attributed to the central government. As formulated, these claims against the Argentine Republic are not subject to the jurisdiction of the contentious administrative tribunals of Tucumán, if only because, *ex hypothesi*, those claims are not based on the Concession Contract but allege a cause of action under the BIT.

---

88  *Ibid*., paras. 24–26.                    89  *Ibid*., para. 27.
90  *Ibid*., paras. 61–64.                     91  *Ibid*.
92  *Vivendi* v. *Argentina*, Award, 21 November 2000.
93  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002. For a more detailed discussion see *Schreuer, C.*, Investment Treaty Arbitration and Jurisdiction over Contract Claims – The *Vivendi I* Case Considered, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 281 (2005).
94  *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 27.

> 54. Thus, Article 16.4 of the Concession Contract cannot be deemed to prevent the investor from proceeding under the ICSID Convention against the Argentine Republic on a claim charging the Argentine Republic with a violation of the Argentine-French BIT.[95]

**80**    In dealing with the merits, however, the Tribunal dismissed the claims because it found it impossible to separate potential contract breaches from BIT violations because the alleged violations of the relevant treaty were closely linked with the performance of the Concession Contract. The Tribunal stated that it could not decide on the BIT claims unless and until the Claimant had asserted its rights in the domestic courts.[96]

**81**    The *ad hoc* Committee, which had to decide on the request for annulment of the Award, found, on the one hand, that the *Vivendi* Tribunal had rightly held that it had jurisdiction and, on the other hand, that the Tribunal had manifestly exceeded its powers by not examining the merits of the claims concerning the acts of the Tucumán authorities under the BIT. Therefore, it annulled the Award with regard to those claims. The *ad hoc* Committee summarized the issue as follows:

> 41. The Tribunal's stated rationale for rejecting Claimants' position is "the impossibility, on the facts of the instant case, of separating potential breaches of contract claims from BIT violations without interpreting and applying the Concession Contract, a task that the contract assigns expressly to the local courts". The Tribunal appears to have considered that, because Claimants' contract and treaty claims could not be separated, a distinct claim "based on the BIT" was impossible in the circumstances of the case, at least prior to submission of the dispute to the provincial courts.[97]

**82**    The *ad hoc* Committee found it "evident that a particular investment dispute may at the same time involve issues of the interpretation and application of the BIT's standards and questions of contract".[98] This did not impair the jurisdiction of the ICSID Tribunal.

**83**    On the relation between breach of contract and breach of treaty, the *ad hoc* Committee pointed out that these related to independent standards. "A state may breach a treaty without breaching a contract, and *vice versa*." Therefore, "whether there has been a breach of the BIT and whether there has been a breach of contract are different questions".[99] This led the *ad hoc* Committee to the following conclusions:

> . . . where "the fundamental basis of the claim" is a treaty laying down an independent standard by which the conduct of the parties is to be judged, the existence of an exclusive jurisdiction clause in a contract between the claimant and the respondent state or one of its subdivisions cannot operate as a bar to the application of the treaty standard.[100] . . .

---

95  *Ibid.*, paras. 53, 54. Footnotes omitted.        96  *Ibid.*, paras. 78, 81.
97  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 41.
98  *Ibid.*, para. 60. See also para. 76.        99  *Ibid.*, paras. 95, 96.
100  *Ibid.*, para. 101. Footnote omitted.

> A state cannot rely on an exclusive jurisdiction clause in a contract to avoid the characterisation of its conduct as internationally unlawful under a treaty.[101]
>
> ... it is one thing to exercise contractual jurisdiction (arguably exclusively vested in the administrative tribunals of Tucumán by virtue of the Concession Contract) and another to take into account the terms of a contract in determining whether there has been a breach of a distinct standard of international law, such as that reflected in Article 3 of the BIT.[102]

Consequently, the *ad hoc* Committee held that the *Vivendi* Tribunal had man-  **84**
ifestly exceeded its powers in that it had failed to decide the claims under the
BIT:

> ... the Committee can only conclude that the Tribunal, in dismissing the Tucumán claims as it did, actually failed to decide whether or not the conduct in question amounted to a breach of the BIT. In particular, the Tribunal repeatedly referred to allegations and issues which, it held, it could not decide given the terms of Article 16 (4) of the Concession Contract, even though these were adduced by Claimants specifically in support of their BIT claim.[103]
>
> ... It was open to Claimants to claim, and they did claim, that these acts taken together, or some of them, amounted to a breach of Articles 3 and/or 5 of the BIT. In the Committee's view, the Tribunal, faced with such a claim and having validly held that it had jurisdiction, was obliged to consider and to decide it.[104]

The Decision on Annulment in *Vivendi* established the principle that a forum  **85**
selection clause in a contract pointing to domestic courts will not oust ICSID's
jurisdiction based on a treaty. The decisive reason is that contract claims and treaty
claims have a different legal basis. A failure by an ICSID tribunal to exercise its
jurisdiction under these circumstances amounts to an excess of powers and is a
ground for annulment of the award.

In *CMS* v. *Argentina*[105] ICSID jurisdiction was based on an offer of consent,  **86**
accepted by the investor, in the BIT between Argentina and the United States.
Argentina objected to jurisdiction arguing that the investor's licence contained
forum selection clauses in favour of the Federal Courts of Buenos Aires. The
Claimant responded that its cause of action was founded on the BIT.[106] The
Tribunal, after reviewing some of the cases discussed above, stated as follows:

> 76. The Tribunal shares the views expressed in those precedents. It therefore holds that the clauses in the License or its Terms referring certain kinds of disputes to the local courts of the Republic of Argentina are not a bar to the assertion of jurisdiction by an ICSID tribunal under the Treaty, as the functions of these various instruments are different.[107]

---

101  *Ibid.*, para. 103.                    102  *Ibid.*, para. 105.
103  *Ibid.*, para. 111.                    104  *Ibid.*, para. 112.
105  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003.
106  *Ibid.*, paras. 70–71.                 107  *Ibid.*, para. 76.

**87**     In *SGS* v. *Pakistan*,[108] jurisdiction was based on the BIT between Pakistan and Switzerland. The Claimant had entered into a Pre-Shipment Inspection Agreement ("PSI Agreement") with the Government of Pakistan. The PSI Agreement contained a dispute settlement clause which provided for domestic arbitration in Pakistan. That procedure had been initiated by Pakistan some time before the ICSID proceedings under the BIT. The ICSID proceedings concerned non-payment by Pakistan of invoices submitted by SGS and Pakistan's attempt to terminate the PSI Agreement. Pakistan contested the jurisdiction of the ICSID Tribunal, arguing that the essential basis of the claims put forward by SGS was a breach of contract and that the parties had agreed to submit their contractual dispute to the domestic arbitration.[109]

**88**     The ICSID Tribunal, relying on the Decision on Annulment in *Vivendi*, pointed out that the same set of facts could give rise to contract claims and treaty claims.[110] It found that the contractual forum selection clause in the PSI Agreement did not affect its jurisdiction based on the BIT. The Tribunal stated:

> 155. We conclude that the Tribunal has jurisdiction to pass upon and determine the claims of violation of provisions of the Swiss-Pakistan BIT raised by the Claimant. We do not consider that that jurisdiction would to any degree be shared by the PSI Agreement arbitrator.[111]

At the same time the Tribunal found that it did not have jurisdiction over pure contract claims which did not also amount to breaches of the relevant BIT.[112]

**89**     In *Azurix* v. *Argentina*,[113] jurisdiction was based on an offer of consent, accepted by the investor, in the BIT between Argentina and the United States. Argentina's objection to ICSID's jurisdiction was based on forum selection clauses contained in a series of contractual arrangements between Argentina and the Claimant. These provided for the exclusive jurisdiction of the courts for contentious-administrative matters of the city of La Plata. The Respondent pointed out that the forum selection clause not only provided for the exclusive jurisdiction of the domestic courts but explicitly waived any other forum or jurisdiction.[114]

**90**     The Tribunal relied on the decisions in *Lanco* and *Vivendi* and adopted the distinction between contract claims and treaty claims in the following terms:

> 79. The tribunals in the cases cited concluded that such forum selection clauses did not exclude their jurisdiction because the subject-matter of any proceedings before the domestic courts under the contractual arrangements in question and the

---

108   *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003. For a more detailed discussion see: *Gaillard, E.*, Investment Treaty Arbitration and Jurisdiction Over Contract Claims – The SGS Cases Considered, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 325 (2005); *Alexandrov, S.*, Breaches of Contract and Breaches of Treaty: The Jurisdiction of Treaty-based Arbitration Tribunals to Decide Breach of Contract Claims in *SGS* v. *Pakistan* and *SGS* v. *Philippines*, 5 The Journal of World Investment and Trade 555 (2004).

109   *Ibid.*, paras. 43, 44, 48–74.          110   *Ibid.*, paras. 147–148.
111   *Ibid.*, para. 155.                      112   *Ibid.*, paras. 156–173.
113   *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003.
114   *Ibid.*, para. 26.

> dispute before the ICSID tribunal was different and therefore the forum selection clauses did not apply. This reasoning applies equally to the waiver of jurisdiction clause in this case. The claims or causes of action before this Tribunal are different in nature from any claims which ABA could bring before the courts of the city of La Plata under the Contract Documents.[115]

In *Enron* v. *Argentina*, jurisdiction was also based on the offer of consent, **91** accepted by the investor, in the BIT between Argentina and the United States. Argentina objected to ICSID's jurisdiction on the basis of a forum selection clause contained in a Transfer Agreement which provided for the submission of disputes to the Argentine courts. The *Enron* Tribunal found the issue so clearly settled by previous tribunals that there was no need to dwell on it at length.[116]

These authorities indicate that a forum selection clause contained in a contract **92** between the investor and the host State does not affect the competence of an ICSID tribunal based on a treaty. Domestic and international proceedings result from different causes of action even though they may arise from the same set of facts: while domestic proceedings based on dispute settlement clauses in contracts are designed to deal with contract claims, ICSID proceedings based on treaties concern claims arising from alleged violations of those treaties.

The Decision on Jurisdiction in *SGS* v. *Philippines*[117] represents an apparent **93** departure from earlier practice as described above. The Tribunal first confirmed that it had jurisdiction over the claim but then refused to proceed to the merits and stayed the proceedings relying on a forum selection clause in a contract.[118]

In *SGS* v. *Philippines*, the dispute arose from contracts for pre-shipment inspec- **94** tions carried out by the investor on behalf of the government. The claim was for monies unpaid under the contracts. Most of the amount claimed was conceded by the Respondent to be payable but a smaller portion of the amount was disputed. The ICSID proceedings were instituted on the basis of Article VIII of the BIT between the Philippines and Switzerland. That provision foresaw ICSID jurisdiction generally for "disputes with respect to investments". The Tribunal found that this covered not only disputes about an alleged violation of the BIT but also disputes arising from an investment contract.[119] The Tribunal also found that it had jurisdiction over claims based on the contract on the basis of the so-called umbrella clause in Article X(2) of the BIT. That clause puts commitments or obligations arising under contracts entered into by the host State under the protection of the BIT.[120]

The contract underlying the dispute contained the following clause selecting a **95** domestic forum:

> All actions concerning disputes in connection with the obligations of either party to this agreement shall be filed in the Regional Trial Courts of Makati or Manila.

---

115  *Ibid.*, para. 79.
116  *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 91.
117  *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004.
118  Unlike the decision in *Vivendi*, in *SGS* v. *Philippines* the Tribunal rendered a Decision on Jurisdiction which is not subject to annulment.
119  *Ibid.*, paras. 130–135.                    120  *Ibid.*, paras. 113–128.

**96**    The *SGS* v. *Philippines* Tribunal described the contractual forum selection clause as exclusive[121] and found that its effect was not overridden by the BIT or by the ICSID Convention.[122] The Tribunal's reasons for this conclusion were twofold. First, the BIT provision on which ICSID jurisdiction was founded was a general one and as such could not be presumed to override a specific provision in a particular contract (*generalia specialibus non derogant*).[123] The Tribunal did not address the point that the BIT's clause on investor-State arbitration is only a standing offer that requires the investor's acceptance to become an arbitration agreement.[124] The ICSID arbitration agreement, as perfected through the institution of proceedings (see Art. 25, paras. 416–426, 447–455), applies to the particular dispute only. The contractual clause refers to any dispute arising from the contract and is hence more general.

**97**    Second, the Tribunal also rejected Art. 26 of the ICSID Convention as a basis for giving effect to the ICSID consent agreement. For the Tribunal, Art. 26 is only a rule of interpretation and not a mandatory rule[125] and the phrase ". . . unless otherwise stated . . ." indicates that the rule of exclusivity of ICSID proceedings will not apply if there is a contrary agreement such as a non-ICSID forum selection.[126] Article 26 does not override other dispute settlement procedures provided in a BIT.[127]

**98**    The Tribunal made the following general statement about the possibility of a waiver of a treaty-based jurisdiction by way of a contract:

> It is, to say the least, doubtful that a private party can by contract waive rights or dispense with the performance of obligations imposed on the States parties to those treaties under international law. Although under modern international law, treaties may confer rights, substantive and procedural, on individuals, they will normally do so in order to achieve some public interest. Thus the question is not whether the Tribunal has jurisdiction: unless otherwise expressly provided, treaty jurisdiction is not abrogated by contract.[128]

Nevertheless, the Tribunal found that as a matter of admissibility (see Art. 25, para. 18) a party should not be allowed to rely on a contract where the contract itself refers the claim exclusively to another forum. For the Tribunal, the principle that a party to a contract cannot claim on that contract without itself complying with it was a matter of admissibility rather than jurisdiction.[129] Therefore, the Tribunal stayed the proceedings pending a decision on the amount due either by agreement or by decision of the Philippine court as agreed in the contract.[130]

---

121  *Ibid*., para. 137.                          122  *Ibid*., paras. 139–148.
123  *Ibid*., para. 141.
124  The Tribunal described this process at para. 31.
125  *Ibid*., para. 146.
126  *Ibid*., para. 147. The Tribunal quotes the First Edition of this Commentary.
127  *Ibid*., para. 148. In his dissent appended to the Decision, Arbitrator *Antonio Crivellaro* pointed out that, when several dispute settlement clauses coexist, they are not necessarily mutually exclusive and a claimant has the right to select amongst the alternative fora (paras. 3–6).
128  *Ibid.*, para. 154. Footnotes omitted. For a detailed examination of the issue of waiver of jurisdiction see: *Hoffmann, A. K.*, The Investor's Right to Waive Access to Protection under a Bilateral Investment Treaty, 22 ICSID Review – FILJ 69 (2007).
129  *Loc. cit.*                                   130  *Ibid.*, paras. 155, 170–173, 177.

In a decision, made almost three years after the Tribunal's original decision, the **99** Tribunal found that the open issues of quantum had been sufficiently clarified to warrant a resumption of the ICSID proceedings.[131]

Investment tribunals have since generally followed the distinction between con- **100** tract claims, which are subject to contractual forum selection clauses, and treaty claims, which are unaffected by such clauses. Under this consistent practice, the treaty-based jurisdiction of international arbitral tribunals to decide on violations of treaties is not affected by domestic forum selection clauses contained in contracts and the contractual selection of domestic courts appears to be restricted to violations of the respective contracts.[132]

For instance, in *AES* v. *Argentina*,[133] the jurisdiction of the international tribunal **101** was based on an offer of consent, accepted by the investor, in the BIT between Argentina and the United States. Argentina objected to ICSID's jurisdiction on the basis of forum selection clauses contained in concession contracts. The Tribunal rejected Argentina's argument. It said:

> . . . the Entities concerned have consented to a forum selection clause electing Administrative Argentine law and exclusive jurisdiction of Argentine administrative tribunals in the concession contracts and related documents. But this exclusivity only plays within the Argentinean legal order, for matters in relation with the execution of these concession contracts. They do not preclude AES from exercising its rights as resulting, within the international legal order from two international treaties, namely the US-Argentina BIT and the ICSID Convention.
>
> 94. In other terms, the present Tribunal has jurisdiction over any alleged breach by Argentina of its obligations under the US-Argentina BIT.[134]

In two cases involving the Government of Pakistan the Respondent raised the **102** question of the relationship between treaty claims and contract claims. In *Impregilo* v. *Pakistan*,[135] the Claimant relied on the Italy-Pakistan BIT to establish ICSID's jurisdiction. Pakistan objected on the basis of dispute settlement provisions in contracts between the Claimant and WAPDA, the Pakistan Water and Power Development Authority. According to Impregilo, Pakistan was in breach of its

---

131  *SGS* v. *Philippines*, Order of the Tribunal on Further Proceedings, 17 December 2007.

132  *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, paras. 50–70; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, paras. 58–62; *Enron* v. *Argentina*, Decision on Jurisdiction (Ancillary Claim), 2 August 2004, paras. 23–24, 47–51; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, paras. 174–183; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, paras. 92–96; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 219, 258, 286–289; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 90–99; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 105–119; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 116–128; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 94–123; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 41–45; *National Grid* v. *Argentina* (UNCITRAL), Decision on Jurisdiction, 20 June 2006, paras. 167–170; *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 43, 212–217; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 388–391; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 7.3.1–7.3.11.

133  *AES Corp.* v. *Argentina*, Decision on Jurisdiction, 26 April 2005.

134  *Ibid.*, paras. 93, 94.

135  *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005.

obligations under the contracts and had violated its obligations under the BIT between Italy and Pakistan.

**103**    Pakistan argued that the two sets of claims advanced by Impregilo were so inextricably linked that the treaty claims could not be separated from the contract claims, thus falling outside the scope of the Tribunal's jurisdiction. The Tribunal disagreed with Pakistan's analysis of the inter-relationship between treaty and contract claims and noted, in particular:

> The fact that Article 9 of the BIT does not endow the Tribunal with jurisdiction to consider Impregilo's Contract Claims does not imply that the Tribunal has no jurisdiction to consider Treaty Claims against Pakistan which at the same time could constitute breaches of the Contracts.[136]

Furthermore:

> [C]ontrary to Pakistan's approach in this case, the fact that a breach may give rise to a contract claim does not mean that it cannot also – and separately – give rise to a treaty claim.[137]

**104**    Similar objections to the Tribunal's jurisdiction were raised by Pakistan in a subsequent case, *Bayindir* v. *Pakistan*.[138] The dispute arose as a result of the termination of a contract between the Turkish company Bayindir and Pakistan's National Highway Authority ("NHA") for the construction of a motorway and the subsequent expulsion of Bayindir. The ICSID Tribunal's jurisdiction was based on the BIT between Turkey and Pakistan. The contract foresaw a complex dispute settlement procedure culminating in domestic arbitration.[139]

**105**    Pakistan objected to the ICSID Tribunal's jurisdiction arguing, *inter alia*, that Bayindir's treaty claims were in reality contract claims because their elements were contractual and because the amount of the treaty claims corresponded to the amount of the contract claims.[140] Accordingly, Pakistan contended that Bayindir's claims fell outside the purview of the ICSID Tribunal's jurisdiction.[141] Bayindir, for its part, relied on the *Impregilo* Decision and contended that Pakistan had terminated the relevant contract for reasons of convenience which had nothing to do with Bayindir's performance, thus violating its commitments under the Treaty between Turkey and Pakistan.[142] Bayindir withdrew its contract claims at the hearing on jurisdiction and therefore pursued only treaty claims in the ICSID arbitration.

**106**    The Tribunal considered that the principle that treaty violations are legally distinct from contractual breaches, even when they arise from the same factual context, was well established.[143] The Tribunal observed:

---

136  *Ibid.*, para. 219.                        137  *Ibid.*, para. 258.
138  *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005.
139  *Ibid.*, paras. 20, 36, 37.                 140  *Ibid.*, paras. 152–153.
141  *Ibid.*, para. 139.                         142  *Ibid.*, paras. 143–145.
143  *Ibid.*, para. 148.

. . . the Tribunal considers that when the investor has a right under both the contract and the treaty, it has a self-standing right to pursue the remedy accorded by the treaty. The very fact that the amount claimed under the treaty is the same as the amount that could be claimed (or was claimed) under the contract does not affect such self-standing right.[144]

The distinction between contract claims and treaty claims has appeared in many investment arbitrations.[145] The respondents' objection that the case only involves contract claims and the claimants' insistence that treaty rights are involved have become routine features in these cases. The separation of contract claims and treaty claims is intellectually attractive but leads to a number of practical problems. A clear-cut separation of treaty claims and contract claims is often difficult and hinges on the facts of each case. As pointed out by several tribunals, a particular course of action by the host State may well constitute a breach of contract and a violation of international law. On the other hand, a mere breach of contract may, but need not, amount to a treaty violation. The two categories are not mutually exclusive, but, rather, two different standards have to be applied to determine whether one or the other or both have been violated.[146]     **107**

The situation is made even more complex by the fact that some treaties offer jurisdiction for *any* investment dispute, a terminology which may be interpreted to include contract claims while others restrict jurisdiction to alleged violations of the treaty (see Art. 25, paras. 533–536). Therefore, it is incorrect to assume that the jurisdiction of treaty-based tribunals is necessarily restricted to violations of the treaty's substantive provisions. The jurisdiction of a tribunal is not determined by its establishment through a treaty but by the wording of the clause offering consent to jurisdiction. In addition, umbrella clauses may operate to convert contract breaches into treaty breaches, although this point is not undisputed.[147]     **108**

The separate treatment of contract claims and treaty claims may lead to the undesirable phenomenon of claim splitting and parallel proceedings.[148] The claimant may be compelled to pursue part of its claim through national procedures and another part through international procedures. National as well as international proceedings arising from the same dispute are not only uneconomical. They also     **109**

---

144   *Ibid.*, para. 167.

145   See *e.g.*, *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 63–65; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 79–82; *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 84; *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 32, 47(1), 50; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 139–142; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 257, 260–266, 289, 317, 345; *TSA* v. *Argentina*, Award, 19 December 2008, paras. 56–66.

146   See also *Schwebel, S. M.*, On Whether the Breach by a State of a Contract with an Alien is a Breach of International Law, *in*: International Law at the Time of its Codification, Essays in Honour of Roberto Ago, III, 401 (1987).

147   For a brief survey see *Dolzer, R./Schreuer, C.*, Principles of International Investment Law 153–162 (2008).

148   See generally: *Yannaca-Small, C.*, Parallel Proceedings, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1008 (2008).

require coordination and measures to avoid double-dipping. Even worse is the prospect of conflicting decisions in national and international proceedings.

### C. ". . . shall, . . . be deemed consent to such arbitration to the exclusion of any other remedy."

**110**      Art. 26 creates a presumption that the parties intended to resort to ICSID arbitration to the exclusion of all other means of dispute settlement. This is expressed in the Report of the Executive Directors to the Convention:

> 32. It may be presumed that when a State and an investor agree to have recourse to arbitration, and do not reserve the right to have recourse to other remedies or require the prior exhaustion of other remedies, the intention of the parties is to have recourse to arbitration to the exclusion of any other remedy. This rule of interpretation is embodied in the first sentence of Article 26. . . .

Once it has been established that there is a valid consent to ICSID arbitration, any other forum of a Contracting State in which an attempt is made to pursue the claim must decline to deal with it.

**111**      The drafting history of Art. 26 centred almost exclusively around the relationship of ICSID arbitration to domestic courts, especially the requirement to exhaust local remedies in a host State before the initiation of ICSID arbitration by the foreign investor (see paras. 189, 190 *infra*). A possible competition of ICSID arbitration with other international judicial proceedings was barely discussed (see para. 114 *infra*). Intervention of domestic courts in ICSID proceedings, such as orders to compel or to stay arbitration or court-ordered provisional measures, do not seem to have been considered by the drafters.

**112**      Art. 1121 of the NAFTA provides, in relevant part, that investors may submit a claim to arbitration only if they

> . . . waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach . . . [149]

**113**      The waivers may be regarded as redundant as far as arbitration under the ICSID Convention is concerned since they merely restate the exclusive remedy rule of Art. 26. But Art. 1120 of the NAFTA provides not only for ICSID Convention arbitration but also for arbitration under the Additional Facility and under the UNCITRAL Rules (see para. 22 *supra*). The waivers are important primarily in relation to these two systems. Art. 1121 of the NAFTA has been applied in several Additional Facility and UNCITRAL arbitrations.[150]

---

149   32 ILM 605, 643 (1993).
150   *Waste Management* v. *Mexico I* (AF), Award, 2 June 2000, para. 18; *Waste Management* v. *Mexico II* (AF), Decision on Jurisdiction, 26 June 2002; *Loewen* v. *United States* (AF), Award, 26 June 2003, paras. 158–164 at 164; *Thunderbird* v. *Mexico* (UNCITRAL), Award, 26 January 2006, paras. 111–118.

### 1. Non-ICSID Arbitration

One of the functions of Art. 26 is to create a rule of priority vis-à-vis other **114** systems of adjudication in order to avoid contradictory decisions and to preserve the principle of *ne bis in idem* (History, Vol. II, p. 114, para. 34, pp. 274, 758). Therefore, a non-ICSID tribunal should decline jurisdiction in the face of a valid submission to ICSID arbitration unless a contrary intention of the parties can be established (see also Art. 27, paras. 18–22). Nevertheless, a respondent before a non-ICSID tribunal is well advised to make a timely appearance and to point out ICSID's exclusive jurisdiction. Failure to protest the pursuit of remedies before a non-ICSID tribunal in a timely fashion can lead to considerable complications and delays and may affect a decision on legal expenses.

In *MINE* v. *Guinea* (see also paras. 9–14 *supra*, 149–153, 167–168 *infra*), MINE **115** pursued its claim before the American Arbitration Association (AAA) which rendered an award in its favour. Subsequently, this award turned out to be invalid in view of ICSID's exclusive jurisdiction. However, Guinea's failure to appear in the AAA proceedings as well as before American courts in the proceedings to compel arbitration ultimately worked to its disadvantage. Before the ICSID Tribunal, which subsequently decided the case, Guinea brought a counterclaim for legal fees and expenses related to the AAA arbitration. The Tribunal denied this particular counterclaim in view of Guinea's failure to respond or to voice a timely objection.[151]

In a number of cases ICSID tribunals were confronted with concurrent non- **116** ICSID arbitration proceedings. In some of these cases the competing proceedings were based on contractual provisions while ICSID's jurisdiction was based on a BIT. In *SGS* v. *Pakistan* (see paras. 87–88 *supra*), the Respondent had initiated an arbitration in Pakistan under the disputed agreement, the PSI Agreement, before ICSID proceedings were instituted by the Claimant.[152] After initiating the ICSID arbitration, SGS objected to the arbitration proceedings in Pakistan before the courts of Pakistan but ultimately the Supreme Court of Pakistan granted the Respondent's request to proceed with the arbitration.[153] Before the ICSID Tribunal, Pakistan argued that SGS's claim was essentially a claim for breach of contract and as such should be submitted to the exclusive jurisdiction of the arbitrator in Pakistan.[154] SGS submitted as follows in relevant part: (a) that the Tribunal's jurisdiction extended to SGS's claims as formulated by SGS; (b) that the forum selection clause in the PSI Agreement did not diminish the ICSID Tribunal's jurisdiction; (c) that in the event of *prima facie* overlapping arbitration provisions, the Tribunal's jurisdiction should prevail; (d) that the *lis pendens* principle did not bar the ICSID Tribunal from hearing SGS's claims; and (e) that

---

151  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76/7.
152  *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 26–29.
153  *Ibid.*, paras. 35–42.                    154  *Ibid.*, paras. 43–74.

SGS did not waive its right to pursue ICSID arbitration, nor was it estopped from presenting its claims to the Tribunal.[155]

**117**    The Tribunal referred to previous decisions recognizing that contractual claims and treaty claims could co-exist and upheld its jurisdiction with respect to alleged violations of the treaty, since that jurisdiction would not be shared by the PSI Agreement arbitrator.[156] As to the claims arising from alleged breaches of contract, the Tribunal held that it was not competent to decide contractual claims unless they also constituted or amounted to treaty violations.[157]

**118**    In *Lucchetti* v. *Peru*, the Respondent filed a request for suspension of the ICSID arbitration, in view of the fact that the request for arbitration was the subject of a concurrent State-to-State dispute between Peru and Chile.[158] After exchanges of submissions by the parties on the subject, the Tribunal found that "the conditions for a suspension of the proceedings were not met".[159]

**119**    In *Bayindir* v. *Pakistan* (see paras. 104–106 *supra*), the Respondent asked for a stay of the ICSID proceedings pending a decision on the contractual issues in the arbitral proceedings initiated in Pakistan in conformity with the contract.[160] Pakistan contended that the contractual arbitral tribunal was already seized of the dispute between the National Highway Authority ("NHA") and Bayindir and was obliged to proceed to the merits. Pakistan maintained that there were compelling reasons of principle and orderly administration of justice to stay the ICSID proceedings pending resolution of the local contractual arbitration.[161]

**120**    The *Bayindir* Tribunal disagreed with Pakistan and found that there were no compelling reasons to stay its proceedings. It stated:

> 270. In the Tribunal's view its jurisdiction under the BIT allows it – if this should prove necessary – to resolve any underlying contract issue as a preliminary question. Exactly like the arbitral tribunal sitting in Pakistan, this Tribunal should proceed with the merits of the case. This is an inevitable consequence of the principle of the distinct nature of treaty and contract claims. The Tribunal is aware that this system implies an intrinsic risk of contradictory decisions or double recovery. . . .
>
> 271. In any event, accepting that it has discretion to order the stay of the present proceedings as requested by Pakistan, that discretion is to be exercised only if there are truly compelling reasons. In the present case, the Tribunal cannot see any compelling reason to stay the current arbitration.[162]

**121**    A different issue arose in *Saipem* v. *Bangladesh*, where the Claimant alleged that Bangladesh violated the terms of the Italy-Bangladesh BIT by unlawfully interfering with an ICC arbitration and precluding enforcement of the ICC award.[163] The ICC arbitration had been initiated by Saipem under the contractual dispute resolution mechanism against the Bangladeshi State entity Petrobangla. The

---

155  *Ibid.*, para. 88.                          156  *Ibid.*, para. 155.
157  *Ibid.*, paras. 156–162. See also paras. 178–181, 185–189.
158  *Lucchetti* v. *Peru*, Award, 7 February 2005, para. 7.
159  *Ibid.*, para. 9.
160  *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 264–273.
161  *Ibid.*, para. 269.                          162  *Ibid.*, paras. 270–271.
163  *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 18–36.

Tribunal noted that Bangladesh had stated in its oral arguments on jurisdiction that Art. 26 of the Convention does not allow an ICSID tribunal to accept the findings of another tribunal for their own decisions. The Tribunal emphasized that the Tribunal was not requested to "accept and use" the ICC tribunal's findings, but, rather, its mission was "to review whether the ICC Award was frustrated contrary to the protection provided in the BIT".[164]

In *Fraport* v. *Philippines*, the Respondent made allegations of fraud and corruption on the part of shareholders, including the Claimant, of the investment vehicle PIATCO, as well as of various public officials of the Philippines. The Philippines contended that evidence of such corruption could be found in documents and submissions filed in a pending ICC arbitration initiated by PIATCO against the Philippines.[165] The Claimant subsequently filed a formal request for production of documents by the Respondent including the submissions and documents filed in the ICC arbitration.[166] **122**

The Tribunal accepted the Claimant's argument that the underlying issues overlapped in both arbitrations. Consequently, the Respondent was directed to produce all submissions and documents filed in the ICC arbitration on "an on-going basis". The Tribunal's Procedural Order read as follows, in relevant part: **123**

> While the present ICSID arbitration and the ICC arbitration are not, strictly speaking, parallel arbitrations, the Tribunal accepts Claimant's representations that the underlying issues in both arbitration [*sic*] are, in substantial part, overlapping.
>   In the circumstances, there exists a real possibility that the two arbitral tribunals, presented with and asked to consider similar facts, could render conflicting or inconsistent decisions regarding those facts. This is not a desirable outcome.[167]

## 2. Consolidation and Identical Tribunals

Consolidation is the joinder of separate proceedings on the basis of common questions of law or fact in the underlying disputes. It may be ordered either by a court, an arbitral tribunal or by the arbitral institution chosen by the parties. Consolidation is designed to promote procedural efficiency and consistency of decisions and to relieve the hardship to the respondent in having to defend separately against multiple claimants.[168] Exceptionally, claims arising from the same **124**

---

164  *Ibid.*, para. 115.
165  *Fraport* v. *Philippines*, Award, 16 August 2007, para. 5.
166  *Ibid.*, para. 18.
167  *Ibid.*, para. 19, citing the Tribunal's Procedural Order of 18 October 2004.
168  Generally see *Yannaca-Small, C.*, Parallel Proceedings, *in*: The Oxford Handbook of International Investment Law (Muchlinski, P./Ortino, F./Schreuer, C. eds.) 1008 (2008); *Kaufmann-Kohler, G./Boisson de Chazournes, L./Bonnin, V./Mbengue, M. M.*, Consolidation of Proceedings in Investment Arbitration: How Can Multiple Proceedings Arising from the Same or Related Situations Be Handled Efficiently?, Colloquium, Geneva, April 22, 2006, *in*: 21 ICSID Review – FILJ 59–149 (2006); *Ben Hamida, W.*, La consolidation des procédures arbitrales, Les Cahiers de l'Arbitrage, N° 2006/3, 30–35; *Crivellaro, A.*, Consolidation of Arbitral and Court Proceedings in Investment Disputes, 4 The Law and Practice of International Courts and Tribunals 371 (2005); *Platte, M.*, When Should an Arbitrator Join Cases?, 18 Arbitration International 67 (2002).

overall transaction between the same parties but subject to several jurisdictional instruments may call for consolidation.[169]

**125**    Procedures for the consolidation of related proceedings are provided *inter alia* by Article 1126 of the NAFTA,[170] Article 33 of the United States Model BIT,[171] Article 32 of the 2004 Canadian Model Foreign Investment Protection Agreement (FIPA)[172] and a number of international investment and free trade agreements.[173] Under these provisions, consolidation may be requested if two or more claims have been submitted separately that have a question of law or fact in common. In that case, a tribunal may be established to decide on the consolidation request.

**126**    Consolidation offers obvious advantages for respondents[174] since it avoids the proliferation of parallel proceedings, which are likely to result in increased costs and may lead to conflicting results.[175] Not surprisingly, the consolidation proceedings conducted under the NAFTA are usually initiated by the respondent State and opposed by the claimants.[176] Misgivings of the claimants against consolidation in these cases concerned the protection of confidential information from competitors in consolidated proceedings, full participation of claimants in the composition of the consolidated tribunal and the opportunity of individual claimants to present their case fully.[177]

---

169   *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 186–207.

170   Article 1126(2) of NAFTA provides: "Where a Tribunal established under this Article is satisfied that claims have been submitted to arbitration under Article 1120 that have a question of law or fact in common, the Tribunal may, in the interests of fair and efficient resolution of the claims, and after hearing the disputing parties, by order: (a) assume jurisdiction over, and hear and determine together, all or part of the claims; or (b) assume jurisdiction over, and hear and determine one or more of the claims, the determination of which it believes would assist in the resolution of the others."

171   Article 33(1) of the US Model BIT of 2004 provides: "Where two or more claims have been submitted separately to arbitration under Article 24(1) and the claims have a question of law or fact in common and arise out of the same events or circumstances, any disputing party may seek a consolidation order in accordance with the agreement of all the disputing parties sought to be covered by the order or the terms of paragraphs 2 through 10."

172   For the Model Canadian FIPA, see http://www.sice.oas.org/Investment/NatLeg/Can/2004-FIPA-model-en.pdf.

173   See Investor-State Dispute Settlement and Impact on Investment Rulemaking, UNCTAD's Series on International Investment Policies for Development, 2007, pp. 83–84. UNCTAD/ITE/IIA/2007/3.

174   But see *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 186–207. In this case the Respondent State unsuccessfully opposed the pursuit of related claims in one set of proceedings.

175   A classical example of conflicting arbitral awards rendered on the same dispute is provided by the *Lauder* and *CME* UNCITRAL arbitrations, where the Czech Republic opposed consolidation. *Lauder* v. *Czech Republic*, Award, 3 September 2001; *CME* v. *Czech Republic*, Partial Award, 13 September 2001, and Final Award, 14 March 2003.

176   See *Corn Products* v. *Mexico* (AF), *Archer Daniels Midland* v. *Mexico* (AF), Order of the Consolidation Tribunal, 20 May 2005; *Canfor* v. *United States*, *Tembec et al.* v. *United States*, *Terminal Forest Products* v. *United States* (UNCITRAL), Order of the Consolidation Tribunal, 7 September 2005.

177   In *Corn Products* v. *Mexico* (AF), the Claimants were direct competitors and argued that accepting Mexico's request for consolidation would not have been efficient or fair because the Claimants could not exchange details regarding their respective business. The Consolidation Tribunal agreed and concluded that the Claimants were unable to cooperate in a single claim.

In *Pan American* v. *Argentina*, on 23 May 2003, Pan American Energy LLC and BP Argentina Exploration Company (the "First Claimants") filed a Request for Arbitration against Argentina. The Request was registered on 6 June 2003. On 17 December 2003, BP America Production Company, Pan American Sur SRL, Pan American Fueguina SRL and Pan American Continental SRL (the "Second Claimants") also submitted a Request for Arbitration against Argentina. This Request was registered on 27 February 2004. The Respondent and the First and the Second Claimants agreed that the Tribunal should consist of the same members and that the cases should be consolidated. The parties agreed that the two cases would be considered to form one set of proceedings and that the Tribunal would issue a single decision on jurisdiction for both proceedings.[178]    **127**

Another method that can be used to improve efficiency and to avoid inconsistency is the creation of identical tribunals for separate but related claims. This method has been employed in some ICSID cases that were closely related but had been filed separately.[179] For instance, in *Salini* v. *Morocco* and in *RFCC* v. *Morocco*, where the factual background was almost identical and the same BIT applied, the parties were invited by the ICSID Secretariat to appoint the same arbitrators, who then appointed the same Chairman. As a result, although the two arbitral proceedings remained distinct, the identically composed tribunals issued similar decisions on jurisdiction.[180]    **128**

The same approach has been used to coordinate some of the ICSID arbitrations brought against Argentina. In *Sempra* v. *Argentina* and *Camuzzi* v. *Argentina*, although the cases were based on different BITs, the Claimants were both shareholders in two gas distribution companies that served certain Argentine provinces. The parties agreed to set up identical tribunals to hear the two requests for arbitration. Sempra and Camuzzi appointed one arbitrator jointly and the Secretary-General of ICSID appointed the Chairman of the Tribunal.[181]    **129**

Similarly, identical arbitral tribunals were constituted in *Suez and AWG* v. *Argentina.* In this case, the Claimants invoked Argentina's consent under the Argentina-France BIT, the Argentina-Spain BIT and the Argentina-UK BIT. The first two BITs offered ICSID arbitration but under the third BIT only UNCITRAL arbitration was available. The parties agreed that the same tribunal would hear the ICSID case and the UNCITRAL arbitration.[182] The Tribunal said:    **130**

---

178    *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 1–4, 7.
179    See also the early cases *Alcoa Minerals* v. *Jamaica*, *Kaiser Bauxite* v. *Jamaica* and *Reynolds* v. *Jamaica* and the note at 1 ICSID Reports 296.
180    *RFCC* v. *Morocco*, Decision on Jurisdiction, 16 July 2001; *Salini* v. *Morocco*, Decision on Jurisdiction, 23 July 2001. See *Crivellaro, A.*, Consolidation of Arbitral and Court Proceedings in Investment Disputes, 4 The Law and Practice of International Courts and Tribunals 371 (2005). See also *Parra, A.*, Desirability and Feasibility of Consolidation: Introductory Remarks, Colloquium on Consolidation of Proceedings in Investment Arbitration, Geneva, April 22, 2006, *in*: 21 ICSID Review – FILJ 59–149 at 133 (2006).
181    *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 4–6; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 5–7, 11, 14, 15, 19.
182    *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 1–7.

> Since the parties pleaded ICSID Case No. ARB/03/19 jointly with the UNCITRAL case of AWG v. Argentina and filed joint memorials relating thereto and since the facts and the legal questions in both cases are virtually identical, the Tribunal has determined that it is appropriate to issue a single Decision on Jurisdiction covering both cases.[183]

**131**    The practice of appointing the same tribunal to decide cases that present close connections such as the examples provided above is not always the most cost-effective and expedient method. Moreover, this method has caused concerns with respect to due process when a tribunal relies on information acquired in one arbitration to resolve another.[184] In any event, these cases remain exceptional since – in the absence of an express provision in the relevant treaty – consolidation requires the consent of the parties and this cannot always be easily achieved.

### 3. Domestic Proceedings

**132**    It is beyond doubt that the exclusive remedy rule of Art. 26 also operates against domestic courts. Therefore, turning to domestic proceedings instead of ICSID would clearly be impermissible unless this has been "otherwise stated" between the parties. *Delaume* has succinctly expressed the duties of a court in this situation:

> . . . If a court in a Contracting State becomes aware of the fact that a claim before it may call for adjudication under ICSID, the court should refer the parties to ICSID to seek a ruling on the subject. Until such a ruling is made, if the possibility exists that the claim may fall within the jurisdiction of ICSID, the court must stay the proceedings pending proper determination of the issue by ICSID. Only in the event of an adverse decision by ICSID, which, for example, may result from the Secretary-General's refusal to register a request for arbitration or from a decision of an ICSID arbitral tribunal that the issue involved does not fall within its competence, may the court in question resume hearing the case, assuming, of course, that it has an independent basis for entertaining jurisdiction over the parties and the subject matter of the dispute.[185]

Nevertheless, problems of competing jurisdiction have arisen. At times, court proceedings may simply appear more promising to a party than ICSID arbitration. ICSID tribunals have firmly asserted their own jurisdiction when attempts were made to claim competence for domestic courts in proceedings on the merits. In a number of cases ICSID tribunals issued provisional measures enjoining parties from pursuing related claims in domestic courts[186] (see Art. 47, paras. 99–133).

---

183  *Ibid.*, para. 19.
184  *Kaufmann-Kohler et al.*, Geneva Colloquium, 21 ICSID Review – FILJ 75 (2006).
185  *Delaume, G. R.*, ICSID Arbitration in Practice, 2 International Tax and Business Lawyer 58 at 68 (1984) (footnote omitted); see also *Delaume, G. R.*, Foreign Sovereign Immunity: Impact on Arbitration, 38 The Arbitration Journal 34 at 38 (1983); *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 AJIL 784 at 785 (1983).
186  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 69; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 9; *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 388; *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 45; *Tokios Tokelès* v. *Ukraine*, Procedural Order No. 1, 1 July 2003.

In *Benvenuti & Bonfant* v. *Congo*, the Government advanced the argument of *lis pendens* before the ICSID Tribunal, in view of proceedings that were pending between the Government and Mr. Bonfant before the Revolutionary Tribunal of Brazzaville. The Tribunal declared that there could only be a case of *lis pendens* where there was identity of the parties, object and cause of action in both proceedings. These conditions were not satisfied, since the case before the ICSID Tribunal was between B&B and the Government and not between Mr. Bonfant and the Government.[187]

**133**

In *LETCO* v. *Liberia*, domestic proceedings were used in an attempt to evade ICSID arbitration. The respondent Government not only failed to participate in the proceedings before ICSID, but after their initiation also instituted proceedings in its own courts against the Claimant in respect of the same dispute. The Tribunal left no doubt as to the impropriety of this course of action. In awarding costs incurred for carrying out the arbitration, it took account of Liberia's lack of cooperation.[188]

**134**

In *Holiday Inns* v. *Morocco*, the Tribunal rejected reliance on dispute settlement clauses referring certain aspects of the overall relationship to domestic courts by relying on the general unity of the investment operation (see paras. 49–51 *supra*).

**135**

In *Amco* v. *Indonesia*, proceedings were pending before the domestic courts of Indonesia when ICSID arbitration was instituted by Amco claiming damages for the seizure of their investment and cancellation of their investment licence by Indonesia. The domestic proceedings had been initiated by P.T. Wisma, a company indirectly controlled by the Indonesian government. In the ICSID proceedings, Indonesia argued that the Claimants had waived any right to have their claim heard by an ICSID tribunal since they had co-operated in the domestic proceedings and had not requested a stay of those proceedings so that the matter could be brought before ICSID for arbitration.

**136**

The Tribunal in its Decision on Jurisdiction rejected this contention for two reasons. It pointed out that the parties to the two lawsuits were not identical. In addition, the issue in the domestic proceedings was simply a lease dispute which was not the object of the international arbitration.[189]

**137**

In its decision on the merits, the Tribunal returned to the Indonesian court proceedings in some detail.[190] It found that they did not constitute a denial of justice and therefore did not commit the State's international responsibility.[191] But the domestic decisions were not binding on the Tribunal. The Tribunal said:

**138**

> In any case, an international tribunal is not bound to follow the result of a national court. One of the reasons for instituting an international arbitration procedure is precisely that parties – rightly or wrongly – feel often more confident with a legal institution which is not entirely related to one of the parties. If a national

---

187  This decision of 19 January 1979 is unpublished. It is summarized in *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.12–1.14.

188  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 356, 378.

189  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, paras. 50–52.

190  *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 131–141.

191  At para. 150.

> judgment was binding on an international tribunal such a procedure could be rendered meaningless.
>
> Accordingly, no matter how the legal position of a party is described in a national judgment, an international arbitral tribunal enjoys the right to evaluate and examine this position without accepting any *res judicata* effect of a national court. In its evaluation, therefore, the judgments of a national court can be accepted as one of the many factors which have to be considered by the arbitral tribunal.[192]

Therefore, the opinions expressed in the national decisions were in no way binding in the international procedure.[193]

**139**    After the annulment of the Award, when the second ICSID Tribunal rendered its Award in the Resubmitted Case, it found that a confirmation of the lower court decisions by the Indonesian Supreme Court after the first ICSID award could not be accepted as *novus actus interveniens*.[194]

**140**    It follows that failure of a party to protest the institution of domestic proceedings and to insist on the exclusive nature of ICSID arbitration may be interpreted as a waiver of the exclusive remedies principle contained in Art. 26. However, this does not in any way amount to a renunciation of ICSID jurisdiction. Even less does it mean that an ICSID tribunal would be bound by a finding of a domestic court in matters falling within the former's jurisdiction. This does not preclude an ICSID tribunal from relying on decisions of domestic courts, especially where the applicable law, in accordance with Art. 42, is the law of the domestic court's forum State.

**141**    In *CSOB* v. *Slovakia*, a Slovak "Collection Company" defaulted on payments that were due to the Claimants. These payments were secured by a guarantee of the Slovak Ministry of Finance to cover any losses of the Collection Company (see Art. 25, para. 100). Parallel to the proceedings before the ICSID Tribunal, there were bankruptcy proceedings against the Slovak Collection Company in Slovak courts. The Tribunal issued provisional measures under Art. 47 recommending that the bankruptcy proceedings be suspended to the extent that they may lead to determinations as to whether the Collection Company had a valid claim against the Slovak Republic to cover its losses and as to whether it had made any losses (see Art. 47, paras. 111–114).[195]

**142**    In *Autopista* v. *Venezuela*, the Claimant argued that the Respondent's resort to the Venezuelan Supreme Court of Justice to obtain a declaration of termination of the relevant agreement represented a breach of the arbitration clause contained in that agreement which provided for ICSID arbitration.[196] The Respondent contended that its action could not represent a breach because the law governing the agreement, Venezuelan law, reserved to the Venezuelan courts any issues relating

---

192  At para. 177.                          193  At para. 263.
194  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 146–153.
195  *CSOB* v. *Slovakia*, Procedural Orders Nos. 4 and 5 of 11 January 1999 and 1 March 2000.
196  *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 200.

to termination of the agreement.[197] The Tribunal referred to the dispute settlement clause contained in the agreement and to its own decision on jurisdiction which demonstrated that its jurisdiction included issues relating to the termination of the contract.[198] The Tribunal further noted that the dispute settlement clause submitted all disputes under the agreement exclusively to ICSID arbitration and held as follows:

> By entering into such an exclusive arbitration agreement, both parties have accepted to refrain from proceeding before a court which is not the one jointly entrusted with the resolution of the dispute. As long as jurisdiction is challenged and not decided upon, an argument may be made that a party has a right to proceed elsewhere. However, that argument cannot be maintained after a decision affirming jurisdiction was issued. In the present case, the proceedings before the Supreme Court were initiated after the Decision on Jurisdiction had been rendered.[199]

The Tribunal added that the fact that the governing law of the agreement **143** appeared to refer matters relating to the termination of the contract to the jurisdiction of the local courts did not change this position. The Tribunal observed in this respect:

> Further, it is a well settled principle of international law that a state cannot rely on a provision of its domestic law to defeat its consent to arbitration (Schreuer, referred to above, Nr. 95, ad Article 42 and ref.). It is further a well accepted practice that the national law governing by virtue of a choice of law agreement (pursuant to Article 42(1) first sentence of the ICSID Convention) is subject to correction by international law in the same manner as the application of the host state law failing an agreement (under the second sentence of the same treaty provision) (Schreuer, referred to above, Nrs. 62–70, ad Article 42 and ref., in particular Nr. 70). As a result, Venezuela's defense based on national law is no bar to Aucoven's claim of a breach of Clause 64.[200]

In *Tanzania Electric* v. *IPTL*, the Respondent filed a petition in the High Court **144** of Tanzania at Dar Es Salaam against the Claimant and three officials of the Government, a few days after the request for arbitration was introduced. When the Claimant sought a stay of the court proceedings, the Respondent filed further submissions arguing that the Claimant had waived its right to pursue ICSID arbitration.[201] The High Court of Tanzania granted IPTL the relief sought, but eventually IPTL agreed not to execute the amount due under the Court's order for a limited period of time.[202] Although the Claimant filed a request for provisional measures partly related to the Tanzanian court proceedings, the parties later requested the Tribunal to defer consideration of this matter, which was thus not addressed in the Tribunal's Decision on provisional measures[203] (see also Art. 47, paras. 115, 116).

---

197  *Ibid.*, para. 201.                        198  *Ibid.*, para. 202.
199  *Ibid.*, para. 205.                        200  *Ibid.*, para. 207.
201  *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 21–23.
202  *Ibid.*, para. 25.                          203  *Ibid.*, paras. 29–31.

**145**    In *Wena Hotels* v. *Egypt*, the domestic proceedings were initiated after the Tribunal had rendered its Award. Therefore, the issue was not a matter of concurrent proceedings but rather of the Award's effect as *res judicata*. The Tribunal found that Egypt's actions had amounted to an expropriation.[204] Wena sought the Award's interpretation claiming that, despite the Award's conclusion that Egypt had expropriated Wena's rights under ease and development agreements, recent legal actions undertaken by Egypt and its constituent entities against Wena raised questions about that finding.[205] Wena argued that legal proceedings initiated by a company owned and controlled by the Egyptian State seeking payment of rent due under the agreements overlooked the Tribunal's finding that Egypt had expropriated Wena's interests. In its Request for Interpretation, Wena requested the Tribunal to indicate whether the expropriation constituted a total and permanent deprivation of Wena's rights, such as to preclude subsequent legal actions by Egypt that presumed the contrary.[206] In its response, Egypt sought to distinguish the BIT dispute – resolved by the Tribunal's Award – from the other disputes concerning the lease which, in its view, were left for another forum.[207]

**146**    The Tribunal observed that the Award did not refer to an expropriation of Wena's rights, but rather stated that Egypt's actions amounted to an expropriation of Wena's *investments*.[208] However, the Tribunal also noted as follows:

> It is true that the Original Tribunal did not explicitly state that such expropriation totally and permanently deprived Wena of its fundamental rights of ownership. However, in assessing the weight of the actions described above, there was no doubt in the Tribunal's mind that the deprivation of Wena's fundamental rights of ownership was so profound that the expropriation was indeed a total and permanent one.[209]

**147**    In the circumstances, the Tribunal found that Egypt was "precluded from legal actions that would presume the contrary of the Tribunal's determinations in the Award".[210]

**148**    In *Fraport* v. *Philippines*, during the ICSID proceedings, the Respondent sought and obtained a writ of possession through the Philippine courts authorizing it to take immediate possession of the airport terminal which was at issue in the arbitration.[211] The Tribunal's Award did not discuss these domestic proceedings since it rejected the claim for lack of jurisdiction.[212]

### 4. Enforcement of Non-ICSID Awards by Domestic Courts

**149**    In *MINE* v. *Guinea*, the Claimant had obtained a non-ICSID award under the auspices of the American Arbitration Association (AAA). An attempt to have the

---

204    *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 131.
205    *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, paras. 6–7.
206    *Ibid*., para. 33.                    207    *Ibid*., paras. 38–41.
208    *Ibid*., para. 112.                   209    *Ibid*., para. 120.
210    *Ibid*., para. 125.
211    *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 22, 228.
212    *Ibid.*, paras. 396–404.

award confirmed in the American courts failed (see paras. 9–11 *supra*). MINE's next step was to initiate ICSID arbitration in May 1984. Despite the proceedings pending before ICSID, MINE started attachment proceedings in May and June 1985 to have the AAA award enforced by courts in Belgium and Switzerland. The Court of First Instance of Antwerp lifted attachments that MINE had obtained on assets belonging to Guinea in Belgium.[213] It noted ICSID's exclusive competence and found that the proceedings to obtain a seizure fell within the definition of "remedy" in Art. 26 and were hence inadmissible. Consequently, there was no need to examine the question of State immunity.[214]

Proceedings before Swiss courts led to a similar result. MINE obtained an **150** attachment order against various Guinean bank accounts on the basis of the 1980 AAA award. The Swiss Federal Tribunal,[215] after dealing with questions of State immunity, at first upheld the attachment order since a *prima facie* debt had been shown, but referred the question of the ICSID Tribunal's exclusive competence under Art. 26 of the Convention to the Court of First Instance.

In the meantime Guinea requested the ICSID Tribunal to direct MINE to dis- **151** solve all pending attachments in accordance with Art. 26. MINE responded by arguing that the actions before domestic courts were not related to the ICSID arbitration but sought enforcement of the AAA award. The ICSID Tribunal issued a provisional measure under Art. 47 (see Art. 47, paras. 106–109) ruling that "MINE's litigation to enforce the AAA award in European courts constituted an 'other remedy' under Art. 26 of the ICSID Convention; . . ." Therefore, it directed that "MINE dissolve every existing attachment and that it seek no new remedy in any national court".[216] MINE thereupon withdrew its appeal in Belgium but continued its attachments in Switzerland contending that Guinea refused to agree to the withdrawal of the security that MINE had filed in order to obtain the attachments.[217]

When the case reached the Court of First Instance of the Canton of Geneva **152** in March 1986,[218] the Court noted the proceedings pending before ICSID and the Tribunal's provisional measures. It found that the AAA award which was the basis for the attachments was not final and that by virtue of Art. 26 of the ICSID Convention the parties did not have the right to seek non-ICSID remedies. Therefore, MINE's application to have the AAA award enforced was rejected.[219]

---

213  *Guinea* v. *MINE*, Belgium, Court of First Instance, Antwerp, 27 September 1985, 4 ICSID Reports 32. It appears that these attachments had been obtained for the purpose of enforcing the AAA award rather than as provisional measures in the ICSID proceedings, although this is not entirely clear from the court's decision.

214  An appeal by MINE against this decision was subsequently abandoned.

215  *Guinea* v. *MINE*, Switzerland, Tribunal fédéral, 4 December 1985, 4 ICSID Reports 39.

216  The Decision on Provisional Measures of 4 December 1985 is unpublished. The above citations are taken from *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 69.

217  At p. 77.

218  *Guinea* v. *MINE*, Tribunal de première instance, Geneva, 13 March 1986, 4 ICSID Reports 41.

219  A subsequent effort by MINE to maintain the attachments not on the basis of the AAA award but as provisional or conservatory measures in connection with the pending ICSID proceedings failed. See para. 168 *infra*.

**153**    In the proceedings on the merits before the ICSID Tribunal, Guinea made counterclaims for legal expenses arising from the AAA arbitration and the subsequent attachments to have the resulting award enforced in Belgium and Switzerland. The counterclaims concerning the AAA arbitration were rejected in view of Guinea's failure to respond or voice a timely objection to MINE's selection of what proved to be an improper forum (see para. 115 *supra*). With regard to the attachment proceedings before the national courts, the Tribunal found that they were contrary to ICSID's exclusive jurisdiction and, therefore, allowed Guinea's counterclaim. However, the particular circumstances, *i.e.* Guinea's lack of response to prior proceedings, the inconclusive decision of the US Court of Appeals (see paras. 10–11 *supra*) and a lack of precedent for the Tribunal's own order to discontinue the attachments, were seen to excuse somewhat MINE's actions to enforce the AAA award. Consequently, the sum awarded under this counterclaim was reduced by about one third.[220]

### 5. Intervention by Domestic Courts to Stay ICSID Arbitration

**154**    ICSID proceedings are even more immediately affected where domestic courts do not deal with the merits of the case but enjoin the parties from instituting or proceeding with ICSID arbitration. In some cases parties have resorted to national courts to oppose ICSID proceedings. This is usually done through measures known as "anti-suit injunctions". The question is central not only to the principle of the exclusive jurisdiction of ICSID tribunals under Art. 26, but also to the power of an arbitral tribunal to be the judge of its own competence under Art. 41(1).[221]

**155**    In *Attorney-General* v. *Mobil Oil NZ Ltd*[222] the Government and the foreign investor had in 1982 entered into an agreement granting Mobil certain favourable "offtake rights". The agreement contained an ICSID arbitration clause. Subsequent legislation purported to affect these favourable rights. Mobil referred the matter to ICSID arbitration. After the case had been properly registered with ICSID in accordance with Art. 36(3), the Government commenced injunction proceedings in the New Zealand courts seeking to restrain Mobil from continuing to refer the dispute to ICSID. Mobil, in turn, applied for a stay of these injunction proceedings, relying on Sec. 8 of the Arbitration (International Investment Disputes) Act 1979 which is designed to give effect to the ICSID Convention in New Zealand.[223] Sec. 8 provides that a court may order a stay of domestic judicial proceedings

220   *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76/7.
221   *Kerameus, K. D.*, Anti-Suit Injunctions in ICSID Arbitration, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 131 (2005); more generally see *Paulsson, J.*, Interference by National Courts, *in*: The Leading Arbitrators' Guide to International Arbitration (*Newman, L. W./Hill, R. D.* eds.) 107 (2004).
222   *Attorney-General* v. *Mobil Oil NZ Ltd*, New Zealand, High Court, Wellington, 1 July 1987, 4 ICSID Reports 117; [1987] 2 NZLR 649; 2 ICSID Review – FILJ 497 (1987). See also *Broches, A.*, A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 5 at 8 *et seq.* (1991).
223   See ICSID/8-F, Contracting States and Measures Taken by them for the Purpose of the Convention. The Act was amended in 2000.

in respect of matters relating to the Convention if it is satisfied that there is no sufficient reason why the matter should not be dealt with under the Convention. The Government claimed that there was no dispute under the 1982 agreement, but only an essentially domestic dispute relating to the "offtake rights" and the subsequent legislation. The New Zealand High Court disagreed with the attempt to separate the allegedly domestic from the international aspects of the case:

> Having regard to the interlocking considerations which obviously must apply in a contract of this magnitude and complexity, to isolate one aspect of the investment which is possibly largely domestic, and advance that as a ground for applying domestic rather than international principles, ignores the overall impact of the contract.[224]

Moreover, the Court found that the question was a matter that amounted to a dispute under the 1982 agreement and that either party was entitled to refer it to ICSID.[225] Therefore, all proceedings were stayed until the Arbitral Tribunal had determined its jurisdiction.[226]                                          **156**

The outcome of this case is undoubtedly in full accord with the requirements of Art. 26. What is disquieting about the Court's reasoning is the fact that it emphasized its discretion on the basis of New Zealand's legislation and that it considered a number of arguments in favour of and against ICSID arbitration,[227] including the fact that the parties had chosen New Zealand law as the applicable law and had agreed on a New Zealand national as the chairman of the Tribunal.[228] A faithful application of Art. 26 would have required an automatic deference to the impending decision of the Arbitral Tribunal on its jurisdiction. Any attempt to block ICSID arbitration through injunctions by domestic courts is at variance with the clear mandate of the Convention and may well be in violation of that State's international obligations under the Convention.[229]                      **157**

In *SGS* v. *Pakistan* (see paras. 87–88, 116–117 *supra*) the dispute arose from a contract (the "PSI Agreement") containing a dispute resolution clause providing for arbitration in Pakistan. Pakistan terminated the PSI Agreement and started arbitration proceedings in conformity with the arbitration clause in the PSI Agreement. SGS filed a request for arbitration with ICSID alleging that Pakistan had expropriated its investment and violated a number of standards under the BIT between Switzerland and Pakistan. SGS also applied to the Pakistani court for      **158**

---

224  *Attorney-General* v. *Mobil Oil NZ Ltd*, New Zealand High Court, Judgment, 1 July 1987, 4 ICSID Reports 135.
225  At p. 133.
226  At p. 139. The Crown subsequently informed the ICSID Tribunal that it no longer wished to challenge its jurisdiction. See *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, para. 2.9.
227  See 4 ICSID Reports 133 *et seq*.       228  At p. 129.
229  *Schwebel, S.*, Anti-Suit Injunctions in International Arbitration – An Overview, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 5 at 12 (2005). See also *Greenwood, C. J.*, Anti-Suit Injunctions in International Arbitration: A Public International Lawyer's Perspective, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 147 at 150 (2005).

an injunction against the PSI arbitration initiated by the Respondent in Pakistan, arguing that ICSID had exclusive jurisdiction over the claim. For its part, Pakistan filed a petition with the Pakistani courts to enjoin SGS from proceeding with the ICSID proceedings and sought to hold SGS in contempt of court for pursuing the ICSID arbitration. The Supreme Court of Pakistan eventually granted Pakistan's request to proceed with the Pakistani arbitration and restrained SGS from pursuing or participating in the ICSID arbitration.[230]

**159**     SGS reacted by introducing two requests for provisional measures before the ICSID Tribunal (see Art. 47, paras. 119–125). The first of these requests was for a withdrawal of the judicial proceedings initiated before the Pakistani courts, including Pakistan's request for a stay of the ICSID arbitration and its application for SGS to be held in contempt of court. SGS's second request was that the local arbitration be stayed until the ICSID Tribunal rendered a decision on jurisdiction.

**160**     The Tribunal granted both requests and stressed that any ICSID tribunal is the judge of its own competence pursuant to Art. 41 of the Convention.[231] On that basis, although the Tribunal recognized that the judgment of the Supreme Court of Pakistan was final and binding as a matter of Pakistani law, it also stated that, as a matter of international law, it was not binding on the Tribunal. The Tribunal also held that the right of access to international adjudication must be preserved and cannot be constrained by an order of a national court. Thus, while recognizing that the judgment of the Supreme Court of Pakistan was final, the Tribunal also requested the Respondent not to act on its earlier complaint of an alleged breach of the Court's stay or file a new complaint.[232]

**161**     The Tribunal's procedural order carefully weighed the parties' respective concerns in the light of the procedural history of the case and recommended a provisional stay of the Islamabad-based arbitration until a decision was rendered declining the Tribunal's jurisdiction. It should be noted that the Tribunal also requested that a copy of the order be transmitted to the Pakistani arbitrator so that he could be fully informed of the status of the ICSID proceedings.[233]

### 6. Provisional Measures by Domestic Courts in ICSID Arbitration

**162**     Provisional measures ordered by domestic courts are a normal feature of international commercial arbitration.[234] The question whether domestic courts are

---

230  *SGS* v. *Pakistan*, Supreme Court of Pakistan, Judgment, 3 July 2002, 8 ICSID Reports 352, 356. Also reproduced *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 183 (2005). See also *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, and Decision on Jurisdiction, 6 August 2003, para. 39.

231  *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 388.

232  *Ibid.*, pp. 393–394.                     233   *Ibid.*, p. 397.

234  See Art. 23(2) of the 1998 ICC Rules of Arbitration, 36 ILM 1606, 1613 (1997); Art. 26(3) of the 1976 UNCITRAL Arbitration Rules, 15 ILM 701, 711 (1976); Art. 9 of the 1985 UNCITRAL Model Law on International Commercial Arbitration, 24 ILM 1302, 1304 (1985). See also *Toope, S. J.*, Mixed International Arbitration 190–196 (1990); *Brower, Ch. N./Tupman, W. M.*, Court-Ordered Provisional Measures under the New York Convention, 80 AJIL 24 (1986).

*Article 26 – Exclusive Remedy*                                        395

permitted to order such measures in the context of ICSID arbitration was a controversial aspect in the interpretation of Art. 26.[235] Provisional measures may be initiated by the host State, usually in its own courts, or by the foreign investor, usually in the courts of another State.

Art. 47 provides for provisional measures to be recommended by the tribunal **163** itself to preserve the respective rights of the parties (*cf.* also Arbitration Rule 39). The controversy surrounding the power of domestic courts to order provisional measures is usually phrased in terms of whether the power of the ICSID tribunal under Art. 47 is exclusive or not.[236]

It should be pointed out that this disagreement as to the power of domestic **164** courts to order provisional measures does not extend to measures designed to safeguard evidence in the course of ICSID arbitration. The exclusive power of the Tribunal to make "discovery orders" or to take similar procedural action under Art. 43 is uncontested.[237]

The *travaux préparatoires* are silent on the question of provisional measures **165** by domestic courts in support of ICSID arbitration. Judicial practice does not provide clear guidance. The decisions of domestic courts and of ICSID tribunals are uneven and somewhat contradictory. Scholarly opinion was sharply divided. A 1984 amendment to the Arbitration Rules has however clarified the situation for submissions given after that date and the controversy seems to have disappeared. Nevertheless, it is advisable to give careful attention to this detail when drafting ICSID clauses.

### a) Judicial Practice

In *Holiday Inns* v. *Morocco*,[238] the respondent Government, after the initiation **166** of ICSID arbitration, turned to the Moroccan courts and obtained provisional

---

235  *Fouchard/Gaillard/Goldman* On International Commercial Arbitration (*Gaillard, E./Savage, J.* eds.) para. 1309, at p. 713 (1999).

236  For comprehensive treatment of this question see *Brower, Ch. N./Goodman, R. E. M.*, Provisional Measures and the Protection of ICSID Jurisdictional Exclusivity Against Municipal Proceedings, 6 ICSID Review – FILJ 431 (1991); *Collins, L.*, Provisional and Protective Measures in International Litigation, 234 RC 98 (1992-III); *Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335 (1986); *Friedland, P. D.*, ICSID and Court-Ordered Provisional Remedies: An Update, 4 Arbitration International 161 (1988); *Marchais, B. P.*, ICSID Tribunals and Provisional Measures – Introductory Note to Decisions of the Tribunals of Antwerp and Geneva in MINE v. Guinea, 1 ICSID Review – FILJ 372 (1986); *Marchais, B. P.*, Mesures provisoires et autonomie du système d'arbitrage CIRDI, 14 Droit et Pratique du Commerce International 275 (1988); *Parra, A. R.*, The Practices and Experience of ICSID, *in*: Conservatory and Provisional Measures in International Arbitration (ICC Publication No. 519) 37 (1993); *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 322 *et seq.* (1999).

237  *Gaillard, E.*, Note, 115 Journal du Droit International 188 (1988); *Marchais*, Mesures provisoires, pp. 298 *et seq.*

238  *Lalive, P.*, The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 BYIL 123 at 132 *et seq.* (1980), reproduced in 1 ICSID Reports 645; *Marchais*, Mesures provisoires, pp. 287 *et seq.*; *Friedland*, Provisional Measures, pp. 340 *et seq.*

measures authorizing the Government to take the necessary steps to resume and complete construction of the hotels at the Claimants' cost and to appoint a judicial administrator. The Claimants relied on Arts. 26 and 47 to protest these measures by domestic courts. Morocco claimed sole jurisdiction of its courts for the provisional measures. These contentions met with a somewhat vague reply by the Tribunal in a Decision on Provisional Measures.[239] While affirming its power under Art. 47 to recommend provisional measures, the Tribunal merely found that "the Parties are under an obligation to abstain from all measures likely to prevent definitely the execution of their obligations"[240] (see Art. 47, paras. 33, 100–102).

**167**    In *MINE* v. *Guinea*[241] (see paras. 9–14, 149–153 *supra*), attachment proceedings in domestic courts were initially instituted by the claimant to enforce the AAA award, shortly after ICSID proceedings had been instituted. The decision by the Belgian Court and the early decisions of the Swiss Courts, therefore, did not concern provisional measures in the context of the ICSID arbitration. The Tribunal's Ruling on Provisional Measures of 4 December 1985 was also primarily directed at MINE's attempt to enforce the AAA award. Nevertheless, the Tribunal, after dealing with the proceedings based on the AAA award, added:

> (2) The Tribunal further recommends that MINE dissolve every existing provisional measure obtained in litigation in national courts (including attachment, garnishment, sequestration, or seizure of the property of Guinea, by whatever term it is designated and by whatever means obtained) and that MINE seek no new provisional remedy in a national court.[242]

In view of MINE's argument before the Tribunal that the actions in the national courts were steps to enforce the AAA award, and not prejudgment attachments related to the ICSID arbitration,[243] it is difficult to draw clear conclusions from the Tribunal's recommendation. Nevertheless, it seems permissible to interpret the Tribunal's broad language as being directed at the second possibility as well.

**168**    After the Court of First Instance of Geneva had refused to confirm the attachments for the purpose of enforcing the AAA award, MINE sought to maintain them as provisional measures in the context of the pending ICSID proceedings. The Supervisory Authority of the Office des Poursuites for the Enforcement of Debts and Bankruptcy of Geneva was quite unequivocal in rejecting this attempt. In doing so it relied on Art. 26 of the ICSID Convention and on the Tribunal's Provisional Measures of 4 December 1985.[244]

---

239  Decision on Provisional Measures, 2 July 1972. Unpublished. See *Lalive*, The First "World Bank" Arbitration, p. 136.

240  *Lalive*, The First "World Bank" Arbitration, p. 136; *Parra*, The Practices, p. 42.

241  See also *Friedland*, Provisional Measures, pp. 345 *et seq.*, 352 *et seq.*; *Marchais*, Mesures provisoires, pp. 284 *et seq.*

242  The Ruling on Provisional Measures of 4 December 1985 is unpublished. The citation is taken from the decision of the Autorité de surveillance, 4 ICSID Reports 47.

243  See *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 68.

244  *Guinea* v. *MINE*, Autorité de surveillance des offices de poursuite pour dette et de faillite, Geneva, 7 October 1986, 4 ICSID Reports 45.

*Atlantic Triton* v. *Guinea* produced sharply conflicting decisions and has evoked **169** considerable critical comment.[245] The Claimant had obtained an order in France attaching three vessels belonging to the Respondent before starting ICSID proceedings. Guinea appealed. The Court of Appeal of Rennes accepted Guinea's reliance on ICSID's exclusivity in accordance with Art. 26. The attachments were, therefore, lifted.[246]

In an interim decision rendered shortly thereafter,[247] the ICSID Tribunal found **170** that the request to direct Atlantic Triton to have the attachments lifted had been rendered moot by the French courts. The Tribunal also refused to make a general recommendation that the parties should abstain from actions in national courts. This refusal was based on the somewhat formalistic ground that the request rested on Art. 44 of the Convention which only deals with procedural questions. Therefore, the role of Art. 26 was not addressed.

In its Award,[248] the Tribunal returned to this question in the context of a claim by **171** Guinea for damages from Atlantic Triton for having instituted abusive proceedings to obtain the conservatory measures.[249] The claim was rejected. After citing Arts. 26 and 47, the Tribunal said:

> 2.6. While it certainly follows from the foregoing texts that the Tribunal has jurisdiction to *recommend* conservatory measures, it hardly follows, as obviously, that such jurisdiction should be exclusive and prohibit any recourse to national courts, traditionally and virtually universally recognized as having sole jurisdiction to *order* such measures.[250]

When the case reached the French Cour de cassation, the actual attachments had **172** been overtaken by events. The ships had left port and the ICSID award had been rendered. Nevertheless, the highest French court gave a strongly worded decision affirming the power of domestic courts to order interim measures in the course of ICSID arbitration.[251] With regard to Art. 26, it said:

> . . . This provision was not intended to prohibit parties from applying to a national court to seek conservatory measures in order to guarantee the execution of an award which might subsequently be given.[252]

In *Cable TV* v. *St. Kitts and Nevis*, the Claimants sought to increase the charges **173** for their services. The Respondent refused to permit the increase of these charges. After the Claimants had given notice of their intention to institute ICSID arbitration, the Respondent obtained an *ex parte* injunction from a local court restraining

---

245  For a general description see *Friedland*, Provisional Measures, pp. 343 *et seq.*; *Friedland*, ICSID and Court-Ordered Provisional Measures, pp. 162 *et seq.*; *Marchais*, ICSID Tribunals, pp. 375 *et seq.*; *Marchais*, Mesures provisoires, pp. 276 *et seq.*, 283, 289 *et seq.*
246  *Guinea* v. *Atlantic Triton*, France, Cour d'appel, Rennes, Judgment, 26 October 1984, 3 ICSID Reports 3.
247  18 December 1984, 3 ICSID Reports 18.
248  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 17.
249  At p. 19.                              250  At p. 35.
251  *Guinea* v. *Atlantic Triton*, France, Cour de cassation, Judgment, 18 November 1986, 3 ICSID Reports 10.
252  At p. 11.

and enjoining the Claimants from raising their rates prior to the completion of ICSID arbitration. The ICSID Tribunal declined jurisdiction since there was no valid consent to jurisdiction by the Respondent (see Art. 25, paras. 249, 381, 906). It did not express an opinion as to the compatibility of the injunction with Art. 26.[253]

### b) The Scholarly Debate

**174**    Scholarly opinion on the permissibility of provisional measures by domestic courts in the context of ICSID arbitration was sharply divided. The conflicting reactions to the decisions of the Court of Appeal of Rennes[254] and of the Court of Cassation[255] in the *Atlantic Triton* case are characteristic of this controversy. The primary arguments of the proponents of an independent power of domestic courts to order provisional measures in ICSID arbitration proceedings[256] were as follows:

- The urgency of circumstances in which a party may dispose of assets or otherwise change a situation to the detriment of the other party does not make it practical to wait until the ICSID tribunal is constituted and may start to act under Art. 47;
- The power of the tribunal under Art. 47 is limited to a recommendation and hence inadequate;
- The concept of "remedy" in Art. 26 only covers decisions on the merits and not interim measures;
- The exclusive power of an ICSID tribunal does not extend to the enforcement of awards, which is left to domestic courts (Art. 54). Provisional measures must be seen as steps preliminary to enforcement;
- The common rule in arbitration as evidenced by other arbitration rules and by domestic law is that domestic courts have the power to order provisional measures.[257] An intention to deviate from this common rule is not apparent from the drafting history of Art. 26 and would have to be clearly expressed by the parties to a dispute.

---

253  See *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 1.05, 2.20, 4.04, 4.05, 4.11, 4.15.

254  *Delaume*, 24 ILM 340 (1985); *Friedland*, Provisional Measures, p. 352; *Gaillard, E.*, Note, 112 Journal du Droit International 934 (1985); *Flecheux*, Note, Revue de l'arbitrage 449 (1985).

255  *Gaillard, E.*, Note, 114 Journal du Droit International 127 (1987); *Audit, B.*, Note, 76 Revue Critique de Droit International Privé 762 (1987); *Delaume, G. R.*, Judicial Decisions Related to Sovereign Immunity and Transnational Arbitration, 2 ICSID Review – FILJ 421 (1987); *Friedland*, ICSID and Court-Ordered Provisional Measures, pp. 162 *et seq.*

256  See esp. *Gaillard, E.*, Note, 112 Journal du Droit International 934 (1985); *Gaillard, E.*, Note, 114 Journal du Droit International 127 (1987); *Audit, B.*, Note, 76 Revue Critique de Droit International Privé 762 (1987); *van den Berg, A. J.*, Some Recent Problems in the Practice of Enforcement under the New York and ICSID Conventions, 2 ICSID Review – FILJ 439 at 453 *et seq.* (1987); *Broches, A.*, A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 5 at 9 (1991). *Cf.* also *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 159 *et seq.* (1993).

257  See *Toope, S. J.*, Mixed International Arbitration, pp. 190–196 (1990).

*Article 26 – Exclusive Remedy*　　　　　399

Against this, the supporters of the theory that the ICSID tribunal's power to **175** recommend provisional measures is exclusive[258] have argued that:

- Art. 26 is unequivocal and does not provide for an exception in respect of court-ordered provisional measures;
- The self-contained character of the ICSID Convention would be seriously affected by the intervention of domestic courts;
- This self-contained character as well as the mixed nature of the dispute between States and foreign investors fundamentally distinguishes ICSID arbitration from other arbitration regimes. Therefore, provisional measures by domestic courts should only be permitted if the parties to a dispute have given their express consent;
- The danger of abuse of provisional measures both in the host State and in third countries far outweighs their usefulness;
- The Tribunal may take account of any refusal to comply with provisional measures it has recommended as well as of attempts to dissipate assets to the detriment of the other party;
- The highly effective enforcement mechanism provided by the Convention minimizes the need for provisional measures.

### c) ICSID Arbitration Rule 39(6)

This question was clarified on 26 September 1984 when a new para. 5 (renum-**176** bered para. 6 in April 2006) was added to Arbitration Rule 39. The other paragraphs of Arbitration Rule 39 deal with provisional measures recommended by the tribunal in the exercise of its powers under Art. 47 of the Convention. Para. 6 reads as follows:

> (6) Nothing in this Rule shall prevent the parties, provided that they have so stipulated in the agreement recording their consent, from requesting any judicial or other authority to order provisional measures, prior to or after the institution of the proceeding, for the preservation of their respective rights and interests.

Since the introduction of this addition to Arbitration Rule 39, the issue of provi-**177** sional measures by domestic courts in ICSID arbitration is no longer controversial. It is now clear that provisional measures by domestic courts are permissible only if the parties have expressly agreed to them in the instrument recording their consent to arbitration. The new paragraph has been regarded as a mere clarification of a

---

258  *Delaume, G. R.*, Foreign Sovereign Immunity: Impact on Arbitration, 38 The Arbitration Journal 34 at 41 (1983); *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 239 at 248 (1986); *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, pp. 41 *et seq.* (1990); *Delaume, G. R.*, Judicial Decisions Related to Sovereign Immunity and Transnational Arbitration, 2 ICSID Review – FILJ 403 at 420 (1987); *Friedland*, ICSID and Court-Ordered Provisional Measures; *Marchais*, Mesures provisoires; *Toope, S. J.*, Mixed International Arbitration 236 *et seq.* (1990); *Parra*, The Practices, p. 41; *Dominicé, Ch.*, Quelques observations sur la question des mesures conservatoires dans les arbitrages CIRDI, 112 La Semaine Judiciaire 327 (1990).

rule already contained in Art. 26 by some authors[259] and as an attempt to amend substantive law by others.[260] The fact that the new rule was adopted unanimously by the Administrative Council,[261] and that its draft was accompanied by a note by the Secretary-General to the effect that the new provision was merely a clarification and a continuation of a pre-existing rule,[262] would lend support to the former view.

**178**    Cases in which consent to arbitration was given before 26 September 1984 are, in principle, subject to the older Rules, that is without the clarification provided by Rule 39(6) (see Art. 44, paras. 42–52). The parties may agree otherwise. They may provide that the Arbitration Rules in effect on the date on which the proceeding is instituted shall apply (see Model Clause 16 of 1993). Such an agreement to opt for the Arbitration Rules in their current version may also be made after the case is submitted to the Centre. But with the passage of time, cases in which consent was given before 26 September 1984 have become increasingly unlikely.

### d) Provisional Measures under the Additional Facility

**179**    The power of domestic courts to order provisional measures under the Additional Facility is in stark contrast to the solution adopted in Arbitration Rule 39(6) under the Convention. Arbitration (Additional Facility) Rule 46 provides for provisional measures to be ordered or recommended by the Tribunal in paras. (1) to (3). As concerns domestic courts, Arbitration (Additional Facility) Rule 46(4) says:

> (4) The parties may apply to any competent judicial authority for interim or conservatory measures. By doing so they shall not be held to infringe the agreement to arbitrate or to affect the powers of the Tribunal.

**180**    It is important to note that the rules governing the Additional Facility operate outside the Convention. Therefore, Art. 26 does not apply in this context. For the same reason it would be impermissible to draw any conclusions from the Additional Facility Rules for the interpretation of Art. 26. To understand the different solution adopted in the Additional Facility Rules for the role of domestic courts in ordering provisional measures it is important to remember that the Convention's provisions on the recognition and enforcement of awards (Arts. 53 and 54) do not apply to awards rendered under the Additional Facility.[263]

### e) Clauses Permitting Provisional Measures by Domestic Courts

**181**    There was never any doubt that the parties are free to provide by agreement for the possibility of having provisional measures ordered by a domestic court

---

259  *E.g.*, *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 4 at 6 (1985).
260  *E.g.*, *Audit, B.*, Note, 76 Revue Critique de Droit International Privé at 771 (1987).
261  Res. AC (18)/RES/57 – see Annual Report 1985, pp. 14, 18.
262  *Marchais*, Mesures provisoires, pp. 292 *et seq.*; *Parra*, The Practices, p. 40; *O'Neill, P. D.*, American Legal Developments in Commercial Arbitration Involving Foreign States and State Enterprises, 6 J. Int. Arb. 117, 127 (1989).
263  *Parra*, The Practices, pp. 40 *et seq.*

or other authority. <u>Arbitration Rule 39(6) requires that this possibility must have been stipulated in the agreement recording the consent to the Centre's jurisdiction.</u> The Model Clauses of 1993 offer a formula for this purpose in Clause 14 (see Art. 55, para. 109).[264]

The availability of provisional measures, thus provided for, may still run into **182** the obstacle of sovereign immunity. The rules on immunity from conservatory measures or pre-judgment attachment vary considerably from one country to another (see Art. 55, paras. 94–96). The consent to provisional or conservatory measures as contained in Model Clause 14 will not necessarily be accepted as a waiver of immunity. A court may find that the Clause addresses the question of ICSID's exclusive jurisdiction but not immunity. Moreover, the words "either party . . . may request" may be held not to be sufficiently specific for a waiver of immunity. Therefore, it is advisable to add an express proviso whereby the Government waives its immunity in such proceedings.[265] Such a waiver of immunity in the context of provisional measures may, but need not, be combined with a waiver of immunity from enforcement of an award[266] (see Art. 55, paras. 97–110) (see Model Clause 15 of 1993).

Provision for the right to request provisional measures by domestic courts **183** need not be contained in a direct agreement between the parties but may be contained in a treaty that offers consent to ICSID arbitration. Art. 1121 of the NAFTA, which requires a waiver of other remedies, including domestic courts (see para. 112 *supra*), adds the following formula:

> . . . except for proceedings for injunctive, declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party.[267]

Once this clause has become part of the consent agreement between the parties, it may be accepted as a stipulation in the sense of Arbitration Rule 39(6).

### 7. Non-Judicial Remedies

The idea that the concept of "other remedy", excluded by the first sentence **184** of Art. 26, might extend to measures other than those that can be taken through domestic courts or non-ICSID arbitration was discussed in *Amco* v. *Indonesia*. The Respondent contended that the Claimants had been responsible for the publication of propaganda in the form of a newspaper article in violation of Art. 26. The Tribunal in its Decision on Provisional Measures held:

---

264  4 ICSID Reports 365. The Model Clauses of 1981 contained a similar Clause XVI – see 1 ICSID Reports 206.

265  *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784, 795 (1981).

266  *Cf. Gaillard, E.*, Note, 114 Journal du Droit International 131 (1987), who expresses the concern that States in agreeing to provisional measures might inadvertently waive immunity from execution.

267  32 ILM 605, 643 (1993).

> . . . obviously, such an article, would it even be proved that it was "promoted" by
> the Claimants, does not mean that the same rely on any legal remedy other than
> the ICSID arbitration.[268]

The reference to a "legal remedy" indicates that the Tribunal was of the view
that non-judicial remedies are not covered by the first sentence of Art. 26 of the
Convention.

185     On the other hand, the second sentence of Art. 26 specifically refers to "admin-
istrative or judicial remedies" in the context of the exhaustion of local remedies
(see para. 191 *infra*). There is no evidence in the preparatory history of Art. 26 that
would support the view that the concept of remedy has different meanings in the
two sentences of Art. 26. In fact, the second sentence was originally introduced as
a clarification for the first (see para. 190 *infra*). Therefore, the better view appears
to be that the exclusion of any other remedy would go beyond judicial proceedings.

186     The non-judicial remedy of diplomatic protection is ruled out by Art. 27 except
in case of failure to comply with an award. However, Art. 27 is directed at
Contracting States and does not create an obligation on the part of the investor
to refrain from seeking diplomatic protection. Therefore, the investor's obligation
corresponding to its home State's duty under Art. 27 must be sought in Art. 26.
Under certain circumstances a State attempting to exercise diplomatic protection
may not be a Contracting State and would, hence, not be bound by Art. 27 (see
Art. 25, paras. 660–663, 741–750; Art. 27, paras. 10, 11). In a situation of this
kind, Art. 26 could not stop the investor's home State from exercising its right
to diplomatic protection. However, it could be seen to constitute a bar for the
investor to take any steps to obtain diplomatic protection (History, Vol. II, pp. 74,
80). In addition, in the case of diplomatic protection by a non-Contracting State,
the host State may insist on the exhaustion of local remedies since the rule of non-
exhaustion (see para. 188 *infra*) only applies to relations between Contracting
States.

### D.  "A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention."

187     The exhaustion of local remedies is a concept of traditional international law
which requires that before a claim for the violation of the rights of an individual
or a corporation can be pursued against a State through international procedures,
that individual or corporation must first have recourse to all means of redress
available under the domestic law of the State concerned. Developed originally
in the context of diplomatic protection (see Art. 27, paras. 1–3), the concept of
the exhaustion of local remedies was retained in procedures granting individuals
direct access to an international forum, especially for the protection of human
rights. The requirement to exhaust local remedies is a right of the State concerned
that it may renounce in a particular context.

---

268    *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983, para. 3.

### 1. The Basic Rule of Non-Exhaustion

Article 26 reverses the situation under traditional international law: the Contract-   **188**
ing States waive the requirement of exhaustion of local remedies unless otherwise
stated. The second sentence of Art. 26 clarifies that a State may make the exhaus-
tion of local remedies a condition of its consent to arbitration. In the absence of
such a proviso, there is no requirement to exhaust local remedies. The Report of
the Executive Directors on the Convention gives the following explanation for this
provision:

> 32. . . . In order to make clear that it was not intended thereby to modify the
> rules of international law regarding the exhaustion of local remedies, the second
> sentence explicitly recognizes the right of a State to require the prior exhaustion
> of local remedies.

This question dominated the drafting history of Art. 26. The Working Paper   **189**
contained a provision similar to what eventually became the first sentence of
Article 26 (History, Vol. I, p. 132). The subsequent debate centred almost exclu-
sively on the possibility to resort to domestic courts and on the requirement to
exhaust local remedies before going to arbitration. Especially participants from
Latin America and other developing countries sought to retain the traditional
requirement and expressed concern that the rule, as stated, would eliminate or
undermine the role of domestic courts and might create procedural privileges for
foreign investors (History, Vol. II, p. 58, para. 28, pp. 61–62, para. 6, pp. 88–89,
paras. 12, 14, p. 96, para. 54, p. 97, paras. 57, 59, pp. 523–526, 543, 758). Even
an "appeals function" for the Centre seemed acceptable to some delegates only in
cases of denial of justice or discrimination (at pp. 326, 350, 432, 527). Mr. *Broches*
repeatedly explained that the provision merely created a rule of interpretation, that
is, a presumption that arbitration was intended to be the sole remedy, but that it left
the parties entirely free to require the exhaustion of local remedies (at p. 59, para.
35, pp. 84–85, 97, para. 56, pp. 241, 303, 326, 347, 348, 371, 431, 464, 506, 524,
756). This position was supported by some of the delegates from industrialized
countries (at pp. 432–433, 758–759). Some delegates wanted to reverse the pre-
sumption, thereby making direct access to arbitration the exception and the prior
exhaustion of local remedies the rule (at pp. 431, 505, 663, 756–757, 761). An
Israeli proposal sought to differentiate between different types of disputes requir-
ing the exhaustion of local remedies for some but not for others (at pp. 498, 553).

Eventually, a second sentence was inserted into the Revised Draft (History,   **190**
Vol. I, p. 134) to clarify the possibility for States to require the exhaustion of
local remedies, although this had already been expressed in the words "unless
otherwise stated" in the first sentence (History, Vol. II, pp. 792–793, 936, 958,
1029). The additional sentence was criticized by some as superfluous and leading
to its unnecessary use (at pp. 794, 973). A vote on the second sentence showed a
narrow majority in its favour (at p. 794).

The sentence refers to "administrative or judicial remedies". The exhaustion   **191**
of local remedies is usually associated with redress in domestic courts. But

administrative remedies are clearly also part of the overall system of measures that must be taken. The separation of the words "administrative" and "judicial" by the word "or" rather than "and" creates the impression of two mutually exclusive alternatives. The Convention's *travaux préparatoires* give no clear explanation for the choice of these words, although they might have been chosen in response to misgivings by some delegates concerning the review of final domestic court decisions by an arbitral tribunal (History, Vol. II, p. 794; see also p. 772). It is possible that an investor may seek and find relief through the decision of an administrative authority of the host State rather than through its courts, possibly in the form of a negotiated settlement. Therefore, insistence on the utilization of administrative as well as judicial remedies would be in line with the traditional concept of the exhaustion of local remedies.

### 2. Exhaustion of Local Remedies as a Condition of Consent

**192**      A State may make the exhaustion of local remedies a condition of its consent to arbitration. The condition may be expressed in a bilateral investment treaty offering consent to ICSID arbitration (see Art. 25, paras. 427–455), in national legislation providing for ICSID arbitration (see Art. 25, paras. 390–426) or in a contract with the investor containing an ICSID arbitration clause (see Art. 25, paras. 382–389).[269]

**193**      The condition that local remedies must be exhausted before ICSID arbitration can be instituted may be expressed by a State party to the Convention only up to the time consent to arbitration is perfected but not later (History, Vol. II, p. 974) (see Art. 25, paras. 468–474). This is a consequence of the principle that, once consent to jurisdiction has been given, it may not be unilaterally withdrawn or restricted[270] (see Art. 25, paras. 540, 599, 606). On the other hand, the condition that local remedies must be exhausted may be withdrawn at any time, thereby opening direct access to ICSID arbitration.

**194**      A State may also give advance notice that it will require the exhaustion of local remedies as a condition for its consent to ICSID arbitration by way of a general notification to the Centre. But a general notification of this kind is a statement for information purposes only. It is an announcement of the State's intentions much like the notifications under Art. 25(4) (see Art. 25, paras. 921–941). If a State subsequently consents to ICSID arbitration in terms inconsistent with the prior general notification, the consent will prevail over the notification.

**195**      There are only few examples of such notifications. These notifications are published in Document ICSID/8-D and are available on the ICSID website.

**196**      Israel upon its ratification of the Convention in 1983 issued the following notification:

---

269  In this sense: *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 39.
270  *Amerasinghe, C. F.*, Whither the Local Remedies Rule?, 5 ICSID Review – FILJ 292 at 294 (1990).

> Israel requires the exhaustion of local administrative or judicial remedies as a condition under this Convention.[271]

This notification was withdrawn by Israel by a communication received by the Centre on 21 March 1991.

On 27 April 1993, Costa Rica notified the Centre that                       **197**

> [t]here may only be recourse to arbitration pursuant to [the Convention] where all existing administrative or judicial remedies have been exhausted.

On 16 January 2003, Guatemala notified the Centre that                      **198**

> the Republic of Guatemala will require the exhaustion of local administrative remedies as a condition of its consent to arbitration under the Convention.

It is worth noting that this notification refers to administrative remedies only. By implication, it does not extend to judicial remedies.

### a) Bilateral Investment Treaties

The situation with regard to bilateral investment treaties (BITs) is somewhat    **199**
complex.[272] Most BITs do not mention the question, thereby leaving the basic rule of Art. 26 untouched. Some treaties explicitly provide that local remedies need not be exhausted, thereby restating the residual rule of Art. 26. For instance, Art. 10 of the BIT between Austria and the United Arab Emirates of 2001 provides:

> (5) If the investor chooses to file for arbitration, the host Contracting Party agrees not to request the exhaustion of local settlement procedures.[273]

Other treaties specifically state that the requirement of exhaustion of domestic    **200**
remedies is waived by virtue of a State's consent to submit a dispute to arbitration. An illustration of this is provided by Art. 10 of the Cambodia-Croatia BIT of 2001, which, in relevant part, reads as follows:

> 2(b) [ . . . ] In case of arbitration, each Contracting Party, by this Agreement irrevocably consents in advance, even in the absence of an individual arbitral agreement between the Contracting Party and the investor, to submit any such dispute to the Centre. This consent implies the renunciation of the requirement that the internal administrative or judicial remedies shall be exhausted . . .

---

271  ICSID/8-D. See also *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 20 Fn 12 (1993).

272  For a survey of BIT provisions see Bilateral Investment Treaties 1995–2006: Trends in Investment Rulemaking (UNCTAD ed.) 2007, pp. 108–109, http://www.unctad.org/en/docs/iteiia20065_en.pdf. See also *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, p. 41 (1990); *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 333 *et seq.* (1997); *Peters, P.*, Dispute Settlement Arrangements in Investment Treaties, 22 Netherlands Yearbook of International Law 91, 133–135 (1991).

273  See also *e.g.*, the Australia-Hungary BIT (1991) Art. 12; Australia-Poland BIT (1991) Art. 13; Belgium/Luxembourg Economic Union (BLEU)-Egypt BIT (1977) Art. IX; BLEU-Cameroon BIT (1980) Art. 10; BLEU-Bangladesh BIT (1981) Art. 6; Austria-Malaysia BIT (1985) Art. 9; Austria-Korea BIT (1991) Art. 8; Austria-Estonia BIT (1994) Art. 8. See also *Dolzer, R./Stevens, M.*, Bilateral Investment Treaties 172/3 (1995).

**201**    Some treaties unequivocally provide for the exhaustion of local remedies before ICSID arbitration may be instituted. This type of provision is prevalent in the older investment treaties concluded by Romania.[274] The BIT between China and Côte d'Ivoire of 2002, in Article 9, requires the exhaustion of domestic administrative review procedures:

> 3. If such dispute cannot be settled amicably through negotiations, any legal dispute between an investor of one Contracting Party and the other Contracting Party in connection with an investment in the territory of the other Contracting Party shall have exhausted the domestic administrative review procedure specified by the laws and regulations of that Contracting Party, before submission of the dispute to the aforementioned arbitration procedure . . .

**202**    Yet another group of bilateral investment treaties provides for resort to ICSID if a dispute has not been settled through local remedies within a certain period of time.[275] Technically, this is not a requirement to exhaust local remedies, since the parties are free to turn to ICSID, once the time has elapsed. British treaties provide for ICSID arbitration if

> . . . agreement cannot be reached within three months between the parties to this dispute through pursuit of local remedies or otherwise . . .[276]

**203**    The addition "or otherwise" indicates that the pursuit of local remedies is just one of several options such as negotiations or conciliation. The time limit of three months makes any notion of exhaustion quite unrealistic. Longer periods are foreseen in some other treaties. For instance, the BIT between Belgium-Luxembourg and Botswana of 2003 provides for a period of six months within which a dispute may be submitted to a local court for its decision. A number of BITs, such as Article 10 of the Argentina-Germany BIT, provide for submission to international arbitration if no decision has been rendered within eighteen months of submission of the dispute to domestic courts or if the dispute persists despite such a decision.

**204**    Tribunals have held that a requirement that local remedies be used for a certain period of time is not an application of the exhaustion of local remedies rule.[277]

---

274    *Delaume*, Le Centre, p. 785; *Laviec*, *op. cit.*, p. 287; *Broches, A.*, Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration 63 at 69 (1982); *Golsong, H.*, A Guide to Procedural Issues in International Arbitration, 18 International Lawyer 637 Fn 10 (1984); *Ziadé, N. G.*, ICSID and Arab Countries, News from ICSID, Vol. 5/2, pp. 6/7 (1988).

275    *Schreuer, C.*, Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, 4 The Law and Practice of International Courts and Tribunals 1, 3–5 (2005).

276    Art. 8(3) of the British Model Agreement 2005, *Dolzer/Schreuer*, Principles of International Investment Law 380 (2008). See also *e.g.*, the treaties with Egypt, Art. 8, 14 ILM 1472 (1975); with Singapore, Art. 8, 15 ILM 593 (1976); with Sri Lanka, Art. 8, 19 ILM 888 (1980); and with Hungary, Art. 8, 4 ICSID Review – FILJ 163 (1989). See also *Delaume*, Le Centre, p. 783 Fn 23(e).

277    *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, para. 28; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 104; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, para. 30.

It should be added that the usefulness of such a requirement is questionable as it creates a considerable burden to the party seeking arbitration with little chance of advancing the settlement of the dispute. A substantive decision by the domestic courts in a complex investment dispute is unlikely to be rendered within eighteen months, particularly if the possibility of appeals is also considered. Even if a decision can be rendered within this time period, the dispute is likely to persist if the investor is dissatisfied with the outcome and arbitration remains an option. It follows that the most likely effect of a clause of this kind is delay and additional costs. One tribunal called a provision of this kind "nonsensical from a practical point of view".[278]

There is a series of decisions on BIT provisions containing the requirement    **205** to try to settle disputes in domestic courts for eighteen months before going to arbitration. Tribunals have consistently held that claimants were entitled to invoke MFN clauses in order to avoid this requirement.[279]

## b) National Legislation

It is evident that a State offering ICSID arbitration in its legislation on investment    **206** may make this offer conditional on the exhaustion of its local remedies. Little use, if any, appears to have been made of this possibility.

## c) Investment Contracts

Agreements between the host State and the investor providing for ICSID arbi-    **207** tration are another obvious place for States to reserve the requirement to exhaust local remedies. The ICSID Model Clauses of 1993 contain a sample for such a provision:

### Clause 13

Before either party hereto institutes an arbitration proceeding under the Convention with respect to a particular dispute, that party must have taken all steps necessary to exhaust the [following] [administrative] [and] [judicial] remedies available under the laws of the Host State with respect to that dispute [list of required remedies], unless the other party hereto waives that requirement in writing.[280]

---

278  *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 224.
279  *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 38–64; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, paras. 32–110; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 117–121; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 24–31, 41–49; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 52–66; *National Grid* v. *Argentina* (UNCITRAL), Decision on Jurisdiction, 20 June 2006, paras. 53–94; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 52–68.
280  4 ICSID Reports 365. See also Clause XIV of the 1981 Model Clauses, 1 ICSID Reports 205 and Clause XVII of the 1968 Model Clauses, 7 ILM 1174 (1968).

### 3. Practice of Tribunals

### a) Exhaustion of Local Remedies and Jurisdiction

**208**        States parties to ICSID proceedings have invoked the principle of the exhaustion of local remedies as a jurisdictional requirement in a number of cases but never with success. In *Benvenuti & Bonfant* v. *Congo* the principle was invoked by reference to a somewhat unclear ICSID clause in a contract. However, the Tribunal did not reach the question, finding that the claims at issue did not directly arise from a dispute as to the application of that particular contract.[281]

**209**        In the annulment proceedings to *Amco* v. *Indonesia*, Indonesia argued "that the Tribunal manifestly exceeded its powers by holding that Amco could bring its claim for compensation of damages based on the acts of the army and police personnel involved directly to an ICSID Tribunal without previously seeking redress before the Indonesian courts in conformity with the general international law rule on exhaustion of local remedies".[282] The *ad hoc* Committee had little problem to dispose of this argument:

> By acceptance of ICSID jurisdiction without reserving under Article 26 of the Convention a right to require prior exhaustion of local remedies as a condition for obtaining access to an ICSID tribunal, Indonesia must be deemed to have waived such right.[283]

**210**        In *Lanco* v. *Argentina*, the Respondent objected to ICSID jurisdiction arguing that a dispute settlement provision had been agreed in the contract subsequent to the entry into force of the Argentina-US BIT, thus replacing the consent given to ICSID arbitration.[284] The Tribunal analysed Art. 26 and held that it was "merely a standard for interpretation, a presumption that arbitration is the exclusive remedy, but that the parties may require exhaustion of domestic remedies".[285] However, the Tribunal found that the State's valid consent came directly from the Argentina-US BIT and that this treaty did not contain a requirement of prior resort to the local courts.[286]

**211**        In *Maffezini* v. *Spain*, the BIT between Argentina and Spain provided that the dispute must first be submitted to the host State's domestic courts. It may be submitted to international arbitration only under the following condition:

> . . . if no decision has been rendered on the merits of the claim after the expiration of a period of eighteen months from the date on which the proceedings referred to in paragraph 2 of this Article [*i.e.* domestic courts] have been initiated, or if such decision has been rendered, but the dispute between the parties continues;[287]

---

281   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.13–1.16.
282   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 62.
283   *Ibid.*, para. 63.
284   *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 33.
285   *Ibid.*, para. 38.                          286   *Ibid.*, para. 40.
287   See *Maffezini* v. *Spain,* Decision on Jurisdiction, 25 January 2000, para. 19.

The Respondent objected to the Tribunal's jurisdiction contending that the treaty **212** required the exhaustion of local remedies in Spain before it could be submitted to ICSID.[288] In addition, Spain argued that once a decision of a Spanish court had been rendered there was no longer any dispute and therefore the case could no longer be referred to international arbitration.[289]

The Tribunal did not interpret the relevant provision of the BIT as requiring **213** the exhaustion of all available local remedies in the sense of international law. Any decision by a Spanish court would not even have to be final.[290] Even if the treaty had contained such a clause, this still would not have deprived the parties of their right to go to international arbitration.[291] The Tribunal further interpreted the treaty as leaving the parties the option to bring the dispute to international arbitration after the expiration of the eighteen-month period regardless of the decision rendered by the domestic court.[292] The treaty gave national courts "an opportunity to vindicate the international obligations guaranteed in the BIT".[293] Eventually, the Claimant succeeded to avoid this requirement by relying on the MFN clause contained in the BIT.[294] However, the Tribunal specified that – had a party expressly conditioned its consent to ICSID jurisdiction on the exhaustion of local remedies – this requirement could not be bypassed by invoking the MFN clause.[295]

In *Generation Ukraine* v. *Ukraine* the Respondent maintained that on the basis **214** of Art. 26 it had the right to insist on the exhaustion of local remedies by the Claimant as a precondition to the submission of the dispute to arbitration.[296] The Tribunal observed that the US-Ukraine BIT did not contain a requirement of prior exhaustion of local remedies before submitting a dispute to ICSID. The Tribunal said:

> 13.4 The first sentence of Article 26 secures the exclusivity of a reference to ICSID arbitration vis-à-vis any other remedy. A logical consequence of this exclusivity is the waiver by Contracting States to the ICSID Convention of the local remedies rule, so that the investor is not compelled to pursue remedies in the respondent State's domestic courts or tribunals before the institution of ICSID proceedings. This waiver is implicit in the second sentence of Article 26, which nevertheless allows Contracting States to reserve its right to insist upon the prior exhaustion of local remedies as a condition of its consent.
>
> 13.5 Any such reservation to the Ukraine's consent to ICSID arbitration must be contained in the instrument in which such consent is expressed, *i.e.* the BIT itself.[297]

The Tribunal added that once the investor had accepted the State's offer to **215** arbitrate in the BIT by instituting arbitration proceedings, no further limitations

---

288  *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 19–37.
289  *Ibid.*, para. 25.                    290  *Ibid.*, para. 28.
291  *Ibid.*, para. 29.                    292  *Ibid.*, paras. 32–33.
293  *Ibid.*, paras. 35–36.                294  *Ibid.*, paras. 38–64.
295  *Ibid.*, para. 63.
296  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 13.1–13.6.
297  *Ibid.*, paras. 13.4, 13.5.

or restrictions can be imposed unilaterally. Therefore, the Claimant was under no constraint to exhaust remedies in the Ukrainian courts before starting arbitration at ICSID.[298]

**216**    Ecuador also opposed the Tribunal's jurisdiction in *IBM* v. *Ecuador* arguing that, on the basis of Art. 26, it could condition its consent to ICSID arbitration on the existence of a prior decision by the courts of Ecuador.[299] The Tribunal rejected Ecuador's position. It said:

> The provision of article 26 of the Convention authorized the Ecuadorian Government to establish certain conditions for the applicability of an International Treaty; i.e., the Ecuadorian Government should have included, as previous requirement, the condition of exhausting the administrative or judicial channels, at the moment it ratified the BIT. And it has not. On the contrary, the first part of article 26 of the Convention, as well as number 2 of article 11 of the BIT, excluded the possibility to call on the national judges if the ICSID arbitration has been sought first.[300]

**217**    Similarly, the Tribunal in *AES* v. *Argentina* reiterated that the ICSID system was established "on the basis of a reversed rule of exhaustion of local remedies", which needs to be "expressly required as a condition of the consent of one party to arbitration under the Convention".[301] The Tribunal recalled that previous decisions rejected recourse to local judicial remedies as a prerequisite of ICSID jurisdiction and added that no precedent exists of an ICSID tribunal subordinating its jurisdiction to the exhaustion of prior negotiations between the parties.[302]

### b) The Use of Local Remedies as a Substantive Requirement

**218**    In contrast to the above cases, a number of tribunals have required parties to resort to domestic courts before initiating international arbitration. In these cases, however, resort to local remedies was not treated as a matter of jurisdiction or admissibility. Rather, the substantive violation of the international obligation would not have occurred until at least an attempt had been made to obtain redress through domestic courts.[303] Some but not all of these cases involved the question whether a denial of justice had occurred.[304]

**219**    For instance, in *Vivendi* v. *Argentina* (see paras. 78–85 *supra*), the Tribunal found that there was a close connection between the terms of the contract and the alleged treaty violations. Because of that close connection, the Tribunal also held that the Claimants could not pursue international arbitration until their rights had been asserted before the Tucumán courts and those courts had denied those rights, either procedurally or substantively. The Tribunal's position was as follows:

---

298  *Ibid.*, paras. 13.5–13.6.
299  *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, paras. 77–84.
300  *Ibid.*, para. 80.
301  *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 69.
302  *Ibid.*, para. 70.
303  See *Schreuer, C.*, Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, 4 The Law and Practice of International Courts and Tribunals, 1 (2005), at pp. 13–16.
304  See also *Rompetrol* v. *Romania*, Decision on Jurisdiction, 18 April 2008, paras. 58, 111, 114.

> . . . any claim against the Argentine Republic could arise only if Claimants were
> denied access to the courts of Tucumán to pursue their remedy under Article 16.4
> or if the Claimants were treated unfairly in those courts (denial of procedural
> justice) or if the judgment of those courts were substantively unfair (denial of
> substantive justice) or otherwise denied rights guaranteed to French investors
> under the BIT by the Argentine Republic.[305]

The Tribunal however emphasized that its decision did not impose a requirement **220**
to exhaust local remedies because that requirement would be incompatible with
Art. 26 of the ICSID Convention. Rather, the need to resort to the local courts was
based on the contract and arose from the impossibility to separate the contractual
and treaty claims.[306] The *Vivendi ad hoc* Committee partly annulled this Award
and held that the fact that the contractual dispute resolution clause referred claims
under the contract to the courts of Tucumán did not preclude the jurisdiction of the
international tribunal with respect to claims based on a violation of the treaty.[307]

The Tribunal in *Feldman* v. *Mexico* also considered the availability of local **221**
remedies in examining the Claimant's allegations of unlawful conduct by the host
State. The Tribunal drew attention to the fact that the Claimant had failed to seek
an administrative ruling and court review regarding the withdrawal of certain tax
benefits affecting its investment. The Tribunal concluded that the State's conduct
was not tantamount to expropriation.[308]

In *Loewen* v. *USA*, the question of the exhaustion of local remedies was exam- **222**
ined in connection with a denial of justice. The Tribunal interpreted it as "an
obligation to exhaust remedies which are effective and adequate and are reason-
ably available to the complainant in the circumstances in which it is situated".[309] In
other words, as observed later by the Tribunal in *Waste Management II*, the *Loewen*
Tribunal interpreted the exhaustion of local remedies not only as a procedural pre-
requisite to an international claim but as part of the substantive standard.[310]

In *Generation Ukraine* v. *Ukraine*, the Claimant complained of an indirect **223**
expropriation.[311] The Tribunal found that the Claimant should have at least
attempted to bring its claim before the domestic courts and explained its rea-
soning as follows:

> In such instances, an international tribunal may deem that the failure to seek
> redress from national authorities disqualifies the international claim, not because
> there is a requirement of *exhaustion* of local remedies but because the very
> reality of conduct tantamount to expropriation is doubtful in the absence of
> a *reasonable* – not necessarily exhaustive – effort by the investor to obtain
> correction.[312]

---

305  *Vivendi* v. *Argentina*, Award, 21 November 2000, para. 80.
306  *Ibid.*, para. 81.
307  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 76.
308  *Feldman* v. *Mexico* (AF), Award, 16 December 2002, paras. 114 and 134.
309  *Loewen* v. *USA* (AF), Award, 26 June 2003, para. 168.
310  *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, para. 97.
311  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 20.30, 20.33.
312  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 20.30. Emphasis in the orig-
     inal. See also *Lauder* v. *Czech Republic* (UNCITRAL), Award, 3 September 2001, para. 204;
     *EnCana* v. *Ecuador* (UNCITRAL), Award, 3 February 2006, para. 194.

**224**    The Tribunal further stated:

> In the circumstances of this case, the conduct cited by the Claimant was never
> challenged before the domestic courts of Ukraine. More precisely, the Claimant
> did not attempt to compel the Kyiv City State Administration to rectify the alleged
> omissions in its administrative management of the Parkview Project by instituting
> proceedings in the Ukrainian courts. There is, of course, no formal obligation
> upon the Claimant to exhaust local remedies before resorting to ICSID arbitration
> pursuant to the BIT. Nevertheless, in the absence of any *per se* violation of the BIT
> discernable from the relevant conduct of the Kyiv City State Administration, the
> only possibility in this case for the series of complaints relating to highly technical
> matters of Ukrainian planning law to be transformed into a BIT violation would
> have been for the Claimant to be denied justice before the Ukrainian courts in a
> *bona fide* attempt to resolve these technical matters.[313]

**225**    The Tribunal in *Waste Management* v. *Mexico II* discussed the issue of exhaus-
tion of local remedies in connection with the State's obligation to ensure investors
fair and equitable treatment and full protection and security.[314] The *Waste Man-
agement II* Tribunal also considered the issue important not only on a procedural
level, but also with respect to a State's compliance with substantive standards. The
Tribunal held:

> It is true that in a general sense the exhaustion of local remedies is a proce-
> dural prerequisite for the bringing of an international claim, one which is dis-
> pensed with by NAFTA Chapter 11. But the availability of local remedies to
> an investor faced with contractual breaches is nonetheless relevant to the ques-
> tion whether a standard such as Article 1105(1) has been complied with by the
> State.[315]

**226**    The Tribunal in *Jan de Nul* v. *Egypt* agreed with the Claimants' legal expert that
there is "a clear trend of cases requiring an attempt to seek redress in domestic
courts before bringing a claim for violations of BIT standards irrespective of any
obligation to exhaust local remedies".[316]

**227**    In *Saipem* v. *Bangladesh*, the Tribunal rejected, on the basis of Art. 26,
Bangladesh's arguments that Saipem's claim was not admissible for failure to
meet the requirement to exhaust local remedies. The Tribunal recognized that this
requirement does apply to claims of denial of justice but this was a substantive
rather than a procedural matter. Since Saipem's claim was based on expropria-
tion and the expropriating authority was a judicial body, the Tribunal raised the
question of a possible application by analogy of the exhaustion of local remedies
requirement. However, the Tribunal refrained from deciding the issue which was
left for consideration at the merits stage.[317]

---

313  *Ibid.*, para. 20.33.
314  *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 97, 116.
315  *Ibid.*, para. 116.
316  *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 121.
317  *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 150–153.

The Award in *Parkerings* v. *Lithuania* repeatedly referred to the possibility of, or the need for, obtaining preliminary determinations by domestic courts without explaining the relationship of this requirement to Art. 26.[318]   **228**

## 4. General Considerations

It is questionable whether insistence by a host State on the exhaustion of local remedies prior to ICSID arbitration serves any useful purpose. Most consent agreements do not, in fact, contain this condition. Some of the BITs that refer to resort to local remedies do so under severe time constraints demonstrating the half-hearted nature of the adherence to the principle of exhaustion of local remedies. Claimants have succeeded in avoiding the imposition of time-limits for the exhaustion of local remedies by relying on MFN clauses in the relevant BITs (see paras. 202–205 *supra*).   **229**

Insistence on the exhaustion of local remedies does not seem to serve the interests of either party. From the investor's perspective, resort to local remedies before the institution of ICSID arbitration is a waste of time and money. The host State's investment climate may be affected by the public proceedings in its courts and may further exacerbate the dispute between the parties. If the ICSID tribunal overturns a decision by the host State's highest court, this may be a source of embarrassment. Therefore, it seems wisest to leave the Convention's basic rule of non-exhaustion in place and to follow the example of the vast majority of consent agreements in not requiring the exhaustion of local remedies.   **230**

The cases examined above show a consistent approach of ICSID tribunals not to impose an obligation to exhaust local remedies before a case is brought to international arbitration. Nevertheless, some tribunals have required an attempt to seek redress before the courts of the host State not as a procedural pre-requisite, but in order to show that a substantive standard under the treaty had been violated.   **231**

---

318   *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 316–320, 344, 360, 361, 449, 453, 454.

# Article 27

**(1) No Contracting State shall give diplomatic protection, or bring an international claim, in respect of a dispute which one of its nationals and another Contracting State shall have consented to submit or shall have submitted to arbitration under this Convention, unless such other Contracting State shall have failed to abide by and comply with the award rendered in such dispute.**

**(2) Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplomatic exchanges for the sole purpose of facilitating a settlement of the dispute.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–8 |
| II. | INTERPRETATION | 9–50 |
|  | A. General | 9 |
|  | B. "(1) No Contracting State . . ." | 10–12 |
|  | C. ". . . shall give diplomatic protection, . . ." | 13–17 |
|  | D. ". . . or bring an international claim, . . ." | 18–23 |
|  |   1.   Inter-State Arbitration | 18–22 |
|  |   2.   The International Court of Justice | 23 |
|  | E. ". . . in respect of a dispute which one of its nationals and another Contracting State . . ." | 24–29 |
|  | F. ". . . shall have consented to submit or shall have submitted to arbitration under this Convention, . . ." | 30–37 |
|  | G. ". . . unless such other Contracting State shall have failed to abide by and comply with the award rendered in such dispute." | 38–43 |
|  | H. "(2) Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplomatic exchanges for the sole purpose of facilitating a settlement of the dispute." | 44–50 |

## BIBLIOGRAPHY

*Kokott*, *J.*, The Role of Diplomatic Protection in the Field of the Protection of Foreign Investment, International Law Association 70th Conference, New Delhi (2002);

*Schreuer*, *C.*, Investment Protection and International Relations, *in*: The Law of International Relations, Liber Amicorum Hanspeter Neuhold (*Reinisch, A./Kriebaum, U.* eds.) 345 (2007).

*Article 27 – Diplomatic Protection*    415

# I. INTRODUCTION

Diplomatic protection is a concept of customary international law whereby a **1** State espouses the claim of its national against another State and pursues it in its own name.[1] It was developed as a consequence of the non-availability of international remedies to individuals and corporations under traditional international law. Diplomatic protection depends on a number of conditions. The individual's or corporation's nationality of the protecting State must be established. This bond of nationality must have existed continuously from the time of the injury until the claim is made or, according to some, until the claim is settled. There must have been a wrongful act under international law on the part of the State against which diplomatic protection is to be exercised. The legal remedies in the State that has allegedly committed the violation must have been exhausted by the individual or corporation concerned.

In addition to these stringent legal requirements, a number of political factors **2** reduce the usefulness of this device to the private party. The individual or corporation has no right to diplomatic protection under international law but depends on the political discretion of his government. The government may refuse to take up the claim. It may discontinue diplomatic protection at any time. It may waive the national's claim or agree to a reduced settlement. As soon as a State has taken up the claim of its national, the claim becomes part of the foreign policy process with all the attendant political risks.

Diplomatic protection as an institution of international law has not remained **3** unchallenged. Under the so-called Calvo Doctrine, Latin American countries have sought to exclude any special rights for foreigners.[2] This has led them to reject

---

1  In 2006 the International Law Commission ("ILC") adopted Draft Articles on Diplomatic Protection. See Official Records of the General Assembly, Sixty-first Session, Supplement No. 10 (A/61/10). Article 17 of these draft articles ("Special rules of international law") states: "The present draft articles do not apply to the extent that they are inconsistent with special rules of international law, such as treaty provisions for the protection of investments." The Commentary to this Article describes the treaty regime for the protection of foreign investments, especially through the ICSID Convention and BITs. The Commentary states that draft article 17 makes it clear that the draft articles do not apply to this treaty regime to the extent that they are inconsistent with the provisions of a BIT.

2  Echoes of the Calvo Doctrine can still be heard in recent ICSID arbitrations. Respondent States have repeatedly objected to the jurisdiction of ICSID tribunals arguing that the investors had agreed to national forum selection clauses, thus precluding ICSID arbitration. ICSID tribunals have uniformly rejected this argument, stressing the difference between the proceedings before local courts, which concern disputes arising out of a breach of the contractual agreements, and the jurisdiction of ICSID tribunals, based on a treaty violation. See Article 26 paras. 73–109. In particular, in *AES* v. *Argentina*, one of Argentina's jurisdictional objections drew a comparison between the waiver of jurisdiction in that case and the Calvo Clause. The Tribunal, in its Decision on Jurisdiction, rejected the comparison as irrelevant and stated that the Calvo Clause could only make sense by reference to the notion of diplomatic protection, a notion which "is per *definition* put aside" under the ICSID system of dispute settlement. See *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 97–99. See also *Schreuer, C.*, Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, 4 The Law and Practice of International Courts and Tribunals 1 (2005).

diplomatic protection as an undesirable or even impermissible interference in their internal affairs or to limit it to cases of denial of justice.

**4**     Against this background, the arbitration procedure provided by ICSID offers considerable advantages to both sides. The foreign investor no longer depends on the uncertainties of diplomatic protection but obtains direct access to an international remedy. The dispute settlement process is depoliticized and subjected to objective legal criteria. Moreover, there is no requirement to exhaust local remedies before resorting to ICSID arbitration unless this has been made an explicit condition of consent by the host State (see Art. 26, paras. 187–231). In turn, by consenting to ICSID arbitration the host State obtains the assurance that it will not be exposed to an international claim by the investor's home State, as long as it abides by the award. Diplomatic protection in investment disputes by capital exporting countries against developing countries has been a frequent source of irritation for the latter.

**5**     Art. 27 must also be seen in the context of the exclusive remedy rule of Art. 26. Like Art. 26, Art. 27 only applies to arbitration but not to conciliation. As a condition of submission to ICSID arbitration, the parties not only relinquish resort to national and international judicial remedies but also forego resort to the political remedy of diplomatic protection. However, there is an important difference between the two provisions. Whereas the exclusive remedy rule of Art. 26 is subject to variation by the parties ("unless otherwise stated"), the exclusion of diplomatic protection is mandatory. In other words, it is not possible to reserve the right to diplomatic protection when submission is made to ICSID arbitration. This mandatory exclusion of diplomatic protection makes sense. A combination of arbitration and diplomatic protection would lead to undesirable results. The balance of interests between the parties would be upset if the host State, after consenting to international arbitration, remained exposed to diplomatic protection by the investor's home State. In fact, the guarantee against diplomatic protection may constitute a strong incentive for the host State to consent to arbitration. Also, the arbitration process between the host State and the foreign investor could be severely hampered by simultaneous efforts to pursue the claim through diplomatic channels.

**6**     Art. 27 is the last of three Articles in the Convention's Chapter II on Jurisdiction of the Centre. But it would be erroneous to assume that abstention from diplomatic protection is a condition for the Centre's jurisdiction. A violation of Art. 27 will not affect the Centre's jurisdiction or the tribunal's competence but will enable the host State to legitimately resist diplomatic protection. An international court or tribunal before which a claim is brought in violation of Art. 27 will have to decline jurisdiction[3] (see para. 22 *infra*).

---

3  *Amerasinghe, C. F.*, The Jurisdiction of the International Centre for the Settlement of Investment Disputes, 19 Indian Journal of International Law 166, 226/7 (1979).

*Article 27 – Diplomatic Protection*                                                      417

In *Banro* v. *DR Congo*[4] Canada – not a Contracting Party to the ICSID Convention at the time – gave diplomatic protection to its national, Banro Resource. The request for arbitration was first introduced by an affiliate of Banro Resource, the US company Banro American. The United States did not provide diplomatic protection to Banro American. The Tribunal said:                                                     **7**

> . . . the United States did not intervene diplomatically in favour of Banro American. If they had, they would have violated Article 27 of the ICSID Convention and would have committed an unlawful act under international law, however, such act would not affect the jurisdiction of this Tribunal.[5]

A similar conclusion was reached in *Autopista* v. *Venezuela* where the Tribunal found that the efforts of Mexican officials towards an amicable resolution did not affect jurisdiction:                                                     **8**

> While active solicitation of diplomatic protection by the investor might be a violation of Article 26, there is no support, however, for the proposition that an ICSID tribunal may deny jurisdiction on this ground.[6]

The Tribunal added that even if Mexico's interventions were to constitute prohibited diplomatic interventions in the meaning of Art. 27, this would have no bearing on its jurisdiction.[7]

## II. INTERPRETATION

### A.  General

Diplomatic protection does not appear to have created any practical problems in the context of ICSID arbitration. Nowadays most disputes relating to investments are referred to arbitration through the mechanism offered by treaties on investment protection. Investment tribunals have pointed to these treaty arrangements as a *lex specialis* which, although not amounting to a rule of customary law, can now be considered the general rule in respect of foreign investments.[8] Diplomatic protection has become "a residual mechanism available when the affected individual has no direct channel to claim on its own right".[9]                                                     **9**

### B.  "(1) No Contracting State . . ."

Under the terms of Art. 27, the obligation to refrain from diplomatic protection is incumbent upon Contracting States. Under normal circumstances, States that are not parties to the ICSID Convention will not have the opportunity to exercise diplomatic protection in the context of ICSID arbitration since access to the Centre is open only to nationals of Contracting States (History, Vol. II, p. 406).                                                     **10**

---

4   *Banro* v. *DR Congo* – excerpts of the Award are published in ICSID Review 380 (2002) at paras. 18 and 19.
5   *Banro* v. *DR Congo*, Award, 1 September 2000, para. 18.
6   *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, para. 75.
7   At para. 140.
8   *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 157.
9   *Loc. cit.* See also *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 157.

Nevertheless, there are possible situations where cases involving nationals of non-Contracting States might be subject to ICSID arbitration. An investor may have dual nationality or his nationality may be unclear (see also para. 24 *infra*). A corporate investor may possess the nationality of a Contracting State while a shareholder in the corporation does not (see Art. 25, para. 150). In situations of this kind, the investor may have gained access to ICSID arbitration as a national of a Contracting State. A non-Contracting State may, nevertheless, claim him or her as its own national and proceed to exercise diplomatic protection (see Art. 25, paras. 660–663, 741–751). But in the case of diplomatic protection by a non-Contracting State, the host State may insist on the exhaustion of local remedies since the rule of non-exhaustion (see Art. 26, paras. 188–191) only applies to relations between Contracting States.

**11**     There is no simple solution to situations of this kind. The obligation imposed by Art. 27 does not apply to non-Contracting States. Since diplomatic protection is a right of the protecting State and not of the national to be protected, consent to ICSID arbitration by the investor cannot be construed as a valid waiver of diplomatic protection. This is why Art. 27 is addressed to Contracting States and not to investors. On the other hand, diplomatic protection is rarely accorded unless it is actively solicited by the national to be protected. Any solicitation of diplomatic protection (except in the case of a non-performance of an award) by an investor who has consented to ICSID arbitration is clearly contrary to the spirit of the Convention. It is also a violation of Art. 26, which excludes any other remedy where consent to arbitration has been given (see Art. 26, para. 186). A Tribunal that is aware of an attempt by a non-State party before it to enlist the diplomatic protection of a non-Contracting State to the Convention should view this action as a sign of procedural impropriety. Where appropriate, it might issue provisional measures in accordance with Art. 47 of the Convention to enjoin the party from seeking diplomatic protection. Non-compliance with provisional measures or other signs of bad faith may be taken into account when rendering the award on the merits and for the allocation of costs (see Art. 47, paras. 31–36).

**12**     An interesting example of this kind of situation is provided by *Banro* v. *Congo* where Canada had provided diplomatic protection to Banro Resource while arbitration was sought by a US company of the Banro group, Banro American (see para. 7 *supra*). The Tribunal held that the prohibition of requesting diplomatic protection and asserting ICSID jurisdiction simultaneously applies equally to the investor and the State and that Art. 27, read in the context of Art. 26, must be interpreted in the sense of preventing the investor from using a plurality of channels.[10] The Tribunal observed that, since Canada had chosen not to be a party to the ICSID Convention, it was free to provide diplomatic protection to one of its

_____
10   *Banro* v. *DR Congo*, Award, 1 September 2000, para. 20.

nationals. However, the Tribunal also noted that the Banro group was not at liberty to pursue diplomatic protection on the part of the Canadian Government by using the nationality of the parent company, Banro Resource, as well as ICSID arbitration proceedings by availing itself of the nationality of one of its subsidiaries, Banro American.[11] The Tribunal said:

> since the ICSID Convention has as its purpose and aim to protect the host State from diplomatic intervention on the part of the national State of the investor and to "depoliticize" investment relations, it would go against this aim and purpose to expose the State to, at the same time, both diplomatic pressure and an arbitration claim.[12]

## C.  ". . . shall give diplomatic protection, . . ."

The Executive Directors' Report summarizes the idea underlying the exclusion   **13**
of diplomatic protection in Art. 27 as follows:

> 33. When a host State consents to the submission of a dispute with an investor to the Centre, thereby giving the investor direct access to an international jurisdiction, the investor should not be in a position to ask his State to espouse his case and that State should not be permitted to do so. Accordingly, Article 27 expressly prohibits a Contracting State from giving diplomatic protection, or bringing an international claim, in respect of a dispute which one of its nationals and another Contracting State have consented to submit, or have submitted, to arbitration under the Convention, unless the State party to the dispute fails to honor the award rendered in that dispute.

In the course of the Convention's drafting, the exclusion of diplomatic protection   **14**
was variously explained in terms of the obligation to abide by the agreement to arbitrate (History, Vol. II, pp. 74, 80, 221), the protection of the host State from having to deal with a multiplicity of claims and claimants (at pp. 242, 303, 372, 464, 527), the removal of the dispute from the realm of politics and diplomacy into the realm of law (at pp. 242, 273, 303, 372, 464) and the absence of any necessity for diplomatic protection once the investor gained direct access to an international remedy (at pp. 221, 242, 273, 303, 372, 432, 464, 960).

Although there seemed to be general agreement that diplomatic protection   **15**
should not be available under the conditions described in Art. 27, some experts objected to the mention of the concept in the Convention. Especially experts from Latin America feared that by expressly excluding diplomatic protection under these conditions, the Convention might imply that it was available otherwise (History, Vol. II, pp. 349, 350, 432, 576). The reference to diplomatic protection was retained nevertheless.

The Preliminary Draft of the Convention contained a reference to diplomatic   **16**
protection in its preamble:

---

11  At para. 23.
12  At para. 19.

> 3. RECOGNIZING that while such disputes would usually be subject to national legal processes (without prejudice to the right of any State to espouse a claim of one of its nationals in accordance with international law), international methods of settlement may be appropriate in certain cases;[13]

Following objections by experts from Brazil and from Venezuela (History, Vol. II, pp. 306, 364), the reference to diplomatic protection in the preamble was omitted in the subsequent First Draft (at p. 611) and does not appear in the Convention's final text.

**17**    The misgivings of some experts about completely relinquishing the capacity of the investor's home State to take any action (History, Vol. II, pp. 62 *et seq.*, 1032) were accommodated through the insertion of the second paragraph on informal diplomatic exchanges (see para. 44 *infra*). The words "or bring an international claim" were put between commas in order to clarify the fact that diplomatic protection would only be suspended under the specific circumstances set forth in the Article (at p. 1032). Put differently, the words "No Contracting State shall give diplomatic protection" must not be read in isolation but apply only in respect of a dispute that the parties have consented to submit or have submitted to ICSID arbitration.

### D. ". . . or bring an international claim, . . ."

#### 1. Inter-State Arbitration

**18**    The reference to an international claim separated by "or" from the phrase dealing with diplomatic protection would indicate that an international claim in this context is something distinct from or additional to diplomatic protection. In actual fact, bringing an international claim is a typical element of diplomatic protection. The reason for this particular phrase is the existence of arbitration clauses in many bilateral investment treaties (BITs) for the settlement of disputes between the States parties to the treaties. This opens the possibility of two different arbitration procedures arising from the same claim: one under ICSID between the investor and the host State, the other between the two States based on the alleged violation of the investment treaty.[14]

**19**    This possibility greatly concerned the drafters of the Convention. Mr. *Broches* pointed out that under these circumstances abstract questions of interpretation of a treaty might be arbitrated between the States parties to it but that the outcome of any such arbitration would not affect the decision in the case before ICSID to which the investor was a party (History, Vol. II, pp. 65, 66). A separate paragraph was added into the Preliminary Draft to make this clear:

> (2) Nothing in this Section shall be construed as precluding a Contracting State from founding an international claim against another Contracting State upon the facts of a dispute which one of these Contracting States and a national of the other

---

13   History, Vol. II, p. 187.
14   See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 376 *et seq.* (1972-II).

shall have consented to submit or shall have submitted to arbitration pursuant to this Convention, where those facts also give rise to a dispute concerning the interpretation or application of an agreement between the States concerned; without prejudice, however, to the finality and binding character of any arbitral award rendered pursuant to this Convention as between the parties to the arbitral proceedings.[15]

In the ensuing debates, Mr. *Broches* pointed out that an award in a subsequent inter-State arbitration would not affect an existing ICSID award but would only be declaratory. However, an ICSID tribunal was likely to consider itself bound by an earlier decision under the bilateral agreement (History, Vol. II, pp. 273, 274, 349, 350, 527, 528, 576).[16] Nevertheless, a number of delegates had misgivings about this provision fearing it might lead to conflicting decisions or might provide dual remedies in cases where investments were covered by State-run investment insurance (at pp. 433, 435, 528, 577). The conclusion was that the continued availability of inter-State dispute settlement should be regarded as self-evident and that the reference to it could give rise to widespread misunderstanding. Therefore, it seemed wiser to drop it (at p. 577). No provision to this effect was introduced in the subsequent drafts nor does the Convention refer to inter-State arbitration. **20**

The removal of the clause referring to inter-State arbitration from the drafts did not resolve the underlying problem. Parallel proceedings of this kind do not strictly compete with each other since they involve different parties. Nevertheless, conflicting decisions on the same question, possibly involving the same set of facts, are feasible and clearly undesirable. One possibility to deal with the matter is a provision in the BIT barring inter-State arbitration where ICSID arbitration has been instituted or is available. A possible formula was suggested in the 1969 ICSID Model Clauses for Use in Bilateral Investment Agreements.[17] Clauses of this kind have been utilized in practice.[18] **21**

Even in the absence of such a provision in a BIT, a tribunal in an inter-State arbitration may be expected to decline jurisdiction if the claim brought before it is in conflict with Art. 27. This would be the case if the inter-State proceedings are designed to avoid, obstruct or influence ICSID arbitration or if they are designed to affect the implementation of an ICSID award or revise its outcome. This does not mean that the mere existence of a valid consent to ICSID arbitration will necessarily exclude a claim from inter-State arbitration. Under the terms of Art. 27, a claim may be brought by the investor's State of nationality if the host **22**

---

15  History, Vol. I, p. 136; Vol. II, p. 221. See also the comment at p. 222 and the Annotated First Preliminary Draft Convention at pp. 163 *et seq.*

16  See also *Broches*, The Convention, pp. 376 *et seq.*

17  8 ILM 1341 at 1346 (1969).

18  See some older United States BITs, such as, for instance: United States-Turkey BIT (1985) Art. VII(7); United States-Cameroon BIT (1986) Art. VIII(9); United States-Senegal BIT (1983) Art. VIII(7). See also *Gann, P. B.*, The U.S. Bilateral Investment Treaty Program, 21 Stanford Journal of International Law 373, 423, 454 (1985); *Ziadé, N. G.*, ICSID and Arab Countries, News from ICSID, Vol. 5/2, p. 7 (1988). The more recent BITs of the United States no longer contain this clause. See also *Dolzer/Stevens*, Bilateral Investment Treaties, p. 249.

State has failed to abide by the ICSID award (see paras. 38–43 *infra*). In addition, an investor may have been compensated by an investment insurance operated by its home State. As a consequence, the insurer succeeds to the investor's claim by way of subrogation. Since the investor's home State has no access to ICSID arbitration, it may obligate the investor to pursue the claim through ICSID despite the fact that it has been indemnified under the insurance (see Art. 25, paras. 364–373). Alternatively, the investor's home State may pursue the claim directly against the host State as the investor's subrogee. Some BITs reserve the right of the investor's State of nationality to pursue claims through inter-State arbitration against the host State in case of subrogation.[19]

### 2. The International Court of Justice

23    Art. 64 provides that disputes between Contracting Parties concerning the interpretation or application of the Convention are to be referred to the International Court of Justice (ICJ). In the course of the drafting of the Convention, some delegates showed concern that the clause, which eventually became Art. 64, might lead to conflicts with the activities of ICSID tribunals (History, Vol. II, pp. 274, 439, 906). The Report of the Executive Directors clearly establishes that Art. 64 must not be used to undermine or circumvent consent to ICSID arbitration. The Report specifically states that Art. 64 does *not*:

> 45. . . . empower a State to institute proceedings before the Court in respect of a dispute which one of its nationals and another Contracting State have consented to submit or have submitted to arbitration, since such proceedings would contravene the provisions of Article 27, unless the other Contracting State had failed to abide by and comply with the award rendered in that dispute.

### E. ". . . in respect of a dispute which one of its nationals and another Contracting State . . ."

24    One of the cornerstones of diplomatic protection is the requirement that the protected individual or corporation must have the nationality of the protecting State. In the case of corporations, difficulties have arisen where the formal aspects of nationality, *i.e.* the place of the company's incorporation or its registered office, do not coincide with the economic control over the corporation, *i.e.* the nationality of the shareholders. Under traditional international law, as evidenced by the International Court of Justice's decision in the *Barcelona Traction* case,[20] the company's incorporation and registered seat are decisive. However, the ICSID Convention offers a more flexible approach towards questions of nationality. For purposes of the Centre's jurisdiction, the parties may determine the nationality of the foreign investor by agreement under certain circumstances (see Art. 25, paras. 708–717). In particular, it may be agreed under Art. 25(2)(b) that a juridical person having

---

19  See also *Ziadé, N. G.*, ICSID Clauses in the Subrogation Context, News from ICSID, Vol. 7/2, p. 6 (1990).

20  *Barcelona Traction, Light and Power Co., Ltd. (Belgium v. Spain)*, Judgment, 5 February 1970, 1970 ICJ Reports 3.

the nationality of the host State should be treated, because of foreign control, as a national of another Contracting State "for the purposes of this Convention" (see Art. 25, paras. 760–902). The question arises whether an agreed determination of nationality would also apply to the provision on diplomatic protection in Art. 27.

No problems are likely to arise in cases covered by the first part of Art. 27(1). **25** If diplomatic protection is disallowed, it makes no difference which concept of nationality is invoked by a State attempting to exercise it. A State claiming to exercise it on the basis of incorporation or location of the corporation's *siège social* will be just as much debarred by Art. 27(1) as a State relying on foreign control and an agreement of the parties concerning nationality.[21] Either the investor is a national of the protecting State, in which case Art. 27(1) will not allow diplomatic protection, or the investor is not a national of the protecting State, in which case diplomatic protection will not be available under traditional international law.[22]

The question of nationality becomes acute where diplomatic protection is **26** revived as a consequence of a State's failure to abide by and comply with an ICSID award (see paras. 38–43 *infra*). In this situation, a decision will have to be made whether diplomatic protection may only be exercised in accordance with traditional concepts of the nationality of corporations or also on the basis of any agreement on nationality that the parties may have made.

It has been suggested that under the Convention nationality is irrelevant in this **27** context. Under this theory, Art. 64, which provides for the settlement of disputes concerning the interpretation or application of the Convention between Contracting States by the International Court of Justice, should be read as giving standing to every Party to the Convention to insist on the compliance with awards. This means that every State Party to the Convention would have an enforceable interest in the observance of the Convention irrespective of the nationality of the investor. Therefore, any Contracting State could bring a case before the ICJ alleging noncompliance with an award without having to prove a bond of nationality.[23]

Even if it were true that Art. 64 gives a right of action to all Contracting **28** States since they have an interest in the Convention's faithful observance (see para. 38 *infra*), this does not resolve the problem of diplomatic protection and the attendant question of nationality. While any Contracting Party may require the Convention's observance in general terms, only the national State of an aggrieved investor demanding compliance with an ICSID award may espouse the claim and pursue it in its own name. It may demand payment directly to the protecting State, it may freeze assets of the delinquent State to obtain payment and it may offset any claim that the delinquent State may have against the protecting State. A State exercising diplomatic protection is in a much stronger position than a Contracting State demanding compliance with the Convention in general terms.

---

21    *Cf. Broches*, The Convention, p. 375.
22    *Szasz, P. C.*, The Investment Disputes Convention – Opportunities and Pitfalls (How to Submit Disputes to ICSID), 5 Journal of Law and Economic Development 23, 35 (1970).
23    *Broches*, The Convention, pp. 379 *et seq.*

**29**    If the right to diplomatic protection becomes available because the State party to ICSID arbitration has failed to comply with an award, the more flexible model of nationality under the Convention should be applied. This means that a valid agreement on nationality should also apply to the post-award phase for purposes of diplomatic protection. The wording of Art. 25(2)(b) envisages that the agreement on nationality should be "for the purposes of this Convention" and not just for purposes of ICSID's jurisdiction. A systematic interpretation of the Convention would also suggest that it is more rational to use the same concept of nationality for purposes of jurisdiction and for purposes of securing compliance with an award. Most importantly, the effectiveness of the Convention requires that the remedy of diplomatic protection to enforce awards be available to all investors irrespective of the basis on which they have gained access to the Centre. It would not make sense to grant the possibility to obtain post-award diplomatic protection to investors who are incorporated in or have their registered office in another Contracting State but not to those which the host State specifically consented to treat as nationals of another Contracting State. Any expectation that non-compliance with awards would lead to different consequences for different categories of investors is liable to have an adverse effect on the entire arbitration process.

### F.  ". . . shall have consented to submit or shall have submitted to arbitration under this Convention, . . ."

**30**    Under the wording of the Convention, the suspension of the right to diplomatic protection operates from the moment consent is given to ICSID arbitration and not just from the moment proceedings are instituted. At one point in the course of the Convention's drafting, a suggestion was made to allow diplomatic protection until a dispute is brought before the Centre and to exclude it only during the period when proceedings are actually in progress, since diplomatic means might be used to prevent litigation (History, Vol. II, p. 763). A show of hands on this proposal revealed that a majority was against it (at p. 765) (see also para. 44 *infra*).

**31**    Where the existence of valid consent to ICSID arbitration is disputed, the appropriate procedure would be to submit a request for arbitration. If the Secretary-General has found, in accordance with Art. 36(3), that the dispute is manifestly outside the jurisdiction of the Centre or if the tribunal has determined that the Centre does not have jurisdiction, Art. 27 does not apply and any right to diplomatic protection may be exercised. This rule is sometimes stated in bilateral investment treaties (see para. 21 *supra*, 34, 36 *infra*).

**32**    Practical problems may arise where the investor does not institute proceedings and the State of the investor's nationality denies the Centre's jurisdiction in order to start exercising diplomatic protection. The host State against which the claim is put forward is unlikely to institute ICSID proceedings in which it finds itself in a defensive role. Even if the host State has merely argued for purposes of Art. 27 that the Centre has jurisdiction it can no longer credibly dispute jurisdiction in any subsequent ICSID proceedings.

Under the wording of Art. 27, both parties to a dispute, the foreign investor **33** and the host State, must have consented to arbitration. Consent in writing in accordance with Art. 25 need not be expressed in a single instrument between the parties. It may be based on investment legislation in the host State or on a clause in a treaty between the host State and the State of the investor's nationality. In such a case, the acceptance by the investor of the offer contained in the legislation or the treaty may take place at any time before the institution of proceedings or, most likely, by actually commencing proceedings before the Centre (see Art. 25, paras. 416–426, 447–455). In situations where the host State has offered consent to ICSID arbitration but the investor has not explicitly accepted the offer nor started proceedings, Art. 27 does not apply. Therefore, the investor retains the option to request diplomatic protection from its home State despite the fact that ICSID arbitration is open to it. But in that case, the investor would first have to exhaust local remedies. It does not appear that this question was ever considered during the Convention's drafting. A choice between ICSID arbitration and diplomatic protection appears to be contrary to at least some of the avowed purposes of Art. 27 (see paras. 13, 14 *supra*).

This situation may be remedied by an agreement between the host State and the **34** investor's home State to the effect that no diplomatic protection will be given where the host State has offered consent to submit disputes to ICSID arbitration. The 1969 ICSID Model Clauses for Use in Bilateral Investment Agreements suggested a specific formula for this purpose.[24] As the commentary to that provision explains, the principle on which it is based is "that the host State might already be offered immunity from diplomatic intervention or international claims if and as soon as it indicates its willingness to submit a dispute to the Centre – even if the investor fails to do so".

To make it absolutely clear that the investor does not have a choice of remedies, **35** another formula is suggested in the same document:

> IX. *Condition for requesting diplomatic intervention*
> [The Contracting Parties agree that] Article 27 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States shall also apply in respect of any dispute which the national concerned has declined to submit to the International Centre for Settlement of Investment Disputes for settlement by arbitration under the Convention.[25]

Older British BITs deal with the relation between diplomatic protection and **36** submission of disputes to the Centre in the following terms:

> Neither Contracting Party shall pursue through the diplomatic channel any dispute referred to the Centre unless
> (a) the Secretary-General of the Centre, or a conciliation commission or an arbitral tribunal constituted by it, decides that the dispute is not within the jurisdiction of the Centre, or

---

24  8 ILM 1341 at 1345 (1969).
25  8 ILM 1341 at 1351 (1969).

    (b)  the other Contracting Party should fail to abide by or to comply with any award rendered by an arbitral tribunal.[26]

**37**    Unfortunately, the terse formula "any dispute referred to the Centre" is not very clear.[27] Presumably, "referred to" covers not only the actual institution of proceedings but also consent to jurisdiction (see para. 30 *supra*). A negative finding on jurisdiction by the Secretary-General or the tribunal opens the way for diplomatic protection but it is not clear who would have to take the initiative to obtain such a finding (see paras. 31, 32 *supra*). It is also not entirely clear whether "referred to" means consent by both parties or just the offer by the host State expressed in the BIT (see paras. 33–35 *supra*). The context of the investment treaty suggests that what is meant is reference by the treaty. This interpretation is supported by the fact that the ICSID clauses in these treaties bear the heading "Reference to International Centre for Settlement of Investment Disputes". If this reading is correct, consent to ICSID arbitration by the investor would not be required to block diplomatic protection.[28] Any other interpretation of these BIT clauses would render them redundant since they would add nothing to Art. 27 of the Convention.

### G.  "... unless such other Contracting State shall have failed to abide by and comply with the award rendered in such dispute."

**38**    The last part of Art. 27(1) makes it clear that the right of diplomatic protection will revive in case of non-compliance with the award. This should be seen in the context of Arts. 53 and 54 of the Convention, dealing with the binding effect and enforcement of awards. Diplomatic protection is an alternative and supplement to the judicial enforcement of awards. In exercising diplomatic protection, the national State of the investor may avail itself of Art. 64 of the Convention, giving jurisdiction to the International Court of Justice to settle disputes between Contracting States concerning the interpretation or application of the Convention (History, Vol. II, p. 906).[29] However, Art. 64 merely provides an additional procedure for the exercise of the right existing under Art. 27 without creating a new cause of action. (See paras. 23, 26, 27 *supra*.)

---

26  Art. 8(4) of the UK Model Agreement (first alternative), *Dolzer/Stevens*, Bilateral Investment Treaties, p. 235. For other examples of similar provisions, see UK-United Arab Emirates BIT (1992) Art. 8(4); UK-Turkey BIT (1991) Art. 8(3); UK-Burundi BIT (1990) Art. 8(4). See also Belgo-Luxembourg Economic Union-Sri Lanka BIT (1982) Art. 10(6); Sweden-Sri Lanka BIT (1982) Art. 9(3); Sweden-Yemen BIT (1983) Art. 7(2); Switzerland-Sri Lanka BIT (1981) Art. 9(3); Australia-Laos BIT (1995) Art. 12(4). See also *Broches, A.*, Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration, Liber Amicorum Pieter Sanders 63 at 71 (1982); *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes §15.18 (1990); *Laviec, J.-P.*, Protection et promotion des investissements 288/9 (1985); *Langer, G.*, Das Weltbankübereinkommen zur Beilegung von Investitionsstreitigkeiten, 18 Recht der Internationalen Wirtschaft/Außenwirtschaftsdienst des Betriebs-Beraters 321 at 324 (1972).

27  The Swiss Model Agreement uses the words "a dispute submitted to the arbitration of the Centre" – see *Dolzer/Stevens*, Bilateral Investment Treaties, p. 225.

28  This interpretation is supported by *Laviec, loc. cit.*, note 93.

29  *Cf.* also *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, Annex II, para. 25.

In the course of the Convention's drafting, some delegates voiced concern that diplomatic protection to secure compliance with the award would create a one-sided situation in favour of the investor without a corresponding right for the host State in case the investor failed to abide by the award. The Chairman pointed out that there were sufficient means to enforce an award against the non-State party through the courts while there was no such possibility of enforcement against States (History, Vol. II, pp. 58, 59, 60, 763, 764, 767). Therefore, diplomatic protection to secure compliance with the award is also designed to counterbalance any State immunity that is preserved by Art. 55 of the Convention. **39**

The Working Paper and the Preliminary Draft to the Convention contained a somewhat wider description of the circumstances under which the right to diplomatic protection would revive. They were not restricted to non-compliance with an award but referred generally to violations of obligations under the Convention (History, Vol. II, p. 136). In the ensuing debates, there was some uncertainty as to what obligation other than compliance with awards should be secured by diplomatic protection (at pp. 349, 527, 763). In view of the automatic nature of ICSID proceedings and the possibility of an award being rendered by default, the more restrictive version referring only to compliance with awards was adopted (at pp. 764, 767). **40**

Some delegates from developing countries indicated that they would prefer the exclusion of diplomatic protection even in the context of securing compliance with awards (History, Vol. II, pp. 710, 764, 766). Other delegates showed a clear preference for the retention of diplomatic protection under these circumstances (at pp. 403, 430/1, 766/7). A show of hands on the proposal to exclude diplomatic protection even where a Contracting State had failed to abide by an award indicated a negative response (at p. 767). **41**

Provisions in bilateral investment treaties dealing with diplomatic protection in an ICSID context routinely state that the right may be exercised if the State party fails to abide by an award (see paras. 21, 34, 36 *supra*). **42**

Under the Convention, diplomatic protection after an award has been rendered is available exclusively for the purpose of its implementation. It does not afford another remedy independently of the award. Therefore, if an investor's claim or part of a claim has been rejected by the tribunal, it cannot be pursued through subsequent diplomatic protection. **43**

## H.  "(2) Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplomatic exchanges for the sole purpose of facilitating a settlement of the dispute."

No provision corresponding to Art. 27(2) was present in the earlier drafts to the Convention. Some delegates from developed countries expressed the view that informal diplomatic contacts might actually be useful and might facilitate negotiated settlements (History, Vol. II, pp. 433, 434, 576, 763, 764). A British proposal to retain the possibility of diplomatic assistance in the friendly settlement **44**

of a dispute (at pp. 667, 763 *et seq.*) was endorsed by the Chairman (at p. 764) and accepted by a majority in a show of hands (at pp. 764, 767, 880, 937). Therefore, para. 2 does not establish an exception to para. 1 of Art. 27 but is merely designed to avoid an overly strict interpretation of the basic rule. The espousal of a national's claim and the presentation of a formal international claim are not permitted under the conditions of Art. 27. Less formal international contacts are allowed.

**45**     In *Autopista* v. *Venezuela* the Tribunal was confronted with the diplomatic efforts by a State to reach an amicable settlement of the dispute. The Claimant was a Venezuelan company controlled by Mexican interests. Mexican officials attempted to find an amicable settlement of the dispute on several occasions including after the filing of the Request for Arbitration.[30] The Tribunal's Decision on Jurisdiction curiously made no express mention of paragraph 2 of Art. 27. It stated that Art. 27 would not apply to this case in any event since Mexico is not a Contracting Party to the ICSID Convention. In addition, it recalled that the prohibition of diplomatic protection contained in this Article is "not meant to discourage the amicable resolution of disputes".[31] The Tribunal emphasized the distinction made in Art. 27 between diplomatic protection and possible diplomatic efforts aimed at reaching an amicable resolution of a dispute and specified that, while the ICSID Convention provides a forum for dispute settlement, at the same time, "its purpose is not to commit parties to arbitration, when there is a possibility to reach an amicable solution".[32]

**46**     A different kind of State intervention took place in *Santa Elena* v. *Costa Rica*. The Claimant in that case was a Costa Rican company, the majority of whose shareholders were US citizens. The dispute arose in relation to the expropriation by Costa Rica of a property known as "Santa Elena". In recalling the events that occurred prior to the beginning of the arbitration, the Final Award mentioned that the US Government had exercised a form of indirect pressure to persuade Costa Rica to consent to ICSID arbitration. A 1994 law enacted by the United States prohibited foreign aid to any country that had expropriated property of US citizens or corporations of which US citizens owned at least 50% (the so-called "Helms Amendment"), unless the country provided an effective remedy including ICSID arbitration. This law was invoked against Costa Rica in connection with the granting of a loan to this country by the Inter-American Development Bank. The US Government requested a delay of the loan until Costa Rica consented to refer the *Santa Elena* case to ICSID arbitration.[33]

**47**     In *Aguas del Tunari* v. *Bolivia*, although there was no question of diplomatic protection, the investor's home State (the Netherlands) expressed an opinion on the interpretation of the relevant Netherlands-Bolivian BIT at the Tribunal's request

---

30  *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001, paras. 35–36 and 45–46.
31  At para. 72.                          32   At para. 138.
33  *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 24–25.

pursuant to Rule 34 of the ICSID Arbitration Rules.[34] The Tribunal's letter of inquiry addressed to the Legal Advisor of the Netherlands Foreign Ministry stated, in relevant part:

> The ICSID Convention entrusts the Tribunal with deciding upon its jurisdiction in this matter. The parties to this arbitration have put in issue provisions of the BIT between the Netherlands and Bolivia. Given that the Government of the Netherlands is not a party or otherwise present in this arbitration, the Tribunal concludes that information from the Government of the Netherlands would assist the work of the Tribunal. Given further the above quoted Article 27 of the ICSID Convention and the fact that the Netherlands is not a party to this arbitration, the Tribunal is also of the view that such questions must be specific and narrowly tailored, aiming at obtaining information supporting interpretative provisions of general application rather than ones related to a specific case.[35]

The Tribunal however found that the reply letter from the Netherlands Government did not provide it with any relevant information as to the BIT's interpretation. As a result, the Tribunal disregarded this document in reaching its decision.[36] **48**

A different situation arose in *SGS* v. *Pakistan*, where the Government of the Claimant's nationality took the unusual step of writing to ICSID to voice its disapproval as to the interpretation of the relevant BIT given by the Tribunal.[37] The Swiss Government, in a letter addressed to ICSID's Deputy Secretary-General, stated that the Swiss authorities were wondering why the Tribunal had not found it necessary to enquire about their view of the meaning of the provision of the Pakistan-Switzerland BIT in spite of the fact that the Tribunal attributed considerable importance to the intent of the Contracting Parties in drafting it. The Swiss authorities were alarmed by the interpretation given by the Tribunal to the provision. The letter added that the interpretation ran counter to the intention of Switzerland when concluding the Treaty and was neither supported by the meaning of similar articles in BITs concluded by other countries nor by academic comments.[38] **49**

Some bilateral investment treaties provide for the settlement of disputes by diplomatic means first, and only if these turn out to be unsuccessful, for settlement by ICSID.[39] Thus, Art. 10 of the Belgium Luxembourg-Cameroon Treaty of 1980 provides: **50**

> Preferably, this dispute shall be settled amicably by direct arrangement between the disputing parties, and failing, by conciliation between the contracting parties through diplomatic means.

---

34   *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 258–263.
35   At para. 258.                              36   At paras. 260–262.
37   *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003.
38   See *Alexandrov, S. A.*, Breaches of Contract and Breaches of Treaty, 5 The Journal of World Investment and Trade 555, 570–571 (2004); *Gaillard, E.*, Investment Treaty Arbitration and Jurisdiction Over Contract Claims – The SGS Cases Considered, *in*: International Investment Law and Arbitration (*Weiler, T.* ed.) 325, 341–342 (2005).
39   See also *Laviec, J.-P.*, Protection et Promotion des Investissements 289/90 (1985).

In the absence of an amicable settlement by direct arrangement between the parties or conciliation through diplomatic means within six months with effect from the date of notice, the dispute shall, at the request of the investor concerned, be referred to the I.C.S.I.D. for conciliation or arbitration.[40]

---

40  The majority of the bilateral investment treaties concluded by the Belgo-Luxembourg Economic Union (BLEU) contain a mechanism for investor-State dispute resolution which refers to the prior exhaustion of diplomatic means of settlement. A full list of these treaties can be found in the UNCTAD database, at http://www.unctadxi.org/templates/. See, for instance, BLEU-Pakistan BIT (1998) Art. 11; BLEU-Albania BIT (1999) Art. 11; BLEU-Algeria BIT (1991) Art. 9; BLEU-Uganda BIT (1989) Art. 10; BLEU-Benin BIT (2001) Art. 9; BLEU-Burkina Faso BIT (2001) Art. 9; and BLEU-Burundi BIT (1989) Art. 8. See also the BLEU-Sri Lanka BIT (1982) Art. 10; BLEU-Bangladesh BIT (1981) Art. 6; and Italy-Gabon BIT (1968) Art. VII.

# Article 28

**(1) Any Contracting State or any national of a Contracting State wishing to institute conciliation proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.**

**(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to conciliation in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.**

**(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.**

Art. 28 is the first Article in the Convention's Chapter III on Conciliation. **1** Art. 28 is entitled "Request for Conciliation". Other Articles in Chapter III deal with the "Constitution of the Conciliation Commission" (Arts. 29–31) and "Conciliation Proceedings" (Arts. 32–35).

Art. 28 is substantively identical to Art. 36, its counterpart in the Chapter on **2** Arbitration. The only difference is the substitution of the word "conciliation" for "arbitration" in Art. 28(1) and (2).

All drafts to the Convention leading to Art. 28 were identical to the parallel **3** drafts leading to Art. 36 (History, Vol. I, pp. 140, 142, 144, 170, 172, 174). The two provisions were mostly discussed together (see Art. 36, paras. 10, 19, 23, 30, 44, 48 and 57). The debates on the drafts that became Art. 28 (History, Vol. II, pp. 326/7, 412, 508/9, 568, 790, 946, 982) did not lead to any differentiations in the texts. There were suggestions to treat the institution of conciliation proceedings differently from the institution of arbitration proceedings in view of the more consensual nature of conciliation (at pp. 262/3, 404, 409, 770, 778). It was pointed out that, since conciliation could only take place if both parties cooperated, requests for conciliation should be submitted jointly by both parties (at p. 771). However, in a vote it was decided that the rules for the institution of conciliation proceedings and for arbitration proceedings would be kept identical (at p. 782).

The Institution Rules provide detail for the application of Arts. 28 and 36. The **4** Institution Rules apply to conciliation and arbitration in identical terms. In view of the near identity of Arts. 28 and 36, the provisions of Art. 28 should be read in the

light of this Commentary on Art. 36.[1] The observations made there apply *mutatis mutandis* to the first stage of conciliation proceedings as regulated by Art. 28.

**5**    Other systems for the settlement of disputes also provide for conciliation.[2] These systems include the International Chamber of Commerce[3] and UNCITRAL.[4]

**6**    Despite its equivalent treatment under the Convention, ICSID conciliation has been used sparingly (see Art. 34, para. 5). It shares this fate with other forms of conciliation.[5] The reasons for the scarcity of requests for conciliation lie with the perceptions and expectations of the parties, especially investors. By late 2008 only six requests for conciliation had ever been registered.[6]

---

1  See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 365 (1972-II); *Ziadé, N. G.*, ICSID Conciliation, News from ICSID, Vol. 13/2, pp. 3, 4 (1996).

2  See *Ziadé, loc. cit.*; *Reif, L. C.*, Conciliation as a Mechanism for the Resolution of International Economic and Business Disputes, 14 Fordham International Law Journal 578 (1991).

3  See ICC Rules of Optional Conciliation, 1998, 28 ILM 231, 234 (1989).

4  Conciliation Rules of the United Nations Commission on International Trade Law, 1980, GA Res. 35/52, 20 ILM 300 (1981).

5  See *Reif, op. cit.*, at pp. 587/8.

6  *SEDITEX* v. *Madagascar I* (Case No. CONC/82/1), registered 5 October 1982; *Tesoro* v. *Trinidad and Tobago* (Case No. CONC/83/1), registered 26 August 1983 – see *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 345 (1986); *SEDITEX* v. *Madagascar II* (Case No. CONC/94/1), registered 13 June 1994 – see *Gaillard, E.*, Centre International pour le Règlement des Différends Relatifs aux Investissements: Chronique des sentences arbitrales, 124 Journal du Droit International 277, 278 (1997); *TG World Petroleum Ltd.* v. *Niger* (Case No. CONC/03/1), registered 8 December 2003; *Togo Electricité* v. *Togo* (Case No. CONC/05/1), registered 20 May 2005; *Shareholders of SESAM* v. *Central African Republic* (Case No. CONC/07/1), registered 13 August 2007.

# Article 29

**(1) The Conciliation Commission (hereinafter called the Commission) shall be constituted as soon as possible after registration of a request pursuant to Article 28.**

**(2) (a) The Commission shall consist of a sole conciliator or any uneven number of conciliators appointed as the parties shall agree.**

**(b) Where the parties do not agree upon the number of conciliators and the method of their appointment, the Commission shall consist of three conciliators, one conciliator appointed by each party and the third, who shall be the president of the Commission, appointed by agreement of the parties.**

Art. 29 is the first of three Articles in Section 2 of Chapter III on Conciliation. Section 2 is entitled "Constitution of the Conciliation Commission". Art. 29 is the basic provision on the constitution of a conciliation commission. Art. 30 deals with the appointment of conciliators by the Chairman in default of the parties. Art. 31 deals with the appointment of conciliators who are or are not designated to the Panel of Conciliators under Arts. 12–16. A comparison with the parallel Section 2 of the Convention's Chapter IV (Arbitration) reveals that the rules on the constitution of a conciliation commission do not contain a provision that corresponds to Art. 39 dealing with the nationality requirements for arbitrators (see para. 5 *infra*). **1**

Art. 29 is substantively identical to Art. 37, its counterpart in the Chapter on Arbitration. The only difference is the substitution of "Conciliation Commission" and "Commission" for "Arbitral Tribunal" and "Tribunal" and "conciliator(s)" for "arbitrator(s)" as well as the reference to Art. 28 rather than to Art. 36. **2**

The drafts to Art. 29 were almost identical to the parallel drafts to Art. 37 (History, Vol. I, pp. 146, 148, 176, 178). The debates on what became Art. 29 did not lead to any differentiations in the texts (History, Vol. II, pp. 78, 152/3, 262/3, 412, 782/3, 790). **3**

The details on the constitution of a conciliation commission are set out in Conciliation Rules 1–7. These are mostly identical to the parallel Arbitration Rules 1–7 except for references to "(Conciliation) Commissions" and "conciliator(s)" rather than "(Arbitral) Tribunals" and "arbitrator(s)". Substantive differences relate to the absence of an exclusion of nationals or co-nationals of the parties from a conciliation commission.[1] Also, the declaration to be signed by each conciliator **4**

---

1 Conciliation Rules 1, 3(1); Arbitration Rules 1(3), 3(1).

under Conciliation Rule 6 does not contain the formula "I shall judge fairly as between the parties, according to the applicable law, . . ." which is contained in the otherwise similar declaration required by Arbitration Rule 6 (see Art. 40, para. 18). In addition, Arbitration Rule 1(4), excluding persons who had previously acted as conciliators or arbitrators in the same case from appointment as arbitrators, does not have a parallel in the Conciliation Rules.

**5**    The non-exclusion of nationals or co-nationals of parties from appointment as conciliators is the consequence of a deliberate decision made during the Convention's drafting. Mr. *Broches* explained that the appointment of conciliators of the same nationality as the parties might be helpful in reaching a settlement. Familiarity with the particular views of the parties might be useful (History, Vol. II, pp. 266, 329, 510/1, 569) (see also Art. 13, para. 9; Art. 39, para. 4). As a consequence, Art. 39, dealing with the nationality of arbitrators, does not have a parallel in the Convention's Section on the constitution of a conciliation commission. Similarly, the last sentence of Art. 38, dealing with the nationality of arbitrators appointed by the Chairman, is not reflected in the parallel provision of Art. 30, dealing with the appointment of conciliators by the Chairman (see Art. 30, para. 4).

**6**    In view of the near identity of Arts. 29 and 37, the provisions of Art. 29 should be read in the light of this Commentary on Art. 37. Subject to the remarks made above, the observations made on Art. 37 apply *mutatis mutandis* to the constitution of a conciliation commission as regulated by Art. 29.

**7**    Practice on Art. 29 is scant. In *SEDITEX* v. *Madagascar I*[2] and in *TG World Petroleum Ltd.* v. *Niger*,[3] settlements were reached by the parties and the proceedings were closed before the constitution of commissions.[4]

**8**    In *Tesoro* v. *Trinidad and Tobago*, the request was registered on 26 August 1983. The parties agreed to have a single conciliator and to negotiate the person to be appointed directly. They notified the Secretary-General of their appointment who sought the acceptance from the appointee. Upon receiving this acceptance, the Secretary-General notified the parties. This had the effect of constituting the "Commission" by 6 January 1984.[5] The appointment of a sole conciliator in this case had the effect of expediting the procedure and of keeping the costs low.[6]

**9**    In *SEDITEX* v. *Madagascar II*, the request was registered on 13 June 1994. SEDITEX appointed a national of France and Madagascar appointed a person of its own nationality as conciliators. A national of Belgium was appointed by agreement

---

2   Case No. CONC/82/1.                          3   Case No. CONC/03/1.

4   *Gaillard*, Centre International pour le Règlement des Différends Relatifs aux Investissements: Chronique des sentences arbitrales, 124 Journal du Droit International 277, 278 (1997).

5   *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 346 (1986).

6   *Op. cit.* at p. 343.

of the parties as President of the Conciliation Commission.[7] The Commission was constituted on 23 September 1994.

In *Togo Electricité* v. *Togo*[8] the request was registered on 20 May 2005 and the Commission, consisting of Portugese, Belgian and Canadian nationals, was constituted on 21 September 2005. No details concerning the constitution of the Commission are known.   **10**

---

7   *Gaillard*, *loc. cit*.                              8   Case No. CONC/05/1.

# Article 30

---

**If the Commission shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 28, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the conciliator or conciliators not yet appointed.**

**1**     Art. 30 is designed to safeguard the constitution of a conciliation commission in the absence of timely appointments by the parties, through appointments by the Chairman (Art. 5). Art. 30 is substantively identical to the first sentence of Art. 38, its counterpart in the Chapter on Arbitration. The only difference is the substitution of "Commission" for "Tribunal" and "conciliator or conciliators" for "arbitrator or arbitrators" as well as the reference to Art. 28 rather than 36. The second sentence of Art. 38, dealing with the nationality of arbitrators appointed by the Chairman, is not reflected in Art. 30 or elsewhere in the Chapter on Conciliation (see Art. 29, para. 5).

**2**     All drafts to Art. 30 were substantively identical to the parallel drafts to the first sentence of Art. 38 (History, Vol. I, pp. 148, 150, 180, 182). The debates on what became Art. 30 (History, Vol. II, pp. 152/3, 262/3, 412/3, 783, 790/1, 1035) did not lead to any differentiations in the text. There were doubts about the usefulness of the appointment of conciliators by the Chairman since conciliation was a strictly voluntary matter and a refusal by one party to appoint a conciliator was bound to lead to the failure of the conciliation effort.[1] But Mr. *Broches* argued successfully that the parties might be willing to accept nominations by a third party and would find it difficult not to cooperate once a commission had been set up. A proposal to delete the provision that later became Art. 30 was defeated in a vote (at pp. 409, 413, 783).

**3**     The details on the appointment of conciliators by the Chairman are set out in Conciliation Rule 4. Conciliation Rule 4 is almost identical to the parallel Arbitration Rule 4 except for references to "Commission" and "conciliator(s)" rather than "Tribunal" and "arbitrator(s)". A small difference in Conciliation and Arbitration Rules 4(4) is due to the absence of a nationality requirement in Art. 30.

---

1   See also *de Waart, P. J. I. M.*, ICSID and Other Forms of Arbitration and Conciliation: Institutionalization of Dispute Settlement in the Context of the Right of Development, *in*: Foreign Investment in the Present and a New International Economic Order (*Dicke, D.* ed.) 116, 118 (1987).

The absence in Art. 30 of a prohibition to appoint nationals or co-nationals **4** of the parties is the major difference to Art. 38. It is in line with the absence in the Chapter on Conciliation of a provision corresponding to Art. 39. This is the consequence of a decision made during the Convention's drafting to accept conciliators of the same nationality as the parties (see Art. 29, para. 5). Therefore, in making appointments under Art. 30, the Chairman may appoint one or several nationals or co-nationals of one or both parties.

In view of the near identity of Art. 30 and the first sentence of Art. 38, the pro- **5** visions of Art. 30 should be read in the light of this Commentary on Art. 38, paras. 1–23. Subject to the remarks made above, the observations made on Art. 38 apply *mutatis mutandis* to the appointment of conciliators by the Chairman as regulated by Art. 30.

There is no available practice on Art. 30. In the five conciliation cases registered **6** by the Centre, two were settled before the constitution of the Commission. In two other cases the conciliators were appointed by the parties under Art. 29 obviating the need for the Chairman to become active under Art. 30 (see Art. 29, paras. 7–10). The circumstances of the appointment of three conciliators in the fifth case are not known.

# Article 31

**(1) Conciliators may be appointed from outside the Panel of Conciliators, except in the case of appointments by the Chairman pursuant to Article 30.**

**(2) Conciliators appointed from outside the Panel of Conciliators shall possess the qualities stated in paragraph (1) of Article 14.**

1    Art. 31 is substantively identical to Art. 40, its counterpart in the Chapter on Arbitration. The only difference is the substitution of "Conciliators" for "Arbitrators" and the reference to Art. 30 rather than to Art. 38.

2    The drafting of what became Art. 31 was closely parallel to the drafting of Art. 40 (History, Vol. I, pp. 150, 152, 154, 184, 186). In the case of conciliation, the sentiment in favour of maximum flexibility was even stronger including the possibility for the parties to select conciliators from outside the Panel of Conciliators (History, Vol. II, pp. 262, 327, 412/3, 486/7, 510, 569, 783, 791, 938, 955, 960/1, 1038). The requirement that conciliators appointed from outside the Panel possess the same qualities evoked little discussion (at pp. 946, 982/3).

3    In view of the near identity of Arts. 31 and 40, the provisions of Art. 31 should be read in the light of this Commentary on Art. 40. Most of the observations made on Art. 40 apply *mutatis mutandis* to the appointment and qualities of conciliators as regulated by Art. 31 (but see Art. 29, para. 4; Art. 40, paras. 18, 25, 28).

# Article 32

---

**(1) The Commission shall be the judge of its own competence.**

**(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Commission, shall be considered by the Commission which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.**

Art. 32 is the first Article in the Section on "Conciliation Proceedings". Other Articles in this Section deal with the Conciliation Rules (Art. 33), the conduct of conciliation (Art. 34) and the prohibition to rely on statements made in the course of conciliation in other proceedings (Art. 35). **1**

Art. 32 is substantively identical to Art. 41, its counterpart in the Chapter on Arbitration. The only difference is the substitution of the word "Commission" for "Tribunal".[1] **2**

Art. 32 was drafted in close conjunction with Art. 41. All drafts provided in identical terms that commissions and tribunals, respectively, would be judges of their own competence (History, Vol. I, pp. 154, 156, 186, 188). There was practically no separate discussion of this provision concerning its relation to conciliation commissions (History, Vol. II, pp. 399, 408, 508, 783, 784, 791, 800, 946). An inconclusive discussion on whether a decision by a conciliation commission on its competence should only be a non-binding recommendation (at pp. 206, 407/8) is not reflected in the Convention's text. The idea to submit the question of jurisdiction in conciliation proceedings to separate arbitration was dropped at an early stage of the drafting (at p. 156). **3**

The details on the exercise of a conciliation commission's power to determine its own competence are set out in Conciliation Rule 29.[2] It is similar to Arbitration Rule 41 (see Art. 41, paras. 32, 43, 60, 73) but there are some differences. There is some allowance for the less formal procedure in conciliation. Conciliation Rule 29(2) does not refer to an ancillary claim in view of the absence of a parallel provision to Art. 46 in the Chapter on Conciliation. Under Conciliation Rule 29(5), a decision by a conciliation commission to the effect that the dispute is not within the Centre's jurisdiction or not within the commission's competence is rendered in the form of a reasoned report. **4**

In view of the near identity of Arts. 32 and 41, the provisions of Art. 32 should be read in the light of this Commentary on Art. 41. Subject to the remarks made **5**

---

1   See also Report of the Executive Directors on the Convention, para. 38, 1 ICSID Reports 31.
2   See also the Notes to the identical Conciliation Rule 30 of 1968, 1 ICSID Reports 148/9.

above, the observations made on Art. 41 apply *mutatis mutandis* to a decision on jurisdiction by a conciliation commission.

**6**     In *Tesoro* v. *Trinidad and Tobago*, at the preliminary procedural consultation held in accordance with Conciliation Rule 20, the Government reserved its right to object to jurisdiction. The parties agreed that this first meeting would not constitute the "first hearing" in the sense of Conciliation Rule 29, which requires that an objection to jurisdiction be filed no later than either in a party's first written statement or at the first hearing, depending on which occurs earlier. Consequently, the Government remained free to raise an objection to jurisdiction.[3]

**7**     The Government made an objection to jurisdiction in its Counter-Memorial. The objection was based on the fact that the ICSID Clause was contained in Heads of Agreement between the parties and the claim was based on a side letter that did not contain an ICSID clause. The Conciliator decided to join the Government's objection to jurisdiction to the merits. After extensive oral presentations and further memorials, the Conciliator found that ICSID had jurisdiction over the dispute on the ground that the side letter and the Heads of Agreement constituted one agreement.[4]

---

3   *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 346/7 (1986).
4   *Op. cit.*, pp. 347/8.

# Article 33

---

**Any conciliation proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Conciliation Rules in effect on the date on which the parties consented to conciliation. If any question of procedure arises which is not covered by this Section or the Conciliation Rules or any rules agreed by the parties, the Commission shall decide the question.**

Art. 33 is substantively identical to Art. 44, its counterpart in the Chapter on Arbitration. The only difference is the substitution of "conciliation" and "Conciliation Rules" for "arbitration" and "Arbitration Rules" and "Commission" for "Tribunal". **1**

The early drafts to the Convention sought to give some influence to conciliation commissions on the choice of procedural rules. A plan to subject an agreement of the parties on the adoption of conciliation rules to the commission's approval was dropped (History, Vol. I, pp. 158, 160; Vol. II, pp. 264, 327/8, 414, 479, 510). Starting with the First Draft, the drafts to what became Arts. 33 and 44 were substantively identical and the two provisions were mostly discussed together (at pp. 791, 946–947) (see Art. 44, paras. 2, 11, 32, 43, 44, 53). **2**

In view of the near identity of Arts. 33 and 44, the provisions of Art. 33 should be read in the light of the applicable parts of this Commentary on Art. 44. **3**

The Conciliation Rules are adopted by the Centre's Administrative Council in accordance with Art. 6(1)(c). The Conciliation Rules were adopted on 25 September 1967 with effect from 1 January 1968.[1] On 26 September 1984, the Administrative Council adopted revisions to the Rules which took effect immediately.[2] The 1968 version of the Conciliation Rules continues to apply to consents given before 26 September 1984.[3] The Conciliation Rules in their current version have been published as part of the ICSID Regulations and Rules as amended effective 10 April 2006.[4] **4**

Conciliation procedure differs considerably from arbitration procedure. The more flexible and informal nature of conciliation is reflected in the absence of a number of the Convention's provisions dealing with arbitration in the Chapter on **5**

---

1   Rules of Procedure for Conciliation Proceedings (Conciliation Rules), 1968, 1 ICSID Reports 119. These Rules superseded Provisional Conciliation Rules adopted on 2 February 1967, 6 ILM 225, 246 (1967), 7 ILM 351, 365 (1968).
2   Rules of Procedure for Conciliation Proceedings (Conciliation Rules), 1984, 1 ICSID Reports 181.
3   For a review of the 1984 revisions of the Rules see *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 4 (1985).
4   http://www.worldbank.org/icsid/basicdoc/basicdoc.htm.

Conciliation. The Convention's provisions on arbitration dealing with evidence, default of a party, ancillary claims, provisional measures and the award (Arts. 43, 45, 46, 47 and 48) have no direct counterpart in the Chapter on Conciliation but are reflected, in different terms, in Art. 34 (see Art. 34, paras. 12, 13, 19, 24, 29–32, 36–38). Other provisions on arbitration dealing with rectification, interpretation, revision and annulment (Arts. 49, 50, 51 and 52) as well as those dealing with the recognition and enforcement of awards (Arts. 53, 54 and 55) are entirely without parallel in the Chapter on Conciliation.

**6**     The differences between conciliation and arbitration are also reflected in divergences of the Conciliation and Arbitration Rules (see also Art. 29, para. 4; Art. 32, para. 4).[5] The more informal character of conciliation is already apparent from the fact that the Conciliation Rules are much shorter. The rules on written statements and hearings in conciliation as well as on witnesses and on evidence (Conciliation Rules 25–28) are less elaborate and more flexible than their counterparts in the Arbitration Rules. The preparation of the report (Conciliation Rule 32) is much simpler than the drafting of an award and the resulting document will be much shorter. There are no provisions in the Conciliation Rules dealing with remedies and procedures after the report has been drawn up.[6]

---

5   See also *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 349 (1986).

6   See also *Ziadé, N. G.*, ICSID Conciliation, News from ICSID, Vol. 13/2, p. 3 (1996).

# Article 34

---

**(1) It shall be the duty of the Commission to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms. To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties. The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, and shall give their most serious consideration to its recommendations.**

**(2) If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement. If, at any stage of the proceedings, it appears to the Commission that there is no likelihood of agreement between the parties, it shall close the proceedings and shall draw up a report noting the submission of the dispute and recording the failure of the parties to reach agreement. If one party fails to appear or participate in the proceedings, the Commission shall close the proceedings and shall draw up a report noting that party's failure to appear or participate.**

## OUTLINE

*Paragraphs*

I.   INTRODUCTION                                                          1–7
II.  INTERPRETATION                                                        8–38
  A. **"(1) It shall be the duty of the Commission to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms."**     8–16
  B. **"To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties."**     17–22
  C. **"The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, . . ."**     23–25
  D. **". . . and shall give their most serious consideration to its recommendations."**     26–28
  E. **"(2) If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement."**     29–32

F.  **"If, at any stage in the proceedings, it appears to the
    Commission that there is no likelihood of agreement between
    the parties, it shall close the proceedings and shall draw up a
    report noting the submission of the dispute and recording the
    failure of the parties to reach agreement."**          33–35

G.  **"If one party fails to appear or participate in the proceedings,
    the Commission shall close the proceedings and shall draw up
    a report noting that party's failure to appear or participate."**  36–38

## BIBLIOGRAPHY

*Gaillard, E.*, La Jurisprudence du CIRDI 417–419 (2004);

*Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad
    and Tobago, 1 ICSID Review – FILJ 340 (1986);

*Reif, L. C.*, Conciliation as a Mechanism for the Resolution of International Economic and Business
    Disputes, 14 Fordham International Law Journal 578 (1991);

*Ziadé, N. G.*, ICSID Conciliation, News from ICSID, Vol. 13/2, p. 3 (1996).

## I. INTRODUCTION

**1**    Art. 34 is the Convention's core Article on conciliation. Under the Convention's
general scheme, conciliation and arbitration are equivalent methods of dispute
settlement. This equivalence was maintained despite doubts concerning the use-
fulness or effectiveness of conciliation during the Convention's drafting (History,
Vol. II, pp. 263, 265, 415). The Convention has separate Chapters on Concilia-
tion (Chapter III, Arts. 28–35) and Arbitration (Chapter IV, Arts. 36–55). Other
parts of the Convention are common to both types of procedures. These com-
mon provisions include Art. 25, dealing with jurisdiction, Chapter V, dealing with
the replacement and disqualification of conciliators and arbitrators, Chapter VI,
dealing with the cost of proceedings, and Chapter VII, dealing with the place of
proceedings.

**2**    Conciliation is not based on an adversarial procedure resulting in a binding third
party decision. Rather, it is directed towards an agreed settlement. The procedure
is relatively informal. Conciliation requires a certain degree of flexibility and
goodwill from the parties.[1]

**3**    Conciliation is particularly appropriate where the parties are prepared to con-
tinue their cooperation on the investment. Arbitration will, typically, be used where
the parties have reached the end of their business relationship.[2] Conciliation has

---

1   See generally *Reif, L. C.*, Conciliation as a Mechanism for the Resolution of International
    Economic and Business Disputes, 14 Fordham International Law Journal 578, esp. at pp. 586/7,
    634–638 (1991).

2   *Broches, A.*, Settlement of Disputes Arising Out of Investment in Developing Countries, 11
    International Business Lawyer 206 (1983); *Broches, A.*, Avoidance and Settlement of International
    Investment Disputes, 78 American Society of International Law Proceedings 38, 54 (1984).

also been regarded as particularly attractive for cultures that are less favourably disposed towards adversarial procedures such as China.[3]

Conciliation may be considerably less costly than arbitration. The limited experience with ICSID conciliation suggests that a successful proceeding can be quite inexpensive.[4] Under Art. 61(1), costs in ICSID conciliation are always borne equally by the parties[5] (Art. 61, paras. 5–7). In contrast, under Art. 61(2) the apportionment of costs in arbitration is left to the tribunal's discretion. **4**

In the practice of ICSID, conciliation has been used only in a few cases. Only six requests for conciliation have ever been registered (see Art. 28, para. 6). Of these, two were settled before the constitution of a conciliation commission.[6] Another led to a successful settlement agreed by the parties.[7] Another two cases led to reports by the Commissions but it is not known whether this led to settlements.[8] A sixth one did not lead to an immediate settlement.[9] This infrequent use may have its source in the perception that conciliation is likely to be a waste of time, effort and money since either party can at any time withdraw from the procedure or repudiate a recommendation of the commission.[10] **5**

Art. 25 of the Convention, dealing with ICSID's jurisdiction, does not differentiate between conciliation and arbitration. A consent agreement may refer to one or the other. Consent may also be given to both without stating any priority. In such a situation, the choice between conciliation or arbitration is with the party instituting proceedings. The most rational way of including both procedures in a consent agreement would be to provide for conciliation to be followed by arbitration if the former turns out to be unsuccessful (see Art. 25, paras. 19–28). **6**

The Additional Facility (see Art. 6, para. 25; Art. 25, paras. 9–13) also provides for conciliation of certain disputes that are outside the jurisdiction of the Centre. ICSID's Administrative Council has adopted Conciliation (Additional Facility) Rules for this purpose.[11] **7**

---

3  *Koa, C. M.*, The International Bank for Reconstruction and Development and Dispute Resolution: Conciliating and Arbitrating with China through the International Centre for Settlement of Investment Disputes, 24 New York University Journal of International Law and Politics 439, 487 (1991).

4  *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 349 (1986); *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 246 (1986).

5  *Ziadé, N. G.*, ICSID Conciliation, News from ICSID, Vol. 13/2, pp. 3, 6/7 (1996).

6  *SEDITEX* v. *Madagascar I* (Case No. CONC/82/1); *TG World Petroleum* v. *Niger* (Case No. CONC/03/1).

7  *Tesoro* v. *Trinidad and Tobago* (Case No. CONC/83/1). See esp. *Nurick/Schnably*, The First ICSID Conciliation.

8  *Togo Electricité* v. *Togo* (Case No. CONC/05/1); *Shareholders of SESAM* v. *Central African Republic* (Case No. CONC/07/1).

9  *SEDITEX* v. *Madagascar II* (Case No. CONC/94/1). See esp. *Gaillard, E.*, La Jurisprudence du CIRDI 417–419 (2004).

10  *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 87 (1985); *Reif*, Conciliation, pp. 587, 635.

11  http://www.worldbank.org/icsid/facility/partC.htm.

# II. INTERPRETATION

## A. "(1) It shall be the duty of the Commission to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms."

**8**    The basic function of conciliation, to clarify the issues in dispute and to facilitate an agreement between the parties, was reflected in all drafts to the Convention (History, Vol. I, pp. 162, 164). A suggestion to delete the words "upon mutually accepted terms" was defeated in a vote (History, Vol. II, pp. 784/5).

**9**    The aim of conciliation is also reflected in the Report of the Executive Directors to the Convention. After referring to the Convention's Articles dealing with conciliation and arbitration respectively, it says:

> 37. . . . The differences between the two sets of provisions reflect the basic distinction between the process of conciliation which seeks to bring the parties to agreement and that of arbitration which aims at a binding determination of the dispute by the Tribunal.[12]

**10**    The function of the conciliator has been described by *Lord Wilberforce* in *Tesoro* v. *Trinidad and Tobago* in the following terms:

> . . . to examine the contentions raised by the parties, to clarify the issues, and to endeavour to evaluate their respective merits and the likelihood of their being accepted, or rejected, in Arbitration or Court proceedings, in the hope that such evaluation may assist the parties in reaching an agreed settlement.[13]

**11**    The procedure in conciliation is considerably more flexible than in arbitration (see Art. 33, para. 6). The Conciliation Rules describe the function of a commission to clarify the issues in dispute in the following terms:

### Rule 22
#### *Functions of the Commission*

(1) In order to clarify the issues in dispute between the parties, the Commission shall hear the parties and shall endeavour to obtain any information that might serve this end. The parties shall be associated with its work as closely as possible.

(2) [see para. 18 *infra*]

(3) The Commission, in order to obtain information that might enable it to discharge its functions, may at any stage of the proceeding:

- (a) request from either party oral explanations, documents and other information;
- (b) request evidence from other persons; and
- (c) with the consent of the party concerned, visit any place connected with the dispute or conduct inquiries there, provided that the parties may participate in any such visits and inquiries.[14]

---

12    1 ICSID Reports 31.
13    See *Nurick/Schnably*, The First ICSID Conciliation, p. 348; *Ziadé*, ICSID Conciliation, p. 6.
14    See also Conciliation (Additional Facility) Rules, Art. 30.

Like in arbitration, both parties must be heard by the commission. But in conciliation, the parties may be heard separately and not all communications from the parties are necessarily conveyed to the other party.[15]   **12**

The sequence of written and oral statements by the parties is not determined by the Rules. Under Conciliation Rule 25(1) the parties are initially invited to give written statements of their positions within 30 days. But either party may at any stage of the proceedings "file such other written statements as it deems useful and relevant". Under Conciliation Rule 22(3), the conciliation commission may request oral explanations from either party at any stage of the proceedings.[16] Under Conciliation Rule 28(1) each party may at any stage of the proceeding request that the commission hear witnesses and experts whose evidence the party considers relevant.[17]   **13**

In *Tesoro* v. *Trinidad and Tobago*,[18] the Request was registered on 26 August 1983. The briefing schedule set by the Conciliator (*Lord Wilberforce*) provided for an opening Memorial by Tesoro on 20 April 1984. This was to be followed by the Government's Counter-Memorial by 22 June 1984 and a Reply Memorial by 16 July 1984. The parties made oral presentations on 23 July 1984. The sole Conciliator decided, with the parties' agreement, that no further hearing would be necessary and that he would decide on the basis of the written submissions of the parties. The Conciliator invited both parties to submit to him, in confidence, their views on what might constitute an acceptable settlement. After that, the Government filed a Rejoinder Memorial followed by a Rebuttal Memorial by Tesoro and a Response Memorial by the Government.   **14**

On 5 February 1985, the Conciliator issued his recommendation. He analysed the merits of the parties' arguments and proposed a specific settlement. This was followed by eight months of negotiations between the parties in the course of which they also communicated with the Conciliator. In response, the Conciliator modified one aspect of his recommendation. On 15 October 1985, the parties announced that they had reached a settlement of the dispute. On 27 November 1985 the Conciliator issued his report in which he formally closed the proceedings.   **15**

In *SEDITEX* v. *Madagascar II*,[19] the Request was registered on 13 June 1994. The parties first exchanged two rounds of memorials. At a subsequent session of the Conciliation Commission, its President directed the parties to make proposals with a view to a complete settlement of the dispute. These proposals would not be communicated to the other party. After the submission of these proposals, the parties still responded to precise questions posed by the Commission. Thereafter,   **16**

---

15  Note A to Conciliation Rule 22 of 1968, 1 ICSID Reports 142. *Cf.* also UNCITRAL Conciliation Rules, Art. 10, 20 ILM 300, 304 (1981).
16  See also Notes D and E to Conciliation Rule 22 of 1968, 1 ICSID Reports 142/3.
17  *Ziadé*, ICSID Conciliation, p. 6.
18  The description of the proceeding is based on *Nurick/Schnably*, The First ICSID Conciliation, pp. 347–349.
19  The description of the proceeding is based on *Gaillard*, La Jurisprudence du CIRDI 417–419 (2004).

the Commission communicated a draft recommendation to the parties and invited their observations thereon. When significant divergences persisted, the Commission held another session in the course of which it invited the parties to advance specific proposals for the resolution of the remaining open questions. At the end of that session, the Commission found that the parties were unable to reach agreement and announced its intention to close the proceedings after 30 days. The Commission's Report of 19 July 1996 describes the proceedings and concludes that no agreement had been reached.

### B. "To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties."

**17**     The power of a conciliation commission to recommend terms of settlement is part of its essential functions and was reflected in all drafts to the Convention (History, Vol. I, pp. 162, 164). The words "and from time to time" were inserted to avoid any interpretation to the effect that, after a recommendation had been made, the commission would be without functions (History, Vol. II, p. 154). On the question of whether a conciliation commission would state the grounds on which its recommendation was based, Mr. *Broches* pointed out that "such a statement of reasons was not excluded" (at p. 414).

**18**     Conciliation Rule 22(2) specifies the commission's power to make recommendations:

> (1) [see para. 11 *supra*]
> (2) In order to bring about agreement between the parties, the Commission may, from time to time at any stage of the proceeding, make – orally or in writing – recommendations to the parties. It may recommend that the parties accept specific terms of settlement or that they refrain, while it seeks to bring about agreement between them, from specific acts that might aggravate the dispute; it shall point out to the parties the arguments in favour of its recommendations. It may fix time limits within which each party shall inform the Commission of its decision concerning the recommendations made.
> (3) [see para. 11 *supra*][20]

**19**     The commission's power to make recommendations extends to specific terms of settlement but may also be directed at provisional measures designed to avoid an aggravation of the dispute (*cf.* Art. 47, paras. 135–147). The commission "shall point out" the arguments supporting its recommendation. This means that a commission has to give reasons for its recommendation (*cf.* Art. 48, paras. 54–68).

**20**     The words "at any stage of the proceedings" and "from time to time" give the conciliation commission much flexibility. The commission need not wait until a particular stage of the proceedings has been reached before it can make a recommendation. In particular, it need not wait until it has completed clarifying the issues in dispute. It may also make recommendations repeatedly. In doing so,

---

20  See also the Conciliation (Additional Facility) Rules, Art. 30(3).

it may vary and adjust its recommendations as the deliberations progress. The recommendations may be made orally or in writing.[21]

In both *Tesoro* and in *SEDITEX II*, the conciliators issued recommendations **21** to the parties. In both cases, the parties continued to negotiate on the basis of these recommendations. In both cases, the conciliators showed their willingness to adjust their recommendations as the need arose (see paras. 15, 16 *supra*).

The recommendation of terms of settlement is not unique to conciliation. Agreed **22** settlements may be reached in the course of adjudication including arbitration. A considerable number of ICSID arbitration cases were at some stage settled or otherwise discontinued by the parties (see Art. 48, paras. 69–87). In many of these cases the role of tribunals must have been instrumental in bringing about that result.[22]

### C. "The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, . . ."

Consent to conciliation (see Art. 25, paras. 19–28, 386, 387) creates a legally **23** binding obligation to cooperate in the proceedings. This principle was contained in all drafts leading to the Convention (History, Vol. I, pp. 162, 164) and was not seriously challenged during the deliberations (History, Vol. II, pp. 54/5, 57, 154/5, 263, 328, 435, 785/6). This procedural obligation is in contrast to a party's right to reject the conciliation commission's recommendations on the merits (see para. 26 *infra*). In contrast to arbitration (Art. 45), participation in conciliation is necessary for the conciliation commission to proceed and non-participation will lead to a closure of the proceedings (see paras. 36–38 *infra*). The procedural obligation to cooperate in conciliation is also referred to in the Convention's Preamble which recognizes "that mutual consent by the parties to submit such disputes to conciliation . . . constitutes a binding agreement . . .".

The duty to cooperate is set out in more detail in the Conciliation Rules: **24**

**Rule 23**
*Cooperation of the Parties*

(1) The parties shall cooperate in good faith with the Commission and, in particular, at its request furnish all relevant documents, information and explanations as well as use the means at their disposal to enable the Commission to hear witnesses and experts whom it desires to call. The parties shall also facilitate visits to and inquiries at any place connected with the dispute that the Commission desires to undertake.

(2) The parties shall comply with any time limits agreed with or fixed by the Commission.[23]

---

21  *Ziadé*, ICSID Conciliation, p. 6. See also Note C to Conciliation Rule 22 of 1968, 1 ICSID Reports 142. *Cf.* also Art. 7(4) of the UNCITRAL Conciliation Rules, 20 ILM 300, 303 (1981).
22  See also *Ziadé*, ICSID Conciliation, p. 7.
23  See also the Notes to the identical Conciliation Rule 23 of 1968, 1 ICSID Reports 143/4; Conciliation (Additional Facility) Rules, Art. 31.

**25**　　Art. 25(1), second sentence, states that consent to ICSID jurisdiction is irrevocable (see Art. 25, paras. 596–634). Art. 25 does not distinguish between conciliation and arbitration. Therefore, a party that has consented to ICSID jurisdiction for conciliation is under an obligation to carry out this undertaking through constructive cooperation in proceedings.[24] This leads to the seemingly paradoxical situation that although a party cannot prevent the initiation of conciliation through non-cooperation in the constitution of the commission (Art. 30) and is under an obligation to participate in the proceedings, its non-participation leads to a closure of proceedings and it may, nevertheless, reject any recommendation of the conciliation commission.[25] A party's refusal to cooperate in conciliation proceedings is without a sanction under the ICSID Convention except that such non-cooperation will be noted in the commission's report (see paras. 36–38 *infra*).

### D. ". . . and shall give their most serious consideration to its recommendations."

**26**　　Unlike arbitral awards, recommendations of conciliation commissions are not binding. The parties may not reject these recommendations arbitrarily but must consider them in good faith. This principle was reflected in all drafts to the Convention (History, Vol. I, pp. 162, 164). It remained uncontested during the Convention's drafting (History, Vol. II, pp. 154/5, 328, 785, 786, 791).

**27**　　The Convention's Preamble also states that mutual consent to conciliation "constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators".

**28**　　The parties may agree in advance to accept a recommendation of conciliators as binding. The Preliminary Draft and the First Draft provided that the recommendations of the conciliation commission would not be binding "except as the parties to the dispute shall otherwise agree" (History, Vol. I, pp. 162, 164; Vol. II, pp. 328, 786). This provision was not carried over into the Convention's final text. But the parties remain free to make such an agreement although it would not derive its sanction from the Convention.[26] An agreement to accept the recommendations of a conciliation commission as binding would not give the recommendation the status of an award. In particular, it would not be enforceable in accordance with Art. 54.[27]

---

24　*Cf.* also Arts. 2(3) and 11 of the UNCITRAL Conciliation Rules, 20 ILM 300, 304 (1981).

25　*Ziadé*, ICSID Conciliation, pp. 4, 8; *de Waart, P. J. I. M.*, ICSID and Other Forms of Arbitration and Conciliation: Institutionalization of Dispute Settlement in the Context of the Right of Development, *in*: Foreign Investment in the Present and a New International Economic Order (*Dicke, D.* ed.) 116, 118 (1987).

26　*Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 337 (1972-II). The Convention on the Privileges and Immunities of the United Nations, 1 UNTS 15, provides for a similar procedure: under Sec. 30, if a difference arises from the interpretation and application of the Convention between the United Nations and a Member, a request shall be made for an advisory opinion of the International Court of Justice. "The opinion given by the Court shall be accepted as decisive by the parties." See also Sec. 32 of the Convention on the Privileges and Immunities of the Specialized Agencies, 33 UNTS 261.

27　*Ziadé*, ICSID Conciliation, p. 7.

**E. "(2) If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement."**

The report of the commission is the final document in conciliation proceed-    **29**
ings. It was foreseen in all drafts to the Convention. The Working Paper and the
Preliminary Draft provided that, except as the parties otherwise agree, the report
should not contain the terms of settlement reached by the parties (History, Vol. I,
pp. 164, 166). After some debate, this provision was deleted (History, Vol. II,
pp. 153, 263/4, 328, 783/4, 786, 791). Mr. *Broches* explained that governments
and private investors might feel embarrassed by a publication of the terms of
settlement (at p. 510). The requirement that the "issues in dispute" be noted was
inserted instead (History, Vol. I, pp. 164, 166; Vol. II, pp. 784/5).

Conciliation Rule 30(1) opens the possibility for the parties to request the    **30**
inclusion of the terms of settlement in the report:

**Rule 30**

*Closure of the Proceeding*

(1) If the parties reach agreement on the issues in dispute, the Commission
shall close the proceeding and draw up its report noting the issues in dispute and
recording that the parties have reached agreement. At the request of the parties,
the report shall record the detailed terms and conditions of their agreement. . . .[28]

A request that the report shall record the detailed terms of an agreement must be
made by both parties.[29]

The parties' agreement is binding although neither the Convention nor the    **31**
Conciliation Rules say so explicitly.[30] But an agreement reached in the course
of conciliation does not enjoy the status of an award. There is no possibility to
incorporate such an agreement into an award in analogy to Arbitration Rule 43(2)
(see Art. 48, paras. 70, 73). Enforcement of a settlement reached in the course
of conciliation does not benefit from Art. 54 on enforcement but requires a new
legal action.[31] Therefore, it may be wise to include an arbitration clause into an
agreement reached under Art. 34(2).

Conciliation Rule 33(3) provides that the report of a conciliation commission    **32**
shall not be published without the consent of the parties. This provision echoes
Art. 48(5) relating to the publication of an arbitral award (see Art. 48, paras. 107–
129). Under Administrative and Financial Rule 22(2), if both parties consent to the
publication of a report of a conciliation commission, the Secretary-General shall
arrange for its publication in an appropriate form. There is no prohibition against
one party releasing a report for publication (*cf.* Art. 48, para. 114).[32] None of the
Reports in *Tesoro*, in *SEDITEX II* or in *Togo Electricité* have been published.

---

28   See also the Conciliation (Additional Facility) Rules, Art. 37(3).
29   See Note C to Conciliation Rule 31 of 1968, 1 ICSID Reports 150.
30   The UNCITRAL Conciliation Rules, Art. 13(3), 20 ILM 300, 304 (1981), state that the parties
     are bound by the agreement.
31   See also *Reif*, Conciliation, p. 636.
32   Contrast the UNCITRAL Conciliation Rules, Art. 14, 20 ILM 300, 304 (1981).

**F.  "If, at any stage in the proceedings, it appears to the Commission that there is no likelihood of agreement between the parties, it shall close the proceedings and shall draw up a report noting the submission of the dispute and recording the failure of the parties to reach agreement."**

**33**    A report of the conciliation commission in case of a failure of its efforts was provided for in all drafts to the Convention. A clause in the Working Paper stating that the report should not contain the terms of a settlement recommended by the commission, unless the parties otherwise agree, was deleted (History, Vol. I, pp. 164, 166, 168). The provision led to little debate (History, Vol. II, pp. 154, 415, 510, 784, 791/2). The original wording to the effect that the commission "may close the proceedings" was changed into the more peremptory wording "shall close the proceeding" (at p. 785).

**34**    Conciliation Rule 30(2)[33] does little more than restate the second sentence of Art. 34(2).

**35**    The Report in *SEDITEX II* describes the different stages of the proceedings and records the fact that the parties have not reached an agreement.[34]

**G.  "If one party fails to appear or participate in the proceedings, the Commission shall close the proceedings and shall draw up a report noting that party's failure to appear or participate."**

**36**    Non-appearance or non-participation in ICSID conciliation to which a party has consented would be a violation of a legal obligation (see paras. 23–25 *supra*). Starting with the Preliminary Draft, the drafts to the Convention all provided that a party's non-cooperation would be reflected in the report (History, Vol. I, pp. 166, 168; Vol. II, pp. 264, 409, 784, 785, 792).

**37**    The Convention does not foresee a sanction for non-cooperation in conciliation beyond a statement of this fact in the commission's report. Art. 30 of the Conciliation Rules states:

>    (3) If one party fails to appear or participate in the proceeding, the Commission shall, after notice to the parties, close the proceeding and draw up its report noting the submission of the dispute to conciliation and recording the failure of that party to appear or participate.[35]

**38**    Since conciliation depends on the cooperation of the parties, the Convention does not provide for *ex parte* proceedings in analogy to Art. 45(2).[36]

---

33  See also Conciliation (Additional Facility) Rules, Art. 37(2).
34  *Gaillard*, La Jurisprudence du CIRDI, pp. 417–419.
35  See also Conciliation (Additional Facility) Rules, Art. 37(1).
36  See also *Ziadé*, ICSID Conciliation, pp. 7, 8.

# Article 35

---

**Except as the parties to the dispute shall otherwise agree, neither party to a conciliation proceeding shall be entitled in any other proceeding, whether before arbitrators or in a court of law or otherwise, to invoke or rely on any views expressed or statements or admissions or offers of settlement made by the other party in the conciliation proceedings, or the report or any recommendations made by the Commission.**

The principle contained in Art. 35 was reflected in all drafts to the Convention (History, Vol. I, pp. 168, 170). As explained during the drafting, its purpose is to encourage the parties to remain flexible during conciliation proceedings and to dispel the fear that any position taken by them in conciliation might be used against them in subsequent adjudication (History, Vol. II, pp. 154/5, 328, 414). The idea was not uncontested during the deliberations and the possibility for parties to agree otherwise was adopted as a compromise (at pp. 263, 265, 328, 414/5, 786/7). Since reports and recommendations of conciliation commissions usually have their origin in offers made by the parties, reports and recommendations were included in the prohibition (at pp. 415, 787). Mr. *Broches* made it clear that if an agreement is reached by the parties to accept a recommendation of a conciliation commission, that agreement would not be excluded from invocation in subsequent judicial proceedings (at p. 787) (see also Art. 34, para. 31). **1**

A related provision in the Arbitration Rules (Rule 1(4)) prohibits the appointment of a person, who had previously acted as conciliator, to an arbitral tribunal constituted in the same dispute[1] (see Art. 40, para. 25). **2**

Art. 35 is designed to ensure that disclosures and admissions made by the parties in conciliation proceedings will not be used in subsequent arbitration (see Art. 34, para. 6) or court proceedings. This assurance is likely to foster the parties' readiness to agree to conciliation and their flexibility in freely negotiating an agreed settlement.[2] The Conciliation (Additional Facility) Rules[3] and other instruments governing international conciliation incorporate the same principle.[4] On the other hand, this may lead to additional legal costs in subsequent arbitration proceedings. The parties will have to prove the facts underlying the dispute anew **3**

---

1   See also Note I to Arbitration Rule 1 of 1968, 1 ICSID Reports 67.
2   *Ziadé, N. G.*, ICSID Conciliation, News from ICSID, Vol. 13/2, pp. 3, 4 (1996).
3   Art. 37(4).
4   See UNCITRAL Conciliation Rules, Art. 20, 20 ILM 300, 306 (1981). See also *Reif, L. C.*, Conciliation as a Mechanism for the Resolution of International Economic and Business Disputes, 14 Fordham International Law Journal 578, 586, 614, 618/9 (1991).

and will have to present arguments to a tribunal that have previously been put before a conciliation commission.[5]

**4**      The prohibition in Art. 35 is subject to the clause "except as the parties to the dispute shall otherwise agree". Therefore, the parties may agree to permit the use of material presented in conciliation proceedings or of the report or recommendation of a conciliation commission in subsequent judicial proceedings. An agreement of this kind may be made in advance, together with the agreement containing consent to conciliation.[6] More likely, such an agreement may be made in the course of conciliation proceedings and may be part of an arbitration clause contained in an agreement reached under Art. 34(2) (see Art. 34, para. 31).

**5**      The Conciliation Rules provide that any agreement under Art. 35 must be reflected in the report of the conciliation commission:

### Rule 32
#### *The Report*

(2) The report shall also record any agreement of the parties, pursuant to Article 35 of the Convention, concerning the use in other proceedings of the views expressed or statements or admissions or offers of settlement made in the proceeding before the Commission or of the report or any recommendation made by the Commission. . . .[7]

---

5  *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 343 (1986).

6  See Clause XXIX of the 1968 Model Clauses, 7 ILM 1159, 1181. The subsequent versions of the Model Clauses do not contain such a clause.

7  See also the Conciliation (Additional Facility) Rules, Art. 38(2).

# Article 36

**(1) Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.**

**(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.**

**(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.**

## OUTLINE

|    |    | *Paragraphs* |
| --- | --- | --- |
| I. | INTRODUCTION | 1–8 |
| II. | INTERPRETATION | 9–70 |
|    | A. **"(1) Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party."** | 9–21 |
|    | 1. Initiative | 9–10 |
|    | 2. The Request | 11–17 |
|    | 3. Transmittal of Copy | 18–21 |
|    | B. **"(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings."** | 22–43 |
|    | 1. Required Information | 22–31 |
|    | 2. Optional Information | 32–34 |
|    | 3. Consultation, Supplementation and Correction | 35–37 |
|    | 4. Procedural Nature of Institution Rules | 38–43 |
|    | C. **"(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction** | |

**of the Centre. He shall forthwith notify the parties of
registration or refusal to register."**                                              44–70
  1.  Purpose of Screening                                        44–47
  2.  Basis for Decision on Registration                           48–56
  3.  Finality of Decision on Registration                         57–59
  4.  Notification and Consequences of Registration                60–63
  5.  Withdrawal of Request                                        64–70

## BIBLIOGRAPHY

*Brower, Ch. N.*, The Initiation of Arbitration Proceedings: "Jack be Nimble, Jack be Quick . . . !",
    13 ICSID Review – FILJ 15 (1998);

*Parra, A. R.*, The Screening Power of the ICSID Secretary General, News from ICSID, Vol. 2/2,
    p. 10 (1985);

  The Institution of ICSID Arbitration Proceedings, News from ICSID, Vol. 20/2, p. 12 (2003);

*Sutton, S. D.*, *Emilio Augustin Maffezini v. Kingdom of Spain* and the ICSID Secretary General's
    Screening Power, 21 Arbitration International 113 (2005);

*Townsend, J. M.*, The Initiation of Arbitration Proceedings: "My Story Had Been Longer",
    13 ICSID Review – FILJ 21 (1998).

## I. INTRODUCTION

**1**    Art. 36 is the single article in Section 1 of the Convention's Chapter IV on "Arbitration". Section 1 is entitled "Request for Arbitration".

**2**    Art. 36 deals with the institution, that is the first stage of arbitration proceedings. It describes the request that must be submitted to the Secretary-General by the claimant and the information contained therein. It also deals with the steps that the Secretary-General must take, in particular his or her duty to determine whether the request is manifestly outside the Centre's jurisdiction.

**3**    The more detailed rules for this initial stage of the proceedings are contained in the Institution Rules[1] (see Art. 44, paras. 5, 13, 39, 40). They are adopted by the Administrative Council pursuant to Art. 6(1)(b) of the Convention. The Institution Rules deal with the submission and registration of the request for arbitration and the notice of registration to the parties.[2] They are restricted in scope to the period of time from the filing of a request to the dispatch of the notice of registration. After that time proceedings are regulated by the Conciliation Rules and the Arbitration Rules. The Institution Rules are examined in more detail and in their proper context below.

---

1  Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings,
    http://www.worldbank.org/icsid/basicdoc/partD.htm.

2  See also *Sutherland, P. F.,* The World Bank Convention on the Settlement of Investment Disputes,
    28 International and Comparative Law Quarterly 367, 386/7 (1979).

Other instruments governing international adjudication show considerable variation in their provisions on the initiation of proceedings.[3] This variation is manifest, in particular, with respect to the addressee of the request[4] and with respect to the existence of a preliminary screening of the request.[5]  **4**

Art. 36 does not follow any pre-existing model but was developed independently during the Convention's drafting. Questions prominent in the deliberations on what eventually became Art. 36 were the necessity or desirability of a joint request (see para. 10 *infra*), the transmittal of the request to the respondent (see para. 19 *infra*), the information to be included in the request (see para. 23 *infra*), the requirement of prior consent (see Art. 25, para. 481) and the circumstances of the Secretary-General's screening power (see paras. 44, 48, 57 *infra*).  **5**

Art. 36 has its counterpart in Art. 28 dealing with conciliation. The provisions of Arts. 28 and 36 are identical with the exception of the words "conciliation" and "arbitration" appearing in the respective articles. During the Convention's preparation, there was some discussion on whether different rules should apply to the two procedures since conciliation depends on co-operation and good faith (History, Vol. II, pp. 262/3, 404, 409, 770/1, 788). But in the end, the opinion prevailed that the two provisions should be substantively identical (at p. 782).  **6**

Art. 36 does not apply to the Additional Facility (see Art. 25, paras. 9–13).[6] The Arbitration (Additional Facility) Rules contain a chapter on Institution of Proceedings (Arts. 2–5) which is similar to the ICSID Institution Rules (see para. 3 *supra*). The most important difference between the two sets of rules is the fact that under the Additional Facility the registration of the claimant's request instituting arbitration is subject to an additional requirement: the agreement of the parties providing for arbitration under the Additional Facility must have been approved by the Secretary-General in accordance with Art. 4 of the Additional Facility Rules[7] (see Art. 25, paras. 31, 32, 202, 205, 210, 224). Other aspects of the Arbitration (Additional Facility) Rules dealing with the institution of proceedings are referred to in their proper context below (see paras. 10, 11, 17, 24, 47, 61, 64 *infra*).  **7**

---

3  See esp. *Brower, Ch. N.*, The Initiation of Arbitration Proceedings: "Jack be Nimble, Jack be Quick . . . !", 13 ICSID Review – FILJ 15, 17 *et seq.* (1998); *Parra, A. R.*, The Screening Power of the ICSID Secretary General, News from ICSID, Vol. 2/2, pp. 10/11 (1985); *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 303/4 (1997).

4  See *e.g.*, Art. 3 of the 1976 UNCITRAL Arbitration Rules, 15 ILM 702 (1976), providing for direct delivery of the notice of arbitration to the respondent.

5  See *e.g.*, Arts. 4(5), 5(1) and 6(2) of the 1998 ICC Rules of Arbitration, 36 ILM 1608/9 (1997), providing for a screening of the request after the respondent has been given the opportunity to provide an answer.

6  See Art. 3 of the Additional Facility Rules.

7  See Arbitration (Additional Facility) Rules, Art. 3(1)(c); *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 344 *et seq.* (1999).

**8**       The Secretary-General performs a different screening function with respect to a request for annulment. He or she will refuse to register an application for annulment if it does not relate to an award (see Art. 52, paras. 65, 66), if it is outside the time limits or if it is not submitted by one of the parties to the original proceedings (see Art. 52, paras. 95–104). Similar considerations apply to a request for revision (see Art. 51, paras. 13, 14). In the case of a request for interpretation there is no time limit to observe (Art. 50, para. 15). There is no screening power under Art. 36(3) with respect to the resubmission of a dispute under Art. 52(6) after the annulment of an award (see Art. 52, para. 667).

## II. INTERPRETATION

### A.  "(1) Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party."

### *1. Initiative*

**9**       The request for arbitration may come from either the host State or the investor. In actual practice, the request for arbitration nearly always comes from the investor.[8] An investor does not require any authorization from its State of nationality to institute proceedings.[9] A request for arbitration may also be submitted by a host State's constituent subdivision or agency provided the requirements of Art. 25(1) and (3) have been complied with (see Art. 25, paras. 230–267, 903–920).[10]

**10**      The request may be made jointly by both parties. The Institution Rules provide to this effect:

<div align="center">

**Rule 1**
*The Request*
(2) The request may be made jointly by the parties to the dispute.[11]

</div>

The issue of a joint request was the subject of some debate during the Convention's preparation. A suggestion that the Convention require a joint request by the parties was rejected since it was seen as amounting to a requirement of a second consent (History, Vol. II, pp. 770–773, 776).

---

8   For cases initiated by the host State or an agency of the host State see *Gabon* v. *Société Serete S.A.*; *Tanzania Electric Supply Co. Ltd.* v. *IPTL*; *Government of the Province of East Kalimantan* v. *PT Kaltim Prima Coal and others*.

9   A suggestion to this effect during the Convention's drafting found no support: History, Vol. II, p. 982.

10  Institution Rules 2(1)(b) and (c) – see para. 24 *infra*.

11  See also Arbitration (Additional Facility) Rules, Art. 2(2).

## 2. The Request

The request for arbitration is to be directed to the Secretary-General.[12] The Institution Rules elaborate on the Convention's text in the following manner:    **11**

### Rule 1
#### *The Request*

(1) Any Contracting State or any national of a Contracting State wishing to institute conciliation or arbitration proceedings under the Convention shall address a request to that effect in writing to the Secretary-General at the seat of the Centre. The request shall indicate whether it relates to a conciliation or an arbitration proceeding. It shall be drawn up in an official language of the Centre, shall be dated, and shall be signed by the requesting party or its duly authorized representative.[13]

In accordance with Art. 2, the Centre's seat is at the principal office of the International Bank for Reconstruction and Development. The address is: ICSID, 1818 H Street, N.W. Washington, D.C. 20433, U.S.A.    **12**

The parties' consent may cover both conciliation and arbitration (see Art. 25, paras. 19–28) or conciliation followed by arbitration. If there is a choice between the two methods, the request is the latest opportunity to make such an election. If arbitration is to follow an unsuccessful attempt at conciliation, separate requests are required at each stage.[14]    **13**

The official languages of the Centre are specified in Administrative and Financial Regulation 34(1) as English, French and Spanish. Therefore, the request must be drawn up in one of these three languages. The choice of one of these languages for the request is without prejudice to the choice of the procedural language(s) for the arbitration proceedings in accordance with Arbitration Rule 22[15] (see Art. 44, paras. 61–71).    **14**

In accordance with Institution Rule 4, a request must be accompanied by five additional signed copies. The Secretary-General may require further copies. Any documentation supporting the request (see paras. 28–29 *infra*) must conform to Administrative and Financial Regulation 30. This Regulation specifies the form of documents, the number of copies, the possibility of submitting extracts and the languages of supporting documentation.[16]    **15**

The request should be accompanied by a lodging fee in accordance with Administrative and Financial Regulation 16 (see Art. 59, para. 8). This fee is a charge for the use of the Centre in the sense of Art. 59. The fee is non-refundable even if registration is refused or the request is withdrawn (see paras. 64–68 *infra*). Its amount is determined from time to time by the Secretary-General. The Schedule    **16**

---

12  See also Report of the Executive Directors, para. 34, 1 ICSID Reports 30.
13  See also Arbitration (Additional Facility) Rules, Art. 2(1).
14  See Note C to Institution Rule 1 of 1968, 1 ICSID Reports 52.
15  See Note D to Institution Rule 1 of 1968, 1 ICSID Reports 52.
16  See also Note L. to Institution Rule 2 of 1968 and Notes A–D to Institution Rule 4 of 1968, 1 ICSID Reports 55, 56/7.

of Fees in its version of 6 July 2005 sets this fee at US $25,000 (twenty-five thousand). Non-payment of the lodging fee at the time of the request will stall the procedure: under Institution Rule 5(1) the Secretary-General will not take any action except to acknowledge receipt of the request to the requesting party until payment of the fee.[17]

**17**    Neither the Convention nor the Institution Rules contain any time limits for requests.[18] But an agreement between the parties may contain certain temporal conditions for consent. Chapter XI of the NAFTA, providing for ICSID and Additional Facility arbitration (see Art. 25, paras. 457–459), requires that six months must have elapsed since the events giving rise to a claim before an investor may make a request for arbitration.[19] But a claim is allowed only within three years from the date on which the investor acquired knowledge of the relevant facts.[20]

### 3. Transmittal of Copy

**18**    The requesting party will receive an acknowledgement from the Secretary-General that the request has been received (Institution Rule 5(1)(a)). The Secretary-General will also transmit a copy of the request to the respondent. The Institution Rules provide to this effect:

<div align="center">

**Rule 5**
*Acknowledgement of the Request*
</div>

   (2) As soon as he has received the fee for lodging the request, the Secretary-General shall transmit a copy of the request and of the accompanying documentation to the other party.[21]

**19**    During the Convention's drafting there was some debate on who should notify the respondent of the request. The original idea was that the claimant would have to send a copy of the request to the respondent (History, Vol. II, pp. 769, 771, 773, 775, 787). This was subsequently changed to the final version under which it is the Secretary-General's duty to transmit a copy of the request to the respondent (at pp. 788, 861).

**20**    After receiving a copy of the request, the respondent need not react immediately. Registration of the request by the Secretary-General is not a matter of adversary determination[22] (see para. 50 *infra*). But the respondent is not precluded from reacting and often argues that the request should not be registered.[23] The requesting party is given an opportunity to comment on the reaction of the respondent, particularly if that reaction raises serious jurisdictional issues or casts doubt on

---

17   See also Notes A–E to Institution Rule 5 of 1968, 1 ICSID Reports 57/8.
18   See Note A to Institution Rule 1 of 1968, 1 ICSID Reports 52.
19   Art. 1120(1) NAFTA, 32 ILM 643 (1993).        20   Arts. 1116(2) and 1117(2) NAFTA.
21   See also Note E to Institution Rule 5 of 1968, 1 ICSID Reports 58.
22   *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 659 (1993).
23   See *e.g. Olguín* v. *Paraguay*, Award, 26 July 2001, para. 8; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 2.

the veracity of the claimant's assertions.[24] Sometimes there are several rounds of submissions by the parties before a decision on the request's registration is taken.[25] Also, the notification of the request to the respondent gives the parties an opportunity to settle the dispute before the arbitration procedure is actually set in motion (see History, Vol. II, p. 769).[26] The request may be withdrawn up to the date of its registration (see paras. 64–70 *infra*).

The agreement between the parties may add further procedural requirements to   **21**
the lodging of the request. Art. 1119 of the NAFTA[27] requires a notice of intent to submit a claim to arbitration to be delivered by the investor to the host State at least ninety days before the claim is submitted to arbitration. Some treaties provide for a mandatory waiting period for amicable settlement and/or an attempt to settle the dispute through domestic courts (see Art. 25, paras. 541–550).

## B. "(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings."

### 1. Required Information

Art. 36(2) specifies the information to be included in the request. This infor-   **22**
mation covers the jurisdictional requirements as set out in Art. 25(1). It relates to jurisdiction *ratione materiae and ratione personae* and to consent (see Art. 25, para. 3).

The provision dealing with the information to be contained in a request under-   **23**
went considerable changes during the Convention's drafting.[28] The Preliminary Draft simply required that the request "shall state that the other party has consented to the jurisdiction of the Center" (History, Vol. I, p. 172). After some deliberation (History, Vol. II, pp. 262/3, 412/3, 511) the First Draft provided that the request shall contain information concerning the subject-matter of the dispute, the identity of the parties as well as consent sufficient to establish *prima facie* that the dispute is within the Centre's jurisdiction (History, Vol. I, p. 172). The formula dealing with *prima facie* proof of jurisdiction was deleted after some debate (History, Vol. II, pp. 770, 773, 775, 787, 861). It was replaced by the provision on the Secretary-General's screening power in Art. 36(3). In response to demands that the request for arbitration should contain more specific information, it was decided to relegate further detail to the Institution Rules (at pp. 773, 774, 787, 861).

---

24  See *e.g. Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 40; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 44; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 3; *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, para. 20.
25  *Parra, A. R.*, The Institution of ICSID Arbitration Proceedings, News from ICSID, Vol. 20/2, pp. 12, 13 (2003).
26  See also Note E to Institution Rule 5 of 1968, 1 ICSID Reports 58.
27  32 ILM 643 (1993).                              28  See *Parra*, The Screening Power, p. 11.

**24**    The necessary detail concerning the information to be included in the request for arbitration is provided in the Institution Rules:

### Rule 2
*Contents of the Request*

(1) The request shall:

(a) designate precisely each party to the dispute and state the address of each;

(b) state, if one of the parties is a constituent subdivision or agency of a Contracting State, that it has been designated to the Centre by that State pursuant to Article 25(1) of the Convention;

(c) indicate the date of consent and the instruments in which it is recorded, including, if one party is a constituent subdivision or agency of a Contracting State, similar data on the approval of such consent by that State unless it had notified the Centre that no such approval is required;

(d) indicate with respect to the party that is a national of a Contracting State:

(i) its nationality on the date of consent; and

(ii) if the party is a natural person:

(A) his nationality on the date of the request; and

(B) that he did not have the nationality of the Contracting State party to the dispute either on the date of consent or on the date of the request; or

(iii) if the party is a juridical person which on the date of consent had the nationality of the Contracting State party to the dispute, the agreement of the parties that it should be treated as a national of another Contracting State for the purposes of the Convention;

(e) contain information concerning the issues in dispute indicating that there is, between the parties, a legal dispute arising directly out of an investment; and

(f) state, if the requesting party is a juridical person, that it has taken all necessary internal actions to authorize the request.

(2) The information required by subparagraphs (1)(c), (1)(d)(iii) and (1)(f) shall be supported by documentation.

(3) "Date of consent" means the date on which the parties to the dispute consented in writing to submit it to the Centre; if both parties did not act on the same day, it means the date on which the second party acted.[29]

**25**    The request does not have to be formulated in any particular manner but must contain all the information listed in Institution Rule 2. A complete request is in the claimant's interest since it will expedite the procedure (see paras. 35–37 *infra*). The Secretary-General needs all the information before he or she can exercise his or her screening power in accordance with Art. 36(3). Since the Institution Rules are not, generally, subject to modification by the parties (see Art. 44, para. 12), the required information cannot be waived by the parties even in the case of a joint request (see para. 10 *supra*).

---

29   See also Arbitration (Additional Facility) Rules, Art. 3.

The information required by Institution Rule 2 echoes the jurisdictional require- **26** ments of Art. 25.[30] These are dealt with in some detail in the Commentary on that Article. Under Institution Rule 2(1)(a) the request must designate as parties a Contracting State (see Art. 25, paras. 211–229) and a national of another Contracting State[31] (see Art. 25, paras. 268–302). Under Institution Rule 2(1)(b) if one of the parties is a constituent subdivision or agency of a Contracting State, it must have been designated to the Centre (see Art. 25, paras. 230–267). Under Institution Rule 2(1)(c), the instrument recording consent (see Art. 25, paras. 374–463) as well as the date of consent (see Art. 25, paras. 468–478) must be indicated. If one of the parties is a constituent subdivision or agency of a Contracting State, data on the approval of the consent is required unless the State concerned has indicated that no such approval is required (see Art. 25, paras. 903–920). Institution Rule 2(1)(d) requires that all the relevant information concerning the investor's nationality be included in order to indicate that the requirements of Art. 25(2) are fulfilled (see Art. 25, paras. 635–759). In the case of a juridical person incorporated in the host State, this would include the agreement of the parties that the juridical person should be treated as a national of another Contracting State in accordance with Art. 25(2)(b) (see Art. 25, paras. 760–902). Institution Rule 2(1)(e) requires information on the issues in dispute to show that there is between the parties a legal dispute arising directly out of an investment (see Art. 25, paras. 41–201). The information concerning the issue in dispute given in the request does not affect the right to submit incidental or additional claims under Art. 46 at a later stage. Institution Rule 2(1)(f) requires a statement to the effect that all necessary internal actions to authorize the request have been taken if the claimant is a juridical person (see Art. 44, para. 40).

Art. 36(2) requires that "information" on these points be contained in the request. **27** Institution Rule 2 says that the request must "designate", "state", "indicate" and "contain information". Therefore, no proof is required at this stage. On most points a mere assertion in the request will suffice and the information thus given may be developed at a later stage.[32] But on certain points of the request, Institution Rule 2(2) requires that they be supported by documentation. These are the instrument recording consent, any agreement by the parties to treat a juridical person as a national of another Contracting State in accordance with Art. 25(2)(b) and internal authorization of a juridical person to commence proceedings. Documentation of authorization for the request in the case of juridical persons is meant to forestall a

---

30  See also *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, pp. 4, 5/6 (1997).

31  In *SPP* v. *Egypt*, an additional claimant joined the proceedings after the registration of the Request for Arbitration. This intervention was agreed to by the Respondent and the Tribunal accepted the informal notification of the intervention. But the Dissenting Opinion criticized this procedure as being at odds with the formal requirement of Institution Rule 2. See *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 14, Diss. Op. para. 3; Award, 20 May 1992, paras. 145, 146, Diss. Op. at 3 ICSID Reports 318.

32  *CMS* v. *Argentina*, Award, 12 May 2005, paras. 106, 115. See also Note D to Institution Rule 2 and Note B to Institution Rule 6 of 1968, 1 ICSID Reports 53/4, 58.

later dispute between the parties about the company's internal procedure leading to the institution of the proceedings.[33] Documentation under Institution Rule 2(2) must conform to Administrative and Financial Regulation 30 (see para. 15 *supra*).

**28**     The information concerning the instrument of consent must be supported by documentation. Institution Rule 2(2) also requires documentation on the approval of consent in case of a constituent subdivision or agency. The documentation may consist of the copy of a contractual clause between the parties providing for ICSID arbitration (see Art. 25, paras. 382–389). In the case of a joint request (see para. 10 *supra*), consent may be recorded in the request. If consent is based on legislation of the host State or on a treaty between the host State and the investor's home State, a copy of the relevant legislative or treaty provision should be included. If consent is based on a treaty, evidence of its entry into force is required. In addition, documentation may be required to demonstrate that the case is within the scope of the consent in the legislation or treaty (see Art. 25, paras. 513–539). If consent is subject to procedural conditions, such as a mandatory waiting period for amicable settlement, documentation of compliance may be required (see Art. 25, paras. 540–550).[34]

**29**     If the investor has accepted the offer of arbitration in writing prior to the request for arbitration, a copy of that document should be supplied. Otherwise, the request for arbitration may express the investor's consent thereby perfecting the agreement between the parties[35] (see Art. 25, paras. 416–426, 447–456).

**30**     During the Convention's drafting, there was some debate on whether a claimant should be allowed to institute proceedings even without prior consent. The respondent's consent might then be indicated by not contesting jurisdiction (History, Vol. I, p. 112) (see also Art. 25, para. 481). The idea was based on a practice of the International Court of Justice whereby failure to contest jurisdiction by the respondent State is deemed to be consent to the Court's jurisdiction.[36] The idea was dropped since it might have led to the embarrassment of a State that did not wish to give its consent and since it would be undesirable to set the arbitration machinery in motion where it was unlikely that consent would be given[37] (History, Vol. II,

---

33  See *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 4; *Scimitar* v. *Bangladesh*, Award, 4 May 1994, paras. 6, 13, 15, 21, 25, 28, 29; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 72, 175–183; *Vivendi* v. *Argentina*, Decision on Jurisdiction, 14 November 2005, paras. 22–23, 45–49, 98–104.

34  *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, para. 18. See also *Parra*, The Institution, p. 13.

35  See also Note F to Institution Rule 2 of 1968, 1 ICSID Reports 54.

36  See *Rosenne, S.*, The World Court 98 (1995). Under the Rules of the International Court of Justice as revised in 1978 (Art. 38(5)), an application not based on prior consent of the respondent State will not be entered in the Court's General List nor will any action be taken, unless and until the respondent State consents to the Court's jurisdiction.

37  See *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 272–277 (1966); *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 366/7 (1972-II); *Masood, A.*, Jurisdiction of International Centre for Settlement of Investment Disputes, 14 Journal of the Indian Law Institute 119, 123/4 (1972); *Parra*, The Screening Power, p. 11.

pp. 402, 403, 470, 499, 509, 540, 566, 711). Art. 36(2) and Institution Rule 2 leave no doubt that consent must exist when the request is lodged (see Art. 25, paras. 479, 480, 482). But consent may be confirmed and extended during the proceedings before the tribunal (see Art. 25, paras. 483–498).

The "date of consent" is defined in Institution Rule 2(3). It is relevant for a **31** number of questions under the Convention (see Art. 25, paras. 475–478).[38] If consent is based on legislation or a treaty, the date of consent is the time at which the investor accepts the offer contained therein. Unless the offer has been accepted separately in writing, the date of consent will be the date of the request for arbitration (see Art. 25, paras. 468–469).

## 2. Optional Information

The requesting party is not restricted to the information required by Institution **32** Rule 2. The Institution Rules provide to this effect:

### Rule 3
#### Optional Information in the Request
The request may in addition set forth any provisions agreed by the parties regarding the number of conciliators or arbitrators and the method of their appointment, as well as any other provisions agreed concerning the settlement of the dispute.

Under Art. 37(1) the tribunal shall be constituted as soon as possible after the **33** registration of the request. In order to expedite the proceedings it is wise to indicate already in the request any agreement that is relevant to the tribunal's constitution.[39] Other procedural agreements may also be communicated in the request. These may concern the place and language of proceedings or any modification of the Arbitration Rules that the parties may have agreed upon (see Art. 44, paras. 11–31). In addition, the request may contain a designation of counsel, agents or advocates and may indicate the extent of their authority.[40] If the request is signed by counsel, it should be accompanied by the appropriate authorization signed by the party.

The request is also an opportunity for the claimant to present its case on the **34** merits. The issues in dispute may be described in more or less detail. Since the request is likely to be the first document that the arbitrators will read, it is advisable that it contain a persuasive, coherent and complete statement of the facts underlying the dispute.[41]

## 3. Consultation, Supplementation and Correction

The fact that the Convention and the Institution Rules require a formal request **35** does not rule out informal communication between the claimant and the Centre. During the Convention's drafting, the possibility to supplement an incomplete or

---

38  See also Note M to Institution Rule 2 of 1968, 1 ICSID Reports 55.
39  See also Note B to Institution Rule 3 of 1968, 1 ICSID Reports 56.
40  See Notes C and D to Institution Rule 3 of 1968, 1 ICSID Reports 56.
41  See *Townsend, J. M.*, The Initiation of Arbitration Proceedings: "My Story Had Been Longer", 13 ICSID Review – FILJ 21 (1998).

inadequate request upon the advice of the Secretary-General was already foreseen (History, Vol. II, p. 774).

**36**     Advance consultation with the Centre prior to lodging the request for arbitration is possible and can be useful. It can clarify points that need to be addressed and can spare the claimant the cost and embarrassment of a request that is subsequently rejected.[42]

**37**     If the request does not conform to the requirements of the Convention or the Institution Rules, the Secretary-General will consult with the requesting party. This also applies if he or she feels that additional information is needed.[43] He or she will give the party concerned an opportunity to supplement or correct the request before taking a decision on its registration.[44] Such consultation may result in the request's withdrawal (see paras. 64–69 *infra*).

### 4. Procedural Nature of Institution Rules

**38**     Institution Rule 2 is of a procedural nature. It lists the information that must be submitted to the Secretary-General in order to enable him or her to make a decision on the request's registration. Nevertheless, in some cases tribunals have treated Institution Rule 2 as if it contained jurisdictional requirements in addition to Article 25.

**39**     In *Cable TV* v. *St. Kitts and Nevis*,[45] the Claimant had entered into an agreement with the Nevis Island Administration (NIA) containing consent to ICSID arbitration. The Tribunal found that the NIA was a constituent subdivision of the Federation of St. Kitts and Nevis. But the NIA had not been designated to the Centre as a constituent subdivision in accordance with Art. 52(1). Nor had its consent been approved by the Federation in accordance with Art. 25(3). The Tribunal rejected the attempted substitution of the Federation as a party to the proceedings in lieu of the NIA[46] (see Art. 25, para. 249).

**40**     Having thus found that there was no jurisdiction, the Tribunal proceeded to examine the same issues from the perspective of Institution Rule 2.[47] The Tribunal admitted that the Request had established a *prima facie* case for jurisdiction and

---

42  *Brower*, The Initiation, p. 17; *Parra*, The Screening Power, p. 13.

43  See *e.g. Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 2; *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 5, 7; *MTD* v. *Chile*, Award, 25 May 2004, para. 3; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, para. 4; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 2; *Vivendi* v. *Argentina*, Decision on Jurisdiction, 14 November 2005, paras. 100, 101; *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 3, 4; *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, paras. 18, 19; *Parkerings* v. *Lithuania*, Award, 11 September 2007, para. 13; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 7.

44  See *Delaume, G. R.*, ICSID Arbitration Proceedings: Practical Aspects, 5 Pace Law Review 563, 569 (1985); *Parra*, The Screening Power, p. 12; *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 308/9 (1999).

45  *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997.

46  At paras. 2.32–2.33, 3.01–3.02, 8.01.     47  At paras. 5.01–5.24.

stated that it was in full agreement with the Secretary-General's decision to register the Request.[48] But it also held that the Request did not comply with the Institution Rules in several respects and that this was fatal for the claim. In particular, the Tribunal found that Institution Rule 2(1)(a) had not been complied with since the Federation had been named incorrectly as a party. Furthermore, Institution Rule 2(1)(b) and (c) had not been complied with since the correct party, the NIA, had not been designated and no documentation had been furnished concerning the approval of its consent.[49] In addition, Institution Rule 2(1)(d)(iii) had not been complied with since there was no documentation of an agreement concerning nationality in accordance with Art. 25(2)(b).[50]

Similarly, the Tribunal in *Impregilo* v. *Pakistan* entertained a jurisdictional **41** objection based on the alleged non-compliance of the Request with Institution Rule 2(1)(f). It examined whether Impregilo's internal authorization for the commencement of the arbitration proceedings satisfied the requirements of Institution Rule 2(1) and (2). The Tribunal found that the authorization supplied by the Claimant was sufficient and dismissed the objection to jurisdiction.[51]

It would appear that reliance on Institution Rule 2 to determine jurisdiction is **42** inappropriate. Institution Rule 2 does not set out jurisdictional requirements in addition to Art. 25. It is merely a rule of procedure. It lists the information and documentation that must be contained in the request. Its purpose is to enable the Secretary-General to decide whether a request should be registered in accordance with Art. 36(3). Once a request has been registered, the tribunal must ascertain the existence of all jurisdictional requirements on the basis of Art. 25 in the light of all available evidence. Omissions, errors and other deficiencies in the request for arbitration are not an independent basis for the tribunal to decline jurisdiction.

This position was fully endorsed in the Resubmitted Case in *Vivendi* v. **43** *Argentina*. In that case, Argentina invoked Institution Rule 2(1)(f) to challenge the powers of attorney of several of the Claimants' representatives in the proceedings. The Tribunal, relying on the First Edition of this Commentary, found that objections to jurisdiction must be premised on a failure to satisfy an element of Art. 25 of the Convention. The corporate authorization requirement is not a jurisdictional requirement but merely a rule of procedure. Moreover, when faced with any shortcomings in a request under Art. 36(2) and Institution Rule 2, the Secretary-General will not necessarily decline to register the request but may consult with the claimant with a view to the request's supplementation or correction. Once the request is registered, deficiencies in the request can no longer be raised and cannot operate as a bar to the Tribunal's jurisdiction.[52]

---

48  At para. 5.02.                          49  At paras. 5.06–5.10.
50  At para. 5.24.
51  *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 72, 175–183.
52  *Vivendi* v. *Argentina*, Decision on Jurisdiction, 14 November 2005, paras. 22, 23, 45–49, 98–104;
    see also *Metalpar* v. *Argentina*, Award, 6 June 2008, para. 11.

## C. "(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register."

### 1. Purpose of Screening

**44**    The Preliminary Draft to the Convention did not provide for the screening of requests for arbitration. Several delegates expressed the opinion that before setting the Centre's machinery into motion, the requirements for jurisdiction, especially consent, should be established by *prima facie* evidence (History, Vol. II, pp. 399, 408, 409, 451, 568). This idea was reflected in the First Draft (History, Vol. I, p. 174; Vol. II, pp. 653, 689, 769). Various officers and bodies were suggested for the function of verifying jurisdiction until it became clear that it was to be exercised by the Secretary-General (History, Vol. I, p. 174; Vol. II, pp. 399, 409, 451, 653, 689, 771–775, 787, 861). The purpose was to deal with unfounded proceedings at an early stage (at p. 772) (see also para. 23 *supra*).

**45**    The Report of the Executive Directors on the Convention explains the Secretary-General's screening power in the following terms:

> 20. . . . , the Secretary-General is given the power to refuse registration of a request for conciliation proceedings or arbitration proceedings, and thereby to prevent the institution of such proceedings, if on the basis of the information furnished by the applicant he finds that the dispute is *manifestly* outside the jurisdiction of the Centre (Article 28(3) and 36(3)). The Secretary-General is given this limited power to "screen" requests for conciliation or arbitration proceedings with a view to avoiding the embarrassment to a party (particularly a State) which might result from the institution of proceedings against it in a dispute which it had not consented to submit to the Centre, as well as the possibility that the machinery of the Centre would be set in motion in cases which for other reasons were obviously outside the jurisdiction of the Centre, e.g., because either the applicant or the other party was not eligible to be a party in proceedings under the Convention.[53]

**46**    The constitution of a tribunal involves time, effort and expense. The Secretary-General's screening power is designed to avoid a situation where a tribunal, once established, would almost certainly find itself without competence. In addition, the procedure should not be set in motion merely to pressure or embarrass a party, especially a host State, if it had not given its consent to jurisdiction.[54]

---

53    1 ICSID Reports 27, italics original.
54    *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 273 (1966); *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 659/60 (1993); *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 818 (1982); *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, pp. 4, 5 (1997); *Parra*, The Screening Power, p. 10.

The Secretary-General performs a similar function with respect to the registra- **47** tion of requests for arbitration under the Additional Facility. He or she will only register the request after satisfying him or herself that the request conforms in form and substance to the requirements.[55] These requirements are similar to those under the Convention but add the precondition that the agreement providing for Additional Facility arbitration must have been approved by the Secretary-General[56] (see Art. 25, para. 202).[57]

## 2. Basis for Decision on Registration

The First Draft still provided that the Secretary-General would have to find the **48** request to be in conformity with the Convention (History, Vol. I, p. 174). In the subsequent discussions this wording was seen as imposing too strict a requirement. It was pointed out that a refusal to register should only take place where there was not the slightest doubt as to the request's impropriety. The nature of the screening process was expressed through the adoption of negative wording making the Secretary-General's screening power the exception to the basic obligation to register (History, Vol. II, pp. 771, 772, 774, 775).

The Institution Rules express the Secretary-General's power to screen requests **49** in the following terms:

### Rule 6
#### Registration of the Request
(1) The Secretary-General shall, subject to Rule 5(1)(b),[58] as soon as possible, either:
   (a)  register the request in the Conciliation or the Arbitration Register and on the same day notify the parties of the registration; or
   (b)  if he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre, notify the parties of his refusal to register the request and of the reasons therefor.
(2) A proceeding under the Convention shall be deemed to have been instituted on the date of the registration of the request.

The Secretary-General's decision to register or to refuse registration is made **50** primarily on the basis of the information contained in the request.[59] But the

---

55  Arbitration (Additional Facility) Rules, Art. 4. See *Azinian* v. *Mexico* (AF), Award, 1 November 1999, paras. 38, 39.

56  Arbitration (Additional Facility) Rules, Art. 3(1)(c) and Additional Facility Rules, Art. 4.

57  For a comparative analysis including other arbitration institutions see *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 303 *et seq.* (1997).

58  Institution Rule 5(1)(b) requires the prior payment of the lodging fee (see para. 16 *supra*).

59  *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 274 (1966); *Parra*, The Screening Power, p. 12; *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12

respondent is given the opportunity to be heard on the question of whether the request should be registered (see para. 20 *supra*). If the respondent does not avail itself of that opportunity, it retains the right to contest jurisdiction before the tribunal (see Art. 41, paras. 30–42).

**51**   The Secretary-General will assume the information supplied by the requesting party to be true unless there are indications to the contrary. The request must contain information and documentation on certain points (see paras. 24–30 *supra*). But the requesting party is not required to establish or prove that the dispute is within the Centre's jurisdiction.[60] The information contained in the request may well turn out to be incorrect in the light of argument before the tribunal.[61]

**52**   The request must be drawn up in one of the Centre's three official languages (see paras. 11, 14 *supra*). Documentation filed in support of a request that is not in one of the Centre's official languages must be accompanied by a translation.[62] For the purpose of deciding whether to register the request, the Secretary-General will look at the translation in one of the official languages. But, if a translation does not correspond to the original, the claimant will be asked to comment. If, in the light of this comment, the original clearly does not form a basis for ICSID jurisdiction, registration will be refused.

**53**   In *SPP* v. *Egypt*, the Tribunal noted that the Secretary-General had registered the request despite the fact that he had reached the conclusion that the English translation of Art. 8 of Egyptian Law No. 43 of 1974, which was put forward as the basis for jurisdiction, did not adequately reflect the Arabic text.[63] The Tribunal undertook a detailed analysis of the Arabic original of this text on the basis of which it found that it had jurisdiction[64] (see Art. 25, paras. 400–404).

**54**   The Secretary-General may only refuse to register a request if it is manifestly outside the Centre's jurisdiction. Manifest means easily recognizable (see also Art. 52, paras. 134–141). This would be the case if neither party is a Contracting State or a duly designated subdivision or agency of a Contracting State or if neither party is a national of a Contracting State. It would also be the case if there is no showing of a written consent to jurisdiction.[65] If the Secretary-General has doubts in the matter he or she must register the request.[66]

---

ICSID Review – FILJ 287, 305 (1997); *Szasz, P. C.*, A Practical Guide to the Convention on Settlement of Investment Disputes, 1 Cornell International Law Journal 1, 11 (1968); *Parra*, The Institution, p. 12.

60   *Parra*, The Screening Power, p. 12; *Brower*, The Initiation, pp. 16/7.
61   See *e.g.*, *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 45, footnote 36.
62   Administrative and Financial Regulation 30(3).
63   *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 3; Decision on Jurisdiction II, 14 April 1988, para. 3; Award, 20 May 1992, para. 3.
64   *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, paras. 74–82.
65   See Note C to Institution Rule 6 of 1968, 1 ICSID Reports 58/9.
66   See also *Broches, A.*, The Convention on the Settlement of Investment Disputes, Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 276 (1966); *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 368 (1972-II); *Brower*, The Initiation, pp. 19/20; *Delaume*,

Formal decisions to refuse registration of requests are not published. But **55** instances of such decisions appear to be relatively rare.[67] This is due, in large part, to advance consultation with the Centre and to the possibility to supplement or withdraw a request after it has been submitted (see paras. 35–37 *supra*). Cases in which requests were not registered include lack of consent to ICSID, the absence of a legal dispute, non-ratification of the Convention by the investor's home State and the absence of an investment.

If the information and documentation required by Institution Rule 2 is before **56** the Secretary-General and the lodging fee has been paid, he or she is under an obligation to register the request.[68] There is no discretion beyond the criterion described in Art. 36(3). Registration may take place within a few days of the arrival of the request at the Centre.[69] But in cases involving complex issues registration may take several months.[70]

### 3. Finality of Decision on Registration

During the Convention's drafting, there was some discussion on whether the **57** Secretary-General's decision to refuse registration of a request should be subject to review. A number of suggestions to this effect were made but Mr. *Broches* expressed his unequivocal opposition to this idea (History, Vol. II, pp. 770, 772). A series of votes led to the rejection of all proposals to introduce a review of the Secretary-General's decision on registration (at pp. 773/4).

Therefore, a decision by the Secretary-General not to register a request for **58** arbitration is non-reviewable. It is not subject to any form of recourse. No further action will be taken upon the request in that case.[71] But a party may at any time submit a new request based on the same claim. A new request would have to follow the procedure of Art. 36 and the Institution Rules including the payment of the lodging fee.

A decision by the Secretary-General to register a request for arbitration does **59** not in any way bind the tribunal in its determination of its own competence or the Centre's jurisdiction in accordance with Art. 41.[72] A respondent remains free to raise jurisdictional objections and a tribunal remains free to decline jurisdiction even if the Secretary-General has found that the dispute is not manifestly outside

———

*G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 818 (1982).

67  See News from ICSID, Vol. 2/2, p. 3 (1985); see also ICSID Annual Report 1985, pp. 4, 6; *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 307/8 (1999).

68  *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 660 (1993).

69  See *e.g. CSOB* v. *Slovakia*, Award, 29 December 2004, para. 1. The Request was filed on 18 April 1997 and was registered on 25 April 1997. For a detailed survey see the Procedural Calendar of Cases at p. lxviii, columns 1 and 2.

70  See *e.g. Telenor* v. *Hungary*, Award, 13 September 2006, paras. 3, 4. The Request was filed on 16 December 2003 and was registered on 2 August 2004.

71  *Parra*, The Screening Power, p. 12.          72  *Parra*, The Institution, p. 12.

the Centre's jurisdiction (see Art. 41, paras. 11–15). In fact Institution Rule 7(e) (see para. 61 *infra*) requires the Secretary-General, when sending the notice of registration, to remind the parties that the registration of the request is without prejudice to the powers and functions of the conciliation commission or arbitral tribunal.

### 4. Notification and Consequences of Registration

**60**    Registration consists of the entry of the request into the Arbitration Register kept by the Secretary-General in accordance with Administrative and Financial Regulation 23. Institution Rule 6(1)(a) requires that the Secretary-General notify the parties of the registration on the same day (see para. 49 *supra*).

**61**    The Institution Rules prescribe the particulars of a notice of registration:

**Rule 7**
*Notice of Registration*

The notice of registration of a request shall:

(a) record that the request is registered and indicate the date of the registration and of the dispatch of that notice;

(b) notify each party that all communications and notices in connection with the proceeding will be sent to the address stated in the request, unless another address is indicated to the Centre;

(c) unless such information has already been provided, invite the parties to communicate to the Secretary-General any provisions agreed by them regarding the number and the method of appointment of the conciliators or arbitrators;

(d) invite the parties to proceed, as soon as possible, to constitute a Conciliation Commission in accordance with Articles 29 to 31 of the Convention, or an Arbitral Tribunal in accordance with Articles 37 to 40;

(e) remind the parties that the registration of the request is without prejudice to the powers and functions of the Conciliation Commission or Arbitral Tribunal in regard to jurisdiction, competence and the merits; and

(f) be accompanied by a list of the members of the Panel of Conciliators or of Arbitrators of the Centre.[73]

The Arbitration (Additional Facility) Rules in Arts. 4 and 5 provide similarly for a notice of registration to be sent to the parties.[74]

**62**    The registration triggers a number of consequences. Arbitration proceedings are formally instituted from the date of registration in accordance with Institution Rule 6(2) (see para. 49 *supra*). The tribunal is to be constituted "as soon as possible" after that date under Art. 37(1). If the tribunal is not constituted within 90 days from that date, the Chairman shall complete its constitution in accordance with Art. 38 at the request of either party. In addition, the date of registration is relevant under Art. 25(2)(a) in connection with the nationality of a natural person party to the dispute (see Art. 25, paras. 679–687).

---

73    See also the Notes to Institution Rule 7 of 1968, 1 ICSID Reports 59/60.
74    See *e.g. Azinian* v. *Mexico* (AF), Award, 1 November 1999, para. 39.

Registration of the request provides a basis for provisional measures under Art. 47. Such measures may be taken by the tribunal while the question of jurisdiction is still under dispute (see Art. 47, paras. 46–57). **63**

### 5. Withdrawal of Request

The withdrawal of a request for arbitration is possible only before its registration. The Institution Rules provide to this effect: **64**

**Rule 8**
*Withdrawal of the Request*
The requesting party may, by written notice to the Secretary-General, withdraw the request before it has been registered. The Secretary-General shall promptly notify the other party, unless, pursuant to Rule 5(1)(b), the request had not been transmitted to it.[75]

The withdrawal of a request may be based on a settlement between the parties. The transmission of a copy of the request to the other party gives the parties an opportunity to reach such a settlement (see para. 20 *supra*). The withdrawal may also be based on the requesting party's realization that registration is unlikely or impossible in the light of informal consultations with the Centre (see paras. 35–37 *supra*). **65**

In *Tokios Tokelės* v. *Ukraine* the Request for Arbitration was submitted in the name of Tokios Tokelės, registered in Lithuania, and its wholly owned subsidiary Taki spravy, registered in Ukraine. Two months later, ICSID notified the requesting parties that a mandatory waiting period for the purpose of reaching a settlement had not been complied with. Thereupon the requesting parties informed ICSID that they withdrew the Request for Arbitration. The Request was resubmitted a few weeks later.[76] **66**

Thereupon the Centre alerted the requesting parties to the fact that there was no agreement under Art. 25(2)(b) to treat the locally incorporated company as a national of another Contracting State. In response, Tokios Tokelės informed the Centre that Taki spravy would be removed as a requesting party.[77] **67**

The withdrawal of the request before its registration does not require the assent of the other party. But if the request was made jointly by both parties it can only be withdrawn by joint action of the parties.[78] The lodging fee (see para. 16 *supra*) will not be refunded in case of a withdrawal. **68**

It is clear that withdrawal of the request cannot constitute withdrawal of a pre-existing consent.[79] If the request contains the investor's acceptance of an offer of consent made by the host State in its legislation or in a treaty with the investor's home State (see para. 29 *supra*) the situation is less clear. Art. 25(1) provides that **69**

---

75  The Arbitration (Additional Facility) Rules do not contain a comparable provision.
76  *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, paras. 16, 18.
77  At para. 19.
78  See Note B to Institution Rule 8 of 1968, 1 ICSID Reports 60.
79  See Note C to Institution Rule 8 of 1968, 1 ICSID Reports 60.

a consent once given may not be withdrawn unilaterally (see Art. 25, paras. 596–606). Therefore, it would appear that even after the withdrawal of a request that has been transmitted to the respondent, the investor's consent remains effective. This means that the host State could thereafter submit a request for arbitration based on the investor's acceptance of the offer of consent.[80] But consent to jurisdiction will only exist to the extent of the investor's acceptance which may be quite narrowly circumscribed in the request.

**70**    Once the request has been registered, its unilateral withdrawal becomes impossible. The proceedings may thereafter be discontinued at one party's request with the other party's assent in accordance with Arbitration Rule 44 (see Art. 45, para. 56). Alternatively, the parties may submit a joint request of discontinuance on the basis of a settlement in accordance with Arbitration Rule 43 (see Art. 48, paras. 69–87). Failure of both parties to act for more than six months will lead to a discontinuance in accordance with Arbitration Rule 45 (see Art. 45, para. 57).

_____

80   See Note E to Institution Rule 8 of 1968, 1 ICSID Reports 61.

# Article 37

(1) **The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36.**

   (2) (a)  **The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators appointed as the parties shall agree.**

       (b)  **Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–5 |
| II. | INTERPRETATION | 6–54 |
| | A. "(1) The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36." | 6–10 |
| | B. "(2) (a) The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators . . ." | 11–14 |
| | C. ". . . appointed as the parties shall agree." | 15–35 |
| |   1. Prior Agreement | 17–24 |
| |   2. *Ad hoc* Agreement | 25–35 |
| | D. "(b) Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties." | 36–54 |
| |   1. Appointment | 36–46 |
| |   2. Acceptance and Replacement | 47–54 |

## I. INTRODUCTION

Art. 37 is the first of four articles in Section 2 of the Convention's Chapter IV **1** on "Arbitration". Section 2 bears the title "Constitution of the Tribunal". Art. 37 deals with some basic principles for the constitution of a tribunal and with the

475

appointment of arbitrators by the parties. Art. 38 deals with the appointment of arbitrators in default of the parties. Art. 39 deals with the nationality requirements for arbitrators. Art. 40 deals with the appointment of arbitrators who are or are not designated to the Panel of Arbitrators under Arts. 12–16. It also deals with the general qualities of arbitrators.

**2**    The constitution of tribunals is governed by two principles. One is the principle of freedom of choice by the parties. The other is the principle of non-frustration. The parties are free to shape the size, composition and method of appointment by agreement. There is only a limited number of mandatory rules in the Convention in this respect.[1] These are:

- Art. 37(2)(a) prescribing that the tribunal must consist of a sole arbitrator or an uneven number of arbitrators;
- Art. 39 prescribing that the majority of arbitrators must not be nationals or co-nationals of the parties. This rule does not apply if each arbitrator is appointed by agreement of the parties;
- Art. 40(2) providing that arbitrators appointed from outside the Panel of Arbitrators must possess the qualities required of persons on the Panel.[2]

**3**    The Convention also deals with the problem of a party's non-cooperation during the stage of the tribunal's constitution. If the parties are unable or unwilling to constitute the tribunal, the task devolves upon the Chairman of the Administrative Council in accordance with Art. 38.[3] This means that a party cannot block the proceedings by refusing to cooperate in the tribunal's constitution.[4] But the Chairman is more limited in his or her choice of arbitrators than the parties (see Art. 38, paras. 24–26; Art. 40, paras. 8–13). Art. 56(3) of the Convention contains a safeguard against the unilateral withdrawal of an arbitrator appointed by one of the parties.

**4**    The Report of the Executive Directors on the Convention summarizes the interplay of the two principles in the following terms:

> 35. Although the Convention leaves the parties a large measure of freedom as regards the constitution of Commissions and Tribunals, it assures that a lack of agreement between the parties on these matters or the unwillingness of a

---

1  See *Amerasinghe, C. F.*, How to Use the International Centre for Settlement of Investment Disputes by Reference to its Model Clauses, 13 Indian Journal of International Law 530, 545 *et seq.* (1973); *Delaume, G. R.*, ICSID Arbitration, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 23, 32 (1987); *Shihata, I. F. I.*, Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1, 8/9 (1986).

2  See also Note B to Arbitration Rule 1 of 1968, 1 ICSID Reports 66.

3  See also *Lalive, P.*, Aspects procéduraux de l'arbitrage entre un Etat et un investisseur étranger dans la Convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 111, 112 *et seq.* (1969); *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642, 645 *et seq.* (1968).

4  For an illustration of the problem see the Advisory Opinion of the International Court of Justice in *Interpretation of Peace Treaties (second phase)*, 1950 ICJ Reports 221.

party to cooperate will not frustrate proceedings (Articles 29–30 and 37–38, respectively).[5]

Improper constitution of the tribunal is a ground for annulment of the resulting **5** award under Art. 52(1)(a) (see Art. 52, paras. 118–129). The provisions controlling the constitution of tribunals are fairly complex and may lead to the inadvertent non-observance of a rule. But the ICSID Secretariat monitors the constitution of tribunals carefully. A party may challenge the appointment of an arbitrator by making a proposal for her/his disqualification under Art. 57. In order to forestall later challenges, tribunals typically state at their first session with the parties that they have been validly constituted and obtain the parties' agreement.[6] In its standard agenda the Secretariat suggests that this always be done during first sessions of tribunals.

## II. INTERPRETATION

### A. "(1) The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36."

Art. 37(1) sets out an obligation to constitute the tribunal as soon as possible. **6** The Arbitration Rules restate this obligation in the following terms:

**Rule 1**
*General Obligations*
(1) Upon notification of the registration of the request for arbitration, the parties shall, with all possible dispatch, proceed to constitute a Tribunal, with due regard to Section 2 of Chapter IV of the Convention.[7]

The parties may have reached an agreement concerning the number of arbitrators **7** and the method for their appointment. If such an agreement exists at the time of the request for arbitration, it is advisable, in the interest of expediting the proceedings, to include information concerning that agreement in the request itself (see Art. 36, paras. 32, 33). In case that information has not been so included, Arbitration Rule 1 provides as follows:

(2) Unless such information is provided in the request, the parties shall communicate to the Secretary-General as soon as possible any provisions agreed by them regarding the number of arbitrators and the method of their appointment.[8]

---

5   1 ICSID Reports 30.
6   See *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 663/4 (1993). See *e.g.*, *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 8; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 6; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 8; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 48.
7   See also Art. 6(2) of the Arbitration (Additional Facility) Rules.
8   See also Note F to Arbitration Rule 2 of 1968, 1 ICSID Reports 67.

An agreement between the parties concerning the constitution of the tribunal may be contained in a clause in the instrument providing for consent (see paras. 16–24 *infra*) or in an *ad hoc compromis* between the parties (see paras. 25–35 *infra*).[9]

**8**    Theoretically, 90 days after the registration of the request, the Chairman could appoint any arbitrators that the parties have failed to appoint in accordance with Art. 38. But the parties may extend this period by agreement. Also, the Chairman will act only if requested by one of the parties.

**9**    The actual time spent for the constitution of tribunals varies considerably.[10] The constitution of a tribunal in less than 90 days is possible but rather exceptional.[11] In some cases the constitution has taken over 12 months.[12] In the majority of cases, the period for the constitution of tribunals lies between these two extremes.[13]

**10**    The process of constituting the tribunal is completed upon the acceptance of their appointments by all arbitrators. The Arbitration Rules provide to this effect:

> **Rule 6**
> *Constitution of the Tribunal*
>    (1) The Tribunal shall be deemed to be constituted and the proceeding to have begun on the date the Secretary-General notifies the parties that all the arbitrators have accepted their appointment.[14]

In principle, from the date of the tribunal's constitution its composition shall remain unchanged in accordance with Art. 56.[15]

## B. "(2) (a) The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators . . ."

**11**    The requirement that a tribunal must have an uneven number of arbitrators is one of the Convention's few mandatory provisions concerning the constitution and composition of the tribunal.[16] The parties may not deviate from this rule by agreement. It is designed to avoid a stalemate if the tribunal is evenly divided.

---

9    See Note A to Arbitration Rule 2 of 1968, 1 ICSID Reports 66.

10   See also *Branson, D. J./Tupman, W. M.*, Selecting an Arbitral Forum: A Guide to Cost-Effective International Arbitration, 24 Virginia Journal of International Law 917, 925 (1984); *Delaume, G. R.*, ICSID Arbitration Proceedings: Practical Aspects, 5 Pace Law Review 563, 572 (1985).

11   See *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 4, 5, date registered: 22 March 1997, date of constitution of Tribunal: 28 May 1997; *Compagnie Française* v. *Ivory Coast*, date registered: 4 November 1997, date of constitution of Tribunal: 20 January 1998; *CDC* v. *Seychelles*, date registered: 7 November 2002, date of constitution of Tribunal: 19 December 2002; *Oko* v. *Estonia*, date registered: 20 February 2004, date of constitution of Tribunal: 8 March 2004; *BP America* v. *Argentina*, date registered: 7 February 2004, date of constitution of Tribunal: 25 March 2004.

12   *Manufacturers Hanover Trust* v. *Egypt*, date registered: 15 June 1989, date of constitution of Tribunal: 2 July 1990; *Tradex* v. *Albania*, date registered: 8 December 1994, date of constitution of Tribunal: 3 January 1996; *Wintershall* v. *Argentina*, date registered: 15 July 2004, date of constitution of Tribunal: 7 September 2005; *TSA Spectrum* v. *Argentina*, date registered: 8 April 2005, date of constitution of Tribunal: 12 June 2006.

13   For more detail see the Procedural Calendar at p. lxviii.

14   See also Art. 13(1) of the Arbitration (Additional Facility) Rules.

15   See also Notes A and B to Arbitration Rule 6 of 1968, 1 ICSID Reports 74.

16   See also Art. 6(3) of the Arbitration (Additional Facility) Rules.

Other instruments governing international arbitration either mandate or express a strong preference for an uneven number of arbitrators.[17]

The early drafts to the Convention did not provide for an uneven number of arbitrators. The Working Paper and the Preliminary Draft made reference to a sole arbitrator or several arbitrators (History, Vol. I, pp. 176, 178). A suggestion to specify that an uneven number of arbitrators must be appointed in order to avoid a possible impasse was incorporated into the later drafts (History, Vol. II, pp. 329, 416). **12**

The possibility of appointing a sole arbitrator was foreseen in all drafts to the Convention (History, Vol. I, pp. 176, 178). Suggestions to narrow the parties' choice to three arbitrators or to a sole arbitrator did not prevail (History, Vol. II, pp. 266, 270, 326, 329). **13**

Theoretically, the parties may choose any uneven number of arbitrators, that is 1, 3, 5, 7 etc. A number higher than three appears unlikely because of the attendant cost. But an agreement to appoint five arbitrators in a particularly weighty case is possible (see also Art. 39, para. 2). In actual practice, most ICSID tribunals have consisted of three arbitrators. The appointment of sole arbitrators has remained exceptional.[18] There have been no instances of tribunals comprising more than three arbitrators. **14**

## C.  ". . . appointed as the parties shall agree."

The primary principle for the composition and method of constitution of the tribunal is agreement by the parties. This principle was reflected in all drafts leading to the Convention and found consistent support (History, Vol. I, pp. 176, 178; Vol. II, pp. 265, 295, 326, 486, 983). **15**

The agreement may exist prior to the institution of proceedings. In this case, its contents should either be set out in the request for arbitration (see Art. 36, paras. 32, 33) or should be communicated by the parties to the Secretary-General as soon as possible after the registration of the request (see para. 7 *supra*). The agreement may also be contained in a joint request for arbitration by the parties **16**

---

17  See International Law Commission Model Rules on Arbitral Procedure, 1958, Art. 3(3), YBILC 83, 84 (1958-II); UNCITRAL Arbitration Rules, 1976, Arts. 5–7, 15 ILM 701, 703 *et seq*. (1976); UNCITRAL Model Law, 1985, Art. 10, 24 ILM 1302, 1304 (1985); ICC Rules of Arbitration, 1998, Art. 8(1), 36 ILM 1604, 1610 (1997). See also *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 305–307 (1997).

18  See *Misima Mines* v. *Papua New Guinea* (1998); *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 4.1–4.5; *CDC* v. *Seychelles*, Award, 17 December 2003. In *Generation Ukraine* the Claimant proposed to the Respondent that the arbitral tribunal consist of a sole arbitrator appointed by agreement of the parties from a list of three persons. However, the Respondent rejected this proposal and a three-member panel was appointed. See *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 4.5; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 26. See also *Griffith, G.*, Constitution of Arbitral Tribunals: The Duty of Impartiality in Tribunals or Choose Your Arbitrator Wisely, 13 ICSID Review – FILJ 36, 44 *et seq*.

(Art. 36, para. 10). Alternatively, the parties may reach an *ad hoc* agreement on the tribunal's composition and constitution after the request's registration.

### 1. Prior Agreement

**17**     An advance agreement by the parties concerning the composition and method of appointment of the tribunal will typically be contained in the instrument providing for consent to ICSID arbitration. The ICSID Model Clauses of 1993 (see Art. 25, para. 385) offer the following formula which provides the parties with a number of alternatives:

**Clause 9**

Any Arbitral Tribunal constituted pursuant to this agreement shall consist of [a sole arbitrator]/[uneven total number arbitrators, number appointed by each party, and an arbitrator, who shall be President of the Tribunal, appointed by [agreement of the parties]/[title of neutral official]/[agreement of the parties or, failing such agreement, by title of neutral official]].[19]

**18**     On the basis of this Model Clause the parties may opt for a sole arbitrator or, typically, three arbitrators. If they opt for a sole arbitrator, the appointment will usually be by agreement. It is useful to nominate a neutral official as appointing authority, in case no agreement can be reached (see paras. 19, 23 *infra*). It is also possible to provide for appointment by the neutral official as the primary method of appointment.

**19**     If the parties opt for a tribunal of three arbitrators, one will be appointed by each party. The third member may be appointed by agreement of the parties. This formula would correspond to the residual provision of Art. 37(2)(b) which may be incorporated into the parties' agreement as their primary choice.[20] In case the parties are unable to agree on the third member, it is useful to provide for appointment by an appointing authority. Appointment of the third member by an appointing authority may also be made the primary choice; that is, without a prior attempt by the parties to make the appointment by agreement. Such a formula may save time since it avoids the potentially lengthy negotiations on the third member.[21]

**20**     There is yet another possibility, which is not reflected in Model Clause 9 but is open to the parties. It consists in the appointment of one arbitrator each by the parties and the subsequent appointment of the third arbitrator by agreement of

---

19  4 ICSID Reports 364. See also Model Clause X of 1981, 1 ICSID Reports 204 and Model Clause XVIII of 1968, 7 ILM 1174/5 (1968).

20  This was the case in *Mobil Oil* v. *New Zealand*. The arbitration clause is reproduced in the decision of the New Zealand High Court, Wellington, of 1 July 1987 in *Attorney-General* v. *Mobil Oil NZ Ltd.*, 4 ICSID Reports 123. See also *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 5–6; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 5; *Fraport* v. *Philippines*, Award, 16 August 2007, para. 9; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 10, 15–19.

21  See also *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 236/7 (1973/74); *Szasz, P. C.*, A Practical Guide to the Convention on Settlement of Investment Disputes, 1 Cornell International Law Journal 1, 27 (1968).

*Article 37 – Composition of Tribunal*                    481

the two arbitrators who have been chosen by the parties. This method has been employed in a number of cases.[22] The two members of the tribunal designated by the parties are more likely to reach agreement on the third member than the parties themselves.[23] The possibilities, as described above, may be appropriately adapted in case the parties decide on a tribunal consisting of more than three arbitrators (see para. 14 *supra*).

The president of the tribunal should be designated clearly. In case of a tribunal consisting of three persons, the "third" arbitrator should be the president (see also History, Vol. II, p. 412). It is undesirable that a member who has been appointed by one of the parties presides over the tribunal. Therefore, selection of the president of the tribunal by lot or through election by the members of the tribunal, while possible,[24] should be avoided. In the case of appointments by a neutral official, the appointing authority should be required to designate the president of the tribunal, if necessary.

The choice of a neutral official as appointing authority for arbitrators should be made with care. Possible choices would be the Chairman of the Administrative Council or the Secretary-General of ICSID. In *Joy Mining Machinery* v. *Egypt*, the Claimants suggested that the Chairman of the ICSID Administrative Council be the appointing authority if an appointment was not made within the proposed time-limit. The Respondent accepted the proposal but the parties ultimately agreed – upon proposal of the Centre and for administrative reasons – to replace the Chairman of the Administrative Council as appointing authority with the Secretary-General of ICSID.[25]

Persons not officially associated with ICSID, such as the President of the International Court of Justice or the president of a national supreme court, might also be formally asked whether they are willing to undertake the possible task of acting as appointing authority. But even in the case of an affirmative response, there is no guarantee that the appointment will actually be made. The neutral official is usually designated by reference to his or her office rather than in an individual capacity. A successor in the office may not see him or herself bound by the assent of a predecessor.[26] But the risk of a refusal by an appointing authority to exercise

21

22

23

---

22  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, paras. 5–10; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 10, 12; *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 14; *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 5; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 38; *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 5, 6; *ADC* v. *Hungary*, Award, 2 October 2006, paras. 17, 20; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 45; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, para. 5.

23  *Golsong, H.*, A Guide to Procedural Issues in International Arbitration, 18 The International Lawyer 633, 639 (1984).

24  Arbitration Rule 13(1) envisages an agreement of the parties that the tribunal's president shall be elected by its members.

25  *Joy Mining* v. *Egypt*, Award, 6 August 2004, para. 5.

26  See *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 236 *et seq.* (1973/74); *Lalive, P.*, Aspects procéduraux de l'arbitrage entre un Etat et un investisseur étranger dans la Convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre

its function is limited in the case of ICSID arbitration: Art. 38 designates the Chairman as *ex officio* appointing authority should other methods of constituting the tribunal fail.

24    A treaty providing for consent to ICSID arbitration (see Art. 25, paras. 427–463) may also contain provisions on the constitution of a tribunal. By accepting the offer of arbitration contained in the treaty, the investor also agrees to these provisions. Bilateral investment treaties do not commonly deal with the composition of ICSID tribunals. But some multilateral treaties do.[27] Arts. 1123–1124 of the NAFTA[28] adopt the basic formula of Art. 37(2)(b) of the Convention but designate the Secretary-General of ICSID rather than the Chairman as appointing authority. Also, in appointing the presiding arbitrator, the Secretary-General shall normally choose a person from a special roster of presiding arbitrators. The latter provision is evidently designed to contribute to continuity and uniformity in the application of the pertinent NAFTA provisions[29] (see also Art. 38, para. 27).

### 2. Ad hoc *Agreement*

25    Since advance agreements concerning the constitution of tribunals appear to be rather rare, the more likely opportunity to reach agreement is after the registration of the request. The Arbitration Rules provide a special procedure to facilitate such an agreement:

> **Rule 2**
>
> *Method of Constituting the Tribunal in the Absence of Previous Agreement*
>
> (1) If the parties, at the time of the registration of the request for arbitration, have not agreed upon the number of arbitrators and the method of their appointment, they shall, unless they agree otherwise, follow the following procedure:
>
> (a) the requesting party shall, within 10 days after the registration of the request, propose to the other party the appointment of a sole arbitrator or of a specified uneven number of arbitrators and specify the method proposed for their appointment;
>
> (b) within 20 days after receipt of the proposals made by the requesting party, the other party shall:
>
> (i) accept such proposals; or
>
> (ii) make other proposals regarding the number of arbitrators and the method of their appointment;

---

Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 111, 114 *et seq.* (1969); *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642, 646/7 (1968).

27  *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, p. 6 (1997).

28  32 ILM 605, 644 (1993).

29  See *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 351 (1997); *Eklund, C. D.*, A Primer on the Arbitration of NAFTA Chapter Eleven Investor-State Disputes, 11 Journal of International Arbitration 135, 149/50 (1994).

(c) within 20 days after receipt of the reply containing any such other proposals, the requesting party shall notify the other party whether it accepts or rejects such proposals.

(2) The communications provided for in paragraph (1) shall be made or promptly confirmed in writing and shall either be transmitted through the Secretary-General or directly between the parties with a copy to the Secretary-General. The parties shall promptly notify the Secretary-General of the contents of any agreement reached.

(3) At any time 60 days after the registration of the request, if no agreement on another procedure is reached, either party may inform the Secretary-General that it chooses the formula provided for in Article 37(2)(b) of the Convention. The Secretary-General shall thereupon promptly inform the other party that the Tribunal is to be constituted in accordance with that Article.

**26**  Arbitration Rule 2 is designed to facilitate an agreement on the number of arbitrators and on the method of their appointment. It does not deal with their actual appointment. Rule 2 merely suggests a sequence of communications between the parties subject to certain time limits. The underlying idea is that the actual constitution of the tribunal will be easier once a procedural framework has been set up for this purpose.

**27**  The time limits of Rule 2 are meant to make it possible to achieve an agreement concerning constitution as well as the actual appointments of the arbitrators within 90 days of registration; that is, before the alternative procedure of Art. 38 becomes available. The requesting party has 10 days to make its first proposal. The other party has 20 days to accept it or make a counterproposal. Thereafter, the requesting party has another 20 days to react. If no agreement concerning the number of arbitrators and the modalities for their appointment is reached in this way after 60 days, either party may abandon the procedure of Rule 2 and opt for the residual rule of Art. 37(2)(b). All these time limits are subject to modification by agreement of the parties. The parties may also vary the procedure of Rule 2 in other ways; for instance, by adding further exchanges of proposals.[30]

**28**  The procedure of Rule 2 gives the parties the possibility to exercise their freedom of choice in the composition and constitution of the tribunal. But it also limits the opportunities for non-cooperation and procrastination. If the parties do not reach agreement within 60 days, the Convention offers a perfectly reasonable method in Art. 37(2)(b). This leaves them some time to make the actual appointments before the expiry of the time limit of 90 days under Art. 38. Once the parties have reached an agreement, they are individually bound by it and are no longer free to opt for Art. 37(2)(b) except by another agreement.[31]

---

30  See Note B to Arbitration Rule 2 of 1968, 1 ICSID Reports 68.
31  See Note F to Arbitration Rule 2 of 1968, 1 ICSID Reports 69.

**29**    The Secretary-General and the legal staff of ICSID carefully monitor the constitution of tribunals. Therefore, the agreement reached and all communications leading up to it must be communicated to the Secretary-General.[32]

**30**    An agreement reached by the parties under Arbitration Rule 2 may embody any of the options described above for advance agreements (see paras. 17–23 *supra*). Such an agreement will facilitate the constitution of the tribunal but is no guarantee that the actual appointment of the arbitrators will be smooth and speedy. In particular, if the third arbitrator is to be appointed by agreement of the parties, the choice of a person that is acceptable to both sides may prove difficult. Therefore, even if the parties have reached an agreement on the composition and method of constituting the tribunal, action by the Chairman under Art. 38 may still become necessary.

**31**    An agreement on the composition and method of constituting the tribunal is not an agreement in the sense of Art. 39. Art. 39 waives the nationality requirements for arbitrators if each individual member of the tribunal has been appointed by agreement of the parties. Art. 39 refers to the actual process of appointment and not to any agreement concerning the number of arbitrators and the method of their appointment.[33]

**32**    The descriptions in decisions of ICSID tribunals of their own constitution are not always entirely clear.[34] At times, the parties did not seem to clearly distinguish the agreement on the composition and constitution of the tribunal and the actual appointments of arbitrators. In *MINE* v. *Guinea*, the parties had first agreed on the appointment of the third arbitrator by the Chairman. But the third arbitrator was eventually appointed by agreement of the parties.[35]

**33**    In *Fedax* v. *Venezuela*, the Claimant first proposed that the Tribunal consist of three arbitrators and suggested a method for their appointment. Not having received a response within 60 days, the Claimant informed the Centre that it was choosing the formula of Art. 37(2)(b) and appointed an arbitrator. Venezuela promptly nominated the second arbitrator. Shortly thereafter, Venezuela proposed that the third, presiding, arbitrator be appointed by the Chairman. The Claimant accepted this proposal and the third arbitrator was appointed accordingly.[36]

**34**    In *SOABI* v. *Senegal* the Application for Arbitration was registered on 8 November 1982. The procedure for the Tribunal's constitution (see also Art. 38, para. 7; Art. 39, paras. 27–30) is described as follows:

---

32  See also Administrative and Financial Regulation 24.

33  See the Declaration of the President of the Tribunal (*A. Broches*) in *SOABI* v. *Senegal*, 25 February 1988, paras. 8–10.

34  See *e.g.*, *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 10; *SPP* v. *Egypt*, Award, 20 May 1992, paras. 4–7.

35  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 1.05, 1.06.

36  *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, paras. 4–7. The proposal by Venezuela that the third arbitrator be appointed by the Chairman was made on the 90th day after registration. The acceptance by the Claimant of this proposal would indicate that the appointment was not made under Art. 38.

4. On 3 February 1983, the Government and SOABI nominated by mutual agreement Mr Kéba Mbaye (Senegalese) and Baron Jean Van Houtte (Belgian) as arbitrators. On 9 March 1983, Baron Van Houtte notified the Centre by letter of his acceptance of the nomination. On 24 March 1983, Mr Kéba Mbaye also notified the Centre of his acceptance.

5. On 3 February 1983, the Government and SOABI also nominated by mutual agreement Mr Pierre Lalive (Swiss) as arbitrator and President of the Tribunal. On 18 April 1983, Mr Lalive declined the nomination. In the absence of agreement on a further nominee, SOABI, in a letter dated 17 June 1983, requested that the Chairman of the Centre's Board of Directors nominate a President of the Tribunal pursuant to Article 38 of the Convention. On 22 July 1983 Professor R. L. Bindschedler (Swiss) was nominated and on 15 September 1983 Professor Bindschedler accepted his nomination both as arbitrator and as President of the Tribunal. Pursuant to Article 6 of the Arbitration Rules, the Tribunal was thus fully constituted and the proceedings commenced.[37]

In a number of cases the parties agreed to establish identical tribunals for closely related cases (see Art. 26, paras. 127–131).[38]    **35**

## D. "(b) Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties."

### 1. Appointment

Art. 37(2)(b) is the formula for the composition and constitution of the tribunal that will apply if the parties do not reach an agreement in accordance with Art. 37(2)(a).[39] It was contained in a similar fashion in all drafts leading to the Convention and evoked practically no comment (History, Vol. I, pp. 176, 178; Vol. II, pp. 266, 862).    **36**

Either party may opt for Art. 37(2)(b) if no agreement on the number of arbitrators and the method of their appointment has been reached within 60 days of the registration of the request for arbitration (see paras. 25–27 *supra*).[40] The parties are free to extend this time limit by agreement. They may also adopt the formula of Art. 37(2)(b) by agreement. Theoretically, they may also agree not to exhaust    **37**

---

37  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 4, 5; Award, 25 February 1988, paras. 1.04, 1.05.

38  *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, para. 4; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 5, 11, 14, 15; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 4, 7; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 1–7, 19.

39  A very similar formula is contained in Art. 6(1) of the Arbitration (Additional Facility) Rules.

40  See also *Amerasinghe, C. F.*, How to Use the International Centre for Settlement of Investment Disputes by Reference to its Model Clauses, 13 Indian Journal of International Law 530, 546/7 (1973); *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 820 (1982).

the time limit of 60 days but to move on to Art. 37(2)(b) earlier. In practical terms, it is of little relevance whether the parties adopt the terms of Art. 37(2)(b) in their agreement or use Art. 37(2)(b) in the absence of an agreement. Other instruments governing international arbitration offer similar fallback formulae if the parties do not agree on the composition and constitution of the tribunal.[41]

**38**    Art. 37(2)(b) provides that the "third arbitrator" shall be the tribunal's president. It would be undesirable if an arbitrator who was appointed by one of the parties were to preside over the tribunal (see para. 21 *supra*). This provision is mandatory. It means, in particular, that the three arbitrators are not free to agree on one of the other two arbitrators to be president. The parties may not waive this requirement.

**39**    In order to expedite the process of appointing the three arbitrators, the Arbitration Rules offer the following procedure:

### Rule 3
*Appointment of Arbitrators to a Tribunal Constituted in Accordance with Convention Article 37(2)(b)*

(1) If the Tribunal is to be constituted in accordance with Article 37(2)(b) of the Convention:

  (a)  either party shall in a communication to the other party:

    (i)  name two persons, identifying one of them, who shall not have the same nationality as nor be a national of either party, as the arbitrator appointed by it, and the other as the arbitrator proposed to be the President of the Tribunal; and

    (ii)  invite the other party to concur in the appointment of the arbitrator proposed to be the President of the Tribunal and to appoint another arbitrator;

  (b)  promptly upon receipt of this communication the other party shall, in its reply:

    (i)  name a person as the arbitrator appointed by it, who shall not have the same nationality as nor be a national of either party; and

    (ii)  concur in the appointment of the arbitrator proposed to be the President of the Tribunal or name another person as the arbitrator proposed to be President;

  (c)  promptly upon receipt of the reply containing such a proposal, the initiating party shall notify the other party whether it concurs in the appointment of the arbitrator proposed by that party to be the President of the Tribunal.

(2) The communications provided for in this Rule shall be made or promptly confirmed in writing and shall either be transmitted through the Secretary-General or directly between the parties with a copy to the Secretary-General.[42]

---

41  See International Law Commission Model Rules on Arbitral Procedure, 1958, Art. 3(3)(4), YBILC 83, 84 (1958-II); UNCITRAL Arbitration Rules, 1976, Arts. 5 and 7, 15 ILM 701, 703/4, 705 (1976); UNCITRAL Model Law on International Commercial Arbitration, 1985, Arts. 10(2), 11(3)(a), 24 ILM 1302, 1304, 1305 (1985); ICC Rules of Arbitration, 1998, Art. 8(2), 36 ILM 1604, 1610 (1997).

42  A similar procedure is foreseen in Art. 9 of the Arbitration (Additional Facility) Rules.

This procedure may be used by the parties if Art. 37(2)(b) is directly applicable **40** because there is no agreement on the tribunal's constitution. It may also be used if the parties have agreed to adopt the formula of Art. 37(2)(b). Either of the parties may take the first step. There are no specific time limits in Rule 3 but the parties will be under pressure if they want to avoid the time limit of 90 days under Art. 38, especially if they have previously exhausted the procedure of Rule 2 (see paras. 25, 27 *supra*). But Art. 38 allows the parties to extend that time limit by agreement.

Rule 3 is designed to expedite the process of appointing arbitrators. Rather than **41** go through the selection of the party appointed arbitrators first and then proceed to negotiating the person of the third, agreed arbitrator, the two steps are to be taken simultaneously. The selection of the party appointed arbitrator goes hand in hand with a proposal for the third arbitrator or a reaction to such proposal. In this way, the tribunal can be constituted through two or three communications between the parties.

Only the appointment of the third arbitrator is subject to an agreement by the **42** parties. The appointments of the first two arbitrators are unilateral acts that are not subject to the approval of the other party. Suggestions to grant a veto to the other side against a party appointed arbitrator who is regarded as *persona non grata* were made during the Convention's drafting but were not pursued (History, Vol. II, pp. 484, 486, 513, 569). A disqualification of an arbitrator can be proposed only in accordance with Art. 57 if the requirements for an appointment contained in the Convention are lacking.

The parties may modify and extend the procedure offered by Rule 3. In particu- **43** lar, they can agree on further exchanges for the appointment of the third arbitrator. The procedure foreseen in Rule 3 may, subject to appropriate adjustments, also be used for other methods for the tribunal's constitution; that is, outside the formula of Art. 37(2)(b) (see paras. 19–23 *supra*).

The provisions in Rule 3 concerning the nationality of arbitrators are designed **44** to take account of Art. 39. They are discussed in the Commentary to that Article (see Art. 39, paras. 12–22).

All communications between the parties under Rule 3 are to be transmitted to **45** the Secretary-General who monitors the proper constitution of the tribunal.[43]

The formula offered by Art. 37(2)(b) for the composition of the tribunal and **46** the appointment of arbitrators has been used repeatedly. In some cases the reports make it clear that one party availed itself of this option after the expiry of the time limit of Arbitration Rule 2(3) (see para. 25 *supra*).[44] In other cases it is not clear

---

43  See also Administrative and Financial Regulation 24.
44  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 47; *AMT* v. *Zaire*, Award, 21 February 1997, para. 2.01; *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 June 1997, para. 6; *Alcoa Minerals* v. *Jamaica* – see *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 96 (1976); *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, para. 5; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction,

whether this formula for the composition and constitution of the tribunal was used on the basis of an agreement or in the absence of an agreement.[45]

## 2. Acceptance and Replacement

**47**    The appointment of an arbitrator is subject to the acceptance by the individual concerned. The actual acceptance is sought by the Secretary-General. The Arbitration Rules foresee the following procedure for this purpose:

### Rule 5
*Acceptance of Appointments*

(1) The party or parties concerned shall notify the Secretary-General of the appointment of each arbitrator and indicate the method of his appointment.

(2) As soon as the Secretary-General has been informed by a party or the Chairman of the Administrative Council of the appointment of an arbitrator, he shall seek an acceptance from the appointee.

(3) If an arbitrator fails to accept his appointment within 15 days, the Secretary-General shall promptly notify the parties, and if appropriate the Chairman, and invite them to proceed to the appointment of another arbitrator in accordance with the method followed for the previous appointment.[46]

**48**    The duty to notify the Secretary-General is either incumbent upon the appointing party or upon both parties, in the case of appointment by agreement (see paras. 29, 45 *supra*). In turn, the Secretary-General has to inform the parties, and, if necessary, the Chairman or other appointing authority, of a refusal to accept. The Secretary-General will also inform the parties of the acceptance by the arbitrators of their appointments in accordance with Rule 6(1) (see para. 10 *supra*).

**49**    There is no duty to accept an appointment. Even a person on the Panel of Arbitrators is under no obligation to accept a particular appointment. Before making appointments, the parties or any appointing authority will be wise to enquire informally whether a prospective arbitrator is willing to accept. Acceptance may depend on an agreement on the fees of arbitrators in accordance with Art. 60(2)[47] (see Art. 60, paras. 10–14).

**50**    No particular form is foreseen for the acceptance of the appointment. The acceptance may be expressed in writing, by fax, by e-mail or by telephone. But the acceptance must be communicated to the Secretary-General. The formal declaration under Arbitration Rule 6(2) (see Art. 40, para. 18) can be made after the tribunal's constitution.[48]

---

22 February 2006, para. 8; *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 5; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, para. 5; *Tokios Tokelés* v. *Ukraine*, Award, 26 July 2007, para. 21; *MCI* v. *Ecuador*, Award, 31 July 2007, para. 3.

45    *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, paras. 4–8; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 17; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 1.09; *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 19–28.

46    Art. 11 of the Arbitration (Additional Facility) Rules is substantially identical.

47    See Note B to Arbitration Rule 5 of 1968, 1 ICSID Reports 73.

48    See Note C to Arbitration Rule 5 of 1968, 1 ICSID Reports 73.

If the person appointed fails to accept, the party, parties or appointing authority that made the original appointment will be given the chance to select another arbitrator. The short time limit of 15 days in Arbitration Rule 5(3) is designed to expedite matters. An appointee who does not respond within 15 days will be deemed to have declined. This time limit can be extended by agreement of the parties. The time limit of Art. 38 may well elapse during this process. If it does, either party may request the Chairman to make any outstanding appointment. In that case, a party may lose its right to appoint an arbitrator even if it is willing to do so and has made every effort to make the appointment.[49]    **51**

The tribunal's composition is fixed only after its constitution is completed in accordance with Arbitration Rule 6(1) (see para. 10 *supra*). In accordance with Art. 56(1), the tribunal's composition shall remain unchanged after that date. Before that date, arbitrators may be replaced. The Arbitration Rules provide:    **52**

<div align="center">

**Rule 7**

*Replacement of Arbitrators*

</div>

At any time before the Tribunal is constituted, each party may replace any arbitrator appointed by it and the parties may by common consent agree to replace any arbitrator. The procedure of such replacement shall be in accordance with Rules 1, 5 and 6.[50]

Therefore, an arbitrator who has accepted the appointment may still be removed until the tribunal is finally constituted. Rule 7 speaks of the replacement rather than of the withdrawal of an arbitrator. Therefore, the removal of an arbitrator would only be permissible through the simultaneous appointment of another arbitrator. Replacement may take place even after the Chairman has been requested to make an appointment or appointments under Art. 38. Even an arbitrator appointed by the Chairman may be replaced by agreement of the parties before the tribunal is constituted.    **53**

After the tribunal's constitution in accordance with Arbitration Rule 6(1), any change in the tribunal's composition would have to take place in accordance with Articles 56–58.    **54**

---

49  See Notes C and D to Arbitration Rule 5 of 1968, 1 ICSID Reports 73.
50  Art. 12 of the Arbitration (Additional Facility) Rules provides for the same solution.

# Article 38

**If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the arbitrator or arbitrators not yet appointed. Arbitrators appointed by the Chairman pursuant to this Article shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute.**

## OUTLINE

*Paragraphs*

I. INTRODUCTION — 1–4

II. INTERPRETATION — 5–27

A. **"If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, . . ."** — 5–8

B. **". . . at the request of either party and after consulting both parties as far as possible . . ."** — 9–14

  1. Initiative — 9–11

  2. Consultation — 12–14

C. **". . . the Chairman shall, . . . appoint the arbitrator or arbitrators not yet appointed."** — 15–23

  1. Obligation to Appoint — 15–18

  2. Appointments and Designations — 19–23

D. **"Arbitrators appointed by the Chairman pursuant to this Article shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute."** — 24–27

## I. INTRODUCTION

**1**    Art. 38 is part of Section 2 of Chapter IV of the Convention. Section 2 deals with the "Constitution of the Tribunal". Art. 38 is the most important Article designed to safeguard the principle of non-frustration in the constitution of the tribunal. The parties are first given a chance to appoint the arbitrator or arbitrators in accordance with Art. 37. If they fail, Art. 38 provides a fallback procedure that

may be initiated by either party. In that case, appointments are to be made by the Chairman (of the Administrative Council) (see Art. 5).[1]

The basic concept of Art. 38 was embodied in all drafts leading to the Convention (History, Vol. I, pp. 180, 182). It evoked little reaction and hardly any opposition (History, Vol. II, pp. 77, 78, 108, 119, 306, 862). The discussion revolved mainly around the nationality of arbitrators to be appointed by the Chairman (see para. 24 *infra*) and around the requirement to consult with the parties (see para. 12 *infra*).    **2**

Other instruments governing international arbitration contain comparable provisions for the appointment of arbitrators if the parties are unable to do so.[2]    **3**

The application of Art. 38 is a frequent occurrence in ICSID practice (see paras. 7, 22, 23 *infra*). The application of Art. 38 may be triggered by a variety of circumstances.[3] The parties may be unable to agree on a joint appointment. The appointed members of the tribunal may be unable to agree on the appointment of a third member or of further members if the tribunal is to consist of more than three arbitrators. A party may have failed to make the appointment or appointments for which it has sole responsibility. An external appointing authority (see Art. 37, paras. 19, 22) may have failed to make an appointment foreseen in an agreement between the parties. The parties may have co-operated in the constitution of the tribunal but may have missed the 90-day time limit provided by Art. 38. Therefore, the application of Art. 38 is not necessarily an indication that one of the parties has been uncooperative or negligent.    **4**

## II. INTERPRETATION

### A.  "If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, . . ."

The time limit of 90 days begins to run on the day the Secretary-General informs the parties of the registration of the request for arbitration in accordance with Art. 36(3) (see Art. 36, paras. 60–62). The parties may extend this limit by agreement at any time before the tribunal's constitution. Even after the expiry of the 90 days and before one of the parties has made a request to the Chairman to appoint, the    **5**

---

1  See also Art. 6(4) of the Arbitration (Additional Facility) Rules.

2  See International Law Commission Model Rules on Arbitral Procedure, 1958, Art. 3(2), YBILC 83 (1985-II); UNCITRAL Arbitration Rules, 1976, Arts. 6(2)(3) and 7(2)(3), 15 ILM 701, 704/5 (1976); UNCITRAL Model Law, 1985, Art. 11(3)(4), 24 ILM 1302, 1305 (1985); ICC Rules of Arbitration, 1998, Art. 8(4), 36 ILM 1604, 1610 (1997). See also *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 305/6 (1997).

3  See also *Szasz, P. C.*, A Practical Guide to the Convention on Settlement of Investment Disputes, 1 Cornell International Law Journal 1, 28 (1968).

parties may agree to extend the time period. The parties may also agree to reduce the 90-day time limit.

**6**     Even in the absence of such an agreement, the parties may continue their attempts to constitute the tribunal without the Chairman's intervention beyond the 90 days as long as neither party makes a request to the Chairman to appoint. Therefore, the passage of 90 days after registration merely opens the possibility for either party to initiate the procedure provided by Art. 38. It does not trigger the procedure of Art. 38 automatically.

**7**     The applicability of Art. 38 is independent of any wrongdoing or negligence by either party. Although the primary purpose of Art. 38 is to overcome the non-cooperation of a recalcitrant party, it may be applied even if both parties are perfectly cooperative (see para. 4 *supra*). The constitution of the Tribunal in *SOABI* v. *Senegal* (see Art. 39, paras. 27–29) is a good example. The parties had nominated all three arbitrators by mutual agreement within 90 days of the registration. But the person designated as President of the Tribunal declined the nomination. By that time the 90-day limit had expired. The parties were unable to reach agreement on a further nominee and SOABI requested the Chairman to make the appointment in accordance with Art. 38.[4]

**8**     The deadline of 90 days is difficult to meet in practice. If there is no prior agreement between the parties on the composition of the tribunal and the method of appointment of the arbitrators, Arbitration Rule 2(3) gives the parties 60 days to reach such an agreement (see Art. 37, paras. 25–27). If they exhaust this time limit, they have 30 days left for the actual process of appointing arbitrators. The appointment of arbitrators involves preliminary consultation with prospective appointees (see Art. 37, para. 49), communication between the parties and notifications to the Secretary-General (see Art. 37, paras. 39–41, 43, 45) as well as acceptance by the persons nominated as arbitrators (see Art. 37, paras. 47, 48, 50, 51). Under Arbitration Rule 5 appointees have 15 days to accept or decline. Even if the parties have agreed previously on the modalities of the tribunal's constitution or have reached such agreement quickly after registration, the time limit of 90 days is likely to create problems. In practice, the constitution of a tribunal usually takes considerably more than 90 days (see Art. 37, para. 9).[5]

## B. ". . . at the request of either party and after consulting both parties as far as possible . . ."

### 1. Initiative

**9**     The Chairman will only proceed to make appointments upon the request of a party. Normally, the request to appoint will come from the party that has submitted

---

4   *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 4, 5; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 1.04, 1.05.

5   For a detailed overview of the time taken for the constitution of tribunals see the Procedural Calendar at p. lxviii.

*Article 38 – Appointment by Chairman*                    493

the request for arbitration. But the request under Art. 38 may also be made by the respondent or by both parties jointly. The Chairman will not take the initiative under Art. 38. The parties may continue in their efforts to make the appointments without making a request to the Chairman (see para. 6 *supra*).

The Arbitration Rules offer the following clarification:                    **10**

### Rule 4
*Appointment of Arbitrators by the Chairman of the Administrative Council*

(1) If the Tribunal is not constituted within 90 days after the dispatch by the Secretary-General of the notice of registration, or such other period as the parties may agree, either party may, through the Secretary-General, address to the Chairman of the Administrative Council a request in writing to appoint the arbitrator or arbitrators not yet appointed and to designate an arbitrator to be the President of the Tribunal.

(2) The provision of paragraph (1) shall apply *mutatis mutandis* in the event that the parties have agreed that the arbitrators shall elect the President of the Tribunal and they fail to do so.

(3) The Secretary-General shall forthwith send a copy of the request to the other party.

(4) The Chairman shall use his best efforts to comply with that request within 30 days after its receipt. Before he proceeds to make an appointment or designation, with due regard to Articles 38 and 40(1) of the Convention, he shall consult both parties as far as possible.

(5) The Secretary-General shall promptly notify the parties of any appointment or designation made by the Chairman.[6]

The request under Art. 38 is directed to the Chairman but it must be made through the Secretary-General.[7] The request has to contain precise information on any agreement concerning the composition of the tribunal and the appointment of arbitrators. If the parties have not reached such an agreement, the Chairman will proceed on the basis of the formula contained in Art. 37(2)(b). The request must also contain precise information on the appointment or appointments already made.                    **11**

### 2. Consultation

The Chairman must consult both parties as far as possible. A clause providing for consultation with the parties was contained in the earlier drafts to the Convention. It was dropped at one point but later restored, all with very little discussion (History, Vol. I, p. 180; Vol. II, pp. 108, 330, 797/8). The purpose of this rule is to avoid appointments that are objectionable to one or both of the parties. Theoretically, the Chairman is free to disregard objections by a party. But this would be difficult in practice unless the objections are obviously unreasonable.[8]                    **12**

---

6   The Arbitration (Additional Facility) Rules, Art. 10, offer a similar procedure.
7   See also Administrative and Financial Regulation 24(1).
8   *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75,

**13**     The obligation to consult both parties extends to any arbitrators not yet appointed. It is not limited to the appointment of the arbitrator or arbitrators who should have been appointed by agreement of the parties. This has a curious side effect: if a party fails to appoint an arbitrator that it is entitled to nominate unilaterally, the other party gains an additional procedural right. It will be consulted on the appointment of an arbitrator whom the party that has failed to act could have appointed alone and without consultation.

**14**     Consultations may be held with both parties jointly or individually. They may be held orally or in writing. The Chairman must hold these consultations only as far as possible. In particular, he or she will not be held up by an unresponsive party. He or she must make an effort to consult but failure to elicit a constructive response from a party will not affect his power to make the appointment.[9]

### C.   ". . . the Chairman shall, . . . appoint the arbitrator or arbitrators not yet appointed."

#### 1. Obligation to Appoint

**15**     The Chairman is under an obligation to make appointments if so requested. The Convention's wording ("shall . . . appoint") leaves no doubt in this regard. The Chairman does not have the discretion not to appoint.[10]

**16**     The Chairman, in making appointments, acts at the recommendation of the Secretary-General.[11] Under Art. 5, the President of the International Bank for Reconstruction and Development is *ex officio* Chairman of ICSID's Administrative Council. The Secretary-General of ICSID is in the best position to identify appropriate individuals who may serve as arbitrators.

**17**     The Chairman is to use his or her best efforts to make any appointments within 30 days of receipt of the request.[12]

**18**     An appointment by the Chairman is subject to acceptance by the appointee. It is for the Secretary-General to seek this acceptance (Arbitration Rule 5(2) – see Art. 37, para. 47). The Secretary-General has to inform the parties of appointments made by the Chairman.

---

93 (1985); *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 395 (1991); *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 312 (1999).

9   See also Note G to Arbitration Rule 4 of 1968, 1 ICSID Reports 72.

10  See also *Lalive, P.*, Aspects procéduraux de l'arbitrage entre un Etat et un investisseur étranger dans la Convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 111, 115 (1969); *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642, 647/8 (1968).

11  See *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, pp. 4, 6 (1997); *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 307/8 (1997).

12  Earlier versions of Arbitration Rule 4 provided for a mandatory deadline of 30 days for appointments by the Chairman.

## 2. Appointments and Designations

The substance of the Chairman's obligation to appoint depends on the com-    **19**
position of the tribunal and on appointments already made. He or she may have
to appoint a sole arbitrator. If the tribunal is to consist of three arbitrators, he or
she may have to appoint a third arbitrator if the parties have each appointed one
arbitrator but have failed to agree on the third. A similar situation arises if the
two party-appointed arbitrators are charged with the task of appointing the third
arbitrator but have been unable to agree on the person. It is possible but unlikely
that the parties have agreed on a person as president but that one party has failed
to appoint an arbitrator.

If only one party has made an appointment and there is no agreement on the    **20**
president, the Chairman will have to make two appointments. One in lieu of
the unilateral appointment by the party that has failed to act and the other in
the absence of an agreement on the third arbitrator. In that case, the Chairman
also has to designate one of the arbitrators appointed by him or her as president of
the tribunal. A designation as president is not necessary if both parties have made
their appointments but no agreement has been reached on the third. In this case,
the third arbitrator appointed by the Chairman will be the president.

In making appointments, the Chairman is more limited in his choice than the    **21**
parties. Under the second sentence of Art. 38 he or she may not appoint a national
or co-national of one of the parties (see paras. 24–26 *infra*). In addition, under
Art. 40(1), he or she is restricted to persons who are on the Panel of Arbitrators
(see Art. 40, paras. 8–13).

In actual practice, the Chairman has frequently acted under Art. 38.[13] In most    **22**
cases he was charged with appointing only the tribunal's president.[14] In other cases,
the respondent State had failed to make its appointment. Nor was there agreement
on the president. Therefore, the Chairman had to make two appointments. One of
the appointees was designated president by the Chairman.[15]

---

13  *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of
   Investment Disputes, 14 ICSID Review – FILJ 299, 312 (1999).
14  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.3; *LETCO* v. *Liberia*, Award,
   31 March 1986, 2 ICSID Reports 347; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986,
   para. 2; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 5; *Goetz* v. *Burundi*, Award, 10 February
   1999, paras. 24–28; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 5; *Maffezini*
   v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 7, 8; *Maffezini* v. *Spain*, Award,
   13 November 2000, para. 10; *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras.
   10, 11; *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 13, 14; *CMS* v. *Argentina*, Decision on
   Jurisdiction, 17 July 2003, paras. 7, 8; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August
   2004, paras. 3, 4; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 3, 4; *Salini* v. *Jordan*,
   Decision on Jurisdiction, 29 November 2004, paras. 6, 7; *Continental Casualty* v. *Argentina*,
   Decision on Jurisdiction, 22 February 2006, paras. 10, 11; *Suez et al.* v. *Argentina*, Decision
   on Jurisdiction, 16 May 2006, para. 6; *Suez and AWG* v. *Argentina*, Decision on Jurisdiction,
   3 August 2006, para. 6; *Total* v. *Argentina*, Decision on Jurisdiction, 25 August 2006, para.
   3; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 11, 12; *Tokios Tokelės* v. *Ukraine*, Award,
   26 July 2007, para. 22; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 3, 4.
15  *AGIP* v. *Congo*, Award, 30 November 1979, para. 3; *Tradex* v. *Albania*, Decision on Jurisdiction,
   24 December 1996, 5 ICSID Reports 47/8; *AMT* v. *Zaire*, Award, 21 February 1997, paras. 2.01–
   2.03.

**23**     In three closely related cases against Jamaica, the Claimants appointed the same person as arbitrator. After Jamaica had failed to act for over 90 days from registration, the Claimants requested the Chairman to appoint, for each proceeding, two arbitrators and to designate one of them as President of each Tribunal. The Chairman, after consulting with the parties, appointed the same two persons as arbitrators for all three Tribunals and designated one of them as President for each Tribunal.[16]

### D.   "Arbitrators appointed by the Chairman pursuant to this Article shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute."

**24**     The nationality of arbitrators was the subject of much debate during the Convention's preparation (see Art. 39, paras. 1, 2). The resulting compromise is reflected in most part in Art. 39. With regard to appointments made by the Chairman, the opinion prevailed that national arbitrators should be avoided under all circumstances (History, Vol. I, pp. 180/1; Vol. II, pp. 265, 266, 513, 789, 797, 799). The purpose is to avoid even the semblance of a lack of objectivity.[17] The prohibition of national arbitrators does not have a parallel in the otherwise corresponding Art. 30 dealing with conciliators.

**25**     The prohibition against appointing arbitrators who have the nationality of a party or are co-nationals of a party does not only apply to sole arbitrators or to "third arbitrators" who would preside over the tribunal. This prohibition also applies to arbitrators who are to be appointed primarily by unilateral decision of one of the parties. If a party has failed to make the unilateral appointment to which it was entitled and the Chairman is called upon to make the appointment instead, he or she does not have the limited flexibility granted to the parties by the first sentence of Art. 39 but, rather, must appoint a national of a third State. In addition, he or she must appoint a person from the Panel of Arbitrators in accordance with Art. 40(1).

**26**     The exclusion of national arbitrators applies only if the appointment by the Chairman is made "pursuant to this Article". It does not apply if the Chairman acts as appointing authority under an agreement between the parties. In *Mobil Oil* v. *New Zealand*, the arbitration clause in the contract between the parties contained the following provision on the constitution of the Tribunal:

> 7.6 An Arbitral Tribunal to be constituted in relation to a dispute shall consist of three arbitrators, one of whom shall be appointed by each party to the dispute and the third, who shall be the president of the Arbitral Tribunal, shall be a New

---

16   *Alcoa Minerals* v. *Jamaica* (unpublished); *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 3; *Reynolds* v. *Jamaica* (unpublished). See also *Delaume, G. R.*, ICSID Arbitration: Practical Considerations, 1 Journal of International Arbitration 101, 123 (1984); *Delaume, G. R.*, ICSID Arbitration Proceedings: Practical Aspects, 5 Pace Law Review 563, 572/3 (1985); *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 51/2 (1990).

17   See also Art. 7(2) of the Arbitration (Additional Facility) Rules.

Zealand national appointed by agreement of such parties, but failing agreement shall be a New Zealand national appointed by the chairman, as that term is described in the Convention.[18]

This clause is not in conflict with Art. 38. An appointment by the Chairman under this clause is not pursuant to Art. 38 but falls under Art. 37(2)(a) (see also Art. 40, para. 8).

The NAFTA contains a different solution for the appointment of arbitrators **27** under the conditions of Art. 38 of the ICSID Convention. Any appointments are to be made by the Secretary-General rather than by the Chairman. In addition, appointments of presiding arbitrators are to be made from a roster of presiding arbitrators specially set up for this purpose. The relevant Article of the NAFTA provides:

> **Article 1124: Constitution of a Tribunal When a Party Fails to Appoint an Arbitrator or the Disputing Parties are Unable to Agree on a Presiding Arbitrator**
>
> 1. The Secretary-General shall serve as appointing authority for an arbitration under this Section.
>
> 2. If a Tribunal, other than a Tribunal established under Article 1126, has not been constituted within 90 days from the date that a claim is submitted to arbitration, the Secretary-General, on the request of either disputing party, shall appoint, in his discretion, the arbitrator or arbitrators not yet appointed, except that the presiding arbitrator shall be appointed in accordance with paragraph 3.
>
> 3. The Secretary-General shall appoint the presiding arbitrator from the roster of presiding arbitrators referred to in paragraph 4, provided that the presiding arbitrator shall not be a national of the disputing Party or a national of the Party of the disputing investor. In the event that no such presiding arbitrator is available to serve, the Secretary-General shall appoint, from the ICSID Panel of Arbitrators, a presiding arbitrator who is not a national of any of the Parties.
>
> 4. On the date of entry into force of this Agreement, the Parties shall establish, and thereafter maintain, a roster of 45 presiding arbitrators meeting the qualifications of the Convention and rules referred to in Article 1120 and experienced in international law and investment matters. The roster members shall be appointed by consensus and without regard to nationality.[19]

An appointment in accordance with Art. 1124 of the NAFTA is an appointment under Art. 37(2)(a) rather than under Art. 38 of the Convention.

---

18  See *Attorney-General* v. *Mobil Oil NZ Ltd*, New Zealand, High Court, Wellington, 1 July 1987, 4 ICSID Reports 123.

19  32 ILM 605, 644 (1993). See also *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 351 (1997).

# Article 39

**The majority of the arbitrators shall be nationals of States other than the Contracting State party to the dispute and the Contracting State whose national is a party to the dispute; provided, however, that the foregoing provisions of this Article shall not apply if the sole arbitrator or each individual member of the Tribunal has been appointed by agreement of the parties.**

## OUTLINE

*Paragraphs*

I.   INTRODUCTION — 1–11

II.  INTERPRETATION — 12–31

   A.  **"The majority of the arbitrators shall be nationals of States other than the Contracting State party to the dispute and the Contracting State whose national is a party to the dispute;"** — 12–22

   B.  **". . . provided, however, that the foregoing provisions of this Article shall not apply if the sole arbitrator or each individual member of the Tribunal has been appointed by agreement of the parties."** — 23–31

## I. INTRODUCTION

**1**    The drafts leading to what eventually became Art. 39 were the subject of much discussion during the Convention's drafting. The Preliminary Draft sought to exclude nationals or co-nationals of parties from appointment as arbitrators without exception (History, Vol. I, p. 182). The debates on this provision showed opposing views. Some delegates were in agreement with the exclusion of national arbitrators in order to avoid any lack or even semblance of lack of impartiality. Another group thought that arbitrators possessing the nationality or co-nationality of the parties were useful sources of information on the law and position of the parties and would inspire the parties' confidence in the arbitration process (History, Vol. II, pp. 265, 266, 295, 306, 329, 386, 387, 416, 417, 487, 489, 510, 511, 512, 569). The First Draft tightened the provision by also excluding persons who had been designated to the Panel of Arbitrators by either of the two States. After further debate (at pp. 663, 789), several votes were taken. These showed a majority against the total exclusion of national arbitrators. There was also a majority for the proposition that national arbitrators should never constitute a majority on a tribunal. Another vote approved an exception where the parties were in agreement on the person of each arbitrator (at p. 789). Subsequent proposals to remove most of the restrictions on national arbitrators were defeated

(at pp. 796/7). The provision was adopted subject to certain drafting adjustments (History, Vol. I, p. 182; Vol. II, pp. 862, 938, 947).

Mr. *Broches* explained that the provision was intended "to avoid a situation in which the third arbitrator, as the only one appointed by a neutral party, might find himself in the position of a sole arbitrator in having to maintain a balance between the two other arbitrators who were more inclined to act as advocates for the parties appointing them". In the case of a tribunal consisting of five persons, two could be national arbitrators appointed by each party since there would be a majority not linked by nationality to either party (History, Vol. II, p. 983).[1]    **2**

The provision, as eventually adopted, attempts to strike a compromise in two ways. First, national arbitrators are to be avoided, in principle, but are allowed if they constitute only a minority on the tribunal. This would normally be the case in a tribunal of five or more arbitrators where the parties would be allowed one national arbitrator each. Second, the principle of freedom of choice (see Art. 37, para. 2) accounts for the power of the parties to override the prohibition of national arbitrators if they agree on the identity of each arbitrator. The exclusion of national arbitrators is absolute only in case of an appointment by the Chairman under Art. 38 (see Art. 38, paras. 24, 25).    **3**

Art. 39 does not have a parallel in the provisions on the constitution of a conciliation commission (Arts. 29–31). During the Convention's drafting a conscious decision was made to treat the composition of arbitral tribunals and of conciliation commissions differently on this point (History, Vol. II, pp. 266, 329, 487, 510/11, 569). On the other hand, Art. 52(3) contains very strict rules concerning the exclusion of persons from *ad hoc* committees, including an absolute exclusion of nationals or co-nationals of parties to the dispute (see Art. 52, paras. 461–465).    **4**

The provision on the exclusion of national arbitrators is untypical for international arbitration. Other documents governing international arbitration contain much weaker provisions. They merely mandate that nationality be taken into account in the appointment of arbitrators.[2]    **5**

The Report of the Executive Directors on the Convention offers the following explanation on Art. 39:    **6**

> 36. . . . While the Convention does not restrict the appointment of conciliators with reference to nationality, Article 39 lays down the rule that the majority of the members of an Arbitral Tribunal should not be nationals either of the State party to the dispute or of the State whose national is a party to the dispute. This

---

1   See also *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 662 (1993); *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 94 (1985).

2   See UNCITRAL Arbitration Rules, 1976, Art. 6(4), 15 ILM 701, 704/5 (1976); UNCITRAL Model Law, 1985, Art. 11(1)(5), 24 ILM 1302, 1305 (1985); ICC Rules of Arbitration, 1998, Art. 9(1), 36 ILM 1604, 1610 (1997). Art. 9(5) of the ICC Rules provides that a sole arbitrator or chairman of a tribunal may have the nationality of one of the parties if neither of the parties objects.

rule is likely to have the effect of excluding persons having these nationalities from serving on a Tribunal composed of not more than three members. However, the rule will not apply where each and every arbitrator on the Tribunal has been appointed by agreement of the parties.[3]

**7**  There are good practical reasons for excluding or restricting the appointment of national arbitrators. National arbitrators may be expected to side with their countries of nationality or their co-nationals. In order to achieve a majority, the third arbitrator will have no choice but to side with one of the two national arbitrators (see Art. 48, paras. 15–19).[4] The resulting decision will not necessarily represent the best objective outcome. Even if a compromise can be reached as to the award's *dispositif*, the drafting of the reasons can be made extremely difficult by strongly held divergent views.[5] In extreme cases, this may lead to contradictory reasons which in turn can constitute a ground for annulment (see Art. 52, paras. 389–398). Unlike certain other arbitration systems,[6] ICSID arbitration does not allow a decision by the presiding arbitrator alone if no majority can be formed (see Art. 48, paras. 16, 19).

**8**  The application of Art. 39 requires knowledge of the investor's nationality. Institution Rule 2(1)(d) requires precise information concerning the investor's nationality in the request for arbitration (see Art. 36, paras. 24, 26). But there may still be problems in the proper identification of the investor's nationality (see Art. 25, paras. 283–299, 640–759). This is particularly so if the parties have agreed under Art. 25(2)(b) to treat a national of the host State as a national of another Contracting State because of foreign control (see Art. 25, paras. 760–895). In a situation of this kind it is advisable, in the application of Art. 39 and of the last sentence of Art. 38, to avoid the appointment of nationals of States that may turn out to be linked to the investor through nationality or control (see Art. 25, paras. 896–902).

**9**  Noncompliance with the nationality requirements for arbitrators may have several consequences. Under Art. 57, a party may propose the disqualification of an arbitrator if [s]he was ineligible for appointment under Art. 39 or the last sentence of Art. 38. In addition, the resulting award will be subject to annulment under Art. 52(1)(a) if the tribunal was not properly constituted (see Art. 52, paras. 118–129).

---

3  1 ICSID Reports 30.

4  *Dolzer, R.*, Dispute Settlement Mechanisms in the IMF, the World Bank and MIGA, *in*: Adjudication of International Trade Disputes in International and National Economic Law (*Petersmann, E. U./Jaenicke, G.* eds.) 139, 147/8 (1992).

5  See also *Reisman, W. M.*, The Supervisory Jurisdiction of the International Court of Justice: International Arbitration and International Adjudication, 258 Recueil des Cours 291–296 (1996).

6  See Art. 25(1) of the 1998 ICC Rules of Arbitration, 36 ILM 1604, 1613 (1997): "If there is no majority, the Award shall be made by the chairman of the Arbitral Tribunal alone." See also Art. 31(2) of the 1976 UNCITRAL Arbitration Rules, 15 ILM 701, 713 (1976), dealing with questions of procedure only. In the three Brcko Awards of 1997, 1998 and 1999, the Decision was made by the Presiding Arbitrator alone. See 36 ILM 396 (1997), 38 ILM 534 (1999) and *Schreuer, C.*, The Brcko Award of 14 February 1997, 11 Leiden Journal of International Law 71, 73/4 (1998).

In the case of arbitrators who have dual or multiple nationalities, the more **10** flexible rule would be to look only at the dominant nationality. But in view of the possible consequences arising from the improper constitution of a tribunal it will be wiser not to appoint a person even if a non-dominant nationality is excluded by the Convention (see Art. 52, para. 122).

Neither the Convention nor the Arbitration Rules contain any rules concerning **11** a nationality of arbitrators not related to the two parties. In particular, there is no requirement that the arbitrators represent different forms of civilization or different legal systems.[7] Nor is there a rule of diversity requiring arbitrators on one tribunal to be of different nationalities.[8] In fact, there have been ICSID tribunals consisting of three arbitrators of the same nationality.[9] There has been some concern about the insufficient representation of arbitrators from developing countries on ICSID's tribunals. But this situation appears to be improving rapidly.[10]

## II. INTERPRETATION

### A. "The majority of the arbitrators shall be nationals of States other than the Contracting State party to the dispute and the Contracting State whose national is a party to the dispute;"

Art. 39 does not exclude national arbitrators. It merely states that they must **12** not form a majority. In a tribunal of three members this means that one arbitrator may be a national or co-national of a party but not two. This could lead to the unsatisfactory result that the party acting first in the unilateral appointment of an arbitrator can appoint a national arbitrator thereby precluding the other party from doing the same.

In order to forestall this result, Arbitration Rule 1(3) provides: **13**

> (3) The majority of the arbitrators shall be nationals of States other than the State party to the dispute and of the State whose national is a party to the dispute, unless the sole arbitrator or each individual member of the Tribunal is appointed by agreement of the parties. Where the Tribunal is to consist of three members, a

---

7   *Cf.* Art. 9 of the Statute of the International Court of Justice.

8   *Cf.* Art. 3(1) of the Statute of the International Court of Justice.

9   *Adriano Gardella* v. *Côte d'Ivoire*, 1 ICSID Reports xxi; *MINE* v. *Guinea*, 4 ICSID Reports lix; *Occidental* v. *Pakistan*; *Astaldi* v. *Honduras*; *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, para. 4; *Compagnie d'Exploitation du Chemin de Fer Transgabonais* v. *Gabon.* See also *El-Kosheri, A. S.*, ICSID Arbitration and Developing Countries, 8 ICSID Review – FILJ 104, 111/2 (1993).

10  See *Agyemang, A. A.*, African States and ICSID Arbitration, 21 Comparative and International Journal of Southern Africa 177, 183 *et seq.* (1988); *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 29/30 (1993); *Marchais, B. P.*, Composition of ICSID Tribunals, News from ICSID, Vol. 4/2, pp. 5, 6/7 (1987); *Shihata, I. F. I.*, Obstacles Facing ICSID's Proceedings and International Arbitration in General, News from ICSID, Vol. 3/1, pp. 8, 9 (1986); *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 311/2 (1999); *Westberg, J. A.*, Applicable Law, Expropriatory Takings and Compensation in Cases of Expropriation, ICSID and Iran-United States Claims Tribunal Case Law Compared, 8 ICSID Review – FILJ 1, 3/4 (1993); ICSID Annual Report 1998, pp. 4/5.

national of either of these States may not be appointed as an arbitrator by a party without the agreement of the other party to the dispute. Where the Tribunal is to consist of five or more members, nationals of either of these States may not be appointed as arbitrators by a party if appointment by the other party of the same number of arbitrators of either of these nationalities would result in a majority of arbitrators of these nationalities.[11]

**14**     Therefore, if the tribunal is to consist of three arbitrators, a national or co-national of one of the parties may be appointed by a party only if the other party agrees thereto. The party agreeing to the appointment of a national arbitrator by the other party will be aware of the fact that by doing so it foregoes the possibility of doing the same. Once one national arbitrator is appointed, the appointment of another national arbitrator would create a majority of national arbitrators on the tribunal which is prohibited by the first sentence of Art. 39. The only exception to this result is the appointment of all three arbitrators by agreement under the second sentence of Art. 39.

**15**     The need to obtain the agreement of the other party to the appointment of a national arbitrator applies even after the party making the first appointment has appointed a national of a third State. In that situation the appointment of a national arbitrator by the party making the second appointment would not create a majority of national arbitrators on the tribunal. But it would give an unfair advantage to the party making the second appointment. Therefore, Arbitration Rule 1(3), in requiring agreement on the appointment of a national arbitrator, does not distinguish between the first and the second appointment.

**16**     If the tribunal is to consist of five arbitrators, both parties may appoint one national arbitrator each. The two national arbitrators would not be a majority in a tribunal of five.[12]

**17**     Arbitration Rule 1(3) operates regardless of whether there was an advance agreement on the constitution of the tribunal (see Art. 37, paras. 17–24) or whether an *ad hoc* agreement was reached after the registration of the request for arbitration (see Art. 37, paras. 25–31). If Art. 37(2)(b) is applied (see Art. 37, paras. 36–46), Arbitration Rule 3(1) contains further restrictions on the nationality of arbitrators (see Art. 37, para. 39).[13] It provides that neither of the two party appointed arbitrators may have the same nationality or be a national of either party. Therefore, under Arbitration Rule 3(1) the prohibition against the appointment of a national arbitrator by a party applies regardless of an agreement.

**18**     Arbitration Rule 1(3) does not preclude the appointment of a national or co-national of one of the parties as the third, presiding arbitrator. But the appointment

---

11   See also Arbitration (Additional Facility) Rules, Art. 7(1).

12   See Note G to Arbitration Rule 1 of 1968, 1 ICSID Reports 67. See also *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 662/3 (1993); *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 237/8 (1973/74).

13   See Note H to Arbitration Rule 1 of 1968, 1 ICSID Reports 67.

*Article 39 – Nationality of Arbitrators* 503

of a national or co-national of one of the parties as third arbitrator who is to be president of the tribunal is unlikely to arise as a problem. Since the parties must usually agree on this person, either party can prevent such an appointment. If they do agree, there is nothing to stop them from making such an appointment.[14] If the third arbitrator is to be appointed by agreement of the arbitrators appointed by the parties (see Art. 37, para. 20), two arbitrators who have the nationalities of third States could, theoretically, appoint a third arbitrator who is a national or co-national of one of the parties. If the Chairman acts as appointing authority under Art. 38, he or she may not select a national or co-national of one of the parties under any circumstances (see Art. 38, paras. 24, 25). But if he or she acts as appointing authority under an agreement of the parties rather than under Art. 38, the exclusion of a national arbitrator does not apply.[15] If the parties have agreed on another neutral official as appointing authority (see Art. 37, paras. 19, 23) it is possible that a person will be appointed as the presiding arbitrator who has the nationality or co-nationality of one of the parties. It is obvious that such a choice will generally be imprudent and should only be made in exceptional circumstances.

Whereas Art. 39 is mandatory, the Arbitration Rules are subject to modification **19** by agreement of the parties (see Art. 44, paras. 11–31). In particular, the parties are free to depart from Arbitration Rules 1(3) and 3(1) by mutual agreement. This means that they can agree in advance that in a tribunal of three arbitrators one, but only one, party shall be permitted to appoint a national or co-national as arbitrator.

In *SPP* v. *Egypt*, Egypt designated an Egyptian national in accordance with **20** Arbitration Rule 3. SPP informed the Centre "that it did not object to the nationality of the arbitrator named by Egypt, as it might have done under Arbitration Rule 3(1)(a)(i)" (see Art. 37, para. 39). SPP designated a national of a third State as arbitrator and the parties agreed on the person of a national of a third State as President of the Tribunal. All three persons accepted their appointments.[16]

In *Olguín* v. *Paraguay*, Paraguay nominated a Paraguayan national as arbitrator. **21** The ensuing developments are reported as follows:

> The Centre immediately informed the Republic of Paraguay that, pursuant to Article 39 of the ICSID Convention and Rule 1(3) of the Rules of Procedure for Arbitration Proceedings (Arbitration Rules), in cases where the Arbitral Tribunal has been established with three arbitrators, the appointment as arbitrator by one of the parties of a national of that party's State, or of a State whose national is a party to the dispute, requires the consent of the other party. As the Claimant had not given such consent, Paraguay was prevented from appointing Mr Villalba

---

14  In *Mobil Oil* v. *New Zealand*, the arbitration clause in a contract between the parties provided for appointment by agreement of the parties of the third arbitrator who was to be a New Zealand national. See *Attorney-General* v. *Mobil Oil NZ Ltd*, New Zealand, High Court, Wellington, 1 July 1987, 4 ICSID Reports 123.

15  In *Mobil Oil* v. *New Zealand*, the arbitration clause provided that failing agreement between the parties on the appointment of the third arbitrator, the Chairman was to appoint a New Zealand national as third arbitrator. *Loc. cit.*

16  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 7; *SPP* v. *Egypt*, Award, 20 May 1992, para. 7.

> Zaldivar as arbitrator. Consequently, on 25 November 1998, the Republic of
> Paraguay appointed Justice Francisco Rezek, a Brazilian national, as arbitrator
> for the present case.[17]

**22**    Also in *Olguín* v. *Paraguay*, the Claimant appointed a national of the United
States as arbitrator. After the constitution of the Tribunal the Respondent chal-
lenged the appointment of the arbitrator because the Claimant held dual Peruvian
and United States nationality. Therefore, the Claimant was prevented from appoint-
ing a United States national as arbitrator. The arbitrator tendered his resignation
and was replaced by a national of Guatemala.[18]

### B.  ". . . provided, however, that the foregoing provisions of this Article shall not apply if the sole arbitrator or each individual member of the Tribunal has been appointed by agreement of the parties."

**23**    The rule that a majority of arbitrators must be nationals of States other than the
host State and the State of the investor's nationality does not apply if the parties
agree on the appointment of each member of the tribunal (see also para. 6 *supra*).
This provision does not relate to a general agreement on the composition of a
tribunal and the method of appointment (see Art. 37, paras. 15–35). Rather, it
relates to the actual appointment of individual arbitrators who must be identified
by name. Therefore, it is possible to apply this provision even where Art. 37(2)(b)
is applied since the parties have not reached an agreement on the composition of
the tribunal.

**24**    The requirement that members of the tribunal must be appointed by agreement
of the parties applies not just to the nationals or co-nationals of the parties.
Every single arbitrator, including a national of a third State, must be appointed
by agreement. Therefore, it is not possible to charge two national arbitrators who
have been appointed by agreement of the parties with the task of appointing
the third arbitrator. In a situation of this kind, the third arbitrator must also be
appointed by agreement of the parties. If, in a tribunal of three members, one
party has appointed unilaterally a national of a third State, this appointment must
be agreed to by the other party if the parties wish to jointly appoint two further
arbitrators who are nationals or co-nationals of the parties. Also, the parties may
not agree on the appointment of a presiding arbitrator and grant each other the
right to appoint national arbitrators. Rather, the agreement of the parties on each
individual appointment is necessary. The agreement must identify the appointees
by name. Advance agreement to the selection by the other party of a national
arbitrator would not suffice.

**25**    The NAFTA attempts to preserve the right to appoint national arbitrators in the
following terms:

---

17  *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 8, 9; *Olguín* v. *Paraguay*,
Award, 26 July 2001, paras. 11, 12.
18  *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 12, 13; *Olguín* v. *Paraguay*,
Award, 26 July 2001, paras. 15, 16.

**Article 1125: Agreement to Appointment of Arbitrators**

For purposes of Article 39 of the ICSID Convention and Article 7 of Schedule C to the ICSID Additional Facility Rules, and without prejudice to an objection to an arbitrator based on Article 1124(3) or on a ground other than nationality:

(a) the disputing Party agrees to the appointment of each individual member of a Tribunal established under the ICSID Convention or the ICSID Additional Facility Rules;

(b) a disputing investor referred to in Article 1116 may submit a claim to arbitration, or continue a claim, under the ICSID Convention or the ICSID Additional Facility Rules, only on condition that the disputing investor agrees in writing to the appointment of each individual member of the Tribunal; and

(c) a disputing investor referred to in Article 1117(1) may submit a claim to arbitration, or continue a claim, under the ICSID Convention or the ICSID Additional Facility Rules, only on condition that the disputing investor and the enterprise agree in writing to the appointment of each individual member of the Tribunal.[19]

This provision merely foresees the appointment of each arbitrator by agreement. It neither constitutes nor makes superfluous a specific agreement on each arbitrator under Art. 39.

The requirement of an appointment by agreement of the parties of every single arbitrator under Art. 39 also means that an appointment by a neutral official as appointing authority (see Art. 37, paras. 19, 23) is impermissible. This applies also to the procedure of Art. 38. If the parties appoint two national arbitrators by agreement but are unable to agree on the third arbitrator, an appointment by the Chairman is not possible. This would be otherwise if the nomination by the Chairman or other appointing authority is confirmed by both parties. In that case it could be said that the third arbitrator was also appointed by agreement of the parties. **26**

In *SOABI* v. *Senegal*, the Claimant was a company incorporated in the host State but wholly owned by Flexa, a Panamanian company. Flexa, in turn, was controlled by a Belgian national. Therefore, the relevant nationality of the investor was Belgian (see Art. 25, paras. 801, 802, 818, 830, 843, 844, 854). By mutual agreement the parties nominated a Senegalese and a Belgian national as arbitrators. The two persons accepted the appointments. Also by agreement the two parties nominated a Swiss national as third arbitrator and President of the Tribunal. This person declined the nomination. In the absence of agreement on a further nominee, SOABI requested the appointment of a third arbitrator by the Chairman under Art. 38. The Chairman nominated another Swiss national as arbitrator and President of the Tribunal who accepted the appointment (see Art. 38, para. 7). **27**

The published records do not reveal an agreed confirmation by the parties of the Chairman's appointment. If such confirmation was indeed lacking, the Tribunal **28**

---

19   32 ILM 605, 644 (1993).

would have been improperly constituted. But the President of the Tribunal resigned only a few weeks after his appointment. The proceedings were suspended and the Chairman nominated a national of the Netherlands as arbitrator and designated him President of the Tribunal. The new President accepted the appointment.[20] Shortly thereafter, the parties agreed to the composition of the Tribunal. The Tribunal pointed out that "[e]ach member of the Tribunal was thus designated in accordance with Article 39 of the Convention".[21]

29    At a later stage of the proceedings, the Belgian arbitrator resigned. He was replaced through a nomination of SOABI by a national of the Netherlands under Art. 56(1) in accordance with Arbitration Rule 11 (see Art. 56, paras. 17–19). The new arbitrator accepted his appointment.[22] The records do not reveal an agreement between the parties on this new appointment. But the nomination of a Dutch rather than a Belgian national meant that there was no longer a majority of nationals and co-nationals of the parties on the Tribunal. Therefore, Art. 39 was no longer applicable and there was no need to appoint each arbitrator by agreement of the parties.

30    The method for the appointment of arbitrators became relevant in the Tribunal's discussion of SOABI's nationality. The Tribunal noted that designation of the arbitrators by mutual consent pursuant to Art. 39 appeared necessary to the parties in light of the Senegalese and Belgian nationalities of the two arbitrators.[23] It seemed to follow that the parties had recognized SOABI as a Belgian company (see Art. 25, paras. 898, 899). This conclusion led to a debate in the Dissenting Opinion and in a Declaration of the Tribunal's President.[24]

31    Some tribunals were composed of three arbitrators who all had the nationality of the respondent State. In *IBM* v. *Ecuador* "[p]ursuant to article 39 of the Convention, the parties, by common consent, appointed" three nationals of Ecuador.[25]

---

20    *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 3–6; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 1.04–1.06.
21    Decision on Jurisdiction, at para. 7.        22    Award, at para. 1.25.
23    Decision on Jurisdiction, at para. 42.
24    Dissenting Opinion, paras. 67–73; President's Declaration, paras. 8–10.
25    *IBM* v. *Ecuador*, Decision on Jurisdiction, 22 December 2003, para. 4. In *Astaldi* v. *Honduras* the parties appointed three nationals of Honduras as arbitrators.

# Article 40

---

**(1) Arbitrators may be appointed from outside the Panel of Arbitrators, except in the case of appointments by the Chairman pursuant to Article 38.**
**(2) Arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in paragraph (1) of Article 14.**

## OUTLINE

|   |   | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–3 |
| II. | INTERPRETATION | 4–28 |
| | A. **"(1) Arbitrators may be appointed from outside the Panel of Arbitrators, except in the case of appointments by the Chairman pursuant to Article 38."** | 4–13 |
| | 1. Appointment by the Parties | 4–7 |
| | 2. Appointment by the Chairman | 8–13 |
| | B. **"(2) Arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in paragraph (1) of Article 14."** | 14–28 |
| | 1. General Qualities | 14–16 |
| | 2. Independent Judgment | 17–24 |
| | 3. Other Reasons for the Exclusion of Arbitrators | 25–26 |
| | 4. Consequences of Improper Appointment | 27–28 |

## BIBLIOGRAPHY

*Griffith, G.*, Constitution of Arbitral Tribunals: The Duty of Impartiality in Tribunals or Choose Your Arbitrator Wisely, 13 ICSID Review – FILJ 36 (1998);

*Hoffmann, A. K.*, Duty of Disclosure and Challenge of Arbitrators: The Standard Applicable Under the New IBA Guidelines on Conflicts of Interest and the German Approach, 21 Arbitration International 427 (2005);

*Malintoppi, L.*, Independence, Impartiality, and Duty of Disclosure of Arbitrators, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 789 (2008);

*Mann, H.*, The Emperor's Clothes Come Off: A Comment on Republic of Ghana v. Telekom Malaysia Berhad, and the Problem of Arbitrator Conflict of Interest, TDM Vol. 1, Issue 5, 2004;

*Mann, H. et al.*, Comments on ICSID Discussion Paper "Possible Improvements on the Framework for ICSID Arbitration", http://www.iisd.org, December 2004;

*Paulsson, J.*, Ethics, Elitism, Eligibility, 14 Journal of International Arbitration 13 (1997);

507

*Shelton, D.*, Legal Norms to Promote the Independence and Accountability of International Tribunals, 2 The Law and Practice of International Courts and Tribunals 27 (2003);

*Shihata, I. F. I.*, The Experience of ICSID in the Selection of Arbitrators, News from ICSID, Vol. 6/1, p. 4 (1989);

*Tupman, W. M.*, Challenge and Disqualification of Arbitrators in International Commercial Arbitration, 38 International and Comparative Law Quarterly 26 (1989).

# I. INTRODUCTION

**1** Article 40(1) deals with appointments from the Panel of Arbitrators kept by the Centre in accordance with Articles 12–16. The Chairman, in making appointments under Art. 38, is restricted to the Panel of Arbitrators. The parties, when making appointments, are not. Art. 40(2) deals with the qualities of arbitrators. Curiously, these qualities are only defined in the limited terms of Article 14(1).

**2** The earlier drafts of the Convention had sought to restrict the parties in their choice of arbitrators to persons on the Panel of Arbitrators unless the parties had reached agreement on the tribunal's constitution (History, Vol. I, p. 184; Vol. II, pp. 568, 938). The ensuing discussion showed a preponderance of opinions in favour of giving the parties the freedom to choose persons from outside the Panel (History, Vol. II, pp. 265, 266, 329/30, 346, 416, 417, 487, 510, 527). Eventually, a vote was taken which showed a clear majority in favour of allowing the parties to select arbitrators from outside the Panel at all times with the result that only the Chairman would be obliged to appoint arbitrators from the Panel (at pp. 798, 862, 948). It was emphasized that arbitrators selected from outside the Panel would have to possess the same qualifications (at pp. 265, 387, 798, 862, 948).

**3** The Report of the Executive Directors on the Convention rephrases the provision of Art. 40 in the following terms:

> 21. . . . In keeping with the essentially flexible character of the proceedings, the Convention permits the parties to appoint conciliators and arbitrators from outside the Panels but requires (Articles 31(2) and 40(2)) that such appointees possess the qualities stated in Article 14(1). The Chairman, when called upon to appoint a conciliator or arbitrator pursuant to Article 30 or 38, is restricted in his choice to Panel members.[1]

# II. INTERPRETATION

## A. "(1) Arbitrators may be appointed from outside the Panel of Arbitrators, except in the case of appointments by the Chairman pursuant to Article 38."

### 1. Appointment by the Parties

**4** Arts. 12–16 contain detailed provisions concerning a Panel of Arbitrators. Contracting States may designate four persons each to the Panel. In addition, the

---

1    1 ICSID Reports 27. See also para. 36 of the Executive Directors' Report.

Chairman may designate ten persons to the Panel (Art. 13). The persons designated to the Panel must have certain qualities and qualifications (Art. 14). The purpose of the Panel is to assist the parties in the selection of arbitrators by providing a pool of suitable individuals. Moreover, the Panel may contribute to a certain degree of continuity. Even appointments from outside the Panel are sometimes related to it since there have been appointments of former Panel members or of persons who later became Panel members.

The freedom of the parties to select arbitrators who are not on the Panel is in keeping with the principle of freedom of choice for the parties in the constitution of the tribunal (see Art. 37, para. 2). It enables them not only to select persons who enjoy their special confidence but also to appoint arbitrators who have some specific expertise in the matter under dispute.[2]    **5**

This freedom of the parties applies regardless of whether they make their appointments on the basis of an agreement concerning the constitution of the tribunal (see Art. 37, paras. 15–35) or in the absence of such an agreement in application of Art. 37(2)(b) (see Art. 37, paras. 36–46). It also applies regardless of whether a particular appointment is made unilaterally by one party or jointly by agreement of the parties.    **6**

The freedom to appoint persons from outside the Panel extends to neutral officials who are chosen by the parties as appointing authority (see Art. 37, paras. 19, 23). In this context it is irrelevant whether, under the parties' agreement, the appointing authority has primary authority to appoint or only authority to appoint if the parties are unable to make an appointment.    **7**

### 2. Appointment by the Chairman

The Chairman is restricted to designating persons from the Panel of Arbitrators only in the case of appointments pursuant to Art. 38. The restriction does not apply if the Chairman has been chosen as appointing authority by agreement of the parties (see Art. 38, para. 26). Even if the parties' agreement provides for an appointment by the Chairman in case one of them fails to appoint an arbitrator or in case they fail to agree on the appointment of the third arbitrator, the resulting appointment is not pursuant to Art. 38 but rather on the basis of the parties' agreement. Therefore, in such a case the Chairman would also not be restricted by Art. 40(1) to making the appointment from the Panel.    **8**

In *Kaiser Bauxite* v. *Jamaica*, the Tribunal was constituted in accordance with Art. 37(2)(b). Since the Tribunal had not been constituted 90 days after notice of registration, the Claimant made a request under Art. 38 to the Chairman to appoint two arbitrators and to designate one of them as President of the Tribunal. The Chairman appointed two arbitrators and designated one of them as President. As    **9**

---

2  *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ, 244/5 (1986).

required by Art. 40(1), both these arbitrators were appointed from the Panel of Arbitrators.[3]

**10**    In making appointments under Art. 38, the Chairman is restricted in his or her choice in several ways. Not only must he or she make all appointments from the Panel of Arbitrators, but also may not appoint nationals or co-nationals of either party (see Art. 38, paras. 24–26). In addition, he or she must consult or try to consult both parties (see Art. 38, paras. 12–14). Under Arbitration Rule 4(4), the Chairman is to use his or her best efforts to make the appointment within 30 days.

**11**    In making appointments under Art. 38 the Chairman is given some additional flexibility through the Chairman's List. Art. 13(2) provides that the Chairman may designate ten persons to the Panel of Arbitrators. The Chairman may use this power to meet the requirements of a particular proceeding.[4] In other words, if there is an absence or shortage of eligible candidates, a person who appears suitable for appointment as arbitrator but is not listed on the Panel of Arbitrators may be designated to the Panel by the Chairman. Once designated to the Panel, the person will normally remain for six years. Therefore, the designee must be suitable for appointments throughout the term of service on the Panel. Since the Chairman may only designate up to ten persons to the Panel, he/she would deprive him/herself of this possibility if he/she were to fill all ten slots.[5]

**12**    An arbitrator who has been appointed by the Chairman under Art. 38 in accordance with Art. 40(1) continues to be a member of the tribunal even if his/her term of office as a Panel member expires. Under Art. 56(2), a person who has been appointed as arbitrator will continue to serve as a member of the tribunal regardless of that person's current membership on the Panel (see History, Vol. II, p. 488).

**13**    The Chairman's restriction to making appointments from the Panel of Arbitrators has a parallel in Art. 52(3). In making appointments to an *ad hoc* committee, the Chairman is also restricted to persons serving on the Panel of Arbitrators. In the case of Art. 52(3), the Chairman's choice is even further restricted (see Art. 52, paras. 451–465).

**B.  "(2) Arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in paragraph (1) of Article 14."**

*1. General Qualities*

**14**    Art. 14(1) lists the qualities that a person must have in order to be eligible to serve on the Panel of Arbitrators. These are:

---

3   *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 3. In *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 68, all three arbitrators were appointed by the parties. The Tribunal erroneously states that "[t]he Tribunal was formed after the parties waived the ICSID procedures for composition of tribunals, so that the members did not need to be drawn from lists of ICSID arbitrators".

4   *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 92/3 (1985).

5   In January 2008 nine persons had been designated to the Chairman's list.

- high moral character;
- recognized competence in the fields of law, commerce, industry or finance;
- reliability to exercise independent judgment.[6]

Of these three qualities only the requirement of reliability to exercise independent judgment has played a practical role.

Under Art. 40(2) arbitrators appointed from outside the Panel of Arbitrators **15** must also have these qualities. An appointment from the Panel carries a strong presumption that the person in question has these qualities. A demonstrable absence of one or several of these qualities would mean that a party may propose the disqualification of that member in accordance with Art. 57 (see Art. 57, paras. 15–34). It would also mean that the tribunal is not properly constituted. This, in turn, could form the basis of a request for annulment in accordance with Art. 52(1)(a) (see Art. 52, para. 123).

Other instruments governing international arbitration also contain provisions **16** concerning the qualities of arbitrators.[7] Significantly, most of these instruments put more emphasis on the arbitrators' independence from the parties than on general qualifications and qualities.[8]

### *2. Independent Judgment*

Art. 14(1) only addresses the eligibility of persons to serve on the Panel of **17** Arbitrators. A person may be perfectly qualified as a member of the Panel but may still be unsuitable as an arbitrator in a particular case. A person may be relied upon to exercise independent judgment generally but there may be a conflict of interest in respect of a specific dispute.

The Arbitration Rules address this question in a somewhat indirect way. They **18** require a statement by each arbitrator of any professional, business or other relationships with the parties. To this end, Rule 6(2), as amended on 10 April 2006, provides:

> (2) Before or at the first session of the Tribunal, each arbitrator shall sign a declaration in the following form:
>
> "To the best of my knowledge there is no reason why I should not serve on the Arbitral Tribunal constituted by the International Centre for Settlement of Investment Disputes with respect to a dispute between _____ and _____.
>
> "I shall keep confidential all information coming to my knowledge as a result of my participation in this proceeding, as well as the contents of any award made by the Tribunal.

---

6   See also Art. 8 of the Arbitration (Additional Facility) Rules.

7   See International Law Commission Model Rules on Arbitral Procedure, 1958, Art. 3(5), YBILC 83, 84 (1958-II).

8   See UNCITRAL Arbitration Rules, 1976, Arts. 6(4), 9, 15 ILM 701, 704/5, 706 (1976); UNCITRAL Model Law, 1985, Arts. 11(5), 12(1), 24 ILM 1302, 1305 (1985); ICC Rules of Arbitration, 1998, Art. 7(1)(3), 36 ILM 1604, 1609 (1997).

> "I shall judge fairly as between the parties, according to the applicable law, and shall not accept any instruction or compensation with regard to the proceeding from any source except as provided in the Convention on the Settlement of Investment Disputes between States and Nationals of Other States and in the Regulations and Rules made pursuant thereto.
>
> "Attached is a statement of (a) my past and present professional, business and other relationships (if any) with the parties *and (b) any other circumstance that might cause my reliability for independent judgment to be questioned by a party. I acknowledge that by signing this declaration, I assume a continuing obligation promptly to notify the Secretary-General of the Centre of any such relationship or circumstance that subsequently arises during this proceeding*."[9]
>
> Any arbitrator failing to sign a declaration by the end of the first session of the Tribunal shall be deemed to have resigned.

**19**  The amendments of 2006 to Rule 6(2) added two important requirements which were not included in the previous version: (i) the inclusion in the declaration of a statement disclosing any other circumstance that might cause questions about the arbitrator's reliability for independent judgment and (ii) the imposition on the arbitrator of a continuing obligation to notify the Secretary-General of the Centre of any such relationship or circumstance that may subsequently arise during the arbitral proceedings.[10]

**20**  With respect to the first of these new requirements the explanatory note states that the purpose of this amendment is to "expand the scope of disclosures of arbitrators to include any circumstances likely to give rise to justifiable doubts as to the arbitrator's reliability for independent judgment". However, no further specification of the type of circumstances envisaged by this Rule is provided.

**21**  Although the existence of a particular relationship is not specifically mentioned as being incompatible with the appointment as arbitrator, it is clear that a conflict of interest in a particular case is a bar to the appointment as arbitrator. Even party-appointed arbitrators must exercise independent judgment and must be expected to judge fairly between the parties.[11] A subjective belief on the part of the arbitrator, of the appointing party or of the neutral appointing authority that the appointee will be capable of independent and fair judgment is not sufficient. A conflict of interest is an objective criterion that is independent of the moral character of the arbitrator in question. In particular, a conflict of interest may exist even if there is no suspicion or likelihood of corruption in the sense of Art. 52(1)(c) (see Art. 52, paras. 271–277).

---

9  The italicized portion of the declaration was added through the amendment of the Arbitration Rules in 2006. Similar changes were made to the corresponding provision of the Additional Facility Arbitration Rules, Article 13(2).

10  The Discussion Paper published by the ICSID Secretariat on 22 October 2004 had also made a third proposal with respect to this provision, concerning the elaboration of a code of conduct for ICSID arbitrators. However, this proposal was ultimately not adopted.

11  See also *Eisemann, F.*, La double sanction prévue par la Convention de la B.I.R.D. en cas de collusion ou d'ententes similaires entre un arbitre et la partie qui l'a désigné, 23 Annuaire Français de Droit International 436, 440 *et seq.*, 451 (1977).

A relationship with a party affecting the eligibility as arbitrator may be of a **22** personal, family or business nature. It would include a permanent attorney/client relationship, any other permanent or recurrent business relationship, employment by a party, including civil service in a State that is a party, substantial participation or shareholding in a company that is a party and any form of relationship in which the arbitrator stands to profit directly or indirectly from the financial gain of a party.[12]

The practice on the independence of arbitrators is set out in more detail in the **23** context of Art. 57 dealing with challenges. Not every past contact, professional or personal, with a party would disqualify a person from being appointed as arbitrator.[13] Professional contacts between an arbitrator and legal counsel representing one of the parties are not, as a rule, an obstacle to the exercise of independent judgment.[14] Dissatisfaction by a party with a decision rendered by the Tribunal or with a decision rendered by another tribunal in which an arbitrator had participated was not accepted as evidence of a lack of independence or impartiality.[15]

Political beliefs or philosophical orientations are not a basis for the exclusion **24** of an arbitrator for lack of impartiality. A person's personal convictions may be known from published writings or public statements and may give some idea of an arbitrator's likely judgment. A particular person may be known to be supportive of the causes of capital importing countries or may favour protecting private property rights. A supposed or real predisposition of this kind is not an obstacle to independent judgment in a particular case for a person of high moral character. It is not illegitimate for parties to appoint arbitrators who they believe to be sympathetic to their arguments. Neutral appointing authorities will be prudent to avoid the selection of persons who are known for strongly held views on

---

12  For a detailed analysis see *Tupman, W. M.*, Challenge and Disqualification of Arbitrators in International Commercial Arbitration, 38 International and Comparative Law Quarterly 26, 49 *et seq.* (1989). Some guidance as to the standards to be applied is offered by the 2004 IBA Guidelines on Conflicts of Interest in International Arbitration. The Guidelines use three colour-coded lists (red, orange and green) encompassing a number of situations, illustrated by examples, where the duty to disclose varies. If a matter falls under the red list, the arbitrator should not accept the appointment or resign (but exceptions are made for matters that can be waived by the parties); the orange list is an intermediate area describing situations where the arbitrator may or may not disclose or resign, and the green list contains situations where the disqualification is unfounded and there is no need to disclose. See *Hoffmann, A. K.*, Duty of Disclosure and Challenge of Arbitrators: The Standard Applicable Under the New IBA Guidelines on Conflicts of Interest and the German Approach, 21 Arbitration International 427 (2005).

13  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 2; *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October 2001; *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 19–24.

14  *SGS* v. *Pakistan*, Decision on Disqualification of Arbitrator, 19 December 2002, 8 ICSID Reports 398; *Azurix* v. *Argentina*, Decision on the Challenge to the President of the Tribunal, 25 February 2005, unpublished. See *Saipem* v. *Bangladesh*, Decision on Proposal for Disqualification, 11 October 2005, unpublished; *Saipem* v. *Bangladesh,* Decision on Jurisdiction, 21 March 2007, para. 47; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 33; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 31, 35–38.

15  *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 53–60, 66; *Suez et al.* v. *Argentina*, Decision on the Challenge of an Arbitrator, 22 October 2007.

controversial issues touching upon international investment. Parties appointing arbitrators by agreement will opt for arbitrators who are likely to be balanced as well as independent in their judgment. In several cases, not conducted under the ICSID Convention, *Tecmed* v. *Mexico*,[16] *S.D. Myers* v. *Canada*[17] and *Canfor* v. *United States*[18] arbitrators resigned against the background of controversial opinions expressed outside the proceedings.

### 3. Other Reasons for the Exclusion of Arbitrators

**25**      Arbitration Rule 1(4) contains an additional exclusion for the appointment of an arbitrator:

> (4) No person who had previously acted as a conciliator or arbitrator in any proceeding for the settlement of the dispute may be appointed as a member of the Tribunal.[19]

This rule is based on the principle that no person should take part twice in the settlement of a dispute as an impartial decision maker.[20] It applies regardless of who made the appointments. The question may arise if ICSID arbitration is preceded by inconclusive non-ICSID arbitration (see Art. 26, paras. 34–40, 149–153) or if conciliation is to be followed by arbitration (see Art. 25, paras. 19–25; Art. 34, paras. 6, 31). But it would apply only if the previous proceeding had actually taken place.[21] It also applies to successive steps in ICSID arbitration such as annulment and resubmission to a new tribunal in accordance with Art. 52(6) (see Art. 52, para. 669). Art. 52(3) goes even further in not only excluding members of the tribunal which rendered the award from appointment to an *ad hoc* committee, but also persons having the same nationality as any such member (see Art. 52, para. 463). Since the Arbitration Rules are generally subject to modification by

---

16  *Tecmed* v. *Mexico* (AF), Award, 29 May 2003, paras. 13–16.

17  *S.D. Myers* v. *Canada* (UNCITRAL), Award on Liability, 13 November 2000, 8 ICSID Reports 21, paras. 25, 28, 29. The Claimant objected to the appointment of an arbitrator by the Respondent because he was a registered lobbyist in connection with the softwood Lumber Agreement between the United States and Canada. The decision on the challenge, which had not alleged actual bias but, rather, lack of independence, was to be made by the Secretary-General of ICSID under Article 12.1 of the UNCITRAL Rules. The Secretary-General of ICSID informed the parties that he would uphold the challenge of the arbitrator unless he discontinued his lobbying activities. The following day, the arbitrator tendered his resignation from the Tribunal.

18  In *Canfor* v. *United States*, the Respondent challenged the arbitrator appointed by the Claimant on the basis of a statement during a speech made to a Canadian Government council where he commented on some of the measures alleged by the Claimant to be in breach of the NAFTA. Three months after the challenge was introduced, *i.e.* in March 2003, the Secretary-General of ICSID announced his intention to issue a decision upholding the challenge if the arbitrator did not wish to withdraw. The arbitrator resigned shortly thereafter and no formal decision was issued by ICSID. Documents relating to this case can be found at http://www.state.gov/s/l/c7424.htm. For a discussion of this case and the arbitrator's challenge, see *Legum, B.*, Investor-State Arbitrator Disqualified for Pre-Appointment Statements on Challenged Measures, 21 Arbitration International 241 (2005).

19  See also Arbitration (Additional Facility) Rules, Art. 6(5).

20  See also Note I to Arbitration Rule 1 of 1968, 1 ICSID Reports 67.

21  *Loc. cit.*

the parties (see Art. 44, paras. 10–31), Rule 1(4) may be waived by agreement of the parties.[22]

Under Administrative and Financial Regulation 13, the Secretary-General, the Deputy Secretary-General and the members of the staff of ICSID may not serve on the Panel of Arbitrators and may not be appointed as arbitrators. This provision is not subject to waiver by the parties (see Art. 44, para. 13).                **26**

### 4. Consequences of Improper Appointment

Any appointment that is in violation of the provisions of the Convention or the attendant rules may lead to a proposal for the disqualification of the arbitrator in question in accordance with Art. 57. A decision on disqualification is made by the other members of the tribunal or by the Chairman under Art. 58.                **27**

Improper appointments of arbitrators may lead to the annulment of the resulting award. The most likely ground for annulment would be improper constitution of the tribunal under Art. 52(1)(a) (see Art. 52, paras. 118–129). Lack of impartiality may lead to the charge of a serious departure from a fundamental rule of procedure under Art. 52(1)(d) (see Art. 52, paras. 294–304). In extreme cases of a demonstrable exploitation of a conflict of interest there may be an allegation of corruption in accordance with Art. 52(1)(c) (see Art. 52, paras. 271–277).[23]                **28**

---

22  *Loc. cit.*
23  See also *Shihata*, The Experience, p. 5.

# Article 41

---

**(1) The Tribunal shall be the judge of its own competence.**

**(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.**

## OUTLINE

*Paragraphs*

I.   INTRODUCTION — 1–9
II.  INTERPRETATION — 10–102
   A.  **"(1) The Tribunal shall be the judge of its own competence."** — 10–29
      1.  Exclusive Power to Determine Jurisdiction — 10–20
         a)  The International Court of Justice — 10
         b)  The Secretary-General's Screening Power — 11–15
         c)  Domestic Courts — 16–20
      2.  Review of the Decision on Jurisdiction — 21–29
         a)  The International Court of Justice — 21
         b)  Domestic Courts — 22–23
         c)  Internal ICSID Review Procedures — 24–29
   B.  **"(2) Any objection by a party to the dispute . . ."** — 30–55
      1.  Jurisdictional Objections — 30–42
      2.  Examination of Jurisdiction on the Tribunal's Initiative — 43–55
         a)  Contested Proceedings — 45–51
         b)  Uncontested Proceedings — 52–55
   C.  **". . . that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, . . ."** — 56–59
      1.  Jurisdiction and Competence — 56–57
      2.  Jurisdictional Issues — 58–59
   D.  **". . . shall be considered by the Tribunal . . ."** — 60–74
      1.  Procedure — 60–64
      2.  Obligation to Decide — 65–68
      3.  Form of Decision — 69–74

E. **". . . which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute."**    75–102
   1. General    75–76
   2. Preliminary Question    77–78
   3. Joinder to the Merits    79–85
   4. *Prima Facie* Test    86–92
   5. Summary Procedure    93–102

## BIBLIOGRAPHY

*Sheppard, A.*, The Jurisdictional Threshold of a Prima-Facie Case, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 932 (2008)

## I. INTRODUCTION

The power of a judicial body to determine its own competence is an accepted **1** principle of international adjudication[1] and is a common feature in instruments governing international judicial procedure. Comparable clauses can be found in Art. 36(6) of the Statute of the International Court of Justice, in Art. 21 of the UNCITRAL Arbitration Rules of 1976,[2] in Art. 9 of the International Law Commission's Model Rules on Arbitral Procedure of 1958,[3] in Art. 16 of the UNCITRAL Model Law on International Commercial Arbitration of 1985,[4] in Art. 6(2) of the International Chamber of Commerce Rules of Arbitration of 1998[5] and in Art. 3(b) of the Institute of International Law's Articles on Arbitration between States, State Enterprises or State Entities and Foreign Enterprises of 1989.[6]

In the Convention's drafting, the principle as such was not cast into doubt **2** (History, Vol. I, pp. 186–190; Vol. II, pp. 76, 97, 206, 291/2, 406, 511), although there was some discussion on the details (see paras. 10, 11, 21, 43, 58, 75 *infra*). The Report of the Executive Directors to the Convention points out:

> 38. Article 41 reiterates the well-established principle that international tribunals are to be the judges of their own competence . . .

The first paragraph of Art. 41 states the general principle of the tribunal's **3** power to rule on its own competence. The second paragraph addresses a number of procedural issues in connection with this power. Art. 41 is supplemented by Arbitration Rule 41.

---

1  See *e.g.*, *Topco & Calasiatic* v. *Libya*, Preliminary Award, 27 November 1975, 53 ILR 404 *et seq.* (1979).
2  15 ILM 701, 709 (1976).    3  YBILC 83, 84 (1958-II).
4  24 ILM 1302, 1306 (1985).    5  36 ILM 1604, 1609 (1997).
6  63 Annuaire IDI 324, 326 (1990); 5 ICSID Review – FILJ 139 (1990).

**4**      Within the chapter on arbitration, Art. 41 is the first of a section of seven Articles dealing with the powers and functions of the tribunal. Art. 41 is materially identical to Art. 32 dealing with the parallel power of a conciliation commission. Art. 52(4) extends the application of Art. 41 to *ad hoc* committees charged with the task of deciding on an application for annulment of the original award. Art. 41 also applies to proceedings before a new tribunal constituted after an annulment in accordance with Art. 52(6).[7]

**5**      The primary purpose of Art. 41 is to prevent a frustration of the arbitration proceedings through a unilateral denial of the tribunal's competence by one of the parties. Therefore, Art. 41 is an essential procedural corollary to the last sentence of Art. 25(1), which provides that once the parties have given their consent, they may not withdraw it unilaterally. This includes the tribunal's power to interpret a party's consent in the face of that party's attempt to interpret it restrictively.[8] This power of the tribunal to determine its own competence in the face of a recalcitrant party has never been challenged seriously in ICSID proceedings.

**6**      Art. 41 also implies that a tribunal constituted pursuant to the Convention's procedure is validly constituted even if the validity of the consent to arbitration is disputed and may turn out to be defective. The tribunal has its independent legal basis in the Convention even if it finds that it does not have competence or if its decision on jurisdiction is eventually annulled for excess of power.[9]

**7**      In *Inceysa* v. *El Salvador* the Respondent raised the objection that the investment had not been made in accordance with the host State's law. The Claimant argued that this objection raised issues that belonged to the merits on which the Tribunal could not rule when deciding on its own competence.[10] The Tribunal found that its power to decide on its own competence existed independently of the existence of a valid consent:

> . . . the Arbitral Tribunal has an original and unquestionable competence, which arises from its own constitution and the ICSID Convention, and whose only object is to determine its competence to decide the substantive dispute presented by the parties. Only after the Arbitral Tribunal determines its own competence can it hear and decide the merits of the matter presented.
>
> 151. As an obvious consequence of the above, there are cases in which an Arbitral Tribunal decides that it lacks competence to decide the merits of the matter brought before it, without such decision implying that the Arbitral Tribunal exceeded its bounds or acted illegally.

---

7  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988; *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005.

8  In *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 60, the Tribunal refused to accept Egypt's interpretation of its legislation containing an ICSID clause: "While Egypt's interpretation of its own legislation is unquestionably entitled to considerable weight, it cannot control the Tribunal's decision as to its own competence."

9  *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 664 (1993).

10  *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 146.

152. Such being the case, there is no paradox when an Arbitral Tribunal rules on its own competence, as asserted by Inceysa, because the power to decide this issue stems directly from the command of Article 41 of the ICSID Convention.[11]

In *Zhinvali* v. *Georgia*, the Tribunal found that it lacked jurisdiction because **8** there was no qualifying investment. Nevertheless, it found that it was competent to make a decision on costs since "Article 61(2) applies even where the Tribunal determines that 'the dispute is not within the jurisdiction of the Centre'".[12]

A secondary effect of Art. 41 is that it gives the tribunal an exclusive power to **9** decide on matters of its jurisdiction in relation to other decision-makers. These other decision-makers include the International Court of Justice in the context of Art. 64 of the Convention, the Secretary-General of ICSID in the context of Art. 36(3) and domestic courts.

## II. INTERPRETATION

### A. "(1) The Tribunal shall be the judge of its own competence."

#### 1. Exclusive Power to Determine Jurisdiction

#### a) The International Court of Justice

Art. 64 contains a submission to the jurisdiction of the International Court of **10** Justice (ICJ) for disputes concerning the interpretation or application of the Convention between Contracting States if the dispute is not settled by negotiation. This is a fairly standard clause in treaties. But during the Convention's drafting there was considerable debate about the ICJ's power to interpret the Convention in matters of jurisdiction in specific cases.[13] There were various suggestions for the referral of questions concerning competence to the ICJ (History, Vol. II, pp. 57, 292). This was to be achieved either through a suspension of proceedings during which the interested States might bring the matter to the ICJ[14] (at pp. 290, 354, 533, 578, 906) or, possibly, through a request for an advisory opinion[15] (at pp. 533/4, 578). The view prevailed that such procedures would be impractical, that they would lead to procrastination, that they might bring about an undesirable intervention by States and that, therefore, the tribunal's exclusive power to determine its own jurisdiction should be upheld (at pp. 59, 290, 354, 439/40, 533/4, 578).

---

11  At paras. 150–152.
12  *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 420.
13  *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 368/9 (1972-II).
14  See Statute of the ICJ, Art. 34(1): only States may be parties in cases before the Court.
15  See United Nations Charter, Art. 96:
    1. The General Assembly or the Security Council may request the International Court of Justice to give an advisory opinion on any legal question.
    2. Other organs of the United Nations and specialized agencies, which may at any time be so authorized by the General Assembly, may also request advisory opinions of the Court on legal questions arising within the scope of their activities.

Eventually, the Chairman recorded the general consensus of the delegates that the provision providing for the ICJ's jurisdiction would in no case enable a State, party to proceedings pursuant to the Convention, to frustrate those proceedings by a referral of the matter to the ICJ (at p. 906) (see also Art. 27, para. 23). While it is, therefore, clear that the ICJ will not determine the competence of a tribunal in proceedings pending before ICSID, this does not affect the general jurisdiction of the ICJ concerning the interpretation or application of the Convention. No case concerning the competence of an ICSID tribunal or any other question arising from the Convention has ever been brought to the ICJ.

### b) The Secretary-General's Screening Power

**11**    Under Art. 36(3) the Secretary-General shall register the request for arbitration unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the Centre's jurisdiction. In the course of the Convention's drafting, there were various suggestions to entrust the determination of the tribunal's competence to one of the Centre's administrative bodies or to an *ad hoc* committee (History, Vol. II, pp. 409, 451, 653, 770). Eventually, the view prevailed that the Secretary-General's decision was to be purely preliminary and that the actual decision on jurisdiction would be left to the tribunal (at pp. 508, 769).

**12**    The Report of the Executive Directors on the Convention contains the following clarification in para. 38:

> . . . It is to be noted in this connection that the power of the Secretary-General to refuse registration of a request for conciliation or arbitration ( . . . ) is so narrowly defined as not to encroach on the prerogative of Commissions and Tribunals to determine their own competence and, on the other hand, that registration of a request by the Secretary-General does not, of course, preclude a Commission or Tribunal from finding that the dispute is outside the jurisdiction of the Centre.

Therefore, a tribunal remains free to decline jurisdiction even if the Secretary-General has found that the dispute is not manifestly outside the Centre's jurisdiction.[16]

**13**    This principle has been confirmed by ICSID tribunals. In *Holiday Inns* v. *Morocco*, the Tribunal rejected an argument that ICSID had tacitly recognized a particular position on a point of jurisdiction by the very fact of registration of the request. The Tribunal found that such registration

> . . . does not of course preclude a finding by the Tribunal that the dispute is outside the jurisdiction of the Centre.[17]

---

16    See also Note A to Arbitration Rule 41, 1968, 1 ICSID Reports 101; *Broches*, Convention, Explanatory Notes and Survey, p. 664 (1993).

17    Decision on Jurisdiction, 1 July 1973, *Lalive, P.*, The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 BYIL 123, 144 (1980), reproduced in 1 ICSID Reports 665. See also *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 8; *SOABI* v. *Senegal*, Dissenting Opinion to Award, 25 February 1988, paras. 101–104; *AMT* v.

In *Mihaly* v. *Sri Lanka* the Tribunal confirmed that the Request's registration in   **14**
no way prejudiced its power to examine its own competence. The Tribunal said:

> . . . the fact of the registration of this case as ICSID Case No ARB/00/2 constituted
> an indication that, on the basis of the information contained in the request for
> arbitration, the dispute was not manifestly outside the jurisdiction of the Centre.
> Such registration is naturally without prejudice to the further examination of
> arguments of evidence presented by the Parties on issues of jurisdiction. The
> Tribunal is competent to determine the limits of its own competence.[18]

The tribunal is not necessarily restricted to the basis of jurisdiction underlying   **15**
the Secretary-General's decision to register the request. In *Plama* v. *Bulgaria* the
Respondent argued that the Request for Arbitration had been registered on the basis
of the Energy Charter Treaty but not on the basis of the Bulgaria-Cyprus BIT.[19]
The Tribunal found that the BIT, by its terms, did not establish its competence.[20]
The Tribunal added that the Request for Arbitration had been registered without
any limitation. It was up to the Tribunal under Art. 41 to determine its own
competence.[21]

### c) Domestic Courts

Art. 26 of the Convention provides that, unless otherwise stated, consent to   **16**
ICSID arbitration shall exclude other remedies. Art. 26 operates from the moment
of consent. Therefore, whether a valid submission to ICSID arbitration exists may
well be relevant to a domestic court's or other decision-maker's determination
of its own competence (see Art. 26, para. 8). It is only after ICSID proceedings
have been instituted that Art. 41(1) begins to operate. From this moment, any
question of competing competence is up to the tribunal. Domestic courts of ICSID
Contracting States must defer to the tribunal's decision on its own jurisdiction.

In *Mobil Oil* v. *New Zealand*, the case had been registered with ICSID in   **17**
April 1987. Shortly thereafter, the Government commenced proceedings in the
New Zealand courts to obtain an interim injunction seeking to restrain Mobil from
continuing the proceedings before ICSID. The Government argued that the dispute
was outside ICSID's jurisdiction. Mobil applied for a stay of the proceedings. The
New Zealand High Court granted the stay of proceedings until the ICSID Tribunal
had determined its jurisdiction.[22] The Court based its decision on a variety of
reasons (see Art. 26, paras. 154–157) including the ICSID Tribunal's power under
Art. 41.[23]

---

*Zaire*, Award, 21 February 1997, para. 5.01; *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August
2003, footnote 125.

18    *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, para. 57. See also *Zhinvali* v. *Georgia*, Award, 24
January 2003, para. 13.

19    *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 38, 52, 67.

20    At paras. 183–227.                            21    At paras. 231–234.

22    *Attorney-General* v. *Mobil Oil NZ Ltd.*, High Court, Wellington, 1 July 1987, 4 ICSID Reports
117.

23    At p. 128.

**18**     In *SGS* v. *Pakistan*, a Request for Arbitration had been registered by ICSID when the Supreme Court of Pakistan issued a judgment restraining SGS from pursuing or participating in the ICSID arbitration. The judgment was based mainly on a finding that there was no investment in the sense of the applicable BIT and that SGS had waived the right to avail itself of ICSID arbitration.[24] Thirteen months later the ICSID Tribunal determined its own jurisdiction finding that the activities in question constituted an investment under the applicable BIT as well as under the ICSID Convention.[25] It found that it had jurisdiction over SGS's claims arising from the applicable BIT but that it did not have jurisdiction over the claims arising from the contract that was the basis of the investment.[26]

**19**     Under certain circumstances, a domestic court's decision may be preliminary to an issue of jurisdiction to be decided by an ICSID tribunal. In *SPP* v. *Egypt*, the Claimants relied on an ICSID clause in Egyptian legislation as a basis for jurisdiction (see Art. 25, paras. 400–404). ICSID arbitration was available only if there was no agreement between the parties on another mode of settlement.[27] There was an agreement providing for International Chamber of Commerce (ICC) arbitration and an ICC award had been rendered in favour of the Claimants. Egypt had applied to the French courts for the annulment of the ICC award. The Tribunal decided to stay the proceedings before it until the French courts had finally resolved the question of whether the parties had agreed to submit their dispute to the ICC.[28] The French Court of Cassation finally determined that Egypt had not consented to ICC arbitration.[29] As a result, the ICSID Tribunal found that the parties had not agreed on another method of dispute resolution. Therefore, the clause in the Egyptian legislation operated to confer jurisdiction upon ICSID[30] (see Art. 26, paras. 34–43).

**20**     A tribunal's power to decide on its own competence should be distinguished from its willingness to leave certain matters to be decided by domestic courts. The delimitation of competences between ICSID tribunals and domestic courts is discussed in the context of Art. 26 (see Art. 26, paras. 132–148, 154–161, 162–183, 187–231).

### 2. Review of the Decision on Jurisdiction

### a) The International Court of Justice

**21**     During the Convention's preparation, the debates on the respective powers of a tribunal and of the International Court of Justice in matters of competence and jurisdiction (para. 10 *supra*) also turned to the question of a review by the ICJ

---

24    *SGS* v. *Pakistan*, Judgment, Supreme Court of Pakistan, 3 July 2002, 8 ICSID Reports 356.
25    *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 140.
26    At para. 190.
27    *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, paras. 70–79.
28    At paras. 80–88.
29    Judgment, 6 January 1987, 3 ICSID Reports 96.
30    Decision on Jurisdiction II, 14 April 1988, para. 117.

of a tribunal's decision. Mr. *Broches* emphasized that a tribunal's decision on its competence should be final (History, Vol. II, pp. 440, 534, 910). This view is reflected in the Executive Directors' Report on the Convention dealing with the jurisdiction of the ICJ under Art. 64:

> 45. . . . the provision does not confer jurisdiction on the Court to review the decision of a Conciliation Commission or Arbitral Tribunal as to its competence with respect to any dispute before it. . . .

### b) Domestic Courts

The Convention's provisions on the recognition and enforcement of ICSID **22** awards underline the self-contained nature of ICSID awards by disallowing any review by domestic courts. Art. 53(1) provides that an award is not subject to any appeal or other remedy outside the Convention's system. Art. 54(1) enjoins Contracting States to recognize an ICSID award as binding and to enforce pecuniary obligations imposed by it as if it were a final judgment of a domestic court. Therefore, the review normally exercised by domestic courts over commercial arbitration (see para. 19 *supra*) does not apply to ICSID awards (see Art. 54, paras. 3, 4, 85).

Decisions on jurisdiction and competence by ICSID tribunals enjoy the status **23** of awards for purposes of their binding force for domestic courts (see para. 78 *infra*).

### c) Internal ICSID Review Procedures

The Convention provides for a number of precisely defined review procedures. **24** They are supplementation and rectification (Art. 49(2)), interpretation (Art. 50), revision (Art. 51) and annulment (Art. 52). Of these, supplementation and rectification are incumbent on the original tribunal. Requests for interpretation and revision are to be submitted, if possible, to the original tribunal. Although the Convention provides for these procedures in respect of awards only, there appears to be nothing to stop a tribunal from supplementing, rectifying, interpreting or revising a preliminary decision on jurisdiction informally while the case is still pending before it. Once the tribunal has rendered its final award all preliminary decisions are encompassed in it (see para. 78 *infra*) and it is clear that these procedures are available also in respect of preliminary decisions on jurisdiction.

Annulment proceedings may take place after the award has been rendered. **25** Art. 52 provides for the possible annulment of an award. It does not provide for the annulment of interim decisions. Tribunals routinely incorporate decisions that uphold jurisdiction into their awards. This is true even if jurisdiction is not joined to the merits but the decision on jurisdiction is made in the form of a separate interim decision (see para. 78 *infra*). If the tribunal makes a decision declining jurisdiction or competence, such a decision has to be rendered in the form of

an award[31] (see para. 73 *infra*). A request for annulment of the award may also contend that a decision on jurisdiction on which the award is based suffered from one of the defects listed in Art. 52(1).

**26**    A preliminary decision on jurisdiction is not subject to annulment proceedings before the tribunal has given its final award. In *SPP* v. *Egypt*, the Tribunal had confirmed its jurisdiction. The Respondent filed an Application for Annulment of the Tribunal's Decision on Jurisdiction. The Acting Secretary-General of ICSID notified the Respondent of his decision not to register the Application for Annulment on the ground that the Tribunal's Decision was not an award in the sense of Art. 52 of the Convention and Rule 50 of the Arbitration Rules.[32]

**27**    Apart from the wording of Art. 52, considerations of procedural economy also militate against the subjection of interim decisions to annulment (see Art. 52, paras. 61–68). Annulment proceedings against preliminary decisions on jurisdiction are liable to lead to excessive delays. A concentration of annulment proceedings after the tribunal's final award is the more efficient solution. The possibility that the tribunal proceeds with the merits without a valid jurisdictional base weighs less heavily.[33]

**28**    Requests for annulment connected with jurisdictional questions would normally be based on the ground that the tribunal has manifestly exceeded its powers in accordance with Art. 52(1)(b). *Ad hoc* committees have repeatedly examined decisions on jurisdiction contained in awards for alleged excess of powers (see Art. 52, paras. 155–190).

**29**    It is clear that an affirmative decision on jurisdiction where jurisdiction does not, in fact, exist may amount to an excess of powers in the sense of Art. 52(1)(b). A decision declining jurisdiction, where jurisdiction does, in fact, exist, also constitutes an excess of powers, although this may appear paradoxical at first sight. Excess of powers *infra petita* is also an impermissible deviation from the terms of the arbitration agreement and may lead to annulment (see Art. 52, paras. 167–171).

### B.    "(2) Any objection by a party to the dispute . . ."

#### 1. *Jurisdictional Objections*

**30**    Jurisdictional objections are a standard feature in ICSID arbitration. In the majority of cases, tribunals are confronted with the argument that they lack jurisdiction either entirely or at least with regard to some of the claims put forward. This argument is normally couched in terms of formal objections to jurisdiction. At times, tribunals have also looked at arguments expressed in more tentative terms such as "doubts"[34] and "questions".[35]

---

31  Arbitration Rule 41(6).
32  *SPP* v. *Egypt*, Award, 20 May 1992, para. 26; News from ICSID, Vol. 6/1, p. 2 (1989).
33  See *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 46/7 (1993).
34  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 12.
35  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, para. 54.

As might be expected, jurisdictional objections are usually put forward by **31** the respondent in the case. Sometimes, respondents make counter-claims and the original claimants will contest the tribunal's competence with respect to the counter-claim.[36]

Since jurisdictional objections are preliminary in character, they must be raised **32** as early as possible. To this effect, the Arbitration Rules contain the following provision:

**Rule 41**

*Preliminary Objections*

(1) Any objection that the dispute or any ancillary claim is not within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal shall be made as early as possible. A party shall file the objection with the Secretary-General no later than the expiration of the time limit fixed for the filing of the counter-memorial, or, if the objection relates to an ancillary claim, for the filing of the rejoinder – unless the facts on which the objection is based are unknown to the party at that time.[37]

The primary rule under Rule 41 is that jurisdictional objections be made "as **33** early as possible". In *Desert Line* v. *Yemen* the Respondent waited until the last day of the time fixed for the filing of its counter-memorial to file its objections to jurisdiction.[38] The Tribunal found it difficult to accept that the objections could not have been made earlier. It said:

The fact that objections shall be filed with ICSID "no later" than the deadline for the Counter-Memorial does not mean that the Respondent was not bound to raise them before that date, if such objections were or ought to have been already manifest, in view of the "as early as possible" requirement in the first sentence of Article 41.[39]

The Tribunal nevertheless examined and disposed of the objections.

Jurisdictional objections are sometimes filed with considerable speed even **34** before the tribunal's constitution[40] or soon thereafter.[41] The first session of the tribunal is an obvious opportunity to raise jurisdictional objections.[42] In some

---

36  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13–18; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, para. 3.1.2; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, para. 9.

37  See also Note C to Arbitration Rule 41 of 1968, 1 ICSID Reports 102. See also the parallel provision in Article 45(2) of the Arbitration (Additional Facility) Rules.

38  *Desert Line* v. *Yemen*, Award, 6 February 2008, para. 90.

39  At para. 97.

40  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 5; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 4.10–4.18.

41  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 12. In *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 198, 199, the Claimant unsuccessfully argued that the Respondent should have waited until the memorial on the merits before raising its jurisdictional objections.

42  *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 9; *Gruslin* v. *Malaysia*, Award, 27 November 2000, para. 6.5; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 9–11; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 9, 10.

cases objections to jurisdiction were raised only after a memorial on the merits had been submitted by claimants.[43]

**35**     The deadline provided by Arbitration Rule 41 for the filing of jurisdictional objections is the time limit fixed for the counter-memorial. If the respondent raises jurisdictional objections early on in the proceedings it may get a second chance to do so. In *CSOB* v. *Slovakia* the Respondent declared its intention to raise jurisdictional objections at the Tribunal's first session. These objections were extensively addressed by the parties in a series of written and oral pleadings.[44] After a Decision on Jurisdiction the Claimant filed its Memorial on the Merits. Thereupon, within the time limit for its Counter-Memorial, the Respondent filed a Further and Partial Objection to Jurisdiction. After confirming its competence in a second jurisdictional decision,[45] the Tribunal proceeded to the merits of the case.[46]

**36**     If the respondent makes a counter-claim, the procedure is somewhat more complicated. Normally, counter-claims will not be advanced before the filing of the respondent's counter-memorial. Therefore, the claimant can only raise jurisdictional objections to the counter-claims in its reply memorial.[47] Additional claims (see Art. 46, paras. 32–63) are typically raised after the claimant's first pleading, especially in its reply. Arbitration Rule 41(1) gives the respondent the opportunity to raise jurisdictional objections against these until its rejoinder is due.

**37**     In *Atlantic Triton* v. *Guinea*, the Government's Counter-Memorial of January 1985 contained counter-claims. Atlantic Triton implicitly raised jurisdictional objections to the counter-claims in its Reply Memorial of 6 March 1985. After a Memorial in Rejoinder from the Government of 29 April 1985, Atlantic Triton filed another Memorial in Rejoinder on the counter-claims on 13 August 1985 in which it explicitly raised the lack of jurisdiction. The Tribunal upheld these jurisdictional objections to the counter-claims in its final award.[48]

**38**     If the facts on which an objection to jurisdiction may be based are unknown before the expiration of these time limits, Arbitration Rule 41(1) provides that the objection may be raised later. For instance, the State party to the proceeding may at a later stage become aware of the fact that the other party is its national.[49] It

---

43  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.7; *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 3; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 12; *AMT* v. *Zaire*, Award, 21 February 1997, paras. 4.02, 4.03; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 5–7; *Saipem* v. *Bangladesh*, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, para. 50; *Enron* v. *Argentina*, Award, 22 May 2007, para. 14.
44  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 7.
45  *CSOB* v. *Slovakia*, Decision on Further and Partial Objection to Jurisdiction, 1 December 2000.
46  *CSOB* v. *Slovakia*, Award, 29 December 2004, paras. 3–5.
47  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13/4; Decision on Annulment, 3 May 1985, para. 5.
48  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 18, 39.
49  See Note C to Arbitration Rule 41 of 1968, 1 ICSID Reports 102.

*Article 41 – Decision on Jurisdiction*          527

is impossible to provide time limits for this contingency but it is clear that such objections must be raised immediately once the relevant facts come to light.

In *Tokios Tokelės* v. *Ukraine* the Tribunal had issued its Decision on Jurisdic- **39** tion[50] when the Claimant, for the first time, disclosed certain information. This disclosure formed one of several grounds for additional objections to jurisdiction by the Respondent.[51] The Tribunal declined to rule immediately on these objections but disposed of them in its Award.[52]

In a number of cases respondents submitted jurisdictional objections outside **40** the time limits provided by Arbitration Rule 41(1). The reaction of tribunals to belated jurisdictional objections is not uniform.[53] In one case the Tribunal declared that a belated objection would not be taken into consideration.[54] In other cases jurisdictional objections were also dismissed as belated but the Tribunals found it appropriate to point out that the objections were also unmeritorious.[55]

In *AIG* v. *Kazakhstan* the Respondent filed its objections to jurisdiction two **41** and a half months after the time limit originally fixed for the filing of its counter-memorial. The Claimant argued that these belated objections should not be entertained. The Tribunal squarely rejected this contention. It said:

> 9.2 In the opinion of the Tribunal this plea cannot be accepted. Objections to the jurisdiction of an adjudicatory body cannot be ignored, if raised during the arbitral proceedings – delay notwithstanding. Mere tardiness in raising a point of jurisdiction cannot preclude it being considered by the Tribunal at a later stage: so long as the same is raised in the course of the arbitral proceedings.
>
> Rule 41 of the Arbitration Rules (Objection to Jurisdiction) cannot and does not negate the mandate of Article 41 of the Convention: the latter requires a Tribunal to determine every objection to jurisdiction.
>
> The time limits prescribed in Rule 41(1) and the requirement that every objection as to jurisdiction or competence of the Tribunal shall be made "as early as possible" is intended to alert the parties to bring forth their objections, basic to the dispute being adjudicated upon on merits, at the earliest possible point of time. It appears to be rationally and reasonably related only to the expeditious disposal of ICSID arbitral proceedings. It cannot be read as coercive. It could not for instance empower the Arbitral Tribunal to grant relief to a Claimant when there is apparently no jurisdiction of the Centre or the Tribunal to entertain and try the case. The plea of the Claimants based on Article 41 of the Arbitration Rules must therefore stand rejected.[56]

---

50  *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004.
51  *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, paras. 5, 27.
52  At paras. 96–112.
53  See also *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, where the Tribunal avoided a formal pronouncement on the admissibility of a second objection. *Lalive, P.*, The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 British Year Book of International Law 123, 160 (1980); 1 ICSID Reports 681.
54  *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 90.
55  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 16.1; *Siemens* v. *Argentina*, Award, 6 February 2007, para. 68.
56  *AIG* v. *Kazakhstan*, Award, 7 October 2003, para. 9.2.

**42**    The inadmissibility of submissions filed outside time limits would not make sense in the context of Art. 41. Under Arbitration Rule 41(2) the tribunal may examine jurisdictional questions at any time (see para. 43 *infra*) and may be expected to do so even if a party's submissions are out of order. Several tribunals have held that failure by a party to adhere to the time limits of Arbitration Rule 41(1) did not affect their duty to satisfy themselves that all jurisdictional requirements were fulfilled.[57]

### 2. Examination of Jurisdiction on the Tribunal's Initiative

**43**    During the Convention's drafting, the preponderant view was that a tribunal would not only have to deal with objections to its jurisdiction by the parties but would also have the power to deal with jurisdictional questions of its own motion (History, Vol. II, pp. 271, 399, 407, 409, 702). This principle is reflected in Arbitration Rule 41(2) which provides:

>       (2) The Tribunal may on its own initiative consider, at any stage of the proceeding, whether the dispute or any ancillary claim before it is within the jurisdiction of the Centre and within its own competence.[58]

**44**    The tribunal's authority to examine questions of jurisdiction and competence on its own motion is essential. This authority is designed to avoid awards that exceed the tribunal's powers (see para. 30 *supra*) if the parties fail to make jurisdictional objections or file these outside time limits.

### a) Contested Proceedings

**45**    If the respondent appears before the tribunal and contests the case, it may reasonably be expected that all pertinent jurisdictional objections will be raised. Tribunals have, at times, explicitly satisfied themselves of jurisdictional requirements that were not raised by the parties.[59] Normally, tribunals restrict themselves to the objections raised by the parties without going into other jurisdictional questions.

**46**    In some cases, the tribunals did not discuss jurisdictional questions. In *MINE* v. *Guinea*, the institution of ICSID arbitration had been preceded by lengthy proceedings before United States courts and an arbitration procedure of the American

---

57    *Gruslin* v. *Malaysia*, Award, 27 November 2000, para. 19.7; *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 286, 313–324, and the dissenting opinion at paras. 10, 12, 21; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, paras. 44, 68.

58    See also the parallel provision in Article 45(3) of the Arbitration (Additional Facility) Rules.

59    See *e.g.*, *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, paras. 46, 47; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 5.03; *AMT* v. *Zaire*, Award, 21 February 1997, para. 5.03; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 11; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 13; *CDC* v. *Seychelles*, Award, 17 December 2003, paras. 3–6; *MTD* v. *Chile*, Award, 25 May 2004, paras. 90–97; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 5, 6; *Saipem* v. *Bangladesh*, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, paras. 71–74; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 108–119. See also *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 July 1997, para. 25; *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, para. 65.

Arbitration Association. A crucial question in these proceedings was whether MINE met the ICSID Convention's nationality requirements (see Art. 25, paras. 711–714). When the case was eventually brought to ICSID, the Secretary-General at first hesitated to register it and eventually did so, "without prejudice" to the jurisdictional question.[60] Before the Tribunal, neither party raised the fact that the Claimant appeared to be a national of a non-Contracting State. The Tribunal never addressed the question and proceeded to give a decision on the merits.[61] The Tribunal chose to ignore an important jurisdictional question that had been debated extensively and of which the Tribunal must have been aware.[62]

In *Mobil Oil* v. *New Zealand*, the question of whether ICSID had jurisdiction **47** over the case had also been the subject of proceedings in domestic courts. The New Zealand High Court had granted a stay of proceedings until the ICSID Tribunal had determined its jurisdiction[63] (see para. 17 *supra*; Art. 26, paras. 155, 156). But the Government wrote to the ICSID Tribunal that it no longer wished to challenge its jurisdiction. The Tribunal was content to record this statement without examining its jurisdiction *proprio motu*.[64]

In other cases in which no jurisdictional objections were raised the Tribunal **48** barely touched upon the question of their jurisdiction.[65]

Failure to raise jurisdictional objections may be interpreted as implicit consent **49** to jurisdiction. Once the request for arbitration has cleared the hurdle of the Secretary-General's screening power under Art. 36(3), the parties may indicate their consent to jurisdiction by not raising jurisdictional questions.[66] Therefore, *forum prorogatum* is a definite possibility in ICSID proceedings (see Art. 25, paras. 481–498).

But it must be remembered that not all of the Convention's jurisdictional require- **50** ments are subject to the parties' disposition. The Convention also contains objective requirements (see Art. 25, paras. 5–7). Thus, the existence of a legal dispute arising directly out of an investment is an objective fact which must be ascertained independently of the parties' consent (see Art. 25, paras. 62, 63, 80, 84, 85, 122–123). Similarly, the Convention's nationality requirements cannot be replaced by

---

60  News from ICSID, Vol. 2/1, p. 3 (1985); *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 88 (1993).

61  The Tribunal only mentioned the issue of the Claimant's nationality in passing in the context of whether Guinea was entitled to the reimbursement of legal fees arising from the US proceedings. *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76; see also Decision on Annulment, 22 December 1989, paras. 1.01, 1.02 and Fn 1.

62  See the criticism by *Hirsch*, The Arbitration Mechanism, pp. 88–91.

63  *Attorney-General* v. *Mobil Oil NZ Ltd.*, High Court, Wellington, 1 July 1987, 4 ICSID Reports 117.

64  *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, para. 2.9.

65  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 1, 2; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 11; *CDC* v. *Seychelles*, Award, 17 December 2003, para. 6; *Noble Ventures* v. *Romania*, Award, 12 October 2005; *World Duty Free* v. *Kenya*, Award, 4 October 2006.

66  *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 367/8 (1972-II).

the parties' agreement (see Art. 25, paras. 638, 639, 657, 710, 813). Therefore, the tribunal may rely on a party's failure to invoke the non-existence of its consent as an indication of its consent. But it cannot rely on the parties' understanding when it comes to the Convention's objective requirements.[67]

51    Failure to discuss a jurisdictional question in a published decision does not necessarily mean that a tribunal has not considered it. The obligation set out in Art. 48(3) that the award deal with every question and state reasons only applies to questions submitted to the tribunal. It would not make sense to go through a ritualistic examination of all possible jurisdictional issues even if they do not give rise to any questions. But it is sensible and desirable for a tribunal to briefly discuss all jurisdictional questions that are relevant to the case, even if the parties have not raised them.

### b) Uncontested Proceedings

52    If the respondent fails to appear and plead before the tribunal, the situation is somewhat different. Art. 45(1) of the Convention provides that failure of a party to appear or to present its case shall not be deemed an admission of the other party's assertions. (See Art. 45, paras. 13–15.) Arbitration Rule 42(4) dealing with default proceedings directs that:

> (4) The Tribunal shall examine the jurisdiction of the Centre and its own competence in the dispute and, if it is satisfied, decide whether the submissions made are well-founded in fact and in law. To this end, it may, at any stage of the proceeding, call on the party appearing to file observations, produce evidence or submit oral explanations.[68]

It follows that, whereas in contested proceedings the tribunal *may consider* jurisdictional questions *proprio motu* (Arbitration Rule 41(2) – see para. 43 *supra*), it *shall examine* them *ex officio* in default proceedings.

53    In *Kaiser Bauxite* v. *Jamaica*, the Government failed to appear. The Tribunal decided that the question of the jurisdiction of the Centre and the competence of the Tribunal should be dealt with as a preliminary issue. The Tribunal made a procedural order directing the Claimant to submit a memorial containing full argument on any issue of jurisdiction and competence and directing the Government to file a counter-memorial in reply. The Claimant filed its Memorial but the Government did not respond. The Tribunal said:

> 10. The Tribunal regrets that Jamaica has failed to appear and to bring forward any objections to the jurisdiction of the Centre and the competence of the Tribunal which it might entertain. The Tribunal, nevertheless, decided to examine its own jurisdiction *proprio motu* and in doing so to consider any objections which might be raised against its jurisdiction.[69]

---

67  See also *Nathan, K. V. S. K.*, Submission to the International Centre for Settlement of Investment Disputes in Breach of the Convention, 27 Journal of International Arbitration 39 *et seq.* (1995).

68  See also the parallel provision in Article 48(3) of the Arbitration (Additional Facility) Rules.

69  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 10.

The Tribunal proceeded to a detailed examination of the jurisdictional requirements, as set out in Art. 25 of the Convention, and concluded that the dispute was within the jurisdiction of the Centre and the competence of the Tribunal.[70]

The situation in *LETCO* v. *Liberia* was similar. The Government declined **54** to appear or present any case. The Tribunal requested both parties to submit their arguments concerning the jurisdiction of the Tribunal. LETCO submitted a Memorandum in support of jurisdiction, but Liberia did not respond.[71] The Tribunal undertook a detailed and systematic examination of all jurisdictional requirements and concluded:

> Given the fact that Liberia had failed to file a pleading in this dispute, the Tribunal has raised the question of jurisdiction of its own initiative and required LETCO to submit evidence on this question. The evidence submitted has proven beyond a reasonable doubt that this Tribunal has jurisdiction within the meaning of Article 25 of the Convention and that it may now proceed to a consideration of the substance of the dispute between the parties.[72]

In *Goetz* v. *Burundi* the Respondent was represented intermittently in the pro- **55** ceedings.[73] Burundi had reserved the right to raise jurisdictional objections but, in the end, had not done so. The Tribunal said:

> 78. No objection to the jurisdiction of the Centre or of the Tribunal has been raised by the Republic of Burundi in the course of the written or oral proceedings.
> 79. The Tribunal must do more, however, than make this statement, since Article 42 of the Arbitration Rules obliges it, if one party defaults or fails to put forward its side of the case, to examine whether the dispute is or is not "within the jurisdiction of the Centre and its own competence".[74]

The Tribunal proceeded to a full examination of the jurisdictional questions in the case.[75]

### C. ". . . that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, . . ."

#### *1. Jurisdiction and Competence*

In the Convention's terminology the word "jurisdiction" refers to the require- **56** ments set out in Art. 25, which are conditional for the power of a conciliation commission or arbitral tribunal. "Competence" refers to the narrower issues confronting a specific tribunal, such as its proper composition or *lis pendens*.[76] The

---

70  At paras. 11–25. For a description of the decision in a parallel case see *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in *Alcoa Minerals of Jamaica Inc.* v. *Government of Jamaica*, 17 Harvard International Law Journal 90, 98 *et seq.* (1976).

71  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348.

72  *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 353. This decision is reproduced as part of the final Award.

73  *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 50–57.

74  At paras. 78, 79.                        75  At paras. 80–85.

76  See also *Delaume, G. R.*, ICSID Arbitration Proceedings: Practical Aspects, 5 Pace Law Review 563, 577 (1985).

Convention's English text is consistent in distinguishing between the jurisdiction of the Centre and the competence of the Commission or Tribunal[77] (see Art. 25, paras. 15–17).

**57**    In practical terms, the distinction is of little consequence. Tribunals must be satisfied that both conditions are fulfilled. The two terms are frequently used interchangeably. Thus, when Art. 41(1) says that the tribunal shall be the judge of its own competence, it is clear that the tribunal must also judge whether the Centre has jurisdiction in the case before it. The inclusion of jurisdiction in the term competence is also clear from the wording of Art. 41(2). It speaks of an objection that the dispute is not within the Centre's jurisdiction *or for another reason* not within the tribunal's competence. Conversely, tribunals sometimes speak of their own jurisdiction.[78]

### 2. Jurisdictional Issues

**58**    The preparatory works to Art. 41(2) show an effort to detail the types of jurisdictional issues that a party may raise before a tribunal. The Working Paper listed the existence of a dispute, the scope of consent and the validity of consent. The Preliminary Draft added the nationality of a Contracting State (History, Vol. I, p. 188). In the ensuing debate, a number of delegates pointed out that this list of possible preliminary objections was incomplete (History, Vol. II, pp. 321, 324, 325, 407, 451). It was suggested to clarify that the list was non-exhaustive and was not intended to exclude other jurisdictional issues (at pp. 325, 406/7, 507, 567), or to refer to jurisdictional questions in general terms (at pp. 498, 543, 567). The First Draft and the Revised Draft speak of a claim that the dispute is not one in respect of which arbitration proceedings can be instituted pursuant to the Convention, or is not within the scope of consent (History, Vol. I, p. 190). Eventually, this formula was replaced by a general reference to the jurisdiction of the Centre or the competence of the Tribunal (History, Vol. II, p. 948).

**59**    The practice of ICSID tribunals shows a broad range of jurisdictional questions covering nearly all items listed in Art. 25. These questions are discussed in some detail in the Commentary on Art. 25. Therefore, it will suffice to list them here:
- the existence of a dispute (Art. 25, paras. 41–47);
- the legal nature of the dispute (Art. 25, paras. 57–73);
- the existence of an investment (Art. 25, paras. 113–210);
- the existence of a claim arising directly from an investment (Art. 25, paras. 83–112);

---

77  The Spanish text distinguishes between "jurisdicción" and "competencia". The French text uses "compétence" for both purposes.

78  See *e.g.*, *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 10; *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 52; Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 564, 565; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13, 18; *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 353.

- the status of one party as a Contracting State (Art. 25, paras. 211–220, 306–310);
- the status of a constituent subdivision or agency (Art. 25, paras. 230–267, 311–318);
- the nationality of the investor (Art. 25, paras. 635–639, 640–902);
- the status and identity of the investor (Art. 25, paras. 270–288, 319–373);
- the existence of consent to jurisdiction (Art. 25, paras. 374–512, 903–920);
- the scope of consent to jurisdiction (Art. 25, paras. 513–577);
- the interpretation of consent to jurisdiction (Art. 25, paras. 578–595);
- the withdrawal of consent (Art. 25, paras. 596–634).

In addition, parties to ICSID arbitration have at times put forward jurisdictional objections arising from Art. 26:

- the existence of another remedy (Art. 26, paras. 25–31, 34–43, 49–53, 73–109, 116–120, 135, 136–139);
- "fork in the road" clauses (Art. 26, paras. 55–72);
- litispendence (Art. 26, paras. 133–139);
- exhaustion of local remedies (Art. 26, paras. 208–217).

### D.  ". . . shall be considered by the Tribunal . . ."

#### *1. Procedure*

Arbitration Rule 41 provides in relevant part:                             **60**

> (3) Upon the formal raising of an objection relating to the dispute, the Tribunal may decide to suspend the proceeding on the merits. The President of the Tribunal, after consultation with its other members, shall fix a time limit within which the parties may file observations on the objection.
>
> (4) The Tribunal shall decide whether or not the further procedures relating to the objection made pursuant to paragraph (1) shall be oral. It may deal with the objection as a preliminary question or join it to the merits of the dispute. If the Tribunal overrules the objection or joins it to the merits, it shall once more fix time limits for the further procedures.[79]

An objection to jurisdiction over the dispute may lead to the suspension of    **61**
the proceedings on the merits. This is followed by an interim procedure dealing only with the jurisdictional questions. The interim procedure is to consist of an exchange of written observations and, possibly, oral hearings. Once the interim procedure has been completed and the jurisdictional objection has been rejected, the tribunal is to fix new time limits for the proceedings on the merits.

Under Arbitration Rule 41(3), as in force until April 2006, the suspension    **62**
of the proceedings upon the raising of jurisdictional objections was mandatory ("the proceeding on the merits shall be suspended"). The Arbitration Rules, as amended with effect from 10 April 2006, now provide for the tribunal's discretion in this respect ("the Tribunal may decide to suspend").

---

79   See also the parallel provision in Article 45(4) and (5) of the Arbitration (Additional Facility) Rules.

534                    THE ICSID CONVENTION: A COMMENTARY

**63**     ICSID tribunals have routinely suspended proceedings on the merits upon
receipt of an objection to jurisdiction.[80] Even where there is no published record
of a formal order to suspend, tribunals have in fact gone through a formal pre-
liminary procedure to determine jurisdiction.[81] Where the jurisdictional objection
related to a counter-claim, proceedings on the merits of the principal claim were
not suspended.[82]

**64**     In most of these cases, the tribunals made orders for written observations as
well as oral hearings. In a minority of cases, notably where only one of the parties
had appeared (see paras. 53, 54 *supra*), the tribunals restricted these proceedings
to written submissions.[83]

### 2. Obligation to Decide

**65**     Art. 41(2) directs the tribunal to consider jurisdictional objections but it does
not spell out, in terms, an obligation of the tribunal to decide jurisdictional issues.
Art. 48(3) provides that the award must deal with every question submitted to the
tribunal and give the reasons therefor. This obligation is repeated in Arbitration
Rule 47(1)(i). Therefore, it is clear that the tribunal must decide all jurisdictional
questions that have been raised by the parties.

**66**     In *SPP* v. *Egypt*, the Dissenting Opinion stated that the Tribunal had not found
it necessary to answer a jurisdictional objection by Egypt. This objection had
asserted that the Egyptian Law on which the Claimants had based jurisdiction
was not applicable since the claim related to the non-performance of obligations
under a contract. The dissent quotes from the Decision on Jurisdiction to the effect
that it was unnecessary to address this question since the Egyptian objection could
simply be answered by a recapitulation of certain facts.[84] However, an examination
of the criticized decision reveals that the recapitulation of facts was, in fact, a legal

---

80  See *e.g.*, *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.8; *Amco* v. *Indonesia*,
Decision on Jurisdiction, 25 September 1983, para. 3; *SOABI* v. *Senegal*, Decision on Jurisdic-
tion, 1 August 1984, para. 12; *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985,
para. 10; *Scimitar* v. *Bangladesh*, Award, 4 May 1994, para. 12; *Tradex* v. *Albania*, Decision
on Jurisdiction, 24 December 1996, 5 ICSID Reports 48; *Fedax* v. *Venezuela*, Decision on
Jurisdiction, 11 June 1997, para. 10; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999,
para. 7; *Gruslin* v. *Malaysia*, Award, 27 November 2000, para. 6.5; *CMS* v. *Argentina*, Decision
on Jurisdiction, 17 July 2003, para. 13; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 Decem-
ber 2003, para. 8; *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 13. See also *Shihata,
I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment
Disputes, 14 ICSID Review – FILJ 299, 321 (1999).
81  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports
543; *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984, 2 ICSID Reports 349;
*Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 17 (in this case, the Tribunal never
reached the merits); *Lanco* v. *Argentina*, Decision on Jurisdiction, 8 December 1998, para. 3.
82  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13–18; *Atlantic Triton* v.
*Guinea*, Award, 21 April 1986, 3 ICSID Reports 39.
83  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 7–9; *Benvenuti &
Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.7–1.12; *LETCO* v. *Liberia*, Award, 31
March 1986, 2 ICSID Reports 348/9.
84  *SPP* v. *Egypt*, Dissenting Opinion to Award of 20 May 1992, 3 ICSID Reports 252.

*Article 41 – Decision on Jurisdiction*                                    535

analysis that resulted in the conclusion that the alleged breach of the contractual obligations simultaneously constituted a breach of the Egyptian Law.[85]

Arbitration Rule 42(4) (see para. 52 *supra*) provides that, if a party fails to participate, the tribunal shall examine the jurisdiction of the Centre and its own competence and, if it is satisfied, decide the merits of the case. It follows that whereas in contested proceedings the tribunal must only decide those jurisdictional questions that have been raised by the parties, in default proceedings a full consideration on jurisdiction is mandatory.[86] Obviously, it is wise for a tribunal to also address all relevant jurisdictional questions in contested proceedings even if they are not raised by the parties.    **67**

The failure of a tribunal to account for the jurisdictional basis of its award may expose that award to annulment. Under Art. 52(1)(e) annulment may be requested on the ground that the award has failed to state the reasons on which it is based. The omission of a reasoning on jurisdiction relating to a point that is open to debate would fall into this category.    **68**

### 3. Form of Decision

The tribunal has essentially three possibilities to deal with jurisdictional questions:[87] first, it may decide the question by way of a separate preliminary decision; second, it may decide the question as part of the award on the merits; and third, it may make a finding that it does not have jurisdiction, a decision that is final by definition and hence an award.    **69**

A preliminary decision on jurisdiction will uphold jurisdiction at least in some matters. Otherwise it would not be preliminary. It terminates the interim procedure described above (paras. 60–64 *supra*) and opens the way to proceedings on the merits. Upon delivery of the award on the merits, the decision on jurisdiction becomes part of the final award especially for purposes of annulment and recognition. Art. 48(3) of the Convention, providing that the award shall deal with every question submitted to the tribunal and state the reasons upon which it is based, requires that a preliminary decision on jurisdiction should be reflected in the final award (see para. 78 *infra*).    **70**

The terminology of tribunals in denominating their interim decisions on jurisdiction has not been uniform. Neither the Convention nor the Arbitration Rules offer a clear designation. Tribunals have at times called preliminary decisions on jurisdiction "Award on Jurisdiction",[88] "Decision on Objections to Jurisdiction",[89]    **71**

---

85  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, paras. 67–69.
86  See Note E to Arbitration Rule 42 of 1968, 1 ICSID Reports 104.
87  See also Note E to Arbitration Rule 41 of 1968, 1 ICSID Reports 102.
88  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 4; Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 543.
89  *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.17; *Fedax* v. *Venezuela*, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997, 37 ILM 1378 (1998); *CSOB* v. *Slovakia*, Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999; *Maffezini* v. *Spain*, Decision of the Tribunal on Objections to Jurisdiction, 25 January 2000; *CMS* v. *Argentina*,

"Interim Award",[90] "Decision on Preliminary Objections to Jurisdiction"[91] and "Decision on Jurisdiction and Competence".[92] For practical reasons, "Decision on Jurisdiction" is to be preferred and is, in fact, followed by most tribunals.[93] The term "Award" is better avoided in this context to avoid confusion with final awards declining jurisdiction (see para. 73 *infra*).

**72**     If jurisdictional questions are joined to the merits (see paras. 79–84 *infra*), they will be decided as part of the final award. They are often addressed in an opening portion of the award to signal their preliminary nature.[94] If the jurisdictional question relates to an ancillary claim, such as a counter-claim, it may be disposed of in the context of the discussion of that claim.[95] It is evident that jurisdictional decisions made as part of the final award partake of that award's legal nature for purposes of annulment and recognition.

**73**     If a tribunal finds that it does not have jurisdiction over the case, this decision will be final. Arbitration Rule 41(6) provides:

> (6) If the Tribunal decides that the dispute is not within the jurisdiction of the Centre or not within its own competence, or that all claims are manifestly without legal merit, it shall render an award to that effect.[96]

This award should conform with all the requirements for awards in general as contained in Arts. 48 and 49. It should also contain a decision on costs in

---

Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003; *SGS* v. *Pakistan*, Decision of the Tribunal on Objections to Jurisdiction, 6 August 2003; *SGS* v. *Philippines*, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004; *LG&E* v. *Argentina*, Decision of the Tribunal on Objections to Jurisdiction, 30 April 2004; *Sempra* v. *Argentina*, Decision on Objections to Jurisdiction, 11 May 2005.

90  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348, 349.

91  *SPP* v. *Egypt*, Award, 20 May 1992, paras. 15, 24, 26; *Gas Natural* v. *Argentina*, Decision of the Tribunal on Preliminary Questions on Jurisdiction, 17 June 2005; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006.

92  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction and Competence, 6 July 1975; *IBM* v. *Ecuador*, Decision on Jurisdiction and Competence, 22 December 2003.

93  See *e.g.*, *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996; *Autopista* v. *Venezuela*, Decision on Jurisdiction, 27 September 2001; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004; *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005; *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007.

94  See *e.g.*, *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, paras. 4.1–4.2; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13–18; *Vivendi* v. *Argentina*, Award, 21 November 2000, paras. 40–55; *Genin* v. *Estonia*, Award, 25 June 2001, paras. 27, 319–335; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 6.1–17.7; *AIG* v. *Kazakhstan*, Award, 7 October 2003, paras. 9.1–9.4.9; *CDC* v. *Seychelles*, Award, 17 December 2003, paras. 3–6; *MTD* v. *Chile*, Award, 25 May 2004, paras. 90–97; *ADC* v. *Hungary*, Award, 2 October 2006, paras. 294–364; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 16, 26–191; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 234–266.

95  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 39.

96  See also the parallel provision in Article 45(7) of the Arbitration (Additional Facility) Rules.

accordance with Art. 61(2). An award declining jurisdiction is subject to the post-award remedies specified in Arts. 49(2) and 50–52.[97]

Tribunals that have found that the dispute before them was not within the jurisdiction of the Centre or not within their competence have issued awards to this effect.[98] **74**

### E. ". . . which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute."

#### 1. General

The Working Paper and the Preliminary Draft to the Convention provided in mandatory terms that the tribunal decide on jurisdictional objections as preliminary questions (History, Vol. I, p. 188; Vol. II, pp. 79, 206). Subsequent debates showed a strong preference for a solution that would let the tribunal decide whether to make a preliminary decision on jurisdiction or join the issue to the merits (History, Vol. II, pp. 270/1, 325, 407, 408/9, 507, 567). A solution opening that choice and modelled on the International Court of Justice's Rules was adopted in the First Draft and remained unchanged in the Revised Draft (History, Vol. I, p. 190) and in the Convention's final text. The two alternatives are repeated in the second sentence of Arbitration Rule 41(4) (see para. 60 *supra*). **75**

The choice between a preliminary decision and a joinder to the merits is a matter of procedural economy. It does not make sense to go through lengthy and costly proceedings dealing with the merits of the case unless the tribunal's jurisdiction has been determined authoritatively. On the other hand, some jurisdictional questions are so intimately linked to the merits of the case that it is impossible to dispose of them in preliminary form. **76**

#### 2. Preliminary Question

In the practice of ICSID tribunals, treatment of jurisdictional issues as preliminary questions is standard procedure. No specific reasons are given for this choice. The tribunal either formally declares the matter a preliminary question[99] **77**

---

97   See also Note F to Arbitration Rule 41 of 1968, 1 ICSID Reports 102.

98   *Vacuum Salt* v. *Ghana*, Award, 16 February 1994; *Scimitar* v. *Bangladesh*, Award, 4 May 1994; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997; *Banro* v. *DR Congo*, Award, 1 September 2000; *Gruslin* v. *Malaysia*, Award, 27 November 2000; *Mihaly* v. *Sri Lanka*, Award, 15 March 2002; *Zhinvali* v. *Georgia*, Award, 24 January 2003; *Soufraki* v. *UAE*, Award, 7 July 2004; *Joy Mining* v. *Egypt*, Award on Jurisdiction, 6 August 2004; *Lucchetti* v. *Peru*, Award, 7 February 2005; *Inceysa* v. *El Salvador*, Award, 2 August 2006; *Telenor* v. *Hungary*, Award, 13 September 2006; *Malaysian Historical Salvors* v. *Malaysia*, Award on Jurisdiction, 17 May 2007; *Fraport* v. *Philippines*, Award, 16 August 2007.

99   *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 6, 7; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.16; *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 79; *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 June 1997, para. 10; *Maffezini* v. *Spain*, Decision on Objections to Jurisdiction, 25 January 2000, para. 16; *Tokios Tokelés* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 11, 12; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, para. 46; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 16.

or simply suspends the proceedings on the merits (see para. 63 *supra*). Treatment of jurisdictional issues as preliminary questions is particularly important if the respondent defaults and therefore does not avail itself of the possibility to present jurisdictional objections (see paras. 53, 54 *supra*).

**78**    Tribunals have invariably incorporated preliminary decisions on jurisdiction into their final awards. This is done either by reference,[100] by reciting the conclusions of the preliminary decision,[101] by quoting the relevant portions of the decision on jurisdiction,[102] or by attaching the decision on jurisdiction to the final award.[103]

### 3. Joinder to the Merits

**79**    In a considerable number of cases tribunals have joined the consideration of jurisdictional questions to the merits of the case. In some cases the reasons for this decision are not apparent.[104] Tribunals deciding to join the jurisdictional question to the merits of the dispute sometimes stated that the questions of jurisdiction were closely related to the merits of the dispute,[105] that they were not yet ripe for decision,[106] or required a fuller examination of factual evidence.[107]

**80**    The need for a joinder to the merits is apparent where the answer to the jurisdictional questions depends on testimony and other evidence that can only be

---

100  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 4; Resubmitted Case: Award, 5 June 1990, paras. 25, 36; *Fedax* v. *Venezuela*, Award, 9 March 1998, para. 15; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 16; *Siemens* v. *Argentina*, Award, 6 February 2007, para. 24; *LG&E* v. *Argentina*, Award, 25 July 2007, para. 5.

101  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.12–1.16; *SPP* v. *Egypt*, Award, 20 May 1992, paras. 15, 24, 257; *Tradex* v. *Albania*, Award, 29 April 1999, para. 17; *Maffezini* v. *Spain*, Award, 13 November 2000, para. 21; *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 7; *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 27, 28; *CSOB* v. *Slovakia*, Award, 29 December 2004, paras. 3, 5; *CMS* v. *Argentina*, Award, 12 May 2005, para. 20; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 23, 32; *Tokios Tokelés* v. *Ukraine*, Award, 26 July 2007, para. 24.

102  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 349–354; *RFCC* v. *Morocco*, Award, 22 December 2003, paras. 29, 32–35; *CSOB* v. *Slovakia*, Award, 29 December 2004, paras. 41, 42; *PSEG* v. *Turkey*, Award, 19 January 2007, para. 5; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, para. 2.6.8.

103  *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 1.18; *Maffezini* v. *Spain*, Award, 13 November 2000, para. 22; *Olguín* v. *Paraguay*, Award, 26 July 2001, para. 29; *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 61; *Salini* v. *Jordan*, Award, 31 January 2006, para. 15; *Champion Trading* v. *Egypt*, Award, 27 October 2006, para. 12; *PSEG* v. *Turkey*, Award, 19 January 2007, para. 6; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 21, 22.

104  *AMT* v. *Zaire*, Award, 21 February 1997, para. 4.09; *Vivendi* v. *Argentina*, Award, 21 November 2000, paras. 17, 40–55; *AIG* v. *Kazakhstan*, Award, 7 October 2003, paras. 6.6, 9.1–9.4.9; *ADC* v. *Hungary*, Award, 2 October 2006, para. 25; *MCI* v. *Ecuador*, Award, 31 July 2007, para. 16; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 33, 234–266.

105  *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, paras. 4.1–4.2; *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 102.

106  *Genin* v. *Estonia*, Award, 25 June 2001, para. 27; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 257.

107  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 6.3; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 270, 284.

obtained through a full hearing of the case. This would be the case, in particular, if the jurisdictional questions are closely related to the merits and depend on the same factual questions. In such a case, the decision on jurisdiction can only be made after a full consideration of the evidence.

In *Tradex* v. *Albania*, the Albanian law offering consent to ICSID's jurisdiction limited that consent to disputes arising from expropriations. The Tribunal noted that the question of whether the alleged conduct of Albania could be considered an expropriation was relevant for purposes of jurisdiction but was also the decisive issue for the merits of the claim. The Tribunal dealt with all other jurisdictional matters in a separate Decision on Jurisdiction.[108] But it felt that a further examination of the question of whether an expropriation had taken place for purposes of establishing jurisdiction would be closely related to the merits. Therefore, it decided that it had jurisdiction subject to joining the issue of whether an expropriation had taken place to the merits.[109] The subsequent Award was based on the conclusion that the Claimant had been unable to prove an expropriation[110] (see Art. 25, para. 525).   **81**

In some cases certain jurisdictional issues were dealt with by way of a preliminary decision while others were joined to the merits.[111] In *SOABI* v. *Senegal*, the Respondent raised two distinct objections to the Tribunal's jurisdiction. One concerned the nationality of the Claimant. The Tribunal disposed of this question by way of a preliminary decision.[112] The second objection concerned the question whether the dispute was covered by the Parties' consent to jurisdiction (see Art. 25, paras. 558–559). The Decision on Jurisdiction concluded that this question required an in-depth examination of the evidence and consequently joined it to the merits.[113] The Award resumed the discussion of this question before dealing with the merits. It concluded that the jurisdictional objection must be rejected and that the Tribunal had jurisdiction over the dispute.[114]   **82**

In *Kardassopoulos* v. *Georgia* the Tribunal disposed of two of the Respondent's jurisdictional objections by way of a preliminary decision. It joined the third objection, relating to the Tribunal's jurisdiction *ratione temporis* under the BIT, to the merits, since whether the facts relevant to the alleged violations of the BIT occurred after the BIT's entry into force could only be determined after a full hearing of the case.[115] The Tribunal added the following general remark:   **83**

> 260. It is well settled that whenever a jurisdictional issue is closely related to the facts to be examined at the merits phase of the case, it can be joined to the

---

108  *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 47.
109  At pp. 62, 69.
110  *Tradex* v. *Albania*, Award, 29 April 1999, paras. 70, 91–93, 132–205.
111  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 3; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 271, 285.
112  *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 28–46.
113  At para. 62.
114  *SOABI* v. *Senegal*, Award, 25 February 1988, at paras. 2.15, 4.01–4.52.
115  *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 107, 257–261.

merits. The Tribunal's decision on jurisdiction here is closely related to the merits and will depend, to a large extent, on the same factual questions.[116]

**84**    If the jurisdictional question at issue relates not to the primary dispute but to an ancillary claim such as a counter-claim, the case in favour of joining it to the merits is strong. Considerations of expediency will usually militate in favour of proceeding with the main claim even if the question of jurisdiction over the ancillary claim is as yet undecided. In *Klöckner* v. *Cameroon* the Claimants' jurisdictional objections against the counter-claims were joined to the merits and decided in the Award.[117]

**85**    In *Fraport* v. *Philippines* the Tribunal opted for a different form of bifurcation of proceedings: it decided that the issues of jurisdiction and liability would be determined as part of the first phase and the issue of quantum, if required, as part of the second phase.[118] As it turned out, the Tribunal declined jurisdiction and issued an award to that effect.

### 4. Prima Facie *Test*

**86**    Tribunals have developed a practice under which they will apply a *prima facie* test as to the merits of the case at the stage of determining jurisdiction.[119] It is applied especially where the claim alleges the violation of a treaty that is invoked as the basis of jurisdiction. This test is traced back to the Separate Opinion of Judge Higgins in the *Oil Platforms* case.[120] It requires that the facts alleged by the claimant, if established, are capable of forming the basis for a treaty violation.

**87**    Tribunals have applied this test in a large number of cases. It does not appear to be controversial in principle.[121] In *Siemens* v. *Argentina* the Respondent argued that

---

116  At para. 260. Footnote omitted.
117  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13–18.
118  *Fraport* v. *Philippines*, Award, 16 August 2007, para. 14.
119  For detailed treatment see *Sheppard, A.*, The Jurisdictional Threshold of a Prima Facie Case, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 932 (2008).
120  *Oil Platforms* (*Iran* v. *United States*), Preliminary Objection, Judgment, Separate Opinion of Judge Higgins, 12 December 1996, ICJ Reports 1996, p. 847 at 856, para. 33: "The Court should thus see if, on the facts as alleged by Iran, the United States actions complained of might violate the Treaty articles."
121  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 38; *Wena Hotels* v. *Egypt*, Decision on Jurisdiction, 29 June 1999, 6 ICSID Reports 86; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 99; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, paras. 26, 159, 161, 162; *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 29, 30; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 151; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 118–119, 132; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 87; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, paras. 59–63; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 40–45, 109; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 69–71; *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 84iv; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, paras. 73, 81, 91, 94; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, paras. 139–141; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 103, 104; *MCI* v. *Ecuador*, Award,

Siemens was pursuing contract claims for which the domestic courts were competent. Siemens insisted that its claims pertained to violations of the Argentina-Germany BIT. The Tribunal said in its Decision on Jurisdiction:

> At this stage of the proceedings, the Tribunal is not required to consider whether the claims under the Treaty made by Siemens are correct. This is a matter for the merits. The Tribunal simply has to be satisfied that, if the Claimant's allegations would be proven correct, then the Tribunal has jurisdiction to consider them.[122]

In *Impregilo* v. *Pakistan* the issue before the Tribunal was also whether the **88** claims put forward qualified as treaty claims. It examined the practice of the ICJ as well as of previous investment tribunals in some detail and reached the following conclusion:

> The present Tribunal is in full agreement with the approach evident in this jurisprudence. It reflects two complementary concerns: to ensure that courts and tribunals are not flooded with claims which have no chance of success, or may even be of an abusive nature; and equally to ensure that, in considering issues of jurisdiction, courts and tribunals do not go into the merits of cases without sufficient prior debate. In conformity with this jurisprudence, the Tribunal has considered whether the facts as alleged by the Claimant in this case, <u>if</u> established, are capable of coming within those provisions of the BIT which have been invoked.[123]

In *Bayindir* v. *Pakistan* the issue was once again whether the Claimant's treaty **89** claims were sufficiently substantiated for jurisdictional purposes.[124] After quoting from the decision in *Impregilo*, the Tribunal said:

> the Tribunal's first task is to determine the meaning and scope of the provisions which Bayindir invokes as conferring jurisdiction and to assess whether the facts alleged by Bayindir fall within those provisions or are capable, if proved, of constituting breaches of the obligations they refer to. In performing this task, the Tribunal will apply a *prima facie* standard, both to the determination of the meaning and scope of the BIT provisions and to the assessment whether the facts alleged may constitute breaches. If the result is affirmative, jurisdiction will be established, but the existence of breaches will remain to be litigated on the merits.[125]

In *Pan American* v. *Argentina* the parties disagreed as to which questions were **90** to be addressed as jurisdictional ones.[126] The Respondent took an extensive view of what belonged to the jurisdictional sphere while the Claimants took a restrictive position.[127] The Tribunal said:

---

31 July 2007, paras. 162, 163; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 143–165; *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, paras. 66–67.

122 *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 180.
123 *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, para. 254. Emphasis original.
124 *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 185–196.
125 At para. 197. Footnote omitted.
126 *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 43–51, 131.
127 At para. 43.

> the issue is not whether the claim is well-founded on the merits, but whether, in the way in which it is stated, it fits into the jurisdictional framework designed by the relevant arbitration clause.[128]

**91**    In *Saipem* v. *Bangladesh* the Tribunal summarized the issue in the following terms:

> the Tribunal's task is to determine the meaning and scope of the provisions upon which Saipem relies to assert jurisdiction and to assess whether the facts alleged by Saipem fall within those provisions or would be capable, if proven, of constituting breaches of the treaty obligations involved. In performing this task, the Tribunal will apply a *prima facie* standard, both to the determination of the meaning and scope of the relevant BIT provisions and to the assessment whether the facts alleged may constitute breaches of these provisions. In doing so, the Tribunal will assess whether Saipem's case is reasonably arguable on its face. If the result is affirmative, jurisdiction will be established, but the existence of breaches will remain to be litigated on the merits.[129]

**92**    In *Telenor* v. *Hungary*, under the terms of the applicable BIT, the Claimant had to prove the existence of an expropriation in order to establish jurisdiction (see Art. 25, para. 574). The Tribunal reached the conclusion that, on the basis of the facts as pleaded by Telenor, it had failed to make out a *prima facie* case of expropriation.[130] The case was consequently dismissed.

### 5. Summary Procedure

**93**    In April 2006 an amendment to the Arbitration Rules introduced a summary or expedited procedure. The newly inserted Arbitration Rule 41(5) provides as follows:

> (5) Unless the parties have agreed to another expedited procedure for making preliminary objections, a party may, no later than 30 days after the constitution of the Tribunal, and in any event before the first session of the Tribunal, file an objection that a claim is manifestly without legal merit. The party shall specify as precisely as possible the basis for the objection. The Tribunal, after giving the parties the opportunity to present their observations on the objection, shall, at its first session or promptly thereafter, notify the parties of its decision on the objection. The decision of the Tribunal shall be without prejudice to the right of a party to file an objection pursuant to paragraph (1) or to object, in the course of the proceeding, that a claim lacks legal merit.[131]

**94**    The idea behind this provision is to efficiently dispose of cases that are manifestly without merit. The Secretary-General's screening power under Art. 36(3) is limited to ascertaining whether the dispute is manifestly outside the Centre's jurisdiction. It does not extend to the merits of a case. Therefore, even if the

---

128   At para. 47.
129   *Saipem* v. *Bangladesh*, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, para. 91. See also paras. 83–93, 129–134, 144–147, 149.
130   *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 34, 53, 68, 80.
131   See also the parallel provision in Article 45(6) of the Arbitration (Additional Facility) Rules.

Secretary-General believes that a claim is manifestly unmeritorious, he or she is under an obligation to register the case.

The procedure under this provision is considerably accelerated as compared **95** to proceedings triggered by an objection to jurisdiction. Whereas the filing of an objection to jurisdiction is to be made within the time limit for the filing of the counter-memorial, the summary procedure must be initiated within 30 days of the tribunal's constitution and before its first session. The tribunal's decision is to be made at its first session or shortly thereafter. It follows that the decision under the summary procedure will be made before the tribunal has had an opportunity to examine matters of jurisdiction and competence.

Where jurisdiction and merits are closely connected (see paras. 79–85 *supra*), **96** the summary proceedings may also address jurisdiction. For instance, if the basis of jurisdiction is limited to expropriation, an objection asserting that there was manifestly no expropriation may relate to both jurisdiction and the merits.

Before making its decision, the tribunal must give the parties the opportunity to **97** present their observations on the objection. These observations will normally be limited to written statements. If the decision is given at the tribunal's first session there will be no opportunity for a hearing on the request for summary dismissal. Nevertheless, the parties' observations will require an orderly procedure with time limits for the filing of statements. Failure to give both parties a full opportunity to be heard is likely to lead to a charge of a serious departure from a fundamental rule of procedure with the consequence of a possible annulment under Art. 52(1)(d).

Arbitration Rule 41(5) refers to lack of *legal* merit. This and the summary **98** nature of the procedure imply that the tribunal will not entertain factual evidence at this stage. The lack of legal merit would have to be evident from the claimant's assertions as set out in the request for arbitration.

The objection leading to the summary procedure must state that a claim is **99** manifestly without legal merit. It need not state that the entire case is without legal merit. Therefore, it is possible that a tribunal disposes of one of several claims by way of a summary decision under Arbitration Rule 41(5) while proceeding with other claims. Even if the respondent objects to all claims as being manifestly without legal merit, the tribunal may still uphold the objection with respect to some claims while rejecting it with respect to others.

If the tribunal's decision upholds the objection in summary proceedings with **100** respect to all claims it will have to issue an award (see Art. 48, para. 22). In accordance with Arts. 48(3) and 52(1)(e) such an award will have to state the reasons on which it is based. If the decision dismisses the objection it will also have to state reasons in accordance with the established practice of ICSID tribunals (see Art. 48, paras. 88–91). But a decision that declines a summary disposal of claims and hence reserves full examination of the merits to a future award requires less elaborate reasoning.

If the tribunal dismisses the objection in the summary proceedings, the right to **101** raise jurisdictional objections remains unaffected. Equally, the right to object that

a claim lacks merit is unaffected by a prior dismissal of an objection in summary proceedings. But it is doubtful whether a party should be allowed to insist on the application of the *prima facie* test at the stage of jurisdiction (see paras. 86–92 *supra*) once its objection that a claim is manifestly without legal merit has been dismissed in summary proceedings.

**102**     The summary procedure introduced by Arbitration Rule 41(5) may enable tribunals to dispose of evidently unmeritorious and abusive claims in some cases.[132] In many cases it is likely to lead to an additional procedural layer, thereby delaying proceedings and increasing costs.

---

132  For an early application of Arbitration Rule 41(5) see *Trans-Global Petroleum* v. *Jordan*, Decision on Respondent's Objection under Rule 41(5), 12 May 2008.

# Article 42

---

**(1) The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.**

**(2) The Tribunal may not bring in a finding of *non liquet* on the ground of silence or obscurity of the law.**

**(3) The provisions of paragraphs (1) and (2) shall not prejudice the power of the Tribunal to decide a dispute *ex aequo et bono* if the parties so agree**.

## OUTLINE

*Paragraphs*

I.  INTRODUCTION    1–20
   A.  Purpose    1–2
   B.  The Law Applicable to Procedure, Jurisdiction and Nationality    3–12
   C.  Methodology    13
   D.  Proper Law and Nullity    14–20
II.  INTERPRETATION    21–279
   A.  **"(1) The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties."**    21–132
      1.  Freedom of Choice    21
      2.  Modality of Choice    22–23
      3.  The Law Chosen by the Parties    24–38
         a)  The Law of the Host State    24–26
         b)  The Law of a Third State    27–32
         c)  International Law    33–36
         d)  The Law of the Contract    37–38
      4.  Choice of Law or Choice of Rules    39–42
      5.  Limits on Choice of Law    43–52
         a)  Reasonable Connection    43
         b)  Mandatory Provisions of the Host State's Law    44–47
         c)  Public Policy    48–52
      6.  *Renvoi*    53–55
      7.  Supervening Choice of Law    56–61
      8.  Indirect and Implicit Choice of Law    62–95
         a)  Choice of Law by Reference to Domestic Legislation    63–69
         b)  Choice of Law through the Parties' Submissions    70–79

|   | c) Reliance on a Clause on Applicable Law in a Treaty | 80–88 |
|   | d) Reliance on a Treaty as an Implicit Choice of International Law | 89–95 |
| 9. | The Applicability of International Law | 96–115 |
|   | a) International Law as the Chosen Law | 96–99 |
|   | b) International Law as Part of Domestic Law | 100–103 |
|   | c) International Law in the Absence of its Choice | 104–115 |
| 10. | Subsequent Changes in the Chosen Law | 116–132 |
|   | a) Stabilization Clauses | 117–128 |
|   | b) In the Absence of Stabilization Clauses | 129–132 |
| B. | **"In the absence of such agreement, . . ."** | 133–137 |
| C. | **". . . the Tribunal shall apply the law of the Contracting State party to the dispute . . ."** | 138–160 |
| 1. | The Decision in Favour of the Host State's Law | 138–142 |
| 2. | Application of the Host State's Law by ICSID Tribunals | 143–152 |
| 3. | Limits on the Application of the Host State's Law | 153–159 |
|   | a) International Law | 153 |
|   | b) The Host State's Capacity to Submit to Arbitration | 154–156 |
|   | c) The Investor's Legal Status | 157–159 |
| 4. | Subsequent Changes in the Host State's Law | 160 |
| D. | **". . . (including its rules on the conflict of laws) . . ."** | 161–166 |
| E. | **". . . and such rules of international law . . ."** | 167–191 |
| 1. | Rules or Principles of International Law | 167–168 |
| 2. | Finding the Rules of International Law | 169–191 |
|   | a) Treaties | 171–174 |
|   | b) Customary International Law | 175–177 |
|   | c) General Principles of Law | 178–182 |
|   | d) Judicial Decisions | 183–187 |
|   | e) Writings | 188 |
|   | f) Resolutions and Guidelines | 189–191 |
| F. | **". . . as may be applicable."** | 192–244 |
| 1. | Applicability of International Law to Investment Disputes | 192–198 |
|   | a) Reliance of Private Parties on International Law | 192–197 |
|   | b) International Nature of Investment Disputes | 198 |
| 2. | Which Rules of International Law are Applicable? | 199–203 |
| 3. | The Relationship of International Law to Domestic Law | 204–244 |
|   | a) Parallel Application of International and Domestic Law | 206–213 |
|   | b) Supplemental and Corrective Function of International Law | 214–235 |
|   | c) Autonomous Application of Both Legal Systems | 236–244 |
| G. | **"(2) The Tribunal may not bring in a finding of *non liquet* on the ground of silence or obscurity of the law."** | 245–248 |

H. **"(3) The provisions of paragraphs (1) and (2) shall not
   prejudice the power of the Tribunal to decide a dispute
   *ex aequo et bono* if the parties so agree."**                          249–279
   1. General Meaning                                                      249–253
   2. Agreement on Decision *ex aequo et bono*                             254–265
      a) Drafting the Agreement                                           254–256
      b) Supervening Agreement                                            257–259
      c) Necessity of an Agreement                                        260–265
   3. The Relationship of Equity to Law                                    266–271
      a) Application of Equity and Law                                    266–268
      b) Equity Within the Law                                            269–271
   4. Limits on Equity                                                     272–275
   5. Decisions *ex aequo et bono* by ICSID Tribunals                      276–279

# BIBLIOGRAPHY

*Banifatemi, Y.* (ed.), Precedent in International Arbitration (2008);

*Begic, T.*, Applicable Law in International Investment Disputes (2005);

*Ben Hamida, W.*, L'arbitrage transnational unilatéral. Réflexions sur une procédure réservée à
   l'initiative d'une personne prive contre une personne public (Thèse pour le Doctorat en droit
   de l'Université Panthéon-Assas, Paris II) (2003);

*Bjorklund, A.*, Investment Treaty Arbitral Decisions as *Jurisprudence Constante*, *in*: International
   Economic Law: The State and Future of the Discipline (*Picker, C./Bunn, I./Arner, D.* eds.)
   (2008);

*Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nation-
   als of Other States, 136 Recueil des Cours 331 at 381–395 (1972-II);

   Convention on the Settlement of Investment Disputes between States and Nationals of Other
   States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook of Commercial
   Arbitration 627 at 666–674 (1993);

*Cheng, Tai-Heng*, Precedent and Control in Investment Treaty Arbitration, 30 Fordham Interna-
   tional Law Journal 1014 (2007);

*Cherian, J.*, Investment Contracts and Arbitration, The World Bank Convention on the Settlement
   of Investment Disputes 74 (1975);

*Chukwumerije, O.*, International Law and Municipal Law in ICSID Arbitration, 1 Canadian
   Journal of International Business Law and Policy 61 (1996);

*Commission, J. P.*, Precedent in Investment Treaty Arbitration: A Citation Analysis of a Developing
   Jurisprudence, 24 Journal of International Arbitration 129 (2007);

   Precedent in Investment Treaty Arbitration: The Empirical Backing, TDM, March (2007);

*Crawford, J.*, Similarity of Issues in Disputes Arising under the Same or Similarly Drafted
   Investment Treaties, *in*: Precedent in International Arbitration (*Banifatemi, Y.* ed.) 97 (2008);

*Curtis, C. T.*, The Legal Security of Economic Development Agreements, 29 Harvard International
   Law Journal 317 (1988);

*Delaume, G. R.*, Le Centre International pour le règlement des Différends relatifs aux Investisse-
   ments (CIRDI), 109 Journal du Droit International 775 at 825–835 (1982);

The Proper Law of State Contracts and the *Lex Mercatoria*: A Reappraisal, 3 ICSID Review –
     FILJ 79 (1988);

L'affaire du Plateau des Pyramides et le CIRDI: Considérations sur le droit applicable, Revue
     de l'arbitrage 39 (1994);

The Proper Law of State Contracts Revisited, 12 ICSID Review – FILJ 1 (1997);

*Di Pietro, D.*, Applicable Law under Article 42 of the ICSID Convention – The Case of *Amco*
     v. *Indonesia*, *in*: International Investment Law and Arbitration – Leading Cases from the
     ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 223–279
     (2005);

*Douglas, Z.*, Nothing if Not Critical for Investment Treaty Arbitration: *Occidental, Eureko and
     Methanex*, 22 Arbitration International 27 (2006);

*Elombi, G.*, ICSID Awards and the Denial of Host State Law, 11 Journal of International Arbitration
     61 (1994);

*Feuerle, P.*, International Arbitration and Choice of Law under Article 42 of the Convention on
     the Settlement of Investment Disputes, 4 Yale Studies in World Public Order 89 (1977);

*Firth, Th. V.*, The Law Governing Contracts in Arbitration under the World Bank Convention, 1
     New York University Journal of International Law and Politics 253 (1968);

*Gaillard, E.*, The Extent of Review of the Applicable Law in Investment Treaty Arbitration, *in*:
     Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 190–205 (2004);

*Gaillard, E./Banifatemi, Y.*, The Meaning of "and" in Article 42(1), Second Sentence, of the
     Washington Convention: The Role of International Law in the ICSID Choice of Law Process,
     18 ICSID Review – FILJ 375 (2003);

*Giardina, A.*, La legge regolatrice dei contratti di investimento nel sistema ICSID, 18 Rivista di
     diritto internazionale privato e processuale 677 (1982);

International Investment Arbitration: Recent Developments as to the Applicable Law and
     Unilateral Recourse, 5 The Law and Practice of International Courts and Tribunals 29 (2006);

*Gill, J.*, Inconsistent Decisions: An Issue to be Addressed or a Fact of Life?, *in*: Investment Treaty
     Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 23 (BIICL 2006);

*Goldman, B.*, Le droit applicable selon la Convention de la B.I.R.D., du 18 mars 1965, pour le
     règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres
     Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Con-
     vention B.I.R.D. 133 (1969);

*Guillaume, G.*, Can Arbitral Awards Constitute a Source of International Law under Article 38 of
     the Statute of the International Court of Justice?, *in*: Precedent in International Arbitration
     (*Banifatemi, Y.*, ed.) 105 (2008);

*Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment
     Disputes 109–153 (1993);

Interactions between Investment and Non-Investment Obligations, *in*: The Oxford Handbook
     of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 154 (2008);

*Igbokwe, V. C.*, Developing Countries and the Law Applicable to International Arbitration of Oil
     Investment Disputes, 14 Journal of International Arbitration 99 (1997);

Determination, Interpretation and Application of Substantive Law in Foreign Investment Treaty
     Arbitrations, 23 Journal of International Arbitration 267 (2006);

*Kahn, P.*, The Law Applicable to Foreign Investments: The Contribution of the World Bank
     Convention on the Settlement of Investment Disputes, 44 Indiana Law Journal 1 (1968);

*Kaufmann-Kohler, G.*, Arbitral Precedent: Dream, Necessity or Excuse?, 23 Arbitration International 357 (2007);

Is Consistency a Myth?, *in*: Precedent in International Arbitration (*Banifatemi, Y.* ed.) 137 (2008);

*Kreindler, R.*, The Law Applicable to International Investment Disputes, *in*: Arbitrating Foreign Investment Disputes – Procedural and Substantive Legal Aspects (*Horn, N.* ed.) 401–424 (2004);

*Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642 at 652–662 (1968);

Aspects of the Administration of International Justice 117–152 (1991);

*Leben, C.*, La Théorie du contrat d'état et l'évolution du droit international des investissements, 302 Recueil des Cours 199 (2003);

*Lillich, R. B.*, The Law Governing Disputes under Economic Development Agreements: Re-examining the Concept of "Internationalization", *in*: International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? (*Lillich, R. B./Brower, C. N.* eds.) 61 (1993);

*Masood, A.*, Law Applicable in Arbitration of Investment Disputes under the World Bank Convention, 15 Journal of the Indian Law Institute 311 (1973);

*Nassar, N.*, Internationalization of State Contracts: ICSID, The Last Citadel, 14 Journal of International Arbitration 185 (1997);

*Parra, A. R.*, Applicable Substantive Law in ICSID Arbitrations Initiated under Investment Treaties, 16 ICSID Review – FILJ 20 (2001);

Applicable Law in Investor-State Arbitration, TDM, November (2007);

*Reinisch, A.*, The Role of Precedent in ICSID Arbitration, *in*: Austrian Arbitration Yearbook 495 (2008);

*Reisman, W. M.*, The Regime for *Lacunae* in the ICSID Choice of Law Provision and the Question of Its Threshold, 15 ICSID Review – FILJ 362 (2000);

*Reisman, W. M./Arsanjani, M. H.*, The Question of Unilateral Governmental Statements as Applicable Law in Investment Disputes, 19 ICSID Review – FILJ 328 (2004);

*Sacerdoti, G.*, Investment Arbitration under ICSID and UNCITRAL Rules: Prerequisites, Applicable Law, Review of Awards, 19 ICSID Review – FILJ 1 (2004);

*Schreuer, C.*, Decisions Ex Aequo et Bono under the ICSID Convention, 11 ICSID Review – FILJ 37 (1996);

International and Domestic Law in Investment Disputes. The Case of ICSID, 1 Austrian Review of International and European Law 89 (1996);

Failure to Apply the Governing Law in International Investment Arbitration, 7 Austrian Review of International and European Law 147 (2002);

Diversity and Harmonization of Treaty Interpretation in Investment Arbitration, TDM, Vol. 3, #2, April (2006);

*Schreuer, C./Weiniger, M.*, A Doctrine of Precedent?, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1188 (2008);

*Shihata, I. F. I./Parra, A. R.*, Applicable Substantive Law in Disputes Between States and Private Foreign Parties: The Case of Arbitration under the ICSID Convention, 9 ICSID Review – FILJ 183 (1994);

*Spiermann, O.*, Applicable Law, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 89 (2008);

*Tawil, G. S.*, Applicable Law, *in*: Course on Dispute Settlement. International Centre for Settlement of Investment Disputes (*UNCTAD* ed.) (2003);

*Wälde, T.*, Alternatives for Obtaining Greater Consistency in Investment Arbitration, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 135 (BIICL 2006);

    Confidential Awards as Precedent in Arbitration: Dynamics and Implication of Award Publication, *in*: Precedent in International Arbitration (*Banifatemi, Y.* ed.) 113 (2008);

*Weil, P.*, The State, the Foreign Investor, and International Law: The No Longer Stormy Relationship of a *Ménage à Trois*, 15 ICSID Review – FILJ 401 (2000).

# I. INTRODUCTION

## A. Purpose

**1**    The Convention does not provide substantive rules for the relationship between host States and foreign investors. It is merely designed to establish a procedural framework for the settlement of investment disputes. Suggestions, made in the course of the Convention's drafting, to offer some substantive guidance to tribunals (History, Vol. II, pp. 418 *et seq.*) were not pursued (at pp. 465, 472, 570). Doing so would have led to insurmountable difficulties in trying to reconcile sharply conflicting positions and would have endangered the entire project. At the same time, it was considered necessary to offer some legal security and predictability concerning the outcome of arbitration proceedings.

**2**    Art. 42 provides a mechanism whereby the tribunal is to select the appropriate rules of law for the particular dispute. It is designed to combine flexibility with certainty. Flexibility by granting maximum autonomy to the parties in choosing rules, certainty by ensuring that the tribunal will find appropriate rules even in the absence of such a choice. The aim of flexibility is served by the first sentence of para. (1), on agreement by the parties, and by para. (3), extending party autonomy to equitable principles. The aim of certainty is served by the second sentence of para. (1), designating the host State's law in conjunction with international law as the applicable law in the absence of agreement, and by para. (2), prohibiting a finding of *non liquet* by the tribunal.

## B. The Law Applicable to Procedure, Jurisdiction and Nationality

**3**    Art. 42 addresses only the substantive law to be applied, not procedure.[1] Art. 44 of the Convention unequivocally provides that arbitration proceedings are regulated exhaustively by the Convention itself and by the rules adopted under it subject to any agreement by the parties. In the absence of guidance within the

---

1    *Hirsch*, The Arbitration Mechanism, p. 110; *Goldman*, Le droit applicable, pp. 138 *et seq.*

*Article 42 – Applicable Law*                    551

Convention's system, the tribunal is to decide any procedural question independently of outside regulations[2] (see Art. 44, para. 3).

Similarly, Art. 42 does not govern questions of the tribunal's jurisdiction under **4** Art. 25 (see also paras. 154–156 *infra*). In *SPP* v. *Egypt*, jurisdiction was based on a provision of Egyptian law (see Art. 25, paras. 400–404). Egypt contended that the jurisdictional issues were governed by Egyptian law by virtue of Art. 42(1). This would have led to the application of sections 501 and 502 of the Egyptian Code of Civil Procedure, which require a specific and independent *compromis* or a special agreement for arbitration. Since these requirements had not been fulfilled, this argument would have led to a denial of the ICSID tribunal's jurisdiction.[3] The Claimants' contention that the provision of municipal law providing for ICSID jurisdiction should be treated as a mere fact or should be construed in accordance with the rules of treaty interpretation did not find favour with the Tribunal. Still, the Tribunal rejected Egypt's argument that its own interpretation of an ICSID clause in its legislation was controlling. Instead, it pointed out that the statutory provision, which SPP claimed to be a unilateral acceptance of the Centre's jurisdiction, would have to be considered in light of the international law governing unilateral juridical acts.[4] After referring to decisions of the Permanent Court of International Justice and of the International Court of Justice on unilateral consent to jurisdiction, the Tribunal concluded:

> . . . in deciding whether in the circumstances of the present case Law No. 43 constitutes consent to the Centre's jurisdiction, the Tribunal will apply general principles of statutory interpretation taking into consideration, where appropriate, relevant rules of treaty interpretation and principles of international law applicable to unilateral declarations.[5]

In *CSOB* v. *Slovakia*, jurisdiction was based on an agreement between the **5** parties (see Art. 25, para. 390). The Tribunal held:

> 35. The question of whether the parties have effectively expressed their consent to ICSID jurisdiction is not to be answered by reference to national law. It is governed by international law as set out in Article 25(1) of the ICSID Convention.[6]

In *Siemens* v. *Argentina*, the Tribunal had to assess its treaty-based jurisdic- **6** tion. It rejected Argentina's argument that the provision on applicable law in the Argentina/Germany BIT governed questions of jurisdiction:

> 31. Argentina in its allegations has not distinguished between the law applicable to the merits of the dispute and the law applicable to determine the Tribunal's jurisdiction. This being an ICSID Tribunal, its jurisdiction is governed by Article 25 of the ICSID Convention and the terms of the instrument expressing the parties' consent to ICSID arbitration, namely, Article 10 of the Treaty.

---

2  See *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 357.
3  See also a similar argument in *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 4.54, 4.55.
4  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, paras. 55 *et seq*.
5  At para. 61. *Cf.* also the Dissenting Opinion to this decision at 3 ICSID Reports 170, 177 and 186.
6  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 35.

> Therefore, the Tribunal needs to assess whether the Request for Arbitration meets the requirements of Article 25 of the ICSID Convention and of Article 10 of the Treaty.[7]

**7**    The prevailing view, that Art. 42 does not address questions of jurisdiction, was reaffirmed in the Decision on Jurisdiction in *CMS* v. *Argentina*.[8] The Tribunal held:

> 88. Article 42 is mainly designed for the resolution of disputes on the merits and, as such, it is in principle independent from the decisions on jurisdiction, governed solely by Article 25 of the Convention and those other provisions of the consent instrument which might be applicable, in the instant case the Treaty provisions. However, the argument of the Republic of Argentina has merit in so far as the parties can agree to a different choice of law applicable also to jurisdictional questions. The very option the investor has under the Treaty to submit a dispute to local jurisdiction also involves to an extent a choice of law provision, as local courts will apply mainly domestic law. In such a case, domestic law might apply together with the Treaty and Convention or separately.[9]

**8**    Other tribunals have confirmed that the law applicable to the tribunal's jurisdiction were the provisions of the BIT and Art. 25.[10] A minority of tribunals have recognized a role for the host State's domestic law in determining jurisdiction.[11]

**9**    Another issue that is not governed by the rule of Art. 42 is the nationality of the investor. The nationality of a natural person is determined primarily by the law of the State whose nationality is claimed (see Art. 25, paras. 641–647). In *Soufraki* v. *UAE* the Tribunal reaffirmed the primary relevance of the law of the State whose nationality is claimed. The Tribunal also emphasized that it had jurisdiction to scrutinize whether the nationality requirements under domestic law were fulfilled:

> 55. It is accepted in international law that nationality is within the domestic jurisdiction of the State, which settles, by its own legislation, the rules relating to the acquisition (and loss) of its nationality. Article 1(3) of the BIT reflects this rule. But it is no less accepted that when, in international arbitral or judicial proceedings, the nationality of a person is challenged, the international tribunal is competent to pass upon that challenge. It will accord great weight to the

---

7   *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 31; see also *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, paras. 48–50.

8   *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 42, 87–89.

9   At para. 88. To the same effect: *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 68.

10  *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 38; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 34–39; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 15–17, 57; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 25–28; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 65–68; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 68–70, 78–82; *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 56, 57.

11  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 296–301, 339; *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 131, 222–264.

*Article 42 – Applicable Law*    553

nationality law of the State in question and to the interpretation and application of that law by its authorities. But it will in the end decide for itself whether, on the facts and law before it, the person whose nationality is at issue was or was not a national of the State in question and when, and what follows from that finding. [ . . . ][12]

The nationality of a juridical person is determined by the criteria of incorporation or seat of the company in question subject to pertinent agreements, treaties and legislation (see Art. 25, paras. 694–740). This view was expressly endorsed by the decision on jurisdiction in *AES* v. *Argentina* which rejected the assertion of the host State that Art. 42 would be applicable to issues on nationality.[13] The law of the investor's nationality also governs the investor's status and legal capacity (see paras. 157–159 *infra*).    **10**

An issue related to nationality is the problem of *jus standi*, in particular of minority shareholders, to submit claims to ICSID. It is not governed by Art. 42. Rather, it is determined according to the applicable international investment agreements and Art. 25 (see Art. 25, para. 150). In the Decision on Preliminary Objections in *Pan American* v. *Argentina*, the Tribunal rejected the host State's view that the law applicable to the merits would also determine the existence of *jus standi* for the Claimants.[14] Instead, it found that    **11**

> the instant case is not situated at the level of general international law but at that of treaty law – the BIT and the ICSID Convention – and the Claimants have established that the applicable Treaty deviates from *Barcelona Traction*, allowing, *inter alia*, claims based on direct or indirect shareholdings of nationals of one Contracting State in companies of another Contracting State.[15]

The same solution was reached in the Decision on Jurisdiction in the case of *CMS* v. *Argentina*. Argentina had challenged the ability of minority shareholders to institute ICSID proceedings on the basis of domestic law provisions "in that country, as in most civil and common law countries, to the effect that the corporate legal personality is distinct and separate from that of the shareholders".[16] The *CMS* Tribunal, however, did not consider this legal distinction of Argentinian law "determinant" because it found that "the applicable jurisdictional provisions are only those of the Convention and the BIT, not those which might arise from national legislation".[17]    **12**

---

12  *Soufraki* v. *UAE*, Award, 7 July 2004, para. 55. See also *Champion Trading* v. *Egypt*, Decision on Jurisdiction, 21 October 2003, sec. 3.4.1; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, paras. 195–201; *Micula* v. *Romania*, Decision on Jurisdiction, 24 September 2008, paras. 86, 101.

13  *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 78, citing the First Edition of this Commentary.

14  *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 192–193.

15  At para. 217.

16  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 42.

17  *Loc. cit.* This finding was explicitly endorsed by the *ad hoc* Committee: *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 68.

## C. Methodology

**13**    A municipal court having to decide which system of law is applicable to a dispute is guided by the rules of private international law of the *lex fori*. The *lex fori* containing conflict of laws rules in the case of ICSID arbitration is Art. 42. Art. 42 is designed to give guidance to the ICSID tribunal in choosing the proper law. The tribunal's first task is to ascertain whether the parties have chosen a system of law or individual rules of law (Art. 42(1), first sentence). This choice may extend beyond legal rules *stricto sensu* to principles of equitable justice (Art. 42(3)). Only after determining that there is no agreement on applicable rules of law may the tribunal resort to the residual rule referring it to the law of the host State and to international law (Art. 42(1), second sentence).[18] This method should provide the tribunal with sufficient authority to resolve all questions of law before it and should leave no room for silence or obscurity of the law making a decision impossible (Art. 42(2)). Despite the apparent clarity of Art. 42, ICSID tribunals have not always followed the method set out there. In particular, whether an agreement between the parties existed was not always clarified. At times, such a determination was considered immaterial to applying the proper law (see paras. 65–67 *infra*). At other times, the line between the different situations envisaged in Art. 42 appears to have been blurred.

## D. Proper Law and Nullity

**14**    The risks of applying Art. 42 carelessly are well illustrated by the possible consequence of nullity of the resulting award[19] (see also Art. 52, paras. 191–270). During the drafting of what eventually became Art. 52 on annulment, a suggestion was made to add to the clause on excess of powers (Art. 52(1)(b)) the words "including failure to apply the proper law" (History, Vol. II, p. 517). The suggestion was not adopted. But the Chairman expressed the opinion that while a mistake in applying the law would not be a valid ground for annulment, applying a different law from that agreed by the parties would lead to an award that could be properly challenged on the ground that the arbitrators had gone against the terms of the *compromis* (at p. 518).

**15**    In *Klöckner* v. *Cameroon*, the *ad hoc* Committee confirmed that an excess of powers leading to nullity may consist in the non-application of the rules contained in the arbitration agreement or in the application of other rules.[20] It

---

18    *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231 at 241/2 (1993); *Delaume*, L'affaire, pp. 41, 47; *Begic*, Applicable Law in International Investment Disputes, p. 11.

19    See also *Shihata/Parra*, Applicable Substantive Law, pp. 206 *et seq.*; *Lauterpacht, E.*, Aspects of the Administration of International Justice 102 *et seq.* (1991); *Giardina, A.*, ICSID: A Self-Contained, Non-National Review System, *in*: International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? (*Lillich, R. B./Brower, C. N.* eds.) 199 at 211 (1994); *Reisman*, The Regime for *Lacunae*, p. 380; *Kreindler, R.*, The Law Applicable to International Investment Disputes, p. 422.

20    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 59.

adopted the distinction between a non-application of the governing law and a mistaken application of such law, holding that a mere error in law, even an essential one, would not generally constitute an excess of powers.[21] The *ad hoc* Committee found that in the instant case the Tribunal, after having identified the applicable law correctly,[22] had not, in fact, applied it but had based its decision on a broad equitable principle without establishing its existence in positive law. No attempt had been made to show that Cameroonian law, based on French law, contained a "duty of full disclosure to a partner" in a contract.[23] In the *ad hoc* Committee's opinion, the award's reasoning seemed very much like a simple reference to equity. By limiting its reasoning to postulating rather than demonstrating the existence of the principle, the Tribunal had not applied the law of the Contracting State.[24] In applying concepts or principles it probably considered equitable, the Tribunal had acted outside the framework of Art. 42(1) and had thus manifestly exceeded its powers in the sense of Art. 52(1)(b) (see paras. 262, 263 *infra*).[25]

In the Decision on Annulment in *Amco* v. *Indonesia*, the *ad hoc* Committee **16** reiterated the distinction between a failure to apply the proper law and a mere misconstruction of that law and pointed out that only the former would constitute a manifest excess of powers and a ground for nullity under Art. 52(1)(b).[26] Also, in the *ad hoc* Committee's view, the invocation of equitable considerations was not automatically equivalent to a decision *ex aequo et bono* which, in the absence of an agreement by the parties in accordance with Art. 42(3), would render a decision annullable for manifest excess of powers (see paras. 269–271 *infra*).[27] In this case too, the complaint was not that the Tribunal had erred in selecting the proper law[28] but rather that it had failed to apply an essential provision of the correctly chosen applicable law. In calculating Amco's investments in Indonesia, the Tribunal had ignored a rule of Indonesian law that only investments recognized and registered as such by the competent Indonesian authority were to be considered investments. By failing to apply this fundamental provision of Indonesian law, the Tribunal had manifestly exceeded its powers. The relevant portion of the Award, therefore, had to be annulled.[29]

In *MINE* v. *Guinea*, the *ad hoc* Committee confirmed the view that disregard **17** of the agreed rules of law would constitute a derogation from a tribunal's terms of reference and could hence constitute an excess of powers. This would include a

---

21  At para. 61.
22  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 58/9.
23  At p. 59.
24  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 79 (see also paras. 150, 151 *infra*).
25  *Loc. cit.*
26  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 23.
27  At paras. 26, 28.
28  See *Amco* v. *Indonesia*, Award, 20 November 1984.
29  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 93–105.

decision not based on any law unless the parties had agreed on a decision *ex aequo et bono*. It also distinguished disregard of the applicable rules of law from a mere erroneous application, which furnishes no ground for annulment.[30] Guinea had put forward the argument that in ruling on the point of breach of contract the Tribunal had "failed to apply any law whatsoever, much less the correct law – Guinean law, based on French law".[31] The *ad hoc* Committee rejected this contention. MINE had based its case on Art. 1134 of the Code Civil de l'Union Française applicable in Guinea and containing the principles of *pacta sunt servanda* and good faith. The Tribunal had erred in that it had cited Art. 1134 of the French Civil Code.[32] The *ad hoc* Committee noted that the two Articles in the two Codes not only bore the same number but also had the same contents and that this error did not warrant annulment.[33]

**18**    Despite the distinction they made between a non-application of the proper law and its mere misapplication, the *Klöckner* and *Amco ad hoc* Committees applied extremely strict standards to the Awards before them. There was no question of an incorrect choice of law in either case. In *Klöckner* the Tribunal had failed to substantiate the rule it applied in terms of the relevant legislation and court practice. In *Amco*, the Tribunal had failed to take account of a procedural rule of the applicable law which would have led it to disregard investments which had, in fact, been made. The two *ad hoc* Committees' reasoning blurs the boundary between an error in the interpretation or application of the governing law and a failure to apply the applicable law. In this way, the distinction between an incorrect choice of law and a misapplication of the correctly chosen law becomes tenuous.

**19**    No matter how justified the annulments in *Klöckner* and *Amco* were in terms of a failure to apply the proper law, the fact remains that a violation of Art. 42 may lead to the annulment of an award. The preparatory works (see para. 14 *supra*) as well as the decisions of the *ad hoc* Committees referred to above leave no doubt that an agreement on choice of law is an essential element of the parties' undertaking to arbitrate. In the absence of an express agreement on choice of law, the second sentence of Art. 42(1) would equally form part of the tribunal's "terms of reference". Its violation would therefore also expose the award to annulment.[34]

**20**    Subsequent *ad hoc* committees have confirmed that a non-application of the proper law may constitute an excess of powers which calls for annulment. At the same time, the committees stressed the distinction between a mere misapplication

---

30   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.04.

31   At para. 6.30.

32   See *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 73.

33   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.40. A similar argument on "failure to apply the law" in the context of the award of damages was not dealt with by the *ad hoc* Committee, at paras. 6.93, 6.109.

34   *Shihata/Parra*, Applicable Substantive Law, p. 207.

of the properly selected law and an error of such magnitude as to amount to a non-application of the proper law.[35] The relevant cases are examined in more detail in the context of the provision of Art. 52 on manifest excess of powers (see Art. 52, paras. 210–225).

## II. INTERPRETATION

### A.  "(1) The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties."

#### 1. Freedom of Choice

Art. 42(1) proceeds from the basic freedom of the parties to choose the law they consider most appropriate for their relationship.[36] This freedom of choice is a recurrent theme in the *travaux préparatoires* (History, Vol. II, pp. 266/7, 330, 514, 569/70, 984), although misgivings were aired that this might be exploited to the advantage of the foreign investor (at p. 803). The parties are free to avail themselves of the option offered by Art. 42(1), first sentence, or to leave the question of applicable law to the residual rule of Art. 42(1), second sentence. There are several possible motives for selecting a particular system of law. The parties may be influenced by a desire to create greater certainty, by a preference for a law with which one of them or both is familiar or by the wish to maximize the legal protection for one of them, most notably the foreign investor.[37] On the other hand, the law most closely connected to the contractual relationship will presumably be the most practical choice. In addition, the State party to an investment contract may insist on the application of its own domestic law as a matter of principle and of national prestige.     **21**

#### 2. Modality of Choice

The choice of law open to the parties may be exercised in one of several ways. One is a direct agreement between the parties. The 1993 ICSID Model Clauses offer the following sample for an agreement on choice of law:     **22**

---

35  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 17 December 1992, paras. 7.18–7.29; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 21–55; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 44–47; *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 38; *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, paras. 44–48, 59–77; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 35, 37, 79–114; *Lucchetti* v. *Peru*, Decision on Annulment, 5 September 2007, para. 98.

36  Generally on the freedom of choice of law see *Lipstein, K.*, International Arbitration Between Individuals and Governments and the Conflict of Laws, *in*: Contemporary Problems of International Law: Essays in Honour of Georg Schwarzenberger 177 (1988).

37  *Broches, A.*, Choice-of-Law Provisions in Contracts with Governments, 26 The Record of the Association of the Bar of the City of New York 42, 43 (1971).

**Clause 10**

Any Arbitral Tribunal constituted pursuant to this agreement shall apply <u>specification of system of law</u> [as in force on the date on which this agreement is signed]/[subject to the following modifications: . . .].[38]

The explanatory comments to the Model Clauses point out that the parties are free to agree on rules of law defined as they choose. They spell out that they may refer to national law, international law, a combination of national and international law, or a law frozen in time or subject to certain modifications. Earlier versions of the Model Clauses offered specific references to international law[39] and a formula for the exclusion of a particular system of law.[40] Parties have exercised this choice in a number of cases (see paras. 24–37 *infra*). In *Santa Elena* v. *Costa Rica*, the Tribunal held that an agreement on choice of law would have to be clear and unequivocal.[41]

**23**    If jurisdiction is based not on a direct agreement between the parties but on a provision in the host State's law or in a treaty (see Art. 25, paras. 390–463), those instruments may provide for a choice of law prior to the institution of proceedings. Typically, the first direct contact between the parties in these cases is the request for arbitration. But the national legislation or treaty offering consent to jurisdiction may contain its own clause on applicable law. By taking up the offer of consent, the investor accepts the choice of law clause contained in the legislation or treaty. Therefore, the clause on applicable law becomes a choice of law agreed by the parties. A national investment code providing for ICSID arbitration (see Art. 25, paras. 394–426) may specify the law to be applied by the tribunal (see para. 63 *infra*). Some bilateral investment treaties (BITs) offering consent to ICSID jurisdiction (see Art. 25, paras. 427–455) designate the applicable law (see paras. 80, 84 *infra*). Multilateral treaties providing for ICSID's jurisdiction (Art. 25, paras. 456–463) also contain clauses on applicable law (see paras. 85–88 *infra*).

### 3. The Law Chosen by the Parties

### a) The Law of the Host State

**24**    Practice shows considerable variety in the drafting of choice of law clauses.[42] A straightforward reference to the domestic law of the host State is relatively rare. An example for such a choice of law is contained in the Participation Agreement of 1982 between New Zealand and Mobil Oil NZ Ltd. Art. VII, providing for ICSID arbitration, contains the following formula:

7.7 An Arbitral Tribunal shall apply the Law of New Zealand.[43]

---

38    4 ICSID Reports 364.
39    See the 1981 Model Clauses, Clause XVII, 1 ICSID Reports 206.
40    See the 1968 Model Clauses, Clauses XIX–XXI, 7 ILM 1175/6 (1968).
41    *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 28, 35, 37, 40, 60–68.
42    For overviews of practice see *Shihata/Parra*, Applicable Substantive Law, pp. 198 *et seq.*; *Delaume*, Le Centre, pp. 825 *et seq.*; *Delaume*, L'affaire, pp. 42 *et seq.*
43    *Attorney-General* v. *Mobil Oil NZ Ltd.*, New Zealand, High Court, 1 July 1987, 4 ICSID Reports 123.

*Article 42 – Applicable Law*                                                    559

In *Tanzania Electric* v. *IPTL*, the Tribunal applied the law of Tanzania "that   **25**
being the governing law of the contract expressly designated by the parties by
Article 19.4 of the [Power Purchase Agreement]".[44]

A more cautious approach is taken where the law of the host State is chosen   **26**
subject to a stabilization or intangibility clause designed to protect the contract
from subsequent changes in the law (see paras. 117–128 *infra*). This is exemplified
by clauses in contracts concluded by Guinea. Thus, *Atlantic Triton* v. *Guinea* arose
from a 1981 contract containing the following clause:

> *Article 14 – Law*
>
> The term "law" in the present Agreement refers to Guinean law. However,
> Guinean law will be applicable only insofar as it is not incompatible with the
> terms of the present Agreement, and where it is not more restrictive than the law
> in force at the date of entry into force of the present Agreement.[45]

Similarly, the Agreement of 1971 underlying the case of *MINE* v. *Guinea* contains
the following Art. XIII, para. 1:

> La Loi de la présente Convention sera la Loi de la République de Guinée en
> vigueur à la date de signature, sous réserve des dispositions du présent Article
> XIII.[46]

## b) The Law of a Third State

References to the law of the investor's home country or to the law of a third   **27**
State are rare. Where the investment involves extensive activities of the investor
in the host State, the choice of a law other than that of the host State would lead to
difficulties. The investor's activities will be so closely linked to the administrative
law, labour law, tax law, foreign exchange regulations, real property legislation
and many other areas of the host State's legal system that it would be impractical
to choose the law of another country.[47] But in cases involving loan contracts, there
is a well-established practice to submit the agreement to the law of the lender's
country or, less frequently, to the law of a third country which has an important
financial centre.[48]

In *SPP* v. *Egypt*, a loan agreement of 1976 which was supplementary in nature   **28**
to the parties' primary agreement provided:

> This Agreement shall be governed by and construed in all respects in accordance
> with the laws of England.[49]

---

44  *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 51, Appendix B, paras. 98 *et seq*.
45  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 23. Interestingly, the subse-
    quent Article containing an ICSID arbitration clause contains a reference to Art. 42(3) of the
    Convention – see 3 ICSID Reports 17.
46  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.31. Subsequent paragraphs
    guarantee precedence of the Agreement over the law of Guinea (see paras. 37, 38 *infra*).
47  *Goldman*, Le droit applicable, p. 155; *Kahn*, The Law Applicable, pp. 12/13.
48  *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ
    237 at 243 (1986).
49  *SPP* v. *Egypt*, Award, 20 May 1992, para. 225. The choice of English law to the exclusion of
    Egyptian law turned out to be decisive for the computation of interest.

560                    THE ICSID CONVENTION: A COMMENTARY

**29**    In *CDC* v. *Seychelles*, an Amending and Rescheduling Agreement to a loan agreement between an English company and the host State provided as follows:

> This Agreement and its performance shall be governed by and construed in all respects in accordance with the laws of England . . .

The Tribunal noted that the submissions presented by the parties proceeded on the footing that the claim was to be resolved in accordance with English law.[50]

**30**    A choice of the law of the investor's home country also seems to have been made in *Colt Industries* v. *Korea*.[51] The investment concerned technical and licensing agreements for the production of weapons and was apparently most closely connected with the licensor's home country.[52]

**31**    In *World Duty Free* v. *Kenya*, a contract for the construction, maintenance and operation of an airport duty free complex contained two choice of law clauses opting for both English and Kenyan law. Because of the substantial similarity of the two legal systems, the Tribunal did not see any problem in applying this "perhaps awkwardly worded" choice of law:

> 158. The Tribunal now turns to the applicable laws chosen by the Parties in their Agreement of 27th April 1989, as required by Article 42(1) of the ICSID Convention. As already recorded above, Article 9(2)(c) of this Agreement provides that "any arbitral tribunal constituted pursuant to this Agreement shall apply English law"; and Article 10(A) provides that "This Agreement shall be governed by and construed in accordance with the law of Kenya".
>
> 159. As an express choice of applicable law to their contractual relations, these two provisions are perhaps awkwardly worded. For present purposes, however, no practical difficulty arises from their apparent inconsistency. . . . the Tribunal considers the two legal systems to have the same material effect as applied to this case ( . . . ).[53]

**32**    In situations where the application of a law other than that of the host State is feasible and desirable, it is particularly important that the parties avail themselves of the possibility to choose the governing law. In the absence of an explicit choice of law it is not, as might be expected, the law most closely related to the relationship which will be selected by the ICSID tribunal in accordance with general principles of the conflict of laws. Rather, the mechanical rule of Art. 42(1), second sentence, will direct the tribunal to apply the law of the State party to the dispute (together with any applicable international law) no matter how tenuous the connection of the transaction with that law may be. The rules of the State party's conflict of laws may but need not refer to another more appropriate law (see paras. 161–166 *infra*).

*c) International Law*

**33**    In most situations, a more realistic way to protect the investors' interests against the vagaries of the host State's law is to internationalize their agreement.[54] This

---

50    *CDC* v. *Seychelles*, Award, 17 December 2003, para. 43.
51    This case was settled and discontinued with no published record of the proceedings.
52    See *Shihata/Parra*, Applicable Substantive Law, p. 199.
53    *World Duty Free* v. *Kenya*, Award, 4 October 2006, paras. 158–159.
54    *Lillich, R. B.*, The Law Governing Disputes, p. 61; *Di Pietro*, Applicable Law, p. 238.

is most frequently achieved by a reference to international law or to general principles of law, together with the host State's law. The result is closely akin to the residual rule of Art. 42(1), second sentence.[55] Some BITs contain combined choice of law clauses of this kind (see paras. 80–84 *infra*). In *AGIP* v. *Congo*, the choice of law clause read as follows:

> The law of the Congo, supplemented if need be by any principles of international law, will be applicable.[56]

In *Kaiser Bauxite* v. *Jamaica*, the 1969 Agreement between the parties contained a reference to the host State's law and international law supplemented by a stabilization clause: **34**

> (3) In determining any dispute submitted to arbitration as aforesaid, the Arbitration Tribunal shall apply the law of Jamaica and such rules of international law as may be applicable excluding however any enactments passed or brought into force in Jamaica subsequent to the date of this agreement which may modify or affect the rights of the parties under the Principal Agreement or this Agreement and excluding also any law or rule which could throw doubt upon the authority or ability of the Government to enter into the Principal Agreement and this Agreement.[57]

In *CSOB* v. *Slovakia*, the Consolidation Agreement (CA), underlying the dispute, contained the following choice of law clause in its Art. 7(4): **35**

> This agreement shall be governed by the laws of the Czech Republic and the [BIT].

The Tribunal applied a combination of international law and Czech private law. It said:

> An implied submission to international law can be seen in Article 7(4) CA where it is stated that the CA shall be governed by the BIT, in addition to the laws of the Czech Republic. In its First Decision on Jurisdiction (No. 55), the Tribunal concluded that by referring to the BIT in Article 7(4) CA, the Parties intended to incorporate the arbitration clause of Article 8 of the BIT into the CA. As the reference to the BIT in Article 7(4) is not limited to this particular provision, such incorporation into the CA is equally pertinent in respect of any other provision of the BIT that may be relevant for the interpretation and application of the CA. Even to the extent the CA is not governed by international law as such, the BIT, as it is incorporated into the CA, has to be interpreted in the context of the legal system under which it has been drafted. Consequently, the incorporation of the BIT includes the rules of international law that are relevant for its interpretation.[58]

---

55  For examples see *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784 at 796 *et seq.* (1981); *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes (1990), Ch. XV, p. 64; *Delaume*, Le Centre, pp. 825 *et seq.*; *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168 at 184/5 (1992); *Delaume*, L'affaire, p. 50; *Firth*, The Law Governing Contracts, pp. 267 *et seq.*; *Kahn*, The Law Applicable, pp. 15 *et seq.*; *Lalive, P.*, L'Etat en tant que partie à des contrats de concession ou d'investissement conclus avec des sociétés privées étrangères, *in*: 1 New Directions in International Trade Law (*UNIDROIT*) 317 at 332 *et seq.* (1977).

56  Art. 15 of the Agreement of 2 January 1974, *AGIP* v. *Congo*, Award, 30 November 1979, para. 18. This provision was supplemented by stabilization clauses contained in separate Articles.

57  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 12.

58  *CSOB* v. *Slovakia*, Award, 29 December 2004, para. 63.

The Tribunal added that the substance of the dispute, which involved a guarantee by the Czech and Slovak governments to cover losses from the privatization of the Claimant, was governed by Czech private law.[59]

**36**    It is possible to completely internationalize a contract by referring exclusively to international law, to general principles of law or to a set of usages customarily governing like transactions.[60] But this is not advisable. The contacts of the investment activity to various technical provisions of the host State's law (see para. 27 *supra*) would make such a formula impractical. The law thus chosen may lack the clarity and the technical detail that is desirable.[61] But several multilateral treaties providing for ICSID arbitration, including NAFTA and the Energy Charter Treaty, contain clauses on applicable law that refer only to the respective treaty and to rules of international law (see paras. 85–87 *infra*).

### d) The Law of the Contract

**37**    A doubtful method to select rules applicable to the parties' relationship is to treat the agreement as a self-contained legal system detached from any existing domestic or international law. The choice of law provision in the 1971 Agreement underlying the case *MINE* v. *Guinea* goes a long way towards reducing the impact of domestic law but stops short of making the agreement a "*contrat sans loi*":

> la Loi Guinéenne n'interviendra dans l'interprétation et l'exécution de la présente Convention qu'à titre supplétif et seulement dans le cas où celle-ci laisserait une difficulté sans solution.[62]

**38**    A genuine detachment of an agreement from any pre-existing and extraneous system of law is not only questionable on theoretical grounds but may also create practical problems.[63] In terms of Art. 42(1), there is no compelling reason why

---

59  At paras. 71–72.

60  On the general problem of a "*lex mercatoria*" as the applicable law in international arbitration, see *Delaume, G. R.*, The Proper Law of State Contracts and the *Lex Mercatoria*: A Reappraisal, 3 ICSID Review – FILJ 79 (1988); *Giardina*, La legge regolatrice, pp. 682/3; *Goldman*, Le droit applicable, p. 145; *Kahn*, The Law Applicable, p. 18; *Klein, F.-E.*, The Law to be Applied by the Arbitrators to the Substance of the Dispute, *in*: The Art of Arbitration: Essays on International Arbitration. Liber Amicorum Pieter Sanders 189 at 196 *et seq.* (1982); *Lalive, P.*, L'Etat en tant que partie à des contrats de concession ou d'investissement conclus avec des sociétés privées étrangères, *in*: 1 New Directions in International Trade Law (*UNIDROIT*) 317 at 324/5 (1977); *Gaillard, E.*, Thirty Years of Lex Mercatoria: Towards the Selective Application of Transnational Rules, 10 ICSID Review – FILJ 208 (1995).

61  *Sutherland, P. F.*, The World Bank Convention on the Settlement of Investment Disputes, 28 International and Comparative Law Quarterly 367 at 394 (1979); *Lalive, op. cit.*, pp. 335/6 (1977). For a contrary view see *Curtis*, The Legal Security of Economic Development Agreements, pp. 341 *et seq.*

62  Art. XIII, para. 4, cited in *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.34. *Cf.* also *Delaume*, Le Centre, p. 827.

63  See esp. *Curtis*, The Legal Security of Economic Development Agreements, p. 340; *Delaume, G. R.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 1 International Lawyer 64 at 77 (1966); *Goldman*, Le droit applicable, pp. 146/7; *Hirsch*, The Arbitration Mechanism, pp. 119/20; *Kahn*, The Law Applicable, pp. 14 *et seq.*; *Lalive, op. cit.*, p. 335; *Peter, W.*, Arbitration and Renegotiation of International Investment Agreements 91 *et seq.* (1986).

the "rules of law as may be agreed by the parties" cannot be confined to the rules contained in their agreement. However, if a tribunal can find no guidance on a particular question in the agreement itself, it may resort to the second sentence of Art. 42(1). In view of the clear prohibition of a *non liquet* in Art. 42(2), an agreement to apply a set of rules that provide no answer to a question may be treated as an absence of agreement on applicable law concerning this particular question (see paras. 135–137 *infra*). Therefore, a choice of law clause couched in terms of an exclusive reference to the terms of the agreement between the parties is not necessarily a promising method to avoid the application of the law of the host State. Alternatively, where the contract is agreed by the parties to be the applicable law, the tribunal may conclude that the parties' agreement authorizes it, by implication, to fill gaps by recourse to general principles of law or to some other national law.

### 4. Choice of Law or Choice of Rules

Art. 42(1), first sentence, refers to "rules of law" rather than to systems of law.[64]   **39** Therefore, it is generally accepted that the parties are not restricted to accepting an entire system of law *tel quel* but are free to combine, to select and to exclude rules or sets of rules of different origin.[65] The parties may want to choose rules of law common to their two countries or indeed to any combination of countries they select.[66] Alternatively, they may choose certain pieces of legislation from a particular legal system. In *Autopista* v. *Venezuela*, the Tribunal expressly endorsed this method. It stated:

> 96. The Tribunal observes that the first sentence of Article 42(1) refers to "rules of law" rather than to systems of law. It is generally accepted that this wording allows the parties to agree on a partial choice of law, and in particular to select specific rules from a system of law.[67]

Not infrequently, choice of law clauses refer to several legal systems cumula-   **40** tively. For instance, a number of BITs refer to the law of the host State and to international law in a way similar to the residual rule of the second sentence of Art. 42(1) (see paras. 80–84 *infra*). The parties may also subject different parts of

---

64  Earlier drafts to the Convention referred to "the law to be applied". The change to "rules of law" was only made relatively late. No reasons for the change are apparent from the *travaux préparatoires*. See History, Vol. I, pp. 190–192.

65  *Curtis*, The Legal Security of Economic Development Agreements, p. 341; *Cherian*, Investment Contracts, p. 75; *Giardina, A.*, The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214 at 216 (1989); *Hirsch*, The Arbitration Mechanism, pp. 118/9; *Lalive*, *op. cit.*, pp. 328/30.

66  *Shihata/Parra*, Applicable Substantive Law, p. 189; *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 238/9 (1973/74); *Delaume, G. R.*, The Proper Law of State Contracts Revisited, 12 ICSID Review – FILJ 1 (1997); *Kreindler, R.*, The Law Applicable, p. 408.

67  *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 96.

their relationship to different systems of law, a process called *dépeçage*.[68] This is particularly likely to occur where the overall relationship is governed by separate agreements concluded at different times and regulating different issues.[69]

**41**     The parties may also exclude certain parts of a chosen system of law from its application to their relationship. The most common use of this technique is the exclusion of legislation passed by the host State after the conclusion of the investment agreement through a stabilization clause (see paras. 26, 34 *supra*, 117–128 *infra*). The parties may agree to exempt the investor from certain fiscal, foreign exchange or social security legislation.[70] They may even purport to exclude rules which would limit the capacity of the government to enter into the agreement at issue.[71]

**42**     The parties are also free to declare applicable the rules of a treaty that is not in force[72] or of a non-binding code of conduct such as the World Bank's 1992 Guidelines on the Treatment of Foreign Direct Investment.[73] Although the term "rules of law" might indicate that only existing legal rules can be chosen,[74] there is nothing to stop the parties from adopting their own rules by reference to a document which by itself is not binding. The 1992 Guidelines may be seen as a suitable blueprint for a set of "rules of law" to be agreed by the parties under Art. 42(1).

### 5. Limits on Choice of Law

#### a) Reasonable Connection

**43**     Despite the parties' basic freedom to choose the system or rules of law they consider best suited for their relationship, certain limitations to this freedom have been suggested. It is generally accepted that there is no requirement of a reasonable connection of the transaction to the law chosen by the parties in ICSID arbitration. Such a requirement of reasonable connection is mandated in some domestic legal systems to prevent irrational choices of law but is less appropriate in international arbitration where the choice of an unrelated "neutral" legal system may be desirable and rational.[75]

---

68    See esp. Institute of International Law, Articles on Arbitration between States, State Enterprises or State Entities and Foreign Enterprises, 1989, Art. 6, 63 Annuaire IDI II 330 (1990); *Di Pietro, D.*, Applicable Law, p. 238.

69    In *SPP* v. *Egypt*, a supplementary loan agreement contained a choice of law clause not applicable to the rest of the parties' relationship. See para. 28 *supra*.

70    See *e.g.*, *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.24 *et seq.*

71    See the choice of law rule in *Kaiser Bauxite* v. *Jamaica*, cited in para. 34 *supra*. But see also paras. 46, 47, 154–156 *infra*.

72    *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, paras. 36–55.

73    *Cf.* also *Broches*, Convention, Explanatory Notes and Survey, p. 667; *Hirsch*, The Arbitration Mechanism, p. 119.

74    *Masood*, Law Applicable, p. 317.

75    *Branson, D. J./Wallace, R. E.*, Choosing the Substantive Law to Apply in International Commercial Arbitration, 27 Virginia Journal of International Law 39 at 53 *et seq.* (1986); *Hirsch*, The Arbitration Mechanism, pp. 125/6.

*Article 42 – Applicable Law*                                                        565

## b) Mandatory Provisions of the Host State's Law

A variant of the above theory is the suggestion that certain mandatory or core **44** provisions of the most closely connected system of law, usually the host State's, cannot be dispensed with. Such rules would include the host State's administrative, labour, monetary, regulatory and penal law. These areas of legal regulation would be inherently reserved to the host State and would not be subject to contractual waiver.[76]

While it would probably cause inconvenience to choose a law other than the **45** host State's in these matters (see also para. 27 *supra*), there is no reason why the host State should not have the power to do so.[77] An investor may be required to apply higher standards of labour law than are otherwise required in the host State. The contract may contain special tax and customs arrangements. The investor may wish to exclude certain aspects of the host State's traditional penal law in relation to his employees. The best that can be said is that the choice of a law other than the host State's in these matters cannot be presumed lightly and that it would require proof of the parties' unequivocal intent.

A more difficult question is the exclusion of provisions in the host State's **46** domestic law limiting the authority or capacity of the host State to enter into certain types of arrangements. Thus, some domestic legal systems purport to curtail the capacity of the government to submit to international arbitration or to assent to the application of systems of law other than their own (see Art. 25, para. 625).[78] In *Kaiser Bauxite* v. *Jamaica*, the choice of law provision in the 1969 agreement purported to exclude, *inter alia*, any rule of Jamaican law which could throw doubt upon the authority or ability of the Government to enter into agreements between the Parties[79] (see para. 34 *supra*; *cf.* also paras. 154–156 *infra*).

The theoretical question, whether a State can contract out of a rule of its own **47** law limiting its freedom to enter into agreements, is not easy. Much will depend on whether the domestic provision is seen to affect the State's capacity to contract resulting in the agreement's nullity or whether it is seen as a simple prohibition not affecting the agreement's validity. In case of doubt, the latter solution, upholding the validity of the agreement, is to be preferred, especially where the investor has relied in good faith on the host State's capacity to contract.[80] Nevertheless, provisions of this kind in domestic law should be a cause of concern and should

---

76  *Feuerle*, International Arbitration and Choice of Law, p. 108; *Giardina*, La legge regolatrice, pp. 683/4.
77  *Goldman*, Le droit applicable, pp. 154/5; *Hirsch*, The Arbitration Mechanism, p. 126.
78  *Delaume*, The Proper Law, pp. 94/5; *Lalive, P.*, L'Etat en tant que partie à des contrats de concession ou d'investissement conclus avec des sociétés privées étrangères, *in*: 1 New Directions in International Trade Law (*UNIDROIT*) 317, 326/7 (1977).
79  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 12.
80  In this sense: Institute of International Law, Articles on Arbitration between States, State Enterprises, or State Entities and Foreign Enterprises, 1989, Art. 4, 63 Annuaire IDI II 328 (1990).

be investigated thoroughly before relying on a contractual clause purporting to exclude them.[81]

### c) Public Policy

**48**     Public policy (*ordre public*) is a classic reason for excluding the application of foreign law by domestic courts. It represents the superiority of basic value choices of the local community over the strict application of conflict of laws rules. In the case of ICSID arbitration, there is no domestic legal system which would provide the standards for public policy. A host State's reliance on its own *ordre public* in the face of an agreed choice of law pointing to another system of law is simply a breach of the undertaking to make the chosen law controlling.[82] For instance, a State, after having consented to the subjection of a loan agreement to French law, could not argue that the obligation to pay interest is contrary to the public policy of its religiously inspired domestic law. Reliance on the *ordre public* of another State in which an ICSID award might have to be enforced[83] would be equally unwarranted. Arts. 53 and 54 do not provide for such an exception to the obligation to recognize and enforce awards.[84]

**49**     The matter is different with regard to certain basic international tenets that may be described as international public policy.[85] These principles would include but not be restricted to peremptory rules of international law. Examples are the prohibition of slavery, piracy, drug trade, terrorism and genocide, the protection of basic principles of human rights, the prohibition to prepare and wage an aggressive war or the use of force contrary to Art. 2(4) of the United Nations Charter. Provisions that would otherwise be applicable, whether contained in an investment agreement or adopted by reference, which violate these basic principles, would have to be disregarded by an ICSID tribunal.[86] If any theoretical justification is needed for this conclusion, it can be found in the fact that the Convention is rooted in international law which, in a wider sense, is the *lex fori* of ICSID arbitration.

**50**     The application of international public policy to investment contracts is less far-fetched than might appear at first sight. For instance, co-operation in certain forms of weapons production, especially of weapons of mass destruction, could easily be seen to violate one or several of the principles enumerated above. The

---

81    *Broches, A.*, Choice-of-Law Provisions in Contracts with Governments, 26 The Record of the Association of the Bar of the City of New York 42, 54 (1971).

82    See, however, *Grigeria Naón, H. A.*, Choice-of-Law Problems in International Commercial Arbitration 281 (1992).

83    *Feuerle*, International Arbitration and Choice of Law, pp. 108/9.

84    *Hirsch*, The Arbitration Mechanism, p. 127.

85    See *Cremades, B. M./Cairns, D. J. A.*, The Brave New World of Global Arbitration, 3 The Journal of World Investment and Trade 173, 205–208 (2002); *Sheppard, A.*, Final Report on Public Policy as a Bar to the Enforcement of Arbitral Awards, ILA Conference London 2000, 340, 345 (2000).

86    *Delaume*, The Proper Law, pp. 90/1; *Feuerle*, International Arbitration and Choice of Law, pp. 107/8; *Hirsch*, The Arbitration Mechanism, pp. 120, 127 *et seq.* See also Institute of International Law, Articles on Arbitration between States, State Enterprises, or State Entities and Foreign Enterprises, 1989, Art. 2, 63 Annuaire II 326 (1990).

refusal of an ICSID tribunal to apply and enforce arrangements which serve the violation of one of these principles would be the only appropriate response. The application of international public policy would have to extend to arrangements which violate binding Security Council resolutions under Chapter VII of the UN Charter, even where the resolutions have not been made controlling by a domestic system of law chosen by the parties.

An example for the decisive influence of international public policy is *World Duty Free* v. *Kenya*. The case arose from a contract for the construction, maintenance and operation of an airport duty free complex which, the Tribunal found, had been procured by corruption. The Tribunal based its decision not only on the express choice of law clauses opting for both English and Kenyan law (see para. 31 *supra*). It also relied on international public policy as evidenced by the widespread condemnation of corrupt business practices in a number of regional and universal instruments outlawing bribery and corruption.[87] The Tribunal held that the Claimant was not legally entitled to maintain any of its pleaded claims "as a matter of *ordre public international* and public policy under the contract's applicable laws".[88] It reasoned: **51**

> 157. In light of domestic laws and international conventions relating to corruption, and in light of the decisions taken in this matter by courts and arbitral tribunals, this Tribunal is convinced that bribery is contrary to the international public policy of most, if not all, States or, to use another formula, to transnational public policy. Thus, claims based on contracts of corruption or on contracts obtained by corruption cannot be upheld by this Arbitral Tribunal.[89]

These instances of international public policy should be distinguished from the applicability of international law pure and simple, which will be discussed below in paras. 80–115. **52**

### 6. Renvoi

A law determined to be applicable to a transaction may in turn contain rules on the conflict of laws which refer to another legal system. This process is termed *renvoi*. The second sentence of Art. 42(1), in referring to the host State's law, specifically includes its rules on the conflict of laws (see paras. 161–166 *infra*). No such mention is made in the first sentence of Art. 42(1) in connection with the law agreed by the parties. This may be taken as an indication that *renvoi* is not contemplated under the first sentence. Moreover, the first sentence refers to "rules **53**

---

87  *E.g.*, the OAS Inter-American Convention against Corruption, 29 March 1996, 35 ILM 724 (1996); the United Nations Declaration against Corruption and Bribery in International Commercial Transactions, 16 December 1996, 36 ILM 1043 (1997); the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 21 November 1997, 37 ILM 4 (1998); the Council of Europe Criminal Law Convention on Corruption, 27 January 1999, 38 ILM 505 (1999); the African Union Convention on Preventing and Combating Corruption, 11 July 2003, 43 ILM 5 (2004); and the United Nations Convention against Corruption, 31 October 2003, 43 ILM 37 (2004).

88  *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 188.

89  At para. 157.

of law" rather than to a system of law. Only the latter could be expected to contain conflict of laws rules.

**54**     *A. Broches* has explained that this kind of reasoning would not be warranted. Express reference to conflict rules in the first sentence would have been inappropriate precisely because the rules chosen by agreement need not be the rules of a national system. Therefore, it is arguable that the choice of a given national law does not necessarily exclude its conflict provisions.[90]

**55**     While a purely textual interpretation may leave the question open, an interpretation directed towards the parties' intention strongly supports the view that an explicit choice of law only refers to the substantive rules of the chosen law but not to the conflict rules contained therein. Unless the parties express a contrary intention, it must be assumed that by their choice of law they did not want to subject their transaction to the uncertainties of *renvoi* to another, as yet undetermined, system of law.[91] In drafting a choice of law clause it may be appropriate to clarify the question through an express reference to the substantive rules of the chosen law or an express exclusion or inclusion of its conflict rules (see para. 81 *infra*).

### 7. Supervening Choice of Law

**56**     The normal way to agree on a choice of law is a clause in the initial investment agreement between the host State and the investor (see paras. 22, 24–38 *supra*). If jurisdiction is based on the host State's legislation or a treaty (see para. 23 *supra*), these may contain a provision on applicable law which is transformed into an agreement on choice of law between the parties upon the acceptance of jurisdiction by the investor (see paras. 63, 80–88 *infra*). If there has been no choice of law by the parties, there is nothing to preclude a later agreement on applicable law.[92] The institution of arbitration proceedings or the first session of the tribunal may be good opportunities to agree on choice of law.[93] The parties may also reach agreement at some later stage during the proceedings.

**57**     ICSID tribunals have on several occasions addressed the question of whether a choice of law may be made in the course of the proceedings. In *Adriano Gardella* v. *Côte d'Ivoire*, the Tribunal made a somewhat unclear statement on the Parties' pleadings which leaves the question open whether the choice of law was made under the first or second sentence of Art. 42(1)[94] (see para. 207 *infra*).

---

90   *Broches*, The Convention, pp. 390/1; *Broches*, Convention, Explanatory Notes and Survey, pp. 668/9.

91   *Branson, D. J./Wallace, R. E.*, Choosing the Substantive Law to Apply in International Commercial Arbitration, 27 Virginia Journal of International Law 39 at 44/5 (1986); *Goldman*, Le droit applicable, pp. 148/9; *Hirsch*, The Arbitration Mechanism, pp. 130 *et seq.*

92   *Delaume*, Le Centre, pp. 828/9; *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 66/7 (1990); *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168 at 186 (1992); *Delaume*, L'affaire, pp. 44 *et seq.*; *Delaume*, The Proper Law, pp. 19 *et seq.*; *Goldman*, Le droit applicable, p. 192; *Hirsch*, The Arbitration Mechanism, p. 123; *Shihata/Parra*, Applicable Substantive Law, p. 201.

93   *Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, p. 9 (1988).

94   *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, para. 4.3.

In *SOABI* v. *Senegal*, the finding on applicable law is equally unclear. After **58** noting the absence of an agreement on applicable law, the Tribunal notes that it appears from the parties' submissions to the Tribunal that they agree that the applicable law is Senegalese law[95] (see also paras. 145, 146 *infra*).

In *Benvenuti & Bonfant* v. *Congo*, the Parties reached agreement in the course of **59** the arbitration proceedings to authorize the Tribunal to rule *ex aequo et bono*,[96] a power which was accepted by the Tribunal.[97] While this agreement did not strictly relate to rules of law in the sense of Art. 42(1), first sentence, it may be inferred that such an agreement reached in the course of the proceedings would be equally acceptable.

If jurisdiction is based on national legislation or on a treaty and there is no **60** rule on applicable law in the legislation or treaty, an agreement on applicable law may be reached after the institution of proceedings.[98] In *AAPL* v. *Sri Lanka*, the arbitration was initiated under the terms of the Sri Lanka/UK BIT of 1980. The BIT did not contain a provision on applicable law. The Tribunal opened its finding on applicable law with the following observation:

> 19. . . . the Parties in dispute have had no opportunity to exercise their right to choose in advance the applicable law determining the rules governing the various aspects of their eventual disputes.
>
> In more concrete terms, the prior choice-of-law referred to in the first part of Article 42 of the ICSID Convention could hardly be envisaged in the context of an arbitration case directly instituted in implementation of an international obligation undertaken between two States in favour of their respective nationals investing within the territory of the other Contracting State.
>
> 20. Under these special circumstances, the choice-of-law process would normally materialize after the emergence of the dispute, by observing and construing the conduct of the Parties throughout the arbitration proceedings.[99]

The Tribunal proceeded to hold that the Parties had by their conduct demon- **61** strated agreement to choose the Sri Lanka/UK BIT as the primary legal source and the relevant rules of international and Sri Lanka domestic law as a supplementary source.[100] The conclusions drawn by the Tribunal from the parties' behaviour may be open to doubt and are discussed below (see paras. 70–79) in the context of implicit choice. But, the basic assumption that the parties may agree on the law applicable to their dispute in the course of the arbitration proceedings appears sound and has not been cast into doubt.[101]

---

95  *SOABI* v. *Senegal*, Award, 25 February 1988, para. 5.02.
96  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.22. The suggestion was originally put forward by the Claimants at the Tribunal's first session on 14/15 June 1978 but rejected by the Respondent (para. 1.6). An agreement to this effect was formally reached by the Parties on 5 June 1979 and communicated to the Tribunal (para. 1.22).
97  At paras. 4.4, 4.65. See also para. 259 *infra*.    98    *Kahn*, The Law Applicable, pp. 7/8.
99  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 19, 20.
100  *Ibid*., para. 22.
101  *Delaume, G. R.*, ICSID Tribunal Determines That Parties Could and Did Make a Valid Belated Choice of Law, 6 News and Notes from the Institute for Transnational Arbitration 1 at 2 (1991); *Ziadé, N. G.*, Some Recent Decisions in ICSID Cases, 6 ICSID Review – FILJ 514, 517 (1991).

### 8. Indirect and Implicit Choice of Law

**62**     It is an open question whether a choice of law by the parties must be direct and explicit or can be indirect and implicit and may be inferred from the facts and circumstances of the relationship between the parties. This point was discussed in the course of the Convention's drafting and appears to have been answered in the latter sense (History, Vol. II, pp. 418, 570).[102] On the other hand, assumption of a hypothetical agreement derived from the objective circumstances of a case, a method that is sometimes utilized in private international law, would not be in line with the meaning of Art. 42(1) and is likely to undermine the residual rule of its second sentence. The French version of the Convention, which uses the word "*adoptées*" for "agreed" in the English text, would suggest that the parties must have taken some positive action to justify an assumption of choice of law.[103] Therefore, no conclusions as to applicable law may be drawn from the fact that the dispute has been submitted to international arbitration[104] and certainly not from the place of proceedings determined under Arts. 62 and 63.[105]

### a) Choice of Law by Reference to Domestic Legislation

**63**     National investment laws providing for ICSID's jurisdiction (see para. 23 *supra*) may contain a clause on applicable law.[106] Acceptance by the investor of the offer to consent to jurisdiction would include the acceptance of the clause on applicable law leading to an agreed choice of law. But explicit choice of law clauses of this kind are rare. The mere fact that jurisdiction is based on a provision of the host State's law cannot be taken as a choice of the host State's law. Nor can a jurisdictional provision relating to ICSID for disputes arising out of the interpretation and application of a national investment law necessarily be taken as a general choice of the host State's legal system (see Art. 25, paras. 394, 518–525).

**64**     Reference in a direct agreement between the parties to an item in the host State's legislation is also not a reliable indication of an intention to choose the host State's

---

102   See, however, the contrary inferences by *Shihata/Parra*, Applicable Substantive Law, p. 190, note 28.

103   *Giardina, A.*, The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214 at 217 (1989); *Goldman*, Le droit applicable, pp. 142/3; *Shihata/Parra*, Applicable Substantive Law, p. 190.

104   *Bowett, D.*, State Contracts with Aliens: Contemporary Developments on Compensation for Termination or Breach, 59 BYIL 49 at 52 (1988); *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784 at 798/9 (1981); *Delaume*, The Proper Law, p. 88; *Lalive, P.*, L'Etat en tant que partie à des contrats de concession ou d'investissement conclus avec des sociétés privées étrangères, *in*: 1 New Directions in International Trade Law (*UNIDROIT*) 317 at 339/40 (1977).

105   See the clearly erroneous decision of the District Court for the District of Columbia in *MINE* v. *Guinea*, 505 F. Supp. 141 (1981), 4 ICSID Reports 3, in which the Court sought to base the applicability of US legislation on the alleged fact that ICSID arbitration could be expected to take place in the United States. See also Art. 26, para. 9.

106   The Madagascar Investment Code, 1989, Art. 42, provides that, in the case of ICSID arbitration, only the law of Madagascar shall be applicable to the substance of the dispute.

entire legal system. In *LETCO* v. *Liberia*, the Concession Agreement between the Parties stated in its opening paragraph that it was made under the General Business Law, Title 15 of the Liberian Code of Laws of 1956. The Tribunal concluded that

> [t]his appears to indicate an express choice by the parties of the Law of Liberia as the law governing the Concession Agreement.[107]

A similar argument was put forward in *SPP* v. *Egypt*.[108] This case concerned **65** a tourism development project which had been terminated by Egypt, ostensibly to protect undiscovered antiquities in the area. The preamble of the underlying contract, the "Heads of Agreement" of 1974, referred to three items of Egyptian legislation stemming from 1973 and 1974.[109] Paradoxically, both parties were interested in the application of international law in addition to Egyptian law. Egypt relied on the 1972 UNESCO Convention for the Protection of the World Cultural and Natural Heritage. SPP relied on general international law relating to nationalization, expropriation and the termination of foreign investment projects.[110] Egypt argued that the reference to Egyptian legislation in the preamble of the 1974 agreement amounted to a choice of Egyptian law. This was corroborated by the fact that one of the items of legislation referred to, Law No. 43 of 1974, provided that "[m]atters not covered by this Law are subject to the applicable laws and regulations".[111] Therefore, the role of international law would be limited to those rules and principles incorporated in Egyptian law. This was the case for the 1972 UNESCO Convention.[112] SPP denied that an agreement on choice of law in favour of Egyptian law existed and argued that the second sentence of Art. 42(1) would have to be applied leading to the application of Egyptian law and of applicable rules of international law.[113] The Tribunal refused to take a position on this question, holding that:

> The Parties' disagreement as to the manner in which Article 42 is to be applied has very little, if any, practical significance.[114]

It proceeded to hold that under either solution Egyptian and international law **66** would have to be applied and that the same sources of law would apply under the first and second sentences of Art. 42(1).[115] (See also paras. 107–109 *infra*.)

Situations under which a particular agreement on choice of law would lead to the **67** same result as the residual rule in the second sentence of Art. 42(1) are feasible and the situation in *SPP* v. *Egypt* may have been just such a case. However, this should

---

107  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 358. See also para. 215 *infra*.
108  *SPP* v. *Egypt*, Award, 20 May 1992. On this point see esp. *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264 (1993); *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231 (1993); *Shihata/Parra*, Applicable Substantive Law, pp. 201/2.
109  *SPP* v. *Egypt*, Award, 20 May 1992, para. 44.
110  *Craig, op. cit.*, p. 273.
111  See also the Dissenting Opinion to the Award which rests its choice of law arguments primarily on this aspect: *SPP* v. *Egypt*, Dissenting Opinion, 20 May 1992, 3 ICSID Reports 321 *et seq*.
112  *SPP* v. *Egypt*, Award, 20 May 1992, paras. 76 *et seq*.
113  At para. 80.                    114   At para. 78.
115  At paras. 80 *et seq*.

not lead to a dismissal of the distinction between the two situations envisaged in Art. 42(1). Despite the relevance of international law even where it is not part of the law chosen by the parties (see paras. 104–115 *infra*), its position is somewhat different and clearly stronger under the residual rule where there is no agreed choice of law (see paras. 204–244 *infra*). Moreover, whether or not the parties have, in fact, agreed on a choice of law also affects the applicability of the conflict of laws rules of the host State's law (see paras. 53–55 *supra*, 161–166 *infra*). Therefore, the preferable method is the one advocated by *Delaume* under which a tribunal first has to determine whether an agreed choice of law does, in fact, exist before proceeding either under the first or second sentence of Art. 42(1)[116] (see para. 13 *supra*).

**68**      In *Autopista* v. *Venezuela*, a reference to specific parts of the host State's legislation in a concession agreement between the investor and the host State was in issue. According to its preamble, the concession agreement was to "be governed by [ . . . ] [Decree] Law Nr. 138 [ . . . ] Executive Decree Nr. 502 [ . . . ] and the provisions of any other laws, regulations, or other documents as may be applicable".[117] In addition, clause 5 of the concession agreement provided that it "shall be governed by [Decree Law 138]; [Executive Decree Nr. 502]; by the Clauses and Annexes [of the Concession Agreement]; by the terms set forth in the Bid submitted by [the investor]; and by the conditions set forth in the Bid Documents".[118] The parties disagreed whether these provisions led to the exclusive application of Venezuelan law. The Tribunal found that clause 5 of the concession agreement led to a valid "partial choice of law" in favour of the two mentioned Venezuelan decrees.[119] (See para. 39 *supra*.) However, it found that the reference to specific texts of Venezuelan law did not necessarily amount to a general choice of Venezuelan law.[120] The Tribunal recognized that such an "extension" of the choice of law was accepted in *LETCO* v. *Liberia* (see para. 64 *supra*), but it found that the question whether this language constituted an implied choice of any other Venezuelan laws or regulations depended upon the interpretation of the terms "[ . . . ] and the provisions of any other laws, regulations, or other documents as may be applicable".[121] According to the Tribunal, "the parties' mutual intent to submit their contract to Venezuelan law exclusively" could not be sufficiently established. The Tribunal stated:

> 100. The parties could easily have adopted language showing their common intent to apply exclusively Venezuelan law, i.e., they could easily have expressed their agreement on a general choice of Venezuelan law in the Concession Agreement. Had they meant to provide for international law, they could also have expressed it. But they did not. Failing any indication on record demonstrating that, when agreeing on the Preamble's wording the parties impliedly meant to

---

116  *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231 at 241/2 (1993).
117  *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 94.
118  *Loc. cit.*                              119   At para. 96.
120  At para. 97.                            121   At para. 98.

*Article 42 – Applicable Law*                                          573

provide for a general choice of Venezuelan law or for international law, the Tribunal comes to the conclusion that, except for the matters covered by Venezuelan Decree Law Nr. 138 and Executive Decree Nr. 502, it must look to the second sentence of Article 42(1).[122]

As a general proposition, it is not convincing to accept the recital of a provision **69** of domestic law or even of an entire piece of legislation in an agreement as a general choice of the domestic law concerned. This *pars pro toto* argument is neither logical nor likely to be indicative of the intention of the parties. Such an argument is particularly unconvincing in the context of an arrangement which allows the parties great latitude in combining, selecting and excluding parts of different legal systems (see paras. 39–42 *supra*). Moreover, it is beyond doubt that certain aspects of the host State's domestic law will almost inevitably be applicable to the parties' relationship unless specifically excluded. Therefore, reference to specific aspects of the host State's law may be seen as clarifying certain details concerning the application of that law but cannot be taken as an implicit general choice of that law. This is not to say that genuine choice of law clauses may not contain reference to specific domestic legislation. Thus, the parties may agree that their contract should be governed by the investment code and other pertinent rules of law of the host State. But in the absence of such a general reference, the choice of a system of law in its entirety cannot be imputed to the parties.

## b) Choice of Law through the Parties' Submissions

Another example of an implicit choice of law rests on the argument that by **70** relying on certain sources of law in their submissions before the tribunal, the parties have demonstrated agreement on the choice of these sources. In *AAPL* v. *Sri Lanka*, the case was brought to ICSID arbitration under the terms of the Sri Lanka/UK BIT. The conduct of the Parties in the arbitration proceedings led the Tribunal to conclude that:

> . . . both Parties acted in a manner that demonstrates their mutual agreement to consider the provisions of the Sri Lanka/UK Bilateral Investment Treaty as being the primary source of the applicable legal rules.[123]

After establishing the BIT as the primary source of the applicable legal rules, **71** the Tribunal proceeded to draw conclusions on a general choice of law:

> 21. . . . the Bilateral Investment Treaty is not a self-contained closed legal system limited to provide for substantive material rules of direct applicability, but it has to be envisaged within a wider juridical context in which rules from other sources are integrated through implied incorporation methods, or by direct reference to certain supplementary rules, whether of international law character or of domestic law nature . . .
>
> 22. In fact, the submissions of both Parties . . . clearly demonstrate that they are in agreement about admitting the supplementary role of the recourse – regarding

---

122  At para. 100.
123  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, at para. 20.

certain issues – to general customary international law, other specific international rules rendered applicable in implementation of the most-favoured-nation clause, as well as to Sri Lankan domestic legal rules.[124]

**72**    Having determined that the BIT had to be applied in the context of international law in general,[125] the Tribunal used a most-favoured-nation (MFN) clause in the BIT[126] to apply principles of State responsibility under general international law.[127] The Tribunal's conclusion is that the respondent Government's responsibility was established under international law.[128]

**73**    The Tribunal's method of establishing the applicable law has been criticized severely,[129] not least in the Dissenting Opinion attached to the Award,[130] which points out that the Respondent had no choice but to respond to the Claimant's arguments based on the BIT. This did not necessarily imply a choice of law.[131]

**74**    In the absence of a published detailed record of the proceedings, it is impossible to form a definitive opinion as to whether the parties' behaviour did, in fact, demonstrate an agreement on international law as the applicable law. It appears that Sri Lankan law was not fully pleaded during the arbitration proceedings,[132] which would indicate a failure of the Respondent to insist on the applicability of its own law in accordance with the second sentence of Art. 42(1). Reliance on the BIT could hardly have justified the assumption of an agreement to adopt international law in general as the chosen law. Legal provisions invariably have to be interpreted in the broader context of the legal system to which they belong. This process is quite different from choice of law.

**75**    Unlike in *LETCO* and *SPP* (see paras. 64–66 *supra*), in *AAPL* the acceptance by the Tribunal of an implicit agreement on choice of law was not immaterial. In *AAPL* v. *Sri Lanka*, a different result concerning the applicable law would have been reached under the residual rule of Art. 42(1), second sentence. The assumption of an agreement in favour of the BIT and of international law in general effectively blocked the application of Sri Lankan law.

**76**    An analysis of *LETCO, SPP* and *AAPL*, in which the tribunals accepted an agreement on choice of law by implication, suggests that a stricter standard of

---

124  At paras. 21, 22.                     125  See also at para. 42.
126  At para. 66.                          127  At para. 78.
128  At para. 86.
129  *Asiedu-Akrofi, D.*, Asian Agricultural Products Limited (AAPL) v. Republic of Sri Lanka, 86 AJIL 371 (1992); *Perera, A. R./Dias, N.*, Asian Agricultural Products Ltd. v. The Republic of Sri Lanka, 2 The American Review of International Arbitration 216 (1991); *Vasciannie, S. C.*, Bilateral Investment Treaties and Civil Strife: The AAPL/Sri Lanka Arbitration, 39 Netherlands International Law Review 332 (1992); *Sornarajah, M.*, ICSID Involvement in Asian Foreign Investment Disputes: The Amco and AAPL Cases, 4 Asian Yearbook of International Law 69, 95 *et seq*. (1994); *Chukwumerije, O.*, International Law and Municipal Law in ICSID Arbitration, 1 Canadian Journal of International Business Law and Policy 61, 78 *et seq.* (1996); *Elombi, G.*, ICSID Awards and the Denial of Host State Law, 11 Journal of International Arbitration 61, 65/6 (1994). But see *Amerasinghe, C. F.*, The Prawn Farm (AAPL) Arbitration, 4 Sri Lanka Journal of International Law 155 (1992), who supports the Tribunal's conclusions on choice of law.
130  *AAPL* v. *Sri Lanka*, Dissenting Opinion, 4 ICSID Reports 296.
131  At p. 310.
132  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 71; *AAPL* v. *Sri Lanka*, Dissenting Opinion, 4 ICSID Reports 296, at p. 299. See, however, Award, paras. 36 *et seq.*

proof for the existence of such an agreement should be adopted. In these cases there was no unequivocal expression of an agreement. *A. Broches* has expressed the opinion that an agreement under Art. 42(1) requires an affirmative choice and should be express.[133] Ironically, in an article published in 1969, *B. Goldman*, one of the arbitrators in the majority in *AAPL* v. *Sri Lanka*, concluded after a careful analysis of the modes of designation of the applicable law under the Convention that while there was no "*règle impérative de forme*", the designation of an applicable law had to be perfectly clear.[134]

In other cases, tribunals relied on the submissions of parties merely as corroboration of their findings on applicable law. This was the case in the first Award in *Amco* v. *Indonesia*. The Tribunal determined that, since the Parties had not expressed agreement as to rules of applicable law, Indonesian law and such rules of international law as it deemed applicable were to be applied (see para. 144 *infra*). The Tribunal found support for this finding in the fact that both parties had not only failed to deny the applicability of these two systems of law but had, in fact, constantly referred to both of them.[135] **77**

In *Wena Hotels* v. *Egypt*, the Tribunal found that, except for the BIT, there was no special agreement between the parties on the rules of law applicable to the dispute. But the "pleadings of both parties indicate[d] that, aside from the provisions of the [BIT], the Tribunal should apply both Egyptian law (*i.e.* 'the law of the Contracting State party to the dispute') and 'such rules of international law as may be applicable'".[136] **78**

In *Enron* v. *Argentina* the Tribunal also relied on the parties' submissions in order to corroborate its finding that it should apply both host State law and international law.[137] The Tribunal noted that the parties had "relied on many [ . . . ] rules of the Argentine legal system, including the Constitution, the Civil Code, specialized legislation and the decisions of courts"[138] and that "international conventions [had] been invoked by the parties, as they [had] also discussed the meaning of customary international law".[139] **79**

### c) Reliance on a Clause on Applicable Law in a Treaty

Some treaties providing for ICSID arbitration (Art. 25, paras. 427–463) offer their own rules on applicable law. Acceptance by the investor of an offer to consent **80**

---

133  *Broches*, The Convention, p. 389; *Broches*, Convention, Explanatory Notes and Survey, p. 667. See also *Kahn*, The Law Applicable, pp. 8/9; *Shihata/Parra*, Applicable Substantive Law, p. 190.
134  *Goldman*, Le droit applicable, p. 144.
135  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 148. It is possible that the somewhat contradictory finding of the Tribunal in *SOABI* v. *Senegal*, Award, 25 February 1988 (see paras. 58 *supra* and 145, 146 *infra*), has to be interpreted in this sense. For a more detailed analysis see *Ziadé, N. G.*, Some Recent Decisions in ICSID Cases, 6 ICSID Review – FILJ 514 (1991).
136  *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 79.
137  *Enron* v. *Argentina*, Award, 22 May 2007, para. 209.
138  At para. 206.                           139  At para. 207.

to jurisdiction includes the acceptance of the clause on applicable law in the treaty leading to an agreed choice of law. Such an acceptance may be expressed simply by instituting proceedings.[140]

**81**    A number of bilateral investment treaties (BITs) contain choice of law clauses.[141] Most of these clauses incorporate references to the BIT itself, the law of the State party to the dispute, including its rules on the conflict of laws, and the rules and principles of international law.[142] Some BITs add a reference to agreements relating to the particular investment. For instance, Art. 10 of the Argentina/Netherlands BIT of 1992, after providing for ICSID arbitration, adds:

> 7. The arbitration tribunal addressed in accordance with paragraph (5) of this Article shall decide on the basis of the law of the Contracting Party which is a party to the dispute (including its rules on the conflict of law), the provisions of the present Agreement, special Agreements concluded in relation to the investment concerned as well as such rules of international law as may be applicable.[143]

**82**    Tribunals have held that treaty clauses of this type were the basis for an agreement on choice of law between the host State and the investor. The Tribunal in *Goetz* v. *Burundi*, applying the BIT between Belgium and Burundi, held:

> Without doubt the determination of the applicable law is not, in its true sense, made by the parties to the present dispute (Burundi and the claimant investors) but by the parties to the investment treaty (Burundi and Belgium). As that was a case for the parties' consent, the Tribunal considers however that the Republic of Burundi decided in favour of the applicable law as it is determined in the already cited provision of the Belgium-Burundi investment treaty in becoming a party to this treaty and that the claimant investors have effected a similar choice in lodging their claim for arbitration based on the said treaty. If this is not the first time, as we have noted, that the jurisdiction of the centre results directly from a bilateral treaty for the protection of investments, and not from a distinct agreement between the host State and the investor, it is one of the first times, it seems, that an ICSID Tribunal is called to apply the law as directly determined by such a treaty.[144]

**83**    In *Middle East Cement* v. *Egypt*, the Tribunal also found that the applicable law was determined by a choice of law provision contained in a BIT. Art. 11 of the

140    *Gaillard, E.*, The Extent of Review of the Applicable Law in Investment Treaty Arbitration, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y*. eds.) 190, 193/4 (2004); *Kühn, W./Wiegel, U.*, The Application of International Law and Treaty Provisions by Arbitrators, 4(3) Journal of World Investment and Trade 451, 471 (2003); *Begic*, Applicable Law, p. 25.

141    *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 332 (1997); *Peters, P.*, Dispute Settlement Arrangements in Investment Treaties, 22 Netherlands Yearbook of International Law 91, 147/8 (1991); *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 336 (1999).

142    See *e.g.*, the US Model BIT of 2004, Art. 30.

143    Many BITs, especially of Latin American countries, contain similar clauses. See *Fedax* v. *Venezuela*, Award, 9 March 1998, para. 30.

144    *Goetz* v. *Burundi*, Award, 10 February 1999, para. 94. Footnote omitted.

Bilateral Investment Treaty between Egypt and Greece provided that, "in addition to the rules of the BIT, obligations for a more favourable treatment stemming from the national law of the Contracting Parties or existing under international law between the Contracting Parties [should] prevail". The Tribunal held that Art. 11 of the BIT was the basis for an agreement on applicable law in the sense of the first sentence of Art. 42. Since the Tribunal found that there were no additional obligations for more favourable treatment, it concluded that it could only consider and accept claims under the Egypt/Greece BIT.[145]

In *Siemens* v. *Argentina*, the applicable BIT provided that a tribunal established **84** under the Treaty should decide on "the basis of this Treaty, and, as the case may be, on the basis of other treaties in force between the Contracting Parties, the internal law of the Contracting Party in whose territory the investment was made, including its rules of private international law, and on the general principles of international law".[146] In the Tribunal's view this choice of law provision in the BIT led to an agreement by the parties pursuant to Art. 42(1), first sentence, of the ICSID Convention. The Tribunal held:

> [. . .] By accepting the offer of Argentina to arbitrate disputes related to invest-
> ments, Siemens agreed that this should be the law to be applied by the Tribunal.
> This constitutes an agreement for purposes of the law to be applied under Article
> 42(1) of the Convention.[147]

Multilateral treaties by which the Contracting States offer consent to ICSID **85** arbitration to investors from other Contracting States (see Art. 25, paras. 456–463) invariably contain clauses on applicable law.[148] These clauses are similarly transformed into agreements on choice of law between the host State and the investor upon the acceptance by the investor of the offer of consent to jurisdiction. The North American Free Trade Agreement (NAFTA) in its Chapter Eleven, Section B, dealing with the settlement of investment disputes, contains the following provision:

**Article 1131: Governing Law**

1. A Tribunal established under this Section shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law.[149]

The Energy Charter Treaty provides similarly in its Art. 26: **86**

---

145 *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 86, 87.
146 Argentina-Germany BIT, Art. 10(5).
147 *Siemens* v. *Argentina*, Award, 6 February 2007, para. 76.
148 *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 347 (1997).
149 32 ILM 605, 645 (1993). See also *Eklund, C. D.*, A Primer on the Arbitration of NAFTA Chapter Eleven Investor-State Disputes, 11 Journal of International Arbitration 135, 146 (1994); *Burdeau, G.*, Nouvelles perspectives pour l'arbitrage dans le contentieux économique intéressant les états, Revue de l'arbitrage 1, 25/6 (1995).

> (6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.[150]

**87**    In *Kardassopoulos* v. *Georgia*, the Claimant relied on the Energy Charter Treaty (ECT) as well as on the BIT between Greece and Georgia. The latter contained a clause on applicable law very similar to Art. 26(6) of the ECT. The Tribunal after quoting these provisions said:

> . . . whatever may be the determination of a municipal court applying Georgian law to the dispute, this Tribunal can only decide the issues in dispute in accordance with the applicable rules and principles of international law.[151]

**88**    The Colonia Investment Protocol of MERCOSUR (Mercado Común del Sur) in its Art. 9(5) provides that the tribunal shall apply the Protocol itself, the law of the State party to the dispute, including its rules on the conflict of laws, any contracts relating specifically to the investment and the applicable principles of international law. The Cartagena Free Trade Agreement between Mexico, Colombia and Venezuela replicates Art. 1131 of the NAFTA in its Art. 17–20.

### d) Reliance on a Treaty as an Implicit Choice of International Law

**89**    Although many bilateral investment treaties (BITs) contain choice of law clauses,[152] a large number of them do not provide for any express choice of law.[153] Strictly speaking, this should lead to the application of the default rule of Art. 42(1), second sentence ("In the absence of such agreement, [. . .]"). Nevertheless, ICSID tribunals have treated cases of treaty claims brought on the basis of BITs as involving an implicit choice of international law. In investment treaty arbitration, claimants regularly assert violations of the substantive treatment standards contained in the applicable investment instrument. Even in the absence of any express choice of law provisions, it is generally accepted that the substantive provisions of these treaties constitute the rules of law applicable to the dispute. Whether such an implicit choice of law also encompasses other rules of international law is less clear. It has been suggested that "[t]he treaty being an instrument of international law, it is [. . .] also implicit in such cases that the arbitrators should have recourse to the rules of general international law to supplement those of the treaty".[154]

---

150   34 ILM 400 (1995). See also *Wälde, T. W.*, International Investment under the 1994 Energy Charter Treaty – Legal, Negotiating and Policy Implications for International Investors within Western and Commonwealth of Independent States/Eastern European Countries, 29 Journal of World Trade 5, 60 *et seq.* (1995).

151   *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 146.

152   See previous section.

153   *Gaillard, E.*, The Extent of Review of the Applicable Law in Investment Treaty Arbitration, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 190, 194 (2004).

154   *Parra*, Applicable Substantive Law in ICSID Arbitrations Initiated under Investment Treaties, p. 21. See also *Sacerdoti*, Investment Arbitration, p. 24, who reasons that "in case of arbitration on the basis of a BIT, international law, *in primis* the very BIT provisions and the standards

This view was endorsed in *Middle East Cement* v. *Egypt*, where the Tribunal **90** assessed an applicable law provision in a BIT which provided that, "in addition to the rules of the BIT, obligations for a more favourable treatment stemming from the national law of the Contracting Parties or existing under international law between the Contracting Parties [should] prevail".[155] The Tribunal stated:

> 87. [. . .] both according to the 1st sentence of Art. 42 (1) as the rules of law chosen by the Parties in Art. 11 of the BIT and according to the 2nd sentence of Art. 42 (1) of the ICSID Convention as "rules of international law as may be applicable", the reference to and application of the BIT implies that the Tribunal may have recourse to the rules of general international law to supplement those of the BIT.[156]

In *MTD* v. *Chile*[157] the Tribunal had to determine the applicable law in a **91** dispute brought under the Chile-Malaysia BIT which did not contain a choice of law. The Tribunal rejected the Respondent's argument that the ICSID Convention required – in the absence of agreement between the parties – the application of Chilean legislation. The Tribunal "limit[ed] itself to note that, for purposes of Article 42(1) of the Convention, the parties [had] agreed to this arbitration under the BIT. This instrument being a treaty, the agreement to arbitrate under the BIT require[d] the Tribunal to apply international law."[158] This reasoning was subsequently reaffirmed when the Tribunal asserted that "[t]his being a Tribunal established under the BIT, it [was] obliged to apply the provisions of the BIT [. . .]".[159] For the Tribunal it followed that domestic law was secondary:

> The breach of an international obligation will need, by definition, to be judged in terms of international law. To establish the facts of the breach, it may be necessary to take into account municipal law.[160]

The Tribunal in *CSOB* v. *Slovakia* endorsed the implicit choice of international **92** law by way of a BIT in more cautious terms. In that case the claim was based on a "Consolidation Agreement" (CA) which provided:

> This agreement shall be governed by the laws of the Czech Republic and the [BIT].[161]

The Tribunal found that this meant that international law had to be applied to the extent necessary for the BIT's interpretation:

> Even to the extent the CA is not governed by international law as such, the BIT, as it is incorporated into the CA, has to be interpreted in the context of the legal system under which it has been drafted. Consequently, the incorporation of the BIT includes the rules of international law that are relevant for its interpretation.[162]

---

of treatment and protection they refer to, have to be applied, including when the BIT does not contain any indication as to the applicable law".

155 *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 86.
156 At para. 87.                          157 *MTD* v. *Chile*, Award, 25 May 2004.
158 At para. 87.                          159 At para. 112.
160 At para. 204.
161 *CSOB* v. *Slovakia*, Award, 29 December 2004, para. 61.
162 At para. 63.

**93**     In *ADC* v. *Hungary*, the BIT did not contain a choice of law clause.[163] The Tribunal found that consent to arbitration under the BIT implied a choice of the BIT as the applicable law. This, in turn, implied a choice of international law in general. The Tribunal said:

> 290. In the Tribunal's view, by consenting to arbitration under Article 7 of the BIT [. . .] the Parties also consented to the applicability of the provisions of the Treaty [. . .]. Those provisions are Treaty provisions pertaining to international law. That consent falls under the first sentence of Article 42(1) of the ICSID Convention ("The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties"). The consent must also be deemed to comprise a choice for general international law, including customary international law, if and to the extent that it comes into play for interpreting and applying the provisions of the Treaty.[164]

**94**     The concept of an implicit choice of international law through the invocation of a BIT was discussed but not followed in *LG&E* v. *Argentina.* The Tribunal reasoned as follows:

> 85. It is to be noted that the Argentine Republic is a signatory party to the Bilateral Investment Treaty, which may be regarded as a tacit submission to its provisions in the event of a dispute related to foreign investments. In turn, LG&E grounds its claim on the provisions of the Treaty, thus presumably choosing the Treaty and the general international law as the applicable law for this dispute. Nevertheless, these elements do not suffice to say that there is an implicit agreement by the Parties as to the applicable law, a decision requiring more decisive actions. Consequently, the dispute shall be settled in accordance with the second part of Article 42(1).[165]

**95**     Although the Tribunal continued to address the issue of the applicable law under the second sentence of Art. 42(1) (see paras. 203, 226, 238 *infra*), its solution came very close to the concept of an implicit choice of international law. The *LG&E* Tribunal cited the view "[. . .] that when submitting the settlement of a dispute to an Arbitral Tribunal acting within the framework of an international agreement, like ICSID, the dispute falls under public international law; thus its rules are to be applied".[166] Finally, the Tribunal concluded that it would first apply the BIT, second, "in the absence of explicit provisions therein, general international law, and, third, the Argentine domestic law".[167]

### 9. The Applicability of International Law

#### a) International Law as the Chosen Law

**96**     There is no doubt that a choice of international law by the parties either in conjunction with a national law or on its own is valid and has to be respected by the tribunal (see paras. 33–36 *supra*). The most common agreement of this kind,

163   Somewhat confusingly, the Tribunal quoted the choice of law clause from the BIT's provision on State-State arbitration: *ADC* v. *Hungary*, Award, 2 October 2006, para. 290.
164   *ADC* v. *Hungary*, Award, 2 October 2006, para. 290.
165   *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 85. Footnote omitted.
166   At para. 93.                              167   At para. 99.

a combined choice of the law of the host State and of international law (see paras. 80–84 *supra*), would produce a result similar to the residual rule of Art. 42(1), second sentence. But an exclusive reference to international law such as in the NAFTA and in the Energy Charter Treaty (see paras. 85–88 *supra*) is also feasible.

In *AGIP* v. *Congo*, the parties had agreed on the application of Congolese law **97** supplemented by the principles of international law (see para. 33 *supra*). After establishing that the Congolese ordinance, which had nationalized the Claimant's property, was in breach of Congolese law, the Tribunal turned to international law:

> 80. These observations, with respect to Congolese Law, do not, however, exempt the Tribunal from examining the acts of nationalization from the point of view of international law.
>
> . . .
>
> 82. In the present case, it must be recalled, that according to Article 15 of the Agreement, Congolese law can be "supplemented" when the occasion arises by principles of international law.
>
> 83. It has been maintained by AGIP that the qualification of "supplemented" must be interpreted as implying the subordination of Congolese law to international law. Whatever the merits of this argument it suffices for the Tribunal to note that the use of the word "supplemented" signifies at the very least that recourse to principles of international law can be made either to fill a lacuna in Congolese law, or to make any necessary additions to it.[168]

The Tribunal proceeded to look at the compatibility of the nationalization **98** with international law in the light of a stabilization clause. It pointed out that it was using the principles of international law to "complete" Congolese law. On this basis, it reached the result that the nationalization was irregular in nature and led to an obligation to compensate the Claimant[169] (see para. 120 *infra*). The Tribunal's use of the words "supplement", "addition" and "complete" in describing the relationship of international law to the host State's law is not very precise.[170] Nevertheless, the circumstances of the case permit the conclusion that the claim would have been upheld even if the host State's actions had been found legal under Congolese law (see also para. 220 *infra*).

In *AAPL* v. *Sri Lanka*, the Tribunal reached the conclusion that the parties had **99** by their conduct in the arbitration proceedings made an implicit choice of law in favour of the Sri Lanka/UK BIT and hence of international law in general (see paras. 70–72 *supra*). Although reference was made to the admissibility of recourse to Sri Lankan domestic legal rules (para. 22 of the Award; see para. 71 *supra*), the decision is, in fact, completely dominated by considerations of international law. Similarly, Tribunals that found that reliance on a BIT implied a general choice of international law (see paras. 90, 91 *supra*) concentrated on the application of the BIT as interpreted in the light of international law.

---

168    *AGIP* v. *Congo*, Award, 30 November 1979, paras. 80 *et seq.*
169    At para. 88.
170    *Broches*, Convention, Explanatory Notes and Survey, pp. 671 *et seq.*

582                  THE ICSID CONVENTION: A COMMENTARY

*b) International Law as Part of Domestic Law*

**100**      International law is frequently incorporated into domestic law through a variety
of techniques.[171] To the extent that it thereby becomes applicable internally, it
may be seen as part of a system of domestic law chosen by the parties and may be
relied upon before an ICSID tribunal (see para. 200 *infra*).[172] In *Adriano Gardella*
v. *Côte d'Ivoire*[173] (see paras. 57 *supra*, 207 *infra*) and *LETCO* v. *Liberia*[174] (see
paras. 64 *supra*, 215 *infra*), the respective Tribunals found the law of the host State
to be applicable. In response to arguments for the Claimants that international law
should be applied as well, the Tribunals pointed out that no divergence existed
between the chosen domestic law and international law, since the former was in
full accord with the latter (see also para. 106 *infra*).

**101**      The *ad hoc* Committee in the annulment proceedings of *Wena Hotels* v. *Egypt*
noted that, under the Egyptian Constitution, treaties that had been ratified and
published had the force of law. It further noted that a number of important domes-
tic laws contained a "without prejudice clause" in favour of the relevant treaty
provisions. According to the *ad hoc* Committee, "[t]his amount[ed] to a kind of
*renvoi* to international law by the very law of the host State".[175] It further held
"that when a tribunal applies the law embodied in a treaty to which Egypt is a
party it is not applying rules alien to the domestic legal system of this country".[176]

**102**      In a series of decisions relating to Argentina, ICSID Tribunals similarly noted
that, according to the Argentine Constitution, treaties are the supreme law of the
nation, and have primacy over domestic laws.[177]

**103**      Still, it would not be wise to rely on the incorporation of international law into
domestic law as a general proposition. The status of international law under domes-
tic constitutions varies greatly. Some constitutions do not provide for an automatic
application of certain parts of international law but require specific incorporation
by legislation. Even where there are constitutional provisions to this effect, their
import is often uncertain. Subsequent domestic enactments may take precedence
over treaties or customary international law or both. Certain parts of international
law may be regarded as non-self-executing or may be defeated by other doctrines
such as Act of State or Political Question. Finally, even constitutional provisions

---

171   Oppenheim's International Law, 9th edition, 54 *et seq.* (1992).
172   *Broches*, The Convention, p. 389; *Delaume*, The Proper Law, p. 89. The States parties in *SPP*
v. *Egypt*, Award, 20 May 1992, 3 ICSID Reports 207 (see para. 47 *supra*), and in *AAPL* v. *Sri
Lanka*, Award, 27 June 1990, 4 ICSID Reports 257, referred to certain treaties as part of their
own domestic law. However, in neither case did the Tribunal accept the host State's law as the
law chosen by agreement.
173   *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, para. 4.3.
174   *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 343.
175   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 42.
176   At para. 44.
177   *CMS* v. *Argentina*, Award, 12 May 2005, paras. 119, 120; *Azurix* v. *Argentina*, Award, 14
July 2006, para. 65; *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, paras. 90, 91;
*Siemens* v. *Argentina*, Award, 6 February 2007, para. 79; *Enron* v. *Argentina*, Award, 22 May
2007, para. 208; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 237, 238.

*Article 42 – Applicable Law* 583

mandating the application of international law may be amended or defeated by other constitutional provisions authorizing or directing action which is contrary to international law. An investor seeking protection in international law must be advised not to put its faith in references to international law in the law of the host State, but to insist either on its explicit inclusion in a choice of law clause or on the application of the second sentence of Art. 42(1).[178]

### c) International Law in the Absence of its Choice

**104** The question remains whether international law will be taken into account by an ICSID tribunal where it is not included in the formula on choice of law agreed to by the parties. At first sight a negative reply would be indicated by the juxtaposition of the first and second sentences of Art. 42(1). Whereas the second sentence includes a reference to applicable rules of international law, the first sentence does not. *A. Broches* has explained this omission as a matter of drafting technique. The first sentence speaks of "rules of law" rather than of a system of national law. Since such "rules of law" may be national as well as international, a separate reference to international law would have been out of place.[179]

**105** The principle of freedom of choice of law (see para. 21 *supra*) would also indicate that a failure to mention international law in an agreement actually amounts to a negative choice of law effectively excluding its applicability. Several authors have, in fact, drawn this conclusion arguing that the application of international law in this situation would violate the parties' declared will.[180] Nevertheless, the practice of ICSID tribunals, the overwhelming weight of writers and important policy considerations all indicate that there is at least some place for international law even in the presence of an agreement on choice of law which does not incorporate it.

**106** In *LETCO* v. *Liberia*, the Tribunal determined that a reference to Liberian legislation in the concession agreement "appears to indicate an express choice by the parties of the Law of Liberia"[181] (see para. 64 *supra*). The Claimant had argued that no express choice of law had been made and that, in accordance with the second sentence of Art. 42(1), international law should also be applied. The Tribunal pointed out that, though the Contracting State's law is recognized as paramount within its own territory, it is nevertheless subjected to the control of international law[182] (see para. 215 *infra*). After confirming the general compliance of Liberian law with the generally accepted principles of public international law,

---

178  *Kreindler, R.*, The Law Applicable, p. 414.
179  *Broches*, Convention, Explanatory Notes and Survey, p. 668.
180  *Bettems, D.*, Les contrats entre Etats et entreprises étrangères 76, 79 (1989); *Masood*, Law Applicable, p. 319; *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 238/9 (1990); *Chukwumerije*, International Law and Municipal Law, pp. 69 *et seq.*; *Nassar, N.*, Internationalization of State Contracts: ICSID, The Last Citadel, 14 Journal of International Arbitration 185, 196 *et seq.* (1997).
181  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 358.
182  *Loc. cit.*

the Tribunal proceeded to examine the legality of the revocation of the concession and the question of damages under both Liberian and international law. It came to the conclusion that

> . . . both according to international law and, more importantly, Liberian law, LETCO is entitled to compensation for damages . . .[183]

**107**     In *SPP* v. *Egypt*, there was also disagreement as to whether a choice of Egyptian law had been made by the Parties and, consequently, whether international law was applicable in conformity with the residual rule of Art. 42(1), second sentence. The Tribunal declared this disagreement immaterial, holding that the same sources of law would have to be applied either way (see paras. 65, 66 *supra*). It found:

> 80. Finally, even accepting the Respondent's view that the Parties have implicitly agreed to apply Egyptian law, such an agreement cannot entirely exclude the direct applicability of international law in certain situations. The law of the ARE [Arab Republic of Egypt], like all municipal legal systems, is not complete or exhaustive, and where a lacuna occurs it cannot be said that there is agreement as to the application of a rule of law which, *ex hypothesi*, does not exist. In such case, it must be said that there is "absence of agreement" and, consequently, the second sentence of Article 42(1) would come into play.[184]

**108**     The Tribunal proceeded to apply international law to defeat an Egyptian argument that certain acts of its officials were invalid under Egyptian law. It held that these acts created expectations protected by the application of the principle of international law establishing the international responsibility of States for unauthorized or *ultra vires* acts of officials having an official character:

> 83. Whether legal under Egyptian law or not, the acts in question were the acts of Egyptian authorities, including the highest executive authority of the Government. These acts, which are now alleged to have been in violation of the Egyptian municipal legal system, created expectations protected by established principles of international law. A determination that these acts are null and void under municipal law would not resolve the ultimate question of liability for damages suffered by the victim who relied on the acts. If the municipal law does not provide a remedy, the denial of any remedy whatsoever cannot be the final answer.

> 84. When municipal law contains a lacuna, or international law is violated by the exclusive application of municipal law, the Tribunal is bound in accordance with Article 42 of the Washington Convention to apply directly the relevant principles and rules of international law.[185]

The Tribunal continued to apply international law in a variety of contexts.[186]

**109**     It is true that the Tribunal never made a determination that Egyptian law was the law chosen by the Parties. However, its insistence that international law was to be applied either way indicates that international law will not be ousted by a simple choice of a national system of law. The Tribunal's reasoning as to lacunae

---

183   At p. 372.
184   *SPP* v. *Egypt*, Award, 20 May 1992, para. 80.
185   At paras. 83 *et seq*.                    186   At paras. 153 *et seq*., 190, 222 *et seq*.

in the chosen domestic law pointing towards an absence of agreement in the sense of Art. 42(1), first sentence, and hence leading to the application of international law in accordance with Art. 42(1), second sentence, may be open to doubt and has, in fact, been criticized.[187] What the Tribunal did, in fact, was not the closing of lacunae but the subjection of the national law to the scrutiny and control of international law. The example of the *ultra vires* acts of Egyptian officials shows that the answer offered by Egyptian domestic law was simply superseded by the solution mandated by international law.

The Tribunal in *Autopista* v. *Venezuela* affirmed the view that the corrective **110** function of international law (see paras. 214–235 *infra*) was also relevant in the case of a choice of law in favour of domestic law. In the specific dispute, the Tribunal had to decide the question of the applicable law on the basis of Art. 42(1), second sentence, ICSID Convention (see paras. 224, 225 *infra*). Nevertheless, the Tribunal expressly considered

> [it] a well accepted practice that the national law governing by virtue of a choice of law agreement (pursuant to Article 42(1) first sentence of the ICSID Convention) [was] subject to correction by international law in the same manner as the application of the host state law failing an agreement (under the second sentence of the same treaty provision).[188]

The Tribunal in *Duke Energy* v. *Peru* also stressed the corrective function of **111** international law even in the absence of its choice.[189] The Tribunal found that the agreement between the investor and the host State did not contain a specific choice regarding the applicable substantive law and that thus the default rule of Art. 42(1), second sentence, ICSID Convention had to apply (see paras. 133 *et seq. infra*). It added, however, that

> even if the law of Peru were held to apply to the interpretation of the [agreement between the investor and the host State], this Tribunal has the authority and duty to subject Peruvian law to the supervening control of international law.[190]

Despite a lack of methodical rigor in these decisions and the fact that some of **112** them were *obiter dicta*, this practice shows a general reluctance to abandon international law in favour of the host State's domestic law. The complete exclusion of standards of international law as a consequence of an agreed choice of law pointing towards a domestic legal system would indeed lead to some extraordinary consequences. It would mean that an ICSID tribunal would have to uphold discriminatory and arbitrary action by the host State, breaches of its undertakings which are evidently in bad faith or amount to a denial of justice as long as they

---

187   See the Dissenting Opinion, 3 ICSID Reports 321 *et seq.*; *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231 at 248, 261 (1993); *Delaume*, L'affaire, p. 48.
188   *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 207. The Tribunal's reasoning on this point expressly relied upon the First Edition of this Commentary.
189   *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 162, footnote 52, also relying on the First Edition of this Commentary.
190   At para. 162.

conform to the applicable domestic law, which is most likely going to be that of the host State. It would mean that a foreign investor, simply by assenting to a choice of law, could sign away the minimum standards for the protection of aliens and their property developed in customary international law. Such a solution would hardly be in accordance with one of the goals of the Convention, namely

> . . . promoting an atmosphere of mutual confidence and thus stimulating a larger flow of private international capital into those countries which wish to attract it.[191]

**113**    The idea that a choice of law clause might be construed as a waiver of the substantive standards of international law is not entirely without parallel in the procedural field. Under so-called Calvo Clauses investors were induced, especially by Latin American host States, to waive any rights to diplomatic protection by their home States. These clauses were less than successful and have been looked upon with some reserve by arbitral tribunals.[192] The limited success of a clause that was specifically designed to exclude remedies under international law must cast grave doubt on the ability of a choice of law clause to exclude international minimum standards by the mere omission of a reference to international law. In addition, it is highly unlikely that parties intend to make a choice to the total exclusion of international law including the international minimum standards.

**114**    It is for these and similar reasons that a number of authors have advocated the retention of international standards for the protection of foreign investments, even in the face of a choice of law clause pointing towards the host State's domestic law alone.[193] As early as 1968, *E. Lauterpacht* (as he then was) has pointed out that the competence of an ICSID tribunal to pass upon questions of international law is inherent in its very status as a tribunal to dispose of issues under international investment contracts in substitution for alternative modes of international protection.[194] Other authors have elaborated on this theme pointing out that it would be extraordinary if the traditional procedure of diplomatic protection ousted by Art. 27 of the Convention were to be replaced by a procedure which ignored internationally guaranteed minimum standards.[195] In a similar vein, the prospect of awards which are in disregard of international law would be difficult to reconcile

191    Report of the Executive Directors, para. 9.
192    *García-Amador, F. V.*, Calvo Doctrine, Calvo Clause, *in*: Encyclopedia of Public International Law, Vol. I, 521 (1992); *Shea, R. R.*, The Calvo Clause (1955).
193    *Curtis*, The Legal Security of Economic Development Agreements, pp. 325 *et seq.*; *Burdeau, G.*, Nouvelles perspectives pour l'arbitrage dans le contentieux économique intéressant les états, Revue de l'arbitrage, 1 at 5 (1995); *Feuerle*, International Arbitration and Choice of Law, pp. 110 *et seq.*; *Firth*, The Law Governing Contracts, pp. 262 *et seq.*; *Goldman*, Le droit applicable, pp. 151 *et seq.* For a broad investigation see *Lillich, R. B.*, The Law Governing Disputes, p. 61.
194    *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 658 (1968).
195    *Muchlinski, P. T.*, Dispute Settlement under the Washington Convention on the Settlement of Investment Disputes, *in*: Control over Compliance with International Law (*Butler, W. E.* ed.) 175 at 186 (1991); *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an

with the general obligation to recognize and enforce awards under Art. 54(1) of the Convention.[196] Other authors have demanded that any agreed exclusion of international law must be made perfectly clear,[197] thereby indicating that the mere omission of its mention in a choice of law clause would not be sufficient to achieve this result.

The weight of the arguments outlined above strongly militates in favour of the **115** preservation of the international minimum standards, even in the absence of a reference to international law in a choice of law clause. Apart from the highly undesirable results that may arise from a complete disregard for international law and the incompatibility of such a course of action with the purpose and overall system of the Convention, it is doubtful whether this problem can be adequately dealt with in terms of choice of law. The mandatory rules of international law, which provide an international minimum standard of protection for aliens, exist independently of any choice of law made for a specific transaction. They constitute a framework of public order within which such transactions operate. Their obligatory nature is not open to the disposition of the parties. This assertion is quite different from questions of applicable law under the conflict of laws. International law does not thereby become the law applicable to the contract. The transaction remains governed by the domestic legal system chosen by the parties. However, this choice is checked by the application of a number of mandatory international rules such as the prohibition of denial of justice, the discriminatory taking of property or the arbitrary repudiation of contractual undertakings.

### 10. Subsequent Changes in the Chosen Law

For the investor, the most dangerous aspect of choosing the host State's domestic **116** legal system is the prospect of subsequent changes in that law which affect the investment. This is particularly so where the host State's law is chosen exclusively. Subsequent changes in the governing law may have an incisive effect on the parties' relationship, going as far as the complete termination of a contract and the expropriation of the investor's property. Such action may be taken in conformity with the host State's constitutional requirements. In fact, measures causing injury to a foreign investor are frequently presented in the form of a change of domestic law. It is evident that exclusive reliance on domestic law and on domestic remedies will be of little or no use in a situation of this kind. Other changes in the host State's law are less dramatic but may still have a profound impact on the investor's activities. They include changes in taxation and labour standards, environmental

---

ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264 at 275 (1993); *Giardina*, La legge regolatrice, pp. 687 *et seq*.

196  The *ad hoc* Committee in *Amco* v. *Indonesia* has echoed these considerations in the context of an absence of choice of law. *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 21. See para. 194 *infra*. These observations are equally valid where the parties have chosen the host State's law.

197  *Broches*, The Convention, Explanatory Notes and Survey, p. 669.

regulations and zoning laws, the freezing of tariffs for utilities and other aspects of the regulatory framework for the investor's operations.

### a) Stabilization Clauses

**117**     One technique to shield a foreign investor from the consequences of a change in the host State's law is the insertion of a stabilization clause into the investment contract. Under such a clause, the host State undertakes to leave the investor unaffected by subsequent changes of the local law. This is not a prohibition to change the law but merely a promise not to apply any changes vis-à-vis the investor or a promise to compensate the investor for any adverse consequences of such a change. From the investor's perspective, the law becomes frozen at the time of the contract. Put differently, the parties' choice of law is specified also in terms of the chosen law's evolution over time. The rules of law agreed to by the parties are only those enacted up to the date of the contract. In order to immunize stabilization clauses against their abrogation by subsequent national law of the host State, it is sometimes said that they are governed by international law even if otherwise the chosen law is domestic law. Despite some debate concerning the precise legal foundations of stabilization clauses and their relationship to the host State's sovereign right to legislate, arbitral practice,[198] as well as scholarly writings,[199] indicate that these clauses are binding and should be respected.

**118**     ICSID Model Clause 10 of 1993[200] dealing with applicable law contains a reference to the possibility to stabilize the chosen law. It suggests the insertion of the words "as in force on the date on which this agreement is signed" (see para. 22 *supra*).[201] Stabilization clauses have, in fact, been used repeatedly in contracts providing for ICSID arbitration (see paras. 26, 34 *supra*, 119–128 *infra*).

**119**     Stabilization clauses need not be comprehensive but may be used selectively. It is possible to apply them only to special areas of concern. Thus, they may be directed to taxation or company law but not to other areas of the host State's law.

---

198   *TOPCO* v. *Libya*, Award, 19 January 1977, 17 ILM 1, 24 (1978); *Kuwait* v. *Aminoil*, Award, 24 March 1982, 66 ILR 519, 586 *et seq.*, 621 *et seq.* (1984).

199   *Begic*, Applicable Law, pp. 84–96; *Curtis*, The Legal Security of Economic Development Agreements, pp. 346 *et seq.*; *Coale, M.*, Stabilisation Clauses in International Petroleum Transactions, 30 Denver Journal of International Law & Policy 217 (2003); *Delaume*, The Proper Law, pp. 23 *et seq.*; *Faruque, A.*, Validity and Efficacy of Stabilisation Clauses, 23 Journal of International Arbitration 317 (2006); *Hansen, T. B.*, The Legal Effect Given Stabilization Clauses in Economic Development Agreements, 28 Virginia Journal of International Law 1015 (1988); *Giardina*, La legge regolatrice, pp. 684 *et seq.*; *Hirsch*, The Arbitration Mechanism, pp. 141 *et seq.*; *Lillich, R. B.*, The Law Governing Disputes, pp. 97 *et seq.*; *Wälde, Th./Ndi, G.*, Stabilizing International Investment Commitments: International Law versus Contract Interpretation, 31 Texas International Law Journal 215 (1996); *Weil, P.*, Les clauses de stabilisation ou d'intangibilité insérées dans les accords de développement économique, *in*: Mélanges offerts à Charles Rousseau: La communauté internationale 301 (1974); and the authorities cited by these authors.

200   4 ICSID Reports 364.

201   Earlier versions of the Model Clauses also offered formulas for stabilization. See the 1981 Model Clause XVII, 1 ICSID Reports 206 and the 1968 Model Clauses XIX and XX, 7 ILM 1176 (1968).

Selective stabilization clauses provide additional flexibility and may be easier to obtain than comprehensive clauses.[202] An example for such a selective stabilization is offered by the Principal Agreement underlying the *Kaiser Bauxite* v. *Jamaica* case which contained a "no further tax" clause.[203]

ICSID tribunals have adopted a favourable attitude towards stabilization clauses. **120** In *AGIP* v. *Congo*, the chosen law was Congolese law supplemented by international law (see para. 33 *supra*). The agreement between the parties contained clauses protecting the investor against certain subsequent changes of Congolese law: the Government undertook not to apply ordinances or subsequent decrees the object of which would be to change the private joint-stock character of the Company set up locally and promised in the event of modifications to the company laws to enact appropriate provisions to ensure that these modifications would not affect the structure and composition of the organs of the Company.[204] The Tribunal, after examining the legality of the Company's nationalization under Congolese law, turned to the situation under international law, pointing out that the act of nationalization was, after all, itself a piece of Congolese law which might provide a juridical basis for the measures (see paras. 97, 98 *supra*). After reciting the clauses, the Tribunal said:

> 86. These stabilization clauses, which were freely entered into by the Government, do not affect the principle of its legislative and regulatory sovereignty since it retains both with respect to those, whether nationals or foreigners, with whom the Government has not entered into such undertakings, and that, in the present case, they are limited to rendering the modifications to the legislative and regulatory provisions provided for in the Agreement, unopposable to the other contracting party.
>
> 87. [. . .] It suffices to concentrate the examination of the compatibility of the nationalization with international law on the stabilization clauses.
>
> 88. It is indeed in connection with these clauses that the principles of international law are used to complete the rules of Congolese Law. The reference made to international law suffices to demonstrate the irregular nature, from the point of view of this law, of the acts of nationalization carried out in the present case. It follows that the Government is obliged to compensate AGIP for the damage suffered by it as a result of the nationalization . . .[205]

This decision shows not only a general deference to the stabilization clauses **121** but also a willingness to regard them as part of international law, thereby shielding them against unilateral abrogation through host State legislation.

In other cases, stabilization clauses did not play a central role in the tribunals' **122** reasoning but were referred to as an effective way to safeguard the rights of

---

202  *Glossner, O./Bartels, M.*, Internationale Bergbauvorhaben und Vertragspraxis für die Beilegung von Streitigkeiten, 28 Recht der Internationalen Wirtschaft/Außenwirtschaftsdienst des Betriebs-Beraters 555, 561 (1982).

203  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 12. The Tribunal did not reach the question of the clause's relevance.

204  *AGIP* v. *Congo*, Award, 30 November 1979, paras. 68–70.

205  At paras. 86–88.

investors. In *LETCO* v. *Liberia*, the Tribunal determined that there had been a choice of Liberian law (see para. 64 *supra*). The Concession Agreement contained the following general stabilization clause:

> Except as otherwise provided in this Agreement, no amendment or repeal of any law or regulation governing this Agreement or any part thereof shall affect the rights and duties of the CONCESSIONAIRE without its consent.[206]

**123**    After pointing out that it had found no indication that the laws of Liberia had been changed so as to affect the Concession Agreement, the Tribunal offered the following observation:

> This clause, commonly referred to as a "Stabilization Clause", is commonly found in long-term development contracts and, as is the case with notification procedures of the Concession Agreement, is meant to avoid the arbitrary actions of the contracting government. This clause must be respected, especially in this type of agreement. Otherwise, the contracting State may easily avoid its contractual obligations by legislation.[207]

**124**    In *MINE* v. *Guinea*, the parties had agreed on Guinean law in force on the date of signature (see para. 26 *supra*) and specified that their agreement would be binding:

> nonobstant toutes les dispositions du droit interne public, administratif ou privé, qui pourraient intervenir en Guinée, et ce, sans exception ni réserve.[208]

**125**    The *ad hoc* Committee observed that subsequent Guinean legislation could not affect the agreement and that the agreement could be said to have "frozen" the applicable law.[209]

**126**    In *SEMOS* v. *Mali*, stability guarantees were contained in national legislation as well as in agreements ("Conventions") with the investor. The Tribunal said:

> [. . .] the 1999 wording of Article 993 of the General Tax Code of Mali constitutes an innovation in relation to the legal texts in force when the Amended Convention was signed. As such, it is not applicable to Semos, in view of the guarantee of the stability of the fiscal and customs regime the company enjoys under the 1970 and 1991 Mining Codes, as well as under the Original and Amended Conventions which are applicable to it.[210]

**127**    In *CMS* v. *Argentina*, the Claimant's licence contained a specific undertaking that the tariff structure would not be subject to further regulation or price control, as well as a more general undertaking that the basic rules governing the licence would not be amended.[211] The Tribunal said:

> The important question, [. . .], is that concerning the right to benefit from stabilization clauses. This discussion is well known in international law and to the

---

206  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 368.
207  *Loc. cit.*
208  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.33.
209  At para. 6.36.
210  *SEMOS* v. *Mali*, Award, 25 February 2003, 10 ICSID Reports 116, 126.
211  *CMS* v. *Argentina*, Award, 12 May 2005, paras. 145–151.

extent this dispute concerns the simultaneous operation of the License and protection under the Treaty, the stabilization ensured a right that the Claimant can properly invoke.[212]

In *Duke Energy* v. *Peru*, the Foreign Investment Law was the basis for the conclusion of "legal stability agreements" (LSAs) which provided for the stabilization of legal regimes applicable to various fundamental rights of foreign investors.[213] The Tribunal held that **128**

> . . . pursuant to the investment laws of Peru, the main features of LSAs are that (i) the stabilized legal regimes cannot be changed unilaterally by the State, and (ii) the agreements are subject to private or civil law and not administrative law.[214]

## b) In the Absence of Stabilization Clauses

The problem of changes to the chosen law subsequent to the agreement becomes considerably more complex where the parties have not agreed on a stabilization clause. The Convention's drafting history shows some awareness of the problem but offers no obvious solution. There was some suggestion that subsequent legislation should not apply, at any rate, if it worked to the investor's detriment (History, Vol. II, pp. 405, 406, 419, 803, 985). On the other hand, the Chairman (Mr. *Broches*) pointed out that it was up to the parties to decide whether they wanted the chosen law to apply as it prevailed from time to time or whether the investor should receive assurances in this respect as part of the incentives offered to the investor (at p. 502). **129**

In the absence of any reference to the time factor, it is difficult to argue that a choice of the host State's law is made on the tacit understanding that it only refers to the law as it existed at the time of the agreement.[215] The more obvious meaning of an agreement on choice of law, unqualified by a stabilization clause, is that the contract is governed by the chosen law subject to later change.[216] This general principle does not, however, mean that the host State is free to dispose of its contractual obligations through subsequent legislation. A number of authors have suggested that host States are not free to change their law in a manner that would defeat, cancel or gravely affect prior contractual commitments.[217] **130**

---

212  At para. 151.
213  *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 24–31, 85.
214  At para. 31.
215  But see *Lauterpacht*, The World Bank Convention, pp. 657/8.
216  *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784 at 805 (1981); *Delaume*, Le Centre, p. 829; *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 70 (1990); *Delaume*, L'affaire, p. 62; *Giardina*, La legge regolatrice, pp. 685 *et seq.*; *Goldman*, Le droit applicable, pp. 152 *et seq.*; *Hirsch*, The Arbitration Mechanism, p. 124.
217  See *Broches*, The Convention, p. 389; *Curtis*, The Legal Security of Economic Development Agreements, p. 329; *Feuerle*, International Arbitration and Choice of Law, p. 119; *Goldman*, Le droit applicable, p. 153; *Hirsch*, The Arbitration Mechanism, p. 124; *Masood*, Law Applicable, p. 323, and the authorities cited by these authors.

**131**    It appears that the solution to this problem can only be found by distinguishing between two different types of legislation in terms of their intended and actual effect. Normal changes to the host State's legal system which may be expected in the course of time to adjust to changing social, economic and technological conditions would undoubtedly apply to existing investment arrangements. These would typically include adjustments of labour law, reasonable changes of tax law and the updating of technical safety standards. These *bona fide* evolutions of the local law would have to apply in a non-discriminatory fashion and in a way which does not point towards undeclared secondary purposes. The situation is different with respect to legislation with the declared or undeclared purpose of defeating undertakings which have been freely made by the host State. Action taken through changes in the local law which is designed to strike at the root of the contractual relationship or to create an environment under which the investor can no longer operate need not be accepted. A repudiation of the contract or the confiscatory expropriation of the investor's property through legislative action are obvious examples. The creation of economic conditions designed to force the investor to abandon its operations would also fall into this category. An obvious indicator of impermissible purpose would be legislation directed selectively at a particular investor or group of investors. The host State's freedom to legislate is limited by the minimum standards of protection mandated by international law (see para. 115 *supra*).

**132**    Under the regime of a bilateral investment treaty, changes in the host State's legislation would be examined primarily against the standard of fair and equitable treatment. The legislative framework existing at the time of the investment will often be the basis for legitimate expectations of the investor. Any drastic change in that framework, that seriously affects the investment, is likely to constitute a breach of the BIT's fair and equitable treatment standard.[218]

### B.  "In the absence of such agreement, . . ."

**133**    Before the tribunal may proceed to apply the residual rule contained in the second sentence of Art. 42(1), it must determine that the parties have not agreed on a choice of law. This determination may be made simply by a search of any contractual document which governs their relationship for an explicit choice of law clause, failing which the tribunal may conclude that there is no agreement on choice of law. This was the method adopted in *Benvenuti & Bonfant* v. *Congo*. After referring to two Articles in agreements between the Parties containing ICSID arbitration clauses, the Tribunal said:

> 4.2. These Articles do not contain any provision regarding the law applicable. In this case, according to Article 42 (1) of the Convention, the Tribunal applies

---

218  See *e.g.*, *CMS* v. *Argentina*, Award, 12 May 2005, paras. 274–276; *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, paras. 124–133; *PSEG* v. *Turkey*, Award, 19 January 2007, paras. 240, 250.

the law of the contracting State which is a party to the dispute as well as the principles of international law in the matter.[219]

Another method is to also look for an indirect or implicit choice of law either in the original agreement or in the parties' subsequent conduct. In two cases it was argued that reference to specific items of the host State's legislation in the agreements between the parties amounted to a general choice of its law. The argument was accepted in *LETCO* v. *Liberia* (see para. 64 *supra*) but the question was left open in *SPP* v. *Egypt* (see paras. 65, 66 *supra*). In *Autopista* v. *Venezuela* it was only partially accepted (see para. 68 *supra*). As pointed out above in para. 69, arguments of this kind should be treated with great caution. Yet another way to infer agreement on choice of law is to look at the parties' submissions to the tribunal in the course of the proceedings (see paras. 70–79 *supra*) or at the reliance on a treaty as an indirect choice of law (see paras. 89–95 *supra*). As a general proposition, agreement on choice of law should be proven and not construed (see para. 76 *supra*). Where a clear indication to this effect is lacking, the tribunal should assume absence of such agreement and apply the residual rule. **134**

The parties may choose a law that fails to provide an answer to the question before the tribunal. In *SPP* v. *Egypt* the Tribunal found that lacunae in the law allegedly chosen by the parties amounted to an "absence of agreement" which led to the application of the residual rule of Art. 42(1), second sentence (see paras. 107, 108 *supra*). The choice of a system of domestic law is unlikely to lead to gaps in the chosen law necessitating resort to the residual rule (see para. 109 *supra*). As pointed out in the Dissenting Opinion to the Award,[220] Egyptian law, like other domestic systems, has its own devices to close any perceived gaps. **135**

However, choice of law clauses which leave the tribunal without clear direction in a particular situation are indeed feasible. This is particularly so since Art. 42(1) does not mandate the choice of an entire system of law but opens the possibility to choose rules of law selectively (see paras. 39–42 *supra*). In *Wena Hotels* v. *Egypt*, the Tribunal found that the parties had chosen the BIT as "the primary source of applicable law for this arbitration". The Tribunal noted that the BIT was a terse document that did not contain all the applicable rules. After quoting Art. 42(1) of the Convention, the Tribunal said: **136**

> The Tribunal finds that, beyond the provisions of the IPPA [*i.e.* the BIT], there is no special agreement between the parties on the rules of law applicable to the dispute. Rather, the pleadings of both parties indicate that, aside from the provisions of the IPPA, the Tribunal should apply both Egyptian law (*i.e.*, "the law of the Contracting State party to the dispute") and "such rules of international law as may be applicable".[221]

---

219  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.2. For similar findings see *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 6.02; *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, paras. 83, 84.

220  *SPP* v. *Egypt*, Dissenting Opinion, 20 May 1992, 3 ICSID Reports 249, 321.

221  *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 79.

**137**    Art. 42(2) contains a clear prohibition of *non liquet* (see paras. 245–248 *infra*), thereby forcing the tribunal to come up with a decision even where the rules of law chosen by the parties do not offer a solution. At the same time, Art. 42(3) makes clear that, unless otherwise directed, the tribunal must rest its decision on legal rules and not on equitable considerations (see paras. 260–265 *infra*). In the case of an agreement on rules of law which turn out to be incomplete, the only acceptable avenue for the tribunal is to turn to the residual rule of Art. 42(1), second sentence, to the extent that the law cannot be determined within the framework of the agreed rules. Therefore, resort to the residual rule remains a possible fallback position, even where the parties have made an agreement, although an incomplete one, on choice of law. But this is unlikely to be the case where the parties have chosen an entire legal system since such a choice of law would include the legal system's rules on closing any gaps (see paras. 246–248 *infra*).

### C.   "... the Tribunal shall apply the law of the Contracting State party to the dispute ..."

#### 1. The Decision in Favour of the Host State's Law

**138**    Earlier versions of what eventually became Art. 42(1) contained no reference to the law of the host State (or "Contracting State party to the dispute"). The Working Paper, the Preliminary Draft and the First Draft provided that, in the absence of an agreement, the tribunal should decide in accordance with such rules of national or (and) international law "as it shall determine to be applicable" (History, Vol. I, pp. 190, 192). The idea behind this somewhat open-ended formula was to let the tribunal find the proper law by applying generally accepted principles of the conflict of laws or private international law (History, Vol. II, pp. 79, 110, 267, 330, 506, 570). As Mr. *Broches* explained, this would lead to the law to which the transaction had the most significant connection. In most cases, this would be the law of the host State, but there would be cases in which other national laws would become applicable (at pp. 514, 571, 800).

**139**    Some delegates wanted more precision (at pp. 469, 669) and a growing number, especially from capital-importing countries, insisted that only the law of the host country could apply in the absence of agreement between the parties (at pp. 418, 419, 466, 513, 515, 516, 653, 660, 663, 800, 801, 802). In the end, Mr. *Broches* accepted these demands and presented a redrafted version which directed the tribunal to apply the law of the State party to the dispute including its rules on the conflict of laws (at p. 804; see also p. 985). The new draft was adopted by a majority of 35 to 1 (at p. 804; see also p. 939 and *cf.* para. 198 *infra*).[222]

---

222   See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Applicable Law and Default Procedure, *in*: International Arbitration Liber Amicorum for Martin Domke 12, 14, 16 (1967); *Broches*, The Convention, Explanatory Notes and Survey, pp. 667/8; *Chukwumerije*, International Law and Municipal Law, pp. 66/7.

The solution eventually adopted contains a clear decision in favour of the host **140**
State's law. The qualifying words at the end of the sentence "as may be applicable"
cannot be taken as making this decision contingent on the particular circumstances
of the case, since these words do not refer to the law of the Contracting State party
to the dispute (see also paras. 201–203 *infra*). Other systems of domestic law
are excluded unless their application is mandated by the host State's rules on the
conflict of laws.[223]

This clear victory for the law of the host State is mitigated by four factors:      **141**

1. In the vast majority of cases, the host State's law is also the law to which the
investment relationship has the closest connection. In other words, it is the law
that general principles of the conflict of laws would most likely designate as the
proper law anyway.[224]

2. The adoption of the host State's law in the second sentence of Art. 42(1)
explicitly includes its conflict of laws rules. Therefore, where a particular con-
tractual relationship has stronger connections to the law of another State, the host
State's private international law will probably provide for *renvoi* to the law of that
other State (see paras. 53–55 *supra*, 161–164 *infra*). It may be expected that the
host State's rules on the conflict of laws will usually lead to the same result as the
generally accepted principles of the conflict of laws envisaged in the earlier drafts
of the Convention.

3. Whenever reliance on the residual rule of Art. 42(1) would lead to unsatis-
factory results the parties may avail themselves of the possibility to choose a more
appropriate set of rules in accordance with the first sentence of the Article (see
also paras. 27–32 *supra*).

4. The host State's law will be subject to the corrective function of international
law. If the host State's law is in violation of international law, the latter will provide
relief to the investor (see paras. 204–229 *infra*).

The formula contained in Art. 42(1) is not only a careful compromise between      **142**
the interests of host States and of investors but also strikes a delicate balance
between flexibility and predictability. While flexibility is provided by the almost
unlimited freedom to agree on a choice of law, the residual rule gives a clear
indication of the rules of law that will govern if no such agreement is made. This
certainty is a unique feature of the ICSID Convention. Other arbitration rules, such
as those of the International Chamber of Commerce (Art. 17(1)),[225] of UNCITRAL

---

223  See, however, the contrary position taken by *Feuerle*, International Arbitration and Choice of
    Law, pp. 114 *et seq.*
224  *Broches, A.*, *in*: Liber Amicorum for Martin Domke, p. 16; *Broches*, The Convention, p. 390;
    *Delaume, G. R.*, Convention on the Settlement of Investment Disputes Between States and
    Nationals of Other States, 1 International Lawyer 64 at 78 (1966); *Hirsch*, The Arbitration
    Mechanism, p. 133; *Kahn*, The Law Applicable, pp. 21 *et seq.*; *Shihata/Parra*, Applicable
    Substantive Law, p. 191.
225  36 ILM 1612 (1979).

(Art. 33(1)),[226] of the American Arbitration Association (Art. 28(1))[227] and of the Iran-US Claims Tribunal (Art. V of the Claims Settlement Declaration),[228] all direct the respective tribunals, in terms, to apply those rules and principles which they determine to be appropriate.[229] Interestingly enough, even the Arbitration Rules governing the ICSID Additional Facility contain a provision that follows the traditional, more open-ended formula:

### Article 54
*Applicable Law*

(1) The Tribunal shall apply the rules of law designated by the parties as applicable to the substance of the dispute. Failing such designation by the parties, the Tribunal shall apply (a) the law determined by the conflict of laws rules which it considers applicable and (b) such rules of international law as the Tribunal considers applicable.

## 2. Application of the Host State's Law by ICSID Tribunals

**143**    In the absence of an agreed choice of law, ICSID tribunals have not hesitated to turn to the law of the host State. In *Benvenuti & Bonfant* v. *Congo*, the Tribunal found that since there was no provision regarding the applicable law in the Parties' arbitration clauses, it had to apply Congolese as well as international law (see para. 133 *supra*).[230]

**144**    In *Amco* v. *Indonesia*, the Tribunal in the original proceedings said after citing Art. 42(1):

148. The parties having not expressed an agreement as to the rules of law according to which the disputes between them should be decided, the Tribunal has to apply Indonesian law, which is the law of the Contracting State Party to the dispute, and such rules of international law as the Tribunal deems to be applicable, considering the matters and issues in dispute.[231]

**145**    In *SOABI* v. *Senegal*, the Tribunal said in relation to Art. 42(1):

In the Tribunal's view, in the absence of agreement between the parties, the national law applicable to the relations of two Senegalese parties in respect of a project that was to take place in Senegal, can only be Senegalese law. The Tribunal is of the opinion that the agreements in question must be characterized as

---

226   15 ILM 714 (1976).
227   As amended and effective 1 April 1997; http://www.adr.org.
228   20 ILM 232 (1981).
229   *Hirsch*, The Arbitration Mechanism, pp. 110/1, 132; *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multi-lateral Instruments on Investment, 12 ICSID Review – FILJ 287, 309 (1997); *Shihata/Parra*, Applicable Substantive Law, p. 191; *Westberg, J. A.*, Applicable Law, Expropriatory Takings and Compensation in Cases of Expropriation: ICSID and Iran-United States Claims Tribunal Case Law Compared, 8 ICSID Review – FILJ 5 (1993).
230   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.2. See also *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 6.02, 6.25.
231   *Amco* v. *Indonesia*, Award, 20 November 1984, para. 148.

"government contracts", the effect and execution of which are governed primarily by the Code of Governmental Obligations (C.G.O.). It appears from the position of the Government stated in its Counter-Memorial (p. 11) and that of SOABI contained in its Reply (p. 7) that both parties agree that the applicable law is Senegalese administrative law.[232]

**146** The apparent contradiction in this passage containing references to an absence of agreement and to the existence of agreement on choice of law (see also para. 58 *supra*) may be resolved in the following way: the parties had not agreed on a choice of law in accordance with Art. 42(1), first sentence. Once the Tribunal had determined that it had to apply Senegalese law in accordance with the second sentence of Art. 42(1), it found corroboration for the application of Senegalese administrative law in the parties' submissions.

**147** In *Genin* v. *Estonia*, the Tribunal restated the rule contained in Art. 42(1). It then concluded that

> [i]n the present case, in the absence of any agreement by the parties to the contrary, it is the law of the Republic of Estonia that applies.[233]

**148** Similarly, in *MCI* v. *Ecuador*, the Tribunal considered that:

> it must respect the provisions of the second part of Article 42(1) of the ICSID Convention, i.e., in the absence of an agreement, the Tribunal shall apply Ecuadorian law, including its rules of private international law and such rules of international law as may be applicable.[234]

**149** In all these cases, the Tribunals proceeded to examine and apply the respective domestic systems of law.[235] In *Benvenuti & Bonfant* v. *Congo* and in *SOABI* v. *Senegal*, the Tribunals also noted that the respective domestic legal systems were heavily influenced by French law and relied on that law as a way of establishing the appropriate rules of the host State's domestic law.[236]

**150** In *Klöckner* v. *Cameroon*, the Tribunal determined that it had to apply the law of the Contracting State, that is the civil and commercial law applicable in Cameroon, which in its relevant part (see para. 165 *infra*) is also based on French law.[237] The Tribunal's subsequent analysis contains some reference to French authorities.[238] Before the *ad hoc* Committee it was argued that the Award should be annulled for manifest excess of powers in the sense of Art. 52(1)(b) of the Convention because of a violation of Art. 42(1). The *ad hoc* Committee had no problem with the Tribunal's basic finding on the applicable law but held that it had failed to

---

232  *SOABI* v. *Senegal*, Award, 25 February 1988, para. 5.02. Footnote omitted.
233  *Genin* v. *Estonia*, Award, 25 June 2001, para. 350.
234  *MCI* v. *Ecuador*, Award, 31 July 2007, para. 217.
235  See also *SEMOS* v. *Mali*, Award, 25 February 2003, 10 ICSID Reports 116, 122–125, where the Tribunal simply applied the law of Mali without a discussion of Art. 42.
236  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.2–4.3; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 5.06 *et seq.*, 5.34, 6.15 *et seq.*, 7.13.
237  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 59. For a critical discussion of this issue see *Elombi*, ICSID Awards, pp. 62 *et seq.*
238  At pp. 62 *et seq.*, 66/7, 70/1.

discharge its duty to actually apply that law[239] (see para. 15 *supra*; Art. 52, paras. 234–238).

**151**    A careful reading of the Award and of the Decision on Annulment suggests that the issue was not a failure to select the correct law nor a material error in the application of that law, a point which the *ad hoc* Committee never addressed, but simply the quality and thoroughness of the reasoning supporting a portion of the Award. The *ad hoc* Committee held that by not providing detailed authority in positive law, the Tribunal had not, in fact, applied the host State's law. Whatever the merits of such a strict standard for the annulment (see paras. 18–20 *supra*), this case is an apt reminder that in applying the host State's law great care must be taken to substantiate any particular findings of law.

**152**    The situation in *Amco* v. *Indonesia* was similar in that the *ad hoc* Committee acknowledged that the Tribunal had correctly identified and selected the proper law in accordance with the second sentence of Art. 42(1).[240] However, in the *ad hoc* Committee's view, the Tribunal had failed to apply an essential rule of Indonesian law and had thereby exceeded its powers[241] (see para. 16 *supra*; Art. 52, paras. 227–230).

### 3. Limits on the Application of the Host State's Law

### a) International Law

**153**    The most important limits on the application of the host State's law arise from the applicable rules of international law and are discussed below at paras. 204–230. These include considerations of international public policy (see paras. 48–52 *supra*) which are not only applicable to cases of choice of law by agreement but also to the application of the host State's law by virtue of the residual rule of Art. 42(1), second sentence.

### b) The Host State's Capacity to Submit to Arbitration

**154**    Other possible limits to the application of the host State's law concern the status and capacity of the parties. Some domestic legal systems contain limitations on the power of the State and of State agencies to enter into arbitration agreements.[242] Unlimited reliance on the host State's law as the law applicable to the dispute would support that State's argument that its submission to ICSID arbitration was invalid.[243] One possible solution to this problem is the adoption of a special clause in the agreement between the parties excluding the application of any provision in

---

239    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 57 *et seq.*
240    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 19.
241    At paras. 93–98.
242    *Delaume*, The Proper Law, pp. 94/5; *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168, 169/70 (1992); *Lalive, P.*, L'Etat en tant que partie à des contrats de concession ou d'investissement conclus avec des sociétés privées étrangères, *in*: 1 New Directions in International Trade Law (*UNIDROIT*) 317 at 326/7 (1977).
243    See *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 4.54 *et seq.*, Dissenting Opinion, paras. 25 *et seq.*

the host State's law which might cast doubt on its capacity to submit to arbitration (see paras. 34, 46 *supra*). Even in the absence of such a specific provision, the arbitration clause may be read as a special agreement on a rule of law in the sense of the first sentence of Art. 42(1) modifying the otherwise applicable law of the host State.

The more difficult question of the State's capacity to contract in violation of its **155** own law (see paras. 46, 47 *supra*) is likely to involve the interplay of domestic and international law (see paras. 204–244 *infra*). The principles of good faith and of estoppel would strongly suggest that a State cannot rely on its own law to extricate itself from contractual commitments to the investor.[244] In addition, Art. 25(1), second sentence, provides that a party may not withdraw its consent unilaterally. It follows that a State cannot rely on a provision of its domestic law to defeat its consent to arbitration (see also paras. 4–8 *supra*; Art. 25, paras. 625–632).

In *Autopista* v. *Venezuela*, the Respondent argued that Venezuelan law did not **156** allow the submission of a dispute concerning the termination of a concession contract to arbitration. The Tribunal rejected this argument as belated.[245] It added the following observation:

> Moreover, a jurisdictional challenge based on an alleged exclusive jurisdiction of a Venezuelan authority would also violate the well-established principle of international law pursuant to which a state cannot rely on its domestic legislation to renege on a contractual obligation to resort to arbitration.[246]

## c) The Investor's Legal Status

Another situation in which the application of the host State's law must be **157** qualified concerns the status of the investor. The legal status and capacity of the foreign investor is not subject to the control of the host State's law but is governed by the law of the State of incorporation.[247]

In *Amco* v. *Indonesia* (see Art. 25, para. 341), the Claimant, a company registered **158** in Delaware, was dissolved under the laws of Delaware approximately one month after the rendering of the first Award. Indonesia argued that under Indonesian law, which was applicable by virtue of Art. 42(1), second sentence, once a limited liability corporation is dissolved, it ceases to exist for any purpose.[248] The Tribunal disagreed with Indonesia's argument on applicable law:

> When a company enters into an agreement with a foreign legal person, the legal status and capacity of that company is determined by the law of the state of incorporation. Similarly, one should apply the law of the state of incorporation to determine whether such a company, though dissolved, is still an existing legal entity for any specified legal purpose.

---

244   See *Schwebel, S. M.*, International Arbitration: Three Salient Problems 68 *et seq.* (1987) and the authorities cited there.
245   *Autopista* v. *Venezuela*, Award, 23 September 2003, paras. 89, 90, 206.
246   At para. 91. See also para. 207. The Tribunal relied on the First Edition of this Commentary.
247   See also *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, paras. 87–89.
248   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 561.

> The dissolution of Amco Asia was governed by the law of the state of Delaware. Under Delaware law Amco Asia remains a juridical entity for purposes of any action, suit or proceeding begun by or against it prior to or within three years of dissolution or until such action, suit or proceeding is completed and any judgment, order or decree therein is executed (Section 278, Delaware General Corporation Law).[249]

**159**    In *Scimitar* v. *Bangladesh* the Respondents objected to jurisdiction on the ground that proceedings had been instituted by persons not competent to act for the Claimant. The Claimant was a company established under the laws of the British Virgin Islands. The Tribunal said:

> It is the joint position of the Parties that the law applicable to the question of corporate transactions and governance is the law of the British Virgin Islands. Upon its own review of applicable law, the Tribunal sees no reason to depart from this position, which is consonant with Article 42 [of the ICSID Convention]. . . . The Tribunal has also examined the question of corporate authorization under the law of the British Virgin islands, which is that proceedings initiated by a corporation without proper corporate authority or authorization are invalid.[250]

Therefore, the Tribunal found that the law governing corporate transactions and governance was the law under which the company had been established. On that basis the Tribunal found that the dispute was not within the jurisdiction of ICSID.[251]

### 4. Subsequent Changes in the Host State's Law

**160**    Most of what has been said about a subsequent change by the host State of its law in the context of the first sentence of Art. 42(1) (see paras. 116–132 *supra*) is equally valid where that law is applicable by virtue of the residual rule of the second sentence. In principle, the host State's law will be applicable as it evolves over time; that is, subject to any changes that may occur after the establishment of the investment relationship. Stabilization clauses (see paras. 117–128 *supra*) are less likely where the parties have not addressed the question of choice of law. Nevertheless, they would have to be respected also in the context of the residual rule. In the more likely case of an absence of a stabilization clause, one would have to distinguish between routine adjustments of the host State's law and changes which fundamentally affect an investment agreement between the parties (see paras. 129–132 *supra*) or otherwise encroach upon rights of the investor protected by international law. Changes of the former kind would have to be accepted by the investor, whereas changes of the latter kind would give rise to the host State's responsibility. However, there is an important difference in this respect between the first and second sentence of Art. 42(1). The problems encountered where an agreed choice of law does not include reference to international law (see paras.

---

249    At p. 562.
250    *Scimitar* v. *Bangladesh*, Award, 5 April 1994, paras. 26, 28.
251    At para. 29.

104–115 *supra*) would not arise here. Under the residual rule of Art. 42(1), the tribunal is instructed to apply the law of the Contracting State party in conjunction with international law. As set out below (see paras. 204–244), any alteration of the host State's law which is in violation of international law would lead an ICSID tribunal to hold that State liable for a breach of its obligations.

### D.  ". . . (including its rules on the conflict of laws) . . ."

The earlier drafts to the Convention had not provided for the application of the host State's law in the absence of agreement on choice of law but had foreseen a wide discretion for the tribunal to apply such rules of law as it would determine to be applicable (History, Vol. I, pp. 190–192). The expectation was that, in exercising this discretion, a tribunal would apply generally accepted principles on the conflict of laws (see paras. 138–140 *supra*). When, under mounting pressure, especially from representatives of capital importing countries, the draft was changed to refer the tribunal to the host State's law, a reference to that State's rules on private international law was added (History, Vol. II, p. 804). The idea was to take some of the rigidity out of the automatic reference to the host State's law in case another system of law has stronger contacts to the transaction and a court of the host State would apply that other system of law.[252] It is this origin in the Convention's drafting history which explains the highly unusual phenomenon of a choice of law clause containing a reference to the conflict rules of the chosen law.[253] Typical situations where a law other than that of the host State would turn out to be the proper law would be commercial loan contracts or licensing agreements[254] (see paras. 27–32 *supra*). **161**

The *renvoi* provision of the second sentence of Art. 42(1) constitutes an important difference to the rule on agreed choice of law in the first sentence. While the difference may be explained in the technicalities of the drafting of Art. 42(1) (see para. 54 *supra*), there is a strong presumption that an agreed choice of law would only refer to the chosen law's substantive provisions (see para. 55 *supra*). The residual rule clearly directs the tribunal to take the host State's own rules on the conflict of laws into account. A tribunal, after having determined that there is no agreement on choice of law, would, therefore, first have to examine the host State's private international law. Only after establishing that these rules do not refer to another system of law may the tribunal proceed to apply the host State's substantive law. **162**

The original Award in *Amco* v. *Indonesia* contains some reference to this process. After noting that the parties had not agreed on a choice of law and that, therefore, the second sentence of Art. 42(1) had to be applied (see para. 144 *supra*), the Tribunal said: **163**

---

252  *Broches*, Convention, Explanatory Notes and Survey, p. 668.
253  *Cf. Delaume*, Le Centre, p. 828; *Delaume*, L'affaire, p. 52.
254  *Delaume, G. R.*, Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 1 International Lawyer 64 at 79 (1966).

> As to Indonesian law, there is no need to enter into a discussion of its conflicts of laws' rules. Indeed, Claimants as well as Respondent were constantly referring, in their discussion on the merits to the substantive law of Indonesia. Moreover, the dispute before the Tribunal relating to an investment in Indonesia, there is no doubt that the substantive municipal rules of law to be applied by the Tribunal are to [be] drawn from Indonesian law.[255]

**164**   There is no doubt that the flexibility provided by the *renvoi* clause of Art. 42(1) somewhat detracts from the predictability achieved through the reference to the host State's law.[256] One possible outcome is that the host State's conflict rules might refer the tribunal to another State's law for certain aspects of the dispute but not for others. While this may appear an unnecessary complication, it is a normal result of private international law rules before domestic courts. Of course, the *renvoi* clause is subject to variation or exclusion by agreement of the parties.

**165**   The only case in which conflict of laws rules of the host State have become relevant involved circumstances which were most probably not in the minds of the drafters of the Convention. In *Klöckner* v. *Cameroon* there was no agreement on choice of law. Therefore, the second sentence of Art. 42(1) became operative directing the Tribunal to apply the law of Cameroon. As a consequence of its colonial heritage, Cameroon continues to apply two different systems of law, common law in the former British Cameroon and the French Civil Code in the previously French part. The Tribunal accepted the Claimant's position that only French law should be applied to the dispute. It noted that the factory project's location and the place where the agreements between the parties were finalized both pointed towards that part of Cameroonian law which was based on French law.[257] The Tribunal proceeded to analyse the merits of the case primarily by reference to French law.[258] However, some uncertainty seems to have lingered in the Tribunal's mind. At one point in its analysis it said:

> In view of the parties' divergence of views as to applicable law under Article 42 of the ICSID Convention, it is appropriate to remark that English law and international law reach similar conclusions.[259]

After citing an English law and an international law authority, the Tribunal reverts to its analysis in the light of French law.

**166**   Despite some reserve that has been expressed towards this use of the *renvoi* rule for choice of law questions arising within a State,[260] the Tribunal's approach

---

255   *Amco* v. *Indonesia*, Award, 20 November 1984, para. 148. This reasoning of the *Amco* Tribunal was expressly endorsed by the Tribunal in *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 87.

256   See esp. *Kahn*, The Law Applicable, pp. 24 *et seq.*, who is highly critical of the *renvoi* provision. *Cf.* also *Giardina*, La legge regolatrice, pp. 690 *et seq.*

257   *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 59.

258   At pp. 61–64, 71/2.

259   At p. 63. See also *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 168.

260   *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 67/8 (1990); *Delaume*, L'affaire, p. 52; *Hirsch*, The Arbitration Mechanism, pp. 134/5.

appears eminently reasonable. What matters in choice of law questions is not political organization but law districts, whether they coincide with a State's boundaries or not. This would have to apply whether the country concerned has a federal structure or not. If the Contracting State party to the dispute were to be the United States, it would make some difference whether the applicable law is that of Delaware or of Louisiana. If the State concerned is the United Kingdom, it would be necessary to clarify whether English or Scottish law is to be applied.

### E.  ". . . and such rules of international law . . ."

#### 1. Rules or Principles of International Law

This passage of Art. 42(1) contains a curious discrepancy between the English **167** and Spanish texts of the Convention on one side and the French text on the other. Whereas the English text speaks of "rules of international law" (Spanish "normas de derecho internacional"), the French text speaks of "principes de droit international" which would be better translated as "principles of international law" and would indicate a higher level of generality and abstraction. Even Mr. *Broches* found the difference hard to explain in view of the joint sessions of the trilingual drafting committee.[261] The mystery is compounded by the fact that the English text of Art. 42(1) contains the word "rules" three times which in the French text is rendered as "règles" twice but as "principes" on the third occasion. The Spanish text is consistent in the use of the word "normas". A look at the drafting history of the French text shows that it initially contained the word "règle" also in reference to international law but that this was changed to "principes" in the Revised Draft for no apparent reason (History, Vol. I, pp. 190–191). This background would indicate that the French term "principes" should not be accorded any particular significance and should not be used to exclude the application of specific rules.[262]

The difference between rules and principles of international law does not seem **168** to have created major difficulties for tribunals. However, in *Klöckner* v. *Cameroon*, the *ad hoc* Committee, writing in French, seemed to be unaware of any version of the Convention other than the French one. In castigating the Tribunal for applying what it assumed to be a basic principle of French law, it notes that Art. 42(1) itself distinguishes between the concepts of "rules of law" and "principles of law".[263] It continues to speculate that the Tribunal might have confused the "principles of international law" referred to in Art. 42(1) with the "general principles of law recognized by civilized nations" in the sense of Art. 38 of the Statute of the International Court of Justice[264] (see paras. 178–182 *infra*).

---

261    *Broches*, The Convention, p. 391.
262    *Broches*, *loc. cit.*; see also the Dissenting Opinion to the Award in *SPP* v. *Egypt*, 2 May 1992, 3 ICSID Reports 326.
263    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 68.
264    At para. 69.

## 2. Finding the Rules of International Law

**169**    Reference to rules of international law was contained in all drafts of the Convention, although their inclusion was by no means uncontested (see para. 198 *infra*). There was repeated concern that the mere reference to rules of international law was too unspecific and required further elaboration (History, Vol. II, pp. 330, 418, 570, 801). Suggestions to clarify the contents of "rules of international law" by reference to the established sources of international law (at p. 418) led to a definition in the First Draft of the Convention which specifically refers to Art. 38(1) of the Statute of the International Court of Justice (History, Vol. I, p. 192; Vol. II, p. 802). This definition was later transferred from the text of the Convention to the Report of the Executive Directors (History, Vol. II, pp. 962, 1029). Its para. 40 runs in part:

> The term "international law" as used in this context should be understood in the sense given to it by Article 38(1) of the Statute of the International Court of Justice, allowance being made for the fact that Article 38 was designed to apply to inter-State disputes.[265]

**170**    The reference to the enumeration of sources of international law as contained in Art. 38(1) of the ICJ Statute by no means resolves the problem of establishing the rules of international law relevant to the particular dispute. It is debatable whether the list provided there paints a complete picture of contemporary international law and whether the neat categories suggested there conform to the complex realities of international legal practice. Nevertheless, this reference demonstrates that an ICSID tribunal is directed to look at the full range of sources of international law in a similar way as the International Court of Justice[266] (see also paras. 192–203 *infra*).

### a) Treaties

**171**    There can be no doubt that treaty law is an important aspect of international law to be applied by ICSID tribunals. First and foremost among treaties would be bilateral investment treaties (BITs) between the host State and the home State of the investor. In addition, a number of multilateral treaties such as the NAFTA,

---

265    The following footnote is attached to the Report of the Executive Directors:
    Article 38(1) of the Statute of the International Court of Justice reads as follows:
        "1. The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:
            a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
            b. international custom, as evidence of a general practice accepted as law;
            c. the general principles of law recognized by civilized nations;
            d. subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules law."
266    *Kahn*, The Law Applicable, pp. 28 *et seq.*

the Energy Charter Treaty and the MERCOSUR Investment Protocols (see paras. 85, 86 *supra*; Art. 25, paras. 457–463) contain detailed rules concerning foreign investment. These treaties are specifically designed to govern the type of relationship that is likely to come before an ICSID tribunal. It is also clear from the Convention's drafting history that BITs were meant to be included among the "rules of international law" of Art. 42(1) (History, Vol. II, p. 984). The large and rapidly growing number of BITs[267] and multilateral treaties dealing with investment makes them the most important source of international law for ICSID tribunals.

*AAPL* v. *Sri Lanka* was the first case in which consent to jurisdiction was based on a BIT. The Tribunal also accepted the Sri Lanka/United Kingdom BIT as the primary source of the applicable legal rules.[268] Although the Tribunal reached this result by construing an implied agreement of the parties through their conduct before the Tribunal (see paras. 60, 61, 70 *supra*), there can be no doubt that the Treaty would have constituted the main source of the rules of international law also under the residual rule of Art. 42(1), second sentence. Ever since that case, reliance on BITs has become a routine feature of numerous ICSID cases. In the majority of contemporary cases, a BIT is the centrepiece of the law applied by tribunals. **172**

Other treaties may also become relevant in ICSID arbitration.[269] In particular, the Vienna Convention on the Law of Treaties is frequently applied by tribunals, especially when interpreting BITs.[270] Human rights treaties have been invoked occasionally before ICSID tribunals but without notable success.[271] **173**

In *SPP* v. *Egypt*, Egypt argued that the cancellation of a tourism project was required by the 1972 UNESCO Convention for the Protection of the World Cultural and Natural Heritage. The Tribunal declared the question of whether the parties **174**

---

267  *Laviec, J.-P.*, Protection et Promotion des Investissements (1985); United Nations Centre on Transnational Corporations: Bilateral Investment Treaties (1988 with 1992 supplement); The World Bank: Legal Framework for the Treatment of Foreign Investment, Vol. I, Survey of Existing Instruments (1992); *Dolzer, R./Stevens, M.*, Bilateral Investment Treaties (1995); Investment Treaties (ICSID ed.) loose-leaf collection.

268  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 20.

269  See *Hirsch, M.*, Interactions between Investment and Non-Investment Obligations, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 154 (2008).

270  See *e.g.*, *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 38–42; *Tokios Tokelès* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 27; *MTD* v. *Chile*, Award, 25 May 2004, para. 112; *Enron* v. *Argentina*, Decision on Jurisdiction (Anc. Claim), 2 August 2004, para. 32; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 80; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 75; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 117, 147–165; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 141; *Camuzzi* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, para. 133; *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 50; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 88–93, 226, 230, 239; *Fraport* v. *Philippines*, Award, 16 August 2007, para. 339.

271  *CMS* v. *Argentina*, Award, 12 May 2005, paras. 114, 121; *Azurix* v. *Argentina*, Award, 14 July 2006, paras. 254, 261; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 75, 79.

had made an agreed choice of law in favour of Egyptian law immaterial, holding that the UNESCO Convention and general international law would be applicable either way[272] (see paras. 65, 66, 107, 108 *supra*). It came to the conclusion that the UNESCO Convention did not justify the measures taken by the Respondent and did not exclude the Claimant's right to compensation. This was primarily so because it was not until some time after the project's cancellation that the area in question was registered in the inventory of property to be protected by the UNESCO Convention. On the other hand, the concern for the antiquities was accepted as genuine.[273]

### b) Customary International Law

**175**     Customary international law offers important guidance in investment disputes. Its rules on the minimum standard for the treatment of aliens including their property, more specifically on expropriation and compensation, on the prohibition of denial of justice and on State responsibility for injury to aliens are obvious examples.[274] In the course of the Convention's drafting, a number of suggestions were made concerning possible rules of international law that might be applied by tribunals. These included protection against discriminatory treatment, the obligation to act in good faith, the prohibition of measures contrary to international public policy, *pacta sunt servanda*, the exhaustion of local remedies and rules on State succession (History, Vol. II, pp. 419, 570, 801, 985). Mr. *Broches* pointed out that the reference to international law in Art. 42 comprised, apart from treaty law, only such principles as that of good faith and the principle that one ought to abide by agreements voluntarily made and ought to carry them out in good faith (at p. 985).

**176**     ICSID tribunals have affirmed in the context of Art. 42(1) that "applying the rules of international law is to be understood as comprising the general international law, including customary international law [. . .]".[275]

**177**     ICSID tribunals have frequently applied rules of customary international law either under the first or second sentence of Art. 42(1). This practice may be illustrated by the following examples:
- principles of State responsibility;[276]
- the principle of respect for acquired rights;[277]

---

272    *SPP* v. *Egypt*, Award, 20 May 1992, paras. 75–78.
273    At paras. 150–159.
274    For a more elaborate analysis see *Firth*, The Law Governing Contracts, pp. 262 *et seq.*
275    *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 89. See also *ADC* v. *Hungary*, Award, 2 October 2006, para. 290.
276    *SPP* v. *Egypt*, Award, 20 May 1992, para. 85; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 108; *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 102; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 89; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 50; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 148; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 190.
277    *Amco* v. *Indonesia*, Award, 20 November 1984, para. 248(v).

- consequences of a state of necessity;[278]
- denial of justice;[279]
- the standard of protection in case of an insurrection;[280]
- nationalization in breach of a stabilization clause;[281]
- expropriation requires compensation;[282]
- the *Chorzów Factory* standard[283] providing the appropriate measure of compensation for wrongful expropriation;[284]
- a lawful nationalization requires a legislative enactment, taken for a *bona fide* public purpose, non-discrimination and appropriate compensation;[285]
- not only tangible property rights but also contractual rights may be indirectly expropriated;[286]
- jurisdiction is determined by reference to the date on which proceedings are instituted;[287]
- is there a requirement to exhaust local remedies?[288]
- is it permissible to pierce the corporate veil to determine jurisdiction?[289]
- are shareholders protected under general international law?[290]

## c) General Principles of Law

Under prevailing theory and practice, general principles of law are found **178** through a process of comparative law whereby features common to domestic

---

278  *CMS* v. *Argentina*, Award, 12 May 2005, paras. 304–331; *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, paras. 245–266; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 294–313; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 101–150; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 333–354, 392–397.

279  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 122–138.

280  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 72.

281  *AGIP* v. *Congo*, Award, 30 November 1979, paras. 84–88.

282  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.64; *Amco* v. *Indonesia*, Award, 20 November 1984, para. 188; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 68–95.

283  *Case Concerning the Factory at Chorzów*, Judgment No. 13, 13 September 1928, Merits, 1928, P.C.I.J., Series A, No. 17, p. 47.

284  *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 8.2.2–8.2.7.

285  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 366.

286  *SPP* v. *Egypt*, Award, 20 May 1992, paras. 160–168.

287  *Goetz* v. *Burundi*, Decision on Jurisdiction, 10 February 1999, para. 72; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 31; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 178; *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, paras. 60, 63; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 117–136; *Enron* v. *Argentina*, Award, 22 May 2007, para. 396.

288  *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, paras. 28 *et seq.*; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 13.1–13.6; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 150–153.

289  *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, paras. 53–56.

290  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 48; *Camuzzi* v. *Argentina I*, Decision on Jurisdiction, 11 May 2005, paras. 144, 145; *Sempra* v. *Argentina*, Decision on Jurisdiction, 11 May 2005, paras. 156, 157.

legal systems are established. Although formally equivalent to treaty and custom, they are frequently used to fill gaps left by these two sources. Since treaties and custom are created through the interaction of States, general principles of law are particularly useful in areas of the law which involve non-State actors such as investment relationships. They have played a prominent role in arbitrations between States and foreign nationals[291] as is aptly illustrated by the practice of the Iran-US Claims Tribunal.[292] General principles of law are an important source of international law also in ICSID cases.[293] Typically, they involve questions of a less political and more technical character than rules of customary international law.

**179**    In *Inceysa* v. *El Salvador*, the Tribunal, after quoting Art. 38 of the Statute of the International Court of Justice, described general principles of law as follows:

> 226. According to the precept transcribed above, the general principles of law are an autonomous or direct source of International Law, along with international conventions and custom.
>
> 227. Without attempting to define what the general principles of law are, the Tribunal notes that, in general, they have been understood as general rules on which there is international consensus to consider them as universal standards and rules of conduct that must always be applied and which, in the opinion of important commentators, are rules of law on which the legal systems of the States are based.[294]

**180**    The practice of ICSID tribunals on general principles of law may be illustrated by the following examples:
- good faith;[295]
- prohibition of corruption;[296]
- nobody can benefit from his or her own fraud (*nemo auditur propriam turpitudinem allegans*);[297]

---

291    *Curtis*, The Legal Security of Economic Development Agreements, pp. 331 *et seq.*; *Kahn, P.*, Les principes généraux du droit devant les arbitres du commerce international, 116 Journal du Droit International 305 (1989); *Lipstein, K.*, International Arbitration between Individuals and Governments and the Conflict of Laws, *in*: Contemporary Problems of International Law: Essays in Honour of Georg Schwarzenberger 177 (1988); *Lillich, R. B.*, The Law Governing Disputes, pp. 107 *et seq.* (1993).

292    *Hanessian, G.*, "General Principles of Law" in the Iran-U.S. Claims Tribunal, 27 Columbia J. Transnat'l L. 309 (1989).

293    *Cherian*, Investment Contracts, pp. 90 *et seq.*; *Gaillard, E.*, Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI). Chronique des sentences arbitrales, 114 Journal du Droit International 135, 159 (1987).

294    *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 226, 227.

295    *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 47; *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 230 *et seq.*

296    *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 111; *World Duty Free* v. *Kenya*, Award, 4 October 2006, paras. 138–157.

297    *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 240 *et seq.*

- general principles of contract law[298] including *pacta sunt servanda*[299] and the *exceptio non adimpleti contractus*;[300]
- estoppel;[301]
- unjust enrichment;[302]
- full compensation of prejudice resulting from a failure to fulfil contractual obligations;[303]
- the principle of compensation in case of nationalization;[304]
- general principles of due process;[305]
- the claimant bears the burden of proof;[306]
- *res judicata*;[307]
- prohibition of abuse of right;[308]
- the duty to mitigate damage;[309]
- no one can transfer a better title than he or she has (*nemo plus iuris transferre potest quam ipse habet*);[310]
- valuation of damages.[311]

---

298  *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 180–183.
299  *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, para. 4.3; *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 248 *et seq. Cf.* also *Toope, S. J.*, Mixed International Arbitration: Studies in Arbitration Between States and Private Persons 241 *et seq.* (1990).
300  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 61 *et seq.*; *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 316.
301  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 47; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 144–145; *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 123; *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 63; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 47; *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 20.1–20.5; *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 244–248; *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 122, 175–177; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 109; *Pan American* v. *Argentina*, Decision on Jurisdiction, 27 July 2006, paras. 140–161; *ADC* v. *Hungary*, Award, 2 October 2006, paras. 474, 475; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 346, 347.
302  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 154–156; *SPP* v. *Egypt*, Award, 20 May 1992, paras. 245–249; *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 253 *et seq.*
303  *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 265–268.
304  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.64.
305  *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 199–201; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 75–79.
306  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 56; *Tradex* v. *Albania*, Award, 29 April 1999, para. 74; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 89; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 19.1, 19.4; *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 100; *Salini* v. *Jordan*, Award, 31 January 2006, paras. 70–75; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 83; *Tokios Tokelès* v. *Ukraine*, Award, 26 July 2007, para. 121.
307  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 548 *et seq.*
308  *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 154–158; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, paras. 119, 125, 213.
309  *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 167.
310  *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, para. 24.
311  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 267; *Fedax* v. *Venezuela*, Award, 9 March 1998, para. 30; *Enron* v. *Argentina*, Award, 22 May 2007, para. 360.

**181**    Before applying presumed general principles of law, great care must be taken to establish these principles by inductive proof and not simply to assume or postulate their existence. In *Klöckner* v. *Cameroon*, the Tribunal, while purporting to apply domestic law, added that a "duty of full disclosure to a partner in a contract" was not only a principle of French civil law but that this was "indeed the case under the other national codes which we know of" and that this was the criterion which "applies to relations between partners in simple forms of association anywhere"[312] (see also paras. 15, 150 *supra*). The *ad hoc* Committee took these allusions as a reference to general principles of law.[313] In annulling the Award, it deplored the absence of any authority for these general principles or universal requirements[314] and concluded that the Award's reasoning seemed more like a simple reference to equity[315] (see paras. 262, 263 *infra*).

**182**    It is important to remember that general principles of law are not a substitute for decisions *ex aequo et bono* provided for in Art. 42(3). These would require specific consent (see paras. 260–265 *infra*). General principles of law are not an expression of general feelings of justice or equity but are part of the body of international law which, in a particular case, must be proven and not presumed. This proof must be furnished on the basis of a rigorous examination, if not of all systems of law at least of the most important major representative systems.

### d) Judicial Decisions

**183**    At one point in the Convention's drafting, concerns about the scarcity or lack of clarity of rules of international law which might have to be applied by ICSID tribunals led to a suggestion to obtain the authorization by the UN General Assembly for ICSID tribunals to seek advisory opinions from the International Court of Justice (History, Vol. II, p. 420). For practical reasons this idea was not pursued. However, ICSID tribunals have relied heavily on previous international judicial decisions as authority when dealing with questions of international law. References to international adjudication include decisions of the Permanent Court of International Justice and of the International Court of Justice, of the European Court of Human Rights, the Iran-US Claims Tribunal and other courts and arbitral tribunals.[316]

**184**    Reference to previous ICSID decisions has become a standard feature in most decisions of ICSID tribunals (see also Art. 53, paras. 16, 17).[317] Tribunals regularly rely on other ICSID decisions and awards to the extent that they find their reasoning persuasive.[318] At times they disregard earlier decisions and voice their

---

312    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 59.
313    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 69.
314    At para. 72.                              315    At para. 77.
316    For a comprehensive survey of citations see *Commission, J. P.*, Precedent in Investment Treaty Arbitration – A Citation Analysis of a Developing Jurisprudence, 24 Journal of International Arbitration 129–158 (2007).
317    For a comprehensive survey see *Commission, op. cit*.
318    See *Bjorklund, A.*, Investment Treaty Arbitral Decisions as *Jurisprudence Constante*, in: International Economic Law: The State and Future of the Discipline (*Picker, C./Bunn, I./Arner, D.*

disagreement.[319] While it is clear that ICSID tribunals are not legally "bound by any other judgments or arbitral awards"[320] and that "the decisions of ICSID tribunals are not binding precedents".[321] tribunals have generally tried to interpret similar issues in a similar way attempting to establish a coherent body of law.[322] The notion of a "common legal opinion or *jurisprudence constante*" first used by the Tribunal in *SGS* v. *Philippines*[323] was espoused by the Tribunal in *AES* v. *Argentina* which spoke of the ICSID *de facto* case-law as the contribution "to the development of a common legal opinion or *jurisprudence constante*, to resolve some difficult legal issues discussed in many cases, inasmuch as these issues share the same substantial features".[324]

In *Gas Natural* v. *Argentina*, the Tribunal took an unusually cautious attitude **185** towards "precedents". It first gave its Decision on Jurisdiction "independently, without considering itself bound by any other judgments or arbitral awards". Only after having reached a result, the Tribunal added that it would be useful to compare its conclusions with the conclusions reached in other ICSID arbitrations.[325]

In *ADC* v. *Hungary* the Tribunal summarized the practice of ICSID tribunals **186** by stating that "cautious reliance on certain principles developed in a number of those cases, as persuasive authority, may advance the body of law, which in turn may serve predictability in the interest of both investors and host States".[326]

---

eds. 2008); *Cheng, T.*, Precedent and Control in Investment Treaty Arbitration, 30 Fordham International Law Journal 1014 (2007); *Kaufmann-Kohler, G.*, Arbitral Precedent: Dream, Necessity, or Excuse, 23 Arbitration International 357 (2007); *Paulsson, J.*, International Arbitration and the Generation of Legal Norms: Treaty Arbitration and International Law, TDM September 2006; *Reinisch, A.*, The Role of Precedent in ICSID Arbitration, *in*: Austrian Arbitration Yearbook 495 (2008); *Schreuer, C.*, Diversity and Harmonization of Treaty Interpretation in Investment Arbitration, TDM, Vol. 3, #2, April 2006; *Schreuer, C./Weiniger, M.*, A Doctrine of Precedent?, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1188 (2008); *Shahabuddeen, M.*, Precedent in the World Court (1996); *Banifatemi, Y.* (ed.), Precedent in International Arbitration (2008).

319 See *e.g.*, *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, paras. 97, 128, 134; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 216–226; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 75, 76. See also *Franck, S. D.*, The Legitimacy Crisis in Investment Treaty Arbitration: Privatizing Public International Law Through Inconsistent Decisions, 73 Fordham Law Review 1521 (2005).

320 *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, para. 36.

321 *Enron* v. *Argentina*, Decision on Jurisdiction (Ancillary Claim), 2 August 2004, para. 25, cited in *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 23. See also *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 352; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 44.

322 *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 352; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 44; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 39; *Suez* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 26, 31, 60–65; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 63, 64; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 391; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 42.

323 *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 97.

324 *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 33.

325 *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 36, 52.

326 *ADC* v. *Hungary*, Award, 2 October 2006, para. 293.

**187**    The Tribunal in *Saipem* v. *Bangladesh* summarized the relevance of previous decisions as follows:

> The Tribunal considers that it is not bound by previous decisions. At the same time, it is of the opinion that it must pay due consideration to earlier decisions of international tribunals. It believes that, subject to compelling contrary grounds, it has a duty to adopt solutions established in a series of consistent cases. It also believes that, subject to the specifics of a given treaty and of the circumstances of the actual case, it has a duty to seek to contribute to the harmonious development of investment law and thereby to meet the legitimate expectations of the community of States and investors towards certainty of the rule of law.[327]

### e) Writings

**188**    As would be expected, ICSID tribunals and *ad hoc* committees have also frequently relied on academic writings. With regard to the interpretation of the ICSID Convention, the First Edition of this Commentary has frequently been relied upon by ICSID tribunals.[328]

### f) Resolutions and Guidelines

**189**    In addition to the classical sources of international law as enumerated in Art. 38(1) of the Statute of the ICJ, ICSID tribunals have also had occasion to refer to resolutions of the General Assembly on questions of nationalization.[329]

**190**    During the drafting of the Convention, concern that the scarcity of well-established rules in the area of international investment law might cause difficulties led the French and British representatives to propose that at least a general code of conduct or guidelines for the investor and the host country should be laid down (History, Vol. II, pp. 418, 420). At the time of drafting it did not appear possible to enter into the substance of investment law. However, the World Bank has since adopted guidelines on the treatment of foreign direct investment.[330]

**191**    When looking at such guidelines and General Assembly resolutions, it must be borne in mind that they do not necessarily reflect "rules of international law" in the sense of Art. 42(1). They may become part of the law applicable by virtue of their incorporation into an agreement on choice of law under the first sentence of Art. 42(1) (see para. 42 *supra*), through a reference contained in a treaty, or because they reflect customary international law.

---

327  *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 67. See also *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 50.

328  For a comprehensive survey of citations see *Commission, J. P.*, Precedent in Investment Treaty Arbitration – A Citation Analysis of a Developing Jurisprudence, 24 Journal of International Arbitration 129–158 (2007).

329  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 188; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 366; *SPP* v. *Egypt*, Dissenting Opinion to Award, 20 May 1992, 3 ICSID Reports 254/5.

330  Report to the Development Committee and Guidelines on the Treatment of Foreign Direct Investment, 31 ILM 1363 (1992).

## F. ". . . as may be applicable."

### *1. Applicability of International Law to Investment Disputes*

### *a) Reliance of Private Parties on International Law*

The Report of the Executive Directors in defining the term "international law" **192** refers to Art. 38(1) of the Statute of the International Court of Justice but adds that allowance would have to be made for the fact that Article 38 was designed to apply to inter-State disputes (see para. 169 *supra*). The meaning of this qualification is by no means clear. It could mean that rules of international law would have to be appropriately adjusted to apply to relationships in which one party is not a State. For instance, rules of the Vienna Convention on the Law of Treaties might be adapted to apply to agreements between investors and host States. It could also mean that rules of international law, which by their nature are designed to apply between States, are not applicable between a State and a foreign investor. The latter view has prompted some authors to argue that the remedies of a private investor would arise solely from its contractual relationship with the host State and that the private party cannot invoke the principles of State responsibility.[331]

This view appears unfounded. Already in the course of the Convention's draft- **193** ing, it was repeatedly pointed out, especially by the Chairman (Mr. *Broches*), that an investor before an ICSID tribunal would have identical rights to those of its government exercising diplomatic protection (History, Vol. II, pp. 259, 267, 400, 420). *E. Lauterpacht* has argued cogently that the waiver of diplomatic protection contained in Art. 27(1) makes it essential that the Convention provides a substi- tute for the consideration of the international law aspect which is excluded by that provision.[332] The purpose of the Convention, advancing the cause of investment, could not be achieved by withdrawing an important procedure for the investor's protection without having all legal issues decided by a single tribunal.[333] In addi- tion, enforcement of awards under Art. 54 is only conceivable if they are in conformity with international law.[334]

This line of reasoning was adopted by the *ad hoc* Committee in *Amco* v. **194** *Indonesia* which found that the application of international law and its precedence over domestic law was

> . . . suggested by an overall evaluation of the system established by the Conven- tion. The law of the host State is, in principle, the law to be applied in resolving the dispute. At the same time, applicable norms of international law must be complied with since every ICSID award has to be recognized, and pecuniary

---

331 *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 243 *et seq.* (1990); *Masood*, Law Applicable, p. 321.

332 *Lauterpacht*, The World Bank Convention, pp. 655/6. See also History, Vol. II, p. 803.

333 *Ibid.*, at p. 660.

334 *Giardina, A.*, The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214 at 217/8 (1989).

obligations imposed by such award enforced, by every Contracting State of the Convention (Art. 54(1), Convention). Moreover, the national State of the investor is precluded from exercising its normal right of diplomatic protection during the pendency of the ICSID proceedings and even after such proceedings, in respect of a Contracting State which complies with the ICSID award (Art. 27, Convention). The thrust of Article 54(1) and of Article 27 of the Convention makes sense only under the supposition that the award involved is not violative of applicable principles and rules of international law.[335]

**195**    In a number of investment cases, the question arose whether private parties could invoke the principles of State responsibility even though these principles primarily address responsibility between States. The International Law Commission clarified, however, that its 2001 Articles on State Responsibility[336] "apply to the whole field of the international obligations of States, whether the obligation is owed to one or several States, to an individual or group, or to the international community as a whole".[337] ICSID tribunals thus have had no difficulty in relying on State responsibility principles, especially those concerning the attribution of conduct to host States, or the preclusion of wrongfulness.[338]

**196**    In *Azurix* v. *Argentina*, the Tribunal relied on customary international law principles as evidenced by the ILC Articles on State Responsibility in order to attribute acts of Argentine provinces to the Republic of Argentina. The Tribunal held:

> The responsibility of States for acts of its organs and political subdivisions is well accepted under international law. The Draft Articles [. . .] are the best evidence of such acceptance and as such have been often referred to by international arbitral tribunals in investor-State arbitration.[339]

**197**    The application of international law to the relationship between a State and a foreign investor is not limited to reliance of private parties on international law. It may also result from the invocation of international law by host States. The cases in which Argentina invoked the plea of necessity as a ground for precluding international wrongfulness provide examples of such a situation. Without explicitly discussing the question whether state responsibility principles were applicable to the relationship between a State and a foreign investor, the tribunals in *CMS*

---

335  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 21.

336  Draft Articles on Responsibility of States for Internationally Wrongful Acts, *in*: Report of the International Law Commission on the Work of Its Fifty-third Session, UN GAOR, 56th Sess., Supp. No. 10, 43, UN Doc. A/56/10 (2001).

337  Commentaries to the Draft Articles on Responsibility of States for Internationally Wrongful Acts, adopted by the International Law Commission at its fifty-third session (2001), Official Records of the General Assembly, Fifty-Sixth Session, Supplement No. 10 (A/56/10), 62. See also *Crawford, J.*, The International Law Commission's Articles on State Responsibility 76 (2002).

338  *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 108; *Tokios Tokelés* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 102; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 89; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 148; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, para. 190.

339  *Azurix* v. *Argentina*, Award, 14 July 2006, para. 50.

*Article 42 – Applicable Law*                                    615

v. *Argentina*,[340] *LG&E* v. *Argentina*,[341] *Enron* v. *Argentina*[342] and *Sempra* v. *Argentina*[343] implicitly gave affirmative answers by applying Art. 25 of the ILC Articles as an expression of general international law on state of necessity.

### b) International Nature of Investment Disputes

A somewhat different argument against the application of international law **198** was put forward by the representatives of capital-importing countries during the Convention's drafting. They insisted that a foreign investor, by making the investment, submitted to the host State's law, that the host State's sovereignty required the exclusive application of its law and that reliance on international law might actually contribute to the perpetuation of an unjust system (History, Vol. II, pp. 267, 501, 505, 513/4, 571, 801 *et seq.*, 804, 984). In turn, representatives of capital-exporting countries insisted on the necessity to retain international law as part of the applicable law (at pp. 419, 421, 801, 803). At one point, representatives of capital-importing countries suggested that international law only be used in cases of alleged discrimination (at p. 800) or in order to fill lacunae in the host State's law (at pp. 802/3). Eventually, a compromise was reached which preserved the applicability of international law but yielded to demands of developing countries that the national law to be applied in the absence of agreement on choice of law would be that of the host State[344] (see paras. 138–140 *supra*). A vote taken under these auspices produced a majority of 24 to 6 in favour of retaining the formula which included international law (at p. 804). A suggestion to limit the application of international law to cases where the domestic legislation of the host State was silent was defeated by 19 to 7 (at p. 804).[345]

---

340  *CMS* v. *Argentina*, Award, 12 May 2005, para. 315: "The Tribunal, like the parties themselves, considers that Article 25 of the Articles on State Responsibility adequately reflect[s] the state of customary international law on the question of necessity."

341  *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 245: "[. . .] the Tribunal recognizes that satisfaction of the state of necessity standard as it exists in international law (reflected in Article 25 of the ILC's Draft Articles on State Responsibility) supports the Tribunal's conclusion."

342  *Enron* v. *Argentina*, Award, 22 May 2007, para. 303: "The Tribunal's understanding of Article 25 of the Articles on State Responsibility, to the effect that it reflects the state of customary international law on the matter, is not different from the view of the parties in this respect. This is not to say that the Articles are a treaty or even a part of customary law themselves; it is simply the learned and systematic expression of the development of the law on state of necessity by decisions of courts and tribunals and other sources along a long period of time."

343  *Sempra* v. *Argentina*, Award, 28 September 2007, para. 344: "The Tribunal shares the parties' understanding of Article 25 of the Articles on State Responsibility as reflecting the state of customary international law on the matter."

344  *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Applicable Law and Default Procedure, *in*: International Arbitration Liber Amicorum for Martin Domke 12 at 16 (1967).

345  For detailed accounts of the *travaux préparatoires* on this point see *Cherian*, Investment Contracts, pp. 78 *et seq.*; *Masood*, Law Applicable, p. 313.

## 2. Which Rules of International Law are Applicable?

**199**     The acceptance of the applicability of international law, in principle, to disputes before ICSID tribunals does not answer the question as to the meaning of the qualifying phrase "as may be applicable". It might be inferred from these words that only some rules of international law are applicable while others are not.

**200**     There is no good reason to believe that the applicability of rules of international law might depend on their incorporation into or adoption by the host State's domestic law. A suggestion in the course of the drafting of Art. 42(1) to make international law applicable only if the national law of the host country so provides did not prevail (History, Vol. II, p. 802). Unlike the domestic law of another country which depends on the host State's rules on the conflict of laws for its applicability (see paras. 161–166 *supra*), international law is independent of such domestic rules. This is clear from the wording of Art. 42(1). Whereas the "rules on the conflict of laws" are linked to "the law of the Contracting State" by the word "including", no such linkage exists for the "rules of international law". If the drafters had intended to make the applicability of international law dependent on the provisions of the host State's law, they would have chosen words such as "and including such rules of international law as may be applicable", or "and such rules of international law as may be applicable by virtue of the rules of the law of the Contracting State".[346] Most ICSID tribunals, when applying rules of international law, have not investigated their status under the host State's domestic law.[347] However, some tribunals have noted that, in situations falling under Art. 42(1), second sentence, international law is applicable also by virtue of its incorporation into domestic law (see paras. 100–103 *supra*).[348]

**201**     The most plausible explanation for the words "as may be applicable" can be found in the drafting history of Art. 42(1). The Working Paper, the Preliminary Draft and the First Draft referred the tribunal to rules of national or (and) international law "as it shall determine to be applicable" (History, Vol. I, pp. 190, 192). At that stage, the idea was to let the tribunal find the proper law by applying generally accepted principles of the conflict of laws. Eventually, the view prevailed that the national law to be applied should not be left to the determination of the tribunal but should be the law of the host State (see paras. 138–140 *supra*). Therefore, the words concerning the determination of the applicable law were severed from the part of the sentence dealing with national law and were moved to the end of the paragraph.

---

346  *Broches*, The Convention, pp. 391/2; *Firth*, The Law Governing Contracts, p. 274; *Lauterpacht*, The World Bank Convention, p. 660.

347  See, however, the Dissenting Opinion to the Award in *AAPL* v. *Sri Lanka*, 27 June 1990, 4 ICSID Reports 299, which emphasizes the applicability of international law by virtue of its incorporation into Sri Lankan law.

348  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 42; *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 90.

A look at the French version of the Convention confirms the impression that, **202** in the course of drafting, this phrase lost its original meaning (History, Vol. I, pp. 190–192). The earlier drafts corresponded to their English counterpart by directing the tribunal to apply "règles de droit international ou (et) national, qu'il considère applicables". Since the insertion of the rule on the applicability of the host State's law, the formula "as may be applicable" is rendered in the French version by the words "en la matière" which is probably best translated as "on the subject". It follows that this phrase is not designed to limit the rules of international law by declaring some of them inapplicable. It simply means that the relevant rules of international law are to be applied.[349] This interpretation is corroborated by the defeat of attempts during the Convention's drafting to limit the applicability of international law (see para. 198 *supra*).

This interpretation was expressly endorsed by the Tribunal in *LG&E* v. **203** *Argentina*. It rejected the idea that the words "as may be applicable" would make the application of international law conditional. Instead, it shared the view that the applicability criterion meant that the relevant rules of international law were to be applied. The Tribunal held:

> 88. With reference to the rules of international law and, particularly, to the language "as may be applicable", found in Article 42(1) of the ICSID Convention, the Tribunal holds the view that it should not be understood as if it were in some way conditioning application of international law. Rather, it should be understood as making reference, within international law, to the competent rules to govern the dispute at issue. This interpretation could find support in the ICSID Convention's French version that refers to the rules of international law "*en la matière*".[350]

### 3. The Relationship of International Law to Domestic Law

The relationship of international law to the host State's domestic law has turned **204** out to be the most complex question in the application of the second sentence of Art. 42(1).[351] The Working Paper and the Preliminary Draft had provided for the application of "rules of law, whether national *or* international" (emphasis added; see History, Vol. I, pp. 190, 192). The word "or", which had indicated two mutually exclusive alternatives, was replaced by the more neutral "and" in the First Draft (History, Vol. I, p. 192; Vol. II, p. 421). An attempt to restrict the applicability of international law to filling gaps in the host State's law was defeated (at pp. 802–804; see para. 198 *supra*). Although some mention was made of a principle of priority for domestic law which was to be "of primary importance" and would be applied "in the first place" (at pp. 571, 800, 984), a suggestion to insert the word "first" into the text was not adopted (at p. 804). It was made clear that international law would prevail where the host State's domestic law violated international law, for instance, through a subsequent change of its own law to the

---

349  *Giardina*, La legge regolatrice, pp. 692/3.
350  *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 88. Footnotes omitted. The Tribunal cited the First Edition of this Commentary.
351  *Di Pietro*, Applicable Law, p. 250.

detriment of the investor (at pp. 570/1, 985). The Chairman's explanation of the vote which retained the reference to international law (at p. 804; see also para. 198 *supra*) pointed out that international law would come into play both in the case of a lacuna in domestic law and in the case of any inconsistency between the two (at p. 804). Asked whether the validity of the host State's law could be questioned before an ICSID tribunal, Mr. *Broches* answered that the validity of national laws would not be at issue but that a valid law of the host State might give rise to international responsibility (at p. 986).

**205**    The formula of the supplemental and corrective effect of international law used to be widely accepted. Most commentators, writing on this aspect of Art. 42(1), agreed that the function of international law was to close any gaps in domestic law as well as to remedy any violations of international law that may arise through the application of host State law.[352]

*a) Parallel Application of International and Domestic Law*

**206**    In the practice of ICSID tribunals, especially in earlier decisions, domestic law and international law were frequently looked at side by side without any deeper analysis of their relationship. In a number of cases, the tribunals were content simply to state in general terms that there was an identity of rules or that the host State's domestic law was in conformity with international law.

**207**    In *Adriano Gardella* v. *Côte d'Ivoire*, the dispute turned on reciprocal claims for breach of a joint venture agreement. The Tribunal said:

> 4.3 Both parties admit that their agreement is governed by the law of the Ivory Coast. Gardella has pleaded, it is true, that the law of the Ivory Coast ought to apply, in this case, within the framework and in the context of public international law. However, Gardella has not drawn any other conclusion from that argument than that it is necessary to have regard to the rule "pacta sunt servanda" and to the principle of good faith, principles which are equally recognized by the law of the Ivory Coast as well as by French law.[353]

**208**    In *Benvenuti & Bonfant* v. *Congo*, the Tribunal applied the law of the Congo and international law in accordance with the second sentence of Art. 42(1) (see para.

---

352    *Broches*, The Convention, p. 392; *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 68 *et seq.* (1990); *Feuerle*, International Arbitration and Choice of Law, pp. 118/9; *Giardina, A.*, The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214 at 217 (1989); *Goldman*, Le droit applicable, p. 151; *Hirsch*, The Arbitration Mechanism, pp. 134, 140/1; *Jaenicke, G.*, The Prospects for International Arbitration: Disputes between States and Private Enterprises, *in*: International Arbitration: Past and Prospects (*Soons, A. H. A.* ed.) 155 at 159 (1990); *Kahn*, The Law Applicable, p. 213; *Lauterpacht*, The World Bank Convention, p. 660; *Sacerdoti*, Investment Arbitration Under ICSID and UNCITRAL Rules: Prerequisites, Applicable Law, Review of Awards, p. 23. See, however, *Rubino-Sammartano, M.*, International Arbitration Law 55 (1990); *Chukwumerije*, International Law and Municipal Law, pp. 82 *et seq.*; *Elombi*, ICSID Awards, pp. 66 *et seq.*; *Igbokwe, V. C.*, Developing Countries and the Law Applicable to International Arbitration, 14 Journal of International Arbitration 99, 114 *et seq.* (1997); *Nassar*, Internationalization, pp. 202 *et seq.*

353    *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, para. 4.3.

133 *supra*) but was also authorized to rule *ex aequo et bono* in accordance with Art. 42(3) (see para. 259 *infra*). The Tribunal determined that the Government had seized the Claimant's assets and must therefore be ordered to pay damages. On the law applicable, the Tribunal was rather terse:

> 4.64. This principle of compensation in case of nationalization is in accordance with the Congolese Constitution and constitutes one of the generally recognized principles of international law as well as of equity.[354]

In *Klöckner* v. *Cameroon*, the Tribunal after examining the law of the host **209** State on the *exceptio non adimpleti contractus* simply added that international law reaches similar conclusions[355] (see para. 165 *supra*).

In *Amco* v. *Indonesia*, the first Tribunal found that in the absence of an agree- **210** ment on choice of law between the parties, it had to apply Indonesian law and international law (see para. 144 *supra*). It added that both parties had left no doubt that they believed both Indonesian law and international law to be applicable by constantly referring to both legal systems in their pleadings and oral arguments.[356] The Tribunal proceeded to examine a number of legal questions from the perspectives of Indonesian law and international law, finding in each case that both systems led to identical solutions. Thus, it held that under both legal systems there is a right of the State to nationalize private property in the public interest coupled with a duty to compensate the previous owner.[357] The modalities of the revocation of the investment authorization were held contrary to Indonesian regulations as well as to the "general and fundamental principle of due process".[358] On the substance of Indonesia's liability for the withdrawal of the investment authorization, the Tribunal went into a detailed examination of Indonesian as well as international law, both of which established that the Respondent had acted illegally and was liable to pay damages.[359] In discussing the legal basis for its calculation of the damages, the Tribunal, once again, found that there was a concordance between Indonesian and international law.[360] The investor's right to full and effective compensation required the repatriation of the money awarded in US Dollars also under Indonesian law.[361] Finally, in determining the date for the commencement of interest, the Tribunal decided that Indonesian and international law required that interest must run from the date of the Request for Arbitration.[362]

These instances of a parallel application of domestic and international law, cou- **211** pled with assurances of their harmony, do not provide much useful information on the interaction of the two legal systems. It is obvious that the tribunals did not draw upon international law in its supplemental function, since there were no gaps in the domestic law that needed to be filled. It is arguable that an attempt was

---

354  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.64.
355  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 63.
356  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 148.
357  At para. 188.                              358  At para. 201.
359  At paras. 245–250.                          360  At paras. 265–268.
361  At para. 280.                               362  At para. 281.

made to employ international law in its corrective function. Under this reading, the tribunals made sure that the solutions offered by domestic law did not violate international law. However, the way in which the legal arguments are presented in these cases does not support the assumption that domestic law was checked against international law for compliance. Rather, each legal position was adopted after being established separately under national and international law. Such a parallel application may seem reasonable where compliance with mandatory standards of international law is at stake. It is much less convincing where the rules of international law derive from general principles of law. If a clear rule is offered by the host State's domestic law, a comparative search for general principles is of doubtful value. It will be difficult to argue that there is a general principle of law which is at variance with the host State's law. Moreover, general principles of law do not necessarily set mandatory minimum standards which must be complied with.

**212**    The Decision on Annulment in *Amco* v. *Indonesia* contains a brief hint that the *ad hoc* Committee was aware of this aspect. It approved the way in which the Tribunal had substantiated Indonesia's obligation under Indonesian law to pay damages in US Dollars outside Indonesia and converted as of the day on which the damage occurred (see para. 210 *supra*). However, it added that the Tribunal's amplification concerning international law in this regard appeared *obiter*.[363] In *Mobil Oil* v. *New Zealand*, the Tribunal found it unnecessary to deal with "the difficult questions of international law" since it found in favour of Mobil on the basis of New Zealand law.[364]

**213**    Considerations of this kind may have been on the minds of the Tribunal in *SOABI* v. *Senegal*. After citing Art. 42(1), the Tribunal determined that there was no agreement on choice of law between the parties and concluded that, under the prevailing circumstances, the applicable law could only be Senegalese law[365] (see paras. 145, 146 *supra*). It proceeded to examine the legal questions surrounding the Government's unilateral termination of the contract purely from the perspective of the host State's law. On this basis, it found in favour of the investor and awarded compensation.[366] It is possible that the Tribunal examined the results reached on the basis of domestic law for compliance with international law but found it unnecessary to say so. More probably, the lack of any reference to international law was caused by a failure of the parties to plead it before the Tribunal.

### b) Supplemental and Corrective Function of International Law

**214**    Starting with the *ad hoc* Committee's decision in *Klöckner* v. *Cameroon*, a more careful discussion of the interaction of international and national law can be observed. The Tribunal had based part of its Award on a somewhat broadly defined

363    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 118.
364    *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, 4 ICSID Reports 196/7. See also at pp. 166 and 210.
365    *SOABI* v. *Senegal*, Award, 25 February 1988, para. 5.01.
366    At paras. 5.01 *et seq.*

principle which it sought to base on French law as well as on other national codes (see paras. 15, 150, 181, 209 *supra*). The *ad hoc* Committee said:

> Article 42 of the Washington Convention certainly provides that "in the absence of agreement between parties, the Tribunal shall apply the law of the Contracting State party to the dispute . . . and *such principles of international law as may be applicable*". This gives these principles (perhaps omitting cases in which it should be ascertained whether the domestic law conforms to international law) a dual role, that is, *complementary* (in the case of a "lacuna" in the law of the State), or *corrective*, should the State's law not conform on all points to the principles of international law. *In both cases*, the arbitrators may have recourse to the "principles of international law" only *after* having inquired into and established the content of the law of the State party to the dispute (which cannot be reduced to *one* principle, even a basic one) and *after* having applied the relevant rules of the State's law.
>
> Article 42(1) therefore clearly does not allow the arbitrator to base his decision *solely* on the "rules" or "principles of international law".[367]

The decision thus confirms the supplemental and corrective functions of international law while emphasizing that an award may not be based on international law alone.

The Award in *LETCO* v. *Liberia* determined that the parties had by their reference to Liberian legislation in the Concession Agreement chosen the law of Liberia as the governing law (see para. 64 *supra*). In response to the Claimant's argument that no express choice of law had been made and that, therefore, the second sentence of Art. 42(1) applied, the Tribunal said:

**215**

> This provision of the ICSID Convention envisages that, in the absence of any express choice of law by the parties, the Tribunal must apply a system of concurrent law. The law of the Contracting State is recognized as paramount within its own territory, but is nevertheless subjected to control by international law. The role of international law as a "regulator" of national systems of law has been much discussed, with particular emphasis being focused on the problems likely to arise if there is divergence on a particular point between national and international law. No such problem arises in the present case; the Tribunal is satisfied that the rules and principles of Liberian law which it has taken into account are in conformity with generally accepted principles of public international law governing the validity of contracts and the remedies for their breach.[368]

In view of the prior finding that there had been an agreed choice of law, the Tribunal's observations on the interpretation of the second sentence of Art. 42(1) are *obiter*. It is still worth noting that the Tribunal examined the merits of the case on the basis of national as well as international law (see para. 106 *supra*).

---

367  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 69. Italics original. The original decision was rendered in French. The reference to "principles of international law" rather than "rules of international law" is explained by a discrepancy between the French and English texts of Art. 42(1). See paras. 167, 168 *supra*.

368  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 358/9.

**216**    The *ad hoc* Committee in *Amco* v. *Indonesia* approved of the Tribunal's use of Art. 42[369] (see para. 210 *supra*). It reiterated the formula of the supplemental and corrective function of international law:

> 20. It seems to the *ad hoc* Committee worth noting that Article 42(1) of the Convention authorizes an ICSID tribunal to apply rules of international law only to fill up lacunae in the applicable domestic law and to ensure precedence to international law norms where the rules of the applicable domestic law are in collision with such norms.[370]

It found that this relationship of international law vis-à-vis the law of the host State was suggested by an overall evaluation of the Convention's system, notably by Arts. 27 and 54(1)[371] (see para. 194 *supra*).

**217**    The second Tribunal in the resubmitted case of *Amco* v. *Indonesia* noted the positions of the first Tribunal and of the *ad hoc* Committee (see paras. 210, 216 *supra*). It also observed that Indonesia had advanced legal arguments on each of the issues under, first, the heading of Indonesian law and, second, the heading of international law. Nevertheless, counsel for Indonesia had explained that international law was only relevant if there was a lacuna in the law of the host State, or if the law of the host State was incompatible with international law, in which case the latter would prevail. Amco submitted no contrary arguments. The Tribunal said:

> 40. This Tribunal notes that Article 42(1) refers to the application of host-state law and international law. If there are no relevant host-state laws on a particular matter, a search must be made for the relevant international laws. And, where there are applicable host-state laws, they must be checked against international laws, which will prevail in case of conflict. Thus international law is fully applicable and to classify its role as "only" "supplemental and corrective" seems a distinction without a difference. In any event, the Tribunal believes that its task is to test every claim of law in this case first against Indonesian law, and then against international law.[372]

**218**    The Tribunal proceeded to examine the substantive questions before it in accordance with this method. On the point of the revocation of Amco's licence the Tribunal first looked into Indonesian law concluding that it did not clearly stipulate whether a procedurally unlawful act *per se* generates compensation or whether a decision tainted by bad faith is necessarily unlawful.[373] It then turned to international law finding that there the decisive criterion was the existence of a denial of justice. It concluded that the circumstances surrounding the revocation of the licence constituted a denial of justice making the decision unlawful irrespective of certain substantive grounds that may have existed for it.[374] The procedure employed by the Tribunal to establish principles of compensation and the method of valuation was similar. It found that non-speculative lost profits were recoverable

---

369  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 19.
370  At para. 20.                                    371  *Loc. cit.*
372  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 40.
373  At para. 121.                                   374  At paras. 136–139.

*Article 42 – Applicable Law* 623

under both legal systems.[375] As to valuation, it found the discounted cash flow method appropriate. This method was supported by international authority but neither prescribed nor prohibited in Indonesian law. It concluded:

> The Tribunal finds it a method that is entirely consistent with Indonesian law and international law.[376]

In *SPP* v. *Egypt*, the Tribunal refused to decide whether an agreed choice of law had taken place, finding that, either way, Egyptian and international law would have to be applied (see paras. 65–67 *supra*). It found that if municipal law contained a lacuna or if international law was violated by the exclusive application of municipal law, the Tribunal was bound to apply international law directly. It proceeded to apply international law in addition to national law in a variety of contexts (see paras. 107, 108 *supra*). The Tribunal's findings on interest offer some interesting insights concerning the interaction of national and international law. On the rate of interest it held that the determination must be made according to Egyptian law because there was no rule of international law that would fix the rate or proscribe the limitation imposed by Egyptian law.[377] On the other hand, the Tribunal observed that Egyptian law lacked any provision concerning the date from which interest would run for compensation arising out of an act of expropriation. In the face of this gap in the host State's law, the Tribunal turned to international law, which it found to offer a rule providing for interest from the date on which the dispossession effectively took place.[378] **219**

*AGIP* v. *Congo* was not decided under the second sentence of Art. 42(1), but the choice of law clause agreed to by the parties resembles the residual rule of Art. 42(1) in that it provided for the application of the law of the host State "supplemented if need be by any principles of international law" (see para. 33 *supra*). The Tribunal came to the conclusion that the Congolese ordinance which had nationalized the Claimant's property was illegal even under Congolese law. However, it left no doubt that the claim would have been upheld under international law, even if no illegality under Congolese law had been found to exist.[379] The "supplementation" of the host State's law by international law clearly led to its correction (see paras. 97, 98, 120 *supra*). **220**

In *Tradex* v. *Albania*, the Tribunal found that it had jurisdiction on the basis of the Albanian Law on Foreign Investment of 1993 (see Art. 25, para. 395). The Tribunal held that the 1993 Law was determinative also of the merits of the case to the exclusion of other sources including international law.[380] But the Tribunal added that in applying the second sentence of Art. 42(1) it would use and take guidance from sources of international law for the interpretation of the term "expropriation" used in the 1993 Law[381] (see also Art. 25, para. 525). **221**

---

375   At paras. 171–178.          376   At para. 197.
377   *SPP* v. *Egypt*, Award, 20 May 1992, para. 222. See also *Delaume*, L'affaire, p. 57.
378   At paras. 232–234. See also *Delaume*, L'affaire, p. 60.
379   *AGIP* v. *Congo*, Award, 30 November 1979, paras. 79–88.
380   *Tradex* v. *Albania*, Award, 29 April 1999, paras. 68–69.
381   At paras. 69, 135–136.

**222**    In *Santa Elena* v. *Costa Rica*, the Tribunal found that the parties had not reached a clear and unequivocal agreement that their dispute would be decided solely in accordance with international law (see para. 22 *supra*). Therefore, it had to rely on the second sentence of Art. 42(1). After stating that the relevant rules and principles of Costa Rican law were generally consistent with international law, it added that in case of any inconsistency public international law would have to prevail. This led the Tribunal to the conclusion that international law was controlling.[382] Somewhat surprisingly, it held that:

> The Tribunal is satisfied that, under the second sentence of Art. 42(1), the arbitration is governed by international law.[383]

It proceeded by applying the appropriate rules of international law.

**223**    The Award in *Wena Hotels* v. *Egypt* provides another example of the "corrective" function of international law. The Tribunal first determined that pursuant to Art. 42(1) it had to apply both Egyptian law and international law. The host State had argued that one of the investor's claims was time-barred on the basis of Egyptian legislation. The Tribunal refused to apply the domestic law statute of limitations because it considered it to be contrary to international law. The Tribunal held that:

> strict application of [the] three-year limit, even if applicable, would collide with the general, well-established international principle recognized since before the *Gentini* case: that municipal statutes of limitation do not bind claims before an international tribunal [. . .][384]

**224**    The Tribunal in *Autopista* v. *Venezuela* again stressed the "corrective and supplemental functions of international law". In finding that there was no choice of law by the parties, the Tribunal held that it had to rely upon Art. 42(1), second sentence, ICSID Convention, and held:

> 102. The role of international law in ICSID practice is not entirely clear. It is certainly well settled that international law may fill lacunae when national law lacks rules on certain issues (so called complementary function). It is also established that it may correct the result of the application of national law when the latter violates international law (corrective function). [. . .] Whatever the extent of the role that international law plays under Article 42(1) (second sentence), this Tribunal believes that there is no reason in this case, considering especially that it is a contract and not a treaty arbitration, to go beyond the corrective and supplemental functions of international law.[385]

**225**    On this basis, the Tribunal held that the dispute must be resolved by Venezuelan law. However, it added that "international law prevails over conflicting national rules".[386]

---

382   *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 28, 35, 37, 40, 60–68.
383   At para. 65.
384   *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 107. To the same effect: *Maffezini* v. *Spain*, Award, 13 November 2000, paras. 92, 93.
385   *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 102. The Tribunal cited the First Edition of this Commentary.
386   At para. 105. See also para. 207.

In *LG&E* v. *Argentina*, the Tribunal found that submission to the BIT was not    **226**
sufficient to indicate an implicit agreement on choice of law (see para. 95 *supra*).
The Tribunal was explicit about the superiority of international law under the
second sentence of Article 42(1):

> International law overrides domestic law when there is a contradiction since a
> State cannot justify non-compliance of its international obligations by asserting
> the provisions of its domestic law.[387]

A similar outcome was reached in *MCI* v. *Ecuador*. After finding that the parties    **227**
had not even implicitly agreed on the applicable law the Tribunal resorted to Art.
42(1), second sentence, and concluded:

> In the event of possible contradictions between the rules of Ecuadorian law and
> the BIT and other applicable rules of general international law, the Tribunal will
> decide on their compatibility, bearing in mind the contents and purpose of those
> rules in light of the precedence that international rules take over the domestic
> legislation of a State.[388]

The Tribunal in *Goetz* v. *Burundi* summarized the practice of tribunals, and the    **228**
discussion surrounding it, in the following terms:

> 97. In the previous case-law the problem of the links between the various
> applicable sources of international law is posed in the context of the second
> sentence of Article 42, first paragraph, of the ICSID Convention, and it has
> received divergent responses, abundantly commented on in academic writings:
> hierarchal relationships according to some, domestic law applying first of all
> but being overborne where it contradicts international law; according to others,
> relationships based on subsidiarity, with international law being called upon
> only to fill lacunae or to settle uncertainties in national law; according to others
> again, complementary relationships, with domestic law and international law
> each having its own sphere of application.[389]

The *ad hoc* Committee in *Wena Hotels* v. *Egypt* gave a broad overview of the    **229**
past practice of ICSID tribunals in the following terms:

> 38. This discussion brings into light the various views expressed as to the role of
> international law in the context of Article 42(1). Scholarly opinion, authoritative
> writings and some ICSID decisions have dealt with this matter. Some views have
> argued for a broad role of international law, including not only the rules embodied
> in treaties but also the rather large definition of sources contained in Article 38(1)
> of the Statute of the International Court of Justice. Other views have expressed
> that international law is called in to supplement the applicable domestic law in
> case of the existence of *lacunae*. In *Klöckner I* the *ad hoc* Committee introduced
> the concept of international law as *complementary* to the applicable law in case
> of *lacunae* and as *corrective* in case that the applicable domestic law would not
> conform on all points to the principles of international law. There is also the view
> that international law has a controlling function of domestic applicable law to

---

387  *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 94.
388  *MCI* v. *Ecuador*, Award, 31 July 2007, para. 218.
389  *Goetz* v. *Burundi*, Award, 10 February 1999, para. 97.

the extent that there is a collision between such law and fundamental norms of international law embodied in the concept of *jus cogens*.

    39. Some of these views have in common the fact that they are aimed at restricting the role of international law and highlighting that of the law of the host State. Conversely, the view that calls for a broad application of international law aims at restricting the role of the law of the host State. There seems not to be a single answer as to which of these approaches is the correct one. The circumstances of each case may justify one or another solution. [. . .][390]

**230**    The main points emerging from the practice, as outlined above, may be summarized as follows:[391]

    1. A tribunal applying the second sentence of Art. 42(1) may not restrict itself to applying either the host State's law or international law but must examine the legal questions at issue under both systems.

    2. A decision which can be based on the host State's domestic law need not be sustained by reference to general principles of law.

    3. A tribunal may give a decision based on the host State's domestic law, even if it finds no positive support in international law as long as it is not prohibited by any rule of international law.

    4. A tribunal may not render a decision on the basis of the host State's domestic law which is in violation of a mandatory rule of international law.

    5. A claim which cannot be sustained on the basis of the host State's domestic law must be upheld if it has an independent basis in international law.

**231**    The complex relationship between national and international law under Art. 42(1), second sentence, has given rise to a range of different interpretations amongst legal scholars. While most writers seem to adhere to the "supplemental and corrective function" approach, some have called for an entirely autonomous application of international law.

**232**    Even those scholars who follow the dominant view of a "supplemental and corrective function of international law" come to markedly divergent results, depending on whether they emphasize the importance of domestic or of international law.

**233**    *W. M. Reisman* would limit the relevance of international law by asserting that the corrective function would only apply in the case of "international *jus cogens*".[392] Specifically referring to Article 53 of the Vienna Convention on the Law of Treaties, *Reisman* proposes that "the test, then, is not inconsistency, but whether applying the Contracting State's law would constitute a violation of something fundamental to international law".[393]

---

390  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 38–39. Footnotes omitted; emphasis original.

391  See also *Gaillard, E.*, Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 118 Journal du Droit International 165 at 182/3 (1991).

392  *Reisman*, The Regime for *Lacunae* in the ICSID Choice of Law Provision, pp. 374 *et seq*.

393  At p. 375.

In contrast, *P. Weil* has stressed the importance of international law.[394] He rejects **234**
the "complex and multifaceted" theories about the relationship between domestic
and international law under Art. 42(1), second sentence, as "futile", arguing that
"under the second sentence of Article 42(1), international law always gains the
upper hand and ultimately prevails".[395] According to his theory, international law
would either prevail "indirectly" through the application of domestic law where the
latter is deemed consistent with international law or incorporates it, or "directly"
where domestic law is deemed deficient or contrary to international law.[396] From
this point of view, the reference to the domestic law of the host State "is indeed
a pointless exercise, the sole *raison d'être* of which is to avoid offending the
sensibilities of the host State".[397]

*Weil*'s theory is based mainly upon the pronouncements of the second Tribunal in **235**
the resubmitted case of *Amco* v. *Indonesia* which had noted that "international law
is fully applicable and to classify its role as 'only' 'supplemental and corrective'
seems a distinction without a difference".[398]

## c) Autonomous Application of Both Legal Systems

The *ad hoc* Committee in *Wena Hotels* v. *Egypt*, after giving a broad overview **236**
of practice (see para. 223 *supra*), made the following statement on the relationship
of host State law and international law:

> [. . .] the use of the word "may" in the second sentence of this provision [Art.
> 42(1)] indicates that the Convention does not draw a sharp line for the distinction
> of the respective scope of international and of domestic law and, correspondingly,
> that this has the effect to confer on to the Tribunal a certain margin and power
> for interpretation.
>
>     40. What is clear is that the sense and meaning of the negotiations leading to
> the second sentence of Article 42(1) allowed for both legal orders to have a role.
> The law of the host State can indeed be applied in conjunction with international
> law if this is justified. So too international law can be applied by itself if the
> appropriate rule is found in this other ambit.[399]

The broad statement that "international law can be applied by itself if the **237**
appropriate rule is found in this other ambit"[400] has given rise to an alternative
interpretation of the role of international law. The theory of the supplemental and
corrective functions of international law has been criticized as a misinterpretation
of the clear and unambiguous wording of Art. 42(1), second sentence, triggered
by the *Klöckner* and *Amco ad hoc* Committees. According to *E. Gaillard* and *Y.
Banifatemi*, neither the wording nor the drafting history of the ICSID Convention

---

394   *Weil*, The State, the Foreign Investor and International Law, pp. 401 *et seq*.
395   At p. 409.                                    396   *Loc. cit.*
397   *Loc. cit.*
398   *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 40.
399   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 39, 40.
400   This passage was quoted with approval in *Siemens* v. *Argentina*, Award, 6 February 2007,
      para. 77.

supports the view that international law would come into play only in cases of lacunae or inconsistency.[401] Instead, they argue that ICSID tribunals "may also apply international law as a body of substantive rules in order to resolve the dispute or a particular issue".[402] Based on the decision of the *ad hoc* Committee in *Wena Hotels* v. *Egypt*, they argue that "each ICSID tribunal should have discretion to decide whether any rules of international law are directly applicable, without any requirement of initial scrutiny into the law of the host State".[403] In their view, this approach "is consistent with both the text of Article 42(1) – 'and' should only mean 'and' – and its object and purpose".[404]

**238**    This view was expressly endorsed by the Tribunal in *LG&E* v. *Argentina* which held:

> 96. It is this Tribunal's opinion that "and" means "and", so that the rules of international law, especially those included in the ICSID Convention and in the Bilateral Treaty, as well as those of domestic law are to be applied. In the *Wena Hotels Limited v. Arab Republic of Egypt* case, the Tribunal affirmed that "and means and", but accepted the supremacy of international law.[405]

**239**    ICSID tribunals are increasingly turning to a simultaneous application of international law and domestic law. In cases falling under the residual rule of Art. 42(1), second sentence, they will apply domestic law to some aspects of disputes and rules of international law to other aspects.

**240**    Tribunals, like the one in *CMS* v. *Argentina*, have called for a "more pragmatic and less doctrinaire approach".[406] The dispute arose from the unilateral suspension and later abrogation of various tariff stipulations under a long-term licence for the transport of gas. Since there was no express choice of law and since the BIT did not contain a provision on applicable law, the Tribunal had to revert to Art. 42(1), second sentence.[407] It noted that both parties had invoked both national and international law rules.[408] It concluded that it would apply the Argentine constitution, Civil Code, gas legislation and regulations, as well as Argentina's emergency law, while it would "also apply" the BIT and customary international law "in reaching the pertinent conclusions".[409]

**241**    In justifying this "à la carte" approach, the *CMS* Tribunal expressly relied upon the decision of the *ad hoc* Committee in *Wena Hotels* v. *Egypt*.[410] The Tribunal held:

> 116. More recently, however, a more pragmatic and less doctrinaire approach has emerged, allowing for the application of both domestic law and international law if the specific facts of the dispute so justifies. It is no longer the case of one prevailing over the other and excluding it altogether. Rather, both sources have a role to play. [. . .]

---

401    *Gaillard/Banifatemi*, The Meaning of "and", pp. 382 *et seq.*
402    At p. 399.                                    403    At p. 409.
404    *Loc. cit.*
405    *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, para. 96.
406    *CMS* v. *Argentina*, Award, 12 May 2005, para. 116.
407    At para. 108.                                  408    At para. 118.
409    At para. 122.
410    *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002.

117. This is the approach this Tribunal considers justified when taking the facts of the case and the arguments of the parties into account. Indeed, there is here a close interaction between the legislation and the regulations governing the gas privatization, the License and international law, as embodied both in the Treaty and in customary international law. All of these rules are inseparable and will, to the extent justified, be applied by the Tribunal.[411]

Other ICSID tribunals have also followed a more pragmatic, fact-specific approach in determining the applicable law and, in particular, the relationship between international and domestic law.[412] Again, relying upon the *ad hoc* Committee's decision in *Wena* v. *Egypt*,[413] the Tribunal in *Azurix* v. *Argentina* said:                            **242**

66. Article 42(1) has been the subject of controversy on the respective roles of municipal law and international law. It is clear from the second sentence of Article 42(1) that both legal orders have a role to play, which role will depend on the nature of the dispute and may vary depending on which element of the dispute is considered. The Annulment Committee in *Wena v. Egypt* considered that "The law of the host State can indeed be applied in conjunction with international law if this is justified. So too international law can be applied by itself if the appropriate rule is found in this other ambit."

67. Azurix's claim has been advanced under the BIT and, as stated by the Annulment Committee in *Vivendi II*, the Tribunal's inquiry is governed by the ICSID Convention, by the BIT and by applicable international law. While the Tribunal's inquiry will be guided by this statement, this does not mean that the law of Argentina should be disregarded. On the contrary, the law of Argentina should be helpful in the carrying out of the Tribunal's inquiry into the alleged breaches of the Concession Agreement to which Argentina's law applies, but it is only an element of the inquiry because of the treaty nature of the claims under consideration.[414]

The Tribunal in *Sempra* v. *Argentina* also opted for a solution that gives both legal systems an autonomous and simultaneous role. In response to a detailed discussion of the parties concerning the meaning of Art. 42(1) the Tribunal said:                                                              **243**

235. The parties' discussion concerning Article 42(1) of the Convention appears to be theoretical to some extent since this Article provides for a variety of sources to play simultaneous roles. Indeed, the Respondent is right to argue that domestic law is not confined in scope of application to the determination of factual questions. It indeed has a broader role, as is evident from the pleadings and arguments of the parties to this very case. The License is itself governed by the legal order of the Argentine Republic, and it must be interpreted in its light.

411  *CMS* v. *Argentina*, Award, 12 May 2005, paras. 116–117.
412  See also *MTD* v. *Chile*, Award, 25 May 2004, para. 204; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 205–209. But see *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, para. 143, where the Tribunal, after endorsing the approach of the *Wena ad hoc* Committee, found that the system of protection provided by Ukrainian law was "replaced *ratione materiae* by the substantive provisions of the Treaty and international law, to the extent that the latter govern the same subject-matter".
413  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002.
414  *Azurix* v. *Argentina*, Award, 14 July 2006, paras. 66–67. Footnotes omitted.

> 236. So too, the Claimant is right in arguing for the prominent role of international law. In fact, the Treaty, international conventions and customary law have been invoked by the parties in respect of a number of matters. While writers and decisions have on occasion tended to consider domestic law and international law as mutually incompatible in their application, this is far from actually being the case. Both have a role to perform in the resolution of the dispute, as has been recognized.[415]

The Tribunal proceeded to examine the issues before it, first under the law of Argentina, and then under international law.[416]

**244**    This pragmatic, fact-specific approach means that tribunals will have to identify the various legal issues before them in their proper legal contexts. Tribunals will then apply international law to some of these issues and domestic law to other issues. Tribunals will not have complete discretion in selecting international and domestic law. They will have to identify the questions to which the respective legal systems apply.

### G.  "(2) The Tribunal may not bring in a finding of *non liquet* on the ground of silence or obscurity of the law."

**245**    This provision directs that the tribunal may not refuse to give a decision on the ground that the law is not sufficiently clear. It applies equally to a refusal to render an award at all and to a refusal to decide certain questions only. Art. 42(2) is reinforced by Art. 48(3) which says that the award shall deal with every question submitted to the tribunal. The prohibition of *non liquet* is generally accepted in international adjudication.[417] It was adopted from Art. 11 of the International Law Commission's Model Rules on Arbitral Procedure.[418] The wording remained essentially unchanged throughout the Convention's drafting (History, Vol. I, p. 194) and evoked virtually no comment (History, Vol. II, pp. 158, 330, 805).

**246**    Art. 42(2) applies irrespective of the choice of law under Art. 42(1). It must be observed whether the parties have agreed on applicable rules of law or whether the residual rule referring the tribunal to the host State's domestic law and to international law is applied. The underlying assumption is that the body of law provided by Art. 42(1) is sufficiently complete to provide an answer to every question which may come before the tribunal. In the case of an agreed choice of law, the tribunal must first exhaust the possibilities for closing any perceived gaps within the chosen rules of law. Where a domestic system of law has been chosen, the appropriate rules of that system for closing lacunae have to be utilized.[419]

---

415   *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 235, 236. Footnotes omitted.
416   At paras. 241 *et seq.*, 270 *et seq.*
417   *Stone, J.*, *Non-liquet* and the Function of Law in the International Community, 35 BYIL 124 (1959); *Lauterpacht, H.*, Some Observations on the Prohibition of "Non Liquet" and the Completeness of the Law, *in*: Symbolae Verzijl 196 (1958).
418   YBILC 84 (1958-II).
419   *Shihata/Parra*, Applicable Substantive Law, pp. 195/6.

If the chosen law provides no answer, the tribunal will have recourse to the residual rule in Art. 42(1), second sentence (see paras. 135–137 *supra*). The combination of the host State's law and international law offers such a broad range of authority that a genuine *non liquet* is almost unthinkable.[420] Gaps in the host State's law may be filled through international law's supplemental function.[421] In this process, a tribunal will deal with a silence of the law on a specific point through such techniques as analogy, looking at the general legal context and applying broader principles.[422] Obscurities of the law will be clarified by various interpretation techniques including object and purpose. Non-binding authority such as judicial decisions, scholarly writings, resolutions or codes of conduct may assist the tribunal (see paras. 183–191 *supra*). General principles of law will frequently provide guidance where other sources fail.    **247**

Nevertheless, it must be borne in mind that applicable rules must be proven and cannot simply be assumed or postulated (see para. 182 *supra*). The function of closing gaps is inherently different from that of applying equity under Art. 42(3). Decisions *ex aequo et bono* require the specific consent of the parties (see paras. 260–265 *infra*). The tribunal's obligation under Art. 48(3) to state the reasons for the award requires rigorous legal reasoning. Failure to do so will expose the award to annulment under Art. 52(1)(e). Failure to apply positive law may constitute an excess of powers under Art. 52(1)(b) (see paras. 14–20 *supra*).    **248**

### H. "(3) The provisions of paragraphs (1) and (2) shall not prejudice the power of the Tribunal to decide a dispute *ex aequo et bono* if the parties so agree."

#### 1. General Meaning

Art. 42(3) provides that a tribunal, if it is so authorized by the parties, may base its award on extra-legal considerations which it regards as equitable.[423] In other words, it may disregard the rules of law otherwise applicable under Art. 42(1) in favour of justice and fairness. In a sense, this provision is an extension of Art. 42(1), first sentence. The parties are free not only to choose the rules of law to be applied but may also go beyond these rules and choose equity. But it must be borne in mind that while an authorization under Art. 42(3) achieves maximum flexibility it does so at considerable cost to predictability.    **249**

Decisions *ex aequo et bono* do not have the function of filling gaps in the applicable law thereby assisting tribunals to avoid a *non liquet* in accordance with Art. 42(2). Decisions based on law must be distinguished from decisions based on equity. Where parties have not agreed to authorize the tribunal to decide *ex aequo*    **250**

---

420  *Di Pietro*, Applicable Law, p. 259.
421  *Cherian*, Investment Contracts, pp. 77, 84 *et seq.*
422  *Masood*, Law Applicable, p. 323.
423  More generally see *Schreuer, C.*, Decisions Ex Aequo et Bono Under the ICSID Convention, 11 ICSID Review – FILJ 37 (1996).

*et bono*, it must remain within the limits of the applicable rules of law (see paras. 260–265 *infra*).

**251**     Art. 42(3) does not adopt a distinction between legal and non-legal disputes. Under Art. 25(1), the jurisdiction of the Centre extends to legal disputes only. Therefore, questions decided *ex aequo et bono* are capable of being decided in accordance with rules of law. It is not the nature of the dispute but the parties' agreement that makes equity applicable to it.

**252**     An agreement to authorize the tribunal to decide *ex aequo et bono* may be particularly appropriate in the case of complex long-term relationships. As an investment evolves over time, new circumstances may appear which were not taken into account originally. If a re-negotiation turns out to be impossible, the tribunal's power to decide *ex aequo et bono* may be a second-best method to achieve a result which is fair and suitable to changed circumstances.[424]

**253**     The possibility to authorize a tribunal to decide *ex aequo et bono* was envisaged throughout the Convention's drafting history and has elicited very little comment (History, Vol. I, pp. 194–196; see also paras. 260, 266 *infra*). The text, as eventually adopted, closely follows Art. 38(2) of the Statute of the International Court of Justice. Other documents governing international arbitration contain similar clauses.[425]

### 2. Agreement on Decision ex aequo et bono

### a) Drafting the Agreement

**254**     The power of the tribunal to decide *ex aequo et bono* is contingent on an agreement by the parties. Such an agreement must be explicit. The ICSID Model Clauses of 1993 offer the following formula for use by the parties:

**Clause 11**
Any Arbitral Tribunal constituted pursuant to this agreement shall have the power to decide a dispute *ex aequo et bono*.[426]

**255**     The parties may also call upon the tribunal to act as an *amiable compositeur*, although following the wording of Art. 42(3) may be preferable. In *Atlantic Triton* v. *Guinea*, the agreement between the parties contained the following formula:

---

424   *Broches*, The Convention, pp. 394/5; *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 240 (1973/74).

425   ICC Rules of Arbitration (1998), Art. 17(3), 36 ILM 1612 (1997); UNCITRAL Arbitration Rules (1976), Art. 33(2), 15 ILM 714 (1976); ILC Model Rules on Arbitral Procedure (1958), Art. 10(2), YBILC 84 (1958-II). See also *Sohn, L. B.*, The Function of International Arbitration Today, 108 Recueil des Cours 1 at 41–59 (1963-I); *Scheuner, U.*, Decisions ex aequo et bono by International Courts and Arbitral Tribunals, *in*: International Arbitration Liber Amicorum for Martin Domke 275 (1967); *Lauterpacht, E.*, Aspects of the Administration of International Justice 117 *et seq.* (1991).

426   4 ICSID Reports 364. *Cf.* also Clause XVIII of the Model Clauses of 1981, 1 ICSID Reports 206 and Clause XXII of the Model Clauses of 1968, 7 ILM 1177 (1968).

> . . . the disagreement shall be settled *ex aequo et bono* in accordance with the provisions of Article 42(3) . . .[427]

**256** Clauses authorizing the tribunal to decide *ex aequo et bono* need not be comprehensive but may cover a limited number of points only. Other matters will then remain to be decided in accordance with rules of law.[428] This method of *dépeçage* (see paras. 39, 40 *supra*) adds flexibility to the drafting and may facilitate compromise. In such a situation, it is perfectly reasonable to combine an agreement authorizing decision *ex aequo et bono* with an agreement on choice of law.[429]

### b) Supervening Agreement

**257** While an agreement on decision *ex aequo et bono* will normally be made in advance of the proceedings before the tribunal, this need not be the case. Especially where jurisdiction is not based on a direct agreement between the parties but on a treaty or on national legislation (see Art. 25, paras. 392–463), there will not be an early opportunity to agree on this question. Just as with an agreement on applicable law under Art. 42(1) (see paras. 56–61 *supra*), the parties may agree on decision *ex aequo et bono* at the beginning or in the course of the proceedings.

**258** In *AGIP* v. *Congo*, the Government proposed in its Counter-Memorial that the Tribunal should adopt the role of a friendly arbitrator (*amiable compositeur*). Since AGIP did not agree to this proposal, the Tribunal found that it had to make its decision in accordance with the provisions of the applicable law.[430]

**259** In *Benvenuti & Bonfant* v. *Congo*, there was no agreed choice of law and the residual rule of Art. 42(1) applied (see para. 133 *supra*). At the Tribunal's first session, the Claimant suggested that the Tribunal be granted the power to decide *ex aequo et bono*. However, this initial suggestion was rejected by the Respondent.[431] Later on, during the proceedings, the parties reached an agreement to attempt an amicable settlement failing which they authorized the Tribunal "to render its award as quickly as possible by judgment *ex aequo et bono*".[432] After being notified of the failure to settle through negotiations,[433] the Tribunal proceeded to apply Art. 42(3).[434]

### c) Necessity of an Agreement

**260** In the course of the Convention's drafting, there was some suggestion to allow the tribunal to decide *ex aequo et bono* even without the parties' specific authorization (History, Vol. II, pp. 330, 570). On the other hand, it was pointed out that

---

427  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, para. 7. For another example see *Nurick, L./ Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 344 (1986).
428  *Broches*, The Convention, p. 395; *Broches*, Convention, Explanatory Notes and Survey, p. 666.
429  *Amerasinghe*, Submissions to the Jurisdiction, p. 250.
430  *AGIP* v. *Congo*, Award, 30 November 1979, para. 44.
431  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.5–1.6.
432  At para. 1.22.          433   At para. 1.23.
434  At para. 4.4.

certain legal systems draw a clear distinction between arbitration under law and the reference of a dispute to *amiables compositeurs*, who had the power to decide *ex aequo et bono* (at p. 419). The Convention's text clearly follows this distinction.

**261**     Therefore, there can be no doubt that an explicit agreement under the terms of Art. 42(3) is an indispensable requirement for a decision *ex aequo et bono*. The application of equitable principles without the parties' authorization exposes the award to annulment for excess of powers.[435] In *Amco* v. *Indonesia*, the first Tribunal noted that the parties had not agreed to entrust the Tribunal with the power to decide *ex aequo et bono* and that, therefore, it had to decide according to the applicable rules of law.[436] Before the *ad hoc* Committee, Amco argued that this explicit recognition by the Tribunal created an overwhelming presumption that the arbitrators did indeed refrain from deciding *ex aequo et bono*. The *ad hoc* Committee rejected this argument and held that it had to "examine closely both what the Tribunal said it was doing and what it was in fact doing, in resolving particular questions".[437] While no impermissible resort to equitable principles appeared in the Award, the *ad hoc* Committee pointed out that in view of the law applicable to the case (see para. 144 *supra*), a decision *ex aequo et bono*

> . . . would constitute a decision annullable for manifest excess of powers. Nullity would be a proper result only where the Tribunal decided an issue *ex aequo et bono* in lieu of applying the applicable law.[438]

**262**     In *Klöckner* v. *Cameroon*, there was also no agreement on decision *ex aequo et bono*. The *ad hoc* Committee pointed out that an excess of powers might consist not only in failure to apply the governing law but also in a solution in equity where there was a requirement to decide in law.[439] In dealing with the Tribunal's suggestion that there was a basic and general principle of full disclosure to a partner in a contractual relationship,[440] the *ad hoc* Committee found that the Tribunal had failed to establish such a principle under the host State's law or under international law (see paras. 15, 150, 181 *supra*). It drew the following conclusion:

> 77. Now, the Award's reasoning and the legal grounds on this topic (to the extent that they are not in any case mistaken because of the inadequate description of the duty of "full disclosure") seem very much like a simple reference to equity, to "universal" principles of justice and loyalty, such as amiable compositeurs might invoke.[441]

It followed that the Tribunal did

435   *Broches*, Convention, Explanatory Notes and Survey, p. 666; *Delaume*, L'affaire, p. 55; *Giardina, A.*, ICSID: A Self-Contained, Non-National Review System, *in*: International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? (*Lillich, R. B./Brower, C. N.* eds.) 199 at 212 (1994); *Schreuer*, Decisions Ex Aequo et Bono, pp. 53 *et seq.*
436   *Amco* v. *Indonesia*, Award, 20 November 1984, para. 147.
437   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 24.
438   At para. 28.
439   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 59.
440   *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 59.
441   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 77.

> . . . act outside the framework provided by Article 42(1), applying concepts or principles it probably considered equitable (acting as an amiable compositeur, which should not be confused with applying "equitable considerations" as the International Court of Justice did in the *Continental Shelf* case). However justified its award may be (a question on which the Committee has no opinion), the Tribunal thus "manifestly exceeded its powers" within the meaning of Article 52(1)(b) of the Washington Convention.[442]

Similarly, the *ad hoc* Committee took issue with the Tribunal's attempt to make a quantitative comparison of the parties' respective failure of performance which had led it to conclude that the partial amount already paid to the Claimant corresponded equitably to the value of its defective performance.[443] It concluded that **263**

> . . . the Award is based more on a sort of general equity than on positive law (and in particular French civil law) or precise contractual provisions, . . .[444]

Therefore, in the *ad hoc* Committee's opinion, the Award's passages on the evaluation of the respective obligations or debts contain little in the way of legal reasoning but are based on an "equitable estimate".[445]

The principle that a decision based on equity without authorization may constitute an excess of powers in the sense of Art. 52(1)(b) was confirmed by the *ad hoc* Committee in *MINE* v. *Guinea*. It pointed out that, unless the parties had agreed on a decision *ex aequo et bono*, a decision not based on any law would constitute a derogation from the Tribunal's terms of reference.[446] In the instant case, no such decision was found to exist (see para. 17 *supra*). **264**

In *Zhinvali* v. *Georgia*, the Tribunal found that in the absence of a qualifying investment it had no jurisdiction over the case. It observed that the Claimant may find this result unfair and painful and added: **265**

> But the Tribunal is without any special equitable powers. Article 42(3) of the ICSID Convention provides that an ICSID tribunal only has "the power to decide a dispute *ex aequo et bono* if the parties so agree", and here the parties have *not* so agreed. Consequently, the Tribunal can only seek fairly and properly to apply the governing law to the facts before it.[447]

One might add that even an agreement on the tribunal's power to decide *ex aequo et bono* would not have cured a lack of jurisdiction.

### 3. The Relationship of Equity to Law

### a) Application of Equity and Law

The power to decide *ex aequo et bono* gives the tribunal a certain element of discretion not only with regard to the selection of the principles of equity to be **266**

---

442  At para. 79.
443  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 72.
444  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 163.
445  At para. 176.
446  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.03.
447  *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 418. Italics original.

applied but also insofar as it is open to the tribunal to apply rules of law after all. In other words, Art. 42(3) is permissive and does not preclude the application of law. The Convention's *travaux préparatoires* show that the power to apply equity does not prevent the application of law (History, Vol. II, pp. 420, 570). Therefore, the tribunal is free to apply the law, to depart from it or to apply rules of law which would not be applicable otherwise under Art. 42(1). Just as a clause may authorize the tribunal to decide only certain matters *ex aequo et bono* (see para. 256 *supra*), the tribunal may choose to decide some of the matters which are within an authorization under Art. 42(3) in accordance with equity and others with law.[448]

267        In *Benvenuti & Bonfant* v. *Congo*, the Tribunal was authorized by the parties to decide *ex aequo et bono* (see para. 259 *supra*). This did not stop the Tribunal from looking at rules of law.[449] Thus it found that compensation in case of nationalization was mandated by the host State's law, by international law as well as by equity (see para. 208 *supra*). It proceeded to determine the quantum of damages *ex aequo et bono*.[450] The interplay of equity and law is particularly well illustrated by the following passage:

> . . . B&B claimed interest at the rate of 15% a year on all sums awarded to it.
>
> 4.98. The Tribunal does not consider it possible to uphold this claim seeing as the law applicable, Congolese Law, lays down a significantly lower rate of interest. The Tribunal observes, however, that the Government, in its Memorial in Defence, suggested a rate of interest of 10% in connection with its counterclaim. By virtue of its power to rule *ex aequo et bono*, the Tribunal considers it equitable to adopt this rate in relation to the compensation awarded to B&B.[451]

268        In *Atlantic Triton* v. *Guinea*, the agreement between the parties contained a choice of law clause referring to the law of the host State (see para. 26 *supra*) as well as a clause authorizing decision *ex aequo et bono* (see para. 255 *supra*).[452] The Tribunal proceeded to apply at times the law of Guinea[453] and at times equitable principles.[454]

### b) Equity Within the Law

269        Not every invocation of equitable considerations amounts to a decision *ex aequo et bono*. A tribunal may take note of equitable standards provided for by the law or may exercise some discretion in applying rules of law on the basis of justice and fairness.[455] In other words, a decision *ex aequo et bono* must be distinguished from equity within the law. In *Amco* v. *Indonesia*, the *ad hoc* Committee said:

---

448   *Amerasinghe, C. F.*, How to Use the International Centre for Settlement of Investment Disputes by Reference to Its Model Clauses, 13 Indian Journal of International Law 530 at 545 (1973).
449   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.5–4.6.
450   At para. 4.65.                          451   At paras. 4.97–4.98.
452   *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 17, 19, 23.
453   At pp. 33, 36.                          454   At pp. 30, 32, 42.
455   *Lauterpacht, E.*, Aspects of the Administration of International Justice 120 *et seq.* (1991); *Di Pietro*, Applicable Law, p. 271.

*Article 42 – Applicable Law*                                                    637

26. Neither does the *ad hoc* Committee consider that any mention of "equitable consideration" in the Award necessarily amounts to a decision *ex aequo et bono* and a manifest excess of power on the part of the Tribunal. Equitable considerations may indeed form part of the law to be applied by the Tribunal, whether that be the law of Indonesia or international law.

. . .

28. The *ad hoc* Committee thus believes that invocation of equitable considerations is not properly regarded as automatically equivalent to a decision *ex aequo et bono* . . .[456]

The Committee also rejected the contention that the International Court of Justice had applied equitable considerations only in the context of delimitation of maritime boundaries.[457]

The fact that a tribunal may take equitable considerations into account without **270** deciding *ex aequo et bono* was also recognized in the ICSID Additional Facility case of *Tecmed* v. *Mexico*. The Tribunal found that an

Arbitral Tribunal may consider general equitable principles when setting the compensation owed to the Claimant, without thereby assuming the role of an arbitrator *ex aequo et bono*.[458]

Similarly, the *ad hoc* Committee in *MTD* v. *Chile* pointed out that considerations **271** of fairness and balancing of interests did not necessarily amount to decision *ex aequo et bono*. The Committee said:

It should be noted that Article 42(3) of the ICSID Convention concerns the determination *ex aequo et bono* of *disputes*, i.e., of the substantial matter referred to the tribunal. This is different from taking into account considerations of fairness in applying the law. For example, individual rules of law will often require fairness or a balancing of interests to be taken to account. This is the case with the fair and equitable treatment standard itself, the standard the Tribunal was required to apply.[459]

### 4. Limits on Equity

The authorization by the parties to go beyond rules of law and to apply equitable **272** principles of justice does not give the tribunal unlimited discretion. The tribunal may not act arbitrarily but must base its decision on objective and rational considerations which must be stated.[460] The obligation of Art. 48(3) that the tribunal shall state the reasons underlying an award extends to decisions *ex aequo et bono*, although the burden of reasoning may be somewhat lighter than in the case of decisions based on law. Failure to state any reasons for a decision *ex aequo et*

---

456  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 26, 28. See also the remark by the *ad hoc* Committee in *Klöckner* v. *Cameroon* cited in paras. 262, 263 *supra*, and the Dissenting Opinion to the Award in *SOABI* v. *Senegal*, 25 February 1988, 2 ICSID Reports 282.

457  At para. 27.

458  *Tecmed* v. *Mexico* (AF), Award, 29 May 2003, para. 190.

459  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 48. Italics original.

460  *Broches*, The Convention, p. 394; *Hirsch*, The Arbitration Mechanism, pp. 151 *et seq.*

*bono* may expose the award to annulment under Art. 52(1)(e) (see Art. 48, para. 57; Art. 52, para. 349).

273    In addition, certain fundamental principles of international law which may be summarized as international public policy and *ius cogens* (see paras. 49–52 *supra*) constitute an outer margin for the tribunal's discretion. Even an award *ex aequo et bono* may not violate peremptory rules such as the prohibition of slavery and terrorism and other grave violations of human rights.

274    The domestic law of some States does not permit arbitration *ex aequo et bono*. Some commentators have therefore concluded that, when a tribunal sits in such a country, it lacks the power to decide on the basis of equity rather than law.[461] Such a conclusion is unwarranted in the case of ICSID arbitration. Arbitration under the ICSID Convention is truly international and free from the interference of national rules.[462] The choice of an ICSID tribunal's place or places of proceedings is purely a matter of convenience and has no impact on the applicable law (see para. 62 *supra*).

275    Even if parties combine an authorization to decide *ex aequo et bono* with the choice of a law (see paras. 256, 266 *supra*) that prohibits *ex aequo et bono* decisions, they would not affect the tribunal's power to use equitable principles. Art. 42(3) provides that the tribunal's power to decide *ex aequo et bono* is not prejudiced by the selection of the proper law under Art. 42(1). In other words, an agreement authorizing the tribunal to decide equitably under Art. 42(3) would to that extent derogate from contrary provisions of the law otherwise applicable under Art. 42(1). This principle applies irrespective of whether the governing law applies by virtue of the first or second sentence of Art. 42(1). By contrast, Art. 54(2) of the Arbitration (Additional Facility) Rules provides that a decision *ex aequo et bono* not only requires express authorization by the parties but also the permission of the law applicable to the arbitration.

### 5. *Decisions* ex aequo et bono *by ICSID Tribunals*

276    The practice of ICSID tribunals acting under an agreed authorization to decide *ex aequo et bono* is restricted to two known cases.[463] Nevertheless, it may be worthwhile to examine briefly the issues that the two tribunals chose to decide in accordance with equitable principles.[464]

---

461    *Bouchez, L. J.*, The Prospects for International Arbitration: Disputes between States and Private Enterprises, *in*: International Arbitration: Past and Prospects (*Soons, A. H. A.* ed.) 109 at 138 (1990).

462    *Goldman*, Le droit applicable, p. 140; *Hirsch*, The Arbitration Mechanism, p. 151.

463    See also an *obiter dictum* in the Dissenting Opinion to the Award in *AAPL* v. *Sri Lanka*, 27 June 1990, 4 ICSID Reports 319, where the Arbitrator points out that the claim must be dismissed on strict legal grounds but that, if the Tribunal were competent to decide *ex aequo et bono*, he would recommend an *ex gratia* amount.

464    See also *Schreuer*, Decisions Ex Aequo et Bono, pp. 44 *et seq*.

In *Benvenuti & Bonfant* v. *Congo* (see paras. 259, 267 *supra*), the Tribunal **277** specifically described its decision as being "determined *ex aequo et bono*" or as "equitable" on the following points:

- the quantum of damages for the nationalization without compensation;[465]
- the award of a sum for a claim that was not contested by the Respondent;[466]
- the award of a relatively small amount as compensation for *préjudice moral*;[467]
- the rate of interest on all sums awarded[468] (see para. 267 *supra*);
- the dates from which interest was to run;[469] and
- the award of a special amount to cover additional procedural costs caused by the Respondent's delay in participating in the proceedings.[470]

In *Atlantic Triton* v. *Guinea* (see paras. 255, 268 *supra*), the Tribunal noted that **278** a subcontractor had initiated court proceedings in Norway against the Claimant and the Respondent in respect of one of the claims between the parties. Therefore, in order to avoid Guinea being ordered to pay twice, the Tribunal subjected payment for this claim to the condition that Atlantic Triton produce a bank guarantee. The Tribunal made this ruling despite the fact that this point was not raised during argument and described it as being made *ex aequo et bono*.[471] In addition, the Tribunal set interest on this amount "equitably" at 9 per cent seeing that the parties had chosen the US Dollar as their monetary unit and that this was the current inter-bank interest rate in the United States.[472] Finally, with regard to outstanding management fees, the Tribunal found that the services were reduced after a while and then terminated altogether during the period in question. Moreover, the Claimant had not exercised the necessary diligence in performing its functions. For these reasons, the Tribunal, ruling *ex aequo et bono*, awarded a lump sum of less than one third of what would have been due otherwise.[473] The Tribunal reiterated that it was acting *ex aequo et bono* before the final dispositif of the award.[474]

This brief survey indicates that, in the majority of instances, rulings *ex aequo* **279** *et bono* were used to calculate or estimate the amounts of monetary compensation including the interest due on them. There is no clear instance in which a tribunal disregarded rules of law in favour of equitable principles. A possible exception to this observation is the award of special procedural costs in *Benvenuti & Bonfant* v. *Congo* (see para. 277 *supra*) seeing that the agreement between the parties had provided that the costs of the arbitration were to be shared equally.

---

465   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.65.
466   At para. 4.82.                          467   At para. 4.96.
468   At para. 4.98.                          469   At paras. 4.99–4.100.
470   At paras. 4.127–4.129.
471   *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 30.
472   *Loc. cit.*                             473   At pp. 31/2.
474   At p. 42.

# Article 43

Except as the parties otherwise agree, the Tribunal may, if it deems it neces-
sary at any stage of the proceedings,
(a) call upon the parties to produce documents or other evidence, and
(b) visit the scene connected with the dispute, and conduct such inquiries
    there as it may deem appropriate.

## OUTLINE

|                                                                          | *Paragraphs* |
|--------------------------------------------------------------------------|:------------:|
| I.  INTRODUCTION                                                | 1–4          |
| II.  INTERPRETATION                                             | 5–124        |
|   A.  **"Except as the parties otherwise agree, . . ."** | 5–9       |
|   B.  **". . . the Tribunal may, if it deems it necessary . . ."** | 10–29 |
|     1.  Necessity and Discretion            | 10–22        |
|     2.  Default Proceedings                 | 23–25        |
|     3.  Expenses                            | 26–29        |
|   C.  **". . . at any stage of the proceedings, . . ."** | 30–43     |
|   D.  **". . . (a) call upon the parties to produce . . ."** | 44–67 |
|     1.  Initiative                          | 44–50        |
|     2.  Addressee                           | 51–54        |
|     3.  Form                                | 55–62        |
|     4.  Legal Effect                        | 63–67        |
|   E.  **". . . documents or other evidence, . . ."**  | 68–118       |
|     1.  Types of Evidence                   | 68–103       |
|       a)  Documents               | 70–80        |
|       b)  Witnesses               | 81–94        |
|       c)  Experts                 | 95–103       |
|     2.  Probative Value                     | 104–115      |
|     3.  Burden of Proof                     | 116–118      |
|   F.  **". . . and (b) visit the scene connected with the dispute, and conduct such inquiries there as it may deem appropriate."** | 119–124 |

## BIBLIOGRAPHY

*Amerasinghe, C. F.*, Evidence in International Litigation (2005);

*Berger, K. P.*, Evidentiary Privileges: Best Practice Standards versus/and Arbitral Discretion, 22 Arbitration International 501 (2006);

*Böckstiegel, K.-H.*, Presenting Evidence in International Arbitration, 16 ICSID Review – FILJ 1 (2001);

*Brower, C. N.*, Evidence Before International Tribunals: The Need for Some Standard Rules, 28 International Law 47 (1994);

*Kazazi, M.*, Burden of Proof and Related Issues. A Study of Evidence Before International Tribunals (1996);

*Pietrowski, R.*, Evidence in International Arbitration, 22 Arbitration International 373 (2006);

*Raeschke-Kessler, H.*, The Production of Documents in International Arbitration – A Commentary of Article 3 of the New IBA Rules of Evidence, 18 Arbitration International 411 (2002);

*Redfern, A./Hunter, M. with Blackaby, N. and Partasides, C.*, Law and Practice of International Commercial Arbitration, 4th ed., 6.61–6.103 (2004);

*Sandifer, D. V.*, Evidence Before International Tribunals (1975);

*Sharpe, J. K.*, Drawing Adverse Inferences from the Non-production of Evidence, 22 Arbitration International 549 (2006).

## I. INTRODUCTION

Provision for the power of an international court or tribunal to take evidence is a standard feature in instruments governing international adjudication. Comparable clauses may be found in the Statute of the International Court of Justice (Arts. 49, 50 and 51), in the 1958 International Law Commission's Model Rules on Arbitral Procedure (Arts. 17(2), 18),[1] in the 1993 Permanent Court of Arbitration's Optional Rules for Arbitrating Disputes between Two States and in the 1993 Permanent Court of Arbitration's Optional Rules for Arbitrating Disputes between Two Parties Only One of Which Is a State (Arts. 24(2)(3) and 25(6)).[2] Moreover, comparable clauses exist in the 1998 International Chamber of Commerce Rules of Arbitration (Art. 20),[3] in the 1976 UNCITRAL Arbitration Rules (Arts. 16(2)(3), 24(2)(3), 25, 27)[4] and in the 1985 UNCITRAL Model Law on International Commercial Arbitration (Arts. 24, 26).[5]    **1**

The Preliminary Draft of the ICSID Convention did not have a provision on the tribunal's power to summon evidence (History, Vol. I, p. 196). It was inserted in the First Draft upon the suggestion of the delegate from the Central African Republic and remained almost unchanged (History, Vol. II, pp. 244, 269, 572, 805) (but see para. 68 *infra*). There was some suggestion to delete the Article and to relegate its contents to the Arbitration Rules (at p. 806). Three successive votes on the matter eventually resulted in the Article's retention (at p. 807).    **2**

During the Convention's drafting, it was also made clear that fact-finding is not an independent function of a tribunal but an indispensable task incidental to its judicial function (see Art. 25, paras. 29, 74, 75). Pure fact-finding was introduced by means of the Additional Facility but this is an activity that is totally separate from arbitration under the Convention (see Art. 25, paras. 10, 11, 30, 31, 34, 210).    **3**

---

1    YBILC 85 (1958-II).
2    Available on the PCA's website, at http://www.pca-cpa.org.
3    36 ILM 1612 (1997).                    4    15 ILM 708–712 (1976).
5    24 ILM 1308/9 (1985).

**4**    The taking and evaluation of evidence is a crucial aspect of fair and impartial judicial proceedings. Failure to abide by the relevant standards, as contained in the Arbitration Rules but also in general principles of law, may expose an award to annulment on the ground that there has been a serious departure from a fundamental rule of procedure in accordance with Art. 52(1)(d) of the Convention (see Art. 52, paras. 278–337).

## II. INTERPRETATION

### A.  "Except as the parties otherwise agree, . . ."

**5**    Art. 43 is one of several Articles that is open to variation by the parties (*cf.*, Arts. 26, 33, 35, 44, 46, 47, 60, 61, 62, 63). This is an expression of the consensual nature of proceedings under the Convention leaving the parties a large measure of discretion.

**6**    During the Convention's drafting, the exception clause in the context of the tribunal's power to obtain evidence was repeatedly cast into doubt. This power was described as an essential element in rendering an award. There were several calls to delete the clause (History, Vol. II, pp. 663, 805, 806). On the other hand, there was concern that States parties to proceedings might need to withhold sensitive information relating to national security and would have to claim privilege in respect of certain documents (at pp. 805/6). A vote on the deletion of the clause did not produce a majority (at p. 807).

**7**    In a typical arbitration, matters of fact as well as of law will be contested. It is difficult to see how a tribunal could proceed under these circumstances without the power to ascertain all relevant facts. But it is conceivable that the parties may submit to the tribunal an agreed statement of facts coupled with a request to render an award purely on the legal issues arising therefrom. In a situation of this kind, an agreement by the parties to withhold from the tribunal the power to obtain further factual information is feasible. Alternatively, the parties may agree on specific rules governing the taking of evidence.

**8**    Parties to ICSID proceedings as well as tribunals often make reference on the International Bar Association's Rules on the Taking of Evidence in International Commercial Arbitration ("the IBA Rules on Evidence") as an appropriate standard. In *Noble Ventures* v. *Romania* the Tribunal noted that the IBA Rules on Evidence,

> though not directly applicable in this case and primarily provided for use in the field of commercial arbitrations, can be considered (particularly in Articles 3 and 9) as giving indications of what may be relevant criteria for what documents may be requested and ordered to be produced in ICSID procedures between investors and States.[6]

---

6  *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 20, citing para. 2 of Procedural Order No. 1 of the Tribunal. See also *Glamis Gold* v. *United States* (UNCITRAL), Decision on Objections to Document Production, 20 July 2005, paras. 9, 10; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 22, quoting Procedural Order No. 1; *Bayindir* v. *Pakistan*, Procedural Order No. 4, 27 November 2006, para. 22 (unpublished).

The Arbitration Rules offer a special procedure to reach agreement on uncontested facts:   **9**

### Rule 21
*Pre-Hearing Conference*

(1) At the request of the Secretary-General or at the discretion of the President of the Tribunal, a pre-hearing conference between the Tribunal and the parties may be held to arrange for an exchange of information and the stipulation of uncontested facts in order to expedite the proceeding.

## B. ". . . the Tribunal may, if it deems it necessary . . ."

### *1. Necessity and Discretion*

The parties are primarily interested in bringing all the evidence supporting   **10**
their case before the tribunal. Therefore, most of the relevant information will be supplied on the parties' initiative. In this context, Arbitration Rule 33 provides:

*Marshalling of Evidence*

Without prejudice to the rules concerning the production of documents, each party shall, within time limits fixed by the Tribunal, communicate to the Secretary-General, for transmission to the Tribunal and the other party, precise information regarding the evidence which it intends to produce and that which it intends to request the Tribunal to call for, together with an indication of the points to which such evidence will be directed.[7]

The Arbitration Rules go on to state:

### Rule 34
*Evidence: General Principles*

(1) The Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value.[8]

Arbitration Rule 34 continues by paraphrasing Art. 43 of the Convention. Therefore, the tribunal's power under Art. 43 is supplementary in the sense that it is designed to close gaps left after the parties have adduced all the material that they deem relevant.

The tribunal has discretion in deciding on the relevance and admissibility of   **11**
the evidence adduced by the parties and in exercising the power to summon further evidence[9] and is not bound by the parties' submissions regarding the taking of evidence. It is for the tribunal and not for an interested party to determine whether a piece of evidence is admissible and relevant. In some cases tribunals have, in fact, denied requests for the production of evidence.[10]

---

7   Article 40 of the Arbitration (Additional Facility) Rules is identical. See also the Note to the identical Rule 32 of 1968, 1 ICSID Reports 94.

8   Article 41(1) of the Arbitration (Additional Facility) Rules is identical.

9   See also Note A to Arbitration Rule 33 of 1968, 1 ICSID Reports 95.

10   *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 223–226; *MCI* v. *Ecuador*, Award, 31 July 2007, para. 20.

**12**     In *Vacuum Salt* v. *Ghana*, the Respondent strongly urged the Tribunal to make its decision without holding a hearing. The Tribunal acceded to the Claimant's request for oral proceedings, *inter alia*, in view of the potential importance of observing the witnesses.[11]

**13**     In *SPP* v. *Egypt*, the Respondent formally requested the Tribunal to order an expert opinion on certain expenses claimed by the Claimants. Instead, the Tribunal issued a procedural order requesting further information from the parties.[12]

**14**     In *Tradex* v. *Albania*, Tradex objected to certain witnesses whom it rejected as unreliable. The Tribunal ruled that all witnesses should be heard and that the points raised by Tradex could be brought up in cross-examination and would be taken into account in evaluating the evidence[13] (see also para. 110 *infra*). Albania, in turn, objected to certain documents filed by Tradex but subsequently withdrew these objections. On that basis, the Tribunal's President ruled that all documents submitted to the Tribunal were admissible.[14]

**15**     The Tribunal's discretion in ruling on evidence, however, is not without limits. The Tribunal in *Aguas del Tunari* found that its exercise of discretion regarding the production of documentary evidence under Article 43 of the Convention and Arbitration Rule 34(2) was contingent upon a number of considerations which guide tribunals in requesting the production of documents or witnesses from the parties. The Tribunal said that its discretion in ordering parties to produce evidence

> is informed by concepts of materiality, relevance, and specificity present in the laws of evidence generally and by the customs of evidentiary production in international arbitration generally.[15]

**16**     In particular, the *Aguas del Tunari* Tribunal emphasized that Article 43 requires that a tribunal may order the production of documents at any stage of the proceedings "if necessary" and identified the following considerations that may be taken into account by tribunals in evaluating whether or not to request the production of evidence:

> [T]he necessity of the requests made to the point the requesting party wishes to support, the relevance and likely merit of the point the requesting party seeks to support, the cost and burden of the request on the Claimant and the question of how the request may be specified so as to both fulfill legitimate requests by a party while not allowing inquiries that are an abuse of process.[16]

In that specific case, the Tribunal concluded that the parties' arguments as to the necessity of the requests for production of documents were not sufficiently

---

11  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 45. See also *Tradex* v. *Albania*, Award, 29 April 1999, paras. 25, 26.

12  *SPP* v. *Egypt*, Award, 20 May 1992, para. 37.

13  *Tradex* v. *Albania*, Award, 29 April 1999, para. 34. See also *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 49.

14  *Loc. cit.*

15  *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 25, citing the Tribunal's Procedural Order No. 1, paras. 13–15.

16  At para. 14 of Procedural Order No. 1.

developed or clear to allow the Tribunal to decide the issue at that stage of the proceedings.[17]

In *ADF* v. *United States*, decided under the Additional Facility, ADF asked **17** the Tribunal to order the United States to produce a number of documents. The Tribunal identified two main aspects of the "necessity" requirement, contained in Article 41(2) of the Arbitration (Additional Facility) Rules,[18] for the production of documents: (i) a substantive inquiry into the relevance of the document requested for purposes of the proceedings and (ii) a procedural inquiry "into the effective and equal availability of the documents requested to both the requesting party and the party requested". When only one party has access to the relevant documents, the Tribunal considered that it should make them available to the other party. By contrast, when the documents are in the public domain, and available to both parties, there should be no necessity for one party to produce and deliver the documents to the other.[19] The Tribunal ordered the production of some documents but denied the production of other documents whose identification was problematic due to the fact that they had been described in "overly broad terms". Another ground for denial of production was the fact that the party making the request had not shown the documents' relevance for the subject-matter of the case.[20]

Under Article 3(3)(b) of the IBA Rules on Evidence the request must concern **18** documents that are "relevant and material to the outcome of the case". Article 9(2) allows tribunals to exclude from evidence or production any documents on a number of grounds, including "lack of sufficient relevance or materiality", "legal impediment or privilege" under the legal rules determined to be applicable by the tribunal, "unreasonable burden" to produce the evidence, "loss or destruction of the document that has been reasonably shown to have occurred", grounds of "commercial or technical confidentiality", "political or institutional sensitivity" and "considerations of fairness or equality" of the parties which the tribunal must determine to be compelling.

Applicants in annulment proceedings have repeatedly referred to the use of **19** discretion by tribunals in the treatment of evidence as constituting an excess of powers and/or a serious departure from a fundamental rule of procedure. *Ad hoc* committees have rejected such applications as attempts to reintroduce evidence in annulment proceedings.

In the annulment proceedings in *Wena Hotels* v. *Egypt*, the Applicant, Egypt, **20** alleged that the Tribunal had exceeded its powers because it failed to decide an alleged instance of corruption. The *ad hoc* Committee dismissed the issue as "a purely factual issue which is irrelevant as a matter of minimal standard of procedure".[21] Egypt also argued that the Tribunal breached a fundamental rule

---

17  See also para. 327.
18  Arbitration (Additional Facility) Rule 41(2) closely follows the text of Art. 43 of the Convention and of Arbitration Rule 34.
19  *ADF* v. *United States*, Award, 9 January 2003, para. 29, citing Procedural Order No. 3.
20  At paras. 32–38.
21  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 60.

of procedure when it did not call for further evidence under Arbitration Rule 34(2) and allegedly decided the issue against the Respondent "on the basis of the absence of the evidence it had, in its discretion, decided not to ask for". The *ad hoc* Committee observed that "it is incumbent to the parties to produce the evidence they wish to present or they intend to request the Tribunal to call for". Neither the Rules nor the Convention impose any obligation on ICSID tribunals "to call for evidence on any item critical for the outcome of the dispute". The *ad hoc* Committee therefore concluded that the Tribunal's conduct in this case did not represent a serious departure from a fundamental rule of procedure and dismissed the Applicant's request.[22]

**21**    In *CDC* v. *Seychelles*, the Applicant contended that the Award had failed to state reasons regarding conflicting witness statements. In rejecting the Application, the *ad hoc* Committee held that the Tribunal did not ignore the relevant evidence but simply came to a conclusion as to the meaning of this evidence with which the Applicant disagreed.[23]

**22**    In *MTD* v. *Chile*, the Applicant, Chile, argued that the Tribunal's alleged failure to consider expert evidence presented by both Parties on a variety of issues constituted a serious departure from a fundamental rule of procedure. The *ad hoc* Committee ruled that there was no indication of any procedural failure by the Tribunal "let alone a serious one".[24]

### 2. Default Proceedings

**23**    If a party does not appear before the tribunal and does not make written submissions, the tribunal's task in obtaining all the necessary evidence is particularly delicate. Art. 45(1) of the Convention provides that a party's failure to appear or to present its case shall not be deemed an admission of the other party's assertions. Arbitration Rule 42(3) in its second sentence paraphrases the Convention's provision. This means that the tribunal must on its own motion verify all the factual assertions made by the active party[25] (see Art. 45, paras. 10–20).

**24**    In *LETCO* v. *Liberia*, the Respondent declined to appear or present any case. The Tribunal cited Art. 45 of the Convention and Arbitration Rule 42 dealing with default. The Tribunal found that it had to examine *proprio motu* the merit of the assertions made by the active party in order to satisfy itself whether they are well founded. The Tribunal said:

> It is this procedure which was followed by the Tribunal in the present arbitration. The Tribunal did not take for granted the assertions of law and fact made by the claimant. On the contrary, it submitted them to careful examination; and its award is made on the basis of that examination.[26]

22   At paras. 71–74.
23   *CDC* v. *Seychelle*s, Decision on Annulment, 29 June 2005, paras. 77, 83, 85.
24   *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, paras. 56, 57.
25   See also Note E to Arbitration Rule 42 of 1968, 1 ICSID Reports 104.
26   *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 356/7.

*Article 43 – Evidence*                                                    647

The Tribunal sent procedural orders to both parties requesting further evidence regarding certain issues. The Tribunal also appointed a firm of accountants to investigate and report on the amount of damages claimed by LETCO. In two rounds of oral hearings, the Tribunal heard testimony from various witnesses concerning the issue of whether LETCO had complied with its contractual obligations and as to the validity of the accountants' report[27] (see Art. 45, paras. 18, 19).

In *Goetz* v. *Burundi*, the Respondent failed to present its case. The Tribunal    **25** noted that it regretted not being able to hear Burundi's position on matters of fact and law. Echoing a ruling of the International Court of Justice in a similar case, the Tribunal held as follows:

> The Tribunal, like the Court, is certainly obliged to "proceed to an examination of the conclusions of the party pleading"; it is not however obliged to "verify all details of it in their minutia – a task which, in certain cases and in the absence of contradiction, could reveal itself as totally impossible".[28]

### 3. Expenses

Arbitration Rule 34(4) provides:                                            **26**

> Expenses incurred in producing evidence and in taking other measures in accordance with paragraph (2) shall be deemed to constitute part of the expenses incurred by the parties within the meaning of Article 61(2) of the Convention.

According to Art. 61(2), the tribunal shall decide how and by whom expenses    **27** are to be paid. Under Arbitration Rule 28(1)(b) (see Art. 61, para. 27), the tribunal may decide with respect to any part of the proceeding that the related costs shall be borne entirely or in a particular share by one of the parties. This opens the possibility to charge the party whose conduct has necessitated a particular measure to obtain evidence with all or a major share of the cost of that measure. For example, if a party wishes to have the tribunal visit the scene connected with the dispute, in accordance with Art. 43(b), the tribunal may do so at the cost of that party.[29] A party that fails to cooperate with the tribunal, thereby causing additional effort and expenses, may be charged with a higher proportion of the costs, or indeed the entire cost[30] (see Art. 61, paras. 27–32).

In *SOABI* v. *Senegal*, the Respondent was dissatisfied with the Claimant's cal-    **28** culations concerning its operating expenses and capital expenditures. Therefore, the Respondent demanded that SOABI's accounts be audited by an expert of the Tribunal's choosing. The Government added that the expert's expenses should be paid by SOABI, which had failed to explain any of its figures. The Tribunal appointed a professional accountant, who submitted a detailed report which was

---

27  At pp. 348/9.
28  *Goetz* v. *Burundi*, Award, 10 February 1999, para. 56, citing *Military and Paramilitary Activities in and against Nicaragua (Nicaragua* v. *United States)*, Judgment, 27 June 1986, ICJ Reports 1986, p. 25, para. 30.
29  See Note B to Arbitration Rule 27 of 1968, 1 ICSID Reports 90.
30  See *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 378.

accepted by the Tribunal. The Tribunal also accepted the Government's position that the fees and expenses of the expert should be borne by SOABI.[31]

**29**     In *Plama* v. *Bulgaria*, the Claimant resisted the Respondent's requests for documents. The Tribunal issued an Order directing the Claimant to produce all documents falling within a particular category.[32] Later on in the proceedings, Bulgaria requested an award on costs arguing that Plama's refusal to disclose information in its possession obliged it to find the information itself and thus needlessly aggravated its costs.[33] The Tribunal showed some sympathy for Bulgaria's position that it was entitled to costs because Plama had been unwilling to respond fully to its request for information. The Tribunal acknowledged that Bulgaria had to spend considerable time, effort and money to obtain the information. In the Tribunal's words:

> The Claimant had access to and/or control over all information relating to its ownership and control. . . . The evidence of . . . asserted ownership and control of [the Claimant] should have been submitted by the Claimant as part of its case. The fact that it did not and that the structure of ownership it described in its memorials is so obtuse has raised many questions in the minds of the Arbitrators which remain to be explored in the second phase of this arbitration.[34]

The *Plama* Tribunal eventually deferred its decision on costs to the second phase of the case when it would be in a better position to make a judgment about the costs of the arbitration.[35]

### C.  ". . . at any stage of the proceedings, . . ."

**30**     The tribunal may request further information and evidence as the need arises. Typically, the need for further documents will become apparent after the completion of the written procedure.[36] Witnesses will be called to testify during oral hearings. But the need to take action to obtain evidence may arise at an early stage of the proceedings. Conversely, the need for further facts may emerge at a later stage.

**31**     In *AGIP* v. *Congo*, the Tribunal requested the production of documents before it had received memorials. This was necessary because all AGIP's records had been seized by the Government in the course of the nationalization which was the object of the dispute. Accordingly, the Tribunal recommended a "measure of preservation" in accordance with Art. 47 for the production of these records[37] (see para. 61 *infra*; Art. 47, para. 81).

**32**     In *Noble Ventures* v. *Romania*, the Claimant introduced a document entitled "Investor's Proposal for Document Production" at the first procedural session between the parties and the Tribunal. After hearing the parties in this respect,

---

31   *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 9.05–9.25.
32   *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 16.
33   At para. 110.                                34   At para. 238.
35   At para. 239.
36   See Note C to Arbitration Rule 33 of 1968, 1 ICSID Reports 95.
37   *AGIP* v. *Congo*, Award, 30 November 1979, paras. 7–9.

*Article 43 – Evidence*   649

the Tribunal decided to use this document only as a guideline to be used for the production of documents in the case.[38] It was further specified in the minutes of the first procedural session that the parties would attach any evidence to their written submissions and that the Tribunal would allow introduction of new evidence at a later stage of the proceedings only under exceptional circumstances.[39] Noble Ventures introduced three further requests for production of documents before the pleadings were filed. In the circumstances, the Tribunal found that it was unable to identify which documents may be relevant and material for its decision and invited the parties to try and agree on the disclosure of documents and, in the absence of such an agreement, to submit new requests for the production of documents together with their written pleadings.[40]

In *Champion Trading* v. *Egypt*, the Claimant submitted a first request to conduct limited discovery and for production of documents after the filing of a limited Memorial. Counsel for the Claimant announced his intention to introduce a request for production of documents after a hearing for the examinations of two witnesses. Subsequently, the Tribunal and the parties agreed on a schedule to answer the request and the parties exchanged submissions in that respect.[41]   **33**

In *Fraport* v. *Philippines*, the Award ultimately turned on the existence of secret shareholder agreements which were in violation of host State law. The Tribunal found that Fraport had sought to conceal these agreements. Most of the relevant documents were produced either immediately before the hearing on jurisdiction and liability or during the hearing.[42] In *Noble Energy* v. *Ecuador*, the Claimants objected that the Respondents had introduced new evidence at the hearing. The Tribunal found that the issues developed by the Respondents during their oral argument were aimed at rebutting issues developed in the Claimants' Rejoinder and were hence admissible.[43]   **34**

In several cases tribunals requested further evidence after the oral pleadings.[44] In *SOABI* v. *Senegal*, the President of the Tribunal, in preparation for hearings, had requested the parties to supply all the information provided for in Art. 33 of the Arbitration Rules[45] (see para. 10 *supra*). During the hearings, the Government indicated that it wished to produce a document not previously filed. The Tribunal granted the request. At the close of the hearings in July 1985, the Tribunal indicated   **35**

---

38   *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 18, citing the minutes of the first session, item 15.

39   *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 18, citing the minutes of the first session, items 15 and 18.

40   At para. 20, citing paras. 7, 8.1 and 8.3, of Procedural Order No. 1 of the Tribunal. See also *Libananco* v. *Turkey*, Decision on Preliminary Issues, 23 June 2008, paras. 10–11, 53–54, 61–71.

41   *Champion Trading* v. *Egypt*, Award, 27 October 2006, paras. 17–23.

42   *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 383, 400.

43   *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 48.

44   See *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 11. In *SPP* v. *Egypt*, the Tribunal requested further information from the parties five months after the final hearings on the merits: Award, 20 May 1992, paras. 32, 37.

45   *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.23.

that the proceedings were not yet closed within the meaning of Arbitration Rule 38(1) (see para. 36 *infra*) and that it reserved the right to request additional information. This it did in a Procedural Order of January 1986, in which it requested financial accounts from the Claimant.[46] In February 1986, the Tribunal submitted written questions to the parties. In March 1986, the Tribunal appointed a chartered accountant who submitted his report in March 1987. After an exchange of comments in April 1987,[47] the Tribunal met in August and December 1987.[48] It rendered its Award in February 1988.

**36**    The tribunal remains free to examine evidence up to the time it renders the award. Arbitration Rule 38 (see Art. 49, para. 11) provides that, even after the closure of the proceeding, the tribunal may exceptionally reopen the proceeding in order to take new evidence.

**37**    In *Klöckner* v. *Cameroon*, the written as well as the oral phase of the proceedings had been completed and the Chairman of the Tribunal declared the proceedings to be at an end pursuant to Arbitration Rule 38(1). Two days later, the arbitrators met and decided under Arbitration Rule 38(2) to ask the parties to respond in writing to an additional question of fact.[49]

**38**    Even after the award has been rendered, the appearance of new evidence may lead to the award's revision. Art. 51 provides that a party may request revision of the award on the ground of discovery of some decisive fact that was unknown to the tribunal and to the applicant when the award was rendered.

**39**    The tribunal's discretion extends to the acceptance of evidence from the parties even after the expiry of time limits. In *Benvenuti & Bonfant* v. *Congo*, the Government had missed several deadlines for the filing of its Counter-Memorial and hearings had been held. The Government's offer to lodge its Counter-Memorial nearly six months after the expiry of the last period of grace was at first rejected. But the Government's offer to submit certain relevant documents was accepted. At a subsequent hearing, the Claimant's representative took the view that the documents presented by the Government should not be admitted. But the Tribunal found that special circumstances of a domestic political nature explained the Government's failure to comply with the successive time limits. The Tribunal also considered "that the documents presented by the Government could be considered as an indication that the Tribunal did not have at its disposal all the necessary facts for it to render its award".[50] Therefore, it set new time limits for the Government's Counter-Memorial and Counter-Claim. This time, the Government complied with the time limit.

**40**    In *Tradex* v. *Albania*, the Tribunal had issued a ruling that no new documents could be submitted by the Parties at that stage. When Tradex nevertheless sought to submit new documents, Albania objected and the Tribunal ruled that the new

---

46  At para. 1.32.                              47  At para. 9.14.
48  At para. 1.39.
49  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 12.
50  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.20–1.33.

documents were inadmissible. The Tribunal added that these documents would not have changed its reasoning or decision on the merits. The Tribunal subsequently issued a formal Order closing the proceedings in accordance with Arbitration Rule 38(1).[51]

In *Azurix* v. *Argentina*, during deliberations of the Award, the Tribunal requested **41** the Claimant to explain some discrepancies in its financial statements for certain fiscal years. After submission of the relevant information by the Claimant, Argentina was also invited by the Tribunal to submit its comments.[52]

In *Siemens* v. *Argentina*, the Respondent filed post-hearing briefs which also **42** included additional accounting information. Siemens contested this submission and the Tribunal invited Argentina to make some observations on Siemens' arguments. Argentina failed to meet the deadline fixed by the Tribunal for the filing of these observations and Siemens requested a declaration from the Tribunal that the proceedings were closed. However, Argentina informed the Tribunal that it had not received the Tribunal's letter setting the deadline for its observations and opposed Siemens' request for the closure of the proceedings. Argentina later filed its observations with supporting documentation explaining why the Tribunal's letter had not been received. The Tribunal accepted Argentina's explanation, admitted its letter into the evidence and invited Siemens to make further comments to the letter. The Tribunal however disregarded a subsequent exchange of correspondence between the parties because it was unsolicited.[53]

In the Resubmitted Case in *Vivendi* v. *Argentina*, Claimants sought to file **43** additional evidence after the conclusion of the hearing but before the closure of the proceeding. The additional evidence concerned alternative approaches to the calculation of damages. The Respondent objected. The Tribunal declined to exercise its discretion to accept the Claimants' new evidence.[54]

## D.  ". . . (a) call upon the parties to produce . . ."

### *1. Initiative*

The initiative to provide relevant evidence will be primarily with the parties **44** (see para. 10 *supra*). The Rules and Regulations adopted under the Convention control the submission of evidence by the parties.[55] If, in the tribunal's view, the evidence thus supplied remains incomplete, it may request further information.

In some cases the initiative for a request for further information originated **45** from the tribunal. Tribunals have asked parties to provide answers to specific

---

51  *Tradex* v. *Albania*, Award, 29 April 1999, paras. 43–49.
52  *Azurix* v. *Argentina*, Award, 14 July 2006, para. 36.
53  *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 60–67.
54  *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 2.7.17, 8.1.6–8.1.9. The Tribunal's detailed reasons for the decision are contained in a letter from the Tribunal to the parties of 15 September 2006, which is attached to the Award.
55  Arbitration Rules 23, 24, 33; Administrative and Financial Regulation 30.

questions,[56] to produce specific documents[57] and witnesses[58] or have appointed experts on their own motion.[59]

**46**      In *Feldman* v. *Mexico*, conducted under the Additional Facility, the Tribunal invited the parties to submit requests for discovery and production of documents. Following a request from Mexico that the Tribunal order production of documents by the Claimant concerning the preliminary issues briefed by the parties, the Tribunal ordered the parties to comply promptly with any requests for the production of documents which they regarded (in good faith and after exhaustion of all best efforts) "to be admissible, relevant and otherwise inaccessible to the party requesting them". Several submissions concerning the production of documents and presentation of witnesses were filed by both parties during the jurisdictional and merits phases and eventually the Tribunal ruled on the issue with a procedural order regarding the marshalling of the evidence at the hearing on the merits.[60]

**47**      At the first procedural session with the parties in *Impregilo* v. *Pakistan*, Pakistan stated that, before it could formulate its position with respect to the jurisdiction of the Tribunal and decide whether to raise jurisdictional objections, it needed additional information beyond what was contained in the Claimant's Request for Arbitration. The Tribunal thereafter ordered Pakistan to submit a document specifying the kind of information it needed in order to formulate possible objections to jurisdiction. Following Pakistan's submission, Impregilo raised several objections concerning the nature and scope of Pakistan's request for information. The Tribunal – rather than requesting a specific response to Pakistan's request for information – directed Impregilo to submit a Limited Memorial on the Merits in which it was to articulate the legal basis for each of its claims.[61]

**48**      In *Fraport* v. *Philippines* the decisive documents were produced at a late stage in the proceedings upon the insistence of the Tribunal's President.[62]

**49**      In the majority of cases, requests for production of documentary evidence or witnesses originate from one of the parties.[63] In *SOABI* v. *Senegal*, the appointment

---

56  See *e.g.*, *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.28; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 12; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.23. See also the SCC case *Petrobart* v. *Kyrgyz Republic*, Award, 29 March 2005, pp. 79–80 and 83.

57  See *e.g.*, *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 11; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 11; *Feldman* v. *Mexico* (AF), Award, 16 December 2002, para. 33.

58  *Maffezini* v. *Spain*, Award, 13 November 2000, paras. 26, 27, 32; *Champion Trading* v. *Egypt*, Award, 27 October 2006, para. 15.

59  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.77.

60  *Feldman* v. *Mexico* (AF), Award, 16 December 2002, paras. 33–41.

61  *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 5, 6.

62  *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 383, 400, 401.

63  See *e.g.*, *AGIP* v. *Congo*, Award, 30 November 1979, para. 7; *Azinian* v. *Mexico* (AF), Award, 1 November 1999, para. 50; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 36; *Feldman* v. *Mexico* (AF), Award, 16 December 2002, para. 33; *ADF* v. *United States*, Award, 9 January 2003, paras. 27–38; *Yaung Chi Oo* v. *Myanmar* (ASEAN), Award, 31 March 2003, 42 ILM 540 (2003), paras. 14, 15, 17; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 4.20; *Waste Management* v. *Mexico* (AF), Award, 30 April 2004, para. 18; *CSOB* v.

of a professional accountant had been demanded by the Government.[64] In *SPP* v. *Egypt*, the Respondent had formally requested that the Tribunal order an expert opinion to examine the Claimant's alleged expenses. Instead, the Tribunal confined itself to request further documentation from the Claimant.[65]

In *Tanzania Electric* v. *IPTL*, the Claimant submitted a request to the Tribunal **50** for an "order for discovery" of documents allegedly showing briberies made or promised by the Respondent to agents of the Government of Tanzania. The Tribunal declined to make the order since no allegation of bribery had ever been formally pleaded by the parties and the only basis for these allegations were unsworn statements. The request was renewed later on in the proceedings when Tanzania Electric made allegations of bribery for the first time in its Reply which was said to be an "Ancillary Claim" under ICSID Arbitration Rule 40. The Tribunal allowed Tanzania Electric to plead the bribery issue pursuant to Rule 40 and ordered both parties to produce documents in their possession, custody or power regarding that issue. The *Tanzania Electric* Tribunal also ruled that the Claimant should produce relevant documents in the files of its counsel originating from the Government of Tanzania, even though they were not in the possession, custody or power of the Claimant itself. These documents were eventually produced by Tanzania Electric's counsel on the basis of an express agreement between the parties as to their confidentiality.[66]

## 2. Addressee

The Convention's text provides that the tribunal direct its call for further infor- **51** mation to the parties. During the Convention's drafting, there was some discussion of a possible power to compel the appearance of witnesses before the tribunal (History, Vol. II, pp. 805, 806). A proposal to give the tribunal the right to call witnesses directly and not through the parties was defeated narrowly (at p. 807).

The Convention does not provide for the right of an ICSID tribunal to enlist **52** the assistance of national authorities, notably domestic courts, to obtain evidence. Under Arbitration Rule 39(6) (see Art. 26, paras. 176–178), the parties may agree that provisional measures may be requested from domestic courts. But such

---

*Slovakia*, Award, 29 December 2004, para. 9; *Tokios Tokelės* v. *Ukraine*, Procedural Order No. 3, 18 January 2005, paras. 1, 24–36; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 16; *Glamis Gold* v. *United States* (UNCITRAL), Decision on Objections to Documents Production, 20 July 2005; *Noble Ventures* v. *Romania*, Award, 12 October 2005, paras. 19–20, 96–98; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 23–27; *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, paras. 99–103, Procedural Order No. 2, 24 May 2006; *Azurix* v. *Argentina*, Award, 14 July 2006, paras. 22–27, 29, 31; *ADC* v. *Hungary*, Award, 2 October 2006, paras. 30, 33–37; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, paras. 13, 19–23; *Champion Trading* v. *Egypt*, Award, 27 October 2006, paras. 15–16; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 30, 39, 43, 44, 48–52; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 29–31, 36.
64    *SOABI* v. *Senegal*, Award, 25 February 1988, para. 9.05.
65    *SPP* v. *Egypt*, Award, 20 May 1992, para. 37.
66    *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 36, 39, 40–44.

requests may be made by the parties only. There is no explicit legal basis for a tribunal's request for judicial assistance (see Art. 26, para. 164).

**53**     In the majority of instances, tribunals have directed their calls for evidence to the parties. In this manner, questions were asked and the production of documents was ordered. When witnesses were heard, they were normally brought to the tribunal through the intercession of the parties (see para. 83 *infra*).

**54**     There is nothing that would prevent a tribunal from directly inviting a witness to appear before it and to testify (see para. 81 *infra*). But it is clear that a tribunal has no power to compel a witness's appearance. In a number of cases, tribunals have directly approached independent experts requesting reports from them.[67] There is no indication of any opposition to such a procedural step. In *CMS* v. *Argentina*, the Tribunal decided to retain independent expert advice in order to "better understand the underlying assumptions and methodology relied upon in the valuation reports submitted by the Parties' experts" and the parties were invited by the Tribunal to file observations on the independent expert report.[68] The ICSID Secretariat was repeatedly approached to supply documents to *ad hoc* committees.[69]

### 3. Form

**55**     There is no clear indication in which form the tribunal shall call upon the parties to produce the required evidence. Arbitration Rule 34(2) simply repeats the Convention's relevant words. Arbitration Rule 19 provides for procedural orders in general terms:

*Procedural Orders*
The Tribunal shall make the orders required for the conduct of the proceeding.

It is only in the context of visits and enquiries that Arbitration Rule 37 specifically requires the tribunal to make an order (see paras. 119, 120 *infra*).

**56**     In some cases tribunals call upon the parties to deal with the production of evidence directly between themselves.[70] In *Generation Ukraine* v. *Ukraine*, the Respondent made a request for the production of corporate documents of the Claimant. The Tribunal urged the parties to deal with any request for production of documents directly between themselves. The Claimant produced the documents requested and, in turn, filed a request for production of documents by the Respondent. The Claimant was dissatisfied with the response to its request and submitted a motion complaining that the Respondent had not complied with the Parties' agreement regarding discovery of documents and had destroyed the

---

67   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.24, 4.77; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 9.06; *AMT* v. *Zaire*, Award, 21 February 1997, para. 7.19.

68   *CMS* v. *Argentina*, Award, 12 May 2005, paras. 50–51.

69   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 12.

70   See *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 24–28.

documents requested. After further correspondence the Tribunal dismissed the Claimant's motion.[71]

In *Duke Energy* v. *Peru*, the Claimant had requested and obtained documentation directly from a Government agency under the country's Transparency Law. The Respondent accused the Claimant of attempting to conduct unauthorized discovery and requested the Tribunal to direct the Claimant to desist from seeking information without its permission. The Tribunal reminded both parties to respect the terms of Arbitration Rule 34(2).[72] **57**

The standard procedure for Tribunals is to issue formal procedural orders for the purpose of obtaining evidence from the parties.[73] Occasionally, the parties were simply "asked", "invited" or "requested" to furnish the required evidence.[74] **58**

The power of a tribunal to make formal orders extends only to the parties. A tribunal cannot order third parties to do anything. In *Waste Management* v. *Mexico* an issue was ownership and control of the relevant investment by a Mexican company which was the actual concessionaire. The Respondent called on the Tribunal to order access to information regarding this company which was in the possession of another company, not a party to the proceedings. The Tribunal requested Waste Management to promptly disclose to Mexico all the relevant documents that this third company could provide to Waste Management.[75] **59**

A tribunal cannot issue an order to experts or to the ICSID Secretariat to provide evidence. Therefore, experts were "appointed"[76] or merely "asked to be kind enough" to provide a report.[77] The ICSID Secretariat was "asked" or "requested" to provide information.[78] **60**

In *AGIP* v. *Congo*, the Tribunal acceded to a request for provisional measures in accordance with Art. 47 of the Convention in order to obtain necessary **61**

---

71  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 4.20, 4.25, 4.26, 4.28–4.30.
72  *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 19.
73  See *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.32; *SPP* v. *Egypt*, Award, 20 May 1992, para. 37; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 8; *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 30, 31; *CSOB* v. *Slovakia*, Award, 29 December 2004, para. 9; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 16; *Noble Ventures* v. *Romania*, Award, 12 October 2005, paras. 19, 20; *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, paras. 99–103, Procedural Order No. 2, 24 May 2006; *Azurix* v. *Argentina*, Award, 14 July 2006, paras. 22–27, 29, 31; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 22; *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2007, paras. 24, 222, 224–225; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 18, 25, 31, 38, 42, 47.
74  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.28; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 12; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 11.
75  *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 18, 22, 30.
76  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 9.06; *AMT* v. *Zaire*, Award, 21 February 1997, para. 7.19.
77  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.77.
78  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 12.

documentation[79] (see para. 31 *supra* and Art. 47, paras. 34, 81). There is no apparent reason why the Tribunal acted under Art. 47 rather than issuing a procedural order under Art. 43.

**62**     By contrast, in *Biwater Gauff* v. *Tanzania*, when the Claimant sought production of documents pursuant to Art. 47 of the Convention, the Tribunal ruled that document production "is usually not considered within the ambit of such interim relief" but, rather, it falls under the purview of Art. 43 of the Convention and ICSID Arbitration Rule 34. The Tribunal further warned against the risk of using Art. 47 as a method of obtaining disclosure of documents in order to circumvent other procedures and concluded that requests for production should be considered under Art. 43.[80]

### 4. Legal Effect

**63**     During the Convention's drafting, Mr. *Broches* pointed out in the context of what eventually became Art. 43 that the parties could not be forced to do things that they might be asked by the tribunal but that failure to produce a document would probably lead to an inference by the tribunal (History, Vol. II, pp. 269, 805, 806). A suggestion to add the words "formal note should be taken of any refusal" was defeated in a vote together with the proposal to delete the clause "except as the parties otherwise agree" (at p. 807) (see para. 6 *supra*).

**64**     Procedural decisions do not enjoy the status of awards for purposes of their recognition and enforcement under Arts. 53 and 54. But Arbitration Rule 34(3) provides:

> The parties shall cooperate with the Tribunal in the production of the evidence and in the other measures provided for in paragraph (2). The Tribunal shall take formal note of the failure of a party to comply with its obligations under this paragraph and of any reasons given for such failure.

**65**     The duty to cooperate with the tribunal is a natural consequence of the consent to jurisdiction. The tribunal's only sanction is to draw the appropriate conclusions from a refusal which will be reflected in the award. The tribunal will take note of any reasons that may exonerate a party that fails to produce the requested evidence.[81]

**66**     In *AGIP* v. *Congo*, the Tribunal had chosen to make its call for documentation from the Government in the form of a recommendation of provisional measures under Art. 47 (see para. 61 *supra*). Paradoxically, the more formal step of issuing a provisional measure under Art. 47 led to a less authoritative decision than a simple procedural order under Arbitration Rules 19 and 34(3). Whereas the tribunal can only recommend provisional measures (see Art. 47, paras. 15, 16), the "parties shall cooperate" in the case of measures taken under Arbitration Rule 34(3).

---

79  *AGIP* v. *Congo*, Award, 30 November 1979, paras. 7, 9.
80  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, paras. 100–103.
81  See Note D to Arbitration Rule 33 of 1968, 1 ICSID Reports 96. See also *Kazazi, M.*, Burden of Proof and Related Issues: A Study on Evidence Before International Tribunals 312/3 (1996).

But the practical consequences would seem to be the same. In *AGIP* v. *Congo*, the Government's failure to comply with the provisional measure is reflected in the Tribunal's assessment of damages awarded to the Claimant[82] (see Art. 47, para. 34).

In a number of cases tribunals have indicated that they would draw adverse **67** inferences from a party's failure to supply documents.[83] In *Fraport* v. *Philippines* the Tribunal had issued numerous orders for the production of documents and had warned the parties of "appropriate inferences" in case of a failure to comply.[84] The Tribunal found that the Claimant had consciously concealed a secret shareholder agreement that was in violation of Philippine law. The relevant documents were produced at a late stage at the insistence of the Tribunal's President.[85] The Tribunal said:

> Despite requests for document production, the obvious relevance of these secret documents to the Respondent's jurisdictional objection, and a stern warning by the President of the Tribunal early in the arbitration that adverse consequences could be drawn from the failure to produce such documents, it was only in the course of the hearing that the existence of many of these documents became known. It was only at the insistence of the President of the Tribunal at that moment that they were finally produced.[86]

The Tribunal found that Fraport had intentionally circumvented Philippine law and had thus not made an investment "in accordance with law" as required by the applicable BIT. Therefore, jurisdiction was denied.[87]

### E. ". . . documents or other evidence, . . ."

#### 1. *Types of Evidence*

The First Draft still contained the phrase "documents or other information" **68** (History, Vol. I, p. 196). Upon the suggestion of Mr. *Broches*, this was replaced by "documents or other evidence" in order to broaden its meaning and to enable the tribunal to call for evidence in every form (History, Vol. II, pp. 806/7). Arbitration Rule 34(2)(a), which paraphrases Art. 43, refers to "documents, witnesses and experts".

Normally, the information obtained by these means will be of a factual nature. **69** A note to the Arbitration Rules of 1968 also refers to "experts on national law who (in view of Article 42(1) of the Convention) may be of special importance".[88] ICSID tribunals have, at times, admitted expert opinions not only on national but

---

82  *AGIP* v. *Congo*, Award, 30 November 1979, para. 42.
83  See *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, para. 30; *UPS* v. *Canada* (non-ICSID), Decision of the Tribunal Relating to Canada's Claim of Cabinet Privilege, 8 October 2004, para. 15.
84  *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 18, 25, 31, 38, 42, 47, quoting its Procedural Order No. 21, at para. 18.
85  At para. 383.                        86  At para. 400.
87  At para. 401.
88  Note B to Arbitration Rule 33 of 1968, 1 ICSID Reports 95.

also on international law[89] or have called on the parties to provide documents illustrating points of national and international law.[90]

### a) Documents

**70**    ICSID tribunals have on a number of occasions asked for additional documentation.[91] Most often, these documents were financial statements or accounts.[92] At times, the documents concerned were memoranda and notes,[93] files and transcripts of the original proceedings in annulment proceedings,[94] or transcripts and expert reports in separate arbitrations.[95]

**71**    Tribunals have attempted to balance the interest in a full disclosure of all relevant information against a disproportionate burden involved in the production of documents. In *Noble Ventures* v. *Romania*, the Tribunal found that the ICSID Convention and the Arbitration Rules did not provide a basis for the application of national rules of discovery such as those of the United States.[96] The Tribunal invited the parties to agree on a disclosure of documents taking into account certain considerations specified by the Tribunal and, in particular, the fact that the Respondent was a civil law country where production of documents is less customary than in common law countries. The Tribunal further stated:

> The Tribunal further recognises that, on one hand, ordering the production of documents can be helpful in the Tribunal's task of establishing the facts of the case relevant for the issues to be decided, but, on the other hand, (1) the process of discovery and disclosure may be time-consuming, excessively burdensome and even oppressive and that unless carefully limited, the burden may be disproportionate to the value of the result, and (2) Parties may have a legitimate interest of confidentiality.[97]

**72**    It is not uncommon in investor-State arbitrations for Respondent States to invoke the privileged or politically sensitive nature of certain documents as grounds for refusing production and to invoke executive privilege under their national laws.

---

89    See *e.g.*, *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 548; Resubmitted Case: Award, 5 June 1990, para. 155; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, para. 137; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 40; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 48, 91, 119, 135. For published legal opinions, statements and affidavits, see: http://ita.law.uvic.ca/expert_opinions.htm.

90    See *e.g.*, *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 13.

91    See *e.g.*, *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.30; *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1.

92    See *e.g.*, *AGIP* v. *Congo*, Award, 30 November 1979, paras. 7, 9; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 1.32, 9.06; *SPP* v. *Egypt*, Award, 20 May 1992, para. 37; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 43–45, 48–52, 58–60.

93    See *e.g.*, *Amco* v. *Indonesia*, Award, 20 November 1984, para. 95.

94    See *e.g.*, *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 11.

95    See *e.g.*, *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2005, para. 22; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 5, 19, 42.

96    *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 20, quoting Procedural Order No. 1 at para. 1.2.

97    At paras. 18, 20, citing Procedural Order No. 1, para. 4.

Tribunals have generally viewed such claims with disfavour.[98] In *Biwater Gauff* v. *Tanzania* the Tribunal held that issues relating to document production can be decided without resorting to national standards. International tribunals are not bound by national rules of evidence. The Tribunal said:

> [T]he nature of this dispute resolution process is entirely different from a national court process. This is an international tribunal, governed by an international convention, which is mandated to enquire into the conduct and responsibility of a State in light of its international treaty and customary international law obligations. It is hardly conceivable that, in this setting, a State might invoke domestic notions of public interest and policy relating to the operations of its own government as a basis to object to the production of documents which are relevant to determine whether the State has violated its international obligations and whether, therefore, its international responsibility is engaged.
>
>     . . . Further, if a State were permitted to deploy its own national law in this way, it would, in effect, be avoiding its obligation to produce documents in so far as called upon to do so by this Tribunal. This, in itself, is an international legal obligation arising from the State's consent by way of the BIT to ICSID arbitration. It may also thereby stifle the evaluation of its own conduct and responsibility. As such, this would be to undermine the well established rule that no State may have recourse to its own internal law as a means of avoiding its international responsibilities.[99]

The *Biwater Gauff* Tribunal added that invocation of Crown privilege would     **73** create an imbalance between the parties which would be contrary to one of the most fundamental principles of international arbitration. The only ground which might justify a refusal to produce documents would be the protection of privileged or politically sensitive information, including State secrets. Any decision on politically sensitive information would have to be finally made by the Tribunal.[100]

Tribunals operating under the Additional Facility came to similar conclusions.     **74** In *ADF* v. *United States* the Respondent invoked "government deliberative and pre-decisional privileges". The Tribunal ruled that

> for it to be able to determine the applicability of the privileges adverted to, the Respondent will have to specify the documents in respect of which one or more privilege is claimed and the nature and scope of the particular privilege claimed, and show the applicability of the latter to the former.[101]

Occasionally the desire to withhold sensitive information is expressed by the     **75** claimant. In *Zhinvali* v. *Georgia*, the parties had entered into a confidentiality agreement.[102] The material supplied by the Claimant included a "financial model".

---

98    See also the non-ICSID cases *Pope and Talbot Inc.* v. *Government of Canada*, Ruling on Claim of Crown and Privilege, 6 September 2000, para. 1.4; *United Parcel Services of America Inc.* v. *Government of Canada*, Decision of the Tribunal Relating to Canada's Claim of Cabinet Privilege, 8 October 2004, para. 1.

99    *Biwater Gauff* v. *Tanzania*, Procedural Order No. 2, 24 May 2006, p. 8.

100   At p. 9.

101   *ADF* v. *United States* (AF), Award, 9 January 2003, para. 38.

102   *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 35–37.

The Respondent argued that this model could only be analysed in depth if it were to be provided in electronic form. The Claimant refused to supply the electronic version arguing that it was at the core of its competitive position and strictly proprietary. The Tribunal ordered the delivery of the model's electronic version to the Respondent to the extent it was relevant for the calculation of lost profits. In case the electronic version was not supplied the Tribunal would not take the financial model into account for ascertaining the quantum of damages, if any. The Claimant did not supply the financial model's electronic version.[103]

**76**    In *Fireman's Fund* v. *Mexico* both parties made numerous requests for the production of documents. The Tribunal ruled that, to the extent that the Tribunal would refer to documents or information, it would identify the portions that were confidential and these should not be published to third parties. This led the parties to designating all documents submitted by them as containing "reserved information". In its Award the Tribunal ordered the parties to reach an agreement within 30 days as to which portions of the Award should be redacted for purposes of confidentiality.[104]

**77**    The broad and general nature of a request for documents can be a problem. Article 3(3)(a)(ii) of the IBA Rules on Evidence stresses that requests for production of documents should describe in sufficient detail "narrow and specific" categories of documents which "are reasonably believed to exist". Therefore, tribunals have insisted that the documents requested be precisely identified.[105]

**78**    In some cases, tribunals denied requests for production of documents since the requests were too broad. In *Noble Ventures* v. *Romania* the Tribunal said:

> the Tribunal is not in a position to identify, within the many and broad requests submitted by Claimant, which documents must be considered relevant and material for the Tribunal to decide on the relief sought.[106]

**79**    In *Aguas del Tunari* v. *Bolivia* the Tribunal found that the requests for documents in the main did not specifically identify documents but were general. It ruled that the parties' arguments as to the necessity of requests for production of documents were insufficiently developed to make an order upon them.[107]

**80**    In *Biwater Gauff* v. *Tanzania*, the Tribunal ordered the production of documents which comprised "a specifically identified, narrow category of documents that are of obvious potential relevance and materiality to the issues in dispute".[108] The Tribunal took a different position with respect to other requests which

---

103  At paras. 47–53.
104  *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2007, paras. 24, 222–225.
105  See also *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, para. 21; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 22, quoting Procedural Order No. 1.
106  *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 20, incorporating Procedural Order No. 1, paras. 7, 9.1.
107  *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, at paras. 24–28, 324–327.
108  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, para. 104.

comprised broad categories of documents. In view of the potential burden of meeting such requests it concluded that it would be more appropriate to give these issues further consideration and deal with them through a "Redfern Schedule" procedure.[109]

### b) Witnesses

There is no doubt that witness testimony is covered by the Convention's term "other evidence" (History, Vol. II, p. 806) (see para. 68 *supra*). Since the tribunal has no power to subpoena witnesses, their appearance will normally be arranged by the parties (see paras. 51–54 *supra*). The tribunal may however request the parties to produce witnesses on its own motion or following a party's request.[110] **81**

In *Duke Energy* v. *Peru*, the parties indicated, during the pre-hearing call, that they did not wish to produce any witnesses. The Tribunal nonetheless requested them to call one witness each at the hearing in order to address the history of negotiations between the parties. The parties agreed and called one witness each as instructed by the Tribunal.[111] **82**

There is recurrent reference to witness testimony in decisions of ICSID tribunals. In most instances, the fact that witnesses were presented by or appeared for one or the other party is mentioned specifically.[112] In some cases, the tribunal's summary of the proceedings states that the witnesses were examined by both parties as well as by the tribunal.[113] **83**

---

109  At paras. 107–113. Biwater Gauff and Tanzania subsequently submitted their respective requests for production of documents in the form of a "Redfern Schedule" and the Tribunal ruled on the matter with Procedural Order No. 2 of 24 May 2006. The Redfern Schedule takes its name from the British practitioner, *Alan Redfern*. The publication Law and Practice of International Commercial Arbitration, by *Alan Redfern*, *Martin Hunter*, *Nigel Blackaby* and *Constantine Partasides* (4th ed., 2004), describes a "Redfern Schedule" as "a spreadsheet in which the first column sets out a list and description of the documents requested; the second column sets out the requesting party's justification for the request (including relevance and importance); the third column sets out the requested party's reasons for refusing the request (for example, no such document exists, lack of relevance, proportionality, legal professional privilege, etc.). The final column is left blank, for the tribunal to record its decision" (at para. 6.77).

110  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 20; *Maffezini* v. *Spain*, Award, 13 November 2000, paras. 26 and 27; *Champion Trading* v. *Egypt*, Award, 27 October 2006, paras. 15–16.

111  *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 20.

112  See *e.g.*, *Amco* v. *Indonesia*, Award, 20 November 1984, para. 6; Resubmitted Case: Award, 5 June 1990, para. 22; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348/9; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 19; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.28; *AMT* v. *Zaire*, Award, 21 February 1997, para. 3.20; *Tradex* v. *Albania*, Award, 29 April 1999, para. 36; *Azinian* v. *Mexico* (AF), Award, 1 November 1999, paras. 71–72, 112; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 45, 46; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 17.

113  See *e.g.*, *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 11; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 20; *AMT* v. *Zaire*, Award, 21 February 1997, para. 3.24; *Tradex* v. *Albania*, Award, 29 April 1999, paras. 36, 37; *Maffezini* v. *Spain*, Award, 13 November 2000, para. 33; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 9; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, para. 172.

**84**    The examination of witnesses is governed by Arbitration Rule 35:

*Examination of Witnesses and Experts*

(1) Witnesses and experts shall be examined before the Tribunal by the parties under the control of its President. Questions may also be put to them by any member of the Tribunal.

(2) Each witness shall make the following declaration before giving his evidence:

"I solemnly declare upon my honour and conscience that I shall speak the truth, the whole truth and nothing but the truth."[114]

**85**    Witnesses will normally testify before the tribunal and in the presence of the parties. Exceptionally, this rule may be waived. Arbitration Rule 36 provides:

*Witnesses and Experts: Special Rules*

Notwithstanding Rule 35 the Tribunal may:

(a) admit evidence given by a witness or expert in a written deposition; and

(b) with the consent of both parties, arrange for the examination of a witness or expert otherwise than before the Tribunal itself. The Tribunal shall define the subject of the examination, the time limit, the procedure to be followed and other particulars. The parties may participate in the examination.[115]

**86**    The probative value of testimony not given directly before the tribunal may be subject to doubt (see paras. 104–118 *infra*). Written depositions by witnesses should be notarized or attested in another appropriate manner. The examination of witnesses otherwise than before the tribunal is subject to the consent of both parties.[116] In addition, the parties may participate in such an examination. The tribunal may appoint one of its members or another trustworthy person or body as "commissioner" or "examiner" for the purpose of taking such evidence.[117]

**87**    In *Tradex* v. *Albania*, Tradex submitted written witness statements. The witness did not come to the hearing to present oral testimony. Albania had requested his appearance and objected to the acceptance of the written statements without cross-examination. The Tribunal found that, in view of the Claimant's burden of proof, the written statements of a single witness who was not available for questioning at the hearing was not sufficient to prove the point in issue[118] (see also para. 110 *infra*).

**88**    Tribunals have discretion in deciding whether – in the absence of oral testimony – a written statement or an affidavit filed by a witness is admissible as evidence. In *Enron* v. *Argentina*, a witness was prevented from attending

---

114   See also Art. 42 of the Arbitration (Additional Facility) Rules.
115   See also Art. 43 of the Arbitration (Additional Facility) Rules.
116   See *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 14; *Azinian* v. *Mexico* (AF), Award, 1 November 1999, para. 71.
117   See Notes to Arbitration Rule 35 of 1968, 1 ICSID Reports 97.
118   *Tradex* v. *Albania*, Award, 29 April 1999, paras. 184, 185.

the hearing by an injunction issued by an Argentine judge at the request of the Respondent. The Tribunal decided that the written statement filed by the witness was admissible.[119] By contrast, the same Tribunal disregarded the testimony of a witness who submitted a written statement but could not be cross-examined and gave no satisfactory explanation for his absence at the hearing.[120]

In *Vivendi* v. *Argentina*, the parties had agreed that statements of witnesses **89** who were not also heard at the hearing should not be taken into evidence by the Tribunal.[121] Prior to the hearings on the merits, a witness for the Claimants fell ill and was unable to attend the hearing. Similarly, during the hearing, one of the witnesses for Argentina also fell ill and could not attend the hearing. In both cases, medical certificates were produced at the Tribunal's request. The parties agreed to admit into evidence the written statements submitted by the witnesses in spite of their inability to be present at the hearing, having regard to the medical certificates they both filed.[122]

Also in *Vivendi* v. *Argentina* a different situation arose when the Respondent **90** requested that one of its witnesses be heard by video conference, without providing further justification. The Claimants opposed the application. The Tribunal denied Argentina's application to present the witness by video conference, noting that no reasons had been given for the witness's inability to attend the hearing. It granted the Claimants' request to have the relevant witness statement stricken from the record. The Tribunal's decision was influenced, *inter alia*, by the fact that the Respondent had been offered a number of opportunities to explain the witness's whereabouts and the reason of his absence but had failed to do so.[123]

Other tribunals have permitted the examination of witnesses and experts by **91** video conference.[124]

In *Fireman's Fund* v. *Mexico*, Fireman's Fund alleged that Mexico had exerted **92** undue pressure on one of its witnesses not to testify at the hearing on the merits on its behalf and asked the Tribunal to issue an order calling for the witness to give testimony. Although the Tribunal did issue an order to this effect, the witness remained unavailable. In the circumstances, the Tribunal decided that the evidence that the witness had given in his first testimony "would not be declared inadmissible, without prejudice to its relevance, weight and materiality".[125]

In *Azinian* v. *Mexico*, decided under the Additional Facility, the question arose **93** as to whether one party may approach the other party's witnesses. The Claimants in that case complained that Mexico was violating Art. 43 of the Additional

---

119  To the same effect see: *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 31, 37, 44, 156.
120  *Enron* v. *Argentina*, Award, 22 May 2007, para. 142.
121  *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, para. 2.4.3.
122  At paras. 2.7.6–2.7.8.               123   At paras. 2.7.9–2.7.16.
124  *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 41; *Fraport* v. *Philippines*, Award, 16 August 2007, para. 43.
125  *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2006, para. 29.

Facility Rules[126] by contacting the Claimants' witnesses and asked the Tribunal to establish an understanding to the effect that the witnesses produced by one side should not be contacted unilaterally by the other side. The Tribunal ruled that the issue is not covered by the Additional Facility Rules. The Tribunal added that it was not aware of any rule precluding communications between a party and a third-party witness. Thus, the Tribunal advised the parties that: (i) it declined "to restrict any party's ability to interview witnesses who freely choose to meet with that party's representative(s)"; (ii) the witness is free to answer or decline to answer any questions; (iii) any such witness must be informed in advance of his/her right to have his/her attorney present during the interview; (iv) statements made by a witness during such an interview shall not be received into evidence; (v) only signed written statements or testimony that are provided orally before the Tribunal have probative value; and (vi) the Tribunal did not require that a party that obtains the agreement of a witness to participate in an interview ask the other side to be present during the interview.[127]

**94**     A frequent issue before ICSID tribunals concerns the credibility of witnesses and the reliability of their testimony. This issue is discussed below in the section on "Probative Value" (see paras. 109–115 *infra*).

*c) Experts*

**95**     Experts are mentioned specifically in Arbitration Rules 34, 35 and 36. Their testimony and examination is governed by the same rules as that of witnesses (see paras. 84, 85 *supra*). In addition, Arbitration Rule 35(3) provides:

> (3) Each expert shall make the following declaration before making his statement:
>
> "I solemnly declare upon my honour and conscience that my statement will be in accordance with my sincere belief."

**96**     The North American Free Trade Agreement of 1992 (NAFTA) in Chapter Eleven, Section B, deals with dispute settlement between an investor and a host State. Art. 1133 provides:

> **Expert Reports**
> Without prejudice to the appointment of other kinds of experts where authorized by the applicable arbitration rules, a Tribunal, at the request of a disputing party or, unless the disputing parties disapprove, on its own initiative, may appoint one or more experts to report to it in writing on any factual issue concerning environmental, health, safety or other scientific matters raised by a disputing party in a proceeding, subject to such terms and conditions as the disputing parties may agree.[128]

---

126   Art. 43 of the Arbitration (Additional Facility) Rules is largely identical with Arbitration Rule 36.
127   *Azinian* v. *Mexico* (AF), Award, 1 November 1999, paras. 53–56.
128   32 ILM 605, 646 (1993). See also the US Model BIT 2004, Article 32.

In ICSID proceedings, experts are often requested to give information on one **97** of the parties' initiative.[129] At other times experts are appointed directly by tribunals.[130] Tribunals may also call upon parties to produce expert reports.[131] In some cases the tribunals retained independent experts to assess the various reports produced by the parties' experts.[132]

The experts employed were mostly financial experts or chartered accountants. **98** Their reports were given in writing. These reports were then sent to the parties for comments.[133]

In *SOABI* v. *Senegal*, the Respondent objected unsuccessfully to the procedure **99** that led to the Report by the expert appointed by the Tribunal. The Respondent pointed out that the expert's report was based on information he had received from the Claimant and that the expert had met with the Claimant's representatives. The Tribunal said:

> The Tribunal observes that the Government had every opportunity to challenge such information as well as the Report's conclusions, in writing and orally, after having received its copy of it from the Tribunal. The Tribunal therefore rejects the reservations expressed by the Government. . . . It is obvious that the expert had to meet with SOABI's representatives in order to obtain information necessary to his work, but there is not the slightest reason to suspect that Mr Diallo went beyond the parameters of his assignment, . . . [134]

In *PSEG* v. *Turkey*, the Tribunal noted that the amounts claimed under one **100** of the Claimant's heads of claim had been the subject of a detailed audit by the Claimant's experts who had also taken into account comments made by Turkey and had revised the figures accordingly. Thus, the Tribunal relied on these reports as offering "a solid basis on which to proceed".[135]

In *Middle East Cement* v. *Egypt* the Tribunal used its discretion under Rule 34 **101** and held that it would be too time-consuming and expensive to seek an independent

---

129  See *e.g.*, *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.75–4.76; *SPP* v. *Egypt*, Award, 20 May 1992, para. 37; *CMS* v. *Argentina*, Award, 12 May 2005, para. 418; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, para. 40; *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 163; *PSEG* v. *Turkey*, Award, 19 January 2007, para. 320.

130  See *e.g.*, *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.24, 4.77; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 9.06; *AMT* v. *Zaire*, Award, 21 February 1997, para. 7.19; *CMS* v. *Argentina*, Award, 12 May 2005, paras. 50–51.

131  See *e.g.*, *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, para. 83.

132  See *e.g.*, *CMS* v. *Argentina*, Award, 12 May 2005, para. 418; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 38, 364; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 47.

133  See *e.g.*, *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.24, 4.77–4.78; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348/9; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 1.36–1.38; *AMT* v. *Zaire*, Award, 21 February 1997, paras. 7.19–7.20; *CMS* v. *Argentina*, Award, 12 May 2005, para. 418; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 50, 51.

134  At pp. 268/9. Footnote omitted.

135  *PSEG* v. *Turkey*, Award, 19 January 2007, para. 320.

expert opinion to assess the value of a ship. Instead, the Tribunal preferred to obtain an estimate of its value from the evidence available in the record of the case.[136]

102    In some cases the parties submitted expert opinions not on questions of fact but on questions of law.[137] In *Aguas del Tunari* v. *Bolivia* the Respondent indicated that it intended to produce two expert witnesses and asked that all witnesses relied upon by the Claimant be made available for cross-examination. The Claimant stated that it did not intend to have any expert witnesses present at the hearing and argued that cross-examination of experts was expensive and unnecessary since they were testifying on points of law and not of fact. The Tribunal held that it is customary in international arbitration to make witnesses available for examination, if so requested, whether they are experts in law or witnesses of fact.[138]

103    In *World Duty Free* v. *Kenya*, the Tribunal relied on the opinion of a legal expert submitted by the Respondent not as expert evidence by a party-appointed witness, but "as part of the materials submitted by Respondent". The Tribunal found the opinion useful not only because of the authority of the expert (Lord Mustill), who was referred to by the Tribunal as "one of the most eminent jurists in England", but also because counsel for the Claimant expressed general agreement with the expert opinion's treatment of English legal principles. The Tribunal also stressed that the expert was not expressing views as to the facts of the case and noted that, had he done so, the Tribunal would have discounted his views since it was only concerned to ascertain the relevant legal principles.[139]

### 2. Probative Value

104    ICSID arbitration is not governed by formal rules nor by national laws on evidence. ICSID tribunals have full discretion in assessing the probative value of any piece of evidence introduced before them. This fact is stated specifically in Arbitration Rule 34(1) (see para. 10 *supra*).[140]

105    Tribunals have followed these principles.[141] The Tribunal in *Soufraki* v. *United Arab Emirates* stated that, as an international tribunal, it was not bound by the rules of evidence of Italian civil procedure. It held that the weight to be assigned to the evidence in ICSID proceedings is only determined by Rule 34(1) of the ICSID Arbitration Rules. The Tribunal accepted Mr. Soufraki's certificate of nationality

---

136  *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 150.
137  See *e.g.*, *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 9; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, para. 137; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 48, 91, 119, 135; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 202, 233, 390.
138  *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 39–42. See also paras. 173–174.
139  *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 163.
140  See also Note A to Arbitration Rule 33 of 1968, 1 ICSID Reports 95.
141  See also *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 56.

*Article 43 – Evidence*                                                    667

as *prima facie* evidence and thus falling within the purview of Article 43 of the Convention.[142]

In *Middle East Cement* v. *Egypt*, the Claimant accused the Respondent of having submitted into the evidence "untrue documents". The Respondent requested the deletion of these accusations from the Claimant's post-hearing brief. Pursuant to ICSID Rule 34, the Tribunal held that it is "the judge of the admissibility and probative value of the documents submitted by the Respondent and the Tribunal is not in any way bound by the evaluations given by the Claimant and the Respondent".[143] **106**

The Claimant in *Generation Ukraine* v. *Ukraine* argued that it was hampered in discharging its burden of proof by the fact that the main documentary evidence showing its expenditures in Ukraine had been accidentally destroyed. The Claimant thus contended that it was obliged to rely on financial reports and other evidence to substantiate its alleged expenditures. The Tribunal expressed serious reservations as to the credibility and reliability of the evidence submitted by the Claimant and held that the latter had been unable to discharge its burden of proof in spite of the fact that several avenues were open to it to obtain such evidence.[144] **107**

ICSID tribunals often proceed to a detailed examination of the evidence before them.[145] In *Vacuum Salt* v. *Ghana*, the Tribunal emphasized the superior value of evidence obtained at hearings and the importance of observing the witnesses.[146] **108**

A frequent issue before ICSID tribunals concerns the credibility of witnesses and the reliability of their testimony. Tribunals have discarded witness testimony as untruthful or in error on a number of occasions.[147] **109**

In *Tradex* v. *Albania*, the evidential value of witnesses and of documents was disputed. There were claims that witnesses lacked independence, that there had been interference with witnesses, that witnesses had contradicted themselves and other witnesses and that documents had been forged. The Tribunal held that these various objections did not make the evidence concerned inadmissible but that the Tribunal remained the judge of its probative value.[148] The Tribunal carefully analysed the evidence put before it. It dismissed some of the witness testimony as dubious and contradictory.[149] But it accepted minutes of a meeting as proof in view of the fact that this was a contemporaneous document.[150] **110**

---

142  *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 59–63. The Tribunal cited this Commentary, 1st ed., at p. 268, para. 433, with approval.
143  *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 74–75, 92–94.
144  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 19.2 *et seq*., 19.15, 19.26.
145  See *e.g.*, *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 94 *et seq.*; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 19.5 *et seq.*
146  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 45.
147  See *e.g.*, *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 19.7; *PSEG* v. *Turkey*, Award, 19 January 2007, paras. 177, 178; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 328, 329; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 4.13.7–4.13.10.
148  *Tradex* v. *Albania*, Award, 29 April 1999, paras. 76–84.
149  At paras. 158–164, 171–175, 182–183.        150  At para. 169.

668                      THE ICSID CONVENTION: A COMMENTARY

**111**     In *Azinian* v. *Mexico*, the Tribunal rejected the oral assertion of a witness which it described as "self-serving" and inconsistent with the record. The Tribunal complained about a long list of demonstrably unreliable representations made before it.[151]

**112**     In the jurisdictional phase of *Plama* v. *Bulgaria*, the Respondent complained that Plama's explanations as to its ownership and control by an individual who testified at the hearing on its behalf were "belated, incomplete, unreliable, incredible and even where technically correct, less than the whole truth". Bulgaria requested that the Tribunal reject the testimony. The Tribunal, while recording that the evidence in question was not only unsupported by the contemporary record but also appeared materially inconsistent with parts of the contemporary documentary evidence and with statements apparently attributable to the same witness, did not wish to reject the witness's testimony as false at that stage of the proceedings. For the Tribunal, the issues involved were not relevant only for jurisdiction but also overlapped with the merits of the case.[152]

**113**     In *Noble Ventures* v. *Romania*, the Respondent relied on the testimony of a Romanian official who recalled that he had a telephone conversation with a representative of Noble Ventures. Noble Ventures denied that such a conversation had ever taken place and pointed to the absence of any record or contemporary reference to such a telephone conference. The Tribunal declined to rely on the official's "uncorroborated and disputed evidence" regarding this telephone conversation.[153]

**114**     In *ADC* v. *Hungary*, the Tribunal accepted the testimony of ADC's witnesses as it gave "the Tribunal confidence that it could be relied upon" and was consistent with their written statements. By contrast, the Tribunal found that testimony of one of the witnesses for Hungary cast serious doubts on the soundness of the testimony provided by two other of its witnesses. Thus, the Tribunal considered the testimony of Hungary's witnesses, not only in the light of the evidence provided by the other side, but also in the light of the testimony of its own witnesses, and concluded that the evidence of ADC's witnesses was to be preferred.[154]

**115**     The Tribunal in *Soufraki* v. *United Arab Emirates* did not find the affidavits of two witnesses for the Claimant to be "disinterested and convincing evidence", since they both had a relationship of financial dependence with the Claimant. Having weighed and assessed the totality of the evidence adduced, the Tribunal concluded that the Claimant had failed to discharge his burden of proof.[155]

---

151  *Azinian* v. *Mexico* (AF), Award, 1 November 1999, paras. 119, 122, 123.
152  *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 177, 178.
153  *Noble Ventures* v. *Romania*, Award, 12 October 2005, paras. 96–98.
154  *ADC* v. *Hungary*, Award, 2 October 2006, paras. 250–257.
155  *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 78, 80, 81.

## 3. Burden of Proof

**116**   ICSID tribunals have applied several rules regarding the burden of proof concerning facts upon which the parties rely. These rules are well established in international adjudication. The rules are as follows:

- normally the burden of proof is with the claimant;[156]
- the burden of proof lies with the party asserting a fact, whether it is the claimant or the respondent;[157]
- if a party adduces evidence that proves *prima facie* the facts alleged, the burden of proof may shift to the other party, who needs to produce evidence to rebut the presumption.[158]

**117**   ICSID tribunals have developed a special rule concerning the burden of proof for purposes of jurisdiction. This rule is adapted from the approach taken by Judge Rosalyn Higgins in her separate opinion in the *Oil Platforms* case.[159] Under this approach the tribunal will examine whether the facts alleged, if proven, are capable of establishing jurisdiction. In other words, the tribunal will assess whether the claimant's case is reasonably arguable on its face.[160] Numerous tribunals have adopted this *prima facie* approach.[161]

---

156  *SOABI* v. *Senegal*, Award, 25 February 1988, para. 9.23; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 56; *Tradex* v. *Albania*, Award, 29 April 1999, paras. 73–75; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 88–91; *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 19.1, 19.4; *CSOB* v. *Slovakia*, Award, 29 December 2004, paras. 225–226; *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 100; *Salini* v. *Jordan*, Award, 31 January 2006, paras. 70–75; *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, paras. 121, 122. See also *Bin Cheng*, General Principles of Law as Applied by International Courts and Tribunals, Cambridge 327–331 (1987).

157  *Feldman* v. *Mexico* (AF), Award, 16 December 2002, para. 177; *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 58, 81; *Thunderbird* v. *Mexico* (UNCITRAL), Award, 26 January 2006, para. 95; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 83. See also the ICJ in: *Military and Paramilitary Activities in and Against Nicaragua* (*Nicaragua* v. *United States of America*), Judgment, 26 November 1984, ICJ Reports 1984, p. 437, para. 101; *Case concerning Avena and other Mexican Nationals* (*Mexico* v. *United States of America*), Judgment, 31 March 2004, ICJ Reports 2004, p. 41, paras. 55–57. See also Article 24(1) of the 1976 UNCITRAL Arbitration Rules.

158  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 56; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 94, 170; *Feldman* v. *Mexico* (AF), Award, 16 December 2002, para. 177; *Thunderbird* v. *Mexico* (UNCITRAL), Award, 26 January 2006, paras. 92–95.

159  *Case concerning Oil Platforms* (*Iran* v. *United States*), Judgment, Separate Opinion, 12 December 1996, ICJ Reports 1996, p. 856, paras. 32–34.

160  For detailed treatment see *Sheppard, A.*, The Jurisdictional Threshold of a Prima Facie Case, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 932 (2008).

161  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 38; *Maffezini* v. *Spain*, Decision on Jurisdiction, 25 January 2000, para. 69; *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 145; *Azurix* v. *Argentina*, Decision on Jurisdiction, 8 December 2003, para. 76; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 26; *Siemens* v. *Argentina*, Decision on Jurisdiction, 3 August 2004, para. 180; *Joy Mining* v. *Egypt*, Award, 6 August 2004, paras. 29, 30; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 151; *Plama* v. *Bulgaria*, Decision on Jurisdiction, 8 February 2005, paras. 118–120, 132; *Impregilo* v. *Pakistan*, Decision on Jurisdiction, 22 April 2005, paras. 230, 237–254;

**118**     The Tribunal in *Bayindir* v. *Pakistan*, following this approach, described the Tribunal's task in this regard as follows:

> Accordingly, the Tribunal's first task is to determine the meaning and scope of the provisions which Bayindir invokes as conferring jurisdiction and to assess whether the facts alleged by Bayindir fall within those provisions or are capable, if proved, of constituting breaches of the obligations they refer to. In performing this task, the Tribunal will apply a *prima facie* standard, both to the determination of the meaning and scope of the BIT provisions and to the assessment whether the facts alleged may constitute breaches. If the result is affirmative, jurisdiction will be established, but the existence of breaches will remain to be litigated on the merits.[162]

### F.  ". . . and (b) visit the scene connected with the dispute, and conduct such inquiries there as it may deem appropriate."

**119**     Arbitration Rule 34(2)(b) paraphrases this portion of Art. 43 by authorizing the tribunal to "visit any place connected with the dispute or conduct inquiries there". Arbitration Rule 37 is more specific:

> *Visits and Inquiries; . . .*
>     (1) If the Tribunal considers it necessary to visit any place connected with the dispute or to conduct an inquiry there, it shall make an order to this effect. The order shall define the scope of the visit or the subject of the inquiry, the time limit, the procedure to be followed and other particulars. The parties may participate in any visit or inquiry.

**120**     Whereas documents, witness testimony and expert opinions may be obtained without a formal procedural step, visits and inquiries require a separate procedural order by the tribunal (see paras. 55–62 *supra*). The parties must be given the option to participate. The use of the word "there" would indicate that any inquiry must be connected to the location of a visit. But the broad concept of evidence used in para. (a) of Art. 43 would also include inquiries not linked to a particular locality.

**121**     Under the Convention's text, inquiries are related to visits by the tribunal. Under the Arbitration Rules (see para. 119 *supra*), the word "or" indicates that

---

        *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 185–200; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 87; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, paras. 59–64; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 40–45, 109; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 69–71; *LESI & Astaldi* v. *Algeria*, Decision on Jurisdiction, 12 July 2006, para. 84iv; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 43–51, 131; *Total* v. *Argentina*, Decision on Jurisdiction, 25 August 2006, paras. 52–55; *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 34, 53, 68, 80; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, paras. 73, 81, 91, 94; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 83–91, 129–134, 144–147, 149; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, paras. 139–141; *Kardassopoulos* v. *Georgia*, Decision on Jurisdiction, 6 July 2007, paras. 103, 104; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 162, 163.
162   *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 197. Footnote omitted.

visits by the tribunal and inquiries are alternatives. There is no good reason why a tribunal should not entrust an inquiry to a competent individual or to some body or organization in analogy to witness testimony under Arbitration Rule 36 (see paras. 85, 86 *supra*).[163]

If a particular visit or inquiry is undertaken upon a party's wish or insistence, the costs arising therefrom may be charged to that party (see para. 26 *supra*). **122**

In *SOABI* v. *Senegal*, there is a brief reference to a visit by the Tribunal's President to Dakar where he held discussions with persons who might eventually be appointed as experts. There is no mention of a procedural order in relation to the visit.[164] Tribunals have on several occasions decided to "visit the scene connected with the dispute".[165] In the *Santa Elena* case a possible site visit was considered a number of times by the Tribunal in the course of the proceedings. Eventually the Tribunal concluded that a site visit would not be necessary.[166] **123**

The fact that site visits are mentioned in the Convention means that the tribunal's authority to make them cannot be denied by a country. Any Contracting Party to the Convention must admit the tribunal and the parties' representatives for this purpose. The special immunities accorded by Art. 21 of the Convention to arbitrators also apply to site visits. Art. 22 extends these privileges and immunities to the parties and their representatives as well as to witnesses and experts. **124**

---

163   See also the Note to Arbitration Rule 36 of 1968, 1 ICSID Reports 97.
164   *SOABI* v. *Senegal*, Award, 25 February 1988, para. 135.
165   *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 95 (1998).
166   *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 14.

# Article 44

**Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–4 |
| II. | INTERPRETATION | 5–58 |
| | A. **"Any arbitration proceeding . . ."** | 5–8 |
| | B. **". . . shall be conducted in accordance with the provisions of this Section . . ."** | 9 |
| | C. **". . . and, except as the parties otherwise agree, . . ."** | 10–31 |
| |    1. Freedom of Choice | 11–19 |
| |    2. Limits on Choice | 20–23 |
| |    3. Modalities of Choice | 24–31 |
| | D. **". . . in accordance with the Arbitration Rules . . ."** | 32–41 |
| |    1. Relationship of the Arbitration Rules to the Convention | 32–33 |
| |    2. Adoption and Amendment | 34–36 |
| |    3. Features | 37–38 |
| |    4. Related Rules and Regulations | 39–41 |
| | E. **". . . in effect on the date on which the parties consented to arbitration."** | 42–52 |
| |    1. The Inter-temporal Rule | 42–46 |
| |    2. Agreement to Use Updated Version | 47–52 |
| | F. **"If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question."** | 53–58 |
| III. | INTERRELATIONSHIP OF PROCEDURAL RULES | 59–60 |
| IV. | SPECIFIC PROCEDURAL QUESTIONS | 61–128 |
| | A. **Procedural Languages** | 61–71 |
| | B. **Representation of the Parties** | 72–79 |
| | C. **Written and Oral Procedure** | 80–96 |
| | D. **Confidentiality, Transparency and *Amicus Curiae* Participation** | 97–128 |

672

1. Confidentiality and Transparency    97–121
2. *Amicus Curiae* Participation    122–128

# BIBLIOGRAPHY

*Antonietti, A.*, The 2006 Amendments of the ICSID Rules and Regulations and the Additional Facility Rules, 21 ICSID Review – FILJ 427 (2006);

*Bennaim-Selvi, O.*, Third Parties in International Investment Arbitrations – A Trend in Motion, 6 The Journal of World Investment and Trade 773 (2005);

*Boisson de Chazournes, L.*, Transparency and *Amicus Curiae* Briefs, 5 The Journal of World Investment and Trade 333 (2004);

*Boralessa, A.*, The Limitations of Party Autonomy in ICSID Arbitration, 15 American Review of International Arbitration 253 (2004);

*Cordero Moss, G.*, Tribunal's Power versus Party Autonomy, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1207 (2008);

*Delaney, J./Magraw, D. B.*, Procedural Transparency, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 721 (2008);

*de Lotbinière MacDougall, A./Santens, A.*, ICSID Amends its Arbitration Rules, 9 International Arbitration Law Review 119 (2006);

*Friedman, M. W.*, Non-Party States' Efforts to Influence Ongoing Proceedings, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 83 (BIICL 2006);

*Kantor, M.*, Amendments to the ICSID Arbitration Rules Take Effect, Asian Dispute Review (2006);

*Knahr, C.*, Transparency, Third Party Participation and Access to Documents in International Investment Arbitration, 23 Arbitration International 327 (2007);

*Knahr, C./Reinisch, A.*, Transparency versus Confidentiality in International Investment Arbitration – The *Biwater Gauff* Compromise, 6 The Law and Practice of International Courts and Tribunals 97 (2007);

*Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, p. 5 (1988);

*Mistelis, L.*, Confidentiality and Third Party Participation: *UPS* v. *Canada* and *Methanex Corp.* v. *United States*, *in*: International Investment Law and Arbitration (*Weiler, T.* ed.) 169 (2005); *also in*: 21 Arbitration International 211 (2005);

*Mourre, A.*, Are *Amici Curiae* the Proper Response to the Public's Concerns on Transparency in Investment Arbitration?, 5 The Law and Practice of International Courts and Tribunals 257 (2006);

*Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 4 (1985);

The Limits of Party Autonomy in Arbitration Proceedings under the ICSID Convention, 10 ICC International Court of Arbitration Bulletin (1999);

New Amendments of the Regulations and Rules of the International Centre for Settlement of Investment Disputes, 19 News from ICSID 1 (2002);

The New Amendments to the ICSID Regulations and Rules and the Additional Facility Rules, 28 Yearbook of Commercial Arbitration 357 (2003);

The New Amendments to the ICSID Regulations and Rules and Additional Facility Rules, 3 The Law and Practice of International Courts and Tribunals 181 (2004);

The Development of the Regulations and Rules of the International Centre for Settlement of Investment Disputes, 22 ICSID Review – FILJ 55 (2007);

*Rubins, N.*, Opening the Investment Arbitration Process: At What Cost, for What Benefit?, Transnational Dispute Management, Vol. 3, Issue 3, June (2006);

*Smutny, A. C./Serran, E.*, The Amended ICSID Rules – In Brief, 1 Global Arbitration Review 29 (2006);

*Stern, B.*, Un petit pas de plus: l'installation de la société civile dans l'arbitrage CIRDI entre Etat et investisseur, Revue de l'arbitrage 3 (2007);

*Stevens, M.*, Confidentiality Revisited, News from ICSID, Vol. 17, p. 1 (2000);

*Stumpe, F.*, Participation of *Amici Curiae* in Investment Treaty Arbitration, TDM, August (2008);

*Tams, C. J./Zoellner, C.-S.*, Amici Curiae im internationalen Investitionsschutzrecht, 45 Archiv des Völkerrechts 217 (2007);

*Woolhouse, S.*, Transparency and Procedural Integrity of Arbitration – The *Biwater* Tribunal's Balancing Act, TDM, October (2006);

*Yannaca-Small, K.*, Transparency and Third Party Participation in Investor-State Dispute Settlement Procedures, *in*: International Investment Law: A Changing Landscape (OECD ed.) 9 (2005);

*Zoellner, C.-S.*, Third-Party Participation (NGOs and Private Persons) and Transparency in ICSID Proceedings, *in*: The International Convention on the Settlement of Investment Disputes (ICSID) (*Hofmann, R./Tams, C. J.* eds.) 179 (2007).

# I. INTRODUCTION

**1**    The Convention itself contains a number of provisions on procedure. Art. 44 is a residual rule directing a tribunal and the parties to use ICSID's Arbitration Rules in addition to the Convention. The parties are free to exclude or adapt these Rules subject to certain limitations (see paras. 20–23 *infra*). The tribunal is authorized to fill any remaining gaps.

**2**    In the Convention's drafting, the text of what eventually became Art. 44 underwent only a few changes and was largely uncontested (History, Vol. I, pp. 198–200) (see also paras. 11, 43, 44, 53 *infra*). The only major point of debate was to what extent procedural questions should be regulated in the Convention itself rather than in the Arbitration Rules (see para. 32 *infra*).

**3**    Art. 44 is the procedural counterpart to the choice of law provision of Art. 42(1). Art. 42(1) only applies to substantive questions but not to the procedure before an ICSID tribunal (see Art. 42, para. 3). Whereas Art. 42(1) contains reference to the law of the State party to the dispute, Art. 44 creates a comprehensive and self-contained system that is insulated from national rules of procedure. In particular, the place of proceedings has no influence on procedure before an ICSID tribunal[1]

---

1   *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642, 650/1 (1968); *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 809/10 (1982); *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 234/5 (1990). For a comparison of non-ICSID arbitration see *Lipstein, K.*, International Arbitration

*Article 44 – Rules on Procedure*    675

(see also paras. 21, 54 *infra*) if the place is in a Contracting State to the ICSID Convention (see Art. 62, paras. 3, 4). But points of contact with the procedure under national law arise in the context of provisional measures by domestic courts under Arbitration Rule 39(6) (see Art. 26, paras. 162–183) and in the context of recognition and enforcement under Art. 54.

A violation of the procedural provisions of the Convention and of the Arbitration **4** Rules may expose an award to annulment. Art. 52(1)(d) states that annulment may be requested on the ground that there has been a serious departure from a fundamental rule of procedure. But not every violation of a rule of procedure would automatically lead to nullity. The violation must be serious and the rule thus violated must be fundamental. In the course of the Convention's drafting, Mr. *Broches* pointed out that fundamental rules of procedure might have a wider connotation than the concrete rules adopted by ICSID's Administrative Council. They could comprise principles of natural justice, *e.g.* that both parties must be heard and that there must be adequate opportunity for rebuttal (History, Vol. II, p. 480) (see also paras. 22, 23 *infra*).

## II. INTERPRETATION

### A. "Any arbitration proceeding . . ."

Arbitration proceedings under the Convention commence with a request to the **5** Secretary-General of ICSID in accordance with Art. 36. The requirements for the early stages of proceedings up to the notification of registration are regulated by separate Institution Rules[2] (see paras. 39, 40 *infra*). The Arbitration Rules proper (see paras. 34–36 *infra*) only start to operate with the first steps towards the tribunal's constitution.[3]

The Arbitration Rules do not necessarily cease to operate with the rendering **6** of the award. They cover certain post-award procedures such as supplementary decisions, rectification, interpretation, revision and annulment.[4] Art. 52(4) of the Convention specifically states that Art. 44 shall also apply to proceedings before an *ad hoc* committee whose task is to deal with a request for annulment of the original award.[5] Arts. 50 and 51 dealing with interpretation and revision do not contain corresponding clauses. But Arbitration Rule 53 says that the Arbitration Rules shall apply, *mutatis mutandis*, to any procedure relating to the interpretation, revision or annulment of an award. In addition, Art. 44 also applies to proceedings

---

between Individuals and Governments and the Conflict of Laws, *in*: Contemporary Problems of International Law: Essays in Honour of Georg Schwarzenberger 177, 189–193 (1988).

2   Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings. For the 1968 Institution Rules with notes see 1 ICSID Reports 51.

3   Arbitration Rule 39 was amended in 2006 to introduce an expedited procedure for dealing with preliminary measures prior to the constitution of a tribunal – see Art. 47, para. 5.

4   Arbitration Rules 49–54.

5   See also *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 18.

before a tribunal to which the case is resubmitted after annulment in accordance with Art. 52(6).[6]

**7**     Art. 52(4) of the Convention does not list Art. 57, dealing with the disqualification of arbitrators, among the Convention's Articles that are applicable in annulment proceedings. Nevertheless, in *Vivendi* v. *Argentina* the members of the *ad hoc* Committee found that Arbitration Rule 9, dealing with the disqualification of arbitrators, was applicable. This finding was based on Arbitration Rule 53[7] (see Art. 57, para. 5).

**8**     Art. 33, dealing with conciliation, parallels Art. 44 and refers to the Conciliation Rules.

### B.   ". . . shall be conducted in accordance with the provisions of this Section . . ."

**9**     Art. 44 refers to Section 3 of the Convention's Chapter IV. This Section is headed "Powers and Functions of the Tribunal" and contains Arts. 41–47. These Articles deal with the tribunal's power to determine its own jurisdiction, applicable law, the taking of evidence, default proceedings, incidental or additional claims and counter-claims as well as provisional measures. But Section 3 of Chapter IV is by no means the only part of the Convention containing procedural provisions. Arts. 48, 49, 50, 51, 56, 57, 58, 60, 61, 62 and 63 deal with a variety of procedural issues that a tribunal must observe. In addition, there are a number of further procedural provisions in the Convention that must be observed either before the tribunal has commenced its work, such as those on the request for arbitration or on the constitution of the tribunal, or after the tribunal has completed its work, such as those on the award's annulment, recognition and enforcement.

### C.   ". . . and, except as the parties otherwise agree, . . ."

**10**    The grammatical context of the except-clause in Art. 44 makes it clear that it applies only to the Arbitration Rules and not to the relevant parts of the Convention. But some of the Convention's procedural Articles contain their own except-clauses opening them to modification by the parties. These include Arts. 43, 46 and 47 in Section 3 of Chapter IV. Arts. 26, 37, 38, 60, 61, 62 and 63 also allow for certain modifications by the parties. Whereas the Arbitration Rules are generally open to variation or exclusion by the parties, some of the Convention's procedural provisions are mandatory while others are not.

#### 1. Freedom of Choice

**11**    During the Convention's drafting, the nonmandatory character of the Arbitration Rules was never cast into doubt. Mr. *Broches* emphasized repeatedly that the parties were free to exclude or vary some or all of these rules and to substitute their own

---

6   Arbitration Rule 55(4).

7   *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October 2001, paras. 3–13.

(History, Vol. II, pp. 79, 107, 111, 249, 357, 383, 479, 481, 807). This principle
was restated in the Executive Directors' Report in the following terms:

> 39. In keeping with the consensual character of proceedings under the Con-
> vention, the parties to conciliation or arbitration proceedings may agree on the
> rules of procedure which will apply in those proceedings. However, if or to the
> extent that they have not so agreed the Conciliation Rules and Arbitration Rules
> adopted by the Administrative Council will apply (Articles 33 and 44).[8]

Some Arbitration Rules contain their own "except as the parties otherwise    **12**
agree" clauses.[9] This may appear illogical since all Arbitration Rules are open to
modification or exclusion by the parties unless they reflect mandatory provisions
of the Convention (see para. 20 *infra*). These except-clauses must be read as a
reminder that even if the Arbitration Rules are accepted, in principle, variation is
possible and as an indication of rules that appear particularly flexible.

Unlike the Arbitration Rules, the Institution Rules (see paras. 5 *supra*, 39, 40    **13**
*infra*) and the Centre's Administrative and Financial Regulations (see para. 41
*infra*) are not generally subject to modification by the parties. The parties may
only derogate from the Institution Rules and from the Administrative and Financial
Regulations to the extent permitted by a particular Rule or Regulation.[10]

Several options are open to the parties when exercising their freedom to shape    **14**
procedure:[11]

1. They may discard the Arbitration Rules to the extent that they do not reflect
   mandatory provisions of the Convention and substitute a system of procedural
   rules of their own design or taken from some national legal system or from
   some other international arbitration mechanism.[12]
2. They may discard the Arbitration Rules without substituting their own.
3. They may retain the Arbitration Rules subject to certain modifications.
4. They may retain the Arbitration Rules either through express confirmation or
   by default in the absence of an agreement to the contrary.

There is little reason to choose options 1 and 2. The Arbitration Rules are    **15**
carefully drafted and are as fair as possible (see paras. 37, 38 *infra*). Moreover,
they are specifically designed for proceedings under the Convention, and it is
difficult to see how the procedure could be improved through the adoption of
external rules. If no alternative set of rules is substituted, the tribunal will exercise
its discretion in accordance with the last sentence of Art. 44 (see History, Vol. II,

---

8  1 ICSID Reports 31.
9  See *e.g.*, Arbitration Rules 14(2), 28(1), 29 and 40(1).
10  See Introductory Note D to the 1968 Arbitration Rules, 1 ICSID Reports 65.
11  See also Introductory Note E to the 1968 Arbitration Rules, 1 ICSID Reports 65.
12  In *Suez and AWG* v. *Argentina*, Argentina did not agree to extend ICSID jurisdiction to the
    claims of one of the Claimants, AWG Group Ltd, but agreed that the case initiated by that party
    be administered by the ICSID Secretariat, albeit subject to the UNCITRAL Rules. See *Suez and
    AWG* v. *Argentina*, Decision on Jurisdiction, 3 August 2006, para. 4.

p. 807). It is likely that in doing so it will closely follow the Arbitration Rules in their current form.

**16**     In selecting option 3, the parties may wish to apply the Arbitration Rules in their most up-to-date form rather than as in force at the time of consent (see paras. 47–50 *infra*). Additionally, they may agree on specific time limits that may appear appropriate in view of the unusually complex nature of a dispute or they may agree on special rules of evidence, for instance, in view of difficulties in bringing witnesses directly before the tribunal[13] (see Art. 43, paras. 81–94).

**17**     Absence of an agreement to depart from the Arbitration Rules (option 4) may indicate satisfaction with them or the inability to agree on alternatives. In either case, the Arbitration Rules are binding on the parties and on the tribunal. In the absence of agreement between the parties to vary the procedure, tribunals have referred to the direction contained in Art. 44 of the Convention to conduct the arbitral proceedings in accordance with the Arbitration Rules.[14]

**18**     The mandatory character of the Arbitration Rules in the absence of other arrangements by the parties is particularly important in the case of a non-cooperating party. This is part of the general policy of non-frustration under the Convention. Once consent has been given, a party may not prevent the progress of proceedings by withholding agreement on a point of procedure.[15]

**19**     In actual practice, the parties have frequently reached agreement on specific procedural points.[16] But these agreements did not constitute major departures from the Arbitration Rules and were generally more in the nature of specifications rather than modifications of the Rules. In particular, agreement was reached on the following points of procedure:

- the constitution of the tribunal (Arbitration Rules 2–5);
- place of proceedings (Convention Arts. 62 and 63; Administrative and Financial Regulation 26; Arbitration Rule 13(3));
- application of the Arbitration Rules in their most recent form (see paras. 47–50 *infra*);
- procedural languages (Arbitration Rules 20(1)(b) and 22) (see paras. 61–71 *infra*);
- conduct of oral hearings (Arbitration Rules 20(1)(g) and 32);

---

13  *Szasz, P. C.*, The Investment Disputes Convention – Opportunities and Pitfalls (How to Submit Disputes to ICSID), 5 Journal of Law and Economic Development 23, 40/1 (1970).

14  See *e.g.*, *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 357/8; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 6; *Genin* v. *Estonia*, Award, 25 June 2001, para. 8; *SEMOS* v. *Mali*, Award, 25 February 2003, 10 ICSID Reports 117; *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, para. 8.

15  *Szasz, P. C.*, A Practical Guide to the Convention on Settlement of Investment Disputes, 1 Cornell International Law Journal 1, 26 (1968).

16  See *e.g.*, *AGIP* v. *Congo*, Award, 30 November 1979, para. 6; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 11/12; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 9; *SPP* v. *Egypt*, Award, 20 May 1992, para. 8; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, paras. 5–7; *Goetz* v. *Burundi*, Award, 10 February 1999, para. 34; *Maffezini* v. *Spain*, Award, 13 November 2000, para. 15.

- quorum requirements for the tribunal (Arbitration Rules 14(2) and 20(1)(a));
- delegation of the power to make orders for time limits to the tribunal's president (Arbitration Rule 26(1));
- specific time limits (Rule 31(1) and (2));
- written and oral procedures (Arbitration Rules 20(1)(e) and 29);
- number and sequence of pleadings and time limits (Arbitration Rules 20(1)(c) and 31);
- submission and production of evidence (Convention Art. 43; Administrative and Financial Regulation 30; Arbitration Rules 24 and 33–37);
- sequence of issues to be addressed by the tribunal;[17]
- confidentiality;[18]
- publication of decisions (Convention Art. 48(5), Administrative and Financial Regulation 22).

## 2. *Limits on Choice*

The parties' discretion to depart from the Arbitration Rules is not unlimited. To **20** the extent that the Rules restate mandatory provisions of the Convention, they may not be modified by the parties. In particular, Arts. 37–40 and 56 of the Convention contain a number of mandatory rules concerning the composition of the tribunal which may not be departed from through a modification of the Arbitration Rules. Similarly, the parties may agree on the proportion of the costs to be borne by each of them. But they cannot reduce or remove their overall financial obligation towards the Centre under Arts. 59–61 through an agreed modification of Arbitration Rule 28.

In modifying the Arbitration Rules, the parties are not constrained by the rules **21** of a particular national system of law. In particular, the national law governing arbitration at the tribunal's seat will not apply. Nor does the *ordre public* (public policy) of the legal system of the tribunal's seat affect the choice of procedural rules by the parties[19] (see also paras. 3 *supra*, 54 *infra*). The same principle must apply to the law and public policy of the State party to the ICSID arbitration.

However, certain international minimum standards of fair procedure must be **22** observed by the parties when agreeing on procedural issues. These standards would include such principles as the tribunal's obligation to hear both sides (*audiatur et altera pars*) and each party's right to be informed of the other side's arguments.[20]

The application by a tribunal of agreed rules that violate such fundamental **23** principles could expose an award to annulment under Art. 52(1)(d) (see para. 4

---

17  *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, 4 ICSID Reports 145.
18  *Gruslin* v. *Malaysia*, Award, 27 November 2000, para. 6.7; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 36, 39, 40–44; *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 35–37.
19  *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 113/4 (1993).
20  *Hirsch, M.*, *op. cit.*, pp. 113–115.

*supra*). In *MINE* v. *Guinea*, the *ad hoc* Committee gave the following comment on fundamental rules of procedure:

> The Committee considers that a clear example of such a fundamental rule is to be found in Article 18 of the UNCITRAL Model Law on International Commercial Arbitration which provides:
>> The parties shall be treated with equality and each party shall be given full opportunity of presenting his case.
>> The term "fundamental rule of procedure" is not to be understood as necessarily including all of the Arbitration Rules adopted by the Centre.[21]

### 3. Modalities of Choice

24    The Convention does not state how and at what stage the Arbitration Rules may be modified, except that this has to be by agreement of the parties to the arbitration. An obvious opportunity for an agreement on procedure would be a consent agreement (see Art. 25, paras. 374–389). But there is nothing to preclude the parties from reaching agreement on procedure at a later stage (see History, Vol. II, p. 481). It may be wise to address important procedural questions as early as possible since it is more difficult to reach agreement after a dispute has arisen. On the other hand, it is probably not realistic to expect parties to give detailed attention to ICSID procedure when accepting a consent clause as part of an overall agreement concerning an investment project.

25    The ICSID Model Clauses (see Art. 25, para. 385) offer a formula for the modification of the Arbitration Rules in the following terms:

**Clause 17**

> Any arbitration proceeding pursuant to this agreement shall be conducted in accordance with the Arbitration Rules of the Centre except that the following provisions shall be substituted for the Rules indicated below: . . .[22]

Parties rarely agree on modifications of the Arbitration Rules as part of their consent agreements.[23]

26    Another possible time for reaching agreement on procedure would be the institution of arbitration proceedings, especially if this is done in the form of a joint filing of a request for arbitration by both parties.[24] But this rarely, if ever, happens. If the consent by the State party is expressed in general terms through legislation or treaty and is accepted by the investor through the institution of proceedings (see Art. 25, paras. 392–467), this is the earliest opportunity for an agreement on procedure. This possibility is foreseen in the Institution Rules:

---

21   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.06.
22   4 ICSID Reports 366.
23   But see Arts. 7.6, 7.8 and 7.9 of the 1982 Participation Agreement between New Zealand and Mobil Oil in *Attorney-General* v. *Mobil Oil NZ Ltd.*, Judgment, 1 July 1987, High Court Wellington, New Zealand, 4 ICSID Reports 123. See also *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, Appendix A, para. 7.
24   On the possibility of a joint request see Institution Rule 1(2).

### Rule 3
#### *Optional Information in the Request*

The request may in addition set forth any provisions agreed by the parties regarding the number of conciliators or arbitrators and the method of their appointment, as well as any other provisions agreed concerning the settlement of the dispute.

A BIT or other treaty offering consent to ICSID arbitration may contain provisions concerning the conduct of the arbitration.[25] An investor who accepts the offer of consent in the treaty also accepts these provisions, turning them into an agreement on procedure between the parties to the arbitration.      **27**

The most obvious opportunity to agree on matters of procedure presents itself at an early stage of the proceedings before the tribunal. The Arbitration Rules themselves provide for a preliminary procedural consultation for this purpose in the following terms:      **28**

### Rule 20
#### *Preliminary Procedural Consultation*

(1) As early as possible after the constitution of a Tribunal, its President shall endeavour to ascertain the views of the parties regarding questions of procedure. For this purpose he may request the parties to meet him. He shall, in particular, seek their views on the following matters:

    (a) the number of members of the Tribunal required to constitute a quorum at its sittings;

    (b) the language or languages to be used in the proceeding;

    (c) the number and sequence of the pleadings and the time limits within which they are to be filed;

    (d) the number of copies desired by each party of instruments filed by the other;

    (e) dispensing with the written or the oral procedure;

    (f) the manner in which the cost of the proceeding is to be apportioned; and

    (g) the manner in which the record of the hearings shall be kept.

(2) In the conduct of the proceeding the Tribunal shall apply any agreement between the parties on procedural matters, except as otherwise provided in the Convention or the Administrative and Financial Regulations.[26]

Rule 20(1), by its own terms, is not exhaustive. Other matters may also be the subject of a determination in the framework of preliminary procedural consultations. These include channels of communication between the parties and the tribunal, decisions by the tribunal, the place of proceedings and the holding of a pre-hearing conference in accordance with Rule 21.[27] The Secretariat has      **29**

---

25  See *e.g.*, the detailed provisions in Articles 28 and 29 of the United States Model BIT of 2004.

26  See the Notes to Arbitration Rule 20 of 1968, 1 ICSID Reports 85; Article 28 of the Arbitration (Additional Facility) Rules. See also Conciliation Rule 20 and *Nurick, L./ Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 346/7 (1986).

27  For a detailed description of the working of Arbitration Rule 20 see *Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, p. 5 (1988). See also *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux

developed a standardized draft provisional agenda for this purpose. It lists the procedural issues that should be clarified between the parties.[28]

**30**    Preliminary consultations may be conducted through correspondence. But the more common method is to settle questions of procedure at the tribunal's first session.[29] The agreements are almost invariably recorded in the form of the minutes of the first session of the tribunal.[30] Tribunals have recorded the resulting agreements of the parties on procedural questions in varying terms. The Tribunal took the measures "with the parties' agreement",[31] rules were established "with the agreement of the parties",[32] or "discussed and agreed",[33] the Tribunal made "decisions with the consent of the parties",[34] "in accordance with Arbitration Rule 20 it was decided",[35] "the Committee and the Parties agreed",[36] it was found to be "common ground between the parties"[37] and "the Parties and the Tribunal established the framework".[38] The record shows that the resulting arrangements are essentially trilateral accords between the tribunal and the parties.

**31**    An agreement on procedure under Arbitration Rule 20 is not possible if one party fails to participate in the proceedings. The tribunal may still hold preliminary consultations on procedural matters with the cooperating party. But the outcome of these consultations can only be measures taken by the tribunal within the framework of the Arbitration Rules.[39]

### D.  ". . . in accordance with the Arbitration Rules . . ."

#### 1. Relationship of the Arbitration Rules to the Convention

**32**    Rules of procedure to supplement the Convention were planned throughout the Convention's drafting (History, Vol. II, pp. 109, 110, 382, 383, 479, 572).

---

Investissements (CIRDI), 109 Journal du Droit International 775, 821/3 (1982); *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 53/4 (1990); *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 93/5 (1998).

28    A version of the draft provisional agenda is reproduced at 13 ICSID Review – FILJ 100 (1998).

29    See *e.g.*, *Goetz* v. *Burundi*, Award, 10 February 1999, para. 34; *Maffezini* v. *Argentina*, Award, 13 November 2000, para. 15; *Olguín* v. *Paraguay*, Award, 26 July 2001, para. 18; *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, para. 10; *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 9–10; *Fraport* v. *Philippines*, Award, 16 August 2007, para. 13.

30    The Award in *Noble Ventures* v. *Romania*, Award, 12 October 2005, at para. 18, reproduces the full minutes of a preliminary hearing.

31    *AGIP* v. *Congo*, Award, 30 November 1979, para. 6.

32    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 11/12.

33    *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 48.

34    *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 9; Award, 25 February 1988, para. 1.09.

35    *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 9.

36    *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 3.07; *Tradex* v. *Albania*, Award, 29 April 1999, para. 10.

37    *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, 4 ICSID Reports 145.

38    *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 6.

39    See *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.5.

The exact relationship of such rules to the Convention was the object of some debate. The Working Paper, the Preliminary Draft and the First Draft, which are otherwise very similar to the final version of Art. 44, contained a reference to the Arbitration Rules but not to the Convention itself (History, Vol. I, pp. 198, 200). It was explained that regulating the mechanics of arbitration procedure in the rules of procedure rather than in the Convention would be convenient and in the interest of flexibility (History, Vol. II, p. 79). These rules could not be inconsistent with the Convention but would only implement or supplement it in matters of detail (at pp. 249, 331, 357, 382). Nevertheless, a number of delegates had misgivings about this arrangement and demanded that some or all of the rules of procedure be included in the Convention proper or attached to it in the form of an annex (at pp. 382, 383, 479, 480, 572). In the Revised Draft, the reference to arbitration rules was retained but the Article was amended to reflect the fact that arbitration proceedings would be governed by the Convention as well as by the Rules (History, Vol. I, p. 200; Vol. II, p. 807).

The Convention does, in fact, contain a large number of procedural rules, some **33** of which go into considerable detail (see para. 9 *supra*). The Arbitration Rules provide even more depth and detail. The Arbitration Rules are subject to the Convention. In the unlikely case of conflict, the latter prevails. The Convention's provisions are mandatory unless otherwise stated. The Arbitration Rules are generally subject to modification by the parties (see paras. 10, 20, 22 *supra*).

### 2. Adoption and Amendment

The Arbitration Rules are adopted by the Centre's Administrative Council in **34** accordance with Art. 6(1)(c). The Arbitration Rules were adopted on 25 September 1967 with effect from 1 January 1968.[40] On 26 September 1984, the Administrative Council adopted revisions to the Rules, which took effect immediately.[41] The most important changes made in 1984 concerned the records of hearings,[42] the introduction of a pre-hearing conference to establish uncontested facts or to facilitate an amicable settlement[43] and the clarification that provisional measures may be requested from national courts and authorities if express provision to this effect has been made in the consent agreement[44] (see Art. 26, paras. 176, 177). There were also a few minor additions and clarifications of language.[45]

Another set of amendments to the Arbitration Rules was made on 29 September **35** 2002, with effect from 1 January 2003.[46] The first amendment concerned

---

40   Rules of Procedure for Arbitration Proceedings (Arbitration Rules), 1968, 1 ICSID Reports 63. These Rules superseded Provisional Arbitration Rules adopted on 2 February 1967, 6 ILM 225, 260 (1967), 7 ILM 351, 376 (1968).
41   Rules of Procedure for Arbitration Proceedings (Arbitration Rules), 1984, 1 ICSID Reports 157.
42   Arbitration Rule 37 of 1968 and Arbitration Rule 20(1)(g) of 1984.
43   Arbitration Rule 21 of 1984.                    44   Arbitration Rule 39(5) of 1984.
45   For a full review of the 1984 revision of the Arbitration Rules see *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 4 (1985); 1985 Annual Report 14/5.
46   The Additional Facility Rules were also amended correspondingly on 29 September 2002.

Rule 1(3) on the nationality of arbitrators, and was introduced in order to clarify that, if a panel of three arbitrators is to be appointed, a party can nominate its national or co-national only subject to the agreement of the other party. The time-limits imposed by Rules 4 and 9 for the Chairman of the Administrative Council to appoint an arbitrator and to decide on a request for disqualification of arbitrators, respectively, were relaxed. The time-limit imposed by Rule 46 for the preparation of the arbitral award was doubled and the period after which the Chairman of the Administrative Council might be called upon under Arbitration Rule 11 to appoint arbitrators to fill vacant positions in the tribunal was increased from 30 to 45 days.[47]

**36**     The latest amendments to the ICSID Rules adopted by the Administrative Council of the Centre came into effect on 10 April 2006.[48] In view of the inter-temporal rule of Art. 44 (see paras. 42–46 *infra*), the old version of the Arbitration Rules continues to apply to consent given before that date (see para. 46 *infra*). The most significant changes introduced in 2006 concern an expansion of the scope of the mandatory declaration of independence of a prospective arbitrator (see Art. 40, paras. 18, 19, 20),[49] the possibility for tribunals to authorize the attendance at hearings of third-party observers unless either party objects,[50] the possibility for tribunals, after consulting both parties, to authorize *amicus* submissions by third parties,[51] the possibility for a party to request provisional measures after the institution of proceedings even before the constitution of the tribunal,[52] the possibility for a party to file an objection within 30 days of the tribunal's constitution that a claim is "manifestly without merit"[53] and the Centre's obligation to include in its publications excerpts of the legal reasoning of the tribunal.[54] The corresponding Additional Facility Rules have been amended in the same manner as the ICSID Arbitration Rules.

### 3. Features

**37**     The Arbitration Rules give detailed guidance to the tribunal and the parties leaving few gaps to be filled by the tribunal in accordance with the last sentence of Art. 44. They address the various stages of proceedings such as the establishment of the tribunal, the written and oral procedure, the award as well as the post-award remedies of interpretation, revision and annulment. Particular procedures such as provisional measures, ancillary claims, jurisdictional objections, default as well as settlement and discontinuance are addressed separately. In addition, the Rules provide general guidance on the working of the tribunal and regulate such matters as languages, documentation, time limits and costs.

---

47  See *Parra, A. R.*, The New Amendments to the ICSID Regulations and Rules and Additional Facility Rules, 3 The Law and Practice of International Courts and Tribunals 181, 185 (2004).

48  At http://www.worldbank.org/icsid. For an overview of the 2006 amendments, see *Antonietti, A.*, The 2006 Amendments to the ICSID Rules and Regulations and the Additional Facility Rules, 21 ICSID Review – FILJ 427 (2006).

49  ICSID Arbitration Rule 6.              50  Arbitration Rule 32(2).

51  New Arbitration Rule 37(2).            52  Arbitration Rule 39(1).

53  New Arbitration Rule 41(5) and (6).    54  New Arbitration Rule 48(4).

*Article 44 – Rules on Procedure*                                        685

The Arbitration Rules are designed to reflect the best features of the common law and civil law approaches. This is evident, in particular, in the balance between the written and oral parts of the proceedings and in the rules on the taking of evidence.[55]    **38**

### 4. Related Rules and Regulations

The Arbitration Rules are supplemented by Institution Rules (see para. 5 *supra*) as well as by Administrative and Financial Regulations.[56] The Institution Rules regulate procedure for the submission of the request for arbitration, the registration of the request and the dispatch of the notice of registration to the parties. All subsequent transactions, beginning with the tribunal's constitution, are governed by the Arbitration Rules.    **39**

The Institution Rules are adopted by the Administrative Council in accordance with Art. 6(1)(b). The original Institution Rules were put into effect on 1 January 1968.[57] They were replaced by revised Institution Rules on 26 September 1984.[58] Two important amendments were made to the ICSID Institution Rules on 29 September 2002, with effect from 1 January 2003. The first, regarding Institution Rule 2, was intended to codify the practice of requiring corporate claimants to submit with their request for arbitration evidence that they had taken the necessary internal steps to authorize the request. The second, concerning Institution Rule 7, was introduced in order to add that notices of registration of requests for conciliation or arbitration state that registration is without prejudice to the powers and functions of the conciliators and arbitrators with respect to their jurisdiction, competence and the merits.[59] The inter-temporal rule of Art. 44 (see paras. 42–46 *infra*) does not apply to the Institution Rules. In other words, they are applied in their most recent version.[60] The Institution Rules are generally not subject to modification by the parties (see para. 13 *supra*).    **40**

The Administrative and Financial Regulations mostly deal with the internal operations of the Centre but also touch upon arbitration procedure in such matters as costs, means of communication, place of proceedings and time limits. The Administrative and Financial Regulations are adopted by the Administrative Council in accordance with Art. 6(1)(a). They were adopted effective from    **41**

---

55  See *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 396/7 (1991).

56  The entire set of Rules and Regulations is published in ICSID Convention, Regulations and Rules (ICSID/15) as well as on the ICSID homepage: http://icsid.worldbank.org/ICSID/ICSID/RulesMain.jsp.

57  1 ICSID Reports 51. These Rules superseded Provisional Institution Rules adopted on 2 February 1967, 6 ILM 225, 241 (1967), 7 ILM 351 (1968).

58  1 ICSID Reports 153.

59  See *Parra, A. R.*, The New Amendments to the ICSID Regulations and Rules and Additional Facility Rules, 3 The Law and Practice of International Courts and Tribunals 181–188 (2004).

60  Statements to the contrary in 1 ICSID Reports 51 and 153 represent neither the opinion nor the practice of the ICSID Secretariat.

1 January 1968[61] and were revised periodically with a major revision taking place on 26 September 1984.[62] New amendments to Administrative and Financial Regulation 14 (Arbitrators' Fees) were introduced at the same time as the 2006 amendments to the Arbitration Rules, also with effect from 10 April 2006. The amendments clarified that any request for higher fees than the standard fees must be made through the Centre, since it is the only channel of communication between the tribunal and the parties. The inter-temporal rule of Art. 44 (see paras. 42–46 *infra*) does not apply to the Administrative and Financial Regulations. In other words, only the revised Regulations will be applied.[63] The Administrative and Financial Regulations are generally not subject to modification by the parties (see para. 13 *supra*).

### E.  ". . . in effect on the date on which the parties consented to arbitration."

#### *1. The Inter-temporal Rule*

**42**     The idea underlying the inter-temporal rule in Art. 44 is that parties consenting to ICSID arbitration should also be fully aware of the procedural consequences of their decision. Subsequent changes to the Arbitration Rules might not suit them and should not be imposed upon them. Therefore, the Arbitration Rules as they existed at the time of consent are frozen even if they are changed before the institution of proceedings.[64]

**43**     The various drafts to the Convention show some hesitation as to whether this principle should be applied by reference to the date when the consent was given or to the date when the consent became effective. A party may offer consent long before that consent is perfected by its acceptance (see Art. 25, paras. 468–474). This is particularly so if the host State's consent is offered in general terms through legislation or a treaty. In that case, consent will be perfected upon its acceptance by the investor which may be as late as the actual institution of proceedings (see Art. 25, paras. 416–426, 447–455).

**44**     The Working Paper to the Convention provided that the Arbitration Rules should apply as in effect at the time consent is given. The Preliminary Draft changed the critical date to the date on which the consent becomes effective (History, Vol. I, p. 198). In response to an argument that this may lead to the application of changed rules that the parties had not been aware of when giving their consent (History, Vol. II, p. 479), the relevant date was changed back in the First Draft to the date on which the consent was given. This version was retained in the Revised Draft (History, Vol. I, p. 200). The final text of the Convention was changed once more

---

61   1 ICSID Reports 35. See also the Provisional Administrative and Financial Regulations of 2 February 1967, 6 ILM 225, 226 (1967), 7 ILM 351 (1968).
62   See also *Parra*, Revised Regulations and Rules.
63   1985 Annual Report 15.
64   See Introductory Note D to the 1968 Arbitration Rules, 1 ICSID Reports 65.

to "the date on which the parties consented to arbitration" in order to make it clear that the date in question is the date by which both parties have given their consent (History, Vol. II, pp. 946/7, 948).

Therefore, the critical date is the date on which all the conditions for consent **45** are satisfied. If the parties did not give their consent on the same day, the date of consent is the day on which the second party acted.[65] Any other solution would lead to unworkable results. It is not possible to apply different versions of the Arbitration Rules in the same proceedings.

In practical terms, since most requests for arbitration rely on an investment **46** law or treaty for the State's expression of consent and the investor's consent is provided by submitting the case to ICSID, the date of consent usually corresponds to the date of the request for arbitration (see Art. 25, para. 469). Thus, the Rules in force on the date of the request will usually apply. Accordingly, the Rules as revised in 2006 apply to proceedings based on consents perfected after 10 April 2006.

### 2. Agreement to Use Updated Version

The parties are not constrained by the inter-temporal rule of Art. 44. They may **47** agree to accept the Arbitration Rules in their most recent form. The phrase "except as the parties otherwise agree" extends to this portion of Art. 44.[66]

The Model Clauses offer a formula for the parties to agree in advance to the **48** application of the Arbitration Rules in their most up-to-date form. The reference date is the date of the institution of proceedings:

**Clause 16**

Any arbitration proceeding pursuant to this agreement shall be conducted in accordance with the Arbitration Rules of the Centre in effect on the date on which the proceeding is instituted.[67]

Advance agreements to use the most recent version of the Arbitration Rules **49** are made in practice.[68] Thus, in *Mobil Oil* v. *New Zealand*, the parties had agreed in their contract containing consent to ICSID jurisdiction that any arbitration proceedings shall be conducted in accordance with the Arbitration Rules in effect on the date of the dispute's submission to the Centre.[69]

As with other agreements on procedure (see paras. 24–30 *supra*), the parties **50** are free to agree on the use of the Arbitration Rules' updated version at a later

---

65  See Institution Rule 2(3).
66  See Introductory Note D to the Arbitration Rules of 1968, 1 ICSID Reports 65; *Parra*, Revised Regulations and Rules, p. 6.
67  4 ICSID Reports 366. See also Clause XXIII of the 1968 Model Clauses, 7 ILM 1177 (1968). The 1981 Model Clauses, 1 ICSID Reports 197, did not contain a similar clause.
68  In *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 1.03, 4.02, a consent agreement concluded on 18 September 1986 provided for arbitration under the ICSID Arbitration Rules "in effect as of February 1, 1981". There is no explanation for this seemingly illogical choice of older Rules that had been superseded by newer ones by the time of consent.
69  Art. 7.8 of the Participation Agreement of 12 February 1982, reproduced in 4 ICSID Reports 123.

stage. The preliminary procedural consultation (see paras. 28–30 *supra*) may be a good opportunity. Alternatively, the parties may confirm the application of the Arbitration Rules in accordance with Art. 44's inter-temporal rule.

**51**    In *SPP* v. *Egypt*, consent was based on Egyptian legislation of 1974 (see Art. 25, paras. 400–404). This offer was accepted by the investor through a letter of 15 August 1983 (see Art. 25, para. 421). The Request for Arbitration was registered on 28 August 1984, approximately four weeks before the revision of the Arbitration Rules on 26 September 1984. At the Tribunal's first meeting on 8 February 1985, it was decided that the Arbitration Rules in effect up to 26 September 1984 would apply.[70]

**52**    In *AAPL* v. *Sri Lanka*, the host State had expressed its consent in a Bilateral Investment Treaty of 1980. There was no acceptance of consent by the investor prior to the institution of proceedings on 20 July 1987 (see Art. 25, paras. 431, 432). Since consent was only perfected some time after the revision of the Arbitration Rules on 26 September 1984, the revised version was applicable to the proceedings. This was recorded at the Tribunal's first session in the form of an agreement.[71]

### F.  "If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question."

**53**    All drafts leading up to the Convention provided for the residual power of the tribunal to decide on procedural matters not covered by the Arbitration Rules. The relevant parts of the Convention and rules agreed by the parties were added in the course of the drafting to complete the framework within which the tribunal would have to operate (History, Vol. I, pp. 198, 200). At one point, there was some debate on whether the Arbitration Rules should not be drawn up by the tribunals themselves or by the panel of arbitrators, but these suggestions were found to be impractical (History, Vol. II, p. 694). A situation in which a tribunal would have to adopt a full set of rules of procedure would arise only if the parties had agreed that the Arbitration Rules adopted by the Administrative Council should not apply without substituting their own rules (at p. 807).

**54**    An ICSID tribunal's power to close gaps in the rules of procedure is declaratory of the inherent power of any tribunal to resolve procedural questions in the event of *lacunae*.[72] In exercising this power, the tribunal may not go beyond the framework of the Convention, the Arbitration Rules and the parties' procedural agreements but must, primarily, attempt to close any apparent gaps through the established

---

70  *SPP* v. *Egypt*, Award, 20 May 1992, para. 8.
71  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 6.
72  See Introductory Note D to the 1968 Arbitration Rules, 1 ICSID Reports 65; *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 87.

*Article 44 – Rules on Procedure*                                                      689

methods of interpretation for treaties and other legal documents.[73] But the tribunal is free of the constraints of procedural law in any national legal system of law, including that of the tribunal's seat[74] (see also paras. 3, 21 *supra*).

ICSID tribunals have exercised their procedural discretion by formulating general rules for the proceedings before them or by making specific decisions. They have done this either in the form of procedural orders or informally. The Arbitration Rules provide in this context:                                                          **55**

### Rule 19

*Procedural Orders*

The Tribunal shall make the orders required for the conduct of the proceeding.

Tribunals have issued procedural orders in numerous cases.[75]

Decisions by tribunals of a more general nature cover such matters as the modalities of decision-making by the tribunal, delegation of the power to set time limits to the tribunal's president and the holding of oral proceedings and procedures for dealing with preliminary objections. Specific procedural decisions address questions like particular dates and time limits, the production of documents and the suspension of proceedings on the merits pending a decision on jurisdiction.[76]                                                        **56**

---

73   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 18; Dissenting Opinion to *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988, 3 ICSID Reports 184.

74   See *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 357/8; *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 809/10 (1982); *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 115/6 (1993); *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 234/5 (1990). Contrast the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958, Art. V (1.d), 330 UNTS 38, 42.

75   Most procedural orders are unpublished. For examples of published orders or references to unpublished orders see: *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 3; *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, 2 ICSID Reports 96; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, para. 10, Award, 25 February 1988, paras. 1.10, 1.16, 1.19; *MINE* v. *Guinea*, Procedural Order No. 1, 17 May 1988, Interim Order No. 1, 12 August 1988; *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, 4 ICSID Reports 324, Award, 16 February 1994, para. 17; *AMT* v. *Zaire*, Award, 21 February 1997, para. 3.22; *Fedax* v. *Venezuela*, Decision on Jurisdiction, 11 June 1997, para. 10; *Tradex* v. *Albania*, Award, 29 April 1999, paras. 19, 21, 28, 33, 43; *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002; *Tokios Tokelès* v. *Ukraine*, Procedural Order No. 1, 1 July 2003, Procedural Order No. 3, 18 January 2005; *Western NIS* v. *Ukraine*, Order, 16 March 2006; *Suez and AWG* v. *Argentina*, Procedural Order No. 1, 14 April 2006, Procedural Order No. 2, 3 August 2006; *Biwater Gauff* v. *Tanzania*, Procedural Orders Nos. 1–3 and 5–6, 31 March, 24 May, 29 September 2006, 2 February and 25 April 2007; *Suez et al.* v. *Argentina*, Procedural Order No. 1, 14 April 2006; *Pey Casado* v. *Chile*, Procedural Order No. 13, 24 October 2006, Procedural Order No. 14, 22 November 2006.

76   See *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.5; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 10–18; Award, 25 February 1988, paras. 1.09–1.24; *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *SPP* v. *Egypt*, Award, 20 May 1992, para. 9; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 17; *AMT* v. *Zaire*, Award, 21 February 1997, para. 3.01; *Noble Ventures* v. *Romania*, Award, 12 October 2005, paras. 19, 20.

**57**    *SGS* v. *Philippines* provides an example for the exercise of a tribunal's residual power under Art. 44. The Tribunal found that it had the power to stay proceedings pending the determination, by some other competent forum, of an issue relevant to its own decision. In doing so, the Tribunal relied on its general power to make orders necessary for the conduct of the proceedings under Arbitration Rule 19, and on the second sentence of Art. 44.[77]

**58**    In *Suez and AWG* v. *Argentina (Aguas Argentinas)*, the Tribunal relied on the second sentence of Art. 44 to deal with the question whether it had the power to accept *amicus curiae* submissions (see paras. 125–126 *infra*). The Tribunal said:

> The last sentence of Article 44 is a grant of residual power to the Tribunal to decide procedural questions not treated in the Convention itself or the rules applicable to a given dispute. . . . The Tribunal unanimously concludes that Article 44 of the ICSID Convention grants it the power to admit *amicus curiae* submissions from suitable nonparties in appropriate cases.[78]

## III. INTERRELATIONSHIP OF PROCEDURAL RULES

**59**    The different sets of provisions, as described above, combine to create a complex framework of rules governing procedure before ICSID tribunals. Within this framework, it is possible to identify a hierarchy of norms. This hierarchy has several aspects to it. Rules at a lower level of the hierarchy either have to conform to or are of subsidiary character in relation to those superior to them. In either case, the rules of a higher level will be applied if they conflict with ones at a lower level.

**60**    This hierarchy may be described as follows:[79]

1. Mandatory provisions of the Convention, *i.e.* those that are not open to modification by the parties (see para. 20 *supra*).
2. The Administrative and Financial Regulations and the Institution Rules (except to the extent that they permit variation by the parties by their own terms) (see para. 13 *supra*).
3. Procedures agreed to by the parties (see paras. 14, 17, 20 *supra*).
4. Provisions of the Convention that are open to modification by the parties (see para. 10 *supra*).
5. The Arbitration Rules (see paras. 11, 12, 17, 33 *supra*).
6. Decisions by the tribunal on procedural matters (see para. 54 *supra*).

---

77    *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 173.
78    *Suez and AWG* v. *Argentina*, Order in Response to Transparency and *Amicus Curiae* Petition, 19 May 2005, paras. 10, 16.
79    This list is similar to the one by *Szasz, P. C.*, The Investment Disputes Convention – Opportunities and Pitfalls (How to Submit Disputes to ICSID), 5 Journal of Law and Economic Development 23, 39/40 (1970). For a somewhat less elaborate description of the interrelation of procedural rules see Introductory Notes D and E to the 1968 Arbitration Rules, 1 ICSID Reports 65.

# IV. SPECIFIC PROCEDURAL QUESTIONS

## A. Procedural Languages

The Convention does not contain a provision on procedural languages. The **61** Final Clause merely states that the Convention is authentic in English, French and Spanish.

Art. 34(1) of the Administrative and Financial Regulations lists English, French **62** and Spanish as the Centre's official languages. Institution Rule 1(1) states that a request for conciliation or arbitration shall be drawn up in an official language of the Centre. But the choice of one of these three languages for the request does not determine the procedural language of the arbitration proceedings (see Art. 36, paras. 11, 14, 52).

The Arbitration Rules offer the parties a choice of language or languages in the **63** following terms:

### Rule 22
#### *Procedural Languages*
(1) The parties may agree on the use of one or two languages to be used in the proceeding, provided that, if they agree on any language that is not an official language of the Centre, the Tribunal, after consultation with the Secretary-General, gives its approval. If the parties do not agree on any such procedural language, each of them may select one of the official languages (i.e., English, French and Spanish) for this purpose.

(2) If two procedural languages are selected by the parties, any instruments may be filed in either language. Either language may be used at the hearings, subject, if the Tribunal so requires, to translation and interpretation. The orders and the award of the Tribunal shall be rendered and the record kept in both procedural languages, both versions being equally authentic.[80]

Therefore, the parties may choose one or two languages for the proceedings. **64** If they do not agree, each party may choose a language. If the parties select two languages, the proceedings will be bilingual. This means that written instruments and hearings may be in either or both languages. Orders, awards, other decisions and the procedural records will be in both languages.

Until 1996 all ICSID proceedings were conducted in English or French or both. **65** Since 1996 Spanish has been used increasingly. In a number of cases two of the official languages were chosen.[81]

If two procedural languages are used, translation and interpretation is likely to **66** slow the proceedings and increase costs. The parties may submit pleadings and

---

80   See also Conciliation Rule 21. Arbitration (Additional Facility) Rule 30 is substantively identical.
81   For instance, in *MTD* v. *Chile*, it was agreed that the proceedings would be conducted in English and Spanish: *MTD* v. *Chile*, Award, 25 May 2004, para. 18. See *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 96 (1998); *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 329/30 (1999).

other documents in just one of the chosen languages or together with a translation. If necessary, the Secretariat will engage the services of interpreters and arrange for translations at the cost of the parties.[82] In some cases this was considered dispensable since the arbitrators and both parties were sufficiently familiar with both languages.[83]

**67**    A variety of arrangements may be adopted depending on the parties' and tribunal's preferences and their fluency in the three official languages of the Centre. In *Fedax* v. *Venezuela*, the Tribunal determined in a procedural order that the language of the proceeding would be Spanish, except that the orders, decisions and Award would be made in English with a translation into Spanish.[84]

**68**    In *Jan de Nul* v. *Egypt*, both French and English were used by the parties in their pleadings and documents were filed in either language, without any need for translation. The Tribunal used English as its working language and French, when appropriate, while records of the proceedings were kept in English.[85]

**69**    In *Champion Trading* v. *Egypt*, it was agreed that the procedural language of the arbitration would be English, but that pleadings and other documents could be submitted in either English or French. It was also agreed that any documents in a language other than English or French would be translated into either of these languages.[86]

**70**    Similarly, in *Total* v. *Argentina*, it was agreed that the languages of the proceedings would be English and Spanish. The Claimant would file its pleadings in English and Argentina would file its pleadings in Spanish without the need of translation.[87]

**71**    In *Mitchell* v. *Congo*, although the languages of the proceedings were English and French, the hearings were conducted in French, with simultaneous translation into English, as all participants preferred to express themselves in French. The transcript of the hearing was produced in French.[88]

### B. Representation of the Parties

**72**    The parties are free to decide on their representation in proceedings. There is no requirement for counsel to have any special qualification or to be admitted to practice in a particular jurisdiction. Representation by a lawyer is not mandatory but it is highly advisable that a party be represented by counsel with appropriate training and experience in international law and arbitration.[89]

---

82   See Administrative and Financial Regulation 27(1).
83   See *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, pp. 4, 8 (1997); *Parra*, The Role, p. 96.
84   *Fedax* v. *Venezuela*, Award, 9 March 1998, para. 10.
85   *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 43 and 51.
86   *Champion Trading* v. *Egypt*, Award, 27 October 2006, para. 5.
87   *Total* v. *Argentina*, Decision on Jurisdiction, 25 August 2006, para. 5.
88   *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 7, 12.
89   *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 330/1 (1999); Note B to Arbitration Rule 18 of 1968, 1 ICSID Reports 83.

The Arbitration Rules address the issue in the following terms:    **73**

### Rule 18
*Representation of the Parties*

(1) Each party may be represented or assisted by agents, counsel or advocates whose names and authority shall be notified by that party to the Secretary-General, who shall promptly inform the Tribunal and the other party.

(2) For the purposes of these Rules, the expression "party" includes, where the context so admits, an agent, counsel or advocate authorized to represent that party.[90]

The request for arbitration may designate agents, counsel and advocates and    **74** indicate the extent of their authority (see Art. 36, para. 33).[91] The respondent party should notify the Secretary-General as soon as possible of its representation, preferably in response to the Secretary-General's transmission to it of the request. The notice of registration (see Art. 36, para. 61) will notify each party that all communications and notices in connection with the proceeding will be sent to the address stated in the request, unless another address is indicated by the party.[92] Any agent, counsel or advocate will usually be indicated as addressee of communications and notices.[93]

In international litigation, States are frequently represented by "agents" usually    **75** assisted by "counsel". The agent would be in charge of the general management and control of the case. Arbitration Rule 18 does not distinguish between the authority of agents, counsel or advocates. Any notification of a representation should clearly indicate the scope of the authority of the person in question.[94]

In practice, parties are nearly always represented by lawyers. State parties are    **76** represented by government lawyers, lawyers in private practice or a combination of both. Investors are nearly always represented by lawyers in private practice although representation by in-house counsel is not unheard of. Representatives are often specialists in arbitration with ICSID experience. With the consistent growth of investment arbitration, party representation is no longer limited to lawyers coming from the United States and Europe, but increasingly reflects the nationality of the parties involved and thus includes lawyers from Latin America, the Middle East and Asia.[95]

Arbitration Rule 47(1)(d) (see Art. 48, para. 23) states that an award shall    **77** contain the names of the agents, counsel and advocates of the parties. Awards routinely reproduce the names of the parties' representatives.

---

90    Conciliation Rule 18 is substantively identical. See also Article 26 of the Arbitration (Additional Facility) Rules.
91    See Note D to Institution Rule 3 of 1968, 1 ICSID Reports 56.
92    See Institution Rule 7(b).
93    See Note C to Institution Rule 7 of 1968, 1 ICSID Reports 59/60.
94    See Notes A and C to Arbitration Rule 18 of 1968, 1 ICSID Reports 83/4.
95    *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 330/1 (1999).

**78**    At the final hearing in *Generation Ukraine* v. *Ukraine*, the Respondent raised a jurisdictional objection based on the fact that the Claimant's counsel had allegedly not been formally appointed by Generation Ukraine's board of directors. The Tribunal dismissed the objection as outside the time-limit of Arbitration Rule 41. Even if that were not the case the objection would have been rejected as "hypertechnical and unmeritorious". The presence at the hearing of the Claimant's sole shareholder left no doubt that the corporation chose to be represented by the counsel who appeared on its behalf.[96]

**79**    In *Scimitar* v. *Bangladesh*, the Respondent objected to the Tribunal's jurisdiction because the request for arbitration had been introduced by persons not properly authorized to act on behalf of the Claimant. Scimitar stated that the Respondent's jurisdictional objections were not resisted. The Tribunal found that the proceedings had not been initiated with proper authority and that there had not been any subsequent authorization. It followed that there was no jurisdiction.[97]

### C.    Written and Oral Procedure

**80**    The procedure before a tribunal normally consists of a written and of an oral part. The Arbitration Rules provide to this effect:

#### Rule 29
*Normal Procedures*
Except if the parties otherwise agree, the proceeding shall comprise two distinct phases: a written procedure followed by an oral one.[98]

**81**    The parties are free to modify the normal course of the procedure. In particular, they may dispense with parts of the procedure. Therefore, proceedings that only consist of a written procedure are possible if the parties agree not to hold hearings.[99]

**82**    Arbitration Rule 47(1)(f) requires that the award shall contain a summary of the proceeding (see Art. 48, para. 23). Awards typically offer a comprehensive description of the written and oral procedure.

**83**    The two phases of the procedure also apply to incidental or subsidiary parts of the proceedings. These would be proceedings relating to objections to jurisdiction (see Art. 41, paras. 60–64), to provisional measures (see Art. 47, paras. 6, 12), to ancillary claims (see Art. 46, paras. 15–29, 64–67), to reopened proceedings (see Art. 49, paras. 11–12; Art. 43, paras. 35–36), to supplementation and rectification (see Art. 49, paras. 32–37), to interpretation (see Art. 50, paras. 15–25), to revision (see Art. 51, paras. 8–15) and to annulment (see Art. 52, paras. 83–86, 558–561).[100]

**84**    The written procedure consists of the request and communications relating to it as well as of the parties' pleadings. The Arbitration Rules provide to this effect:

---

96    *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, para. 16.1.
97    *Scimitar* v. *Bangladesh*, Award, 5 April 1994, paras. 7–8, 21, 25, 28–29.
98    See also Conciliation Rules 24–27. See also Articles 36–39 of the Arbitration (Additional Facility) Rules.
99    See Note A to Arbitration Rule 28 of 1968, 1 ICSID Reports 91.
100    See Note B to Arbitration Rule 28 of 1968, 1 ICSID Reports 91.

**Rule 30**

*Transmission of the Request*

As soon as the Tribunal is constituted, the Secretary-General shall transmit to each member a copy of the request by which the proceeding was initiated, of the supporting documentation, of the notice of registration and of any communication received from either parts in response thereto.

**Rule 31**

*The Written Procedure*

(1) In addition to the request for arbitration, the written procedure shall consist of the following pleadings, filed within time limits set by the Tribunal:

    (a)  a memorial by the requesting party;

    (b)  a counter-memorial by the other party;

    and, if the parties so agree or the Tribunal deems it necessary:

    (c)  a reply by the requesting party; and

    (d)  a rejoinder by the other party.

(2) If the request was made jointly, each party shall, within the same time limit determined by the Tribunal, file its memorial and, if the parties so agree or the Tribunal deems it necessary, its reply; however, the parties may instead agree that one of them shall, for the purposes of paragraph (1), be considered as the requesting party.

(3) A memorial shall contain: a statement of the relevant facts; a statement of law; and the submissions. A counter-memorial, reply or rejoinder shall contain an admission or denial of the facts stated in the last previous pleading; any additional facts, if necessary; observations concerning the statement of law in the last previous pleading; a statement of law in answer thereto; and the submissions.[101]

The request for arbitration (see Art. 36, paras. 11–17) is part of the written procedure. The request and any supporting documentation may be necessary for the tribunal to make a decision on jurisdiction. In addition, the request may contain procedural arrangements that the parties have agreed upon (see Art. 36, paras. 22–33).[102]    **85**

Under Arbitration Rule 20(1)(c) the number and sequence of pleadings as well as the time limits within which they are to be filed are typically determined in the framework of the preliminary procedural consultation (see paras. 28–30 *supra*). Under Administrative and Financial Regulation 29(2), a time limit is satisfied if the pleading or other instrument is received by the Secretary-General or the Secretary of the tribunal on the indicated date. Parties may request extensions of the time limits originally fixed by a tribunal and explain the reasons why such extensions are needed.    **86**

The Arbitration Rules contain the following provision on time limits:    **87**

---

101   See also Conciliation Rules 24–26. See also Articles 37, 38 of the Arbitration (Additional Facility) Rules.

102   See Notes to Arbitration Rule 29 of 1968, 1 ICSID Reports 91/2.

### Rule 26
*Time Limits*

(1) Where required, time limits shall be fixed by the Tribunal by assigning dates for the completion of the various steps in the proceeding. The Tribunal may delegate this power to its President.

(2) The Tribunal may extend any time limit that it has fixed. If the Tribunal is not in session, this power shall be exercised by its President.

(3) Any step taken after expiration of the applicable time limit shall be disregarded unless the Tribunal, in special circumstances and after giving the other party an opportunity of stating its views, decides otherwise.[103]

**88**    Tribunals usually grant extensions, albeit not necessarily for the amount of time requested, if a request appears to be well grounded. Ordinarily they will give the same extension of time to both sides.[104] Tribunals make the necessary procedural orders on the basis of the Arbitration Rules and any agreements with the parties (see paras. 53–56 *supra*).

**89**    Pleadings are limited to one round unless the parties agree or the tribunal deems it necessary to have a second round.[105] Two rounds of pleadings are standard practice.

**90**    In the case of a joint request by both parties the pleadings would normally be simultaneous. However, consecutive pleadings tend to be more practical since they enable the parties to respond to each other's argument more effectively. Therefore, Arbitration Rule 31(2) opens the possibility to agree that one of the parties be regarded as the requesting party for purposes of the sequence of pleadings.[106]

**91**    Pleadings consist of three elements: statements of fact, statements of law and submissions. A submission is a decision proposed to the tribunal. Pleadings should relate closely to the other party's last previous pleading.[107]

**92**    Administrative and Financial Regulation 24 provides that pleadings and other documents are to be introduced by way of the Secretary-General. Under Arbitration Rule 23, pleadings and other documents are to be filed in the form of a signed original and, if the tribunal consists of three persons, five additional copies. The Secretary-General will retain the original for the Centre's files and will arrange for the distribution of copies to the other party and the arbitrators.[108]

**93**    The oral procedure consists of a hearing by the tribunal. The Arbitration Rules provide to this effect:

---

103   See also Article 33 of the Arbitration (Additional Facility) Rules.
104   See, for instance, *PSEG* v. *Turkey*, Decision on Jurisdiction, 4 June 2004, paras. 12, 13.
105   See Notes A and B to Arbitration Rule 30 of 1968, 1 ICSID Reports 92.
106   See Note C to Arbitration Rule 30 of 1968, 1 ICSID Reports 92/3.
107   See also Note E to Arbitration Rule 30, 1 ICSID Reports 93.
108   See *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 88 (1998).

### Rule 32
*The Oral Procedure*

(1) The oral procedure shall consist of the hearing by the Tribunal of the parties, their agents, counsel and advocates, and of witnesses and experts.

(2) [See para. 101 *infra*]

(3) The members of the Tribunal may, during the hearings, put questions to the parties, their agents, counsel and advocates, and ask them for explanations.[109]

The hearing offers the parties an opportunity to further develop their arguments. **94** Hearings take place under the direction of the tribunal's president.[110] The sequence of statements is similar to that in the written procedure (see para. 84 *supra*). It is important that the parties be given full and equal opportunity to be heard. Members of the tribunal have the right to put questions to the parties and any witnesses.[111] The examination of witnesses and experts is regulated by Arbitration Rules 35 and 36 (see Art. 43, paras. 69–97).

In a number of cases the tribunals permitted the filing of post-hearing sub- **95** missions, including additional documentation. Post-hearing briefs were usually restricted to specific points. Post-hearing briefs typically require several rounds of submissions since each party must have the opportunity to respond to the material submitted by the other side.[112]

In *Fraport* v. *Philippines*, the parties exchanged numerous briefs, letters, addi- **96** tional submissions, observations and documents after the hearing. This process took more than 14 months.[113] The Tribunal noted that the decisive point, that ultimately formed the basis for the award, was essentially argued in post-hearing submissions since most of the relevant documents were released either immediately before or during the hearing.[114]

## D. Confidentiality, Transparency and *Amicus Curiae* Participation

### *1. Confidentiality and Transparency*

Confidentiality is traditionally considered one of the cornerstones of interna- **97** tional commercial arbitration between private parties.[115] The issues of public

---

109    See also Conciliation Rule 27 and Article 39 of the Arbitration (Additional Facility) Rules.

110    For an outline for the conduct of a hearing see *Maffezini* v. *Spain*, Award, 13 November 2000, para. 28. For a detailed set of rules concerning the preparation, scheduling, form and length of a hearing see *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 26, quoting Procedural Order No. 2 of 3 September 2004.

111    See the Notes to Arbitration Rule 31 of 1968, 1 ICSID Reports 93/4.

112    *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 86, 87; *Siag* v. *Egypt*, Decision on Jurisdiction, 11 April 2007, paras. 15, 16, 128–136; *LG&E* v. *Argentina*, Award, 25 July 2007, para. 7; *MCI* v. *Ecuador*, Award, 31 July 2007, para. 24; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 2.7.17, 8.1.6–8.1.9; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 44–46; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 46–53.

113    *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 49–75.

114    At para. 383.

115    See, for instance, the UNCITRAL Rules of 1976: Arts. 25(4) and 32(5). This requirement can only be lifted with the parties' consent.

interest in investment arbitration have led to increasing demands for more openness and transparency. Tribunals have been called upon to exercise their discretion in the conduct of the arbitration to achieve a proper balance between the public interest in information and the need to maintain the confidentiality of the arbitral proceedings.[116] A number of treaties reflect a trend towards increasing transparency and access to information in investment arbitration.[117]

**98**     The Arbitration Rules contain a number of provisions that are designed to protect the privacy of the arbitration proceedings. Under Rule 6(2) an arbitrator must sign a declaration that provides in part:

> I shall keep confidential all information coming to my knowledge as a result of my participation in this proceeding, as well as the contents of any award made by the Tribunal.

**99**     The Rules also secure the privacy of the tribunal's deliberations:

**Rule 15**
*Deliberations of the Tribunal*
> (1) The deliberations of the Tribunal shall take place in private and remain secret.
> (2) Only members of the Tribunal shall take part in its deliberations. No other person shall be admitted unless the Tribunal decides otherwise.

**100**     The Arbitration Rules do not say that the parties must keep their memorials secret. In fact, a note to the 1968 Arbitration Rules specifically points out that the parties are not prohibited from publishing their pleadings. It adds that they may, however, come to an understanding to refrain from doing so, particularly if they feel that publication may exacerbate the dispute.[118]

**101**     Arbitration Rule 32(2), as amended in 2006, deals with the attendance at hearings in the following terms:

> (2) Unless either party objects, the Tribunal, after consultation with the Secretary-General, may allow other persons, besides the parties, their agents, counsel and advocates, witnesses and experts during their testimony, and officers of the Tribunal, to attend or observe all or part of the hearings, subject to appropriate logistical arrangements. The Tribunal shall for such cases establish procedures for the protection of proprietary or privileged information.[119]

**102**     Arbitration Rule 32(2) secures the privacy of the oral procedure before the tribunal by providing that, if either party objects, persons besides the parties, their

---

116  See *Knahr, C./Reinisch, A.*, Transparency Versus Confidentiality in International Investment Arbitration – The Biwater Gauff Compromise, 6 The Law and Practice of International Courts and Tribunals 97–118 (2007).

117  See Arts. 28 and 29 of the United States Model BIT of 2004; Arts. 38 and 39 of the Canada Model BIT of 2003. Concerning the NAFTA see the Notes of Interpretation of Certain Chapter 11 Provisions by the NAFTA Free Trade Commission of 31 July 2001. The Interpretation negates a general duty of confidentiality in Chapter 11 proceedings and states that nothing precludes the parties from providing public access to documents relating thereto. See 95 AJIL 885 (2001).

118  Note F to Arbitration Rule 30 of 1968, 1 ICSID Reports 93.

119  Article 39(2) of the Arbitration (Additional Facility) Rules is identical.

agents, counsel and advocates, witnesses and experts during their testimony and officers of the Tribunal shall not attend the hearings. Therefore, as a matter of principle, arbitration proceedings are not public. The tribunal may require any expert or witness to absent him or herself from the hearing when not giving testimony. In addition to the persons mentioned in Rule 32, the presence of the Secretary of the Tribunal appointed in accordance with Administrative and Financial Regulation 25 will normally be required.[120]

Hearings are usually held in private. This means that the only persons normally allowed to attend are the members and officers of the tribunal, the parties and their representatives as well as witnesses and experts during their testimony. Under Arbitration Rule 32(2), tribunals may permit, in the absence of either party's objection and after consultation with the Secretary-General, other persons to attend or observe all or part of the hearing. This permission is subject to appropriate logistical arrangements and procedures for the protection of proprietary and privileged information. **103**

Prior to the amendment of the Arbitration Rules in 2006 the attendance of other persons was subject to the parties' consent. When petitions to attend the hearings were introduced by non-parties in specific cases, tribunals rejected the requests in the absence of consent by both parties.[121] **104**

Some modern investment treaties provide that investor-state arbitration hearings shall be open to the public. Arbitration Rule 32(2) accommodates the possibility of public hearings in such cases. In October 2004, the ICSID Secretariat raised for discussion whether the consent of both parties should still be required if a hearing is to be open to the public.[122] The right of one party to veto opening hearings to the public was, however, retained in Arbitration Rule 32(2) of the 2006 Arbitration Rules. **105**

The *Biwater Gauff* Tribunal, operating under the Rules as amended in 2006, rejected the request of petitioners to attend the hearing due to the Claimant's objection to the petitioners' presence at the hearing.[123] However, while denying the petition to have the hearing open to the public, the Tribunal nonetheless reserved the right to ask the petitioners specific questions or request the filing of submissions and/or documentary evidence "which might assist in better understanding the Petitioners' position, . . .".[124] **106**

The Arbitration Rules of 1968 contained detailed provisions on the keeping of minutes of all hearings. These contained a rule that the minutes were not to be **107**

120   See Note C to Arbitration Rule 31 of 1968, 1 ICSID Reports 94.
121   *Suez and AWG* v. *Argentina*, Order in Response to Transparency and *Amicus Curiae* Petition, 19 May 2005; *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 15–18; *Suez et al.* v. *Argentina*, Order in Response to *Amicus Curiae* Petition, 17 March 2006.
122   ICSID Secretariat, Discussion Paper, Possible Improvements of the Framework for ICSID Arbitration (22 October 2004), para. 10.
123   *Biwater Gauff* v. *Tanzania*, Procedural Order No. 5, 2 February 2007, paras. 69–71.
124   At para. 72.

published without the consent of the parties.[125] The provisions on the keeping of minutes proved too rigid and were deleted when the Arbitration Rules were revised in 1984.[126] Instead, Rule 20(1)(g) now provides that the manner in which the record of the hearings shall be kept is to be settled at a preliminary procedural consultation.

**108**    The parties are free to agree on a total or partial publication of documents relating to a proceeding. In *Malaysian Historical Salvors* v. *Malaysia*, the Tribunal recorded the following agreement of the Parties:

> . . . the Parties granted full authority to the Centre to publish (on its website) all the pleadings and their supporting documents to be filed in these proceedings, as well as decisions of the Tribunal, including its Award. The Respondent reserved its right to redact its submissions for purposes of deleting sensitive information before publication by the Centre.[127]

**109**    The Tribunal in *Loewen* v. *United States*, operating under the Additional Facility, was confronted with a request by the United States that all pleadings and minutes of the proceedings be made public. The Tribunal applied an old version of the Arbitration (Additional Facility) Rules which provided that the minutes were not to be published without the consent of the parties[128] and decided accordingly. At the same time the Tribunal rejected the Claimant's suggestion that there was a general obligation of confidentiality. But it found that during the proceeding public discussion ought to be limited to what is necessary.[129]

**110**    In *ADC* v. *Hungary*, a witness asked the Tribunal for a copy of the transcript of the proceeding and a copy of another witness's statement. The Tribunal denied the request and ruled as follows:

> Having considered all the submissions on this matter, the Tribunal is satisfied that confidentiality does attach to all the documents produced in this ICSID arbitration. Confidentiality is important because parties to ICSID arbitrations may not want the details of the dispute made public and furthermore witnesses who come forward to assist the Tribunal in their difficult task should do so with the knowledge that what they say is confidential and cannot be released without an order of the Tribunal. Such a rule is necessary to preserve the integrity of the arbitral process.[130]

**111**    The Secretary-General is under an obligation to publish information about the existence and progress of pending cases. The Administrative and Financial Regulations require the Secretary-General to record and publish relevant data about registered requests for arbitration and certain information about the status of proceedings:

---

125    Arbitration Rule 37(2) of 1968, 1 ICSID Reports 97/8. *Cf.* also Conciliation Rule 29(3) of 1968, 1 ICSID Reports 147.
126    *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 5 (1985).
127    *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 32.
128    Arbitration (Additional Facility) Rule 44(2), 1 ICSID Reports 264.
129    *Loewen* v. *United States* (AF), Decision on Jurisdiction, 9 January 2001, para. 26.
130    *ADC* v. *Hungary*, Award, 2 October 2006, para. 68.

### Regulation 22
*Publication*

(1) The Secretary-General shall appropriately publish information about the operation of the Centre, including the registration of all requests for conciliation or arbitration and in due course an indication of the date and method of the termination of each proceeding.

(2) If both parties to a proceeding consent to the publication of:

   (a)  reports of Conciliation Commissions;

   (b)  arbitral awards; or

   (c)  the minutes and other records of proceedings,

the Secretary-General shall arrange for the publication thereof, in an appropriate form with a view to furthering the development of international law in relation to investments.

### Regulation 23
*The Registers*

(1) The Secretary-General shall maintain, in accordance with rules to be promulgated by him, separate Registers for requests for conciliation and requests for arbitration. In these he shall enter all significant data concerning the institution, conduct and disposition of each proceeding, including in particular the method of constitution and the membership of each Commission, Tribunal and Committee. On the Arbitration Register he shall also enter, with respect to each award, all significant data concerning any request for the supplementation, rectification, interpretation, revision or annulment of the award, and any stay of enforcement.

(2) The Registers shall be open for inspection by any person. The Secretary-General shall promulgate rules concerning access to the Registers, and a schedule of charges for the provision of certified and uncertified extracts therefrom.

The appropriate publication mentioned in Regulation 22(1) is achieved primarily through the Centre's website: http://icsid.worldbank.org/ICSID/Index.jsp. **112**

Article 48(5) of the Convention provides that the Centre shall not publish an award without the consent of the parties (see Art. 48, paras. 107–129). Arbitration Rule 48(4) after reiterating the Convention's provision adds: **113**

> The Centre shall, however, promptly include in its publications excerpts of the legal reasoning of the Tribunal.[131]

In *Amco* v. *Indonesia*, the unilateral release of information by a party during proceedings pending before a tribunal was the subject of a request for provisional measures (see Art. 47, paras. 137, 138, 160). Indonesia's primary contention was that newspaper articles promoted by the Claimants might exacerbate the dispute and might do harm to the economy of Indonesia by discouraging foreign investment there. In addition, Indonesia alleged that "Claimants' actions are incompatible with the spirit of confidentiality which imbues these international arbitral proceedings", relying on Art. 48(5) and the relevant portions of the Arbitration **114**

---

131   See also Article 53(3) of the Arbitration (Additional Facility) Rules.

Rules. The Claimants countered that "the Convention and Arbitration Rules do not prohibit individual parties from discussing the case and the status of the arbitration, publicly or otherwise". The Tribunal refused to recommend the provisional measures. It said:

> . . . as to the "spirit of confidentiality" of the arbitral procedure, it is right to say that the Convention and the Rules do not prevent the parties from revealing their case; . . .[132]

**115**     The Tribunal in *Metalclad* v. *Mexico*, operating under the Additional Facility, addressed an alleged general principle of confidentiality in investment arbitration that would prohibit public discussion of the proceedings by either party. The Tribunal stressed that no express restriction exists either in the NAFTA or in the ICSID (Additional Facility) Rules on the parties' freedom to discuss arbitral proceedings publicly. The Tribunal added that it would be of advantage if during the proceedings the parties were to limit public discussion of the case to a minimum.[133]

**116**     The ICSID Tribunal in *Biwater Gauff* v. *Tanzania* undertook a detailed treatment of different types of documents and their disclosure. The issue arose when Biwater Gauff filed a request for provisional measures complaining of Tanzania's unilateral publication of the minutes of the first procedural session and the Tribunal's Procedural Order No. 2 on the internet. Tanzania argued that the level of transparency in investment arbitration cases is higher than in private commercial arbitrations. The Tribunal observed that the position of ICSID with respect to confidentiality had evolved and recognized that the new ICSID Rules in force from 2006 clearly reflected the existence of "an overall trend in this field towards transparency".[134]

**117**     The Tribunal noted that parties are free to conclude confidentiality agreements. No such agreement existed in that case and no provision on confidentiality was included in the relevant investment treaty. The Tribunal recalled that, in the absence of a specific agreement between the parties regarding confidentiality, there is no provision imposing a general obligation of confidentiality, or, conversely, a general rule imposing transparency in ICSID arbitration.[135] But the Tribunal warned of the possible negative repercussions on the integrity of the arbitral process of selective reporting and disclosure in the media of documents or information regarding an on-going arbitration.[136] At the same time, the Tribunal noted that "the tension between the interests in transparency and in procedural integrity", which exists while an arbitration is pending usually ceases to exist after the proceedings are closed and a final award is rendered.[137]

---

132  *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983, para. 4. See also *Tahyar, B. H.*, Confidentiality in ICSID Arbitration after *Amco Asia Corp.* v. *Indonesia*: Watchword or White Elephant?, 10 Fordham International Law Journal 93 (1986).

133  *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, para. 13.

134  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 3, 29 September 2006, para. 122.

135  At paras. 121–126.          136   At paras. 136–142.

137  At para. 140.

The Tribunal considered each category of documents that formed the object **118** of the request for provisional measures and issued detailed recommendations regarding the different categories as follows:

(i) <u>General discussion of the case</u>: The parties were free to discuss the case as long as such discussions were not used to exacerbate their differences or unduly pressure one another;

(ii) <u>Awards</u>: The parties agreed that the Centre may publish the awards as it deems fit;

(iii) <u>Decisions, orders and directions of the Tribunal</u>: Although the Tribunal recognized that there is a general presumption in favour of publication of these documents, in the light of their varying nature and subject-matter, the Tribunal decided not to impose general confidentiality restrictions but to treat this category on a case-by-case basis;

(iv) <u>Minutes or records of hearings</u>: Recognizing that disclosing minutes or records of hearings could potentially affect the procedural integrity and efficiency of the proceedings, the Tribunal ruled that these should not be disclosed unless the parties so agree or the Tribunal so directs;

(v) <u>Documents disclosed in the proceedings</u>: The Tribunal ruled that, while no restrictions applied on the publication by either party of its own documents, it was appropriate to restrict publication or distribution of documents produced by the opposing party;

(vi) <u>Pleadings/written memorials</u>: In the absence of the parties' agreement or an order by the Tribunal, the disclosure of this category of documents was restricted pending conclusion of the proceedings since any uneven publication or distribution of pleadings and memorials might give a misleading impression about the proceedings;

(vii) <u>Correspondence between the parties and the Tribunal in respect of the proceedings</u>: The Tribunal found that, given that this category of documents concerns the conduct of the process, rather than issues of substance, the need for transparency was outweighed by the requirements of procedural integrity. Consequently, the Tribunal ruled that these documents should be restricted.[138]

Having thus determined the degree of confidentiality for each category of **119** documents, the *Biwater Gauff* Tribunal also considered it appropriate to keep each category under continued review and continue to act as a "gate-keeper" on disclosures.[139]

Subsequent to this Procedural Order, petitioners for *amicus curiae* status also **120** sought access to key documents including the pleadings produced for the arbitration. The Tribunal did not permit access to the key arbitration documents. The Tribunal considered that the safeguards to the integrity of the process put in place

---

138   At paras. 148–161.                    139   At para. 162.

by its previous Procedural Order No. 3 would be swept away if access to the documents were given to the *amici*. The Tribunal stated it would revisit the question after the oral hearing.[140]

121      In *World Duty Free* v. *Kenya*, the Respondent's Request for Provisional Measures invoked a general principle of confidentiality that would prevent either party from discussing the proceedings publicly. The Tribunal noted that neither the Convention nor the Arbitration Rules contain an express restriction with regard to the parties' freedom to discuss the arbitration and added that "[e]specially in an arbitration to which a Government is a Party, it cannot be assumed that the Convention and the Rules incorporate a general obligation of confidentiality which would require the Parties to refrain from discussing the case in public". Kenya complained that the minutes and audio-recordings of the preliminary session had been disseminated to the press without a prior request to open the hearings to the media. The Tribunal noted that the question is regulated by Rule 32(2) of the Arbitration Rules and ICSID Administrative and Financial Regulation 22, providing, respectively, that tribunals decide only with the consent of the parties who can attend hearings and whether minutes and records of proceedings will be published. The Tribunal concluded that "when no decision has been taken to open the hearings to the public, the records of such hearings should not be disseminated unilaterally by one of the Parties".[141]

### 2. Amicus Curiae *Participation*

122      The filing of *amicus curiae* briefs in ICSID arbitration is governed by Arbitration Rule 37(2), in force since 10 April 2006, which reads as follows:

> (2) After consulting both parties, the Tribunal may allow a person or entity that is not a party to the dispute (in this Rule called the "non-disputing party") to file a written submission with the Tribunal regarding a matter within the scope of the dispute. In determining whether to allow such a filing, the Tribunal shall consider, among other things, the extent to which:
> > (a) the non-disputing party submission would assist the Tribunal in the determination of a factual or legal issue related to the proceeding by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties;
> > (b) the non-disputing party submission would address a matter within the scope of the dispute;
> > (c) the non-disputing party has a significant interest in the proceeding.
> The Tribunal shall ensure that the non-disputing party submission does not disrupt the proceeding or unduly burden or unfairly prejudice either party, and that both parties are given an opportunity to present their observations on the non-disputing party submission.[142]

---

140  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 5, 2 February 2007, paras. 62–68.
141  *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 16, quoting the Decision on a Request by Respondent for a Recommendation of Provisional Measures of 25 April 2001.
142  Article 41(3) of the Arbitration (Additional Facility) Rules is substantively identical.

Already before the adoption of this provision there were significant steps outside the ICSID framework. Non-ICSID tribunals operating in the framework of NAFTA under the UNCITRAL Rules allowed third parties to make written submissions.[143] In October 2003 the NAFTA Free Trade Commission issued a statement regarding the participation of non-disputing parties.[144]          **123**

Several ICSID cases raised the issue of *amicus curiae* participation before the adoption of Rule 37(2). In *Aguas del Tunari* v. *Bolivia*, a group of petitioners introduced a request to participate as parties – or, alternatively, to be granted *amicus curiae* status – invoking the public character of the dispute and the public interests that may be affected. The Tribunal found that it did not have the authority to grant the request. This was due to the "interplay" between the ICSID Convention and the relevant investment treaty and the consensual nature of arbitration. These did not confer upon a tribunal – absent the parties' agreement – the power to join a non-party to the proceedings, to open the hearings to non-parties or to the public and to make public information relating to the arbitration.[145]          **124**

A different conclusion was reached by the identically composed Tribunals in *Suez et al.* v. *Argentina* (*Aguas Argentinas*) and in *Suez and AWG* v. *Argentina* (*Aguas Provinciales*). In contrast with the decision of the *Aguas del Tunari* Tribunal, the Tribunals in these arbitrations held that they had the power under Article 44 of the ICSID Convention to grant *amicus curiae* submissions to suitable parties "who establish to the Tribunal's satisfaction that they have the expertise, experience, and independence to be of assistance" in appropriate cases.[146] The Tribunals identified three criteria for the acceptance of *amicus* submissions under Article 44 of the Convention:          **125**

> a) the appropriateness of the subject-matter of the case; b) the suitability of a given nonparty to act as *amicus curiae* in that case; and c) the procedure by which the *amicus* submission is made and considered. The Tribunal believes that the judicious application of these criteria will enable it to balance the interests of concerned nondisputant parties to be heard and at the same time protect the substantive and procedural rights of the disputants to a fair, orderly and expeditious arbitral process.[147]

---

143   *Methanex* v. *United States* (UNCITRAL), Decision on *Amici Curiae*, 15 January 2001; *United Parcel Services* v. *Canada* (UNCITRAL), Decision of the Tribunal on Petitions for Intervention and Participation as *Amici Curiae*, 17 October 2001. For a commentary on these decisions, see *Mistelis, L.*, Confidentiality and Third Party Participation: *UPS* v. *Canada* and *Methanex Corp.* v. *United States*, *in*: International Investment Law and Arbitration (*Weiler, T.* ed.) 169 (2005); *also in*: 21 Arbitration International 211 (2005).

144   NAFTA Free Trade Commission Statement on Non-Disputing Party Participation, 7 October 2003, 44 ILM 796 (2005).

145   *Aguas del Tunari* v. *Bolivia*, Decision on Jurisdiction, 21 October 2005, paras. 15–18.

146   *Suez and AWG* v. *Argentina*, Order in Response to Transparency and *Amicus Curiae* Petition, 19 May 2005, paras. 15 and 24; *Suez et al.* v. *Argentina*, Order in Response to *Amicus Curiae* Petition, 17 March 2006, paras. 14 and 23; *Suez and AWG* v. *Argentina*, Order in Response to *Amicus Curiae* Petition, 12 February 2007, para. 13.

147   *Suez and AWG* v. *Argentina*, Order in Response to Transparency and *Amicus Curiae* Petition, 19 May 2005, para. 17; *Suez et al.* v. *Argentina*, Order in Response to *Amicus Curiae* Petition,

**126**    Given the particular public dimension of these cases, involving the water distribution and sewage systems of a large metropolitan area, the Tribunals recognized the potential impact of their decisions on the public at large. They concluded that appropriate non-parties may assist the Tribunals in reaching correct decisions in those particular cases. At the same time, the Tribunals emphasized that the question of admission of *amicus* briefs is a procedural question which requires the establishment of a procedure for introducing and considering such submissions in order to "safeguard due process and equal treatment as well as the efficiency of the proceedings".[148] The Tribunals were also careful to stress that an *amicus curiae* is not a party to the proceedings, and defined its role as follows:

> The traditional role of an *amicus curiae* in an adversary proceeding is to help the decision maker arrive at its decision by providing the decision maker with arguments, perspectives and expertise that the litigating parties may not provide. In short, a request to act as *amicus curiae* is an offer of assistance – an offer that the decision maker is free to accept or reject. An *amicus curiae* is a volunteer, a friend of the court, not a party.[149]

**127**    The new ICSID Arbitration Rule 37(2) was put to the test for the first time in *Biwater Gauff* v. *Tanzania*. The case concerned the possible privatization of water or other infrastructure services. A group of five petitioners requested *amicus curiae* status. The petitioners contended that the case raised issues of concern not only to the population of Tanzania, but was of potential interest for the entire international community. For the petitioners, the participation of Tanzanian civil society groups in the arbitration was justified by the combination of natural resources and human rights issues involved in the case. The petitioners further argued that under the new ICSID Arbitration Rule 37(2) the Tribunal could accept *amicus curiae* submissions without the approval of the disputing parties.[150]

**128**    The Tribunal noted that the ICSID Arbitration Rules do not provide for "*amicus curiae* status" in the sense of a standing equal to that of a party, but rather regulate two specific types of *amicus* participation, to be assessed by each tribunal on a case-by-case basis: (a) the filing of written submissions (Rule 37(2)) and (b) the attendance at the hearings (Rule 32(2)). The Tribunal further noted that, while Rule 37(2) allows tribunals to accept a particular written submission from a non-party, it does not contain a blanket authorization for tribunals to accept all submissions. A tribunal's decision under Rule 37(2) to allow an *amicus curiae*

---

17 March 2006, para. 17. The Tribunal in *Suez and AWG* v. *Argentina*, Order in Response to *Amicus Curiae* Petition, 12 February 2007, para. 15, subsequently found that the new formulation of ICSID Arbitration Rule 37(2) is in accord with the three criteria identified by the Tribunal in these cases.

148   *Suez and AWG* v. *Argentina*, Order in Response to Transparency and *Amicus Curiae* Petition, 19 May 2005, paras. 21, 29; *Suez et al.* v. *Argentina*, Order in Response to *Amicus Curiae* Petition, 17 March 2006, paras. 20, 28.

149   *Suez and AWG* v. *Argentina*, Order in Response to Transparency and *Amicus Curiae* Petition, 19 May 2005, para. 13; *Suez et al.* v. *Argentina*, Order in Response to *Amicus Curiae* Petition, 17 March 2006, para. 13.

150   *Biwater Gauff* v. *Tanzania*, Procedural Order No. 5, 2 February 2007, paras. 12, 14, 17.

submission does not make the *amicus* a party in the arbitration.[151] The Tribunal concluded that a written submission by the petitioners may potentially assist the Tribunal in bringing a perspective, knowledge and insight different from that of the parties. Therefore, it granted the petitioners' request to file a written submission in the proceedings.[152] At the same time, the *Biwater Gauff* Tribunal took steps to ensure, in accordance with the last part of Rule 37(2), that the *amicus* submission would not cause disruption to the proceedings or result in an undue burden or prejudice for either party.[153]

---

151   At para. 46.                          152   At para. 50.
153   At paras. 56–60. See also *Biwater Gauff* v. *Tanzania*, Award, 24 July 2008, paras. 356–392.

# Article 45

**(1) Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions.**

**(2) If a party fails to appear or to present his case at any stage of the proceedings the other party may request the Tribunal to deal with the questions submitted to it and to render an award. Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so.**

## OUTLINE

|   |   |   | *Paragraphs* |
|---|---|---|---|
| I. | INTRODUCTION | | 1–9 |
| II. | INTERPRETATION | | 10–90 |
| | A. | **"(1) Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions."** | 10–20 |
| | | 1. General | 10–12 |
| | | 2. Jurisdiction | 13–16 |
| | | 3. Merits | 17–20 |
| | B. | **"(2) If a party fails to appear or to present his case . . ."** | 21–44 |
| | | 1. The Defaulting Party | 21–23 |
| | | 2. What Constitutes Default? | 24–38 |
| | | 3. Obligation to Appear and to Present a Case | 39–44 |
| | C. | **". . . at any stage of the proceedings . . ."** | 45–54 |
| | D. | **". . . the other party may request the Tribunal . . ."** | 55–64 |
| | | 1. Initiative | 55–60 |
| | | 2. Discretion | 61–64 |
| | E. | **". . . to deal with the questions submitted to it and to render an award."** | 65–75 |
| | | 1. The Questions before the Tribunal | 65–70 |
| | | 2. Sanctions for Noncooperation | 71–75 |
| | F. | **"Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so."** | 76–90 |
| | | 1. Purpose | 76–77 |
| | | 2. Procedure | 78–84 |
| | | 3. Timing | 85–90 |

## BIBLIOGRAPHY

*Alexandrov, S. A.*, Non-Appearance before the International Court of Justice, 33 Columbia Journal of Transnational Law 41 (1995);

*Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Applicable Law and Default Procedure, *in*: International Arbitration Liber Amicorum for Martin Domke (*Sanders, P.* ed.) 12 (1967);

*Masood, A.*, Default Procedure in Arbitration under the World Bank Convention, 22 The Law Review (Punjab University, Chandigarh, India) 1 (1970).

## I. INTRODUCTION

Most modern instruments governing international adjudication contain provisions dealing with the phenomenon of non-cooperating parties. Comparable clauses may be found in the Statute of the International Court of Justice (Art. 53), in the 1958 International Law Commission's Model Rules on Arbitral Procedure (Art. 25),[1] in the 1998 International Chamber of Commerce Rules of Arbitration (Art. 21(2)),[2] in the 1976 UNCITRAL Arbitration Rules (Art. 28),[3] in the 1985 UNICITRAL Model Law on International Commercial Arbitration (Art. 25)[4] and in the Institute of International Law's 1989 Articles on Arbitration between States, State Enterprises or State Entities and Foreign Enterprises (Art. 3(c)).[5]   **1**

Art. 45 covers three points. The first is the principle of non-frustration. In other words, arbitral proceedings will not be thwarted by one side's lack of cooperation. The first sentence of Art. 45(2) expresses this principle. The second point is a rule of evidence. The appearing party's assertions will not be accepted just because the other party does not cooperate and hence does not contest them. This principle is expressed in Art. 45(1). The third point is a procedural rule designed to protect the interests of the non-cooperating party. It is expressed in the second sentence of Art. 45(2).   **2**

The wording of what eventually became Art. 45 underwent considerable changes. The original text of the Preliminary Draft was closely modelled on Art. 53 of the International Court of Justice's Statute (History, Vol. I, p. 202). The subsequent discussions and resulting changes (see paras. 22, 55, 71, 77 *infra*) were not so much directed at questioning the basic principles contained therein but at clarifying them. In particular, the evidentiary rule of Art. 45(1) gave rise to some debate (see para. 10 *infra*).   **3**

---

1   YBILC 85 (1958-II).                    2   36 ILM 1613 (1997).
3   15 ILM 712 (1976).                     4   24 ILM 1308 (1985).
5   63 Annuaire de l'Institut de Droit International 328 (1990). Generally on default in international adjudication see *Fitzmaurice, G.*, The Problem of the "Non-Appearing" Defendant Government, 51 BYIL 89 (1980); *Highet, K.*, Nonappearance and Disappearance Before the ICJ, 81 AJIL 237 (1987); *Alexandrov, S. A.*, Non-Appearance before the International Court of Justice, 33 Columbia J. Transnat'l Law 41 (1995); *Masood, A.*, Default Procedure in Arbitration under the World Bank Convention, 22 The Law Review 1, 6–8 (1970); *Thirlway, H. W. A.*, Non-appearance before the International Court of Justice (1985).

**4**      The wording of Art. 45 contains a linguistic anomaly. Art. 45(1) refers to a party failing to present "his case". The male form is used again in the first sentence of Art. 45(2). But the second sentence of Art. 45(2) refers to a party failing to present "its case". The context of the ICSID Convention rarely justifies the male or the female forms. One party to proceedings, by necessity, is a state or a state entity calling for "it" as a personal pronoun. In the vast majority of cases, the investor is a corporation leading to the same linguistic consequence (see Art. 25, para. 640). Individuals, including women, have been parties to some ICSID cases.

**5**      Non-frustration is one of the Convention's guiding principles. During the Convention's drafting, it was rarely challenged (but see History, Vol. II, p. 334) and strongly defended especially by Mr. *Broches* (at pp. 78, 332–336, 573, 986). This principle is a necessary procedural corollary to the last sentence of Art. 25(1), whereby consent once given may not be withdrawn unilaterally.[6] A party may not foil this obligation through a refusal to cooperate (see Art. 25, para. 605). Art. 45 is the clearest, but not the only, expression of this principle. The provisions on the establishment of the tribunal in the face of an uncooperative party in Arts. 37(2)(b) and 38 are another example. In addition, Art. 41 puts the determination of the tribunal's competence and the Centre's jurisdiction into the hands of the tribunal. Failure to agree on a choice of law will lead to the application of the residual rule on applicable law in Art. 42(1). Non-cooperation will not affect the award's binding force under Art. 53 or its enforcement in accordance with Art. 54.

**6**      Art. 45 applies not only to proceedings before the original tribunal but also to proceedings before an *ad hoc* committee which has to decide on a request for annulment of the original award. Art. 52(4) specifically extends the application of Art. 45 to proceedings on annulment. Art. 45 also applies to proceedings before a new tribunal charged with deciding the dispute in accordance with Art. 52(6) after the original award has been annulled.

**7**      In conciliation proceedings, the parallel provision is Art. 34(2). Unlike Art. 45, Art. 34(2) does not provide for proceedings in the defaulting party's absence. Rather, the conciliation commission is directed to close the proceedings and to draw up a report noting the defaulting party's failure to appear or participate.

**8**      A tribunal's failure to abide by the rules of Art. 45 may expose the resulting award to annulment in accordance with Art. 52. Non-compliance with the evidentiary rule of Art. 45(1) may lead to the charge that the tribunal has manifestly exceeded its powers (Art. 52(1)(b)) or that the award has failed to state the reasons on which it is based (Art. 52(1)(e)). Non-observance of the procedure provided in the second sentence of Art. 45(2) may constitute a serious departure from a fundamental rule of procedure (Art. 52(1)(d)) (see also History, Vol. II, pp. 807, 809).

---

6    See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Applicable Law and Default Procedure, *in*: International Arbitration Liber Amicorum for Martin Domke (*Sanders, P*. ed.) 12 (1967) and History, Vol. II, p. 158.

Default has occurred in several proceedings before ICSID tribunals. But it **9** should be noted that in almost all these cases the noncooperation of the State party concerned was not so much prompted by an unwillingness to cooperate but by domestic disturbances such as civil strife or a collapse of the State's administration (see paras. 29, 64 *infra*).

## II. INTERPRETATION

### A.  "(1) Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions."

#### *1. General*

Starting with the Preliminary Draft, all versions of what eventually became **10** Art. 45 provided that the tribunal could not simply rely on the cooperating party's assertions but had to be satisfied that it had jurisdiction and that the merits of the claim were well-founded in fact and in law (History, Vol. I, pp. 202–204; Vol. II, p. 158). The idea that non-appearance should lead to a presumption of confession was floated at one point but quickly put to rest (History, Vol. II, pp. 332/3). But the Preliminary Draft and the First Draft contained reference to an award in favour of the cooperating party. Moreover, the Preliminary Draft required only that the claim "appears" to be well-founded (History, Vol. I, p. 202; Vol. II, pp. 269/70). In the debates that followed, it was emphasized that there was no question of an automatic decision in favour of the appearing party and that it would not suffice to make out a *prima facie* case but that the cooperating party's assertions would have to be fully proven (History, Vol. II, pp. 332–334, 336, 421, 572, 807–810, 827). The formula eventually adopted as Art. 45(1) was designed to remove any doubt about the need of the appearing party to prove its case and to make it clear that the tribunal could hold in favour of the non-appearing party (at pp. 882, 883, 986).[7]

The Arbitration Rules offer further detail: **11**

**Rule 42**
*Default*

(1) [see para. 47 *infra*]

(2) [see para. 78 *infra*]

(3) . . . Failure of the defaulting party to appear or to present its case shall not be deemed an admission of the assertions made by the other party.

(4) The Tribunal shall examine the jurisdiction of the Centre and its own competence in the dispute and, if it is satisfied, decide whether the submissions made are well-founded in fact and in law. To this end, it may, at any stage of the proceeding, call on the party appearing to file observations, produce evidence or submit oral explanations.[8]

---

7  See also *Broches*, Applicable Law and Default Procedure, pp. 17–19; *Masood*, Default Procedure, pp. 2–6, 9.

8  See also Article 48(3) of the Arbitration (Additional Facility) Rules.

**12**    As a consequence of default, the procedure is no longer adversarial. The initiative is shifted to the tribunal, which must examine the cooperating party's submissions on its own motion.[9] This puts an extra burden on the tribunal but also on the cooperating party. The latter may be called upon to prove assertions which might otherwise be accepted as uncontested. The defaulting party loses its chance to present its case but the normal presumption that it accepts the other party's assertions unless it contests them will not operate against it. Moreover, the tribunal's duty to investigate the veracity and persuasiveness of the cooperating party's assertions may induce it to look at irregularly received communications from the defaulting party.[10] This phenomenon further shifts the procedural balance against the cooperating party.

### 2. Jurisdiction

**13**    In default proceedings, the tribunal, when dealing with the Centre's jurisdiction and its own competence, must examine all the requirements as contained in Art. 25 and verify that all of them are met. In contested proceedings the tribunal "may on its own initiative consider" questions of jurisdiction and competence (Arbitration Rule 41(2); see Art. 41, para. 43). But tribunals rarely do so. Normally, they will restrict themselves to dealing with jurisdictional objections raised by the parties (see Art. 41, paras. 45–51). In default proceedings, the tribunal "shall examine" jurisdiction and competence (Arbitration Rule 42(4); see Art. 41, para. 52). This means that non-appearance cannot have the effect of *forum prorogatum* (see Art. 25, paras. 481–498). Failure to appear or to respond cannot be interpreted as an admission of jurisdiction (see Art. 25, para. 484).

**14**    ICSID tribunals have carefully examined questions of jurisdiction and competence in default proceedings. In the three cases instituted by bauxite producers against Jamaica, the Government refused to appoint an arbitrator and failed to participate in the proceedings (see Art. 25, paras. 607, 608). The Tribunals directed both parties to submit full argument on all issues of jurisdiction and competence that might arise. The Claimant complied but Jamaica did not respond. Thereupon, the Tribunals announced that they would examine their own jurisdiction *proprio motu* and in doing so would consider any objections which might be raised against their jurisdiction. They proceeded to a detailed examination of the jurisdictional requirements under the Convention and concluded that the dispute was within the Centre's jurisdiction and the Tribunals' competence (see Art. 41, para. 53).[11]

---

9   See Note E to Arbitration Rule 42 of 1968, 1 ICSID Reports 104.

10   For the ICJ's practice on this point see *Alexandrov*, Non-Appearance, pp. 55–58.

11   *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 6–25. The other two decisions are unpublished. See also *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 98 *et seq.* (1976); *Tupman, W. M.*, Case Studies in the Jurisdiction of the International Centre for Settlement of Investment Disputes, 35 International and Comparative Law Quarterly 813, 820 *et seq.* (1986).

The Tribunal in *LETCO* v. *Liberia* acted in a similar way. The Respondent **15** failed to respond to any of the Tribunal's notifications and did not appear at the hearings. In its Decision on Jurisdiction,[12] the Tribunal noted that, in view of Liberia's failure to cooperate, the Tribunal had to examine its jurisdiction on its own initiative and to that end had required LETCO to submit evidence[13] (see Art. 41, para. 54). The Tribunal's detailed and systematic examination of the jurisdictional requirements under the Convention led to the conclusion that it had jurisdiction within the meaning of Art. 25.

In *Goetz* v. *Burundi*, the Respondent expressly reserved the right to raise objec- **16** tions to the jurisdiction of the Tribunal or to the admissibility of the Request for Arbitration when it expressed its views on the method of constitution of the Tribunal and, later, when it nominated its arbitrator.[14] However, Burundi otherwise failed to participate in the proceedings and at no stage in the arbitration made any jurisdictional objection. In the presence of Burundi's default, the Tribunal examined the question of its jurisdiction, finding that it did have jurisdiction both *ratione materiae* and *ratione personae* and that the claim was admissible.[15]

### 3. Merits

In proceedings on the merits, the situation is similar. The tribunal must verify, **17** on its own motion, that the claim is well-founded in fact and in law. To that end, it may call upon the cooperating party to supply additional evidence that might be dispensable in contested proceedings.

In *LETCO* v. *Liberia*, the Tribunal said after noting Liberia's total failure to **18** respond to any of its communications:

> Nevertheless, the failure of the Government of Liberia to take part in the present arbitral proceedings does *not* entitle the claimant to an award in its favour as a matter of right. The onus is still upon the claimant to establish the claim which it has put forward in its Request for Arbitration and other documents.[16]

The Tribunal added that in this way the onus of testing the assertions made by the appearing party shifts onto the tribunal itself. The Tribunal also emphasized that it did not simply accept the assertions of law and fact made by the Claimant but submitted them to careful examination[17] (see Art. 43, para. 24).

In fact, the Tribunal appears to have taken particular care to test the Claimant's **19** assertions. It appointed a firm of accountants to investigate and report on the amount of damages claimed by LETCO and heard testimony from various witnesses as to the validity of that report.[18] The Tribunal also pointed out that, in view of Liberia's absence, prudence had led it to examine any possible non-compliance

---

12   *LETCO* v. *Liberia*, Decision on Jurisdiction, 24 October 1984. The Decision on Jurisdiction is reproduced as part of the Final Award, 2 ICSID Reports 349–354.
13   2 ICSID Reports 353.
14   *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 21, 24, 50.
15   At paras. 77–93.
16   *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 356. Emphasis original.
17   At pp. 356/7.                                   18   At pp. 348/9.

with the concession agreement by LETCO since a determination of non-compliance by the Claimant could affect the decision concerning an award of damages. This despite the fact that normally LETCO should not be obligated to demonstrate its own compliance.[19] To this end, the Tribunal heard witnesses concerning the issue of whether LETCO had complied with its contractual obligations.[20]

20    In *Goetz* v. *Burundi*, the Tribunal recalled that, in case of default of a party, a tribunal has the obligation to ensure that its conclusions are well-founded in fact and in law. It must seek further evidence from the appearing party, if need be, in order to complete the information at its disposal. At the same time, the Tribunal recognized that – although it did have the duty to examine the conclusions of the appearing party – it was not in a position to verify all the points alleged in the absence of contradiction.[21]

### B. "(2) If a party fails to appear or to present his case . . ."

#### 1. The Defaulting Party

21    In default proceedings, the cooperating party will normally be the claimant whereas the defaulting party will be the respondent. But this is not necessarily so. The claimant may institute proceedings and abandon them subsequently. A counterclaim may reverse the original situation to an extent that the original claimant decides to withdraw. The case may be brought to the Centre through a joint submission, in which case the roles of claimant and respondent are not clear.

22    The Preliminary Draft made reference to a decision in favour of the claim in case of default thereby implying that the defaulting party would always be the respondent (History, Vol. I, p. 202). This led to some discussion and a change of language designed to take account of a possible default by the claimant (History, Vol. II, pp. 333, 334, 421, 572, 808, 809, 882/3). Art. 45, in its final version, is neutral on the defaulting party's role in the proceeding. It speaks of a party failing to present his case and of the question, rather than the claim, submitted to the tribunal.

23    In *Scimitar* v. *Bangladesh*, the Claimant, in effect, went into default by failing to pursue its claims and by declining to resist the Respondent's objections to jurisdiction. This despite the fact that the Claimant maintained its physical presence before the Tribunal at the hearings. The Award declined jurisdiction over the dispute.[22]

#### 2. What Constitutes Default?

24    Art. 45 speaks of a failure to appear or to present a case. Physical appearance without presentation of a case is unlikely in international arbitration (but see para. 23 *supra*). Presentation of a case without physical appearance is possible but would

---

19  At pp. 364, 365/6.                    20  At p. 348.
21  *Goetz* v. *Burundi*, Award, 10 February 1999, para. 56.
22  *Scimitar* v. *Bangladesh*, Award, 4 May 1994, paras. 21–25.

affect the value of hearings. Cooperation, though not entirely absent, can be so poor that it may amount to default. This is particularly so if a party repeatedly fails to submit memorials in a timely fashion or does not show up at hearings. The second sentence of Art. 45(2) as well as Arbitration Rule 42(2) and (3) try to address deficiencies in a party's cooperation (see paras. 76–90 *infra*). Default may also be seen to arise from a failure to make the advance payments in accordance with Administrative and Financial Regulation 14(3).

In *Kaiser Bauxite* v. *Jamaica* and in *LETCO* v. *Liberia*, there was a complete **25** failure of cooperation on the part of the Respondents. The Governments did not respond to any of the Tribunals' communications nor were they represented at any of the Tribunals' sessions.[23] There is no doubt that this amounted to default in the sense of Art. 45 and of Arbitration Rule 42.

In *Benvenuti & Bonfant* v. *Congo*, the situation was more complicated. The **26** Government cooperated in principle but repeatedly missed time limits for procedural actions by wide margins. This dilatory attitude already manifested itself at the Tribunal's first session on 15 June 1978 devoted to a preliminary consultation (see Art. 44, paras. 28, 29), which the Government did not attend.[24] At that meeting, the deadline for the Government's Counter-Memorial was set for 31 October 1978. A document from the Government, described as its Counter-Memorial, arrived on 20 October 1978 but was restricted to a denial of competence.[25] The Tribunal suspended the proceedings as to the merits pending a decision on jurisdiction in accordance with Arbitration Rule 41(3) and requested further comments from the Government by 29 December 1978 on matters of jurisdiction and on the merits. A request of 20 December 1978 by the Government to have this time limit extended was rejected and a document was received from the Government on 4 January 1979 which essentially restated the arguments contained in the document of 20 October 1978. In addition, the Government had failed to make the advance payments which had been requested of it towards the cost of the proceedings. Thereupon, the Claimant suggested that the Government should be declared to be in default.

In its decision of 19 January 1979, the Tribunal decided not to take the document **27** received on 4 January 1979 into account since the Arbitration Rules provide that steps taken after the expiry of time limits are to be disregarded unless there are special circumstances.[26] No special circumstances were found to exist.[27] After making an affirmative decision on its own competence, the Tribunal said:

> 1.17. With respect to B&B's request to the Tribunal to declare the Government to be in default, the Tribunal considered that the fact that the Government did not

---

23  See *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 6–10; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 347/8, 348/9, 354–357.

24  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.4.

25  At para. 1.7.

26  Arbitration Rule 25(3) of 1968, 1 ICSID Reports 88. The current Arbitration Rule 26(3) is identical.

27  At para. 1.12.

attend the preliminary consultative meeting of 15 June 1978 did not constitute a default within the meaning of Article 45 of the Convention or of Article 42 of the Rules and that it was entitled to deposit a denial of competence within the time limit fixed for the lodging of the Counter-Memorial (Article 41 of the Rules). No doubt the Government was invited by the Tribunal, for reasons of convenience, to lodge, at the same time as its supplementary observations on the question of competence, a counter-memorial on the merits of the case. It was not, however, obliged to do so, the proceedings as to the merits having been suspended by virtue of Article 41(3) of the Rules after the denial of competence had been lodged. As to the Government's alleged failure to reply to the observations of B&B, it does not seem to the Tribunal to be of a nature to be held against it, since the Tribunal considered that it was already in possession of all the facts necessary to render a fully informed decision on the denial of competence.[28]

The Tribunal accordingly dismissed the Claimant's argument that the Government should be declared in default.

**28**    The Tribunal then fixed new time limits, including one for the Government's Counter-Memorial at 8 March 1979. Subsequent developments are best described by reproducing the Tribunal's own summary:

> 1.19. The Government did not deposit its Counter-Memorial within the pre-scribed time limit and B&B addressed to the Tribunal on 9 March 1979 a letter in which it requested that the phase of written proceedings be declared closed and that the oral proceedings be commenced forthwith. The Tribunal treated this letter as a claim by B&B falling within the framework of Article 45 of the Convention and Article 42 of the Rules. In accordance with these Articles the Tribunal granted a period of grace to the Government in which to lodge its Counter-Memorial, by 30 April at the latest. This decision was conveyed to the Parties by telegram on 11 April 1979. The Government did not lodge its Counter-Memorial within the period of grace.
>
> 1.20. On 3 May 1979, the Government requested an extension of the time limit, taking into account the change which had taken place at the Department of Industry and Tourism. On the 8 May 1979, the Government was informed by the Centre that the Tribunal had decided not to extend the time limit since:
> (a)  the request for an extension of the time limit was made after its expiry;
> (b)  it was the third time limit fixed for the lodging of the Counter-Memorial; and
> (c)  the written proceedings were to be followed by a phase of oral proceedings in the course of which the Government would have every opportunity to present the grounds of its defence.[29]

**29**    There followed a period of oral hearings, at which both sides were represented, and of direct negotiations between the parties trying to reach a settlement. After the breakdown of these negotiations, the Government on 1 October 1979 requested a fresh hearing. Subsequent developments are described by the Tribunal in the following terms:

> 1.27. On 23 October 1979 the Government announced that it would immedi-ately lodge a Counter-Memorial. The President reminded the Government that

---

28   At para. 1.17.                                 29   At paras. 1.19–1.20.

after several extensions of the time limits fixed for the lodging of the Counter-Memorial, the Tribunal had granted a final period of grace by virtue of Article 45 of the Convention, that this delay had expired on 30 April 1979 and that for this reason it could no longer accept a Counter-Memorial (telexes dated 10 and 25 October 1979).

1.28. Furthermore, on 25 October 1979, the President of the Tribunal asked the Government for details of the new facts which according to it, would justify a new hearing and required that before any hearing be convened the Government pay its share of the costs of the proceedings, all before 31 October 1979.

1.29. The Government mentioned in telexes dated 29 and 30 October 1979 that it was in possession of certain documents relating to the case which could be remitted to the Tribunal if it was given the opportunity and that, unfortunately, the political changes which had taken place throughout the proceedings had prevented the Government from presenting to the Tribunal all the available documentation relating to the case within the time limits which had been fixed.

1.30. On 6 November 1979, the Tribunal invited the Government to lodge those documents at the latest by 12 November 1979 at 9.00 a.m. and ordered the parties to attend a hearing at 2.30 p.m. on the same day so as to enable the Tribunal to obtain clarification of them. On 9 November 1979, the Government paid to the Centre the sum of FF 126,000 in respect of the costs of the proceedings.[30]

The Government was represented at the session on 12 and 13 November 1979:

1.32. The Government's representatives asked that the Tribunal exercise the discretionary power granted by the Rules to permit the Government to refute B&B's Memorial and to make a counterclaim. For their part, the counsel and representatives of B&B took the view that the documents presented by the Government should not be admitted by the Tribunal since they had been lodged after the expiry of the time limit of 31 October 1979 and that any prolongation of the proceedings resulting from their admission would not be justified.

1.33. The Tribunal nevertheless considered that special circumstances of a domestic political nature had prevented the normal functioning of certain Congolese State agencies, and these were such as to explain the Government's failure to comply with the successive time limits fixed by the Tribunal. The Tribunal also took the view that the documents presented by the Government could be considered as an indication that the Tribunal did not have at its disposal all the necessary facts for it to render its award.[31]

Therefore, the Tribunal fixed yet another time limit for the Government's Counter-Memorial and Counterclaim at 21 December 1979. These documents were submitted within the prescribed time limits. The Tribunal still met in February 1980 without the parties and on 7 August 1980 declared the proceedings to be closed. It rendered its Award on 15 August 1980.

This somewhat lengthy description of procedural developments in *Benvenuti & Bonfant* v. *Congo* serves to demonstrate several points. Non-compliance with a time limit does not automatically lead to default but carries its own sanctions. Repeated failure to meet time limits may lead the tribunal to declare a party to be in default, triggering the period of grace under the second sentence of Art. 45(2).

**30**

---

30  At paras. 1.27–1.30.                    31  At paras. 1.32–1.33.

But the defaulting party's failure to act within the period of grace need not be the end of the matter. The desire to obtain all relevant factual information as well as "special circumstances" may prompt a tribunal to grant new time limits far beyond the expiry of the period of grace (see also paras. 61–64, 87 *infra*).

**31**    *Goetz* v. *Burundi* also provides an example of a party's repeated failure to meet time limits leading to the application of Art. 45(2), despite the defaulting party's expressed willingness to engage in the proceedings. The Respondent participated in the constitution of the Tribunal.[32] On two separate occasions, the second one day prior to the date fixed for the first procedural session, Burundi requested the suspension of proceedings pending the result of amicable negotiations. The Claimants refused. Burundi was not subsequently represented at the first procedural session, at which the Claimants opposed Burundi's request for a suspension.[33]

**32**    The Tribunal contacted Burundi by letter the day after the hearing and expressed regret that Burundi had not been represented. The Claimants suggested a pre-hearing conference under Arbitration Rule 21(2), with a view to reaching an amicable settlement. Burundi acknowledged the Tribunal's letter, but did not indicate any willingness to take part in the proposed conference, which did not take place.[34]

**33**    The Claimants submitted their Memorial. On the day prior to the expiry of the deadline for the Counter-Memorial, the Republic of Burundi requested a 40-day extension, again arguing that an amicable settlement was being pursued. The Tribunal granted this extension in spite of the Claimants' opposition. The Claimants subsequently requested that, should the new deadline fixed by the Tribunal not be met by Burundi, the proceedings should nevertheless continue under Art. 45 of the Convention and Arbitration Rule 42.[35]

**34**    Burundi did not meet the deadline and, in application of Art. 45 of the Convention and Arbitration Rule 42, the Tribunal extended a period of grace to Burundi, for the submission of its Counter-Memorial. However, Burundi requested an extra 45-day extension for the filing, arguing that concrete proposals for amicable settlement were then being discussed with the Claimants. The Tribunal responded that, under Arbitration Rule 42, the period of grace was restricted to a maximum of 60 days without the consent of the other party, which was lacking in this case. The Tribunal therefore decided in accordance with Arbitration Rule 42(3) to continue to examine the dispute and fixed a date for the hearings. The Tribunal however stressed that, not only were arbitration proceedings no bar to the parties reaching settlement, but also the parties could at any time jointly request a suspension of proceedings.[36]

**35**    Burundi requested a further moratorium of one month in order to pursue a settlement. However, the Tribunal denied this request and the proceedings continued

32  *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 21 and 24.
33  At para. 34.                    34  At paras. 35, 36.
35  At paras. 39, 40.               36  At paras. 41–44.

in the absence of Burundi. The Tribunal's award commented on Burundi's conduct as follows:

> At no moment in the course of proceedings did the Republic of Burundi declare, or even give to understand, that it had decided, or that it might decide, not to participate in the hearings or to put forward its side of the case. Quite the contrary, as indicated previously, the Republic of Burundi on numerous occasions requested ICSID and the Tribunal to push back the dates fixed for the various stages of the proceedings and to allow it extra time extensions; . . . Conscious of the difficulties that Burundi has found itself in over a number of years and wishing to facilitate an amicable settlement, the arbitral Tribunal allowed it numerous time extensions, sometimes with the consent of the claimants, sometimes despite their objections. At every stage of the proceedings the secretary of the arbitral Tribunal has entered into contact with the government of the Republic of Burundi by telephone in order to inform it of the wish of the Tribunal that it participate in the hearings, to assure it of the Tribunal's understanding and to stress that it was in Burundi's own interest not to leave the proceedings to go by default.[37]

**36**  Despite Burundi's stated intention to participate in the proceedings, the Tribunal concluded that Burundi had nevertheless failed to present its side of the case and proceeded with the hearing in Burundi's absence in accordance with Arbitration Rule 42.[38]

**37**  In *AMT* v. *Zaire*, the Respondent failed to participate in the Tribunal's constitution. The arbitrators were appointed in accordance with Art. 38 and Arbitration Rule 4.[39] Zaire was not represented at the Tribunal's first meeting with the parties at which time limits were fixed for the written pleadings.[40] Zaire requested an extension of the time limit for the filing of its Counter-Memorial which was granted by the Tribunal.[41] Zaire duly filed its Counter-Memorial and its Rejoinder in which it dealt with questions of jurisdiction and the merits of the case.[42]

**38**  Zaire subsequently also nominated representatives for the oral procedure.[43] A request by Zaire, dated 30 November 1994, to postpone the hearing scheduled for 5 and 6 December 1994 was declined by the Tribunal. At the hearing, the Respondent remained without representation except in the person of a Counsellor of the Embassy who was without nomination, authorization or accreditation. The Tribunal held the hearing with the Applicant's representatives. It granted the Respondent a period of grace and scheduled a supplemental hearing (see para. 89 *infra*).[44] After the Respondent's failure to avail itself of the supplemental hearing, the Tribunal proceeded to deal with the questions submitted to it and rendered an Award.[45]

---

37  At paras. 50–51.                          38  At para. 46.
39  *AMT* v. *Zaire*, Award, 21 February 1997, paras. 2.01–2.04.
40  At para. 3.01.                             41  At para. 4.02.
42  At paras. 3.08–3.19.                       43  At para. 3.21.
44  At para. 3.25.                             45  At paras. 3.26 *et seq.*

### 3. Obligation to Appear and to Present a Case

**39**    Art. 45 does not state in terms that the parties are under a duty to cooperate and that non-appearance is illegal.[46] Neither does Arbitration Rule 42, dealing with default, condemn non-cooperation. The Convention is generally drafted in permissive terms as far as the procedural moves by the parties are concerned.

**40**    One episode in the drafting of Art. 45 carries the implication that the parties' cooperation in ICSID arbitration is obligatory. At one point it was proposed to add the words "where it was under an obligation to do so" after the words describing failure to appear and to present a case. This proposal was opposed by Mr. *Broches*, since it seemed to imply that the constitution of the Tribunal did not in itself impose an obligation of appearance. Thereupon, the proposal was defeated in a vote by a wide margin (History, Vol. II, p. 810).

**41**    The Arbitration Rules contain certain duties of the parties to participate in the proceedings. The most important one is Rule 34(3), which provides that the parties shall cooperate with the tribunal in the production of evidence. The tribunal must take formal note of a party's failure to comply with this obligation (see Art. 43, paras. 63–66). The tribunal is authorized to conduct the proceedings by way of procedural orders under Rule 19 (see Art. 43, paras. 55–58; Art. 44, paras. 55–56), which must be presumed to be binding.

**42**    The general circumstances of ICSID arbitration support the view that non-cooperation with the tribunal is a breach of an obligation. Participation in the Convention, together with consent to arbitration, establishes not only jurisdiction but also an obligation to participate actively in the resulting procedure. Nonparticipation causes an additional burden for the other party and for the tribunal. The tribunal's task to satisfy itself of the jurisdiction of the Centre and of its own competence, as well as to examine the facts and law on the merits, is far more onerous in default proceedings than in contested proceedings (see paras. 12–20 *supra*).

**43**    In addition, non-cooperation typically goes hand in hand with clear violations of obligations under the Convention and its Rules and Regulations. Non-appearance is usually coupled with failure to make the advance payments required by Administrative and Financial Regulation 14(3). Non-cooperation often goes hand in hand with a denial of jurisdiction in contradiction to Art. 41 which gives the tribunal the sole power to decide on its competence. Non-appearance may be aimed at exerting pressure on a tribunal to adopt a course more amenable to the defaulting party's wishes on matters of jurisdiction and substance. In addition, non-cooperation may be a precursor to non-compliance with the resulting award in violation of Arts. 53 and 54. Refusal to participate in ICSID arbitration is all the more unjustifiable in view of the Convention's annulment procedure, which opens the chance to correct serious mistakes that the tribunal may have made.

**44**    The view that default represents a violation of a legal duty was shared by the Tribunal in *LETCO* v. *Liberia*. After describing Liberia's default, it expressed regret

---

46  For a debate of the related question in connection with Art. 53 of the Statute of the ICJ, see *Alexandrov*, Non-Appearance, pp. 44–47 and the authorities cited there.

that the Government had chosen to ignore its obligation under the Convention.[47] In awarding costs to LETCO, the Tribunal referred to Liberia's failure to partake in the arbitral proceedings as a manifestation of procedural bad faith[48] (see also para. 74 *infra*).

### C.   ". . . at any stage of the proceedings . . ."

Default may occur at any stage of ICSID arbitration, but Art. 45(2) applies only to proceedings before the tribunal. Prior to the constitution of the tribunal, the provisions on the registration of a request (Art. 36(3)) and on the constitution of the tribunal (Arts. 37–40) ensure a continuation of the procedure despite a party's failure to cooperate.                                                                          **45**

The operation of Art. 45 includes the jurisdictional phase. The duty to cooperate and the tribunal's power to act extend to the period before jurisdiction and competence are finally established. Art. 41 serves as an independent basis for the tribunal's jurisdiction to decide on jurisdiction and a corresponding duty of the parties to cooperate (see Art. 41, para. 6). Therefore, a party may be in default even if it later turns out that the Centre lacks jurisdiction or that the tribunal has no competence.                                                                          **46**

Art. 45 covers all stages and aspects of procedure before the tribunal. This includes the written and the oral procedure, the marshalling of evidence, provisional measures and ancillary claims. It extends up to the time of the discontinuance of the proceedings. Arbitration Rule 42(1), which otherwise paraphrases the first sentence of Art. 45(2), provides to this effect:                                          **47**

#### Rule 42
#### *Default*

(1) If a party (in this Rule called the "defaulting party") fails to appear or to present its case at any stage of the proceeding, the other party may, at any time prior to the discontinuance of the proceeding, request the Tribunal to deal with the questions submitted to it and to render an award.[49]

If the proceedings are not discontinued (see paras. 56, 57 *infra*), the application of Art. 45 extends to proceedings for the interpretation, revision and annulment of the award. Art. 52(4), dealing with annulment proceedings, specifically provides for the application of Art. 45 in proceedings before an *ad hoc* committee. Arts. 50 and 51, dealing with interpretation and revision, do not contain corresponding clauses. But Arbitration Rule 53 says that the Arbitration Rules shall apply, *mutatis mutandis*, to any procedure relating to the interpretation, revision or annulment of an award. This would make Arbitration Rule 42, dealing with default, also applicable to these proceedings.                                                                     **48**

Default has occurred at various stages of proceedings. Only in the cases against Jamaica was there a total absence of cooperation. Jamaica neither appointed an          **49**

---

47   *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 356.
48   At p. 378.
49   See also Article 48(1) of the Arbitration (Additional Facility) Rules.

arbitrator nor participated in the proceedings in any manner. The non-cooperation included a failure to even bring forward any objections to jurisdiction (see also Art. 25, paras. 607–608).[50]

**50**     In *AGIP* v. *Congo*, there was no default in the technical sense of the word. The Government failed to nominate an arbitrator but subsequently participated in the proceedings.[51]

**51**     In *Benvenuti & Bonfant* v. *Congo*, both parties participated in the Tribunal's constitution.[52] Before the Tribunal, the Government participated, in principle, but fell behind with its procedural actions to an extent that the Tribunal, at one stage, began to apply Art. 45. At a later stage, the Government resumed full and timely cooperation with the Tribunal's permission (see paras. 26–29 *supra*).

**52**     In *LETCO* v. *Liberia*, the Government cooperated in the Tribunal's constitution. The Government was represented at an early stage, but its counsel resigned during the procedure for the Tribunal's constitution.[53] Liberia failed to appoint a new representative and did not participate in the proceedings. The non-cooperation included a failure to bring forward any objection to jurisdiction.[54]

**53**     In *AMT* v. *Zaire*, the Respondent failed to participate in the constitution of the Tribunal and was not represented at the Tribunal's first meeting.[55] But it filed a Counter-Memorial and a Rejoinder objecting to the Tribunal's jurisdiction and pleading on the merits of the case.[56] At the hearing Zaire remained unrepresented and it failed to avail itself of the possibility of a supplemental hearing[57] (see paras. 37, 38 *supra*, 89 *infra*).

**54**     In *Goetz* v. *Burundi*, Burundi participated in the constitution of the Tribunal[58] and, whilst asking for extensions of time limits and postponements of hearings, never expressly stated that it did not intend to participate in the proceedings. However, Burundi did not file a counter-memorial and was not represented at the hearings (see paras. 31–36 *supra*).[59]

**D.  "... the other party may request the Tribunal ..."**

### *1. Initiative*

**55**     During the Convention's drafting, it was suggested that, upon default by one party, the tribunal should proceed to adjudicate on the claim and render its award (History, Vol. II, p. 808). This idea was opposed by several members of the Legal Committee, who thought that proceedings should continue only at the request of the other party (at p. 809).

---

50   *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 3–10.
51   *AGIP* v. *Congo*, Award, 30 November 1979, para. 3.
52   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.3.
53   *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 347.
54   At pp. 348, 353–357.
55   *AMT* v. *Zaire*, Award, 21 February 1997, paras. 2.01–3.01.
56   At paras. 3.08–3.13, 3.17–3.19.        57   At paras. 3.23, 3.26.
58   *Goetz* v. *Burundi*, Award, 10 February 1999, para. 24.
59   At paras. 29 *et seq*.

*Article 45 – Default of a Party*                                                         723

A request may emanate from the cooperating party regardless of whether that **56**
party made the original request for the institution of proceedings[60] (see paras. 21,
23 *supra*). If the cooperating party is the claimant it may request the tribunal to
make a finding that it has jurisdiction and to decide in its favour on the merits. If
the cooperating party is the respondent, it may request the tribunal to discontinue
the proceedings in accordance with Arbitration Rule 44 (but see paras. 23 *supra*,
66 *infra*), which states:

> **Rule 44**
> *Discontinuance at Request of a Party*
> If a party requests the discontinuance of the proceeding, the Tribunal, or
> the Secretary-General if the Tribunal has not yet been constituted, shall in
> an order fix a time limit within which the other party may state whether it
> opposes the discontinuance. If no objection is made in writing within the time
> limit, the other party shall be deemed to have acquiesced in the discontinuance
> and the Tribunal, or if appropriate the Secretary-General, shall in an order take
> note of the discontinuance of the proceeding. If objection is made, the proceeding
> shall continue.[61]

The tribunal may not continue the proceedings on its own initiative in case of a **57**
default. If there is no request by the other party to deal with the questions submitted
to the tribunal and to render an award nor a request to discontinue in accordance
with Arbitration Rule 44, the Arbitration Rules provide that the proceedings will
be discontinued for failure of the parties to act:

> **Rule 45**
> *Discontinuance for Failure of Parties to Act*
> If the parties fail to take any steps in the proceeding during six consecutive
> months or such period as they may agree with the approval of the Tribunal, or of
> the Secretary-General if the Tribunal has not yet been constituted, they shall be
> deemed to have discontinued the proceeding and the Tribunal, or if appropriate
> the Secretary-General, shall, after notice to the parties, in an order take note of
> the discontinuance.[62]

Proceedings may also be discontinued as a consequence of financial default. **58**
Under Administrative and Financial Regulation 14(3) the parties must make
advance payments to cover the expenses of proceedings. If there is a default
by a party, either party is given the opportunity to make the required payment. If
payment is not forthcoming for over six months, the Secretary-General may move
that the tribunal discontinue the proceedings.[63]

An explicit request to proceed in accordance with Art. 45(2) directed to the **59**
tribunal would clarify the situation beyond doubt. But continued cooperation by
the non-defaulting party and procedural steps to present its case may be accepted
as an implicit request for the continuation of proceedings.

---

60  See also Note B to Arbitration Rule 42 of 1968, 1 ICSID Reports 103.
61  See also Article 50 of the Arbitration (Additional Facility) Rules.
62  See also Article 51 of the Arbitration (Additional Facility) Rules.
63  Administrative and Financial Regulation 14(3)(d).

**60**    In *Benvenuti & Bonfant* v. *Congo* (see paras. 26–28 *supra*), in *LETCO* v. *Liberia*[64] and in *Goetz* v. *Burundi*[65] the Claimants made specific requests. The record in the bauxite cases against Jamaica[66] and in *AMT* v. *Zaire*[67] is not clear on this point.

### 2. Discretion

**61**    The tribunal has full discretion to act upon the request or to decline it. The Convention describes default in very general terms as a failure to appear or to present a case (see paras. 24–38 *supra*) and it is up to the tribunal to determine whether this has, in fact, occurred. The criteria for this determination are not so much objective standards dealing with past behaviour but reasonable expectations about future behaviour. If the tribunal concludes that there is a realistic chance that a hitherto uncooperative party is about to cooperate, it will give that party the chance to participate in the proceedings. The second sentence of Art. 45(2) clearly shows that the decisive criterion is the Tribunal's view of the non-cooperating party's intentions. It also shows that a defaulting party must be given the chance to make amends (see also Arbitration Rule 42(2), para. 78 *infra*). Therefore, the procedure in default is not a sanction for procedural shortcomings that is imposed automatically once a party has failed to take certain procedural steps. Rather, it is a measure of last resort that is taken once the tribunal has reached the conclusion that there is no realistic chance to secure cooperation.

**62**    The point is well illustrated by the proceedings in *Benvenuti & Bonfant* v. *Congo*. The Tribunal at first resisted the Claimant's request to declare the Government to be in default (see para. 27 *supra*). When the Government persisted in its non-cooperation, the Tribunal acceded to the Claimant's renewed request to apply the default procedure (see para. 28 *supra*). Subsequently, against the Claimant's resistance, the Government persuaded the Tribunal to accept its cooperation and to receive the written submissions it had failed to produce at an earlier stage (see para. 29 *supra*).

**63**    This case also shows that the tribunal's discretion goes beyond its decision to initiate default proceedings. Even after the tribunal has started to proceed under Art. 45, it may revert to the normal adversary procedure if it is of the opinion that the defaulting party intends to cooperate in the future.

**64**    In exercising its discretion, the tribunal may take into consideration special circumstances affecting the defaulting party (see also para. 29 *supra*). In *AMT* v. *Zaire*, the Government repeatedly affirmed that it had never entertained any disdainful attitude towards the Tribunal but that its failures were due to the

---

64  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 355.
65  *Goetz* v. *Burundi*, Award, 10 February 1999, para. 40.
66  *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 3–10.
67  *AMT* v. *Zaire*, Award, 21 February 1997, paras. 3.25–3.27.

"unfortunate and disastrous" consequences triggered by the disturbances in the country. The Tribunal, on its part, noted that it had amply taken into consideration the circumstances referred to by Zaire and that it had, in effect, demonstrated a deep understanding in regard to the Respondent.[68]

### E.  ". . . to deal with the questions submitted to it and to render an award."

### *1. The Questions before the Tribunal*

Under Art. 48(3), the award must deal with every question submitted to the tribunal. Art. 45(2) reiterates this general obligation in the context of default proceedings. The tribunal has discretion on whether it accedes to the cooperating party's request to apply the default procedure (see paras. 61–63 *supra*). But, unless proceedings are discontinued (see paras. 56, 57 *supra*), the tribunal's duty to deal with the questions submitted to it applies in the same way as in contested proceedings. **65**

The questions before the tribunal may have been submitted by the cooperating party or by the defaulting party. If a party cooperates at one stage but goes into default subsequently, the questions raised by its submissions must be dealt with. Even if the claimant abandons its case and goes into default, the respondent may opt not for a discontinuance of the proceedings (see paras. 56, 57 *supra*), but instead for the adjudication of the questions submitted by the claimant. In doing so, the respondent runs the risk of an unfavourable award despite the claimant's default. But if it prevails, as is likely under such circumstances, given that the burden of proof normally falls on the party asserting the claim, it has the advantage of a binding award carrying the effect of *res judicata*. **66**

In actual fact, Art. 45(1) implies that the tribunal must deal with questions even if they are not submitted explicitly to it. In default proceedings, the tribunal must verify all the cooperating party's assertions and must, in effect, examine all the questions that the defaulting party might have raised (see paras. 10–19 *supra*). Therefore, it would be better to say that the tribunal must deal with all the questions before it or with all the questions arising from the submissions made to it. **67**

The questions to be dealt with cover the full range of questions that may also arise in contested proceedings. They may include provisional measures under Art. 47, jurisdiction under Art. 25 (see paras. 13–16 *supra*), any question of fact or law on the merits (see paras. 17–20 *supra*), interpretation and revision of the award (Arts. 50, 51) and nullity in proceedings before an *ad hoc* committee under Art. 52 (see para. 48 *supra*). **68**

The tribunal's decision in default proceedings on the questions before it may go either way. There is no automatic decision in favour of the cooperating party nor a presumption against the defaulting party. The cooperating party's assertions must **69**

---

68  *AMT* v. *Zaire*, Award, 21 February 1997, paras. 4.06–4.07.

726    THE ICSID CONVENTION: A COMMENTARY

be found by the tribunal to be well-founded in fact and in law, and the cooperating party may be required to file observations, produce evidence and submit oral explanations to this end. Therefore, the tribunal may decline its jurisdiction even if it is not contested by the defaulting party or may render an award on the merits in favour of the defaulting party.[69]

70    If default proceedings are not discontinued (see paras. 56, 57 *supra*) they will eventually result in an award. If the tribunal finds that it has jurisdiction, it will dispose of the substantive questions before it in the form of an award on the merits. If it declines jurisdiction, that decision also will be given in the form of an award (see Art. 41, paras. 69–74).

### 2. Sanctions for Noncooperation

71    Art. 45 does not provide for sanctions against the defaulting party other than the continuation of proceedings in its absence. In the course of the Convention's drafting, there was mention of a sanction or penalty for non-appearance (History, Vol. II, p. 334), but the idea was not pursued. The illegal nature of non-cooperation (see paras. 39–44 *supra*) together with the considerable additional burden for the other party as well as for the tribunal (see paras. 12–19 *supra*) would call for a sanction against the defaulting party.

72    This sanction may be imposed on the defaulting party through the tribunal's decision on the costs of the proceedings (see also Art. 43, paras. 24–27). Under Art. 61(2), the tribunal's award must contain a decision on how and by whom the expenses incurred by the parties, the fees and expenses of the members of the tribunal and the charges for the use of the facilities of the Centre shall be paid. Even before the final award, the tribunal may, under Arbitration Rule 28(1), decide the portion of the advance payments that each party shall make or, with respect to any part of the proceeding, that the related costs shall be borne entirely or in a particular share by one of the parties.

73    ICSID tribunals have made use of this possibility to deal with defaulting parties. In *Benvenuti & Bonfant* v. *Congo*, the Tribunal at one point decided that all future costs of the Tribunal and of the Centre would be paid by the Government in view of the latter's failure to comply with successive time limits.[70] In the final decision on costs, the Tribunal, after noting that the parties' arbitration agreement provided for costs to be shared equally, held as follows:

> 4.127. Moreover, considering that the Government did not, before the sessions in Paris of 13 November 1979, take a significant part in the proceedings and that this attitude led to serious delays as well as to additional costs for B&B, the latter asked the Tribunal to take this into account in the preparation of its final award.
>
> 4.128. The Tribunal observes that the Government did not formally object to this request.

---

69    See Note D to Arbitration Rule 42 of 1968, 1 ICSID Reports 104.
70    *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.33.

4.129. The Tribunal therefore considers it equitable that this request be accepted and decides accordingly that the Government must pay B&B in addition to the sums already awarded, the sum of US $15,000 with interest at the rate of 6% per annum from the date of the award until payment.[71]

**74** The decision on costs in *LETCO* v. *Liberia* was more severe. The Tribunal, acting under Art. 61(2), awarded LETCO the full costs for carrying out the arbitration, including those for LETCO's own legal representation. This decision was based largely on Liberia's procedural bad faith as found by the tribunal, and manifested, *inter alia*, by its failure to partake in the arbitration proceedings.[72]

**75** In *AMT* v. *Zaire*,[73] and in *Goetz* v. *Burundi*,[74] the Tribunals did not draw any consequences from the Respondents' default for purposes of awarding costs (see also para. 64 *supra*). They decided that each party should bear an equal share of the expenses in the arbitral proceedings.

## F. "Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so."

### 1. Purpose

**76** The second sentence of Art. 45(2) provides a procedural safeguard for the defaulting party. It is designed to strike a balance between the need for the expeditious continuation of proceedings and a certain flexibility towards the defaulting party by giving it another chance.

**77** The drafting history of what became Art. 45 shows some concern for the procedural rights of parties that fail to act without fault on their part (History, Vol. II, pp. 336, 422, 572). There was also some consideration of the proper notification of parties since failure to do so would amount to a serious departure from a fundamental rule of procedure and might lead to annulment (at pp. 807, 809). But there is nothing in the materials to suggest that the period of grace is owed only to a party that defaults for legitimate reasons.

### 2. Procedure

**78** The Arbitration Rules contain further elaboration on the procedure in case of a default following a request:

**Rule 42**
*Default*

(1) [see para. 47 *supra*]
(2) The Tribunal shall promptly notify the defaulting party of such a request. Unless it is satisfied that that party does not intend to appear or to present its case

---

71   At paras. 4.127–4.129.
72   *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 378.
73   *AMT* v. *Zaire*, Award, 21 February 1997, *in fine*.
74   *Goetz* v. *Burundi*, Award, 10 February 1999, Second Part, para. 7.

in the proceeding, it shall, at the same time, grant a period of grace and to this end:

   (a) if that party had failed to file a pleading or any other instrument within the time limit fixed therefor, fix a new time limit for its filing; or

   (b) if that party had failed to appear or present its case at a hearing, fix a new date for the hearing.

The period of grace shall not, without the consent of the other party, exceed 60 days.

   (3) After the expiration of the period of grace or when, in accordance with paragraph (2), no such period is granted, the Tribunal shall resume the consideration of the dispute. . . . [see para. 11 *supra*][75]

**79**    The granting of a period of grace is obligatory unless the tribunal is satisfied that there is no intention to cooperate. This would be the case if the defaulting party has specifically stated that it will not participate in the proceedings.[76]

**80**    In the bauxite cases against Jamaica (see para. 14 *supra*), the Government had purported to withdraw its consent to ICSID arbitration shortly before the institution of the proceedings (see Art. 25, paras. 607, 608). The Tribunals evidently took this as an announcement that Jamaica would not participate in the proceedings.[77] There is no published indication of a formal granting of a period of grace, but the Government was fully notified at all times, invited to a hearing and ordered to file a Counter-Memorial.[78]

**81**    In *Goetz* v. *Burundi*, the Tribunal granted a formal period of grace for the Respondent's Counter-Memorial. When Burundi did not submit its Counter-Memorial within the period of grace, the proceeding continued without the Respondent's participation[79] (see paras. 34–36 *supra*).

**82**    Arbitration Rule 26 contains the general rule on time limits. The tribunal shall fix time limits for the completion of the various procedural steps. These time limits may be extended at the tribunal's discretion. Procedural steps taken after the expiry of time limits shall be disregarded unless the tribunal, in special circumstances, decides otherwise.

**83**    Arbitration Rule 42, dealing with a period of grace in case of default, differs in several respects. The period of grace in the form of a new time limit is not discretionary but must be granted by the tribunal. Whereas under Rule 26 the tribunal is free in the selection of dates for time limits and their extension, the period of grace may not exceed sixty days in default proceedings without the consent of the other party. This limitation is based on the assumption that the defaulting party had adequate time to prepare its case before the default.[80]

---

75   See also Article 48(2), (3) of the Arbitration (Additional Facility) Rules.

76   See Note C to Arbitration Rule 42 of 1968, 1 ICSID Reports 104.

77   *Broches, A.*, A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 8 (1991).

78   *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, paras. 3–10.

79   *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 41 *et seq*.

80   See Note C to Arbitration Rule 42 of 1968, 1 ICSID Reports 104.

*Article 45 – Default of a Party*    729

In default proceedings, there is no rule to disregard steps taken after the expiry **84** of the period of grace. In fact, the tribunal's obligation under Art. 45(1) to examine the appearing party's assertions carefully would require it to look at any communications from the defaulting party even after the expiry of the period of grace. *LETCO* v. *Liberia* (see para. 88 *infra*) and *Benvenuti & Bonfant* v. *Congo* (see para. 87 *infra*) show that the Tribunals were willing to accept the parties' cooperation and in fact did so even after they had been declared to be in default and after the expiry of the periods of grace.

### 3. Timing

According to the Convention, the notification to the defaulting party of the **85** granting of a period of grace shall take place before the rendering of an award. In most cases, the period of grace will be much earlier. The timing is determined by the stage at which the party ceases to cooperate (see paras. 45–54 *supra*) and by the other party's request (see paras. 55–60 *supra*). After receiving the request, the tribunal must notify the defaulting party promptly and grant the period of grace at the same time (Arbitration Rule 42(2); see para. 78 *supra*).

If the default occurs in proceedings for interpretation, revision or annulment **86** (see para. 48 *supra*), the procedural steps of notification and granting of a period of grace will take place after the rendering of the award. They must be taken before the tribunal or *ad hoc* committee makes the respective decision.

In *Benvenuti & Bonfant* v. *Congo*, the Tribunal first resisted the Claimant's **87** request to declare the Government to be in default (see para. 27 *supra*). Upon a new request by the Claimant of 9 March 1979, the Tribunal on 11 April 1979, acting under Art. 45 and Arbitration Rule 42, granted a period of grace until 30 April 1979 (see para. 28 *supra*). This period was much shorter than the maximum period of sixty days allowed by Arbitration Rule 42(2) (see para. 78 *supra*). A request for the extension of this time limit, made on 3 May 1979, was denied on 8 May 1979. An announcement by the Government of 23 October 1979 that it would now lodge its long overdue Counter-Memorial was rejected by the Tribunal by reference to the expiration of the period of grace on 30 April 1979. After the Government had indicated that it was in possession of new information and after it had attended a hearing on 12 and 13 November 1979, the Tribunal set a new time limit for 21 December 1979. This decision was based on the general rule for time limits[81] and on the existence of special circumstances of a domestic political nature (see para. 29 *supra*).

In *LETCO* v. *Liberia*, the Government's failure to cooperate extended to all **88** stages of the proceedings before the Tribunal (see para. 52 *supra*). At its preliminary hearing on 21 May 1984, the Tribunal, noting Liberia's absence, granted a period of grace of thirty days to expire on 22 June 1984. Despite the expiry, the

---

81    Arbitration Rule 25 of 1968 corresponding to current Arbitration Rule 26.

Tribunal continued to send Liberia notifications concerning all procedural steps and invited it to participate in the proceedings.[82]

**89**    In *AMT* v. *Zaire*, the Respondent was unrepresented at the hearings on 5 and 6 December 1994. In the course of the hearing on 5 December 1994, the Tribunal adopted a Procedural Order which formally granted a period of grace under Art. 45(2) and Arbitration Rule 42. The Order provided for a supplemental hearing to be held on 13 and 14 February 1995.[83] The supplemental hearing was conditioned upon the Respondent agreeing to cover the additional expenses related to it. Since the Respondent chose neither to confirm its intention to appear before the Tribunal at the supplemental hearing nor its acceptance of the related financial obligations, the supplemental hearing was never held. Rather, the Tribunal proceeded to deal with the questions, as presented by the parties, on jurisdiction and on the merits.[84]

**90**    In *Goetz* v. *Burundi*, the Tribunal on 8 September 1997 extended a period of grace ending on 10 October 1997 for the submission of Burundi's Counter-Memorial. A request by Burundi made on 30 September 1997 for an extra period of 45 days was rejected. Not having received the Counter-Memorial, the Tribunal on 15 October 1997 fixed the hearing for 1 December 1997. On 28 November 1997 Burundi asked the Tribunal for "more patience" and asked for a moratorium of one month. The hearing took place as scheduled without Burundi's participation.[85]

---

82  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348/9, 354–356.
83  *AMT* v. *Zaire*, Procedural Order No. II, 5 December 1994, reproduced in part in the Award of 21 February 1997, para. 3.25. The published record does not indicate whether the Claimant had consented to an extension of the time limit beyond 60 days.
84  At paras. 3.27 *et seq*.
85  *Goetz* v. *Burundi*, Award, 10 February 1999, paras. 41–46.

# Article 46

---

**Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–5 |
| II. | INTERPRETATION | 6–95 |
|  | A. **"Except as the parties otherwise agree, . . ."** | 6–11 |
|  | B. **". . . the Tribunal shall, if requested by a party, determine . . ."** | 12–31 |
|  | 1. Initiative | 12–14 |
|  | 2. Timing | 15–29 |
|  | 3. Obligation to Decide | 30–31 |
|  | C. **". . . any incidental or additional claims or counterclaims . . ."** | 32–71 |
|  | 1. Incidental or Additional Claims | 35–63 |
|  | a) Third Party Contracts | 36–42 |
|  | b) Interest | 43–60 |
|  | c) Procedural Costs | 61–63 |
|  | 2. Counterclaims | 64–71 |
|  | a) Procedure | 64–67 |
|  | b) Substance | 68–71 |
|  | D. **". . . arising directly out of the subject-matter of the dispute . . ."** | 72–85 |
|  | 1. Directness and Jurisdiction | 73–78 |
|  | 2. Examination of a Close Connection | 79–85 |
|  | E. **". . . provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre."** | 86–95 |

## BIBLIOGRAPHY

*Gotanda, J. Y.*, Awarding Interest in International Arbitration, 90 AJIL 40 (1996);
  Compound Interest in International Disputes, 2 Oxford University Comparative Law Forum (2004);

*Hoffmann, A. K.*, Counterclaims by the Respondent State in Investment Arbitrations, Zeitschrift für Schiedsverfahren, German Arbitration Journal 317 (2006);

*Mann, F. A.*, Compound Interest as an Item of Damage in International Law, 21 U.C. Davis Law Review 577 (1988);

*Schwebel, S.*, Compound Interest in International Law, TDM, Vol. 2, Issue 5 (2005);

*Veenstra-Kjos, H. E.*, Counterclaims by Host States in Investment Treaty Arbitration, TDM, Vol. 4, Issue 4 (2007).

# I. INTRODUCTION

**1**     The basic idea of Art. 46 is to deal with closely related claims in one set of proceedings. Parallel or consecutive proceedings relating to different aspects of the same dispute are not only costly and inefficient but are also liable to lead to conflicting outcomes. The principles of economy and of finality militate in favour of hearing and deciding all aspects of a dispute in one set of proceedings. (*Cf.* Art. 26, paras. 124–131.)

**2**     An incidental claim arises as a consequence of the primary claim, such as interest or compensation for procedural costs. An additional claim is made by way of a later addendum to the original claim. A counterclaim is put forward by the respondent. The three types of claims may be referred to collectively as ancillary claims (see paras. 32–34 *infra*).

**3**     Provisions for a simultaneous decision on ancillary questions are not uncommon in instruments governing international adjudication. Examples may be found in the Rules of the International Court of Justice (Art. 80),[1] in the 1958 International Law Commission's Model Rules on Arbitral Procedure (Art. 19 on counterclaims or setoff claims and Art. 20 on possible amendments to a claim or defence),[2] in the 1998 International Chamber of Commerce Rules of Arbitration (Arts. 5(5), 19)[3] and in the 1976 UNCITRAL Arbitration Rules (Art. 19(3)).[4]

**4**     In the Convention's drafting, the principle of dealing with all aspects of a dispute simultaneously was not cast into doubt. Mr. *Broches* emphasized that the point of this Article was to obviate separate proceedings for incidental claims and to make it unnecessary for parties who have additional claims or counterclaims to start new procedures (History, Vol. II, pp. 270, 337). The debates on this provision were generally restricted to details of drafting (see paras. 7, 30, 32, 87 *infra*).

**5**     Art. 46 is located in the Convention's Section on "Powers and Functions of the Tribunal" and not in the Section on the "Jurisdiction of the Centre". Art. 46 does not deal with the Centre's jurisdiction but with a specific aspect of the tribunal's competence. For a claim to fall under Art. 46 it must both be covered by the

---

1     Article 80 of the Rules of the ICJ, as amended in 2001, provides that the Court may entertain a counterclaim "only if it comes within the jurisdiction of the Court and is directly connected with the subject-matter of the claim of the other party". See *Rosenne, S.*, The International Court of Justice: Revision of Articles 79 and 80 of the Rules of Court, 14 Leiden Journal of International Law 77–87 (2001).

2     YBILC 85 (1958-II).          3    36 ILM 1609, 1612 (1997).

4     15 ILM 709 (1976).

*Article 46 – Ancillary Claims*                        733

Centre's jurisdiction and arise directly out of the subject-matter of the dispute. Art. 46 presupposes jurisdiction and does not extend it (see paras. 86–95 *infra*). A claim that is within the Centre's jurisdiction in accordance with Art. 25 may be too indirectly related to the subject-matter of the dispute and may hence be beyond the competence of the particular tribunal (see paras. 72–85 *infra*). Conversely, a claim that arises directly out of the subject-matter of the dispute may be outside the Centre's jurisdiction (see paras. 86–93 *infra*).

## II. INTERPRETATION

### A. "Except as the parties otherwise agree, . . ."

The tribunal's power to deal with ancillary claims is subject to variation or exclusion by the parties. This exception clause is a recurrent feature in the Convention giving the parties a large measure of discretion over the subject-matter and procedure in ICSID proceedings. Other examples are Arts. 26, 33, 35, 43, 44, 47, 60, 61 and 63.    **6**

The parties' power to exclude ancillary claims was never cast into doubt during the Convention's drafting. At one point it was suggested to reverse the rule/exception relationship in Art. 46 by stating that the tribunal should only be authorized to deal with ancillary claims "to the extent that the parties so agree". The suggestion was not adopted (History, Vol. II, pp. 337, 573).    **7**

Art. 26 provides for the exclusion of other remedies if the parties have consented to ICSID arbitration "unless otherwise stated". The exclusion of other remedies is an added reason for dealing with a dispute comprehensively; that is, including ancillary claims. But even a stipulation providing for other remedies in relation to certain parts of or all of the dispute does not necessarily oust ICSID jurisdiction. Competing dispute settlement clauses may simply offer the parties a choice (see Art. 26, paras. 17–54). Similarly, dispute settlement clauses in several instruments dealing with various aspects of an investment may refer to different methods of dispute settlement including ICSID. These seemingly conflicting clauses have not stopped ICSID tribunals from assuming jurisdiction over the entire relationship (see Art. 25, paras. 551–566). It follows that non-ICSID dispute settlement clauses covering certain peripheral or ancillary aspects of the investment will not necessarily be a bar to ICSID jurisdiction. In order to remove an ICSID tribunal's competence over these matters, the parties would have to agree specifically that the ICSID tribunal shall not deal with them.    **8**

The parties may do so by providing in their consent agreement in general terms that the tribunal's authority shall not, without their special consent, extend to determining claims which are merely incidental or additional or constitute a counterclaim.[5] The 1968 Model Clauses, in fact, contained such a general    **9**

---

[5]  *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 242 (1973/74).

formula.[6] A general clause of this kind was not included in later versions of the Model Clauses for good reasons since such a blanket exclusion will almost inevitably lead to difficulties in delimiting the primary claim from claims that are merely ancillary. More importantly, it carries the danger of leading to a decision that falls short of a comprehensive settlement of the dispute.

10    The situation may be different if the parties agree on an alternative method of dispute settlement for a specific well-defined aspect of their relationship. If there are strong reasons for settling certain types of claims through procedures other than ICSID arbitration, it may make sense to combine an alternative dispute settlement clause with an exclusion clause under Art. 46. Clause 4 of the 1993 Model Clauses offers a formula to restrict the Centre's jurisdiction to certain well-defined matters[7] (see Art. 25, para. 515).

11    There is no evidence that actual use has been made of the exception clause in Art. 46. Papua New Guinea has notified the Centre "that it will only consider submitting those disputes to the Centre which are fundamental to the investment itself"[8] (see also Art. 25, para. 105). But this notification is only an expression of future intent and would have to be repeated in an agreement with an investor in order to meet the requirements of Art. 46 (see Art. 25, paras. 921–941).

### B.  ". . . the Tribunal shall, if requested by a party, determine . . ."

### 1. *Initiative*

12    The initiative for a consideration of ancillary claims must come from one of the parties. The tribunal may not, on its own initiative, include incidental, additional or counterclaims in its deliberations or decision. To do so might lead to an award *ultra petita* which would be subject to annulment in accordance with Art. 52(1)(b) on the ground that the tribunal has manifestly exceeded its powers.[9]

13    Arbitration Rule 40(1) rephrases Art. 46 making it clear that the tribunal's duty ("shall determine") is matched by a corresponding right of the parties ("may present"):

> **Rule 40**
> *Ancillary Claims*
>     (1) Except as the parties otherwise agree, a party may present an incidental or additional claim or counter-claim arising directly out of the subject-matter of the dispute, provided that such ancillary claim is within the scope of the consent of the parties and is otherwise within the jurisdiction of the Centre.[10]

---

6   Clause XXV, 7 ILM 1159, 1178 (1968).
7   4 ICSID Reports 361. See also Clauses XIV and XV of the 1968 Model Clauses, 7 ILM 1159, 1172/3 (1968), and Clause V of the 1981 Model Clauses, 1 ICSID Reports 201.
8   14 September 1978, ICSID/8-D, 2.
9   See *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231, 255 (1993); *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 280 (1993).
10  See also the corresponding provision in Art. 47(1) of the Arbitration (Additional Facility) Rules.

Complaints by the host State about the investor's faulty performance, in response **14** to claims by the investor, may be countered by a reference to the possibility to bring a counterclaim. In *Sempra* v. *Argentina*, the Respondent complained about the investor's lack of diligence and good faith, about excessive earnings, failure to observe contract commitments and failure to respect the regulatory framework. The Tribunal said:

> The Tribunal notes that to the extent that any such issues would be within the Tribunal's jurisdiction to decide, and could have resulted in breaches of the Treaty, the Respondent would be entitled to raise a counterclaim. While this right has been resorted to by Respondent States only to a limited extent in cases submitted to ICSID tribunals, nothing prevents its exercise in the light of Article 46 of the Convention and Rule 40 of the Arbitration Rules. This right was not exercised in the present case.[11]

### 2. Timing

In order to guarantee an orderly conduct of proceedings, ancillary claims should **15** be presented as early as possible. For this reason, Arbitration Rule 40 provides:

> (2) An incidental or additional claim shall be presented not later than in the reply and a counter-claim no later than in the counter-memorial, unless the Tribunal, upon justification by the party presenting the ancillary claim and upon considering any objection of the other party, authorizes the presentation of the claim at a later stage in the proceeding.
> (3) The Tribunal shall fix a time limit within which the party against which an ancillary claim is presented may file its observations thereon.

It follows that, in the absence of a specific justification, an ancillary claim **16** must be presented in the course of the written proceedings. A claimant may already present an incidental or additional claim in its memorial (its first pleading) but should do so no later than in its reply (its second pleading). A respondent should present its counterclaim no later than in its counter-memorial (its first pleading). Any later presentation of an ancillary claim by a party would have to be supported by a justification and requires a specific decision by the tribunal after having heard any objections from the other party.[12] An obvious justification for a later presentation would be the emergence of new facts in the course of the proceedings.

Upon presentation of an ancillary claim by one party, the other party must **17** be given an opportunity to file observations thereon subject to time limits to be fixed by the tribunal.[13] If the ancillary claim is presented in a timely fashion, as provided in Arbitration Rule 40(2), first part, this need not lead to a prolongation

---

11   *Sempra* v. *Argentina*, Award, 28 September 2007, para. 289.
12   See Note C to Arbitration Rule 40 of 1968, 1 ICSID Reports 101.
13   It should be noted that Article 47 of the Arbitration (Additional Facility) Rules, while containing the same requirement with regard to timing as Arbitration Rule 40(2), does not explicitly require that the party against which the ancillary claim is introduced be given an opportunity to file observations.

of the written procedure. Normally, the written procedure on an ancillary claim is restricted to one "round".[14] Under Arbitration Rule 31(1) the sequence of pleadings is as follows:

- memorial (by claimant);
- counter-memorial (by respondent);

and, if the parties so agree or the tribunal deems it necessary:

- reply (by claimant);
- rejoinder (by respondent).

**18**   If a counterclaim is presented in the respondent's counter-memorial, the claimant can make its observations in its reply. If an incidental or additional claim is made in the claimant's reply, the respondent can still make its observations in its rejoinder.

**19**   In some ICSID cases, no problems have arisen from the parties' timing of their ancillary claims. Ancillary claims were presented in accordance with the Arbitration Rule 40(2), first part, thus giving the other side sufficient time to respond.[15] In *Atlantic Triton* v. *Guinea*, the Tribunal allowed an additional round for the Government's counterclaims. The counterclaims were first raised in the Counter-Memorial. The Claimant responded to them in its Memorial in Reply. The Government's Memorial in Rejoinder (entitled Reply of Guinea) contained added points on the counterclaims. Thereupon, Atlantic Triton was permitted to submit another Memorial in Rejoinder on the counterclaim.[16]

**20**   In *Middle East Cement* v. *Egypt*, the Respondent objected to a claim, raised by Middle East Cement in its Reply, because it was higher than the one put forward in its original pleading. The Tribunal referred to ICSID Arbitration Rule 40 as allowing additional claims no later than the filing of the reply and thus held that Middle East Cement's additional claims were admissible.[17]

**21**   If a claimant already presents an incidental claim in its first memorial, all later pleadings may deal with it without any extension of the written proceedings. In *SOABI* v. *Senegal*, the claim for interest was already contained in the original request for arbitration and was repeated in SOABI's Memorial. The exchange on this claim continued in the Government's Counter-Memorial, in SOABI's Memorial Reply and in the Government's Rejoinder (entitled the Government's Reply).[18]

**22**   In *Tanzania Electric* v. *IPTL*, the Claimant submitted for the first time with its Reply an ancillary claim under Rule 40 based on allegations of bribery. The Tribunal allowed the ancillary claim. At the same time it made it clear that the

---

14   See Note D to Arbitration Rule 40 of 1968, 1 ICSID Reports 101.
15   See *e.g.*, *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, para. 4.9.
16   *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, para. 7.
17   *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 64–65.
18   *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 6.23–6.26.

introduction of this new issue should not delay the hearing, which had been scheduled for some time.[19]

In *Metalclad* v. *Mexico*, a NAFTA arbitration under the Additional Facility,    **23** Metalclad amended its original claim subsequent to the enactment by Mexico of an Ecological Decree. Mexico contended that the Tribunal did not have jurisdiction to consider events that had occurred after the filing of the claim.[20] The Tribunal ruled that Art. 48 (now Art. 47) of the Arbitration (Additional Facility) Rules allowed amendments to claims and consideration of facts and events taking place after the filing of a notice of claim, particularly if they "arise out of and/or are directly related to the original claim".[21] The Tribunal found that procedural fairness was ensured by the requirement that any ancillary claim must be introduced no later than with the Claimant's Reply. Since the ancillary claim had been presented as early as the Claimant's Memorial, Mexico "had ample notice and opportunity" to address the claim and had thus not been prejudiced.[22]

In other cases the timing of ancillary claims led to difficulties. In *Benvenuti*    **24** *& Bonfant* v. *Congo*, the Government had missed several time limits for the submission of its Counter-Memorial and the proceedings had moved on to the oral stage. At one of the Tribunal's sessions, the Government's representative asked the Tribunal to exercise its discretionary power under the Arbitration Rules to permit the submission of the Counter-Memorial and the presentation of a counterclaim. The Tribunal granted the request in view of the fact that "special circumstances of a domestic political nature had prevented the normal functioning of certain Congolese State Agencies". After the Tribunal had granted a new time limit for the Counter-Memorial and counterclaim, the Government lodged the document within this time limit[23] (see Art. 45, paras. 26–29). The Tribunal said:

> 4.102. The Tribunal considers that the counterclaim, the admissibility of which was disputed by B&B, can nevertheless be allowed in accordance with Article 40(2) of the Rules, the Tribunal having decided that the Government provided a sufficient explanation for the delay in presenting its claim, after having taken into account the objections of the other party (*cf.* Procedural Order of 14 November 1979).[24]

In *SPP* v. *Egypt*, the proceedings had been instituted by SPP(ME) Ltd., a    **25** subsidiary of SPP Ltd. During the hearings on jurisdiction, the parties decided to join SPP Ltd. as claimant in the proceedings (see Art. 25, paras. 345–348). When the Government contested SPP(ME)'s status as a foreign investor, the

---

19  *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 40–42.
20  Mexico relied, *inter alia*, on Articles 1119 and 1120 of the NAFTA. See also *Ethyl Corporation* v. *Canada* (UNCITRAL), Award, 24 June 1998, para. 85.
21  *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, para. 67.
22  At paras. 68–69.
23  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.32–1.34.
24  Para. 4.102.

Claimants took the position that SPP Ltd. would advance the claim in its own name. Thereupon, the Government raised the objection that SPP Ltd. had not presented any claim in its own name in the written memorials and that its claim put forward in the oral proceedings should be declared inadmissible as being outside the time limits of Arbitration Rule 40(2) (see para. 15 *supra*). The Tribunal rejected this objection:

> 149. The Tribunal cannot accept the Respondent's contention that a claim by SPP at this point in the proceedings would contravene Rule 40. What is involved here is neither an "incidental" nor an "additional" claim: SPP was voluntarily joined as a claimant in the case at the Respondent's request. As a claimant, SPP must be presumed to be claiming something, and there is nothing in the record which suggests that SPP has ever claimed anything different than what SPP(ME) claims. Rather, SPP(ME) and SPP have claimed jointly against the Respondent ever since SPP was joined in the proceedings.[25]

**26**    In *Amco* v. *Indonesia*, the Government had presented a counterclaim in its Counter-Memorial seeking the payment of taxes and of duties that would have been due but for the tax holiday granted under the investment licence. The legality of the revocation of the licence was one of the central issues in this dispute. The Claimant in its Reply objected to the counterclaim in all respects. The Government in its Rejoinder confirmed and specified it. The Tribunal rejected the counterclaim finding that, since the revocation of the licence was unlawful, the revocation of the tax facilities was unlawful as well[26] (see para. 80 *infra*).

**27**    After the first Award's annulment,[27] the case was submitted to a new tribunal. At that stage, Indonesia advanced a modified counterclaim based on alleged tax fraud by Amco. Indonesia contended that the alleged tax fraud had been raised before the first Tribunal but had not been decided. Moreover, it was contended that tax fraud could also be introduced as a new claim or counterclaim. The Tribunal found that the question of tax fraud had indeed been referred to during the hearings before the first Tribunal but only as one of the arguments justifying the licence revocation. It was raised as a defence in the course of argument and not as a counterclaim. Indonesia had been in a position to make a counterclaim in accordance with Arbitration Rule 40(2) but had failed to do so. Therefore, tax fraud was a new claim.[28]

**28**    The Tribunal held that the claim of tax fraud was outside the Centre's jurisdiction *ratione materiae* since it did not relate to a dispute "arising directly out of an investment" as required by Art. 25(1) (see para. 91 *infra*; Art. 25, para. 97). Nevertheless, the Tribunal proceeded to address the question of whether claims

---

25  *SPP* v. *Egypt*, Award, 20 May 1992, para. 149.
26  *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 145, 283–287. The second Tribunal in the Resubmitted Case after the Award's annulment reached essentially the same conclusion: *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 157–162.
27  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986.
28  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 562–565.

*Article 46 – Ancillary Claims*                                    739

not presented to an ICSID tribunal may be advanced before a new tribunal after the first award's annulment. The Tribunal said:

> . . . Article 46 is to be read together with Rule 40, which provides specific procedures and time limits for the intervention of ancillary or additional claims, which, as noted above, have not been pursued here. It is also clear that Article 46 and Rule 40 are directed essentially to the question of additional claims presented before an ongoing single Tribunal hearing an arbitration and does not in terms address the issue of new claims and counterclaims as it may arise in relation to a new Tribunal under Article 52(6).[29]

Ultimately, the Tribunal reached the conclusion that the resubmission of a dispute in accordance with Art. 52(6) after the annulment of an award was not an opportunity to advance new claims but a procedure to resubmit an existing dispute. Therefore, the resubmitted dispute

> is necessarily the dispute as formulated in the pleadings before the First Tribunal whose Award (save insofar as it is *res judicata*) is now being reconsidered. The principle of finality to litigation also leads to the same view.[30]

In *Enron* v. *Argentina*, while proceedings were well under way, the Claimants **29** filed a new request for arbitration against Argentina. The Centre forwarded the request to the Tribunal for a determination of whether this new request should be treated as an additional or incidental claim pursuant to Article 46. The Tribunal decided to accept the new request for arbitration as an ancillary claim.[31] The Tribunal's rationale for this manner of proceeding was that both complaints arose from the same factual background and involved the same causes of action under the relevant investment treaty. In the circumstances, the Tribunal held that the conduct of a separate proceeding "would lead to a superlative degree of inefficiency and inequity", which was "particularly unjustified in view of the many efforts by ICSID to avoid the multiplicity of proceedings concerning the Argentine Republic".[32] In ruling upon its jurisdiction over the ancillary claim, the Tribunal chose not to rely on its findings relating to the main claim, but, rather, examined *de novo* the jurisdictional arguments made with respect to the ancillary claim. The Tribunal's conclusion was that, since the parties had advanced no new arguments, it could apply to this claim the decision already reached for the original claim, *i.e.* that the Claimants had *jus standi*.[33] The original claim was subsequently discontinued upon Enron's request but the Tribunal declared that this did not affect the ancillary claim which was decided by a separate award on the merits.[34]

### 3. Obligation to Decide

Art. 46 provides that the tribunal "shall determine" any incidental or additional **30** claim or counterclaim brought before it. Therefore, a decision on an ancillary

---

29  At p. 566.                              30   At p. 567.
31  *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, paras. 16–17.
32  At para. 85. See also paras. 82–84, 86–88.
33  *Enron* v. *Argentina*, Decision on Jurisdiction (Ancillary Claim), 2 August 2004, para. 26.
34  *Enron* v. *Argentina*, Award, 22 May 2007, paras. 5–6, 26–33.

claim is not discretionary but obligatory. During the Convention's drafting, this question was debated at one point. A vote showed a majority in favour of making such a decision compulsory (History, Vol. II, pp. 810/11). The obligation to decide ancillary claims is nothing but a special manifestation of the more general rule contained in Art. 48(3) that the award shall deal with every question submitted to the tribunal. Failure to deal with an ancillary claim that has been advanced by a party may lead to a charge of manifest excess of powers under Art. 52(1)(b)[35] or that the award has failed to state the reasons on which it is based under Art. 52(1)(e).

**31**    A tribunal may discharge this obligation in one of several ways. It may find that the ancillary claim is outside the Centre's jurisdiction, especially if it is not covered by the parties' consent (see paras. 86–93 *infra*). It may find that the ancillary claim does not arise directly out of the subject-matter of the dispute before it (see paras. 72–85 *infra*). Or it may examine the merits of the ancillary claim and dismiss or uphold it. Any one of these courses of action would satisfy the tribunal's duty under Art. 46.

### C.  ". . . any incidental or additional claims or counterclaims . . ."

**32**    The meaning of the terms "incidental" and "additional" was the subject of a brief debate during the Convention's drafting. Suggestions to delete both or to merge them into one expression did not prevail. The difference between the two was never clarified (History, Vol. II, p. 811). One may surmise that an incidental claim is one that arises as a consequence of the primary claim, such as a claim for interest or procedural costs. An additional claim may be seen to be one that is put forward by way of a later amendment to the original pleading. The Tribunal in *ADF* v. *United States* did not find it necessary to distinguish between "incidental" and "additional" claims since both must have a close connection with the original claim.[36]

**33**    By contrast, the concept of a counterclaim is reasonably clear. It is a claim put forward by the respondent rather than the original claimant. Of course, the counterclaim may be of an incidental or additional nature.

**34**    The distinction between these three categories is not very satisfactory since it lacks inherent logic. It is based on such shifting criteria as the dependence on the primary claim, the time the claim is presented and the procedural position of the party presenting it. No legal consequences are attached to a distinction between incidental or additional claims. Counterclaims are distinguishable from the other two categories only on account of the procedural position of the party presenting them and carry different time limits for their presentation (see

---

35  On the concept of *excès de pouvoir infra petita* see the Dissenting Opinion by Judges Aguilar Mawdsley and Ranjeva, in *Case Concerning the Arbitral Award of 31 July 1989 (Guinea-Bissau* v. *Senegal)*, 12 November 1991, 1991 ICJ Reports 120 at 126–129. See also *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 86.

36  *ADF* v. *United States* (AF), Award, 9 January 2003, para. 144.

paras. 15–18 *supra*). Arbitration Rule 40 refers to the three types of claims collectively as ancillary claims. Additional claims should be distinguished from additional claimants.[36a]

## 1. Incidental or Additional Claims

Incidental or additional claims can be of a varied nature. Recurrent instances of incidental or additional claims are third party contracts, interest on the sums claimed and procedural costs.    **35**

### a) Third Party Contracts

Incidental claims may arise from transactions between the claimant and a third party designed to facilitate the investment operation. If the investment relationship is terminated prematurely, the claimant may find that it has obligations *vis-à-vis* the third party for which it wants to be compensated. In *SOABI* v. *Senegal*, the investor had undertaken to construct housing units in the host State. For this purpose, SOABI had signed a contract with a firm of architects. After the project's abandonment by the Government, SOABI was confronted with charges for services rendered as well as indemnity for services contracted but not rendered. Before the ICSID Tribunal, SOABI claimed indemnification for these expenses from the Government. The Tribunal, while emphasizing that it did not have jurisdiction in a dispute between SOABI and the firm of architects, found that it had jurisdiction to order the Government to reimburse SOABI for any amount the latter would have to pay to the firm of architects. The amount was to be determined by the competent domestic courts.[37]    **36**

In *AAPL* v. *Sri Lanka*, the Claimant had participated in the equity capital of Serendib, a Sri Lankan public company. AAPL had also issued a guarantee for the benefit of Serendib to the European Asian Bank. After the destruction of Serendib's shrimp farm by Sri Lankan security forces, AAPL considered its investment in Serendib a total loss. The parties to the arbitration were agreed that AAPL would transfer all its shares in Serendib to the Government in exchange for adequate compensation. The Tribunal invited the two parties to take all the necessary steps for this transfer "with the understanding that said transfer of title on the shares entails in exchange the passing of any potential liability under the European Asian Bank Guarantee from AAPL to the new owner of the shares".[38]    **37**

In *SPP* v. *Egypt*, SPP had created a joint venture company named ETDC together with its Egyptian partner EGOTH. SPP made substantial loans to ETDC. The Tribunal found that when the investment project was cancelled by the Government and the Central Bank blocked the funds of EGOTH and of the Claimant, the contractual rights under the loan agreement were in effect expropriated. The Tribunal held:    **38**

---

36a  See *Continental Casualty* v. *Argentina*, Award, 5 September 2008, paras. 65–66, 78, 95–99.
37   *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 8.01–8.23, 12.05.
38   *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 109–111.

> Thus, ETDC was prevented from repaying the loan and the interest that it had agreed to. Therefore, this loan is to be reimbursed to the Claimants with all of the interest stipulated in the loan agreement. This is the full and uncontestable value of the expropriated credit.[39]

**39**    In *Middle East Cement* v. *Egypt*, Middle East also claimed damages for expenses incurred in connexion with a bank loan, foreign employees' compensation and liquidation expenses. The Tribunal held that costs related to bank loans are normal commercial risks for investors and can only be claimed if it is shown that they were caused by conduct of the Respondent which was in breach of the relevant investment treaty, which was not the case in the particular instance. Similarly, with respect to the other ancillary claims, the Tribunal did not find any discriminatory or abusive conduct on the part of the Respondent. It concluded that the Claimant had not discharged its burden of proof to show that the damage complained of had been incurred as a result of the Claimant's conduct.[40]

**40**    In *Zhinvali* v. *Georgia*, the Claimant sought to seek redress not only on its own behalf but also on behalf of its three shareholders. The Tribunal treated the issue not as one of incidental claims but as a matter of standing. It noted that the three shareholders had not been registered as claimants in the ICSID proceedings. The Tribunal concluded that the Claimant did not have the right to claim on behalf of its shareholders.[41]

**41**    In *PSEG* v. *Turkey*, the Claimants included payments made by entities which were not parties to the proceedings and alleged that these expenses had been incurred on behalf of one of the Claimants. The Tribunal found that these amounts were not subject to compensation since they had not been made by any of the Claimants. The Tribunal also recalled that it had already held in its Decision on Jurisdiction that the entities which incurred the expenses had no standing in the proceedings.[42] The Tribunal added:

> The Tribunal will not undo with one hand what it did with the other. This would be the result if compensation is awarded in respect of investments or expenses incurred by entities over which there is no jurisdiction, even if this was done on behalf of one of the Claimants. As the Tribunal also noted in the Decision on Jurisdiction, these entities might have a claim against PSEG in the light of intra-corporate arrangements, but this is not something for which Turkey is liable, directly or indirectly.[43]

**42**    In *Siemens* v. *Argentina*, Siemens included damages claimed by subcontractors and suppliers in its calculations. The Tribunal, after finding that there had been an unlawful expropriation, decided that Argentina had to hold the Claimant harmless from any claims asserted by a specified number of subcontractors.[44]

---

39  *SPP* v. *Egypt*, Award, 20 May 1992, para. 230.
40  *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 154–156.
41  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 392–405.
42  *PSEG* v. *Turkey*, Award, 19 January 2007, paras. 322–326.
43  At para. 325.
44  *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 322, 329, 365, 387, 403.

## b) Interest

Interest is a sum paid or payable as compensation for the temporary withholding of money.[45] It is a standard feature in money awards.[46] Compensatory or pre-award interest is part of the assessment of damages in the award. Moratory or post-award interest is due if there is a delay in payment of the sum awarded.[47]    **43**

A claim for interest is governed by the law applicable to the dispute in accordance with Art. 42(1). The parties may regulate the question of interest by specific agreement.[48] For instance, in *Fedax* v. *Venezuela*, the promissory notes which formed the basis of the claim contained precise provisions on interest.[49] Alternatively, the parties may agree on the modalities of interest in the course of the proceedings.[50] In the absence of an agreement, the law chosen by the parties will apply. In the absence of a choice of law, the tribunal will apply the host State's law and international law. If the applicable law is that of an Islamic country based on the Shari'a, interest may be denied.[51]    **44**

In *SPP* v. *Egypt*, the parties had exercised all three of these options in relation to different parts of their transactions. With respect to certain loans it had been agreed that they would not bear interest.[52] Another loan agreement contained a choice of English law.[53] The remaining claims were governed by the residual rule of Art. 42(1). Therefore, they were to bear interest according to Egyptian law since no rule of international law was available.[54]    **45**

In *Autopista* v. *Venezuela*, the Claimant asked for interest to be calculated in accordance with the concession agreement. Venezuela relied on the Venezuelan Civil Code which would have limited post-award interest to 3%. The Tribunal held that Venezuelan law did not prohibit the higher contractual rate and awarded interest accordingly.[55]    **46**

In some cases, the Convention's rule on applicable law led the tribunals to apply the host State's domestic law to the question of interest.[56] In other cases, it led to    **47**

---

45   *McCollough & Co.* v. *Ministry of Post, Telegraph and Telephone*, 11 Iran-U.S. Claims Tribunal Reports 29 (1986).
46   For a general discussion, see *Gotanda, J. Y.*, Awarding Interest in International Arbitration, 90 AJIL 40 (1996).
47   See *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 6.23–6.38.
48   Art. 1135 of the NAFTA provides that "… the Tribunal may award, … any applicable interest", 32 ILM 646 (1993). The Energy Charter Treaty provides in Art. 26(8) that the award "may include an award of interest", 34 ILM 401 (1995).
49   *Fedax* v. *Venezuela*, Award, 9 March 1998, para. 32.
50   *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 112, 113.
51   See *Gotanda*, Awarding Interest, pp. 47–50.
52   *SPP* v. *Egypt*, Award, 20 May 1992, paras. 231, 257.
53   At paras. 225, 229, 257.
54   At paras. 220–236, 257. See also *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 276 *et seq.* (1993).
55   *Autopista* v. *Venezuela*, Award, 23 September 2003, paras. 382–387.
56   *AGIP* v. *Congo*, Award, 30 November 1979, paras. 110–115; *Amco* v. *Indonesia*, Award, 20 November 1984, para. 281; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 6.23–6.38; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 33, 257–258; *CSOB*

the application of international law[57] or to a combination of host State law and international law.[58] Failure to rely on the proper law for the calculation of interest may expose an award to annulment.[59]

**48**    An authorization to decide *ex aequo et bono* in accordance with Art. 42(3) may also affect the decision on interest. In *Benvenuti & Bonfant* v. *Congo*, the Tribunal noted that the Government had suggested a rate of 10 per cent in connection with its counterclaim. This prompted the Tribunal, by virtue of its power to rule *ex aequo et bono*, to adopt this rate in relation to the principal claim.[60] Similarly, in *Atlantic Triton* v. *Guinea*, the parties had chosen the US Dollar as the monetary unit for their transactions. Therefore, the Tribunal "judging equitably" set the interest rate at the current US inter-bank interest rate.[61]

**49**    When awarding interest, tribunals have to address several questions. The most important of these questions are the date from which interest is to run (*dies a quo*), the rate of interest, and whether interest would be simple or compounded.

**50**    As to the *dies a quo*, in some cases tribunals found that interest should run only from the date the dispute was submitted for arbitration.[62] In other cases, the day the original obligation had fallen due or the day of dispossession was chosen as the starting point for the calculation of interest.[63] In *SOABI* v. *Senegal*, the Claimant had originally claimed interest from the date of registration of its request for arbitration but later amended its pleading to include interest from the date of termination of the project. The Tribunal chose a third date based on the cut-off

v. *Slovakia*, Award, 29 December 2004, paras. 238 *et seq.*; *Eastern Sugar* v. *Czech Republic* (Stockholm CC), Partial Award, 27 March 2007, para. 373.

57   *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 112–115; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 96–107; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 174.

58   *SPP* v. *Egypt*, Award, 20 May 1992, paras. 219–236.

59   See *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76, 77; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 6.68, 6.70, 6.85, 6.86, 6.93, 6.100–6.108; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 50–53.

60   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.97–4.100.

61   *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 30, 32, 33.

62   *Amco* v. *Indonesia*, Award, 20 November 1984, para. 281; *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 557/8; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 33, 257; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 30, 32, 43; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 114, 115; *S.D. Myers* v. *Canada* (UNCITRAL), 2nd Partial Award, 21 October 2002, para. 303; *CME* v. *Czech Republic* (UNCITRAL), Final Award, 14 March 2003, para. 630.

63   *AGIP* v. *Congo*, Award, 30 November 1979, 1 ICSID Reports 329; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.99–4.100; *SPP* v. *Egypt*, Award, 20 May 1992, paras. 232–236; *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, para. 128; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 175; *CME* v. *Czech Republic* (UNCITRAL), Final Award, 14 March 2003, paras. 108, 192, 635; *MTD* v. *Chile*, Award, 25 May 2004, para. 247; *PSEG* v. *Turkey*, Award, 19 January 2007, paras. 349–351; *Siemens* v. *Argentina*, Award, 6 February 2007, para. 397; *Enron* v. *Argentina*, Award, 22 May 2007, para. 452; *LG&E* v. *Argentina*, Award, 25 July 2007, para. 104; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 485.

date for the calculation of operating expenses and capital expenditures.[64] In *ADC*
v. *Hungary*, the calculation of damages was based on the value of the expropriated
investment as of the date of the Award. Therefore, the Tribunal decided that no
pre-award interest had accrued.[65]

In cases where damages for a wrongful act are claimed, the *dies a quo* will **51**
normally be the date on which the responsibility for the wrongful act arose. The
ILC Articles on State Responsibility contain the following provision on interest:

### Article 38
*Interest*

1. Interest on any principal sum payable under this Chapter shall be payable
when necessary in order to ensure full reparation. The interest rate and mode of
calculation shall be set so as to achieve that result.

2. Interest runs from the date when the principal sum should have been paid
until the date the obligation to pay is fulfilled.[66]

In some cases the rate of interest was set by reference to some objective indicator. **52**
Indicators included the average US prime interest rate,[67] "the lowest rates in effect
in the respective markets",[68] the average bank interest rate,[69] the six-month average
LIBOR rate plus 2 per cent,[70] an interest rate based on short-term US Treasury
bills[71] and the average rate of interest applicable to US six-month certificates of
deposit.[72] In other cases the tribunals chose interest rates at 6 per cent,[73] at 7.5 per
cent,[74] at 9 per cent,[75] at 10 per cent[76] or at 5 per cent plus a "deflation factor"; that

---

64 *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 3.03–3.05, 6.23–6.38, 9.26, 12.05, Dissent-
ing Opinion, paras. 306, 307.
65 *ADC* v. *Hungary*, Award, 2 October 2006, para. 520.
66 Articles on Responsibility of States for Internationally Wrongful Acts adopted by the Interna-
tional Law Commission at its 53rd session (2001), reproduced in *Crawford, J.*, The International
Law Commission's Articles on State Responsibility 235 (2002).
67 *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76; *MINE* v. *Guinea*, Decision on
Annulment, 22 December 1989, para. 6.104.
68 *AGIP* v. *Congo*, Award, 30 November 1979, para. 115.
69 *Bogdanov* v. *Moldova* (Stockholm CC), Award, 22 September 2005, para. 5.3.
70 *PSEG* v. *Turkey*, Award, 19 January 2007, para. 348; *Enron* v. *Argentina*, Award, 22 May 2007,
para. 452; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 486.
71 *CMS* v. *Argentina*, Award, 12 May 2005, para. 471; *LG&E* v. *Argentina*, Award, 25 July 2007,
para. 102.
72 *Siemens* v. *Argentina*, Award, 6 February 2007, para. 396.
73 *Amco* v. *Indonesia*, Award, 20 November 1984, para. 281; *Amco* v. *Indonesia*, Resubmitted
Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 557/8; *Amco* v. *Indonesia*,
Resubmitted Case: Award, 5 June 1990, paras. 33, 166, 257–258, Appendix; *Metalclad* v.
*Mexico* (AF), Award, 30 August 2000, para. 128; *Maffezini* v. *Spain*, Award, 13 November
2000, para. 97; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 175; *Tecmed* v.
*Mexico* (AF), Award, 29 May 2003, para. 197; *Nykomb* v. *Latvia* (Stockholm CC), Award,
16 December 2003, para. 5.3; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007,
para. 9.2.8.
74 *AMT* v. *Zaire*, Award, 21 February 1997, 36 ILM 1555 (1997), referring to post-award interest.
75 *Wena* v. *Egypt*, Award, 8 December 2000, para. 128.
76 *SOABI* v. *Senegal*, Award, 25 February 1988, para. 12.05.

is, an adjustment for currency devaluation.[77] Where the tribunals ruled *ex aequo et bono* they adopted 10 per cent[78] and 9 per cent[79] respectively.

**53**  Simple interest is interest payable on the principal only and not on accumulated interest. Compound interest is interest payable on both the principal and the previously accumulated interest.[80] Some tribunals have only awarded simple interest.[81] More recently, there has been a growing trend towards awarding compound interest.[82]

**54**  In *SPP* v. *Egypt*, simple interest was applied to the part of the transaction that was governed by Egyptian law while compound interest was awarded on the part governed by English law. The prohibition in Egyptian law against the interest exceeding the principal was applied to the former part but not to the latter.[83]

**55**  In *CMS* v. *Argentina*, the Tribunal awarded simple pre-award interest but compounded post-award interest.[84]

**56**  In a number of cases the tribunals offered legal as well as economic reasons for awarding compound interest. In *Santa Elena* v. *Costa Rica*, the Tribunal granted compound interest and specified that simple interest is awarded mainly in cases of injury or simple breach of contract.[85] The Tribunal noted:

---

77  *SPP* v. *Egypt*, Award, 20 May 1992, paras. 223, 237–244. See also *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231, 251–256 (1993); *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 276–281 (1993).

78  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.98.

79  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 30, 32, 43.

80  See *Mann, F. A.*, Compound Interest as an Item of Damage in International Law, 21 U.C. Davis Law Review 577 (1988); *Gotanda, J. Y.*, Awarding Interest in International Arbitration, 90 AJIL 40 (1996); *Ball, M.*, Assessing Damages in Claims by Investors Against States, 16 ICSID Review – FILJ 408, 429 (2001); *Gotanda, J. Y.*, Compound Interest in International Disputes, 2 Oxford University Comparative Law Forum (2004); *Schwebel, S.*, Compound Interest in International Law, TDM, Vol. 2, Issue 5 (2005).

81  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76, 78; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 1.09; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 258, Appendix; *Feldman* v. *Mexico* (AF), Award, 16 December 2002, paras. 205, 206; *CME* v. *Czech Republic*, Final Award, 14 March 2003, paras. 642–647; *Autopista* v. *Venezuela*, Award, 23 September 2003, paras. 393–397; *Occidental* v. *Ecuador* (UNCITRAL), Award, 1 July 2004, para. 211 and *dispositif*, paras. 8, 9, 13; *Desert Line* v. *Yemen*, Award, 6 February 2008, paras. 292–298.

82  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 33, 43; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 97–107; *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, para. 128; *Maffezini* v. *Spain*, Award, 13 November 2000, paras. 96–97; *Wena Hotels* v. *Egypt*, Award, 8 December 2000, paras. 129–130; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 174–175; *Pope & Talbot* v. *Canada* (UNCITRAL), Award in Respect of Damages, 31 May 2002, para. 90; *Tecmed* v. *Mexico* (AF), Award, 29 May 2003, para. 196; *MTD* v. *Chile*, Award, 25 May 2004, paras. 251, 253(4); *Azurix* v. *Argentina*, Award, 14 July 2006, paras. 439–440; *ADC* v. *Hungary*, Award, 2 October 2006, para. 522; *PSEG* v. *Turkey*, Award, 19 January 2007, para. 348; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 399–401; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 451–452; *LG&E* v. *Argentina*, Award, 25 July 2007, paras. 28, 54–57, 102–105; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 9.2.4–9.2.8; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 486; *Continental Casualty* v. *Argentina*, Award, 5 September 2008, paras. 306–316.

83  *SPP* v. *Egypt*, Award, 20 May 1992, paras. 219–236. See also *Craig*, The Final Chapter, p. 281.

84  *CMS* v. *Argentina*, Award, 12 May 2005, para. 471.

85  *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, paras. 97–107.

[W]here an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due to him, the amount of compensation should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest. It is not the purpose of compound interest to attribute blame to, or to punish, anybody for the delay in the payment made to the expropriated owner; it is a mechanism to ensure that the compensation awarded the Claimant is appropriate in the circumstances.[86]

**57** In *Metalclad*, the Tribunal applied the rule that compensation for damages must restore the position that would have prevailed had the illegal act not taken place:

So as to restore the Claimant to a reasonable approximation of the position in which it would have been if the wrongful act had not taken place, interest has been calculated at 6% p.a. compounded annually.[87]

**58** In *Wena Hotels*, the Tribunal cited *Metalclad* with approval and added the following explanation:

This tribunal believes that an award of compound (as opposed to simple) interest is generally appropriate in most modern, commercial arbitrations. As Professor Gotanda has observed "almost all financing and investment vehicles involve compound interest. . . . If the claimant could have received compound interest merely by placing its money in a readily available and commonly used investment vehicle, it is neither logical nor equitable to award the claimant only simple interest." For similar reasons, Professor Mann has "submitted that . . . compound interest may be and, in absence of special circumstances, should be awarded to the claimant as damages by international tribunals".[88]

**59** The Award in *Vivendi II* noticed that the award of compound interest "is no longer the exception to the rule" and observed that:

[A] number of international tribunals have recently expressed the view that compound interest should be available as a matter of course if economic reality requires such an award to place the claimant in the position it would have been in had it never been injured (*i.e.* had the wrongful act not taken place).[89]

**60** Post-award (moratory) interest is usually addressed separately by the tribunals. It must be requested expressly by the claimant. In some cases post-award interest was denied because it had not been specifically mentioned in claimants' memorials.[90] Post-award interest is expressed either as an extension of compensatory

---

86  At para. 104.
87  *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, para. 128.
88  *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 129. Footnotes omitted. The *ad hoc* Committee held that the decision on interest was within the Tribunal's discretionary power and rejected Egypt's annulment request. See *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 50–53, 66–70 and 94–99.
89  *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, para. 9.2.6.
90  *Enron* v. *Argentina*, Award, 22 May 2007, para. 452; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 485.

interest up to the date of the actual payment of the sum awarded or as a separate head to run from the date of the award or a date shortly thereafter until payment.[91]

*c) Procedural Costs*

**61**    The costs of ICSID proceedings are another recurrent type of incidental claim. They are regulated in Arts. 59–60 of the Convention and are discussed in the chapters dealing with those articles.

**62**    At times, an ICSID tribunal may be asked to compensate a party for procedural expenses incurred in non-ICSID proceedings. This is particularly likely in a case where the other party has sought a remedy before another forum in violation of the exclusive remedy rule of Art. 26. In *MINE* v. *Guinea*, the Claimant had first pursued its claim before the American Arbitration Association (AAA). Guinea declined to appear and the AAA Tribunal gave an *ex parte* award in MINE's favour. After the US courts had refused to confirm the award (see Art. 26, paras. 9–13), MINE turned to courts in Belgium and Switzerland to have the AAA award enforced. These steps were also unsuccessful (see Art. 26, paras. 149–153). When the case was eventually brought before an ICSID tribunal, Guinea claimed legal expenses arising from the AAA arbitration as well as from the subsequent attempts to have the resulting award enforced in Belgium and Switzerland. The Tribunal rejected Guinea's claim for the costs of the AAA arbitration, primarily because Guinea had neither responded nor voiced a timely objection to these proceedings[92] (see Art. 26, para. 115). With respect to the proceedings before Belgian and Swiss courts, the Tribunal awarded a reduced sum. It found that MINE's actions in these proceedings were contrary to ICSID's exclusive jurisdiction. On the other hand, Guinea's initial lack of response, the inconclusive nature of the decision of the US court on the AAA award and the lack of precedent for the Tribunal's own order to discontinue the European attachments (see Art. 47, paras. 106–109) seemed to excuse MINE somewhat in seeking to enforce what it argued was a valid AAA award.[93]

**63**    In *Atlantic Triton* v. *Guinea*, the Claimant had obtained a court order in France attaching three vessels belonging to the Respondent before starting ICSID proceedings. The vessels were released in accordance with a judgment of the Court of Appeal of Rennes (see Art. 26, para. 169). Before the ICSID Tribunal, the

---

91  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.129; *Amco* v. *Indonesia*, Award, 20 November 1984, para. 281; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, 1 ICSID Reports, paras. 33, 166, 295; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 379; *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 78; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 1.09; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 6.32–6.35, 12.06; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 114–115; *SPP* v. *Egypt*, Award, 20 May 1992, paras. 233–236, 257; *AMT* v. *Zaire*, Award, 21 February 1997, 36 ILM 1555 (1997); *CMS* v. *Argentina*, Award, 12 May 2005, para. 471; *PSEG* v. *Turkey*, Award, 19 January 2007, para. 351; *LG&E* v. *Argentina*, Award, 25 July 2007, para. 105.

92  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76.

93  At p. 77.

Government claimed damages for what they described as abusive proceedings. The Tribunal rejected the claim on the ground that Atlantic Triton's decision to turn to the French courts was not open to reproach in view of the complexity of the question of whether parties to ICSID proceedings were debarred by the exclusive remedy rule of Art. 26 from seeking provisional measures from domestic courts[94] (see Art. 26, para. 171).

## 2. Counterclaims

### a) Procedure

By definition, a counterclaim will be put forward not by the party requesting the institution of the proceedings but by the respondent party. The counterclaim may relate to the main substance of the dispute or may be an incidental or additional claim.[95] Counterclaims may at times exceed the primary claim in terms of the money award requested.[96]   **64**

The presentation of a counterclaim does not change the parties' procedural status as claimant and respondent.[97] The rules on the sequence and time limits for the presentation of pleadings distinguish between the "requesting party" and the "other party" (see Arbitration Rule 31). These rules continue to apply after a counterclaim has been introduced. Arbitration Rule 40, dealing with counterclaims, also distinguishes between the procedural position of a claimant and that of a party presenting a counterclaim (see paras. 15–17 *supra*).   **65**

This preservation of procedural status extends to proceedings dealing with a resubmitted dispute under Art. 52(6) after the first award has been annulled. In *Amco* v. *Indonesia*, there were requests for resubmission under Art. 52(6) by both parties. In these proceedings Indonesia initially described itself as a claimant. The new Tribunal held that, since these proceedings were a resubmission of the dispute before the first Tribunal, the parties were in the same position as they were before the first Tribunal. This did not put Indonesia into any disadvantage since the ability to advance claims and arguments did not turn on the parties' status as claimant or defendant.[98]   **66**

In the non-ICSID case *Saluka* v. *Czech Republic*, the counterclaim, although allegedly directed against the Claimant, Saluka, identified a different company, Nomura, as the defendant. The Tribunal did not find it necessary to rule upon the   **67**

---

94  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 35/6.
95  See Note A to Arbitration Rule 40 of 1968, 1 ICSID Reports 100.
96  See *e.g.*, *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 12; *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 142–145; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 18/9.
97  For a description of the procedure on a counterclaim in non-ICSID proceedings see *Saluka* v. *Czech Republic* (UNCITRAL), Decision on Jurisdiction over the Czech Republic's Counterclaim, 7 May 2004; *Saluka* v. *Czech Republic*, Partial Award, 17 March 2006, paras. 12–21, 179–182.
98  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 567/8.

issue of these companies' relationship while deciding upon its jurisdiction to hear and determine the counterclaim.[99]

### b) Substance

**68**    In the majority of cases in which counterclaims were presented, they related to the main substance of the case and were not of an incidental nature. They alleged faulty performance or some other wrongdoing on the part of the claimant. These allegations, although couched in the form of counterclaims, were usually of a defensive nature and were intended to fend off the primary claim. They were disallowed by the tribunals[100] although the primary claims were at times disallowed or reduced as a consequence of arguments made to substantiate the counterclaims.[101]

**69**    An exaggerated counterclaim may undermine the respondent's credibility. In *Atlantic Triton* v. *Guinea*, the Government attempted to shift the responsibility for the failure of the investment, the conversion and operation of fishing vessels, to the Claimant and presented counterclaims far in excess of the original claim.[102] The Tribunal, after noting that the Government had failed to substantiate its counterclaims, added:

> 4.2 In broader terms, it must be underscored that if Guinea itself considered Atlantic Triton responsible for the significant damages it claims to have suffered, it is surprising that Guinea did not take the initiative and institute arbitration proceedings following the rescission of the Management Agreement but waited until Atlantic Triton filed its request for arbitration before making its claims.[103]

**70**    In *Genin* v. *Estonia*, the Respondent introduced a counterclaim for money which the Claimant had allegedly illegally diverted from the financial institution in which it had invested. The Tribunal rejected the counterclaim since Estonia had failed to show the merits of its case to the Tribunal's satisfaction.[104]

**71**    In some cases counterclaims were of an incidental nature. They concerned claims for interest (see paras. 43–60 *supra*),[105] for procedural costs arising from non-ICSID proceedings (see paras. 62, 63 *supra*) or for outstanding taxes (see paras. 26–28 *supra*, 80, 91 *infra*).

---

99    *Saluka* v. *Czech Republic* (UNCITRAL), Decision on Jurisdiction over the Czech Republic's Counterclaim, 7 May 2004, paras. 41–44; *Saluka* v. *Czech Republic*, Partial Award, 17 March 2006, paras. 179–182. For a commentary on this case, see *Hoffmann, A. K.*, Counterclaims by the Respondent State in Investment Arbitrations, Zeitschrift für Schiedsverfahren, German Arbitration Journal 317–320 (2006).

100    See *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, paras. 4.9, 4.12; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 3.5, 4.101–4.123; *SPP* v. *Egypt*, Award, 20 May 1992, paras. 254–256.

101    *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 77; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 41; *Desert Line* v. *Yemen*, Award, 6 February 2008, paras. 216–225.

102    *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 19, 37–41.

103    At p. 42.

104    *Genin* v. *Estonia*, Award, 25 June 2001, paras. 376–378. See also paras. 201, 235, 309 and 314.

105    See esp. *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 3.5.

## D.  ". . . arising directly out of the subject-matter of the dispute . . ."

The ancillary claim must be closely related to the primary claim:                **72**

> . . . to be admissible such claims must arise "directly" out of the "subject-matter of the dispute" (French version: "*l'objet du différend*"; Spanish version: "*la diferencia*"). The test to satisfy this condition is whether the factual connection between the original and the ancillary claim is so close as to require the adjudication of the latter in order to achieve the final settlement of the dispute, the object being to dispose of all the grounds of dispute arising out of the same subject matter;[106]

### *1. Directness and Jurisdiction*

The close connection required by Art. 46 is not a matter of jurisdiction. The   **73**
wording of Art. 46 makes it clear that the "arising directly" requirement must
be fulfilled in addition to the jurisdictional requirements. A claim may well be
within the Centre's jurisdiction but not arise directly from the subject-matter of
a particular dispute before the tribunal. An obvious example would be a claim
arising from a different investment operation between the same investor and the
same host State (see para. 92 *infra*). Conversely, a claim may arise directly from
the subject-matter of the dispute but may not be subject to ICSID's jurisdiction
(see para. 93 *infra*).

The "arising directly" clause of Art. 46 should be distinguished from a different   **74**
clause in Art. 25 restricting the Centre's jurisdiction to disputes "arising directly
out of an investment" (see Art. 25, paras. 83–112). The "arising directly" clause
in Art. 25 is a condition for jurisdiction and refers to an investment. It looks at the
connection of the dispute to the overall investment operation. The "arising directly"
clause in Art. 46 presupposes jurisdiction and refers to a particular dispute. It
looks at an ancillary claim's connection to the dispute before the tribunal. In a
particular case, the two questions may appear closely related. The tribunal may
have to ascertain if the Centre's jurisdiction extends to the ancillary claim under
Art. 25 and, if the answer is affirmative, whether the ancillary claim is sufficiently
connected to the primary claim to satisfy Art. 46. In practice, the reasoning on
these two questions has sometimes become blurred.

In some cases, the tribunals reached the conclusion that ancillary claims were   **75**
not within the Centre's jurisdiction (see paras. 91–93 *infra*). Therefore, they never
reached the question whether these claims arose directly from the disputes' subject-
matter. One can only speculate whether the "arising directly" requirement would
have been held to be satisfied had jurisdiction been upheld.

Other cases give the impression that the affirmative decision on jurisdiction   **76**
over ancillary claims was strongly influenced by the close connection of the
ancillary claim to the subject-matter of the dispute. In *Holiday Inns* v. *Morocco*,

---

106   Note B(a) to Arbitration Rule 40 of 1968, 1 ICSID Reports 100.

the question arose whether the Tribunal's jurisdiction extended to separate loan contracts despite the fact that these contracts provided for dispute settlement by domestic courts. The Tribunal confirmed its jurisdiction emphasizing the general unity of the investment operation[107] (see Art. 25, para. 95; Art. 26, paras. 61–63). There is no indication of a separate examination of the connection of the loan contract to the subject-matter of the dispute.

**77**     In *Klöckner* v. *Cameroon*, the Government's counterclaim alleged shortcomings in the management of the fertilizer factory that was at the centre of the dispute. Much of the case turned on the question whether the Tribunal's jurisdiction extended to the facility's management seeing that there was a separate management contract which contained an ICC clause rather than an ICSID clause. The Tribunal ultimately found that it had jurisdiction. A decisive element in this finding was the fact that there was "a close connecting factor", that the "reciprocal obligations had a common origin, identical sources and an operational unity" and that they "were assumed for the accomplishment of a single goal, and are thus interdependent"[108] (see Art. 25, paras. 553–557; Art. 26, paras. 25–31). It is hardly surprising that, after having reached this conclusion, the Tribunal did not examine separately whether the counterclaim arose directly out of the subject-matter of the dispute in accordance with Art. 46.

**78**     In the non-ICSID case *Saluka* v. *Czech Republic*, the Tribunal, having ascertained that in principle the Czech Republic could introduce a counterclaim under the relevant treaty, held that it did not have jurisdiction to hear and decide the counterclaims for two reasons: (a) because certain heads of the counterclaim related to the alleged non-performance of a Share Purchase Agreement containing a separate dispute settlement clause, and (b) because there was no close connection between the primary claim and the counterclaim.[109]

## 2. Examination of a Close Connection

**79**     In most cases involving ancillary claims, the "arising directly" issue was never discussed. The close connection to the subject-matter of the dispute was too obvious to merit attention. This applies to the claims for interest on the primary claim (see paras. 38–48 *supra*) but also to cases in which compensation for non-ICSID procedural costs were claimed (see paras. 62–63 *supra*). In other cases too, the "arising directly" issue was neither raised by a party nor addressed by the tribunal. Only rarely do tribunals make a specific finding that a counterclaim relates

---

107     *Lalive, P.*, The First "World Bank" Arbitration (Holiday Inns v. Morocco) – Some Legal Problems, 51 BYIL 123, 159 (1980).

108     *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 65. The *ad hoc* Committee, while criticizing the Tribunal's reasoning also on this point, upheld this portion of the Award: Decision on Annulment, 3 May 1985, paras. 4–56.

109     *Saluka* v. *Czech Republic* (UNCITRAL), Decision on Jurisdiction over the Czech Republic's Counterclaim, 7 May 2004, paras. 47–82.

directly to the object of the dispute[110] or that an incidental claim is admissible in principle.[111]

In *Amco* v. *Indonesia*, the ancillary character of Indonesia's counterclaim for taxes was not discussed in terms of the "arising directly" clause of Art. 46 but became apparent as a consequence of the procedural developments in this case. Indonesia demanded the payment of taxes and import duties from which Amco had been exempted under the terms of its investment licence.[112] The legality of the revocation of the investment licence was one of the central issues in the case. The first Tribunal found that since the revocation of the licence was unlawful, the revocation of the tax facilities was unlawful as well and, consequently, rejected the counterclaim.[113] The *ad hoc* Committee annulled the finding of the Award that the revocation of the licence was unlawful and found that the part of the Award dismissing the counterclaim for recovery of the tax had to be annulled as well since there was an inseparable link between the two.[114] In the Resubmitted Case, Indonesia reintroduced its claim for restitution of taxes.[115] The second Tribunal found that a lawful revocation of the investment licence or even a lawful termination of only the tax facilities could have supported Indonesia's claim for taxes. But since neither was the case, the counterclaim was rejected.[116]    **80**

In *ADF* v. *United States*, a NAFTA arbitration under the Additional Facility, ADF's Memorial, in addition to its main claim, also included references to "other projects". The Tribunal found that this claim could not be characterized as an "incidental or additional" claim within the meaning of Art. 48 (now Art. 47) of the Arbitration (Additional Facility) Rules. The Tribunal noted that Article 46 of the ICSID Convention and ICSID Arbitration Rule 40(1), even though they do not apply to Additional Facility proceedings, provide guidance in this context since they elaborate on the meaning of incidental or additional claims. The Tribunal said:    **81**

> It is not necessary to distinguish between "incidental claims" and "additional claims"; both must satisfy the requirement of a close relationship with or connection to the original or primary claim.[117]

In the particular case, the Tribunal found that connection to be lacking because the projects in question were totally unrelated to the "original or primary claim".[118] The Tribunal thus dismissed ADF's new claim as inadmissible.    **82**

In *CMS* v. *Argentina*, Argentina contended that CMS had submitted two separate disputes and asserted that the second dispute had not been registered with the    **83**

---

110  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 4.104.
111  *SOABI* v. *Senegal*, Award, 25 February 1988, para. 8.06.
112  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 145.
113  At para. 287.
114  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 116.
115  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 24, 34.
116  At paras. 157–162.
117  *ADF* v. *United States* (AF), Award, 9 January 2003, para. 144.
118  At paras. 144–146.

Centre in conformity with Article 36(3) of the Convention. Argentina also objected to claims concerning events that took place after the request for arbitration was introduced. CMS responded that the fact that the events giving rise to the second claim were not mentioned in the request for arbitration did not deprive it of the right to submit the claim and argued that it was in any event entitled to pursue additional or incidental claims under Article 46 of the Convention and Arbitration Rule 40.[119]

**84**    The *CMS* Tribunal interpreted Note B to Arbitration Rule 40 (see para. 72 *supra*) as supporting the conclusion that the events subsequent to the request for arbitration in the case before it gave rise to incidental or additional claims. The Tribunal emphasized that its task was not to decide whether there were one or two disputes, but, rather, to decide whether the investor's additional claims arose directly out of the same subject-matter. The Tribunal concluded that there was undoubtedly a close connection between the additional claims and the main claims which required adjudication of both to achieve the final settlement of the dispute.[120]

**85**    The Tribunal in *LG&E* v. *Argentina* decided that for reasons of efficiency it had to address the facts complained of by LG&E in its additional request in the same proceeding as the original claim. The Tribunal noted that the facts underlying LG&E's additional request were "aspects of a single, continuous dispute" and that Argentina had not shown any prejudice that might result from having both disputes decided in the same proceeding. Furthermore, the Tribunal held that this was in compliance with Article 46 of the ICSID Convention.[121]

### E.  ". . . provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre."

**86**    The inclusion of ancillary claims under Art. 46 does not extend the Centre's jurisdiction. Rather, the existence of jurisdiction over an ancillary claim is a precondition for the operation of this provision[122] (see paras. 5, 73 *supra*).

**87**    The early drafts to the Convention did not spell out in terms that incidental or additional claims or counterclaims had to be within the Centre's jurisdiction (History, Vol. I, p. 204). But Mr. *Broches* pointed out repeatedly that these claims too had to be covered by the parties' consent and that the provision was in no way intended to extend the tribunal's competence (History, Vol. II, pp. 270, 337, 422, 573). In order to clarify this point, the words "provided that they are within the jurisdiction of the Centre" were added in the First Draft (History, Vol. I, p. 204). On the basis of a Chinese proposal (History, Vol. II, p. 810), the Revised Draft added a reference to the consent of the parties (History, Vol. I, p. 206). Since consent is part of the requirements for jurisdiction, the Convention's final text

---

119   *CMS* v. *Argentina*, Decision on Jurisdiction, 17 July 2003, paras. 101–106.
120   At paras. 107–119.
121   *LG&E* v. *Argentina*, Decision on Jurisdiction, 30 April 2004, paras. 41 and 81.
122   See also Note B(b) to Arbitration Rule 40 of 1968, 1 ICSID Reports 100.

*Article 46 – Ancillary Claims*                                            755

states that the claims must be within the parties' consent *and otherwise* within the Centre's jurisdiction (History, Vol. II, pp. 948, 987).

In many of the cases before ICSID tribunals involving ancillary claims, the **88** question of jurisdiction over these claims was neither raised by one of the parties nor addressed by the tribunals. For instance, in the context of interest (see paras. 43–60 *supra*), or compensation for costs of non-ICSID proceedings (see paras. 61–63 *supra*), the issue never arose.[123]

In some cases, the tribunals considered the question of jurisdiction over coun- **89** terclaims and reached an affirmative conclusion. Thus, in *Benvenuti & Bonfant* v. *Congo*, even though jurisdiction over the Government's counterclaims was not disputed, the Tribunal considered the question and upheld its competence.[124]

In *Klöckner* v. *Cameroon*, the question of jurisdiction over the Government's **90** counterclaim turned out to be one of the thorniest issues of the entire case (see para. 77 *supra*; Art. 25, paras. 553–555; Art. 26, paras. 25–31). The Tribunal's affirmative decision[125] was strongly criticized in the Dissenting Opinion.[126] This part of the decision was subjected to detailed scrutiny by the *ad hoc* Committee which ultimately upheld it.[127]

In other cases, the tribunals came to the conclusion that there was no jurisdiction **91** over ancillary claims. In *Amco* v. *Indonesia*, the Government introduced a new counterclaim for tax fraud in the Resubmitted Case after the first Award had been annulled. This claim was distinct from the counterclaim for recovery of taxes discussed above (see para. 80 *supra*). The second Tribunal held that this counterclaim was outside the jurisdiction of the Centre since it did not arise directly out of an investment in accordance with Art. 25(1). Therefore, tax fraud was beyond the Tribunal's competence *ratione materiae*[128] (see Art. 25, para. 97). In addition, the Tribunal found that it was impermissible to introduce a new claim in a case that was resubmitted in accordance with Art. 52(6) (see paras. 26–28 *supra*).

In *LETCO* v. *Liberia*, the Claimant had included damages for lost profits arising **92** from the P. Bork Area, a concession other than the one under dispute. The Tribunal held that its jurisdiction was limited to the Concession Agreement of 1970 containing an ICSID arbitration clause and did not extend to the P. Bork Area concession.[129] There is no indication whether the P. Bork Area concession also contained an ICSID clause. Even if it did, the claim would not have been ancillary

---

123  See also *SPP* v. *Egypt*, Award, 20 May 1992, paras. 254–256, where the Tribunal dismisses the counterclaims on the merits without discussing the question of jurisdiction over them. The Dissenting Opinion reaches the conclusion that the Tribunal should have found the counterclaims outside ICSID's jurisdiction, 3 ICSID Reports 318.

124  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 4.102–4.104.

125  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13/14, 17/18, 65–69.

126  At pp. 89–93.

127  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 4–56.

128  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 565.

129  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 374.

since it did not arise directly out of the subject-matter of the dispute (see para. 73 *supra*).

93    In *Atlantic Triton* v. *Guinea*, the dispute arose from an agreement between the parties for the conversion, equipping and operation of three fishing vessels in order to establish a fishing industry in Guinea. The agreement contained an ICSID arbitration clause. After the operation had broken down, Atlantic Triton instituted ICSID arbitration. One of Guinea's counterclaims concerned Atlantic Triton's alleged errors in the choice of the vessels.[130] The Tribunal noted that the agreement containing the ICSID clause by its own terms was to apply to the vessels only from the date they were accepted by the owner. Therefore, and despite its close connection to the subject-matter of the dispute, the counterclaim was held to be outside the Tribunal's jurisdiction.[131]

94    In cases where jurisdiction is based on a general offer by the host State contained in its legislation or a treaty (see Art. 25, paras. 392–463), the possibility for counterclaims may be limited. Consent will be restricted to the extent of the investor's acceptance of the offer. If the investor accepts the offer only in respect of its specific claim, consent will be restricted by the terms of the acceptance. If the investor accepts the offer of jurisdiction by instituting proceedings, consent exists only to the extent necessary to deal with the investor's request.[132] But if a counterclaim of the State is closely connected to the investor's complaint, it is arguable that it will be covered by the mutual consent of the parties.[133]

95    In the non-ICSID case *Saluka* v. *Czech Republic*, the Tribunal examined whether the Respondent's counterclaims fell within its jurisdiction under the terms of the applicable BIT. The Tribunal concluded that, in principle, the language of the treaty, referring to "all disputes", was "wide enough to include disputes giving rise to counterclaims, so long, of course, as other relevant requirements are also met".[134] The Tribunal did not discuss the issue that the acceptance of jurisdiction by the investor may be narrower than the offer contained in the treaty (see Art. 25, para. 514).

---

130    *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 37–39.
131    At p. 39.
132    See the parties' arguments in *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, para. 108.
133    *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 320 (1999).
134    *Saluka* v. *Czech Republic*, Decision on Jurisdiction over the Czech Republic's Counterclaim, 7 May 2004, paras. 37–39.

# Article 47

**Except as the parties otherwise agree, the Tribunal may, if it considers that the circumstances so require, recommend any provisional measures which should be taken to preserve the respective rights of either party.**

## OUTLINE

*Paragraphs*

I.  INTRODUCTION 1–7
II. INTERPRETATION 8–177
   A. **"Except as the parties otherwise agree, . . ."** 8–10
   B. **". . . the Tribunal may, . . ."** 11–14
      1. The Initiative to Request Provisional Measures 11
      2. The Right of the Parties to be Heard 12
      3. The Tribunal's Discretion 13–14
   C. **". . . recommend any provisional measures . . ."** 15–62
      1. The Legal Authority of Provisional Measures 15–22
      2. The Implementation of Provisional Measures 23–30
      3. The Consequences of Non-Compliance with Provisional Measures 31–36
      4. Priority and Speed 37–45
      5. Provisional Measures and Jurisdiction 46–57
      6. The Temporary Nature of Provisional Measures 58–62
   D. **". . . if it considers that the circumstances so require, . . . which should be taken to preserve the respective rights . . ."** 63–169
      1. Necessity and Urgency 63–71
      2. Circumstances, Protected Rights and Required Measures 72–151
         a) Obtaining Evidence 80–89
         b) Financial Guarantees 90–98
         c) Parallel Domestic Proceedings 99–134
         d) Aggravation of the Dispute 135–147
         e) Confidentiality of the Proceedings 148–151
      3. The Addressees of Provisional Measures 152–156
      4. The Rights in Dispute 157–169
   E. **". . . of either party."** 170–177
      1. Investor Rights and Host State Rights 171–172
      2. Rights of Third Parties 173–177

757

# BIBLIOGRAPHY

*Antonietti, A.*, ICSID and Provisional Measures: An Overview, 21 News from ICSID, No. 2, 10 (2004);

    Le CIRDI et les mesures conservatoires: récentes expériences, 7 Forum du Droit International, No. 1, 41 (2005);

*Brower, Ch. N./Goodman, R. E. M.*, Provisional Measures and the Protection of ICSID Jurisdictional Exclusivity Against Municipal Proceedings, 6 ICSID Review – FILJ 431 (1991);

*Collins, L.*, Provisional and Protective Measures in International Litigation, 234 Recueil des Cours 98 (1992-III);

*Delaume, G. R.*, ICSID Tribunals and Provisional Measures – A Review of the Cases, 1 ICSID Review – FILJ 392 (1986);

*Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335 (1986);

    ICSID and Court-Ordered Provisional Measures: An Update, 4 Arbitration International 161 (1988);

*Lalive, P.*, The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 BYIL 123 (1980), reprinted in 1 ICSID Reports 645 (1993);

*Masood, A.*, Provisional Measures of Protection in Arbitration under the World Bank Convention, 1 Delhi Law Review 138 (1972);

*Parra, A. R.*, The Practices and Experience of ICSID, *in*: Conservatory and Provisional Measures in International Arbitration 37 (ICC Publication No. 519) (1993);

*Rosenne, S.*, Provisional Measures in International Law (2005);

*Rueda García, J. Á.*, Provisional Measures in Investment Arbitration: Recent Experiences in Oil Arbitrations Against the Republic of Ecuador, TDM, July (2008).

# I. INTRODUCTION

**1**     Provisional measures (interim, protective, conservatory measures) are a common feature in national as well as international adjudication and arbitration.[1]

---

1  *Collins, L.*, Provisional and Protective Measures in International Litigation, 234 Recueil des Cours 98–105 (1992-III); *Oellers-Frahm, K.*, Interim Measures of Protection, Encyclopedia of Public International Law, Vol. 1, 69 (1981); *Bösch, A.* (ed.), Provisional Remedies in International Commercial Arbitration (1994); *Bernhardt, R.* (ed.), Interim Measures Indicated by International Courts (1994); *Rosenne, S.*, The World Court, What it is and How it works, 96 *et seq.* (1995); *Higgins, R.*, Interim Measures for the Protection of Human Rights, 36 Columbia Journal of Transnational Law 91 (1997); *Gross, L.*, Some Observations on Provisional Measures, *in*: International Law at a Time of Perplexity, Essays in Honour of Shabtai Rosenne (*Dinstein, Y.* ed.) 307 (1989); *Oda, S.*, Provisional Measures, *in*: Fifty Years of the International Court of Justice, Essays in Honour of Sir Robert Jennings (*Lowe, V./Fitzmaurice, M.* eds.) 541 (1996); *Merrills, J. G.*, Interim Measures of Protection in the Recent Jurisprudence of the International Court of Justice, 44 International and Comparative Law Quarterly 90 (1995); International Law Association, Résolution adoptée par la 67éme Conférence tenue à Helsinki (1996); Committee on International Civil and Commercial Litigation, Provisional and Protective Measures in International Litigation, 124 Journal du Droit International 112 *et seq.* (1997); *Donovan, D.*, The Scope and Enforceability of Provisional Measures in International Commercial Arbitration: A Survey of Jurisdictions, the Work of UNCITRAL and Proposals for Moving Forward, International Council for Commercial Arbitration Congress Series No. 11, 2003, at p. 108; *Rosenne, S.*, Provisional Measures in International Law (2005).

The most famous example of a provision concerning conservatory or provisional measures is Art. 41 of the Statute of the International Court of Justice,[2] which served as a model in the drafting of Art. 47 of the ICSID Convention (History, Vol. II, pp. 668, 813). Nevertheless, the mixed nature of ICSID proceedings, certain special features of ICSID procedure (see para. 48 *infra*) and the specific wording of this provision have given Art. 47 of the Convention its own characteristics. The authority to issue provisional measures is also provided for in other instruments governing international adjudication. These include the International Law Commission's 1958 Model Rules on Arbitral Procedure (Art. 20),[3] the 1998 International Chamber of Commerce Rules of Arbitration (Art. 23),[4] the 2006 Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (Art. 32),[5] the 1996 CAMCA Arbitration Rules (Art. 23),[6] the London Court of Arbitration Rules (Art. 25),[7] the 1976 UNCITRAL Arbitration Rules (Art. 26)[8] and the 1985 UNCITRAL Model Law as amended in 2006 (Chapter IV A).[9]

The purpose of provisional measures is to induce behaviour by the parties that is conducive to a successful outcome of the proceedings such as securing discovery of evidence, preserving the parties' rights, preventing self-help, safeguarding the awards' eventual implementation and generally keeping the peace. They have to be taken at a time when the outcome of a dispute is still uncertain. Therefore, the Tribunal has to strike a careful balance between the urgency of a request for provisional measures and the need not to prejudge the merits of the case.[10]  **2**

The drafting history of what eventually became Art. 47 shows considerable disagreement. The Working Paper, the Preliminary Draft and the First Draft (History, Vol. I, p. 206) envisaged a much stronger wording, providing for binding measures including the tribunals' power to impose sanctions for non-compliance. These drafts encountered considerable opposition (see paras. 15, 23, 31 *infra*). At one point, a suggestion to delete the Article entirely was put to the vote but defeated (History, Vol. II, p. 814). The final version represents a compromise between those who wanted powerful provisional measures and those who found them unnecessary.  **3**

Provisional measures should be distinguished clearly from awards. The provisions of Arts. 48–55 of the Convention do not apply to provisional measures. This  **4**

---

2  ICJ Statute, Art. 41, para. 1: "The Court shall have the power to indicate, if it considers that circumstances so require, any provisional measures which ought to be taken to preserve the respective rights of either party."
3  YBILC 85 (1958-II).              4   36 ILM 1613 (1997).
5  http://www.sccinstitute.com.      6   35 ILM 1555/6 (1996).
7  http://www.lcia-arbitration.com.  8   15 ILM 711 (1976).
9  http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/1985Model_arbitration.html. Article 17 of the 1985 Model Law has been replaced by a new Chapter IV A to introduce a new legal regime regarding interim measures.
10  The Tribunal in *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, para. 67, quoted this passage from the First Edition of this Commentary.

means, in particular, that the procedures governing annulment, recognition and enforcement provided by the Convention do not extend to provisional measures. Art. 47 should also be distinguished from another type of interim measure provided for by the Convention, namely the stay of enforcement of an award pending a decision on its interpretation (Art. 50(2)), revision (Art. 51(4)) and annulment (Art. 52(5)).

5    The application of Art. 47 is set out in more detail in Arbitration Rule 39. Arbitration Rule 39 was amended with effect on 10 April 2006 to allow a party seeking provisional measures to introduce the request at any time after the institution of the arbitral proceedings, even before the constitution of the tribunal. Accordingly, the first paragraph was modified and a new paragraph 5 was inserted to provide for that eventuality.

6    The first five paragraphs of Arbitration Rule 39, as amended in 2006, provide the procedural framework for provisional measures and run as follows:

### Rule 39
*Provisional Measures*

(1) At any time after the institution of the proceeding, a party may request that provisional measures for the preservation of its rights be recommended by the Tribunal. The request shall specify the rights to be preserved, the measures the recommendation of which is requested, and the circumstances that require such measures.

(2) The Tribunal shall give priority to the consideration of a request made pursuant to paragraph (1).

(3) The Tribunal may also recommend provisional measures on its own initiative or recommend measures other than those specified in a request. It may at any time modify or revoke its recommendations.

(4) The Tribunal shall only recommend provisional measures, or modify or revoke its recommendations, after giving each party an opportunity of presenting its observations.

(5) If a party makes a request pursuant to paragraph (1) before the constitution of the Tribunal, the Secretary-General shall, on the application of either party, fix time limits for the parties to present observations on the request, so that the request and observations may be considered by the Tribunal promptly upon its constitution.

Paragraphs (2) to (4) are identical to Arbitration Rule 39 in its previous version.[11]

7    Pursuant to Art. 46 of the Arbitration (Additional Facility) Rules (see Art. 25, paras. 9–13) a tribunal may issue provisional measures under similar conditions. This provision was not amended to reflect the changes brought to Arbitration Rule 39 in 2006. Another important difference to the Convention is the fact that under the Arbitration (Additional Facility) Rules a party may request that provisional measures be *ordered* by the tribunal. But the tribunal may also *recommend* provisional measures on its own initiative.

---

11  Paragraph (6) of Rule 39 deals with provisional measures ordered by domestic courts or authorities. It is discussed in the context of Art. 26 (see Art. 26, paras. 176–178).

## II. INTERPRETATION

### A. "Except as the parties otherwise agree, . . ."

Art. 47 is subject to exclusion or variation by the parties.[12] The parties may **8** agree to exclude the possibility of provisional measures altogether or to limit the tribunal's power with respect to the circumstances under which they are to be recommended or with respect to the types of measures which will be permissible. Conversely, the parties may extend the tribunal's power by providing that provisional measures or certain categories of provisional measures will be binding.[13]

The 1981 and 1993 versions of the Model Clauses do not cover agreements by **9** the parties on provisional measures.[14] An earlier version of the Model Clauses[15] offered the parties a formula to exclude provisional measures:

> XXVI. No Arbitral Tribunal constituted pursuant to this agreement shall, without the special consent of the parties hereto, be empowered to recommend any provisional measures before rendering its award.

It also offered a formula to make provisional measures binding:

> XXVII. The parties hereto agree to abide by and comply with any provisional measures [unanimously] recommended by an Arbitral Tribunal constituted pursuant to this agreement.

These and similar possibilities to exclude or vary Art. 47 are still open to the parties.[16]

The Section of the NAFTA on settlement of investment disputes (see Art. 25, **10** paras. 457–459) contains a specific provision dealing with provisional measures in the following terms:

> **Article 1134: Interim Measures of Protection**
> A Tribunal may order an interim measure of protection to preserve the rights of a disputing party, or to ensure that the Tribunal's jurisdiction is made fully effective, including an order to preserve evidence in the possession or control of a disputing party or to protect the Tribunal's jurisdiction. A Tribunal may not order attachment or enjoin the application of the measure alleged to constitute a breach referred to in Art. 1116 or 1117. For purposes of this paragraph, an order includes a recommendation.[17]

---

12  A vote to delete this part of the Article in the course of the preparatory works was defeated. History, Vol. II, p. 815.

13  Note B to Arbitration Rule 39 of 1968, 1 ICSID Reports 99; *Masood, A.*, Provisional Measures of Protection in Arbitration under the World Bank Convention, 1 Delhi Law Review 138 at 145 (1972).

14  Clause 14 of the 1993 version of the Model Clauses is directed at provisional or conservatory measures by a domestic court or other authority and is dealt with elsewhere (see Art. 26, paras. 181, 182; Art. 55, paras. 109, 110).

15  7 ILM 1159 (1968).

16  See also *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211 at 241 (1973/74).

17  32 ILM 646 (1993).

## B.  ". . . the Tribunal may, . . ."

### 1. The Initiative to Request Provisional Measures

**11**     The earlier drafts to what eventually became Art. 47 foresaw provisional measures only "at the request of either party" (History, Vol. I, p. 206). In the subsequent debates it was suggested that the tribunal be given this power even without the request of a party (History, Vol. II, pp. 268 *et seq.*, 422, 573 para. 70). The clause requiring a request from a party was deleted in the First Draft. Arbitration Rule 39(3) makes it clear that the tribunal may also recommend measures on its own initiative.[18] Nevertheless, it is obvious that the initiative will normally come from an interested party. Arbitration Rule 39(1) specifically provides that a party may request provisional measures. In the published cases in which tribunals have, so far, considered provisional measures, the initiative has always come from one of the parties. In many of these cases the request was made by the non-State Claimant.[19] In other cases the request came from the Respondent State.[20] In some cases requests came from both parties.[21]

### 2. The Right of the Parties to be Heard

**12**     Despite the provisional nature of the measures and the urgency that may be involved, Arbitration Rule 39(4) directs that the tribunal may only recommend, modify or revoke provisional measures after giving each party an opportunity to present its observations. The purpose of this requirement is to avoid surprises or

---

18   In *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, 4 ICSID Reports 328, the Tribunal specifically reserved the right to recommend provisional measures on its own initiative. See also *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, para. 16.

19   *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 653–659; *AGIP* v. *Congo*, Award, 30 November 1979, para. 7; *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, 4 ICSID Reports 323; *CSOB* v. *Slovakia*, Procedural Order No. 2, 9 September 1998; *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 388; *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 38; *Tokios Tokelès* v. *Ukraine*, Procedural Order No. 1, 1 July 2003; *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, para. 1; *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005, para. 1; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 46; *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, para. 2; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 8; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 163; *Enron* v. *Argentina*, Award, 22 May 2007, para. 40; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 23, 24; *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, para. 4; *Railroad Development Corp.* v. *Guatemala*, Decision on Provisional Measures, 15 October 2008, para. 1.

20   *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983, para. 1; *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 68; *Maffezini* v. *Spain*, Decision on Provisional Measures, 28 October 1999, para. 1; *Tanzania Electric* v. *IPTL*, Decision on Provisional Measures, 20 December 1999, para. 3; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 15; *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 16.

21   *Atlantic Triton* v. *Guinea* – see *Friedland*, Provisional Measures, pp. 347 *et seq.*; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 26–28; *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, paras. 28, 78; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 46.

unintentionally unfair dispositions.[22] In compliance with this requirement, ICSID tribunals customarily invite parties to exchange written submissions and often hold oral hearings on the subject of provisional measures.[23] Failure to give the other party an opportunity to be heard will amount to a serious departure from a fundamental rule of procedure in the sense of Art. 52(1)(d). This may expose the resulting award to annulment (see Art. 52, paras. 305–317).

### 3. The Tribunal's Discretion

It is obvious that a tribunal, in recommending provisional measures, is not **13** bound by the parties' submissions, but may recommend measures other than those specified in a request. In a number of cases requests for provisional measures were denied.[24] In other cases the applications were granted although the tribunals in recommending provisional measures sometimes departed from the requests.[25] In *CSOB* v. *Slovakia*, the request was first twice denied and then granted in two separate procedural orders in modified form.[26]

---

22  Note E to Arbitration Rule 39 in its 1968 version, 1 ICSID Reports 100.
23  *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 653–659; *AGIP* v. *Congo*, Award, 30 November 1979, para. 9; *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983, para. 2; *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 68/9; *Atlantic Triton* v. *Guinea*, see: *Delaume, G. R.*, ICSID Tribunals and Provisional Measures – A Review of the Cases, 1 ICSID Review – FILJ 392 at 393 (1986); *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, 4 ICSID Reports 324; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 14; *Maffezini* v. *Spain*, Decision on Provisional Measures, 28 October 1999, para. 26; *Tanzania Electric* v. *IPTL*, Decision on Provisional Measures, 20 December 1999, para. 4; *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, para. 34; *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 388; *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 39–41; *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, para. 1; *Tokios Tokelés* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 11; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 17; *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, paras. 21, 31–64; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 163–169; *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, para. 5.
24  *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983; *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993; *Maffezini* v. *Spain*, Decision on Provisional Measures, 28 October 1999, para. 27; *Tanzania Electric* v. *IPTL*, Decision on Provisional Measures, 20 December 1999, para. 19; *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, para. 89; *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005, para. 50; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, para. 14; *Enron* v. *Argentina*, Award, 22 May 2007, para. 40; *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, para. 101.
25  *Holiday Inns* v. *Morocco*, Decision on Provisional Measures, 2 July 1972, 1 ICSID Reports 658; *AGIP* v. *Congo*, Award, 30 November 1979, para. 9; *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 69; *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002; *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 45; *Tokios Tokelés* v. *Ukraine*, Procedural Order No. 1, 1 July 2003, para. 7; *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, para. 50; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 46; *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006; *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 16; *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 183–185; *Sempra* v. *Argentina*, Award, 28 September 2007, para. 37.
26  *CSOB* v. *Slovakia*, Procedural Order No. 2, 9 September 1998, Procedural Order No. 3, 5 November 1998, Procedural Order No. 4, 11 January 1999, Procedural Order No. 5, 1 March 2000.

**14**    Under Arbitration Rule 39(3) the tribunal may, at any time, modify or revoke provisional measures if they are no longer required by the circumstances (see paras. 58–62 *infra*).

### C.  ". . . recommend any provisional measures . . ."

#### 1. The Legal Authority of Provisional Measures

**15**    The legal authority of decisions on provisional measures was a central question in the drafting history of Art. 47.[27] The Working Paper, the Preliminary Draft and the First Draft foresaw the power of an ICSID tribunal to prescribe rather than merely recommend provisional measures (History, Vol. I, p. 206). This power was opposed especially by the delegate from China, who objected to binding measures particularly against the State party which might be unable to comply for reasons of "necessity on national policy" (History, Vol. II, pp. 515, 518, 655, 813). An idea to authorize the tribunal to make "interim awards" on provisional measures (at pp. 516, 523) did not prevail. Eventually, the word "prescribe" was replaced by the word "recommend" by a large majority (at pp. 814 *et seq.*).[28]

**16**    The Convention's legislative history suggests that a conscious decision was made not to grant the tribunal the power to order binding provisional measures. However, this lack of binding force would not deprive them of all legal relevance. The general obligation not to frustrate the object of the proceedings will in many cases amount to an obligation to abide by provisional measures that are necessary to complete the arbitration successfully. Moreover, the tribunal has the power to take the parties' conduct into account when making the award (see paras. 31–36 *infra*), the binding force of which is beyond doubt.

**17**    One way of making provisional measures binding is to persuade the parties to put them into the form of an agreement. In *Vacuum Salt* v. *Ghana*, the Tribunal's first Decision on Provisional Measures embodied undertakings on the part of the Government which had been accepted by the Claimant[29] (see para. 110 *infra*).

**18**    Despite the apparently clear restriction to recommendations, tribunals have developed a doctrine under which provisional measures have binding effect on the parties. In *Maffezini* v. *Spain*, the Tribunal noted that the difference between the word "recommend" used in Arbitration Rule 39, and the word "order" used elsewhere in the Rules to indicate a tribunal's power to direct a party to undertake a certain action, is "more apparent than real". The *Maffezini* Tribunal went on to state that its authority to rule on provisional measures was "no less binding than

---

27    For an overview see *Brower, Ch. N./Goodman, R. E. M.*, Provisional Measures and the Protection of ICSID Jurisdictional Exclusivity Against Municipal Proceedings, 6 ICSID Review – FILJ 431 at 440 *et seq.* (1991).

28    The legal authority of provisional measures issued by other judicial bodies varies. The relevant instruments (see para. 1 *supra*) variously use the expressions "indicate", "order" and "interim award".

29    *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, reproducing the operative part of the Decision on Provisional Measures of 3 December 1992. See also *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, para. 87.

that of a final award" and hence concluded that it deemed "the word 'recommend' to be of equivalent value to the word 'order'".[30]

In *Pey Casado* v. *Chile*, the Tribunal relied on *Maffezini* for its conclusion that the **19** question of the binding nature of provisional measures is no longer controversial. The Tribunal also drew an analogy with the case law of the International Court of Justice on the interpretation of Art. 41 of the Statute and with the case law of the Iran-US Claims Tribunal. The Tribunal referred to "the questionable method of interpretation which consists of referring to the *travaux préparatoires*".[31] It did not discuss the difference between the terms "indicate" in Art. 41 of the Statute of the ICJ and "recommend" in Art. 47 of the ICSID Convention. In terms of the methods of treaty interpretation, the Tribunal concentrated on the provision's object and purpose rather than on its ordinary meaning.

In *Tokios Tokelės* v. *Ukraine* the Tribunal unquestioningly accepted the binding **20** force of provisional measures. The Tribunal said:

> It is to be recalled that, according to a well-established principle laid down by the jurisprudence of the ICSID tribunals, provisional measures "recommended" by an ICSID tribunal are legally compulsory; they are in effect "ordered" by the tribunal, and the parties are under a legal obligation to comply with them.[32]

Similarly, in *Occidental* v. *Ecuador*, the Tribunal had no doubt about its power **21** to order binding provisional measures:

> The Tribunal wishes to make clear for the avoidance of doubt that, although Article 47 of the ICSID Convention uses the word "recommend", the Tribunal is, in fact, empowered to <u>order</u> provisional measures. This has been recognized by numerous international tribunals, among them the ICSID tribunal in the *Tokios Tokelės* case.[33]

In *Biwater Gauff* v. *Tanzania*, the Tribunal both recommended and ordered **22** certain measures following Biwater's applications for provisional measures. The Tribunal "recommended" the preservation of evidence and the procurement of an inventory of documents.[34] By contrast, the Tribunal "ordered" the production of certain documents. However, the Tribunal emphasized that it made the order for the production of documents not under Art. 47 but under Art. 43 of the Convention.[35]

## 2. *The Implementation of Provisional Measures*

As long as the draft of what eventually became Art. 47 still provided for **23** provisional measures to be "prescribed", there was also some debate about their enforcement (History, Vol. II, pp. 338, 347). Even those who favoured only non-binding measures agreed that damages would be due in case of non-compliance

---

30  *Maffezini* v. *Spain*, Decision on Provisional Measures (Procedural Order No. 2), 28 October 1999, para. 9.

31  *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, paras. 17–26.

32  *Tokios Tokelės* v. *Ukraine*, Procedural Order No. 1, 1 July 2003, para. 4.

33  *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, para. 58. Emphasis original.

34  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, paras. 87–88 and 97–98.

35  *Ibid.*, paras. 99–106.

(at pp. 515 *et seq.*, 523). The suggestion to render provisional measures in the form of interim awards (at p. 516) would have led to their treatment like final awards for purposes of enforcement (at pp. 523, 573). At one point, a second paragraph was added into the First Draft providing: "The Tribunal may fix a penalty for failure to comply with such provisional measures" (History, Vol. I, p. 206; Vol. II, pp. 655, 664). The idea was to include the penalty in the final award (at pp. 812 *et seq.*). The second paragraph providing for a penalty for non-compliance was eventually deleted by a "nearly unanimous vote" (at p. 815).

24      There was also some debate on the role of domestic courts to enforce provisional measures emanating from ICSID arbitration (History, Vol. II, pp. 338, 812). Mr. *Broches* pointed out that there was no way for a private investor to obtain their specific enforcement against the State (at p. 516). Some delegates envisaged difficulties where a provisional measure might conflict with the municipal law, especially the constitutional law of the country where it should be carried out (at pp. 270, 515, 573, 813, 814). These difficulties were removed when the tribunal's power was restricted to recommending provisional measures (at p. 815).

25      It is uncertain whether a domestic court could be induced to enforce a provisional measure by an ICSID tribunal that is only couched in the form of a recommendation.[36] Nevertheless, it must be borne in mind that, to the extent that provisional measures give rise to a legal obligation (see paras. 15–22 *supra*) such an obligation extends to the domestic courts of the State party concerned. Under international law, States are responsible also for the actions of their judiciaries and cannot rely on the insufficiency of their domestic laws to excuse non-compliance with international obligations.[37]

26      The cases in which domestic courts have played a role in the context of ICSID provisional measures concerned not the enforcement of the provisional measures by domestic courts but rather with ICSID provisional measures being directed against action taken in domestic courts (see paras. 99–134 *infra*). The recommendations given by the ICSID tribunals seem to have exerted some influence on the courts in deciding on the propriety of attachments that were contested before them.

27      In *MINE* v. *Guinea*, the ICSID Tribunal in its Ruling on Provisional Measures of 4 December 1985 had unequivocally recommended the discontinuation of all proceedings in domestic courts.[38] The Court of First Instance of Geneva cited the Tribunal's recommendation at length[39] and took it into consideration as one of several grounds supporting its decision to lift the attachments. An application by

36    The decision of the Court of Appeal of Rennes of 26 October 1984 in *Atlantic Triton* v. *Guinea*, 3 ICSID Reports 9, contains a brief reference to a necessity for the parties to have recourse to national courts for the implementation of conservatory measures recommended by an ICSID tribunal.

37    Art. 4 of the International Law Commission's Articles on State Responsibility; Art. 27 of the Vienna Convention on the Law of Treaties. See also *Brower/Goodman*, Provisional Measures, p. 451. For a possible role of courts in third States, see paras. 153, 154 *infra*.

38    *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 69.

39    *MINE* v. *Guinea*, Switzerland, Tribunal de Première Instance, Geneva, 13 March 1986, 4 ICSID Reports 41, 43.

MINE to the Supervisory Authority of the Office des Poursuites for the Enforcement of Debts and Bankruptcy in Geneva to have the attachments maintained was unsuccessful. The Supervisory Authority also cited the Tribunal's recommendation on provisional measures.[40] In rejecting MINE's application, it said:

> We know not only that the Arbitral Tribunal did not authorize recourse to such measures but that, on the contrary, it recommended to MINE, in its decision on provisional measures of 4 December 1985, that it should withdraw and permanently discontinue all pending litigation before national courts as well as withdraw all other provisional measures.[41]

These Swiss decisions illustrate the fact that while domestic courts may not be in a position to enforce ICSID provisional measures, they can be strongly influenced by them in situations where the exclusive jurisdiction of ICSID *vis-à-vis* domestic courts is at issue.

In *Atlantic Triton* v. *Guinea* (see paras. 103–105 *infra*), the Court of Appeal of Rennes gave its decision while the application for provisional measures was still pending before the ICSID Tribunal. In quashing attachments that had been obtained by Atlantic Triton, the court noted the fact that the ICSID Tribunal had been asked by Guinea to order Atlantic Triton to consent to the immediate vacation of the attachments.[42]    **28**

In *CSOB* v. *Slovakia*, the Tribunal, in its Procedural Order of 11 January 1999, had recommended the suspension of domestic bankruptcy proceedings to the extent that these proceedings might involve the determinations of issues before the Tribunal.[43] The Supreme Court of the Slovak Republic in a ruling of 23 September 1999 upheld a decision of the Bratislava Regional Court denying the request for suspension of the bankruptcy proceedings. The Slovak Supreme Court found that there was no conflict between the two proceedings and that the decision of the ICSID Tribunal would be valid and binding notwithstanding the results of the bankruptcy proceedings. The Tribunal's subsequent Procedural Order of 1 March 2000 reaffirmed and extended its earlier recommendation of provisional measures.[44]    **29**

In *Zhinvali* v. *Georgia*, the Tribunal granted provisional measures directing that a Georgia court stay and suspend proceedings insofar as they concerned issues pending before the ICSID tribunal (see para. 177 *infra*).[45] The Tribunal directed the Respondent to bring its recommendation to the attention of the Georgia court so that it might take the exclusive jurisdiction of ICSID into account.[46] An earlier decision by a Georgia court that had interfered with the Tribunal's jurisdiction was subsequently vacated.[47]    **30**

---

40  *MINE* v. *Guinea*, Switzerland, Autorité de surveillance des offices de poursuite pour dette et de faillite, Geneva, 7 October 1986, 4 ICSID Reports 45, 47.
41  At p. 51.
42  *Atlantic Triton* v. *Guinea*, France, Cour d'appel Rennes, 26 October 1984, 3 ICSID Reports 4, 7.
43  *CSOB* v. *Slovakia*, Procedural Order No. 4, 11 January 1999.
44  *CSOB* v. *Slovakia*, Procedural Order No. 5, 1 March 2000.
45  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 38–46.
46  *Ibid.*, para. 45.        47  *Ibid.*, para. 46.

### 3. The Consequences of Non-Compliance with Provisional Measures

**31**    The legislative history of Art. 47 contains repeated references to the tribunals' power to award damages to the aggrieved party where the other party had not complied with provisional measures (History, Vol. II, pp. 515 *et seq.*, 655, 664, 813 *et seq.*). At one point, a suggestion was put to the vote to add a provision to the effect that "the Tribunal shall take into account in its award the consequence of a failure to comply with the provisional measures". This proposal was defeated, but the Chairman immediately announced that "he assumed the majority was opposed to any *specific* mention of the effect of non-compliance with the recommendation, but that naturally the Tribunal would normally have to take account of this fact when it came to make its award" (at p. 815). This announcement remained unopposed.

**32**    The idea that the tribunal would take the effects of non-compliance with its recommendations into account in its award was later repeated in Note B to Arbitration Rule 39 of 1968.[48] It has also been supported by several authors.[49]

**33**    The cases in which provisional measures were ordered tend to support this suggestion. In *Holiday Inns* v. *Morocco*, the measures recommended were so vague (see paras. 100–102 *infra*) that it is difficult to say whether they were complied with. Nevertheless, *Lalive* interprets them as a "discreet warning . . . to both parties that the Tribunal could and would take notice of any disregard of its recommendations".[50]

**34**    In *AGIP* v. *Congo* (see para. 81 *infra*), the Government clearly did not comply with the interim measures.[51] It persisted in its refusal despite the fact that, in the course of the proceedings, the Tribunal had "decided to invite the Government to comply with the Tribunal's decision of 18 January 1979 as to the measures of preservation".[52] In its decision on the merits, the Tribunal, in examining the grievances invoked by the Claimant and in assessing the reparation for the damage caused to it, took into account:

> (c) that the Government did not comply with the decision of the Tribunal, dated 18 January 1979, as to the measures of preservation and as a consequence AGIP was unable to have access to a certain number of documents which could have assisted it in presenting its case.[53]

**35**    In *MINE* v. *Guinea*, the Tribunal had expressed a warning to the Claimant in its Decision on Provisional Measures of 4 December 1985:

> the Tribunal would take into account in its award the effects of any non-compliance by MINE with its recommendations.[54]

---

48  1 ICSID Reports 99.
49  *Friedland*, Provisional Measures, p. 337; *Masood*, Provisional Measures, p. 146; *Parra, A. R.*, The Practices and Experience of ICSID, *in*: Conservatory and Provisional Measures in International Arbitration (ICC Publication No. 519) 37 at 41 (1993).
50  *Lalive*, The First "World Bank" Arbitration, p. 137.
51  *AGIP* v. *Congo*, Award, 30 November 1979, paras. 7–9.
52  *Ibid.*, para. 12.                    53  *Ibid.*, para. 42(c).
54  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 69.

MINE was hesitant to comply but did so eventually (see paras. 106–109 *infra*). **36**
In the proceedings on the merits, Guinea's counterclaim included legal expenses
resulting from non-compliance with the Tribunal's recommendation. The Tribunal
awarded damages for costs and legal fees relating to the attachment proceedings
in Belgium and Switzerland but reduced the amount requested by about one third.
Guinea's lack of response to prior proceedings, the situation created by the US
Court of Appeals decision (see Art. 26, paras. 9–11) and "the lack of precedent
for the Tribunal's order to discontinue the European attachments" were seen to
excuse MINE somewhat.[55]

### 4. Priority and Speed

The provisional nature of interim measures is closely linked to the urgency of **37**
the situation. The measures must receive priority attention and must be taken with
due speed. At the same time, they are temporary in nature and subject to change
and withdrawal as the circumstances may require. Most importantly, they must
not be seen to prejudge any questions of jurisdiction or of the merits that are still
pending before the tribunal (see paras. 46–57 *infra*).

Under Arbitration Rule 39(1), as amended, a party may request provisional **38**
measures at any time after the institution of the proceeding. Pursuant to Rule
39(5) inserted in April 2006, if the request is made before the constitution of the
tribunal, the Secretary-General of ICSID, on the application of either party, fixes
time-limits for the parties to submit observations on the request for provisional
measures, which will be considered by the tribunal as soon as it is constituted.[56]
If a request for provisional measures is introduced already before the tribunal has
been constituted, it can be considered by the tribunal without delay on the basis
of the request itself and any observations that may have been filed in accordance
with Rule 39(5).[57]

Under Arbitration Rule 39(2), the tribunal shall give priority to a request for **39**
provisional measures. Speedy action may require special procedures. The pro-
cedure may be accelerated by convening a special session of the tribunal. In
accordance with Arbitration Rule 16(2), the tribunal may also take a decision by

---

55  *Ibid.*, p. 77.
56  An interesting example of an effective and rapid disposal of provisional measures before the
     constitution of an arbitral tribunal is provided by the practice of the International Tribunal
     for the Law of the Sea (ITLOS), established by the 1982 UN Convention on the Law of the
     Sea. Pursuant to Art. 290 of the Convention, ITLOS can consider and may prescribe provisional
     measures, following a party's request, pending the constitution of an Annex VII arbitral tribunal,
     *e.g.* an *ad hoc* tribunal selected by the parties as the preferred means of dispute resolution under
     Art. 287 of the Convention. ITLOS has done effectively so in actual practice in several cases:
     *Dispute concerning Southern Bluefin Tuna (Australia and New Zealand* v. *Japan)*, Order of
     27 August 1999; *Mox Plant Case (Ireland* v. *United Kingdom)*, Order of 3 December 2001;
     *Case concerning Land Reclamation by Singapore In and Around the Straits of Johor (Malaysia*
     v. *Singapore)*, Order of 8 October 2003. Further information on these cases and ITLOS can be
     found on the ITLOS website, at www.itlos.org.
57  See also Note A to Arbitration Rule 39 of 1968, 1 ICSID Reports 99.

correspondence among its members, provided that all of them are consulted.[58] Even under this expedited procedure, Arbitration Rule 39(4) requires that both parties must be heard before provisional measures may be taken (see para. 12 *supra*).

**40**    The practice of ICSID tribunals shows that requests for provisional measures may be disposed of with reasonable speed, although there are considerable variations in the time it takes from an application to a decision. In *Holiday Inns* v. *Morocco*, the request was made on 12 May 1972, and a decision was given on 2 July 1972. In *AGIP* v. *Congo*, the request was made on 21 November 1978, and the decision was given on 18 January 1979. In *Amco* v. *Indonesia*, the request was made on 30 September 1983, and the decision was given on 9 December 1983. In *Atlantic Triton* v. *Guinea*, the request was made on 20 August 1984, and the decision was given on 18 December 1984. In *MINE* v. *Guinea*, the request was made on 25 June 1985, and the decision was given on 4 December 1985.[59] In *Vacuum Salt* v. *Ghana*, the first request was made on 22 October 1992 and the decision was given on 3 December 1992. A second request was made on 23 March 1993 and the decision was given on 14 June 1993. In *CSOB* v. *Slovakia*, several requests were made between 6 October 1997 and 5 January 1999. The Tribunal made several decisions on those requests on 9 September 1998, on 5 November 1998 and on 11 January 1999.[60] Another request of 21 December 1999 led to a decision on 1 March 2000.

**41**    In *Maffezini* v. *Spain*, the decision took longer: the Respondent's request was filed on 3 July 1998 and the Tribunal issued its Procedural Order No. 2 over a year later, on 28 October 1999.[61] In *Tanzania Electric* v. *IPTL*, the Respondent filed its request for provisional measures on 28 June 1999 and the Tribunal rendered its decision on 20 December 1999.[62]

**42**    In *Pey Casado* v. *Chile*, both parties requested provisional measures, the Respondent on 13 September 1999 and the Claimants on 23 April 2001. On 10 May 2001 the Tribunal invited the parties to give their views on the requests for provisional measures. Written submissions were filed by the parties on 17 and 21 May 2001 and were followed by a hearing on 21 June 2001. The decision of the Tribunal was rendered on 25 September 2001.[63]

**43**    In *Zhinvali* v. *Georgia*, the Claimant filed a motion for a recommendation for provisional measures on 17 December 2001 and the Tribunal issued its recommendation and order on 24 January 2002.[64] In *SGS* v. *Pakistan*, SGS introduced

---

58  *AGIP* v. *Congo*, Award, 30 November 1979, para. 9.
59  The *MINE* case was untypical in that the Tribunal on 3 July 1985 initially denied the request as premature and Guinea on 8 August 1985 submitted a request for reconsideration. See *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 68/9.
60  *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 9.
61  *Maffezini* v. *Spain*, Decision on Provisional Measures, 28 October 1999.
62  *Tanzania Electric* v. *IPTL*, Decision on Provisional Measures, 20 December 1999.
63  *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001.
64  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 38, 44.

its request on 7 May 2002 and the Tribunal issued its Procedural Order No. 2 on 16 October 2002.[65]

In *Azurix* v. *Argentina* the request was made on 14 July 2003, and the decision **44** was given on 6 August 2003.[66] In *Tokios Tokelès* v. *Ukraine* the request was made on 3 June 2003, and the Tribunal's Order was rendered on 1 July 2003.[67] In *Bayindir* v. *Pakistan*, Bayindir introduced its request for provisional measures on 20 July 2004 and the Tribunal issued its decision on 29 November 2004.[68] In *Plama* v. *Bulgaria* the request was made on 29 July 2005, and the Tribunal's Order was rendered on 6 September 2005.[69] In *Biwater Gauff* v. *Tanzania*, the Claimant first introduced its request for provisional measures with the request for arbitration on 2 August 2005 and subsequently amended it on 21 February 2006. The Tribunal issued its Procedural Order No. 1 on 31 March 2006.[70]

In *Saipem* v. *Bangladesh*, the Claimant introduced a request for provisional **45** measures with the request for arbitration of 5 October 2004, but the parties subsequently agreed that a decision be deferred until after the hearing on jurisdiction. The decision on provisional measures was rendered on 21 March 2007, together with the decision on jurisdiction.[71] In *Occidental* v. *Ecuador*, Occidental first introduced its request for provisional measures with the request for arbitration on 17 May 2006 and then reiterated it in a separate application on 18 October 2006. The request was significantly amended during the hearing on provisional measures held on 2–3 May 2007. The Tribunal's Decision was rendered on 17 August 2007.[72]

### 5. Provisional Measures and Jurisdiction

Giving priority to a request for provisional measures means that it has to take **46** precedence over any other issues pending before the tribunal. Where a party has raised jurisdictional objections, the tribunal may have to decide on provisional measures before having ruled on its own jurisdiction. As a consequence, a party may be exposed to provisional measures even though it contests the jurisdiction of an ICSID tribunal. On the other hand, the urgency of the matter often makes it impossible to defer provisional measures until the tribunal's jurisdiction has been fully argued and decided.

This question has arisen frequently before other arbitral tribunals and before **47** the International Court of Justice (ICJ).[73] The case law of the ICJ has adopted

---

65  *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002.
66  *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003.
67  *Tokios Tokelès* v. *Ukraine*, Procedural Order No. 1, 1 July 2003.
68  *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, paras. 43, 46.
69  *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005.
70  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006.
71  *Saipem* v. *Bangladesh*, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, paras. 162–185.
72  *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007.
73  See *Lauterpacht, H.*, The Development of International Law by the International Court 110 *et seq.* (1958); *Shihata, I.*, The Power of the International Court to Determine its Own Jurisdiction

the approach that a *prima facie* showing of jurisdiction is sufficient to establish its power to indicate provisional measures. As held in the Judgment in the *Case concerning Pulp Mills on the River Uruguay (Argentina* v. *Uruguay)*:

> [I]n dealing with a request for provisional measures the Court need not finally satisfy itself that it has jurisdiction on the merits of the case but will not indicate such measures unless there is, prima facie, a basis on which the jurisdiction of the Court might be established.[74]

**48**     The ICSID Convention has a special feature which is helpful in this regard. Art. 36(3) of the Convention provides that the Secretary-General shall register a request for arbitration unless he finds that the dispute is manifestly outside the jurisdiction of the Centre. Therefore, unlike in other procedures, such as in State-to-State cases brought before the ICJ, there is a preliminary examination of jurisdiction before the case even reaches the tribunal. Although the tribunal is, of course, in no way bound by this preliminary examination of jurisdiction, it provides a useful basis for its power to recommend provisional measures.[75] The Secretary-General's registration of a request, in accordance with Art. 36(3) of the Convention, does not preclude the tribunal from examining the question of jurisdiction before recommending provisional measures. It is equally clear that a party may continue to challenge the jurisdiction after provisional measures have been recommended until the tribunal has formally decided on its competence (see Art. 41, paras. 11–15). It is ultimately with the tribunal whether it will accept the Secretary-General's registration as a sufficient basis or whether it wants to form a *prima facie* opinion on jurisdiction before recommending provisional measures.[76]

**49**     In *Holiday Inns* v. *Morocco*, the question of jurisdiction was still disputed when the Tribunal gave its decision on provisional measures. The Tribunal said:

> The Tribunal . . . considers that it has jurisdiction to recommend provisional measures according to the terms of Art. 47 . . . the Parties still having the right to express, in the rest of the procedure, any exception relating to the jurisdiction of the Tribunal on any other aspect of the dispute.[77]

**50**     In *Vacuum Salt* v. *Ghana*, the Tribunal's order on provisional measures, incorporating a voluntary undertaking by the Government, was issued at an early stage of

170 *et seq.* (1965); *Mendelson, M.*, Interim Measures of Protection in Cases of Contested Jurisdiction, 46 BYIL 259 (1972/73); *Oellers-Frahm, K.*, Die einstweilige Anordnung in der internationalen Gerichtsbarkeit 59 *et seq.* (1975); *Merrills, J. G.*, Interim Measures of Protection and the Substantive Jurisdiction of the ICJ, 36 Cambridge LJ 86 (1977); *Oxman, B.*, Jurisdiction and the Power to Indicate Provisional Measures, *in*: The International Court of Justice at a Crossroads (*Damrosch, L.* ed.) 323 (1987); *Brower/Goodman*, Provisional Measures, pp. 451 *et seq.*; *Rosenne, S.*, Provisional Measures in International Law (2005).

74   *Case concerning Pulp Mills on the River Uruguay (Argentina* v. *Uruguay)*, Order, 23 January 2007, para. 24. See also the ICJ precedents referred to therein.

75   *Delaume*, ICSID – Provisional Measures, p. 393; *Masood*, Provisional Measures, p. 145; *Friedland*, Provisional Measures, p. 341.

76   *Brower/Goodman*, Provisional Measures, pp. 451 *et seq.*; *Parra*, The Practices, p. 42; *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 326 (1999).

77   *Holiday Inns* v. *Morocco*, Decision on Jurisdiction, 12 May 1974, 1 ICSID Reports 658. See also *Broches*, Convention, Explanatory Notes and Survey, p. 679.

Case 1:19-cv-01618-TSC     Document 74-15     Filed 06/29/22     Page 849 of 1601

*Article 47 – Provisional Measures*                                              773

the proceedings.[78] The Government continued to contest ICSID's jurisdiction and the Tribunal ultimately found that there was no jurisdiction *ratione personae*.[79]

In *CSOB* v. *Slovakia*, jurisdiction was still being considered by the Tribunal when it issued its first three decisions on provisional measures.[80] By the time of its fourth decision on provisional measures on 1 March 2000, the Respondent had submitted a Further and Partial Objection to Jurisdiction which was pending before the Tribunal.[81]    **51**

In *Pey Casado* v. *Chile*, the preliminary measures requested by both parties were addressed by the Tribunal before the issue of jurisdiction. The Tribunal observed that international case law is clear in stating that the fact that jurisdiction may be disputed does not deprive a tribunal of its power to decide upon provisional measures. The Tribunal noted that, while Chile objected to the Tribunal's jurisdiction, it nevertheless also introduced a request for provisional measures. The Tribunal interpreted this conduct as recognition of the Tribunal's powers under Art. 47 of the Convention and of Arbitration Rule 39. The Tribunal said:    **52**

> ... provisional measures, which are provisional by nature and by definition ... can be modified or annulled at any time by the Tribunal, do not enjoy "res judicata" effect, are only valid for the duration of the procedure and "would automatically fall" were the arbitral tribunal to decide that it is incompetent to consider the dispute.[82]

Similarly, in *SGS* v. *Pakistan*, the Tribunal dealt with SGS' request for provisional measures before it ruled on Pakistan's jurisdictional objections. The Tribunal was careful to state in its decision on provisional measures that it had considered SGS' request without prejudice to Pakistan's objection to the Tribunal's competence and jurisdiction to hear the claim.[83]    **53**

In *Azurix* v. *Argentina*, the Tribunal received Azurix's request while the parties were exchanging memorials on the objections to the Tribunal's jurisdiction. The Tribunal relied on Art. 47 of the Convention and Arbitration Rule 39 to confirm that it was within its power to recommend provisional measures while objections to jurisdiction were pending, since neither provision specified any particular time in the procedure when such measures can be recommended.[84] The timing of the request was not a source of contention between the parties and the Respondent had simply noted that the Tribunal should "avoid anticipating any judgment on matters still pending before the Tribunal".[85] The Tribunal stated that, whilst its finding that it had authority to recommend provisional measures    **54**

---

78   *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, reproducing the operative part of the Decision on Provisional Measures of 3 December 1992.
79   *Vacuum Salt* v. *Ghana*, Award, 16 February 1994.
80   *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 9.
81   *CSOB* v. *Slovakia*, Procedural Order No. 5, 1 March 2000; *CSOB* v. *Slovakia*, Decision on Further and Partial Objection to Jurisdiction, 1 December 2000.
82   *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, para. 14.
83   *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 391.
84   *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, para. 29.
85   *Ibid.*, para. 30.

reflected its view that it had *prima facie* jurisdiction, this was without prejudice to its determination on this matter which would be made following the hearing on jurisdiction.[86]

**55**    Similarly, in *Bayindir* v. *Pakistan*, the Tribunal emphasized that the reasons contained in its decision on provisional measures were "without prejudice to a later decision of this Tribunal on Pakistan's objection to the jurisdiction of the Tribunal".[87]

**56**    In *Biwater Gauff* v. *Tanzania*, the Claimant formulated its request for provisional measures in the request for arbitration and later reformulated them with a separate submission.[88] In its reply to the reformulated request, Tanzania anticipated that it intended to introduce objections to jurisdiction and other preliminary issues and asked the Tribunal to take these factors into account and exercise caution in acting under Art. 47 of the ICSID Convention.[89] In its response, Biwater relied on the First Edition of this Commentary to argue that, since a request for provisional measures may have to be decided before a tribunal has ruled on its jurisdiction, a party may be exposed to provisional measures even if it contests the tribunal's jurisdiction.[90] The Tribunal also relied on this statement – which was not disputed between the parties – but added that in some instances the existence of objections to jurisdiction may be "a relevant factor in a tribunal's exercise of its discretion to recommend provisional measures (for example in a case where there is no urgency or questionable necessity)".[91]

**57**    In *Occidental* v. *Ecuador*, the Tribunal said:

> Whilst the Tribunal need not definitely satisfy itself that it has jurisdiction in respect of the merits of the case at issue for purposes of ruling upon the requested provisional measures, it will not order such measures unless there is, *prima facie*, a basis upon which the Tribunal's jurisdiction might be established.[92]

After noting that the Request for Arbitration invoked the Ecuador-US BIT as well as a contract as a basis for jurisdiction, the Tribunal concluded that *prima facie* bases of jurisdiction existed in the case before it.[93]

### 6. The Temporary Nature of Provisional Measures

**58**    The provisional nature of interim measures implies that they are recommended only for the duration of the proceedings. Moreover, there is no *res judicata* effect which means that the parties may at any time request their modification or termination.[94] In accordance with Arbitration Rule 39(3) the tribunal may at any time

---

86  *Ibid.*, para. 31.
87  *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 47, citing Procedural Order No. 1 of 29 November 2004 (unreported). See also *Tokios Tokelês* v. *Ukraine*, Procedural Order No. 1, 1 July 2003, para. 6; *Helnan* v. *Egypt*, Award, 3 July 2008, para. 11.
88  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, paras. 2 and 20.
89  *Ibid.*, para. 32.          90  *Ibid.*, para. 47.
91  *Ibid.*, para. 70.
92  *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, para. 55.
93  *Loc. cit.* See also para. 102; and *Railroad Development Corp.* v. *Guatemala*, Decision on Provisional Measures, 15 October 2008, para. 31.
94  *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, para. 14.

modify or revoke them.[95] If the circumstances requiring the provisional measures no longer exist, the tribunal is under an obligation to revoke them.

**59** Provisional measures will lapse automatically upon the rendering of the tribunal's award. They will also lapse upon the discontinuance of the proceedings in accordance with Arbitration Rules 43–45. Although neither Art. 47 nor Arbitration Rule 39 say so explicitly, this is a consequence of their provisional nature.

**60** In *MINE* v. *Guinea*, a request was made for the re-hearing and modification of the provisional measures recommended on 4 December 1985. The ICSID Tribunal rejected this request on 5 February 1986.[96]

**61** In *SGS* v. *Pakistan*, the Tribunal stressed its power to reconsider provisional measures at any time:

> It is scarcely necessary to add that this like any procedural order on provisional measures may be re-visited on the application of either party and after hearing the other party, should circumstances change materially during the pendency of the jurisdictional phase of this proceeding.[97]

**62** In *City Oriente* v. *Ecuador*, the Tribunal, after holding a hearing, had ordered provisional measures on 19 November 2007. The order for provisional measures stated that they shall remain in force until modified or revoked by the Tribunal or until the rendering of the final award. On 1 February 2008, the Respondent filed a Request for Revocation of the Provisional Measures. After pleadings by both parties the Tribunal on 13 May 2008 decided to deny the request for revocation and "to ratify the Provisional Measures previously ordered".[98]

### D. ". . . if it considers that the circumstances so require, . . . which should be taken to preserve the respective rights . . ."

#### 1. Necessity and Urgency

**63** The preparatory works to the Convention give little indication of the circumstances which would require provisional measures, although more clarity on this point was at times demanded (History, Vol. II, pp. 337 *et seq.*, 515, 573). It was pointed out that such measures would only be used in situations of absolute necessity (at pp. 270, 523) and that tribunals would exercise self-restraint in their application (at p. 516). An attempt to have a reference to urgency and imminent danger included was defeated (at p. 815) but it is clear that provisional measures will only be appropriate where a question cannot await the outcome of the award on the merits.[99]

---

95  See also Note D to Arbitration Rule 39 of 1968, 1 ICSID Reports 100; History, Vol. II, p. 814. See also *Tokios Tokelės* v. *Ukraine*, Procedural Order No. 1, 1 July 2003, para. 5.

96  Unreported. The decision is mentioned by the Court of First Instance of Geneva, 13 March 1986, 4 ICSID Reports 41, 43.

97  *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 396. See also *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, 4 ICSID Reports 328.

98  *City Oriente* v. *Ecuador*, Decision on Revocation of Provisional Measures, 13 May 2008, paras. 1, 78, 95, 96.

99  This passage contained in the First Edition of this Commentary is quoted with approval in *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, para. 68.

**64**    ICSID arbitration practice shows that tribunals will only grant provisional measures if they are found to be necessary, urgent and are required in order to avoid irreparable harm. The requesting party has the burden of showing why the measures should be recommended. As noted by the Tribunal in *Maffezini* v. *Spain*:

> The imposition of provisional measures is an extraordinary measure which should not be granted lightly by the Arbitral Tribunal. There is no doubt that the applicant, in this case the Respondent, has the burden to demonstrate why the Tribunal should grant its application.[100]

**65**    In *Tanzania Electric* v. *ITPL*, the Tribunal also held, with respect to the request for provisional measures, that the burden was on the requesting party to demonstrate that an urgent need existed for the relief sought. It denied the request *inter alia* because the requesting party had failed to comply with this requirement.[101]

**66**    The Tribunal in *Azurix* v. *Argentina* noted that Art. 47 of the Convention does not specify the degree of urgency required to grant provisional measures. It related the probability of prejudice to the requirement of urgency as follows:

> Given that the purpose of the measures is to preserve the rights of the parties, the urgency is related to the imminent possibility that the rights of a party be prejudiced before the tribunal has rendered its award.[102]

**67**    The Tribunal in *Plama* v. *Bulgaria* also stressed that the need for provisional measures must be urgent and necessary to preserve the *status quo* or to avoid irreparable damage.[103] In the particular case, the Tribunal found both the urgency and the irreparable nature of the harm invoked by Plama to be lacking. The Tribunal's ability to decide on the Claimant's right to monetary damages would not be affected by the outcome of the proceedings in Bulgaria addressed in the Claimant's request for provisional measures.[104]

**68**    In *Biwater Gauff* v. *Tanzania*, the Claimant justified the urgency of its request by stating that, in accordance with ICSID jurisprudence,

> necessity and urgency are present where a Respondent fails to take steps to preserve or to provide documentation relevant to a Claimant's case, or in circumstances where there is a risk of loss or destruction of such documentation.[105]

The Tribunal expressed the view that the degree of urgency required for a recommendation of provisional measures depended on the circumstances of the case and may be satisfied when a party can prove that there is a need to obtain the measure requested before the issuance of an award. The Tribunal added that it also believed that the level of urgency required depends on the type of measure requested.[106] In

---

100  *Maffezini* v. *Spain*, Decision on Provisional Measures (Procedural Order No. 2), 28 October 1999, para. 10.
101  *Tanzania Electric* v. *IPTL*, Decision on Provisional Measures, 20 December 1999, para. 18. See also *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 31.
102  *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, para. 33.
103  *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005, para. 38.
104  *Ibid.*, para. 46.
105  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, para. 30. See also paras. 33, 44–54, 60.
106  *Ibid.*, para. 76.

the particular case, the Tribunal concluded that the requirements of necessity and urgency were met, for the following reasons:

> [T]he former because of the potential need for the evidence in question, and the latter because there is a need for such evidence to be preserved before the proceedings progress any further (e.g. to enable each party properly to plead their respective cases).[107]

The Tribunal in *Saipem* v. *Bangladesh* confirmed that Art. 47 requires "that the requested measure be both necessary and urgent". It found that pending litigation for the encashment of a warranty bond meant that these conditions were met. On the other hand, there was no necessity and urgency with respect to the return of a retention money.[108]                                                                    **69**

The Tribunal in *Occidental* v. *Ecuador* also recalled the well-established rule that provisional measures should only be granted in situations of necessity and urgency to avoid irreparable harm.[109] The *Occidental* Tribunal relied mainly on the case law of the International Court of Justice and cited the *Aegean Sea Continental Shelf* case for the premise that a provisional measure is necessary where the actions of a party "are capable of causing or of threatening irreparable prejudice to the rights invoked".[110] The Tribunal mentioned another ICJ precedent, the *Passage through the Great Belt* case,[111] for the proposition that "a measure is urgent where action prejudicial to the rights of either party is likely to be taken before such final decision is given". The Tribunal also referred to the *Maffezini* case for its elaboration of the meaning of an "existing right",[112] or a right existing at the time of the request, and concluded that,                                                      **70**

> in order for an international tribunal to grant provisional measures, <u>there must exist both a right to be preserved and circumstances of necessity and urgency to avoid irreparable harm</u>.[113]

The *Occidental* Tribunal added that the mere possibility of future harm was not sufficient:                                                                          **71**

> Provisional measures are not meant to protect against any potential or hypothetical harm susceptible to result from uncertain actions. Rather they are meant to protect the requesting party from imminent harm.[114]

The Tribunal was convinced that in the case before it there was no risk of irreparable or imminent harm which could justify the request for provisional measures sought by the Claimants.[115]

---

107   *Ibid.*, para. 86.
108   *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, paras. 174, 182, 185.
109   *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, para. 59.
110   *Aegean Sea Continental Shelf Case* (*Greece* v. *Turkey*), Order, 11 September 1976, ICJ Reports 1976, p. 11.
111   *Case concerning Passage through the Great Belt* (*Finland* v. *Denmark*), Order, 29 July 1991, ICJ Reports 1991, p. 17.
112   *Maffezini* v. *Spain*, Decision on Provisional Measures, Procedural Order No. 2, 28 October 1999, paras. 12–14.
113   *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, para. 61. Emphasis original.
114   *Ibid.*, para. 89.                         115   *Ibid.*, paras. 87–91.

### 2. Circumstances, Protected Rights and Required Measures

**72**    The Convention and the Arbitration Rules are silent on the types of provisional measures that may be taken. In the course of the drafting of the Convention, the question was raised whether it would be advisable to clarify what kind of provisional measures lay within the powers of the tribunal (History, Vol. II, p. 337). One suggestion was to require parties having recourse to ICSID arbitration to post a bond (at p. 347). A Turkish proposal provided for the party seeking provisional measures to give a pecuniary guarantee in case the measures might harm the other party (at pp. 664, 813). The Chairman pointed out that "in international practice authority to prescribe provisional measures was left to the appreciation of the tribunal, presumably because it was difficult to foresee the types of situations that might arise" (at p. 515). In a show of hands on the kind of provisional measures which could be recommended, the Legal Committee eventually accepted the broad and open-ended formulation of Art. 47 which closely follows that of Art. 41 of the Statute of the International Court of Justice (at p. 815).

**73**    The Convention and the Arbitration Rules do not specify which rights might deserve protection by way of provisional measures. The Working Paper, the earliest draft to the Convention, as well as the immediately subsequent Preliminary Draft, referred to "any provisional measures necessary for the protection of the rights of the parties" (History, Vol. I, p. 206). The Comment to the Preliminary Draft explained that the provisional measures were designed to preserve the *status quo* between the parties pending the tribunal's final decision on the merits (History, Vol. II, p. 216). At one point, the question was raised whether the *status quo* existing during the normal execution of the contract or at the time when the controversy arose would be decisive. The Chairman thought that the purpose of the provisional measures must be as far as possible to preserve the *status quo* at the time when the provisional measures were requested (at p. 337). One expert suggested that the purpose of provisional measures must be to ensure that a party did not take action that would frustrate a possible award (at p. 337). Other proposals referred to an obligation of the parties to refrain from taking any steps that would aggravate or extend the dispute and a provisional protection of the rights of the parties on the merits (at p. 338).

**74**    At the next stage of the drafting process, the First Draft provided for provisional measures "necessary to prevent or halt any action by either party which might frustrate an eventual award" (History, Vol. I, p. 206). This wording was criticized as being too restrictive since it would mean that, before provisional measures could be ordered, the tribunal had to be satisfied that the whole purport of the award would be completely frustrated unless the provisional measures were ordered. It was also pointed out that it was not logical to prescribe provisional measures that would depend on a future and uncertain fact such as the eventual award (History, Vol. II, p. 813). Other experts were against a provision that did not specify the right to be preserved or advocated retaining a reference to the possible frustration of the

award (at pp. 814, 891). Nevertheless, the reference to a possible frustration of the eventual award was dropped in the Revised Draft (at p. 925) and the Convention was adopted without any reference to the nature of the respective rights which were to be protected.

Arbitration Rule 39(1) requires a party requesting provisional measures to, **75** *inter alia*, specify the right to be preserved. The cases before ICSID tribunals show that the parties in requesting provisional measures have invoked a number of different rights discussed during the Convention's drafting such as the non-aggravation of the dispute, the non-frustration of the eventual award and the "rights in dispute". However, the most frequently invoked rights were not addressed during the Convention's drafting process, namely procedural rights of the parties in the arbitration such as the preservation and production of evidence, the exclusive nature of ICSID arbitration and the confidentiality of proceedings.

It is evident that the nature of the measures to be recommended will very much **76** depend on the particular circumstances of the case and on the rights that are to be protected. Therefore, no exhaustive list of provisional measures which may be used by tribunals can be given. Under Arbitration Rule 39(1), a party requesting provisional measures must, *inter alia*, specify the measures the recommendation of which is requested. A look at the cases in which ICSID tribunals have dealt with such requests shows that a variety of measures have been sought.[116] They include discovery requests to secure vital evidence, requests for pre-judgment security, requests for injunctions directed at the parties to abstain from seeking relief in domestic courts and requests for recommendations that the other party refrain from resorting to the press. Sometimes, tribunals admit the availability of certain types of provisional measures in principle, while denying that they are required by the specific circumstances of the case.

The degree of specificity of provisional measures varies greatly. Some are very **77** concrete and indicate exactly what steps are to be taken by the parties. Others remain at a high level of abstraction and merely contain general guidelines as to the parties' behaviour. The *Azurix* Tribunal observed in this respect:

> ICSID arbitral tribunals have recommended specific provisional measures but they have also specified the objective to guide the measures to be taken and have left it to the party or parties concerned "to consider the various possible hypotheses" that will achieve the recommended objective.[117]

The Tribunal in *Biwater Gauff* v. *Tanzania* cited the First Edition of this Com- **78** mentary for its assertion that the power of tribunals to grant provisional measures is very broad and is not limited to substantive rights, but also includes procedural

---

116    For surveys of some of these cases see *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook of Commercial Arbitration 627 (1993); *Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335 (1986); *Delaume*, ICSID – Provisional Measures, p. 392.

117    *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, para. 40.

rights.[118] Another frequently stated objective of provisional measures is the non-aggravation of the dispute.

**79**　　There are several typical situations in which parties request provisional measures:

- It may be necessary to require the parties to co-operate in the proceedings and to furnish all relevant evidence.
- It may be necessary to take early measures to secure compliance with an eventual award.
- It may be necessary to stop the parties from resorting to self-help or seeking relief through other remedies.
- It may be necessary to prevent a general aggravation of the situation through unilateral action.
- It may be necessary to safeguard the confidentiality of proceedings.

### a) Obtaining Evidence

**80**　　Access to evidence is secured by Art. 43 of the Convention, which provides that the tribunal may "call upon the parties to produce documents or other evidence". Nevertheless, parties have at times requested provisional measures under Art. 47 to secure or obtain evidence. In some cases tribunals have acceded to these requests.

**81**　　In *AGIP* v. *Congo* the Claimant's subsidiary in the Congo had been nationalized. In the course of the nationalization, the Government had occupied the local offices and seized the company's records. AGIP lodged a request for "measures of preservation" in accordance with Art. 47 to the effect that the Government should be directed to collect all the documents that had been kept at the local office, furnish the Tribunal with a complete list of these documents and keep these documents available for presentation to the Tribunal at AGIP's request. The Tribunal made a decision, as requested,[119] but the Government did not comply with the recommendation (see para. 34 *supra*).

**82**　　In *Vacuum Salt* v. *Ghana*, the Claimant submitted a Request for Provisional Measures expressing concern, *inter alia*, over the preservation of its corporate records. The Tribunal's first Decision on Provisional Measures of 3 December 1992 took note of a voluntary undertaking by the Government that it would not deny the Claimant access to its records.[120]

**83**　　In *Azurix* v. *Argentina*, the Respondent asked the Tribunal to request Azurix to submit the original of a decision of the Argentine Appeals Chamber, which it could not obtain due to the period of judicial holidays in Argentina. The Tribunal did not consider it necessary to accept this request because it depended on a temporary

---

118  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, para. 71.

119  *AGIP* v. *Congo*, Award, 30 November 1979, paras. 7–9; *Friedland*, Provisional Measures, p. 347; *Delaume*, ICSID – Provisional Measures, p. 393.

120  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 16. See also *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, quoting the earlier Decision of 3 December 1992.

situation (the judicial holidays) and because it was a decision of the Respondent's own tribunals.[121]

In *Sempra* v. *Argentina*, the Claimant filed a request for provisional measures to secure the oral testimony of two of its witnesses. The Tribunal, in a decision on provisional measures, noted that an Argentinian federal court had issued an injunction to prevent one of the witnesses from testifying in the ICSID proceedings. The Tribunal referred to Arts. 21 and 22 of the ICSID Convention dealing with the immunity of witnesses, to Art. 26 dealing with the exclusivity of ICSID proceedings, and to Arbitration Rule 34(3) dealing with the parties' duty to cooperate in the production of evidence. The Tribunal's order was that Argentina shall adopt the necessary measures to comply with these provisions and in particular shall refrain from any conduct that may impair the witness's ability to provide oral testimony.[122]

**84**

In *Biwater Gauff* v. *Tanzania*, the Claimant requested, *inter alia*, that the Tribunal recommend provisional measures to preserve its rights in respect of certain records, papers, documents and mail of the company which the Claimant had set up in Tanzania in order to carry out its investment, City Water.[123] Biwater subsequently reformulated its request for provisional measures to include the preservation and provision of documentation in respect of City Water's bank accounts, and a statement of account relating to City Water's assets. Biwater further requested that the Respondent procure an inventory of all of City Water's papers, records and correspondence seized at the time of the occupation of City Water's offices.[124] Biwater argued that it had been denied access to documentary evidence which was central to its claims for damages and that this would hamper the presentation of its claims in an effective manner and affect the Tribunal's ability to decide the claims fairly.[125]

**85**

Tanzania, for its part, argued that Biwater had failed to show a threat to its right to the preservation and production of evidence. Tanzania added that parties to ICSID proceedings, at most, have a right to ask for production of documents under Art. 43 of the Convention, a right which – in Tanzania's view – should not be bypassed by asking for document production in the guise of a request for provisional measures under Art. 47 of the Convention.[126]

**86**

The *Biwater* Tribunal found that the Claimant's request to preserve evidence was reasonable, as the requirements of necessity and urgency had been met. There was a potential need for the evidence and it needed to be preserved before the proceedings progressed any further, in order to enable the parties to properly plead their respective cases.[127] The Tribunal noted Tanzania's undertaking to

**87**

---

121  *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, paras. 24, 48.
122  Decision on Provisional Measures of 16 January 2006, reproduced in *Sempra* v. *Argentina*, Award, 28 September 2007, para. 37.
123  *Biwater Gauff* v. *Tanzania*, Procedural Order No. 1, 31 March 2006, paras. 15–16.
124  *Ibid.*, para. 20.          125  *Ibid.*, para. 45.
126  *Ibid.*, para. 56.          127  *Ibid.*, para. 86.

voluntarily preserve all the evidence involved.[128] The Tribunal recommended under Art. 47 that Tanzania preserve the relevant documents.[129] The Tribunal also invited the parties "to cooperate in establishing a workable and non-burdensome inventory".[130]

88    With regard to the production of documents, the *Biwater* Tribunal observed that normally such a request is made within the ambit of Art. 43 of the Convention and Arbitration Rule 34. Arts. 47 and 43 serve different purposes:

> Indeed, the two procedures are aimed at two different issues: Art. 47 is designed to ensure that the arbitral tribunal can properly discharge its mandate, whilst Art. 43 is one element in a range of provisions that structures how the mandate is to be discharged.[131]

89    The Tribunal did not exclude the possibility, albeit exceptional, that document production could be ordered under Art. 47. However, the Tribunal found that this was not warranted in the circumstances of the case, primarily because no right was threatened.[132]

### b) Financial Guarantees

90    In some cases parties have demanded that their opponent provide a financial security. Claimants have demanded that respondents post a security for the award's performance. In turn, respondents have demanded that claimants provide a guarantee for costs caused by their action. These demands have not succeeded. The rights of the prevailing party are protected by the Convention's provisions on the recognition and enforcement of awards. It is difficult to see how a respondent whose willingness or ability to abide by a final award is in doubt could be persuaded to pay on the basis of a recommendation for provisional measures. However, a claimant whose claim may be doubtful, and whose willingness or ability to cover the resulting costs is not clear, may be required to provide a financial guarantee as a condition for the tribunal proceeding with the principal claim.

91    In *Atlantic Triton* v. *Guinea*,[133] the Claimant requested that the Respondent be directed to post a guarantee in an amount equal to that pursued on the principal claim. The Claimant argued that the Respondent might be unable or unwilling to honour an eventual award. Guinea, in turn, demanded a guarantee to cover its expenses arising from attachments which had been obtained by Atlantic Triton (see paras. 103–105 *infra* and Art. 26, paras. 169–172). The Government argued that the foreign investor was in the process of liquidating its assets and would soon be insolvent and unable to pay Guinea its costs.

92    The Tribunal, in an unpublished opinion of 18 December 1984, rejected both parties' requests. While finding that recommendations of this kind were within

---

128  *Ibid.*, para. 87.                          129  *Ibid.*, para. 88.
130  *Ibid.*, para. 98.                          131  *Ibid.*, para. 100. See also paras. 77–81.
132  *Ibid.*, paras. 101–102. See also *Railroad Development Corp.* v. *Guatemala*, Decision on Provisional Measures, 15 October 2008, paras. 34–36.
133  This part of the case is unreported. It is summarized by *Friedland*, Provisional Measures, pp. 347 *et seq.*

its mandate under Art. 47, it found that neither party had established that the circumstances of the case required the requested relief:

> The Tribunal was unconvinced that Atlantic Triton was in the process of liquidation, and was unmoved by the foreign investor's allegations of the Republic's insolvency, stating that "there is no reason to suppose that the Government of Guinea could not perform any obligations for which the final award might hold it responsible".[134]

The Tribunal also expressed some fundamental reservations about pre-judgment **93** security. They are summarized by *Friedland* in the following terms:

> The Tribunal was further dissuaded from granting the requested pre-judgment security by the fact that both requests were directly linked to, and dependent on, resolution of the basic claims in the arbitration. This was particularly so with respect to Atlantic Triton's request which virtually restated its principal claim.
>
> The *Atlantic Triton* decision thus establishes that pre-judgment security to ensure payment of an eventual award will not be granted in the ordinary course of ICSID arbitrations.[135]

In *Maffezini* v. *Spain*, the Respondent requested the Tribunal to require the **94** Claimant to post a bond, or some form of guarantee for the costs which were likely to be sustained in the arbitration.[136] In denying Spain's request for provisional measures, the Tribunal noted that the request hinged on two hypotheticals: whether the Claimant would succeed in its claim and whether the Respondent would be required to pay the costs of the arbitration. Consequently, it held that "[e]xpectations of success or failure in an arbitration or judicial case are conjectures", and concluded that "[i]t would be improper for the Tribunal to prejudge the Claimant's case by recommending provisional measures of this nature".[137] The Tribunal further ruled that the relief requested was unrelated to the subject-matter of the arbitration and should therefore be rejected for that additional reason.[138]

In *Pey Casado* v. *Chile*, Chile asked the Tribunal to order the production of **95** guarantees sufficient to cover the costs which would be incurred by the losing party in the arbitration.[139] The Claimants opposed the request arguing that it was unfounded as it concerned non-existing or potential rights and prejudged the decision of the Tribunal. The Tribunal noted that neither Art. 47 nor Arbitration Rule 39 foresee the granting of a conservatory measure aiming at the payment of a *cautio judicatum solvi*, or a "pre-judgment security".[140] Nevertheless, the Tribunal observed that in some particular cases a tribunal could recommend the deposit of a guarantee protecting a respondent against the non-payment by a claimant of costs in case of insolvency. The recommendation of such a measure fell within an

---

134  *Friedland*, Provisional Measures, p. 348.       135   At p. 348.
136  *Maffezini* v. *Spain*, Decision on Provisional Measures (Procedural Order No. 2), 28 October 1999, paras. 1–3.
137  *Ibid.*, paras. 20–21.              138   *Ibid.*, paras. 23–25.
139  *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, paras. 78–89.
140  *Ibid.*, para. 82.

ICSID tribunal's mandate under Art. 47 of the Convention as held by the Tribunal in *Atlantic Triton* v. *Guinea*.[141]

**96**    The Tribunal stated that in the circumstances of the case the recommendation of the measure requested was not justified since

> it has not been shown nor even suggested as particularly probable or evident that this risk is present in this case, or, even assuming that this risk is established, that it makes the recommendation of the conservative measure requested necessary.[142]

**97**    In *Bayindir* v. *Pakistan*, the Tribunal rejected Pakistan's request to recommend that Bayindir provide security for Pakistan's costs in the arbitration.[143]

**98**    It follows from these authorities that ICSID tribunals are reluctant to grant requests for guarantees to cover the costs of arbitrations, based on hypothetical assumptions about the outcome of a given case. However, this practice also indicates that, if it is proven that a party is insolvent or will be unable to perform its obligations under an award, a tribunal has the power to establish financial guarantees under Art. 47.

## c) Parallel Domestic Proceedings

**99**    The largest group of cases in which tribunals have dealt with requests for provisional measures concerned proceedings before domestic courts.[144] As such, they affected the exclusive nature of ICSID arbitration and are therefore also discussed in that context (see Art. 26, paras. 162–178). The exclusive nature of ICSID proceedings is secured by Art. 26 of the Convention. ICSID tribunals have been asked repeatedly to enjoin parties from seeking relief in domestic courts.

**100**    In *Holiday Inns* v. *Morocco*,[145] a contract had provided for the construction of hotels by the Holiday Inns group in Morocco. The Claimant had stopped the construction of the hotels after a dispute had developed with the Government. Shortly after ICSID arbitration had been initiated, the Government turned to its own courts and obtained orders authorizing them to take all necessary measures to have construction resumed and completed at the Claimant's cost. They also obtained the appointment of a judicial administrator. A request by the Claimant to the Tribunal for provisional measures sought to have the actions in the Moroccan courts terminated. Unfortunately, the exact nature of the request is unreported.

**101**    The Tribunal's Decision on Provisional Measures of 2 July 1972 declined to recommend a series of measures suggested in the request and did not specifically direct the Government to have the court actions withdrawn. The Tribunal said:

---

141  *Ibid.*, para. 88.                142  *Ibid.*, para. 89.

143  *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 46. See also *Libananco* v. *Turkey*, Decision on Preliminary Issues, 23 June 2008, paras. 56–60.

144  See also *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 325/6 (1999).

145  The case is unreported. The following account is based on *Lalive*, The First "World Bank" Arbitration, pp. 132 *et seq.*; also in 1 ICSID Reports 653–659. See also *Broches*, Convention, Explanatory Notes and Survey, pp. 678–680.

*Article 47 – Provisional Measures*                                                    785

To some extent these requests bear on injunctions which are beyond the frame-
work of provisional measures which the Tribunal could consider.[146]

The Tribunal merely exhorted the parties in general terms to abstain from **102**
measures incompatible with the upholding of the contract and recommended
that the parties co-operate to that end. It remains unclear why the Tribunal thought
that the suggested measures were beyond the scope of its powers.[147] Most probably,
the Tribunal was motivated by general caution and did not wish to confront the
State party at an early stage of the proceedings. At any rate, the Tribunal did
issue recommendations, although they were of a general kind and directed at both
parties (see para. 159 *infra*).

In *Atlantic Triton* v. *Guinea*, the Tribunal had to deal with attachment pro- **103**
ceedings in domestic courts. Even before ICSID proceedings were instituted in
January 1984, the Claimant had in 1983 obtained the attachment of three vessels
belonging to the Respondent in France. Guinea submitted a request to the ICSID
Tribunal to direct Atlantic Triton to dissolve the attachments, to pay damages or
to provide a guarantee to cover costs arising from the attachments and to desist
from any actions before other jurisdictions.

Guinea also appealed the attachments in the French courts (see Art. 26, paras. **104**
169–172). The Court of Appeals of Rennes vacated the attachments on 26 Octo-
ber 1984, but shortly thereafter Atlantic Triton secured a second attachment and
Guinea reiterated its request to the ICSID Tribunal relying on Art. 44 of the
Convention. The second attachment was also lifted and a third attempt to attach
the vessels failed since the vessels had sailed. On 18 December 1984, the Tri-
bunal issued a recommendation that declined Guinea's request for provisional
measures.[148] It found that the request to direct Atlantic Triton to consent to the
lifting of the attachments had been rendered moot by the decisions of the French
courts. Therefore, the Tribunal never reached the question whether protection
against proceedings in domestic courts through provisional measures might be
appropriate. It refused the guarantee for expenses since there was no necessity for
such a measure (see paras. 91–93 *supra*). Finally, the Tribunal refused to make
a general recommendation to the parties to abstain from pursuing actions before
national courts, since the request had been based on Art. 44 of the Convention
rather than on Arts. 26 and 47.

The decision on Provisional Measures of 18 December 1984, as reported, **105**
does not explain whether, given the right circumstances and a properly drafted
application, the Tribunal would have considered it appropriate to direct a party to
desist from attachment proceedings in domestic courts. The subsequent Award,
in which the Tribunal refused to award damages for the attachment proceedings

---

146  *Lalive*, The First "World Bank" Arbitration, p. 136.
147  *Cf. Lalive*, p. 136; *Broches*, Convention, Explanatory Notes and Survey, p. 680; *Friedland*,
     Provisional Measures, p. 341.
148  The decision is unreported. It is summarized by *Friedland*, Provisional Measures, p. 343. See
     also *Delaume*, ICSID – Provisional Measures, p. 393.

in France[149] (see Art. 26, para. 171), can be taken as an indication that it was generally disinclined to interfere with domestic court proceedings directed at obtaining conservatory measures.

**106**    In *MINE* v. *Guinea*, the Claimant had obtained an award against the Respondent before the American Arbitration Association (AAA) in 1980 (see Art. 26, paras. 9–14). The award was not paid and in May 1985 MINE started attachment proceedings in Belgian and Swiss courts for the purpose of enforcing the AAA award. In September 1984 MINE had instituted ICSID arbitration and the Tribunal was constituted on 17 June 1985. Guinea presented the Tribunal with an "Emergency Request for Relief from Attachment of its Assets by MINE" asking that MINE be directed to dissolve all pending attachments of Guinea's bank accounts. Guinea relied on Art. 26 of the Convention, providing for remedies exclusively through ICSID arbitration (see Art. 26, paras. 149–153, 167). On 3 July 1985, the Tribunal denied Guinea's request as premature since Guinea had not yet offered any defence in the attachment proceedings. Guinea appealed against the Belgian and Swiss attachment orders and submitted a request for reconsideration of the Emergency Request.

**107**    In its Decision on Provisional Measures of 4 December 1985,[150] the Tribunal directed MINE to immediately discontinue all its actions and attachments in domestic courts:

> (1) The Tribunal recommends that MINE immediately withdraw and permanently discontinue all pending litigation in national courts, and commence no new action, arising out of the dispute. Litigation based upon the award of the American Arbitration Association is considered to arise out of this dispute for purposes of this Provisional Measure.
>
> (2) The Tribunal further recommends that MINE dissolve every existing provisional measure in litigation in national courts (including attachment, garnishment, sequestration, or seizure of the property of Guinea, by whatever term designated and by whatever means performed) and seek no new provisional remedy in a national court.[151]

It is noteworthy that the Tribunal not only directed MINE to withdraw the existing actions in domestic courts but also enjoined the Claimant from starting any new proceedings in the future.

**108**    MINE thereupon withdrew its appeal in Belgium, but a dispute ensued between the parties concerning the security arrangements that MINE had provided to the Swiss courts.[152] In a decision of 5 February 1986,[153] the ICSID Tribunal rejected MINE's request for revision and modification of the provisional measures. After

---

149  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, paras. 2.1–2.9.
150  The Decision is unreported. It is summarized in the Tribunal's Award of 6 January 1988, 4 ICSID Reports 69.
151  Unreported. This passage is cited by the Court of First Instance of Geneva, 13 March 1986, 4 ICSID Reports 41.
152  See *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 77.
153  Cited in the decision of the Court of First Instance of Geneva, 13 March 1986, 4 ICSID Reports 41, 43.

the Tribunal had clarified its Decision on Provisional Measures on 22 September 1986, recommending that all attachments be lifted and that all security arrangements be vacated, MINE had the attachment released.[154]

*MINE* v. *Guinea* gives unequivocal support to the protection of ICSID exclusivity *vis-à-vis* domestic proceedings by way of provisional measures. This is clear not only from the unambiguous language in which the Tribunal directs MINE to withdraw and permanently discontinue the domestic proceedings but also from the threat of sanctions and the eventual award of damages for failure to comply with the Tribunal's recommendation in a timely fashion (see paras. 35, 36 *supra*; see also Art. 26, para. 167).    **109**

In *Vacuum Salt* v. *Ghana*, the Government had adopted legislation cancelling the lease agreement underlying the investment and establishing a domestic procedure for resolving claims to compensation arising from the cancellation. After the institution of ICSID proceedings, Vacuum Salt submitted a Request for Provisional Measures asserting that, by establishing a parallel procedure for resolving the dispute, the Government was undermining the ICSID arbitration. The Tribunal's Decision No. 1 embodied voluntary undertakings on the part of the Government. These undertakings contained a promise to negotiate the investor's claim and to defer formal domestic procedures until either (a) agreement had been reached on the claim, (b) agreement had been reached to continue the domestic proceedings, or (c) the case before ICSID had been resolved. Vacuum Salt accepted those undertakings.[155] The Claimant made another request for provisional measures asserting that the Respondent had taken actions in violation of Decision No. 1. The Tribunal in its Decision of 14 June 1993 examined the facts but came to the conclusion that there had been no violation. Therefore, it declined the request but reserved the right to recommend provisional measures should new events so dictate.[156]    **110**

In *CSOB* v. *Slovakia*, a "Consolidation Agreement" between the parties provided for the assignment of non-performing receivables by CSOB to a Collection Company created for this purpose. The Collection Company was to pay CSOB for the assigned receivables in accordance with a loan arrangement. The loan was secured by a guarantee of the Slovak Ministry of Finance (see Art. 25, para. 100). When the Collection Company defaulted, CSOB instituted ICSID proceedings against Slovakia on the basis of the guarantee. Bankruptcy proceedings against the Collection Company in the Slovak domestic courts were pending simultaneously. These bankruptcy proceedings were likely to lead to the determination of issues that were also before the ICSID Tribunal.    **111**

---

154    See *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 77.
155    *Vacuum Salt* v. *Ghana*, Decision No. 1, 3 December 1992. The decision is unpublished. It is quoted in: *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, 4 ICSID Reports 323; Award, 16 February 1994, 4 ICSID Reports 332.
156    *Vacuum Salt* v. *Ghana*, Decision on Provisional Measures, 14 June 1993, 4 ICSID Reports 323, 328.

**112**      CSOB made several requests for provisional measures seeking the suspension of the bankruptcy proceedings pending against the Collection Company. The Tribunal at first declined this request in two procedural orders.[157] The Tribunal found that it had no reason to assume that the competent domestic court would fail to suspend the bankruptcy proceedings to the extent that these would include a determination of issues before the Tribunal. At the same time, the Tribunal found that the rights to be preserved included, in principle, the right to the exclusive remedy provided for in Art. 26 and reserved further consideration and decision of the request for provisional measures.

**113**      In a subsequent order, the Tribunal granted the request and recommended the suspension of the bankruptcy proceedings:

> to the extent that such proceedings might include determinations as to whether the . . . [Slovak Collection Company] has a valid claim in the form of a right to receive funds from the Slovak Republic to cover its losses as contemplated in the Consolidation Agreement at issue in this arbitration.[158]

**114**      After the continuation of the bankruptcy proceedings in the Slovak courts, CSOB submitted another request for provisional measures. The Tribunal granted this request. It noted the denial by the Slovak courts of CSOB's request for suspension of the bankruptcy proceedings and affirmed and extended its previous order. The Tribunal recommended that the bankruptcy proceedings be suspended to the extent that they might include determinations as to whether the Collection Company had made a loss from the operating costs and the schedule of payments for the receivables assigned to it by CSOB[159] (see also Art. 25, para. 100).

**115**      In *Tanzania Electric* v. *IPTL*, subsequent to the filing by Tanzania Electric of the request for arbitration in the ICSID proceedings, IPTL applied to the High Court of Tanzania seeking an order for interim payments. The Tanzania court granted the relief but its execution was subsequently stayed. The Claimant requested an order of provisional measures from the ICSID Tribunal directed at a cessation of the proceedings in the courts of Tanzania. Since the order of the High Court had been stayed the parties requested deferral of the Claimant's request for provisional measures directed at the Tanzanian court proceedings. Therefore, the Tribunal did not deal with the issue of the relationship between local and ICSID proceedings.

**116**      IPTL in turn filed with the Tribunal a request for provisional measures substantially to the same effect as it had obtained from the High Court. IPTL's provisional measures request was denied since the Tribunal found that it would change rather than maintain the *status quo* and that IPTL had in any event failed to prove the urgency of the measures sought.[160]

---

157  *CSOB* v. *Slovakia*, Procedural Order No. 2, 9 September 1998, Procedural Order No. 3, 5 November 1998; see *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 9.

158  *CSOB* v. *Slovakia*, Procedural Order No. 4, 11 January 1999, quoted in *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 9.

159  *CSOB* v. *Slovakia*, Procedural Order No. 5, 1 March 2000.

160  *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 26–32; *Tanzania Electric* v. *IPTL*, Decision on Provisional Measures, 20 December 1999, attached to the Award as Appendix A.

In *Pey Casado* v. *Chile* the Claimants requested the stay of execution of a **117**
decision of a Chilean Minister (Decision No. 43) by way of a recommendation for
provisional measures in order to preserve their rights in the ICSID proceedings.
For the Claimants, Decision No. 43 represented a threat to the ICSID proceedings
because it decided a dispute that was identical or analogous to the one pending
before the Arbitral Tribunal. The Claimants further argued that the execution of
this Decision would amount to a rejection of the exclusive jurisdiction of the
Arbitral Tribunal to rule on the issues before it and would have the effect of
aggravating the terms of the dispute.[161]

The Tribunal declined the request. It found that, although there were some **118**
common elements, the dispute that formed the object of Decision No. 43 was
clearly not identical to the dispute submitted to ICSID, if only because the par-
ties were not the same.[162] The Tribunal added that the jurisdiction of an ICSID
tribunal would prevail over any inconsistent decision of a local court and con-
cluded that, by virtue of the principle of primacy of international procedures over
internal procedures, Decision No. 43 was not binding on the Tribunal nor could
it prevail over any decision the Tribunal might render if it decided that it was
competent to hear the merits of the claim.[163] It followed that the recommendation
of provisional measures as requested was unnecessary and inappropriate in the
circumstances.[164]

In *SGS* v. *Pakistan*, an agreement between the parties provided for national **119**
arbitration in Pakistan. The Respondent initiated arbitration under this clause
whereas SGS initiated ICSID arbitration. Pakistan applied to its courts to enjoin
SGS from pursuing the ICSID arbitration. In addition, Pakistan applied to the
Supreme Court to hold SGS in contempt of court. On 7 May 2002 SGS requested
provisional measures from the ICSID Tribunal seeking the discontinuance of all
proceedings relating to the ICSID arbitration in the courts of Pakistan. SGS also
requested a provisional measure to stay the national arbitration.

On 3 July 2002 the Supreme Court of Pakistan rendered its decision allowing **120**
the Respondent to proceed with the local arbitration and restraining the Claimant
from pursuing or participating in the ICSID arbitration. Although the Supreme
Court did not issue a notice of contempt, the possibility that SGS would be
held in contempt of court remained. The Claimant thereupon requested the ICSID
Tribunal to recommend that the Respondent "remove" or "undo" this judgment.[165]

The ICSID Tribunal issued its recommendation on 16 October 2002. It referred **121**
to its power to determine its own competence in accordance with Art. 41 of the
ICSID Convention and ruled that the judgment of the Supreme Court of Pakistan
was not binding upon it. The Tribunal said:

---

161  *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, paras. 28 *et seq.*
162  *Ibid.*, para. 40.                    163   *Ibid.*, paras. 53–60.
164  *Ibid.*, para. 61.
165  *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 388/9.

> It is essential for the proper operation of both the BIT and the ICSID Convention that the right of access to international adjudication be maintained. In the Tribunal's view, it has a duty to protect this right of access and should exercise such powers as are vested in it under Article 47 of the ICSID Convention in furtherance of that duty. . . .
>
> The right to seek access to international adjudication must be respected and cannot be constrained by an order of a national court. Nor can a State plead its internal law in defence of an act that is inconsistent with its international obligations. Otherwise, a Contracting State could impede access to ICSID arbitration by operation of its own law.[166]

**122**    With respect to Pakistan's application to have SGS held in contempt of court, the Tribunal requested Pakistan to refrain from acting on its earlier complaint or file a new complaint. The Tribunal further asked Pakistan to ensure that no action be taken in respect of contempt proceedings.[167]

**123**    With regard to SGS's request that Pakistan refrain from participating in proceedings "in any way" relating to the arbitration in the future, the Tribunal found the request to be too broad. It held that it could not "enjoin a State from conducting the normal process of criminal, administrative and civil justice within its own territory".[168]

**124**    With respect to SGS's request for a stay of the national arbitration in Islamabad, the Tribunal noted that it raised a number of substantial issues regarding the Tribunal's competence and jurisdiction. Nevertheless, having weighed up the different elements of the case, the Tribunal decided that "it would be wasteful of resources for two proceedings relating to the same or substantially the same matter to unfold separately while the jurisdiction of one tribunal awaits determination".[169] Therefore it concluded that it would be appropriate to recommend a stay of the Pakistani arbitration until the Tribunal had reached its decision on jurisdiction.[170]

**125**    The order for provisional measures in *SGS* v. *Pakistan* was as follows:

> First, the Tribunal recommends that the Government of Pakistan not take any step to initiate a complaint for contempt. It recommends further that, in the event that any other party, including the Supreme Court of Pakistan *sua sponte*, were to initiate a complaint, the Government of Pakistan take all necessary steps to inform the Court of the current standing of this proceeding and of the fact that this Tribunal must discharge its duty to determine whether it has the jurisdiction to consider the international claim on the merits. The Government of Pakistan should ensure that if contempt proceedings are initiated by any party, such proceedings not be acted upon.
>
> Second, the Tribunal recommends that the Islamabad-based arbitration pending between the Government of Pakistan and SGS be stayed until such time, if any, as this Tribunal has issued an award declining jurisdiction over the present dispute, and that award is no longer capable of being interpreted, revised or annulled pursuant to the ICSID Convention. The Tribunal requests that a copy of this

---

166  *Ibid.*, p. 393. Footnote omitted.          167  *Ibid.*, p. 394.
168  *Loc. cit.*                                       169  *Ibid.*, p. 396.
170  *Ibid.*, p. 397.

procedural order be transmitted to the designated arbitrator so that he is made fully aware of the status of this international proceeding.[171]

In *Zhinvali* v. *Georgia*, the Claimant filed a motion for a recommendation of **126** provisional measures under Art. 26 and Art. 47 of the Convention and Arbitration Rule 39 in order to preserve its rights against a domestic litigation. The domestic litigation had been introduced by Tbilisi Water Utilities Ltd. against the City of Tbilisi Government to declare cancelled an agreement between the parties to the ICSID proceedings. The Claimant argued that the Georgia lawsuit was essentially a governmental entity suing itself and that the purpose of the litigation was to take away from the ICSID Tribunal the decision as to the validity and effect of the agreement between the parties. The Claimant added that it had been named as a "third person" in the lawsuit in Georgia.[172]

The Tribunal expressed its concern that the Georgian litigation may have an **127** adverse effect on the Claimant's rights and interests, especially given its "third person" status in that litigation.[173] Consequently, in light of the circumstances and of the pertinent provision of Art. 26 and Art. 47 of the Convention, the Tribunal recommended:

> (1) that the Georgia court stay and suspend its proceedings insofar as any issues pending before the Tribunal were concerned and (2) that the Respondent immediately bring the Tribunal's recommendation to the attention of the Georgia court so that it might take into account what appeared to the Tribunal as the "exclusive" jurisdiction of ICSID over issues that any final judgment in the Georgia lawsuit might otherwise implicate in a manner that was prejudicial to the Claimant.[174]

The Claimant subsequently informed the Tribunal that the higher court had vacated the lower court's judgment declaring the agreement between the parties null and void.[175]

In *Tokios Tokelės* v. *Ukraine*, the Claimant requested the suspension of parallel **128** proceedings in Ukraine and investigations conducted by Ukrainian tax authorities which, it argued, could seriously affect its rights.[176] Holding that Ukraine had committed itself to the exclusivity of ICSID proceedings, and hence to the exclusion of domestic judicial or administrative remedies, the Tribunal stated that parties "must refrain from initiating or pursuing proceedings in any other forum in respect of the subject matter of the dispute before ICSID".[177] The Tribunal ruled, in relevant part:

> The Tribunal has determined that in the present instance the circumstances require that provisional measures be taken to preserve the respective rights of either party. The Ukrainian authorities – whether judicial or other – are, therefore, under the legal obligation to abstain from, and to suspend and discontinue, any proceedings

---

171 *Loc. cit.*
172 *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 38.
173 *Ibid.*, para. 44.                          174  *Ibid.*, para. 45.
175 *Ibid.*, para. 46.
176 *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, para. 11.
177 *Tokios Tokelės* v. *Ukraine*, Order No. 1, 1 July 2003, para. 1.

before any domestic body, whether judicial or other, which might in any way jeopardize the principle of exclusivity of ICSID proceedings or aggravate the dispute before it.[178]

**129**    The Tribunal decided as follows:

> Pending the resolution of the dispute now before the Tribunal, both parties shall refrain from, suspend and discontinue, any domestic proceedings, judicial or other, concerning Tokios Tokelės or its investment in Ukraine, [ . . . ] which might prejudice the rendering or implementation of an eventual decision or award of this Tribunal or aggravate the existing dispute;[179]

**130**    In *Plama* v. *Bulgaria*, the Claimant filed a request for provisional measures seeking the discontinuance of insolvency proceedings brought by the Respondent before the Bulgarian courts.[180] The Tribunal recognized that it was within its powers under Art. 47 of the Convention to recommend provisional measures in order to preserve the exclusivity of ICSID arbitration to the exclusion of local judicial remedies.[181] But the Tribunal found that the claims and causes of action in the ICSID proceedings and in the Bulgarian proceedings were different and concluded that the proceedings pending in Bulgaria could not affect the outcome of the ICSID arbitration.[182] The Tribunal added that the parties to the bankruptcy proceedings were also different from those of the ICSID arbitration. It stated that it was "reluctant to recommend to a State that it order its courts to deny third parties the right to pursue their judicial remedies".[183]

**131**    The *Plama* Tribunal distinguished the situation before it from that in *CSOB* v. *Slovakia*, where the suspension of bankruptcy proceedings had been recommended. In *CSOB* the court might have determined the right to receive funds which was at issue in the arbitration. Moreover, in *CSOB* there was a direct link between the Slovak Republic, the Respondent in the ICSID arbitration, and the Slovak Collection Agency, which was the subject of the Slovak bankruptcy proceedings in which CSOB was the only named creditor.

**132**    Although the Tribunal admitted that the proceedings in Bulgaria might aggravate the dispute between the parties, it also considered "that the right to non-aggravation of the dispute refers to actions which would make resolution of the dispute by the Tribunal more difficult".[184] Moreover, there was no urgency since Plama's claim was limited to monetary damages. Therefore, whatever the outcome of the Bulgarian proceedings, the Claimant's right to pursue its monetary claims in the ICSID arbitration would not be affected. The Tribunal concluded as follows:

> The Tribunal accepts Respondent's argument that harm is not irreparable if it can be compensated for by damages, which is the case in the present arbitration and which, moreover, is the only remedy Claimant seeks.[185]

---

178  *Ibid.*, para. 3.                                    179  *Ibid.*, para. 7.
180  *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005, para. 2.
181  *Ibid.*, para. 38.                                   182  *Ibid.*, para. 42.
183  *Ibid.*, para. 43.                                   184  *Ibid.*, para. 45.
185  *Ibid.*, para. 46.

Therefore, the *Plama* Tribunal rejected the Claimant's request for provisional **133** measures in its entirety.[186]

In *Duke Energy* v. *Peru*, the Respondent's request for provisional measures was **134** directed not at proceedings in the host State. The request asked the Tribunal to recommend that the Claimant withdraw a petition it had filed before the United States Trade Representative for the revocation or suspension of Peru's beneficiary status under the Andean Trade Preference Act. The request was withdrawn without a decision from the Tribunal.[187]

## d) Aggravation of the Dispute

Note A to Arbitration Rule 39 in its 1968 version states that Art. 47 **135**

is based on the principle that once a dispute is submitted to arbitration the parties should not take steps that might aggravate or extend their dispute or prejudice the execution of the award.[188]

In *Holiday Inns* v. *Morocco*, one of the Claimant's contentions was that the **136** measures taken by Morocco for the completion or operation of the hotels led to an aggravation of the dispute.[189] The Tribunal's Decision on Provisional Measures of 2 July 1972 does not appear to address the problem of aggravation directly.[190] However, its general recommendations to the parties to abstain from measures incompatible with the upholding of the contract, to exchange information and to consult on the maintenance of the enterprise (see para. 159 *infra*) were probably motivated, *inter alia*, by the intention to calm the relationship between the parties and to contain the dispute.

In *Amco* v. *Indonesia*, Indonesia requested provisional measures to the effect that **137** the Claimants should desist from propaganda that might aggravate or extend the dispute. The alleged publication of propaganda consisted of an article containing statements attributed to a controlling shareholder of the Claimants published in a Hong Kong newspaper, which Indonesia found to be a "one-sided version of the Claimant's story in tones designed to be detrimental to international perceptions of the climate for foreign investment in Indonesia". The Tribunal declined to make the recommendation. It found that the article "could not have done any actual harm to Indonesia, nor aggravate or exacerbate the legal dispute".[191]

The Tribunal recognized the principle that the parties are under an obligation **138** to avoid any aggravation of the dispute. It referred to a rule

---

186  *Ibid.*, para. 50.
187  *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 15–18.
188  1 ICSID Reports 99.
189  *Lalive*, The First "World Bank" Arbitration, p. 134. Reproduced in 1 ICSID Reports 645, 653–659.
190  *Ibid.*, p. 137.
191  *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983, 1 ICSID Reports 410. See also *Tahyar, B. H.*, Confidentiality in ICSID Arbitration after *Amco Asia Corp.* v. *Indonesia*: Watchword or White Elephant?, 10 Fordham International Law Journal 103–109 (1986).

according to which both parties to a legal dispute should refrain, in their own interest, to do anything that could aggravate or exacerbate the same, thus rendering its solution possibly more difficult. However, in the circumstances of the case, the Tribunal does not find any symptom of an intention of the one or the other party to take steps that could have such consequences; accordingly, the Tribunal does not deem it appropriate to issue a recommendation to the parties . . .[192]

**139**    The Tribunal's evaluation of the factual situation arising from the newspaper article and its finding that no harm had been done creates the impression that, given the right circumstances, it would have been prepared to recommend provisional measures against an aggravation of the dispute.

**140**    The Respondent objected to the newspaper article also on the ground that it was inconsistent with the exclusive nature of ICSID proceedings under Art. 26.[193] The Tribunal rejected this contention. It found that even if the article had been promoted by the Claimants, this "does not mean that the same rely on any legal remedy other than ICSID arbitration".[194] (See also Art. 26, para. 184.)

**141**    In *CSOB* v. *Slovakia*, the Claimant requested the Tribunal to recommend that the Respondent take no action of any kind that might aggravate or further undermine the dispute. The Tribunal denied this request finding that the Claimant had failed to demonstrate the need for such a measure.[195]

**142**    In *Pey Casado* v. *Chile*, the Claimants sought a general recommendation against the aggravation of the dispute. The Tribunal noted that the Respondent did not dispute the existence of a general principle to that effect nor the Tribunal's competence to order provisional measures to avoid the aggravation or exacerbation of the dispute. It referred to the established case law of the International Court of Justice, the Iran-US Claims Tribunal and ICSID tribunals.[196] Looking at the facts of that case, the Tribunal remarked on the tension existing between the parties and recalled that its mission was to try and reduce such tension or at least prevent its aggravation during the proceedings.[197] Accordingly, the Tribunal invited the parties to "prevent any act, of whatever nature, which could aggravate or extend the dispute submitted to the Arbitral Tribunal".[198]

**143**    In *SGS* v. *Pakistan*, the Claimant's application for provisional measures included a request that the Respondent take no action that might aggravate or further extend the dispute. The Tribunal concluded that there was no need to make such an order since the parties were cooperating and neither one of them had taken any measure to aggravate the dispute.[199]

**144**    In *Azurix* v. *Argentina*, the Claimant alleged that once it had initiated ICSID arbitration the Argentinian Province had taken a series of measures harassing it. This included action taken by the Province in bankruptcy proceedings initiated

---

192  *Ibid.*, para. 5.                          193  *Ibid.*, para. 1.
194  *Ibid.*, para. 3.
195  *CSOB* v. *Slovakia*, Procedural Order No. 3, 5 November 1998.
196  *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, paras. 67–72.
197  *Ibid.*, para. 74.                          198  *Ibid., dispositif*, item 4.
199  *SGS* v. *Pakistan*, Procedural Order No. 2, 16 October 2002, 8 ICSID Reports 388, 397.

by the Claimant to protect its interests.[200] The Claimant relied on a "universally admitted principle of international law that the parties to an international case are obliged to abstain from adopting measures that might aggravate or extend the dispute". Therefore the Claimant asked for a provisional measure recommending Argentina to refrain from any action or omission capable of aggravating or extending the dispute.[201]

The *Azurix* Tribunal recognized the validity of the principle of non-aggravation **145** or non-extension of the dispute.[202] Although the request was couched in general terms, its objective was stated with sufficient precision to meet the requirement of a "specific measure". The Tribunal invited the parties "to abstain from adopting measures of any character that could aggravate or extend the controversy submitted to this arbitration".[203]

In *Plama* v. *Bulgaria*, the Claimant also requested an order to have the Respon- **146** dent take no action that might aggravate or further extend the dispute.[204] The principal thrust of the request for provisional measures was directed against insolvency proceedings against Plama and the execution of tax debts. The Claimant argued that these actions would lead to the aggravation of the dispute.[205] The Tribunal confirmed that provisional measures are appropriate to prevent parties from taking measures which might aggravate or extend the dispute or render its resolution more difficult.[206] However, the right to non-aggravation must be related to the specific dispute in arbitration.[207] Although the domestic proceedings may well, in a general sense, aggravate the dispute between the parties, the subject-matter of these proceedings was different from the claims before the Tribunal.[208] Therefore, the Tribunal rejected the request for provisional measures.

In *Occidental* v. *Ecuador*, the Tribunal confirmed that provisional measures can **147** be granted to avoid aggravation of the dispute. However, provisional measures are not an appropriate means to mitigate damages. The Tribunal observed that, in any situation resulting from an illegal act, the mere passage of time aggravates the damages that can ultimately be granted. Where the only harm is more damage, the appropriate remedy is monetary compensation and not provisional measures.[209]

### e) Confidentiality of the Proceedings

Confidentiality and transparency in arbitration proceedings are two conflicting **148** principles. Their respective weight in ICSID arbitration has been the subject-matter of some debate. These principles are discussed in other parts of this Commentary (see Art. 44, paras. 97–127; Art. 48, paras. 107–129). In some cases parties have

---

200  *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, paras. 16–20.
201  *Ibid.*, paras. 21, 22, 36.        202  *Ibid.*, paras. 38, 46, 47.
203  *Ibid.*, para. 50.
204  *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005, para. 2.
205  *Ibid.*, paras. 3(e), 6.        206  *Ibid.*, para. 38.
207  *Ibid.*, para. 40.        208  *Ibid.*, paras. 44, 45.
209  *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, paras. 50, 96–100.

sought to have the confidentiality of proceedings protected through provisional measures (see also Art. 44, paras. 116–120).

**149**     In *Amco* v. *Indonesia*, the Respondent claimed that a newspaper article attributed to a controlling shareholder of the Claimants was incompatible with the spirit of confidentiality of the proceedings, in particular with Art. 48(5) of the Convention and Arbitration Rules 6(2), 15, 31(2), 37(2) and 48(4).[210] The Tribunal rejected this argument by pointing out that the Convention and Rules do not prevent the parties from revealing their case.[211]

**150**     In *World Duty Free* v. *Kenya*, the Respondent's Request for Provisional Measures invoked a general principle of confidentiality that would prevent either party from discussing the proceedings publicly. The Tribunal noted that neither the Convention nor the Arbitration Rules contain an express restriction with regard to the parties' freedom to discuss the arbitration and added that "[e]specially in an arbitration to which a Government is a Party, it cannot be assumed that the Convention and the Rules incorporate a general obligation of confidentiality which would require the Parties to refrain from discussing the case in public". Nevertheless, the Tribunal directed the parties to avoid any action that "would aggravate or exacerbate the dispute" and that "any public discussion should be an accurate report".[212]

**151**     The Request also raised the issue of privacy of the hearings to the extent that Kenya complained that the minutes and audio-recordings of the preliminary session had been disseminated to the press without a prior request to open the hearings to the media. The Tribunal noted that the question is regulated by Rule 32(2) of the Arbitration Rules and ICSID Administrative and Financial Regulation 22, providing, respectively, that tribunals decide only with the consent of the parties who can attend hearings and whether minutes and records of proceedings will be published. The Tribunal concluded that "when no decision has been taken to open the hearings to the public, the records of such hearings should not be disseminated unilaterally by one of the Parties". Since no such decision had been made in that case, the Tribunal stated that the relevant minutes and audio-recordings may not be disseminated to the public by one of the parties.[213]

### 3. *The Addressees of Provisional Measures*

**152**     Neither the Convention nor the Arbitration Rules indicate to whom provisional measures may be addressed (see also para. 170 *infra*). During the negotiations leading to the Convention, the question was raised to whom the tribunal would direct its recommendations. Mr. *Broches* stated that the recommendations would be made to the parties (History, Vol. II, p. 814).

---

210  *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983, para. 1. The Arbitration Rules applicable at the time were those of 1968 – see 1 ICSID Reports 63.

211  *Ibid.*, para. 4.

212  *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 16, quoting the Decision on a Request by Respondent for a Recommendation of Provisional Measures of 25 April 2001.

213  *Loc. cit.*

In the context of Art. 47, there is no provision analogous to Art. 54 of the **153** Convention which would require each Contracting State to recognize and enforce provisional measures. But an involvement of third States and their courts[214] cannot be ruled out entirely. Situations may arise in which evidence, assets or objects which are essential for the proceedings are located in a State other than the State party to the dispute. Proceedings that have a bearing on an ICSID arbitration case may be pending in the courts of third States (see paras. 103–109 *supra*). It would be extraordinary if in the face of such a situation a tribunal would be entirely powerless to make a recommendation beyond the parties to the dispute, or if the authorities of a State, including its courts, would have to regard any recommendations as irrelevant. In a number of cases, courts confronted with provisional measures took the ICSID tribunals' recommendations into account (see paras. 27–30 *supra*).

The reaction of a domestic court in a third State to a recommendation for pro- **154** visional measures would depend very much on the specific situation and on the claim put forward. However, such a court should not dismiss the invocation of an ICSID tribunal's provisional measures offhand. To the extent that legal conse- quences arise from provisional measures (see paras. 15–22 *supra*), all Contracting States are under a general obligation to ensure in good faith that the Convention's object and purpose are not frustrated.

Requests for provisional measures have invariably sought provisional measures **155** directed at the other party. Whenever tribunals have recommended provisional measures, they were directed at one or both of the parties to the proceedings before them.

International law sees a State and its organs as one unit. For purposes of State **156** responsibility the conduct of a State organ, whether it exercises legislative, execu- tive judicial or any other functions, is attributable to the State.[215] Therefore, even though a State will normally be represented in ICSID arbitration by the executive, provisional measures are also directed at the other organs of the State. In *CSOB* v. *Slovakia*, the Tribunal called upon the parties to the ICSID arbitration to bring its Order recommending provisional measures to the attention of the appropriate judicial authorities of the Slovak Republic so that they may act accordingly.[216]

## 4. The Rights in Dispute

A recurrent theme is the relationship of the rights to be protected through **157** provisional measures to the rights in dispute between the parties. The references in the *travaux préparatoires* to the preservation of the *status quo* (see para. 73 *supra*) are an expression of the principle that in the course of litigation the parties must refrain from taking steps that might affect the rights of the other side which are the

---

214   On the role of domestic courts in the implementation of ICSID provisional measures see paras. 27–30 *supra*.

215   See Article 4 of the International Law Commission's Articles on State Responsibility.

216   *CSOB* v. *Slovakia*, Procedural Order No. 5, 1 March 2000. Unpublished. See also *SGS* v. *Pakistan*, paras. 119–125 *supra*; *Zhinvali* v. *Georgia*, para. 30 *supra*.

object of the proceedings on the merits. This is particularly so where an ongoing legal relationship remains in existence or where a business is at stake which may be damaged through unilateral action or an attempt at self-help. Therefore, the rights to be protected through provisional measures must relate to the rights in dispute between the parties. At the same time, provisional measures must not prejudge the rights to be determined by the tribunal's decision on the merits.

**158**    Under Art. 1134 of the NAFTA (see para. 10 *supra*), interim measures of protection may be granted to preserve evidence in the possession or control of a disputing party or to protect the tribunal's jurisdiction. But attachments and injunctions may not be used against measures alleged to be in violation of the NAFTA. In other words, rights in dispute may not be the subject matter of provisional measures if the ICSID arbitration takes place under the NAFTA.[217] ICSID tribunals operating outside the NAFTA have adopted varying attitudes on this question.

**159**    In *Holiday Inns* v. *Morocco*, the Tribunal in its Decision on Provisional Measures of 2 July 1972 was primarily concerned with preserving the existing contractual rights (see paras. 100–102 *supra*). It called upon the parties to abstain from measures likely to prevent the execution of their obligations and from measures incompatible with the upholding of the contract in the following terms:

> Both Parties are invited to abstain from any measure incompatible with the upholding of the Contract and to make sure that the action already taken should not result in any consequences in the future which would go against such upholding.

The Tribunal's decision, as reported by *Lalive*, continued as follows:

> A second recommendation, formulated in a carefully balanced manner, concerns the exchange of information by the parties regarding the management of the completed hotels and the completion of those hotels still to be constructed. In a third and last recommendation, the Tribunal, taking special account of one of the claimants' complaints, recommended consultations "in order to maintain in the hotels the character of the enterprise which is part of the international chain of Holiday Inns Hotels".[218]

**160**    In *Amco* v. *Indonesia*, the Government's request invoked a number of rights, none of which were directly related to the rights in dispute. They were the non-aggravation of the dispute through an adverse newspaper report (para. 137 *supra*), the exclusive nature of ICSID arbitration (para. 140 *supra*) and the confidential nature of the proceedings (para. 149 *supra*). In rejecting the request, the Tribunal emphasized that the rights to which Art. 47 of the Convention relates are the rights in dispute which could not be affected by the newspaper article:

> . . . Claimants rightly point out that Rule 39(1), implementing the very general provision of Art. 47 of the Convention, requires the party which solicits a provisional measure to specify the rights that such measure would be purported to

---

217    See *Ecklund, C. D.*, A Primer on the Arbitration of NAFTA Chapter Eleven Investor-State Disputes, 11 Journal of International Arbitration 151 (1994).

218    *Lalive*, The First "World Bank" Arbitration, pp. 136 *et seq.*; reproduced in 1 ICSID Reports 645 at 658.

preserve. Obviously, the rights to which this provision is relating are the rights in dispute, and no such right could be threatened by the publication of articles like those which are produced by both parties. Moreover, it can not be seriously contended that the article in *The Hong Kong Business Standard* may have whatever influence on Indonesia's economy.

It might possibly be that a large press campaign could have such an influence. However, even so, it would not be an influence on rights in dispute.[219]

In *Maffezini* v. *Spain*, the Respondent had requested a guaranty bond to cover **161** the expected procedural costs (see para. 94 *supra*). The Tribunal analysed the language of Rule 39(1) and concluded that it concerned existing rights, such as rights in property whose ownership is disputed, and not rights to be created in the future. Applying this analysis to the case before it, the Tribunal considered that there were no present rights to be preserved because the request for relief hinged on hypothetical questions relating to future events.[220] The Tribunal said:

23. Any preliminary measure to be ordered by an ICSID arbitral tribunal must relate to the subject matter of the case before the tribunal and not to separate, unrelated issues or extraneous matters.[221]

The Tribunal dismissed the application for provisional measures.

The Respondent in *Tanzania Electric* v. *IPTL* requested provisional measures **162** directed at the performance of the contract that was the subject-matter of the dispute before the Tribunal.[222] The Tribunal relied on *Atlantic Triton* v. *Guinea* (see paras. 91–93 *supra*) for its conclusion that "there is some precedent for the view that conservatory or provisional measures under Rule 39 should not be recommended in order, in effect, to give security for the claim".[223] The Tribunal agreed with the Claimant that the measure sought was in effect specific performance of the relevant agreement, *i.e.* an interim injunction requiring that performance. The Tribunal concluded that the recommendations requested would not maintain the *status quo*, but, rather, "were plainly directed to affect a fundamental change to it".[224] Having said that, the Tribunal acknowledged that provisional measures may be recommended for the performance of a contract, and specified as follows in that respect:

We do not go as far as to conclude that "provisional measures" under Rule 39 can <u>never</u> include recommending the performance of a contract in whole or in part: it is not necessary for us to go that far. But where what is sought is, in effect, performance of the Agreement, and where the only right said to be preserved thereby is the right to enjoy the benefits of that Agreement, we consider that the application falls outside the scope of Rule 39, and therefore is beyond our jurisdiction to grant.[225]

---

219  *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983, para. 3.
220  *Maffezini* v. *Spain*, Decision on Provisional Measures, 28 October 1999, paras. 11–22.
221  *Ibid.*, para. 23.
222  *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 28, 30.
223  *Tanzania Electric* v. *IPTL*, Decision on Provisional Measures, 20 December 1999, para. 14.
224  *Ibid.*, para. 15.          225  *Ibid.*, para. 16. Emphasis original.

**163**    The Claimants in *Pey Casado* v. *Chile* requested the stay of the execution of a decision of a Chilean Ministry (see paras. 117–118 *supra*). Chile objected that this request would prejudge the substance of the case. The Tribunal entered into a discussion on whether the existence of "real and present rights", as distinguished from hypothetical or conditional rights, was a condition for the recommendation of provisional measures. The Tribunal emphasized that a decision on provisional measures would not prejudge the substance of the case. Rather, it would have to proceed on the basis of hypotheses as to the recognition of the rights in dispute and the possible danger of these rights in the absence of provisional measures. The Tribunal distanced itself from the language used by the *Maffezini* Tribunal (see para. 161 *supra*) which it found susceptible to misunderstanding.[226] The Tribunal summarized its position as follows:

> To demand that the right that one seeks to preserve must be existing, demonstrated or proved "at the time of the claim" can certainly, in certain circumstances, be seen as raising no difficulties. On the other hand, in other circumstances, it could, *ex natura rerum*, oblige the Tribunal to prejudge the substance, at a time when it is not yet in a position to judge it, and in hypotheses which, by definition, cannot be used to affirm or prove the existence or reality of the right invoked *until later*, by the judgment on the merits of the case.[227]

Nevertheless, the Tribunal declined the request for provisional measures because it found that the dispute forming the object of the Ministerial decision was not identical to the dispute before it.

**164**    In *Azurix* v. *Argentina*, Azurix, by way of provisional measures, sought to protect the right of its locally incorporated investment vehicle, ABA, to continue judicial proceedings in Argentina.[228] The Respondent, for its part, contended that the dispute between ABA and the Province of Buenos Aires was different *ratione materiae* and *ratione personae* from the ICSID dispute. The Tribunal noted that the Claimant's ability as a US investor to enforce rights of ABA and the international responsibility of Argentina for actions of its province were central issues in the arbitration. Accordingly, the question of whether the granting of provisional measures was appropriate or not depended on merits issues. In the circumstances, the Tribunal held that it was not in a position to recommend the measure requested because doing so "would inevitably lead the Tribunal to prejudge the merits of the case".[229]

**165**    In *Plama* v. *Bulgaria*, the Claimant requested provisional measures to protect its investment against insolvency proceedings[230] (see paras. 131–134 *supra*). The Tribunal stated that provisional measures must relate to the preservation of the requesting party's rights.[231] Not any and all rights of a party may be thus protected.

---

226    *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, paras. 43–49.
227    *Ibid.*, para. 48. Italics original.
228    *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, para. 41.
229    *Ibid.*, paras. 42–45.
230    *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005, para. 2.
231    *Ibid.*, para. 38.

In the Tribunal's view, a limitation such as "rights relating to the dispute" was reasonable and necessary. The Tribunal said:

> Thus the rights to be preserved by provisional measures are circumscribed by the requesting party's claims and requests for relief. They may be general rights, such as the rights to due process or the right not to have the dispute aggravated, but those general rights must be related to the specific disputes in arbitration, which, in turn, are defined by the Claimant's claims and requests for relief to date.[232]

**166** In the particular case, the Claimant's claims and requests for relief were limited to damages. Therefore, the Tribunal found that the scope of the rights in dispute in the ICSID proceedings to be protected by provisional measures was limited to the damages claims.[233] The domestic proceedings concerned different parties, different claims and different requests for relief.[234] The Tribunal held that the harm invoked by Plama to justify its request for provisional measures was not irreparable since it could be compensated by damages, which were the only remedy sought by Plama in the ICSID arbitration.[235] Therefore, the Tribunal rejected the request for provisional measures.

**167** In *Occidental* v. *Ecuador*, the Claimant requested a number of provisional measures that were designed to secure the eventual restitution of assets that had been taken from the investor.[236] The Tribunal looked at the existence of rights of the Claimant deserving protection. It found that a right may not yet have been recognized by the Tribunal but may nevertheless be deserving of protection by way of provisional measures. The right must potentially form part of the Claimant's rights.[237] The requested provisional measures were predicated on the assumption that the Claimant had a right to specific performance or restitution.[238]

**168** In the particular case, the Tribunal found specific performance to be impossible. Where a State had in the exercise of its sovereign powers put an end to a contract or licence, specific performance was legally impossible. Reinstatement of a concession after nationalization or termination would be a disproportionate interference with the sovereignty of the State. The appropriate remedy would be monetary compensation.[239] Since the Claimants had not established a strongly arguable case for the existence of a right to specific performance, it was not appropriate for the Tribunal to grant a provisional measure for the protection of such a right.[240]

**169** This survey of practice shows highly differentiated attitudes of tribunals towards the relationship between the rights to be protected by way of provisional measures and the rights in dispute between the parties. Some tribunals either granted provisional measures seeing that they related to the rights in dispute (*Holiday Inns*) or denied them because they did not relate to the rights in dispute (*Amco*, *Maffezini*,

---

232  *Ibid.*, para. 40.
233  *Ibid.*, para. 41.
234  *Ibid.*, paras. 42–43.
235  *Ibid.*, para. 46.
236  *Occidental* v. *Ecuador*, Decision on Provisional Measures, 17 August 2007, paras. 4, 22, 35.
237  *Ibid.*, paras. 61–65.
238  *Ibid.*, paras. 66–68.
239  *Ibid.*, paras. 85, 92.
240  *Ibid.*, paras. 76, 79, 82, 84–86.

*Plama*). The *Occidental* Tribunal went as far as examining the right claimed by the applicant. Since the right in question did not exist, provisional measures relating to it were declined. By contrast, in other cases the close relationship of the requested measures to the rights in dispute was a reason for declining provisional measures. The tribunals pointed out that the requested measures would have amounted to a provisional performance of the claim at issue (*Tanzania Electric*), or might prejudge the merits of the case (*Pey Casado*, *Azurix*).

### E.    "... of either party."

170    The qualifying phrase "of either party" refers to the rights to be protected and not to the addressee of the recommendation. Therefore, it does not answer the question whether recommendations are necessarily restricted in their effect to the parties in the proceedings (see paras. 25–30, 152–156 *supra*).

### 1. Investor Rights and Host State Rights

171    The most distinctive characteristic of ICSID is the mixed nature of the proceedings invariably involving a State party and a non-State party. This raises the question whether tribunals in their practice on provisional measures are more sensitive towards States' rights than towards the rights of investors. A comparison of two early decisions on provisional measures in *Holiday Inns* v. *Morocco* and in *MINE* v. *Guinea* might have created this impression. In the first case, the Tribunal declined to direct Morocco to discontinue proceedings in its domestic courts (see paras. 100–102 *supra*). In the second case, the Tribunal unequivocally directed MINE to desist from the domestic proceedings (see paras. 106–109 *supra*). However, it would be misleading to draw far-reaching conclusions from these two cases.[241]

172    An overall survey of cases in which requests have been made for provisional measures does not show any particular inclination in favour or against the granting of provisional measures requested by one or the other party.

**Requests made by investors granted:**
*Holiday Inns* v. *Morocco*
*AGIP* v. *Congo*
*CSOB* v. *Slovakia* (first denied and later granted)
*Zhinvali* v. *Georgia*
*SGS* v. *Pakistan*
*Tokios Tokelės* v. *Ukraine*
*Bayindir* v. *Pakistan*
*Sempra* v. *Argentina*
*Biwater Gauff* v. *Tanzania*
*Saipem* v. *Bangladesh*
*City Oriente* v. *Ecuador*

---

241    *Brower/Goodman*, Provisional Measures, pp. 445 *et seq.*

**Requests made by investors declined:**
*Vacuum Salt* v. *Ghana*
*Tanzania Electric* v. *IPTL*
*Azurix* v. *Argentina*
*Plama* v. *Bulgaria*
*Helnan* v. *Egypt*
*Enron* v. *Argentina*
*Occidental* v. *Ecuador*

**Requests made by host States granted:**
*MINE* v. *Guinea*
*World Duty Free* v. *Kenya*

**Requests made by host States declined:**
*Amco* v. *Indonesia*
*Maffezini* v. *Spain*

**Requests made by both parties declined:**
*Atlantic Triton* v. *Guinea*
*Pey Casado* v. *Chile*

## 2. Rights of Third Parties

**173**  In a number of cases the requests for provisional measures were directed primarily at the preservation of rights of third parties. The tribunals had to decide whether these third party rights were sufficiently closely related to the rights of one of the parties to the disputes before them.

**174**  In *Pey Casado* v. *Chile* the Claimants requested the stay of execution of a Ministerial Decision by way of a provisional measure (see paras. 117, 118 *supra*). One of the reasons the Tribunal gave for declining this request was the fact that the Ministerial Decision concerned different parties.[242]

**175**  In *Azurix* v. *Argentina*, the adverse measures against which the request for provisional measures was directed concerned ABA, a corporation registered in Argentina through which the Claimant carried out its investment (see para. 164 *supra*). The Tribunal noted that under Arbitration Rule 39(1) the rights to be preserved had to be rights of the parties. The request for provisional measures indicated that the right to be preserved would be the right of ABA. Argentina argued that ABA, as a third party, could not benefit from provisional measures. The Tribunal noted that under the US-Argentina BIT only Azurix had party status. The relationship of the rights of ABA to Azurix was under dispute between the parties. The Tribunal found that answering these questions would lead it to prejudge the merits of the case.

_____
242  *Pey Casado* v. *Chile*, Decision on Provisional Measures, 25 September 2001, paras. 28 *et seq.*, 40.

Therefore, the Tribunal was not in a position to recommend the provisional measure.[243]

**176**    In *Plama* v. *Bulgaria*, the request for provisional measures was directed against insolvency proceedings in Bulgaria (see para. 131 *supra*). The insolvency proceedings concerned Nova Plama, a locally incorporated company owned by the Claimant. The Tribunal, rejecting the request, noted that the insolvency proceedings could not affect the outcome of the ICSID arbitration. It found it significant that the parties to the bankruptcy proceedings and the parties to the arbitration before it were different. In particular, the bankruptcy proceedings had been brought by private persons unconnected to the ICSID arbitration.[244]

**177**    In *Zhinvali* v. *Georgia*, the request for provisional measures was directed against domestic litigation between two government-controlled entities (see paras. 126, 127 *supra*). The apparent purpose of the domestic lawsuit was to declare cancelled an agreement between the Claimant and the Respondent in the ICSID arbitration. Zhinvali enjoyed the status of a "third person" in the Georgia lawsuit. The Tribunal granted provisional measures directing that the Georgia court stay and suspend its proceedings insofar as they concerned issues pending before the ICSID Tribunal (see para. 30 *supra*).[245]

---

243  *Azurix* v. *Argentina*, Decision on Provisional Measures, 6 August 2003, paras. 41–45.
244  *Plama* v. *Bulgaria*, Order on Provisional Measures, 6 September 2005, paras. 42, 43.
245  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 38–46.

# Article 48

**(1) The Tribunal shall decide questions by a majority of the votes of all its members.**

**(2) The award of the Tribunal shall be in writing and shall be signed by the members of the Tribunal who voted for it.**

**(3) The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based.**

**(4) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent.**

**(5) The Centre shall not publish the award without the consent of the parties.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–3 |
| II. | INTERPRETATION | 4–129 |
|  | A. **"(1) The Tribunal shall decide questions by a majority of the votes of all its members."** | 4–21 |
|  |   1. Questions to be Decided | 4–6 |
|  |   2. Modes of Decision | 7–8 |
|  |   3. Quorum | 9–14 |
|  |   4. Majority | 15–21 |
|  | B. **"(2) The award of the Tribunal shall be in writing and shall be signed by the members of the Tribunal who voted for it."** | 22–41 |
|  |   1. The Award | 22–30 |
|  |   2. Written Form | 31–33 |
|  |   3. Signature | 34–38 |
|  |   4. Decisions Other than Awards | 39–41 |
|  | C. **"(3) The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based."** | 42–91 |
|  |   1. Exhaustiveness | 44–53 |
|  |   2. Reasons | 54–68 |
|  |   3. Settlement and Discontinuance | 69–87 |
|  |   4. Decisions Other than Awards | 88–91 |

D.  **"(4) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent."**   92–106
    1.  General                                              92–95
    2.  Substance                                            96–99
    3.  Procedure                                          100–103
    4.  Decisions Other than Awards                        104–106
E.  **"(5) The Centre shall not publish the award without the consent of the parties."**   107–129
    1.  Publication of Awards                              107–119
    2.  Publication of Decisions Other than Awards         120–121
    3.  Publication of Other Information about Cases            122
    4.  General Considerations                             123–129

## I. INTRODUCTION

**1**    Art. 48 deals with a number of diverse matters: majority decisions, the form of the award, the requirement that the award be exhaustive and reasoned, the possibility of individual opinions and restrictions on the award's publication. Art. 48 is the first of two Articles in the Convention's Chapter IV, Section 4, entitled "The Award". Paras. (2) to (5) of Art. 48, by their own terms, address certain aspects of the award. By contrast, para. (1) has a wider application. It addresses questions to be decided by the tribunal in general. It is not restricted to questions decided in awards but also applies to the numerous preliminary and procedural questions that arise before the tribunal (see para. 4 *infra*). Therefore, it would have been more logical to incorporate the provision of Art. 48(1) into the Section on "Powers and Functions of the Tribunal".

**2**    Art. 48 applies not only to awards and decisions of the original tribunal. Art. 52(4) extends its application to proceedings before an *ad hoc* committee that deals with a request for annulment. It is also applicable to proceedings before a new tribunal to which the dispute is submitted in accordance with Art. 52(6) after the original award's annulment.

**3**    Art. 48 is mandatory. A number of the Convention's Articles are subject to modification by agreement of the parties. These provide that they shall apply "except as the parties otherwise agree" (Arts. 43, 44, 46, 47 and 61; see Art. 44, paras. 10–31). Art. 48 does not contain such a clause although its insertion was considered during the Convention's drafting with respect to the duty to state the reasons for the award (Art. 48(3)) and the possibility to attach individual opinions to the award (Art. 48(4)) (see paras. 56, 94 *infra*). The provisions of Art. 48 cannot be dispensed with or modified even if the parties are prepared to do so. Only Art. 48(5) gives the parties some latitude: they may consent to the publication of an award.

# II. INTERPRETATION

## A. "(1) The Tribunal shall decide questions by a majority of the votes of all its members."

### *1. Questions to be Decided*

Despite its inclusion in the Convention's Section on the award, Art. 48(1) refers **4** to the tribunal's decisions in general terms. This is underlined by the fact that the corresponding Arbitration Rule 16 is contained in the Chapter on the "Working of the Tribunal" and not in the Chapter on "The Award". The tribunal will have to make a number of preliminary and procedural decisions long before it reaches the stage where it can vote on the award. Arbitration Rule 19 provides that the tribunal shall make the orders required for the conduct of the proceeding (see Art. 44, paras. 53–58). The tribunal may have to decide on a recommendation of provisional measures (Art. 47), on its own competence in the form of a preliminary decision (see Art. 41, paras. 69–71, 77–78) and on the admissibility of evidence (see Art. 43, paras. 10–22). All these questions are also covered by the rule of Art. 48(1).[1]

A limited exception to Art. 48(1) is contained in Arbitration Rule 26 dealing with **5** time limits. The tribunal may delegate its power to fix time limits to its president. If the tribunal is not in session, this power shall be exercised by its president. This provision is designed to avoid unnecessary delays in the proceedings. A president who is reluctant to act without the assent of the full tribunal may still obtain a decision of the full tribunal.[2]

It is evident that Art. 48(1) also applies to the rectification, interpretation **6** and revision of the award in accordance with Arts. 49, 50 and 51. Moreover, Art. 52(4) extends the provisions of Art. 48 to proceedings before an *ad hoc* committee charged with deciding on a request for annulment of the award. If the award is annulled, the new tribunal, constituted under Art. 52(6), also must proceed in accordance with Art. 48(1).

### *2. Modes of Decision*

The tribunal has two ways of reaching a decision. It may vote at one of its **7** sessions in the physical presence of its members in accordance with Arbitration Rules 13 and 14. Alternatively, it may take a decision by correspondence:

**Rule 16**
*Decisions of the Tribunal*

(1) [see para. 18 *infra*]

(2) Except as otherwise provided by these Rules or decided by the Tribunal, it may take any decision by correspondence among its members, provided that all

---

1   See Note A to Arbitration Rule 16 of 1968, 1 ICSID Reports 82.
2   See Note C to Arbitration Rule 25 of 1968, 1 ICSID Reports 89.

of them are consulted. Decisions so taken shall be certified by the President of the Tribunal.

**8**    Any decision may be taken by correspondence including the vote on the final award. The tribunal may decide otherwise. Every single member must be consulted, but it is not necessary that every member respond in order to reach a decision.

### 3. Quorum

**9**    A quorum is the minimum number of members that must be present or participate for a body to be able to take a vote. During the Convention's drafting, the question of requiring a quorum was raised but not pursued. Mr. *Broches* pointed out that a refusal by one of the members of the tribunal to attend a session should not invalidate the procedure (History, Vol. II, pp. 268, 271).

**10**    The Arbitration Rules contain the following requirement:

#### Rule 14
##### Sittings of the Tribunal
(2) Except as the parties otherwise agree, the presence of a majority of the members of the Tribunal shall be required at its sittings.

**11**    A different rule may be agreed upon by the parties. Arbitration Rule 20, providing for a Preliminary Procedural Consultation, foresees consultation on the number of members of the tribunal required to constitute a quorum at its sittings[3] (see Art. 44, paras. 28–30).

**12**    The quorum requirement of Arbitration Rule 14(2) applies to the tribunal's sittings but does not apply to decisions by correspondence (see paras. 7, 8 *supra*). This apparent incongruity is of no practical consequence.[4] Art. 48(1) requires that decisions be made by a majority of the votes of *all* the tribunal's members and not just those present or voting. Since ICSID tribunals normally consist of three members, two votes will be necessary irrespective of whether the third member participates or not. Under the Convention's Art. 37(2)(a), the tribunal can consist of any uneven number of arbitrators as the parties may agree. So far, all ICSID tribunals have consisted of one or three arbitrators, although parties have sometimes discussed the possibility of tribunals consisting of five arbitrators. Even if the parties agree on more than three arbitrators, no particular problems are likely to arise. If the tribunal consists of five arbitrators, the required majority for any decision would be three regardless of how many of its members participate in the vote. Even if only three out of five members participate, the required majority will still be three and not two.

**13**    Arbitration Rule 17 provides that if at any time the president of the tribunal should be unable to act, his functions shall be performed by one of the other members of the tribunal. In *Vacuum Salt* v. *Ghana*, the two arbitrators appointed by the

---

3   Arbitration Rule 20(1)(a).
4   See Note B to Arbitration Rule 47 of 1968, 1 ICSID Reports 108.

parties appointed Judge Sir Robert Jennings as President of the Tribunal. Judge Jennings advised ICSID that he had been able to accept the appointment only on the condition that, so long as he was President of the International Court of Justice, it would not be possible for him to preside over oral hearings. The Tribunal's first session in December 1992 was conducted by the other two members. At that session the Tribunal issued a decision on provisional measures and a decision on procedures relating to objections to jurisdiction and related matters. Another session was held in June 1993 in the absence of Judge Jennings at which testimony was heard from witnesses and counsel made oral submissions. Following that session, the Tribunal issued a decision declining provisional measures. The Tribunal, including its President Judge Jennings, held its deliberations in November 1993 and January/February 1994. It rendered its Award on 16 February 1994.[5]

The parties may agree that the presence of all the tribunal's members shall be   **14** required at its sittings. They may also agree that no decisions may be taken by correspondence or that such decisions may only be taken if all members participate (see Art. 44, paras. 11–19). While possible, such an agreed introduction of more stringent quorum requirements might carry certain risks. It would enable one member of the tribunal to block the proceedings by failing to attend sittings or to participate in a decision by correspondence.[6] It would also undermine the provision of Art. 48(1) providing for majority decisions since any member could prevent a decision merely by his/her absence or failure to participate.[7]

### *4. Majority*

The rule that a tribunal shall decide by a majority was contained in all the drafts   **15** leading up to the Convention and was never cast into doubt in principle (History, Vol. I, p. 209). It was made clear that majority meant an absolute majority, that is the number of votes in favour of the award would have to be larger than the ones against (History, Vol. II, pp. 270, 331). Concern was voiced at the possibility that no majority could be reached, for instance, if all three members differed on a particular point (at pp. 244, 269, 421, 816). The idea to appoint a "tiers arbitre" in that case, who would cast his vote in favour of one of the three solutions, was not pursued (at pp. 269, 421). In a formal vote, it was decided to leave open the question of what would happen if no majority could be found. A second vote brought unanimous approval of the idea that this problem should be dealt with in the Arbitration Rules (at p. 816). As it turns out, the Arbitration Rules do not provide for this contingency. The Notes to the 1968 Arbitration Rules explain this absence of a rule covering disagreement among the arbitrators in the following terms:

---

5   *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, paras. 9–10, 15, 20, 23, 24. See also *Broches, A.*, Denying ICSID's Jurisdiction: The ICSID Award in Vacuum Salt Products Limited, 13 Journal of International Arbitration 21, 22/3, 29/30 (1996).

6   Generally on the problem of truncated international arbitral tribunals see *Schwebel, S. M.,* International Arbitration: Three Salient Problems 144–296 (1987).

7   See also Note C to Arbitration Rule 14 of 1968, 1 ICSID Reports 81.

D. Consideration has been given to the formulation of a provision to cover the contingency that a Tribunal might be unable to reach a majority decision on an issue, in particular on the amount of damages to be awarded. It was, however, concluded that with respect to most questions, which admit of only a positive or a negative answer, no problem can arise under Article 48(1) of the Convention, since if a proposition (such as a submission) fails to achieve a majority it is automatically decided negatively. (In this connection it should be recalled that Rule 16(1) provides explicitly, as Article 48(1) of the Convention requires implicitly, that abstentions shall be counted as negative votes, and that Article 37(2) of the Convention requires the Tribunal to consist of an uneven number of arbitrators.) If the question is not one susceptible of merely two possible answers (such as the determination of an amount), a decision can normally be reached by a proper sequence of votes by which alternatives are successively eliminated. Since this aspect of the proceeding will be controlled by the President of the Tribunal (Rule 14(1)) it was considered unnecessary and presumptuous to attempt to specify a precise voting procedure for this purpose, which in any case could not cover every situation.[8]

**16**   The mandatory language of Art. 48(1) ("shall decide") means that the tribunal is under an obligation to reach a majority. This obligation is underlined by Art. 48(3) providing that the tribunal shall deal with every question before it and by Art. 42(2) disallowing a finding of *non liquet* (see Art. 42, paras. 245–248). The members of the tribunal must continue their deliberations until a majority has been reached.[9]

**17**   A majority vote is not affected by an apparent contradiction contained in a declaration or individual opinion (see paras. 92–106 *infra*) made by a member who has voted in favour of the decision.[10] A member of a tribunal may vote for an award not because he or she wholly agrees with it but because he or she feels that it is necessary to provide a majority.[11] The International Court of Justice said in the case concerning the *Arbitral Award of 31 July 1989 (Guinea-Bissau* v. *Senegal)*:

As the practice of international tribunals shows, it sometimes happens that a member of a tribunal votes in favour of a decision of the tribunal even though he might individually have been inclined to prefer another solution. The validity of his vote remains unaffected by the expression of any such differences in a declaration or separate opinion of the member concerned, which are therefore without consequence for the decision of the tribunal.[12]

---

8   Note D to Arbitration Rule 47 of 1968, 1 ICSID Reports 108. The ICC Rules of Arbitration (Art. 25(1)) provide that if there is no majority, the award shall be made by the Chairman of the arbitral tribunal alone, 36 ILM 1613 (1997). See also the UNCITRAL Arbitration Rules, Art. 31, providing for a similar solution for procedural decisions, 15 ILM 713 (1976).

9   For an incisive analysis of the decision dynamics in a three-member tribunal see *Reisman, W. M.*, The Supervisory Jurisdiction of the International Court of Justice: International Arbitration and International Adjudication, 258 Recueil des Cours 291–296 (1996).

10   See the Individual Opinion and Declaration in *AMT* v. *Zaire*, Award, 21 February 1997.

11   See *Schwebel, S. M.*, The Majority Vote of an International Arbitral Tribunal, *in*: Etudes de Droit International en l'Honneur de Pierre Lalive (*Dominicé, C./Patry, R. C.* eds.) 671 (1993).

12   1991 ICJ Reports 64/5.

The determination of a majority is governed by the Arbitration Rules in the following terms: **18**

### Rule 16
*Decisions of the Tribunal*

(1) Decisions of the Tribunal shall be taken by a majority of the votes of all its members. Abstention shall count as a negative vote.

(2) [see para. 7 *supra*]

Therefore, a decision must be supported by the affirmative votes of more than **19** half of all of the tribunal's members. A majority of the members present and voting would not suffice. If a tribunal consisted of five members, the majority would always be three and never two even if two members fail to participate in the vote. In a tribunal of three members, non-participation by two members would not enable the remaining member to form a "majority". The earlier drafts to the Convention provided only for a majority vote without stating the basis for its calculation. The later drafts, like the Convention, provided that the majority must be that of all the tribunal's members (History, Vol. I, p. 209).

A tribunal's membership may be reduced by the death, incapacity, resignation **20** or disqualification of a member. In addition, a vacancy may arise as a consequence of the failure of an arbitrator to sign the required declaration in accordance with Arbitration Rule 6(2). The Convention (Arts. 56, 57 and 58) and the Arbitration Rules (8, 9, 10 and 11) make detailed provision for these contingencies. In particular, any vacancy will be filled promptly in accordance with Arbitration Rule 11. Nevertheless, the membership of the tribunal will be reduced for the duration of the vacancy, and the basis for the calculation of a majority may be affected. Arbitration Rule 10(2) provides that no decision shall be made during a vacancy (see Art. 56, para. 9).

Deaths and resignations of members of tribunals have occurred in a number of **21** cases[13] (see also Art. 56, paras. 22–30).

## B. "(2) The award of the Tribunal shall be in writing and shall be signed by the members of the Tribunal who voted for it."

### 1. *The Award*

The Convention does not provide a definition of the term "award". An award **22** may be described as the final decision of an arbitral tribunal by which it disposes

---

13 See *Lalive, P.,* The First "World Bank" Arbitration (Holiday Inns v. Morocco) – Some Legal Problems, 51 British Year Book of International Law 124 (1980); *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 3; *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977, 1 ICSID Reports 283; *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.3; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 343, 347; *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 1.06, 1.07, 1.25; *Tokios Tokelês* v. *Ukraine*, Award, 26 July 2007, paras. 25, 26; *SETIMEG S.A.* v. *Gabon* (Case No. ARB/87/1) (this case was settled without a published record); *Kardassopoulos* v. *Georgia* (pending); *Azpetrol* v. *Azerbaijan* (pending); *Fuchs* v. *Georgia* (pending).

of all questions before it. An award need not be a decision on the merits of the case. A tribunal's finding that it does not have jurisdiction to decide on the dispute before it is also an award (see Art. 41, paras. 69–74).[14]

**23**    Under the ICSID Convention, an award must conform to the requirements of form and substance as set out in Art. 48(2) and (3). The information to be included in an award is set out in more detail in the Arbitration Rules:

<div align="center">

**Rule 47**

*The Award*

</div>

(1) The award shall be in writing and shall contain:

    (a) a precise designation of each party;

    (b) a statement that the Tribunal was established under the Convention, and a description of the method of its constitution;

    (c) the name of each member of the Tribunal, and an identification of the appointing authority of each;

    (d) the names of the agents, counsel and advocates of the parties;

    (e) the dates and place of the sittings of the Tribunal;

    (f) a summary of the proceeding;

    (g) a statement of the facts as found by the Tribunal;

    (h) the submissions of the parties;

    (i) the decision of the Tribunal on every question submitted to it, together with the reasons upon which the decision is based; and

    (j) any decision of the Tribunal regarding the cost of the proceeding.

(2) [see para. 35 *infra*]

**24**    Under the Convention's system, the requirements for awards are extended by reference to final decisions of *ad hoc* committees. Art. 52(4) provides that Art. 48 shall apply *mutatis mutandis* to proceedings before an *ad hoc* committee. Arbitration Rule 53 provides that the Arbitration Rules shall apply *mutatis mutandis* to the decisions of an *ad hoc* committee. Therefore, a decision on annulment must conform to Art. 48(2) and (3) and to Arbitration Rule 47.

**25**    If an award is annulled, the dispute may be resubmitted to a new tribunal in accordance with Art. 52(6). Rule 55(4) confirms that the award of the new tribunal deciding on a resubmitted case is also an award in the sense of the Convention and of the Arbitration Rules.

**26**    Other decisions of a tribunal are not awards.[15] In particular, a preliminary decision upholding jurisdiction (see Art. 41, paras. 69–74) is not an award. It is ultimately incorporated into the award on the merits and becomes part of it (see

---

14    See *Vacuum Salt* v. *Ghana*, Award, 16 February 1994; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997; *Mihaly* v. *Sri Lanka*, Award, 15 March 2002; *Soufraki* v. *UAE*, Award, 7 July 2004; *Joy Mining* v. *Egypt*, Award, 6 August 2004; *Lucchetti* v. *Peru*, Award, 7 February 2005; *Inceysa* v. *El Salvador*, Award, 2 August 2006; *Telenor* v. *Hungary*, Award, 13 September 2006; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007; *Bayview* v. *Mexico* (AF), Award, 19 June 2007; *Fraport* v. *Philippines,* Award, 16 August 2007.

15    See also the comments in *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 32.

Art. 41, para. 78). Neither is a decision to recommend provisional measures in accordance with Art. 47 or a procedural order in accordance with Arbitration Rule 19 (see Art. 44, para. 55) an award.

A decision on liability that does not finally dispose of the issues in dispute is **27** not properly to be called an award. In *LG&E* v. *Argentina*, the Tribunal issued a Decision on Jurisdiction on 30 April 2004, and a Decision on Liability on 3 October 2006. The Decision on Liability did not address questions of quantum. Such a decision, or "partial award", is common in the practice of commercial arbitration but is not expressly provided for in the ICSID system. It is not an award, because it does not deal with "every question submitted to the Tribunal". Therefore, it is not subject to annulment procedures until the case is finally disposed of.[16]

An order taking note of the discontinuance of proceedings in accordance with **28** Arbitration Rules 43–45 is not an award unless the tribunal records a settlement in the form of an award upon the request of the parties (see paras. 70–79 *infra*).

Decisions on requests for the supplementation, rectification, interpretation and **29** revision of awards are not by themselves awards. While they must conform to the formal requirements of awards, such as written form and signature (see paras. 31–38 *infra*), they do not need to restate the full range of information required by Art. 48(2) and Arbitration Rule 47(1).

The correct identification of an award is important not only in the context of **30** Art. 48. Art. 49, relating to dispatch, supplementation and rectification, also applies to awards only. Arts. 50, 51 and 52, providing the remedies of interpretation, revision and annulment, are available in relation to awards. Arts. 53 and 54, dealing with binding force, recognition and enforcement, also relate to awards. The concept of an "award", as used in the context of these Articles, is not entirely uniform. It is discussed separately in relation to these provisions.

### 2. Written Form

The rule that an award must be in writing is a standard requirement in inter- **31** national arbitration.[17] It was contained in all drafts leading up to the Convention (History, Vol. I, p. 209) and was never seriously debated. At one point, it was suggested that the phrase stating that the award had to be in writing should be eliminated as superfluous. The suggestion was defeated (History, Vol. II, p. 816).

Arbitration Rule 47(1) reiterates that the award must be in written form (see **32** para. 23 *supra*).

There is no requirement that the award must be delivered orally at a sitting of the **33** tribunal (see Art. 49, para. 4). This is to avoid the inconvenience and expense that

---

16  See also *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989.

17  See Art. 28(1) of the International Law Commission's Model Rules on Arbitral Procedure, YBILC 85 (1958-II); Art. 32(2) of the UNCITRAL Arbitration Rules, 15 ILM 713 (1976); Art. 31(1) of the UNCITRAL Model Law, 24 ILM 1310 (1985); Art. 29(1) of the CAMCA (Commercial Arbitration and Mediation Center for the Americas) Arbitration Rules, 35 ILM 1557 (1996).

might be caused by a need to reconvene the tribunal merely to read the award.[18] The purely written form of the award is in contrast to procedural requirements for certain other forms of international adjudication.[19]

### 3. Signature

**34**    The rule that the arbitrators must sign the award is a standard feature of international arbitration.[20] During the Convention's drafting, there was some debate on whether the award would have to be signed by all members of the tribunal or only by those who had voted for it (History, Vol. II, pp. 269, 271, 331, 332, 516, 572, 816, 864). The First Draft provided that an award was to be signed by all members of the tribunal but that a refusal of a minority to sign would not invalidate it (History, Vol. I, p. 211). Eventually, the view prevailed that only those members of the tribunal who vote for an award must also sign it.

**35**    Arbitration Rule 46 provides for a time limit of 120 days, which may be extended by an additional 60 days, for the drawing up and signature of the award (see Art. 49, paras. 11–24). Signatures must be accompanied by an indication of their date:

**Rule 47**
*The Award*

(1) [see para. 23 *supra*]
(2) The award shall be signed by the members of the Tribunal who voted for it; the date of each signature shall be indicated.
(3) ...

**36**    The award need not be drawn up and signed at a sitting of the tribunal. Nor is it necessary that all members who vote for it sign on the same day. All signatures must be within the 120- or 180-day limit provided by Rule 46 (see paras. 101–103 *infra*).

**37**    The date of the last signature is the date relevant to the Secretary-General's duty promptly to dispatch a certified copy of the award to the parties in accordance with Art. 49(1) and Arbitration Rule 48(1).[21] But the dates of the signatures do not determine the date of the award. In accordance with Art. 49(1), the award shall be deemed to have been rendered on the date on which the Secretary-General of ICSID has dispatched certified copies to the parties. The award's date in accordance with Art. 49(1) and not the date(s) of signature(s) is decisive for the time limits

---

18  See Note B to Arbitration Rule 48 of 1968, 1 ICSID Reports 109.
19  See Art. 58 of the Statute of the International Court of Justice; Art. 94(2) of the Rules of the International Court of Justice; Art. 28(3) of the International Law Commission's Model Rules on Arbitral Procedure, YBILC 85 (1985-II).
20  See Art. 28(1) of the International Law Commission's Model Rules on Arbitral Procedure, YBILC 85 (1985-II); Arts. 27, 28(1) of the Rules of Arbitration of the ICC, 36 ILM 1614 (1997); Art. 32(4) of the UNCITRAL Arbitration Rules, 15 ILM 713 (1976); Art. 31(1) of the UNCITRAL Model Law, 24 ILM 1310 (1985); Art. 29(3) of the CAMCA Arbitration Rules, 35 ILM 1557 (1996).
21  See Note to Arbitration Rule 46 of 1968, Note C to Arbitration Rule 47 of 1968 and Note B to Arbitration Rule 48 of 1968, 1 ICSID Reports 107, 108, 109.

for a request for the award's supplementation and rectification in accordance with Art. 49(2), a request for its revision in accordance with Art. 51(2), and a request for its annulment in accordance with Art. 52(2).

The ICSID Reports do not reproduce the signatures on awards nor state the **38** dates of the signatures. Other collections or sources do so occasionally. Frequently scanned copies of original signed awards showing signatures and their dates are published on the internet.

### 4. Decisions Other than Awards

The requirements as stated in Art. 48(2) apply to the award (see paras. 22–30 **39** *supra*). Art. 48(2) does not require that an interim decision be in writing or that it be signed by the tribunal's members voting for it.

Interim decisions of a more formal character, such as decisions on jurisdiction **40** under Art. 41 or recommendations for provisional measures under Art. 47, will invariably be made in writing. More informal procedural decisions, especially during the oral procedure before the tribunal, may be rendered orally and will normally be reflected in the minutes of the hearing.

The practice on the signing of interim decisions is not uniform. Some interim **41** decisions are signed only by the tribunals' presidents indicating the dates of signatures.[22] Other interim decisions are signed by all members of the tribunals who voted for them with an indication of the dates of signatures[23] or just bear these signatures without an indication of their dates.[24]

### C. "(3) The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based."

The two requirements for an award that it must be exhaustive and reasoned are **42** closely related. If the tribunal does not deal with a question submitted to it, it will, by definition, not give reasons for doing so. On the other hand, the tribunal may deal with a question by making a decision on it without expressly giving any or by giving only inadequate reasons.

In practice, the allegations that an award is not exhaustive and that it is not **43** properly reasoned have usually been put forward in conjunction.[25] This is not so much because the two requirements cannot be separated but because failure

---

22  *E.g.*, *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983; *Amco* v. *Indonesia*, Decision on Provisional Measures, 9 December 1983; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984; *CSOB* v. *Slovakia*, Procedural Orders Nos. 3 and 5 on Provisional Measures, 5 November 1998 and 1 March 2000 (unpublished).

23  *E.g.*, *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985; *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988; *Vacuum Salt* v. *Ghana*, Decisions on Provisional Measures, 3 December 1992 (unpublished) and 14 June 1993; *Vacuum Salt* v. *Ghana*, Decision on Procedures Relating to Objections to Jurisdiction and Related Matters, 3 December 1992 (unpublished).

24  *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988.

25  See *e.g.*, *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 131–164; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 6.98–6.108.

to state reasons is explicitly mentioned as one of the reasons for annulment in Art. 52(1)(e) (see Art. 52, paras. 338–434), while failure to deal with every question is not. The omission of a question in the award is primarily redressed through the remedy of rectification provided for in Art. 49(2) (see paras. 51, 52 *infra*; Art. 49, paras. 28–77). Whatever the practical reasons for joining the two requirements of exhaustiveness and of stating reasons in annulment proceedings, they are analytically distinct and must be addressed separately.

### *1. Exhaustiveness*

**44**    The express requirement that the award shall deal with every question submitted to the tribunal was not contained in the earlier drafts to the Convention (History, Vol. I, pp. 211/13). It was first raised in the context of introducing a remedy against an award that had failed to deal with every issue presented to the tribunal (History, Vol. II, p. 664). Mr. *Broches* suggested that the tribunal's duty to rule on every issue submitted to it should be stated expressly. A vote on this question showed unanimous approval but a motion to make a failure to comply with this duty a ground for annulment was defeated (at pp. 848/9, 864, 939) (see also Art. 52, paras. 399, 400).

**45**    A number of the Convention's Articles provide for the tribunal's duty to decide specific issues. Under Art. 41, the tribunal must rule on questions of jurisdiction and competence (see Art. 41, paras. 43–55, 65–68). Under Art. 44, the tribunal shall decide on questions of procedure (see Art. 44, paras. 53–58). Under Art. 46, the tribunal shall determine incidental or additional claims or counterclaims (see Art. 46, paras. 30–31). Under Art. 45(2), dealing with default by a party, the other party may request the tribunal to deal with the questions submitted to it and to render an award. Such a request results in the tribunal's duty to deal with the questions submitted to it (see Art. 45, paras. 65–70). Art. 42(2) provides that a tribunal may not bring a finding of *non liquet* on the ground of silence or obscurity of the law (see Art. 42, paras. 245–248). Under Art. 49(2), the tribunal shall rectify any clerical, arithmetical or similar error in the award upon the request of a party (see Art. 49, para. 39).

**46**    Arbitration Rule 47(1) gives a detailed list of the information an award must contain (see para. 23 *supra*). It requires, among other points, a statement of facts as found by the tribunal, the submissions of the parties and the decision of the tribunal on every question submitted to it, together with the reasons upon which the decision is based.

**47**    The requirement that the award must deal exhaustively with the dispute, as submitted by the parties, is one of the general principles underlying arbitration. A tribunal may not hand down a partial award leaving questions submitted to it undecided. This principle is mandated by the parties' will underlying the arbitration as well as by requirements of procedural economy. An award that is not comprehensive and exhaustive of the parties' questions amounts to an excess

of powers just like a decision on questions that have not been submitted to the tribunal.[26]

The requirement of exhaustiveness does not mean that the award has to discuss **48** every argument put forward by the parties in their pleadings (see also Art. 52, paras. 418–434). In particular, the tribunal does not have to address each of a series of alternative arguments if the acceptance of one of them leads to the result desired by the party putting them forward. For instance, in proceedings for the annulment of an award, the party seeking annulment typically presents a series of grounds. If the *ad hoc* committee finds that the award is to be annulled on ground A, it need not (but may) go into grounds B and C.[27]

The duty to state reasons relates to the arguments and evidence on the record. **49** The *Wena Hotels* v. *Egypt ad hoc* Committee explained that "the Tribunal's duty to state the reasons supporting its conclusions has as its basis the statement on facts and law, together with all the evidence adduced, that were before the Tribunal" by the close of proceedings.[28] Awards cannot be challenged for failing to comply with Art. 48(3) in respect of allegations or arguments that were not presented during the proceeding before the tribunal.

The questions submitted to the tribunal must be reasonably related to the prin- **50** cipal issues before it.[29] Arguments must be decisive in the sense that their serious consideration might conceivably have affected the outcome. In *Klöckner* v. *Cameroon*, the *ad hoc* Committee noted that "questions" in the sense of Art. 48(3) may be formulated separately as a party's final conclusions or submission or may be presented in the main text of the party's document as part of an argument.[30] The Decision on Annulment deals with a number of complaints concerning failure to deal with every question submitted to the tribunal upholding some and rejecting others.[31] One of the complaints concerned the question of limitation of Klöckner's liability. Before the Tribunal, Klöckner had invoked a contractual clause limiting its liability. The *ad hoc* Committee said:

> It is clear that the argument Klöckner bases on the contractual clauses limiting liability can and should be considered a "question submitted to the Tribunal" and that this is an essential question for both parties. The Claimant has a major interest in seeing these contractual clauses deemed applicable and applied. The Respondent has a major interest in seeing them judged inapplicable or irrelevant to the present case. Both parties have for that matter addressed this subject.[32]

---

26  See the International Court of Justice's Judgment of 12 November 1991 in the case of *Arbitral Award of 31 July 1989*, 1991 ICJ Reports 53 at 65–74, and the Dissenting Opinion at p. 120. See also *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 86.

27  See *e.g.*, *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 82; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.109. See also *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 143; *AMT* v. *Zaire*, Award, 21 February 1997, paras. 6.17–6.19; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 116.

28  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 82.

29  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 16.

30  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 131.

31  At paras. 131–164.                32  At para. 148.

The *ad hoc* Committee noted that the Award said nothing on this essential question and contained no reasoning on this topic. Since the Tribunal had not dealt with one of the Claimant's essential questions, the complaint was upheld.[33]

**51**    A remedy against an award's failure to deal with every question submitted to the tribunal may be found, first of all, in Art. 49(2), which provides that the tribunal may, upon the request of a party, decide any question which it had omitted to decide in the award. This possibility does not preclude a request for annulment of the award. Successive *ad hoc* committees have considered whether a violation of the obligation to deal with every question may potentially expose the award to annulment for failure to state reasons (Art. 52(1)(e)), for departure from a fundamental rule of procedure (Art. 52(1)(d)) and for manifest excess of powers (Art. 52(1)(b))[34] (see Art. 49, paras. 68–77; Art. 52, paras. 113–116, 295, 300, 403–417, 518, 522).

**52**    In *Wena Hotels* v. *Egypt*, Egypt applied for annulment of the Award under Art. 52(1)(e) on the ground that the award failed to state the reasons on which it is based. The *ad hoc* Committee immediately noted that Art. 52(1)(e) is related to the duty in Art. 48(3) to deal with every question submitted, and to state reasons for the award.[35] The *ad hoc* Committee stated that Art. 52(1)(e) was concerned with a "minimum requirement" only, and should not be of such a low threshold as to risk confusion with other post-award remedies:

> 80. Any other than a limited scope given to this ground for annulment would cause some confusion with other remedies provided by the Convention. Indeed, when the reasons stated in the award give rise to doubts about its meaning, either party may request interpretation of the award under Article 50. In the case where the Tribunal omitted to decide on a question or where the award contains an error, either party may request that the award be rectified, according to Article 49(2). These remedies confirm the understanding that any challenge as to the substance of reasons given in the award cannot be retained as a ground for annulment under Article 52(1)(e).[36]

The *ad hoc* Committee's reasoning suggests that annulment for failure to comply with Art. 48(3) would only be appropriate where the reasoning in the award as a whole fails to satisfy the "minimum requirement"; the normal remedy should be an application for supplementation under Art. 49(2). The *ad hoc* Committee explained the relationship between Arts. 48(3) and 49(2) as follows:

> 100. Article 48(3) of the Convention . . . makes a distinction between the Tribunal's duty to deal with every question submitted to it, and the requirement that the award shall state the reasons upon which it is based. The ground for

---

33  At para. 151.
34  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 114, 115; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 29–37; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 5.11–5.13; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 86–115.
35  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 75.
36  At para. 80.

annulment of Article 52(1)(e) only refers to the latter element. In case a Tribunal had omitted to decide a question in the award, a party may request the Tribunal to decide such question, in an additional proceeding pursuant to Article 49(2) which is distinct from an annulment proceeding under Article 52.[37]

In *CDC* v. *Seychelles*, it was argued that the Tribunal failed to address every question put to it by the parties, as required by Article 48(3), and that this constituted a departure from a fundamental rule of procedure.[38] The *ad hoc* Committee held that the applicant for annulment could not seek to define by its own terms specific questions that the Tribunal was obliged to answer. There was in fact no "question" relating to the parties' rights and liabilities that the Tribunal had not decided.[39]     **53**

### 2. Reasons

The requirement of stating reasons is a standard feature in contemporary international adjudication. Provisions to this effect may be found in the Statute of the International Court of Justice (Art. 56(1)) and in its Rules (Art. 95), in the International Law Commission's 1958 Model Rules on Arbitral Procedure (Art. 29)[40] and in the ICC's 1998 Rules of Arbitration (Art. 25(2)).[41] Some provisions requiring reasons are subject to the qualification that no reasons need to be given if there is an agreement to this effect between the parties. Clauses of this kind may be found in the 1976 UNCITRAL Arbitration Rules (Art. 32(3)),[42] in the 1985 UNCITRAL Model Law on International Commercial Arbitration (Art. 31(2))[43] and in the 1996 CAMCA Arbitration Rules (Art. 29(1)).[44]     **54**

The requirement that an international judicial decision must be accompanied by a statement of reasons has been confirmed by the International Court of Justice. In the *Case concerning the Arbitral Award made by the King of Spain on 23 December 1906 (Honduras* v. *Nicaragua)*, the Court examined the allegation of lack or inadequacy of reasons. It reached the result that the Award dealt in logical order and in some detail with all relevant considerations and that it contained ample reasoning and explanation in support of the conclusions arrived at by the arbitrator.[45] In the *Application for Review of Judgement No. 158 of the United Nations Administrative Tribunal (Fasla)* case, the Court relied on Art. 10(3) of the United Nations Administrative Tribunal's Statute which states that "the     **55**

---

37  At para. 100.

38  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 50, 56.

39  At para. 57.          40  YBILC 85 (1958-II).

41  36 ILM 1613 (1997). The ICC's 1975 Arbitration Rules did not provide for an obligation to supply reasons. See also *Thompson, R.*, The Court of Arbitration of the International Chamber of Commerce, *in*: *Cohn, E. J./Domke, M./Eisemann, F.*, Handbook of Institutional Arbitration in International Trade 17 at 28/9 (1977).

42  15 ILM 713 (1976).          43  24 ILM 1310 (1985).

44  35 ILM 1557 (1996).

45  Judgment, 18 November 1960, 1960 ICJ Reports 192 at 216. See also the ICJ's Judgment in *Arbitral Award of 31 July 1989 (Guinea-Bissau* v. *Senegal)*, Judgment, 12 November 1991, 1991 ICJ Reports 53 at 67 *et seq.*

judgements shall state the reasons on which they are based". It described this obligation in the following terms:

> 95. While a statement of reasons is thus necessary to the validity of a judgement of the Tribunal, the question remains as to what form and degree of reasoning will satisfy this requirement. The applicant appears to assume that, for a judgment to be adequately reasoned, every particular plea has to be discussed and reasons given for upholding or rejecting each one. But neither practice nor principle warrants so rigorous an interpretation of the rule, which appears generally to be understood as simply requiring that a judgment shall be supported by a stated process of reasoning. This statement must indicate in a general way the reasoning upon which the judgment is based; but it need not enter meticulously into every claim and contention on either side. While a judicial organ is obliged to pass upon all the formal submissions made by a party, it is not obliged, in framing its judgment, to develop its reasoning in the form of a detailed examination of each of the various heads of claim submitted. Nor are there any obligatory forms or techniques for drawing up judgments: a tribunal may employ direct or indirect reasoning, and state specific or merely implied conclusions, provided that the reasons on which the judgment is based are apparent. The question whether a judgment is so deficient in reasoning as to amount to a denial of the right to a fair hearing and a failure of justice, is therefore one which necessarily has to be appreciated in the light both of the particular case and of the judgment as a whole.[46]

**56**    During the ICSID Convention's drafting, the requirement that an award must be reasoned was not seriously cast into doubt (History, Vol. II, pp. 269, 330, 331, 421, 572, 654, 817/8). Mr. *Broches* pointed out that this requirement implied that it must enable the reader to follow the reasoning of the tribunal both on points of fact and of law, including the applicable law (at p. 515). The First Draft provided that the award should state reasons subject to the qualifying phrase "except as the parties otherwise agree" (History, Vol. I, p. 213). This qualifying phrase attracted criticism since the reasons were seen to be too important to allow the parties to waive them. In a vote, a large majority resolved to delete the qualifying phrase (History, Vol. II, pp. 664, 816) (see para. 3 *supra*; Art. 52, para. 339).

**57**    Arbitration Rule 47(1)(i) restates without elaboration the requirement that an award must contain the reasons upon which the decision is based (see para. 23 *supra*). This obligation extends to a decision *ex aequo et bono* in accordance with Art. 42(3). A tribunal that is authorized to base its decision on equity is not restricted to applying rules of law and need not substantiate its award by legal reasons. But even an award *ex aequo et bono* must be based on objective and rational considerations and must not be arbitrary. These considerations must be expressly stated. The tribunal's duty to provide reasons when deciding on principles of equity rather than law is of a different character and may be somewhat lighter. But the obligation under Art. 48(3) to state reasons and the possible consequence of a violation of this obligation as provided by Art. 52(1)(e) extend

---

46   Advisory Opinion, 12 July 1973, 1973 ICJ Reports 166 at 210/11.

to awards *ex aequo et bono* made under Art. 42(3)[47] (see Art. 42, paras. 249–279; Art. 52, para. 349).

ICSID tribunals have invariably provided reasons for their awards. The problem of a total absence of reasons has never arisen and is unlikely to arise in the future. Rather, the question is one of quality, coherence and cogency. Successive *ad hoc* committees were confronted with allegations that the reasoning accompanying awards was so seriously flawed that it amounted to a failure to state reasons in the sense of Art. 52(1)(e). The *ad hoc* committees have wrestled with the problem of establishing whether the reasons provided by the tribunals met the requirements of Art. 48(3), without re-examining the merits of the cases. A re-examination of the merits would amount to a procedure in appeal contrary to Art. 53(1) (see Art. 52, paras. 8–13).  **58**

In *Klöckner* v. *Cameroon* (see also Art. 52, paras. 350, 364–368, 390, 391), the applicants had complained of contradictory reasons, dubious or hypothetical reasons lacking legal relevance, as well as absence and inadequacy of reasons.[48] Concerning the first of these complaints, the *ad hoc* Committee said:  **59**

> 116. As for "contradiction of reasons", it is in principle appropriate to bring this notion under the category "failure to state reasons" for the very simple reasons that two *genuinely* contradictory reasons cancel each other out. Hence the failure to state reasons. The arbitrator's obligation to state reasons which are not contradictory must therefore be accepted.[49]

The *ad hoc* Committee added that one also had to ask whether this failure caused harm to the party seeking annulment and whether the Award was not sufficiently well founded by other reasons stated in the Award.[50] In the particular case, it was found that the reasons were not contradictory.[51]

As to dubious or hypothetical reasons, the *ad hoc* Committee held that these were not of themselves improper. Assumptions on what could have happened were perfectly appropriate in the context of a decision on "loss of an opportunity". Moreover, the complaint had failed to distinguish between the *ratio decidendi* and overabundant considerations (*obiter dicta*), which are not in themselves impermissible.[52]  **60**

On the question of the absence and inadequacy of reasons, the *ad hoc* Committee said in relation to Art. 52(1)(e):  **61**

> The text of this Article requires a *statement* of reasons *on which the award is based*. This does not mean just any reasons, purely formal or apparent, but rather reasons having some substance, allowing the reader to follow the arbitral tribunal's reasoning, on facts and on law.[53]

---

47  See *Schreuer, C.*, Decisions Ex Aequo et Bono Under the ICSID Convention, 11 ICSID Review – FILJ 37, 50/1 (1996).
48  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 114.
49  At para. 116. Italics original.    50  *Loc. cit.*
51  At para. 123.    52  At paras. 124–126.
53  At para. 119. Italics original.

It continued by saying that it was not enough for the reasons to be "apparently relevant". Reasons had to be "sufficiently relevant"; that is, reasonably sustainable and capable of providing a basis for the decision.[54] The *ad hoc* Committee added:

> 130. There would be a "failure to state reasons" if no reasoning or explanation whatsoever, or no "sufficiently relevant" or "reasonably acceptable" reasoning could be found for some conclusion or decision in the Award. Such would not be the case if the Tribunal, having justified its finding or a particular decision in a certain way, even if subject to criticism, did not address this or that particular argument . . .[55]

Of the various complaints based on failure to state reasons, the *ad hoc* Committee upheld some and rejected others.[56] In upholding one of the complaints, it said:

> . . . the Award in no ways allows the *ad hoc* Committee or for that matter the parties to reconstitute the arbitrators' reasoning in reaching a conclusion that is perhaps ultimately perfectly justified and equitable (and the Committee has no opinion on this point) but is simply asserted or postulated instead of being reasoned.[57]

**62**    In the annulment proceedings in *Amco* v. *Indonesia* (see also Art. 52, paras. 351, 369, 392), Indonesia argued that the mere presence of a statement of reasons would be insufficient if that statement is not reasonably capable of justifying the result reached by the Tribunal. By contrast, Amco argued that only a simple test was required of whether or not a statement of reasons is in fact set forth in the Award without regard to the quality of the reasoning.[58] The *ad hoc* Committee found that the decisive criterion was that the parties may be expected to understand the award in its context. It adopted the criterion of "sufficiently pertinent reasons" as set out in *Klöckner* and said:

> . . . supporting reasons must be more than a matter of nomenclature and must constitute an appropriate foundation for the conclusions reached through such reasons. Stated a little differently, there must be a reasonable connection between the bases invoked by a tribunal and the conclusions reached by it. The phrase "sufficiently pertinent reasons" appears to this *ad hoc* Committee to be a simple and useful clarification of the term "reasons" used in the Convention.[59]

**63**    In *MINE* v. *Guinea* (see also Art. 52, paras. 352, 372–373, 393–395), the *ad hoc* Committee described the Tribunal's obligation to provide reasons in the following terms:

> 5.08 The Committee is of the opinion that the requirement that an award has to be motivated implies that it must enable the reader to follow the reasoning of the Tribunal on points of fact and law. . . .
>
> 5.09 In the Committee's view, the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from

---

54  At paras. 119, 120.                          55  At para. 130.
56  At paras. 131–164.
57  At para. 144. See also para. 164 and *Schreuer*, Decisions Ex Aequo et Bono, pp. 53–59.
58  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 38.
59  At para. 43.

Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons.[60]

Turning to specific points, the *ad hoc* Committee held that there was no need to give reasons for stating an obvious truth[61] and that it was not necessary for the Tribunal to deal with all the parties' arguments as long as its finding was supported by reasons that can be followed without great difficulty.[62]

The Award's damages section was the object of particularly strong criticism **64** by Guinea, which argued that the Tribunal had on a number of issues adopted a solution without addressing arguments, the acceptance of which would have required a different solution.[63] The *ad hoc* Committee agreed that the Tribunal had failed to deal with questions raised by Guinea, the answer to which might have affected its conclusion. Failure to address these questions constituted a failure to state the reasons on which the conclusion was based:

> The Tribunal either failed to consider them, or it did consider them but thought that Guinea's arguments should be rejected. But that did not free the Tribunal from its duty to give reasons for its rejection as an indispensable component of the statement of reasons on which its conclusion was based.[64]

The *ad hoc* Committee also found that, to the extent that the Tribunal purported to state the reasons for its decision, the reasons were inconsistent and in contradiction with the Tribunal's own analysis of damages. The requirement that the award must state the reasons on which it is based was not satisfied by contradictory reasons.[65] Therefore, the Award's portion relating to damages was annulled for failure to state the reasons.[66] But the *ad hoc* Committee refused to annul the award of costs, holding that Art. 61(2) conferred a discretionary power on the Tribunal, which was under no obligation to state reasons for awarding costs against the losing party.[67]

The *ad hoc* Committee in *Amco II* declined to annul the Supplementary Award **65** on grounds that the Second Tribunal had failed to state reasons in supplementing its award on quantum. The *ad hoc* Committee said that, in correcting a clerical error, the duty to state reasons in Art. 48(3) required no more than

> making plausible the assertion that the error was inadvertent and that the rectified figures corresponded to the decision it had taken when it adopted the Award.[68]

The *ad hoc* Committee observed that the Second Tribunal had given sufficiently relevant indications of its reasons, and that no violation of its duty to state reasons could be found.

In *Wena Hotels* v. *Egypt* the *ad hoc* Committee noted that the Tribunal's duty to **66** state reasons was no more than to ensure that the parties were able to comprehend the award.

---

60  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 5.08, 5.09.
61  At para. 6.46.                        62  At paras. 6.51–6.53.
63  At paras. 6.84–6.92.                  64  At para. 6.101.
65  At para. 6.107.                       66  At para. 6.108.
67  At paras. 6.110, 6.111.
68  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 9.11.

> 81. Neither Article 48(3) nor Article 52(1)(e) specify the manner in which the Tribunal's reasons are to be stated. The object of both provisions is to ensure that the Parties will be able to understand the Tribunal's reasoning. This goal does not require that each reason be stated expressly. The Tribunal's reasons may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision.[69]

**67**    It is not possible to establish a simple and definitive test that will determine with mathematical precision whether or not the reasoning given by a tribunal meets the obligation under Art. 48(3) to state the reasons upon which the award is based. Nevertheless, it is possible to formulate a few criteria on the basis of the practice:

- The award must be supported by a consistent and logical line of reasoning sufficient to enable an informed reader, in particular the parties, to understand the tribunal's motives.
- The reasons need not deal with all arguments that the parties presented to the tribunal. The reasons are complete if they address all arguments of the parties that were accepted as necessary or relevant for the decision. They must also address all arguments made by the parties that were rejected and which, had they been accepted, would have changed the decision's outcome. The reasons need not (but may) address arguments whose acceptance or rejection did not affect the outcome of the decision.
- A tribunal need not provide reasons if it rejects arguments that are logically ruled out or rendered irrelevant by the reasoned acceptance of other arguments. For instance, an award upholding a party's objection to the tribunal's jurisdiction need not address the parties' arguments going to the merits of the case.
- A tribunal need not address each of several arguments if every one of those arguments by itself is designed to sustain the decision. For instance, if it is claimed that a party's conduct is illegal for three separate reasons, it may suffice to base a holding on just one finding of illegality.

**68**    Under normal circumstances, it will suffice to deal with the arguments presented by the parties. But the tribunal may volunteer some of its own thoughts, especially to close gaps in the parties' arguments. The situation is somewhat different in default proceedings. If one of the parties fails to cooperate, especially through nonappearance, the tribunal may not simply rely on the cooperating party's arguments. Under Art. 45(1), nonappearance may not be taken as acceptance of the appearing party's assertions. This means that the tribunal must deal with any argument that the non-cooperating party might reasonably have put forward (see Art. 45, paras. 10–20, 65–68).

### 3. Settlement and Discontinuance

**69**    Rules governing international adjudication typically make allowance for an agreed settlement between the parties while the dispute is pending, in which case

---

69    *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 81.

the proceedings are discontinued. The parties may ask for the incorporation of their settlement into a judgment or award. Provisions of this kind can be found in the Rules of the International Court of Justice (Arts. 88, 89), in the International Law Commission's Model Rules on Arbitral Procedure (Arts. 22, 23),[70] in the International Chamber of Commerce Rules of Arbitration (Art. 26)[71] and in the UNCITRAL Model Law on International Commercial Arbitration (Art. 30).[72] Some of these rules state specifically that in such a case the tribunal is not under an obligation to give reasons for the award. This is the case with respect to the UNCITRAL Arbitration Rules (Art. 34)[73] and the CAMCA Arbitration Rules (Art. 31).[74]

The ICSID Convention does not, in terms, provide for the discontinuance of    **70** arbitration proceedings as a result of an agreed settlement between the parties. But the Arbitration Rules do so in the following terms:

### Rule 43
#### *Settlement and Discontinuance*

(1) If, before the award is rendered, the parties agree on a settlement of the dispute or otherwise to discontinue the proceeding, the Tribunal, or the Secretary-General if the Tribunal has not yet been constituted, shall, at their written request, in an order take note of the discontinuance of the proceeding.

(2) If the parties file with the Secretary-General the full and signed text of their settlement and in writing request the Tribunal to embody such settlement in an award, the Tribunal may record the settlement in the form of its award.

A settlement in accordance with Rule 43 leads to one of two procedural out-    **71** comes. If the tribunal is not requested by the parties to embody their settlement in an award, the tribunal will simply issue an order under Rule 43(1) noting the discontinuance. If at the time of the settlement the tribunal has not yet been constituted, the Secretary-General will issue such an order. An order noting the discontinuance is not an award. Art. 48(3) does not apply to it. The tribunal will not deal with any questions submitted to it prior to the request for discontinuance. Nor need it give reasons for the order except for the fact that the parties have reached a settlement. The order noting the discontinuance is not required to contain a decision on the proceeding's costs in accordance with Art. 61(2).[75] The order will not be subject to rectification, interpretation, revision and annulment (Arts. 49(2), 50, 51 and 52). The Convention's provisions on recognition and enforcement of an award (Arts. 53, 54 and 55) will not apply to it.

If the parties provide the full text of their settlement and request the tribunal to    **72** embody the settlement in an award under Rule 43(2), the situation is different. The tribunal is under no obligation to comply with the request. Instead, it may conclude that it is without jurisdiction and render an award to this effect (see Art. 41,

---

70  YBILC 85 (1958-II).
72  24 ILM 1309 (1985).
74  35 ILM 1557 (1996).
75  See Note B to Arbitration Rule 43 of 1968, 1 ICSID Reports 105.

71  36 ILM 1613 (1997).
73  15 ILM 714 (1976).

paras. 43, 44, 73).[76] The tribunal may also find it improper to take part in a particular settlement. Therefore, even if the parties make a request to have their settlement embodied in an award, the tribunal may still simply note the discontinuance in an order.

73    If the tribunal accedes to the parties' request in accordance with Arbitration Rule 43(2), the result will be an award. But only some of the Convention's provisions on awards will apply to such an award. The award should contain a decision on costs in accordance with Art. 61(2) either as part of the agreed settlement or in addition to it. But otherwise the obligation to deal with every question and to state reasons will not apply to such an award. The tribunal cannot be expected to supply reasons for an award based on a settlement other than a reference to the parties' agreement.

74    If the parties decide to settle only some points of their dispute by agreement but not others, the result will not be a "settlement of the dispute" and will not lead to discontinuance in accordance with Rule 43. But the tribunal will incorporate a partial settlement into its award while deciding other parts of the dispute autonomously.[77]

75    A comprehensive settlement reached before the institution of proceedings cannot be converted into an award under Arbitration Rule 43(2). Under Art. 25(1), the existence of a dispute is an objective requirement for the jurisdiction of the Centre which cannot be waived by the parties. A request for arbitration that reveals the absence of a dispute would be manifestly outside the Centre's jurisdiction. Its registration would have to be refused by the Secretary-General in accordance with Art. 36(3).

76    In *Fedax* v. *Venezuela*, the parties reached a partial agreement after the institution of proceedings. The agreement covered the payment of the capital and interest of the promissory notes in question, the currency in which payment would be made and the payment of accrued interest. But the parties had not agreed on the date of payment and on the payment of expenses and legal costs of the Claimant. In addition, the parties had not agreed on the procedure for the settlement of the dispute pending before the Tribunal. While Venezuela requested the discontinuance of the proceeding, Fedax requested the settlement to be incorporated in an award. Therefore, the parties had not agreed on one of the options offered by Arbitration Rule 43 (see para. 70 *supra*). The Tribunal rendered its own reasoned Award, which was, however, based on the settlement reached on the merits.[78]

77    In *Goetz* v. *Burundi*, the parties entered into negotiations to reach a settlement in the course of the proceeding. The Tribunal, aware of these negotiations, did not, at first, render an award but a decision on liability. It decided that there had been a measure tantamount to an expropriation. The Tribunal specified that Burundi would be declared liable only if it did not provide adequate and fair compensation.

---

76    See Note C to Arbitration Rule 43 of 1968, 1 ICSID Reports 105.
77    *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, paras. 58, 59, 64.
78    *Fedax* v. *Venezuela*, Award, 9 March 1998, paras. 27, 28.

Following that decision, the parties reached a settlement. At the parties' request, the Tribunal embodied the settlement into the Award in accordance with Arbitration Rule 43(2). The Tribunal determined that the parties were to share the costs of the proceedings.[79]

**78** In the case of an award recording a settlement of the parties in accordance with Arbitration Rule 43(2), the application of the post-award remedies provided for in the Convention is severely restricted. While rectification is conceivable, interpretation by the tribunal would make little sense in the case of an award based on the parties' agreement. Revision on the ground of discovery of new facts may be appropriate to such an award. As to annulment, most of the grounds listed in Art. 52(1) would hardly apply. While the tribunal's improper constitution may be invoked, it is difficult to see how corruption on the part of a member of the tribunal or a serious departure from a fundamental rule of procedure would matter in case of an award embodying an agreed settlement, although these matters may, perhaps, influence a party's motivation to settle and, thus, taint the award recording that settlement. Failure to state the reasons clearly would not apply.

**79** The most important consequence of the incorporation of an agreed settlement into an award is the fact that the Convention's provisions on recognition and enforcement of awards are applicable. The parties' agreement is transformed into a judicial decision, which under Art. 54(1) enjoys the same status as a final judgment of a court in each Contracting State to the ICSID Convention. Failure by the State party to comply with such an award is a violation of the Convention. It may trigger diplomatic protection under Art. 27 (see Art. 27, paras. 38–43) and may lead to a dispute between Contracting States that can be referred to the International Court of Justice in accordance with Art. 64.

**80** Discontinuance of proceedings on the basis of an agreed settlement is in accord with the avowed objective of the Convention to create and preserve an investment climate that promotes economic development.[80] This purpose is best served by an outcome that restores the atmosphere of mutual confidence even after a disturbance has occurred in the form of a dispute. An agreed settlement is more likely to promote continued cooperation than an award finding one or both parties at fault.[81]

**81** In part in order to promote the likelihood of agreement between the parties, a provision on a pre-hearing conference was introduced into the Arbitration Rules in 1984. Such a conference may simply serve the purpose of exchanging information, typically concerning hearing logistics, and establishing uncontested facts (see Art. 43, para. 9). But it may also serve the purpose of an agreed settlement of the dispute:

---

79  *Goetz* v. *Burundi*, Award, 10 February 1999. For a summary of the proceeding see 15 ICSID Review – FILJ 454 (2000). See also *Lemire* v. *Ukraine* (AF), Award, 18 September 2000.

80  See the Preamble to the Convention, First Paragraph. See also the Report of the Executive Directors on the Convention, para. 9.

81  See also *Delaume, G. R.*, ICSID Arbitration Proceedings: Practical Aspects, 5 Pace Law Review 563, 575 (1985); *Shihata, I.*, Obstacles Facing ICSID's Proceedings and International Arbitration in General, News from ICSID, Vol. 3/1, p. 10 (1986).

### Rule 21
*Pre-Hearing Conference*

. . .

> (2) At the request of the parties, a pre-hearing conference between the Tribunal
> and the parties, duly represented by their authorized representatives, may be held
> to consider the issues in dispute with a view to reaching an amicable settlement.

**82**    Under Arbitration Rule 21(2), only the parties may request a pre-hearing con-
ference. But the Secretary-General may take the initiative of inviting the parties
informally to discuss cases with a view to their friendly settlement before they
go to arbitration.[82] The requirement that the parties' authorized representatives
should be present at the pre-hearing conference is designed to enable them to hear
the case as presented by each side. The underlying idea, if not the actual practice,
is that this procedure will add realism and a better understanding of the other side's
position to the parties' perspective, thereby facilitating an amicable settlement.[83]

**83**    Discontinuance is not necessarily the result of an agreed settlement between the
parties. Under Arbitration Rule 44, a party may at any time unilaterally request
the discontinuance of the proceedings.[84] If the other party does not object, the
tribunal will take note of the discontinuance.

**84**    Discontinuance does not necessarily mean that the proceeding is terminated.
Discontinuance in respect of just one of several parties is possible.[85] Discontinu-
ance may relate to only part of the claim[86] and discontinuance of the main claim
does not necessarily affect an ancillary claim which may be continued indepen-
dently.[87]

**85**    Under Arbitration Rule 45, the parties are deemed to have discontinued the
proceedings if they fail to take any procedural steps for a certain period of time,
which is normally six months (see Art. 45, paras. 56, 57). In either case, the
discontinuance will be noted in an order by the tribunal or, if the tribunal has not
yet been constituted, by the Secretary-General. Such an order is not an award. The
observations made in para. 68, *supra*, will apply to it *mutatis mutandis*.

**86**    A look at the practice shows that a high percentage of cases submitted to ICSID
arbitration were at some stage settled or otherwise discontinued by the parties.[88]
Of the 152 concluded arbitration proceedings as at 1 March 2009, 70 had been
settled or otherwise discontinued. Discontinuance has occurred at various stages
of the proceedings. In some cases, the parties reached a settlement before a tribunal
was constituted. In some cases, the parties settled after the tribunal's constitution
but before any important decisions had been made. In some cases, the tribunals had

---

82   *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 385/6 (1991).

83   *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, pp. 5/6 (1985).

84   Mere failure to resist the assertions or submissions of the other party is not tantamount to a
     request for discontinuance: *Scimitar* v. *Bangladesh*, Award, 4 May 1994, para. 22.

85   *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 16–18; *Suez and AWG*
     v. *Argentina*, Decision on Jurisdiction, 3 August 2006, paras. 16–18, 38–40.

86   *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 77–81.

87   *Enron* v. *Argentina*, Award, 22 May 2007, paras. 27–28, 33.

88   See List of Concluded Cases at: http://icsid.worldbank.org/icsid.

recommended provisional measures and made decisions on jurisdiction before the parties reached a settlement. In a number of cases, the tribunal had already issued a preliminary decision on the merits before the parties reached a settlement. Settlement is also possible after an award has been rendered.[89] Occasionally, cases have been discontinued during proceedings for revision, supplementation or rectification. In a small number of cases, the Award had been rendered, an application for annulment had been registered and the *ad hoc* Committee had been constituted when the parties decided to settle by agreement. In one case, the Award had been rendered and partially annulled by an *ad hoc* Committee. After the dispute had been resubmitted in accordance with Art. 52(6), but before the new tribunal was constituted, the parties agreed on a settlement.[90]

It is impossible to say with precision to what extent the progress in the arbitration **87** proceedings influenced the substance of the settlements eventually reached by the parties in these cases. Few of the settlements have been made public. In several cases the parties availed themselves of the possibility of Arbitration Rule 43(2) to have their agreement incorporated into an award.[91] But even most of these awards have remained unpublished.[92] Nevertheless, it is safe to say that the effort and money that went into arbitration in these cases was not wasted. The parties will have developed a better perception of their opponents' perspectives as well as a more realistic idea of their own chances to prevail in litigation. If the Convention's objective is the promotion of a good investment climate (see para. 80 *supra*), an agreed settlement is a more successful outcome than a final award. An agreed settlement is more conducive to continued cooperation between the parties and is more likely to send positive signals to other potential investors than a judicial decision imposed on the parties. In some situations, the institution of arbitration may be a necessary catalyst for reaching agreement. But arbitration leading to a binding award is not an aim in itself. It is often not the most efficient or the most effective method for the settlement of disputes.

### *4. Decisions Other than Awards*

Art. 48(3), by its own terms, refers to awards (see paras. 22–30 *supra*) and not **88** to other decisions of the tribunal (see also paras. 4–6, 39–41 *supra*). Therefore, the requirements of exhaustiveness and reasoning do not, strictly, apply to such preliminary decisions as recommendations of provisional measures under Art. 47, decisions upholding jurisdiction under Art. 41 or procedural orders under Art. 44. To the extent that these preliminary decisions are decisive for the outcome of

---

89  See *CMS* v. *Argentina*, Award, 12 May 2005, para. 407, contemplating a settlement on a form of restitution. The envisaged settlement was not implemented by the parties.

90  *MINE* v. *Guinea*, Order noting Discontinuance, 20 November 1990.

91  *Guadeloupe Gas* v. *Nigeria*, Award, 22 July 1980; *WRB* v. *Grenada*, Award, 21 December 1998; *Cemex* v. *Indonesia*, Award, 23 February 2007.

92  But see *Goetz* v. *Burundi*, Award, 10 February 1999, 6 ICSID Reports 46, 15 ICSID Review – FILJ 454 (2000); *Lemire* v. *Ukraine* (AF), Award, 18 September 2000, 15 ICSID Review – FILJ 528 (2000).

the case, they must be reflected in the award. This must be done exhaustively and must be supported by reasons. Thus, decisions upholding jurisdiction must be incorporated into the award (see Art. 41, para. 78). The tribunal may do so by referring to an earlier decision on jurisdiction that is exhaustive and reasoned or by making a decision on jurisdiction which conforms to Art. 48(3) as part of the award (see Art. 41, paras. 69–74). Similarly, a decision admitting or rejecting evidence that is vital to the outcome of the case will need to be reflected in the award together with reasons. At the same time, it is clear that not every procedural order must be accompanied by reasons. For instance, it would be unrealistic to require that every decision setting time limits be reasoned.

89    Decisions on rectification, interpretation and revision in accordance with Arts. 49(2), 50 and 51 become part of the award. They need not by themselves be exhaustive of the case. But together with the award to which they relate they must deal with every question submitted to the tribunal. If they raise issues that are not sufficiently covered by the reasons contained in the award, they must state the reasons on which they are based.

90    Art. 52(4) extends the application of Art. 48 to proceedings before an *ad hoc* committee. Therefore, a final decision of an *ad hoc* committee, whether it annuls the award or rejects annulment, must comply with the same standards of exhaustiveness and reasoning as an original award.[93] It is clear that this also applies to the award of a new tribunal to which the dispute is resubmitted in accordance with Art. 52(6).

91    The decisions other than awards that are publicly available generally attempt to conform to the requirements of Art. 48(3). In particular, preliminary decisions on jurisdiction are usually quite elaborate, cover all the major points raised by the parties and contain detailed reasons. Decisions recommending provisional measures also contain reasons although they are typically shorter. The same observations can be made with respect to decisions on rectification of an award and orders for a stay of enforcement of an award.

### D.  "(4) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent."

#### 1. General

92    Under many legal systems, individual members of courts and tribunals are allowed to express their personal opinion in connection with a decision with which they do not fully agree. A judge or arbitrator who disagrees with the majority's reasoning and outcome may write a dissenting opinion. If he or she agrees with the result reached but disagrees with the reasons in the majority opinion, a concurring opinion may be offered. Dissenting and concurring opinions may be referred to collectively as individual or separate opinions. Individual opinions may be

---

93  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 16.

elaborate and supported by detailed reasons much like a majority decision. Shorter clarifications that typically only address one or a few points are called "declaration" or "statement".

Instruments regulating international adjudication are not uniform on the point of permitting individual opinions. Examples of provisions allowing them may be found in the Statute of the International Court of Justice (Art. 57), in the Rules of the International Court of Justice (Art. 95(2)) and in the International Law Commission's Model Rules on Arbitral Procedure (Art. 28(2)).[94]    **93**

The earlier drafts of the Convention did not provide for individual opinions (History, Vol. I, p. 212). The idea was first brought up by several Central American delegates and was initially received with some reserve by Mr. *Broches* (History, Vol. II, pp. 331, 421, 512). Other delegates supported the idea (at pp. 515, 516, 572), and the First Draft provided that, except as the parties otherwise agree, "any arbitrator dissenting from the majority decision may attach his dissenting opinion or a bare statement of his dissent" (History, Vol. I, p. 212). Subsequent debates led to suggestions to delete the "except as the parties otherwise agree" clause with respect to individual opinions and to allow concurring opinions as well as dissenting ones. Both suggestions were overwhelmingly approved in two votes (History, Vol. II, pp. 816/17, 939). A suggestion to introduce an obligation for a dissenting arbitrator to give a full opinion by eliminating the permission to give a mere statement of dissent was defeated (at p. 817).    **94**

Art. 48(4) uses the masculine personal pronoun three times in reference to a member of the tribunal. It is unlikely that the drafters thought that there would not be any women arbitrators.[95] They probably assumed that the male form included the female. A number of women arbitrators have, in fact, participated in ICSID arbitrations including some of the most frequently appointed ICSID arbitrators.    **95**

### 2. Substance

The text as adopted is permissive. It leaves an individual member of a tribunal with several options. A member voting in favour of the majority opinion may offer a concurring opinion.[96] A member voting against the majority opinion has three possibilities (but see the Concurring and Dissenting Opinion in *Biwater Gauff* v. *Tanzania*). The first is simply to vote against the majority opinion without offering an explanation. The second is to offer a statement of dissent without offering a full opinion.[97] The third is to write a detailed and fully reasoned dissenting    **96**

---

94    YBILC 85 (1958-II). The provision states that the *compromis* may provide otherwise.

95    Several women experts and Executive Directors participated in the Convention's drafting: two from Austria and one each from Germany and Sweden – see History, Vol. I, pp. 360, 388, 396, 400.

96    See *AMT* v. *Zaire*, Award, 21 February 1997, Individual Opinion Golsong; *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, Individual Concurring Opinion. The Separate Opinion rendered in *Houston Industries* v. *Argentina* is neither declared to be a concurring nor a dissenting opinion. The Award and Separate Opinion dated 24 August 2001 are not publicly available. See also: *TSA Spectrum* v. *Argentina*, Award, 19 December 2008, Concurring Opinion of Arbitrator Abi-Saab.

97    See *AMT* v. *Zaire*, Award, 21 February 1997, Declaration Mbaye.

opinion.[98] The same approach applies to annulment proceedings. Members of *ad hoc* committees also have the right to issue dissenting opinions.[99]

**97**    The text of the Convention offers the possibility of a mere statement only to a dissenting but not to a concurring arbitrator. This should not be read as restricting the possibilities of a member of the tribunal who has voted with the majority. A concurrence may affect only one of many points covered by the tribunal. Consequently, a concurring opinion may be quite short and restricted to one or a few points.[100]

**98**    A concurring opinion that differs from the majority opinion on certain points of the reasons does not affect the majority necessary for reaching a decision (see para. 17 *supra*). What matters for the validity of the award in accordance with Art. 48(1) is that the result has attracted the votes of a majority of the tribunal and not that the members who voted for the award agreed on all points of the reasoning accompanying it.

**99**    Dissenting opinions may go into as much detail as the dissenting member of the tribunal wishes. They may deal with every question submitted to the tribunal and state the reasons for the dissenting member's opinion or may focus on just a few points in the majority decision. There is no clear dividing line between a mere statement of dissent and a full dissenting opinion. The requirements of exhaustiveness and of a full statement of reasons under Art. 48(3) do not apply to an expression of dissent.

### *3. Procedure*

**100**    The Arbitration Rules offer little guidance with regard to procedure on individual opinions. Arbitration Rule 47(3) simply restates Art. 48(4) without variation. The production of a dissenting opinion requires that the dissenter is familiar with the majority opinion or at least with its main points. In fact, dissenting opinions typically refer to specific points in the majority opinion with which they disagree. It is less clear to what extent the majority has a chance to study the views of a member wishing to produce a dissenting opinion. Good practice would require that the dissenting arbitrator finalize the dissenting opinion well in advance of the

---

98    See *Klöckner* v. *Cameroon*, Award and Dissenting Opinion, 21 October 1983; *SOABI* v. *Senegal*, Award and Dissenting Opinion, 25 February 1988; *AAPL* v. *Sri Lanka*, Award and Dissenting Opinion, 27 June 1990; *SPP* v. *Egypt*, Award and Dissenting Opinion, 20 May 1992; *Waste Management* v. *Mexico I* (AF), Award and Dissenting Opinion, 2 June 2000; *Banro* v. *DR Congo*, Award and Dissenting Opinion, 1 September 2000; *Feldman* v. *Mexico* (AF), Award and Dissenting Opinion, 16 December 2002; *Mitchell* v. *DR Congo*, Award and Dissenting Opinion, 9 February 2004; *Tokios Tokelès* v. *Ukraine*, Decision on Jurisdiction and Dissenting Opinion, 29 April 2004. Award and Dissenting Opinion, 26 July 2007; *Waste Management* v. *Mexico II* (AF), Award and Dissenting Opinion, 30 April 2004; *Biwater Gauff* v. *Tanzania*, Award and Concurring and Dissenting Opinion, 24 July 2008; *African Holding* v. *DR Congo*, Award and Dissenting Opinion, 29 July 2008; *TSA Spectrum* v. *Argentina*, Award and Dissenting Opinion, 19 December 2008.

99    *Soufraki* v. *UAE*, Decision on Annulment and Dissenting Opinion, 5 June 2007; *Lucchetti* v. *Peru*, Decision on Annulment and Dissenting Opinion, 5 September 2007.

100    See the President's Declaration to the Award of 25 February 1988 in *SOABI* v. *Senegal*.

finalization of the award in order that the majority may consider and address any salient points in the award. In many cases the Awards' full texts contain references to the fact that the majorities had seen the Dissenting Opinions before signing the Awards, although the practice is not uniform.[101]

Arbitration Rule 46 provides that the award must be drawn up and signed within 120 days after the closure of the proceedings. This period may be extended by 60 days if necessary (see paras. 35, 36 *supra*). Arbitration Rule 46 in its original 1968 version did not explicitly include individual or dissenting opinions. The 1984 version of Arbitration Rule 46 added the phrase "(including any individual or dissenting opinion)". If the individual opinion is to be attached to the award as provided by Art. 48(4) and if the Secretary-General is promptly to dispatch certified copies of the award to the parties in accordance with Art. 49(1), the award and the individual opinion must be available at more or less the same time.[102] **101**

Before the amendment of the Arbitration Rules that entered into force on 1 January 2003, the time limit for the drawing up and signing of the award was 60 days with the possibility of an extension by 30 days. This may have somewhat restricted the opportunity for a full exchange among tribunal members. The new time limit of 180 days ought to allow for orderly deliberations and for a complete exchange of views within the tribunal (see Art. 49, paras. 12–24). Ideally, the members of the tribunal should have a chance to study each other's drafts before writing their definite opinions. **102**

The *ad hoc* Committee in *Klöckner* v. *Cameroon* attributed at least some of the Award's perceived shortcomings to the peremptory time limit of Rule 46, as then in force, which it branded as generally unrealistic and dangerous. It pointed out that the Tribunal could not have taken material advantage, if it had so desired, of the Dissenting Opinion's arguments.[103] **103**

---

101  In *SOABI* v. *Senegal*, Award, 25 February 1988, the reference to the Dissenting Opinion is omitted from the Award's text as reproduced in 2 ICSID Reports 274. It is contained in the original version of the Award as published in 6 ICSID Review – FILJ 214 (1991). In *AAPL* v. *Sri Lanka*, Award, 27 June 1990, the reference to the Dissenting Opinion is omitted from the Award's text as reproduced in 4 ICSID Reports 295, but is contained in the Award's original version as reproduced in 30 ILM 577 at 627 (1991). The excerpts from *Banro* v. *DR Congo*, Award, 1 September 2000, as published in 17 ICSID Review – FILJ 380 (2002), and the Award in *Waste Management* v. *Mexico I* (AF), 2 June 2000, do not refer to the content of the dissenting opinion. In *Feldman* v. *Mexico* (AF), Award, 16 December 2002, the majority references and discusses the dissenting opinion of one of the arbitrators. In *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, the majority of the *ad hoc* Committee stated that the Decision was rendered "after taking note" of the dissenting Committee member's opinion. In *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction, 29 April 2004, the decision notes that it is rendered "after taking notice" of the dissenting opinion. In *Lucchetti* v. *Peru*, Decision on Annulment, 5 September 2007, the Decision is signed by all three members of the *ad hoc* Committee and makes no reference to the dissenting opinion rendered by one of its members. The dissenting opinion is signed later than the last signature appended to the Decision by the other *ad hoc* Committee members.
102  See Note B to Arbitration Rule 48 of 1968, 1 ICSID Reports 109.
103  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 86, 112–113.

### 4. Decisions Other than Awards

**104**    Art. 48(4), by its own terms, refers to awards (see paras. 22–30 *supra*). It does not refer to other decisions of the tribunal (see also paras. 4–6, 39–41, 88–91 *supra*). Therefore, the possibility to attach an individual opinion would not, at first sight, extend to such preliminary decisions as recommendations of provisional measures under Art. 47, decisions upholding jurisdiction under Art. 41 or procedural orders under Art. 44. Despite the Convention's restrictive language, there is nothing that would militate against individual opinions to preliminary decisions provided they are of sufficient importance. In *SPP* v. *Egypt*, one of the three arbitrators appended a lengthy dissenting opinion to the Tribunal's second Decision on Jurisdiction.[104] In *Tokios Tokelės* v. *Ukraine*, the President of the Arbitral Tribunal issued an opinion dissenting from the majority's Decision on Jurisdiction.[105]

**105**    Decisions on rectification, interpretation and revision, in accordance with Arts. 49(1), 50 and 51, become part of the award. It seems logical to expect individual opinions to them, where the occasion arises, in the same way as to awards.

**106**    Art. 52(4) extends the application of Art. 48 to proceedings before *ad hoc* committees. Therefore, a decision in the course of annulment proceedings may give rise to individual opinions. Dissenting opinions have been issued in annulment proceedings.[106] It is clear that this also applies to decisions by a new tribunal to which the dispute has been resubmitted in accordance with Art. 52(6).

### E. "(5) The Centre shall not publish the award without the consent of the parties."

### 1. Publication of Awards

**107**    Unlike proceedings before courts of law, arbitration usually takes place behind closed doors.[107] Unlike judgments, arbitral awards are not necessarily made public. The reasons for confidentiality in arbitration most frequently mentioned are the private nature of the agreement underlying arbitration, the desire to protect sensitive business information and the wish to spare the parties the embarrassment of public litigation. Where States are parties to mixed arbitration, as in ICSID, the desire not to divulge accusations or findings of improper action on their part is another strong motive[108] (see also paras. 123–129 *infra*).

**108**    Rules regulating international arbitration, other than ICSID, sometimes provide specifically that awards may not be published without the parties' consent.

---

104  *SPP* v. *Egypt*, Decision on Jurisdiction II and Dissenting Opinion, 14 April 1988.

105  *Tokios Tokelės* v. *Ukraine*, Decision on Jurisdiction and Dissenting Opinion, 29 April 2004.

106  *Soufraki* v. *UAE*, Decision on Annulment and Dissenting Opinion, 5 June 2007; *Lucchetti* v. *Peru*, Decision on Annulment and Dissenting Opinion, 5 September 2007.

107  For a general discussion of confidentiality, transparency and *amicus curiae* participation see Art. 44, paras. 97–128.

108  See also *Gaillard, E.*, Le principe de confidentialité de l'arbitrage commercial international, 22 Recueil Dalloz Sirey Chronique 153 (1987); *Lew, J. D. M.*, The Case for the Publication of Arbitration Awards, *in*: The Art of Arbitration, Essays on International Arbitration, Liber Amicorum Peter Sanders (*Schultsz, J. C./Van den Berg, A. J.* eds.) 233 (1982).

Examples may be found in the UNCITRAL Arbitration Rules (Art. 32(5))[109] and in the CAMCA Arbitration Rules (Art. 29(4)).[110] Arbitration under the NAFTA offers a differentiated solution that depends, in part, on which State is party to the dispute.[111] Other systems, such as ICC arbitration, do not regulate the issue explicitly. The assumption that confidentiality is generally understood to apply is open to doubt in a number of legal systems. If confidentiality is desired it is often prudent to provide for it expressly in the arbitration clause or terms of reference.

**109**  The drafts leading up to the ICSID Convention were silent on the question of publication of awards (History, Vol. I, p. 214). The issue was raised only at a relatively late stage in the drafting. It was discussed only in terms of the Centre's authority to publish. A party's right to do so was never questioned. A suggestion to authorize the Centre to publish the award "except as the parties otherwise agree" was changed into a prohibition to do so without the consent of the parties (History, Vol. II, pp. 817/8, 948/9, 987).

**110**  Art. 48(5) of the Convention prohibits publication of awards by the Centre.[112] The first sentence of Arbitration Rule 48(4) simply reiterates Art. 48(5). From 1984 to 2006 Rule 48(4) provided that the Centre *may* publish excerpts of the legal rules applied by a tribunal.[113] In December 2005, the Administrative Council voted to amend Rule 48(4),[114] which now mandates the Centre promptly to publish excerpts of the legal reasoning of awards (see Art. 44, paras. 34–36). Arbitration Rule 48(4), in force since 10 April 2006, therefore provides:

**Rule 48**

*Rendering of the Award*

(4) The Centre shall not publish the award without the consent of the parties. The Centre shall, however, promptly include in its publications excerpts of the legal reasoning of the Tribunal.

The change was prompted by a desire to achieve greater transparency in ICSID proceedings.[115] The Secretariat has yet to publish excerpts of the reasoning of awards in a systematic manner. The majority of awards are published by the parties in other fora.

**111**  The parties may authorize the Centre to publish a future award in their agreement providing for consent to jurisdiction. The Model Clauses of 1968 offered a formula for this purpose.[116] Little if any use appears to have been made of this clause and the 1981 and 1993 versions of the Model Clauses (see Art. 25, para. 385) have

---

109  15 ILM 713 (1976).

110  35 ILM 1557 (1996). See also NAFTA Free Trade Commission Interpretation of 31 July 2001, 95 AJIL 885 (2001).

111  See Annex 1137.4, 32 ILM 648 (1993).        112   See also Conciliation Rule 33(3).

113  For Arbitration Rule 48(4) of 1968 see 1 ICSID Reports 109. For discussion of Arbitration Rule 48(4) of 1984, see the First Edition of this Commentary, Art. 48, para. 96.

114  News from ICSID, Vol. 22(2), 2005.

115  ICSID Secretariat, Working Paper, Suggested Changes to the ICSID Rules and Regulations (12 May 2005), p. 9.

116  Clause XXVIII, 7 ILM 1179/80 (1968).

dropped it for good reasons. The time of an agreement containing consent to jurisdiction appears premature for this purpose. The parties will want to have a clearer picture of the circumstances and the outcome of an arbitration before giving their consent to the publication of the resulting award. The parties are routinely asked whether they consent to the publication of any award at the tribunal's first session.[117]

**112**    If both parties consent to the publication of an award, the Secretary-General is under an obligation to take the necessary steps. The Administrative and Financial Regulations provide:

### Regulation 22
*Publication*

    (1) [see Art. 44, para. 108]
    (2) If both parties to a proceeding consent to the publication of:
        (a)  reports of Conciliation Commissions;
        (b)  arbitral awards; or
        (c)  the minutes and other records of proceedings,
the Secretary-General shall arrange for the publication thereof, in an appropriate form with a view to furthering the development of international law in relation to investments.

**113**    If both parties have given their consent, the award or other pertinent decision (see para. 121 *infra*) is normally published in full in the ICSID Review – Foreign Investment Law Journal under the rubric "Cases". The publication is usually accompanied by a statement that both parties have agreed to the publication by the Centre. The Centre also publishes decisions, awards and excerpts of the legal reasoning of decisions and awards through its website: http://icsid.worldbank.org.

**114**    Art. 48(5) is addressed to the Centre only. While it is clear that ICSID will not publish an award without the parties' consent,[118] Art. 48(5) does not enjoin the parties from releasing the award.[119] The parties may agree to keep an award confidential. But if they do not, each party is free to make the award available to the public. Parties to ICSID arbitrations or their legal representatives often do release awards and other pertinent decisions for publication. When this practice first emerged, a number of these releases were accompanied by a statement along the following lines:

> We believe that the Tribunal's Decision is the product of substantial study by eminent international jurists and that its publication will not only be of interest to the international bar, but will serve generally to advance international law and order, and specifically the purposes of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States.[120]

---

117  *E.g. Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 32.
118  *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 97, footnote 30.
119  *Broches, A.*, A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 9 (1991).
120  See 23 ILM 351 (1984); 24 ILM 365 (1985); 24 ILM 1022 (1985); 27 ILM 1281 (1988); 89 ILR 660; 30 ILM 577 (1991).

The most important print sources for the publication of ICSID decisions and **115**
awards are the ICSID Reports and International Legal Materials (ILM). The Table
of Cases included in this Commentary shows the various sources of publication,
where available.

More recently, decisions and awards simply appear on relevant websites, some- **116**
times within days or even hours of their release to the parties. Useful websites
include:
• http://ita.law.uvic.ca
• http://www.investmentclaims.com

Some awards have been released in less than their full text. In some cases, **117**
only certain portions of the award were made available for publication.[121] In
one case, a portion of the award was withheld from publication.[122] In *Fireman's
Fund* v. *Mexico*, the Tribunal had ruled in a procedural order that, to the extent it
was to make use of confidential documents or information in an award or other
decision, it would designate the relevant portions as confidential. Those portions
were not to be published. In its Award the Tribunal ordered the parties to reach an
agreement within 30 days as to which of the Award's portions should be redacted
for purposes of confidentiality.[123] The Award was published with portions of the
text and footnotes deleted with the annotation "REDACTED".

Another avenue for publication of awards is judicial proceedings for their **118**
enforcement. In *LETCO* v. *Liberia*, the Award's text was provided by the US
District Court before which the case was brought for purposes of the Award's
enforcement.[124]

The majority of ICSID awards and other relevant decisions have been brought **119**
into the public domain in one of these ways. Their systematic publication in the
ICSID Reports since 1993, and more recently on the internet, has contributed
to their accessibility. However, a few awards and other decisions have remained
inaccessible.

### 2. Publication of Decisions Other than Awards

Art. 48(5), by its own terms, refers to the award. This term extends to the decision **120**
of an *ad hoc* committee and to an award of a new tribunal to which the dispute
has been submitted after the annulment of the first award in accordance with Art.
52(6). Decisions for the rectification, interpretation and revision of awards become
parts of the award to which they relate (see paras. 22–25, 29 *supra*).

Other decisions of the tribunal such as recommendations of provisional mea- **121**
sures (Art. 47), preliminary decisions on jurisdiction (Art. 41) or procedural orders
are not, strictly, awards (see para. 28 *supra*). But it would be illogical to withhold

---

121  *Adriano Gardella* v. *Côte d'Ivoire*, Award, 29 August 1977; *SIREXM* v. *Burkina Faso*, Award,
     19 January 2000; *Banro* v. *DR Congo*, Award, 1 September 2000.
122  *AGIP* v. *Congo*, Award, 30 November 1979.
123  *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2006, paras. 222–225.
124  See 26 ILM 647 (1987).

awards from publication while releasing interim decisions some of which contain extensive discussion of the factual and legal issues in dispute and will ultimately be incorporated into the award (see Art. 41, para. 78). For purposes of their publication, the Centre has treated these decisions in the same way as awards (see also paras. 4–6, 39–41, 88–91, 104–106 *supra*).

### 3. Publication of Other Information about Cases

**122**    Publication of other information about ICSID cases, including access to and publication of documents in pending cases as well as access to hearings, is discussed in this Commentary in the context of Art. 44 in a separate chapter on Confidentiality, Transparency and *Amicus Curiae* Participation (see Art. 44, paras. 97 *et seq.*).

### 4. General Considerations

**123**    Art. 48(5) and the attendant rules and regulations are a compromise between the confidentiality of the arbitration process and public access to its outcomes. This does not alter the fact that the arguments in favour of keeping awards and other decisions secret (see para. 107 *supra*) are less than persuasive. A host State is unlikely to preserve confidence in its investment climate by trying to conceal the details of a dispute with an investor. The fact that the dispute exists and that arbitration has been instituted is a matter of public record. Secrecy surrounding the outcome of the process is likely to arouse suspicion rather than instil confidence.

**124**    Similar considerations apply to the investor's reputation. Eagerness to keep an award away from the public eye is likely to give rise to questions about proper corporate behaviour. In fact, the expectation that both the host State's and the investor's conduct may be the object of a judicial examination and that the result of this examination would become a matter of public knowledge may have a positive effect. This expectation may improve standards of behaviour and may further instil confidence.

**125**    There are also weighty arguments of a more general character in favour of publishing awards and other decisions. These relate not so much to the resolution of the individual dispute or to the particular parties but to the integrity and transparency of the arbitration process in general.[125]

**126**    The availability of a track record is likely to increase confidence in arbitration. Access to past decisions ought to demonstrate to potential users that the process is fair and rational. It ought to show that arbitration is not inherently slanted either in favour of the investor or the host State but that it works to their mutual advantage. This ought to induce faith in and increase use of ICSID arbitration.

**127**    Access to concluded cases helps parties in subsequent cases to select arbitrators. A study of decisions in which potential arbitrators have participated can reveal

---

125   See also *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 360/1 (1999).

their strengths and weaknesses. A review of awards ought to enable the parties to choose individuals whose experience and ability seems best suited to the case at hand.

The availability of the Centre's case law should improve the predictability and **128** quality of future decisions. It is much easier to advise parties about their chances to prevail in a potential or existing dispute on the basis of well-documented cases. The arbitration process will be more rational if the tribunals as well as the parties can build on the experience and wisdom of past decisions. While it is clear that there is no doctrine of binding precedent in ICSID arbitration, reference to earlier decisions is a useful tool in all systems of adjudication. The application of the Convention, the attendant Rules and Regulations as well as the substantive law relating to investments by a series of individually composed tribunals makes the development of a consistent case law particularly important. The development of such a case law should, over time, increase the predictability of decisions, simplify proceedings and thereby lower costs. This should further increase the attractiveness of ICSID arbitration (for discussion of the issue of "precedent" see Art. 42, paras. 183–187, and Art. 53, paras. 16, 17).

So far, the system of publishing ICSID awards and other decisions, as governed **129** by Art. 48(5), has worked reasonably well. In most cases, either one or both parties have released the texts for publication. It is to be hoped that this practice will continue and that the parties and their counsel will recognize the overriding value of making these decisions available to the legal community. Where this is not the case with respect to particular decisions, it is to be hoped that the Centre will indeed promptly and systematically publish excerpts from the legal reasoning of decisions and awards, as required by Arbitration Rule 48(4) in its 2006 version (see para. 110 *supra*). This practice should facilitate understanding of the questions arising from the Convention's application as well as from the application of substantive law.

# Article 49

**(1) The Secretary-General shall promptly dispatch certified copies of the award to the parties. The award shall be deemed to have been rendered on the date on which the certified copies were dispatched.**

**(2) The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award. The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | INTERPRETATION | 2–85 |
| | A. **"(1) The Secretary-General shall promptly dispatch certified copies of the award to the parties."** | 2–9 |
| | B. **"The award shall be deemed to have been rendered on the date on which the certified copies were dispatched."** | 10–27 |
| |    1. Time of Completion of the Award | 11–24 |
| |    2. Time of Dispatch of the Award | 25–27 |
| | C. **"(2) The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award."** | 28–77 |
| |    1. General | 28–31 |
| |    2. Procedure | 32–37 |
| |    3. Substance: Omissions and Errors | 38–41 |
| |    4. Practice of Tribunals | 42–67 |
| |    5. Supplementation and Annulment | 68–77 |
| | D. **"Its decision shall become part of the award and shall be notified to the parties in the same manner as the award."** | 78–80 |
| | E. **"The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered."** | 81–85 |

# I. INTRODUCTION

Art. 49 is the second of two Articles in the Convention's Section 4 of Chapter IV  **1**
entitled "The Award". This Article deals with two diverse questions. Paragraph 1 addresses the modality of the award's transmission to the parties and the date of the award. Paragraph 2 deals with the award's supplementation and the rectification by the tribunal of technical errors in the award. Supplementation and rectification may be seen as one of several post-award procedures and remedies. These also include interpretation, revision and annulment. Interestingly, supplementation and rectification are not grouped with these measures. The latter are placed in a separate Section 5 entitled "Interpretation, Revision and Annulment of the Award".[1]

# II. INTERPRETATION

## A. "(1) The Secretary-General shall promptly dispatch certified copies of the award to the parties."

A formal procedure for the delivery of a decision to the parties is part of  **2**
an orderly judicial process. Rules governing international adjudication variously provide for oral delivery in open court[2] or a mere notification of the decision's text.[3]

The Preliminary Draft to the Convention only provided that the award shall  **3**
be immediately communicated to the parties (History, Vol. I, p. 214). Subsequent discussions led to the conclusion that this task should be entrusted specifically to the Secretary-General (History, Vol. II, pp. 268, 272; Vol. I, p. 216). This provision corresponds with Art. 11 of the Convention which provides that the Secretary-General "shall have the power to authenticate arbitral awards rendered pursuant to this Convention, and to certify copies thereof".

At one point during the Convention's drafting, it was suggested that the award  **4**
be delivered orally at a formal session of the tribunal in the presence of the parties (History, Vol. II, pp. 333, 826; Vol. I, p. 216). But it was realized that such a reading of the award would lead to unnecessary cost and inconvenience. Therefore, a decision was made to delete the requirement of a formal reading (History, Vol. II, at pp. 826/7, 939) (see also Art. 48, para. 33).

The details of the Secretary-General's task in this respect are set out in more  **5**
detail in the Arbitration Rules:

---

1   A suggestion to group correction with the other remedies made in the course of the Convention's preparation was not taken up (History, Vol. II, p. 883).
2   See Art. 58 of the Statute of the International Court of Justice and Art. 94(2) of the ICJ's Rules; Art. 28(3) of the International Law Commission's 1958 Model Rules on Arbitral Procedure, YBILC 85 (1958-II).
3   See Art. 28(1) and (3) of the ICC Arbitration Rules, 36 ILM 1614 (1997); Art. 32(2) and (6) of the 1976 UNCITRAL Arbitration Rules, 15 ILM 713 (1976); Art. 31 of the 1985 UNCITRAL Model Law on International Commercial Arbitration, 24 ILM 1310 (1985); Art. 29(5) of the 1996 CAMCA Arbitration Rules, 35 ILM 1557 (1996).

**Rule 48**

*Rendering of the Award*

(1) Upon signature by the last arbitrator to sign, the Secretary-General shall promptly:

    (a) authenticate the original text of the award and deposit it in the archives of the Centre, together with any individual opinions and statements of dissent; and

    (b) dispatch a certified copy of the award (including individual opinions and statements of dissent) to each party, indicating the date of dispatch on the original text and on all copies.

(2) The award shall be deemed to have been rendered on the date on which the certified copies were dispatched.

(3) The Secretary-General shall, upon request, make available to a party additional certified copies of the award.[4]

**6**    The Secretary-General's task is twofold. He or she has to first authenticate the award's original, which is to remain in the Centre's archives. He or she then has to dispatch a certified copy of the award to each party. This has to include any individual opinions and statements of dissent. The date of dispatch (see paras. 10, 25–27 *infra*) must be noted on the original text and on all copies. Certification is done by means of a separate document accompanying the award. This document entitled "certificate" contains a precise identification of the case and a formula along the following lines:

> I hereby certify that the attached is a true copy of the original of the Award of the Arbitral Tribunal in the above case. The Award is rendered in the English/[and]French/[and] Spanish language[s].

References to individual opinions or statements of dissent are added to this formula as appropriate. The certificate is dated and signed by the Secretary-General.

**7**    The Convention provides for the prompt dispatch of the copies to the parties. The date relevant to this duty is the date of the award's signature. If the signatures of several arbitrators are given on several dates, it is the day of the last signature (see Art. 48, paras. 35–37). Since the Secretary-General's duty to dispatch extends to individual opinions and statements of dissent (see para. 5 *supra*), these have to be ready and signed as well before the Secretary-General can discharge his duty.[5] A comparison of the dates of signatures with the dates of dispatch indicate that this task is carried out with appropriate expeditiousness. Typically, dispatch takes a few days from the last signature (see para. 26 *infra*).

**8**    Art. 49(1) refers to awards (see Art. 48, paras. 22–30). Art. 52(4) of the Convention extends the application of Art. 49 *mutatis mutandis* to decisions of *ad hoc* committees. Arbitration Rule 53 generally extends the provisions of the Rules, including Rule 48 (see para. 5 *supra*), to procedures relating to the interpretation,

---

4   See also the corresponding Article 53 of the Arbitration (Additional Facility) Rules.

5   See also Note B to Arbitration Rule 48 of 1968, 1 ICSID Reports 109.

revision and annulment of awards. Therefore, a decision on an application for interpretation, revision or annulment is also subject to the Secretary-General's duty to dispatch certified copies to the parties. It is clear that this also applies to an award of a new tribunal deciding in accordance with Art. 52(6). Decisions for the supplementation and rectification of awards in accordance with Art. 49(2) become part of the award. They must be notified to the parties in the same way as awards (see paras. 78–80 *infra*). Decisions preliminary to the award such as decisions on jurisdiction are not covered by the Secretary-General's obligation under Art. 49(1). They may be certified and dispatched by the Secretary of the Tribunal.

Regulation 28 of the Administrative and Financial Regulations further specifies the duties of the Secretary-General with regard to awards and other documents relating to ICSID proceedings:    **9**

### Regulation 28
#### *Depositary Functions*

(1) The Secretary-General shall deposit in the archives of the Centre and shall make arrangements for the permanent retention of the original text:

(a) of the request and of all instruments and documents filed or prepared in connection with any proceeding, including the minutes of any hearing;

(b) of any report by a Commission or of any award or decision by a Tribunal or Committee.

(2) Subject to the Rules and to the agreement of the parties to particular proceedings, and upon payment of any charges in accordance with a schedule to be promulgated by the Secretary-General, he shall make available to the parties certified copies of reports and awards (reflecting thereon any supplementary decision, rectification, interpretation, revision or annulment duly made, and any stay of enforcement while it is in effect), as well as of other instruments, documents and minutes.

## B.  "The award shall be deemed to have been rendered on the date on which the certified copies were dispatched."

The exact date of the award is important in view of the time limits imposed by Arts. 49(2), 51(2) and 52(2) for its supplementation or rectification, revision and annulment. These time limits run from the date of the award's dispatch to the parties. If the award is rectified subsequently, the beginning of the time limit is deferred in accordance with Art. 49(2) (see paras. 81–85 *infra*). In the Convention's preparation, the necessity to specify the award's date was first discussed in connection with its enforcement (History, Vol. II, pp. 339, 340, 342, 512). Later it was realized that the date would be important primarily in light of the remedies offered by the Convention (at pp. 517, 572). There was agreement that the relevant date should be the date of the award's notification to the parties rather than the date when it was completed (at pp. 339, 342, 422, 512, 517, 572, 664). The date of    **10**

dispatch rather than the date of receipt was chosen in view of the difficulties that might arise if the award is received on different dates by the parties (at p. 826).

### 1. Time of Completion of the Award

11      While the critical date is the award's dispatch to the parties, there are earlier dates which are relevant. One such date is the date of the closure of the proceeding. In this connection the Arbitration Rules provide as follows:

**Rule 38**
*Closure of the Proceeding*
    (1) When the presentation of the case by the parties is completed, the proceeding shall be declared closed.
    (2) Exceptionally, the Tribunal may, before the award has been rendered, reopen the proceeding on the ground that new evidence is forthcoming of such a nature as to constitute a decisive factor, or that there is a vital need for clarification on certain specific points.[6]

12      Closure of the proceeding triggers a time limit within which the tribunal must complete the award. The Arbitration Rules, as in force before 2003, provided that the award had to be drawn up and signed within 60 days after the closure of the proceedings, with a possible extension of this period by a further 30 days. The Arbitration Rules, as amended and in force since 1 January 2003, extended these time limits as follows:

**Rule 46**
*Preparation of the Award*
    The award (including any individual or dissenting opinion) shall be drawn up and signed within 120 days after closure of the proceeding. The Tribunal may, however, extend this period by a further 60 days if it would otherwise be unable to draw up the award.

13      Under the old Rules, the completion of the presentation by the parties of their case was the starting point of a tight schedule. The 2003 amendment to the Rules presumably responded to some of the criticism the previous tight deadlines attracted from tribunals[7] and commentators.[8] In practice, tribunals frequently treated Rules 38 and 46 with some flexibility.[9] Failure to issue an award in a timely manner has been held not to amount to a serious departure from a fundamental rule of procedure, warranting annulment.[10]

14      At the completion of the parties' presentation of their cases, the tribunal is to issue a procedural order declaring the proceeding closed. The closure of the hearing

---

6   Article 44 of the Arbitration (Additional Facility) Rules is identical.
7   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 112–113.
8   See the First Edition of this Commentary to Art. 49 at paras. 12–21.
9   See First Edition of this Commentary to Art. 49, paras. 15–17; *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 1, 2; *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 68.
10  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 65.

on the merits is often not the end of the parties' presentations.[11] A reopening is possible only exceptionally if decisive new evidence turns up or if further clarification is needed by the tribunal. After closure of the proceeding, the tribunal has to prepare the award, including any individual or dissenting opinions within 120 days. It may grant itself an extension of another 60 days for this purpose. Once the award, including any individual and dissenting opinions, is drawn up and signed by all arbitrators, the Secretary-General must authenticate it and promptly dispatch certified copies to the parties (see paras. 5–7 *supra*). It follows that, according to the Arbitration Rules, an award's date should lie within the 120 or 180 days following the parties' completion of their presentations and the additional time necessary for certification and dispatch.

An examination of practice is complicated by the fact that the date of the closure **15** of the proceeding in accordance with Arbitration Rule 38 is not always recorded in the published awards. Moreover, the signatures and their dates are missing from some of the awards' published versions (see Art. 48, para. 35).[12] Finally, the date of dispatch was apparently not recorded in some of the earlier cases (see para. 25 *infra*).

The 2003 amendment to Rule 46 considerably eased the time pressures on tri- **16** bunals. But some proceedings continue to take place under the former time limits. A survey of awards,[13] for which information is available, shows the following: awards are rendered on average approximately 13 months after the conclusion of the hearing on the merits; yet only 6 or 7 weeks elapse, on average, from the date the proceedings are formally closed to the date of the award.

Some cases show surprisingly short periods for the preparation of the awards **17** or decisions on annulment well within the 60-day period of the former Rule 46. The hearing in *Olguín* v. *Paraguay* was concluded on 12 March 2001. In the absence of any pending request from either party, nor any reason to reopen the proceedings, the proceeding was declared closed in accordance with Rule 38(1) on 8 May 2001.[14] The award was rendered on 26 July 2001.

In other cases, it appears that the last communications from the parties were **18** received some time before the tribunal or *ad hoc* committee formally declared the proceedings closed.[15] In *Noble Ventures* v. *Romania*, the parties submitted post-hearing briefs on 21 December 2004. The proceeding was declared closed, in accordance with Rule 38(1), on 15 August 2005, once the Tribunal noted that there

---

11  For a case involving numerous post-hearing submissions see *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 48–75.
12  Signatures and their dates are generally omitted in the ICSID Reports.
13  See the Procedural Calendar at p. lxviii.
14  *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 42–44.
15  *Maffezini* v. *Spain*, Award, 13 November 2000, paras. 36–38; *Tokios Tokelès* v. *Ukraine*, Award, 26 July 2007, paras. 28, 30; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 2.7.1, 2.7.18.

was no outstanding request by a party nor any reason to reopen the proceeding, as is possible under Rule 38(2).[16] The award was rendered on 12 October 2005.

**19**      In yet other cases the dates of the last communications from the parties were closer to the closure of proceedings but the tribunals still managed to stay within the time limit of 60 days. In *LETCO* v. *Liberia*, the Tribunal declared the closure of proceedings on 10 February 1986 once it had received the last necessary information[17] and produced an Award signed by the three arbitrators between 21 February and 11 March 1986.[18] In *Atlantic Triton* v. *Guinea*, the Tribunal received a post-hearing Memorial from each of the parties in February 1986 before it "closed argument" on 25 February 1986.[19] Its Award was completed by 14 April and signed between 16 and 21 April 1986.[20] In *Fedax* v. *Venezuela*, the Tribunal received the last communication on 20 December 1997 and closed the proceeding on 13 January 1998. It produced an Award signed between 12 and 26 February 1998.[21] In *Champion Trading* v. *Egypt*, the Tribunal received the last communication on 24 July 2006 and closed the proceeding on 26 September 2006. It produced an Award signed between 19 and 23 October 2006.[22] In *Sempra* v. *Argentina*, the Tribunal received the last communication on 6 July 2007 and closed the proceeding on 19 July 2007. It produced an Award signed between 9 and 18 September 2007.[23]

**20**      In *Azurix* v. *Argentina*, the proceedings were resumed, following a challenge to the President of the Tribunal, on 14 March 2005. On 15 March 2005, ICSID transmitted the parties' post-hearing briefs dated 29 November 2004 to the Tribunal. The Tribunal met and deliberated on a draft of their award on 7–9 September 2005. The Claimant was requested to furnish additional financial explanations, which it did on 27 September 2005. The Respondent provided its comments on those explanations on 14 October 2005. On 17 April 2006, the proceedings were declared closed pursuant to Rule 38.[24] The award was rendered on 14 July 2006.

**21**      In some cases, the awards do not state the date of the formal closure of the proceedings in accordance with Arbitration Rule 38. But the interval between the last communication from the parties and the completion of the award is worth noting. For example, in the original proceeding in *Amco* v. *Indonesia*, the hearings ended on 23 March 1984 and the Award was signed on 20 November of that year.[25] In *SOABI* v. *Senegal*, the last recorded communication from a party took place

---

16   *Noble Ventures* v. *Romania*, Award, 12 October 2005, para. 31.
17   *LETCO* v. *Liberia*, Award, 31 March 1986, 26 ILM 651 (1987).
18   At p. 677.
19   *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 20.
20   Published version omits the signatures and their dates.
21   *Fedax* v. *Venezuela*, Award, 9 March 1998, 37 ILM 1391, 1395, 1397 (1998).
22   *Champion Trading* v. *Egypt*, Award, 27 October 2006, para. 32.
23   *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 73–75.
24   *Azurix* v. *Argentina*, Award, 14 July 2006, paras. 35–37.
25   *Amco* v. *Indonesia*, Award, 20 November 1984, para. 6.

on 12 May 1987[26] but the Tribunal did not complete its Award before 9 February 1988.[27] In the annulment proceedings in *MINE* v. *Guinea*, the last contact with the parties recorded in the decision took place on 28 October 1988[28] but the Decision on Annulment was signed only on 14 December 1989 (and dispatched on 22 December 1989).[29] In *AAPL* v. *Sri Lanka*, the parties transmitted their last comments on 29 January 1990[30] and the Award was signed on 21 June 1990.[31] In *Vacuum Salt* v. *Ghana*, the Tribunal held its last session with the parties on 10 June 1993[32] and the Tribunal completed its work on the Award on 1 February 1994.[33] In *AMT* v. *Zaire*, the Tribunal scheduled the last hearing with the parties for 14 February 1995. After Zaire's nonappearance, the Tribunal appointed an expert, who issued a report on damages. The Tribunal took until 11 February 1997, that is almost two years after the last hearing, to produce a signed Award.[34] In *Cable TV* v. *St. Kitts and Nevis* the last recorded submissions by the parties to the Tribunal were made on 2 July 1996 and the Award was signed on 16 December 1996.[35]

In *Siemens* v. *Argentina*,[36] the Tribunal informed the parties on 13 March **22** 2006 that it would disregard certain unsolicited observations put forward by the parties on grounds that they were untimely and that the parties had enjoyed a full opportunity to make their submissions. On 13 April 2006 it confirmed this decision in response to an inquiry from the Respondent. This was the last recorded communication with the parties. The award was rendered on 6 February 2007. In all these examples it appears that the period between the date at which the tribunals were supposed to have closed the proceedings in accordance with Arbitration Rule 38(1) (see para. 11 *supra*) and the date of the award's actual completion exceeded the time limits of Arbitration Rule 46 by wide margins.

In the Decision on Annulment in *CDC* v. *Seychelles*, the Committee addressed **23** the argument that the Tribunal had committed a serious departure from a fundamental rule of procedure under Art. 52(1)(d) by failing to issue the award in a timely manner as required under Rule 46. The application was based on the assumption that the old Arbitration Rules were applicable, but the Respondent "later conceded the applicability of the 120-day (plus 60 days) rule".[37] The Committee found that the proceeding was closed only when the award was rendered on 17 December 2003, since there was no formal closure of proceedings.[38] The

---

26  *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.38.
27  Published version omits the signatures and their dates.
28  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 3.08.
29  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989.
30  *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 15.
31  See 30 ILM 627, 655 (1991).
32  *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 19.
33  See 9 ICSID Review – FILJ 101 (1994).
34  *AMT* v. *Zaire*, Award, 21 February 1997, 36 ILM 1540, 1555/6 (1997).
35  *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 1.11.
36  *Siemens* v. *Argentina*, Award, 6 February 2007.
37  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 62.
38  A casual concluding remark at the end of the hearing did not amount to a formal closure of the proceeding. At para. 63.

Committee held that even assuming that the proceeding closed on the last day of the hearing, the Award was still timely, having been rendered 147 days later. This would have fallen squarely within the rule "which allows for 180 days in total for the issuance of an Award if the Tribunal is unable to do so in 120 days".[39]

**24**    Although the rather short time limit of 60 or 90 days imposed by the old version of Arbitration Rule 46 did not, in practice, create untoward pressure for tribunals, the extended time limits in the amended Rules more accurately reflect the modern practice of investment arbitration proceedings. In some cases the choice of the date for the formal closure of proceedings appears to have been influenced less by the completion of the parties' presentations than by the tribunals' expectations of the time still needed for the completion of the awards. Even if proceedings have been closed formally and the tribunal runs against the deadlines of 120 or 180 days, the possibility of a further extension with the parties' consent remains an option.[40]

### 2. Time of Dispatch of the Award

**25**    Under the Convention, the decisive date for the award is not its completion but its dispatch to the parties (see Art. 48, paras. 35–37). This rule extends to decisions on the supplementation or rectification, interpretation, revision and annulment of awards as well as to awards by new tribunals in accordance with Art. 52(6) (see para. 8 *supra*). Under Arbitration Rule 48(1)(b) the date of dispatch is to be indicated on the original text and on all copies (see para. 5 *supra*). Despite this clear rule, some of the earlier decisions are cited by the time of their signature and the time of their dispatch is not recorded separately. This conclusion is possible by comparing the dates of signatures on the original awards with the dates later given for these awards in ICSID's publications and in the ICSID Reports. In a number of cases these dates are identical and the date cited in ICSID's official listing[41] is specified as being the date of signature.[42]

**26**    In the more recent cases the date of dispatch to the parties is recorded separately. Where the dates of the signatures on the awards are available, the period of time taken for their prompt dispatch may be calculated. An examination of some of these dates reveals periods ranging from dispatch on the same day[43] to a maximum

---

39   At para. 64.

40   Under Art. 44 of the Convention, the Arbitration Rules are subject to variation by agreement of the parties. See Art. 44, paras. 10–19.

41   ICSID Cases, Doc. ICSID/16/Rev. 5 (1996).

42   See *Amco* v. *Indonesia*, Award, 20 November 1984, 1 ICSID Reports 413, 24 ILM 1039 (1985) and Doc. ICSID/16/Rev. 5, p. 15; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, 1 ICSID Reports 509, 25 ILM 1465 (1986) and Doc. ICSID/16/Rev. 5, p. 16; *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, 2 ICSID Reports 95, 1 ICSID Review – FILJ 144 (1986) and Doc. ICSID/16/Rev. 5, p. 19; *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 13, original and Doc. ICSID/16/Rev. 5, p. 23.

43   *CDC* v. *Seychelles*, Award, 17 December 2003, date of signature: 17 December 2003; *Soufraki* v. *UAE*, Award, 7 July 2004, date of signature: 7 July 2004.

of 28 days.[44] In all these cases, the decisions are listed by the ICSID Secretariat as having been "rendered" on the date of their dispatch.[45]

The Convention's rule on the date of awards applies only to awards as defined in para. 8 *supra*. It does not apply to preliminary decisions of tribunals such as decisions upholding jurisdiction or decisions on provisional measures. Since these decisions are not, by themselves, subject to the post-award remedies of supplementation and rectification, revision or annulment in accordance with Arts. 49(2), 51 and 52, the time limits provided for these remedies do not apply to them. These decisions are cited with the dates on which they were actually completed and signed. With respect to a stay of enforcement in connection with the interpretation (Art. 50), revision (Art. 51) or annulment (Art. 52) of an award, Arbitration Rule 54(5) provides that such a stay shall become effective on the date on which the Secretary-General dispatches the notification of the stay to the parties. **27**

**C. "(2) The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award."**

### 1. General

Art. 49(2) provides a remedy for inadvertent omissions and minor technical errors in the award. It is not designed to afford a substantive review or reconsideration of the decision but enables the tribunal to correct mistakes that may have **28**

---

44   See *e.g.*, *LETCO* v. *Liberia*, Award, 31 March 1986, date of last signature: 11 March 1986; *MINE* v. *Guinea*, Award, 6 January 1988, date of last signature: 30 December 1987; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, date of signature: 14 December 1989; *SOABI* v. *Senegal*, Award, 25 February 1988, date of last signature: 9 February 1988; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, date of last signature: 21 June 1990; *SPP* v. *Egypt*, Award, 20 May 1992, date of last signature on the majority award: 1 April 1992 (the unusually long period for the dispatch in this case may have been caused by the late arrival of the Dissenting Opinion which is undated); *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, date of signature: 1 February 1994; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, date of last signature: 19 December 1996; *AMT* v. *Zaire*, Award, 21 February 1997, date of last signature: 10 February 1997; *Fedax* v. *Venezuela*, Award, 9 March 1998, date of last signature: 26 February 1998; *Maffezini* v. *Spain*, Award, 13 November 2000, date of signature: 9 November 2000; *Genin* v. *Estonia*, Award, 25 June 2001, date of last signature: 18 June 2001; *Mihaly* v. *Sri Lanka*, Award, 15 March 2002, date of last signature: 7 March 2002; *MTD* v. *Chile*, Award, 25 May 2004, date of last signature: 21 May 2004; *CMS* v. *Argentina*, Award, 12 May 2005, date of last signature: 25 April 2005; *Salini* v. *Jordan*, Award, 31 January 2006, date of last signature: 23 January 2006; *Azurix* v. *Argentina*, Award, 14 July 2006, date of last signature: 23 June 2006; *ADC* v. *Hungary*, Award, 2 October 2006, date of last signature: 27 September 2006; *PSEG* v. *Turkey*, Award, 19 January 2007, date of last signature: 17 January 2007; *Siemens* v. *Argentina*, Award, 6 February 2007, date of last signature: 17 January 2007; *Enron* v. *Argentina*, Award, 22 May 2007, date of last signature: 15 May 2007; *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, date of signature: 29 June 2007; *Fraport* v. *Philippines*, Award, 16 August 2007, date of last signature: 23 July 2007; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, date of last signature: 15 August 2007.

45   http://icsid.worldbank.org/ICSID/Index.jsp.

occurred in the award's drafting in a non-bureaucratic and expeditious manner (see also Art. 52, paras. 401, 402). A number of regulations governing other types of international arbitration offer similar procedures.[46]

**29**    The Preliminary Draft and the First Draft for the Convention did not provide for the supplementation or rectification of awards (History, Vol. I, p. 216). Discussion about the respective functions of supplementation, rectification, interpretation and annulment of awards led to the conclusion that there should be a separate procedure for supplementation and rectification by the tribunal of its own award. In particular, the question of what remedy should be offered if a tribunal failed to deal with every question submitted to it preoccupied the members of the Legal Committee (History, Vol. II, pp. 342, 664, 846, 847, 848, 849). A provision enjoining arbitrators to rule on every issue presented to them was adopted (see also Art. 48, para. 44; Art. 52, paras. 399, 400). But a motion to make a failure to comply with this duty a ground for annulment was defeated. Thereupon, the Legal Committee decided that for situations of this kind a supplemental review different from revision should be introduced (at p. 849). This led to a number of drafts which eventually became Art. 49(2) (History, Vol. II, pp. 864, 883/4, 891; Vol. I, pp. 216, 218).[47]

**30**    Under Art. 49(2), the remedy of supplementation and rectification is available in respect of awards. Art. 52(4) extends its application to decisions of *ad hoc* committees.[48] It is clear that the award of a new tribunal in a resubmitted case under Art. 52(6) is also subject to this remedy.[49] The Arbitration (Additional Facility) Rules in Articles 56 and 57 contain similar provisions.

**31**    This remedy is not applicable to decisions preliminary to awards. In particular, decisions on jurisdiction and on provisional measures are not, by themselves, subject to this procedure. To the extent that such a preliminary decision is incorporated into a subsequent award it is also subject to this remedy.[50] The reason for this is obvious. The procedure of Art. 49(2) and Arbitration Rule 49 is designed for situations in which the tribunal has terminated its activity. If the need for a supplementation or rectification of a preliminary decision arises while the proceedings are still pending, a party can always make an informal application to this effect.[51]

---

46  See Art. 31 of the International Law Commission's 1958 Model Rules on Arbitral Procedure, YBILC 85/6 (1958-II); Arts. 36, 37 of the 1976 UNCITRAL Arbitration Rules, 25 ILM 715 (1976); Art. 33 of the 1985 UNCITRAL Model Law on International Commercial Arbitration, 24 ILM 1310/1 (1985); Art. 32 of the 1996 CAMCA Arbitration Rules, 35 ILM 1557 (1996).

47  See also *Broches, A.*, Die dritte Annullierung eines ICSID-Schiedsspruches – Eine Entgegnung auf F. Niggemann, 11 Praxis des Internationalen Privat- und Verfahrensrechts 295 (1991).

48  See *Vivendi* v. *Argentina*, Decision on Supplementation and Rectification of Annulment Decision, 28 May 2003; *Soufraki* v. *UAE*, Rectification of the Annulment Decision, 13 August 2007.

49  This was the case in *Amco* v. *Indonesia*, Resubmitted Case: Decision on Supplemental Decisions and Rectification, 17 October 1990.

50  *Loc. cit.*

51  For example, this occurred during the proceedings in *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 13–17. Mexico requested a correction and interpretation of certain

## 2. Procedure

Art. 49(2) contains a number of procedural provisions. They concern the need **32** for a request by a party, a time limit of 45 days and notice to the other party. The Arbitration Rules offer the necessary details:

<div align="center">

**Rule 49**

*Supplementary Decisions and Rectification*

</div>

(1) Within 45 days after the date on which the award was rendered, either party may request, pursuant to Article 49(2) of the Convention, a supplementary decision on, or the rectification of, the award. Such a request shall be addressed in writing to the Secretary-General. The request shall:

    (a) identify the award to which it relates;

    (b) indicate the date of the request;

    (c) state in detail:

        (i) any question which, in the opinion of the requesting party, the Tribunal omitted to decide in the award; and

        (ii) any error in the award which the requesting party seeks to have rectified; and

    (d) be accompanied by a fee for lodging the request.

(2) Upon receipt of the request and of the lodging fee, the Secretary-General shall forthwith:

    (a) register the request;

    (b) notify the parties of the registration;

    (c) transmit to the other party a copy of the request and of any accompanying documentation; and

    (d) transmit to each member of the Tribunal a copy of the notice of registration, together with a copy of the request and of any accompanying documentation.

(3) The President of the Tribunal shall consult the members on whether it is necessary for the Tribunal to meet in order to consider the request. The Tribunal shall fix a time limit for the parties to file their observations on the request and shall determine the procedure for its consideration.

(4) Rules 46–48 shall apply, *mutatis mutandis*, to any decision of the Tribunal pursuant to this Rule.

(5) If a request is received by the Secretary-General more than 45 days after the award was rendered, he shall refuse to register the request and so inform forthwith the requesting party.[52]

---

alleged translation errors of the Spanish version of the Tribunal's Decision on Jurisdiction of 26 June 2002. The Acting Secretary-General confirmed that an application under Articles 56 and 57 (now 55 and 56) of the Arbitration (Additional Facility) Rules was inappropriate in respect of preliminary decisions, but that it was open to a party immediately to ask the Tribunal to clarify, correct or supplement a preliminary or interim decision under Rule 35. The Tribunal indicated that, whilst still exercising its functions and prior to the closure of the proceedings, it could exercise such powers of its own motion or on the request of a party. In this particular case, no error of translation was identified.

52  This provision was redrafted on a number of points in 1984. For Arbitration Rule 49 in its 1968 version see 1 ICSID Reports 109/10. For the 1984 version see 1 ICSID Reports 175.

**33**    The procedure of supplementation or rectification is contingent upon a request by a party to the case. The tribunal may not issue such a decision on its own initiative.[53] The party's request must say exactly what points it wishes to have supplemented or corrected. A request may be directed at both a supplementary decision and a correction. In other words, the requesting party need not choose between those two alternatives. But a request under Art. 49(2) should be filed separately from any requests for interpretation, revision and annulment under Arts. 50, 51 and 52. This is necessary in view of the different time limits and procedures for these remedies.[54]

**34**    The time limit of 45 days for a request is computed from the day on which the original award was dispatched to the parties (see paras. 10, 25 *supra*). The time limit is satisfied in accordance with Administrative and Financial Regulation 29 if the request arrives no later than on the 45th day after that date. Under Arbitration Rule 49(5) the Secretary-General's authority to refuse registration is limited to requests that do not arrive within this time limit. There is no other "screening power" in the case of requests under Art. 49(2) except to verify that the request relates to an award (see paras. 30, 31 *supra*) and that it is made by a party to the case.[55]

**35**    Art. 49(2) of the Convention and Arbitration Rule 49(2)(b) provide for the notification to the other party of a request after its registration by the Secretary-General. Although the Convention does not specifically provide that the other party be heard rather than merely notified, it is clear that hearing the other party is a fundamental procedural requirement. Arbitration Rule 49(3) provides a procedure for the filing and consideration of the parties' observations.

**36**    Supplementation and rectification can only be made by the tribunal that rendered the award. This is in contrast to interpretation and revision which are to be made "if possible" by the original tribunal. Applications for annulment are always decided by a separate *ad hoc* committee. If, for whatever reason, the original tribunal is no longer available, the remedy of Art. 49(2) cannot be used. In that case, the party concerned would have to look into the question of whether interpretation, revision or annulment is a possible alternative.[56] It should be noted that consideration and decision of a request on supplementation and rectification does not require the physical presence of the tribunal's members at a meeting. Under Arbitration Rule 49(3) it is up to the tribunal to determine the procedure for the request's consideration. Under Arbitration Rule 16(2) a tribunal may take decisions by correspondence.

**37**    Arbitration Rule 49(4) provides that the requirements for awards as contained in Rules 46–48 apply *mutatis mutandis* to decisions on supplementation and

---

53    By contrast, the Arbitration (Additional Facility) Rules in Article 56(1) provide for the possibility of correction upon the tribunal's own initiative.

54    See also Note B to Arbitration Rule 49 of 1968 and Note B to Arbitration Rule 50 of 1968, 1 ICSID Reports 110, 111/2.

55    See Notes C and E to Arbitration Rule 49 of 1968, 1 ICSID Reports 110.

56    See also Note D to Arbitration Rule 49 of 1968, 1 ICSID Reports 110.

rectification. The time limit of 120 (extendable to 180) days in Rule 46 (see para. 12 *supra*) should be more than ample for the completion of a decision that will normally only concern minor points in the award. The full statement of the details required by Rule 47(1) (see Art. 48, para. 23) will only apply in part to decisions under Art. 49(2). The provisions on signatures, dates and individual opinions in Rule 47(2) and (3) are fully applicable. This also applies to the formalities for authentication and dispatch to the parties under Rule 48 (see paras. 78–80 *infra*). In accordance with Administrative and Financial Regulation 28(2), any supplementary decision or rectification should be reflected on all certified copies of awards made available by the Secretary-General under Art. 49(1) of the Convention. Since the certified copies of the original award will normally be dispatched before a decision can be made on supplementation or rectification, this can only apply to "additional certified copies of the award" in accordance with Arbitration Rule 48(3).

### 3. Substance: Omissions and Errors

Art. 49(2) offers a remedy for two types of defects in the award. One is the existence of a question which the tribunal has omitted to decide in the award. The other is the existence of a clerical, arithmetical or similar error in the award. While the existence of clerical or arithmetical errors is readily identifiable, the existence of a question which the tribunal had omitted to decide is a somewhat more difficult issue. The possibility of a supplemental decision under Art. 49(2) to remedy an omission is related to the provision of Art. 48(3) requiring that the award shall deal with every question submitted to the tribunal (see Art. 48, paras. 44–53). In fact, the drafting histories of the two provisions are closely linked. The decision to introduce the supplemental review contained in Art. 49(2) was taken in connection with the adoption of the provision requiring the arbitrators to rule on every issue presented to them (History, Vol. II, p. 849) (see also para. 29 *supra*; para. 69 *infra*; Art. 48, para. 44; Art. 52, paras. 399, 400). **38**

Art. 49(2) makes a subtle distinction between supplementation and rectification. Whereas the tribunal "may" decide any question which it had omitted to decide in the award, it "shall" rectify any clerical, arithmetical or similar error. In other words, a supplemental decision is discretionary. The rectification of an error is obligatory. **39**

Supplementation under Art. 49(2) will be useful where the omission is due to an oversight on the part of the tribunal which is likely to be corrected by it once this oversight is pointed out. This oversight should however concern a "question" before the tribunal; that is, an issue that affects the award and is of sufficient importance to justify the procedure leading to a supplemental decision. Typical examples would be the inadvertent omission of an item in the calculation of damages or of a factor determining costs. **40**

Art. 49(2) is unlikely to be useful where the omission is the result of a considered and deliberate decision by the tribunal. If an argument put forward by a party **41**

was seen to be irrelevant or a decision on a particular point was regarded as immaterial or inappropriate, it is unlikely that the tribunal can be induced to make a supplemental decision under Art. 49(2) (see Art. 48, paras. 48–50). In a situation of this kind, a request for annulment may be the appropriate course of action (see paras. 68–77 *infra*; Art. 52, paras. 401, 402).

### 4. Practice of Tribunals

**42**    ICSID tribunals have been confronted with requests for supplemental decisions or rectifications in a number of cases. In the resubmitted case in *Amco* v. *Indonesia*, the Award was rendered on 5 June 1990.[57] A Request for Supplemental Decision and Rectification submitted by Amco was registered on 6 August 1990.[58] On 14 August 1990 Indonesia submitted a memorandum in which it urged the Tribunal to decline jurisdiction over the Request and reserved the right to make submissions on the substance of the Request should the Tribunal decide that further proceedings were appropriate. The Tribunal did not fix a time limit for the Respondent's observations as provided for by Arbitration Rule 49(3) (Rule 49(4) of the 1968 Arbitration Rules applicable in the case) (see paras. 32, 35 *supra*) but dealt with the Request in a summary fashion.[59] This failure to give the Respondent an opportunity to present its views later prompted a second *ad hoc* Committee to annul the Decision on Rectification[60] (see Art. 52, paras. 306–308).

**43**    The Request called for decision on seven specified questions which the Tribunal was said to have omitted to decide. It also asked for the rectification of certain matters identified as clerical, arithmetical or similar errors. With one exception, the Tribunal rejected all the points in the request. It held that there was no decision that the Tribunal had omitted to take nor any clerical, arithmetical or similar error that must be rectified on six of the seven points put forward. On one point the Tribunal acknowledged that a clerical, arithmetical or similar error had occurred. The Award's *dispositif* was also amended accordingly.[61] Overall, the Decision is terse, going into very little detail. Apart from the one point where the Tribunal upholds the Request, the Decision merely briefly identifies the points made by

57  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990. The date of 31 May 1990 cited at 1 ICSID Reports 569 is the date of the Award's signature and not the date on which it was rendered in accordance with Art. 49(1).

58  The Decision on this Request states that the Request was submitted on 6 August 1990. This would have made the Request inadmissible as being outside the time limit of 45 days.

59  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Supplemental Decisions and Rectification, 17 October 1990.

60  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 17 December 1992. See *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 693/4 (1993).

61  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Supplemental Decisions and Rectification, 17 October 1990. The date of 10 October 1990 cited in 1 ICSID Reports 638 is the date on which the Decision was signed and not the date on which it was rendered in accordance with Art. 49(1).

Amco and states that there is no reason for a supplemental decision or rectification, without giving any reasons.

In *LETCO* v. *Liberia*, the Award had been dispatched to the parties on 31 March **44** 1986. On 12 May 1986, within the time limit of 45 days, LETCO sent a Request for Rectification to the Secretary-General which was registered on 14 May. The Decision on Rectification contains no mention of a notice to Liberia nor of an observation on the Request by Liberia.[62] The Request for Rectification concerned the calculation of costs and expenses to be awarded to LETCO. The need for this rectification arose from the fact that LETCO had transmitted US $50,000 to ICSID after the Award's completion and signature on 11 March 1986, in response to a request by ICSID of 13 March 1986. Also, LETCO's legal fees had been calculated in the Award on the basis of a statement by its law firm which had since been revised after the closure of proceedings. The Tribunal made the appropriate adjustments in its calculation of reimbursable expenses.[63]

It is not clear whether rectification under Art. 49(2) was the appropriate pro- **45** cedure in this case. The Tribunal had not committed any clerical, arithmetical or similar error but had calculated LETCO's costs and expenses correctly on the basis of the data existing at the time. The information submitted in LETCO's request for rectification was unknown to the Tribunal at the time it drew up the Award. It was also unknown to LETCO before the closure of the proceeding. A request for revision under Art. 51 might have been the more appropriate procedure. In view of the more generous time limits under Art. 51(2) and the possibility of a decision by a different tribunal under Art. 51(3), if the original tribunal is no longer available, this would have given more procedural flexibility. In this particular case the use of rectification rather than revision does not appear to have made any difference.

In *Santa Elena* v. *Costa Rica*, the Tribunal rendered its Award on 17 February **46** 2000. On 30 March 2000, the Claimant submitted a Request for Rectification of three matters in the Award. Dispensing with an oral hearing, the Tribunal fixed time limits for the filing of the Respondent's written observations on the Request and the Claimant's Reply, which were submitted on 3 May and 11 May 2000, respectively.

In the absence of any objection from the Respondent, the Tribunal agreed, in **47** its Decision on Rectification issued on 8 June 2000, to rectify two clerical errors in the text of the Award. A sentence in paragraph 27 of the Award was amended to clarify that the Claimant's Memorial had been accompanied by supporting documentation, whilst another sentence in paragraph 45 was amended to identify correctly the relevant witness in question.[64]

---

62  Liberia had failed to appear or to otherwise participate in the proceedings leading to the Award. (See Art. 45, paras. 15, 18, 19, 25, 44, 52, 74, 88.)

63  *LETCO* v. *Liberia*, Decision on Rectification, 10 June 1986. The decision's precise date is somewhat unclear. The date of 14 May 1986 given at 26 ILM 647 (1987), at 89 ILR 352 and at 2 ICSID Reports 343, 346 and 380 is an obvious error since the Request was only registered on that date. ICSID's homepage gives the date of 10 June 1986.

64  *Santa Elena* v. *Costa Rica*, Decision on Rectification, 8 June 2000, paras. 7, 8.

**48**    The Tribunal refused an application to rectify its summary, in paragraph 61(iii) of the Award, of the Claimant's position "on the relationship of Costa Rican law to international law". The Tribunal held that no rectification of paragraph 61(iii) was required because that paragraph properly summarized the Claimant's position on whether international law or Costa Rican law applied to the dispute generally. It did not address the Claimant's arguments on the particular rules and principles of law applicable to specific questions of compensation, which were separately and accurately described in another section of the Award.[65] Each party was directed to bear its own expenses in connection with the rectification proceedings and the costs of the Tribunal were borne by the parties in equal proportions.

**49**    A Decision on Rectification was also issued in *Maffezini* v. *Spain*. The Tribunal issued its Award on 13 November 2000. On 13 December 2000, the Respondent submitted a Request for Rectification of the Award in accordance with Art. 49(2), requesting an amendment to the Tribunal's summary of the Respondent's arguments. The fee for the application, prescribed in Rule 49(1)(d), was lodged by the Respondent two weeks later. The Tribunal set time limits for the Claimant to file its observations on the Request and for the Respondent to reply, but on 9 January 2001 the Claimant announced that he did not have any observations to make. The Respondent did not file any additional submissions on the Request.

**50**    On 31 January 2001, the Tribunal issued its Decision, agreeing to the rectification requested on the grounds that the Award had contained a "material error".[66] The rectification involved substituting the word "employee" for the word "official" in one sentence of paragraph 45 of the Award in order to convey accurately the Respondent's position on the status of the employees of the state agency SODIGA. Each party bore its own costs incurred in the rectification proceeding.

**51**    In *Genin* v. *Estonia*, the Award was issued on 25 June 2001. On 7 August 2001, the Claimants submitted a Request for Supplementary Decisions and Rectification of the Award, consistent with the requirements of Art. 49 and Rule 49. In accordance with the time limits and procedure set by the Tribunal in consultation with the parties for the filing of further written submissions on the Request, the Claimants filed a Memorial in Support of their Request on 9 November 2001, and the Respondent filed a Memorial in Response on 13 December 2001. The Tribunal advised the parties on 19 December 2001 that a hearing would not be required to discuss the issues arising from the Request. By letters dated 7 January 2002 and 10 January 2002 respectively, the Claimants and the Respondent confirmed that they had no objection to the Tribunal deciding the matter based on the parties' written submissions alone.

**52**    The Tribunal unanimously denied the Request. The Request had not identified any question that the Tribunal had failed to decide. In the Tribunal's view, the request for a supplementary decision related "to issues that Claimants themselves

---

65   At paras. 12–14.
66   *Maffezini* v. *Spain*, Decision on Rectification, 31 January 2001, para. 18.

failed virtually altogether to address in either their written or oral submissions in the arbitration".[67] The Claimants had alleged that the Tribunal had failed to address three substantive provisions of the Estonia-United States bilateral investment treaty. The Tribunal noted that "the extent to which these provisions were ever raised by Claimants is limited to their mere invocation in the concluding paragraphs of certain sections of Claimants' pre-hearing submissions". Besides this, the Tribunal noted that:

> Claimants neither adduced evidence nor made arguments concerning the BIT provisions that they now suggest were "omitted" from the Tribunal's Award. Indeed, the provisions of the BIT in question were not even mentioned by Claimants either during the hearing or in their post-hearing submissions.[68]

Simply put, the Tribunal insisted that it had addressed all of the questions raised **53** by the Claimants "with at least as much seriousness and care as did Claimants themselves in their written and oral submissions". In the Tribunal's view, there was no omission requiring any supplementary decision.[69] The request for rectification of the Award was also denied. The Tribunal had described some of the transactions the Claimants had participated in as "highly questionable". The Tribunal thought this view "speaks for itself" and required no rectification.[70] The Tribunal ordered the Claimants to pay all the costs associated with the proceeding for supplementation and rectification.

In *Vivendi* v. *Argentina*, the *ad hoc* Committee rendered its Decision on Annulment on 3 July 2002. On 16 August 2002, Argentina submitted a request under Art. **54** 49(2) for supplementation and rectification of some aspects of the Decision. The Claimants filed observations on the request on 4 November 2002, and Argentina filed a reply on 6 December 2002.

The Committee was faced with seven independent bases for rectification of **55** its Decision on Annulment, which, Argentina alleged, were so serious "that, unless rectified, they could 'nullify the Decision on Annulment' and prejudice Argentina's position in future ICSID arbitrations".[71] (On the request for a supplementary decision, see paras. 73–76 *infra*.)

The Committee first remarked on the nature of rectification under Art. 49(2), **56** confirming that:

> the availability of the rectification remedy afforded by Article 49(2) depends upon the existence of two factual conditions. First, a clerical, arithmetical or similar error in an award or decision must be found to exist. Second, the requested

---

67  *Genin* v. *Estonia*, Decision on Supplementation and Rectification, 4 April 2002, para. 10.
68  At para. 11.                              69  At paras. 13, 14.
70  At paras. 16–18.
71  *Vivendi* v. *Argentina*, Decision on Supplementation and Rectification of Annulment Decision, 28 May 2003, para. 23. The Claimants were of the view that Argentina was seeking to lay the foundations for arguments it might advance in the resubmitted case. See *Alexandrov, S. A.*, The *Vivendi* Annulment Decision and the Lessons for Future ICSID Arbitrations – The Applicants' Perspective, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 97, 119 (2004).

rectification must concern an aspect of the impugned award or decision that is purely accessory to its merits.[72]

Thus, the sole purpose of a rectification is to correct clerical, arithmetical or similar errors, not to reconsider the merits of issues already decided, nor the "weight or credence" accorded to arguments or evidence put forward by the parties.

**57**    The first alleged error concerned the Committee's finding that the parties were in agreement in respect of CGE's factual acquisition of control of CAA. The Committee denied that it had committed any error. It had not commented on the validity or juridical consequences of that transfer, for example as regards CAA's status as a foreign investor under the ICSID Convention.[73] No error having been found, the Committee rejected the first rectification requested.

**58**    Argentina's second request for rectification alleged that the Committee had erred in suggesting that Argentina had "acknowledged that there exists no presumption either in favour of or against annulment of an arbitral award". The Committee explained that it had summarized complex legal arguments and reached the conclusion, which the parties had independently arrived at in their submissions, that there is no definitive presumption one way or another. As it had not committed any error, the Committee rejected the request for rectification.[74]

**59**    The third request for rectification was rejected on similar grounds. The Committee found that it amounted to an attempt to revise the Committee's summary of the parties' assertions in respect of the possibility for partial annulment and its consequences, rather than to correct any error as such.[75]

**60**    The fourth request alleged that the Committee had erred in not treating Argentina's arguments in relation to the issues arising from the transfer of CAA's shares from DyCASA to CGE as a question of jurisdiction. The request was rejected because it was found to be merely an attempt to rewrite the Committee's summary of the parties' submissions. Moreover, the Committee stressed that it had fully considered Argentina's subsidiary argument relating to jurisdiction.[76]

**61**    The Committee agreed to a rectification in two instances, leading to minor edits to the text of the decision.[77] First, it rectified a clerical error in its summary of the parties' positions. The Committee also rectified its summary of the parties' arguments where it had stated in paragraph 86 of its decision that "neither party disputes" that a tribunal commits an excess of powers if it fails to exercise its jurisdiction. The Committee acknowledged that Argentina had, in its Memorial, contested the point, although not during the oral hearings. The Committee therefore corrected what it admitted "could be seen as a clerical or similar error" by deleting the offending words. The Committee stressed that the error in no way affected the merits of the Decision.[78]

---

72  At para. 25.                    73  At paras. 26, 27.
74  At paras. 28–30.                75  At paras. 31, 32.
76  At paras. 33–35.                77  At paras. 36–37.
78  At paras. 38–40.

Argentina's final request for rectification was rejected because it failed to **62** identify any clerical, arithmetical or similar error susceptible of rectification. Argentina's request sought "to have the Committee substantially alter the summary, in paragraph 93 of the Decision, of what it appreciated as the most relevant aspects of the parties' positions concerning the issue under consideration". The Committee held that there was no identifiable error. The relevant passage captured the essence of Argentina's submissions, in particular, as they were expressed at the oral hearing.[79]

The Committee ordered that the parties would bear their own costs incurred **63** in connection with the Request for Supplementation and Rectification, but that Argentina would pay the entirety of the fees and expenses incurred by the Committee in this phase of the proceeding. The Committee allocated costs in this manner because:

> in all but two instances, the Committee has found that the various requests that comprise Respondent's Request are not only unfounded but inappropriate, consisting essentially of attempts to re-argue substantive elements of the Committee's Decision.[80]

The Award in *Noble Ventures* v. *Romania* was rendered on 12 October 2005. **64** On 18 October, the Respondent submitted to ICSID a Request for Rectification in accordance with Art. 49 to amend the list of persons who represented it as counsel. The Request was unopposed and unanimously accepted by the Tribunal.[81]

A similar decision on rectification was issued on 13 August 2007 by the *ad hoc* **65** Committee in *Soufraki* v. *UAE*. No order for costs was made.[82]

In *LG&E* v. *Argentina*, the Award was issued on 25 July 2007. On 23 August **66** 2007 the Claimants submitted a Request for a Supplementary Decision. The Award had adopted 28 February 2005 as the cut-off date for the calculation of damages for procedural reasons.[83] The Claimants requested a supplementary decision for damages sustained after that date. The parties filed two rounds of written submissions on the Request.[84]

The Tribunal denied the Request. It found that the Request did not concern a **67** question that the Tribunal had omitted to decide in the Award. Rather, the Tribunal had dealt at length with the Claimants' arguments concerning the cut-off date. Therefore, the Claimants were attempting to reopen the discussion of a question that had been dealt with and disposed of by the Tribunal.[85] The Tribunal pointed out that:

---

79   At paras. 41, 42.                    80   At paras. 43, 44.
81   *Noble Ventures* v. *Romania*, Decision on Rectification, 19 May 2006.
82   *Soufraki* v. *UAE*, Rectification of the Annulment Decision, 13 August 2007.
83   *LG&E* v. *Argentina*, Award, 25 July 2007, paras. 92–95.
84   *LG&E* v. *Argentina*, Decision on Supplementation, 8 July 2008, paras. 5–7.
85   At paras. 13–15.

[t]he supplementation process is not a mechanism by which the parties can continue proceedings on the merits or seek a remedy that calls into question the validity of the Tribunal's decision.[86]

### 5. *Supplementation and Annulment*

**68**    The special provision in Art. 49(2) of a remedy for situations in which the tribunal has omitted to decide a question in the award raises the question whether this remedy is exclusive. In other words, if a tribunal fails to discharge its duty under Art. 48(3) to deal with every question submitted to it, is the affected party restricted to a request for a supplementary decision under Art. 49(2) or may it seek annulment in accordance with Art. 52?

**69**    The Convention's *travaux préparatoires* suggest that only supplementation and not annulment is available in this situation.[87] A vote on the question of whether a failure by the tribunal to comply with the duty to rule on every issue would give the parties the right to seek annulment yielded a negative result (History, Vol. II, p. 849) (see para. 29 *supra*; Art. 52, paras. 399, 400). On the other hand, the procedure of self-correction under Art. 49(2) will be useful only in the case of inadvertent omissions of a technical character but not in the case of a considered omission affecting a fundamental aspect of the tribunal's reasoning (see paras. 40, 41 *supra*; Art. 52, paras. 401–412). The grounds for annulment for failure to state reasons (Art. 52(1)(e)), departure from a fundamental rule of procedure (Art. 52(1)(d)) and manifest excess of powers (Art. 52(1)(b)) may be available in case of a failure to decide an essential question[88] (see Art. 52, paras. 113–117, 295, 300, 403–417, 518, 522).

**70**    Successive *ad hoc* committees have addressed this question.[89] In the first annulment proceeding in *Klöckner* v. *Cameroon*, the Application for Annulment listed a number of complaints which were designed to demonstrate that the Tribunal had failed to deal with questions submitted to it. These questions did not concern technical details but fundamental issues going to the core of the claims. The complaints were listed under the heading of failure to state reasons (Art. 52(1)(e)) but included explicitly failure to deal with questions submitted to the Tribunal under Art. 48(3).[90] The *ad hoc* Committee was quite categorical that in this situation annulment was the appropriate remedy:

---

86  At para. 16. See also *Enron* v. *Argentina*, Decision on Supplementation and/or Rectification, 25 October 2007 (not published); *Continental Casualty* v. *Argentina*, Decision on Rectification, 23 February 2009 (not published).

87  See also *Feldman, M. B.*, The Annulment Proceedings and the Finality of ICSID Arbitral Awards, 2 ICSID Review – FILJ 105/6 (1987).

88  See also *Broches, A.*, Die dritte Annullierung eines ICSID-Schiedsspruches – Eine Entgegnung auf F. Niggemann, 11 Praxis des Internationalen Privat- und Verfahrensrechts 295 (1991).

89  See also *Broches, A.*, Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 351/2, 367 (1991); *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 683, 695–697 (1993); *Caron, D. D.*, Reputation and Reality in the ICSID Annulment Process: Understanding the Distinction Between Annulment and Appeal, 7 ICSID Review – FILJ 44/5 (1992).

90  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, at paras. 114, 115.

With regard to Article 48(3) of the Convention, and the obligation to "deal with every question submitted to the Tribunal", it may be noted that there is one sanction in Article 49(2). Article 49(2) provides that: . . . This is not relevant in the present case and the part of Article 48(3) imposing the obligation to give reasons is obviously enforced by Article 52(1)(e).[91]

In the first annulment proceeding in *Amco* v. *Indonesia*, the *ad hoc* Committee **71** also dealt with the relationship of annulment under Art. 52 and supplementation under Art. 49(2). Indonesia had based a claim of nullity on a violation of Art. 48(3) in that the Tribunal had refused to consider some grounds that could have led it to conclude that the revocation of PT Amco's business licence was lawful. Amco contended that a failure by the Tribunal to decide some of the questions submitted to it was not a ground for annulment but merely entitled a party to request the Tribunal to complete or correct the Award under Art. 49(2).[92] The Committee adopted the distinction between unintentional omissions of relatively minor points and a disregard of facts and arguments going to the basis of the award. In this particular case, it confirmed Indonesia's right to rely on Art. 52(1) as a remedy for the omissions, without having first tried supplementation under Art. 49(2):

34. Moreover, Article 49(2) of the Convention must be considered in its entirety. After authorizing a Tribunal to "decide any question which it had omitted to decide in the award", Article 49(2) goes on immediately to direct the Tribunal to "rectify any clerical, arithmetical or similar error in the award". Article 49(2) thus appears to offer a remedy merely for unintentional omissions to decide "any question" ("*question*" in the French text and not "*chef de conclusion*", "*puntos*" in the Spanish text and not "*pretensiones*", . . .).[93] It may be sagely assumed that arbitrators will strive in their award to express clearly at least the main reasons on which the award rests. Any omissions of relatively minor points may be repaired pursuant to Article 49(2) by simply inserting the Tribunal's conclusions thereof in the award, the main reasoning of the award remaining unaffected by such insertion. . . .

35. In the present case, however, Indonesia alleges that the Tribunal had disregarded facts and arguments which, had they been considered, could have obliged the Tribunal to abandon the very bases of its Award. If the Tribunal had accepted as valid any of the arguments invoked in the Application for annulment, their insertion in the Award would have contradicted what had hitherto been the main lines of reasoning of the Award. Thus, the Tribunal would have been obliged to modify the rationale of the Award. However, the full or partial annihilation of the reasoning and conclusion of an award is the very task which the Convention allots to an *ad hoc* Committee created pursuant to Article 52(3) of the Convention, and not to the Tribunal which had rendered the Award.

36. It follows that the remedy provided by Article 49(2) would be inadequate to cope with the allegations set out in the Application before the present *ad hoc* Committee. Further, in line with the international law rule that a claimant does

---

91   At para. 115.
92   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 30, 31.
93   This linguistic comparison refers to Art. 48(3).

not need to exhaust inadequate remedies before resorting to remedies believed to be more efficient, . . . Indonesia can have recourse to Article 52(1) without having previously requested the Tribunal, under Article 49(2), to decide the questions which, according to Indonesia, it had omitted to decide in the Award. This conclusion of the *ad hoc* Committee finds support in Note B to Arbitration Rule 50 prepared by the ICSID Secretariat,[94] and according to which an application for annulment under Arbitration Rule 50 must be made separately from a request for supplementary decisions and rectifications under Arbitration Rule 49.[95]

**72**    In the annulment proceeding in *MINE* v. *Guinea*, Guinea alleged that the Tribunal had failed to address pivotal questions which, had they been resolved in the Government's favour, "would have reversed the Tribunal's liability determination". In Guinea's view, this violation of the Tribunal's obligation to deal with every question, in violation of Art. 48(3), afforded a ground for annulment "as a species of failure to state reasons", even though this is not specifically mentioned in Art. 52(1).[96] The *ad hoc* Committee agreed. After addressing the drafting history of Art. 49(2) (see para. 29 *supra*) it said:

> 5.12 The Committee has considered whether Article 49(2) constitutes the only remedy for non-compliance with the obligation to deal with every question submitted to the tribunal. It has concluded that Article 49(2) provides a satisfactory remedy for the case of a tribunal having failed to exercise its jurisdiction in full. For example, in the present case the Tribunal failed to rule on MINE's claim to be reimbursed for the costs and expenses incurred in the United States District Court and in arbitration before the American Arbitration Association in earlier stages of its conflict with Guinea. Article 49(2) would have provided a specific remedy and, not having invoked it, MINE could not have relied on that failure for purposes of annulment.
>
> 5.13 Guinea's complaint against the Award falls into a different category. Article 49(2) would not have provided a remedy for the Award's failure to deal with questions submitted by Guinea to the Tribunal. The defect complained of by Guinea could not have been cured by supplementing the Award, but would have required in effect that it be reconsidered in the light of the Tribunal's decision on the "omitted" question. The Committee accepts that in such a case failure to deal with a question may render the award unintelligible and thus subject to annulment for failure to state reasons.[97]

**73**    In its Decision on Supplementation and Rectification of the Annulment Decision the *ad hoc* Committee in *Vivendi* v. *Argentina* commented that the nature and purpose of the procedure in Art. 49:

94   1 ICSID Reports 111/12.

95   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 34–36. See also *Broches, A.*, Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 349/50 (1991); *Seidl-Hohenveldern, I.*, Die Aufhebung von ICSID Schiedssprüchen, 2 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 112 (1989).

96   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 2.04. See also *Broches*, Observations, 6 ICSID Review – FILJ 355, 367 (1991); *Sturzenegger, M.*, ICSID Arbitration and Annulment for Failure to State Reasons, 4 Journal of International Arbitration 189 *et seq.* (1992).

97   At paras. 5.12, 5.13.

in no way consists of a means of appealing or otherwise revising the merits of the decision subject to supplementation or rectification. Those sorts of proceedings are simply not provided for in the ICSID system.[98]

**74**    In this instance, Argentina had argued that the Committee had omitted to rule on Argentina's claim that the Tribunal's decision upholding its jurisdiction was undermined by an alleged failure to take account of the manner in which shares in CAA had been transferred from a Spanish entity to CGE, a French entity, without obtaining the express authorization of the Government of Tucumán. Argentina requested the Committee to supplement its Decision on Annulment by taking account of the existence or non-existence of such authorization and the consequences flowing from that finding for the Tribunal's jurisdiction.[99]

**75**    The Committee responded that neither it nor the Tribunal had neglected to consider the circumstances raised in Argentina's Application. Jurisdiction turned on whether CAA was in fact controlled by CGE on the date the dispute was submitted to ICSID. The Committee had noted that it was. The Committee had made "material and substantive findings" on this point in its decision, which belied the factual basis for Argentina's request for a supplementary decision. Whilst the Committee acknowledged that it had not expressly responded to Argentina's legal argument, "the Decision itself demonstrates that, as asserted by Claimants in their written submissions, the Committee in fact considered – and denied – the relevance of Argentina's arguments with respect to jurisdiction".[100] The Committee stressed that "it was not necessary, in order to decide that CGE controlled CAA at the time of the commencement of the arbitration, to decide whether relevant contractual requirements had been met".[101]

**76**    The Committee rejected the application for a supplementary decision because the Committee had already addressed and decided the matters in its Decision on Annulment. Art. 49(2) did not permit a tribunal or committee to revisit the merits of their decisions:

> In no way can it be said that the Committee omitted to address Argentina's arguments. Rather, it appears that Respondent is seeking to reopen a substantive debate that occurred and was resolved during the earlier, merits phase of the annulment proceeding, with a view to having the Committee reconsider its findings concerning CAA's status as an investor subject to the jurisdiction of the Tribunal and the manner in which the issue was addressed by the Tribunal. This is something that, in this exceptional phase of the annulment proceeding, the Committee cannot and will not do.[102]

In other words, a request for supplementation or rectification of a decision on annulment cannot be used to examine the correctness of the underlying tribunal award, rather than the decision on annulment.

---

98    *Vivendi* v. *Argentina*, Decision on Supplementation and Rectification of Annulment Decision, 28 May 2003, para. 11.

99    At para. 14.                          100    At para. 17.

101    At para. 21.                         102    At para. 19.

**77**     This case law on Art. 49(2) confirms the limited relevance of the remedy of supplementation. It is useful for unintentional omissions of a technical nature. As the Committee in *Wena Hotels* v. *Egypt* explained, "a proceeding under Article 49(2) would not allow the Tribunal to go further than to decide upon the question it had omitted to deal with".[103] It is not a sufficient remedy for a failure to address major facts and arguments which go to the core of the tribunal's decision. In the latter case, a party must seek annulment if it can demonstrate one of the grounds listed in Art. 52(1). The *Wena Hotels* Committee observed that "the ground for annulment under Article 52(1)(e) includes therefore the case where the Tribunal omitted to decide upon a question submitted to it to the extent such supplemental decision may affect the reasoning supporting the Award".[104] In that case a prior exhaustion of the lesser remedy of supplementation under Art. 49(2) is not necessary.

### D.  "Its decision shall become part of the award and shall be notified to the parties in the same manner as the award."

**78**     The tribunal's decision on a request for a supplementary decision or rectification becomes part of the award.[105] Under Administrative and Financial Regulation 28(2) certified copies of the award made available by the Secretary-General should reflect any supplemental decision or rectification. Arbitration Rule 49(4) provides that Rules 46–48 dealing with the preparation of the award, the contents and form of the award, the authentication and dispatch of the award and the publication of the award shall apply *mutatis mutandis* to decisions under Art. 49(2) (see para. 37 *supra*).

**79**     As parts of the award, decisions under Art. 49(2) are subject to the remedies provided by the Convention. They may be the object of further supplemental decision or rectification, of an interpretation under Art. 50, of a revision under Art. 51 and of an annulment under Art. 52.

**80**     The provision of Art. 49(1) on the dispatch of certified copies to the parties (see paras. 2–9 *supra*) applies to decisions supplementing or rectifying the original award.

### E.  "The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered."

**81**     Requests for the revision and annulment of awards are subject to time limits. Considering the complexity of some of the cases, these time limits may be difficult to meet. It would be impossible to first await the outcome of a procedure for the supplementation and rectification of an award and then request revision or annulment within the original time limits. Therefore, the time limits for requests for revision and annulment are deferred by the procedure under Art. 49(2).

---

103   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 101.
104   *Loc. cit*.
105   *Maffezini* v. *Spain*, Decision on Rectification, 31 January 2001, para. 20.

The date on which the decision on supplementation or rectification was rendered is determined by the dispatch of its certified copy to the parties in accordance with Art. 49(1) (see paras. 37, 78 *supra*). This date should be noted on the decision by the Secretary-General in accordance with Arbitration Rule 48(1)(b) before its dispatch (see para. 5 *supra*). **82**

The deferral of the time limits for revision and annulment is independent of the success of the request for supplementation and rectification. Even if the tribunal rejects the request under Art. 49(2), the beginning of the time limits for revision and annulment will still run from the date of that decision. **83**

A party that feels that it needs additional time for the preparation of its request for revision or annulment may be tempted to request a decision under Art. 49(2). The effect of deferring the time limits will be achieved even if the request is not promising or concerns a detail of minor relevance. The Secretary-General's power to refuse registration of requests under Art. 49(2) is limited to examining whether the time limit of 45 days for such requests has been complied with (see para. 34 *supra*). He or she may not refuse to register them as being manifestly without merit or devoid of significance. **84**

In the resubmitted case in *Amco* v. *Indonesia*, the Award was rendered on 5 June 1990. The Decision on Supplemental Questions and Rectification was rendered on 17 October 1990[106] (see para. 42 *supra*). The request for the second annulment proceeding was registered on 18 October 1990. Therefore, the request for annulment was comfortably within the time limit as extended by Art. 49(2) but would otherwise have been outside the time limit of 120 days provided by Art. 52(2). **85**

---

106  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Supplemental Decision and Rectification, 17 October 1990.

# Article 50

**(1) If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General.**

**(2) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter. The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision.**

## OUTLINE

*Paragraphs*

I. INTRODUCTION ....................................................... 1–4

II. INTERPRETATION .................................................. 5–45

  A. **"(1) If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General."** ......... 5–29

    1. Disputes Concerning Awards ........................... 5–13

    2. Procedure ................................................ 14–26

    3. Legal Nature of Interpretation ........................ 27–29

  B. **"(2) The request shall, if possible, be submitted to the Tribunal which rendered the award."** ........................ 30–33

  C. **"If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter."** ... 34–41

  D. **"The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision."** 42–45

## I. INTRODUCTION

**1**    Provisions for an authoritative interpretation of judicial decisions are common in the rules governing international adjudication. Typically, they offer a formal procedure for the interpretation of a judgment or award by the original court or tribunal.[1]

---

1  See Art. 60 of the Statute of the International Court of Justice and Arts. 98 and 100 of the Court's Rules; Arts. 33 and 34 of the International Law Commission's 1958 Model Rules on Arbitral Procedure, YBILC 86 (1958-II); Art. 35 of the 1976 UNCITRAL Arbitration Rules, 15 ILM 714 (1976); Art. 33(1)(b) of the 1985 UNCITRAL Model Law, 24 ILM 1310 (1985); Art. 32 of the 1996 CAMCA Arbitration Rules, 35 ILM 1557 (1996); Art. 29(2)(3) of the 1998 ICC Arbitration Rules, 36 ILM 1614 (1997).

*Article 50 – Interpretation* 867

A provision for the interpretation of awards was contained in all drafts leading to the Convention (History, Vol. I, pp. 218–222). The principle was never cast in doubt. Discussions surrounding the draft that eventually matured into Art. 50 concerned mainly the questions whether time limits should be provided for the introduction of a request (see para. 19 *infra*) and whether there should be provision for a stay of enforcement pending a proceeding for interpretation (see para. 42 *infra*). **2**

Art. 50 is the first of three Articles in Section 5 of Chapter IV (Arbitration). Section 5 is entitled "Interpretation, Revision and Annulment of the Award". Curiously, Art. 49(2) dealing with the related post-award measure of supplementation and rectification is located not in this Section but in the previous Section 4 on "The Award". **3**

Art. 50 deals with disputes between parties to arbitration proceedings relating to the interpretation of the award.[2] It should be distinguished from Art. 64 which deals with disputes between Contracting States concerning the interpretation or application of the Convention. The latter type of dispute is to be referred to the International Court of Justice. During the Convention's drafting there was at times confusion as to the distinction between the two procedures (History, Vol. II, pp. 279/80, 354/5). So far, whilst Art. 64 has generated no practice, a Decision on Interpretation has been rendered, in *Wena Hotels* v. *Egypt* (see paras. 7–9 *infra*).[3] **4**

## II. INTERPRETATION

### A. "(1) If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General."

#### 1. Disputes Concerning Awards

The institution of the procedure for interpretation requires the existence of a dispute. Such a dispute must be sufficiently concrete to be susceptible of a specific request for interpretation[4] (see also Arbitration Rule 50(1)(c)(i), para. 15 *infra*). General complaints about the award's lack of clarity would not be admissible. The existence of a dispute also presupposes a certain degree of communication between the parties demonstrating a difference of opinion,[5] but no particular formality is **5**

---

2   The Arbitration (Additional Facility) Rules in Art. 55 contain a differently worded provision on Interpretation of the Award.

3   *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005. A decision on correction and interpretation of an award dated 16 December 2002 was given in *Feldman* v. *Mexico* (AF), Correction and Interpretation of the Award, 13 June 2003, and in *Archer Daniels* v. *Mexico* (AF), Decision on Requests for Supplementary Decision, Interpretation and Correction of the Award, 10 July 2008. These decisions were issued pursuant to the Additional Facility Rules. See also *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 13–17. An interpretation proceeding was pending as at 1 March 2009 in *Tanzania Electric* v. *IPTL*.

4   See also *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, para. 81.

5   See the Judgment of the International Court of Justice in *Request for Interpretation of the Judgment of 20 November 1950 in the Asylum Case*, 1950 ICJ Reports 403. See also *Application for Revision and Interpretation of the Judgment of 24 February 1982 in the Case Concerning the Continental Shelf (Tunisia* v. *Libya)*, 1985 ICJ Reports 217/8, 222/3.

required. It is sufficient if the parties "have actually exposed their divergence of views on definite points in relation to the award's meaning or scope".[6] Moreover, the dispute must have some practical relevance to the award's implementation. Abstract discussions concerning the award's theoretical implications would not amount to a dispute as to the meaning or scope of an award (see also Art. 25, paras. 44–46). However, disputes as to the meaning or scope of an award are not limited to circumstances that would preclude its execution.[7]

**6**     The request for interpretation must relate to the meaning or scope of an existing award. The purpose of interpretation is to clarify points which had been settled with binding force.[8] It must not concern new points which go beyond the limits of the award,[9] or facts arising subsequent to an award save that it may rely upon such facts to establish the existence of a dispute as to the award's meaning.[10]

**7**     In *Wena Hotels* v. *Egypt*, a Tribunal was constituted to determine a request brought by Wena for interpretation of an award finding that Egypt had expropriated its investment in certain hotel enterprises. The request for interpretation had two aspects. First, Wena requested the new Tribunal to give an interpretation of the original Tribunal's finding that its investment had been expropriated. This included the question whether the "expropriation" constituted a total and permanent deprivation of Wena's "fundamental rights of ownership" under a particular hotel lease contract (the "Luxor Lease"). Subsequent legal actions by Egypt seemed to presume the contrary. Wena also sought confirmation that the expropriation had taken place on 1 April 1991.

**8**     Secondly, Wena requested the Tribunal to address the consequences of the expropriation of Wena's rights for its relationships with third parties, among them EGOTH, the Egyptian General Company for Tourism and Hotels. EGOTH had served Wena with a claim for US $3,532,791.67 for rent allegedly due under the Luxor Lease. Wena requested the Tribunal to clarify whether or not Wena, as party to the lease, could continue to incur any liability associated with those rights after the date of the expropriation.

**9**     The Tribunal insisted that the request for interpretation "must relate to the meaning or scope of what has been decided with binding force, thus in principle to the award's operative section", although it is permissible to elucidate what was actually decided by reference to the tribunal's reasoning.[11] Although Egypt had fully satisfied the pecuniary obligations under the Award, the Tribunal found that

---

6   *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, para. 81.
7   At para. 87.                                        8   At para. 106.
9   *Asylum Case*, 1950 ICJ Reports 402, and *Interpretation of the Decision of 20 June 1977 in Delimitation of the Continental Shelf Case* (*France* v. *United Kingdom*), Court of Arbitration Decision, 14 March 1978, 54 ILR 139 at p. 171 (1978).
10   *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, para. 91.
11   At paras. 82, 89. Also *Interpretation of Judgments Nos. 7 and 8 in the Case concerning the Factory at Chórzow*, Judgment, 16 December 1927, PCIJ Series A, No. 13 at p. 12, *Continental Shelf Case (Tunisia* v. *Libya)*, *supra*, at p. 218, and *Interpretation of the Decision of 20 June 1977 in Delimitation of the Continental Shelf Case* (*France* v. *United Kingdom*), Decision, 14 March 1978, 54 ILR 139 at p. 170 (1978).

Egypt denied that the expropriation had a total and permanent effect. Also, Egypt was equivocal as to the date of the expropriation, and denied that the Tribunal had made any ruling on the rights and obligations of Wena under the Luxor Lease.[12] The new Tribunal was therefore satisfied that there was a dispute between the parties as to the meaning of the term "expropriation" as used in the operative section of the Award.[13]

The new Tribunal resolved that the expropriation was a total and permanent **10** deprivation of Wena's rights under the Luxor Lease, effective from 1 April 1991. Egypt, as a party to the Award, was precluded from taking legal actions that presumed the contrary.[14] The approach the Tribunal took in reaching this conclusion was based on an analysis of the reasoning in the Award, but also took into account the fact that the original Tribunal had been aware, when making its decision, that Wena had re-entered the Luxor Hotel. The manner and the date from which the original Tribunal had calculated its award of compensation confirmed that it had found that there had been an expropriation.[15]

The Tribunal rejected the second branch of the application for interpretation **11** as inadmissible because the award had not addressed the consequences of the expropriation on the legal relationships between Wena and third parties. The request was therefore "outside the scope of the Original Award".[16] Whilst the original Tribunal might have contemplated issues arising as to the consequences of its finding, the tribunal rejected Wena's submissions in the light of:

> . . . the purpose of interpretation, namely, to give a clarification of what has been decided with binding force without adding new facts and arguments. It is for the parties in the initial proceedings to present their case and to establish the limits of the Award.[17]

The procedure of interpretation is not applicable to decisions preliminary to **12** awards such as decisions on jurisdiction or on provisional measures.[18] To the extent that such preliminary decisions are eventually incorporated into awards, they become subject to the procedure of interpretation. Art. 50 is designed for situations in which the tribunal has terminated its activity. It is clear that the procedure provided by Art. 50 is also available in respect of an award by a

---

12  *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, para. 99.
13  At para. 100.                              14  At para. 132.
15  At paras. 122–126.                         16  At para. 127.
17  At para. 129.
18  In *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 13–17, Mexico requested a correction and interpretation of certain alleged translation errors of the Spanish version of the Tribunal's Decision on Jurisdiction of 26 June 2002. The Acting Secretary-General confirmed that an application under Articles 56 and 57 (now 55 and 56) of the Arbitration (Additional Facility) Rules, dealing with interpretation and correction, was inappropriate in respect of preliminary decisions, but that it was open to a party to ask the Tribunal to clarify, correct or supplement a preliminary or interim decision under Rule 35. The Tribunal indicated that, whilst still exercising its functions and prior to the closure of the proceedings, it could exercise such powers of its own motion or on the request of a party. The Tribunal rejected the request for interpretation indicating that the Decision was clear and that the issue was irrelevant for the further proceedings.

new tribunal constituted after the original award's annulment in accordance with Art. 52(6).

13    The procedure of interpretation is not available with respect to the decision of an *ad hoc* committee. Art. 52(4) enumerates the provisions of the Convention that apply, *mutatis mutandis*, to proceedings before *ad hoc* committees. These include Art. 49 dealing with supplementation and rectification and Art. 53 dealing with the award's binding force. But they do not include Arts. 50, 51 and 52. It follows that these procedures, including interpretation, cannot be used with respect to a decision on annulment. Any dispute as to the meaning and scope of a decision on annulment would have to be settled, not by way of an interpretation by the *ad hoc* committee under Art. 50, but by the tribunal in the resubmitted case under Art. 52(6).[19]

## 2. Procedure

14    The request for interpretation must come from one of the parties to the original arbitration proceeding. The idea that a Contracting State that was not a party to proceedings but is asked to enforce an award might request an interpretation was aired during the provision's drafting but not pursued (History, Vol. II, pp. 845/6). Also, a suggestion to allow the tribunal to give an interpretation of its award on its own initiative was not taken up (at p. 846).

15    The procedure for the institution of the procedure of interpretation is regulated in Arbitration Rule 50. It provides in relevant part:

### Rule 50
#### *The Application*

(1) An application for the interpretation, revision or annulment of an award shall be addressed in writing to the Secretary-General and shall:

    (a) identify the award to which it relates;

    (b) indicate the date of the application;

    (c) state in detail:

        (i) in an application for interpretation, the precise points in dispute;

        . . .

    (d) be accompanied by the payment of a fee for lodging the application.

(2) Without prejudice to the provisions of paragraph (3), upon receiving an application and the lodging fee, the Secretary-General shall forthwith:

    (a) register the application;

    (b) notify the parties of the registration; and

    (c) transmit to the other party a copy of the application and of any accompanying documentation.

(3). . .

---

19   See *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988.

*Article 50 – Interpretation*    871

The application must not only adequately identify the award to which it relates **16** but must state the precise points on which an interpretation is sought. A general request for clarification will not suffice.

The Tribunal in *Wena Hotels* v. *Egypt* confirmed, in the light of Art. 50(1) **17** and Arbitration Rule 50(1), that two conditions govern the admissibility of an application for interpretation:

> 76. Taken together, the relevant provisions of the ICSID Convention and the ICSID Arbitration Rules thus establish two main conditions for the admissibility of an application for interpretation: first, there has to be a dispute between the original parties as to the meaning or scope of the award; second, the purpose of the application must be to obtain an interpretation of the award.[20]

The Tribunal emphasized that these twin conditions are to be applied mindful that "the admissibility of an application for interpretation has to be balanced against the principle that an ICSID award is final and binding on the parties to the dispute".[21]

If a party also seeks other remedies such as supplementation and rectification **18** (Art. 49(2)), revision (Art. 51) or annulment (Art. 52) it should do so by filing separate applications. This is necessary in view of the different time limits and procedures for these remedies.[22] For instance, the Secretary-General may refuse to register an application for rectification or revision as being outside the time limits of Arts. 49(2) or 51(2) whereas an application for interpretation may still be admissible.

Art. 50 does not provide a time limit for an application requesting an inter- **19** pretation. In this respect, interpretation differs from the related provisions on supplementation and rectification (Art. 49(2)), revision (Art. 51(2)) and annulment (Art. 52(2)). It also differs from most provisions on interpretation in other rules regulating international adjudication.[23] The early drafts to the Convention still foresaw a time limit (History, Vol. I, p. 218). In the ensuing debate, it was pointed out that an award might impose a continuing obligation over a long period and that questions of interpretation might arise at any time during that period (History, Vol. II, pp. 339, 340, 341, 422, 845, 846, 987). On the other hand, there was apprehension that requests for interpretation that were combined with a stay of enforcement (see paras. 42–45 *infra*) might lead to unacceptable delays in the award's implementation (at pp. 340, 845, 846). A vote in the Legal Committee on the question of time limits produced a majority against such a limitation (at p. 847). A stay of enforcement was left to the tribunal's discretion (see paras. 42–45 *infra*).

---

20    *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, para. 76. See also *Interpretation of Judgments Nos. 7 and 8 in the Case concerning the Factory at Chórzow*, Judgment, 16 December 1927, PCIJ Series A, No. 13, p. 10, and the *Asylum Case*, *supra*, p. 402.

21    At para. 103.

22    See Note B to Arbitration Rule 50 of 1968, 1 ICSID Reports 112.

23    See para. 1 *supra*. Of the provisions cited there, only those relating to the International Court of Justice do not provide for a time limit.

872                    THE ICSID CONVENTION: A COMMENTARY

**20**     In *Wena Hotels* v. *Egypt*, Wena filed an application for interpretation of the Award three and a half years after the original Award had been rendered.[24] In the interim, an application for annulment had been heard and denied.[25]

**21**     The absence of a time limit means not only that a request for interpretation may be submitted at any time after the award has been rendered. It also means that successive requests may be made at different times without any limitation.

**22**     The absence of a time limit for an application for interpretation also means that the Secretary-General has no screening power with regard to such requests, except to verify that the request relates to an award (see paras. 6, 12 and 13 *supra*) and that it is by a party to the case. The Secretary-General has the power to refuse to register a request for a supplementary decision or rectification, or for revision and annulment, as being outside one of the time limits (Arbitration Rules 49(5) and 50(3)), but he or she does not have this power with regard to an application for interpretation.

**23**     The applicability of the Arbitration Rules is extended in general terms to the procedure for the award's interpretation:

> **Rule 53**
> *Rules of Procedure*
> The provisions of these Rules shall apply *mutatis mutandis* to any procedure relating to the interpretation, revision or annulment of an award and to the decision of the Tribunal or Committee.

**24**     Unlike Art. 49(2) on supplementation and rectification, Art. 50 does not provide specifically for notice to the other party of a request for interpretation. But Arbitration Rule 50(2) (see para. 15 *supra*) instructs the Secretary-General to notify the parties of the registration of an application and to transmit a copy of the application to the other party. The general applicability of the Arbitration Rules means that the other party's right to be heard will be safeguarded. If necessary, the tribunal may invite the parties to make written submissions and may conduct oral hearings. In *Wena Hotels* v. *Egypt*, the Tribunal did, in fact, conduct an oral hearing.[26] Procedural arrangements made by the parties for the original proceeding (see Art. 44, paras. 10–31) will remain in force unless agreed otherwise by the parties.[27]

**25**     The introduction of a time limit for the preparation of a decision on interpretation was rejected during the Convention's drafting (History, Vol. II, p. 847) but the general extension of the Arbitration Rules to the procedure for interpretation

---

24   In *Wena Hotels* v. *Egypt* the Award was rendered on 8 December 2000. The application for interpretation was introduced on 29 June 2004. The decision on interpretation was rendered on 31 October 2005.
25   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002.
26   *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, paras. 10, 14.
27   See Notes A and B to Arbitration Rule 53 of 1968, 1 ICSID Reports 114.

would include Rule 46 setting a limit of 120 days which may be extended by a further 60 days, if necessary, to draw up the award.

The provisions on signature, dates and individual opinions in Rule 47(2) and (3) **26** are applicable. This also extends to the formalities for authentication and dispatch to the parties under Rule 48. In accordance with Administrative and Financial Regulation 28(2) any decision on interpretation should be reflected on all certified copies of awards made available by the Secretary-General in accordance with Art. 49(1) of the Convention. Since the certified copies of the original award will normally be dispatched before a decision on interpretation can be made, this can only apply to "additional certified copies of the award" in accordance with Arbitration Rule 48(3).

### 3. Legal Nature of Interpretation

Art. 50 contains procedural provisions but does not offer a statement on the **27** legal nature of an interpretation thus obtained. Unlike Art. 49(2), it does not state that the decision on interpretation shall become part of the award. During the Convention's drafting, a proposal providing that an interpretation given to the award by the tribunal shall have effect as part of the award was defeated (History, Vol. II, pp. 845, 847).

On the other hand, Art. 53(2) provides that for the purposes of the Section on **28** "Recognition and Enforcement of the Award", that is Arts. 53–55, "award" shall include a decision interpreting, revising or annulling the award pursuant to Arts. 50, 51 and 52. Therefore, for purposes of recognition and enforcement, the award will be binding as interpreted in accordance with Art. 50.

The refusal to assign to a decision on interpretation the status of an award or **29** part of an award except for purposes of recognition and enforcement means that the decision on interpretation cannot itself be the object of supplementation and rectification (Art. 49(2)), interpretation (Art. 50), revision (Art. 51) and annulment (Art. 52). The provisions of Arts. 48 and 49(1) dealing with the award and its dispatch are applicable to a decision on interpretation to the extent that these Articles are reflected in the Arbitration Rules. Since Arbitration Rule 53 (see para. 23 *supra*) extends the Rules generally to the procedure relating to interpretation, revision or annulment, Rule 47 dealing with the form and contents of awards and Rule 48 dealing with the authentication, dispatch and publication of awards will apply *mutatis mutandis* to decisions interpreting awards.

### B. "(2) The request shall, if possible, be submitted to the Tribunal which rendered the award."

Since the purpose of the procedure for interpretation is to elucidate the meaning **30** of the original award, it seems logical to try to obtain an explanation from the tribunal that drew up that award. The Arbitration Rules prescribe the following procedure for reconstituting the tribunal:

### Rule 51

*Interpretation or Revision: Further Procedures*

(1) Upon registration of an application for the interpretation or revision of an award, the Secretary-General shall forthwith:

> (a) transmit to each member of the original Tribunal a copy of the notice of registration, together with a copy of the application and of any accompanying documentation; and
>
> (b) request each member of the Tribunal to inform him within a specified time limit whether that member is willing to take part in the consideration of the application.

(2) If all members of the Tribunal express their willingness to take part in the consideration of the application, the Secretary-General shall so notify the members of the Tribunal and the parties. Upon dispatch of these notices the Tribunal shall be deemed to be reconstituted.

(3) [see para. 36 *infra*].

**31**    This procedure is analogous to the original constitution of the tribunal under Arbitration Rule 6. But Rule 6(2) dealing with the declaration by the arbitrators does not apply since all members will have signed such a declaration already.[28]

**32**    Participation by the original arbitrators in proceedings for the interpretation of an award is voluntary. An interpretation by the original tribunal is contingent upon all members of that tribunal expressing their willingness to take part in proceedings for interpretation. A majority of the original arbitrators will not suffice. Therefore, even if only a dissenting member of the original tribunal, who did not participate in the drafting of the award, refuses to take part, an interpretation by the original tribunal is not possible.

**33**    While participation in the interpretation proceedings by members of the original tribunal is voluntary, the tribunal once constituted is under an obligation to give a decision on interpretation.[29] By virtue of Rule 53 (see para. 23 *supra*), Rule 47(1)(i) applies, which provides that the tribunal must decide on every question submitted to it, together with the reasons upon which the decision is based.

### C. "If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter."

**34**    A request for an interpretation is not subject to a time limit (see paras. 19–22 *supra*). This means that requests can be made a considerable time after the award has been rendered. This is possible, particularly, if the award imposes continuing obligations upon the parties which are to be discharged over a period of time. Indeed successive requests for interpretation could be made at different times.

**35**    The availability of the original tribunal becomes increasingly unlikely with the passage of time. Even if only one arbitrator becomes unavailable, the entire tribunal

---

28    See Note B to Arbitration Rule 51 of 1968, 1 ICSID Reports 113.

29    Under Art. 49(2) supplementation is optional but rectification is obligatory (see Art. 49, para. 39).

must be constituted anew. This constitution is to take place in accordance with
Section 2 of Chapter IV, entitled "Constitution of the Tribunal" and comprising
Arts. 37–40.

Arbitration Rule 51 (see para. 30 *supra*) provides for the following step by the     **36**
Secretary-General:

> (3) If the Tribunal cannot be reconstituted in accordance with paragraph (2),
> the Secretary-General shall so notify the parties and invite them to proceed, as
> soon as possible, to constitute a new Tribunal, including the same number of
> arbitrators, and appointed by the same method, as the original one.

The default procedure stipulated in Arbitration Rule 51(3) was followed in          **37**
*Wena Hotels* v. *Egypt*. In constituting a new Tribunal, Wena exercised its right
to appoint one of the arbitrators from the original Tribunal. Egypt appointed a
new arbitrator, and the two party-appointed arbitrators agreed on a third presiding
arbitrator.[30]

The use of the same number of arbitrators and of the same method of their           **38**
appointment is a matter of convenience. It replaced a version in the First Draft to
the Convention which mandated the constitution of the new tribunal in accordance
with the agreement, if any, leading to the constitution of the first tribunal (History,
Vol. I, p. 222; Vol. II, pp. 846, 949). The idea of using the same method for the
constitution of the new tribunal as for the original one is that the new tribunal can
be constituted more quickly.[31] This would dispense with the procedure provided
by Arbitration Rule 2 to settle the method for the constitution of the tribunal
or with the notification to the Secretary-General under Rule 1(2) of a previous
agreement on the appointment of arbitrators.

But the parties are not bound by the Secretary-General's invitation to use the       **39**
same number of arbitrators and the same method for their appointment. They may
use a different, presumably smaller, number and may use a different, presumably
simpler, method of appointment.

There is no reason why some or one of the arbitrators who served on the             **40**
original tribunal should not be appointed to a reconstituted tribunal for purposes
of interpreting the award. Indeed, one arbitrator from the original Tribunal was
appointed to the new Tribunal constituted for purposes of interpretation in *Wena*
v. *Egypt*. The presence of arbitrators who are familiar with the case will expedite
proceedings and their involvement in the drafting of the award will help to explain
its meaning. Therefore, it is possible and may even be advisable to appoint the
remaining arbitrators if one arbitrator becomes unavailable. But the mandatory
provision of the Convention's Art. 37(2)(a), whereby a tribunal shall consist of
a sole arbitrator or an uneven number of arbitrators, remains applicable. Even if
in a tribunal of three arbitrators the dissenting arbitrator becomes unavailable for
interpretation, it is not possible to submit the question to be interpreted to a tribunal

---

30   *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, para. 8. The interpretation
      proceeding in *Tanzania Electric* v. *IPTL* was before the original Tribunal.
31   See Note C to Arbitration Rule 51 of 1968, 1 ICSID Reports 113.

consisting only of the two remaining arbitrators who drafted the majority award. The new tribunal would have to include at least one new arbitrator or consist of only one of the original arbitrators as sole arbitrator.

**41**    Of course it is permissible to appoint new arbitrators in lieu of the original ones even if the original ones are available. New arbitrators must strive to remain faithful to the considerations and approach of the original tribunal. Their task is to ascertain the meaning of the original award and not to rewrite it.[32]

### D. "The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision."

**42**    A possible stay of enforcement was discussed intensively in the deliberations on the drafting of Art. 50. The Working Paper and the Preliminary Draft foresaw an automatic stay of enforcement upon the submission of a request for interpretation (History, Vol. I, pp. 218, 220). This raised fears that applications for interpretation might be used to delay enforcement (History, Vol. II, pp. 339, 340, 341). When the time limit for applications for interpretation was removed (see para. 19 *supra*) it was also decided to make a stay of enforcement discretionary (at pp. 422, 723, 845, 846, 885, 887, 987). A proposal to make a decision by the tribunal to stay enforcement mandatory rather than discretionary (at p. 818) was defeated in a vote (at p. 848). A suggestion that the tribunal should merely have the power to "recommend" a stay of enforcement was also defeated (at p. 847).

**43**    Under Art. 50(2) a stay of enforcement can only be ordered by the tribunal itself. Therefore, a provisional stay of enforcement before the constitution of the tribunal for purposes of interpreting the award is not possible. This is in contrast to Arts. 51(4) and 52(5) dealing with a stay of enforcement in cases of application for revision and annulment. These latter provisions provide for a nondiscretionary provisional stay of enforcement upon the request of the applicant until the tribunal or *ad hoc* committee can decide the matter.

**44**    Arbitration Rule 54 deals with the procedure for the stay of enforcement of an award. It provides in those parts relevant to interpretation:

**Rule 54**

*Stay of Enforcement of the Award*

(1) The party applying for the interpretation, revision or annulment of an award may in its application, and either party may at any time before the final disposition of the application, request a stay in the enforcement of part or all of the award to which the application relates. The Tribunal or Committee shall give priority to the consideration of such a request.

. . .

(3) If a stay of enforcement has been granted pursuant to paragraph (1) . . . , the Tribunal or Committee may at any time modify or terminate the stay at the

---

32  See also *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 685 (1993).

request of either party. All stays shall automatically terminate on the date on which the final decision is rendered on the application, . . .

(4) A request pursuant to paragraph (1), . . . or (3) shall specify the circumstances that require the stay or its modification or termination. A request shall only be granted after the Tribunal or Committee has given each party an opportunity of presenting its observations.

(5) The Secretary-General shall promptly notify both parties of the stay of enforcement of any award and of the modification or termination of such a stay, which shall become effective on the date on which he dispatches such notification.

A stay of enforcement may be granted upon the request of either party but **45** not upon the tribunal's own initiative. The stay may be granted for part or all of the award as the circumstances may appear to justify.[33] The tribunal may modify or terminate the stay of enforcement at any time at the request of either party. A request may only be granted after the tribunal has heard both sides. A stay of enforcement will terminate automatically on the date on which the decision on interpretation is rendered.[34] All notifications become effective upon their dispatch by the Secretary-General. Under Administrative and Financial Regulation 28(2), certified copies of awards issued by the Secretary-General while a stay of enforcement is in effect shall reflect such stay.

---

33   See also Note C to Arbitration Rule 54 of 1968, 1 ICSID Reports 115.
34   See also Note B(b) to Arbitration Rule 54 of 1968, 1 ICSID Reports 115.

# Article 51

**(1) Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence.**

**(2) The application shall be made within 90 days after the discovery of such fact and in any event within three years after the date on which the award was rendered.**

**(3) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter.**

**(4) The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request.**

## OUTLINE

*Paragraphs*

I. INTRODUCTION — 1–3
II. INTERPRETATION — 4–41
    A. **"(1) Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence."** — 4–25
        1. Revision of Awards — 4–6
        2. Procedure — 7–15
        3. Decisive New Facts — 16–24
        4. Legal Nature of Revision — 25
    B. **"(2) The application shall be made within 90 days after the discovery of such fact and in any event within three years after the date on which the award was rendered."** — 26–31
    C. **"(3) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be**

**possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter."**                                    32–33

D.   **"(4) The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request."**                                    34–41

## I. INTRODUCTION

Revision involves a substantive alteration of the original award on the basis of newly discovered facts that were unknown when the award was rendered. The Convention's text is modelled on the International Court of Justice's Statute (Art. 61).[1] Revision is not widely used in international adjudication. Other documents regulating international arbitration rarely provide for it.[2] In practice though, international tribunals may have an inherent power to reopen proceedings in order to revise awards, notwithstanding the absence of an express provision in their governing instruments.[3]    **1**

The drafts leading to the Convention all contained provisions for the revision of awards in terms similar to what eventually became Art. 51 (History, Vol. I, pp. 222–230). The desirability of a procedure for revision was hardly ever challenged in principle (but see History, Vol. II, pp. 422/3). The discussion concerned mainly the time limits for making a request (see para. 26 *infra*) and the modalities of a stay of enforcement once a request has been made (see para. 34 *infra*).    **2**

Art. 51 is the second of three Articles in Section 5 of Chapter IV dealing with "Interpretation, Revision and Annulment of the Award". Like Art. 50 (Interpretation), Art. 51 provides that any revision shall be made, if possible, by the same tribunal that rendered the award. By contrast, annulment under Art. 52 is always carried out by a separate *ad hoc* committee. Unlike Art. 50 (Interpretation), Art. 51 imposes time limits for a request for revision. Art. 52 on annulment also establishes time limits although they are different. All three Articles provide for a discretionary stay of enforcement by the tribunal or *ad hoc* committee. But only Arts. 51 and 52 provide for an immediate and automatic stay of enforcement if requested in the application. Practice under the ICSID Convention shows only three examples of the use of Art. 51 and, as at 1 March 2009, no published decision. In *AMT* v. *Zaire*, the Respondent made an application for revision of the Award (see also paras. 30,    **3**

---

1   See also Arts. 99 and 100 of the Rules of Court. For commentary see *Geiß, R.*, Revision Proceedings before the International Court of Justice, 63 ZaöRV 167 (2003).

2   But see Art. 38 of the International Law Commission's 1958 Model Rules on Arbitral Procedure, YBILC 86 (1958-II).

3   See *Caron, D./Caplan, L./Pellonpää, M.*, The UNCITRAL Arbitration Rules: A Commentary 914–925 (2006); *Weiss, F.*, Inherent Powers of National and International Courts, *in*: The WTO Dispute Settlement System 1995–2003 (*Ortino, F./Petersmann, E.-U.* eds.), 177, 185/6 (2004).

38 *infra*).[4] As at 1 March 2009, revision proceedings were pending in *Pey Casado* v. *Chile* and *Siemens* v. *Argentina*.

# II. INTERPRETATION

**A. "(1) Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence."**

## *1. Revision of Awards*

4     The request must relate to an award. The procedure of revision is not applicable to decisions preliminary to awards such as decisions on jurisdiction or on provisional measures. To the extent that such preliminary measures are eventually incorporated into awards they become subject to revision.

5     Art. 51 is designed specifically for situations in which the tribunal has terminated its activity. A tribunal that is still in session can always revise its preliminary decisions informally. It is clear that the procedure provided by Art. 51 is also available in respect of an award by a new tribunal constituted after the original award's annulment in accordance with Art. 52(6).

6     The procedure of revision is not available with respect to the decision of an *ad hoc* committee. Art. 52(4) enumerates the provisions of the Convention that apply, *mutatis mutandis*, to proceedings before *ad hoc* committees. These include Art. 49 dealing with supplementation and rectification and Art. 53 dealing with the award's binding force. But they do not include Arts. 50, 51 and 52. It follows that these procedures, including revision, cannot be used with respect to a decision on annulment. Therefore, the final decision of an *ad hoc* committee is not subject to revision. A revision proceeding was commenced in *Siemens* v. *Argentina*, however, following an application for annulment, based on new facts alleged to affect the original Award.

## *2. Procedure*

7     The institution of the procedure for revision does not require the existence of a dispute between the parties. There is no need for prior communication between the parties demonstrating a difference of opinion. In view of the award's *res judicata* effect, a party has a right to revision even if there is no disagreement as to the

---

4   *AMT* v. *Zaire*, Award, 21 February 1997. The Application for Revision was submitted on 29 January 1999. After the Tribunal's reconstitution, the parties reached a settlement and the Tribunal issued an order on 26 July 2000 noting the discontinuance of the proceeding pursuant to Arbitration Rule 44.

existence and relevance of new facts. This is also reflected in the different texts of Arts. 50 and 51.

The request for revision must come from one of the parties to the original **8** proceeding. The tribunal may not undertake a revision of its award on its own initiative. Nor is it possible for the Secretary-General to initiate revision.

The procedure for the institution of revision is regulated in Arbitration Rule 50. **9** It provides in relevant part:

### Rule 50
*The Application*

(1) An application for the interpretation, revision or annulment of an award shall be addressed in writing to the Secretary-General and shall:

    (a) identify the award to which it relates;

    (b) indicate the date of the application;

    (c) state in detail:

      . . .

      (ii) in an application for revision, pursuant to Article 51(1) of the Convention, the change sought in the award, the discovery of some fact of such a nature as decisively to affect the award, and evidence that when the award was rendered that fact was unknown to the Tribunal and to the applicant, and that the applicant's ignorance of that fact was not due to negligence;

      . . .

    (d) be accompanied by the payment of a fee for lodging the application.

(2) Without prejudice to the provisions of paragraph (3), upon receiving an application and the lodging fee, the Secretary-General shall forthwith:

    (a) register the application;

    (b) notify the parties of the registration; and

    (c) transmit to the other party a copy of the application and of any accompanying documentation.

(3) The Secretary-General shall refuse to register an application for:

    (a) revision, if, in accordance with Article 51(2) of the Convention, it is not made within 90 days after the discovery of the new fact and in any event within three years after the date on which the award was rendered (or any subsequent decision or correction).

    . . .

(4) If the Secretary-General refuses to register an application for revision, or annulment, he shall forthwith notify the requesting party of his refusal.

The application must not only adequately identify the award to which it relates **10** but must state the precise points on which a change is sought in the award. It must also specify the new facts which are to affect the award decisively. In addition, the application must contain evidence that these facts were unknown to the applicant and to the tribunal and that the applicant's ignorance was not due to negligence. In view of the Secretary-General's duty to refuse registration of an application that is outside the 90-day time limit, it should also state the date on which the new fact was discovered.

**11**      If a party also seeks other remedies such as supplementation and rectification (Art. 49(2)), interpretation (Art. 50) or annulment (Art. 52), it should do so by filing separate applications. This is necessary in view of different time limits and procedures for these remedies.[5] For instance, the Secretary-General may refuse to register an application for rectification as being outside the time limit of Art. 49(2), whereas an application for revision may still be admissible under Art. 51(2). Applications for interpretation or annulment may still be admissible under Arts. 50 and 52(2) while an application for revision is already inadmissible under Art. 51(2).

**12**      In *Siemens* v. *Argentina*, a request for revision of the Award[6] was submitted by Argentina at a time when annulment proceedings were already pending. The *ad hoc* Committee suspended the annulment proceedings in order to await the outcome of the proceedings for revision.

**13**      The Secretary-General has to ascertain whether the application relates to an award, is made by a party and was submitted within the time limits of Art. 51(2) (see paras. 26–31 *infra*). The time limit of three years from the date on which the award was rendered is easy to ascertain. Determining the date on which the new fact was discovered and from which a time limit of 90 days is to run is more difficult. Arbitration Rule 50 in its original version of 1968 did not charge the Secretary-General with supervising this latter time limit.[7] It is likely that the Secretary-General will restrict him- or herself to ascertaining whether the application is made within 90 days of the day on which the application asserts the new facts were discovered.

**14**      Neither the Convention nor the Arbitration Rules foresee a refusal of a registration of an application for revision for other reasons. During the Convention's drafting there was some discussion of a possible procedure to obtain leave for review, for which a *prima facie* case would have been required (History, Vol. II, p. 422). There was also a question concerning a possible duty of the Secretary-General to determine whether the relevant facts were indeed unknown to the tribunal and to the applicant and whether the applicant's ignorance was not due to negligence (at p. 848). None of these ideas was pursued. However, under Rule 50(1)(c)(ii) of the Arbitration Rules (see para. 9 *supra*), the Secretary-General may ascertain whether an application states in detail the change sought in the award, the discovery of some fact of such a nature as decisively to affect the award, and evidence that when the award was rendered that fact was unknown to the Tribunal and to the applicant, and that the applicant's ignorance of that fact was not due to negligence. Before registering an application, the Secretary-General may request the applicant to address in more detail those elements such as the discovery of

---

5   See Note B to Arbitration Rule 50 of 1968, 1 ICSID Reports 112.
6   *Siemens* v. *Argentina*, Award, 6 February 2007.
7   1 ICSID Reports 111. See also Note C to Arbitration Rule 50 of 1968.

the fact invoked in the application as well as the explanation for the applicant's ignorance of that fact at the time the Award was rendered.

Arbitration Rule 53 extends the applicability of the Arbitration Rules, *mutatis mutandis*, to any procedure relating to the interpretation, revision or annulment of an award and to the resulting decision of the tribunal or *ad hoc* committee. Some of the implications of Rule 53 are discussed in the context of the procedure for interpretation (see Art. 50, paras. 23–26). The observations made there also apply to the procedure for revision. **15**

### 3. Decisive New Facts

Revision is contingent upon the discovery of new facts that are capable of affecting the award decisively. The discovery of the non-existence of a decisive fact will fulfil the requirement of the discovery of a new fact. The discovery of a new document may also fall within the scope of new "facts". **16**

The new element must be one of fact and not of law.[8] This applies also to the legal consequences of new facts which may impact upon an award.[9] A suggestion to allow revision also in cases where the award is manifestly erroneous in law was not pursued during the Convention's drafting (History, Vol. II, p. 847). There was also an unsuccessful suggestion that revision might be used if the tribunal has not decided some of the matters submitted to it (at p. 848). **17**

The fact must be capable of affecting the award decisively. It must be of such a nature that it would have led to a different decision had it been known to the tribunal. A new fact that would not have a decisive effect on the award does not warrant reopening the case for revision.[10] The new fact may relate to jurisdiction or to the merits. A fact that would have led to a different outcome on the merits, such as a finding that a party had not committed an illegal act for which it is held responsible, is clearly decisive. Facts that affect the calculation of damages are also decisive. It is less clear whether facts that lead to different reasons but do not affect the award's *dispositif* are decisive.[11] A finding by an international court or tribunal that a violation of a legal obligation has occurred may, under certain circumstances, constitute appropriate satisfaction in itself.[12] Therefore, a fact that **18**

---

8  See the Judgment of the International Court of Justice in *Application for Revision of the Judgment of 11 July 1996 in the Case concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Yugoslavia* v. *Bosnia and Herzegovina)*, 2003 ICJ Reports 7.

9  *Geiß, R.*, Revision Proceedings before the International Court of Justice, 63 ZaöRV 167, 186 (2003).

10  See the Judgment of the International Court of Justice in *Application for Revision of the Judgment of 11 September 1992 in the Case concerning the Land, Island and Maritime Frontier Dispute (El Salvador* v. *Honduras, Nicaragua intervening)*, 2003 ICJ Reports 392.

11  See on this point the Judgment of the International Court of Justice in *Application for Revision and Interpretation of the Judgment of 24 February 1982 in the Case concerning the Continental Shelf (Tunisia* v. *Libya)*, 1985 ICJ Reports 207–214.

12  See *Corfu Channel Case (Merits)*, 1949 ICJ Reports 36.

affects the legal position of the parties in an important way may be regarded as decisive even if it is not reflected in monetary terms in the award. The burden is on the applicant for revision to establish the decisiveness of a new fact.

19      The fact must be new in the sense that it was unknown to the tribunal and to the party making the application. It has been suggested that attribution of knowledge of a fact to a Contracting State may entail application by analogy of the ILC Articles on State Responsibility.[13] Attribution of knowledge to an investor will involve a separate factual and legal investigation, depending upon whether it is a natural or a juridical person. Normally, the fact would have existed objectively at the time the award was made. Exceptionally, a new fact may arise after the award has been completed that may be an appropriate basis for revision. For instance, payments made to ICSID towards the costs of proceedings after the award's completion or legal fees that are billed after the award's signature will not be reflected in the award's determination on costs (see Art. 49, paras. 44, 45).

20      The decisive fact must have been unknown to the tribunal and to the party making the application when the award was rendered (see Arbitration Rule 50(1)(c)(ii), para. 9 *supra*). For the tribunal, the critical date is the moment it loses the opportunity to make changes to the original award. This will be the date of signature and transmission of the award to the Secretary-General for authentication and dispatch to the parties in accordance with Arbitration Rule 48.

21      For the party making the application, the critical time is, in principle, the closure of the proceeding in accordance with Arbitration Rule 38(1). This marks the completion of the presentation by the parties of their case. But under Rule 38(2) the tribunal may, until the award is rendered, reopen the proceeding on the ground that new evidence is forthcoming of such a nature as to constitute a decisive factor. Therefore, newly discovered facts may be brought to the tribunal's attention right up to the moment the award is signed. It follows that a party's failure to draw the tribunal's attention to a decisive fact where it had the opportunity to do so at any time before the award's signature would result in the inadmissibility of an application for revision.

22      Only the ignorance of the party making the application for revision is decisive. Ignorance of the other party is not relevant. The other party may have been aware of the decisive fact and may have withheld it deliberately. Such a course of action in no way affects the right of the innocent party to request revision.

23      The applicant's ignorance of the newly discovered fact must not be due to negligence. Awareness at the time of the existence, but not the content, of documents is unlikely to be sufficient to establish that they contain "new" facts.[14] It is clear that the deliberate suppression or non-presentation of evidence deprives the responsible party of its right to request revision (see also History, Vol. II, p. 271). But even a negligent omission of decisive facts will lead to the same result.[15] Revision is

---

13   *Geiß*, Revision Proceedings, p. 187.
14   See Case 56/70, *Fonderie Acciaierie Giovanni Mandell* v. *Commission* (1971) ECR 1.
15   *Continental Shelf (Tunisia* v. *Libya)*, 1985 ICJ Reports 202–207.

not an appropriate procedure to remedy careless preparation and presentation of the case.

It is for the tribunal to decide whether the applicant's ignorance was due to negligence. This question was discussed briefly during the provision's drafting. Mr. *Broches* stated in reply to a question that there would probably be a presumption of absence of knowledge and that the burden of proof would be on the party that resisted the application for revision on the ground that the tribunal or the other party had had such knowledge (History, Vol. II, p. 518). Failure to draw the tribunal's attention to a pre-existing fact that was obtainable at the time would be an indication of negligence if it would have been in the applicant's interest to do so.[16]    **24**

### 4. Legal Nature of Revision

The legal nature of a decision on an application for revision is closely analogous to that of a decision on interpretation. The observations made in the context of the legal nature of interpretation (see Art. 50, paras. 27–29) apply also to revision.    **25**

### B.  "(2) The application shall be made within 90 days after the discovery of such fact and in any event within three years after the date on which the award was rendered."

Provisions for time limits for applications requesting revision were contained in all drafts leading to the Convention. The early drafts foresaw much more generous limits of six months and ten years (History, Vol. I, pp. 224–226). There was a general feeling that these limits were too long and they were shortened accordingly (History, Vol. II, pp. 271, 341, 423, 818/9, 865).    **26**

Art. 51(2) imposes a dual time limit. A party that discovers a fact that may be the basis for a revision must make its request within 90 days of the discovery. In addition, there is an absolute cut-off for applications after three years from the date on which the award was rendered. Both time limits must be complied with cumulatively. A party's application for revision made more than 90 days after it had discovered the fact will be refused registration by the Secretary-General even if it is within the three-year limit. After three years, the Secretary-General will refuse to register a request regardless of when the fact was discovered (see Arbitration Rule 50(3)(a), para. 9 *supra*) (see also History, Vol. II, p. 847).    **27**

The time limit of three years is calculated from the date of the award's dispatch to the parties (see Art. 49, paras. 10, 25–27). In accordance with Art. 49(2), last sentence, a decision on supplementation and rectification extends the commencement of the time limit for purposes of Art. 51(2) (see Art. 49, paras. 81–85). The time limit is satisfied in accordance with Administrative and Financial Regulation    **28**

---

16   *Loc. cit.*

29 if the application arrives within three years of the day that follows the date of the award's dispatch.

**29**    In *AMT* v. *Zaire*, the Award was rendered on 21 February 1997. The Request for Revision was submitted on 29 January 1999. In *Siemens* v. *Argentina*, the Award was issued on 6 February 2007. The Request for Revision was received by ICSID on 6 June 2008 and was registered on 9 July 2008. In *Pey Casado* v. *Chile*, the Award was rendered on 8 May 2008. The Request for Revision was registered on 17 June 2008.

**30**    The time limit of 90 days is calculated from the date on which the fact has come to the knowledge of the party making the application. The time limit is satisfied if the application arrives on the 90th day after discovery. In view of this peremptory time limit it is important that the requesting party submits information as to the date of discovery in its application (see paras. 10, 13 *supra*).

**31**    In accordance with Arbitration Rule 50(3)(a) (see para. 9 *supra*), the Secretary-General's screening power in the registration of the application extends to both time limits (see para. 13 *supra*). His or her determination that the application complies with the 90-day time limit can only be provisional since he or she must rely on the assertion made in the application. If the tribunal finds subsequently on the basis of the evidence before it that the requesting party has obtained knowledge of the decisive fact more than 90 days before the application, it must still reject the request as inadmissible.

**C.  "(3) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter."**

**32**    Submission of the request for revision to the original tribunal is clearly the better solution. The original tribunal is already familiar with the case and is in the best position to decide whether the fact adduced by the applicant was unknown to it. In *AMT* v. *Zaire*, *Siemens* v. *Argentina* and *Pey Casado* v. *Chile*, the requests for revision were, in fact, submitted to the original Tribunal.[17] But the time limit of up to three years makes it possible that the original tribunal may no longer be available in its entirety. If this is the case, a new tribunal will be constituted.

**33**    Art. 51(3) is identical with the first two sentences of Art. 50(2). The questions surrounding the reconvening of the tribunal or the constitution of a new tribunal are examined in the context of Art. 50(2) dealing with interpretation (see Art. 50, paras. 30–41). The observations made there are also relevant to Art. 51(3) dealing with revision.

---

17  In *AMT* v. *Zaire*, the original Tribunal was reconstituted on 17 February 1999. After the death of a member of the Tribunal another arbitrator was appointed on 18 April 2000. The Tribunal issued an order on 26 July 2000 noting the discontinuance of the proceeding pursuant to Arbitration Rule 44 after the parties had reached a settlement.

**D.  "(4) The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request."**

The drafts leading to the Convention provided for a discretionary power of **34** the tribunal to stay the enforcement of the award pending a decision on revision (History, Vol. I, pp. 228–230). A proposal to make a stay of enforcement by the tribunal mandatory was discussed (History, Vol. II, pp. 339, 341, 723) but eventually defeated (at pp. 818/9, 849). A suggestion to allow a court to refuse recognition and enforcement while a request for revision is pending before the Centre also did not succeed (at pp. 885, 887/8). Finally, Mr. *Broches* submitted a proposal which subsequently became the final text of Art. 51(4) (at p. 949). The automatic and provisional suspension of enforcement, if requested by the party making the application for revision, was explained by the possible urgency of the matter and by the fact that the tribunal which would have to consider the application would not be available immediately. Since it may take some time to reconvene the tribunal, the losing party requesting a revision should have an absolute right of suspension of enforcement until the tribunal could rule on the suspension (at pp. 987/8).

Art. 51(4) makes provision for two forms of a stay of enforcement. One is **35** automatic and is merely contingent upon a request to stay enforcement by the party submitting the application for revision. The other leaves a stay of enforcement to the tribunal's discretion. Art. 51(4) differs from Art. 50(2), last sentence, in that the latter only allows the discretionary stay of enforcement by the tribunal (see Art. 50, paras. 42–45). Art. 51(4) is materially identical to Art. 52(5) which also provides for both forms of a stay of enforcement. Unlike Art. 51(4), Art. 52(5) has generated considerable practice.[18] Therefore, the Commentary on Art. 52(5) should be consulted also for purposes of Art. 51(4) (see Art. 52, paras. 574–655).

Arbitration Rule 54 deals with the procedure for both forms of stay of enforce- **36** ment. It provides in the parts relevant to revision:

**Rule 54**

*Stay of Enforcement of the Award*

(1) The party applying for the interpretation, revision or annulment of an award may in its application, and either party may at any time before the final disposition of the application, request a stay in the enforcement of part or all of the award to which the application relates. The Tribunal or Committee shall give priority to the consideration of such a request.

---

18  See *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 5, 6, 8, 126; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 2.07, 3.02, 3.06, 7.01, 8.01 and Annex II; *Amco* v. *Indonesia*, Interim Order Concerning Stay of Enforcement, 2 March 1991; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 5, 6; *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004; *Mitchell* v. *DR Congo*, Decision on Stay of Enforcement, 30 November 2004; *MTD* v. *Chile*, Decision on Stay of Execution, 1 June 2005; *Azurix* v. *Argentina*, Decision on Continued Stay of Enforcement, 28 December 2007.

(2) If an application for the revision or annulment of an award contains a request for a stay of its enforcement, the Secretary-General shall, together with the notice of registration, inform both parties of the provisional stay of the award. As soon as the Tribunal or Committee is constituted it shall, if either party requests, rule within 30 days on whether such stay should be continued; unless it decides to continue the stay, it shall automatically be terminated.

(3) If a stay of enforcement has been granted pursuant to paragraph (1) or continued pursuant to paragraph (2), the Tribunal or Committee may at any time modify or terminate the stay at the request of either party. All stays shall automatically terminate on the date on which a final decision is rendered on the application, . . .

(4) A request pursuant to paragraph (1), (2) (second sentence) or (3) shall specify the circumstances that require the stay or its modification or termination. A request shall only be granted after the Tribunal or Committee has given each party an opportunity of presenting its observations.

(5) The Secretary-General shall promptly notify both parties of the stay of enforcement of any award and of the modification or termination of such a stay, which shall become effective on the date on which he dispatches such notification.

**37**    A party submitting an application for revision may request a stay of the award's enforcement in that application. Such a request is granted automatically upon the application's registration. The Secretary-General has to notify the parties of this stay but he/she has no discretion to refuse it. If the application for revision is refused registration due to non-compliance with one of the time limits of Art. 51(2) (see paras. 26–31 *supra*), there will be no stay of enforcement. Until the tribunal is reconstituted, only the party filing the application for revision can request a stay of enforcement. At this stage the stay of enforcement can only relate to the entire award. Otherwise, the requesting party would be able to select the stay of only those portions of the award that are contrary to its interest.[19]

**38**    Once the tribunal is constituted, the situation changes significantly. From that moment, the decision on a stay of enforcement is at the tribunal's discretion. But the tribunal may only act upon the request of one of the parties. It may not act upon its own initiative. Either party may at any time before the final decision on revision move that the tribunal impose a stay of enforcement or that it continue, terminate or modify an existing stay. A stay of enforcement that is in place by virtue of the applicant's original request will lapse unless it is confirmed by the tribunal within 30 days of the tribunal's constitution. A stay of enforcement granted by the tribunal may relate to part or to all of the award as the tribunal deems appropriate.

**39**    A request for a stay of enforcement may only be granted after the tribunal has heard both sides. The tribunal must give priority to such a request. Once the tribunal gives its final decision on revision, the stay of enforcement terminates automatically. All notifications become effective upon their dispatch by the

---

19   See Note C to Arbitration Rule 54 of 1968, 1 ICSID Reports 115.

Secretary-General. Under Administrative and Financial Regulation 28(2), certified copies of awards issued by the Secretary-General while a stay of enforcement is in effect shall reflect such stay.

In *AMT* v. *Zaire*, the Democratic Republic of the Congo's application for revision contained a request for the stay of enforcement of the Award until a decision was made on the application. Therefore, in accordance with Arbitration Rule 54(2), when the Secretary-General registered the application, he informed the parties that, pursuant to Article 51(4) of the Convention, the enforcement of the Award was provisionally stayed until the Tribunal ruled on the said request. The Tribunal decided to maintain the provisional stay of enforcement of the Award until it made a final ruling on the request.[20] The Tribunal gave each party an opportunity of presenting its observations. **40**

In *Siemens* v. *Argentina*, the application for revision contained a request for a stay of the enforcement of the Award. The Secretary-General noted that the enforcement of the Award was already stayed in the context of the annulment proceedings pending at the time (see para. 12 *supra*). In *Pey Casado* v. *Chile*, the Request for Revision was registered on 17 June 2008 and the Tribunal was reconstituted on 20 June 2008. The Respondent filed a request for a stay of enforcement of the Award on 16 July 2008. Following observations from the Claimants, the Tribunal issued a decision on the stay of enforcement of the Award on 5 August 2008. **41**

---

20  *AMT* v. *Zaire*, Order, 1 June 1999. The Tribunal issued an order on 26 July 2000 noting the discontinuance of the proceeding pursuant to Arbitration Rule 44 after the parties had reached a settlement.

# Article 52

**(1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:**

    **(a) that the Tribunal was not properly constituted;**

    **(b) that the Tribunal has manifestly exceeded its powers;**

    **(c) that there was corruption on the part of a member of the Tribunal;**

    **(d) that there has been a serious departure from a fundamental rule of procedure; or**

    **(e) that the award has failed to state the reasons on which it is based.**

**(2) The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered.**

**(3) On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an *ad hoc* Committee of three persons. None of the members of the Committee shall have been a member of the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute. The Committee shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1).**

**(4) The provisions of Articles 41–45, 48, 49, 53 and 54, and of Chapters VI and VII shall apply *mutatis mutandis* to proceedings before the Committee.**

**(5) The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.**

**(6) If the award is annulled the dispute shall, at the request of either party, be submitted to a new Tribunal constituted in accordance with Section 2 of this Chapter.**

# OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–40 |
|  | A. **The Place of Annulment in the Convention** | 1–4 |
|  | B. **Review of Arbitral Awards** | 5–15 |
|  |   1.  Comparative Remarks | 5–7 |
|  |   2.  Annulment and Appeal | 8–13 |
|  |   3.  Basic Policies | 14–15 |
|  | C. **Methodology of *Ad Hoc* Committees** | 16–24 |
|  | D. **Overview of Cases** | 25–40 |
| II. | INTERPRETATION | 41–700 |
|  | A. **"(1) Either party may request annulment . . ."** | 41–60 |
|  |   1.  Initiative | 41–43 |
|  |   2.  Discretionary Nature | 44–45 |
|  |   3.  Waiver of Right to Request Annulment | 46–60 |
|  |     a)  Post-Award Waiver | 46–48 |
|  |     b)  Advance Waiver | 49–59 |
|  |     c)  Waiver through Failure to Object before the Tribunal | 60 |
|  | B. **". . . of the award . . ."** | 61–82 |
|  |   1.  Pre-Award Decisions | 61–68 |
|  |   2.  Parts of Awards | 69–73 |
|  |   3.  Orders and Awards Noting Settlement and Discontinuance | 74–76 |
|  |   4.  Post-Award Decisions | 77–82 |
|  | C. **". . . by an application in writing addressed to the Secretary-General . . ."** | 83–104 |
|  |   1.  Procedure | 83–86 |
|  |   2.  Substantiation | 87–94 |
|  |   3.  Screening | 95–104 |
|  | D. **". . . on one or more of the following grounds:"** | 105–117 |
|  |   1.  History | 105–107 |
|  |   2.  Exhaustive Nature of Grounds | 108–110 |
|  |   3.  Use of Multiple Grounds | 111–112 |
|  |   4.  Classification of Grounds | 113–117 |
|  | E. **"(a) that the Tribunal was not properly constituted;"** | 118–129 |
|  |   1.  History and Introduction | 118–120 |
|  |   2.  Substance | 121–123 |
|  |   3.  Timely Objection to Improper Constitution | 124–129 |
|  | F. **"(b) that the Tribunal has manifestly exceeded its powers;"** | 130–270 |
|  |   1.  History and Introduction | 130–133 |
|  |   2.  Manifest Nature of Excess of Powers | 134–154 |
|  |   3.  Lack of Jurisdiction | 155–190 |

|  |  |  |
|---|---|---|
| | a) Jurisdiction and Excess of Powers | 155–166 |
| | b) Failure to Exercise Jurisdiction | 167–171 |
| | c) Prior Examination of Jurisdiction and Timely Objection | 172–174 |
| | d) Extent of Jurisdiction | 175–190 |
| 4. | Failure to Apply the Proper Law | 191–270 |
| | a) History | 193–195 |
| | b) Excess of Powers and Proper Law | 196–207 |
| | c) Form of Agreement on Proper Law | 208–209 |
| | d) Non-Application or Erroneous Application of the Proper Law | 210–225 |
| | e) Non-Application of Individual Provisions of the Proper Law | 226–232 |
| | f) Substantive Application or Substantiation of Sources | 233–243 |
| | g) Equity and Proper Law | 244–258 |
| | h) International Law and Proper Law | 259–270 |
| G. | **"(c) that there was corruption on the part of a member of the Tribunal;"** | 271–277 |
| H. | **"(d) that there has been a serious departure from a fundamental rule of procedure;"** | 278–337 |
| 1. | History | 278–279 |
| 2. | Serious Departure and Fundamental Rule | 280–292 |
| 3. | Affected Rules of Procedure | 293–333 |
| | a) Impartiality and Equality of Treatment | 294–304 |
| | b) Right to be Heard | 305–317 |
| | c) Deliberation | 318–322 |
| | d) Evidence and Proof of Facts | 323–332 |
| | e) Violation of Limits of Standing | 333 |
| 4. | Timely Objection to Procedural Violation | 334–337 |
| I. | **"or (e) that the award has failed to state the reasons on which it is based."** | 338–434 |
| 1. | History and Introduction | 338–347 |
| 2. | Absence of Reasons | 348–362 |
| 3. | Insufficient and Inadequate Reasons | 363–388 |
| 4. | Contradictory Reasons | 389–398 |
| 5. | Failure to Deal with Every Question | 399–434 |
| | a) History | 399–400 |
| | b) Relationship to Article 49(2) | 401–402 |
| | c) Relationship to Article 48(3) | 403–412 |
| | d) Relationship to Other Grounds for Annulment | 413–417 |
| | e) What Constitutes a Question? | 418–426 |
| | f) How to Deal with a Question | 427–434 |

J.   **"(2) The application shall be made within 120 days
     after the date on which the award was rendered except
     that when annulment is requested on the ground of
     corruption such application shall be made within
     120 days after discovery of the corruption and in
     any event within three years after the date on which
     the award was rendered."**                             435–450
     1.  History and Introduction                           435–436
     2.  General Time Limit                                 437–447
     3.  Time Limit in Case of Corruption                   448–450
K.   **"(3) On receipt of the request the Chairman shall
     forthwith appoint from the Panel of Arbitrators an
     *ad hoc* Committee of three persons."**                451–460
     1.  History and Introduction                           451–452
     2.  Procedure                                          453–456
     3.  Composition                                        457–460
L.   **"None of the members of the Committee shall have
     been a member of the Tribunal which rendered the
     award, shall be of the same nationality as any such
     member, shall be a national of the State party to the
     dispute or of the State whose national is a party to the
     dispute, shall have been designated to the Panel of
     Arbitrators by either of those States, or shall have
     acted as a conciliator in the same dispute."**         461–465
M.   **"The Committee shall have the authority to annul…"** 466–492
     1.  Obligation or Discretion to Annul                  466–485
     2.  Annulment and Confirmation                         486–492
N.   **"…the award or any part thereof…"**                  493–510
     1.  Annulment of Awards                                    493
     2.  Partial Annulment                                  494–510
         a)  Conditions for Partial Annulment               494–504
         b)  Interrelated Parts of Awards                   505–510
O.   **"…on any of the grounds set forth in paragraph (1)."** 511–538
     1.  Exhaustive Nature of Grounds                       511–515
     2.  Distinct or Interchangeable Nature of Grounds      516–523
     3.  Cumulative Use of Grounds                          524–530
     4.  Limitation to Grounds Advanced by the Parties      531–538
P.   **"(4) The provisions of Articles 41–45, 48, 49, 53 and 54,
     and of Chapters VI and VII shall apply *mutatis mutandis*
     to proceedings before the Committee."**                539–573
     1.  Excluded Provisions                                540–552
     2.  Included Provisions                                553–573

Q.  **"(5) The Committee may, if it considers that the
    circumstances so require, stay enforcement of the award
    pending its decision. If the applicant requests a stay of
    enforcement of the award in his application, enforcement
    shall be stayed provisionally until the Committee rules
    on such request."**                                       574–655
    1.  History and Introduction                              574–582
    2.  Provisional Stay of Enforcement                       583–585
    3.  Stay of Enforcement Ordered by the *Ad Hoc* Committee 586–655
        a)  Initiative                                        586–592
        b)  Discretion                                        593–594
        c)  Procedure                                         595–608
        d)  Circumstances Requiring a Stay of Enforcement     609–626
        e)  Posting of Security                               627–649
        f)  Termination and Extension                         650–655
R.  **"(6) If the award is annulled the dispute shall, at the
    request of either party, be submitted to a new Tribunal
    constituted in accordance with Section 2 of this Chapter."** 656–700
    1.  History and Introduction                              656–661
    2.  Initiative for Resubmission                           662–664
    3.  Procedure for Resubmission                            665–667
    4.  Constitution of the New Tribunal                      668–669
    5.  Status of Parties in Resubmitted Proceeding           670–673
    6.  Partial Annulment and *Res Judicata*                  674–682
    7.  Legal Effect of Reasoning of *Ad Hoc* Committees      683–688
    8.  New Claims and Arguments                              689–695
    9.  Stay of Enforcement                                   696–700

## BIBLIOGRAPHY

*Alexandrov, S. A.*, The *Vivendi* Annulment Decision and the Lessons for Future ICSID Arbitrations – The Applicant's Perspective, *in*: Annulment of ICSID Awards (*Gaillard, E./ Banifatemi, Y.* eds.) 97 (2004);

*Alvarez, H. C.*, Setting Aside Additional Facility Awards: The *Metalclad* Case, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 267 (2004);

*Balaš, V.*, Review of Awards, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1125 (2008);

*Baldwin, E./Kantor, M./Nolan, M.*, The Arbitration Risk Facing Sovereign Investors, 23 International Financial Law Review 22 (2004);

*Ben Hamida, W.*, Two Nebulous ICSID Features: The Notion of Investment and the Scope of Annulment Control – *Ad Hoc* Committee's Decision in *Patrick Mitchell* v. *Democratic Republic of Congo*, 24 Journal of International Arbitration 287 (2007);

*Berranger de, T.*, L'article 52 de la Convention de Washington du 18 mars 1965 et les premiers enseignements de sa pratique, Revue de l'Arbitrage 93 (1988);

*Bishop, D.*, The Case for an Appellate Panel and its Scope of Review, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 15 (BIICL 2006);

*Bjorklund, A. K.*, The Continuing Appeal of Annulment: Lessons from *Amco Asia* and *CME*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 471 (2005);

*Branson, D. J.*, Annulments of "Final" ICSID Awards Raise Questions about the Process, National Law Journal 25 (1986);

*Broches, A.*, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287 (1987);

Die dritte Annullierung eines ICSID-Schiedsspruches – Eine Entgegnung auf F. Niggemann, 11 Praxis des Internationalen Privat- und Verfahrensrechts 293 (1991/5);

Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook of Commercial Arbitration 627, 686–699 (1993);

Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 321 (1991);

On the Finality of Awards: A Reply to Michael Reisman, 8 ICSID Review – FILJ 92 (1993);

*Caron, D. D.*, Reputation and Reality in the ICSID Annulment Process: Understanding the Distinction Between Annulment and Appeal, 7 ICSID Review – FILJ 21 (1992);

*Craig, W. L.*, Uses and Abuses of Appeals from Awards, 4 Arbitration International 174 (1988);

The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264 (1993);

*Cremades, B. M.*, Litigating Annulment Proceedings – The *Vivendi* Matter: Contract and Treaty Claims, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 87 (2004);

*Curtis, C. T.*, Amco v. Indonesia, 83 American Journal of International Law 106 (1989);

*Delaume, G. R.*, The Finality of Arbitration Involving States: Recent Developments, 5 Arbitration International 21 (1989);

How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168 (1992);

Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5 (1995);

*Feldman, M. B.*, The Annulment Proceedings and the Finality of ICSID Arbitral Awards, 2 ICSID Review – FILJ 85 (1987);

*Fernando, A. F. T.*, The Requirement to Provide a Bank Guarantee in Return for a Continuation of the Provisional Stay of Enforcement of the Award under Article 52(5) of the ICSID Convention – Can This Be Justified?, 2(1) TDM (January, 2005);

*Friedland, P. D.*, Stay of Enforcement of the Arbitral Award Pending ICSID Annulment Proceedings, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.*, eds.) 177 (2004);

*Gaillard, E.*, Landmark in ICSID Arbitration: Committee Decision in *Wena Hotels*, New York Law Journal (April, 2002);

The Extent of Review of the Applicable Law in Investment Treaty Arbitration, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 223 (2004);

*Gaillard, E./Banifatemi, Y.*, A Black Year for ICSID, New York Law Journal (March, 2007);

*Gaillard, E./Banifatemi, Y.* (eds.), Annulment of ICSID Awards (2004);

*Gantz, D. A.*, An Appellate Mechanism for Review of Arbitral Decisions in Investor-State Disputes: Prospects and Challenges, 39 Vanderbilt Journal of Transnational Law 39 (2006);

*Giardina, A.*, ICSID: A Self-Contained, Non-National Review System, *in*: International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? (*Lillich, R. B./Brower, Ch. N.* eds.) 199 (1994);

*Golsong, H.*, Schwächung des Schiedsdispositifs bei Investitionsstreitigkeiten, *in*: Festschrift für Walter J. Habscheid 113 (1989);

*Jacob, K. S.*, Reinvigorating ICSID With a New Mission and With Renewed Respect for Party Autonomy, 33 Virginia Journal of International Law 123 (1992);

*Johnson, T.*, Factual Review, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 59 (BIICL 2006);

*Kahn, P.*, Le contrôle des sentences arbitrales rendues par un Tribunal CIRDI, *in*: La juridiction internationale permanente (Société Française pour le Droit International, Colloque de Lyon) 363 (1986);

*Kaufmann-Kohler, G.*, Annulment of ICSID Awards in Contract and Treaty Arbitrations: Are There Differences?, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 189 (2004);

*Kolkey, D. M.*, Attacking Arbitral Awards: Rights of Appeal and Review in International Arbitrations, 22 The International Lawyer 693 (1988);

*Lamm, C. B.*, Jurisdiction of the International Centre for Settlement of Investment Disputes, 6 ICSID Review – FILJ 462 (1991);

*Lattanzi, F.*, Convenzione di Washington sulle controversie relative ad investimenti e invalidità delle sentenze arbitrali, 70 Rivista di Diritto Internazionale 521 (1987);

*Legum, B.*, The Introduction of an Appellate Mechanism: The U.S. Trade Act of 2002, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 289 (2004);
  Visualizing an Appellate System, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 121 (BIICL 2006);
  Options to Establish an Appellate Mechanism for Investment Disputes, *in*: Appeals Mechanism in International Investment Disputes (*Sauvant, K. P./Chiswick-Patterson, M.* eds.) 231 (2008);

*Leigh, M.*, Arbitration – Annulment of Arbitral Award for Failure to Apply Law Applicable Under ICSID Convention and Failure to State Sufficiently Pertinent Reasons, 81 American Journal of International Law 222 (1987);

*Mayer, P.*, To What Extent Can an *Ad Hoc* Committee Review the Factual Findings of an Arbitral Tribunal?, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 243 (2004);

*Niggemann, F.*, Das Washingtoner Weltbankübereinkommen von 1965 – Das Nichtigkeitsverfahren im Ad-Hoc-Komitee, 4 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 97 (1990);
  Die dritte Annullierung eines ICSID-Schiedsspruches – Die Entscheidung in Sachen Mine v. Guinea, 11 Praxis des Internationalen Privat- und Verfahrensrechts 77 (1991);

*Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380 (1991);
  Avoiding Unintended Consequences, *in*: Appeals Mechanism in International Investment Disputes (*Sauvant, K. P./Chiswick-Patterson, M.* eds.) 241 (2008);

*Pinsolle, P.*, The Annulment of ICSID Arbitral Awards, 1 The Journal of World Investment 243 (2000);
  Jurisdictional Review of ICSID Awards, 5 The Journal of World Investment & Trade 613 (2004);

"Manifest" Excess of Powers and Jurisdictional Review of ICSID Awards, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 51 (BIICL 2006). Also *in*: 2(2) TDM 28 (2005);

*Pirrwitz, B.*, Annulment of Arbitral Awards Under Article 52 of the Washington Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 23 Texas International Law Journal 73 (1988);

*Qureshi, A. H.*, An Appellate System in International Investment Arbitration?, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1154 (2008);

*Rambaud, P.*, L'annulation des sentences Klöckner et Amco, 32 Annuaire Français de Droit International 259 (1986);

De la compétence du tribunal C.I.R.D.I. saisi après une décision d'annulation, 34 Annuaire Français de Droit International 209 (1988);

*Redfern, A.*, ICSID – Losing its Appeal?, 3 Arbitration International 98 (1987);

*Reisman, W. M.*, The Breakdown of the Control Mechanism in ICSID Arbitration, Duke Law Journal 739 (1989);

Repairing ICSID's Control System: Some Comments on Aron Broches' "Observations on the Finality of ICSID Awards", 7 ICSID Review – FILJ 196 (1992);

Systems of Control in International Adjudication and Arbitration. Breakdown and Repair (1992);

The Supervisory Jurisdiction of the International Court of Justice: International Arbitration and International Adjudication, 258 Recueil des Cours 23 (1996);

*Rubins, N.*, Judicial Review of Investment Arbitration Awards, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 75 (BIICL 2006);

*Sacerdoti, G.*, Investment Arbitration Under ICSID and UNCITRAL Rules: Prerequisites, Applicable Law, Review of Awards, 19 ICSID Review – FILJ 1 (2004);

*Salomon, C./Knox, K.*, Options for Change in the Annulment Process, 2(1) Global Arbitration Review 35 (2007);

*Sauvant, K. P./Chiswick-Patterson, M.* (eds.), Appeals Mechanism in International Investment Disputes (2008);

*Schatz, S.*, The Effect of the Annulment Decisions in *Amco* v. *Indonesia* and *Klöckner* v. *Cameroon* on the Future of the International Centre for the Settlement of Investment Disputes, 3 American University Journal of International Law and Policy 481 (1988);

*Schlechtriem, P.*, Zur Überprüfbarkeit von ICSID-Schiedssprüchen: Die Aufhebungsentscheidung im Falle Klöckner/Kamerun, 6 Praxis des Internationalen Privat- und Verfahrensrechts 69 (1986);

*Schreuer, C.*, Decisions Ex Aequo et Bono Under the ICSID Convention, 11 ICSID Review – FILJ 37 (1996);

ICSID Annulment Revisited, 30 Legal Issues of Economic Integration 103 (2003);

Three Generations of ICSID Annulment Proceedings, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 17 (2004);

Preliminary Rulings in Investment Arbitration, *in*: Appeals Mechanism in International Investment Disputes (*Sauvant, K.* ed.) 207 (2008);

*Schwartz, E. A.*, Finality at What Cost? The Decision of the Ad Hoc Committee in *Wena Hotels* v. *Egypt*, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 43 (2004);

898                THE ICSID CONVENTION: A COMMENTARY

*Seidl-Hohenveldern, I.*, Die Aufhebung von ICSID Schiedssprüchen, 2 Jahrbuch für die Praxis
     der Schiedsgerichtsbarkeit 100 (1989);

*Shifman, B.*, The Challenge of Administering an Appellate System for Investment Disputes, *in*:
     Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 113
     (BIICL 2006);

*Sinclair, A. C.*, Award-Creditor Security and a Continuing Stay of Enforcement in *CDC Group
     plc* v. *Republic of the Seychelles*, 19(9) Mealey's International Arbitration Report 35 (2004);

*Smutny, A. C.*, Procedural Review, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino,
     F./Sheppard, A./Warner, H.* eds.) 65 (BIICL 2006);

*Sturzenegger, M.*, ICSID Arbitration and Annulment for Failure to State Reasons, 9 Journal of
     International Arbitration 173 (1992);

*Suarez Anzorena, C. I.*, Vivendi v. Argentina: On the Admissibility of Requests for Partial Annul-
     ment and the Ground of a Manifest Excess of Powers, *in*: Annulment of ICSID Awards
     (*Gaillard, E./Banifatemi, Y.* eds.) 123 (2004);

*Tams, C. J.*, An Appealing Option? The Debate about an ICSID Appellate Structure, *in*: Essays
     in Transnational Economic Law 43 (No. 57/June 2006);

   Is There a Need for an ICSID Appellate Structure?, *in*: The International Convention on the
     Settlement of Investment Disputes (ICSID) (*Hofmann, R./Tams, C.* eds.) 223 (2007);

*Tawil, G. S.*, An International Appellate System: Progress or Pitfall?, *in*: Investment Treaty Law
     Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 131 (BIICL 2006);

*Thompson, D.*, The *Klöckner* v. *Cameroon* Appeal, 3 Journal of International Arbitration 93
     (1986);

*Trooboff, P. D.*, To What Extent May an *Ad Hoc* Committee Review the Factual Findings of an
     Arbitral Tribunal based on a Procedural Error?, *in*: Annulment of ICSID Awards (*Gaillard,
     E./Banifatemi, Y.* eds.) 251 (2004);

*van Houtte, H.*, Article 52 of the Washington Convention – A Brief Introduction, *in*: Annulment
     of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 11 (2004);

*Wälde, T.*, ICSID "Annulment Committee", 1(1) TDM (2004);

*Walsh, T. W.*, Substantive Review of ICSID Awards: Is the Desire for Accuracy Sufficient to
     Compromise Finality?, 24 Berkeley Journal of International Law 444 (2006);

*Williams, D.*, International Commercial Arbitration and Globalization, Review and Recourse
     against Awards Rendered Under Investment Treaties, 4 The Journal of World Investment 251
     (2003).

*Williams, D. A. R.*, Challenging Investment Treaty Arbitration Awards – Issues Concerning the
     Forum (16th ICCA Congress, 2002);

# I. INTRODUCTION

## A. The Place of Annulment in the Convention

**1**     In the Convention's drafting history, a provision on annulment of awards was
first included in the Preliminary Draft (History, Vol. I, p. 230). It was closely
modelled on Art. 35 of the ILC's 1958 Model Rules on Arbitral Procedure.[1] That
provision, in turn, was the result of abortive plans to create a permanent review
procedure for international arbitral awards to be administered by the PCIJ and

---

1   YBILC 86 (1958-II).

*Article 52 – Annulment* 899

later the ICJ.[2] The idea to create an international review procedure was never seriously challenged during the Convention's drafting (but see para. 4 *infra*). The drafts leading to what eventually became Art. 52 show no dramatic changes (History, Vol. I, pp. 230–241). The debates on these drafts concerned mainly the precise formulation of the grounds for annulment (see paras. 105, 106, 118, 119, 131, 193–195, 272, 279, 340, 399, 400 *infra*), the time limits for the submission of applications (see para. 435 *infra*), the appointment of members of *ad hoc* committees (see paras. 451, 461, 462 *infra*), partial annulment (see para. 494 *infra*) and stay of enforcement pending annulment proceedings (see paras. 574–576 *infra*).

Art. 52 is the last of three Articles in Section 5 of the Convention's Chapter IV (Arbitration). Section 5 covers interpretation, revision and annulment of the award. Annulment is by far the most drastic form of review. Whereas interpretation (Art. 50) and revision (Art. 51) are made, if possible, by the tribunal which rendered the award, annulment is always put into the hands of a different body, called the *ad hoc* committee. The three provisions also differ in terms of time limits for requests and the exact circumstances of a stay of enforcement (see Art. 51, para. 3). **2**

Art. 52 constitutes a limited exception to the principle of the finality of awards as embodied in Art. 53. Art. 53 excludes any appeal or other remedy "except those provided for in this Convention".[3] Art. 53(2) extends the binding force of awards to decisions annulling such awards. The obligation to recognize and enforce awards under Art. 54 is subject to a possible annulment of the award and may be suspended by a stay of enforcement in accordance with Art. 52(5). **3**

The exclusive remedy rule of Art. 26 extends to the review phase of the award. Under the Convention, Art. 52 is the only way of having the award set aside.[4] In particular, domestic courts have no power of review over ICSID awards. During the Convention's drafting the question was raised whether nullity might not be taken up before the courts through which enforcement of the award is sought. A vote was taken and the proposal to maintain the system embodied in the draft, providing for internal review only, was carried with no opposition (History, Vol. II, pp. 849/50). **4**

---

2  See *Reisman, W. M.*, The Breakdown of the Control Mechanism in ICSID Arbitration, Duke Law Journal 739, 751 *et seq.* (1989); *Reisman, W. M.*, The Supervisory Jurisdiction of the International Court of Justice: International Arbitration and International Adjudication, 258 Recueil des Cours 221 *et seq.* (1996); *Broches, A.*, Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 321, 324 *et seq.* (1991); *Broches, A.*, On the Finality of Awards: A Reply to Michael Reisman, 8 ICSID Review – FILJ 92, 101 *et seq.* (1993). For a proposal to create a review mechanism for international commercial arbitral awards see *Schwebel, S. M.*, The Creation and Operation of an International Court of Arbitral Awards, *in*: The Internationalization of International Arbitration (*Hunter, M./Marriott, A./Veeder, V. V.* eds.) 115 (1995). The prospect of appeals from ICSID awards is canvassed, in the modern context, in *Sauvant, K. P./Chiswick-Patterson, M.* (eds.), Appeals Mechanism in International Investment Disputes (2008).

3  See *e.g.*, *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.02.

4  *Giardina, A.*, ICSID: A Self-Contained, Non-National Review System, *in*: International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? (*Lillich, R. B./Brower, C. N.* eds.) 199, 200 *et seq.* (1994).

## B. Review of Arbitral Awards

### 1. Comparative Remarks

**5**    In non-ICSID arbitration the normal method to challenge an award is through national courts. This function of review may be exercised by the courts of the country in which the tribunal had its seat or by the courts charged with the task of enforcing the award.[5] This would also apply to awards rendered under the Additional Facility (see Art. 25, paras. 9–13) since these awards are not subject to the Convention's autonomous system of annulment. The trend in national legislation is to restrict the reasons for review and to give the parties some discretion to limit or even exclude review by national courts.[6]

**6**    Art. V of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 lists a number of specific and narrow grounds on the basis of which recognition and enforcement of an arbitral award may be refused at the request of a party.[7] The UNCITRAL Model Law on International Commercial Arbitration of 1985 foresees a limited number of grounds for setting aside or non-recognition of an international commercial award by a domestic court, which are closely modelled on Art. V of the New York Convention.[8] The International Chamber of Commerce Rules of Arbitration of 1998 provide that the parties shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.[9]

**7**    In arbitration between States there is no institutionalized review. A claim by one State party that an award is void may be submitted to international adjudication by

---

5 For an example, see the ICC Award in *SPP* v. *Egypt*, 11 March 1983, 3 ICSID Reports 46, and its treatment by domestic courts: District Court of Amsterdam, 12 July 1984, 3 ICSID Reports 92; Cour d'appel, Paris, 12 July 1984, 3 ICSID Reports 79; France, Cour de cassation, 6 January 1987, 3 ICSID Reports 96. See also this Commentary, Art. 26, paras. 34–40.

6 See *e.g.*, *Schmitthoff*, Finality of Arbitral Awards and Judicial Review, *in*: Contemporary Problems in International Arbitration (*Lew* ed.) 230 (1986); *Redfern, A./Hunter, M.*, Law and Practice of International Commercial Arbitration 419 *et seq.*, 429 *et seq.* (1991); *Craig, W. L.*, Uses and Abuses of Appeal from Awards, 4 Arbitration International 174, 179 (1988); *Delaume, G. R.*, The Finality of Arbitration Involving States: Recent Developments, 5 Arbitration International 21, 28 *et seq.* (1989); *Delaume, G. R.*, Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5 (1995); *Koa, C. M.*, The International Bank for Reconstruction and Development and Dispute Resolution: Conciliating and Arbitrating with China through the International Centre for Settlement of Investment Disputes, 24 New York University Journal of International Law and Politics 439, 472–476 (1991); *Berranger de, T.*, L'article 52 de la Convention de Washington du 18 mars 1965 et les premiers enseignements de sa pratique, Revue de l'Arbitrage 93, 113 *et seq.* (1988); and see the references cited by *Pirrwitz, B.*, Annulment of Arbitral Awards Under Article 52 of the Washington Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 23 Texas International Law Journal 73 at p. 78 (1988).

7 330 UNTS 38 (1959). See *Freyer, D. H./Gharavi, H. G.*, Finality and Enforceability of Foreign Arbitral Awards: From "Double Exequatur" to the Enforcement of Annulled Awards: A Suggested Path to Uniformity Amidst Diversity, 13 ICSID Review – FILJ 101 (1998). See also *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investments, 12 ICSID Review – FILJ 287, 300/1 (1997), and the authorities cited there.

8 Arts. 34, 36; 24 ILM 1302, 1311 (1985).        9 Art. 28(6); 36 ILM 1614 (1997).

mutual consent. The International Court of Justice will decide on such a dispute only if there has been a submission to its jurisdiction.[10]

## 2. Annulment and Appeal

Annulment is distinct from an appeal. This is apparent from the wording of Art. 53, which provides that the award shall not be subject to any appeal or to any other remedy except those provided for in the Convention. Hence annulment, which is provided for in the Convention, is a remedy other than an appeal. The difference was barely discussed during the Convention's drafting (but see History, Vol. II, p. 854). **8**

The distinction between annulment and appeal essentially consists of two elements. The first relates to the result of the process, the second to the aspects of the decision under review.[11] **9**

As to the first, the result of a successful application for an annulment is the invalidation of the original decision. The result of a successful appeal is its modification. A decision-maker exercising the power to annul has only the choice between leaving the original decision intact or declaring it void. It can destroy a *res judicata* but cannot create a new one.[12] An appeals body may substitute its own decision on the merits for the decision that it has found to be deficient. Under the ICSID Convention, an *ad hoc* committee only has the power to annul the award. The *ad hoc* committee may not amend or replace the award by its own decision, whether in respect of jurisdiction or the merits. After annulment the dispute may be resubmitted to a new tribunal in accordance with Art. 52(6). The new tribunal deciding the merits of the dispute in a resubmitted case is not bound by the reasons given by the *ad hoc* committee for annulling the original award (see paras. 683–688 *infra*).[13] **10**

As to the second element, annulment is only concerned with the legitimacy of the process of decision: it is not concerned with its substantive correctness.[14] Appeal is concerned with both. Annulment is based typically on a very limited number of fundamental standards. In the case of the ICSID Convention these are listed exhaustively in Art. 52(1). Appeal can be based on a much broader variety of reasons including those going to the merits of the decision.[15] **11**

---

10  See also International Law Commission, Model Rules on Arbitral Procedure, 1958, Arts. 36, 37, YBILC 86 (1958-II).

11  See *Caron, D. D.*, Reputation and Reality in the ICSID Annulment Process: Understanding the Distinction Between Annulment and Appeal, 7 ICSID Review – FILJ 21 (1992) at pp. 23 *et seq*.

12  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 1.17, 5.06.

13  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 552.

14  See *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 34; *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 97; and *Schreuer*, ICSID Annulment Revisited, p. 104.

15  See also *Berranger de*, L'article 52 de la Convention, p. 100; *Reisman*, The Breakdown, p. 748; *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 392 (1991).

**12**       Annulment is concerned with the dispute that was put before the tribunal. It is not an opportunity to raise new arguments on the merits or introduce new contemporaneous evidence. As the *ad hoc* Committee in *MTD* v. *Chile* stressed, annulment "is a form of review on specified and limited grounds which take as their premise the record before the Tribunal".[16] In the sense that annulment is "directed against the Award and indirectly the Tribunal",[17] an *ad hoc* committee may not impeach a tribunal for not addressing in its award arguments or evidence that were not put before it.[18]

**13**       In every published annulment decision to date, *ad hoc* committees have stressed this distinction. They have stated repeatedly that their functions are limited and that they do not have the powers of a court of appeal[19] (see also paras. 210–214 *infra*). Committees have insisted that a decision to annul had to be based on one of the five reasons listed in Art. 52(1)[20] and they could not review the awards' findings for errors of fact or law.[21] The *ad hoc* Committee in *MINE* described this limited function in the following terms:

> 4.04 Article 52(1) makes it clear that annulment is a limited remedy. This is further confirmed by the exclusion of review of the merits of awards by Article 53. Annulment is not a remedy against an incorrect decision. Accordingly, an *ad hoc* Committee may not in fact reverse an award on the merits under the guise of applying Article 52.[22]

Commentators concur that Art. 52(1) does not provide for annulment on the basis of "error of fact or law no matter how egregious".[23] Despite this self-professed restraint, early decisions on annulment in *Klöckner I*[24] and *Amco I*[25] have been

---

16  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 31.
17  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 1.15.
18  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 58, 62.
19  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 61; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 23, 38–44; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 5.04, 5.08; *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 1.14, 7.19, 8.08; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 18; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 62, 64; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 34–37; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 19/20; *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 38; *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 31; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 20, 24; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 43, 44, 135, 136, 158. The Decision on Annulment dated 18 January 2006 in *RFCC* v. *Morocco* has not been published.
20  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 3.
21  *Loc. cit.*, paras. 60/1, 142; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 23; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 45; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 85–87, 97.
22  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.04. See also *Sturzenegger, M.*, ICSID Arbitration and Annulment for Failure to State Reasons, 4 Journal of International Arbitration 173, 183/4 (1992).
23  *Feldman*, The Annulment Proceedings, p. 103.
24  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985.
25  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986.

criticized severely for crossing the line between annulment and appeal by re-examining aspects of the cases before them that lay outside the narrow confines of annulment.[26] A similar criticism has been made of the Decision on Annulment dated 1 November 2006 in *Mitchell* v. *DR Congo* (see para. 39 *infra*).

### 3. Basic Policies

Review of arbitral awards is designed to preserve the interests of the parties to the arbitration. Due to the essentially private nature of arbitration, this requirement may be satisfied through a control mechanism that ensures that the decision has remained within the framework of the parties' agreement to arbitrate and was reached by a process that was in accord with basic requirements of fair procedure. If the arbitration takes place within an institutionalized framework, such as ICSID, there is an additional public interest in the integrity and quality of the process. This public interest may go beyond what is needed to protect the interests of the parties to a particular arbitration.[27]    **14**

There are two potentially conflicting principles at work in the review process. One is the principle of finality; the other is the principle of correctness. Finality is designed to serve the purpose of efficiency in terms of an expeditious and economical settlement of disputes. Correctness may be an elusive goal that takes time and effort and may involve several layers of control, a phenomenon that is well known from domestic court procedure. In international arbitration the principle of finality is often seen to take precedence over the principle of correctness. The desire to see a dispute settled is regarded as more important than the substantive correctness of the decision. Annulment is the preferred solution to balance these two objectives. It is designed to provide emergency relief for egregious violations of a few basic principles while preserving the finality of the decision in most respects.[28] Art. 52 follows this model of a limited review process. *Ad hoc* committees have emphasized that the annulment process is concerned with the "process of decision" or "whether the manner in which the Tribunal carried out its functions met the requirements of the ICSID Convention".[29] But the exact line between an exceptional emergency supervision and a correction of perceived substantive mistakes has been difficult to draw. Commentators have differed in    **15**

---

26  See *e.g.*, *Berranger de*, L'article 52 de la Convention, pp. 111 *et seq.*; *Gaillard, E.*, Note, 25 ILM 1439 (1986); *Gaillard, E.*, Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI): Chronique des sentences arbitrales, 114 Journal du Droit International 135, 188 *et seq.* (1987); *Rambaud, P.*, L'annulation des sentences Klöckner et Amco, 32 Annuaire Français de Droit International 259, 260 (1986); *Reisman*, The Breakdown, pp. 765, 783.

27  *Caron*, Reputation and Reality, pp. 26/7.

28  *Caron*, Reputation and Reality, pp. 49 *et seq.*; *Feldman, M. B.*, The Annulment Proceedings and the Finality of ICSID Arbitral Awards, 2 ICSID Review – FILJ 85 (1987); *Paulsson*, ICSID's Achievements, pp. 386 *et seq.*; *Reisman*, The Breakdown, pp. 740 *et seq.*

29  *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 97.

their preference for the goal of finality[30] or substantive correctness.[31] In *CMS* v. *Argentina*, the *ad hoc* Committee rekindled the controversy in concluding that, whilst the Tribunal's legal analysis, on a matter going to the heart of Argentina's defence, had been faulty, it was not open to the Committee to annul the Award (see paras. 189, 190, 225 *infra*).

## C. Methodology of *Ad Hoc* Committees

**16**    The difficulties in circumscribing the function of annulment as part of the ICSID arbitration process have led to speculation about the interpretation of Art. 52. *Ad hoc* committees have discussed a number of alleged principles of interpretation that were argued before them.[32]

**17**    The *ad hoc* Committee in *Amco I* pointed out that since the proceedings before it were governed by the ICSID Convention, any problems of interpretation had to be solved "in accordance with the principles and rules of treaty interpretation generally recognized in international law".[33] This approach is reflected in the annulment decision in *Klöckner I*,[34] and applied, for example, by the *ad hoc* Committees in *Amco II*[35] and *Soufraki* v. *UAE*.[36]

**18**    *Ad hoc* Committees have also addressed the question as to whether the grounds for annulment should be interpreted narrowly or broadly. Arguments have been advanced in favour of a restrictive or extensive interpretation,[37] but neither theory has been accepted. In the words of the *MINE ad hoc* Committee:

> 4.05 The fact that annulment is a limited, and in that sense extraordinary, remedy might suggest either that the terms of Article 52(1), i.e., the grounds for annulment, should be strictly construed or, on the contrary, that they should be given a liberal interpretation since they represent the only remedy against unjust awards. The Committee has no difficulty in rejecting either suggestion. In its view, Article 52(1) should be interpreted in accordance with its object and purpose,

---

30 See *e.g.*, *Reisman*, The Supervisory Jurisdiction, pp. 230 *et seq*.

31 See *e.g.*, *Seidl-Hohenveldern, I.*, Die Aufhebung von ICSID Schiedssprüchen, 2 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 100, 103/4, 116/7 (1989).

32 See also *Caron*, Reputation and Reality, p. 33; *Niggemann, F.*, Das Washingtoner Weltbankübereinkommen von 1965 – Das Nichtigkeitsverfahren im Ad-Hoc-Komitee, 4 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 97, 104/5 (1990).

33 *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 18–21; also *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 21/2. These principles and rules have been codified in Arts. 31–33 of the 1969 Vienna Convention on the Law of Treaties, 1155 UNTS 331, 8 ILM 679 (1969). However, it should be noted that, technically, the Vienna Convention is not applicable to the ICSID Convention since under Art. 4 of the Vienna Convention it applies only to treaties concluded after its entry into force. The Vienna Convention entered into force in 1980; the ICSID Convention entered into force in 1966.

34 *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 119.

35 *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 7.55. See also *Kahn, P.*, Le contrôle des sentences arbitrales rendues par un Tribunal CIRDI, *in*: La jurisdiction internationale permanente (Société Française pour le Droit International, Colloque de Lyon) 363, 372 (1986).

36 *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 21.

37 See *Berranger de*, L'article 52 de la Convention, pp. 103/4; *Kahn*, Le contrôle des sentences arbitrales, pp. 371/2.

which excludes on the one hand, as already stated, extending its application to the review of an award on the merits and, on the other, an unwarranted refusal to give full effect to it within the limited but important area for which it was intended.[38]

The same attitude is expressed in *Amco II*,[39] *Wena Hotels* v. *Egypt*,[40] *Vivendi I*,[41] **19** *CDC* v. *Seychelles*,[42] *Mitchell* v. *DR Congo*[43] and *Soufraki* v. *UAE*.[44] It is also endorsed by commentators.[45]

In *Soufraki*, the *ad hoc* Committee stated that: **20**

> 21. Article 52 of the ICSID Convention must be read in accordance with the principles of treaty interpretation forming part of general international law, which principles insist on neither restrictive nor extensive interpretation, but rather on interpretation in accordance with the object and purpose of the treaty.[46]

At the same time *ad hoc* Committees have pointed out that the wording of **21** Art. 52(1) itself placed limits on their power of scrutiny. The *Klöckner I ad hoc* Committee said:

> The very language of the provision demands a cautious approach: sub-paragraph (b) requires that the Tribunal's excess of powers be "*manifest*". Likewise, under sub-paragraph (d), only a "*serious* departure" from a *fundamental* rule of procedure can justify challenging an award. Finally, the Convention envisages in sub-paragraph (e) a "failure to state" reasons and not, for example, a mistake in stating reasons. With respect to each complaint, the *ad hoc* Committee will determine the meaning which must be given to the legal concepts involved.[47]

The *Klöckner I* Committee also found that in case of doubt or uncertainty as **22** to the existence of a manifest excess of powers, the question should be resolved "*in favorem validitatis sententiae*".[48] This would imply that whenever an *ad hoc* committee entertains doubts as to the existence of a ground for annulment, it should uphold rather than annul the award. Support for such a broad principle can be found neither in the Convention nor in the general law of treaties. The *Klöckner I* Committee itself does not seem to have applied it in the section of its decision dealing with the applicable law (see paras. 234–238 *infra*).[49] After

---

38  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.05. See also *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 3, 62, 119.

39  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 1.17, 7.55.

40  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 18.

41  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 62.

42  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 33.

43  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 19.

44  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 21.

45  For example, *Kaufmann-Kohler*, Annulment of ICSID Awards, p. 191.

46  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 21.

47  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 3. Italics original. See also *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.06.

48  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 52(e).

49  *Gaillard*, Chronique (1987), p. 188; *Reisman*, The Breakdown, p. 766.

dismissing arguments to the effect that Art. 52 must be interpreted either narrowly or broadly, the Committee added:

> Of course, the system for settling disputes established by the Convention would be seriously jeopardized if there were any laxity in deciding whether the conditions listed in Article 52, taken in itself or in relation to Articles 42 and 48, are met.[50]

Subsequent *ad hoc* committees have not endorsed a presumption in favour of the award's validity. The *ad hoc* Committee in *Soufraki* v. *UAE* stated that "[s]uch presumption . . . finds no basis in the text of Article 52 and has not been used by annulment committees".[51]

**23**     After the first two annulments of ICSID awards in *Klöckner I* and *Amco I* had come under severe criticism (see paras. 29, 30 *infra*), parties in subsequent cases contended that repeated annulments were harmful to the institution and that, therefore, *ad hoc* committees should proceed with added restraint. This suggestion was rejected by the *ad hoc* Committee in *MINE*:

> 4.11 In the course of the proceedings, MINE has advanced the argument that a series of annulments of ICSID awards might impair the effectiveness and integrity of ICSID as an international institution for settlement of disputes between States and foreign investors. The Committee was accordingly urged to keep this consideration in mind in its examination of Guinea's application.
>
> 4.12 MINE's argument wrongly assumes that frequent annulments will necessarily be the result of overly strict tests applied by *ad hoc* Committees. It overlooks the possibility that such frequent annulments reflect neglect by arbitrators, parties or counsel of requirements flowing from the specificity of ICSID arbitration as defined in the Convention and the Arbitration Rules. A pure statistical approach, for which there is in any event no significant basis at the present time, is wholly inappropriate as a measure of ICSID's effectiveness.[52]

This view was shared by the *ad hoc* Committee in *Klöckner II*.[53]

**24**     The modern view confirms that *ad hoc* committees should avoid the more interventionist approach that led to the cycle of tribunal and annulment proceedings of the kind observed in *Klöckner* and *Amco*,[54] albeit now repeated in *Vivendi II*.[55] In *Amco II*, it was said that "[i]t is incumbent upon Ad Hoc Committees to resist the temptation to rectify incorrect decisions or to annul unjust awards".[56] However, the *ad hoc* Committee did not believe that preservation of the ICSID system would in itself constitute a proper motive to decline annulment.[57]

---

50   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 62.
51   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 22.
52   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 4.11–4.12.
53   *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990, para. 5.08, and see *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 105.
54   *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 54.
55   An application for annulment of the Award in the Resubmitted Case was registered on 19 December 2007.
56   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 1.18.
57   At para. 1.21.

## D. Overview of Cases

As at 1 January 2008, ICSID had registered 23 requests for annulment.[58] Since **25** that date, a further ten applications for annulment were registered.[59] This number of requests for annulment should be seen in the context of the 256 ICSID arbitration proceedings concluded or pending at that same time.

Three annulment proceedings – *SPP* v. *Egypt*, *Gruslin* v. *Malaysia* and *Joy* **26** *Mining* v. *Egypt* – were settled or discontinued without a decision being rendered. 15 decisions on annulment had been rendered by 1 March 2009. Space does not permit a systematic overview in this chapter of the facts of all cases. Only one of these – the Decision on Annulment dated 18 January 2006 in *RFCC* v. *Morocco* – remains unpublished.[60] Since the First Edition of this Commentary, decisions in two of the earliest cases – *Klöckner II* v. *Cameroon* and *Amco II* v. *Indonesia* – have been made available to the public. It is now possible to describe the contribution to the law on annulment of these decisions with reference to the primary sources. On 1 March 2009, sixteen cases were still pending.

Repeated, "back-to-back" annulment proceedings have occurred in relation to **27** the same dispute on three occasions, involving *Klöckner* v. *Cameroon*, *Amco* v. *Indonesia* and *Vivendi* v. *Argentina*.

Three of the five grounds for annulment in Art. 52(1) have been invoked in the **28** cases that have led to published decisions. Two grounds – improper constitution of the tribunal (Art. 52(1)(a)) and corruption (Art. 52(1)(c)) – have not been invoked in any of these cases.[61] The following table sets out the grounds for annulment put forward in the cases and the main arguments adduced in support of those grounds. Awards have been annulled, in part or in whole, in the following cases: *Klöckner I*, *Amco I*, *Amco II*, *MINE, Vivendi I*, *Mitchell* and *CMS*.

---

58  For general surveys of ICSID annulment cases see contributions in: Annulment of ICSID Awards, *Gaillard, E./Banifatemi, Y.* (eds., 2004), including *Schreuer, C. H.*, Three Generations of ICSID Annulment Proceedings, *loc. cit.*, p. 17; *Schreuer, C. H.*, ICSID Annulment Revisited, 30(2) Legal Issues of Economic Integration 103 (2003); *Broches, A.*, Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 321, 334 *et seq.* (1991); *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 687 *et seq.* (1993); *Caron*, Reputation and Reality, pp. 28 *et seq.*; *Koa, C. M.*, The International Bank for Reconstruction and Development and Dispute Resolution: Conciliating and Arbitrating with China through the International Centre for Settlement of Investment Disputes, 24 New York University Journal of International Law and Politics 439, 464 *et seq.* (1991); *Paulsson*, ICSID's Achievements, pp. 388 *et seq.*; *Pirrwitz*, Annulment, pp. 94 *et seq.*; *Rambaud*, L'annulation; *Redfern, D. A.*, ICSID – Losing its Appeal?, 3 Arbitration International 98, 103 *et seq.* (1987); *Reisman*, The Breakdown, pp. 755 *et seq.*

59  *Fraport* v. *Philippines*, registered on 8 January 2008; *Viera* v. *Chile*, registered on 24 January 2008; *Sempra* v. *Argentina*, registered on 30 January 2008; *Enron* v. *Argentina*, registered on 7 March 2008; *CECFT* v. *Gabon*, registered on 10 July 2008; *LG & E* v. *Argentina*, registered on 19 September 2008; *Rumeli* v. *Kazakhstan*, registered on 7 November 2008; *Helnan* v. *Egypt*, registered on 10 November 2008; *Duke Energy* v. *Peru*, registered on 24 December 2008; *Continental Casualty* v. *Argentina*, registered on 14 January 2009.

60  See *Investment Treaty News*, ICSID Committee Rejects Request for Annulment in *RFCC* v. *Morocco*, http://www.iisd.org/investment/itn (29 March 2006).

61  Improper constitution of the tribunal has been invoked as ground for annulment in cases that are pending at the time of writing.

## Overview of Arguments in Annulment Cases

*Symbols:*

invoked and accepted: √              invoked and rejected: X
invoked but not decided: ◯          relevant paragraphs: ¶

| | Klöckner I | Amco I | MINE | Klöckner II |
|---|---|---|---|---|
| **Art. 52(1)(a): improper constitution of tribunal** | | | | |
| **Art. 52(1)(b): manifest excess of powers:** | | | | |
| lack or excess of jurisdiction | X<br>¶4 *et seq.* | X<br>¶61–70 | | X<br>¶8.08–8.13 |
| non exercise of jurisdiction | | | | |
| failure to apply the proper law | X<br>¶57 *et seq.* | X<br>¶57–60, 71–83, 86<br>√<br>¶89–98 | X<br>¶6.38–6.43 | |
| **Art. 52(1)(c): corruption** | | | | |
| **Art. 52(1)(d): serious departure from a fundamental rule of procedure:** | | | | |
| impartiality | X<br>¶93 *et seq.* | X<br>¶87 | | |
| right to be heard | X<br>¶87 *et seq.* | | X<br>pp. 106–9 | X<br>¶6.63–6.72 |
| deliberation | X<br>¶84 *et seq.* | | | X<br>6.42–6.53 |
| evidence and proof | | X<br>¶88 | | X<br>¶6.80–6.84 |
| **Art 52(1)(e): failure to state reasons:** | | | | |
| absence of reasons | √<br>131 *et seq.* | X | X<br>¶6.44–6.46 | X<br>¶7.16–7.18 |
| insufficient and inadequate reasons | √<br>127 *et seq.* | ◯ | X<br>¶6.44–6.56 | X<br>¶7.13–7.15, 9.13–9.17 |
| contradictory reasons | X<br>¶121 *et seq.* | √ | √<br>¶6.98–6.108 | X<br>¶7.46–7.51 |
| failure to deal with questions | √<br>¶131 *et seq.* | | X<br>¶6.47–6.56<br>√<br>6.98–6.108 | X<br>¶7.64–7.71 |

|  | Amco II | Wena | Vivendi I | CDC |
|---|---|---|---|---|
| **Art. 52(1)(a): improper constitution of tribunal** |  |  |  |  |
| **Art. 52(1)(b): manifest excess of powers:** |  |  |  |  |
| lack or excess of jurisdiction | X<br>¶5.05 | X<br>¶54 | X<br>¶72–80 |  |
| non exercise of jurisdiction |  |  | X<br>89–92<br>√<br>86–88,<br>93–115 |  |
| failure to apply the proper law | X | X<br>¶26–53 | ○ | X<br>¶44–47 |
| **Art. 52(1)(c): corruption** |  |  |  |  |
| **Art. 52(1)(d): serious departure from a fundamental rule of procedure:** |  |  |  |  |
| impartiality |  |  |  | X<br>¶51–55 |
| right to be heard | X<br>¶1.02–1.05<br>√<br>¶1.11–1.12 | X<br>¶66–70 | X<br>¶82–85 |  |
| deliberation |  |  |  | X<br>¶58 |
| evidence and proof |  | X<br>¶59–65,<br>71–73 |  | X<br>¶59–61 |
| failure to answer question put to the Tribunal |  |  |  | X<br>¶56–57 |
| untimely issue of award |  |  |  | X<br>¶62–65 |
| **Art 52(1)(e): failure to state reasons:** |  |  |  |  |
| absence of reasons |  | X<br>¶84–86 | X<br>¶50,116 | X<br>¶87 |
| insufficient and inadequate reasons | X<br>¶7.54–7.58 | X<br>¶87–89 |  | X<br>¶73–76 |
| contradictory reasons |  |  | ○<br>¶65,72 | X<br>¶77–86 |
| failure to deal with questions |  | X<br>¶102–110 |  | X<br>¶77–86 |

(*cont.*)

**Overview of Arguments in Annulment Cases** (*Cont.*)

| | RFCC[62] | Mitchell | Repsol | Soufraki |
|---|---|---|---|---|
| **Art. 52(1)(a): improper constitution of tribunal** | | | | |
| **Art. 52(1)(b): manifest excess of powers:** | | | | |
| lack or excess of jurisdiction | √<br>¶42–48 | X<br>¶55–57 | X<br>¶36–45, 48–56, 62–75, 79–81 | X<br>¶31, 46 |
| non exercise of jurisdiction | | | | X<br>¶31, 46 |
| failure to apply the proper law | | X<br>¶55–57 | X<br>¶62–75 | X<br>¶32, 46 |
| **Art. 52(1)(c): corruption** | | | | |
| **Art. 52(1)(d): serious departure from a fundamental rule of procedure:** | | | | |
| impartiality | | | | |
| right to be heard | | | | |
| deliberation | | | | |
| evidence and proof | | | | |
| time limits | | | | |
| standing/"power of representation" | | | X<br>¶79–81 | |
| **Art 52(1)(e): failure to state reasons:** | | X<br>¶58–60 | | |
| absence of reasons | | √<br>¶34–41<br>X<br>¶58–66 | | X<br>¶131–134 |
| insufficient and inadequate reasons | | | | X<br>¶131–134 |
| contradictory reasons | | X<br>¶58–60 | | |
| failure to deal with questions | | | | |

---

62  Unpublished.

|  | MTD | CMS | Lucchetti |
|---|---|---|---|
| **Art. 52(1)(a): improper constitution of tribunal** | | | |
| **Art. 52(1)(b): manifest excess of powers:** | | | |
| lack or excess of jurisdiction | | X ¶68–76 | |
| non exercise of jurisdiction | | | X ¶99–116 |
| failure to apply the proper law | X ¶68–71, 75, 77 | X ¶81–85, 128–136, 144–150 | X ¶112–116 |
| **Art. 52(1)(c): corruption** | | | |
| **Art. 52(1)(d): serious departure from a fundamental rule of procedure:** | | | |
| impartiality | | | |
| right to be heard | | | X ¶122–125 |
| deliberation | | | |
| evidence and proof | X ¶57 | | X ¶117–121, 125 |
| time limits | | | |
| **Art 52(1)(e): failure to state reasons:** | | | |
| absence of reasons | | √ ¶89–97 X ¶119–127, 144–150, 154–157 | |
| insufficient and inadequate reasons | X ¶83–92, 101, 106 | | |
| contradictory reasons | | X ¶154–157 | X ¶126–130 |
| failure to deal with questions | | | |

**29**    The decisions annulling awards in *Klöckner I* and *Amco I* attracted severe criticism. It has been argued that the two *ad hoc* Committees exceeded their authority by re-examining the merits of the cases, thereby transgressing the line between annulment and appeal.[63] The extensive interpretation the two *ad hoc* Committees applied to their review function was said to have affected one of arbitration's primary goals, the finality of awards.[64] In *Amco* v. *Indonesia*, the new Tribunal also intimated that the *ad hoc* Committee had made findings that were *obiter* to the annulment function,[65] and had expressed views beyond its jurisdiction *ratione materiae*.[66] It has also been argued that in *SPP* v. *Egypt* the uncertainty surrounding the outcome of annulment proceedings was used for leverage to obtain a favourable settlement, or at least as delaying tactics to postpone compliance.[67] Some authors even spoke of a breakdown of ICSID's control system, which posed a grave risk to the institution's future effectiveness.[68] A number of suggestions were made to reform the system.[69]

**30**    A smaller group of commentators have defended the approach adopted in these early annulment cases.[70] They have described any transgressions by the two *ad*

---

63    *Berranger de*, L'article 52 de la Convention, p. 107; *Curtis*, Amco v. Indonesia, pp. 110 *et seq.*; *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 70 (1990); *Gaillard, E.*, Note, 25 ILM 1439/40 (1986); *Gaillard*, Chronique (1987), p. 190; *Lauterpacht, E.*, Aspects of the Administration of International Justice 101 *et seq.* (1991); *Muchlinski, P. T.*, Dispute Settlement under the Washington Convention on the Settlement of Investment Disputes, *in*: Control over Compliance with International Law (*Butler, W. E.* ed.) 175, 188 (1991); *Paulsson*, ICSID's Achievements, pp. 388 *et seq.*; *Rambaud, P.*, De la compétence du tribunal C.I.R.D.I. saisi après une décision d'annulation, 34 Annuaire Français de Droit International 209, 215 (1988).

64    *Branson, D. J.*, Annulments of "Final" ICSID Awards Raise Questions about the Process, National Law Journal 25 (4 August 1986); *Craig*, Uses and Abuses, pp. 211 *et seq.*; *Delaume G. R.*, The Finality of Arbitration Involving States: Recent Developments, 5 Arbitration International 21, 32 (1989); *Feldman, M. B.*, The Annulment Proceedings and the Finality of ICSID Arbitral Awards, 2 ICSID Review – FILJ 85 (1987).

65    *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 560.

66    *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 151.

67    *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 290 *et seq.* (1993).

68    *Reisman, W. M.*, The Breakdown of the Control Mechanism in ICSID Arbitration, Duke Law Journal 739 (1989); *Niggemann*, Die dritte Annullierung, pp. 83 *et seq.*; *Peter, W.*, Arbitration and Renegotiation of International Investment Agreements 306 *et seq.* (1995); *Redfern, D. A.*, ICSID – Losing its Appeal?, 3 Arbitration International 98 (1987); *Rambaud*, L'annulation, p. 274.

69    See esp. *Reisman*, The Breakdown, pp. 787 *et seq.*, 804 *et seq.*, and *Broches*, Observations, pp. 372 *et seq.* See also *Buckley, R. P.*, Now We Have Come to the ICSID Party: Are its Awards Final and Enforceable?, 14 Sydney Law Review 358, 372 (1992); *Delaume*, The Finality of Arbitration, pp. 32 *et seq.*; *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 160/1 (1993); *Koa, C. M.*, The International Bank for Reconstruction and Development and Dispute Resolution: Conciliating and Arbitrating with China through the International Centre for Settlement of Investment Disputes, 24 New York University Journal of International Law and Politics 439, 474 *et seq.* (1991); *Leigh*, Arbitration, p. 225; *Seidl-Hohenveldern*, Die Aufhebung, pp. 104, 116/7.

70    *Broches*, Observations, p. 321; *Caron*, Reputation and Reality; *El-Kosheri, A. S.*, ICSID Arbitration and Developing Countries, 8 ICSID Review – FILJ 104, 113/4 (1993); *El Kosheri, A. S.*,

*hoc* Committees as minor or have actually welcomed the activist role taken by them.

Subsequent *ad hoc* committees have adopted a much more cautious approach. **31** The decision in *MINE*[71] addressed most of the concerns that had been voiced with regard to the earlier two Decisions. The refusal to annul the Award in *Klöckner II* and the second Award (although not the supplemental Award) in *Amco II* speaks for itself. It may, therefore, be said that, after a difficult start, the system of annulment began to find its proper balance, particularly with the *MINE* Decision on Annulment.[72]

The subsequent Decisions on Annulment in *Wena Hotels* v. *Egypt* and *Vivendi I* **32** confirmed that *ad hoc* committees should "guard against the annulment of awards for trivial cause",[73] and refrain from reviewing the substantive correctness of awards. The *ad hoc* Committee in *Wena Hotels* v. *Egypt* also confirmed that the remedy for a violation of one of the grounds of Art. 52(1) "need not be the annulment of the award".[74] These decisions have been described as ushering in a "third generation" of annulment decisions.[75]

The modern law of annulment has the appearance of being more settled. The **33** *CDC* v. *Seychelles* Decision was an express continuation of the more balanced approach evident in *MINE, Wena* and *Vivendi I*.[76] The Respondent raised 19 separate arguments for annulment, under three of the five heads in Art. 52(1). None was accepted. The *ad hoc* Committee observed that in the development of annulment jurisprudence

> there has been an evolution in the ICSID annulment case law and scholarship away from *Klöckner I* and *Amco Asia I* that has culminated, in our view correctly, in *ad hoc* Committees reviewing arbitral proceedings only to the extent of ensuring their fundamental fairness, eschewing any temptation to "second guess" their substantive result.[77]

The request for annulment in *RFCC* v. *Morocco* was also rejected, although the **34** reasons for doing so are unknown, as the decision has remained confidential.[78]

---

The *Klöckner* Case and the Finality of ICSID Arbitral Awards, *in*: Liber Amicorum Professor Ignaz Seidl-Hohenveldern in honour of his 80th birthday 103 (1998); *Lattanzi, F.*, Convenzione di Washington sulle controversie relative ad investimenti e invalidità delle sentenze arbitrali, 70 Rivista di Diritto Internazionale 521, 535 (1987); *Schlechtriem, P.*, Zur Überprüfbarkeit von ICSID-Schiedssprüchen: Die Aufhebungsentscheidung im Falle Klöckner/Kamerun, 6 Praxis des Internationalen Privat- und Verfahrensrechts 69, 72/3 (1986); *Seidl-Hohenveldern, I.*, Die Aufhebung von ICSID Schiedssprüchen, 2 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 100 (1989).

71  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989.
72  *Delaume*, Reflections, p. 16.
73  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 63.
74  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 83.
75  *Schreuer*, Three Generations, p. 17.
76  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 35.
77  *Ibid.*, para. 35.
78  *RFCC* v. *Morocco*, Decision on Annulment, 18 January 2006, unpublished.

**35**    The *ad hoc* Committee in *MTD* v. *Chile* noted that, "after an uncertain start", *ad hoc* committees have "established with reasonable clarity the extent and limits of the grounds for annulment under Article 52".[79] *Ad hoc* committees and commentators alike are in broad agreement that

> an *ad hoc* committee does not have the jurisdiction to review the merits of the original award in any way. The annulment system is designed to safeguard the integrity, not the outcome, of the ICSID arbitration proceedings.[80]

**36**    The *ad hoc* Committee in *Soufraki* v. *UAE* observed that there is general consensus that "annulment review, although obviously important, is a limited exercise".[81] The Committee described the role of *ad hoc* committees as follows:

> 23. In the view of the *ad hoc* Committee, the object and purpose of an ICSID annulment proceeding may be described as the control of the fundamental integrity of the ICSID arbitral process in all its facets. An *ad hoc* committee is empowered to verify (i) *the integrity of the tribunal* – its proper constitution (Article 52(1)(a)) and the absence of corruption on the part of any member thereof (Article 52(1)(c)); (ii) *the integrity of the procedure* – which means firstly that the tribunal must respect the boundaries fixed by the ICSID Convention and the Parties' consent, and not manifestly exceed the powers granted to it as far as its jurisdiction, the applicable law and the questions raised are concerned (Article 52(1)(b)), and secondly, that it should not commit a serious departure from a fundamental rule of procedure (Article 52(1)(d)); and (iii) *the integrity of the award* – meaning that the reasoning presented in the award should be coherent and not contradictory, so as to be understandable by the Parties and must reasonably support the solution adopted by the tribunal (Article 52(1)(e)). Integrity of the dispute settlement mechanism, integrity of the process of dispute settlement and integrity of solution of the dispute are the basic interrelated goals projected in the ICSID annulment mechanism.[82]

**37**    *Ad hoc* committees are more prepared to take a "proactive role" to explain apparent defects in awards, especially in relation to alleged failures to state reasons.[83] *Ad hoc* committees have been admonished not to annul awards "for trivial cause".[84] It is clear that annulment is an extraordinary remedy for unusual and important cases,[85] involving situations that are grossly illegitimate.

**38**    Even when a ground for annulment may be made out, *ad hoc* committees have asserted a discretion whether to annul (see also paras. 466–485 *infra*). In *Wena Hotels* v. *Egypt*, *Vivendi I*, *CDC* v. *Seychelles* and *Soufraki* v. *UAE*, *ad hoc* committees have confirmed that even if a violation of one of the grounds

---

79    *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 54.
80    *Reed/Paulsson/Blackaby*, Guide to ICSID Arbitration, p. 99.
81    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 20.
82    At para. 23. Italics original.
83    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 24/5.
84    *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 63.
85    *Schreuer*, Three Generations, p. 42.

*Article 52 – Annulment*                                                                 915

in Art. 52(1) is detected, "an annulment need not be the necessary outcome in all circumstances".[86] The *ad hoc* Committee in *Vivendi I* stated that an award should be annulled in whole or in part only if annulment is "appropriate in the circumstances".[87] In *CDC* v. *Seychelles*, the *ad hoc* Committee noted that:

> . . . the *ad hoc* Committees operating during the last two decades have considered that a Committee has discretion to determine not to annul an Award even where a ground for annulment under Article 52(1) is found to exist.[88]

In *Mitchell* v. *DR Congo*, the *ad hoc* Committee stated, at the outset, that an award should not be annulled unless the *ad hoc* committee is convinced that there has been a "substantial violation" of one of the grounds in Art. 52(1).[89] Nevertheless, it annulled the Award on the ground that the Tribunal had been wrong to find that the claimant had an investment. Evidently the *ad hoc* Committee perceived a defect of such a degree in the Award so as to justify its annulment (see paras. 160–163 *infra*). The decision to annul the Award in *Mitchell* v. *DR Congo* has been described as bringing the law on investment "back to the starting point".[90]

**39**

*Mitchell* v. *DR Congo* stands apart from an otherwise consistent line of cases in which *ad hoc* committees have refrained from substituting their own view of the "correct" decision for that of the tribunal. Indeed, *ad hoc* committees have even expressly disagreed with the analysis or reasoning in awards, but have adhered to the overarching principle that annulment is not an appeal and declined to annul. In *CMS* v. *Argentina*, the *ad hoc* Committee clearly demonstrated the limits to the annulment remedy:

**40**

> 158. Throughout its consideration of the Award, the Committee has identified a series of errors and defects. The Award contained manifest errors of law. It suffered from lacunae and elisions. All this has been identified and underlined by the Committee. However the Committee is conscious that it exercises its jurisdiction under a narrow and limited mandate conferred by Article 52 of the ICSID Convention. The scope of this mandate allows annulment as an option only when certain specific conditions exist. . . . the Committee cannot simply substitute its own view of the law and its own appreciation of the facts for those of the Tribunal.[91]

The *ad hoc* committees' adherence to the strict limits of the annulment function confirms the direction in which the law on annulment has developed from the third generation cases and onwards. At the same time, *CMS* v. *Argentina* highlights the very real practical difference between annulment and appeal.

---

86   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 24.
87   *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 66.
88   *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 37.
89   *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 20.
90   *Ben Hamida*, Two Nebulous ICSID Features, p. 300.
91   *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 158.

# II. INTERPRETATION

## A. "(1) Either party may request annulment..."

### 1. Initiative

**41**    The initiation of annulment proceedings must come from one of the parties to the original arbitration. There is no power of any organ of the Centre to initiate annulment proceedings *ex officio*. Nor is there a power of third parties to start an *actio popularis* for the annulment of an ICSID award even if such third parties claim that they are directly affected by the award.

**42**    Art. 52(1) speaks of "either party" in the singular. But it is clear that annulment may be sought by both parties either separately or, less likely, jointly. Annulment is a remedy against the award, and indirectly the tribunal;[92] it follows that either party may feel aggrieved by an award or the procedure leading towards it. Requests for annulment by both parties were submitted in *Klöckner II* and *Amco II*.

**43**    Questions of identity and succession may arise both with respect to the State party and the investor. These questions should be answered by analogy to the solutions suggested in the context of consent to jurisdiction (see Art. 25, paras. 303–373). During the Convention's drafting the question was raised whether a Contracting State would have the power to request annulment on behalf of a constituent subdivision that had given consent to jurisdiction without the approval of its State. Mr. *Broches* pointed out that a State that did not want to run the risk of consent by a political subdivision had the possibility of not designating it (History, Vol. II, p. 859) (see also Art. 25, paras. 247–267). As a general proposition, constituent subdivisions or agencies act in their own name in ICSID proceedings and must take all necessary procedural steps, including a request for annulment, themselves. This principle of procedural autonomy may be mitigated in a situation where the entity in question has been abolished or has lost its official status through privatization.

### 2. Discretionary Nature

**44**    It is clear that a request for annulment is discretionary. There is no obligation to initiate the procedure even in the perceived presence of a ground for annulment. In fact, the parties will almost invariably have substantive reasons for a request. Typically, they will hope that a new decision will be more favourable to them. An important question of principle may also be involved. Thus, in *Amco* v. *Indonesia*, the Government may have felt that awards which failed to sanction noncompliance with Indonesian foreign exchange regulations could affect their entire system of foreign investment legislation[93] (see para. 227 *infra*). In *CMS* v. *Argentina*, Argentina sought annulment of the Award on points that could be expected to be relied upon in the large number of other cases brought against it.[94]

---

92   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 1.15.
93   *Reisman*, The Breakdown, p. 797; *Seidl-Hohenveldern*, Die Aufhebung, p. 102; *Broches*, Observations, pp. 376/7.
94   *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 43.

The exhaustion of all procedural remedies may also be a political imperative. **45**
A government official will be reluctant to bear the responsibility for not pursuing
the case to the bitter end.[95] Responsible officials may find it difficult to honour an
award if unable to assure both constituencies and superiors that all efforts have
been made to overturn it. In *Repsol* v. *Petroecuador*, the Applicant explained that
"the laws of Ecuador obligate State institutions to exhaust all permissible legal
remedies to prevent any decision from becoming enforceable and enforced".[96]
Private counsel may see it as their professional duty to avail themselves of all pro-
cedural options. In these situations, annulment may be sought even if the prospects
of success are slim. Not surprisingly, a request for annulment is usually made by
the party that sees itself as the loser, whether that perception relates to liability
for the claim, or counter-claim, the remedy awarded, or more particular findings.

### 3. *Waiver of Right to Request Annulment*

### a) *Post-Award Waiver*

The discretionary nature of the request for annulment would imply that a party **46**
may waive this right. The right may conceivably be waived explicitly, before the
expiry of the time limit for the application (see paras. 435–450 *infra*). More likely,
a party may waive certain claims of nullity in the course of annulment proceedings,
while continuing to press other claims.

In *Amco I*, Indonesia's Application for Annulment of 18 March 1985 claimed **47**
that the Tribunal's Decision on Jurisdiction constituted an excess of powers. But its
Memorial of 30 August 1985 withdrew that ground "so that the Committee might
focus on other issues bearing directly on Indonesia's liability for payment".[97]
Later on in the annulment proceedings, Indonesia argued that the Tribunal had
manifestly exceeded its powers by assuming jurisdiction over the acts of the army
and police personnel in the hotel's forcible takeover. Indonesia argued that these
acts, if illegal under international law, constituted an international tort which was
quite different from an investment dispute. The *ad hoc* Committee, apart from
disagreeing with the substance of the argument (see Art. 25, para. 71), found that
Indonesia, having expressly waived the claims of nullity relating to the jurisdiction
of the Tribunal, was precluded from thus challenging the Tribunal's jurisdiction.[98]

Amco alleged that Indonesia had abandoned and therefore effectively with- **48**
drawn other grounds for annulment set out in its Application but not repeated in
its Memorial. The *ad hoc* Committee did not believe that such a non-reiteration
was an adequate basis for a finding of waiver or of withdrawal of a claim of
nullity. It noted that when Indonesia decided to withdraw its annulment claim
relating to the jurisdiction of the Tribunal, it did so explicitly. Waiver of grounds

---

95   *Seidl-Hohenveldern*, Die Aufhebung, p. 102.
96   *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 5.
97   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 10.
98   *Ibid.*, para. 69.

for annulment seemed to the *ad hoc* Committee to be so serious that an intention to waive or withdraw could not lightly be inferred from mere non-repetition in the Memorial of particular grounds set out in the Application.[99]

### b) Advance Waiver

**49**    A somewhat different question would arise if the parties were to waive in advance their right to seek annulment. May the parties forego the right to request annulment even before an award has been handed down? This idea has been put forward as a method to avoid the costs, delays and uncertainties inherent in the annulment process and as a cure to the malaise that was seen to have arisen from the early decisions on annulment (see para. 29 *supra*). It would follow the example of some national laws on arbitration which authorize the parties to enter into "exclusion agreements" waiving their right to seek judicial control of awards.[100]

**50**    Some commentators have suggested the possibility of broad exclusion agreements eliminating all or most reasons for annulment. But even these suggestions are mitigated by the recognition that certain standards such as those relating to fraud and corruption are not at the parties' disposal.[101] Other proposals envisage a differentiated system whereby the parties may opt out of certain grounds for annulment which are seen to be under their control, such as applicable law, certain questions of jurisdiction and possibly the obligation to provide reasons, while preserving other more "objective" grounds for annulment such as the tribunal's improper constitution, the non-existence of an investment dispute, corruption and lack of impartiality.[102] Yet other commentators reject advance party agreements on annulment as contrary to the Convention's overall system. Under this view, Art. 52 is mandatory and the right to request annulment is inalienable.[103]

**51**    A systematic interpretation of the Convention does not support a right to exclude the possibility of annulment by advance agreement. The Convention contains a number of Articles that are subject to modification by the parties. These Articles contain the formula "except as the parties otherwise agree" or a similar phrase.

---

99    *Ibid.*, paras. 54–56.
100    *Kolkey*, Attacking Arbitral Awards, pp. 700, 703, 713/4; *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168, 190/1 (1992); *Delaume*, Reflections, pp. 11 *et seq.*; *Berger, K. P.*, The Modern Trend Towards Exclusion of Recourse Against Transnational Arbitral Awards: A European Perspective, 12 Fordham Intl. Law Journal 605 (1989).
101    *Reisman*, The Breakdown, p. 805; *Koa, C. M.*, The International Bank for Reconstruction and Development and Dispute Resolution: Conciliating and Arbitrating with China through the International Centre for Settlement of Investment Disputes, 24 New York University Journal of International Law and Politics 439, 476 (1991).
102    *Delaume*, The Finality of Arbitration, p. 33; *Delaume*, How to Draft, pp. 191/2; *Delaume*, Reflections, p. 16; *Jacob, K. S.*, Reinvigorating ICSID with a New Mission and with Renewed Respect for Party Autonomy, 33 Virginia Journal of International Law 123, 152 *et seq.* (1992).
103    *Gaillard, E.*, Some Notes on the Drafting of ICSID Arbitration Clauses, 3 ICSID Review – FILJ 136, 142/3 (1988); *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 245 (1973/74).

*Article 52 – Annulment*                                               919

Examples are Arts. 26, 38, 43, 46, 47, 60 and 63. Art. 52 does not contain such a formula.

It has been suggested that Art. 44, which provides that arbitration proceedings shall be conducted in accordance with the Convention's Section 3 of Chapter IV, that is Arts. 41–47, does not extend to Section 5 of which Art. 52 is part. Therefore, Art. 52 would seem to be derogable by the parties' agreement.[104] This argument overlooks the fact that Art. 52(4) specifically extends the application of Art. 44 to proceedings before an *ad hoc* committee (see Art. 44, paras. 6, 7).

**52**

The Arbitration Rules are generally subject to modification or exclusion by the parties (see Art. 44, paras. 10–19). Therefore, the parties may modify or even exclude Rules 50 and 52–55 dealing with annulment. But this does not mean that they may thereby opt out of Art. 52.[105]

**53**

Apart from the Convention's wording, an interpretation that looks at the object and purpose of Art. 52 would also support the conclusion that annulment is not generally at the parties' disposal. The limited review process provided by the Convention does not serve only the interests of the parties. It is also designed to preserve the integrity of the system of ICSID arbitration and has a public order function (see para. 14 *supra*).[106] Therefore, a general or near general exclusion of annulment by advance agreement does not appear possible.

**54**

This does not rule out a differentiated approach, such as the one suggested by *Delaume*,[107] under which the parties might be allowed to agree on the exclusion of grounds for annulment related to matters over which they can exercise control. With respect to jurisdiction this would mean that the parties may undertake not to seek annulment on the ground that the tribunal has gone beyond the scope of their consent. This would preserve the possibility to seek annulment on the ground that the award has violated one of the Convention's objective requirements for jurisdiction *ratione materiae* or *ratione personae*, such as the requirement of a legal dispute arising directly out of an investment or that the investor be a national of another Contracting State. Similarly, in choosing the applicable law under Art. 42, the parties may give the tribunal much discretion, adding that they undertake not to seek annulment for failure to apply the proper law.

**55**

The question is more problematic with respect to a serious departure from a fundamental rule of procedure. While the parties are free to shape the procedure through agreement (see Art. 44, paras. 10–19), Art. 52(1)(d) is not directed at procedural technicalities such as the parties may wish to modify, but at requirements of basic procedural fairness that are inherent in any judicial process. These are so fundamental to the ICSID arbitration process that they must be seen to be

**56**

104  *Reisman*, The Breakdown, p. 805; *Jacob*, Reinvigorating ICSID, p. 153.
105  See also *Seidl-Hohenveldern*, Die Aufhebung, p. 111.
106  *Delaume*, The Finality of Arbitration, pp. 33/4; *Delaume*, How to Draft, p. 191; *Reisman*, The Breakdown, p. 805; *Broches*, Observations, pp. 373/4; *Reisman, W. M.*, Repairing ICSID's Control System: Some Comments on Aron Broches' Observations on the Finality of ICSID Awards, 7 ICSID Review – FILJ 196, 208 (1992).
107  *Delaume*, How to Draft, pp. 191/2.

920                        THE ICSID CONVENTION: A COMMENTARY

part of the framework of public order, preserving the institution's integrity and legitimacy.

**57**     Even more difficult is the question whether the parties should be allowed to waive annulment for failure to state reasons. Arbitration without any or with very little reasoning is not *per se* unthinkable or illegitimate (see Art. 48, para. 54). But in the case of ICSID, a conscious decision was made to require reasons (see Art. 48, para. 56, and paras. 107, 339, 340 *infra*). This requirement would appear to reflect not only the parties' interests but also the institution's interest in the integrity and credibility of the process.[108]

**58**     Thus even on the assumption that some form of advance waiver of certain grounds for annulment is possible, it will be difficult to determine which kinds of waiver are permissible and which are not. The decision on the effect of exclusion agreements will not be with the Secretary-General but with the *ad hoc* committee (see para. 101 *infra*).[109] It is impossible to predict with certainty how *ad hoc* committees will react to clauses waiving the right to request annulment.

**59**     It is doubtful whether parties should be encouraged to enter into exclusion agreements. Such agreements may create the deceptive impression that they are an effective barrier against annulment. Even if they work, it is impossible to predict at the time they are drafted in whose favour they might operate. A party that wishes to preserve the finality of a future award may later regret that it has given up a possible remedy against an unfavourable decision. Moreover, the situation that led to the suggestions to restrict annulment – the expansive exercise of the *Klöckner I* and *Amco I* Committees of their powers – seems to have been corrected by later decisions on requests for annulment (see para. 31 *supra*).

### c) Waiver through Failure to Object before the Tribunal

**60**     A different form of "waiver" of the right to request annulment may arise if a party fails to make a timely objection to a defect that may give rise to annulment. Arbitration Rule 27 provides:

> #### Rule 27
> ##### *Waiver*
> A party which knows or should have known that a provision of the Administrative and Financial Regulations, of these Rules, of any other rules or agreement applicable to the proceeding, or of an order of the Tribunal has not been complied with and which fails to state promptly its objections thereto, shall be deemed – subject to Article 45 of the Convention – to have waived its right to object.

Arbitration Rule 27 does not, in terms, refer to annulment. But Arbitration Rule 53 extends the applicability of the Arbitration Rules, including Rule 27, to annulment proceedings in general terms. Also, it would appear unacceptable to let a party that has knowingly failed to challenge a serious irregularity before the tribunal later attack the award in annulment proceedings. A party who, with notice of the defect

---

108   See also *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 5.10–5.11.
109   *Contra*: *Jacob*, Reinvigorating ICSID, pp. 156 *et seq*.

in question, has failed to seek the disqualification of an arbitrator under Art. 57, has failed to object to the tribunal's jurisdiction under Art. 41 or has failed to oppose a procedural irregularity should not be allowed to request annulment on the ground of improper constitution of the tribunal (see paras. 124–129 *infra*), manifest excess of powers (see paras. 172–174 *infra*) or serious departure from a fundamental rule of procedure (see paras. 334–337 *infra*). To hold otherwise would mean that a party that is aware of a serious defect that may constitute a ground for annulment might be tempted to refrain from raising that defect before the tribunal in order to later attack an unfavourable award in annulment proceedings (see also paras. 119, 124–129, 174, 334–337 *infra*). Therefore, unlike advance waiver which is given before the ground for annulment has arisen, failure to object to a defect that has arisen in the course of the arbitration proceedings deprives a party from using this defect as a ground for annulment.

## B. "... of the award..."

### 1. Pre-Award Decisions

Requests for annulment may be made in respect of awards but not in respect of other decisions (see Art. 48, paras. 22–30). The drafts leading to the Convention all referred to awards in this context (History, Vol. I, pp. 230–232). At one point, the suggestion was made to open the possibility for annulment before a final award is rendered in relation to an interim decision making a ruling on a preliminary objection or in relation to the constitution of the tribunal (History, Vol. II, pp. 850, 851). This was opposed by members of the Legal Committee who thought that it was not only unnecessary but would open endless possibilities to frustrate or delay the proceedings (at p. 852). A proposal that the parties be given an immediate right of redress after a tribunal had decided that it was properly constituted, without having to wait for the award, was defeated by a clear majority (at p. 853) (see also para. 119 *infra*). **61**

Therefore, it is clear that a preliminary decision upholding jurisdiction and paving the way for a subsequent award on the merits is not an award for purposes of Art. 52(1). It is not subject to an independent request for annulment (see Art. 41, paras. 26, 27). Preliminary decisions on jurisdiction are subsequently incorporated into awards either explicitly or by implication (see Art. 41, para. 78). At that stage they become subject to annulment as parts of awards. **62**

If the tribunal decides that the dispute is not within the Centre's jurisdiction or outside its competence (see Art. 25, para. 15; Art. 41, paras. 56, 57) it will render an award to this effect[110] (Arbitration Rule 41(5)). Such an award is, by definition, final and subject to annulment. **63**

---

110  See *e.g.*, *Vacuum Salt* v. *Ghana*, Award, 16 February 1994; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997; *Mihaly* v. *Sri Lanka*, Award, 15 March 2002; *Soufraki* v. *UAE*, Award, 7 July 2004; *Joy Mining* v. *Egypt*, Award, 6 August 2004; *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Award, 7 February 2005; *Inceysa* v. *El Salvador*, Award, 2 August 2006; *Telenor* v. *Hungary*, Award, 13 September 2006; *Malaysian Historical*

**64**    Other decisions of the tribunal prior to its award are also not subject to annulment. This applies to procedural orders (see Art. 44, paras. 53–58) or to decisions on provisional measures under Art. 47. To the extent that such interim measures are reflected in the award, they become subject to annulment.

**65**    In *Holiday Inns* v. *Morocco*, the proceedings had been suspended following the resignation of a member of the Tribunal and the death of its President. The reconstituted Tribunal made a Decision and Procedural Order determining the modalities of the continuation of the proceedings. The Claimant submitted to the Secretary-General a request for annulment of this Decision and Procedural Order. The Secretary-General declared that he had no power to register the request for annulment, since the Convention provides for the annulment of awards and no award had been rendered.[111]

**66**    In *SPP* v. *Egypt*, the Tribunal had made a Decision on Jurisdiction.[112] Egypt filed an application for annulment of this decision. The acting Secretary-General declared that the Decision on Jurisdiction was not an "award" as the term is used in Art. 52 of the Convention and Arbitration Rule 50 and that, therefore, he did not have the power to register the application for annulment.[113]

**67**    The fact that a preliminary decision on jurisdiction may become the subject of a request for annulment as part of the award which incorporates it is shown by the annulment proceedings in *Amco I*. Indonesia's application for annulment contained the complaint that the Decision on Jurisdiction[114] constituted an excess of powers. The Decision on Jurisdiction had been incorporated into the Award by reference.[115] The admissibility of the request for annulment relating to the Decision on Jurisdiction was not called into question but Indonesia later withdrew this ground for annulment (see para. 47 *supra*).[116]

**68**    The deferment of requests for annulment until after the tribunal has handed down its final award appears sensible. It does run the risk of lengthy proceedings which are in the end declared null because the initial decision on jurisdiction constituted an excess of powers or because the tribunal was not properly constituted. But this danger appears to be more than offset by the risk of repeated interruptions and delays caused by annulment proceedings relating to interim decisions. The possibility to attack preliminary decisions at every stage of the proceedings would be an open invitation to an uncooperative party bent on disruption and delay. The

---

*Salvors* v. *Malaysia*, Award, 17 May 2007; *Bayview* v. *Mexico* (AF), Award, 19 June 2007; *Fraport* v. *Philippines*, Award, 16 August 2007.

111   ICSID Twelfth Annual Report 1977/78, p. 5. See also *Broches*, Observations, p. 328; *Broches*, Convention, Explanatory Notes and Survey, pp. 688/9.

112   *SPP* v. *Egypt*, Decision on Jurisdiction II, 14 April 1988.

113   News from ICSID, Vol. 6/1, p. 2. See also *Caron*, Reputation and Reality, p. 37; *Delaume, G. R.*, The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231, 238/9 (1993).

114   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983.

115   *Amco* v. *Indonesia*, Award, 20 November 1984, para. 4.

116   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 67–69.

consolidation of all grounds for annulment in one set of proceedings after the tribunal has completed its work is clearly the preferable solution.[117]

### 2. Parts of Awards

Whether a party may request annulment of part of an award rather than the entire award would seem doubtful at first sight. During the Convention's drafting the issue was discussed and a proposal to permit a request for annulment of only part of the award was defeated by a large majority (History, Vol. II, pp. 850, 851, 852). Thus the words "of the award" might be thought not to include "or any part thereof". **69**

On the other hand, Art. 52(3), last sentence, specifically provides that the *ad hoc* committee shall have the authority to annul the award *or any part thereof* (see paras. 494–510 *infra*). It is true that a decision to annul might only be partial even if the request related to the entire award. But it would seem illogical to require a party to request annulment of the entire award even though it only seeks annulment of parts thereof.[118] This is particularly so where the award deals with a claim and a counter-claim and the party requesting annulment only wishes to attack the part of the award that is unfavourable to it. **70**

In *MINE* v. *Guinea*, Guinea requested partial annulment of the award, explaining that "Guinea does not seek annulment of the decision on the two counter-claims, . . .".[119] The *ad hoc* Committee had no doubts concerning the admissibility of this request: **71**

> 4.07 Paragraph (3) of Article 52 authorizes an *ad hoc* Committee to annul *the award or any part thereof*. Guinea's request for partial annulment is clearly admissible. It seeks the annulment of the portion of the Award adjudging MINE's claim. It does not request annulment of the portion of the Award adjudging Guinea's counter-claim. Nor, for that matter, has annulment of that portion been requested by MINE. That portion of the Award will remain in effect regardless of the annulment in whole or in part of the portion of the Award in respect of which Guinea has formulated its request for annulment.[120]

In *Vivendi I*, the Claimant sought partial Annulment of the Award dated 21 November 2000. Argentina responded that, if any one of the asserted grounds were upheld, the Award as a whole should be annulled.[121] The *ad hoc* Committee **72**

---

117  See also *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 45 *et seq.* (1993). For a contrary view see *Pinsolle, P.*, The Annulment of ICSID Arbitral Awards, 1 The Journal of World Investment 243, 253–255 (2000); *Pinsolle, P.*, Jurisdictional Review of ICSID Awards, 5 The Journal of World Investment & Trade 613 (2004).

118  See also *Broches*, Observations, p. 333.

119  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 2.01.

120  *Ibid.*, para. 4.07. Italics original. For a critical comment on this point see *Caron*, Reputation and Reality, p. 36.

121  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 2, 67.

held that the scope of the application will not constrain the power of the Committee to decide to what extent an impugned award should be annulled, if at all.[122]

**73**    Whether a "partial award" is subject to annulment is an open question. It may be suggested that a request for annulment is admissible if the partial award is not of a preliminary or interlocutory nature but deals with a clearly defined portion of the dispute, is severable from the remainder of the arbitration and may be regarded as final.[123]

### 3. Orders and Awards Noting Settlement and Discontinuance

**74**    A significant proportion of cases registered with ICSID are ultimately settled by agreement of the parties. Arbitration Rule 43(1) provides that if the parties agree on a settlement of the dispute before the award is rendered, the tribunal shall take note of the discontinuance in an order (see Art. 48, paras. 70, 71).[124] An order under Rule 43(1) is not an award. It is not subject to annulment.

**75**    Under Arbitration Rule 43(2), if the parties provide the full text of their settlement and request the tribunal to embody this settlement in an award, the tribunal may record the settlement in the form of its award (see Art. 48, paras. 70, 72–79).[125] The tribunal is under no obligation to comply with the request. It may instead render an award declining jurisdiction. If the tribunal finds it improper to take part in a particular settlement, it can note the discontinuance of proceedings in a simple order.

**76**    If the tribunal accedes to the parties' request in accordance with Rule 43(2), the result is an award. Such an award is, in principle, subject to annulment. But the applicability of the grounds for annulment listed in Art. 52(1) will be severely restricted. Improper constitution of the tribunal and corruption of one of its members might be invoked, but it is difficult to see how this could affect the outcome of an agreed settlement. Excess of powers is possible if the settlement adopted by the tribunal as its award goes beyond ICSID's jurisdiction or the tribunal's competence. Excess of powers may also arise if the settlement does not dispose of the dispute in its entirety but only covers certain of its aspects. A serious departure from a fundamental rule of procedure will hardly be material in an agreed settlement. Since the tribunal's obligation to state reasons will not go beyond a reference to the parties' agreement, failure to state reasons would not apply.

### 4. Post-Award Decisions

**77**    Under Art. 49(2), the tribunal may upon the request of a party decide a question it had omitted to decide in the award and shall rectify any clerical, arithmetical or

---

122  *Ibid.*, paras. 68/9.                    123  *Caron*, Reputation and Reality, p. 37.
124  If the tribunal has not yet been constituted, this duty is incumbent upon the Secretary-General.
125  For example, this was the case in *Guadalupe Gas* v. *Nigeria*, Award Pursuant to Arbitration Rule 43(2), 22 July 1980, unpublished.

similar error in the award. Such a decision will become part of the award. As such it is also subject to annulment.

In the resubmitted case in *Amco* v. *Indonesia*, the Tribunal issued a Decision **78** on Supplemental Decisions and Rectification in accordance with Art. 49(2)[126] (see Art. 49, paras. 42, 43). Indonesia requested annulment of this supplemental Award on a number of grounds including serious violation of a fundamental rule of procedure (see paras. 306, 307 *infra*). The *ad hoc* Committee in *Amco II* annulled this decision (see para. 308 *infra*).[127] Both parties had also requested annulment of the Award in the resubmitted case to which the supplemental Award related. But the application for annulment of the supplemental Award was submitted separately, at a later date and by only one party.[128] The request to annul the supplemental Award was consolidated with the requests to annul the second Award.[129] Nevertheless, this treatment indicates that decisions under Art. 49(2) are subject to separate requests for annulment despite their being part of the award (see also paras. 69–73 *supra*).

Under Art. 50, the parties may request an interpretation of the award. Under Art. **79** 51 they may request its revision on the ground of discovery of new facts. Unlike Art. 49(2), these Articles do not state that decisions on interpretation and revision shall become part of the award (see Art. 50, paras. 27–29; Art. 51, para. 25). Art. 53(2) provides that "award" shall include any decision interpreting, revising or annulling such award pursuant to Arts. 50, 51 and 52 *for the purpose of Section 6* of Chapter IV; that is, for the purpose of recognition and enforcement. Section 5, dealing with interpretation, revision and annulment, does not contain a similar clause. Therefore, annulment is not available in relation to decisions interpreting or revising awards. Conversely, interpretation and revision are not available in relation to decisions on annulment (see Art. 50, para. 13; Art. 51, para. 6; paras. 545, 546 *infra*).

Decisions on annulment are not themselves subject to annulment. This is a **80** further illustration of the different use of the word "award" in Arts. 52 and 53. An *ad hoc* committee is an invigilator of last recourse. Its decision is not subject to any formal process of review by way of annulment or otherwise.

The award of a new tribunal under Art. 52(6), to which a dispute is resub- **81** mitted after the annulment of the first award, is an award in the full sense of Art. 52. Therefore, it is subject to annulment in exactly the same manner as the award of the first tribunal. Parts of the first award that have not been annulled by the first *ad hoc* committee become *res judicata* and are, therefore, not part of the award of the new tribunal (see paras. 674–682 *infra*). It follows that these

---

126  *Amco* v. *Indonesia*, Resubmitted Case: Rectification, 17 October 1990, 1 ICSID Reports 638.
127  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992. See also *Broches*, Convention, Explanatory Notes and Survey, pp. 693/4.
128  1 ICSID Reports 640.
129  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 1.13.

surviving parts of the first award are not subject to annulment by a second *ad hoc* committee.

**82**    In *Klöckner II* as well as in *Amco II*, the Awards of the new Tribunals were the object of requests for annulment by both parties. In both cases the second *ad hoc* Committees rejected the requests, although in *Amco II* the Second Tribunal's supplemental Award was annulled (see para. 78 *supra*).

## C.  "... by an application in writing addressed to the Secretary-General ..."

### *1. Procedure*

**83**    The procedure for the submission of a request for annulment is regulated by Arbitration Rule 50. It provides in relevant part:

#### Rule 50
##### *The Application*

(1) An application for the interpretation, revision or annulment of an award shall be addressed in writing to the Secretary-General and shall:

(a)  identify the award to which it relates;

(b)  indicate the date of the application;

(c)  state in detail:

. . .

(iii)  in an application for annulment, pursuant to Article 52(1) of the Convention, the grounds on which it is based. These grounds are limited to the following:

– that the Tribunal was not properly constituted;

– that the Tribunal has manifestly exceeded its powers;

– that there was corruption on the part of a member of the Tribunal;

– that there has been a serious departure from a fundamental rule of procedure;

– that the award has failed to state the reasons on which it is based;

(d)  be accompanied by the payment of a fee for lodging the application.

(2) Without prejudice to the provisions of paragraph (3), upon receiving an application and the lodging fee, the Secretary-General shall forthwith:

(a)  register the application;

(b)  notify the parties of the registration; and

(c)  transmit to the other party a copy of the application and of any accompanying documentation.

(3) The Secretary-General shall refuse to register an application for:

. . .

(b)  annulment, if, in accordance with Article 52(2) of the Convention, it is not made:

(i)  within 120 days after the date on which the award was rendered (or any subsequent decision or correction) if the application is based on any of the following grounds:

– the Tribunal was not properly constituted;

– the Tribunal has manifestly exceeded its powers;

– there has been a serious departure from a fundamental rule of procedure;

– the award has failed to state the reasons on which it is based;

(ii) in the case of corruption on the part of a member of the Tribunal, within 120 days after discovery thereof, and in any event within three years after the date on which the award was rendered (or any subsequent decision or correction).

(4) If the Secretary-General refuses to register an application for revision, or annulment, he shall forthwith notify the requesting party of his refusal.

**84** The application must identify the award to which it relates. The date of the application is important in view of the time limits provided by Art. 52(2) (see paras. 435–450 *infra*). The application should state clearly that it seeks the annulment of the award. If a party also seeks other remedies such as supplementation and rectification (Art. 49(2)), interpretation (Art. 50) or revision (Art. 51), it should do so by filing separate applications. This is necessary in view of the different time limits and procedures for these remedies. For instance, the Secretary-General may have to refuse registration of an application for rectification or revision as being outside the time limit of Art. 49(2) or 51(2), whereas an application for annulment would still be admissible.[130]

**85** Under Administrative and Financial Regulation 16, the party requesting annulment of an arbitral award shall pay to the Centre a non-refundable fee determined from time to time by the Secretary-General.[131]

**86** If the Secretary-General registers the application, he or she will notify both parties of the registration and will transmit a copy of the application and any accompanying documentation to the other party.

### 2. Substantiation

**87** The application should not restrict itself to a simple assertion that one or more of the five grounds for annulment is present but should also state which of the award's features exhibit flaws that constitute grounds for annulment. Arbitration Rule 50(1)(c) requires that the application shall state in detail the grounds on which it is based (see para. 83 *supra*).

**88** In *Amco I*, Amco contended that certain pleas advanced by Indonesia were time-barred since they were not raised in the original Application for Annulment but only in Indonesia's Memorial and outside the time limit of Art. 52(2). In considering the initial Application, the *ad hoc* Committee said:

46. It appears to the *ad hoc* Committee that Arbitration Rule 50(1)(c) is not adequately complied with by an Application for annulment which merely recites *verbatim* the specific subparagraph(s) of Articles 52(1) of the Convention being

130   See Note B to Arbitration Rule 50 of 1968, 1 ICSID Reports 111.
131   See Schedule of Fees, para. 2.

928                    THE ICSID CONVENTION: A COMMENTARY

> invoked by the applicant. The thrust of Arbitration Rule 50 is not successfully avoided by coupling a recital of the subparagraphs invoked with a general reservation of a "right to supplement (a) presentation [of Indonesia's claims] with further written submissions" . . . [132]

89      This does not preclude the requesting party from further developing its argument in its memorial. A Note to Arbitration Rule 50 of 1968 states that the procedure pertaining to the filing and registration of an application for annulment is roughly analogous to that for the filing and registration of an original request for arbitration in accordance with the Institution Rules.[133] Institution Rule 2(1)(e) states that the request shall contain information concerning the issues in dispute. A Note to Institution Rule 2 of 1968 states that no evidence on this subject need be submitted at this stage. The information given can be developed by the requesting party in subsequent phases of the proceeding.[134]

90      The *ad hoc* Committee in *Amco I* took this to mean that the statements made in Indonesia's Application for Annulment could be taken together with the development and amplification of such statements in Indonesia's Memorial. The *ad hoc* Committee then proceeded to a detailed examination to verify whether the claims for annulment, as contained in Indonesia's Memorial, could reasonably be considered as covered by the statements made in its Application for Annulment (see para. 442 *infra*).[135]

91      Also in *Amco I*, Indonesia subsequently developed an argument at the hearings that the acts of the army and police personnel in the hotel's forcible takeover, if illegal under international law, constituted an international tort which was quite different from an investment dispute. Indonesia argued that, by assuming jurisdiction over that aspect of the case, the Tribunal had manifestly exceeded its powers. The *ad hoc* Committee disagreed with the substance of the argument (see Art. 25, para. 71) and found that Indonesia had waived its claims of nullity relating to the Tribunal's jurisdiction (see para. 47 *supra*). The *ad hoc* Committee added that, even if this were otherwise, Indonesia was time-barred from presenting this argument for the first time at the hearings.[136]

92      *Klöckner II* contains a detailed analysis of the requirements of Arbitration Rule 50(1)(c). Cameroon objected to the admissibility of Klöckner's Application for Annulment on grounds that it had not supplied "a detailed statement of the reasons therefor".[137] The objection was unsuccessful, since the grounds invoked in the Application and the reasons underpinning the complaint were capable of being understood.[138]

---

132  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 46.
133  Note B to Arbitration Rule 50 of 1968, 1 ICSID Reports 111.
134  Note K to Institution Rule 2 of 1968, 1 ICSID Reports 55.
135  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 52, 53.
136  At para. 69.
137  *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990, paras. 4.21–4.43.
138  *Ibid.*, para. 4.43.

The *ad hoc* Committee in *Wena Hotels* v. *Egypt* also addressed the requirements    **93**
of Arbitration Rule 50(1)(c). Wena objected that certain grounds for annulment
were time-barred because they had not been argued in the initial Application for
Annulment, but only later in the Memorial. Wena conceded, however, that the
new arguments did not exceed the scope of the grounds for annulment initially
invoked. The Committee ruled that:

> Arbitration Rule 50(1)(c) requires indeed that the grounds for annulment be
> stated "in detail" in the application for annulment. On the other hand, the ICSID
> Convention does not state any requirement of completeness of the Application,
> except to the extent that the Application must invoke one or more of the grounds
> listed in Article 52(1) on which it is based. The ICSID Convention thus does
> not preclude raising new arguments which are related to a ground of annulment
> invoked within the time limit fixed in the Convention. This is of no harm to the
> opposing party, which is not required to answer the Request, but later only the
> first memorial of the Applicant. The Committee therefore does not retain Wena's
> objection.[139]

Provided a head of annulment in Art. 52(1) is invoked in the Application, it    **94**
appears open to an Applicant to develop it with further arguments in the Memorial.
New arguments will not be ruled inadmissible on grounds of failure to comply
with Arbitration Rule 50(1)(c).

### 3. Screening

Art. 36(3), which relates to a request for arbitration, provides that the Secretary-    **95**
General shall register the request unless he or she finds, on the basis of the informa-
tion contained in the request, that the dispute is manifestly outside the jurisdiction
of the Centre. The idea of the screening power under Art. 36(3) is to avoid the
embarrassment to a party, particularly a State, which might result from the institu-
tion of proceedings against it in a dispute which it had not consented to submit to
the Centre or which for other reasons is obviously outside the Centre's jurisdiction,
for instance if the State party is not a Contracting State to the Convention or the
other party is not a national of a Contracting State[140] (see Art. 36, paras. 44–47).

Art. 52 does not provide for a screening power of this kind by the Secretary-    **96**
General in relation to a request for annulment. Arbitration Rule 50(3)(b) (see
para. 83 *supra*) merely states that the Secretary-General shall refuse to register the
application if it is outside the time limits of Art. 52(2).

But registration of an application does not settle the question of the time limit    **97**
conclusively. A Note to Arbitration Rule 50 of 1968 states that the registration
of an application does not preclude the *ad hoc* committee from deciding that
an application is not receivable, as having been filed after the expiration of the
time limit established by the Convention.[141] This was confirmed by the *ad hoc*

---

139   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 19.
140   See Report of the Executive Directors, para. 20, 1 ICSID Reports 27.
141   Note C to Arbitration Rule 50 of 1968, 1 ICSID Reports 112.

930    THE ICSID CONVENTION: A COMMENTARY

Committee in *Amco I*, which pointed out that the registration of Indonesia's Application for Annulment did not, by itself, resolve the time-bar argument of Amco[142] (see paras. 88–90 *supra*, 439, 450 *infra*).

**98**    The Secretary-General's duty to refuse registration of an application for annulment applies also if the decision in question is not an award in the sense of Art. 52(1) (see paras. 61–82 *supra*). There are two known instances in which the Secretary-General refused to register applications for annulment because they did not relate to awards (see paras. 65, 66 *supra*). But a decision by the Secretary-General to register an application will not preclude the *ad hoc* committee from examining the question of whether it relates to an award.

**99**    The Secretary-General will also refuse to register an application for annulment if it is not submitted by one or both of the parties to the original arbitration proceeding (see paras. 41, 42 *supra*). Problems concerning the identity of the parties may arise (see para. 43 *supra*). The Secretary-General's decision to register an application will not preclude the *ad hoc* committee from examining this question.

**100**    If the application for annulment does not state in sufficient detail the grounds on which it is based in accordance with Arbitration Rule 50(1)(c)(iii), the Secretary-General is unlikely to refuse registration but will give the requesting party an opportunity to amend and supplement its application.

**101**    It is unlikely that the Secretary-General will refuse to register an application for annulment because a party has waived its right to request annulment entirely or in part. It is doubtful whether advance waiver of this right is permissible at all (see paras. 46–58 *supra*). But even if it is, the resulting problems of which forms of waiver are permissible will have to be dealt with by the *ad hoc* committee and not by the Secretary-General (see para. 58 *supra*).

**102**    The Secretary-General does not have the power to examine whether the application is well-founded. He or she will have to register it even if the Secretary-General thinks that it has no merit. There is no substantive screening of an application[143] (see also paras. 129, 174, 334 *infra*). But if it is obvious that a request is frivolous or abusive, the Secretary-General may conclude that it is not really a request for annulment subject to registration.

**103**    Frivolous and abusive applications for annulment may be dealt with through *ad hoc* committees' decisions on costs.[144] Under Art. 61(2), the tribunal decides how and by whom the costs shall be paid. Art. 52(4) extends the application of Art. 61(2) to annulment proceedings. Arbitration Rule 28(1)(b) provides that the tribunal may decide with respect to any part of the proceeding that the related costs shall be borne entirely or in a particular share by one of the parties. Arbitration Rule 53 extends the applicability of the Arbitration Rules generally to any procedure

---

142    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 47.
143    For suggestions to introduce such a mechanism see *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 160/1 (1993).
144    See *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 89; *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, paras. 87/8.

relating to annulment (see Art. 61, paras. 4, 57, 58, 61, 64). The *ad hoc* committee may also require advance payments in accordance with Arbitration Rule 28(1)(a) and Administrative and Financial Regulation 14(3).[145] *Broches* has suggested that an *ad hoc* committee may attach to a decision finding that the application is not admissible a condemnation of the applicant to pay compensatory and even punitive damages.[146] In view of the reluctance of international tribunals to accept the concept of punitive damages, it is doubtful whether this suggestion will be taken up. Although in exceptional cases *ad hoc* committees may order one party to pay the costs of the other party and of ICSID,[147] the common practice is for committees, in their discretion, to make no order as to the parties' own costs and to hold that the committee's and ICSID's costs should be borne equally by the parties. This practice is evident both where applications for annulment succeed and where they fail.[148]

In *CDC* v. *Seychelles*, the *ad hoc* Committee ordered the unsuccessful applicant for annulment to pay CDC's costs, given that the application was "fundamentally lacking in merit".[149] In *Repsol* v. *Petroecuador*, the *ad hoc* Committee ordered Petroecuador to bear all costs incurred by the Centre and the Committee. It was also directed to pay one half of Repsol's professional fees and expenses. The reason given was the exceptional delay in the proceedings brought about by Petroecuador's "tardiness in making the first advance payment requested by the Centre", and "its continual refusal to pay the subsequent advances".[150] **104**

### D.  ". . . on one or more of the following grounds:"

#### 1. History

The Working Paper for the Convention did not provide for annulment and hence listed no grounds. The Preliminary Draft[151] foresaw three grounds: excess of powers, corruption and departure from a fundamental rule of procedure including failure to state the reasons for the award (History, Vol. I, p. 230). There was little reaction to this provision. One delegate thought that the grounds for annulment should be set out in greater detail. Another pointed to the risk of frustration of awards and suggested that the section be made more restrictive (History, Vol. II, p. 423). **105**

---

145  Typically the applicant for annulment is required to make advance payments, although where both parties have sought annulment, advances on costs may be apportioned: see *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 3.08.
146  *Broches*, Observations, p. 328.
147  See *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 89; *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, paras. 87, 88.
148  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 110; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 138; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 161.
149  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 89, 90.
150  *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 88.
151  The Preliminary Draft is closely modelled on the International Law Commission's 1958 Model Rules on Arbitral Procedure, Art. 35, YBILC 86 (1958-II).

**106**    The First Draft listed the improper constitution of the tribunal as an additional ground for annulment (see also paras. 118, 119 *infra*). It added that any excess of powers would have to be manifest. Failure to state the reasons for the award became a ground separate from serious departure from a fundamental rule of procedure. Failure to state reasons was qualified by the words "unless the parties have agreed that reasons need not be stated" (History, Vol. II, p. 232).

**107**    There was some debate on whether the reasons for annulment should not be drafted more restrictively, and several delegates pointed out that annulment should be confined to very rare cases based on exceptional causes and for very extreme cases of serious misconduct (History, Vol. II, pp. 850, 852, 854). The qualifying clause to failure to state reasons referring to the parties' agreement was removed after it had been decided that the tribunal's duty to provide reasons should not be subject to the parties' discretion (at p. 816) (see also Art. 48, para. 56). Otherwise, the text remained substantively unchanged in the Revised Draft (History, Vol. I, p. 232) and in the Convention as eventually adopted.

### 2. Exhaustive Nature of Grounds

**108**    The reasons for annulment as listed in Art. 52(1) are exhaustive.[152] Any request for annulment must be brought under at least one of these grounds. Arbitration Rule 50(1)(c)(iii) (see para. 83 *supra*) states explicitly that the grounds are limited to those listed[153] (see also paras. 511–515 *infra*). This means, in particular, that a party may not present new arguments on fact and law that it failed to put forward in the original arbitral proceeding. The *ad hoc* Committees in *Klöckner I* and in *MINE* pointed out that an application for annulment was not an occasion for a party to present, complete and develop an argument which it could and should have made in the arbitral proceeding.[154] Nor should a party present new contemporaneous evidence, since annulment takes as its premise "the record before the tribunal".[155]

**109**    The restriction to the five listed grounds for annulment has forced applicants to present other perceived flaws in the award in terms of these grounds. For instance, Art. 42(1) directs the tribunal to decide the dispute in accordance with the proper law. Art. 52(1) does not say, in terms, that failure to apply the proper law shall be a ground for annulment. But parties have argued that a violation of Art. 42(1) may constitute a manifest excess of powers (see paras. 192–270, 512 *infra*) or a failure to state reasons (see paras. 238, 248, 521 *infra*).

**110**    Similarly, Art. 48(3) requires that the award deal with every question submitted to the tribunal and shall state the reasons upon which it is based. Art. 52(1)(e) lists failure to state reasons as a ground for annulment. It does not say, in terms, that failure to deal with every question submitted to the tribunal shall be a ground for

---

152    *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 17, 18.
153    The grounds listed in Arbitration Rule 50(1)(c)(iii) reproduce the list of Art. 52(1).
154    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 83. See also *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.42.
155    *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 31.

annulment. But parties have argued, not always with success, that a failure to deal with every question in the sense of Art. 48(3) constitutes either a serious departure from a fundamental rule of procedure or a failure to state the reasons for the award (see paras. 300, 399–434, 513 *infra*).[156]

### 3. *Use of Multiple Grounds*

Art. 52(1) states that a request for annulment may be based on *one or more* of the grounds listed there. One of the most widely accepted strategic principles of litigation is to seek a remedy not by a single shot method but by a shrapnel tactic whereby a multitude of arguments is fired off simultaneously in the hope that at least one of them will score a hit. Although one of the grounds listed in Art. 52(1) would be sufficient to cause the award's annulment, the applicants typically list several of them. **111**

Of the five grounds for annulment, two have not been used in any of the published decisions on annulment. They are improper constitution of the tribunal (see paras. 118–129 *infra*) and corruption on the part of a member of the tribunal (see paras. 271–277 *infra*). The first of these has been raised by Argentina in pending annulment proceedings, but no decision has yet been published on this ground at the time of writing.[157] As illustrated in the table above (see after para. 28 *supra*) the other three grounds have been invoked in most cases to cover a large variety of perceived shortcomings in the awards under scrutiny (see also paras. 524–530 *infra*). **112**

### 4. *Classification of Grounds*

The fact that the different grounds for annulment do not constitute neatly distinguishable categories was already apparent during the Convention's drafting. There was some debate on whether failure by a tribunal to decide all matters submitted to it would constitute an excess of powers or a serious departure from a fundamental rule of procedure (History, Vol. II, pp. 342, 848/9). There was also some uncertainty as to whether failure to state reasons was a serious departure from a fundamental rule of procedure (at p. 851) or a separate ground for annulment (see paras. 105, 106 *supra*). **113**

Practice has demonstrated not only that a wide array of perceived flaws are subsumed under the three frequently used grounds in Art. 52(1) but also that the same set of facts is often seen to amount to different grounds for annulment simultaneously (see also paras. 516–523 *infra*). Not infrequently, it is argued that one and the same aspect of an award constitutes a manifest excess of powers, a serious departure from a fundamental rule of procedure and a failure to state reasons or, at least, falls under two of these grounds. In *Lucchetti* v. *Peru*, the **114**

---

156  See also *Reisman*, The Breakdown, pp. 763 *et seq.*, 788 *et seq.*; *Reisman*, Repairing ICSID's Control System, pp. 202 *et seq.*

157  See *Azurix* v. *Argentina*, Decision on Continued Stay of Enforcement, 28 December 2007, para. 2.

*ad hoc* Committee suggested that one ground for annulment could be seen as reinforcing another.[158] This should not be construed to mean that a defect that does not, by itself, warrant annulment may rise to the level of one that does by the compound effect of other deficiencies in an award.

**115**   It is an infelicitous feature of the Decision on Annulment in *Mitchell* v. *DR Congo* that the *ad hoc* Committee seemed to find a manifest excess of power, where it said there otherwise would not have been, when coupled with a failure to state reasons:

> 45. The *ad hoc* Committee has already identified a serious failure to state reasons as to the existence of an investment on which the jurisdiction of the Arbitral Tribunal would be based. If this had not been the case and the Award had been adequately and cohesively reasoned as to the existence of an investment by the Claimant, the error committed by the Arbitral Tribunal as to the inclusion of non-reinvested returns in the notion of investment could not be identified as a manifest excess of power . . . this combination of flaws in the Award is such that an excess of power on the part of the Arbitral Tribunal must be acknowledged.[159]

**116**   The grounds for annulment in Art. 52(1) are not satisfied merely by an accumulation of complaints: "a series of errors is no more necessarily a ground for annulment than a single error".[160] It is still necessary to distinguish the various grounds for challenge,[161] since the different grounds raise different problems, which have to be addressed independently.[162]

**117**   The decisions of *ad hoc* committees reflect uncertainty concerning the exact meaning and reach of the grounds for annulment. Extensive interpretations of these grounds and multiple classifications of shortcomings of awards in terms of these grounds are a recurrent feature (see paras. 512–530 *infra*).

### E.  "(a) that the Tribunal was not properly constituted;"

### *1. History and Introduction*

**118**   Improper constitution of an arbitral tribunal as a ground for the setting aside or non-enforcement of an award is also a recurrent feature in other instruments governing post-award procedures.[163] This ground was not contained in the Preliminary Draft to the Convention (History, Vol. I, p. 230). In the ensuing debates it was suggested that the exclusion of national arbitrators should also be reflected in the grounds for annulment (History, Vol. II, p. 423). After lack of proper constitution of the tribunal had been added as a ground for annulment in the First Draft

---

158  *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 72.

159  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 45, 46.

160  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 116.

161  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 55.

162  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 36.

163  [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, Art. V1(d), 330 UNTS 42; UNCITRAL Model Law on International Commercial Arbitration, 1985, Arts. 34(2)(a)(iv), 36(1)(a)(iv).

(History, Vol. I, p. 232) there was a question as to the meaning of this provision. It was explained that this was intended to cover a variety of situations such as absence or invalidity of an agreement between the parties, non-compliance with a nationality requirement or another form of ineligibility (History, Vol. II, p. 850). A suggestion to add disqualification of an arbitrator as a separate ground did not succeed (at p. 872).

There was some debate as to how early a party would have to raise an objection **119** against the composition of the tribunal. It was pointed out that parties should raise the improper constitution of the tribunal as a preliminary objection and not only after the award had been rendered unless the facts were unknown at the time. On the other hand, there was opposition to the idea of allowing annulment prior to the award (History, Vol. II, pp. 851/2) (see also para. 61 *supra*). A proposal that this ground for annulment be deleted entirely because it would inevitably be raised in the arbitral proceedings was defeated. Another proposal that a party be required to state an objection to the tribunal's composition in the arbitration proceedings and thus should not be allowed to use this ground for the first time in annulment proceedings found no support. A proposal that the parties be given an immediate right of redress after the tribunal had decided that it was properly constituted without having to wait for the award was also defeated (at p. 853). Therefore, the drafting history is not without contradiction. But the outcome is that while a party should raise the improper constitution of a tribunal as early as possible, it must await the tribunal's award before it can submit an application for annulment.

Until 1 January 2008 there had not been a published decision on a request for **120** annulment invoking improper constitution of the tribunal. Argentina invoked this argument in an application dated 13 November 2006, contending that the Award dated 14 July 2006 in *Azurix* v. *Argentina* should be annulled.[164] Argentina also invoked this ground for annulment in its application for annulment registered on 16 July 2007 directed against the Award in *Siemens* v. *Argentina*.[165]

### *2. Substance*

It is understandable that improper constitution of the tribunal is rarely invoked **121** as a ground for annulment. The ICSID Secretariat carefully monitors this stage of the proceeding and procedural irregularities are unlikely.[166]

Questions concerning the tribunal's proper constitution might arise from dis- **122** satisfaction in the manner in which challenges to arbitrators and alleged conflicts of interest have been handled. Questions also might conceivably arise from the Convention's exclusionary clauses in relation to the nationality of arbitrators.[167]

---

164   See *Azurix* v. *Argentina*, Decision on Continued Stay of Enforcement, 28 December 2007, para. 2.
165   *Siemens* v. *Argentina*, Award, 6 February 2007.
166   *Delaume*, The Finality of Arbitration, p. 30.
167   See *Shihata, I. F. I./Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 313/4 (1999).

Arts. 38 and 39 exclude nationals of the host State and co-nationals of the investor under certain circumstances. If an arbitrator has more than one nationality, a non-dominant nationality may be overlooked at the time the tribunal is constituted but may serve as the basis of a request for annulment later on (see also Art. 25, paras. 289–298; Art. 38, paras. 24–27). More likely, there may be uncertainties surrounding the nationality of a corporate investor which cannot be clarified with certainty at the time of the tribunal's constitution. Especially if there is an agreement in accordance with Art. 25(2)(b), the corporation's controlling nationality may become evident only in the course of the proceedings (see Art. 25, paras. 896–902; Art. 39, paras. 8–10).

**123**     Art. 14(1) describes the qualifications of individuals who may be designated to serve on the Panel of Arbitrators. Competence in the fields of law, commerce, industry or finance are listed with competence in the field of law being emphasized. In addition, the individuals must be persons of high moral character who may be relied upon to exercise their independent judgment. Under Art. 40(2) even arbitrators appointed from outside the Panel of Arbitrators must possess these qualities. Appointment of an arbitrator who manifestly does not possess these qualities may be put forward as a ground for annulment (see also Art. 40, para. 28).

### 3. Timely Objection to Improper Constitution

**124**     Art. 57 provides for the disqualification of arbitrators upon the proposal of a party. The grounds are lack of the qualities listed in Art. 14(1) (see para. 123 *supra*) or ineligibility under the provisions regulating the constitution of the tribunal (Arts. 37–40). In essence, this means ineligibility under the nationality requirements of Arts. 38 and 39.

**125**     Art. 58 lays down the procedure for the disqualification of an arbitrator. The decision is to be made by the other members of the tribunal or, under certain circumstances, by the Chairman of the Administrative Council (Art. 5). Arbitration Rule 9 further details the procedure for the disqualification of arbitrators (see Art. 57, paras. 8–14).

**126**     The parties have ample opportunity to raise objections against the constitution of the tribunal during the primary proceeding. In principle, they may do so at any stage. At a tribunal's first session the parties are typically asked to confirm that the tribunal has been properly constituted.[168] Arbitration Rule 27 requires that objections to violations of rules and regulations must be raised promptly and that failure to do so will mean that a party is precluded from objecting later on (see para. 60 *supra*).

**127**     There is no reason why Arbitration Rule 27 should not extend to applications for annulment. Rule 53 makes the Arbitration Rules applicable to annulment

---

168   See *e.g.*, *Maffezini* v. *Spain*, Award, 13 November 2000, para. 14; *Fraport* v. *Philippines*, Award, 16 August 2007, para. 13.

proceedings in general terms. A party that is aware of circumstances that would affect the tribunal's proper constitution must be expected to raise this point as early as possible. It cannot be allowed to withhold this argument in order to ambush the proceedings at a moment convenient to it.

For the purposes of a request for annulment this means that a party must exhaust the remedies available during the primary proceedings. Failure to do so should lead to the inadmissibility of this ground for annulment. Otherwise a party aware of a defect in the tribunal's composition could await the outcome of the proceedings in order to attack an unfavourable award on this ground (see para. 60 *supra*). On the other hand, this ground for annulment remains available if relevant facts come to the requesting party's knowledge at a stage that is too late for a challenge to the tribunal's constitution in the primary proceedings (see Art. 57, paras. 8–14). **128**

Therefore, a party requesting annulment on the ground that the tribunal was not properly constituted will have to explain why it did not raise this objection during the arbitration proceedings. If it has done so unsuccessfully its right to invoke this ground for annulment remains unaffected. But the question is always one for the *ad hoc* committee. The Secretary-General has no power to refuse registration of an application for annulment because the requesting party has not exhausted its remedies in the primary proceedings (see paras. 95–104 *supra*). **129**

## F.  "(b) that the Tribunal has manifestly exceeded its powers;"

### 1. History and Introduction

Other documents governing post-award procedures also address excess of powers as a ground for the setting aside or non-enforcement of awards.[169] Some describe it in terms of a decision beyond the submission of the parties.[170] **130**

Excess of powers was included in all drafts leading to the Convention that provided for annulment. But the word "manifestly" was not present in the Preliminary Draft (see para. 134 *infra*). There were some unsuccessful attempts at redrafting, including the suggestion to explicitly bring "lack of jurisdiction" or the concept of *ultra petita* into the clause (History, Vol. II, pp. 271, 423, 517, 851). Mr. *Broches* explained that the clause referred to cases where the tribunal would have gone beyond the scope of the parties' agreement or *compromis* or would have decided points which had not been submitted to it or had been improperly submitted to it (at pp. 517, 850). A proposed amendment to include reference to a decision beyond the scope of the submissions was defeated (at p. 853). There was some debate on the relationship of this ground for annulment to what eventually became Art. 41, namely the tribunal's power to determine its own jurisdiction (at pp. 799, **131**

---

169   International Law Commission, Model Rules on Arbitral Procedure, 1958, Art. 35(a), YBILC 86 (1958-II).
170   [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, Art. V1(c), 330 UNTS 42; UNCITRAL Model Law on International Commercial Arbitration, 1985, Arts. 34(2)(a)(iii), 36(1)(a)(iii), 24 ILM 1312 (1985).

850, 851), as well as considerable discussion on whether it should extend to a failure to apply the proper law (see paras. 193–195 *infra*).

**132**    An arbitral tribunal derives its power from the parties' agreement. The agreement to arbitrate constitutes both the basis and the outer limit of the tribunal's power. In the case of ICSID arbitration, the agreement to arbitrate incorporates the Convention by reference. Therefore, the parameters for the tribunal's powers are to be found in the Convention and in any additional relevant provisions in the parties' agreement.

**133**    The most important form of excess of powers occurs when a tribunal exceeds the limits of its jurisdiction (see paras. 155–190 *infra*). In the case of ICSID arbitration, jurisdiction is determined by Art. 25 of the Convention and the parties' agreement on consent. A tribunal may also exceed its power by failing to exercise a jurisdiction it does have. Another instance of excess of powers would be a violation of Art. 42 on applicable law. Non-application of the law agreed by the parties or of the law determined by the residual rule in Art. 42(1) goes against the parties' agreement to arbitrate and may constitute an excess of powers.[171]

### 2. Manifest Nature of Excess of Powers

**134**    The Preliminary Draft to the Convention, like the ILC Model Rules on which it was based,[172] did not contain the word "manifestly" (History, Vol. I, p. 230). The successful German proposal to insert the word was based on the fear that otherwise there might be some risk of frustration of awards (History, Vol. II, pp. 423, 850). Proposals to delete the word "manifestly" were put to a vote but defeated (at pp. 851/2).[173] Thus, Art. 52(1)(b) entails a dual requirement: there must be an excess of powers, and that excess must be "manifest".[174]

**135**    In accordance with its dictionary meaning, "manifest" may mean "plain", "clear", "obvious", "evident" and easily understood or recognized by the mind. Therefore, the manifest nature of an excess of powers is not necessarily an indication of its gravity. Rather, it relates to the ease with which it is perceived.[175] On this view, the word relates not to the seriousness of the excess or the fundamental nature of the rule that has been violated but rather to the cognitive process that makes it apparent.[176] An excess of powers is manifest if it can be discerned with little effort and without deeper analysis.[177]

---

171    See the discussion in *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 37.
172    International Law Commission, Model Rules on Arbitral Procedure, 1958, Art. 35(a), YBILC 86 (1958-II).
173    See also *Broches*, Observations, p. 329.
174    See *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 39.
175    See also *Caron*, Reputation and Reality, p. 38.
176    But see *Niggemann*, Die dritte Annullierung, p. 81; *Niggemann*, Das Washingtoner Weltbankübereinkommen, pp. 110/11.
177    See also *Feldman*, The Annulment Proceedings, pp. 100/1; *Paulsson*, ICSID's Achievements and Prospects, p. 392.

This approach has been approved in annulment decisions in *Wena Hotels* v. **136**
*Egypt*,[178] *CDC* v. *Seychelles*[179] and *Repsol* v. *Petroecuador*.[180]

The *ad hoc* Committee in *Wena Hotels* v. *Egypt* stated:                    **137**

> The excess of power must be self evident rather than the product of elaborate
> interpretations one way or the other. When the latter happens the excess of power
> is no longer manifest.[181]

The *ad hoc* Committee in *CDC* v. *Seychelles* adopted the same approach, in the **138**
following terms:

> . . . even if a Tribunal exceeds its powers, the excess must be plain on its face
> for annulment to be an available remedy. Any excess apparent in a Tribunal's
> conduct, if susceptible of argument "one way or the other", is not manifest.[182]

On another view, the word "manifest" is a qualitative matter concerned not **139**
with the clarity of any excess but its extent.[183] The excess of powers in *Vivendi* v.
*Argentina* was not obvious from the Tribunal's award, which evidently took the
*ad hoc* Committee some deciphering to understand. But once it was clear that the
Tribunal had declined to adjudicate the claim, as opposed to dismissing the claims
on their merits, the excess of powers was manifest.[184]

The *ad hoc* Committee in *Soufraki* v. *UAE* attempted to reconcile these two **140**
competing lines of thought. It first agreed with the case law that requires a man-
ifest excess to be "obvious", but then added that it should also be substantively
"serious":

> . . . the Committee believes that a strict opposition between two different mean-
> ings of "manifest" – either "obvious" or "serious" – is an unnecessary debate. It
> seems to this Committee that a manifest excess of power implies that the excess
> of power should at once be textually obvious and substantively serious.[185]

The same term "manifest" is used in Art. 36(3) to describe the Secretary- **141**
General's duty to refuse registration of a request for arbitration. The Secretary-
General will refuse to register the request if he or she finds, on the basis of
the information contained in the request, that the request is *manifestly* outside
the Centre's jurisdiction. The Secretary-General, in screening requests, does not
perform a judicial function. He or she will refuse registration only if the lack of
jurisdiction is so obvious that the request does not deserve consideration by a
tribunal (see para. 172 *infra*).[186]

---

178  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 25.
179  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 41.
180  *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 36.
181  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 25.
182  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 41.
183  The Respondent's submissions in *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para.
     38, footnote 26.
184  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 104–112, 115.
185  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 40.
186  This analogy is adopted in *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para.
     42. See also *Pirrwitz*, Annulment, pp. 100–102; *Thompson, D.*, The Klöckner v. Cameroon
     Appeal, 3 Journal of International Arbitration 93, 99 (1986).

**142**    The practice of *ad hoc* committees is mixed on the concept "manifestly" in the context of Art. 52(1)(b). Either of two methodological approaches would seem plausible. Under a two-step approach the *ad hoc* committee would first determine whether there had been an excess of powers. If the answer is yes, it would then determine whether this excess of powers was also manifest. Another approach would be a *prima facie* test under which the committee would undertake merely a summary examination to ascertain if any alleged excess of powers was so egregious as to be manifest. If it did not reach an affirmative answer under this *prima facie* test it would not enquire whether there might have been a non-manifest excess of powers.

**143**    The *Klöckner I ad hoc* Committee had to determine whether the Tribunal had manifestly exceeded its powers by assuming jurisdiction over the question of Klöckner's management, despite the fact that there was a Management Contract containing an ICC arbitration clause (see Art. 25, paras. 553–557). The *ad hoc* Committee made the preliminary statement that a cautious approach was warranted in view of the fact that any excess of powers would have to be "manifest". It then seemed to adopt the two-step approach, saying that it would first decide whether the Tribunal had indeed exceeded its jurisdiction in any way whatsoever and then determine the extent to which such an excess might be characterized as "manifest".[187] The *ad hoc* Committee then went into a detailed and lengthy examination of the Award on this point.[188] This examination is highly critical of the Award's reasoning but stops short of declaring that there was an excess of powers, pointing out that the Award's position is "tenable".[189] In the context of examining an interpretation given by the Tribunal the *ad hoc* Committee says:

> Even if it is assumed that they thereby exceeded their powers, which remains to be proven, it would, as required by Article 52(1)(b) of the Convention, be necessary that this be "manifest" for the Application to be accepted.[190]

It concludes:

> It is possible to have different opinions on these delicate questions, or even, as do the Applicant for Annulment or the Dissenting Opinion, to consider the Tribunal's answers to them not very convincing, or inadequate. But since the answers seem tenable and not arbitrary, *they do not constitute the manifest excess of powers* which alone would justify annulment under Article 52(1)(b).[191]

**144**    The *ad hoc* Committee clearly did not adopt the *prima facie* approach. Its examination of the question was long and elaborate. But neither does it seem to have used the two-step approach consistently. Despite its critical attitude, it never reached the decision that there was an excess of powers, manifest or not. Instead,

---

187  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 4.
188  *Ibid.*, paras. 4–56.                    189  *Ibid.*, paras. 16, 52(b).
190  *Ibid.*, para. 17.                         191  *Ibid.*, para. 52(e). Italics original.

it tried to explain "manifestly" with the words "tenable and not arbitrary" a test that is equally ambiguous.[192]

The *ad hoc* Committee in *Wena Hotels* v. *Egypt* indicated that the appropriate **145** method was first to inquire whether the Tribunal had committed an excess of powers and, if so, then to ascertain whether the excess of powers was also "manifest". It explained that:

> The excess of power must be self-evident rather than the product of elaborate interpretations one way or the other. When the latter happens the excess of power is no longer manifest.[193]

In the circumstances, the Committee found that there had not been any excess of powers, let alone a "self-evident" or manifest excess. Even if, in selecting the legal rule to apply on the payment of interest, the Tribunal had exceeded its powers (which the Committee stated it had not) this "would not amount to a manifest excess of power leading to annulment".[194]

In *Mitchell* v. *DR Congo*, the *ad hoc* Committee supplied a dictionary definition **146** of the term manifest, and concluded that a "manifest" excess was one that was "obvious".[195] In its view, this meant that:

> If an excess of powers is to be the cause of an annulment, the *ad hoc* Committee must so find with certainty and immediacy, without it being necessary to engage in elaborate analyses of the award.[196]

In *Repsol* v. *Petroecuador*, the *ad hoc* Committee maintained that "manifest" **147** meant "obvious by itself" and detectable "simply by reading the Award, that is, even prior to a detailed examination of its contents".[197]

It has been argued that to limit excess of powers as a ground for annulment to **148** manifest cases does not make sense where the tribunal's jurisdiction is at issue. Under this view jurisdiction is such a fundamental issue that there cannot be degrees. An answer must be in the affirmative or negative. Otherwise the tribunal may make a valid award even though its jurisdiction has been exceeded.[198] Thus, according to this thesis, *any* jurisdictional mistake is necessarily a manifest excess of power.[199] As against this, it has been pointed out that the extreme complexity of the jurisdictional requirements under the Convention makes it necessary to limit the permissible reassessment of the tribunal's competence by an *ad hoc* committee. In particular, the difficulties in determining the nationality of a corporate investor under Art. 25(2)(b) (see Art. 25, paras. 688–902) could threaten the stability of

---

192  *Pirrwitz*, Annulment, pp. 96 *et seq.*, 104 *et seq.*; *Berranger de*, L'article 52 de la Convention, pp. 104/5; *Thompson*, The Klöckner v. Cameroon Appeal, pp. 97 *et seq.*
193  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 25.
194  *Ibid.*, para. 53.
195  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 20, 47.
196  *Ibid.*, para. 20, approving of the approach taken in *Wena Hotels* v. *Egypt, supra.*
197  *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 36 (unofficial translation).
198  *Thompson*, The Klöckner v. Cameroon Appeal, p. 99; *Pirrwitz*, Annulment, pp. 99/100.
199  *Pinsolle*, Jurisdictional Review of ICSID Awards, pp. 617–620.

the system if an *ad hoc* committee could simply substitute its view on jurisdiction for that of the tribunal.[200]

**149**    The view that any jurisdictional mistake is necessarily a manifest excess of power is not supported by the text of Art. 52(1) itself. As the *ad hoc* Committee in *MTD* v. *Chile* noted, "the grounds for annulment do not distinguish formally (as, say, the UNCITRAL Model Law does) between jurisdictional errors and errors concerning the merits of the dispute".[201]

**150**    The *ad hoc* Committee in *Soufraki* v. *UAE* concurred with that view. The Committee did not agree with the Applicant's assertion that all jurisdictional errors should be deemed to be manifest:

> 118. The *ad hoc* Committee sees no reason why the rule that an excess of power must be manifest in order to be annullable should be disregarded when the question under discussion is a jurisdictional one. Article 52(1)(b) of the Convention does not distinguish between findings on jurisdiction and findings on the merits. ( . . . )
>
> 119. It follows that the requirement that an excess of power must be "*manifest*" applies equally if the question is one of jurisdiction. A jurisdictional error is not a separate category of excess of power. Only if an ICSID tribunal commits a *manifest* excess of power, whether on a matter related to jurisdiction or to the merits, is there a basis for annulment.[202]

As the *ad hoc* Committee had already found that the Tribunal's conclusion on Soufraki's nationality did not involve any excess of power, it also rejected the contention that the Tribunal's refusal to take jurisdiction constituted a manifest excess of powers.[203]

**151**    In the same vein, the *ad hoc* Committee in *Lucchetti* v. *Peru* noted that the wording of Art. 52(1)(b) is general and "makes no exception for issues of jurisdiction".[204] The *ad hoc* Committee in *Lucchetti* declined to substitute its own view of the proper interpretation of a temporal limitation in the applicable bilateral investment treaty for the Tribunal's interpretation.[205] These decisions confirm that an excess of power on a matter of jurisdiction must be "manifest" if it is to warrant annulment.

**152**    Interestingly, the *ad hoc* Committee in *Klöckner I* v. *Cameroon* did not discuss the question of manifestness in the context of the failure to apply the proper law (see paras. 197, 211, 234–238, 248–251 *infra*).[206] In *Amco I*, the *ad hoc* Committee came to the conclusion that the Tribunal had failed to apply Indonesian law, the law applicable in the case under Art. 42(1), when it had calculated the shortfall

---

200  *Kahn*, Le contrôle des sentences arbitrales, p. 372; *Gaillard*, Chronique (1987), p. 187.
201  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 54.
202  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 118, 119. Italics original.
203  At para. 120.
204  *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 101. The dissenting committee member, Sir Franklin Berman QC, agreed.
205  At para. 112.                    206  *Pirrwitz*, Annulment, pp. 104 *et seq*.

in the amount Amco was required to invest[207] (see Art. 42, para. 16). The *ad hoc* Committee simply concluded that in doing this the Tribunal had manifestly exceeded its powers. Like the *Klöckner I* Committee, it did not explain the manifest nature of this mistake[208] (see also paras. 227, 228 *infra*). In a later commentary, the *ad hoc* Committee's President *Seidl-Hohenveldern* conceded that from the Tribunal's perspective the non-application of the relevant Indonesian provisions was by no means a manifest mistake. Indonesia had pleaded the relevant provisions but had not pointed to their fundamental character. Their relevance was lost in the long debates on the calculation and valuation of the complicated methods of financing chosen by the investor.[209]

**153**   In *Amco I*, the *ad hoc* Committee went beyond a *prima facie* examination and undertook a fairly extensive substantive analysis. This analysis led to the result that the Tribunal had not just erred in applying Indonesian law but had, in fact, failed to apply it. This, in turn, constituted a manifest excess of powers.[210] The manifest nature of this excess of powers becomes even more difficult to explain when it is conceded that it was not manifest to the Tribunal. Apparently, an excess of powers may be sufficiently manifest to an *ad hoc* committee to warrant annulment without being manifest in the original arbitration proceedings.

**154**   The Decision on Annulment in *MINE* is also not very helpful on this point. The *ad hoc* Committee notes that in order to serve as a ground for annulment "the excess [must] be *manifest* which necessarily limits an *ad hoc* Committee's freedom of appreciation as to whether the tribunal has exceeded its powers".[211] In discussing a possible disregard of the applicable law it states that "[i]f the derogation is manifest, it entails a manifest excess of power".[212] In the event, the *ad hoc* Committee did not use this ground for annulment.

### 3. Lack of Jurisdiction

#### a) Jurisdiction and Excess of Powers

**155**   A decision on the merits by a tribunal that lacks competence[213] is the most obvious example of an excess of powers.[214] This is also borne out by the Convention's drafting history. The lack of support for several amendments designed to elaborate on this point was evidently based on the belief that the clause on excess

---

207  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 89–98.
208  *Ibid.*, para. 97.
209  *Seidl-Hohenveldern, I.*, Die Aufhebung von ICSID Schiedssprüchen, 2 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 100, 109 (1989). See also the Decision on Annulment, para. 96.
210  At para. 97. See also *Pirrwitz*, Annulment, p. 109.
211  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.06.
212  *Ibid.*, para. 5.03.
213  The Convention distinguishes between the jurisdiction of the Centre and the competence of the tribunal (see Art. 25, para. 17; Art. 41, paras. 56, 57). For the purpose of this discussion the terms are used interchangeably.
214  See *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 20; *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 54; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 42.

of powers was clear enough. A specific reference to jurisdiction or to the parties' agreement was seen as superfluous (see para. 131 *supra*).

**156**    A possible lack of jurisdiction may relate to any of the requirements for jurisdiction listed in Art. 25(1) of the Convention. It may relate to jurisdiction *ratione personae*, especially to the claimant's nationality. It may relate to jurisdiction *ratione materiae*, specifically the existence of a dispute arising directly out of an investment. It may also relate to the consent of the parties to the jurisdiction of ICSID.

**157**    In *Klöckner I* the *ad hoc* Committee said:

> Clearly, an arbitral tribunal's lack of jurisdiction, whether said to be partial or total, necessarily comes within the scope of an "excess of powers" under Article 52(1)(b).
>
> Consequently, an applicant for annulment may not only invoke lack of jurisdiction *ratione materiae* or *ratione personae* under Articles 25 and 26 of the Convention, but may also contend that the award exceeded the Tribunal's jurisdiction as it existed under the appropriate interpretation of the ICSID arbitration clause.[215]

**158**    Art. 25, dealing with jurisdiction, contains a number of requirements some of which are objective and some of which relate to the parties' consent. A deficiency in meeting any of these requirements would mean that there is no jurisdiction. For instance, if there is no legal dispute there is no jurisdiction and an award on the merits would constitute an excess of powers. The same would apply if the dispute does not arise directly out of an investment.[216] The parties must meet certain conditions in that one must be a Contracting State and the other a national of another Contracting State. If the investor's nationality requirements are not met there is no jurisdiction and a decision on the merits would be an excess of powers.[217] If the dispute is not covered by consent to arbitration there is no jurisdiction and an award on the merits would be an excess of powers. The need for consent also requires that any preconditions to such consent, such as the requirements under an investment treaty or conditions in an investment agreement, are also met.[218] Therefore, the full range of jurisdictional requirements in Art. 25(1)–(3) may serve as a basis for a successful claim that there has been an excess of powers.[219]

**159**    In *Mitchell* v. *DR Congo*, the Tribunal had held that the Claimant's law office established in the territory of the DRC, its movable property, documents and files, its know-how, goodwill and right to provide legal services, as well as its "returns", fell within the meaning of "investment" as used in the applicable treaty and the

---

215   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 4. See also *Berranger de*, L'article 52 de la Convention, pp. 98, 104; *Broches*, Observations, pp. 358/9; *Caron*, Reputation and Reality, p. 39; *Gaillard*, Chronique (1987), p. 187.
216   See *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 48.
217   *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 83/4.
218   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 37.
219   See also *Kahn*, Le contrôle des sentences arbitrales, p. 372.

Convention.[220] In the annulment proceedings, the Respondent argued that the Tribunal had committed a manifest excess of powers by upholding jurisdiction where there was in fact no "investment".

The *ad hoc* Committee referred first to the applicable bilateral investment treaty **160** and found that it did not contain, "properly speaking, a definition of investment as such" but merely "an enumerative and non exhaustive approach to investment".[221] The *ad hoc* Committee also noted that it was necessary for the notion of investment set out in the parties' agreement or in an investment protection treaty to conform to the concept of investment as used in the Convention.[222] The *ad hoc* Committee then referred to ICSID case law on the meaning of investment and found there to be "four characteristics" of an investment (see Art. 25, paras. 152–174).[223] In analysing the question before it against these "characteristics", the *ad hoc* Committee appears to have preferred its own view of the meaning of investment to that of the Tribunal.[224] It declared that:

> 38. In the opinion of the *ad hoc* Committee, one should avoid confusing the economic operation or project – which, if it fulfills certain characteristics, becomes the investment within the meaning of the Convention and the Treaty, even if it is "smaller" and "of shorter duration and with more limited benefit to the host State's economy" (para. 56) – with all the rights and assets protected by the Treaty because they are part of the operation or project, or concern the same in one way or another.

The *ad hoc* Committee found one of these "four characteristics" to be lacking in **161** relation to the law office and its business activities. Specifically, these were found not to contribute substantially to the economic development of the host State. The *ad hoc* Committee found that:

> 40. The Award is incomplete and obscure as regards what it considers an investment: it refers to various fragments of the operation, without finally indicating the reasons why it regards it overall as an investment . . .

The *ad hoc* Committee took the view that the notion of "investment" protected by the relevant bilateral investment treaty (and in respect of disputes that may be arbitrated under the Convention) does not mean the different assets, rights or interests referred to in the applicable treaty, but an overall economic operation or project. By not identifying such an operation, the Committee concluded that the Award should be annulled for failure to state reasons[225] (see para. 381 *infra*).

In relation to the alleged manifest excess of powers, the *ad hoc* Committee **162** was reluctant to condemn the Award. The Committee did consider that the Tribunal had erred in treating "returns" that had not been re-invested into the DRC as an investment. These "returns" were payments for services rendered in the

---

220  *Ben Hamida*, Two Nebulous ICSID Features, p. 292, describing the Award issued on 9 February 2004. The Award has not yet been published.
221  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 26.
222  *Ibid.*, para. 25.                              223  *Ibid.*, para. 27.
224  *Ibid.*, para. 38; *Ben Hamida*, Two Nebulous ICSID Features, p. 303.
225  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 41.

DRC to the accounts of the Claimant in the United States. Nevertheless, the *ad hoc* Committee stated that if it had not already identified a serious failure to state reasons as to the existence of an investment, "the error committed by the Arbitral Tribunal as to the inclusion of non-reinvested returns in the notion of investment could not be identified as a manifest excess of power".[226] It emphasized that "[a]n *ad hoc* Committee ought not to sanction an error of interpretation of the Treaty – as awkward as it may be – when, even in the absence of such error, the result would have been the same".[227] It was only since this error was compounded by a failure to state reasons that the *ad hoc* Committee resolved to annul the Award as a whole also on ground of a manifest excess of power[228] (see para. 115 *supra*).

**163**    Lack of jurisdiction need not be absolute. A tribunal may be competent in principle, but may go beyond the limits of its competence. A tribunal may include aspects of the dispute that are too indirectly related to the investment to be covered by the Centre's jurisdiction (see Art. 25, paras. 88–105). Or, it may include matters that are outside the scope of the parties' consent (see Art. 25, paras. 513–566). This was argued in *Klöckner I* with regard to the Tribunal's exercise of jurisdiction over the counter-claim (see paras. 175–180 *infra*). In fact, the expression "excess of powers" would indicate that there is jurisdiction but that the tribunal has exceeded the limits of its powers. Where there is no jurisdiction the term "absence of powers" would be more appropriate.

**164**    There will not be an excess of powers where the relief awarded falls within the scope of the parties' prayers, even if it may be different from that specifically requested.[229]

**165**    In *Amco II*, the *ad hoc* Committee addressed Indonesia's arguments that the second Tribunal had manifestly exceeded its powers by failing to accept the *res judicata* effect of the unannulled findings in the first Tribunal's Award.[230] Amco also sought partial annulment of the award of damages in the second Award for the same reason, namely that this aspect of the first Tribunal's Award survived annulment and was *res judicata*.[231]

**166**    After a lengthy deconstruction of the reasoning in the first Award, the annulment decision pertaining to it, and the second Award, the *ad hoc* Committee found that the second Tribunal had not disregarded any *res judicata* holding.[232] In particular, the Tribunal's interpretation of the findings in the earlier decisions was "by no means unreasonable".[233] In that analysis, it was not bound by the first *ad hoc* Committee's own interpretation of the findings in the first Award. An *ad hoc*

---

226  *Ibid.*, para. 45.                          227  *Ibid.*, para. 45.
228  *Ibid.*, paras. 46–48.
229  *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 84.
230  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 5.05, 5.10. Also, in respect of the Supplemental Award, at para. 5.26.
231  *Ibid.*, para. 6.01.                        232  *Ibid.*, paras. 7.02–7.17, 8.09/8.10.
233  *Ibid.*, para. 7.15.

*Article 52 – Annulment*                                                947

Committee cannot authoritatively interpret an award for the benefit of a tribunal in a resubmitted case. The second Tribunal therefore committed no annullable error when it declined to follow that interpretation.[234] The second Tribunal's conclusions, based on procedural defects affecting Indonesia's decision to revoke Amco's investment licence, also did not infringe any principle of finality, since the first Tribunal had also admitted the possibility that liability could be established on this basis.[235]

### b) Failure to Exercise Jurisdiction

Failure to exercise jurisdiction where jurisdiction does, in fact, exist also consti-   **167**
tutes an excess of powers. It is not within the tribunal's powers to refuse to decide a dispute or part of a dispute that meets all jurisdictional requirements of Art. 25. Therefore, somewhat paradoxically, *ad hoc* committees have confirmed that a shortfall in the exercise of jurisdiction may constitute an excess of powers. The term relates to a deviation from the arbitration agreement and not to a quantitative concept of jurisdiction.

In *Vivendi I*, the *ad hoc* Committee explained the principle that a failure to   **168**
exercise jurisdiction may be an excess of powers in the following terms:

> 86. It is settled[236] that an ICSID tribunal commits an excess of powers not only if it exercises a jurisdiction which it does not have under the relevant agreement or treaty and the ICSID Convention, read together, but also if it fails to exercise a jurisdiction which it possesses under those instruments. One might qualify this by saying that it is only where the failure to exercise a jurisdiction is clearly capable of making a difference to the result that it can be considered a manifest excess of power. Subject to that qualification, however, the failure by a tribunal to exercise a jurisdiction given it by the ICSID Convention and a BIT, in circumstances where the outcome of the inquiry is affected as a result, amounts in the Committee's view to a manifest excess of powers within the meaning of Article 52(1)(b).[237]

In *Soufraki* v. *UAE*, the Tribunal concurred that there is an excess of power if   **169**
a tribunal acts "too little" in relation to its jurisdiction *rationae personae*, *ratione materiae* or *ratione voluntatis*:

> The *manifest* and *consequential* non-exercise of one's full powers conferred or recognized in a tribunal's constituent instrument such as the ICSID Convention and the relevant BIT, is as much a disregard of the power as the overstepping of the limits of that power.[238]

Soufraki's complaint that the Tribunal manifestly exceeded its powers by refusing to exercise a power it did have was predicated on the assertion that he *was* an

---

234  *Ibid.*, para. 7.17.                        235   *Ibid.*, para. 7.29.
236  The words "and neither party disputes" were contained in the Decision's original version but were deleted through the Decision on Supplementation and Rectification of 28 May 2004, para. 40.
237  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 86.
238  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 43 (emphasis original). See also para. 44.

Italian and entitled to invoke the Italy-UAE BIT. But the Tribunal had already made findings of fact and law to the contrary.[239] It was not open to the *ad hoc* Committee to look behind these findings.[240]

**170**     In *Lucchetti* v. *Peru*, the *ad hoc* Committee concurred that an unwarranted failure to exercise jurisdiction amounts to an excess of powers. The Committee said:

> 99. Where a tribunal assumes jurisdiction in a matter for which it lacks competence under the relevant BIT, it exceeds its powers. The same is true in the inverse case where a tribunal refuses or fails to exercise jurisdiction in a matter for which it is competent under the BIT. The *Ad hoc* Committee considers that these situations are analogous and should be assessed according to the same legal standards.[241]

**171**     Under Arbitration Rule 41(6), a decision by a tribunal that states that it lacks competence is rendered in the form of an award (see Art. 41, para. 73). Such an award is subject to annulment on any of the grounds listed in Art. 52(1), including excess of powers. If a tribunal renders an award on the merits but declines jurisdiction on certain points, this may also give rise to a claim of excess of powers. In ICSID practice, non-exhaustion of jurisdiction has at times been perceived in terms of a failure to answer questions presented to the tribunal and has been attacked primarily as a failure to state reasons (see paras. 399–434 *infra*).

### c) Prior Examination of Jurisdiction and Timely Objection

**172**     Before the question of a valid exercise of jurisdiction reaches an *ad hoc* committee, it will have been examined on two previous occasions. The Secretary-General will register a request for arbitration only if he or she has determined that the dispute is not manifestly outside the jurisdiction of the Centre (see Art. 36(3)). But this determination is made only on the basis of the information contained in the request, which may or may not be correct or complete. Unlike the tribunal and the *ad hoc* committee, the Secretary-General does not have the benefit of adversarial argument from both parties (see also para. 141 *supra*). Moreover, the Secretary-General will refuse registration only if he concludes that there is a total absence of jurisdiction. The Secretary-General does not determine the limits of the tribunal's competence. Even a perfectly correct decision to register the request for arbitration under Art. 36(3) may lead to an excess of powers if the tribunal later exceeds the limits of its competence. In addition, the tribunal may exceed its powers in ways other than by exceeding its competence (see para. 133 *supra*).

**173**     The tribunal examines the question of its competence before it proceeds to the merits. Examination of competence and merits are distinct, although the phases for receiving written and oral evidence on them may be bifurcated or joined together.

---

239   *Soufraki* v. *UAE*, Award, 7 July 2004, paras. 83, 84.
240   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 24, 50, 51.
241   *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 99.

Although Art. 41 only speaks of jurisdictional decisions in terms of a response to an objection by a party, Arbitration Rule 41(2) makes it clear that the tribunal may also consider its competence on its own initiative at any stage of the proceedings (see Art. 41, paras. 43–51). In default proceedings, the tribunal must examine its competence under Arbitration Rule 42(4) (see Art. 41, paras. 52–55).

A party that is aware of a lack of jurisdiction should make its objections as **174** early as possible before the tribunal.[242] Under Arbitration Rule 41(1) the normal time limit for jurisdictional objections by the respondent would be the time the counter-memorial is due (see Art. 41, paras. 30–42). If the facts on which the jurisdictional objections rest are not known at that time, the objection must be raised as soon as the party making it gains knowledge. Under Arbitration Rule 27, a party that knows that a jurisdictional requirement has not been met, and which fails to state its objections thereto promptly, shall be deemed to have waived its right to object (see para. 60 *supra*). If the alleged lack of jurisdiction relates to the parties' consent, failure to raise an objection before the tribunal may be interpreted as consent to jurisdiction (see Art. 25, paras. 481–498; Art. 41, para. 49). Therefore, it is not an option for a party first to await the outcome of the proceedings on the merits without making an objection to jurisdiction and then, if the award turns out to be unfavourable, to request annulment on the ground of an excess of powers because the tribunal has acted outside its competence[243] (see Art. 25, para. 489). This question will have to be dealt with by the *ad hoc* committee. The Secretary-General has no power to refuse registration of an application for annulment because the requesting party has not exhausted its remedies in the primary proceedings (see paras. 95–102 *supra*).

### d) Extent of Jurisdiction

In *Klöckner I*, the Tribunal held that its competence extended to a counter- **175** claim regarding the Claimant's management functions. This finding was based on a Protocol of Agreement between Klöckner and Cameroon containing an ICSID clause and providing in its Art. 9 that Klöckner would "be responsible for the technical and commercial management of the Company, to be carried out under a Management Contract".[244] A Management Contract was concluded but its parties were Klöckner and SOCAME, a joint venture company which at the time was under the majority control of the foreign investor. The Management Contract did not contain an ICSID clause but an ICC arbitration clause. The Tribunal found that Klöckner had accepted jurisdiction under the Protocol of Agreement and that this jurisdiction extended to issues of management (see Art. 25, paras. 492–497). In addition, the Tribunal, though finding that it could not evaluate or interpret the

---

242   See also *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 90.
243   See *Zhinvali* v. *Georgia*, Award, 24 January 2003, para. 322, quoting the First Edition of this Commentary.
244   *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 13. See also Decision on Annulment, 3 May 1985, para. 16.

Management Contract, held that it had competence over the counter-claim in view of the direct connection between the different instruments and the parties' claims (see Art. 25, paras. 553–557).

**176**    The Tribunal found that Klöckner had failed in the performance of its management duties. Thereupon, Klöckner applied for annulment, arguing that the Tribunal had manifestly exceeded its powers due to its lack of jurisdiction over disputes arising from the Management Contract.

**177**    The *ad hoc* Committee went into a detailed analysis of the Tribunal's finding on its competence over management, rejecting or criticizing virtually each of the Tribunal's arguments.[245] The *ad hoc* Committee found that it was impossible to base jurisdiction over management on Klöckner's acceptance of the ICSID clause in the Protocol of Agreement since Klöckner had interpreted Art. 9 of that Agreement as no more than an obligation to conclude a management contract.[246] The arbitration clause referring to ICC in the Management Contract had covered *all* disputes arising therefrom.[247] The fact that management had, in fact, been exercised by Klöckner prior to the conclusion of the Management Contract was rendered largely irrelevant by the fact that the Management Contract was retroactive.[248] The Tribunal's rejection of the view that the Protocol of Agreement's ICSID Clause had been terminated by implicit derogation, as far as management was concerned, was contradicted by the fact that the Management Contract stated that it cancelled all prior correspondence.[249] The *ad hoc* Committee conceded that the Tribunal's holding that Art. 9 of the Protocol of Agreement provided an independent basis for jurisdiction over management was a possible interpretation though *prima facie* fragile.[250] But the *ad hoc* Committee was not satisfied by the Tribunal's assertion that it could pass on issues of management without applying the Management Contract.[251] Neither the Tribunal's characterization of the Protocol of Agreement as a framework agreement nor its presumption of perfect compatibility between the two contracts seemed convincing to the *ad hoc* Committee.[252] Also, the Award's reference to the "close connection" between the contractual instruments, their "interdependence" and the existence of "a single legal relationship" hardly explained, in the *ad hoc* Committee's view, how this general conception could be reconciled with the Tribunal's own finding that it lacked jurisdiction to interpret or pronounce upon the Management Contract.[253]

**178**    After this devastating criticism of the Tribunal's opinion on its competence over the counter-claim, it is surprising to see the *ad hoc* Committee conclude that there was no cause for annulment. It said:

---

245   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 4–56.
246   *Ibid.*, paras. 6–9.                          247   *Ibid.*, para. 11.
248   *Ibid.*, paras. 12, 26/7.                       249   *Ibid.*, para. 12.
250   *Ibid.*, paras. 16, 27/8.                        251   *Ibid.*, paras. 18–52.
252   *Ibid.*, paras. 34–47.                          253   *Ibid.*, para. 48.

*Article 52 – Annulment*     951

> The Tribunal may have implicitly accepted that the ICSID clause constituted for
> both parties an "essential jurisdictional guarantee", the relinquishment of which
> could neither be presumed nor accepted in the absence of clear evidence.
>
>      Such an interpretation of the agreements and especially of the two arbitration
> clauses, whether correct or not, is tenable and does not in any event constitute
> a manifest excess of powers. To this extent, the complaint, while admissible, is
> unfounded.[254]

The *ad hoc* Committee added that the Tribunal's answers, though not very con-
vincing, seemed tenable and not arbitrary (see para. 143 *supra*) and that, in case
of doubt, the question should be resolved *in favorem validitatis sententiae*[255] (see
para. 22 *supra*).

   This part of the *ad hoc* Committee's Decision gives rise to some questions.[256]    **179**
The *ad hoc* Committee, like the Tribunal, does not seem to have realized why the
parties chose to insert an ICC arbitration clause rather than an ICSID clause into
the Management Contract.[257] The Management Contract was between Klöckner
and SOCAME. At the time the Management Contract was concluded, SOCAME
was under the majority control of the foreign investor. The Convention provides
for dispute settlement between a State and a foreign investor. Neither of the parties
to the Management Contract was a State when it was concluded. Therefore, ICSID
arbitration was not an option. It was only later that SOCAME came under Govern-
ment control and was ultimately joined to the ICSID proceedings as a constituent
subdivision of the State of Cameroon (see Art. 25, paras. 260–261, 557). It follows
that the entire debate on whether the ICC clause in the Management Contract was
meant to derogate from the ICSID clause in the Protocol of Agreement between
Klöckner and Cameroon was futile. The two agreements were *res inter alios acta*
in relation to each other at the time of their conclusion.

   Another questionable assumption was that in the case of two conflicting arbi-    **180**
tration clauses the one that is later in time would necessarily supersede the earlier
one. In fact, concurrent arbitration clauses are not only possible but quite common
(see Art. 26, paras. 20–24). Typically, they give the party initiating the arbitration
a choice. Therefore, even apart from the parties' identity, the choice of another
arbitration system such as ICC in one of several contracts does not necessarily
exclude ICSID if the latter is chosen for the overall relationship (see Art. 26,
paras. 25–32).

   Other *ad hoc* committees have also pronounced upon jurisdictional questions    **181**
in the context of excess of powers.

---

254  *Ibid.*, para. 52(b).                255  *Ibid.*, para. 52(e).
256  For scholarly comment on this part of the Decision see esp. *Broches*, Observations,
     pp. 338/9; *Gaillard*, Chronique (1987), pp. 186–188; *Niggemann*, Das Washingtoner Welt-
     bankübereinkommen, pp. 107–109; *Pirrwitz*, Annulment, pp. 95–102; *Rambaud*, L'annulation,
     pp. 262/3; *Thompson*, The Klöckner v. Cameroon Appeal.
257  But see an unclear reference in *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985,
     para. 18.

952                    THE ICSID CONVENTION: A COMMENTARY

**182**    In *Repsol* v. *Petroecuador*, Petroecuador maintained that the Tribunal had manifestly exceeded its powers in deciding that a contractual dispute was within the jurisdiction of the Centre. Petroecuador argued that the Tribunal had incorrectly asserted that it had jurisdiction, having apparently referred to the wrong contract.[258] It also argued that there was no legal dispute, since the competent Ecuadorian authorities had already issued a decision on the issue, creating an administrative *res judicata*.[259] On the first issue, the *ad hoc* Committee disagreed with Petroecuador and concluded that there was "ample proof" to support the Tribunal's conclusion that the dispute, and its jurisdiction, arose out of a modified agreement that replaced an earlier version.[260] In relation to the second issue, the *ad hoc* Committee also concluded that the Tribunal had been correct when it found that the administrative decision did not give rise to a *res judicata*, since that decision and the dispute before the Tribunal concerned different causes of action and sought different relief. The Minister of Energy and Mines had also subsequently recommended that the dispute should be referred to ICSID for arbitration. The parties' conduct was also consistent with the conclusion that there was no *res judicata* and that they had agreed to refer the matter to ICSID.[261] In neither case was there an excess of power.

**183**    In *Soufraki* v. *UAE*, Soufraki argued that the Tribunal arrogated to itself a power that it did not have.[262] He complained that, other than in exceptional circumstances of fraud or lack of "effectiveness", the Tribunal was not competent to disregard official documents issued by the investor's State evidencing nationality, nor inquire into the circumstances in which they were issued. The *ad hoc* Committee was convinced that the Tribunal did not exceed its powers when it announced that it had to verify Soufraki's nationality in order to ascertain its competence.[263] According to the *ad hoc* Committee, the Tribunal had correctly stated that:

> Where, as in the instant case, the jurisdiction of an international tribunal turns on an issue of nationality, the international tribunal is empowered, indeed bound, to decide that issue.[264]

**184**    The *ad hoc* Committee found that the Tribunal had acted properly in deciding this issue when it applied Italian law. It disagreed with Soufraki's assertion that only Italian authorities could conclusively pronounce on issues of Italian nationality, including the validity of certificates of nationality. The Tribunal's jurisdiction depended upon this issue and, as such, the Tribunal was competent to decide it.[265] After a lengthy survey of the relevant international decisions and commentaries, the *ad hoc* Committee concluded that:

---

258    *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 48.
259    *Ibid.*, para. 57.                    260    *Ibid.*, paras. 50, 55.
261    *Ibid.*, paras. 62–73.
262    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 31.
263    *Ibid.*, para. 52.
264    *Soufraki* v. *UAE*, Award, 7 July 2004, para. 55.
265    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 57–60, 64, 76–78.

> . . . the Tribunal did not manifestly exceed its powers, but on the contrary asserted a power which it was bound to exercise in order to verify its competence under the ICSID Convention and the Italy-U.A.E. BIT.[266]

In *CMS* v. *Argentina*, Argentina argued that the Tribunal had committed a manifest excess of powers in two respects by exceeding its jurisdiction. First, it had allegedly exceeded its powers by exercising jurisdiction over claims brought by a company's shareholder for income lost by the company. Secondly, it had allegedly exceeded its powers by authorizing CMS to bring a claim for breach of an "umbrella clause" even though CMS was not a party to any of the applicable instruments.[267] **185**

The Tribunal's treatment of Argentina's defences based on necessity also gave rise to two complaints that it had committed a manifest excess of powers. First, Argentina complained that the Tribunal failed to give effect to the exceptions set out in Article XI of the applicable treaty. Secondly, it alleged that the Tribunal's rejection of the defence of necessity under customary international law was a manifest excess of powers.[268] **186**

The *ad hoc* Committee found that the Tribunal had correctly ruled that its jurisdiction was governed by Art. 25 and the BIT and not by any other law that might be identified under Art. 42(1).[269] CMS qualified as an investor, having made an investment, under the terms of the applicable treaty.[270] It was not necessary for the *ad hoc* Committee to decide whether the Tribunal had committed a manifest excess of power in relation to its finding that Argentina had violated the umbrella clause.[271] This finding of liability was annulled for failure to state reasons (see para. 360 *infra*). **187**

The Tribunal's interpretation and application of the fair and equitable treatment standard in the relevant treaty was found to be "adequately founded on the applicable law and the relevant facts".[272] The *ad hoc* Committee added that it had "no jurisdiction to control the interpretation thus given by the Tribunal to that Article, still less to reconsider its evaluation of the facts".[273] This aspect of the Award involved no excess of powers. **188**

In relation to the Tribunal's treatment of Argentina's "necessity" defences under Article XI of the treaty and customary international law, Argentina argued that the Tribunal had committed a manifest excess of power by conflating the interpretation and application of Article XI with the customary international law approach. Argentina also argued that the Tribunal failed to state reasons why it was proper to do so[274] (see para. 385 *infra*). **189**

The *ad hoc* Committee found that the Tribunal had assimilated the exception contained in Article XI of the treaty to the concept of necessity under customary **190**

---

266   *Ibid.*, para. 75.
267   *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 46, 62–66.
268   *Ibid.*, para. 48.            269   *Ibid.*, para. 68.
270   *Ibid.*, para. 75.            271   *Ibid.*, para. 98.
272   *Ibid.*, para. 85.            273   *Ibid*.
274   *Ibid.*, para. 111.

international law as expressed in Article 25 of the ILC Articles on State Responsibility.[275] However, the *ad hoc* Committee found the two texts to be "substantively different" and, therefore, concluded that the Tribunal had committed "a manifest error of law".[276] The Tribunal committed "another error of law" when it had held that the conditions necessary for the implementation of Article XI were the same as those applicable to the state of necessity under customary international law.[277] Nevertheless, even if these errors were decisive, they did not lead to annulment:

> 135. These two errors made by the Tribunal could have had a decisive impact on the operative part of the Award. As admitted by CMS, the Tribunal gave an erroneous interpretation to Article XI. In fact, it did not examine whether the conditions laid down by Article XI were fulfilled and whether, as a consequence, the measures taken by Argentina were capable of constituting, even *prima facie*, a breach of the BIT. If the Committee was acting as a court of appeal, it would have to reconsider the Award on this ground.
>
> 136. The Committee recalls, once more, that it has only a limited jurisdiction under Article 52 of the Convention. In the circumstances, the Committee cannot simply substitute its own view of the law and its own appreciation of the facts for those of the Tribunal. Notwithstanding the identified errors and lacunas in the Award, it is the case in the end that the Tribunal applied Article XI of the Treaty. Although applying it cryptically and defectively, it applied it. There is accordingly no manifest excess of powers.[278]

### 4. Failure to Apply the Proper Law

**191**    It is clear that a manifest excess of powers can occur on a question of merits.[279] In practice, this allegation has primarily concerned failure to apply the proper law.

**192**    Art. 42(1) deals with the law applicable to the dispute. It provides that the tribunal shall decide a dispute in accordance with such rules as may be agreed by the parties. In the absence of such an agreement it shall apply the law of the host State and applicable rules of international law. Art. 52(1) does not, in terms, provide for annulment in case of a failure to apply the proper law. But the provisions on applicable law are essential elements of the parties' agreement to arbitrate and constitute part of the parameters for the tribunal's activity (see also Art. 42, paras. 14–20). Their violation may amount to an excess of powers.

### a) History

**193**    The drafts leading to the Convention contained no direct reference to the proper law among the grounds for annulment (History, Vol. I, pp. 230–232). Suggestions

---

275  *Ibid.*, para. 128.
276  *Ibid.*, para. 130.                         277  *Ibid.*, paras. 131/2.
278  *Ibid.*, paras. 135/6. At para. 146 the *ad hoc* Committee explained that the Tribunal committed another error of law, albeit in the context of *obiter dicta*, when it failed to consider whether application of Article XI would exclude any obligation to pay compensation and in what circumstances.
279  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 54.

to add to "serious departure from a fundamental rule of procedure" a provision that would also make "a serious departure from the principles of natural justice" or "a serious misapplication of the law" a ground for annulment (History, Vol. II, pp. 271, 340, 423) were not pursued. A proposal to clarify the concept of excess of powers by adding "including failure to apply the proper law" was made at one point (at p. 517; see also p. 654). Mr. *Broches* remarked that the draft Convention did not provide for an appeal against an award and a mistake in the application of the law would not be a valid ground for annulment. But after further debate he conceded that if the tribunal had applied a law different from that agreed by the parties, the award could be challenged on the ground that the arbitrators had gone against the terms of the *compromis* (at p. 518). At a later stage, Mr. *Broches* confirmed that failure to apply the proper law would constitute an excess of powers if the parties had instructed the tribunal to apply a particular law (at p. 851).[280]

Another proposal suggested that revision should be available also where the award was manifestly erroneous in law. Mr. *Broches* responded that the question of erroneous application of the law could be properly dealt with, if at all, under the Article providing for annulment (History, Vol. II, pp. 847/8). This led to a suggestion to add a provision making annulment possible on the ground of an error in the application of the proper law by the tribunal (at p. 851). A proposal to insert as a ground for annulment a "manifestly incorrect application of the law" was defeated in a vote (at pp. 853/4).                                              **194**

Therefore, the preparatory works yield a distinction between failure to apply the proper law and an incorrect or erroneous application of that law. Application of a law other than that agreed to by the parties constitutes an excess of powers and is a valid ground for annulment. An error in the application of the proper law, even if it leads to a manifestly incorrect application of the law, is not a ground for annulment.                                                                              **195**

## *b) Excess of Powers and Proper Law*

There is widespread agreement that a failure to apply the proper law may amount to an excess of powers by the tribunal.[281] The practice of *ad hoc* committees on this point leads to the same result (see also Art. 42, paras. 14–20).                **196**

In *Klöckner I*, the *ad hoc* Committee expressed the link between applicable law and an excess of powers leading to annulment in the following terms:                **197**

> In the opinion of the *ad hoc* Committee, the provisions of Article 42 could not be interpreted as stating simple advice or recommendations to the arbitrators or an obligation without sanction. Obviously, and in accordance with principles of interpretation that are recognized generally – for example, by Article 31 of

---

280  See also *Broches*, Observations, pp. 331 *et seq.*
281  See esp. *Berranger de*, L'article 52 de la Convention, p. 108; *Broches*, Observations, pp. 28/9; *Gaillard*, Chronique (1987), pp. 188 *et seq.*; *Niggemann*, Das Washingtoner Weltbankübereinkommen, pp. 109 *et seq.*; *Pirrwitz*, Annulment, pp. 103 *et seq.*; *Rambaud*, L'annulation, pp. 263 *et seq.*; *Seidl-Hohenveldern*, Die Aufhebung, p. 104. But see: *Feldman*, The Annulment Proceedings, pp. 101 *et seq.*

> Vienna Convention on the Law of Treaties – Article 52 on the annulment of
> awards must be interpreted in the context of the Convention and in particular
> of Articles 42 and 48, and vice versa. It is furthermore impossible to imagine that
> when they drafted Article 52, the Convention's authors would have forgotten the
> existence of Articles 42 or 48(3), just as it is impossible to assume that the authors
> of provisions like Articles 42(1) or 48(3) would have neglected to consider the
> sanction for non-compliance.[282]

The argument that non-compliance with Art. 42(1) must be presumed to find a
sanction in Art. 52 has been rightly criticized. It is inherent in a system of limited
review that not every legal defect must lead to annulment.[283]

**198**    In *Amco I*, the *ad hoc* Committee also took it for granted that failure to apply the
proper law will constitute a manifest excess of powers and a ground for annulment
(see para. 212 *infra*). There was no deeper analysis of the theoretical foundation
of this conclusion.[284]

**199**    In *MINE*, the *ad hoc* Committee provided a more detailed reasoning, based on
party autonomy and the tribunal's terms of reference. After citing the first sentence
of Art. 42(1) it said:

> The Committee is of the view that the provision is significant in two ways. It
> grants the parties to the dispute unlimited freedom to agree on the rules of law
> applicable to the substance of their dispute and requires the tribunal to respect the
> parties' autonomy and to apply those rules. From another perspective, the parties'
> agreement on applicable law forms part of their arbitration agreement. Thus, a
> tribunal's disregard of the agreed rules of law would constitute a derogation from
> the terms of reference within which the tribunal has been authorized to function.
> Examples of such a derogation include the application of rules of law other than
> the ones agreed by parties, or a decision not based on any law unless the parties
> had agreed on a decision *ex aequo et bono*. If the derogation is manifest, it entails
> a manifest excess of power.[285]

**200**    The *ad hoc* Committee in *Amco II* also held that non-application of the appli-
cable law may constitute a manifest excess of powers, which calls for annulment.
But incorrect interpretation or misapplication of the law "normally" would not,
unless it is "of such a nature or degree as to constitute objectively (regardless of
the Tribunal's actual or presumed intentions) its effective non-application".[286] The
*ad hoc* Committee found that the second Tribunal, in exercising its judgment in
relation to the strength of the authorities before it, had remained within its scope
of appreciation, and committed no annullable error. It was therefore sufficient for
the *ad hoc* Committee to conclude that:

---

282    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 58. The *ad hoc* Committee
       substantiates this statement by reference to two older international judicial decisions: paras.
       59, 61.
283    *Pirrwitz*, Annulment, p. 104; *Reisman*, The Breakdown, pp. 763 *et seq.*, 788 *et seq.*
284    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 23.
285    *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.03.
286    *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 7.19.

> ... the treatment of the issue and the conclusions reached by the Second Tri-
> bunal are not so clearly in disregard of Indonesian law as to suggest that the
> Tribunal has failed to apply that law, thereby manifestly exceeding its powers,
> and secondly that the Tribunal has given reasons for reaching the conclusions it
> reached.[287]

The Tribunal had also relied upon authorities stemming from international law,   **201**
which the *ad hoc* Committee found to be "fully applicable" under the regime in
Art. 42(1). It found that the second Tribunal, in seeking a solution to the issues
before it within the frameworks of both Indonesian and international law, had
remained within the provisions of Art. 42(1) and not committed an annullable
error.[288]

In *Lucchetti* v. *Peru*, the *ad hoc* Committee agreed that it is "widely accepted   **202**
that a failure to apply the proper law may amount to an excess of powers".[289]
The Tribunal had not identified or described the rules of treaty interpretation it
applied to a question of inter-temporal law. A majority of the *ad hoc* Committee
declined to find that the Tribunal had disregarded any significant rule of treaty
interpretation. Although the analysis on this point was "summary and somewhat
simplified", the Award contained no excess of power – much less a manifest
excess.[290] The dissenting *ad hoc* Committee member disagreed. He proceeded
to analyse the Tribunal's reasoning and concluded that the Tribunal had failed to
apply elements of the applicable law that "must necessarily have formed part of a
properly-conducted interpretative process".[291]

In *Mitchell* v. *DR Congo*, the Respondent argued that the Tribunal committed   **203**
a manifest excess of powers with regard to the law applicable to the dispute,[292]
in so far as the Award did not address the application of Article X(1) of the rele-
vant treaty, which concerned exceptional circumstances precluding wrongfulness.
However, the Respondent had not invoked this provision before the Tribunal.
The Committee noted that annulment proceedings are not an occasion to present
new arguments. The Committee did consider, however, whether the Tribunal
was obliged to examine Article X(1) *proprio motu*, and found that it was under
no such obligation.[293] Moreover, even if it had been considered, application of
Article X(1) might have had no influence on the Tribunal's award of damages.

---

287  *Ibid.*, para. 7.21.                              288  *Ibid.*, para. 7.26.
289  *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5
     September 2007, para. 98.
290  Confusingly, the *ad hoc* Committee referred in paragraph 116 to the absence of an excess
     of power evident in "the Tribunal's reasoning in the Award". Reasoning may or may not
     reveal an excess of power, but the scope of review called for by Art. 52(1)(b) takes into
     account the entire decision-making process, not merely the reasons that may or may not be
     supplied.
291  *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Dissenting Opinion of Sir
     Franklin Berman, 5 September 2007, paras. 7, 8, 12.
292  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 17.
293  *Ibid.*, para. 57.

In the circumstances, there was no manifest excess of power in relation to the non-application of Article X(1) of the treaty.[294]

**204**    The *ad hoc* Committee in *Soufraki* v. *UAE* confirmed that a failure to apply the proper law may amount to an excess of powers. It noted, however, that:

> 85. ICSID *ad hoc* committees have commonly been quite clear in their statements – if not always in the effective implementation of these statements – that a distinction must be made between the failure to apply the proper law, which can result in annulment, and an error in the application of the law, which is not a ground for annulment.[295]

**205**    It reached this conclusion by first identifying "the basic architecture of ICSID arbitration".[296] This consists of the core elements of ICSID jurisdiction set out in Art. 25, the rule on the applicable law embodied in Art. 42, and the issues put to the tribunal for its decision as circumscribed by the parties' consent.[297] Failure to apply the applicable law identified pursuant to Art. 42 is an excess of powers, since "[t]he relevant provisions of the applicable law are constitutive elements of the Parties' agreement to arbitrate and constitute part of the definition of the tribunal's mandate".[298]

**206**    Article 1(3) of the Italy-UAE BIT defined "an investor of the other Contracting State" as a "natural person holding the nationality of that State in accordance with its laws". The Tribunal had explained its approach to the application of Italian nationality law as follows:

> 55. It is accepted in international law that nationality is within the domestic jurisdiction of the State, which settles, by its own legislation, the rules relating to the acquisition (and loss) of its nationality. Article 1(3) of the BIT reflects this rule. But it is no less accepted that when, in international arbitral or judicial proceedings, the nationality of a person is challenged, the international tribunal is competent to pass upon that challenge. It will accord great weight to the nationality law of the State in question and to the interpretation and application of that law by its authorities. But it will in the end decide for itself whether, on the facts and law before it, the person whose nationality is at issue was or was not a national of the State in question and when, and what follows from that finding.[299]

**207**    Before the *ad hoc* Committee, Soufraki argued that the Tribunal committed a manifest excess of powers by not applying Italian law but only according it "great weight". Soufraki also argued that the Tribunal had applied Italian law differently from the manner that Italian courts would have done, on matters of both substance and evidence.[300] The *ad hoc* Committee declined to annul the Award on this ground. It was evident on the face of the Award and sufficient that the Tribunal did

---

294    *Ibid.*, para. 57.
295    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 85.
296    *Ibid.*, para. 37.            297    *Ibid.*
298    *Ibid.*, para. 45; also Dissenting Opinion of O. Nabulsi, 5 June 2007, para. 19.
299    *Soufraki* v. *UAE*, Award, 7 July 2004, para. 55.
300    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 81/2.

apply Italian law to the issues of nationality before it,[301] and not any other law,[302] and that it had strived to do so in good faith.[303]

### c) Form of Agreement on Proper Law

Art. 42(1) foresees two methods for the choice of the applicable law. The first **208** sentence provides that the tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. The second sentence provides that, in the absence of such an agreement, the tribunal shall apply the law of the host State, including its rules on the conflict of laws, and such rules of international law as may be applicable.

Despite the repeated reference to the parties' agreement on the applicable law **209** in the *travaux préparatoires* (see para. 193 *supra*), it is irrelevant for purposes of Art. 52(1)(b) whether the failure to apply the proper law relates to the first or to the second sentence of Art. 42(1).[304] If the parties do not identify the rules of law to be applied by agreement, the residual rule of the second sentence applies. The residual rule, referring to the host State's law and to applicable rules of international law, is also part of the contractual arrangement between the parties. By incorporating the ICSID Convention into their agreement to arbitrate without agreeing explicitly on the rules of law to be applied by the tribunal, the parties consent to the residual rule of Art. 42(1).[305]

### d) Non-Application or Erroneous Application of the Proper Law

A principle that is uncontested, at least in theory, is the distinction between **210** non-application of the proper law and a mere error in its application (see also paras. 193–195 *supra*). Non-application is a valid reason for annulment. A mere error is not.

*Ad hoc* Committees have all paid at least lip service to this distinction. In **211** *Klöckner I*, the Committee said:

> 60. While the complaint based on failure to observe Article 42 is thus admissible in principle, it remains to be determined what exactly constitutes not deciding "in accordance with such rules of law as may be agreed by the parties", or not "applying the law of the Contracting State party to the dispute". This raises the fine distinction between "non-application" of the applicable law and mistaken application of such law.
>
> 61. It is clear that "*error in judicando*" could not in itself be accepted as a ground for annulment without indirectly reintroducing an appeal against the arbitral award, and the *ad hoc* Committee under Article 52 of the Convention does not, any more than the Permanent Court of Arbitration in the *Orinoco* case,

---

301  *Ibid.*, paras. 89, 91/2.            302   *Ibid.*, para. 93.
303  *Ibid.*, para. 102.
304  See also *Broches*, Observations, pp. 345/6.
305  See also *Pirrwitz*, Annulment, pp. 103/4.

have the "duty . . . to say if the case has been well or ill judged, but whether the award must be annulled".[306]

212    The decision of the *ad hoc* Committee in *Amco I* was similarly categorical:

> 23. The law applied by the Tribunal will be examined by the *ad hoc* Committee, not for the purpose of scrutinizing whether the Tribunal committed errors in the interpretation of the requirements of applicable law or in the ascertainment or evaluation of the relevant facts to which such law has been applied. Such scrutiny is properly the task of a court of appeals, which the *ad hoc* Committee is not. The *ad hoc* Committee will limit itself to determining whether the Tribunal did in fact apply the law it was bound to apply to the dispute. Failure to apply such law, as distinguished from mere misconstruction of that law, would constitute a manifest excess of powers on the part of the Tribunal and a ground for nullity under Article 52(1)(b) of the Convention. The *ad hoc* Committee has approached this task with caution, distinguishing failure to apply the applicable law as a ground for annulment and misinterpretation of the applicable law as a ground for appeal.[307]

213    This opinion was shared by the *ad hoc* Committee in *MINE*. After explaining why non-application of the proper law would constitute a form of excess of powers (see para. 199 *supra*), it added:

> 5.04 Disregard of the applicable rules of law must be distinguished from erroneous application of those rules which, even if manifestly unwarranted, furnishes no ground for annulment (see History of the Convention, Vol. II, pp. 340 and 854).[308]

214    Whether the *Klöckner I* and *Amco I ad hoc* Committees remained faithful to this principle is another matter. Despite their self-professed refusal to examine the substantive correctness of the Awards before them, these Committees did not restrict themselves to establishing whether the Tribunals had identified the applicable law correctly. Rather, they also looked at the question of how this law had been applied. Commentators have criticized these two decisions as having overstepped the line between annulment and appeal[309] (see also paras. 29, 30 *supra*).

215    In *Wena Hotels* v. *Egypt*, it was argued that the Tribunal had manifestly exceeded its powers by failing to apply the proper law to the merits of the dispute. The *ad hoc* Committee stated that it was

> . . . mindful of the distinction between failure to apply the proper law and the *error in judicando* drawn in *Klöckner I*, and the consequential need to avoid

---

306    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 60/1.
307    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 23.
308    *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.04.
309    *Berranger de*, L'article 52 de la Convention, p. 112; *Broches*, Observations, pp. 360 *et seq.*; *Feldman*, The Annulment Proceedings, pp. 102 *et seq.*; *Gaillard*, Chronique (1987), p. 189; *Niggemann*, Das Washingtoner Weltbankübereinkommen, pp. 110 *et seq.*; *Paulsson*, ICSID's Achievements, pp. 388 *et seq.*; *Pirrwitz*, Annulment, pp. 104 *et seq.*; *Redfern*, ICSID, p. 116; *Reisman*, The Breakdown, p. 767; *Sturzenegger*, ICSID, p. 179.

the reopening of the merits in the proceedings that would turn annulment into appeal.[310]

Egypt cited a number of instances of such alleged failure including, in relation to the validity of certain leases, allegations of corruption or conflict of interest tainting the formation of those agreements. The *ad hoc* Committee denied that the Tribunal had committed any annullable error, but, rather, that **216**

> [t]he Tribunal did not consider that there was sufficient evidence to prove such a claim. It is therefore not a question of the applicable law but of evidence, the evaluation of which relates to the merits of the case and is not a matter for the ground of annulment related to a purported excess of power by the Tribunal.[311]

Egypt also complained that the Tribunal had failed to consider the extent and nature of the rights under the leases, which were governed by Egyptian law. The *ad hoc* Committee rejected this argument, noting that the claims before the Tribunal had been directed against Egypt itself under the applicable bilateral investment treaty, and not the Egyptian party to the lease agreements. The *ad hoc* Committee held that the Tribunal had properly distinguished the governing law clause in the leases from the law governing the merits of the arbitration under the investment treaty.[312] **217**

Finally, Egypt argued that by awarding the Claimant interest at nine per cent compounded quarterly, the Tribunal had neglected to apply provisions of Egyptian law that would have limited the award of interest. The *ad hoc* Committee concluded that the Tribunal had correctly identified the proper hierarchy of applicable legal norms in a case under the relevant investment treaty. The Committee accepted that the Tribunal was entitled to refer to international law, including in the event of inconsistency between Egyptian law and applicable international standards. There was no failure to apply the proper law, and no manifest excess of power.[313] **218**

*CDC* v. *Seychelles* also illustrates the distinction between failure to apply the proper law and application of the proper law to the facts as the Tribunal finds them, albeit facts that the party seeking annulment may dispute. In *CDC* v. *Seychelles*, the *ad hoc* Committee commented that "[r]egardless of our opinion of the correctness of the Tribunal's legal analysis . . . our inquiry is limited to a determination of whether or not the Tribunal endeavoured to apply English law".[314] The Tribunal had not ignored aspects of English law cited by the Respondent. It just found them inapplicable considering the relevant facts.[315] It was not open to the *ad hoc* Committee to investigate whether those facts were adequately supported. **219**

The *ad hoc* Committee in *MTD* v. *Chile* observed that "it is established that a complete failure to apply the law to which a Tribunal is directed by Article 42(1) of the ICSID Convention can constitute a manifest excess of powers, as **220**

---

310  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 22.
311  *Ibid.*, para. 47.                    312  *Ibid.*, para. 49.
313  *Ibid.*, para. 46.
314  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 45.
315  *Ibid.*, para. 45.

also a decision given *ex aequo et bono*".[316] Chile argued that the Tribunal had failed to apply international law and Chilean law, as applicable, and that it had effectively decided aspects of the dispute on an *ex aequo et bono* basis. The *ad hoc* Committee did not share the view expressed by Chile that error in the application of the proper law may rise to such a level as to warrant the conclusion that the Tribunal had not applied the proper law at all and so justify annulment.[317] This approach was inconsistent with the test articulated in *MINE* and *CDC* (see paras. 213, 219 *supra*). The *ad hoc* Committee also thought such an approach would go too far down the "slippery slope" of appeal for error of law.[318]

> An award will not escape annulment if the tribunal while purporting to apply the relevant law actually applies another, quite different law. But in such a case the error must be "manifest", not arguable, and a misapprehension (still less mere disagreement) as to the content of a particular rule is not enough.[319]

**221**   The *ad hoc* Committee posited a three-stage test. First: what law was applicable to a given issue, in accordance with Art. 42(1)? Second: what law did the tribunal purport to apply to the issue? Third: was there any basis for concluding that the tribunal's decision "involved a manifest failure to apply the applicable law"?[320] The Tribunal had rightly found that international law was applicable to the application of the fair and equitable treatment provisions set out in the applicable bilateral investment treaty. And whilst the *ad hoc* Committee thought some criticisms of the Tribunal's exposition of the fair and equitable treatment standard were justified, the Tribunal's formulation of the standard was "defensible" and did not amount to a manifest excess of powers by virtue of a failure to apply the applicable law.[321] The Tribunal had also applied Chilean law, where appropriate, to issues governed by it. The *ad hoc* Committee stated that whether the Tribunal "got Chilean law (or for that matter international law) right on a matter falling within its jurisdiction is not for the Committee to decide on an annulment application".[322]

**222**   The *ad hoc* Committee in *Repsol* v. *Petroecuador* also noted that, in ICSID's annulment system, errors made in the application of the applicable law or rules of law do not constitute grounds for annulment.[323] Petroecuador's application was rejected under this head.[324]

**223**   In *Soufraki* v. *UAE*, the *ad hoc* Committee distinguished between serious errors in the application of the applicable law, and errors that are so gross or egregious as substantially to amount to non-application:

> 86. Misinterpretation or misapplication of the proper law may, in particular cases, be so gross or egregious as substantially to amount to failure to apply the proper law. Such gross and consequential misinterpretation or misapplication of the proper law which no reasonable person ("*bon père de famille*") could

---

316  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 44.
317  *Ibid.*, para. 46.                          318  *Ibid.*, para. 47.
319  *Ibid.*, footnote omitted.                  320  *Ibid.*, para. 59.
321  *Ibid.*, paras. 68–71.                       322  *Ibid.*, para. 75.
323  *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 38.
324  *Ibid.*, paras. 42, 44.

accept needs to be distinguished from simple error – even a serious error – in the interpretation of the law which in many national jurisdictions may be the subject of ordinary appeal as distinguished from, e.g., an extraordinary writ of *certiorari*.[325]

The Committee added that an error in a tribunal's findings of facts would not give rise to a manifest excess of powers, provided there is no other annullable error.[326]

The *ad hoc* Committee found that it was evident on the face of the Award that   **224**
the Tribunal did apply Italian law to the issues of nationality before it.[327] It did not apply any other law.[328] According to the *ad hoc* Committee:

> 96. An international tribunal's duty to apply Italian law is a duty to endeavour to apply that law in good faith and in conformity with national jurisprudence and the prevailing interpretations given by the State's judicial authorities. ( . . . )
>
> 97. It is the view of the Committee that the Tribunal had to strive to apply the law as interpreted by the State's highest court, and in harmony with its interpretative (that is, its executive and administrative) authorities. This does not mean that, if an ICSID tribunal commits errors in the interpretation or application of the law, while in the process of striving to apply the relevant law in good faith, those errors would necessarily constitute a ground for annulment.

The Tribunal may have erred on one aspect of Italian law, but this was "an error quite marginal in reaching the final decision" and not "so egregious as to amount to a failure to apply the proper law".[329] The Tribunal did not commit any error when it did not simply defer to the interpretations of the Italian nationality law by Italian officials.[330] The Tribunal did "strive in good faith to apply Italian law as it would have been applied by Italian courts" and committed no annullable error.[331] The *ad hoc* Committee also concluded that the Tribunal correctly determined for itself in accordance with Arbitration Rule 34 the applicable international rules of evidence and procedure, and found itself not bound by Italian rules of evidence.[332]

In *CMS* v. *Argentina*, the *ad hoc* Committee found that the Tribunal had applied   **225**
the proper law, but in relation to the Tribunal's treatment of Argentina's "necessity" defences under Article XI of the applicable bilateral investment treaty and customary international law, it had committed a number of "manifest error[s] of law"[333] (see paras. 189, 190 *supra*). These "errors" were not, however, grounds for annulment. Although the Tribunal had applied the proper law, including

---

325  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 86. See also Dissenting Opinion of O. Nabulsi, para. 24.

| | |
|---|---|
| 326  *Ibid.*, para. 87. | 327  *Ibid.*, paras. 89, 91/2. |
| 328  *Ibid.*, para. 93. | 329  *Ibid.*, paras. 99, 101. |
| 330  *Ibid.*, para. 96. | 331  *Ibid.*, para. 102. |

332  *Ibid.*, paras. 105, 107, 111, 113. Nabulsi dissented on this point, stating that the issue should have been governed exclusively by "substantive rules of Italian law", Dissenting Opinion, 5 June 2007, paras. 63, 76. Nabulsi also considered that the Tribunal had not stated the applicable evidential rules upon which it relied when evaluating Soufraki's evidence of nationality, and therefore committed a further annullable error by failing to state reasons: *ibid.*, para. 72.

333  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 130.

Article XI, "cryptically and defectively", it had applied it. There could be no manifest excess of powers.[334]

### e) Non-Application of Individual Provisions of the Proper Law

**226**    While it is clear that the non-application of the proper law *in toto* would amount to an excess of powers, it is not so obvious that a non-application of only parts of the proper law has the same effect. If partial non-application has the same consequence as total non-application, the omission or neglect of a single provision in the applicable law could lead to annulment. But the inadvertent oversight of a detail in the law is one of the most common legal errors. A *pars pro toto* argument holding that disregard of one provision amounts to non-application of the law does not appear tenable. Partial non-application and erroneous application are indistinguishable.

**227**    The *Amco I ad hoc* Committee seemed to follow this path when examining the alleged shortfall in the investment required from Amco.[335] The Tribunal had calculated the total sum of actual investments at US $2,472,490 and had concluded that the shortfall in relation to the required amount of US $3,000,000 had been immaterial and did not justify the revocation of Amco's investment licence.[336] The *ad hoc* Committee found the Tribunal's calculation faulty since, under the relevant provision of Indonesian law, only amounts recognized and registered by the competent Indonesian authority were investments within the meaning of the Foreign Investment Law. The relevant rules on registration of invested capital were contained in a Circular or Announcement of the Foreign Exchange Bureau of Bank Indonesia. Amco had not complied with the approval and registration formalities for all the amounts involved. The *ad hoc* Committee concluded:

> 95. The evidence before the Tribunal showed that as late as 1977, Amco's investment of foreign capital duly and definitely registered with Bank Indonesia in accordance with the Foreign Investment Law, amounted to only US $983,992 . . . The Tribunal in determining that the investment of Amco had reached the sum of US $2,472,490 clearly failed to apply the relevant provisions of Indonesian law. The *ad hoc* Committee holds that the Tribunal manifestly exceeded its powers in this regard and is compelled to annul this finding.[337]

**228**    The *ad hoc* Committee even offered an explanation that comes close to an excuse for the Tribunal's perceived mistake: the Tribunal's failure to seize the critical importance of the duty to register investments was the result of the fact that the basic rule on the matter was obscured by the lengthy arguments on accounting principles. The Tribunal became so preoccupied with the complicated financing procedures that it lost sight of the basic rule that only approved and registered

---

334  *Ibid.*, paras. 135/6. At para. 146 the *ad hoc* Committee explained that the Tribunal committed another error of law, albeit in the context of *obiter dicta*, when it failed to consider whether application of Article XI would exclude any obligation to pay compensation and in what circumstances.

335  See also *Redfern*, ICSID, pp. 114 *et seq.*; *Reisman*, The Breakdown, pp. 778 *et seq*.

336  *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 241, 242.

337  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 95.

foreign capital inputs are investments in the sense of the Foreign Investment Law[338] (see also para. 152 *supra*).

The *ad hoc* Committee also criticized the fact that the Tribunal had apparently **229** included a loan in its calculation. It found that if this was the case:

> . . . then the Tribunal had effectively failed to apply Article 2 of the Foreign Investment Law which limits qualified foreign investment to investment of equity capital.[339]

A look at the Award shows that the Tribunal undertook a detailed examination **230** of Indonesian law and, in particular, of the Foreign Investment Law. In this context it cites Arts. 1 and 3 of that Law in full[340] and mentions Art. 2 twice.[341] To speak of a non-application that is distinguishable from an erroneous application in this context is not meaningful. The *ad hoc* Committee simply came to a different interpretation and described what it perceived as an erroneous application as a non-application. The new Tribunal in the resubmitted case under Art. 52(6) found that the *ad hoc* Committee had simply disagreed with the Award's application of Indonesian law:

> . . . the present Tribunal notes that this is an example of the *ad hoc* Committee treating the annulment ground under Article 52(1)(b) – "that the Tribunal has manifestly exceeded its powers" – as having been evidenced by a perceived failure to apply the applicable law, by virtue of its having been applied in a manner that reaches a conclusion believed untenable by the *ad hoc* Committee.[342]

Under these circumstances a distinction between non-application and erroneous application becomes impossible.[343]

In *CMS* v. *Argentina*, Argentina alleged that the Tribunal's treatment of its **231** defences under Article XI of the applicable treaty and customary international law revealed a failure to apply the governing law.[344] The *ad hoc* Committee accepted that a "complete failure" to apply the governing law may be a manifest excess of powers. But it emphasized the consistent practice of *ad hoc* committees to distinguish between failure to apply the law and error in its application.[345] Even a manifest error in the application of the proper law was not a ground for annulment.[346]

The foregoing development in the cases points to the clear conclusion that a **232** misapplication of the applicable law is not an annullable error, even if it is a "manifest error of law",[347] provided it is not of such a magnitude as to amount to a veritable non-application of the proper law as a whole.

---

338  *Ibid.*, para. 96.                           339  *Ibid.*, para. 97.
340  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 224.
341  *Ibid.*, paras. 228, 234.
342  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 559.
343  See also *Feldman*, The Annulment Proceedings, pp. 95/6; *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 110; *Pirrwitz*, Annulment, pp. 108 *et seq*.
344  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 48.
345  *Ibid.*, para. 49.                           346  *Ibid.*, paras. 135/6.
347  *Ibid.*

*f) Substantive Application or Substantiation of Sources*

**233**    In applying the proper law, a tribunal will normally refer to specific authority in that law by citing statutory and treaty provisions or relevant cases. But the quality of legal reasoning in national as well as in international judicial decisions varies, and there are significant differences among legal traditions and cultures as to the detail that goes into judicial reasoning. In addition, an award will often constitute a compromise that is presented in terms of a decision based on law. Inevitably, such a decision will be accompanied by reasoning that operates at a higher level of generality and displays a certain laxity in citing relevant sources.[348] The question arises whether an ICSID tribunal that has failed to cite specific legal authority in the properly identified law can be said to have failed to apply that law and to have thereby committed an excess of powers.

**234**    In *Klöckner* v. *Cameroon* (see also Art. 42, paras. 150, 151), the applicable law was Cameroonian law based on French law. The Tribunal made a specific finding to this effect that remained uncontradicted.[349] In looking at the investor's obligations the Tribunal made the following statement:

> We take for granted that the principle according to which a person who engages in close contractual relations, based on confidence, must deal with its partner in a frank, loyal and candid manner is a basic principle of French civil law, as is indeed the case under the other national codes which we know of. This is the criterion that applies to relations between partners in simple forms of association anywhere. The rule is particularly appropriate in more complex international ventures, such as the present one.[350]

The Tribunal did not substantiate this statement with any further reference to French law but continued to refer to "universal requirements of frankness and loyalty".[351] It found that Klöckner had not dealt frankly with Cameroon but had "violated its contractual obligation of full disclosure"[352] and, therefore, did not have a right to the full contract price.[353]

**235**    The *ad hoc* Committee found this style of reasoning unacceptable. It reprimanded the Tribunal for presenting its conclusions as having been reached on the basis of the applicable law in accordance with Art. 42, without having, in fact, applied that law. The absence of specific legal authority made it impossible to determine whether the proper law had been applied:

> 71. Does the "basic principle" referred to by the Award . . . as one of "French civil law" come from positive law, i.e., from the law's body of rules? It is impossible to answer this question by reading the Award, which contains no reference whatsoever to legislative texts, to judgments, or to scholarly opinions.[354]

---

348  See *Reisman*, The Breakdown, pp. 764/5, 774, 791/2, 796; *Seidl-Hohenveldern*, Die Aufhebung, pp. 109/10.
349  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 59.
350  *Loc. cit.*                                351  At p. 60.
352  At p. 61.                                 353  At pp. 60/1.
354  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 71.

*Article 52 – Annulment*                                                967

The *ad hoc* Committee was less concerned with the substantive correctness of the Award than with the way it was presented. It was unwilling to inquire on its own initiative whether an obligation of full disclosure did, in fact, exist in French law.[355] By not demonstrating the existence of concrete rules, the Tribunal had not applied the proper law:

> 79. *In conclusion*, it must be acknowledged that in its reasoning, limited to postulating and not demonstrating the existence of a principle or exploring the rules by which it can only take concrete form, the Tribunal has not applied "the law of the Contracting State".[356]

The *ad hoc* Committee's approach in *Klöckner I* has attracted criticism.[357] Perhaps the most serious objection has been the argument that the Tribunal's conclusions were in accord with French law and that the Award would have been upheld by a French judge.[358]                                              **236**

It would appear that the *ad hoc* Committee in *Klöckner I* was not concerned with the application or not of the proper law, nor even with its correct application, but rather with the judicial quality of the reasoning underlying it.[359] The Tribunal's reasoning was, no doubt, open to criticism on account of its laxity in citing sources and its failure to rely on specific legal authority. But this is a far cry from a failure to apply the proper law constituting an excess of powers. The function of annulment is to preserve the basic legitimacy of the arbitration process (see paras. 11–15 *supra*). Quality control over the reasoning of tribunals is not one of the functions of annulment.                                                                  **237**

The absence of adequate legal reasoning in an award may amount to a failure to state reasons in the sense of Art. 52(1)(e). The *Klöckner I ad hoc* Committee considered this possibility but rejected it. It pointed out that it could not be said that the Tribunal had made its decision without providing reasons within the meaning of Arts. 48(3) and 52(1)(e). Rather, in the *ad hoc* Committee's opinion, the Tribunal had acted outside the framework of Art. 42(1) by applying concepts or principles it probably considered equitable, thereby manifestly exceeding its powers in the sense of Art. 52(1)(b)[360] (see para. 248 *infra*).        **238**

Subsequent *ad hoc* committees did not follow the example of *Klöckner I*. In *Amco* v. *Indonesia*, the proper law was Indonesian law and applicable rules of international law.[361] The *ad hoc* Committee, after noting that the Tribunal had not been authorized to decide *ex aequo et bono* (see paras. 252–256 *infra*), said:     **239**

---

355   *Ibid.*, para. 73.                         356   *Ibid.*, para. 79. Italics original.
357   See esp. *Broches*, Observations, pp. 360 *et seq.*; *Feldman*, The Annulment Proceedings, pp. 92, 101 *et seq.*; *Paulsson*, ICSID's Achievements, p. 389; *Pirrwitz*, Annulment, pp. 103, 106; *Redfern*, ICSID, pp. 106 *et seq.*; *Reisman*, The Breakdown, pp. 766 *et seq.*
358   *Berranger de*, L'article 52 de la Convention, pp. 112, 114; *Gaillard*, Chronique (1987), p. 140; *Kahn*, Le contrôle des sentences arbitrales, p. 376.
359   It has been suggested that an apparent bias against Klöckner by the Tribunal more than the lack of reference to legal rules was the real, yet disguised, motive for the *ad hoc* Committee in granting annulment. See *Pirrwitz*, Annulment, p. 106.
360   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 81.
361   *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 147, 148.

25. At the same time, the *ad hoc* Committee does not believe that the Tribunal had necessarily to preface each finding or conclusion with a specification of the Indonesian or international law rule on which such finding or conclusion rests. The Tribunal's conclusions or findings must of course be read in their context . . . [362]

Indonesia claimed that the Tribunal had manifestly exceeded its powers and had failed to state any reasons in holding Indonesia responsible for the hotel's forcible takeover by army and police personnel on the basis of international law[363] (see also para. 267 *infra*). In Indonesia's view, the Tribunal should have established whether Indonesian law provided a special duty to protect foreign investors and their property. The *ad hoc* Committee rejected this argument:

The *ad hoc* Committee reads this portion of the Award to mean that the Tribunal found the acts of PT Wisma, and therefore also the acts of the army and police personnel involved, to be illegal under Indonesian law. It is true that the Tribunal did not refer to any specific Indonesian statutory or regulatory provision nor to any Indonesian case-law, but this omission is no more decisive of non-application of Indonesian law than it is indicative of an intent on the part of the Tribunal, at that point in the Award, to apply international law.[364]

The *ad hoc* Committee proceeded to reconstruct the situation in Indonesian law on the basis of statements by counsel for Indonesia and by reference to Indonesian statutory law. It concluded that there was under Indonesian law a duty to protect a person in actual peaceful possession of property. Therefore, the *ad hoc* Committee was unable to sustain the contention that the Tribunal had failed to apply Indonesian law.[365]

**240**     In another part of the Award the Tribunal held that the procedure leading to the revocation of the investment licence had not offered the investor a fair and adequate hearing and therefore had been contrary "to the general and fundamental principle of due process".[366] Before the *ad hoc* Committee, Indonesia argued that Indonesian administrative law did not include any general principles or standards of due process. Nor did the words "due process" appear in Indonesia's Constitution. But Indonesia admitted that Indonesian law offered redress against administrative decisions on the basis of certain general standards.[367] Despite the Tribunal's failure to define the conditions for its "general and fundamental principle", the *ad hoc* Committee held:

It appears to the *ad hoc* Committee that these general standards of Indonesian law are not qualitatively different from, and seem equivalent in a functional sense to, what the Tribunal appears to have had in mind in referring to "the general and fundamental principle of due process".[368]

---

362  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 25.
363  Award, pp. 458/9.                    364  Decision on Annulment, para. 58.
365  *Ibid.*, para. 59.
366  *Amco* v. *Indonesia*, Award, 20 November 1984, 1 ICSID Reports 472/3.
367  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 77.
368  *Ibid.*, para. 78.

Therefore, the *ad hoc* Committee held that this part of the Award was not vitiated by a failure to apply the proper law amounting to a manifest excess of powers nor by failure to state reasons.[369]

**241** The Decision on Annulment in *Amco I* offers additional examples of unsuccessful contentions of failure to apply the proper law in connection with alleged technical errors concerning Indonesian law.[370] But the above examples suffice to show that the *ad hoc* Committee was concerned with an application of the substance of the proper law rather than with its correct substantiation. It follows that a tribunal's failure to cite specific authority for a rule it applies will not be taken as an indication of a failure to apply the proper law as long as the rule is, in fact, in accord with the applicable law.

**242** The Decision on Annulment in *MINE* is a further example of an *ad hoc* committee refusing to attribute decisive importance to a technical error in the citation of the applicable law. In this case, there was a specific agreement between the parties designating Guinean law as the applicable law.[371] The Tribunal found that Guinea had violated the principle of good faith set forth in Art. 1134 of the French Civil Code.[372] In its Application for Annulment, Guinea claimed that the Tribunal had "failed to apply any law, let alone the correct law", thereby committing a manifest excess of powers.[373] The *ad hoc* Committee cited the relevant passage from the Award and said:

> 6.40 There is thus no basis for saying that the Tribunal failed to apply any law. Admittedly, the Tribunal erred in citing Article 1134 of the French Civil Code. The Committee notes, however, that the relevant provision of the applicable Guinean law is contained in the "Code Civil de l'Union Française" with the same number and the same contents as Article 1134 of the French Civil Code. For this reason, the Committee does not consider that this error warrants annulment.[374]

**243** A failure to provide legal authorities for an award might more appropriately be relied upon in the context of an alleged failure to state reasons under Art. 52(1)(e) (see paras. 338–434 *infra*). But lack of documentation does not necessarily make reasons insufficient or inadequate. The *ad hoc* Committee in *Soufraki* v. *UAE* also rejected the view that the absence of references to previous decisions or literature manifests an annullable error:

> Lack of references supporting a proposition in an award is not, by itself, a ground for annulment, particularly where such documentation is provided by the parties to the case in their memorials and counter-memorials, and relate to well-known propositions.[375]

---

369    *Loc. cit.*                              370    At paras. 65/6, 72–74, 80–83, 86.
371    *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 6.34–6.36.
372    *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 73.
373    *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.38.
374    *Ibid.*, para. 6.40.
375    *Soufraki* v. *UAE*, Decision on Annulment, 5 July 2007, para. 128. Footnote omitted. The footnote quotes a passage from the First Edition of this Commentary.

### g) Equity and Proper Law

**244**    Art. 42(3) provides that the tribunal may decide *ex aequo et bono* if the parties so agree (see Art. 42, paras. 249–279). Art. 42(3) is an exception from the rules on applicable law in Art. 42(1) in the sense that the parties may agree to authorize the tribunal to go beyond rules of law and to decide on the basis of equity. But the tribunal's power to decide *ex aequo et bono* is restricted to cases in which the parties have given their explicit permission (see Art. 42, paras. 260–265). A decision based on equity, rather than on law, without an authorization by the parties, constitutes an excess of powers for failure to apply the proper law.[376]

**245**    ICSID *ad hoc* committees have held consistently that a decision *ex aequo et bono* without a party authorization, as provided in Art. 42(3), amounts to an excess of powers. The *Klöckner I* Committee was quite specific on this point:

> Excess of powers may consist of the non-application by the arbitrator of the rules contained in the arbitration agreement (*compromis*) or in the application of other rules. Such may be the case if the arbitrator (like Umpire Barge in the *Orinoco* case) applies rules of local law while the arbitration agreement prescribes that he decide "on the basis of absolute equity, without regard . . . to the provisions of local law", or if, conversely, he reaches a solution *in equity* while he is required to decide *in law* . . . [377]

The Decision on Annulment in *Amco I*[378] (see para. 255 *infra*) and in *MINE* (see para. 199 *supra*) also show clearly that an award that is based on equity instead of the applicable law may be annulled for excess of powers.

**246**    An accurate identification of a decision that was rendered *ex aequo et bono* instead of in accordance with the applicable law is not easy. It is unlikely that a tribunal will openly declare that it disregards the proper law in favour of equitable considerations. Rather, it may disguise these equitable considerations as legal rules.[379] An *ad hoc* committee cannot simply accept what the tribunal says it is doing but must ascertain what it is doing in fact.

**247**    On the other hand, not every invocation of equitable principles is a reliable indication that the tribunal wanted to or did, in fact, depart from the applicable law. In *MTD* v. *Chile*, the *ad hoc* Committee noted that determination *ex aequo et bono* of a dispute "is different from taking into account considerations of fairness in applying the proper law".[380] The latter was appropriate in applying the fair and equitable treatment standard in the relevant bilateral investment treaty, which the Tribunal was required to apply. There was no indication that the Tribunal's

---

376    See *Broches*, Convention, Explanatory Notes and Survey, p. 666; *Delaume, G. R.*, L'affaire du *Plateau des Pyramides* et le CIRDI. Considérations sur le droit applicable, Revue de l'arbitrage 39, 55 (1994); *Feldman*, The Annulment Proceedings, p. 104; *Giardina*, ICSID, p. 212; *Seidl-Hohenveldern*, Die Aufhebung, p. 108; *Schreuer, C.*, Decisions Ex Aequo et Bono Under the ICSID Convention, 11 ICSID Review – FILJ 37, 53, 61 (1996).

377    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 59.

378    See *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 27/8.

379    See also *Reisman*, Systems of Control, p. 82.

380    *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 48.

decision had been "made in a law-free zone on a basis of general equity".[381] The application of equity within the law is a normal and entirely permissible process[382] (see Art. 42, paras. 269–271).

In *Klöckner* v. *Cameroon*, the parties had not authorized the Tribunal to decide **248** *ex aequo et bono*. The *ad hoc* Committee held that the Tribunal's broad finding on an obligation of full disclosure (see para. 234 *supra*) amounted to an unauthorized resort to equitable principles:

> 77. Now, the Award's reasoning and the legal grounds on this topic (to the extent that they are not in any case mistaken because of the inadequate description of the duty of "full disclosure") seem very much like a simple reference to equity, to "universal" principles of justice and loyalty, such as amiable compositeurs might invoke.[383]

This, in the Committee's view, constituted a manifest excess of powers:

> Strictly speaking, it could not be said that it made this decision without providing reasons, within the meaning of Articles 48(3) and 52(1)(e). It did, however, act outside the framework provided by Article 42(1), applying concepts or principles it probably considered equitable (acting as an amiable compositeur, which should not be confused with applying "equitable considerations" as the International Court of Justice did in the *Continental Shelf* case). However justified its award may be (a question on which the Committee has no opinion), the Tribunal thus "manifestly exceeded its powers" within the meaning of Article 52(1)(b) of the Washington Convention.[384]

The allegation that the *Klöckner* Tribunal had used equitable principles improp- **249** erly also arose in another context. The Award had rejected both the claim and the counter-claim. The Tribunal had reached this result on the basis of a finding that not only Cameroon but also Klöckner had failed to discharge its obligations properly. It entered into an extensive discussion of the *exceptio non adimpleti contractus* in French law[385] and found that it had to make a quantitative compari-son of the respective failures of performance.[386] A detailed comparison of the parties' performance under the contract, which the Tribunal called an "equitable evaluation",[387] led to the following result:

> In the present case, taking into account, on the one hand, the significant payments effected by Defendant, and, on the other hand, the significance of Claimant's fail-ures to live up to contractual undertakings, it is appropriate to conclude that the amount paid corresponds equitably to the value of Klöckner's defective perfor-mance. There is a certain equilibrium, a certain relationship, as we have suggested above, between that which was paid and the approximate value of the components

---

381  *Ibid.*, para. 77.
382  See also *Giardina*, ICSID, p. 212; *Lauterpacht, E.*, Aspects of the Administration of Inter-national Justice 120 (1991); *Schreuer*, Decisions Ex Aequo et Bono, pp. 37 *et seq.*; *Seidl-Hohenveldern*, Die Aufhebung, pp. 107/8.
383  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 77.
384  *Ibid.*, para. 79.
385  *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 61 *et seq*.
386  At pp. 68 *et seq*.                    387   At p. 71.

972      THE ICSID CONVENTION: A COMMENTARY

> supplied by Klöckner in 1974–1975 and used by Defendant in the redesigned fac-
> tory, which was restarted successfully in 1980. The two methods of analysis lead
> to results approximately equivalent, and we have thus concluded that Klöckner
> is entitled to what it has already received, but to nothing more.[388]

This, in the *ad hoc* Committee's view, amounted to an impermissible resort to equity:

> 163. . . . it is possible to discern quite clearly a dominant concern, inspired by
> equity, which will ultimately send the parties back to "square one" – each keeping
> what it already has, but each having its claim rejected, be it the principal claim for
> payment of the balance of the price or the counterclaim for damages. But it must
> also be recognized here that the Award is based more on a sort of general equity
> than on positive law (and in particular French civil law) or precise contractual
> provisions, such as Article 9 of the Turnkey Contract.[389]

**250**  The *ad hoc* Committee's accusation that the Award rests on equity rather than on the proper law is purely inferential. The *ad hoc* Committee admitted that the Tribunal had identified the applicable law correctly but found that it had failed to apply it. There is no doubt that the Tribunal believed that it was applying the proper law. It said so at the outset and kept referring to French civil law. It never claimed to have the power to decide *ex aequo et bono*. In discussing the "duty of full disclosure" it specifically described it as a principle of French civil law. The *ad hoc* Committee concluded from a lack of cited references in the Award, and from the Tribunal's use of somewhat general language, that it had not applied the proper law. Lack of detailed proof of a rule meant that it must be presumed not to exist. Reliance on a rule which was not proven to exist amounted to a decision in equity.

**251**  Interestingly, the *Klöckner I ad hoc* Committee used a different approach in the discussion on the balancing of the parties' respective claims. The Tribunal's reasoning on this point was fairly detailed. It was supplemented by a calculation of the value of the parties' respective incomplete performance. But the Tribunal used terminology that had certain equitable connotations. The *ad hoc* Committee seized upon imprecise expressions such as "corresponds equitably", "certain equilibrium" and "approximately equivalent" to charge that the Award was based more on general equity than on positive law.

**252**  In *Amco I*, the *ad hoc* Committee refused to follow *Klöckner I* on the point of impermissible resort to equity.[390] In *Amco* v. *Indonesia*, there was also no authorization to decide *ex aequo et bono* and the Tribunal had recognized this explicitly.[391] But the *ad hoc* Committee rejected the idea that every reliance on broad principles or equitable considerations amounted to an impermissible decision *ex aequo et bono*.

---

388   At p. 72.
389   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 163.
390   See also *Broches*, Observations, pp. 342 *et seq*.
391   *Amco* v. *Indonesia*, Award, 20 November 1984, para. 147.

Indonesia had argued that the "general and fundamental principle of due process", on which the Tribunal had relied (see para. 240 *supra*), had every appearance of being based on equity and not on the law prescribed to be applied by Article 42(1) of the Convention.[392] Amco argued that the Tribunal's explicit recognition that the parties had not authorized it to decide the case *ex aequo et bono* created an overwhelming, though rebuttable, presumption that the arbitrators had indeed refrained from doing so.[393]

**253**

The *ad hoc* Committee rejected both these arguments. It denied the existence of the alleged presumption and found that it had to examine closely both what the Tribunal said it was doing and what it was in fact doing.[394] In response to Indonesia's argument, the *ad hoc* Committee found that the Tribunal did not need to preface each finding or conclusion by specifying the legal rule on which such finding or conclusion rests (see para. 239 *supra*). The Committee added:

**254**

> 26. Neither does the *ad hoc* Committee consider that any mention of "equitable consideration" in the Award necessarily amounts to a decision *ex aequo et bono* and a manifest excess of power on the part of the Tribunal. Equitable considerations may indeed form part of the law to be applied by the Tribunal, whether that be the law of Indonesia or international law.[395]

The *ad hoc* Committee also rejected Indonesia's assertion that the International Court of Justice had applied equitable considerations or principles only in the context of the delimitation of maritime boundaries and that, therefore, the application of such considerations should remain restricted to such context. Citing the *Corfu Channel* case,[396] the *Barcelona Traction* case[397] and the *Advisory Opinion on Judgments of the Administrative Tribunal of the ILO upon complaints made against the UNESCO*,[398] the Committee found that the ICJ had taken equitable considerations into account in other contexts as well.[399] It pointed out that this view was fairly widely shared among scholars in international law[400] and concluded as follows:

**255**

> The *ad hoc* Committee thus believes that invocation of equitable considerations is not properly regarded as automatically equivalent to a decision *ex aequo et bono* which, in view of the determination of the law applicable to the present case . . . , would constitute a decision annullable for manifest excess of powers. Nullity would be a proper result only where the Tribunal decided an issue *ex aequo et bono* in lieu of applying the applicable law.[401]

Indonesia had also complained about the Tribunal's statement that the hotel which was at the centre of the dispute was now part of the travel and tourist facilities of the City of Jakarta. The *ad hoc* Committee responded by saying that this statement was clearly *obiter* and that

**256**

---

392  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 77.
393  *Ibid.*, para. 24.                    394  *Loc. cit.*
395  *Ibid.*, para. 26.                    396  1949 ICJ Reports 249.
397  1970 ICJ Reports 48.                  398  1956 ICJ Reports 100.
399  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 27.
400  *Ibid.*                               401  *Ibid.*, para. 28.

> . . . while it would be interesting to examine recourse to equitable considerations as part of the applicable law as distinguished from resort to decision *ex aequo et bono* the *ad hoc* Committee believes there is no need to do so.[402]

257    The two cases in which an unauthorized decision *ex aequo et bono* was invoked as a ground for annulment permit a number of conclusions. A decision *ex aequo et bono* without the parties' authorization is a failure to apply the proper law and is subject to annulment. On the other hand, an unauthorized decision *ex aequo et bono* should not be assumed lightly. As long as the tribunal identifies the applicable law correctly and strives to apply it, it is impossible to conclude that the tribunal has disregarded law for the sake of equity. Nor does a tribunal necessarily decide *ex aequo et bono* if it does not cite detailed legal authority for a particular finding. Also, not every reference to equity in a tribunal's reasoning indicates that it has decided *ex aequo et bono*. The *ad hoc* Committee's decision in *Klöckner I* clearly went too far on these points. The subsequent decision in *Amco I* has rectified the situation to some extent.

258    It is not always easy to establish whether an award is, in fact, based on the proper law or on equity. The *ad hoc* Committees have wrestled with the problem of identifying decisions *ex aequo et bono* with the help of shifting criteria. These have involved formal as well as substantive tests. A formal test looks at the tribunal's own statement as to whether it is deciding *ex aequo et bono* or on the basis of positive law. A substantive test examines whether the decision has remained within the general limits of positive law or has substantially departed from it. Neither test on its own is entirely satisfactory. The tribunal's own description of what it is doing cannot be the last word. On the other hand, an apparent departure from the applicable law may be no more than a mistake in applying that law. Therefore, a combination of both tests is indispensable. First, the award's reasoning must be examined to ascertain the tribunal's intention. In particular, references to equity, justice and similar terms must be analysed. These may, or may not, indicate that the tribunal wanted to go beyond legal rules. Second, the award's general adherence to the applicable law must be examined. Major and systematic discrepancies may provide evidence that the tribunal did not just make a mistake but chose to disregard the proper law in favour of equity.

### h) International Law and Proper Law

259    International law may be part of the applicable law in several ways. The claim may be brought under an investment protection treaty that contains a clause on applicable law (see Art. 42, paras. 23, 80–84). Or the parties may have included international law in a choice of law clause in their contract, in accordance with the first sentence of Art. 42(1) (see Art. 42, paras. 22, 24–37). Or international law may be incorporated into and hence be part of a chosen domestic law (see

---

402    *Ibid.*, para. 104.

Art. 42, paras. 100–103). Even if an agreement on applicable rules of law contains no reference to international law, it may still govern certain aspects of the relationship (see Art. 42, paras. 104–115).

If the parties have not agreed on applicable rules of law, the tribunal is to apply **260** the law of the host State "and such rules of international law as may be applicable" in accordance with the second sentence of Art. 42(1) (see Art. 42, paras. 133–244).

Once international law is part of the applicable law, failure to apply it may **261** amount to an excess of powers. The *ad hoc* Committee in *Amco I* emphasized the need to respect international law and at the same time supplied reasons for doing so:

> The law of the host State is, in principle, the law to be applied in resolving the dispute. At the same time, applicable norms of international law must be complied with since every ICSID award has to be recognized, and pecuniary obligations imposed by such award enforced, by every Contracting State of the Convention (Art. 54(1), Convention). Moreover, the national State of the investor is precluded from exercising its normal right of diplomatic protection during the pendency of the ICSID proceedings and even after such proceedings, in respect of a Contracting State which complies with the ICSID award (Art. 27, Convention). The thrust of Article 54(1) and of Article 27 of the Convention makes sense only under the supposition that the award involved is not violative of applicable principles and rules of international law.[403]

Indonesia had argued that the Tribunal had manifestly exceeded its powers **262** by holding that Amco could bring its claim directly to an ICSID tribunal without previously seeking redress before the Indonesian courts in conformity with the general international law rule on the exhaustion of local remedies. The *ad hoc* Committee did not address the question whether such a mistake, had it occurred, would have affected the Tribunal's jurisdiction[404] or constituted a failure to apply international law or merely an error in applying international law. It simply pointed to Art. 26 containing a general waiver of the exhaustion of local remedies unless the host State reserves that requirement as a condition of its consent to arbitration.[405]

A general failure to apply international law, if it is part of the applicable law, **263** would amount to an excess of powers exposing the award to annulment. A mere error in the application of international law would not have this effect (see paras. 210–225 *supra*). In the same way, a non-application of individual provisions of international law would not, in principle, furnish a ground for annulment (see paras. 226–232 *supra*). However, a case can be made that certain fundamental rules of international law do by themselves form an appropriate and necessary standard for review of awards. These fundamental rules may be described as the

---

403  *Ibid.*, para. 21.
404  Indonesia was precluded from raising this point in terms of a lack of jurisdiction since it had expressly waived grounds of nullity relating to jurisdiction. See para. 47 *supra*.
405  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 64.

public policy of the international community (see Art. 42, paras. 49–52). They would include peremptory rules of international law. Examples are the prohibition of slavery, the drug trade, terrorism, genocide and the protection of basic human rights. An award, even if it applies international law in principle, that violates one of these rules should be subject to annulment.

**264**    It is an open question whether a non-application of other important rules of international law should be seen as an excess of powers for failure to apply the proper law. Examples are the principles of *pacta sunt servanda*, prohibition of bad faith and denial of justice, the international minimum standard for the treatment of foreigners and the rules on state responsibility (see also Art. 42, paras. 114, 115). It may be argued that at least some of these principles are so basic to the structure of international law that their disregard amounts to a non-application of international law as a whole. On the other hand, it must be admitted that such an approach runs the risk of blurring the line between a non-application of international law and its erroneous application.

**265**    In actual practice, the problem has been less a failure to apply international law than allegations of its overzealous application at the expense of the host State's law.[406] The relationship of international law and host State law is discussed in some detail in the Commentary on Art. 42 (see Art. 42, paras. 96–115, 204–244).

**266**    In *Klöckner I*, the Tribunal's reliance on a purported principle of frankness and loyalty (see para. 234 *supra*) incurred the *ad hoc* Committee's criticism. It pointed out that the Tribunal may have wanted to base its decision on the general principles of law recognized by civilized nations which, under Art. 38(1)(c) of the Statute of the International Court of Justice, are part of the accepted sources of international law. The *ad hoc* Committee rejected such a resort to international law independently of the host State's domestic law:

> . . . Article 42 of the Washington Convention certainly provides that "in the absence of agreement between the parties, the Tribunal shall apply the law of the Contracting State party to the dispute . . . and *such principles of international law as may be applicable*". This gives these principles (perhaps omitting cases in which it should be ascertained whether the domestic law conforms to international law) a dual role, that is, *complementary* (in the case of a "lacuna" in the law of the State), or *corrective*, should the State's law not conform on all points to the principles of international law. *In both cases*, the arbitrators may have recourse to the "principles of international law" only *after* having inquired into and established the content of the law of the State party to the dispute (which cannot be reduced to *one* principle, even a basic one) and *after* having applied the relevant rules of the State's law.
>
>    Article 42(1) therefore clearly does not allow the arbitrator to base his decision *solely* on the "rules" or "principles of international law".[407]

406  See also *Berranger de*, L'article 52 de la Convention, p. 109; *Seidl-Hohenveldern*, Die Aufhebung, p. 114.
407  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 69. Italics original. The *ad hoc* Committee, writing in French, adds some remarks on the difference between the words

The *Amco I ad hoc* Committee adopted a somewhat different approach. Indonesia claimed that the Tribunal had manifestly exceeded its powers and had failed to state any reasons in holding Indonesia responsible on the basis of international law for the hotel's forcible takeover. In Indonesia's view, the Tribunal should have applied Indonesian law before undertaking to apply international law. The *ad hoc* Committee stated that it read the Award's relevant portion to mean that the acts in question were illegal under Indonesian law. This despite the fact that the Tribunal did not refer to Indonesian law in this context. The Committee simply concluded that this omission was not indicative of a non-application of Indonesian law or an intent of the Tribunal to apply international law[408] (see para. 239 *supra*). The Committee then proceeded to establish that the forcible takeover was illegal under Indonesian law. It cast doubt on the Tribunal's finding that there was a special duty of States to protect foreign-owned property in international law.[409]   **267**

The *ad hoc* Committee rejected the contention that international law had been applied improperly at the cost of domestic law, simply by demonstrating that the application of the domestic law would have led to the same result. This would suggest that shortcomings in the reasoning supporting a decision will not amount to a failure to apply the proper law even if they cross the line between the host State's domestic law and international law. A violation of the rules governing the interplay of international law and domestic law constitutes an excess of powers only if it affects the decision's outcome.   **268**

In another context, the *Amco I* Decision on Annulment finds a reference to international law simply superfluous. The Tribunal had based its decision on damages to be paid in US Dollars outside Indonesia on Indonesian law. The Tribunal's amplifications concerning international law on this issue appeared *obiter* to the *ad hoc* Committee.[410]   **269**

In the second annulment proceeding in *Amco II*, Indonesia argued that the second Tribunal too had manifestly exceeded its powers by disregarding Indonesian law and applying international law instead, or by deciding *ex aequo et bono*.[411] The *ad hoc* Committee rejected this complaint. It found that in seeking a solution to the issues before it within the frameworks of both Indonesian and international law, the second Tribunal had remained within the provisions of Art. 42(1) and had not committed an annullable error[412] (see para. 201 *supra*). The Tribunal had not departed from its task to apply law, and had therefore not decided the matter *ex aequo et bono*.[413]   **270**

---

"principes" and "règles" as used in Art. 42(1). It seems to have been unaware of the fact that the Convention's English and Spanish versions use the same words ("rules" and "normas") in both instances (see Art. 42, paras. 167, 168).

408   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 58.
409   *Ibid.*, paras. 58–60.                    410   *Ibid.*, para. 120.
411   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 5.11.
412   *Ibid.*, para. 7.26.                    413   *Ibid.*, para. 7.48.

### G. "(c) that there was corruption on the part of a member of the Tribunal;"

271    Corruption of an arbitrator is an obvious ground for annulment. It strikes at the root of the integrity of the arbitral process. Instances of corruption of members of arbitral tribunals seem to be so unusual that they are rarely contemplated.[414]

272    The Convention's provisions on the grounds for annulment were modelled on the International Law Commission's 1958 Model Rules on Arbitral Procedure (see para. 1 *supra*). The provision on corruption was taken from that text[415] into the Preliminary Draft for the Convention and remained unchanged throughout its drafting history (History, Vol. I, pp. 230–232). The principle of retaining corruption as ground for annulment was never cast into doubt. But there were various unsuccessful attempts to replace the word "corruption" with "bias" (History, Vol. II, p. 271), "misconduct" (at p. 851) or "lack of integrity" (at p. 852). There was also some debate on how proof of corruption was to be furnished (at p. 340). A suggested requirement that corruption would have to be evidenced by a court judgment was not pursued (at p. 851). An amendment to the effect that the existence of "reasonable grounds to believe that there was corruption" would be sufficient was defeated in a vote (at pp. 851/2).

273    It follows from the Convention's wording and drafting history that the fact of corruption must be established and not inferred in order to constitute a ground for annulment. Corruption would be improper conduct by an arbitrator induced by personal gain. Under Arbitration Rule 6 each arbitrator must, before or at the first session of the tribunal, sign a declaration containing the following formula:

> I shall . . . not accept any instruction or compensation with regard to the proceeding from any source except as provided in the Convention . . . [416]

Corruption would be present if biased behaviour could be shown to have been caused by an improper "compensation". Acceptance of an improper payment in connection with ICSID proceedings would create a strong presumption of corruption.

274    Mere bias without improper payment would not amount to corruption. In particular, a predisposition by a party-appointed arbitrator towards the arguments of the appointing party is not a basis for annulment on the ground of corruption. Unauthorized communication between an arbitrator and a party that takes place outside the official proceedings is improper and could possibly amount to a serious departure from a fundamental rule of procedure. But it does not, by itself, amount to corruption.

---

414    Corruption is not listed as one of the reasons for setting aside or non-enforcement of awards in the [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, Art. V, 330 UNTS 40, and in the UNCITRAL Model Law, 1985, Arts. 34, 36, 24 ILM 1311/2.

415    See Art. 35(b) of the Model Rules, YBILC 86 (1958-II).

416    Arbitration Rule 6(2).

Under Arbitration Rule 6(2), arbitrators must also give a statement of any past **275** and present professional business and other relationship with the parties and any other circumstance that may cause their reliability for independent judgment to be questioned by a party. An incomplete or untruthful statement of this kind would not, by itself, amount to corruption. But it may, if the circumstances are sufficiently serious, form the basis of a claim that the tribunal was not properly constituted in accordance with Art. 52(1)(a). Depending on the nature and closeness of the relationship, acceptance of an appointment as arbitrator may create a presumption of corruption if the arbitrator stands to derive personal profit or loss from the outcome of the proceedings. This would be the case if the arbitrator is a close partner of or a major shareholder in one of the parties.

Under Art. 14, persons designated to the Panel of Arbitrators must be persons of **276** high moral character who may be relied upon to exercise independent judgment. The procedures for the designation to the Panel of Arbitrators (Arts. 12–16), for the constitution of a tribunal (Arts. 37–40; Arbitration Rules 1–6) and for the replacement and disqualification of arbitrators (Arts. 56–58; Arbitration Rules 7–12) offer a high measure of guarantee against corruption. No case of corruption has ever been alleged in any of the annulment proceedings that have led to published decisions.

The most serious problem with corruption as a ground for annulment is that it **277** will, almost by definition, be kept secret from the party to whose disadvantage it operates. Whereas all other grounds for annulment will usually be readily apparent to the parties either during the proceedings or upon receipt of the award, evidence of corruption may emerge only at a much later stage. For this reason Art. 52(2) contains a special provision on time limits for a request for annulment based on corruption which is different from the time limit for requests based on other grounds (see paras. 448–450 *infra*).

## H. "(d) that there has been a serious departure from a fundamental rule of procedure;"

### *1. History*

The observance of a proper procedure is another requirement for the preser- **278** vation of the integrity and legitimacy of the arbitration process. Violation of procedural rules is a ground for the setting aside or refusal to enforce also under other documents governing post-award procedures.[417]

The Convention's wording on this point is closely modelled after the Interna- **279** tional Law Commission's 1958 Model Rules on Arbitral Procedure[418] (see para. 1 *supra*). The basic formula remained unchanged throughout the Convention's drafting (History, Vol. I, pp. 230–232) and was never challenged in principle.

---

417   [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, Art. V1(d), 330 UNTS 42; UNCITRAL Model Law, 1985, Arts. 34(2)(a)(iv), 36(1)(a)(iv), 24 ILM 1311–1313 (1985).

418   Art. 35(c), YBILC 86 (1958-II).

There was some concern that rules of procedure under national systems would differ and that, therefore, it would be necessary to incorporate the main rules of procedure into the Convention or into an annex to it (History, Vol. II, pp. 478, 480, 515). But there was general consensus that not all rules of procedure contained in the Arbitration Rules would fall under the concept of "fundamental rules". The fundamental rules of procedure that might furnish a ground for annulment, if violated, would be restricted to the principles of natural justice (at pp. 271, 423, 480, 517). Mr. *Broches* offered the principles that both parties must be heard and that there must be adequate opportunity for rebuttal as examples (at p. 480). A suggestion to refer specifically to a requirement that both parties must have a fair hearing was defeated (at p. 853). A suggestion was also made to use the expression "principle of procedure" rather than "rule" to make it clear that what was meant was different from the rules of procedure to be adopted by the Administrative Council (see Art. 44, para. 34). Mr. *Broches* stated that by spelling "rule of procedure" without capital letters and by referring to a "fundamental" rule there was a clear reference to principles (at p. 854).[419]

### 2. Serious Departure and Fundamental Rule

**280**    Violation of a rule of procedure will be a ground for annulment only if two requirements are met: the departure from the rule must be serious and the rule concerned must be fundamental. The words "serious" and "fundamental" have a meaning different from "manifestly" used in Art. 52(1)(b) (see paras. 134–154 *supra*). The preparatory works to the Convention described in the previous paragraph make it clear that only procedural principles of special importance would qualify as "fundamental rules" and that a mere violation of one of the arbitration rules would not necessarily suffice. But the materials do not give guidance as to the serious nature of a violation.

**281**    The wording of the provision suggests that both criteria must be met.[420] Even a serious violation of a rule of procedure would not constitute a ground for annulment if the particular rule was not fundamental. In *Repsol* v. *Petroecuador*, the *ad hoc* Committee noted that the word "fundamental" is omitted before the words "rules of procedure" in the Spanish text of Art. 52(1)(d). The Committee concluded that this was a mere oversight of no substantive effect in the light of the fact that the word is included in the other two equally authentic texts.[421]

**282**    Conversely, the violation of even a fundamental rule could not lead to annulment if the violation was not serious. All of this makes it clear that proof of a procedural impropriety in the proceedings before the tribunal will not be enough. In particular, a simple violation of the Arbitration Rules is not, by itself, a ground for annulment.

---

419   See also *Broches*, Observations, pp. 329/30.
420   See also *Broches*, Convention, Explanatory Notes and Survey, pp. 692–693; *Caron*, Reputation and Reality, pp. 41/2.
421   *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 81.

*Article 52 – Annulment*                    981

The twin test of "serious" and "fundamental" must be met. This has been confirmed by several *ad hoc* committees.[422] In *MINE*, the *ad hoc* Committee said that:

> . . . the text of Article 52(1)(d) makes [it] clear that not every departure from a rule of procedure justifies annulment; it requires that the departure be a *serious* one and that the rule of procedure be *fundamental* in order to constitute a ground for annulment.[423]

The *MINE* Decision on Annulment also contains a brief analysis of the two requirements:                                                                    **283**

> 5.05 A first comment on this provision concerns the term "serious". In order to constitute a ground for annulment the departure from a "fundamental rule of procedure" must be serious. The Committee considers that this establishes both quantitative and qualitative criteria: the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide.
>
> 5.06 A second comment concerns the term "fundamental"; even a serious departure from a rule of procedure will not give rise to annulment, unless that rule is "fundamental". The Committee considers that a clear example of such a fundamental rule is to be found in Article 18 of the UNCITRAL Model Law on International Commercial Arbitration which provides:
>
> > The parties shall be treated with equality and each party shall be given full opportunity of presenting his case.
>
> The term "fundamental rule of procedure" is not to be understood as necessarily including all of the Arbitration Rules adopted by the Centre.[424]

In *Wena Hotels* v. *Egypt*, the *ad hoc* Committee explained that a departure is serious where it is "substantial and [is] such as to deprive a party of the benefit or protection which the rule was intended to provide".[425] In relation to the qualification that rules must be "fundamental", the *ad hoc* Committee thought these to mean the "set of minimal standards of procedure to be respected as a matter of international law".[426]                                                              **284**

The Decision on Annulment in *Wena Hotels* v. *Egypt* contains the following further explanation of this ground for annulment:                                    **285**

> The Applicant has to identify the fundamental rule of procedure from which the Tribunal departed and it has to show that such departure has been serious.
>
> [Article 52(1)(d)] refers to a set of minimal standards of procedure to be respected as a matter of international law. It is fundamental, as a matter of procedure, that each party is given the right to be heard before an independent and impartial tribunal. This includes the right to state its claim or its defence and to produce all arguments and evidence in support of it. This fundamental right

---

422  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.06; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 56; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 48.

423  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.06. Italics original.

424  *Ibid.*, paras. 5.05/6. See also *Sturzenegger*, ICSID, p. 187.

425  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 58.

426  *Ibid.*, para. 57.

has to be ensured on an equal level, in a way that allows each party to respond adequately to the arguments and evidence presented by the other . . . [427]

**286**     In *CDC* v. *Seychelles*, the *ad hoc* Committee speculated that the consensus is that only rules of natural justice, concerned with the essential fairness of the proceeding, are fundamental.[428] Other examples might include "impartiality of the Tribunal" and "meaningful deliberation by the Tribunal".[429] The Committee was clearly also of the opinion that not all ICSID Arbitration Rules are fundamental in the sense used in Art. 52(1)(d).

**287**     While this analysis does not add anything to the term "fundamental" not already contained in the *travaux préparatoires*, it does offer two criteria on "serious departure". In order to be serious the departure must be more than minimal. It must be substantial. In addition, the cases confirm that this departure must potentially have caused the tribunal to render an award "substantially different from what it would have awarded had the rule been observed".[430] It must have deprived that party of the benefit of the rule in question. For instance, if a party is deprived of its right to be heard on a particular point, the rule affected would be fundamental. If the point in question concerned more than a formality, the departure is substantial. But if it is clear from the circumstances that the party had not intended to exercise the right, there would be no material effect and the departure would not be "serious" under this analysis.

**288**     *Ad hoc* committees have pronounced on complaints that were not "serious". In *CDC* v. *Seychelles*, the complaint that the Tribunal failed to follow rules of evidence was rejected. Seychelles provided no authority for the proposition that rules of evidence were fundamental or that any departure from them was serious. Moreover, the Committee concluded that the Tribunal did not violate any rules of evidence to the prejudice of the Seychelles.[431]

**289**     Seychelles also argued that the Award was a nullity because it was issued outside the time limit of 60 days, which it contended was specified in ICSID Arbitration Rule 46. Seychelles then conceded that the parties had agreed to apply the time limit of 120 days plus a further 60 set out in the revised Arbitration Rules. 147 days passed from the conclusion of the preliminary hearing to the issuing of the Award, which fell within the time limits set out in the applicable *Rules*.[432] Even if the Tribunal had erred in issuing the Award when it did, the *ad hoc* Committee would not have annulled the Award since there was no evidence that any delay had prejudiced Seychelles.[433]

**290**     Other decisions on annulment contain only passing references to the criteria of "serious" and "fundamental". In *Klöckner I*, the *ad hoc* Committee found that it

---

427  *Ibid.*, paras. 56/7.
428  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 49.
429  *Ibid.*, para. 49; and see *Schreuer*, Three Generations, pp. 29–32.
430  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 58; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 49.
431  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 59.
432  *Ibid.*, paras. 63/4.                    433  *Ibid.*, para. 65.

was possible to hold that the requirement of deliberation among the arbitrators is a fundamental rule of procedure[434] (see also paras. 319, 320 *infra*). On the other hand, the same *ad hoc* Committee found that arbitrators do not commit a serious departure from a fundamental rule of procedure if they base their decision on an argument that was not developed and discussed by the parties[435] (see also paras. 309–317 *infra*).

In another context, the *Klöckner I ad hoc* Committee appears to emphasize **291** the element of "fundamental rule" at the cost of "serious departure" when it says:

> Impartiality of an arbitrator is a fundamental and essential requirement. Any shortcoming in this regard, that is any sign of partiality, must be considered to constitute, within the meaning of Article 52(1)(d), a "serious departure from a fundamental rule of procedure" in the broad sense of the term "procedure", i.e., a serious departure from a fundamental rule of arbitration in general, and of ICSID arbitration in particular.[436]

The wording of this passage would imply that, if the rule was sufficiently fundamental, even the slightest departure from it would be serious. But it is not clear whether the *ad hoc* Committee really wanted to enter into an analysis of the respective relevance of the two concepts.

The *ad hoc* Committee in *Amco II*[437] annulled the Decision on Rectification **292** rendered by the Second Tribunal[438] (see also Art. 49, para. 42). The Decision on Rectification was annulled since the Tribunal had rendered it on the request of one party without giving the other party the opportunity to file its observations.[439] The *ad hoc* Committee, relying on the analysis in *MINE* (see para. 283 *supra*), found the rule that had been violated fundamental and the departure serious. It also specifically held that the matter was not *de minimis* (see paras. 303, 306–308 *infra*).

### 3. Affected Rules of Procedure

The allegation that there was a serious departure from a fundamental rule of **293** procedure was made in almost all annulment proceedings. These allegations were of the following types: lack of impartiality, violation of the right to be heard, absence or abuse of deliberation among the arbitrators, violation of the rules of evidence, and violation of rules of representation.

### a) Impartiality and Equality of Treatment

The allegation that the Tribunal had shown lack of impartiality was a central **294** issue in the annulment proceedings in *Klöckner I*. The *ad hoc* Committee annulled

---

434   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 84.
435   *Ibid.*, para. 91.                          436   *Ibid.*, para. 95.
437   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992.
438   *Amco* v. *Indonesia*, Resubmitted Case: Rectification, 17 October 1990, 1 ICSID Reports 638.
439   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras.
       9.05–9.10. See also *Broches*, Convention, Explanatory Notes and Survey, pp. 693/4.

984                          THE ICSID CONVENTION: A COMMENTARY

the award for manifest excess of powers due to the Tribunal's failure to apply the proper law (see paras. 234–238, 248–249 *supra*). But it still went into a detailed examination of the Claimant's other allegations including "obvious lack of impartiality".[440]

**295**     The Application for Annulment criticized the Award as being systematically hostile to Klöckner, thus showing an obvious lack of impartiality. This, in the Applicant's view, was evident, in particular, by a total failure to examine Klöckner's arguments in the oral pleadings.[441] The *ad hoc* Committee pointed out that these accusations were certainly serious but *prima facie* implausible in view of the statement signed by each arbitrator pursuant to Arbitration Rule 6[442] and the high reputation of the members of the Tribunal. Nevertheless, the Committee was under an obligation to examine the complaints carefully. If proven, lack of impartiality would indeed constitute a serious departure from a fundamental rule of procedure[443] (see para. 291 *supra*).

**296**     The *ad hoc* Committee proceeded to a detailed textual and systematic analysis to determine whether there were signs of a lack of impartiality. It listed a number of findings in the Award which severely castigated Klöckner's behaviour in the context of the duty of full disclosure to a partner[444] (see paras. 234, 235 *supra*). These findings, although harsh, were not proof of a lack of impartiality:

> 98. Such evaluations, however severe they are or may be, cannot in themselves justify the allegation or even the suspicion of partiality. Their wording and repetition simply show the high idea the Tribunal had of the duties of cooperation and mutual disclosure of parties to such a legal relationship and reflect a high moral conception.[445]

**297**     The *ad hoc* Committee then addressed three factors that seem to have given rise to the complaint of lack of impartiality. First, it conceded that the absence of any reference to a precise legal basis for the Award's reliance on "the duty of full disclosure" must have aroused the losing party's incomprehension and even suspicion.[446] Second, certain aspects of the Award's structure were liable to create the suspicion of partiality: the Award devoted much more space to the Claimant's duties and shortcomings than to the Claimant's arguments. Also, the Award rejected Klöckner's claim for payment before even discussing the principal arguments concerning the Government's duties and responsibility. Third, the comparatively brief examination of the Government's obligations created the impression that the Tribunal seemed to attach little importance to the Government's responsibility.[447]

**298**     Despite these shortcomings, the *ad hoc* Committee found that there was no justification for the accusation of partiality or hostility:

440  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 93–113. See also *Broches*, Observations, p. 347; *Caron*, Reputation and Reality, p. 42; *Niggemann*, Das Washingtoner Weltbankübereinkommen, pp. 111/2.

441  *Ibid.*, para. 93.                       442  *Ibid.*, paras. 93–113.
443  *Ibid.*, para. 95.                       444  *Ibid.*, para. 97.
445  *Ibid.*, para. 98.                       446  *Ibid.*, para. 97.
447  *Ibid.*, paras. 100–107.

> None of these elements would suffice to establish or even to cause one to assume partiality on the part of the arbitrators, who in all conscience and neutrality could perfectly well have arrived at the Award's interpretations and conclusions. The complaint must therefore be rejected, and there can be no question of annulling the Award on this ground.[448]

This did not stop the *ad hoc* Committee from expressing its dissatisfaction with the Tribunal's style especially in view of the "severity of the Tribunal's moral evaluations of the Claimant and the harm to reputation likely to result therefrom . . .".[449] It added the following observation:

> While the *ad hoc* Committee was able without hesitation to respond negatively, it had to note that certain appearances, due to the Award's wording and structure, may rightly or wrongly have aroused the Claimant's emotions and suspicions. This is to be regretted if we recall the English adage, from which every international arbitration could usefully take inspiration: "It is not enough that justice be done, it must be seen manifestly to be done." From this point of view, it is essential to note that an award has not fully attained its purpose if it leaves one of the parties with the feeling – no doubt mistaken but perhaps understandable in the circumstances of the case – of unequal treatment and injustice.[450]

In *Amco I*, lack of impartiality was put forward as a ground for annulment in several contexts. These arguments were all rejected mostly on factual grounds. One of Indonesia's arguments was that while the Tribunal had effectively attributed to Indonesia knowledge of certain facts, it had denied that PT Amco had been duly warned about its failure to register its claimed investments. The *ad hoc* Committee refused to see a lack of impartiality in the conclusions reached by the Tribunal on these two unrelated issues:

**299**

> 88. The *ad hoc* Committee acknowledges that differing results were reached by the Tribunal in the two above situations. But the *ad hoc* Committee, after according due regard to the fundamental rule of equality of the parties, is unable to conclude that the Tribunal in evaluating the surrounding facts in the two situations clearly exceeded the scope of discretionary authority granted to it by Arbitration Rule 34 and must consequently refuse Indonesia's claim of nullity in this regard.[451]

Indonesia sought annulment in another context, in which the Tribunal had refused to consider certain grounds that, in Indonesia's view, would have made the revocation of the investment licence lawful. These grounds were not set forth in the revocation order but had been put forward in argument before the Tribunal. Indonesia contended that the Tribunal's refusal to consider these grounds constituted a denial of equal treatment and, hence, a serious procedural defect.[452] In

**300**

---

448  *Ibid.*, para. 110.
449  The *ad hoc* Committee mentioned the Award's publication by the Respondent's counsel as a factor contributing to the harm to reputation. *Loc. cit.*
450  *Loc. cit.*
451  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 88. Arbitration Rule 34 deals with evidence.
452  *Ibid.*, para. 30.

Indonesia's view, the inequality of treatment was demonstrated by the fact that PT Amco was allowed to put forward arguments before the Tribunal even though it had not raised them in prior proceedings before Indonesian courts.[453] The *ad hoc* Committee found that failure to deal with a question raised by a party would find its sanction in Art. 52(1)(e) dealing with failure to state reasons. But such an omission could in particular situations amount to a serious departure from a fundamental rule of procedure and to a manifest excess of powers.[454] In this particular case, there was no evidence of unequal treatment of the parties. The two issues compared by Indonesia were quite different and the Tribunal had given sufficient reason for holding the additional grounds for the revocation of the investment licence irrelevant.[455]

**301**    In yet another context Indonesia complained about unequal treatment of the parties in the allocation of the burden of proof. The *ad hoc* Committee rejected the assertion that the Tribunal had systematically favoured PT Amco in the evaluation of the evidence on factual grounds[456] (see paras. 325, 326 *infra*).

**302**    The above practice would indicate that partiality and unequal treatment will not be assumed lightly by an *ad hoc* committee. In particular, language that is critical of one of the parties, or unequal space devoted to the parties' respective arguments, will not suffice as a proof of bias. Also, comparisons of the tribunal's conclusions drawn from different sets of evidence will not be a successful basis for inferring lack of objectivity.

**303**    In *Amco II*, the Decision on Rectification[457] was annulled because of a violation of the right to be heard[458] (see paras. 292 *supra*, 306–308 *infra*). In the *ad hoc* Committee's view, taking a decision on a request of a party without giving the other party an opportunity to state its views violated the requirement of equal treatment of the parties[459] (see paras. 314–316 *infra*).

**304**    In *CDC* v. *Seychelles*, Seychelles argued that the Tribunal was not impartial when it heard argument on whether witnesses of fact would be heard at a hearing. Seychelles complained that the Sole Arbitrator interjected during the hearing with questions "framed in a way which indicates that the Arbitrator is expecting an answer favourable to CDC". Seychelles also complained that the very Award itself, coupled with these other factors, revealed the Tribunal's partiality.[460] The *ad hoc* Committee concluded that the record disclosed not lack of impartiality and that "Sir Anthony served as an unbiased, independent sole Arbitrator whose conduct was entirely appropriate and designed to ensure that the case was vigorously argued and rigorously decided".[461]

---

453  *Ibid.*, para. 122.                          454  *Ibid.*, paras. 32, 36.
455  *Ibid.*, paras. 123–124. See also *Broches*, Observations, pp. 349/50, 366/7.
456  *Ibid.*, para. 91.
457  *Amco* v. *Indonesia*, Resubmitted Case: Rectification, 17 October 1990, 1 ICSID Reports 638.
458  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992.
459  *Ibid.*, paras. 9.08–9.10; *Broches*, Convention, Explanatory Notes and Survey, pp. 693/4.
460  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 51.
461  *Ibid.*, para. 54.

## b) Right to be Heard

The principle that both sides must be heard on all issues affecting their legal position is one of the most basic concepts of fairness in adversarial proceedings. It is expressed in the Latin maxim of *audiatur et altera pars*. It is reflected throughout the ICSID Arbitration Rules (see esp. Rules 20, 21, 27, 31, 32, 37, 39, 40, 41, 42, 44, 49, 50, 54, 55).    **305**

The only straightforward instance of an allegation of a violation of the right to be heard occurred in *Amco II*. Indonesia alleged violation of this rule in respect of the second tribunal's "recourse to a new framework of liability without notice to the parties", and "when it refused to consider new evidence, while making new inferences from the First Tribunal's factual findings".[462] These allegations were rejected,[463] but a separate complaint was upheld. After the Award in the resubmitted case had been rendered,[464] Amco submitted a Request for Supplemental Decision and Rectification in accordance with Art. 49(2) (see Art. 49, para. 42). Art. 49(2) provides that the tribunal may make such a decision "after notice to the other party". Arbitration Rule 49(3) (Rule 49(4) in the version applicable in the case) provides that the tribunal "shall fix a time limit for the parties to file their observations on the request and shall determine the procedure for its consideration" (see Art. 49, para. 35). Indonesia submitted a Memorandum in which it urged the Tribunal to decline jurisdiction over the Request but stated that, if the Tribunal were to determine that further proceedings were appropriate, it reserved "the right to make submissions on the substance of [the Request] before the Tribunal considers it on those grounds".[465] The Tribunal did not fix a time limit. Nor did it take note of Indonesia's desire to make further submissions. The Decision gave no reasons for proceeding in this manner. It dealt with the Request in a summary fashion. It rejected the request for a supplemental decision stating that there were no omissions but granted the request for the correction of a clerical, arithmetical or similar error.[466]    **306**

On 20 February 1991, Indonesia applied for annulment of the Rectification.[467] It argued that the Tribunal deliberated on the requested supplementation or rectification, "without giving notice to Indonesia, that it had failed to fix a time limit for receiving the observations of Indonesia, as required by Arbitration Rule 49(3), and had violated the principle that the Parties be treated equally".[468]    **307**

The *ad hoc* Committee annulled the supplemental Award.[469] The *ad hoc* Committee regarded the rule, in Arbitration Rule 49(4), that each party should have    **308**

---

462  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 5.22.
463  *Ibid.*, para. 7.50.
464  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, 1 ICSID Reports 569.
465  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 9.05; see also *Broches*, Convention, Explanatory Notes and Survey, pp. 693/4.
466  *Amco* v. *Indonesia*, Resubmitted Case: Rectification, 17 October 1990, 1 ICSID Reports 638.
467  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 5.24.
468  *Ibid.*, para. 5.27.
469  See also *Broches*, Convention, Explanatory Notes and Survey, p. 694.

an opportunity within a certain time period to make observations on the request for supplementation or rectification as fundamental. Departure from that rule was also serious.[470] That the decision may have been straightforward did not justify ignoring a mandatory rule of procedure the effect of which was to safeguard the equality of the parties, and to ensure they were each heard. The argument that the error was *de minimis* was rejected in the light of the importance of the rule.[471]

**309**   The allegation of a violation of the right to be heard was made also in *Klöckner I*, *MINE* v. *Guinea*, *Lucchetti* v. *Peru* and *MTD* v. *Chile*. In these cases, the complaints were of a different and more indirect kind.

**310**   In *Klöckner I*, the Claimant complained that there had been a serious departure from a fundamental rule of procedure in that the Tribunal had based its decision on "arguments not advanced or at the very least not developed by either of the parties or at any rate not discussed by the parties".[472] The point in question was the Tribunal's interpretation of Article 9 of the Protocol of Agreement (see paras. 175–180 *supra*).

**311**   The *ad hoc* Committee observed that the Award seems to have taken a somewhat intermediate position between the parties' respective positions. It accepted that if counsel had expressed themselves on this intermediate position, the Tribunal might perhaps have modified its views. But it had been open to counsel to advance other subsidiary hypotheses or interpretations.[473] Therefore, the Tribunal was neither under an obligation to hear the parties on the reasons it was about to select for its decision nor bound to choose among the arguments put forward by the parties:

> 91. As for the Tribunal itself, when in the course of its deliberations it reached the provisional conclusion that the true legal basis for its decision could well be different from either of the parties' respective arguments, it was not, subject to what will be said below, in principle prohibited from choosing its own argument. Whether to reopen the proceeding before reaching a decision and allow the parties to put forward their views on the arbitrators' "new" thesis is rather a question of expedience.
>
> The real question is whether, by formulating its own theory and argument, the Tribunal goes beyond the "legal framework" established by the Claimant and Respondent. This would for example be the case if an arbitral tribunal rendered its decision on the basis of tort while the pleas of the parties were based on contract.
>
> Within the dispute's "legal framework", arbitrators must be free to rely on arguments which strike them as the best ones, even if those arguments were not developed by the parties (although they could have been). Even if it is generally desirable for arbitrators to avoid basing their decision on an argument that has not been discussed by the parties, it obviously does not follow that they therefore commit a "serious departure from a fundamental rule of procedure". Any other

---

470 *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 9.08/9.09.
471 *Ibid.*, para. 9.10.
472 *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 89.
473 *Ibid.*, para. 90.

solution would expose arbitrators to having to do the work of the parties' counsel for them and would risk slowing down or even paralysing the arbitral solutions to disputes.[474]

It followed that even if the parties regarded the Tribunal's interpretation as incorrect or shaky, they would have difficulty in challenging it on the ground that they never anticipated it, or analysed or developed it insufficiently, in their written or oral pleadings.[475]

In *MINE*, Guinea advanced a similar ground for annulment. It argued that the Tribunal departed from a fundamental rule of procedure by adopting a measure of damages that had not been advanced or discussed by the parties and which Guinea had had no occasion to address.[476] MINE responded that the final calculation of damages was clearly within the Tribunal's discretion.[477] The Decision on Annulment recites MINE's references to relevant portions of the *Klöckner I* Decision[478] (see para. 310 *supra*). But it does not reach its own decision on this point. Since the damages portion of the Award had to be annulled for failure to state reasons, there was no need to examine the question of a serious departure from a fundamental rule of procedure.[479] **312**

In *Wena Hotels* v. *Egypt*, Wena had requested "interest at an appropriate rate" without addressing the issue of compound interest. The modalities for the calculation of interest were not discussed before the Tribunal. The Tribunal awarded interest at the rate of 9% compounded quarterly.[480] In its Application for Annulment, Egypt argued that it was not offered the opportunity to address the issue of the appropriate rule of interest and was thus deprived of its right to be heard. The *ad hoc* Committee concluded that the parties must have been aware of the possibility that the Tribunal might consider compound interest as "appropriate" in the particular case. Therefore, it did not accept that the Applicant had not been given an opportunity to express its views on the issue.[481] **313**

In *Vivendi* v. *Argentina*, the Claimants argued that the Tribunal had departed from a fundamental rule of procedure in that its decision to dismiss certain claims on grounds related to Article 16(4) of the Concession Contract concerned a question that was not adequately canvassed in argument.[482] The *ad hoc* Committee rejected this argument. It found that the Claimants had been given a full opportunity to be heard. The Committee said: **314**

> 84. Claimants contend the Tribunal's decision came unannounced, and that they had no opportunity to present arguments on the decision to dismiss their claim on the merits on grounds related to Article 16(4) of the Concession Contract. It

---

474   *Ibid.*, para. 91.                                    475   *Loc. cit.*
476   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.94.
477   *Ibid.*, para. 6.95.                                 478   *Loc. cit.*
479   *Ibid.*, para. 6.109. See also *Sturzenegger*, ICSID, pp. 180, 187/8.
480   *Wena Hotels* v. *Egypt*, Award, 8 December 2000, paras. 128, 130, 136.
481   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 66–70. See also *LG&E* v. *Argentina*, Award, 25 July 2007, para. 98.
482   *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 82.

may be true that the particular approach adopted by the Tribunal in attempting to reconcile the various conflicting elements of the case before it came as a surprise to the parties, or at least to some of them. But even if true, this would by no means be unprecedented in judicial decision-making, either international or domestic, and it has nothing to do with the ground for annulment contemplated by Article 52(1)(d) of the ICSID Convention. . . .

85. From the record, it is evident that the parties had a full and fair opportunity to be heard at every stage of the proceedings. They had ample opportunity to consider and present written and oral submissions on the issues, and the oral hearing itself was meticulously conducted to enable each party to present its point of view. The Tribunal's analysis of issues was clearly based on the materials presented by the parties and was in no sense *ultra petita*. For these reasons, the Committee finds no departure at all from any fundamental rule of procedure, let alone a serious departure.[483]

**315**  In *MTD* v. *Chile*, Chile argued that the Tribunal had merely recited the parties' evidence and arguments, and occasionally not cited evidence at all, to such an extent that the Tribunal departed "from its fundamental obligation to accord the parties the right to be heard".[484] The *ad hoc* Committee thought it was "conceivable" that an award might recite the parties' arguments in such a defective or inaccurate way as to evidence a failure to hear the arguments in the first place, but that suggestion was not sustainable in the present case.[485]

**316**  In *Lucchetti* v. *Peru*, the Claimants argued that they had not been heard in respect of allegations of corruption that had a certain effect on the Tribunal's reasoning. The *ad hoc* Committee found that the Tribunal had afforded the Claimants a fair opportunity to advance such arguments or evidence on the issue as they saw fit. There was no unfairness or violation of the right to be heard. The suggestion was that the Tribunal would have committed an annullable error if it had not afforded the Claimants that opportunity.[486]

**317**  The practice, as outlined above, would indicate that the right to be heard is an important procedural principle that will be applied carefully in a decision on annulment. Each party must be given the opportunity to address every formal motion before the tribunal and every legal issue raised by the case. This principle must apply even if the answer appears obvious to the tribunal. The failure to refer to every argument put forward by the parties will not, in and of itself, indicate a violation of the right to be heard and is more properly considered in the light of the obligations to address questions, in Art. 48(3), or to state reasons, in Art. 52(1)(e).[487] But this principle does not mean that it is the tribunal's task to draw the parties' attention to an aspect of a legal question that they may have failed to

---

483  *Ibid.*, paras. 84, 85.
484  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 56.
485  *Ibid.*, para. 57.
486  *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 122.
487  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 57.

address. Nor is the tribunal precluded from adopting legal reasoning that was not put forward by one of the parties without first seeking the parties' opinion.

### c) Deliberation

Discussion among the several members of a tribunal is inherent in a majority decision. Arbitration Rule 46 provides for a time limit for the drawing up of the award (see Art. 48, paras. 35, 36, 101–103; Art. 49, paras. 12–24). The Arbitration Rules allow voting not only at sessions of the tribunal in the physical presence of its members but also by correspondence (see Art. 48, paras. 7, 8). The Arbitration Rules do not require deliberations explicitly but rather presuppose them by providing in Rule 15 that deliberations shall take place in private and remain secret.     **318**

In *Klöckner I*, the Claimant alleged that there could not have been serious deliberation among the arbitrators. This allegation was based on a perceived total discrepancy of views expressed in the majority Award and in the Dissenting Opinion.[488] The *ad hoc* Committee accepted the admissibility of this argument:     **319**

> While this ground is not expressly provided for in Article 52, it is possible to hold that the requirement of deliberation among the arbitrators is a "basic rule of procedure". It is also possible to hold that such deliberation must be real and not merely apparent.[489]

The *ad hoc* Committee did not reach the conclusion that there had been an absence of deliberation. It was impossible for the *ad hoc* Committee to judge the seriousness of the deliberation in view of its secrecy. But there was evidence of deliberation in the ICSID Secretariat's minutes as well as in the Award's references to a minority opinion advanced within the Tribunal.[490]     **320**

The Decision in the annulment proceedings in *Klöckner II*[491] dealt with a curious argument relating to the privacy of the deliberation. Cameroon claimed that the fact that Klöckner was represented in the resubmitted case by counsel who had been an arbitrator in the original arbitration proceeding constituted a serious departure from a fundamental rule of procedure.[492] The *ad hoc* Committee rejected this argument. Neither the Convention nor the Arbitration Rules contained a prohibition of such a representation. The second Tribunal had permitted the former arbitrator to appear before it as counsel.[493] No violation of the secrecy of the deliberation in the first Tribunal was to be seen in this situation.[494] Nor did Klöckner gain any advantage through information available to the arbitrator that was not accessible to the other side.[495] For an arbitrator to act as counsel for one of the parties at a later stage in     **321**

---

488    *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 84.
489    *Ibid*.                                          490    *Loc. cit.*
491    *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990.
492    *Ibid.*, paras. 6.01–6.53.                        493    *Ibid.*, para. 6.43.
494    *Ibid.*, paras. 6.46/6.47.
495    *Ibid.*, paras. 6.50/6.51. This point is summarized by *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 112.

the same case may not be a ground for annulment. But it does raise serious ethical issues and should be discouraged.

**322**    In *CDC* v. *Seychelles*, the Applicant alleged that the Sole Arbitrator had himself failed properly to deliberate and so seriously violated a fundamental rule of procedure. The *ad hoc* Committee denied that the arbitrator had failed to deliberate on the matter,[496] treating the complaint essentially as one amounting to an alleged failure to state reasons (see paras. 356, 378, 397 *infra*).

### d) Evidence and Proof of Facts

**323**    Arbitration Rule 34(1) states that the tribunal shall be the judge of the admissibility as well as of the probative value of any evidence (see Art. 43, paras. 10, 104–115). The Convention knows no formal rules of evidence. But parties have repeatedly attacked awards in annulment proceedings for the way they dealt with evidence and the burden of proof, alleging a serious departure from a fundamental rule of procedure.

**324**    In some instances the requesting party perceived the way in which the tribunal dealt with evidence as a sign of lack of impartiality and equal treatment (see also para. 299 *supra*). In *Amco I*, one of the Tribunal's problems was the incompleteness of the evidence submitted by both parties. In part, this was due to the fact that PT Amco had been expelled from its business premises under circumstances imposing at least the risk of loss of business records. Therefore, documents that should ordinarily have been submitted by PT Amco were submitted by Indonesia. But the evidence submitted by Indonesia was also incomplete. In this situation Indonesia complained about unequal treatment of the parties in the allocation of the burden of proof.[497]

**325**    The *ad hoc* Committee rejected this allegation. It made a general statement to the effect that a reasonably prudent foreign non-resident investor may be expected in the ordinary course of business to keep copies of important documents outside the host State. It also noted that the relatively low capability of an administrative agency efficiently to store, monitor and enforce the submission of required documentation is commonly a reflection of the realities of developing countries, and not an indication of bad faith towards investors. The assertion that the Tribunal systematically favoured PT Amco in the evaluation of the evidence was disproved by a number of instances where decisions had been made against PT Amco.[498]

**326**    The allocation of the burden of proof also played a role in the annulment proceedings in *Klöckner II*.[499] The Award in the Resubmitted Case found that an important reason for the project's failure had been the setting by Cameroon of local prices for fertilizer below world market prices. The Tribunal held that Cameroon

---

496    *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 58.
497    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 90/1.
498    *Loc. cit.*
499    See also *Niggemann*, Das Washingtoner Weltbankübereinkommen, pp. 112–114.

was given the opportunity to submit evidence concerning the local prices but had failed to do so. In its Application for Annulment, Cameroon complained that the Tribunal had reversed the burden of proof against Cameroon and that it had had no opportunity to submit the relevant evidence.

The *ad hoc* Committee found that Cameroon had been given sufficient opportunity to submit evidence on the fertilizer prices.[500] As to the reversal of the burden of proof, the Committee found that this was a procedural rather than a substantive issue. This resulted from Arbitration Rules 32 and 33.[501] Therefore, an erroneous reversal of the burden of proof could amount to a serious departure from a fundamental rule of procedure.[502] But the complaint was rejected as unfounded on the particular facts of the case.[503] **327**

The decisions in *Wena Hotels* v. *Egypt* and *CDC* v. *Seychelles* both draw a distinction between a failure to follow applicable rules of evidence and the tribunals' discretion to form their own view as to the relevance and weight to be accorded to the evidence. **328**

In *Wena Hotels* v. *Egypt*, the *ad hoc* Committee rejected the argument that the Tribunal had seriously departed from a fundamental rule of procedure when it made certain findings in respect of a consultancy agreement between the Claimant and an Egyptian individual.[504] The *ad hoc* Committee noted only that the Tribunal had found Egypt not to have discharged its burden of proof in respect of its own contrary allegations. There was no departure from any rule of procedure in weighing the evidence and drawing conclusions from it.[505] **329**

In *CDC* v. *Seychelles*, the *ad hoc* Committee noted that certain of Seychelles' complaints disclosed little more than dissatisfaction with the Tribunal's findings on the evidence. There was no violation of any fundamental rule of procedure. Even if the Tribunal had erred, error in a tribunal's appreciation of the evidence would not in itself constitute grounds for annulment.[506] **330**

The proper approach in annulment proceedings to tribunals' findings on the evidence is fairly summarized in the recommendation of one commentator that *ad hoc* committees: **331**

> . . . should defer to the tribunal where the latter considers that the claimant has, *as a matter of law*, failed to present evidence in support of [a] theory. This same position would, of course, apply with respect to a line of defense that the tribunal

---

500  *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990, paras. 6.63–6.72.

501  Arbitration Rules 33 and 34 in the current version. See 1 ICSID Reports 94/5 and 169/70. The two Rules deal with evidence in general terms but do not address burden of proof.

502  *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990, para. 6.80.

503  *Ibid.*, para. 6.83.

504  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 60/1.

505  *Ibid.*, paras. 65, 72/3.

506  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 59–61. See also an *obiter dictum* in: *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 87.

finds, again as a matter of law, is not supported by the facts presented by the respondent.[507]

**332**    In *Lucchetti* v. *Peru*, the Applicants insisted that the Tribunal had violated a rule of international law, reflected in Judge Higgins' opinion in the *Oil Platforms Case*,[508] to the effect that in resolving a preliminary issue it is necessary to accept *pro tempore* that the facts alleged by the claimant are true. The *ad hoc* Committee denied that this was an inevitable rule in relation to preliminary issues of jurisdiction. Where the existence of jurisdiction turns on a question of fact, a tribunal may examine the evidence and make a finding in that regard, provided the parties are each given an opportunity to present arguments and adduce evidence on the matter.[509] The *ad hoc* Committee found that the disputed facts, which concerned alleged corruption on the part of the Claimants, did not form the basis for the Tribunal's decision.[510] Moreover, although the Tribunal had declined to permit the Claimants to produce a full memorial on the merits at the preliminary phase, the *ad hoc* Committee found that the Claimants had enjoyed "full freedom" to produce such evidence and arguments as they saw fit. The Tribunal would have committed an annullable error if it had not afforded the Claimants that opportunity.[511] For similar reasons, there was no violation of any "right to presumption of innocence" as asserted by the Claimants.[512]

### e) Violation of Limits of Standing

**333**    In *Repsol* v. *Petroecuador*, Petroecuador argued that the Tribunal had incorrectly afforded Repsol standing to represent other companies in a consortium, and so committed a serious breach of a rule of procedure for the purposes of Art. 52(1)(d).[513] The *ad hoc* Committee accepted that it had been demonstrated before the Tribunal that Repsol was so authorized, as a matter of fact and law, and declined to reopen that decision.[514]

### 4. Timely Objection to Procedural Violation

**334**    Some violations of procedural principles will be evident to the affected party in the proceeding before the tribunal. Others may become visible only after the award

---

507    *Trooboff, P. D.*, To What Extent May an *Ad Hoc* Committee Review the Factual Findings of an Arbitral Tribunal based on a Procedural Error?, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 251 at 264 (2004). Italics original.

508    *Case Concerning Oil Platforms* (*Islamic Republic of Iran* v. *United States of America*), Preliminary Objections, 12 December 1996, 1996 ICJ Rep. 803.

509    *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, paras. 117–123.

510    *Ibid.*, para. 124. The dissenting *ad hoc* Committee member concluded that the Tribunal had failed to evaluate the facts of this allegation and, because this had been a "critical element" in the Award, the Tribunal had committed a serious departure from a fundamental rule of procedure: *Lucchetti* v. *Peru*, Dissenting Opinion of Sir Franklin Berman, 5 September 2007, paras. 15/16.

511    *Ibid.*, para. 122.                    512    *Ibid.*, para. 124.

513    *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 76.

514    *Ibid.*, para. 80.

has become available. A party that is aware of a violation of proper procedure must react immediately by stating its objection and by demanding compliance. Under Arbitration Rule 27 failure to do so will be interpreted as a waiver to object at a later stage (see para. 60 *supra*). Rule 27 does not refer to annulment proceedings *expressis verbis*, but Rule 53 extends the applicability of the Arbitration Rules to annulment in general terms. It follows that a party that has failed to protest against a perceived procedural irregularity before the tribunal is precluded from claiming that this irregularity constituted a serious departure from a fundamental rule of procedure for purposes of annulment. To hold otherwise would mean that a party could leave a procedural irregularity unopposed to keep it in store as ammunition against a possible unfavourable award in annulment proceedings (see also paras. 124–129, 174 *supra*). This question is one for the *ad hoc* committee. The Secretary-General has no power to refuse registration of an application for annulment because the requesting party has not exhausted its remedies in the primary proceedings (see paras. 95–102 *supra*).

*Ad hoc* committees have held that a party that has failed to object to a violation **335** of procedure before the tribunal may not rely on this violation as a ground for annulment. In *Klöckner I*, the *ad hoc* Committee remarked in the context of an alleged violation of Art. 52(1)(d) that an application for annulment ". . . [cannot] be used by one party to complete or develop an argument which it could and should have made during the arbitral proceeding . . .".[515] More specifically, in the context of an alleged violation of the right to be heard (see paras. 309–311 *supra*), the *ad hoc* Committee said:

> . . . it suffices to note that the Claimant has not established that it made a timely protest against the serious procedural irregularities it now complains of. Subject to what will be said later, Rule 26 [now Rule 27] of the ICSID Rules of Procedure for Arbitration Proceedings would therefore rule out a good part of its complaints.[516]

The *ad hoc* Committee in *Klöckner II* shared this view. Cameroon's complaint **336** about Klöckner's representation by a former arbitrator (see para. 321 *supra*) was rejected also on the ground that Cameroon had not protested against this fact before the Tribunal. Arbitration Rule 26 (now Rule 27) constituted a bar to a grant for annulment on procedural grounds that a party had failed to raise in the original proceeding.[517]

In *CDC* v. *Seychelles*, Seychelles argued that the Tribunal was not impartial **337** at the hearing. The *ad hoc* Committee noted that the Respondent had "failed to challenge Sir Anthony's alleged improper conduct at any time prior to the issuance of the Award", although the conduct about which it complained occurred during the hearing. A timely objection under Art. 57 and Rule 9 would have been the appropriate remedy, if there was substance to the complaint. Seychelles' failure

---

515   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 83.
516   *Ibid.*, para. 88.
517   *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990, paras. 6.43/6.44. See also *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 112.

to raise the allegations in a timely manner gave rise to "questions regarding the bona fides of the objection". The *ad hoc* Committee deemed that the complaint was effectively waived.[518]

### I. "or (e) that the award has failed to state the reasons on which it is based."

#### 1. History and Introduction

**338**    A statement of the reasons for a judicial decision is widely regarded to be a prerequisite for an orderly administration of justice. A reasoned judgment contributes to ensuring not only that justice is done but that it is perceived to be done.[519] In the framework of the ICSID Convention, this duty is stated in Art. 48(3) (see Art. 48, paras. 54–68). A violation of this duty is listed as one of the reasons for annulment in Art. 52(1).[520]

**339**    The International Law Commission's 1958 Model Rules, on which the Convention's grounds for annulment were originally modelled, provide that an award may be challenged if "there has been a failure to state the reasons for the award or a serious departure from a fundamental rule procedure".[521] The Preliminary Draft to the Convention rephrased this section slightly by saying "that there has been a serious departure from a fundamental rule of procedure, including failure to state the reasons for the award" (History, Vol. I, p. 230). The subsequent First Draft separated failure to state reasons from serious departure from a fundamental rule of procedure by listing it as a separate ground. But it made this ground for annulment subject to the qualification "unless the parties have agreed that reasons need not be stated" (at p. 232). This qualification was in line with another provision in the First Draft that had made the obligation to state reasons subject to a possible contrary agreement by the parties (see Art. 48, para. 56). After the possibility to waive a statement of reasons by agreement of the parties had been removed, the qualifying phrase was deleted from what later became Art. 52(1)(e)[522] (History, Vol. II, p. 854).

**340**    Therefore, the tribunal's obligation to state reasons is mandatory and not subject to the parties' disposition (see also Art. 48, para. 3). An agreement between the parties to the effect that reasons need not be stated would be invalid and would not preclude a subsequent application for annulment on this ground (see paras. 49–59 *supra*). This conclusion is confirmed by the *ad hoc* Committee in *MINE*:

> 5.10 A statement of reasons is a valuable element of the arbitration process. The Committee has noted that the Committee of Legal Experts, which was to

---

518    *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 51–53.
519    *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 98.
520    The New York Convention and the UNCITRAL Model Law do not provide for failure to state reasons as a ground for the setting aside or non-enforcement of awards. See [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, Art. V, 330 UNTS 40; UNCITRAL Model Law, 1985, Arts. 34, 36, 24 ILM 1311–1313 (1985).
521    ILC Model Rules on Arbitral Procedure, Art. 35(c), YBILC 86 (1958-II).
522    See *Broches*, Observations, pp. 330/1.

advise the Executive Directors of the World Bank on the draft Convention, by a vote of 28 to 3 rejected a proposal which would allow the parties to dispense with the requirement of a reasoned award (History of the Convention, Vol. II, p. 816). A waiver of the requirement in an arbitration agreement would therefore not bar a party from seeking an annulment for failure of an award to state reasons.[523]

The *ad hoc* Committee in *Wena Hotels* v. *Egypt* also noted that tribunals are under a duty to state reasons for their award:    **341**

> This requirement is based on the Tribunal's duty to identify, and to let the parties know, the factual and legal premises leading the Tribunal to its decision. If such sequence of reasons has been given by the Tribunal, there is no room left for a request for annulment under Article 52(1)(e).[524]

The duty to state reasons refers only to a minimum requirement. It does not call for tribunals to strain every sinew in an attempt to convince the losing party that the decision was the right one. Even the most earnest and diligent efforts would very often be futile. The duty requires no more than to state reasons sufficient "to explain to the parties the motives that have induced the tribunal to adopt its decision".[525]    **342**

The basic proposition that failure to state reasons should form a ground for annulment was not seriously called into question during the Convention's drafting (but see History, Vol. II, p. 851). There is no indication in the *travaux préparatoires* whether contradictory or insufficient reasons were seen to fall under this category (but see p. 664).[526] At one point the Chairman ascertained that no delegate objected to the understanding that "reasons" implied a statement of both facts and law[527] (at pp. 817, 818, 851). There was also some debate as to whether a tribunal's failure to answer every question before it should form a ground for annulment (see paras. 399, 400 *infra*).    **343**

The principle that failure to state reasons for an award is a ground for annulment is also confirmed outside the ICSID context.[528] What is less clear is to what extent these reasons must be pertinent and capable of supporting the results reached by the tribunal. No doubt frivolous, perfunctory or absurd arguments by a tribunal would not amount to "reasons". On the other hand, it is difficult to determine with any degree of objectivity what standard of reasoning should be held sufficient by an *ad hoc* committee. Of all the grounds for annulment, an evaluation of the tribunal's reasoning is most likely to blend into an examination of the award's    **344**

---

523  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.10.
524  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 79.
525  *Schreuer*, ICSID Annulment Revisited, p. 103.
526  See also *Feldman*, The Annulment Proceedings, p. 106.
527  *Broches*, Observations, pp. 331/2.
528  See the Judgment of the International Court of Justice in the *Case concerning the Arbitral Award made by the King of Spain*, 1960 ICJ Reports 192; Judgment of the International Court of Justice in *Arbitral Award of 31 July 1989*, 1991 ICJ Reports 53, 65 *et seq.*, and the Dissenting Opinion of Judge Weeramantry at pp. 164 *et seq.*

substantive correctness and hence to cross the border between annulment and appeal[529] (see paras. 8–13 *supra*).

**345**     This problem is exacerbated by the fact that different legal cultures have different conceptions about what constitutes adequate reasons for a judicial ruling. In addition, the need to find a compromise formula in a divided tribunal sometimes leads to the adoption of language that may not appear entirely coherent and logical to an outside reader (see para. 233 *supra*).

**346**     The Convention's French version renders this ground for annulment in the terse formula "défaut de motifs". This might be taken to suggest that the technical meaning that this term has in French law should be read into the Convention. If it could be shown that the French, English and Spanish texts[530] disclose a difference of meaning, the meaning which best reconciles the three texts, having regard to the object and purpose of the Convention, will have to be adopted.[531] Therefore, it is by no means clear that "défaut de motifs", as understood in French law, would be the correct interpretation of this provision. At any rate, a narrow interpretation of this term, in the sense of a total absence of reasons, does not appear to be in line with French law.[532]

**347**     Failure to state reasons was invoked in every application for annulment in respect of which there is a published Decision.[533] Of all the grounds for annulment in Art. 52(1), it is the one that may be relied upon most easily. In *Klöckner I*, the *ad hoc* Committee had already annulled the award for manifest excess of powers (see paras. 234–235 *supra*) before it embarked upon an extensive examination of the Tribunal's alleged failure to state reasons.[534] It justified this apparent *obiter dictum* by the fact that it was dealing with the first application for annulment under the Convention and because it might be of interest to the parties and to the new Tribunal to be constituted under Art. 52(6)[535] (see paras. 525, 684 *infra*).

### 2. Absence of Reasons

**348**     A total absence of reasons is extremely unlikely.[536] Art. 48(3) is quite unequivocal in enjoining a tribunal to state the reasons on which an award is based (see Art. 48, paras. 54–68). This requirement is restated in Arbitration Rule 47(1)(i).

---

529   See also *Caron*, Reputation and Reality, pp. 38, 45; *Seidl-Hohenveldern*, Die Aufhebung, pp. 103 *et seq.*; *Sturzenegger*, ICSID, p. 188.

530   The Convention is equally authentic in these languages. See Final Clause.

531   Art. 33(4) of the Vienna Convention on the Law of Treaties, 1969. Technically, the Vienna Convention is not applicable to the ICSID Convention (see Footnote 33 to para. 17 *supra*), but the provision in question also reflects customary international law.

532   See *Gaillard*, Chronique (1991), p. 172; *Seidl-Hohenveldern*, Die Aufhebung, p. 11; *Schlechtriem*, Zur Überprüfbarkeit, p. 72; *Pirrwitz*, Annulment, p. 110.

533   Art. 52(1)(e) was also reportedly invoked in *RFCC* v. *Morocco* – see *Investment Treaty News*, ICSID Committee Rejects Request for Annulment in *RFCC* v. *Morocco*, http://www.iisd.org/investment/itn (29 March 2006).

534   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 114–164.

535   *Ibid.*, para. 82. See also *Broches*, Observations, pp. 363/4; *Pirrwitz*, Annulment, pp. 109/10.

536   See also *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 122.

All published awards by ICSID tribunals have offered elaborate statements of reasons.

The reasons will primarily consist of the legal arguments that have induced the **349** tribunal to adopt its decision. In addition, a statement of the facts that the tribunal has accepted as proven will be a necessary element. Equitable considerations may have to be explained where the law leaves the tribunal with some discretion. Therefore, reasons are not restricted to the purely legal aspects of the case. In particular, the obligation to state reasons also exists in cases where the parties have authorized the tribunal to decide *ex aequo et bono* in accordance with Art. 42(3) (see Art. 42, para. 272). An award that simply refers to the tribunal's power to decide *ex aequo et bono* without giving any further reasons would be subject to annulment. ICSID tribunals acting under authorizations to decide *ex aequo et bono* have given reasons for their awards[537] (see Art. 42, paras. 276–279; Art. 48, para. 57).

A more likely situation is the absence of reasons for a particular aspect of **350** the award.[538] In *Klöckner I*, the *ad hoc* Committee found that the Tribunal had imposed an "obligation of result" upon the Claimant without ever explaining the reasons for doing so:

> 141. In this regard, it is essential to note that the Award's text gives no indication of the reasons why the Tribunal decided, in substance if not in so many words, that there was an "obligation of result". Above all, it did not take into consideration Klöckner's pleas on the best efforts obligation or the contractual or legislative provisions limiting seller/supplier liability. Despite many readings of the text, it is impossible to discern how and why the Tribunal could reach its decision on this point.[539]

The *ad hoc* Committee found it impossible to reconstruct the Tribunal's reasoning (see also para. 235 *supra*):

> . . . the Award in no way allows the *ad hoc* Committee or for that matter the parties to reconstitute [reconstruct?] the arbitrators' reasoning in reaching a conclusion that is perhaps ultimately perfectly justified and equitable (and the Committee has no opinion on this point) but is simply asserted or postulated instead of being reasoned.
>
> The complaint must therefore be regarded as well founded, to the extent that it is based on Article 52(1)(e).[540]

The *Amco I ad hoc* Committee was more generous in reconstructing reasoning **351** missing in the Award. Indonesia had complained that the Tribunal had failed to state any reasons under Indonesian law in holding Indonesia responsible for the acts of army and police personnel. The *ad hoc* Committee, rather than addressing the question of the absence of reasons in the Award, proceeded to supply the

---

537  *Schreuer*, Decisions Ex Aequo et Bono, pp. 44–50.
538  See also *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 122.
539  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 141.
540  *Ibid.*, para. 144. See also *Broches*, Observations, p. 353.

missing reasons in its Decision[541] (see also para. 267 *supra*). Similarly, in response to Indonesia's argument that the Tribunal had not applied the principle of the exhaustion of local remedies without giving any reasons for doing so, the *ad hoc* Committee simply pointed out that in view of the Convention's Art. 26 there was no need to exhaust local remedies (see also para. 262 *supra*).

**352**    The Decision on Annulment in *MINE* also provides an instance of a reconstruction of reasons, although the *ad hoc* Committee criticized the Tribunal for not making the reasons explicit. Guinea had complained that the Tribunal had failed to give reasons for awarding interest for the period prior to the ICSID arbitration and for awarding interest at the US bank rate. The *ad hoc* Committee said:

> 6.103 In objecting to the award of interest on the ground that many United States jurisdictions "do not permit recovery of the pre-judgment interest on unliquidated damages", Guinea disregards the applicable law. It is, on the other hand, not open to doubt that the Tribunal should have stated the reason why it rejected Guinea's argument based on MINE's delay in starting ICSID proceedings.
>
> 6.104 Guinea advances a separate objection to the Tribunal's failure to give reasons for the award of interest at the U.S. bank rate. In light of the fact that the U.S. dollar was the currency of the contract, the justification of that currency and bank rate of interest is apparent. An express statement to that effect is however wanting.[542]

**353**    In *Amco II*, the *ad hoc* Committee noted that not every gap or ambiguity constitutes a failure to state reasons. Statements must be read in their context; reasons may be found in the developments that follow. Both remarks necessarily entail some appreciation of the reasoning provided. However, the Committee emphasized that Article 52(1)(e) does not call for over-elaborate or mechanistic explanation of every statement and conclusion. There may be grounds for annulment under Art. 52(1)(e) only where there are no reasons at all, or when they are so weak or inconsistent as to be "frivolous".[543] This was not true of the Second Tribunal's Award.[544]

**354**    The *Wena Hotels* v. *Egypt ad hoc* Committee also took the view that reasons may be implicit in the considerations and conclusions contained in an award and, therefore, may properly be inferred from the terms used and explanation expressly given. According to the Committee:

> Neither Article 48(3) nor Article 52(1)(e) specify the manner in which the Tribunal's reasons are to be stated. The object of both provisions is to ensure that the Parties will be able to understand the Tribunal's reasoning. This goal does not require that each reason be stated expressly. The Tribunal's reasons may be

---

541  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 57–60.
542  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 6.103/6.104. See also *Sturzenegger*, ICSID, pp. 194/5.
543  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 7.56/7.57.
544  *Ibid.*, paras. 7.57/7.58.

implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision.[545]

The *ad hoc* Committee in *Vivendi I* confirmed that Art. 52(1)(e) is concerned **355** with the absence of reasons, not their quality:

> it is well accepted both in the cases and the literature that Article 52(1)(e) concerns a failure to state *any* reasons with respect to all or part of an award, not the failure to state correct or convincing reasons . . . Provided that the reasons given by a tribunal can be followed and relate to the issues that were before the tribunal, their correctness is beside the point in terms of Article 52(1)(e).[546]

In *CDC* v. *Seychelles*, the *ad hoc* Committee concluded that the emerging **356** practice on Art. 52(1)(e) was "to apply Article 52(1)(e) in such a manner that the Committee does not intrude into the legal and factual decision-making of the Tribunal".[547] Seychelles argued that the Tribunal's Award had ignored relevant matters, considered irrelevant matters, and was both contradictory and arbitrary. It also failed to state reasons for its award of costs.[548] The *ad hoc* Committee declined to annul the Award for failure to state reasons. It found no absence of reasons in relation to the Tribunal's interpretation of the loan agreement in the light of its findings on the relevant evidence.[549] The *ad hoc* Committee doubted whether Art. 52(1)(e) was intended also to apply to decisions in respect of costs. However, there is no basis in the text of the Convention or the drafting history for the proposition that some operative parts of an award need not be reasoned. Nevertheless, the *ad hoc* Committee stated that it would not annul the Tribunal's award of costs, since it could be explained in the light of all the circumstances.[550]

There cannot be a failure to state reasons by virtue of not referring to a matter **357** that was not raised before the tribunal. In *Mitchell* v. *DR Congo*, the Respondent argued that the Award failed to state reasons "for the justification *ratione materiae* of the Arbitral Tribunal with regard to the characterization of the measures under dispute as expropriation, and the amount of compensable damages".[551] There was no failure to state reasons in relation to the Tribunal's non-application of Article X(1) of the treaty, which concerned exceptional circumstances precluding wrongfulness. This was especially so because the provision had not been invoked before the Arbitral Tribunal.[552] Nor could the Award have been annulled for failure to state reasons in its calculation of damages. The reasons supplied were relatively lengthy and detailed and did not entail an absence of reasons or contradiction such as effectively to cancel out the reasons supplied.[553]

---

545 *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 81. See also paras. 83, 93, 98, 106.
546 *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 64.
547 *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 70.
548 *Ibid.*, para. 72.          549 *Ibid.*, paras. 76/7, 79, 83, 85/6.
550 *Ibid.*, para. 87.
551 *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 17.
552 *Ibid.*, para. 58.          553 *Ibid.*, paras. 65/6.

**358**    In relation to the standard of failure to state reasons, the *ad hoc* Committee in *Soufraki* v. *UAE* said that even if there is no substantiation of a principle relied upon in an Award, "if the principle on which the Award is based does exist, there is in reality no ground for annulment".[554] The *ad hoc* Committee had been concerned with the principle that certificates of nationality are not conclusive of an investor's nationality but merely *prima facie* evidence on the point to be examined together with any other evidence. The Tribunal had not engaged in any substantive analysis of the circumstances in which the *prima facie* validity of the certificates would be offset by other factors, but the *ad hoc* Committee accepted that the principle was correct and the answer implicit in the Tribunal's reasoning.[555] The application for annulment under Art. 52(1)(e) was declined.

**359**    In *MTD* v. *Chile*, the *ad hoc* Committee said it was the "consistent jurisprudence of annulment committees" to treat this head of annulment in terms of absence rather than inadequacy or brevity of reasoning.[556]

**360**    In *CMS* v. *Argentina*, the Tribunal had upheld a claim by CMS that Argentina had failed to "observe any obligation it may have entered into with regard to investments" in violation of Article II(2)(c) of the applicable treaty.[557] The relevant obligations to which this "umbrella clause" applied were contained in a licence. The holder of the licence was not CMS but TGN, a company in which CMS held shares. The licence was governed by Argentine law. Under Argentine law, CMS had no right to enforce the obligations contained in the licence.[558] The Committee noted that the Award did not explain on what legal basis CMS was entitled to bring a claim under Article II(2)(c) to enforce an obligation that was not addressed to it, and in respect of which it had no right under the applicable law to demand compliance.[559] The Award was also unclear as to how the Tribunal arrived at its conclusion that CMS could enforce the obligations owed to TGN. It was "impossible for the reader to follow the reasoning on this point".[560] That an award could have plausibly been based upon another possible interpretation will not prevent annulment if, in fact, it was not.[561] In the light of the "significant lacuna" it had identified in the Award, the *ad hoc* Committee annulled the finding that Argentina had violated Article II(2)(c) for failure to state reasons.[562]

**361**    In a different context, concerning the interpretation of a state of necessity, the *ad hoc* Committee in *CMS* v. *Argentina* was willing to reconstruct missing reasons.

554    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 63.
555    *Ibid.*, paras. 63/4. In a Dissenting Opinion, Arbitrator Nabulsi concluded that the Tribunal had disregarded the certificates without reference to any identified rule of law, and therefore committed a manifest excess of powers by failing to apply the proper law: Dissenting Opinion, paras. 29, 35. Nabulsi also believed that the Tribunal caused an improper reversal of the burden of proof in relation to the probative value of the certificates, which he believed was a serious departure from a fundamental rule of procedure and therefore another ground to annul the Award: *ibid.*, para. 49.
556    *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 78.
557    *CMS* v. *Argentina*, Award, 12 May 2005, para. 303.
558    *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 90.
559    *Ibid.*, para. 94.                          560    *Ibid.*, para. 97.
561    *Ibid.*, para. 91.                          562    *Ibid.*, para. 97.

The Committee found that although the reasoning could have been clearer "a careful reader can follow the implicit reasoning of the Tribunal".[563]

The jurisprudence on Art. 52(1)(e) confirms that *ad hoc* committees are inclined **362** to reconstruct missing reasons where the result reached by the tribunal appears capable of explanation in the light of the reasons actually supplied. An award will not be annulled if the reasons for a decision, though not stated, are readily apparent to the *ad hoc* committee. If the *ad hoc* committee can explain an award by clarifying reasons that may have been only implicit, it may do so and need not annul.[564] If the decision appears incorrect or inexplicable, the *ad hoc* committee will be more inclined to view the absence of reasons as a ground for annulment. Absence of reasons on a particular point is closely related to failure to deal with every question submitted to the tribunal. This question is treated below at paras. 399–434.

### 3. Insufficient and Inadequate Reasons

The purpose of a statement of reasons is to explain to the reader of the award, **363** especially to the parties, how and why the tribunal came to its decision in the light of the facts and applicable law. It cannot be expected, however, that reasons must go to such lengths as to persuade a disgruntled party why it has lost. Reasons also permit the reader to observe what the tribunal has in fact done or not done in the light of the fundamental prohibition of manifest excess of power.[565] Therefore, a statement that does not offer such an explanation may not properly be called a statement of reasons. On the other hand, the standard for an acceptable explanation is highly subjective. Once an *ad hoc* committee starts looking into whether the tribunal's explanation is sufficient to constitute a statement of reasons, it has already embarked upon a quality control of the award. The formal test of the presence of a statement of reasons blends into a substantive test of adequacy and correctness and the distinction between annulment and appeal (see paras. 8–13 *supra*) becomes blurred.[566]

*Ad hoc* committees have been aware of this dilemma but have used different **364** criteria in an attempt to deal with it. In *Klöckner I*, the *ad hoc* Committee stated that in order to form the basis of the decision the reasons would have to be "sufficient". But it was also aware of the danger that this may lead to an appeal in disguise.[567] After some discussion of general methodology it settled for the following formula:

> The text of this Article requires a *statement* of reasons *on which the award is based*. This does not mean just any reasons, purely formal or apparent, but

---

563  *Ibid.*, paras. 125–127.
564  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 24.
565  See *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 128.
566  See also *Berranger de*, L'article 52 de la Convention, pp. 110/1, 114/5; *Broches*, Observations, p. 377; *Caron*, Reputation and Reality, p. 44; *Feldman*, The Annulment Proceedings, p. 109; *Gaillard*, Chronique (1987), p. 190; *Giardina*, ICSID, pp. 212/3; *Reisman*, The Breakdown, pp. 791/2.
567  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 118.

> rather reasons having some substance, allowing the reader to follow the arbitral tribunal's reasoning, on facts and on law.
>
> . . .
>
> A middle and reasonable path is to be satisfied with reasons that are "sufficiently relevant", that is, reasonably capable of justifying the result reached by the Tribunal. In other words, there would be a "failure to state reasons" in the absence of a statement of reasons that are "sufficiently relevant", that is, reasonably sustainable and capable of providing a basis for the decision.[568]

**365**    The *ad hoc* Committee seems to have felt uncomfortable with its own standard. A few pages later, after confirming that inadequacy of reasons might under certain conditions constitute a failure to state reasons, it stated again that there can be no question of expanding the concept so as to permit a sort of disguised appeal.[569] After finding that the Claimant's criticism of the Award was aimed not so much at the absence of reasons but at the reasons themselves, the *ad hoc* Committee said:

> 130. There would be a "failure to state reasons" if no reasoning or explanation whatsoever, or no "sufficiently relevant" or "reasonably acceptable" reasoning could be found for some conclusion or decision in the Award. Such would not be the case if the Tribunal, having justified its finding or a particular decision in a certain way, even if subject to criticism, did not address this or that particular argument.[570]

**366**    More specifically, the *ad hoc* Committee looked at the Tribunal's application of the *exceptio non adimpleti contractus* in French civil law. The Tribunal's reasons on some points in this context were acknowledged but the *ad hoc* Committee also noted that the Award did not examine all of the conditions required under French law for the application of the *exceptio*. Therefore, the Award contained some reasoning but the question remained whether these reasons were sufficient or "sufficiently relevant". More importantly, in the *ad hoc* Committee's view, the Tribunal had erred by using the *exceptio* as a ground for extinguishing obligations. The *ad hoc* Committee's shift to a substantive review becomes apparent in its conclusion:

> On the basis of the Award's own citations, this conclusion does not necessarily follow, nor does it conform to the understanding the *ad hoc* Committee may have of this area of law, but in any case it should have been expressly justified.
>
> The complaint that there was a failure to state reasons therefore appears to be not only admissible but well founded.[571]

**367**    A little later, the *ad hoc* Committee took issue with the Tribunal's evaluation of damages. The Award had rejected both the claim and the counter-claim on the basis of a finding that both parties had failed to discharge their obligations properly. A detailed comparison of the parties' performance under the contract led the Tribunal to the result that the amount paid corresponded equitably to the

---

568  *Ibid.*, paras. 119–120. Italics original.          569  *Ibid.*, para. 128.
570  *Ibid.*, para. 130.          571  *Ibid.*, para. 171.

value of Klöckner's defective performance.[572] The *ad hoc* Committee found this reasoning unacceptable:

> 176. In the Award's passages on the evaluation of the respective obligations or debts, the main ones of which have just been cited, it is difficult to find any legal reasoning as required by provisions of Articles 52(1)(e) or 48(3). Instead, there is really an "equitable estimate" (to use the Tribunal's own words, . . . ) based on "approximately equivalent" estimates or approximations, which is in any case impossible to justify solely on the basis of the Award's explanations of the *exceptio non adimpleti contractus* or the counterclaim.
>
> The complaint is therefore not only admissible but well founded.[573]

**368**  The standard for the adequacy of a statement of reasons, as put forward in *Klöckner I*, has been criticized severely.[574] What is problematic about the *ad hoc* Committee's approach is not so much its formulation of general standards but their application in practice. To require "sufficiently relevant" reasons is not as such improper. But the application of this requirement to specific questions shows that the *ad hoc* Committee was less concerned with the existence and pertinence of reasons than with their quality and correctness.

**369**  In *Amco I*, the parties presented clearly opposing arguments before the *ad hoc* Committee on the standard of adequacy for reasons. Indonesia argued that the mere presence in the Award of a statement of reasons would be insufficient to avoid annulment if that statement was not reasonably capable of justifying the result reached by the Tribunal. Amco argued that, for purposes of nullity, the test was whether or not a statement of reasons was, in fact, set forth in the Award without reference to the quality of the reasoning. The *ad hoc* Committee decided in favour of Indonesia and followed the interpretation in *Klöckner I*:

> 43. This *ad hoc* Committee finds the above reading of the *Klöckner ad hoc* Committee convincing. If it be true that a full control and review of the reasoning followed by an ICSID tribunal would transform an annulment proceeding into an ordinary appeal, it is also true that supporting reasons must be more than a matter of nomenclature and must constitute an appropriate foundation for the conclusions reached through such reasons. Stated a little differently, there must be a reasonable connection between the bases invoked by a tribunal and the conclusions reached by it. The phrase "sufficiently pertinent reasons" appears to this *ad hoc* Committee to be a simple and useful clarification of the term "reasons" used in the Convention.[575]

---

572  *Klöckner* v. *Cameroon*, Award, 21 October 1983, Section VI.C(a) *et seq.*, Section VI.C(e) *et seq.*

573  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 176. See also *Schreuer*, Decisions Ex Aequo et Bono, pp. 56 *et seq.*

574  *Broches*, Observations, pp. 352/3, 364/5; *Craig*, Uses and Abuses, p. 211; *Feldman*, The Annulment Proceedings, pp. 93/4; *Pirrwitz*, Annulment, pp. 110 *et seq.*; *Rambaud*, L'annulation, pp. 265/6, 271 *et seq.*; but see also: *Schlechtriem*, Zur Überprüfbarkeit, p. 72; *Seidl-Hohenveldern*, Die Aufhebung, pp. 105, 116.

575  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 43. For a critical comment see *Feldman*, The Annulment Proceedings, pp. 107 *et seq.*

**370**    In *Amco II*, the *ad hoc* Committee said there was "no justification for adding a further requirement that the reasons stated be 'sufficiently pertinent'".[576] Such a phrase would amend the standard set out in Art. 52(1)(e), not merely explain it. The *ad hoc* Committee thought that to require that reasons be "sufficiently pertinent" would be "to provide an Ad Hoc Committee with an unwarranted opportunity to act as a Court of Appeal".[577] The *ad hoc* Committee considered that not every gap or ambiguity in an award amounts to a failure to state reasons. Reasons for a statement may also be inferred from the context in which they are made.[578]

**371**    In that case, Indonesia alleged that the second Tribunal had failed to state reasons when it purported to apply authorities, both in Indonesian and international law, "which were not apposite in view of what the Tribunal wanted them to show".[579] The *ad hoc* Committee rejected this argument, finding that the second Tribunal's treatment of the Indonesian authorities was arguable, and supported by reasons that were presented in the Award[580] (see para. 200 *supra*). The *ad hoc* Committee doubted the explanation given for the Tribunal's reference to international authorities, but found that its actual use of them remained within the bounds of its jurisdiction under Art. 42(1).[581] To the extent that Indonesia's complaints asserted that the Tribunal had erred in its application of the applicable law, these complaints were rejected.[582] The Decision on Annulment in *Amco II* exhibits a clear departure from the early tests in *Klöckner I* and *Amco I*, and the scope for substantive review that they presented.

**372**    The Decision on Annulment in *MINE* also adopted a somewhat different standard from *Klöckner I* and *Amco I* for a statement of reasons for the purposes of annulment:

> 5.08 The Committee is of the opinion that the requirement that an award has to be motivated implies that it must enable the reader to follow the reasoning of the Tribunal on points of fact and law. It implies that, and only that. The adequacy of the reasoning is not an appropriate standard of review under paragraph (1)(e), because it almost inevitably draws an *ad hoc* Committee into an examination of the substance of the tribunal's decision, in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention. A Committee might be tempted to annul an award because that examination disclosed a manifestly incorrect application of the law, which, however, is not a ground for annulment.
>
> 5.09 In the Committee's view, the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons.[583]

**373**    Guinea had complained that the Award on breach of contract should be annulled because a number of important decisions of the Tribunal were unreasoned and

576    *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 7.55.
577    *Loc. cit.*                                578    *Ibid.*, paras. 7.56, 7.57.
579    *Ibid.*, para. 5.21.                       580    *Ibid.*, para. 7.21.
581    *Ibid.*, para. 7.26.                       582    *Ibid.*, para. 7.29.
583    *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 5.08/5.09.

unsupported.[584] In response, the *ad hoc* Committee held that the Tribunal's finding on breach of contract

> . . . is supported by reasons which can be followed without great difficulty. Their substance is not subject to review by the Committee.[585]

The *MINE* Committee merely required that the reasons supplied enabled the reader to understand what motivated the Tribunal. Provided an *ad hoc* committee can follow the reasons, it is irrelevant what it thinks of their quality.[586]

The Decision on Annulment in *Klöckner II*[587] was rendered shortly after *MINE*. **374** In view of the identity of two out of three members of the *ad hoc* Committees in *MINE* and *Klöckner II* (see para. 458 *infra*), it is hardly surprising to see a strong similarity in the two Decisions. The Decision in *Klöckner II* rejected the parties' applications for annulment. On the issue of the adequacy of reasons it closely followed the wording in *MINE* (see para. 372 *supra*). But it also reintroduced the word "sufficient" in relation to the reasons.[588]

The Tribunal in *Klöckner II*[589] had given very little in the way of reasons for **375** its decision on damages, stating that after the passage of considerable time it had become impossible to establish a clear causal nexus between the breach of contract and the damages incurred. The *ad hoc* Committee called the Tribunal's reasoning on this point "très synthétique"[590] but ultimately accepted the argument that an exact calculation of damages would have been impossible. The amount of damages was fully understandable on the basis of the Tribunal's explanations and this was all that mattered.[591] In its application of Art. 52(1)(e), *Klöckner II* continued the approach expounded in *MINE*.

In *Wena Hotels* v. *Egypt*, the *ad hoc* Committee observed that the Convention **376** does not prescribe the manner in which the Tribunal's reasons are to be stated. The object of Art. 52(1)(e), coupled with Art. 48(3) and other post-award remedies found in the Convention, is no more than to ensure that the parties may understand the Tribunal's reasoning.[592] This test does not permit any review of the persuasiveness of those reasons, provided they are present and not frivolous:

> . . . when the reasons stated in the award give rise to doubts about its meaning, either party may request interpretation of the award under Article 50. In the case where the Tribunal omitted to decide on a question or where the award contains an

---

584  *Ibid.*, para. 6.44.                        585  *Ibid.*, para. 6.53.

586  See also *Broches*, Die dritte Annullierung, p. 294; *Broches*, Observations, pp. 354/5, 365/6, 377; *Caron*, Reputation and Reality, pp. 43/4; *Niggemann*, Die dritte Annullierung, pp. 81/2; *Reisman*, Systems of Control, pp. 83, 84; *Sturzenegger*, ICSID, pp. 180, 189. But see: *El-Kosheri, A. S.*, ICSID Arbitration and Developing Countries, 8 ICSID Review – FILJ 104, 114 (1993).

587  *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990. See also *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 97; *Giardina*, ICSID, p. 214.

588  *Ibid.*, para. 7.51; *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 115.

589  *Klöckner* v. *Cameroon*, Resubmitted Case: Award, 26 January 1988.

590  *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990, para. 7.13.

591  *Ibid.*, paras. 7.14, 7.71; *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 118.

592  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 75–83.

error, either party may request the award be rectified, according [to] Article 49(2). These remedies confirm the understanding that any challenge as to the substance of reasons given in the award cannot be retained as a ground for annulment under Article 52(1)(e).[593]

. . . Art. 52(1)(e) does not allow any review of the challenged Award which would lead the *ad hoc* Committee to reconsider whether the reasons underlying the Tribunal's decisions were appropriate or not, convincing or not.[594]

**377**    The Decision on Annulment in *Vivendi I* is in a sense the culmination and summary of the reasoning in *Amco II*, *Wena* and especially *MINE* on the meaning of Art. 52(1)(e). *Vivendi I* laid out the leading statement of the law, to date, on the Art. 52(1)(e) standard:

. . . it is well accepted both in the cases and the literature that Article 52(1)(e) concerns a failure to state *any* reasons with respect to all or part of an award, not the failure to state correct or convincing reasons . . . Provided that the reasons given by a tribunal can be followed and relate to the issues that were before the tribunal, their correctness is beside the point in terms of Article 52(1)(e). Moreover, reasons may be stated succinctly or at length, and different legal traditions differ in their modes of expressing reasons. Tribunals must be allowed a degree of discretion as to the way in which they express their reasoning.

In the Committee's view, annulment under Article 52(1)(e) should only occur in a clear case. This entails two conditions: first, the failure to state reasons must leave the decision on a particular point essentially lacking in any expressed rationale; and the second, that point must itself be necessary to the tribunal's decision.[595]

The *Vivendi I* Committee's exposition on the standard for annulment in Art. 52(1)(e) has informed every subsequent annulment decision.

**378**    In *CDC* v. *Seychelles*, the *ad hoc* Committee declined to annul the Award finding there to be no failure to state reasons.[596] The Committee went on to emphasize that it was not entitled to annul the Award even if it disagreed with the Tribunal's legal analysis:

75. As noted above, Article 52(1)(e) simply requires that the Tribunal have stated its reasons in such a fashion that the parties are able to follow the reasoning to its conclusion, not that it state any particular reasons or that the reasons be convincing to the Committee. Thus, even if this Committee were to disagree with the Tribunal's legal conclusions, Article 52(1)(e) does not allow annulment on that basis alone.[597]

**379**    These requirements for reasons appear less exacting than in *Klöckner I* and *Amco I*. *MINE*, *Amco II*, *Wena Hotels* v. *Egypt*, *CDC* v. *Seychelles*, *MTD* v. *Chile* and *Vivendi I* each specifically dismiss the concept of the adequacy of reasons subject only to the rejection of contradictory or frivolous reasons. The standard of "sufficiently relevant" or "sufficiently pertinent" reasons left it to the *ad hoc*

---

593  *Ibid.*, para. 80. See also para. 83.        594  *Ibid.*, para. 79.

595  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 64/5. Italics original.

596  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 76/7, 79, 83, 85/6.

597  *Ibid.*, para. 75.

committee to judge whether the award was well-founded enough to be convincing. The *MINE* standard, as now restated in *Vivendi I*, merely requires that the reasons enable the reader to understand what motivated the tribunal. As long as the *ad hoc* committee can follow the reasons it is irrelevant what it thinks of their quality.

The *ad hoc* Committee in *Mitchell* v. *DR Congo* embraced the *MINE* test on **380** Art. 52(1)(e).[598] However, it said that a complaint as to the merits of an award may lead to annulment under Art. 52(1)(e) in certain circumstances. In particular, in addressing an argument that there was a failure to state reasons for the award of damages, the *ad hoc* Committee commented that an award could be annulled for failure to state reasons if the reasoning is "inadequate or contradictory".[599] The reference to the inadequacy of reasons is at odds with the developing line of cases described above. The *ad hoc* Committee commented that the Tribunal, in finding that the measures qualified as expropriation, was within its "freedom of judgment" and had not failed to state reasons.[600] As to the question of damages, the reasons supplied were relatively lengthy and detailed and did not entail an absence of reasons or contradiction warranting annulment, notwithstanding that the *ad hoc* Committee identified possibly incorrect findings.[601]

On the other hand, the *ad hoc* Committee in *Mitchell* found the Award to be **381** incomplete and obscure as regards the existence of an investment. It held that the Award was tainted by a failure to state reasons in the sense that the inadequacy of the reasons affected the coherence of the reasoning. As a consequence, it annulled the Award.[602]

The *ad hoc* Committee in *MTD* v. *Chile* explained that the relevant question **382** under Art. 52(1)(e) is "not whether the Tribunal's reasoning is unassailable but whether it is annullable".[603] The Award should not be annulled if "an informed reader" of the Award would understand the reasons given and would discern no material contradiction in them, and provided they were "sufficiently clear and sufficiently displayed" and entailed no contradiction.[604] Whilst the Tribunal might have supplied further reasons for allocating responsibility for the damage done to the investment in equal shares, the Committee noted that the Tribunal had analysed the faults on both sides in some detail and its apportionment of fault fell within its "margin of estimation".[605] The reasons given by the Tribunal for a certain aspect of its quantum decision were extremely succinct but they were not elusive. In the circumstances, the *ad hoc* Committee was not prepared to annul this minor aspect of the Award under Art. 52(1)(e).[606]

The *ad hoc* Committee in *Soufraki* v. *UAE* noted that insufficient or inadequate **383** reasons as well as contradictory reasons can give rise to an annulment.[607] But

---

598   *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 21.
599   *Ibid.*, para. 65.                    600   *Ibid.*, paras. 52–54.
601   *Ibid.*, paras. 65/6.                  602   *Ibid.*, paras. 40, 41, 67.
603   *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 90.
604   *Ibid.*, para. 92.                     605   *Ibid.*, para. 101.
606   *Ibid.*, para. 106.
607   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, paras. 122–126.

it also found that Art. 52(1)(e) "was not designed to drive arbitrators to reach for juridical perfection in the crafting of their awards".[608] Generally accepted propositions need not be extensively justified, nor every word explained.[609] The *ad hoc* Committee stated that its task was "to verify the *existence* of reasons as well as their *sufficiency* – that they are adequate and sufficient reasonably to bring about the result reached by the Tribunal – but it cannot look into their *correctness*".[610] The *ad hoc* Committee reviewed the Tribunal's reasoning that led to its denial of jurisdiction and found it to be readily understandable, with no gaps and no internal inconsistencies.[611] The application for annulment under Art. 52(1)(e) was declined.

**384**    In *Lucchetti* v. *Peru*, the *ad hoc* Committee stated that the requirement of reasons "aims at ensuring the parties' right to ascertain whether or to what extent a tribunal's findings are sufficiently based on the law and on a proper evaluation of relevant facts".[612] The *ad hoc* Committee found that the Tribunal had not espoused all of the various elements that should be taken into account in the course of treaty interpretation. Nevertheless, there was no lack or contradiction in reasons such as "to leave a doubt about the legal or factual elements upon which the Tribunal based its conclusion". The application for annulment under Art. 52(1)(e) was denied.[613]

**385**    In *CMS* v. *Argentina*, a complaint was raised under Art. 52(1)(e) in relation to the Tribunal's treatment of Argentina's "necessity" defences under Article XI of the treaty and customary international law. Argentina argued that the Tribunal had conflated the interpretation and application of Article XI with the customary international law approach.[614] The Tribunal had not provided any independent reasoning to explain why the conditions for the application of Article XI were not satisfied.[615]

**386**    The *ad hoc* Committee found this analysis to be "inadequate". It stated that the Tribunal:

> . . . should certainly have been more explicit in specifying, for instance, that the very same reasons which disqualified Argentina from relying on the general law of necessity meant that the measures it took could not be considered "necessary" for the purpose of Article XI either.[616]

**387**    Nevertheless, the Committee observed that both parties had understood the Award in this respect and that "a careful reader can follow the implicit reasoning of the Tribunal". Notwithstanding that the reasoning may have been "inadequate", the Committee did not accept that there was a failure to state reasons warranting

---

608  *Ibid.*, para. 127.                    609  *Ibid.*, para. 131.
610  *Ibid.*, para. 131. Italics original.    611  *Ibid.*, paras. 133/4.
612  *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, para. 98.
613  *Ibid.*, para. 129. A dissenting opinion was issued by Sir Franklin Berman, who concluded that the Award failed to state reasons to such an extent as to warrant annulment: *ibid.*, Dissenting Opinion of Sir Franklin Berman, 5 September 2007, para. 14.
614  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 111.
615  *Ibid.*, para. 123.                    616  *Ibid.*, para. 125 (footnote omitted).

annulment.[617] On the other hand, the Committee found an absence of reasons in the context of the Tribunal's application of the umbrella clause warranting annulment of that part of the Award (see para. 360 *supra*).

*Ad hoc* committees have consistently confirmed that Art. 52(1)(e) does not **388** permit any inquiry into the quality or persuasiveness of reasons. *Ad hoc* committees may be dissatisfied with the adequacy of reasons, but provided they meet the conditions set out in *MINE*, and confirmed in *Vivendi I*, there will not be grounds for annulment.

### *4. Contradictory Reasons*

Contradictory reasons are a variant of inadequate reasons. Contradictory reasons **389** will not enable the reader to understand the tribunal's motives. In strict logic, they are as useful as no reasons at all.[618]

There is agreement among the *ad hoc* committees that contradictory reasons **390** amount to a failure to state reasons. The *Klöckner I* Committee made the following general statement:

> 116. As for "contradiction of reasons", it is in principle appropriate to bring this notion under the category "failure to state reasons" for the very simple reasons that two *genuinely* contradictory reasons cancel each other out. Hence the failure to state reasons. The arbitrator's obligation to state reasons which are not contradictory must therefore be accepted.[619]

More specifically, the Application for Annulment charged that the Award was **391** contradictory in dealing with Klöckner's perceived violation of a "duty of full disclosure"[620] (see paras. 234, 235 *supra*). The Tribunal had found that because of this violation Klöckner could not insist upon payment of the entire price as agreed in the contract.[621] But the Tribunal had also rejected Cameroon's counter-claim since it had participated in the joint venture with open eyes and full understanding of its actions.[622] The *ad hoc* Committee did not see a contradiction:

> In reality, the two reasons are not contradictory, despite certain ambiguities in language. In neither case is the decision based on the existence or non-existence of the result, a deception, or on its possibility or impossibility. The complaint must therefore be rejected.[623]

In *Amco I*, the charge of contradictory reasons concerned the method employed **392** by the Tribunal for calculating the required amount of invested capital[624] (see paras. 227–229 *supra*). The Award had apparently included a loan in calculating the investment made,[625] although it had acknowledged previously that

---

617  *Ibid.*, para. 127.
618  *Seidl-Hohenveldern*, Die Aufhebung, p. 107.
619  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 116. Italics original.
620  *Ibid.*, paras. 121–124.
621  *Klöckner* v. *Cameroon*, Award, 21 October 1983, Section VI.B.
622  *Ibid.*, Section VI.F.
623  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 123.
624  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 95–98.
625  *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 204–205, 237–238.

only equity capital but not loans could be taken into account.[626] The *ad hoc* Committee concluded that "the Tribunal seems to have contradicted itself. At least, this impression is not fully disproved by the text of the Award itself." Therefore, the Tribunal had failed to state reasons for its calculation of the investment.[627]

**393**    In *MINE*, the *ad hoc* Committee annulled the damages portion of the Award. One of the grounds for the annulment was that the Award's reasons appeared contradictory to the *ad hoc* Committee. Before the Tribunal, MINE had advanced several damages theories, two of which were called "Y" and "Z", for the calculation of its lost profits arising from the breach of contract. After holding that MINE was entitled to the profits its could have earned, the Tribunal found that lost profits need not be proven with complete certainty. But it found that neither theory Y nor Z presented a usable approach since the underlying assumptions were too hypothetical and hence the results too speculative. Instead, it adopted a third method for the calculation of lost profits that it saw as more realistic.[628]

**394**    The *ad hoc* Committee found that

> . . . to the extent that the Tribunal purported to state the reasons for its decision, they were inconsistent and in contradiction with its analysis of damages theories "Y" and "Z". . . .
>
>    It did . . . for its own damages calculations assume, without explanation and contrary to what really happened, that arrangements yielding 50 cents per ton (the royalty rate of the Afrobulk agreement) could have been concluded for a period of ten years. Having concluded that theories "Y" and "Z" were unusable because of their speculative character, the Tribunal could not, without contradicting itself, adopt a "damages theory" which disregarded the real situation and relied on hypotheses which the Tribunal itself had rejected as a basis for the calculation of damages. As the Committee stated . . . , the requirement that the Award must state the reasons on which it is based is in particular not satisfied by contradictory reasons.[629]

**395**    The *ad hoc* Committee's arguments on this point are not convincing and have been criticized by several commentators.[630] The calculation of lost profits always has a speculative element. What the Tribunal had done was to dismiss two theories that had appeared to it as too speculative and to adopt another method that seemed more realistic. The speculative character of damages theories in the calculation of lost profits is a matter of degree. To adopt a theory that is speculative but less so than other ones is not inherently contradictory. That a method for the calculation

---

626  *Ibid.*, paras. 228, 236.
627  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 97.
628  *MINE* v. *Guinea*, Award, 6 January 1988, Section 9.
629  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 6.105, 6.107.
630  *Niggemann*, Das Washingtoner Weltbankübereinkommen, pp. 116/7; *Niggemann*, Die dritte Annullierung, pp. 80, 82; *Broches, A.*, Die dritte Annullierung eines ICSID-Schiedsspruches – Eine Entgegnung auf F. Niggemann, 11 Praxis des Internationalen Privat- und Verfahrensrechts 293, 296/7 (1991); *Sturzenegger*, ICSID, pp. 192/3, 195–197.

of damages is "contrary to what really happened" is inherent in a situation of lost profits. The only possible criticism that may be levelled against the Tribunal is that the Award could have explained in more detail why it found the method for the calculation of damages that it adopted more realistic than the theories that it dismissed.

The *Vivendi I ad hoc* Committee urged *ad hoc* committees to be slow to find **396** contradiction and, thus, a failure to state reasons. The Committee said:

> It is frequently said that contradictory reasons cancel each other out, and indeed, if reasons are genuinely contradictory so they might. However, tribunals must often struggle to balance conflicting considerations, and an *ad hoc* committee should be careful not to discern contradiction when what is actually expressed in a tribunal's reasons could more truly be said to be a reflection of such conflicting considerations.[631]

In *CDC* v. *Seychelles* the Respondent alleged that the Tribunal had contradicted **397** itself, and so failed to state reasons. The *ad hoc* Committee found no contradiction in the reasons, and urged that *ad hoc* committees strive to read awards "whenever possible, in a way that results in consistency".[632]

In *MTD* v. *Chile*, the *dispositif* section of the Award confirmed that the Tribunal **398** had upheld a claim for a violation of the fair and equitable treatment standard but, in doing so, it referred to just one of the two relevant provisions of the applicable treaty. The *dispositif* also recorded that all other claims were dismissed. The failure to refer specifically to both articles of the treaty produced a formal contradiction, but not one of any substance warranting annulment.[633]

### 5. Failure to Deal with Every Question

### a) History

During the Convention's drafting there were concerns about omissions in tri- **399** bunal decisions that may lead to incomplete awards (History, Vol. II, pp. 342, 664). In the course of the Legal Committee's deliberations on revision, a suggestion was made to add a provision in case the tribunal did not adjudicate on certain matters. There was some debate as to whether this contingency should be dealt with by way of revision, as a form of excess of powers *infra petita* or as a serious departure from a fundamental rule of procedure (at pp. 848/9, 850). Mr. *Broches* suggested that a specific provision should be inserted for a duty by the tribunal to rule on every issue submitted to it and that the Article on annulment should be changed to state that failure to comply with this duty could be a ground for annulment. The subsequent events are described in the History of the Convention as follows:

> . . . a vote was taken on the question whether arbitrators should be required to rule on every issue presented, with 32 delegates voting in the affirmative and

---

631  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 65.
632  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 81.
633  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 80.

none against. The meeting then voted on the question whether a failure to comply with this duty would give the parties the right to seek annulment and the motion was defeated by 8 to 6. Thirty delegations, however, then voted in favor of there being some kind of remedy where the Tribunal has failed to discharge its duty. A majority of 32 to none then indicated that the remedy should be in the nature of a supplemental review which was not identical with the revision of the award, and the Chairman announced that the Secretariat would try and prepare a draft provision giving effect to the sense of the meeting.[634]

**400**     These votes led to the insertion into the Convention of what later became Art. 48(3), on the requirement to deal with every question submitted to the tribunal (see Art. 48, para. 44). They also led to the provision of Art. 49(2) dealing with supplementation and rectification (see Art. 49, para. 29). But the delegates declined to adopt failure to deal with every issue as a ground for annulment.

### b) Relationship to Article 49(2)

**401**     The relationship between supplementation, as provided by Art. 49(2), and annulment, including the practice of *ad hoc* committees on this point, is treated in some detail in this Commentary at Art. 49, paras. 68–77. A brief summary will suffice here.

**402**     Art. 49(2) is one of the outcomes of the debate on failure to deal with every question submitted to the tribunal (see Art. 49, para. 29; paras. 399, 400 *supra*). It provides for supplementation of the award by the original tribunal upon the request of a party if the tribunal has omitted to decide a question in the award. But the remedy offered by Art. 49(2) will be useful only in cases of inadvertent omissions of a technical character. This is particularly so if the tribunal has overlooked one of several claims by a party and has not fully exercised its competence. Art. 49(2) will not be useful in cases of a failure to address major facts and arguments which go to the core of the tribunal's decision. This is particularly so if the question the tribunal has failed to address was seen by it to be immaterial for the outcome of the case or inappropriate for a decision. It follows that the remedy of supplementation, as provided in Art. 49(2), does not obviate failure to deal with every question at least as a *possible* ground for annulment. Nor does it make sense to require the exhaustion of the lesser remedy of Art. 49(2) before failure to deal with every question may be invoked as a possible ground for annulment (see Art. 49, paras. 68–77). Failure to address a question is not *ipso facto* a failure to state reasons, but it is capable of being so.

### c) Relationship to Article 48(3)

**403**     The texts of Art. 48(3) and of Art. 52(1)(e) show a conspicuous difference. Art. 48(3) states that the award shall deal with every question submitted to the tribunal and shall state the reasons upon which it is based. Art. 52(1)(e) states that failure

---

[634]   History, Vol. II, p. 849. See also *Broches*, Die dritte Annullierung, pp. 294/5; *Broches*, Observations, pp. 332, 366 *et seq*.

to state reasons is a ground for annulment. Art. 52 does not refer, in terms, to a failure to deal with every question submitted to the tribunal.

The Convention's drafting history (see para. 399 *supra*) may lead to the conclusion that failure to deal with every issue was specifically rejected as a ground for annulment and may not be read into the Convention.[635] But some commentators have drawn the opposite conclusion, arguing that a tribunal's failure to address all questions may be covered by other grounds for annulment and that, therefore, its explicit mention appeared superfluous.[636]    **404**

The *ad hoc* Committee in *Amco I* clearly adopted the latter view. After referring to Amco's argument that failure of the Tribunal to decide some of the questions submitted to it is not, in itself, a ground for annulment, it said:    **405**

> 33. To support its above view, Amco . . . draws on the drafting history of the Convention and points in particular to the fact that a motion for insertion of a clause providing that failure to comply with the duty to state reasons could be a ground for annulment was rejected by a majority vote (*History*, II/1, p. 849; . . . ). It seems worth noting, however, that, at the time such vote was cast, the present Article 52(1)(e) had already been approved and adopted (*History*, I, pp. 210 and 230). Votes against the above motion cannot therefore necessarily be regarded as importing an objection to the content of the clause proposed, since the delegates voting against the motion may simply have found it redundant in view of the prior adoption of Article 52(1)(e).[637]

Commentators have adopted sharply conflicting views on whether failure to deal with every question may be a cause for annulment.[638] *Ad hoc* committees have taken different approaches to the question whether both requirements of Art. 48(3) are covered by Art. 52(1)(e).    **406**

The *Klöckner I ad hoc* Committee, after dismissing Art. 49(2) as irrelevant to the case (see Art. 49, para. 70), stated:    **407**

> *Prima facie*, therefore, one does not see how a failure to deal with "every question submitted to the Tribunal" can have a sanction other than annulment for a failure to state reasons – unless, of course, the failure to deal with "every question submitted to the Tribunal" is considered to be a "serious departure from a fundamental rule of procedure" under Article 52(1)(d), a question which need not be examined here under the heading "failure to state reasons".[639]

---

635  In this sense: *Feldman*, The Annulment Proceedings, pp. 105/6; *Niggemann*, Die dritte Annullierung, p. 82.

636  *Seidl-Hohenveldern*, Die Aufhebung, pp. 105/6; *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 119.

637  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 33.

638  For a particularly lively debate see *Reisman*, The Breakdown, p. 763; *Broches*, Observations, p. 367; *Reisman*, Repairing ICSID's Control System, pp. 203/4; *Broches, A.*, On the Finality of Awards: A Reply to Michael Reisman, 8 ICSID Review – FILJ 92, 96/7 (1993). See also *Feldman*, The Annulment Proceedings, p. 105; *Niggemann*, Die dritte Annullierung, p. 82; *Pirrwitz*, Annulment, p. 112.

639  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 115. See also *Broches*, Die dritte Annullierung, p. 295; *Broches*, Observations, pp. 351/2, 360; *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 115.

The *ad hoc* Committee proceeded to a detailed examination of five instances of alleged failure to deal with questions submitted to the Tribunal and upheld most of them.[640]

**408**    The *ad hoc* Committee in *Amco I* did not believe that the Convention's drafting history provided a valid argument against reading both requirements of Art. 48(3) into Art. 52(1)(e) (see para. 405 *supra*). It said:

> 32. The *ad hoc* Committee believes that the obligation set out in Article 48(3) of the Convention to "deal with every question submitted to the Tribunal and [to] state the reasons upon which [the award] is based", can find its sanction in Article 52(1)(e) of the Convention. Failure to deal with one or more questions raised by the parties would entail annulment of the award where such omission amounts to "failure to state reasons upon which [the award] is based" (Art. 52(1)(e), Convention). Such an omission could, moreover, amount in particular situations to a "serious departure from a fundamental rule of procedure" (Art. 52(1)(d)) and to a manifest excess of power (Art. 52(1)(b)).[641]

**409**    The *ad hoc* Committee in *MINE* was more differentiated in its approach. Guinea alleged that the Tribunal had failed to address pivotal questions and argued that failure by a tribunal to deal with every question submitted to it as required by Art. 48(3) affords a ground for annulment as a species of failure to state reasons, even though it is not specifically mentioned as such.[642] After analysing the texts of Arts. 48(3) and 52(1)(e) and examining their drafting history,[643] the Committee found that the defect complained of could not have been cured by supplementing the Award under Art. 49(2) but would have required its reconsideration (see Art. 49, para. 72). It said:

> The Committee accepts that in such a case failure to deal with a question may render the award unintelligible and thus subject to annulment for failure to state reasons.[644]

The *ad hoc* Committee proceeded to examine the numerous instances of alleged violations of both parts of Art. 48(3) and concluded that several of these appeared singly to justify and collectively to compel annulment of the affected portion of the Award[645] (see para. 424 *infra*).

**410**    The *ad hoc* Committee in *Wena Hotels* v. *Egypt* drew a distinction between the obligation to deal with every question in Art. 48(3) and the duty to state reasons in Art. 52(1)(e). It elaborated on this distinction by noting that the Convention provides, in Art. 49(2), a specialized remedy for violations of Art. 48(3). The *ad hoc* Committee explained that:

> Article 48(3) of the Convention . . . makes a distinction between the Tribunal's duty to deal with every question submitted to it, and the requirement that the

---

640  *Ibid.*, paras. 131–164.
641  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 32. See also *Broches*, Die dritte Annullierung, p. 296.
642  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 2.04, 6.44, 6.91–6.92.
643  *Ibid.*, paras. 5.07–5.11.                644  *Ibid.*, para. 5.13. See also para. 6.83.
645  *Ibid.*, para. 6.98. See also *Broches*, Observations, pp. 354 *et seq.*; *Sturzenegger*, ICSID, p. 189.

award shall state the reasons upon which it is based. The ground for annulment of Article 52(1)(e) only refers to the latter element. In case a Tribunal had omitted to decide a question in the award, a party may request the Tribunal to decide such question, in an additional proceeding pursuant to Article 49(2) which is distinct from an annulment proceeding under Article 52.[646]

According to the *ad hoc* Committee, a failure to address questions put to the Tribunal will only be relevant under Art. 52(1)(e) where "the Tribunal omitted to decide upon a question submitted to it to the extent such supplemental decision may affect the reasoning supporting the Award".[647] In Art. 50, there is also a procedure for interpretation when reasons stated give rise to doubts as to the meaning of an award.[648]

**411**    In *CDC* v. *Seychelles*, the *ad hoc* Committee confirmed that the approach in *Wena Hotels* v. *Egypt* "makes sense given the twin aims of finality and fairness".[649]

**412**    The approach in *MINE* and *Wena Hotels* is more subtle than in *Klöckner I* and *Amco I*. Failure to deal with a question, according to *MINE* and *Wena*, is not automatically tantamount to a failure to state reasons. This would be the case only if the failure to deal with a particular question rendered the award unintelligible.[650] For other shortcomings in breach of Art. 48(3), the remedy in Art. 49(2) is available. The mechanical requirement that every argument put forward by a party must be addressed is replaced by the requirement that the reasoning must be coherent.

### d) Relationship to Other Grounds for Annulment

**413**    *Ad hoc* committees seem to be agreed that a failure to deal with every question *could* lead to annulment, under certain limited circumstances. But it is less clear whether the appropriate ground should always be a failure to state reasons under Art. 52(1)(e).[651] Other possible reasons would be a manifest excess of powers and a serious departure from a fundamental rule of procedure (see paras. 113–116, 167–171, 295, 300, 393 *supra*, 522 *infra*).

**414**    The *Klöckner I ad hoc* Committee seemed quite uncertain which of the three grounds was the appropriate one (see also para. 407 *supra*). At one point it said:

> 131. As for the failure to deal with questions submitted to the Tribunal, reference should be made both to Article 48(3), as we have [s]een, and to Article 52(1)(e) (failure to state reasons) or (d) (serious departure from a fundamental rule of procedure).[652]

But a little further into its discussion of failure to deal with questions submitted to the Tribunal it complained:

---

646  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 100.
647  *Ibid.*, para. 101.                    648    *Ibid.*, para. 82.
649  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 71.
650  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.13.
651  See also *Broches*, Die dritte Annullierung, p. 295; *Broches*, Observations, p. 368; *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 119; *Niggemann*, Die dritte Annullierung, p. 82; *Pirrwitz*, Annulment, p. 113.
652  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 131.

> 135. It is difficult to determine from the Claimant's none too clear explanations whether the complaint is based on Article 52(1)(b) (manifest excess of powers) or on Article 52(1)(e) (failure to state reasons) (and more precisely failure to deal with questions submitted to the Tribunal), or on both.[653]

In the end it settled for failure to state reasons.[654]

**415**   In *Amco I* the *ad hoc* Committee found that the obligation to deal with every question could find its sanction in Art. 52(1)(e), but added that failure to deal with questions could also amount to a serious departure from a fundamental rule of procedure and to a manifest excess of powers (see para. 408 *supra*). In the end, it decided to deal with the issue as a serious departure from a fundamental rule of procedure[655] (see para. 300 *supra*).

**416**   In *CDC* v. *Seychelles* an alleged violation of Art. 48(3) was also considered within the context of an alleged serious departure from a fundamental rule of procedure. The complaint was rejected.[656]

**417**   The *MINE* and *Wena Hotels ad hoc* Committees seemed quite certain that Art. 52(1)(e) was the only ground for annulment appropriate for a failure to deal with every question[657] (see paras. 409, 410 *supra*). Each analysed the complaints under the heading of failure to state reasons. In *MINE*, after annulling the portion of the Award on damages for failure to state reasons, the *ad hoc* Committee saw no need to examine the alternative grounds for annulment.[658]

### e) What Constitutes a Question?

**418**   The Convention's English version uses the word "question" in Arts. 48(1), 48(3) and 49(2). The French version uses "questions" in Arts. 48(1) and 49(2) but "chefs de conclusions" in Art. 48(3). The Spanish version uses "cuestiones" in Art. 48(1), "pretensiones" in Art. 48(3) and "punto" in Art. 49(2). If one accepts, as *ad hoc* committees have at least in certain circumstances, that a violation of the first part of Art. 48(3) may lead to annulment, it is still by no means clear what the "questions", "chefs de conclusions" and "pretensiones" are that the award must deal with. For purposes of a request for annulment "question" could mean alternatively a particular claim, a decisive argument made by a party, a relevant argument made by a party or just any argument advanced by a party.[659]

**419**   Arguments may be presented in the parties' memorials or orally before the tribunal. Some arguments may be of a subsidiary nature to cover the contingency

---

653  *Ibid.*, para. 135.                    654  *Ibid.*, paras. 145, 151, 157.
655  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, 1 ICSID Reports 519. See also *Broches*, Die dritte Annullierung, p. 296; *Broches*, Observations, pp. 349, 354, 366/7.
656  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 56/7.
657  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 5.13; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 75–110.
658  *Ibid.*, para. 6.109. See also *Sturzenegger*, ICSID, p. 194.
659  See also *Broches*, Observations, p. 377; *Gaillard*, Chronique (1991), p. 172; *Niggemann*, Das Washingtoner Weltbankübereinkommen, p. 115; *Redfern*, ICSID, pp. 109/10; *Schlechtriem*, Zur Überprüfbarkeit, p. 72; *Sturzenegger*, ICSID, pp. 191/2.

that the tribunal rejects a primary argument. Some arguments may be quite peripheral or even irrelevant. To enjoin the tribunal to deal with every single argument put forward by the parties in the course of the proceedings on pain of annulment would impose a very heavy burden. Arguments not presented by the parties cannot be the basis for a complaint for failure to state reasons.[660]

The *ad hoc* Committee in *Klöckner I*, writing in French, did not believe that **420** every single argument needs to be dealt with:

> 131. . . . According to a general principle, embodied in Article 48(3), the Award must deal with "every question submitted to the Tribunal" (*tous les chefs de conclusions soumises au Tribunal*). Given the relative ambiguity of the term "questions" (*conclusions*), it should first be noted that these may be formulated separately, at the end of an application or memorial, or constitute part of an argument. It may therefore be that certain "questions submitted to the Tribunal" are presented formally in the main text of the parties' documents rather than, for example, in the form of "final conclusions" or "submissions".
>
> On the other hand, while some arguments may therefore really be "questions submitted to the Tribunal", it is clear that the arbitrators do not have to deal with all of the parties' arguments.[661]

The *ad hoc* Committee then proceeded to examine in detail several complaints **421** put forward by Klöckner. These complaints all concerned "essential arguments" that had been presented to the Tribunal. One concerned contractual provisions limiting Klöckner's liability. The *ad hoc* Committee said:

> 148. . . . It is clear that the argument Klöckner bases on the contractual clauses limiting liability can and should be considered a "question submitted to the Tribunal" and that this is an essential question for both parties. The Claimant has a major interest in seeing these contractual clauses deemed applicable and applied. The Respondent has a major interest in seeing them judged inapplicable or irrelevant to the present case. Both parties have for that matter addressed this subject.[662]

Another complaint concerned a confirmation by Cameroon of its debts to **422** Klöckner. The *ad hoc* Committee said:

> 153. . . . Clearly such an argument, based on the Respondent's alleged acknowledgment of the debt, must be considered to be a question submitted to the Tribunal, calling for a response.[663]

It is, therefore, clear that the *ad hoc* Committee in *Klöckner I* took the view that a "question", in order to form a basis for annulment, must be an essential question in the sense that it could have affected the outcome of the Award.

This view is confirmed by *Amco I*. The *ad hoc* Committee described the **423** questions that the Tribunal had allegedly failed to deal with in the following terms:

---

660   *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 58, 62.
661   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 131.
662   *Ibid.*, para. 148. See also *Pirrwitz*, Annulment, pp. 11/2.
663   *Ibid.*, para. 153.

> 35 . . . Indonesia alleges that the Tribunal had disregarded facts and arguments which, had they been considered, could have obliged the Tribunal to abandon the very bases of its Award. If the Tribunal had accepted as valid any of the arguments invoked in the Application for annulment, their insertion in the Award would have contradicted what had hitherto been the main lines of reasoning of the Award. Thus, the Tribunal would have been obliged to modify the rationale of the Award.[664]

**424**  The impression that "question" is to be interpreted as decisive argument for purposes of Art. 52(1) is confirmed by *MINE*. Guinea complained that the Tribunal had failed to deal with "questions" or arguments that, had they been accepted, would have required the Tribunal to reconsider the Award.[665] The *ad hoc* Committee concluded that several of the alleged violations of Art. 48(3) appeared singly to justify and collectively to compel annulment of the damages portion of the Award.[666]

**425**  In *CDC* v. *Seychelles*, the *ad hoc* Committee noted that it is not for the Applicant to define the question the Tribunal allegedly failed to decide.

> 57. The specific terminology used by the Republic in its Memorial cannot define the question the Tribunal was obliged to answer. Rather, the Tribunal was required to answer a legal question, or to put it another way, come to a conclusion about the Parties' rights and liabilities. In this case, the legal question for the Tribunal's determination was whether or not the Republic's claimed defenses protected it from liability under the 1993 Guarantee. This question necessarily entailed, under English law as the Tribunal understood it, the determination, *inter alia*, of whether the Republic was entitled to rely on CDC's loan decision as a representation regarding the substance of the project it financed. The Tribunal answered the question in the negative, thereby answering the proper legal question before it.[667]

**426**  This practice makes it clear that "question" in this context is to be understood objectively in the sense of a crucial or decisive argument. An argument is crucial or decisive if its acceptance would have altered the tribunal's conclusions. Identification of that question or argument is objective. Such an argument may not be ignored but must be addressed by the tribunal.

### f) How to Deal with a Question

**427**  The normal way to deal with a question, that is a decisive argument, would be to address it directly by either accepting it and restating it in the award or by rejecting it and giving reasons for its rejection. In some situations it may appear superfluous to address an argument directly, since it is logically ruled out or made irrelevant by something the tribunal has found or because it is so patently erroneous that it does not deserve discussion.

---

664  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 35.
665  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 5.13, 6.50, 6.84, 6.91.
666  *Ibid.*, paras. 6.99–6.101. See also *Sturzenegger*, ICSID, pp. 180, 190 *et seq*.
667  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 57.

The *Klöckner I ad hoc* Committee examined several instances of alleged indirect **428**
or implicit treatment of questions. On the issue of a contractual limitation of
Klöckner's liability (see para. 415 *supra*) it noted that the Award contained no
express reasons. Therefore, it was *prima facie* undeniable that the Tribunal had
not dealt with one of the Claimant's essential questions. The *ad hoc* Committee
looked into the argument that it was not necessary for the Tribunal to deal with
this point since its finding on Klöckner's lack of frankness and loyalty implied the
inapplicability of the contract provisions in question.[668] This argument seemed
far-fetched and purely conjectural to the *ad hoc* Committee since nothing in the
text of the Award made it possible to say with certainty that the Tribunal actually
considered the question and resolved it in this way:

> 151. . . . it is not for the Committee to imagine what might or should have been
> the arbitrators' reasons, any more than it should substitute "correct" reasons for
> possibly "incorrect" reasons, or deal "*ex post facto*" with questions submitted to
> the Tribunal which the Award left unanswered.[669]

The issue of an indirect treatment of a question also came up in another context **429**
in *Klöckner I*. The Award did not discuss Klöckner's argument that its warranty
was limited by law to hidden defects which had to be raised within a brief time
limit.[670] The *ad hoc* Committee said:

> 164. . . . it must be accepted that the Tribunal did not deal, at least expressly,
> with the questions submitted to it by Klöckner. In order to be exhaustive, it
> might however be asked whether there is an *implicit* rejection of these questions
> elsewhere in the reasoning.[671]

After finding that the Tribunal's reasons seemed to relate to a different legal issue
and were of a quite general nature, the *ad hoc* Committee concluded:

> On a question as essential as the warranty against defects and the conditions,
> especially the time limit, for its enforcement, it is in any case difficult to conceive
> that an indirect and implicit response may be found in reasons given on another
> subject.[672]

But in yet another context, the *ad hoc* Committee did accept indirect reasoning. **430**
The Claimant argued that there was a failure to deal with questions submitted to the
Tribunal since the Award had not examined the conditions under which wrongful
inducement to contract could be invoked.[673] The *ad hoc* Committee rejected this
complaint seeing that the Award had neither accepted the allegation of wrongful
inducement to contract nor declared the nullity of the Contract:

> Having refused to accept that there was wrongful inducement to contract, no doubt
> within the scope of its power to evaluate the facts and evidence, the Tribunal could
> not be required to examine or discuss "the conditions under which Article 1116
> of the Civil Code on wrongful inducement to contract may be invoked".[674]

---

668  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 147–150.
669  *Ibid.*, para. 151.                    670  *Ibid.*, paras. 158–160.
671  *Ibid.*, para. 164.                    672  *Loc. cit.*
673  *Ibid.*, para. 145.                    674  *Ibid.*, para. 145.

**431**    The Decision on Annulment in *MINE* also shows an instance of acceptance of indirect treatment of questions. One of Guinea's complaints was that the Award did not address certain of its detailed allegations of breaches of contract by MINE.[675] The *ad hoc* Committee first stated that the Tribunal had been aware of Guinea's arguments which were reflected in the Award's statement of "Guinea's Assertions". The *ad hoc* Committee then came to the conclusion that the Tribunal did not have to address these specific contentions because it had found that MINE had not breached the agreement and had supported this finding by reasons which can be followed without great difficulty. The reasons given made it clear why it did not have to address Guinea's assertions which had become irrelevant.[676]

**432**    In *Wena Hotels* v. *Egypt*, the Applicant complained that the Tribunal had erred in not considering the impact of alleged corrupt activities or conflict of interest on the part of a certain Mr Kandil on the validity of the Claimant's lease contract. The *ad hoc* Committee held that this complaint was limited "to a purely factual question which is irrelevant as a matter of minimal standard of procedure".[677] Moreover, where Egypt had made certain allegations of fact, it remained for Egypt to discharge its onus of proving them. In respect of the alleged corruption, the Tribunal held that Egypt had failed to discharge its burden of proof. In relation to the alleged conflict of interest, the *ad hoc* Committee first recounted the distinction between claims under the lease contract and claims under the investment treaty. It then observed that the allegedly overlooked question could not have been relevant to the outcome in the Award. Alternatively, the Tribunal had dealt with the question implicitly:

> 106. . . . this Committee observes that the Tribunal did not address in as much express terms the argument based on an alleged conflict of interest than it dealt with the question whether improper influence had been exercised on Mr. Kandil. The said argument is, however, rejected implicitly in the Award, where it is noted that Egypt failed to present "any evidence" which would have led to think that the agreement was not legitimate . . .[678]

**433**    This practice demonstrates that questions may be dealt with indirectly (see also paras. 354, 358, 361, 362, 387 *supra*). If it can be implied from the reasons given why a particular argument cannot be supported, it is not necessary to address that argument explicitly. If an argument rests on premises that have been dismissed by the tribunal, the argument need not be addressed as long as the tribunal has stated reasons for dismissing the premises. Where one of several defensive arguments has been accepted and the claim has been dismissed, it may be superfluous to address the remaining arguments. The decisive criterion is whether the argument has the potential to alter the award's outcome (see also Art. 48, paras. 67, 68).

---

675    *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.47.
676    *Ibid.*, paras. 6.48–6.53. See also *Sturzenegger*, ICSID, p. 193; *Reisman*, Systems of Control, pp. 84/5.
677    *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 60.
678    *Ibid.*, para. 106.

Despite these limitations on the obligation to deal with questions, a tribunal will be well advised to treat all the parties' major arguments with great care. Therefore, a tribunal should not merely demonstrate a consistent and convincing ratiocination. It should also try to address all relevant arguments expressly and leave as little as possible to inference and reconstruction. In particular, it should expressly reject unsuccessful arguments by the losing party and give reasons for doing so.[679]    **434**

**J. "(2) The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered."**

### *1. History and Introduction*

The early drafts to the Convention provided for much shorter time limits for an application for annulment. The Preliminary Draft stated that an application would have to be made generally within sixty days but allowed six months in case of corruption (History, Vol. I, p. 232). A number of delegates stated that the time limit in case of corruption should run not from the date of the award but from the date the corruption was discovered (History, Vol. II, pp. 339, 340, 517). Thereupon, the First Draft provided that in case of corruption too the time limit should be sixty days, but should run from the date of discovery and should terminate three years after the award was rendered (History, Vol. I, p. 234). After some further debate (History, Vol. II, pp. 652, 819, 855), a proposal to extend the sixty-day time period to 120 days was adopted. A suggestion to reduce the overall time period of three years in case of corruption was defeated (at p. 855).    **435**

Art. 52(2) imposes a general time limit for all cases except corruption and a special set of time limits for corruption. These time limits are more generous than those for supplementation and rectification under Art. 49(2) (see Art. 49, para. 34) and for revision under Art. 51(2) (see Art. 51, paras. 26–31). Interpretation under Art. 50 is not subject to a time limit (see Art. 50, paras. 19–22). In view of the complexity of an application for annulment, the longer time limit is clearly justified.    **436**

### *2. General Time Limit*

The general time limit is calculated from the date on which the award was rendered. In accordance with Art. 49(1), the award shall be deemed to have been rendered on the date on which certified copies were dispatched to the parties (see Art. 49, paras. 10, 25–27). In accordance with Administrative and Financial Regulation 29, the time limit is satisfied if the application for annulment arrives at the seat of the Centre on the 120th day following the dispatch of the award.    **437**

---

679  See also *Sturzenegger*, ICSID, pp. 193 *et seq.*

**438**    In accordance with Art. 49(2), the time limit for an application for annulment will be extended if a party makes a request for supplementation or rectification of the award. In that case, the time limit for an application for annulment will run from the date on which the decision on supplementation or rectification has been rendered by the tribunal. Since this deferral of the time limit for annulment is independent of the success of the request for supplementation and rectification, a party may extend the time available for preparing its application for annulment by making a request under Art. 49(2) (see Art. 49, paras. 81–85).

**439**    Under Arbitration Rule 50(3)(b) the Secretary-General shall refuse to register an application for annulment if it is not made within the 120 days (see para. 83 *supra*). But registration by the Secretary-General does not preclude the tribunal from making its own determination as to whether the application is in compliance with the time limit (see para. 97 *supra*).

**440**    The available information suggests that applications for annulment were generally submitted in a timely manner:

- In *Klöckner I*, the Award was rendered on 21 October 1983. The Application for Annulment was lodged with the ICSID Secretariat on 10 February 1984.
- In *Amco I*, the Award was rendered on 20 November 1984 and the Application for Annulment was filed on 18 March 1985.
- In *MINE*, the Award was rendered on 6 January 1988 and the Application for Annulment was made on 28 March 1988.
- In *Klöckner II*, the Award was rendered on 26 January 1988. The Application for Annulment was submitted to the Centre on 10 May 1988.
- In *Amco II*, the Award was rendered on 5 June 1990. The supplemental Decision on Rectification was rendered on 17 October 1990 and the Request for Annulment was registered on 17 October 1990 (see Art. 49, para. 85).
- In *SPP* v. *Egypt*, the Award was rendered on 20 May 1992 and the Application for Annulment was registered already on 27 May 1992.
- In *Wena Hotels* v. *Egypt*, the Award was rendered on 8 December 2000 and the Application for Annulment was filed on 19 January 2001.
- In *Vivendi I* v. *Argentina*, the Award was rendered on 21 November 2000. The Application for Annulment was filed on 20 March 2001, just inside the 120-day limit.
- In *CDC* v. *Seychelles*, the Application for Annulment was filed on 30 March 2004, in respect of an Award rendered on 17 December 2003.
- In *RFCC* v. *Morocco*, the Award was rendered on 22 December 2003. The date of the Application for Annulment is not publicly available, but the annulment proceeding was registered by the Secretariat on 30 April 2004, just over 120 days after the Award.
- In *Mitchell* v. *DR Congo*, the Tribunal had rendered its Award on 9 February 2004. The Application for Annulment was filed on 7 June 2004.

- In *Repsol* v. *Petroecuador*, the Award was rendered on 20 February 2004. The Application for Annulment was filed on 7 June 2004.
- In *MTD* v. *Chile*, the Application for Annulment was filed on 20 September 2004 in respect of an Award, which was rendered on 25 May 2004.
- In *Soufraki* v. *UAE*, the Application for Annulment was lodged with the Centre on 4 November 2004, in respect of the Award dated 7 July 2004.
- In *Lucchetti* v. *Peru*, the Award was rendered on 7 February 2005. The Application for Annulment was filed on 6 June 2005, just within the 120-day time limit.
- In *CMS* v. *Argentina*, the Award was rendered on 12 May 2005. The Application for Annulment was filed on 8 September 2005.

Submission of a document called "Application for Annulment" within 120 days **441** does not necessarily resolve the problem of time limits. Arbitration Rule 50(1)(c) requires that the application state the grounds on which it is based *in detail* (see para. 83 *supra*). Therefore, it is not sufficient to file a purely formal application within 120 days and provide substantiation later on.

In *Amco I*, Amco contended that a number of pleas advanced by Indonesia for **442** the annulment of the Award were time-barred since they were raised only in a memorial of 30 August 1985, that is outside the time limit of 120 days. The *ad hoc* Committee agreed that it would be insufficient for an application for annulment merely to recite grounds for annulment as contained in Art. 52(1) together with a prospect for further submissions at a later stage (see para. 88 *supra*). The Application's registration by the Secretary-General did not resolve the problem and did not bind the *ad hoc* Committee.[680] The *ad hoc* Committee drew upon Institution Rule 2(1)(e) which requires that a request shall "contain information concerning the issues in dispute". But statements made in the Application could be taken together with their development and amplification in a later memorial. The *ad hoc* Committee said:

> 51. The above general considerations would seem sufficient by themselves to lead to a denial of the time-bar plea of Amco. The *ad hoc* Committee, however, believes it useful to proceed to a detailed examination of the time-bar pleas of Amco, in order to verify whether the claims for annulment made by Indonesia can reasonably be considered as covered by the statements made in Indonesia's Application for annulment, which Application had been lodged in a timely manner.[681]

This examination led to the following result:

> 53. The *ad hoc* Committee believes that the grounds above pointed to by Amco are not really new grounds raised for the first time by Indonesia in its Memorial but were either in fact referred to in the Application or reasonably implicit in the Application. The statements in Indonesia's Memorial

---

680  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 45–47, 69.
681  *Ibid.*, para. 51.

thus constitute developments or specifications of statements already made in the Application . . .[682]

**443**    In *Wena Hotels* v. *Egypt*, Wena argued that several grounds for annulment were time-barred since they had not been argued in the Request for Annulment but only later in the Applicant's Memorial. The *ad hoc* Committee noted that Arbitration Rule 50(1)(c) requires that the grounds for annulment be stated "in detail" in the application. The Committee rejected Wena's objection and said:

> On the other hand, the ICSID Convention does not state any requirement of completeness of the Application, except to the extent that the Application must invoke one or more of the grounds listed in Article 52(1) on which it is based. The ICSID Convention thus does not preclude raising new arguments which are related to a ground of annulment invoked within the time limit fixed in the Convention. This is of no harm to the opposing party, which is not requested to answer the Request, but later only the first memorial of the Applicant. The Committee therefore does not retain Wena's objection.[683]

**444**    In *Vivendi I* v. *Argentina*, the Claimant had sought only the partial annulment of the Award. The Respondent resisted the arguments in favour of annulment but further argued that, if any of them were to be upheld, the Award as a whole should be annulled. The Claimant, in turn, argued that the Respondent's argument for the Award's total annulment was "out of time".

**445**    The *ad hoc* Committee agreed with the Claimant that a "counterclaim" for annulment, not raised in accordance with Art. 52(1), is inadmissible. But it was open to the Respondent to plead that the grounds put forward by the party seeking annulment affected the Award as a whole. It was for the *ad hoc* Committee and not for the requesting party to determine the extent of the annulment. The Respondent was not making a late annulment application by way of a counterclaim but was arguing that if the Claimant's position were to be upheld the effect must be to bring down the whole Award. That position was open to the Respondent.[684]

**446**    In *Soufraki* v. *UAE*, the *ad hoc* Committee considered whether the allegation that the Tribunal manifestly exceeded its powers by failing to apply the proper law was inadmissible, since it was not introduced with Soufraki's initial application for annulment. The *ad hoc* Committee explained that:

> . . . because of the existence of strict time limits in the ICSID Convention, a new ground for annulment cannot in principle be admitted in the course of the proceedings, while of course new arguments fleshing out grounds already admitted can be developed.[685]

**447**    The Committee concluded that the claim was already present in the application for annulment, although "intermingled" with other grounds.[686]

---

682  *Ibid.*, para. 53. See also *Seidl-Hohenveldern*, Die Aufhebung, p. 111.
683  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 19.
684  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 67–70.
685  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 33.
686  *Ibid.*, para. 34.

### 3. Time Limit in Case of Corruption

An application for annulment because of corruption of an arbitrator is subject to a dual time limit. The application must be made within 120 days of the discovery of the corruption. This provision only makes sense if discovery is read to mean "discovery by the party making the application". A suggestion to clarify this point was rejected during the Convention's drafting (History, Vol. II, p. 856) probably not because the majority disagreed with it but because the point seemed obvious. In addition, there is an absolute cut-off for applications after three years from the date on which the award was rendered. Both time limits must be complied with cumulatively. **448**

Under Arbitration Rule 50(3)(b), the Secretary-General will refuse to register an application for annulment because of corruption made more than 120 days after discovery even if it is within the three-year limit. Therefore, it is important that the application contains information as to the date of the discovery of the corruption. Three years after the award has been made, the Secretary-General will refuse to register an application regardless of when the corruption was discovered. **449**

The Secretary-General's determination that the application complies with the 120-day limit can only be provisional since he or she must rely on the assertion made in the application. If the *ad hoc* committee finds subsequently on the basis of evidence before it that the requesting party has obtained knowledge of the corruption more than 120 days before the application, it must still reject the request as inadmissible (see para. 97 *supra*). **450**

### K.  "(3) On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an *ad hoc* Committee of three persons."

### 1. History and Introduction

The provision on the modality for the appointment of members of *ad hoc* committees remained unchanged throughout the Convention's drafting (History, Vol. I, p. 236). The idea to submit an award to the International Court of Justice for annulment was dismissed since access to the ICJ would have required the active involvement of the investor's home State (History, Vol. II, pp. 423/4, 429/30). There was some debate on whether members of *ad hoc* committees should be drawn from the Panel of Arbitrators in view of possibly different qualifications (at pp. 729, 854/5). A suggestion to give the parties the right to appoint *ad hoc* committees was rejected (at p. 855). **451**

The right to appoint persons to *ad hoc* committees is with the Chairman of the Administrative Council. In accordance with Art. 5 this function is performed *ex officio* by the President of the World Bank. The Panel of Arbitrators is composed of persons designated by Contracting States and by the Chairman in accordance with Arts. 12–16. **452**

### *2. Procedure*

453    The procedure for the appointment of an *ad hoc* committee is regulated by
Arbitration Rule 52 in the following terms:

**Rule 52**

*Annulment: Further Procedures*

(1) Upon registration of an application for the annulment of an award, the
Secretary-General shall forthwith request the Chairman of the Administrative
Council to appoint an *ad hoc* Committee in accordance with Article 52(3) of the
Convention.

(2) The Committee shall be deemed to be constituted on the date the Secretary-
General notifies the parties that all members have accepted their appointment.
Before or at the first session of the Committee, each member shall sign a decla-
ration conforming to that set forth in Rule 6(2).

454    In principle, the Chairman is free in his choice of persons, except that they
must be taken from the Panel of Arbitrators and subject to the exclusionary rules
of the second sentence of Art. 52(3) (see paras. 461–465 *infra*). In the earlier
cases, the Secretary-General consulted with the parties on the composition of
*ad hoc* committees and advised the Chairman on the appointments.[687] For the
most part, this practice has changed. The current practice is for the Secretary-
General to advise the Chairman on the composition of *ad hoc* committees without
consultation with the parties. No consultation process is described in the decisions
in *CDC* v. *Seychelles*,[688] *Mitchell* v. *DR Congo*,[689] *Repsol* v. *Petroecuador*,[690]
*MTD* v. *Chile*,[691] *Soufraki* v. *UAE*[692] or *CMS* v. *Argentina*.[693] Only in *Lucchetti*
v. *Peru* is there an acknowledgement of a consultation process with the parties as
to the composition of the *ad hoc* Committee.[694]

455    The appointment of members of *ad hoc* committees differs considerably from
the appointment of arbitrators as regulated in Arts. 37–40. The most important
difference is the absence of the possibility of party appointments. Under Art. 38
the appointment of arbitrators by the Chairman is only subsidiary in case the
parties are unable to accomplish the constitution of the tribunal. Under Art. 52(3)
appointment by the Chairman is the only possibility. The number of members of
*ad hoc* committees is fixed at three persons. This is another important difference
to the more flexible rule of Art. 37(2).

---

687    *Broches*, Observations, p. 373; *Broches*, Convention, Explanatory Notes and Survey, p. 697;
*Paulsson*, ICSID's Achievements, p. 392; *Reisman*, The Breakdown, p. 807; *Reisman*, Repair-
ing ICSID's Control System, p. 211.

688    *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 15.

689    *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 6.

690    *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 4.

691    *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 4.

692    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 2.

693    *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 6.

694    *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment,
5 September 2007, para. 24.

The appointment of the *ad hoc* committee's president is regulated neither in the Convention nor in the Arbitration Rules. The rules concerning the appointment of presidents of arbitral tribunals (Art. 37(2)(b); Arbitration Rules 3 and 4) are not capable of application by analogy to *ad hoc* committees due to the differences in the appointment processes. In practice, the three members of an *ad hoc* committee elect a president from their midst.[695]  **456**

### 3. Composition

Some commentators have regarded the absence of party-appointed arbitrators as affecting the authority of *ad hoc* committees or, at least, as making them less attractive to the parties.[696] On the other hand, their distance to the parties gives a higher probability of complete objectivity of every single member and a better basis for rational cooperation among members.[697] The detailed provisions on exclusion of members who could possibly have a prior interest in the dispute (see paras. 461–465 *infra*) underline this goal of a completely unbiased body. Contracting States exercise a limited indirect influence on the composition of *ad hoc* committees due to the fact that appointments must be made from the Panel of Arbitrators. In accordance with Art. 13 most persons on the Panel of Arbitrators are designated by the Contracting States.[698] But under the second sentence of Art. 52(3) persons on the Panel of Arbitrators are disqualified from serving as members of an *ad hoc* committee if they have been designated by the State party to the dispute or the State of the investor's nationality (see paras. 461, 462 *infra*).  **457**

In view of the considerable importance of annulment for the entire ICSID arbitration process, consistency of decisions on applications for annulment is important. This is best achieved through a high degree of continuity in the composition of successive *ad hoc* committees.[699] The attempt to achieve some continuity is apparent from the following chronological list of members of *ad hoc* committees up to 1 January 2008:  **458**

### *Klöckner I*:
Date Registered: 16 February 1984

---

695  For example, *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 5; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 3.01; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 4.

696  See *Berranger de*, L'article 52 de la Convention, p. 99; *Gaillard*, Chronique (1987), p. 185; *Kahn*, Le contrôle des sentences arbitrales, p. 377; *Paulsson*, ICSID's Achievements, p. 392; *Reisman*, The Breakdown, p. 786.

697  See also *Giardina*, ICSID, pp. 204/5; *Lauterpacht, E.*, Aspects of the Administration of International Justice 78/9 (1991).

698  See also *Feldman*, The Annulment Proceedings, p. 97.

699  See *Caron*, Reputation and Reality, pp. 32, 48; *Golsong, H.*, Schwächung des Schiedsdispositifs bei Investitionsstreitigkeiten, *in*: Festschrift für Walter J. Habscheid 113, 117 (1989); *Niggemann*, Das Washingtoner Weltbankübereinkommen, pp. 103/4; *Paulsson*, ICSID's Achievements, p. 391; *Reisman*, The Breakdown, pp. 804/5; *Reisman*, Repairing ICSID's Control System, p. 211; *Seidl-Hohenveldern*, Die Aufhebung, pp. 115, 117.

Date of Constitution: 19 March 1984
*Composition*:
  President: Pierre LALIVE (Swiss)
  Members: Ahmed Sadek EL-KOSHERI (Egyptian)
           Ignaz SEIDL-HOHENVELDERN (Austrian)

### *Amco I*:
Date Registered: 18 March 1985
Date of Constitution: 22 April 1985
*Composition*:
  President: Ignaz SEIDL-HOHENVELDERN (Austrian)
  Members: Florentino P. FELICIANO (Philippine)
           Andrea GIARDINA (Italian)

### *MINE*:
Date Registered: 30 March 1988
Date of Constitution: 29 April 1988
*Composition*:
  President: Sompong SUCHARITKUL (Thai)
  Members: Aron BROCHES (Dutch)
           Kéba MBAYE (Senegalese)

### *Klöckner II*:
Date Registered: 1 July 1988
Date of Constitution: 8 July 1988
*Composition*:
  President: Sompong SUCHARITKUL (Thai)
  Members: Andrea GIARDINA (Italian)
           Kéba MBAYE (Senegalese)

### *Amco II*:
Dates Registered: 17 October 1990 and 20 February 1991
Date of Constitution: 30 January 1991
*Composition*:
  President: Sompong SUCHARITKUL (Thai)
  Members: Arghyrios A. FATOUROS (Greek)
           Dietrich SCHINDLER (Swiss)

### *SPP* **v.** *Egypt*:
Date Registered: 27 May 1992
Date of Constitution: 25 June 1992
*Composition*:
  President: Claude REYMOND (Swiss)
  Members: Arghyrios A. FATOUROS (Greek)
           Kéba MBAYE (Senegalese)

***Gruslin* v. *Malaysia***:
Date Registered: 19 December 2000
Date of Constitution: 26 January 2001
*Composition*:
  President: Thomas BUERGENTHAL (American)
  Members: Kamal HOSSAIN (Bangladeshi)
         Gabrielle KAUFMANN-KOHLER (Swiss)

***Wena Hotels* v. *Egypt***:
Date Registered: 14 January 2001
Date of Constitution: 6 March 2001
*Composition*:
  President: Konstantinos D. KERAMEUS (Greek)
  Members: Andreas BUCHER (Swiss)
         Francisco ORREGO VICUÑA (Chilean)

***Vivendi I* v. *Argentina***:
Date Registered: 23 March 2001
Date of Constitution: 18 May 2001
*Composition*:
  President: L. Yves FORTIER (Canadian)
  Members: James R. CRAWFORD (Australian)
         José Carlos FERNÁNDEZ ROZAS (Spanish)

***CDC* v. *Seychelles***:
Date Registered: 30 April 2004
Date of Constitution: 28 May 2004
*Composition*:
  President: Charles N. BROWER (American)
  Members: David A. R. WILLIAMS (New Zealander)
         Michael HWANG (Singaporean)

***RFCC* v. *Morocco***:
Date Registered: 30 April 2004
Date of Constitution: 8 June 2004
*Composition*:
  President: Bernard HANOTIAU (Belgian)
  Members: Arghyrios A. FATOUROS (Greek)
         Sir Franklin BERMAN (British)

***Mitchell* v. *DR Congo***:
Date Registered: 15 July 2004
Date of Constitution: 24 August 2004
*Composition*:
  President: Antonias C. DIMOLITSA (Greek)

Members: Robert S. M. DOSSOU (Beninese)
         Andrea GIARDINA (Italian)

### *Repsol* **v.** *Petroecuador*:
Date Registered: 15 July 2004
Date of Constitution: 14 September 2004
*Composition*:
  President: Judd L. KESSLER (American)
  Members: Piero BERNADINI (Italian)
           Gonzalo BIGGS (Chilean)

### *MTD* **v.** *Chile*:
Date Registered: 30 September 2004
Date of Constitution: 18 January 2005
*Composition*:
  President: Gilbert GUILLAUME (French)
  Members: James R. CRAWFORD (Australian)
           Sara ORDOÑEZ NORIEGA (Colombian)

### *Soufraki* **v.** *UAE*:
Date Registered: 12 November 2004
Date of Constitution: 18 January 2005
*Composition*:
  President: Florentino P. FELICIANO (Philippine)
  Members: Oman NABULSI (Jordanian)
           Brigitte STERN (French)

### *Joy Mining* **v.** *Egypt*:
Date Registered: 22 December 2004
Date of Constitution: 9 March 2005
*Composition*:
  President: Antonias C. DIMOLITSA (Greek)
  Members: Michael HWANG (Singaporean)
           José Luis SHAW (Uruguayan)

### *Lucchetti* **v.** *Peru*:
Date Registered: 1 July 2005
Date of Constitution: 17 November 2005
*Composition*:
  President: Hans DANELIUS (Swedish)
  Members: Andrea GIARDINA (Italian)
           Sir Franklin BERMAN (British)

### *CMS* **v.** *Argentina*:
Date Registered: 27 September 2005
Date of Constitution: 18 April 2006

*Composition*:
   President: Gilbert GUILLAUME (French)
   Members: Nabil ELARABY (Egyptian)
             James R. CRAWFORD (Australian)

*Azurix* **v.** *Argentina*:
Date Registered: 11 December 2006
Date of Constitution: 14 June 2007
*Composition*:
   President: Gavan GRIFFITH (Australian)
   Members: Bola AJIBOLA (Nigerian)
             Michael HWANG (Singaporean)

*Siemens* **v.** *Argentina*:
Date Registered: 16 July 2007
Date of Constitution: 4 October 2007
*Composition*:
   President: Gilbert GUILLAUME (French)
   Members: Florentino P. FELICIANO (Philippine)
             Mohammed SHAHABUDDEEN (Guyanese)

*Malaysian Salvors* **v.** *Malaysia*:
Date Registered: 17 September 2007
Date of Constitution: 30 October 2007
*Composition*:
   President: Stephen M. SCHWEBEL (American)
   Members: Mohammed SHAHABUDDEEN (Guyanese)
             Peter TOMKA (Slovak)

Continuity is particularly apparent in the fact that certain individuals appear to be relied upon to sit on *ad hoc* committees on several occasions. In the earlier cases, the same person served as President to the *MINE, Klöckner II* and *Amco II ad hoc* Committees. But other members also served on two or three different committees. In later cases, it appears to be exceptional for an *ad hoc* committee not to contain at least one member with previous experience of an annulment proceeding.

The possibilities for appointing the same persons to successive *ad hoc* commit-  **459** tees are limited by the exclusions contained in the second sentence of Art. 52(3). They disqualify candidates not only on the basis of previous involvement in the dispute, but also on the basis of a whole range of nationalities and of designation (see paras. 461–465 *infra*). Linguistic requirements and familiarity with the legal system or systems involved impose further limitations.[700]

---

700   See *Broches*, Observations, p. 372; *Giardina*, ICSID, pp. 204/5.

**460**     The idea of consistency through continuity has led to a discussion about a permanent review institution in the framework of ICSID.[701] The creation of such a permanent institution would require an amendment of the Convention. In view of the requirements for the amendment of the Convention (Arts. 65, 66) this is not a promising possibility.[702] In 2004, the ICSID Secretariat engaged in a consultation process with users of the ICSID system about the creation of a facility for appeals.[703] Following that consultation process the idea of an appeals facility has been dropped, at least for the time being.[704]

**L. "None of the members of the Committee shall have been a member of the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute."**

**461**     The exclusionary rules with respect to members of *ad hoc* committees were made progressively stricter in the course of the Convention's drafting. The Preliminary Draft only provided for the disqualification of persons who have served on the tribunal that has rendered the award, have served as conciliators in the dispute or have the nationality of either the host State or the same nationality as the investor (History, Vol. I, p. 236; Vol. II, p. 340). The First Draft added persons who have been designated by the host State or the investor's State of nationality to the Panel of Arbitrators (Vol. I, p. 236). A United Kingdom proposal suggested the ineligibility of persons of the same nationality as any member of the tribunal since nullity proceedings were designed only for very extreme cases of serious misconduct (Vol. II, pp. 668, 854). This amendment was adopted by a large majority (at p. 855) and was incorporated into the Revised Draft (History, Vol. I, p. 236) and into the Convention.

**462**     These exclusionary rules are considerably stricter than those for arbitral tribunals as provided by Arts. 38 and 39. Persons of the nationality or co-nationality

---

701  See *Berranger de*, L'article 52 de la Convention, p. 99; *Broches*, Observations, pp. 371/2; *Gaillard*, Chronique (1987), pp. 190/1; *Golsong*, Schwächung, pp. 116/7; *Kahn*, Le contrôle des sentences arbitrales, pp. 369/70; *Redfern*, ICSID, p. 102; *Reisman*, The Supervisory Jurisdiction, p. 35; *Salomon, C./Knox, K.*, Options for Change in the Annulment Process 2(1) Global Arbitration Review 35 (2007); *Tams, C. J.*, An Appealing Option? The Debate about an ICSID Appellate Structure, *in*: Essays in Transnational Economic Law 43 (No. 57/June 2006); *Sauvant, K. P./Chiswick-Patterson, M.* (eds.), Appeals Mechanism in International Investment Disputes (2008); *Qureshi, A. H.*, An Appellate System in International Investment Arbitration, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1154 (2008).
702  For a discussion on the Appellate Body of the WTO and its creation of a case law, see *Jackson, J. H.*, Dispute Settlement and the WTO, 1 Journal of International Economic Law 329 (1998).
703  Possible Improvements of the Framework for ICSID Arbitration (Discussion Paper of the ICSID Secretariat, 22 October 2004), p. 14.
704  Suggested Changes to the ICSID Rules and Regulations (Working Paper of the ICSID Secretariat, 12 May 2005), p. 4.

of one of the parties are eligible as arbitrators under certain circumstances (see Art. 39, paras. 12–26). But their membership in an *ad hoc* committee is forbidden to safeguard maximum objectivity. The disqualification of persons who have been designated to the Panel of Arbitrators by the host State or the investor's State of nationality was discussed but not adopted for arbitral tribunals (History, Vol. II, p. 513). Their disqualification from an *ad hoc* committee is also prompted by the desire to avoid any appearance of lack of objectivity.

The exclusion from an *ad hoc* committee of persons who have acted as arbi-    **463** trators or conciliators in the same dispute is clearly appropriate and requires no further explanation. The disqualification of co-nationals of arbitrators whose award is under scrutiny is based on the conception that annulment of an award implies a severe censure of the arbitral tribunal and that the small group of individuals from one country who qualify as arbitrators and members of *ad hoc* committees will be linked by close professional affinity so as to impair dispassionate judgment.

The disqualifications based on nationality may give rise to difficulties. The    **464** nationality of investors will be clarified in the original proceedings since it is an important element of jurisdiction. But in the case of corporate investors complications in the determination of the nationality or nationalities may persist even in annulment proceedings (see Art. 25, paras. 896–902). In case of multiple nationalities of arbitrators and of members of *ad hoc* committees, incompatibilities with regard to non-dominant nationalities may arise. Therefore, it is advisable to clarify all nationalities of the persons concerned (see also para. 122 *supra*).

Curiously, Art. 52(3) does not mention other possible conflicts of interest. In    **465** particular, there is no reference to the representation of a party in an earlier stage of the dispute or a business relationship to a party by a person who may be appointed to an *ad hoc* committee. But neither is there an explicit exclusion of such a person from appointment as arbitrator. Nevertheless, it is obvious that any form of relationship to a party that may impair the objectivity of a member of an *ad hoc* committee or creates the impression of such a possibility is an absolute bar to appointment. The point may be regarded as covered by Arbitration Rule 6 under which an arbitrator must sign a declaration to the effect that there is no reason why (s)he should not serve on the tribunal. In addition, the arbitrator must give a statement of past and present professional, business and other relationships (if any) with the parties (see para. 275 *supra*). Arbitration Rule 53 makes this provision applicable also to annulment proceedings.

## M.  "The Committee shall have the authority to annul . . ."

### 1. Obligation or Discretion to Annul

Even if an *ad hoc* committee finds that there is a ground for annulment as listed    **466** in Art. 52(1) it is not under an obligation to annul. It retains some discretion not to annul in appropriate cases depending on the importance of the issue. The Convention's text itself indicates that an *ad hoc* committee is not under an obligation

to annul but is merely authorized to do so. However, the drafting history of Art. 52(3) is silent on the matter. Early *ad hoc* committees gave conflicting answers to this question, but this confusion has been resolved in more recent cases.

**467**     The *Klöckner I ad hoc* Committee adopted a strictly formalistic approach. It raised the question whether the principle "no annulment without grievance" should be applied[705] but ultimately answered it in the negative. It rejected the idea that it might reconstruct the Tribunal's reasoning by determining what rules of French law had been applied[706] (see para. 235 *supra*) or by filling gaps in the Tribunal's reasoning. It saw its task in the defence of the Convention's legal purity.[707] The Award's material correctness seemed secondary since the *ad hoc* Committee did not have the power to find that it would have reached the same result on other grounds.[708]

**468**     At the end of its decision, the *Klöckner I ad hoc* Committee specifically rejected the idea that it had discretion in the face of a ground for annulment. It found that, save under exceptional circumstances, annulment would have to be automatic:

> Considered as a whole, it seems that Article 52 of the Washington Convention can be interpreted in two ways, at least if taken literally:
> (a) First, as triggering inevitable and "automatic" annulment on a finding that there is one of the grounds for annulment under Article 52(1), the committee lacking discretion and having no power to abstain from annulling an award tainted on one or other of the grounds listed in paragraph 1;
> (b) Second, as containing a sort of space or "no man's land" between the finding under Article 52(1) that there is a ground for annulment and the declaration of annulment under Articles 52(3) and 52(6). This would give the Committee a certain margin of appreciation. It could, for example, have the power to abstain from annulling if it believes that the ground for annulment either did not harm the Applicant (*cf.* the adage well-known in some legal systems, "no annulment without grievance") or did not substantially affect the arbitral award taken as a whole, which perhaps amounts to the same thing. In such a case even a purely partial annulment could seem excessive and contrary to the spirit of the Convention. Finally, the Committee could abstain from annulling because the Claimant abused its rights in invoking the said ground.
>     Save under exceptional circumstances, which in any case are not present here, the Committee is inclined to consider that the finding that there is one of the grounds for annulment in Article 52(1) must in principle lead to total or partial annulment of the award, without the Committee having any discretion, the parties to the Washington Convention and the parties to an arbitration under the ICSID system having an absolute right to compliance with the Convention's provisions, and in particular with the provisions of Article 52.[709]

**469**     The *Amco I ad hoc* Committee did not enter into a theoretical discussion of the issue but seems to have embraced a more flexible approach. It refused to annul

---

705  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 116.
706  *Ibid.*, para. 73.                    707  *Ibid.*, para. 151.
708  *Ibid.*, para. 179.                   709  *Loc. cit.*

where the Tribunal had reached the correct result though on the basis of the wrong legal system.[710] It supplied missing reasons for a substantively correct decision[711] and it declared certain incriminated passages in the Award as *obiter dicta*.[712] In the context of the shortfall of Amco's required investment (see paras. 227–230 *supra*), it emphasized the materiality of the Tribunal's incorrect calculation which arose from the non-application of a rule of Indonesian law.[713]

The *ad hoc* Committee in *Amco II* emphatically departed from the approach taken in *Klöckner I*. It stated that:                                        **470**

> 1.20 The authority provided by Article 52(3) to enable an Ad Hoc Committee to annul the Award or any part thereof does not imply its automatic exercise whenever and wherever one of the Parties has established one of the grounds for annulment. An Ad Hoc Committee retains a measure of discretion in its ruling on applications for annulment. This is clearly implied in the Convention through the use of terms such as "manifest", "serious" and "fundamental". This discretion is not unlimited and should not be exercised to the point of defeating the object and purpose of the remedy of annulment. The Ad Hoc Committee may refuse to exercise its authority to annul an Award if and when annulment is clearly not needed to remedy procedural injustice and annulment would unwarrantably erode the binding force and finality of ICSID Awards.[714]

In *MINE*, the *ad hoc* Committee unequivocally embraced the notion of a discretionary function that had to be exercised in the service of material justice:  **471**

> 4.09 Article 52(3) provides that an *ad hoc* Committee "shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1)". The Convention does not require automatic exercise of that authority to annul an award whenever a timely application for its annulment has been made and the applicant has established one of the grounds for annulment. Nor does the Committee consider that the language of Article 52(3) implies such automatic exercise.
>
> 4.10 An *ad hoc* Committee retains a measure of discretion in ruling on applications for annulment. To be sure, its discretion is not unlimited and should not be exercised to the point of defeating the object and purpose of the remedy of annulment. It may, however, refuse to exercise its authority to annul an award where annulment is clearly not required to remedy procedural injustice and annulment would unjustifiably erode the binding force and finality of ICSID awards.[715]

The *MINE ad hoc* Committee refused to annul the Award on the technical ground  **472** that the Tribunal had erroneously referred to French rather than the applicable Guinean law on a particular point seeing that the relevant provisions in the two legal systems were identical[716] (see para. 242 *supra*). Its material rather than formal approach is also expressed in the introduction to its findings on damages

---

710   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 57–60, 75–79.
711   *Ibid.*, paras. 63–64.                          712   *Ibid.*, paras. 104, 114, 120.
713   *Ibid.*, paras. 99–101.
714   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 1.20.
715   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 4.09/4.10.
716   *Ibid.*, para. 6.40.

where it states that several of the grounds for annulment advanced by Guinea appeared "singly to justify, and collectively to compel, annulment of that portion" of the Award.[717]

**473**    The *ad hoc* Committee in *Wena Hotels* v. *Egypt* confirmed that the remedy for a violation of the obligation to state reasons in Art. 52(1)(e) "need not be the annulment of the award".[718] *Ad hoc* committees may reconstruct or explain these reasons.

**474**    The *Vivendi I ad hoc* Committee summarized this trend in the cases, agreeing that

> . . . an *ad hoc* committee has a certain measure of discretion as to whether to annul an award, even if an annullable error is found. Article 52(3) provides that a committee "shall have the authority to annul the award or any part thereof", and this has been interpreted as giving committees some flexibility in determining whether annulment is appropriate in the circumstances. Among other things, it is necessary for an *ad hoc* committee to consider the significance of the error relative to the legal rights of the parties.[719]

**475**    The *ad hoc* Committee in *CDC* v. *Seychelles* also emphasized its discretion:

> 37. Keeping the object and purpose of the Convention as well as these underlying policy considerations in mind, we note that the *ad hoc* Committees operating during the last two decades have considered that a Committee has discretion to determine not to annul an Award even where a ground for annulment under Article 52(1) is found to exist.[720]

**476**    In *Mitchell* v. *DR Congo*, the *ad hoc* Committee emphasized that annulment required that the error in question made a material difference to the outcome of the case. It said:

> An *ad hoc* Committee ought not to sanction an error of interpretation of the Treaty – as awkward as it may be – when, even in the absence of such error, the result would have been the same.[721]

**477**    The *Soufraki ad hoc* Committee endorsed that view, confirming that *ad hoc* committees need not annul if they

> . . . can make clear – without adding new elements previously absent – that apparent obscurities are, in fact, not real, that inadequate statements have no consequence on the solution, or that succinct reasoning does not actually overlook pertinent facts.[722]

**478**    Commentators have overwhelmingly endorsed the view expressed in cases such as *Amco II*, *MINE*, *Wena*, *Vivendi I*, *CDC* and *Soufraki* that an *ad hoc*

---

717   *Ibid.*, para. 6.98.
718   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 83.
719   *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 66. Footnote omitted. The Committee cited the First Edition of this Commentary.
720   *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 37. See also para. 65.
721   *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 45. See also paras. 57, 59.
722   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 24.

committee should apply discretion in exercising its authority to annul.[723] *Reisman*, in particular, has compared the "hair-trigger" or "automatic technical discrepancy standard" of *Klöckner I*, which ignores the magnitude and practical relevance of a defect, with the "material violation" approach of *MINE*.[724] Under the latter approach, an *ad hoc* committee proceeds in two steps. It first examines the award in order to establish whether there are any grounds for annulment. If it finds a ground it will then examine whether this ground has led to practical consequences for the parties. Annulment will only take place if there is a positive answer to both questions.[725]

Some commentators have expressed doubt whether the grounds described in **479** Art. 52(1) leave much latitude to an *ad hoc* committee not to annul once their presence has been established. In particular, the requirement of manifestness attached to ground (b) (paras. 134–154 *supra*) and the adjectives serious and fundamental in connection with ground (d) (paras. 280–292 *supra*) would leave little in the way of a margin of appreciation.[726] But it would appear that technical violations without practical effect to the parties are possible in connection with all five grounds. This may be demonstrated with the help of the following examples.

52(1)(a): Arbitration Rule 6 provides that each arbitrator shall sign a declaration. **480** An arbitrator who has failed to sign the declaration by the end of the tribunal's first session shall be deemed to have resigned. If an arbitrator signs the declaration after the end of the first session and continues to serve on the tribunal, the tribunal will not be properly constituted. But it is hardly reasonable to suggest that a minor delay in signing the declaration under Arbitration Rule 6 would warrant the annulment of the award.

52(1)(b): failure to apply the proper law may constitute a manifest excess of **481** powers (see paras. 192–270 *supra*). But a correct decision may be based on the application of the wrong law. The *Amco I* and *MINE ad hoc* Committees did not apply the technical discrepancy standard in situations of this kind and refused annulment on this ground by applying a material violation approach (see paras. 239–242, 469, 472 *supra*).

52(1)(c): a party-appointed arbitrator who acts under the influence of a prospect **482** of employment by or profitable contract with the party appointing him would be under grave suspicion of corruption. But if it can be demonstrated that the views of that arbitrator were rejected by the tribunal's majority and are not reflected in the award, it is doubtful whether annulment of the award would be warranted.

---

723  *Broches*, Observations, pp. 356 *et seq*., 369/70, 378; *Caron*, Reputation and Reality, pp. 45/6; *Giardina*, ICSID, pp. 207 *et seq*.; *Rambaud*, L'annulation, p. 267. But see *Gaillard*, Chronique (1987), p. 186.

724  *Reisman*, The Breakdown, pp. 762 *et seq*., 776 *et seq*., 780; *Reisman*, Systems of Control, p. 81; *Reisman*, Repairing ICSID's Control System, pp. 200, 204.

725  *Seidl-Hohenveldern*, Die Aufhebung, pp. 112 *et seq*.

726  See *Niggemann*, Die dritte Annullierung, p. 83, and the response by *Broches*, Die dritte Annullierung, p. 298; *Sturzenegger*, ICSID, pp. 184 *et seq*.

483    52(1)(d): if a tribunal were to decide on a motion by one party without hearing the other party, it would commit a serious departure from a fundamental rule of procedure (see paras. 305–317 *supra*). But if the tribunal rejects the motion and decides fully in the interest of the party that was not heard, it is difficult to argue that this technical mistake would warrant annulment.

484    52(1)(e): failure to state reasons is an inherently imprecise concept (see paras. 338–434 *supra*). Shortcomings or gaps in the reasoning will not automatically lead to annulment (see paras. 363–388 *supra*). *Ad hoc* Committees have undertaken to reconstruct certain gaps in the reasoning thereby avoiding annulment on these points. The *CDC* v. *Seychelles ad hoc* Committee expressed the view that even if there was a lack of stated reasons for the Tribunal's decision on costs, reasons could be inferred and annulment was not warranted.[727]

485    The above examples suffice to demonstrate the superiority of the material violation approach over the automatic technical discrepancy standard. The complexity of arbitral proceedings and of the process leading to an award make it quite likely that there will be some technical defect that may be brought under one of the grounds listed in Art. 52(1). It would undermine the usefulness of the arbitral process and, in particular, the principle of finality if annulment were available upon the presence of any technical flaw no matter how inconsequential it is for the outcome of the case. Therefore, annulment should be contingent not only upon the presence of one of the defects listed in Art. 52(1) but also upon its material impact on one or both parties.

### 2. Annulment and Confirmation

486    Under the Convention's wording, an *ad hoc* committee's only alternative is to annul or not. There is no express authority to confirm an award. During the Convention's drafting there was a suggestion to add the words "or otherwise" after the words dealing with the authority to annul (History, Vol. II, pp. 851, 854, 855). But it was not adopted.

487    If an *ad hoc* committee refuses to annul an award or part thereof it will, by implication, confirm the award or its relevant part. Positive or negative language used in this context is primarily a matter of style.[728] The *ad hoc* committee may specifically confirm the award or part thereof or simply reject the request for annulment.[729] If the *ad hoc* committee does not deal with a particular aspect of the request, it may be in violation of Art. 48(3) (see para. 566 *infra*) but the award will be confirmed by implication. Criticism of the part of the award not annulled may be noted for posterity, but can have no impact on the award itself.

488    In *Amco I*, the *ad hoc* Committee stated that its annulment did not extend to the Tribunal's finding that the action of the army and police personnel in taking over

---

727    *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 87.
728    But see *Reisman*, The Breakdown, pp. 792 *et seq*.
729    See also *Lamm, C. B.*, Jurisdiction of the International Centre for Settlement of Investment Disputes, 6 ICSID Review – FILJ 462, 477/8 (1991).

the hotel was illegal nor to the finding that Amco was entitled to damages from Indonesia.[730]

In *MINE*, the Committee stated that the portion of the award for which annulment had not been requested remained in effect as *res judicata*. It rejected the request for annulment of one portion of the Award and granted the request for annulment of another portion.[731]    **489**

In *CMS* v. *Argentina*, Argentina stressed the importance of the issues raised in that case to the large number of other claims against it then pending before ICSID. It insisted that "the extraordinary implications of the Tribunal's decision mandate close scrutiny of its reasoning by the Annulment Committee".[732] The *ad hoc* Committee appeared to bow to that request, and criticized the Tribunal's analysis of Argentina's defences of necessity, although it found there to have been no annullable error in the Tribunal's treatment of the subject.[733]    **490**

Notwithstanding the approach in *CMS* v. *Argentina*, the *ad hoc* committee's function is purely that of a court of cassation. It can annul but it cannot replace an annulled award or an annulled part of an award with its own decision on the merits: it can extinguish a *res judicata* but it cannot create a new one.[734] The result can only be "the invalidation of the original decision, not its correction".[735] Nor can it interpret an unannulled award authoritatively.[736] If it decides to annul, it is for the new tribunal established under Art. 52(6) to decide the merits of any issue on which the first tribunal's award has been annulled, although it may be expected to have regard to the reasoning of the *ad hoc* committee.[737] The *ad hoc* committee does not accept or reject the parties' claims on the merits. It may only send them back to a new tribunal.    **491**

Nor is the new tribunal bound by the reasoning of the *ad hoc* committee (see paras. 683–688 *infra*). If the *ad hoc* committee annuls the award for manifest excess of powers since the tribunal lacked competence, the second tribunal may still find in favour of jurisdiction. If the *ad hoc* committee annuls because it believes the tribunal erred in upholding the claim and failed to state adequate reasons for doing so, the second tribunal may still uphold the claim. The *ad hoc* Committee in *Klöckner I* seems to have misconceived its role when, after having annulled the entire award, it gave "additional indications" that may be of interest to the parties and to the new tribunal to be constituted under Art. 52(6) (see para. 525 *infra*).[738] The *ad hoc* committee is not a higher authority that sets standards    **492**

---

730  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 108, and Part X.
731  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 8.01.
732  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 43.
733  *Ibid.*, paras. 45, 127, 136.
734  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 54.
735  *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 24.
736  See also *Reisman*, The Breakdown, p. 795.
737  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 7.10–7.17.
738  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 82.

or makes policy. Its function is purely to clear the way for a fresh decision by a new tribunal.

### N.  "...the award or any part thereof..."

#### 1. Annulment of Awards

**493**     Only awards are subject to annulment. Pre-award decisions are not subject to separate annulment. Therefore, preliminary decisions on jurisdiction and decisions on provisional measures cannot be annulled unless and until they are incorporated into the award (see paras. 61–68 *supra*). Awards recording a settlement in accordance with Arbitration Rule 43(2) are subject to annulment, in principle, although the applicability of the grounds for annulment listed in Art. 52(1) will be severely limited (see paras. 74–76 *supra*). Decisions supplementing or rectifying awards in accordance with Art. 49(2) are subject to annulment (see paras. 77, 78 *supra*). The supplemental Award in *Amco II* was annulled.[739] Annulment is not possible in relation to a decision interpreting or revising an award in accordance with Arts. 50 and 51. Nor can a decision of an *ad hoc* committee be annulled by another *ad hoc* committee (see paras. 79, 80 *supra*). But an award of a new tribunal in a resubmitted case in accordance with Art. 52(6) may be annulled (see paras. 81, 82 *supra*).

#### 2. Partial Annulment

#### a) Conditions for Partial Annulment

**494**     The wording of the Convention leaves no doubt that partial annulment of an award is a possibility. All drafts leading to the Convention contained the words "or any part thereof" in connection with the annulment of awards. During the Convention's drafting the possibility of partial annulment was not cast into doubt. But there was some discussion as to whether a party should be allowed to request annulment of only part of an award (History, Vol. II, pp. 850, 851, 852). The rejection of this idea (see para. 69 *supra*) has led to the somewhat paradoxical situation that under para. 1 of Art. 52 a party may only request annulment "of the award", whereas under para. 3 of Art. 52 the *ad hoc* committee may annul "the award or any part thereof".[740] It is not inconceivable that a party may only request complete annulment but an *ad hoc* committee has discretion to decide on partial annulment. But logic as well as practice suggest that it is open to a requesting party to ask for full or partial annulment (see paras. 70, 71 *supra*).

**495**     In *Klöckner I*, the request for annulment came from Klöckner and related to the entire Award. The *ad hoc* Committee addressed the question of partial annulment in the following terms:

---

[739]  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 9.08–9.10.

[740]  See also *Broches*, Observations, p. 333; *Caron*, Reputation and Reality, pp. 36/7; *Reisman*, The Breakdown, pp. 801/2.

80. The finding that there is a ground for annulment of the Award under Article 52 of the Washington Convention immediately raises the question of the *consequences* of that finding. According to Article 52(3) *in fine*, the "Committee shall have the authority to annul the award *or any part thereof* on any of the grounds set forth in paragraph (1)".

In concrete terms, the question is whether, applying the principle of *favor validitatis* or "partial annulment of legal acts", *only a part* of the contested award should be annulled, or whether it should be annulled in its *entirety*.

Generally speaking, partial annulment would seem appropriate if the part of the Award affected by the excess of powers is identifiable and detachable from the rest, and if so, the remaining part of the Award has an independent basis.[741]

The *ad hoc* Committee did not find that these requirements were met in the instant case. The defects leading to annulment affected the entire Award and extended to the part that related to the counter-claim. It did not seem possible to the *ad hoc* Committee to dissociate matters relating solely to certain aspects of the case and to decide on only a partial annulment.[742]

In *Amco I*, annulment of the entire Award was requested by Indonesia. The *ad hoc* Committee's finding concerning the partial annulment of the Award appears somewhat contradictory. The Committee first set out certain parts of the Award that it found it must annul.[743] After having singled out portions of the Award for annulment, it then declared that it annulled the Award as a whole subject to qualifications.[744] It found that the annulment did not extend to the Tribunal's finding as to the illegality of the action by the army and police personnel nor to the finding that Amco was entitled to damages from Indonesia.[745] But the annulment did extend to the Tribunal's finding on the duration of this illegality and to the amount of the damages due as a consequence.[746]                                        **496**

An annulment that purports to extend to the Award as a whole but then preserves certain parts is not very logical. But there is a more fundamental question: is it possible to annul an award's *dispositif* entirely but to leave certain parts of the reasons unaffected? May parts of the reasons become *res judicata* and binding on the new tribunal in the resubmitted case (see paras. 674–682 *infra*) without an attendant *dispositif*? Some commentators have criticized this form of partial annulment.[747]                                                                             **497**

The new Tribunal in *Amco II* saw no problem in a partial annulment relating to certain findings of fact and law but leaving intact other findings. It went through a detailed analysis of the *ad hoc* Committee's Decision identifying certain points on     **498**

---

741  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 80. Italics original.
742  *Ibid.*, paras. 80–81.
743  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 103, 105/6, 109/10, 116/7.
744  *Ibid.*, Part X.                                    745  *Ibid.*, para. 108.
746  *Ibid.*, Part X.
747  *Berranger de*, L'article 52 de la Convention, p. 101; *Gaillard*, Chronique (1987), p. 186. It should be noted that the word "finding" as used by the *Amco I ad hoc* Committee at pp. 538 and 542 is rendered as "motifs" in the French translation, 114 Journal du Droit International 184 (1987). "Motifs" corresponds with "reasons" in the Convention's text in Arts. 48(3) and 52(1)(e).

which the first Award had been annulled and others on which there had not been an annulment. The findings in the Award that had not been annulled remained *res judicata* for purposes of the proceedings:[748]

> This Tribunal fully accepts each and every determination by the *ad hoc* Committee that a finding of the first Tribunal is or is not nullified. All of these matters are *res judicata*, and this Tribunal thereby gives full effect to the Decision of the *ad hoc* Committee.[749]

**499**   The new Tribunal, in analysing the exact reach of the Decision on Annulment, identified certain principles to determine which parts of the Award had been annulled and which parts were *res judicata*. These principles are:

- Matters sought by a party to be annulled, but expressly not annulled or expressly confirmed by the *ad hoc* Committee, are *res judicata*.[750]
- Matters decided by the Tribunal that have not been put forward for annulment remain binding as *res judicata*.[751]
- Matters expressly annulled can be relitigated before the new Tribunal.[752]
- The *ad hoc* Committee's reasoning does not bind the new Tribunal. Annulled portions of the Award must be decided afresh in the resubmitted case.[753]

**500**   In the second annulment proceedings, Indonesia sought annulment of the second Award as a whole. Amco sought only partial annulment of the second Tribunal's findings on damages. The *ad hoc* Committee accepted that Amco was entitled to seek only partial annulment, although the extent of annulment was ultimately a matter for the Committee's own discretion.[754]

**501**   In *MINE*, Guinea requested partial annulment of the Award. Guinea did not seek annulment of the part of the Award relating to its counter-claims. The *ad hoc* Committee found the request for partial annulment clearly admissible and determined that since neither party had requested annulment of the part of the Award relating to the counter-claim, that portion would remain in effect[755] (see para. 71 *supra*). The Committee also noted that it may annul an award (or any part thereof) only pursuant to a request by a party and only within the scope of that request unless by necessary implication annulment entails the annulment of other portions.[756]

**502**   This decision would suggest that an *ad hoc* committee is limited by the parameters of the request for partial annulment.[757] This would mean that an *ad hoc* committee may not annul portions of the award for which no annulment has been

---

748   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 546/7. See also at 549/50.
749   At p. 552.                                    750   At pp. 553 *et seq.*
751   At pp. 556 *et seq.*                          752   At p. 558.
753   At pp. 548 *et seq.*, 558 *et seq.*
754   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 1.20.
755   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.07.
756   *Ibid.*, para. 4.08.
757   But see *Caron*, Reputation and Reality, pp. 36/7.

sought by either party. Neither may the *ad hoc* committee annul on grounds that have not been put forward by a requesting party (see paras. 531–538 *infra*).

The *ad hoc* Committee in *Vivendi I* confirmed that partial annulment is an option for *ad hoc* committees:                                                          **503**

> Certain grounds of annulment will affect the award as a whole – for example, where it is demonstrated that the tribunal which rendered the award was not properly constituted (Article 52(1)(a)). Others may only affect part of the award. An *ad hoc* committee is expressly authorized by the Convention to annul an award "in whole or in part" (Article 52(3)).[758]

In doing so, the *Vivendi I ad hoc* Committee implicitly accepted that parties may apply for annulment of just part of an award.[759] But the *ad hoc* Committee also held that it was not bound by the applicant's request as to the complete or partial annulment of the award:

> . . . it is for the *ad hoc* committee, and not the requesting party, to determine the extent of the annulment. In making this determination, the committee is not bound by the applicant's characterisation of its request, whether in the original application or otherwise, as requiring either complete or partial annulment of the award.[760]

In *CMS* v. *Argentina*, the *ad hoc* Committee annulled the Tribunal's finding of liability under the "umbrella clause". It did not follow that the whole Award was affected. The *ad hoc* Committee adopted the view in *Vivendi I* that "severable parts of an award which are not themselves annulled will stand", as contemplated in Art. 52(3).[761] The award of damages had been based on independent findings of violations of the fair and equitable treatment standard and the "umbrella clause". Annulment of the latter did not affect the former nor the order to pay damages.[762]    **504**

### b) Interrelated Parts of Awards

The annulment of certain portions of the award may affect other parts of the award. The interrelated nature of parts of awards means that nullification of one part may automatically entail the nullification of other parts leading to a type of "domino effect".[763] This may be the case if an annulled part of an award is a logical premise for another part or because, as a consequence of the annulment of one part, another part becomes devoid of practical significance.    **505**

In *Amco I*, the Tribunal had calculated the total investment made by Amco at US $2,472,490. The Tribunal found that the shortfall in relation to the sum of US $3,000,000, which Amco had promised to make, was not material enough to justify the revocation of the investment licence.[764] The *ad hoc* Committee    **506**

---

758    *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 68.
759    *Ibid.*, paras. 68/9.                      760    *Ibid.*, para. 69.
761    *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 99.
762    *Ibid.*, paras. 100, 149, 154, 163.        763    *Reisman*, The Breakdown, p. 793.
764    *Amco* v. *Indonesia*, Award, 20 November 1984, paras. 240/1.

annulled the calculation of the investment made by Amco for failure to apply the proper law (see paras. 227–230 *supra*). It followed that the Tribunal's ruling on the non-materiality of the shortfall of Amco's investment also had to fall.[765] Therefore, the revocation order relating to the licence had to be regarded as a reasonable and proportional, and hence a lawful, response.[766] Since the withdrawal of the investment licence could not be considered unjustified, the resulting effects, including the inability to manage the hotel, could not be considered unjustified either.[767] This, in turn, affected the period for which damages were due and hence the overall calculation of damages. Therefore, the Tribunal's finding on the amount of damages was annulled as a whole.[768] This conclusion rendered academic a number of other claims concerning the Award's nullity adduced by Indonesia.[769] In addition, since the *ad hoc* Committee had annulled the findings of the Award that the revocation of the licence was unlawful, the part of the Award dismissing the counter-claim for recovery of the tax and import facilities had to be annulled as well since there was an inseparable link between the conclusions on the licence revocation and on the counter-claim.[770]

**507**    In *MINE*, the *ad hoc* Committee spoke of the possibility that "by necessary implication annulment entails the annulment of other portions".[771] It applied this principle to the award of costs:

> 6.112 The award of costs can nevertheless not remain in existence since its basis, viz., that Guinea was the losing party, had disappeared as a result of the annulment of the portion of the Award relating to damages. The award of costs cannot survive the annulment of that portion of the Award with which it is inextricably linked. The Committee therefore finds that the award of costs must be annulled in consequence of the annulment of the damages portion of the Award.[772]

**508**    In *Vivendi I*, the Claimant applied for the partial annulment of the Award. The Award had made an affirmative decision on jurisdiction concerning the BIT claims but had declined to address essential portions of the merits seeing that the claims before it were closely linked to contract claims for which domestic courts had been made competent.[773] Vivendi applied for the annulment of the portion of the Award that declined to address the merits. Argentina, while resisting this application, argued, in the alternative, that if the *ad hoc* Committee were to accept Vivendi's argument it should annul the Award in its entirety. The *ad hoc* Committee found that it was open to Argentina to argue that if Vivendi's arguments were to be upheld the effect must be to bring down the whole Award.[774] The *ad hoc* Committee

---

765  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 103.
766  *Loc. cit.*                              767  *Ibid.*, para. 107.
768  *Ibid.*, para. 110.                       769  *Ibid.*, para. 111.
770  *Ibid.*, para. 116.
771  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.08.
772  *Ibid.*, para. 6.112.
773  *Vivendi* v. *Argentina*, Award, 21 November 2000.
774  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 67–70.

found that the Tribunal had rightly held that it had jurisdiction over the claims but had manifestly exceeded its powers by not examining some of the merits of the claims. Accordingly it partially annulled the Award.[775]

In these instances, the *ad hoc* Committees themselves traced the "domino effect" **509** of certain findings of nullity to other parts of the Awards. But this need not be the case. The conclusion that part of an award is nullified by necessary implication as a consequence of the annulment of another part may be left to the parties or to the new tribunal in the resubmitted case in accordance with Art. 52(6).

The possibility of a partial annulment has a certain stabilizing effect on the **510** system of ICSID arbitration. The dispositive effect of an award is not destroyed entirely through annulment but narrowed to the unannulled portion of the award. In proceedings before a new tribunal under Art. 52(6) the dispute to be decided is restricted to the annulled portion of the award (see paras. 674–682 *infra*). The incentive for a dissatisfied party to seek the annulment of an unfavourable decision through successive requests is reduced as the issues which are not yet *res judicata* become more limited.[776] As a consequence, the likelihood of an annulment of an award in a resubmitted case diminishes as the scope of the dispute narrows.[777]

## O. "... on any of the grounds set forth in paragraph (1)."

### 1. Exhaustive Nature of Grounds

Annulment is restricted to the five grounds listed in Art. 52(1). The *ad hoc* **511** committee may not annul on other grounds. A request for annulment must specify which of these grounds is (or are) invoked.[778] Parties to annulment proceedings have invariably presented their grievances in terms of these grounds (see paras. 108–110 *supra*).

*Ad hoc* committees have been flexible in bringing perceived flaws in awards **512** under one or more of the headings listed in Art. 52(1). For instance, Art. 42(1) contains rules on the law to be applied by the tribunal. But failure to apply the proper law is not listed among the grounds for annulment in Art. 52(1) (see also paras. 192–193 *supra*). But *ad hoc* committees have concluded that failure to apply the proper law will constitute a manifest excess of powers in the sense of Art. 52(1)(b) (see paras. 196–207 *supra*).

In a similar way, Art. 48(3) directs the tribunal to deal with every question **513** submitted to it and to state the reasons upon which the award is based. Art. 52(1)(e) lists failure to state reasons among the grounds for annulment but it does not include failure to deal with every question (see paras. 399, 400 *supra*). But *ad hoc* committees have concluded that failure to deal with every question submitted

---

775  *Ibid.*, para. 119.
776  See also *Reisman*, The Breakdown, p. 786.
777  In *Amco II*, the second annulment proceedings relating to the Award in the Resubmitted Case of 5 June 1990 led to the rejection of the requests for annulment in a Decision of 3 December 1992. In *MINE*, the case was settled by agreement and discontinued after the first annulment.
778  Arbitration Rule 50(1)(c)(iii).

to the tribunal may amount to a failure to state reasons in the sense of Art. 52(1)(e) (see paras. 405–412 *supra*) or to a manifest excess of powers in the sense of Art. 52(1)(b) or to a serious departure from a fundamental rule of procedure in the sense of Art. 52(1)(d) (see paras. 413–417 *supra*).

**514**    The *Klöckner I ad hoc* Committee, in particular, adopted an expansive reading of the grounds listed in Art. 52(1). It suggested that Art. 52 had to be interpreted "in the context" of other provisions of the Convention, that it was impossible that "the Convention's authors would have forgotten the existence of Articles 42 or 48(3)" when drafting Art. 52 and that "it is impossible to assume that the authors of provisions like Articles 42(1) or 48(3) would have neglected to consider the sanction for non-compliance"[779] (see para. 197 *supra*). *Reisman* has warned that this kind of reasoning may lead to the untenable conclusion that the rest of the Convention was intended to be incorporated into Art. 52.[780]

**515**    It would clearly be incorrect to see the grounds listed in Art. 52(1) as authorizing the sanction of annulment for any departure from the Convention. Such an interpretation would make nonsense of a carefully drafted list of grounds. To achieve that result it would have been much simpler to provide for annulment for "any serious departure from this Convention". Therefore, the existence of one of the grounds as listed in Art. 52(1) must be established specifically in every case. On the other hand, it must be admitted that the grounds are relatively broad and not always very precise. In a particular instance, a ground for annulment is quite likely also to constitute a violation of the Convention and of the Arbitration Rules. But no *e contrario* argument may be drawn from this fact. Violations of the Convention, of the Arbitration Rules or of the substantive law to be applied to the case do not automatically amount to grounds for annulment. The existence of one of the grounds set forth in Art. 52(1) must be established independently by the *ad hoc* committee in every particular instance.

### 2. Distinct or Interchangeable Nature of Grounds

**516**    A superficial reading of the grounds listed in Art. 52(1) would indicate that they deal with entirely different types of situations. A closer examination in the context of the practice to Art. 52 shows that it is often not possible to deal with them separately. The cases show that three out of the five grounds listed in Art. 52(1) are invoked in virtually every request for annulment, whereas two, improper constitution of the tribunal and corruption of an arbitrator, are very seldom used (see para. 112 *supra*). Typically, awards were attacked on the basis of two or three grounds. In several instances it was argued that one and the same aspect of an award constituted a manifest excess of powers, a serious departure from a fundamental rule of procedure and a failure to state reasons (see paras. 113–116 *supra*). In addition, *ad hoc* committees were confronted with a barrage of grounds

---

779   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 58.
780   *Reisman*, The Breakdown, pp. 763 *et seq*., 788 *et seq.*; *Reisman*, Repairing ICSID's Control System, pp. 202 *et seq*.

*Article 52 – Annulment*                                           1049

for annulment relating to various parts of the awards.[781] This has at times led to a blurring of the grounds for annulment.[782]

*Ad hoc* committees have dealt with this multiplicity of arguments in different ways. In *Klöckner I*, the *ad hoc* Committee structured its decisions by looking in turn at the various grounds for annulment that had been put forward by Klöckner.[783] It first dealt with excess of powers due to the Tribunal's lack of jurisdiction.[784] Then with excess of powers due to a violation of Art. 42(1).[785] Then with serious departure from a fundamental rule of procedure.[786] Then with failure to state reasons including failure to deal with questions submitted to the tribunal.[787] And finally with "other complaints".[788] But even this methodology of dealing with the grounds one by one did not save the *ad hoc* Committee from the problems of overlapping and competing grounds for annulment. **517**

The Tribunal's reference to broad equitable principles was classified as an excess of powers. The alternative of a failure to state reasons was rejected[789] (see paras. 238, 248 *supra*). On the point of failure to deal with every question submitted to the Tribunal, the *ad hoc* Committee seemed less certain. It considered failure to state reasons, serious departure from a fundamental rule of procedure[790] and even manifest excess of powers[791] but settled for failure to state reasons.[792] **518**

In the context of attacking the Tribunal's use of the *exceptio non adimpleti contractus*, Klöckner had failed to specify on which of the grounds of Art. 52(1) it was relying. The *ad hoc* Committee concluded that the complaint was probably based on manifest excess of powers or, alternatively or subsidiarily, on failure to state reasons.[793] The interaction of these two grounds for annulment was described in the following terms: **519**

> 169. It would be impossible to ask whether there was a "manifest excess of powers" regarding this "exception" without examining the Award's *reasoning*. We must therefore first consider the complaint that there was a "failure to state reasons" within the meaning of Article 52(1)(e). Only if the Award's reasons reveal, as the Applicant for Annulment alleges (p. 26), a "serious error in law" would it then be necessary to decide whether this alleged error, assuming it is established, may be attributed to a simple "mistaken application of law" or "*error in judicando*", or to an excess of powers, and finally to decide whether this excess of powers is "manifest".[794]

781 *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 2, 57, 82/3, 114, 165; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 4; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 2.02; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 38; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 36.
782 See *Broches*, Die dritte Annullierung, p. 296; *Pirrwitz*, Annulment, pp. 113/4.
783 See also *Broches*, Observations, p. 348.
784 *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 4–56.
785 *Ibid.*, paras. 57–82.               786 *Ibid.*, paras. 82*bis*–113.
787 *Ibid.*, paras. 114–164.             788 *Ibid.*, paras. 165–180.
789 *Ibid.*, para. 79. See also *Broches*, Observations, p. 341.
790 *Ibid.*, paras. 129/30.              791 *Ibid.*, para. 135.
792 *Ibid.*, paras. 144, 151, 157. See also *Broches*, Observations, p. 366; *Broches*, Die dritte Annullierung, p. 296.
793 *Ibid.*, para. 166.                  794 *Ibid.*, para. 169. Italics original.

The *ad hoc* Committee reached the conclusion that the Award's reasoning on this point was insufficient and that, therefore, there was a failure to state reasons.[795]

**520**    In *Amco I*, the *ad hoc* Committee's overall methodology was somewhat different. The Decision on Annulment's structure does not follow the list of grounds as presented by Art. 52(1). Rather, the *ad hoc* Committee dealt with the various claims of nullity raised by Indonesia following the general sequence of the findings and conclusions adopted by the Tribunal in its Award.[796] Since Indonesia had sought annulment of the Award on a number of points with the help of a variety of grounds,[797] this meant that the *ad hoc* Committee had to address the different grounds for annulment in a variety of contexts.

**521**    On the question of the calculation of the amount of investment effected by Amco (see paras. 227–230 *supra*), Indonesia had requested annulment for no fewer than three grounds.[798] The *ad hoc* Committee found that the tribunal in calculating Amco's investment had manifestly exceeded its power in failing to apply fundamental provisions of Indonesian law (see para. 227 *supra*) and had failed to state reasons for its calculation.[799]

**522**    The claim of nullity relating to an alleged failure on the part of the Tribunal to answer all the questions submitted to it also led the *ad hoc* Committee into a discussion of three different grounds for annulment. Specifically, Indonesia complained that the Tribunal had wrongly refused to consider some reasons that would have rendered the revocation of the investment licence lawful.[800] The *ad hoc* Committee stated that failure to deal with every question can find its sanction in annulment for failure to state reasons. But in a particular situation such an omission could amount to a serious departure from a fundamental rule of procedure and to a manifest excess of powers[801] (see paras. 300, 408, 415 *supra*).

**523**    In *CDC* v. *Seychelles*, the Applicant raised multiple undifferentiated arguments for annulment. The *ad hoc* Committee grouped these systematically by ground, addressing arguments under more than one ground only to the extent necessary to understand its disposition under each potential ground for annulment:

> 38. By our reckoning, the Republic has raised at least 19 separate arguments for annulment and has done so generally without specifically indicating in each case which ground for annulment set forth in Article 52(1) it believes to be applicable. In the following sections of this Decision, however, we set forth each of the Article 52(1) grounds invoked, describing each one generally and then addressing the Republic's particular contentions that appear to relate to it. Where an argument made by the Republic can be analyzed under more than one of the Article 52(1) grounds we have disposed of the argument primarily in one section and have referred to it only briefly in any other applicable section, adding any

---

795  *Ibid.*, para. 172.
796  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 16. See also *Broches*, Observations, p. 348.
797  *Ibid.*, para. 4.                          798  *Ibid.*, paras. 4, 89.
799  *Ibid.*, paras. 97/8.                       800  *Ibid.*, para. 30.
801  *Ibid.*, paras. 32, 38. See also paras. 78/9, 86.

*Article 52 – Annulment* 1051

such additional analysis as may be necessary to understand its disposition under such other section.[802]

## 3. Cumulative Use of Grounds

An award may be affected by more than one ground for annulment. Parties **524** requesting annulment have almost invariably claimed the presence of more than one defect justifying annulment (see paras. 111–117 *supra*). If the *ad hoc* committee finds that there is indeed more than one ground for annulment, it may annul on several grounds. Art. 52(3) authorizes annulment "on any of the grounds" rather than on "one of the grounds". On the other hand, it may be regarded as superfluous to continue belabouring the shortcomings of an award that has been annulled already.

The *Klöckner I ad hoc* Committee seems to have expended much time and **525** energy in shooting a horse that it had declared dead. After declaring the Award void for excess of powers due to a violation of Art. 42(1), it apparently felt that its examination of further grounds for annulment was a public service to the system of ICSID arbitration:[803]

> 82. Once the *ad hoc* Committee has concluded that the Award is to be annulled because of a manifest excess of powers, it could dispense with examining the other complaints of the Applicant for Annulment, who also invoked Articles 52(1)(d) (serious departure from a fundamental rule of procedure) and 52(1)(e) (failure to state reasons).
>
> In view of this case's importance, the fact this is the first Application for Annulment ever lodged against an ICSID award and, finally, because it may be of interest to the parties and to the new Tribunal that may be constituted under Article 52(6) of the Washington Convention to have additional indications, it would nonetheless be appropriate to examine, albeit in less depth, the main arguments raised and discussed in the course of the annulment proceeding.[804]

More than half of the Decision is devoted to additional grounds for annulment that could, strictly, have been dispensed with (see paras. 347, 492, 517 *supra*).

In *Amco I*, the question did not arise in this form due to the different structure of **526** the Decision on Annulment (see para. 520 *supra*). The *ad hoc* Committee looked at different parts of the Award, nullifying some and upholding others (see paras. 496–499 *supra*). Under this methodology, a general annulment of the Award on one ground, obviating the examination of other grounds for annulment, did not arise. But the *ad hoc* Committee made a general statement to the effect that Art. 48(3) was applicable in annulment proceedings (see para. 566 *infra*) and that, therefore, it would deal with every question that reasonably related to the principal issues before it.[805]

---

802  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 38. See also *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 22.
803  See also *Broches*, Observations, p. 348.
804  *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 82.
805  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 16.

**527**  In *MINE*, the *ad hoc* Committee was more economical. The portion of the Award relating to damages had been attacked for failure to state reasons, for manifest excess of powers and for serious departure from a fundamental rule of procedure.[806] The *ad hoc* Committee found that the Award, insofar as it related to damages, must be annulled for failure to state reasons.[807] Having reached that conclusion, it saw no need to examine the two alternative grounds for annulment advanced by Guinea.[808]

**528**  In *Vivendi I*, the *ad hoc* Committee annulled the Award, in part, for the reason that the Tribunal had committed a manifest excess of powers in not deciding certain of the Claimants' treaty claims.[809] This made it unnecessary to decide whether there had also been a failure to state reasons for declining jurisdiction. The *ad hoc* Committee concluded that the Tribunal had in fact upheld its jurisdiction but had not exercised it.[810]

**529**  The *ad hoc* Committee in *CMS* v. *Argentina* also displayed judicial economy, at least in its treatment of the "umbrella clause". The Committee found that there was a basis to annul this aspect of the Award, under Art. 52(1)(b). It followed that it was unnecessary to consider whether the same part of the Award could have been annulled for breach of Art. 52(1)(e).[811]

**530**  The *ad hoc* Committee in *Mitchell* v. *DR Congo* annulled the Award as a whole, under Art. 52(1)(b) and (e), since it found that there was no investment.[812] Nevertheless, the *ad hoc* Committee embarked upon a debate about whether the Tribunal had also manifestly exceeded its powers and failed to state reasons for its findings on expropriation.[813] Unusually, the *ad hoc* Committee did explain that there would have been no basis to annul the part of the Award dealing with compensation.[814] This latter discussion seems to have been wholly superfluous to the Decision.

### 4. Limitation to Grounds Advanced by the Parties

**531**  The initiative to request annulment and to put forward grounds in support of such a request is clearly with the parties. There is no *ex officio* annulment of awards (see para. 41 *supra*). A request for annulment is discretionary in the sense that a party may refrain from making it even if it believes that there is a valid ground for doing so (see paras. 44, 45 *supra*). The party seeking annulment is free to decide on what grounds for annulment it wishes to rely. At times, there was some uncertainty as to which ground or grounds for annulment would be appropriate for a particular defect in the award (see paras. 113–117, 516–523 *supra*). The

---

806  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.97.
807  *Ibid.*, para. 6.108.          808  *Ibid.*, para. 6.109.
809  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 115.
810  *Ibid.*, para. 116.
811  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, para. 98.
812  *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 40, 41, 47.
813  *Ibid.*, paras. 48–62.                    814  *Ibid.*, paras. 65/6.

ground or grounds relied upon by a party must be specified in its application for annulment (see paras. 83, 87 *supra*). Grounds for annulment put forward in the application may be further developed in the course of the proceedings. But a party may not introduce new grounds for annulment after the expiry of the time limit set out in Art. 52(2) (see paras. 88–94 *supra*).

All of this leads to the question whether an *ad hoc* committee that finds in the course of its examination of the award that there is an additional ground for annulment which has not been relied upon in the request has the authority to annul on that additional ground. The question may arise in two different ways. The *ad hoc* committee may discover a defect that the requesting party has not put forward for annulment. Or the *ad hoc* committee may find that a defect that has been put forward should have been classified differently in terms of the grounds for annulment listed in Art. 52(1).          **532**

The *ad hoc* Committee in *MINE* noted that an *ad hoc* committee may annul an award, or any part thereof,          **533**

> . . . only pursuant to a request by a party and only within the scope of that request . . . [815]

Annulment is subject to waiver by the parties. It is doubtful if and to what extent the parties may, prior to the award, enter into "exclusion agreements" containing broad waivers to request annulment (see paras. 49–59 *supra*). But it is clear that a party may waive the remedy of annulment entirely or in part once the award has been issued (see paras. 46–48 *supra*). Under Arbitration Rule 27 failure to object to a fault that becomes apparent in the course of the proceedings before the tribunal may also be interpreted as a waiver of the right to use the resulting defect as a ground for annulment (see paras. 60, 124–129, 172–174, 334–337 *supra*). A request for annulment directed at certain shortcomings and based on certain grounds for annulment may be seen as a waiver of any right to request annulment based on other defects or on other grounds.          **534**

It follows that a party may not amend its application for annulment in the course of the proceedings for annulment on points that were known to it but which it failed to raise in the original application. It makes little practical difference whether this prohibition is based on an implicit waiver of reasons for annulment other than those put forward in the application or whether one sees this as following from the time limits of Art. 52(2) (see paras. 435–450 *supra*). It would also seem clear that, if one party has requested annulment, the other party should not be allowed to ask for annulment for different reasons outside the time limits of Art. 52(2).[816]          **535**

The situation is different if, in the course of annulment proceedings, new facts come to light that warrant annulment. If these facts were unknown to the parties,          **536**

815  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.08.
816  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 67–70.

failure to request annulment on their basis cannot be interpreted as waiver. If additional grounds for annulment come to light during annulment proceedings, they may be relied upon by the parties and used as a basis for annulment by the *ad hoc* committee provided that it is clear that there was no waiver in relation to them through failure to rely on them in a timely fashion. Obviously, waiver may even occur in the course of annulment proceedings. Just as a party may retract part of its application for annulment, it may abstain from relying on any new facts. An *ad hoc* committee may not annul unless it is asked to do so by a party even if it comes to the conclusion that, objectively, there is a ground for annulment.

**537**    This solution is not contradicted by the time limits contained in Art. 52(2). These time limits relate to an application by a party directed at the institution of annulment proceedings. They do not preclude the *ad hoc* committee from taking cognizance of additional facts once the proceedings are under way. The situation is clear if a case of corruption becomes known after the institution of annulment proceedings but within the three-year limit of Art. 52(2). This ground may be brought before the existing *ad hoc* committee within 120 days of discovery. But even in relation to other grounds for annulment there is no good reason to exclude them peremptorily once annulment proceedings are under way. The purpose of the time limits is to safeguard the finality of an award after the expiry of the time limits. The parties are given a short window of opportunity to request annulment. If they fail to avail themselves of this opportunity they are precluded from doing so later on in the interest of finality. This purpose would not apply in relation to an award that is already the object of annulment proceedings. Once annulment proceedings have been instituted in a timely fashion, the cause of finality will not be advanced significantly by excluding points that were not raised in the application through no fault of the requesting party.

**538**    An incorrect classification of a defect in terms of the grounds for annulment listed in Art. 52(1) is unlikely to create problems. Prudent counsel will be careful to describe a perceived flaw in terms of as many grounds for annulment as possible. Nevertheless, in view of the recurrent difficulties in drawing a clear line between the grounds listed in Art. 52(1)(b), (d) and (e) (see paras. 113–117, 516–523 *supra*) it is possible that an *ad hoc* committee concludes that a particular aspect of the award would justify annulment on a ground different from that put forward in the application. It would be overly formalistic to hold a party to the classification made in the application and to deny annulment for that reason. A party should be given the opportunity to develop or amplify its application (see paras. 442–447 *supra*) by reclassifying the perceived defect in terms of the grounds listed in Art. 52(1). Even in the absence of such a reclassification by the party, the *ad hoc* committee has the authority to annul the award on the basis of a different category of grounds as long as the incriminated defect has been pleaded as a basis for annulment by a party.

**P. "(4) The provisions of Articles 41–45, 48, 49, 53 and 54, and of Chapters VI and VII shall apply *mutatis mutandis* to proceedings before the Committee."**

The Convention contains a number of provisions regulating procedural questions with respect to proceedings before a tribunal. Rather than reiterate them in the context of annulment, Art. 52(4) makes some of them applicable to proceedings before *ad hoc* committees. A provision to this effect was contained in all drafts that dealt with annulment leading to the Convention (History, Vol. I, p. 238) and was barely discussed (History, Vol. II, p. 872). **539**

### 1. Excluded Provisions

Not all provisions of the Convention relating to arbitration are incorporated by reference for purposes of annulment proceedings. Thus, Art. 36 dealing with the request for arbitration has its independent corresponding provision in Art. 52(1) and (2) dealing with the request for annulment. Arts. 37–40 dealing with the constitution of the tribunal are also not made applicable to annulment proceedings in view of the autonomous rules for the constitution of an *ad hoc* committee in Art. 52(3). Similarly, Art. 47 dealing with provisional measures does not apply since under Art. 52(5) an *ad hoc* committee has its own specialized power to impose interim measures pending the outcome of proceedings before it. **540**

The exclusion of Art. 46, which deals with incidental claims, additional claims and counter-claims, from the list of applicable provisions in Art. 52(4) is less obvious at first sight. It is possible to argue that if one party requests annulment of part of an award that is unfavourable to it, a request by the other party for annulment of another part that is unfavourable to the other party is not really a counter-claim. Art. 46 also deals with incidental or additional claims. Decisions of *ad hoc* committees routinely also deal with the cost of annulment proceedings. It is difficult to classify procedural costs as anything but incidental claims. But the award of cost of proceedings is regulated specifically in Chapter VI (Arts. 59–61) of the Convention. Chapter VI is incorporated in Art. 52(4) (see para. 572 *infra*). **541**

The non-inclusion of the provisions dealing with the jurisdiction of the Centre (Arts. 25, 26, 27) also requires some comment. Art. 25, the central provision on jurisdiction, is highly relevant to an *ad hoc* committee, especially in connection with an allegation under Art. 52(1)(b) that the tribunal has manifestly exceeded its powers (see paras. 155–190 *supra*). **542**

The exclusion of other remedies under Art. 26 clearly extends to annulment proceedings. In particular, the parties may not seek annulment of an ICSID award through other remedies such as resort to domestic courts (see para. 4 *supra*). But Art. 53, which is incorporated in Art. 52(4), states that an award shall not be subject to any appeal or to any other remedy and may be seen to fill the gap created by the non-inclusion of Art. 26. **543**

**544**     Art. 27 prohibiting diplomatic protection pending ICSID proceedings clearly extends to the annulment phase of the proceedings. Whether diplomatic protection becomes permissible under Art. 27(1) as a consequence of a state's failure to abide by the award would depend on the terms of a decision by the *ad hoc* committee on a stay of enforcement in accordance with Art. 52(5). It can only be assumed that all of this seemed so obvious during the Convention's drafting that its specific mention appeared unnecessary.

**545**     The omission of Arts. 50, 51 and 52 providing for the post-award remedies of interpretation, revision and annulment is clearly intentional. The decision of an *ad hoc* committee is not subject to a formal interpretation by the *ad hoc* committee or by a new *ad hoc* committee under Art. 50. If the *ad hoc* committee annuls the award, any questions arising in connection with the interpretation of the *ad hoc* committee's decision will have to be dealt with independently by a new tribunal constituted under Art. 52(6).

**546**     Neither is a decision on annulment subject to the procedure of revision under Art. 51 if new facts arise that were unknown when the decision was rendered. Annulment is a limited exception to the principle of finality of awards. Once the *ad hoc* committee has rejected a request for annulment, appearance of new facts will be of no avail. Discovery of a case of corruption within three years of the award is a possible exception but will have to be dealt with not under Art. 51 but through a new application under Art. 52. New facts that would cast doubt on the *ad hoc* committee's decision to annul may be taken into account appropriately by the new tribunal under Art. 52(6). The *ad hoc* committee's decision to annul is final only in the sense that the original award cannot be reinstated. But the new tribunal is free to take all relevant information into account when making its decision on the merits (see paras. 683–695 *infra*).

**547**     In the same way, a decision on annulment is not subject to annulment. If a request for annulment is rejected that is the end of the matter, even if the aggrieved party believes that the *ad hoc* committee was not properly constituted, that it has manifestly exceeded its powers, that there was corruption on the part of members of the *ad hoc* committee, that there has been a serious departure from a fundamental rule of procedure in the annulment proceedings or that the decision on annulment has failed to state the reasons on which it is based. If a decision annulling the award is seen to suffer from any of these defects, the damage is more limited. The original award cannot be reinstated but the aggrieved party is given another chance to litigate the dispute on the merits before a new tribunal under Art. 52(6).

**548**     The non-incorporation in Art. 52(4) of Chapter V (Arts. 56–58) dealing with the replacement and disqualification of conciliators and arbitrators, creates a curious gap. Art. 56 deals with the procedure following the death, incapacity or resignation of an arbitrator. Art. 52 does not foresee a corresponding procedure in respect of a member of an *ad hoc* committee. Nor does Art. 52(4) incorporate Art. 56 by reference.

*Article 52 – Annulment* 1057

Arts. 57 and 58 provide a procedure for the disqualification and replacement of **549** an arbitrator who lacks the required qualifications for appointment or is otherwise ineligible. No similar procedure can be found in Art. 52 nor does Art. 52(4) incorporate Arts. 57 and 58 by reference. This omission is all the more conspicuous in view of the stringent exclusionary rules for appointment to an *ad hoc* committee (see paras. 461–465 *supra*; see also Art. 57, para. 4).

One way to close this gap is the direct application of Arbitration Rules 8–12 **550** dealing with the incapacity, resignation and disqualification of arbitrators and with the resulting procedural steps. Arbitration Rule 53 states in general terms that the Arbitration Rules shall apply to any procedure relating to annulment. This requires considerable adjustment of these Rules in view of the different methods of appointing members of tribunals and of *ad hoc* committees. In particular, all references to appointments by the parties would become inapplicable in view of the appointment procedure for *ad hoc* committees (see paras. 453–456 *supra*). The most important provision would be Rule 11(1) providing for the same method that was used to make the original appointment to fill a vacancy.

But the application of Arbitration Rules 8–12 to annulment proceedings is only **551** possible on the assumption that the omission of the Convention's Chapter V from the list of provisions in Art. 52(4) was unintentional. If the omission of Arts. 56–58 from Art. 52(4) is interpreted as a deliberate exclusion, it is not permissible to reintroduce these Articles under the guise of the corresponding Arbitration Rules (see paras. 558, 559 *infra*). If this were otherwise, one could introduce the procedures for interpretation, revision and annulment in respect of decisions on annulment by way of applying the pertinent Arbitration Rules, a result that is clearly not intended by the Convention.

In *Vivendi I*, Argentina proposed the disqualification of the *ad hoc* Committee's **552** President. The two remaining members of the Committee noted that Chapter V of the Convention, dealing with the replacement and disqualification of conciliators and arbitrators, does not refer to members of *ad hoc* committees. Nor does Article 52(4) mention Chapter V. But the two members concluded that the effect of Arbitration Rule 53 was to make Arbitration Rule 9, dealing with the disqualification of arbitrators, applicable to a member of an *ad hoc* Committee.[817]

### *2. Included Provisions*

The Articles and Chapters listed in Art. 52(4) are to be applied *mutatis mutandis* **553** to proceedings before the *ad hoc* committee. This means that any necessary adaptations must be made to the listed provisions in order to make them suitable. In particular, references to "the Tribunal" must be read as "the *ad hoc* Committee". References to "the award" must be read as "the decision on annulment".

---

817  *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October 2001, paras. 3–13, quoting the First Edition of this Commentary.

**554**    The reference to Art. 41 means that the *ad hoc* committee shall be the judge of its power to hear the request for annulment. This applies, in particular, to the decision on whether the application was timely (see paras. 435–450 *supra*), in compliance with other procedural requirements (see paras. 83–86 *supra*) and sufficiently substantiated (see paras. 87–94 *supra*). This would also cover the power of an *ad hoc* committee to decide on the validity and effect of an "exclusion agreement" purporting to waive the right to request annulment (see paras. 49–59 *supra*).

**555**    The reference to Art. 42 means that, in principle, the same rules on applicable law govern annulment proceedings as proceedings before the tribunal. Art. 42 is particularly important if the request for annulment is directed at an excess of powers for failure to apply the proper law (see paras. 191–270 *supra*). In *Amco I*, the Decision on Annulment contains an entire subchapter on the law to be applied by the *ad hoc* Committee. It made the following general statement:

> 18. The first general question which the *ad hoc* Committee must deal with preliminarily, refers to the law governing the annulment proceedings and to the law governing the resolution of the dispute among the parties.
> The *ad hoc* Committee, having been established under the provisions of an international instrument – i.e., the Convention – believes that the proceedings before it are governed by the relevant Articles of the Convention and by the Rules of Procedure for Arbitration Proceedings (Arbitration Rules) adopted by the Administrative Council of ICSID. Problems of interpretation or lacunae which emerge have to be solved or filled in accordance with the principles and rules of treaty interpretation generally recognized in international law.
> 19. As to the law applicable in respect of the substance of the dispute before it, the *ad hoc* Committee considers Article 42 of the Convention controlling, in exactly the same way that the Tribunal regarded the same Article decisive of the law governing the substantive dispute before it.[818]

The Decision continues by analysing the relationship between international law and host State law under Art. 42(1) (see Art. 42, paras. 194, 216).

**556**    The reference to Art. 43 means that an *ad hoc* committee has the same authority to request evidence as a tribunal. Most if not all of the evidence relevant in annulment proceedings should relate to the procedure before the tribunal. *Ad hoc* committees have sought and obtained files and transcripts of proceedings before the tribunals. They sought and obtained various other documents from the parties as well as from the ICSID Secretariat.[819]

**557**    The reference to Art. 44 means that the Convention's provisions on the powers and functions of the tribunal (Section 3 of Chapter IV) and the Arbitration Rules apply also in annulment proceedings. If the Rules relating to procedure leave a *lacuna*, the *ad hoc* committee may decide autonomously. The fact that Art. 52(4) refers to Art. 44 which in turn refers to Section 3 (Arts. 41–47) creates a rather

---

818    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 18–19.
819    For example, *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 11–14.

curious contradiction. Art. 52(4) itself refers to Arts. 41–45 but not to Arts. 46 and 47. But the latter two are referred to by Art. 44. Since Art. 52(4) is the more specialized provision for purposes of annulment proceedings, the exclusion of Arts. 46 and 47 must prevail.

Arbitration Rule 53 makes the Arbitration Rules generally applicable to annulment proceedings: **558**

### Rule 53

#### *Rules of Procedure*

The provisions of these Rules shall apply *mutatis mutandis* to any procedure relating to the interpretation, revision or annulment of an award and to the decision of the Tribunal or Committee.

This somewhat undifferentiated extension of the Arbitration Rules in their entirety to annulment proceedings should not be read to include those Rules that correspond to Articles of the Convention that are excluded from the reference of Art. 52(4) (see paras. 540–552 *supra*). It would not make sense to have a differentiated reference to some Articles of the Convention but not to others only to have the omitted Articles reintroduced through the vehicle of the Arbitration Rules that are designed to implement them.[820] Arbitration Rule 53 in its pre-1984 version was more differentiated in excluding the Rules dealing with the establishment of the tribunal, with provisional measures, with ancillary claims and with interpretation, revision and annulment.[821] These excluded Rules corresponded to the Articles omitted from the reference in Art. 52(4). It is not clear why the more differentiated version of Rule 53 was given up in 1984. **559**

The *ad hoc* committee will be entitled to assume that any procedural dispositions agreed to by the parties with respect to the original proceeding will remain unchanged during the annulment proceeding. This would apply to such questions as procedural languages, the number of copies of instruments to be filed and the appointment of representatives.[822] **560**

Proceedings before *ad hoc* committees typically follow the same procedure as before tribunals. After preliminary procedural consultations there are written and oral procedures followed by a formal closure of the proceeding.[823] **561**

---

820 But see *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October 2001, paras. 3–13. See para. 552 *supra*.

821 1 ICSID Reports 114.

822 See Note B to Arbitration Rule 53 of 1968, 1 ICSID Reports 114.

823 See *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 1; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 7–15; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 3.03–3.09; *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990, paras. 2.01–2.09; *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, paras. 3.01–3.17; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 8/9; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 6/7; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 15–18; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, paras. 11, 12; *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, paras. 7–12; *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, paras. 8, 9; *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*,

**562**    The reference to Art. 45 covers the contingency of default proceedings before an *ad hoc* committee. Failure of a party to appear or to present its case in annulment proceedings is unlikely. Only an unsuccessful or partly unsuccessful party will request annulment. The successful other party will have an interest in defending the award which is in its favour. Therefore, it is not likely to leave the application for annulment uncontested. Both parties were fully represented and cooperating in all annulment proceedings that have yielded published records.

**563**    In the unlikely event of default proceedings pursuant to a request for annulment, the *ad hoc* committee may not accept the appearing party's submissions without their full scrutiny. The *ad hoc* committee cannot just rely on the assertions of the cooperating party but must be fully satisfied that there is a ground for annulment before making a decision to this effect.

**564**    The reference to Art. 48 means that the Convention's rules on voting and on the formal contents of awards are also applicable to *ad hoc* committees and their final decisions. Since *ad hoc* committees always consist of three members, majority voting is relatively simple. The fact that there are no party-appointed members of *ad hoc* committees makes unanimity easier. Most published decisions of *ad hoc* committees were adopted unanimously. The exceptions are *Soufraki* v. *UAE*[824] and *Lucchetti* v. *Peru*.[825]

**565**    A decision on annulment must be in writing and must be signed by the members of the *ad hoc* committee who voted for it. In addition, a decision on annulment must conform to the detailed requirements of Arbitration Rule 47(1) and (2) (see Art. 48, paras. 23, 24, 35).

**566**    It is clear that a decision on annulment must state the reasons on which it is based. It is less clear that it must deal with every question submitted to the *ad hoc* committee. If the *ad hoc* committee annuls the award on one of several grounds submitted to it, it seems superfluous to continue looking into other reasons for annulment[826] unless one believes that this serves a "pedagogical" purpose.[827] *Ad hoc* committees have adopted conflicting positions on this point (see paras. 524–530 *supra*).

**567**    Individual opinions, including dissenting opinions, by members of *ad hoc* committees may be attached to decisions on annulment, and have been on two occasions.[828] The Centre is prohibited from publishing decisions on annulment without

---

Decision on Annulment, 5 September 2007, paras. 26–28; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 22–28.

824   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, and Dissenting Opinion of Mr. Omar Nabulsi.

825   *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, and Dissenting Opinion of Sir Franklin Berman QC.

826   See *Broches*, Convention, Explanatory Notes and Survey, pp. 698/9; *Broches*, Observations, pp. 370/1.

827   See *Rambaud*, L'annulation, p. 267.

828   *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, and Dissenting Opinion of Mr. Omar Nabulsi; *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007, and Dissenting Opinion of Sir Franklin Berman QC.

the parties' consent, but it may publish redacted extracts of the key legal findings (see Art. 48, paras. 110, 117, 120). All known annulment decisions rendered up to 1 March 2009 have been published, with the exception of *RFCC* v. *Morocco*.[829]

The reference to Art. 49 means that the Convention's rules on the dispatch of **568** awards and on supplementation and rectification extend to decisions on annulment. The precise date of a decision on annulment is less important than the date of an award since the time limits for revision and annulment do not apply to a decision on annulment (see paras. 545–547 *supra*). But an *ad hoc* committee may decide any question which it has omitted to decide and must rectify technical errors upon the request of a party made within 45 days of the date on which certified copies of the decision on annulment were dispatched to the parties.

The reference to Art. 53 means that the decision on annulment is binding on the **569** parties and not subject to any appeal or remedy except as provided in the Convention. Only two further steps are open to the parties: a request for supplementation or rectification in accordance with Art. 49(2) and the resubmission of the dispute in accordance with Art. 52(6) in case of annulment. The parties must abide by and comply with the terms of a decision on annulment. If the award is annulled, a party may not seek its enforcement. If annulment is rejected, the obligation of compliance, as contained in Art. 53(1), applies to the award. In case of a partial annulment, the obligation of compliance is restricted to the surviving part of the award. The reference in Art. 52(4) to Art. 53 has its counterpart in Art. 53(2) which extends the application of Arts. 53–55 to a decision on annulment.

Normally, compliance with a decision on annulment will simply mean that **570** the parties will abstain from implementing the award to the extent that it has been annulled. Exceptionally, compliance with a decision on annulment may also involve active performance of a duty such as payment of cost or action pursuant to a decision on a stay of enforcement such as the return of a security or the lifting of a bond (see paras. 627–648 *infra*).

The reference to Art. 54 means that decisions on annulment must be recog- **571** nized and enforced by all States parties to the Convention. Normally, this will mean refusal to recognize and enforce awards to the extent that they have been annulled pursuant to Art. 52. A domestic court that is confronted with an ICSID award and a decision annulling it in whole or in part is not allowed to examine the substance of the decision on annulment and refuse to give effect to it. In particular, a domestic court may not form its own opinion as to the nullity of the award. An award that has been annulled in whole or in part is inexistent to the extent of the annulment for purposes of its recognition and enforcement. An obligation to recognize and enforce a decision on annulment actively may arise in connection with a decision on cost or with a return of a security or the lifting of a bond.

---

829    *RFCC* v. *Morocco*, Decision on Annulment, 18 January 2006.

572    The reference to Chapter VI means that the Convention's provisions on the cost of proceedings extend to annulment proceedings. The decision on cost is part of the decision on annulment. *Ad hoc* committees have, in fact, made decisions on cost as part of their decisions on annulment (see Art. 61, paras. 4, 39, 40, 57, 58, 61).

573    The reference to Chapter VII means that the place of annulment proceedings is the seat of the Centre unless the parties agree otherwise (see Art. 62, paras. 6, 20). Hearings may and do take place at such other venues as the parties and the Centre may agree.

**Q.  "(5) The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request."**

### 1. History and Introduction

574    The drafting of what eventually became Art. 52 was inspired by the International Law Commission's 1958 Model Rules on Arbitral Procedure.[830] The ILC's Model Rules provide for a discretionary power of the International Court of Justice to grant a stay of execution pending a final decision on an application for annulment.[831] The Preliminary Draft to the Convention contained a similar provision for the stay of execution pending the decision of the *ad hoc* committee. It added the possibility for the *ad hoc* committee to recommend any provisional measures necessary for the protection of the rights of the parties (History, Vol. I, p. 238). The clause on provisional measures does not appear in subsequent drafts (at p. 240). A suggestion to give an *ad hoc* committee the power to continue or revive provisional measures recommended by the tribunal was rejected. The idea to give the *ad hoc* committee the formal power to recommend provisional measures was also rejected in a formal vote (History, Vol. II, p. 856) and does not appear in the Convention (but see paras. 627–648 *infra*).

575    All drafts as well as the Convention itself use permissive language in relation to the *ad hoc* committee's power to stay enforcement of the award (History, Vol. I, pp. 238, 240). The *ad hoc* committee may, but need not, take this step. A proposal to couch the "stay enforcement" provision in mandatory rather than discretionary terms was defeated in a vote (History, Vol. II, p. 849).

576    The drafts did not contain a provision to cover the period between the filing of an application for annulment and the constitution of the *ad hoc* committee. In view of the comparatively simple procedure for constitution, this period is typically

---

830    YBILC 86 (1958-II).
831    ILC Model Rules, Art. 36: 3. The Court may, at the request of the interested party, and if circumstances so require, grant a stay of execution pending the final decision on the application for annulment.

quite short (see paras. 453–456, 458 *supra*). But the question of enforceability during that period gave rise to some debate during the Convention's drafting. The idea of an automatic stay of enforcement upon the submission of an application for annulment was aired early (History, Vol. II, p. 341) but not, at first, pursued. A possible solution was seen in giving domestic courts the discretion to refuse recognition and enforcement of the award while an application for annulment is pending[832] (at pp. 885, 887/8, 902). Eventually, the second sentence of Art. 52(5) was inserted into the Convention in order to give the losing party an absolute right of suspension of enforcement until an *ad hoc* committee can be appointed (at pp. 949/50, 988).

The drafting of Art. 52(5) was closely related to that of Art. 51(4) (see Art. 51, para. 34) and to a lesser degree of Art. 50(2), last sentence (see Art. 50, para. 42). In fact, Arts. 51(4) and 52(5) are identical except for the respective references to "the Tribunal" and "the Committee". Art. 50(2), last sentence, differs in that it does not provide for an automatic stay of enforcement upon the submission of an application for interpretation (see Art. 50, para. 43). **577**

Art. 52(5) is also reflected in Art. 53(1). The obligation to abide by and comply with the terms of the award is subject to the exception that the enforcement may have been stayed pursuant to the Convention's relevant provisions. A stay of enforcement is not specifically mentioned in Art. 54 dealing with the recognition and enforcement of awards. But it is clear that an award that is subject to a stay of enforcement under the Convention and hence does not carry an obligation of compliance is not subject to enforcement by Contracting States. **578**

The *ad hoc* Committee in *MINE* described the relationship of Art. 52(5) to Art. 53(1) in the following terms: **579**

> 9. Article 53(1) provides that the award is binding on the parties and that each party "shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention". Article 52(4) [*sic*] is one of those relevant provisions. Thus, if an *ad hoc* Committee grants a stay of enforcement, the obligation of the party against whom the Award was rendered to abide and comply with the terms of the Award is *pro tanto* suspended.

> 10. The first sentence of Article 54(1) provides that each Contracting State shall recognize an Award rendered pursuant to the Convention as binding and enforce the pecuniary obligations imposed by the Award within its territories as if it were a final judgment of a court in that State. Although the Convention does not explicitly so provide, it seems to be clear that suspension of a party's obligation to abide by and comply with the award necessarily carries with it suspension of a Contracting State's obligation (and for that matter its authority) to enforce the Award, even though during the pendency of the Committee's

---

832   This is the solution adopted by the [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, Art. VI, 330 UNTS 42, and in the UNCITRAL Model Law on International Commercial Arbitration, 1985, Art. 36(2), 24 ILM 1313 (1985).

examination of the application for annulment the validity of the Award remains unaffected.[833]

**580**    The *ad hoc* Committee in *Azurix* v. *Argentina* gave a similar explanation. The successful party's right to enforcement of an award is potentially circumscribed, from the outset, by the respondent's right to seek annulment[834] (see para. 645 *infra*).

**581**    On the other hand, annulment proceedings that are not accompanied by a stay of enforcement under either the first or the second sentence of Art. 52(5) are neither a justification for non-compliance with the award nor a basis for domestic courts to withhold recognition or refuse enforcement. The detailed provisions in the Convention and in Arbitration Rule 54 make it clear that a stay of enforcement is contingent upon a party taking the necessary steps. If the party submitting the request for annulment fails to make a request for a stay of enforcement or if the *ad hoc* committee, once it is constituted, declines to continue or to grant a stay, the award is fully binding and enforceable. The fact alone that annulment proceedings are pending has no suspensive effect.[835]

**582**    The details for the application of Art. 52(5) are set out in Arbitration Rule 54 in the following terms:

### Rule 54
#### Stay of Enforcement of the Award

(1) The party applying for the interpretation, revision or annulment of an award may in its application, and either party may at any time before the final disposition of the application, request a stay in the enforcement of part or all of the award to which the application relates. The Tribunal or Committee shall give priority to the consideration of such a request.

(2) If an application for the revision or annulment of an award contains a request for a stay of its enforcement, the Secretary-General shall, together with the notice of registration, inform both parties of the provisional stay of the award. As soon as the Tribunal or Committee is constituted it shall, if either party requests, rule within 30 days on whether such stay should be continued; unless it decides to continue the stay, it shall automatically be terminated.

(3) If a stay of enforcement has been granted pursuant to paragraph (1) or continued pursuant to paragraph (2), the Tribunal or Committee may at any time modify or terminate the stay at the request of either party. All stays shall automatically terminate on the date on which a final decision is rendered on the application, except that a Committee granting the partial annulment of an award may order the temporary stay of enforcement of the unannulled portion in order to give either party an opportunity to request any new Tribunal constituted pursuant to Article 52(6) of the Convention to grant a stay pursuant to Rule 55(3).

---

833  *MINE* v. *Guinea*, Interim Order No. 1 on Guinea's Application for Stay of Enforcement of the Award, 12 August 1988, paras. 9/10.

834  *Azurix* v. *Argentina*, Decision on Continuation of Stay of Enforcement, 28 December 2007, paras. 41, 42. Also *Enron* v. *Argentina*, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, 7 October 2008, para. 77.

835  See also *Gaillard*, Chronique (1987), p. 185.

*Article 52 – Annulment*                                                    1065

(4) A request pursuant to paragraph (1), (2) (second sentence) or (3) shall specify the circumstances that require the stay or its modification or termination. A request shall only be granted after the Tribunal or Committee has given each party an opportunity of presenting its observations.

(5) The Secretary-General shall promptly notify both parties of the stay of enforcement of any award and of the modification or termination of such a stay, which shall become effective on the date on which he dispatches such notification.

## *2. Provisional Stay of Enforcement*

A party submitting an application for annulment may request in that application a stay of the award's enforcement. Such a request is granted automatically upon the application's registration. The Secretary-General is required to notify the parties of this stay (Arbitration Rule 54(2)) and has no discretion to refuse it. If the application for annulment is refused registration for being outside one of the time limits of Art. 52(2) (see paras. 435–450 *supra*), there will be no stay of enforcement.     **583**

Until the *ad hoc* committee is constituted, only the party filing the application for annulment can request a stay of enforcement. At this stage the stay of enforcement can only relate to the entire award. Otherwise the requesting party would be able to select the stay of only those portions of the award that are contrary to its interest.[836] In *CMS* v. *Argentina*, the *ad hoc* Committee confirmed that the provisional stay extended to the award as a whole. The suspensory effect of the stay therefore extended also to the Tribunal's order that Argentina had an option it could exercise within a certain time period to purchase CMS's shares in its Argentine subsidiary.[837]     **584**

Parties filing applications for annulment have routinely requested that enforcement be stayed provisionally.[838] This is universally true of respondents, seeking the annulment of adverse awards. On certain other occasions, in respect of which     **585**

---

836  See Note C. to Arbitration Rule 54 of 1968, 1 ICSID Reports 115.

837  *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 10. The time to exercise this option resumed when the *ad hoc* Committee rendered its Decision on Annulment, which upheld the award of damages.

838  *SPP* v. *Egypt*, Order Taking Note of Discontinuance, 9 March 1983, described in *Craig*, The Final Chapter, p. 284 (the case was settled without a published decision relating to the annulment proceedings); *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, Initial Procedural Decision, 6 February 1991, noted in *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 3.03; *MINE* v. *Guinea*, Interim Order No. 1 on Guinea's Application for Stay of Enforcement of the Award, 12 August 1988; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 5; *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, para. 2; *Mitchell* v. *DR Congo*, Decision on Continuation of Stay, 30 November 2004, para. 2; *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 2; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 3; *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 1; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, para. 3; *Enron* v. *Argentina*, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, 7 October 2008, para. 4; *Sempra* v. *Argentina*, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, 5 March 2009, para. 4. A stay of enforcement is not expressly recorded in *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990.

information is publicly available, applications for annulment have not included a request for a stay. In *Klöckner I*, the Award had rejected both the claim and the counter-claim.[839] Consequently, there was no opportunity for a stay of enforcement. In *Vivendi I*, the Tribunal had declined to rule on the merits of the claims arising out of the conduct of the Province of Tucumán, so there was no part of the Award's *dispositif* that warranted a stay.[840] In *Soufraki* v. *UAE*, the Tribunal had ruled that it lacked jurisdiction so, again, there was no call for a stay of enforcement.[841] Likewise, in *Lucchetti* v. *Peru*, it was the Claimant that sought annulment of an Award that had concluded that the Tribunal lacked jurisdiction.[842] In such circumstances, a stay of enforcement is inappropriate.

### 3. Stay of Enforcement Ordered by the Ad Hoc Committee

#### a) Initiative

**586**    Once the *ad hoc* committee is constituted, the party seeking a stay of enforcement must direct its request to the committee. If a provisional stay has been obtained (see paras. 583–585 *supra*), a party that wishes to have the stay continued must direct a request to that effect to the *ad hoc* committee. Otherwise, the stay will be terminated automatically (Arbitration Rule 54(2)). If there has been no provisional stay, a party that wishes to secure a stay must direct a request to this effect to the *ad hoc* committee (Arbitration Rule 54(1)). The *ad hoc* committee has no authority to grant a stay of enforcement on its own motion.

**587**    Either party may request the continuation of a provisional stay of enforcement or for the first time request a stay of enforcement by the *ad hoc* committee (Arbitration Rule 54(1) and (2)). The initiative is not restricted to the party seeking annulment. For instance, a party opposing the annulment of an award may still request a stay of enforcement of the part of the award relating to a counter-claim. Either party may request a stay of enforcement of part or all of the award (Arbitration Rule 54(1)).

**588**    The modification or termination of a stay of enforcement that has been continued or granted by the *ad hoc* committee is also subject to a request from one of the parties (Arbitration Rule 54(3)). Thus, in *MTD* v. *Chile*, the party resisting annulment requested the stay of enforcement to be lifted, unless security was put in place.[843] Likewise, in *CMS* v. *Argentina*, it was the Claimant that requested that the stay of enforcement be terminated "unless Argentina were to provide adequate assurances as to the payment of the Award should its application for annulment fail".[844]

839    *Klöckner* v. *Cameroon*, Award, 21 October 1983.
840    *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002.
841    *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007.
842    *Lucchetti* v. *Peru (sub nomine: Industria Nacional de Alimentos)*, Decision on Annulment, 5 September 2007.
843    *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 4.
844    *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 5.

A provisional stay will lapse automatically unless it is continued by the *ad hoc* committee. Likewise, all stays of enforcement will terminate automatically on the date of the final decision on annulment (see para. 650 *infra*). **589**

A stay of enforcement upon the *ad hoc* committee's own initiative may only occur if a committee grants a partial annulment of an award. Under Arbitration Rule 54(3) it may order the temporary stay of enforcement of the unannulled portion of the award until a new tribunal constituted under Art. 52(6) can grant a stay under Arbitration Rule 55(3) (see para. 653 *infra*). Such a continued stay or new stay of enforcement ordered by the new tribunal would also depend on a request by one of the parties. **590**

In annulment proceedings, parties have made requests both for and against the imposition of stays of enforcement. In practice, written submissions have been invited from the parties on the continuation of a provisional stay. These have been submitted either simultaneously[845] or consecutively.[846] At times, oral submissions are also invited.[847] **591**

In *SPP* v. *Egypt*, Egypt supported its request for a stay of enforcement with detailed pleadings. SPP also made submissions on the issue. But the parties were able to agree on a waiver of steps leading to enforcement in exchange for a bank guarantee pending the annulment proceedings[848] (see paras. 599, 634 *infra*). **592**

## *b) Discretion*

Whereas a provisional stay of enforcement is granted automatically upon a request (see para. 583 *supra*) a decision by the *ad hoc* committee on a request is discretionary.[849] The Convention's wording ("the Committee may, . . . , stay enforcement") is clear in this respect. Paragraphs (2) and (3) of Arbitration Rule 54 also distinguish between the Secretary-General's duty to simply notify the parties, and the *ad hoc* committee's power of decision.[850] The *ad hoc* committee's discretion extends to whether it stays enforcement of part or all of the award and to the modification or termination of the stay. **593**

---

845  *Wena Hotels* v. *Egypt*, Procedural Order No. 1 on Continuation of Stay, 5 April 2001, para. 4; *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, para. 5; *Repsol* v. *Petroecuador*, Procedural Order No. 1, 22 December 2005, para. 6; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, paras. 6, 7.

846  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 5, 6; *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 3.04; *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 4; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 5, 6; *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, paras. 4, 6; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 6; *Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335, 349 (1986).

847  *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 5; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, paras. 6, 8.

848  *Craig*, The Final Chapter, pp. 268, 284/5.

849  *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 26; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 35; *Sempra* v. *Argentina*, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, 5 March 2009, para. 23.

850  See Note C to Arbitration Rule 54 of 1968, 1 ICSID Reports 115.

**594**    The criteria for the exercise of this discretion are the circumstances that may require the stay of enforcement (see paras. 609–614 *infra*). *Ad hoc* committees have gone into a detailed examination of these circumstances before exercising their discretion.[851]

### c) Procedure

**595**    Arbitration Rule 54 contains a number of procedural requirements for a stay of enforcement by the *ad hoc* committee. There must be a request by one of the parties (see paras. 586–588 *supra*). The *ad hoc* committee must give priority to a request for a stay of enforcement (Rule 54(1)). This means that it should be dealt with before the committee goes into the merits of the application for annulment. If the request relates to the continuation of a provisional stay, the *ad hoc* committee must make its ruling within 30 days of its constitution (Rule 54(2)).

**596**    Another procedural requirement is that a request for a stay of enforcement shall only be granted after the *ad hoc* committee has given each party the opportunity to present its observations (Rule 54(4)). This is a basic principle of fairness (see paras. 305–317 *supra*). Violation of the right to be heard would be a serious departure from a fundamental rule of procedure. The respective parties in every annulment proceeding were each given the opportunity to present their observations.

**597**    In *Amco I*, the *ad hoc* Committee was constituted on 22 April 1985. It gave priority to the request for a stay of enforcement and granted a "provisional stay"[852] on 17 May 1985, within the 30-day time limit. The stay was confirmed on 7 September 1985 until the issuance of the Decision on Annulment.[853]

**598**    In *MINE*, the *ad hoc* Committee was constituted on 29 April 1988. It gave priority to the question of the continuation of the stay of enforcement but missed the 30-day limit by a wide margin. It was not until 17 May 1988 that the Committee invited MINE to submit its observations on Guinea's request for a stay of enforcement. A protracted exchange of observations, additional observations, memoranda and replies, as well as oral presentations on 16 June 1988, ensued, followed by another exchange of memoranda. On 12 August 1988, that is 105 days after its constitution, the *ad hoc* Committee decided to continue the provisional stay of enforcement.[854] It is arguable that the provisional stay lapsed automatically

---

851    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, and see *Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335, 349/50 (1986); *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, paras. 12–27; *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004; *Mitchell* v. *DR Congo*, Decision on Continuation of Stay, 30 November 2004; *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007; *Enron* v. *Argentina*, Decision on Continuation of Stay, 7 October 2008, paras. 38–100; *Sempra* v. *Argentina*, Decision on Continuation of Stay, 5 March 2009, para. 23–66.

852    In view of the Convention's terminology in Art. 52(5) (second sentence), the use of the term "provisional stay" in this context is infelicitous.

853    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 8/9.

854    *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, paras. 3–5.

30 days after the *ad hoc* Committee's constitution and was only reinstituted on 12 August 1988 in the light of Rule 54(2).

In *SPP* v. *Egypt*, the *ad hoc* Committee, with the agreement of the parties, prolonged the period for deciding this issue which was to be taken up at a preliminary hearing.[855] The issue was decided by an agreement of the parties (see paras. 592 *supra*, 634 *infra*). **599**

In *Amco II*, the *ad hoc* Committee was constituted on 17 October 1990. Indonesia had sought a provisional stay of enforcement together with its request dated 3 October 1990 for annulment of the second Award. The provisional stay was confirmed by the *ad hoc* Committee in a procedural order dated 6 February 1991, apparently outside the 30-day time limit in Arbitration Rule 54(2). The first session with the parties took place on 1 and 2 March 1991. The *ad hoc* Committee decided, on 2 March 1991, to continue the stay of enforcement on condition that Indonesia provide security.[856] **600**

In *Wena Hotels* v. *Egypt*, the Application for Annulment dated 19 January 2001 contained a request for a provisional stay. On 25 January 2001, Wena sought the termination of the stay or, in the alternative, sought its modification by requiring that Egypt post security as a condition for its continuation. The *ad hoc* Committee was constituted on 6 March 2001. It invited and received further written submissions, then issued its decision to continue the stay, subject to the fulfilment of conditions, on 5 April 2001.[857] **601**

In *CDC* v. *Seychelles*, the *ad hoc* Committee was constituted on 28 May 2004. Following two rounds of written submissions, and additional observations at the first session on 8 July 2004, the *ad hoc* Committee issued its decision to continue the stay, on certain conditions, on 14 July 2004.[858] **602**

In *Mitchell* v. *DR Congo*, the *ad hoc* Committee was constituted on 24 August 2004. In view of the 30-day time limit, the Committee asked the Parties for an extension until 30 November 2004. The Parties agreed. An exchange of written submissions was followed by a telephone conference and further written submissions. The Parties agreed that there was no need to hold a hearing on the issue of the stay of enforcement. The *ad hoc* Committee rendered its decision to continue the stay of enforcement on 30 November 2004.[859] **603**

The constitution of the *ad hoc* Committee in *MTD* v. *Chile* occurred on 18 January 2005. At the first session on 23 March 2005, the parties agreed to extend the 30-day time limit, which had already expired. The decision to continue the stay of enforcement was subsequently made on 1 June 2005.[860] **604**

In *Repsol* v. *Petroecuador*, the *ad hoc* Committee was constituted on 14 September 2004. The Committee first received observations on the stay of enforcement **605**

---

855   *Craig*, The Final Chapter, p. 284.
856   *Amco* v. *Indonesia*, Resubmitted Case: Interim Order No. 1, 2 March 1991, attached as Annex 1 to the Decision on Annulment, 3 December 1992, and *ibid.*, para. 3.07.
857   *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 5, 6.
858   *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004.
859   *Mitchell* v. *DR Congo*, Decision on Continuation of Stay, 30 November 2004, paras. 3–9.
860   *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 5.

on 15 October 2004. No particular reference was made to the 30-day time limit. A procedural session was scheduled for 9 November 2004, but this meeting did not take place due to Petroecuador's late payment of an advance towards ICSID's fees and expenses. Once payment was eventually made, the first session was rescheduled to take place on 31 January 2006. In the light of the passage of time, the *ad hoc* Committee invited the parties to submit any additional observations by 12 December 2005.[861] The *ad hoc* Committee issued its decision to maintain the stay of enforcement on condition that Petroecuador post a bond for the sum of the Award, on 22 December 2005.[862] Petroecuador requested the *ad hoc* Committee to reconsider this decision. The *ad hoc* Committee declined to do so, but did extend the time limit to post the bond by 10 days.

**606**    The Claimant, in *CMS* v. *Argentina*, made a request under Arbitration Rule 54(2) that the provisional stay of enforcement of the Award be lifted unless Argentina provide adequate assurances as to the payment of the Award should the application for annulment fail. On 17 May 2006, the *ad hoc* Committee issued its decision, having received written observations from the parties, to continue the stay until the date of the first session with the parties. This decision was made within 30 days of the constitution of the *ad hoc* Committee.[863] The Committee confirmed the stay in a further decision on 1 September 2006.[864]

**607**    In *Azurix* v. *Argentina*, the *ad hoc* Committee was constituted on 14 June 2007. The parties filed their observations on the continuation of the stay of enforcement on 12 September 2007. At a hearing on 21 September 2007 both parties addressed the Committee concerning the stay of enforcement. After a further exchange of observations by the parties, the *ad hoc* Committee decided on 28 December 2007 to grant the continuation of the stay of enforcement.[865]

**608**    Notification of any stay of enforcement of an award as well as of any modification or termination of a stay must be made by the Secretary-General. This duty relates to a provisional stay as well as to a stay ordered by the *ad hoc* committee. The provision to this effect in Rule 54(5) is, in part, a repetition of Rule 54(2) which directs the Secretary-General to inform the parties of a provisional stay. The stay of enforcement becomes effective on the date of dispatch of the notification to the parties. Under Administrative and Financial Regulation 28(2) certified copies of awards issued by the Secretary-General while a stay of enforcement is in effect shall reflect such stay.

### d) Circumstances Requiring a Stay of Enforcement

**609**    Under Art. 52(5) the *ad hoc* committee may stay enforcement of the award only if it considers that such a step is required by the circumstances. Rule 54(4) directs the parties when making a request to specify the circumstances that require the

---

861  *Repsol* v. *Petroecuador*, Procedural Order No. 1, 22 December 2005, para. 6.
862  *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 8.
863  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 6–12.
864  *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006.
865  *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, paras. 5–12.

*Article 52 – Annulment* 1071

stay or its modification or termination. But neither provision gives any indication of the kind of circumstances that may require a stay. Nor do the notes to the Arbitration Rules or the drafting history.[866]

A number of criteria have emerged which *ad hoc* committees have considered **610** in deciding whether a temporary stay of enforcement should be continued. These are:

- the strength of the case for or against annulment;[867]
- whether the party seeking a stay also furnishes security for the award;[868]
- the risk that there would be problems in recovering payment made in compliance with the award should it be annulled;[869]
- whether there is a dilatory motive underlying the application for annulment;[870]
- the prospect of prompt enforcement of the award if it is upheld,[871] including enforcement that is unimpeded by problems arising from immunity from execution;[872]
- hardship to either party in the event that the stay is continued, or lifted;[873]
- possible irreparable injury to the award debtor in the case of immediate enforcement.[874]

---

866  *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, para. 8, citing the First Edition of this Commentary.

867  *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, paras. 16, 18; *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, paras. 13–15; *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 28; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 37.

868  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 8, 9 (the Decision of 17 May 1985 in *Amco* v. *Indonesia* is unpublished but is referred to in the Decision on Annulment; it is reproduced in part by *Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335, 349 (1986)); *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, paras. 15, 19–22; *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, paras. 29, 30; *Repsol* v. *Petroecuador*, Procedural Order No. 1, 22 December 2005, para. 9; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 38.

869  *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, paras. 14, 26; *Amco* v. *Indonesia*, Resubmitted Case: Interim Order No. 1, 2 March 1991, para. 19; *Wena Hotels* v. *Egypt*, Procedural Order No. 1 on Continuation of Stay, 5 April 2001, para. 7(a); *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, para. 18; *Mitchell* v. *DR Congo*, Decision on Continuation of Stay, 30 November 2004, paras. 10, 17, 28; *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 29; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 38; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, paras. 14(f)/15(q).

870  *Amco* v. *Indonesia*, Decision of 17 May 1985, unpublished but reproduced in part in *Friedland*, 349/50; *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 17; *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 28; *Repsol* v. *Petroecuador*, Procedural Order No. 1, 22 December 2005, para. 9; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, paras. 14(a)/15(j).

871  *Amco* v. *Indonesia*, Decision of 17 May 1985 – see *Friedland*, 2 Arbitration International 349/50 (1986); *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, paras. 31–35; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 38; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, paras. 14(d)/15(h); *Enron* v. *Argentina*, Decision on Continuation of Stay, 7 October 2008, paras. 83–94; *Sempra* v. *Argentina*, Decision on Continuation of Stay, 5 March 2009; paras. 30–76.

872  *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, paras. 24, 25.

873  *Ibid.*, paras. 27, 28.

874  *Ibid.*, para. 27; *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, para. 19; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, para. 14(c).

1072                THE ICSID CONVENTION: A COMMENTARY

**611**    The strength of the case in favour of annulment has been raised by parties in support of a continuation of a stay of enforcement. As to a *prima facie* case, the *ad hoc* Committee in *MINE* pointed out that Guinea's application alleged defects that, if proved, would indeed justify annulment.[875] The Committee did not concur that this was a decisive factor in deciding whether or not to continue the stay, provided the application for annulment was not frivolous and merely a dilatory tactic.[876] The *ad hoc* Committee in *CDC* v. *Seychelles* stated that it did not believe it was appropriate to consider the merits of the application in relation to the preliminary question whether or not to continue a stay of enforcement.[877] The *ad hoc* Committees in *MTD* v. *Chile* and *CMS* v. *Argentina* both opined that unless there is some indication that the application for annulment is without basis, it is not for an *ad hoc* committee to assess as a preliminary matter whether or not it is likely to succeed.[878]

**612**    The tight time frame of just 30 days for determination of the question whether a stay should be continued does not allow for a preliminary assessment of the merits of an application. Only where an application for annulment is manifestly baseless or an abuse of process should an *ad hoc* committee consider the merits of the application for this purpose. This is consistent with the approach of other international courts and tribunals.[879]

**613**    In *Repsol* v. *Petroecuador*, the stay of enforcement was continued. But it was considered appropriate to require a bond in order to prevent applications for annulment made merely for dilatory purposes.[880]

**614**    In the *MINE* case, in response to Guinea's fears that MINE might frustrate recoupment of amounts paid on the award in the event of annulment, MINE offered to deposit the amount in an escrow account or to protect Guinea by a bond. The Committee found that satisfactory security would indeed be a "circumstance" to be taken into account.[881] Ultimately, the *ad hoc* Committee decided to continue the stay of enforcement primarily because of the hardship immediate enforcement would cause Guinea and the risk that it could not recoup from the Claimant sums paid out on the award:

> 28. Having reviewed the circumstances of the case, the Committee is of the view that termination of the stay at this time would impose hardships on Guinea whose interests would be severely affected. This prospect of hardships combined with the risk of frustration of recoupment, in case of Guinea's success in this

---

875    *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 18.

876    *Ibid.*, paras. 16–17.

877    *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, paras. 13–15.

878    *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 28; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 37.

879    ICJ Statute, Art. 41 – see The Statute of the International Court of Justice: A Commentary (*Zimmermann, A./Tomuschat, C./Oellers-Frahm, K.* eds.) Art. 41, paras. 35–37 (2006); Iran-US Claims Tribunal Rules, Art. 26(1); and see *van Hof, J. J.*, Commentary on the UNCITRAL Arbitration Rules 190 (1991).

880    *Repsol* v. *Petroecuador*, Procedural Order No. 1, 22 December 2005, para. 9.

881    *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 26.

*Article 52 – Annulment*    1073

annulment proceeding, have led the Committee to decide that the provisional stay of enforcement of the Award should continue for the time being.[882]

In *Amco II*, the *ad hoc* Committee took the view that the risk that Indonesia would not be able to recoup any monies paid if the award was annulled "constitutes justifiable circumstance to continue the provisional stay of enforcement of the award".[883] **615**

The risk of difficulties in subsequently recovering any payments made in compliance with the award was again a relevant factor in *Wena Hotels*. The claimant entity lacked substantial assets and was controlled by a sole individual.[884] **616**

The *ad hoc* Committee in *Mitchell* v. *DR Congo* took the same view in the circumstances of that case. The Committee considered that there was a real risk that the Respondent would not be able to recover from the Claimant any payments made in compliance with the award, if it were to be subsequently annulled. This conclusion was reached in the light of the fact that the Claimant's activities and assets were spread across a number of jurisdictions and relatively mobile. This risk was not offset by the Claimant's offer to provide a list of assets that might be attached.[885] **617**

In *CDC* v. *Seychelles*, on the other hand, it was noted that CDC was an established entity with a broad portfolio of investment activities. There was no substantial risk of difficulties in recouping payments if the award was subsequently annulled.[886] **618**

The *ad hoc* Committee in the *MTD* case ordered the stay of execution to be continued until the date of its decision. It did so on the ground that the only prejudice that the Claimants would suffer would be delay, which was in any case considered "incidental to the Convention system of annulment".[887] Delay could be remedied by the payment of interest in the event that the application for annulment failed.[888] Chile was merely availing itself of a right given to it by the Convention.[889] The Committee was influenced by Chile's representations that the Convention was fully implemented in local law with the consequence that, consonant with Art. 54, an ICSID award is given the same effect as a final judgment of the Chilean courts, and that Chile would promptly comply with the award, if it was not annulled, as it had done in the past.[890] The Committee thought that a respondent seeking annulment should be entitled to a stay if it gives reasonable assurances that the **619**

_____

882  *Ibid.*, para. 28.
883  *Amco* v. *Indonesia*, Resubmitted Case: Interim Order No. 1, 2 March 1991, para. 19.
884  *Wena Hotels* v. *Egypt*, Procedural Order No. 1 on Continuation of Stay, 5 April 2001, para. 7(a).
885  *Mitchell* v. *DR Congo*, Decision on Continuation of Stay, 30 November 2004, paras. 17, 28.
886  *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, para. 18.
887  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 6.
888  *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, paras. 30, 36.
889  *Ibid.*, para. 26.
890  *Ibid.*, paras. 31–35; *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, para. 6.

award, if not annulled, will be satisfied. If there is doubt as to the prospects of compliance, a bank guarantee might be required.[891]

**620**   The reasoning in *CMS* v. *Argentina* closely followed the decision in *MTD* v. *Chile*. Indeed, the respective committees had two members in common. The Committee in *CMS* v. *Argentina* framed the issue of whether a stay should be continued as follows:

> 38. As a general matter a respondent State seeking annulment should be entitled to a stay provided it gives reasonable assurances that the award, if not annulled, will be complied with. It should not be exposed, while exercising procedural rights open to it under the Convention, to the risk that payment made under an award which is eventually annulled may turn to [be] irrecoverable from an insolvent claimant. At the same time a Respondent seeking a remedy under the Convention should demonstrate that for its part it will comply with the Convention, and if there is doubt in that regard the Committee may order the provision of a bank guarantee as a condition of a stay.[892]

**621**   The decisive feature for the Committee, in deciding to continue the stay, was the obligation in Art. 54 of the Convention and the steps taken by Argentina to respect and give effect to it.[893] In deciding whether to continue the stay, the Committee considered it appropriate to inquire whether the respondent State had taken satisfactory steps in accordance with its internal laws and constitution to give effect to Art. 54.[894] In the circumstances, the Committee was satisfied that Art. 54 had been given direct effect in Argentine law.[895] In the light of public statements by Argentine officials that Argentina might seek to review ICSID awards, or refuse to comply with them, the Committee requested a written statement on behalf of Argentina with respect to its compliance with the award in the event that it was not annulled. The Agent of Argentina in the case responded in writing, on behalf of Argentina, providing:

> an undertaking to CMS Gas Transmission Company that, in accordance with its obligations under the ICSID Convention, it will recognize the award rendered by the Arbitral Tribunal as binding and will enforce the pecuniary obligations imposed by that award within its territories, in the event that annulment is not granted.[896]

**622**   The Committee, noting that the Agent had authority to bind Argentina, concluded that this statement should dispel the Claimant's doubts. The Committee was satisfied that CMS would not be prejudiced by the grant of a stay, other than in respect of delay, which is "incidental to the Convention system of annulment and which can be remedied by the payment of interest".[897] The stay of enforcement was continued.

---

891   *Ibid.*, para. 29.
892   *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 38.
893   *Ibid.*, paras. 40–50.                      894   *Ibid.*, para. 41.
895   *Ibid.*, para. 45. See also *Enron* v. *Argentina*, Decision on Continuation of Stay, 7 October 2008; *Sempra* v. *Argentina*, Decision on Continuation of Stay, 5 March 2009.
896   *Ibid.*, para. 47.                          897   *Ibid.*, para. 50.

The *ad hoc* Committee in *Azurix* v. *Argentina* also offered Argentina an oppor- **623**
tunity to file a written statement of its intention to comply with the Award in the
event that it was not annulled.[898] Argentina provided an undertaking to Azurix in
identical terms to the undertaking given in *CMS* v. *Argentina*.[899] Azurix argued
that this undertaking afforded it no comfort, "given Argentina's prior actions, and
particularly in light of their recent public announcements that Argentina would
not acknowledge the final and binding nature of the Decision on Annulment in
*CMS* v. *Argentina*".[900] The *ad hoc* Committee continued the stay of enforcement.
It noted that a stay of enforcement was appropriate in all but "very exceptional cir-
cumstances".[901] Azurix had not directed the *ad hoc* Committee to circumstances
militating against the continuation of the stay, but had focused more on the issue of
whether the stay should be conditional upon the provision of security (see paras.
643–646 *infra*).

In *MINE*, Guinea's claim of irreparable injury was based on the contention that **624**
in view of its strained foreign exchange resources the termination of the stay would
lead to catastrophic consequences for its ability to conduct its affairs. The *ad hoc*
Committee pointed out that poverty as such is not a circumstance justifying a stay
any more than non-payment of the Award.[902] Continuation of a stay would only
be considered on this ground if lifting it would cause "catastrophic immediate and
irreversible consequences".[903]

In *CDC* v. *Seychelles*, the Respondent pleaded that the stay of enforcement **625**
should continue because if the Award were executed this would trigger "catas-
trophic consequences" for the country's economy. The *ad hoc* Committee balanced
such fears against CDC's "not unreasonable" fear that, if Seychelles were indeed
on the verge of financial collapse, CDC's prospects of recovery on the award
could be commensurately lessened.[904] The Committee granted the stay of enforce-
ment provided that the Respondent furnished security in the form of a letter of
guarantee.[905]

In *Mitchell* v. *DR Congo*, the *ad hoc* Committee may have been partly influenced **626**
by evidence of other pressing budgetary needs at a time when the UN Security
Council had observed that the country faced serious political instability. The
Committee granted the continuation of the stay of enforcement.[906]

*e) Posting of Security*

The requirement that the award debtor provide some security for the eventual **627**
payment of the award, should it be upheld, is a possible counterbalance to a

---

898  *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, para. 9.
899  *Ibid.*, para. 10.                          900  *Ibid.*, para. 11.
901  *Ibid.*, para. 22.
902  *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 27.
903  *Loc. cit*. See also *Sempra* v. *Argentina*, Decision on Continuation of Stay, 5 March 2009, para.
     79.
904  *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, para. 17.
905  *Ibid.*, para. 23.
906  *Mitchell* v. *DR Congo*, Decision on Continuation of Stay, 30 November 2004, para. 29.

stay of enforcement. Such a security may be in the form of a bank guarantee or a similar arrangement that may be drawn upon when the award becomes final and enforceable. The New York Convention provides for the possibility to require a "suitable security" in similar circumstances.[907] The Preliminary Draft to the Convention provided for the recommendation by the *ad hoc* committee of unspecified provisional measures for the protection of the rights of the parties in connection with a stay of enforcement (History, Vol. I, p. 238). But this power was rejected in a vote and does not appear in later drafts (see para. 574 *supra*). Neither the Convention nor the Arbitration Rules mention the posting of a security in connection with a stay of enforcement.

**628**    The practice of *ad hoc* committees is mixed in relation to requiring security to be posted if a stay of enforcement is to be continued.

**629**    In *Amco I*, Amco opposed Indonesia's request for a stay of enforcement and asked for the termination of the provisional stay. Alternatively, it requested that Indonesia be directed to post security equivalent to the sum of the unpaid award plus interest in an escrow account as a condition for continuing the stay. The *ad hoc* Committee felt empowered "to extend the stay of enforcement on condition that the party seeking annulment provide some security that the Award will be promptly paid if the application for annulment is eventually rejected".[908] Consequently, the Committee granted the stay, provided that Indonesia furnished an irrevocable and unconditional bank guarantee for payment of the Award in accordance with the final decision the *ad hoc* Committee might reach.

**630**    If Indonesia failed to arrange for such a guarantee by a specified date, the Award would become immediately enforceable.[909] The bank guarantee was issued. It was approved by the Chairman of the *ad hoc* Committee.[910] When the first Award was annulled, the bank guarantee furnished by Indonesia expired in accordance with its terms.[911]

**631**    In *Amco II*, the *ad hoc* Committee held that the "convenience provided by a bank guaranty to Amco justifies the imposition of such requirement", Stay of enforcement was continued on condition of Indonesia furnishing a bank guarantee on terms and provisions stipulated by the President of the Committee.[912]

**632**    In *MINE*, Guinea's request for continuation of the stay of enforcement was not opposed by MINE provided that Guinea posted an adequate security in the form

---

907    Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, Art. VI, 330 UNTS 42. See also UNCITRAL Model Law, 1985, Art. 36(2), 24 ILM 1313 (1985).

908    *Amco* v. *Indonesia*, Decision of 17 May 1985, unpublished; but see *Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335, 349 (1986); *Friedland, P. D.*, Stay of Enforcement of the Arbitral Award Pending ICSID Annulment Proceedings, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 177 (2004). See also *Enron* v. *Argentina*, Decision on Continuation of Stay, 7 October 2008; *Sempra* v. *Argentina*, Decision on Continuation of Stay, 5 March 2009, published while this manuscript was near completion, preventing a detailed treatment of these decisions.

909    *Friedland*, Provisional Measures, pp. 349/50.

910    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 8.

911    *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 2.18.

912    *Amco* v. *Indonesia*, Resubmitted Case: Interim Order No. 1, 2 March 1991, para. 19.

of a bank guarantee. Guinea argued that an *ad hoc* committee's power is limited to granting or denying a stay and that it has no power to attach conditions to this decision. Therefore, in Guinea's opinion, the decision in *Amco I* (see paras. 629, 630 *supra*) was in error. Even if this were otherwise, Guinea argued, the *ad hoc* Committee should exercise its discretion and decline to order the posting of security in view of the heavy financial burden this would impose upon Guinea.[913]

The *ad hoc* Committee did not address the question of its power to order **633** the posting of a security but declined to order a bank guarantee as a matter of discretion:

> 22. Regardless of its power to do so, the present Committee remains unconvinced that Guinea should be required to provide a bank guarantee in return for a continuation of the provisional stay of enforcement of the Award. To require such a guarantee would, in addition to involving what might turn out to be very heavy expenditure for the fees of the guaranteeing bank and possibly making it necessary to freeze the amount of the Award and the interest accruing thereon, place MINE in a much more favourable position than it enjoys at the present time and also in a more favourable position than it enjoyed prior to the provisional stay. The Committee does not feel that such a one-sided change in the relative position of the parties is justified.[914]

The Committee was unimpressed by MINE's argument that the latter was entitled to a guarantee that the Award would be promptly paid in case it remained unannulled. Neither the possibility that Guinea might move its assets to avoid honouring its debts nor the problems that might be created by State immunity from execution, preserved by Art. 55, seemed a sufficient reason to require a bank guarantee.[915]

In *SPP* v. *Egypt*, the *ad hoc* Committee received a request for the continuation **634** of the provisional stay of enforcement. But the parties reached an agreement to the effect that Egypt would post a bank guarantee in exchange for a waiver by SPP to make any attachment or bring enforcement proceedings pending the outcome of the annulment proceedings (see also paras. 592, 599 *supra*).[916]

In *Wena Hotels*, the *ad hoc* Committee considered it "fair and just . . . that the **635** continuation of the stay be counter-balanced by requiring the posting of security for the performance of the Award in the event the application is denied".[917] The *ad hoc* Committee added the following specification:

> The letter of guarantee may be entirely drawn down upon by Wena Hotels Limited in the event that the application is denied in its entirety. In the event the application is accepted only in part, the letter of guarantee may be drawn down upon Wena Hotels Limited to the extent of the unannulled part of the Award, subject to any

---

913  *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, paras. 15, 20–21.
914  *Ibid.*, para. 22.
915  *Ibid.*, para. 25. See also *Sturzenegger*, ICSID, pp. 181/2.
916  *Craig*, The Final Chapter, pp. 285, 290. The case was settled and discontinued without a published decision by the *ad hoc* Committee.
917  *Wena Hotels* v. *Egypt*, Procedural Order No. 1 on Continuation of Stay, 5 April 2001, para. 7(b).

1078                    THE ICSID CONVENTION: A COMMENTARY

> further stay granted by the Committee under Arbitration Rule 54(3) or by a new
> Arbitral Tribunal under Arbitration Rule 55(3).[918]

After the *ad hoc* Committee had declined to annul the Award the Claimant was able to draw down upon the letter of guarantee.

**636**      An order that the Respondent post security with a leading international bank for the sum of the award plus interest was also made as a condition for the continuation of a stay of enforcement in *CDC* v. *Seychelles*.[919] Given that Seychelles had promptly paid an advance of the costs of the proceeding to ICSID, the Committee presumed that Seychelles would also be able to furnish security and meet the expenses attendant in doing so. The *ad hoc* Committee said:

> . . . continuation of the complete stay of the Award on condition of the posting
> of full security maximally protects the legitimate interests of both Parties to this
> proceeding . . .[920]

**637**      In *Repsol* v. *Petroecuador*, Petroecuador challenged the *ad hoc* Committee's competence to require that a bond be posted as a condition for the continuation of a stay of enforcement.[921] The *ad hoc* Committee concluded that the combined effect of the last sentence of Art. 52(3) of the Convention, the first sentence of Art. 52(5), and the first sentence of Art. 54(3) of the Arbitration Rules, demonstrated that it did have such competence. The *ad hoc* Committee observed that it had sufficient authority to order the stay of enforcement of the challenged award. In the light of these provisions and "the consistent jurisprudence of ICSID", the *ad hoc* Committee also concluded that, in deciding whether to do so, it also had the authority to establish conditions for the continuation of the stay.[922] The *ad hoc* Committee considered that:

> [T]he rule emerging from earlier arbitration proceedings is that the party request-
> ing the annulment of an award may obtain its stay of enforcement for the duration
> of the proceeding, upon the posting of a bond for the total amount of the award.[923]

**638**      The *ad hoc* Committee distinguished decisions in which a bond was not required for the continuation of a stay by the fact of the relatively modest amount in dispute, or by other special circumstances. A bond was appropriate "in order to prevent a party from applying for an annulment for the purposes of delaying or extending the enforcement date for the arbitral award".[924] In the circumstances, Petroecuador had already benefited from a long stay of enforcement of the award without incurring any costs, to Repsol's prejudice.[925] The Committee ordered that the stay of enforcement would remain in effect for the duration of the annulment

---

918  *Ibid.*, para. 7(c). See also *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 6.
919  *CDC* v. *Seychelles*, Decision on Continuation of Stay, 14 July 2004, noted by *Sinclair*, Award-Creditor Security.
920  *Ibid.*, para. 22. The Committee quoted the First Edition of this Commentary at para. 20.
921  *Repsol* v. *Petroecuador*, Procedural Order No. 4, 22 February 2006, para. 13.
922  *Ibid.*, paras. 14–15.
923  *Repsol* v. *Petroecuador*, Procedural Order No. 1, 22 December 2005, para. 8.
924  *Ibid.*, para. 9.                    925   *Loc. cit.*

proceeding, provided Petroecuador posted an unconditional and irrevocable bond for the full amount of the award plus interest. The bond was to be delivered to the President of the *ad hoc* Committee and held in escrow. In the event that the award was annulled, it would be returned. If the award was partially annulled, it would be returned in part. Otherwise, Repsol would be entitled to collect, without prejudice to any possible continuation of a stay allowed by Arbitration Rule 54(3) or ordered by a new tribunal under Rule 55(3).

On 9 January 2006, the *ad hoc* Committee extended the time limit for posting the bond until 25 January 2006. That time limit was further extended to 1 February 2006. On 22 February 2006, the *ad hoc* Committee noted that Petroecuador had not posted the bond as directed and, therefore, terminated the stay of enforcement of the Award.[926] **639**

The *ad hoc* Committee in *Mitchell* v. *DR Congo* declined, by a majority,[927] to require the Respondent to provide a guarantee in respect of the sum due under the award. The Committee considered the "strongest argument" against requiring a guarantee was that it would put the beneficiary in a much more favourable position regarding enforcement than it enjoyed prior to granting the continuation of the stay. The Committee recited Art. 55, which confirms that the Convention does not derogate from the right of Contracting States to assert immunity from execution. The Committee also thought that, if it became routine for a guarantee to be required, this practice may have a deterrent effect on the submission by developing countries of applications for annulment made in good faith.[928] **640**

The *ad hoc* Committee in *MTD* v. *Chile* also observed that "since a stay is not automatic the Tribunal [*sic* Committee] could grant the request subject to conditions, including a condition that an appropriate bond be provided".[929] However, the *ad hoc* Committee agreed with the view that a bank guarantee would put a claimant in a better position than it would be otherwise, since it would convert the obligation in Art. 53 into a financial guarantee and avoid the reservation of sovereign immunity in Art. 55.[930] **641**

The *ad hoc* Committee in *CMS* v. *Argentina* likewise confirmed that *ad hoc* committees are competent to order a stay of enforcement subject to conditions, "including a condition that an appropriate bond be provided".[931] The *ad hoc* Committee also thought that requiring a State to provide a bank guarantee would place a claimant in a more advantageous position than if annulment had not been sought. It would convert Art. 53 into a "financial guarantee" and avoid any issue of sovereign immunity from execution, "which is expressly reserved" by Art. 55. **642**

926   *Repsol* v. *Petroecuador*, Procedural Order No. 4, 22 February 2006, para. 19.
927   *Mitchell* v. *DR Congo*, Decision on Continuation of Stay, 30 November 2004, para. 43.
928   *Ibid.*, paras. 30–42.
929   *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 26.
930   *Ibid.*, para. 30.
931   *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 35.

The delay to the claimant, and the consequent possibility of prejudice, could be dealt with by an award of interest in the event that the application for annulment was denied.[932] Given Argentina's commitments, in addition to the obligation in Art. 54 to enforce the pecuniary obligations imposed by the Award in the event it was not annulled, the Committee was satisfied that a bank guarantee was not required as a condition of continuing the stay.[933]

**643**    In *Azurix* v. *Argentina*, Argentina argued that no bank guarantee should be required because, as the Committee summarized:

   (i)  Argentina's domestic law already secures execution of the Award;

  (ii)  provision of such a guarantee would adversely affect the right of defense;

 (iii)  no provision of the ICSID Convention establishes the need to post bonds for the purpose of continuing a stay of enforcement of an award;

 (iv)  the commission that an international bank would charge to provide such a guarantee would be exorbitant (stated to be approximately USD 23 million);

  (v)  as has been recognised in other ICSID cases, provision of a guarantee would place a claimant such as Azurix in a much more favourable position than it presently enjoys by converting an undertaking of compliance into a financial guarantee and by avoiding any issue of sovereign immunity; and

 (vi)  provision of a guarantee would penalize Argentina for requesting annulment and curtail the right provided for by Article 52 of the ICSID Convention to apply for annulment.[934]

**644**    Azurix countered that security was required because the application for annulment interfered with the enforceability of a final and binding award. Security would "counterbalance" the negative effect of the stay on the award creditor.[935] Accrual of interest would not redress the harm caused by delay, Azurix argued, since it had "a present right to compensatory funds and to *use* of the funds".[936] Security was also justified where there was doubt about the award debtor's intent to comply promptly with the award if it survived the application for annulment.[937] Azurix argued that there was little prospect that Argentina would comply with its obligation to pay given the statements of officials and its default on other international financial obligations.[938] Azurix argued that the relevant standard was that security should be required unless there is no "reasonable doubt as to the State's intent to comply".[939]

**645**    The *ad hoc* Committee concluded that in the particular circumstances Argentina should not be required to furnish security. It did not accept that there was any rule or norm mandating security to counterbalance the continued stay of enforcement.[940] The Committee explained that the "integrity" of the ICSID system and the Contracting States' confidence in it require a mechanism to annul awards where the

---

932  *Ibid.*, para. 39.

933  *Ibid.*, para. 50.

934  *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, para. 14(g) (footnote omitted).

935  *Ibid.*, para. 15(c), (d), (f).

936  *Ibid.*, para. 15(o) (emphasis original).

937  *Ibid.*, para. 15(g).

938  *Ibid.*, para. 15(h), (i).

939  *Ibid.*, para. 15(i).

940  *Ibid.*, para. 25.

circumstances so require.[941] The Committee denied that there could be any rule requiring security, since:

> To require that security be provided as a matter of course in all but the exceptional case would risk compromising the important confidence-balancing function for state parties served by the annulment procedure.[942]

The *ad hoc* Committee also did not accept that there was a rule that security **646** should be required if there was a reasonable doubt as to the State's intent to comply with the Award. The Committee noted that Art. 52(5) grants an *ad hoc* committee only a general discretion to grant a stay on terms it sees fit. It does not state that security is the *quid pro quo* of a stay. To require otherwise would cut across the Convention's provisions on enforcement and immunity.[943] The applicant for annulment was under no obligation to explain why security should be not required; it was for the party seeking security to make out its case for security consequent upon a stay being ordered.[944] There was no risk of prejudice beyond mere delay, such as a risk that assets might be moved or sold, to justify the request for security.[945] Mere delay could be compensated by interest and did not warrant the provision of security.[946] Azurix's right to enforcement was circumscribed from the outset by the express terms of Art. 53, which provides that parties shall comply with awards "except to the extent that enforcement shall have been stayed".[947] Such qualified rights could not be the subject of prejudice.

In the First Edition of this Commentary, it was said that the requirement of a **647** performance bond by the party seeking annulment has much to commend itself. As the above survey shows, this solution has been adopted in a number of cases. Until an award is annulled, the award debtor must be presumed to be under an obligation to pay eventually. The award creditor's annulment risk may be suitably offset by a reduction of his enforcement risk. The award debtor does not incur any additional risk if the stay of enforcement is conditioned on a security and does not have to worry about recouping payments made under the award in case the annulment is granted. The guarantee will only operate if annulment is rejected and the award becomes final.

The option available to *ad hoc* committees of making a stay of enforcement **648** conditional upon the posting of a security for the award's eventual performance serves a dual purpose. It facilitates enforcement. But it may also serve as a possible deterrent to requests for annulment that are motivated primarily by a desire to delay and, possibly, to avoid compliance. Any improvement of the effectiveness and efficiency of ICSID's dispute settlement system will ultimately further the Convention's goal of furthering co-operation for international development.

The First Edition of this Commentary also expressed the view that resisting **649** enforcement of an award that has become final after annulment is rejected, through

---

941  *Ibid.*, paras. 28, 30.
943  *Ibid.*, paras. 33–35, 39, 43.
945  *Ibid.*, paras. 43/4.
947  *Ibid.*, paras. 41/2.

942  *Ibid.*, para. 31.
944  *Ibid.*, para. 37.
946  *Ibid.*, para. 40.

immunity or otherwise, is not a legitimate position that deserves protection.[948] That view has not been shared, however, by some *ad hoc* committees.[949] The alternative view has been expressed that to apply for annulment is a right afforded to parties by the Convention. If onerous requirements were to be required as a condition for seeking annulment, that might upset the "integrity" of the system and Contracting States' confidence in the checks and balances it provides to remedy egregious faults in the arbitral process and awards.

### f) Termination and Extension

**650**    The *ad hoc* committee may terminate a stay of enforcement at any time at the request of either party (Arbitration Rule 54(3)). Such a termination is called for if the circumstances that have required the stay (see paras. 609–626 *supra*) are no longer present. Any existing stay of enforcement is terminated automatically on the date on which the *ad hoc* committee makes its final decision on the application for annulment. If annulment is rejected, the award is binding and enforceable in accordance with Arts. 53 and 54. If the award is annulled, there is nothing to enforce until a new tribunal has rendered a new award under Art. 52(6).

**651**    In *CMS* v. *Argentina*, the *ad hoc* Committee specifically addressed the extent of a stay of enforcement. The award had provided that Argentina could, within a certain time limit, acquire CMS's shares in the Argentine subsidiary that had been the subject of its claim upon payment of compensation decided in the award, plus an additional sum of US $2,148,100. The Committee held that, since the award of compensation was stayed, the condition precedent to the transfer of shares could not be met and therefore the time for the acquisition of shares did not run.[950]

**652**    The fate of a security attached to the stay of enforcement (see paras. 627–649 *supra*) will depend on the outcome of the annulment proceedings. If the award is upheld, the award's creditor will be able to draw upon a bank guarantee in accordance with its terms. If the award is annulled the security will lapse. In *Amco I*, the *ad hoc* Committee, after annulling the Award, stated that the bank guarantee issued by Indonesia (see paras. 629, 630 *supra*) would expire in accordance with its terms.[951]

**653**    The situation is more complicated in case of a partial annulment (see paras. 494–510 *supra*). Part of the award remains in existence and would, in theory, be

---

948    See also *Craig*, The Final Chapter, pp. 285, 293; *Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335, 350 (1986); *Sturzenegger*, ICSID, p. 182; *Reisman*, The Breakdown, p. 804; *Broches*, Observations, p. 373; *Reisman*, Repairing ICSID's Control System, p. 207; *Broches*, On the Finality of Awards, pp. 97/8.

949    *MTD* v. *Chile*, Decision on Continuation of Stay, 1 June 2005, para. 30; *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 39; *Azurix* v. *Argentina*, Decision on Continuation of Stay, 28 December 2007, paras. 34, 43.

950    *CMS* v. *Argentina*, Decision on Continuation of Stay, 1 September 2006, para. 52; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 160, 163(3).

951    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, Part X; *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992, para. 2.18. See also *Sempra* v. *Argentina*, Decision on Continuation of Stay, 5 March 2009, para. 117 specifying terms of escrow.

enforceable. But an award that has been annulled in part and upheld in another is likely to create a lopsided situation. This is particularly so if the part relating to one party's claim is annulled and the part relating to the other party's (counter)claim is upheld. In all likelihood, a new tribunal constituted under Art. 52(6) will have to decide on the dispute relating to the award's annulled portion. Arbitration Rule 55(3) provides that the new tribunal may stay or continue to stay the enforcement of the unannulled portion of the original award until its own award is rendered. In order to bridge the period between the decision on partial annulment and the point at which the new tribunal is constituted and ready to rule on a stay of enforcement, an *ad hoc* committee can order a temporary stay for that period. Arbitration Rule 54(3) provides that a committee granting partial annulment may order the temporary stay of enforcement of the award's unannulled portion in order to give either party an opportunity to request the new tribunal to grant a stay pursuant to Rule 55(3).

**654** In *MINE*, the *ad hoc* Committee annulled the part of the Award relating to damages due to MINE but did not annul the Award's portion on Guinea's counterclaims (see para. 501 *supra*). That portion remained in effect and became final. The *ad hoc* Committee noted that the stay of enforcement ordered by it terminated automatically on the date of the Decision on Annulment. It ordered, in accordance with Rule 54(3), the temporary stay of enforcement of the unannulled portion of the Award for a period of 90 days in order to give either party the opportunity to request a stay from the new tribunal under Rule 55(3).[952]

**655** In *CMS* v. *Argentina*, the *ad hoc* Committee annulled the part of the Award dealing with the umbrella clause. But it upheld other parts of the Award that had found independent breaches of the BIT. The *ad hoc* Committee found that the Award's partial annulment did not affect its finding on damages. As a consequence the stay of enforcement was automatically lifted as from the date of the Decision on Annulment.[953]

## R. "(6) If the award is annulled the dispute shall, at the request of either party, be submitted to a new Tribunal constituted in accordance with Section 2 of this Chapter."

### 1. History and Introduction

**656** A decision by an *ad hoc* committee upholding a request for annulment invalidates the original award. But it does not replace it with a new decision on the merits. In case of a complete annulment, the parties are sent back to square one and are given the opportunity to start ICSID arbitration proceedings afresh. In case of a partial annulment, the effect is somewhat more limited but normally also requires new proceedings.

---

952  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 7.01. The case was settled before the constitution of a new tribunal.

953  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 99, 100, 160.

1084                        THE ICSID CONVENTION: A COMMENTARY

**657**    Art. 52(6) follows the example of Art. 37 in the International Law Commission's 1958 Model Rules.[954] It shows little change during the Convention's drafting (History, Vol. I, pp. 240/1) and evoked no comment from the delegates (History, Vol. II, pp. 856, 950).

**658**    Only a few cases have yielded published decisions in resubmitted proceedings. In *Amco II* the new Tribunal gave a Decision on Jurisdiction followed by an Award.[955] This Award was the object of a second set of annulment proceedings that ended in a Decision rejecting the parties' applications for annulment of the second Award but annulling the Decision on Supplemental Decision and Rectification[956] (see paras. 306–308 *supra*).

**659**    In *Klöckner* v. *Cameroon*, the Decision on Annulment led to the resubmission of the case and to a second Award.[957] The second Award was the subject of another set of annulment proceedings which ended with a Decision rejecting the parties' applications for annulment.[958] For many years these two decisions were unpublished.[959] Both decisions have recently been made available for publication in the ICSID Reports.[960]

**660**    In *MINE* v. *Guinea*, the case was resubmitted under Art. 52(6) after the Decision on Annulment.[961] The parties agreed on a settlement and the proceeding was discontinued at their request before the constitution of a new tribunal. An Order taking note of the discontinuance was issued by the Secretary-General pursuant to Arbitration Rule 43(1) on 20 November 1990.

**661**    In *Vivendi* v. *Argentina*, the Decision on Annulment led to the resubmission of the case. In *Vivendi II*, the new Tribunal gave a Decision on Jurisdiction followed by an Award.[962] This new Award is the object of yet another application for annulment registered on 19 December 2007.

### 2. Initiative for Resubmission

**662**    The initiative for resubmission must come from one or both parties. There is no resubmission *ex officio* after the annulment of an award. Resubmission is discretionary. If neither party wishes to go through another round of ICSID arbitration, the annulment will be the last stage of the proceeding. If the *ad hoc* committee has annulled the award because of a total lack of jurisdiction of ICSID, a resubmission has little chance of success (but see para. 688 *infra*).

**663**    A party confronted with the annulment of an award may wish to turn to another form of dispute resolution including non-ICSID arbitration or domestic courts.

---

954   YBILC 86 (1958-II).
955   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990.
956   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Annulment, 3 December 1992.
957   *Klöckner* v. *Cameroon*, Resubmitted Case: Award, 26 January 1988.
958   *Klöckner* v. *Cameroon*, Resubmitted Case: Decision on Annulment, 17 May 1990.
959   See a note in 2 ICSID Reports 163.          960   Forthcoming.
961   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989.
962   *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005; *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007.

In doing so, it is likely to be confronted with the argument that the exclusive remedy rule enshrined in Art. 26 continues to apply and that resubmission under Art. 52(6) is its only option. This argument is reinforced by the mandatory language of Art. 52(6) ("shall, at the request of either party, be submitted to a new Tribunal"). But this principle may be inapplicable if the annulment is based on the absence of ICSID's jurisdiction (see Art. 53, paras. 31, 32, 62). On the other hand, a new tribunal under Art. 52(6) is not bound by the reasoning of the *ad hoc* committee and may reach a different conclusion on jurisdiction (see Art. 54, paras. 35, 45).

Either of the parties may take the initiative for a resubmission. The existence **664** of claims and counter-claims as well as a situation of partial annulment may contribute to a situation in which both parties have an interest in relitigating the case. In *Klöckner II* as well as in *Amco II*, requests for resubmission came from both parties.[963] In *Vivendi II* the request for resubmission came from the Claimant.[964]

### 3. Procedure for Resubmission

The procedure for resubmission is regulated by Arbitration Rule 55:         **665**

**Rule 55**

*Resubmission of Dispute after an Annulment*

(1) If a Committee annuls part or all of an award, either party may request the resubmission of the dispute to a new Tribunal. Such a request shall be addressed in writing to the Secretary-General and shall:

(a) identify the award to which it relates;
(b) indicate the date of the request;
(c) explain in detail what aspect of the dispute is to be submitted to the Tribunal; and
(d) be accompanied by a fee for lodging the request.

(2) Upon receipt of the request and of the lodging fee, the Secretary-General shall forthwith:

(a) register it in the Arbitration Register;
(b) notify both parties of the registration;
(c) transmit to the other party a copy of the request and of any accompanying documentation; and
(d) invite the parties to proceed, as soon as possible, to constitute a new Tribunal, including the same number of arbitrators, and appointed by the same method, as the original one.

(3) [see paras. 674, 697 *infra*]

---

963  *Klöckner* v. *Cameroon*, Resubmitted Case: Award, 26 January 1988, paras. 58, 62; *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 562, 567.

964  *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 5.

> (4) Except as otherwise provided in paragraphs (1)–(3), these Rules shall apply
> to a proceeding on a resubmitted dispute in the same manner as if such dispute
> had been submitted pursuant to the Institution Rules.

**666**    The Secretary-General has no discretion in registering the request. If the request
relates to an award that has been annulled in whole or in part and comes from a
party to the original proceeding (see paras. 670, 671 *infra*), the Secretary-General
must register the request. The request is not subject to a time limit. Therefore,
the Secretary-General has no authority to refuse registration of a request as being
outside a time limit.[965]

**667**    Neither does the Secretary-General have a screening power in analogy to Art.
36(3) with respect to a request for resubmission. This applies even if the *ad hoc*
committee has annulled the award for manifest excess of powers because of a total
lack of jurisdiction. Even if on the basis of the *ad hoc* committee's decision, the
Secretary-General believes that the dispute is manifestly outside the jurisdiction
of the Centre, he/she must register the request for resubmission (see also para. 688
*infra*).

### 4. Constitution of the New Tribunal

**668**    The new tribunal is to be constituted in accordance with Section 2 of
Chapter IV, that is Arts. 37–40. These Articles regulate the constitution of the
original tribunal. Arbitration Rule 55(2)(d) provides that the Secretary-General
shall invite the parties to constitute a new tribunal as soon as possible. The new
tribunal is to have the same number of arbitrators and is to be appointed by the
same method as the original one. This provision is designed to simplify and expe-
dite the procedure for the new tribunal's constitution. In particular, it will carry
over any agreement that the parties may have reached on the original tribunal's
composition.

**669**    The parties are free to agree otherwise. They may agree on a sole arbitrator
if the original tribunal was composed of three arbitrators or vice versa. They
may also agree on a different method for the appointment of arbitrators. This
is a consequence of the fact that the Arbitration Rules are generally open to
modification by agreement of the parties (see Art. 44, paras. 11–31).[966] In principle,
a person who had previously acted as conciliator or arbitrator in the case may
not be appointed as a member of the new tribunal (Arbitration Rule 1(4)). This
prohibition extends to members of the *ad hoc* committee. But this rule too is
subject to modification by agreement of the parties (see Art. 40, para. 25).

### 5. Status of Parties in Resubmitted Proceeding

**670**    Submission to a new tribunal is in respect of "the dispute". This means that the
parties to the resubmitted proceeding must be the same parties as in the original
proceeding. Problems may arise if one of the parties changes its legal status

---

965    See also Note B to Rule 55 of 1968, 1 ICSID Reports 116.
966    See also Note C to Arbitration Rule 55 of 1968, 1 ICSID Reports 116.

or ceases to exist. On the host State's side, this may lead to problems of State succession (see Art. 25, paras. 306–310).

On the investor's side, problems may arise if there is a change of corporate **671** structure, assignment of rights or a dissolution of a corporate investor (see Art. 25, paras. 336–363). In *Amco* v. *Indonesia*, a claimant, Amco Asia, a company registered in Delaware, was dissolved approximately one month after the rendering of the first Award. The Tribunal in the resubmitted case found that the legal status and capacity of a company was determined by the law of the State of incorporation. Therefore, the dissolution of Amco Asia was governed by the law of the State of Delaware (see Art. 42, para. 158). Under Delaware law, Amco Asia remained a juridical entity for the purpose of judicial proceedings begun before or within three years of its dissolution (see Art. 25, para. 341).[967]

In *Vivendi II*, one of the original claimants, CGE, had been succeeded in the **672** resubmitted case by Vivendi Universal. Argentina contended that Vivendi Universal had failed to establish itself as the successor-in-interest of CGE. The Tribunal in the resubmitted case found that CGE had changed its name to Vivendi S.A. which then merged with several other companies to form Vivendi Universal. The latter company continued to hold the shares in the Argentinian company CAA that had previously been held by CGE. Vivendi Universal was the successor of CGE. Therefore, the parties to the resubmitted case were the same as the parties to the original case.[968]

The original parties retain their position as claimant and respondent. In *Amco II*, **673** requests for the resubmission of the dispute came from both parties. Indonesia initially described itself as a claimant in the resubmitted proceeding. The Tribunal said:

> As these proceedings are a resubmission of what is not *res judicata* in the dispute brought before the first Tribunal, the starting point is that the parties in this resubmission are in the same position as they were before the first Tribunal.[969]

The Tribunal added that Indonesia was not procedurally disadvantaged by being in the position of defendant. The ability to advance arguments and new claims (see paras. 689–695 *infra*) did not turn on a party's status as claimant or defendant (see also Art. 46, para. 66).[970]

### 6. *Partial Annulment and* Res Judicata

Art. 52(3) states that an *ad hoc* committee has the authority to annul the award **674** "or any part thereof" (see paras. 494–510 *supra*). Arbitration Rule 55(3) provides in part:

---

967  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 561/2.

968  *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, paras. 10(i), 14–18, 34–35, 73, 82–86.

969  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 567.

970  At p. 568.

> (3) If the original award had only been annulled in part, the new Tribunal shall not reconsider any portion of the award not so annulled.

In other words, the unannulled portion of the original award remains *res judicata* and is binding on the new tribunal.[971]

**675**    This issue was not discussed during the Convention's drafting but assumed great importance in *Amco II*.[972] The *ad hoc* Committee had annulled the first Award as a whole but subject to broad qualifications. In addition, it identified certain specific findings of the first Tribunal to which the annulment did or did not apply (see para. 496 *supra*).[973]

**676**    The Tribunal in the resubmitted case, *Amco II*, undertook a careful stocktaking of findings of the first Tribunal that had been annulled or had not been annulled by the *ad hoc* Committee. At an early stage of the proceeding it issued a "Provisional Indication" as to what had been annulled and what remained *res judicata*.[974] The two lists were substantially supplemented in the Tribunal's Decision on Jurisdiction. It identified a list of points on which the *ad hoc* Committee had explicitly refused to annul the first Tribunal's findings or had specifically confirmed the holdings in the original Award. These points were held by the new Tribunal to be pertinent to an understanding of the "qualifications" made by the *ad hoc* Committee to its annulment of "the Award as a whole". In addition, the new Tribunal gave a list of specific annulment findings of the *ad hoc* Committee.[975] It was clear that points on which the Award was annulled fell to be relitigated.[976] It was equally clear that matters sought by a party to be annulled but which had expressly not been annulled or had been expressly confirmed were *res judicata*.[977]

**677**    Less obvious was the fate of holdings by the first Tribunal that had not been challenged in the annulment proceedings and on which the *ad hoc* Committee, consequently, had not made a pronouncement. Amco contended that these matters could be relitigated. Indonesia argued to the contrary. The new Tribunal found that these matters were *res judicata*:

> The Tribunal is unable to accept Amco's contention. Matters decided by the first Tribunal but never put forward for annulment are binding on the parties and can not be relitigated. This is not because, as Indonesia suggests . . . such matters are implicitly confirmed by the *ad hoc* Committee and are therefore binding, but simply because, never having been before the *ad hoc* Committee, they remain binding as *res judicata* of the first Tribunal. However, it follows from the present

---

971    Note D to Arbitration Rule 55 of 1968 explains that this is in accordance with the first sentence of Art. 53(1), which indicates that awards shall not be subject to appeal except as provided in the Convention. 1 ICSID Reports 117.

972    See also *Broches*, Observations, p. 334; *Curtis*, Amco v. Indonesia, pp. 107, 108; *Giardina*, ICSID, pp. 215/6, 216/7, 217/8; *Lamm*, Jurisdiction of the International Centre, p. 478; *Rambaud*, De la compétence, pp. 209, 212; *Reisman*, The Breakdown, pp. 781/2, 786, 798–802.

973    *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986.

974    Provisional Indication of 21 December 1987, cited in *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 547.

975    At pp. 546/7, 553–556.    976    See also at p. 558.

977    At p. 553.

> Tribunal's general approach [to] *res judicata* that, while unchallenged findings of the first Tribunal will constitute *res judicata*, not every incidental statement or procedural ruling made by the first Tribunal is to be treated as a "finding" to which this principle applies.[978]

The Tribunal added that any other result would lead to the somewhat illogical consequence that a party wishing to rely on a finding of the original tribunal would have to bring it before the *ad hoc* committee in the hope that an undesired challenge will be rejected in order to have it affirmed as *res judicata*.[979]

**678** In its Award on the merits, the new Tribunal carefully followed the distinction between findings in the first Award that had been annulled and therefore needed to be relitigated and findings that had not been annulled and therefore were *res judicata*. At the beginning of its Award, it identified a list of issues of fact or law on which there were no *res judicata* findings and which, therefore, had to be decided.[980] On the other hand, the new Tribunal relied on a number of findings of the first Tribunal which it had found to be *res judicata*.[981] One example was the finding of the first Tribunal that the conduct of the army and police in the hotel's takeover constituted an unlawful act for which Indonesia was internationally responsible. The *ad hoc* Committee had upheld this finding of illegality. Therefore, the finding was *res judicata* and binding on the new Tribunal.[982]

**679** In *Vivendi I* the original Tribunal had distinguished between treaty claims and contract claims. It found that it had jurisdiction over the former but was unable to adjudicate upon them before the competent domestic courts had decided upon the contract claims. In addition, the Tribunal dismissed claims directed at the Argentine Republic for failure to respond to the position in the province to prevent the actions which had caused the damage to the investor.[983] The *ad hoc* Committee partially annulled the Award for manifest excess of powers. It found that the Tribunal's affirmative decision as to its jurisdiction had been correct but found that the Tribunal had manifestly exceeded its powers by not examining the merits of some of the claims before it.[984]

**680** The Tribunal in *Vivendi II* found that jurisdiction under the ICSID Convention and under the BIT had been established by the First Tribunal.[985] The *ad hoc* Committee had found that this finding of jurisdiction was correct.[986] The First Tribunal's decision on jurisdiction was governed by the doctrine of *res judicata* and binding on the new Tribunal.[987] Arbitration Rule 55(3) adopts the doctrine of *res judicata* and precludes resubmission to a new tribunal of any claims or issues

---

978  At pp. 556/7.                          979  At p. 558.
980  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 36.
981  *Ibid.*, paras. 61, 65, 70, 132, 146, 164, 257.   982  *Ibid.*, paras. 41–63.
983  *Vivendi* v. *Argentina*, Award, 21 November 2000, paras. 53, 54, 77–80, 83–90, 92.
984  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 41, 60, 76, 86, 89–92, 95–96, 101, 103, 105, 108, 111, 112, 115.
985  *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 66.
986  *Ibid.*, para. 70.                       987  *Ibid.*, paras. 71, 72.

adjudicated by the First Tribunal and not subsequently annulled.[988] It followed that the new Tribunal was precluded from reconsidering the First Tribunal's jurisdictional conclusions pursuant to which the requirements for jurisdiction were fulfilled.[989]

**681**    More specifically, the new Tribunal noted that the First Tribunal had held that CGE, as the majority shareholder of CAA, could pursue the treaty claims it asserted. That holding not having been annulled but having been endorsed by the *ad hoc* Committee was *res judicata*.[990] Similarly, the First Tribunal's finding as to CAA's French nationality had been endorsed by the *ad hoc* Committee and was hence *res judicata*.[991]

**682**    The new Tribunal confirmed that the First Tribunal had found that it had jurisdiction over all claims arising under the BIT, including BIT claims relating to rights and obligations under the Concession Contract. The *ad hoc* Committee had not annulled this finding but had confirmed it. The new Tribunal concluded:

> Because the *ad hoc* Committee affirmed the jurisdiction of the First Tribunal and annulled the portion of the First Tribunal's Award where it declined to deal with those claims on the merits, this Tribunal is now charged with resolving all claims for Treaty breach, including contract-related Treaty claims.[992]

### 7. Legal Effect of Reasoning of *Ad Hoc Committees*

**683**    *Ad hoc* committees were not content to diagnose specific grounds for annulment but have delved deeply into the merits of the cases before them, often expressing opinions as to what the correct decision should have been. This practice is evident, in particular, in the context of manifest excess of powers for failure to apply the proper law and failure to state reasons (see paras. 214–225, 227, 229, 230–232, 239, 241, 267, 366 *supra*). Before a new tribunal, the question arises whether the findings of the *ad hoc* committee on the substance of the case are *res judicata* and binding[993] or whether the new tribunal is free to make its own determinations once the award or part of the award has been annulled.

**684**    The expansive nature of the reasoning in the decisions on annulment would indicate that the *ad hoc* committees saw it as part of their mission to give guidance to new tribunals after annulment. In particular, the *ad hoc* Committee in *Klöckner I*, after having annulled the Award for manifest excess of powers, proceeded to discuss other grounds for annulment "because it may be of interest to the parties and to the new Tribunal . . . to have additional indications, . . ." (see paras. 347, 525 *supra*).[994] Similarly, the *ad hoc* Committee in *CMS* v. *Argentina* diagnosed and discussed "a series of errors and defects" but declined to annul most of the

---

988   *Ibid.*, para. 75.                          989   *Ibid.*, paras. 78, 87.
990   *Ibid.*, para. 89.
991   *Ibid.*, paras. 95–97. See also *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, para. 7.2.5.
992   *Ibid.*, para. 114.
993   *Seidl-Hohenveldern*, Die Aufhebung, pp. 104, 116/7, advocates this solution *de lege ferenda*.
994   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, para. 82.

Award.[995] The detailed reasoning in the decisions on annulment going beyond the reasons for annulment listed in Art. 52(1) may be explained by the fact that Art. 52(4) enjoins the *ad hoc* committee to proceed in accordance with Art. 48 which in para. 3 requires a full statement of reasons.

Before the new Tribunal in *Amco II*, the argument was put forward on behalf of Indonesia that not only the *dispositif* of the Decision on Annulment as to what is annulled was binding on the new Tribunal. Indonesia argued that the principle of integrality of the Annulment Decision required that certain findings of fact and law that were essential to, or necessarily flow from, the Annulment Decision must also be binding on the new Tribunal.[996] The new Tribunal refused to accept the Indonesian argument under which the reasons of the *ad hoc* Committee were to be treated as *res judicata*, effectively closing off annulled parts of the Award from redetermination. Rather, the normal effect of annulment was to place the parties in the legal position in which they stood before the commencement of the proceedings.[997] Only the *ad hoc* Committee's determination as to the existence of one of the grounds for annulment listed in Art. 52(1) was binding. The *ad hoc* Committee was not an appeals court rehearing the case on its merits.[998] An examination of various authorities and of the Convention's system led the new Tribunal to the following conclusion:

685

> The authority given to the *ad hoc* Committee is clearly that of nullity and not of substantive revision.
>
> If the present Tribunal were bound by "integral reasoning" of the *ad hoc* Committee, then the present Tribunal would have bestowed upon the *ad hoc* Committee the role of an appeal court. The underlying reasoning of an *ad hoc* Committee could be so extensive that the tasks of a subsequent Tribunal could be rendered mechanical, and not consistent with its authority – as indicated in Article 52(6), which speaks of "the dispute" being submitted to a new Tribunal.[999]

The new Tribunal applied this principle to a number of issues on which the *ad hoc* Committee had taken a position and which Indonesia had suggested were now *res judicata*.[1000] It determined that these matters fell to be reconsidered. Under Art. 52(6) the consequence of annulment is the submission of the dispute to a new tribunal for its own consideration, should a party so request.[1001]

686

This doctrine is well illustrated by the consequences of the *ad hoc* Committee's finding on the validity of the revocation of Amco's investment licence. Under

687

---

995  *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 122–136, 144–150, 158, 163.

996  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 548. This argument was developed, principally, in an Opinion by Professor *Reisman*. See also *Reisman*, The Breakdown, pp. 782, 783/4, 795, 797. In the same vein see *Lamm*, Jurisdiction of the International Centre, pp. 478–480, who was counsel for Indonesia in this case. See also *Giardina*, ICSID, pp. 216–219, who was a member of the *ad hoc* Committee.

997  *Ibid.*, p. 549.    998  *Ibid.*, p. 550.

999  *Ibid.*, p. 552.    1000  *Ibid.*, pp. 558, 559, 607.

1001  *Ibid.*, pp. 559/60. See also *Curtis*, Amco v. Indonesia, p. 109; *Rambaud*, De la compétence, pp. 211/2.

1092                    THE ICSID CONVENTION: A COMMENTARY

Indonesia's theory, the *res judicata* effect would not have been restricted to the annulment of the first Tribunal's finding that the revocation order was invalid. It would have extended to the opinion offered by the *ad hoc* Committee that the revocation order was valid.[1002] In its Award, the new Tribunal carefully re-examined the revocation of the licence and came to the conclusion that it was unlawful.[1003]

**688**    The difference between the two competing theories would be even more dramatic in the hypothetical situation of an *ad hoc* committee annulling an award for manifest excess of powers because of a total absence of jurisdiction. If the *res judicata* effect of the *ad hoc* committee's decision on annulment were to extend to its reasons, there would be nothing left for a new tribunal to decide. Under the approach adopted in *Amco II*, a new tribunal would be bound by the decision annulling the first award but would have to decide the question of jurisdiction afresh and could come to a decision at variance with the reasoning of the *ad hoc* committee.[1004]

### 8. New Claims and Arguments

**689**    The reference in Art. 52(6) to "the dispute" which may be submitted to a new tribunal suggests that it is the original dispute that was before the first tribunal which falls to be relitigated. If there was partial annulment, it is the annulled portion of the original dispute that must be decided.[1005] This would indicate that the parties may not introduce new claims before the new tribunal.

**690**    Before the new Tribunal in *Amco II*, Indonesia introduced a counter-claim for tax fraud.[1006] The issue of tax fraud had been discussed in the original proceeding as one of the arguments justifying the revocation of the investment licence. Therefore, before the first Tribunal it was raised by Indonesia merely as a defence and not as a counter-claim.[1007]

**691**    The new Tribunal came to the conclusion that Art. 46, dealing with counter-claims, did not give a party the right to introduce new counter-claims in a resubmitted case (see Art. 46, paras. 26–28).[1008] It said:

> Article 52 is not a provision for starting a totally new arbitration, restricted only by the requirements of Article 25. Rather, it is a procedure for resubmission of an existing dispute in respect of which Article 25 jurisdiction exists.
>
>    . . .
>
>    "A dispute" in arbitration is to be understood not merely as subject matter within the scope of jurisdiction that is contested, nor even arguments that have been

---

1002  *Ibid.*, p. 555.
1003  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 64–143.
1004  See also *Curtis*, Amco v. Indonesia, p. 111; *Hirsch*, The Arbitration Mechanism, p. 37; *Rambaud*, L'annulation, p. 273; *Rambaud*, De la compétence, p. 215.
1005  See also Note B to Arbitration Rule 55 of 1968, 1 ICSID Reports 116.
1006  *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 562 *et seq*. See also *Curtis*, Amco v. Indonesia, p. 109; *Lamm*, Jurisdiction of the International Centre, pp. 481/2; *Rambaud*, De la compétence, pp. 213/4.
1007  At pp. 564/5.                          1008    At p. 566.

advanced in oral hearings and responded to. Argument is directed to supporting a dispute: it does not define the dispute. A dispute is defined by claims formally asserted and responded to in claim and defence, or in counterclaim and reply to counterclaim – in other words, the causes of action.

"The" dispute or "the former" dispute is necessarily the dispute as formulated in the pleadings before the First Tribunal whose Award (save insofar as it is *res judicata*) is now being reconsidered. The principle of finality to litigation also leads to the same view.

For all these reasons the Tribunal finds that the tax fraud issue is beyond its jurisdiction in the present proceedings.[1009]

In addition, the new Tribunal found that tax fraud was outside its jurisdiction *ratione materiae* as not "arising directly out of an investment" (see Art. 25, para. 97; Art. 46, para. 91).[1010]

The prohibition of new claims in a resubmitted case does not mean that a party **692** may not reintroduce claims or arguments that it had used before the first tribunal but on which that tribunal had found it unnecessary to rule.[1011] A claim of unjust enrichment was advanced by Amco before the first Tribunal but that Tribunal reached its pertinent findings on other grounds. Therefore, unjust enrichment was not decided upon by the first Tribunal. The second Tribunal rejected Indonesia's contention that the introduction of unjust enrichment would create a seemingly new argument to evade the force *res judicata*. It ruled that the claim of unjust enrichment could still be advanced in the resubmitted proceeding[1012] but rejected it on the merits.[1013]

On the other hand, a party may be barred from introducing a new argument in **693** a resubmitted case that is in contradiction to a position it has taken in the original proceeding. Common findings or uncontested positions in the earlier phase may limit the range of arguments available before a new tribunal. This may be seen as a form of estoppel or a consequence of the prohibition of *venire contra factum proprium*.[1014]

New facts that come to light after the completion of the first award (see Art. **694** 51, paras. 16–24) may be taken into account by a new tribunal. In *Amco II*, the new Tribunal held that it had jurisdiction to deal with possible intervening effects of a decision of the Indonesian Supreme Court rendered after the date of the first Award.[1015] On the merits, it held that the Supreme Court judgment was not to be regarded as *novus actus interveniens*.[1016] Similarly, the new Tribunal expressed

---

1009   At p. 567.                                    1010   At p. 565.
1011   At p. 555.                                    1012   At pp. 560/1.
1013   *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 32/3, 154–156.
1014   See also *Giardina*, ICSID, p. 215. The issue of estoppel was discussed in a different context in *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 144/5.
1015   *Amco* v. *Indonesia*, Resubmitted Case: Decision on Jurisdiction, 10 May 1988, 1 ICSID Reports 553/4.
1016   *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 146–153.

its willingness to look at certain evidence which had not been before the first Tribunal.[1017]

695    In *Vivendi II*, Argentina contested the identity of the Claimants in the original proceedings and in the resubmitted proceedings as a consequence of restructuring measures that had taken place in the interim (see para. 672 *supra*). The *ad hoc* Committee had confirmed the correctness of the first Tribunal's decision on jurisdiction. The Tribunal in the Resubmitted Case was confronted with the question of whether new facts permit prior jurisdictional findings to be reopened. The Tribunal found that the question of whether new facts must bear on the applicability of *res judicata* could be left open since there were in fact no new facts.[1018]

### 9. Stay of Enforcement

696    Under Art. 52(5) enforcement may be stayed during annulment proceedings (see paras. 574–655 *supra*). Such a stay is terminated automatically on the day the *ad hoc* committee makes its final decision (see para. 650 *supra*). In the case of a partial annulment, the *ad hoc* committee may under Arbitration Rule 54(3) order the temporary stay of enforcement of the unannulled portion in order to give either party an opportunity to request a new tribunal to grant a stay (see paras. 653–655 *supra*).

697    Under Arbitration Rule 55(3), if the original award has only been annulled in part, the new tribunal

> . . . may . . . , in accordance with the procedures set forth in Rule 54, stay or continue to stay the enforcement of the unannulled portion of the award until the date its own award is rendered.

698    The reference to the procedures set forth in Rule 54 means that a stay of enforcement, and its modification or termination, is contingent upon a request by a party. The new tribunal's decision is not automatic but discretionary. The request for a stay of enforcement must be given priority and both parties must be heard before a decision is made. A stay of enforcement, its modification and termination must be notified to the parties. A stay, its modification and termination depend on the existence of circumstances that, in the new tribunal's view, require such a step (see paras. 586–614 *supra*).

699    It is not entirely clear whether there is a possibility of an automatic provisional stay of enforcement until the new tribunal is constituted and can rule on a request. Such a stay is granted by virtue of Arbitration Rule 54(2) if it is requested in an application for annulment (see paras. 583–585 *supra*). The reference in Rule 55(3), dealing with a resubmitted dispute, to Rule 54 would suggest that an automatic provisional stay is possible also in a resubmitted case. On the other hand, Rule 54(3) opens the possibility for the *ad hoc* committee to order a temporary stay

---

1017   *Ibid.*, para. 72.
1018   *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, paras. 79, 80.

to bridge the time period until a new tribunal can order a stay under Rule 55(3) (see paras. 653–655, 696 *supra*). This would seem to make a provisional stay superfluous. But if the *ad hoc* committee orders a partial annulment without ordering a temporary stay under Rule 54(3) it would seem anomalous to regard the unannulled portion of the award enforceable until a new tribunal is constituted and can rule on a request for a stay of enforcement under Rule 55(3). Therefore, the better view is that in case of a partial annulment but in the absence of a ruling by the *ad hoc* committee on a temporary stay, a request for resubmission may contain a request for a stay of enforcement which is automatically granted until the new tribunal can rule on the matter.

There is no published practice on a stay of enforcement in resubmitted pro-  **700** ceedings. In *Klöckner II*, the first Award had been annulled as a whole and the question, therefore, did not arise. In *Amco II* and in *Vivendi II* the circumstances of the cases did not call for a stay of enforcement. In *MINE*, the *ad hoc* Committee ordered a temporary stay under Rule 54(3) (see para. 654 *supra*). But the case was settled by the parties before the constitution of a new tribunal.

# Article 53

**(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.**

**(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.**

## OUTLINE

| | | | *Paragraphs* |
|---|---|---|---|
| I. | INTRODUCTION | | 1–9 |
| | A. | **General** | 1–4 |
| | B. | **The Additional Facility** | 5–9 |
| II. | INTERPRETATION | | 10–66 |
| | A. | **"(1) The award shall be binding on the parties . . ."** | 10–17 |
| | | 1. The Binding Nature of the Award | 10–11 |
| | | 2. The Binding Force Between the Parties | 12–15 |
| | |    a) General | 12–13 |
| | |    b) Constituent Subdivision or Agency | 14–15 |
| | | 3. Authority for Subsequent Decisions | 16–17 |
| | B. | **". . . and shall not be subject to any appeal or to any other remedy except those provided for in this Convention."** | 18–32 |
| | | 1. Exhaustive Nature of the Convention's Review System | 18–30 |
| | |    a) National Courts | 20–22 |
| | |    b) The International Court of Justice | 23–27 |
| | |    c) The Proposal of an Appeals Facility | 28–30 |
| | | 2. Exclusion of Another Remedy | 31–32 |
| | C. | **"Each party shall abide by and comply with the terms of the award . . ."** | 33–46 |
| | | 1. Obligation to Comply | 33–38 |
| | | 2. Means to Secure Compliance | 39–46 |
| | D. | **". . . except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention."** | 47–59 |
| | | 1. Suspension of the Obligation to Comply | 47–49 |
| | | 2. Timing | 50–59 |

E.  **"(2) For the purposes of this Section, 'award' shall include
    any decision interpreting, revising or annulling such award
    pursuant to Articles 50, 51 or 52."**                    60–66

## BIBLIOGRAPHY

*Alexandrov, S. A.*, Enforcement of ICSID Awards: Articles 53 and 54 of the ICSID Convention, TDM, Fall (2008);

*Broches, A.*, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287 (1987);

*Wang, D.*, Binding Force and Enforcement, *in*: Dispute Settlement. International Centre for Settlement of Investment Disputes (UNCTAD ed.) UNCTAD/EDM/Misc232/Add.8 (2003);

*Williams, D.*, International Commercial Arbitration and Globalization, Review and Recourse against Awards Rendered under Investment Treaties, 4 The Journal of World Investment 251 (2003).

## I. INTRODUCTION

### A.  General

Art. 53 is the first of three Articles of Section 6 of Chapter IV of the Convention. Section 6 is entitled "Recognition and Enforcement of the Award". Art. 54 deals more specifically with recognition and enforcement. Art. 55 deals with the immunity of a foreign State from execution.    **1**

Art. 53 addresses the effects of a final award on the parties to ICSID arbitration. It deals with three issues. One is the finality of an ICSID award: once an ICSID award has been rendered, the parties may not seek a remedy on the same dispute in another forum. Another issue is the absence of any external review of an ICSID award: ICSID's review system, as offered by Arts. 49(2), 50, 51 and 52, is exhaustive and self-contained. The third issue is the binding force of an award: non-compliance by a party with an award would be a breach of a legal obligation.    **2**

Other instruments governing international adjudication contain similar provisions concerning the binding force and finality of judgments and awards. Examples are the Statute of the International Court of Justice (Arts. 59, 60), the International Law Commission's 1958 Model Rules on Arbitral Procedure (Arts. 30, 32),[1] the 1976 UNCITRAL Arbitration Rules (Art. 32(2)),[2] the 1985 UNCITRAL Model Law (Art. 35(1)),[3] the 1998 International Chamber of Commerce Rules of Arbitration (Art. 28(6)),[4] the 1996 Commercial Arbitration and Mediation Centre for the Americas' Arbitration Rules (Art. 29(1))[5] and the 1998 Arbitration Rules of the London Court of International Arbitration (Art. 26.9).[6]    **3**

---

1  YBILC 85/6 (1958-II).                    2  15 ILM 713 (1976).
3  24 ILM 1312 (1985).                       4  36 ILM 1614 (1997).
5  35 ILM 1557 (1996).                       6  37 ILM 684 (1998).

**4**    During the Convention's drafting there was little discussion on the substance of what ultimately became Art. 53.[7] All drafts embodied the principles of finality and binding force (see paras. 11, 39 *infra*). The later drafts also contained an explicit exclusion of any external appeal (History, Vol. I, pp. 242, 244) (see paras. 18, 24 *infra*). The discussions primarily concerned the exact date at which an award would have to be complied with (see paras. 47, 48 *infra*).

### B. The Additional Facility

**5**    The ICSID Convention, including its Art. 53, does not apply to arbitration under the Additional Facility Rules (see Art. 25, paras. 9–13). This means that, unlike ICSID arbitration, arbitration under the Additional Facility is not insulated from national law. Review, recognition and enforcement of awards made under the Additional Facility are governed by the national law of the place of arbitration and by any applicable treaties.[8]

**6**    Art. 52 of the Arbitration (Additional Facility) Rules provides in part:

> (4) The award shall be final and binding on the parties. . . .

While the Arbitration (Additional Facility) Rules thus embody the principles of finality and binding force, they do not contain a rule excluding external review (see para. 2 *supra*). This is a consequence of the fact that awards rendered under the Additional Facility are not subject to internal review procedures comparable to Arts. 51 and 52.

**7**    The Arbitration (Additional Facility) Rules contain the following provisions on the place of arbitration:

#### Article 19
##### *Limitation on Choice of Forum*
Arbitration proceedings shall be held only in States that are parties to the 1958 UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

#### Article 20
##### *Determination of Place of Arbitration*
(1) Subject to Article 19 of these Rules the place of arbitration shall be determined by the Arbitral Tribunal after consultation with the parties and the Secretariat.
. . .
(3) The award shall be made at the place of arbitration.

Under Art. 1 of the Arbitration (Additional Facility) Rules, peremptory provisions of the law applicable to the arbitration will continue to govern.

---

7    For a detailed analysis of the drafting history of this Article see *Broches, A.*, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287, 290 *et seq.* (1987).

8    See *Williams, D.*, International Commercial Arbitration and Globalization, Review and Recourse against Awards Rendered under Investment Treaties, 4 The Journal of World Investment 251 (2003).

This means that an award rendered under the Additional Facility is subject to any **8** review or appeal provided by the law of the place of arbitration.[9] The requirement that proceedings be held only in States parties to the 1958 [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards[10] is designed to facilitate the recognition and enforcement of resulting awards in States parties to the New York Convention.[11] But it also means that an award will be subject to the reasons for non-enforcement listed in Art. V of the New York Convention (see also Art. 54, paras. 12–22).

The partial setting aside of the Award in *Metalclad* v. *Mexico*[12] by a Cana- **9** dian court illustrates that NAFTA Chapter 11 arbitration under the Additional Facility is not an exhaustive and self-contained system. The Supreme Court of British Columbia held that – on the basis of the British Columbia *International Commercial Arbitration Act* – it had jurisdiction to review an award rendered in Vancouver. On the merits, the Canadian court found that the Additional Facility Tribunal had partially exceeded its competence in finding that the breach of the fair and equitable treatment standard was triggered by a lack of transparency.[13]

## II. INTERPRETATION

### A. "(1) The award shall be binding on the parties..."

#### 1. The Binding Nature of the Award

The binding nature of the award is inherent in the concept of arbitration. It is **10** often expressed in terms of *res judicata*. Since arbitration is based on an agreement between the parties and this agreement includes a promise to abide by the resulting award, the award's binding force can also be based on the maxim *pacta sunt servanda*.[14] The principle of the binding force of arbitral awards is expressed in most instruments governing arbitration (see para. 3 *supra*) and is frequently restated in arbitration agreements.[15]

---

9    *United Mexican States* v. *Metalclad*, Canada, Supreme Court of British Columbia, 2 May 2001, 2001 BCSC 664, 1529, 5 ICSID Reports 236, 6 ICSID Reports 52; *United Mexican States* v. *Feldman Karpa*, Ontario Superior Court of Justice, 3 December 2003, 8 ICSID Reports 500, and Ontario Court of Appeal, 11 January 2005, 9 ICSID Reports 508; *Raymond L. Loewen* v. *United States*, US District Court for the District of Columbia, 31 October 2005, 10 ICSID Reports 448.

10   330 UNTS 38; 7 ILM 1046 (1968).

11   See also *Broches, A.*, The "Additional Facility" of the International Centre for Settlement of Investment Disputes (ICSID), 4 Yearbook Commercial Arbitration 373, 379 (1979); *Toriello, P.*, The Additional Facility of the International Centre for Settlement of Investment Disputes, 4 Italian Yearbook of International Law 59, 70, 82/3 (1978/79).

12   *Metalclad* v. *Mexico* (AF), Award, 30 August 2000.

13   *United Mexican States* v. *Metalclad*, Canada, Supreme Court of British Columbia, 2 May 2001, 2001 BCSC 664, 1529, 5 ICSID Reports 236, 6 ICSID Reports 52. See also *Dodge, W. S.*, case note, 95 AJIL 910 (2001); *Alvarez, H. C.*, Setting Aside Additional Facility Awards: The *Metalclad* Case, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 267 (2004).

14   See also *Broches*, Awards Rendered, p. 289.

15   *Delaume, G. R.*, Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5 (1995).

**11**     The principle of the binding force of an award found expression in all drafts leading to the Convention (History, Vol. I, pp. 242, 244) and was never cast into doubt in the debates on these drafts. Rather, the award's binding force was emphasized on numerous occasions (History, Vol. II, pp. 54/5, 57, 58, 74, 80, 110, 161, 304, 344, 347, 424, 428, 430, 502, 505, 521, 574, 763, 819, 916, 989).[16] The Report of the Executive Directors underscores the binding force of an arbitral award in terms of the difference between conciliation and arbitration:

> 37. . . . The differences between the two sets of provisions reflect the basic distinction between the process of conciliation which seeks to bring the parties to agreement and that of arbitration which aims at a binding determination of the dispute by the Tribunal.

### 2. The Binding Force Between the Parties

### a) General

**12**     Art. 53 only addresses the award's effect on the parties to the arbitration proceeding. This is not to say that the legal consequences of an award are limited to the parties. For instance, Art. 54 provides for an obligation of each Contracting State of the Convention to cooperate in the award's recognition and enforcement. But this obligation is different from the primary obligation of the parties to the ICSID arbitration to comply with the terms of the award.

**13**     The legal basis for the award's binding force is not entirely symmetrical. ICSID proceedings, by necessity, involve a State party and a non-State party. Both are parties to the agreement to arbitrate (see para. 10 *supra*). But during the Convention's drafting it was pointed out repeatedly that the State party additionally has an obligation to abide by the award under the ICSID Convention to which it is a party (History, Vol. II, pp. 57, 344, 521, 574). This obligation, arising directly under the ICSID Convention, exists *vis-à-vis* other parties to the Convention. Its violation may lead to State responsibility (see also para. 46 *infra*).

### b) Constituent Subdivision or Agency

**14**     In accordance with Art. 25(1), the party on the host State's side may be a constituent subdivision or agency designated to the Centre by that State (see Art. 25, paras. 230–267). An entity thus designated has a separate *locus standi* in ICSID proceedings. Its consent to ICSID jurisdiction is subject to approval by the host State (see Art. 25, paras. 903–920). Consent by a constituent subdivision or agency does not amount to consent by the host State itself (see Art. 25, paras. 311–318). Since it is the constituent subdivision or agency that is the party to the proceeding under these circumstances, the effect of the award's binding force under Art. 53 would be upon that entity. The host State, not being a party to the proceeding, would not be subject to the obligation of Art. 53. Conversely,

---

16   See also *Broches*, Awards Rendered, pp. 291 *et seq*.

a constituent subdivision or agency would not be bound by an award rendered against its parent State.[17]

On the other hand, the *travaux préparatoires* to the Convention contain some **15** indication that a host State would be responsible for the compliance with an award rendered against one of its constituent subdivisions or agencies (History, Vol. II, pp. 858, 859, 990). *A. Broches*, after a careful analysis of the Convention's history on this point,[18] reaches the following conclusion:

> If a constituent subdivision or an agency of a Contracting State meets the require-
> ments of the Convention as regards designation and approval and has consented
> to submit or has submitted a dispute with a national of another Contracting State
> to arbitration under the Convention, the former Contracting State is responsible
> for compliance with a resulting award, whether or not the subdivision or agency
> is acting for or on behalf of that Contracting State.[19]

This responsibility for compliance would not rest on any role of the host State as party to the proceeding or as award debtor. Rather, it would arise from its role as designating and approving authority under Art. 25(1) and (3), from the obligation of Art. 54 to recognize and enforce awards, and generally from the principle of good faith.

### 3. Authority for Subsequent Decisions

The first part of Art. 53(1) may also be read as excluding the applicability **16** of the principle of binding precedent to successive ICSID cases.[20] Nothing in the Convention's *travaux préparatoires* suggests that a doctrine of *stare decisis* should be applied to ICSID arbitration. Tribunals and *ad hoc* committees routinely refer to and rely on previous decisions. But they have also pointed out on several occasions that they were not bound by these decisions.[21] (See also Art. 42, paras. 183–187.)

---

17  *Cf. Benvenuti and Bonfant Srl* v. *Banque Commerciale Congolaise*, France, Cour de cassation, 21 July 1987, 1 ICSID Reports 373. In this case an attempt to enforce an ICSID award against a Congolese bank failed. But the bank was not a constituent subdivision or agency.

18  *Broches,* Awards Rendered, pp. 294 *et seq*.      19  At p. 298.

20  Art. 59 of the Statute of the International Court of Justice is more specific on this point by saying: "The decision of the Court has no binding force except between the parties and in respect of that particular case."

21  *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 14; *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 44; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 343, 352; *Feldman* v. *Mexico* (AF), Award, 16 December 2002, para. 107; *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 40; *Enron* v. *Argentina*, Decision on Jurisdiction (Ancillary Claim), 2 August 2004, para. 25; *AES* v. *Argentina*, Decision on Jurisdiction, 26 April 2005, paras. 17–33; *Gas Natural* v. *Argentina*, Decision on Jurisdiction, 17 June 2005, paras. 36–51; *Bayindir* v. *Pakistan*, Decision on Jurisdiction, 14 November 2005, para. 76; *Vivendi* v. *Argentina*, Resubmitted Case: Decision on Jurisdiction, 14 November 2005, para. 94; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, para. 39; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 26, 31, 60–65; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, paras. 63, 64; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 391; *Pan American Energy* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, para. 42; *ADC* v. *Hungary*, Award, 2 October 2006, para. 293; *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 16.

**17**      The lack of a system of *stare decisis* implies a certain risk of inconsistent awards. In fact, some ICSID tribunals have come to divergent conclusions, such as the two *SGS* Tribunals concerning the meaning of umbrella clauses[22] or the *CMS* and the *LG&E* Tribunals with regard to the availability of a necessity defence.[23] The Tribunal in *SGS* v. *Philippines* openly addressed the question whether ICSID tribunals should defer to previous ICSID decisions and came to a nuanced conclusion:

> The ICSID Convention provides only that awards rendered under it are "binding on the parties" (Article 53(1)), a provision which might be regarded as directed to the *res judicata* effect of awards rather than their impact as precedents in later cases. In the Tribunal's view, although different tribunals constituted under the ICSID system should in general seek to act consistently with each other, in the end it must be for each tribunal to exercise its competence in accordance with the applicable law, which will by definition be different for each BIT and each Respondent State. Moreover there is no doctrine of precedent in international law, if by precedent is meant a rule of the binding effect of a single decision. There is no hierarchy of international tribunals, and even if there were, there is no good reason for allowing the first tribunal in time to resolve issues for all later tribunals. It must be initially for the control mechanisms provided for under the BIT and the ICSID Convention, and in the longer term for the development of a common legal opinion or *jurisprudence constante*, to resolve the difficult legal questions discussed by the *SGS* v. *Pakistan* Tribunal and also in the present decision.[24]

**B. ". . . and shall not be subject to any appeal or to any other remedy except those provided for in this Convention."**

### *1. Exhaustive Nature of the Convention's Review System*

**18**      The Convention provides for its own self-contained system of review of awards. The idea that this review system should be exclusive was expressed repeatedly in the course of the Convention's drafting (History, Vol. II, pp. 161, 408, 426, 427, 519, 889, 901, 902, 908). But it was not clearly reflected in the text before the Revised Draft (History, Vol. I, p. 244). The relationship of Art. 53 to the Convention's system of review is summarized in the Report of the Executive Directors in the following terms:

> 41. Article 53 declares that the parties are bound by the award and that it shall not be subject to appeal or to any other remedy except those provided for in the Convention. The remedies provided for are revision (Article 51) and annulment (Article 52). In addition, a party may ask a Tribunal which had omitted to decide any question submitted to it, to supplement its award (Article 49(2)) and may request interpretation of the award (Article 50).

---

22  *SGS* v. *Pakistan*, Decision on Jurisdiction, 6 August 2003, paras. 163–173; *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, paras. 113–129.

23  *CMS* v. *Argentina*, Award, 12 May 2005, paras. 304–394; *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006, paras. 201–266.

24  *SGS* v. *Philippines*, Decision on Jurisdiction, 29 January 2004, para. 97 (footnotes omitted; the Tribunal referred to this section of this Commentary's First Edition).

The exclusive nature of the remedies provided by the Convention against awards **19** is related to the Convention's general exclusive remedy rule in Art. 26. But the rule as reflected in Art. 26 applies only "unless otherwise stated" by the parties (see Art. 26, paras. 17–109). By contrast, Art. 53 is not open to modification by the parties (see also Art. 48, para. 3). Therefore, the parties may not agree on appeals procedures beyond those provided by the Convention.[25] This does not affect the parties' right to reach an agreed settlement which is at variance with the terms of the award.

### a) National Courts

The self-contained and exhaustive nature of review procedures under the ICSID **20** Convention is one of the Convention's distinctive features. It serves the interest of finality of awards and provides a clear advantage over other arbitration mechanisms. Awards stemming from arbitration systems such as the ICC, the AAA or UNCITRAL are subject to potentially protracted and costly review procedures by the courts of the arbitration forum.[26]

The *ad hoc* Committee in *MINE* v. *Guinea* expressed this effect of Art. 53 in **21** the following terms:

> 4.02 Article 53 of the Convention provides that the award shall be binding on the parties "and shall not be subject to any appeal or to any other remedy except those provided for in this Convention". The post-award procedures (remedies) provided for in the Convention, namely, addition to, and correction of, the award (Art. 49), and interpretation (Art. 50), revision (Art. 51) and annulment (Art. 52) of the award are to be exercised within the framework of the Convention and in accordance with its provisions. It appears from these provisions that the Convention excludes any attack on the award in national courts. The award is final in that sense. It is also final in the sense that even within the framework of the Convention it is not subject to review on the merits. It is not final, on the other hand, in the sense that it is open to being completed or corrected, interpreted, "revised" or annulled.[27]

This independence from national procedures for review of arbitral awards means **22** that the place of arbitration in ICSID proceedings is irrelevant for the award's validity and enforcement. ICSID arbitration is delocalized and independent of judicial control in the country where the proceedings take place and the award is rendered (see Art. 44, paras. 3, 21, 54). Consequently, a party to ICSID proceedings may not initiate action before a domestic court to seek the annulment or another

---

25  *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 244/5 (1973/74).

26  *Berger, K. P.*, The Modern Trend Towards Exclusion of Recourse Against Transnational Arbitral Awards: A European Perspective, 12 Fordham International Law Journal 605 (1989); *Delaume, G. R.*, Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5 (1995).

27  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.02. *Cf.* also *loc. cit.*, paras. 4.04 and 5.08.

form of review of an ICSID award. A court of a State that is a party to the ICSID Convention would be under an obligation to dismiss such an action.

### b) The International Court of Justice

**23**     The exclusion of any appeal against an ICSID award extends to a possible review by the International Court of Justice (ICJ). Art. 64 provides that a dispute between Contracting Parties concerning the interpretation or application of the Convention may be referred to the ICJ. This is a fairly standard clause for the settlement of disputes between States parties to a treaty.

**24**     This question was discussed during the Convention's drafting. Mr. *Broches* noted that on no account should the provision of what later became Art. 64 be used as a procedure for appeal against awards and that any decision of the ICJ would in no way affect the award of the arbitral tribunal (History, Vol. II, pp. 274, 438, 440).

**25**     Art. 64 does not confer jurisdiction on the ICJ to review the decision of an arbitral tribunal (see Art. 64, paras. 12, 13). The Report of the Executive Directors says so specifically with respect to the tribunal's competence (see Art. 41, para. 21). It continues by saying:

> 45. . . . Nor does it empower a State to institute proceedings before the Court in respect of a dispute which one of its nationals and another Contracting State have consented to submit or have submitted to arbitration, since such proceedings would contravene the provisions of Article 27, unless the other Contracting State had failed to abide by and comply with the award rendered in that dispute.

**26**     The obligation of the investor's State of nationality under Art. 27 not to give diplomatic protection extends to the post-award phase unless the host State has failed to comply with the award (see paras. 42–44 *infra*). A claim or part of a claim that has been rejected in the award may not be brought before the ICJ in the exercise of diplomatic protection (see Art. 27, para. 43).

**27**     A host State is enjoined by Art. 53 from challenging an award before the ICJ in proceedings against the investor's home State or against a third State in which the award is to be recognized and enforced. The same principle will apply if a third State that is a party to the ICSID Convention seeks to have an ICSID award reviewed by the ICJ in the course of enforcement proceedings or otherwise. This means, in particular, that a Contracting State may not evade its obligation under Art. 54 to recognize and enforce an award by arguing the award's nullity before the ICJ.

### c) The Proposal of an Appeals Facility

**28**     The United States Model BIT of 2004 in its Annex D envisages the possibility of a bilateral appellate mechanism to review awards, including ICSID awards. This provision has found its way into some actual treaties of the United States.[28]

---

28   See *e.g.*, the United States-Uruguay BIT of 2005, Annex E.

ICSID at one point proposed the establishment of a central Appeals Facility[29] but has shelved these plans as premature.[30] These ideas and proposals have triggered a lively debate.[31] The principal arguments in favour of an appeals mechanism are coherence and consistency in the practice of tribunals and the possibility to correct erroneous decisions.

An appeals mechanism would be incompatible with Art. 53 in its present form. **29** The wording, excluding any appeal or other remedy except those provided for in the Convention, is unequivocal. Other provisions of the Convention are open to variation by the parties by including the formula "except as the parties otherwise agree" or similar wording. Examples are Arts. 26, 33, 35, 43, 44, 46, 47, 60, 61 and 63. Significantly, the general exclusive remedy rule of Art. 26 applies only "unless otherwise stated" (see Art. 26, paras. 17–109). By contrast, Art. 53 does not contain such a formula. Therefore, the parties to the arbitration may not derogate from it. An amendment of the Convention under Art. 66 to open the way for an appeals mechanism, while not impossible, would be extremely difficult and generally inadvisable.

An agreement on an *inter se* modification of the Convention between certain of **30** its parties to allow for an appeals mechanism also would not be without difficulties. If Art. 41 of the Vienna Convention on the Law of Treaties is to be followed,[32] it would have to be established that the modification is not prohibited by the ICSID Convention and that it is not incompatible with the effective execution of its object and purpose as a whole.

## *2. Exclusion of Another Remedy*

The exclusion of another remedy means that a party to ICSID proceedings that **31** is dissatisfied with the award may not turn to another forum to seek relief for the same claim. Once the ICSID tribunal has rendered its award and the review procedures under the Convention have been exhausted, the case is *res judicata*. The principle *ne bis in idem* precludes resort to any national or international judicial remedy. Therefore, an ICSID award may be used as a defence against an action in the same matter before another judicial forum (History, Vol. II, pp. 344, 519).

---

29  Possible Improvements of the Framework for ICSID Arbitration, Discussion Paper of the ICSID Secretariat, 22 October 2004, paras. 20–23 and Annex.

30  Suggested Changes to the ICSID Rules and Regulations, Working Paper of the ICSID Secretariat, 12 May 2005, paras. 2, 4.

31  See Investment Treaty Law, Current Issues, Vol. I, Appeals and Challenges to Investment Treaty Awards: Is it Time for an International Appellate System? (*Ortino, F./Sheppard, A./Warner, H.* eds.) (2006) (with contributions by *Veeder, V. V./Bishop, D./Gill, J./Blackaby, N./Suarez Anzorena, C. I.*); *Tams, C.*, Is There a Need for an ICSID Appellate Structure?, *in*: The International Convention on the Settlement of Investment Disputes (ICSID): Taking Stock after 40 Years (*Hofmann, R./Tams, C.* eds.) 223 (2007); *Qureshi, A. H.*, An Appellate System in International Investment Arbitration?, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1154 (2008); Appeals Mechanism in International Investment Disputes (*Sauvant, K. P.* ed.) (2008).

32  Technically the Vienna Convention on the Law of Treaties is not applicable to the ICSID Convention since under its Art. 4 it applies only to treaties concluded after its entry into force.

This would apply even if a court or tribunal would otherwise have jurisdiction over the matter. For instance, a dispute settlement clause referring alternatively to national courts, ICSID arbitration and UNCITRAL arbitration (see Art. 26, paras. 17–109) is no longer of any avail once an ICSID award has been rendered.

32    This principle applies only if the ICSID award has yielded a decision on the merits of the dispute. This would include awards under Arbitration Rule 43(2) which authorizes the tribunal to embody an agreed settlement of the parties in its award (see Art. 48, paras. 70–80). The principle of *ne bis in idem* does not apply to the substance of a dispute if the ICSID tribunal has given an award in which it finds that the dispute is not within the jurisdiction of the Centre or not within its own competence, in accordance with Arbitration Rule 41(6) (see Art. 41, para. 73). In other words, if an ICSID tribunal declines jurisdiction over a dispute, a party may take that dispute to another forum for a decision on the merits. But if the tribunal's decision to decline jurisdiction is annulled by an *ad hoc* committee, the principle of the exclusion of another remedy revives in favour of a tribunal constituted in accordance with Art. 52(6).

### C.  "Each party shall abide by and comply with the terms of the award . . ."

### 1. Obligation to Comply

33    The obligation to abide by and comply with the terms of the award is a logical consequence of its binding nature. The principle was contained in all drafts leading to the Convention (History, Vol. I, pp. 242, 244) and was never cast into doubt during the deliberations. It is expressed in the Report of the Executive Directors in the following terms:

> 42. Subject to any stay of enforcement in connection with any of the above proceedings in accordance with the provisions of the Convention, the parties are obliged to abide by and comply with the award . . .

34    The obligation to comply applies equally to both parties. There is no difference between a host State and a foreign investor in this respect. This obligation rests on the Convention itself and on the consent to jurisdiction which is an agreement between the parties (see Art. 25, paras. 374–378). But the consequences of non-compliance may differ for the two parties (see paras. 13 *supra*, 41–46 *infra*).

35    The obligation to comply is independent of any enforcement proceedings. In particular, an award debtor may not insist on the initiation of enforcement proceedings to delay compliance. The need for enforcement measures under Art. 54 implies default and hence a breach of Art. 53.

36    Procedural obstacles that may arise in the course of enforcement in no way affect the obligation to comply with the award. Art. 54 refers to the law of the State in which recognition and enforcement are sought. But any difficulties that may arise under that law in no way affect the obligation of a party to comply with the award. Therefore, a party that successfully resists enforcement of an award

before a court, or another authority of a State in which enforcement is sought, is in violation of its obligation under Art. 53 (see Art. 54, para. 115; Art. 55, para. 7).

In particular, the obligation to comply exists also where a State party finds **37** that it can rely on State immunity in accordance with Art. 55. State immunity may be used to thwart enforcement against certain types of property of the award debtor. But it does not affect the obligation to comply with the award. The *ad hoc* Committee in *MINE* v. *Guinea* expressed this principle in the following terms:

> 25. . . . It should be clearly understood, . . . , that State immunity may well afford a legal defense to forcible execution, but it provides neither argument nor excuse for failing to comply with an award. In fact, the issue of State immunity from forcible execution of an award will typically arise if the State party refuses to comply with its treaty obligations. Non-compliance by a State constitutes a violation by that State of its international obligations and will attract its own sanctions. The Committee refers in this connection among other things to Articles 27 and 64 of the Convention, and to the consequences which such a violation would have for such a State's reputation with private and public sources of international finance.[33]

The existence of the obligation to abide by and comply with the award, regard- **38** less of the availability of an immunity defence, was equally affirmed by the *ad hoc* Committee in *Mitchell* v. *DR Congo*. It followed the reasoning of the *ad hoc* Committee in *MINE* v. *Guinea* and stated:

> The immunity of a State from execution (Article 55 of the Convention) does not exempt it from enforcing the award, given its formal commitment in this respect following signature of the Convention. If it does not enforce the award, its behaviour is subject to various indirect sanctions. Precisely, reference is made to Articles 27 and 64 of the Convention. The investor's State has the right, according to Article 27, to exercise diplomatic protection against the State which does not respect its obligation to enforce an arbitral award of the Centre; but also, according to Article 64, to have recourse to the International Court of Justice. Moreover, a State's refusal to enforce an ICSID award may have a negative effect on this State's position in the international community with respect to the continuation of international financing or the inflow of other investments.[34]

### 2. Means to Secure Compliance

During the Convention's drafting there was a general expectation that compli- **39** ance by the host State with ICSID awards would not be a practical problem and that voluntary compliance would be a natural consequence of the treaty obligation expressed in Art. 53. Any other course of conduct was likely to lead to adverse reactions by other States and would affect the standing of the State concerned with the international business community (History, Vol. II, pp. 273, 425, 428, 430).

---

33  *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 25.
34  *Mitchell* v. *DR Congo*, Decision on the Stay of Enforcement of the Award, 30 November 2004, para. 41. The *ad hoc* Committee's terminology is infelicitous: when using the term "enforce" the Committee evidently meant "comply with".

This view is supported by a cost/benefit analysis of non-compliance[35] and by most of the practice following ICSID awards.[36]

**40**      During the Convention's preparation reference was made to the connection of the International Centre for Settlement of Investment Disputes to the International Bank for Reconstruction and Development (History, Vol. II, pp. 471, 654). But it is by no means clear whether it was expected that the World Bank's strong position with many host States would serve as an incentive to comply with awards. It is known that the Secretary-General of ICSID, who is usually also the World Bank's General Counsel, has communicated officially with recalcitrant parties reminding them of their obligation to comply with awards.[37] However, it remains an untested assumption that ICSID's affiliation with the World Bank implies an "institutional gravitas that creates an incentive for sovereigns to comply with ICSID awards, lest they have difficulty securing future World Bank financing".[38]

**41**      There are essentially two types of legal action that are available to secure compliance with an award. One is recognition and enforcement in accordance with Art. 54. Recognition and enforcement action may be taken against either the host State or the investor. It is discussed in the Commentary on Art. 54. The other is legal action by a State party to the Convention in accordance with Arts. 27 and 64. The latter remedy is only available against a host State that has failed to comply with the award.

**42**      During the Convention's drafting, Mr. *Broches* confirmed that diplomatic protection by the investor's home State would remain available to secure compliance with an award by the host State (History, Vol. II, pp. 344, 425, 763). Art. 27 excludes diplomatic protection once consent to arbitration has been given. But Art. 27 specifically provides that the right to diplomatic protection revives if the host State fails to comply with the award (see Art. 27, paras. 38–43).

**43**      Diplomatic protection for the purpose of securing compliance with the award may be exercised by the State of nationality of the aggrieved natural or juridical

---

35   See *Delaume, G. R.*, Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5 (1995); *Paulsson, J.*, Third World Participation in International Investment Arbitration, 2 ICSID Review – FILJ 19, 54/5 (1987); *Shihata, I. F. I.*, Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1, 9 (1986); *Soley, D. A.*, ICSID Implementation: An Effective Alternative to International Conflict, 19 The International Lawyer 521, 543 (1985).

36   See *e.g.*, News from ICSID, Vol. 1, No. 1, p. 2, concerning compliance with the award in *Benvenuti & Bonfant* v. *Congo*. But see also the attempts to enforce the Awards in *Benvenuti & Bonfant* v. *Congo* and in *SOABI* v. *Senegal* in the French courts, 1 ICSID Reports 368–375, 2 ICSID Reports 337–342, and the attempts to enforce the Award in *LETCO* v. *Liberia* in US courts, 2 ICSID Reports 383–396. At the time of writing there are indications that Argentina is resisting compliance with awards by insisting on "enforcement" in the Argentine federal courts.

37   *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 386 (1991). See also *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 290 *et seq.* (1993); *Giardina, A.*, L'exécution des sentences du Centre international pour le règlement des différends relatifs aux investissements, 71 Revue Critique de Droit International Privé 273, 293 (1982).

38   *Franck, S.*, Foreign Direct Investment, Investment Treaty Arbitration, and the Rule of Law, 19 Pacific McGeorge Global Business & Development Law Journal 337, 372 (2007).

person (see Art. 27, paras. 27–29). Diplomatic protection may be exercised through negotiations, the institution of judicial proceedings between the two States or by any other means of dispute settlement that may be available. In the course of diplomatic protection the protecting State may threaten to take or may actually take countermeasures such as withholding payments due to the recalcitrant award debtor, offsetting the claim arising from the award against claims that the award debtor may have against the protecting State or the freezing of assets that belong to the award debtor.

Referral of the dispute between the two countries to the International Court **44** of Justice would be one of the means for dispute settlement available in such a situation of diplomatic protection. Art. 64 provides the jurisdictional basis required by Art. 36(1) of the Statute of the ICJ. A dispute over non-compliance with an award clearly falls under the concept of a "dispute . . . concerning the interpretation or application of this Convention" as required by Art. 64. The result would be a judgment of the ICJ in which the host State may be found to be in violation of Art. 53 of the Convention.[39]

Art. 1136(5) of the NAFTA (see Art. 25, paras. 457–459) provides for a specific **45** procedure in case of non-compliance with an award. It leads to the establishment of a panel that may determine that the failure to abide by and comply with the award is inconsistent with the obligations under the NAFTA and may recommend that the party concerned abide by and comply with the award.[40]

States parties to the ICSID Convention, other than the investor's State of nation- **46** ality, have no right of diplomatic protection. But they may show a general interest in the effectiveness of the arbitration process under the Convention and in the compliance with awards. Every State party to the Convention may demand that other States parties meet their obligations under the Convention including compliance with awards in accordance with Art. 53. To the extent that a third State is able to show a legal interest in the compliance with an award it may also rely on Art. 64 to bring the resulting dispute before the ICJ (see Art. 27, paras. 27, 28, 38).[41]

**D. " . . . except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention."**

*1. Suspension of the Obligation to Comply*

During the Convention's drafting there was considerable debate on the exact **47** time at which the parties would have to comply with the award.[42] The Working

---

39  See also *Amerasinghe, C. F.*, The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt Journal of Transnational Law 793, 813/4 (1976); *Broches*, Awards Rendered, p. 294.

40  32 ILM 646 (1993).

41  See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 379/80 (1972-II).

42  For a summary of the drafting history on this point see *Broches*, Awards Rendered, pp. 291 *et seq.*

Paper provided that parties would have to "comply with the award immediately, unless the Arbitral Tribunal shall have allowed a time limit for the carrying out of the award or any part thereof" (History, Vol. I, p. 242). The Preliminary Draft retained this formula but added a reference to a stay of enforcement in connection with procedures for the award's interpretation, revision and annulment (History, Vol. I, p. 242; Vol. II, pp. 161/2). This led to a debate as to whether a general period of grace or time limit for compliance with an award should be introduced (History, Vol. II, pp. 271, 340/1, 342/3, 428). On the suggestion of Mr. *Broches*, the First Draft omitted the reference to immediate compliance and replaced the tribunal's power to allow a time limit with an obligation to comply with the award "in accordance with its terms" (History, Vol. I, p. 244; Vol. II, p. 519). The except clause referring to a stay of enforcement was apparently overlooked in the First Draft.[43]

**48**     The coordination of proceedings for the interpretation, revision and annulment of awards with the obligation to comply continued to trouble the delegates (History, Vol. II, pp. 845, 847, 885, 887/8, 890). Mr. *Broches* pointed out that there should be a complete parallelism between the obligation to comply with the award and the possibility of seeking enforcement (at p. 900). The introduction of a provisional stay of enforcement upon the request of a party applying for revision or annulment (see Art. 51, para. 34; Art. 52, para. 576) was adopted to bridge the period until the tribunal or *ad hoc* committee can decide on a stay of enforcement (History, Vol. II, pp. 900, 902, 950). This is also why the Convention does not refer to a stay of enforcement by the tribunal or *ad hoc* committee but pursuant to the Convention's relevant provisions. The Report of the Executive Directors merely paraphrases the Convention's provision by saying that the parties' obligation to abide by and comply with the award is subject to a stay of enforcement in accordance with the provisions of the Convention (see para. 33 *supra*).

**49**     A stay of enforcement affects the finality of the award in the sense that to the extent of such a stay the award may not be relied upon as a final decision.[44] The *ad hoc* Committee in *MINE* v. *Guinea* has described this effect in the following terms:

> Article 53(1) provides that the award is binding on the parties and that each party "shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention". Article 52(4) is one of those relevant provisions. Thus, if an *ad hoc* Committee grants a stay of enforcement, the obligation of the party against whom the Award was rendered to abide and comply with the terms of the Award is *pro tanto* suspended.[45]

### 2. Timing

**50**     The solution adopted in the Convention to link the suspension of the obligation to comply with the award to a stay of enforcement does not resolve all problems.

---

43   *Broches*, Awards Rendered, p. 292.          44   *Broches*, Awards Rendered, p. 294.
45   *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 9.

Under the terms of the Convention, the obligation to comply with the award arises when the award is rendered, that is on the date on which the certified copies are dispatched (see Art. 49, paras. 10, 25–27). This means that the parties must take all steps to give effect to it promptly. But these steps may take some time. For instance, payments by the State party may require budgetary appropriations. The parties may agree in advance that a certain period of grace is allowed for compliance with the award[46] (see also para. 55 *infra*).

Stays of enforcement are provided for by the Convention in connection with the interpretation, revision and annulment of awards (see Arts. 50, 51 and 52). A stay of enforcement is not possible in connection with a request for supplementation or rectification in accordance with Art. 49(2). Therefore, even if the omission or the clerical, arithmetical or similar error concerned affects the performance of the award, the obligation to comply with the award in its original form remains unchanged until the tribunal has given its decision which then becomes part of the award (see Art. 49, paras. 78–80; para. 65 *infra*). **51**

A request for the interpretation of an award in accordance with Art. 50 is not subject to a time limit (see Art. 50, paras. 19–22). A mere request for interpretation does not lead to a stay of enforcement. But under Art. 50(2), the tribunal may grant a stay of enforcement upon a party's request pending its decision (see Art. 50, paras. 42–45). It follows that the period of time between the date of the award and a possible stay of enforcement in the course of proceedings for its interpretation is entirely indeterminate. The obligation to comply with the award may have existed for a considerable period of time before it is suspended by a decision of the tribunal. A stay of enforcement terminates automatically on the date on which the decision on interpretation is given. **52**

A request for revision of an award in accordance with Art. 51 is subject to a time limit of 90 days after discovery of the relevant fact and to an absolute time limit of three years from the date of the award (see Art. 51, paras. 26–31). If the party requesting revision also requests a stay of enforcement, a provisional stay of enforcement is granted automatically upon the application's registration (see Art. 51, para. 37). The tribunal may grant a stay of enforcement upon a party's request pending its decision (see Art. 51, paras. 38, 39). It follows that the period of time between the date of the award and a stay of enforcement in the course of proceedings for revision may last over three years. A stay of enforcement terminates automatically on the date on which the decision on revision is given. **53**

A request for annulment of an award in accordance with Art. 52 is subject to a time limit of 120 days from the date on which the award was rendered. If the request for annulment is based on the ground of corruption the time limit is more flexible (see Art. 52, paras. 448–450). If the party requesting annulment also requests a stay of enforcement, a provisional stay of enforcement is granted **54**

---

46  *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 72 (1990).

1112                    THE ICSID CONVENTION: A COMMENTARY

automatically upon the application's registration (see Art. 52, paras. 583–585).
The *ad hoc* committee may grant a stay of enforcement pending its decision (see
Art. 52, paras. 586–655). It follows that the time period between the date of
the award and the stay of enforcement in the course of annulment proceedings
should not, except in the unlikely case of alleged corruption, last much longer than
120 days (but see para. 59 *infra*).

**55**     The NAFTA (see Art. 25, paras. 457–459) contains a specific clause providing
for a stay of enforcement of ICSID awards. Art. 1136(3) provides:

> 3. A disputing party may not seek enforcement of a final award until:
>    (a) in the case of a final award made under the ICSID Convention
>       (i) 120 days have elapsed from the date the award was rendered and no
>           disputing party has requested revision or annulment of the award, or
>       (ii) revision or annulment proceedings have been completed;[47]

The period of 120 days is designed to stay enforcement during the time limit
available for an application for annulment. It will not necessarily suffice for the
time limit available for revision (see para. 53 *supra*).

**56**     The stay of enforcement under this provision is more far-reaching in that it is
automatic and does not depend on any request by a party or a decision of the
tribunal or *ad hoc* committee. It will last until the completion of the revision
or annulment proceedings. The suspension of the obligation to comply under
Art. 53 is contingent upon a stay of enforcement pursuant to the relevant provisions
of the ICSID Convention. But it would be illogical to separate the obligation to
comply from a stay of enforcement just because that stay of enforcement is not
based on the Convention but on an agreement between the parties.[48] Therefore,
in the case of ICSID arbitration under the NAFTA, the obligation to abide by and
comply with an award would not take effect until 120 days after the award has
been rendered or until revision or annulment proceedings have been completed.

**57**     Under the Convention, once annulment proceedings are completed, a stay of
enforcement will lapse, in principle (see Art. 52, para. 589), and its suspensive
effect on the obligation to comply will come to an end. If annulment is rejected,
the obligation to comply revives. If the award is annulled, there is no obligation
to comply (see Art. 52, para. 650). If there is a partial annulment, the *ad hoc*
committee may grant a temporary stay of enforcement of the award's unannulled
portion until a new tribunal constituted under Art. 52(6) can grant a stay of
enforcement. This stay of enforcement remains in effect until the new award is
rendered (see Art. 52, paras. 590, 653). The obligation to comply with the original
award under Art. 53 would be suspended accordingly.

---

47   32 ILM 646 (1993). See *Parra, A. R.*, Provisions on the Settlement of Investment Disputes
     in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments in
     Investment, 12 ICSID Review – FILJ 287, 348 (1997).
48   By taking up the offer to arbitrate contained in the NAFTA, the investor accepts the modalities
     of the offer including the provision on stay of enforcement.

The link of the obligation to comply to the existence or non-existence of a **58** formal stay of enforcement means that this obligation depends on the procedural exigencies of proceedings for the interpretation, revision and annulment of awards. An award may give rise to an obligation to comply for a certain period of time. This obligation may then be suspended through a stay of enforcement or may even disappear altogether as a consequence of annulment. Even a realistic expectation of a forthcoming stay of enforcement is not a valid justification for non-compliance with the award until the stay of enforcement is in effect.

The problem of a temporary obligation to comply is compounded by the varying **59** time limits governing the different procedures. Annulment proceedings, the most likely basis for a stay of enforcement, are normally subject to a 120-day time limit from the day of the award (see para. 54 *supra*). Revision may be requested up to three years after the date of the award (see para. 53 *supra*). Interpretation is not subject to any time limit (see para. 52 *supra*). The situation may become even more complicated as a consequence of the operation of Art. 49(2). Proceedings for supplementation and rectification do not lead to a stay of enforcement (see para. 51 *supra*) but they postpone the time limits for revision and annulment (see Art. 49, paras. 81–85). Therefore, the period of time until a stay of enforcement takes effect and the obligation to comply is suspended may be further extended.

### E.  "(2) For the purposes of this Section, 'award' shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52."

Art. 53(2) was not reflected in the earlier drafts to the Convention and was only **60** inserted into the Revised Draft at the initiative of the Secretariat (History, Vol. I, p. 244).[49] Under its own terms, Art. 53(2) applies not just to Art. 53 but to "this Section"; that is, also to Art. 54, dealing with recognition and enforcement, and to Art. 55, dealing with immunity from execution.

Art. 53(2) clarifies that the obligation to abide by and comply with the award **61** relates to the award as interpreted or revised (see also Art. 50, paras. 27, 28; Art. 51, para. 25). From the date of the decision on interpretation or revision, the obligation to comply applies only to its modified version. This is independent of any prior suspension of the obligation to comply as a consequence of a stay of enforcement (see paras. 47–59 *supra*).

Once the award has been annulled, the obligation to comply with the award **62** disappears. But even a total annulment does not remove the effects of Art. 53(1) entirely. The exhaustive nature of the Convention's review system (see paras. 18–30 *supra*) continues to apply in the sense that a party has no other means of appeal. The *ad hoc* committee's decision to annul is not subject to any review either inside or outside the Convention's system. The exclusion of another remedy (see paras. 31, 32 *supra*) also continues to apply in favour of a new tribunal constituted under

---

49  *Broches*, Awards Rendered, p. 294.

Art. 52(6). Therefore a party may not, after annulment, turn to another remedy not provided for by the Convention. Of course, it is always open to the parties to settle the case by agreement or to agree to submit it to another court or tribunal (see Art. 54, para. 35).

**63**      In the case of partial annulment (see Art. 52, paras. 494–510), the obligation to comply with the award would apply, in principle, to the unannulled portion of the award. But in the case of a partial annulment, a stay of enforcement and a consequent suspension of the obligation to comply is likely (see para. 57 *supra*).

**64**      Curiously, Art. 53(2) does not refer to Art. 49(2) dealing with the award's supplementation and rectification. But Art. 49(2) itself says that the decision on supplementation or rectification shall become part of the award (see Art. 49, paras. 37, 78–80). It follows that "award" for purposes of Arts. 53, 54 and 55 includes also any decision supplementing or rectifying the award pursuant to Art. 49(2). This means that the obligation to comply applies to the award as supplemented or rectified.

**65**      The possibility of the award's modification through supplementation, rectification, interpretation, revision and annulment means that the substance of the parties' obligation to comply may be subject to change. This is particularly so in view of the varying periods of time during which the award is to be performed in its original form before any stay of enforcement may become effective (see paras. 50, 51 *supra*). A party may have started to give effect to an award in its original form but may later be informed that its obligation differs from what it had assumed. At that point any performance will have to be adjusted retroactively to conform to the award as modified. Underpayments will have to be made up. Overpayments will have to be refunded or credited. Any performance made in good faith in accordance with the award's original version will be lawful until the award is modified. Post-award interest (see Art. 46, para. 60) will not be due for underpayment in accord with an award before its modification.

**66**      The term "award", as used in Art. 53, only refers to final decisions of the tribunal (see Art. 48, paras. 22–30, 70–79). It does not include preliminary decisions on jurisdiction although these will be reflected in the award (see Art. 41, para. 70). It also does not include decisions on provisional measures (see Art. 47, para. 4). Nor does it refer to procedural orders which the tribunal makes in the course of the proceedings (see Art. 44, paras. 55, 56).

# Article 54

**(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.**

**(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.**

**(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–22 |
|  | A. **General** | 1–11 |
|  | B. **The Additional Facility** | 12–22 |
| II. | INTERPRETATION | 23–115 |
|  | A. **"(1) Each Contracting State..."** | 23–29 |
|  | B. **"...shall recognize an award rendered pursuant to this Convention as binding..."** | 30–63 |
|  |    1. Awards Rendered Pursuant to the Convention | 30–41 |
|  |      a) What Constitutes an Award? | 30–36 |
|  |      b) Stay of Enforcement | 37–41 |
|  |    2. Recognition of Awards | 42–49 |
|  |    3. Practice on Recognition | 50–63 |
|  | C. **"...and enforce the pecuniary obligations imposed by that award within its territories..."** | 64–80 |
|  |    1. Enforcement and Execution | 64–71 |
|  |    2. Pecuniary Obligations | 72–80 |
|  | D. **"...as if it were a final judgment of a court in that State."** | 81–91 |
|  |    1. Finality and Nonreviewability | 81–87 |

1116                    THE ICSID CONVENTION: A COMMENTARY

        2.  Final Judgment of Domestic Court                    88–91
    E.  **"A Contracting State with a federal constitution may
        enforce such an award in or through its federal courts and
        may provide that such courts shall treat the award as if it
        were a final judgment of the courts of a constituent state."**  92–96
    F.  **"(2) A party seeking recognition or enforcement in the
        territories of a Contracting State shall furnish to a
        competent court or other authority which such State shall
        have designated for this purpose a copy of the award
        certified by the Secretary-General."**                   97–105
    G.  **"Each Contracting State shall notify the Secretary-
        General of the designation of the competent court or other
        authority for this purpose and of any subsequent change
        in such designation."**                                  106–109
    H.  **"(3) Execution of the award shall be governed by the
        laws concerning the execution of judgments in force in
        the State in whose territories such execution is sought."**  110–115

## BIBLIOGRAPHY

*Alexandroff, A. S./Laird, I. A.*, Compliance and Enforcement, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer C.* eds.) 1171 (2008);

*Alexandrov, S. A.*, Enforcement of ICSID Awards: Articles 53 and 54 of the ICSID Convention, TDM, Fall (2008);

*Baldwin, E./Kantor, M./Nolan, M.*, Limits to Enforcement of ICSID Awards, 23 Journal of International Arbitration 1 (2006);

*Boralessa, A.*, Enforcement in the United States and United Kingdom of ICSID Awards Against the Republic of Argentina: Obstacles that Transnational Corporations May Face, 17 New York International Law Review 53 (2004);

*Bottini, G.*, Recognition and Enforcement of ICSID Awards, TDM, May (2008);

*Broches, A.*, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287 (1987);

*Cane, G.*, The Enforcement of ICSID Awards: Revolutionary or Ineffective?, 15 The American Review of International Arbitration 439 (2004);

*Carias-Borjas, S.*, Recognition and Enforcement of ICSID Awards: The Decision of the French *Cour de Cassation* in *SOABI* v. *Senegal*, 2 The American Review of International Arbitration 354 (1991);

*Choi, S.*, Judicial Enforcement of Arbitration Awards under the ICSID and New York Conventions, 28 New York University Journal of International Law and Politics 175 (1995);

*Coll, R. J.*, United States Enforcement of Arbitral Awards Against Sovereign States: Implications of the ICSID Convention, 17 Harvard International Law Journal 401 (1976);

*Franzoni, D. B.*, International Law – Enforcement of International Centre for Settlement of Investment Disputes Arbitral Awards in the United States, 18 Georgia Journal of International and Comparative Law 101 (1988);

*Gaillard, E.*, The Enforcement of ICSID Awards in France: The Decision of the Paris Court of Appeal in the SOABI Case, 5 ICSID Review – FILJ 69 (1990);

*Giardina, A.*, L'exécution des sentences du Centre international pour le règlement des différends relatifs aux investissements, 71 Revue Critique de Droit International Privé 273 (1982);

*Leahy, E. R./Orentlicher, D. F.*, Enforcement of Arbitral Awards Issued by the Additional Facility of the International Centre of Settlement of Investment Disputes (ICSID), 2 Journal of International Arbitration, No. 3, at 15 (1985);

*Marzorati, O. J.*, Enforcement of Treaty Awards and National Constitutions (The Argentinian Cases), 7 Business Law International 226 (2006);

*Nmehielle, V. O. O.*, Enforcing Arbitral Awards Under the International Convention for the Settlement of Investment Disputes (ICSID Convention), 7 Annual Survey of International and Comparative Law 21 (2001);

*Schreuer, C.*, Non-Pecuniary Remedies in ICSID Arbitration, 20 Arbitration International 325 (2004);

*van den Berg, A. J.*, Recent Enforcement Problems under the New York and ICSID Conventions, 5 Arbitration International 2 (1989);

*Wang, D.*, Binding Force and Enforcement, *in*: Dispute Settlement. International Centre for Settlement of Investment Disputes (UNCTAD ed.) UNCTAD/EDM/Misc232/Add.8 (2003);

*West, L. C.*, Award Enforcement Provisions of the World Bank Convention, 23 Arbitration Journal 38 (1968);

*Wood, J.*, Enforcement of ICSID Awards in National Courts, TDM, April (2005);

*Ziadé, N. G.*, Some Recent Decisions in ICSID Cases, 6 ICSID Review – FILJ 514 (1991);

    Comment [on 5 December 1989 Paris Court of Appeal Decision in *SOABI* v. *Senegal*], 80 Revue Critique de Droit International Privé 124 (1991).

# I. INTRODUCTION

## A. General

Art. 54 is the second of three Articles in Section 6 of Chapter IV of the Convention. Section 6 is entitled "Recognition and Enforcement of the Award". Art. 53 deals with the award's binding force on the parties. Art. 55 deals with an exception to Art. 54 in preserving the immunity of a foreign State from execution. **1**

Art. 54 is one of the most important provisions of the Convention. It provides for recognition and enforcement of ICSID awards by the courts of all States parties to the Convention. In addition to this general obligation, Art. 54 offers certain procedural directions: Parties to the Convention shall designate the competent authorities for recognition and enforcement to the Centre; a party to arbitration proceedings may submit a certified copy of an award to such an authority; and the modalities of execution are governed by the law concerning the execution of judgments of the country where execution is sought. **2**

This enforcement provision is a distinctive feature of the ICSID Convention. Most other instruments governing international dispute settlement do not cover **3**

enforcement but leave this issue to domestic laws or applicable treaties.[1] These domestic laws and treaties typically provide for some review of arbitral awards at the enforcement stage.

**4**    The most important treaty in this context is the 1958 [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards.[2] Art. V of that Convention lists a number of grounds on which recognition and enforcement may be refused (see para. 14 *infra*). At an early stage in the ICSID Convention's drafting, reliance on the provisions of the New York Convention was still planned (History, Vol. I, p. 246; Vol. II, pp. 65, 272, 429, 521, 671, 888, 1018). But Mr. *Broches* argued successfully in favour of limiting or eliminating the grounds for review contained in the New York Convention, especially in view of the internal review system provided by the ICSID Convention (History, Vol. II, pp. 425, 426, 430, 522, 575). Therefore, the ICSID Convention provides a system for enforcement that is independent of the New York Convention and other international and domestic rules dealing with the enforcement of foreign arbitral awards.[3]

**5**    Since enforcement under the ICSID Convention is easier to obtain than under the New York Convention, the question of the applicability of the New York Convention to ICSID awards is not likely to arise. But this issue may become relevant in exceptional circumstances like the enforcement of an ICSID award in a State that is a party to the New York Convention but not to the ICSID Convention. Another possibility would be the enforcement of a non-pecuniary obligation, which is not possible under Art. 54 (see paras. 72–80 *infra*). It is submitted that in such a situation the question should be dealt with by analogy to Additional Facility awards (see paras. 12–22 *infra*).

**6**    The basic idea of an automatic recognition of ICSID awards was modelled on Art. 192 of the Treaty of Rome establishing the European Economic Community (History, Vol. II, pp. 343, 344, 424, 425, 426, 428, 431, 519/20, 521, 574).[4] In

---

1    See *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 332, 347/8 (1997).

2    330 UNTS 38; 7 ILM 1046 (1968).

3    See *Amerasinghe, C. F.*, The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt Journal of Transnational Law 793, 815 (1976); *van den Berg, A. J.*, Recent Enforcement Problems under the New York and ICSID Conventions, 5 Arbitration International 2, 4, 8 (1989); *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 401 *et seq.* (1972-II); *Broches, A.*, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287, 308, 309, 311 (1987); *Choi, S.*, Judicial Enforcement of Arbitration Awards under the ICSID and New York Conventions, 28 New York University Journal of International Law and Politics 175 (1995); *Coll, R. J.*, United States Enforcement of Arbitral Awards Against Sovereign States: Implications of the ICSID Convention, 17 Harvard International Law Journal 401, 404/5 (1976); *Delaume, G. R.*, Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5, 17 (1995); *Giardina, A.*, L'exécution des sentences du Centre international pour le règlement des différends relatifs aux investissements, 71 Revue Critique de Droit International Privé 273, 278 (1982).

4    See also *Broches*, Awards Rendered, pp. 304, 305, 306, 308, 311, 314, 326.

fact, the final version of Art. 54 still bears a strong resemblance to the text of Art. 192 of the Treaty of Rome.[5]

Art. 54 does not distinguish between the recognition and enforcement of awards **7** against investors on the one side, and against host States on the other.[6] Therefore, it can be used by either party to the arbitration proceedings. But the *travaux préparatoires* to the Convention show clearly that the original motive for the inclusion of a provision on enforcement was to give recourse against a defaulting investor. It was considered highly unlikely that a State party to the Convention would not carry out its treaty obligation under the Convention to comply with an award. This obligation would be backed up by concern for a State's reputation as a place of investment and by the revival of the right to diplomatic protection by the investor's State of nationality (see Art. 27, paras. 38–43). A provision on enforcement was seen as necessary to balance the situation in favour of the host State, should the investor not comply with an award (History, Vol. II, pp. 58, 59/60, 64, 177, 273, 304, 344, 345, 347, 379, 424, 425, 427, 428, 430, 501, 502, 520, 521, 574, 888, 889, 890, 892, 989, 991)[7] (see also Art. 53, para. 39). But all the drafts leading to the Convention refer to recognition and enforcement against the parties in equal terms, without distinguishing between investors and host States, and it is clear that this was also the intention of the drafters (History, Vol. I, pp. 246, 248; Vol. II, pp. 889, 890).

The drafts leading to Art. 54 were the subject of detailed and prolonged discus- **8** sion. Apart from the relationship to the New York Convention (see para. 4 *supra*) and the belief that host States would be the main beneficiaries (see para. 7 *supra*), the question of whether the obligation to recognize and enforce should be incumbent upon all States parties to the Convention (see para. 24 *infra*), the exact date at which this obligation would arise (see para. 37 *infra*), the restriction to pecuniary

---

5   Art. 192 of the Treaty of Rome, renumbered Art. 256 by the Treaty of Amsterdam, 1999, provides:
    Decisions of the Council or of the Commission which involve a pecuniary obligation on persons other than States, shall be enforceable.
    Enforcement shall be governed by the rules of civil procedure in force in the State in the territory of which it is carried out. The order for its enforcement shall be appended to the decision, without other formality than verification of the authenticity of the decision, by the national authority which the Government of each Member State shall designate for this purpose and shall make known to the Commission and to the Court of Justice.
    When these formalities have been completed on application by the party concerned, the latter may proceed to enforcement in accordance with the national law, by bringing the matter directly before the competent authority.
    Enforcement may be suspended only by a decision of the Court of Justice. However, the courts of the country concerned shall have jurisdiction over complaints that enforcement is being carried out in an irregular manner.
    Art. 187 of the Treaty of Rome, renumbered 244, provides:
    The judgments of the Court of Justice shall be enforceable under the conditions laid down in Article 256 [192].
6   But see Art. 55 dealing with the immunity of States from execution.
7   See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 356, 404/5 (1972-II); *Broches*, Awards Rendered, pp. 299 *et seq.*, 303/4.

obligations (see para. 73 *infra*), the finality and non-reviewability at this stage (see paras. 82–84 *infra*), the assimilation of awards to judgments of domestic courts (see para. 88 *infra*), the situation in federal States (see para. 92 *infra*), the question of the competent domestic authority to deal with recognition and enforcement (see para. 106 *infra*), the procedure for submitting an award (see para. 97 *infra*) and the procedure for dealing with a request for recognition and enforcement (see para. 104 *infra*) were discussed at various stages of the deliberations.

9     The obligation to recognize and enforce an award applies quite generally and is not subject to exclusion or variation by agreement of the parties. It is unnecessary to provide for recognition and enforcement in any agreement containing consent to jurisdiction.[8] No clause to this effect is contained in the Model Clauses (see Art. 25, para. 385) offered by the Centre.[9]

10     The otherwise self-contained nature of the Convention does not apply at the stage of recognition and enforcement of awards.[10] Art. 54, in requiring the intervention of domestic courts and other authorities, constitutes an exception to the exclusive remedy rule of Art. 26. Therefore, Art. 26 may not be used to defeat the obligation under Art. 54.

11     Art. 54 may be used concurrently with diplomatic protection in accordance with the last part of Art. 27(1) (see Art. 27, paras. 38–43). Both remedies are available, in principle, to investors to secure compliance with awards. There is no indication of any relationship of priority or mutual exclusivity between the two remedies. Enforcement and diplomatic protection may be used simultaneously. It is clear that, as soon as one of these remedies has succeeded, the other must be discontinued.

## B. The Additional Facility

12     The ICSID Convention, including its Art. 54, does not apply to arbitration under the Additional Facility Rules (see Art. 25, paras. 9–13). The Additional Facility Rules are quite specific on this point:

### Article 3
*Convention Not Applicable*
Since the proceedings envisaged by Article 2[11] are outside the jurisdiction of the Centre, none of the provisions of the Convention shall be applicable to them or to recommendations, awards, or reports which may be rendered therein.

13     The Arbitration Rules governing the Additional Facility[12] do not contain any provisions on recognition and enforcement of awards. This means that an award, rendered under the Additional Facility, is subject to the normal rules governing

---

8   See also *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168, 193 (1992).

9   4 ICSID Reports 357. But see Model Clause 15 dealing with immunity from execution of the award at p. 366.

10   *Broches*, Awards Rendered, p. 288.      11   See Art. 25, para. 10.

12   The official designation is: Arbitration (Additional Facility) Rules.

*Article 54 – Enforcement*                                    1121

the recognition and enforcement of arbitral awards contained in national laws and applicable treaties.[13] This is also recognized indirectly by Arts. 19 and 20(3) of the Arbitration (Additional Facility) Rules which provide that the arbitration proceedings shall be held only in States that are parties to the 1958 New York Convention and that the award shall be made at the place of arbitration (see Art. 53, para. 7).[14]

The applicability of the New York Convention does not give the same degree **14** of enforceability as Art. 54 of the ICSID Convention. Art. V of the New York Convention lists a number of reasons upon which recognition and enforcement of an award may be refused.[15] Some of these may be put forward by the party against which recognition and enforcement is sought:

(a)  incapacity of the parties to enter into the arbitration agreement or invalidity of the arbitration agreement;

(b)  lack of proper notice to or incapacity to present its case of the party against which the award is invoked;

(c)  decision beyond the terms of the arbitration agreement;

(d)  improper composition of the tribunal or improper arbitral procedure;

(e)  award not yet binding on the parties or set aside or suspended.

In addition, the authority requested to recognize and enforce the award may refuse to do so on its own initiative if:

(a)  the subject matter is not capable of settlement by arbitration under the local law; or

(b)  recognition or enforcement would be contrary to the local public policy.

It will be noted that several of the reasons for non-enforcement in Art. V **15** of the New York Convention are covered by the reasons for annulment under Art. 52 of the ICSID Convention. Since arbitration under the Additional Facility is not covered by Art. 52 of the ICSID Convention and is not subject to its own annulment procedure, the retention of the possibility to review awards at the stage of recognition and enforcement appears logical.

Participation in the New York Convention may be made subject to two limiting **16** declarations.[16] One is that a State may, on the basis of reciprocity, declare that

---

13  See also Comment on Art. 3 of the Additional Facility Rules, 1 ICSID Reports 218 *et seq.*

14  See also *Broches, A.*, The "Additional Facility" of the International Centre for Settlement of Investment Disputes (ICSID), 4 Yearbook Commercial Arbitration 373, 379 (1979); *van den Berg, A. J.*, The New York Arbitration Convention of 1958 98, 99 *et seq.* (1981); *Giardina, A.*, La Mise en oeuvre au niveau national des arrêts et des décisions internationaux, 165 Recueil des Cours 257, 276 (1979-IV); *Toriello, P.*, The Additional Facility of the International Centre for Settlement of Investment Disputes, 4 Italian Yearbook of International Law 59, 70, 82 *et seq.* (1978/79).

15  330 UNTS 40; 7 ILM 1047 (1968).

16  New York Convention, Art. I(3): "When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration."

it will apply the Convention only to the recognition and enforcement of awards made in the territory of another Contracting State. Declarations of this kind should not pose any problems in view of the requirements contained in Arts. 19 and 20(3) of the Additional Facility Arbitration Rules that an award must be made in a State party to the New York Convention (see para. 13 *supra*).

**17**     The other declaration possible under Art. I(3) of the New York Convention is that the Convention will only be applied to differences arising out of relationships that are considered as commercial under the law of the State making such declaration. A number of States parties to the New York Convention have made such limiting declarations. The Additional Facility Rules, in accordance with their Art. 2, cover three categories of disputes (see Art. 25, paras. 9–11), the second of which is legal disputes not arising directly out of an investment. But under Art. 4(3) of the Additional Facility Rules the underlying transaction must have features which distinguish it from an ordinary commercial transaction (see Art. 25, paras. 202–204).[17]

**18**     It would seem erroneous to construe an incompatibility between the "commercial relationships" declarations under the New York Convention and this requirement of the Additional Facility Rules. The features distinguishing these transactions from ordinary commercial transactions should not be interpreted in the sense of "other than" but rather "more than". This means that the disputes covered by the Additional Facility, whether arising from investments or not, should be covered by the New York Convention even if they are subject to a "commercial relationships" declaration.[18]

**19**     Problems of a different kind may still arise. The underlying transaction may be classified as commercial but the host State's act leading to the dispute, an expropriation or other act of public authority, may be classified differently. This may lead an enforcing authority to believe that the legal relationship is not commercial in the sense of a declaration made under Art. I(3) of the New York Convention.

**20**     Another potential problem is the question whether Additional Facility awards are "foreign arbitral awards" in the sense of the New York Convention. Art. I(1) of the New York Convention defines such awards as those that have been made in the territory of a State other than the enforcing State as well as "arbitral awards not considered as domestic awards".[19] Despite these broad terms of reference, the

---

17   See also *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 82 (1990).

18   See also *Leahy, E. R./Orentlicher, D. F.*, Enforcement of Arbitral Awards Issued by the Additional Facility of the International Centre of Settlement of Investment Disputes (ICSID), 2 Journal of International Arbitration 15, 23 *et seq.* (1985). Art. 1136(7) of the NAFTA makes this result explicit, 32 ILM 646 (1993).

19   New York Convention, Art. I(1): "This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought."

argument has been made that a-national or denationalized awards would not qualify for purposes of the New York Convention.[20] The better view, which is supported by the majority of writers and some judicial authority,[21] is that international, a-national or denationalized awards are covered by the New York Convention.

Additional Facility awards can be seen as covered by the New York Convention    **21**
either by looking at the place where the award has been made or by regarding such awards as non-domestic in the sense of Art. I(1). The second of these two solutions is to be preferred. It makes the New York Convention applicable even if the award has been made in the country where recognition and enforcement is sought. This means that if the Additional Facility award is made in Washington D.C., a party seeking recognition and enforcement in the United States can rely on the New York Convention and on the US legislation giving effect to it.[22]

Some treaties providing for Additional Facility arbitration also deal with    **22**
enforcement. A number of bilateral investment treaties (BITs) contain an under-taking of each country concerned to provide in its territory for the enforcement of awards rendered pursuant to the arbitration clauses in the BITs.[23] Other BITs refer to the New York Convention.[24] The NAFTA, the Energy Charter Treaty and the 1994 Free Trade Agreement between Mexico, Colombia and Venezuela (see Art. 25, paras. 457–463) also require that States parties to these treaties provide for enforcement in their territories of awards rendered pursuant to the provisions on arbitration.[25]

## II. INTERPRETATION

### A.  "(1) Each Contracting State . . ."

The obligation to recognize and enforce awards applies to all States parties to    **23**
the ICSID Convention. It applies not just to the State party to the proceedings and

---

20  *Van den Berg*, Recent Enforcement Problems, pp. 7 *et seq.*
21  See *Delaume, G. R.*, Law and Practice of Transnational Contracts 315, 388 *et seq.* (1988); *Delaume, G. R.*, Enforcement of State Contract Awards: Jurisdictional Pitfalls and Remedies, 8 ICSID Review – FILJ 29, 48 *et seq.* (1993); *Delaume, G. R.*, Reflections on the Effective-ness of International Arbitral Awards, 12 Journal of International Arbitration 5, 17 (1995); *Leahy/Orentlicher*, Enforcement, pp. 18 *et seq.*; *Choi*, Judicial Enforcement, pp. 190 *et seq.*
22  Chapter 2 of the United States Arbitration Act. See *Leahy/Orentlicher*, Enforcement, pp. 17, 25; *Gudgeon, K. S.*, Arbitration Provisions of U.S. Bilateral Investment Treaties, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S. J./Nelson, R. W.* eds.) 41, 55 (1985).
23  See *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 332 (1997).
24  See *Peters, P.*, Dispute Settlement Arrangements in Investment Treaties, 22 Netherlands Year-book of International Law 91, 149 (1991).
25  NAFTA Art. 1136(4), 32 ILM 646 (1993); Energy Charter Treaty Art. 26(8), 34 ILM 401 (1995). See also *Parra*, Provisions on the Settlement, p. 347; *Eklund, C. D.*, A Primer on the Arbitration of NAFTA Chapter Eleven Investor-State Disputes, 11 Journal of International Arbitration 135, 147 (1994).

to the State whose national was a party to the proceedings. By contrast, Art. 53 refers to the obligations of the parties only.[26]

**24**     This principle was the subject of considerable debate during the Convention's drafting.[27] A duty for "each Contracting State" was foreseen in all drafts leading to the Convention and was consistently defended by Mr. *Broches* (History, Vol. I, pp. 246, 248; Vol. II, pp. 80, 162, 272, 304, 372, 464, 522, 574/5). But the idea to make awards enforceable in third States that were unconnected to the arbitration ran into some opposition (History, Vol. II, pp. 176, 426, 429, 521, 522, 549, 550, 671, 892). Compromise suggestions were made to treat awards in third States like foreign rather than domestic judgments or to allow third States to refuse recognition and enforcement on the ground that the award was contrary to the local *ordre public* (public policy) (at pp. 346, 523, 656, 885, 889, 892, 893, 900, 901, 903) (see also paras. 82–84 *infra*). Eventually, these suggestions were voted down (at pp. 903, 904) and the full enforceability of awards in all States parties to the Convention was preserved.

**25**     The Report of the Executive Directors on the Convention in para. 42 confirms that

> . . . Article 54 requires every Contracting State to recognize the award as binding and to enforce the pecuniary obligations imposed by the award as if it were a final decision of a domestic court.[28]

**26**     Therefore, recognition and enforcement of an award may be sought in any State party to the ICSID Convention including the State party to the arbitration proceedings and the State of nationality of the investor who was a party to the proceedings. In the case of recognition and enforcement of an award against the investor, assets are most likely to be located in its State of nationality. The requirement under Art. 25 that the investor must be a national of a Contracting State (see Art. 25, paras. 268–298) assures that its State of nationality will be bound by Art. 54.[29]

**27**     Art. 54 gives the party seeking recognition and enforcement of an award the possibility to select the forum most favourable for this purpose. This selection will be determined primarily by the availability of assets of the award debtor that are suitable for execution. In the case of enforcement against a State, considerations of the law on sovereign immunity from execution will also be an important factor.[30] In the reported cases in which ICSID awards were recognized by domestic courts

---

26   *Broches*, Awards Rendered, p. 288; *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 399/400 (1972-II).

27   For a more detailed account of the drafting history on this point see *Broches*, Awards Rendered, pp. 301/2, 305, 307, 308, 309, 310, 313, 314.

28   See also the Statement of the US Department of State on the Convention, 5 ILM 824/5 (1966).

29   *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 356 (1972-II).

30   See *Jacob, K. S.*, Reinvigorating ICSID with a New Mission and with Renewed Respect for Party Autonomy, 33 Virginia Journal of International Law 123, 134 (1992).

(see paras. 50–63 *infra*, esp. para. 57), the forum State was neither the host State nor the investor's home State.

Failure of a State party to the Convention to recognize and enforce an award **28** would be a breach of a treaty obligation. This obligation is reinforced by Art. 69 which contains an obligation to take legislative and other measures necessary to make the Convention effective. Non-compliance with Art. 54, whether on the basis of local law or not, would carry the usual consequences of State responsibility, including diplomatic protection. The State of the nationality of an investor who has prevailed in an ICSID arbitration could bring an international claim against a State that was not a party to the arbitration but whose court and authorities have failed to recognize and enforce the award in violation of Art. 54. This would include the right to refer the dispute to the International Court of Justice in accordance with Art. 64.[31] In the case of a victorious host State, failure by the investor's State of nationality or by any other State party to the Convention to recognize and enforce the award would have the same consequence.

Recognition and enforcement may also be sought through the courts and author- **29** ities of the State that was a party to the arbitration proceedings. Of course, the obligation to comply with the award exists independently of any enforcement measures. The need to resort to enforcement would be a consequence of non-compliance in violation of Art. 53. If recognition and enforcement of the award is sought against the State through its own courts and authorities but fails, the consequence would be twofold. The State in question would be in violation of its obligation under Art. 53 to abide by and comply with the award. Additionally, it would be in violation of the separate obligation under Art. 54 to recognize and enforce the award (see also Art. 55, paras. 112–114).

## B. "...shall recognize an award rendered pursuant to this Convention as binding..."

### 1. Awards Rendered Pursuant to the Convention

### a) What Constitutes an Award?

Only final awards under the Convention (see Art. 48, paras. 22–30) are subject **30** to recognition and enforcement. Decisions preliminary to awards such as decisions upholding jurisdiction under Art. 41, decisions recommending provisional measures under Art. 47[32] and procedural orders under Arts. 43 and 44 are not awards. They are not by themselves subject to recognition and enforcement. But to the extent that these preliminary decisions are eventually incorporated into awards or are reflected in awards (see Art. 41, paras. 70, 78), they are subject to recognition and enforcement (see also Art. 52, paras. 62–64).

---

31  See also *Giardina*, L'exécution, p. 293.
32  The parties may agree on binding provisional measures by the tribunal (see Art. 47, paras. 8, 9), on provisional measures by domestic courts (see Art. 26, paras. 181–183) or on a combination of both. But such a procedure would be outside Art. 54.

**31**    A decision by a tribunal that it does not have jurisdiction is an award (see Art. 41, paras. 73, 74). It is conceivable that such an award may be the subject of proceedings for its recognition and enforcement, for instance, as regards costs of the arbitration.

**32**    A settlement by the parties that is embodied into an award in accordance with Arbitration Rule 43(2) (see Art. 48, paras. 70–73, 78, 79) is covered by Art. 54 and therefore subject to recognition and enforcement. This constitutes an important advantage over an ordinary out of court settlement leading to a mere discontinuance of proceedings under Arbitration Rule 43(1). Parties reaching a settlement in the course of ICSID proceedings would be wise to consider this option. It will transform their agreement into a judicial decision enjoying the status of a final court decision in each State party to the Convention.

**33**    In accordance with Art. 53(2), the concept of an award, as used in Art. 54, includes decisions under Arts. 50, 51 and 52 on interpretation, revision and annulment (see Art. 53, paras. 60–66). This means that awards are to be recognized and enforced subject to any interpretation, revision or annulment.

**34**    Curiously, Art. 53(2) does not refer to Art. 49(2) dealing with the award's supplementation and rectification. But Art. 49(2) itself says that the decision on supplementation or rectification shall become part of the award (see Art. 49, paras. 78–80). Therefore, the concept of an award for purposes of recognition and enforcement under Art. 54 includes any decision supplementing or rectifying the award pursuant to Art. 49(2).

**35**    A decision annulling the award removes the obligation to recognize or enforce it. But the annulment of an award may raise questions concerning the continued applicability of the exclusive remedy rule of Art. 26. The normal procedure after annulment is the resubmission of the dispute to a new tribunal in accordance with Art. 52(6). In this case, the exclusive remedy rule continues to apply (see Art. 53, para. 62). But if the decision annulling the award is based on a finding that there was no jurisdiction and that the tribunal lacked competence, a party may wish to pursue other remedies. Such a party may seek to have the decision on annulment recognized in accordance with Art. 54 in order to pave the way for non-ICSID proceedings. The other party may seek the continuation of ICSID proceedings under Art. 52(6) arguing that a new tribunal is not bound by the *ad hoc* committee's reasoning (see Art. 52, paras. 683–688). It is submitted that as long as there is a reasonable possibility of a continuation of proceedings under Art. 52(6), the exclusive remedy rule should take precedence over any attempt to have a finding of lack of jurisdiction by an *ad hoc* committee recognized under Art. 54. Put differently, a decision annulling an award will only terminate the obligation to recognize and enforce the award. But the decision on annulment will not be an award in the sense of Art. 54 as long as there is a possibility to continue proceedings in accordance with Art. 52(6).

**36**    In case of a partial annulment (see Art. 52, paras. 494–510), the obligation to recognize and enforce the award would apply, in principle, to the unannulled

portion of the award. But in such a case a stay of enforcement is quite likely (see Art. 52, paras. 696–700).

## b) Stay of Enforcement

During the Convention's drafting, there was some debate on stay of enforcement pending procedures for the award's interpretation, revision or annulment (see also Art. 50, para. 42; Art. 51, para. 34; Art. 52, paras. 574–577; Art. 53, paras. 47, 48). At one point there was a draft that foresaw discretion for the national court or authority to refuse recognition and enforcement in such a situation (History, Vol. II, p. 885). After some debate (at pp. 886–890, 893, 895, 902), the opinion prevailed that there should be complete parallelism between the parties' obligation to comply (Art. 53) and recognition and enforcement (Art. 54) (at p. 900).   **37**

The rather curious result is that the Convention's provision on binding force (Art. 53) contains a reference to stay of enforcement while the Article on recognition and enforcement does not. The reason for this omission is that it seemed obvious that enforcement under Art. 54 was subject to any stay of enforcement under Arts. 50, 51 and 52. The fact did not require restating. Therefore, recognition and enforcement is also subject to the condition that there is no stay of enforcement.[33] The *ad hoc* Committee in *MINE* v. *Guinea* expressed this in the following terms:   **38**

> Although the Convention does not explicitly so provide, it seems to be clear that suspension of a party's obligation to abide by and comply with the award necessarily carries with it suspension of a Contracting State's obligation (and for that matter its authority) to enforce the Award, even though during the pendency of the Committee's examination of the application for annulment the validity of the Award remains unaffected.[34]

The Report of the Executive Directors states the following:   **39**

> 42. Subject to any stay of enforcement in connection with any of the above proceedings in accordance with the provisions of the Convention, the parties are obliged to abide by and comply with the award and Article 54 requires every Contracting State to recognize the award as binding and to enforce the pecuniary obligations imposed by the award as if it were a final decision of a domestic court.

The language of this passage could be clearer but the only logical interpretation is that the words "subject to a stay of enforcement" extend to the part of the sentence dealing with Art. 54 on recognition and enforcement.

The Convention, as eventually adopted, leaves no discretion to domestic courts or other authorities in the context of Art. 54 to make allowance for possible or actually pending proceedings for the interpretation, revision or annulment of awards. The only decisive criterion is whether there has, in fact, been a stay of enforcement in accordance with Arts. 50, 51 or 52. A party may find that if it has failed to request a stay of enforcement or if the tribunal or *ad hoc* committee has   **40**

---

33   See *Broches*, Awards Rendered, p. 317.
34   *MINE* v. *Guinea*, Interim Order No. 1, 12 August 1988, para. 10.

refused a stay of enforcement, the procedures for recognition and enforcement will go ahead despite the fact that proceedings for interpretation, revision or annulment are pending (see para. 100 *infra*).

**41**     Stay of enforcement is subject to certain conditions and procedures which are described in their proper context (see Art. 50, paras. 42–45; Art. 51, paras. 34–39; Art. 52, paras. 574–655). The time limits for requests for interpretation, revision and annulment vary considerably. The date of a stay of enforcement arising from one of the proceedings is difficult to predict. In fact, a stay of enforcement may come a considerable time after the date of the award. The problems arising from these different time limits and the resultant timing of stays of enforcement are discussed in the context of Art. 53 (see Art. 53, paras. 57–59). The observations made there apply *mutatis mutandis* to recognition and enforcement under Art. 54. A possible result can be that proceedings for recognition and enforcement of awards are legitimately initiated but may have to be suspended or even terminated at a later stage.

### 2. Recognition of Awards

**42**     Recognition of an award is the formal confirmation that the award is authentic and that it has the legal consequences provided by the law. Recognition of awards is often subject to specific procedures sometimes called *exequatur*. Depending on the law of the country where recognition is sought, including any applicable treaties, recognition of non-ICSID awards may be subject to certain conditions or may be an opportunity for the award's review. ICSID awards must not be made subject to conditions for recognition not provided for by the Convention. Nor is it permissible to subject them to review at the stage of recognition. The domestic court's or other authority's task is limited to verifying the authenticity of the ICSID award (see paras. 81–87 *infra*).

**43**     Recognition has two possible effects. One is the confirmation of the award as binding or *res judicata*. The other is a step preliminary to enforcement. In a particular case, both effects may arise simultaneously.

**44**     The obligation to recognize an award as binding has the effect of rendering the award *res judicata* in each Contracting State[35] (History, Vol. II, pp. 344, 519). This means that the claim on which the award has decided must not be the subject of another proceeding before a domestic court or arbitral tribunal. A victorious respondent in ICSID proceedings may wish to have an award dismissing the claim on the merits recognized in order to protect itself against action before domestic courts arising from the same dispute.

**45**     A party to ICSID proceedings that have resulted in an award will have to undergo the formal procedure for the award's recognition by the competent court or other authority before it can successfully plead *res judicata*. Art. 54(2) provides

---

35   *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 400 (1972-II); *Giardina*, L'exécution, p. 277.

that the formal procedure of furnishing a copy of the award certified by the Secretary-General to the specially designated court or other authority shall apply to recognition as well as to enforcement. A court before which the same dispute is brought is unlikely to accept the plea of *res judicata* unless the award has been formally recognized.[36] Even an award holding that there is no jurisdiction may be formally recognized in order to pave the way for non-ICSID proceedings (see para. 31 *supra*).

The restriction to pecuniary obligations relates to the enforcement of awards (see paras. 72, 114 *infra*) but not to their recognition. Therefore, an obligation of specific performance, like restitution, or an obligation to desist from a certain course of action that is spelt out in an award, is subject to recognition and will enjoy the effect of *res judicata* even though it is not subject to enforcement. Similarly, a finding in an award that a certain course of action was legal or illegal is *res judicata* even though it has no immediate consequence in terms of enforcement. Such a finding in an award may determine a preliminary issue in different proceedings. **46**

In most cases recognition will be seen as a first step towards enforcement or execution. As a consequence of recognition, the award becomes a valid title which can form the basis for execution.[37] Recognition is subject only to the requirements of the Convention and may not be refused for reasons of domestic law. By contrast, Art. 54(3) subjects execution to the modalities of the local law of the country where execution is sought[38] (see paras. 110–115 *infra*). **47**

The provision on sovereign immunity from execution in Art. 55 does not apply at the stage of recognition. Submission to arbitration may be seen as a waiver of immunity in proceedings to have the award recognized.[39] Therefore, the effect of the award as *res judicata* will apply irrespective of any immunity from execution. **48**

Recognition as a preliminary step to execution may be meaningful even if there are no immediate prospects of an execution because there are no assets that are subject to execution in the State where recognition is sought. Once recognition has been obtained, execution will be quicker and easier should assets become available at a later stage. In addition, recognition will put the award debtor on notice that execution will be sought as soon as assets become available. Since this **49**

---

36  See also *Broches*, Awards Rendered, p. 326.

37  *Delaume, G. R.*, ICSID Arbitration in Practice, 2 International Tax and Business Law 58, 74 (1984).

38  *Giardina*, L'exécution, p. 288.

39  *Delaume, G. R.*, Foreign Sovereign Immunity: Impact on Arbitration, 38 Arbitration Journal 34, 45 (1983); *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784, 816 (1981); *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 838/9 (1982); *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 250 (1986); *Delaume, G. R.*, Judicial Decisions Related to Sovereign Immunity and Transnational Arbitration, 2 ICSID Review – FILJ 403, 405/6 (1987); *Giardina*, L'exécution, p. 288; *Langkeit, J.*, Staatenimmunität und Schiedsgerichtsbarkeit: Verzichtet ein Staat durch Unterzeichnung einer Schiedsgerichtsvereinbarung auf seine Immunität? 96 *et seq.* (1989).

will create obstacles to economic transactions in the country concerned, such a prospect may turn out to be an inducement to comply with the award.[40]

### 3. Practice on Recognition

**50**   In *Benvenuti & Bonfant* v. *Congo*, the investor had obtained an award in its favour.[41] It was granted an *exequatur* by the *Tribunal de grande instance* of Paris on 23 December 1980. The order of *exequatur* contained the following limiting condition:

> No measure of execution, or even a conservatory measure, shall be taken pursuant to the said award, on any assets located in France, without the prior authorization of this Court.[42]

An order of 13 January 1981 by the same Court confirmed the prior decision and refused to remove the limiting condition on the ground that it was impossible at that stage to distinguish funds or assets that were to be used for sovereign activities from those originating from commercial activity of a private law character. This might lead to a situation that would infringe upon the sovereignty of the foreign State.[43]

**51**   An appeal against this decision to the *Cour d'appel* of Paris was successful. After quoting Art. 54 of the Convention, the Court found that this provision lays down a simplified procedure for obtaining an *exequatur* and that the function of the court concerned was restricted to ascertaining the authenticity of the award certified by the Secretary-General. After quoting Art. 55 of the Convention, the Court held that the order granting an *exequatur* does not constitute a measure of execution but merely a step preliminary to execution. The Court said:

> The judge at first instance, acting on a request pursuant to Article 54 of the Convention of Washington, could not therefore, without exceeding his competence, become involved in the second stage, that of execution, to which the question of the immunity from execution of foreign States relates.
>
> Consequently that part of the order of 23 December 1980 of the President of the *Tribunal de grande instance* of Paris which is the object of this appeal must be deleted.[44]

Therefore, the limiting condition was deleted.[45]

---

40  *Choi*, Judicial Enforcement, p. 213.
41  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980.
42  The Decision of 23 December 1980 is unpublished. This passage is quoted at 1 ICSID Reports 370, 372. See also 108 Journal du Droit International 843 (1981).
43  1 ICSID Reports 369; 108 Journal du Droit International 365/6 (1981).
44  Cour d'appel, Paris, 26 June 1981, 1 ICSID Reports 369, 371; 108 Journal du Droit International 843, 845 (1981).
45  For discussion of these decisions see: *van den Berg, A. J.*, Recent Enforcement Problems under the New York and ICSID Conventions, 5 Arbitration International 2, 11/2 (1989); *Broches*, Awards Rendered, pp. 318 *et seq.*; *Choi*, Judicial Enforcement, p. 181; *Chukwumerjie, O.*, ICSID Arbitration and Sovereign Immunity, 19 Anglo-American Law Review 166, 179 (1990); *Delaume*, Introductory Note, 20 ILM 877/8 (1981); *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784, 816 (1981); *Delaume, G. R.*, Le Centre International pour le

*Article 54 – Enforcement*                                                          1131

A subsequent attempt to enforce the Award in France through the attachment **52**
of funds owned by Banque Commerciale Congolaise (BCC) failed. The *Cour de
cassation* found that BCC was distinct from the State of the Congo and could not
be regarded as an emanation of the State.[46] Ultimately, the Congo paid the sum
due under the Award.[47]

In *SOABI* v. *Senegal*, the French courts reached the same result. The Award[48] **53**
received an *exequatur* by the *Tribunal de grande instance* of Paris on 14 November
1988. Senegal appealed and the *Cour d'appel* of Paris vacated the order of *exe-
quatur*.[49] It held that the State of Senegal by signing the arbitration clause and by
submitting to an ICSID tribunal had, under Art. 54 of the Convention, undertaken
to ensure the enforcement of the pecuniary obligations imposed by the Award in
its territory but had not waived its right to invoke its immunity from execution in a
Contracting State under Art. 55 of the Convention. The Court found that in France
the principle of immunity from execution could be set aside only in exceptional
circumstances if the assets in question are designed for an economic and commer-
cial activity under private law. It had not been demonstrated that execution would
be carried out against such assets. Therefore, the execution of the Award in France
would be contrary to the international *ordre public* (public policy) since it would
violate the principle of immunity. It followed that the *exequatur* had to be vacated
in accordance with the applicable provision of the Code of Civil Procedure.[50]

An appeal against this decision to the *Cour de cassation* was successful.[51] The **54**
Court held that a foreign State which has submitted to arbitration had thereby
accepted that the award may receive an *exequatur*. An *exequatur* does not in
itself constitute an act of execution which could give rise to immunity from
execution. The Court added that the ICSID Convention had in its Articles 53 and

———————
    Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit Interna-
tional 775, 839 (1982); *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 AJIL 784, 797
(1983); *Giardina, A.*, L'exécution, p. 281; *Giardina, A.*, The International Centre for Settlement
of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on
International Commercial Arbitration (*Sarcevic, P.* ed.) 214, 219 (1989); *Soley, D. A.*, ICSID
Implementation: An Effective Alternative to International Conflict, 19 The International Lawyer
521, 531 (1985); *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between
States and Private Persons 246 (1990); *Ziadé, N. G.*, Some Recent Decisions in ICSID Cases,
6 ICSID Review – FILJ 514, 523 (1991).
46  *Benvenuti & Bonfant* v. *Banque Commerciale Congolaise*, Cour de cassation, 21 July 1987,
1 ICSID Reports 373; 115 Journal du Droit International 108 (1988).
47  *Broches, A.*, Avoidance and Settlement of International Investment Disputes, 78 American
Society of International Law Proceedings 38, 55 (1984).
48  *SOABI* v. *Senegal*, Award, 25 February 1988.
49  *SOABI* v. *Senegal*, Cour d'appel, Paris, 5 December 1989, 2 ICSID Reports 337; 117 Journal
du Droit International 141 (1990). The English translations of the French courts' decisions in
this case must be treated with some caution. The decisions deal with the issue of distinguishing
between the granting of an *exequatur* and measures of execution. The English translations use
"enforcement" for both these concepts and are liable to lead to confusion. See also paras. 64–71
*infra*.
50  At 2 ICSID Reports 340/1.
51  *SOABI* v. *Senegal*, Cour de cassation, 11 June 1991, 2 ICSID Reports 341; 118 Journal du Droit
International 1005 (1991).

1132          THE ICSID CONVENTION: A COMMENTARY

54 created an autonomous and simplified regime for recognition and execution which excluded the otherwise applicable provisions of the Code of Civil Procedure and the remedies provided therein. The decision of the *Cour d'appel* was quashed and annulled.[52]

**55**    These decisions of French courts draw a clear distinction between the recognition of an award and its execution. There is no sovereign immunity with respect to the recognition of an award. Immunity from execution under Art. 55 only arises when actual measures of execution are taken.[53] The *Cour de cassation* also pointed out that the recognition and enforcement of ICSID awards are independent of provisions of domestic law dealing with the recognition and enforcement of other arbitral awards. Art. 54 creates an autonomous regime.

**56**    In *LETCO* v. *Liberia*, attempts were made to have the Award[54] recognized and enforced in the United States. Upon LETCO's application, a United States District Court issued an *ex parte* order that contained the following language:

> . . . it is ORDERED that the annexed arbitration award, as rectified, in favor of LETCO be docketed and filed by the Clerk of this Court in the same manner and with the same force and effect as if it were a final judgment of this Court; and it is further
>
> ORDERED, ADJUDGED and DECLARED that, in accordance with the provisions of the aforementioned arbitration award, as rectified, the applicant Liberian Eastern Timber Corporation recover from the Government of the Republic of Liberia the sum of . . . (\$ 9,076,857.25), and that the applicant have execution therefore.[55]

A Writ of Execution was issued to the United States Marshal for the Southern District of New York pursuant to the Judgment and copies were served on shipowners and agents of Liberia appointed to collect fees and taxes due to Liberia.

**57**    Liberia moved to vacate the *ex parte* order. The same District Court first acknowledged the obligation arising from Art. 54 and from the US enabling legislation to Art. 54 (see para. 93 *infra*). It then said:

> Liberia, as a signatory to the Convention, waived its sovereign immunity in the United States with respect to the enforcement of any arbitration award entered pursuant to the Convention. When it entered into the concession contract with

---

52   For discussion of these decisions see: *Broches, A.*, Note, Revue de l'Arbitrage 164 (1990); *Broches, A.*, Note, Revue de l'Arbitrage 638 (1991); *Carias-Borjas, S.*, Recognition and Enforcement of ICSID Awards: The Decision of the French *Cour de Cassation* in *SOABI* v. *Senegal*, 2 The American Review of International Arbitration 354 (1991); *Choi*, Judicial Enforcement, pp. 183/4; *Delaume, G. R.*, Introductory Note, 30 ILM 1167 (1991); *Delaume, G. R.*, Comment, 86 AJIL 138 (1992); *Gaillard, E.*, The Enforcement of ICSID Awards in France: The Decision of the Paris Court of Appeal in the SOABI Case, 5 ICSID Review – FILJ 69 (1990); *Gaillard*, Note, 108 Journal du Droit International 1006 (1991); *Ziadé, N. G.*, Some Recent Decisions, p. 521; *Ziadé*, Comment, 80 Revue Critique de Droit International Privé 124 (1991).
53   See also Tribunal de grande instance, Paris, Judgment of July 1970 concerning the non-ICSID Award in *SEEE* v. *Yugoslavia*, 98 Journal du Droit International 131 (1971).
54   *LETCO* v. *Liberia*, Award, 31 March 1986.
55   *LETCO* v. *Liberia*, United States District Court, Southern District of New York, Order, 5 September 1986, 2 ICSID Reports 384.

LETCO, with its specific provision that any dispute thereunder be settled by arbitration under the rules of ICSID and its enforcement provision thereunder, it invoked the provision contained in Article 54 of the Convention which requires enforcement of such an award by Contracting States. That action, and reading the treaty as a whole, leaves little doubt that the signatories to the Convention intended that awards made pursuant to its provisions be given full faith and credit in their respective jurisdictions subject to such rights as are reserved by signatories thereunder. Therefore, Liberia clearly contemplated the involvement of the courts of any of the Contracting States, including the United States as a signatory to the Convention, in enforcing the pecuniary obligations of the award.

The fact that LETCO is a French entity and Liberia a foreign sovereign does not deprive the district court of subject matter jurisdiction. Thus, this Court had jurisdiction to direct the entry of judgment against Liberia to enforce the pecuniary obligations of the arbitration award in favor of LETCO. The motion to vacate the judgment is denied.[56]

The Court then proceeded to examine Liberia's immunity from execution in accordance with Art. 55 (see Art. 55, paras. 35, 36). It found that under the provisions of the US Foreign Sovereign Immunities Act the assets against which execution was attempted, fees and taxes, were sovereign rather than commercial. Therefore, the motion to vacate the executions upon such funds was granted. The Court added that LETCO was not enjoined from issuing executions with respect to any properties which were used for commercial activities.[57]    **58**

A further attempt to enforce the *LETCO* v. *Liberia* Award was made through the United States District Court for the District of Columbia. LETCO recorded the judgment of the New York District Court recognizing the Award with the District of Columbia District Court and the latter issued writs of attachment which were served on several banks. Liberia's motion to quash the writs of attachment seizing Liberia's bank accounts was granted since the accounts were held by Liberia's Embassy and enjoyed immunity from execution (see Art. 55, paras. 65–67).[58]    **59**

The decisions of the US courts in *LETCO* v. *Liberia* also distinguish between the recognition of awards and their actual execution. The Judgment of the New York court may be criticized for examining the issue of immunity at the stage of recognition.[59] But in holding that participation in the Convention in combination with consent to ICSID arbitration amounted to a waiver of immunity in proceedings to recognize the resulting award (see para. 57 *supra*), the Court reached the    **60**

---

56  *LETCO* v. *Liberia*, United States District Court, Southern District of New York, Judgment, 12 December 1986, 2 ICSID Reports 387/8. Footnotes omitted.

57  At 2 ICSID Reports 388/9. This Judgment was affirmed on appeal with no published opinion by the United States Court of Appeals (2d Circuit) on 19 May 1987.

58  *LETCO* v. *Liberia*, United States District Court, District of Columbia, 16 April 1987, 2 ICSID Reports 390. For discussion of these decisions see *van den Berg*, Recent Enforcement Problems, pp. 12/3; *Broches*, Awards Rendered, pp. 324 *et seq.*; *Choi*, Judicial Enforcement, pp. 184 *et seq.*; *Franzoni, D. B.*, Enforcement of ICSID Awards in the United States, 18 Georgia Journal of International and Comparative Law 101 (1988); *Joyce, A.*, Note, 29 Harvard International Law Journal 135 (1988); *Kahale, G. III.*, Enforcing an ICSID Arbitral Award, 6 International Financial Law Review 40 (1987); *Ziadé*, Some Recent Decisions, p. 524.

59  See also *Choi*, Judicial Enforcement, pp. 185/6.

result mandated by Art. 54. The use of the term "enforcement" in the context of recognition is merely a matter of terminology but is liable to lead to confusion (see paras. 64–71 *infra*).

**61**    In *AIG* v. *Kazakhstan* the investors had obtained an ICSID award in their favour.[60] They tried to have the Award recognized and enforced in the United Kingdom. The recognition of the Award was unproblematic. The Claimants obtained leave to register the Award in the High Court pursuant to the United Kingdom implementing legislation of the ICSID Convention.[61] Their attempt to enforce the Award through a third-party debt and charging order against assets of the National Bank of Kazakhstan held by a private bank in London failed however.[62]

**62**    The National Bank of Kazakhstan successfully intervened and resisted the issuance of the orders by showing that the cash and securities held by the London banks were owned by it and not by Kazakhstan.[63] The fact that the Republic of Kazakhstan may ultimately have had a beneficial interest in the money was deemed irrelevant.

**63**    Additionally, the High Court examined whether the assets involved enjoyed immunity from execution (see Art. 55, paras. 38, 39, 70, 71). It came to the conclusion that the UK State Immunity Act 1978 provided for "complete immunity from the enforcement process in the United Kingdom courts" for the property of a state's central bank or other monetary authority.[64] Since it found that the National Bank of Kazakhstan was Kazakhstan's central bank it refused to grant third-party debt orders.

## C.   ". . . and enforce the pecuniary obligations imposed by that award within its territories . . ."

### 1. Enforcement and Execution

**64**    Art. 54(1) uses the word "enforce" twice. Art. 54(2) also refers to "enforcement". By contrast, Art. 54(3) uses the word "execution" twice. This would suggest that the words "enforcement" and "execution" stand for different concepts. But a look at the equally authentic French and Spanish texts of the Convention yields a different picture. The French text consistently uses "l'exécution" five times in paras. 1, 2 and 3 of Art. 54. Similarly, the Spanish text is consistent in using "ejecutar" and "ejecuten" in Art. 54(1), "ejecución" in Art. 54(2) and "ejecutará" and "ejecución" in Art. 54(3). This means that a distinction between enforcement and execution cannot be sustained on the basis of the French and Spanish texts.

---

60    *AIG* v. *Kazakhstan*, Award, 7 October 2003.
61    Arbitration (International Investment Disputes) Act 1966, Sec. 1.
62    *AIG Capital Partners Inc. and another* v. *Republic of Kazakhstan (National Bank of Kazakhstan Intervening)*, High Court, Queen's Bench Division (Commercial Court), 20 October 2005, [2005] EWHC 2239 (Comm), 11 ICSID Reports 118.
63    At 11 ICSID Reports 134/5.               64    At 11 ICSID Reports 141.

*Article 54 – Enforcement*    1135

The three texts are equally authoritative and must be reconciled. Under **65**
Art. 33(4) of the 1969 Vienna Convention on the Law of Treaties,[65] when a
comparison of the authentic texts discloses a difference of meaning which cannot
be reconciled by the Convention's other rules on interpretation, the meaning which
best reconciles the texts, having regard to the object and purpose of the treaty,
shall be adopted. In the case of Art. 54 of the ICSID Convention, the interpretation
that best reconciles the three texts would appear to be that the words "enforce-
ment" and "execution" are identical in meaning. This is more plausible than the
alternative of giving different meanings to the same French and Spanish words in
paras. 1 and 2 on the one hand and in para. 3 on the other.

The Convention's drafting history yields no information that would explain this **66**
inconsistency.[66] The answer may simply lie in the circumstances of the work on
this Article which took place under great time pressure and is described by *Broches*
as being characterized by great fluidity, sometimes bordering on confusion.[67]

The confusion is compounded by the court decisions that apply Art. 54. For **67**
instance, the Judgment of the US District Court for the Southern District of New
York of 12 December 1986 (see para. 57 *supra*) used the term "enforcement"
where it evidently meant recognition and found that there is no immunity from
"enforcement". It immediately proceeded to hold that there was immunity from
execution.[68]

The decisions of the French courts in *SOABI* v. *Senegal* (see paras. 53–55 *supra*) **68**
deal with the distinction between the granting of an *exequatur* on the one hand
and the Award's *exécution* on the other. But the English translation uses the word
"enforcement" both to describe the *exequatur* and when dealing with immunity
from execution.[69]

Some authors have built elaborate theories on the distinction between enforce- **69**
ment and execution as used in Art. 54.[70] Other authors, including a leading author-
ity on ICSID, have also made a distinction between enforcement and execution.[71]

---

65  The Vienna Convention on the Law of Treaties is not, technically, applicable to the ICSID
    Convention but reflects customary international law on this point.
66  See also *Broches*, Awards Rendered, pp. 313, 315, 318, 320/1.
67  At p. 322.                             68   2 ICSID Reports 387/8.
69  2 ICSID Reports 340/1.
70  See *Booysen, H.*, The Municipal Enforcement of Arbitration Awards against States in Terms
    of Arbitration Conventions, with Special Reference to the New York Convention – Does Inter-
    national Law Provide for a Municipal Law Concept of an Arbitrable Act of State?, 12 South
    African Yearbook of International Law 73, 111 *et seq.* (1986/87); *Franzoni, D. B.*, Enforcement
    of ICSID Awards in the United States, 18 Georgia Journal of International and Comparative Law
    101, 115/6 (1988); *Soley, D. A.*, ICSID Implementation: An Effective Alternative to International
    Conflict, 19 The International Lawyer 521, 525, 531/2 (1985).
71  *Delaume, G. R.*, Arbitration with Governments: Domestic v. International Awards, 17 The
    International Lawyer 687, 695/6 (1983); *Delaume, G. R.*, ICSID Arbitration and the Courts, 77
    AJIL 784, 799 (1983); *Delaume, G. R.*, Introductory Note, 20 ILM 877 (1981); *Buckley, R. P.*,
    Now We Have Come to the ICSID Party: Are its Awards Final and Enforceable?, 14 Sydney Law
    Review 358, 368/9 (1992); *Chukwumerjie, O.*, ICSID Arbitration and Sovereign Immunity, 19
    Anglo-American Law Review 166, 179/80 (1990); *van den Berg*, Recent Enforcement Problems,
    pp. 11 *et seq.*; *Ziadé*, Some Recent Decisions, p. 524.

They assimilate "enforcement" to "recognition" and use the terms more or less synonymously. Even *Broches*, the person with the most intimate knowledge of the Convention's history, is not entirely clear on the subject. He suggests that the word "enforce" in Art. 54(1) should have been replaced by language indicating that the pecuniary obligations imposed by an award "shall be enforceable"[72] (see already History, Vol. II, p. 519). He appears to suggest that enforcement is a broader term that covers both recognition and execution but seems to dismiss that idea in a different context.[73]

70    None of the above uses of the term "enforcement" is inherently correct or incorrect. But the use of the same word for different concepts in the same context is liable to lead to confusion and should be avoided. Using "recognition" and "enforcement" synonymously is not helpful. The wording of Art. 54(1) in its English version alone is enough to demonstrate that the words have different meanings: the entire award is to be recognized as binding. But only its pecuniary obligations are to be enforced (see paras. 46 *supra*, 72 *infra*). A triad of concepts involving recognition, enforcement and execution is also not useful. It is not supported by the Convention's French and Spanish texts. Nor is there any authority for three different concepts in the Convention's drafting history. The decisions of domestic courts, although not always consistent in their terminology, draw a distinction between recognition on the one hand and measures of execution on the other (see paras. 50–63 *supra*).

71    The courts and authors have used the term "enforcement" variously to denote "execution", "recognition" or a broad concept embracing all steps covered by Art. 54. A consistent use of the word "enforcement" as meaning the same as "execution" in the context of Art. 54 would have been more faithful to the Convention's trilingual character and would have avoided much confusion.[74] The best that can be suggested at this stage is that great caution should be exercised when using the word "enforcement" in the context of Art. 54. This Commentary uses "enforcement" as meaning the same as "execution" unless indicated otherwise.

### *2. Pecuniary Obligations*

72    The obligation to enforce extends only to the pecuniary obligations imposed by the award. It does not extend to any other obligation under the award such as restitution or other forms of specific performance or an injunction to desist from a certain course of action. By contrast, the obligation to recognize extends to the entire award (see para. 46 *supra*).

73    The drafts leading to the Convention did not contain the restriction to pecuniary obligations of the obligation to enforce (History, Vol. I, pp. 246, 248). There were misgivings concerning the feasibility of enforcement of non-pecuniary obligations arising from awards (History, Vol. II, pp. 344, 346, 347, 425). A German objection

---

72  *Broches*, Awards Rendered, p. 318.        73  At pp. 318, 320/1.
74  For an author following this model see *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 246/7 (1990).

to eliminating the power of domestic courts to apply the local *ordre public* when enforcing awards (see para. 84 *infra*) led to a suggestion by Mr. *Broches* to restrict enforcement to the award's pecuniary obligations (at p. 990). Mr. *Broches* emphasized that awards could well order the performance or non-performance of certain acts but all that could be enforced would be the obligation to pay damages if the party did not comply with that order (at pp. 903, 991). In the course of further discussion, Mr. *Broches* pointed out that the *res judicata* effect of the entire award and the obligation of parties under Art. 53 to carry out the award would not be affected by the restriction of the award's enforceability to its pecuniary obligations (at p. 1019; see also pp. 1026, 1029).[75]

The restriction of the obligation to enforce to pecuniary obligations deals with the difficulty that might have arisen if the award provides for forms of relief that are unknown to the law of the country where enforcement is sought. For instance, in some countries the courts may not have the power to order specific performance (see para. 110 *infra*). Art. 54(3) provides that execution shall be governed by the law of the State where execution is sought. Since enforcement of pecuniary obligations is presumably available under every legal system, this provision eliminates the problems that could arise from different procedures for the enforcement of judgments.[76]                                            **74**

There is a wide range of possibilities for non-pecuniary obligations that awards might impose. They include the employment of local personnel or the reinstatement of wrongfully discharged personnel.[77] Other examples might be compliance with performance requirements like the use of local components. Possible obligations imposed upon the host State would include the restitution of seized property,[78] the return of an investment licence that has been withdrawn, the granting of permission to transfer currency, discontinuance of harassment of the investor's personnel or desistance from imposing unreasonable taxes.                      **75**

In the cases so far published, most ICSID tribunals have framed the obligations imposed by their awards in pecuniary terms. This is not due to a belief that they lack the power to proceed otherwise. Rather, the cases involved situations in which the investment relationship had broken down and the claimants had defined their demands in pecuniary terms.[79]                                              **76**

The situation was different in *Goetz* v. *Burundi* where the Claimants primarily demanded the re-instatement of a tax and customs-free zone certificate and   **77**

---

75  For a more detailed analysis of the *travaux préparatoires* on this point see *Broches*, Awards Rendered, pp. 303, 315, 316, 328/9.

76  *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 703/4 (1993); *Carias-Borjas*, Recognition and Enforcement, p. 359.

77  See the Statement by the US Department of State in connection with the enactment of implementing legislation to the ICSID Convention, 5 ILM 820, 824 (1966).

78  See the non-ICSID Award in *Texaco* v. *Libya*, 19 January 1977, 53 ILR 422 (1979).

79  *Schreuer, C.*, Non-Pecuniary Remedies in ICSID Arbitration, 20 Arbitration International 325, 332 (2004).

asked for damages only in a subsidiary way. In an interim decision on liability the Tribunal found that the revocation of the free zone regime amounted to an indirect expropriation. Since it was aware of settlement negotiations between the parties, the Tribunal did not impose non-pecuniary remedies at that stage. Rather, it suggested that it was within the "sovereign discretion" of the host State to either "give an adequate and effective indemnity to the claimants" or "to return the benefits of the free zone to them".[80] Under the final settlement agreement, which was embodied in the Tribunal's award pursuant to Rule 43(2) of the ICSID Arbitration Rules, Burundi had to reimburse the illegally imposed taxes and customs duties and consented to the creation of a new free zone regime.[81]

**78**     While the *Goetz* v. *Burundi* Tribunal did not have to decide the question whether an ICSID tribunal has the power to order specific performance, this was affirmatively answered in the decision on jurisdiction in *Enron* v. *Argentina*. The Claimants had not only requested the Tribunal to rule that certain stamp taxes were unlawful and expropriatory but also to annul them and to enjoin their collection. While reserving a decision on the merits to the final award, the Tribunal concluded "that, in addition to declaratory powers, it [had] the power to order measures involving performance or injunction of certain acts".[82]

**79**     It is likely that in the future more cases will arise, involving disputes stemming from ongoing relationships, in which awards providing for specific performance or injunctions will become relevant. Tribunals imposing such non-pecuniary obligations should keep the impossibility to enforce them in mind. Such awards should follow the example of the *Goetz* v. *Burundi* Tribunal and provide for a pecuniary alternative in case of non-performance such as liquidated damages, penalties or another obligation to pay a certain amount of money.[83]

**80**     There is no doubt that an obligation imposed by an award that is expressed not in monetary terms but in terms of an obligation to perform a particular act or to refrain from a certain course of action is equally binding and gives rise to the effect of *res judicata*. The Convention merely exempts such an obligation from the simplified and automatic enforcement procedure of Art. 54. It is conceivable, though not likely, that a non-pecuniary obligation imposed by an ICSID award may be enforced on a different legal basis. The 1958 [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards[84] does not contain a comparable limitation to pecuniary obligations.[85] Despite the other limitations of the New York Convention (see paras. 4, 5, 14 *supra*, 81, 82 *infra*), a party

---

80  *Goetz* v. *Burundi*, Award, 10 February 1999, para. 135.
81  At 6 ICSID Reports 46–51.
82  *Enron* v. *Argentina*, Decision on Jurisdiction, 14 January 2004, para. 81.
83  See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 400 (1972-II); *Schreuer, C.*, Non-Pecuniary Remedies, p. 332.
84  330 UNTS 38; 7 ILM 1046 (1968).
85  Art. III: "Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon . . ."

to an ICSID arbitration may find it useful to rely on the New York Convention where Art. 54 of the ICSID Convention is of no avail because the award imposes a non-pecuniary obligation.[86]

## D. "... as if it were a final judgment of a court in that State."

### 1. Finality and Nonreviewability

Art. 53(1) provides that the award shall not be subject to any appeal or to any other remedy except those provided for in the Convention (see Art. 53, paras. 18–22). Art. 26 expresses the exclusive remedy rule in more general terms. The Convention provides for a number of remedies and review procedures in Arts. 49(2) (supplementation and rectification), 50 (interpretation), 51 (revision) and 52 (annulment). The system of review under the Convention is self-contained and does not permit any external review. This principle also extends to the stage of recognition and enforcement of ICSID awards. A domestic court or authority before which recognition and enforcement is sought is restricted to ascertaining the award's authenticity. It may not re-examine the ICSID tribunal's jurisdiction. It may not re-examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID tribunal. This is in contrast to non-ICSID awards, including Additional Facility awards, which may be reviewed under domestic law and applicable treaties. In particular, the New York Convention gives a detailed list of grounds on which recognition and enforcement may be refused[87] (see paras. 12–22 *supra*).

During the Convention's preparation, the principle of finality of awards in the context of their enforcement was by no means uncontested and gave rise

**81**

**82**

---

86  *Cane, G.*, The Enforcement of ICSID Awards: Revolutionary or Ineffective?, 15 American Review of International Arbitration 439 (2004).

87  See in general *Carias-Borjas*, Recognition and Enforcement, p. 365; *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784, 815 (1981); *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 838 (1982); *Giardina*, L'exécution, pp. 277, 281, 284; *Giardina, A.*, The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214, 218, 220 (1989); *Kahn, P.*, Le contrôle des sentences arbitrales rendues par un Tribunal CIRDI 379 (1986); *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642, 651 (1968); *Pirrwitz, B.*, Annulment of Arbitral Awards Under Article 52 of the Washington Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 23 Texas International Law Journal 73, 82 (1988); *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 104/5 (1976); *Shihata, I. F. I.*, Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1, 8/9 (1986); *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 245/6 (1990). For a critical evaluation see *West, L. C.*, Award Enforcement Provisions of the World Bank Convention, 23 Arbitration Journal 38, 45 *et seq*. (1968).

to extensive discussion.[88] The Working Paper contained a reference to most favourable treatment given to foreign awards whether under local law or the New York Convention. But the Preliminary Draft already referred to enforcement as if the award were a final judgment of the local courts (History, Vol. I, p. 246). The ensuing debate showed that a number of delegates wanted to retain some possibility of a review under local law (History, Vol. II, pp. 346, 426, 427, 466, 575) or the permission of a refusal to enforce on the grounds provided by the New York Convention (at pp. 425, 426, 429, 521) or at least on the ground of a conflict with the *ordre public* (public policy) of the forum (at pp. 345, 346, 347, 427, 521, 575). Other delegates expressed support for the draft's "bold innovation" (at pp. 427, 430, 519) and Mr. *Broches* defended the idea of the Convention's self-contained regime of review (at pp. 425, 426, 427, 430, 522, 575).

**83**     The subsequent First Draft not only reiterated the formula of the final judgment of the courts of the enforcing State but added a sentence to the effect that no review other than verification of the award's authenticity would be allowed[89] (History, Vol. I, pp. 248, 252). This led to further debates about the desirability of following the example of the New York Convention (History, Vol. II, pp. 671, 887, 888, 894/5) or the need to preserve the right to refuse enforcement on the ground of the forum's *ordre public* (at pp. 661, 699, 888, 889, 890, 891, 893, 895, 901, 902, 903). A compromise was discussed that would have allowed the refusal to enforce an award on grounds of *ordre public* in third States but not in the State party to the proceedings and the State whose national was a party to the proceedings (at pp. 658, 671, 889, 893, 900, 901, 903). This idea was contained in two drafts (at pp. 885, 900) but was eventually defeated in a vote (at p. 903).

**84**     The Revised Draft retained the formula of the final judgment of a court of the enforcing State (History, Vol. I, p. 248). The German Executive Director insisted on retaining some discretionary power on the basis of the forum's *ordre public* (History, Vol. II, pp. 989, 991/2, 1018) but was strongly opposed by other Executive Directors and by Mr. *Broches* (at pp. 989, 990, 991). A compromise proposal to restrict the obligation to enforce to pecuniary obligations under awards (see para. 73 *supra*) was adopted to accommodate this difficulty (at pp. 990, 991, 1018).

**85**     The Convention's drafting history shows that domestic authorities charged with recognition and enforcement have no discretion to review the award once its authenticity has been established.[90] Not even the *ordre public* (public policy) of

---

88  For a detailed analysis of the drafting history on this point see *Broches*, Awards Rendered, pp. 304/5, 308–317. See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 402/3 (1972-II).

89  *Broches*, Awards Rendered, p. 314, has emphasized that this sentence, which was subsequently deleted, was unnecessary because other portions of the Article are sufficiently explicit as to the unconditional enforceability of the award.

90  See also the Statement of *Andreas F. Lowenfeld*, Deputy Legal Adviser, Department of State on the US Act implementing the ICSID Convention, 5 ILM 820, 826 (1966).

the forum may furnish a ground for refusal.[91] The finality of awards would also exclude any examination of their compliance with international public policy or international law in general. The observance of international law is the task of the arbitral tribunal in application of Art. 42 of the Convention subject to a possible control by an *ad hoc* committee[92] (see Art. 42, paras. 96–115, 167–235; Art. 52, paras. 259–270). Nor would there be any room for the application of the Act of State doctrine in connection with the recognition and enforcement of an ICSID award (see Art. 55, para. 34).[93]

The French courts do not seem to have been fully aware of their lack of power    **86** to review ICSID awards. In *Benvenuti & Bonfant* v. *Congo*, the *Tribunal de grande instance* of Paris in its order of 23 December 1980 (see para. 50 *supra*) based its decision to grant an *exequatur* also on the fact that the award "contains nothing that is contrary to [French] law and *ordre public*".[94] Benvenuti & Bonfant did not raise this point in its appeal and the *Cour d'appel* did not mention it in its judgment.[95] In the particular case, the reference to domestic law and *ordre public* did not make any difference. But it is clear that the Court by looking at domestic law and *ordre public* violated its duty under Art. 54 and may have created a negative precedent.[96] The *Cour de cassation* in *SOABI* v. *Senegal*[97] also found it necessary to remind the *Cour d'appel* that the regime created by Arts. 53 and 54 of the Convention excluded the remedies of the French Code of Civil Procedure (see para. 54 *supra*).

In the wake of numerous ICSID proceedings against Argentina, Argentine    **87** officials have suggested that its national courts may review ICSID awards if recognition and enforcement is sought in Argentina.[98] While this approach may be explained on the basis of national constitutional law, it would be contrary to Argentina's obligations under the ICSID Convention.[99]

---

91   *Amerasinghe, C. F.*, The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt Journal of Transnational Law 793, 815 (1976).

92   *Giardina*, L'exécution, pp. 285/6.

93   *Op. cit.*, p. 285. The 1988 amendment to the US Arbitration Act specifically excludes the application of the Act of State doctrine from confirmation of arbitral awards and execution upon judgments based on orders confirming such awards. 9 USC 15; 28 ILM 396, 398 (1989). See also *Kahale, G.*, New Legislation in the United States Facilitates Enforcement of Arbitral Agreements and Awards Against Foreign States, 6 Journal of International Arbitration 57, 63 (1989).

94   *Broches*, Awards Rendered, p. 318; *Ziadé*, Comment, p. 127.

95   1 ICSID Reports 369.

96   See also *Bernardini, P.*, Considérations pratiques sur le règlement des différends relatifs aux investissements: le point de vue des utilisateurs, 20 Rassegna dell' Arbitrato 15 (1981); *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 85 (1985); *Broches*, Awards Rendered, p. 320; *Choi*, Judicial Enforcement, pp. 182/3; *Giardina*, L'exécution, pp. 282/3.

97   *SOABI* v. *Senegal*, Cour de cassation, Judgment, 11 June 1991, 2 ICSID Reports 341.

98   *Rosatti, H.*, Los tratados bilaterales de inversión, el arbitraje internacional obligatorio y el sistema constitucional argentino, La Ley, 15 October 2003.

99   See *Marzorati, O. J.*, Enforcement of Treaty Awards and National Constitutions (The Argentinian Cases), 7 Business Law International 226, 239 *et seq.* (2006).

### 2. Final Judgment of Domestic Court

**88**    The reference to a final judgment of a court in the State where enforcement is sought was contained in the Preliminary Draft and in all subsequent drafts (History, Vol. I, pp. 246, 248). Mr. *Broches* explained that this would simply put an award on the same footing as a final judgment of the national courts. If such a judgment could be enforced under the domestic law in question, so could the award[100] (History, Vol. II, pp. 242, 304, 372, 464, 889). Suggestions to extend the reference to the "highest" or "superior" court were not successful (at pp. 272, 273, 890). Proposals to remove the reference to a final judgment of a local court altogether or to replace it by a reference to a local arbitral award or a foreign judgment were defeated in three separate votes[101] (at p. 904). The change from the original plural ("the courts") to the singular ("a court") appears to have been purely a matter of drafting convenience without practical significance.[102]

**89**    The Report of the Executive Directors on the Convention restates the position in the following terms:

> 43. The doctrine of sovereign immunity may prevent the forced execution in a State of judgments obtained against foreign States or against the State in which execution is sought. Article 54 requires Contracting States to equate an award rendered pursuant to the Convention with a final judgment of its own courts. It does not require them to go beyond that and to undertake forced execution of awards rendered pursuant to the Convention in cases in which final judgments could not be executed.

**90**    The position in the national hierarchy of courts of the national court to whose judgment the award shall be equivalent does not appear decisive.[103] A final court decision is one against which no ordinary remedy is available.[104] A judgment by a lower court that is subject to appeal or another form of review would not qualify as "final". But even a judgment of a lower court may be final if it is not subject to review or if the time limits for an appeal or other remedy have expired.

**91**    The fact that Art. 54(1) assimilates ICSID awards to final judgments of domestic courts implies that enforcement may be resisted in countries where national

---

100    See also *Broches*, Awards Rendered, p. 303.    101    See also *op. cit.* at p. 314.

102    *Broches*, Awards Rendered, pp. 313, 317; *Albrecht, W. E.*, Some Legal Questions Concerning the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 12 St. Louis University Law Journal 679, 681/2 (1968). But see *Rodley, N. S.*, Some Aspects of the World Bank Convention on the Settlement of Investment Disputes, 4 Canadian Yearbook of International Law 43, 47/8 (1966); *Giardina*, L'exécution, p. 279.

103    But see *Giardina, A.*, The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214, 219 (1989).

104    *Broches*, Awards Rendered, pp. 317/8; *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 701 (1993).

rules provide for an exceptional refusal to enforce a final judgment.[105] Though this possibility was already acknowledged during the drafting of the Convention,[106] it has not yet been relied upon in practice in order to defy recognition and enforcement of ICSID awards. Instead, past attempts to resist enforcement of awards have relied upon immunity from execution (see Art. 55, paras. 35–48, 64–71, 75, 117, 118).

### E. "A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state."

The provision dealing with federal constitutions was not contained in the earlier **92** drafts to the Convention but was inserted into the Revised Draft at the insistence of the delegate of the United States (History, Vol. I, pp. 246, 248; Vol. II, pp. 344, 889, 890, 893, 895, 900, 939, 990). No explanation of the need for this provision is evident from the published records. The same effect could have been achieved through the simple designation of the desired courts under Art. 54(2) (see paras. 106–109 *infra*). In a much later article, *Broches* expresses regret for not having questioned the US proposal.[107] As it turns out, this provision authorizes the United States to do what it could have done anyway. Other States with federal constitutions, such as Australia and Switzerland (see para. 108 *infra*), have followed a different course.

The United States has adopted the Convention on the Settlement of Investment **93** Disputes Act of 1966.[108] The Act states in relevant part:

> SEC. 3. (a) An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.
>
> (b) The district courts of the United States (including the courts enumerated in title 28, United States Code, section 460) shall have exclusive jurisdiction over actions and proceedings under paragraph (a) of this section, regardless of the amount in controversy.[109]

By stating that the Federal Arbitration Act shall not apply, the 1966 Act makes **94** it clear that the normal review procedures for arbitral awards at the stage of their

---

105  *Baldwin, E./Kantor, M./Nolan, M.*, Limits to Enforcement of ICSID Awards, 23 Journal of International Arbitration 1, 9 *et seq*. (2006).

106  According to *Broches*, "treating awards in the same way as court judgments implied that exceptional grounds only could be invoked to prevent recognition and enforcement". *Broches*, Awards Rendered, p. 312.

107  *Broches*, Awards Rendered, p. 322.

108  22 USC §§1650, 1650(a) (1966). Reproduced in 5 ILM 820 (1966).

109  *Loc. cit.*

enforcement are inapplicable in the case of ICSID awards. But the equalization of an ICSID award with a judgment of a state court combined with the reference to the full faith and credit clause of the Constitution and the conferral of jurisdiction on US district courts creates the impression that the federal courts have the power to review the ICSID tribunals' jurisdiction and to investigate whether the proceedings satisfied standards of procedural fairness.[110] This would be inconsistent with the principle of the award's finality (see Art. 53, paras. 18–32; paras. 81–87 *supra*). It is doubtful whether the Convention's authorization to federal States to treat awards like judgments of constituent states and to have them enforced through their federal courts implies that the review mechanisms for judgments of constituent states that may exist in these States can be applied to ICSID awards.

**95**    Another difficulty arising from the 1966 Act is that its language appears to preclude a simple registration and execution of ICSID awards, since this treatment is reserved to judgments of federal courts.[111] In fact, a memorandum submitted by the Treasury Department at the time of the adoption of the 1966 Act indicates that enforcement of an ICSID award would require the bringing of an original federal action against the losing party.[112] Such a procedure would not meet the requirements of Art. 54(2) (see para. 105 *infra*).[113]

**96**    When an attempt was made to enforce an ICSID Award in *LETCO* v. *Liberia* (see paras. 56–60 *supra*), the US District Court for the Southern District of New York, after citing 22 USC 1650(a) (see para. 93 *supra*), ordered that the Award "be docketed and filed by the Clerk of this Court in the same manner and with the same force and effect as if it were a final judgment of this Court" (see para. 56 *supra*).[114] Significantly, the District Court did not treat the Award as if it were "a final judgment of a court of general jurisdiction of one of the several States"[115] (see para. 93 *supra*). Liberia did not raise this point when it moved to vacate the Order of 5 September 1986, and the Judgment of 12 December 1986[116] (see paras. 57, 58 *supra*) does not address the issue.

---

110    See *Baldwin/Kantor/Nolan*, Limits to Enforcement, pp. 11 *et seq.*; *Coll*, United States Enforcement, pp. 410 *et seq.*; *Carias-Borjas*, Recognition and Enforcement, p. 365; *Franzoni, D. B.*, Enforcement of ICSID Awards in the United States, 18 Georgia Journal of International and Comparative Law 101, 107 (1988); *Choi*, Judicial Enforcement, p. 180; *Giardina*, L'exécution, pp. 279/80; *Giardina, A.*, La Mise en oeuvre au niveau national des arrêts et des décisions internationaux, 165 Recueil des Cours 257, 301/2 (1979-IV).

111    *Coll*, United States Enforcement, p. 413.

112    See *Broches*, Awards Rendered, pp. 322 *et seq.*; *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 702/3 (1993).

113    The requirement to bring an original action in the courts was reflected in an unsuccessful US proposal during the Convention's drafting: History, Vol. II, p. 885.

114    *LETCO* v. *Liberia*, United States District Court, Southern District of New York, Order, 5 September 1986, 2 ICSID Reports 384.

115    For a detailed discussion see *Broches*, Awards Rendered, pp. 324 *et seq*.

116    *LETCO* v. *Liberia*, United States District Court, Southern District of New York, Judgment, 12 December 1986, 2 ICSID Reports 385.

**F.  "(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General."**

The early drafts to the Convention did not contain any provisions concerning the procedure for the recognition and enforcement of awards[117] (History, Vol. I, p. 250). The idea that there should be a specially designated authority in every State party to the Convention was modelled after Art. 192 of the Treaty of Rome (see para. 6 *supra*) (History, Vol. II, pp. 272, 343, 424, 425, 520, 521, 574). The First Draft provided that the duly authenticated original or a duly certified copy thereof would have to be furnished. This was changed in the Revised Draft and in the Convention as eventually adopted to a copy of the award certified by the Secretary-General (History, Vol. I, p. 250; Vol. II, pp. 886, 894, 900, 902). **97**

In order to obtain recognition or enforcement, a party must furnish a copy of the award certified by the Secretary-General. Under Art. 11 of the Convention, the Secretary-General authenticates arbitral awards and certifies copies thereof. The original of the award remains in the archives of the Centre. Under Art. 49(1) certified copies of the award will be dispatched promptly by the Secretary-General to the parties (see Art. 49, paras. 5, 6). Additional certified copies of the award will be sent to the parties by the Secretary-General upon their request.[118] **98**

Only awards that are not subject to a stay of enforcement may be furnished to a competent court or other authority for purposes of recognition and enforcement (see paras. 37–41 *supra*). Certified copies of awards dispatched after the imposition of a stay of enforcement will reflect this fact[119] (see Art. 49, para. 9). But since the Secretary-General is under a duty to dispatch certified copies promptly after the award's signature, a subsequent stay of enforcement will not be reflected on these certified copies. The period between the date of the award and a stay of enforcement is difficult to foresee and may be considerable (see Art. 53, paras. 50–59). Therefore, a competent court or authority to which a copy of the award certified by the Secretary-General is furnished will have to make sure that the award is not subject to any intervening stay of enforcement. **99**

The obligations under Arts. 53 and 54 arise as soon as the award is rendered (see Art. 53, para. 50). Therefore, recognition and enforcement may be sought even while a request for rectification or supplementation, revision and annulment is still possible under the time limits provided by Arts. 49(2), 51(2) and 52(2). If **100**

---

117   For an analysis of the drafting history on this point see *Broches*, Awards Rendered, pp. 308/9, 310, 311, 314, 326.
118   See Arbitration Rule 48(3).
119   Administrative and Financial Regulation 28(2).

proceedings under Art. 54(2) have been commenced, they have to be suspended in case of a subsequent stay of enforcement. But the mere initiation of procedures for the interpretation, revision or annulment of an award without a stay of enforcement should not have any suspensive effect on recognition and enforcement (see para. 40 *supra*).

101    The NAFTA contains a specific provision to deal with this problem (see also Art. 53, paras. 55, 56). Under its Art. 1136(3)(a) a party may not seek enforcement of an ICSID award until either 120 days have elapsed from the date the award was rendered and no party has requested revision or annulment of the award, or revision or annulment proceedings have been completed.[120] The time limit of 120 days will take care of normal cases of requests for revision or annulment under Arts. 51(2) and 52(2). But problems may still arise if a rectification or supplementation procedure in accordance with Art. 49(2) extends the time limits under Arts. 51(2) and 52(2) beyond 120 days (see Art. 49, paras. 81–85). The time limit of 120 days in the NAFTA may also be insufficient if new facts are discovered under Art. 51(2) (see Art. 51, paras. 26–31) or if a request for annulment is based on corruption under Art. 52(2) (see Art. 52, paras. 448–450).

102    Only a party to the original ICSID arbitration proceeding may initiate the procedure under Art. 54(2). This would exclude action by an interested third party. It would, in particular, exclude action by a State purporting to act on behalf of its constituent subdivision or agency (see Art. 25, paras. 230–267, 311–318). Action under Art. 54(2) by a State acting in the exercise of diplomatic protection of its national who was a party to an ICSID proceeding (see Art. 27, paras. 38–43) would also be impossible. The requirement that only one of the original parties may initiate a proceeding for the recognition and enforcement of an award may also lead to problems of State succession or corporate succession (see Art. 25, paras. 306–310, 336–363; Art. 52, paras. 41–43).

103    There is nothing to preclude the simultaneous introduction of proceedings for recognition and enforcement of an ICSID award in several Contracting States. In fact, recognition of an award in several States may be reasonable and advisable in view of its *res judicata* effect (see para. 44 *supra*). If execution of the award is sought in several States, the courts and competent authorities in these States will have to co-ordinate their steps to ensure that payment is not made more than once. Partial payment in different States would be possible and legitimate.

104    Art. 54(2) does not give guidance as to the procedure that must be followed by the competent court or other authority after the certified copy of the award has been furnished. During the Convention's drafting, there was some expectation that Contracting States would enact legislation for this purpose (History, Vol. II, pp. 60, 272, 347, 474, 519, 521, 574, 903). Art. 69 provides in general terms that Contracting States shall take the legislative measures necessary to make the

---

120    32 ILM 646 (1993). See also *Parra*, Provisions on the Settlement, p. 348.

Convention effective. A number of States have taken such measures[121] (see paras. 93–95 *supra*; Art. 69, paras. 5, 6).

Art. 54(3) states that execution shall be governed by the local law concerning **105** the execution of judgments and hence refers to the modalities of the laws of individual States. But Art. 54(2) refers to recognition and enforcement. This would suggest that, before actual measures of execution are taken, the Convention mandates a simplified procedure that requires nothing more of the party seeking recognition and enforcement than furnishing the certified copy of the award. *Broches* has expressed the opinion that the requirement of an original action or new formal lawsuit for this purpose (see para. 95 *supra*) would be inconsistent with Art. 54(2).[122] The US District Court for the Southern District of New York in *LETCO* v. *Liberia*[123] appears to have followed the simplified procedure foreseen by Art. 54(2) (see paras. 56, 96 *supra*). The practice of the French courts would also support this conclusion (see paras. 50–55 *supra*).

### G. "Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation."

The idea that Contracting States would designate a competent authority for **106** purposes of recognition and enforcement was modelled after Art. 192 of the Treaty of Rome (see paras. 6, 97 *supra*) and was first contained in the First Draft (History, Vol. I, p. 250). After some debate as to whether the term competent authority included courts (History, Vol. II, pp. 671, 820, 884, 885, 893, 894, 900), the term was extended to "competent court or other authority" (History, Vol. I, p. 250).

Many but by no means all States parties to the Convention have made the des- **107** ignation required by Art. 54(2). As of April 2008, of the 143 Contracting States, 73 have made designations. The list of designated courts or other authorities is published as document ICSID/8-E.[124] The States that have made such designations include practically all leading commercial and financial centres. Therefore, the failure of some States to make the designations should not lead to major difficulties.[125]

Some countries have designated a single court or authority. Others have desig- **108** nated certain types of courts such as the locally competent district courts. Federal States have either designated their lowest federal courts like the United States,

---

121 See Doc. ICSID/8-F: Legislative or Other Measures Relating to the Convention: http://icsid. worldbank.org/ICSID/ICSID/DocumentsMain.jsp.
122 *Broches*, Awards Rendered, pp. 322 *et seq.*; *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 703 (1993).
123 *LETCO* v. *Liberia*, United States District Court, Southern District of New York, Order, 5 September 1986, 2 ICSID Reports 384.
124 See http://icsid.worldbank.org/ICSID/ICSID/DocumentsMain.jsp.
125 *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 837 (1982).

or the supreme courts of the respective component States or provinces, such as Australia. Switzerland has designated different courts for each canton. Most designations refer to courts but some refer to executive authorities such as the Ministry of Foreign Affairs in the case of Belgium and Sweden or the Ministry of Justice in the case of the Czech Republic, Egypt and Latvia. Where courts have been designated, these are sometimes the courts of first instance or district courts and sometimes the respective supreme courts. Designations may be changed at any time but prompt notification of such change should be made to the Secretary-General.

**109**     Many States have designated the courts or authorities that are also competent to deal with the recognition and enforcement of domestic and foreign arbitral awards as well as foreign judgments. This carries the danger of ICSID awards being subjected to the same procedures and standards of review as other awards or foreign judgments, a result that would be inconsistent with the finality and nonreviewability of ICSID awards (see paras. 81–87 *supra*). It is likely that in *Benvenuti & Bonfant* v. *Congo* this factor contributed to the erroneous reference to French law and *ordre public*[126] (see para. 86 *supra*).

### H. "(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought."

**110**     The earliest drafts to the Convention did not contain a provision comparable to Art. 54(3)[127] (History, Vol. I, p. 252). The debates touching upon the modalities of execution were strongly influenced by the question of State immunity from execution (History, Vol. II, pp. 177, 242, 304, 372, 424, 428, 429, 430, 464/5, 520, 575, 671, 892, 905). The application of the local law on execution seemed implicit in the equalization of ICSID awards to local judgments (at pp. 242, 272, 464). There was consensus that the application of the local procedural law implied that only the means and methods for execution of that local law would be available (at pp. 244, 379, 426, 428, 430, 520, 574, 575). Art. 192 of the Treaty of Rome (see para. 6 *supra*) served as a model for the First Draft which provided that execution would be governed by the rules of civil procedure in force in the State in whose territories such execution is sought[128] (History, Vol. I, p. 252; Vol. II, pp. 343, 431, 519/20, 521, 575). After some more debate on the significance of different procedural rules on execution and the different types of execution available in States (History, Vol. II, pp. 819/20, 884, 885, 886, 893, 894, 896, 900), it was

---

126  *Giardina*, L'exécution, pp. 281, 283; *Broches*, Awards Rendered, p. 327; *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 703 (1993).

127  For the drafting history on this point see also *Broches*, Awards Rendered, pp. 306/7, 309, 311, 313, 314.

128  *Broches*, Awards Rendered, p. 328.

*Article 54 – Enforcement* 1149

agreed that execution would only be available in respect of "pecuniary obligations" (at pp. 990 *et seq.*) (see para. 73 *supra*). Linguistic changes led to the version as eventually adopted (History, Vol. I, p. 252; Vol. II, pp. 886, 887, 889, 900).

The Report of the Executive Directors to the Convention gives the following explanation for this provision: **111**

> 42. . . . Because of the different legal techniques followed in common law and civil law jurisdictions and the different judicial systems found in unitary and federal or other non-unitary States, Article 54 does not prescribe any particular method to be followed in its domestic implementation, but requires each Contracting State to meet the requirements of the Article in accordance with its own legal system.[129]

The drafting history and the context of Art. 54(3) make it clear that the laws of the enforcing State that govern execution of an ICSID award are of a procedural nature only. Art. 54(3) does not detract from the obligation of every State party to the Convention to enforce awards. In particular, the laws of the enforcing State may not serve as a standard for the review of awards. Art. 54(3) does not affect the finality and nonreviewability of awards (see paras. 81–87 *supra*). **112**

States may carry out their obligation to enforce ICSID awards according to the modalities of their own laws concerning the execution of judgments. This implies that only procedures and remedies that are available under the local law will be applied to ICSID awards. A State is under no obligation to create new execution procedures for ICSID awards.[130] But the restriction to the enforcement of pecuniary obligations (see paras. 72–80 *supra*) should make this problem rather theoretical. It can be assumed that every State has procedures for the execution of pecuniary obligations imposed by judgments. **113**

Art. 54(3) refers only to the execution of awards but not to their recognition. Therefore, States do not have the same procedural flexibility with respect to recognition. This fact underlines the difference in the procedures for recognition and execution of awards. The problems encountered by the French courts with ICSID awards are primarily due to the fact that the laws concerning the execution of judgments were erroneously applied to the recognition of the awards (see paras. 50–55 *supra*). Similarly, the US courts also did not always clearly separate the two steps (see paras. 56–60 *supra*). **114**

The impossibility to enforce an ICSID award as a consequence of the law concerning the execution of judgments in one or several States in no way affects the obligation of the party to the ICSID arbitration to abide by and comply with the award in accordance with Art. 53(1). In particular, a State that successfully **115**

---

129   See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 401 (1972-II).

130   *Broches*, Awards Rendered, pp. 328/9; *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 703/4 (1993); *Carias-Borjas*, Recognition and Enforcement, p. 359.

relies on the laws concerning State immunity from execution will be in violation of its obligation under the Convention. The consequence would be a revival of the right of diplomatic protection under Art. 27(1) including the possibility of taking the dispute to the International Court of Justice in accordance with Art. 64[131] (see Art. 53, paras. 36–38).

---

131  See *Broches*, Awards Rendered, pp. 302, 329; *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 AJIL 784, 801 (1983); *Giardina, A.*, La mise en œuvre au niveau national des arrêts et des décisions internationaux, 165 Recueil des Cours 257, 275/6 (1979-IV); *Giardina*, L'exécution, pp. 291 *et seq.*; *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 25 (1993); *Shihata, I. F. I.*, Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1, 9 (1986).

# Article 55

---

**Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.**

## OUTLINE

*Paragraphs*

I.   INTRODUCTION                                                                     1–8
II.  INTERPRETATION                                                                  9–127
   A. **"Nothing in Article 54 shall be construed as derogating . . ."**           9–12
   B. **". . . from the law in force in any Contracting State**
      **relating to immunity . . . from execution."**                             13–110
      1. The Law in Force                                                         13–16
      2. Principles Governing State Immunity from Execution                       17–27
      3. Which Property is Protected from Execution?                              28–71
         a) Non-Commercial Property                                              28–59
         b) Specially Protected Property                                         60–71
      4. Waiver of Immunity                                                       72–110
         a) Conditions and Limitations on Waiver                                 77–93
         b) Conservatory Measures                                               94–98
         c) Drafting Waiver Clauses                                            99–110
   C. **". . . of that State or of any foreign State . . ."**                   111–127
      1. States                                                                111–114
      2. Constituent Subdivision or Agency                                     115–127

## BIBLIOGRAPHY

*Bernini, G./van den Berg, A.*, The Enforcement of Arbitral Awards Against a State: The Problem of Immunity from Execution, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 359 (1987);

*Broches, A.*, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287 (1987);

*Byers, M.*, State Immunity: Article 18 of the ILC's Draft, 44 International and Comparative Law Quarterly 882 (1995);

*Chamlongrasdr, D.*, Foreign State Immunity and Arbitration (2007);

Council of Europe and *Hafner, G./Kohen, M./Breau, S.* (eds.), State Practice Regarding State Immunities/La Pratique des Etats concernant les Immunités des Etats (2006);

*Crawford, J. R.*, Execution of Judgments and Foreign Sovereign Immunity, 75 American Journal of International Law 820 (1981);

*Delaume, G. R.*, Judicial Decisions Related to Sovereign Immunity and Transnational Arbitration, 2 ICSID Review – FILJ 403 (1987);

Sovereign Immunity and Transnational Arbitration, 3 Arbitration International 28 (1987);

Contractual Waivers of Sovereign Immunity: Some Practical Considerations, 5 ICSID Review – FILJ 232 (1990);

Enforcement of State Contract Awards: Jurisdictional Pitfalls and Remedies, 8 ICSID Review – FILJ 29 (1993);

*Dickinson, A./Lindsay, R./Loonam, J. P.*, State Immunity. Selected Materials and Commentary (2004);

*Fox, H.*, The Law of State Immunity, 2d ed. (2008);

*Gaillard, E.*, Effectiveness of Arbitral Awards, State Immunity from Execution and Autonomy of State Entities – Three Incompatible Principles, *in*: State Entities in International Arbitration (*Gaillard, E./Younan, J.* eds.) 179 (2008);

*Giardina, A.*, L'exécution des sentences du Centre international pour le règlement des différends relatifs aux investissements, 71 Revue Critique de Droit International Privé 273 (1982);

*Langkeit, J.*, Staatenimmunität und Schiedsgerichtsbarkeit: Verzichtet ein Staat durch Unterzeichnung einer Schiedsgerichtsvereinbarung auf seine Immunität? (1989);

*Meessen, K. M.*, State Immunity in the Arbitral Process, *in*: Arbitrating Foreign Investment Disputes – Procedural and Substantive Legal Aspects (*Horn, N./Kröll, S.* eds.) 387 (2004);

*Reinisch, A.*, European Court Practice Concerning State Immunity from Enforcement Measures, 17 European Journal of International Law 803 (2006);

*Schreuer, C.*, State Immunity: Some Recent Developments (1988);

*Wang, D.*, Binding Force and Enforcement, *in*: Dispute Settlement. International Centre for Settlement of Investment Disputes (UNCTAD ed.) UNCTAD/EDM/Misc232/Add.8 (2003).

## I. INTRODUCTION

**1**     Art. 55, by its own terms, is an interpretation of Art. 54. It provides a clarification to Art. 54(3) which states that execution of an award is governed by the law of the State in which execution is sought. This law includes the law on State immunity.

**2**     It also provides a clarification to the provision in Art. 54(1) which requires the enforcement of the pecuniary obligations under an ICSID award as if the award were a final judgment of a local court. The reference to "judgments in force" in Art. 54(3) has the same meaning. State immunity will apply to the execution of an ICSID award in the same way as it would apply to the execution of a judgment of a domestic court.

**3**     The drafting history of Art. 55 reveals no controversy.[1] The earlier drafts did not include a provision on State immunity (History, Vol. I, p. 254). Non-compliance by a State with an award was regarded as extremely unlikely (History, Vol. II, p. 520; see also Art. 54, para. 7). The preservation of State immunity was taken for granted (at pp. 176/7, 242, 304, 346, 372, 379, 424, 426, 429, 430, 464/5, 575). The text of what became Art. 55 was inserted into the First Draft merely to

---

1   *Broches, A.*, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287, 329/30 (1987).

clarify this point (at pp. 343, 428, 575, 905, 989). It remained unchanged and was barely discussed (History, Vol. I, p. 254; see also paras. 10, 11, 17, 72, 112 *infra*).

The Report of the Executive Directors on the Convention gives the following commentary:    **4**

> 43. The doctrine of sovereign immunity may prevent the forced execution in a State of judgments obtained against foreign States or against the State in which execution is sought. Article 54 requires Contracting States to equate an award rendered pursuant to the Convention with a final judgment of its own courts. It does not require them to go beyond that and to undertake forced execution of awards rendered pursuant to the Convention in cases in which final judgments could not be executed. In order to leave no doubt on this point Article 55 provides that nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

Art. 55 only applies to immunity from execution. It does not apply to immunity from jurisdiction. The question of immunity from jurisdiction does not arise in the context of the Convention.[2] Jurisdiction is governed by Art. 25 of the Convention and is determined by the tribunal under Art. 41. Domestic courts have no role to play in the determination of jurisdiction.    **5**

Art. 55 does not apply to the recognition of an award by a domestic court (see Art. 54, para. 48). Recognition is governed by Art. 54. The obligation to recognize an award as binding under Art. 54(1) is unconditional. Under Art. 54(3) only execution but not recognition is governed by the law of the forum State. Art. 55, by its own terms, refers to execution but not to recognition. Therefore, State immunity cannot be used to thwart proceedings for the recognition of an award. In addition, State immunity does not affect the *res judicata* effect of an award once it has been recognized[3] (see Art. 54, paras. 43–46). State immunity only comes into play when concrete measures of execution are taken to enforce the award's pecuniary obligations, typically after recognition has been granted.[4]    **6**

A successful invocation of State immunity does not alter the fact that non-compliance with an award is a violation of the Convention. State immunity is a procedural bar to measures of execution against a recalcitrant party. It does not affect in any manner the award debtor's obligation under Art. 53 to abide by and comply with the award (History, Vol. II, p. 763). Refusal to comply with the award and reliance on State immunity leads to the revival of the right of diplomatic    **7**

---

2   See also *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 403 (1972-II); *Delaume, G. R.*, Judicial Decisions Related to Sovereign Immunity and Transnational Arbitration, 2 ICSID Review – FILJ 403, 404 (1987); *Delaume, G. R.*, Contractual Waivers of Sovereign Immunity: Some Practical Considerations, 5 ICSID Review – FILJ 232, 250, 252 (1990); *Giardina, A.*, L'exécution des sentences du Centre international pour le règlement des différends relatifs aux investissements, 71 Revue Critique de Droit International Privé 273, 288/9 (1982).

3   See also *Sutherland, P. F.*, The World Bank Convention on the Settlement of Investment Disputes, 28 International and Comparative Law Quarterly 367, 398 (1979).

4   *Giardina*, L'exécution, p. 289.

protection under Art. 27(1) and may lead to the submission of the dispute to the International Court of Justice in accordance with Art. 64[5] (see Art. 53, paras. 35–38; Art. 54, para. 115).

**8**    Art. 55 may be seen as the Achilles' heel of the Convention. The otherwise effective machinery of arbitration has its weak point when it comes to the actual execution against States of pecuniary obligations under awards. The self-contained nature of the procedure which excludes the intervention of domestic courts does not extend to the stage of execution.[6] Arbitral tribunals do not have the power to order execution of their own awards. The Convention does not enjoin the courts of States parties to the Convention to enforce ICSID awards if this would be contrary to their law governing the immunity from execution of judgments and arbitral awards. Therefore, a State whose courts refuse execution of an ICSID award for reasons of State immunity is not in violation of Art. 54. This weakness of the enforcement procedure may make itself felt long before the stage of execution is reached. It may affect the bargaining position of the parties before or during the ICSID proceedings and may be reflected in a settlement between the parties (see Art. 48, paras. 69–87). It may also lead to a discount factor in an agreement concerning compliance with an award.[7]

## II. INTERPRETATION

### A. "Nothing in Article 54 shall be construed as derogating..."

**9**    Art. 55 leaves the law on State immunity from execution intact. This was the result of a conscious decision in the Convention's drafting. The inclusion of a waiver of immunity from execution would have been technically possible. But it was felt that the time was not ripe for such a drastic step. An attempt to include such a waiver would have run into the determined opposition of developing countries and would have jeopardized the wide ratification of the Convention.[8]

**10**    During the Convention's drafting, the concept of preserving immunity was barely questioned, although the idea that the Convention should provide for a waiver of immunity from enforcement as a consequence of consent to jurisdiction was aired at one point (History, Vol. II, pp. 345, 575). Also, there was some dissatisfaction at the prospect of unequal treatment of awards depending on which country was chosen for their enforcement (at pp. 429, 671). But Mr. *Broches*

---

5    See *Delaume, G. R.*, Sovereign Immunity and Transnational Arbitration, 3 Arbitration International 28, 43 (1987).

6    *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 246 *et seq.* (1990).

7    See *Schreuer, C.*, State Immunity: Some Recent Developments 125 (1988); *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 282 *et seq.* (1993).

8    *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 403 (1972-II); *Broches*, Awards Rendered, pp. 333, 334.

consistently advocated a solution that would leave the law of State immunity from execution unaffected (at pp. 242, 304, 346, 372, 424, 428, 464/5, 520, 905).

Thus, the Convention does not provide for a waiver of immunity. But neither does it grant or confirm immunity. The statement in Art. 55 is purely negative: Art. 54 is not to be read as affecting the law on immunity from execution. The award becomes a valid title like a final domestic judgment by virtue of Art. 54 but no more. The availability and extent of execution depends on the domestic law. If State immunity from execution is not granted or is limited under the local law of the enforcing State, ICSID awards will be enforceable to that extent[9] (see also History, Vol. II, pp. 520, 575). **11**

Art. 55 does not freeze the law on State immunity from execution as it existed when the Convention was drafted or entered into force. Rather, Art. 55 must be read as a reference to the law on immunity from execution as it evolves over time.[10] To the extent that immunity from execution undergoes changes and is limited through State practice, the possibilities for the execution of ICSID awards against States evolve as well. **12**

## B. "... from the law in force in any Contracting State relating to immunity ... from execution."

### 1. The Law in Force

Art. 55 refers to the law in force in any Contracting State. But it is clear that in a particular case only the law in force in the State where execution is sought can be relevant. Art. 55 is an interpretation of Art. 54. Art. 54(3) refers to the "laws . . . in force in the State in whose territories such execution is sought". Moreover, Art. 55 provides that Art. 54 shall not be construed as derogating from the relevant law in force. Derogation from the law that is not in force in the forum State would not be possible. It follows that a State against which execution is attempted can rely only on the law concerning immunity from execution in force in the State where enforcement is sought. A State opposing execution in another State cannot rely on its own law relating to immunity (but see paras. 112–114 *infra*). Nor can it rely on the law of a third State. **13**

The law relating to State immunity is at the borderline between international law and domestic law.[11] Traditionally, it was developed by domestic courts which made important contributions to State practice leading to the creation of a body **14**

9  *Giardina*, L'exécution, pp. 287/8.
10  *Amerasinghe, C. F.*, The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt Journal of Transnational Law 793, 814 (1976); *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 404 (1972-II); *Broches*, Awards Rendered, p. 332; *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 704 (1993); *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 24 (1993).
11  See *Schreuer*, State Immunity, pp. 1 *et seq*.

of customary international law. During the 1970s and 1980s a number of countries, including the United States,[12] Britain,[13] Canada[14] and Australia,[15] adopted legislation to regulate the law of State immunity comprehensively. There is also some treaty law such as the European Convention on State Immunity of 1972.[16] In addition, there are attempts at global codification such as the International Law Commission's Draft Articles on Jurisdictional Immunities of States and Their Property of 1991.[17] In 2004, the International Law Commission's work led to the adoption of the United Nations Convention on Jurisdictional Immunities of States and Their Property.[18]

**15**    In most instances, the relevant law that may be gleaned from these various sources for purposes of interpreting Arts. 54 and 55 is the law relating to immunity from execution of judgments of domestic courts. Art. 54 equates ICSID awards with final judgments of domestic courts. But in some countries the law on State immunity offers separate rules on the execution of arbitral awards (see paras. 32, 33, 81, 86, 87 *infra*). The law in force on immunity from execution of domestic judgments as well as of arbitral awards would be applicable in the case of ICSID awards.

**16**    It is not possible to undertake a comprehensive comparative analysis of the law governing State immunity from execution in the framework of this Commentary. All that can be offered is a broad overview of the principles applied in the legal systems of some of the most important commercial centres. Assets of foreign States are often located at these commercial centres. Therefore, attempts to enforce the pecuniary obligations arising from an award are more likely in these countries than elsewhere (see Art. 54, para. 27).

### 2. Principles Governing State Immunity from Execution

**17**    At the time of the Convention's drafting, State immunity tended to be considerably more comprehensive than today. In particular, there were few, if any, exceptions to the immunity from forced execution. The Convention's *travaux préparatoires* reflect the belief that, in general, actual enforcement measures against foreign States would not be possible (History, Vol. II, pp. 177, 242, 304, 372, 464, 522, 892).

**18**    A number of important developments in the law of State immunity have taken place since the adoption of the Convention in 1965. Most of these developments

---

12  Foreign Sovereign Immunities Act 1976, 28 USC §§ 1330, 1602–1611, 15 ILM 1388 (1976), as amended in 1988, 28 ILM 396 (1989), and in 1996/7, 36 ILM 759 (1997).
13  State Immunity Act 1978, 17 ILM 1123 (1978).
14  State Immunity Act 1982, 21 ILM 798 (1982).
15  Foreign States Immunities Act 1985, 25 ILM 715 (1986).
16  European Treaty Series No. 74, 11 ILM 470 (1972).
17  General Assembly Doc. A/46/405, YBILC 12 (1991-II/2), 30 ILM 1563 (1991).
18  Adopted by the UN General Assembly on 2 December 2004, UN, GAOR, 59th Session, Supp. No. 22 (A/59/22), 44 ILM 803 (2005); see also *Hafner, G./Köhler, U.*, The United Nations Convention on Jurisdictional Immunities of States and Their Property, 35 Netherlands Yearbook of International Law 3 (2004); *Stewart, D. P.*, The UN Convention on Jurisdictional Immunities of States and Their Property, 99 AJIL 194 (2005).

concern immunity from jurisdiction rather than immunity from execution. Execution against a foreign State still has a much lower probability of success than the institution of proceedings on the merits before a domestic court. But certain changes in the law on immunity from execution now make the enforcement of an ICSID award against a State possible.

One approach to immunity from execution is to link it to immunity from jurisdiction.[19] Under this principle, execution would be permissible whenever there was no immunity from jurisdiction (see also paras. 120, 121, 124–126 *infra*). Decisions to this effect may be found in Switzerland[20] and Germany.[21] But the significance of this seemingly generous attitude towards execution against foreign States is drastically reduced by other limiting factors such as the requirement of a close link to the forum State (see paras. 26, 27 *infra*) or the availability of property that is suitable for execution (see paras. 28–71 *infra*). **19**

For purposes of enforcing ICSID awards, a principle of linking immunity from execution to immunity from jurisdiction is not promising. It would require a court before which execution is sought to revisit the merits of the case in order to determine whether it could have been tried before the domestic courts of that country. ICSID arbitration is quite likely to involve government activity that is to be classified as *acta jure imperii* (see Art. 25, paras. 68–72) and would lead to immunity from jurisdiction if brought before a domestic court. The fundamentally different basis for establishing and determining ICSID jurisdiction (see para. 5 *supra*) does not make this principle helpful. **20**

Another possible approach to deal with the enforcement of arbitral awards is to treat consent to arbitration as an implicit waiver of immunity from execution of the award[22] (see para. 74 *infra*). There is only limited evidence that this principle has been adopted in its pure form,[23] in particular because it relies on implied consent which may be fictional. Accordingly, many national courts have **21**

---

19  *Bernini, G./van den Berg, A.*, The Enforcement of Arbitral Awards Against States: The Problem of Immunity from Execution, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 359, 364 *et seq*. (1987); *van Blankenstein, A.*, Enforcement of an Arbitral Award against a State: With Whom Are We Dealing?, *in*: The Flame Rekindled – New Hopes for International Arbitration (*Muller, S./Mijs, W.* eds.) 159 (1993); *Schreuer*, State Immunity, pp. 134 *et seq*.

20  See *e.g.*, *Arab Republic of Egypt* v. *CINETEL*, Federal Tribunal, 20 July 1979, 65 ILR 425, 430 (1984).

21  See *e.g.*, *Central Bank of Nigeria*, Landgericht Frankfurt, 2 December 1975, 65 ILR 131, 135 (1984).

22  See *van den Berg, A. J.*, Recent Enforcement Problems under the New York and ICSID Conventions, 5 Arbitration International 2, 13 (1989); *Bernini/van den Berg*, The Enforcement, p. 360; *Fox, H.*, States and the Undertaking to Arbitrate, 37 International and Comparative Law Quarterly 1, 12 *et seq*. (1988); *Delaume*, Judicial Decisions, pp. 411/2; *Schreuer*, State Immunity, pp. 75 *et seq*.

23  See *Libyan American Oil Company* v. *Socialist People's Arab Republic of Libya*, Sweden, Svea Court of Appeals, 18 June 1980, 62 ILR 225 (1982); see also *Société Creighton c/ ministre des finances de l'Etat du Qatar et autre*, France, Cour de cassation (1re chambre civile), 6 July 2000, Bulletin civil I, n°207, Revue de l'arbitrage 114 (2001). The same result had already been reached by a lower French court with regard to *ad hoc* arbitration in *Société Bec Frères c/ Office des Céréales de Tunisie*, Rouen Court of Appeal, 20 June 1996, Revue de l'arbitrage 263 (1997), 113 ILR 485.

held that an arbitration agreement does not imply a waiver from measures of execution.[24] This view is also supported by Art. 17 of the United Nations Convention on Jurisdictional Immunities of States and Their Property which provides that an arbitration agreement has the effect that a State cannot invoke "immunity from jurisdiction" with regard to certain supervisory powers usually exercised by national courts over commercial arbitration proceedings. Art. 17 does not mention that a State could not invoke "immunity from execution" as a result of an arbitration agreement (see para. 87 *infra*). Also the fact that Art. 19 of the United Nations Convention (see paras. 52, 53 *infra*) requires express consent to measures of execution militates against the assumption of an implied waiver through consent to arbitration.

**22**    There is some evidence that courts will find awards enforceable if the underlying claim was of a commercial nature.[25] The Australian Foreign States Immunities Act denies State immunity in proceedings for the recognition or enforcement of an award if the foreign State would not have been immune in proceedings on the merits.[26] For purposes of enforcing ICSID awards this reference back to the nature of the merits of the dispute before the tribunal is not helpful (see para. 20 *supra*).

**23**    The most widely accepted criterion for immunity from execution is the purpose of the assets which are to be the object of enforcement. The domestic statutes dealing with State immunity (see para. 14 *supra*) distinguish between commercial and non-commercial property. Measures of execution are permissible, in principle, with regard to commercial property but not with regard to property serving governmental purposes.[27] But the exact rules concerning the application of this principle and the distinction between the two types of property are by no means uniform. They are examined in more detail in the next section (paras. 28–71 *infra*).

**24**    Court practice in some countries without comprehensive legislation in the field of State immunity has adopted a similar distinction. There is authority to this effect in France, Germany, the Netherlands and Switzerland (see paras. 42–48 *infra*). In these countries too, much depends on the criteria for distinguishing between commercial and non-commercial property.

**25**    In some countries enforcement measures against the property of foreign States are subject to executive control.[28] This applied in particular in Italy, where execution against assets of a foreign State was subject to a prior authorization by the

---

24  See the traditional approach of French courts in *République Islamique d'Iran et consorts c/ sociétés Eurodif et Sofidif*, Cour d'appel de Paris, 21 April 1982, 65 ILR 93, 98. See also *Duff Development* v. *Kelantan Government*, [1923] 1 Ch 385 (CA), 2 ILR 124, [1924] AC 797 (HL).
25  *N.V. Cabolent* v. *National Iranian Oil Company*, Netherlands, Court of Appeal of The Hague, 28 November 1968, 47 ILR 141, 147 (1974); *SEEE* v. *Yugoslavia*, Netherlands, Supreme Court, 26 October 1973, 65 ILR 360 (1984).
26  Sec. 17(2), 25 ILM 715, 719 (1986).          27  See *Broches*, Awards Rendered, pp. 333/4.
28  See also *Bernini/van den Berg*, The Enforcement, p. 361.

Minister of Justice.[29] But a decision by the Italian Constitutional Court of 1992 has held the relevant legislation unconstitutional to the extent that it would prevent measures of execution against the assets of a foreign State used for commercial purposes.[30]

Some countries require a significant connection of the dispute to the forum State **26** before courts will assume jurisdiction in cases involving arbitration.[31] Especially the Swiss courts have held that the mere presence of assets of a foreign State will not suffice as a basis for enforcement proceedings. In *LIAMCO*,[32] the Swiss Federal Tribunal held that the seat of the Tribunal in Switzerland did not furnish a sufficient jurisdictional link to Switzerland to justify enforcement.[33]

This problem of a substantive relationship of the dispute underlying the arbitra- **27** tion to the State in whose courts execution is sought is not relevant in the context of ICSID awards. Art. 54 provides that each Contracting State shall enforce the pecuniary obligations imposed by ICSID awards (see Art. 54, paras. 23–29). This general obligation of all the Parties to the Convention is not restricted to recognition but extends to enforcement; that is, execution (see Art. 54, paras. 64–71). Therefore, the Convention itself provides the necessary jurisdictional link.[34]

### 3. Which Property is Protected from Execution?

### a) Non-Commercial Property

The most common standard for the immunity of foreign States from execution **28** is the distinction between types of property that are subject to execution and those that are not. The distinction is usually made between property intended for commercial use and property designated for sovereign or official functions. The difficult task of characterizing property as belonging to one category or the other leads to questions of burden of proof which are addressed in some national laws but not in others.

---

29  See *Socialist People's Libyan Arab Jamahiriya* v. *Rossbeton*, Corte di cassazione, 25 May 1989, 84 AJIL 573 (1990), 72 Rivista di Diritto Internazionale 691 (1989); see also *Schreuer*, State Immunity, pp. 135/6; *Delaume, G. R.*, Enforcement of State Contract Awards: Jurisdictional Pitfalls and Remedies, 8 ICSID Review – FILJ 29, 37/8 (1993).

30  2 July 1992, 33 ILM 593 (1994).

31  See *Delaume, G. R.*, Enforcement of State Contract Awards; *Schreuer*, State Immunity, pp. 80 *et seq.* By contrast, the Australian Foreign States Immunities Act, Sec. 17(2), provides for non-immunity in proceedings for the recognition and enforcement of arbitral awards "wherever the award was made", 25 ILM 719 (1986).

32  *Socialist People's Libyan Arab Jamahiriya* v. *LIAMCO*, Federal Tribunal, 19 June 1980, 20 ILM 151 (1981), BGE 106 Ia 142.

33  See also *Delaume*, Judicial Decisions, p. 419; *Delaume*, Sovereign Immunity, p. 42; *Delaume*, Enforcement of State Contract Awards, pp. 38 *et seq.*; *Schreuer*, State Immunity, pp. 36, 85/6, 163.

34  See also *Delaume, G. R.*, Contractual Waivers of Sovereign Immunity: Some Practical Considerations, 5 ICSID Review – FILJ 232, 250 (1990); *Delaume*, Enforcement of State Contract Awards, pp. 44 *et seq.*; *Schreuer*, State Immunity, pp. 90/1. See also the Judgment of the United States District Court, S.D.N.Y., 12 December 1986, in *LETCO* v. *Liberia*, where the Court held that it had subject matter jurisdiction in a case involving the enforcement of an ICSID award by virtue of Art. 54, 2 ICSID Reports 387, 388.

**29**    Some national laws also require that there is a specific link between the underlying claim and the property that is subject to execution. This is another serious limitation on the availability of assets for execution. It is unlikely that a host State will keep commercial assets in another country that can be said to have a direct connection to an investment in its territory. Especially in the case of loan agreements, it will be difficult to find funds that can be said to meet this criterion unless the borrowing State keeps an account in the forum State that is earmarked for loan service purposes.[35]

**30**    The Foreign Sovereign Immunities Act of the United States of 1976 (FSIA)[36] provides for a general immunity from execution which is subject to a number of exceptions.[37] These exceptions only apply to property in the United States of a foreign State used for commercial activity in the United States.[38] The most general exception is property that is or was used for the commercial activity upon which the claim is based.[39] This provision will be of limited use in the execution of ICSID awards. Apart from the difficulty of finding commercial property of the host State that is used for the investment, it will often be impossible to argue that the underlying activity on the host State's side was commercial. It is highly doubtful whether the host State's actions *vis-à-vis* the investor that led to the dispute can be classified as commercial.

**31**    Other exceptions to immunity under the FSIA relate to waiver (see paras. 77, 78 *infra*) and to rights in property which has been taken in violation of international law or which has been exchanged for such property.[40] The latter provision may become relevant in the somewhat limited circumstances of an ICSID award based on an unlawful expropriation. Execution would be possible if proceeds from the expropriation were present in the United States. Restitution in kind of unlawfully expropriated property, while possible under the FSIA, would not be possible through the execution of an ICSID award: Art. 54 provides for the enforcement of pecuniary obligations only (see Art. 54, paras. 72–80).

**32**    The most important exception to immunity from execution under the FSIA for purposes of executing ICSID awards was added through a 1988 amendment.[41] It provides for non-immunity of commercial property if a "judgment is based on an order confirming an arbitral award rendered against the foreign State, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement".[42] This provision is an important step

---

35   See also *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 252 (1986); *Delaume*, Judicial Decisions, pp. 414 *et seq.*
36   15 ILM 1388 (1976). Amended in 1988, 28 ILM 396 (1989).
37   28 USC 1609.                           38   28 USC 1610.
39   28 USC 1610(a)(2). See also *Delaume*, Judicial Decisions, p. 414; *Schreuer*, State Immunity, p. 130.
40   28 USC 1610(a)(1)(3).
41   28 ILM 396 (1989). See also *Kahale, G.*, New Legislation in the United States Facilitates Enforcement of Arbitral Agreements and Awards Against Foreign States, 6 Journal of International Arbitration 57, 63 (1989).
42   28 USC 1610(a)(6).

towards facilitating the execution of ICSID awards. It still requires the presence of property used for a commercial activity in the United States. But it does not require that there is a special nexus between the property and the claim underlying the award. In this regard, the FSIA, as amended, is more generous to arbitral awards than to decisions of US courts.[43]

The provision relating to arbitral awards in the FSIA which is more favourable **33** to execution should apply to ICSID awards despite the fact that Art. 54 refers to their enforcement like domestic judgments of the forum State. The equalization of ICSID awards to domestic judgments was meant to give them the highest attainable degree of effectiveness. It was never meant to curtail the possibilities for their enforcement. A literal reading of Art. 55 leads to the same result. It refers to the law relating to immunity from execution. It does not restrict this reference to the law relating to immunity from execution of domestic judgments. Also, the FSIA's provision on the execution of arbitral awards is the more specialized one. Therefore, the principle of giving effectiveness to arbitration agreements (*favor contractus*) and the principle of letting the more specialized rule prevail (*lex specialis*) militate in favour of treating ICSID awards in accordance with the FSIA's provision on the execution of arbitral awards.

The Act of State doctrine constitutes another potential obstacle to the execution **34** in the United States of arbitral awards against foreign States.[44] Under this doctrine a domestic court will not pass judgment on the legality and validity of the acts of foreign governments, performed in their sovereign capacities, within their own territories. Legislation passed together with the 1988 amendment to the FSIA also amended the Arbitration Act. It specifically excludes the applicability of the Act of State doctrine in the context of executions of judgments based on orders confirming arbitral awards.[45]

In *LETCO* v. *Liberia*, attempts were made to execute an ICSID award[46] in the **35** United States. The District Court for the Southern District of New York recognized the Award and declared it enforceable (see Art. 54, paras. 56, 57). The Court then examined the separate issue of whether the property in question was "used for a commercial activity in the United States". The assets were registration fees and other taxes due from ships flying the Liberian flag. The Court held that these were revenues for the support and maintenance of government functions. Therefore, Liberia's motion to vacate the executions was granted. The court added that LETCO was not enjoined from issuing executions with respect to any properties

---

43   See also *Delaume*, Enforcement of State Contract Awards, p. 42.
44   See *Kahale, G.*, New Legislation in the United States Facilitates Enforcement of Arbitral Agreements and Awards Against Foreign States, 6 Journal of International Arbitration 57 (1989); *West, L. C.*, Award Enforcement Provisions of the World Bank Convention, 23 The Arbitration Journal 38, 50 *et seq.* (1968).
45   9 USC 15; 28 ILM 396, 398 (1989).
46   *LETCO* v. *Liberia*, Award, 31 March 1986.

which are used for commercial activities and that may fall within one of the exceptions delineated in Sec. 1610 of the FSIA.[47]

**36**    In finding that the assets in question did not qualify as property used for a commercial activity in the United States, the Court never reached the question of whether any of the exceptions to immunity from execution (see paras. 30–32 *supra*) applied. Provided the Court's classification of the assets as non-commercial was correct,[48] the decision would have to be the same after the 1988 amendment to the FSIA. A second attempt to execute the award against bank accounts held by the Liberian Embassy in Washington, D.C. also failed (see Art. 54, para. 59; paras. 65–67 *infra*).

**37**    The United Kingdom State Immunity Act of 1978 (SIA)[49] also provides for a basic rule of immunity of the property of a State from enforcement of a judgment or arbitration award subject to certain exceptions.[50] Apart from a waiver of immunity (see paras. 79, 80 *infra*), the SIA allows execution in respect of property which is for the time being in use or intended for use for commercial purposes.[51] No link between the commercial property and the claim leading to the execution is required. A commercial purpose is defined as the purpose of transactions for the supply of goods or services, loans and any other activity other than in the exercise of sovereign authority.[52] If there is uncertainty as to the commercial nature of property, the head of the affected State's diplomatic mission may issue a certificate to the effect that any property is not in use or intended for use by the State for commercial purposes. Such a certificate shall be accepted as sufficient evidence unless the contrary is proved.[53]

**38**    In *AIG Capital Partners* v. *Kazakhstan*[54] investors tried to execute an ICSID award[55] in the United Kingdom. The Claimants attempted to enforce the award through a third-party debt and charging order against assets of the National Bank of Kazakhstan held by a private bank in London (see Art. 54, paras. 61–63). The attempt failed because the High Court found that the assets against which execution was sought belonged to the National Bank of Kazakhstan, the host State's central

---

47    District Court, S.D.N.Y., 12 December 1986, 2 ICSID Reports 385, 388/9. The decision was affirmed on appeal with no published opinion by the United States Court of Appeals for the Second District on 19 May 1987. See also *Broches*, Awards Rendered, p. 331; *Delaume*, Contractual Waivers, pp. 252/3; *Joyce, A.*, Recent Developments, 29 Harvard International Law Journal 135 (1988); *Choi, S.*, Judicial Enforcement of Arbitration Awards under the ICSID and New York Conventions, 28 New York University Journal of International Law and Politics 175, 186 (1995); *Franzoni, D. B.*, Enforcement of ICSID Awards in the United States, 18 Georgia Journal of International and Comparative Law 101 (1988); *Ziadé, N. G.*, Some Recent Decisions in ICSID Cases, 6 ICSID Review – FILJ 514, 524/5 (1991).

48    See *Schreuer*, State Immunity, p. 175.    49    17 ILM 1123 (1978).

50    Sec. 13(2)(b).    51    Sec. 13(4).

52    Sec. 17(1) referring to Sec. 3(3). See also *Schreuer*, State Immunity, pp. 11 *et seq.*, 145.

53    Sec. 13(5). See also *Bernini/van den Berg*, The Enforcement, p. 367.

54    *AIG Capital Partners Inc. and another* v. *Republic of Kazakhstan (National Bank of Kazakhstan Intervening)*, High Court, Queen's Bench Division (Commercial Court), 20 October 2005, [2005] EWHC 2239 (Comm), 11 ICSID Reports 118.

55    *AIG* v. *Kazakhstan*, Award, 7 October 2003.

bank, and not to the State itself. The High Court's refusal to grant execution was also based on what it termed the "complete immunity" of a foreign State's central bank property from the enforcement process in the United Kingdom courts (see paras. 70, 71 *infra*).

Since the decision rested upon the finding that the assets belonged to the central **39** bank and not to the State it did not have to rely upon the certificate of the ambassador of Kazakhstan under Sec. 13(5) of the UK State Immunity Act of 1978. The ambassador had stated that the assets in issue formed part of the Kazakh National Fund and beneficially belonged to the Republic of Kazakhstan, that they had never been used for commercial purposes since they had been opened in 2001, and that they were not intended to be used for such purposes.[56]

Under the Canadian State Immunity Act of 1982[57] property of a foreign State **40** located in Canada is immune from execution in principle. Apart from a waiver (see para. 82 *infra*), the most important exception relates to property that is used or intended for a commercial activity.[58] There is no requirement of a nexus between the underlying claim and the property in question.

The Australian Foreign States Immunities Act of 1985[59] also provides for **41** a general rule of immunity from execution for the property of a foreign State subject to exceptions.[60] Apart from a waiver (see para. 83 *infra*), execution is possible in respect of commercial property.[61] Commercial property is defined as property, other than diplomatic or military property, that is in use by the foreign State concerned substantially for commercial purposes.[62] There is no requirement of a nexus between the underlying claim and the property in question. A certificate by the affected State's head of diplomatic mission to the effect that property is or was in use for specified purposes is admissible as evidence but is not decisive.[63]

French court practice has developed along similar lines. The subjection of **42** assets to execution will depend on whether they are used for commercial or governmental activities.[64] Immunity from execution is granted in principle. This immunity may be disregarded in exceptional circumstances. This would be the case if the property attached was intended to be used for the commercial activity upon which the claim is based.[65] The burden of establishing the nexus between the property and the underlying claim is borne by the claimant.[66]

---

56  At 11 ICSID Reports 130.
58  Sec. 11(1)(b).
60  Sec. 30.
62  Sec. 32(3)(a).
63  Sec. 41. See also *Schreuer*, State Immunity, pp. 132, 152, 153.
64  *Procureur de la République* v. *Société LIAMCO*, Tribunal de grande instance, Paris, 5 March 1979, 106 Journal du Droit International 857 (1979).
65  See *Société Eurodif* v. *République Islamique d'Iran*, Cour de cassation, 14 March 1984, 23 ILM 1062 (1984). See also *Bernini/van den Berg*, The Enforcement, pp. 369 *et seq.*; *Broches*, Awards Rendered, pp. 330/1; *Delaume*, Sovereign Immunity, p. 38.
66  See the decision in the same case by Cour d'appel, Versailles, 9 July 1986, 2 ICSID Review – FILJ 161 (1987). See also *Delaume, G. R.*, Recent French Cases on Sovereign Immunity and Economic Development Activities, *loc. cit.*, at p. 152; *Delaume*, Judicial Decisions, p. 415.

57  21 ILM 798 (1982).
59  25 ILM 715 (1986).
61  Sec. 32(1).

**43**     In *Benvenuti & Bonfant* v. *Congo* the *Tribunal de grande instance* had added a limiting condition to its order of *exequatur* for the award.[67] The condition had consisted of making all measures of execution subject to prior authorization (see Art. 54, para. 50). The reason for the condition was that:

> It was not in fact immediately possible to make a breakdown of the funds or assets which were destined for an activity of sovereignty or public service and those which originated from a normal commercial activity governed by private law. This Court considered that it was not right, without any prior procedure of inquiry, to allow a situation to develop which might infringe the sovereignty of a foreign State by the imposition of a degree of constraint contrary to any notion of courtesy and international independence.[68]

**44**     On appeal, the *Cour d'appel* of Paris amended the order of *exequatur* by deleting the limiting condition.[69] The reason for the deletion was the fact that the court below had impermissibly become involved in matters of execution when granting the *exequatur* (see Art. 54, para. 51). Significantly, the *Cour d'appel* did not disapprove of the distinction between the different types of property designated for sovereign or commercial activity.[70]

**45**     The attempted execution of the Award in *SOABI* v. *Senegal*[71] led to the same result. The order of *exequatur* by the *Tribunal de grande instance* was set aside on appeal by the *Cour d'appel* of Paris (see Art. 54, para. 53). The Court found that there was no assurance that any measures of execution would be carried out against assets designated for commercial activity:

> Considering that the immunity from enforcement enjoyed by a foreign State in France is a matter of principle; that in exceptional circumstances it can be set aside when the assets against which enforcement is sought have been assigned by the State to an economic and commercial activity governed by private law;
>
>     Considering that in the case in question SOABI has not demonstrated that the award will be enforced against assets assigned by the State of Senegal to an economic or commercial activity and that, therefore, there can be no objection to the immunity from enforcement;
>
>     That the enforcement of the award in France is contrary to public international order in that it would be contrary to the principle of immunity;[72]

**46**     This judgment of the *Cour d'appel* was set aside by the *Cour de cassation*.[73] It found that the granting of an *exequatur* did not constitute an act of execution

67   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980.
68   Tribunal de grande instance, Paris, 13 January 1981, 1 ICSID Reports 369; 108 Journal du Droit International 365, 366 (1981).
69   Cour d'appel, Paris, 26 June 1981, 1 ICSID Reports 369; 108 Journal du Droit International 843 (1981).
70   See also *Broches*, Awards Rendered, p. 330.
71   *SOABI* v. *Senegal*, Award, 25 February 1988.
72   Cour d'appel, Paris, 5 December 1989, 2 ICSID Reports 338, 340; 117 Journal du Droit International 141 (1990). The above translation uses "enforcement" when the French original uses "exécution". See also Art. 54, paras. 61–68, and Art. 54, footnote 51.
73   Cour de cassation, 11 June 1991, 2 ICSID Reports 341; 118 Journal du Droit International 1005 (1991).

*Article 55 – State Immunity*                                      1165

which might give rise to immunity from execution (see Art. 54, para. 54). The *Cour de cassation* did not take issue with the distinction between commercial assets which would be subject to execution and other assets which would enjoy immunity.

The German courts have also adopted the distinction between property serving commercial purposes and property serving sovereign purposes. Assets that are designated for public functions of the foreign State are considered immune from execution.[74]    **47**

In Switzerland the Federal Tribunal has adopted the same distinction. Funds that are not earmarked for sovereign purposes are subject to execution.[75] Assets allocated for the performance of acts of sovereignty are immune from execution.[76]    **48**

The European Convention on State Immunity of 1972[77] provides for an absolute immunity from execution except in case of a waiver[78] (see para. 85 *infra*). A State party to the European Convention may make an optional declaration to the effect that its courts shall be entitled to entertain proceedings against another Contracting State to the extent that its courts are entitled to entertain proceedings against States not parties to the European Convention.[79] If both the forum State and the State against which execution is sought have made such a declaration, judgments relating to an industrial or commercial activity may be enforced against the State's property which is used exclusively in connection with such an activity.[80] For purposes of executing ICSID awards this arrangement is of little value. The host State's role in its relationship to a foreign investor will rarely qualify as industrial or commercial activity[81] (see paras. 20, 30 *supra*).    **49**

The Draft Articles on Jurisdictional Immunities of States and Their Property adopted by the International Law Commission in 1991[82] also adopt a fairly restrictive approach to execution. Execution is impermissible unless one of several exceptions applies. These exceptions include express waiver (see paras. 86, 87 *infra*) and the existence of earmarked property for the satisfaction of the claim which is the object of the proceeding.[83] In addition, execution is possible against "property [that] is specifically in use or intended for use by the State for other    **50**

---

74  *Central Bank of Nigeria*, Landgericht Frankfurt, 2 December 1975, 65 ILR 131 (1984); *Philippine Embassy Bank Account*, Bundesverfassungsgericht, 13 December 1977, 65 ILR 146 (1984), BVerfGE 46, 399; *National Iranian Oil Company*, Bundesverfassungsgericht, 12 April 1983, 65 ILR 215 (1984), BVerfGE 64, 1.

75  *United Arab Republic* v. *Mrs. X.*, Federal Tribunal, 10 February 1960, 55 AJIL 167 (1961), 65 ILR 385 (1984), BGE 86 I 23.

76  *Arab Republic of Egypt* v. *CINETEL*, Federal Court, 20 July 1979, 65 ILR 425 (1984). See also a legal opinion by the Swiss Foreign Ministry of 9 June 1976 concerning the admissibility of measures of execution as practised in Switzerland against the property of foreign State-owned banks (in French), 33 Annuaire Suisse du Droit International 163 (1977).

77  European Treaty Series No. 74, 11 ILM 470 (1972). Parties as of April 2008: Austria, Belgium, Cyprus, Germany, Luxembourg, Netherlands, Switzerland, United Kingdom.

78  Art. 23.                                      79  Art. 24.

80  Art. 26.

81  See also *Bernini/van den Berg*, The Enforcement, pp. 366/7.

82  30 ILM 1563 (1991).                          83  Art. 18, 1(a)(b).

1166                    THE ICSID CONVENTION: A COMMENTARY

than government non-commercial purposes and is in the territory of the State of the forum and has a connection with the claim which is the object of the proceeding . . .".[84]

**51**     The required connection of the commercial property to the underlying claim would be a serious limitation to the execution of ICSID awards. A host State will not normally keep commercial property that is specifically linked to an investment in its territory in another country (see para. 29 *supra*). On the other hand, this provision would not go as far as requiring that the underlying claim is also of a commercial nature. The latter requirement, which is present in some other provisions on State immunity from execution (see paras. 19–21, 30, 49 *supra*), would seriously limit the usefulness of the exception from immunity for the enforcement of ICSID awards.

**52**     The 2004 United Nations Convention on Jurisdictional Immunities of States and Their Property[85] modified the link criteria of the property serving commercial purposes by eliminating the "connection with the underlying claim". While it maintained the exceptions from immunity in the case of express waiver and earmarked property, it introduced a new link criterion concerning the entity against which the proceeding was directed. Art. 19 of the United Nations Convention now provides:

> No post-judgment measures of constraint, such as attachment, arrest and execution, against property of a State may be taken in connection with a proceeding before a court of another State unless and except to the extent that: [. . .] (c) it has been established that the property is specifically in use or intended for use by the State for other than government non-commercial purposes and is in the territory of the State of the forum, provided that post-judgment measures of constraint may only be taken against property that has a connection with the entity against which the proceeding was directed.[86]

**53**     This new nexus requirement will make the execution of ICSID awards easier than the regime envisaged under the 1991 Draft Articles. Though it is unclear what precise level of "connection with the entity against which the proceeding was directed" will be required, it is likely that awards directed against States will fulfil this nexus requirement if execution measures are directed against property owned by the same States. Equally, execution measures directed against property owned by constituent subdivisions or agencies of Contracting States (see Art. 25, para. 1) will be permissible if the ICSID proceedings were directed against the same subdivisions or agencies. This interpretation of the nexus requirement of Art. 19 is supported by the understanding annexed to the Convention according to which the expression "entity" means "the State as an independent legal personality, a constituent unit of a federal State, a subdivision of a State, an agency or instrumentality of a State or other entity, which enjoys independent legal personality".[87]

---

84  Art. 18, 1(c).                         85    44 ILM 803 (2005).
86  Art. 19(c) of the United Nations Convention.
87  United Nations Convention, Annex to the Convention, Understandings with respect to certain provisions of the Convention, with respect to article 19.

It should be noted that not all States provide for a specific connection requirement in their judicial practice.[88] No nexus requirement can be found in the UK State Immunity Act 1978[89] (see para. 37 *supra*). The Italian Constitutional Court characterized a "specific link with the subject matter of the request, namely the specific allocation of the property for the commercial transaction from which the dispute arose", as a "further restriction [which] is not generally recognized, and in particular is rejected in Western Europe, including the United Kingdom".[90]    **54**

The distinction between commercial State property, which is subject to execution, and property that serves governmental purposes, which is not, is also reflected in a number of multilateral treaties dealing with seagoing ships.[91] The 1926 Brussels Convention for the Unification of Certain Rules Relating to the Immunity of State-Owned Vessels[92] distinguishes between ordinary State-owned ships and cargoes and State ships exclusively on governmental non-commercial service. While the former are to be treated in the same way as privately owned ships and cargoes,[93] the latter are to be immune from any measures of enforcement.[94] This solution was later adopted in the British Act.[95] The 1958 Geneva Conventions on the High Seas[96] and on the Territorial Sea and the Contiguous Zone[97] also subject government ships operated for commercial purposes to the same execution regime as private ships, while preserving immunity for ships operated and used on governmental non-commercial service.[98] These provisions were subsequently carried over into the UN Convention on the Law of the Sea of 1982.[99] In a similar way, the 1962 Convention on the Liability of Operators of Nuclear Ships[100] provides that any immunity shall be waived for purposes of the Convention. However, enforcement action against warships and other State-owned ships on non-commercial service is specifically excluded.[101]    **55**

The widely accepted distinction between commercial property and property serving sovereign purposes in the context of immunity from execution inevitably leads to the problem of qualification. In practice, the distinction is by no means always obvious. For purposes of immunity of foreign States from jurisdiction the overwhelming authority points towards a test that looks at the nature of the activity and not at its purpose.[102] But the test for immunity from execution usually looks at    **56**

88  See *Reinisch*, European Court Practice, pp. 822 *et seq*.
89  Sec. 13(4), UK SIA.
90  *Condor and Filvem* v. *Ministry of Justice*, Italian Constitutional Court, Case No. 329, 15 July 1992, 101 ILR 394, at 402.
91  See also *Crawford, J. R.*, Execution of Judgments and Foreign Sovereign Immunity, 75 AJIL 820, 821 *et seq*. (1981).
92  176 LNTS 199. See also UN Legislative Series, Materials on Jurisdictional Immunities of States and their Property, ST/LEG/SER.B/20, p. 173.
93  Articles 1 and 2.    94  Article 3.
95  Section 10.    96  450 UNTS 82, Articles 8, 9.
97  516 UNTS 205, Articles 18–22.
98  A number of reservations were made to these provisions. See *Crawford*, Execution, p. 822.
99  21 ILM 1261 (1982), Articles 28(3), 32, 95, 96.
100  57 AJIL 268 (1963).    101  Article X(3).
102  See *Schreuer*, State Immunity, pp. 15 *et seq*; *Reinisch*, European Court Practice, p. 804.

the purpose of the property that is to be seized in order to determine its commercial or non-commercial quality, although the origin of the property is sometimes also taken into account.[103] Since purpose looks at future intended or probable use, it is often difficult to ascertain unless the property in question is clearly designated.

**57**     The problem of distinguishing commercial from sovereign property is particularly acute with bank accounts. Bank accounts are popular objects for the enforcement of judgments and awards. But the question of their intended use is particularly difficult. The future use of money is usually uncertain.[104] One possible answer would be to see bank accounts and money in general as inherently commercial. Another opposing solution would be to see the mere possibility of the future public use of bank accounts belonging to foreign States as sufficient ground to grant immunity as a precaution. Neither of these extreme positions has been accepted in practice.

**58**     The decisive criterion has turned out to be whether moneys are specifically designated for a particular public function. The courts have usually not accepted general claims of immunity for accounts held by foreign States on the argument that they might be allocated for sovereign functions in the future.[105] Where funds are allocated to serve specific official activities, the situation is different.[106] Moneys specifically designated for a particular public function and held by the agency carrying out that function are immune. This is particularly so with bank accounts held by diplomatic missions (see paras. 61–67 *infra*).

**59**     Accounts kept for mixed official and commercial purposes carry particular problems. The identification of the respective amounts serving official and commercial purposes is difficult and may already be seen as an impermissible intrusion. The tendency is to err on the safe side and to leave such accounts untouched.[107]

### b) Specially Protected Property

**60**     Certain types of property are regarded as particularly sensitive for the international relations of States. These include diplomatic property, military property and, to a somewhat lesser extent, property held by central banks. Some of the relevant instruments dealing with immunity from execution (see para. 14 *supra*) grant special protection to these types of property.

**61**     Diplomatic property is protected primarily by the Vienna Convention on Diplomatic Relations of 1961.[108] The Vienna Convention provides that the premises of the mission, their furnishings and other property thereon and the means

---

103  *Schreuer*, State Immunity, at p. 145.
104  More generally see *Schreuer, C.*, Zur Zulässigkeit von Vollstreckungsmaßnahmen in Bankkonten ausländischer Staaten, Festschrift für Karl H. Neumayr 521 (1985); *Schreuer*, State Immunity, pp. 149 *et seq.*
105  For more details see *Schreuer*, State Immunity, p. 150.
106  *Op. cit.*, p. 151.                    107  *Op. cit.*, pp. 151 *et seq.*
108  500 UNTS 95.

of transport of the mission shall be immune from attachment or execution.[109] Interestingly, the Vienna Convention is silent on other property including bank accounts.

Some of the national statutes dealing with State immunity single out diplomatic property for special protection. The United States FSIA foresees execution relating to a judgment establishing rights in immovable property situated in the United States provided it is not used for diplomatic purposes.[110] The United Kingdom State Immunity Act preserves diplomatic privileges and rights for diplomatic property.[111] The Australian Act defines commercial property as specifically excluding diplomatic property.[112] **62**

The 2004 United Nations Convention on Jurisdictional Immunities of States and Their Property, based on the International Law Commission's Draft Articles (see paras. 50–53 *supra*), has a separate Article that deals with specific categories of property that is explicitly protected from execution. It includes "property, including any bank account, which is used or intended for use for the purposes of the diplomatic mission of the State or its consular posts, special missions, missions to international organizations, or delegations to organs of international organizations or to international conferences".[113] It is noteworthy that this provision, unlike other instruments, specifically refers to bank accounts of diplomatic missions. **63**

Courts have treated embassy accounts with great respect.[114] The German Constitutional Court refused to permit even an investigation into the governmental or commercial use of assets in an account held by a foreign embassy. The abstract danger to the running of the embassy was sufficient to uphold immunity.[115] The British House of Lords came to a very similar decision. Money in a diplomatic mission's bank account used for meeting the expenses of running the mission did not serve commercial purposes. The ambassador's certificate (see para. 37 *supra*) was accepted as conclusive evidence.[116] The Austrian Supreme Court,[117] **64**

---

109 Art. 22(3). See also Art. 25(3) of the United Nations Convention on Special Missions, 9 ILM 127, 138 (1970); Art. 23(3) of the Convention on the Representation of States in Their Relations with International Organizations of a Universal Character, 69 AJIL 730, 737 (1975).

110 28 USC 1610(a)(4)(B), 15 ILM 1391 (1976).

111 Sec. 16(1), 17 ILM 1127 (1978).          112 Sec. 32(3)(a), 25 ILM 722 (1986).

113 Art. 21(1)(a) of the United Nations Convention, 44 ILM 803 (2005).

114 See also *Schreuer*, State Immunity, pp. 153 *et seq.*; *Reinisch*, European Court Practice, pp. 827 *et seq.*

115 *Philippine Embassy Bank Account*, Bundesverfassungsgericht, 13 December 1977, 65 ILR 146 (1984), BVerfGE 46, 342.

116 *Alcom* v. *Colombia*, House of Lords, 12 April 1984, 23 ILM 719 (1984). See also *Fox, H.*, Enforcement Jurisdiction, Foreign State Property and Diplomatic Immunity, 34 International and Comparative Law Quarterly 115, 120 *et seq.* (1985).

117 *Execution of Embassy Account*, Oberster Gerichtshof, 30 April 1986, 77 ILR 489 (1988), 108 Juristische Blätter 733 (1986).

the Dutch Council of State,[118] the Italian Court of Cassation[119] and the Spanish Constitutional Court[120] reached the same result.

**65**    In *LETCO* v. *Liberia*, after the unsuccessful attempt to execute the Award[121] in New York (see paras. 35, 36 *supra*), LETCO issued writs of attachment against bank accounts of the Embassy of the Republic of Liberia in Washington, D.C. The US District Court for the District of Columbia[122] quashed the writs of attachment seizing Liberia's bank accounts. LETCO had relied on an earlier decision in which the same Court had found that an embassy account had been used for mixed, that is sovereign and commercial, purposes, and that public purpose and commercial activity funds had to be segregated.[123]

**66**    In reaching the conclusion that Liberia's bank accounts were immune from attachment, the Court relied on two grounds. One was Art. 25 of the Vienna Convention on Diplomatic Relations which provides in general terms that "[t]he receiving State shall accord full facilities for the performance of the functions of the mission". The "full facilities" included the bank accounts which required full protection so that the Embassy could function efficiently.[124]

**67**    The other ground for immunity was found in the FSIA. The Court held that the accounts did not qualify as property in use for commercial activity in the sense of the FSIA[125] (see para. 30 *supra*). Rather, the bank accounts were utilized to perform Liberia's diplomatic and consular functions and were, therefore, of a public or governmental nature. The Court also dismissed the idea of segregating commercial from public funds for purposes of execution:

> The Court presumes that some portion of the funds in the bank accounts may be used for commercial activities in connection with running the Embassy, such as transactions to purchase goods or services from private entities. The legislative history of the FSIA indicates that these funds would be used for a commercial activity and not be immune from attachment. The Court, however, declines to order that if any portion of a bank account is used for a commercial activity then the entire account loses its immunity ... On the contrary, following the narrow definition of "commercial activity", funds used for commercial activities which are "incidental" or "auxiliary", not denoting the essential character of the use of the funds in question, would not cause the entire bank account to lose its mantle of sovereign immunity.[126]

In the Court's view, discovery to determine the precise portion of the bank account used for commercial activities would entail severe hardship. It would practically

---

118    *M.K.* v. *State Secretary for Justice*, Council of State, President of the Judicial Division, 24 November 1986, 94 ILR 357, at 360.

119    *Benamar* v. *Embassy of the Democratic and Popular Republic of Algeria*, Corte di cassazione, 4 and 25 May 1989, 84 AJIL 573 (1990), 72 Rivista di Diritto Internazionale 416, 691 (1989).

120    *Diana Gayle Abbott* v. *República de Sudáfrica*, Constitutional Court, 1 July 1992, *Aranzadi* 1992, Decision No. 107, 113 ILR 413, at 423.

121    *LETCO* v. *Liberia*, Award, 31 March 1986.         122    16 April 1987, 2 ICSID Reports 390.

123    *Birch Shipping Corp.* v. *Embassy of the United Republic of Tanzania*, D.D.C., 18 November 1980, 63 ILR 524 (1982). See also *Delaume*, Sovereign Immunity, p. 39.

124    2 ICSID Reports 392/3.              125    28 USC 1610(a), 15 ILM 1391 (1976).

126    2 ICSID Reports 395.

gut one of the purposes behind immunity, to afford deference to the governmental affairs of foreign States.[127]

**68** Military property of foreign States also enjoys special protection from execution.[128] Under the United States FSIA, property of a foreign State is immune from attachment and execution if it is used or is intended to be used in connection with a military activity and is of a military character, or is under the control of a military authority.[129] The Canadian State Immunity Act contains a very similar provision.[130] The Australian Foreign States Immunities Act explicitly excludes military property from its definition of commercial property.[131] The 2004 United Nations Convention on Jurisdictional Immunities of States and Their Property also excludes "property of a military character or used or intended for use for military purposes" from the concept of commercial property.[132] The protection of military property from execution is also inherent in the treaty provisions dealing with seagoing ships (see para. 55 *supra*).

**69** The special protection granted to central banks and other monetary authorities is more differentiated. There is some case law that does not contemplate any privileged immunity status for accounts kept by foreign central banks.[133] But most of the national statutes dealing with State immunity do provide for such a privileged status. The United States FSIA preserves the immunity from attachment and execution of property belonging to a foreign central bank or monetary authority held for its own account.[134] The phrase "held for its own account" preserves the distinction between funds held in connection with genuine central bank activities from those used to finance commercial transactions.[135] A waiver of immunity from execution remains possible but has to be explicit (see para. 78 *infra*). The Canadian Act contains a very similar provision.[136] The British Act excludes property of a central bank or other monetary authority from the concept of commercial property.[137] The Australian Act provides that for purposes of execution the property of a foreign central bank or monetary authority shall be treated like property of the foreign State.[138] The International Law Commission's Draft Articles also specifically exclude the property of the central bank or other monetary authority

---

127  At pp. 395/6. See also *Broches*, Awards Rendered, p. 331; *Choi, S.*, Judicial Enforcement of Arbitration Awards under the ICSID and New York Conventions, 28 New York University Journal of International Law and Politics 175, 187 (1995); *Joyce, A.*, Recent Developments, 29 Harvard International Law Journal 135, 138/9 (1988).

128  See also *Schreuer*, State Immunity, p. 146.

129  28 USC 1611(b)(2), 15 ILM 1391 (1976).

130  Sec. 11(3), 21 ILM 800 (1982). The British State Immunity Act is rather vague on this point: Sec. 16(2), 17 ILM 1127 (1978).

131  Sec. 32(3)(a), 25 ILM 722 (1986).

132  Art. 21(1)(b) of the United Nations Convention, 44 ILM 803 (2005).

133  See *Schreuer*, State Immunity, pp. 156 *et seq*.    134    28 USC 1611(b)(1).

135  House Report, 15 ILM 1414 (1976). See also *Banco Central de Reserva del Peru* v. *The Riggs National Bank of Washington, D.C.*, D.D.C., 12 December 1994, 35 ILM 1159 (1996).

136  Sec. 11(4)(5), 21 ILM 801 (1982).        137    Sec. 14(4), 17 ILM 1127 (1978).

138  Sec. 35(1), 25 ILM 722 (1986).

of a foreign State from the concept of commercial property.[139] This provision has been retained in the 2004 United Nations Convention which excludes "property of the central bank or other monetary authority of the State" from the types of property possibly subject to execution measures.[140]

**70**    The broad immunity from execution of foreign central bank assets was the decisive factor in the UK case of *AIG Capital Partners* v. *Kazakhstan*[141] where the Claimants attempted to enforce an ICSID Award[142] by obtaining a third-party debt and charging order against assets belonging to the National Bank of Kazakhstan held by a private bank in London.

**71**    The decision of the English High Court was based on an interpretation of Sec. 14(4), first sentence, of the UK State Immunity Act 1978 "using common law principles of construction". It provided that "Property of a State's central bank or monetary authority shall not be regarded for the purposes of subsection (4) of section 13 above as in use or intended for use for commercial purposes." The English court found that as a result of this wording the question of the intended use of central bank property was irrelevant:

> (3) Given the wording of s 14(4), then the property of a state's central bank (or other monetary authority) must enjoy complete immunity from the enforcement process in the United Kingdom courts.
>
> (4) If the central bank (etc.) has an interest in the property concerned, but the state of the central bank has another interest in the same property, then in my view the effect of s 14(4) is that the relevant property is immune from enforcement in respect of a judgment against that state, whether the property concerned is in use or intended for use for commercial purposes or not.[143]

### 4. Waiver of Immunity

**72**    The likelihood of a successful invocation of State immunity from execution in proceedings for the enforcement of ICSID awards remains high. Investors should have no illusions that the trend towards the restriction of sovereign immunity will secure enforcement of awards by domestic courts. Therefore, a waiver of immunity from execution is an essential part of an ICSID arbitration clause.[144] The possibility of a waiver of immunity from execution was mentioned during the Convention's drafting but was not discussed any further (History, Vol. II, p. 892).

**73**    While waivers of immunity are possible in principle, they may be subject to specific conditions under the local law. In particular, certain waivers have to be explicit while others may be given implicitly. Also, the possibility to waive

---

139   Art. 19, 1(c), 30 ILM 1573 (1991).

140   Art. 21(1)(c) of the United Nations Convention, 44 ILM 803 (2005).

141   *AIG Capital Partners Inc. and another* v. *Republic of Kazakhstan (National Bank of Kazakhstan Intervening)*, High Court, Queen's Bench Division (Commercial Court), 20 October 2005, [2005] EWHC 2239 (Comm), 11 ICSID Reports 118.

142   *AIG* v. *Kazakhstan*, Award, 7 October 2003.    143    11 ICSID Reports 141, para. 57.

144   The inclusion of an express waiver of immunity into the agreement recording consent to ICSID arbitration has been called "a matter of elementary prudence", *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168, 194 (1992).

immunity may not be unlimited. Certain forms of waiver of immunity may be invalid even if agreed upon by the parties. These questions will have to be answered in accordance with the law in force in the country where execution is sought[145] (see paras. 100–108 *infra*).

In theory, consent to arbitration might be interpreted as a waiver of immunity **74** in proceedings to execute the resulting award. But the contrary is also arguable and the practice on this point is inconclusive[146] (see para. 21 *supra*). Therefore, it would be imprudent to rely on this form of indirect waiver. The validity of this argument would depend on the local law.

Participation in the ICSID Convention cannot be interpreted as an implicit **75** waiver of immunity from execution. Art. 55 specifically preserves immunity. A dictum by a United States District Court in *LETCO* v. *Liberia*[147] to the effect that Liberia as a signatory [*sic*!] to the Convention waived its sovereign immunity with respect to the enforcement of the Award (see Art. 54, para. 57) is not authority to the contrary. The Court was evidently referring to recognition and not to execution[148] (see also Art. 54, para. 67).

Whether a waiver of immunity should be agreed upon and how far it should go **76** is ultimately a matter for the parties' judgment. States may refuse to grant waivers in principle or may refuse to waive immunity for certain types of property.[149] An outright refusal to agree to any waiver of immunity from execution should be a cause of alarm to the investor. In many situations the investor will never have the chance to negotiate a waiver of immunity. This is particularly so if consent to jurisdiction is not based on a direct agreement between the parties but on host State legislation or on a bilateral or multilateral treaty (see Art. 25, paras. 392–463).

### a) Conditions and Limitations on Waiver

The instruments dealing with State immunity (see para. 14 *supra*) contain a **77** variety of provisions on waiver of immunity from execution. Under the United States FSIA, a waiver of immunity from attachment in aid of execution or from execution may be given either explicitly or by implication.[150] The waiver of immunity is one of several exceptions to immunity from execution. Another exception that was added in 1988 is a judgment based on an order confirming an arbitral award against the foreign State[151] (see para. 32 *supra*). Since arbitration

---

145  See also *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 248 *et seq.* (1973/74).

146  For a more detailed analysis see *Delaume*, Judicial Decisions, p. 411; *Delaume*, Contractual Waivers, pp. 235 *et seq.*; *Schreuer*, State Immunity, pp. 75 *et seq.*

147  Southern District, New York, 12 December 1986, 2 ICSID Reports 385, 387/8.

148  This is evident from the context of the statement as well as from the subsequent separate discussion of Art. 55. See also footnote 9 at 2 ICSID Reports 388.

149  See also *Gaillard, E.*, Some Notes on the Drafting of ICSID Arbitration Clauses, 3 ICSID Review – FILJ 136, 146 (1988), who describes a waiver of immunity from execution as a grave decision that calls for the greatest restraint.

150  28 USC 1610(a)(1), 15 ILM 1391 (1976).       151  28 USC 1610(a)(6), 28 ILM 398 (1989).

is an independent and equivalent basis for non-immunity under the FSIA, it is unclear what, if anything, an explicit waiver would add for purposes of enforcing an ICSID award. Also, it should be kept in mind that under the FSIA all exceptions to immunity, including a waiver, only apply if the property in question is used for a commercial activity in the United States (see paras. 30–32 *supra*). Therefore, it is doubtful whether a waiver of immunity from execution in respect of non-commercial property of a State is possible under the FSIA. A waiver of immunity from execution by an agency or instrumentality of a foreign State is possible for any of its property (see paras. 122, 123 *infra*).

**78**     The effect of a waiver in respect of specially protected property (see paras. 60–71 *supra*) is even more doubtful. The FSIA gives special protection to property of central banks (see para. 69 *supra*). But this immunity may be waived explicitly by the central bank or authority or its parent foreign government.[152] In order to be explicit any such waiver should refer to the property of the central bank or monetary authority in specific terms. Military and diplomatic property is not subject to a similar provision on waiver of immunity from execution.[153]

**79**     The British State Immunity Act also provides for a waiver of immunity from execution. The State concerned may give its written consent which may be contained in a prior agreement. This waiver of immunity from execution may be given either generally or to a limited extent.[154] A waiver is an exception to immunity from execution that is independent of the commercial nature of the property concerned. In fact, the commercial nature of property is a separate and equivalent exception to immunity from execution[155] (see para. 37 *supra*). Therefore, a waiver may refer to non-commercial property and would indeed only make sense with respect to such property since commercial property does not enjoy immunity anyway.

**80**     It is doubtful whether a waiver of immunity with respect to diplomatic or military property is possible under the British Act.[156] Property of a central bank shall not be regarded as commercial property[157] (see para. 69 *supra*). But this would not exclude the possibility of a waiver of immunity with respect to that property. Here, too, it is advisable to refer to such property in specific terms.

**81**     The British Act also contains a general provision on arbitration. If a State has submitted to arbitration it is not immune with respect to proceedings in the courts which relate to the arbitration.[158] But it is doubtful whether the meaning of this provision extends to immunity from execution. Since a waiver of immunity from jurisdiction does not imply a waiver of immunity from execution,[159] a mere arbitration clause should not be relied upon as an implicit waiver of immunity

---

152  28 USC 1611(b)(1), 15 ILM 1391 (1976).    153  28 USC 1611(b)(2).
154  Sec. 13(3), 17 ILM 1126 (1978).            155  Sec. 13(4).
156  Sec. 16(1)(2).                             157  Sec. 14(4).
158  Sec. 9(1).
159  Sec. 13(3). See also *An International Bank* v. *Republic of Zambia*, High Court, Queen's Bench Division, 23 May 1997, 118 ILR 602.

from execution of the resulting award.[160] The inclusion of an express waiver of immunity from execution of arbitral awards is still highly advisable.[161]

The Canadian Act provides for waiver as an exception to immunity from execution.[162] Like in the British Act, this is in addition to non-immunity of commercial property.[163] Therefore, a waiver of immunity for non-commercial property is possible. Like in the United States FSIA, the immunity of a foreign central bank or monetary authority can only be withdrawn by explicit waiver by the bank, authority or parent government.[164] Military property is especially protected: there is no provision for waiver of immunity of military property.[165] **82**

Under the Australian Act a waiver of immunity from execution is also independent of and in addition to the commercial nature of property.[166] Therefore, a waiver of immunity may relate to and indeed would only have effect with respect to non-commercial property. The waiver may be subject to specified limitations. Any waiver does not apply in relation to property of a diplomatic or military nature unless that property is expressly designated as being subject to the waiver.[167] Central bank property is subject to the same rules as other property of foreign States,[168] *i.e.* a waiver is possible. The Australian Act also specifies that, in addition to anyone else who may have that authority, the head of the foreign State's diplomatic mission has the authority to waive immunity from execution. **83**

The judicial practice of many other States also shows that courts normally accept express waivers of immunity from execution.[169] They generally do not regard waivers of immunity from jurisdiction as implied waivers of immunity from execution[170] nor do they assume implied waivers resulting from agreements to arbitrate (see para. 19 *supra*). **84**

The European Convention on State Immunity contains a broad clause prohibiting execution "except where and to the extent that the State has expressly consented thereto in writing in any particular case".[171] In view of the broad protection from execution granted by the European Convention even for commercial property (see para. 49 *supra*), waiver of immunity is particularly important. The requirement that the waiver must have been given "in any particular case" may be interpreted as requiring consent after the institution of enforcement proceedings. Such an interpretation would deprive this provision of any practical value. Therefore, the **85**

---

160  For detailed discussion see *Fox, H. J.*, States and the Undertaking to Arbitrate, 37 International and Comparative Law Quarterly 1, 11 *et seq.* (1988).

161  *Op. cit.*, at p. 18.                              162  Sec. 11(1)(a), 21 ILM 800 (1982).

163  Sec. 11(1)(b).                                     164  Sec. 11(4)(5).

165  Sec. 11(3).                                        166  Sec. 31, 25 ILM 721/2 (1986).

167  Sec. 31(4).                                        168  Sec. 35(1).

169  See *Reinisch*, European Court Practice, pp. 817 *et seq.*

170  *Socialist Federal Republic of Yugoslavia* v. *Société Européenne d'Etudes et d'Entreprises*, Tribunal de grande instance of Paris, 6 July 1970, 65 ILR 46, at 49; *République Islamique d'Iran et consorts c/ Sociétés Eurodif et Sofidif*, Cour d'appel de Paris, 21 April 1982, 65 ILR 93, at 97; *Socifros c/ URSS*, Cour d'appel d'Aix, 23 November 1938, 9 Ann.Dig. (1938–40), 236, at 237.

171  Art. 23, 11 ILM 478 (1972).

phrase should be interpreted as relating to the particular relationship between the parties. This would allow an advance waiver of immunity from execution.

**86**    The International Law Commission's Draft Articles provide for waiver of immunity from execution by treaty, arbitration agreement or other contract or after the dispute has arisen.[172] This waiver exception has been retained in the 2004 United Nations Convention on Jurisdictional Immunities of States and Their Property. Its Art. 19 provides that "post-judgment measures of constraint" may be taken only if:

> (a) the State has expressly consented to the taking of such measures as indicated:
>>    (i) by international agreement;
>>    (ii) by an arbitration agreement or in a written contract; or
>>    (iii) by a declaration before the court or by a written communication after a dispute between the parties has arisen;[173]

**87**    A waiver under the United Nations Convention is independent of the commercial or non-commercial nature of the property. The mere existence of an arbitration agreement does not amount to a waiver of immunity from the execution of the resulting award. According to Art. 17 of the United Nations Convention, the effect of an arbitration agreement is limited to a loss of the immunity defence in proceedings relating to (a) the validity, interpretation or application of the arbitration agreement; (b) the arbitration procedure; or (c) the confirmation or the setting aside of the award, unless the arbitration agreement provides otherwise.[174]

**88**    Since Art. 17 of the United Nations Convention specifically refers to agreements "to submit to arbitration differences relating to a commercial transaction" and since its Art. 2 narrowly defines "commercial transaction"[175] it is unclear whether an agreement to arbitrate an investment dispute triggers the above mentioned effects. This textual uncertainty has been removed by an explicit understanding with respect to Art. 17, annexed to the Convention, according to which the expression "commercial transaction" includes investment matters.[176] The clarification only implies that investment arbitration in general may deprive States of the immunity defence in the listed types of proceedings. It is not relevant to ICSID arbitration because the Convention provides a self-contained legal system excluding any domestic court review (see Art. 53).

**89**    The United Nations Convention states that "consent to the exercise of jurisdiction [. . .] shall not imply consent to the taking of measures of constraint".[177]

---

172  Art. 18, 1(a), 30 ILM 1572 (1991).
173  Art. 19(1)(a) of the United Nations Convention, 44 ILM 803 (2005).
174  Art. 17 of the United Nations Convention.
175  Art. 2(1)(c) of the United Nations Convention defines "commercial transaction" as contract or transaction for the sale of goods or supply of services, for loans, guarantees or indemnities or of any other commercial, industrial, trading or professional nature (excluding employment contracts).
176  United Nations Convention, Annex to the Convention, Understandings with respect to certain provisions of the Convention, with respect to article 17.
177  Art. 20 of the United Nations Convention.

It thus codifies the prevailing judicial State practice which rejects the idea of an implicit waiver of immunity from execution resulting from a waiver of immunity from jurisdiction.

Under the United Nations Convention, diplomatic, military and central bank property shall not be considered as commercial property.[178] Thus the possibility of a waiver in respect of this type of property remains. The German Constitutional Court has held that a general waiver of immunity from execution, as contained in bond agreements, does not encompass property serving the diplomatic mission of a State.[179]

**90**

The above survey indicates that under the national statutes dealing with State immunity, a waiver of immunity from execution that only covers commercial property has little if any effect. Under most laws, commercial property does not enjoy immunity anyway. Under the United States FSIA, consent to arbitration leads to non-immunity of commercial property independently of any waiver. The picture is different under the European Convention and under the United Nations Convention. Because of their far-reaching protection of even commercial property from execution (see paras. 49–53 *supra*), a waiver that covers commercial property would make sense.

**91**

A waiver of immunity from execution for non-commercial property would appear particularly important. Since most statutes provide for non-immunity of commercial property anyway, provisions on waiver of immunity from execution make sense only if they extend to non-commercial property. Whether a waiver may relate to specially protected property, like diplomatic or military property, is usually not entirely clear. Only the Australian Act says that diplomatic and military property may be expressly included in a waiver. The United States FSIA is unique in that it makes waiver available only in respect of commercial property. Therefore, a waiver would seem to be impossible for non-commercial property (but see paras. 122, 123 *infra*). But like in other national statutes, an express waiver is possible under the FSIA for property of a foreign central bank (see paras. 77, 78 *supra*).

**92**

If any broad generalizations may be drawn from this material, they are as follows:

**93**

- general waivers of immunity from execution should, in principle, be interpreted as extending to non-commercial property;
- specially protected property enjoys a presumption of immunity even in the face of a waiver;
- this presumption may be overcome, especially with respect to central bank property, by an express waiver that specifically names that property.

---

178   Art. 21, of the United Nations Convention.
179   2 BvM 9/03, Bundesverfassungsgericht, 6 December 2006 (not yet reported).

### b) Conservatory Measures

**94**   Conservatory measures are designed to secure assets before a decision on the merits has been rendered. These assets may eventually serve as objects for the execution of the decision. The idea of conservatory measures is to prevent the removal or dissipation of property while proceedings on the merits are pending. In proceedings against States the problem is particularly acute. States may not only remove assets but may also shelter them as privileged property such as embassy accounts (see paras. 59–67 *supra*).

**95**   In the context of ICSID arbitration there are two distinct obstacles to conservatory measures by domestic courts. One is the exclusive nature of ICSID arbitration under Art. 26 which, in principle, excludes the intervention of courts during proceedings (see Art. 26, paras. 162–183). Under Arbitration Rule 39(5), as revised in 1984, the parties may include a clause providing for provisional measures by domestic courts for the preservation of the parties' rights and interests in their agreement giving consent to ICSID arbitration (see Art. 26, para. 176). The Model Clauses offer a formula for this purpose that may be used by the parties[180] (see Art. 26, para. 181; para. 109 *infra*).

**96**   The other obstacle is State immunity from pre-judgment attachment, provisional measures, injunctions or the like. There is some authority to the effect that domestic courts will allow such measures as long as they are directed at commercial property of the State concerned.[181] National statutes and international instruments dealing with State immunity typically subject pre-judgment attachments, injunctions or preventive measures to the requirement of an express consent by the State concerned.[182] The United Nations Convention on Jurisdictional Immunities of States and Their Property makes a very clear distinction between pre-judgment and post-judgment measures of constraint which it addresses in two separate articles (Arts. 18, 19). As a result of this differentiation, which was not contained in the ILC Draft Articles, pre-judgment measures are only permissible in cases of consent or with regard to earmarked property.[183]

**97**   A clause providing for conservatory measures should meet the requirements of Art. 26 of the Convention and Arbitration Rule 39(5) as well as of the rules on State immunity in the country or countries concerned. In view of the widespread requirement of express consent, a waiver of immunity from pre-judgment attachment should be as clear and explicit as possible[184] (see para. 110 *infra*).

---

180   Model Clause 14 of 1993, 4 ICSID Reports 365.
181   See *Delaume, G. R.*, Foreign Sovereign Immunity: Impact on Arbitration, 38 Arbitration Journal 34, 41/2 (1983); *Reinisch*, European Court Practice, pp. 834 *et seq.*; *Schreuer*, State Immunity, pp. 162 *et seq.*
182   See United States FSIA, 28 USC 1610(d), 15 ILM 1391 (1976); British SIA, Sec. 13(2)(a)(3), 17 ILM 1126 (1978); Canadian SIA, Sec. 10(1), 21 ILM 800 (1982); European Convention, Art. 23, 11 ILM 478 (1972); ILC Draft Articles, Art. 18, 1(a), 30 ILM 1572 (1991).
183   Art. 18 of the United Nations Convention.
184   See also *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 250 *et seq.* (1986).

The desirability of such a waiver should be considered carefully. Whereas a **98** waiver of immunity from execution of a final and binding ICSID award may be seen as a means to close a loophole in the Convention's system, a waiver of immunity from conservatory measures is quite a different matter. In proceedings for the execution of an award the recalcitrant party is in violation of Art. 53. In the case of conservatory measures, the rights and obligations of the parties are still unclear. A State party to ICSID proceedings may be fully willing to comply with a future award against it. Also, conservatory measures that are taken before or during ICSID proceedings may be used to harass, embarrass or intimidate the host State. They are not necessarily conducive to the effective conduct of arbitration proceedings. In most cases, provisional measures recommended by the ICSID tribunal, in accordance with Art. 47, will be sufficient.

### c) Drafting Waiver Clauses

Express waivers of immunity from execution do not seem to be used very **99** often.[185] The one area where they appear with some regularity are transnational lending operations.[186] The reason for the relative scarcity of waiver clauses is not entirely clear. It may be attributable to a reluctance of States to sign such clauses. More probably, it is to be found in a lack of foresight on the part of investors. Express waivers of immunity would not only increase the chances of forced execution of awards. They would also act as an added incentive to comply with awards voluntarily.

The validity of waivers of immunity would depend on the law in force in the **100** country where execution is sought. A State can renounce certain of its sovereign rights. But the reference of Art. 55 to the law of the respective country means that any limitation in that law to the validity of a waiver would have to be respected. For instance, if the domestic law of that State provides for waiver of immunity from execution only in respect of commercial property (see paras. 77, 92 *supra*), it is doubtful whether a waiver that goes beyond that provision would be effective.

At the time of the drafting of a waiver clause it will usually not be possible **101** to anticipate in which State execution of an award will be attempted. Much will depend on the availability of assets at the time of execution. Therefore, it is inadvisable to design waiver clauses specifically for execution in one particular country. Rather, waiver clauses should be broad enough to be useful in as many jurisdictions as possible.

One way to draft a waiver clause is to make it as general as possible. Such a **102** clause may state that the State will "not plead any sovereign immunity" or that

---

185   But see *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 54, at lit. f.
186   See *Delaume*, Judicial Decisions, pp. 412/13; *Delaume, G. R.*, The ICSID and the Banker, 9 International Financial Law Review 9, 12 (1983); *Delaume, G. R.*, Economic Development and Sovereign Immunity, 79 AJIL 319, 344 (1985); *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 254 (1986).

it "renounces" or "waives any immunity from execution". Such a general waiver clause is suggested by ICSID's Model Clauses of 1993 which state:

### Clause 15

The Host State hereby waives any right of sovereign immunity as to it and its property in respect of the enforcement and execution of any award rendered by an Arbitral Tribunal constituted pursuant to this agreement.[187]

**103**    The problem with general waiver clauses is that they are susceptible to restrictive interpretation. For instance, a court may hold that such a clause should only apply to a State's non-sovereign, commercial property. Such an interpretation would leave the waiver largely ineffective (see paras. 77, 79, 82, 83, 91, 92 *supra*). To counteract such a narrow interpretation, the clause may add that it refers to "any property" or "all the property" belonging to the State. The ICSID Model Clauses of 1981 offer such a formula:

### Clause XIX

The [name of Contracting State] hereby irrevocably waives any claim to immunity in regard to any proceedings to enforce any arbitral award rendered by a Tribunal constituted pursuant to this Agreement, including, without limitation, immunity from service of process, immunity from jurisdiction of any court, and immunity of any of its property from execution.[188]

**104**    Better still may be a formula to the effect that the waiver extends to "any property regardless of its commercial or non-commercial nature". This would forestall an unduly restrictive interpretation and would be in line with several of the instruments on State immunity (see paras. 79, 82, 83, 86, 87, 90, 92 *supra*). But it would probably be of no avail under the United States FSIA (see paras. 77, 92 *supra*).

**105**    Bank accounts are particularly attractive objects of execution. But States can easily shelter them from execution by presenting them as embassy accounts (see paras. 61–67 *supra*). Therefore, it may be useful to specify that the property in question "includes any bank accounts belonging to the State whether held in the name of a diplomatic mission or otherwise" (see para. 83 *supra*).

**106**    Central bank accounts often require a special waiver of immunity (see paras. 78, 80, 82 *supra*). Therefore, it may be useful to add that "the waiver extends to property, including bank accounts, belonging to the State's central bank or other monetary authority".

**107**    Obviously, the availability of these specifications will, to a large extent, depend on the willingness of the State concerned to make such concessions. All of this will be subject to negotiation. The suggested formula represents a maximum that may well be unattainable in a particular case.

---

187    4 ICSID Reports 366. For examples of other similarly broad clauses see *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 841/2 (1982); *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 76/7 (1990).

188    1 ICSID Reports 207. See also *Delaume*, Contractual Waivers, p. 253.

A consolidated version that includes all the above features may run as follows:    **108**

> The Host State hereby irrevocably waives any right of sovereign immunity as
> to it and any of its property, regardless of the commercial or non-commercial
> nature of this property, in respect of the enforcement and execution of an award
> rendered by an Arbitral Tribunal constituted pursuant to this agreement. Such
> property includes any bank account belonging to the Host State whether held in
> the name of a diplomatic mission or otherwise. This waiver extends to property,
> including bank accounts, belonging to the Host State's central bank or other
> monetary authority.

The parties may extend the waiver of immunity to conservatory measures (see    **109**
paras. 94–98 *supra*). ICSID's Model Clauses of 1993 offer the following formula
for this purpose:

> **Clause 14**
> Without prejudice to the power of the Arbitral Tribunal to recommend provisional
> measures, either party hereto may request any judicial or other authority to
> order any provisional or conservatory measure, including attachment, prior to
> the institution of the arbitration proceeding, or during the proceeding, for the
> preservation of its rights and interests.[189]

The above formula may be interpreted by a court as addressing the issue of    **110**
ICSID's exclusive jurisdiction (see para. 95 *supra*; Art. 26, paras. 176–178) but
as not expressing a waiver of immunity from pre-judgment attachment. Also, the
language used in Model Clause 14 may be seen as falling short of an express
waiver of immunity from provisional measures (see para. 96 *supra*; Art. 26, para.
182). Therefore, it may be useful to add a sentence to the effect that "the Host State
waives any immunity with regard to such provisional or conservatory measures".
The parties may wish to specify that this waiver extends to certain categories of
property as outlined above (see paras. 103–108 *supra*).

## C. "... of that State or of any foreign State..."

### 1. States

Art. 55 refers to two types of States. The phrase "of any foreign State" relates    **111**
to States other than the State in which execution is sought. The "law in force" in
relation to these States would be the law on foreign sovereign immunity or State
immunity discussed in the previous sections.

The phrase "of that State" relates to the State in whose courts execution is    **112**
sought. It contemplates a situation in which the investor tries to enforce an award
through the courts of the host State (see Art. 54, para. 29). The host State would
then be entitled to avail itself of any immunity from execution that it has under its
own legal system.[190] The idea of withdrawing immunity under these circumstances

_____

189   4 ICSID Reports 365. See also Model Clause XVI of 1981, 1 ICSID Reports 206.
190   See also *Giardina, A.*, La mise en œuvre au niveau national des arrêts et des décisions interna-
      tionaux, 165 Recueil des Cours 257, 297 (1979-IV).

113  It is doubtful whether an attempt to seek forced execution of an award in the courts of the host State is promising. A State that refuses to abide by its obligation under Art. 53 of the Convention to comply with an ICSID award is unlikely to be coerced to do so by its own courts. One of the central functions of investment arbitration is to allay the investor's fears about the objectivity and effectiveness of the host State's judicial system. It is not likely that investors will put their faith into measures of forced execution of awards against recalcitrant host States in their own courts.

114  Immunity from execution of the host State in its own courts would depend entirely on its domestic law. It is difficult to make any general observations regarding that law. Whereas execution against foreign States will usually be attempted in one of the major commercial centres where States are likely to own assets, attempted execution against the forum State is conceivable in any of numerous host States. The law governing the immunity of foreign States in major commercial centres is accessible for general analysis. The laws governing the immunity from execution of the forum State in any of numerous potential host States is not readily susceptible to such comparative analysis.

### 2. Constituent Subdivision or Agency

115  Art. 25(1) of the Convention provides that not only the host State itself but also a constituent subdivision or agency designated to the Centre by the host State may be a party to ICSID proceedings (see Art. 25, paras. 230–267). Consent to jurisdiction by a constituent subdivision or agency is subject to the host State's approval (see Art. 25, paras. 903–920). States parties to the Convention have designated either territorial entities (constituent subdivisions) or public agencies that deal with foreign investments (see Art. 25, para. 253).

116  A constituent subdivision or agency thus designated may become a party to ICSID arbitration independently of its parent State. In such a case the obligation to abide by and comply with an award (Art. 53) would be incumbent upon the constituent subdivision or agency rather than upon the host State (see Art. 53, paras. 14, 15). Conversely, an award rendered against the host State would not be enforceable against one of its independent entities.[191]

117  An attempt to enforce the award in *Benvenuti & Bonfant* v. *Congo*[192] in France against Banque Commerciale Congolaise (BCC) failed. BCC was not a constituent subdivision or agency designated under Art. 25. The *Cour de cassation*, upholding a decision of the *Cour d'appel* of Paris, held that Benvenuti & Bonfant was the creditor of the State of the Congo but not of BCC. BCC could not be regarded as

---

191 *Giardina*, L'exécution, pp. 289 *et seq*. More generally see *Schreuer*, State Immunity, pp. 118 *et seq*.

192 *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980.

an emanation of the State of the Congo. The control exercised by the State was not sufficient to regard dependent entities as emanations of that State.[193]

The attempted execution of the award in *AIG* v. *Kazakhstan*[194] in the United Kingdom failed for similar reasons. In that case the High Court found that the assets against which execution was sought belonged to the National Bank of Kazakhstan, the host State's central bank, and not to the State itself (see Art. 54, paras. 61–63).[195]  **118**

Execution of an award against a constituent subdivision or agency of the host State carries its own problems. Only property belonging to the particular constituent subdivision or agency is open to execution. There is no execution against the property of the State itself. Also, there is no execution against the property of one constituent subdivision or agency to satisfy an award against another. The chances of finding property owned by such an entity in another State are considerably smaller than in the case of the host State itself. This applies both to territorial entities and to national agencies dealing with foreign investors. In addition, problems of immunity are likely to arise. These may be somewhat different from those involving the host States themselves.  **119**

In principle, immunity from execution should be easier to overcome in the case of separate State entities.[196] But the national legal rules are far from uniform. A variety of criteria are applied. They include the question of whether the entity is engaged in commercial activity in the forum State, whether the underlying claim was such that the courts had jurisdiction on the merits and whether the property involved was of a commercial nature.  **120**

The first two of these criteria are not helpful in the context of ICSID arbitration. Commercial activity of the constituent subdivision or agency in the State where execution is sought is neither likely nor relevant for purposes of enforcing an ICSID award. Jurisdiction over the merits of the claim is also not useful (see paras. 19, 20 *supra*). The activity of the constituent subdivision or agency in dealing with foreign investors will typically involve such sovereign functions as regulation and supervision. Therefore, it will scarcely qualify as commercial and hence be subject to the jurisdiction of the courts. This may be otherwise if consent to arbitration is interpreted as waiver of immunity from jurisdiction[197] (see para. 21 *supra*). As to the third criterion, the non-commercial character of property in the hands of a separate entity will usually carry a heavier burden of proof.  **121**

---

193  *Benvenuti and Bonfant* v. *Banque Commerciale Congolaise*, France, Cour de cassation, 21 July 1987, 1 ICSID Reports 373, 115 Journal du Droit International 108 (1988). See also *Delaume*, Contractual Waivers, p. 254.

194  *AIG* v. *Kazakhstan*, Award, 7 October 2003.

195  *AIG Capital Partners Inc. and another* v. *Republic of Kazakhstan (National Bank of Kazakhstan Intervening)*, High Court, Queen's Bench Division (Commercial Court), 20 October 2005, [2005] EWHC 2239 (Comm), 11 ICSID Reports 118.

196  See also *Delaume*, Judicial Decisions, p. 413.

197  Generally see *Schreuer*, State Immunity, pp. 63 *et seq.*

**122**    The United States FSIA includes a political subdivision or an agency or instru-mentality of a foreign State in the concept of a foreign State also for purposes of execution.[198] Therefore, execution against a constituent subdivision or agency designated under Art. 25(1) of the Convention is possible under the same condi-tions as against the foreign State itself (see paras. 30–33, 77, 78 *supra*). In addition, execution is possible against any property in the United States of an agency or instrumentality engaged in commercial activity in the United States if the agency or instrumentality has either waived its immunity from execution or did not enjoy immunity from jurisdiction for certain specified reasons.[199]

**123**    The reference to "any property" is a welcome extension over the limitation to "property used for a commercial activity" in the case of States themselves (see paras. 30, 32 *supra*). But the provision is largely devalued for purposes of enforcing ICSID awards by the requirement of a commercial activity of the agency or instrumentality in the United States (see para. 121 *supra*). Even the validity of a waiver of immunity from execution by the agency or instrumentality relating to any of its property would appear to depend on the existence of a commercial activity in the United States.

**124**    Under the British State Immunity Act, separate entities are not immune from jurisdiction unless the proceedings relate to anything done in the exercise of public authority.[200] If a separate entity submits to the jurisdiction where it would be entitled to immunity, the provisions relating to immunity from execution of States (see paras. 38–39 *supra*) will apply to it.[201] Submission to arbitration leads to non-immunity with respect to proceedings that relate to the arbitration.[202] Therefore, an ICSID award against a constituent subdivision or agency would seem to be enforceable in the same way as an award against the State.

**125**    Under the Canadian State Immunity Act, the property of an agency of a foreign State is not immune from execution in proceedings in respect of which the agency is not immune from jurisdiction.[203] Under the Australian Act, the provisions on execution will apply to separate entities as they apply to foreign States if the entity would have been immune but has submitted to the jurisdiction.[204] Submission to arbitration means that the foreign State is not immune from the supervisory jurisdiction of a court in respect of the arbitration.[205]

**126**    Decisions of courts in Germany, The Netherlands and in France point to the nature or purpose of the assets held by the State-controlled entity as the decisive criterion for immunity from execution.[206] The German Federal Constitutional Court held that assets kept in the name of a legally separate entity and not directly

---

198   28 USC 1603(a)(b), 1610(a); 15 ILM 1389, 1391 (1976).
199   28 USC 1610(b).
201   Sec. 14(3).
203   Sec. 11(2), 21 ILM 800 (1982).
205   Sec. 17(1).
206   See *Schreuer*, State Immunity, pp. 140 *et seq.*

200   Sec. 14(1)(2), 17 ILM 1127 (1978).
202   Sec. 9(1).
204   Sec. 35(2), 25 ILM 722 (1986).

serving governmental functions did not enjoy immunity.[207] Swiss practice tends to look at the sovereign or commercial nature of the underlying activity in addition to the nature of the assets.[208]

The International Law Commission's Draft Articles would have withdrawn **127** immunity from commercial property that has a connection with the "agency or instrumentality against which the proceeding was directed" or "with the claim which is the object of the proceeding".[209] The 2004 United Nations Convention on Jurisdictional Immunities of States and Their Property replaced these two alternative connection requirements by the requirement that the commercial property has a connection "with the entity against which the proceeding was directed".[210] According to the understanding annexed to the Convention, the expression "entity" includes a constituent unit or subdivision of the State as well as an agency or instrumentality that has independent legal personality[211] (see paras. 52, 53 *supra*).

---

207  *National Iranian Oil Company*, Bundesverfassungsgericht, 12 April 1983, 65 ILR 215 (1984), BVerfGE 64, 1.
208  *Schreuer*, *op. cit.*, p. 142.        209   Art. 18, 1(c), 30 ILM 1572 (1991).
210  Art. 19(c) of the United Nations Convention.
211  United Nations Convention, Annex to the Convention, Understandings with respect to certain provisions of the Convention, with respect to article 19.

# Article 56

**(1) After a Commission or a Tribunal has been constituted and proceedings have begun, its composition shall remain unchanged; provided, however, that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.**

**(2) A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel.**

**(3) If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy.**

## OUTLINE

|     |     |     | *Paragraphs* |
|-----|-----|-----|-----|
| I.  | INTRODUCTION | | 1–4 |
| II. | INTERPRETATION | | 5–44 |
|     | A. **"(1) After a Commission or Tribunal has been constituted and proceedings shall remain unchanged;"** | | 5–13 |
|     | B. **". . . provided, however, that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV."** | | 14–30 |
|     |     | 1. Method of Filling Vacancies | 15–19 |
|     |     | 2. Incapacity | 20–21 |
|     |     | 3. Resignation | 22–27 |
|     |     | 4. Death | 28–30 |
|     | C. **"(2) A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel."** | | 31–34 |
|     | D. **"(3) If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy."** | | 35–44 |

1186

*Article 56 – Replacement* 1187

# BIBLIOGRAPHY

*Eisemann, F.*, La double sanction prévue par la Convention de la B.I.R.D. en cas de collusion ou d'ententes similaires entre un arbitre et la partie qui l'a désigné, 23 Annuaire Français de Droit International 436 (1977).

## I. INTRODUCTION

Art. 56 is the first of three Articles in the Convention's Chapter V headed **1** "Replacement and Disqualification of Conciliators and Arbitrators". Art. 56(1) deals with the principle of the unchanged composition or immutability of a commission or tribunal and with the replacement of conciliators or arbitrators should the need arise. Art. 56(2) states that the expiry of membership on the Panel of Conciliators or Arbitrators does not affect membership in a commission or tribunal. Art. 56(3) provides a special procedure for the replacement of conciliators or arbitrators in case of their resignation without the consent of the commission or tribunal. Art. 57 deals with proposals for the disqualification of conciliators or arbitrators. Art. 58 deals with the procedure for decision on such proposals and the consequent replacements.

Art. 56 serves the principle of non-frustration of proceedings by avoiding trun- **2** cated commissions or tribunals.[1] It seeks to avoid vacancies primarily through a speedy replacement of conciliators or arbitrators who have become unavailable.

The drafts to what eventually became Art. 56 show little change during the **3** work on the Convention (History, Vol. I, pp. 256, 258, 260). There was relatively little discussion and no controversy concerning these provisions (see paras. 6, 11, 16, 31, 36 *infra*).

Art. 56 does not apply to an *ad hoc* committee constituted in accordance with **4** Art. 52(3). Art. 52(4) lists the provisions of the Convention that shall apply *mutatis mutandis* to annulment proceedings. Art. 56 is not among these provisions. This gap may be explained, in part, by the fact that members of *ad hoc* committees are always appointed by the Chairman (see Art. 52, paras. 453–455). Therefore, any vacancy on an *ad hoc* committee would have to be filled also through an appointment by the Chairman (see Art. 52, paras. 548–551).

## II. INTERPRETATION

### A. "(1) After a Commission or Tribunal has been constituted and proceedings have begun, its composition shall remain unchanged;"

A commission or tribunal is constituted and proceedings are deemed to have **5** begun on the date on which the Secretary-General notifies the parties that all the conciliators or arbitrators have accepted their appointments (see Art. 37,

---

[1] On the authority of truncated international tribunals see *Schwebel, S. M.*, International Arbitration: Three Salient Problems 144 *et seq*. (1987).

para. 10).[2] It is only from that date that the principle of the commission's or tribunal's immutability applies. Before the date of the commission's or tribunal's constitution each party may replace a conciliator or arbitrator appointed by it and the parties may replace any conciliator or arbitrator by agreement (see Art. 37, paras. 52, 53).[3]

**6**     The principle of the commission's or tribunal's immutability was contained in all drafts leading to the Convention and evoked virtually no comment (History, Vol. I, p. 256; Vol. II, pp. 166, 529, 734). It is based on the idea that, if at all possible, each conciliator or arbitrator should participate in the entire proceeding and should see and hear every argument and every piece of evidence.[4]

**7**     The Convention contains certain exceptions to the principle of a commission's or tribunal's immutability. These exceptions are:
- death of a conciliator or arbitrator (see paras. 28–30 *infra*);
- incapacity of a conciliator or arbitrator (see paras. 20, 21 *infra*);
- resignation of a conciliator or arbitrator either with or without the commission's or tribunal's consent (see paras. 22–27, 35–44 *infra*);
- disqualification of a conciliator or arbitrator in accordance with Arts. 57 and 58.

**8**     The Convention does not deal with a temporary inability of a member of a commission or tribunal to participate in its work.[5] But the Arbitration and Conciliation Rules deal with the issue of the non-participation of individual members (see Art. 48, paras. 9–14).[6]

**9**     If a vacancy on a commission or tribunal does occur in a manner provided for in one of these exceptions, proceedings may not continue but are immediately suspended. The Arbitration Rules provide to this effect:

### Rule 10
*Procedure during a Vacancy on the Tribunal*

(1) The Secretary-General shall forthwith notify the parties and, if necessary, the Chairman of the Administrative Council of the disqualification, death, incapacity or resignation of an arbitrator and of the consent, if any, of the Tribunal to a resignation.

(2) Upon the notification by the Secretary-General of a vacancy on the Tribunal, the proceeding shall be or remain suspended until the vacancy has been filled.[7]

---

2   Arbitration and Conciliation Rules 6(1). See also Arts. 13(1) of the Conciliation and Arbitration (Additional Facility) Rules.

3   Arbitration and Conciliation Rules 7. See also Arts. 12 of the Conciliation and Arbitration (Additional Facility) Rules.

4   See also Art. 4(1) of the International Law Commission's Model Rules on Arbitral Procedure, 1958, YBILC 84 (1958-II); see *Hrvatska Elektroprivreda* v. *Slovenia*, Ruling, 6 May 2008, paras. 25–28.

5   For an example see *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, paras. 10, 15, 20, 23, 24.

6   See Conciliation and Arbitration Rules 14(2), 16(1), 17. See also Arts. 21(2), 23(1) and 24 of the Conciliation (Additional Facility) Rules and Arts. 22(2), 24(1) and 25 of the Arbitration (Additional Facility) Rules.

7   Conciliation Rule 10 is substantively identical. See also the respective Arts. 16 of the Conciliation and Arbitration (Additional Facility) Rules.

Once a vacancy has been filled and proceedings resume, a new conciliator **10** or arbitrator will not have the benefit of participation in the proceedings prior to the vacancy. Lack of direct cognizance of arguments and evidence presented by the parties may affect the conciliator's or arbitrator's judgment. On the other hand, starting the proceedings *de novo* may be an unacceptable waste of time and resources especially if the vacancy occurs at an advanced stage.

The issue was discussed briefly during the Convention's drafting (History, Vol. **11** II, p. 529) but is not reflected in the Convention's text. Instead, the Rules of Procedure offer a compromise between the principle of direct cognizance and the need to expedite proceedings. This compromise is reflected in the Arbitration Rules in the following terms:

### Rule 12
#### Resumption of Proceeding after Filling a Vacancy

As soon as a vacancy on the Tribunal has been filled, the proceeding shall continue from the point it had reached at the time the vacancy occurred. The newly appointed arbitrator may, however, require that the oral procedure be recommenced, if this had already been started.[8]

Other instruments governing international arbitration contain similar provisions.[9]

This Rule is based on the assumption that the new conciliator or arbitrator will **12** be able to read the record of the written procedure and the transcript of hearings without loss of relevant information. The decision on whether the oral procedure is to be repeated is with the new conciliator or arbitrator alone. It is not subject to a majority decision by the commission or tribunal.

In *MTD* v. *Chile* a dispute arose as to the effect of a suspension of the proceeding **13** under Rule 10(2) and its continuation under Rule 12. The Tribunal, in a procedural order, decided that the suspension applied to all matters related to the proceeding, including time limits. It followed that the time limit for memorials had to be adjusted accordingly.[10]

## B.  "... provided, however, that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV."

Art. 56(1) deals with three of four possible causes for a vacancy on a commission **14** or tribunal: death, incapacity and resignation. The fourth cause, disqualification, is dealt with in Arts. 57 and 58 (see also para. 7 *supra* and Art. 58, para. 18).

---

8  Conciliation Rule 12 is similar. See also the respective Arts. 18 of the Conciliation and Arbitration (Additional Facility) Rules.
9  International Law Commission Model Rules on Arbitral Procedure, 1958, Art. 7, YBILC 84 (1958-II); UNCITRAL Arbitration Rules, 1976, Art. 14, 15 ILM 707 (1976); ICC Rules of Arbitration, 1998, Art. 12(4), 36 ILM 1611 (1997).
10  *MTD* v. *Chile*, Award, 25 May 2004, paras. 22–30.

Other instruments governing international arbitration similarly offer provisions on filling vacancies on tribunals.[11]

### 1. Method of Filling Vacancies

**15**      Art. 56(1) refers to Sections 2 of Chapters III and IV on "Constitution of the Conciliation Commission" (Arts. 29–31) and "Constitution of the Tribunal" (Arts. 37–40). This means that, in principle, the method for the filling of a vacancy shall be the same as for the constitution of the original commission or tribunal. Art. 56(3) contains an exception in case of a resignation without the consent of the commission or tribunal.

**16**      The Working Paper and the Preliminary Draft to the Convention provided that a vacancy caused by the death, incapacity or resignation of a conciliator or arbitrator shall be filled by the method *used* for the original appointment. This led to suggestions to allow a party who had initially failed to appoint a conciliator or arbitrator to do so when a vacancy occurs. Thereupon, the First Draft foresaw the filling of a vacancy by the method *prescribed* for the original appointment. This was replaced in the Revised Draft and in the Convention, as eventually adopted, by the reference to Sections 2 of Chapters III and IV (History, Vol. I, p. 256; Vol. II, pp. 351, 418, 897).

**17**      This drafting history may lead to the conclusion that in case of a vacancy the parties are permitted to make an appointment even if the original appointment was made by the Chairman under Art. 38. In other words, even if a party had failed to make an appointment to which it was originally entitled, it would still be allowed to make the appointment once the vacancy occurs. But the Rules of Procedure provide that a vacancy shall be filled by the same method by which the original appointment had been *made*. The Arbitration Rules provide to this end:

**Rule 11**
*Filling Vacancies on the Tribunal*
      (1) Except as provided in paragraph (2), a vacancy resulting from the disqual-
ification, death, incapacity or resignation of an arbitrator shall be promptly filled
by the same method by which his appointment had been made.[12]

**18**      Therefore, if the original appointment had been made by one of the parties, that party should, in principle, make the new appointment. If the original appointment had been made jointly by the parties, the new appointment should be made jointly. If the original appointment had been made by the Chairman under Art. 38 or by

---

11  International Law Commission Model Rules on Arbitral Procedure, 1958, Art. 5, YBILC 84 (1958-II); UNCITRAL Arbitration Rules, 1976, Art. 13, 15 ILM 707 (1976); UNCITRAL Model Law, 1985, Arts. 14, 15, 24 ILM 1306 (1985); ICC Rules of Arbitration, 1998, Art. 12, 36 ILM 1604 (1997).

12  Conciliation Rule 11(1) is substantively identical. See also the respective Arts. 17(1) of the Conciliation and Arbitration (Additional Facility) Rules.

another appointing authority, the new appointment should be made by the same appointing authority (see paras. 24–30 *infra*).[13]

    This rule is subject to the exception provided for by Art. 56(3) (see paras. 35–44 **19** *infra*). In addition, the Chairman will make the appointment if the party or parties fail(s) to make the appointment within 30 days. Arbitration Rule 11(2) and (3) provides to this end:

>     (2) In addition to filling vacancies relating to arbitrators appointed by him, the Chairman of the Administrative Council shall appoint a person from the Panel of Arbitrators:
>
> > (a) to fill a vacancy caused by the resignation, without the consent of the Tribunal, of an arbitrator appointed by a party; or
> >
> > (b) at the request of either party, to fill any other vacancy, if no new appointment is made and accepted within 45 days of the notification of the vacancy by the Secretary-General.
>
>     (3) The procedure of filling a vacancy shall be in accordance with Rules 1, 4(4), 4(5), 5 and, *mutatis mutandis*, 6(2).[14]

The references in Rule 11(3) concern certain modalities of the original appointment which apply also to the procedure of filling a vacancy (see Art. 37, paras. 6, 7, 47; Art. 38, para. 15; Art. 39, para. 13; Art. 40, paras. 18, 25). The addition of the words "*mutatis mutandis*" to Rule 6(2) relates to the fact that the declaration will be signed by the new member not at the first but the next session of the commission or tribunal.

## 2. Incapacity

    The filling of a vacancy for incapacity is subject to a special procedure. Inca- **20** pacity relates to a mental or physical inability to participate in the commission's or tribunal's work for reasons of health. It does not relate to a supervening conflict of interest (see Art. 40, paras. 17–24) or to the conciliator's or arbitrator's inability to find the time to participate in the commission's or tribunal's work. These contingencies would call for a resignation.

    Arbitration Rule 8 extends the procedure for the disqualification of an arbitrator **21** to cases of incapacity. To this end the Arbitration Rules provide:

> **Rule 8**
> *Incapacity or Resignation of Arbitrators*
>
>     (1) If an arbitrator becomes incapacitated or unable to perform the duties of his office, the procedure in respect of the disqualification of arbitrators set forth in Rule 9 shall apply.[15]

The reference to the procedure prevailing in the case of disqualification means that there must be a proposal by a party and that there will be a vote by the other

---

13  See Notes B to Rules 11 of 1968, 1 ICSID Reports 78, 132.

14  Conciliation Rule 11(2) and (3) is substantively identical. See also the respective Arts. 17(2) and (3) of the Conciliation and Arbitration (Additional Facility) Rules.

15  Conciliation Rule 8(1) is substantively identical. See also the respective Arts. 14(2) of the Conciliation and Arbitration (Additional Facility) Rules.

members of the commission or tribunal. If the proposal relates to a sole conciliator or arbitrator, if the proposal relates to a majority of the members, or if the other members are equally divided, the decision will be made by the Chairman[16] (see Art. 57, paras. 6–12; Art. 58, paras. 5–11).

### 3. Resignation

**22**    Neither the Convention nor the Rules specify legitimate grounds for resignation. The acceptance of an appointment (see Art. 37, paras. 47–51) entails an obligation to serve on the commission or tribunal. Therefore, any resignation would have to be accompanied by a statement of serious and convincing reasons (History, Vol. II, pp. 734, 871). These reasons may be of a professional or personal nature. In case of a supervening conflict of interests (see Art. 40, para. 19), there would be an obligation to resign.[17]

**23**    The member concerned must submit the resignation to the other members of the commission or tribunal and to the Secretary-General. The resignation should be accompanied by a statement of reasons. If the resigning member was appointed by agreement of the parties, by the Chairman or another appointing authority, the commission or tribunal has no discretion. If the resigning member was appointed by a party, the commission or tribunal must decide whether it consents to the resignation in accordance with Art. 56(3) (see paras. 40, 41 *infra*). Arbitration Rule 8 provides:

> (2) An arbitrator may resign by submitting his resignation to the other members of the Tribunal and the Secretary-General. If the arbitrator was appointed by one of the parties, the Tribunal shall promptly consider the reasons for his resignation and decide whether it consents thereto. The Tribunal shall promptly notify the Secretary-General of its decision.[18]

**24**    Resignations of arbitrators have occurred in several cases (see also paras. 43, 44 *infra*; Art. 48, para. 21).[19] In some cases a party-appointed arbitrator resigned with the consent of the tribunal. In these cases the party that had made the original appointment was allowed to make the appointment to fill the vacancy.[20]

---

16   See the respective Arbitration and Conciliation Rules 9.

17   See Notes C to Arbitration and Conciliation Rules 8 of 1968, 1 ICSID Reports 75, 130.

18   Conciliation Rule 8(2) is substantively identical. See also the respective Arts. 14(3) of the Conciliation and Arbitration (Additional Facility) Rules.

19   See also the resignations in the non-ICSID proceedings in *Tecmed* v. *Mexico* (AF), Award, 29 May 2003, paras. 13–16, and *S.D. Myers* v. *Canada* (UNCITRAL), Award on Liability, 13 November 2000, 8 ICSID Reports 21, paras. 25, 28, 29.

20   *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 3; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 347, see also p. xxxv; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.25; *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 12, 13; *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 15, 16; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 9; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, para. 17; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 28; *World Duty Free* v. *Kenya*, Award, 4 October 2006, paras. 10, 11.

In *Generation Ukraine Inc.* v. *Ukraine*, the President of the Tribunal had been **25** appointed by agreement of the parties. After he had resigned a new President was appointed by agreement of the parties.[21] In *ADC* v. *Hungary* the President of the Tribunal had been appointed by the two party-appointed arbitrators. After his resignation, the two remaining arbitrators appointed a new President to fill the vacancy.[22]

In other cases the Chairman had appointed the tribunals' presidents in accor- **26** dance with Art. 38. Upon their resignation, the Chairman, after consultation with the parties, filled the vacancies by new appointments.[23]

In *MTD* v. *Chile* each party had appointed one arbitrator and the presiding **27** arbitrator had been appointed by agreement of the parties. After the resignation of all three members of the Tribunal, the parties appointed new arbitrators by the same method.[24]

### *4. Death*

Unlike incapacity, resignation and disqualification, death is an objective fact **28** that does not call for a decision. It triggers the procedure for the filling of vacancies under the Rules of Procedure (see paras. 17–19 *supra*).

Deaths of arbitrators have occurred in several cases. In *Holiday Inns* v. *Morocco*, **29** the President of the Tribunal had been appointed by the two other arbitrators. Upon his death, the vacancy was filled through an appointment by the Chairman.[25]

In *Adriano Gardella* v. *Côte d'Ivoire*, a party-appointed arbitrator died. The **30** vacancy was filled through an appointment by the same party. Some months later, the Tribunal's President died. Since he had been appointed by the parties, the vacancy was filled through an appointment by the parties[26] (see paras. 17, 18 *supra*).

### C. "(2) A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel."

Art. 56(2) is a specification to the first sentence of Art. 56(1) providing for the **31** unchanged composition of a commission or tribunal after the commencement of proceedings. The provision contained in Art. 56(2) was not reflected in any of the drafts leading to the Convention (History, Vol. I, p. 258). The principle was

---

21   *Generation Ukraine Inc.* v. *Ukraine*, Award, 16 September 2003, paras. 4.6, 4.13–4.14.
22   *ADC* v. *Hungary*, Award, 2 October 2006, paras. 17–21.
23   *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, para. 1.3; *SOABI* v. *Senegal*, Decision on Jurisdiction, 1 August 1984, paras. 5–6, *SOABI* v. *Senegal*, Award, 25 February 1988, paras. 1.05–1.06; *Tokios Tokelės* v. *Ukraine*, Award, 26 July 2007, paras. 22, 25, 26.
24   *MTD* v. *Chile*, Award, 25 May 2004, paras. 7, 8, 12–17.
25   See ICSID Annual Report 1976/77, Annex 6, pp. 32, 33. The suspension of proceedings lasted for four months. The appointment was presumably made under Arbitration Rule 11(2)(b) (see para. 19 *supra*).
26   See ICSID Annual Report 1976/77, Annex 6, pp. 34, 35.

never cast into doubt. Rather, it was confirmed repeatedly during the Convention's drafting. Eventually, it was decided to make it explicit in the Convention's text (History, Vol. II, pp. 386, 488, 657, 730/1, 734, 950).

**32**    Arts. 12–16 contain detailed provisions concerning the Panel of Conciliators and the Panel of Arbitrators. Appointments to the Panels are made by States parties to the Convention and to a more limited extent by the Chairman. Panel members serve for renewable periods of six years.

**33**    Under Arts. 31(1) and 40(1) the parties are free to make appointments from outside the Panels (see Art. 40, paras. 4–7). Therefore, it would be illogical to terminate the membership in a commission or tribunal upon the expiry of a term on a Panel. But the Chairman, in making appointments under Arts. 30 and 38, is restricted by Arts. 31(1) and 40(1) to persons serving on the appropriate Panel (see Art. 40, paras. 8–13).

**34**    Any solution other than the one provided for by Art. 56(2) would lead to untenable consequences. It would mean that in making an appointment care would have to be taken not to choose a person whose term on the Panel was scheduled to expire before the anticipated end of the proceeding. In addition, States would be able to influence the composition of a commission or tribunal by refusing to renew the designation of an acting conciliator or arbitrator to a Panel.

### D.  "(3) If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy."

**35**    Art. 56(3) is an exception to the principle that vacancies should be filled by the same method that was used for the original appointment (see paras. 15–19 *supra*). In the words of *A. Broches* "[t]his provision reflects the suspicion that the party [that made the original appointment] may not be a stranger to the resignation".[27]

**36**    A provision to this effect was contained in all drafts leading to the Convention and underwent little substantive change (History, Vol. I, pp. 258, 260). It was explained that the purpose of the provision was to prevent the possibility of collusion between the arbitrator and the appointing party. A party should not be able to frustrate or slow down the proceedings by prevailing upon an arbitrator to resign (History, Vol. II, pp. 872, 992).[28]

------

27  *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 706 (1993). See also more generally *Lalive, P.*, Aspects procéduraux de l'arbitrage entre un Etat et un investisseur étranger dans la Convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 111, 119 *et seq*. (1969).

28  See also *Eisemann, F.*, La double sanction prévue par la Convention de la B.I.R.D. en cas de collusion ou d'ententes similaires entre un arbitre et la partie qui l'a désigné, 23 Annuaire Français de Droit International 436, 447 *et seq*. (1977).

The effect of avoiding procrastination through the withdrawal of a conciliator **37** or arbitrator could have been achieved, at least in part, by giving the party that made the original appointment a limited period of time to fill the vacancy. If no new appointment had been made during that time, the Chairman could have made the appointment instead.[29] Art. 56(3) goes beyond that purpose. By attaching a sanction to an unjustified resignation, it discourages any attempt, made for whatever reason, to withdraw a member of a commission or tribunal. In doing so it serves not only the principles of non-frustration and expediency but also the principle of the immutability of the commission or tribunal (see paras. 5–7 *supra*).

Art. 56(3) applies only to a conciliator or arbitrator appointed by a party. It does **38** not apply to a conciliator or arbitrator who has been appointed by agreement of the parties or has been appointed by agreement of the other two arbitrators. Nor does it apply if the appointment has been made by the Chairman or another appointing authority.

The resignation is to be made to the other members of the commission or tribunal **39** and to the Secretary-General. The commission or tribunal shall promptly consider the reasons for the resignation and decide whether it consents thereto. Since the resigning member ceases to be a member upon submitting the resignation, the commission or tribunal will consist only of the remaining members (see also Art. 58, para. 9). If a member resigns from a commission or tribunal consisting of three members, the remaining two members will make the decision.

Unlike Art. 58, dealing with the disqualification of a conciliator or arbitrator, **40** Art. 56(3) does not address the question of what happens if the remaining members are equally divided (see Art. 58, para. 5). Since Art. 56(3) requires a positive decision to give consent, failure to reach agreement would amount to a refusal to give consent. The decision is to be notified promptly to the Secretary-General (see para. 23 *supra*). There is no indication of acceptable reasons for a resignation. The Convention and the Rules of Procedure only provide a procedure for deciding whether consent should be given or withheld (see para. 22 *supra*).[30]

Refusal by the commission or tribunal to consent to a resignation is not designed **41** to stop the resignation. The continued cooperation of a conciliator or arbitrator cannot be enforced. Rather, refusal to give consent leads to a different method for filling the resulting vacancy. The appointment will be made not by the same method as the original appointment, but by the Chairman. In other words, the party who made the original appointment loses the right to appoint a replacement. In addition, refusal to consent may be taken as an expression of disapproval and as reflecting the belief that the resignation constitutes a violation of the duties assumed upon the acceptance of the appointment.

Under Rule 11(2)(a) of the Conciliation and Arbitration Rules (see para. 19 **42** *supra*), the Chairman is under an obligation to make the appointment once he has

---

29   See Conciliation and Arbitration Rules 11(2)(b).
30   See also *Eisemann*, La double sanction, p. 449.

been notified by the commission or tribunal that its consent has been withheld. No request by a party is necessary. The appointment must be made from the Panel of Conciliators or Panel of Arbitrators as the case may be. But the prohibition to appoint nationals or co-nationals of parties, as contained in the last sentence of Art. 38 (see Art. 38, paras. 24–26), does not apply. An appointment made by the Chairman will be notified promptly by the Secretary-General.

**43**    In *Holiday Inns* v. *Morocco*, more than four years after the constitution of the Tribunal, the arbitrator appointed by the Claimants informed the President of the Tribunal that he had become an "outside director" of one of the Claimants. He submitted his resignation subject to the condition that the Claimants appoint his successor. The other two members met and decided that the condition attached to the resignation was improper and should be disregarded. In view of the circumstances surrounding the resignation they also decided to withhold the Tribunal's consent to the resignation. Therefore, the vacancy was filled by the Chairman in accordance with Art. 56(3).[31]

**44**    In *Enron* v. *Argentina* the arbitrator appointed by the Respondent resigned at a late stage of the proceedings after the hearing on the merits and after the parties had filed their post-hearing briefs. The Chairman appointed a new arbitrator in accordance with Arbitration Rule 11(2)(a).[32]

---

31  ICSID Annual Report 1980/81, Annex 6, p. 32; *Eisemann*, La double sanction, pp. 438/9, 445 *et seq.*; *Shihata, I. F. I.*, The Experience of ICSID in the Selection of Arbitrators, News from ICSID, Vol. 6/1, pp. 4, 6 (1989).

32  *Enron* v. *Argentina*, Award, 22 May 2007, para. 39.

# Article 57

**A party may propose to a Commission or Tribunal the disqualification of any of its members on account of any <u>fact</u> indicating a <u>manifest lack</u> of the qualities required by paragraph (1) of Article 14. A party to arbitration proceedings may, in addition, propose the disqualification of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV.**

## OUTLINE

*Paragraphs*

I.   INTRODUCTION                                                                              1–5

II.  INTERPRETATION                                                                          6–46

   A.  **"A party may propose to a Commission or Tribunal the disqualification of any of its members . . ."**     6–14

     1.  Initiative                                                                         6–7

     2.  Time of Proposal                                                      8–14

   B.  **". . . on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14."**     15–42

     1.  Lack of Independent Judgment                               20–34

     2.  Supervening Grounds for Challenge                   35–42

   C.  **"A party to arbitration proceedings may, in addition, propose the disqualification of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV."**     43–46

## BIBLIOGRAPHY

*Bishop, D./Reed, L.*, Practical Guidelines for Interviewing, Selecting and Challenging Party Appointed Arbitrators in International Commercial Arbitration, 14 Arbitration International 395 (1998);

*Cremades, B. M./Cairns, D. J. A.*, The Brave New World of Global Arbitration, 3 The Journal of World Investment 173, 202–206 (2002);

*De Witt Wijnen, O./Voser, N./Rao, N.*, Background Information on the IBA Guidelines on Conflicts of Interest, 5 International Arbitration in Business Law International 433 (2004);

*Donahey, M.*, The Independence and Neutrality of Arbitrators, 9 Journal of International Arbitration 31 (2002);

*<u>Guillaume, G.</u>*, Some Thoughts on the Independence of International Judges Vis à Vis States, 2 The Law and Practice of International Courts and Tribunals 163 (2003);

*Hoffmann, A. K.*, Duty of Disclosure and Challenge of Arbitrators: The Standard Applicable Under the New IBA Guidelines on Conflicts of Interest and the German Approach, 21 Arbitration International 427 (2005);

*Malintoppi, L.*, Independence, Impartiality and Duty of Disclosure of Arbitrators, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.*, eds.) 789 (2008);

*Olbourne, B.*, Independence and Impartiality: International Standards for National Judges and Courts, 2 The Law and Practice of International Courts and Tribunals 97 (2003);

*Tupman, W. M.*, Challenge and Disqualification of Arbitrators in International Commercial Arbitration, 38 International and Comparative Law Quarterly 26 (1989).

# I. INTRODUCTION

**1**     Art. 57 is one of two articles dealing with the disqualification of conciliators or arbitrators. Art. 57 deals with the initiation of the proceeding to disqualify and with the basis for a proposal to disqualify. Art. 58 deals with the method of reaching a decision on a proposal to disqualify and the replacement of a person so disqualified. Other instruments governing international arbitration also contain detailed provisions concerning the disqualification of arbitrators.[1]

**2**     Provisions concerning the disqualification of a conciliator or arbitrator were contained in all drafts leading to the Convention and underwent certain changes (History, Vol. I, p. 262). The discussions surrounding these provisions centred mainly on whether a distinction should be made depending on who made the appointment (see para. 7 *infra*), on time limits for a proposal to disqualify (see para. 9 *infra*) and on whether the grounds for disqualification should be specified in the Convention (see para. 17 *infra*).

**3**     Art. 57 is important in view of Art. 52(1)(a). Under that provision, a party may request an award's annulment if the tribunal was not properly constituted (see Art. 52, paras. 118–129). The procedure for an arbitrator's disqualification is an important means to avoid a later annulment. On the other hand, a party that objects to the appointment of an arbitrator must propose his or her disqualification in a timely manner on pain of losing the right to request annulment for improper constitution of the tribunal (see paras. 11, 12 *infra*).

---

1    International Law Commission Model Rules on Arbitral Procedure, 1958, Art. 6, YBILC 84 (1958-II); UNCITRAL Arbitration Rules, 1976, Arts. 10, 11, 12, 15 ILM 706/7 (1976); UNCITRAL Model Law, 1985, Arts. 12, 13, 24 ILM 1305/6 (1985); ICC Rules of Arbitration, 1998, Art. 11, 36 ILM 1611 (1997); IBA Guidelines on Conflicts of Interest in International Arbitration, 2004. See also the bibliograhpy listed under Art. 40 above and *Branson, D. J./Tupman, W. M.*, Selecting an Arbitral Forum: A Guide to Cost-Effective International Arbitration, 24 Virginia Journal of International Law 917, 926 (1984); *Golsong, H.*, A Guide to Procedural Issues in International Arbitration, 18 The International Lawyer 633, 641 (1984); *Lalive, P.*, Aspects procéduraux de l'arbitrage entre un Etat et un investisseur étranger dans la Convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 111, 117/8 (1969); *Tupman, W. M.*, Challenge and Disqualification of Arbitrators in International Commercial Arbitration, 38 International and Comparative Law Quarterly 26, 30–34 (1989).

*Article 57 – Proposal to Disqualify*                    1199

Art. 57 applies to a member of a conciliation commission or arbitral tribunal. **4**
It does not, by its terms, apply to a member of an *ad hoc* committee constituted
in accordance with Art. 52(3). Art. 52(4) lists the provisions of the Convention
that shall apply *mutatis mutandis* to annulment proceedings. Art. 57 is not listed
there (see Art. 52, paras. 548–552). Members of *ad hoc* committees are appointed
exclusively by the Chairman (see Art. 52, paras. 451–456). These appointments
are subject to considerable restrictions (see Art. 52, paras. 461–465). Also, a
decision on annulment is not subject to annulment on the ground that the *ad
hoc* committee was improperly constituted or on any other ground (see Art. 52,
para. 547).

Nevertheless, in *Vivendi* v. *Argentina* a challenge to the President of the *ad* **5**
*hoc* Committee was treated in accordance with the procedure for the challenge of
arbitrators. The other two members of the Committee noted the absence of any
reference to the disqualification of members of *ad hoc* Committees in Chapter V of
the Convention dealing with the replacement and disqualification of conciliators
and arbitrators. They also noted that Art. 52(4) does not make Arts. 57 and 58
applicable to annulment proceedings. But they relied on Arbitration Rule 9, dealing
with the disqualification of arbitrators, in conjunction with Arbitration Rule 53
which declares the Arbitration Rules applicable " . . . *mutatis mutandis* to any
procedure relating to the interpretation, revision or annulment of an award . . . ".
The two members found that, in extending the application of the Arbitration Rules
to annulment proceedings, the Administrative Council had acted in conformity
with the Convention's object and purpose.[2]

## II. INTERPRETATION

### A.  "A party may propose to a Commission or Tribunal the disqualification of any of its members . . ."

#### *1. Initiative*

The initiative for a disqualification must always come from a party. Neither the **6**
commission or tribunal nor the Centre may start the procedure for disqualification.

The proposal may be directed at any member of the commission or tribunal **7**
regardless of the method used in the appointment. At one point during the Con-
vention's drafting a distinction was foreseen that would have limited the disquali-
fication of members appointed by the Chairman (History, Vol. I, p. 262). This
idea was rejected after some debate (History, Vol. II, pp. 166, 276, 351, 436,
529). There was also some debate as to whether the disqualification could be pro-
posed only by the party that had appointed the member or only by the other party
(at pp. 529, 530, 873).

---

2  *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October
2001, paras. 3–13.

## 2. Time of Proposal

**8**    The proposal to disqualify is subject to certain time restraints. Since the proposal must be directed to the commission or tribunal, it can only be made after the commission or tribunal has been constituted in accordance with Arbitration and Conciliation Rules 6(1) (see Art. 37, para. 10).

**9**    During the Convention's drafting, there was some debate on temporal limitations for a proposal to disqualify. The Working Paper required the proposal to be made at the beginning of the proceedings unless the relevant facts were unknown at that time (History, Vol. I, p. 262). After the removal of this limitation it was suggested that the proposal to disqualify could be made at any time before the rendering of the award (History, Vol. II, pp. 166, 530). The idea that proposals to disqualify would have to be raised as a preliminary objection or that there should be a time limit did not find entry into the Convention (at pp. 852, 872).

**10**    The Arbitration Rules regulate the filing of a proposal to disqualify in the following terms:

### Rule 9
#### *Disqualification of Arbitrators*

(1) A party proposing the disqualification of an arbitrator pursuant to Article 57 of the Convention shall <u>promptly</u>, and in any event before the proceeding is declared closed, file its proposal with the Secretary-General, stating its reasons therefor.[3]

Conciliation Rule 9(1) is similar.[4]

**11**    <u>Promptly means that the proposal to disqualify must be made as soon as the party concerned learns of the grounds for a possible disqualification.</u>[5] Under Arbitration Rule 27 a party that fails to object promptly to a violation of a relevant rule is deemed to have waived its rights to object.[6] (See Art. 52, para. 60.)[7]

**12**    The proposal to disqualify must be made before the proceedings are declared closed in accordance with Arbitration Rule 38 (see Art. 49, para. 11) and Conciliation Rule 30. If a party learns of a ground for the disqualification of an arbitrator so late that it can no longer make a proposal before the closure of the proceeding, it may request the annulment of the award in accordance with Art. 52(1)(a).[8] But if the information was available, failure to raise the improper constitution of the tribunal during the primary proceedings and to promptly propose an arbitrator's disqualification will entail the loss of the right to request annulment on this ground (see Art. 52, paras. 119, 124–129). In case of an unsuccessful proposal to

---

3    See also Art. 15(1) and (2) of the Arbitration (Additional Facility) Rules.
4    See also Art. 15(1) and (2) of the Conciliation (Additional Facility) Rules.
5    See Note B to Arbitration and Conciliation Rule 9 of 1968, 1 ICSID Reports 76/7, 131.
6    1 ICSID Reports 167. Arbitration Rule 26 of 1968 is identical, 1 ICSID Reports 89.
7    See also *Tupman*, Challenge and Disqualification, p. 33.
8    See Note B to Arbitration Rule 9 of 1968, 1 ICSID Reports 77. See also *Shihata, I. F. I.*, The Experience of ICSID in the Selection of Arbitrators, News from ICSID, Vol. 6/1, pp. 4, 6 (1989).

disqualify, the party's right to later request annulment for the same reason remains unaffected.

In the annulment proceedings in *CDC* v. *Seychelles*, the Republic alleged that **13** the sole arbitrator had demonstrated a lack of impartiality at the hearing. The *ad hoc* Committee pointed out that the Republic had failed to challenge the alleged improper conduct at any time prior to the issuance of the Award. In the absence of a timely objection or challenge under Art. 57 and Arbitration Rule 9, the complaint as to the arbitrator's lack of impartiality had been waived and was inadmissible.[9]

In *Suez et al.* v. *Argentina* the Respondent challenged one of the arbitrators **14** on the basis of her participation as arbitrator in another tribunal that had rendered an award unfavourable to Argentina (*Vivendi* v. *Argentina*).[10] Argentina filed its Proposal to Disqualify on 12 October 2007; that is, 53 days after it had knowledge of the Award in *Vivendi*. The other two members of the Tribunal in *Suez et al.* found that Argentina's Proposal to Disqualify had not been prompt, as required by Arbitration Rule 9(1). Therefore Argentina had waived its objection under Arbitration Rule 27.[11]

## B. "...on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14."

The first set of grounds for disqualification relates to members of conciliation **15** commissions as well as of arbitral tribunals. The second set in sentence two of Art. 57 (see paras. 43–46 *infra*) only relates to arbitrators.

The grounds for disqualification of conciliators and arbitrators are phrased in **16** terms of a lack of the qualities required for designation to the Panels of Conciliators and Arbitrators under Art. 14(1).[12] In the case of arbitrators, the lack of the qualities listed in Art. 14(1) is given twice as a reason for disqualification: once through the direct reference to Art. 14(1) in the first sentence of Art. 57; the second time through the reference to Section 2 of Chapter IV in the second sentence of Art. 57. Art. 40(2), which is part of that Section, requires that arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in Art. 14(1).

During the Convention's drafting there was some debate on whether and in **17** what manner the grounds for disqualification should be specified. The Working Paper included reasons for disqualification, namely "that he [*i.e.* the arbitrator] has an interest in the subject matter of the dispute or that he had, prior to his appointment, dealt with the dispute in any capacity whatever". But the Preliminary Draft simply referred to "any fact" without further explanation (History,

---

9  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 53.
10  *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007.
11  *Suez et al.* v. *Argentina*, Decision on the Challenge of an Arbitrator, 22 October 2007, paras. 18–26.
12  See also the respective Arts. 15(1) of the Conciliation and Arbitration (Additional Facility) Rules.

Vol. I, p. 262). In the ensuing debate, several grounds for disqualification, including general unfitness, personal prejudice, misconduct, interest in the subject matter and lack of independence, were suggested (History, Vol. II, pp. 166, 387/8, 436, 529, 551). Eventually, the general view was that these grounds should be defined in terms of Art. 14(1) (at pp. 728, 897, 993).

18    The qualities required by Art. 14(1) are:
- high moral character;
- recognized competence in the fields of law, commerce, industry or finance;
- reliability to exercise independent judgment.[13]

Of these three qualities only the requirement of reliability to exercise independent judgment has played a role in practice.

19    Designation to the Panels of Conciliators and Arbitrators carries a presumption that the persons so designated have the required qualities. But this presumption can be overcome by appropriate evidence. The requirement that the lack of qualities must be "manifest" imposes a relatively heavy burden of proof on the party making the proposal (see also Art. 52, paras. 134–154).

### 1. Lack of Independent Judgment

20    A conflict of interest in respect of a particular dispute is the most likely cause for a lack of independence. Therefore, even a person of high moral character who is competent and generally reliable to exercise independent judgment would be subject to disqualification if it can be shown that the person has a personal interest in the dispute (see Art. 40, paras. 17–24).[14]

21    In a number of cases parties have challenged arbitrators on the ground that they appeared to have contacts with a party or had professional contacts with counsel for one of the parties. In _Amco_ v. _Indonesia_, shortly after the Tribunal's constitution, the Respondent filed a proposal for the disqualification of the arbitrator appointed by the Claimants.[15] The proposal was based on the ground that in the past the challenged arbitrator had given tax advice to the individual who controlled the Claimants. In addition, the arbitrator's law firm and the Claimants' counsel in the arbitration had had a joint office and a profit-sharing arrangement. The profit sharing had ended prior to the commencement of the proceedings. The other two members of the Tribunal rejected the suggestion that the standards of impartiality applicable to an arbitrator appointed by a party would be different from those that applied to an arbitrator appointed by mutual agreement, or by an appointing authority.[16] The two members said:

---

13  See also Art. 7 of the Conciliation (Additional Facility) Rules and Art. 8 of the Arbitration (Additional Facility) Rules.
14  _Tupman_, Challenge and Disqualification, pp. 28–30.
15  _Amco_ v. _Indonesia_, Decision on Jurisdiction, 25 September 1983, para. 2.
16  The Decision on Disqualification of 24 June 1982 is reproduced in _Reisman/Craig/Park/ Paulsson_, International Commercial Arbitration 624–631 (1997).

> It goes without saying that . . . an absolute impartiality of the sole arbitrator or, as the case may be, of all the members of an arbitral tribunal, is required, and it is right to say that no distinction can and should be made, as to the standard of impartiality, between members of an arbitral tribunal, whatever the method of their appointment.[17]

The two arbitrators found that a party-appointing system inherently presumes some acquaintance between the party and the appointee. The facts of the case did not reveal a manifest or highly probable lack of independence. The tax advice in the past was singular and did not amount to a regular attorney/client relationship while the profit-sharing relationship had ended six years before the appointment.[18] The arbitrators said that the mere appearance of partiality was not a sufficient ground for disqualification. The lack of independence had to be "manifest" or "highly probable" and not just "possible". The facts did not demonstrate a manifest lack of independence.[19]    **22**

A similar situation arose in *Vivendi* v. *Argentina*. The Respondent proposed to disqualify the President of the *ad hoc* committee who had disclosed in his declaration that his law firm had provided legal services to one of the Claimants. The Respondent, while not questioning the legal competence or moral character of the designated President, argued that the professional connection between the President and one of the Parties may affect his ability to exercise independent judgment.[20]    **23**

The other two Committee members rejected the disqualification proposal. In doing so, they stressed the following facts as being particularly relevant: (a) the relationship was immediately and fully disclosed, (b) the challenged President had no personal relationship with the party for which the work was carried out by his firm, (c) the work done had nothing to do with the present case, (d) the work concerned a specific transaction and not general legal advice, and the President's firm was not lead counsel, and (e) the relationship between the Claimant and the President's law firm would soon come to an end.[21] In these circumstances, the Committee members held that the President's independence could not be regarded as being impaired. The decision stated, in relevant part:    **24**

> [T]he mere existence of some professional relationship with a party is not an automatic basis for disqualification of an arbitrator or Committee member. All the circumstances need to be considered in order to determine whether the relationship is significant enough to justify entertaining reasonable doubts as to the capacity of the arbitrator or member to render a decision freely and independently.[22]

---

17  At p. 629.
18  *Tupman*, Challenge and Disqualification, p. 45.
19  At p. 45.
20  *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October 2001, paras. 15–19.
21  At para. 26.                              22  At para. 28.

25    The two members added that the term "manifest" excluded reliance on speculative assumptions or arguments. The question was whether a real risk of lack of impartiality based on the facts could reasonably be apprehended by either party.[23]

26    In *Zhinvali* v. *Georgia*, the Respondent questioned the independent judgment of an arbitrator who had been appointed by the Claimant. The challenge was based on the arbitrator's occasional social contacts with a "central player" on the Claimant's side. The proposal to disqualify the arbitrator was rejected by the other two arbitrators. They found that the facts surrounding the proposal failed to meet the test of a manifest lack of the qualities required by Article 14(1). The Respondent's position was based on speculation and inference not permitted by the word "manifest".[24]

27    In some cases arbitrators were challenged on the basis of a role they played or had played in other cases. Some of these challenges did not lead to a decision since the arbitrators resigned.[25] In *Salini* v. *Jordan*, the Claimants objected to the appointment of the arbitrator chosen by the Respondent, partly because he had acted as opposing counsel in other cases involving one of the Claimants. The Claimants noted that the arbitrator would be challenged if he accepted the appointment.[26] The arbitrator accepted his appointment and, shortly before the first session of the Tribunal was scheduled to take place, the Claimants filed a proposal for the disqualification of the arbitrator, pursuant to Article 57 of the ICSID Convention. The proceeding was suspended pending a decision on the proposal, pursuant to Rule 9(6). However, no decision was necessary since the challenged arbitrator resigned.[27]

28    Challenges based on professional contacts between an arbitrator and counsel were generally unsuccessful. In *SGS* v. *Pakistan* the Claimant proposed to disqualify Mr. T., the arbitrator appointed by the Respondent. The disqualification proposal was based on the disclosure made by T. that his law firm had provided legal advice to Mexico in an another, unrelated, arbitration, *GAMI* v. *Mexico*, where Mr. P., a member of Pakistan's legal team in *SGS* v. *Pakistan*, had been appointed President of the Tribunal by agreement of the parties. According to the Claimant, this situation raised "some reasonable doubts" as to T.'s impartiality. The Claimant's concerns were reinforced by the disclosure made by T. in his CV that he had represented Mexico in another unrelated arbitration (*Azinian* v. *Mexico*) where P. had also presided over the Tribunal. The Claimant was concerned that T. may "feel indebted" to P. because the Tribunal he had presided over in *Azinian* had issued an award favourable to Mexico.[28]

---

23  At para. 25.
24  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 19–24.
25  In *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 10, the Claimant raised the issue of a professional relationship between the arbitrator appointed by the Respondent and the law firm representing the Respondent. The arbitrator resigned.
26  *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 5.
27  At para. 9.
28  *SGS* v. *Pakistan*, Decision on Disqualification of Arbitrator, 19 December 2002, 8 ICSID Reports 398–401.

In dismissing the proposal for disqualification, the President of the Tribunal **29** and the other co-arbitrator noted that the Claimant had failed to show what it asserted, *i.e.* that there was "a clear relationship of dependency" between T., the arbitrator, and P., counsel for the Respondent. In the absence of such showing, the challenge could not be sustained because the facts of the case did not show that a "real risk" existed that the challenged arbitrator could not be relied upon to act with independence and impartiality.[29]

In two ICSID cases[30] introduced against the Government of Argentina, *Azurix* **30** v. *Argentina* and *Siemens* v. *Argentina*, the Respondent challenged the President of the Tribunals (the same individual) on the basis of an alleged connection with counsel for the Claimants.[31] Both challenges involved concerns about the arbitrator's professional relationship with the law firm representing another investor in a separate ICSID arbitration. Argentina based its challenges on the fact that the law firm in question had appointed as arbitrator, in a different and unrelated case (*Duke Energy* v. *Peru*), counsel representing the Claimants in both the *Azurix* and *Siemens* arbitrations.

Both challenges failed. In *Azurix* v. *Argentina* the two party-appointed arbitra- **31** tors rejected the challenge.[32] In *Siemens* v. *Argentina* the decision was made on the recommendation of the Permanent Court of Arbitration.[33]

In *Saipem* v. *Bangladesh* a proposal for disqualification was triggered by the **32** arbitrator's disclosure that he had entertained professional contacts with counsel representing the Claimant, the party that had appointed the arbitrator. The arbitrator further indicated that the professional contacts with the Claimant's counsel were likely to continue in the future. The Respondent objected to the arbitrator's appointment, contending that the existing professional relationship between the arbitrator and the Claimant's counsel may involve personal contacts and lead to the discussion of the issues relating to the pending arbitration. The Respondent further argued that the arbitrator had a financial and economic relationship with the Claimant's lawyers. In the Respondent's view, this factual situation might create a subconscious bias in favour of the Claimant in the arbitrator's mind. An additional ground on which the proposal for disqualification was based was the fact that the arbitrator had expressed opinions in his writings which, in the Respondent's view, showed preconceived positions with regard to some of the central issues of the

---

29  At p. 405.
30  A third unsuccessful challenge against the same arbitrator was initiated by Argentina in an arbitration under the UNCITRAL Rules: *National Grid* v. *Argentina*, Decision on Jurisdiction, 20 June 2006, paras. 11–18.
31  The decisions on these challenges are not in the public domain. Some of the factual aspects have been summarized in an internet newsletter: "ICSID Tribunals diverge over independence of arbitrator to hear Argentine claims", Investment Law and Policy News Bulletin, 25 March 2005, at http://www.icsid.org/investment.
32  *Azurix* v. *Argentina*, Decision on the Challenge to the President of the Tribunal, 25 February 2005. Unpublished. See *Azurix* v. *Argentina*, Award, 14 July 2006, para. 33.
33  *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 31, 35–38.

1206                    THE ICSID CONVENTION: A COMMENTARY

arbitration. The Respondent insisted that, in the circumstances, there was a "real likelihood that he [the arbitrator] will be biased in favour of the Claimant".

33    In their Decision, the unchallenged arbitrators dismissed the disqualification proposal on the following grounds: (i) the arbitrator had no connection with any of the parties in the arbitration; (ii) the Respondent's allegations that the arbitrator may have *ex parte* communications with the Claimant's counsel and that he may be biased to the Respondent's detriment were based on pure speculation since no evidence of impropriety had been adduced or proven; and (iii) the arbitrator's doctrinal opinions "expressed in the abstract without reference to any particular case do not affect the arbitrator's impartiality and independence".[34]

34    The above situations should be distinguished from a so-called issue conflict. This type of conflict arises in investment arbitrations when an arbitrator is also involved as counsel in another pending case. Challenging parties in those types of situations argue that if an arbitrator also acts as counsel in another investment case, involving similar legal issues, an unbiased approach cannot be maintained.[35]

### 2. Supervening Grounds for Challenge

35    The prohibition of a conflict of interest and the disclosure obligation continue after the appointment. If the facts that could cast doubt on the arbitrator's independence and impartiality arise during the course of the proceeding, the arbitrator is expected to reveal them promptly.[36] The declaration to be signed by each arbitrator under Arbitration Rule 6(2), as amended in 2006 (see Art. 40, para. 18), contains a reference to a continuing obligation to disclose relevant relationships and circumstances that arise after the declaration during the proceedings.

36    In *Holiday Inns* v. *Morocco*, the arbitrator appointed by the Claimants disclosed that four years after the registration of the Request for Arbitration he had become a director of one of the Claimants. He had to resign in accordance with Art. 56(3) (see Art. 56, para. 43).[37]

37    In *Pey Casado* v. *Chile* the Respondent proposed the disqualification of the entire Tribunal, including its own nominee. Thereupon, the arbitrator nominated by Chile resigned, while the remaining co-arbitrator and the President of the Tribunal did not step down. The reasons underlying the disqualification proposal

---

34  *Saipem* v. *Bangladesh*, Decision on Proposal for Disqualification, 11 October 2005. Unpublished. See *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 47.

35  See the non-ICSID case *Telekom Malaysia Berhad* v. *Republic of Ghana* ("*TMB/Ghana*"), District Court of The Hague, 18 October 2004, Challenge No. 13/2004, Petition No. HA/RK/2004/667; and Challenge No. 17/2004, Petition No. HA/RK/2004/778, 5 November 2004. Unofficial English translations of the judgments can be found at: www.transnational-dispute-management.com.

36  *Shihata, I. F. I.*, The Experience of ICSID in the Selection of Arbitrators, News from ICSID, Vol. 6/1, pp. 5, 6 (1989).

37  *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 52 (1990); *Tupman*, Challenge and Disqualification, p. 44; *Eisemann, F.*, La double sanction prévue par la Convention de la B.I.R.D. en cas de collusion ou d'ententes similaires entre un arbitre et la partie qui l'a désigné, 23 Annuaire Français de Droit International 436, 438/9, 455 *et seq.* (1977).

are not in the public domain. But it appears that one of the Respondent's arguments was that the co-arbitrator should be disqualified in light of his recent appointment as Foreign Minister of his country. Chile argued that the arbitrator's continuing service in the Tribunal would violate the law of the arbitrator's country and raise diplomatic problems in the relation between the latter and the Respondent State.

On 17 February 2006, the Secretary-General of the Permanent Court of Arbitration rejected the proposal to disqualify the President of the Arbitral Tribunal and accepted the proposal to disqualify the co-arbitrator.[38]  **38**

Dissatisfaction with interim decisions of tribunals is not a valid ground for the challenge of arbitrators. In *Sempra* v. *Argentina*, the hearing had taken place and the Tribunal had received post-hearing briefs and a series of additional communications from the parties. A year after the hearing, the Respondent submitted copies of a decision in another ICSID case.[39] The Tribunal refused to admit the submission, referring to its duty to conduct the proceedings in an orderly and efficient manner and the danger of a never-ending exchange of arguments.[40]  **39**

In response, Argentina proposed the disqualification of the Tribunal's President and later of all members of the Tribunal. The Chairman of the Administrative Council rejected the proposal to disqualify the members of the Tribunal.[41]  **40**

In *Suez et al.* v. *Argentina* the Tribunal had been properly constituted and the parties had confirmed that they had no objections. The case had advanced beyond the jurisdictional stage, and a hearing on the merits, when the Respondent filed a proposal to disqualify one of the arbitrators. The ground put forward was that there were "justified doubts with respect to her impartiality" since she had been a member of another ICSID Tribunal in *Vivendi* v. *Argentina*, which had recently rendered an Award against Argentina.[42] The other two members of the Tribunal in *Suez et al.* deciding on the challenge noted that Argentina had offered no evidence of any fact that would bring into question the challenged arbitrator's independence or impartiality. In particular, the Award in *Vivendi* offered no evidence of a lack of impartiality or independence.[43] The two arbitrators said:  **41**

> A finding of an arbitrator's or a judge's lack of impartiality requires far stronger evidence than that such arbitrator participated in a unanimous decision with two other arbitrators in a case in which a party in that case is currently a party in a case now being heard by that arbitrator or judge. To hold otherwise would have serious negative consequences for any adjudicatory system.[44]

The two arbitrators added that the standard required by Art. 14 and hence by Art. 57 was an objective one. The use of the word "manifest" in Art. 57 indicated  **42**

---

38  Unpublished.
39  *LG&E* v. *Argentina*, Decision on Liability, 3 October 2006.
40  *Sempra* v. *Argentina*, Award, 28 September 2007, para. 53.
41  At paras. 54–60, 66.
42  *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007.
43  *Suez et al.* v. *Argentina*, Decision on the Challenge of an Arbitrator, 22 October 2007, paras. 27–35.
44  At para. 36.

that a subjective belief of the challenging party was not enough.[45] Therefore, the Proposal to Disqualify was dismissed.

### C. "A party to arbitration proceedings may, in addition, propose the disqualification of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV."

**43**    The second sentence of Art. 57 relates only to the disqualification of an arbitrator but not to the disqualification of a conciliator. The reason for this distinction is the fact that Section 2 of Chapter IV in Arts. 38 and 39 contains nationality requirements for arbitrators that have no counterparts in the Chapter dealing with conciliation (see Art. 39, para. 4).

**44**    The eligibility criteria in Section 2 of Chapter IV (Arts. 37–40) relate to the nationality requirements for arbitrators and to membership on the Panel of Arbitrators.[46] These requirements vary depending on whether the appointment is made by the Chairman under Art. 38 or by the parties under Art. 39. Therefore, one and the same person may be eligible if appointed by one of the parties or by agreement of the parties but ineligible if appointed by the Chairman.

**45**    A violation of the eligibility criteria in Section 2 of Chapter IV is relatively unlikely. The stricter criteria of Art. 38, last sentence, and of Art. 40(1) are to be observed by the Chairman who acts on the advice of the Secretary-General of ICSID. In appointing arbitrators, the parties are assisted by the ICSID Secretariat with a view to ensuring the tribunal's proper composition. Possible problems may arise if the investor's nationality is not entirely clear (see Art. 25, paras. 283–298, 640–870) and in cases of dual nationalities of arbitrators or parties. In case of difficulties of this kind, the problem may be overcome by appointing arbitrators who are clearly unconnected through nationality to the investor (see Art. 39, para. 8).

**46**    In *Olguín* v. *Paraguay*, the Claimant had appointed a national of the United States as arbitrator. After the constitution of the Tribunal the Respondent challenged the appointment of the arbitrator because the Claimant held dual Peruvian and United States nationality. Therefore, pursuant to Art. 39 and Arbitration Rule 1(3) (see Art. 39, para. 13) the Claimant was prevented from appointing a United States national as arbitrator. The arbitrator tendered his resignation and was replaced by a national of Guatemala.[47]

---

45  At paras. 39, 40.
46  See Note A to Arbitration Rule 9 of 1968, 1 ICSID Reports 76; *Shihata, I. F. I.*, The Experience of ICSID in the Selection of Arbitrators, News from ICSID, Vol. 6/1, pp. 4, 6 (1989).
47  *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 12, 13; *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 15, 16.

# Article 58

**The decision on any proposal to disqualify a conciliator or arbitrator shall be taken by the other members of the Commission or Tribunal as the case may be, provided that where those members are equally divided, or in the case of a proposal to disqualify a sole conciliator or arbitrator, or a majority of the conciliators or arbitrators, the Chairman shall take that decision. If it is decided that the proposal is well-founded the conciliator or arbitrator to whom the decision relates shall be replaced in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–3 |
| II. | INTERPRETATION | 4–19 |
|  | 1. Decision to Disqualify | 4–16 |
|  | 2. Replacement | 17–19 |

## I. INTRODUCTION

Art. 58 is closely related to Art. 57 and deals with the procedure on a proposal to disqualify a conciliator or arbitrator. It also deals with the filling of a vacancy in case there is a decision to disqualify.[1] **1**

The drafts leading to Art. 58 show considerable change (History, Vol. I, pp. 264, 266) but relatively little discussion. The changes concern the question of who would make the decision on the proposal to disqualify (see para. 4 *infra*) and the method for the replacement of any person who has been disqualified (see para. 17 *infra*). **2**

Like Art. 57, Art. 58 applies to a member of a conciliation commission or of an arbitral tribunal. By its terms, it does not apply to a member of an *ad hoc* committee constituted in accordance with Art. 52(3) (see Art. 52, paras. 549–552; Art. 57, para. 4). Nevertheless, in *Vivendi* v. *Argentina* a challenge to the President of the *ad hoc* Committee was treated in accordance with the procedure for the challenge of arbitrators and was decided by the other two members of the Committee (see Art. 57, para. 5).[2] **3**

---

1 For comparative observations see *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 308 (1997).

2 *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October 2001, paras. 3–13.

## II. INTERPRETATION

### 1. Decision to Disqualify

**4**    The provision dealing with the decision on a proposal to disqualify underwent certain changes during the Convention's drafting. The basic principle that the other members of the commission or tribunal should make the decision was always accepted. A decision by the Chairman was foreseen originally only for cases of single conciliators or arbitrators. Subsequently, the Chairman's power was extended to cases where the other members are equally divided and, later still, to cases where the proposed disqualification concerns the majority of the members (History, Vol. I, pp. 264, 266; Vol. II, pp. 108, 276, 530, 820, 872).

**5**    The basic method is a majority decision by the unchallenged members of the commission or tribunal. Since a commission or tribunal must consist of an uneven number (Arts. 29(2)(a), 37(2)(a)), the remaining members will consist of an even number, at any rate if the proposal to disqualify relates to one member. Most commissions and tribunals consist of three members. Therefore, the remaining two members would have to agree on a decision. If they do not agree, the proposal is not deemed rejected. Rather, the task of making the decision will pass on to the Chairman.

**6**    In the case of a sole conciliator or arbitrator, there are no remaining members to make a decision. Therefore, the Chairman is called upon to make the decision.

**7**    The possibility that a majority of the members of a tribunal are challenged through proposals to disqualify them is not as remote as may appear at first sight. If one party proposes the disqualification of the conciliator or arbitrator appointed by the other party, that other party may retaliate by a like proposal. In that case, in a commission or tribunal of three members, it is not the remaining member who decides on the proposal but the Chairman. If two members of a five-member commission or tribunal are challenged, the remaining three members would have to decide on the proposals. It is clear that if a challenge is directed at all members of a commission or tribunal, the Chairman has to decide.

**8**    The rules of procedure offer further detail. Arbitration Rule 9 provides:

**Rule 9**

*Disqualification of Arbitrators*

(1) [see Art. 57, para. 10]

(2) The Secretary-General shall forthwith:

    (a) transmit the proposal to the members of the Tribunal and, if it relates to a sole arbitrator or to a majority of the members of the Tribunal, to the Chairman of the Administrative Council; and

    (b) notify the other party of the proposal.

(3) The arbitrator to whom the proposal relates may, without delay, furnish explanations to the Tribunal or the Chairman, as the case may be.

(4) Unless the proposal relates to a majority of the members of the Tribunal, the other members shall promptly consider and vote on the proposal in the absence of the arbitrator concerned. If those members are equally divided, they shall, through the Secretary-General, promptly notify the Chairman of the proposal, of any explanation furnished by the arbitrator concerned and of their failure to reach a decision.

(5) Whenever the Chairman has to decide on a proposal to disqualify an arbitrator, he shall use his best efforts to take that decision within 30 days after he has received the proposal.

(6) The proceeding shall be suspended until a decision has been taken on the proposal.[3]

Conciliation Rule 9(2)–(6) is substantively identical.[4]

The decision on a proposal to disqualify is to be made by the other members in the absence of the member concerned. Therefore, the decision is not to be made by the commission or tribunal as such but by its other members. By contrast, a decision on whether to consent to the resignation of a conciliator or arbitrator appointed by a party under Art. 56(3) is to be made by the commission or tribunal (see Art. 56, para. 39). This terminological differentiation results from the fact that, upon resignation, the resigning conciliator or arbitrator ceases to be a member of the commission or tribunal which is from then on formally composed of its remaining members. A challenged member remains on the commission or tribunal pending a decision on the challenge. **9**

The conciliator or arbitrator against whom the proposal to disqualify is directed may furnish explanations. The procedure leading to the decision whether to disqualify is informal. It is not an adversarial procedure in which the other members or the Chairman sit in judgment of the challenged member.[5] **10**

As soon as a proposal to disqualify has been filed, the proceedings are suspended in accordance with Conciliation or Arbitration Rule 9(6) (see para. 8 *supra*). If the proposal is rejected, the procedure can continue. If the proposal is accepted, the result is a vacancy on the commission or tribunal. A vacancy leads to the suspension of the proceeding in accordance with Conciliation or Arbitration Rule 10(2) (see Art. 56, para. 9). **11**

In some cases challenges led to the resignation of the arbitrators concerned, thus obviating the need for a decision on the challenge.[6] In a number of cases **12**

---

3  See also Art. 15(3)–(7) of the Arbitration (Additional Facility) Rules.
4  See also Art. 15(3)–(7) of the Conciliation (Additional Facility) Rules.
5  *Golsong, H.*, A Guide to Procedural Issues in International Arbitration, 18 The International Lawyer 633, 642 (1984).
6  *Olguín* v. *Paraguay*, Decision on Jurisdiction, 8 August 2000, paras. 12, 13; *Olguín* v. *Paraguay*, Award, 26 July 2001, paras. 15, 16; *Salini* v. *Jordan*, Decision on Jurisdiction, 29 November 2004, para. 9. In *World Duty Free* v. *Kenya*, Award, 4 October 2006, para. 10, the arbitrator resigned before a formal challenge was lodged.

one member of a tribunal consisting of three arbitrators was challenged and the other two arbitrators decided on the proposal to disqualify. The proposals were rejected.[7]

**13**    In *Generation Ukraine* v. *Ukraine*, the other two members of the Tribunal were equally divided on the proposal to disqualify an arbitrator. Therefore, the proposal was transmitted to the Chairman of the ICSID Administrative Council. However, since the challenged arbitrator had previously been a member of the World Bank staff, the question was sent to the Secretary-General of the Permanent Court of Arbitration (PCA) for his recommendation. The Deputy Secretary-General of ICSID subsequently informed the parties that the Secretary-General of the PCA had recommended to decline the Claimant's proposal to disqualify the arbitrator and that the Acting Chairman of the Administrative Council had accepted the recommendation.[8]

**14**    In *Siemens* v. *Argentina*, the challenge followed the same procedure with the same result.[9]

**15**    In *Sempra* v. *Argentina*, Argentina proposed the disqualification of the Tribunal's President and later of all members of the Tribunal. The Chairman of the Administrative Council rejected the proposal to disqualify the members of the Tribunal.[10]

**16**    In *Pey Casado* v. *Chile* the Respondent proposed the disqualification of the entire Tribunal. The arbitrator nominated by Chile resigned, while the President and the remaining co-arbitrator did not step down. In a decision of 17 February 2006 the Secretary-General of the Permanent Court of Arbitration recommended the rejection of the proposal to disqualify the President of the Arbitral Tribunal and the acceptance of the proposal to disqualify the co-arbitrator.[11]

### 2. Replacement

**17**    In the drafting of what eventually became Art. 58, the Preliminary Draft provided that the vacancy should be filled by the method used for the original appointment. This was subsequently changed to the procedure prescribed for the original appointment and finally replaced by a reference to the provisions of Sections 2 of Chapters III and IV (History, Vol. I, pp. 264, 266; Vol. II, pp. 223/4, 351, 530) (see also Art. 56, para. 16).

---

7   *Amco* v. *Indonesia*, Decision on Jurisdiction, 25 September 1983, para. 2; *Vivendi* v. *Argentina*, Decision on the Challenge to the President of the Committee, 3 October 2001; *SGS* v. *Pakistan*, Decision on Disqualification of Arbitrator, 19 December 2002, 8 ICSID Reports 398; *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 19–23; *Azurix* v. *Argentina*, Decision on the Challenge to the President of the Tribunal, 25 February 2005 (unpublished) – see *Azurix* v. *Argentina*, Award, 14 July 2006, para. 33; *Saipem* v. *Bangladesh*, Decision on Proposal for Disqualification, 11 October 2005 (unpublished) – see *Saipem* v. *Bangladesh*, Decision on Jurisdiction, 21 March 2007, para. 47; *Suez et al.* v. *Argentina*, Decision on the Challenge of an Arbitrator, 22 October 2007.

8   *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 4.8–4.18.

9   *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 31, 35–38.

10  *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 53–60, 66.

11  Unpublished.

The second sentence of Art. 58 supplements Art. 56(1) which deals only with   **18**
the filling of a vacancy arising from the death, incapacity or resignation of a
conciliator or arbitrator. The provisions for the filling of a vacancy in case of
a disqualification are substantively identical to those in Art. 56(1). Conciliation
and Arbitration Rules 11 apply in all these cases. Therefore, Art. 58, second
sentence, may be read in light of the comments made to Art. 56(1) (see Art. 56,
paras. 15–19).

After the filling of the vacancy, proceedings are resumed in accordance with   **19**
Conciliation and Arbitration Rules 12 (see Art. 56, paras. 10–12).

# Article 59

**The charges payable by the parties for the use of the facilities of the Centre shall be determined by the Secretary-General in accordance with the regulations adopted by the Administrative Council.**

## BIBLIOGRAPHY

*Nurick, L.*, Costs in International Arbitrations, 7 ICSID Review – FILJ 57 (1992).

## I. INTRODUCTION

**1**     Art. 59 is the first of three Articles in Chapter VI of the Convention entitled "Cost of Proceedings". Art. 59 deals with the charges for the use of the Centre's facilities. Art. 60 deals with the fees and expenses of conciliators and arbitrators. Art. 61 deals with the apportionment of costs between the parties.

**2**     The costs of proceedings consist of three elements:
- the charges for the use of the facilities and expenses of the Centre;
- the fees and expenses of the conciliators or arbitrators;
- expenses incurred by the parties in connection with the proceedings.

Of these three categories, the third, consisting mainly of the costs for legal representation, is typically by far the largest.[1]

**3**     Other instruments governing international arbitration also contain detailed provisions on the costs of proceedings.[2] ICSID proceedings usually involve lower costs than proceedings under alternative regimes. This is due, in part, to lower administrative costs (see para. 13 *infra*) and in part to the way the fees of conciliators and arbitrators are determined (see Art. 60, paras. 7–9).[3]

**4**     The actual costs of a particular ICSID proceeding depend on several factors. Apart from the complexity of the case, they include the size of the commission or tribunal (see Art. 37, para. 14), the duration of the proceeding, the number and length of sessions of the commission or tribunal, the location of sessions and the

---

1   See also *Nurick*, *L.*, Costs in International Arbitrations, 7 ICSID Review – FILJ 57/8 (1992).

2   See UNCITRAL Arbitration Rules, 1976, Arts. 38–40, 15 ILM 715/6 (1976); ICC Rules of Arbitration, 1998, Arts. 30, 31, 36 ILM 1614/5 (1997).

3   See also *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 94 *et seq.* (1985); *Delaume, G. R.*, ICSID Arbitration Proceedings: Practical Aspects, 5 Pace Law Review 563, 578/9 (1985); *Delaume, G. R.*, Transnational Contracts, Applicable Law and Settlement of Disputes, Ch. XV, 47 (1990); *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 310/1 (1997); *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 395 *et seq.* (1991).

need to employ interpreters, translators and clerical staff.[4] In addition, a request for annulment, whether successful or not, will be a considerable additional cost factor. There is a wide variation from case to case. Whilst in complex arbitration cases the total costs, including legal representation and fees, can amount to several million US \$,[5] direct costs of ICSID conciliation proceedings can be quite low. In one successful case they are reported to have been less than US \$11,000.[6]

The Convention's provisions on costs, including Art. 59, also apply to annul- **5** ment proceedings. Art. 52(4) contains a specific reference to Chapter VI of the Convention (see Art. 52, para. 572).

All the drafts leading to the Convention contained a provision reflecting the **6** basic idea of Art. 59 (History, Vol. I, pp. 266, 268). They underwent little change and there was no controversy concerning them. There was agreement that the charges in question should be pre-established but subject to periodic adjustments (History, Vol. II, pp. 76, 108, 277, 352, 436, 437, 545, 692), and that they should be levied only to cover the costs of a particular proceeding (at pp. 128, 167, 176, 177, 660, 967).

## II. INTERPRETATION

The regulations to be adopted by the Administrative Council under Art. 59 **7** are the Administrative and Financial Regulations, currently in their version of 10 April 2006.[7] The Secretary-General has determined the charges under these Regulations in a Schedule of Fees, currently in its version of 1 January 2008.[8]

The only fixed general charge for the services of the Centre is the lodging fee. **8** The Administrative and Financial Regulations provide in this respect:

> **Regulation 16**
> *Fee for Lodging Requests*
> The party or parties (if a request is made jointly) wishing to institute a conciliation or arbitration proceeding, requesting a supplementary decision to, or the rectification, interpretation, revision or annulment of an arbitral award, or requesting resubmission of a dispute to a new Tribunal after the annulment of an arbitral award, shall pay to the Centre a non-refundable fee determined from time to time by the Secretary-General.

---

4   See also *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 816 (1982); *Shihata, I. F. I./ Parra, A. R.*, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299, 334 (1999).

5   See *e.g.*, *PSEG* v. *Turkey*, Award, 19 January 2007, paras. 352, 353.

6   *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 343 (1986).

7   See http://www.worldbank.org/icsid/basicdoc/partC.htm. Under Article 5 of the Additional Facility Rules, the relevant parts of the Administrative and Financial Regulations apply *mutatis mutandis* to proceedings under the Additional Facility.

8   See http://www.worldbank.org/icsid/schedule/fees.pdf.

**9**        The lodging fee varies depending on the type of request.[9] Under the Schedule of Fees in its version of 1 January 2008 the fee is US $25,000 (twenty-five thousand) in connection with a request for the institution of conciliation or arbitration proceedings (Arts. 28, 36). The fee is US $10,000 in connection with the following requests:

- supplementation or rectification of an award (Art. 49);
- interpretation of an award (Art. 50);
- revision of an award (Art. 51);
- annulment of an award (Art. 52);
- resubmission of a dispute after annulment (Art. 52(6)).

The Secretary-General will take no action, except to acknowledge a request for the institution of proceedings, until payment has been received[10] (see Art. 36, para. 16). The fee is non-refundable even if the request is withdrawn (see Art. 36, paras. 64–70) or denied.

**10**        Apart from the lodging fee, an administrative charge of US $20,000 is made following the constitution of a conciliation commission, arbitral tribunal or *ad hoc* committee and on an annual basis thereafter. In addition, administrative charges are made to cover the out-of-pocket expenses for a particular proceeding. These include expenses for the services of persons, such as interpreters, reporters and secretaries, especially hired by the Centre for the proceeding. If the proceedings are held away from the Centre, these expenses include charges of the institution hosting the proceedings, US $1,500 per day of meetings when the Secretary of the commission, tribunal or *ad hoc* committee attends the meeting, as well as travel and subsistence expenses.[11] These expenses are met from advance payments that the parties have to make periodically[12] (see Art. 61, paras. 46–61).

**11**        A Secretary is appointed for each commission, tribunal and *ad hoc* committee by the Secretary-General.[13] The Secretary is usually an experienced member of the Centre's legal staff. The services of the Secretary do not entail the payment of an additional fee to the Centre unless meetings are held away from the Centre.[14]

**12**        The costs of special services for a party are to be borne by that party. The Administrative and Financial Regulations provide to this end:

### Regulation 15
#### *Special Services to Parties*

(1) The Centre shall only perform any special service for a party in connection with a proceeding (for example, the provision of translations or copies) if the party shall in advance have deposited an amount sufficient to cover the charge for such service.

---

9   See *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, pp. 4, 5 (1985).
10   Institution Rule 5(1)(b).                    11   Schedule of Fees, para. 5.
12   Administrative and Financial Regulation 14(3); Schedule of Fees, para. 6.
13   Administrative and Financial Regulation 25.
14   *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, pp. 4, 7 (1997).

(2) Charges for special services shall normally be based on a schedule of fees to be promulgated from time to time by the Secretary-General and communicated by him to all Contracting States as well as to the parties to all pending proceedings.

The charges for special services are determined on the basis of rates established by the World Bank under its normal administrative procedures.[15]

Under Art. 17 of the Convention, the expenditures of the Centre, to the extent **13** that they are not met by charges for the use of its facilities and other receipts, are to be borne by the States parties to the Convention. In actual fact, ICSID's administrative budget is met in full by the World Bank.[16] It follows that the World Bank supports or subsidizes the operations of ICSID[17] (see Art. 17, paras. 6–9).

---

15  Schedule of Fees, para. 7.

16  See *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 310/11 (1997). See also ICSID Annual Report 2006, p. 11. The legal basis for this practice is the Memorandum of Administrative Arrangements of February 1967 concluded between the World Bank and ICSID – see ICSID First Annual Report 1966/67, pp. 15/6.

17  *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 96 (1985); *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 246/7 (1986); *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 397/8 (1991).

# Article 60

**(1) Each Commission and each Tribunal shall determine the fees and expenses of its members within limits established from time to time by the Administrative Council and after consultation with the Secretary-General.**

**(2) Nothing in paragraph (1) of this Article shall preclude the parties from agreeing in advance with the Commission or Tribunal concerned upon the fees and expenses of its members.**

## OUTLINE

|     |                                   | *Paragraphs* |
| --- | --------------------------------- | ------------ |
| I.  | INTRODUCTION                      | 1–2          |
| II. | INTERPRETATION                    | 3–15         |
|     | 1. Limits Established by the Centre | 5–9        |
|     | 2. Agreement on Fees              | 10–14        |
|     | 3. Payment of Fees and Expenses   | 15           |

## I. INTRODUCTION

**1**  Art. 60 is part of the Convention's Chapter VI on "Cost of Proceedings". It deals with the remuneration and expenses of conciliators and arbitrators. Other instruments regulating international arbitration also contain detailed provisions on the fees and expenses of arbitrators.[1]

**2**  Art. 60 also applies to members of *ad hoc* committees established in accordance with Art. 52(3). Art. 52(4) extends the application of Art. 60 to proceedings before an *ad hoc* committee. In addition, Administrative and Financial Regulation 14(1),[2] dealing with the fees and expenses of conciliators and arbitrators, by its own terms also applies to members of *ad hoc* committees.

## II. INTERPRETATION

**3**  The drafts leading to the Convention originally provided that, in the absence of an agreement with the parties, the commission or tribunal was to fix its fees and

---

1  See *e.g.*, UNCITRAL Arbitration Rules, 1976, Arts. 38 and 39, 15 ILM 716 (1976); ICC Rules of Arbitration, 1998, Art. 31, Appendix III, 36 ILM 1615, 1617 *et seq*. (1997). See also *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 310 *et seq*. (1997).

2  See http://www.worldbank.org/icsid/basicdoc/partC.htm. Under Article 5 of the Additional Facility Rules, Administrative and Financial Regulation 14 applies, *mutatis mutandis*, to the Additional Facility.

expenses after consultation with the Secretary-General (History, Vol. I, pp. 268, 270). There were suggestions to determine these amounts not on an *ad hoc* basis but in accordance with predetermined guidelines or tariffs (History, Vol. II, pp. 277/8, 437, 531, 898, 993). This led to the adoption of the text that foresees limits established by the Administrative Council.

The fees and expenses of a commission or tribunal are to be determined by an **4** agreement between the commission or tribunal and the parties or, in the absence of such an agreement, a decision by the commission or tribunal, within limits set by the Administrative Council and the Secretary-General. An agreement on the fees and expenses would be the primary method of determining the fees. In the absence of such an agreement, the commission or tribunal makes a decision. In making this decision it has to stay within the limits set by the Administrative Council and the Secretary-General.

## 1. Limits Established by the Centre

In the majority of cases, fees and expenses are determined in accordance with **5** Art. 60(1). Before the revision in 1984 of the Administrative and Financial Regulations, these Regulations themselves set forth maximum fees for conciliators, arbitrators and members of *ad hoc* committees. These were adjusted periodically through a formal amendment of the relevant Regulation.[3] The Regulations in their current form delegate the determination of the amounts to the Secretary-General with the approval of the Chairman.

The Administrative and Financial Regulations provide: **6**

### Regulation 14
#### *Direct Costs of Individual Proceedings*

(1) Unless otherwise agreed pursuant to Article 60(2) of the Convention, and in addition to receiving reimbursement for any direct expenses reasonably incurred, each member of a Commission, a Tribunal or an *ad hoc* Committee appointed from the Panel of Arbitrators pursuant to Article 52(3) of the Convention (hereinafter referred to as "Committee") shall receive:

(a) a fee for each day on which he participates in meetings of the body of which he is a member;

(b) a fee for the equivalent of each eight-hour day of other work performed in connection with the proceedings;

(c) in lieu of reimbursement of subsistence expenses when away from his normal place of residence, a *per diem* allowance based on the allowance established from time to time for the Executive Directors of the Bank;

(d) travel expenses in connection with meetings of the body of which he is a member based on the norms established from time to time for the Executive Directors of the Bank.

---

3  *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, pp. 4/5 (1985).

> The amounts of the fees referred to in paragraphs (a) and (b) above shall be determined from time to time by the Secretary-General, with the approval of the Chairman. Any request for a higher amount shall be made through the Secretary-General.

**7**     The Schedule of Fees, as amended on 1 January 2008, provides for a fee of US $3,000 (three thousand) per day for meetings or other work performed. Subsistence and travel expenses are reimbursed on the basis of a Memorandum on the Fees and Expenses of ICSID Arbitrators.[4] This Memorandum provides for *per diem* subsistence allowances at standardized rates and travel expenses in accordance with detailed guidelines. In addition, any other direct expenses reasonably incurred such as communications, copying and typing will be reimbursed.

**8**     Theoretically, the fees set out in the Schedule of Fees are limits within which the commission or tribunal can determine the fees of its members in the absence of an agreement.[5] In practice, these fees are usually regarded as automatically applicable.[6]

**9**     The fees of conciliators and arbitrators under the ICSID system are lower than typical lawyers' fees in private practice. It has been pointed out that work on a commission or tribunal should be seen as performance of a public service.[7]

### 2. Agreement on Fees

**10**     Under Art. 60(2) the parties may agree in advance with the commission or tribunal on different fees and expenses. Theoretically, such an agreement could set fees higher or lower than the ones foreseen in the Schedule of Fees. In practice, agreed fees would be higher. Such a step might be justified as an exceptional measure in cases involving unusually high sums of money.[8] There have been several cases in which the tribunals and the parties have agreed on fees that were higher than the limits set out in the Schedule of Fees.[9] This step may have been

---

4  See Memorandum on the Fees and Expenses of ICSID Arbitrators (6 July 2005), http://www.worldbank.org/icsid/pubs/memorandum/memorandum.htm; *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings Under the ICSID Convention, 13 ICSID Review – FILJ 85, 89/90 (1998).

5  See *e.g.*, *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.08.

6  *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 310 (1997).

7  See *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 96 (1985); *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 397/8 (1991).

8  See *Broches, loc. cit.*

9  *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 709 (1993); *Parra, A. R.*, Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287, 310 (1997).

necessary to obtain the acceptance of an appointment as arbitrator since there is no duty to accept an appointment[10] (see Art. 37, para. 47).

In *MTD* v. *Chile* the Tribunal, in its original composition, requested a rate of **11** remuneration higher than the Centre's current rate. When both the Respondent and the Claimant advised the Tribunal that they were unable to offer the rate of remuneration proposed by the Tribunal, the members of the first Tribunal tendered their resignation.[11] The parties then proceeded to constitute a new Tribunal.[12]

The Model Clauses (see Art. 25, para. 385) in their previous versions foresaw **12** agreements between the parties prior to the submission of a case on the fees of conciliators and arbitrators.[13] Such an agreement by the parties would have to be accepted by the conciliators or arbitrators in order to be relevant under Art. 60(2). Significantly, the Model Clauses in their current form[14] do not offer such a provision.

The Memorandum on the Fees and Expenses of ICSID Arbitrators (see para. 7 **13** *supra*), after referring to the current level of the fees, states: "That amount has been determined for the fees in the expectation that Tribunals will not propose higher amounts to the parties." An amendment, made in 2006, to Administrative and Financial Regulation 14(1) added the requirement that any request for a higher amount is to be made through the Secretary-General.

Any agreement under Art. 60(2) can only be made by both parties with the **14** entire commission or tribunal. It is absolutely impermissible for one party to reach a separate agreement on higher fees or expenses with a conciliator or arbitrator appointed by it (or with any other arbitrator or conciliator) (see also History, Vol. II, p. 531). Such an arrangement would amount to corruption in the sense of Art. 52(1)(c) and could lead to the annulment of the award (see Art. 52, paras. 271–277). The declaration required of each arbitrator under Arbitration Rule 6(2) (see Art. 40, para. 18) rules out the acceptance of any compensation except as provided in the Convention.

### 3. Payment of Fees and Expenses

Payments of fees and expenses are to be made exclusively by the Centre. **15** Administrative and Financial Regulation 14 provides to this end:

> (2) All payments, including reimbursement of expenses, to the following shall in all cases be made by the Centre and not by or through either party to the proceeding:
>> (a) members of Commissions, Tribunals and Committees;
>> (b) witnesses and experts summoned at the initiative of a Commission, Tribunal or Committee, and not of one of the parties;

---

10  See also Note B to the Arbitration and Conciliation Rules 5 of 1968, 1 ICSID Reports 73, 127.
11  *MTD* v. *Chile*, Award, 25 May 2004, paras. 11–13.
12  At paras. 14–17.
13  See Clause XII in the 1981 version, 1 ICSID Reports 204, Clause XXX in the 1968 version, 7 ILM 1180/1 (1968) and the note thereto.
14  ICSID Model Clauses, 1993, 4 ICSID Reports 357.

    (c)  members of the Secretariat of the Centre, including persons (such as interpreters, translators, reporters or secretaries) especially engaged by the Centre for a particular proceeding;

    (d)  the host of any proceeding held away from the seat of the Centre pursuant to Article 63 of the Convention.

This rule covers not only payments to conciliators, arbitrators and members of *ad hoc* committees but also certain types of other payments. It is designed to serve the proper administration of the proceedings by avoiding the appearance of financial dependence of any of the persons listed on payments by one of the parties. The payments by the Centre under this Regulation are financed through advance payments by the parties in accordance with Administrative and Financial Regulation 14(3) (see Art. 61, paras. 46–61).

# Article 61

**(1) In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings.**

**(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.**

## OUTLINE

*Paragraphs*

I.  INTRODUCTION                                                                      1–4
II. INTERPRETATION                                                                   5–74
   A. **"(1) In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings."**   5–7
   B. **". . . , except as the parties otherwise agree, . . ."**                        8–14
   C. **"(2) In the case of arbitration proceedings the Tribunal shall . . . assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid."**   15–61
      1. Apportionment of Costs                                                       17–40
         a) Loser Pays                                                               19–21
         b) Procedural Conduct                                                        22–26
         c) Payment for Parts of Proceedings                                          27–32
         d) Equal Sharing                                                             33–40
      2. Reasons                                                                      41–45
      3. Advance Payments                                                             46–61
         a) Necessity of Advance Payments                                            46–49
         b) Apportionment of Advance Payments                                         50–58
         c) Final Settlement of Advance Payments                                      59–61
   D. **"Such decision shall form part of the award."**                               62–74

# BIBLIOGRAPHY

*Ben Hamida, W.*, Cost Issue in Investor-State Arbitration Decisions Rendered Against the Investor: A Synthetic Table, 2/5 TDM (2005);

*Gotanda, J. Y.*, Awarding Costs and Attorneys' Fees in International Commercial Arbitrations, 21 Michigan Journal of International Law 1 (1999);

*Nurick, L.*, Costs in International Arbitrations, 7 ICSID Review – FILJ 57 (1992);

*Rubins, N. D.*, The Allocation of Costs and Attorney's Fees in Investor-State Arbitration, 18 ICSID Review – FILJ 109 (2003);

*Schill, S. W.*, Arbitration Risk and Effective Compliance – Cost-Shifting in Investment Treaty Arbitration, 7 The Journal of World Investment & Trade 653 (2006);

*Weiniger, M./Page, M.*, Treaty Arbitration and Investment Disputes: Adding up the Costs, 1 Global Arbitration Review 44 (2006);

*Wilson, J./Cain, J./Gray, J.*, ICSID Arbitration Awards and Cost, TDM, October (2006).

# I. INTRODUCTION

**1**     Art. 61 is the last of the three Articles in the Convention's Chapter VI on "Cost of Proceedings". Art. 61 deals with the apportionment of the costs of proceedings between the parties. These costs consist of the charges payable to the Centre, the fees and expenses of conciliators or arbitrators and the expenses incurred by the parties themselves (see Art. 59, para. 2). Other documents governing international arbitration also offer rules on the distribution of costs between the parties.[1]

**2**     The drafts leading to the Convention's provision on the apportionment of costs underwent considerable changes. Initially, the provisions on costs were phrased in identical terms for conciliation and arbitration (History, Vol. I, pp. 272, 274, 276). After some debate, a more differentiated solution was adopted. In the case of conciliation, the original formula was retained, subject to certain adjustments, and found entry into the Convention (see para. 6 *infra*). In the case of arbitration, after a discussion on competing principles, the discretionary formula of Art. 61(2) was adopted (see paras. 8, 16 *infra*).

**3**     Art. 61 contains several factors determining the apportionment of costs. In conciliation proceedings, the costs will always be borne in accordance with the formula contained in Art. 61(1) (see paras. 5–7 *infra*). In arbitration proceedings, the parties may agree on the distribution of costs (see paras. 8–14 *infra*). If there is no such agreement, the tribunal is given discretion to make a decision on the issue.

**4**     Art. 61 also applies to annulment proceedings. Art. 52(4) extends the application of Art. 61 to proceedings before an *ad hoc* committee. The Arbitration Rules, in accordance with Rule 53, also apply to a procedure relating to the interpretation, revision or annulment of an award. This includes Arbitration Rule 28 dealing with the costs of proceedings (see paras. 27, 55, 60 *infra*). Administrative and Financial

---

1     UNCITRAL Arbitration Rules, 1976, Art. 40, 15 ILM 716 (1976); ICC Rules of Arbitration, 1998, Art. 31(3), 36 ILM 1615 (1997).

Regulation 14(3)(e) contains a special provision on advance payments in the case of an application for annulment (see para. 57 *infra*).

## II. INTERPRETATION

### A. "(1) In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings."

The apportionment of costs in conciliation proceedings is regulated uniformly by Art. 61(1). There is no provision for a different solution by agreement. Nor does the commission have any discretion in this regard. The charges for the use of the Centre's facilities (Art. 59) and the fees and expenses of the conciliators (Art. 60) are always borne in equal shares by the parties. The parties always bear their own costs.[2]    **5**

All drafts to the Convention foresaw this basic formula for conciliation proceedings. Exceptions for frivolous claims or proceedings in bad faith as well as a possibility to agree otherwise were included originally. This may be explained by the fact that arbitration proceedings were covered by the same formula in the early drafts (History, Vol. I, p. 272). Initially, this formula for the apportionment of costs was discussed without distinction between conciliation and arbitration (History, Vol. II, pp. 121, 122, 128, 176, 277, 278, 820). Later, a distinction began to emerge between conciliation and arbitration for purposes of apportioning costs (at pp. 177, 351–353, 436, 531, 671). Eventually, a decision was made to give discretion to an arbitral tribunal on the apportionment of costs. A separate vote indicated that a majority was in favour of retaining the original formula for conciliation proceedings (at pp. 873, 898). Therefore, it was decided that, in conciliation proceedings, the parties would bear their own expenses and share the expenses of the commission and the Centre in equal parts (at pp. 939, 993).    **6**

This formula has been applied in the few conciliation proceedings that have taken place before the Centre.[3] The Centre requires the parties to make periodic advance payments in accordance with Administrative and Financial Regulation 14(3) to cover the costs of pending proceedings (see paras. 46–61 *infra*).    **7**

### B. "..., except as the parties otherwise agree, ..."

The possibility for the parties to agree on the apportionment of the costs was contained in the Working Paper and the Preliminary Draft (History, Vol. I, p. 274). After a warning that this might be misinterpreted as leaving it open to the parties    **8**

---

2  See also Conciliation (Additional Facility) Rules, Art. 40. *Cf.* also the UNCITRAL Conciliation Rules, Art. 17(2), 20 ILM 300, 305 (1981), and the ICC Rules of Optional Conciliation, Art. 9, 28 ILM 231, 235 (1989).

3  See *Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: Tesoro Petroleum Corporation v. Trinidad and Tobago, 1 ICSID Review – FILJ 340, 342/3 (1986).

1226        THE ICSID CONVENTION: A COMMENTARY

to agree not to pay the charges for the use of the Centre (History, Vol. II, p. 352), this formula disappeared from the First Draft but was restored in the Revised Draft and found entry into the Convention. In the adopted version, the possibility for an agreement by the parties on costs only applies to arbitration but not to conciliation proceedings.

**9**    Art. 61(2) is one of several Articles of the Convention that is open to modification by agreement of the parties. Other examples are Arts. 26, 33, 35, 37, 43, 44, 46, 60, 62 and 63. This feature is an expression of the consensual nature of arbitration that leaves the parties a large measure of discretion. But it does not affect the basic obligation of the parties to meet the charges, fees and expenses under Arts. 59 and 60. The Centre's Arbitration Rules may be modified by the parties (see Art. 44, paras. 10–23). On the other hand, the Centre's Administrative and Financial Regulations are not subject to modification by the parties except under the terms of the Regulations (see Art. 44, paras. 13, 41).[4] Therefore, while the parties may reach agreement on the apportionment of costs between them, they cannot reduce or remove their overall financial obligation towards the Centre by agreement (see Art. 44, para. 20).

**10**    The Model Clauses offer a formula for an advance agreement on division of costs:

### Clause 18

> In any arbitration proceeding conducted pursuant to this agreement, the fees and expenses of the members of the Arbitral Tribunal as well as the charges for the use of the facilities of the Centre shall be [borne equally by the parties hereto]/[divided between the parties hereto as follows: . . .].[5]

Curiously, this clause does not address the expenses incurred by the parties. Under Art. 61(2) apportionment of the parties' own expenses is also subject to a decision by the tribunal in the absence of an agreement by the parties. In the most likely case of an agreement on the equal sharing of costs, it may be useful for the parties to clarify that each shall bear its own expenses.

**11**    Advance agreements on the apportionment of costs in ICSID arbitration are relatively uncommon. Where they exist, the parties typically adopt the formula provided for conciliation by Art. 61(1).[6] If the parties reach an agreement to have a settlement incorporated into an award, in accordance with Arbitration Rule 43(2) (see Art. 48, paras. 69–87), the agreement will include an allocation of costs.

**12**    An agreement on how to divide costs would have to be clear and unequivocal. In *Cable TV* v. *St. Kitts and Nevis*, each party had submitted that the costs of

---

4  See Introductory Notes D to both the Arbitration and the Conciliation Rules of 1968, 1 ICSID Reports 65, 120.

5  4 ICSID Reports 367. See also Model Clause XIII of 1981, 1 ICSID Reports 205 and Model Clause XXXI of 1968, 7 ILM 1181 (1968).

6  *Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, pp. 5, 7 (1986).

the successful party should be borne by the unsuccessful party. The Tribunal did not view these submissions as an agreement but found that the words "the parties otherwise agree" of Art. 61(2) were not applicable. The Claimant was unsuccessful for lack of jurisdiction. The Tribunal decided that each party had to bear the expenses incurred by it in connection with the proceedings and that the fees and expenses of the members of the Tribunal and the charges for the use of the Centre's facilities were to be paid by them in equal shares.[7]

Even a clear agreement on the apportionment of costs does not entirely shield **13** a party from the consequences of poor management of its representation. In *Benvenuti & Bonfant* v. *Congo*, the agreement between the parties had provided that "the costs of the arbitration shall be shared equally between the parties". The Tribunal held that this clause implied that each party must bear its own costs without being indemnified. Therefore, the Tribunal decided that each party must bear its own costs and that each party must pay half of the costs of the Centre and of the Tribunal. But the Tribunal then proceeded to point out that the Government had in the initial stages not taken a significant part in the proceedings (see also Art. 45, paras. 26–30, 51, 62, 63, 87). This attitude had led to serious delays as well as to additional costs for the Claimant. The Claimant asked the Tribunal to take this into account, and the Government did not formally object to this request. The Tribunal held that, under these circumstances, it was equitable to award an additional amount of US $15,000 with interest to the Claimant[8] (see Art. 45, para. 73).

In *SEMOS* v. *Mali*, the arbitration agreement had provided that "the arbitration **14** costs shall be borne by the losing party". The Tribunal decided that Mali should reimburse the sums paid to ICSID to the prevailing Claimant. However, in view of the seriousness and difficulty of the issue involved, the Tribunal decided that SEMOS had to pay the costs and fees of its lawyers.[9]

**C. "(2) In the case of arbitration proceedings the Tribunal shall . . . assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid."**

Art. 61(2) addresses three types of costs:                                    **15**
- the expenses incurred by the parties in connection with the proceedings;
- the fees and expenses of the members of the tribunal (Art. 60); and
- the charges for the use of the facilities of the Centre (Art. 59).

The expenses incurred by the parties in connection with the proceedings consist primarily of the costs of legal representation. They may also include the costs

---

7  *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, at paras. 8.04, 8.05.
8  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, at paras. 4.124–4.129.
9  *SEMOS* v. *Mali*, Award, 25 February 2003, 10 ICSID Reports 116, 129.

of the work of in-house staff working on the case,[10] accounting costs, expenses incurred in producing evidence and the costs of witnesses and experts presented by the parties.[11] Apportionment of all three types of these costs is subject to the tribunal's decision except where the parties have agreed otherwise (see paras. 8–14 *supra*).[12]

**16**   During the Convention's drafting, the provision that eventually became Art. 61(2) underwent significant change and led to considerable discussion.[13] The Working Paper, the Preliminary Draft and the First Draft all embodied the principle that each party to arbitration should bear its own expenses and that the charges for the facilities of the Centre as well as the fees and expenses of the tribunal should be borne equally by the parties. Only if a tribunal was to determine that a party had instituted the proceedings frivolously or in bad faith could it assess any of these costs against that party (History, Vol. I, pp. 274, 276; Vol. II, pp. 121, 122, 166/7, 177, 257/8, 277/8, 351/2, 410/1). Later it was made clear that the sanction against bad faith would apply equally to a respondent (Vol. I, pp. 274, 276; Vol. II, pp. 353, 531). The ensuing debate led to suggestions to assess costs against the unsuccessful party (at pp. 176, 351/2, 436, 671, 820, 873). Other proposals favoured a flexible system granting discretion to the tribunal in light of the circumstances of each case (at pp. 353, 873). Eventually, a vote showed a large majority in favour of letting the tribunal make the decision on the assessment of costs (at pp. 873, 898, 939, 993).[14]

### 1. Apportionment of Costs

**17**   Neither the Convention nor the attendant Rules and Regulations offer substantive criteria for the tribunal's decision on which party should bear the costs. Possible principles are the costs follow the event ("loser pays") maxim, the use of costs as a sanction for procedural misconduct (see Art. 45, paras. 71–75) or the equal sharing of costs.[15] Other instruments governing international arbitration are by no means uniform on this point. The UNCITRAL Arbitration Rules of 1976 adopt the rule that, in principle, the costs of arbitration shall be borne by the unsuccessful party.[16] The ICC Rules of Arbitration of 1998 give full discretion to the tribunal.[17]

**18**   The decision on the division of costs is not governed by the law applicable to the merits of the dispute in accordance with Art. 42. Art. 42 addresses the substantive law but not issues of procedure (see Art. 42, para. 3). The tribunal's decision on

---

10   See *Nurick*, Costs, p. 69. See also *CSOB* v. *Slovakia*, Award, 29 December 2004, at para. 371.
11   See Arbitration Rule 34(4).
12   See also Arbitration (Additional Facility) Rules, Art. 58.
13   See *Schill, S. W.*, Arbitration Risk and Effective Compliance – Cost-Shifting in Investment Treaty Arbitration, 7 The Journal of World Investment & Trade 653, 659 (2006).
14   See also *Nurick*, Costs, pp. 59/60.
15   *Rubins, N. D.*, The Allocation of Costs and Attorney's Fees in Investor-State Arbitration, 18 ICSID Review – FILJ 109, 126–129 (2003).
16   Art. 40, 15 ILM 716 (1976).          17   Art. 31(3), 36 ILM 1615 (1997).

*Article 61 – Apportionment of Expenses*                                      1229

the costs relates to the procedure.[18] ICSID tribunals have not relied on Art. 42 when apportioning the costs of proceedings.

### a) Loser Pays

The practice of ICSID tribunals in apportioning costs is neither clear nor uniform.[19] In some cases, tribunals awarded costs against the party that had lost on the merits of the case. If the claimant was partly victorious, costs may be apportioned proportionally.[20] The practice that costs follow the event serves the purposes of compensating the victorious party and of dissuading unmeritorious actions[21] (see paras. 35–38 *infra*). This principle seems to be gaining ground in ICSID practice but is still far from generally accepted.[22]

Decisions to the effect that the losing party bears the entire burden of the procedural costs, including the other party's expenses, have remained rare.[23] In *ADC* v. *Hungary* the Tribunal, in awarding the entire costs to the successful claimant, found that "ICSID arbitrators do in practice award costs in favour of the successful party and sometimes in large sums" and that "the Tribunal can find no reason to depart from the starting point that the successful party should receive reimbursement from the unsuccessful party".[24] In a larger group of cases the tribunals awarded certain parts of the costs or a higher proportion of the costs against the losing party.[25] The award of a lump sum towards the reimbursement of costs is another possibility.[26]

In *SPP* v. *Egypt*, the Claimants were successful on the merits. The Claimants sought reimbursement of both their legal and arbitration costs from the Government including costs of proceedings leading to an ICC award that was subsequently annulled (see Art. 26, paras. 34–40). They argued that a great deal of the

**19**

**20**

**21**

---

18  *Nurick*, Costs, p. 58; *Gotanda*, Awarding Costs, pp. 15 *et seq*. *Rubins*, Allocation, p. 128, notes that some jurisdictions categorize cost-shifting as a substantive issue.

19  See also *Nurick*, Costs, pp. 60–64; *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 710 (1993); *Gotanda*, Awarding Costs, pp. 1/2, 20 *et seq*.; *Rubins*, Allocation, pp. 112–119.

20  *Gotanda*, Awarding Costs, pp. 38 *et seq*.; *Rubins*, Allocation, p. 127.

21  *Schill*, Arbitration Risk, p. 665.

22  See *Rubins*, Allocation, p. 127; *Weiniger, M./Page, M*., Treaty Arbitration and Investment Disputes: Adding up the Costs, 1 Global Arbitration Review 44 (2006).

23  *Scimitar* v. *Bangladesh*, Award, 4 May 1994, paras. 30–32; *Genin* v. *Estonia*, Decision on Supplementation and Rectification, 4 April 2002, paras. 20, 21; *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, para. 90; *Telenor* v. *Hungary*, Award, 13 September 2006, para. 107.

24  *ADC* v. *Hungary*, Award, 2 October 2006, paras. 531, 533.

25  *AGIP* v. *Congo*, Award, 30 November 1979, 1 ICSID Reports 329; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, para. 116; *Wena Hotels* v. *Egypt*, Award, 8 December 2000, para. 130; *Soufraki* v. *UAE*, Award, 7 July 2004, para. 85; *Inceysa* v. *El Salvador*, Award, 2 August 2006, para. 338; *Champion Trading* v. *Egypt*, Award, 27 October 2006, paras. 165–178; *PSEG* v. *Turkey*, Award, 19 January 2007, paras. 352–353; *Siemens* v. *Argentina*, Award, 6 February 2007, para. 402; *Desert Line Projects* v. *Yemen*, Award, 6 February 2008, para. 304; *Plama* v. *Bulgaria*, Award, 27 August 2008, paras. 307–324.

26  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76; *CSOB* v. *Slovakia*, Award, 29 December 2004, para. 372.

preparation involved in the ICC arbitration obviated the need to undertake the same work in the ICSID proceedings.[27] The Tribunal held that legal costs must be considered as part and parcel of the compensation. But only the expenses for work that was relevant and useful to the ICSID proceedings were to be included in the compensation. The Claimants submitted a detailed list of all payments made for legal, audit and arbitration costs in connection with the ICC proceedings, related domestic court proceedings and ICSID proceedings. The Tribunal estimated that approximately one half of the expenses in the ICC proceedings were spent on work that was utilized directly in the ICSID proceedings. It awarded the entire amount of the expenses incurred by the Claimants in the ICSID proceedings and one half of those in the ICC proceedings.[28]

### b) Procedural Conduct

**22**    In a number of cases, tribunals awarded costs against parties as a sanction against what they saw as dilatory or otherwise improper conduct in the proceedings[29] (see also Art. 45, paras. 71–75). In some cases the additional costs arose from the respondents' non-participation in the proceedings.[30] In *LETCO* v. *Liberia*, the Government did not appear nor present any case (see Art. 45, paras. 15, 44, 52, 74, 88). In addition, the Government instituted proceedings in its own courts in respect of the same dispute (see Art. 26, para. 134). LETCO had claimed the full costs of the arbitration including ICSID's administrative costs and the arbitrators' fees as well as its own expenses.[31] The Tribunal awarded these costs in full and said:

> This decision is based largely on Liberia's procedural bad faith. Not only did Liberia fail to partake in these arbitral proceedings, contrary to its contractual agreement, but it has also undertaken judicial proceedings in Liberia in order to nullify the results of this arbitration. The foregoing decision of the Tribunal is made pursuant to Article 61(2) of the ICSID Convention and based on the criteria described in the preceding paragraphs . . .[32]

**23**    In *MINE* v. *Guinea*[33] the Respondent made a counterclaim for costs related to the attachment by MINE of Guinea's property contrary to the Tribunal's recommendation (see Art. 26, paras. 149–153; Art. 47, para. 106). The Tribunal considered that MINE's action in connection with the attachments was contrary to ICSID's exclusive jurisdiction. But the Tribunal also found that there were circumstances that excused MINE somewhat. Therefore, it awarded a reduced sum towards Guinea's costs and legal fees relating to the attachment proceedings.[34]

---

27  *SPP* v. *Egypt*, Award, 20 May 1992, para. 205.    28  At paras. 207–211.
29  See also *Rubins*, Allocation, p. 127; *Schill*, Arbitration Risk, p. 666.
30  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, at paras. 4.124–4.129.
31  *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 370.
32  At p. 378.
33  *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 61.
34  At p. 77.

In *Amco* v. *Indonesia*, in the Resubmitted Case, Amco demanded an adjustment **24** of costs in connection with allegedly stolen documents. The claim was rejected on factual grounds for lack of evidence.[35]

In *Zhinvali* v. *Georgia*, the Respondent had missed the deadline for objections to **25** jurisdiction and had submitted its objections with considerable delay. The Tribunal found that this led to disruption and to "unnecessary escalation in the costs of the Claimant". Nevertheless, the Tribunal accepted the objections and found on their basis that it lacked jurisdiction. In its decision on costs the Tribunal held that fundamental fairness required that the Respondent reimburse the Claimant's attorneys' fees that had arisen as a consequence of the Respondent's irregular behaviour.[36]

In several cases tribunals took exception to the way the case was presented before **26** it and awarded costs accordingly.[37] In *Generation Ukraine* v. *Ukraine* the Tribunal found that the Claimant's written presentation had been convoluted, repetitive and legally incoherent, that its characterization of evidence had been unacceptably slanted, that its position had been inconsistent and that its damages claim rested on the flimsiest foundation. Therefore it ordered that all the Respondent's payments to ICSID plus a lump sum towards its legal fees be reimbursed.[38]

## c) Payment for Parts of Proceedings

The apportionment of costs need not relate to the entire proceeding. The Tribunal **27** may charge one party the costs or a major share of the costs of a particular part of the proceeding. Often this will be in reaction to undesirable conduct by a party in the proceedings. The Arbitration Rules provide to this end:

> **Rule 28**
> *Cost of Proceeding*
> (1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:
> . . .
>> (b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.

A party whose conduct has necessitated a particular measure may have to bear **28** the resulting costs. For instance, if one party wishes to have the tribunal visit the scene connected with the dispute in accordance with Art. 43(b), the tribunal may decide to do so at the cost of that party[39] (see Art. 43, paras. 119–124). If a party

---

35  *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 287–291.
36  *Zhinvali* v. *Georgia*, Award, 24 January 2003, paras. 420–430, 433.
37  See also *Azurix* v. *Argentina*, Award, 14 July 2006, para. 441; *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 104–107; *Desert Line Projects* v. *Yemen*, Award, 6 February 2008, para. 304.
38  *Generation Ukraine* v. *Ukraine*, Award, 16 September 2003, paras. 24.2–24.8.
39  See Note B to Arbitration Rule 27 of 1968, 1 ICSID Reports 90.

1232          THE ICSID CONVENTION: A COMMENTARY

fails to comply with a procedural direction by the tribunal the resulting additional costs may be awarded against it.[40]

**29**     In *AMT* v. *Zaire*, the Government was not represented at the hearings. The Tribunal adopted a Procedural Order granting a period of grace in accordance with Art. 45(2) (see Art. 45, paras. 37, 38, 53, 89). The Order provided for a supplemental hearing subject to the condition that the Government cover the fees and expenses of the arbitrators as well as for the administrative fees related to the hearing. The Government was to deposit the necessary funds before the hearing. The Government failed to react to this Order and the supplemental hearing was never held.[41]

**30**     In *SOABI* v. *Senegal*, the Government questioned the figures which formed the basis of SOABI's claims. The Government pointed out that SOABI had failed to explain any of its figures and demanded that an accounting expert be appointed at SOABI's expense.[42] The Tribunal accepted this position and decided that the fees and expenses of the expert, appointed by the Tribunal, should be borne by SOABI[43] (see Art. 43, para. 28).

**31**     In the *Vivendi* case the *ad hoc* Committee found most of Argentina's Request for Supplementation and Rectification not only unfounded but also inappropriate since it consisted mostly of attempts to re-argue substantive elements of the Decision on Annulment. Therefore, it decided that Argentina was to pay the entirety of the fees and expenses incurred by the *ad hoc* Committee in connection with the Request.[44]

**32**     The Award in the Resubmitted Case in *Vivendi* stated that the Respondent's objections to jurisdiction were not only without merit but most of them had been unsuccessfully raised previously by Argentina before the Original Tribunal and the *ad hoc* Committee as well as before numerous other tribunals in other cases. Also, one jurisdictional objection had been raised for the first time eight and a half years into the proceedings. All of the objections were unfounded and had been raised inappropriately mostly in an attempt to re-argue elements of earlier decisions. Argentina's conduct had unnecessarily extended and added considerably to the cost of the proceedings. Therefore, the Claimants were awarded reimbursement of their reasonable costs in the jurisdictional phase.[45]

*d) Equal Sharing*

**33**     In a large number of cases the tribunals decided that each party was to bear half of the fees and expenses of the arbitrators and of the charges for the use of the Centre's facilities, and that each party was to bear its own expenses for the

---

40   *Azurix* v. *Argentina*, Award, 14 July 2006, para. 441.
41   *AMT* v. *Zaire*, Award, 21 February 1997, paras. 3.25, 3.26.
42   *SOABI* v. *Senegal*, Award, 25 February 1988, para. 9.05.
43   At paras. 9.26, 12.05 (f) (iii).
44   *Vivendi* v. *Argentina*, Decision on Supplementation and Rectification of Annulment Decision, 28 May 2003, paras. 43, 44. See also *Genin* v. *Estonia*, Decision on Supplementation and Rectification, 4 April 2002, paras. 20, 21.
45   *Vivendi* v. *Argentina*, Resubmitted Case: Award, 20 August 2007, paras. 10.2.3–10.2.6.

preparation and presentation of its case. In the first Award in *Amco* v. *Indonesia*, the Tribunal based this decision on the finding that both parties had done their best to assist the Tribunal in its task. In addition, the Tribunal pointed to the size of the claim compared to the amount that was awarded.[46] In other cases too, the tribunals pointed out that both parties had acted professionally and in good faith[47] or that the case had involved complex and novel questions.[48]

Even the cases in which tribunals declined to award costs indicate a growing **34** awareness of the principle that the losing party should bear the consequences in terms of costs also. In many of these cases the tribunals pointed out that both parties had been partly successful and partly unsuccessful.[49] In one case the Tribunal found that the case had been decided on a matter of factual evidence against the party bearing the burden of proof.[50] In a number of cases the decision to split the costs of the arbitration evenly and to leave the parties with their own expenses was based on a finding that the winning party had been guilty of some wrongdoings of a substantive or procedural nature.[51] Decisions that simply adopt the formula of the equal sharing of costs and the payment of each party's own expenses without giving specific reasons[52] have become less frequent.

---

46  *Amco* v. *Indonesia*, Award, 20 November 1984, para. 291.

47  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 42, 44; *Fedax* v. *Venezuela*, Award, 9 March 1998, paras. 34, 35; *Azinian* v. *Mexico* (AF), Award, 1 November 1999, paras. 125, 126; *Waste Management* v. *Mexico II* (AF), Award, 30 April 2004, paras. 182, 184; *Parkerings* v. *Lithuania*, Award, 11 September 2007, para. 463.

48  *Azinian* v. *Mexico* (AF), Award, 1 November 1999, paras. 125, 126; *ADF* v. *United States* (AF), Award, 9 January 2003, para. 200; *RFCC* v. *Morocco*, Award, 22 December 2003, paras. 112, 113.

49  *Atlantic Triton* v. *Guinea*, Award, 21 April 1986, 3 ICSID Reports 42, 44; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 12.05; *Tradex* v. *Albania*, Award, 29 April 1999, paras. 206, 207; *Maffezini* v. *Spain*, Award, 13 November 2000, paras. 98, 99; *Vivendi* v. *Argentina*, Award, 21 November 2000, paras. 95, 96; *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, Appendix C, paras. 170–172; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 176; *Mondev* v. *United States* (AF), Award, 11 October 2002, para. 159; *Autopista* v. *Venezuela*, Award, 23 September 2003, para. 425; *RFCC* v. *Morocco*, Award, 22 December 2003, paras. 112, 113; *MTD* v. *Chile*, Award, 25 May 2004, para. 252; *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. 43; *Enron* v. *Argentina*, Award, 22 May 2007, para. 453; *LG&E* v. *Argentina*, Award, 25 July 2007, paras. 112–114.

50  *Salini* v. *Jordan*, Award, 31 January 2006, paras. 103, 104.

51  *Gruslin* v. *Malaysia*, Award, 27 November 2000, paras. 27.5–27.12; *Genin* v. *Estonia*, Award, 25 June 2001, paras. 379–383; *Olguín* v. *Paraguay*, Award, 26 July 2001, para. 85; *Parkerings* v. *Lithuania*, Award, 11 September 2007, para. 464.

52  *Adriano Gardella* v. *Ivory Coast*, Award, 29 August 1977, para. 412; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 77; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 286; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 58; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, paras. 8.04, 8.05; *AMT* v. *Zaire*, Award, 21 February 1997, para. 7.21; *Santa Elena* v. *Costa Rica*, Award, 17 February 2000, para. 109; *Metalclad* v. *Mexico* (AF), Award, 30 August 2000, para. 130; *Loewen* v. *United States* (AF), Award, 26 June 2003, para. 240; *Joy Mining* v. *Egypt*, Award, 6 August 2004; *Lucchetti* v. *Peru*, Award, 7 February 2005; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 150; *Tokios Tokelès* v. *Ukraine*, Award, 26 July 2007, para. 146; *MCI* v. *Ecuador*, Award, 31 July 2007, para. 372; *Sempra* v. *Argentina*, Award, 28 September 2007.

**35**     In *Azinian* v. *Mexico*,[53] the Tribunal pointed out that the claim had failed in its entirety and that in ordinary circumstances it was common in international arbitration that a losing claimant would be ordered to bear the costs of the arbitration, as well as to contribute to the prevailing respondent's reasonable costs of representation. In the particular case, however, the Tribunal found that there were special circumstances militating against an award of costs against the losing claimant. These circumstances included unfamiliarity with a novel dispute settlement mechanism and the efficient and professional presentation of the case.

**36**     In *Noble Ventures* v. *Romania*, the Tribunal noted that the "loser pays" principle is not common to all national laws or international law, and in particular is stated neither in the ICSID Convention nor the Arbitration Rules. In view of the Claimant's partial success it decided that the cost burden be shared equally by the parties.[54]

**37**     In *Fireman's Fund* v. *Mexico*, the Tribunal found that since the decision on the preliminary question had been decided on a technicality and the Claimant, although it had lost, had a respectable claim on the merits, the principle that costs follow the event should not be applied.[55]

**38**     In *Fraport* v. *Philippines*, the Tribunal referred to a general practice according to which in international arbitration the successful party should recover its legal costs. But it found this approach inappropriate under the circumstances seeing that the claim had failed on jurisdictional grounds. Therefore, there was no successful party on the merits in the traditional sense.[56] This decision is remarkable since the jurisdictional decision was based on the Claimant's wrongdoing: the claim had failed since the investment was found to be in violation of the host State's law.

**39**     In decisions on annulment, the costs of the proceedings before the *ad hoc* committees were mostly divided equally, with each party bearing its own expenses.[57] In *Amco I*, the *ad hoc* Committee pointed out that both parties had shown equal diligence in helping the *ad hoc* Committee reach its conclusions.[58] In *Klöckner I*, the *ad hoc* Committee mentioned that the Applicant's charge of lack of impartiality, although ultimately unfounded (see Art. 52, paras. 294–298), was not rash for purposes of the decision on the costs of the proceeding.[59] In *Vivendi*, the *ad hoc*

53   *Azinian* v. *Mexico* (AF), Award, 1 November 1999, paras. 125, 126. This case was decided under the Additional Facility. Art. 58 of the Additional Facility Arbitration Rules is substantively identical to Art. 61(2) of the Convention.
54   *Noble Ventures* v. *Romania*, Award, 12 October 2005, paras. 234–236.
55   *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2006, paras. 220–222.
56   *Fraport* v. *Philippines*, Award, 16 August 2007, para. 405.
57   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 8.01; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 67; *Soufraki* v. *UAE*, Decision on Annulment, 5 June 2007, para. 138; *Lucchetti* v. *Peru*, Decision on Annulment, 5 September 2007, para. 131; *CMS* v. *Argentina*, Decision on Annulment, 25 September 2007, paras. 161, 162.
58   *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, para. 125. To the same effect also the second Decision on Annulment in this case of 3 December 1992, para. 10.01.
59   *Klöckner* v. *Cameroon*, Decision on Annulment, 3 May 1985, paras. 111, 180. The second Decision on Annulment in this case of 17 May 1990 reached the same result without stating reasons therefor.

Committee pointed out that the Claimants had only partly succeeded.[60] In *Wena Hotels* the *ad hoc* Committee cited "the importance of the arguments advanced by the Parties" as reason for its decision on costs.[61] In *MTD* v. *Chile* the *ad hoc* Committee took into account that both parties were held to be at fault in relation to the dispute.[62]

**40**  In *CDC* v. *Seychelles*, the *ad hoc* Committee departed from this practice and awarded the entirety of the costs to the prevailing party. In doing so it pointed out that the Republic's case for annulment "was fundamentally lacking in merit".[63]

In *Repsol* v. *Petroecuador*, the *ad hoc* Committee ordered a major part of the costs to be borne by Petroecuador on account of its failure to make advance payments[63a] (see Art. 52, para. 104).

### *2. Reasons*

**41**  Under the last sentence of Art. 61(2), the tribunal's decision on costs forms part of the award (see paras. 62–74 *infra*). Under Art. 48(3) the award shall state the reasons upon which it is based (see Art. 48, paras. 54–68). Under Art. 52(1)(e), failure to state reasons may lead to an award's annulment (see Art. 52, paras. 338–362). Failure to state reasons for part of an award may lead to the award's partial annulment (see Art. 52, paras. 494–510).

**42**  The Convention and the attendant Rules and Regulations give tribunals broad discretion in awarding costs and offer little guidance on how this discretion is to be exercised.[64] In *MINE* v. *Guinea*, the Government requested the annulment of the decision to award a lump sum towards the costs of the ICSID arbitration[65] (see para. 72 *infra*) because the Tribunal had failed to state the reasons therefor. The *ad hoc* Committee was of the opinion that a discretionary power absolved a tribunal from stating reasons for its decision:

> Article 61(2) of the Convention provides that the Tribunal shall decide how and by whom the costs of proceedings including the expenses incurred by the parties, the fees and expenses of the members of the Tribunal and the charge for the use of the facilities of the Centre shall be paid. The article confers a discretionary power on the Tribunal which was in particular under no obligation to state reasons for awarding costs against the losing party. Guinea has not alleged that the Tribunal abused its discretion.[66]

**43**  This argument is not convincing. The exercise of discretion and the obligation to state reasons are two different things. A tribunal that exercises discretion is not bound by legal rules and is hence under no obligation to state such rules

---

60  *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, paras. 117, 118.
61  *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, paras. 112, 114.
62  *MTD* v. *Chile*, Decision on Annulment, 21 March 2007, paras. 109–112.
63  *CDC* v. *Seychelles*, Decision on Annulment, 29 June 2005, paras. 89, 90.
63a  *Repsol* v. *Petroecuador*, Decision on Annulment, 8 January 2007, para. 88.
64  See also *Nurick*, Costs, pp. 57 *et seq.*
65  See *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76.
66  *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.111.

when making a decision. But it is still under an obligation to explain the equitable motives that have led it to that decision. This situation is closely analogous to that of a tribunal that has been authorized to decide *ex aequo et bono* in accordance with Art. 42(3). Such a tribunal is also free to use its discretionary power and need not rely on rules of law. But this does not absolve the tribunal from basing its award on rational rather than arbitrary considerations. These considerations must be stated expressly. Reasons are not restricted to purely legal arguments. Equitable considerations applied in the exercise of discretion also need to be explained (see Art. 48, para. 57; Art. 52, para. 349). The practice of tribunals and *ad hoc* committees indicates that most decisions do, in fact, contain a statement of reasons on costs.

**44**    The Convention's *travaux préparatoires*, the practice of ICSID tribunals and the practice of other arbitration regimes[67] offer several principles for a decision on costs. The most important of these principles may be stated as follows:

- If a party has completely or overwhelmingly prevailed on the merits, the losing party may have to bear a major part or all of the costs of the arbitration and part or all of the expenses of the winning party.
- Misconduct by a party during the proceedings such as non-cooperation with the tribunal, disregard for a recommendation of provisional measures, default in participating in the proceedings or violation of the Centre's exclusive jurisdiction should be reflected in the award on costs.
- A party that is responsible for a particular part of the proceeding should bear the resulting costs.
- In the absence of reasons to decide otherwise, each party should bear half of the costs of the arbitration including the charges for the Centre's services and the fees and expenses of the arbitrators and should pay for its own expenses in preparing and presenting its case.

**45**    These principles give sufficient rational guidance to tribunals in making decisions on costs. Tribunals appear to be motivated by these principles in most of their decisions. The application of one or several of these principles should be explained by the tribunals as part of the reasons.

### 3. Advance Payments

### a) Necessity of Advance Payments

**46**    Under Administrative and Financial Regulation 14(2) (see Art. 60, para. 15), the Centre must make payments to members of conciliation commissions, arbitral tribunals, *ad hoc* committees, witnesses and experts summoned at the initiative of one of these bodies, members of the Secretariat of the Centre, including persons specially engaged by the Centre for a particular proceeding, and hosts of proceedings held away from the seat of the Centre. In addition, there will be other direct expenses in connection with a proceeding (see Art. 59, para. 10). These

---

67    See *Nurick*, Costs, pp. 64 *et seq*.

payments are financed through advance payments by the parties.[68] Other instruments governing international arbitration similarly provide for advance payments by the parties.[69]

Administrative and Financial Regulation 14(3) contains detailed provisions on advance payments: **47**

> (3) In order to enable the Centre to make the payments provided for in paragraph (2), as well as to incur other direct expenses in connection with a proceeding (other than expenses covered by Regulation 15):
>> (a) the parties shall make advance payments to the Centre as follows:
>>> (i) initially as soon as a Commission or Tribunal has been constituted, the Secretary-General shall, after consultation with the President of the body in question and, as far as possible, the parties, estimate the expenses that will be incurred by the Centre during the next three to six months and request the parties to make an advance payment of this amount;
>>> (ii) if at any time the Secretary-General determines, after consultation with the President of the body in question and as far as possible the parties, that the advances made by the parties will not cover a revised estimate of expenses for the period or any subsequent period, he shall request the parties to make supplementary advance payments.
>> (b) the Centre shall not be required to provide any service in connection with a proceeding or to pay the fees, allowances or expenses of the members of any Commission, Tribunal or Committee, unless sufficient advance payments shall previously have been made;
>> (c) if the initial advance payments are insufficient to cover estimated future expenses, prior to requesting the parties to make additional advance payments, the Secretary-General shall ascertain the actual expenses incurred and commitments entered into by the Centre with regard to each proceeding and shall appropriately charge or credit the parties;[70]

The payments are to be made on the basis of quarterly or half yearly statements by the Secretary-General. The Secretary of the Tribunal, acting on behalf of the Secretary-General, prepares these statements in consultation with the President of the commission, tribunal or *ad hoc* committee in question. The first advance payment is due soon after the constitution of the body in question. Supplementary advances can be requested at any time. **48**

---

68  See also *Branson, D. J./Tupman, W. M.*, Selecting an Arbitral Forum: A Guide to Cost-Effective International Arbitration, 24 Virginia Journal of International Law 917, 933 (1984); *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 709 (1993); *Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, pp. 5, 7 (1988); *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings Under the ICSID Convention, 13 ICSID Review – FILJ 85, 90 (1998).

69  See UNCITRAL Arbitration Rules, 1976, Art. 41, 15 ILM 717 (1976); ICC Rules of Arbitration, 1998, Art. 30, 36 ILM 1614 (1997).

70  Under Article 5 of the Additional Facility Rules, Regulation 14 of the ICSID Administrative and Financial Regulations shall apply *mutatis mutandis* to proceedings under the Additional Facility.

**49**    The Centre is under no obligation to provide services in connection with a proceeding or to pay fees and expenses under Art. 60 unless sufficient advance payments have been made. If advance payments are not forthcoming, proceedings may be stayed and ultimately discontinued (see para. 54 *infra*).

### b) Apportionment of Advance Payments

**50**    The duty to make advance payments is incumbent, in principle, on both parties. Administrative and Financial Regulation 14(3)(d) provides:

> (d) in connection with every conciliation proceeding, and in connection with every arbitration proceeding unless a different division is provided for in the Arbitration Rules or is decided by the parties or the Tribunal, each party shall pay one half of each advance or supplemental charge, without prejudice to the final decision on the payment of the cost of an arbitration proceeding to be made by the Tribunal pursuant to Article 61(2) of the Convention. All advances and charges shall be payable, at the place and in the currencies specified by the Secretary-General, as soon as a request for payment is made by him. If the amounts requested are not paid in full within 30 days, then the Secretary-General shall inform both parties of the default and give an opportunity to either of them to make the required payment. At any time 15 days after such information is sent by the Secretary-General, he may move that the Commission or Tribunal stay the proceeding, if by the date of such motion any part of the required payment is still outstanding. If any proceeding is stayed for non-payment for a consecutive period in excess of six months, the Secretary-General may, after notice to and as far as possible in consultation with the parties, move that the competent body discontinue the proceeding;

**51**    The basic rule is that each party shall pay half of every advance. This rule is subject to any contrary agreement of the parties. A tribunal may also decide on a different apportionment of advances (see paras. 55, 56 *infra*). Any agreement, decision or actual payment of advances does not prejudice the tribunal's final decision on the division of costs between the parties.

**52**    Non-payment of advances by a party will not block the progress of proceedings. If the amounts requested are not paid within 30 days, the Secretary of the Tribunal, acting on behalf of the Secretary-General, will inform both parties of the default. Either of them will then have a chance to make the necessary payment. In other words, the diligent party is given the opportunity to assume the defaulting party's advance payment in order to enable the proceeding to move on. The tribunal's final decision on costs will take the default in making advance payments into account.

**53**    In several cases parties to ICSID arbitrations have failed to make any or some of the required advance payments. The proceedings went forward on the basis of deposits made by the Claimants whose advances were eventually reflected in the awards on costs (see para. 61 *infra*).

**54**    If the payment of the advance is still outstanding 15 days after the Secretary's notice of the default (see para. 52 *supra*), the Secretary of the Tribunal, acting

on behalf of the Secretary-General, may move a stay of the proceedings.[71] If the proceedings are stayed for non-payment for a consecutive period of over six months, the Secretary-General may move that the proceedings be discontinued. Before doing so, the Secretary-General must give the parties notice and, as far as possible, consult with them. The Secretary-General's motion and the commission's, tribunal's or *ad hoc* committee's decision to stay or to discontinue are discretionary.[72]

In principle, each party shall make half of each advance payment. A special service to a party in connection with a proceeding will be performed by the Centre only if that party has deposited an amount sufficient to cover the costs[73] (see Art. 59, para. 12). A tribunal may also decide on a different division of costs. Arbitration Rule 28(1)(a) provides:    **55**

**Rule 28**

*Cost of Proceeding*

(1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:

    (a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;

Therefore, the tribunal is not restricted to apportioning costs in its final award on costs (see also paras. 27–32 *supra*). During the proceedings, the tribunal may decide that one party has to bear a higher share of the costs.[74] A party that causes extra costs through a lack of cooperation or by making additional procedural demands may be requested to make advances to cover these costs. This was the case in *AMT* v. *Zaire* where the Tribunal ordered the Government to deposit additional funds required to finance a supplementary hearing that had become necessary as a consequence of the Government's default[75] (see para. 29 *supra*).    **56**

In the case of annulment proceedings, the party requesting annulment has to make the entire advance payment. Administrative and Financial Regulation 14(3)(e) provides to this end:    **57**

    (e) in the event that an application for annulment of an award is registered, the above provisions of this Rule shall apply *mutatis mutandis*, except that the applicant shall be solely responsible for making the advance payments requested by the Secretary-General to cover expenses following the constitution of the Committee, and without prejudice to the

---

71  See *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 13.

72  In the second case of *Gruslin* v. *Malaysia* annulment proceedings were discontinued for lack of payment of advances pursuant to Administrative and Financial Regulation 14(3)(d). The order for the discontinuance of the proceeding was issued by the *ad hoc* Committee on 2 April 2002.

73  Administrative and Financial Regulation 15(1).

74  For an example of an unsuccessful attempt by one party to have the Tribunal allocate advance payments to the other party see *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, para. 295.

75  *AMT* v. *Zaire*, Award, 21 February 1997, para. 3.25.

> right of the Committee in accordance with Article 52(4) of the Convention to decide how and by whom expenses incurred in connection with the annulment proceeding shall be paid.

**58**     This provision was introduced in 1984. It is intended to prevent frivolous annulment applications. An additional consideration was the fact that the party in whose favour the award was rendered might be reluctant to cooperate in financing the costs of a procedure for its annulment.[76] Curiously, this provision does not extend to requests for revision of the award under Art. 51. In annulment proceedings, the advances made by the requesting party are subject to the *ad hoc* committee's final decision on the apportionment of costs (see paras. 39, 40 *supra*; para. 61 *infra*).

### c) Final Settlement of Advance Payments

**59**     All advance payments and their apportionment are provisional in the sense that the award will decide how and by whom all costs will be paid. In the case of conciliation, the parties will always bear their own costs and will share the other costs of the proceedings in equal portions (see paras. 5–7 *supra*).

**60**     In order to enable a tribunal to make its definitive decision on costs, the parties and the Secretary-General must submit to the tribunal full statements and accounts. These statements and accounts include, but are not restricted to, advance payments by the parties. Arbitration Rule 28(2) provides to this end:

> (2) Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding.

**61**     The Secretary of the Tribunal and the Centre's administrative staff prepare a final statement of account which is approved by the World Bank's accounting department. If a party has failed to make any advances or has not paid its full share of advances, it will be debited accordingly and in line with the award's decision on the final apportionment of costs.[77] If each party has paid its half of all advances and the tribunal decides that the parties shall bear the costs of the proceedings in equal shares, no settlement of advances is necessary between the parties.[78] In

---

76   *Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, pp. 4, 5 (1985).

77   See *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, 1 ICSID Reports 366/7; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 355, 378/9; *SOABI* v. *Senegal*, Award, 25 February 1988, 2 ICSID Reports 274–276; *AMT* v. *Zaire*, Award, 21 February 1997, 5 ICSID Reports 37; *Fedax* v. *Venezuela*, Award, 9 March 1998, para. 34; *Middle East Cement* v. *Egypt*, Award, 12 April 2002, para. 177; *LESI-DIPENTA* v. *Algeria*, Award, 10 January 2005, para. 43; *PSEG* v. *Turkey*, Award, 19 January 2007, para. 353.

78   See *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, para. 59; *Cable TV* v. *St. Kitts and Nevis*, Award, 13 January 1997, para. 8.04; *Genin* v. *Estonia*, Award, 25 June 2001, para. 384; *Salini* v. *Jordan*, Award, 31 January 2006, para. 104; *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2006, para. 220.

*Article 61 – Apportionment of Expenses*                              1241

annulment proceedings, if the costs of the proceedings are borne equally by the parties (see para. 39 *supra*), the party that has requested the annulment will get half of its advances (see paras. 57, 58 *supra*) reimbursed by the other party.[79]

### D.  "Such decision shall form part of the award."

A decision on costs is a necessary part of every award. Arbitration Rule 47(1)(j) **62** lists "any decision of the Tribunal regarding the cost of the proceeding" as an element of the award (see Art. 48, para. 23). An award is the tribunal's final decision (see Art. 48, para. 22). Interim decisions, such as decisions recommending provisional measures under Art. 47, decisions upholding jurisdiction under Art. 41, or procedural orders under Art. 44, are not awards and do not contain decisions on costs except in the case of decisions on advance payments. A tribunal's finding that it does not have jurisdiction is an award (see Art. 41, paras. 73, 74) and must contain a decision on costs.

Decisions on rectification, interpretation and revision in accordance with **63** Arts. 49(2), 50 and 51 become part of the award to which they relate (see Art. 49, paras. 78–80; Art. 50, paras. 27–29; Art. 51, para. 25). Any additional costs that arise in connection with these procedures would have to be assessed and apportioned by the tribunal in the relevant decision.[80]

Decisions of *ad hoc* committees on requests for annulment also contain deci- **64** sions on costs. Art. 61(2) and the attendant Rules and Regulations apply to annulment proceedings subject to certain modifications (see paras. 4, 39, 57, 58, 61 *supra*).

If the parties reach a settlement before an award is rendered they may, in accor- **65** dance with Arbitration Rule 43(2), request the tribunal to embody the settlement in an award. If the tribunal accedes to the request, the award should contain a decision on costs either based on the settlement or in addition to it. But if the parties do not request an award (Arbitration Rule 43(1)) or if the tribunal declines to endorse the settlement in the form of an award, the discontinuance of the proceedings will simply be noted in an order. Such an order will not normally contain a decision on costs[81] (see Art. 48, paras. 70–73).

The proceedings may also be discontinued upon the request of one party with **66** the acquiescence of the other party or because of the party's failure to act (Arbitration Rules 44 and 45) (see Art. 45, paras. 55–57). In addition, the proceedings

---

79  See *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 8.01; *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 292–295; *Wena Hotels* v. *Egypt*, Decision on Annulment, 5 February 2002, para. 114; *Vivendi* v. *Argentina*, Decision on Annulment, 3 July 2002, para. 119; *Mitchell* v. *DR Congo*, Decision on Annulment, 1 November 2006, para. 67.

80  See *Santa Elena* v. *Costa Rica*, Rectification of Award, 8 June 2000, para. 16; *Maffezini* v. *Spain*, Rectification of the Award, 31 January 2001, para. 21; *Genin* v. *Estonia*, Decision on Supplementation and Rectification, 4 April 2002, paras. 20, 21; *Vivendi* v. *Argentina*, Decision on Supplementation and Rectification of Annulment Decision, 28 May 2003, paras. 43, 44; *Wena Hotels* v. *Egypt*, Decision on Interpretation, 31 October 2005, para. 139.

81  See also Note B to Arbitration Rule 43 of 1968, 1 ICSID Reports 105.

may be discontinued because of the nonpayment of advances under Administrative and Financial Regulation 14(3)(d) (see paras. 50, 54 *supra*). In these cases the discontinuance will be noted in an order. Such an order will not normally contain a decision on costs. Rather, the parties must settle between themselves the apportionment of the costs incurred prior to the discontinuance.[82]

**67**     Costs incurred in the context of proceedings for the recognition and enforcement of an award in accordance with Art. 54 cannot be assessed and apportioned by an ICSID tribunal. A domestic court dealing with the recognition or enforcement of an award may award costs arising from these proceedings.[83]

**68**     The inclusion of the decision on costs into the award subjects that decision to the Convention's requirements for awards. In particular, under Art. 48(3) the decision on costs must deal with every question submitted to the tribunal in this context and must state the reasons upon which it is based (see paras. 41–45 *supra*).

**69**     The decision on costs is subject to supplementation and rectification in accordance with Art. 49(2). In *LETCO* v. *Liberia*, the Claimant submitted a Request for Rectification of the Award's decision on costs. The need for the Award's rectification arose not from an error committed by the Tribunal, but rather from additional payments made by LETCO to ICSID and from billings by LETCO's law firm after the Tribunal's calculation of costs (see Art. 49, paras. 44, 45). In its Decision on Rectification the Tribunal made the adjustments to the Award as requested.[84]

**70**     The decision on costs is also subject to interpretation and revision in accordance with Arts. 50 and 51. For instance, a tribunal that has decided that each party shall bear half of the costs of the arbitration may interpret this decision to mean that the parties shall bear the costs for the charges of the Centre and for the arbitrators' fees and expenses in equal shares and that each party shall bear its own costs. A tribunal may revise its decision on costs if new facts affecting the costs emerge that were unknown when the award was rendered.

**71**     The decision on costs is also subject to annulment in accordance with Art. 52. For instance, the decision on costs may be attacked for excess of powers if the amount awarded goes beyond the actual expenses incurred in the course of the proceedings. More likely, a request for annulment of a decision on costs may be based on the charge that the award has failed to state the reasons on which it is based[85] (see paras. 41–43 *supra*).

**72**     In *MINE* v. *Guinea*, the Tribunal had awarded a lump sum to MINE towards its fees and expenses apparently on the basis of the "loser pays" principle.[86] The *ad hoc* Committee annulled the Award in part. As to the Tribunal's decision on costs, it held that this part of the Award had to be annulled since it was inextricably linked with the damages portion of the Award which had been annulled. The reasoning

---

82    See Note D to Arbitration Rule 27 of 1968, 1 ICSID Reports 90.

83    See *e.g.*, *SOABI* v. *Senegal*, Cour d'appel, Paris, 5 December 1989, 2 ICSID Reports 340.

84    *LETCO* v. *Liberia*, Decision on Rectification, 17 June 1986, 2 ICSID Reports 380.

85    See *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.110.

86    *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 76.

behind the award of costs, namely that Guinea was the losing party, had thus disappeared and hence a new decision was necessary[87] (see Art. 52, para. 507).

The decision on costs is binding and final in accordance with Art. 53. It is **73** subject to recognition and enforcement in accordance with Art. 54 (History, Vol. II, pp. 436, 873).

A decision on costs relating to the proceedings before an *ad hoc* committee **74** becomes part of the decision on annulment. Therefore, the last sentence of Art. 61(2) should be read to include the words "or decision on a request for annulment". As a consequence of Art. 52(4), the decision on costs in a decision on annulment is subject to supplementation and rectification in accordance with Art. 49(2) (see Art. 49, para. 30; Art. 52, para. 568). But the procedures for the interpretation, revision and annulment of awards are not applicable to decisions on annulment (see Art. 50, para. 13; Art. 51, para. 6; Art. 52, paras. 545–547). It follows that a decision on costs contained in a decision on annulment is not subject to these procedures. Any issues concerning costs arising from the procedure before the *ad hoc* committee may be dealt with by the new tribunal constituted under Art. 52(6).[88]

---

87   *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 6.112.
88   See *Amco* v. *Indonesia*, Resubmitted Case: Award, 5 June 1990, paras. 292–295.

# Article 62

**Conciliation and arbitration proceedings shall be held at the seat of the Centre except as hereinafter provided.**

## OUTLINE

|                                                      | *Paragraphs* |
|------------------------------------------------------|:------------:|
| I. INTRODUCTION                                      | 1–10         |
|   A. **General**                           | 1–6          |
|   B. **The Additional Facility**           | 7–10         |
| II. INTERPRETATION                                   | 11–22        |
|   1. Proceedings at the Seat of the Centre | 11–16        |
|   2. Proceedings in More Than One Location | 17–22        |

## I. INTRODUCTION

### A. General

**1**    Art. 62 is the first of two Articles in the Convention's Chapter VII on "Place of Proceedings". Art. 62 sets out the basic rule. Art. 63 provides for variation by agreement of the parties subject to certain conditions.

**2**    Other instruments governing international arbitration typically provide that, in the absence of an agreement by the parties, the tribunal shall fix the place of arbitration.[1]

**3**    Unlike in arbitration governed by other regimes,[2] the place of arbitration under the ICSID Convention has little legal relevance.[3] ICSID arbitration and conciliation are entirely self-contained and insulated from the legislation at the place of proceedings.[4] The procedure is governed exclusively by the Convention and its ancillary rules (see Art. 44, paras. 3, 21, 54). Any provisional measure is to be recommended by the tribunal under Art. 47 and not by local courts except in

---

1 See *e.g.*, UNCITRAL Arbitration Rules, 1976, Art. 16, 15 ILM 701, 708 (1976); UNCITRAL Model Law, 1985, Art. 20, 24 ILM 1302, 1307 (1985); ICC Rules of Arbitration, 1997, Art. 14, 36 ILM 1604, 1611 (1997).

2 See *Branson, D. J./Tupman, W. M.*, Selecting an Arbitral Forum: A Guide to Cost-Effective International Arbitration, 24 Virginia Journal of International Law 917, 927/8 (1984).

3 See *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 228.

4 See also *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 711 (1993); *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168, 187 (1992); *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, p. 7 (1997); *Gaillard, E.*, Some Notes on the Drafting of ICSID Arbitration Clauses, 3 ICSID Review – FILJ 136, 138/9 (1988).

the unusual situation of an agreement of the parties under Arbitration Rule 39(5) (see Art. 26, paras. 176–178, 181–183). The law applicable to the merits of the dispute is governed by Art. 42 and is independent of the place of proceedings (see Art. 42, paras. 62, 274). Most importantly, ICSID awards are not subject to review by the courts of the place of arbitration (see Art. 53, paras. 20–22). Recognition and enforcement of an award is incumbent upon all Contracting States to the Convention regardless of where the award was made (see Art. 54, paras. 23–29).

Therefore, the choice of a place of proceedings is largely a matter of convenience to the parties and to the members of a commission or tribunal. But it is advisable to conduct proceedings in the territory of a Contracting State to the Convention. This would appear necessary to guarantee the non-interference of domestic courts as mandated by Art. 26. The courts of a State that is not a party to the Convention would not be bound by the rule of abstention contained in that Article. In addition, the immunities granted by Arts. 21 and 22, which are designed to guarantee the independent functioning of conciliation and arbitration proceedings, would not be guaranteed in a State that is not a party to the Convention[5] (History, Vol. II, p. 881). **4**

A decision by a US District Court in *MINE* v. *Guinea*, to the effect that consent to ICSID arbitration amounted to an agreement to arbitrate in the United States for purposes of the Foreign Sovereign Immunities Act[6] (see Art. 26, paras. 9–11), would appear to be in error.[7] The Convention leaves the parties a wide choice of venues. In actual fact, ICSID proceedings take place in a large variety of places (see para. 20 *infra*). **5**

Arts. 62 and 63 extend to annulment proceedings. Art. 52(4) lists Chapter VII among the Convention's provisions that apply to proceedings before an *ad hoc* committee (see Art. 52, para. 443; para. 20 *infra*). **6**

## B.  The Additional Facility

The ICSID Convention, including its provisions on the place of proceedings, does not apply to the Additional Facility (see Art. 25, paras. 9–13).[8] This means that, unlike proceedings under the Convention, Additional Facility proceedings will not be insulated from the law of the place of the proceedings. This is recognized by the Additional Facility Arbitration Rules in the following terms: **7**

---

5  See also *Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/2, p. 8 (1988).

6  *MINE* v. *Guinea*, US District Court, District of Columbia, 12 January 1981, 4 ICSID Reports 4, 6.

7  See US Court of Appeals, District of Columbia Circuit, 12 November 1982, 4 ICSID Reports 8, 18 *et seq.*; Brief for the United States, 20 ILM 1436, 1443, 1484/5; see also *Gordon, E.*, Introductory Note, 20 ILM 666, 668 (1981); *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 American Journal of International Law 784, 788 (1983).

8  See Additional Facility Rules, Art. 3.

### Article 1

*Scope of Application*

Where the parties to a dispute have agreed that it shall be referred to arbitration under the Arbitration (Additional Facility) Rules, the dispute shall be settled in accordance with these Rules, save that if any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the parties cannot derogate, that provision shall prevail.[9]

**8**    Consequently, Additional Facility proceedings may be open to the intervention of the courts at the place of the proceedings.[10] Also, an award under the Additional Facility is subject to any review or appeal provided by the law of the place of the arbitration. Since the Additional Facility Rules do not contain an independent system for recognition and enforcement, awards will be subject to the rules contained in national laws and applicable treaties (see Art. 54, paras. 12, 13, 22). Therefore, Art. 19 of the Additional Facility Arbitration Rules requires that arbitration proceedings shall be held only in States parties to the New York Convention[11] (see Art. 53, paras. 5–8). The enforceability of Additional Facility awards will usually be subject to the New York Convention (see Art. 54, paras. 14–21).

**9**    In addition to the requirement of Art. 19, the Additional Facility Arbitration Rules provide as follows:

### Article 20

*Determination of Place of Arbitration*

(1) Subject to Article 19 of these Rules the place of arbitration shall be determined by the Arbitral Tribunal after consultation with the parties and the Secretariat.

(2) The Arbitral Tribunal may meet at any place it deems appropriate for the inspection of goods, other property or documents. It may also visit any place connected with the dispute or conduct inquiries there. The parties shall be given sufficient notice to enable them to be present at such inspection or visit.

(3) The award shall be made at the place of arbitration.[12]

Some tribunals have made formal decisions on the place of proceedings under the Additional Facility.[13]

**10**    The Additional Facility Conciliation Rules give more freedom to the parties:

---

9   The Additional Facility Conciliation Rules do not contain a corresponding provision.

10   *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, pp. 4, 7/8 (1997).

11   [New York] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, 330 UNTS 38; 7 ILM 1046 (1968).

12   See also Additional Facility Conciliation Rules, Art. 30(4)(c).

13   *ADF* v. *United States* (AF), Procedural Order No. 2 Concerning Place of Arbitration, 11 July 2001, 6 ICSID Reports 453; *Waste Management* v. *Mexico II* (AF), Decision on Venue of the Arbitration, 26 September 2001, 6 ICSID Reports 541.

**Article 19**

*Determination of Place of Conciliation Proceeding*

Unless the parties have agreed upon the place where the conciliation proceeding is to be held, such place shall be determined by the Secretary-General in consultation with the President of the Commission, or if there is no President, with the single conciliator, having regard to the circumstances of the proceeding and the convenience of the parties.

## II. INTERPRETATION

### 1. Proceedings at the Seat of the Centre

All the drafts to the Convention foresaw proceedings at the seat of the Centre (History, Vol. I, pp. 276, 278). This principle was never cast into doubt. During the debates on other places for conciliation and arbitration proceedings (see Art. 63, paras. 2, 4, 14, 19, 24), the assumption was always that these would merely be an additional possibility (History, Vol. II, pp. 104, 167, 278, 326, 353, 437, 476, 680, 683, 882, 898). **11**

Art. 62 contains the residual rule on the place of proceedings. It applies whenever the conditions of Art. 63 are not met. This would be the case if there is no agreement of the parties. It would also be the case, even if there is an agreement of the parties, if there is no arrangement with another appropriate institution and no approval has been given by the commission or tribunal after consultation with the Secretary-General.[14] Arbitration and Conciliation Rules 13(3) state that the tribunal or commission shall meet at the seat of the Centre or at such other places as may have been agreed by the parties in accordance with Art. 63 (see Art. 63, para. 20). **12**

In the absence of contrary arrangements, the place of proceedings is the seat of the Centre. Under Art. 2, the seat of the Centre is the principal office of the International Bank for Reconstruction and Development (the World Bank). The principal office of the World Bank is in Washington, D.C. The address is: 1818 H Street, N.W., Washington, D.C., 20433, U.S.A. **13**

The World Bank has agreed to provide ICSID with various services and facilities for proceedings. The legal basis is an arrangement between the two institutions of 1966 (see Art. 6, para. 16).[15] The costs for these services and facilities are reimbursed from the funds advanced by the parties[16] (see Art. 61, paras. 46–49). **14**

---

14  *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 242/3 (1973/74).

15  Memorandum of Administrative Arrangements agreed between the International Bank for Reconstruction and Development and the International Centre for Settlement of Investment Disputes, ICSID First Annual Report 1966/67, pp. 15–16.

16  *Parra, A.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 92/3 (1998).

**15**    Under Administrative and Financial Regulation 26, the Secretary-General shall make arrangements for the holding of conciliation and arbitration meetings at the seat of the Centre (see Art. 63, para. 22).

**16**    Proceedings have been held in Washington, D.C. in many cases brought under the Convention. The published records do not always state whether the venue was determined on the basis of an agreement of the parties on the place of proceedings or, in the absence of such an agreement, in accordance with Art. 62.[17]

### 2. Proceedings in More Than One Location

**17**    Arts. 62 and 63 do not address the possibility of a proceeding taking place in more than one place. The issue of part of a proceeding being held at a place other than the seat of the Centre was raised during the deliberations on what eventually became Art. 63. Mr. *Broches* thought that the language of the provision was broad enough to cover that possibility (History, Vol. II, p. 882).

**18**    Art. 43(b) provides for a visit by the tribunal of the scene connected with the dispute (see Art. 43, paras. 119–124). Arbitration Rule 37(1) offers further technical detail on site visits.[18] The Additional Facility Rules contain similar provisions (see para. 9 *supra*). The Administrative and Financial Regulations charge the Secretary-General with making the necessary administrative arrangements:

> **Regulation 26**
> *Place of Proceedings*
> (1) [see Art. 63, para. 22]
> (2) The Secretary-General shall assist a Commission or Tribunal, at its request, in visiting any place connected with a dispute or in conducting inquiries there.

**19**    A different situation arises if the parties consent to have witnesses or experts examined "otherwise than before the tribunal itself" in accordance with Arbitration Rule 36(b).[19] The evidence may be taken by a member of the tribunal. The parties may participate in the examination (see Art. 43, paras. 84, 85).

---

17    *Kaiser Bauxite* v. *Jamaica*, Decision on Jurisdiction, 6 July 1975, para. 4; *MINE* v. *Guinea*, Award, 6 January 1988, 4 ICSID Reports 68; *AAPL* v. *Sri Lanka*, Award, 27 June 1990, paras. 6, 11; *Fedax* v. *Venezuela*, Award, 9 March 1998, para. 8; *CSOB* v. *Slovakia*, Decision on Jurisdiction, 24 May 1999, para. 6; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, paras. 10, 21, 23; *Continental Casualty* v. *Argentina*, Decision on Jurisdiction, 22 February 2006, paras. 12, 18; *Metalpar* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 11, 19; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, paras. 9, 13; *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2006, paras. 20, 38; *Inceysa* v. *El Salvador*, Award, 2 August 2006, paras. 8, 19, 21; *PSEG* v. *Turkey*, Award, 19 January 2007, paras. 4, 10; *Siemens* v. *Argentina*, Award, 6 February 2007, paras. 4, 22, 57; *MCI* v. *Ecuador*, Award, 31 July 2007, paras. 4, 15, 23; *Fraport* v. *Philippines*, Award, 16 August 2007, paras. 13, 24, 32, 41, 48.
18    See also Conciliation Rule 22(3)(c).
19    See also Additional Facility Arbitration Rules, Art. 43(b).

In actual practice, tribunals have often met at different locations over the course **20** of a proceeding.[20] Apart from Washington, popular locations include Paris, London, The Hague, Geneva and Frankfurt. *Ad hoc* committees have at times also displayed mobility[21] (see also Art. 52, para. 573).

Any change of venue would have to conform to the requirements of Art. 63. **21** In particular, it would require the agreement of the parties. This would be the case even if proceedings were to move to Washington if there were a previous agreement to hold them elsewhere.

Modern communication technology has contributed to flexibility. Tribunals **22** frequently hold organizational sessions with the parties by telephone conference[22] or occasionally with the help of videolink.[23]

---

20  *Benvenuti & Bonfant* v. *Congo*, Award, 15 August 1980, paras. 1.4, 1.5, 1.8, 1.21, 1.31, 1.35; *Klöckner* v. *Cameroon*, Award, 21 October 1983, 2 ICSID Reports 11, 12; *LETCO* v. *Liberia*, Award, 31 March 1986, 2 ICSID Reports 348; *SPP* v. *Egypt*, Award, 20 May 1992, paras. 8, 12, 20, 21, 24, 29, 31, 37, 41; *Tradex* v. *Albania*, Decision on Jurisdiction, 24 December 1996, 5 ICSID Reports 48; *Tradex* v. *Albania*, Award, 29 April 1999, paras. 10–13, 22, 30, 44; *El Paso* v. *Argentina*, Decision on Jurisdiction, 27 April 2006, paras. 4, 7; *Azurix* v. *Argentina*, Award, 14 July 2006, paras. 7, 16, 32; *Pan American* v. *Argentina*, Decision on Preliminary Objections, 27 July 2006, paras. 6, 9; *ADC* v. *Hungary*, Award, 2 October 2006, paras. 22, 34, 48, 57; *World Duty Free* v. *Kenya*, Award, 4 October 2006, paras. 9, 36, 50, 59; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, paras. 31, 34; *Enron* v. *Argentina*, Award, 22 May 2007, paras. 13, 22, 30, 35; *Parkerings* v. *Lithuania*, Award, 11 September 2007, paras. 20, 22, 42; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 12, 19, 32, 40. See also *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 American Journal of International Law 784, 788 (1983); *Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News from ICSID, Vol. 14/2, pp. 4, 7 (1997); *Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, pp. 5, 8 (1988).

21  *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, paras. 7, 9, 11, 14; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, paras. 3.05, 3.08.

22  See *e.g.*, *Middle East Cement* v. *Egypt*, Award, 12 April 2002, paras. 16, 17; *Duke Energy* v. *Peru*, Decision on Jurisdiction, 1 February 2006, para. 20; *Suez et al.* v. *Argentina*, Decision on Jurisdiction, 16 May 2006, para. 8; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 51; *Fireman's Fund* v. *Mexico* (AF), Award, 17 July 2006, para. 36; *ADC* v. *Hungary*, Award, 2 October 2006, para. 31; *Fraport* v. *Philippines*, Award, 16 August 2007, para. 30; *Parkerings* v. *Lithuania*, Award, 11 September 2007, para. 36.

23  *Champion Trading* v. *Egypt*, Award, 27 October 2006, para. 4. See also *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 99 (1998).

# Article 63

**Conciliation and arbitration proceedings may be held, if the parties so agree,**
(a) **at the seat of the Permanent Court of Arbitration or of any other appropriate institution, whether private or public, with which the Centre may make arrangements for that purpose; or**
(b) **at any other place approved by the Commission or Tribunal after consultation with the Secretary-General.**

## OUTLINE

*Paragraphs*

I.  INTRODUCTION  1–2
II. INTERPRETATION  3–25
    A.  **"Conciliation and arbitration proceedings may be held, if the parties so agree, . . ."**  3–13
    B.  **". . . (a) at the seat of the Permanent Court of Arbitration or of any other appropriate institution, whether private or public, with which the Centre may make arrangements for that purpose; . . ."**  14–18
    C.  **". . . or (b) at any other place approved by the Commission or Tribunal after consultation with the Secretary-General."**  19–25

## BIBLIOGRAPHY

*Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, p. 5 (1988);

*Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85 (1998).

## I. INTRODUCTION

**1**  Art. 63 is the second of two Articles in the Convention's Chapter VII on "Place of Proceedings". It allows for exceptions to the Rule of Art. 62 that proceedings are to be held at the seat of the Centre. These exceptions are subject to certain conditions. All proceedings away from the Centre's seat are subject to an agreement of the parties. In addition, there must either be an arrangement under Art. 63(a) or an approval by the Commission or the Tribunal after consultation with the Secretary-General under Art. 63(b).

All the drafts to the Convention provided for the conduct of proceedings away from the Centre in terms similar to what eventually became Art. 63 (History, Vol. I, pp. 278–282) (see also para. 4 *infra*). The debates centred mainly on the types of institutions and the kinds of arrangements that might be suitable for this purpose (see paras. 14, 19 *infra*) and on whether proceedings might be held in the territory of an interested party (see para. 24 *infra*).

**2**

## II. INTERPRETATION

### A. "Conciliation and arbitration proceedings may be held, if the parties so agree,..."

The conduct of formal proceedings away from the seat of the Centre is contingent upon an agreement of the parties. Art. 63 is one of a number of provisions of the Convention that give the parties discretion in ICSID proceedings. Other examples are Arts. 26, 29, 30, 33, 35, 37, 38, 39, 43, 44, 46, 47, 60 and 61.

**3**

The parties' freedom, in principle, to determine the place of proceedings was contained in all drafts to the Convention (History, Vol. I, pp. 278–282) and was confirmed in the deliberations (History, Vol. II, pp. 104, 278, 683). Mr. *Broches* repeatedly emphasized the need to keep the text flexible (at pp. 313, 327/8, 353, 379, 381, 437, 940).

**4**

The parties' freedom to agree on a place for the proceedings is limited by the conditions contained in the subsequent part of Art. 63. These conditions are phrased as alternatives: the parties may either agree on the seat of an appropriate institution with which the Centre has an arrangement (see paras. 14–18 *infra*), or the parties' agreement is subject to approval by the commission or tribunal after consultation with the Secretary-General (see paras. 19–23 *infra*).

**5**

The commission or tribunal may not move the place of proceedings away from the seat of the Centre without the agreement of both parties. But members of tribunals are usually given flexibility to meet for deliberations without the parties at a place convenient to them (see para. 12 *infra*).

**6**

An agreement by the parties on the place of proceedings can be made before the institution of proceedings. A clause in the instrument providing for consent to ICSID's jurisdiction may deal with the matter. Alternatively, the parties may agree at an early stage of the proceedings where future meetings are to be held. The preliminary procedural consultation, in accordance with Arbitration and Conciliation Rules 20, is a good opportunity to reach agreement on this point (see Art. 44, paras. 28–31).[1]

**7**

Several factors affect the choice of the place of proceedings:[2]

**8**

---

1  See also *Parra, A. R.*, The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85, 93, 100 (1998).

2  See also *Marchais, B. P.*, Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1, pp. 5, 8 (1988); *Paulsson, J.*, Third World Participation in International Investment Arbitration, 2 ICSID Review – FILJ 19, 44 (1987).

1252                    THE ICSID CONVENTION: A COMMENTARY

- a proceeding should take place in the territory of a party to the Convention (see Art. 62, para. 4);
- the place should be convenient for the parties;
- the place should be convenient for members of the commission or tribunal;
- the place should preferably provide a neutral venue;
- the place should give easy access to evidence, especially witnesses.

It is clear that a compromise must be found between these different factors. The last two items in particular may not always be easy to reconcile (see also paras. 24, 25 *infra*).

**9**    The Model Clauses of 1993 (see Art. 25, para. 385) offer the following formula:

**Clause 19**

The parties hereto hereby agree that any arbitration proceeding conducted pursuant to this agreement shall be held at/in <u>name of institution or place</u>.[3]

**10**    An agreement on the place of conciliation or arbitration proceedings may either state an institution or a locality.[4] But if it states an institution or locality that does not meet the requirements of Art. 63(a) it will not be enforceable unless the commission or tribunal gives its approval in accordance with Art. 63(b).[5] Therefore, if the parties' agreement does not select the seat of an institution with which the Centre has made arrangements under Art. 63(a), it may be wise to also select an alternative venue. The 1968 Model Clauses provided for this contingency.[6]

**11**    An example of a contract clause that takes account of these possibilities may be found in the participation agreement between Mobil Oil NZ and New Zealand of 1982:

7.9 The arbitration proceedings shall be held at the seat of an appropriate institution in New Zealand if arrangements can be made by the Centre pursuant to article 63(a) of the Convention, or at a place in New Zealand if approval is given pursuant to article 63(b) of the Convention, provided always that each party to the dispute shall use its best endeavours to secure such arrangements or approval immediately upon the dispute being submitted to the Centre. If such arrangements have not been made or approval not given within six months of the date on which the dispute is submitted to the Centre the proceedings shall be held at the Centre.[7]

---

3   4 ICSID Reports 367. See also Model Clause XI of 1981, 1 ICSID Reports 204.
4   See *e.g.*, *Tanzania Electric* v. *IPTL*, Award, 12 July 2001, para. 10; *Champion Trading* v. *Egypt*, Award, 27 October 2006, para. 5; *Parkerings* v. *Lithuania*, Award, 11 September 2007, para. 22; *Sempra* v. *Argentina*, Award, 28 September 2007, paras. 19, 32, 40. For a contradictory agreement see *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 226.
5   See also *Delaume, G. R.*, How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168, 187 (1992).
6   Art. XXXII, 7 ILM 1181/2 (1968). See also *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 242/3 (1973/74).
7   4 ICSID Reports 123. The Tribunal sat in Auckland and in Washington, D.C.: *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, para. 2.1.10.

It is generally understood that the tribunal may meet not only in the place **12**
selected for the proceedings where the hearings are to be held but also at other
locations that are convenient to its members.[8]

A treaty offering consent to ICSID's jurisdiction may contain a provision on the **13**
place of proceedings. By accepting the host State's offer, the investor also agrees
to this provision (see Art. 25, paras. 427–463). The NAFTA (see Art. 25, paras.
457–459) contains the following provision:

<div align="center">

**Article 1130: Place of Arbitration**
</div>

Unless the disputing parties agree otherwise, a Tribunal shall hold an arbitration
in the territory of a Party that is a party to the New York Convention, selected in
accordance with:
(a) the ICSID Additional Facility Rules if the arbitration is under those Rules or
    the ICSID Convention; or
(b) the UNCITRAL Arbitration Rules if the arbitration is under those Rules.[9]

The requirement to hold proceedings in the territory of a party to the New York
Convention is designed to facilitate the enforcement of Additional Facility and
UNCITRAL awards. It is of little significance for ICSID arbitration (see Art. 53,
paras. 5–8; Art. 54, paras. 4, 5, 12–22; Art. 62, paras. 3, 7–10).

## B.  ". . . (a) at the seat of the Permanent Court of Arbitration or of any other appropriate institution, whether private or public, with which the Centre may make arrangements for that purpose; . . ."

The idea to make an arrangement with the Permanent Court of Arbitration was **14**
contained in all drafts leading to the Convention and was reiterated on numerous
occasions during the debates (History, Vol. I, pp. 278, 280; Vol. II, pp. 55, 56,
105, 110, 112, 113, 114, 116, 119, 120, 121, 127, 168, 180/1, 248, 314, 353, 375,
380, 381, 474, 476/7, 659, 679, 681, 684, 689, 881). Later, a reference to "another
public institution" was added (at pp. 113, 180/1, 248, 353, 380, 477, 659, 678, 680,
684, 689, 881). The designation of such an institution as "public" was replaced
by a reference to an "appropriate institution whether private or public" to allow
arrangements also with private institutions (at pp. 665, 678, 680/1, 682, 684, 873,
881, 940). A suggestion to create regional centres for this purpose did not find
entry into the Convention (at pp. 181, 379, 477, 680, 683, 881). There was also

---

8  See *e.g.*, *AGIP* v. *Congo*, Award, 30 November 1979, para. 6; *Benvenuti & Bonfant* v. *Congo*,
   Award, 15 August 1980, para. 1.5; *SOABI* v. *Senegal*, Award, 25 February 1988, para. 1.09;
   *Telenor* v. *Hungary*, Award, 13 September 2006, paras. 8, 12, 13, 15. See also *Marchais*, Setting
   up, p. 8; *Parra*, The Role, p. 93.
9  32 ILM 605, 645 (1993). For decisions dealing with Art. 1130 of the NAFTA see *Ethyl Corp.* v.
   *Canada*, Decision Regarding the Place of Arbitration, 28 November 1997, 38 ILM 702 (1999), 7
   ICSID Reports 5; *Methanex* v. *United States* (UNCITRAL), Decision on the Place of Arbitration,
   31 December 2000, 7 ICSID Reports 213; *ADF* v. *United States* (AF), Procedural Order No.
   2 Concerning Place of Arbitration, 11 July 2001, 6 ICSID Reports 453; *Waste Management* v.
   *Mexico II* (AF), Decision on Venue of the Arbitration, 26 September 2001, 6 ICSID Reports 541.

some debate on the types of facilities and services that would be made available under these arrangements (at pp. 679, 684, 873, 940).

**15**     The Report of the Executive Directors on the Convention offers the following comment on the place of proceedings:

> 44. In dealing with proceedings away from the Centre, Article 63 provides that proceedings may be held, if the parties so agree, at the seat of the Permanent Court of Arbitration or of any other appropriate institution with which the Centre may enter into arrangements for that purpose. These arrangements are likely to vary with the type of institution and to range from merely making premises available for the proceedings to the provision of complete secretariat services.

**16**     The Centre has made arrangements with the following institutions:

1. Permanent Court of Arbitration, The Hague, Netherlands, 1968.[10]
2. Regional Centre for Commercial Arbitration, Kuala Lumpur, Malaysia, 1979.[11]
3. Regional Centre for Commercial Arbitration, Cairo, Egypt, 1980.[12]
4. Australian Commercial Disputes Centre, Sydney, Australia, 1993.[13]
5. Australian Centre for International Commercial Arbitration, Melbourne, Australia, 1993.[14]
6. Singapore International Arbitration Centre, 1998.[15]
7. Gulf Cooperation Council Commercial Arbitration Centre, 1999.[16]
8. Frankfurt International Arbitration Centre of DIS and FIAC.[17]

---

10   Memorandum of General Arrangements between the Permanent Court of Arbitration and the International Centre for Settlement of Investment Disputes, 23 April 1968, ICSID Second Annual Report 1967/68, pp. 19–20.

11   Agreement among the Asian-African Legal Consultative Committee, the Regional Centre for Commercial Arbitration (Kuala Lumpur) and the International Centre for Settlement of Investment Disputes regarding General Arrangements between the Regional Centre and the ICSID, 5 Feburary 1979, ICSID Thirteenth Annual Report 1978/79, pp. 4, 34/5; 22 ILM 522/3 (1983). See also *Lim, P. G.*, The Kuala Lumpur Regional Arbitration Centre, 3 ICSID Review – FILJ 118, 121 (1988).

12   Agreement among the Asian-African Legal Consultative Committee, the Regional Centre for Commercial Arbitration (Cairo) and the International Centre for Settlement of Investment Disputes regarding General Arrangements between the Regional Centre and the ICSID, 6 February 1980, ICSID Fourteenth Annual Report 3/4, 36/7; 22 ILM 524/5 (1983).

13   Memorandum of General Arrangements between the Australian Commercial Disputes Centre and the International Centre for Settlement of Investment Disputes, 13 January 1993, unpublished.

14   Memorandum of General Arrangements between the Australian Centre for International Commercial Arbitration and the International Centre for Settlement of Investment Disputes, 13 January 1993, unpublished.

15   Memorandum of General Arrangements between the Singapore International Arbitration Centre and the International Centre for Settlement of Investment Disputes, 5 June 1998, unpublished.

16   Memorandum of General Arrangements between the Gulf Cooperation Council Commercial Arbitration Centre and the International Centre for Settlement of Investment Disputes, 11 May 1999, unpublished.

17   Cooperation agreement regarding the conduct of arbitrations under the ICSID Arbitration Rules at the Frankfurt International Arbitration Centre of DIS (Deutsche Institution für Schieds-gerichtsbarkeit) and FIAC (Frankfurt Chamber of Industry and Commerce), 16 December 2005, unpublished.

These arrangements are quite similar.[18] They provide for:                **17**
- meeting rooms, offices and other premises;
- office, simultaneous interpretation and other equipment; and
- services of interpreters, translators and other personnel.

The requesting institution is to reimburse the host institution for any expenditures incurred under such arrangements.[19] The ICSID Secretariat will conclude specific arrangements with the partner institutions for particular proceedings.

Parties to ICSID arbitration proceedings have, in a number of cases, availed    **18**
themselves of the facilities offered by these institutions.[20]

## C. ". . . or (b) at any other place approved by the Commission or Tribunal after consultation with the Secretary-General."

All drafts of the Convention contained a provision similar to what eventually    **19**
became Art. 63(b) (History, Vol. I, pp. 278–282). Such an arrangement was to be subject to the commission's or tribunal's approval (History, Vol. II, pp. 278, 326, 881). In view of the administrative arrangements that would have to be made, consultations with the Secretary-General appeared necessary (at pp. 108, 278, 354, 545, 679, 881).

The Arbitration Rules contain the following provisions:                **20**

### Rule 13
#### *Sessions of the Tribunal*

. . .

(3) The Tribunal shall meet at the seat of the Centre or at such other place as may have been agreed by the parties in accordance with Article 63 of the Convention. If the parties agree that the proceeding shall be held at a place other than the Centre or an institution with which the Centre has made the necessary arrangements, they shall consult with the Secretary-General and request the approval of the Tribunal. Failing such approval, the Tribunal shall meet at the seat of the Centre.

(4) The Secretary-General shall notify the members of the Tribunal and the parties of the dates and place of the sessions of the Tribunal in good time.[21]

Approval by the commission or tribunal of another place is a requirement    **21**
under Art. 63(b).[22] The most obvious opportunity to obtain this approval is the preliminary procedural consultation (see para. 7 *supra*). But it is equally possible for the parties to agree on, and for the commission or tribunal to approve, new venues as the proceedings evolve. Tribunals have often met in a variety of locations

---

18  Arrangements 4–7, as listed above, contain references to the Additional Facility.
19  See also *Parra*, The Role, p. 93.
20  See *e.g.*, *SPP* v. *Egypt*, Award, 20 May 1992, para. 8; *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 3.05; *Vacuum Salt* v. *Ghana*, Award, 16 February 1994, paras. 14, 19, 24; *World Duty Free* v. *Kenya*, Award, 4 October 2006, paras. 36, 50, 59; *Malaysian Historical Salvors* v. *Malaysia*, Award, 17 May 2007, para. 34.
21  Conciliation Rule 13(3) is substantively identical.
22  *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 227.

in the course of one proceeding (see Art. 62, para. 20). More recently, telephone conferences and videolinks have also been utilized (see Art. 62, para. 22).

**22**    Consultation with the Secretary-General before a decision on the place of proceedings has the purpose of ascertaining whether the Secretariat will be able to perform its functions with respect to meetings at the agreed place.[23] The Administrative and Financial Regulations provide:

### Regulation 26
#### *Place of Proceedings*

(1) The Secretary-General shall make arrangements for the holding of conciliation and arbitration proceedings at the seat of the Centre or shall, at the request of the parties and as provided in Article 63 of the Convention, make or supervise arrangements if proceedings are held elsewhere.

(2) [see Art. 62, para. 18][24]

**23**    The choice of an appropriate location for proceedings is facilitated by the fact that the World Bank has offices in many different countries. Not infrequently, proceedings take place at one of these offices, especially in Paris.[25]

**24**    During the Convention's drafting, there was some debate as to whether proceedings should take place, at least initially, in the territory of the host State or, at least, in the host State's region (History, Vol. II, pp. 312/3, 327, 354, 381, 437, 559, 680, 683, 873, 881). A counterproposal to exclude proceedings in an interested country was defeated in a vote (at pp. 684, 873, 881) and neither idea found entry into the Convention.

**25**    Practical considerations would speak in favour of holding proceedings in the host State. Especially the taking of evidence would be greatly facilitated by such a solution. On the other hand, the location of proceedings in the territory of an interested party may affect the independence of the commission or tribunal.[26] In one case there was a specific agreement that the place of proceedings should be outside the countries of the parties.[27] But there are also clauses in contracts providing that ICSID arbitration proceedings are to be held in the host State.[28] This was the case in *Mobil Oil* v. *New Zealand* (see para. 11 *supra*). In that case

---

23  *Parra*, The Role, p. 92.                    24  See also *Marchais*, Setting up, pp. 8/9.

25  See *e.g.*, *Salini* v. *Jordan*, Award, 31 January 2006, para. 12; *Jan de Nul* v. *Egypt*, Decision on Jurisdiction, 16 June 2006, para. 42; *Azurix* v. *Argentina*, Award, 14 July 2006, para. 32; *Helnan* v. *Egypt*, Decision on Jurisdiction, 17 October 2006, paras. 11, 30; *Champion Trading* v. *Egypt*, Award, 27 October 2006, paras. 4, 5. See also *Parra*, The Role, p. 92; *Marchais*, Setting up, p. 9.

26  *Paulsson, J.*, Third World Participation in International Investment Arbitration, 2 ICSID Review – FILJ 19, 45 (1987).

27  *Lalive, P.*, The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 British Year Book of International Law 123, 128 (1980).

28  See *Noble Energy* v. *Ecuador*, Decision on Jurisdiction, 5 March 2008, para. 223. See also *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 242/3 (1973/74); *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 822 (1982).

*Article 63 – Proceedings at Another Place*                                     1257

the majority of the Tribunal's sessions were held in Auckland, New Zealand.[29] Another possibility is for the parties to agree that the tribunal's meetings should alternate between the capital of the host State and the capital of the investor's home State.

---

29   *Mobil Oil* v. *New Zealand*, Findings on Liability, Interpretation and Allied Issues, 4 May 1989, para. 2.1.10.

# Article 64

**Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| 1. | The Jurisdiction of the International Court | 1–5 |
| 2. | Relationship to ICSID Cases | 6–15 |
|  | a) Preliminary Rulings | 7–11 |
|  | b) Review of Decisions | 12–13 |
|  | c) Compliance with Awards | 14–15 |
| 3. | Advisory Opinions | 16–21 |

### 1. The Jurisdiction of the International Court

**1**     Art. 64 deals with disputes between States parties to the Convention. Clauses in treaties providing for the settlement of disputes arising from the treaty by the International Court of Justice (ICJ) are common.[1]

**2**     Art. 64 establishes the compulsory jurisdiction of the ICJ in the sense that no further agreement between the States parties to a dispute is needed. Art. 36(1) of the Statute of the ICJ states that "[t]he jurisdiction of the Court comprises . . . all matters specifically provided for . . . in treaties and conventions in force". Art. 64 is such a treaty provision.

**3**     A clause providing for the ICJ's compulsory jurisdiction was contained in all drafts leading to the Convention (History, Vol. I, pp. 282, 284). This clause was opposed by some delegates and there was concern that it might lead to reservations to the Convention (History, Vol. II, pp. 279, 291, 292, 294, 438, 439, 440, 441, 443, 532, 577, 905/6). In the end, a vote showed a large majority in favour of retaining this clause (at p. 906).

**4**     Art. 64 has not attracted any reservation and it is doubtful whether reservations are admissible under the Convention (see Art. 68, paras. 3–5). But there is a

---

1  *Merrills, J. G.*, International Dispute Settlement 122 (1998); *Collier, J./Lowe, V.*, The Settlement of Disputes in International Law 137–139 (1999); 57 Yearbook of the International Court of Justice 121–192 (2002–3).

declaration by Turkey expressing a preference for negotiations over third party settlement.[2]

During the Convention's drafting, disputes concerning the States' general duty    **5** to cooperate with the Centre, the compliance with awards,[3] the recognition and enforcement of awards, as well as the immunities of the Centre and of persons enjoying special privileges under the Convention, were considered suitable for submission to the ICJ (History, Vol. II, pp. 354, 403, 533, 906, 994, 1030).[4] Other matters that may lead to disputes between States are the duty of domestic courts not to interfere in ICSID proceedings[5] (see Art. 26, paras. 132–178) or the duty of States under Art. 27 not to give diplomatic protection in respect of disputes that are subject to ICSID arbitration. By January 2008 no case had ever been brought to the ICJ under Art. 64.

### 2. Relationship to ICSID Cases

The relationship of what eventually became Art. 64 to cases pending before    **6** a tribunal or commission or decided by a tribunal was the subject of extensive discussions during the Convention's drafting. These discussions concerned the possibility of interim or preliminary rulings by the ICJ in cases pending before a tribunal or commission (see paras. 7–11 *infra*) and the question of review of an arbitral award by the ICJ (see para. 12 *infra*).

### a) Preliminary Rulings

There was much debate during the Convention's drafting on whether the ICJ    **7** should be called upon to provide an interpretation of the Convention in cases pending before a tribunal or commission.[6] Despite the clear statement, in what eventually became Arts. 32 and 41, to the effect that the commission or tribunal shall be the judge of its own competence, this debate extended to matters of jurisdiction (see Art. 41, para. 10) (History, Vol. II, pp. 57, 59, 439, 440, 533/4, 578, 940, 1031).

---

2   The declaration by Turkey states: "With respect to Article 64 of the Convention, the Government of Turkey is of the opinion that the disputes which may arise from the interpretation and application of the Convention can be solved through meaningful negotiations between the parties to the dispute, without the need of having recourse to third party settlement." See Document ICSID/8-A, p. 5. A declaration should be distinguished from a reservation.

3   *Mitchell* v. *DR Congo*, Decision on Stay of Enforcement, 30 November 2004, para. 41.

4   See also *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 712 (1993); *Reed, L./Paulsson, J./Blackaby, N.*, Guide to ICSID Arbitration 109–110 (2004).

5   See *Delaume, G. R.*, ICSID Arbitration and the Courts, 77 American Journal of International Law 784, 785 (1983).

6   See also *Broches, A.*, The Convention on the Settlement of Investment Disputes: Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263, 278–280 (1966); *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 368–370 (1972-II).

**8**     A "tentative amendment" was tabled to allow arbitration proceedings to be suspended to seek a ruling of the ICJ on a matter concerning the Convention's interpretation or application (History, Vol. II, pp. 279/80, 290, 292, 354, 437, 440, 532, 577/8, 906). The reason put forward was a possible lack of familiarity of arbitrators with the technicalities of international law and the desire to attain uniformity in the Convention's application (at pp. 291, 355, 420). The expectation was that either the host State or the State of the investor's nationality would initiate contentious proceedings before the ICJ (at pp. 355, 357, 439, 440, 441, 532). But the idea that the Centre or the tribunal itself might somehow seek an advisory opinion was also aired (at pp. 279, 280, 291, 420, 532/3, 578) (see also paras. 16–21 *infra*).

**9**     Objections to this planned amendment included the fear that recourse to the ICJ might be used as dilatory tactics and that it would be contrary to the Convention's objective to insulate ICSID proceedings from inter-State disputes (History, Vol. II, pp. 290, 354, 439, 578).

**10**    The proposal was quietly dropped. But there was concern that Art. 64, even as eventually adopted, might lead to a frustration of arbitration proceedings through resort to the ICJ. A proposed amendment to rule out this possibility (History, Vol. II, p. 910) was withdrawn when it was agreed that the comments, attached to the Convention, would make it quite clear that Art. 64 would in no case enable a State party to an arbitration to frustrate the proceedings by a referral of the matter to the ICJ (at pp. 906, 940, 993, 1030) (see also Art. 27, para. 23).

**11**    The relationship between the jurisdiction conferred upon the ICJ by Art. 64 and specific investment disputes under the Convention is explained in the Report of the Executive Directors to the Convention in the following terms:

> **Disputes Between Contracting States**
>
> 45. Article 64 confers on the International Court of Justice jurisdiction over disputes between Contracting States regarding the interpretation or application of the Convention which are not settled by negotiation and which the parties do not agree to settle by other methods. While the provision is couched in general terms, it must be read in the context of the Convention as a whole. Specifically, the provision does not confer jurisdiction on the Court to review the decision of a Conciliation Commission or Arbitral Tribunal as to its competence with respect to any dispute before it. Nor does it empower a State to institute proceedings before the Court in respect of a dispute which one of its nationals and another Contracting State have consented to submit or have submitted to arbitration, since such proceedings would contravene the provisions of Article 27, unless the other Contracting State had failed to abide by and comply with the award rendered in that dispute.[7]

### b) Review of Decisions

**12**    Art. 64 does not confer upon the ICJ the power to review a decision of an arbitral tribunal and to act as a court of appeal (see Art. 53, paras. 23–27). During

---

7   1 ICSID Reports 32/3.

the Convention's drafting, this question was raised but the opinion prevailed at all times that decisions of tribunals would not be subject to an appeal to the ICJ (History, Vol. II, pp. 274, 423, 424, 429/30, 438, 439, 440, 534, 578, 993, 1030). This principle extends to a tribunal's or commission's decision on competence and jurisdiction[8] (see Art. 41, para. 21).

The International Law Commission's Model Rules on Arbitral Procedure of **13** 1958 foresee a jurisdiction of the ICJ to pronounce upon the nullity or revision of an arbitral award between States.[9] The Convention does not follow this model but has internal procedures for the revision and annulment of awards in Arts. 51 and 52. These internal procedures are exclusive. There is no place for any external remedy, including resort to the ICJ.

### c) Compliance with Awards

The self-contained nature of ICSID proceedings does not extend to the enforce- **14** ment stage. Under Art. 27, the investor's State of nationality has the right to exercise diplomatic protection if the host State does not comply with the award (see Art. 27, paras. 27, 38–43). This right includes the possibility to bring an action before the ICJ under Art. 64[10] (see Art. 53, paras. 41, 44). This right is not affected by any procedural bar under domestic law that may affect the award's enforcement such as State immunity (see Art. 53, paras. 36, 37; Art. 54, para. 115; Art. 55, para. 7).

Resort to the ICJ would also be possible against a State party to the ICSID **15** Convention that was not a party to the ICSID proceedings if it fails to recognize and enforce an award in violation of Art. 54 (see Art. 54, para. 28).

### 3. Advisory Opinions

Art. 64 relates to the ICJ's jurisdiction in contentious proceedings. It does not **16** relate to the ICJ's jurisdiction to give advisory opinions in accordance with Art. 96 of the United Nations Charter and Arts. 65–68 of the ICJ's Statute.

During the Convention's drafting there were several references to a possible **17** power of ICSID to seek advisory opinions from the ICJ (History, Vol. II, pp. 279, 280, 356, 420, 533). But the possibility did not seem realistic and was not pursued (at pp. 533, 578).

Under Art. 96 of the United Nations Charter, organs of the United Nations **18** may seek advisory opinions. In addition, specialized agencies that have been so authorized by the General Assembly of the United Nations may request advisory opinions on legal questions arising within the scope of their activities. ICSID

---

8  *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 712 (1993).

9  Arts. 36–38, YBILC 86 (1958-II).

10  *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 379/80 (1972-II).

is not a specialized agency in terms of Art. 57 of the United Nations Charter.[11] The question of whether ICSID might be able to attain the status of a specialized agency was examined but answered in the negative.[12] Therefore, an authorization of the Centre under Art. 96(2) of the United Nations Charter is not possible.

**19**     ICSID functions in close cooperation with the World Bank. This cooperation is based on an agreement between the two institutions of 1966[13] (see Art. 6, para. 16). The World Bank is a specialized agency of the United Nations and has been authorized by the United Nations General Assembly to seek advisory opinions in accordance with Art. 96(2) of the UN Charter.[14]

**20**     ICSID is a separate international institution based on its own Convention and with its own membership. Pursuant to Art. 96(2) of the UN Charter, specialized agencies may only be authorized to request advisory opinions "on legal questions arising within the scope of their activities".[15] It follows that the World Bank may not request an advisory opinion on behalf of ICSID.

**21**     Neither Art. 64 nor any other provision of the Convention provide for the settlement of disputes between ICSID and a State party to the Convention.[16] Some treaties provide for the settlement of disputes between international organizations and their member States by way of advisory opinions.[17] This method is not open to ICSID. Therefore, the only methods for the settlement of disputes of this kind are *ad hoc* arbitration or negotiations.

---

11  *Broches, A.*, Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 321, 374 (1991).

12  *Broches, A.*, On the Finality of Awards: A Reply to Michael Reisman, 8 ICSID Review – FILJ 92, 99/100 (1993).

13  Memorandum of Administrative Arrangements agreed between the International Bank for Reconstruction and Development and the International Centre for Settlement of Investment Disputes, ICSID First Annual Report 1966/67, pp. 15–16.

14  57 Yearbook of the International Court of Justice 121 (2002–03).

15  See *Legality of the Use by a State of Nuclear Weapons in Armed Conflict*, ICJ, Advisory Opinion, 8 July 1996, 1996 ICJ Reports 63.

16  See *Amerasinghe, C. F.*, Principles of the Institutional Law of International Organizations 30 (1996).

17  *Ibid*., pp. 25 *et seq*.; see *e.g.*, Sec. 30 of the Convention on the Privileges and Immunities of the United Nations, 1946, 1 UNTS 15.

# Article 65

**Any Contracting State may propose amendment of this Convention. The text of a proposed amendment shall be communicated to the Secretary-General not less than 90 days prior to the meeting of the Administrative Council at which such amendment is to be considered and shall forthwith be transmitted by him to all the members of the Administrative Council.**

1  Art. 65 is the first of two Articles in the Convention's Chapter IX entitled "Amendment". Art. 65 deals with the initiation of the procedure to amend the Convention. Art. 66 deals with the decision on an amendment and its entry into force. It also deals with the effect of an amendment on an existing consent to jurisdiction.

2  The drafts leading to Art. 65 show little substantive change and led to hardly any debate (History, Vol. I, pp. 284, 286; Vol. II, pp. 281/2, 952).

3  Any State party to the Convention may take the initiative for an amendment. The proposal is to be directed to the Administrative Council through the Secretary-General. Since under Art. 4(1) the Administrative Council is composed of the representatives of all States parties to the Convention, this procedure assures that all these States will be apprised of the proposal.

4  Under Art. 7(1) the Administrative Council holds at least one meeting a year. The period of 90 days is designed to give the members of the Administrative Council sufficient time to study the proposed amendment before a decision is made. If the proposal arrives with the Secretary-General later than 90 days before the Administrative Council's meeting, it will have to be considered at a subsequent meeting.

5  No proposal under Art. 65 has ever been made. Dissatisfaction with some of the earlier decisions on annulment led to suggestions by scholars to amend the Convention accordingly (see Art. 52, para. 29). The idea of creating an ICSID Appeals Facility did not foresee an amendment of the Convention.[1]

---

1  Possible Improvements of the Framework for ICSID Arbitration, Discussion Paper, 10 September 2004, paras. 3, 18.

# Article 66

**(1) If the Administrative Council shall so decide by a majority of two-thirds of its members, the proposed amendment shall be circulated to all Contracting States for ratification, acceptance or approval. Each amendment shall enter into force 30 days after dispatch by the depositary of this Convention of a notification to Contracting States that all Contracting States have ratified, accepted or approved the amendment.**

**(2) No amendment shall affect the rights and obligations under this Convention of any Contracting State or of any of its constituent subdivisions or agencies, or of any national of such State arising out of consent to the jurisdiction of the Centre given before the date of entry into force of the amendment.**

## OUTLINE

| | *Paragraphs* |
|---|---|
| 1. Adoption of Amendments | 1–6 |
| 2. Effect of Amendments | 7–8 |

### *1. Adoption of Amendments*

**1**    The legislative history of Art. 66 shows considerable debate.[1] The Preliminary Draft provided for a final adoption of amendments by a qualified majority of the Administrative Council (History, Vol. I, p. 286). In the ensuing debate, several delegates opposed amendments by majority decision since this would create insuperable constitutional problems in their respective countries. Suggested solutions included a right of States to withdraw from the Convention if an amendment seemed unacceptable to them or the application of amendments only to States that had accepted them (History, Vol. II, pp. 282, 288, 357/8, 441/2, 534/5, 579, 652, 671).

**2**    The Subsequent First Draft required unanimous adoption by the Administrative Council of amendments involving new obligations or fundamental alterations but adoption by majority of all other amendments (History, Vol. I, pp. 286, 288; Vol. II, pp. 660, 682). A Working Group submitted a proposal that required the ratification of any amendment by all States parties to the Convention. This proposal was adopted by a large majority (at pp. 905, 909/10, 940). This point was the subject of extensive debate by the Executive Directors. Some Directors favoured a more

---

1  See also *Broches, A.*, Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 321, 375 (1991).

*Article 66 – Decision on Amendment*     1265

flexible approach to amendments but in the end the proposal requiring ratification by all States parties prevailed (at pp. 994–996, 1000–1003).

Art. 66(1) requires two steps for amendments to become effective. The first step **3** is a decision by the Administrative Council taken by two-thirds of its members. The second step is ratification, acceptance or approval of the amendment by all States parties to the Convention. The World Bank, as the depositary of the Convention, is to notify the States parties of this fact. An amendment enters into force 30 days after its notification. The World Bank is to notify all signatory States of this date in accordance with Art. 75(e).

This procedure rules out any amendment by a majority of States. It also rules **4** out an amendment that is effective only among States that have agreed to it.[2]

Art. 66(1) makes any amendment extremely difficult. The requirement of a **5** ratification by all States parties to the Convention means that the opposition or mere inaction by a single State can obstruct the adoption of an amendment. The growing number of States parties to the Convention (see Art. 68, paras. 8–10) increases this obstacle accordingly.

The adoption of the Additional Facility Rules in 1978 (see Art. 25, paras. 9–13) **6** shows that there is some flexibility without a formal amendment of the Convention. The Additional Facility expands the activities of ICSID's Secretariat. Additional Facility proceedings operate in analogy to ICSID proceedings but they are not governed by the Convention.[3] The Additional Facility was created by a majority decision of the Administrative Council (see Art. 6, paras. 25, 26).

### 2. Effect of Amendments

From the day of an amendment's entry into force, in accordance with Art. **7** 66(1), the Convention applies only as amended. But Art. 66(2) provides that the amendment will not affect consent to jurisdiction given before the entry into force of the amendment. This provision did not elicit any substantive comments during the Convention's drafting (History, Vol. I, pp. 288, 290; Vol. II, p. 357). The rule of non-retroactivity is an expression of the Convention's general policy to preserve consent to jurisdiction under the legal conditions that prevailed when it was given. Other expressions of this principle are the rules that consent may not be withdrawn unilaterally (Art. 25, paras. 596–634), that the Arbitration Rules shall be applied

---

2   Art. 40 of the Vienna Convention on the Law of Treaties foresees the application of an agreement amending a treaty only among States that are parties to the amending agreement. But this rule does not apply in cases where the treaty in question provides otherwise. Art. 66(1) of the ICSID Convention provides otherwise. But see *Reisman, W. M.*, Repairing ICSID's Control System: Some Comments on Aron Broches' Observations on the Finality of ICSID Awards, 7 ICSID Review – FILJ 196, 209/10 (1992). See also *Broches, A.*, Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 321, 374/5 (1991); *Broches, A.*, On the Finality of Awards: A Reply to Michael Reisman, 8 ICSID Review – FILJ 92, 100 *et seq.* (1993).

3   Generally see *Broches, A.*, The "Additional Facility" of the International Centre for Settlement of Investment Disputes (ICSID), 4 Yearbook Commercial Arbitration 373 (1979); *Toriello, P.*, The Additional Facility of the International Centre for Settlement of Investment Disputes, 4 Italian Yearbook of International Law 59 (1978/79).

as they were on the date when the parties gave their consent (Art. 44, paras. 42–52), that exclusions of territories from the application of the Convention shall not affect existing consent (Arts. 70, 72) and that the denunciation of the Convention by a State shall not affect existing consent (Arts. 71, 72).

**8**     Therefore, if an amendment were to alter the conditions of consent, the modalities for giving consent or the persons that may give consent through a modification of Art. 25, such alterations would become operative only for consent given after the amendment's entry into force. Cases brought after the entry into force of the amendment but based on consent perfected before the amendment's entry into force would have to be decided on the basis of the pre-amendment provisions of the Convention dealing with consent (see Art. 25, paras. 468–478).

# Article 67

**This Convention shall be open for signature on behalf of States members of the Bank. It shall also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign the Convention.**

Art. 67 is the first of the Convention's "Final Provisions". Art. 67 determines **1** the States that may sign the Convention. By contrast, Art. 68 sets out the rules for the Convention's entry into force. Art. 68 also makes it clear that the Convention is subject to ratification, acceptance or approval. This means that a State's signature, in accordance with Art. 67, does not amount to consent to be bound by the Convention. A State that has signed the Convention under Art. 67, but has not ratified, accepted or approved it in accordance with Art. 68, is not a Contracting State to the Convention.[1]

Under Art. 25(1), a mere signatory cannot become a party to proceedings under **2** the Convention (see Art. 25, paras. 211–220). By the same token, a national of a State that has signed the Convention under Art. 67, but has not ratified, accepted or approved it in accordance with Art. 68, may not become a party to proceedings under the Convention (see Art. 25, paras. 284–288). By contrast, the Additional Facility is available if only one of the States, the host State or the State of the investor's nationality, has fulfilled the requirements of Art. 68 (see Art. 25, paras. 224–226).

During the early stages of the Convention's drafting, there was a preference for **3** opening the Convention to non-members of the World Bank as well, although some technical problems concerning the composition of the Administrative Council were discussed (History, Vol. II, pp. 56, 113, 114/5, 122, 123, 127, 128) (see Art. 4, paras. 1–4). The Preliminary Draft provided that the Convention should be open for signature by all members of the Bank and all other sovereign States (History, Vol. I, p. 290). After further debate (History, Vol. II, pp. 362, 442, 537, 547/8, 551, 552, 583), the First Draft and the Revised Draft provided that the Convention was to be open to members of the Bank, of the United Nations or any of its specialized agencies and to parties to the Statute of the International Court of Justice (History, Vol. I, pp. 290, 292).

There were strong misgivings against a formula that was too open in particular **4** amongst representatives of divided countries like China and Germany (History, Vol. II, pp. 654, 660, 686, 799, 907, 997). After a contentious debate by the

---

1  The designation of States parties to a treaty as "signatories" is misleading and should be avoided.

Executive Directors on whether to adopt the principle of open admission or to restrict access to the Convention (at pp. 996–998), Mr. *Broches* presented a formula that would have opened the Convention to members of the Bank. Other States would have required the approval of two-thirds of the Administrative Council. A further amendment limited the group of States that might be approved by the Administrative Council to States parties to the Statute of the International Court of Justice (at pp. 998/9, 1015, 1026).

**5**     The reference to States parties to the Statute of the International Court of Justice includes all members of the United Nations. Under Art. 92 of the United Nations Charter, the Court's Statute forms an integral part of the Charter. But the Statute is open to ratification by States that are not Members of the United Nations.

**6**     The Report of the Executive Directors on the Convention gives the following explanation on Art. 67:

### Entry into Force

46. The Convention is open for signature on behalf of States members of the Bank. It will also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign. No time limit has been prescribed for signature. Signature is required both of States joining before the Convention enters into force and those joining thereafter (Article 67). . . .

**7**     Under Art. 68(1), only signatory States may ratify, accept or approve the Convention. A State may not become a party to the Convention by accession; that is, without prior signature. This means that non-members of the World Bank that have not been invited to sign by ICSID's Administrative Council may not become parties to the Convention.

**8**     The Administrative Council has invited Switzerland in 1967 and Seychelles in 1977 to sign the Convention. Both countries were not Members of the World Bank at the time. Both countries subsequently ratified the Convention.[2]

**9**     Under Art. 75(a), signatures in accordance with Art. 67 are to be notified by the depositary (Art. 73) to all signatory States.

---

2   *Broches, A.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627, 713/4 (1993).

# Article 68

**(1) This Convention shall be subject to ratification, acceptance or approval by the signatory States in accordance with their respective constitutional procedures.**

**(2) This Convention shall enter into force 30 days after the date of deposit of the twentieth instrument of ratification, acceptance or approval. It shall enter into force for each State which subsequently deposits its instrument of ratification, acceptance or approval 30 days after the date of such deposit.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| 1. | Ratification, Acceptance or Approval | 1–2 |
| 2. | Reservations | 3–5 |
| 3. | Entry Into Force | 6–7 |
| 4. | Participation | 8–11 |

### *1. Ratification, Acceptance or Approval*

Art. 68(1) contains the common requirement that, in addition to signature, **1** consent to be bound must be expressed separately. Only signatories may ratify, accept or approve the Convention (see Art. 67, para. 7). There is no substantive difference between ratification, acceptance and approval (History, Vol. II, pp. 442, 1000, 1019). In accordance with Art. 73, instruments of ratification, acceptance or approval are to be deposited with the World Bank. The World Bank, as depositary of the Convention, notifies all signatory States of such deposits in accordance with Art. 75(b).

The Report of the Executive Directors merely restates the contents of Art. 68: **2**

> 46. . . . The Convention is subject to ratification, acceptance or approval by the signatory States in accordance with their constitutional procedures (Article 68). As already stated, the Convention will enter into force upon the deposit of the twentieth instrument of ratification, acceptance or approval.

### *2. Reservations*

During the Convention's drafting, the issue of reservations was raised in a **3** number of contexts (History, Vol. II, pp. 57/8, 59, 60, 66, 84, 283, 292, 442, 579). Mr. *Broches* pointed out that consent to jurisdiction was voluntary and that this fact should make most reservations unnecessary (at pp. 311, 362/3). The provision of Art. 25(4), allowing States to state in advance which types of disputes they would consider suitable for submission to ICSID's jurisdiction, was specifically designed

to avoid reservations (see Art. 25, para. 924). There was a conscious decision not to include a provision on the subject of reservations and to leave the issue subject to the general rules of international law (at p. 443).

**4**    The Convention does not contain a provision either permitting or excluding reservations. No State party to the Convention has made a reservation. The notifications under Art. 25(4) are mere statements of intent but not reservations (see Art. 25, paras. 921–941). Nor is Turkey's declaration on Art. 64 a reservation (see Art. 64, para. 4).

**5**    The Vienna Convention on the Law of Treaties of 1969 (Arts. 19–23) contains detailed provisions on the validity, effect and procedure with regard to reservations and objections thereto. But the Vienna Convention, in accordance with its Art. 4, only applies to treaties concluded after its entry into force. Therefore, it is not applicable to the ICSID Convention. Under customary international law, any reservation to the ICSID Convention would have to be compatible with the Convention's object and purpose. It is difficult to imagine any reservation that meets this criterion. The admissibility of any reservation would presumably be judged by the Administrative Council as the "competent organ of the organization" in which all States parties to the Convention are represented.

### 3. Entry Into Force

**6**    Discussions during the Convention's preparation were also directed at the number of ratifications required for its entry into force (History, Vol. I, pp. 294, 296; Vol. II, pp. 282/3, 362, 443, 654, 907, 908, 1003–1006). There was much concern that the Convention would be ratified, at least initially, by capital exporting States rather than by capital importing States. Various formulae were discussed to ensure a balanced participation at the time of the Convention's entry into force. These included a plan to subject the entry into force to a decision by the World Bank's Executive Directors (History, Vol. II, pp. 179/80, 181, 283, 443, 654, 908, 965, 1003–1006).

**7**    The Convention entered into force on 14 October 1966, 30 days after the Netherlands had deposited the twentieth instrument of ratification. By international standards, the period of time between the Convention's adoption on 18 March 1965 and its entry into force was short. As it turned out, of the 20 ratifications that brought the Convention into force, 17 came from developing, mostly African States.

### 4. Participation

**8**    Over the years, participation in the Convention has grown steadily and impressively.[1] By mid-2008 there were 143 parties to the Convention. Another 12 had

---

1  For comments on the gradually growing participation over time see *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 347/8 (1972-II); *Broches, A.*, The Experience of the International

signed but not yet ratified the Convention.[2] All major industrialized countries with the exception of Canada[3] have become parties.[4] Most African countries are parties.[5] Notable exceptions are Angola and South Africa. The majority of Arab countries are represented.[6] Important exceptions are Iraq and Libya. Among Asian countries, the most important non-parties are India, North Korea, Laos, Myanmar, Thailand[7] and Viet Nam. China became a party in 1993.[8] Of the former communist countries only Poland and Tajikistan have stayed away from the Convention. But a number of former Soviet Republics (Russian Federation, Kyrgyz Republic and Moldova), though signatories, have yet to ratify the Convention.

Latin American countries are in a category of their own. Latin America has    **9** a long tradition of rejecting international arbitration between States and foreign citizens. This tradition has its underpinnings in the Calvo doctrine.[9] During the Convention's drafting, Latin American countries displayed a reserved attitude.[10] At the meeting of the World Bank Board of Governors in Tokyo in 1964, a statement on behalf of Latin American countries rejected the basic idea of the Convention as being contrary to the accepted legal principles of the countries concerned[11] (History, Vol. II, p. 606).

---

Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 78 *et seq.* (1985); *Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes 38 (1993); *Muchlinski, P. T.*, Dispute Settlement under the Washington Convention on the Settlement of Investment Disputes, *in*: Control over Compliance with International Law (*Butler, W. E.* ed.) 175, 177/8 (1991); *Paulsson, J.*, ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380, 381/2 (1991); *Rambaud, P.*, Note sur l'extension du système CIRDI, 29 Annuaire Français de Droit International 290, 291 *et seq.* (1983).

2  For a current list of participating States see: http://www.worldbank.org/icsid/constate/c-states-en.htm.

3  Canada signed the Convention in December 2006 but has not ratified it at the time of writing.

4  Of the 30 Member States of OECD only Canada, Mexico and Poland are not parties to the Convention.

5  See *Agyemang, A. A.*, African States and ICSID Arbitration, 21 Comparative and International Law Journal of Southern Africa 177 (1988).

6  See *Blumereau, J.-E.*, L'adhésion de l'Arabie Saoudite à la Convention CIRDI: ouverture à l'arbitrage international, 7 Droit et Pratique du Commerce International 726 (1981); *Shihata, I. F. I.*, Le CIRDI et les pays en voie de développement et plus particulièrement les pays arabes, *in*: Proceedings of the First Euro-Arab Arbitration Conference (*Kemischa, F.* ed.) 89, 92 (1987); *Ziadé, N. G.*, ICSID and Arab Countries, News from ICSID, Vol. 5/2, p. 5 (1988).

7  Thailand signed the Convention in 1985 but has not ratified it.

8  Taiwan had ratified the Convention in 1968. In 1980 the Administrative Council of ICSID decided that the Republic of China be removed from the list of Contracting States, ICSID Sixteenth Annual Report 1981/82, p. 5. See also *Rambaud, P.*, Note sur l'extension du système CIRDI, 29 Annuaire Français de Droit International 290, 293 (1983).

9  See *Abbott, A. F.*, Latin America and International Arbitration Conventions: The Quandary of Non-Ratification, 17 Harvard International Law Journal 131, 136 *et seq.* (1976); *Shihata, I. F. I.*, ICSID and Latin America, News from ICSID, Vol. 1/2, p. 2 (1984); *Sprague, M. T.*, A Courageous Course for Latin America: Urging the Ratification of the ICSID Convention, 5 Houston Journal of International Law 157 (1982).

10  See *Szasz, P. C.*, The Investment Disputes Convention and Latin America, 11 Virginia Journal of International Law 256 (1971).

11  3 ILM 1174 (1964).

1272                          THE ICSID CONVENTION: A COMMENTARY

**10**      Until 1980 Latin American countries uniformly stayed away from the Convention. This position softened in the 1980s when Paraguay, El Salvador, Ecuador and Honduras became parties.[12] During the 1990s the picture changed completely:[13] Argentina, Bolivia,[14] Chile, Colombia, Costa Rica, Nicaragua, Panama, Peru and Venezuela became parties. Guatemala and Uruguay became parties in the following decade. Important non-parties are Brazil, Cuba, the Dominican Republic[15] and Mexico. In 2007 Bolivia denounced the Convention (see Art. 71, para. 3).

**11**      The Convention's Final Clause includes Spanish among the Convention's authentic languages. At the time of the Convention's conclusion this was a clear expression of hope that Latin America might join in after all. Art. 34(1) of the Administrative and Financial Regulations lists Spanish among the Centre's official languages together with English and French. This opens the way to requests for conciliation or arbitration and to proceedings in Spanish[16] (see Art. 36, para. 14). Latin American countries represent a large proportion of the parties to more recent cases.

---

12   For a comment on the state of ratifications by Latin American countries see *Baker, J. C./Yoder, L. J.*, ICSID and the Calvo Clause – A Hindrance to Foreign Direct Investment in LDCs, 5 Ohio State Journal on Dispute Resolution 75, 89/90 (1989); *Broches, A.*, The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75, 79 *et seq.* (1985); *Delaume, G. R.*, ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237, 255/6 (1986); *Paulsson, J.*, Third World Participation in International Investment Arbitration, 2 ICSID Review – FILJ 19 (1987); *Rogers, W. D.*, Of Missionaries, Fanatics and Lawyers: Some Thoughts on Investment Disputes in the Americas, 72 American Journal of International Law 1, 2 *et seq.* (1978).

13   See, generally, *Zagel, G.*, Auslandsinvestitionen in Lateinamerika (1999).

14   Bolivia denounced the Convention in May 2007. See Art. 71, para. 3.

15   The Dominican Republic signed the Convention in 2000 but has not ratified it.

16   See Institution Rule 1(1), Arbitration Rule 22 and Conciliation Rule 21.

# Article 69

---

**Each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of this Convention effective in its territories.**

## I. INTRODUCTION

The measures that are necessary to make a treaty effective in the domestic legal sphere vary depending on the respective constitutional system. Some countries, such as the United Kingdom, require legislation to incorporate treaties into their domestic law. In other countries, such as the United States, treaties that have been duly promulgated internally may be applied in principle. But even in countries where treaties are susceptible of direct application, implementing legislation may be necessary. Especially in areas of the law where there is detailed domestic legislation, it is often necessary to bring this legislation into line with treaty obligations. The law governing arbitration is such an area. **1**

Art. 69 deals with the duty of States parties to the Convention to take the measures necessary in their domestic law to carry out their obligations under the Convention. Art. 69 does not address the possibility of giving consent to jurisdiction under Art. 25. Consent to jurisdiction may be offered through the host State's legislation (see Art. 25, paras. 392–426). But consent to jurisdiction is voluntary and there is no obligation of a Contracting State to give it (see Art. 25, paras. 374–377). While an offer of consent through a State's legislation would make the Convention more effective, this type of legislation is not necessary to carry out the obligations under the Convention in the Sense of Art. 69. **2**

## II. INTERPRETATION

The Preliminary Draft to the Convention provided that States, when ratifying the Convention, would declare that they had taken all steps necessary to enable them to carry out their obligations under it (History, Vol. I, p. 296). The ensuing debate showed that legislation appeared necessary especially to ensure the enforcement of awards (History, Vol. II, pp. 345, 346, 347, 378, 519, 521/2, 574, 747, 1006) and to facilitate the implementation of the provisions on privileges and immunities (at pp. 248/9, 389, 747, 1006). The First Draft contained two separate provisions, one enjoining States to take measures to implement privileges and immunities and the other to secure the enforcement of awards (History, Vol. I, pp. 296, 298). But there were also voices that argued that these provisions were unnecessary since any treaty creates the obligation to take the necessary legislative measures to carry it out whether or not this is specifically mentioned in its text **3**

(History, Vol. II, pp. 442/3, 521, 747, 1006). Eventually, it was decided to include a general clause providing for implementing legislation and to move it to the Convention's final provisions (at pp. 746/7, 907, 936, 1006/7) (see also Art. 54, para. 104).

**4**    Many States parties to the Convention have enacted legislation for the purpose of implementing it. A list of "Legislative or Other Measures Relating to the Convention (Art. 69 of the Convention)" has been compiled by the ICSID Secretariat. This list is based on communications by Contracting States to the Centre. It has been published as document ICSID/8-F.[1]

**5**    Legislative measures have concerned primarily Art. 54. These measures deal with the procedures for the recognition and enforcement of awards and the courts competent for these purposes. This includes legislation by the United States in pursuance of the "federal clause" of Art. 54(1) (see Art. 54, paras. 92–96).[2]

**6**    These legislative provisions sometimes specifically exclude the review of ICSID awards by domestic courts. This is necessary in view of Art. 53(1) and the practice of domestic courts to review arbitral awards (see Art. 53, paras. 20–22). Some Acts direct that the normal rules on arbitral awards which would allow such a review shall not apply to ICSID awards[3] (see also Art. 54, para. 94).

**7**    Other legislative provisions concern the exclusive remedy rule of Art. 26. They enjoin domestic courts from intervening in ICSID proceedings or from entertaining claims that are subject to ICSID's jurisdiction (see Art. 26, paras. 132–148).[4] A provision of this kind[5] was the basis of a stay of domestic proceedings in *Attorney-General* v. *Mobil Oil NZ Ltd.* by a New Zealand court[6] (see Art. 26, paras. 155–157).

**8**    Some provisions in domestic legislation concerning the Convention deal with the taking of evidence.[7] Other legislative provisions deal with privileges and immunities, the appointment of representatives and panel members under the Convention or the authorization to make payments to the Centre pursuant to Art. 17 of the Convention.

---

1  See http://www.worldbank.org/icsid/pubs/icsid-8/icsid-8-f.htm. For a detailed survey of legislative measures taken by African countries see *Asouzu, A. A.*, African States and the Enforcement of Arbitral Awards: Some Key Issues, 15 Arbitration International 1, 28–33 (1999).

2  Convention on the Settlement of Investment Disputes Act, 22 USC §§1650, 1650a (1966). Reproduced in 5 ILM 820 (1966).

3  See *e.g.*, Australia ICSID Implementation Act, 1990, Sec. 4; New Zealand Arbitration (International Investment Disputes) Act, 1979, Sec. 9; United Kingdom Arbitration (International Investment Disputes) Act 1966, Sec. 3(2); United States Convention on the Settlement of Investment Disputes Act, Sec. 3(a).

4  See *e.g.*, United Kingdom Arbitration (International Investment Disputes) Act 1966, Sec. 3(2).

5  Sec. 8 of the New Zealand Arbitration (International Investment Disputes) Act, 1979, reproduced at 4 ICSID Reports 127.

6  *Attorney-General* v. *Mobil Oil NZ Ltd.*, High Court, Wellington, 1 July 1987, 4 ICSID Reports 117.

7  See *e.g.*, Ireland Arbitration Act, 1980, Sec. 15; New Zealand Arbitration (International Investment Disputes) Act, 1979, Sec. 7; United Kingdom Arbitration (International Investment Disputes) Act 1966, Sec. 3(1).

The legislative instruments purporting to implement the Convention do not **9** normally authorize the giving of consent or contain actual consent in accordance with Art. 25 (see para. 2 *supra*; Art. 25, paras. 392–426). The designation under Art. 25(4) of classes of disputes which the country would or would not consider submitting to the Centre (see Art. 25, paras. 926, 927) may be contained in these legislative instruments.

# Article 70

---

**This Convention shall apply to all territories for whose international relations a Contracting State is responsible, except those which are excluded by such State by written notice to the depositary of this Convention either at the time of ratification, acceptance or approval or subsequently.**

**1**  Art. 70 reflects the fact that at the time of the Convention's drafting a number of, mostly European, States were in possession of colonies and other overseas territories. These territories had varying degrees of autonomy. In order to provide additional flexibility, the Convention gives discretion to the States parties to include or exclude such territories from the Convention's application.

**2**  A provision reflecting the basic idea of Art. 70 was already included in the Preliminary Draft but without specification as to the time at which the written notice would have to be furnished (History, Vol. I, p. 298). Subsequent drafts provided for the notice to be given at the time of signature or subsequently (History, Vol. I, pp. 298/9; Vol. II, pp. 284, 443). This was replaced in the final version by "the time of ratification, acceptance or approval or subsequently".

**3**  Art. 70 establishes a presumption that the Convention will apply to all territories of a State. The contrary would have to be expressed explicitly in a written notice to the Convention's depositary. In the absence of such a notice the Convention will apply.

**4**  Art. 70 gives maximum flexibility as to the time of the notice. The notice may be given at the time of consent to be bound by the Convention (Art. 68, para. 1). But it may also be given at a later time. This means that a State may withdraw territories from the Convention's application after its entry into force for these territories.[1] But under Art. 72, the exclusion of a territory from the Convention's application will not affect consent to the Centre's jurisdiction given prior to the notice of exclusion.

**5**  The Convention's wording leaves open the question of whether parts of a State's metropolitan area may be excluded by a notice under Art. 70. The historical context and drafting history of the Convention would suggest that this is not the case. This conclusion is supported by a comparison with Art. 71 which, unlike Art. 70, subjects withdrawal from the Convention to a six-month waiting period.

**6**  During the Convention's drafting, the question was raised whether the exclusion of a territory, once made, could be withdrawn subsequently. Mr. *Broches* expressed the firm view that the Convention's wording would permit a Contracting State

---

1  The United Kingdom ratified the Convention on 19 December 1966. It filed a notice excluding certain territories on 19 June 1973.

to exclude a dependent territory from the Convention's application and later to include it (History, Vol. II, p. 1007). In fact, Denmark,[2] the Netherlands[3] and the United Kingdom[4] have withdrawn exclusions of overseas territories that they had made earlier.

Notices under Art. 70 must be submitted to the depositary of the Convention. Under Art. 73, the World Bank acts as depositary of the Convention. The depositary notifies all signatory States of the Convention of notices under Art. 70 in accordance with Art. 75(d). The notices of exclusion of territorial application pursuant to Art. 70 have been compiled by the ICSID Secretariat and published as document ICSID/8-B.[5]    **7**

The current list of exclusions of territories is quite short. New Zealand has excluded Cook Islands, Niue and Tokelau. The United Kingdom has excluded British Indian Ocean Territory, Pitcairn Islands, British Antarctic Territory and the Sovereign Base Areas of Cyprus.    **8**

During the Convention's drafting, there was a suggestion to clarify the point that, upon a territory's independence, the Convention would cease to apply to it (History, Vol. II, pp. 284, 443/4). This suggestion was not pursued. A number of territories ceased to be covered by the ratifications of their former colonial powers upon their independence but later became parties to the Convention. These include Mauritius, St. Lucia and Swaziland.[6]    **9**

The Convention's application to a territory for which a Contracting State was responsible became relevant in *SPP* v. *Egypt*. The Claimant was a Hong Kong corporation. The Tribunal pointed out that Hong Kong was a territory for whose international relations the United Kingdom, a party to the Convention, was responsible. After quoting Art. 70, the Tribunal found that the United Kingdom had extended the Convention's application to Hong Kong.[7]    **10**

---

2  Denmark excluded, by a notification received on 15 May 1968, the Faroe Islands. By notification received on 30 October 1968, Denmark extended the application of the Convention to the Faroe Islands as of 1 January 1969.

3  On depositing its instrument of ratification, the Netherlands restricted the application of the Convention to the Kingdom in Europe. By a notification, received on 22 May 1970, the Netherlands withdrew that restriction and thus extended the application of the Convention to Suriname and the Netherlands Antilles. When Suriname attained independence on 25 November 1975, the Convention ceased to be applicable to Suriname.

4  On depositing its instrument of ratification, the United Kingdom excluded from its coverage *inter alia* Jersey and the Isle of Man. By notifications, received on 27 June 1979 and 17 November 1983 respectively, the United Kingdom extended the application of the Convention to Jersey as of 1 July 1979 and to the Isle of Man as of 1 November 1983.

5  See http://www.worldbank.org/icsid/pubs/icsid-8/icsid-8-b.htm.

6  1 ICSID Reports 211, 212.

7  *SPP* v. *Egypt*, Decision on Jurisdiction I, 27 November 1985, para. 46, Decisions on Jurisdiction II, 14 April 1988, para. 54. Hong Kong became a special administrative region of China on 1 July 1997 and is now covered by China's ratification of the Convention. Macao, which was covered by Portugal's participation in the Convention, is covered by China's ratification since 19 December 1999.

# Article 71

**Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice.**

**1**   Starting with the Preliminary Draft, all drafts to the Convention provided for denunciation (History, Vol. I, p. 300). The debates show that denunciation was envisaged primarily for States that objected to an amendment (History, Vol. II, pp. 357, 442, 534/5, 536). But Mr. *Broches* pointed out that the right to withdraw from the Convention was unconditional and could be exercised by a State at any time and without giving any reason (at pp. 534/5). The requirement under Art. 66(1) that an amendment be ratified by all Contracting States makes this ground for denunciation otiose. There was also some debate as to whether a denunciation should be subject to a waiting period (at p. 536) and to whom the notice should be addressed (at pp. 1007–1009).

**2**   A notice of denunciation has to be addressed to the World Bank which, under Art. 73, is the depositary of the Convention. The depositary has to notify all signatory States of a notice of denunciation in accordance with Art. 75(f).

**3**   On 2 May 2007, the World Bank received a written notice of denunciation of the Convention from the Republic of Bolivia. The denunciation took effect six months after the receipt of Bolivia's notice on 3 November 2007. In its capacity as the depositary of the ICSID Convention, the World Bank notified all ICSID signatory States of Bolivia's denunciation of the ICSID Convention.

**4**   A denunciation does not affect pending proceedings. Nor does it affect rights and obligations arising from consent to ICSID's jurisdiction given before receipt of the notice (Art. 72). During the six months between receipt of the notice and its taking effect the State in question continues to be bound by such obligations as respect for the Centre's immunities and privileges (Arts. 18–24) and recognition and enforcement of awards (Art. 54).

# Article 72

**Notice by a Contracting State pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary.**

## BIBLIOGRAPHY

*Castro de Figueiredo, R.*, Euro Telecom v. Bolivia: The Denunciation of the ICSID Convention and ICSID Arbitration under BITs, TDM, March (2008);

*Escobar, A. A.*, Bolivia Exposes Critical Date Ambiguity, 2 Global Arbitration Review 17 (2007);

*Fouret, J.*, Denunciation of the Washington Convention and Non-Contractual Investment Arbitration: "Manufacturing Consent" to ICSID Arbitration?, 25 Journal of International Arbitration 71 (2008);

*Gaillard, E.*, The Denunciation of the ICSID Convention, TDM, Vol. 4/5 (2007);

*Garibaldi, O. M.*, On the Denunciation of the ICSID Convention, Consent to ICSID Jurisdiction, and the Limits of the Contract Analogy, TDM, March (2009);

*Manciaux, S.*, Bolivia's Withdrawal from ICSID, TDM, September (2007);

*Nolan, M. D./Sourgens, F. G.*, The Interplay Between State Consent to ICSID Arbitration and Denunciation of the ICSID Convention: The (Possible) Venezuela Case Study, TDM, September (2007);

*Tietje, C./Nowrot, K./Wackernagel, C.*, Once and Forever? The Legal Effect of a Denunciation of ICSID, TDM, March (2008).

## INTERPRETATION

The idea underlying Art. 72 was reflected in the Preliminary Draft and all subsequent drafts to the Convention (History, Vol. I, p. 302). During the debates it was made clear that rights and obligations arising from existing consent to jurisdiction would be preserved (at pp. 536/7, 656). Mr. *Broches* explained that the intention of the article was to make it clear that if a State had consented to arbitration, the subsequent denunciation of the Convention by that State would not relieve it from its obligation to go to arbitration if a dispute arose. An arbitration clause in an agreement with the investor would remain valid for the duration of the agreement. With respect to a general declaration containing submission of claims to the Centre, Mr. *Broches* stated that it would not be binding until it had been accepted by an investor. If the State were to withdraw its unilateral statement by denouncing the Convention before it has been accepted by any investor, no investor could later bring a claim before the Centre. If, however, the unilateral offer of the State has been accepted before the denunciation of **1**

the Convention, disputes arising between the State and the investor after the date of denunciation would still be within the jurisdiction of the Centre (History, Vol. II, pp. 1009–1010). Attempts to limit the continuation of rights and obligations under the Convention to proceedings which had commenced before the denunciation or to introduce a time limit for the continuation were defeated (at pp. 1009–1011).

**2**     Art. 72 is an expression of the rule, contained in Art. 25(1), that consent, once given, cannot be withdrawn unilaterally (see Art. 25, paras. 596–634, esp. 609–611). The rights and obligations arising from consent to ICSID's jurisdiction are preserved and insulated from later legal developments (see Art. 66, para. 7). In the absence of Art. 72, a host State or an investor's State of nationality could have nullified a consent agreement at any time convenient to it by withdrawing from the Convention or by excluding the territory in question.

**3**     Art. 72 constitutes a limited exception to the nationality requirements of Art. 25(1) for the Centre's jurisdiction. Under the latter provision a dispute must arise between a Contracting State (see Art. 25, paras. 211–220) and a national of another Contracting State (see Art. 25, paras. 284–288). If consent was given before the notice of denunciation, a former Contracting State or a national of a former Contracting State may be a party to a dispute.

**4**     It is clear that an existing agreement between the host State and the investor containing consent to jurisdiction will benefit from Art. 72 and will hence not be affected by a subsequent notice of exclusion or denunciation under Arts. 70 and 71. This will be the case if an investment contract contains a consent clause or if an offer of consent in domestic legislation or a treaty was accepted by the investor before the notice under Art. 70 or 71 is received.

**5**     Art. 72 preserves the "rights or obligations under this Convention . . . arising out of consent" from the consequences of the denunciation. A mere offer of consent contained in legislation or in a treaty (see Art. 25, paras. 395–409, 431–435) that has not been accepted by the investor does not create any rights or obligations under the Convention. Any rights and obligations that may arise from an offer of consent contained in a BIT would arise from the BIT but not under the Convention. It follows that the reference to consent in Art. 72 can only refer to perfected consent.

**6**     Consent to jurisdiction is perfected only after its acceptance by both parties. A unilateral offer of consent by the host State through legislation or a treaty before a notice under Art. 70 or 71 would not suffice for purposes of Art. 72. An investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty after receipt of the notice of exclusion or denunciation under Art. 70 or 71 would not succeed. In order to be preserved by Art. 72, consent would have to be perfected prior to the receipt of the notice of exclusion or denunciation. In order to benefit from the continued validity under Art. 72, consent must have been given before the denunciation of the Convention or exclusion of a territory. Under the explicit wording of Art. 72, the relevant date is the date of the receipt of the notice by the depositary. Therefore the provision in

Art. 71 that the denunciation of the Convention by a State party takes effect only six months after notice has been given does not afford an opportunity to perfect consent during this period.

This interpretation does not necessarily expose investors to the danger of a **7** withdrawal of access to ICSID after making their investments in reliance on the host State's offer of consent. The investor may accept the host State's offer of consent contained in legislation or a treaty at any time prior to a notice under Art. 70 or 71. In other words, the investor may perfect consent not only once a dispute has arisen through the institution of proceedings. Subject to the terms of the offer of consent in the legislation or treaty, the investor may perfect consent at an early stage by accepting the offer of consent in general terms (see Art. 25, paras. 416–426, 447–455).

A possible alternative interpretation may be based on a literal reading of Art. 72 **8** in the light of Art. 25(1). Art. 72 refers to "consent . . . given by one of them".[1] By contrast Art. 25(1) refers to consent by "the parties to the dispute" and to "the parties [having] given their consent". It is clear that Art. 25(1) requires consent by both parties to the dispute to establish jurisdiction. But it may be argued that the phrase "given by one of them" indicates that Article 72 covers a unilateral expression of consent by the host State before its acceptance by the investor. This would mean that the mere expression of consent by the host State remains unaffected by a notice under Art. 70 or 71.

Under this interpretation the investor would retain the right to accept the host **9** State's offer of consent, as long as the offer continues to exist, even after a notice under Art. 70 or 71. The expiry of the six-month period in Art. 71 would not affect this right. Art. 72 designates the date of the notice as the only relevant date. The investor's right to accept the offer of consent would remain until the State withdraws the offer. In order to escape the effect of Art. 72, the State would have to revoke its consent separately. In the case of an offer of consent contained in domestic legislation, the legislation would have to be repealed or amended. In the case of an offer of consent contained in a treaty, its withdrawal would be considerably more difficult and would have to conform to the law of treaties.

On the other hand, the phrase "given by one of them" relates to the denouncing **10** State, its constituent subdivisions or agencies and its nationals. It does not relate to the relationship between the host State and the investor. This phrase would not support a theory that consent offered by the host State but not accepted by the investor shall remain unaffected by the denunciation.

The application of Art. 72 to a State that has ceased to be a party to the Conven- **11** tion leads to some unusual results. Much depends on which rights and obligations under the Convention are seen to arise out of consent to the Centre's jurisdiction.

---

1   In the Modified Articles of the Revised Draft Convention, drafted after the relevant discussion, Art. 72 still contained the phrase "given by it". This phrase was substituted by the words "given by one of them" at a late stage of the Convention's drafting process without an indication of the motives underlying this change. See History, Vol. II, p. 1016.

These rights and obligations undoubtedly include the Convention's provisions on arbitration and conciliation procedure. They also include the obligation under Art. 53 to abide by and comply with an award. The exclusion of alternative remedies contained in Art. 26 and the exclusion of the review of awards, as expressed in Art. 53, first sentence, also arise from consent. Similar considerations apply to the interpretation, revision and annulment of awards under Arts. 50, 51 and 52. The obligation of a State that was not a party to proceedings under Art. 54 to recognize and enforce an award would not survive its denunciation of the Convention: this obligation does not arise from consent but is incumbent upon all Contracting States from the Convention.

# Article 73

**Instruments of ratification, acceptance or approval of this Convention and of amendments thereto shall be deposited with the Bank which shall act as the depositary of this Convention. The depositary shall transmit certified copies of this Convention to States members of the Bank and to any other State invited to sign the Convention.**

Art. 73 designates the World Bank as the Convention's depositary (History, Vol. I, p. 304; Vol. II, pp. 1008, 1012). The designation of an international organization that sponsors a treaty as that treaty's depositary is a common practice. The depositary receives instruments of ratification, acceptance or approval in accordance with Art. 66(1) and Art. 68(1). It also receives notices excluding territories in accordance with Art. 70 and any notices of denunciation in accordance with Art. 71. **1**

The depositary is charged with transmitting certified copies of the Convention to all States that are eligible to sign it under Art. 67. This means that a certified copy has to be transmitted to every new member of the World Bank and to every State that is invited by ICSID's Administrative Council to sign the Convention. **2**

Other duties of the World Bank as the Convention's depositary are listed in Arts. 74 and 75. **3**

# Article 74

**The depositary shall register this Convention with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations and the Regulations thereunder adopted by the General Assembly.**

**1**    Art. 102(1) of the United Nations Charter mandates that every international agreement entered into by any Member of the United Nations shall be registered with the UN Secretariat and published by it. The General Assembly has adopted Regulations implementing this provision in Res. 97(I), 364B(IV), 482(V) and 33/141A.

**2**    Under Art. 102(2) of the UN Charter, noncompliance with this obligation would mean that the treaty cannot be invoked before any organ of the United Nations. Under Art. 92 of the UN Charter, the International Court of Justice (ICJ) is the principal judicial organ of the United Nations. Therefore, without registration of the Convention, its Art. 64, providing for the settlement of disputes concerning the Convention's interpretation or application by the ICJ, would not be operative.

**3**    The Convention was registered with the Secretariat of the United Nations on 17 October 1966 under Registration Number 8359. It was published in the United Nations Treaty Series (UNTS) in Vol. 575 at pp. 19 *et seq*.

# Article 75

**The depositary shall notify all signatory States of the following:**

**(a)  signatures in accordance with Article 67;**

**(b)  deposits of instruments of ratification, acceptance and approval in accordance with Article 73;**

**(c)  the date on which this Convention enters into force in accordance with Article 68;**

**(d)  exclusions from territorial application pursuant to Article 70;**

**(e)  the date on which any amendment of this Convention enters into force in accordance with Article 66; and**

**(f)  denunciations in accordance with Article 71.**

Part of the depositary's normal functions is to notify the treaty's signatories of legally relevant facts relating to that treaty.[1] Art. 75 lists the categories of legally relevant facts relating to the Convention that must be so notified (History, Vol. I, pp. 306, 308; Vol. II, pp. 444, 1009). The signatory States mentioned in Art. 75 include States that have ratified, accepted or approved the Convention after signature.

---

1   See Arts. 77 and 78 of the Vienna Convention on the Law of Treaties, 1969.

# Final Clause

**DONE at Washington, in the English, French and Spanish languages, all three texts being equally authentic, in a single copy which shall remain deposited in the archives of the International Bank for Reconstruction and Development, which has indicated by its signature below its agreement to fulfil the functions with which it is charged under this Convention.**

**1**     The Executive Directors of the World Bank approved the Convention's text on 18 March 1965 for submission to member governments of the Bank.[1] The Convention bears the signatures of the World Bank's President *G. D. Woods* and of the World Bank's General Counsel *A. Broches*. These signatures indicate the World Bank's willingness to assume the functions of depositary as outlined in Arts. 70–75.

**2**     The Convention is equally authentic in English, French and Spanish. Under general principles of treaty interpretation[2] the terms of a treaty are presumed to have the same meaning in each authentic text. Apparent discrepancies of the authentic texts are to be resolved by adopting a meaning that best reconciles the texts having regard to the object and purpose of the treaty. This method for reconciling ostensibly different meanings of the three texts is necessary in respect of several of the Convention's provisions (see Art. 25, para. 17; Art. 42, paras. 62, 167, 168; Art. 52, paras. 346, 418; Art. 54, paras. 64–71).

---

1   Report of the Executive Directors to the Convention, para. 2, 1 ICSID Reports 23.
2   These principles are reflected in Art. 33 of the Vienna Convention on the Law of Treaties, 1969.

# CONSOLIDATED BIBLIOGRAPHY

*Abbott, A. F.*, Latin America and International Arbitration Conventions: The Quandary of Non-Ratification, 17 Harvard International Law Journal 131 (1976);

*Acconci, P.*, Determining the Internationally Relevant Link between State and Corporate Investor, 5 The Journal of World Investment & Trade 139 (2004);

Most-Favoured-Nation Treatment, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 363 (2008);

*Adede, A. O.*, Legal Trends in International Lending and Investment in the Developing Countries, 180 Recueil des Cours 9 (1983-I);

*Agyemang, A. A.*, African States and ICSID Arbitration, 21 The Comparative and International Law Journal of Southern Africa 177 (1988);

*Albrecht, W. E.*, Some Legal Questions Concerning the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 12 St. Louis University Law Journal 679 (1968);

*Alexandroff, A. S./Laird, I. A.*, Compliance and Enforcement, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1171 (2008);

*Alexandrov, S. A.*, Non-Appearance before the International Court of Justice, 33 Columbia Journal of Transnational Law 41 (1995);

Breaches of Contract and Breaches of Treaty, The Jurisdiction of Treaty-based Arbitration Tribunals to Decide Breach of Contract Claims in *SGS v. Pakistan* and *SGS v. Philippines*, 5 The Journal of World Investment & Trade 555 (2004);

The *Vivendi* Annulment Decision and the Lessons for Future ICSID Arbitrations – The Applicants' Perspective, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 97 (2004);

The "Baby Boom" of Treaty-based Arbitrations and the Jurisdiction of ICSID Tribunals: Shareholders as "Investors" and Jurisdiction *Ratione Temporis*, 4 The Law and Practice of International Courts and Tribunals 19 (2005);

Enforcement of ICSID Awards: Articles 53 and 54 of the ICSID Convention, TDM, Fall (2008);

*Alfaro, C. E./Lorenti, P. M.*, The Growing Opposition of Argentina to ICSID Arbitral Tribunals: A Conflict Between International and Domestic Law?, 6 The Journal of World Investment & Trade 417 (2005);

*Alvarez, H. C.*, Setting Aside Additional Facility Awards: The *Metalclad* Case, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 267 (2004);

*Amadio, M.*, Le Contentieux International de l'Investissement Privé et la Convention de la Banque Mondiale du 18 Mars 1965 (1967);

*Amerasinghe, C. F.*, How to Use the International Centre for Settlement of Investment Disputes by Reference to its Model Clauses, 13 Indian Journal of International Law 530 (1973);

Model Clauses for Settlement of Foreign Investment Disputes, 28 Arbitration Journal 232 (1973);

Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211 (1973/74);

Jurisdiction *Ratione Personae* under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 47 British Year Book of International Law 227 (1974/75);

The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt Journal of Transnational Law 793 (1976);

Dispute Settlement Machinery in Relations Between States and Multinational Enterprises – With Particular Reference to the International Centre for Settlement of Investment Disputes, 11 The International Lawyer 45 (1977);

The Jurisdiction of the International Centre for the Settlement of Investment Disputes, 19 Indian Journal of International Law 166 (1979);

Investment Disputes, Convention and International Centre for the Settlement of, *in*: Encyclopedia of Public International Law, Vol. 5, 188 (1983);

Whither the Local Remedies Rule?, 5 ICSID Review – FILJ 292 (1990);

The Prawn Farm (AAPL) Arbitration, 4 Sri Lanka Journal of International Law 155 (1992);

Interpretation of Article 25(2)(b) of the ICSID Convention, *in*: International Arbitration in the 21st Century: Towards Judicialization and Uniformity? (*Lillich, R. B./Brower, C. N.* eds.) 223 (1994);

*Antonietti, A.*, ICSID and Provisional Measures: An Overview, 21 News from ICSID, No. 2, 10 (2004);

Le CIRDI et les mesures conservatoires: récentes expériences, 7 International Law Forum du Droit International 41 (2005);

The 2006 Amendments of the ICSID Rules and Regulations and the Additional Facility Rules, 21 ICSID Review – FILJ 427 (2006);

*Aramburu Menchaca, A. A.*, Reflexiones sobre el Arbitraje Comercial Internacional, *in*: Estudios de Derecho Internacional. Homenaje al Profesor Miaja de la Muela 981 (1979);

*Arnoldt, T.*, Praxis des Weltbankübereinkommens (ICSID): Anwendbares Recht und Kontrollverfahren beim Internationalen Zentrum zur Beilegung von Investitionsstreitigkeiten (1997);

*Asiedu-Akrofi, D.*, *Asian Agricultural Products Limited (AAPL) v. Republic of Sri Lanka*, 86 AJIL 371 (1992);

*Asouzu, A. A.*, African States and the Enforcement of Arbitral Awards: Some Key Issues, 15 Arbitration International 1 (1999);

A Review and Critique of Arbitral Awards on Article 25(2)(b) of the ICSID Convention, 3 The Journal of World Investment 397 (2002);

*Audit, B.*, Comment on Cour de cassation decision in Société Atlantic Triton c. République populaire révolutionnaire de Guinée, 76 Revue Critique de Droit International Privé 760 (1987);

L'arbitrage Transnational et les Contrats d'Etat: Bilan et Perspectives, *in*: Transnational Arbitration and States Contracts (*Hague Academy of International Law*) 23 (1987);

Jurisprudence arbitrale et droit du développement, *in*: Contrats Internationaux et Pays en Développement 115 (1989);

*Augenblick, M./Ridgway, D. A.*, Dispute Resolution in World Financial Institutions, 10 Journal of International Arbitration 73 (March 1993);

*Baker, J. C.*, ICSID: An International Method for Handling Foreign Investment Disputes in LDCs, 21 Foreign Trade Review 411 (1987);

Settling Foreign Investment Disputes via ICSID (*World Bank Affiliate International Centre for Settlement of Investment Disputes*), 40 Business 43 (July–Sept. 1990);

*Baker, J. C./Ryans, J. K.*, ICSID: A Little-Known Solution to Investment Disputes in High Risk Countries, 6 Akron Business and Economic Review 8 (1975);

The International Centre for Settlement of Investment Disputes (ICSID), 10 Journal of World Trade Law 65 (1976);

*Baker, J. C./Yoder, L. J.*, ICSID Arbitration and the U.S. Multinational Corporation. An Alternative Dispute Resolution Method in International Business, 5 Journal of International Arbitration 81 (1988);

ICSID and the Calvo Clause a Hindrance to Foreign Direct Investment in LDCs, 5 Ohio State Journal on Dispute Resolution 75 (1989);

*Balaš, V.*, Review of Awards, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1125 (2008);

*Baldwin, E./Kantor, M./Nolan, M.*, The Arbitration Risk Facing Sovereign Investors, 23 International Financial Law Review 22 (2004);

Limits to Enforcement of ICSID Awards, 23 Journal of International Arbitration 1 (2006);

*Balekjian, W. H.*, The Convention of the International Bank on the Settlement of Investment Disputes Between States and Nationals of Other States, 37/38 Yearbook of the A.A.A. 108 (1968);

*Ball, M.*, The Initiation of Arbitration Proceedings: "Whither Dost Thou Wander?", 13 ICSID Review – FILJ 27 (1998);

*Ballreich, H./Stoll, J.*, Vereinbarungen zwischen Staat und ausländischem Investor, Beiträge zum ausländischen öffentlichen Recht und Völkerrecht, Vol. 80 (1982);

*Banifatemi, Y. (ed.)*, Precedent in International Arbitration (2008);

*Begic, T.*, Applicable Law in International Investment Disputes (2005);

*Ben Hamida, W.*, L'arbitrage transnational unilatéral. Réflexions sur une procédure réservée à l'initiative d'une personne privé contre une personne publique (*Thèse pour le Doctorat en droit de l'Université Panthéon-Assas, Paris II*) (2003);

Cost Issue in Investor-State Arbitration Decisions Rendered Against the Investor: A Synthetic Table, 2(5) TDM (2005);

The *Mihaly* v. *Sri Lanka* Case: Some Thoughts relating to the Status of Pre-Investment Expenditures, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 47 (2005);

La consolidation des procédures arbitrales, Les Cahiers de l'arbitrage, N° 2006/3, 30–35;

Two Nebulous ICSID Features: The Notion of Investment and the Scope of Annulment Control: *Ad Hoc* Committee's Decision in *Patrick Mitchell v. Democratic Republic of Congo*, 24 Journal of International Arbitration 287 (2007);

MFN and Procedural Rights: Solutions from WTO Experience?, *in*: Investment Treaty Arbitration and International Law (*Weiler, T. J.* ed.) 231 (2008);

*Bennaim-Selvi, O.*, Third Parties in International Investment Arbitrations, 6 The Journal of World Investment & Trade 773 (2005);

*Berger, K. P.*, The Modern Trend Towards Exclusion of Recourse against Transnational Arbitral Awards: A European Perspective, 12 Fordham International Law Journal 605 (1989);

Evidentiary Privileges: Best Practice Standards versus/and Arbitral Discretion, 22 Arbitration International 501 (2006);

*Berger, R.*, Internationale Zentrale zur Beilegung von Investitionsstreitigkeiten, 11 Außenwirtschaftsdienst des Betriebs-Beraters 434 (1965);

*Bergman, M. S.*, Bilateral Investment Protection Treaties: An Examination of the Evolution and Significance of the U.S. Prototype Treaty, 16 New York University Journal of International Law and Politics 1 (1983);

*Berlin, D.*, Les procédures de règlement des différends dans les contrats Nord-Sud, *in*: Contrats Internationaux et Pays en Développement 65 (1989);

*Berman, F.*, The Relevance of the Law on Diplomatic Protection in Investment Arbitration, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 67 (2007);

*Bernardini, P.*, Considérations pratiques sur le règlement des différends relatifs aux investissements: le point de vue des utilisateurs, 20 Rassegna dell'Arbitrato 15 (1981);

Le prime esperienze arbitrali del Centro internazionale per il regolamento delle controversie relative ad investimenti, 17 Rivista di Diritto Internazionale Privato e Processuale 29 (1981);

CIRDI, Il punto di vista dell' investitore, 22 Rassegna dell'Arbitrato 53 (1982);

Nationality Requirements under BITs and Related Case Law, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 17 (2007);

*Bernini, G./van den Berg, A.*, The Enforcement of Arbitral Awards against a State: The Problem of Immunity from Execution, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 359 (1987);

*Berranger de, T.*, L'article 52 de la Convention de Washington du 18 mars 1965 et les premiers enseignements de sa pratique, Revue de l'Arbitrage 93 (1988);

*Bettems, D.*, Les contrats entre Etats et entreprises étrangères (1989);

*Bishop, D.*, The Case for an Appellate Panel and its Scope of Review, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 15 (2006);

*Bishop, D./Aguirre Luzi, R. J.*, Investment Claims – First Lessons from Argentina, *in*: International Investment Law and Arbitration – Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 425 (2005);

*Bishop, D./Reed, L.*, Practical Guidelines for Interviewing, Selecting and Challenging Party Appointed Arbitrators in International Commercial Arbitration, 14 Arbitration International 395 (1998);

*Bishop, R. D./Crawford, J./Reisman, W. M.*, Foreign Investment Disputes – Cases, Materials and Commentary (2005);

*Bjorklund, A. K.*, The Continuing Appeal of Annulment: Lessons from *Amco Asia* and *CME*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 471 (2005);

*Blackaby, N.*, Testing the Procedural Limits of the Treaty System: The Argentinean Experience, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 29 (2006);

*Bliesener, D. H.*, La compétence du CIRDI dans la pratique arbitrale, 68 Revue de Droit International et du Droit Comparé 95 (1991);

*Blumereau, J.-E.*, L'adhésion de l'Arabie Saoudite à la Convention CIRDI: ouverture à l'arbitrage international, 7 Droit et Pratique du Commerce International 726 (1981);

*Böckstiegel, K.-H.*, Presenting Evidence in International Arbitration, 16 ICSID Review – FILJ 1 (2001);

*Boisson de Chazournes, L.*, Transparency and *Amicus Curiae* Briefs, 5 The Journal of World Investment & Trade 333 (2004);

*Bondzi-Simpson, P. E.*, Legal Relationships Between Transnational Corporations and Host States (1990);

*Booysen, H.*, The Municipal Enforcement of Arbitration Awards against States in Terms of Arbitration Conventions, with Special Reference to the New York Convention – Does International Law Provide for a Municipal Law Concept of an Arbitrable Act of State?, 12 South African Yearbook of International Law 73 (1986/87);

*Boralessa, A.*, Enforcement in the United States and United Kingdom of ICSID Awards Against the Republic of Argentina: Obstacles that Transnational Corporations May Face, 17 New York International Law Review 53 (2004);

The Limitations of Party Autonomy in ICSID Arbitration, 15 American Review of International Arbitration 253 (2004);

*Boskey, S./Sella, P.*, Settling Investment Disputes, 2 Finance and Development 129 (1965);

*Bottini, G.*, Recognition and Enforcement of ICSID Awards, TDM, May (2008);

*Bouchez, L. J.*, The Prospects for International Arbitration: Disputes Between States and Private Enterprises, *in*: International Arbitration: Past and Prospects (*Soons, A. H. A.* ed.) 109 (1990);

*Bowett, D.*, State Contracts with Aliens: Contemporary Developments on Compensation for Termination or Breach, 59 British Year Book of International Law 49 (1988);

*Brandon, M.*, The World Bank Convention on the Settlement of Investment Disputes, 6 Il Diritto negli Scambi Internazionali 397 (1967);

*Branson, D. J.*, Annulments of "Final" ICSID Awards Raise Questions about the Process, The National Law Journal 25 (4 August 1986);

*Branson, D. J./Tupman, W. M.*, Selecting an Arbitral Forum: A Guide to Cost-Effective International Arbitration, 24 Virginia Journal of International Law 917 (1984);

*Branson, D. J./Wallace, R. E.*, Choosing the Substantive Law to Apply in International Commercial Arbitration, 27 Virginia Journal of International Law 39 (1986);

*Brewer, T. L.*, International Investment Dispute Settlement Procedures: The Evolving Regime for Foreign Direct Investment, 26 Law and Policy in International Business 633 (1995);

*Broches, A.*, International Investment Guarantees: Possibilities and Problems, *in*: New Developments in Investment Guarantees: A Panel Discussion, 56 American Society of International Law Proceedings 81 (1962);

Development of International Law by the International Bank for Reconstruction and Development, 59 American Society of International Law Proceedings 33 (1965);

El Convenio sobre Arreglo de Diferencias Relativas a Inversiones, 3 Revista de Derecho Economico 13 (Oct.–Dec. 1965);

The Convention on the Settlement of Investment Disputes, 9 International and Comparative Law Bulletin 11 (1965);

The Convention on the Settlement of Investment Disputes: Some Observations on Jurisdiction, 5 Columbia Journal of Transnational Law 263 (1966);

The Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Applicable Law and Default Procedure, *in*: International Arbitration Liber Amicorum for Martin Domke (*Sanders, P*. ed.) 12 (1967);

La Convention et l'assurance-investissement. Le problème dit de la subrogation, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées: La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements Internationaux de la Faculté de Droit et des Sciences Économiques de Dijon* ed.) 161 (1969);

Promotion du Perfectionnement des Conventions en Matière d'Arbitrage, Revue de l'Arbitrage 271 (1969);

Settlement of Investment Disputes between States and Nationals of Other States, *in*: World Peace Through Law: The Geneva World Conference (*World Peace Through Law Center* ed.) 258 (1969);

Settling International Investment Disputes, 119 The Banker 140 (1969);

Tutelle Juridique des Investissements Internationaux: L'Expérience de la Banque Mondiale, 9/10 Realtà Economica 49 (1969);

The Role of the World Bank in International Transactions, *in*: Private Investors Abroad – Problems and Solutions in International Business in 1970 (1970);

Promotion of the Improvement of Conventions on Arbitration, 5 ICA Arbitration Quarterly 3 (1970);

Choice-of-Law Provisions in Contracts with Governments, 26 The Record of the Association of the Bar of the City of New York 42 (1971);

The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331 (1972-II);

Arbitration Clauses and Institutional Arbitration, ICSID: A Special Case, *in*: Commercial Arbitration, Essays in Memoriam Eugenio Minoli 69 (1974);

The International Centre for Settlement of Investment Disputes, *in*: Handbook of Institutional Arbitration in International Trade (*Cohn, E. et al.* eds.) 1 (1977);

L'évolution du CIRDI, Revue de l'Arbitrage 323 (1979);

The "Additional Facility" of the International Centre for Settlement of Investment Disputes (ICSID), 4 Yearbook Commercial Arbitration 373 (1979);

Arbitration of Investment Disputes, *in*: International Commercial Arbitration (*Schmitthoff, C.* ed.) 1 (1980);

The Role of the International Centre for Settlement of Investment Disputes, 1 Legal Aspects of Doing Business with Black Africa 251 (1981);

Bilateral Investment Protection Treaties and Arbitration of Investment Disputes, *in*: The Art of Arbitration, Liber Amicorum Pieter Sanders (*Schultsz, J./van den Berg, A*. eds.) 63 (1982);

Settlement of Disputes Arising out of Investment in Developing Countries, 11 International Business Lawyer 206 (1983);

A Model Law on International Commercial Arbitration? A Progress Report on the Work Undertaken within the U.N. Commission on International Trade Law (UNCITRAL), 18 George Washington Journal of International Law and Economics 79 (1984);

Arbitration of Investment Disputes, 1 Malaya Law Journal 73 (1984);

Avoidance and Settlement of International Investment Disputes, 78 American Society of International Law Proceedings 38 (1984);

The Experience of the International Centre for Settlement of Investment Disputes, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S./Nelson, R.* eds.) 75 (1985);

Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – FILJ 287 (1987);

The 1985 UNCITRAL Model Law on International Commercial Arbitration: An Exercise in International Legislation, 18 Netherlands Yearbook International Law 3 (1987);

MIGA and Foreign Investment: Origins, Operations, Policies and Basic Documents of the Multilateral Investment Guarantee Agency [Book Review], 84 AJIL 643 (1990);

Note [on 5 December 1989 Paris Cour d'appel decision in *SOABI* v. *State of Senegal*], Revue de l'Arbitrage 164 (1990);

Note [on 11 June 1991 Cour de cassation decision in *SOABI* v. *State of Senegal*], Revue de l'Arbitrage 637 (1991);

Observations on the Finality of ICSID Awards, 6 ICSID Review – FILJ 321 (1991);

A Guide for Users of the ICSID Convention, News from ICSID, Vol. 8/1, p. 5 (1991);

Die dritte Annullierung eines ICSID-Schiedsspruches – Eine Entgegnung auf F. Niggemann, 11 Praxis des Internationalen Privat- und Verfahrensrechts 293 (1991);

ICSID – A Two-Tier System?, 10th Biennial Conference of the Section on Business Law of the International Bar Association (Hong Kong) (*IBA* ed.) (1991);

Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965, Explanatory Notes and Survey of its Application, 18 Yearbook Commercial Arbitration 627 (1993);

On the Finality of Awards: A Reply to Michael Reisman, 8 ICSID Review – FILJ 92 (1993);

Selected Essays: World Bank, ICSID, and Other Subjects of Public and Private International Law (1995);

Denying ICSID's Jurisdiction: The ICSID Award in Vacuum Salt Products Limited, 13 Journal of International Arbitration 21 (1996);

*Brower, C. H. II*, The Place of Arbitration, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 151 (2005);

*Brower, C. N.*, Jurisdiction over Foreign Sovereigns: Litigation v. Arbitration, 17 The International Lawyer 681 (1983);

Evidence Before International Tribunals: The Need for Some Standard Rules, 28 International Law 47 (1994);

The Initiation of Arbitration Proceedings: "Jack be Nimble, Jack be Quick . . . !", 13 ICSID Review – FILJ 15 (1998);

*Brower, C. N./Goodman, R. E. M.*, Provisional Measures and the Protection of ICSID Jurisdictional Exclusivity Against Municipal Proceedings, 6 ICSID Review – FILJ 431 (1991);

*Brower, C. N./Wong, J.*, General Valuation Principles: The Case of *Santa Elena*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Investment Treaties and Customary International Law (*Weiler, T. J.* ed.) 747 (2005);

*Buckley, R. P.*, Now We Have Come to the ICSID Party: Are its Awards Final and Enforceable?, 14 Sydney Law Review 358 (1992);

Some Jurisdictional Difficulties with Australia's Ratification of the ICSID Convention, 2 Asia Pacific Law Review 92 (1993);

*Burdeau, G.*, Nouvelles perspectives pour l'arbitrage dans le contentieux économique intéressant les états, Revue de l'arbitrage 1 (1995);

*Burgstaller, M.*, Nationality of Corporate Investors and International Claims against the Investor's Own State, 7 The Journal of World Investment & Trade 857 (2006);

*Burkhardt, H.-M.*, Das deutsch-chinesische Investititionsschutzabkommen, 30 Recht der Internationalen Wirtschaft 28 (1984);

Investment Protection Treaties: Recent Trends and Prospects, 41 Außenwirtschaft 99 (1986);

*Byers, M.*, State Immunity: Article 18 of the ILC's Draft, 44 International and Comparative Law Quarterly 882 (1995);


*Cancio, L.*, El Centro Internacional de Arreglo de Diferencias Relativas a Inversiones, Revista de Direito da Electricidade 80 (1968);

*Cane, G.*, The Enforcement of ICSID Awards: Revolutionary or Ineffective?, 15 American Review of International Arbitration 439 (2004);

*Carias-Borjas, S.*, Recognition and Enforcement of ICSID Awards: The Decision of the French *Cour de Cassation* in *SOABI v. Senegal*, 2 The American Review of International Arbitration 354 (1991);

*Carlevaris, A.*, La tutela cautelare nell'arbitrato internazionale (2006);

*Caron, D. D.*, Reputation and Reality in the ICSID Annulment Process: Understanding the Distinction Between Annulment and Appeal, 7 ICSID Review – FILJ 21 (1992);

*Castro de Figueiredo, R.*, ICSID and Non-Foreign Investment Disputes, 4(5) TDM (2007);

Euro Telecom v. Bolivia: The Denunciation of the ICSID Convention and ICSID Arbitration under BITs, TDM, March (2008);

*Chamlongrasdr, D.*, Foreign State Immunity and Arbitration (2007);

*Chatterjee, C.*, The Arbitration between American Manufacturing & Trading Inc. and the Republic of Zaire – When Challenges to the Jurisdiction of an ICSID Tribunal Are Not Valid, 16 Journal of International Arbitration 37 (1999);

Investment-Related Promissory Notes Are Investment Under the ICSID Convention: *Fedax N.V. v. The Republic of Venezuela*, 3 The Journal of World Investment 147 (2002);

When Pre-Investment or Development Costs May or May Not Be Regarded as Part of Investment under Article 25(1) of the ICSID Convention, 4 The Journal of World Investment & Trade 909 (2003);

*Chen, A.*, An Introduction to and Some Comments on the ICSID (1989) (in Chinese);

*Cheng, B.*, General Principles of Law as Applied by International Courts and Tribunals, (1987);

*Cheng, T.-H.*, State Succession and Commercial Obligations (2006);

Precedent and Control in Investment Treaty Arbitration, 30 Fordham International Law Journal 1014 (2007);

*Cherian, J.*, Investment Contracts and Arbitration: The World Bank Convention on the Settlement of Investment Disputes (1975);

*Choi, S.*, Judicial Enforcement of Arbitration Awards under the ICSID and New York Conventions, 28 New York University Journal of International Law and Politics 175 (1995);

*Chukwumerije, O.*, ICSID Arbitration and Sovereign Immunity, 19 Anglo-American Law Review 166 (1990);

International Law and Municipal Law in ICSID Arbitration, 1 Canadian Journal of International Business Law and Policy 61 (1996);

International Law and Article 42 of the ICSID Convention, 14 Journal of International Arbitration 79 (1997);

*Coll, R. J.*, United States Enforcement of Arbitral Awards Against Sovereign States: Implications of the ICSID Convention, 17 Harvard International Law Journal 401 (1976);

*Collins, L.*, Provisional and Protective Measures in International Litigation, 234 Recueil des Cours 97 (1992-III);

Colloquium on Consolidation of Proceedings in Investment Arbitration, Geneva, 22 April 2006, 21 ICSID Review – FILJ 59 (2006);

*Commission, J. P.*, Precedent in Investment Treaty Arbitration: A Citation Analysis of a Developing Jurisprudence, 24 Journal of International Arbitration 129 (2007);

Precedent in Investment Treaty Arbitration: The Empirical Backing, 4(5) TDM (2007);

*Cordero Moss, G.*, Tribunal's Power versus Party Autonomy, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1207 (2008);

*Council of Europe and Hafner, G./Kohen, M./Breau, S. (eds.)*, State Practice Regarding State Immunities/La Pratique des Etats concernant les Immunités des Etats (2006);

*Craig, W. L.*, Uses and Abuses of Appeal from Awards, 4 Arbitration International 174 (1988);

ICSID Arbitration: The Foreign Investor's Point of View, *in*: Private Investments Abroad – Problems and Solutions in International Business (*Southwestern Legal Foundation* ed.) ch. 14 (1993);

The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264 (1993);

*Crawford, J. R.*, Execution of Judgments and Foreign Sovereign Immunity, 75 AJIL 820 (1981);

The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002);

Treaty and Contract in Investment Arbitration: The 22nd Freshfields Lecture on International Arbitration, 29 November 2007;

Similarity of Issues in Disputes Arising under the Same or Similarly Drafted Investment Treaties, *in*: Precedent in International Arbitration (*Banifatemi, Y.* ed.) 97 (2008);

*Cremades, B. M.*, Litigating Annulment Proceedings – The *Vivendi* Matter: Contract and Treaty Claims, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 87 (2004);

Parallel Arbitration Tribunals and Awards, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 304 (2006);

*Cremades, B. M./Cairns, D. J. A.*, The Brave New World of Global Arbitration, 3 The Journal of World Investment 173 (2002);

Contract and Treaty Claims and Choice of Forum in Foreign Investment Disputes, *in*: Arbitrating Foreign Investment Disputes – Procedural and Substantive Legal Aspects (*Horn, N./Kröll, S.* eds.) 325 (2004);

*Crivellaro, A.*, Consolidation of Arbitral and Court Proceedings in Investment Disputes, 4 The Law and Practice of International Courts and Tribunals 371 (2005);

*Curtis, C. T.*, The Legal Security of Economic Development Agreements, 29 Harvard International Law Journal 317 (1988);

International Investment Disputes – *res judicata* Effect of Partially Annulled ICSID Award, 83 AJIL 106 (1989);

*De Fina, A. A.*, The Party Appointed Arbitrator in International Arbitration – Role and Selection, 15 Arbitration International 381 (1999);

*de Lotbinière MacDougall, A./Santens, A.*, ICSID Amends its Arbitration Rules, 9 International Arbitration Law Review 119 (2006);

*de Waart, P. J. I. M.*, ICSID and Other Forms of Arbitration and Conciliation: Institutionalization of Dispute Settlement in the Context of the Right of Development, *in*: Foreign Investment in the Present and a New International Economic Order (*Dicke, D.* ed.) 116 (1987);

*De Witt Wijnen, O./Voser, N./Rao, N.*, Background Information on the IBA Guidelines on Conflicts of Interest, 5 International Arbitration in Business Law International, No. 3 (September 2004);

*Delaney, J./Magraw, D. B.*, Procedural Transparency, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 721 (2008);

*Delaume, G. R.*, Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 1 The International Lawyer 64 (1966);

La Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, 93 Journal du Droit International 26 (1966);

State Contracts and Transnational Arbitration, 75 AJIL 784 (1981);

*Le* Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775 (1982);

Experience with ICSID, *in*: International Arbitration Between Private Parties and Government (*Practising Law Institute* ed.) 221 (1982);

Les clauses CIRDI et les procédures s'y rapportant, 22 Rassegna dell'Arbitrato 17 (1982);

Arbitration with Governments: "Domestic" v. "International" Awards, 17 The International Lawyer 687 (1983);

ICSID Arbitration and the Courts, 77 AJIL 784 (1983);

Foreign Sovereign Immunity: Impact on Arbitration, 38 Arbitration Journal 34 (1983);

L'arbitrage CIRDI et le banquier, Banque 889 (1983);

Le CIRDI et l'immunité des Etats, Revue de l'Arbitrage 143 (1983);

The ICSID and the Banker, 9 International Financial Law Review 9 (October 1983);

ICSID and the Courts, News from ICSID, Vol. 1/1, p. 6 (1984);

ICSID Arbitration in Practice, 2 International Tax and Business Lawyer 58 (1984);

ICSID Arbitration: Practical Considerations, 1 Journal of International Arbitration 101 (1984);

ICSID Clauses: Some Drafting Problems, News from ICSID, Vol. 1/2, p. 16 (1984);

ICSID Arbitration Proceedings: Practical Aspects, 5 Pace Law Review 563 (1985);

Economic Development and Sovereign Immunity, 79 AJIL 319 (1985);

ICSID and Bilateral Investment Treaties, News from ICSID, Vol. 2/1, p. 12 (1985);

ICSID and the Transnational Financial Community, 1 ICSID Review – FILJ 237 (1986);

ICSID Arbitration Proceedings, 4 International Tax and Business Lawyer 218 (1986);

ICSID Tribunals and Provisional Measures – A Review of the Cases, 1 ICSID Review – FILJ 392 (1986);

ICSID Arbitration, *in*: Contemporary Problems in International Arbitration (*Lew, J.* ed.) 23 (1987);

Judicial Decisions Related to Sovereign Immunity and Transnational Arbitration, 2 ICSID Review – FILJ 403 (1987);

Sovereign Immunity and Transnational Arbitration, 3 Arbitration International 28 (1987);

Law and Practice of Transnational Contracts (1988);

The Proper Law of State Contracts and the *Lex Mercatoria*: A Reappraisal, 3 ICSID Review – FILJ 79 (1988);

The Finality of Arbitration Involving States: Recent Developments, 5 Arbitration International 21 (1989);

Contractual Waivers of Sovereign Immunity: Some Practical Considerations, 5 ICSID Review – FILJ 232 (1990);

Transnational Contracts, Applicable Law and Settlement of Disputes (1990);

ICSID Tribunal Determines That Parties Could and Did Make a Valid Belated Choice of Law, 6 News and Notes from The Institute for Transnational Arbitration 4: 1 (1991);

Comment on 11 June 1991 French Cour de cassation decision in SOABI (SEUTIN) v. Sénégal, 86 AJIL 138 (1992);

How to Draft an ICSID Arbitration Clause, 7 ICSID Review – FILJ 168 (1992);

Enforcement of State Contract Awards: Jurisdictional Pitfalls and Remedies, 8 ICSID Review – FILJ 29 (1993);

The Pyramids Stand – The Pharaohs Can Rest in Peace, 8 ICSID Review – FILJ 231 (1993);

L'affaire du *Plateau des Pyramides* et le CIRDI. Considérations sur le droit applicable, Revue de l'arbitrage 39 (1994);

Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5 (1995);

The Proper Law of State Contracts Revisited, 12 ICSID Review – FILJ 1 (1997);

*Denza, E./Brooks, S.*, Investment Protection Treaties: United Kingdom Experience, 36 International and Comparative Law Quarterly 908 (1987);

*Derman, A. B.*, Nationalization and the Protective Arbitration Clause, 3 Journal of International Arbitration 131 (1988);

*Di Pietro, D.*, Applicable Law under Article 42 of the ICSID Convention – The Case of *Amco v. Indonesia*, *in*: International Investment Law and Arbitration – Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 223 (2005);

*Dias, N./Perera, R./de Alwis, R.*, Current Developments Note [on *Asian Agricultural Products Ltd.* v. *Republic of Sri Lanka*], 3 Sri Lanka Journal of International Law 211 (1991);

*Dickinson, A./Lindsay, R./Loonam, J. P.*, State Immunity. Selected Materials and Commentary (2004);

*Dolzer, R.*, Dispute Settlement Mechanisms in the IMF, the World Bank and MIGA, *in*: Adjudication of International Trade Disputes in International and National Economic Law (*Petersmann, E. U./Jaenicke, G.* eds.) 139 (1992);

The Notion of Investment in Recent Practice, *in*: Law in the Service of Human Dignity: Essays in Honour of Florentino Feliciano (*Charnovitz, S./Steger, D. P./van den Bossche, P.* eds.) 261 (2005);

*Dolzer, R./Schreuer, C.*, Principles of International Investment Law (2008);

*Dolzer, R./Stevens, M.*, Bilateral Investment Treaties (1995);

*Dominicé, C.*, La clause CIRDI dans les traités bilatéraux suisses de protection des investissements, *in*: Im Dienst an der Gemeinschaft, Festschrift für Dietrich Schindler zum 65. Geburtstag 457 (1989);

Quelques observations sur la question des mesures conservatoires dans les arbitrages CIRDI, 112 La Semaine Judiciaire 327 (1990);

*Consolidated bibliography*

*Donahey, M.*, The Independence and Neutrality of Arbitrators, 9 Journal of International Arbitration 31 (1992);

*Douglas, Z.*, The Hybrid Foundations of Investment Treaty Arbitration, 74 British Year Book of International Law 151 (2003);

Nothing if Not Critical for Investment Treaty Arbitration: Occidental, Eureko and Methanex, 22 Arbitration International 27 (2006);

*Drucker, T. C.*, The Perspective of Canadian Investors on Accession to ICSID, News from ICSID, Vol. 7/1, p. 6 (1990);

*Duchesne, M. S.*, The Continuous-Nationality-of-Claims Principle: Its Historical Development and Current Relevance to Investor-State Investment Disputes, 36 Geo. Wash. Intl. L. Rev. 783 (2004);

*Dugan, C./Wallace, D./Rubins, N.*, Investor-State Arbitration (2005);


*Eastwood, G.*, A Real Danger of Confusion? The English Law Relating to Bias in Arbitrators, 17 Arbitration International 287 (2001);

*Eisemann, F.*, La double sanction prévue par la Convention de la B.I.R.D. en cas de collusion ou d'ententes similaires entre un arbitre et la partie qui l'a désigné, 23 Annuaire Français de Droit International 436 (1977);

*Eklund, C. D.*, A Primer on the Arbitration of NAFTA Chapter Eleven Investor-State Disputes, 11 Journal of International Arbitration 135 (1994);

*El Karkouri, D.*, L'apport jurisprudentiel CIRDI aux contrats de génie civil dans les pays arabes, Revue de Droit des Affaires Internationales 867 (1995);

*El Sheikh, F.*, The Legal Regime of Foreign Private Investment in the Sudan and Saudi Arabia 307 (1984);

*El-Kosheri, A. S.*, ICSID Arbitration and Developing Countries, 8 ICSID Review – FILJ 104 (1993);

The *Klöckner* Case and the Finality of ICSID Arbitral Awards, *in*: Liber Amicorum Professor Ignaz Seidl-Hohenveldern in Honour of His 80th Birthday (*Hafner, G. et al.* eds.) 103 (1998);

*Elombi, G.*, ICSID Awards and the Denial of Host State Laws, 11 Journal of International Arbitration 61 (1994);

*Emole, C. E.*, Nigeria's LNG Venture: Fiscal Incentives, Investment-Protection Schemes and ICSID, 8 African Journal of International and Comparative Law 169 (1996);

*Escobar, A. A.*, Three Aspects of ICSID's Administration of Arbitration Proceedings, News From ICSID, Vol. 14/2 (1997);

Conducting Arbitration Proceedings under the ICSID Convention, *in*: Carswell's Handbook of International Dispute Resolution Rules (*Barin, B.* ed.) 206 (1999);

Procedural Issues Raised by Treaty Interpretation in ICSID Proceedings, *in*: International Institutional Reform: Proceedings of the 2005 Hague Joint Conference on Contemporary Issues of International Law (*Fijalkowski, A.* ed.) 302 (2007);

Bolivia Exposes Critical Date Ambiguity, 2 Global Arbitration Review 17 (2007);

Introductory Note [to *Azurix* v. *Argentina*, Decision on Request for a Continued Stay of Enforcement of the Award], 47 ILM 445 (2008);


*Fadlallah, I.*, La notion d'investissement: vers une restriction à la compétence du CIRDI?, *in*: Global Reflections on International Law, Commerce and Dispute Resolution: Liber Amicorum in Honour of Robert Briner (*Aksen, G.* ed.) (2005);

Are State Entities Liable for the Conduct of their Instrumentalities? ICSID Case Law, *in*: State Entities in International Arbitration (*Gaillard, E./Younan, J.* eds.) 19 (2008);

*Farley, A. N.*, The Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 5 Duq. Law Review 19 (1966);

*Fatouros, A. A.*, Investissements étrangers et arbitrage entre Etats et personnes privées – La Convention BIRD du 18 mars 1969 (book review), 59 Revue Critique du Droit International Privé 580 (1970);

*Feldman, M. B.*, The Annulment Proceedings and the Finality of ICSID Arbitral Awards, 2 ICSID Review – FILJ 85 (1987);

*Fernando, A. F. T.*, The Requirement to Provide a Bank Guarantee in Return for a Continuation of the Provisional Stay of Enforcement of the Award under Article 52(5) of the ICSID Convention – Can This Be Justified?, 2(1) TDM (2005);

*Ferrante, M.*, Su alcuni aspetti della Convenzione di Washington per la risoluzione di controversie tra Stati e nazionali di altri Stati in materia di investimenti, 10 Rassegna dell'Arbitrato 67 (1970);

*Feuerle, P.*, International Arbitration and Choice of Law under Article 42 of the Convention on the Settlement of Investment Disputes, 4 Yale Studies in World Public Order 89 (1977);

*Firth, T. V.*, The Law Governing Contracts in Arbitration under the World Bank Convention, 1 New York University Journal of International Law and Politics 253 (1968);

*Fischer, P.*, Die schiedsgerichtliche Beilegung von privaten Investititionsstreitigkeiten im Lichte der Weltbankkonvention vom 18. März 1965, 1 Verfassung und Recht in Übersee 262 (1968);

*Fouret, J./Khayat, D.*, Centre International pour le Règlement des Différends Relatifs aux Investissements, 15 Revue Québecoise de Droit International 167 (2002);

*Fox, H.*, States and the Undertaking to Arbitrate, 37 International and Comparative Law Quarterly 1 (1988);

   The Law of State Immunity (2002);

   The Law of State Immunity, 2nd ed. (2008);

*Franzoni, D. B.*, International Law – Enforcement of International Centre for Settlement of Investment Disputes Arbitral Awards in the United States, 18 Georgia Journal of International and Comparative Law 101 (1988);

   Note on *Liberian Eastern Timber Corp. v. Government of the Republic of Liberia*, 650 F. Supp. 73 (S.D.N.Y. 1986), 18 Georgia Journal of International and Comparative Law 101 (1988);

*Freyer, D. H./Gharavi, H. G.*, Finality and Enforceability of Foreign Arbitral Awards: From "Double Exequatur" to the Enforcement of Annulled Awards: A Suggested Path to Uniformity Amidst Diversity, 13 ICSID Review – FILJ 101 (1998);

*Friedland, P. D.*, Provisional Measures and ICSID Arbitration, 2 Arbitration International 335 (1986);

   ICSID and Court-Ordered Provisional Remedies: An Update, 4 Arbitration International 161 (1988);

   Stay of Enforcement of the Arbitral Award Pending ICSID Annulment Proceedings, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 177 (2004);

*Friedland, P. D./Wong, E.*, Measuring Damages for the Deprivation of Income-Producing Assets: ICSID Case Studies, 6 ICSID Review – FILJ 400 (1991);

*Friedman, M. W.*, Non-Party States' Efforts to Influence Ongoing Proceedings, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 83 (2006);

*Frutos-Peterson, C.*, El arbitraje de CIADI y su impacto en el arbitraje internacional latinoamericano en materia de inversión, 1 Revista de Arbitragem E Mediação 155 (2004);


*Gaillard, E.*, *Amco v. Indonesia*: Introductory Note, 25 International Legal Materials 1439 (1986);

Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI). Chronique des sentences arbitrales, Journal du Droit International, from Vol. 113 (1986) onwards, annually;

Comment [on 18 November 1986 French Cour de cassation decision in Société Atlantic Triton c/ République populaire révolutionnaire de Guinée], 114 Journal du Droit International 125 (1987);

Le principe de confidentialité de l'arbitrage commercial international, 22 Recueil Dalloz Sirey, Chronique 153 (1987);

Quelques observations sur la rédaction des clauses d'arbitrage CIRDI, 97 Recueil Penant 291 (1987);

Some Notes on the Drafting of ICSID Arbitration Clauses, 3 ICSID Review – FILJ 136 (1988);

Comment [on 5 December 1989 Paris Cour d'appel decision in État du Sénégal c/ Seutin], 117 Journal du Droit International 144 (1990);

The Enforcement of ICSID Awards in France: The Decision of the Paris Court of Appeal in the SOABI Case, 5 ICSID Review – FILJ 69 (1990);

Comment [on 11 June 1991 French Cour de cassation decision in Société Ouest Africaine des Bétons Industriels c. Etat du Sénégal], 118 Journal du Droit International 1006 (1991);

The International Centre for Settlement of Investment Disputes, 219 New York Law Journal 62 (1998);

Landmark in ICSID Arbitration: Committee Decision in *Wena Hotels*, New York Law Journal (April 2002);

La Jurisprudence du CIRDI (2004);

The Extent of Review of the Applicable Law in Investment Treaty Arbitration, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 223 (2004);

Investment Treaty Arbitration and Jurisdiction Over Contract Claims – The *SGS* Cases Considered, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 325 (2005);

Investments and Investors Covered by the Energy Charter Treaty, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 54 (2006);

The Denunciation of the ICSID Convention, 4(5) TDM (2007);

Effectiveness of Arbitral Awards, State Immunity from Execution and Autonomy of State Entities – Three Incompatible Principles, *in*: State Entities in International Arbitration (*Gaillard, E./Younan, J.* eds.) 179 (2008);

*Gaillard, E. (ed.)*, Anti-Suit Injunctions in International Arbitration (2005);

*Gaillard, E./Banifatemi, Y.*, The Meaning of "and" in Article 42(1), Second Sentence, of the Washington Convention: The Role of International Law in the ICSID Choice of Law Process, 18 ICSID Review – FILJ 375 (2003);

A Black Year for ICSID, New York Law Journal (March 2007);

*Gaillard, E./Banifatemi, Y. (eds.)*, Annulment of ICSID Awards (2004);

*Gaillard, E.*/*Savage, J. (eds.)*, Fouchard, Gaillard, Goldman on International Commercial Arbitration (1999);

*Gaillard, E.*/*Younan, J. (eds.)*, State Entities in International Arbitration (2008);

*Gallagher, N.*, The Requirement for Substantive Nationality, *in*: Investment Treaty Law Current Issues II (*Ortino, F.*/*Liberti, L.*/*Sheppard, A.*/*Warner, H.* eds.) 27 (2007);

*Gallins, G.*, Bilateral Investment Protection Treaties, 2 Journal of Energy and Natural Resources Law 77 (1984);

*Gallus, N.*, State Enterprises as Organs of the State and BIT Claims, 7 The Journal of World Investment & Trade 761 (2006);

*Gallus, N.*/*Peterson, L. E.*, International Investment Treaty Protection of NGOs, 22 Arbitration International 527 (2006);

*Gann, P. B.*, The U.S. Bilateral Investment Treaty Program, 21 Stanford Journal of International Law 373 (1985);

*Gantz, D. A.*, An Appellate Mechanism for Review of Arbitral Decisions in Investor-State Disputes: Prospects and Challenges, 39 Vanderbilt Journal of Transnational Law 39 (2006);

*Garcia-Bolívar, O. E.*, Comments on Some ICSID Decisions on Jurisdiction, 32 International Business Lawyer 167 (2004);

  Foreign Investment Disputes under ICSID – A Review of its Decisions on Jurisdiction, 5 The Journal of World Investment & Trade 187 (2004);

*Giardina, A.*, La mise en oeuvre au niveau national des arrêts et des décisions internationaux, 165 Recueil des Cours 233 (1979-IV);

  L'esecuzione delle sentenze CIRDI, 22 Rassegna dell' Arbitrato 69 (1982);

  L'exécution des sentences du Centre international pour le règlement des différends relatifs aux investissements, 71 Revue Critique de Droit International Privé 273 (1982);

  La legge regolatrice dei contratti di investimento nel sistema ICSID, 18 Rivista di diritto internazionale privato e processuale 677 (1982);

  Diritto interno e diritto internazionale nella disciplina dei contratti fra Stati e privati stranieri, *in*: Studi in onore di Giuseppe Sperduti 41 (1984);

  The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214 (1989);

  ICSID: A Self-Contained, Non-National Review System, *in*: International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? (*Lillich, R. B.*/*Brower, C. N.* eds.) 199 (1994);

  International Investment Arbitration: Recent Developments as to the Applicable Law and Unilateral Recourse, 5 The Law and Practice of International Courts and Tribunals 29 (2006);

*Gill, J.*, Inconsistent Decisions: An Issue to be Addressed or a Fact of Life?, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F.*/*Sheppard, A.*/*Warner, H.* eds.) 23 (2006);

*Glossner, O.*/*Bartels, M.*, Internationale Bergbauvorhaben und Vertragspraxis für die Beilegung von Streitigkeiten, 28 Recht der Internationalen Wirtschaft 555 (1982);

*Goldman, B.*, Le droit applicable selon la Convention de la B.I.R.D., du 18 mars 1965, pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. (*Centre de Recherche sur le Droit des Marchés et des Investissements*

*Internationaux de la Faculté de Droit et des Sciences Économiques de Dijon* ed.) 133 (1969);

Case Note on Decision of the Cour d'appel de Paris of 12 July 1984 in the Case République Arabe d'Egypte c. Southern Pacific Properties Limited et Southern Pacific Properties (Middle East), 112 Journal du Droit International 129 (1985);

*Golsong, H.*, Le CIRDI: caractéristiques générales, 22 Rassegna dell'Arbitrato 7 (1982);

A Guide to Procedural Issues in International Arbitration, 18 The International Lawyer 633 (1984);

Dispute Settlement in Recently Negotiated Bilateral Investment Treaties – The Reference to the ICSID Additional Facility, *in*: Realism in Law-Making: Essays on International Law in Honour of Willem Riphagen 35 (1986);

Schwächung des Schiedsdispositifs bei Investititonsstreitigkeiten, *in*: Festschrift für Walter J. Habscheid 113 (1989);

*González, G. M./Padilla, S. B.*, The International Centre for the Settlement of Investment Disputes: An Assessment from the Philippine Perspective, 59 Philippine Law Journal 222 (1984);

*Goo, C.-S.*, International Investment Disputes and ICSID Arbitration, 34 Korean Journal of International Law 139 (1989);

*Gopal, G.*, International Centre for Settlement of Investment Disputes, 14 Case Western Reserve Journal of International Law 591 (1982);

*Gotanda, J. Y.*, Awarding Interest in International Arbitration, 90 AJIL 40 (1996);

Awarding Costs and Attorneys' Fees in International Commercial Arbitrations, 21 Michigan Journal of International Law 1 (1999);

Compound Interest in International Disputes, 2 Oxford University Comparative Law Forum (2004);

*Gozard, G.*, La Convention de la B.I.R.D. pour le règlement des différends relatifs aux investissements, 6 Tiers-Monde 989 (1965);

*Greenwood, C. J.*, Anti-Suit Injunctions in International Arbitration: A Public International Lawyer's Perspective, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 147 (2005);

*Griffith, G.*, Constitution of Arbitral Tribunals: The Duty of Impartiality in Tribunals or Choose Your Arbitrator Wisely, 13 ICSID Review – FILJ 36 (1998);

*Gudgeon, K. S.*, Arbitration Provisions of U.S. Bilateral Investment Treaties, *in*: International Investment Disputes: Avoidance and Settlement (*Rubin, S. J./Nelson, R. W.* eds.) 41 (1985);

*Guillaume, G.*, Some Thoughts on the Independence of International Judges Vis-à-Vis States, 2 The Law and Practice of International Courts and Tribunals 163 (2003);

Can Arbitral Awards Constitute a Source of International Law under Article 38 of the Statute of the International Court of Justice?, *in*: Precedent in International Arbitration (*Banifatemi, Y.* ed.) 105 (2008);

*Guldberg, T.*, Settlement of Disputes Between States and Nationals of Other States, 36 Yearbook of the A.A.A. 98 (1966);

*Hahn, M. J.*, Die Anerkennung und Vollstreckung von ICSID-Schiedssprüchen in Frankreich, 37 Recht der Internationalen Wirtschaft 459 (1991);

*Hansen, T. B.*, The Legal Effect Given Stabilization Clauses in Economic Development Agreements, 28 Virginia Journal of International Law 1015 (1988);

*Happ, R.*, The Nykomb Case in the Light of Recent ICSID Jurisprudence, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 315 (2006);

The "Foreign Nationality"-Requirement and the "Exhaustion of Local Remedies" in Recent ICSID Jurisprudence, *in*: The International Convention on the Settlement of Investment Disputes (ICSID) (*Hofmann, R./Tams, C.* eds.) 103 (2007);

*Happ, R./Rubins, N.*, Awards and Decisions of ICSID Tribunals, German Yearbook of International Law, from Vol. 47 (2005) onwards, annually;

*Hassan, T.*, Publications of Aron Broches, 6 ICSID Review – FILJ 510 (1991);

*Herdegen, M.*, Wirkungen von Schiedssprüchen in Streitigkeiten zwischen Privatpersonen und fremden Staaten, 35 Recht der Internationalen Wirtschaft 329 (1989);

*Hirsch, M.*, The Arbitration Mechanism of the International Centre for the Settlement of Investment Disputes (1993);

Interactions Between Investment and Non-Investment Obligations, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 154 (2008);

*Hobér, K.*, State Responsibility and Investment Arbitration, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 261 (2006);

State Responsibility and Attribution, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 549 (2008);

*Hoffmann, A. K.*, Duty of Disclosure and Challenge of Arbitrators: The Standard Applicable Under the New IBA Guidelines on Conflicts of Interest and the German Approach, 21 Arbitration International 427 (2005);

Counterclaims by the Respondent State in Investment Arbitrations, Zeitschrift für Schiedsverfahren, German Arbitration Journal 317 (2006);

The Investor's Right to Waive Access to Protection under a Bilateral Investment Treaty, 22 ICSID Review – FILJ 69 (2007);

*Horlick, G. N./DeBusk, F. A.*, Dispute Resolution under NAFTA: Building on the U.S.-Canada FTA, GATT and ICSID, 10 Journal of International Arbitration 51 (1993);

*Horn, N.*, Arbitration and the Protection of Foreign Investment: Concepts and Means, *in*: Arbitrating Foreign Investment Disputes – Procedural and Substantive Legal Aspects (*Horn, N./Kröll, S.* eds.) 3 (2004);

*Hornick, R. N.*, The Recognition and Enforcement of Foreign Judgments in Indonesia, 18 Harvard International Law Journal 97 (1977);

The Mihaly Arbitration – Pre-Investment Expenditure as a Basis for ICSID Jurisdiction, 20 Journal of International Arbitration 189 (2003);

*Hynning, C. L.*, The World Bank's Plan for the Settlement of International Investment Disputes, 51 American Bar Association Journal 558 (1965);

*Igbokwe, V. C.*, Developing Countries and the Law Applicable to International Arbitration of Oil Investment Disputes, 14 Journal of International Arbitration 99 (1997);

Determination, Interpretation and Application of Substantive Law in Foreign Investment Treaty Arbitrations, 23 Journal of International Arbitration 267 (2006);

*Jacob, K. S.*, Reinvigorating ICSID With a New Mission and With Renewed Respect for Party Autonomy, 33 Virginia Journal of International Law 123 (1992);

*Jaenicke, G.*, The Prospects for International Arbitration: Disputes between States and Private Enterprises, *in*: International Arbitration: Past and Prospects (*Soons, A. H.* ed.) 155 (1990);

*Jagusch, S./Sinclair, A.*, The Limits of Protection for Investments and Investors under the Energy Charter Treaty, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 73 (2006);

*Johnson, T.*, Factual Review, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 59 (2006);

*Joyce, A.*, Note [on US District Court decisions in *Liberian Eastern Timber Corp.* v. *Republic of Liberia*], 29 Harvard International Law Journal 135 (1988);

*Juillard, P.*, Les conventions bilatérales d'investissement conclues par la France, 106 Journal du Droit International 274 (1979);

*Juncal, J. A.*, El Convenio sobre Arreglos de Diferencias Relativas a Inversiones entre Estados y Nacionales de otros Estados, 2 Jurisprudencia Argentina 2 (17 Nov.1970);

O Convênio do Banco Mundial Referente à Soluçao de Divergência Relativa a Investimentos, de 18 Março de 1965, 4 Revista de Ciência Política 51 (1970);


*Kahale, G.*, Enforcing an ICSID Arbitral Award, 6(5) International Financial Law Review 40 (1987);

New Legislation in the United States Facilitates Enforcement of Arbitral Agreements and Awards Against Foreign States, 6 Journal of International Arbitration 57 (1989);

*Kahn, P.*, The Law Applicable to Foreign Investments: The Contribution of the World Bank Convention on the Settlement of Investment Disputes, 44 Indiana Law Journal 1 (1968);

Souveraineté de l'Etat et règlement du litige. Régime juridique du contrat d'Etat, Revue de l'Arbitrage 641 (1985);

Le contrôle des sentences arbitrales rendues par un Tribunal CIRDI, *in*: La Juridiction Internationale Permanente (*Colloque de Lyon*) 363 (1986);

Les principes généraux du droit devant les arbitres du commerce international, 116 Journal du Droit International 305 (1989);

*Kalicki, J.*, ICSID Arbitration in the Americas, The Arbitration Review of the Americas (2007);

*Kantor, M.*, Amendments to the ICSID Arbitration Rules Take Effect, Asian Dispute Review (2006);

*Karl, J.*, The Promotion and Protection of German Foreign Investment Abroad, 11 ICSID Review – FILJ 1 (1996);

*Kaufmann-Kohler, G.*, Annulment of ICSID Awards in Contract and Treaty Arbitrations: Are There Differences?, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 189 (2004);

Arbitral Precedent: Dream, Necessity or Excuse?, 23 Arbitration International 357 (2007);

Is Consistency a Myth?, *in*: Precedent in International Arbitration (*Banifatemi, Y.* ed.) 137 (2008);

*Kaufmann-Kohler, G./Boisson de Chazournes, L./Bonnin, V./Moïse Mbengue, M.*, Consolidation of Proceedings in Investment Arbitration: How Can Multiple Proceedings Arising from the Same or Related Situations Be Handled Effectively?, Final Report on the Geneva Colloquium on Consolidation of Proceedings in Investment Arbitration, 22 April 2006, 21 ICSID Review – FILJ 59 (2006);

*Kazazi, M.*, Burden of Proof and Related Issues: A Study on Evidence Before International Tribunals (1996);

*Kemby, K. H.*, US Courts May Not Assert Jurisdiction Over Disputes Involving Agreements to Arbitrate Under the Auspices of the ICSID if the FSIA Bars Jurisdiction, 24 Virginia Journal of International Law 217 (1983);

*Kerameus, K. D.*, Anti-Suit Injunctions in ICSID Arbitration, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 131 (2005);

*Khalil, M. I.*, Treatment of Foreign Investment in Bilateral Treaties, 7 ICSID Review – FILJ 339 (1992);

*Kinnas, J. N.*, Some Aspects of the Convention on the Settlement of Investment Disputes, March 18, 1965, 22 Revue Hellénique de Droit International 110 (1969);

*Klein, F.-E.*, The Law to be Applied by the Arbitrators to the Substance of the Dispute, *in*: The Art of Arbitration. Essays on International Arbitration. Liber Amicorum Pieter Sanders (*Schultsz, J. C./Van den Berg, A. J.* eds.) 189 (1982);

*Knahr, C.*, Transparency, Third Party Participation and Access to Documents in International Investment Arbitration, 23 Arbitration International 327 (2007);

Investments "in Accordance with Host State Law", *in*: International Investment Law in Context (*Reinisch, A./Knahr, C.* eds.) 27 (2008);

*Knahr, C./Reinisch, A.*, Transparency Versus Confidentiality in International Investment Arbitration – The Biwater Gauff Compromise, 6 The Law and Practice of International Courts and Tribunals 97 (2007);

*Koa, C. M.*, The International Bank for Reconstruction and Development and Dispute Resolution: Conciliating and Arbitrating with China through the International Centre for Settlement of Investment Disputes, 24 New York University Journal of International Law and Politics 439 (1991);

*Kohona, P. T.*, Investment Protection Agreements: An Australian Perspective, 21 Journal of World Trade Law 79 (1987);

*Kokott, J.*, The Role of Diplomatic Protection in the Field of the Protection of Foreign Investment, International Law Association 70th Conference, New Delhi (2002);

*Kolkey, D. M.*, Attacking Arbitral Awards: Rights of Appeal and Review in International Arbitrations, 22 The International Lawyer 693 (1988);

*Kovar, R.*, La compétence du Centre International pour le règlement des différends relatifs aux investissements, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements Internationaux de la Faculté de Droit et des Sciences Économiques de Dijon* ed.) 25 (1969);

*Krafft, M.-C.*, Les accords bilatéraux sur la protection des investissements conclus par la Suisse, *in*: Foreign Investment in the Present and a New Economic Order (*Dicke, D.* ed.) 72 (1987);

*Kreindler, R.*, The Law Applicable to International Investment Disputes, *in*: Arbitrating Foreign Investment Disputes – Procedural and Substantive Legal Aspects (*Horn, N./Kröll, S.* eds.) 401 (2004);

*Krishan, D.*, *Impregilo S.p.A.* v. *The Islamic Republic of Pakistan* – A Case Comment, 2(3) TDM (2005);

Nationality of Physical Persons, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 57 (2007);

A Notion of ICSID Investment, *in*: Investment Treaty Arbitration and International Law (*Weiler, T. J.* ed.) 61 (2008);

*Kröll, S./Griebel, J.*, Protecting Shareholders in Investment Law: To Pierce or Not to Pierce the Veil, That is the Question!, 2 Stockholm International Arbitration Review 93 (2005);

*Kuchenberg, T.*, The World Bank: Arbiter Extraordinaire, 2 Journal of Law and Economic Development 259 (1968);

*Kunzer, K.*, Developing a Model Bilateral Investment Treaty, 15 Law and Policy in International Business 273 (1983);

*Kurkowski, E.*, Role and Jurisprudence of the International Centre for Settlement of Investment Disputes, 71 Revue de Droit International 151 (1993);

*Kurtz, J.*, The Delicate Extension of MFN Treatment to Foreign Investors: *Maffezini* v. *Kingdom of Spain*, *in*: International Investment Law and Arbitration – Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 523 (2005);

*Lagarde, P.*, Comment [on 1 June 1991 French Cour de cassation decision in Société Ouest Africaine des Bétons Industriels c. Etat du Sénégal], 81 Revue Critique de Droit International Privé 331 (1992);

*Laird, I.*, A Community of Destiny – The *Barcelona Traction* Case and the Development of Shareholder Rights to Bring Investment Claims, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 77 (2005);

A Distinction Without a Difference? An Examination of the Concepts of Admissibility and Jurisdiction in *Salini* v *Jordan* and *Methanex* v *USA*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 201 (2005);

*Lalive, J. F.*, Contrats entre Etats ou entreprises étatiques et personnes privées. Développements récents, 181 Recueil des Cours 9 (1983-III);

*Lalive, P.*, Aspects procéduraux de l'arbitrage entre un Etat et un investisseur étranger dans la Convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements Internationaux de la Faculté de Droit et des Sciences Économiques de Dijon* ed.) 111 (1969);

L'Etat en tant que partie à des contrats de concession ou d'investissement conclus avec des sociétés privées étrangères, *in*: 1 New Directions in International Trade Law (*UNIDROIT*) 317 (1977);

Some Threats to International Investment Arbitration, 1 ICSID Review – FILJ 26 (1986);

The First "World Bank" Arbitration (*Holiday Inns* v. *Morocco*) – Some Legal Problems, 51 British Year Book of International Law 123 (1980); *also in*: 1 ICSID Reports 645 (1993);

*Lamm, C. B.*, Jurisdiction of the International Centre for Settlement of Investment Disputes, 6 ICSID Review – FILJ 462 (1991);

*Lamm, C. B./Cohen Smutny, A.*, The Implementation of ICSID Arbitration Agreements, 11 ICSID Review – FILJ 64 (1996);

The International Centre for Settlement of Investment Disputes: Responses to Problems and Changing Requirements, 12 Mealeys International Arbitration Report 1 (1997);

*Langer, G.*, Das Weltbankübereinkommen zur Beilegung von Investitionsstreitigkeiten, 18 Recht der Internationalen Wirtschaft/Außenwirtschaftsdienst des Betriebs-Beraters 321 (1972);

*Langkeit, J.*, Staatenimmunität und Schiedsgerichtsbarkeit: Verzichtet ein Staat durch Unterzeichnung einer Schiedsgerichtsvereinbarung auf seine Immunität? (1989);

*Lankarani El-Zein, L.*, Quelques remarques sur la sentence SPP c. La République Arabe d'Égypte, 27 Revue Belge de Droit International 533 (1994);

*Larsen, C.*, ICSID Jurisdiction: The Relationship of Contracting States to Sub-States Entities, *in*: Arbitrating Foreign Investment Disputes (*Horn, N./Kröll, S.* eds.) 353 (2004);

*Lattanzi, F.*, Convenzione di Washington sulle controversie relative ad investimenti e invalidità delle sentenze arbitrali, 70 Rivista di Dritto Internazionale 521 (1987);

*Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642 (1968);

Aspects of the Administration of International Justice (1991);

*Laviec, J.-P.*, Protection et promotion des investissements (1985);

*Layton, R.*, Changing Attitudes Toward Dispute Resolution in Latin America, 10 Journal of International Arbitration 123 (1993);

*Leahy, E. R./Orentlicher, D. F.*, Enforcement of Arbitral Awards Issued by the Additional Facility of the International Centre of Settlement of Investment Disputes (ICSID), 2 Journal of International Arbitration 15 (1985);

*Leben, C.*, La théorie du contrat d'état et l'évolution du droit international des investissements, 302 Recueil des Cours 199 (2003);

*Leboulanger, P.*, Les contrats entre Etats et entreprises étrangères (1985);

Etat, politique et arbitrage. L'affaire du Plateau des Pyramides, Revue de l'Arbitrage 3 (1986);

*Legum, B.*, The Introduction of an Appellate Mechanism: The U.S. Trade Act of 2002, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 289 (2004);

Visualizing an Appellate System, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 121 (2006);

Defining Investment and Investor: Who is Entitled to Claim?, 22 Arbitration International 521 (2006);

Options to Establish an Appellate Mechanism for Investment Disputes, *in*: Appeals Mechanism in International Investment Disputes (*Sauvant, K. P./Chiswick-Patterson, M.* eds.) 231 (2008);

*Leigh, M.*, Comment on *Amco* v. *Indonesia*, Decision on Annulment, 16 May 1986, 81 AJIL 222 (1987);

*Lelewer, J. K.*, International Commercial Arbitration as a Model for Resolving Treaty Disputes, 21 New York University Journal of International Law and Politics 379 (1989);

*Lemaire, S.*, Treaty Claims et Contract Claims: la compétence du CIRDI à l'épreuve de la dualité de l'Etat, Revue de l'arbitrage 353 (2006);

*Lew, J. D. M.*, Applicable Law in International Commercial Arbitration (1978);

The Case for the Publication of Arbitration Awards, *in*: The Art of Arbitration. Essays on International Arbitration. Liber Amicorum Pieter Sanders (*Schultsz, J. C./van den Berg, A. J.* eds.) 223 (1982);

ICSID Arbitration: Special Features and Recent Developments, *in*: Arbitrating Foreign Investment Disputes (*Horn, N./Kröll, S.* eds.) 267 (2004);

*Lillich, R. B.*, The Law Governing Disputes under Economic Development Agreements: Reexamining the Concept of "Internationalization", *in*: International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? (*Lillich, R. B./Brower, C. N.* eds.) 61 (1993);

*Lim, P. G.*, The Kuala Lumpur Regional Arbitration Centre, 3 ICSID Review – FILJ 118 (1988);

*Lipstein, K.*, International Arbitration between Individuals and Governments and the Conflict of Laws, *in*: Contemporary Problems of International Law: Essays in Honour of Georg Schwarzenberger 177 (1988);

*Lizares, E. P.*, The New International Economic Order and the International Center for Settlement of Investment Disputes: Contradictory Implications on the Philippine Position, 55 Philippine Law Journal 298 (1980);

*Loncle, J.-M.*, La qualité d'investisseur dans les décisions CIRDI, 6 Revue de droit des affaires internationales 729 (2005);

La notion d'investissement dans les décisions du CIRDI, 3 Affaires Internationales 3 (2006);

*Lopina, D. A.*, The International Centre for Settlement of Investment Disputes: Investment Arbitration for the 1990s, 4 Ohio State Journal on Dispute Resolution 107 (1988);

*Loreti, A. B.*, La Convenzione per il regolamento delle controversie relative agli investimenti tra Stati e cittadini di altri Stati, Bancaria 1340 (1967);

*Lynch, S. T.*, The International Centre for the Settlement of Investment Disputes: Selected Case Studies, 7 International Trade Law Journal 306 (1982/83);


*MacKenzie, G. W.*, ICSID Arbitration as a Strategy for Levelling the Playing Field between International Non-Governmental Organizations and Host States, 19 Syracuse Journal of International Law and Commerce 197 (1993);

*Malintoppi, L.*, Independence, Impartiality, and Duty of Disclosure of Arbitrators, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 789 (2008);

*Manciaux, S.*, Investissements étrangers et arbitrage entre Etats et ressortissants d'autres Etats, Trente années d'activité du CIRDI (2004);

La Bolivie se retire du CIRDI, Revue de l'arbitrage 351 (2007);

The Relationships between States and their Instrumentalities in Investment Arbitration, *in*: State Entities in International Arbitration (*Gaillard, E./Younan, J.* eds.) 195 (2008);

*Mann, F. A.*, British Treaties for the Promotion and Protection of Investments, 52 British Year Book of International Law 241 (1981);

Compound Interest as an Item of Damage in International Law, 21 U.C. Davis Law Review 577 (1988);

*Mann, H.*, Comments on ICSID Discussion Paper "Possible Improvements on the Framework for ICSID Arbitration", www.iisd.org (December 2004);

The Emperor's Clothes Come Off: A Comment on Republic of Ghana v. Telekom Malaysia Berhard, and the Problem of Arbitrator Conflict of Interest, 1(5) TDM (2004);

*Marcantonio, J. B.*, ICSID as a Forum for the Renegotiation and Adaptation of Contracts, *in*: Adaptation and Renegotiation of Contracts in International Trade and Finance (*Horn, N.* ed.) 235 (1985);

*Marchais, B. P.*, ICSID and the Courts, News from ICSID, Vol. 3/2, p. 4 (1986);

ICSID Tribunals and Provisional Measures – Introductory Note to Decisions of the Tribunals of Antwerp and Geneva in *MINE v. Guinea*, 1 ICSID Review – FILJ 372 (1986);

Composition of ICSID Tribunals, News from ICSID, Vol. 4/2, p. 5 (1987);

Mesures provisoires et autonomie du système d'arbitrage CIRDI, 14 Droit et Pratique du Commerce International 275 (1988);

Setting up the Initial Procedural Framework in ICSID Arbitration, News from ICSID, Vol. 5/1 (1988);

*Margolis, A.*, Better Safe Than Sorry: Caution is the Watchword in Avoiding Conflicts of Interest, International Bar News (December 2004);

*Martynov, A. S.*, State Responsibility under the Energy Charter Treaty and Other Investment Protection Treaties, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 290 (2006);

*Marzorati, O. J.*, Enforcement of Treaty Awards and National Constitutions (The Argentinian Cases), 7 Business Law International 226 (2006);

*Maschke, O. M.*, Investitionsschutzabkommen. Neue vertragliche Wege im Dienste der öster-reichischen Wirtschaft, 37 Österreichische Zeitschrift für öffentliches Recht und Völkerrecht 201 (1986);

*Mason, E. S./Asher, R. E.*, The World Bank Since Bretton Woods (1973);

*Masood, A.*, Default Procedure in Arbitration under the World Bank Convention, 22 The Law Review (Punjab University, Chandigarh, India) 1 (1970);

Jurisdiction of International Centre for Settlement of Investment Disputes, 14 Journal of the Indian Law Institute 119 (1972);

Provisional Measures of Protection in Arbitration under the World Bank Convention, 1 Delhi Law Review 138 (1972);

Law Applicable in Arbitration of Investment Disputes under the World Bank Convention, 15 Journal of the Indian Law Institute 311 (1973);

*Mayer, P.*, To What Extent Can an *Ad Hoc* Committee Review the Factual Findings of an Arbitral Tribunal?, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 243 (2004);

*McLachlan, C./Shore, L./Weiniger, M.*, International Investment Arbitration Substantive Principles (2007);

*McLaughlin, J. T.*, Arbitration and Developing Countries, 13 The International Lawyer 211 (1979);

*Meessen, K. M.*, State Immunity in the Arbitral Process, *in*: Arbitrating Foreign Investment Disputes – Procedural and Substantive Legal Aspects (*Horn, N./Kröll, S.* eds.) 387 (2004);

*Mendelson, M.*, Runaway Train: The "Continuous Nationality" Rule from the *Panavezys-Saldutiskis Railway* case to *Loewen*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 97 (2005);

The Requirement for Continuous Nationality, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 41 (2007);

*Mengel, H.-J.*, Probleme der Zuständigkeit des International Centre for Settlement of Investment Disputes (ICSID), 32 Recht der Internationalen Wirtschaft 941 (1986);

*Merciai, P.*, Les enterprises multinationales en droit international (1993);

*Miaja de la Muela, A.*, Aspectos jurídicos de las diferencias entre Estados y personas privadas extranjeras, 22 Revista Española de Derecho Internacional 9 (1969);

*Migliorino, L.*, Gli accordi internazionali sugli investimenti (1989);

Indennizzi per danni e investimenti stranieri in caso di conflitti interni: il caso AAPL-Sri Lanka, 28 Rivista di Diritto Internazionale Privato e Processuale 497 (1992);

*Minoli, E.*, Osservazioni sul recente progetto della Banca Internazionale di Ricostruzione e Sviluppo per la risoluzione internazionale di controversie, Rivista dell'Arbitrato 113 (1965);

*Mistelis, L.*, Confidentiality and Third Party Participation: *UPS* v. *Canada* and *Methanex Corp. v. United States*, *in*: International Investment Law and Arbitration: Leading Cases (*Weiler, T.* ed.) 169 (2005); *also in*: 21 Arbitration International 211 (2005);

*Moore, M. M.*, International Arbitration Between States and Foreign Investors – The World Bank Convention, 18 Stanford Law Review 1359 (1966);

*Moti, J. R.*, Settling Disputes the "ICSID" Way, 25 Australian Law News 5 (June 1990);

Australia to Ratify the ICSID Convention, 17 Australian Construction Law Newsletter 26 (April 1991);

Settlement of International Investment Disputes, 6 Pacific Basin Bulletin 2 (April/May 1991);

*Mourre, A.*, Are *Amici Curiae* the Proper Response to the Public's Concerns on Transparency in Investment Arbitration? 5 The Law and Practice of International Courts and Tribunals 257 (2007);

*Muchlinski, P. T.*, Dispute Settlement under the Washington Convention on the Settlement of Investment Disputes, *in*: Control over Compliance with International Law (*Butler, W. E.* ed.) 175 (1991);

Multinational Enterprises and the Law (2nd ed. 2007);

*Myjer, E. P. J.*, ICSID and the Settlement of Investment Disputes in Poland, 18 Polish Yearbook of International Law 143 (1989/90);


*Nassar, N.*, Internationalization of State Contracts: ICSID, The Last Citadel, 14 Journal of International Arbitration 185 (1997);

*Nathan, K. V. S. K.*, ICSID and Dispute Resolution in International Civil Engineering Contracts, 58 Arbitration: Journal of the Institute of Arbitrators 193 (1992);

Submissions to the International Centre for Settlement of Investment Disputes in Breach of the Convention, 12 Journal of International Arbitration 27 (1995);

The ICSID Convention (2000);

*Nedijar, D.*, Chronique de droit de l'arbitrage international, 21 Droit et Pratique du Commerce International 151 (1995);

*New York City Bar Association Committee on International Law*, The Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 20 The Record of the Association of the Bar of the City of New York 400 (1965);

*Niggemann, F.*, The ICSID *Klöckner v. Cameroon* Award: The Dissenting Opinion, 1 Journal of International Arbitration 331 (1984);

Zuständigkeitsprobleme der Weltbankschiedsgerichtsbarkeit im Licht der bisherigen Schiedsverfahren, 5 Praxis des Internationalen Privat- und Verfahrensrechts 185 (1985);

Das Washingtoner Weltbankübereinkommen von 1965 – Das Nichtigkeitsverfahren im Ad-Hoc-Komitee, 4 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 97 (1990);

Die dritte Annullierung eines ICSID-Schiedsspruches – Die Entscheidung in Sachen Mine v. Guinea, 11 Praxis des Internationalen Privat- und Verfahrensrechts 77 (1991);

*Nmehielle, V. O.*, Enforcing Arbitration Awards Under the International Convention for the Settlement of Investment Disputes (ICSID Convention), 7 Annual Survey of International and Comparative Law 21 (2001);

*Nolan, M. D./Sourgens, F. G.*, The Interplay Between State Consent to ICSID Arbitration and Denunciation of the ICSID Convention: The (Possible) Venezuela Case Study, TDM, September (2007);

*Norton, P. M.*, A Law of the Future or a Law of the Past? Modern Tribunals and the International Law of Expropriation, 85 AJIL 474 (1991);

*Nurick, L.*, Costs in International Arbitrations, 7 ICSID Review – FILJ 57 (1992);

*Nurick, L./Schnably, S. J.*, The First ICSID Conciliation: *Tesoro Petroleum Corporation v. Trinidad and Tobago*, 1 ICSID Review – FILJ 340 (1986);

*O'Hare, P. K.*, The Convention on the Settlement of Investment Disputes, 6 Stanford Journal of International Studies 146 (1971);

*O'Keefe, P. J.*, The International Centre for Settlement of Investment Disputes, 34 The Year Book of World Affairs 286 (1980);

*O'Neill, P. D.*, American Legal Developments in Commercial Arbitration Involving Foreign States and State Enterprises, 6 Journal of International Arbitration 117 (1989);

*Ocran, T. M.*, Bilateral Investment Protection Treaties: A Comparative Study, 8 New York Law School Journal of International and Comparative Law 401 (1987);

*Oellers-Frahm, K.*, Interim Measures of Protection, *in*: Encyclopedia of Public International Law, Vol. 1, 69 (1981);

*Oelstrom, K.*, A Treaty for the Future: The Dispute Settlement Mechanisms of the NAFTA, 25 Law and Policy in International Business 783 (1994);

*Olbourne, B.*, Independence and Impartiality: International Standards for National Judges and Courts, 2 The Law and Practice of International Courts and Tribunals 97 (2003);

*Orrego Vicuña, F.*, Changing Approaches to the Nationality of Claims in the Context of Diplomatic Protection and International Dispute Settlement, 15 ICSID Review – FILJ 340 (2000);

*Ortino, F./Liberti, L./Sheppard, A./Warner, H. (eds.)*, Investment Treaty Law Current Issues II (2007);

*Ortino, F./Sheppard, A./Warner, H. (eds.)*, Investment Treaty Law Current Issues Vol. 1 (2006);

*Osinbajo, Y.*, Sovereign Immunity in International Commercial Arbitration: The Nigerian Experience and Emerging State Practice, 4 African Journal of International and Comparative Law 1 (1992);

*Ott, R.*, Die Beilegung von Investitionsstreitigkeiten durch Schiedsgerichte – Die Praxis von ICSID (1983);

*Ouakrat, P.*, La pratique du CIRDI, 13 Droit et Pratique du Commerce International 273 (1987);

*Paasivirta, E.*, Participation of States in International Contracts and Arbitral Settlement of Disputes (1990);

*Padilla IV, S. B.*, Some Available Options to Save the Viability of ICSID Arbitration in the Light of the Annulment Awards in *Klockner v. Cameroon* and *Amco Asia v. Republic of Indonesia*, 63 Philippine Law Journal 321 (1988);

*Pannier, M.*, Nationality of Corporations under Domestic Law: A Comparative Perspective, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 11 (2007);

*Parra, A. R.*, Revised Regulations and Rules, News from ICSID, Vol. 2/1, p. 4 (1985);

The Screening Power of the ICSID Secretary General, News from ICSID, Vol. 2/2, p. 10 (1985);

The International Centre for Settlement of Investment Disputes and Immunity of Arbitrators, *in*: The Immunity of Arbitrators (*Lew, J.* ed.) 105 (1990);

Principles Governing Foreign Investment, as Reflected in National Investment Codes, 7 ICSID Review – FILJ 428 (1992);

ICSID and New Trends in International Dispute Settlement, 87 American Society of International Law Proceedings 2 (1993);

The Practices and Experience of the ICSID, *in*: Conservatory and Provisional Measures in International Arbitration (*ICC Publication No. 519*) 37 (1993);

Sources of Information on ICSID, News from ICSID, Vol. 11/2, p. 2 (1994);

The Rights and Duties of ICSID Arbitrators, News from ICSID, Vol. 13/1, p. 4 (1996);

The Scope of New Investment Laws and International Instruments, *in*: Economic Development, Foreign Investment and the Law (*Pritchard, R.* ed.) 27 (1996);

Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments on Investment, 12 ICSID Review – FILJ 287 (1997);

The Role of the ICSID Secretariat in the Administration of Arbitration Proceedings under the ICSID Convention, 13 ICSID Review – FILJ 85 (1998);

The Limits of Party Autonomy in Arbitration Proceedings under the ICSID Convention, 10 ICC International Court of Arbitration Bulletin (1999);

The Role of ICSID in the Settlement of Investment Disputes, News from ICSID, Vol. 16/1, p. 5 (1999);

Applicable Substantive Law in ICSID Arbitrations Initiated Under Investment Treaties, 16 ICSID Review – FILJ 20 (2001);

New Amendments of the Regulations and Rules of the International Centre for Settlement of Investment Disputes, 19 News from ICSID 1 (2002);

The Institution of ICSID Arbitration Proceedings, 20 News from ICSID 12 (2003);

The New Amendments to the ICSID Regulations and Rules and the Additional Facility Rules, 28 Yearbook of Commercial Arbitration 357 (2003);

The New Amendments to the ICSID Regulations and Rules and Additional Facility Rules, 3 The Law and Practice of International Courts and Tribunals 181 (2004);

Desirability and Feasibility of Consolidation – Introductory Remarks, 21 ICSID Review – FILJ 132 (2006);

Applicable Law in Investor-State Arbitration, TDM, November (2007);

The Development of the Regulations and Rules of the International Centre for Settlement of Investment Disputes, 41 International Law 47 (2007);

The Development of the Regulations and Rules of the International Centre for Settlement of Investment Disputes, 22 ICSID Review – FILJ 55 (2007);

*Pattison, J. E.*, The United States-Egypt Bilateral Investment Treaty: A Prototype for Future Negotations, 16 Cornell International Law Journal 305 (1983);

*Paulsson, J.*, Les obligations des partenaires dans un accord de développement économique: la sentence arbitrale Cameroun c. Klöckner, Revue de l'Arbitrage 19 (1984);

The ICSID *Klöckner v. Cameroon* Award: The Duties of Partners in North-South Economic Development Agreements, 1 Journal of International Arbitration 145 (1984);

May a State Invoke its Internal Law to Repudiate Consent to Arbitration?, 2 Arbitration International 90 (1986);

International Commercial Arbitrations, *in*: Handbook of Arbitration Practice (*Bernstein, R.* ed.) 335 (1987);

Third World Participation in International Investment Arbitration, 2 ICSID Review – FILJ 19 (1987);

ICSID's Achievements and Prospects, 6 ICSID Review – FILJ 380 (1991);

ICSID Arbitration: The Host State's Point of View, *in*: Private Investments Abroad – Problems and Solutions in International Business (*Southwestern Legal Foundation* ed.) ch. 15 (1993);

The Role of International Arbitration, *in*: Handbook of Arbitration Practice, 2nd ed. (*Bernstein, R./Wood, D.* eds.) 427 (1993);

Arbitration Without Privity, 10 ICSID Review – FILJ 232 (1995);

Dispute Resolution, *in*: Economic Development, Foreign Investment and the Law (*Pritchard, R.* ed.) 209 (1996);

Ethics, Elitism, Eligibility, 14 Journal of International Arbitration 13 (1997);

Avoiding Unintended Consequences, *in*: Appeals Mechanism in International Investment Disputes (*Sauvant, K. P./Chiswick-Patterson, M.* eds.) 241 (2008);

*Perera, A. R./Dias, N.*, *Asian Agricultural Products Ltd. v. The Republic of Sri Lanka*, 2 The American Review of International Arbitration 216 (1991);

*Perera, S. M.*, State Responsibility – Ascertaining the Liability of States in Foreign Investment Disputes, 6 The Journal of World Investment & Trade 499 (2005);

*Perkams, M.*, Piercing the Corporate Veil in International Investment Agreements, *in*: International Investment Law in Context (*Reinisch, A./Knahr, C.* eds.) 93 (2008);

*Peter, C. M.*, Settlement of Investment Disputes, 5 Journal of International Arbitration 67 (1988);

*Peter, W.*, Arbitration and Renegotiation of International Investment Agreements, 2nd ed. (1995);

*Peters, P.*, Dispute Settlement Arrangements in Investment Treaties, 22 Netherlands Yearbook of International Law 91 (1991);

*Picozzi, P.*, The Settlement of International Investment Disputes, 4 Trent Law Journal 37 (1980);

*Pietrowski, R.*, Evidence in International Arbitration, 22 Arbitration International 373 (2006);

*Pinsolle, P.*, The Annulment of ICSID Arbitral Awards, 1 The Journal of World Investment 243 (2000);

Jurisdictional Review of ICSID Awards, 5 The Journal of World Investment & Trade 613 (2004);

"Manifest" Excess of Powers and Jurisdictional Review of ICSID Awards, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 51 (2006); *also in*: 2(2) TDM 28 (2005);

*Pinto, C. W.*, Settlement of Investment Disputes: The World Bank's Convention, 13 Howard Law Journal 337 (1967);

*Pirrung, J.*, Die Schiedsgerichtsbarkeit nach dem Weltbankübereinkommen für Investitionsstreitigkeiten (1972);

Das Weltbankübereinkommen für Investitionsstreitigkeiten vom 18. März 1965, 17 Die Aktiengesellschaft 365 (1972);

*Pirrwitz, B.*, Annulment of Arbitral Awards Under Article 52 of the Washington Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 23 Texas International Law Journal 73 (1988);

*Pogany, I.*, Bilateral Investment Treaties: Some Recent Examples, 2 ICSID Review – FILJ 457 (1987);

*Pogany, S. I.*, Economic Development Agreements, 7 ICSID Review – FILJ 1 (1992);

*Poirat, F.*, L'article 26 du traité relatif à la Charte de l'énergie: procédures de règlement des différends et statut des personnes privées, 102 Revue Générale de Droit International Public 45 (1998);

*Pommier, J.-C.*, La résolution du conflit de lois en matière contractuelle en présence d'une élection de droit: le rôle de l'arbitre, 119 Journal du Droit International 5 (1992);

Principe d'autonomie et loi du contrat en droit international privé conventionnel (1992);

*Poudret, J.-F./Besson, S.*, Droit comparé de l'arbitrage international (2003);

*Qureshi, A. H.*, An Appellate System in International Investment Arbitration?, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1154 (2008);

*Raeschke-Kessler, H.*, The Production of Documents in International Arbitration – A Commentary of Article 3 of the New IBA Rules of Evidence, 18 Arbitration International 411 (2002);

*Rambaud, P.*, Premiers enseignements des arbitrages du C.I.R.D.I., 23 Annuaire Français de Droit International 471 (1982);

Note sur l'extension du "système CIRDI", 29 Annuaire Français de Droit International 290 (1983);

Deux arbitrages C.I.R.D.I., 30 Annuaire Français de Droit International 391 (1984);

L'affaire "des Pyramides", 31 Annuaire Français de Droit International 508 (1985);

L'annulation des sentences Klöckner et Amco, 32 Annuaire Français de Droit International 259 (1986);

De la compétence du tribunal C.I.R.D.I. saisi après une décision d'annulation, 34 Annuaire Français de Droit International 209 (1988);

Des obligations de l'Etat vis-à-vis de l'investisseur étranger (*Sentence AAPL c. Sri Lanka*), 38 Annuaire Français de Droit International 501 (1992);

L'affaire "des Pyramides": suite et fin, 39 Annuaire Français de Droit International 567 (1993);

*Rand, W./Hornick, R. N./Friedland, P.*, ICSID's Emerging Jurisprudence: The Scope of ICSID's Jurisdiction, 19 New York University Journal of International Law and Politics 33 (1986);

*Razafindralambo, E.*, Le CIRDI: Point de vue des États du Tiers Monde, 22 Rassegna dell'Arbitrato 55 (1982);

*Redfern, A.*, ICSID – Losing its Appeal?, 3 Arbitration International 98 (1987);

*Redfern, A./Hunter, M.*, Law and Practice of International Commercial Arbitration (1986);

*Redfern, A./Hunter, M./with Blackaby, N./Partasides, C.*, Law and Practice of International Commercial Arbitration (2004);

*Reed, L./Paulsson, J./Blackaby, N.*, A Guide to ICSID Arbitration (2004);

*Reif, L. C.*, Conciliation as a Mechanism for the Resolution of International Economic and Business Disputes, 14 Fordham International Law Journal 578 (1990–91);

*Reinisch, A.*, From Contested Jurisdiction to Indirect Expropriation and Fair and Equitable Treatment – Developments in ICSID Arbitration in 2004: Introductory Note, The Global Community 1653 (2005);

European Court Practice Concerning State Immunity from Enforcement Measures, 17 European Journal of International Law 803 (2006);

From the Intricacies of Ratione Personae Jurisdiction to Failed Justifications on the Merits under the Necessity Defence – ICSID Arbitration in 2005: Introductory Note, The Global Community 1449 (2006);

New Jurisdictional Hurdles, More on Investment Protection Standards and Novel Procedural Issues – ICSID Arbitration in 2006: Introductory Note, The Global Community 1799 (2007);

The Role of Precedent in ICSID Arbitration, Austrian Arbitration Yearbook 495 (2008);

*Reinisch, A.* (ed.), Standards of Investment Protection (2008);

*Reinisch, A./Knahr, C. (eds.)*, International Investment Law in Context (2008);

*Reinisch, A./Malintoppi, L.*, Methods of Dispute Resolution, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 691 (2008);

*Reisman, W. M.*, The Breakdown of the Control Mechanism in ICSID Arbitration, Duke Law Journal 739 (1989);

Repairing ICSID's Control System: Some Comments on Aron Broches' "Observations on the Finality of ICSID Awards", 7 ICSID Review – FILJ 196 (1992);

Systems of Control in International Adjudication and Arbitration. Breakdown and Repair (1992);

The Supervisory Jurisdiction of the International Court of Justice: International Arbitration and International Adjudication, 258 Recueil des Cours 1 (1996);

The Regime for Lacunae in the ICSID Choice of Law Provision and the Question of its Threshold, 15 ICSID Review – FILJ 362 (2000);

*Reisman, W. M./Arsanjani, M. H.*, The Question of Unilateral Governmental Statements as Applicable Law in Investment Disputes, 19 ICSID Review – FILJ 328 (2004);

*Reuter, P.*, Réflexion sur la compétence du Centre créé par la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements Internationaux de la Faculté de Droit et des Sciences Économiques de Dijon* ed.) 9 (1969);

*Reymond, C.*, The President of the Arbitral Tribunal, 9 ICSID Review – FILJ 1 (1994);

*Ribeiro, C. (ed.)*, Investment Arbitration and the Energy Charter Treaty (2006);

*Rigaux, F.*, Contrats d'Etat et arbitrage transnational, 67 Rivista di Diritto Internazionale 489 (1984);

*Rodley, N. S.*, Some Aspects of the World Bank Convention on the Settlement of Investment Disputes, 4 Canadian Yearbook of International Law 43 (1966);

*Rogers, W. D.*, Of Missionaries, Fanatics and Lawyers: Some Thoughts on Investment Disputes in the Americas, 72 AJIL 1 (1978);

*Rosenne, S.*, Provisional Measures in International Law (2005);

*Roulet, J.-D.*, Convention pour le règlement des différends relatifs aux investissements, 20 Revue Suisse de Jurisprudence 301 (1965);

La Convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, 22 Schweizer Jahrbuch für Internationales Recht 121 (1965);

*Rowat, M. D.*, Multilateral Approaches to Improving the Investment Climate of Developing Countries: The Cases of ICSID and MIGA, 33 Harvard International Law Journal 103 (1992);

*Rubin, S. J.*, Avoidance and Settlement of International Investment Disputes. XII. Curso de Derecho Internacional 43 (1986);

*Rubino-Sammartano, M.*, International Arbitration Law (1990);

*Rubins, N.*, The Allocation of Costs and Attorneys Fees in Investor-State Arbitration, 18 ICSID
    Review – FILJ 109 (2003);

  The Notion of "Investment" in International Investment Arbitration, *in*: Arbitrating Foreign
    Investment Disputes (*Horn, N./Kröll, S.* eds.) 283 (2004);

  Judicial Review of Investment Arbitration Awards, *in*: Investment Treaty Law Current Issues
    Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 75 (2006);

  Opening the Investment Arbitration Process: At What Cost for What Benefit?, 3(3) TDM
    (2006);

  MFN Clauses, Procedural Rights and a Return to the Treaty Text, *in*: Investment Treaty Arbi-
    tration and International Law (*Weiler, T. J.* ed.) 213 (2008);

*Rubins, N./Kinsella, N. S.*, International Investment, Political Risk and Dispute Resolution: A
    Practitioner's Guide (2005);

*Rueda García, J. Á.*, Provisional Measures in Investment Arbitration: Recent Experiences in Oil
    Arbitrations Against the Republic of Ecuador, TDM, July (2008);

*Ryans, J. K./Baker, J. C.*, The International Centre for Settlement of Investment Disputes (ICSID),
    10 Journal of World Trade Law 65 (1976);


*Sacerdoti, G.*, La convenzione di Washington del 1965 per la soluzione delle controversie tra Stati
    e nazionali di altri Stati in materia di investimenti, 5 Rivista di Diritto Internazionale Privato
    e Processuale 614 (1969);

  State Contracts and International Law: A Reappraisal, 7 Italian Yearbook of International Law
    26 (1986/87);

  La convenzione di Washington del 1965: bilancio di un ventennio dell' ICSID, 23 Rivista di
    Diritto Internazionale Privato e Processuale 13 (1987);

  Investment Arbitration Under ICSID and UNCITRAL Rules: Prerequisites, Applicable Law,
    Review of Awards, 19 ICSID Review – FILJ 1 (2004);

*Saleh, W.*, Le règlement des litiges des investissements entre l'Etat et les étrangers, 71 L'Egypte
    Contemporaire 379 (1980);

*Salem, M.*, Le développement de la protection conventionnelle des investissements étrangers, 113
    Journal du Droit International 579 (1986);

*Salomon, C./Knox, K.*, Options for Change in the Annulment Process, 2(1) Global Arbitration
    Review 35 (2007);

*Sandifer, D. V.*, Evidence before International Tribunals (reprinted, 1975);

*Sandy, D.*, Independence, Impartiality, Arbitration and the Human Rights Act in England, 20
    Arbitration International 305 (2004);

*Santosuosso, L.*, L'espropriazione di beni o diritti patrimoniali di cittadini stranieri e la determi-
    nazione dell'indennizzo secondo la giurisprudenza dell'ICSID, 32 Rivista di Diritto Inter-
    nazionale Privato e Processuale 195 (1996);

*Sassoon, D. M.*, Convention on the Settlement of Investment Disputes, 9 The Journal of Business
    Law 334 (1965);

  The Convention on the Settlement of Investment Disputes Between States and Nationals of
    Other States, 1 Israel Law Review 27 (1966);

  Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes
    and the International Chamber of Commerce, 6 World Traders 19 (1973);

*Sauvant, K. P./Chiswick-Patterson, M. (eds.)*, Appeals Mechanism in International Investment
    Disputes (2008);

*Savarese, E.*, La nazionalità delle società commerciali e la funzione del controllo: alcune riflessioni in margine alla decisione ICSID Tokios Tokeles v. Ukraine, 15 Rivista dell'Arbitrato 369 (2005);

Investment Treaties and the Investor's Right to Arbitration between Broadening and Limiting ICSID Jurisdiction, 7 The Journal of World Investment & Trade 407 (2006);

*Schatz, S.*, The Effect of the Annulment Decisions in *Amco v. Indonesia* and *Klöckner v. Cameroon* on the Future of the International Centre for Settlement of Investment Disputes, 3 American University Journal of International Law and Policy 481 (1988);

*Schill, S. W.*, Arbitration Risk and Effective Compliance – Cost-Shifting in Investment Treaty Arbitration, 7 The Journal of World Investment & Trade 653 (2006);

*Schlechtriem, P.*, Zur Überprüfbarkeit von ICSID-Schiedssprüchen: Die Aufhebungsentscheidung im Falle Klöckner/Kamerun, 6 Praxis des Internationalen Privat- und Verfahrensrechts 69 (1986);

*Schlemmer, E. C.*, Investment, Investor, Nationality, and Shareholders, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 49 (2008);

*Schmidt, J. T.*, Arbitration Under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID): Implications of the Decision on Jurisdiction in *Alcoa Minerals of Jamaica Inc. v. Government of Jamaica*, 17 Harvard International Law Journal 90 (1976);

*Schramke, H.-J.*, The Interpretation of Umbrella Clauses in Bilateral Investment Treaties, 4(5) TDM (2007);

*Schreuer, C.*, State Immunity: Some Recent Developments (1988);

Decisions Ex Aequo et Bono Under the ICSID Convention, 11 ICSID Review – FILJ 37 (1996);

International and Domestic Law in Investment Disputes. The Case of ICSID, 1 Austrian Review of International and European Law 89 (1996);

The Interpretation of ICSID Arbitration Agreements, *in*: International Law: Theory and Practice, Essays in Honour of Eric Suy (*Wellens, K.* ed.) 719 (1998);

Access to ICSID Dispute Settlement for Locally Incorporated Companies, *in*: International Economic Law with a Human Face (*Weiss, F. et al.* eds.) 497 (1998);

Settlement of Investment Disputes in the Cause of Development, *in*: Development and Developing International and European Law, Essays in Honour of K. Ginther (*Benedek, W./Isak, H./Kicker, R.* eds.) 285 (1999);

Failure to Apply the Governing Law in International Investment Arbitration, 7 Austrian Review of International and European Law 147 (2002);

The World Bank/ICSID Dispute Settlement Procedures, *in*: Settlement of Disputes in Tax Treaty Law (*Lang, M./Züger, M.* eds.) 579 (2002);

ICSID Annulment Revisited, 30 Legal Issues of Economic Integration 103 (2003);

Non-Pecuniary Remedies in ICSID Arbitration, 20 Arbitration International 325 (2004);

Three Generations of ICSID Annulment Proceedings, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 17 (2004);

Travelling the BIT Route: Of Waiting Periods, Umbrella Clauses and Forks in the Road, 5 The Journal of World Investment & Trade 231 (2004);

Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, 4 The Law and Practice of International Courts and Tribunals 1 (2005);

Investment Arbitration: A Voyage of Discovery, 71 Arbitration 73 (2005);

Investment Treaty Arbitration and Jurisdiction Over Contract Claims – The *Vivendi I* Case Considered, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 281 (2005);

Shareholder Protection in International Law, *in*: Common Values in International Law, Essays in Honour of Christian Tomuschat (*Dupuy, P.-M./Fassbender, B./Shaw, M. N./Sommermann, K.-P.* eds.) 601 (2006); *also in*: 2(3) TDM (2005);

Diversity and Harmonization of Treaty Interpretation in Investment Arbitration, 3(2) TDM (2006);

Investment Protection and International Relations, *in*: The Law of International Relations, Liber Amicorum Hanspeter Neuhold (*Reinisch, A./Kriebaum, U.* eds.) 345 (2007);

The Dynamic Evolution of the ICSID System, *in*: The International Convention on the Settlement of Investment Disputes (ICSID) (*Hofmann, R./Tams, C.* eds.) 15 (2007);

Consent to Arbitration, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 830 (2008);

Preliminary Rulings in Investment Arbitration, *in*: Appeals Mechanism in International Investment Disputes (*Sauvant, K.* ed.) 207 (2008);

*Schreuer, C./Kriebaum, U.*, The Concept of Property in Human Rights Law and International Investment Law, *in*: Human Rights, Democracy and the Rule of Law, Liber Amicorum Luzius Wildhaber (*Breitenmoser, S.* ed.) 743 (2007);

*Schreuer, C./Weiniger, M.*, A Doctrine of Precedent?, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1188 (2008);

*Schwartz, E. A.*, Finality at What Cost? The Decision of the *Ad Hoc* Committee in *Wena Hotels v. Egypt*, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 43 (2004);

*Schwarzenberger, G.*, Foreign Investments and International Law (1969);

*Schwebel, S. M.*, International Arbitration: Three Salient Problems (1987);

On Whether the Breach by a State of a Contract with an Alien is a Breach of International Law, *in*: International Law at the Time of its Codification, Essays in Honour of Roberto Ago, III, 401 (1987);

The Majority Vote of an International Arbitral Tribunal, *in*: Etudes de Droit International en l'Honneur de Pierre Lalive (*Dominicé, C./Patry, R. C.* eds.) 671 (1993);

Arbitration and the Exhaustion of Local Remedies, *in*: Justice in International Law, Selected Writings, 171 (1994);

The Creation and Operation of an International Court of Arbitral Awards, *in*: The Internationalization of International Arbitration (*Hunter, M./Marriott, A./Veeder, V. V.* eds.) 115 (1995);

Anti-Suit Injunctions in International Arbitration: An Overview, *in*: Anti-Suit Injunctions in International Arbitration (*Gaillard, E.* ed.) 5 (2005);

Compound Interest in International Law, 2(5) TDM (2005);

*Sedlak, D. R.*, ICSID's Resurgence in International Investment Arbitration: Can the Momentum Hold?, 23 Penn State International Law Review 147 (2004);

*Seidl-Hohenveldern, I.*, Die Aufhebung von ICSID Schiedssprüchen, 2 Jahrbuch für die Praxis der Schiedsgerichtsbarkeit 100 (1989);

*Shany, Y.*, Contract Claims vs. Treaty Claims: Mapping Conflicts between ICSID Decisions on Multisourced Investment Claims, 99 AJIL 835 (2005);

*Sharma, S. P.*, Interpretation of Bilateral Investment Treaties: The Case of Asian Agricultural Products Ltd. (AAPL) v. Republic of Sri Lanka, 1 Asia Pacific Law Review 123 (1992);

*Sharpe, J. K.*, Drawing Adverse Inferences from Non-Production of Evidence, 22 Arbitration International 549 (2006);

*Shelton, D.*, Legal Norms to Promote the Independence and Accountability of International Tribunals, 2 The Law and Practice of International Courts and Tribunals 27 (2003);

*Sheppard, A.*, The Jurisdictional Threshold of a Prima-Facie Case, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 932 (2008);

*Sheppard, A./Hunter, M.*, An Overview of the Relationship between Courts and Investment Treaty Arbitration, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 153 (2006);

*Shifman, B.*, The Challenge of Administering an Appellate System for Investment Disputes, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 113 (2006);

*Shifman, B. E.*, *Maritime International Nominees Establishment v. Republic of Guinea*: Effect on U.S. Jurisidiction of an Agreement by a Foreign Sovereign to Arbitrate before the International Centre for the Settlement of Investment Disputes, 16 George Washington Journal of International Law and Economics 451 (1982);

*Shihata, I. F. I.*, ICSID and Latin America, News from ICSID, Vol. 1/2, p. 2 (1984);

 Le CIRDI et les pays en voie de développement, Entwicklung/Développement 48 (Oct. 1984);

 Obstacles Facing ICSID's Proceedings and International Arbitration in General, News from ICSID, Vol. 3/1, p. 8 (1986);

 Obstacles Facing International Arbitration, 4 International Tax and Business Lawyer 209 (1986);

 The Multilateral Investment Guarantee Agency, 20 The International Lawyer 485 (1986);

 The Role of ICSID and the Projected Multilateral Investment Guarantee Agency (MIGA), 41 Außenwirtschaft 105 (1986);

 The Settlement of Disputes Regarding Foreign Investments: The Role of the World Bank with Particular Reference to ICSID and MIGA, 1 Arab Law Quarterly 265 (1986); *also in*: 1 The American University Journal of International Law and Policy 97 (1986);

 Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1 (1986);

 Le CIRDI et les pays en voie de développement et plus particulièrement les pays arabes, Proceedings of the First Euro-Arab Arbitration Conference (*Kemicha, F.* ed.) 89 (1987);

 MIGA and Foreign Investment Origins, Operations, Policies and Basic Documents of the Multilateral Investment Guarantee Agency (1988);

 The Experience of ICSID in the Selection of Arbitrators, News from ICSID, Vol. 6/1, p. 4 (1989);

 The Institute of International Law's Resolution on Arbitration between States and Foreign Enterprise – A Comment, 5 ICSID Review – FILJ 65 (1990);

 Promotion of Foreign Direct Investment – A General Account, with Particular Reference to the Role of the World Bank Group, 6 ICSID Review – FILJ 484 (1991);

 The World Bank in a Changing World (1991);

 ICSID Arbitration: The Institution's Point of View, *in*: Private Investments Abroad – Problems and Solutions in International Business (*Southwestern Legal Foundation* ed.) ch. 16 (1993); *also in*: The World Bank in a Changing World, Vol. II, 425 (1995);

The Settlement of Disputes Under Oil and Gas Exploration and Development Agreements – The Relevance of ICSID and the World Bank Group Guidelines, *in*: The World Bank in a Changing World, Vol. II, 497 (1995);

Applicable Law in International Arbitration: Specific Aspects in Case of the Involvement of State Parties, *in*: The World Bank in a Changing World, Vol. II, 595 (1995);

Recent Developments in ICSID, 13 ICSID Review – FILJ 10 (1998);

ICSID and Investment Treaties, *in*: The World Bank in a Changing World, Vol. III (2000);

*Shihata, I. F. I./Parra, A. R.*, Applicable Substantive Law in Disputes Between States and Private Foreign Parties: The Case of Arbitration under the ICSID Convention, 9 ICSID Review – FILJ 183 (1994);

The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Review – FILJ 299 (1999);

*Siller, S. I.*, Settlement of International Investment Disputes: A Functional Approach, 38 Brooklyn Law Review 693 (1972);

*Sinagra, A.*, L'arbitrato commerciale internazionale nel sistema del CIRDI ed i suoi recenti sviluppi (1984);

*Sinclair, A. C*., The Origins of the Umbrella Clause in the International Law of Investment Protection, 4 Arbitration International 411 (2004);

Award-Creditor Security and a Continuing Stay of Enforcement in *CDC Group v. Seychelles*, 19(9) Mealey's International Arbitration Report 35 (2004);

Nationality of Individual Investors in ICSID Arbitration, 7 International Arbitration Law Review 191 (2004);

The Substance of Nationality Requirements in Investment Treaty Arbitration, 20 ICSID Review – FILJ 357 (2005);

ICSID Arbitration: One "Lost" Annulment Case, 1 Global Arbitration Review 14 (2006);

The "Foreign Nationality"-Requirements in ICSID Arbitration, *in*: The International Convention on the Settlement of Investment Disputes (ICSID): Taking Stock After 40 Years (*Hofmann, R.*/*Tams, C.* eds.) 129 (2007);

ICSID's Nationality Requirements, *in*: Investment Treaty Arbitration and International Law (*Weiler, T. J.* ed.) 85 (2008);

*Siorat, L.*, Les limitations apportées à la souveraineté des Etats par la Convention pour le règlement des différends relatifs aux investissements privés internationaux, *in*: Investissements Etrangers et Arbitrage entre Etats et Personnes Privées, La Convention B.I.R.D. du 18 Mars 1965 (*Centre de Recherche sur le Droit des Marchés et des Investissements Internationaux de la Faculté de Droit et des Sciences Économiques de Dijon* ed.) 59 (1969);

*Sirefman, J. P.*, The World Bank Plan for Investment Dispute Arbitration, 20 Arbitration Journal 168 (1965);

*Smets, P. F*., Le Centre international pour le règlement des différends relatifs aux investissements, 32 Revue de la Banque 223 (1968);

*Smutny, A. C.*, Arbitration Before the International Centre for Settlement of Investment Disputes, Business Law International 367 (2002);

State Responsibility and Attribution: When Is a State Responsible for the Acts of State Enterprises? *Emilio Agustín Maffezini* v. *The Kingdom of Spain*, *in*: International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (*Weiler, T.* ed.) 17 (2005);

Procedural Review, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 65 (2006);

Principles of Compensation in Investment Treaty Arbitration, 22 ICSID Review – FILJ 1 (2007);

*Smutny, A. C./Ostrowski, S.*, Foreign Investment and Political Risk: What You Should Know About Investment Protection Treaties (Parts I & II), 2(6) and 2(7) Bloomberg European Law Journal 36 and 40 (2008);

*Smutny, A. C./Serran, E.*, The Amended ICSID Rules – In Brief, 1 Global Arbitration Review 29 (2006);

*Söderlund, C.*, Multiple Judicial Proceedings and the Energy Charter Treaty, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 237 (2006);

*Sohn, L. B.*, Comments on Dispute Resolution, 1 US-Mexico Law Journal 31 (1993);

*Soley, D. A.*, ICSID Implementation: An Effective Alternative to International Conflict, 19 The International Lawyer 521 (1985);

*Sornarajah, M.*, The New International Economic Order, Investment Treaties and Foreign Investment Laws in ASEAN, 27 Malaya Law Review 440 (1985);

International Commercial Arbitration: The Problem of State Contracts (1990);

The International Law on Foreign Investment (1994);

ICSID Involvement in Asian Foreign Investment Disputes: The Amco and AAPL Cases, 4 Asian Yearbook of International Law 69 (1994);

*Sourgens, F. G.*, ICSID Arbitration and the Importance of Public Accountability of a Private Judicature: A Roman Law Perspective, 9 International Community Law Review 58 (2007);

*Spiermann, O.*, Individual Rights, State Interests and the Power to Waive ICSID Jurisdiction under Bilateral Investment Treaties, 20 Arbitration International 179 (2004);

Applicable Law, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 89 (2008);

*Sprague, M. T.*, A Courageous Course for Latin America: Urging the Ratification of the ICSID, 5 Houston Journal of International Law 157 (1982);

*Ssekandi, F. M.*, Contracts Between a State and a Foreign Private Company: Reflections on the Effectiveness of the Arbitration Process, 2 East African Law Journal 281 (1966);

*Starke, J. G.*, The Convention of 1965 on the Settlement of Investment Disputes Between States and Nationals of Other States, *in*: The Protection and Encouragement of Private Foreign Investment (*Starke, J. G.* ed.) 1 (1966);

The International Centre for Settlement of Investment Disputes, 41 Australian Law Journal 442 (1968);

*Stein, S. J./Wotman, D. J.*, International Commercial Arbitration in the 1980's: A Comparison of the Major Arbitral Systems and Rules, 38 Business Lawyer 1685 (1983);

*Stern, B.*, Un petit pas de plus: l'installation de la société civile dans l'arbitrage CIRDI entre Etat et investisseur, Revue de l'arbitrage 3 (2007);

*Stevens, M.*, Confidentiality Revisited, News from ICSID, Vol. 17 (2000);

*Strohbach, H.*, Towards an International Arbitral Award, *in*: The Art of Arbitration, Essays on International Arbitration, Liber Amicorum Pieter Sanders (*Schultsz, J. C./van den Berg, A. J.* eds.) 305 (1982);

*Stumpe, F.*, Participation of Amici Curiae in Investment Treaty Arbitration, TDM, August (2008);

*Sturma, P.*, Decision on Jurisdiction of the ICSID Tribunal in the Case *Ceskoslovenská obchodní banka* v. *Slovak Republic*, 60 Zeitschrift für ausländisches öffentliches Recht und Völkerrecht 151 (2000);

*Sturzenegger, M.*, ICSID Arbitration and Annulment for Failure to State Reasons [case note *MINE* v. *Guinea*], 9 Journal of International Arbitration 173 (1992);

*Suarez Anzorena, C. I.*, *Vivendi* v. *Argentina*: On the Admissibility of Requests for Partial Annulment and the Ground of a Manifest Excess of Powers, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 123 (2004);

   Multiplicity of Claims under BITs and the Argentine Case, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 37 (2006);

*Sullivan, G. B.*, Implicit Waiver of Sovereign Immunity by Consent to Arbitration: Territorial Scope and Procedural Limits, 18 Texas International Law Journal 329 (1983);

*Sutherland, P. F.*, The World Bank Convention on the Settlement of Investment Disputes, 28 International and Comparative Law Quarterly 367 (1979);

*Sutton, S. D.*, *Emilio Augustin Maffezini v. Kingdom of Spain* and the ICSID Secretary General's Screening Power, 21 Arbitration International 113 (2005);

*Szasz, P. C.*, A Practical Guide to the Convention on Settlement of Investment Disputes, 1 Cornell International Law Journal 1 (1968);

   Arbitration Under the Auspices of the World Bank, 3 The International Lawyer 312 (1969);

   The Investment Disputes Convention – Opportunities and Pitfalls (How to Submit Disputes to ICSID), 5 Journal of Law and Economic Development 23 (1970);

   The Investment Disputes Convention and Latin America, 11 Virginia Journal of International Law 256 (1971);

   Using the New International Centre for Settlement of Investment Disputes, 7 East African Law Journal 128 (1971);

*Tahyar, B. H.*, Confidentiality in ICSID Arbitration After *Amco Asia Corp. v. Indonesia*: Watchword or White Elephant?, 10 Fordham International Law Journal 93 (1986);

*Tams, C. J.*, An Appealing Option? The Debate about an ICSID Appellate Structure, *in*: Essays in Transnational Economic Law 43 (No. 57/June 2006);

   Is There a Need for an ICSID Appellate Structure?, *in*: The International Convention on the Settlement of Investment Disputes (ICSID) (*Hofmann, R./Tams, C.* eds.) 223 (2007);

*Tams, C. J./Zoellner, C.-S.*, Amici Curiae im internationalen Investitionsschutzrecht, 45 Archiv des Völkerrechts 217 (2007);

*Tawil, G. S.*, Applicable Law, *in*: Course on Dispute Settlement. International Centre for Settlement of Investment Disputes (*UNCTAD* ed.) (2003);

   An International Appellate System: Progress or Pitfall?, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 131 (2006);

*Thieffry, J.*, The Finality of Awards in International Arbitration, 2 Journal of International Arbitration 27 (1985);

*Thompson, D.*, The *Klöckner* v. *Cameroon* Appeal. A Note on, 3 Journal of International Arbitration 93 (1986);

*Tietje, C./Nowrot, K./Wackernagel, C.*, Once and Forever? The Legal Effect of a Denunciation of ICSID, TDM, March (2008);

*Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons (1990);

*Toriello, P.*, The Additional Facility of the International Centre for Settlement of Investment Disputes, 4 Italian Yearbook of International Law 59 (1978/79);

*Townsend, J. M.*, The Initiation of Arbitration Proceedings: "My Story Had Been Longer", 13 ICSID Review – FILJ 21 (1998);

*Trooboff, P. D.*, To What Extent May an *Ad Hoc* Committee Review the Factual Findings of an Arbitral Tribunal based on a Procedural Error?, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 251 (2004);

*Tupman, W. M.*, Case Studies in the Jurisdiction of the International Centre for Settlement of Investment Disputes, 35 International and Comparative Law Quarterly 813 (1986);

 Challenge and Disqualification of Arbitrators in International Commercial Arbitration, 38 International and Comparative Law Quarterly 26 (1989);

*Turner, P.*, Treaties as Agreements to Arbitrate: Issues of Scope – Parties, Ownership and Control, ICCA Annual Congress, Montreal (2006);


*Ulmer, N. C.*, Drafting the International Arbitration Clause, 20 The International Lawyer 1335 (1986);

*United Nations Centre on Transnational Corporations*, Bilateral Investment Treaties (1988);

*United Nations Conference on Trade and Development,* Investor-State Dispute Settlement and Impact on Investment Rulemaking, Series on International Investment Policies for Development, UNCTAD/ITE/IIA/2007/3 (2007);


*van Blankenstein, A.*, Enforcement of an Arbitral Award against a State: With Whom Are You Dealing?, *in*: The Flame Rekindled – New Hopes for International Arbitration (*Muller, S./Mijs, W.* eds.) 159 (1993);

*van den Berg, A. J.*, The New York Arbitration Convention of 1958 (1981);

 Some Recent Problems in the Practice of Enforcement under the New York and ICSID Conventions, 2 ICSID Review – FILJ 439 (1987);

 Recent Enforcement Problems under the New York and ICSID Conventions, 5 Arbitration International 2 (1989);

 The New York Arbitration Convention and State Immunity, *in*: Acts of State and Arbitration (*Böckstiegel, K. H.* ed.) 41 (1997);

*Vandevelde, K. J.*, The Bilateral Investment Treaty Program of the United States, 21 Cornell International Law Journal 201 (1988);

 U.S. Bilateral Investment Treaties: The Second Wave, 14 Michigan Journal of International Law 621 (1993);

 Arbitration Provisions in the BITs and the Energy Charter Treaty, *in*: The Energy Charter Treaty (*Wälde, T. W.* ed.) 409 (1996);

*van Haersolte-van Hof, J. J./Hoffmann, A. K.*, The Relationship Between International Tribunals and Domestic Courts, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 962 (2008);

*Van Harten, G.*, Investment Treaty Arbitration and Public Law (2007);

*van Houtte, H.*, Article 52 of the Washington Convention – A Brief Introduction, *in*: Annulment of ICSID Awards (*Gaillard, E./Banifatemi, Y.* eds.) 11 (2004);

*van Houtte, H.*/*Hudson, M.*, Les Conventions d'arbitrage conclues entre partenaires commerciaux arabes et européens, Revue de Droit des Affaires Internationales 65 (1990);

*Vasciannie, S. C.*, Bilateral Investment Treaties and Civil Strife: The AAPL/Sri Lanka Arbitration, 39 Netherlands International Law Review 332 (1992);

*Veeder, V. V.*, L'indépendance et l'impartialité de l'arbitre dans l'arbitrage international, *in*: Médiation et arbitrage (*Cadiet, L./Clay, T./Jeuland, E.* eds.) 219 (2005);

*Veenstra-Kjos, H. E.*, Counterclaims by Host States in Investment Treaty Arbitration, 4(4) TDM (2007);

*Vitányi, B.*, Quelques réflexions sur la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, *in*: New Directions in International Law. Essays in Honour of Wolfgang Abendroth 193 (1982);

*Vives Chillida, J. A.*, El Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (*CIADI*) (1998);

*von Mehren, A. T.*, Arbitration Between States and Foreign Enterprises: The Significance of the Institute of International Law's Santiago de Compostela Resolution, 5 ICSID Review – FILJ 54 (1990);

*von Mehren, R. B.*, The Enforcement of Arbitral Awards under Conventions and United States Law, 9 The Yale Journal of World Public Order 343 (1983);

*Vuylsteke, C.*, Foreign Investment Protection and ICSID Arbitration, 4 Georgia Journal of International and Comparative Law 343 (1974);

*Wälde, T.*, International Investment under the 1994 Energy Charter Treaty – Legal, Negotiating and Policy Implications for International Investors within Western and Commonwealth of Independent States/Eastern European Countries, 29 Journal of World Trade 5 (1995);

Investment Arbitration Under the Energy Charter Treaty – From Dispute Settlement to Treaty Implementation, 12 Arbitration International 429 (1996);

ICSID "Annulment Committee", 1(1) TDM (2004);

Alternatives for Obtaining Greater Consistency in Investment Arbitration, *in*: Investment Treaty Law Current Issues Vol. 1 (*Ortino, F./Sheppard, A./Warner, H.* eds.) 135 (2006);

Confidential Awards as Precedent in Arbitration: Dynamics and Implication of Award Publication, *in*: Precedent in International Arbitration (*Banifatemi, Y.* ed.) 113 (2008);

*Wallace, S.*, The "Juridical Architecture" of ICSID Arbitration Under International Petroleum Agreements (And in Other Complex Situations), 18 ICSID Review – FILJ 412 (2003);

*Walsh, T. W.*, Substantive Review of ICSID Awards: Is the Desire for Accuracy Sufficient to Compromise Finality?, 24(2) Berkeley Journal of International Law 444 (2006);

*Wancke, A.-M.*, Washington-konventionens hävningsförfarande – är en ICSID-dom slutlig?, Tidskrift for Rettsvitenkap 408 (1989);

*Wang, D.*, Binding Force and Enforcement, *in*: Dispute Settlement. International Centre for Settlement of Investment Disputes (*UNCTAD* ed.) UNCTAD/EDM/Misc232/Add.8 (2003);

*Weil, P.*, The State, the Foreign Investor, and International Law: The No Longer Stormy Relationship of a Ménage à Trois, 15 ICSID Review – FILJ 401 (2000);

*Weiler, T. (ed.)*, International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law (2005);

*Weiler, T. J. (ed.)*, Investment Treaty Arbitration and International Law (2008);

*Weiniger, M./Page, M.*, Treaty Arbitration and Investment Disputes: Adding up the Costs, 1 Global Arbitration Review 44 (2006);

*West, L. C.*, Award Enforcement Provisions of the World Bank Convention, 23 Arbitration Journal 38 (1968);

*Westberg, J. A.*, Applicable Law, Expropriatory Takings and Compensation in Cases of Expropriation: ICSID and Iran-United States Claims Tribunal Case Law Compared, 8 ICSID Review – FILJ 1 (1993);

*Wetter, J. G.*, The International Arbitral Process: Public and Private (1979);

   Pleas of Sovereign Immunity and Act of Sovereignty before International Arbitral Tribunals, 2 Journal of International Arbitration 7 (1985);

*Williams, D.*, International Commercial Arbitration and Globalization, Review and Recourse against Awards Rendered Under Investment Treaties, 4 The Journal of World Investment 251 (2003);

*Williams, D. A. R.*, Challenging Investment Treaty Arbitration Awards – Issues Concerning the Forum, ICCA Annual Congress, London (2002);

   Jurisdiction and Admissibility, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 868 (2008);

*Wilson, J.*/*Cain, J.*/*Gray, J.*, ICSID Arbitration Awards and Cost, 3(5) TDM (2006);

*Wisner, R.*, Derivative Actions and Indirect Claims, *in*: Investment Treaty Law Current Issues II (*Ortino, F./Liberti, L./Sheppard, A./Warner, H.* eds.) 73 (2007);

*Wisner, R.*/*Gallus, N.*, Nationality Requirements in Investor-State Arbitration, 5 The Journal of World Investment & Trade 927 (2004);

*Wood, J.*, Enforcement of ICSID Awards in National Courts, 2(3) TDM (2005);

*Woolhouse, S.*, Transparency and Procedural Integrity of Arbitration – The *Biwater* Tribunal's Balancing Act, 3(5) TDM (2006);


*Yahiel, E.*/*Cranston, R. M.*, Arbitration and Dispute Resolution in the International Construction Industry, 2 International Construction Law Review 231 (1985);

*Yala, F.*, The Notion of "Investment" in ICSID Case Law: A Drifting Jurisdictional Requirement? Some "Unconventional" Thoughts on Salini, SGS and Mihaly, 22 Journal of International Arbitration 105 (2005);

*Yannaca-Small, K.*, Indirect Expropriation and the Right to Regulate in International Investment Law, *in*: International Investment Law: A Changing Landscape (*OECD* ed.) 73 (2005);

   Fair and Equitable Treatment in International Investment Law, *in*: International Investment Law: A Changing Landscape (*OECD* ed.) 43 (2005);

   Transparency and Third Party Participation in Investor-State Dispute Settlement Procedures, *in*: International Investment Law: A Changing Landscape (*OECD* ed.) 9 (2005);

   Consolidation of Claims: A Promising Avenue for Investment Arbitration?, *in*: International Investment Perspectives: 2006 Edition (*OECD* ed.) 225 (2006);

   Interpretation of the Umbrella Clause in Investment Agreements, OECD Working Paper on International Investment No. 2006/3 (2006);

   Improving the System of Investor-State Dispute Settlement: An Overview, *in*: International Investment Perspectives: 2006 Edition (*OECD* ed.) 183 (2006);

   Indirect Expropriation and the Right of the Governments to Regulate – Criteria to Articulate the Difference, *in*: Investment Arbitration and the Energy Charter Treaty (*Ribeiro, C.* ed.) 159 (2006);

   Parallel Proceedings, *in*: The Oxford Handbook of International Investment Law (*Muchlinski, P./Ortino, F./Schreuer, C.* eds.) 1008 (2008);

Improving the System of Investor-State Dispute Settlement: The OECD Governments' Perspective, *in*: Appeals Mechanism in International Investment Disputes (*Sauvant, K. P./Chiswick-Patterson, M.* eds.) 223 (2008);

Fair and Equitable Treatment: Recent Developments, *in*: Standards of Investment Protection (*Reinisch, A.* ed.) 111 (2008);

*Yun, C. S.*, The Convention on the Settlement of Investment Disputes – Commentary and Forecast, 11 Malaya Law Review 287 (1969);

*Zhou, C.*, Settlement of International Investment Disputes (1989) (in Chinese);

*Ziadé, N. G.*, ICSID and Arab Countries, News from ICSID, Vol. 5/2, p. 5 (1988);

ICSID Clauses in the Subrogation Context, News from ICSID, Vol. 7/2, p. 4 (1990);

Comment [on 5 December 1989 Paris Court of Appeal Decision in Société Ouest Africaine de Bétons Industriels v. Etat du Sénégal], 80 Revue Critique de Droit International Privé 124 (1991);

Introductory Note [to the 25 February 1988 award in *SOABI* v. *State of Senegal*], 6 ICSID Review – FILJ 119 (1991);

Some Recent Decisions in ICSID Cases, 6 ICSID Review – FILJ 514 (1991);

ICSID Conciliation, News from ICSID, Vol. 13/2, p. 3 (1996);

*Ziadé, R.*, Les mesures conservatoires (tribunal arbitral – tribunal étatique), *in*: La procédure arbitrale relative aux investissements internationaux – Aspects récents (2008);

*Zoellner, C.-S.*, Third-Party Participation (NGOs and Private Persons) and Transparency in ICSID Proceedings, *in*: The International Convention on the Settlement of Investment Disputes (ICSID) (*Hofmann, R./Tams, C. J.* eds.) 179 (2007).

# INDEX BY ARTICLE

**Note:** bold numbers indicate the Articles where the issue is discussed; lean numbers indicate the paragraphs.

**Preamble**
as aid to interpretation of "investment"    **25**.121
conciliation
  obligations: due consideration to
    recommendation of conciliators    **34**.27;
    procedural cooperation    **34**.23
conciliation/arbitration, choice    **Preamble** 23
consent of parties to dispute, need for, and
  **25**.374
diplomatic protection, proposed reference to
  **27**.13
drafting history of Convention    **Preamble**
  1–9
  Executive Directors' Report    **Preamble** 5
  Legal Committee meetings    **Preamble**
    6–7
  Preliminary Drafts    **Preamble** 3–4
  Revised Draft    **Preamble** 8–9
  Working Paper    **Preamble** 3
  World Bank's agreement to fulfil functions
    under Convention    **Preamble** 9:
    Directors' signature of Convention as
    indication    **Preamble** 9
inappropriateness of traditional methods of
  dispute settlement    **Preamble** 17–21
  exclusion of private investors from
    international dispute settlement methods
    **Preamble** 20
  Executive Directors' Report    **Preamble** 20

irrevocability of consent    **25**.597
object and purpose of Convention
  facilitation of private international
    investment    **Preamble** 11
  mutual benefit of investor and host State
    **Preamble** 27–8: *Amco I*    **Preamble** 13
  positive impact of investment on
    development    **Preamble** 14, **25**.121,
    **25**.153

  promotion of economic investment
    **Preamble** 11, **48**.80, **48**.87
  settlement agreement/discontinuance of
    proceedings and    **48**.80, **48**.87
  strengthening of partnership between
    countries in the case of economic
    development    **25**.121, **25**.173: Executive
    Directors' Report    **Preamble** 12
possibility of investment disputes arising
  **Preamble** 15–16
  eligible disputes    **Preamble** 16
World Bank role    **Preamble** 31–2
**Article 1(1) (establishment and name of
  Centre),    1**.2, **25**.14
decision to omit "the"    **1**.2
spelling of "Centre"    **1**.2
**Article 1(2) (provision of facilities for
  conciliation and arbitration of
  investment disputes)    Preamble** 25
advice on drafting of arbitration and
  investment laws    **1**.6
collection and dissemination of information
  **1**.5, **11**.14
communication of documents and information
  to parties    **1**.4
conferences    **1**.6
constitution of commissions and tribunals,
  assistance    **1**.4
deletion of reference to additional activities
  **1**.3
model contract clauses    **1**.4
panel of arbitrators    **1**.4
panel of conciliators    **1**.4
publications    **1**.5
research    **1**.4, **1**.5
rules and regulations, adoption of    **1**.4
screening and facilitation of requests    **1**.4
services and facilities, provision
  **1**.4

**Article 2 (seat)**
  place of conciliation/arbitration distinguished
    **2**.3
  regional centres   **2**.1
  World Bank Headquarters   **2**.1–5, **36**.12,
    **62**.13
    relocation, possibility of   **2**.1, **2**.2,
      **6**.2
**Article 3 (administrative structure)**
  Administrative Council   **3**.1, **3**.3
  arbitration and conciliation panels   **3**.3
  Executive Committee   **3**.1
  Secretariat   **3**.3
  simplicity and economy   **3**.2
**Article 4(1) (composition of administrative
    council/alternates)**   **4**.1
**Article 4(2) (*ex officio* membership of World
    Bank governors)**   **2**.5, **4**.2–4
  alternative designation by Contracting State
    **4**.2, **4**.3
  non-Members of World Bank, designation by
    **4**.2–4
**Article 5 (President of Bank as Chairman of
    Administrative Council)**   **2**.5, **5**.1–4
  absence or inability of President to act   **5**.3
  ICSID President distinguished   **5**.1
  vacancy in Presidency   **5**.3
  voting rights   **5**.2
  Working Paper   **5**.1
**Article 6(1) (powers and functions of
    Administrative Council: enumeration)**
    **6**.1–21
  non-exhaustive nature   **6**.2
**Article 6(1)(a) (adoption of administrative and
    financial regulations)**   **6**.4–6
**Article 6(1)(b) (Institution Rules)**   **6**.7–9
**Article 6(1)(c) (Conciliation and Arbitration
    Rules)**, Administrative Council's role
    **6**.10–13
**Article 6(1)(d) (arrangements with World
    Bank)**   **6**.14–16, **11**.3
  Executive Directors' Report   **6**.15
  Memorandum of Administrative
    Arrangements (1967)   **2**.5, **6**.16, **17**.5–6,
    **62**.14, **64**.19
**Article 6(1)(e) (conditions of service of
    Secretary-General and Deputy
    Secretary-General)**   **6**.17
**Article 6(1)(f) (annual budget)**   **6**.18–19
**Article 6(1)(g) (annual report)**   **6**.20
**Article 6(2) (appointment of committees)**
    **6**.22
**Article 6(3) (powers and functions "necessary
    for the implementation of this
    Convention")**   **6**.1, **6**.2, **6**.23–6

Additional Facility and   **6**.25–6, **11**.15
"*other* powers . . . and functions"   **6**.24
powers and functions in addition to those
    covered by Convention   **6**.24
"useful for . . . the achievement of the purposes
    of the Convention" (Working Paper) and
    **6**.3, **6**.26
**Article 7 (meetings of Administrative
    Council)**
  Administrative and Financial Regulations and
    **7**.1, **7**.2, **7**.5
  drafting history   **7**.2–3, **7**.6, **7**.10
**Article 7(1) (Administrative Council
    meetings)**
  additional meetings   **7**.3
    at request of Secretary-General   **7**.3,
      **11**.4
    convening by Chairman   **7**.3
    decision by Administrative Council   **7**.3
  coincidence of annual meetings of
    Administrative Council and World Bank's
    Board of Governors   **7**.2, **7**.4
**Article 7(2) (Administrative Council: voting)**
    **6**.21
  capital importing/capital exporting countries,
    group voting   **7**.6
  Chairman's rights (Article 5)   **5**.2
  matters requiring two-thirds majority   **7**.6,
    **7**.8
  one vote per member   **7**.6
  required majority
    simple majority of votes cast   **7**.6, **7**.7,
      **7**.8
    two-thirds of members   **7**.6, **7**.8
    unanimity   **7**.6
**Article 7(3) (Administrative Council: quorum)**
    **7**.9
**Article 7(4) (Administrative Council:
    simplified voting/vote without meeting)**
    **6**.2, **7**.10–12
  Administrative and Financial Regulation 7(3)
    **7**.11
  Administrative and Financial Regulation 7(4)
    **7**.12
  agreement to by two-thirds majority   **7**.10
  applicability to all matters   **7**.10
  Article 7(4) (procedure for vote without
    meeting), solicitation of votes of absent
    members   **7**.12
  drafting history   **7**.10
  *non-obstat*, rejection   **7**.10
  quorum   **7**.10
  required majority   **7**.10, **7**.11
  time limit   **7**.10
    21 days   **7**.11

**Article 8 (remuneration of members and Chairman)** **8**.1–2
expenses **8**.2
tax privileges **8**.2, **24**.3
**Article 9 (Secretariat)**
Administrative and Financial Regulation 13 **9**.6, **40**.26
concern about proliferation of high officials **9**.1–2
Executive Directors' Report **9**.1–2
**Article 10(1) (election of Secretary-General/Deputies Secretary-General)**
Administrative Council's role **6**.2, **10**.1
Chairman's role
Administrative Council's freedom of action and **10**.1
Administrative and Financial Regulation 8 **10**.2
nomination of candidates **5**.4, **6**.2, **10**.1, **10**.2–3: "after consulting the members of the Administrative Council" **10**.1, **10**.3
Secretary-General's independence and **10**.1
dismissal, absence from Convention of grounds for **10**.1
number of candidates **10**.1, **10**.3
period of service **10**.1, **10**.2, **10**.3
qualifications, absence from Convention **10**.1
transition arrangements, Executive Directors' Report **10**.1
**Article 10(2) (incompatibility of office)** **10**.2, **10**.4–6
Administrative and Financial Regulation 8(b) **10**.6
employment with
Permanent Court of Arbitration **10**.4
World Bank **10**.4
political function **10**.5
waiver of restriction, exclusion **10**.5
waiver of restriction **10**.4
Chairman's concurrence, need for **10**.4
**Article 10(3) (acting Secretary-General)**
in case of vacancy, absence or inability to act of Secretary-General and any Deputy-Secretary-General **10**.9
a Deputy Secretary-General **10**.7–8
determination of order: by Administrative Council in advance **10**.7–8; by Secretary-General **10**.7; by seniority **10**.8; Financial Regulation, 9(1) **10**.8; on proposal of Chairman **10**.8

**Article 11 (powers and functions of Secretary-General)**
administrative and advisory **11**.1, **11**.10–13
alternative sources **11**.2
Executive Directors' Report **11**.1
legal representative **11**.1
limited discussion of overall powers and functions **11**.1
principal officer **11**.1
registrar **11**.1, **11**.9, **54**.98–9
representation of Centre **11**.1, **11**.3
**Articles 12–16 (Panels)**
*see also* Article 31 (commission: appointment from outside Panel); Article 40 (appointment of arbitrator from outside Panel)
Article 44 of Hague Convention for the Peaceful Settlement of Disputes (1907) as model **12**.2
Executive Directors' Report **12**.3
**Article 12 (Panels)**
periodic publication of list
availability on ICSID website **12**.6
new designations in Annual Report **12**.6
periodic publication of list (10) **12**.6
"qualified persons". *See* Article 14 (Panels: qualifications)
remuneration **12**.7
separate Panels
consolidated list **12**.6, **16**.2
overlapping membership **12**.6, **13**.3
willingness to serve
confirmation of, AFR 21(3) **12**.5, **16**.4
on Panel/appointment as conciliator or arbitrator distinguished **12**.5: Panel member's refusal of appointment **12**.5
**Article 13 (Panels: designation)**, "national", natural persons **13**.11
**Article 13(1) (Panels: designation by Contracting States)**
alternatives to designation **13**.1
designation as right of States **13**.3
failure to exercise **13**.3, **13**.5, **14**.5
importance of exercise **13**.3
four per State **13**.1, **40**.4
nationals, appointment of nationals to tribunals distinguished **13**.9
non-nationals
indication of nationality in list **13**.8
limited use of provision **13**.8
nationals of non-member States of the World Bank **13**.7
"nationals of other States with . . . some affinity" **13**.7

**Article 13(1) (Panels: designation by Contracting States) (*cont.*)**
  notification by Secretariat when designation due  **13**.3
  notification to Secretary-General  **13**.2
  procedure, AFR 21  **16**.4
**Article 13(2) (Panels: designation by Chairman)**  **5**.4, **12**.4, **13**.4–6, **40**.4, **40**.11
  nationality of designees  **13**.10
  number of designees
    actual (September 1999)  **13**.6
    desirability of shortfall  **13**.6
    potential  **12**.4, **13**.4, **40**.4, **40**.11
  purpose of provision  **13**.5
  Secretary-General's role  **11**.4, **13**.5
**Article 14(1) (Panels: qualities)**  **40**.1, **40**.4, **40**.14
  annulment of award on grounds of absence  **14**.8, **40**.15, **52**.123
  discretion of States  **14**.6
  high moral character  **52**.123, **52**.276, **57**.18
    ICJ Statute origin  **14**.2
  impartiality  **52.14**.5, **52**.276, **52**.295
  legal qualifications for Panel of Arbitrators  **14**.3, **16**.2
    non-lawyers, eligibility  **14**.3
  presumption of  **57**.109
    burden of proof  **52**.134–54, **57**.19
  qualifications, unspecified  **14**.2
  screening process  **14**.2
  scrutiny, absence  **14**.6
    appointment to commission or tribunal distinguished  **14**.7
  statement of qualifications, need for (AFR 21(2))  **14**.4
  States' obligation to seek advice  **14**.2
  "who may be relied upon to exercise independent judgement"  **14**.5
    importance in context of particular party or dispute  **14**.5
**Article 14(2) (Panels: representation of principal legal systems and main forms of economic activity)**  **13**.9, **14**.9
  Chairman's 2008 list  **14**.12
  "fair representation on the Panels of qualified persons from both investing and receiving countries"  **14**.11
  ICJ Statute as origin  **14**.10
  importance in view of applicability of principles of law common to a group of countries  **14**.10
  "in addition"  **14**.9
  "main forms of economic activity," sectors covered  **14**.11

**Article 14 qualities, need for**
  Article 31 (commission: appointment from outside Panel)  **12**.4, **31**.5002
  drafting history  **31**.2
**Article 15(1) (Panels: period of service (six years))**
  alternative suggestions  **15**.2
  Chairman's right of designation and  **13**.6
  continuation of service beyond six years  **15**.5
  designation for less than six years  **15**.3
  expiry, effect  **15**.4, **15**.5, **56**.1, **56**.31–4
  service on commission or tribunal and  **15**.4
  "subject to the pleasure"  **15**.3
  termination by designating authority  **15**.3
**Article 15(2) (Panels: replacement in case of death or resignation)**  **15**.4, **15**.6
  drafting history  **26**.2–3, **26**.5–6
  effective date  **15**.6, **16**.6
  period of service  **15**.6
**Article 15(3) (Panels: continuance in office until designation of successor)**  **13**.6
**Article 16(1) (Panels: designation to both)**, similarity of required qualifications  **16**.2
**Article 16(2) (Panels: multiple designations)**
  likelihood  **16**.3
  primacy
    designation by State of nationality  **16**.3
    earlier designation  **16**.3
**Article 16(3) (Panels: notification of designations to Secretary-General)**
  AFR 21  **11**.8, **14**.4, **16**.4
  effective date
    date of notification  **16**.6
    expiry of previous Panel member's term of office  **16**.6
  Secretary-General's duty to keep States parties informed of status of list (AFR 21(4))  **16**.5
**Article 17 (financing the Centre)**
  Administrative Council's role  **6**.2
  apportionment of costs  **6**.2
  Secretary-General's role  **11**.6
  States parties, responsibility for
    AFR 18  **17**.9
    members of World Bank  **17**.2, **17**.9
    non-Members of World Bank  **17**.2, **17**.9
  World Bank role  **2**.5, **6**.16, **17**.2–9
    Executive Directors' Report  **17**.4
**Article 18–24**, sole treaty provisions covering status, immunities and privileges of Centre  **18**.1
**Article 18 (status of centre)**
  autonomous  **18**.4

Conventions on the Privileges and Immunities of the UN and Specialized Agencies compared    **18**.3

Executive Directors' Report    **18**.4

international and domestic legal personalities distinguished    **18**.2

need to distinguish from World Bank as reason for inclusion    **18**.2

World Bank Articles of Agreement compared    **18**.3

**Article 18(a) (capacity to contract)**, publishing contracts    **18**.5

**Article 18(b) (capacity to acquire and dispose of property)**, non-exercise    **18**.4

**Article 18(c) (capacity to institute legal proceedings)**, non-exercise    **18**.4

**Article 19 (immunities and privileges)**

international legal personality status and    **19**.1

capacities distinguished    **19**.1

legal relevance of Article    **19**.1–2

territorial application    **19**.3

"to fulfil its functions"    **19**.2

immunities and privileges not serving Centre's functions, interpretation    **19**.2

**Article 20 (immunity of Centre from legal process)**    **18**.6–7

comparison with Conventions on the Privileges and Immunities of the UN and Specialized Agencies    **20**.4

waiver    **20**.3

by Secretary-General or Administrative Council (AFR 32(1)(a))    **20**.5

in case of counterclaims connected with principle claim in proceedings instituted by Centre    **20**.3

World Bank position distinguished    **20**.1–2

**Article 21(personal immunities and privileges of individuals associated with Centre's work)**

absence of proceedings involving    **21**.9

persons covered    **21**.1

arbitrators on site visits    **43**.124

place of proceedings, relevance    **21**.4

World Bank Articles of Agreement compared    **21**.2

**Article 21(a) (personal immunity from legal process)**    **21**.3–9

administrative proceedings    **21**.3

conciliators and arbitrators, application to    **21**.4

corruption of arbitrator, potential for conflict in concurrent proceedings    **21**.8

criminal prosecution    **21**.3

diplomatic immunity, rejection of proposal for    **21**.4

functional immunity    **21**.3

immunity of UN and Specialized Agencies compared    **21**.3, **21**.7

members of *ad hoc* committees, application to    **21**.4

waiver

any person listed in AFR 32(1) and 32(2), by Council (AFR 32(3))    **21**.6

in case of counterclaims directly connected with principal claim in proceedings instituted by persons with immunity    **21**.5

Chairman and members of Council, by Council (AFR 32(3))    **21**.6

circumstances for: "in interests of Centre"    **21**.7; unspecified    **21**.7; where an immunity would impede course of justice    **21**.7

late addition of provision    **21**.5

members of commission, tribunal or *ad hoc* committee, by Chairman (AFR 32(2))    **21**.6

Secretary-General or Deputy-Secretary General, by Chairman (AFR 32(2))    **21**.6

staff of Centre, waiver by Secretary-General (AFR 32(1))    **21**.6

**Article 21(b) (immunities as accorded to representatives, officials and employees of comparable rank)**

difficulty of application    **21**.10

high officials and other officials, uniformity of treatment    **21**.10

surveillance    **22**.10

travel certificates (AFR 31)    **21**.11, **22**.4

travel to and from place of proceedings and stay there, limitation to    **22**.4

waiver by Administrative Council without recommendation (AFR 32(3)(b))    **22**.9

waiver by Chairman on recommendation by relevant commission, tribunal of *ad hoc* committee (AFR 32(2)(c))    **22**.9

**Article 22 (extension of Article 21 immunities and privileges to participants in proceedings)**

"immunities and facilities . . . necessary for independent exercise of their functions," rejection of formulation    **22**.3

**Article 22 (extension of Article 21 immunities and privileges to participants in proceedings) (*cont.*)**
jurisprudence
  *Funnekotter*  **22**.7
  *Libanaco*  **22**.10
  *Tradex*  **22**.6
persons covered
  experts  **22**.1, **22**.2, **43**.124
  parties  **22**.1, **22**.2
  representatives of parties  **22**.1, **22**.2
  witnesses  **22**.1, **22**.2, **43**.124
place of proceedings, relevance  **62**.4
proper functioning of proceedings and  **22**.2
travel difficulties and  **22**.5–8
**Article 23(1) (inviolability of archives)**
comparison with Conventions on Privileges and Immunities of the Specialized Agencies  **23**.2
  UN  **23**.2
information and publication distinguished  **23**.1, **23**.3
waiver, absence of provision for  **23**.3
**Article 23(2) (communications: "not less favourable" treatment)**
comparison with Conventions on the Privileges of the UN and Specialized Agencies  **23**.5
contemporary relevance of provision  **23**.6
documents in transit  **23**.5
persons appearing in Centre proceedings  **22**.3
treatment accorded to other Contracting States, rejection  **23**.5
**Article 24(1) (tax privileges: Centre)**
comparison with Articles of Agreement of World Bank and IMF  **24**.2
local taxes and rates for actual services  **24**.2
"operations and transactions"  **24**.2
tax exemption, reason for inclusion  **24**.2
UN and Specialized Agencies distinguished  **23**.2
**Article 24(2) (tax privileges: persons permanently associated with Centre's work)**
application to Secretary-General and Deputy Secretary-General  **24**.4
Chairman and members of Administrative Council, restriction to expense allowances  **24**.3
in country of nationality, World Bank and IMF Articles of Agreement as model  **24**.3

**Article 24(3) (tax privileges: conciliators, arbitrators and members of *ad hoc* committees)**
fees and expense allowances under Article 60, limitation to  **24**.6
parties to proceedings, exclusion  **24**.6
tax exemption distinguished  **24**.5, **24**.6
tax liability in country of
  fiscal domicile  **24**.5
  nationality  **24**.3
  residence  **24**.6
**Article 25 (jurisdiction)**
objective requirements  **25**.5–7, **41**.50
  consent, relevance  **25**.6
  Executive Directors' Report  **25**.6
  existence of dispute  **48**.75
  nationality  **25**.638–9
purpose, to close procedural gap  **25**.4
*ratione materiae*, dispute between State and foreign national, limitation to  **25**.4
restriction of jurisdiction, desirability  **25**.5
scope of Article  **25**.1, **25**.2
  conciliation, applicability to  **25**.1
**Article 25 (jurisdiction), critical dates for determination of**
*see also* Article 25(1), "consent," critical date; Article 25(1), "Contracting State," critical date; Article 25(2)(a) (nationality: natural persons), critical date; Article 25(2)(b) (nationality: juridical persons), ". . . because of foreign control . . .", critical date
Contracting State status  **25**.35
date of consent  **25**.35
institution of proceedings as  **25**.36–40
  *Arrest Warrant Case*  **25**.37
  *Bayindir*  **25**.38
  *CSOB*  **25**.39
  *Goetz*  **25**.38
  *Vivendi II*  **25**.40
  *Zhinvali*  **25**.38
**Article 25(1), ". . . another Contracting State"**
Additional Facility
  host State not a Contracting Party  **25**.300: BITs  **25**.301; legislative provision  **25**.301
  State of nationality not a Contracting State  **25**.300: BITs  **25**.301
critical date
  institution of proceedings  **25**.35, **25**.287: date for possession of nationality distinguished  **25**.287

future ratification, contingent submission
 BITs   **25**.299
 investment agreement   **25**.299
identification as such a national, need for
  **25**.289–98, **25**.658
 in arbitration agreement   **25**.296
 on institution of proceedings   **25**.290,
  **25**.294–6: Article 25(2)(b) "agreement to
  treat as" and   **25**.296; consequences
  attached to nationality   **25**.295; IR
  2(1)(d)   **25**.294–6; refusal of request,
  possibility   **25**.294
 at time of consent   **25**.290–3: careful
  drafting, need for   **25**.291; diplomatic
  protection and   **25**.292; Model Clauses
  (1993)   **25**.293
 nationals of non-Contracting State, exclusion
  **25**.285, **25**.636, **25**.660
 juridical persons   **25**.285, **25**.894
 reasons: difficulties of enforcement of
  award   **25**.285; diplomatic protection
  and   **25**.285; reciprocity of obligations
  between host State and home State
  **25**.285
 non-compliance
  *ad hoc* arbitration   **25**.302
  Additional Facility: *see* Additional Facility
   *above*
 possibility of various nationalities all of
  Contracting States   **25**.289
 stateless persons, exclusion   **25**.660
 status as
  corporations having seat or registration in
   territories covered by Article 70
   **25**.286
  List of Contracting States   **25**.286
 validity of consent to jurisdiction prior to
   home State's ratification   **25**.287–8
  *Holiday Inns*   **25**.288
**Article 25(1), "arising directly"**   **25**.83–112
 activities linked to investment, sufficiency
   **25**.101–3
  *Duke Energy*   **25**.102
  *Enron*   **25**.102
  *Joy Mining*   **25**.102–3
  *Mitchell*   **25**.102
  *PSEG*   **25**.102
  *Saipem*   **25**.102
  *Tokios Tokelès*   **25**.101
 ancillary transactions   **25**.84, **25**.93–105
  counterclaims   **25**.84
 "arising out of or in connection with any
   investment," rejection of formula   **25**.83
 "direct" undefined in Convention negotiations
   **25**.83

disputes not arising directly, settlement
   procedures
  *ad hoc* arbitration incorporating ICSID
   Rules/Secretary-General as appointing
   authority   **25**.87
  Additional Facility   **25**.11, **25**.87,
   **25**.202–9: *see also* Index by Subject
 drafting history   **25**.83
 "fundamental to the investment itself"
   **25**.105
 general measures affecting investments
   **25**.106–11
  *AES*   **25**.109
  *Camuzzi*   **25**.111
  *CMS*   **25**.107–8
  *Continental Casualty*   **25**.110, **25**.112
  *El Paso*   **25**.111
  *Gas Natural*   **25**.111
  *LG&E*   **25**.111
  *Pan American*   **25**.111
  *Sempra*   **25**.111
  *Suez et al.*   **25**.111
 inclusion of information in request for
   proceedings (IR 2(1)(e))   **25**.86
 indirect investment   **25**.88–92
  *ADC*   **25**.89
  *CMS*   **25**.89, **25**.91
  *Continental Casualty*   **25**.90
  *CSOB*   **25**.89
  *Enron*   **25**.90
  *Fedax*   **25**.88–9
  *Siemens*   **25**.92
 multiple contracts/varying parties   **25**.94–6,
   **25**.100–4
  *Amco I*   **25**.324–6, **25**.389
  *CSOB*   **25**.100
  *Holiday Inns*   **25**.95, **25**.552
  *SOABI*   **25**.96
 multiple instruments/varying parties: *see*
   Article 25(1), "consent", multiple
   instruments/varying parties
 parties' consent, relevance   **25**.84,
   **41**.50
  stipulation of "directness" in case of
   existing dispute/future dispute
   **25**.85
 "relating to" (NAFTA) distinguished
   **25**.112
  *Methanex*   **25**.112
 rights and obligations of general
   application/arising out of investment
   agreement distinguished   **25**.97–8
 tax disputes
  *Amco II*   **25**.97–8
  *Kaiser Bauxite*   **25**.99

**Article 25(1), "consent"**
  as acceptance of Convention and Centre rules
      **25**.378
  binding nature of offer   **25**.395–408
  irrevocability: *see* Article 25(1), "consent",
      withdrawal
  jurisdiction of Centre, dependence on   **25**.5,
      **26**.6
  method of establishing, developments
      **Preamble** 36
  notification to Centre, relevance   **25**.379
  objective requirements and   **25**.6
  relevance   **25**.6
  requirements: *see* Article 25(1), "consent",
      writing, need for
  severability of arbitration provision
      **25**.622–4
    Additional Facility Rules   **25**.623
    provision for within consent clause
        **25**.624
  unilateral offer by host State accepted by
      investor   **25**.378, **25**.392–408
    *see also* Article 25(1), "consent", BITs as
        State's offer; Article 25(1), "consent",
        method, multilateral treaties; Article
        25(1), "consent", national legislation as
        consent or offer
    coincidence of offer and acceptance, need
        for   **25**.514
    offer/acceptance principle   **25**.392
    revocability of offer   **25**.392
    State practice   **25**.394–415
  "unity of investment" approach   **25**.93–105,
      **25**.561–5
**Article 25(1), "consent", applicable law for
      interpretation of**   **25**.578–85
  *see also* Article 42 (applicable law)
  agreement between the parties   **25**.578–82
  general principles of international law
      **25**.580, **25**.582–5
  general principles of statutory interpretation
      **25**.580, **25**.583
  general rules of municipal law, ICSID
      jurisdiction as derogation from   **25**.580,
      **25**.583
  host State law/applicable rules of international
      law   **25**.579–85
  jurisprudence
    *Amco I*   **25**.581–2
    *CMS*   **25**.578, **42**.7, **52**.187–90
    *CSOB*   **25**.582, **42**.5
    *Siemens*   **42**.6
    *SPP II*   **25**.583, **42**.4
    *Zhinvali*   **25**.584

law applicable to merits (Article 42)
    distinguished   **25**.578
treaty interpretation rules   **25**.579
**Article 25(1), "consent", BITs as State's offer**
    **25**.427–55
  acceptance
    diplomatic protection, denial in case of
        refusal   **25**.455
    institution of proceedings as   **25**.417,
        **25**.448–9
    as part of licensing process   **25**.455
    specific provision for   **25**.454
  acceptance, need for   **25**.447–55
    examples of BITs ignoring requirement
        **25**.451–3
    explicit consent   **25**.455
  in case of, choice of method by agreement
      **25**.446
  consent to alternative methods of settlement,
      relevance   **25**.441–6
  contract claims, applicability to   **25**.531
  examples   **25**.431–4
  incorporation of ICSID clause into investment
      agreement   **25**.390
  jurisprudence
    *AAPL*   **25**.432
    *AMT*   **25**.452
    *CSOB*   **25**.390, **25**.429, **25**.435
    *El Paso*   **25**.449
    *Generation Ukraine*   **25**.448
    *Joy Mining*   **26**.41–2
    *Tradex*   **25**.429
  normal method   **25**.428
  reference to future agreement, effect   **25**.439
  requirements
    binding offer   **25**.430–5
    BIT between host State and State of
        investor's nationality   **25**.447
    entry into force of treaty   **25**.429
  right to submit disputes provision, effect
      **25**.435
  "shall be submitted" undertaking and   **25**.434
  "shall give consent in future" undertaking
      **25**.436–7
  "shall give sympathetic consideration"
      undertaking   **25**.438
  specific exclusion of ICSID reference as
      **25**.440
  termination as withdrawal of consent   **25**.619
  variety of provisions   **25**.428
  withdrawal of offer
    as breach of BIT   **25**.450
    withdrawal of consent distinguished
        **25**.450

**Article 25(1), "consent", concurrent
    arbitration provisions**
1993 Model Clauses and    **26**.18
adoption of findings of another forum    **26**.40
denunciation and    **25**.211
effect on exclusive remedy rule    **26**.17, **26**.31
    validity of alternative consent and
        **26**.33
estoppel and    **26**.37
in
    BITs    **25**.446, **26**.20–1
    Cartagena Free Trade Agreement (1994)
        **25**.463
    consecutive documents spread over time
        **26**.24–31: effect of later ICC clause on
        existing ICSID clause    **26**.30
    Energy Charter Treaty (1994)    **25**.460–1,
        **26**.22
    investor/host State agreements    **26**.24
    MERCOSUR Protocols    **25**.462, **26**.22
    NAFTA (1992)    **25**.458, **26**.22, **26**.112–13
    national legislation    **25**.398–408, **26**.23,
        **26**.40: consecutive provisions    **26**.43
jurisprudence
    *Joy Mining*    **26**.41–2
    *Klöckner I*    **26**.25–31
    *SPP*    **25**.400–4, **26**.34–40, **41**.19
    *Tradex*    **26**.43
*ne bis in idem* principle    **26**.31, **26**.114
precedence    **25**.400–4, **26**.40
*res judicata* principle    **26**.31
stay of proceedings by one tribunal while other
    decides its jurisdiction    **26**.38
tribunal's role and    **26**.40
validity
    right of resort to ICSID arbitration and
        **26**.34–42
    "unless otherwise stated" provision and
        **26**.33
**Article 25(1), "consent", conditions**
*see also* Article 25(1), "consent", consultation
    or negotiations obligation; Article 25(1),
    "consent", limitations
admissibility    **25**.422–5, **25**.540
    after consent given    **25**.606
exhaustion of local administrative or judicial
    remedies: *see* Article 26 (exclusive
    remedy rule), exhaustion of local
    administrative or judicial remedies
investment authorization    **25**.422–5
    revocation as indirect withdrawal of consent
        **25**.614–17
prior attempt at conciliation    **25**.386, **25**.387
time limits for request    **36**.17

written consent in addition to investment
    authorization process    **25**.424
**Article 25(1), "consent", consultation or
    negotiations obligation    25**.541–7
*see also* Article 26 (exclusive remedy rule),
    exhaustion of local administrative or
    judicial remedies; Article 26 (exclusive
    remedy rule), exhaustion of local
    administrative or judicial remedies as
    condition of consent (BITs provisions)
Energy Charter Treaty (1994)    **25**.542
jurisprudence
    *Enron*    **25**.546
    *Military and Paramilitary Activities*
        **25**.543
    *SGS* v. *Pakistan*    **25**.545
    *Western NIS*    **25**.547
NAFTA (1992)    **25**.542
non-compliance, effect    **25**.543–7
time limits    **25**.542
**Article 25(1), "consent", critical date**
contingent submissions    **25**.470
continuing breach and    **25**.511–12
date of acceptance    **25**.469
date of fulfilment of all conditions for consent
    **25**.470, **25**.471, **25**.682, **25**.754, **44**.43–6
designation of subdivision or agency    **25**.35,
    **25**.471, **25**.913–15
ECT provisions    **25**.510
entry into force of Convention    **25**.471
institution of proceedings    **25**.472–4,
    **25**.479–98
    Executive Directors' Report    **25**.479
    IR 2(1)(c) and 2(2)    **25**.479
IR 2    **25**.35, **25**.468, **25**.479, **36**.31
jurisprudence
    *Amco I*    **25**.468
    *Autopista*    **25**.474
    *Generation Ukraine*    **25**.473, **25**.507
    *Helnan*    **25**.505
    *Holiday Inns*    **25**.472
    *Impregilo*    **25**.506
    *Jan de Nul*    **25**.504
    *Kardassopoulos*    **25**.507
    *Lucchetti*    **25**.502–3
    *Maffezini*    **25**.500–1
    *Rompetrol*    **25**.754
    *Salini* v. *Jordan*    **25**.507
    *SGS* v. *Pakistan*    **25**.499
    *SGS* v. *Philippines*    **25**.507, **25**.511
    *Siag*    **25**.754
    *SPP*    **25**.491
    *Tecmed*    **25**.512
    *Tradex*    **25**.480, **25**.508–9

**Article 25(1), "consent", critical date (*cont.*)**
legal consequences of consent and   **25**.469,
   **25**.475–8, **44**.46
denunciation of Convention and   **25**.477
determination of applicable Conciliation
   and Arbitration Rules   **25**.478, **44**.17
diplomatic protection, loss of right to
   **25**.476, **27**.30–7
exclusion of other remedies   **25**.476
exclusion of territories and   **25**.477, **70**.4
freezing of rights and duties under
   Convention   **25**.477
irrevocability of consent   **25**.475,
   **25**.599–602
nationality requirements   **25**.35, **25**.475,
   **25**.679–87, **25**.752–9
loss of right to relief in non-ICSID forum and
   **26**.2, **26**.6
NAFTA provisions   **25**.510
parties acting on different dates   **25**.468
request for arbitration   **25**.480, **25**.754
unspecified in Convention   **25**.35, **25**.479
**Article 25(1), "consent", *forum prorogatum***
in case of doubt as to consent   **25**.481–98
   confirmation or extension of consent
     **25**.485
   Court's right/duty to raise of own accord
     **25**.485, **25**.498
   cure of defect after institution of
     proceedings   **25**.488–98
   failure to appear   **25**.483, **45**.13
   failure to challenge   **25**.485–6, **41**.49
drafting history   **25**.481
ICJ practice   **25**.481, **36**.30
jurisprudence
   *Amco I*   **25**.490
   *Klöckner I*   **25**.492–7
   *SPP*   **25**.491
manifest absence of consent and   **25**.482
**Article 25(1), "consent", interpretation**
effectiveness principle   **25**.593
jurisprudence
   *Amco I*   **25**.587
   *Holiday Inns*   **25**.586
   *Mondev*   **25**.591
   *SOABI*   **25**.589
   *SPP II*   **25**.590
   *Tradex*   **25**.593
restrictive/extensive approach   **25**.586–95
**Article 25(1), "consent", limitations**
  *see also* Article 25(1), "consent", conditions
admissibility   **25**.513
   after consent given   **25**.606
   consistency with Convention   **25**.513
BITs   **25**.516–39

"disputes or claims originating before entry
   into force"   **25**.49–56
limitation to some of the treaty rights
   **25**.538–9
US Model Agreement   **25**.532
broad limitation clauses, preference for
   **25**.516
coincidence of offer and acceptance, need for
   **25**.514
in direct agreements   **25**.515–17
drafting history   **25**.513
exclusion of classes of disputes (Article 25(4))
   distinguished   **25**.515
jurisprudence
   *ADC*   **25**.539
   *AGIP*   **25**.517
   *Inceysa*   **25**.521–2, **25**.534
   *Kardassopoulos*   **25**.536
   *Saipem*   **25**.539
   *SGS* v. *Pakistan*   **25**.529
   *SGS* v. *Philippines*   **25**.530
   *Siemens*   **25**.530
   *SPP*   **25**.519
   *Telenor*   **25**.539
   *Tokios Tokelés*   **25**.530
   *Tradex*   **25**.525
   *Vivendi I*   **25**.528
   *Zhinvali*   **25**.520
Model Clauses (1993)   **25**.515, **46**.10
national legislation   **25**.518–25
umbrella clauses   **25**.537, **26**.94,
   **26**.108
**Article 25(1), "consent", method**
investor/host State agreements   **25**.378
   existing disputes   **25**.382–7: *compromis*
     **25**.382, **25**.384; Model Clauses (1993)
     **25**.387; rarity   **25**.384
   future disputes   **25**.382–7: careful drafting,
     need for   **25**.385–7; compromissory
     clause in investment agreement   **25**.382,
     **25**.384; drafting history   **25**.382–3;
     Executive Directors' Report   **25**.384;
     Model Clauses (1993)   **25**.385–7;
     objections to   **25**.383; practice   **25**.384
   invalidity or termination: good faith
     principle   **25**.628–30; investor's lack of
     authority   **25**.632; State's incapacity to
     give consent   **25**.625–31; as withdrawal
     of consent   **25**.620–4
multilateral treaties
   Cartagena Free Trade Agreement   **25**.463:
     investor's consent, need for   **25**.463
   Energy Charter Treaty (1994)   **25**.460–1
   NAFTA (1992): investor's consent, need for
     **25**.459; time limits for request   **36**.17

non-binding references    **25**.464–7: Asean
Agreement for the Promotion and
Protection of Investments (1987)
**25**.465; EC Statement on Investment
Protection Principles (1992)    **25**.467;
World Bank Guidelines on the Treatment
of Foreign Direct Investment (1992)
**25**.466
termination of offer as withdrawal of
consent    **25**.619
request for arbitration as acceptance    **36**.29
submissions before tribunal    **26**.28, **26**.30
**Article 25(1), "consent", MFN clauses,
applicability    25**.567–8
jurisprudence
*Gas Natural*    **25**.570
*Maffezini*    **25**.568–9
*Plama*    **25**.573
*RosInvest*    **25**.575
*Salini* v. *Jordan*    **25**.572
*Telenor*    **25**.574
**Article 25(1), "consent", multiple
instruments/varying parties
25**.324–6, **25**.389, **25**.551–66, **25**.599
*see also* Article 25(1), "arising directly",
multiple contracts/varying parties
jurisprudence
*AGIP*    **25**.328
*Amco I*    **25**.324–6, **25**.389
*CSOB*    **25**.100, **25**.390, **25**.562–3
*Duke Energy*    **25**.561, **25**.564
*Fedax*    **25**.100
*Holiday Inns*    **25**.95, **25**.552
*Klöckner I*    **25**.327, **25**.553–7, **46**.77
*SOABI*    **25**.96, **25**.558–9
*Tesoro*    **25**.560
unity of investment approach    **25**.561–5
**Article 25(1), "consent", national legislation as
consent or offer    25**.392–426
acceptance of offer, need for    **25**.416–26,
**26**.21
by time of institution of proceedings
**25**.417
early acceptance, desirability    **25**.419
extent of acceptance    **25**.420
methods of acceptance    **25**.417–26
request for conciliation or arbitration as
**25**.417–18
Additional Facility, reference to    **25**.301,
**25**.409
concurrent arbitration provisions: *see* Article
25(1), "consent", concurrent arbitration
provisions
conditions: *see* Article 25(1), "consent",
conditions

effective date of consent and    **25**.392
Executive Directors' Report    **25**.393
further action by host State, need for
**25**.410–15
jurisprudence
*Amco I*    **25**.414
*Inceysa*    **25**.391, **25**.396–7, **25**.415
*Manufacturers Hannover Trust*    **25**.405
*SPP*    **25**.400–4, **25**.421, **26**.34,
**41**.19
*Tradex*    **25**.395, **25**.417
*Zhinvali*    **25**.406–8, **25**.418
notification to Centre, value    **25**.393
restrictions on offer    **25**.392
revocability    **25**.392
as withdrawal of consent    **25**.618
subsequent BIT, relevance    **25**.403
**Article 25(1), "consent", validity**
determination by commission or tribunal
**25**.479, **25**.621
determination by non-ICSID forum where
ICSID proceedings not instituted    **26**.6
non-appearance of respondent in non-ICSID
forum    **26**.8, **26**.9
exclusion of diplomatic protection and
**27**.31–7
failure to file or submit formal request for
arbitration    **26**.9–13
failure to waive other remedies, effect    **26**.37
*MINE*    **26**.9–14
poor drafting and    **26**.8, **26**.19
validity of investment agreement and
severability of arbitration provision: *see*
Article 25(1), "consent", severability of
arbitration provision
State's incapacity to give consent
**25**.625–31, **42**.154–6
**Article 25(1), "consent", voluntary nature
Preamble**    33, **25**.5, **25**.374–7, **25**.596,
**69**.2
developing countries' concern
"adverse inferences"    **25**.375
pressure to consent    **25**.375
Executive Directors' Report    **25**.376
participation in Convention, implications
**25**.377
Preamble and    **25**.374
**Article 25(1), "consent", withdrawal**
indirect withdrawal
acquisition of host State nationality
**25**.633
denunciation of Convention    **25**.211,
**25**.215, **25**.477, **25**.609–11, **66**.7, **71**.4,
**72**.1–11
exclusion of territories and    **25**.611

**Article 25(1), "consent", withdrawal (*cont.*)**
  indirect withdrawal (*cont.*)
    expropriation leading to deprivation of
      foreign control    **25**.634, **25**.895
    good faith principle    **25**.628–30
    invalidity or termination of direct
      investment agreement    **25**.620–4
    investor's lack of authority    **25**.632
    jurisprudence, *CSOB*    **25**.619
    national legislation, changes to    **25**.618
    notification of excluded classes of disputes
      (Article 25(4))    **25**.607–8, **45**.49
    State's incapacity to give consent
      **25**.625–31
    termination of treaty offer    **25**.619
    withdrawal of designation or approval in
      respect of constituent subdivision or
      agency as    **25**.267, **25**.612–13, **25**.908
    withdrawal of investment authorization
      **25**.614–17
    withholding of agreement on procedure,
      exclusion    **44**.18
  irrevocability of consent    **Preamble** 33,
    **25**.267, **25**.419, **25**.475, **25**.596–606,
    **26**.193
    critical date    **25**.475, **25**.599–602
    decision to include specific statement of
      principle    **25**.596
    Executive Directors' Report    **25**.597
    new limitations and conditions    **25**.606
    *pacta sunt servanda* principle    **25**.599
    Preamble    **25**.597
    refusal of party to cooperate    **25**.605,
      **45**.5
  jurisprudence
    *Alcoa*    **25**.607
    *CSOB*    **25**.619
    *Gruslin*    **25**.604
    *Holiday Inns*    **25**.601
    *SPP*    **25**.615–16
  withdrawal of BIT offer distinguished
    **25**.450
  withdrawal by agreement (AR 43 *and 44*)
    **25**.603
**Article 25(1), "consent", writing, need for
  Preamble** 35, **25**.379–81
  assignment/succession and    **25**.380
  explicit consent, need for, *Cable TV*    **25**.381
  *Holiday Inns*    **25**.380
  possibility of multiple documents
    **25**.388–90, **25**.393
    *Amco I*    **25**.389
    *CSOB*    **25**.390
    incorporation of BIT clause into investment
      agreement    **25**.390

proof at time of request for proceedings, need
    for (IR2(2))    **25**.379
**Article 25(1), "constituent subdivision or
  agency . . . designated to Centre"**
*see also* Article 25(3) (constituent subdivision
    or agency: approval of consent)
  Article 25(3) provisions distinguished
    **25**.230
  changes to administrative structure
    **25**.313–18
    as indirect withdrawal of consent
      **25**.613
  changes to administrative structure, extension
    of consent to host State
    justification: situation caused by State's own
      act    **25**.315; State's act as indirect
      unilateral withdrawal of consent
      **25**.315
    *Klöckner I*    **25**.317
    separate consent of host State, need for
      **25**.312–16, **25**.920: agreement of
      subdivision or agency to assume
      responsibility as alternative    **25**.312
  designation
    application to both constituent subdivisions
      and agencies    **25**.247
    Article 70 notification of excluded
      territories distinguished    **25**.254
    confirmation from State of status,
      desirability    **25**.257: Model Clauses
      (1993)    **25**.257
    drafting history    **25**.247
    evidence of, need for    **25**.259, **25**.266
    general or specific    **25**.247: *ad hoc*
      designation    **25**.255
    jurisdiction, dependence on    **25**.257,
      **25**.260–1: *Amco I*    **25**.264; *Klöckner I*
      **25**.260–1, **25**.317; *LETCO*    **25**.265
    jurisprudence: *Cable TV*    **25**.249,
      **36**.39–40; *East Kalimantan*    **25**.249;
      *Manufacturers Hanover Trust*    **25**.266;
      *Noble Energy*    **25**.251; *Occidental II*
      **25**.251; *Repsol*    **25**.250
    limitations    **25**.256: conditions    **25**.256;
      time limits    **25**.256
    notification to Centre: BITs provision
      **25**.252; choice of method    **25**.252;
      legislation as    **25**.252; need for
      **25**.252, **25**.255, **25**.257
    origin of idea    **25**.247
    reason for provision: assurance of authority
      to commit State    **25**.248; preservation of
      State's control over dealings with foreign
      investors    **25**.248
    specificity, need for    **25**.252

State responsibility for acts of distinguished
  **25**.233–7: *Autopista* **25**.234;
  *Generation Ukraine* **25**.234; *Genin*
  **25**.234; *Helnan* **25**.234; *Impregilo*
  **25**.234; *Jan de Nul* **25**.234;
  *Kardassopoulos* **25**.234; *Maffezini*
  **25**.234; *Saipem* **25**.234; *Tanzania
  Electric* **25**.234; *Vivendi I* **25**.234,
  **25**.236; *Wena Hotels* **25**.234
State succession and **25**.308
timing: date of request for conciliation or
  arbitration as critical date (IR 2)
  **25**.258, **25**.915; flexibility **25**.258;
  jurisprudence; *Amco I* **25**.264; *Klöckner
  I* **25**.260–1; *Noble Energy* **25**.263;
  *Tanzania Electric* **25**.262
  undertaking to make **25**.257
  withdrawal **25**.267: unilateral withdrawal
    of consent to jurisdiction and **25**.267,
    **25**.908
entities covered **25**.240–6
  Australia, problems relating to
    **25**.242
  change of status, possibility of **25**.260–1,
    **25**.317
  designation requirement and **25**.244
  determination by commission or tribunal
    **25**.244
  drafting difficulties **25**.238–43
  jurisprudence: *Burlington Resources*
    **25**.246; *Cable TV* **25**.246; *City Oriente*
    **25**.246; *East Kalimantan* **25**.246;
    *Klöckner I* **25**.246; *Manufacturers
    Hanover Trust* v. *Egypt* **25**.246; *Noble
    Energy* **25**.244, **25**.246; *Perenco
    Ecuador* **25**.246; *Repsol* **25**.246;
    *Scimitar* **25**.246; *Tanzania Electric*
    **25**.246
  open issues **25**.243
  public functions on behalf of Contracting
    State or constituent subdivision, defining
    requirement **25**.243
extension of consent to host State,
    changes to administrative structure,
    determination by domestic law, exclusion
    **25**.314
justification for provision **25**.230
register **25**.253
Secretary-General's role **11**.7
separate consent of host State, need for
  *Benvenuti & Bonfant* (French proceedings)
    **55**.117
  changes to administrative structure: *see
    above*
  possible formulae **25**.316

  as protection against host State interference
    **25**.312, **25**.920
  State control, need for **55**.117
**Article 25(1), "Contracting State"**
  absolute nature of requirement **25**.3, **25**.213
  *ad hoc* arbitration incorporating ICSID
    Rules/Secretary-General as appointing
    authority **25**.227, **25**.229
  Additional Facility, availability where
    requirement not fulfilled **25**.224–6,
    **25**.300–1, **67**.2
  *see also* Index by Subject
  Convention provisions **25**.211
  critical date
    institution of proceedings **25**.35,
      **25**.214–20
    jurisprudence: *Amco I* **25**.217; *Cable TV*
      **25**.219; *Generation Ukraine* **25**.220;
      *Holiday Inns* **25**.216; *LETCO* **25**.218
    Secretary-General's consideration of request
      **25**.214
  future ratification, contingent submission
    BITs **25**.221, **25**.222: Additional Facility
      as fall-back **25**.222
    investment agreement **25**.221
    Model Clauses (1968) **25**.221:
      undertaking to ratify speedily **25**.221
    Model Clauses (1981) **25**.221
    Model Clauses (1993) **25**.221: Additional
      Facility as fall-back **25**.221
    national legislation, Yemen **25**.223
  identification of party, need for
    Articles 28(3) and 36(2) **25**.214
    IR 2(1)(a) **25**.214
  List of Contracting States and Other
    Signatories **25**.213
  non-compliance, *ad hoc* arbitration **25**.302
  non-Contracting State, possibility of access to
    Centre machinery **25**.212, **25**.213
  ratification, need for **25**.213
    during 30 day period following deposit of
      ratification **25**.214
  reciprocity principle and **25**.212
  Secretary-General's role **25**.214
    refusal to register request **25**.214,
      **25**.259
**Article 25(1), "dispute", existence of**
  critical date **25**.48–56
    terms of consent, dependence on **25**.48
  definition and requirements
    actual dispute of immediate interest to
      parties **25**.44–6: jurisprudence
      **25**.45–7
    clearly identified issues **25**.44
    contact between parties **25**.43

**Article 25(1), "dispute", existence of (*cont.*)**
  definition and requirements (*cont.*)
    definition (ICJ)    **25**.42
    divergence distinguished    **25**.56
    exhaustion of other remedies, relevance
      **25**.43
    "legal" nature: *see* Article 25(1), "*legal
      dispute*"
    measures to remedy, relevance: *AGIP*
      **25**.47, **25**.75; *Santa Elena*    **25**.75
    uncertainty as to measure of damages,
      relevance    **25**.46
  events giving rise to dispute and "dispute"
    distinguished    **25**.50–2
    existence of dispute, determination
      **25**.41–56
  jurisprudence
    *Impregilo*    **25**.49
    *Lucchetti*    **25**.53
    *Maffezini*    **25**.51–2
    *Salini* v. *Jordan*    **25**.49
    *Salini* v. *Morocco*    **25**.127
  limitation of consent to disputes or claims
    arising before entry into force of BIT and
    **25**.49–56
  as objective requirement, settlement agreement
    prior to institution of proceedings and
    **48**.75
**Article 25(1), "investment"**
  criteria    **25**.152–74
    contribution to economic development
      **Preamble** 14, **25**.158, **25**.160, **25**.163–74
    duration    **25**.153, **25**.154
    jurisprudence    **25**.159–71
    mandatory, whether    **25**.159, **25**.167–74
    regularity of profit and return    **25**.153,
      **25**.157
    risk    **25**.153, **25**.154–5
    substantial financial commitment    **25**.153,
      **25**.154–5, **25**.158, **25**.161, **25**.204
  definition
    absence in Convention    **25**.113, **25**.115,
      **25**.121, **25**.153
    arguments in favour of    **25**.113
    Executive Directors' Report ("no attempt to
      define")    **25**.119–20
    object and purpose of Convention as guide
      **25**.121
    suggestions for    **25**.114
  definition by consent
    general/specific provision distinguished
      **25**.123
    limitations on    **25**.122–8
  definition by consent (BITs)    **25**.139–45
    *ad hoc* nature    **25**.144

    inclusion of non-exhaustive list of typical
      rights    **25**.140
    relevance of provision    **25**.139
    UK Model Agreement    **25**.141
    US Model BIT    **25**.142
  definition by consent (contractual agreement)
    **25**.129–33
    advisability of specific statement    **25**.130
    ICSID clause as evidence of    **25**.129–31
    Model Clauses (1981)    **25**.129
    Model Clauses (1993)    **25**.129
    practice    **25**.131
    reference in contract to BIT ICSID clause
      **25**.131
  definition by consent (multilateral treaty)
    Cartagena Freed Trade Agreement (1994)
      **25**.147
    Energy Charter Treaty (1994)    **25**.147
    MERCOSUR Protocol (1994)    **25**.147
    NAFTA (1992)    **25**.146
  definition (national legislation)
    divergence from ICSID usage    **25**.138:
      relevance to consent    **25**.138
    examples    **25**.134–8
  double keyhole/double-barreled test
    **25**.123–7
  examples    **25**.148–51
    bonds, debentures and debt instruments
      **25**.142
    civil engineering and construction contracts
      **25**.151
    concessions including turnkey projects
      **25**.140, **25**.141, **25**.142
    construction contracts    **25**.118
    contractual rights    **25**.149
    economic transactions    **25**.148, **25**.202–4
    enterprise    **25**.142
    intellectual or industrial property rights
      **25**.140, **25**.141, **25**.142
    jurisprudence: *Generation Ukraine*
      **25**.180; *Mihaly*    **25**.176–7; *PSEG*
      **25**.179; *Zhinvali*    **25**.178
    licences, authorizations and permits
      **25**.142
    loans    **25**.118, **25**.142, **25**.149
    money claims    **25**.140, **25**.141, **25**.149
    movable and immovable property rights
      including leases, mortgages, liens and
      pledges    **25**.14, **25**.141, **25**.148
    NGO charitable activities    **25**.157
    outstanding payments    **25**.118
    pre-investment activities including
      negotiations, exclusion    **25**.175–81:
      pre-investment treaty rights, relevance
      **25**.181

services provision    25.151
share ownership    25.118
shares or stock or other interests in company
    25.140, 25.141, 25.142, 25.150
suppliers' credits    25.118
foreign source, relevance    25.182–7
    drafting history    25.182
    host State requirement for    25.183
    jurisprudence: *Amco I*    25.183; *Olguín*
        25.184; *SOABI*    25.184; *Tokios Tokelès*
        25.185; *Tradex*    25.184; *Wena Hotels*
        25.184
"in accordance with host State law" provision,
    relevance    25.199–201
    *Aguas del Tunari*    25.201
    *Bayindir*    25.201
    *Fraport*    25.201
    *Gas Natural*    25.201
    *Gruslin*    25.201
    *Inceysa*    25.201
    *Kardassopoulos*    25.201
    *LESI-DIPENTA*    25.201
    *Plama*    25.201
    *PSEG*    25.201
    *Saipem*    25.201
    *Salini* v. *Morocco*    25.200
    *Saluka*    25.201
    *Tokios Tokelès*    25.201
    *World Duty Free*    25.201
"in the territory" requirement    25.188–98
    absence of provision in Convention
        25.188, 25.197
    BIT provision for    25.189, 25.194
    Executive Directors' Report    25.188
    jurisprudence: *Bayview*    25.196; *CSOB*
        25.192; *Fedax*    25.191; *Gruslin*
        25.195; *LESI* cases    25.195; *SGS* cases
        25.192–3; *Zhinvali*    25.195
    type of investment, relevance    25.197–8
inclusion of information in request for
    proceedings (IR 2(1)(e))    25.123
investments arising prior to Convention's entry
    into force, rejection of proposal to
    exclude    25.117
jurisprudence
    *CSOB*    **Preamble** 14, 25.121, 25.149,
        25.164
    *Fedax*    25.149, 25.154
    *Joy Mining*    25.126, 25.160
    *Kaiser Bauxite*    25.132
    *LESI* cases    25.165
    *LETCO*    25.133
    *Malaysian Historical Salvors*    25.124,
        25.157, 25.167–70
    *Mitchell*    25.166, **52**.160

*Salini* v. *Morocco*    25.154–6, 25.171
*Sempra*    25.149
*Tradex*    25.135–6
minimum financial limit, suggestions for
    25.116
procedure in case of doubt
    *ad hoc* arbitration    25.209, 25.227–9
    reference to Additional Facility    25.209
    specific statement in contract    25.209
**Article 25(1), "jurisdiction"**
Additional Facility: see *Index by Subject*
"admissibility" and    25.18
appropriateness of term    25.15–17
    use in Hague Convention for the Pacific
        Settlement of Disputes (1907) as
        justification    25.15
claim for damages or other legal remedy,
    sufficiency    25.75
commission/tribunal's right to consider on
    own initiative    25.7
"competence" as alternative    25.15, 25.17,
    **41**.56–7
    terminology in Spanish and French texts
        25.17, **41**.56
    tribunal usage    25.17
conciliation/arbitration
    equivalence under Convention    25.19–27,
        25.560, **34**.6, **36**.6, **36**.13
    separate treatment, suggestions for
        25.19
conciliation/arbitration, choice
    BITs provisions    25.23–4
    clarity, need for    25.20, 25.21, 25.27,
        25.28
    investor/host State agreements    25.22
    IR 1    25.20
    jurisprudence: *AAPL*    25.24; *MINE*
        25.22
    method    25.20
    Model Clauses (1993)    25.21
    national legislation    25.25–7
    subsequent change    25.28
    timing    25.20, **36**.13
Executive Directors' Report    25.16
fact-finding
    Additional Facility provision for as
        pre-dispute process    25.11, 25.29–34,
        25.210: Model Clauses (1993) formula
        25.34
    establishment of facts as independent issue,
        risk    25.29
    facts incidental to legal dispute, eligibility
        for clarification    25.29: Article 43
        provisions and    25.74; drafting history
        25.74; practical need for    25.74

**Article 25(1), "jurisdiction" (*cont.*)**
  fact-finding (*cont.*)
    questions of fact as legal dispute   **25**.75
    suggestions for including specific reference
        to   **25**.29
  parties' right to determine, limitation son
      **25**.730–40
**Article 25(1), justiciability**
  capital importing countries' wish to exclude
      certain political issues   **25**.68
  expropriation and other governmental actions
      **25**.68–71
    *AAPL*   **25**.70
    *Amco I*   **25**.71
    *Benvenuti & Bonfant*   **25**.70
    *CSOB*   **25**.72
  parties' right to exclude classes of disputes
      **25**.69, **25**.73
    notification procedure: *see* Article 25(4)
        (notification of excluded classes of
        disputes)
**Article 25(1), "*legal dispute*"**
  availability of non-judicial means of
      settlement, relevance
    application of principles of equity and
        **25**.81
    conciliation   **25**.76–82
    justiciability: *see* Article 25(1),
        justiciability
    parties' request for arbitral decision *ex
        aequo et bono*   **25**.76–82
    settlement of dispute by parties (AR 43)
        **25**.82
  claimant's responsibility for presentation as
      **25**.60–3, **25**.81
    documents, relevance, IR 2(2)   **25**.61
    examples of   **25**.60
    IR 2(1)(e)   **25**.61
  criteria   **25**.57–67
    legal remedies based on legal rights   **25**.60,
        **25**.64
    legal rights and obligations based on
        agreement   **25**.60, **25**.64–6
  definition
    by parties in advance   **25**.62–3: Model
        Clauses (1968)   **25**.63; Model Clauses
        (1981)   **25**.62, **25**.85; Model Clauses
        (1993)   **25**.63; value   **25**.63
    proposal for   **25**.57–8
  "dispute of a legal character", significance of
      change from   **25**.58
  jurisprudence
    *AAPL*   **25**.43
    *Adriano Gardella*   **25**.80
    *Alcoa*   **25**.64

    *Continental Casualty*   **25**.65
    *Suez et al.*   **25**.66
  proposal for deletion   **25**.57
  questions of fact   **25**.75
  reason for inclusion
    developing countries' concerns
        **25**.77
    exclusion of: conflicts of interest   **25**.59,
        **25**.77; political or commercial disputes
        **25**.57
    Executive Directors' Report   **25**.59
  renegotiation of long-standing agreement as
      bar to   **25**.78–81
    adjustment provision in agreement   **25**.78,
        **25**.80
    in case of disagreement between parties
        **25**.80
    legal basis for demand and   **25**.79:
        fundamental change of circumstances
        **25**.79; permanent sovereignty over
        natural resources   **25**.79; validity of
        claim, relevance   **25**.79
  requirement for   **25**.3
**Article 25(1), "national of . . ."**
  direct access of non-State party to
      international forum
    advantages   **25**.269
    objections   **25**.269
    purpose of Convention   **25**.268–9
  multipartite proceedings
    multiple host States   **25**.282
    multiple investors   **25**.277–81: *Goetz*
        **25**.280; *Klöckner I*   **25**.279; number of
        co-claimants, relevance   **25**.281
    single proceedings   **25**.279
  private investor, government-controlled entity
      as   **25**.271–6
    Comment to the Preliminary Draft
        **25**.270
    criteria   **25**.271–6
    functional test   **25**.271–6
    jurisprudence: *CDC*   **25**.273; *CSOB*
        **25**.272; *Rumeli Telekom*   **25**.275;
        *Telenor*   **25**.274
  private status of investor, need for
      **25**.270
    international organisations, exclusion
        **25**.270
    investor States, exclusion   **25**.270
**Article 25(1), ". . . which the parties to the
    dispute"**
  assignment/succession and, renewed consent
      in writing, need for   **25**.380
  assignment/succession of investor's rights and
      responsibilities   **25**.336–63

in absence of direct contractual
arrangements   **25**.344
consent based on legislation or treaty and
**25**.345–8, **25**.349
consent clause provision for
**25**.363
as device to attract ICSID jurisdiction
**25**.350–5
host State agreement to   **25**.362
jurisprudence: *Aguas del Tunari*   **25**.350;
*Amco I*   **25**.339–41; *Amco II*   **52**.671;
*Banro*   **25**.351, **25**.355; *El Paso*
**25**.358; *Enron*   **25**.359; *Fedax*   **25**.349;
*Holiday Inns*   **25**.337–8; *LESI & Astaldi*
**25**.343; *LETCO*   **25**.342; *Mihaly*
**25**.352–5, **25**.361, **25**.749; *Noble Energy*
**25**.343; *SPP*   **25**.345–8; *Vivendi II*
**25**.357
tribunals' realistic approach   **25**.361
complexities in corporation structure and
**25**.304, **25**.319–35
"group enterprise theory"   **25**.329
joint claimants   **25**.793
jurisprudence: *AGIP*   **25**.328; *Amco I*
**25**.324–6; *Cable TV*   **25**.329; *CMS*
**25**.792, **42**.11; *Holiday Inns*   **25**.320–3;
*Impregilo*   **25**.334; *Klöckner I*   **25**.327;
*Lucchetti*   **25**.793; *MTD*   **25**.793; *Pan
American*   **42**.11; *Sempra*   **25**.792;
*Vivendi I*   **25**.793; *Zhinvali*   **25**.330–2
provision for in consent clauses, importance
**25**.335
treatment of local subsidiaries as foreign
national (Article 25(2)(b)) and
**25**.791–4
tribunals' diversity of approach
**25**.329–35
unnamed parent companies   **25**.323–35
consent by parties to dispute, need for
**25**.303
parties not named in original consent
agreement   **25**.303
assignment/succession of investor's rights
and responsibilities: *see above*
complexities in corporation structure and:
*see above*
proceedings against State where consent
given by subdivision or agency   **25**.304,
**25**.311–18, **25**.920: *see also* Article 25(3)
(constituent subdivision or agency:
approval of consent)
State succession and: *see* State succession
and *below*
subrogation in case of insurance indemnity:
*see below*

State succession and   **25**.304, **25**.306–10
in case of ratification subsequent to
independence/merger   **25**.310: critical
date for consent, relevance   **25**.310;
severability of consent clause and
**25**.310; territorial nexus, relevance.
**25**.310
in case of selective succession
**25**.309
in case of universal succession   **25**.309:
continuing participation in the
Convention and   **25**.309; in respect of
territories outside area of investment
**25**.309
former constituent subdivisions designated
under Article 25(1)   **25**.308
formerly dependent States notified under
Article 70   **25**.308
ICSID practice   **25**.307
subrogation in case of insurance indemnity
**25**.305, **25**.364–73
insurer's succession to rights: BITs
provision for   **25**.364; host State's
agreement to, need for   **25**.364, **25**.366;
subrogation distinguished   **25**.365
inter-State arbitration and   **27**.22
private insurer's right of subrogation:
agreement of host State, need for
**25**.367; functional criteria for
determining status   **25**.367
procedural problems, possible solutions:
BITs provisions   **25**.371–2; *CSOB*
**25**.373; Model Clauses (1993)
**25**.370–1
State, State agency or international
organisation, denial of party status
**25**.365–6: negotiating history
**25**.366

**Article 25(2), "national of . . . another
Contracting State"**   **25**.3
*see also* Article 25(1), ". . . another
Contracting State"
clarification of nationality requirements,
limitation to   **25**.635
consensual element in determining   **25**.638,
**25**.762
critical date for determination   **25**.35,
**25**.679–87
exclusion
nationals of host State   **25**.633, **25**.636,
**25**.679, **25**.893: constituent
subdivision/agency as party and
**25**.767
nationals of non-Contracting State   **25**.285,
**25**.636, **25**.660, **25**.894

**Article 25(2), "national of . . . another
    Contracting State" (*cont.*)**
    natural and juridical persons distinguished
        **13**.11, **25**.637, **25**.688, **25**.752–3,
        **25**.873–4
    as objective requirement    **25**.638–9, **41**.50
    tribunal's obligation to examine    **52**.183–4
**Article 25(2)(a) (nationality: natural persons)**
    absence of problems    **25**.640
    agreement between investor and host State
        **25**.657–8
        estoppel and    **25**.658
    applicable law
        BITs provisions    **25**.659
        diplomatic protection rules distinguished
            **25**.646–7
        law applicable to merits (Article 42)
            distinguished    **25**.642, **42**.9
        law of State of claimed nationality
            **25**.642–5, **42**.9–12, **52**.184: exceptions
            **25**.642, **25**.644, **42**.9
    continuity of nationality    **25**.684–7
        IR (1984)    2 **25**.686
    critical date    **25**.35
        double consent/registration of request test
            **25**.679–87, **25**.873, **36**.62: application to
            non-possession of host State nationality
            **25**.681, **25**.683; change from date of
            institution    **25**.681; change of nationality
            between request and registration
            **25**.687
        status as Contracting parties distinguished
            **25**.682
    drafting history    **25**.640, **25**.641, **25**.648–9,
        **25**.665–7, **25**.680–1
    dual/multiple nationals    **25**.661–3
        dominant or effective nationality, relevance
            **25**.662, **25**.668, **25**.670–4
        jurisprudence: *Champion Trading*
            **25**.669–73; *Siag*    **25**.672–4
        nationality of host State, exclusive effect
            **25**.664–78: agreement to contrary,
            ineffectiveness    **25**.668; concurrent
            possession, possibility of    **25**.665;
            Executive Directors' Report    **25**.667;
            involuntary acquisition after consent
            **25**.678; relinquishment of nationality
            before consent    **25**.676–7; subdivision or
            agency as party to dispute    **25**.675
        nationality of non-Contracting State,
            relevance    **25**.662–3: diplomatic
            protection and    **25**.663; drafting history
            **25**.661; estoppel and    **25**.662
    evidence of
        certificate of nationality, conclusiveness
            **25**.648–56

    documentary, need for    **25**.686
    jurisprudence
        *Micula*    **25**.645
        *Olguín*    **25**.645, **25**.646–7
        *Pey Casado*    **25**.656, **25**.677
        *Siag*    **25**.683
        *Soufraki*    **25**.643, **25**.644, **25**.650–5, **42**.9,
            **52**.183–4, **52**.224
        *Vacuum Salt*    **25**.684
    nationality of host State, exclusive effect
        **25**.641, **25**.678
    permanent residents
        Energy Charter Treaty (1994)    **25**.659
        exclusion, MERCOSUR Protocols
            **25**.659
    stateless persons    **25**.660
    Tribunal's right to determine own competence
        (Article 41) and    **25**.643, **25**.644
**Article 25(2)(b) (nationality: juridical
    persons)**
    agreement between investor and host State
        **25**.696, **25**.708–17
        absence of challenge    **25**.713–14
        *CDC*    **25**.715
        conditions for effectiveness    **25**.710,
            **25**.716: deception/misrepresentation and
            **25**.716; host State's specific consent
            **25**.716; parties' awareness of
            circumstances    **25**.716, **25**.717
        control test    **25**.710
        desirability    **25**.709
        freedom to determine (First Draft)    **25**.708
        "have agreed should be treated" provision
            distinguished    **25**.709
        *MINE*    **25**.711–14
        Model Clauses (1993)    **25**.709
        reasonable connection, sufficiency    **25**.717
        *Soufraki*    **25**.715
    applicable law    **25**.689, **25**.693, **42**.10–12
        diplomatic protection compared    **25**.694,
            **25**.698: treatment of enemy aliens in time
            of war compared    **25**.694
    BITs provisions    **25**.717, **25**.718–40
        determinant nature    **25**.723
        variety of criteria    **25**.719–21
    commission/tribunal's right to raise of own
        initiative (AR 41(2))    **25**.714
    comparability with Article 25(2)(a) provisions
        **25**.688
    date of registration requirement, omission
        **25**.688, **25**.755–8
    foreign control provision: *see* Article
        25(2)(b) (nationality: juridical persons),
        ". . . because of foreign control . . ."
    control test ("piercing the corporate veil")
        **25**.694–7

agreement between parties and    **25**.710
agreement to "treat as" provision
     distinguished    **25**.697
difficulties in application    **25**.695
non-Contracting State nationals and
     **25**.695
critical date    **25**.35
  consent, change of nationality following
     **25**.755–8: diplomatic protection and
     **25**.755–8; enforcement of award and
     **25**.755–8
  consent to jurisdiction    **25**.475, **25**.752–9,
     **25**.871
  double time test, rejection    **25**.753
  drafting history    **25**.753
drafting history    **25**.689, **25**.695–6, **25**.741
dual/multiple nationals    **25**.742–51
  all of Contracting States    **25**.743
  dominant or effective nationality, relevance
     **25**.745
  nationality of host State, exclusive effect,
     subdivision or agency as party to dispute
     **25**.675
  nationality of host State, non-exclusive
     effect: *see also* Article 25(2)(b)
     (nationality: juridical persons), ". . . have
     agreed should be treated as . . . national of
     another Contracting State . . ."; mixed
     control    **25**.745; need to establish
     nationality of another Contracting State
     **25**.744
  nationality of non-Contracting State,
     non-exclusive effect    **25**.744: diplomatic
     protection and    **25**.746–9; universality of
     Convention and    **25**.750
  reasonable degree of control test
     **25**.745
  specific nationality, need to state (IR
     2(1)(d))    **25**.743
evidence of
  host State's right to    **25**.717
  IR 2(2)    **25**.759
expropriation and    **25**.634
flexibility, need for    **25**.698
foreign control, change of nationality
     following consent, *Amco I*    **25**.875
host State/non-host State, possibility of
     different treatment    **25**.697
incorporation/seat test    **25**.694–707,
     **25**.718–22, **42**.10
  as "domestic law of Contracting State"
     **25**.695
  *Kaiser Bauxite*    **25**.699
  *SOABI*    **25**.700, **25**.703
  *SPP II*    **25**.699
  *Tokios Tokelės*    **25**.701–2

legal personality, need for    **25**.689–93
  BITs provisions    **25**.693
  *Impregilo*    **25**.692
  *LESA-DIPENTI*    **25**.691
  as objective requirement    **25**.693
legal status and capacity and    **42**.10–12,
     **42**.157–9
  *Amco II*    **25**.341
multilateral treaty provisions    **25**.722
national legislation provisions    **25**.717,
     **25**.718–40
  determinant nature    **25**.723
  variety of criteria    **25**.718
nationality of non-Contracting State, exclusive
     effect    **25**.285, **25**.741, **25**.894
**Article 25(2)(b) (nationality: juridical**
     **persons), ". . . because of foreign**
     **control . . ."**
agreement on nationality and    **25**.815,
     **25**.818–21, **25**.825
agreement raising presumption of, rebuttal
     **25**.821
applicability
  exclusion of foreign control and    **25**.839
  juridical persons controlled by local
     nationals    **25**.826–7, **25**.894
  nationals of non-Contracting State
     **25**.828–30
  nationals of States not parties to investment
     protection treaty    **25**.831–2, **25**.835–7
  shareholders of multiple nationality: all
     Contracting States    **25**.833–4, **25**.892;
     inclusion of nationals of non-Contracting
     State, effect    **25**.834, **25**.838
"because", significance    **25**.829
change of nationality following consent
     **25**.876
"control" for purposes of establishing
     nationality in other contexts distinguished
     **25**.703–7
critical dates    **25**.871–95
  agreement between parties    **25**.811,
     **25**.891–2: foreign control immediately
     before dispute, desirability    **25**.891
  BITs provisions    **25**.888, **25**.890
  consent to jurisdiction    **25**.821, **25**.871–86:
     change of control following    **25**.873–87,
     **25**.892–4, **25**.901
  drafting history    **25**.872
  jurisdiction linked to period during which
     control existed    **25**.887: relevance if
     unnamed parent companies accepted as
     parties    **25**.887
  multilateral treaty provisions    **25**.889–90
  "on that date"    **25**.872
  registration of request    **25**.895

**Article 25(2)(b) (nationality: juridical persons), ". . . because of foreign control . . ." (*cont.*)**

diminishing significance of provision **25**.791, **25**.887

effective nationality considerations **25**.729

entities not all having nationality of same State party to BIT **25**.297–8

explicit agreement, need for **25**.825

expropriation affecting, effect **25**.634, **25**.895

foreign control element, desirability of reference to/ICSID practice **25**.785

form and extent of control **25**.850–70
    adequate control **25**.838
    complexity of factors determining **25**.850, **25**.864
    drafting history **25**.814, **25**.851
    effective control **25**.824, **25**.838
    flexible concept **25**.865
    ICSID clause, relevance **25**.820–1, **25**.856
    majority shareholding **25**.851: subsequently lost (*Klöckner*) **25**.853
    nationals of Contracting States/non-Contracting State, appropriate balance **25**.838, **25**.865
    power of control and exercise distinguished **25**.859–63
    provisions in: BITs **25**.867–8; multilateral treaties **25**.869–70; national legislation **25**.866
    reasonable control **25**.865
    sole or main shareholding **25**.852: at one remove (*SOABI*) **25**.854

indirect control **25**.840–9, **25**.901
    chain including nationals of Contracting and non-Contracting State **25**.842–9: effectiveness of ICSID jurisdiction and **25**.844, **25**.848–9
    need for host State to know nationality **25**.842

joint venture corporations **25**.839

jurisprudence
    *ADC* **25**.736
    *Aguas del Tunari* **25**.831–2, **25**.847, **25**.859–63
    *Amco I* **25**.816, **25**.833, **25**.841–2, **25**.852, **25**.875
    *Autopista* **25**.824, **25**.845–6, **25**.848, **25**.881
    *Cable TV* **25**.822, **25**.858
    *Camuzzi I* **25**.297, **25**.706, **25**.835–7
    *CMS* **25**.704, **25**.706, **25**.792
    *Enron* **25**.706

    *Klöckner I* **25**.783, **25**.817, **25**.853, **25**.884–7
    *LETCO* **25**.819, **25**.855, **25**.876
    *Rompetrol* **25**.737–9
    *Sempra* **25**.297, **25**.706, **25**.792, **25**.835–7
    *SOABI* **25**.818, **25**.830, **25**.843, **25**.854, **25**.877
    *Tanzania Electric* **25**.823
    *Tokios Tokelés* **25**.701–2, **25**.723, **25**.725–35
    *Vacuum Salt* **25**.820–1, **25**.825, **25**.827, **25**.838, **25**.856–7, **25**.878–80, **25**.890
    *Vivendi I* **25**.882
    *Vivendi II* **25**.882
    *Wena Hotels* **25**.704

objective requirement/evidence of **25**.813–25
    examination of as tribunal practice/obligation **25**.815–24

**Article 25(2)(b) (nationality: juridical persons), ". . . for the purposes of this Convention . . ."**

*ad hoc* committee membership and **25**.902

applicability to all nationality provisions **25**.897–902, **27**.24–9

constitution of tribunal and **25**.897–902
    difficulties **25**.900–1
    *SOABI* **25**.898–9

diplomatic protection in case of non-compliance with award and **27**.29

drafting history **25**.896

**Article 25(2)(b) (nationality: juridical persons), ". . . have agreed should be treated as . . . national of another Contracting State . . ."**

documentation, at time of request (IR 2(2)) **25**.774, **25**.776
    defective documentation, effect **25**.774
    evidence of nationality distinguished **25**.774

drafting history **25**.761–3

dual/multiple nationality and **25**.766

exceptional nature of provision **25**.777

Executive Directors' Report **25**.763

form of agreement **25**.768–74
    BITs offer **25**.773, **25**.807–9
    *compromis* **25**.772
    joint request (IR 1(2)) **25**.772
    legislation/treaty offer: additional direct agreement, desirability **25**.812; need for acceptance **25**.811
    Model Clauses (1968–93) **25**.769, **25**.787
    multilateral treaties, offer: Cartagena Free Trade Agreement (1994) **25**.810; Energy Charter Treaty (1994) **25**.810;

MERCOSUR Protocols    **25**.810;
NAFTA (1992)    **25**.810
national legislation offer    **25**.773, **25**.806
subsidiary agreement, preference for
    **25**.779
unambiguous statement, desirability
    **25**.787
formalities
    agreement between parties to dispute
        **25**.811
    documentation showing agreement
        **25**.774, **25**.776
    identification of controlling nationality,
        relevance (IR 2(1)(d))    **25**.296,
        **25**.795–805, **25**.892, **25**.900: imprecision,
        effect    **25**.797–805; Model Clauses
        (1993)    **25**.796; multiple nationalities
        **25**.796
implicit agreement, possibility of    **25**.775–94
    consent to jurisdiction as    **25**.776,
        **25**.788–90: limitation to cases of direct
        agreement between investor and host
        State    **25**.790
incorporation/seat or control as test
    **25**.700–7, **25**.764
jurisprudence    **25**.764–5
    *Aguas del Tunari*    **25**.765, **25**.773
    *Amco I*    **25**.703, **25**.765, **25**.780–1,
        **25**.799–800, **25**.805
    *Autopista*    **25**.765, **25**.771, **25**.804, **25**.805
    *Cable TV*    **25**.765, **25**.774, **25**.786
    *Genin*    **25**.773
    *Holiday Inns*    **25**.778–9, **25**.798
    *Klöckner I*    **25**.765, **25**.783
    *LETCO*    **25**.765, **25**.784
    *Lucchetti*    **25**.773, **25**.793
    *MTD*    **25**.773, **25**.793
    *SOABI*    **25**.700, **25**.703, **25**.765, **25**.801–2,
        **25**.805
    *Tanzania Electric*    **25**.770, **25**.803, **25**.805
    *Vacuum Salt*    **25**.765, **25**.785
    *Vivendi I*    **25**.765, **25**.773, **25**.793
party status of parent companies and
    **25**.791–4
purpose of provision    **25**.760
    foreign investor corporation established
        under host State    **25**.764
specific provision, desirability    **25**.775,
    **25**.777
test, controlling interest    **25**.761–3, **25**.764
**Article 25(3) (constituent subdivision or
    agency: approval of consent)**
*see also* Article 25(1), "constituent
    subdivision or agency . . . designated to
    Centre"

communication to
    investor    **25**.909
    subdivision or agency    **25**.909
consent by host State, whether
    **25**.919–20
critical date    **25**.913–15
    institution of proceedings    **25**.915
designation requirement, relevance    **25**.230,
    **25**.256, **25**.315, **25**.904–5
drafting history    **25**.904
form of approval    **25**.909–12
    Model Clauses (1993)    **25**.910–11
jurisprudence
    *Cable TV*    **25**.906
    *Noble Energy*    **25**.907, **25**.912,
        **25**.914
need for    **25**.903–8
Secretary-General's role    **11**.7, **25**.259
unilateral nature    **25**.909
validity of consent and    **25**.913
waiver of need for by host State    **25**.903,
    **25**.916–18
    drafting history    **25**.916
    equivalence with approval    **25**.917
    form    **25**.917
    list showing    **25**.918
withdrawal following    **25**.267, **25**.612–13,
    **25**.908
**Article 25(4) (notification of excluded classes
    of disputes)**
categories of exclusion/limitation
    exhaustion of local remedies rule and
        **25**.927
    limitation to compensation disputes
        **25**.926
    limitation to disputes "fundamental to the
        investment itself"    **25**.105, **25**.926
    "minerals or other natural resources,,
        **25**.**25**.607
    "property and real rights upon real estates"
        **25**.926
consent to jurisdiction distinguished    **25**.515,
    **25**.928–41
    effect of notification on prior consent
        **25**.938
    interpretation of consent clause and
        **25**.934
    possible extension of consent to "excluded
        classes"    **25**.930
    specific consent, primacy    **25**.931
drafting history    **25**.921–3, **25**.931
    Executive Directors' Report    **25**.923,
        **25**.924
    "investment", effect on definition of    **25**.120,
        **25**.925, **25**.935–7

**Article 25(4) (notification of excluded classes of disputes)** *(cont.)*
  jurisprudence
    *Alcoa* **25**.938
    *CSOB* **25**.936
    *Fedax* **25**.935
    *Kaiser Bauxite* **25**.938
    *Mitchell* **25**.937
    *PSEG* **25**.932–3
    *Reynolds* **25**.938
    *SPP II* **25**.929
  legal effect **25**.925, **25**.932–4
  "questions pertaining to oil and acts of sovereignty" **25**.926
  reason for provision **25**.922, **68**.3
  reservations distinguished **25**.924, **68**.3
  Secretary-General's role **11**.7, **25**.922
  States making
    China **25**.926
    Costa Rica **25**.927
    Ecuador **25**.926, **25**.939–40
    Guatemala **25**.926, **25**.927
    Guyana **25**.927
    Israel **25**.927
    Jamaica **25**.607
    Papua New Guinea **25**.105, **25**.926, **46**.11
    Saudi Arabia **25**.926
    Turkey **25**.926
  timing of notification **25**.924
  as withdrawal of consent **25**.607–8, **25**.938–41, **45**.49, **45**.80
  withdrawal of notification **25**.927
**Article 26 (exclusive remedy rule)** **Preamble** 22, **26**.2, **26**.6
  applicability
    ancillary claims **46**.8
    annulled award **52**.663, **53**.62, **54**.35
    annulment proceedings **52**.4, **52**.545, **53**.32
    arbitration **26**.1
    attachment proceedings, *MINE* **26**.149–53
    conciliation **26**.1
    institution of ICSID proceedings, relevance **26**.6
    settlement and **53**.62
    submission to new tribunal (Article 52(6)) **52**.663, **53**.62, **54**.35
  autonomy of ICSID arbitral process and **26**.1, **26**.3
  provisional measures, power of domestic courts and **26**.175
  concurrent reference to domestic courts **26**.44–84
    *see also* domestic courts *below*

as alternative or preliminary to ICSID arbitration **Preamble** 22, **26**.44
  BITs provisions **26**.45: offering choice **26**.45
  in consecutive documents spread over time **26**.48–54
  jurisprudence: *Holiday Inns* **26**.49–52; *SOABI* **26**.53; *Zhinvali* **26**.47
  national investment laws and **26**.46
  precedence **26**.400–4, **26**.40, **26**.50–1
  subsequent resort to/review by ICSID tribunal **26**.44, **26**.45, **26**.46
consent to ICSID arbitration and
  claim to lack of consent, compatibility with rule **26**.15–16
  *Duke Energy* **26**.15–16
  need for **26**.6
  as trigger **25**.476, **26**.6–7, **26**.34
consolidation of proceedings and **26**.124–7
  BITs provisions **26**.125
  concerns relating to **26**.126
  confidentiality of information and **26**.126
  jurisprudence: *Archer Daniels* **26**.126; *Corn Products* **26**.126; *Pan American* **26**.127
  NAFTA and **26**.125, **26**.126
critical date **25**.476, **26**.2, **26**.21, **26**.34
diplomatic protection (Article 27) and **27**.5
  investor's right to seek **26**.186
domestic courts
  *see also* concurrent reference to domestic courts *above*
  autonomy of ICSID proceedings and **26**.3
  decisions: binding on ICSID, whether **26**.138, **26**.140; reliance on **26**.140
  enforcement role **26**.3
  role, intervention in ICSID proceedings **26**.111
drafting history **26**.111, **52**.4
enforcement measures and **26**.149–53, **26**.174, **54**.10
  *MINE* **26**.149–53
failure to protest improper pursuit of remedies in non-ICSID forum **26**.114–15, **26**.153
finding that Centre has no jurisdiction, effect **26**.6
fork in the road clauses **26**.55–72
  effect on ICSID jurisdiction **26**.72
  jurisprudence: *Azurix* **26**.69; *Champion Trading* **26**.68; *CMS* **26**.65–6; *Continental Casualty* **26**.70; *Enron* **26**.70; *Genin* **26**.59–60; *LG&E* **26**.70; *Middle East Cement* **26**.61; *Pan American* **26**.70; *Sempra* **26**.70; *SGS v. Pakistan* **26**.67; *Vivendi I* **26**.62–4

parallel treaty and contract claims and
  **26**.62–6
same/identical dispute requirement
  **26**.57–72
identical tribunals   **26**.128–31, **37**.35
  jurisprudence: *Camuzzi I*   **26**.129, **37**.35;
    *Pan American*   **37**.35; *RFCC*   **26**.128;
    *Salini* v. *Morocco*   **26**.128; *Sempra*
    **26**.129, **37**.35; *Suez and AGW*   **26**.130,
    **26**.205, **37**.35
interim measures   **26**.174
interpretation
  drafting history   **26**.191
  "or"   **26**.191
municipal–international law relationship
  **26**.13
newspaper article as breach
  **47**.140
non-ICSID arbitration proceedings and
  **25**.228, **26**.111, **26**.114–23
  jurisprudence: *Fraport*   **26**.122–3;
    *Lucchetti*   **26**.118; *MINE*   **26**.115,
    **26**.153; *Saipem*   **26**.121; *SGS* v. *Pakistan*
    **26**.116–17
non-judicial remedies
  "administrative or judicial remedies"
    provision and   **26**.185
  diplomatic protection
    **26**.186
obligation of domestic court to decline
  jurisdiction   **26**.132–48
  bankruptcy proceedings   **26**.141,
    **47**.111–14
  jurisprudence: *Amco I*   **26**.136–9;
    *Autopista*   **26**.142–3; *Benvenuti &*
    *Bonfant*   **26**.133; *CSOB*   **26**.141;
    *Fraport*   **26**.148; *Holiday Inns*
    **26**.135; *LETCO*   **26**.134; *Tanzania*
    *Electric*   **26**.144; *Wena Hotels*
    **26**.145–7
  legislation implementing Convention and
    **69**.7
  *lis pendens*   **26**.133
  penalties for failure   **26**.134
  *res judicata* effect of award and
    **26**.145
  "unity of investment" and   **26**.135
obligation of non-ICSID forum to decline
  jurisdiction   **26**.110, **26**.114
parallel treaty and contract claims   **25**.54–5,
  **26**.73–113
  BIT jurisdiction clauses, relevance of
    distinction   **25**.531
  breach of treaty and breach of contract
    claims distinguished   **26**.83–109

jurisprudence: *AES*   **26**.101; *Azurix*
  **26**.89–90; *Bayindir*   **26**.104–6, **26**.119;
  *CMS*   **26**.86; *Enron*   **26**.91; *Impregilo*
  **26**.102–3; *Jan de Nul*   **25**.54–5; *Lanco*
  **26**.75; *Salini* v. *Morocco*   **26**.76–7; *SGS*
  v. *Pakistan*   **26**.87–8, **26**.116–17; *SGS* v.
  *Philippines*   **26**.93–9; *Vivendi I*
  **26**.78–85
presumption of parties' intention to exclude
  non-ICSID dispute settlement measures
  **26**.110
  Executive Directors' Report   **26**.110
provisional measures and: *see* provisional
  measures, exclusive right of tribunal,
  whether *below*
provisional measures, exclusive right of
  tribunal, whether   **26**.162–83
  *see also* Article 47 (provisional measures)
  Additional Facility Rule, 46, relevance
    **26**.179–80
  agreement to confer jurisdiction on
    domestic courts   **26**.181–3, **55**.95: AR
    39(5)   **55**.95; Model Clauses   **55**.95;
    NAFTA formula   **26**.183; procedure
    **26**.183; requirements   **26**.181; State
    immunity and   **26**.182
  AR 39(6) [39(5)]   **26**.176–8, **44**.34, **55**.95,
    **55**.97
  jurisprudence: *Atlantic Triton*   **26**.169–72;
    *Cable TV*   **26**.173; *Holiday Inns*
    **26**.166; *MINE*   **26**.167–8
  measures to preserve evidence (Article 43)
    **26**.164, **43**.52
  scholarly debate   **26**.174–5
reasons for   **26**.4
  *ne bis in idem* principle and   **53**.32
  as rule of interpretation   **26**.17
  State immunity and   **26**.4, **26**.9–12, **26**.150
stay of proceedings (domestic courts)
  **26**.154–61
stay of proceedings (ICSID) and
  applicable law, relevance   **26**.157
  domestic court intervention   **26**.154–61: as
    breach of Convention obligations
    **26**.157; national legislation, relevance
    **26**.157; tribunal's right to determine own
    competence and   **26**.154
  jurisprudence: *Bayindir*   **26**.119–20; *Mobil*
    *Oil NZ*   **69**.7; *Mobil Oil* (NZ
    proceedings)   **26**.154–61, **41**.17; *SGS* v.
    *Pakistan*   **26**.158–61
  nationality of ICSID chairman, relevance
    **26**.157
traditional exhaustion of local remedies rule
  and   **26**.187, **26**.191

**Article 26 (exclusive remedy rule)** (*cont.*)
  "unless otherwise stated"    **26**.2, **26**.17–29,
        **26**.37
  concurrent arbitration provisions, effect: *see*
        Article 25(1), "consent", concurrent
        arbitration provisions; concurrent
        reference to domestic courts *above*
  waiver
    *Amco I*    **26**.136–7
    cooperation in domestic proceedings as
        **26**.136–40
    effect on ICSID jurisdiction    **26**.140
**Article 26 (exclusive remedy rule), exhaustion
        of local administrative or judicial
        remedies**    **26**.187–91
  "administrative" and "judicial", mutual
        exclusiveness    **26**.191
  Contracting States' concerns in respect of
        **26**.5, **26**.189–90
    proposal to reverse presumption of
        arbitration as first resort    **26**.189
  disadvantage    **25**.550
  drafting history    **26**.5, **26**.188–91
  examples    **25**.548–9
  Executive Directors' Report    **26**.188
  host State's right to insist on    **Preamble** 22,
        **26**.5, **26**.44, **26**.188–231, **27**.10
    consent to arbitration as cut-off date
        **26**.193
    tautologous nature of provision
        **26**.190
    wisdom of so doing    **26**.229–30
  as substantive requirement for establishing
        breach of international obligation
        **26**.218–28, **26**.231
    denial of justice and    **26**.138, **26**.218,
        **26**.219, **26**.227
    jurisprudence: *Feldman*    **26**.221;
        *Generation Ukraine*    **26**.223–4; *Jan de
        Nul*    **26**.226; *Loewen*    **26**.222;
        *Parkerings*    **26**.228; *Saipem*    **26**.227;
        *Vivendi I*    **26**.219–20; *Waste
        Management II*    **26**.222, **26**.225
  waiver of Contracting State's right    **26**.5,
        **26**.187, **26**.188–91
**Article 26 (exclusive remedy rule), exhaustion
        of local administrative or judicial
        remedies as condition of consent (BITs
        provisions)**    **25**.540, **25**.548–50, **26**.45,
        **26**.192–205
  *see also* Article 25(1), "consent", consultation
        or negotiations obligation; Article 26
        (exclusive remedy rule), exhaustion of
        local administrative or judicial remedies
  Costa Rica    **26**.197

general notification to Centre    **26**.194–8
  Guatemala    **26**.198
  host State/investor agreement with ICSID
        arbitration clause    **26**.192, **26**.205
  host State's right to insist on    **Preamble** 22,
        **26**.45, **26**.188–231
  Israel    **26**.196
  jurisprudence
    *AES*    **26**.217
    *Amco I*    **26**.209
    *Benvenuti & Bonfant*    **26**.208
    *Generation Ukraine*    **26**.214–15
    *IBM*    **26**.216
    *Lanco*    **26**.192, **26**.210
    *Maffezini*    **26**.211–13
  MFN clause, effect    **25**.550
  national legislation consenting to ICSID
        arbitration    **25**.540, **26**.92, **26**.206
  period of time for    **26**.202–5
  as restatement of Article 26 rule    **26**.199
  withdrawal of condition    **26**.193
**Article 27 (diplomatic protection, exclusion)**
        **Preamble** 21, **26**.114, **26**.186
  absence of practice relating to    **27**.7
  applicability
    arbitration    **27**.5
    conciliation    **27**.5
    denunciation and    **72**.11
    limitation to specific dispute    **27**.17
    settlement award and    **48**.79
  autonomy of ICSID arbitration process and
        **26**.3
  Calvo Doctrine    **27**.3
  *Camuzzi I*    **27**.9
  customary international law and    **27**.1–3
  denunciation of Convention, effect
        **72**.11
  disadvantages of system    **27**.2–3
  drafting history    **27**.13–17, **27**.30, **27**.38–43,
        **27**.44, **53**.42
  exclusive remedy rule and    **27**.5, **54**.11
  exhaustion of local administrative or judicial
        remedies and    **Preamble** 21, **26**.187,
        **27**.4, **27**.10, **27**.33
  forum selection clause as means of avoidance
        **27**.4
  jurisprudence
    *AES*    **27**.3 n.2
    *Aguas del Tunari*    **27**.47–8
    *Autopista*    **25**.747, **27**.8, **27**.45
    *Banro*    **25**.748, **27**.7, **27**.12
    *Santa Elena*    **27**.46
    *SGS* v. *Pakistan*    **27**.49
  mandatory nature of provision    **27**.5
  non-ICSID arbitration and    **25**.228

reasons for provision   **27**.13–14
   Executive Directors' Report   **27**.13
   objection to mention in Convention
      **27**.15
   proposed reference to in Preamble   **27**.16
resort to diplomatic protection
   effect   **27**.6, **27**.9, **27**.11
   measures falling short of   **27**.7–8
**Article 27(1) (diplomatic protection,
      exclusion)**
choice between ICSID arbitration and
      diplomatic protection
   BITs provisions   **27**.36–7
   exclusion of possibility, Model Clauses
      (1969)   **27**.34–5
   whether   **27**.33
consent to ICSID jurisdiction and
   disputed consent   **27**.42
   as trigger   **25**.292, **25**.476
   unaccepted offer   **27**.33
effective date
   date of consent to ICSID jurisdiction
      **27**.30
   proposal to allow diplomatic protection until
      institution of proceedings   **27**.30
enforcement measures and   **54**.11
ILC Draft Articles on Diplomatic Protection
      (2006)   **27**.1
inter-State arbitration and   **27**.18–22
   availability, host State's failure to abide by
      ICSID award   **27**.22
   barring clause   **27**.21
   BITs provisions   **27**.18–22
   conflicting decisions, risk   **27**.21
   Model Clauses (1993)   **27**.21
   obligation to decline jurisdiction   **27**.22
   proposed Convention clause to protect
      **27**.19–20
   subrogation   **27**.22
"international claim" distinguished   **27**.18
international law, applicability to investment
      disputes and   **42**.114, **42**.193, **42**.194
nationality
   Article 25(2)(b), applicability   **27**.24–9: in
      case of revival of right to diplomatic
      protection   **27**.26, **53**.46;
      non-compliance with award and   **27**.29
non-Contracting State's right to pursue ("No
      Contracting State")   **25**.663, **26**.186,
      **27**.10–12
   dual or doubtful nationality   **27**.10
   exhaustion of local remedies and   **27**.10
as obligation of State   **26**.186
   corresponding obligation of individual
      **26**.186

"or bring an international claim"   **27**.17
reference to ICJ and   **27**.23, **27**.38
revival of right in case of non-compliance with
      award   **27**.38–43, **53**.26, **53**.41–4,
      **54**.102, **54**.115, **55**.7
   as alternative to judicial enforcement
      **27**.38–9: counterbalance to State
      immunity   **27**.39, **55**.7
   BITs provision for   **27**.42
   countermeasures and   **53**.43
   limitation to cases of non-compliance
      **27**.40
   limitation to implementation of award
      **27**.43
   nationality and   **27**.26, **53**.46
   proposed exclusion of provision
      **27**.41
   reference to ICJ   **27**.38, **53**.44, **54**.115,
      **64**.14
**Article 27(2) (diplomatic protection,
      exclusion: informal diplomatic
      exchanges)**   **27**.44–50
BITs provision for   **27**.50
interpretative function   **27**.44
**Article 28 (conciliation: request)**
Article 36 (arbitration) compared
      **28**.2–4
documentation, relevance   **25**.61
drafting history   **28**.3
Institution Rules and   **6**.9, **28**.4
rarity of use   **28**.6, **34**.5
Secretary-General's screening role   **11**.8,
      **11**.9
**Article 29 (commission: constitution)**
Article 37 compared   **29**.2–3
   Conciliation/Arbitration Rules compared
      **29**.4–6
jurisprudence
   *SEDITEX I*   **29**.7
   *SEDITEX II*   **29**.9
   *Tesoro*   **29**.8
   *Togo Electricité*   **29**.10
nationals or co-nationals of parties,
      non-exclusion   **13**.9, **29**.5
sole conciliator   **29**.8
**Article 30 (commission: appointment by
      Chairman)**   **5**.4
absence of practice   **30**.6
Article 38(Tribunal) compared
      **30**.1–5
drafting history   **30**.2
nationals or co-nationals of parties,
      non-exclusion   **30**.4
powers of Secretary-General   **11**.4
proposal to omit provision   **30**.2

**Article 31 (commission: appointment from outside Panel)** **12**.4
  Article 14 qualities, need for **12**.4, **31**.2
  Article 40 compared **31**.1–3
  Chairman's appointments **12**.4, **13**.5
  expiry of panel membership and **56**.31–4
**Article 32 (commission: determination of jurisdiction)**
  Article 41 (tribunal) compared **32**.1–5
  binding nature of decision **32**.3
  "competence"/"jurisdiction", distinction **25**.17
  Conciliation Rules **32**.4
  *Tesoro* **32**.6–7
**Article 33 (Conciliation Rules)**
  Administrative Council role **6**.11, **6**.12, **6**.13
  Article 44 compared **33**.1–6
  Conciliation and Arbitration Rules distinguished **33**.6
  conciliation/arbitration procedures distinguished **33**.5
  critical date **25**.478
  drafting history, proposal for limitation of parties' power to determine procedural rules **33**.2
**Article 34 (conciliation)**
  Additional Facility **34**.7
  advantages of conciliation **34**.2–4
  drafting history **28**.3, **34**.17, **34**.23, **34**.26, **34**.28, **34**.29, **34**.33
  rarity of practice **34**.5
**Article 34(1) (conciliation: commission's duty to clarify issues . . . and bring about agreement . . . upon mutually acceptable terms)**
  arbitrators' duty distinguished **25**.76
  CR 22 3411
  good faith and **Preamble** 33
  procedure **34**.12–16
    *SEDITEX II* **34**.16
    *Tesoro* **34**.14–15
  proposal to delete "mutually agreed terms" **34**.8
  purpose of conciliation and **34**.8–10
    Executive Directors' Report **34**.9
    *Tesoro* **34**.10
**Article 34(1) (conciliation: parties' duty to cooperate in good faith) 34**.23–5
  absence of sanction for noncooperation **34**.25
  CR 23 **34**.24
  legally binding obligation **34**.23

  limitation to procedural cooperation **34**.23, **34**.25
**Article 34(1) (conciliation: recommendation of terms of settlement) 34**.17–25
  CR 22(2) **34**.18
  "from time to time"/"at any stage of the proceedings" **34**.17, **34**.20
  oral, acceptability **34**.20
    *SEDITEX II* **34**.21
    *Tesoro* **34**.21
  provisional measures **34**.19
  statement of reasons, need for **34**.17
**Article 34(1) (conciliation: "serious consideration to recommendations") 34**.26–8
  binding nature of recommendations
    parties' prior agreement **34**.28: status of recommendations and **34**.28
    rejection of proposal to include in Convention **34**.28
  enforceability of recommendations **34**.28
  Preamble provision for "due consideration" **34**.27
**Article 34(2) (conciliation: agreement between parties)**
  binding nature of agreement **34**.31
    status of agreement and **34**.31
  enforcement **34**.31
  publication of report
    parties' consent, need for (CR 33(3)) **34**.32: release by one party **34**.32; Secretary-General's role **34**.32
  terms of settlement
    arbitration clause, desirability **34**.31
    inclusion of terms at request of parties (CR 30(1)) **34**.30
    publication, noting of issues as avoidance of **34**.29
**Article 34(2) (failure of party to appear) 34**.36–8
  Article 45 distinguished **45**.7
  *ex parte* proceedings, exclusion **34**.38
  sanction **34**.36–7
**Article 34(2) (failure to reach agreement) 34**.33–5
  *SEDITEX II* **34**.35
**Article 35 (conciliation: non-invocation of positions taken during)**
  drafting history **35**.1
  "except as parties may agree otherwise" **35**.4
    advance agreement **35**.4
    as compromise **35**.1
    as part of settlement agreement **35**.4
  inclusion in commission's report **35**.5

increased costs in case of subsequent
    arbitration proceedings    **35**.3
reason for provision    **35**.3
settlement agreement distinguished    **35**.1
**Article 36 (arbitration: request)**    **6**.9
Additional Facility and    **36**.7
Article 28 (conciliation) compared    **36**.6
comparable provisions in other international
    instruments    **36**.4–5
discontinuance of request    **36**.70
drafting history    **36**.5, **36**.19, **36**.23
drafting, importance    **36**.34
Secretary-General's screening role
    requests for annulment, revision,
        resubmission or interpretation
        distinguished    **36**.8
    summary procedure (AR 41(5)) and    **41**.94
withdrawal of request    **36**.64–70, **46**.64–70
    effect on consent    **36**.70
    IR 8    **36**.64
    lodging fee, non-refundable    **36**.68
    registration, effect    **36**.20, **36**.64
    settlement as basis    **36**.65
    *Tokios Tokelès*    **36**.66–7
    unilateral    **36**.68: in case of joint
        application    **36**.68
    withdrawal of consent to jurisdiction
        distinguished    **36**.70
**Article 36(1) (arbitration: request)**
copies
    requisite    **36**.15
    transmission to respondent (IR 5)
        **36**.18–20: as opportunity to settle
        **36**.20; respondent's right to choose
        whether to respond    **36**.20
initiative    **36**.9–10
    constituent subdivision or agency    **25**.231,
        **36**.9
    investor's right of without authorization
        from home State    **36**.9
    joint request (IR 1)    **36**.10
Institution Rules and    **36**.3
language    **36**.14
    effect of choice on language of proceedings
        **36**.14, **44**.62
procedure
    IR 1    **36**.11
    Secretary-General's role    **36**.16, **36**.18,
        **36**.19
registration, effect    **36**.20
requirements
    *see also* Article 36(2) (arbitration: request:
        required information)
    lodging fee    **36**.16, **59**.8–9: non-payment,
        effect    **36**.16

NAFTA provisions    **36**.21
parties' agreement to modification    **36**.21
time limits    **36**.17
    NAFTA provisions    **36**.17
    parties' agreement    **36**.17
**Article 36(2) (arbitration: request: required
    information)**    **36**.22–31, **44**.85
    *see also* Article 36(1) (arbitration: request),
        requirements
consent to ICSID jurisdiction, documentation,
    need for    **36**.28
correction    **36**.37
identity of parties    **25**.215, **25**.258, **36**.26
    intervention/addition after registration of
        request    **36**.26
informal consultation with Centre    **36**.35–7,
    **36**.65–7
IR 2    **36**.24–43
jurisprudence
    *Cable Television*    **36**.39–40
    *CMS*    **36**.27
    *Impregilo*    **36**.27, **36**.41–3
    *Scimitar*    **36**.27
    *SPP*    **36**.26
    *Vacuum Salt*    **36**.27
    *Vivendi II* (jurisdiction)    **36**.27, **36**.54
non-compliance, effect    **36**.39–40
optional information    **36**.32–4
    representation of parties    **36**.33, **44**.74
procedural arrangements agreed by the parties
    **44**.85
procedural nature    **36**.38–43
proof distinguished    **36**.27, **36**.51
purpose of provision    **36**.36
scope of provision    **36**.22
variety of proposals    **36**.23
    *prima facie* proof requirement    **36**.23
waiver, exclusion    **36**.25
**Article 36(3) (request for arbitration:
    Secretary-General's role)**    **11**.8, **11**.9,
    **36**.44–79
dependence on provision of all required
    information    **36**.25
documentation, relevance    **25**.61, **36**.28,
    **36**.52
drafting history    **36**.44–5, **36**.48
finding of conformity, rejection of proposal for
    **36**.48
jurisprudence
    *Holiday Inns*    **41**.13
    *Mihaly*    **41**.14
    *Plama*    **41**.14
    *SPP*    **36**.53
presumption of accuracy of information
    **36**.51

**Article 36(3) (request for arbitration:**
    **Secretary-General's role) (*cont.*)**
  provisional measures and    **47**.48
  purpose of provision    **36**.45–6
    Executive Directors' Report    **36**.45
  registration
    basis of decision, IR 6    **36**.49
    consequences    **36**.62
    determination of jurisdiction distinguished
        **36**.40, **36**.59
    finality of decision    **36**.57–9
    grounds for refusal    **36**.54–5: "manifestly
        outside jurisdiction"    **25**.259, **25**.479,
        **36**.2, **52**.141, **52**.172
    notification    **36**.60: parties' representatives
        and    **44**.74
    obligation    **36**.56, **52**.95
    respondent's right to challenge proposal for
        **36**.50
    renewal of request    **36**.58
  as replacement for *prima facie* proof
      requirement    **36**.23, **36**.44
  translation of supporting documentation and
      **36**.52–3
  tribunal's exclusive right to determine own
      competence and    **36**.59, **41**.9–15
    Executive Directors' Report    **41**.12
    preliminary nature of Secretary-General's
        role    **41**.11–15, **47**.48, **52**.141, **52**.172
**Article 37 (constitution of tribunal)**
  autonomy of ICSID arbitration process and
      **26**.3
  drafting history    **37**.12–13, **37**.15
  principles underlying
    Executive Directors' Report    **37**.4
    non-frustration of Convention    **37**.2, **37**.3
    parties' freedom of choice    **37**.2, **40**.5:
        appointment of arbitrators from outside
        Panel and    **40**.5
  proper constitution, importance    **37**.5
  replacement of arbitrator
    *see also* Article 56 (replacement following
        death, incapacity or resignation: general)
    AR 7    **37**.42–3
    by agreement of parties    **37**.52–3, **56**.5
    in case of non-acceptance    **37**.51
    prior to completion of constitution process
        **37**.52–4, **56**.5
  Secretary-General's role    **11**.16
  veto, right of    **37**.42
**Article 37 (constitution of tribunal),**
    **jurisprudence**
  *Fedax*    **37**.33
  *Joy Mining*    **37**.22
  *MINE*    **37**.32
  *SOABI*    **37**.34

**Article 37(1) (constitution of tribunal)**
  completion of process (AR 6)    **37**.10, **37**.52
  time limits    **37**.6–9
    "as early as possible"    **36**.33: AR 1    **37**.6
    date of registration as trigger    **36**.62, **37**.88
    usual timescale    **37**.9, **38**.8
**Article 37(2)(a) (constitution of tribunal:**
    **number and appointment of**
    **arbitrators)**
  acceptance of appointment, need for
      **37**.47–51, **38**.18
    form    **37**.50
  "appointed as the parties shall agree"    **37**.7,
      **37**.15–35
    *ad hoc* agreement (AR 2)    **37**.25–35
    appointment of third member by two
        party-appointed members    **37**.20
    Article 39 "agreement" distinguished
        **37**.31
    binding nature    **37**.28
    BITs provisions    **37**.24
    communication of agreement to
        Secretary-General    **37**.29
    Model Clauses (1993)    **37**.17–18
    NAFTA provisions    **37**.24
    nationality of arbitrators (Article 39) and
        **37**.31, **39**.23
    neutral official as appointing authority
        **37**.18: third member of tribunal of three
        **37**.19
    prior agreement    **37**.17–24
  neutral appointing officer
    *ex officio* designation    **37**.23
    possibilities    **37**.22–3
    risk of refusal    **37**.23
    roster    **37**.24
    Secretary-General as    **37**.24
  number
    absence of ceiling    **37**.14
    new tribunal to interpret award and    **50**.40
    sole arbitrator    **37**.11–13, **37**.18
    uneven    **37**.11–14
    usual practice    **37**.14
  president, clear designation, need for    **37**.21
  refusal, right of    **12**.5, **37**.49, **60**.10
    fees, relevance    **37**.49
**Article 37(2)(b) (absence of agreement)**
    **37**.27–8, **37**.36
  disqualification of arbitrator    **37**.42
  drafting history    **37**.42
  frequency of use of provision    **37**.46
  procedure (AR 3)    **37**.39–45, **39**.17
    expedition    **37**.41
    modification by parties    **37**.42
    time limits    **37**.40
  Secretary-General's role    **37**.45

third arbitrator
  agreement of parties, need for **37**.42
  as president **37**.38: obligatory requirement **37**.38
timing of resort to **37**.36–7, **37**.46, **38**.11
UNCITRAL/ICC provisions compared **37**.37
**Article 38 (appointment of arbitrator by Chairman)** **Preamble** 34, **5**.4, **37**.3
90 day time limit for constitution of tribunal and **38**.5–8
  difficulty of meeting **37**.9, **38**.8: in absence of prior agreement on numbers and appointment **38**.8
  extension or reduction by agreement **38**.5
acceptance by appointee, need for **38**.18
application
  frequency **38**.4, **38**.22
  parties' behaviour, relevance **38**.4, **38**.7: *SOABI* **38**.7
  trigger **38**.4: *see also* request by one or both of parties *below*
  where parties have agreed under Article 37(2) **37**.30
comparable provisions in other international instruments **38**.3
consultation by Chairman with both parties, need for **38**.12–14, **40**.10
  in case of uncooperative party **38**.14
  party-appointed arbitrators and **38**.13
  procedure **38**.14
drafting history **38**.2, **38**.24
*Fedax* **37**.33
general acceptability **38**.2
importance of provision **38**.1
limitations on choice **38**.21
  appointments under Article 37(2)(a) distinguished **38**.12–14, **38**.27, **40**.8
  membership of Panel of Arbitrators, need for **38**.21, **38**.25: *see also* Article 40 (appointment of arbitrator from outside Panel)
  nationals/co-nationals, exclusion **38**.21, **38**.24–7, **40**.10: applicability to all members of tribunal **38**.25; Article 30 (conciliation commission) distinguished **38**.24; NAFTA provisions distinguished **38**.27; purpose of provision **38**.24
non-frustration principle and **38**.1
obligation to appoint **38**.15–18
  designation of president **38**.20
  range of possibilities **38**.19–21

request by one or both of parties **37**.88
  AR 4 **38**.10
  need for **38**.9–11
  requirements **38**.11
Secretary-General's role **11**.4, **38**.11, **38**.16, **38**.18
time limits **38**.17, **40**.10
**Article 39 (nationality of arbitrators)** **13**.9
absence of diversity requirement **39**.11
  ICJ compared **39**.11
agreement of parties to sole or each arbitrator **39**.23–7
  all arbitrators having nationality of respondent State **39**.31
  appointment by Chairman under Article 38, exclusion **39**.26: *SOABI* **39**.27–30
  appointment by neutral official, exclusion **39**.26
  Article 37 agreement on constitution of tribunal distinguished **37**.31, **39**.23
  NAFTA provisions and **39**.25
alternative proposals **39**.1
appointment of president and
  appointment neutral official **39**.18
  in case of parties' agreement **39**.18
comparison with
  *ad hoc* committee provisions **39**.4
  conciliation provisions **39**.4
  UNCITRAL/ICC **39**.5, **39**.7
compromise nature of provision **39**.3
determination of nationality **39**.8
  Article 25(2)(b) agreement to treat as **39**.8
  IR 2(1)(d) **39**.8
drafting history **39**.1–2
dual/multiple nationality and **39**.10
jurisprudence
  *Astaldi* **39**.31
  *IBM* **39**.31
  *Mobil Oil* (NZ proceedings) **39**.18
justification for **39**.7
"majority" provision **39**.12–22
  AR 1(3) **39**.13–22
  in case of, 3-person tribunal **39**.12–15: order of appointment, relevance **39**.12–15
non-compliance, effect **39**.9
obligatory nature of provision **39**.19
  modification of Arbitration Rules and **39**.18–22: 3-person tribunal **39**.12–15; *Olguín* **39**.21–2; order of appointment, relevance **39**.12–15; *SPP* **39**.20
purpose of provision **39**.2
  Executive Directors' Report **39**.6

**Article 40 (appointment of arbitrator from outside Panel)**
exclusion of conciliator in same dispute (AR 1(4))    **35**.2, **40**.25
Executive Directors' Report    **40**.3
possibility of    **12**.4, **40**.1–3
**Article 40(1) (appointment of arbitrator from outside Panel)**
appointment by Chairman    **12**.4, **13**.5, **38**.21, **38**.25, **40**.1, **40**.2, **40**.8–13
  Article 37 and Article 38 appointments distinguished    **40**.8
  designation to Panel and    **40**.11
  expiry of term of office on Panel, effect    **15**.4, **40**.12, **56**.1, **56**.31–4
  *Kaiser Bauxite*    **40**.9
  *MINE*    **40**.9
appointment by neutral official chosen by parties as appointing authority    **40**.7
appointment by parties, parties' freedom of choice and    **40**.4–7
drafting history    **40**.2
**Article 40(2) (appointment of arbitrator from outside Panel: qualities)**
definition by reference to Article 14(1)    **12**.4, **40**.1, **40**.2, **40**.14–15, **52**.123
independence of arbitrator
  jurisprudence: *Canfor*    **40**.24; *Myers*    **40**.24; *Tecmed*    **40**.24
  potential conflicts of interest in particular dispute    **40**.17–24: AR 6 (including, 2006 amendments)    **40**.18–20; declaration of professional, business or other relationships with party    **40**.18–20; as objective criterion    **40**.21; situations possibly giving rise to    **40**.22–3
  right to hold particular political or philosophical views    **40**.24
  UNCITRAL/ICC provisions compared    **40**.16
**Article 41(1) (tribunal's right to determine own competence)    Preamble** 34
acceptance of principle    **41**.5
*ad hoc* committees and    **41**.4
annulment and    **52**.131, **52**.554
Article 32 compared    **41**.4
comparable provisions
  ICC Rules of Arbitration (1998)    **41**.1
  ICJ Statute    **41**.1
  ILC Model Rules on Arbitral Procedure (1958)    **41**.1
  Institute of International Law Articles on Arbitration between States, State Enterprises or State Entities and Foreign Enterprises (1989)    **41**.1

UNCITRAL Arbitration Rules (1976)    **41**.1
UNCITRAL Model Law on International Commercial Arbitration (1985)    **41**.1
"competence"/"jurisdiction," distinction    **25**.15, **25**.17, **41**.56–7
as corollary to Article 25(1) (withdrawal of consent)    **41**.5
decision on as award    **41**.73, **48**.22, **48**.26, **48**.40
  in case of default    **45**.70
  individual opinions and    **48**.104
  "no jurisdiction" finding    **41**.74, **54**.31, **54**.45
  recognition/enforcement    **54**.30–1
  review of decisions and    **41**.23, **41**.70
  writing, need for    **48**.40
drafting history    **41**.10
exclusive nature of tribunal's power
  *see also* Article 26 (exclusive remedy rule)
  exclusive remedy rule (Article 26) and    **26**.154, **41**.9, **41**.16–20, **47**.121
  ICJ (Article 64) and    **41**.9, **41**.10, **64**.7–11, **64**.12
  *Mobil Oil* (NZ proceedings)    **41**.17
  non-ICSID forum's obligation to stay proceedings pending tribunal's decision    **26**.6, **26**.10, **41**.16–20: *SGS* v. *Pakistan*    **41**.18; *SPP*    **41**.19
  Secretary-General's screening role and (Article 36(3))    **36**.59, **41**.9, **41**.11–15, **47**.48, **52**.141, **52**.172
general principle of international adjudication    **41**.1–3
  Executive Directors' Report    **41**.2
independent legal basis of tribunal and    **41**.6–8, **45**.46
jurisprudence
  *Inceysa*    **41**.7
  *SPP II*    **41**.5
  *Zhinvali*    **41**.8
national legislation, interpretation and    **41**.5
nationality (natural personality) and    **25**.643, **25**.652
non-ICSID forum's obligation to stay proceedings pending tribunal's decision    **26**.6, **26**.10
publication of decisions    **48**.121
review of tribunal's decisions
  annulment of award on jurisdictional grounds    **41**.25–9, **41**.68
  by domestic courts    **41**.22
  by ICJ    **41**.21

by ICSID *see also* Article 49(2) (supplementation and rectification of award); Article 50(1) (interpretation of award); Article 51 (revision of award); Article 52 (annulment of award: general)

Executive Directors' Report **41**.21

finality of decision **41**.21, **41**.73

status as award and **41**.23, **41**.70

supplementation, rectification, interpretation or revision of decision on jurisdiction while case pending **41**.24

tribunal's right to raise objections to jurisdiction on own initiative and **41**.44

**Article 41(2) (jurisdictional objections) 41**.30–55

annulment proceedings and **52**.62

counterclaims and **41**.31, **41**.36–7

*Atlantic Triton* **41**.37

separate treatment **41**.72

suspension of proceedings and **41**.63

discussion in award, need for **41**.51

examination of jurisdictional issues on tribunal's own initiative **41**.43–55, **52**.173

contested proceedings **41**.45–51, **52**.173: AR 41(2) **41**.43, **45**.13; non-exercise of right **41**.46–51; in respect of objective requirements **41**.50

as corollary to tribunal's right to determine own competence **41**.44

drafting history **41**.43

jurisprudence: *Goetz* **41**.55, **45**.16; *Kaiser Bauxite* **41**.53, **45**.14; *LETCO* **41**.54, **45**.15; *MINE* **41**.46; *Mobil Oil* (NZ proceedings) **41**.47

uncontested proceedings **41**.52–5, **50**.5154: as duty **41**.52, **41**.67

exhaustiveness of reasons, need for **48**.45

failure of party to raise as consent to jurisdiction **41**.49, **52**.60, **52**.174

finding against jurisdiction

AR 41(6) **41**.73

costs **41**.73

post-award remedies **41**.73

joinder to merits

decision forming part of final award **41**.25, **41**.72, **41**.79–84

grounds **41**.80–5

jurisprudence: *Bayindir* **41**.89, **43**.118; *Fraport* **41**.85; *Impregilo* **41**.88; *Kardassopoulos* **41**.83; *Klöckner I* **41**.84; *Oil Platforms* **41**.86, **43**.117–18; *Pan American* **41**.90; *Saipem* **41**.91;

*Siemens* **41**.87; *SOABI* **41**.82; *Telenor* **41**.92; *Tradex* **41**.81

objection relating to ancillary claim and **41**.58–9, **41**.84

*prima facie* test **41**.86–92, **43**.117–18: applicability following summary procedure rejection of objection **41**.101; treaty violation as basis of claim and **41**.86–92

possible issues **41**.58–9

as preliminary question **41**.32, **41**.70–3, **41**.77–8

AR 41 **41**.32

drafting history **41**.75

incorporation into final award **41**.24, **41**.78, **48**.26, **48**.121, **51**.4, **52**.62

terminology and **41**.71: avoidance of "award" **41**.71

time limits **41**.32

treatment in early part of award and **41**.72

tribunal's right to decide whether **41**.75–6: procedural economy and **41**.76

procedure **41**.60–4

in case of counterclaim **41**.63

form of decision **41**.69–74, **45**.70

summary procedure (AR 41(5)): *see* summary procedure (AR 41(5)) *below*

suspension of proceedings (AR 41) **41**.60–4: 2006 revision **41**.62; discretionary nature **41**.62; objection relating to primary dispute and **41**.63

written/oral submissions **41**.64

summary procedure (AR 41(5)) **41**.93–102, **44**.36

advantages/disadvantages **41**.102

in case of joinder of jurisdiction and merits **41**.96

dismissal of objection: *prima facie* test, applicability following **41**.101; right of objection at jurisdictional stage, effect on **41**.101

lack of legal merit test **41**.98–9

partial upholding of objections **41**.99

reasons, need for **41**.100

reasons for provision **41**.94

Secretary General's screening role and **41**.94

time scale **41**.95

*Trans-Global* **41**.102

time limits **41**.32–42

counter-memorial, due date for and **25**.489, **41**.32, **41**.35–7, **52**.174

facts arising after expiry **41**.38–9

**Article 41(2) (jurisdictional objections)**
    **(*cont.*)**
    time limits (*cont.*)
        jurisprudence: *AIG*    **41**.41; *Atlantic Triton*
            **41**.37; *Autopista*    **52**.174; *CSOB*
            **41**.35; *Desert Line*    **41**.33; *Gruslin*
            **25**.487, **25**.604; *Holiday Inns*    **41**.40;
            *Tokios Tokelès*    **41**.39; *Vacuum Salt*
            **41**.34; *Zhinvali*    **52**.174
        tribunal's right to decide jurisdiction at any
            time and    **41**.42, **52**.173
    tribunal's obligation to consider/decide
        distinction    **41**.65; *SPP*    **41**.66
**Article 42 (applicable law)**
    *see also* Article 25(1), "consent", applicable
        law for interpretation of
    applicability
        annulment proceedings    **52**.555
        apportionment of costs    **61**.18
        jurisdictional issues    **42**.4, **52**.187–90
        jurisprudence: *AES*    **42**.10; *CMS*    **42**.7,
            **42**.12; *Pan American*    **42**.11; *Siemens*
            **42**.6; *Soufraki*    **42**.9
        nationality:  *see also* Article 25(2)(a)
            (nationality: natural persons), applicable
            law; juridical persons    **42**.10–12; natural
            persons    **42**.9
        procedure    **42**.3
        substance    **42**.3
    autonomy of ICSID arbitration process and
        **Preamble** 26, **26**.3, **42**.2, **42**.3, **42**.275,
        **44**.3
    drafting history    **42**.1
    error in application as ground for annulment:
        *see* Article 52(1)(b) (annulment of award:
        manifest excess of powers)
    ICSID Convention as *lex fori*    **42**.13, **42**.49
    ICSID's reliance on decisions of domestic
        courts and    **26**.140
    place of proceedings, relevance    **42**.62
    purpose    **42**.1–2
        *ex aequo et bono* jurisdiction and
            **42**.249
        as mechanism for determining appropriate
            rules of law in particular dispute    **42**.2
    subrogation and    **25**.369
**Article 42(1) (applicable law: in absence of
        agreement)**
    Additional Facility AR 55 distinguished
        **42**.142
    choice of law leaving lacunae    **42**.135
    compromise nature of provision    **42**.142
    drafting history    **42**.138–40, **42**.198, **42**.204,
        **52**.100
    finding of absence, need for    **42**.133–7

international arbitral practice distinguished
    **42**.142
jurisprudence
    *Adriano Gardella*    **42**.207
    *Amco I*    **42**.144, **42**.152, **42**.163, **42**.210,
        **42**.212, **52**.267–9
    *Amco II*    **52**.201, **52**.270
    *Autopista*    **42**.134
    *Benvenuti & Bonfant*    **42**.133, **42**.143,
        **42**.149, **42**.208
    *Genin*    **42**.147
    *Klöckner I*    **42**.150–1, **42**.165–6, **42**.168,
        **42**.2209, **52**.266
    *LETCO*    **42**.134
    *MCI*    **42**.148
    *Mobil Oil*    **42**.212
    *SOABI*    **42**.145–6, **42**.149, **42**.213
    *SPP*    **42**.134, **42**.135
    *Wena Hotels*    **42**.136
purpose of provision
    certainty in absence of choice by parties
        **42**.2, **42**.142
    flexibility    **42**.2, **42**.142, **42**.164
**Article 42(1) (applicable law: in absence of
        agreement: applicable rules of
        international law)**    **42**.32, **42**.167–244,
        **52**.192, **52**.260
    applicability of international law to investment
        disputes    **42**.190–8
    contract as sole source of investor's
        remedies    **42**.192–7
    enforcement of award and    **42**.193–4
    exclusion of diplomatic protection and
        **42**.193, **42**.194
    ICJ Statute, 38(1), Executive Directors'
        Report qualification of    **42**.192
    jurisprudence: *Amco I*    **42**.194; *Azurix*
        **42**.196; *CMS*    **42**.197, **42**.240–1; *Enron*
        **42**.197; *LG&E*    **42**.197, **42**.203; *Sempra*
        **42**.197
    proposed exclusion    **42**.198
    proposed limitation to filling gaps in host
        State law    **42**.198, **42**.204
    State responsibility and    **42**.195–7
"as may be applicable"    **42**.192–244
    English and French texts compared
        **42**.202–3
    explanation for inclusion    **42**.201
    incorporation into host State's law,
        relevance    **42**.200
    private parties' right to rely on international
        law    **42**.192–7: exclusion of diplomatic
        protection and    **42**.193, **42**.194
in case of violation of international law
    **42**.204, **42**.205

drafting history    **42**.169, **42**.183,
    **42**.190, **42**.192–3, **42**.198, **42**.200–3,
    **42**.294
international and domestic law, relationship
    **42**.96–115, **42**.204–48, **52**.265
    autonomous application    **42**.236–44
parallel application    **42**.206–13, **42**.239–44
    disadvantages    **42**.211–13
    jurisprudence: *Amco I*    **42**.210, **42**.212;
        *Azurix*    **42**.242; *Benvenuti & Bonfant*
        **42**.208; *CMS*    **42**.240–1; *Klöckner I*
        **42**.209; *Mobil Oil*    **42**.212; *Sempra*
        **42**.243; *Tokios Tokelēs*    **42**.242; *Wena
        Hotels*    **42**.241
    "principles" distinguished    **42**.167–8
    English/Spanish and French texts compared
        **42**.167–8
    inconsistency in usage    **42**.167
sources
    BITS    **42**.171–2
    customary international law    **42**.175–7:
        State responsibility and    **42**.197
    Executive Directors' Report    **42**.169
    general principles of law    **42**.178–82:
        definition    **42**.179; *ex aequo et bono*
        distinguished    **42**.182, **42**.248; examples
        **42**.180; proof of, need for    **42**.181,
        **42**.248
    ICJ Statute, 38(1) and    **42**.169–70, **42**.190
    judicial decisions: ICSID decisions
        **42**.184; non-ICSID tribunals    **42**.183
    jurisprudence: *AAPL*    **42**.172; *ADC*
        **42**.186; *AES*    **42**.184; *Gas Natural*
        **42**.185; *Inceysa*    **42**.179; *Klöckner I*
        **42**.181; *Saipem*    **42**.187; *SGS v.
        Philippines*    **42**.184; *SPP*    **42**.174
    multilateral treaties    **42**.171: UNESCO
        Convention for the Protection of the
        World Cultural and Natural Heritage
        (1972)    **42**.174
    need for incorporation through choice of
        law agreement    **42**.191
    resolutions and guidelines: General
        Assembly resolutions    **42**.189, **42**.191;
        World Bank Guidelines    **42**.190
    writings    **42**.188
supplemental/corrective function    **42**.110–11,
    **42**.214–35
    filling of gaps in host State law    **42**.204,
        **42**.205
    ICISD practice reviewed    **42**.229–35
    jurisprudence: *AGIP*    **42**.220; *Amco I*
        **42**.216; *Amco II*    **42**.217–18, **42**.235;
        *Autopista*    **42**.110, **42**.224–5; *Duke
        Energy*    **42**.111; *Goetz*    **42**.228;

        *Klöckner I*    **42**.214; *LETCO*    **42**.215;
        *LG&E*    **42**.226, **42**.238; *MCI*    **42**.227;
        *Santa Elena*    **42**.222; *SPP*    **42**.219;
        *Tradex*    **42**.221; *Wena Hotels*    **42**.223,
        **42**.229, **42**.236–7
    *non liquet* and    **42**.247: *ex aequo et bono*
        distinguished    **42**.250
**Article 42(1) (applicable law: in absence of
    agreement: host State law)**    **42**.32,
    **42**.138–66
    *see also* Article 42(1) (applicable law: host
        State law (general considerations))
    French law as aid in establishing    **42**.149,
        **42**.150–2
    "including its rules on the conflict of laws"
        (*renvoi*)    **42**.161–6
    cases of agreed choice of law distinguished
        **42**.162–3
    drafting history    **42**.161
    jurisprudence: *Amco I*    **42**.163; *Klöckner I*
        **42**.165–6
    methodology    **42**.162–3
    predictability, effect on    **42**.164
    reasons for inclusion    **42**.161
    unusual nature of provision    **42**.161
    variation or exclusion by agreement of
        parties    **42**.164
    primacy    **42**.138
        mitigating factors    **42**.141
    subsequent changes to    **42**.160
        stabilization clause and    **42**.160
**Article 42(1) (applicable law: agreement
    between the parties)    Preamble**
    15–16
    *see also* Article 42(1) (applicable law: host
        State law (general considerations))
    agreement on as essential element in consent
        **42**.19, **52**.199
    BITs provision for    **42**.11–12, **42**.23, **42**.33,
        **42**.80–4
    clear and unequivocal choice, need for
        **42**.22, **42**.32
    conflict of laws, inclusion    **42**.53–5
    *contrat sans loi*    **42**.37–8
    drafting history    **42**.21
    exclusion of particular system or part of
        system    **42**.22, **42**.41
        freedom of choice    **42**.21
    freedom of choice
        failure to choose, effect    **42**.105
        mandatory provisions of host State law,
            right of exclusion    **42**.44–7: capacity of
            State to contract    **42**.46–7
    host State law    **42**.24–36, **42**.117–28
        insistence on    **42**.21

**Article 42(1) (applicable law: agreement
    between the parties) (*cont.*)**
host State law (*cont.*)
    subsequent changes to the law and
        **42**.116–32: in absence of stabilization
        clause **42**.129–32;
        acceptable/unacceptable changes
        **42**.131–2; internationalization of contract
        as protection against **42**.33–6;
        stabilization clause as protection against
        **42**.26, **42**.34, **42**.41, **42**.117–28
host State law/international law, jurisprudence
    *Adriano Gardella* **42**.100
    *AGIP* **42**.33, **42**.97–8, **42**.120–1
    *Atlantic Triton* **42**.26
    *CMS* **42**.127
    *CSOB* **42**.35
    *Duke Energy* **42**.128
    *Kaiser Bauxite* **42**.34, **42**.41, **42**.119
    *LETCO* **42**.100, **42**.106, **42**.122–3
    *MINE* **42**.26, **42**.124–5
    *Mobil Oil* (NZ proceedings) **42**.24
    *Semos* **42**.126
    *SPP* **42**.107–9
    *Tanzania Electric* **42**.25
    *Wena Hotels* **42**.101
implicit agreement
    acceptance of: BITs choice of law clause
        **42**.80–4; multilateral treaty provision
        **42**.85; offer in national legislation as
        **42**.23, **42**.63–9
    BIT agreement without express choice of
        law clause **42**.89–95: national
        legislation as implied law **42**.91–2;
        substantive provisions of treaty and
        general international law distinguished
        **42**.89–95
    drafting history **42**.62
    jurisprudence: *AAPL* **42**.60–1, **42**.70–6,
        **42**.99; *ADC* **42**.93; *Amco I* **42**.77;
        *Autopista* **42**.68; *CSOB* **42**.92; *Enron*
        **41**.79; *Goetz* **42**.82; *Kardassopoulos*
        **41**.87, **42**.87; *LETCO* **42**.64, **42**.76;
        *LG&E* **42**.94–5; *Middle East Cement*
        **42**.83, **42**.90; *MTD* **42**.91; *Siemens*
        **42**.84; *SPP* **42**.65–7, **42**.76; *Wena
        Hotels* **41**.78
    possibility of **42**.62
    reliance in particular on submissions before
        tribunal **42**.70–6, **42**.99
international law/general principles of law
    in absence of its choice **42**.104–15
    absence of provision for in first sentence of
        Article 42(1) **42**.104
    as chosen law **42**.96–9, **52**.259

customary international law **42**.175–7
    explicit provision for, desirability **42**.103
    investor/host State agreement, Model
        Clauses (1981) **42**.22
    as part of chosen domestic law **42**.100–3:
        relevance under residual rule
        distinguished **42**.67, **42**.96, **42**.115
    subjection of municipal law to international
        law **42**.106–15
    as supplement to host State law
        **42**.33–6
    use in isolation, disadvantages **42**.36
    waiver of rights under international law
        **42**.113–15
internationalization of contract and
    **42**.33–6
investor/host State agreement **42**.22,
    **42**.24–38, **42**.56
    Model Clauses (1968) **42**.22
    Model Clauses (1993) **42**.22
jurisprudence (except where listed under other
        subheadings)
    *AAPL* **42**.99
    *Santa Elena* **42**.22
methodology **42**.13, **42**.67
    failure to follow **42**.13
motives determining choice **42**.21
multilateral treaties **42**.22, **42**.36, **42**.85–8
national legislation offering consent and
    **42**.23, **42**.63–9
public policy/*ordre public* (domestic) and
    **42**.48
public policy/*ordre public* (international) and
    **42**.49–52, **42**.153
    international law distinguished **42**.52
    peremptory rules of international law
        **42**.49
    Security Council resolutions **42**.50
    *World Duty Free* **42**.51
"rules of law"
    *Autopista* **42**.39
    combination, right to choose **42**.39,
        **42**.135
    *dépeçage* **42**.39, **42**.256
    possibilities: exclusion of particular system
        or part of system **42**.41; non-binding
        code of conduct **42**.42; piecemeal
        choice **42**.39, **42**.136
    systems of law distinguished **42**.39, **42**.53,
        **42**.104
third State law **42**.27–32, **42**.45
    jurisprudence: *CDC* **42**.29; *Colt Industries*
        **42**.30; *SPP* **42**.28; *World Duty Free*
        **42**.31
    loan contracts **42**.27–9

timing
  during or at institution of proceedings
    **42**.56–61
  during proceedings    **42**.56–61
  jurisprudence: *AAPL*    **42**.60–1; *Adriano
    Gardella*    **42**.57; *Benvenuti & Bonfant*
    **42**.59; *SOABI*    **42**.58
  treaty not yet in force    **42**.42
**Article 42(1) (applicable law: host State law
  (general considerations))**
  capacity to submit to arbitration, limitations on
    **42**.154–6
    arbitration clause as modification of the law
      **42**.154
    *Autopista*    **42**.156
    capacity to contract in violation of own law
      **42**.154–6
    estoppel/good faith and    **42**.155
  legal status of investor, exclusion    **42**.157–9
    *Amco II*    **42**.158
    *Scimitar*    **42**.159
**Article 42(2) (*non liquet*: prohibition)**    **42**.2,
  **42**.13, **42**.245–8
  Article 48(3) and    **42**.2, **42**.13, **42**.245–8
  closing the gaps, rules of chosen legal system
    and    **42**.137, **42**.246
  drafting history    **42**.245
  *ex aequo et bono* jurisdiction distinguished
    **42**.250
  failure to make effective choice of law and
    **42**.38, **42**.135–7
  ILC Model Rules on Arbitral Procedure
    (1958)    **42**.245
**Article 42(3) (*ex aequo et bono*)**    **25**.76, **42**.2,
  **42**.13, **42**.15, **42**.249–79
  comparable provisions in other international
    instruments    **42**.253
  *dépeçage*    **42**.40–1, **42**.256
  domestic law, relevance of exclusion in
    **42**.274
    Additional Facility Rules distinguished
      **42**.275
  drafting history    **42**.253, **42**.260
  equitable considerations distinguished    **42**.16,
    **42**.269, **52**.252–6
  equity/law relationship    **42**.266–71
    application of law, admissibility
      **42**.266–8
    equity within the law distinguished
      **42**.269–71, **52**.246–7
  examples of application    **42**.208, **42**.276–9
    compensation/costs as principle field of
      application    **42**.279
  ICJ Statute 38(2) as basis    **42**.253
  interest and    **46**.48

jurisprudence
  *AAPL*    **42**.276
  *AGIP*    **42**.258
  *Amco I*    **42**.16, **42**.18–19, **42**.261, **42**.269,
    **52**.252–6
  *Atlantic Triton*    **42**.255, **42**.268, **42**.278
  *Benvenuti & Bonfant*    **42**.208, **42**.259,
    **42**.267, **42**.277, **42**.279, **46**.48
  *Klöckner I*    **42**.15, **42**.18–19, **42**.262–3,
    **42**.269, **52**.239
  *MINE*    **42**.17, **42**.264, **52**.199, **52**.245
  *MTD*    **42**.271
  *SOABI*    **42**.269
  *Tecmed*    **42**.270
  *Zhinvali*    **42**.265
legal/non-legal disputes, relevance of
  distinction    **42**.251
parties' agreement
  as derogation from agreement on
    applicable law under Article 42(1)
    **42**.274
  during or on institution of proceedings
    **42**.257–9
  Model Clauses (1993)    **42**.254
  need for    **42**.135, **42**.182, **42**.249–50,
    **42**.254, **42**.260–5: manifest excess of
    powers and    **42**.261–5, **52**.244; scope
    **42**.256
peremptory rules of international law/*jus
  cogens* and    **42**.273
predictability, effect on    **42**.249
reasons, need for    **42**.272, **48**.57, **52**.349,
  **61**.43
**Article 43 (taking of evidence)**
  admissibility of evidence    **43**.10–22
    in absence of oral hearing    **43**.88–92
  AR 33 (marshalling of evidence)    **43**.10
  AR 34 (general principles of evidence)
    **43**.10, **47**.84, **47**.88
  "at any stage of the proceedings"    **43**.30–43
    AR 38(2) (reopening of proceedings)
      **43**.36–7
    expiry of time limits and    **43**.39–43
    jurisprudence: *AGIP*    **43**.31, **43**.61, **47**.34,
      **47**.81; *Azurix*    **43**.41; *Benvenuti &
      Bonfant*    **43**.39; *Champion Trading*
      **43**.33; *Fraport*    **43**.34; *Klöckner I*
      **43**.37; *Noble Energy*    **43**.34; *Noble
      Ventures*    **43**.32; *Siemens*    **43**.42;
      *SOABI*    **43**.35; *Tradex*    **43**.40; *Vivendi
      II*    **43**.43
    post-award evidence    **43**.38–9
  comparable instruments in other international
    instruments    **43**.1
  drafting history    **43**.2–3, **43**.6

**Article 43 (taking of evidence) (*cont.*)**
  "except as the parties otherwise agree"
    **43**.5–9
    agreed statement of facts    **43**.7, **43**.9:
      uncontested facts (AR 21)    **43**.9
    agreement on specific rules of evidence
      **43**.7
    proposal to delete    **43**.6
  expenses    **61**.28
    AR 34(4)    **43**.26–9
    expenses incurred as result of one
      party's conduct    **43**.26–9, **43**.122,
      **61**.28–32
  fact-finding as incidental to judicial function
    **43**.3–4
    Additional Facility distinguished    **43**.3
  jurisprudence
    *ADF*    **43**.17
    *Aguas del Tunari*    **43**.15–16
    *Amco I*    **52**.301, **53**.324–5
    *CDC*    **43**.21, **52**.328, **52**.330–1
    *Fraport*    **26**.122–3
    *Klöckner II*    **52**.326–7
    *Lucchetti*    **52**.332
    *MTD*    **43**.22
    *Noble Ventures*    **43**.8
    *SOABI*    **43**.35
    *SPP*    **43**.13
    *Tradex*    **43**.14
    *Vacuum Salt*    **43**.12
    *Wena Hotels*    **43**.20, **52**.328, **52**.329
  as preservation measure    **43**.18
  proposal to transfer to Arbitration Rules
    **43**.2
  provisional measures and    **26**.164, **47**.87–9
    *see also* Article 47 (provisional measures),
      purpose/rights to be protected,
      preservation and production of evidence
  standards
    failure to abide by as excess of
      powers/serious departure from
      fundamental rule of procedure    **43**.4,
      **43**.19–22, **52**.323–32
    IBA Rules as    **43**.8, **43**.18
  supplementary nature of Article 43 provisions
    **43**.10
  timing of request: *see* "at any stage of the
    proceedings" *above*
  tribunal's discretionary powers    **43**.10–22
    *see also* Article 43(a) ("call upon parties to
      produce"); Article 43(b) (visits and
      enquiries)
    relevant factors (including necessity)
      **43**.12–22
  tribunal's exclusive powers    **26**.164

**Article 43(a) ("call upon parties to produce")**
    **43**.44–67
  applicable law    **43**.71
  common and civil law practice distinguished
    **43**.71
  "documents or other evidence"
    alternative formulae    **43**.68
    AR 34(2)(a)    **43**.68
    AR 37    **43**.55
    "documents", examples    **43**.70
    experts    **43**.54, **43**.60
    ICSID Secretariat, request to    **43**.54,
      **43**.60
    invitation or request    **43**.58–60
    procedural order    **43**.55, **43**.58–60
  drafting history    **43**.51, **43**.63,
    **43**.68
  evaluation of evidence/probative value
    **43**.104–15
    burden of proof    **43**.116–18: for purposes
      of jurisdiction (*prima facie* test)
      **41**.86–92, **43**.117–18
    credibility of witnesses    **43**.109–15
    jurisprudence: *ADC*    **43**.114; *Azinian*
      **43**.111; *Bayindir*    **43**.118; *Generation
      Ukraine*    **43**.107; *Middle East Cement*
      **43**.106; *Noble Ventures*    **43**.113; *Oil
      Platforms*    **43**.117–18; *Plama*    **43**.112;
      *Soufraki*    **43**.105, **43**.115; *Tradex*
      **43**.14, **43**.110; *Vacuum Salt*    **43**.108
    tribunal's discretion (AR 34(1))    **43**.10,
      **43**.101, **43**.104–15, **53**.323
  experts
    appointment by parties    **43**.97: NAFTA
      provisions    **43**.96
    appointment or request for    **43**.13, **43**.60:
      direct approach by tribunal    **43**.54,
      **43**.97
    Arbitration Rules and    **43**.95: AR 34(1)
      (tribunal's discretion)    **43**.10, **43**.101,
      **43**.104, **53**.323; AR 35(3) (declaration)
      **43**.95
    examination    **43**.94
    on financial matters    **43**.98
    ICSID practice    **43**.69, **43**.97–103
    jurisprudence: *Aguas del Tunari*    **43**.102;
      *CMS*    **43**.54; *Middle East Cement*
      **43**.101; *PSEG*    **43**.100; *SOABI*    **43**.99;
      *SPP*    **43**.13; *World Duty Free*    **43**.103
    on national or international law    **43**.69,
      **43**.102–3
    reports of, parties' right to comment on
      **43**.98–9
    tribunal's discretion not to appoint (AR 34)
      **43**.101

form
  action under Article 47   **43**.61
  AR 19   **43**.55
  AR 34(2)   **43**.55
on initiative of parties   **43**.10, **43**.44,
    **43**.49–50
on initiative of tribunal   **43**.45–8
judicial assistance, tribunal's right to request
    **26**.164, **43**.52
  failure to comply with request, effect
    **43**.63–7
jurisprudence
  *ADF*   **43**.74
  *AGIP*   **43**.61, **43**.66, **47**.34
  *Aguas del Tunari*   **43**.79
  *Biwater Gauff*   **43**.62, **43**.72–3, **43**.80,
    **47**.86–9
  *CMS*   **43**.54
  *Duke Energy*   **43**.57
  *Feldman*   **43**.46
  *Fireman's Fund*   **43**.76
  *Fraport*   **43**.48
  *Impregilo*   **43**.47
  *Noble Ventures*   **43**.8, **43**.71, **43**.77
  *SOABI*   **43**.49
  *SPP*   **43**.49
  *Tanzania Electric*   **43**.50
  *Waste Management*   **43**.54
  *Zhinvali*   **43**.75
non-ICSID arbitral proceedings and
    **26**.122–3
parties' duty to cooperate   **43**.63–7
  AR 34(3)   **43**.64
procedural decision, status
    **43**.64
procedure   **43**.51–4
refusal by party to comply, effect   **43**.63–7,
    **47**.34
refusal by party to comply, grounds
  disproportionate burden   **43**.71
  political or commercial sensitivity/Crown
    privilege   **43**.72–6
refusal of party's request for want of precision
    **43**.77–80
witnesses
  admissibility in absence of oral hearing
    **43**.88–92
  compulsion   **43**.51, **43**.54
  credibility   **43**.109–15
  examination (AR 35)   **43**.84, **43**.86–93,
    **44**.94: by parties and tribunal   **43**.83;
    other than before the tribunal   **62**.19
  jurisprudence: *Azinian*   **43**.93; *Duke
    Energy* **43**.82; *Enron* **43**.88;
    *Fireman's Fund* **43**.92; *Tradex* **43**.87;

  *Vacuum salt* **43**.108; *Vivendi II*
    **43**.90–1
  testimony as "other evidence"   **43**.81–94
  tribunal's right to call directly   **43**.51,
    **43**.53–4, **43**.81
  video conference evidence   **43**.90–1
  written evidence   **43**.85–9: notarization,
    desirability   **43**.86; probative value
    **43**.86, **43**.87
written evidence   **43**.85–9
**Article 43(b) (visits and enquiries)**
    **43**.119–24, **62**.18
  *amicus curiae* briefs (AR 37(2))   **44**.36,
    **44**.58, **44**.104, **44**.120
  AR 37   **43**.119
  Contracting State's obligation to accept
    **43**.124
  costs and expenses   **43**.27, **43**.122, **61**.28
  inquiry on behalf of tribunal   **43**.121
  jurisprudence
    *Santa Elena*   **43**.123
    *SOABI*   **43**.123
  procedural order, need for   **43**.55, **43**.119,
    **43**.120, **43**.123
    non-compliance with, effect on costs
      **61**.28
**Article 44 (Arbitration Rules)**
  Administrative Council role   **6**.11, **6**.12, **6**.13
  Administrative and Financial Regulations
    (AFR), modification, limited scope for
    **44**.13
  adoption   **44**.34–6
  applicability
    "any arbitration proceeding"   **44**.5–8
    Article 36 request and   **44**.5, **44**.39
    disqualification of arbitrators   **43**.7
    Institution Rules distinguished   **44**.5
    post-award procedures   **44**.6, **52**.52:
      annulment proceedings   **52**.557–61; AR
      53   **44**.6
  Article 33 (Conciliation Rules) compared
    **33**.1–6, **44**.8
  autonomy of ICSID arbitration process and
    **Preamble** 26, **26**.3, **42**.3, **44**.3
    place of proceedings, relevance   **44**.3,
      **44**.21, **44**.54, **53**.22, **62**.3
  as balance between common law and civil law
    approaches   **44**.38
  Convention and   **44**.2, **44**.32–3
    advantages of regulating procedures in
      Rules   **44**.32
    in case of conflict   **44**.33
    mandatory nature of Convention provisions
      **44**.10, **44**.20, **44**.33
    role of Convention   **44**.32–3

**Article 44 (Arbitration Rules) (*cont.*)**
critical date   **25**.478, **44**.17, **44**.42–52
    agreement to use updated version
        **44**.47–52: Model Clauses   **44**.48; timing
        **44**.50
    agreement to use version in force at time of
        request   **44**.51
    date of fulfilment of all conditions for
        consent   **44**.43–6
    drafting history   **44**.43–4
    jurisprudence: *AAPL*   **44**.52; *Mobil Oil*
        **44**.49; *SPP*   **44**.51
    reason for rule   **44**.42
derogation   **6**.6
drafting history   **44**.2, **44**.4, **44**.11, **44**.24,
    **44**.32, **44**.43–4
gaps, tribunal's power to fill   **44**.1, **44**.37,
    **44**.53–8, **48**.45
    applicable law   **44**.54
    inherent nature of power   **44**.54
    interpretation as method of choice   **44**.54
interrelationship of procedural rules deriving
    from different sources   **44**.59–60
languages   **44**.61–71
    absence of provision in Convention   **44**.61
    AR 22 (procedural languages)   **44**.63
    compromise   **44**.67
    cost implications   **44**.66
    inclusion in request   **36**.33
    IR 1(1)   **44**.62
    jurisprudence: *Champion Trading*   **44**.69;
        *Fedax*   **44**.67; *Jan de Nul*   **44**.68;
        *Mitchell*   **44**.71; *Total*   **44**.70
    parties' right to agree on one or two
        languages   **44**.64
    practice   **44**.65
    request and proceedings distinguished
        **36**.14, **44**.62
mandatory character in absence of other
    arrangements   **44**.17–18
    non-frustration principle and   **44**.18
modification by parties   **6**.6, **36**.25, **44**.1,
    **44**.10–31, **61**.9
    absence of party, effect   **44**.31
    annulment proceedings and   **52**.53
    applicable law, freedom of choice   **44**.21
    BIT provision   **44**.27
    examples   **44**.14–16, **44**.19
    Executive Directors' Report   **44**.11
    Institution Rules, limited scope for   **36**.25,
        **44**.13, **44**.40
    limitations   **44**.20–3: mandatory provisions
        of Convention, exclusion   **44**.10, **44**.20;
        minimum standards of fair procedure and
        **44**.22–3

Model Clauses (1993)   **44**.26
procedural provisions other than Article 44
    distinguished   **44**.10
provision for in individual arbitration rules
    **44**.12
time limits for preparation of award (AR 46)
    **49**.24
timing   **44**.24–8: acceptance of BIT or
    other treaty containing procedural
    provisions   **44**.27; "as early as possible
    after the constitution of a Tribunal" (AR
    20)   **44**.30; consent to jurisdiction and
    **44**.25; inclusion in request for arbitration
    **44**.26; institution of proceedings (IR 3)
    **44**.26
trilateral nature of agreement   **44**.30
written/oral procedure   **44**.81
national law procedure and   **44**.3
oral hearings   **44**.93–6
    AR 32   **44**.93
    jurisprudence: *Fraport*   **44**.96, **49**.14;
        *Noble Ventures*   **44**.94
    post-hearing submissions   **44**.95–6
    private nature/attendance at   **44**.36,
        **44**.101–6, **47**.151
preliminary procedural consultation (AR 20)
    **44**.30, **48**.11
    agreement on use of updated version of
        Arbitration Rules and   **44**.50
    draft provisional agenda   **44**.29
    methodology   **44**.30
representation of parties   **44**.72–9
    "agents"   **44**.75
    AR 18   **44**.73, **44**.75
    inclusion: award (AR 47(1)(d))   **44**.77;
        request   **36**.33, **44**.74
    jurisprudence: *Generation Ukraine*   **44**.78;
        *Scimitar*   **44**.79
    legal qualifications, desirability   **44**.72:
        lawyers, practice of using   **44**.76
    scope of authority, need to indicate   **44**.75
revisions   **44.34**.6
supplementary provisions
    Administrative and Financial Regulations
        **44**.39, **44**.41
    Institution Rules   **44**.39, **44**.40
    intertemporal rules and   **44**.40, **44**.41
    modification, limited scope for   **44**.40,
        **44**.41
    revision   **44**.40, **44**.41
"this Section" as "this Convention"   **44**.9
tribunal's discretionary powers   **44**.54
    examples of use   **44**.56–8
    jurisprudence: *SGS* v. *Philippines*   **44**.57;
        *Suez & AWG*   **44**.58

method of exercise    **44**.55: AR 19
(procedural orders)    **43**.55–8, **44**.55–6,
**45**.41, **48**.26
violation as serious departure from
fundamental rule of procedure    **43**.4,
**43**.19–22, **44**.23
written procedure
AFR 24    **44**.92
AR 23    **44**.92
number of rounds    **44**.89
pleadings    **44**.86–92: AR 31(2)    **44**.90;
elements    **44**.91;
simultaneous/consecutive    **44**.90
request and related procedure as part of (AR
30 and 31)    **44**.84, **44**.85
Secretary-General's role    **44**.92
time limits: AR 26    **44**.87; extension
**44**.88
written/oral procedure, division into
**44**.80–96
application to incidental or subsidiary
procedure    **44**.83
AR 29    **44**.80
modification by parties    **44**.81
oral hearings, purpose    **44**.94
**Article 45 (failure of party to appear or**
**present case: general)    Preamble** 34,
**36**.70
annulment proceedings and    **52**.562–3
classification as default    **45**.24–38
comparable provisions in other international
instruments    **45**.1
conciliation proceedings compared    **45**.7
drafting history    **45**.3, **45**.10, **45**.22, **45**.40,
**45**.55, **45**.77
extension to
*ad hoc* committee proceedings    **45**.6
resubmission to new tribunal    **45**.6
"his"/"its," significance    **45**.4
integrity of ICSID process and    **26**.3
non-compliance with provision as
failure to state reasons    **45**.8
manifest excess of powers    **45**.8
reasons for non-appearance    **45**.9
scope
non-frustration principle    **45**.2, **45**.5
protection of noncooperating party    **45**.2
rule of evidence    **45**.2, **45**.3
**Article 45 (failure of party to appear or**
**present case), jurisprudence**
*AGIP*    **45**.50
*AMT*    **45**.37–8, **45**.53, **45**.60, **45**.64, **45**.89,
**61**.29
*Benvenuti & Bonfant*    **45**.26, **45**.51, **45**.60,
**45**.62–3, **45**.73, **45**.84, **45**.87

*Goetz*    **41**.55, **43**.25, **45**.16, **45**.20, **45**.31–6,
**45**.54, **45**.60, **45**.81, **45**.90
*Kaiser Bauxite*    **41**.53, **45**.14, **45**.25, **45**.49,
**45**.60, **45**.80
*LETCO*    **41**.54, **43**.24, **45**.15, **45**.18–19,
**45**.25, **45**.44, **45**.52, **45**.60, **45**.74, **45**.84,
**45**.88
*Scimitar*    **45**.23
**Article 45(1) (failure of party to appear or**
**present case: effect)**
appearance without presentation of case
**45**.23, **45**.24
AR 42 (default)    **45**.11
discontinuance of proceedings (AR 45)
**45**.56, **45**.57–8
limitations on    **45**.66
drafting history    **45**.10, **45**.40
finding in favour of nonappearing party,
possibility    **45**.10, **45**.66, **45**.69
shift of procedural balance    **45**.12
tribunal's obligation to examine
jurisdiction/competence (AR 42(4))
**41**.52, **45**.10, **45**.11, **45**.13–15, **45**.42,
**45**.67, **45**.69
merit of parties' assertions    **43**.23–5, **45**.10,
**45**.17–20, **45**.42, **45**.67, **45**.69, **48**.68
**Article 45(2) (failure of party to appear or**
**present case)**
"at any stage in the proceedings"    **45**.45–54
AR 42(1)    **45**.47, **45**.59
discontinuance of proceedings as terminal
date    **45**.47
jurisdictional phase    **45**.46
post-award proceedings    **45**.48, **45**.86:
AR 53    **45**.48, **45**.86
registration of request and institution of
proceedings distinguished    **45**.45
bad faith and    **45**.44
claimant as defaulting party    **45**.21–3
drafting changes to reflect possibility
**45**.22
failure to
cooperate or cooperate fully    **45**.24, **45**.25,
**45**.52
make advance payments    **45**.24, **45**.43,
**61**.29: AFR 14(3)(d)    **45**.58
meet time limits    **45**.26–30, **45**.51, **45**.84
participate in tribunal's constitution
**45**.37–8, **45**.50, **45**.66
obligation to appear or present case    **45**.39–44
Arbitration Rules    **45**.41
ICJ compared    **45**.39
non-compliance with award and    **45**.43
participation in Convention/consent to
arbitrate constituting    **45**.42

**Article 45(2) (failure of party to appear or present case) (*cont.*)**
obligation to appear or present case (*cont.*)
  permissive nature of Convention   **45**.39
  proposed addition of "where it was under an obligation to do so"   **45**.40
period of grace   **45**.38, **45**.64, **45**.76–90, **61**.29
  AR 42 (default)   **45**.78: AR 26 (time limits) distinguished   **45**.83
  extension of time limits beyond   **45**.30, **45**.83–4, **45**.87
  fault, relevance   **45**.77
  obligation in absence of party's stated intention not to proceed   **45**.79–80
  payment of costs   **45**.58, **61**.29
  purpose   **45**.76–7: avoidance of problems arising from failure to proper notification **45**.77; flexibility   **45**.76
  timing of notification   **45**.85–90
presentation of case without appearance **45**.24
proceedings in absence of party: *see* Article 45(2) (failure or party to appear or to present case: proceedings in absence of party)
sanctions, absence of provision for   **45**.71
  *see also* Article 61(2) (fees, expenses and Centre charges: apportionment: arbitration proceedings), procedural misconduct and

**Article 45(2) (failure of party to appear or to present case: proceedings in absence of party)**
award in case of   **45**.70
request by other party   **45**.55–64
  continued cooperation by nondefaulting party as implied request   **45**.59
  for discontinuance of proceedings (AR 44) **45**.56: limitations   **45**.66
  for finding of jurisdiction and decision on merits   **45**.56, **45**.65–75
  need for   **45**.55, **45**.57
  standing   **45**.56
  tribunal's right to decline: *see* tribunal's discretion *below*
tribunal's Article 48(3) obligation to deal with every question submitted   **45**.65–75
  questions not explicitly submitted   **45**.67
  questions submitted by defaulting party **45**.66
  range   **45**.68
tribunal's discretion   **45**.61–4
  defaulting party's likely future behaviour and   **45**.61–4

reluctance to apply default procedure and **45**.61–4

**Article 46 (ancillary claims)**
"arising directly out of the subject-matter of the dispute"   **46**.5
  "arising out of an investment" distinguished **46**.74
  English, French and Spanish texts compared **46**.72
  jurisdictional requirement distinguished **46**.73–8, **49**.92
  jurisprudence: *ADF*   **46**.81–2; *Amco I* **46**.26, **46**.80; *Amco II*   **25**.97–8, **46**.27–8, **46**.66, **46**.80, **46**.91, **52**.671; *CMS*   **46**.83–4; *Holiday Inns*   **46**.76; *Klöckner I*   **46**.77; *LG&E*   **46**.85; *Saluka*   **46**.67, **46**.78; tribunals' limited discussion of issue   **46**.79–85
  tribunal's failure to address issue **46**.79–85
Article 48(3) (exhaustiveness) and **48**.45
comparable instruments in other international instruments   **46**.3
counterclaims
  *see also* jurisdiction, need for *below*
  "arising directly", as implicit requirement **25**.84
  definition   **46**.33, **46**.64, **52**.2
  as incidental or additional claim   **46**.71
  jurisdiction based on general offer and **46**.94
  jurisprudence: *Amco I*   **46**.26, **46**.80; *Amco II*   **25**.97–8, **46**.66, **46**.80, **46**.91, **52**.671; *Atlantic Triton*   **46**.69; *Benvenuti & Bonfant*   **46**.89; *Genin*   **46**.70; *Klöckner I*   **25**.555; *SPP*   **46**.88
  parties' credibility and   **46**.69
  relating to substance   **46**.68–71
  status of parties, effect on   **46**.65–7: resubmission of dispute and   **46**.66
definitions   **46**.2
  failure to distinguish between types of ancillary claim   **46**.32–4
drafting history   **46**.4, **46**.7, **46**.32, **46**.87
"except as the parties otherwise agree" **46**.6–11
  form of agreement: blanket exclusion, dangers of   **46**.9; Model Clauses (1968) **46**.9; Model Clauses (1993)   **46**.10; restriction of ICSID jurisdiction to specific matters   **46**.10
  non-ICSID dispute settlement clauses, effect **46**.8: parallel dispute settlement provisions, effect   **46**.8

specific agreement of parties, need for
**46**.7
incidental or additional claims
arising out of third party contracts
**46**.36–42
jurisprudence: *AAPL* **46**.37; *Atlantic
Triton* **46**.63; *Middle East Cement*
**46**.39; *MINE* **46**.62; *PSEG* **46**.41;
*Siemens* **46**.42; *SOABI* **46**.36; *SPP*
**46**.38; *Zhinvali* **46**.40
new arguments, relevance **46**.29
proposals to delete or merge **46**.32
time limits, differing requirements
**46**.34
interest, claim for **46**.43–60
applicable law **46**.44–8
compound/simple interest **46**.53–9
critical dates **46**.50
"interest" **46**.43
jurisprudence: *ADC* **46**.50; *Atlantic Triton*
**46**.48; *Autopista* **46**.46; *Benvenuti &
Bonfant* **46**.48; *CMS* **46**.55; *Fedax*
**46**.44; *Metalclad* **46**.57; *Santa Elena*
**46**.56; *SOABI* **46**.50; *SPP* **46**.45,
**46**.54; *Vivendi II* **46**.59; *Wena Hotels*
**46**.58
post-award interest **46**.60
rate **46**.52
jurisdiction, need for **46**.5, **46**.30, **46**.86–95
jurisprudence: *Amco II* **46**.91; *Atlantic
Triton* **46**.93; *Benvenuti & Bonfant*
**46**.89; *Klöckner I* **46**.90; *LETCO*
**46**.92; *Saluka* **46**.95
reasons for inclusion of provision
**46**.87
jurisdiction, objections to, time limits
**41**.36–7
obligation to determine **46**.30–1
Article 48(3) and **46**.30
failure as: failure to state reasons **46**.30;
manifest excess of powers *infra petita*
**46**.30
presentation of ancillary claim
jurisprudence: *Amco I* **46**.26; *Amco II*
**46**.27–8; *Atlantic Triton* **46**.19;
*Benvenuti & Bonfant* **46**.24; *Enron*
**46**.29; *Metalclad* **46**.23; *Middle East
Cement* **46**.20; *SOABI* **46**.21; *SPP*
**46**.25; *Tanzania Electric* **46**.22
right to comment on **46**.17–18
time limits **46**.15–29: AR 40 **46**.15,
**46**.25; conclusion of written proceedings
**46**.16; justification for late presentation
**46**.16
procedural costs, claim for **46**.61–3, **46**.71

purpose
avoidance of conflicting decisions
**46**.1
economy **46**.1
efficiency **46**.1, **46**.4, **46**.29
fairness **46**.29
finality of decisions **46**.1
requirements
*see also* "arising directly out of
subject-matter of the dispute" *and*
jurisdiction, need for *above*
AR 40(1) **46**.13, **46**.81
request by one of the parties **46**.12
taxes, claim for **46**.26–8, **46**.71
tribunal's resort to on own initiative
exclusion **46**.12
as manifest excess of powers **46**.12
**Article 47 (provisional measures)**
addressees **47**.152–6
absence of provision **47**.152
parties **47**.156
adequacy of tribunal's powers **26**.174
AR 39 **47**.5–7
2006 revision **44**.36, **47**.5–7
AR 39(6) [AR 39(5)] **26**.176–8, **44**.34,
**55**.95, **55**.97
award, whether **47**.4, **47**.15, **47**.17, **48**.4,
**48**.26, **48**.40, **48**.88, **48**.104
annulment and **52**.64
writing, need for **48**.40
binding effect/legal status **47**.15–22, **53**.66
incorporation in agreement between parties
and **47**.17, **47**.110
jurisprudence: *Biwater Gauff* **47**.22;
*Maffezini* **47**.18; *Occidental* **47**.21;
*Pey Casado* **47**.19; *Tokios Tokelès*
**47**.20; *Vacuum Salt* **47**.17
circumstances requiring **47**.63–151
avoidance of prejudice to merits, importance
**47**.2, **47**.37, **47**.157
burden of proof **47**.64
hostile propaganda **26**.184, **47**.137–40
jurisprudence: *Azurix* **47**.66; *Biwater
Gauff* **47**.68; *Maffezini* **47**.64;
*Occidental* **47**.70–1; *Plama* **47**.67;
*Saipem* **47**.69; *Tanzania Electric*
**47**.65
necessity and urgency **47**.2, **47**.63–71,
**47**.87, **47**.132
preservation of parties' rights/avoidance of
irreparable damage **47**.66, **47**.67, **47**.70,
**47**.71
commission's power to make
recommendations **34**.19
reasons, need to "point out" **34**.19

**Article 47 (provisional measures) (*cont.*)**
comparable provisions in other international
    instruments
    ICJ Statute as model    **14**.2, **14**.10, **36**.30,
        **41**.75, **47**.1, **47**.19, **47**.72, **51**.1
    NAFTA (1992)    **47**.10, **47**.158
compliance obligation    **47**.16, **47**.25, **47**.154
    *see also* non-compliance *below*
date of registration and    **36**.63
diplomatic protection and    **27**.11
disputed jurisdiction and    **36**.63, **47**.46–57
    jurisprudence: *Azurix*    **47**.54; *Bayindir*
        **47**.55; *Biwater Gauff*    **47**.56; *CSOB*
        **47**.51; *Holiday Inns*    **47**.49; *Occidental*
        **47**.57; *Pey Casado*    **47**.52; *SGS* v.
        *Pakistan*    **47**.53; *Vacuum Salt*    **47**.50
    practice in other international fora    **47**.47
    Secretary-General's screening role under
        Article 36(3) and    **47**.48
domestic courts' right to order    **26**.162–83,
    **44**.3
    *see also* enforcement, domestic courts' role
    *below*
drafting history    **47**.3, **47**.11, **47**.15–16,
    **47**.31, **47**.72–5, **47**.157
    as compromise formula    **47**.3
enforcement
    by third States    **47**.25, **47**.153–4, **47**.170
    domestic courts' role    **47**.24–30, **47**.153,
        **53**.39:  *see also* domestic courts' right to
        order *above*
    jurisprudence: *Atlantic Triton*    **47**.25,
        **47**.28; *CSOB*    **47**.29; *MINE*    **47**.27;
        *Zhinvali*    **47**.30
    non-binding nature of recommendation and
        **47**.25
    proposals to make measures prescriptive
        and    **47**.23–5
exclusive right of tribunal, whether,
    safeguarding of evidence    **26**.164
individual opinions and    **48**.104
jurisprudence
    *AGIP*    **43**.31, **43**.61, **43**.66
    *CSOB*    **47**.13
    ICJ (*Pulp Mills on the River Uruguay*)
        **47**.47
modification or revocation by tribunal
    (AR 39(3))    **47**.14, **47**.58–62
    jurisprudence: *MINE*    **47**.60; *Oriente*
        **47**.62; *SGS v. Pakistan*    **47**.61
non-compliance
    AR 39 (1968), Note B    **47**.32
    costs and    **43**.66, **47**.34
    damages/penalty    **47**.32
    effect on award    **47**.16, **47**.31–6

jurisprudence: *AGIP*    **47**.34; *Holiday Inns*
    **47**.33; *MINE*    **47**.35–6, **47**.109
State responsibility and    **47**.25
parties' right to be heard    **47**.12
    failure as serious departure from
        fundamental rule of procedure    **47**.12
pre- and post-judgment measures
    distinguished    **55**.96
priority and speed, need for
    *see also* disputed jurisdiction and *above*
    accelerated procedure    **47**.39–45
    AR 39(5) (request before constitution of
        tribunal) and    **47**.38
    ITLOS procedures compared    **47**.38
    jurisprudence: *AGIP*    **47**.40; *Amco I*
        **47**.40; *Atlantic Triton*    **47**.40; *Azurix*
        **47**.44; *Bayindir*    **47**.44; *Biwater*    **47**.44;
        *CSOB*    **47**.40; *Holiday Inns*    **47**.40;
        *Maffezini*    **47**.41; *MINE*    **47**.40;
        *Occidental*    **47**.45; *Pey Casado*    **47**.42;
        *Plama*    **47**.44; *Saipem*    **47**.45; *SGS* v.
        *Pakistan*    **47**.43; *Tanzania Electric*
        **47**.41; *Tokios Tokelès*    **47**.44; *Vacuum
        Salt*    **47**.40; *Zhinvali*    **47**.43
    priority (AR 39(2))    **47**.39
provisional nature    **47**.37
publication of recommendations    **48**.121
purpose/rights to be protected
    avoidance of self-help or resort to other
        remedies    **47**.79
    compliance with award    **47**.79, **47**.90–8
    confidentiality of proceedings    **47**.75,
        **47**.148–51
    drafting history: alternative formulae
        **47**.73–4; Comment to Preliminary Draft
        **47**.73
    exclusive nature of ICSID proceedings
        **47**.75, **47**.103–5, **47**.109, **47**.117–18,
        **47**.128–9, **47**.130
    newspaper article and    **47**.138–40
    non-aggravation of dispute    **47**.75, **47**.79,
        **47**.132, **47**.135–47: AR 30, Note A
        **47**.135; bankruptcy proceedings and
        **47**.144–5, **47**.146, **47**.165–6
    non-frustration of award    **47**.16, **47**.73–5,
        **47**.154
    preservation and production of evidence
        **47**.2, **47**.68, **47**.75, **47**.80–9: as exclusive
        right of tribunal    **26**.164
    preservation of rights in dispute    **47**.75,
        **47**.157–69: AR39(1) and    **47**.160,
        **47**.162; hypothetical questions and
        **47**.161, **47**.163, **47**.169; monetary
        compensation as appropriate relief and
        **47**.147, **47**.166, **47**.168; prejudice to

merits and    **47**.164, **47**.169; preservation
of *status quo*    **47**.73, **47**.157, **47**.162;
press criticism, relevance    **47**.160;
specific dispute as determined by parties'
claims and requests for relief    **47**.165–6;
specific performance of contract,
possibility of    **47**.162; specific
performance/restitution as appropriate
relief and    **47**.167
preservation of rights of third parties
**47**.173–7; *Azurix*    **47**.175; *Pey Casado*
**47**.174; *Plama*    **47**.176; *Zhinvali*
**47**.177
preservation of the *status quo*    **47**.73,
**47**.157
protected rights: absence of Convention
provision for    **47**.72–5; parties'
obligation to specify (AR 39(1))    **47**.75
"to preserve the respective rights of either
party"    **47**.73: equality of treatment as
between State and private party
**47**.171–2
purpose/rights to be protected/types of
measure, jurisprudence
*AGIP*    **43**.31, **43**.61, **47**.34, **47**.81
*Amco I*    **47**.91–3, **47**.137–40, **47**.149,
**47**.160
*Atlantic Triton*    **47**.103–5
*Azurix*    **47**.77, **47**.83, **47**.144–5, **47**.164,
**47**.169
*Bayindir*    **47**.97
*Biwater Gauff*    **43**.62, **47**.78, **47**.85–9
*CSOB*    **47**.111–14, **47**.141
*Duke Energy*    **47**.134
*Holiday Inns*    **47**.47, **47**.100–2, **47**.136,
**47**.159, **47**.169, **47**.171
*Maffezini*    **47**.94, **47**.161, **47**.169
*MINE*    **47**.106–9, **47**.171
*Occidental*    **47**.147, **47**.167–8, **47**.169
*Pey Casado*    **47**.95–6, **47**.117–18, **47**.142,
**47**.160, **47**.169
*Plama*    **47**.130–3, **47**.146, **47**.165–6,
**47**.169
*Sempra*    **47**.84
*SGS* v. *Pakistan*    **47**.119–25, **47**.143
*Tanzania Electric*    **47**.115–16, **47**.162,
**47**.169
*Tokios Tokelès*    **47**.128–9
*Vacuum Salt*    **47**.82, **47**.110
*Zhinvali*    **47**.126–7
request of party
relevance    **47**.11
timing    **47**.5–6
tribunal's powers
adequacy    **26**.174

Arbitration Facility Arbitration Rules
distinguished    **47**.7
"except as the parties otherwise agree"
**47**.8–10
measure other than those requested    **47**.13
Model Clauses    **47**.9
recommendations, limitation to    **43**.66,
**47**.15–22
types of measure
*see also* circumstances requiring *and*
purpose/rights to be protected *above*
absence of provision for    **47**.72–5
discovery of evidence    **47**.76
drafting history    **47**.72–5
financial guarantee/pre-judgment security
**47**.76, **47**.90–8
parties' obligation to specify (AR 39(1))
**47**.76
pre-judgment security    **47**.76
press dealings, refrain from    **47**.76
specific performance of contract    **47**.162
specificity, varying practice    **47**.77
stay of proceedings in domestic
courts/injunction against    **47**.76
third party interests and    **47**.126
**Article 48 ("award")**    **48**.8, **48**.22–30, **54**.32
ancillary claims    **48**.45
annulment proceedings    **48**.2, **48**.24,
**52**.564–7
avoidance of "award"    **41**.71
awards and decisions of original tribunal
**48**.2
correct identification as, significance    **48**.30
excluded decisions    **48**.4–6, **48**.26–9,
**48**.39–41, **48**.88–91, **48**.104
interpretation of award    **48**.29
interpretation decisions    **48**.6, **48**.29, **48**.89
modification by parties, decision to exclude
**48**.3
partial award    **48**.27
preliminary decisions    **48**.4
on jurisdiction/competence    **41**.73, **48**.22,
**48**.45, **48**.88
procedural issues    **48**.45
admissibility of evidence    **48**.4
provisional measures    **48**.4
rectification decisions    **48**.29, **48**.45, **48**.89
resubmission to new tribunal    **48**.2, **48**.25,
**48**.90, **48**.120
revision of award    **48**.29, **48**.89
settlement and discontinuance    **48**.28
*see also* Article 48 (award), settlement and
discontinuance
summary proceedings (AR 41(5)) and
**41**.100

**Article 48 ("award") (*cont.*)**
  summary of proceedings (AR 47(1)(f))
    **44**.82
  supplementation of award   **48**.29
**Article 48 (award), settlement and
       discontinuance**   **48**.69–87
  annulment proceedings   **52**.26
  apportionment of costs   **61**.11
  comparable provisions in other international
    instruments   **48**.69
  discontinuance, absence of provision in
    Convention   **48**.70
  discontinuance at unilateral request of party
    (AR 44)   **25**.603, **48**.83–4
    effect   **48**.84
  discontinuance order (AR 43(1))   **48**.70–81
    as alternative to incorporation in award
      **48**.72
    decision on costs, need for   **48**.71
    reasons, need for   **48**.71
    status   **48**.71
  discontinuance, presumption of (AR 43)
    **48**.85
  incorporation of settlement agreement in
    award (AR 43(2))
    annulment and   **48**.78
    decision on costs, need for   **48**.73, **48**.77,
      **61**.11, **61**.65
    interpretation and   **48**.78
    non-compliance: diplomatic protection,
      revival of right of   **48**.79; ICJ
      proceedings, right to   **48**.79
    partial settlement   **48**.74, **48**.76
    reasons, need for   **48**.69, **48**.73
    recognition and enforcement and   **48**.79
    rectification and   **48**.66
    revision and   **48**.78
    settlement prior to institution of proceedings
      and   **48**.75
    tribunal's right to refuse   **48**.72
  jurisprudence
    *Fedax*   **48**.76
    *Goetz*   **48**.77
    *Tanzania Electric*   **48**.74
  partial settlement, status   **48**.74, **48**.76
  pre-hearing conference (AR 21(2)) and
    **48**.81–2
**Article 48(1) (award: decision by majority)**
  absolute majority as requirement   **48**.15
  abstention (AR 16)   **48**.18–19
  appropriateness of place in convention   **48**.1
  concurring opinion dissenting on certain
    points, effect   **48**.98
  death, incapacity, resignation or
    disqualification, effect   **48**.20–1

  AR 10(2)   **48**.19
  declaration or individual opinion, relevance
    **48**.17
  delegation of power to determine time limits
    (AR 26)   **48**.5
  drafting history   **48**.15, **48**.19
  failure to reach, absence of provision
    in Arbitration Rules   **48**.15
    in Convention   **48**.15
  jurisprudence
    *Guinea-Bissau* v. *Senegal*   **48**.17
    *Vacuum Salt*   **48**.13
  obligation to reach   **39**.7, **48**.16
    Article 42 and 48(3) obligations and
      **48**.16
  quorum   **48**.9–14, **56**.8
    AR 14   **48**.10
    non-attendance at a session, effect   **48**.9
    parties' right to decide (AR 20)   **48**.11,
      **48**.14
    *Vacuum Salt*   **48**.13
    voting in session and by correspondence
      distinguished   **48**.12: relevance   **48**.12
  separate opinion, effect   **48**.17, **48**.98
  voting methods
    by correspondence (AR 16)   **48**.7–8:
      failure to respond, effect   **48**.12,
      **48**.6008; need to consult every member
      **48**.8
    in session (AR 13 and 14)   **48**.7
**Article 48(2) (award: requirements)**
  AR 47   **48**.23, **48**.32, **48**.46, **48**.57
  date of dispatch   **49**.25
  drafting in accordance with, importance of
    legal qualifications   **14**.3
  oral delivery, absence of requirement for
    **48**.33, **49**.4
  required information
    AR 47   **48**.23, **48**.46
    decision on costs   **61**.62: supplementation
      or rectification of award and   **49**.37
    names of parties representatives   **44**.80
  signature   **48**.34–8
    AR 47   **48**.35
    on awards   **48**.34–5, **49**.15
    on decisions other than awards   **48**.39–41:
      interpretation of award   **50**.26
    omission   **49**.15
    time limits, AR 46   **48**.36, **48**.101–3,
      **49**.11–24
    timing and dispatch of award, relevance to
      **48**.33, **49**.7, **49**.25
  writing   **48**.31–3
    AR 47   **48**.23, **48**.32
    drafting history   **48**.31

practice of other international fora
    distinguished    **48**.33
**Article 48(3) (award: exhaustiveness/reasons)**
  *see also* Article 52(1)(e) (annulment of award:
    failure to state reasons)
  applicability
    conciliation commission recommendations
      **34**.19
    decision on costs    **52**.356, **61**.41
    default proceedings    **45**.65–75
    dissenting opinion    **48**.99
    preliminary decision on jurisdiction    **41**.70,
      **48**.88, **48**.91
    procedural orders    **48**.88
    provisional measures    **48**.88, **48**.91
    rectification decision    **48**.91
    State immunity from execution, relevance
      **55**.8
    stay of enforcement    **48**.91
  drafting history    **48**.44
  "every question submitted"
    jurisdictional questions    **41**.51,
      **41**.65–8
    *Klöckner I*    **48**.50
    parties' arguments distinguished    **48**.48,
      **49**.41, **52**.418–34
    relationship with principal issues, need for
      **48**.50
  exhaustiveness requirement    **48**.44–53
    failure to comply: excess of powers *infra*
      *petita*    **48**.47; ground for annulment,
      whether    **48**.44, **48**.51, **49**.29, **52**.110;
      request to decide under Article 49(2)
      **48**.51
    principle of arbitration    **48**.47
    supplemental decision and    **49**.38
  exhaustiveness/reasons
    distinction    **48**.43
    interconnectedness    **48**.42–3
  jurisprudence
    *Amco II*    **48**.65
    *CDC*    **48**.53
    *Fasla* case    **48**.55
    *King of Spain's Award of 23 December,*
      *1906* (*Honduras* v. *Nicaragua*)    **48**.47,
      **48**.55
    *Klöckner I*    **48**.50
    *Wena Hotels*    **48**.49, **48**.52, **48**.66
  parties' right to modify/dispense with
    requirement    **48**.3, **48**.56, **52**.339
  reasons, need for    **48**.54–68
    applicability to decisions *ex aequo et bono*
      **42**.272, **48**.57, **52**.349: ICJ practice
      **48**.55
    AR 47(1)(i)    **48**.23, **48**.57

comparable provisions in other international
    instruments    **48**.54
criteria for determining sufficiency
    **48**.67–8, **52**.433: failure of party to
    appear and    **48**.68
drafting history    **48**.56
**Article 48(4) (award: individual opinions)**
alternatives open to arbitrator    **48**.96–9
applicability
  annulment proceedings    **48**.106, **52**.567
  preliminary decision on jurisdiction
    **48**.104
  procedural orders    **48**.104
  provisional measures    **48**.104
  rectification, interpretation or revision
    **48**.105
  resubmission of award    **48**.106
comparable provisions in other international
    instruments    **48**.93
concurring opinion    **48**.96
  effect on majority in case of dissent on
    certain points    **48**.98
  statement of concurrence without reasons,
    exclusion    **48**.97
dispatch with award    **49**.6, **49**.7, **49**.14
dissenting opinion    **48**.96
  advance sight of    **48**.100
  Article 48(3), applicability    **48**.99
  statement of dissent without reasons and
    **48**.94, **48**.96, **48**.99
drafting history    **48**.94
"he"    **48**.95
jurisprudence
  *Klöckner I*    **48**.103
  *SPP II*    **48**.104
  *Tokios Tokelės*    **48**.104
majority, effect on    **48**.17, **48**.98
parties' right to modify provision, exclusion
    **48**.3, **48**.94
procedure
  AR 46 time limits and    **48**.101–3: 2003
    amendment    **48**.102
  AR 47(3)    **48**.100
State practice    **48**.92
vote against without explanation
    **48**.96
**Article 48(5) (award: publication: parties'**
    **consent)**    **48**.107–29
advantages of publication    **48**.124–8
annulment decisions    **52**.26
authorization by parties    **48**.111
  Model Clauses    **48**.111
comparable provisions in other
    international instruments
    **48**.108

**Article 48(5) (award: publication: parties'
      consent) (*cont.*)**
  confidentiality of proceedings
    AFR 22    **47**.151
    *amicus curiae* briefs (AR 37(2)) and
        **44**.120, **44**.122–8: AR 37(2), changes
        introduced by    **44**.122–8; jurisprudence;
        *Aguas del Tunari*    **44**.124; *Biwater
        Gauff*    **44**.119–20, **44**.127–8; *Suez and
        AWG*    **44**.125–6; *Suez et al*    **44**.125–6;
        NAFTA practice    **44**.123
    AR 6(2) (arbitrator's declaration)    **44**.98,
        **50**.31
    AR 15 (privacy of deliberations)
        **44**.99–100
    attendance at proceedings (AR 32(2))
        **44**.36, **44**.101–6, **47**.151
    as fundamental principle    **44**.97
    parties' consent, need for    **44**.104–5
    provisional measures and    **47**.75,
        **47**.148–51
    reasons for    **48**.107, **48**.123
    transparency, balance with    **Preamble** 24,
        **44**.97, **44**.116–19, **47**.148: BITs
        provisions    **44**.97, **44**.105; NAFTA
        **44**.97
    UNCITRAL Rules    **44**.97
  decisions other than awards    **48**.120–1
    preliminary decisions on jurisdiction
        **48**.121
    procedural orders    **48**.120
    provisional measures    **48**.121
  drafting history    **48**.109
  enforcement proceedings and    **48**.118
  jurisprudence
    *ADC*    **44**.110
    *Amco I*    **44**.114, **47**.149
    *Biwater Gauff*    **44**.106, **44**.116–20
    *Fireman's Fund*    **48**.117
    *LETCO*    **48**.118
    *Loewen*    **44**.109
    *Malaysian Historical Salvers*    **44**.108,
        **48**.111
    *Metalclad*    **44**.115
    *World Duty Free*    **44**.121, **47**.150–1
  non-publication    **48**.119
  parties' right to publish    **48**.114
    partial publication    **48**.117
    unilateral publication    **48**.114
  positive nature of requirement    **48**.109
  publication by Centre    **44**.36, **48**.110–13
    AFR 22    **48**.11
    AR 48(4) (1984)    **48**.110
    AR 48(4) (2006)    **11**.14, **44**.36, **48**.110,
        **48**.129

  authorization by parties: medium    **48**.113;
      Model Clauses    **48**.111;
      Secretary-General's role (AFR 22)
      **11**.14, **48**.112
  CR 33(3)    **11**.14, **48**.110
  sources
    publication by Centre    **48**.113
    publication by parties    **48**.115–16
**Article 49(1) (dispatch of certified copies of
      award)**
  applicability
    annulment proceedings    **49**.8, **49**.25,
        **52**.568
    preliminary decisions    **49**.8, **49**.27
    resubmission after annulment    **49**.8, **49**.25
    revision or interpretation of award    **49**.8,
        **49**.25, **50**.26
    stay of enforcement    **49**.27
    supplementation or rectification of award
        **49**.8, **49**.25, **49**.37, **49**.78, **49**.80
  "certificate"    **49**.6
  closure/reopening of proceedings (AR 38)
      **49**.11–24, **49**.29, **49**.34, **57**.12
    jurisprudence: *AAPL*    **49**.20; *Atlantic
        Triton*    **49**.19; *Azurix*    **49**.20; *Cable
        TV*    **49**.21; *CDC*    **49**.13, **49**.23;
        *Champion Trading*    **49**.19; *Fedax*
        **49**.19; *LETCO*    **49**.19; *MINE*    **49**.21;
        *Noble Ventures*    **49**.18; *Olguín*    **49**.17;
        *Siemens*    **49**.22; *SOABI*    **49**.20; *Vacuum
        Salt*    **49**.20
    reopening of proceedings (AR 38(2))
        **49**.17, **49**.18, **51**.21: taking of evidence
        **43**.36–7
  comparable articles in other international
      instruments    **49**.2
  as date of award    **49**.10, **49**.25–7, **49**.34
    date of signature, relevance    **48**.33, **49**.7,
        **49**.25
    jurisprudence: *AAPL*    **49**.21; *Amco I*
        **49**.21; *AMT*    **49**.21; *Azurix*    **49**.20;
        *Cable TV*    **49**.21; *MINE*    **49**.21; *SOABI*
        **49**.21; *Vacuum Salt*    **49**.21
  date of dispatch    **49**.6, **49**.7, **49**.25–7
    failure to record    **49**.15, **49**.25
  drafting history    **49**.3–4
  inclusion of
    individual opinions and statements    **49**.6,
        **49**.7, **49**.14
    supplementation or rectification of award
        **49**.37
  promptness    **49**.7, **49**.26
  Secretary-General's role    **11**.9, **49**.2–9,
      **54**.98–9
    AFR 28    **49**.9

AR 48    **49**.5, **49**.82
authentication    **49**.6, **49**.14
dispatch    **49**.6, **49**.14
time limits for preparation of award (AR 46)
    **49**.12–24
2003 revisions to AR 46    **44**.35, **49**.12–13
failure to meet, effect    **49**.13, **49**.23
**Article 49(2) (supplementation and
    rectification of award)**
annulment as alternative    **48**.51, **48**.52,
    **48**.89, **49**.29, **49**.38, **49**.60–77, **52**.401–2,
    **52**.407
applicability
    annulment proceedings    **49**.30, **61**.74
    discontinuance order    **48**.71
    limited usefulness    **49**.77
    preliminary decisions    **41**.24, **41**.73,
        **49**.31
    provisional measures    **49**.31
    requirements    **49**.40–1
    resubmission    **49**.30
    settlement agreement    **48**.78
application of Articles
    48(3)    **48**.45, **48**.89
    49(1)    **49**.8, **49**.80
award, as part of    **48**.29, **48**.45, **48**.89,
    **48**.120, **49**.8, **49**.78–80
    annulment and    **52**.77–8, **52**.493
    compliance with award and    **53**.63
comparable provisions in other international
    instruments    **49**.28
costs, fees and expenses of proceedings
    **49**.48, **49**.50, **49**.53, **49**.63, **61**.4, **61**.63,
    **61**.65
costs, fees and expenses, supplementation and
    rectification of decisions on (*LETCO*)
    **49**.44, **61**.69
date of
    as date for purposes of Articles, 51(2) and
        52(2)    **49**.81–5
    dispatch of decision    **49**.82
drafting history    **49**.29, **49**.38
exclusive remedy, whether    **49**.68–77, **52**.402
hearing of other party (AR 49(3))    **49**.35
inclusion on certified copy of award    **49**.37
individual opinions and    **48**.105
jurisprudence
    *Amco I*    **49**.42–3, **49**.71
    *Amco II*    **49**.42–3, **52**.78
    *Genin*    **49**.51–3
    *Klöckner I*    **49**.70
    *LETCO*    **49**.44–5, **61**.69
    *LG&E*    **49**.66–7
    *Maffezini*    **49**.49–50
    *MINE*    **49**.72

    *Noble Ventures*    **49**.64
    *Santa Elena*    **49**.46–8
    *Soufraki*    **49**.65
    *Vivendi*    **49**.54–63
    *Vivendi II*    **49**.54–63,
        **49**.73–6
    *Wena Hotels*    **48**.52, **49**.77
location of provision    **49**.1, **50**.3
omissions and errors    **49**.38–41
    supplementation/rectification distinguished
        **49**.39
original tribunal, limitation to    **41**.24, **49**.36
    decision by correspondence    **49**.36
publication of decision    **48**.120
reasons, need for    **48**.91
reasons for provision    **48**.44, **49**.29, **49**.38
recognition/enforcement    **54**.34
request by party, need for    **49**.33
    failure to hear other party/*audiatur et altera
        pars* and    **52**.308
revision/appeal distinguished    **49**.45,
        **49**.73–6
Secretary-General's role    **11**.9, **49**.34
stay of enforcement and    **53**.51, **53**.59
time limits
    AF 46    **49**.37
    AF 49    **49**.32, **49**.34, **49**.37, **52**.308
    AFR 29    **49**.34
    annulment (Article 52(2)) distinguished
        **52**.84
    date of award    **48**.37, **49**.10, **49**.34
    deferment    **49**.10
    revision (Article 51(2)) distinguished
        **51**.11
**Article 50 (interpretation of award: general)**
absence of practice    **50**.4
Article 64 (disputes relating to interpretation
    of Convention) distinguished    **50**.4
comparable provisions in other international
    instruments    **50**.1
denunciation of Convention, effect    **72**.11
jurisprudence
    *Feldman*    **50**.4 n3
    *Waste Management II*    **50**.4, **50**.12
    *Wena Hotels*    **50**.4, **50**.5, **50**.6, **50**.7–11,
        **50**.17, **50**.20, **50**.24, **50**.37, **50**.40
**Article 50(1) (interpretation of award)**
annulment    **52**.79
applicability
    annulment proceedings    **50**.13, **52**.545
    decision relating to costs    **61**.70
    discontinuance order    **48**.71
    dispute relating to existing award    **50**.5–11
    preliminary decision on jurisdiction
        **41**.24

**Article 50(1) (interpretation of award)** (*cont.*)
  application of Articles
    48  **48**.6, **48**.89, **48**.105, **50**.29
    49  **50**.29
    50  **50**.15, **50**.23–4
    51  **50**.29
    52  **50**.13, **50**.17, **50**.18, **50**.29, **52**.79
    53  **50**.13, **50**.17, **50**.23, **50**.28, **50**.29
  as "award"  **48**.6, **48**.29, **48**.89
  drafting history  **50**.2, **50**.14, **50**.19, **50**.25
  finality/binding effect  **50**.28
  part of award, whether  **48**.120, **50**.27–9
    recognition and enforcement  **50**.28
  procedure
    AFR 28(2)  **50**.26
    as agreed by parties for original proceeding
      **50**.24
    AR 47  **50**.26
    AR 48(3)  **50**.26
    AR 50  **50**.15, **50**.23–4
    identification of precise points needing
      interpretation  **50**.16
  recognition/enforcement  **50**.28, **54**.33
  request by
    Contracting State asked to enforce award
      **50**.14
    party, need for  **50**.14
  Secretary-General's role  **11**.9, **50**.22, **50**.24
  successive requests  **50**.21, **50**.5025
  time limits
    absence  **50**.2, **50**.19–22, **50**.5025
    drafting history  **50**.19, **50**.25
    other post-award remedies distinguished
      **50**.18, **50**.19, **50**.22, **50**.84
    preparation of decision  **50**.25
    provisions in other international instruments
      distinguished  **50**.19
  tribunal's right to provide on own initiative
    **50**.14
**Article 50(2) (constitution of new tribunal)**
    **50**.5025–30
  appointment of arbitrators from previous
    tribunal  **50**.40
  AR 51  **50**.5027–8
    adoption of same method/numbers as for
      original tribunal  **50**.5028: parties'
      agreement to adopt different
      method/numbers  **50**.5029
  Article 37(2)(a), applicability  **50**.40
  task  **50**.40
**Article 50(2) (interpretation of award: stay of
    enforcement)**  **50**.2, **50**.19, **50**.42–5,
    **52**.577, **53**.51, **53**.52, **53**.59, **54**.38–40
  Articles, 51(4) and 52(5) distinguished
    **50**.43, **52**.577

discretionary  **50**.19, **50**.42
drafting history  **50**.42
partial stay  **50**.45
procedure
  AR 54  **49**.27, **50**.44
  entry into force  **49**.27
  request by party, need for  **50**.45
  termination on date of decision on
    interpretation  **50**.45
  termination/modification at request of either
    party  **50**.45
  tribunal's right to grant on own initiative
    **50**.45
tribunal's exclusive power  **50**.43
**Article 50(2) (submission to original tribunal)**
    **50**.30–3
drafting history  **50**.38
new arbitrators, appointment of  **50**.41
participation by all members or original
    tribunal, need for  **50**.32–3
reconstitution of tribunal (AR 51)  **50**.30–1,
    **50**.5027
  obligation to give decision  **50**.33
voluntary nature of participation  **50**.32–3
**Article 51 (revision of award)**
  applicability
    annulment proceedings  **51**.6, **52**.545,
      **52**.546, **52**.568
    decision relating to costs  **61**.70
    discontinuance order  **48**.71
    preliminary decision on jurisdiction  **41**.24,
      **41**.73, **51**.4
    resubmission to new tribunal (Article 52(6))
      **51**.5
    settlement award  **48**.78
    termination of tribunal's activity, need for
      **51**.5
  application of Articles
    48  **48**.6, **48**.105, **48**.120
    52  **52**.79
  comparable instruments in other international
    instruments  **51**.1
  costs, fees and expenses, advance payment
    **61**.58
  decision as "award"  **48**.29, **48**.89, **50**.27–9,
    **51**.25
  decision on interpretation compared  **51**.25
  denunciation of Convention, effect  **72**.11
  drafting history  **51**.2, **51**.14, **51**.23–4,
    **51**.26
  existence of dispute, relevance  **51**.7
  grounds
    error of law  **51**.15
    failure to decide all issues  **51**.15
    new fact: *see* new fact *below*

jurisprudence
   *AMT*    **51**.3, **51**.29, **51**.40
   *Siemens*    **51**.12, **51**.41
new fact
   affecting damages    **51**.18
   arising after completion of award    **51**.19
   burden of proof    **51**.18, **51**.5021
   critical date: applicant    **51**.21; tribunal
      **51**.20
   law distinguished    **51**.15
   liability to affect award decisively and
      **51**.16, **52**.694: affect on reasons and
      **51**.18; fact affecting damages    **51**.18;
      fact affecting legal position of parties
      **51**.18; ICJ jurisprudence    **51**.18;
      non-existence of decisive fact as
      **51**.16
   need for    **43**.38, **51**.10, **51**.16
   new document as    **51**.16
   relating to jurisdiction or merits    **51**.18
   unknown to tribunal or applicant    **51**.10,
      **51**.14, **51**.19–24: attribution by analogy
      with ILC Articles on State Responsibility
      **51**.19; ignorance of other party, relevance
      **51**.22; negligence of applicant and
      **51**.10, **51**.14, **51**.23–4
procedure
   AFR 28(2)    **51**.39
   AR 47(1)(i)    **50**.33
   AR 50    **51**.9–14
   AR 53    **50**.23–6, **50**.33, **51**.15
   request by party, need for    **51**.8
   required information    **51**.8: date of
      discovery of new fact    **51**.10, **51**.13,
      **51**.30; identification of award    **51**.10,
      **51**.13; points on which change sought
      **51**.10, **51**.14
   stay of annulment proceedings pending
      outcome    **51**.12, **51**.41
   tribunal's right to undertake on own
      initiative    **51**.8
publication of decision    **48**.120
recognition/enforcement    **54**.33, **54**.100
refusal of request, grounds    **51**.10, **51**.14
Secretary-General's role    **11**.9, **51**.14
   request for arbitration distinguished    **36**.8
**Article 51(2) (revision of award: time limits)**
      **51**.2–3, **51**.26–31
   deferral    **49**.83–5
   other post-award remedies distinguished
      **51**.11, **52**.84
   relevant dates
      award    **51**.13, **51**.27: dispatch    **51**.28
      decision on supplementation or rectification
      and    **49**.81–5, **51**.28, **53**.59

discovery of new fact    **51**.10, **51**.13, **51**.27,
   **51**.30
dispatch of award    **49**.10, **49**.34
signature of award    **48**.37
**Article 51(3) (submission to original tribunal)**
   **51**.3, **51**.32–3, **52**.2
*AMT*    **51**.32
Article 52 distinguished    **51**.3
*Siemens*    **51**.32
**Article 51(4) (revision of award: stay of
   enforcement)**    **51**.3, **52**.3, **52**.574–655,
   **52**.696–700, **53**.51, **53**.54, **53**.59,
   **54**.38–40
Article 50(2) distinguished    **51**.35
Article 52(5) compared    **51**.35
automaticity
   NAFTA    **53**.56, **54**.101
   on request of applicant    **51**.34, **51**.35,
      **51**.37, **52**.53
discretionary power of tribunal    **51**.34, **51**.35,
   **51**.38
drafting history    **51**.34
partial    **51**.37
procedure
   *AMT*    **51**.40
   AR 54    **49**.25, **51**.36
   entry into force    **49**.27
   notification to parties    **51**.39–40
provisional stay    **51**.3, **51**.34, **53**.48
refusal of application for revision    **51**.37
requirements
   hearing of both parties    **51**.39
   request of party    **51**.38
termination of modification    **51**.38
   with decision or revision    **51**.39
**Article 52 (annulment of award: general)**
appeal distinguished    **48**.58, **52**.1, **52**.8–13,
   **52**.344, **52**.363–6, **52**.378
   invalidation/modification as respective
      outcomes    **52**.10
   limitation of annulment to procedural
      considerations    **52**.11, **52**.13
applicability
   *see also* Article 52(3) (annulment of award:
      *ad hoc* committee: "authority to annul")
   ancillary claims    **52**.541
   annulment decision    **52**.3, **52**.80, **52**.493,
      **52**.545, **52**.547, **57**.4
   "award", limitation to    **52**.61–82, **52**.98,
      **52**.493
   decision on costs    **52**.541, **52**.572, **61**.64,
      **61**.71, **61**.74
   decision on jurisdiction    **41**.25–9, **52**.62,
      **52**.67, **52**.131, **52**.542: joinder to merits
      **41**.25, **41**.72; as part of award    **41**.5025

**Article 52 (annulment of award: general)**
 **(*cont.*)**
  applicability (*cont.*)
   discontinuance order   **48**.71
   interpretation of award   **52**.79, **52**.545,
    **52**.546
   partial award   **52**.73
   preliminary decision on jurisdiction   **41**.25,
    **41**.73: annulment prior to final award,
    exclusion   **41**.26–7; decision declining
    jurisdiction   **41**.29, **52**.63; decision
    upholding jurisdiction   **52**.62, **52**.67;
    incorporation into award and   **52**.62
   procedural orders   **52**.64
   provisional measures   **42**.5374, **52**.64,
    **52**.540
   rectification   **52**.77–8, **52**.493
   resubmission decisions following
    annulment of award   **52**.81–2
   revision of award   **52**.79
   separability of proceedings   **52**.78
   settlement award   **48**.78, **52**.74–6, **52**.493
   settlement and discontinuance, orders
    noting   **48**.71, **52**.74–6
   settlement incorporated in award   **52**.76,
    **52**.493: limited grounds for annulment
    **52**.76, **52**.493
  comparable provisions in other international
    instruments
   Additional Facility   **52**.5
   Convention on the Recognition and
    Enforcement of Foreign Arbitral Awards
    (1958)   **52**.6
   ICC   **52**.5
   ICC Arbitration Rules (1998)   **52**.6
   ILC Model Rules on Arbitral Procedure
    (1958)   **52**.1, **52**.7, **52**.105
   inter-State arbitration, absence   **52**.7
   PCIJ/ICJ review, absence   **52**.1
   UNCITRAL Model Law on International
    Commercial Arbitration (1985)   **52**.6
  criticism of annulment decisions   **52**.**52**.29
   jurisprudence: *Amco I*   **52**.29; *Klöckner I*
    **52**.29; *SPP*   **52**.29
  decision as "award"   **48**.2, **48**.6, **48**.24, **48**.25,
    **48**.90, **48**.106, **48**.120, **52**.543–7
  denunciation of Convention, effect   **72**.11
  discontinuance of annulment proceedings
    **52**.26
   *Gruslin*   **52**.26
   *Joy Mining*   **52**.26
   *SPP*   **52**.26
  drafting history   **52**.1, **52**.8, **52**.43
  as exception to Article 53 (finality of award)
    **52**.3

exceptional nature of   **52**.37
exclusive remedy rule and   **52**.4, **52**.545,
 **52**.568, **53**.32
interpretation of Article 52
 *in favorem validitatis sententiae*   **52**.22,
  **52**.178
 strict   **52**.18, **52**.22–4
jurisprudence, *SPP*   **41**.26
jurisprudence (interpretation of Article 52/
  appeal distinguished)
 *Amco I*   **52**.13, **52**.17, **52**.23, **52**.214
 *Amco II*   **52**.17, **52**.19, **52**.24, **52**.29, **52**.31
 *CDC*   **52**.19, **52**.33, **52**.38, **52**.378
 *CMS*   **52**.15, **52**.190
 *Klöckner I*   **52**.13, **52**.17, **52**.21–3, **52**.178,
  **52**.214, **52**.364–5, **52**.514
 *Klöckner II*   **52**.23, **52**.31, **52**.59
 *MINE*   **52**.13, **52**.18, **52**.23, **52**.33, **52**.372
 *Mitchell*   **52**.13, **52**.19, **52**.39–40, **52**.203
 *MTD*   **52**.12, **52**.35
 *RFCC*   **52**.34
 *Soufraki*   **52**.17, **52**.19–20, **52**.22, **52**.36,
  **52**.37, **52**.38
 *Vivendi I*   **52**.19, **52**.32, **52**.38
 *Vivendi II*   **52**.24
 *Wena Hotels*   **52**.19, **52**.32, **52**.33, **52**.38
modification by parties, *see also* Article 52
 (annulment of award: parties' right to
 request), waiver
modification of Convention provisions by
 parties   **52**.51–4
overview of annulment proceedings
 **52**.25–40
 analysis of grounds for annulment by
  frequency of invocation   **52**.28, **52**.112,
  **52**.120
 development of balanced approach   **52**.15,
  **52**.31–40, **52**.59
 number of requests for/dossier   **52**.25–6
 severely criticised awards   **52**.29–30
 successive annulment proceedings   **52**.27,
  **52**.510
principles underlying review   **52**.14–15
 exclusion or modification of provision and
  **52**.54, **52**.57
 finality and correctness, balance between
  **52**.15, **52**.31–40, **52**.59
 integrity and quality of process   **52**.14,
  **52**.54, **52**.57
 preservation of parties' interests   **42**.99,
  **52**.14, **52**.54
proposals for reform   **52**.29
publication of decision   **52**.26
requests for annulment: *see* overview of
 annulment proceedings *above*

stay of proceedings pending outcome of
revision proceedings   **51**.12, **51**.41
**Article 52 (annulment of award: parties' right to request)**
application in writing to Secretary-General
**52**.83–104
AR 50   **52**.83, **52**.441
frivolous application, effect on costs
**52**.103
non-refundable advance fee (AFR 16)
**52**.85
notification of registration   **52**.86
discretionary nature   **52**.38, **52**.44–5
jurisprudence
*Amco I*   **52**.44, **52**.48–9, **52**.67, **52**.88–91
*Amco II*   **52**.42, **52**.78, **52**.82
*CMS*   **52**.44
*Holiday Inns*   **52**.65
*Klöckner II*   **52**.42, **52**.82, **52**.92
*MINE*   **52**.71, **52**.501–2, **52**.507, **52**.510
*SPP*   **52**.66
*Wena Hotels*   **52**.90
reasons for making
exhaustion of procedural remedies as
political imperative and   **52**.45
issue of principle   **52**.44
request by either party   **52**.41–62
corporate/State succession and   **54**.41–3, **54**.102
"either"   **52**.42
need for   **52**.41, **52**.99
State on behalf of constituent subdivision or
agency   **52**.43, **52**.99
request by third party *actio popularis*
**52**.41
request by tribunal on own initiative   **52**.41
required information   **52**.84–91
clear request for annulment   **52**.84
detailed grounds for annulment (AR
50(1)(c))   **52**.84, **52**.87–91, **52**.531
failure to supply, effect   **52**.100
identification of award   **52**.84
time limits and   **52**.84
Secretary-General's role   **11**.9, **52**.95–104
obligation to register   **52**.102, **52**.174, **52**.334
refusal to register: *ad hoc* committee's right
to re-examine Secretary-General's
decision   **52**.97, **52**.98, **52**.129, **52**.174,
**52**.334, **52**.439, **52**.442, **52**.450; "award"
for purposes of Article 52(1), whether
**52**.98; frivolous request   **52**.102; request
not submitted by party to original
proceedings   **52**.99; untimely request
**52**.96–7, **52**.129, **52**.334

successive requests   **52**.27, **52**.510
waiver
advance waiver: admissibility   **52**.49–59,
**52**.534; disadvantages   **52**.59; validity to
be determined by *ad hoc* committee
**52**.58, **52**.101
agreement excluding proceedings on
grounds of breach of jurisdictional
requirement   **52**.55: departure from
fundamental rule of procedure   **52**.56;
failure to apply applicable law   **52**.55;
failure to state reasons   **52**.57
explicit waiver, need for   **52**.48
failure to make timely objection   **52**.60,
**52**.174, **52**.334, **57**.11–14
general exclusion agreements   **52**.49–59
modification of Article 52 by parties,
exclusion   **52**.51–7
post-award   **52**.46–8: before expiry of time
limit for application   **52**.46; partial
waiver during annulment proceedings
**52**.46
**Article 52(1) (annulment of award: grounds)
(general considerations)**
amendment of grounds   **52**.535–6
in light of new facts   **52**.536
disqualification of arbitrator   **57**.3
drafting history   **52**.105–7, **52**.113
error of law, exclusion   **52**.15, **52**.190,
**52**.195, **52**.210
exclusion of new arguments on fact or law
**52**.12–13, **52**.108
*Amco I*   **52**.13
*Klöckner I*   **52**.13, **52**.108
*MINE*   **52**.13, **52**.108
*Mitchell*   **52**.13, **52**.203
*MTD*   **52**.12, **52**.108
exhaustive nature of Article 52(1) provisions
**52**.11, **52**.13, **52**.108–10, **52**.511–15
AR 50(1)(c)(iii)   **52**.108
flexibility in application of Convention
**52**.511–15
jurisprudence (general considerations)
*Klöckner I*   **52**.108, **52**.525
*MINE*   **52**.108, **52**.533
*Mitchell*   **52**.115, **52**.166
*MTD*   **52**.108, **52**.116
*Soufraki*   **52**.116
multiple grounds/classification difficulties
**52**.109–10, **52**.111–12, **52**.113–17,
**52**.166, **52**.516–23, **52**.524–30
consolidation, desirability   **52**.68
cumulative grounds/need to examine all
grounds   **52**.524–30
incorrect classification, relevance   **52**.538

**Article 52(1) (annulment of award: grounds)**
**(general considerations) (*cont.*)**
  multiple grounds/classification difficulties
      (*cont.*)
    jurisprudence: *Amco I*  **52**.415, **52**.520–2,
      **52**.526; *CDC*  **52**.416; *CMS*  **52**.529;
      *Klöckner I*  **52**.414, **52**.517–19, **52**.525;
      *Lucchetti*  **52**.114; *MINE*  **52**.417,
      **52**.527; *Mitchell*  **52**.115, **52**.166,
      **52**.530; *MTD*  **52**.116; *Soufraki*
      **52**.116; *Vivendi I*  **52**.528; *Wena Hotels*
      **52**.417
    reclassification  **52**.538
  parties' responsibility to specify  **52**.87–91,
      **52**.531–3
    *ad hoc* committee's right to identify new
      **52**.532–3
    time limits  **52**.531
    waiver of right to annulment on unspecified
      grounds  **52**.534
**Article 52(1)(a) (annulment of award:**
    **improper constitution of tribunal)**
    **37**.5, **40**.28
  comparable provisions in other international
      instruments  **52**.118
  drafting history  **52**.118–19
  frequency of resort to  **52**.28, **52**.112, **52**.120,
      **52**.121
  nationality of arbitrator and  **52**.122
    dual nationality  **52**.122,
      **52**.464
  qualities/qualifications of arbitrators, absence
      **14**.8, **15**.123
  resort to, *Azurix*  **52**.112, **52**.120
  scope  **52**.118
  Secretary-General's role
    request for arbitration distinguished
      **36**.8
  timing of objection  **52**.119, **52**.126–9
    AR 27  **52**.126–9, **57**.11
    emergence of new fact  **52**.128
    as preliminary objection  **52**.119
    as soon as possible: after award  **52**.61,
      **52**.119; during proceedings  **52**.127–9
**Article 52(1)(b) (annulment of award:**
    **manifest excess of powers)**
    **52**.130–270
  Article 25 as benchmark  **25**.8, **52**.158
  comparable provisions in other international
      instruments  **52**.130
  decision *ex aequo et bono* without agreement
      of parties  **42**.15–19, **42**.261–5, **52**.199,
      **52**.239, **52**.244–58
    jurisprudence: *Amco I*  **42**.16, **42**.18–19,
      **42**.261, **52**.245, **52**.252–7; *Klöckner I*

  **42**.15, **42**.18–19, **42**.262–3, **52**.245,
      **52**.248–51, **52**.257; *MINE*  **42**.17,
      **42**.264, **52**.199, **52**.245; *MTD*  **52**.247
  drafting history  **52**.131
    "manifest", addition  **52**.131, **52**.134
  failure to apply correct applicable law
      **42**.14–20, **52**.191–270
    drafting history  **52**.193–5
  failure to apply international law
      **52**.259–70: erroneous/partial application
      distinguished  **52**.263; important
      principles of international law  **52**.264;
      peremptory norms of international law
      **52**.263
  failure to apply law agreed by parties
      **52**.199
  failure to cite specific legal authority
      **52**.233–43: failure to state reasons as
      alternative ground  **52**.109, **52**.243
    jurisprudence: *Amco I*  **42**.261–3, **52**.198,
      **52**.212, **52**.214, **52**.227–30, **52**.261–2,
      **52**.267–9; *Amco II*  **52**.200–1, **52**.270;
      *CDC*  **52**.219, **52**.220; *CMS*  **52**.225,
      **52**.231; *Klöckner I*  **52**.197, **52**.211,
      **52**.214, **52**.234–8, **52**.257, **52**.266;
      *Lucchetti*  **52**.202; *MINE*  **42**.17,
      **42**.264, **52**.199, **52**.213, **52**.220, **52**.242;
      *Mitchell*  **52**.203; *MTD*  **52**.220–1;
      *Repsol*  **52**.222; *Soufraki*  **52**.184,
      **52**.204–7, **52**.223–4, **52**.243; *Vivendi I*
      **26**.81–5; *Wena Hotels*  **52**.215–18
    method of determining applicable law,
      relevance  **52**.208–9
    non-application/misapplication
      distinguished  **42**.18–20, **52**.153,
      **52**.194–5, **52**.204–7, **52**.210–32
    partial application of international law
      **52**.263
    partial non-application  **52**.226–32:
      erroneous application and  **52**.226–32
    standard of non-compliance  **42**.17,
      **52**.197
    waiver, right of  **52**.55
  failure to comply with evidentiary rules
      **45**.8
*infra petita*  **41**.29, **46**.30, **52**.167–71
    as failure to state reasons  **52**.171
    jurisprudence: *Lucchetti*  **52**.170; *Soufraki*
      **52**.169; *Vivendi I*  **52**.168
  jurisprudence
    *Amco I*  **42**.16, **42**.18–19, **42**.152,
      **52**.239–41, **52**.520–2, **52**.526
    *Klöckner I*  **26**.30, **42**.15, **42**.18–19,
      **42**.150–1, **42**.262, **52**.143–4, **52**.152,
      **52**.163, **52**.175–80

lack of jurisdiction/competence   **52**.155–90
  absence of/exceeding distinguished
    **52**.163
  drafting history   **52**.155
  failure to accept *res judicata* effect
    **52**.165–6
  jurisprudence: *Amco II*   **52**.165–6; *CMS*
    **52**.185–90; *Klöckner I*   **52**.157, **52**.163,
    **52**.175–80; *Mitchell*   **25**.166,
    **52**.159–62; *Repsol*   **52**.164, **52**.182;
    *Soufraki*   **52**.158, **52**.183–4
  *ratione materiae*   **52**.156
  *ratione personae*   **52**.156
  in relation to parties' consent   **52**.156–62:
    Article 25 as benchmark   **25**.8, **52**.158
  remedy falling outside parties' request,
    relevance   **52**.164
"manifest"   **52**.134–54
  Article 36(3) use   **52**.141
  dictionary meaning   **52**.135
  drafting history   **52**.131, **52**.134
  jurisprudence: *Amco I*   **52**.152, **52**.153;
    *CDC*   **52**.136, **52**.138; *Klöckner I*
    **52**.143–4, **52**.152; *Lucchetti*   **52**.151;
    *MINE*   **52**.154; *Mitchell*   **52**.146; *MTD*
    **52**.149; *Repsol*   **52**.136, **52**.147;
    *Soufraki*   **52**.140, **52**.150; *Vivendi I*
    **52**.139; *Wena Hotels*   **52**.136, **52**.137,
    **52**.145
  methodology   **52**.142–54
  relevance of "manifest" requirement
    **52**.148
nationality issues, tribunal's obligation to
  examine   **52**.183–4, **52**.224
parties' agreement as determining factor
  **52**.132–3
practice, limited
registration of arbitration application by
  Secretary-General, relevance   **52**.172
scope of review   **52**.202
supplementation or rectification and
  **49**.69
violation of Convention as, Article 46
  (ancillary claims)   **46**.12
waiver, right of   **52**.55
**Article 52(1)(c) (annulment of award:
  corruption of arbitrator)**   **37**.5, **40**.28,
  **52**.271–7
absence of cases invoking   **52**.28, **52**.112
comparable provisions in other international
  instruments   **52**.272
"corruption"   **52**.273
  bias distinguished   **52**.274
  compensation as key element   **52**.273–4:
    AR 6   **52**.273

failure to disclose relationship with party
  (AR 6)   **52**.275, **52**.465
unauthorized communication with party
  distinguished   **52**.274
drafting history   **52**.272
time limits, special provisions (Article 52(2))
  **52**.277, **52**.435–6, **52**.448–50, **52**.546,
  **53**.54
where corrupt arbitrator has voted against
  award   **21**.8, **52**.482
**Article 52(1)(d) (annulment of award: serious
  departure from fundamental rule of
  procedure)**   **40**.28, **52**.278–337
comparable provisions in other international
  instruments   **52**.278–9
  ILC Model Rules on Arbitral Procedure
    (1958)   **52**.279
drafting history   **52**.226
failure to comply with evidentiary standards
  **43**.4, **43**.19–22, **52**.323–32
  jurisprudence: *Amco I*   **52**.324–5; *CDC*
    **52**.328, **52**.330–1; *Klöckner II*
    **52**.326–7; *Lucchetti*   **52**.332; *Wena
    Hotels*   **52**.329
failure to deal with every question submitted
  **48**.51, **52**.110, **52**.300, **52**.413–17
failure to deliberate   **52**.318–22
  jurisprudence: *CDC*   **52**.322; *Klöckner I*
    **52**.319–20; *Klöckner II*   **52**.321
  representation in resubmitted case by
    arbitrator in original case   **52**.320
failure to hear other party (*audiatur et altera
  pars*)   **52**.293, **52**.303, **52**.305–17,
  **52**.596
  issues not addressed, tribunal's
    responsibility   **52**.317
  jurisprudence: *Amco II*   **52**.292, **52**.303,
    **52**.306–8; as fundamental principle
    **44**.22–3; *Klöckner I*   **52**.310–11;
    *Lucchetti*   **52**.316; *MINE*   **44**.23,
    **52**.312; *MTD*   **52**.315; *Vivendi I*
    **52**.314; *Wena Hotels*   **52**.313
  on provisional measures   **47**.12, **47**.39
  summary procedure (AR 41(5)) and
    **41**.97
  supplementation and rectification, request
    for and   **52**.308
failure to issue award in timely manner
  **49**.13, **49**.23
"fundamental rule of procedure"
  Arbitration Rules distinguished   **44**.4,
    **52**.279, **52**.280, **52**.282
  as "principle"   **44**.23, **52**.279, **52**.281–3
  principles of natural justice   **44**.4, **52**.193,
    **52**.279

**Article 52(1)(d) (annulment of award: serious departure from fundamental rule of procedure) (*cont.*)**
jurisprudence
  *Amco II*   **52**.306–8
  *CDC*   **48**.53, **49**.13, **52**.286, **52**.288–90
  *Klöckner I*   **52**.290–1, **52**.310–11
  *Klöckner II*   **52**.336
  *MINE*   **52**.282–3, **52**.340
  *Repsol*   **52**.281
  *Wena Hotels*   **52**.285
lack of impartiality/inequality of treatment   **52**.294–304
  evidence of   **52**.297–8: allocation of burden of proof   **52**.301, **52**.324–7; failure to cite legal authority and   **52**.297; structure of award and   **52**.297–8
  jurisprudence: *Amco I*   **52**.299–301, **52**.324–5; *Amco II*   **52**.303; *CDC*   **52**.304; *Klöckner I*   **52**.294–8; *Klöckner II*   **52**.326–7
procedure, AR 33   **52**.334
scope of reasons   **52**.343
"serious departure"/"fundamental rule"
  jurisprudence: *Amco II*   **52**.292, **52**.308; *MINE*   **52**.292
  need for both criteria to be met   **52**.280–92
  "serious"   **52**.282–4, **52**.292, **52**.303, **52**.306–8
standing limits, violation   **52**.333
  *Repsol*   **52**.333
supplementation or rectification and   **49**.69
timely objection, need for   **52**.60, **52**.334–7
  failure to make as waiver (AR 27)   **52**.60, **52**.174, **52**.334, **52**.534–7, **57**.11–14
  jurisprudence: *CDC*   **52**.337; *Klöckner I*   **52**.335; *Klöckner II*   **52**.336
waiver, right of   **52**.56, **52**.339–40
**Article 52(1)(e) (annulment of award: failure to state reasons)**   **52**.338–434
absence of reasons   **52**.348–62
  failure to deal with every question compared   **52**.362
  jurisprudence: *Amco I*   **52**.351; *Amco II*   **52**.353; *CDC*   **52**.356; *CMS*   **52**.360–1; *Klöckner I*   **52**.350; *MINE*   **52**.352; *Mitchell*   **52**.357; *MTD*   **52**.359; *Soufraki*   **52**.358; *Vivendi I*   **52**.355; *Wena Hotels*   **52**.354
  "reconstruction" of reasons   **52**.350–2
  in respect of part of award   **52**.350
comparable provisions in other international instruments   **52**.338–9

ILC Model Rules on Arbitral procedure (1958)   **52**.339
contradictory reasons   **48**.59–61, **48**.64, **52**.389–98
  jurisprudence: *Amco I*   **52**.392; *CDC*   **52**.397; *Klöckner I*   **48**.59–61, **52**.390–1; *MINE*   **52**.393–5; *MTD*   **52**.398; *Vivendi I*   **52**.396
for costs and expenses   **61**.41–5, **61**.68, **61**.71–2
  *CDC*   **52**.484
  *MINE*   **48**.64, **61**.42–3, **61**.72
drafting history   **52**.339–40, **52**.343
  serious departure from fundamental rule of procedure, separation from   **52**.106, **52**.113, **52**.339
*ex aequo et bono* decision   **42**.272, **52**.349
failure to
  apply correct applicable law   **52**.109, **52**.243
  determine every ancillary claim   **46**.30
  exercise jurisdiction (*infra petita*)   **52**.171
failure to deal with every question submitted   **48**.44–53, **49**.72, **52**.401–34
  Article 48(3) and   **48**.88, **52**.403–12, **52**.419–20
  Article 49(2) (supplementation or rectification) and   **48**.51, **48**.52, **48**.89, **49**.29, **49**.38, **49**.60–77, **52**.401–2, **52**.407
  "deal with"   **42**.427–34
  drafting history   **52**.399–400, **52**.404
  jurisdictional questions   **41**.51, **41**.65–8
  jurisprudence: *Amco I*   **49**.71, **52**.304, **52**.405, **52**.408, **52**.415, **52**.423; *CDC*   **52**.411, **52**.425; *Klöckner I*   **52**.407, **52**.414, **52**.420–2, **52**.428–30; *MINE*   **52**.409, **52**.412, **52**.417, **52**.424, **52**.431; *Wena Hotels*   **48**.52, **49**.77, **52**.410–12, **52**.432
  "question"   **52**.418–26: as crucial or decisive argument   **52**.426, **52**.433, **52**.434
hypothetical reasons   **48**.60
interpretation of provision, different language versions   **52**.346
jurisdictional decision   **41**.71
quality/sufficiency of reasons   **48**.58–68, **52**.342, **52**.344–6, **52**.363–89
  compromise formulae and   **52**.345
  jurisprudence: *Amco I*   **48**.62, **52**.369; *Amco II*   **52**.370–2; *CDC*   **52**.378–9; *CMS*   **52**.385–7; *Klöckner I*   **52**.364–8; *Klöckner II*   **52**.374–5; *Lucchetti*   **52**.384; *MINE*   **52**.372–3, **52**.379,

**52**.388; *Mitchell* **52**.380–1; *MTD*
**52**.382; *Soufraki* **52**.383; *Vivendi I*
**52**.377, **52**.388; *Wena Hotels* **52**.376
practice in different legal systems and
**52**.345
standard, harm to party, relevance **48**.59
subjective nature **52**.363, **52**.484
*ratio decidendi* and *obiter dicta* distinguished
**48**.60
reasons as standard requirement
jurisprudence, *Wena Hotels* **48**.52, **48**.66,
**49**.77, **52**.341
*Klöckner I* **48**.60, **49**.70, **52**.347
*MINE* **48**.63–4
relevance to decision, need for **48**.61–3
scope of reasons
facts **52**.343, **52**.349
law **52**.343, **52**.349
summary procedure (AR 41(5)) and **41**.100
supplementation or rectification and **49**.69,
**49**.70
waiver, right of **52**.57, **52**.339–40
*MINE* **52**.340
**Article 52(2) (annulment of award: time
limits)** **14**.8, **52**.435–50, **53**.59
corruption, in cases of **52**.277, **52**.435–6,
**52**.448–50, **52**.5047
date of discovery as determinant **52**.449
date of
dispatch of award **49**.10, **52**.437
signature of award and **48**.37:
supplementation or rectification and
**49**.83–5
drafting history **52**.435
examples of compliance **52**.440
extension in case of supplementation or
rectification **49**.81–5, **52**.438
jurisprudence
*Amco I* **49**.85, **52**.442
*Soufraki* **52**.446–7
*Vivendi I* **52**.444–5
*Wena Hotels* **52**.443
purpose of provision **52**.537
requirement to provide detailed grounds and
**52**.441–7
time limits for other post-award remedies
distinguished **51**.11, **52**.84, **52**.436
**Article 52(3) (annulment of award: *ad hoc
committee*)** **52**.451–60
appointment to
appointment of arbitrators distinguished
**52**.455
by Chairman **5**.4, **52**.451: limitation to
Panel of Arbitrators **12**.4, **13**.5, **40**.13,
**52**.454, **52**.457

consultation with parties **52**.454
Secretary-General's role **11**.4, **11**.8,
**52**.454
as body distinct from original tribunal **52**.2
choice to be made from Panel of Arbitrators
**12**.4, **13**.5, **13**.5005, **40**.13, **52**.454
continuity of membership, desirability
**52**.458–60
obstacles to **52**.459
permanent review commission, possibility
of **52**.1, **52**.460, **53**.28–30, **65**.5
drafting history **52**.451
exclusion of **52**.461–5
co-nationals of arbitrators in same dispute
**52**.463–4
conciliators or arbitrators in same dispute
**52**.461–3
drafting history **52**.461–2
nationals or co-nationals of the parties
**13**.9, **39**.4, **52**.461–4: uncertainties over
nationality **52**.464
participants at earlier stage **52**.465
party-appointed members **52**.455, **52**.457,
**52**.462
extension of Article 60 **60**.2
functions, as court of cassation **52**.491–2
interpretation of award, interpretation in
accordance with treaty interpretation
rules **52**.17
nationals or co-nationals of the parties
**13**.9
number of members **52**.455
president, appointment **52**.456
procedure (AR 52) **52**.453
**Article 52(3) (annulment of award: *ad hoc
committee: "authority to annul"*)**
**52**.466–92
*see also* Article 52 (annulment of award:
general), applicability
confirmation of award, possibility of
**52**.486–92
jurisprudence
*Amco I* **52**.469, **52**.470, **52**.488
*CMS* **52**.490–1
*Klöckner I* **52**.467–8, **52**.492
*MINE* **52**.71, **52**.471–2, **52**.489
*Vivendi I* **52**.72
obligation to annul, whether **52**.466–85
jurisprudence: *Amco I* **52**.469; *Amco II*
**52**.470; *CDC* **52**.474; *Klöckner I*
**52**.467–8; *MINE* **52**.471–2; *Mitchell*
**52**.476; *Soufraki* **52**.477; *Vivendi I*
**52**.474; *Wena Hotels* **52**.473
material and technical violation
distinguished **52**.478–85

**Article 52(3) (annulment of award: *ad hoc* committee: "authority to annul") (*cont.*)**

partial annulment    **52**.494–510
  compliance obligation and    **53**.63
  dispositif/reasons, separability    **52**.497
  effect on other parts of award    **52**.505–10
  jurisprudence: *Amco I*    **52**.496–7, **52**.506; *Amco II*    **52**.498–500, **52**.510, **52**.675–8; *CMS*    **52**.504; *Klöckner I*    **52**.495; *MINE*    **52**.71, **52**.501–2, **52**.507, **52**.510; *Vivendi I*    **52**.72, **52**.503, **52**.508
  *res judicata*, effect on    **52**.165–6, **52**.497–9
parties' right to request    **52**.69–73, **52**.494
  effect on *ad hoc* committee's competence    **52**.502
recognition/enforcement    **54**.36
*res judicata* and    **52**.165–6, **52**.497–9, **52**.674–82
tribunal's right to annul any part of award and (Article 52(3))    **52**.70

**Article 52(4) (annulment of award: extension of other Convention provisions to)**    **52**.539–73

AR 8–12 as substitute    **52**.550–2
AR 8 and 53 as substitute    **44**.7, **57**.5
AR 9, applicability    **43**.7
excluded Articles    **52**.540–52
  25    **52**.542
  26    **52**.542–3
  27    **52**.542, **52**.544
  36    **52**.540
  37–40    **52**.540
  46    **52**.541
  47    **52**.540
  50    **50**.13, **51**.6, **52**.545
  51    **51**.6, **52**.545, **52**.546
  52    **51**.6, **52**.545, **52**.547, **57**.4–5
  56    **52**.548, **56**.4
  57    **44**.7, **52**.548, **52**.549–52, **57**.4
  58    **52**.548, **52**.549–52
  61    **61**.58
included Articles    **52**.553–73
  41    **41**.4, **52**.554
  42    **52**.555
  43    **52**.556
  44    **44**.6, **52**.52, **52**.557–61: exclusion of Articles 46 and 47 and    **52**.557
  45    **45**.6, **45**.48, **45**.86, **52**.562–3
  48    **48**.2, **48**.6, **48**.25, **48**.90, **48**.106, **48**.120, **52**.564–7: AR 47    **52**.565
  49    **49**.8, **49**.31, **50**.13, **51**.6, **52**.568, **61**.74
  53    **50**.5007, **52**.543, **52**.569–70

  54    **52**.571
  59–61    **52**.541, **52**.572, **59**.5
  60    **60**.2, **61**.4
  62    **52**.573, **62**.6
  AR 53 and    **52**.58–62
  method of application    **52**.553
jurisprudence, *Vivendi I*    **44**.7, **57**.5

**Article 52(5) (annulment of award: stay of enforcement)**    **51**.3, **52**.3, **52**.573–655, **53**.51, **53**.54, **54**.38–40

Article 53(1) and    **52**.578–81
circumstances requiring    **52**.594, **52**.609–26, **52**.698
  absence of provision for    **52**.609
  specification by parties, need for    **52**.609
discretionary nature of power    **52**.575, **52**.593–4, **52**.698
drafting history    **52**.564–7
  enforceability during period between application and constitution of *ad hoc* committee    **52**.576, **53**.48: Convention on the Recognition and enforcement of Foreign Arbitral Awards (1958)    **52**.576 n832
  Preliminary Draft    **52**.574
  provisional measures, rejection    **52**.574, **52**.627
  ILC Model rules of Arbitral Procedure (1958) as basis    **52**.574
jurisprudence
  *see also* security for eventual payment of award, jurisprudence *below*
  *Amco I*    **52**.597, **52**.600, **52**.610, **52**.652
  *Amco II*    **52**.615
  *Azurix*    **52**.580, **52**.607, **52**.610, **52**.623
  *CDC*    **52**.602, **52**.610, **52**.611, **52**.618, **52**.625
  *CMS*    **52**.588, **52**.606, **52**.610, **52**.611, **52**.620–3, **52**.651, **52**.655
  *Klöckner I*    **52**.585
  *Lucchetti*    **52**.585
  *MINE*    **52**.579, **52**.598, **52**.610, **52**.611, **52**.614, **52**.624, **52**.654
  *Mitchell*    **52**.603, **52**.610, **52**.617, **52**.626
  *MTD*    **52**.588, **52**.603, **52**.610, **52**.611, **52**.619
  *Repsol*    **52**.588, **52**.603, **52**.610, **52**.613
  *Soufraki*    **52**.585
  *SPP*    **52**.592, **52**.599
  *Vivendi I*    **52**.585
  *Wena Hotels*    **52**.601, **52**.616
modification    **52**.588

procedure (AR 54)   **52**.582, **52**.586,
    **52**.595–608
  *ad hoc* committee/tribunal's right of
    initiative   **52**.586, **52**.590
  entry into force   **49**.27, **52**.608
  notification of stay (including provisional),
    modification or termination   **52**.583,
    **52**.608, **52**.698: certification of awards
    (AFR 28(2)) and   **52**.608
  priority of request   **52**.595–607
  requirements   **52**.595: opportunity to
    parties to present case   **52**.596; request
    by one of parties   **52**.586–7, **52**.698
provisional stay   **52**.583–5, **53**.48
  automaticity   **52**.583, **52**.699, **53**.54: time
    limits for determining   **52**.612
  in case of partial annulment   **52**.653,
    **52**.696–7, **52**.699
  continuation of stay, request for, standing
    **52**.587
  extension to award as a whole   **52**.584
  standing   **52**.584
  termination   **52**.582, **52**.586, **52**.588–9,
    **53**.57
security for eventual payment of award
    **52**.600, **52**.605, **52**.613, **52**.627–49
  absence of provision for   **52**.627
  advantages of requirement for   **52**.647–8
  Convention on the Recognition and
    Enforcement of Foreign Arbitral Awards
    (1958)   **52**.627
  jurisprudence: *Amco I*   **52**.629–31; *Amco II*
    **52**.631; *Azurix*   **52**.643–6; *CDC*
    **52**.636; *CMS*   **52**.642; *MINE*
    **52**.632–3; *Mitchell*   **52**.640; *Repsol*
    **52**.605, **52**.637–9; *SPP*   **52**.634; *Wena*
    *Hotels*   **52**.635
  termination of stay, effect   **52**.652
termination   **52**.588–9, **52**.650–5, **53**.57
  automaticity on date of award/decision
    **52**.650, **52**.696
  partial annulment of award and   **52**.653–5
  waiver by agreement   **52**.592
**Article 52(6) (submission to new tribunal)**
    **52**.656–700
  admissibility of
    new arguments   **52**.692–3: estoppel and
      **52**.693
    new claims   **52**.689–92: claims not
      considered by first tribunal   **52**.692
    new facts   **52**.694–5
  annulment, decision on
    finding of invalidity   **52**.10
    interpretation   **50**.5007

restriction to annulled part of award
    **52**.510
applicability of
  Article 44   **44**.6
  Article 45   **45**.6
  Article 48   **48**.2, **48**.6
constitution of new tribunal
  AR 55(2)(d)   **52**.668: modification by
    parties   **52**.669
  Articles 37–40 and   **52**.668
  ILC Model Rules on Arbitral Procedure
    (1958) as model   **52**.657
decision as "award"   **48**.2, **48**.25, **48**.90,
    **48**.120
discretionary nature   **52**.662
drafting history   **52**.656–7, **52**.675
exclusive remedy rule (Article 26) and
    **52**.663, **53**.62, **54**.35
jurisprudence
  *Amco II*   **46**.27–8, **46**.91, **52**.658, **52**.664,
    **52**.671, **52**.673, **52**.675–8, **52**.685–8,
    **52**.690–2, **52**.694
  *CMS*   **52**.684
  *Klöckner I*   **52**.684
  *Klöckner II*   **52**.659, **52**.664
  *MINE*   **52**.660
  *Vivendi II*   **52**.672, **52**.679–82, **52**.695
procedure
  AR 55   **52**.665–7
  counterclaim and   **46**.66
  individual opinions and   **48**.106
  request by one or both parties   **52**.662,
    **52**.664
  time limits, absence   **52**.666
publication of decision   **48**.120
*res judicata* and   **52**.10, **52**.674–88
  legal effect of reasoning of *ad hoc*
    committees   **52**.663, **52**.683–8
  new facts and   **52**.695
revision of award   **51**.5
Secretary-General's role   **11**.9, **52**.666–7
  request for arbitration distinguished   **36**.8,
    **52**.667
status of parties as claimant/respondent
    **46**.65–7
  change of legal status of one of parties
    **52**.670–3
  State succession and   **52**.670
stay of enforcement and   **52**.700
**Article 53 (finality/binding nature of award:**
    **general)   Preamble** 33
  Additional Facility and   **53**.5–9
    *Metalclad*   **53**.9
    Rule 46, relevance   **26**.179–80

**Article 53 (finality/binding nature of award: general)** (*cont.*)
applicability
annulment decision   **50**.5007, **52**.569
decisions: costs   **61**.73; interpreting, revising or annulling award: *see* Article 53(2) (finality/binding nature of award: decision interpreting, revising or annulling award); relating to jurisdiction **52**.63, **53**.32, **53**.66
procedural orders   **53**.66
provisional measures   **47**.15–22, **53**.66
settlement award   **53**.32
in case of denunciation   **72**.11
comparable provisions in other international instruments   **53**.3
denunciation of Convention, effect   **72**.11
drafting history   **53**.4, **53**.11, **53**.13, **53**.15
issues covered   **53**.2
non-cooperation and   **45**.5
provisional measures, exclusive right of tribunal, whether   **26**.179–80
**Article 53(1) (compliance)**   **53**.33–59
changeability of obligations   **53**.65
"compliance"/"enforcement", confusion **53**.38
constituent subdivision or agency, responsibility of host State for **53**.14–15, **55**.116
drafting history   **53**.39–40
Executive Directors' Report   **53**.33
enforcement
*see also* Article 54 (recognition and enforcement)
diplomatic protection   **53**.41–4
ICJ and   **53**.44, **64**.14
NAFTA   **53**.45
enforcement difficulties, relevance   **53**.35–8, **55**.115, **64**.14
Article 54 enforcement measures, need for as breach of compliance obligation **53**.35–6, **53**.115
enforcement difficulties, relevance: *MINE* **53**.37; *Mitchell*   **53**.38
State immunity and   **53**.37–8, **55**.7, **55**.115, **64**.14
non-compliance, consequences   **53**.34, **53**.39
cost/benefit analysis   **53**.39
State responsibility and   **53**.13
as obligation   **53**.33–8
of both parties   **53**.34: consequences of non-compliance and   **53**.34
stay of enforcement and   **52**.578–81, **53**.47–59
expectation of stay, relevance   **53**.58

jurisprudence: *Azurix*   **52**.580; *MINE* **52**.579, **53**.49
NAFTA   **53**.56, **54**.101
third party interest in securing   **53**.46
timing
drafting history   **53**.47
factors determining   **53**.59, **53**.65
period of grace   **53**.47: parties' right to agree on   **53**.50
relevant dates, dispatch of certified copies of award   **53**.50, **54**.100
voluntary compliance, presumption of   **53**.39, **54**.7
World Bank role   **53**.40
**Article 53(1) (finality/binding nature of award)**
appeal, exclusion   **41**.22, **53**.18–30
Appeals Facility, possibility of   **52**.1, **53**.28–30, **65**.5
Article 48(3) and   **48**.58
Article 64 reference to ICJ and   **52**.451, **64**.12–13
domestic courts and   **53**.20–2: *MINE* **53**.21; obligation to dismiss action in **53**.22
modification of rule by parties, exclusion **53**.19, **53**.29–30
autonomy of ICSID arbitration process and **53**.2, **53**.18–32
basis of obligations
agreement to arbitrate/consent to jurisdiction   **53**.13, **53**.34, **53**.56
Convention   **53**.13, **53**.34
State's role as designating and appointing authority and   **53**.15
concepts underlying
*pacta sunt servanda*   **53**.10
*res judicata*   **26**.145, **42**.76, **53**.10, **53**.26
constituent subdivision or agency and **53**.14–15
drafting history   **53**.11, **53**.13, **53**.18
Executive Directors' Report   **53**.11
ICJ
diplomatic protection and   **53**.26, **54**.28, **64**.14
enforcement proceedings   **53**.25, **64**.15
Executive Directors' Report   **53**.25
ICSID 64 powers   **53**.23–5
legislation implementing Convention and **69**.6
*stare decisis* and   **48**.128, **53**.16–17
ICJ Statute distinguished   **53**.16
third parties and   **53**.12–13

**Article 53(2) (finality/binding nature of award: decision interpreting, revising or annulling award)    50**.28, **52**.3, **52**.79, **52**.569, **53**.60–6
applicability
award as interpreted or revised    **53**.61:
suspension because of stay of enforcement distinguished    **53**.61
State immunity    **53**.60
award modified by supplementation/ rectification    **53**.64–5
recognition and enforcement of award    **53**.60
State immunity from execution    **54**.33
**Article 54 (recognition and enforcement: general)    Preamble** 33
Additional Facility and, Rule 46, relevance    **26**.179–80
applicability
Additional Facility awards compared    **54**.5, **54**.12–22, **54**.81
annulled award    **54**.35–6
award modified by supplementation/ rectification    **54**.34
conciliation commission proceedings    **34**.28, **34**.31
discontinuance order    **48**.71
final awards, limitation to    **54**.30
interpretation, revision or annulment decisions    **54**.33
non-ICSID award    **25**.228
preliminary awards incorporated in final award    **54**.30
preliminary decision declining jurisdiction    **54**.31
settlement award    **48**.79, **54**.32
automatic nature    **54**.9
parties' right to modify or exclude    **54**.9
autonomy of ICSID proceedings, departure from    **55**.8
binding effect of award/compliance obligation (Article 53(2))    **53**.60
choice of forum
freedom    **54**.26–7
location of assets and    **54**.26, **54**.27
comparable provisions in other international instruments    **54**.3–6
Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958)    **54**.4–5
Treaty of Rome (1957)    **54**.6, **54**.97, **54**.106, **54**.110

conformity of award with international law and    **42**.193–4
*Amco I*    **42**.194
denunciation of Convention, effect    **71**.4, **72**.11
drafting history    **54**.4, **54**.7–8, **54**.66, **54**.73
enforcement measures and    **54**.10–11
need for as breach of Article 53 obligations    **53**.35–6, **54**.115
exclusive remedy rule and    **54**.10
host State as main beneficiary    **54**.7, **54**.8
legislation implementing    **54**.28, **54**.104, **69**.5–6
national law and    **44**.3
non-compliance, Article 69 obligations and    **54**.28
non-pecuniary obligations
allowability    **54**.75–80
enforceability    **54**.79–80
jurisprudence: *Enron*    **54**.78; *Goetz*    **54**.77–9
possibilities    **54**.75
*res judicata* effect    **54**.80
obligation to cooperate in    **53**.12
public policy/*ordre public* and    **54**.83–5
pecuniary obligations    **54**.5, **54**.46, **54**.72–80, **54**.113
reasons for limitation to    **54**.73–4
recognition/enforcement distinguished    **54**.46
reasons for provision    **54**.7–8
**Article 54 (recognition and enforcement)**
domestic courts' role    **54**.29
right of review and    **54**.85–7
"enforcement"/"execution", failure to distinguish, domestic court practice    **54**.67–8, **54**.71
as final judgment of domestic court    **41**.22, **54**.44, **54**.88–91
domestic law provision for exceptional refusal to enforce    **54**.91
drafting history    **54**.88–9: Executive Directors' Report    **54**.89
federal constitutions and    **54**.92–6, **69**.5: drafting history    **54**.92; United States    **54**.93–6
position in hierarchy, relevance    **54**.90
**Article 54 (1) (recognition and enforcement)**
"Each Contracting State shall recognize . . ."    **54**.23–9, **55**.26
Article 53 compliance obligations distinguished    **53**.12, **54**.23
drafting history    **54**.24–5: Executive Directors' Report    **54**.25

**Article 54 (1) (recognition and enforcement)**
    **(*cont.*)**
    "enforcement"/"compliance", confusion
        **53**.39
        comparison of different language versions
            **54**.64–5, **54**.70
        "enforcement"/"recognition",
            interchangeability    **54**.70, **54**.114
        scholarly debate    **54**.69
    failure to comply as breach of Convention
        **54**.28, **55**.27
    finality/nonreviewability and    **54**.81–7,
        **54**.112
        drafting history    **54**.82–7
    jurisprudence
        *Benvenuti & Bonfant* (French proceedings)
            **54**.50–2, **54**.86, **54**.109
        *LETCO*    **54**.56–60, **54**.96, **54**.105
        *MINE*    **54**.38
        *SOABI*    **54**.105
        *SOABI* (French proceedings)    **54**.53–5,
            **54**.86
    non-compliance
        diplomatic protection, right to    **54**.11,
            **54**.28
        ICJ proceedings    **54**.28,
            **64**.14
    non-cooperation and    **45**.5
    recognition    **54**.42–63
        applicable law, Convention    **54**.47
        definition    **54**.42
        effect    **54**.44, **54**.47
        need for    **54**.45: preliminary decision
            declining jurisdiction    **54**.45
        obligation    **55**.6
        as preliminary to enforcement    **54**.43,
            **54**.49, **55**.6: in absence of assets
            **54**.49
        procedure    **54**.42
        *res judicata* and    **54**.43–8, **54**.103
        State immunity and    **54**.48, **54**.50–63,
            **54**.91, **54**.115, **55**.6
    stay of enforcement and    **54**.37–41,
        **54**.99–101
        courts' obligation to check    **54**.99
        Executive Directors' Report    **54**.39
        expectation of stay, relevance    **54**.40,
            **54**.100: NAFTA    **54**.101
        reasons, need for    **48**.51
**Article 54(2) (recognition and enforcement:**
        **procedure)**    **54**.97–105
    applicability to recognition    **54**.45
    certified copies of award    **54**.98–9
        subsequent stay of execution, courts' duty to
            check    **54**.99

designation of competent authorities    **54**.2,
        **54**.106–9
    drafting history    **54**.97, **54**.106
    federal State practice    **54**.108
    manner of compliance    **54**.108–9:
        difficulties arising from    **54**.109
    States complying (April 2008)    **54**.107
original action, legality of requirement for
        **54**.95, **54**.105
Secretary-General's role    **11**.7
simplified procedure    **54**.105
simultaneous proceedings in several countries
        **54**.103
    double satisfaction and    **54**.103
standing    **54**.102
    diplomatic protection and    **54**.102
    State on behalf of constituent subdivision or
        agency    **54**.102
    succession, problems caused by    **54**.102
    third parties    **54**.102
**Article 54(3) (recognition and enforcement:**
        **applicable law)**
    compliance, method    **54**.113
    drafting history    **54**.110–12
        Executive Directors' Report    **54**.111
    execution, *lex fori*    **54**.2, **54**.47, **54**.74,
        **54**.105, **54**.110–15, **55**.6, **55**.11, **55**.13
**Article 55 (State immunity from execution:**
        **non-derogation)**
    act of State and    **55**.34
    applicability
        Convention as jurisdictional link    **55**.27
        discontinuance order    **48**.71
        enforcement of award    **54**.91, **55**.6,
            **55**.35–48, **55**.64–71, **55**.75, **55**.117,
            **55**.118
        jurisdictional immunity, exclusion
            **55**.5
        law in force in forum State, limitation to
            **55**.13–16
        nexus/"connection with underlying claim"
            requirement    **55**.50–4
        recognition of award    **54**.48, **54**.50–63,
            **54**.91, **55**.6
    binding effect of award/compliance obligation
        (Article 53(2))    **53**.60
    burden of proof    **55**.28
    constituent subdivision or agency    **55**.115–27
        Canada    **55**.125
        difficulties    **55**.119
        France    **55**.126
        Germany    **55**.126
        ILC Draft Articles    **55**.127
        Netherlands    **55**.126
        Switzerland    **55**.126

UN Convention on Jurisdictional
    Immunities (2004)   **55**.127
United Kingdom   **55**.124
United States   **55**.122–3
criteria
    consent to ICSID arbitration as waiver
        **55**.21
    link between underlying claim and property
        under execution   **55**.29
    nature of assets   **55**.23–5
    re-examination of merits and   **55**.20, **55**.22
    State immunity from jurisdiction and
        **55**.19–20, **55**.84
drafting history   **55**.3–4, **55**.9–10
    Executive Directors' Report   **55**.4
    reasons for inclusion   **55**.10
enforcement proceedings/nexus requirement
    **55**.26–7
European Convention on State Immunity
    (1972)   **54**.85
explicit waiver, need for   **55**.74
international instruments relating to
    European Convention on State Immunity
        (1972)   **55**.14, **55**.49, **55**.85, **55**.91
    UN Convention on Jurisdictional
        Immunities (2004)   **55**.14, **55**.21,
        **55**.52–3, **55**.63, **55**.68, **55**.86–91, **55**.96,
        **55**.127
    Vienna Convention on Diplomatic Relations
        (1961)   **55**.61
as interpretation of Article 54   **55**.1–2, **55**.13
jurisprudence
    *AIG*   **54**.61–3, **55**.38–9, **55**.70, **55**.118
    *Benvenuti & Bonfant* (French proceedings)
        **54**.50–2
    *LETCO*   **54**.56–60, **55**.35–6, **55**.65–7,
        **55**.75
    *SOABI*   **55**.53–60
    *SOABI* (French proceedings)   **54**.53–5,
        **55**.45–6
"of that State or or of any foreign State", host
    State as forum   **55**.111–14
protected property   **55**.28–71
    bank accounts   **55**.57–9
    central banks/monetary authorities
        **55**.69–71, **55**.78, **55**.80, **55**.82, **55**.83,
        **55**.90, **55**.92
    diplomatic property   **55**.61–7, **55**.80,
        **55**.83, **55**.90, **55**.92
    executive control of enforcement measures
        and   **55**.25
    international instruments relating to:
        European Convention on State Immunity
        (1972)   **55**.14, **55**.49, **55**.85; ILC Draft
        Articles   **55**.50–1

military property   **55**.68, **55**.80, **55**.82,
    **55**.83, **55**.90, **55**.92
nature/purpose test   **55**.56–9
sea-going ships   **55**.55
specially protected property   **55**.60–71
provisional measures in domestic courts and
    **55**.94–8
    exclusive remedy rule and: *see* Article 26
        (exclusive remedy rule), provisional
        measures, exclusive right of tribunal,
        whether
    pre- and post-judgment measures
        distinguished   **55**.96
    waiver   **26**.182, **55**.97–8
settlement and   **55**.8
sources of law relating to   **55**.15–16
State immunity as evolving concept   **55**.12,
    **55**.14, **55**.17–18
State practice   **55**.17–71
    Australia   **55**.14, **55**.22, **55**.41, **55**.62,
        **55**.68, **55**.69, **55**.83, **55**.92
    Austria   **55**.64
    Canada   **55**.40, **55**.68, **55**.69, **55**.82
    Germany   **55**.24, **55**.47, **55**.64, **55**.90,
        **55**.126
    Italy   **55**.25, **55**.54, **55**.64
    Netherlands   **55**.24, **55**.64
    Spain   **55**.64
    Switzerland   **55**.24, **55**.48, **55**.126
    United Kingdom   **55**.37–9, **55**.62, **55**.64,
        **55**.69–71, **55**.79–81
    United States   **55**.29–36, **55**.37–9, **55**.62,
        **55**.65–9, **55**.77–8, **55**.91, **55**.92
waiver   **55**.72–110
    applicable law   **55**.100
    arbitration clause/agreement to arbitrate:
        provision in   **55**.72–6; whether   **55**.21,
        **55**.74, **55**.81, **55**.87–8
    conditions and limitations   **55**.77–93
    drafting   **55**.99–110: ICSID Model Clauses
        (1981)   **55**.103; ICSID Model Clauses
        (1993)   **55**.109–10
    exclusion of provision in Convention
        **55**.9–11
    explicit waiver, desirability/need for
        **55**.82, **55**.83, **55**.84
    international instruments relating to, ILC
        Draft Articles   **55**.86
    limited use of possibility   **55**.99
    participation in Convention as   **55**.75
    provisional measures in domestic courts
        **55**.94–8
    recognition proceedings   **54**.48
    UN Convention on Jurisdictional
        Immunities (2004)   **55**.21, **55**.52–3

**Article 55 (State immunity from execution: non-derogation)** (*cont.*)
waiver (*cont.*)
   waiver of immunity from jurisdiction, whether   **55**.89
as weakness of ICSID arbitral process   **55**.8
**Article 56 (replacement following death, incapacity or resignation: general)**
applicability
   *ad hoc* committee   **56**.4
   annulment proceedings   **52**.548–52
drafting history   **56**.3, **56**.6
non-frustration principle and   **56**.2, **56**.36–7
suspension of proceedings (AR 10)   **56**.9
   resumption (AR 12)   **56**.10–13
**Article 56(1) (replacement following death, incapacity or resignation)**
in accordance with original method   **56**.15–18
   AR 11   **56**.17, **56**.19
   drafting history   **56**.16–17
   original failure of party to make appointment and   **56**.17–19
death   **56**.28–30
incapacity, special procedure   **56**.20–1
   Arbitration Rules (1984)   **56**.21
"its composition shall remain unchanged"/continuity of membership   **36**.10, **56**.5–13, **56**.31, **56**.37
jurisprudence
   *Adriano Gardella*   **56**.30
   *Holiday Inns*   **56**.29
   *MTD*   **56**.13
resignation   **56**.22–7
   grounds   **56**.22: absence in Convention **56**.22, **56**.40; conflict of interests   **56**.22
   jurisprudence: *ADC*   **56**.25; *Azurix* **56**.24; *Benvenuti & Bonfant*   **56**.26; *Continental Casualty*   **56**.24; *Generation Ukraine*   **56**.25; *Kaiser Bauxite*   **56**.24; *LETCO*   **56**.24; *MTD* **56**.27; *Olguín*   **56**.24; *Salini* v. *Jordan* **56**.24; *SOABI*   **56**.24, **56**.26; *Tokios Tokelės*   **56**.26; *World Duty Free* **56**.24
   procedure   **56**.23, **56**.39–40
   without consent: *see* Article 56(3) (replacement of conciliator/arbitrator following resignation without consent)
temporary inability of conciliator or arbitrator to work distinguished   **56**.8
**Article 56(2) (continuance as conciliator/ arbitrator after expiry of Panel membership)**   **40**.12, **56**.31–4
drafting history   **56**.31

**Article 56(3) (replacement of conciliator/ arbitrator following resignation without consent)**   **12**.4, **13**.5, **56**.35–44
*see also* Article 58 (conciliator/arbitrator: disqualification: procedure), replacement in case of vacancy arising from death, incapacity or resignation
conditional resignation, effect   **56**.43–4
drafting history   **56**.16–17, **56**.36
exceptional nature of procedure   **56**.15, **56**.19, **56**.35–6
   limitation to party appointments   **56**.38
   reason for   **56**.35–6
jurisprudence
   *Enron*   **56**.44
   *Holiday Inns*   **56**.43, **57**.36
nationals or co-nationals, eligibility   **56**.42
powers of Chairman   **5**.4, **37**.3, **56**.41–2
powers of Secretary-General   **11**.4
procedure
   disqualification of conciliator/arbitrator (Article 58) distinguished   **58**.9
   failure to reach agreement, effect   **56**.40
   notification to other members of commission or tribunal or to Secretary-General   **56**.39
   refusal of consent, effect   **56**.41
   time limits   **56**.42
**Article 57 (conciliator/arbitrator: disqualification)**   **14**.7, **37**.5, **40**.27, **52**.124–5
applicability
   *ad hoc* committee   **58**.3
   annulment proceedings   **52**.127, **52**.549, **57**.4–5, **58**.3
   Chairman's appointments   **57**.7
drafting history   **57**.2, **57**.7
jurisprudence
   *Amco I*   **57**.21–2
   *Azurix*   **57**.30–1
   *GAMI*   **57**.28–9
   *National Grid*   **57**.30
   *Saipem*   **57**.32–3
   *Salini* v. *Jordan*   **57**.27
   *SGS* v. *Pakistan*   **57**.28
   *Siemens*   **57**.30–1
   *Vivendi I*   **14**.5, **44**.7, **57**.23–5
   *World Duty Free*   **57**.27
   *Zhinvali*   **57**.26
procedure   **44**.7, **52**.125, **57**.8–14
request by party, need for   **57**.6
timing   **57**.8–14
   AFR 15   **57**.10
   after constitution   **57**.8

AR 9   **57**.10
*CDC*   **52**.337
CFR 15   **57**.10
CR 9   **57**.10
importance   **57**.3
"promptly"   **57**.10–14
time limits, absence of provision of   **57**.9
**Article 57 (conciliator/arbitrator:
    disqualification: grounds)**
dissatisfaction with interim decisions
    **57**.39–40
ineligibility of arbitrator on nationality
    grounds   **39**.509–10, **52**.122, **57**.43–6
    *Olguín*   **57**.46
manifest absence of Article 14 qualities
    **40**.15, **52**.123, **57**.15–19
    conflict of interests   **57**.20–34: issue
        conflict distinguished   **57**.34
    drafting history   **57**.17
supervening grounds   **57**.35–42
    jurisprudence: *Holiday Inns*   **56**.43, **57**.36;
        *Pey Casado*   **57**.37–8; *Sempra*
        **57**.39–40; *Suez and AGW*   **57**.41–2
**Article 58 (conciliator/arbitrator:
    disqualification: procedure)**   **40**.27,
    **52**.125, **58**.1–19
AR 9   **58**.8, **58**.11
CR 9   **58**.8, **58**.11
drafting history   **58**.2, **58**.4
informal nature of proceedings   **58**.10
jurisprudence   **58**.12–16
    *Generation Ukraine*   **58**.13
    *Pey Casado*   **58**.16
    *Sempra*   **58**.15
    *Siemens*   **58**.14
majority of unchallenged members   **58**.5
    in absence of challenged members   **58**.9
    consent to resignation (Article 56(3))
        distinguished   **58**.9
powers of Chairman   **5**.4
    in case of challenge to majority of members
        **58**.7
    in case of sole conciliator/arbitrator   **58**.6
replacement in case of vacancy arising from
    death, incapacity or resignation
    *see also* Article 56(1) (replacement
        following death, incapacity or
        resignation)
    resumption of proceedings following
        **58**.19
right of challenged member to furnish
    explanations   **58**.10
suspension of proceedings   **58**.11
**Article 59 (charges for use of Centre's
    facilities)**   **6**.16, **6**.19

advance payment   **61**.46, **62**.14
annulment proceedings and   **59**.5
communications and costs of persons hired by
    Centre   **59**.10
comparable provisions in other international
    instruments   **59**.3
drafting history   **59**.6
equal shares   **61**.5
expenses of Centre not met by charges   **59**.13
level of costs
    conciliation proceedings   **59**.4
    determining factors   **59**.3–4
lodging fee (AFR 16)   **59**.58–9
obligation to meet   **61**.9
Secretary-General's role   **11**.12
Secretary's travel and subsistence expenses
    **59**.11
special services (AFR 15)   **59**.12
**Article 60 (fees and expenses: commission and
    tribunal members: general)**   **6**.19, **17**.1
AFR 14(1)   **60**.2
applicability to *ad hoc* committees   **60**.2
drafting history   **60**.3
equal shares   **61**.5
Memorandum on Fees and Expenses of ISCID
    Arbitrators   **60**.7, **60**.13, **60**.15
payment by Centre (AFR 14)   **60**.15,
    **61**.46
Schedule of Fees   **60**.7–8, **60**.10–14
tax privileges   **24**.6
**Article 60(1) (fees and expenses: commission
    and tribunal members: limits as
    established by Administrative
    Council/Secretary-General)**   **60**.3–9
in absence of agreement between parties and
    commission/tribunal   **60**.4
AFR as means of establishing   **60**.5–6
allowable expenses   **60**.7
low level of remuneration   **17**.8, **60**.59
    public service nature of appointment and
        **60**.9
Memorandum on Fees and Expenses of ICSID
    Arbitrators   **60**.7
obligation to meet   **61**.9
Schedule (1 January 2008)   **60**.7
**Article 60(2) (fees and expenses: commission
    and tribunal members: agreement)**
    **60**.10–14
AFR 14(1) (2006 amendment)   **60**.13
agreement of entire commission or tribunal,
    need for   **60**.14
    corruption and   **60**.14
fees higher than Schedule   **60**.10–14
    Secretary-General's role (AFR 14)   **44**.41,
        **60**.13

**Article 60(2) (fees and expenses: commission and tribunal members: agreement) (*cont.*)**
  Memorandum on Fees and Expenses of ICSID Arbitrators and   **60**.13
  Model Clauses and   **60**.12
  *MTD*   **60**.11
  Schedule of Fees limits and   **60**.10
**Article 61 (fees, expenses and Centre charges: apportionment: general)**   **6**.19, **17**.1, **61**.4
  *ad hoc* committee proceedings, application to   **61**.4
  advance payment   **61**.4, **61**.46–61, **62**.14
    AFR 14(2)   **61**.46
    AFR 14(3)   **61**.47
    apportionment   **61**.50–8: AFR 14(3)(d)   **61**.50; agreement by parties   **61**.51
    failure to make, consequences   **45**.24, **45**.43, **61**.29, **61**.49, **61**.52–4, **62**.49: stay of proceedings   **61**.49, **61**.54
    final settlement   **61**.59–61
    proportion payable   **61**.55
    timing   **61**.48
  annulment proceedings, application to   **61**.4
  conciliation and arbitration costs, differential treatment   **34**.4, **61**.2–3, **61**.6
  drafting history   **61**.2
  interpretation, revision or annulment proceedings, application to   **61**.4
  Secretary-General's role   **11**.12, **61**.48, **61**.54, **61**.60
  statement of accounts   **61**.60
  tribunal's discretion   **34**.4, **48**.64, **61**.6, **61**.15, **61**.17, **61**.42–3, **61**.55–6
  UNCITRAL and ICC provisions compared   **61**.1
**Article 61(1) (fees, expenses and Centre charges: apportionment: conciliation proceedings)**
  bad faith proceedings and   **61**.6
  determination by Convention   **61**.5
  drafting history   **61**.6, **61**.8
  equal shares   **34**.4, **61**.5–7, **61**.51
  non-discretionary nature   **34**.4, **61**.5–6
  parties to pay own costs   **61**.5, **61**.6
**Article 61(2) (fees, expenses and Centre charges: apportionment: arbitration proceedings)**
  advance payment, annulment proceedings   **61**.57–8
  agreement by parties   **61**.8–14
    clarity, need for   **61**.10, **61**.12–14: *Benvenuti & Bonfant*   **61**.13; *Cable TV*   **61**.12

Model Clauses   **61**.10
responsibility for delays, effect on costs, *Benvenuti & Bonfant*   **61**.13
applicable law   **61**.18
bad faith and   **61**.16
decision as part of award   **61**.41, **61**.62–74
  annulment decision   **61**.64, **61**.74
  compliance with requirements for awards   **62**.5054
  discontinuance order   **61**.66
  final and binding nature   **61**.73
  *LETCO*   **61**.69
  procedural orders   **61**.62
  rectification, interpretation and revision   **61**.63, **61**.69, **61**.70
discontinuance order   **48**.71
drafting history   **61**.8, **61**.16
equal shares   **61**.10, **61**.17, **61**.33–40
  *ad hoc* committee practice   **61**.39–40
  advance agreement   **61**.11: Article 61(1) (conciliation proceedings) formula   **61**.11
  jurisprudence: *Amco I*   **61**.33, **61**.39; *Azinian*   **61**.35; *CDC*   **52**.104, **61**.40; *Klöckner I*   **61**.39; *MTD*   **61**.39; *Repsol*   **52**.104, **61**.40; *Vivendi I*   **61**.39; *Wena Hotels*   **61**.39
  reasons, practice of giving   **61**.34–8
  settlement agreement   **61**.11
expenses incurred as result of one party's conduct   **43**.26–9
  *see also* procedural misconduct and *below*
"loser pays"   **61**.16, **61**.17, **61**.19–21
  costs of non-ICSID proceedings   **61**.21
  extenuating circumstances   **61**.23, **61**.35
  ICSID practice   **61**.19
  jurisprudence: *ADC*   **61**.20; *Azinian*   **61**.35; *Fireman's Fund*   **61**.37; *Fraport*   **61**.38; *MINE*   **48**.64, **61**.23, **61**.72; *Noble Ventures*   **61**.36; *SEMOS*   **61**.14; *SPP*   **61**.21
  procedural misconduct and   **61**.23
  proportional apportionment   **61**.19
lump sum contribution   **61**.20
part of the proceeding, limitation to   **61**.27–32
  *AMT*   **61**.29
  AR 28(1)(b)   **61**.27
  payment of expert, *SOABI*   **61**.30
parties' agreement   **61**.3, **61**.8–14
  clarity, need for   **61**.10, **61**.12–14
  jurisprudence: *Benvenuti & Bonfant*   **61**.13; *Cable TV*   **61**.12; *SEMOS*   **61**.14

Model Clauses    **61**.10
responsibility for delays, effect on costs
**61**.13
parties' own expenses    **61**.10, **61**.12–13,
**61**.16, **61**.33, **61**.39–40
procedural misconduct and    **43**.27–9, **61**.17,
**61**.22–32
*see also* expenses incurred as result of one
party's conduct *above*
annulment proceedings    **52**.103
jurisprudence: *Amco II*    **61**.24; *AMT*
**45**.75, **61**.29, **61**.56; *Azurix*    **61**.28;
*Benvenuti & Bonfant*    **61**.13; *Generation
Ukraine*    **61**.26; *LETCO*    **43**.27, **45**.74,
**61**.22; *MINE*    **61**.23; *Plama*    **43**.29;
*Repsol*    **52**.104, **61**.40; *SOABI*    **43**.28;
*Vivendi II*    **61**.31, **61**.32; *Zhinvali*
**61**.25
reasons for
failure to state as cause for annulment
**61**.41–3: *MINE*    **61**.42–3, **61**.72
possible principles    **61**.44
recognition and enforcement proceedings
**61**.67
settlement agreement incorporated in award
**48**.73, **61**.11, **61**.65
tribunal's discretion    **34**.4, **61**.6, **61**.15
absence of criteria    **61**.17
right to reapportion    **61**.55–6
types of costs and expenses distinguished
**61**.10, **61**.15, **61**.16, **61**.33
UNCITRAL and ICC provisions compared
**61**.17
**Article 62 (place of proceedings)**
Additional Facility and    **62**.7–10
annulment proceedings and
**62**.6
autonomy of ICSID arbitration process and
**44**.3, **44**.21, **44**.54, **53**.22, **62**.3
jurisprudence    **62**.20
*MINE* (US courts)    **62**.5
in more than one location    21, **62**.17–22
*see also* Article 43(b) (visits and enquiries)
*ad hoc* committees    **62**.20
requirements: conformity with Article 63
**62**.21; parties' agreement    **62**.21
seat of Centre
as default option    **2**.3, **62**.12–13
as normal venue    **62**.11–16
Secretary-General's role    **11**.10, **63**.22
videolink/teleconference    21, **62**.22
within territory of contracting State,
desirability    **62**.4
consent to ICSID jurisdiction, effect
**62**.5

**Article 63 (proceedings other than at Centre)**
**2**.3
conformity with Article 63, need for    **63**.05,
**63**.10
determining factors    **63**.8
freedom of choice    **63**.4–5
jurisprudence, *Mobil Oil*    **63**.11
Model Clauses (1968)    **63**.10
Model Clauses (1993)    **63**.9
parties' agreement, need for    **63**.3–6
Secretary-General's role    **11**.10
timing    **63**.7
instrument consenting to ICSID jurisdiction
**63**.7: NAFTA    **63**.13
timing of agreement/approval, preliminary
procedural consultation    21, **63**.7
**Article 63(a) (proceedings at PCA or other
appropriate institution)**
Additional Facility and    **63**.17
drafting history    **63**.14–16
"appropriate institution, whether public or
private"    **63**.14–15
Executive Directors' Report    **63**.15
institutions with whom arrangements made
**63**.16
payment for    **63**.17
Secretary-General's role    **11**.3
**Article 63(b) (proceedings at place approved
by Commission or Tribunal)**
**63**.19–25
AFR 26    **63**.22
AR 13    **63**.20
CR 13(3)    **63**.20
drafting history    **63**.24
proceedings in territory or region of host State
**63**.24–5
*Mobil Oil*    **63**.11
*Mobil Oil* (NZ proceedings)    **63**.25
Secretary-General's role    **11**.13
World Bank Offices    **63**.23
**Article 64 (disputes between Contracting
Parties: reference to ICJ)**
absence of practice    **64**.5
advisory opinions (contentious proceedings)
**64**.16–21
drafting history    **42**.183, **64**.17
ICSID status, relevance    **64**.18–20
limitation to    **42**.183, **64**.17
for settlement of disputes between ICSID
and Contracting Party    **64**.21
Article 27 (diplomatic protection) and    **27**.23,
**27**.38, **53**.44, **53**.46, **64**.10, **64**.14
Article 53 (exclusion of appeal) and    **52**.451,
**53**.23–5, **64**.12–13
drafting history    **64**.7–11

**Article 64 (disputes between Contracting Parties: reference to ICJ)** (*cont.*)

Article 53 (exclusion of appeal) and (*cont.*)
ILC Model Rules on Arbitral Procedure (1958) distinguished   **64**.13

as compulsory jurisdiction clause   **64**.2–3

disputes relating to
diplomatic protection   **27**.3, **27**.38, **53**.44, **64**.5, **64**.10, **64**.14
enforcement/compliance proceedings   **27**.38, **54**.28, **64**.5, **64**.15
exclusive remedy rule   **64**.5
non-compliance with award   **53**.44, **64**.5: settlement award   **48**.79
non-cooperation with Centre   **64**.5

drafting history   **41**.10, **41**.21, **53**.24–5, **64**.3, **64**.5, **64**.6–11
Executive Directors' Report   **53**.25

legal interest, need for   **53**.46

as "matter provided for . . . in treaties and conventions in force" (ICJ Statute)   **64**.2–3

preliminary rulings   **64**.7–11
autonomy of ICSID arbitration process and   **64**.9

reservations, admissibility   **64**.4
Turkish declaration distinguished   **64**.4, **68**.4

tribunal's exclusive right to determine its own competence and   **41**.9, **41**.10, **64**.7–11, **64**.12

**Article 65 (amendment of Convention)**   **65**.1–5

Appeals Facility, possibility of   **53**.28–30, **65**.5

drafting history   **65**.1–2

Secretary-General's role   **11**.4

**Article 66(1) (amendment of Convention: procedure)**

Additional Facility Rules as alternative   **66**.6

difficulty of securing necessary agreement   **53**.29, **66**.5
agreement *inter se*   **53**.30

effectiveness as between States agreeing to it   **66**.4

majority agreement and   **66**.4

ratification, need for   **66**.2, **66**.5

unanimity, need for   **66**.1–5

World Bank role   **66**.3

**Article 66(2) (amendment of Convention: rights and obligations arising out of previous consent)**

critical date   **25**.477

non-retroactivity   **66**.7–8, **72**.2

**Article 67 (signature of Convention)**   **67**.3–8

accession distinguished   **67**.7

Administrative Council's role   **6**.2

effect   **67**.1

non-Members of World Bank   **4**.2, **6**.2, **67**.3–8
Administrative Council invitation, need form   **67**.7
parties to ICJ Statute   **67**.5

notification   **67**.9

Secretary-General's role   **11**.7

Seychelles   **67**.8

Switzerland   **67**.8

**Article 68(1) (ratification, acceptance or approval)**

drafting history, Executive Directors' Report   **68**.2

equivalence of terms   **68**.1

need for   **66**.2, **66**.5, **67**.1–2, **68**.1
Additional Facility and   **67**.2

participation
extensive nature   **68**.7–8
Latin America   **68**.9–11: Spanish as authentic language and   **68**.11

Secretary-General's role   **11**.7

**Article 68(2) (entry into force)**   **Preamble** 10, **68**.6–7

14 October, 1966 as   **68**.7

30-day interval as "limbo"   **25**.214

Article 25(1) and   **25**.211

drafting history   **68**.6

**Article 69 (implementing legislation)**

drafting history   **69**.3

offer of consent to ICSID jurisdiction distinguished   **69**.2, **69**.9

in relation to
appointment of representatives and panel members   **69**.8
Article 17 payments to Centre   **6**.5008
exclusion of classes of disputes   **69**.9
exclusion of review of ICSID awards   **69**.6
exclusive remedy rule   **69**.7
immunities and privileges   **69**.8
recognition and enforcement   **54**.28, **54**.104, **69**.5–6
taking of evidence   **69**.8

Secretariat list of "Legislative or other Measures Relating to the Convention"   **69**.4

Secretary-General's role   **11**.7

**Article 70 (territorial application: notification of excluded territories)**

Article 25(1) designation of subdivisions and agencies distinguished   **25**.254

drafting history   **70**.2

independence of territory, effect   **70**.9
  subsequent accession of territories
    **70**.9
list of excluded territories   **70**.7–8
notice under Article 70, effectiveness
    **70**.5
presumption of application of Convention to
    all of a Contracting Party's territories
    **70**.3
procedure   **70**.7
reasons for provision   **70**.1
Secretary-General's role   **11**.7
*SPP*   **70**.10
timing
  consent, effect on   **25**.477, **25**.611
  flexibility   **70**.4
withdrawal   **70**.6
**Article 71 (denunciation)**
denunciation by Bolivia   **71**.3
effect on
  consent to jurisdiction prior to denunciation
    **25**.211, **25**.215, **71**.4, **72**.2–10
  denouncing States rights and obligations:
    arising from consent to jurisdiction
    **71**.4, **72**.11; under Convention   **72**.11
  immunities and privileges   **71**.4
  recognition and enforcement   **71**.4
effective date   **25**.211, **71**.3
notification to depositary   **71**.2
notification to signatory States   **71**.2
Secretary-General's role   **11**.7

six-month delay   **25**.211, **70**.5, **71**.4
unconditional nature of right
    **71**.1
**Article 72 (effect of exclusion of territories or
    denunciation of Convention)**
consent and   **25**.211, **72**.1–11
  "consent . . . given by one of them"
    **72**.8–10
  nationality requirements and   **72**.3
critical date   **25**.477, **72**.4–10
drafting history   **72**.1
reason for provision   **72**.1–2
**Article 73 (deposit of instruments of
    ratification, acceptance or approval
    and amendments thereto)**
Secretary-General's role   **11**.7
World Bank as depositary   **68**.1, **73**.1
  role   **73**.1–3, **74**.1
**Article 74 (registration)**   **74**.1–3
**Article 75 (depositary's notification
    obligations)**   **68**.1, **75**.1
**Final Clause**
18 March 1965 signatories to Convention
    **Final Clause** 1
authentic languages   **Final Clause** 2
  reconciliation of divergences   **52**.17,
    **52**.346, **52**.418, **54**.64–5, **54**.70, **Final
    Clause** 2
  Spanish as   **68**.11
World Bank's role as depositary   **Final
    Clause** 1

# INDEX BY SUBJECT

**Note:** "Administrative Council" is normally reduced to "Council" and "Chairman of the Administrative Council" to "Chairman" except where there might be ambiguity. "Contracting States" is used rather than "States parties". Passing references to cases, treaties or national legislation are not included. Bold numbers indicate the Articles where the issue is discussed; lean numbers indicate the paragraphs.

**AAA (American Arbitration Association)**
applicable law rules **42**.142
*MINE* **26**.9, **26**.115, **26**.149–53
*AAPL*
ancillary claims, simultaneous determination, incidental or additional claims arising out of third party contracts **46**.37
applicable law
agreement between parties: BIT agreement without express choice of law clause **42**.99; implicit agreement **42**.70–6, **42**.99; timing **42**.60–1
Arbitration Rules (AR), agreement to use version in force at time of consent **44**.52
BIT as source of international law **42**.172
closure/reopening of proceedings (AR 38) **49**.21
consent to ICSID jurisdiction
BIT **25**.432
conciliation/arbitration, choice **25**.24
*ex aequo et bono* jurisdiction **42**.276 n463
existence of legal dispute **25**.43
justiciability **25**.70
**absence of party from proceedings**, autonomy of ICSID arbitration process and **26**.3
**abusive proceedings**, application for provisional measures in domestic courts **26**.171
**act of State doctrine** **55**.34
***ad hoc* committee, appointment to** **52**.451–60
appointment of arbitrators distinguished **52**.455
by Chairman **5**.4, **52**.451
consultation with parties **52**.454: *CDC* **52**.454; *CMS* **52**.454; *Lucchetti* **52**.454; *Mitchell* **52**.454; *MTD*

**52**.454; *Repsol* **52**.454; *Soufraki* **52**.454
limitation to Panel of Arbitrators **12**.4, **13**.5, **40**.13, **52**.454, **52**.457
continuity of membership, desirability **52**.458–60
obstacles to **52**.459
permanent review commission and **52**.460
disqualification of arbitrator **57**.4–5, **58**.3
drafting history **52**.451
exclusion of **52**.461–5
co-nationals of arbitrator in same dispute **52**.463–4
conciliators or arbitrators in same dispute **52**.461–3
drafting history **52**.461–2
nationals or co-nationals of the parties **13**.9, **39**.4, **52**.461–4: dual nationals and **52**.464; uncertainties over nationality **52**.464
participants at earlier stage **52**.465
party-appointed members **52**.455, **52**.457, **52**.462
number of members **52**.455
personal immunity from legal process **21**.4
waiver by Chairman (AFR 32(2)) **21**.6
procedure
application of Convention provisions as specified in Article, 52(4) **52**.553
AR 52 **52**.453–60
replacement following disqualification, death, incapacity or resignation
absence of provision in Convention **52**.548–52, **57**.4–5: applicability of Arbitration Rules (AR) **52**.550–2, **57**.5
appointment by Chairman, need for **56**.4

Secretary-General's role   **11**.5, **11**.8, **52**.454

**ad hoc** committee, "authority to annul"
   **52**.466–92: *see also* annulment of award (general), discretionary nature
   confirmation of award, possibility of **52**.486–92
      *Amco I* **52**.488
      *CMS* **52**.490–1
      *MINE* **52**.489
   obligation to annul, whether **52**.466–85
      jurisprudence: *Amco I* **52**.469; *Amco II* **52**.470; *CDC* **52**.474; *Klöckner I* **52**.467–8; *MINE* **52**.471–2; *Mitchell* **52**.476; *Soufraki* **52**.477; *Vivendi I* **52**.474; *Wena Hotels* **52**.473
      material and technical violation distinguished **52**.478–85
   partial annulment **52**.494–510
      compliance obligation and **52**.569, **53**.63
      dispositif/reasons, separability **52**.497: *res judicata*, effect on **52**.497–9
      effect on other parts of award **52**.505–10
      jurisprudence: *Amco I* **52**.496–7, **52**.505; *Amco II* **52**.498–500, **52**.506, **52**.510 n777, **52**.675–8; *CMS* **52**.504; *Klöckner I* **52**.495; *MINE* **52**.71, **52**.501–2, **52**.507, **52**.510 n777; *Vivendi I* **52**.72, **52**.503, **52**.508
      parties' right to request **52**.69–73, **52**.494, **52**.501, **52**.503: effect on *ad hoc* committee's competence **52**.502; rejection of proposal **52**.69
      recognition/enforcement **54**.36
      *res judicata* and **52**.674–82
      tribunal's right to annul any part of award and **52**.70

**ad hoc** committee, decision as "award"   **48**.2, **48**.6, **48**.24, **48**.25, **48**.90, **48**.106, **48**.120, **52**.564–7
   annulment, possibility of **52**.80, **52**.493, **52**.540
   binding force **50**.13, **52**.3, **52**.546, **52**.569
   certification and dispatch **49**.8, **49**.25, **52**.568
   compliance, obligation **52**.569–70
      practical implications **52**.570
   date **52**.568
   exclusion of
      annulment **50**.13, **52**.569
      interpretation **50**.13, **52**.569
      revision **50**.13, **52**.569
   publication **48**.120, **52**.26, **52**.567
   recognition/enforcement of award and **52**.571, **54**.35, **54**.97–105

requirements
   conformity with AR 47(1) and (2) **52**.565
   jurisprudence: *Lucchetti* **52**.564; *Soufraki* **52**.564
   majority decision **52**.5434
   reasons **52**.566: exhaustiveness **52**.566
   signature **52**.565
   writing **52**.565
   resubmission, 50.13, 52.547, 52.569: *see also* resubmission of dispute after annulment
   revision **51**.5
   supplementation or rectification **49**.30, **50**.13, **52**.568, **61**.74

**ad hoc** committee, procedure and administrative matters
   administrative arrangements **11**.10
   as agreed by parties for original proceedings **52**.822
   applicable law **52**.555
   arbitral award, interpretation in accordance with treaty interpretation rules
      *Amco II* **52**.17
      *Klöckner I* **52**.17
      *Soufraki* **52**.17
   Arbitration Rules (AR)
      applicability **52**.557–61: committee's right to fill gaps **52**.557
   costs, fees and expenses **11**.12, **60**.2
      AFR 14(1) **60**.2
      apportionment **61**.4, **61**.57–8
   evidence, right to request **52**.556
   failure of party to appear **45**.48, **45**.86, **52**.562–3
   individual opinions **48**.106, **52**.567
   president, appointment **52**.456
   proceedings in more than one place **52**.573, **62**.20
   Secretary-General as channel of communication **11**.11
   as for tribunal proceedings **52**.561

**ad hoc** committee, role and competence
   *see also ad hoc* committee, "authority to annul"; annulment of award (general), appeal distinguished
   *compétence de la compétence* **44**.4, **52**.554
   as court of cassation **52**.491–2
   functions
      *Klöckner I* **52**.492
      limited nature **52**.10, **52**.24, **52**.492
   provisional measures, power to order **52**.573
      interim measures distinguished **52**.540

**ADC**
applicable law, agreement between parties,
        BIT agreement without express choice of
        law clause   **42**.93
confidentiality of proceedings   **44**.110,
        **44**.114, **47**.149
consent to ICSID jurisdiction, limitations
        **25**.539
costs and expenses, "loser pays"   **61**.20
"foreign" investment requirement   **25**.184
indirect investment giving rise to jurisdiction
        **25**.89
judicial decisions as source of international
        law   **42**.186
nationality (juridical persons)   **25**.736
resignation of conciliator/arbitrator   **56**.25
**Additional Facility**
  *see also* Additional Facility proceedings
  applicability
    Administrative Council's attempt to define
        **25**.203–4
    annulment proceedings and   **52**.5
    commercial transactions, exclusion
        **25**.202, **25**.203
    conciliation   **34**.7
    disputes not arising directly from an
        investment involving a party to the
        Convention   **Preamble** 16, **25**.11, **25**.87,
        **25**.202–9, **25**.224–6, **25**.300–1, **25**.443:
        host/home State, one or other not a
        Contracting State   **25**.224–6, **25**.409,
        **67**.2; non-Contracting State   **25**.11 n3,
        **25**.31–2; pre-investment activities
        **25**.208
    disputes within jurisdiction of Centre,
        exclusion   **25**.205, **25**.224: combined
        submission clause   **25**.207, **25**.224–6
    fact-finding proceedings, 25.11, 25.29–34,
        25.210: *see also* fact-finding proceedings
    mixed individual/State disputes
        **25**.11
    NAFTA   **25**.13
  combined submission clause
    BITs   **25**.225
    contingent submission in anticipation of
        ratification of Convention   **25**.221,
        **25**.222, **25**.224–6
    "investment" doubt and   **25**.207,
        **25**.209
    Model Clauses (1993)   **25**.225
  *ex aequo et bono* jurisdiction   **42**.270
  ICSID Convention, relationship with   **6**.26–8,
        **25**.12, **26**.180, **43**.3, **46**.81
    amendment of Convention, as alternative to
        **66**.6

as integral part of ICSID machinery   **6**.25
        n15
    "necessary for the implementation of the
        provisions of the Convention", whether
        **6**.26
  Introductory Notes   **25**.11 n3, **25**.30
  reasons for   **25**.9, **25**.202, **25**.224
**Additional Facility Administrative and
        Financial Rules**, fees and expenses of
        commission and tribunal members and
        **60**.5–9
**Additional Facility Arbitration Rules**
  as applicable law   **53**.7
  Arbitration Rules, divergence from
        **47**.6
  institution of proceedings   **36**.7
**Additional Facility Arbitration Rules (2006)
        by article number (figures in square
        brackets indicate corresponding
        number in 1979 version)**   **25**.221,
        **25**.225: *see also* Additional Facility
        Rules; Arbitration Rules (AR)
  1   **53**.7, **54**.13 n13, **62**.7
  2(1)   **36**.11 n13
  2(2)   **36**.10 n11
  3(3)(1)(c)   **36**.7 n7, 36.47
  4   **36**.61
  5   **36**.61
  6(1)   **37**.36 n39
  6(2)   **37**.6 n7
  6(3)   **37**.11 n16
  6(4)   **38**.1 n1
  6(5)   **40**.25 n19
  7(1)   **39**.13 n11
  7(2)   **38**.24n17
  8 [9]   **40**.14 n6, **57**.18 n13
  11 [12]   **37**.47 n46
  12 [13]   **56**.5 n3
  13(1) [14(1)]   **37**.10 n14, **56**.5 n2
  13(2) [14(2)]   **40**.18 n9
  14(2) [15(2)]   **56**.21 n15
  14(3) [15(3)]   **56**.23 n18
  15(1) [16(1)]   **57**.10 n3, **57**.16 n9
  15(2) [16(2)]   **57**.10 n3
  15(3)–(7) [16(3)–(7)]   **58**.8 n3
  16 [17]   **56**.9 n7
  17(1) [18(1)]   **56**.18 n12
  17(2) [18(2)]   **56**.19 n14
  17(3) [18(3)]   **56**.19 n14
  18 [19]   **56**.11 n8
  19 [20]   **53**.7, 53.13
  20 [21]   **53**.7, **62**.8, **62**.9, **62**.18
  20(3) [21]   **54**.13, **54**.16
  22(2) [23]   **56**.8 n6
  24(1) [25]   **56**.8 n6

25 [26]   **56**.8 n6
26 [27]   **44**.73 n90
28 [29]   **44**.28 n26
39   **44**.93 n109
40   **43**.10 n7
41(1)   **43**.10 n8
41(2)   **43**.17
41(3)   **44**.122 n142
42   **43**.84 n114
43   **43**.85 n115, **43**.93
43(b) [43(b)]   **62**.19 n19
44 [45]   **49**.11 n6
45(1) [46(1)]   **25**.623
45(2) [46(2)]   **41**.32 n37
45(3) [46(3)]   **41**.43 n58
45(6) (2006 addition)   **41**.93 n131,
    **44**.36
46(1)–(3) [47]   **26**.179
46(4) [47]   **26**.179–80
47 [48]   **46**.81
48(1) [49(1)]   **45**.47 n49
48(2) [49(2)]   **45**.78 n75
48(3) [49(3)]   **41**.52 n68, **45**.11 n8, **45**.78
    n75
52(4) [53]   **53**.6
53 [54]   **49**.5 n4
54 [55]   **42**.142
55 [56]   **50**.4 n2
56 [57]   **49**.30
56(1) [57(1)]   **49**.33
57 [58]   **49**.30
**Additional Facility Conciliation Rules (2006)**
    **34**.7, **35**.3
8 [9]   **57**.18 n13
13 [14]   **56**.5 n3
14(2) [15]   **56**.21 n15
14(3) [15]   **56**.23 n18
15(1) [16]   **57**.10 n4, **57**.16 n9
15(2) [16]   **57**.10 n4
15(3)–(7) [16]   **58**.8 n4
16 [17]   **56**.9 n7
17(1) [18]   **56**.17 n12
17(2) [18]   **56**.19 n14
17(3) [18]   **56**.19 n14
18 [19]   **56**.11 n8, **62**.10
21(2) [22]   **56**.8 n6
23(1) [24]   **56**.8 n6
24 [25]   **56**.8 n6
30 [33]   **34**.11 n14
30(3) [33(3)]   **34**.18 n20
30(4)(c) [33]   **62**.9 n12
37(3) [41(3)]   **34**.30 n27
40 [44]   **61**.5 n2
**Additional Facility proceedings**
applicable law, *lex fori*   **54**.13, **62**.7–8

finality/binding effect of award: *see*
    finality/binding nature of arbitral award
    (Additional Facility)
foreign arbitral award, whether   **54**.20–1
frequency   **25**.13
place   **54**.13, **62**.7–10
    Additional Facility Arbitration Rules 19 *and*
    20   **53**.7, **62**.8–9
    Additional Facility Conciliation Rules
    **62**.9 n12, **62**.10
    arrangements with other institutions   **63**.17
    n18
    territory of States party to New York
    Convention (1958), limitation to
    **53**.8
recognition and enforcement of award: *see*
    recognition and enforcement of arbitral
    award (Additional Facility)
requirements
    Additional Facility Rules   **25**.10
    conciliation/arbitration   **25**.224:
        Secretary-General's approval   **25**.202,
        **25**.205, **25**.224, **36**.7
    fact-finding   **25**.210
Secretary-General's role   **11**.15, **25**.31,
    **25**.202, **25**.205, **25**.210, **36**.47
**Additional Facility Rules (2006)**   **26**.22: *see*
    *also* Additional Facility Arbitration Rules
    (2006)
2   **6**.25, **25**.10, **25**.31
2(b)   **25**.87, **25**.202
2(c)   **25**.31
3   **25**.12, **36**.24 n29, **54**.13, **62**.7
4   **11**.15, **36**.7, **36**.47
    Comment (iii)   **25**.202
    Comment (iv)   **25**.203
4(1)   **25**.202, **25**.210, **25**.224
4(2)   **25**.224
4(3)   **25**.31, **25**.202
4(4)   **25**.205
adoption (27 September 1978) by
    Administrative Council   **6**.25–6,
    **25**.9
*ADF*
evidence, taking of
    refusal to produce documents
    **43**.74
    tribunal's discretionary powers   **43**.17
incidental or additional claims "arising
    directly out of subject-matter of the
    dispute"   **46**.81–2
**Administrative Arrangements, ICSID–World
    Bank Memorandum (1967):** *see* World
    Bank–ICSID Memorandum of
    Administrative Arrangements (1967)

**Administrative Council**
  Chairman: *see* Chairman of the Administrative
      Council
  establishment    **3**.1–3
  secretary    **7**.5
**Administrative Council, meetings    65**.4
  additional to annual
    at request of five members of
        Administrative Council    **7**.3
    convening by Secretary-General    **7**.3,
        **11**.4
    on decision of Administrative Council
        **7**.3
  agenda    **7**.5
  coincidence with World Bank meetings    **5**.3,
      **7**.2, **7**.4
    Administrative and Financial Regulations
        (AFR) and    **7**.2
  Inaugural Meeting (2 February 1967)    **7**.4
  notice    **7**.5
  presiding officer    **7**.5
  record    **7**.5
**Administrative Council, members**
  alternates, entitlement to participate and act
      **4**.1
  designation by Contracting States    **4**.2
    non-Members of World Bank, rights    **4**.2,
        **4**.3, **4**.4
    procedure    **4**.2
    right to appoint person other than World
        Bank governor    **4**.3
  expenses    **8**.2
  personal immunities and privileges
      **21**.1
  personal immunity from legal process, waiver
      by Council (AFR 32(3))    **21**.6
  remuneration    **8**.1–2
  representatives of each Contracting State
      **4**.1
  restriction
    of numbers    **4**.1, **4**.3
    to World Bank Members, decision against
        **4**.1
  status, "in the service of their governments"
      **8**.1
  tax privileges    **8**.2
  World Bank
    Executive Directors and    **4**.3
    governors *ex officio*    **2**.5, **4**.2–4, **8**.1
**Administrative Council, powers and functions**
  acting Secretary-General    **10**.7–8
  Additional Facility: *see* Additional Facility
      Rules
  administrative facilities, approval of
      arrangements with World Bank    **6**.14

Administrative and Financial Regulations
    (AFR)
  adoption    **6**.4–6
  amendment    **6**.4, **44**.41
annual report, approval    **6**.20
Article 6(1) and 6(3) distinguished    **6**.24
budget, adoption    **6**.18–19
committees, appointment    **6**.2, **6**.22
conciliation and arbitration rules of procedure,
    adoption    **6**.10–13
Convention, role in relation to
  amendment    **6**.2, **7**.8, **65**.3–4
  signature by non-Members of World Bank
      **6**.2
enumeration    **6**.1–21
expenditure, rules for apportionment    **6**.2
Institution Rules (IR), adoption    **6**.7–9
non-exhaustive nature of Article 6(1)    2, 6
"other powers and functions necessary for the
    implementation of this Convention"
    **6**.2, **6**.23–6
  as powers additional to Convention powers
      and functions    **6**.24
  "useful for . . . the achievement of the
      purposes of the Convention" (Working
      Paper), rejection    **6**.3, **6**.23, **6**.26
relocation of seat of ICSID    **2**.1, **6**.2
Secretary-General/Deputy Secretary-General
  determination of conditions of service
      **6**.17
  election    **6**.2
waiver of immunity of Centre    **20**.5
**Administrative Council, voting**
adoption of budget    **6**.21
capital importing/capital exporting countries,
    group voting    **7**.6
Chairman's rights    **5**.2
drafting history    **7**.6, **7**.9, **7**.10
one vote per member    **7**.6
quorum    **7**.9
  in case of vote without meeting    **7**.10
required majority
  adoption of administrative and financial
      regulations, institution rules, conciliation
      rules and arbitration rules    **6**.21
  adoption of simplified voting procedure
      **7**.8
  *non-obstat* principle    **7**.10
  simple majority of votes cast    **7**.6, **7**.7, **7**.8
  two-thirds of members    **6**.21, **7**.6, **7**.8
  unanimity    **7**.6
simplified voting procedure/voting without
    meeting    **6**.2, **7**.10–12
  adoption of procedure, two-thirds majority
      requirement    **7**.8

agreement to by two-thirds majority
   **7**.10
applicability to all matters   **7**.10
quorum   **7**.10
required majority   **7**.10, **7**.11
time limit   **7**.10: 21 days   **7**.11
solicitation of votes of absent members
   **7**.12
**Administrative and Financial Regulations
   (AFR)**   **44**.39, **44**.41: *see also*
   Arbitration Rules (AR) (1968);
   Arbitration Rules (AR) (2006) by article
   number (figures in square brackets
   indicate 1986 articles); Conciliation
   Rules (CR); Institution Rules (IR) (1968);
   Institution Rules (IR) (1984)
Administrative Council's powers   **6**.4–5
   adoption   **6**.4, **6**.5
   amendment   **6**.4
adoption, required majority   **6**.21, **7**.8
amendment   **6**.5, **6**.6
intertemporal rule and   **44**.41
modification by parties   **44**.41
modification/derogation   **6**.6, **40**.26, **44**.13,
   **61**.9
revision   **44**.41
scope   **44**.41
   Administrative Council procedures   **6**.6
   immunities and privileges   **6**.6
   Secretariat organization   **6**.6
**Administrative and Financial Regulations
   (AFR) (Provisional) (1967)**   **6**.5
**Administrative and Financial Regulations
   (AFR) (1968)**   **6**.5
5   **60**.10 n10
**Administrative and Financial Regulations
   (AFR) (1984/2006)**   **6**.5
1–7   **7**.1
1(1)   **7**.2
2   **7**.5
3   **7**.5
4   **7**.5
4(2)   **5**.3
5   **7**.5
7   **7**.7
7(3)   **7**.11
7(4)   **7**.12
8   **10**.2
8(b)   **10**.6
9(1)   **10**.8
9(2)   **10**.9
10   **11**.5
11   **11**.5
12   **11**.5
13   **9**.6, **40**.26

14   **11**.11, **11**.12, **11**.13, **60**.6, **60**.15
14(1)   **60**.2
   2006 amendment   **44**.41, **60**.13
14(2)   **61**.46
14(3)   **45**.24, **45**.43, **45**.58, **52**.103, **60**.15,
   **61**.7, **61**.47
14(3)(d)   **45**.58, **61**.50
14(3)(e)   **61**.4, **61**.57–8
15   **11**.12, **59**.12
16   **11**.13, **36**.16, **52**.85, **59**.8
17   **6**.19, **11**.6
18   **11**.6, **17**.9
19   **11**.6
21   **11**.8, **13**.2, **16**.4
   text   **16**.4
21(2)   **14**.4
21(3)   **12**.5
21(4)   **16**.5
22   **11**.14, **47**.151
22(2)   **48**.112
23   **11**.8, **36**.60, **44**.92
24   **37**.29 n32, **44**.92
25   **11**.10, **44**.102
26   **11**.10, **62**.15, **62**.18
27   **11**.10
27(1)   **44**.66
28   **49**.9
28(2)   **49**.37, **49**.78, **50**.26, **50**.45, **51**.39,
   **52**.608, **54**.99 n119
29   **49**.34, **51**.28, **52**.437
30   **36**.15
30(3)   **36**.52
31   **21**.11
32(1)   **21**.6
32(1)(a)   **20**.5
32(1)(c)   **20**.5
32(2)   **21**.6
32(2)(b)   **22**.9
32(2)(c)   **22**.9
32(3)   **21**.6
34(1)   **36**.14, **44**.62
Article 59 provision for   **59**.7
**admissibility, relevance in ICSID context**
   absence from Convention   **25**.18
   forum selection clauses and   **25**.18
   jurisprudence   **25**.18
*Adriano Gardella*
   applicable law, agreement between parties,
      timing   **42**.57
   international law, relationship with domestic
      law, parallel application   **42**.207
   international law/general principles of law as
      applicable law agreed by parties
      **42**.100
   "*legal* dispute"   **25**.80 n98

*Adriano Gardella* (***cont.***)
   replacement of conciliator/arbitrator following
      death    **56**.30
**advisory functions (ICSID)**, drafting of
      arbitration and investment laws    **1**.6
**advisory functions (Secretary-General)**    **11**.1,
      **11**.4
*AES*
   applicable law    **42**.10
   diplomatic protection    **27**.4 n2
   exhaustion of local administrative or judicial
      remedies    **26**.217
   judicial decisions as source of international
      law    **42**.184
   legal dispute "arising directly", general
      measures    **25**.109
   parallel treaty and contract claims
      **26**.101
**African countries**
   implementation measures    **69**.4 n1
   participation in Convention    **68**.7, **68**.8
**agency:** *see* constituent subdivision or agency as
      party to proceedings
*AGIP*
   consent to ICSID jurisdiction, limitations
      **25**.517
   evidence, taking of
      "at any stage of the proceedings"    **43**.31,
         **47**.81
      parties' duty to cooperate    **43**.66
   *ex aequo et bono* jurisdiction, parties'
      agreement    **42**.258
   existence of dispute, measures to remedy
      dispute, relevance    **25**.47, **25**.75
   failure to participate in Tribunal's constitution
      **45**.50
   international law/general principles of law as
      applicable law agreed by parties    **42**.33,
      **42**.97–8
   international law/host State law,
      interrelationship    **42**.220
   multiple instruments/varying parties, unnamed
      parties, ICSID jurisdiction and    **25**.328
   provisional measures
      non-compliance, effect on award    **43**.66,
         **47**.34
      preservation and production of evidence
         **43**.31, **43**.61, **47**.34, **47**.81
      priority and speed, need for    **47**.40
   stabilization clause    **42**.120–1
**agreements**
   investment, *see also* BITs; investor/host State
      agreements, consent to ICSID
      jurisdiction
   signature on behalf of Centre    **11**.3

to arbitrate: *see* concurrent arbitration
      provisions; consent to ICSID jurisdiction
*Aguas del Tunari*
   *amicus curiae* briefs    **44**.124
   assignment/succession of investor's rights and
      responsibilities    **25**.350
   diplomatic protection, exclusion    **27**.47–8
   evidence, taking of
      admissibility    **43**.15–16
      refusal of request for    **43**.79
   evidence, tribunal's discretionary powers
      **43**.15–16
   experts    **43**.102
   foreign control for purposes of treatment as
      national of another State
      form and extent of control, decision-making
         structure and management    **25**.859–63
      indirect control    **25**.847
   "investment"    **25**.124, **25**.127
      "in accordance with host State law"
         **25**.201
   national of another Contracting State,
      agreement to treat as    **25**.773
   test    **25**.765
*AIG*
   jurisdiction, objections to, time limits
      **41**.41
   State immunity from execution, protected
      property    **54**.61–3, **55**.38–9, **55**.70–1,
      **55**.118
**Albania**
   consent to ICSID arbitration, statutory
      provisions    **26**.43
   Foreign Investment Law 1993    **25**.134–5,
      **25**.395, **25**.508, **25**.524, **25**.541, **26**.46
      n54
*Alcoa*
   excluded classes of disputes, notification
      **25**.938
   "legal" dispute    **25**.64
   withdrawal of consent to ICSID jurisdiction
      **25**.607
*Amco I*
   *ad hoc committee*
      obligation to annul, whether    **52**.469
      power to confirm award    **52**.488
   ancillary claims, simultaneous determination,
      presentation of ancillary claim, time
      limits    **46**.26
   annulment of award
      applicable law    **52**.555
      partial, effect on other parts of award
         **52**.506
      preliminary decision on jurisdiction and
         **52**.67

time limits    **49**.85, **52**.97: requirement to provide detailed grounds and **52**.442

waiver of right to, post-award **52**.47–8

annulment of award, grounds

decision *ex aequo et bono* without agreement of parties    **42**.16, **42**.18–19, **42**.261, **52**.239, **52**.245, **52**.252–6, **52**.257

exclusion of new arguments on fact or law **52**.13

failure to deal with every question submitted **49**.71, **52**.304, **52**.405, **52**.408, **52**.415, **52**.422

failure to state reasons: absence of reasons **52**.351; contradictory reasons    **52**.392; quality/sufficiency of reasons    **48**.62, **52**.369; relevance to decision, need for **48**.62

lack of impartiality, burden of proof **52**.324–5

manifest excess of powers    **52**.152, **52**.153: failure to apply correct applicable law **42**.152, **52**.198, **52**.212, **52**.214, **52**.227–30

multiple grounds/classification difficulties **52**.415, **52**.520–2, **52**.526

serious departure from fundamental rule of procedure: failure to comply with evidentiary standards    **52**.324–5; lack of impartiality/inequality of treatment **52**.299–301, **52**.324–5; allocation of burden of proof    **52**.301, **52**.324–5

annulment of award, request    **52**.48–9, **52**.67

reasons for making    **52**.44

required information    **52**.88–91

applicable law

in absence of agreement between parties **42**.144, **42**.152: host State law, "including its rules on the conflict of laws" (*renvoi*) **42**.163

agreement between parties, implicit agreement    **42**.77

applicable law (interpretation of consent to ICSID jurisdiction)    **25**.581, **25**.582

assignment/succession of investor's rights and responsibilities    **25**.339–41

"authority to annul", partial annulment **52**.496–7, **52**.506

closure/reopening of proceedings (AR 38) **49**.21

consent to ICSID jurisdiction: *see* jurisdiction, objections to *below*

interpretation, restrictive/extensive, whether **25**.5381

investment application and    **25**.389

multiple instruments    **25**.389: critical date and    **25**.468

national legislation as consent or offer **25**.414

constituent subdivision or agency as party to proceedings, designation, dependence of jurisdiction on    **25**.264

Contracting State status, critical date **25**.217

costs and expenses    **61**.39

parties to bear own    **61**.33

criticism of decision    **52**.29

diplomatic protection, exclusion under Convention    **42**.194

disqualification of conciliator or arbitrator, grounds, manifest absence of Article 14 qualities    **57**.21–2

domestic court decisions, binding on international tribunals, whether **26**.138

evidence, tribunal's discretionary powers **52**.324–5

*ex aequo et bono* jurisdiction

*see also* annulment of award, grounds, decision *ex aequo et bono* without agreement of parties *above*

equitable considerations distinguished **42**.16, **42**.269, **52**.252–6

exclusive remedy rule    **26**.136–8

application to non-judicial remedies **26**.184

failure to protest improper pursuit of remedies in non-ICSID forum **26**.136–40

implied waiver    **26**.136–9

exhaustion of local administrative or judicial remedies    **26**.209

foreign control for purposes of treatment as national of another State

change of nationality following consent **25**.875

critical dates    **25**.875

form and extent of control, sole or main shareholding    **25**.852

indirect control    **25**.703, **25**.841–2

objective requirement    **25**.816

"foreign" investment requirement    **25**.183

ICSID Convention, object and purpose **Preamble** 13

independence of arbitrator    **57**.21–2

*Amco I* (*cont.*)
  international law/host State law,
      interrelationship
    of international law  **42**.216
    parallel application  **42**.210, **42**.212
  international minimum standards, desirability
      **42**.114 n196
  investment dispute/international tort
      distinguished  **25**.490
  jurisdiction, objections to, waiver  **25**.490
  justiciability  **25**.71
  multiple instruments/varying parties, unnamed
      parties, ICSID jurisdiction and
      **25**.324–6, **25**.389
  national of another Contracting State,
      agreement to treat as
    identification of recognized nationality
        **25**.799–800, **25**.805
    implicit agreement, possibility of
        **25**.780–1
    test  **25**.765
  proceedings in domestic courts, denial of
      justice, whether  **26**.138
  provisional measures
    circumstances requiring, hostile propaganda
        **26**.184, **47**.137–40
    priority and speed, need for  **47**.40
    purpose/rights to be protected:
        confidentiality of proceedings  **47**.149;
        exclusive nature of ICSID proceedings
        **47**.140; preservation of rights in dispute
        **47**.160, **47**.169
  stay of enforcement in annulment proceedings
    circumstances requiring  **52**.610
    discretionary nature  **52**.594
    procedure (AR 54)  **52**.597
    security for eventual payment of award
        **52**.629–31: termination of stay, effect
        **52**.652
  supplementation or rectification of award
      **49**.42–3, **49**.71, **52**.78
    exclusive remedy, whether  **49**.71
    time limits, extension  **49**.85
  tax dispute, "arising directly", whether
      **46**.26, **46**.80
*Amco II*
  *ad hoc* committee, obligation to annul,
      whether  **52**.470
  annulment of award (general), interpretation of
      Article 52  **52**.17, **52**.19, **52**.24, **52**.31,
      **52**.59
  annulment of award, grounds
    failure to state reasons: absence of reasons
        **52**.353; quality/sufficiency of reasons
        **52**.370–2

  manifest excess of powers  **52**.165–6:
      failure to apply correct applicable law
      **52**.200–1, **52**.270
  serious departure from fundamental rule of
      procedure: failure to hear other party
      (*audiatur et altera pars*)  **52**.292,
      **52**.303, **52**.306–8; lack of
      impartiality/inequality of treatment
      **52**.303; "serious departure"/"fundamental
      rule"  **49**.42, **52**.292, **52**.303,
      **52**.306–8
  annulment of
    rectification decision  **52**.78
    resubmission decision  **52**.82
    supplemental award  **52**.82
  annulment, request, by both parties
      **52**.42
  applicable law, in absence of agreement
      between parties  **52**.201, **52**.270
  arbitral award, interpretation in accordance
      with treaty interpretation rules
      **52**.17
  assignment/succession of investor's rights and
      responsibilities  **52**.671
  "authority to annul", partial annulment
      **52**.498–500, **52**.510 n777
  costs and expenses, procedural misconduct
      and  **61**.24
  exclusive remedy rule, decision of Indonesian
      courts following award as *novus actus
      interveniens*  **26**.139
  exhaustiveness/reasons requirement
      (Article 48(3))  **48**.65
  international law/host State law,
      interrelationship  **42**.217–18,
      **42**.235
  legal status and capacity of investor, applicable
      law  **25**.341, **42**.158
  resubmission of dispute after annulment
      **52**.658, **52**.675–8
    admissibility of: new arguments  **52**.692–3;
        new claims  **46**.27–8, **46**.91, **52**.690–2
    counterclaims, relevance  **46**.66
    procedure, request by one or both parties
        **52**.664
    *res judicata* and, 52.165–6: legal effect of
        reasoning of *ad hoc* committee
        **52**.165–6, **52**.685–8
    status of parties, change in  **52**.671,
        **52**.673
    stay of enforcement and  **52**.700
  stay of enforcement in annulment proceedings
    procedure (AR 54)  **52**.600
    security for eventual payment of award
        **52**.600, **52**.631

supplementation or rectification of award
**49**.42–3, **52**.78
parties' right to be heard (AR 49(3))
**49**.42
tax dispute, "arising directly", whether
**25**.97–8, **46**.27–8, **46**.80
**amendment (ICSID Convention)**
Administrative Council and    **6**.2, **7**.8,
**65**.3–4
agreement *inter se*    **53**.30
modification by parties: *see under separate
headings*
objection to as ground for denunciation
**71**.1
procedure    **66**.3–4
adoption of Additional Facility Rules (1978)
and    **66**.6
World Bank role    **66**.3
proposals for    **65**.1–5
absence    **65**.5
ICSID Appeals Facility    **53**.28–30,
**65**.5
notice    **65**.4
"Possible Improvements of the Framework
for ICSID Arbitration" (2004)
**65**.5
right of any State Party to make
**65**.3
Secretary-General's role    **11**.4,
**65**.3
requirements
ratification    **66**.2, **66**.5
unanimity    **66**.1–5: effectiveness between
States agreeing to it    **66**.4; majority
agreement, rejection of proposal for
**66**.1–5
rights and duties, effect on
critical date    **25**.477
non-retroactivity    **66**.7–8
**amicable settlement** *see* consultation or
negotiations obligation; settlement and
discontinuance (AR 43)
*amicus curiae* **briefs (AR 37(2))/tribunal's
discretionary powers,**    **44**.36, **44**.58,
**44**.104, **44**.120, **44**.122–8
AR 37(2)
changes/subsequent practice    **44**.122,
**44**.127–8
practice prior to    **44**.123–6
jurisprudence
*Aguas del Tunari*    **44**.124
*Biwater Gauff*    **44**.119–20, **44**.127–8
*Suez and AWG*    **44**.125–6
*Suez et al.*    **44**.125–6
NAFTA and    **44**.123

*AMT*
closure/reopening of proceedings (AR 38)
**49**.21
consent to ICSID jurisdiction    **25**.452
costs and expenses
advance payment    **61**.29, **61**.56
procedural misconduct and    **45**.75, **61**.29,
**61**.56
failure of party to appear or to present case
**45**.60, **45**.64, **45**.89
failure to participate in Tribunal's
constitution    **45**.37–8, **45**.53
replacement of conciliator/arbitrator following
death    **51**.32 n17
revision of award    **51**.3, **51**.40
submission to original tribunal    **51**.32
time limits and    **51**.29
**ancillary claims, simultaneous determination**
Article 48(3) (exhaustiveness) and
**48**.45
comparable provisions in other international
instruments    **46**.3
counterclaims: *see* counterclaim arising
directly out of the subject-matter of the
dispute
drafting history    **46**.4, **46**.7, **46**.32, **46**.87
"except as the parties otherwise agree"
**46**.6–11
form of agreement: blanket exclusion;
dangers of    **46**.9; Model Clauses (1968)
**46**.9; Model Clauses (1993)    **46**.10;
restriction of ICSID jurisdiction to
specific matters    **46**.10
non-ICSID dispute settlement clauses, effect
**46**.8
parallel dispute settlement provisions, effect
**46**.8
specific agreement of parties, need for
**46**.7
incidental or additional claims
definition    **46**.2
interest: *see* interest, claim for
jurisprudence: *Atlantic Triton*    **46**.63;
*MINE*    **46**.62
new arguments, relevance    **46**.29
procedural costs    **46**.61–3, **46**.71
incidental or additional claims "arising
directly out of subject-matter of the
dispute"    **46**.5
"arising directly out of an investment"
distinguished    **46**.74
English, French and Spanish texts compared
**46**.72
jurisdictional requirement distinguished
**46**.73–8, **46**.92

**ancillary claims, simultaneous determination**
**(*cont.*)**
incidental or additional claims (*cont.*)
jurisprudence: *ADF*   **46**.81–2; *Amco I*
**46**.26, **46**.80; *Amco II*   **25**.97–8,
**46**.27–8, **46**.80, **46**.91; *CMS*   **46**.83–4;
*Holiday Inns*   **46**.76; *Klöckner I*   **46**.77;
*LG&E*   **46**.85; *Saluka*   **46**.78
limited discussion of issue   **46**.79–85
incidental or additional claims arising out of
third party contracts   **46**.36–42
jurisprudence: *AAPL*   **46**.37; *Middle East
Cement*   **46**.39; *PSEG*   **46**.41; *Siemens*
**46**.42; *SOABI*   **46**.36; *SPP*   **46**.38;
*Zhinvali*   **46**.40
"incidental or additional claims or
counterclaims"
*ADF*   **46**.32
definitions   **46**.2, **46**.32–4
failure to distinguish between   **46**.32–4
jurisdiction, objections to, time limits
**41**.36–7
proposals to delete or merge   **46**.32
time limits, differing requirements   **46**.34
jurisdiction, need for   **46**.5, **46**.13, **46**.86–95
jurisprudence: *Amco II*   **46**.91; *Atlantic
Triton*   **46**.93; *Benvenuti & Bonfant*
**46**.89; *Klöckner I*   **46**.90; *LETCO*
**46**.92; *Saluka*   **46**.95
reasons for inclusion of provision   **46**.87
obligation to determine ancillary claims,
simultaneous determination   **46**.30–1
Article 48(3) and   **46**.30
failure: failure to state reasons   **46**.30;
manifest excess of powers *infra petita*
**46**.30
means of fulfilling   **46**.31
presentation of ancillary claim
jurisprudence: *Amco I*   **46**.26; *Amco II*
**46**.27–8; *Atlantic Triton*   **46**.19;
*Benvenuti & Bonfant*   **46**.24; *Enron*
**46**.29; *Metalclad*   **46**.23; *Middle East
Cement*   **46**.20; *SOABI*   **46**.21; *SPP*
**46**.25; *Tanzania Electric*   **46**.22
right to comment on   **46**.17–18
time limits   **46**.15–29: AR 40   **46**.15,
**46**.17, **46**.25; conclusion of written
proceedings   **46**.16; justification for late
presentation   **46**.16
purpose
avoidance of conflicting decisions   **46**.1
economy   **46**.1
efficiency   **46**.1, **46**.4, **46**.29
fairness   **46**.29
finality of decisions   **46**.1
*Sempra*   **46**.14

requirements
AR 40(1)   **46**.13, **46**.81
request by one of the parties   **46**.12
tribunal's resort to own initiative
exclusion   **46**.12
as manifest excess of powers   **46**.12
**ancillary proceedings**, in foreign courts, States'
dislike   **26**.4
**Angola**, non-participation   **68**.8
**annual report (Centre)**
approval by Administrative Council   **6**.20
Panel designations   **12**.6
scope   **6**.20
**annulment of award, applicability of
Convention provisions to**   **36**.8, **41**.73,
**52**.539–73
ancillary claims   **52**.541
decisions on costs   **52**.541, **52**.572,
**61**.74
annulment decisions   **52**.80, **52**.493, **52**.545,
**52**.547, **57**.4–5, **61**.74
"awards", limitation to   **52**.61–82, **52**.98,
**52**.493
drafting history   **52**.61
jurisprudence: *Amco I*   **52**.67; *Amco II*
**52**.82; *Holiday Inns*   **52**.65; *Klöckner II*
**52**.82; *SPP*   **52**.66
procedural economy and   **41**.27
conciliation proceedings   **33**.5
discontinuance order   **48**.71
excluded provisions   **52**.540–52
interpretation of award   **52**.79
partial award   **52**.73
preliminary decision on jurisdiction   **41**.5–9,
**52**.131, **52**.542, **52**.554
annulment prior to final award, exclusion
**41**.26–7, **52**.64
declining   **52**.63
joinder to merits   **41**.25, **41**.72,
**41**.78–84
as part of award   **41**.25, **52**.62
upholding   **52**.62
procedural orders   **52**.64
provisional measures   **52**.64, **52**.493,
**52**.540
rectification   **52**.77–8, **52**.493
*Amco II*   **52**.78
resubmission decisions after annulment of
award   **52**.81–2
revision   **51**.6
revision of award   **52**.79
separability of proceedings   **52**.78
settlement agreement   **48**.78
incorporated in award   **52**.76, **52**.493:
limited grounds for annulment   **52**.76,
**52**.493

settlement and discontinuance, orders noting **52**.74–6

supplementation or rectification **49**.79

**annulment of award, decision**

annulment: *see* annulment of award, applicability of Convention provisions to, annulment decisions

criticism of **52**.29

*Amco I* **52**.29

*Klöckner I* **52**.29

*SPP* **52**.29

decision on costs as part of

interpretation of award and **61**.74

supplementation/rectification **61**.74

drafting in accordance with Article 48, need for legal qualifications to ensure **14**.3

recognition/enforcement **54**.33

timing **41**.25

**annulment of award (general)** **52**.14–15:

*see also ad hoc* committee

appeal distinguished **48**.58, **52**.1, **52**.2, **52**.8–13, **52**.344, **52**.363–6

finality of award, as exception to **52**.3

invalidation/modification as respective outcomes **52**.10

limitation of annulment to procedural considerations **52**.11, **52**.13

comparable provisions in other international instruments

Additional Facility **52**.5

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958) **52**.6

ICC **52**.5

ICC Arbitration Rules (1998) **52**.6

ILC Model Rules on Arbitral Procedure (1958) **52**.1, **52**.7 n10

inter-State arbitration, absence **52**.7

PCIJ/ICJ review, absence **52**.1

UNCITRAL Model Law on International Commercial Arbitration (1985) **52**.6

diplomatic protection and **52**.542, **52**.544

discretionary nature **52**.38, **52**.44–5, **52**.466–85

drafting history **52**.1, **52**.8, **52**.69

exceptional nature of award **52**.37

exclusive remedy rule and **52**.4, **52**.542–3, **53**.32, **53**.62

failure of party to appear **45**.48, **45**.86

interpretation of Article 52

flexible application of Convention **52**.514

in accordance with object and purpose **52**.18, **52**.20, **52**.36, **52**.54, **52**.346, **52**.470, **52**.471, **52**.475

"in accordance with the principles and rules of treaty interpretation generally recognized in international law" **52**.17

*in favorem validitatis sententiae* **52**.22, **52**.178

strict/liberal **52**.18, **52**.23–4

interpretation of award distinguished **52**.2

jurisprudence (interpretation of Article 52/ appeal distinguished)

*Amco I* **52**.13, **52**.17, **52**.23

*Amco II* **52**.17, **52**.19, **52**.24, **52**.29, **52**.31, **52**.59

*CDC* **52**.19, **52**.33, **52**.38, **52**.378

*CMS* **52**.15, **52**.190

*Klöckner I* **52**.13, **52**.17, **52**.21–3, **52**.178, **52**.214, **52**.364–5, **52**.514

*Klöckner II* **52**.23, **52**.31, **52**.59

*MINE* **52**.13, **52**.18, **52**.23, **52**.31, **52**.33, **52**.372

*Mitchell* **52**.13, **52**.19, **52**.39–40, **52**.203

*MTD* **52**.35

*RFCC* **52**.34

*Soufraki* **52**.17, **52**.19–20, **52**.22, **52**.36, **52**.37, **52**.38

*Vivendi I* **52**.19, **52**.32, **52**.38

*Vivendi II* **52**.24

*Wena Hotels* **52**.19, **52**.32, **52**.33, **52**.38

modification of Convention provisions by parties **52**.51–4

overview of annulment proceedings **52**.25–40

development of balanced approach **52**.31–40

principles underlying

exclusion or modification of provision and **52**.54, **52**.57

finality/correctness, balance between **52**.15, **52**.31–40, **52**.59

integrity and quality of process **52**.14, **52**.54, **52**.57, **52**.237

preservation of parties' interests **52**.14, **52**.54, **52**.57

proposals for reform **52**.29

recognition/enforcement of award and **54**.35

resubmission of dispute after: *see* resubmission of dispute after annulment

revision proceedings

distinguished **51**.3, **52**.2

stay of proceedings pending outcome of **51**.12, **51**.41

submission to different tribunal (*ad hoc* committee) **52**.2

**annulment of award, grounds, corruption of arbitrator**   **40**.28, **52**.271–7
absence of cases invoking   **52**.28, **52**.112
comparable provisions in other international instruments   **52**.271–2
"corruption"   **52**.273
bias distinguished   **52**.274
compensation as key element   **52**.273–4
failure to disclose relationship with party (AR 6)   **52**.275, **52**.465
unauthorized communication with party distinguished   **52**.274
drafting history   **52**.272, **52**.435–6
separate agreement on fees or expenses and **60**.14
time limits, special provisions   **52**.277, **52**.435–6, **52**.448–50, **52**.546, **53**.54
where corrupt arbitrator has voted against award   **21**.8, **52**.482
**annulment of award, grounds, failure to apply correct applicable law**   **42**.14–20, **42**.248, **52**.133, **52**.191–270, **52**.512
decision *ex aequo et bono* without agreement of parties   **42**.15–19, **42**.260–5, **52**.220, **52**.239, **52**.244–58, **52**.518
jurisprudence: *Amco I*   **42**.16, **42**.18–19, **42**.261, **42**.269, **52**.252–6; *Klöckner I* **42**.15, **42**.18–19, **42**.262–3, **52**.245, **52**.248–51, **52**.294; *MINE*   **42**.17, **42**.264, **52**.199, **52**.245; *MTD*   **52**.247
test   **52**.258
drafting history   **52**.193–5, **52**.209
failure to apply international law   **52**.259–70
erroneous/partial application distinguished **52**.263
important principles of international law **52**.264
peremptory norms of international law **52**.263
failure to apply law agreed by parties   **42**.19, **52**.199
failure to cite specific legal authority **52**.233–43, **52**.297
failure to state reasons as alternative ground **52**.109, **52**.243
interest   **46**.47
jurisprudence
*Amco I*   **42**.152, **52**.198, **52**.212, **52**.214, **52**.227–30, **52**.239–41, **52**.245, **52**.252–7, **52**.261–2, **52**.267–9, **52**.481
*Amco II*   **52**.200–1, **52**.270
*CDC*   **52**.219, **52**.220
*CMS*   **52**.225, **52**.231
*Klöckner I*   **42**.150–1, **52**.197, **52**.211, **52**.214, **52**.257, **52**.266, **52**.294–8, **52**.518

*Lucchetti*   **52**.202
*MINE*   **52**.213, **52**.220, **52**.242, **52**.481
*Mitchell*   **52**.203
*Soufraki*   **52**.184, **52**.204–7, **52**.223–4, **52**.243
*Vivendi I*   **26**.81–5
*Wena Hotels*   **52**.215–18
method of determining applicable law, relevance   **52**.208–9
non-application/misapplication distinguished **42**.18–20, **52**.153, **52**.194–5, **52**.204–7, **52**.210–32
partial non-application   **52**.226–32
erroneous application and   **52**.226–32
partial application of international law and **52**.263
standard of non-compliance   **42**.17, **52**.197–9, **52**.232, **52**.481
waiver, right of   **52**.55
**annulment of award, grounds, failure to deal with every question submitted** **48**.44–53, **52**.399–434
"deal with"   **52**.427–34
drafting history   **48**.44, **49**.29, **49**.38, **49**.69, **52**.399–400, **52**.404
exhaustiveness requirement and   **48**.44, **52**.403–10, **52**.419–20
as failure to state reasons   **48**.51–3, **49**.70, **49**.72
interpretation decisions and   **48**.89
jurisdictional questions   **41**.51, **41**.65–8
jurisprudence
*Amco I*   **49**.71, **52**.304, **52**.405, **52**.408, **52**.415, **52**.422
*CDC*   **52**.425
*Klöckner I*   **52**.407, **52**.414, **52**.420–2, **52**.428–30
*MINE*   **52**.409, **52**.412, **52**.417, **52**.424, **52**.431
*Wena Hotels*   **48**.52, **49**.77, **52**.410–12, **52**.432
"question"   **52**.418–26
as crucial or decisive argument   **52**.67–8, **52**.426, **52**.433
as serious departure from fundamental rule of procedure   **48**.51, **52**.110, **52**.300, **52**.413–17, **52**.513
supplementation or rectification and   **48**.51, **48**.52, **48**.89, **49**.29, **49**.38, **49**.68–77, **52**.401–2, **52**.407
**annulment of award, grounds, failure to state reasons**   **52**.338–434
absence of reasons   **52**.348–62
*défaut de motifs*   **52**.346

jurisprudence: *Amco I* **52**.351; *Amco II*
    **52**.353; *CDC* **52**.356; *Klöckner I*
    **52**.350; *MINE* **52**.352; *Mitchell*
    **52**.357; *MTD* **52**.359; *Soufraki*
    **52**.358; *Vivendi I* **52**.355; *Wena Hotels*
    **52**.354
"reconstruction" of reasons   **52**.350–2
in respect of part of award, failure to deal
    with every question compared   **52**.362
comparable provisions in other international
    instruments   **52**.338–9
    ILC Model Rules on Arbitral Procedure
    (1958)   **52**.339
contradictory reasons   **52**.389–98
    jurisprudence: *Amco I* **52**.392; *CDC*
    **52**.397; *Klöckner I* **48**.59–61, **52**.390–2;
    *MINE* **48**.63–4, **52**.393–5; *MTD*
    **52**.398 ; *Vivendi I* **52**.396
costs   **52**.484, **61**.41–5, **61**.68, **61**.71–2
    *CDC* **52**.484
    *MINE* **61**.42–3, **61**.72
drafting history   **52**.339–40, **52**.343
    serious departure from fundamental rule of
    procedure, separation from   **52**.106,
    **52**.113, **52**.339
*ex aequo et bono* decision and   **42**.272, **48**.57,
    **52**.349
exhaustiveness and   **48**.44, **52**.513
failure of party to appear or present case
    **45**.8
failure to apply correct applicable law as
    **52**.109, **52**.243
failure to deal with every question as
    **48**.51–3
failure to determine ancillary claim
    **46**.30
failure to exercise jurisdiction (*infra petita*) as
    **52**.171
hypothetical reasons   **48**.60
interpretation of provision, comparison of
    different language versions   **52**.346
jurisdictional decision   **41**.68
quality/sufficiency of reasons   **48**.58–68,
    **52**.342, **52**.344–6, **52**.363–88
    harm to party, relevance   **48**.59
    jurisprudence: *Amco I* **48**.62, **52**.369;
    *Amco II* **52**.370–2; *CDC* **52**.378–9;
    *CMS* **52**.385–7; *Klöckner I* **52**.364–8;
    *Klöckner II* **52**.374–5; *Lucchetti*
    **52**.384; *MINE* **52**.372–3, **52**.379,
    **52**.388; *Mitchell* **52**.380–1; *MTD*
    **52**.382; *Soufraki* **52**.383; *Vivendi I*
    **52**.377, **52**.388; *Wena Hotels* **52**.376
    practice in different legal systems and
    **52**.345
    subjective nature   **52**.363, **52**.484

*ratio decidendi*/*obiter dicta* distinguished
    **48**.60
reasons as standard requirement
    **52**.54–68
    jurisprudence: *Amco II* **48**.65; *Klöckner I*
    **48**.60, **49**.70, **52**.347; *MINE* **48**.63–4;
    *Wena Hotels* **48**.52, **48**.66, **49**.77,
    **52**.341
relevance to decision, need for   **48**.61–3
scope of reasons
    facts   **52**.343, **52**.349
    law   **52**.343, **52**.349
summary procedure (AR 41(5)) and
    **41**.100
supplementation or rectification of award and
    **49**.69, **49**.70
waiver, right of   **52**.57, **52**.339–40
    *MINE* **52**.340
**annulment of award, grounds (general**
    **considerations)**
amendment of grounds   **52**.535–6
    in light of new facts   **52**.536
comparable provisions in other international
    instruments   **52**.105
defective consent   **25**.489
drafting history   **52**.105–7
error of law, exclusion   **52**.15, **52**.190,
    **52**.195, **52**.210
exclusion of new arguments on fact or law
    *Amco I* **52**.13
    *CMS* **52**.15, **52**.190
    *Klöckner I* **52**.13, **52**.108
    *MINE* **52**.13, **52**.108
    *Mitchell* **52**.13, **52**.203
    *MTD* **52**.12, **52**.108
exhaustive nature of Article 52(1) provisions
    **52**.11, **52**.13, **52**.108–10, **52**.511–15
flexible application of Convention
    **52**.512–92
multiple grounds/classification difficulties
    **52**.109–10, **52**.111–12, **52**.113–17,
    **52**.413–17, **52**.516–23
    consolidation, desirability   **52**.68
    cumulative grounds/need to examine all
    grounds   **52**.524–30
    incorrect classification, relevance
    **52**.538
    jurisprudence: *Amco I* **52**.415, **52**.520–2,
    **52**.526; *CDC* **52**.416, **52**.523; *CMS*
    **52**.528; *Klöckner I* **52**.414, **52**.517–19,
    **52**.525; *Lucchetti* **52**.114; *MINE*
    **52**.417, **52**.527; *Mitchell* **52**.115,
    **52**.166, **52**.530; *MTD* **52**.116; *Soufraki*
    **52**.116; *Vivendi I* **52**.528; *Wena Hotels*
    **52**.417
    reclassification   **52**.538

**annulment of award, grounds (general considerations)** (*cont.*)

parties' responsibility to specify   **52**.87–91, **52**.531–3

*ad hoc* committee's right to identify new **52**.532–3: *MINE*   **52**.533

time limits   **52**.531

waiver of right to annulment on other than specified grounds   **52**.534

**annulment of award, grounds, improper constitution of tribunal**   **14**.3, **37**.5, **40**.15, **40**.28, **52**.118–29

AR 6 declaration, delay in signing and **52**.480

arbitrators lacking required qualities   **14**.8, **37**.5

time limits   **14**.8

comparable provisions in other international instruments   **52**.118

disqualification of arbitrator and   **57**.3

drafting history   **52**.118–19

infrequency of resort to   **52**.28, **52**.112, **52**.121

nationality of arbitrator and   **52**.122

dual nationality   **39**.10, **52**.122, **52**.464

uncertainty   **52**.122, **52**.464

qualities/qualifications of arbitrators, absence **52**.123

resort to, *Azurix*   **52**.112, **52**.120

scope   **52**.118

Secretary-General's role, request for arbitration role distinguished   **36**.8

timing of objection

AR 27   **52**.126–9, **57**.11

as preliminary objection   **52**.119

as soon as possible   **52**.124–9: after award **52**.61, **52**.119; disqualification of arbitrator and   **57**.3, **57**.11–14; during proceedings   **52**.127–9; emergence of new fact   **52**.128

**annulment of award, grounds, manifest excess of powers**   **52**.130–217

comparable provisions in other international instruments   **52**.130

drafting history   **52**.131

"manifest", addition during negotiations **52**.131, **52**.134

failure to apply correct applicable law: *see* annulment of award, grounds, failure to apply correct applicable law

failure to comply with evidentiary standards **45**.8

failure to exercise jurisdiction in case of parallel contract-based claim   **26**.84–5

*infra petita*   **41**.29, **46**.30, **52**.167–71

as failure to state reasons   **52**.171, **52**.513

jurisprudence: *Lucchetti*   **52**.170; *Soufraki* **52**.169; *Vivendi I*   **52**.168

jurisprudence

*Amco I*   **52**.153

*CDC*   **49**.13, **49**.23

*Vivendi I*   **26**.83–4

lack of jurisdiction/competence   **41**.28, **52**.155–90

absence of/exceeding distinguished **52**.163

drafting history   **52**.155

inclusion of incidental, additional or ancillary claims other than at request of party   **46**.12

jurisprudence: *Amco II*   **52**.165; *CMS* **52**.185–90; *Klöckner I*   **52**.157, **52**.163, **52**.175–80; *Mitchell*   **25**.166, **52**.157, **52**.159–62; *Repsol*   **52**.164, **52**.182; *Soufraki*   **52**.158, **52**.183–4

nationality issues, tribunal's obligation to examine   **52**.183–4, **52**.224

*ratione materiae*   **52**.156

*ratione personae*   **52**.156

in relation to parties' consent **52**.156–62: Article 25 as benchmark **25**.8, **52**.158

remedy differing from parties' request **52**.164

"manifest"   **52**.134–54

addition during negotiations   **52**.131, **52**.134

Article 36(3) use   **52**.141

dictionary meaning   **52**.135

jurisdictional error, whether   **52**.148–51

jurisprudence: *Amco I*   **52**.152, **52**.153; *CDC*   **52**.136, **52**.138; *Klöckner I* **52**.143–4, **52**.152; *Lucchetti*   **52**.151; *MINE*   **52**.154; *Mitchell*   **52**.146; *MTD* **52**.149; *Repsol*   **52**.136, **52**.147; *Soufraki*   **52**.140, **52**.150; *Vivendi I* **52**.139; *Wena Hotels*   **52**.136, **52**.137, **52**.145

margin of appreciation   **52**.479

methodology   **52**.142–54

relevance of "manifest" requirement **52**.148

parties' agreement as determining factor **52**.132–3

practice, limited

registration of arbitration application by Secretary-General, relevance   **52**.172

scope of Article 52(1)(b) review   **52**.202 n290

supplementation or rectification of award and **49**.69

waiver, right of   **52**.55

**annulment of award, grounds, serious
departure from fundamental rule of
procedure**   **40**.28, **52**.278–337
comparable provisions in other international
instruments   **52**.278–9
ILC Model Rules on Arbitral Procedure
(1958)   **52**.279
drafting history   **52**.279
examples   **52**.293
failure to comply with evidentiary standards
**43**.4, **52**.323–32
jurisprudence: *Amco I*   **52**.324–5; *CDC*
**52**.328, **52**.330–1; *Klöckner II*
**52**.326–7; *Lucchetti*   **52**.329; *Wena
Hotels*   **52**.329
failure to deal with every question submitted
**48**.51, **52**.110, **52**.300, **52**.413–17,
**52**.513
failure to deliberate   **52**.318–22
jurisprudence: *CDC*   **52**.322; *Klöckner I*
**52**.319–20; *Klöckner II*   **52**.321
failure to hear other party (*audiatur et altera
pars*)   **52**.12, **52**.305–17
damage to that party's interests, relevance
**52**.483
fundamental nature of rule   **44**.22–3,
**52**.308
issues not addressed, tribunal's
responsibilities   **52**.317
jurisprudence: *Amco II*   **52**.292, **52**.303,
**52**.306–8; *Klöckner I*   **52**.310–11;
*Lucchetti*   **52**.316; *MINE*   **44**.23,
**52**.312; *MTD*   **52**.315; *Vivendi I*
**52**.314; *Wena Hotels*   **52**.313
on provisional measures   **47**.12,
**47**.39
summary procedure (AR 41(5)) and
**41**.97
supplementation and rectification, request
for   **52**.308
failure to issue award in timely manner
**49**.13, **49**.23
"fundamental rule of procedure"
Arbitration Rules distinguished   **44**.4,
**52**.279, **52**.280, **52**.282
as "principle"   **52**.279
principles of natural justice   **44**.4, **52**.193,
**52**.279
lack of impartiality/inequality of treatment
**52**.294–304
allocation of burden of proof   **52**.301,
**52**.324–7
evidence of: failure to cite legal authority
and   **52**.297–8; standard of proof
**52**.302; structure of award and
**52**.297–8

jurisprudence: *Amco I*   **52**.299–301,
**52**.324–5; *Amco II*   **52**.303; *CDC*
**52**.304; *Klöckner I*   **52**.294–301
procedure, AR 53   **52**.334
representation in resubmitted case by
arbitrator in original case
**52**.321
"serious departure"/"fundamental rule"
jurisprudence: *Amco II*   **52**.292, **52**.308;
*CDC*   **48**.53, **52**.286, **52**.288–9;
*Klöckner I*   **52**.290–1; *MINE*   **44**.23,
**52**.220, **52**.282–3; *Repsol*   **52**.281; *Wena
Hotels*   **52**.284–5
margin of discretion   **52**.479
need to meet both criteria   **52**.280–92
"serious"   **52**.282–4
standing limits, violation   **52**.333
*Repsol*   **52**.333
timely objection, need for   **52**.334–7
failure to make as waiver   **52**.60, **52**.174,
**52**.334, **57**.11
jurisprudence: *CDC*   **52**.337; *Klöckner I*
**52**.335; *Klöckner II*   **52**.336
waiver, right of   **52**.56
**annulment of award, request**
by party
corporate/State succession and   **52**.41–3,
**54**.102
"either" party   **52**.42
need for   **52**.41, **52**.99, **52**.536
for partial annulment: *see ad hoc
committee, "authority to annul", partial
annulment, parties' right to request*
State on behalf of constituent subdivision or
agency   **52**.43, **52**.99
by third party *actio popularis*   **52**.41
by tribunal on own initiative   **52**.41
drafting history   **52**.69
frivolous application, effect on costs
**52**.103–4
jurisprudence
*Amco I*   **52**.48–9, **52**.67, **52**.88–91, **52**.97,
**54**.102
*Amco II*   **52**.42, **52**.44, **52**.78,
**52**.82
*CDC*   **52**.104
*CMS*   **52**.44
*Klöckner II*   **52**.42, **52**.82, **52**.92
*Repsol*   **52**.45, **52**.104
*Wena Hotels*   **52**.93
procedure (AR 50)   **52**.83, **52**.441
reasons for making
exhaustion of procedural remedies as
political imperative   **52**.45
as matter of principle   **52**.44,
**52**.536

annulment of award, request (*cont.*)
  registration    **11**.9
    notification to other party    **52**.86
    obligation to register    **52**.102, **52**.129,
        **52**.174, **52**.334
  registration, refusal
    *ad hoc* committee's right to re-examine
        Secretary-General's decision    **52**.97,
        **52**.98, **52**.99, **52**.129, **52**.174, **52**.334,
        **52**.439, **52**.442, **52**.450
    application unrelated to award    **36**.8
    decision not "award" for purposes of
        Article 52(1)    **52**.98
    frivolous application    **52**.102
    request not submitted by party to original
        proceedings    **52**.99
    as right    **52**.649
    untimely request    **36**.8, **52**.85, **52**.96–7,
        **52**.334
    waiver of right to annulment    **52**.101
  request for arbitration distinguished
        **52**.95–6
  required information    **52**.84,
        **52**.87–94
    detailed grounds for annulment (AR
        50(1)(c))    **52**.84, **52**.87–91, **52**.531
    failure to supply, effect    **52**.100
    time limits and    **52**.84
  requirements
    application in writing to Secretary-General
        **52**.83–104
    non-refundable advance fee    **52**.85,
        **52**.103, **61**.4, **61**.57–8
  screening by Secretary-General    **52**.95–104
    Executive Directors' Report    **52**.95
  successive requests    **52**.27, **52**.78, **52**.510
annulment of award, time limits    **52**.435–50,
        **53**.54, **53**.59
  corruption, in case of    **52**.277, **52**.435–6,
        **52**.448–50, **53**.54
    date of discovery as determinant    **52**.449
  date of
    dispatch of award    **49**.10, **52**.437
    signature of award and    **48**.37
  drafting history    **52**.435
  examples of compliance with    **52**.440
  extension in case of supplementation or
        rectification    **49**.81–5, **52**.438
    *Amco I*    **49**.85
  purpose of provision    **52**.537
  requirement to provide detailed grounds and
        **52**.441–50
    jurisprudence: *Amco I*    **52**.442; *Soufraki*
        **52**.446–7; *Vivendi I*    **52**.444–5; *Wena
        Hotels*    **52**.443

time limits for other post-award remedies
    distinguished    **51**.11, **52**.84,
        **52**.436
annulment of award, waiver of right to
  advance waiver, admissibility    **52**.49–59,
        **52**.534
    disadvantages    **52**.59
    validity to be determined by *ad hoc*
        committee    **52**.58, **52**.101, **52**.554
  agreement excluding proceedings on grounds
        of
    breach of jurisdictional requirement
        **52**.55
    departure from fundamental rule of
        procedure    **52**.56
    failure to apply applicable law    **52**.55
    failure to state reasons    **52**.57
  explicit waiver, need for    **52**.48
  failure to make timely objection    **52**.60,
        **52**.174, **52**.334, **52**.534–7, **57**.11
  general exclusion agreement    **52**.54
  jurisprudence, *Amco I*    **52**.47–8
  modification of Article 52 by parties,
        exclusion    **52**.51–7
    AR 50 and    **52**.53
    AR 52–5 and    **52**.53
  other than on specified grounds    **52**.534
  post-award    **52**.46–8
    before expiry of time limit for application
        **52**.46
    partial waiver during annulment
        proceedings    **52**.46
appeal from ICSID award, exclusion (ICSID
        53(1))    **41**.22, **53**.18–30, **53**.62
  Appeals Facility, possibility of    **52**.1,
        **53**.28–30, **65**.5
  Article 48(3) and    **48**.58
  autonomy of ICSID process and    **53**.2,
        **53**.18–30
  domestic courts and    **53**.20–2
    *MINE*    **53**.21
    obligation to dismiss action in    **53**.22
  exclusive remedy rule (ICSID 26)
    distinguished    **53**.19
    exclusive remedy rule distinguished
        **53**.19
  ICJ and
    diplomatic protection and    **53**.26, **54**.28
    enforcement proceedings    **53**.27, **54**.28
    Executive Directors' Report    **53**.25
    ICSID 64 powers    **53**.23–5
  modification of rule by parties, exclusion
        **53**.19, **53**.29–30
  recognition and enforcement    **54**.81–7,
        **54**.112

**appeals facility/permanent review
commission, possibility of** **52**.1,
**52**.460, **53**.28–30, **65**.5
**applicable law**
*see also* choice of law clause
Additional Facility proceedings **62**.7–8
recognition and enforcement of award
**25**.12, **53**.5, **62**.8
Arbitration Rules as: *see* Arbitration Rules
(AR)
Article 42, applicability **42**.3–12
jurisprudence: *AES* **42**.10; *CMS* **42**.7,
**42**.12; *CSOB* **42**.5; *Pan American*
**42**.11; *Siemens* **42**.6; *Soufraki* **42**.9;
*SPP II* **42**.4
Article 42, purpose **42**.1–2
autonomy of ICSID arbitration process and
**Preamble** 26, **26**.3, **42**.3, **44**.3, **62**.3
costs and expenses, apportionment **61**.18
drafting history **42**.1
exclusive remedy rule and **26**.157
failure to apply correct as ground for
annulment: *see* annulment of award,
grounds, failure to apply correct
applicable law
ICSID Convention as *lex fori* **42**.13,
**42**.49
ICSID's reliance on decisions of domestic
courts and **26**.140
interest **46**.44–8
international minimum standards and
**42**.112–15, **44**.22–3: *see also*
international minimum standards
intertemporal rule **25**.507–9
applicable law and jurisdiction *ratione
temporis* distinguished **25**.506, **25**.509
*Impregilo* **25**.506
*Tradex* **25**.509
nationality: *see* nationality (juridical persons),
applicable law; nationality (natural
persons), applicable law
place of proceedings, relevance **42**.62
principles of law common to certain group of
countries **14**.10
standing **42**.11–12
**applicable law, in absence of agreement
between parties**
finding of absence, need for **42**.13, **42**.67,
**42**.133–7
choice of law leaving lacunae **42**.135,
**42**.137
host State law
drafting history **42**.138–40, **42**.161
French law as aid in establishing **42**.149,
**42**.150–1, **42**.165

"including its rules on the conflict of laws"
(*renvoi*) **42**.161–6: cases of agreed
choice of law distinguished **42**.53–5,
**42**.162; effect on predictability **42**.164;
reasons for inclusion **42**.161; unusual
nature of provision **42**.161; variation or
exclusion by agreement of parties
**42**.164
primacy of host State law **42**.138–40:
mitigating factors **42**.141
subsequent changes to **42**.160:
stabilization clause **42**.160; in violation
of international law
**42**.160
**applicable law, agreement between parties**
agreement as essential element in consent
**42**.14, **42**.19, **52**.199
BITs provision for **42**.11–12, **42**.23, **42**.33,
**42**.80–4
implicit choice of law, 42.89–92: *see also*
implicit agreement *below*
VCLT (1969) **25**.941
clear and unequivocal choice, need for, *Santa
Elena* **42**.22
conflict of laws rules, inclusion **42**.53–5,
**42**.67
express reference, desirability **42**.55,
**42**.81
*contrat sans loi* **42**.37–8
as determining factor **Preamble** 15
drafting history **42**.21
during or at institution of proceedings
*AAPL* **42**.60–1
*Adriano Gardella* **42**.57
*Benvenuti & Bonfant* **42**.59
*SOABI* **42**.58
exclusion of particular system or part of
system **42**.22, **42**.41
freedom of choice **42**.21
failure to choose and **42**.105
limits **42**.43–52
mandatory provisions of host State law,
right of exclusion **42**.44–7: capacity of
State to contract **42**.46–7
motives determining choice **42**.21
reasonable connection, relevance
**42**.43
host State law
insistence on **42**.21
subsequent changes to law and **42**.116–32:
in absence of stabilization clause
**42**.129–32; acceptable/unacceptable
changes **42**.131–2; drafting history
**42**.129; stabilization clause: *see*
stabilization clause

**applicable law, agreement between parties**
        **(*cont.*)**
    host State law/international law, jurisprudence
        *AGIP*    **42**.33, **42**.97–8
        *Atlantic Triton*    **42**.26
        *CSOB*    **42**.35
        *Kaiser Bauxite*    **42**.34, **42**.41
        *MINE*    **42**.26
        *Mobil Oil* (NZ proceedings)    **42**.24
        *Tanzania Electric*    **42**.25
    implicit agreement
        acceptance of: BIT provision on applicable
            law    **42**.80–4; multilateral treaty
            provision    **42**.85–8
        BIT agreement without an express choice of
            law clause    **42**.89–95: national
            legislation as implied law    **42**.91–2;
            substantive provisions of treaty and
            general international law distinguished
            **42**.89–95
        drafting history    **42**.62
        English and French texts of Convention
            compared    **42**.62
        jurisprudence: *AAPL*    **42**.60–1, **42**.70–6,
            **42**.99; *Amco I*    **42**.77; *Autopista*    **42**.68;
            *CSOB*    **42**.92; *Enron*    **42**.79; *Goetz*
            **42**.82; *Kardassopoulos*    **42**.87; *LETCO*
            **42**.64; *Middle East Cement*    **42**.83,
            **42**.90; *MTD*    **42**.91; *Siemens*    **42**.84;
            *SPP*    **42**.65–7
        national legislation: offer in    **42**.23, **42**.63;
            reference to    **42**.63–9
        possibility of    **42**.62
        reliance on particular law in submissions
            before tribunal    **42**.70–9
    investor/host State agreement    **42**.22,
        **42**.24–38, **42**.56
        Model Clauses (1968)    **42**.22
        Model Clauses (1981)    **42**.22
        Model Clauses (1993)    **42**.22
    methodology    **42**.13, **42**.67
        failure to follow    **42**.13
    multilateral treaties    **42**.36
    public policy and: *see* public policy/*ordre*
        *public* (domestic); public policy/*ordre*
        *public* (international)
    "rules of law"    **42**.39–42
        *dépeçage*    **42**.40–1, **42**.256
        jurisprudence: *Autopista*    **42**.39; *SPP*
            **42**.40
        possibilities: combination of "rules"
            **42**.39–40, **42**.135; exclusion of parts of
            chosen system    **42**.41; non-binding code
            **42**.42; piecemeal choice    **42**.39, **42**.136;
            rules of treaty not in force    **42**.42

    systems of law distinguished    **42**.39, **42**.53,
        **42**.104
    third State law    **42**.27–32, **42**.45
        jurisprudence: *CDC*    **42**.29; *Colt Industries*
            **42**.30; *SPP*    **42**.28; *World Duty Free*
            **42**.31
        loan contracts    **42**.27–9
    timing
        during or at institution of proceedings
            **42**.56–61
        during proceedings    **42**.56–61
        jurisprudence: *AAPL*    **42**.60–1; *Adriano*
            *Gardella*    **42**.57; *Benvenuti & Bonfant*
            **42**.59; *SOABI*    **42**.58, **42**.77 n135
**applicable law, Convention provisions**
    applicability
        annulment proceedings    **52**.555: *Amco I*
            **52**.555
        jurisdictional issues    **42**.4
        procedure    **42**.3
        substance    **42**.3
    purpose
        certainty in absence of choice by parties
            **42**.2, **42**.142: *ex aequo et bono*
            jurisdiction and    **42**.249
        flexibility    **42**.2, **42**.142, **42**.164
        as mechanism for determining appropriate
            rules of law in particular dispute
            **42**.2
**applicable law, host State law (general**
        **considerations)**
    capacity to submit to arbitration, limitations on
        **42**.154–6
        arbitration clause as modification of law
            **42**.154
        capacity to contract in violation of own law
            **42**.154–6
        estoppel/good faith and    **42**.155
        jurisprudence, *Autopista*    **42**.156
    investor's legal status and capacity, exclusion
        **42**.10–12, **42**.157–9
**applicable law (interpretation of consent to**
        **ICSID jurisdiction)**    **25**.314,
        **25**.578–85, **52**.187–8
    agreement between the parties    **25**.578–82,
        **52**.187
    general principles of statutory interpretation
        **25**.583
    general rules of municipal law, ICSID
        jurisdiction as derogation from    **25**.580,
        **25**.589
    international law/host State law    **25**.579–85
    jurisprudence
        *Amco I*    **25**.582
        *CMS*    **25**.578, **52**.187–90

*CSOB*  **25**.582, **42**.5
*SPP II*  **25**.583, **42**.4
law applicable to dispute as  **25**.578
law applicable to merits distinguished
  **25**.578
treaty interpretation rules  **25**.579
**arbitral award (ICSID)**
*see also* annulment of award; certification and
  dispatch of ICSID award; date of ICSID
  award; finality/binding nature of arbitral
  award (ICSID); interpretation of award;
  revision of award; supplementation or
  rectification of award
correct identification as, significance  **48**.30
enforcement: *see* recognition and enforcement
  of arbitral award (Additional Facility);
  recognition and enforcement of arbitral
  award (ICSID)
modification by parties, decision to exclude
  **48**.3
severability  **52**.73
summary of proceeding (AR 47(1)(f))
  **44**.82
**arbitral award (ICSID), interpretation**
"in accordance with the principles and rules of
  treaty interpretation generally recognized
  in international law"
  *Amco II*  **52**.17
  *Klöckner I*  **52**.17
  *in favorem validitatis sententiae* (*Klöckner I*)
  **52**.22, **52**.178
**arbitral award (ICSID), majority decision**
*absolute* majority, need for  **48**.15
abstention (AR 16)  **48**.18–19
appropriateness of position in Convention
  **48**.1
concurring opinion dissenting on certain
  points, effect  **48**.98
death, incapacity, resignation or
  disqualification, effect  **48**.20
declaration or individual opinion, relevance
  **48**.17, **48**.98
  *Guinea-Bissau* v. *Senegal*  **48**.17
delegation of power to fix time limits (AR 26)
  and  **48**.5
drafting history  **48**.15, **48**.19
failure to reach
  absence of provision for: in Arbitration
    Rules (AR)  **48**.15; in Convention
    **48**.15; Notes to 1968 Arbitration Rules
    **48**.15
obligation to reach  **39**.7, **48**.16
  exhaustiveness requirement and  **48**.16
  *non liquet* prohibition and  **48**.16
quorum (AR 14(2))  **48**.9–14, **56**.8

non-attendance at a session, effect  **48**.9,
  **48**.14: *Vacuum Salt*  **48**.13
parties' right to decide (AR 20)  **48**.11,
  **48**.14
voting in session/by correspondence
  distinguished  **48**.12: relevance
  **48**.12
separate opinion, effect  **48**.17, **48**.98
voting methods
  by correspondence (AR 16)  **48**.7–8:
    failure to respond, effect  **48**.8, **48**.12;
    need to consult every member  **48**.8
  in session (AR 13 and 14)  **48**.7
**arbitral award (ICSID), requirements**
AR 47  **48**.23, **48**.46
  decision on costs  **61**.62
  supplementation or rectification of award
    and  **49**.37
date of dispatch  **49**.25
majority decision: *see* arbitral award (ICSID),
  majority decision
mandatory nature  **48**.3
names of parties' representatives  **44**.77
oral delivery: *see* certification and dispatch of
  ICSID award
relevance to timing and dispatch of award
  **48**.37, **49**.25
signature: *see* signature (ICSID award)
statement of facts as found by tribunal  **26**.40,
  **26**.121
writing  **48**.31–3
  drafting history  **48**.31
  interim decisions  **48**.39–41
  practice of other international fora
    distinguished  **48**.33
**arbitration**, advantages  **Preamble** 23–8
**Arbitration (Additional Facility) Rules (2006)**:
  *see* Additional Facility Arbitration Rules
  (2006)
**arbitration (non-ICSID)**
Secretary-General as appointing authority
  **11**.2, **11**.16–19, **25**.87, **25**.227, **25**.229,
  **25**.302
  advance consent, desirability  **11**.17
  applicability of Convention of ICSID rules
    and regulations  **11**.18, **25**.87
  BIT provisions  **11**.16
  circumstances calling for  **11**.17
  Model Clause 22  **11**.19
  NAFTA (1992)  **11**.16
  recommended terms  **11**.17
  right to refuse  **11**.17
  transactions appropriate for  **11**.18, **25**.87
  UNCITRAL  **11**.16
  use of Centre's facilities  **11**.18, **25**.228

**arbitration (non-ICSID) (*cont.*)**
Secretary-General as appointing authority (*cont.*)
where neither host nor home State Contracting State   **25**.302
**arbitration proceedings**
ancillary proceedings, in foreign courts, States' dislike   **25**.302
autonomy: *see* autonomy of ICSID arbitration process
comparable provisions in other international instruments
absence   **36**.5
ICC/UNCITRAL provisions distinguished   **36**.4
conciliation, following unsuccessful   **36**.13
conciliation proceedings compared: *see* conciliation/arbitration proceedings, relationship
discontinuance   **36**.70
independence of domestic courts 26.3: *see also* domestic courts
noninterference principle   **26**.3
parallel ICSID/non-ICSID proceedings, possibility of   **25**.87
place of: *see* place of proceedings
request for: *see* request for arbitration; withdrawal of request for arbitration
**Arbitration Rules (AR)**
*see also* Arbitration Rules (AR) (Provisional) (1967); Arbitration Rules (AR) (1968); Arbitration Rules (AR) (2006); Conciliation Rules (CR)
adoption by
Administrative Council   **6**.10, **44**.34: required majority   **6**.21, **7**.8
arbitration tribunals   **6**.10
Panel of Arbitrators   **6**.10
amendment: *see* revisions to *below*
applicability
"any arbitration proceeding"   **44**.5–9
"except as parties otherwise agree"   **6**.111
Institution Rules (IR) distinguished   **44**.5
post-award procedures   **44**.6, **52**.52: annulment proceedings   **52**.557–61
subsequent to request under Article 36   **44**.5, **44**.39
autonomy of ICSID arbitration process and **Preamble** 26, **26**.3
as balance between common law and civil law approaches   **43**.71, **44**.38
Conciliation Rules (CR) compared   **33**.1–6, **44**.8
Convention and   **44**.2, **44**.32–3

advantages of regulating procedure in Rules **44**.32
in case of conflict   **44**.33
conformity with   **6**.111, **44**.54
mandatory nature of Convention provisions **44**.10, **44**.20, **44**.33
as part of   **6**.10
supplementary to   **6**.111
critical date (intertemporal rule)   **25**.478, **44**.17, **44**.36, **44**.42–52
agreement to use earlier version   **44**.49
agreement to use updated version **44**.47–52: Model Clauses   **44**.48; timing **44**.50
date of fulfilment of all conditions for consent   **44**.43–6
drafting history   **44**.43–4
reason for rule   **44**.42
drafting history   **44**.2, **44**.4, **44**.11, **44**.24, **44**.32, **44**.43–4
fundamental rules of procedure, whether **44**.23, **52**.280, **52**.282
gaps, tribunal's power to fill   **44**.1, **44**.37, **44**.53–8, **48**.45, **52**.557
applicable law   **44**.54
conformity with Convention, need for **44**.54
inherent nature of power   **44**.54
interpretation as method of choice   **44**.54
"in this Section" (Convention, Article 44) as "in this Convention"   **44**.9
interrelationship of procedural rules deriving from different sources   **44**.59–60
jurisprudence
*AAPL*   **44**.52
*Cable TV*   **44**.49
*Mobil Oil*   **44**.49
*SPP*   **44**.51
modification by parties   **36**.33, **39**.18–19, **40**.25, **44**.1, **44**.10–31, **44**.33, **61**.9
absence of party, effect   **44**.31
annulment proceedings and   **52**.53
applicable law, freedom of choice   **44**.54
examples   **44**.14–16, **44**.18
Executive Directors' Report   **44**.11
inclusion in BIT   **44**.27
inclusion in request for arbitration   **44**.26
limitations   **44**.20–3: mandatory provisions of Convention   **44**.10, **44**.20; minimum standards of fair procedure   **44**.22–3; public policy/*ordre public* (domestic) **44**.21
Model Clauses (1993)   **44**.25
procedural provisions other than Article 44 distinguished   **44**.10

provision for in individual Rules   **44**.12
submission to new tribunal and   **52**.669
time limits for preparation of award (AR 46)
   **49**.24
timing   **44**.24–8: acceptance of BIT or
   other treaty containing procedural
   provisions   **44**.27; "as early as possible
   after the constitution of a Tribunal" (AR
   20)   **44**.28; consent to jurisdiction and
   **44**.25; institution of proceedings (IR 3)
   **44**.26
trilateral nature of agreement   **44**.30
written/oral procedure   **44**.81
national law procedure and   **44**.3
revisions to
   44.34–6, 47.5–7: *see also* modification by
      parties *above*
   continuing validity of earlier Rules   **6**.12,
      **26**.178, **44**.36: parties' agreement in
      respect of   **26**.178
   possibility   **6**.10
scope   **44**.37
simultaneous use of different versions,
   exclusion   **44**.45
tribunal's discretionary powers   **44**.54
   jurisprudence: *SGS* v. *Philippines*   **44**.57;
      *Suez & AWG*   **44**.58
   method of exercise   **44**.55: AR 19
      (procedural orders)   **44**.55, **44**.57, **45**.41,
      **48**.26
tribunal's procedural discretion   **44**.55–8
violation as serious departure from
   fundamental rule of procedure   **43**.4,
   **44**.23
waiver of right to object to violation
   **57**.11–14
written/oral procedure: *see* written/oral
   procedure
**Arbitration Rules (AR) (Provisional) (1967)**
   **6**.12, **44**.34 n40
**Arbitration Rules (AR) (1968)**
   1
      Note A   **37**.7 n9, **41**.12 n16
      Note B   **37**.2 n2
      Note G   **39**.16 n12
      Note H   **39**.17 n13
      Note I   **35**.2 n2, **40**.25 n20
   2
      Note B   **37**.27 n30
      Note F   **37**.7 n8, **37**.28 n31
   4, Note G   **38**.14
   5
      Note B   **37**.49 n47
      Note C   **37**.50 n48, **37**.51 n49
      Note D   **37**.51 n49

6
   Note A   **37**.10 n15
   Note B   **37**.10 n15
6(1)   **56**.5 n2
7   **56**.5 n3
8, Note C   **56**.22 n17
8(1)   **56**.21
9, Note B   **57**.11 n5, **57**.12 n8
9(1)   **57**.10
10   **56**.9 n7
11, Note B   **56**.18 n13
12   **56**.11 n8
14, Note C   **48**.14 n7
16, Note A   **48**.4 n1
16(1)   **56**.8 n6
17   **56**.8 n6
18   **44**.75
   Note A   **44**.75
   Note B   **44**.72 n89
   Note C   **44**.75
20, Notes   **44**.28 n26
21   **44**.63 n80
25, Note C   **48**.5 n2
25(3)   **45**.27
26   **57**.11
27   **57**.11 n5
   Note B   **43**.27
28
   Note A   **44**.81
   Note B   **44**.83
29, Notes   **44**.85
30
   Note A   **44**.89
   Note B   **44**.89
   Note C   **44**.90
   Note E   **44**.91 n107
   Note F   **44**.100
31
   Note C   **44**.102
   Notes   **44**.94
32   **52**.327
   Note   **43**.10 n7
33   **52**.327
   Note A   **43**.10 n9, **43**.104 n140
   Note B   69
   Note C   **43**.30
   Note D   **43**.65 n81
34(2)(a)   **43**.68
35, Notes   **43**.86
36, Note   **43**.121 n163
37   **44**.34 n40
39
   Note A   **47**.39 n57, **47**.135
   Note B   **47**.8, **47**.32
   Note E   **47**.12 n22

**Arbitration Rules (AR) (1968) (*cont.*)**
  40
    Note B(a)   **46**.72 n106, **46**.84
    Note B(b)   **46**.86 n122
    Note C   **46**.16 n12
    Note D   **46**.17 n14
  41, Note C   **41**.32 n37, **41**.38 n49
  42
    Note C   **45**.79, **45**.83
    Note D   **45**.69
    Note E   **41**.67, **41**.69, **43**.23 n25, **45**.12
      n9
  43
    Note B   **48**.71 n75
    Note C   **48**.72 n76
  46, Note   **48**.37 n21
  47
    Note B   **48**.12 n4
    Note C   **48**.37 n21
    Note D   **48**.15
  48, Note B   **48**.33 n18, **48**.37 n21, **48**.101
      n102, **49**.7 n5
  48(4)   **48**.110 n113
  49
    Note B   **49**.33 n54
    Note C   **49**.34 n55
    Note D   **49**.36 n56
    Note E   **49**.34 n55
  49(4)   **49**.42
  50   **50**.15
    Note B   **49**.33 n54, **50**.18 n22, **51**.11 n5,
      **52**.84 n130, **52**.89
    Note C   **51**.13 n7, **52**.97
  51
    Note B   **50**.31 n28
    Note C   **50**.38 n30
  53   **52**.559
    Note A   **50**.24 n27
    Note B   **50**.24 n27
  54   **52**.582 n836
    Note B(b)   **50**.45 n34
    Note C   **50**.45 n33, **51**.37 n19
  55
    Note B   **52**.667 n965, **52**.689 n1005
    Note C   **52**.669 n966
    Note D   **52**.674 n971
  adoption   **6**.12, **44**.34
  determination of applicable date   **25**.478
  Introductory Notes
    D   **44**.13 n10, **44**.42, **44**.47, **44**.60 n79
    E   **44**.14 n11, **44**.60 n79
  revisions (1984)   **2**.5429, **44**.34, **48**.81, **49**.32
      n52
**Arbitration Rules (AR) (2003)**
  1(3) (nationality of arbitrators)   **44**.35

  4 (time limits for appointment of arbitrator)
      **44**.35
  5 (time limits for request for disqualification of
      arbitrator)   **44**.35
  11 (appointment of arbitrators by Chairman of
      Administrative Council)   **44**.35
  46 (time limits for request for preparation of
      arbitral award)   **44**.35
  adoption   **6**.12, **44**.35
  key changes   **44**.35
**Arbitration Rules (AR) (2006)**
  adoption   **6**.12, **44**.36, **48**.110
  key changes   **44**.36
**Arbitration Rules (AR) (2006) by article
    number (figures in square brackets
    indicate corresponding number in 1984
    version)**
  *see also* Administrative and Financial
      Regulations (AFR); Arbitration Rules
      (AR) (1968); Conciliation Rules (CR)
      (1984/2006)
  1–6   **11**.11
  1–7   **29**.4
  1(1)   **37**.6
  1(2)   **37**.7, **50**.38
  1(3)   **39**.13–22
    agreement on constitution of tribunal,
      relevance   **39**.17
  1(4)   **29**.4, **40**.25, **52**.669
    modification or waiver by parties   **40**.25
  2   **37**.25–35, **50**.38
    time limits   **37**.27–8
  2(3)   **38**.8
  3   **37**.39–45, **52**.456
    modification by parties   **37**.43, **39**.18–19
  3(1)   **39**.17, **39**.19–22, **46**.17
  3(2)   **44**.90
  4   **38**.10, **45**.37, **52**.456
    2003 amendment   **44**.35
  4(4)   **30**.3, **40**.10
  5   **37**.47
  5(2)   **38**.18
  5(3)   **37**.51
  6   **29**.4, **50**.31, **52**.273, **52**.465, **52**.480
  6(1)   **37**.48, **37**.50, **37**.52, **56**.5 n2, **57**.8
  6(2)   **44**.98, **48**.20, **50**.31, **52**.275, **52**.295,
      **56**.19, **57**.35, **60**.14
    2006 amendment   **40**.18–20, **44**.36
  7   **37**.52–3, **56**.5 n3
  8–11   **11**.11, **48**.20
  8–12   **52**.550–2
  8(1)   **56**.21
  8(2)   **56**.23
  9   **44**.7, **52**.125, **52**.337, **57**.5, **57**.8–11
    2003 revision   **44**.35

9(1)   **57**.10
9(2)–(6)   **58**.8
9(6)   **57**.27, **58**.11
10   **56**.9
10(2)   **48**.20, **58**.11
11   **39**.29, **48**.20, **56**.17, **58**.18
   2003 revision   **44**.35
11(1)   **52**.550
11(2)   **12**.4, **56**.42
11(2)(a)   **56**.19, **56**.44
11(2)(b)   **56**.19, **56**.27 n29, **56**.29 n25, **56**.37
   n29
11(3)   **56**.19
12   **56**.11–13, **58**.19
13   **11**.10, **11**.13, **48**.7, **63**.20
13(1)   **37**.21 n24
13(3)   **62**.12
14   **48**.7
14(2)   **48**.10–12, **56**.8 n6
15   **48**.99, **52**.318
16   **48**.4
16(1)   **48**.18–19, **56**.8 n6
16(2)   **47**.39, **48**.7, **49**.36
17   **48**.13, **56**.8 n6
18   **11**.11, **44**.73
19   **43**.55, **43**.66, **44**.55, **45**.41, **48**.4, **48**.26
20   **44**.28–31, **48**.11, **63**.7
20(1)   **44**.29
20(1)(c)   **44**.86
20(1)(g)   **44**.34 n42, **44**.107
21   **11**.13, **44**.29
21(1)   **48**.81–2
22   **11**.13, **36**.14, **43**.8, **44**.29, **44**.34, **44**.63
23   **11**.13, **43**.44
24   **43**.44
26   **44**.87, **45**.82–3, **48**.5
26(3)   **45**.27 n26
27   **52**.60, **52**.126–9, **52**.174, **52**.334–6,
   **57**.11
28   **44**.20
28(1)   **45**.72
28(1)(a)   **52**.103, **61**.55
28(1)(b)   **43**.26–9, **52**.103, **61**.27
28(2)   **61**.60
29   **11**.13, **44**.80, **61**.4
30   **11**.11, **44**.84, **46**.65
31   **44**.84
32   **44**.93
32(2) (as amended 2006)   **44**.36, **44**.101–6,
   **47**.151
33   **43**.10, **43**.35, **43**.44
34(1)   **43**.10, **43**.104, **52**.323
34(2)   **43**.55
34(2)(b)   **43**.119
34(3)   **43**.64, **43**.66, **45**.41, **47**.84

34(4)   **43**.26–9
35   **43**.84, **44**.94
35(3)   **43**.95
36   **43**.85, **44**.94
36(b)   **62**.19
37   **43**.55, **43**.119
37(2) (2006 addition)   **44**.36, **44**.122–8
38   **43**.36, **49**.11–24, **57**.12, **62**.18
38(1)   **43**.35–7, **43**.40, **49**.17, **49**.18, **51**.21
38(2)   **43**.37, **49**.18, **51**.21
39   **26**.163, **47**.5–7
39(1)   **47**.11, **47**.39, **47**.75–6
   2006 amendment   **44**.36
39(2)   **47**.39
39(3)   **47**.11, **47**.14
39(4)   **47**.12, **47**.39
39(5) (2006 addition)   **47**.6, **47**.38
39(6) [39(5)]   **26**.176–8, **26**.181, **26**.183,
   **43**.52, **44**.3, **44**.34, **55**.95, **55**.97
   as additional 1984 provision   **26**.176–8
   as confirmation of Article 26 rule   **26**.177
40   **46**.65
40(1)   **46**.13, **46**.81
40(2)   **25**.348, **46**.15, **46**.17, **46**.25
41   **11**.11, **25**.17, **32**.4, **41**.3
41(1)   **25**.489, **41**.32–3, **41**.38–42
41(2)   **25**.7, **25**.486, **25**.714, **41**.42, **41**.43–4,
   **41**.52, **45**.13, **52**.173–4
41(3) (1984 version)   **41**.62
41(3) (2006 version)   **41**.62, **45**.26
41(4)   **41**.60, **41**.75, **52**.173
41(5) (2006 addition)   **41**.93–102, **44**.36,
   **52**.63
41(6) [41(5)]   **41**.25, **41**.73, **44**.36, **52**.63,
   **52**.171, **53**.32
42   **43**.24, **45**.11, **45**.25, **45**.39
42(1)   **45**.47, **45**.48
42(2)   **45**.24, **45**.61, **45**.78–84, **45**.85
42(3)   **43**.23, **45**.24, **45**.78–84
42(4)   **41**.52, **41**.67, **45**.13
43–45   **48**.28
43   **11**.13, **25**.82, **36**.68, **48**.70–81
43(1)   **25**.603, **48**.70–81, **52**.74, **54**.32
43(2)   **25**.603, **48**.73–80, **52**.75–6, **52**.493,
   **53**.32, **54**.32, **61**.11
44   **11**.13, **25**.603, **36**.68, **45**.56–7, **48**.83–4,
   **51**.32 n17
45   **11**.13, **36**.68, **45**.57, **48**.85
45(2)   **45**.59
46   **48**.35–6, **48**.101–3, **49**.12–24, **49**.37,
   **52**.318
   2003 amendment   **44**.35, **48**.102,
   **49**.12–24, **49**.37, **50**.25
46–48   **49**.37, **49**.78
47   **48**.23–4, **48**.35

**Arbitration Rules (AR) (2006) by article
number (figures in square brackets
indicate corresponding number in 1984
version) (*cont.*)**
  47(1)  **48**.23, **48**.29, **48**.32, **48**.46, **49**.37,
    **52**.565
  47(1)(d)  **44**.77
  47(1)(f)  **44**.82
  47(1)(g)  **26**.40
  47(1)(i)  **41**.65, **48**.57, **50**.33, **52**.348
  47(1)(j)  **61**.62
  47(2)  **49**.37, **50**.26, **52**.565
  47(3)  **48**.100, **49**.37, **50**.26
  48  **11**.9, **49**.5, **49**.8, **49**.37, **49**.78–80, **50**.26
  48(1)(b)  **49**.5, **49**.25, **49**.82
  48(3)  **49**.37, **50**.26
  48(4)  **11**.14, **48**.110, **48**.129
    2006 amendment  **44**.36, **44**.113, **48**.110,
      **48**.129
  48(5)  **44**.113–14, **48**.129
  49–52  **11**.11
  49–54  **44**.6
  49  **11**.9, **49**.31, **49**.32
  49(2)  **49**.33–41
  49(2)(b)  **49**.35
  49(3)  **49**.35, **49**.36, **49**.42
  49(4)  **49**.37, **49**.78, **52**.308
  49(5)  **49**.34, **50**.22
  50  **11**.9, **41**.26, **50**.13–16, **51**.9–14, **52**.53,
    **52**.83, **52**.441
  50(1)(c)  **50**.87–94, **52**.441
  50(1)(c)(i)  **50**.5
  50(1)(c)(ii)  **51**.14, **51**.20
  50(1)(c)(iii)  **52**.100, **52**.108, **52**.511
  50(2)  **50**.24
  50(3)  **50**.22
  50(3)(a)  **51**.27, **51**.31
  50(3)(b)  **52**.96, **52**.449
  51  **11**.9, **50**.30–3
  51(3)  **50**.36–9
  52  **11**.9, **52**.453–60
  52–5  **52**.53
  53  **44**.6, **49**.8, **50**.23–6, **51**.15, **52**.60, **52**.103,
    **52**.127, **52**.334, **52**.465, **52**.550,
    **52**.558–61, **61**.4, **61**.27, **61**.55, **61**.60
  54  **11**.11, **50**.44, **51**.36, **52**.582, **52**.698
  54(1)  **52**.586–7, **52**.595
  54(2)  **51**.40, **52**.583, **52**.586, **52**.587, **52**.593,
    **52**.595, **52**.608, **52**.699
  54(3)  **52**.588, **52**.650, **52**.653, **52**.654,
    **52**.699
  54(4)  **52**.596, **52**.609
  54(5)  **49**.27
  55  **11**.9, **11**.11, **52**.665–7
  55(2)(d)  **52**.668
  55(3)  **52**.590, **52**.653, **52**.654, **52**.674,
    **52**.697, **52**.699

  55(4)  **44**.6, **48**.25
**Argentina**
  enforcement of ICSID awards and  **53**.39
    n36, **54**.78
  treaties, primacy  **42**.102
**"arising directly":** *see* investment; legal dispute
    as jurisdictional requirement, "arising
    directly"
*Arrest Warrant Case*, critical date for
    determination of jurisdiction  **25**.37
**Asean Agreement for the Promotion and
    Protection of Investments (1987),**
    consent to ICSID jurisdiction,
    non-binding reference  **25**.465
**assignment/succession of investor's rights and
    responsibilities**  **25**.336–63
  in absence of direct contractual arrangements
    **25**.344
  consent based on legislation or treaty and
    **25**.345–8
  consent clause provision for  **25**.363
  as device to attract ICSID jurisdiction
    **25**.350–5
  host State agreement to  **25**.362
  jurisprudence
    *Aguas del Tunari*  **25**.350
    *Amco I*  **25**.339–41
    *Amco II*  **52**.671
    *Banro*  **25**.351, **25**.355, **25**.361
    *El Paso*  **25**.358
    *Enron*  **25**.359
    *Fedax*  **25**.349
    *Holiday Inns*  **25**.337–8, **25**.380
    *LESI & Astaldi*  **25**.343 n465
    *LETCO*  **25**.342
    *Mihaly*  **25**.352–5, **25**.361
    *Noble Energy*  **25**.343
    *SPP*  **25**.345–8, **46**.25
    *Vivendi II*  **25**.357
  renewed consent in writing, need for
    **25**.380
  tribunals' realistic approach  **25**.361
*Astaldi*, tribunal (ICSID), appointment of
    nationals  **39**.31 n25
*Atlantic Triton*
  ancillary claims, simultaneous determination
    jurisdiction, need for  **46**.93
    jurisdiction, objections to  **41**.37
    presentation of ancillary claim, time limits
    **46**.19
  closure of proceedings  **49**.19
  counterclaim arising directly out of the
    subject-matter of the dispute, parties'
    credibility and  **46**.69
  *ex aequo et bono* jurisdiction  **42**.255,
    **42**.278
    equity/law relationship  **42**.268

interest, claim for **46**.48
   *ex aequo et bono* jurisdiction and **46**.48
jurisdiction, objections to, time limits **41**.37
provisional measures
   enforcement, domestic courts' role **47**.25
     n36, **47**.28
   exclusive right of tribunal, whether
     **26**.169–72, **46**.63
   financial guarantee/pre-judgment security
     **47**.91–3
   priority and speed, need for **47**.40
   purpose/rights to be protected, exclusive
     nature of ICSID proceedings **47**.103–5
   stay of proceedings in domestic
     courts/injunction against **47**.103–5
stabilization clause **42**.26
**attachment proceedings**, exclusive remedy rule,
   *MINE* **26**.149–52
***audiatur et altera pars*:** *see* annulment of award,
   grounds, serious departure from
   fundamental rule of procedure, failure to
   hear other party (*audiatur et altera pars*)
**audit**
   *see also* budget (ICSID); costs, fees and
     expenses
   Secretary-General's responsibilities **11**.6
**Australia**
   agencies or political subdivisions, exclusion
     from Article 25(1) and **25**.242 n338
   Foreign States Immunities Act 1985 **55**.14,
     **55**.22, **55**.41, **55**.62, **55**.68, **55**.69, **55**.83,
     **55**.92
**Austria**, State immunity from execution
   **55**.64
**authentic languages:** *see* ICSID Convention,
   interpretation, authentic languages
**autonomy of ICSID arbitration process**
   *see also* status (ICSID), autonomous
   absence of party from proceedings **26**.3
   applicable law rules **Preamble** 26, **26**.3,
     **42**.2, **42**.274
   Arbitration Rules (AR) **Preamble** 26, **26**.3,
     **42**.3, **44**.3, **62**.3
   composition of tribunal **Preamble** 26
   constitution of tribunal **26**.3
   diplomatic protection, exclusion **26**.3,
     **64**.14
   domestic courts' role **26**.3–4, **26**.175
   exclusive nature of ICSID review system and
     **41**.22, **53**.2, **53**.18–32, **53**.62, **62**.3, **64**.14,
     **64**.15
   exclusive remedy rule **26**.1, **26**.3, **53**.19
   ICJ–ICSID relationship and **64**.9
   jurisdiction, determination of **Preamble** 34
   place of proceedings, relevance **44**.3, **44**.21,
     **44**.54, **53**.22, **62**.3
   provisional measures **26**.175, **62**.3

State immunity in enforcement proceedings
   and **55**.8
***Autopista***
   applicable law
     in absence of agreement between parties,
       finding of absence, need for **42**.134
     agreement between parties, implicit
       agreement **42**.68
   consent to ICSID jurisdiction, critical date,
     institution of proceedings **25**.474
   constituent subdivision or agency, designation
     as and State responsibility for acts of
     distinguished **25**.234
   diplomatic protection **25**.747, **27**.8,
     **27**.45
   exclusive remedy rule, obligation of domestic
     court to decline jurisdiction **26**.142–3
   foreign control for purposes of treatment as
     national of another State
     critical dates **25**.881
     indirect control **25**.845–6, **25**.848
     objective requirement **25**.814
   interest, claim for **46**.46
   international law/host State law,
     interrelationship **42**.110, **42**.224
   jurisdiction, objections to, time limits **52**.174
     n242
   national of another Contracting State,
     agreement to treat as **25**.770
   identification of recognized nationality
     **25**.804, **25**.805
   test **25**.765
**"award", classification as** **48**.22–30: *see also*
   arbitral award (ICSID)
   ancillary claims **48**.45
   annulment proceedings **48**.2, **48**.6, **48**.24,
     **48**.25, **48**.90, **48**.106, **48**.120, **52**.564–7
   awards and decisions of original tribunal
     **48**.2
   certification and dispatch and **49**.8
   discontinuance order **48**.28, **48**.71
   excluded decisions **48**.4–6, **48**.26–9,
     **48**.39–41, **48**.88–91, **48**.104
   interpretation of award **48**.6, **48**.29, **48**.89
   partial award **48**.27
     *LG&E* **48**.27
   preliminary decisions **41**.24–5, **48**.4,
     **48**.39–41
     on jurisdiction/competence **41**.73, **48**.22,
       **48**.26, **48**.45, **48**.88, **48**.104, **52**.171
   procedural issues, admissibility of evidence
     **48**.4
   procedural orders **43**.64, **47**.4, **48**.26, **48**.40,
     **48**.45, **48**.88, **48**.104, **48**.121
   provisional measures **47**.4, **47**.15, **47**.18,
     **48**.4, **48**.26, **48**.40, **48**.88, **48**.104
   rectification decisions **48**.29, **48**.45, **48**.89

**"award", classification as (*cont.*)**
  resubmission to new tribunal    **48**.2, **48**.25,
      **48**.90
  revision of award    **48**.6, **48**.29, **48**.89,
      **48**.105
  settlement agreement    **48**.28, **48**.78–9
  summary procedure (AR 41(5)) and    **41**.100
  supplementation or rectification of award
      **48**.29, **48**.45, **48**.89
*Azinian*
  costs and expenses, "loser pays", extenuating
      circumstances    **61**.35
  evidence, taking of, evaluation/probative value
      **43**.111
  witnesses    **43**.93
*Azurix*
  annulment of award, grounds, improper
      constitution of tribunal    **52**.112,
      **52**.120
  closure of proceedings    **49**.20
  costs and expenses, procedural misconduct
      and    **61**.28
  disqualification of conciliator or arbitrator,
      grounds, manifest absence of Article 14
      qualities    **57**.30–1
  evidence, taking of, "at any stage of the
      proceedings"    **43**.41
  fork in the road clauses    **26**.69
  international law, applicability in investment
      disputes    **42**.196
  international law/host State law,
      interrelationship    **42**.242
  parallel treaty and contract claims
      **26**.89–90
  procedural orders, failure to comply    **61**.28
  provisional measures
    circumstances requiring    **47**.66
    disputed jurisdiction and    **47**.54
    preservation and production of evidence
        **47**.83
    priority and speed, need for    **47**.44
    purpose/rights to be protected:
        non-aggravation of dispute    **47**.144–5;
        preservation of rights in dispute    **47**.164,
        **47**.169; preservation of rights of third
        parties    **47**.175
    types of measure    **47**.77
  resignation of conciliator/arbitrator    **56**.24
  stay of enforcement in annulment proceedings
    circumstances requiring    **52**.610,
        **52**.623
    compliance obligation and    **52**.580
    procedure (AR 54)    **52**.607
    security for eventual payment of award
        **52**.643–6

**bad faith**
  costs, fees and expenses, effect on    **61**.6,
      **61**.16
  failure to participate in proceedings    **45**.44,
      **45**.74
**bankruptcy proceedings**
  aggravation of dispute, whether    **47**.144–5,
      **47**.146, **47**.165–7
  obligation of domestic court to decline
      jurisdiction    **26**.141, **47**.111–14
*Banro*
  assignment/succession of investor's rights and
      responsibilities    **25**.351, **25**.355,
      **25**.361
  diplomatic protection    **25**.748, **27**.7, **27**.12
*Barcelona Traction*, nationality (juridical
      persons)    **25**.694, **27**.24
*Bayindir*
  critical date for determination of jurisdiction
      **25**.38
  evidence, taking of, burden of proof    **43**.118
  exclusive remedy rule    **26**.119–20
  "investment"
    contribution to economic development
        requirement    **25**.165
    "in accordance with host State law"
        **25**.201
  jurisdiction, joinder to merits    **41**.89
  parallel treaty and contract claims    **26**.104–6
  provisional measures
    disputed jurisdiction and    **47**.55
    financial guarantee/pre-judgment security
        **47**.97
    priority and speed, need for    **47**.44
  stay of proceedings (ICSID)    **26**.119–20
*Bayview*, "investment", "in the territory"
      requirement    **25**.198
**Belgo-Luxembourg Economic Union (BLEU)**,
      BITs (diplomatic settlement provisions)
      **27**.50
**Benin**, Investments Code 1990    **25**.399,
      **25**.523
*Benvenuti & Bonfant*
  ancillary claims, simultaneous determination,
      presentation of ancillary claim, time
      limits    **46**.24
  applicable law
    in absence of agreement between parties,
        finding of, need for    **42**.133
    agreement between parties, timing
        **42**.59
  concurrent reference to domestic courts,
      precedence    **26**.133
  constituent subdivision or agency, finality of
      award against parent State    **53**.14

costs and expenses
  parties' agreement, need for clarity
    **61**.13
  parties to bear own    **61**.13
  procedural misconduct and    **45**.73, **61**.13
counterclaim arising directly out of the
  subject-matter of the dispute    **46**.89
evidence, taking of
  "at any stage of the proceedings"    **43**.39
  expiry of time limits and    **43**.39
*ex aequo et bono* jurisdiction    **42**.59, **42**.208,
  **42**.259, **42**.267, **42**.277, **42**.279, **46**.48
exclusive remedy rule, obligation of domestic
  court to decline jurisdiction    **26**.133
exhaustion of local administrative or judicial
  remedies    **26**.208
failure of party to appear or to present case
  proceedings in absence of party    **45**.60,
  **45**.62–3
  sanctions    **45**.73
  timing of decision    **45**.87
failure to meet time limits    **45**.26, **45**.51,
  **45**.84
interest, claim for    **46**.48
  *ex aequo et bono* jurisdiction and
  **46**.48
international law/host State law, applicability
  in absence of agreement    **42**.133,
  **42**.143, **42**.149, **42**.208
international law/host State law,
  interrelationship    **42**.208
justiciability    **25**.70
resignation of conciliator/arbitrator
  **56**.26
***Benvenuti & Bonfant* (French proceedings)**
constituent subdivision or agency    **55**.117
public policy/*ordre public*    **54**.86, **54**.109
recognition and enforcement of arbitral award
  (ICSID)    **54**.50–2, **54**.86, **54**.109
  finality/nonreviewability and    **54**.86,
  **54**.109
State immunity from execution    **55**.43–4,
  **55**.117
**bifurcation clauses:** *see* fork in the road clauses
**BITs**
  *NB: BITs treatment of specific subject matter*
   *is dealt with under the relevant subject*
   *matter headings*
Belgo-Luxembourg Economic Union (BLEU)
  and    **27**.50
diplomatic protection and    **27**.36–7, **27**.50
Model Clauses (1969): *see* Model Clauses for
  Use in Bilateral Investment Agreements
  (1969)
as source of international law    **42**.171

termination
  severability of arbitration clause    **25**.310,
   **25**.450, **25**.622–4
  as withdrawal of consent    **25**.619
umbrella clauses    **25**.537, **26**.94, **26**.108
***Biwater Gauff***
confidentiality of proceedings    **44**.106,
  **44**.116–20
evidence, taking of, refusal to produce
  documents    **43**.62, **43**.72–3, **47**.86–9
provisional measures
  binding effect/legal status    **47**.22
  circumstances requiring    **47**.68
  disputed jurisdiction and    **47**.56
  preservation and production of evidence
   **43**.62, **47**.85–9
  priority and speed, need for    **47**.44
  types of measure    **47**.78
**Bolivia**, denunciation (ICSID convention)
  **25**.610, **68**.10, **71**.3
**Botswana**, Settlement of Investment Disputes
  (Convention) Act 1970    **25**.424,
  **25**.520
**Brazil**, non-participation    **68**.10
**budget (ICSID)**
  *see also* Administrative and Financial
   Regulations (AFR); audit; costs, fees and
   expenses
adoption by Administrative Council    **6**.18
  two-thirds majority requirement    **6**.21,
   **7**.8
expenditure, rules for apportionment    **6**.2
financial statement, inclusion of
  lodging fees revenue    **6**.19
  publications revenue    **6**.19
  receipts and expenditures related to
   particular proceedings    **6**.19
  value of services and facilities provided by
   World Bank    **6**.19
Secretary-General's responsibility for
  preparation and submission to Advisory
  Council    **11**.6: execution    **11**.6
for year ending 30 June 2006    **6**.19
**burden of proof**
allocation as departure from fundamental rule
  of procedure    **52**.301, **52**.324–7
credibility of witnesses and    **43**.107
evaluation of evidence and    **43**.87,
  **43**.116–18
jurisprudence
  *Bayindir*    **43**.118
  *Generation Ukraine*    **43**.107
  *Oil Platforms*    **41**.86, **43**.117–18, **52**.332
lack of Article 14 qualities    **52**.134–54, **57**.19
new fact    **51**.24

**burden of proof (*cont.*)**
   provisional measures, circumstances requiring
      **47**.64, **47**.65
   rules governing    **43**.116–18
      for purposes of jurisdiction (*prima facie
       test*)    **41**.86–92, **43**.117–18
   State immunity from execution    **55**.28
**Burkina Faso**, Investment Code 1995    **25**.399
***Burlington Resources***, constituent subdivision
      or agency, status as    **25**.246

***Cable TV***
   Arbitration Rules (AR), agreement to use
      earlier version    **44**.49
   closure/reopening of proceedings (AR 38)
      **49**.21
   complexities in corporation structure    **25**.329
      n438
   consent to ICSID jurisdiction, explicit consent,
      need for    **25**.381
   constituent subdivision or agency
      designation as    **25**.249, **36**.39–40
      as party to proceedings, approval of consent
       **25**.906, **36**.39–40
      status as    **25**.246
   Contracting State status, critical date
      **25**.219
   costs and expenses
      equal share of fees and expenses of Tribunal
       and Centre costs    **61**.12
      parties' agreement, need for clarity    **61**.12
      parties to bear own    **61**.12
   foreign control for purposes of treatment as
      national of another State
      form and extent of control, decision-making
       structure and management    **25**.858
      as objective requirement/evidence of
       **25**.822
   national of another Contracting State,
      agreement to treat as
      documentation, submission at time of
       request    **25**.774
      implicit agreement, possibility of    **25**.786
      test    **25**.765
   provisional measures, exclusive right of
      tribunal, whether    **26**.173
**Calvo Doctrine**    **27**.3
   *AES*    **27**.4 n2
**CAMCA Arbitration Rules**
   award
      delivery to parties    **49**.2 n3
      requirements    **48**.31 n17: reasons
       **48**.54
   interpretation of award    **50**.1
   panels of arbitrators    **12**.2 n2

   provisional measures    **47**.1
   publication of awards    **48**.108
   supplementation or rectification of award
      **49**.28 n46
**Cameroons**, Investment Code 1990    **25**.422,
      **25**.425, **25**.541
***Camuzzi***, exhaustion of local administrative or
      judicial remedies    **26**.205
***Camuzzi I***
   diplomatic protection, exclusion under
      Convention    **27**.9
   foreign control for purposes of treatment as
      national of another State, consolidation of
      interests of entities not all having
      nationality of same State party to BIT
      **25**.297, **25**.835–7
   "foreign control" test, applicability    **25**.706
   identical tribunals    **26**.129, **37**.35
   legal dispute "arising directly", general
      measures    **25**.111
**Canada**
   *Metalclad*    **53**.9
   review of Additional Facility awards    **53**.9
   State Immunity Act 1982    **55**.14, **55**.40,
      **55**.68, **55**.69, **55**.82
   State agency    **55**.125
***Canfor***, independence of arbitrator    **40**.24
**capacity of State to contract in violation of
      own law**    **42**.46–7, **42**.154–6
**Cartagena Free Trade Agreement (1994)**
   applicable law provisions, acceptance as
      implicit agreement    **42**.88
   concurrent arbitration provisions    **25**.463
   consent to ICSID arbitration    **25**.463
   foreign control for purposes of treatment as
      national of another State    **25**.810, **25**.869

   ICSID Secretary-General as appointing
      authority    **11**.16
   "investment"    **25**.147
   nationality provisions    **25**.659, **25**.722
   recognition/enforcement of award    **54**.22
***CDC***
   *ad hoc* committee, appointment to    **52**.454
   annulment of award (general), appeal
      distinguished    **52**.19, **52**.33, **52**.38,
      **52**.378
   annulment of award, grounds
      failure to apply correct applicable law
       **52**.219, **52**.220
      failure to deal with every question submitted
       **52**.425
      failure to state reasons: contradictory
       reasons    **52**.397; quality/sufficiency of
       reasons    **52**.378–9

failure to state reasons for costs and
  expenses **52**.484
interpretation of Article 52 **52**.19, **52**.33
manifest excess of powers **42**.138,
  **52**.136
multiple grounds/classification difficulties
  **52**.416, **52**.523
serious departure from fundamental rule of
  procedure **48**.53: failure to comply with
  evidentiary standards **52**.330–1; failure
  to deliberate **52**.322; failure to issue
  award in timely manner **49**.13, **49**.23;
  lack of impartiality/inequality of
  treatment **52**.304; "serious
  departure"/"fundamental rule" **48**.53,
  **52**.286, **52**.288–9; timely objection, need
  for **52**.337
annulment of award, request, lack of merit,
  effect on costs **52**.104, **61**.40
costs and expenses, failure to state reasons for
  **52**.484
disqualification of conciliator or arbitrator,
  procedure **57**.13
evidence, tribunal's discretionary powers
  **43**.21, **52**.330–1
nationality (juridical persons), agreement
  between investor and host State
  **25**.715
obligation to annul, whether **52**.475
stay of enforcement in annulment proceedings
  circumstances requiring **52**.610, **52**.611,
    **52**.618, **52**.625
  procedure (AR 54) **52**.602
**Central African Republic**, Investment Code
  1988 **25**.398, **25**.422
**Centre**, name and spelling **25**.14
**certification and dispatch of ICSID award**
  *see also* closure/reopening of proceedings
    (AR 38)
  applicability
    annulment proceedings **49**.8, **49**.25
    preliminary decisions **49**.8, **49**.27
    provisional measures **49**.27
    resubmission of award **49**.8, **49**.25
    revision or interpretation of award **49**.8,
      **49**.25
    stay of enforcement **49**.27
    supplementation or rectification of award
      **49**.8, **49**.25, **49**.37, **49**.78
    supplementation or rectification decision
      **49**.8, **49**.25, **49**.37, **49**.78, **49**.80
  authentication **11**.9, **49**.6, **49**.14
  "certificate" **49**.6
  comparable articles in other international
    instruments **49**.2

decision on interpretation **50**.26
dispatch
  date **49**.6, **49**.7, **49**.25–7: omission
    **49**.15, **49**.25
  promptness **49**.7, **49**.26
drafting history **49**.3–4
inclusion of
  individual opinions and statements
    **49**.6–7, **49**.14
  supplementation or rectification of award
    **49**.37
oral delivery **48**.33, **49**.4
registrar's role **11**.9
Secretary-General's role **11**.9, **49**.3–9, **49**.37,
  **54**.98–9
  AFR 28 **49**.9
  AR 48 **49**.5, **49**.82, **54**.98
  dispatch **49**.6, **49**.14
**Chad**, Investments Code 1987, implementation
  decree **25**.399
**Chairman of the Administrative Council**
  *see also* tribunal (ICSID), president
  in case of
    absence or inability of World Bank
      President to act **5**.3
    vacancy in World Bank Presidency
      **5**.3
  expenses **8**.2
  personal immunities and privileges **21**.1
  personal immunity from legal process, waiver
    by Council (AFR 32(3)) **21**.6
  powers and functions
    appointment of members of *ad hoc*
      committee **5**.4
    concern about **5**.1
    conciliation commission/arbitration
      tribunals, designation to **5**.4: *see also*
      conciliation commission, appointment to,
      by Chairman; tribunal (ICSID),
      appointment to, by Chairman
    convening of meeting of Administrative
      Council **7**.3
    designation of members to Panels: *see*
      Panels, designation of members by
      Chairman
    nomination of Secretary-General and
      Deputy Secretary-General, 5.4, 10.1–6,
      10.8: *see also* Secretary-General/Deputy
      Secretaries-General
    waiver of immunity of
      Secretary-General/Deputy
      Secretary-General **21**.6
  President of World Bank as *ex officio* **2**.5,
    **5**.1–4
  remuneration **8**.1–2

**Chairman of the Administrative Council**
    (*cont.*)
  tax privileges   **8**.2
  voting rights   **5**.2
*Champion Trading*
  closure of proceedings   **49**.19
  dual/multiple nationals   **25**.669–71
  evidence, taking of, "at any stage of the
    proceedings"   **43**.33
  fork in the road clauses   **26**.68
  languages   **44**.69
**China**
  accession   **68**.8
  extension of Convention to Hong Kong and
    Macao   **70**.10 n7
  notification of excluded classes of disputes
    **25**.926
**choice of forum**   **26**.23, **26**.45–9: *see also*
    concurrent arbitration provisions;
    concurrent reference to domestic courts;
    parallel treaty and contract
    claims
  admissibility considerations and
    **25**.18
  jurisprudence, *Vacuum Salt*   **26**.48
**choice of law clause**, principles of law common
    to certain group of countries   **14**.10
*City Oriente*
  constituent subdivision or agency, status as
    **25**.246
  provisional measures, modification or
    revocation by tribunal (AR 39(3))
    **47**.62
**closure/reopening of proceedings (AR 38)**
    **49**.11–24, **57**.12: *see also* certification
    and dispatch of ICSID award
  date, failure to mention in published award
    **49**.15
  jurisprudence   **49**.16–24
    *AAPL*   **49**.21
    *Amco I*   **49**.21
    *AMT*   **49**.21
    *Atlantic Triton*   **49**.19
    *Azurix*   **49**.20
    *Cable TV*   **49**.21
    *CDC*   **49**.13, **49**.23
    *Champion Trading*   **49**.19
    *Fedax*   **49**.19
    *LETCO*   **49**.19
    *MINE*   **49**.21
    *Noble Ventures*   **49**.18
    *Olguín*   **49**.17
    *Siemens*   **49**.22
    *SOABI*   **49**.21
    *Vacuum Salt*   **49**.21

  post-hearing submissions   **49**.14
    *Fraport*   **44**.96, **49**.14 n11
  procedural order declaring closure
    **49**.14
  reopening in case of new fact (AR 38(2))
    **49**.17, **49**.18, **51**.21
    taking of evidence and   **43**.36–7
  time limits for preparation of award (AR 46)
    **49**.12–24
    2003 revisions to AR   46, **46**.35,
      **49**.12–13
    failure to meet, effect   **49**.13–14, **49**.23
    ICSID practice   **49**.16–24
    modification of rule by parties   **49**.24
*CMS*
  *ad hoc* committee, appointment to   **52**.454
  *ad hoc* committee, power to confirm award
    **52**.490–1
  annulment of award (general), appeal
    distinguished   **52**.15, **52**.190
  annulment of award, grounds
    exclusion of new arguments on fact or law
      **52**.15
    failure to apply correct applicable law
      **52**.225, **52**.231
    failure to state reasons: absence of reasons
      **52**.360–1; quality/sufficiency of reasons
      **52**.385–7
    manifest excess of powers   **52**.185–90
    multiple grounds/classification difficulties
      **52**.529
  annulment of award, request, reasons for
    making   **52**.44
  applicable law
    interpretation of consent to ICSID
      jurisdiction   **25**.578, **42**.7, **52**.187–90
    nationality (juridical persons)   **42**.12
  "authority to annul", partial annulment
    **52**.496–7
  experts   **43**.54
  "foreign control" test, applicability   **25**.704,
    **25**.706
  fork in the road clauses   **26**.65–6
  incidental or additional claims "arising
    directly out of subject-matter of the
    dispute"   **46**.83–4
  interest, claim for   **46**.55
  international law, applicability in investment
    disputes   **42**.197
  international law/host State law,
    interrelationship   **42**.240–1
  legal dispute "arising directly"
    general measures   **25**.107–8
    indirect investment   **25**.89, **25**.91
  nationality (juridical persons)   **42**.12

parallel treaty and contract claims **26**.86
resubmission of dispute after annulment, *res judicata* and **52**.684
shareholders as parties to dispute **25**.792
stabilization clause **42**.127
*stare decisis* and **53**.17
stay of enforcement in annulment proceedings **52**.584, **52**.588
circumstances requiring **52**.610, **52**.620–2
procedure (AR 54) **52**.606
security for eventual payment of award **52**.642
termination, partial annulment and **52**.655
*Colt Industries*, applicable law, agreement between parties, third State law **42**.30
**commercial transactions, exclusion** **25**.57, **25**.122, **25**.202
**commission:** *see* conciliation commission
**committees, Administrative Council's right to appoint**, 6.2, 6.22: *see also* ad hoc committee
**competence, determination by tribunal**, by commission/tribunal **Preamble** 34
**competence of tribunal, determination by tribunal**
*see also* jurisdiction; jurisdiction, objections to, examination of jurisdictional issues on tribunal's own initiative
application to *ad hoc* committee **41**.4
comparable provisions in other international instruments **41**.1
conciliation commission compared **32**.1–5, **41**.4
as corollary to Article 25(1) (withdrawal of consent) **41**.5
decision as award **41**.73, **48**.4, **48**.22, **48**.26, **48**.45, **48**.88, **48**.104, **52**.171
annulment and **41**.25–9, **41**.72, **52**.62, **52**.63, **52**.67, **52**.131, **52**.542
in case of default **45**.70
certification and dispatch by Secretary of tribunal **49**.3
finality/binding effect **53**.66
writing, need for **48**.40
drafting history **41**.2
exclusive nature of tribunal's power
ICJ (Article 64) and **41**.9, **41**.10: drafting history **41**.10
jurisprudence, *Holiday Inns* **41**.13
non-ICSID forum's obligation to stay proceedings pending tribunal's decision **26**.6, **26**.10, **26**.154, **26**.160–1, **41**.9, **41**.16–20

Secretary-General's screening role (Article 36(3)) and **36**.59, **41**.9, **41**.11–15, **47**.48, **52**.141, **52**.172
exhaustiveness/reasons **41**.70, **48**.88, **48**.91
*forum prorogatum* and **25**.486
as general principle of international adjudication **41**.1–3
acceptance of principle **41**.5
Executive Directors' Report **41**.2
independent legal basis of tribunal and **41**.6–8, **45**.46
individual opinions and **48**.104
jurisprudence
*Inceysa* **41**.7
*Mihaly* **41**.14
*Plama* **41**.15
*SPP II* **41**.5 n8
*Zhinvali* **41**.8
national legislation, interpretation and **41**.5 n8
publication of decisions **48**.121
recognition/enforcement **54**.30
resubmitted case and **41**.4
review of tribunal's decision
by domestic courts **41**.22
by ICJ **41**.21
by ICSID: annulment of award on jurisdictional grounds **41**.25–9, **41**.68; supplementation, rectification, interpretation or revision of decision on jurisdiction while case pending **41**.24
finality of decision **41**.21, **41**.73: Executive Directors' Report **41**.21; status as award and **41**.23, **41**.70
tribunal's right to consider on own initiative **25**.7, **25**.485, **25**.498
tribunal's right to raise objections to jurisdiction on own initiative and **41**.44
**"competence"/"jurisdiction", distinction in usage** **25**.15, **25**.18, **41**.56–7
French text **25**.17 n7, **41**.56 n77
Spanish text **25**.17 n7, **41**.56 n77
**compliance with ICSID award**
constituent subdivision or agency, responsibility of host State **53**.14–15, **55**.116
denunciation of Convention, effect **72**.11
drafting history **53**.39–40
Executive Directors' Report **53**.33
enforcement
diplomatic protection **53**.41–4
ICJ and **53**.44, **64**.14
methods **53**.41
NAFTA **53**.45

**compliance with ICSID award (*cont.*)**
  enforcement difficulties, relevance   **53**.35–8,
    **54**.115
    Article 53 enforcement measures, need for
      as breach of compliance obligation
      **53**.35–6, **54**.115
    State immunity   **53**.37–8, **54**.115, **55**.7:
      *MINE*   **53**.37; *Mitchell*   **53**.38
  non-compliance
    consequences   **53**.34, **53**.39: State
      responsibility and   **53**.13
    cost/benefit analysis   **53**.39
    failure to cooperate in proceedings as
      precursor   **45**.43
    settlement award   **48**.79
  as obligation   **Preamble** 33, **53**.33–8
    of both parties   **53**.34
    changeability of obligation   **53**.65:
      consequences of non-compliance and
      **53**.34
    drafting history   **53**.33
  partially annulled award   **53**.63
  stay of enforcement and, *MINE*
    **53**.49
  third party interest in securing
    **53**.46
  timing
    in case of supplementation/rectification
      proceedings   **53**.51
    drafting history   **53**.47
    factors determining   **53**.59, **53**.65
    period of grace   **53**.47: parties' right to
      agree on   **53**.50
    relevant dates, dispatch of certified copies of
      award   **53**.50, **54**.100
    stay of enforcement and   **52**.578–81,
      **53**.47–59: expectation of stay, relevance
      **53**.58; NAFTA   **53**.55–6, **54**.101
  voluntary compliance, presumption of   **53**.39,
    **54**.7
  World Bank role   **53**.40
**composition of tribunal, number of arbitrators**
  ceiling, absence   **37**.14
  drafting history   **37**.12–13, **37**.15
  sole arbitrator, method of appointment
    **37**.18
  usual practice   **37**.14
**conciliation**
  Additional Facility, 34.7: *see also*
    Additional Facility Conciliation Rules
    (2006)
  purpose   **34**.8–10
**conciliation commission**
  communication with parties,
    Secretary-General's role   **11**.11

costs: *see* costs, fees and expenses
    (apportionment: conciliation
    proceedings)
disqualification: *see* disqualification of
    conciliator or arbitrator
duty to clarify issues . . . and bring about
    agreement . . . upon mutually acceptable
    terms
    CR 22   **34**.11
    procedure, *SEDITEX II*   **34**.16
    proposal to delete "mutually agreed terms"
      **34**.8
    purpose of conciliation and   **34**.8–10:
      Executive Directors' Report   **34**.9;
      *Tesoro*   **34**.10
fees of members: *see* costs, fees and expenses
    (conciliators and arbitrators)
parties' obligation to cooperate in good faith
    **34**.23–5
    absence of sanction for noncooperation
      **34**.25
    CR 23   **34**.24
    legally binding obligation   **34**.23
    procedural cooperation, limitation to
      **34**.23, **34**.25
personal immunity from legal process
    **21**.4
    diplomatic immunity, rejection of proposal
      for   **21**.4
    waiver by Chairman (AFR 3(2))   **21**.6
replacement
    *see also* replacement of
      conciliator/arbitrator following death,
      incapacity or resignation by member of
      Panel   **12**.4, **13**.5
resignation without consent of commission
    **5**.4
temporary inability of conciliator to work
    **56**.8
**conciliation commission, appointment to**
by Chairman
  absence of practice   **30**.6
  arbitral tribunal compared   **30**.1–5
  in case of parties' failure   **5**.4
  in case of resignation without consent
    **5**.4
  proposal to omit provision   **30**.2
conciliators or arbitrators in same dispute
    **29**.4
drafting history   **30**.2
expiry of membership of Panel and   **15**.4
from outside Panel   **12**.4
  arbitral tribunal compared   **31**.1–3
  by Chairman   **12**.4, **13**.5
  drafting history   **31**.2

qualities of Panel members, need for
  **31**.2
nationals or co-nationals of parties   **13**.9,
  **29**.1, **29**.5, **29**.9, **30**.1, **30**.4
public service nature   **60**.9
refusal   **12**.5
Secretary-General's role   **11**.4
**conciliation commission, competence,
  determination by commission**   **25**.2,
  **32**.1–7: *see also* jurisdiction
ancillary claims, absence of provision for
  **32**.4
binding nature of decision   **32**.3
Conciliation Rules (CR)   **32**.4
objection, timing   **32**.7
proposal to submit to separate arbitration
  **32**.3
*Tesoro*   **32**.6–7
tribunal compared   **32**.1–5, **41**.4
**conciliation commission, constitution**
arbitral tribunal compared   **29**.2–6
  Conciliation/Arbitration Rules compared
    **29**.4–6, **30**.3
continuity of membership, desirability, 56.5–6:
  *see also* replacement of
  conciliator/arbitrator following death,
  incapacity or resignation
ICSID assistance   **1**.4
jurisprudence
  *SEDITEX I*   **29**.7
  *SEDITEX II*   **29**.9
  *Tesoro*   **29**.8
  *Togo Electricité*   **29**.10
replacement of conciliator before date of
  constitution   **56**.5
sole conciliator   **29**.8
undertaking to "judge fairly", absence
  **29**.4
**conciliation commission, recommended terms
  of settlement**   **34**.17–22: *see also*
  conciliation commission, report
arbitration clause, desirability   **34**.31
binding nature
  parties' prior agreement   **34**.28: status of
    recommendations and   **34**.28
  rejection of proposal to include in
    Convention   **34**.28
continuing role of commission following
  **34**.17
CR 22 (2)   **34**.18
"from time to time"/"at any stage of the
  proceedings"   **34**.17, **34**.20
  *SEDITEX II*   **34**.21
  *Tesoro*   **34**.21
oral, acceptability   **34**.20

part of award, whether   **34**.28
parties' obligation to
  consider in good faith   **Preamble** 33
  give most serious consideration to
    **34**.26–8: "due consideration" (Preamble)
    **34**.27; enforceability   **34**.28
parties' right to reject   **34**.25
provisional measures   **34**.19
reasons, need for   **34**.17
**conciliation commission, report**
  *see also* conciliation commission,
    recommended terms of settlement
  agreement by parties
    binding nature of agreement   **34**.31: status
      of agreement and   **34**.31
    enforcement: *see* recognition and
      enforcement, absence of provision for
      *below*
  "award", whether   **34**.31
  drafting   **33**.6
  failure to appear   **34**.36–8
  failure to reach agreement   **34**.33–5
    *SEDITEX II*   **34**.35
  publication of report
    parties' consent, need for (CR 33(3))
      **34**.32: release by one party   **34**.32;
      Secretary-General's role
      **34**.32
  recognition and enforcement, absence of
    provision for   **33**.5, **34**.31
    arbitration clause, desirability   **34**.31:
      including agreement on invocation of
      positions taken   **35**.4
  terms of settlement
    *see also* agreement of parties *above*
    exclusion   **34**.29
    inclusion at request of parties (CR 30(1))
      **34**.30
    publication, noting of issues as avoidance of
      **34**.29
**conciliation proceedings**
  advantages   **34**.2–4
  drafting history   **28**.3, **34**.17, **34**.23, **34**.26,
    **34**.28, **34**.29, **34**.33
  "duty to clarify issues . . . and bring about
    agreement . . . upon mutually acceptable
    terms", arbitrators' duty distinguished
    **25**.76
  exclusive remedy rule   **26**.1
  failure of party to appear   **34**.36–8
    arbitration proceedings distinguished
      **45**.7
    *ex parte* proceedings, exclusion
      **34**.38
    sanction   **34**.36–7

**conciliation proceedings (*cont*.)**
   legal dispute requirement    **25**.76–7
     renegotiation of long-standing agreement
      and    **25**.78–82
   limited use of facility    **Preamble** 23, **28**.6,
     **34**.5
     list of cases    **28**.6 n6, **34**.5
     reasons for    **34**.5
   non-invocation of positions taken during
     drafting history    **35**.1
     "except as parties may agree otherwise"
      **35**.4: advance agreement    **35**.4; as
      compromise    **35**.1; inclusion in
      commission's report    **35**.5; as part of
      settlement agreement    **35**.4; settlement
      agreement distinguished    **35**.1
     exclusion of appointment to arbitral tribunal
      of conciliator in previous proceedings
      **35**.2
     increased costs in case of subsequent
      arbitration proceedings    **35**.3
     reason for provision    **35**.3
     reports and recommendations, application to
      **35**.1
     subsequent judicial proceedings
      **35**.1
   place of: *see* place of proceedings
   procedure    **34**.12–16: *see also* Conciliation
     Rules (CR)
     evidence    **34**.13
     flexibility    **34**.11–13
     parties' right to be heard    **34**.12
     *Tesoro*    **34**.14–15
   request for
     arbitration request compared    **28**.2–4,
      **36**.6
     archive relating to    **11**.8
     joint, need for    **28**.3
     registration    **11**.8, **11**.9
**Conciliation Rules (CR)    29**.4
   adoption by
     Administrative Council    **6**.10, **33**.2:
      required majority    **6**.21, **7**.8
     conciliation commissions    **6**.10
     Panel of Conciliators    **6**.10
   amendment: *see* revisions to *below*
   conciliation/arbitration procedures compared
     **33**.1–6, **34**.31, **44**.8
   Convention and
     conformity with    **6**.111
     supplementary to    **6**.111
   critical date    **25**.478
   modification by parties, proposal to limit right
     **33**.2
   as part of Convention    **6**.10

   rectification, revision, interpretation and
     annulment of award, absence of provision
     for    **33**.5
   revisions to    **6**.10, **33**.4
     continuing validity of earlier Rules    **6**.12,
      **33**.4
**Conciliation Rules (CR) (Provisional) (1967)**
     **6**.12, **33**.4 n1
**Conciliation Rules (CR) (1968)**
   6    **56**.5 n2
   7    **56**.5 n3
   8, Note C    **56**.22 n17
   9, Note B    **57**.11 n5
   9(1)    **57**.10 n4
   11, Note B    **56**.18 n13
   22
     Note A    **34**.12 n15
     Note D    **34**.13 n16
     Note E    **34**.13 n16
   30    **32**.4 n2
   31, Note C    **34**.30 n29
   adoption    **6**.12, **33**.4
**Conciliation Rules (CR) (1984/2006)**
   1–7    **29**.4
   4    **30**.3
   6    **56**.5 n2
   6(1)    **57**.8
   7    **56**.5 n3
   8(1)    **56**.21 n15
   9    **56**.21 n16
   9(1)    **57**.10
   9(2)–(6)    **58**.8
   10(2)    **58**.11
   11    **58**.18
   11(1)    **56**.17 n12
   11(2)    **12**.4, **56**.19 n14, **56**.42
   11(2)(b)    **56**.37 n29
   12    **56**.11 n8, **58**.19
   13    **11**.10, **11**.13
   13(3)    **62**.12
   14(2)    **56**.8 n6
   16(1)    **56**.8 n6
   17    **56**.8 n6
   18    **44**.73 n90
   20    **32**.6, **44**.28 n26, **63**.7
   21    **11**.13, **44**.63 n80
   22    **34**.11
   22(2)    **34**.18
   22(3)(c)    **62**.18
   23    **34**.24
   24–27    **44**.80
   25–28    **33**.5
   25(1)    **34**.13
   27    **44**.93 n109
   29    **32**.4

29(1)    **25**.489
29(2)    **25**.7, **25**.486, **32**.4
29(5)    **32**.4
30    **57**.12
30(1)    **34**.30
30(2)    **34**.34
30(3)    **34**.37
32    **33**.6
33(3)    **11**.14, **34**.32, **48**.110 n112
adoption    **6**.12, **33**.4
**conciliation/arbitration, choice at time of consent to jurisdiction    Preamble** 24
BITs and other treaty provisions    **25**.23–4
clarity, desirability    **25**.20, **25**.21, **25**.27, **25**.28
investment agreements    **25**.22
IR 1    **25**.20
method    **25**.20
*MINE*    **25**.22
Model Clauses (1993)    **25**.21
national legislation    **25**.25–7
subsequent change    **25**.28
timing    **25**.20, **36**.13
**conciliation/arbitration proceedings, relationship**
arbitration contingent on prior unsuccessful conciliation    **25**.386, **25**.387, **36**.13
separate requests, need for    **36**.13
conciliation as preliminary to arbitration    **25**.19, **25**.20, **34**.6
equivalence under Convention    **25**.19–27, **25**.560, **34**.1, **34**.6, **36**.6, **36**.13
**conciliators:** *see* panels
**concurrent arbitration provisions**
BITs    **25**.441–6, **26**.20–1
in absence of ICSID arbitration    **26**.20
*ad hoc* arbitration    **25**.229
offering choice    **26**.21
UNCITRAL as default in absence of agreement    **26**.20
in case of doubt as to ICSID jurisdiction    **25**.209
in consecutive documents spread over time, effect of later ICC clause on existing ICSID clause    **26**.30
in consecutive pieces of legislation    **26**.43
effect on exclusive remedy rule, validity of alternative consent and    **26**.33
Energy Charter Treaty (1994)    **26**.22
estoppel and    **26**.37
exclusive remedy rule, effect on    **26**.31
investor/host State agreements
in consecutive documents spread over time    **26**.24–31

implied limitation of earlier clause    **26**.30
jurisprudence
*Joy Mining*    **26**.41–2
*Klöckner I*    **26**.25–31
*SPP*    **25**.400–4, **26**.34–40
*Tradex*    **26**.43
MERCOSUR Protocols    **26**.22
multilateral treaties
Cartagena Free Trade Agreement (1994)    **25**.463
Energy Charter Treaty (1994)    **25**.460–1
MERCOSUR Protocols    **25**.462
NAFTA (1992)    **25**.458
NAFTA (1992)    **25**.458, **26**.22, **26**.112–13
national legislation    **25**.398–408
national legislation consenting to ICSID arbitration    **26**.23, **26**.40
choice of forum    **26**.23, **26**.47
specification of arbitral system as condition of consent    **26**.23
*ne bis in idem* principle    **26**.31, **26**.114, **53**.32
precedence    **25**.400–4, **26**.40, **26**.50–1
*res judicata* and    **26**.31
separability of issues    **26**.31
stay of proceedings by one tribunal while other decides its jurisdiction    **26**.38–9
validity    **26**.33–43
right of resort to ICSID arbitration and    **26**.34–42
"unless otherwise stated" provision and    **26**.33
**concurrent reference to domestic courts    26**.44–54
as alternative or preliminary to ICSID arbitration    **Preamble** 22, **26**.44
BITs provisions    **26**.45
offering choice    **26**.45
choice of forum, right of    **26**.47
in consecutive documents spread over time    **26**.48–53
"unity of investment" approach    **26**.50–1
fork in the road clauses: *see* fork in the road clauses
investor/host State agreements and    **26**.48–53
jurisprudence
*Benvenuti & Bonfant*    **26**.133
*Holiday Inns*    **26**.49–52
*SOABI*    **26**.53
*Zhinvali*    **26**.47
in national investment laws    **26**.46
precedence    **26**.50–1, **26**.133

**concurrent reference to domestic courts (*cont.*)**
  proceedings in respect of corruption of
      arbitrator
    differing criteria   **21**.8
    possibility of conflict   **21**.8
  separability of issues   **26**.51, **26**.155
  submissions to non-ICSID forum as consent to
      **26**.54
  subsequent resort to/review by ICSID tribunal
      **26**.44, **26**.45, **26**.46, **53**.31–2
**concurring opinions:** *see* individual opinions
**confidentiality of proceedings**
    *see also* publication of award
  AR 15   **44**.99
  arbitrator's declaration   **44**.98, **50**.31
  attendance at proceedings (AR 32(2))   **44**.36,
      **44**.101–6, **47**.151
    parties' consent, need for   **44**.104–5
  as fundamental principle   **44**.97
  jurisprudence
    *ADC*   **44**.110
    *Amco I*   **47**.149
    *Biwater Gauff*   **44**.106
    *Loewen*   **44**.109
    *Malaysian Salvors*   **44**.108
    *World Duty Free*   **47**.150–1
  parties' preference for   **Preamble** 24
  provisional measures to protect   **47**.75,
      **47**.148–51
  publication of awards and   **48**.107–29
  reasons for   **48**.107
  representation in annulment proceedings by
      arbitrator in original proceedings
      **52**.321
  settlement agreement   **48**.87
  transparency, balance with   **44**.97,
      **44**.116–19, **47**.148
    BITs provisions   **44**.97, **44**.105
    NAFTA   **44**.97
    procedural transparency, demands for
        **Preamble** 24, **44**.97
  UNCITRAL Rules   **44**.97 n115
**conflict of laws, applicability**
  in absence of agreement between parties
      **42**.67, **42**.161–6
  agreement between parties   **42**.53–5, **42**.67
**Congo,** Investment Code 2002   **25**.541
**consent to ICSID jurisdiction**   **15**.567–77: *see
      also* jurisdiction
  conciliation/arbitration, choice: *see*
      conciliation/arbitration, choice at time of
      consent to jurisdiction
  "consent . . . given by one of them"   **72**.8–10
  denunciation of Convention and   **25**.211,
      **25**.215, **25**.477, **66**.7, **72**.1–11

  effects
    acceptance of Convention and Centre rules
        **25**.378
    loss of right to relief in another forum
        **26**.2, **26**.6
  exclusion of territories and   **25**.477, **25**.611,
      **66**.7, **70**.4, **72**.1–11
  *force majeure*   **25**.312
  *forum prorogatum*: *see forum prorogatum*
  interpretation, applicable law: *see* applicable
      law (interpretation of consent to ICSID
      jurisdiction)
  jurisdiction of Centre, dependence on   **25**.3,
      **25**.5
  MFN clauses and: *see* MFN clause,
      applicability to dispute settlement
      provisions
  national legislation, *SPP*   **41**.19
  need for   **Preamble** 35, **25**.374
  notification of classes of dispute distinguished
      **25**.928–41
  parties to the dispute: *see* parties to the dispute
  promise of, relevance   **25**.436–40
  relevance   **25**.6
  severability   **25**.310, **25**.450, **25**.622–4
    Additional Facility Rules   **25**.623
    provision for within consent clause
        **25**.624
    State succession and   **25**.310
  State immunity from jurisdiction and
      **26**.9–16
  submission to other dispute settlement
      procedures
    1993 Model Clauses   **26**.18
    effect   **26**.17
**consent to ICSID jurisdiction, BITs as State's
      offer**   **25**.427–55
  acceptance
    diplomatic protection, denial in case of
        refusal   **25**.455
    early acceptance, desirability   **25**.450
    explicit consent, need for   **25**.455,
        **25**.599
    incorporation of ICSID clause into
        investor/host State agreement   **25**.390
    institution of proceedings as   **25**.417,
        **25**.448–9, **25**.599, **25**.890
    need for   **25**.427, **25**.447–55, **25**.811,
        **27**.33, **72**.7: examples of BITs ignoring
        requirement   **25**.451–3
    as part of licensing process   **25**.455
    specific provision for   **25**.454
  choice of method by agreement and   **25**.446
  conditions, consultation or negotiation
      obligation   **25**.541–2

consent to alternative methods of settlement,
        relevance    **25**.441–6
contract claims, applicability to    **25**.531
drafting history    **25**.427
entry into force of treaty, relevance    **25**.429,
        **25**.510–12: *see also* non-retroactivity
examples of    **25**.431–4
jurisprudence
        *AAPL*    **25**.432
        *AMT*    **25**.452
        *CSOB*    **25**.429, **25**.435, **25**.619
        *Generation Ukraine*    **25**.448
        *Tradex*    **25**.429
limitations: *see* consent to ICSID jurisdiction,
        limitations, BITs
nature of agreement    **25**.579
normal method    **25**.428
reference to future agreement, effect
        **25**.439
requirements
        binding offer    **25**.430–5
        BIT between host State and State of
        investor's nationality    **25**.447
right to submit disputes provision, effect
        **25**.435
"shall be submitted" undertaking and
        **25**.434
"shall give consent in future" undertaking,
        effect    **25**.436–40
"shall give sympathetic consideration"
        undertaking and    **25**.438
specific exclusion of ICSID reference as
        **25**.440
variety of provisions    **25**.428
withdrawal of offer
        as breach of BIT    **25**.450
        withdrawal of consent distinguished
        **25**.450
**consent to ICSID jurisdiction, concurrent
        arbitration provisions**
in
        consecutive documents spread over time
        **52**.5161
        NAFTA (1992)    **47**.10
precedence    **41**.19
*SPP*    **41**.19
validity, relevance    **41**.19
**consent to ICSID jurisdiction, conditions**
admissibility    **23**.540, **25**.422–5
        after consent given    **25**.606
        consistency with Convention    **23**.540
consultation or negotiations/exhaustion of
        other methods obligation
        Energy Charter Treaty (1994)    **25**.542
        NAFTA (1992)    **25**.542

exhaustion of local remedies: *see* exhaustion
        of local administrative or judicial
        remedies, as condition of consent to
        ICSID arbitration (BITs provisions);
        exhaustion of local administrative or
        judicial remedies, as condition of consent
        to ICSID arbitration (national legislation
        consenting to ICSID arbitration)
investment authorization, revocation as
        indirect withdrawal of consent
        **25**.614–17
prior attempt at conciliation    **25**.386,
        **25**.387
specification of arbitral system in host
        State/investor agreement    **26**.23
time limits for request    **36**.17
written consent in addition to investment
        authorization process    **25**.424
**consent to ICSID jurisdiction, critical date**
amendment of Convention and    **66**.8
contingent submissions    **25**.221–3, **25**.470
date of acceptance    **25**.469
date of fulfilment of all conditions for consent
        **25**.470, **25**.471, **25**.600, **25**.682, **25**.754,
        **44**.43–6
date for purposes of applicable law
        distinguished    **25**.506–9
denunciation of Convention and    **72**.4–10
designation of subdivision or agency    **25**.35,
        **25**.471, **25**.913–15
entry into force of Convention    **25**.471,
        **25**.510–12
        consent limited to violations of treaty and
        **25**.510–12
institution of proceedings    **25**.472–4,
        **25**.479–98
        Executive Directors' Report    **25**.479
        IR 2(1)(c) and 2(2)    **25**.479
IR 2    **25**.35, **25**.468, **36**.31
jurisprudence
        *Amco I*    **25**.468
        *Autopista*    **25**.474
        *Duke Energy*    **25**.501 n667
        *Generation Ukraine*    **25**.473, **25**.507 n677
        *Helnan*    **25**.505
        *Holiday Inns*    **25**.472, **25**.601
        *Impregilo*    **25**.506
        *Jan de Nul*    **25**.504
        *Kardassopoulos*    **25**.507 n677
        *Lucchetti*    **25**.502–3
        *Maffezini*    **25**.500–1
        *Rompetrol*    **25**.754
        *SGS* v. *Pakistan*    **25**.499
        *SGS* v. *Philippines*    **25**.511
        *SPP*    **25**.491

**consent to ICSID jurisdiction, critical date (*cont.*)**
  jurisprudence (*cont.*)
    *Tecmed*  **25**.512
    *Tradex*  **25**.480
  last of dates on which States become Contracting States  **25**.216
  legal consequences of consent and  **25**.469, **25**.475–8, **44**.46
    determination of applicable Conciliation and Arbitration Rules (CR/AR)  **25**.478, **44**.18
    diplomatic protection, loss of right to  **25**.292, **25**.476, **27**.30–7
    exclusion of other remedies  **25**.476
    freezing of rights and duties under Convention  **25**.477
    irrevocability of consent  **25**.216, **25**.475, **25**.599–602
    nationality requirements  **25**.35, **25**.475, **25**.679–87, **25**.752–9
  parties acting on different dates  **25**.468
  request for arbitration  **25**.480, **25**.754
  unspecified in Convention  **25**.35, **25**.479, **25**.495
**consent to ICSID jurisdiction, interpretation**
  effectiveness principle  **25**.586, **25**.593
  good faith  **25**.589
  jurisprudence
    *Amco I*  **25**.5381
    *Holiday Inns*  **25**.586
    *Mondev*  **25**.591
    *SOABI*  **25**.589
    *SPP II*  **25**.590, **41**.5 n8
    *Tradex*  **25**.593
  restrictive/extensive, whether  **25**.586–95
    derogation from sovereignty and  **25**.586
  tribunal's right to determine own competence and  **41**.5
**consent to ICSID jurisdiction, limitations**
  admissibility  **25**.513
    after consent given  **25**.606
    consistency with Convention  **25**.513
  BITs  **25**.526–38
    "disputes or claims originating before entry into force", 25.49–56, 25.510–12: *see also* legal dispute as jurisdictional requirement, critical date; non-retroactivity
    German Model Agreement (2005)  **25**.541
    limitation to some of treaty rights  **25**.538–9
    UK Model BIT  **25**.526
    umbrella clauses  **25**.537, **26**.94, **26**.108
    US Model BIT  **25**.532

  broad limitation clauses, preference for  **25**.516
  coincidence of offer and acceptance, need for  **23**.514, **25**.419
  in direct agreements  **25**.515–17
  drafting history  **25**.513
  Energy Charter Treaty  **25**.535
  exclusion of classes of dispute (Article 25(4)) distinguished  **25**.515, **25**.928–41
  exclusion of disputes relating to application or interpretation of legislation  **23**.517
  good faith attempt at amicable settlement: *see* consultation or negotiations obligation
  investor-host State agreements  **23**.517
  jurisprudence
    *ADC*  **25**.539
    *AGIP*  **25**.517
    *Inceysa*  **25**.521–2, **25**.534
    *Kardassopoulos*  **25**.536
    *Saipem*  **25**.539
    *Salini* v. *Morocco*  **25**.527
    *SGS* v. *Pakistan*  **25**.529
    *SGS* v. *Philippines*  **25**.530
    *Siag*  **25**.754
    *Siemens*  **25**.530
    *SPP*  **25**.519
    *Telenor*  **25**.539
    *Tokios Tokelès*  **25**.530
    *Tradex*  **25**.525
    *Vivendi I*  **25**.528
    *Zhinvali*  **25**.520
  Model Clauses (1993)  **25**.515, **46**.10
  NAFTA  **25**.535
  national legislation  **25**.518–25
**consent to ICSID jurisdiction, method**
  *see also* consent to ICSID jurisdiction, BITs as State's offer; consent to ICSID jurisdiction, multilateral treaties; consent to ICSID jurisdiction, national legislation as consent or offer; investor/host State agreements
  delay in raising objection to jurisdiction, effect  **25**.487
  investment application and  **25**.388–9
  request for arbitration as acceptance  **36**.29
  submissions before tribunal  **26**.28, **26**.30
  unilateral offer by host State accepted by investor, growing popularity  **Preamble** 36, **25**.378
**consent to ICSID jurisdiction, multilateral treaties**
  acceptance, critical date  **25**.469
  Cartagena Free Trade Agreement  **25**.463
    investor's consent, need for  **25**.463
  Energy Charter Treaty (1994)  **25**.460–1

NAFTA (1992)  **25**.457–9
    investor's consent, need for  **25**.459
non-binding references  **25**.464–7
    Asean Agreement for the Promotion and
        Protection of Investments (1987)
        **25**.465
    EC Statement on Investment Protection
        Principles (1992)  **25**.467
    World Bank Guidelines on the Treatment of
        Foreign Direct Investment (1992)
        **25**.466
termination of offer as withdrawal of consent
    **25**.619
**consent to ICSID jurisdiction, multiple
    instruments:** *see* multiple
    instruments/varying parties (investment
    agreements)
**consent to ICSID jurisdiction, national
    legislation as consent or offer**  **25**.378,
    **25**.392–426
acceptance of offer, need for  **25**.392,
    **25**.416–26, **25**.599, **25**.811, **26**.96, **27**.33,
    **72**.7
    by time of institution of proceedings
        **25**.417, **25**.890
    clarity, need for  **25**.426, **25**.599
    coincidence of offer and acceptance, need
        for  **23**.514, **25**.420
    early acceptance, desirability  **25**.419
    extent of acceptance  **25**.420
    flexibility, need for  **25**.426
    institution of proceedings as  **25**.469,
        **25**.599
    methods of acceptance  **25**.417–26
    request for conciliation or arbitration as
        **25**.417–18
Additional Facility and  **25**.301, **25**.409
binding nature of offer  **25**.395–408
concurrent arbitration provisions
    **25**.398–408
conditions
    exhaustion of local administrative or
        judicial remedies  **23**.540
    good faith attempt at amicable settlement
        **25**.541
    investment authorization  **25**.422–5
        as part of consent  **25**.138
    written consent in addition to investment
        authorization process  **25**.424
consent effected through multiple instruments
    and  **25**.393
drafting history  **25**.392–3
effective date of consent and  **25**.392,
    **25**.426
Executive Directors' Report  **25**.393

express provision in legislation  **25**.391
further action by host State, need for
    **25**.410–15
jurisprudence
    *Amco I*  **25**.414
    *Inceysa*  **25**.391, **25**.396–7, **25**.415
    *Manufacturers Hanover Trust*  **25**.405
    *SPP*  **25**.26, **25**.400–4, **25**.421
    *Tradex*  **25**.395, **25**.417
    *Zhinvali*  **25**.406–8
Model Clauses (1968)  **25**.393 n530
notification to Centre, value  **25**.393
repeal of legislation, effect  **25**.419
restrictions on offer  **25**.392
revocability of legislation  **25**.392
    as withdrawal of consent  **25**.618
State practice  **25**.394–415
subsequent BIT, relevance  **25**.403
**consent to ICSID jurisdiction, validity**
acceptance of offer, need for  **26**.34
constitution of tribunal, effect on validity
    **41**.6–8
determination by
    commission or tribunal  **25**.479, **25**.621
    non-ICSID forum where ICSID proceedings
        not instituted  **26**.6, **26**.9–14:
        non-appearance of respondent in
        non-ICSID forum and  **26**.8, **26**.9
exclusion of diplomatic protection and
    **27**.31–7
failure to waive other remedies, effect
    **26**.37
jurisprudence
    *Cable TV*  **25**.381
    *Holiday Inns*  **25**.288, **25**.380
    *MINE*  **26**.9–14
    *SPP*  **26**.34
multiple acceptances of jurisdiction in same
    dispute: *see* concurrent arbitration
    provisions
notification to Centre, relevance  **25**.379
poor drafting and  **26**.8, **26**.19
prior to home State's ratification  **25**.287–8,
    **67**.2
validity of investment agreement and
    **25**.620–32
    State's incapacity to give consent
        **25**.625–31, **42**.154–6
writing, need for  **Preamble** 35, **25**.379–81
    in case of assignment/succession  **25**.380
    multiple instruments: *see* multiple
        instruments/varying parties (investment
        agreements)
    proof at time of request for proceedings,
        need for (IR2(2))  **25**.379

**consent to ICSID jurisdiction, voluntary nature**    Preamble 35, **25**.5, **25**.374–7, **25**.596, **69**.2
  developing countries' concern
    "adverse inferences" in case of refusal **25**.375
    exclusion of classes of dispute and **25**.375
    pressure to consent    **25**.375
  Executive Directors' Report    **25**.376
  participation in Convention, implications **25**.377
**conservatory measures:** *see* provisional measures
**consolidation of proceedings**    **26**.124–7: *see also* identical tribunals
  BITs provision for    **26**.125
  claims under different jurisdictional instruments and    **26**.124
  concerns relating to    **26**.126
  confidentiality of information and    **26**.126
  definition    **26**.124
  jurisprudence
    *Archer Daniels*    **26**.126
    *Corn Products*    **26**.126 n177
    *Pan American*    **26**.127
  NAFTA provision for    **26**.125, **26**.126
  reasons for    **26**.124
**constituent subdivision or agency as party to proceedings**
  annulment of award, Contracting State's right to request    **52**.43
  compliance obligation    **53**.15
  drafting history    **25**.238–9, **25**.904
  finality/binding effect of award and    **53**.14
  initiation of proceedings, right of    **25**.231, **36**.9
  justification for provision    **25**.230
  recognition/enforcement of award    **54**.102
  State immunity: *see* State immunity from execution, constituent subdivision or agency
**constituent subdivision or agency as party to proceedings, approval of consent**
  communication to
    investor    **25**.909
    subdivision or agency    **25**.909
  consent by host State, whether    **25**.919–20
  critical date    **25**.913–15
    institution of proceedings    **25**.479, **25**.915
  designation requirement, relevance    **25**.230, **25**.256, **25**.316, **25**.904–5
  drafting history    **25**.904
  failure    **36**.39–40

  form of approval    **25**.909–12
    as attachment to investment agreement **25**.910
    as integral part of investment agreement **25**.910–11
    Model Clauses (1993)    **25**.910–11
    as separate agreement    **25**.910
  jurisprudence
    *Cable TV*    **25**.906, **36**.39–40
    *Noble Energy*    **25**.907, **25**.912
  need for    **25**.903–8
  unilateral nature    **25**.909
  validity of consent, dependence on **25**.913
  waiver of need for by host State    **25**.903, **25**.916–18
    drafting history    **25**.916
    equivalence with approval    **25**.917
    form    **25**.917
    list showing    **25**.918
  withdrawal following    **25**.267, **25**.612–13, **25**.908
**constituent subdivision or agency as party to proceedings, changes to administrative structure**    **25**.313–18
  extension of consent to host State
    justification: situation caused by State's own act    **25**.315, **25**.613; State responsibility for acts of subdivision/agency    **25**.315; State's act as indirect unilateral withdrawal of consent    **25**.315
    nationality requirements, need to meet **25**.335
    separate consent of host State, need for **25**.312–16, **25**.920: agreement of subdivision or agency to assume responsibility as alternative    **25**.312
  as indirect withdrawal of consent **25**.613
  jurisprudence
    *Klöckner I*    **25**.260–1, **25**.317
    *Repsol*    **25**.318
  request for annulment and    **52**.43
**constituent subdivision or agency as party to proceedings, consent to ICSID proceedings**
  approval of consent: *see* constituent subdivision or agency as party to proceedings, approval of consent
  extension to host State    **25**.304, **25**.311–18, **25**.920
    changes to administrative structure, determination by domestic law, exclusion **25**.314
  irrevocability    **25**.602

separate consent of host State, need for
   possible formulae  **25**.316
    as protection against host State interference
      **25**.311, **25**.312, **25**.920
**constituent subdivision or agency as party to
   proceedings, designation**  **25**.247–67
application to both constituent subdivisions
   and agencies  **25**.247
Article 25(3) requirement for approval
   distinguished  **25**.232
Article 70 notification of excluded territories
   distinguished  **25**.254
confirmation from State of status, desirability
   **25**.257
   Model Clauses (1993)  **25**.257
drafting history  **25**.247
effect
   determination as responsibility of
     commission or tribunal  **25**.245
   estoppel  **25**.244
general or specific  **25**.247
jurisdiction, dependence on  **25**.257,
   **25**.260–1
   *Amco I*  **25**.264
   *Klöckner I*  **25**.260–1
   *LETCO*  **25**.265
jurisprudence
   *Benvenuti & Bonfant* (French proceedings)
     **55**.117
   *Cable TV*  **25**.249, **36**.39–40
   *East Kalimantan*  **25**.249
   *Noble Energy*  **25**.251
   *Occidental II*  **25**.251
   *Repsol*  **25**.250
limitations  **25**.256
   conditions  **25**.256
   time limits  **25**.256
origin of idea  **25**.247
reason for provision
   assurance of authority to commit State
     **25**.248
   control over dealings with foreign investors
     **25**.248
register  **25**.253
State responsibility for acts of distinguished
   **25**.233–7, **53**.15
   *Autopista*  **25**.234
   *Generation Ukraine*  **25**.234
   *Genin*  **25**.234
   *Helnan*  **25**.234
   *Impregilo*  **25**.234
   *Jan de Nul*  **25**.234
   *Kardassopoulos*  **25**.234
   *Maffezini*  **25**.234
   *Saipem*  **25**.234

   *Salini* v. *Morocco*  **25**.235
   *Tanzania Electric*  **25**.234
   *Vivendi I*  **25**.234, **25**.236
   *Wena Hotels*  **25**.234
State succession and  **25**.308
undertaking to make  **25**.257
withdrawal  **25**.267
   unilateral withdrawal of consent to
     jurisdiction and  **25**.267, **25**.612–13
**constituent subdivision or agency as party to
   proceedings, designation, formal
   requirements**
*ad hoc* designation  **25**.255
evidence of designation  **25**.259,
   **25**.266
jurisprudence
   *East Kalimantan*  **25**.266
   *Klöckner I*  **25**.260–1
   *Manufacturers Hanover Trust*  **25**.266
   *Noble Energy*  **25**.263
   *Scimitar*  **25**.266
   *Tanzania Electric*  **25**.262
notification to Centre
   BITs provision  **25**.252
   choice of method  **25**.252
   legislation as  **25**.252
   need for  **25**.252, **25**.255, **25**.257
specificity, need for  **25**.252 n357
timing
   day of request for conciliation or arbitration
     as critical date  **25**.258, **25**.915
   flexibility  **25**.258
**constituent subdivision or agency as party to
   proceedings, entities covered**
   **25**.240–6
Australia, problems relating to  **25**.242 n338
change of status, possibility of  **25**.260–1,
   **25**.317
designation requirement and  **25**.244
determination by commission or tribunal
   **25**.244
drafting difficulties  **25**.238–43
jurisprudence
   *Burlington Resources*  **25**.246
   *Cable TV*  **25**.245
   *City Oriente*  **25**.246
   *East Kalimantan*  **25**.246
   *Klöckner I*  **25**.246
   *Manufacturers Hanover Trust*  **25**.246
   *Noble Energy*  **25**.246
   *Perenco Ecuador*  **25**.246
   *Repsol*  **25**.246
   *Scimitar*  **25**.246
   *Tanzania Electric*  **25**.246
open issues  **25**.243

**constituent subdivision or agency as party to proceedings, entities covered (*cont*.)**
public functions on behalf of Contracting State or constituent subdivision, defining requirement   **25**.243
**constitution of tribunal**, autonomy of ICSID arbitration process and   **26**.3
**consultation or negotiations obligation**
**23**.541–7: *see also* exhaustion of local administrative or judicial remedies, as condition of consent to ICSID arbitration (BITs provisions); exhaustion of local administrative or judicial remedies, as condition of consent to ICSID arbitration (national legislation consenting to ICSID arbitration)
BITs   **25**.541–2
Energy Charter Treaty (1994)   **25**.542
jurisprudence   **25**.544–6
*Enron*   **25**.546
*Military and Paramilitary Activities*   **25**.543
*SGS* v. *Pakistan*   **25**.545
*Western NIS*   **25**.547
NAFTA (1992)   **25**.542
national legislation   **25**.541
non-compliance, effect   **25**.543–7
suspension of proceedings to allow time for completion   **25**.547
time limits   **25**.542
*Continental Casualty*
existence of legal dispute   **25**.45
fork in the road clauses   **26**.70
indirect investment giving rise to jurisdiction   **25**.90
"legal dispute"   **25**.65
legal dispute "arising directly", general measures   **25**.110
**contingent submission**   **25**.221–3, **25**.226, **25**.299
**continuity of nationality requirement**
diplomatic protection   **25**.684
ICSID arbitration   **25**.684–7, **25**.755–8
juridical persons   **25**.755–8
NAFTA   **25**.756
natural persons   **25**.684–7
**contract-based jurisdiction:** *see* BITs; fork in the road clauses; parallel treaty and contract claims
**Contracting State**
Additional Facility, availability where requirement not fulfilled   **25**.224–6, **25**.300–1, **67**.2
non-participation of either host or home State, *ad hoc* arbitration   **25**.302

critical date
institution of proceedings   **25**.214–20, **25**.287: date for investor's possession of nationality distinguished   **25**.287; falling within, 30-days of ratification   **25**.214
jurisprudence: *Amco I*   **25**.217; *Cable TV*   **25**.219; *Generation Ukraine*   **25**.220; *Holiday Inns*   **25**.216; *LETCO*   **25**.218
Secretary-General's consideration of request   **25**.214
eligibility
non-Members of World Bank   **67**.3–8
parties to ICJ Statute   **67**.5–6
future ratification, contingent submission
BITs   **25**.221, **25**.222, **25**.299: Additional Facility as fall-back   **25**.222, **25**.301
investment agreement   **25**.221, **25**.299
Model Clauses (1968)   **25**.221: undertaking to ratify speedily   **25**.221
Model Clauses (1981)   **25**.221
Model Clauses (1993)   **25**.221: Additional Facility as fall-back   **25**.221
national legislation, Yemen   **25**.223
identification of party, need for
Articles 28(3) and 36(2)   **25**.214
IR 2(1)(a)   **25**.214
jurisdictional requirement   **25**.3, **25**.211–23
absolute nature of requirement   **25**.213
drafting history   **25**.212
objective requirement   **25**.213
waiver, impossibility of   **25**.213
limitation of Centre facilities to, reciprocity principle and   **25**.212
ratification, during, 30 day period following deposit   **25**.214
Secretary-General's role   **25**.214
status as
Convention provisions   **25**.211
denunciation of Convention and   **25**.211, **25**.215
effective date   **25**.211
List of Contracting States and Other Signatories   **25**.213, **25**.286
signatories   **25**.213
**Convention:** *see* ICSID Convention
*Corn Products*, consolidation of proceedings   **26**.126 n177
**corporations**, complexities of structure: *see* parties to the dispute, complexities of corporation structure and
**Costa Rica**
exhaustion of local administrative or judicial remedies, as condition of consent to

ICSID arbitration (BITs provisions)
**26**.197
exhaustion of local remedies requirement
**25**.927
**costs, fees and expenses (apportionment:
    arbitration proceedings)**
*ad hoc* committee proceedings   **52**.541,
    **52**.572, **61**.39–40, **61**.61, **61**.64, **61**.71,
    **61**.74
    advance payment (AFR 14(3)(e))
        **61**.57–8
    jurisprudence: *Amco I*   **61**.39; *CDC*
        **52**.104, **61**.40; *Klöckner I*   **61**.39; *MTD*
        **61**.39; *Vivendi I*   **61**.39; *Wena Hotels*
        **61**.39
    *Repsol*   **52**.104, **62**.140
applicable law   **61**.18
bad faith and   **61**.6, **61**.16
Centre costs   **61**.12, **61**.16
decision as part of award   **61**.41, **61**.62–74
    compliance with requirements for awards
        **61**.68
    decisions relating to jurisdiction   **41**.73,
        **61**.62
    discontinuation order   **61**.66
    final and binding nature   **61**.73
    procedural orders   **61**.62
discontinuance order   **48**.71
drafting history   **61**.2, **61**.8, **61**.16
equal shares   **61**.10, **61**.17, **61**.33–40, **61**.44
    *ad hoc* committee practice   **61**.39
    jurisprudence: *Amco I*   **61**.33; *Azinian*
        **61**.35
    reasons, practice of giving   **61**.34–8
expenses incurred at request of party, expert,
    *SOABI*   **43**.28, **61**.30
expenses incurred in non-ICSID proceedings
    **61**.21
expenses incurred as result of one party's
    conduct   **43**.26–9, **43**.122, **61**.28–32,
    **61**.44
"loser pays"   **61**.16, **61**.17, **61**.19–21, **61**.44
    extenuating circumstances   **61**.23, **61**.35
    ICSID practice   **61**.19–21
    jurisprudence: *ADC*   **61**.20; *Azinian*
        **61**.35; *Fireman's Fund*   **61**.37; *Fraport*
        **61**.38; *MINE*   **48**.64, **61**.23, **61**.72;
        *Noble Ventures*   **61**.36; *SEMOS*
        **61**.14; *SPP*   **61**.21
    proportional apportionment   **61**.19
lump sum contribution   **61**.20, **61**.72
part of the proceeding, limitation to
    **61**.27–32
    *AMT*   **61**.29
    AR 28(1)(b)   **43**.26–9, **61**.27

payment of expert, *SOABI*   **61**.30
parties' agreement   **61**.3, **61**.8–14
    clarity, need for   **61**.10, **61**.12–14
    jurisprudence: *Benvenuti & Bonfant*
        **61**.13; *Cable TV*   **61**.12; *SEMOS*
        **61**.14
    Model Clauses   **61**.10
    responsibility for delays, effect on costs
        **61**.13
parties' own expenses   **61**.16, **61**.33,
    **61**.39
    in absence of agreement   **61**.10
    *Benvenuti & Bonfant*   **61**.13
    *Cable TV*   **61**.12
procedural misconduct and   **43**.27–9,
    **45**.72–5, **61**.17, **61**.22–32, **61**.44
    annulment proceedings   **52**.103–4
    frivolous or abusive application for
        annulment   **52**.103–4
    jurisprudence: *Amco II*   **61**.24; *AMT*
        **45**.75, **61**.29, **61**.56; *Azurix*   **61**.28;
        *Benvenuti & Bonfant*   **45**.73, **61**.13;
        *CDC*   **52**.104; *Generation Ukraine*
        **61**.26; *LETCO*   **43**.27, **45**.74, **61**.22;
        *MINE*   **46**.62, **61**.23; *Plama*   **43**.29;
        *Repsol*   **52**.104; *SOABI*   **43**.28; *Vivendi
        II*   **61**.31, **61**.32; *Zhinvali*   **61**.25
provisional measures   **61**.62
    non-compliance and   **43**.66, **47**.34
reasons for
    *ex aequo et bono* jurisdiction compared
        **61**.43
    failure to state as cause for annulment
        **61**.41–3, **61**.68, **61**.71–2: *MINE*
        **61**.42–3, **61**.72
    possible principles   **61**.44–5
reasons, need for   **52**.356, **61**.41
recognition and enforcement proceedings
    **61**.67
settlement agreement   **48**.73, **48**.77, **61**.11,
    **61**.65
supplementation, interpretation and
    rectification proceedings   **61**.4
    *Genin*   **49**.53, **61**.63
    *LETCO*   **49**.44, **61**.69
    *Maffezini*   **49**.50, **61**.63
    *Santa Elena*   **49**.48, **61**.63
    *Soufraki*   **49**.65
    *Vivendi*   **61**.63
    *Vivendi II*   **49**.63
    *Wena Hotels*   **61**.63
tribunal's discretion   **34**.4, **48**.64, **61**.6, **61**.15,
    **61**.42–3
    absence of criteria   **61**.17
    right to reapportion   **61**.55–6

1438 *Index by Subject*

**costs, fees and expenses (apportionment: arbitration proceedings) (*cont.*)**
types of costs and expenses distinguished **61**.15, **61**.33
UNCITRAL and ICC provisions compared **61**.17
**costs, fees and expenses (apportionment: conciliation proceedings)**
arbitration distinguished **34**.4, **61**.2–3, **61**.6, **61**.8
bad faith proceedings and **61**.6
Centre charges **61**.5
drafting history **61**.2, **61**.6, **61**.8
equal shares **34**.4, **61**.5–7, **61**.59
non-discretionary nature **34**.4, **61**.5–6
parties' own expenses **61**.5, **61**.6
**costs, fees and expenses (Centre)**
*see also* audit; budget
annulment proceedings **59**.5
apportionment, equal shares **61**.5, **61**.12, **61**.16, **61**.44
Chairman and members of Administrative Council **8**.1–2
communications and costs of persons hired by Centre **59**.10
Contracting States, responsibility for
members of World Bank **17**.9
non-Members of World Bank **17**.9
drafting history **59**.6
lodging fee **59**.8–9
circumstances requiring **59**.9
as essential preliminary **36**.16, **59**.9
non-refundability **36**.64–70, **59**.9
revenue from **6**.19
obligation to meet **61**.9
principles underlying
limitation to cost of particular proceeding **59**.6
periodic adjustment **59**.6
preestablishment of charges **59**.6
recovery **62**.14
advance payment **11**.12, **59**.10: AFR 14(2) **61**.46
Contracting States: assessment (ARF 18) **17**.9; implementing legislation **69**.8; members of World Bank **17**.2, **17**.9; non-Members of World Bank **17**.2, **17**.9
income from use of Centre's facilities **6**.16, **11**.12, **17**.2: registration fees **17**.7; sale of publications **17**.7
"or out of other receipts", avoidance of explicit reference to World Bank role **17**.3

World Bank responsibility for: *see* World Bank responsibility for *below*
relating to proceedings: *see* costs, fees and expenses (proceedings)
Secretary to commission, tribunal or *ad hoc* committee **59**.11
in case of proceeding away from Centre **59**.11
special services (AFR 15)
advance payment by party requiring **59**.12
level of charge **59**.12
tax exemption and **8**.2, **24**.3
World Bank responsibility for **17**.2–9, **59**.13
administrative costs **6**.16, **17**.5: 2006 contribution **17**.7; provision of premises **17**.4; staff costs **6**.16, **17**.5
Executive Directors' Report, agreement to underwrite **17**.3–4
reasons for underwriting by: avoidance of administrative complexity **17**.3; avoidance of delay in payment by Contracting States **17**.3
reimbursement from Centre revenue, procedure **17**.7
reimbursement from parties' advances **62**.14
as subsidy **17**.8, **59**.13
**costs, fees and expenses (conciliators and arbitrators)** **17**.1: *see also* costs, fees and expenses (apportionment: arbitration proceedings); costs, fees and expenses (apportionment: conciliation proceedings)
*ad hoc* committee **60**.2
AFR 14(1) **60**.2
agreement between parties and commission/tribunal **60**.4, **60**.10–14
agreement of entire commission/tribunal, need for **60**.14: annulment for corruption and **60**.14
fees higher than Schedule **60**.10–14: justification **60**.10; Secretary-General's role (AFR 14) **44**.41, **60**.13
likelihood of higher fees, Memorandum on Fees and Expenses of ICSID Arbitrators **60**.13
Model Clauses **60**.12
*MTD* **60**.11
allowable expenses **60**.7
determination by Secretary-General with approval of Chairman **11**.12

drafting history   **60**.3
equal shares   **61**.44
limits established by Administrative
     Council/Secretary-General   **60**.4–9
     in absence of agreement between parties
          and commission/tribunal   **60**.4,
          **60**.8
     acceptance of proposal   **60**.3
     AFR as means   **60**.5–6
     automatic application   **60**.8
     Schedule of Fees   **60**.7–8
low level of remuneration   **60**.9
Memorandum on Fees and Expenses of ICSID
     Arbitrators   **60**.7, **60**.13
obligation to meet   **61**.9
payable to Centre
     apportionment   **61**.5
     consultation with commission or tribunal
          **11**.12
     determination by Secretary-General
          **11**.12
     fees for lodging requests   **11**.12
payment exclusively by Centre (AFR 14)
     **11**.12, **60**.15, **61**.46
refusal to serve and   **37**.49
Schedule of Fees   **60**.7–8, **60**.10
     automatic application   **60**.8
Secretary-General's role in determination,
     payment and allocation of   **11**.12,
     **60**.5
tax privileges   **24**.6
**costs, fees and expenses (proceedings)**
     *see also* costs, fees and expenses (Centre)
advance agreement   **61**.11
     conciliation proceedings formula   **61**.11
advance payment   **61**.46–61
     AFR 14(3)   **61**.47
     annulment proceedings   **52**.85, **52**.103,
          **61**.4, **61**.57–8
     apportionment   **61**.50–8: AFR 14(3)(d)
          **61**.50; parties' agreement   **61**.51
     failure to make, assumption by claimant of
          defaulting party's payment
          **61**.52–3
     failure to make, consequences   **52**.104,
          **61**.49, **61**.52–4: discontinuance of
          proceedings   **61**.54; discretionary nature
          **61**.54; stay of proceedings   **61**.49,
          **61**.54
     final settlement   **61**.59–61
     jurisprudence: *Amco II*   **61**.56 n74; *AMT*
          **61**.56; *Repsol*   **52**.104, **61**.40
     period of grace, *AMT*   **61**.29
     proportion payable   **61**.55
     revision of award and   **61**.58

Secretary-General's role   **61**.48, **61**.52,
     **61**.54
annulment proceedings   **11**.12, **59**.5
apportionment   **61**.1–74
conciliation proceedings   **59**.4
effect of
     failure of non-ICSID forum to decline
          jurisdiction   **26**.134
     failure to protest improper pursuit of
          remedies in non-ICSID forum   **26**.114,
          **26**.153
     prohibition on invocation of positions in
          conciliation proceedings   **35**.3
elements of   **59**.2, **61**.1, **61**.15
interpretation/translation   **44**.66
level of costs   **59**.3
     conciliation proceedings   **34**.4
     determining factors   **59**.3–4
obligation to pay   **61**.9
statements and accounts
     AR 28(2)   **61**.60
     final statement   **61**.61: offset of advance
          payments   **61**.61
**Côte d'Ivoire**, Investment Code 1995   **25**.398,
     **25**.422
**counterclaim arising directly out of the
     subject-matter of the dispute**
     *see also* ancillary claims
definition   **46**.2, **46**.33, **46**.64
as incidental or additional claim
     **46**.71
jurisdiction based on general offer and
     **46**.94
jurisdictional objections   **41**.31, **41**.36–7,
     **41**.63
jurisprudence
     *Amco I*   **46**.80
     *Amco II*   **46**.80
     *Atlantic Triton*   **46**.69
     *Benvenuti & Bonfant*   **46**.89
     *Genin*   **46**.70
     *Klöckner I*   **25**.555
     *Saluka*   **46**.67, **46**.81
     *SPP*   **46**.88 n123
parties' credibility and   **46**.69
relating to substance   **46**.68–71
status of parties, effect on
     **46**.65–7
     resubmission of dispute and   **46**.66
taxes, claim for   **46**.26–8, **46**.71,
     **46**.80
within the scope of the parties' consent
     requirements   **25**.84
**countermeasures**, diplomatic protection and
     **53**.43

**critical dates (general)**   **25**.35–40: *see also*
      consent to ICSID jurisdiction, critical
      date; Contracting State, critical date;
      foreign control for purposes of treatment
      as national of another State, critical dates;
      Institution Rules (IR) (1984); jurisdiction,
      critical dates for determination;
      nationality (juridical persons), critical
      date; nationality (natural persons), critical
      date
   impossibility of generalization   **25**.35
   terms of consent to jurisdiction, dependence
      on   **25**.48

*CSOB*
   applicable law
      agreement between parties, BIT agreement
         without express choice of law clause
         **42**.92
      applicable law, agreement between parties,
         host State law/international law   **42**.35
      interpretation of consent to ICSID
         jurisdiction   **25**.582, **42**.5
   consent to ICSID jurisdiction
      BITs as State's offer   **25**.429, **25**.619
      right to submit disputes provision, effect
         **25**.435
   critical date for determination of jurisdiction
      **25**.39
   excluded classes of disputes, notification
      **25**.936
   exclusive remedy rule, obligation of domestic
      court to decline jurisdiction   **26**.141,
      **47**.111–14
   indirect investment giving rise to jurisdiction
      **25**.89
   insurance indemnity, subrogation   **25**.373
   "investment"   **Preamble** 14, **25**.121 n145,
      **25**.131, **25**.149
      contribution to economic development
         requirement   **25**.164
      "in the territory" requirement   **25**.192
   jurisdiction, objections to, time limits
      **41**.35
   justiciability   **25**.72
   multiple instruments/varying parties
      (investment agreements)   **25**.390,
      **25**.562–3
      dispute arising directly, whether   **25**.100
   private investor, government-controlled entity
      as   **25**.272
   provisional measures
      disputed jurisdiction and   **47**.51
      enforcement, domestic courts' role   **47**.29
      modification of parties' request   **47**.13
      priority and speed, need for   **47**.40

purpose/rights to be protected: exclusive
      nature of ICSID proceedings   **47**.112;
      non-aggravation of dispute   **47**.141
   responsibility for   **47**.156
   stay of proceedings in domestic
      courts/injunction against   **26**.141,
      **47**.111–14
   withdrawal of consent to ICSID jurisdiction,
      indirect withdrawal   **25**.619
**Cuba**, non-participation   **68**.10
**customary international law**
   diplomatic protection   **27**.1–3,
      **27**.24
   exhaustion of local remedies   **26**.187
      diplomatic protection and   **27**.1–3
   reservations (treaties)   **68**.5
   as source of international law   **42**.175–7,
      **42**.196, **42**.197
      *LG&E*   **42**.176

**date of ICSID award**
   *see also* closure/reopening of proceedings
      (AR 38)
   date of dispatch   **48**.37, **49**.10, **49**.25–7,
      **49**.34, **51**.28, **53**.50
      reason for   **49**.10
   date of signature, relevance   **49**.7, **49**.25,
      **51**.20
   importance   **49**.10
**death of conciliator/arbitrator:** *see*
      replacement of conciliator/arbitrator
      following death, incapacity or resignation
**decisions of domestic courts:** *see* domestic
      courts, decisions
**default proceedings:** *see* failure of party to
      appear or to present case
**denial of benefits clauses**   **25**.728
**denial of justice**, State responsibility for
      **26**.138
**denunciation (ICSID Convention)**
   amendment of Convention, objection to as
      ground for   **71**.1
   by Bulgaria   **71**.3
   drafting history   **72**.1
   effect on
      consent to jurisdiction prior to denunciation
         **25**.211, **25**.215, **25**.477, **25**.609–11, **66**.7,
         **71**.4, **72**.1–11
      denouncing State's rights and obligations:
         arising from consent to jurisdiction
         **72**.6; under Convention   **72**.6
      immunities and privileges   **71**.4
      recognition and enforcement   **71**.4
   effective date   **25**.211, **71**.3
   nationality requirements and   **72**.3

notification to depository   **71**.2,
    **71**.3
notification to signatory States   **71**.2,
    **71**.3
six month delay   **25**.211, **70**.5, **71**.4
unconditional nature of right   **71**.1
*dépeçage*   **42**.40–1, **42**.256
*Desert line*, jurisdiction, objections to, time
    limits   **41**.33
**designation of members**, by Chairman,
    Secretary-General's advisory role   **11**.4
**diplomatic property**
    State immunity from execution   **55**.61–7
        UN Convention on the Representation of
        States in Their Relations with
        International Organizations of a Universal
        Character   **55**.61 n109
        UN Convention on Special Missions
        **55**.61 n109
        Vienna Convention on Diplomatic Relations
        (1961)   **55**.61
**diplomatic protection**
    avoidance of need for as object of Convention
        **Preamble** 21, **Preamble** 28, **25**.269,
        **27**.4
    Calvo Doctrine and   **27**.3
    countermeasures and   **53**.43
    customary international law and   **27**.1–3
    disadvantages   **Preamble** 21, **27**.2–4
    exhaustion of local remedies, need for
        **Preamble** 21
    ILC Draft Articles (2006)   **26**.1 n1
    means of exercising   **53**.43
    nationality rules
        in case of revival of right to diplomatic
            protection   **27**.26–7, **53**.46
        change of nationality following consent
            **25**.755–8
        continuous nationality requirement
            **25**.684, **27**.1
        juridical persons   **25**.694, **25**.698
        relevance to ICSID jurisdiction   **25**.646–7,
            **25**.684, **25**.698, **25**.746–9
    non-availability in case of investor's refusal to
        consent to ICSID jurisdiction   **25**.455
    reasons for   **27**.1
    requirements   **27**.24, **27**.51–2
**diplomatic protection, exclusion under**
    **Convention**   **25**.285, **25**.365
    absence of practice relating to   **27**.9
    applicability
        annulment proceedings   **52**.542, **52**.544
        arbitration   **27**.5
        conciliation   **27**.5
        limitation to specific dispute   **27**.17

settlement award   **48**.79
autonomy of ICSID arbitration process and
    **26**.3, **64**.14
*Camuzzi I*   **27**.9
choice between ICSID arbitration and
        diplomatic protection
    BITs provisions   **27**.36–7
    exclusion of possibility, Model Clauses
        (BITs) (1969)   **27**.34–5
    whether   **27**.33
compliance with award and   **26**.186
consent to ICSID jurisdiction and   **25**.292,
        **25**.476, **27**.30–7
    disputed consent   **27**.31
    proposal to allow diplomatic protection until
        institution of proceedings   **27**.30
    unaccepted offer   **27**.33
    validity of consent and   **27**.31–7
denunciation of Convention, effect   **72**.11
drafting history   **27**.13–17, **27**.30, **27**.38–43,
    **27**.44, **53**.42
effective date: *see* consent to ICSID
    jurisdiction and *above*
enforcement measures and   **54**.11
exclusive remedy rule and   **27**.5, **54**.10
exhaustion of local administrative or judicial
        remedies and   **Preamble** 21, **26**.186,
        **27**.4, **27**.10, **27**.33
forum selection clause as means of avoidance
    **27**.4 n2
ICJ, reference of dispute relating to and
    **27**.23, **27**.38, **53**.44, **53**.46, **64**.5, **64**.10,
    **64**.14
informal diplomatic exchanges   **27**.44–50
    BITs provision for   **27**.50
    interpretative function of provision
        **27**.44
inter-State arbitration and   **27**.18–22
    availability, host State's failure to abide by
        ICSID award   **27**.20
    barring clause   **27**.21
    BITs provisions   **27**.18–22,
        **27**.31
    conflicting decisions, risk   **27**.21
    "international claim" distinguished   **27**.18
    Model Clauses (BITs) (1969)   **27**.21
    obligation to decline jurisdiction   **27**.6,
        **27**.22
    proposed Convention clause to protect
        **27**.19–20
    subrogation   **27**.22
international law, applicability to investment
    disputes and   **42**.114, **42**.193, **42**.194
    *Amco I*   **42**.194
investor's right to seek   **26**.186

**diplomatic protection, exclusion under Convention (*cont.*)**
  jurisprudence
    *AES*  **27**.4 n2
    *Aguas del Tunari*  **27**.47–8
    *Autopista*  **25**.747, **27**.8, **27**.45
    *Banro*  **25**.748, **27**.7, **27**.12
    *Santa Elena*  **27**.46
    *SGS* v. *Pakistan*  **27**.49
  mandatory nature of provision  **27**.5
  nationality, relevance  **27**.24–9
    in case of revival of right to diplomatic protection  **27**.26–7
  non-Contracting State and  **25**.663, **25**.746–9, **27**.10–12
    dual or doubtful nationality  **27**.10
    exhaustion of local remedies and  **27**.10
  non-ICSID arbitration and  **25**.228
  objections to mention in Convention  **27**.15–16
  obligation of Contracting State  **26**.186
    in case of non-Contracting State  **26**.186
    corresponding obligation of individual  **26**.186
    "or bring an international claim"  **27**.17
  provisional measures in case of improper resort to  **27**.11
  reasons for provision  **27**.13–14
    Executive Directors' Report  **27**.13
    proposed reference to in Preamble  **27**.16
  recognition/enforcement of award and  **54**.28, **54**.102
  resort to diplomatic protection
    effect  **27**.6, **27**.11
    measures short of  **27**.7–8
  revival of right in case of non-compliance with award  **27**.38–43, **53**.26, **53**.42, **54**.28, **54**.115, **55**.7
    as alternative to judicial enforcement  **27**.38–9: counterbalance to State immunity  **27**.39, **55**.7
    BITs provision for  **27**.42
    limitation to implementation of award  **27**.40, **27**.43
    nationality and  **27**.26–7, **53**.46
    proposed exclusion of provision  **27**.41
    reference to ICJ  **53**.44, **54**.115, **55**.7, **64**.14
    settlement award  **48**.79
  subrogation under insurance indemnity and  **27**.22
**disclosure of documents:** *see* evidence, taking of, "call upon parties to produce . . . "

**discontinuance of annulment proceedings**  **52**.26, **52**.74–6, **52**.493, **53**.62
  *Gruslin*  **52**.26
  *Joy Mining*  **52**.26
  *SPP*  **52**.26
**discontinuance of arbitration proceedings for reasons other than settlement**
  *see also* settlement and discontinuance (AR 43)
  costs and expenses, apportionment  **61**.66
  failure to appear or present case (AR 45)  **45**.57–8, **45**.66
  failure to make advance payment (AFR 14(3)(d))  **61**.54
**dispatch of ICSID award:** *see* certification and dispatch of ICSID award
**dispute:** *see* legal dispute
**dispute settlement (investment disputes)**
  *see also* arbitration; conciliation; diplomatic protection; ICJ
  disputes between ICSID and Contracting States  **64**.21
  inappropriateness of traditional methods  **Preamble** 17–21
    exclusion of private investors from international dispute settlement methods  **Preamble** 21
    Executive Directors' Report  **Preamble** 20
**disputes not arising directly from investment:**  *see* Additional Facility, applicability
**disqualification of conciliator or arbitrator**  **14**.7, **37**.5, **37**.42, **52**.124–5
  annulment of award for improper constitution of tribunal and  **57**.3
  applicability
    annulment proceedings  **52**.549, **57**.4–5
    Chairman's appointments  **57**.7
  arbitral tribunal provisions, applicability  **34**.1
  comparable provisions in other international instruments  **57**.1
  drafting history  **57**.2, **57**.7
**disqualification of conciliator or arbitrator, grounds**
  ineligibility
    constitution of tribunal rules  **52**.124
    nationality grounds  **39**.9–10, **52**.122, **57**.43–6
  manifest absence of Article 14 qualities  **40**.15, **40**.27, **52**.123, **52**.124, **57**.15–19
    drafting history  **57**.17
    jurisprudence: *Amco I*  **57**.21–2; *Azurix*  **57**.30–1; *GAMI*  **57**.28–9; *National Grid*

57.30 n30; *Saipem*   57.32–3; *Salini* v.
*Jordan*   57.27; *SGS* v. *Pakistan*   57.28;
*Siemens*   57.30–1; *Vivendi I*   14.5,
57.23–5; *World Duty Free*   57.27 n25;
*Zhinvali*   57.26
    lack of independent judgment   57.20–34:
        conflict of interests and issue conflict
        distinguished   57.34
    method of appointment, relevance   37.42
    supervening grounds   57.35–42
        jurisprudence: *Holiday Inns*   56.43, 57.36;
        *Pey Casado*   57.37–8; *Sempra*
        57.39–40; *Suez and AGW*   57.41–2
**disqualification of conciliator or arbitrator,
    procedure**   40.27, 52.125, 58.1–19
    applicability, annulment proceedings   52.127,
        52.549, 57.4–5, 58.3
    AR 9   58.8, 58.11
    Chairman's role   5.4
    CR 9   58.8, 58.11
    drafting history   58.2, 58.4
    informal nature of proceedings   58.10
    jurisprudence   58.12–16
        *CDC*   57.13
        *Generation Ukraine*   58.13
        *Pey Casado*   58.16
        *Sempra*   58.15
        *Siemens*   58.14
        *Suez and AGW*   57.14
        *Vivendi I*   44.7, 57.5
    majority decision of unchallenged members
        58.5
        in absence of challenged member/s
            58.9
    powers of Chairman
        in case of: challenge to majority of members
            58.7; challenge to sole
            conciliator/arbitrator   58.6
    procedure   52.125, 57.8–14
    replacement: *see* replacement of
        conciliator/arbitrator following
        disqualification
    request by party, need for   57.6
    resignation distinguished   58.9
    right of challenged member to furnish
        explanations   58.10
    Secretary-General's role   11.4
    suspension of proceedings   58.11
    time limits   14.8, 44.35
        absence of provision for   57.9
    timing   57.8–14
        after constitution   57.8
        AR 9   57.10
        CR 9   57.10
        importance   57.3

"promptly"   57.10–14: failure as waiver of
    right to object (AR 27)   57.11
**dissenting opinions:** *see* individual opinions
**domestic courts**
    *see also* appeal from ICSID award, exclusion
        (ICSID 53(1)), domestic courts and;
        concurrent reference to domestic courts;
        exclusive remedy rule; exhaustion of
        local administrative and judicial
        remedies; international law/host State
        law, interrelationship; recognition and
        enforcement of arbitral award (ICSID);
        stay of proceedings (domestic courts);
        stay of proceedings (ICSID), domestic
        court intervention
    as alternative or preliminary to ICSID
        arbitration   26.44
    arbitration process, independence of   26.3
    autonomy of ICSID proceedings and   26.3,
        53.20–2
    Convention, effect of   **Preamble** 22
    decisions
        binding on international tribunals, whether
            26.138, 26.140, 26.160, 47.121
        ICSID reliance on   26.140
        review by ICSID tribunal   26.44
    enforcement   26.3, 26.174, 54.29
    intervention in ICSID proceedings   26.111
    investor's home State   **Preamble** 19–20
    provisional measures, right to order   26.3,
        26.171, 44.3
    review of ICSID award, exclusion   54.85–7
        enforcement of award and   54.81–7,
            54.112
    review of non-ICSID award   52.5
    sovereign immunity and: *see* State immunity
    States' dislike of proceedings in foreign courts
        **Preamble** 17–20, 26.4
    third country   **Preamble** 19–20
    UN Charter of Economic Rights and Duties of
        States (1974) and   **Preamble** 17 **n**11
**dominant nationality test, relevance**
    nationality (juridical persons)   25.662,
        25.729, 25.745
    nationality (natural persons)   25.662, 25.668,
        25.670–4
**Dominican Republic**, signature/ratification
    68.10
**drafting history**   25.689
**dual nationality**
    BITs and   25.668
    membership of *ad hoc* committee and
        52.464
    membership of tribunal and   39.10, 52.122,
        52.464

*Index by Subject*

*Duke Energy*
consent to ICSID jurisdiction, critical date
**25**.501 n667
evidence, taking of, witnesses   **43**.82
exclusive remedy rule   **26**.15–16
international law/host State law,
interrelationship   **42**.111
legal dispute "arising directly"   **25**.102
multiple instruments/varying parties
(investment agreements)   **25**.561,
**25**.564
provisional measures, stay of proceedings in
domestic courts/injunction against
**47**.134

*East Kalimantan*
constituent subdivision or agency
designation as   **25**.250, **25**.266
status as   **25**.246
**economic transactions**, investment, whether
**25**.148, **25**.202–4
**Ecuador**, notification of excluded classes of
dispute   **25**.926, **25**.939–40
**Egypt**
consent to ICSID arbitration
Investment Law 1989   **25**.410
Law No. 43: *see SPP*
*El Paso*
assignment/succession following institution of
proceedings, relevance   **25**.358
consent to ICSID jurisdiction, BITs as State's
offer   **25**.449
legal dispute "arising directly", general
measures   **25**.111
**El Salvador**, Investment Law   **25**.201, **25**.391,
**25**.398, **25**.520
**Energy Charter Treaty** (1994)
Additional facility and   **25**.226
applicability, permanent residents
**25**.659
applicable law provisions   **42**.36
acceptance as implicit agreement
**42**.86–7
conciliation/arbitration, choice   **25**.23
concurrent arbitration provisions   **25**.460–1,
**26**.22
consent to ICSID jurisdiction
critical date for purposes of jurisdiction
**25**.510
limitations   **23**.535–6
consultation or negotiations obligation
**25**.542
foreign control for purposes of treatment as
national of another State   **25**.810,
**25**.870, **25**.889

interest   **46**.44 n48
"investment"   **25**.147
"in the territory" requirement   **25**.190
MFN clause, applicability to dispute
settlement provisions   **25**.567
nationality (juridical persons)   **25**.722
recognition/enforcement   **54**.22
submission to arbitration, requirements
**25**.460–1
**enforcement of arbitral award:** *see* recognition
and enforcement of arbitral award
*Enron*
ancillary claims, simultaneous determination,
presentation of ancillary claim, time
limits   **46**.29
applicable law, agreement between parties,
implicit agreement, reliance on particular
law in submissions before tribunal
**42**.79
assignment/succession following institution of
proceedings, relevance   **25**.359
consultation or negotiations obligation
**25**.546
evidence, taking of, witnesses   **43**.88
existence of legal dispute   **25**.45
"foreign control" test, applicability
**25**.706
fork in the road clauses   **26**.70
indirect investment giving rise to jurisdiction
**25**.90
international law, applicability in investment
disputes   **42**.197
legal dispute "arising directly"   **25**.102
non-pecuniary obligations, tribunal's power to
order   **54**.78
parallel treaty and contract claims   **26**.91
resignation of conciliator/arbitrator without
consent   **56**.44
**equitable principles**
*see also ex aequo et bono* jurisdiction
*Klöckner I*   **42**.15
**estoppel**
concurrent arbitration provisions and
**26**.37
constituent subdivision or agency status,
designation   **25**.244
*Noble Energy*   **25**.244
erroneous statement that BIT in force   **25**.429
jurisdiction
attempted rebuttal of claim to diplomatic
protection and   **27**.32
failure to challenge in due time   **25**.489,
**25**.498
nationality, failure to challenge   **25**.657,
**25**.662, **25**.717

resubmission of dispute after annulment and, new arguments **52**.693

**European Community (EC)**, Statement on Investment Protection Principles (1992), consent to ICSID jurisdiction, non-binding reference **25**.467

**European Convention on State Immunity** (1972) **55**.14, **55**.49, **55**.85

**evidence, taking of**
admissibility **43**.10–22, **48**.4
video conference evidence **43**.90–1
written evidence **43**.88–9
AR 33 (marshalling of evidence) **43**.10
AR 34 (evidence: general principles) **43**.10
"at any stage of the proceedings" **43**.30–43
AR 38(2) (reopening of proceeding) **43**.36–7
expiry of time limits and **43**.39–43
jurisprudence: *AGIP* **43**.31, **43**.61, **47**.34, **47**.81; *Azurix* **43**.41; *Benvenuti & Bonfant* **43**.39; *Champion Trading* **43**.33; *Fraport* **43**.34; *Klöckner* **43**.36; *Noble Energy* **43**.34; *Noble Ventures* **43**.32; *Siemens* **43**.42; *SOABI* **43**.35; *Tradex* **43**.40; *Vivendi II* **43**.43
balance between common and civil law approaches **43**.71, **44**.38
burden of proof: *see* burden of proof
"call upon parties to produce . . ." **26**.122–3, **43**.44–67
*ad hoc* committee's right **52**.556
applicable law **43**.71
"documents or other evidence": alternative formulae **43**.68; AR 34(2)(a) **43**.68; documents, examples **43**.70; non-ICSID arbitration proceedings and **26**.122–3
drafting history **43**.51, **43**.63, **43**.68
as exclusive right of tribunal **26**.164
form **43**.55–62: action under Article 47, **43**.31, **43**.61, **47**.34, **47**.81; AR 19 **43**.55; AR 34(2) **43**.55; AR 37 **43**.55; experts **43**.60; ICSID Secretariat, request to **43**.54, **43**.60; invitation or request **43**.60; procedural order **43**.55, **43**.58–60, **43**.61, **43**.119, **43**.120, **43**.123
on initiative of: parties **43**.10, **43**.44, **43**.49–50; tribunal **43**.45–8
judicial assistance, tribunal's right to request **26**.164, **43**.52
jurisprudence: *ADF* **43**.74; *AGIP* **43**.61, **43**.66, **47**.34; *Aguas del Tunari* **43**.79; *Biwater Gauff* **43**.62, **43**.72–3, **43**.80, **47**.86–9; *CMS* **43**.54; *Duke Energy*

**43**.57; *Feldman* **43**.46; *Fireman's Fund* **43**.76; *Fraport* **26**.122–3, **43**.48, **43**.67; *Generation Ukraine* **43**.56; *Impregilo* **43**.47; *Noble Ventures* **43**.8, **43**.71, **43**.78; *SOABI* **43**.49; *SPP* **43**.49; *Tanzania Electric* **43**.50; *Waste Management* **43**.59, **43**.67; *Zhinvali* **43**.75
parties' duty to cooperate **43**.53–7: AR 34(3) **43**.64
procedural decision, status **43**.64
Redfern Schedule **43**.80
refusal by party to comply, effect **43**.63–7, **45**.41, **47**.34
refusal by party to comply, grounds: disproportionate burden **43**.71; political or commercial sensitivity/Crown privilege **43**.72–6
refusal of party's request for want of precision **43**.78–80: IBR Rules **43**.77
tribunal's right to call for further **43**.44
comparable provisions in other international instruments **43**.1
conciliation proceedings **33**.6, **34**.13
drafting history **43**.2–3, **43**.6
evaluation/probative value **43**.104–15
credibility of witnesses **43**.109–15
jurisprudence: *ADC* **43**.114; *Azinian* **43**.111; *Generation Ukraine* **43**.107; *Middle East Cement* **43**.106; *Noble Ventures* **43**.113; *Plama* **43**.112; *Soufraki* **43**.105, **43**.115; *Tradex* **43**.110; *Vacuum Salt* **43**.108
tribunal's discretion (AR 34(1)) **43**.10, **43**.101, **43**.104–15, **53**.323
written testimony **43**.86, **43**.87
"except as the parties otherwise agree" **43**.5–9
agreed statement of facts **43**.7, **43**.9
agreement on specific rules of evidence **43**.7–9: AR 21 **43**.8
proposal to delete exception clause **43**.6
expenses
AR 34(4) **43**.26–9
expenses incurred as result of one party's conduct **43**.26–9, **43**.122
experts: *see* experts
fact-finding as incidental to judicial function **43**.3–4
Additional Facility distinguished **43**.3
failure of party to appear or to present case: *see* failure of party to appear or to present case

**evidence, taking of (*cont.*)**
implementing legislation   **69**.8
jurisprudence
  *ADF*   **43**.17
  *Aguas del Tunari*   **43**.15–16
  *Amco I*   **52**.301, **52**.324–5
  *CDC*   **43**.21, **52**.328, **52**.330–1
  *Klöckner II*   **52**.326–7
  *Lucchetti*   **52**.332
  *MTD*   **43**.22
  *SOABI*   **43**.28
  *SPP*   **43**.13
  *Tradex*   **43**.14
  *Wena Hotels*   **43**.20, **52**.328,
    **52**.329
as preservation measure   **43**.31
preservation and production: *see provisional
  measures (ICSID proceedings),
  purpose/rights to be protected,
  preservation and production of evidence*
probative value: *see evaluation/probative value
  above*
proposal to transfer provision to Arbitration
  Rules (AR)   **43**.2
right to approach other party's witnesses
  **43**.93
standards
  IBA Rules as   **43**.8, **43**.18, **43**.77
  non-compliance as serious departure from
    fundamental rule of procedure   **43**.4,
    **43**.19–22, **52**.323–32
supplementary nature of Article 43 provisions
  **43**.10
tribunal's discretionary powers
  **43**.11–22
  IBA Rules   **43**.18
  relevant factors (including necessity)
    **43**.12–22
visits and enquiries   **43**.119–24, **62**.18: *see
  also proceedings in more than one
  location*
  *amicus curiae* briefs (AR 37(2))/tribunal's
    discretionary powers: *see amicus curiae*
    briefs (AR 37(2))/tribunal's discretionary
    powers
  AR 37   **43**.119
  Contracting State's obligation to accept
    **43**.124
  expenses   **43**.27, **43**.122
  inquiry on behalf of tribunal   **43**.121
  jurisprudence: *Santa Elena*   **43**.123;
    *SOABI*   **43**.123
  parties' participation   **43**.120
  procedural order, need for   **43**.55, **43**.119,
    **43**.120, **43**.123

witnesses
  admissibility of evidence in absence of oral
    hearing   **43**.88–92
  compulsion   **43**.51, **43**.54
  credibility   **43**.109–15
  examination (AR 35)   **43**.84, **43**.86–93: by
    parties and tribunal   **43**.83; other than
    before the tribunal   **62**.19; waiver (AR
    36)   **43**.85
  immunities and privileges   **22**.1, **22**.2,
    **43**.124
  jurisprudence: *Azinian*   **43**.93; *Duke
    Energy*   **43**.82; *Enron*   **43**.88;
    *Fireman's Fund*   **43**.92; *Tradex*
    **43**.87; *Vivendi II*   **43**.90–1
  testimony as "other evidence"   **43**.81–94
  tribunal's right to call directly   **43**.51,
    **43**.53–4, **43**.81
  video conference evidence   **43**.90–1
  written evidence   **43**.85–9: notarization,
    desirability   **43**.86; probative value
    **43**.86, **43**.87

***ex aequo et bono* jurisdiction**   **25**.76, **25**.80–1,
  **42**.2, **42**.13, **42**.249–79: *see also
  annulment of award, grounds, failure to
  apply correct applicable law; equitable
  principles*
Additional Facility and   **42**.270
Article, 38 (2) of ICJ Statute as basis   **42**.253
*dépeçage*   **42**.256
domestic law, relevance of exclusion in
  **42**.274
  Additional Facility Rules distinguished
    **42**.275
drafting history   **42**.253, **42**.260
equitable considerations distinguished, *Amco I*
  **42**.16, **42**.269, **52**.252–6
equity/law relationship   **42**.266–71
  application of law, admissibility   **42**.266–8
  equity within the law distinguished
    **42**.269–71, **52**.246–8
examples of application   **42**.208, **42**.276–9
  compensation/costs as principle field
    **42**.279
interest and   **46**.48
jurisprudence
  *AAPL*   **42**.276 n463
  *AGIP*   **42**.258
  *Atlantic Triton*   **42**.255, **42**.268, **42**.278
  *Benvenuti & Bonfant*   **42**.59, **42**.208,
    **42**.259, **42**.267, **42**.277, **42**.279, **46**.48
  *Klöckner I*   **42**.269 n456
  *MINE*   **42**.17, **42**.264, **52**.199, **52**.245
  *MTD*   **42**.271
  *SOABI*   **42**.269 n456

*Tecmed* **42**.270
    *Zhinvali* **42**.265
legal/non-legal disputes, relevance of
    distinction **42**.251
need to give reasons **61**.43
parties' agreement
    as derogation from agreement on applicable
        law **42**.275
    during or on institution of proceedings
        **42**.257–9
    Model Clauses (1993) **42**.254
    need for **42**.135, **42**.137, **42**.182, **42**.248,
        **42**.249–50, **42**.254, **42**.260–5: manifest
        excess of powers and **42**.260–5,
        **52**.244
    scope **42**.256
peremptory rules of international law/*jus
    cogens* and **42**.273
predictability, effect on **42**.249
reasons, need for **42**.272, **48**.57, **52**.349,
    **61**.43
tribunal as *amiable compositeur* **42**.255,
    **42**.258, **42**.260
**excluded classes of disputes, notification**
categories of exclusion/limitation
    "disputes fundamental to the investment
        itself" **25**.105, **25**.926, **46**.11,
        **69**.9
    exhaustion of local remedies requirement
        and **25**.927
    "exploitation of natural resources"
        **25**.926
    limitation to compensation disputes
        **25**.926
    "minerals or other natural resources"
        **25**.607, **25**.926
    "property and real rights upon real estates"
        **25**.926
    "questions pertaining to oil and acts of
        sovereignty" **25**.926
consent to jurisdiction distinguished **25**.515,
    **25**.928–41
    effect of notification on prior consent
        **25**.938
    interpretation of consent clause and
        **25**.934
    possible extension of consent to "excluded
        classes" **25**.930
    specific consent, primacy
        **25**.931
drafting history **25**.921–3, **25**.931
    Executive Directors' Report **25**.923,
        **25**.924
"investment", effect on definition of **25**.120,
    **25**.923, **25**.935–7

jurisprudence
    *Alcoa* **25**.938
    *CSOB* **25**.936
    *Fedax* **25**.935
    *Kaiser Bauxite* **25**.938
    *Mitchell* **25**.937
    *PSEG* **25**.932–3
    *Reynolds* **25**.938
    *SPP II* **25**.929
legal effect **25**.925, **25**.932–4
reason for provision **25**.921
reservations distinguished **25**.924, **68**.3,
    **68**.4
    desire to avoid **68**.3
Secretary-General's role **11**.7, **25**.922
as statement of intent **25**.924–5, **46**.11,
    **68**.4
States making
    China **25**.926
    Costa Rica **25**.927
    Ecuador **25**.926, **25**.939–41
    Guatemala **25**.926
    Jamaica **25**.607, **25**.926
    Papua New Guinea **25**.105, **25**.926,
        **46**.11
    Saudi Arabia **25**.926
    Turkey **25**.926
timing of notification **25**.924
as withdrawal of consent to jurisdiction
    **25**.607–8, **25**.938–41, **45**.49, **45**.80
withdrawal of notification **25**.927
**exclusion of territories, notification** **11**.7,
    **25**.254, **25**.477, **25**.611
consent, effect on **25**.477, **25**.611, **66**.7, **70**.4,
    **72**.1–11
drafting history **70**.2
independence of territory, effect **70**.9
    subsequent accession of territories **70**.9
list of excluded territories **70**.7–8
nationality (juridical persons) and **25**.286
notice under Article, 70, effectiveness **70**.5
presumption of application of Convention to
    all of a Contracting Party's territories
    **70**.3
procedure **70**.7
reasons for provision **70**.1
*SPP* **70**.10
timing
    consent, effect on **70**.4
    flexibility **70**.4
withdrawal **70**.6
**exclusive jurisdiction** *see also* provisional
    measures (ICSID proceedings), domestic
    courts' right to order in light of Article,
    26 exclusive jurisdiction rule

**exclusive remedy rule Preamble 22**: *see also*
    concurrent arbitration provisions;
    concurrent reference to domestic courts;
    consolidation of proceedings; domestic
    courts; *ne bis in idem* principle
  applicability
    ancillary claims    **46**.8
    annulled award    **52**.663, **53**.32, **53**.62,
      **54**.35
    annulment proceedings    **52**.4, **52**.542–3,
      **53**.32, **53**.62
    arbitration    **26**.1
    conciliation    **26**.1
    institution of ICSID proceedings, relevance
      **26**.6
    settlement, following    **53**.62
    submission to new tribunal    **52**.663, **53**.62,
      **54**.35
  applicable law, relevance    **26**.157
  autonomy of ICSID arbitration process and
      **26**.3, **26**.175
  consent to ICSID arbitration
    claim to lack of consent, compatibility with
      rule    **26**.15–16
    need for    **25**.476, **26**.6–7, **26**.34
    as trigger    **26**.6–7
  critical date    **26**.2, **26**.21, **26**.34
    consent to ICSID arbitration    **25**.476,
      **26**.6–7, **26**.34
  denunciation of Convention, effect
      **72**.11
  diplomatic protection and    **27**.5,
      **27**.11
  dispute relating to, reference to ICJ    **64**.5
  drafting history    **26**.111, **52**.4
  enforcement measures and    **26**.149–53,
      **26**.174, **54**.10
    *MINE*    **26**.149–53
  exclusive nature of ICSID review system
      distinguished    **53**.19
  exhaustion of local remedies and: *see*
      exhaustion of local administrative or
      judicial remedies
  finding that Centre has no jurisdiction, effect
      **26**.6
  fork in the road clauses: *see* fork in the road
      clauses
  implementing measures and    **69**.7
  interim measures    **26**.174
  international judicial proceedings other than
      ICSID: *see* international judicial
      proceedings other than ICSID
  jurisprudence
    *Duke Energy*    **26**.15–16
    non-judicial remedies, *Amco I*    **26**.184

  modification by agreement    **26**.2, **26**.17–19,
      **26**.37
  motive for
    investors' perception of host State courts as
      unreliable    **26**.4
    State immunity distortions    **26**.4
    States' dislike of proceedings in foreign
      courts    **26**.4
  *ne bis in idem* principle and    **53**.31–2
  non-ICSID arbitration proceedings and
      **25**.228, **26**.111, **26**.114–23
    disclosure of documents and    **26**.122–3
    failure to protest improper pursuit of
      remedies in non-ICSID forum
      **26**.114–15, **26**.153: costs and expenses,
      effect on    **26**.114, **26**.153
    jurisprudence: *Fraport*    **26**.122–3;
      *Lucchetti*    **26**.118; *MINE*    **26**.115;
      *Saipem*    **26**.121
    obligation to adopt facts of another tribunal
      and    **26**.121
  non-judicial remedies    **26**.184–6
    "administrative or judicial remedies"
      provision and    **26**.185
    diplomatic protection    **26**.186
  obligation of domestic court to decline
      jurisdiction    **26**.132–48
    bankruptcy proceedings    **26**.141,
      **47**.111–14
    confirmation of lower court decision
      following award as *novus actus
      interveniens*    **26**.139
    jurisprudence: *Amco I*    **26**.136–9;
      *Autopista*    **26**.142–3; *Benvenuti &
      Bonfant*    **26**.133; *CSOB*    **26**.141,
      **47**.111–14; *Fraport*    **26**.148; *Holiday
      Inns*    **26**.135; *LETCO*    **26**.134;
      *Tanzania Electric*    **26**.144; *Wena Hotels*
      **26**.145–7
    legislation implementing Convention and
      **69**.7
    *lis pendens*    **26**.133
    penalties for failure    **26**.134
    *res judicata* effect of award and    **26**.145
    unity of investment operation and    **26**.51,
      **26**.135, **26**.155
  obligation of non-ICSID forum to decline
      jurisdiction    **26**.110, **26**.114
  presumption of parties' intention to exclude
      non-ICSID dispute settlement measures
      **26**.110
    Executive Directors' Report    **26**.110
  provisional measures as means of preserving,
      26.132, 47.99: *see also* provisional
      measures (ICSID proceedings), domestic

courts' right to order in light of Article 26 exclusive jurisdiction rule
pursuit of alternative remedy, disadvantages **26**.13
recognition and enforcement of arbitral award (ICSID) and **54**.10
as rule of interpretation **26**.17
State immunity and **26**.4, **26**.9–14
stay of proceedings (ICSID) and: *see* stay of proceedings (ICSID), exclusive remedy rule and
supplementation and rectification option and **49**.68–77
tribunal's right to determine own competence and **26**.154, **47**.121
"unless otherwise stated": *see* modification by agreement *above*
waiver **26**.136–9
  cooperation in domestic proceedings as **26**.54, **26**.136: identity of issues/parties, need for **26**.137
  effect on ICSID jurisdiction **26**.140
**Executive Directors' Report:** *see under individual headings*
**exhaustion of local administrative or judicial remedies**
  *see also* consultation or negotiations obligation; excluded classes of disputes, notification
  "administrative" / "judicial" **26**.191, **26**.198
  in case of non-Contracting State seeking to exercise diplomatic protection **26**.186
  Contracting States' concerns in respect of **26**.5, **26**.111, **26**.189–90
    proposals to: differentiate between different types of dispute **26**.189; reverse presumption of arbitration as first resort **26**.189
  customary international law **26**.187
  diplomatic protection and **Preamble 21**, **26**.186, **27**.4, **27**.10, **27**.33
  drafting history **26**.5, **26**.188–91
    Executive Directors' Report **26**.188
  existence of dispute and **25**.43
  host State's right to insist on **Preamble 22**, **26**.45, **26**.188–231: *see also* exhaustion of local administrative or judicial remedies, as condition of consent to ICSID arbitration (BITs provisions)
    non-Contracting State **27**.10
    tautologious nature of provision **26**.190
    wisdom of so doing **26**.229–30

notification to Centre of requirement **25**.927
  as substantive requirement for establishing breach of international obligation
    denial of justice and **26**.138, **26**.218, **26**.219, **26**.227, **26**.231
    jurisprudence: *Feldman* **26**.221; *Generation Ukraine* **26**.223–4; *Jan de Nul* **26**.226; *Loewen* **26**.222; *Parkerings* **26**.228; *Saipem* **26**.227; *Vivendi I* **26**.219–20; *Waste Management II* **26**.222, **26**.225
    traditional exhaustion of local remedies rule and **26**.187, **26**.191
    waiver of Contracting State's right under Article 26 **26**.5, **26**.187–91
**exhaustion of local administrative or judicial remedies, as condition of consent to ICSID arbitration (BITs provisions)** **23**.540, **25**.548–9, **26**.5, **26**.44, **26**.45, **26**.192–205
  consent to arbitration as cut-off date **26**.193
  Costa Rica **26**.197
  disadvantages **25**.550
  examples **25**.548–9
  general notification to Centre **26**.194–8
    subsequent consent to arbitration, effect **26**.194
  Guatemala **26**.198
  investor/host State agreements **26**.192, **26**.207
  Israel **26**.196
  jurisprudence
    *AES* **26**.217
    *Amco I* **26**.209
    *Benvenuti & Bonfant* **26**.208
    *Camuzzi* **25**.205
    *Gas Natural* **25**.205, **26**.204
    *Generation Ukraine* **26**.214–15
    *IBM* **26**.216
    *Lanco* **26**.192, **26**.210
    *Maffezini* **25**.205, **26**.204, **26**.211–13
    *National Grid* **25**.205
    *Plama* **26**.204
    *Siemens* **26**.204
  MFN clause, effect **25**.550
  period of time for **26**.202–5
  restatement of Article 26 rule **26**.199
  withdrawal of condition **26**.193
**exhaustion of local administrative or judicial remedies, as condition of consent to ICSID arbitration (national legislation consenting to ICSID arbitration)** **23**.540, **26**.192, **26**.206

**exhaustiveness/reasons requirement
    (Article 48(3))**
    *see also* annulment of award, grounds, failure
        to deal with every question submitted
    applicability
        annulment proceedings    **52**.566
        decisions on costs    **52**.356, **61**.41
        dissenting opinion    **48**.99
        *ex aequo et bono* decisions    **42**.272, **48**.57,
            **52**.349
        preliminary decision on jurisdiction    **41**.70,
            **48**.88, **48**.91
        procedural orders    **48**.88
        provisional measures    **48**.88, **48**.91
        rectification, revision or interpretation of
            award    **48**.89
        settlement and discontinuance    **48**.69
        State immunity from execution, relevance
            **55**.8
        stay of enforcement    **48**.91
    conciliation commission recommendations
        **34**.19
    exhaustiveness ("every question submitted")
        **48**.44–53
        arguments and evidence on the record,
            limitation to    **48**.49
        parties' arguments distinguished    **48**.48,
            **52**.418–34
        relationship with principal issues, need for
            **48**.50
    exhaustiveness/reasons
        distinction    **48**.43
        interconnectedness    **48**.42–3
    failure to comply
        excess of powers *infra petita*    **48**.47
        ground for annulment, whether    **48**.44,
            **48**.51–3, **49**.29, **49**.68–77, **52**.110
        request to decide under Article 49(2)
            **48**.51
    jurisdictional decisions    **41**.51, **41**.65–8
    jurisprudence
        *Amco II*    **48**.65
        *CDC*    **48**.53
        *Fasla* case    **48**.55
        *King of Spain's Award of 23 December,
            1906 (Honduras* v. *Nicaragua)*    **48**.47
            n26, **48**.55
        *Klöckner I*    **48**.50
        *Wena Hotels*    **48**.49, **48**.52, **48**.66,
            **49**.77
    majority decision, obligation to reach and
        **48**.16
    parties' right to modify/dispense with
        requirement    **48**.3, **48**.56, **52**.339
    principle of arbitration    **48**.47

reasons    **48**.54–68
    AR 47(1)(i)    **48**.57
    comparable provisions in other international
        instruments    **48**.54: ICJ practice    **48**.55
    criteria for determining sufficiency
        **48**.67–8, **52**.433
    drafting history    **48**.56
    *ex aequo et bono* decisions and    **42**.272,
        **48**.57, **52**.349
    failure of party to appear and    **48**.68
supplementation/rectification of award and
    **49**.38
**expenses:** *see* costs, fees and expenses
**experts**
    appointment or request for    **43**.13, **43**.60
        appointment by parties    **43**.97
        direct approach by tribunal    **43**.54,
            **43**.97
        NAFTA provisions    **43**.96
    Arbitration Rules and    **43**.95
        AR 34 (tribunal's discretion)    **43**.101
        AR 35(3) (declaration)    **43**.95
    costs and expenses, payment    **43**.28, **61**.30
    examination    **44**.94
    on financial matters    **43**.51
    ICSID practice    **43**.69, **43**.97–103
    immunities and privileges    **22**.1, **22**.2,
        **43**.124
    jurisprudence
        *Aguas del Tunari*    **43**.102
        *CMS*    **43**.54
        *Middle East Cement*    **43**.101
        *SOABI*    **43**.99
        *SPEG*    **43**.100
        *SPP*    **43**.13
        *World Duty Free*    **43**.103
    on national or international law    **43**.69,
        **43**.102–3
    reports, parties' right to comment on
        **43**.98–9
    tribunal's discretion not to appoint (AR 34)
        **43**.101
**expropriation, effect on foreign control**
    **25**.634, **25**.895

**fact-finding proceedings**
    *see also* evidence
    Additional Facility provisions    **25**.11,
        **25**.29–34, **25**.202–9
        Fact-Finding (Additional Facility) Rules
            (1978): *see below*
        jurisdictional requirements    **25**.11, **25**.31:
            absence    **25**.210; facts likely to lead to
            dispute    **25**.34; non-Contracting State
            **25**.31–2

as pre-dispute process **25**.30: Model
Clauses (1993) formula **25**.34
requirements, absence **25**.210
Fact-Finding (Additional Facility) Rules
(1978), absence of jurisdictional
requirements **25**.31, **25**.210
facts incidental to legal dispute, eligibility for
clarification
Article 43 and **25**.74
drafting history **25**.74
practical need for **25**.74
suggestions for including specific reference to
**25**.29
**failure of party to appear or to present case**
**25**.483, **25**.605, **26**.3, **36**.68
agreement on procedure and **44**.31
annulment proceedings and **45**.48, **45**.86,
**52**.562–3
appearance without presentation of case
**45**.23, **45**.24
"at any stage in the proceedings"
AR 42(1) **45**.47, **45**.48
discontinuance of proceedings as terminal
date **45**.47
jurisdictional phase **45**.46
post-award proceedings **45**.48, **45**.86: AR
53 **45**.48
registration of request/institution of
proceedings distinguished **45**.45
bad faith and **45**.44
claimant as defaulting party **45**.21–3
drafting changes in Convention to reflect
possibility **45**.22
comparable provisions in other international
instruments **45**.1
conciliation proceedings compared **45**.7
drafting history **45**.3, **45**.10, **45**.22, **45**.40,
**45**.55, **45**.77
extension of Article 45 to
*ad hoc* committee proceedings **45**.6,
**45**.48, **45**.86
resubmission to new tribunal **45**.6, **45**.48,
**45**.86
"his"/"its", significance **45**.4
jurisdictional objections as a preliminary
question, relevance **41**.77
parties' right to be heard and **49**.44
presentation of case without appearance
**45**.24
reasons for non-appearance **45**.9
sanctions **45**.71–5
absence of provision for **45**.71
scope of Article 45
non-frustration principle **45**.2,
**45**.5

protection of noncooperating party **45**.2
rule of evidence **45**.2, **45**.3, **45**.10
**failure of party to appear or to present**
**case, classification as default** **45**.24–38
failure to cooperate or cooperate fully **45**.24,
**45**.25, **45**.49, **45**.52
failure to make advance payments **45**.24,
**45**.43
AFR 14(3)(d) **45**.58
failure to meet time limits **45**.26–30, **45**.51,
**45**.84
failure to participate in Tribunal's constitution
**45**.37–8, **45**.50, **45**.53
**failure of party to appear or to present case,**
**effect**
*ad hoc* committee's duty **52**.563
AR 42 (default) **45**.11
discontinuance of proceedings (AR 45)
**45**.56, **45**.57–8
limitations on **45**.66
finding in favour of nonappearing party,
possibility **45**.10, **45**.66, **45**.69
non-compliance with provisions as
failure to state reasons **45**.8
manifest excess of powers **45**.8
shift of procedural balance **45**.12
tribunal's duty to examine
jurisdiction/competence (AR 42(4))
**41**.52, **45**.10, **45**.12, **45**.13–15, **45**.42,
**45**.67, **45**.69
merit of parties' assertions **43**.23–5, **45**.10,
**45**.17–20, **45**.42, **45**.67, **45**.69, **48**.68
**failure of party to appear or to present case,**
**jurisprudence**
*AGIP* **45**.50
*AMT* **45**.37–8, **45**.53, **45**.60, **45**.64, **45**.89,
**61**.29
*Benvenuti & Bonfant* **45**.26, **45**.51, **45**.60,
**45**.62–3, **45**.73, **45**.84, **45**.87
*Goetz* **41**.55, **43**.25, **45**.16, **45**.20, **45**.31–6,
**45**.54, **45**.60, **45**.81, **45**.90
*Kaiser Bauxite* **41**.53, **45**.14, **45**.25, **45**.49,
**45**.60, **45**.80
*LETCO* **41**.54, **43**.24, **45**.15, **45**.18–19,
**45**.25, **45**.44, **45**.52, **45**.60, **45**.74,
**45**.88
*Scimitar* **45**.23
**failure of party to appear or to present case,**
**obligation** **45**.39–44, **45**.71
AR 19 and 34(3) **45**.41
denial of justice and **45**.43
ICJ compared **45**.39 n46
non-compliance with award and **45**.43
participation in Convention/consent to
arbitrate constituting **45**.42

**failure of party to appear or to present case,**
    **obligation (*cont.*)**
    permissive nature of Convention    **45**.39
    proposed addition of "where it was under an
        obligation to do so"    **45**.40
**failure of party to appear or to present case,**
    **period of grace**    **45**.38, **45**.76–90
    AR 42 (default)    **45**.78–84
        AR 26 (time limits) distinguished    **45**.83
    extension of time limits beyond    **45**.30,
        **45**.83–4, **45**.87
        *Benvenuti & Bonfant*    **45**.84
        *LETCO*    **45**.84
    fault, relevance    **45**.77
    obligatory except where party has stated
        intention not to proceed    **45**.79–80
    payment of costs    **45**.58
    purpose    **45**.76–7
        avoidance of problems arising from failure
            of proper notification    **45**.77
        flexibility    **45**.76
    timing of decision, *Benvenuti & Bonfant*
        **45**.87
    timing of notification    **45**.85–90
        *LETCO*    **45**.88
**failure of party to appear or to present case,**
    **proceedings *in absentia***
    award in case of    **45**.70
    request by other party    **45**.55–64
        continued cooperation by nondefaulting
            party as implied request    **45**.59
        for discontinuance of proceedings (AR 44)
            **45**.56: limitations    **45**.66
        for finding of jurisdiction and decision on
            merits    **45**.56, **45**.65–70
        need for    **45**.55, **45**.57
        standing    **45**.56
    tribunal's discretion    **45**.61–4, **45**.65
        defaulting party's likely future behaviour as
            determining factor    **45**.61–4
        reluctance to apply default procedure
            **45**.61–4
    tribunal's obligation to deal with every
        question submitted    **45**.65–70
        questions not explicitly submitted
            **45**.67
        questions submitted by defaulting party
            **45**.66
        range    **45**.68
*Fasla*, reasons, need for    **48**.55
*Fedax*
    assignment/succession of investor's rights and
        responsibilities    **25**.349
    closure of proceedings    **49**.19
    constitution of tribunal    **37**.33

excluded classes of disputes, notification
    **25**.935
indirect investment giving rise to jurisdiction
    **25**.88–9
interest, claim for, applicable law    **46**.44
"investment"    **25**.149
    criteria    **25**.154
    "in the territory" requirement    **25**.191
languages    **44**.67
partial settlement    **48**.76
**federal States**
    federal clause    **69**.5
    *MINE* proceedings in US Courts    **26**.9
    recognition and enforcement, 54.92–6, 54.108,
        69.5: *see also* recognition and
        enforcement of arbitral award (ICSID), as
        final judgment of domestic court, federal
        constitutions and
*Feldman*
    evidence, taking of, tribunal's right to call for
        **43**.46
    exhaustion of local administrative or judicial
        remedies    **26**.221
    interpretation of award    **50**.4 n3
**finality/binding nature of arbitral award**
    **(Additional Facility)**    **53**.5–9, **54**.81
    AFAR 52(4)    **53**.6
    external review, possibility of    **53**.6, **53**.8–9,
        **54**.15, **54**.81
    internal review procedures, absence    **53**.6,
        **54**.15
        *Metalclad*    **53**.9
**finality/binding nature of arbitral award**
    **(ICSID)    Preamble** 33
    Additional Facility and: *see* finality/binding
        nature of arbitral award (Additional
        Facility)
    annulment and, 52.3, 52.15, 52.546: *see also*
        decision interpreting, revising or
        annulling award *below*
    appeal, exclusion: *see* appeal from ICSID
        award, exclusion (ICSID 53(1))
    applicability
        annulment decision    **50**.13, **52**.569
        decisions: costs    **61**.73; relating to
            jurisdiction    **52**.63, **53**.32, **53**.66
        procedural orders    **53**.66
        provisional measures    **47**.15–22, **53**.66
        settlement award    **53**.32
    autonomy of ICSID process and    **53**.2,
        **53**.18–32, **53**.62
    basis of obligations
        agreement to arbitrate/consent to
            jurisdiction    **53**.13, **53**.34, **53**.56 n48
        Convention    **53**.13, **53**.34

denunciation of Convention, effect **72**.11

good faith **53**.15

State's role as designating and appointing authority **53**.15

comparable provisions in other international instruments **53**.3

concepts underlying

*pacta sunt servanda* **53**.10

*res judicata* **53**.10, **53**.31–2, **53**.62

constituent subdivision or agency **53**.14

decision interpreting, revising or annulling award **50**.13, **50**.17, **50**.28, **52**.3, **52**.79, **52**.569–70, **53**.60–6

applicability: award as interpreted or revised **53**.61; suspension because of stay of enforcement distinguished **53**.61; award modified by supplementation/rectification **53**.64–5; recognition and enforcement of award **53**.60; State immunity from execution **53**.60

recognition/enforcement **54**.33

revision **51**.6

drafting history **53**.4, **53**.11, **53**.13, **53**.15

Executive Directors' Report **53**.11

jurisprudence

*Benvenuti & Bonfant* **53**.14

*CMS* **53**.17

*LG&E* **53**.17

*SGS* v. *Philippines* **53**.17

non-cooperation of party and **45**.5

recognition of award and **54**.43–4

*stare decisis* and **53**.16–17

ICJ Statute distinguished **53**.16 n20

publication of awards and **42**.183–7, **48**.128

risk of inconsistency **53**.17

third parties and **53**.12–13

*Fireman's Fund*

costs and expenses, "loser pays" **61**.37

evidence, taking of

refusal to produce documents **43**.76

witnesses **43**.92

publication of award **48**.117

*force majeure*, consent to ICSID jurisdiction and **25**.312

**foreign control for purposes of treatment as national of another State**

"control" for purposes of establishing nationality in other contexts distinguished **25**.703–7

diminishing significance of provision **25**.791, **25**.887

expropriation of foreign control, effect on jurisdiction **25**.634, **25**.895

as extension of scope of ICSID jurisdiction **25**.704–6

**foreign control for purposes of treatment as national of another State, applicability**

"because", significance **25**.829

exclusion of foreign control and **25**.839

joint venture corporations **25**.839

juridical persons controlled by local nationals **25**.826–7, **25**.894

nationals of non-Contracting State **25**.828–30

nationals of States not party to investment protection treaty **25**.831–2

shareholders of multiple nationality

all Contracting States **25**.833–4, **25**.892

inclusion of nationals of non-Contracting State, effect **25**.834, **25**.838

**foreign control for purposes of treatment as national of another State, critical dates** **25**.871–95: *see also* nationality (juridical persons), critical date

agreement between the parties **25**.891–2

BITs provisions **25**.888, **25**.890

consent to jurisdiction **25**.821, **25**.871–86

change of control following **25**.873–87, **25**.892–4, **25**.901

change of nationality following, *Amco I* **25**.875

double time test, practicality/rejection **25**.752–3, **25**.873–4

drafting history **25**.872

expropriation, effect **25**.634, **25**.895

foreign control immediately before dispute, desirability **25**.891

jurisdiction linked to period during which control existed **25**.887

relevance if unnamed parent companies accepted as parties **25**.887

multilateral treaty provisions **25**.889–90

nationality (natural persons) provisions distinguished **25**.873

registration of request **25**.895

**foreign control for purposes of treatment as national of another State, form and extent of control** **25**.850–70

adequate control **25**.838

at one remove **25**.854

complexity of factors determining **25**.850, **25**.864

decision-making structure and management **25**.854–72

effective control **25**.824, **25**.838

flexible concept **25**.865

ICSID clause, relevance **25**.820–1, **25**.856

**foreign control for purposes of treatment as national of another State, form and extent of control (*cont.*)**
majority shareholding    **25**.851
  subsequently lost    **25**.853
nationals of Contracting
  States/non-Contracting State, appropriate
  balance    **25**.838, **25**.865
power of control and exercise distinguished
  **25**.859–63
provisions in
  BITs    **25**.867–8
  multilateral treaties    **25**.869–70
  national legislation    **25**.866
reasonable control    **25**.865
sole or main shareholding    **25**.852
**foreign control for purposes of treatment as national of another State, indirect control**    **25**.703, **25**.840–9, **25**.901
chain including nationals of Contracting and non-Contracting State    **25**.842–9
  effectiveness of ICSID jurisdiction and
  **25**.844, **25**.848–9
need for host State to know nationality
  **25**.842
**foreign control for purposes of treatment as national of another State, jurisprudence**
*Aguas del Tunari*    **25**.831–2, **25**.847, **25**.859–63
*Amco I*    **25**.703, **25**.816, **25**.833, **25**.841–2, **25**.852, **25**.875
*Autopista*    **25**.845–6, **25**.848, **25**.881
*Cable TV*    **25**.822, **25**.858
*Camuzzi I*    **25**.835–7
*CMS*    **25**.704
*Klöckner I*    **25**.783, **25**.817, **25**.853, **25**.884–7
*LETCO*    **25**.819, **25**.843, **25**.855, **25**.876
*Sempra*    **25**.835–7
*SOABI*    **25**.703, **25**.818, **25**.830, **25**.843–4, **25**.854, **25**.877
*Tokios Tokelès*    **25**.705
*Vacuum Salt*    **25**.785, **25**.820–1, **25**.825, **25**.827, **25**.838, **25**.856–7, **25**.878–80, **25**.890
*Vivendi I*    **25**.882
*Vivendi II*    **25**.882
*Wena Hotels*    **25**.704
**foreign control for purposes of treatment as national of another State, as objective requirement/evidence of**    **25**.638–9, **25**.813–25, **41**.50
agreement on nationality and    **25**.708, **25**.815, **25**.818–21, **25**.825
  rebuttal    **25**.818, **25**.821, **25**.825

drafting history    **25**.814
examination of as tribunal practice/obligation
  **25**.815–24
explicit agreement, need for    **25**.825
reference to, desirability    **25**.785
**foreign investment:** *see* "investment", "foreign" investment requirement
**fork in the road clauses**    **26**.55–72
description    **26**.55
effect on ICSID jurisdiction    **26**.72
example    **26**.56
as exception to exclusive jurisdiction rule
  **26**.55
jurisprudence
  *Azurix*    **26**.69
  *Champion Trading*    **26**.68
  *CMS*    **26**.65–6
  *Enron*    **26**.70
  *Genin*    **26**.59–60
  *LG&E*    **26**.70
  *Pan American*    **26**.70
  *Sempra*    **26**.70
  *SGS* v. *Pakistan*    **26**.67
  *Vivendi I*    **26**.62–4
parallel treaty and contract claims and,
  **26**.62–6: *see also* parallel treaty and contract claims
same/identical dispute requirement    **26**.57–72
*forum prorogatum*    **25**.481–98
in case of doubt as to consent    **25**.483–98
  confirmation or extension of consent
  **25**.485
  Court's right/duty to raise on own initiative
  **25**.485, **25**.498
  cure of defect after institution of
  proceedings    **25**.488–98
  failure to appear    **25**.483, **45**.13
  failure to challenge    **25**.485, **41**.49
definition    **25**.481
drafting history    **25**.481
ICJ practice    **25**.481, **36**.30
jurisprudence
  *Amco I*    **25**.490
  *Klöckner I*    **25**.492–5
  *SPP*    **25**.491
manifest absence of consent and    **25**.482
**forum selection clause:** *see* choice of forum; parallel treaty and contract claims
**France**
constituent subdivision or agency, *Benvenuti & Bonfant* (French proceedings)    **55**.117
provisional measures (ICSID proceedings), domestic courts' right to order in light of Article 26 exclusive jurisdiction rule, *Atlantic Triton*    **26**.169–72

public policy/*ordre public*  **54**.86, **54**.109
recognition and enforcement  **54**.53–5, **54**.69, **54**.86, **54**.105, **54**.109, **54**.114
State immunity from execution  **55**.24, **55**.42–6, **55**.126
*Benvenuti & Bonfant* (French proceedings)  **55**.43–4, **55**.117
*SOABI* (French proceedings)  **55**.45–6

*Fraport*
costs and expenses, "loser pays"  **61**.38
evidence, taking of
"at any stage of the proceedings"  **43**.34
disclosure of documents  **26**.122–3
non-compliance with request for  **43**.67
tribunal's right to call for  **43**.48
exclusive remedy rule  **26**.122–3
obligation of domestic court to decline jurisdiction  **26**.148
"investment", "in accordance with host State law"  **25**.201
jurisdiction, joinder to merits  **41**.85
oral procedure  **44**.96
post-hearing submissions  **49**.14 n11
**frustration:** *see* non-frustration principle
**functions (ICSID):** *see* ICSID functions
*Funnekotter*, travel difficulties of persons appearing in ICSID proceedings  **22**.7


*GAMI*, disqualification of conciliator or arbitrator, grounds, manifest absence of Article 14 qualities  **57**.28–9
*Gas Natural*
exhaustion of local administrative or judicial remedies  **26**.204, **26**.205
"investment", "in accordance with host State law"  **25**.201
judicial decisions as source of international law  **42**.185
legal dispute "arising directly", general measures  **25**.111
MFN clause, applicability to dispute settlement provisions  **25**.570
**general principles of law:** *see* international law/general principles of law as applicable law agreed by parties
*Generation Ukraine*
consent to ICSID jurisdiction
BITs as State's offer  **25**.448
critical date: applicable law and  **25**.507 n677; institution of proceedings  **25**.473
constituent subdivision or agency, designation as and State responsibility for acts of distinguished  **25**.234

Contracting State status, critical date  **25**.220
costs and expenses, procedural misconduct and  **61**.26
disqualification of conciliator or arbitrator, procedure  **58**.13
evidence, taking of
burden of proof  **43**.107
evaluation/probative value  **43**.107
exhaustion of local administrative or judicial remedies  **26**.214–15, **26**.223–4
"investment", pre-investment activities  **25**.180
representation of parties  **44**.79
resignation of conciliator/arbitrator  **56**.25
*Genin*
applicable law, in absence of agreement between parties  **42**.147
constituent subdivision or agency, designation as and State responsibility for acts of distinguished  **25**.234
counterclaim arising directly out of the subject-matter of the dispute  **46**.70
fork in the road clauses  **26**.59–60
national of another Contracting State, agreement to treat as  **25**.773
supplementation or rectification of award  **49**.51–3
**Georgia**
Concession Law 1996  **25**.408
Investment Law 1996  **25**.136–7, **25**.399, **25**.406–8, **25**.418, **25**.520, **26**.47
**Germany**, State immunity from execution  **55**.24, **55**.47, **55**.64, **55**.90, **55**.126
*Goetz*
applicable law, agreement between parties, implicit agreement  **42**.82
critical date for determination of jurisdiction  **25**.38
failure of party to appear or to present case  **41**.55, **43**.25, **45**.16, **45**.20, **45**.31–6, **45**.54, **45**.60, **45**.75, **45**.90
failure to meet time limits  **45**.31–6, **45**.54, **45**.81, **45**.90
international law/host State law, interrelationship  **42**.228
jurisdiction, objections to, Tribunal's examination on own initiative  **41**.55, **45**.16
multipartite proceedings, multiple investors  **25**.280
non-pecuniary obligations
*res judicata* and  **54**.80
tribunal's power to order  **54**.77–9
settlement agreement  **48**.77

**good faith**
attempt at amicable settlement **23**.541–7
conciliation commission's recommendations
and **Preamble** 33
consent to ICSID jurisdiction
indirect withdrawal, State's breach of own
law **25**.628–30
interpretation **25**.589, **25**.590
obligation to ensure non-frustration of object
and purpose of Convention **47**.154
undertaking to consider sympathetically
request for ICSID jurisdiction **25**.438

*Gruslin*
discontinuance of annulment proceedings
**52**.26
"investment"
"in accordance with host State law"
**25**.201
"in the territory" requirement **25**.195
jurisdiction, objections to **25**.487, **25**.604
delay in raising **25**.487

**Guatemala**
exhaustion of local administrative or judicial
remedies, as condition of consent to
ICSID arbitration (BITs provisions)
**26**.98, **26**.198
exhaustion of local remedies requirement
**25**.927
notification of excluded classes of dispute
**25**.926

**Guinea**, Investment Code 1987 **25**.518

**Hague Convention for the Pacific Settlement
of International Disputes (1907)**
*see also* Permanent Court of Arbitration
"jurisdiction", use as precedent
**25**.15

**headquarters agreement, absence** **18**.1

*Helnan*
consent to ICSID jurisdiction, critical date
**25**.505
constituent subdivision or agency, designation
as and State responsibility for acts of
distinguished **25**.234
existence of legal dispute **25**.56
"investment" **25**.127

*Holiday Inns*
ancillary claims, simultaneous determination,
incidental or additional claims "arising
directly out of subject-matter of the
dispute", jurisdictional requirement
distinguished **46**.76
annulment of award, applicability of
Convention provisions to, "awards",
limitation to **52**.65

assignment/succession of investor's rights
and responsibilities **25**.337–8,
**25**.380
competence of tribunal, Secretary-General's
screening role and **41**.13
concurrent reference to domestic courts
**26**.49–52
documents spread over time **26**.49–52
consent to ICSID jurisdiction
critical date **25**.601: institution of
proceedings **25**.472
interpretation **25**.586
irrevocability **25**.601
validity prior to home State's ratification
**25**.288
writing, need for **25**.380
Contracting State status, critical date
**25**.216
disqualification of conciliator or arbitrator,
grounds **56**.43, **57**.36
exclusive remedy rule, obligation of
domestic court to decline jurisdiction
**26**.135
jurisdiction, objections to, time limits **41**.40
n53
multiple instruments/varying parties
dispute "arising directly", whether **25**.95,
**25**.552
unnamed parties, ICSID jurisdiction and
**25**.320–3
national of another Contracting State,
agreement to treat as
identification of controlling nationality,
relevance (IR 2(1)(d)) **25**.798
implicit agreement, possibility of
**25**.778–9
provisional measures
disputed jurisdiction and **47**.49
exclusive right of tribunal, whether
**26**.166
non-compliance, effect on award
**47**.33
priority and speed, need for **47**.40
purpose/rights to be protected:
non-aggravation of dispute **47**.136;
preservation of rights in dispute **47**.159,
**47**.169
stay of proceedings in domestic
courts/injunction against **47**.100–2,
**47**.171
replacement of conciliator/arbitrator following
death **56**.29
resignation of conciliator/arbitrator without
consent, conditional resignation, effect
**56**.43

separability of issues in dispute   **26**.51, **26**.135
**Hong Kong**, application of Convention to **70**.10 n7

**IBA Rules on the Taking of Evidence in International Commercial Arbitration** **43**.8, **43**.18, **43**.77
*IBM*
exhaustion of local administrative or judicial remedies   **26**.216
tribunal (ICSID), appointment of nationals **39**.31
**IBRC (International Bank for Reconstruction and Development):** *see* World Bank
**ICC Arbitration Rules (1998)**
ancillary claims   **46**.3
annulment/non-recognition or enforcement of award   **52**.6
applicable law   **42**.142
arbitrators
independence   **40**.16
nationality   **39**.5
number and method of appointment   **37**.37
award
delivery to parties   **49**.2 n3
requirements: reasons   **48**.54; signature **48**.34 n20
competence, tribunal's right to determine **41**.1
costs and expenses   **59**.3 n2
advance payment   **61**.46
apportionment   **61**.1, **61**.17
fees and expenses (conciliators and arbitrators)   **60**.1
decision by presiding arbitrator in absence of majority   **39**.7
evidence, taking of   **43**.1
*ex aequo et bono* jurisdiction   **42**.253 n425
institution of proceedings   **36**.4
interpretation of award   **50**.1
majority decision, failure to reach   **48**.15 n8
non-cooperating parties   **45**.1
place of proceedings   **62**.2
provisional measures   **47**.1
settlement agreements   **48**.69
severability of arbitration clause   **25**.622
vacancy on tribunal   **56**.11 n9, **56**.14 n11
**ICC Rules of Optional Conciliation**   **28**.5, **61**.4 n5
**ICJ**
access to   **Preamble** 21
advisory opinions (contentious proceedings) **64**.16–21
ICSID status, relevance   **64**.18–20

for settlement of disputes between ICSID and Contracting State   **64**.21: limitation to   **42**.183, **64**.21
ancillary claims   **46**.3
appeal/review role   **52**.1, **53**.23–7
award, requirements   **48**.33 n19
delivery to parties   **49**.2 n2
reasons   **48**.54, **48**.55
competence of Court, determination by Court **41**.1
dispute, existence of   **25**.42
evidence, taking of   **43**.1
*ex aequo et bono* jurisdiction   **42**.253
exhaustiveness requirement   **48**.47 n26
*forum prorogatum*   **25**.481, **36**.30
individual opinions   **48**.93
interpretation of award   **50**.1
majority decision, individual opinion and (*Guinea-Bissau* v *Senegal*)   **48**.17
non-cooperating parties   **45**.1, **45**.12 n10, **45**.39 n46
provisional measures   **47**.1, **47**.19, **47**.48, **47**.72
revision of award   **51**.1
settlement agreements   **48**.69
Statute provisions as model for ICSID   **14**.2, **14**.10, **36**.30, **41**.75, **47**.1, **47**.19, **47**.72, **51**.1
Article 38(1), applicability   **42**.192
**ICJ–ICSID relationship (ICSID 64)**
absence of practice   **64**.5
as compulsory jurisdiction clause   **64**.2–3
diplomatic protection and   **27**.23, **27**.38, **53**.44, **64**.14
Executive Directors' Report   **27**.23
legal interest, need for   **53**.46
disputes relating to
diplomatic protection   **53**.44, **64**.5
enforcement/compliance proceedings **53**.44, **64**.5
exclusive remedy rule   **64**.5
immunities and privileges 6   **64**.5
non-cooperation with Centre   **64**.5
drafting history   **41**.10, **41**.21, **53**.24–5, **64**.3, **64**.5, **64**.6–11
enforcement/compliance proceedings   **54**.28, **64**.5, **64**.14, **64**.15
State immunity and   **55**.7, **64**.14
exclusion of appeal and   **52**.451, **64**.12–13
ILC Model Rules on Arbitral Procedure (1958) distinguished   **64**.13
as "matter provided for . . . in treaties and conventions in force" (ICJ Statute) **64**.2–3

**ICJ–ICSID relationship (ICSID 64) (*cont.*)**
  preliminary rulings    **64**.7–11
    autonomy of ICSID arbitration process and
        **64**.9
  reservations, admissibility    **64**.4
    Turkish declaration distinguished    **64**.4,
        **68**.4
  tribunal's exclusive right to determine its own
      competence and    **41**.9, **41**.10, **41**.21,
      **64**.7–11, **64**.12
    drafting history    **64**.7–11: Executive
        Directors' Report    **64**.11
**ICSID**
  Administrative Council: *see* Administrative
      Council
  administrative structure, criteria, Executive
      Directors' Report    **3**.2
  advantages of system    **Preamble**
      23–30
  annual report: *see* annual report (Centre)
  audit: *see* audit
  budget: *see* budget (ICSID)
  costs: *see* costs, fees and expenses (Centre)
  establishment    **1**.2
  functions: *see* ICSID functions
  immunities and privileges: *see* immunities and
      privileges
  legal representative, Secretary-General
      **11**.1
  publications: *see* publications (ICSID)
  representation: *see* Secretary-General,
      powers and functions, representation of
      Centre
  seat: *see* seat (ICSID)
  Secretariat: *see* Secretariat
  Secretary-General: *see* Secretary-General,
      powers and functions
  status: *see* status (ICSID)
  World Bank and: *see* World Bank–ICSID
      relationship
**ICSID Convention**
  registration    **74**.1–3
  universality, consequences for nationality
      requirements    **25**.750
**ICSID Convention, applicability**
  Additional Facility    **6**.25–6, **66**.6
  Contracting State: *see* Contracting State
  disputes between ICSID and Contracting
      States, exclusion    **64**.21
  investments arising prior to Convention's entry
      into force, rejection of proposal to
      exclude    **25**.117
  non-ICSID proceedings    **11**.18
  territorial application: *see* exclusion of
      territories, notification

**ICSID Convention, drafting history**
  **Preamble** 1–9: *see also under separate
      headings for specific provisions of
      Convention*
  Executive Directors' Report    **Preamble** 5
  Legal Committee meetings    **Preamble** 6–7
  Preliminary Drafts    **Preamble** 3–4
  Revised Draft    **Preamble** 8–9
  Working Paper    **Preamble** 3
  World Bank's agreement to fulfil functions
      under Convention    **Preamble** 9
    Directors' signature of Convention as
        indication    **Preamble** 9
**ICSID Convention, entry into force**
      **Preamble** 10, **25**.211, **25**.214, **68**.2,
      **68**.6–7
  14 October 1966 as date of    **Preamble** 10,
      **68**.7
  30-day interval as "limbo"    **25**.214
  drafting history    **68**.6
**ICSID Convention, implementation measures**
  African countries    **69**.4 n1
  drafting history    **69**.3
  offer of consent to ICSID jurisdiction
      distinguished    **69**.2, **69**.9
  in relation to
    appointment of representatives and panel
        members    **69**.8
    Article 17 payments    **69**.8
    exclusion of: classes of disputes    **69**.9;
        review of ICSID awards    **69**.6
    exclusive remedy rule    **69**.7
    federal clause    **69**.5
    immunities and privileges    **69**.8
    recognition and enforcement    **54**.28,
        **54**.104, **69**.5–6
    taking of evidence    **69**.8
  Secretariat list of "Legislative or Other
      Measures Relating to the Convention"
      **69**.4
**ICSID Convention, interpretation**
  *see also* annulment of award (general),
      interpretation of Article 52
  authentic languages    **25**.17 n7, **44**.61,
      **68**.11: *see also* languages
    comparison between usage    **25**.17 n7,
        **42**.62, **42**.167–8, **42**.202–3, **42**.214 n367,
        **46**.72, **52**.346, **52**.418, **54**.64–5, **54**.70,
        **Final Clause** 2
    procedural use, absence of provision in
        Convention    **44**.61, Final Clause 2
    reconciliation of discrepancies    Final
        Clause 1
  clear intent in case of departure from normal
      practice    **26**.174

grammatical interpretation  **25**.872
object and purpose as guiding principle
    **52**.18, **52**.20, **52**.36, **52**.54, **52**.346,
    **52**.470, **52**.471, **52**.475
phrases
    "he"  **48**.95
    "his"/"its", significance  **45**.4
    "on that date" (ICSID 25(2)(b))
        **25**.872
    "or"  **26**.191
    "or out of other receipts", avoidance of
        explicit reference to World Bank
        **17**.3
    "representation of principal legal systems
        and main forms of economic activity"
        **13**.9, **14**.9
    "who may be relied upon to exercise
        independent judgement"  **14**.5
provisions relating to immunities and
    privileges of Centre  **19**.2
variation of usage within an article/sentence
    **25**.697, **26**.185
VCLT (1969), applicability  **25**.924, **54**.65,
    **68**.5
**ICSID Convention, object and purpose**
avoidance of need for diplomatic protection
    **Preamble** 28, **25**.269, **27**.4
closing of procedural gap in respect of mixed
    individual/State disputes  **25**.4,
    **25**.268–9
facilitation of private international investment
    **Preamble** 11
good faith obligation to avoid frustration
    **47**.154
mutual benefit of investor and host State
    **Preamble** 27–8
    *Amco I*  **Preamble** 13
positive impact of investment on development
    **Preamble** 14, **25**.121, **25**.153
possibility of investment disputes arising and
    **Preamble** 15–16
as principle of interpretation  **52**.18, **52**.20,
    **52**.36, **52**.54, **52**.346, **52**.470, **52**.471,
    **52**.475
promotion of economic investment
    **Preamble** 11
    settlement agreement/discontinuance of
        proceedings and  **48**.80, **48**.87
strengthening of partnership between countries
    in the case of economic development
    **25**.121, **25**.173: *see also* "investment",
    criteria, contribution to economic
    development
    Executive Directors' Report  **Preamble**
    12

**ICSID Convention, primacy**
municipal law and  **26**.13
UN Charter and  **22**.8
**ICSID functions**
advice on drafting of arbitration and
    investment laws  **1**.6
collection and dissemination of information,
    **1**.5: *see also* Secretary-General, powers
    and functions, information, publication
    and dissemination
communication of documents and information
    to parties  **1**.4
conferences  **1**.6
constitution of commissions and tribunals,
    assistance  **1**.4
deletion of reference in Article 1(2) to
    activities other than facilitation of
    conciliation and arbitration  **1**.3
model contract clauses  **1**.4
panels of conciliators and arbitrators  **1**.4
research  **1**.4, **1**.5
rules and regulations, adoption of, 1.4: *see also*
    Administrative Council, powers and
    functions
screening and facilitation of requests
    for conciliation or arbitration  **1**.4,
    **11**.9
services and facilities, provision  **Preamble**
    25, **1**.4
**ICSID practice**, examples  **42**.180
**identical tribunals**  **26**.128–31, **37**.35: *see also*
    consolidation of proceedings
cost-effectiveness  **26**.131
due process and  **26**.131
jurisprudence
    *Camuzzi I*  **26**.129, **37**.35
    *Pan American*  **37**.35
    *RFCC*  **26**.128
    *Salini* v. *Morocco*  **26**.128
    *Sempra*  **26**.129, **37**.35
    *Suez and AGW*  **26**.130, **26**.205,
        **37**.35
**ILC Articles on State Responsibility**
applicability to Article 51 revision provisions
    **51**.19
customary international law and  **42**.195–7
**ILC Draft Articles on Diplomatic Protection
    (2006)**  **27**.1n1
**ILC Draft Articles on Jurisdictional
    Immunities of States and their
    Property**  **55**.50–1, **55**.63, **55**.69, **55**.86,
    **55**.127
**ILC Model Rules on Arbitral Procedure
    (1958)**
ancillary claims  **46**.3

**ILC Model Rules on Arbitral Procedure (1958)** (*cont.*)
  annulment of award   **52**.1, **52**.7 n10, **52**.105 n151, **52**.130 n169, **52**.272, **52**.279, **52**.339
  arbitrators
    number   **37**.11
    parties' failure to appoint   **38**.3
    qualities/qualifications   **40**.16
  award, requirements   **48**.31 n17, **48**.33 n19
    delivery to parties   **49**.2 n2
    reasons   **48**.54
    signature   **48**.34 n20
  competence of tribunal, determination by tribunal   **41**.1
  continuity of membership, desirability   **56**.6 n4
  disqualification of arbitrator   **57**.1 n1
  evidence, taking of   **43**.1
  *ex aequo et bono* jurisdiction   **42**.253 n425
  individual opinions   **48**.93
  interpretation of award   **50**.1
  *non liquet*   **42**.245
  non-cooperating parties   **45**.1
  provisional measures   **47**.1
  resubmission to new tribunal   **52**.657
  review of arbitral award by ICJ   **64**.13
  revision of arbitral award   **51**.1 n2
  settlement agreements   **48**.69
  stay of enforcement   **52**.573
  supplementation or rectification of award   **49**.28 n46
  vacancy on tribunal   **56**.11 n9, **56**.14 n11
**immunities and privileges (Centre)**
  AFR provisions   **6**.6
  Convention provisions, autonomy   **18**.1
  dispute relating to, reference to ICJ   **64**.5
  immunity from legal process: *see* immunity from legal process (Centre)
  international legal personality status and   **19**.1
    capacities distinguished   **19**.1
  legal relevance of Article 19   **19**.1–2
  purpose
    "to fulfil its functions"   **19**.2: immunities and privileges not serving Centre's functions, interpretation   **19**.2
  territorial application   **19**.3
**immunities and privileges (communications)**
  contemporary relevance of provision   **23**.6
  documents in transit   **23**.5
  participants in proceedings   **22**.3
  treatment accorded to other Contracting States, rejection   **23**.5

**immunities and privileges (implementing legislation)**   **69**.8
**immunities and privileges (individuals associated with Centre's work)**
  absence of proceedings involving   **21**.9
  "as accorded to representatives, officials and employees of comparable rank"   **21**.02, **21**.10
    waiver by Chairman on recommendation by relevant commission, tribunal of *ad hoc* committee (AFR 32(2)(c))   **22**.9
  dispute relating to, reference to ICJ   **64**.5
  immunity from legal process: *see* immunity from legal process (individuals associated with Centre's work)
  persons covered   **21**.1
    arbitrators on site visits   **43**.124
    high officials and other officials, uniformity of treatment   **21**.10
  place of proceedings, relevance   **62**.4
  travel certificates (AFR 31)   **21**.11, **22**.4, **22**.5
  waiver, by Administrative Council without recommendation (AFR 32(3)(b))   **22**.9
  World Bank compared   **21**.02
**immunities and privileges (inviolability of archives)**
  information and publication distinguished   **23**.1, **23**.3
  UN and Specialized Agencies compared   **23**.2
  waiver, absence of provision for   **23**.3
**immunities and privileges (participants in proceedings)**   **22**.3
  communications facilities, rejection   **22**.3
  experts   **22**.1, **22**.2, **43**.124
  "immunities and facilities . . . necessary for independent exercise of their functions", rejection of formulation   **22**.3
  jurisprudence
    *Funnekotter*   **22**.7
    *Tradex*   **22**.6
  *Libananco*   **22**.10
  parties   **22**.2
  persons covered
    experts   **43**.124
    witnesses   **43**.124
  place of proceedings, relevance   **62**.4
  proper functioning of proceedings and   **22**.2
  representatives of parties   **22**.1, **22**.2
  surveillance and   **22**.10
  travel certificates   **22**.4, **22**.5
  travel difficulties   **22**.5–8
  travel to and from place of proceedings and stay there, limitation of travelling facilities to   **22**.4

witnesses **22**.1, **22**.2
**immunities and privileges (taxation):** *see* tax privileges
**immunities and privileges (travel)**, travel certificates (AFR 31) **21**.11, **22**.4, **22**.5
**immunities and privileges (World Bank)**
immunity from legal process **18**.6–7, **20**.1–2
personal **21**.02
**immunity from legal process (Centre)**
UN and Specialized Agencies **20**.4
waiver **20**.3
by Secretary-General or Administrative Council (AFR 32(1)(a)) **20**.5
in case of counterclaims connected with principle claim in proceedings instituted by Centre **20**.3
World Bank position distinguished **18**.7, **20**.1–2
**immunity from legal process (conciliators and arbitrators)** **21**.4
corruption of arbitrator, potential for conflict in parallel proceedings **21**.8
diplomatic immunity, rejection of proposal for **21**.4
waiver by Chairman (AFR 32(2)) **21**.6
**immunity from legal process (individuals associated with Centre's work)** **21**.3–9
administrative proceedings **21**.3
conciliators and arbitrators **21**.4
diplomatic immunity, rejection of proposal for **21**.4
criminal prosecution **21**.3
functional immunity **21**.3
immunity of UN and Specialized Agencies compared **21**.3, **21**.7
members of *ad hoc* committee **21**.4
waiver
in case of counterclaims directly connected with principal claim in proceedings instituted by persons with immunity **21**.5
circumstances for: "in interests of Centre" **21**.7; unspecified **21**.7; where an immunity would impede course of justice **21**.7
late addition of provision **21**.5
parallel proceedings in *ad hoc* committee and **21**.8
**impartiality:** *see* annulment of award, grounds, serious departure from fundamental rule of procedure, lack of impartiality/inequality of treatment; independence of arbitrator; qualities/qualifications of conciliators and arbitrators (Panel membership), impartiality
*Impregilo*
applicable law, intertemporal rule **25**.506
claims on behalf of nationals of non-parties to BIT **25**.334
consent to ICSID jurisdiction, critical date, applicable law and **25**.506
constituent subdivision or agency, designation as and State responsibility for acts of distinguished **25**.234
evidence, tribunal's right to call for **43**.47
existence of legal dispute **25**.49 n58
jurisdiction, joinder to merits **41**.88
parallel treaty and contract claims **26**.102–3
request for arbitration
required information **36**.41–2: addition of party after registration **36**.27
**incapacity of conciliator/arbitrator:** *see* replacement of conciliator/arbitrator following death, incapacity or resignation
**incapacity of State to give consent:** *see* investor/host State agreements, invalidity or termination, State's incapacity to give consent
*Inceysa*
consent to ICSID jurisdiction
limitations **25**.521–2, **25**.534
national legislation as consent or offer **25**.391, **25**.396–7, **25**.415
general principles of law as applicable law **42**.179
"investment", "in accordance with host State law" **25**.201, **25**.391, **41**.7
**independence of arbitrator:**
appointment to tribunal from outside Panel and **40**.17–24
potential conflict of interest in particular dispute **40**.17–24, **57**.20, **57**.21–34: continuing nature of obligation 19, 40; declaration of professional, business or other relationship with party (AR 6) **40**.18–20, **44**.36; as objective criterion **40**.21; prompt disclosure obligation **56**.22; situations possibly giving rise to **40**.22–3
right to hold particular political or philosophical views **40**.24
UNCITRAL/ICC provisions compared **40**.16

**independence of arbitrator (*cont.*)**
 jurisprudence
   *Amco I*  **57**.21–2
   *Canfor*  **40**.24
   *Myers*  **40**.24
   *Tecmed*  **40**.24
 lack of as ground for disqualification
     **57**.20–34
   conflict of interest and issue conflict
     distinguished  **57**.34
**India**, non-participation  **68**.8
**individual opinions**  **48**.92–106
 alternatives open to arbitrator  **48**.96–9
 applicability
   annulment proceedings  **48**.106,
     **52**.567
   preliminary decision on jurisdiction
     **48**.104
   procedural orders  **48**.104
   provisional measures  **48**.104
   rectification, interpretation or revision
     **48**.105
   resubmission  **48**.106
 comparable provisions in other international
     instruments  **48**.93
 concurring opinion  **48**.92, **48**.96
   effect on majority in case of dissent on
     certain points  **48**.98
   statement of concurrence without reasons,
     exclusion  **48**.97
 declaration/statement as  **48**.92, **48**.97
 dispatch with award  **49**.6–7, **49**.14
 dissenting opinion  **48**.92, **48**.96
   advance sight of  **48**.100
   exhaustiveness/reasons requirement
     (Article 48(3))  **48**.99
   statement of dissent without reasons and
     **48**.94, **48**.96, **48**.99
 drafting history  **48**.94
 "he"/"she"  **48**.95
 jurisprudence
   *Klöckner I*  **48**.103
   *SPP II*  **48**.104
 majority award, effect on  **48**.17, **48**.98
 parties' right to modify provision, exclusion
     **48**.3, **48**.94
 procedure
   AR 46 time limits and  **48**.101–3
   AR 47(3)  **48**.100
   dispatch of award and  **49**.6–7, **49**.14
 State practice  **48**.92
 vote against without explanation
     **48**.96
**Indonesia**, *Amco I*, proceedings in domestic
     courts, denial of justice, whether
     **26**.138

**Institute of International Law, Articles on
 Arbitration between States, State
 Enterprises or State Entities and
 Foreign Enterprises (1989)**  **41**.1
 non-cooperating parties  **45**.1
**Institution Rules (IR)**  **36**.3, **44**.5, **44**.39,
     **44**.40
 adoption by Administrative Council, required
     majority  **6**.21, **7**.8
 derogation  **6**.8
 intertemporal rule and  **44**.40
 modification by parties  **6**.7, **6**.8
   limited scope for  **44**.13, **44**.40
 revisions (1984/2003)  **36**.26,
     **44**.40
 rules of procedure distinguished  **6**.7
 scope  **44**.39
   content and registration of request
     for conciliation or arbitration  **6**.9,
     **11**.9
**Institution Rules (IR) (Provisional) (1967)**,
     adoption  **6**.8
**Institution Rules (IR) (1968)**  **6**.8, **25**.687
 1
   Note A  **36**.17
   Note C  **36**.13
   Note D  **36**.14
 2
   Notes A–D  **36**.15 n216
   Note F  **36**.29 n35
   Note K  **52**.89
   Note L  **36**.15 n216
   Note M  **36**.31 n38
 2(3)  **44**.45
 3
   Note B  **36**.33 n39
   Note C  **36**.33 n40
   Note D  **36**.33 n40
 5
   Notes A–E  **36**.16 n17
   Note E  **36**.18 n21
 6
   Note B  **36**.27 n32
   Note C  **36**.54
 7
   Note C  **44**.74
   Notes  **36**.61
**Institution Rules (IR) (1984)**  **6**.8, **28**.4
 1  **11**.9, **25**.20, **36**.10, **36**.11
 1(1)  **44**.62
 1(1)(f)  **36**.41, **36**.43
 1(2)  **44**.26 n24
 2  **25**.35, **25**.258, **25**.686, **36**.24–43, **36**.56
   2003 amendment  **44**.40
   Note D  **36**.27 n32
   procedural nature  **36**.38, **36**.41–3

2(1)   **25**.915
2(1)(a)   **25**.214, **36**.26, **36**.40
2(1)(b)   **36**.9 n11, **36**.26, **36**.40
2(1)(c)   **25**.123, **25**.479, **36**.9 n11, **36**.26, **36**.40
2(1)(d)   **25**.294–6, **25**.743, **25**.795, **36**.26, **39**.8
2(1)(d)(i)   **25**.759, **25**.795
2(1)(d)(iii)   **25**.774, **25**.795, **36**.40
2(1)(d)(iv)   **25**.795
2(1)(e)   **25**.61, **25**.86, **25**.123, **36**.26, **52**.89, **52**.442
2(1)(f) (2003 addition)   **25**.632, **36**.26, **44**.40
2(2)   **25**.61, **25**.86, **25**.379, **25**.479, **25**.915, **36**.28
2(3)   **36**.31
3   **36**.32, **44**.26
4   **36**.15
5   **11**.9, **36**.16
5(1)(a)   **36**.18
5(1)(b)   **59**.10
5(2)   **36**.18
6   **11**.9, **36**.49
6(1)(a)   **36**.60
6(2)   **36**.62
7   **11**.9, **36**.61
    2003 amendment   **44**.40
7(b)   **44**.74
7(e)   **36**.59
8   **11**.9, **36**.64–9
    Note B   **36**.66
    Note C   **36**.67
    Note E   **36**.67
**Institution Rules (IR) (2003)**   **6**.8, **36**.26, **44**.40
**insurance against investment risks**
    Inter-Arab Investment Guarantee Corporation   **25**.364
    Multilateral Investment Guarantee Agency (MIGA)   **25**.364, **25**.372
    subrogation in case of: *see* insurance indemnity, subrogation
**insurance indemnity, subrogation**   **25**.305, **25**.364–73, **27**.22
    diplomatic protection and   **27**.22
    insurer's succession to rights
        BITs provision for   **25**.364
        host State's agreement to, need for   **25**.365, **25**.366
        subrogation distinguished   **25**.365
    private insurer's right of subrogation
        agreement of host State, need for   **25**.367
        functional criteria for determining status   **25**.367

procedural problems, possible solutions
    BIT provisions   **25**.371–2
    *CSOB*   **25**.373
    exhaustion of ICSID remedies as prerequisite to payment, difficulties   **25**.368–73
    Model Clauses (1993)   **25**.370–1
    State, State agency or international organisation, denial of party status   **25**.270, **25**.365–6
    drafting history   **25**.366
    payment made conditional on pursuit of ICSID remedies, difficulties   **25**.369–73
**intangibility clause:** *see* stabilization clause
**interest, claim for**
    as ancillary claim   **46**.43–60
    applicable law   **46**.44–8
        annulment for failure to apply   **46**.47
    compensatory interest   **46**.41
    compound/simple interest   **46**.53–9
    critical dates   **46**.50
    *dies a quo*   **46**.49–51
    Energy Charter Treaty   **46**.44 n48
    *ex aequo et bono* jurisdiction and   **46**.48
    "interest"   **46**.41
    jurisprudence
        *ADC*   **46**.50
        *Atlantic Triton*   **46**.48
        *Autopista*   **46**.46
        *Benvenuti & Bonfant*   **46**.48
        *CMS*   **46**.55
        *Fedax*   **46**.44
        *Metalclad*   **46**.57
        *Santa Elena*   **46**.56
        *SOABI*   **46**.50
        *SPP*   **46**.45, **46**.54
        *Vivendi II*   **46**.59
        *Wena hotels*   **46**.58
    NAFTA provisions   **46**.44 n48
    post-award   **46**.41, **46**.60
        in case of compliance with award subsequently modified   **53**.65
    post-award interest   **46**.60
    rate   **46**.46, **46**.52
**interim measures**, *ad hoc* committee's power to order   **52**.540
**international judicial proceedings other than ICSID**, exclusive remedy rule and   **26**.5
**international law**
    experts on, tribunal use of   **43**.69, **43**.102–3
    individuals and   **25**.269, **42**.192–7
    peremptory rules
        applicable law and   **42**.49, **52**.263
        *ex aequo et bono* jurisdiction and   **42**.273
    as preferred standard for protection of foreign investment   **42**.114

**international law/general principles of law as applicable law agreed by parties**
in absence of its choice   **42**.104–15
absence of provision for in first sentence of Article 42(1)   **42**.104
failure to choose, effect   **42**.105
subjection of municipal law to international law   **42**.106–15
tribunals' preference for international law   **42**.112
waiver of rights under international law, possibility   **42**.113–15
as chosen law   **42**.96–9, **52**.259
explicit provision for, desirability   **42**.103, **42**.114
customary international law, examples   **42**.177
general principles of law   **42**.178–82
decisions *ex aequo et bono* distinguished   **42**.182
definition   **42**.178
ICSID practice   **42**.180–1
jurisprudence
*AAPL*   **42**.99
*Adriano Gardella*   **42**.100
*Inceysa*   **42**.179
*LETCO*   **42**.100, **42**.106
*SPP*   **42**.107–9
*Wena Hotels*   **42**.101
*lex mercatoria*   **42**.36
as part of chosen domestic law   **42**.100–3, **52**.259
relevance under residual rule distinguished   **42**.67, **42**.96, **42**.115
as supplement to host State law   **42**.33–6, **42**.97–8
use in isolation, disadvantages   **42**.36
**international law/host State law as applicable law in absence of agreement (Article 42(1) residual rule)**   Preamble 15, **42**.2, **42**.32, **42**.133–244, **52**.208–9
Additional Facility AR 55 distinguished   **42**.142
compromise nature of provision   **42**.142
drafting history   **42**.18, **42**.169, **42**.183, **42**.190, **42**.192–3, **42**.198, **42**.200–3, **42**.204
international arbitral practice distinguished   **42**.142
jurisprudence
*Amco I*   **42**.144, **42**.152, **42**.163, **42**.194, **42**.210, **42**.212, **52**.267–9
*Amco II*   **52**.201, **52**.270
*Autopista*   **42**.134

*Azurix*   **42**.196
*Benvenuti & Bonfant*   **42**.133, **42**.143, **42**.149, **42**.208
*CMS*   **42**.197
*Enron*   **42**.197
*Genin*   **42**.147
*Klöckner I*   **42**.150–1, **42**.165–6, **42**.168, **42**.209, **52**.266
*LETCO*   **42**.134
*LG&E*   **42**.197, **42**.203
*MCI*   **42**.148
*MINE*   **26**.13
*Mobil Oil*   **42**.212
*Sempra*   **42**.197
*SOABI*   **42**.145–6, **42**.149, **42**.213
*SPP*   **42**.134, **42**.135
*Wena Hotels*   **42**.136
"such rules of international law"   **42**.192–244
applicability to investment disputes   **42**.192–7: contract as sole source of investor's remedies   **42**.192–7; enforcement of award and   **42**.114, **42**.193–4; exclusion of diplomatic protection and   **42**.114, **42**.193, **42**.194; Executive Directors' Report qualification of applicability of Article 38(1) of ICJ Statute   **42**.192; proposed exclusion   **42**.198; State responsibility and   **42**.195–7
"as may be applicable"   **42**.199–205: English and French texts compared   **42**.202–3; explanation for inclusion of phrase   **42**.201; incorporation into host State's law, relevance   **42**.200
"principles" distinguished   **42**.167–8: drafting history   **42**.167; English/Spanish and French texts compared   **42**.167–8, **42**.214 n367; inconsistency in usage   **42**.167
proposed limitation to filling gaps in host State law   **42**.198, **42**.206
**international law/host State law, interrelationship**   **42**.96–115, **42**.204–48, **52**.265
autonomous application of international law   **42**.236–44
in case of violation of international law   **42**.205, **42**.206
drafting history   **42**.204
jurisprudence
*Adriano Gardella*   **42**.207
*AGIP*   **42**.220
*Amco I*   **42**.210, **42**.212, **42**.216
*Amco II*   **42**.217–18
*Autopista*   **42**.110, **42**.224

*Azurix*  **42**.242
*Benvenuti & Bonfant*  **42**.208
*CMS*  **42**.240–1
*Duke Energy*  **42**.111
*Goetz*  **42**.228
*Klöckner I*  **42**.209, **42**.214
*LETCO*  **42**.215
*LG&E*  **42**.226, **42**.238–9
*MCI*  **42**.227
*Mobil Oil*  **42**.212
*Santa Elena*  **42**.222
*Sempra*  **42**.243
*SOABI*  **42**.213
*SPP*  **42**.219
*Tradex*  **42**.221
*Wena Hotels*  **42**.223, **42**.229, **42**.236–7
parallel application  **42**.206–13,
    **42**.239–44
  disadvantages  **42**.211–13
supplemental/corrective function of
    international law  **42**.110–11, **42**.205,
    **42**.214–35
  avoidance of *non liquet* and  **42**.249: *ex
    aequo et bono jurisdiction* distinguished
    **42**.250
  filling of gaps in host State law  **42**.98,
    **42**.205, **42**.206
  ICSID practice reviewed  **42**.229–32
**international law, sources for purposes of
    Article 42(1) residual rule**
  BITs  **42**.171–2
    *AAPL*  **42**.172
    intention to include  **42**.171
  by reference to Article 38(1) of ICJ Statute
    **42**.169–70, **42**.192
  customary international law  **42**.175–7
  Executive Directors' Report  **42**.169
  general principles of law  **42**.178–82
    *ex aequo et bono* decisions distinguished
    **42**.182, **42**.248
    *Klöckner I*  **42**.181
    proof of, need for  **42**.181, **42**.182,
    **42**.248
  judicial decisions  **42**.183–7
    ICSID decisions  **42**.184–7
    jurisprudence: *ADC*  **42**.186; *AES*
    **42**.184; *Gas Natural*  **42**.185; *Saipem*
    **42**.187; *SGS* v. *Philippines*  **42**.184
    non-ICSID tribunals  **42**.183
  multilateral treaties  **42**.171
    *SPP*  **42**.174
    UNESCO Convention for the Protection of
    the World Cultural and Natural Heritage
    (1972)  **42**.174
  resolutions and guidelines  **42**.189–91

General Assembly resolutions  **42**.189,
    **42**.191
    need for incorporation through choice of
    law agreement  **42**.191
    World Bank Guidelines  **42**.190
  writings  **42**.188
**international minimum standards**
  desirability  **42**.112–15
  jurisprudence
    *Amco I*  **42**.114 n196
    *MINE*  **44**.23
  rules of procedure  **44**.4
    as constraint on parties' right to modify
    **43**.22–3
**international organisations**, as party to
    proceedings  **25**.270, **25**.365
**international tort**, investment dispute
    distinguished, *Amco I*  **25**.490
**internationalization of contract**  **42**.33–6
**interpretation of award**, *see also* ICSID
    Convention, interpretation; national
    legislation, interpretation; stay of
    enforcement in interpretation of award
    proceedings; treaties, interpretation, rules
    and principles
**interpretation of award, applicability**
  conciliation proceedings  **33**.5
  decision on
    costs and expenses  **61**.70: in annulment
    decision  **61**.74
    interpretation  **50**.29
    supplementation or rectification  **54**.79
  discontinuance order  **48**.71
  disputes concerning interpretation or
    application of Convention distinguished
    **50**.4
  preliminary decision on jurisdiction  **41**.24,
    **41**.73, **50**.12
  provisional measures  **50**.12
  resubmission  **50**.13
  settlement agreement  **48**.78
**interpretation of award, constitution of new
    tribunal**  **50**.34–41: *see also*
    interpretation of award, submission to
    original tribunal
  appointment of arbitrators, from previous
    tribunal  **50**.40
  AR 51  **50**.36–7
    adoption of same method as for original
    tribunal, agreement of parties to adopt
    different method/numbers  **50**.39
  drafting history  **50**.38
  sole/uneven number of arbitrators, need for
    **50**.40
  task  **50**.40

**interpretation of award, decision**
  annulment   **50**.29, **52**.79
  as "award"   **48**.6, **48**.29, **48**.120
  certification and dispatch   **49**.8, **49**.25, **50**.26,
      **50**.29
  certified copies of award and   **50**.26
  finality/binding effect   **50**.19
  interpretation   **50**.29
  part of the award, whether, recognition and
      enforcement   **50**.28
  publication   **48**.120
  recognition/enforcement   **50**.28, **54**.33
  requirements   **48**.29, **48**.88
  revision   **50**.29
  signature   **50**.26
  supplementation or rectification   **50**.29
**interpretation of award, jurisprudence**
  *Feldman*   **50**.4 n3
  *Waste Management II*   **50**.4 n3,
      **50**.12 n18
  *Wena Hotels*   **50**.4, **50**.5, **50**.6, **50**.7–11,
      **50**.17, **50**.20, **50**.24, **50**.37, **50**.40
**interpretation of award,
      procedure/requirements**
  absence of practice   **50**.4
  AFR 28(2)   **50**.26
  as agreed by parties for original proceeding
      **50**.24
  Arbitration Rules (AR)
    applicability   **44**.6
    AR 47   **50**.26
    AR 48(3)   **50**.26
    AR 50   **50**.15, **50**.23–4
    AR 53   **50**.23–4
  certification and dispatch   **50**.26
  comparable provisions in other international
      instruments   **50**.1, **50**.19
  costs and expenses   **61**.63
  date of award   **50**.26
  dispute relating to existing award   **50**.5–11
    actual difference of opinion   **50**.5,
        **50**.9
    concrete dispute   **50**.5
    implementation of award   **50**.5
    on meaning or scope   **50**.17
    request outside scope of existing award
        **50**.11
  drafting history   **50**.2, **50**.14, **50**.19, **50**.25,
      **50**.38
  failure of party to appear   **45**.48
  finality/binding effect of award and   **50**.13,
      **50**.17
  identification of precise points needing
      interpretation   **50**.16
  individual opinions and   **50**.26

interpretation distinguished   **51**.7
notification to other party   **50**.24
other post-award remedies distinguished
    **20**.22, **50**.18, **50**.19
part of the award, whether   **50**.27–9
parties' right to be heard   **50**.24
request
  by Contracting State asked to enforce award
      **50**.14
  by party, need for   **50**.14
  receipt and registration   **11**.9
  successive requests   **50**.21, **50**.34
Secretary-General's role   **50**.22,
    **50**.24
signature   **50**.26
stay of enforcement and: *see* stay of
    enforcement in interpretation of award
    proceedings
time limits
  absence   **50**.2, **50**.19–22, **50**.34
  drafting history   **50**.19, **50**.25
  other post-award remedies distinguished
      **50**.18, **50**.19, **50**.22, **50**.84, **52**.85
  preparation of decision   **50**.25
  provisions in other international instruments
      distinguished   **50**.19
tribunal's right to provide on own initiative
    **50**.14
**interpretation of award, submission to
      original tribunal   50**.30–3, **52**.2: *see
    also* interpretation of award, constitution
    of new tribunal
  participation by all members of original
      tribunal, need for   **50**.32, **50**.35
  reconstitution of tribunal (AR 51)   **50**.30–1,
      **50**.36
  obligation to give decision   **50**.33
  voluntary nature of participation
      **50**.32–3
**investment**
  assignment/succession of investor's rights and
      responsibilities: *see* assignment/
      succession of investor's rights and
      responsibilities
  authorization/licensing process, consent to
      ICSID proceedings and   **25**.422–5,
      **25**.455, **25**.614–17
  licensing: *see* authorization/licensing *above*
  as objective requirement   **25**.154
**investment agreements:** *see* investor/host State
      agreements, consent to ICSID
      jurisdiction; investor/host State
      agreements, invalidity or termination;
      investor/host State agreements,
      renegotiation (ICSID jurisdiction)

**"investment", criteria**  **25**.152–74
  contribution to economic development
      **Preamble** 14, **25**.158, **25**.160,
      **25**.163–74
    flexibility in interpreting, need for
      **25**.174
    political or cultural benefits  **25**.167–70
  duration  **25**.153, **25**.154
  jurisprudence  **25**.159–71
    *CSOB*  **25**.164
    *Fedax*  **25**.154
    *Joy Mining*  **25**.160
    *LESI* cases  **25**.165
    *Malaysian Historical Salvors*  **25**.157,
      **25**.167–70
    *Mitchell*  **25**.166, **52**.159–62
    *Salini* v. *Morocco*  **25**.154–6, **25**.204
    *Salini/Salini* test  **25**.171
  mandatory, whether  **25**.159, **25**.167–74
  regularity of profit and return  **25**.153,
      **25**.157
  risk  **25**.153, **25**.154–5
  substantial financial commitment  **25**.153,
      **25**.154–5, **25**.158, **25**.161, **25**.204
    proposal for minimum  **25**.116
**"investment", definition**
  absence in Convention  **25**.113, **25**.115,
      **25**.121
  arguments in favour of  **25**.113
  class exclusion (Article 25(4)) and  **25**.120,
      **25**.921–7, **25**.934–7
  double keyhole/double-barrelled test
      **25**.124–7
    *Aguas del Tunari*  **25**.124, **25**.127
    *CSOB*  **25**.125
    *Helnan*  **25**.127
    *Jan de Nul*  **25**.127
    *Joy Mining*  **25**.126
    *Kardassopoulos*  **25**.127
    *Malaysian Historical Salvors*  **25**.124,
      **25**.127
    *Mitchell*  **25**.127
    *Salini* v. *Morocco*  **25**.127
  drafting history  **25**.113, **25**.114
    Executive Directors' Report ("no attempt to
      define")  **25**.119–20
  "in accordance with host State law" provision,
      relevance  **25**.199–201
    *Aguas del Tunari*  **25**.201
    "approved project"  **25**.201
    *Bayindir*  **25**.201
    *Fraport*  **25**.201
    *Gas Natural*  **25**.201
    *Gruslin*  **25**.201
    *Inceysa*  **25**.201, **25**.391

    *Kardassopoulos*  **25**.201
    *LESI-DIPENTA*  **25**.201
    *Plama*  **25**.201
    *PSEG*  **25**.201
    *Saipem*  **25**.201
    *Salini*  **25**.200
    *Saluka*  **25**.201
    *Tokios Tokelès*  **25**.201
    *World Duty Free*  **25**.201
  international tort distinguished, *Amco I*
      **25**.490
  object and purpose of Convention as guide
      **25**.121, **25**.153
    *CSOB*  **25**.121 n145
  objective meaning  **25**.123
  suggestions for  **25**.114
  Working Paper  **25**.113
**"investment", definition by consent**
  BITs  **25**.139–45
    *ad hoc* nature  **25**.144
    inclusion of non-exhaustive list of typical
      rights  **25**.140
    jurisprudence  **25**.145: *Fedax*  **25**.149
    participation in locally incorporated
      companies, relevance  **25**.145
    pre-investment activities, Additional
      Facility and  **25**.208
    relevance of provision  **25**.139
    UK Model Agreement  **25**.141
    US Model BIT  **25**.142
  contractual agreement  **25**.129–33, **25**.209
    advisability of specific statement
      **25**.130
    ICSID clause as evidence of  **25**.129–31
    *Kaiser Bauxite*  **25**.132
    *LETCO*  **25**.133
    Model Clauses (1981)  **25**.129
    Model Clauses (1993)  **25**.129
    practice  **25**.131
    reference in contract to BIT ICSID clause
      (*CSOB*)  **25**.131
  limitations on  **25**.122–8
  multilateral treaty
    Cartagena Free Trade Agreement (1994)
      **25**.147
    Energy Charter Treaty (1994)  **25**.147
    MERCOSUR Protocol (1994)  **25**.147
    NAFTA (1992)  **25**.146
  procedure in case of doubt
    *see also* Additional Facility
    *ad hoc* arbitration  **25**.209, **25**.227–9,
      **25**.302
    Additional Facility  **25**.209: combined
      submission clause  **25**.207, **25**.209
    specific statement in contract  **25**.209

**"investment", definition (national legislation)**
divergence from ICSID usage   **25**.138
  relevance to consent   **25**.138
examples   **25**.134–8
*Tradex*   **25**.135–6
*Zhinvali*   **25**.137
**"investment", examples**
bonds, debentures and debt instruments
  **25**.142
civil engineering contracts   **25**.151
commercial transactions, exclusion   **25**.120,
  **25**.202
concessions including turnkey projects
  **25**.140, **25**.141, **25**.142
construction contracts   **25**.118, **25**.151,
  **25**.154
contractual rights   **25**.148
economic transactions as   **25**.148, **25**.202–4
enterprise   **25**.142
intellectual and industrial property rights
  **25**.140, **25**.141, **25**.142
jurisprudence
  *CSOB*   **25**.149
  *Fedax*   **25**.149
  *Sempra*   **25**.149
licences, authorizations and permits   **25**.142
loans   **25**.118, **25**.142, **25**.149
  jurisprudence   **25**.149
money claims   **25**.140, **25**.149
movable and immovable property rights
  including leases, mortgages, liens and
  pledges   **25**.140, **25**.141, **25**.142,
  **25**.148
NGO charitable activities   **25**.157 n218
outstanding payments   **25**.118
pre-investment activities including
  negotiations, exclusion   **25**.175–81
  Additional Facility and   **25**.208
  *Generation Ukraine*   **25**.180
  *Mihaly*   **25**.176–7
  pre-investment treaty rights, relevance
    **25**.171, **25**.181
  *PSEG*   **25**.179
  *Zhinvali*   **25**.178
range   **25**.148–51
shares or stock or other interests in company
  **25**.118, **25**.140, **25**.141, **25**.142, **25**.150,
  **25**.792
  indirect   **25**.150
  locally incorporated company, relevance
    **25**.150, **25**.792
suppliers' credits   **25**.118
**"investment", "foreign" investment
  requirement**   **25**.182–7
drafting history   **25**.182

funding from persons not entitled to benefit
  from ICSID or BIT   **25**.183
host State requirement   **25**.183
jurisprudence
  *Amco I*   **25**.183
  *Olguín*   **25**.184
  *SIAG*   **25**.184
  *Tokios Tokelès*   **25**.185
  *Tradex*   **25**.184
  *Wena Hotels*   **25**.184
**"investment", "in the territory" requirement**
  **25**.188–98
absence of provision in Convention   **25**.188,
  **25**.197
BIT provision for   **25**.189, **25**.194
Executive Directors' Report   **25**.188
jurisprudence
  *Bayview*   **25**.196
  *CSOB*   **25**.192
  *Fedax*   **25**.191
  *Gruslin*   **25**.195
  *LESI* cases   **25**.195
  *SGS* cases   **25**.192–3
  *Zhinvali*   **25**.195
NAFTA   **25**.190, **25**.196
type of investment, relevance
  **25**.197–8
**investor/host State agreements, consent to
  ICSID jurisdiction**   **25**.378
existing disputes   **25**.382–7
  *compromis*   **25**.382, **25**.384
  Model Clauses (1993)   **25**.387
  rarity   **25**.384
future disputes   **25**.382–7
  careful drafting, need for   **25**.385–7
  compromissory clause in investment
    agreement   **25**.382, **25**.384
  drafting history   **25**.383–4
  Executive Directors' Report   **25**.384
  Model Clauses (1993)   **25**.385–7
  objections to   **25**.383
  practice   **25**.384
invalidity or termination of agreement: *see*
  investor/host State agreements, invalidity
  or termination
limitations on consent   **23**.517
multiple instruments/varying parties: *see*
  multiple instruments/varying parties
  (investment agreements)
**investor/host State agreements, invalidity or
  termination**
commission/tribunal's right to determine
  **25**.621
commission/tribunal's right to determine own
  jurisdiction and   **25**.620

investor's lack of authority    **25**.632
jurisprudence
 *Autopista*    **42**.156
 *IBM*    **25**.629
State's breach of own law, good faith principle
 **25**.628–30
State's incapacity to give consent    **25**.625–31
 consent given improperly    **25**.627
 good faith and    **25**.628–30
 legal restriction on submission to arbitration
  **25**.627
 statement that requirements met, desirability
  **25**.631
as withdrawal of consent    **25**.620–4
**investor/host State agreements, renegotiation
 (ICSID jurisdiction)**    **25**.78–82
adjustment provision in agreement    **25**.79
 *Adriano Gardella*    **25**.80 n98
disagreement between parties over submission
 **25**.80
legal basis    **25**.79
 fundamental change of circumstances
  **25**.79
 permanent sovereignty over natural
  resources    **25**.79
**Iran-US Claims Tribunal**, applicable law rules
 **42**.142
**Iraq**, non-participation    **68**.8
**Israel**, exhaustion of local administrative or
 judicial remedies, as condition of consent
 to ICSID arbitration (BITs provisions)
 **26**.196
**Italy**, State immunity from execution    **55**.24,
 **55**.54, **55**.64
**ITLOS**, provisional measures, priority and speed
 **47**.38 n56

**Jamaica**, notification of excluded classes of
 dispute    **25**.607, **25**.926
*Jan de Nul*
consent to ICSID jurisdiction, critical date
 **25**.504
constituent subdivision or agency, designation
 as and State responsibility for acts of
 distinguished    **25**.234
exhaustion of local administrative or judicial
 remedies    **26**.226
existence of legal dispute    **25**.54–5
"investment"    **25**.127
languages    **44**.68
parallel treaty and contract claims    **25**.54–5
**joint venture corporations**, foreign control and
 **25**.839
**Jordan**, Investment Promotion Law 1995
 **25**.541

*Joy Mining*
concurrent arbitration provisions
 **26**.41–2
discontinuance of annulment proceedings
 **52**.26
"investment"
 criteria    **25**.160
 definition    **25**.126
legal dispute "arising directly"    **25**.103
unilateral undertaking, legal effect
 **26**.42
**judicial assistance, tribunal's right to request**
 **43**.52
provisional measures and    **26**.164,
 **43**.52
**judicial decisions:** *see* international law, sources
 for purposes of Article 42(1) residual
 rule
**jurisdiction**
Additional Facility: *see* Additional Facility
 Rules (2006)
concurrent: *see* concurrent arbitration
 provisions; concurrent reference to
 domestic courts; consent to ICSID
 jurisdiction, concurrent arbitration
 provisions
diplomatic protection, effect of resort to
 **27**.6
effectiveness, tribunals' wish to uphold
 **25**.586, **25**.848–9, **25**.884
fact-finding: *see* fact-finding proceedings
limitation to cases between a State and foreign
 national    **25**.4
requirements: *see* Contracting State;
 jurisdiction, objective requirements; legal
 dispute
**jurisdiction, basis**
claim for damages or other legal remedy,
 sufficiency    **25**.75
consensual nature    **25**.5, **25**.6–7
as derogation from general rules of municipal
 law    **25**.580, **25**.583
validity of claim, relevance    **25**.79
**jurisdiction, critical dates for determination**
 **25**.35–40: *see also* nationality (juridical
 persons), critical date
Contracting State status
 State of investor's nationality    **25**.35
 State party    **25**.35
date of consent    **25**.35
institution of proceedings as    **25**.36–40,
 **25**.754
 assignment/succession following, relevance
  **25**.356–60
IR 2    **25**.35

**jurisdiction, critical dates for determination**
    (***cont.***)
    jurisprudence
        *Arrest Warrant Case*    **25**.37
        *Bayindir*    **25**.38
        *CSOB*    **25**.39
        *Goetz*    **25**.38
        *Holiday Inns*    **25**.472, **25**.601
        *Vivendi II*    **25**.40, **25**.357,
            **25**.755
        *Zhinvali*    **25**.38
    nationality requirements    **25**.35
    time of investment    **25**.35
**jurisdiction, determination**
    by commission/tribunal
        *see also* competence of tribunal,
            determination by tribunal; conciliation
            commission, competence; jurisdiction,
            critical dates for determination
        invalid or terminated investor/host State
            agreement and    **25**.620, **25**.621
        reference to ICJ and    **64**.7–11
    decisions relating to
        as award    **41**.21, **41**.24–9, **48**.22, **48**.26,
            **48**.40, **54**.30–1: "no jurisdiction" finding
            **41**.29, **41**.74, **54**.31, **54**.45
        costs and expenses    **61**.62
        interpretation, exclusion    **50**.12
        timing    **25**.8
    designation of constituent subdivision or
        agency    **25**.35
    limitations on parties' rights of (treaty
        shopping)    **25**.730–40
    wording of consent to jurisdiction as
        determining factor    **26**.108
**jurisdiction, joinder to merits**
    decision forming part of final award    **41**.25,
        **41**.72, **41**.78–85
    grounds    **41**.80–5
    jurisprudence
        *Bayindir*    **41**.89
        *Fraport*    **41**.85
        *Impregilo*    **41**.88
        *Kardassopoulos*    **41**.83
        *Klöckner I*    **41**.84
        *Oil Platforms*    **41**.86, **43**.117–18,
            **52**.332
        *Pan American*    **41**.90
        *Saipem*    **41**.91
        *Siemens*    **41**.87
        *SOABI*    **41**.82
        *Telenor*    **41**.92
        *Tradex*    **41**.81
    *prima facie* test    **41**.86–92, **43**.117–18

    applicability following summary procedure
        rejection of objection    **41**.101
    treaty violation as basis of claim and
        **41**.86–92
    where objection relates to ancillary claim
        **41**.84
**jurisdiction, objections to**    **41**.30–55
    annulment proceedings and    **52**.62, **52**.63,
        **52**.174
    counterclaims    **41**.31, **41**.36–7
        *Atlantic Triton*    **41**.37
        separate treatment    **41**.72
        suspension of proceedings and    **41**.63
    discussion in award, need for    **41**.51,
        **41**.65–8
    "doubts/questions"    **41**.30
    examination of jurisdictional issues on
        tribunal's own initiative
        contested proceedings    **41**.43–55,
            **52**.173: AR 41(2)    **41**.43–4, **45**.13;
            non-exercise of right    **41**.46–51;
            objective requirements and    **41**.50
        as corollary to tribunal's right to determine
            own jurisdiction    **41**.44
        jurisprudence: *Goetz*    **41**.55, **45**.16; *Kaiser
            Bauxite*    **41**.53, **45**.14; *LETCO*    **41**.54,
            **45**.15; *MINE*    **41**.46; *Mobil Oil* (NZ
            proceedings)    **41**.47
        uncontested proceedings    **41**.52–5,
            **52**.173: drafting history    **41**.43; as duty
            **41**.52, **41**.67
    exhaustiveness of reasons, need for    **48**.45
    failure of party to raise as consent to
        jurisdiction, 41.49, 52.174: *see also*
        *forum prorogatum*
    failure to challenge request, relevance    **36**.50
    finding against jurisdiction
        AR 41(5)    **41**.73
        as award    **41**.73, **54**.31, **54**.45
        costs    **41**.73
        post-award remedies    **41**.73
    joinder to merits: *see* jurisdiction, joinder to
        merits
    possible issues    **41**.58–9
        drafting history    **41**.58
    as preliminary question    **41**.32, **41**.70–3,
        **41**.77–8
        AR 41    **41**.32
        incorporation into final award    **41**.24,
            **41**.78, **48**.26, **48**.121, **51**.4, **52**.62
        terminology and    **41**.71: avoidance of
            "award"    **41**.71
        treatment in early part of award and
            **41**.72

tribunal's right to decide whether
**41**.75–6: drafting history    **41**.75;
procedural economy and    **41**.76
procedure    **41**.60–4
in case of counterclaim    **41**.63
discretionary nature    **41**.62
form of decision    **41**.69–74,
**45**.70
Secretary-General's screening role and
**41**.94
summary procedure (AR 41(5)): *see
summary procedure (AR 41(5)) below*
suspension of proceedings (AR 41)
**41**.60–4, **41**.70: 2006 revision    **41**.52;
where objection relates to primary
dispute    **41**.63
written/oral submissions    **41**.64
summary procedure (AR 41(5))    **41**.93–102,
**44**.36
advantages/disadvantages    **41**.102
in case of joinder of jurisdiction and merits
**41**.96
decision as "award"    **41**.100
dismissal of objection *prima facie* test,
applicability following    **41**.101: right of
objection at jurisdictional stage, effect on
**41**.101
lack of legal merit test    **41**.98–9
partial upholding of objections
**41**.99
parties' right to be heard and    **41**.97
reason for provision    **41**.94
reasons, need for    **41**.100: dismissal of
objection and    **41**.100; reservation of
decision on merits and    **41**.100
Secretary-General's screening role and
**41**.94
time scale    **41**.95
*Trans-Global*    **41**.102 n132
time limits    **41**.32–42
"as early as possible"    **41**.32–4
belated objection, effect    **41**.40–2
counter-memorial, due date for and
**25**.489, **41**.32, **41**.35–7, **52**.174
delay, effect    **25**.487, **25**.604
facts arising after expiry    **41**.38–9
jurisprudence: *AIG*    **41**.41; *Atlantic Triton*
**41**.37; *Autopista*    **52**.174 n242; *CSOB*
**41**.35; *Desert Line*    **41**.33; *Gruslin*
**25**.487, **25**.604; *Holiday Inns*    **41**.40
n53; *Vacuum Salt*    **41**.34; *Zhinvali*
**52**.174
tribunal's right to decide jurisdiction at any
time and    **41**.38, **52**.173

tribunal's obligation to consider/decide
**41**.65–8
distinction    **41**.65
*SPP*    **41**.66
waiver, *Amco I*    **25**.490
**jurisdiction, objective requirements**    **25**.5–7
"arising directly" out of investment,
**Preamble 16**, **25**.85, **25**.123, **25**.139: *see
also* legal dispute as jurisdictional
requirement, "arising directly"
Contracting State: *see* Contracting State,
jurisdictional requirement
critical date for meeting: *see* jurisdiction,
critical dates for determination
designation of subdivision or agency: *see*
constituent subdivision or agency as party
to proceedings, designation
difficulty of determining    **25**.6
Executive Directors' Report    **25**.6
foreign control for purposes of treatment as
national of another State    **25**.638,
**25**.813–25
investment    **25**.154
legal dispute as jurisdictional requirement
**25**.80
legal personality of investor    **25**.693
national of host State, exclusion    **25**.668
nationality    **25**.638–9, **25**.657, **41**.50
parties' interpretation, relevance    **25**.6–7
precise definition, need for    **25**.5–6
settlement agreement prior to institution of
proceedings and    **48**.75
valid consent    **25**.6
waiver, exclusion    **25**.213
**jurisdiction, terminology**
appropriateness    **25**.15–17
use in Hague Convention for the Pacific
Settlement of Disputes (1907) as
justification    **25**.15
"competence" as alternative    **25**.15, **25**.17,
**25**.18, **41**.56–7
terminology in Spanish and French texts
**25**.17 n7, **41**.56 n77
tribunal usage    **25**.17
definition
absence from Convention    **25**.14
"power of court or judge to entertain an
action, petition or other proceeding"
**25**.16
Executive Directors' Report    **25**.16
**Jurisdictional Immunities of States and their
Property, UN Convention on (2004)**
**55**.14, **55**.21, **55**.52–3, **55**.63, **55**.68,
**55**.86–91, **55**.96, **55**.127

**justiciability**
capital importing countries' wish to exclude certain political issues    **25**.68
expropriation and other governmental actions    **25**.68–71
  *AAPL*    **25**.70
  *Amco I*    **25**.71
  *Benvenuti & Bonfant*    **25**.70
  *CSOB*    **25**.72
parties' right to exclude classes of disputes, **25**.68: *see also* excluded classes of disputes, notification

*Kaiser Bauxite*
applicable law, agreement between parties capacity of State to contract **42**.46
  host State law/international law    **42**.34, **42**.41
appointment to tribunal by Chairman **38**.23
  from outside Panel    **40**.9
excluded classes of disputes, notification **25**.938
failure of party to appear or to present case, period of grace    **45**.80
failure of party to cooperate or cooperate fully **45**.25, **45**.49
"investment"    **25**.132
jurisdiction, objections to, Tribunal's examination on own initiative    **41**.53, **45**.14
nationality (juridical persons), incorporation or seat as test    **25**.699
resignation of conciliator/arbitrator **56**.24
stabilization clause    **42**.119
tax dispute, "arising directly", whether **25**.99

*Kardassopoulos*
applicable law, agreement between parties, implicit agreement    **42**.87
consent to ICSID jurisdiction, critical date, non-retroactivity of treaties and    **25**.507 n677
constituent subdivision or agency, designation as and State responsibility for acts of distinguished    **25**.234
"investment"    **25**.127
  "in accordance with host State law" **25**.201
**Kazakhstan**, Law on Foreign Investments, 1995, choice of forum    **26**.23
*King of Spain's Award*, reasons, need for **48**.47 n26, **48**.55

*Klöckner I*
ancillary claims, simultaneous determination incidental or additional claims "arising directly out of subject-matter of the dispute", jurisdictional requirement distinguished    **46**.77
  jurisdiction, need for    **46**.90
annulment of award
  grounds, serious departure from fundamental rule of procedure, lack of impartiality/inequality of treatment **52**.294–301
  partial    **52**.495
annulment of award (general), appeal distinguished    **52**.13, **52**.17, **52**.21–3, **52**.178, **52**.214, **52**.364–6
annulment of award, grounds
  decision *ex aequo et bono* without agreement of parties    **42**.262–3, **52**.245, **52**.248–51, **52**.257, **52**.518
  exclusion of new arguments on fact or law **52**.108
  failure to deal with every question submitted **52**.407, **52**.414, **52**.420–2, **52**.428–30
  failure to state reasons: absence of reasons **52**.350; contradictory reasons **48**.59–61, **52**.390–2; quality/sufficiency of reasons    **52**.364–8; reasons as standard requirement    **48**.60, **49**.70, **52**.347
  interpretation of Article 52    **52**.13, **52**.17, **52**.21–3, **52**.178, **52**.214, **52**.364–5, **52**.514
  manifest excess of powers    **26**.30, **42**.15, **52**.143–4, **52**.152, **52**.163, **52**.169, **52**.175–80: failure to apply correct applicable law    **42**.15, **42**.18–19, **42**.150–1, **52**.197, **52**.211, **52**.214, **52**.266
  multiple grounds/classification difficulties **52**.414, **52**.517–19, **52**.525
  serious departure from fundamental rule of procedure: allocation of burden of proof and    **52**.301; failure to deliberate **52**.319; lack of impartiality/inequality of treatment    **52**.294–302; "serious departure"/"fundamental rule" **52**.290–1; timely objection, need for **52**.335
applicable law, in absence of agreement between parties
  host State law    **42**.150–1: "including its rules on the conflict of laws" (*renvoi*) **42**.165–6
arbitral award, interpretation in accordance with treaty interpretation rules    **52**.17

concurrent arbitration provisions    **26**.25–31
    implied limitation of earlier clause    **26**.30
    submissions before Tribunal as consent to
        jurisdiction    **26**.28, **26**.30
constituent subdivision or agency as party to
        proceedings    **25**.246
    change of status    **25**.260–1, **25**.317
    timing of designation    **25**.260–1
costs and expenses    **61**.39
counterclaim arising directly out directly out
        of the subject-matter of the dispute
        **25**.555
criticism of decision    **52**.29
equitable principles    **42**.15
evidence, taking of, "at any stage of the
        proceedings"    **43**.37
exhaustiveness/reasons requirement
        (Article 48(3))    **48**.50
foreign control for purposes of treatment as
        national of another State
    critical dates, consent/subsequent
        developments    **25**.884–7
    form and extent of control, majority
        shareholding subsequently lost    **25**.853
    as objective requirement/evidence of
        **25**.817
*forum prorogatum*    **25**.492–7, **52**.175
functions    **52**.492
individual opinions, time limits    **48**.103
international law, sources, general principles
        of law    **42**.181
international law/host State law,
        interrelationship    **42**.209, **42**.214
international law/host State law, "such rules of
        international law", "principles"
        distinguished    **42**.168
jurisdiction, joinder to merits    **41**.84
multipartite proceedings, multiple investors
        **25**.279
multiple instruments/varying parties
        (investment agreements)    **25**.327,
        **25**.553–7
national of another Contracting State,
        agreement to treat as
    implicit agreement, possibility of    **25**.783,
        **25**.817
    test    **25**.765
obligation to annul, whether    **52**.467–8
resubmission of dispute after annulment, *res
        judicata* and    **52**.684
stay of enforcement in annulment proceedings
        **52**.585
supplementation or rectification of award,
        annulment as alternative    **49**.70
time limits, difficulties    **48**.103

*Klöckner II*
    annulment of award, grounds
        failure to state reasons, quality/sufficiency
            of reasons    **52**.374–5
        interpretation of Article 52    **52**.23, **52**.31,
            **52**.59
        serious departure from fundamental rule of
            procedure: failure to comply with
            evidentiary standards    **52**.326–7; failure
            to deliberate    **52**.321; lack of
            impartiality/inequality of treatment,
            allocation of burden of proof    **52**.326–7;
            timely objection, need for    **52**.336
    annulment of award, request
        by both parties    **52**.42
        required information    **52**.92
    annulment of resubmission decision    **52**.82
    evidence, tribunal's discretionary powers
        **52**.326–7
    resubmission of dispute after annulment
        **52**.659
        procedure, request by one or both parties
            **52**.664
        stay of enforcement and    **52**.700
**Kyrgyz Republic**
    Investments Law 2003    **25**.399
    signature/ratification    **68**.8

*Lanco*
    exhaustion of local administrative or judicial
        remedies    **26**.192, **26**.210
    parallel treaty and contract claims    **26**.75
**languages**
    authentic    **25**.17 n7: *see also* ICSID
        Convention, interpretation, authentic
        languages
        Spanish as    **68**.11
    cost implications    **44**.66
    ICSID practice    **44**.65
    jurisprudence
        *Champion Trading*    **44**.69
        *Fedax*    **44**.67
        *Jan de Nul*    **44**.68
        *Mitchell*    **44**.71
        *SPP*    **36**.53
        *Total*    **44**.70
    official (AFR 34 (1))    **36**.11, **36**.14, **36**.52,
        **44**.65, **68**.11
    procedural    **44**.61–71
        inclusion in request    **36**.33
        interpretation/translation    **11**.10, **44**.66
        language of request, relevance    **36**.14,
            **44**.62
        parties' right to agree on one or two
            languages    **44**.64

**languages (*cont.*)**
  request
    IR 1(1)   **44**.62
    proceedings distinguished   **36**.14, **44**.62
    supporting documentation   **36**.15,
      **36**.52–3
**Laos, non-participation   68**.8
**Latin America**
  diplomatic protection in   **27**.15
    Calvo Doctrine and   **27**.3
  participation in ICSID Convention   **68**.9–11
**legal dispute as jurisdictional requirement,**
    **"arising directly"   25**.83–112
  absence of definition   **25**.83
  activities linked to investment, sufficiency
      **25**.101–3
    *Duke Energy*   **25**.102
    *Enron*   **25**.102
    *Joy Mining*   **25**.103
    *Mitchell*   **25**.102
    *PSEG*   **25**.102
    *Saipem*   **25**.102
    *Tokios Tokelès*   **25**.101
  ancillary transactions   **25**.84, **25**.93–105
    tax dispute   **25**.97–8
  "arising out of or in connection with any
      investment", rejection of formula
      **25**.83
  counterclaims   **25**.84
  disputes not arising directly, settlement
      procedures, *ad hoc* arbitration
      incorporating ICSID Rules/
      Secretary-General as appointing authority
      **25**.87
  "fundamental to the investment", notification
      of limitation to   **25**.105
  general measures affecting investments
      **25**.106–11
    *AES*   **25**.109
    *Camuzzi*   **25**.111
    *CMS*   **25**.107–8
    *Continental Casualty*   **25**.110
    *El Paso*   **25**.111
    *Gas Natural*   **25**.111
    *LG&E*   **25**.111
    *Pan American*   **25**.111
    *Sempra*   **25**.111
    *Suez et al.*   **25**.111
  inclusion of information in request for
      proceedings (IR 2(1)(e))   **25**.86,
      **25**.123
  indirect investment   **25**.88–92
    *ADC*   **25**.89
    *CMS*   **25**.89
    *Continental Casualty*   **25**.90

    *CSOB*   **25**.89
    *Enron*   **25**.90
    *Fedax*   **25**.88–9, **25**.100
    *Siemens*   **25**.92
  multiple instruments/varying parties
      **25**.94–6, **25**.100–4, **25**.552
    jurisprudence: *CSOB*   **25**.100; *Holiday
      Inns*   **25**.95, **25**.552; *SOABI*   **25**.96
  objective requirement   **25**.85
  parties' consent, relevance   **25**.85, **41**.50
    stipulation of "directness" in case of
      existing dispute/future dispute   **25**.85
  "relating to" (NAFTA) distinguished   **25**.112
    *AES*   **25**.112
    *Continental Casualty*   **25**.112
    *El Paso*   **25**.112
    *Pan American*   **25**.112
    *Suez et al.*   **25**.112
  rights and obligations of general
      application/arising out of investment
      agreement distinguished   **25**.97–8
  tax disputes
    *Amco I*   **46**.26, **46**.80
    *Amco II*   **25**.97–8, **46**.91
    *Kaiser Bauxite*   **25**.99
**legal dispute as jurisdictional requirement,**
    **availability of non-judicial means of**
    **settlement and**
  application of principles of equity and
      **25**.81
  conciliation   **25**.76–82
  parties' request for arbitral decision *ex aequo
      et bono*   **25**.76–82
  settlement of dispute by parties (AR 43)
      **25**.82
**legal dispute as jurisdictional requirement,**
    **conciliation/arbitration**, separate
    treatment, suggestions for   **25**.19
**legal dispute as jurisdictional requirement,**
    **critical date   25**.48–56
  crystallization of new dispute   **25**.55
  events giving rise to dispute and "dispute"
      distinguished   **25**.50–2
  jurisprudence
    *Helnan*   **25**.56
    *Impregilo*   **25**.49
    *Jan de Nul*   **25**.54–5
    *Lucchetti*   **25**.53
    *Maffezini*   **25**.51–2
    *MCI*   **25**.50
    *Micula*   **25**.50
    *Salini* v. *Jordan*   **25**.49
  limitation of consent to disputes or claims
      arising before entry into force of BIT,
      **25**.49–56: *see also* non-retroactivity

**legal dispute as jurisdictional requirement, "dispute", definition and requirements** **25**.41–56
actual dispute of immediate interest to parties **25**.44–6
clearly identified issues **25**.44
contact between parties **25**.43
definition (ICJ) **25**.42
divergence distinguished **25**.56
exhaustion of other remedies, relevance **25**.43
jurisprudence
   *AAPL* **25**.43
   *AGIP* **25**.47
   *Continental Casualty* **25**.45
   *Enron* **25**.45
   ICJ **25**.42
   *Micula* **25**.45
   *Pan American* **25**.46
measures to remedy, relevance **25**.47, **25**.75
uncertainty as to measure of damages, relevance **25**.46
**legal dispute as jurisdictional requirement, fact-finding and**
*see also* fact-finding proceedings
incidental to **25**.29, **25**.74
as independent issue **25**.29
possible exclusion **25**.29
**legal dispute as jurisdictional requirement, "legal"**
claimant's responsibility for presentation as **25**.60–3, **25**.81
   in advance **25**.62–3
   documents, relevance **25**.61
   IR 2(1)(e) **25**.61
   IR 2(2) **25**.61
   Model Clauses (1968) **25**.63
   Model Clauses (1981) **25**.62, **25**.85
   Model Clauses (1993) **25**.63
criteria **25**.57–67
   *Alcoa* **25**.64
   *Continental Casualty* **25**.65
   legal remedies based on legal rights **25**.60, **25**.64
   legal rights and obligations based on agreement **25**.64–6
   *Suez et al.* **25**.66
"dispute of a legal character", significance of change from **25**.58
examples of **25**.60
objective requirement **25**.80
proposal for definition **25**.57–8
proposal for deletion **25**.57

questions of fact **25**.75
reason for inclusion
   developing countries' concerns **25**.77
   exclusion of conflicts of interest **25**.59, **25**.77
   exclusion of political or commercial disputes **25**.57, **25**.122, **25**.511
   Executive Directors' Report **25**.59
   renegotiation of long-standing agreement as bar to **25**.78–81: *see also* investor/host State agreements, renegotiation (ICSID jurisdiction)
   legal basis for demand and **25**.79
**legal status and capacity of investor, applicable law** **25**.341, **42**.10–12, **42**.157–9
*Amco II* **25**.341, **42**.158
*Scimitar* **42**.159
**legislation:** *see* national legislation
*LESI & Astaldi*
assignment/succession of investor's rights and responsibilities **25**.343
"investment"
   contribution to economic development requirement **25**.165
   "in the territory" requirement **25**.195
*LESI-DIPENTA*
"investment"
   contribution to economic development requirement **25**.165
   "in accordance with host State law" **25**.201
   "in the territory" requirement **25**.195
*LETCO*
ancillary claims, simultaneous determination, jurisdiction, need for **46**.92
applicable law
   in absence of agreement between parties, finding of absence, need for **42**.134
   agreement between parties: implicit agreement **42**.64, **42**.76; international law/general principles of law; in absence of its choice **42**.106; as part of chosen domestic law **42**.100
assignment/succession of investor's rights and responsibilities **25**.342
closure of proceedings **49**.19
confidentiality of proceedings **48**.118
constituent subdivision or agency as party to proceedings, designation, dependence of jurisdiction on **25**.265
Contracting State status, critical date **25**.218
costs and expenses, procedural misconduct and **43**.27, **61**.22

***LETCO** (cont.)*
  exclusive remedy rule
    obligation of domestic court to decline
      jurisdiction   **26**.134: penalties for
      failure   **26**.134
  failure of party to appear or to present case
    duty of tribunal to examine merits of
      parties' assertions   **43**.24,
      **45**.18–19
    effect   **43**.24, **45**.74
    obligation   **45**.44
    period of grace   **45**.88
    proceedings *in absentia*   **45**.60
  failure of party to cooperate or cooperate fully
    **45**.25, **45**.52
  failure of party to meet time limits   **45**.84
  foreign control for purposes of treatment as
      national of another State
    change following consent   **25**.876
    critical dates   **25**.876
    form and extent of control, decision-making
      structure and management   **25**.855,
      **25**.876
    as objective requirement/evidence of
      **25**.819
  international law/host State law,
      interrelationship   **42**.215
  "investment"   **25**.133
  jurisdiction, objections to, Tribunal's
      examination on own initiative   **41**.54,
      **45**.15
  national of another Contracting State,
      agreement to treat as
    implicit agreement, possibility of   **25**.784,
      **25**.819
    test   **25**.765
  publication of award, parties' consent to,
      enforcement proceedings and
      **48**.118
  recognition and enforcement of arbitral award
      (ICSID)
    "enforcement"/"execution", failure to
      distinguish   **54**.67
    recognition, as preliminary to enforcement
      **54**.56–60, **54**.96, **54**.105, **54**.114
  resignation of conciliator/arbitrator   **56**.24
  stabilization clause   **42**.122–3
  State immunity from execution
    protected property   **55**.35–6,
      **55**.65–7
    waiver   **54**.67, **55**.75
  supplementation or rectification of award
      **49**.44–5
***LETCO** (**rectification**), costs, fees and expenses,*
    rectification of decisions on   **61**.69

*lex fori*
  enforcement of award   **54**.2, **54**.47, **54**.74,
      **54**.105, **54**.110–15, **55**.1, **55**.6, **55**.11,
      **55**.13
  ICSID Convention as   **42**.13, **42**.49
*lex mercatoria*   **42**.36 n60
*LG&E*
  applicable law, agreement between parties,
      BIT agreement without express choice of
      law clause   **42**.94–5
  "award", partial award distinguished   **48**.27
  customary international law as source of
      international law   **42**.176
  fork in the road clauses   **26**.70
  incidental or additional claims "arising
      directly out of subject-matter of the
      dispute"   **46**.85
  international law, applicability in investment
      disputes   **42**.197, **42**.203
  international law/host State law,
      interrelationship   **42**.226, **42**.238
  legal dispute "arising directly", general
      measures   **25**.111
  *stare decisis* and   **53**.17
  supplementation or rectification of award
      **49**.66–7
***Libanaco**, immunities and privileges*
    (participants in proceedings)   **22**.10
**Libya**, non-participation   **68**.8
*lis pendens*   **26**.133
**lodging fee**
  level   **36**.16
  non-payment, effect   **36**.16
  non-refundability   **36**.16, **36**.66
  renewal of request for arbitration and
      **36**.58
  requirement for   **36**.16, **36**.66
*Loewen*
  confidentiality of proceedings/publication
      **44**.109
  exhaustion of local administrative or judicial
      remedies   **26**.222
*Lucchetti*
  *ad hoc* committee, appointment to   **52**.454
  *ad hoc* committee, decision, majority decision
      requirement   **52**.564
  annulment of award, grounds
    failure to apply correct applicable law
      **52**.202
    failure to hear other party (*audiatur et altera
      pars*)   **52**.316
    failure to state reasons, quality/sufficiency
      of reasons   **52**.384
    manifest excess of powers   **52**.151,
      **52**.170, **52**.202

multiple grounds/classification difficulties
**52**.114
serious departure from fundamental rule of
procedure, failure to comply with
evidentiary standards   **52**.332
consent to ICSID jurisdiction, critical date
**25**.502–3
evidence, tribunal's discretionary powers
**52**.332
exclusive remedy rule   **26**.118
existence of legal dispute   **25**.53
national of another Contracting State,
agreement to treat as   **25**.773
shareholders as parties to dispute   **25**.793
stay of enforcement in annulment proceedings
**52**.585

**Macao**, application of Convention to
**70**.10 n7
**Madagascar**, Investment Code 1989   **25**.301,
**25**.518 n695
*Maffezini*
consent to ICSID jurisdiction, critical date
**25**.500–1
constituent subdivision or agency, designation
as and State responsibility for acts of
distinguished   **25**.234
exhaustion of local administrative or judicial
remedies   **26**.204, **26**.205, **26**.211–13
existence of legal dispute   **25**.51–2
MFN clause, applicability to dispute
settlement provisions   **25**.568–9
provisional measures
binding effect/legal status   **47**.18
circumstances requiring   **47**.64
financial guarantee/pre-judgment security
**47**.94
priority and speed, need for   **47**.41
purpose/rights to be protected, preservation
of rights in dispute   **47**.161, **47**.169
supplementation or rectification of award
**49**.49–50
**majority decision:** *see* arbitral award (ICSID),
majority decision
*Malaysian Historical Salvors*
confidentiality of proceedings/publication of
award   **44**.108, **48**.111
"investment"   **25**.124, **25**.127
criteria   **25**.157, **25**.167–70
*Manufacturers Hanover Trust*
consent to ICSID jurisdiction, national
legislation as consent or offer
**25**.405
constituent subdivision or agency, status as
**25**.246, **25**.266

*MCI*
applicable law, in absence of agreement
between parties   **42**.148
existence of legal dispute   **25**.50
international law/host State law,
interrelationship   **42**.227
**Memorandum of Administrative
Arrangements (1967):** *see* World
Bank–ICSID Memorandum of
Administrative Arrangements (1967)
**MERCOSUR Protocols**
applicable law provisions, acceptance as
implicit agreement   **42**.88
concurrent arbitration provisions   **25**.462,
**26**.22
consent to ICSID jurisdiction   **25**.462
foreign control for purposes of treatment as
national of another State   **25**.810,
**25**.869
"investment"   **25**.147
nationality provisions   **25**.659, **25**.722
as source of international law   **42**.171
*Metalclad*
ancillary claims, simultaneous determination,
presentation of ancillary claim, time
limits   **46**.23
confidentiality of proceedings/publication
**44**.115
interest, claim for   **46**.57
**Mexico**, non-participation   **68**.10
**MFN clause, applicability to dispute
settlement provisions   25**.567–77
Energy Charter Treaty (1994) and   **25**.567
exhaustion of local administrative or judicial
remedies obligation   **25**.550
jurisprudence
*Gas Natural*   **25**.570
*Maffezini*   **25**.568–9
*Plama*   **25**.573
*RosInvest*   **25**.575 n781
*Salini* v. *Jordan*   **25**.572
*Telenor*   **25**.574
NAFTA (1992) and   **25**.567
*Micula*
existence of legal dispute   **25**.45, **25**.50
nationality (natural person)   **25**.645
*Middle East Cement*
ancillary claims, simultaneous determination
incidental or additional claims arising out of
third party contracts   **46**.39
presentation of ancillary claim, time limits
**46**.20
applicable law, agreement between parties,
BIT agreement without express choice of
law clause   **42**.90

*Middle East Cement (cont.)*
   applicable law, agreement between parties,
      implicit agreement    **42**.83
   evidence, taking of, evaluation/probative value
      **43**.106
   experts    **43**.101
   fork in the road clauses    **26**.61
*Mihaly*
   assignment/succession of investor's rights and
      responsibilities    **25**.352–5, **25**.361
   competence of tribunal, Secretary-General's
      screening role and    **41**.14
   diplomatic protection    **25**.749
   "investment", pre-investment activities
      **25**.176–7
*MINE*
   AAA *ex parte* award    **26**.9, **26**.115
     District Court proceedings to confirm
      **26**.9
     enforcement    **26**.14
   *ad hoc* committee, decision as "award",
      reasons, need for    **61**.72
   annulment of award
     partial, effect on other parts of award
      **52**.507
   annulment of award (general), appeal
     distinguished    **52**.13, **52**.18, **52**.23,
     **52**.31, **52**.33, **52**.372
   annulment of award, grounds
     *ad hoc* committee's right to identify new
      **52**.533
     decision *ex aequo et bono* without
      agreement of parties    **42**.17, **42**.264,
      **52**.199, **52**.245
     exclusion of new arguments on fact or law
      **52**.13, **52**.108
     failure to deal with every question submitted
      **49**.72, **52**.409, **52**.412, **52**.417, **52**.424,
      **52**.431
     failure to hear other party (*audiatur et altera
      pars*)    **44**.23, **52**.312
     failure to state reasons: absence of reasons
      **52**.352; contradictory reasons    **48**.63–4,
      **52**.393–5; quality/sufficiency of reasons
      **52**.372–3, **52**.388; waiver, right of
      **52**.340
     failure to state reasons for costs and
      expenses    **61**.42–3
     interpretation of Article 52    **52**.18, **52**.23,
      **52**.31, **52**.33
     manifest excess of powers    **52**.154: failure
      to apply correct applicable law    **42**.17,
      **52**.213, **52**.220, **52**.242
     multiple grounds/classification difficulties
      **52**.417, **52**.527

     serious departure from fundamental rule of
      procedure, "serious
      departure"/"fundamental rule"    **44**.23,
      **52**.220, **52**.282–3
   applicable law, place of proceedings, relevance
      **42**.62 n105
   appointment to tribunal from outside Panel
      **40**.9 n3
   closure/reopening of proceedings (AR 38)
      **49**.21
   compliance with ICSID award
     State immunity and    **53**.37
     stay of enforcement and    **53**.49
   consent clause, ambiguity    **25**.22
   constitution of tribunal    **37**.32
   costs and expenses
     failure to state reasons for    **61**.42–3,
      **61**.72
     "loser pays"    **61**.23
     procedural misconduct and    **61**.23
   enforcement of non-ICSID award,
     prejudgment attachments distinguished
     **26**.151, **26**.167
   *ex aequo et bono* jurisdiction, parties'
     agreement    **42**.17
   exclusion of appeal to domestic courts
     **53**.21
   exclusive remedy rule    **26**.9–14
     attachment proceedings    **26**.149–52
     failure to protest improper pursuit of
      remedies in non-ICSID forum    **26**.115,
      **26**.153: costs and expenses, effect on
      **26**.115, **26**.153
     obligation of non-ICSID forum to decline
      jurisdiction    **26**.115
   failure of parties to file consent to arbitrate or
     formally request arbitration    **26**.9
   international law/host state law,
     interrelationship    **26**.13
   jurisdiction, objections to, Tribunal's failure to
     raise on own initiative    **41**.46
   nationality (juridical persons), agreement
     between investor and host State
     **25**.711–14
   obligation to annul, whether    **52**.471–2
   power to confirm award    **52**.489
   proceedings under US Federal Arbitration Act
     (FAA) to compel AAA arbitration
     **26**.9
     Guinea's failure to appear    **26**.9,
      **26**.115
   provisional measures    **26**.151–2
     enforcement, domestic courts' role    **47**.27
     exclusive right of tribunal, whether
      **26**.167–8

*Index by Subject*                                                    1479

modification, refusal of request   **47**.60
non-compliance, effect on award
   **47**.35–6, **47**.109
priority and speed, need for   **47**.40
purpose/rights to be protected, exclusive
   nature of ICSID proceedings   **47**.109
stay of proceedings in domestic
   courts/injunction against   **47**.106–9,
   **47**.171
recognition and enforcement of arbitral award
   (ICSID), stay of enforcement and
   **54**.38
resubmission of dispute after annulment
   **52**.660
   stay of enforcement and   **52**.700
stabilization clause   **42**.26, **42**.37
State immunity   **26**.9–14
State immunity from execution   **26**.150
State immunity from jurisdiction, waiver
   **26**.9, **26**.10
stay of enforcement in annulment proceedings
   circumstances requiring   **52**.598, **52**.610,
      **52**.611, **52**.614, **52**.624, **52**.632–3,
      **52**.654
   compliance obligation and   **52**.579
   discretionary nature   **52**.594
   procedure (AR 54), priority of request
      **52**.598
   security for eventual payment of award
      **52**.632–3
   termination, partial annulment and
      **52**.654
supplementation or rectification of award,
   exclusive remedy, whether   **49**.72
*MINE* (**US courts**)   **62**.5
   consent clause, place of proceedings   **62**.5
*Mitchell*
   *ad hoc* committee, appointment to   **52**.454
   annulment of award (general), appeal
      distinguished   **52**.13, **52**.203
   annulment of award, grounds
      exclusion of new arguments on fact or law
         **52**.13, **52**.203
      failure to state reasons   **25**.166:
         quality/sufficiency of reasons
         **52**.380–1
      interpretation of Article 52   **52**.19,
         **52**.40–1
      manifest excess of powers   **25**.166,
         **52**.146, **52**.159–62: failure to apply
         correct applicable law   **52**.203
      multiple grounds/classification difficulties
         **52**.115, **52**.530
   compliance with ICSID award, State immunity
      and   **53**.38

excluded classes of disputes, notification
   **25**.937
"investment"   **25**.127
"investment" (contribution to economic
   development requirement)   **25**.166,
   **52**.159–62
languages   **44**.71
legal dispute "arising directly"   **25**.102
obligation to annul, whether   **52**.476
stay of enforcement in annulment proceedings
   circumstances requiring   **52**.610, **52**.617,
      **52**.626
   procedure (AR 54)   **52**.603
   security for eventual payment of award
      **52**.640
*Mobil Oil*
   Arbitration Rules (AR), agreement to use
      updated version   **44**.49
   international law/host state law,
      interrelationship   **42**.212
   proceedings other than at Centre   **63**.11,
      **63**.25
*Mobil Oil* (**NZ proceedings**)
   applicable law, agreement between parties,
      host State law   **42**.24
   appointment to tribunal by Chairman   **37**.19
      n20, **38**.26
   jurisdiction, objections to, tribunal's failure to
      raise on own initiative   **41**.47
   president of tribunal, nationality   **39**.18 n15
   separability of issues in dispute   **26**.155
   stay of proceedings (ICSID) by domestic court
      **26**.155–7, **41**.17, **69**.7
**Model Clauses**
   purpose and value   **25**.385
   revisions to   **25**.385
**Model Clauses (1968)**   **25**.393 n530
   VI   **25**.769
   VII   **25**.316, **25**.363
   IX   **25**.129
   X   **25**.221
   XI   **25**.221
   XII   **25**.221, **25**.228
   XIII   **23**.540
   XIV   **46**.10 n7
   XV   **46**.10 n7
   XVI   **26**.18
   XVIII   **37**.17 n19
   XIX   **42**.118 n201
   XIX–XXI   **42**.22
   XX   **42**.118 n201
   XXIII   **44**.48 n67
   XXV   **46**.9
   XXVI   **47**.9
   XXVII   **47**.9

**Model Clauses (1968) (*cont.*)**
  XXVIII  **48**.111
  XXIX  **35**.4
  XXX  **60**.12
  XXXI  **61**.10 n5
  XXXII  **63**.10
**Model Clauses (1981)**
  III  **25**.221, **25**.228
  IV  **25**.62, **25**.85, **25**.129
  V  **46**.10 n7
  VIII  **25**.769
  X  **37**.17 n19
  XI  **63**.9 n4
  XII  **60**.12
  XIII  **61**.10 n5
  XV  **26**.18
  XVII  **42**.22
  XIX  **55**.103
**Model Clauses (1993)**
  1  **25**.21, **25**.386, **60**.12
  2  **25**.21, **25**.386, **25**.387
  3  **25**.129
    "strengthening of presumption . . . of an
    investment"  **25**.129
  4  **25**.515, **46**.10
  5  **25**.910–11
  6  **25**.293, **25**.657, **25**.658, **25**.709
  7  **25**.769, **25**.775, **25**.785, **25**.787, **25**.796
  8  **25**.370–1
  9  **37**.17–20
  10  **42**.22, **42**.118
  11  **42**.254
  12  **26**.18
  13  **26**.207
  14  **26**.181, **26**.182, **47**.9 n14, **55**.95,
    **55**.109–10
  15  **54**.9, **55**.102
  16  **44**.48
  17  **44**.25
  18  **61**.10
  19  **63**.9
  20  **25**.225
  21  **25**.32, **25**.34
  22  **11**.19
  Additional Facility and  **25**.206
  conciliation/arbitration choice  **25**.21
**Model Clauses for Use in Bilateral Investment
    Agreements (1969)**  **25**.428, **25**.455
    n434, **27**.21, **27**.34–5
**Moldova**, signature/ratification  **68**.8
***Mondev***, consent to ICSID jurisdiction,
    interpretation, restrictive/extensive
    approach  **25**.591
**Mozambique**, Law of Investment 1993
    **25**.523

*MTD*
  *ad hoc* committee, appointment to  **52**.454
  annulment of award, grounds
    decision *ex aequo et bono* without
      agreement of parties  **52**.247
    exclusion of new arguments on fact or law
      **52**.12, **52**.108
    failure to hear other party (*audiatur et altera
      pars*)  **52**.315
    failure to state reasons: absence of reasons
      **52**.359; contradictory reasons  **52**.398;
      quality/sufficiency of reasons  **52**.382
    interpretation of Article 52  **52**.35
    manifest excess of powers  **52**.149: failure
      to apply correct applicable law
      **52**.220–1
    multiple grounds/classification difficulties
      **52**.116
  applicable law, agreement between parties,
    BIT agreement without express choice of
    law clause  **42**.91
  arbitrators' fees  **60**.11
  costs and expenses  **61**.39
  evidence, tribunal's discretionary powers
    **43**.22
  *ex aequo et bono* jurisdiction, equitable
    considerations distinguished  **42**.271
  national of another Contracting State,
    agreement to treat as  **25**.773
  resignation of conciliator/arbitrator  **56**.27
  shareholders as parties to dispute  **25**.793
  stay of enforcement in annulment proceedings
    **52**.588
    circumstances requiring  **52**.610, **52**.611,
      **52**.619
    procedure (AR 54)  **52**.604
    security for eventual payment of award
      **52**.641
  suspension and resumption of proceedings
    under ICSID 56(1), effect  **56**.13
  **multiple instruments/varying parties
      (investment agreements)**  **25**.94–6,
      **25**.100–4, **25**.388–91, **25**.551–66,
      **25**.598: *see also* multiple
      instruments/varying parties (investment
      agreements); parties to the dispute,
      complexities in corporation structure and
  ancillary transactions  **25**.93–105
  "arising directly" requirement: *see* legal
    dispute as jurisdictional requirement,
    "arising directly", multiple
    instruments/varying parties
  critical date and  **25**.468
  incorporation of BIT clause into investment
    agreement  **25**.390

jurisprudence
  *AGIP*    **25**.328
  *Amco I*    **25**.324–6, **25**.389
  *CSOB*    **25**.100, **25**.390, **25**.562–3
  *Duke Energy*    **25**.561, **25**.564
  *Fedax*    **25**.100
  *Holiday Inns*    **25**.95, **25**.552
  *Klöckner I*    **25**.327, **25**.553–7, **46**.77
  *SOABI*    **25**.96, **25**.558–9
  *Tesoro*    **25**.560, **32**.7
  tax dispute    **25**.97–8
  tribunals' broad approach    **25**.561–5
  "unity of investment" approach    **25**.93–105,
    **25**.561–5, **26**.51
**municipal law:** *see* domestic courts;
    international law/host State law,
    interrelationship; national legislation
**Myanmar**, non-participation    **68**.8
*Myers*, independence of arbitrator    **40**.24

**NAFTA (1992)**
  Additional Facility and    **25**.226
  *amicus curiae* briefs    **44**.123
  applicable law provisions    **42**.36
    acceptance as implicit agreement    **42**.85
  concurrent arbitration provisions    **25**.458
    Additional Facility    **26**.22
    ratification of ICSID Convention,
      dependence on    **26**.22
    UNCITRAL Rules    **26**.22
    waiver of right to    **26**.112–13: *Waste
      Management I* **26**.113; *Waste
      Management II* **26**.113
  confidentiality of proceedings    **44**.97
  consent to ICSID jurisdiction    **25**.457–9
    conditions, time limits for request    **36**.17
    critical date for purposes of jurisdiction
      **25**.510
    limitations    **23**.535
    place of proceedings and    **63**.13
    request, requirements    **36**.21
  consolidation of proceedings and    **26**.125,
    **26**.126
  consultation or negotiations obligation
    **25**.542
  continuity of nationality requirement
    **25**.756
  experts    **43**.96
  foreign control for purposes of treatment as
    national of another State    **25**.810,
    **25**.869
  ICSID Secretary-General as appointing
    authority    **11**.16
  interest    **46**.44 n48
  "investment"    **25**.146

  "in the territory" requirement    **25**.190
  pre-investment treaty rights, relevance
    **25**.181
  "measures relating to" investors and
    investments    **25**.112
  MFN clause, applicability to dispute
    settlement provisions    **25**.567
  national arbitrators, right to appoint    **39**.25
  non-compliance with award    **53**.45
  number and appointment of arbitrators
    **37**.24, **38**.27
  place of proceedings    **63**.13
  presiding arbitrators, roster    **12**.2 n2, **37**.24
  provisional measures    **47**.10, **47**.158
    in domestic courts    **26**.183
  publication of awards    **48**.108
  recognition/enforcement of award    **54**.22
    in case of revision, supplementation/
      rectification or annulment proceedings
      **54**.101
  as source of international law    **42**.171
  stay of enforcement    **53**.55–6
  submission to arbitration, requirements
    **25**.459
**national of another Contracting State**
  **Preamble** 16: *see also* Contracting State;
      national of another Contracting State,
      agreement to treat as; nationality
      (juridical persons); nationality (natural
      persons)
  Additional Facility
    host State not a Contracting State    **25**.300:
      BITs    **25**.301; legislative provision
      **25**.301
    State of nationality not a Contracting State
      **25**.300: BITs    **25**.301
  consensual element in determining    **25**.638,
    **25**.762
  critical date for determination    **25**.35,
    **25**.679–87
  direct access of non-State party to
      international forum
    advantages    **25**.269
    objections    **25**.269
    purpose of Convention    **25**.268–9
  government-controlled entity as    **25**.271–6
  identification as such a national, need for
    **25**.289–98, **25**.658
    agreement to treat as national of another
      Contracting State distinguished    **25**.709
    in arbitration agreement    **25**.296
    at time of consent    **25**.290–3: careful
      drafting, need for    **25**.291; diplomatic
      protection and    **25**.292; Model Clauses
      (1993)    **25**.293, **25**.709

**national of another Contracting State (*cont.*)**
  identification as such a national (*cont.*)
    entities in BIT arbitration not all having
        nationality of same State party to BIT and
        **25**.297–8, **25**.835–7
    on institution of proceedings    **25**.290,
        **25**.294–6: "agreement to treat as" and
        **25**.296, **25**.795–805, **25**.892, **25**.900;
        consequences attached to nationality
        **25**.295; IR 2(1)(d)    **25**.294–6; refusal of
        request, possibility    **25**.294
    jurisprudence: *Camuzzi I*    **25**.297,
        **25**.835–7; *Sempra*    **25**.297, **25**.835–7
  multipartite proceedings
    multiple host States    **25**.282
    multiple investors    **25**.277–81: *Goetz*
        **25**.280; *Klöckner I*    **25**.279; number of
        co-claimants, relevance    **25**.281
    single proceedings    **25**.279
  natural and juridical persons distinguished
        **13**.11, **25**.637, **25**.688, **25**.752–3,
        **25**.873–4
  non-compliance, *ad hoc* arbitration    **25**.302
  objective requirement    **41**.50
  possibility of various nationalities all of
        Contracting States    **25**.289
  private investor, government-controlled entity
        as    **25**.271–6
    Comment to the Preliminary Draft
        **25**.271
    criteria    **25**.271–6
    functional test    **25**.271–6
    jurisprudence: *CDC*    **25**.273; *CSOB*
        **25**.272; *Rumeli Telekom*    **25**.275;
        *Telenor*    **25**.274
  status as, corporations having seat or
        registration in territories covered by
        Article 70    **25**.286
  validity of consent to jurisdiction prior to home
        State's ratification    **25**.287–8, **67**.2
    *Holiday Inns*    **25**.288
**national of another Contracting State,**
    **agreement to treat as**
  "... because of foreign control": *see* foreign
        control for purposes of treatment as
        national of another State
  drafting history    **25**.761–3, **25**.896
  dual/multiple nationality and    **25**.766
  exceptional nature of provision    **25**.777
  Executive Directors' Report    **25**.763
  "for the purposes of this Convention"
    *ad hoc* committee membership and
        **25**.902
    applicability to all nationality provisions
        **25**.897–902, **27**.29

constitution of tribunal and    **25**.897–902:
    difficulties    **25**.900–1; *SOABI*
    **25**.898–9
diplomatic protection and    **27**.24–9
drafting history    **25**.896
form of agreement    **25**.768–74
  BITs    **25**.773, **25**.807–9
  *compromis*    **25**.772
  joint request (IR 1(2))    **25**.772
  jurisprudence: *Aguas del Tunari*    **25**.773;
    *Autopista*    **25**.771; *Genin*    **25**.773;
    *Lucchetti*    **25**.773; *MTD*    **25**.773;
    *Tanzania Electric*    **25**.770; *Vivendi I*
    **25**.773
  legislation/treaty offer: additional direct
    agreement, desirability    **25**.812; need
    for acceptance    **25**.811
  Model Clauses (1968–93)    **25**.769,
    **25**.775
  multilateral treaties, offer: Cartagena Free
    Trade Agreement (1994)    **25**.810;
    Energy Charter Treaty (1994)    **25**.810;
    MERCOSUR Protocols    **25**.810;
    NAFTA (1992)    **25**.810
  national legislation    **25**.773, **25**.806
  subsidiary agreement, preference for
    **25**.779
  unambiguous statement, desirability
    **25**.787
formalities
  agreement between parties to dispute
    **25**.811
  documentation, submission at time of
    request (IR 2(2))    **25**.774, **25**.776:
    defective documentation, effect
    **25**.774; evidence of nationality
    distinguished    **25**.774
  identification of controlling nationality,
    relevance (IR 2(1)(d))    **25**.296,
    **25**.795–805, **25**.892, **25**.900: imprecision,
    effect    **25**.797–805; Model Clauses
    (1993)    **25**.796; multiple nationalities
    **25**.796
  jurisprudence: *Amco I*    **25**.799–800,
    **25**.805; *Cable TV*    **25**.774; *Holiday Inns*
    **25**.798; *SOABI*    **25**.801–2,
    **25**.805
  requirements for consent to jurisdiction
    distinguished    **25**.776
implicit agreement, possibility of
    **25**.775–94, **25**.821
  consent to jurisdiction as    **25**.776, **25**.788:
    limitation to cases of direct agreement
    between investor and host State
    **25**.790

jurisprudence: *Amco I*  **25**.780–1; *Cable TV*  **25**.786; *Holiday Inns*  **25**.778–9; *Klöckner I*  **25**.783, **25**.817; *LETCO*  **25**.784, **25**.819; *Vacuum Salt*  **25**.785

purpose of provision  **25**.760
  foreign investor corporation established under host State  **25**.764–5
shareholders' direct protection under investment protection treaties and  **25**.792–4
specific provision, desirability  **25**.775, **25**.777
test
  controlling interest  **25**.761–3, **25**.764
  incorporation/seat  **25**.764–5: *Aguas del Tunari*  **25**.765; *Amco I*  **25**.765; *Autopista*  **25**.765; *Cable TV*  **25**.765; *Klöckner I*  **25**.765; *LETCO*  **25**.765; *SOABI*  **25**.765; *Vacuum Salt*  **25**.765; *Vivendi I*  **25**.765
where party status granted to parent companies  **25**.791
**national of another Contracting State, exclusion**
nationals of host State  **25**.633, **25**.636, **25**.679, **25**.893
  in case of dual/multiple nationality  **25**.664–78
constituent subdivision/agency as party and  **25**.767
nationals of non-contracting State  **25**.285, **25**.636, **25**.660
  juridical persons  **25**.285, **25**.741, **25**.894
  reasons: difficulties of enforcement of award  **25**.285; diplomatic protection and  **25**.285; reciprocity of obligations between host State and home State  **25**.285
permanent residents  **25**.659
stateless persons  **25**.660
*National Grid*
disqualification of conciliator or arbitrator, grounds, manifest absence of Article 14 qualities  **57**.57 .30 n30
exhaustion of local administrative or judicial remedies  **26**.205
**national legislation**
applicable law and
  reference to, relevance  **42**.63–9
  specific provision  **42**.23, **42**.63
concurrent arbitration provisions, choice of method as part of licensing process  **25**.411, **25**.422–5

as consent to ICSID jurisdiction: *see* consent to ICSID jurisdiction, national legislation as consent or offer
contingent submission  **25**.223
foreign control for purposes of treatment as national of another State, form and extent of control  **25**.866
ICSID advice on arbitration and investment laws  **1**.6
interpretation, conflict between earlier and later provisions  **26**.43
"investment"  **25**.134–8
  divergence from ICSID usage  **25**.138
national of another Contracting State, agreement to treat as  **25**.773, **25**.806
  diversity of provision  **25**.806
nationality (juridical persons), variety of criteria  **25**.718
**nationality of arbitrators:** *see* tribunal (ICSID), appointment of nationals, limitations on
**nationality (juridical persons)**
absence in Convention of provisions for determining  **25**.696
agreement between investor and host State  **25**.696, **25**.708–17
  absence of challenge  **25**.714
  conditions for effectiveness  **25**.698, **25**.710, **25**.716: deception/misrepresentation and  **25**.716, **25**.800; host State's specific consent  **25**.716; parties' awareness of circumstances  **25**.716, **25**.717
  control test  **25**.710
  desirability  **25**.709
  freedom to determine (First Draft)  **25**.696, **25**.708
  "have agreed should be treated" provision distinguished  **25**.709
  implicit agreement  **25**.716–17
  Model Clauses (1993)  **25**.709
  reasonable connection, sufficiency  **25**.717
applicable law  **42**.9–12
  Article 42, applicability  **42**.10–12
  diplomatic protection compared  **25**.694, **25**.698: treatment of enemy aliens in time of war compared  **25**.694
  domestic law  **25**.689: home State  **25**.693
  national legislation/treaties  **25**.723
BITs provisions
  determinant nature  **25**.723
  implicit agreement distinguished  **25**.717
  variety of criteria  **25**.719–21

**nationality (juridical persons)** (*cont.*)
commission/tribunal's right to raise of own
    initiative (AR 41(2))    **25**.714
continuity of nationality    **25**.755–8
control test ("piercing the corporate veil")
    **25**.695–7
    agreement between parties and    **25**.710,
        **25**.714, **25**.717
    agreement to "treat as" provision
        distinguished    **25**.697
    difficulties in application    **25**.695
    non-Contracting State nationals and
        **25**.695
critical date
    *see also* foreign control for purposes of
        treatment as national of another State,
        critical dates
    consent to jurisdiction    **25**.475, **25**.752–9,
        **25**.871
    consent to jurisdiction, change of nationality
        following    **25**.755–8: acquisition of
        nationality of non-Contracting State and
        **25**.757–8; diplomatic protection and
        **25**.755–8; enforcement of award and
        **25**.755–8; nationality of non-Contracting
        State    **25**.755–8
    double time test, practicality/rejection
        **25**.752–3, **25**.873–4
    drafting history    **25**.753
drafting history    **25**.640, **25**.695–6, **25**.741
dual/multiple nationals    **25**.741–51
    all of Contracting States    **25**.743
    dominant or effective nationality, relevance
        **25**.662, **25**.729, **25**.745
    nationality of host State and: agreement on
        foreign control, need for    **25**.766; mixed
        control    **25**.745; need to establish
        nationality of another Contracting State
        **25**.751; subdivision or agency as party to
        dispute    **25**.675
    nationality of non-Contracting State,
        non-exclusive effect    **25**.744:
        diplomatic protection and    **25**.746–9;
        universality of Convention and
        **25**.750
    reasonable degree of control test
        **25**.745
    specific nationality, need to state (IR
        2(1)(d))    **25**.743
effective link, need for/denial of benefits
    clauses    **25**.728, **25**.736
effective nationality considerations    **25**.729
evidence of
    host State's right to    **25**.717
    IR 2(2)    **25**.759

expropriation as deprivation of foreign control
    and    **25**.634, **25**.895
flexibility, need for    **25**.698
foreign control: *see* foreign control
host State/non-host State, possibility of
    different treatment    **25**.697
incorporation/seat or control as test
    **25**.694–707, **25**.718–22, **42**.10
    as "domestic law of Contracting State"
        **25**.695
    in excluded territories    **25**.286
jurisprudence
    *ADC*    **25**.736
    *Amco I*    **25**.703
    *Autopista*    **25**.747
    *Banro*    **25**.748
    *Barcelona Traction*    **25**.694, **27**.24
    *CDC*    **25**.715
    *Impregilo*    **25**.692
    *Kaiser Bauxite*    **25**.699
    *LESI-DIPENT*    **25**.691
    *Loewen*    **25**.756
    *Mihaly*    **25**.749
    *MINE*    **25**.711–14
    *Rompetrol*    **25**.737–9, **25**.754
    *Siag*    **25**.754
    *SOABI*    **25**.700, **25**.703
    *SPP*    **25**.699
    *SPP II*    **25**.699
    *Tokios Tokelès*    **25**.701–2, **25**.723,
        **25**.725–35
    *Vivendi II*    **25**.755
legal personality, need for    **25**.689–93
    BITs provisions    **25**.693
    objective requirement    **25**.693
legal status and capacity and    **42**.10,
    **42**.157–9
multilateral treaty provisions    **25**.659,
    **25**.722
national legislation provisions
    determinant nature    **25**.723
    implicit agreement distinguished    **25**.717
    variety of criteria    **25**.718
national of non-Contracting State, exclusion
    **25**.285, **25**.741, **25**.894
natural persons distinguished    **13**.11, **25**.637,
    **25**.688, **25**.755–8
    date of registration requirement, omission
        **25**.688, **25**.755–8
**nationality (natural persons)**
absence of problems    **25**.640
agreement between investor and host State
    **25**.647, **25**.657–8
    estoppel and    **25**.657
applicable law    **25**.641–7

BITs provisions    **25**.659
    diplomatic protection rules distinguished
        **25**.646–7
    law applicable to merits distinguished
        **25**.642, **42**.9
    law of State of claimed nationality
        **25**.642–5, **42**.9, **52**.184, **52**.206–7:
        exceptions    **25**.642, **25**.644,
        **42**.9
change after consent, effect    **25**.633
    involuntary change    **25**.633
continuity of nationality    **25**.684–7
    diplomatic protection requirements
        distinguished    **25**.684
critical date    **25**.637, **25**.679–87
    change of nationality between relevant dates
        **25**.685, **25**.687
    double consent/registration of request test
        **25**.679–87, **25**.873, **36**.62: application to
        non-possession of host State nationality
        **25**.681, **25**.683; change from date of
        institution    **25**.681; change of
        nationality between request and
        registration    **25**.687
    status as Contracting States distinguished
        **25**.682
drafting history    **25**.640, **25**.641, **25**.648–9,
    **25**.661, **25**.665–7, **25**.680–1
dual/multiple nationals    **25**.661–3
    jurisprudence: *Champion Trading*
        **25**.669–71; *Siag*    **25**.672–4
    nationality of host State, exclusive effect
        **25**.664–78: agreement to contrary,
        ineffectiveness    **25**.668; concurrent
        possession, possibility of    **25**.5441;
        dominant or effective nationality,
        relevance    **25**.662, **25**.668, **25**.670–4;
        Executive Directors' Report    **25**.667;
        involuntary acquisition    **25**.678;
        relinquishment of nationality before
        consent    **25**.676–7; subdivision or
        agency as party to dispute    **25**.675
    nationality of non-Contracting State,
        relevance    **25**.661–2, **25**.744–50:
        diplomatic protection and    **25**.663;
        estoppel and    **25**.662
effective link, need for (*Nottebohm* Case)
    **25**.644–5
    failure to challenge    **25**.657
evidence of
    agreement between investor and host State
        **25**.657
    certificate of nationality, conclusiveness
        **25**.648–56
    documentary, need for    **25**.686

juridical persons distinguished    **25**.688,
    **25**.752–3, **25**.873–4
jurisprudence
    *Micula*    **25**.645
    *Olguín*    **25**.645, **25**.646–7
    *Pey Casado*    **25**.656, **25**.677
    *Siag*    **25**.683
    *Soufraki*    **25**.643, **25**.644, **25**.650–5,
        **25**.715, **52**.183–4, **52**.224
    *Vacuum Salt*    **25**.684 n905
nationality of host State, exclusive effect
    involuntary acquisition    **25**.641: after
        consent    **25**.678
    permanent residents
        Energy Charter Treaty (1994)    **25**.659
        MERCOSUR Protocols    **25**.659
    renunciation
        effect    **25**.676–7
        requirements    **25**.676–7
    stateless persons    **25**.660
    Tribunal's right to determine own competence
        and    **25**.643, **25**.652
**natural justice**, rules of procedure and    **44**.4,
    **52**.193, **52**.279
***ne bis in idem* principle**    **26**.31, **26**.114
    annulment of ICSID award and    **53**.32
    ICSID finding of no jurisdiction and    **53**.32
**negotiations obligation:** *see* consultation or
    negotiations obligation
**Netherlands**, State immunity from execution
    **55**.24, **55**.64, **55**.126
**New Zealand**
    Arbitration (International Investment
        Disputes) Act 1979    **26**.155
    stay of proceedings (ICSID) by domestic court
        *Mobil Oil* (NZ proceedings)    **26**.155–7
        national legislation, relevance    **26**.157
**NGOs**, charitable activities as "investments"
    **25**.157 n218
**Niger**, Investment Code 1989    **25**.411, **25**.523
*Noble Energy*
    assignment/succession of investor's rights and
        responsibilities    **25**.343
    constituent subdivision or agency
        designation    **25**.251: estoppel and
            **25**.244; timing    **25**.263
        as party to proceedings, approval of consent
            **25**.907, **25**.912, **25**.914
        status as    **25**.246
    evidence, taking of, "at any stage of the
        proceedings"    **43**.34
*Noble Ventures*
    closure/reopening of proceedings (AR 38)
        **49**.18
    costs and expenses, "loser pays"    **61**.36

*Noble Ventures* (**cont.**)
  evidence, taking of    **43**.8, **43**.71
    "at any stage of the proceedings"    **43**.32
    evaluation/probative value    **43**.113
    refusal by tribunal of request for    **43**.78
  oral procedure    **44**.94 n110
  supplementation or rectification of award
      **49**.64
**non-Contracting State**, possibility of access to
    Centre machinery    **25**.212,
    **25**.213
**non-frustration principle**
  death, incapacity or resignation of
    conciliator/arbitrator and    **56**.2,
    **56**.36–7
  as fundamental Convention principle    **37**.2,
    **37**.3, **38**.1, **45**.5
    object and purpose of Convention
      **47**.154
  non-cooperation on procedure    **44**.18
  provisional measures and    **47**.16, **47**.73–5
**non-interference principle**    **26**.3, **26**.4
*non liquet*, **prohibition**    **42**.2, **42**.13, **42**.245–8
  closing the gaps
      **42**.246–7
    rules of chosen legal system and    **42**.137
  drafting history    **42**.245
  *ex aequo et bono* jurisdiction distinguished
      **42**.246, **42**.250
  exhaustiveness/reasons requirement and
      **42**.245, **48**.45
  failure to make effective choice of law and
      **42**.38, **42**.135–7
  ILC Model Rules on Arbitral Procedure
      (1958)    **42**.245
  majority decision, obligation to reach and
      **48**.16
**non-retroactivity**
  consent limited to violations of treaty and
      **25**.510–12
  continuing breach concept and    **25**.511–12
  jurisprudence
    *Generation Ukraine*    **25**.507 n677
    *Tecmed*    **25**.512
    *Tradex*    **25**.508
  legislation    **25**.508
  treaties    **25**.507
**North Korea**, non-participation    **68**.8

*Occidental*
  provisional measures
    binding effect/legal status    **47**.21
    circumstances requiring    **47**.70–1, **47**.147
    disputed jurisdiction and    **47**.57

    purpose/rights to be protected:
      non-aggravation of dispute    **47**.147;
      preservation of rights in dispute
      **47**.167–8, **47**.169
*Oil Platforms*, jurisdiction, joinder to merits
    **41**.86, **43**.117–18, **52**.332
*Olguín*
  appointment of arbitrators, modification of
      nationality provisions    **39**.21–2
  diplomatic protection    **25**.646
  "foreign" investment requirement
      **25**.184
  nationality (natural persons)    **25**.645,
    **25**.646–7
  preparation of awards    **49**.17
  resignation of conciliator/arbitrator    **56**.24
  tribunal (ICSID), appointment of nationals,
      limitations on    **57**.46
**oral procedure:** *see* written/oral procedure
*ordre public: see* public policy/*ordre public*
      (domestic); public policy/*ordre public*
      (international)

*pacta sunt servanda* **principle**, irrevocability of
      consent and    **25**.598
*Pan American*
  applicable law, standing    **42**.11
  consolidation of proceedings    **26**.127
  existence of legal dispute    **25**.46
  fork in the road clauses    **26**.70
  identical tribunals    **37**.35
  jurisdiction, joinder to merits    **41**.90
  legal dispute "arising directly", general
      measures    **25**.111
  shareholders as parties to dispute    **42**.11
**Panels**
    *see also* qualities/qualifications of conciliators
      and arbitrators (Panel membership)
  CAMCA parallel    **12**.2 n2
  Executive Directors' Report    **12**.3
  NAFTA parallel    **12**.2 n2
  remuneration    **12**.7
  replacement in case of death or resignation
      **15**.6
    effective date    **15**.6, **16**.6
    period of service    **15**.6
  Secretariat staff, exclusion    **9**.6, **40**.26
  separate Panels of conciliators/arbitrators
    consolidated list    **12**.6, **16**.2
    overlapping membership    **12**.6, **13**.3,
      **16**.2
  termination of designation, by designating
      authority    **15**.3
  willingness to serve

appointment as conciliator or arbitrator
  distinguished   **12**.5: Panel member's
  refusal of appointment   **12**.5
confirmation of, need for   **12**.5: AFR 21(3)
  **16**.4
**Panels, designation**
effective date
  date of notification   **16**.6
  expiry of previous Panel member's term of
    office   **15**.6, **16**.6
  replacement in case of death or resignation
    **15**.6, **16**.6
formal requirements
  notification to Secretary-General (AFR 21)
    **13**.2, **16**.4: Secretary-General's duty to
    keep Contracting States informed (AFR
    21(4))   **16**.5
multiple designations
  likelihood   **16**.3
  primacy: designation by State of nationality
    **16**.3; earlier designation   **16**.3
**Panels, designation of members by Chairman**
  **5**.4, **13**.4–6, **40**.4, **40**.11, **56**.32
2008 list   **14**.12
number of designees
  actual (September 2008)   **13**.6
  desirability of shortfall   **13**.6
  potential   **12**.4, **13**.4, **14**.4, **14**.11
purpose of provision   **13**.5
requirements   **14**.9–12
Secretary-General's advisory role   **11**.4, **13**.5
to meet requirements of a particular
  proceeding   **13**.5, **40**.11
**Panels, designation of members by
    Contracting States**   **56**.32
alternatives to, rejection   **13**.1
four per State   **13**.1, **13**.3, **40**.4
implementing legislation   **69**.8
limited usefulness   **13**.5
nationality of designees   **13**.10
non-nationals
  indication of nationality in list   **13**.8
  limited use of provision   **13**.8
  nationals of non-member States of the
    World Bank   **13**.7
  "nationals of other States with . . . some
    affinity"   **13**.7
notification by Secretariat when designation
  due   **13**.3
procedure (AFR 21)   **12**.2, **16**.4
right   **13**.3
  failure to exercise   **13**.3, **13**.5, **14**.5
  importance of exercise   **13**.3
scrutiny, absence   **14**.6

termination   **15**.3
**Panels, list**
consolidated   **12**.6, **16**.2
maintenance by ICSID   **1**.4
  Secretary-General's role   **11**.8
periodic publication
  availability on ICSID website   **12**.6
  new designations in Annual Report
    **12**.6
Secretary-General's duty to keep Contracting
  States informed of status (AFR 21(4))
    **16**.5
**Panels, nationality of members**   **13**.7–11
designation by Chairman
  each to have different   **13**.10:
    representation of principal legal systems
    and   **13**.10
designation by Contracting States   **13**.7–9
  appointment of nationals to tribunals
    distinguished   **13**.9
natural persons, limitation to   **13**.11
**Panels, period of service (six years)**
alternative suggestions   **15**.2
Chairman's right of designation and   **13**.6
continuation of service beyond six years
    **15**.5
designation for less than six years   **15**.3
expiry, effect   **15**.5
  on membership of commission or tribunal
    **15**.4, **40**.12, **56**.1, **56**.31–4
replacement in case of death or resignation
    **15**.6
"subject to the pleasure"   **15**.3
**Panels, representation of principal legal
    systems and main forms of economic
    activity, need for**   **13**.10, **14**.9
in addition to individual qualities and
  qualifications   **14**.9
fair representation of qualified persons from
  both investing and receiving countries
    **14**.11
ICJ Statute origin   **14**.10
importance in view of applicability of
  principles of law common to a group of
  countries   **14**.10
sectors covered   **14**.11
**Papua New Guinea**, notification of excluded
  classes of dispute   **25**.105, **25**.926,
    **46**.11
**parallel treaty and contract claims**   **25**.54–5,
  **26**.73–113: *see also* fork in the road
    clauses
BIT jurisdiction clauses, relevance of
  distinction   **25**.531

1488    *Index by Subject*

**parallel treaty and contract claims (*cont.*)**
breach of treaty and breach of contract claims
distinguished    **26**.83–109
difficulty of making clear-cut distinction
**26**.107–8
crystallization of new dispute    **25**.55
*generalia specialibus non derogant* and
**26**.96
jurisprudence
*AES*    **26**.101
*Azurix*    **26**.89–90
*Bayindir*    **26**.104–6
*CMS*    **26**.86
*Enron*    **26**.91
*Impregilo*    **26**.102–3
*Jan de Nul*    **25**.54–5
*Lanco*    **26**.75
*Salini* v. *Morocco*    **26**.76–7
*SGS* v. *Pakistan*    **26**.87–8, **26**.116–17
*SGS* v. *Philippines*    **26**.93–9
*Vivendi I*    **26**.78–85
parallel proceedings, risks    **26**.109
preservation of ICSID jurisdiction    **26**.83–92
dependence on co-existence of treaty claim
**26**.87–8, **26**.116–18
*Parkerings*, exhaustion of local administrative or
judicial remedies    **26**.228
**partial award**, "award", whether    **48**.27
**partial settlement**    **48**.74
**parties to the dispute**
*see also* constituent subdivision or agency as
party to proceedings; Contracting State;
insurance indemnity, subrogation;
national of another Contracting State;
State succession (parties to the dispute)
consent to jurisdiction, need for    **25**.303
exclusion
home State    **25**.365–6
international organisations    **25**.270,
**25**.365
private status of investor, need for    **25**.270
international organisations, exclusion
**25**.270
investor States, exclusion    **25**.270
**parties to the dispute, complexities in
corporation structure and**    **25**.304,
**25**.319–35: *see also* multiple
instruments/varying parties (investment
agreements)
applicable law    **42**.11–12
claims on behalf of nationals of non-parties to
BIT    **25**.333–4
"group enterprise theory"    **25**.329
joint claimants    **25**.793
jurisprudence

*AGIP*    **25**.328
*Amco I*    **25**.324–6
*Cable TV*    **25**.329 n438
*CMS*    **25**.792, **42**.12
*Holiday Inns*    **25**.320–3
*Impregilo*    **25**.334
*Klöckner I*    **25**.327, **25**.553–7
*Lucchetti*    **25**.793
*MTD*    **25**.793
*Pan American*    **42**.11
*Sempra*    **25**.792
*Vivendi I*    **25**.793
*Zhinvali*    **25**.330–2
provision for in consent clauses, importance
**25**.335
shareholders    **25**.150, **25**.792–4
effect on treatment as national of another
country provision    **25**.792, **25**.794
treatment of local subsidiaries as foreign
national (Article 25(2)(b)) and
**25**.791–4
tribunals' diversity of approach    **25**.329–35
unnamed parent companies    **25**.323–35,
**25**.791, **25**.887
**parties to the dispute, parties not named in
original consent agreement**    **25**.303–
73
insurance indemnity and: *see* insurance
indemnity, subrogation
proceedings against State where consent given
by subdivision or agency    **25**.304,
**25**.311–18, **25**.920
State succession and: *see* State succession
(parties to the dispute)
**peremptory rules of international law/*ius
cogens***, 42.29, 42.273, 52.263: *see also*
public policy/*ordre public* (international)
*Perenco Ecuador*, constituent subdivision or
agency, status as    **25**.246
**Permanent Court of Arbitration**
as model for ICSID    **12**.2
Optional Rules for Arbitrating Disputes
between two parties only one of which is
a State (1993)    **43**.1
Optional Rules for Arbitrating Disputes
between two States (1993)    **43**.1
as place of ICSID proceedings    **63**.14–18
*Pey Casado*
disqualification of conciliator or arbitrator,
grounds    **57**.37–8
disqualification of conciliator or arbitrator,
procedure    **58**.16
nationality (natural person)    **25**.656,
**25**.677
provisional measures

binding effect/legal status  **47**.19

disputed jurisdiction and  **47**.52

financial guarantee/pre-judgment security
**47**.95–6

priority and speed, need for
**47**.42

purpose/rights to be protected: exclusive
nature of ICSID proceedings
**47**.117–18; non-aggravation of dispute
**47**.142; preservation of rights in dispute
**47**.163, **47**.169; preservation of rights of
third parties  **47**.174

stay of proceedings in domestic
courts/injunction against  **47**.117–18

treaties, interpretation  **47**.19

**place of proceedings**

annulment proceedings  **52**.573

applicable law and  **42**.62

arbitration/conciliation proceedings, identity
of provisions  **34**.1

PCA or other appropriate institution,
agreements for  **11**.3

visits and enquiries, costs and expenses
**61**.28

*Plama*

competence of tribunal, Secretary-General's
screening role and  **41**.15

costs and expenses, procedural misconduct
and  **43**.29

evidence, taking of, evaluation/probative value
**43**.112

exhaustion of local administrative or judicial
remedies  **26**.204

"investment", "in accordance with host State
law"  **25**.201

MFN clause, applicability to dispute
settlement provisions  **25**.573

provisional measures

circumstances requiring  **47**.67

priority and speed, need for  **47**.44

purpose/rights to be protected: exclusive
nature of ICSID proceedings  **47**.130;
non-aggravation of dispute  **47**.132,
**47**.146; preservation of rights in dispute
**47**.165–6, **47**.169; preservation of rights
of third parties  **47**.176

stay of proceedings in domestic
courts/injunction against  **47**.130–3

**Poland**, non-participation  **68**.8

**post-hearing submissions**  **49**.14

**pre-hearing conference (AR 21)**  **48**.81–2

agreement on arrangements for  **43**.29

at initiative of

parties  **48**.82

Secretary-General  **48**.82

exchange of information/establishment of facts
and  **43**.9

**pre-judgment measures**  **55**.96

**preliminary procedural consultation (AR 20)**
**44**.28, **48**.11

agreement on

proceedings other than at Centre  **63**.7,
**63**.21

use of updated version of Arbitration Rules
and  **44**.50

draft provisional agenda  **44**.29

methodology  **44**.30

**preliminary procedural consultation (CR 20)**
**32**.6

*prima facie* **case:** *see* jurisdiction, joinder to
merits

**procedural orders**

annulment  **52**.64

awards distinguished  **43**.64, **47**.4, **48**.26,
**48**.40, **48**.45, **48**.88, **48**.104

in case of parties' failure to cooperate
**45**.41

closure of proceeding  **49**.14

costs and expenses  **61**.62

drafting, Secretary-General's responsibility
**11**.10

finality/binding effect  **53**.66

individual opinions and  **48**.104

non-compliance, effect on costs  **61**.28

publication  **48**.121

reasons, need for  **48**.88

recognition/enforcement  **54**.30

taking of evidence and  **43**.55, **43**.58–60,
**43**.61, **43**.119, **43**.120, **43**.123

tribunal's discretionary powers and  **44**.55–8,
**45**.41, **48**.26

**proceedings at approved place (ICSID 63(b))**

AFR  26, **63**.22

AR 13(3)  **62**.12, **63**.20

CR 13(3)  **62**.12, **63**.20

drafting history  **63**.24

proceedings in territory or region of host State
**63**.524–5

*Mobil Oil*  **63**.11, **63**.25

timing of approval  **63**.21

preliminary procedural consultation
**63**.21

videolink/teleconference  **62**.22, **63**.21

World Bank Offices  **63**.23

**proceedings at the Centre (ICSID 62)**

Additional Facility and  **62**.7–10

annulment proceedings  **62**.6

autonomy of ICSID arbitration process and
**44**.3, **53**.22, **62**.3

determination by tribunal  **62**.2

**proceedings at the Centre (ICSID 62) (*cont.*)**
    recognition/enforcement of award and
        **62**.3
    seat of Centre
        default option    **62**.12–13
        as normal venue    **62**.11–16
    Secretary-General's role    **62**.12, **62**.15
    within territory of Contracting State,
        desirability
        consent to ICSID jurisdiction, effect    **62**.5:
            *MINE* (US courts)    **62**.5
**proceedings "at the PCA or any other**
    **appropriate institution" (ICSID 63(a))**
    Additional Facility and    **63**.17 n18
    drafting history    **63**.14–15
        "appropriate institution, whether public or
            private"    **63**.14–15
        Executive Directors' Report    **63**.15
    payment for    **63**.17
    with whom arrangements made    **63**.10–11,
        **63**.16
**proceedings in more than one location**
        **62**.17–22, **63**.21: *see also* evidence,
        taking of, visits and enquiries
    *ad hoc* committee    **62**.20
    jurisprudence    **62**.20
    requirements
        conformity with Article 63    **62**.21
        parties' agreement    **62**.21
**proceedings other than at the Centre "if the**
    **parties so agree" (ICSID 63)**    **2**.3,
    **62**.12, **63**.1, **63**.3–13
    conformity with Article 63 provisions, need
        for    **63**.5, **63**.10
    contractual provision    **63**.11–12
    determining factors    **63**.8
        access to evidence    **63**.8
        convenience    **63**.8
        neutrality    **63**.8
        territory of Contracting State    **63**.8
    freedom of choice    **63**.4–5
    meeting of commission/tribunal without
        parties    **63**.6
    *Mobil Oil*    **63**.11
    Model Clauses (1968)    **63**.10
    Model Clauses (1993)    **63**.9
    requirements, approval of commission/tribunal
        **63**.5
    Secretary-General's role    **63**.19–20, **63**.22
    timing    **63**.7
        instrument consenting to ICSID jurisdiction
            **63**.7
        NAFTA    **63**.13
    timing of agreement, preliminary procedural
        consultation    **63**.7

    within territory of Contracting State,
        desirability    **62**.4, **63**.8
**proportionality**, disclosure of documents and
    **43**.71
**provisional measures (ICSID proceedings)**
    *ad hoc* committee's power to order    **52**.573
        interim measures distinguished    **52**.540
    commission's power to make
        recommendations    **34**.19
        reasons, need to "point out"    **34**.19
    comparable provisions in other international
        instruments    **47**.1
        ICJ Statute as model    **14**.2, **14**.10, **36**.30,
            **41**.75, **47**.1, **47**.19, **47**.72, **51**.1
        NAFTA (1992)    **47**.10, **47**.158
    compliance, refusal to comply    **26**.175
    diplomatic protection, in case of improper
        resort to    **27**.11
    drafting history    **47**.3, **47**.11, **47**.15–16,
        **47**.23–4, **47**.72–4
        as compromise formula    **47**.3
        exclusiveness of tribunal's right    **26**.165
    *MINE*    **26**.151–2
    need for in light of ICSID enforcement
        mechanism    **26**.175
    registration of request for arbitration,
        relevance    **36**.63, **47**.48
**provisional measures (ICSID proceedings),**
    **circumstances requiring**    **47**.63–151
    avoidance of prejudice to merits, importance
        **47**.2, **47**.37, **47**.157
    burden of proof    **47**.64, **47**.65
    hostile propaganda    **26**.184, **47**.137–40
    jurisprudence
        *Azurix*    **47**.66
        *Biwater Gauff*    **47**.68
        *Maffezini*    **47**.64
        *Occidental*    **47**.70–1
        *Plama*    **47**.67
        *Saipem*    **47**.69
        *Tanzania Electric*    **47**.65
    necessity and urgency    **47**.2, **47**.63–71, **47**.87,
        **47**.132
    risk of harm other than pecuniary    **47**.147,
        **47**.166, **47**.168
**provisional measures (ICSID proceedings),**
    **decision/recommendations**
    addressees    **47**.152–6
        absence of provision    **47**.152
        parties, *CSOB*    **47**.156
    annulment    **52**.64, **52**.493, **52**.540
    award, whether    **47**.4, **47**.15, **47**.18, **48**.4,
        **48**.26, **48**.40, **48**.88, **48**.104
    binding effect/legal status    **47**.15–22,
        **53**.66

incorporation in agreement between parties
    and   **47**.17, **47**.110
jurisprudence: *Biwater Gauff*   **47**.22;
    *Maffezini*   **47**.18; *Occidental*   **47**.21;
    *Pey Casado*   **47**.19; *Tokios Tokelès*
    **47**.20; *Vacuum Salt*   **47**.17
use of "order", significance   **47**.18,
    **47**.20–2
compliance obligation,   **47**.16, **47**.25, **47**.154:
    *see also* provisional measures (ICSID
    proceedings), decision/recommendations,
    non-compliance
date   **49**.27
enforcement   **47**.23–30
    by third States   **47**.25, **47**.153–4,
        **47**.170
    domestic courts' role: 47.24–30: *see also*
        provisional measures (ICSID
        proceedings), domestic courts' right to
        order; non-binding nature of
        recommendation and   **47**.25
    drafting history   **47**.23–5, **47**.31
    jurisprudence: *Atlantic Triton*   **47**.25 n36,
        **47**.28; *CSOB*   **47**.29; *MINE*   **47**.27;
        *Zhinvali*   **47**.30
    recognition and enforcement under
        Article 54   **54**.30
interpretation   **50**.12
modification or revocation by tribunal (AR
    39(3))   **47**.14, **47**.58–62
    jurisprudence: *City Oriente*   **47**.62; *MINE*
        **47**.60; *SGS* v. *Pakistan*   **47**.61
non-compliance
    costs and   **43**.66, **47**.34
    damages/penalty   **47**.23, **47**.31
    diplomatic protection and   **27**.6, **27**.9,
        **27**.11
    effect on award   **47**.16, **47**.31–6: *AGIP*
        **47**.34; *Holiday Inns*   **47**.33; *MINE*
        **47**.35–6, **47**.109
    State responsibility and   **47**.25, **47**.156
provisional nature   **47**.37–52
publication   **48**.121
requirements
    reasons   **48**.91
    writing   **48**.40
revision   **51**.4
supplementation or rectification   **49**.31
tribunal's powers
    limited nature   **43**.66
    measures other than those requested
        **47**.13
    parties' right to modify or exclude
        **47**.8–10
    to take initiative   **47**.11

**provisional measures (ICSID proceedings),
        disputed jurisdiction and**   **47**.46–
    57
jurisprudence
    *Azurix*   **47**.54
    *Bayindir*   **47**.55
    *Biwater Gauff*   **47**.56
    *CSOB*   **47**.51
    *Holiday Inns*   **47**.49
    ICJ (*Pulp Mills on the River Uruguay*)
        **47**.47
    *Occidental*   **47**.57
    *Pey Casado*   **47**.52
    *SGS* v. *Pakistan*   **47**.53
    *Vacuum Salt*   **47**.50
practice in other international fora
    **47**.48
Secretary-General's screening role under
    Article 36(3) and   **47**.48
**provisional measures (ICSID proceedings),
        domestic courts' right to order in light
        of Article 26 exclusive jurisdiction rule**
    **26**.162–83, **44**.3, **47**.105
abusive proceedings and   **26**.171
Additional Facility Rule 46, relevance
    **26**.179–80
autonomy of ICSID proceedings and   **26**.175,
    **62**.3
jurisprudence
    *Atlantic Triton*   **26**.169–72, **47**.103–5
    *Cable TV*   **26**.173
    *Holiday Inns*   **26**.166
    *MINE*   **26**.167–8
parties' express consent   **26**.181–3,
    **55**.95
    AR 39(6) [39(5)]   **26**.176–8, **44**.34, **55**.95,
        **55**.97
    AR 39 (addition), as confirmation of
        existing rule   **26**.177
    Model Clauses   **55**.95
    NAFTA formula   **26**.183
    need for   **26**.175, **26**.177
    procedure   **26**.183
    stipulation in agreement recording consent
        to ICSID arbitration, need for   **26**.176,
        **26**.181, **26**.183
potential for abuse   **26**.175
pre- and post-judgment attachment
    distinguished   **55**.96
preservation of evidence and   **26**.165
scholarly debate   **26**.174–5
special nature of ICSID proceedings and
    **26**.175
State immunity and   **55**.96
urgency of matter, relevance   **26**.174

**provisional measures (ICSID proceedings),
    procedural matters**
AR 39(1)–(5)    **47**.6
AR 39(6) [39(5)]    **26**.176–8, **44**.34, **47**.5–6,
    **55**.95, **55**.97
costs and expenses    **61**.62
equality of treatment of States and private
    investors    **47**.171–2
individual opinions    **48**.104
jurisprudence, *CSOB*    **47**.13
parties' right to be heard    **47**.12, **47**.39
    failure as serious departure from
        fundamental rule of procedure
        **47**.12
priority and speed, need for    **47**.37–45
    accelerated procedure    **47**.39–45
    ITLOS compared    **47**.38 n56
    jurisprudence: *AGIP*    **47**.40; *Amco I*
        **47**.40; *Atlantic Triton*    **47**.40; *Azurix*
        **47**.44; *Bayindir*    **47**.44; *Biwater*    **47**.44;
        *CSOB*    **47**.40; *Holiday Inns*    **47**.40;
        *Maffezini*    **47**.41; *MINE*    **47**.40;
        *Occidental*    **47**.45; *Pey Casado*    **47**.42;
        *Plama*    **47**.44; *Saipem*    **47**.45; *SGS* v.
        *Pakistan*    **47**.43; *Tanzania Electric*
        **47**.41; *Tokios Tokelès*    **47**.44; *Vacuum
        Salt*    **47**.40; *Zhinvali*    **47**.43
    priority (AR 39(2))    **47**.39
request of party    **47**.11
    right to make    **26**.162
    timing    **44**.36, **47**.5–6
**provisional measures (ICSID proceedings),
    purpose/rights to be protected**
alternative formulae    **47**.73–5
avoidance of irreparable damage    **47**.66,
    **47**.67, **47**.70, **47**.71
avoidance of self-help or resort to other
    remedies    **47**.79
compliance with award    **47**.79, **47**.90–8
confidentiality of proceedings    **47**.75,
    **47**.148–51
drafting history    **47**.72–5, **47**.157
    Comment to Preliminary Draft    **47**.73
exclusive nature of ICSID proceedings
    **47**.75, **47**.99
    *Amco I*    **47**.140
    *Atlantic Triton*    **47**.103–5
    *CSOB*    **47**.112
    *MINE*    **47**.109
    *Pey Casado*    **47**.117–18
    *Plama*    **47**.130
    *Tokios Tokelès*    **47**.128–9
non-aggravation of dispute    **47**.75, **47**.79,
    **47**.132, **47**.135–47
    AR 39, Note A    **47**.135

bankruptcy proceedings and    **47**.144–5,
    **47**.146, **47**.165–6
confidentiality of proceedings and
    **47**.137–40, **47**.150–1
    jurisprudence: *Amco I*    **47**.137–40; *Azurix*
        **47**.144–5; *CSOB*    **47**.141; *Holiday Inns*
        **47**.136; *Occidental*    **47**.147; *Pey Casado*
        **47**.142; *Plama*    **47**.132, **47**.146; *SGS* v.
        *Pakistan*    **47**.143
non-frustration of award    **47**.16, **47**.73–5
preservation and production of evidence
    **47**.2, **47**.68, **47**.75, **47**.79, **47**.80–9
    Article 43 obligations in respect of evidence
        and    **47**.86–9
    jurisprudence: *Azurix*    **47**.83; *Biwater
        Gauff*    **43**.62, **47**.86–9
preservation of "respective rights of either
    party"    **26**.163, **47**.73
    equality of treatment as between State and
        private party    **47**.171–2
preservation of rights in dispute    **47**.75,
    **49**.157–69
    AR 39(1) and    **47**.160, **47**.162
    hostile propaganda and    **47**.160
    hypothetical questions and    **47**.161,
        **47**.163, **47**.169
    jurisprudence: *Amco I*    **47**.160, **47**.169;
        *Azurix*    **47**.164, **47**.169; *Holiday Inns*
        **47**.159, **47**.169; *Maffezini*    **47**.161,
        **47**.169; *Occidental*    **47**.167–8, **47**.169;
        *Pey Casado*    **47**.163, **47**.169; *Plama*
        **47**.165–6, **47**.169; *Tanzania Electric*
        **47**.162, **47**.169
    prejudice to merits and    **57**.164, **57**.169
    preservation of *status quo*    **47**.73, **47**.157,
        **47**.162
    relief available, relevance: monetary
        compensation as appropriate remedy
        **47**.147, **47**.166, **47**.168; specific
        performance/restitution    **47**.167
    specific dispute as determined by parties'
        claims and requests for relief
        **47**.165–6
    specific performance of contract, possibility
        of    **47**.162
preservation of rights of third parties
    **47**.173–7
    *Azurix*    **47**.175
    *Pey Casado*    **47**.174
    *Plama*    **47**.176
    *Zhinvali*    **47**.177
protected rights
    absence of provision for    **47**.72–5
    parties' obligation to specify (AR 39(1))
        **47**.75

**provisional measures (ICSID proceedings), purpose/rights to be protected/types of measure, jurisprudence**
*AGIP*    **43**.31, **43**.61, **47**.34, **47**.81
*Atlantic Triton*    **47**.91–3
*Azurix*    **47**.77
*Bayindir*    **47**.97
*Biwater Gauff*    **47**.78, **47**.85–9
*Maffezini*    **47**.94
*Pey Casado*    **47**.95–6
*Sempra*    **47**.84
*Vacuum Salt*    **47**.82
**provisional measures (ICSID proceedings), tribunal's powers**
adequacy    **26**.174
Arbitration Facility Arbitration Rules distinguished    **47**.7
Model Clauses    **47**.9
recommendations, limitation to: *see* provisional measures (ICSID proceedings), decision/recommendations, binding effect/legal status
**provisional measures (ICSID proceedings), types of measure**
absence of provision for    **47**.72–5
discovery of evidence    **26**.164, **43**.52, **47**.76
drafting history    **47**.72–4
financial guarantee/pre-judgment security    **47**.76, **47**.90–8
parties' obligation to specify requested measures (AR 39(1))    **47**.76
press dealings, refraint from    **47**.76
specific performance of contract    **47**.162
specificity, varying practice    **47**.77
stay of proceedings in domestic courts/injunction against    **47**.76, **47**.99–134
jurisprudence: *Atlantic Triton*    **47**.103–5; *CSOB*    **26**.141, **47**.111–14; *Duke Energy*    **47**.134; *Holiday Inns*    **47**.100–2, **47**.171; *MINE*    **47**.106–9, **47**.171; *Pey Casado*    **47**.117–18; *Plama*    **47**.130–3; *SGS v. Pakistan*    **47**.119–25; *Tanzania Electric*    **47**.115–16; *Tokios Tokelès*    **47**.128–9; *Vacuum Salt*    **47**.110; *Zhinvali*    **47**.126–7
third party interests and    **47**.126
***PSEG***
ancillary claims, simultaneous determination, incidental or additional claims arising out of third party contracts    **46**.41
excluded classes of disputes, notification    **25**.932–3

experts    **43**.100
"investment"
"in accordance with host State law"    **25**.201
pre-investment activities    **25**.179
legal dispute "arising directly"    **25**.102
**public policy/***ordre public* **(domestic)**
applicable law and    **42**.48
application of foreign law and    **42**.48
Arbitration Rules (AR), modification by parties and    **44**.21
recognition and enforcement of arbitral award and    **42**.48, **54**.83–6, **54**.109
**public policy/***ordre public* **(international)**
applicable law and    **42**.49–52, **42**.153
peremptory rules of international law    **42**.49, **42**.273
Security Council decisions and resolutions    **42**.50
applicable rules of law violating    **42**.49–52, **42**.153, **42**.273
*ex aequo et bono* decisions and    **42**.273
arrangements in violation of Security Council decisions and resolutions    **42**.50
international law distinguished    **42**.52
recognition and enforcement of arbitral award and    **54**.85
*World Duty Free*    **42**.51
**publication of award, parties' consent to**    **48**.3, **48**.107–29
advantages of publication    **48**.124–8
*stare decisis* and    **48**.128
comparable provisions in other international instruments    **48**.108
confidentiality of proceedings
AR 6(2) (arbitrator's declaration)    **44**.98
AR 15 (privacy of deliberations)    **44**.99–100
information about status of proceedings distinguished (AFR 22 and 23)    **44**.111–12
measures to protect oral procedure (AR 32(2))    **44**.102
medium for publication    **44**.112
minutes of hearings (AR 20(1)(g))    **44**.107
parties' right to publish memorials    **44**.100
provisional measures and    **47**.75, **47**.148–51
reasons for    **48**.107, **48**.123–9
decisions of
*ad hoc* committee    **48**.120
new tribunal    **48**.120

**publication of award, parties' consent to**
        (*cont.*)
    decisions other than awards    **48**.120–1
        preliminary decisions on jurisdiction
            **48**.121
        procedural orders    **48**.121
        provisional measures    **48**.121
        rectification, interpretation or revision,
            decisions on    **48**.120, **49**.78
    drafting history    **48**.109
    enforcement proceedings and    **48**.118
    jurisprudence
        *ADC*    **44**.110
        *Amco I*    **44**.114, **47**.149
        *Biwater Gauff*    **44**.116–20
        *Fireman's Fund*    **48**.117
        *LETCO*    **48**.118
        *Loewen*    **44**.109
        *Malaysian Historical Salvors*    **44**.108,
            **48**.111
        *Metalclad*    **44**.115
        *World Duty Free*    **44**.121
    non-publication    **48**.119, **52**.26, **52**.34,
        **52**.567
    parties' right to publish    **48**.114
        partial publication    **48**.117
        unilateral publication    **48**.114
    positive nature of requirement    **48**.109
    publication by Centre    **44**.36, **48**.110–13
        AR 48(4) (1984)    **48**.110, **49**.129
        AR 48(4) (2006)    **44**.36, **48**.110, **48**.129
        authorization by parties    **48**.111: Model
            Clauses    **48**.111; Secretary-General's
            role (AFR 22)    **48**.112; timing    **48**.111
        medium    **48**.113
    sources
        publication by Centre    **48**.113
        publication by parties    **48**.115–16
**publication of information about cases**
        **48**.122
**publications (ICSID)**    **1**.5
    inviolability of archives and    **23**.1,
        **23**.3
    revenue from sale    **17**.7
    Secretary-General's role    **11**.14

**qualities/qualifications of conciliators and
        arbitrators (Panel membership)**    **40**.1,
        **40**.4, **40**.14
    adequacy, complaints relating to    **14**.6
    annulment of award on grounds of absence
        **52**.123, **52**.124
    arbitrators appointed from outside Panel
        **57**.16
    availability for appointment    **14**.6

    competence in law, commerce, industry or
        finance    **14**.3, **16**.2, **57**.18
    discretion of States    **14**.6
    exclusion of Secretary-General, Deputy
        Secretary-General and ICSID staff
        **40**.26
    gender, relevance    **48**.95
    high moral character    **52**.123, **52**.276, **57**.18
        ICJ Statute origin    **14**.2
    impartiality    **14**.5, **52**.276, **52**.295
        importance in context of particular party or
            dispute    **14**.5
    Panel of Arbitrators    **14**.3, **16**.2, **16**.3
    presumption of    **57**.19
    qualifications, unspecified    **14**.2
    screening process, absence    **14**.2, **16**.4
        appointment to commission or tribunal
            distinguished    **14**.7
    similarity in both Panels    **16**.2
    statement of, need for    **14**.4
    States' obligation to seek advice    **14**.2
    tribunal membership distinguished    **40**.17,
        **57**.20
    "who may be relied upon to exercise
        independent judgement"    **57**.18
**quorum:** *see* arbitral award (ICSID), majority
        decision

**ratification, acceptance or approval (ICSID
        Convention)**    **68**.1, **75**.1: *see also*
        signature (ICSID Convention)
    contingent submission in case of future
        **25**.221–3, **25**.299
    drafting history, Executive Directors' Report
        **68**.2
    equivalence of terms    **68**.1
    need for    **25**.213, **26**.22, **66**.2, **66**.5, **67**.1–2,
        **68**.1
        Additional Facility and    **67**.2
    notification    **68**.1
    participation    **Preamble** 10, **68**.7, **68**.8
        Latin America    **68**.9–11: Spanish as
            authentic language and    **68**.11
    signature as preliminary to    **67**.7, **68**.1
    World Bank as depository    **Preamble** 9, **66**.3,
        **67**.9, **68**.1, **70**.7, **73**.1–3, **75**.1, Final
        Clause, 1
**reasons:** *see* annulment of award, grounds,
        failure to state reasons;
        exhaustiveness/reasons requirement
**recognition and enforcement of arbitral award
        (Additional Facility)**    **25**.12, **26**.180,
        **53**.5–9, **54**.5, **54**.12–22, **54**.81: *see also*
        finality/binding nature of arbitral award
        (Additional Facility); Recognition and

Enforcement of Foreign Arbitral Awards,
New York Convention (1958)
applicable law   **25**.12, **53**.5, **54**.5, **62**.8
Convention on the Recognition and
    Enforcement of Foreign Arbitral Awards
    (1958)   **54**.13–21, **62**.8
review of award, possibility of   **54**.15
**recognition and enforcement of arbitral award
    (ICSID)   Preamble 25, Preamble 33,
    26**.179–80: *see also* compliance with
    ICSID award; recognition and
    enforcement of arbitral award (Additional
    Facility); recognition and enforcement of
    arbitral award (non-ICSID); stay of
    enforcement in annulment proceedings;
    stay of enforcement in interpretation of
    award proceedings
automatic nature   **54**.9
    parties' right to modify or exclude
    **54**.9
autonomy of ICSID proceedings, departure
    from   **55**.8
BITs provision for   **54**.22
choice of forum
    freedom   **54**.26–7
    location of assets and   **54**.26, **54**.27
comparable provisions in other international
    instruments   **54**.3–6
    Convention on the Recognition and
    Enforcement of Foreign Arbitral Awards
    (19588)   **54**.4–5
    Treaty of Rome (1957)   **54**.6, **54**.97,
    **54**.106, **54**.110
conformity of award with international law
    and   **42**.114, **42**.193–4
    *Amco I*   **42**.194
costs and expenses   **61**.67
denunciation of Convention and   **72**.11
designation of competent courts or other
    authorities   **11**.7
diplomatic protection and   **54**.11, **54**.28
dispute relating to, reference to ICJ
    **64**.5
drafting history   **54**.4, **54**.7–8, **54**.66,
    **54**.73
exclusive remedy rule and   **54**.10
host State as main beneficiary of provision
    **54**.7, **54**.8
implementing legislation   **54**.28, **54**.104,
    **69**.5–6
nationality and   **27**.29
non-compliance
    as breach of treaty obligation   **54**.28
    ICJ proceedings   **54**.28
    implementation obligations and   **54**.28

State responsibility and   **54**.28
non-cooperation and   **45**.5
place of ICSID proceedings, relevance
    **62**.3
public policy/*ordre public* (domestic) and
    **42**.48, **54**.83–6, **54**.109
public policy/*ordre public* (international) and
    **54**.85
reasons for provision   **54**.7–8
stay of enforcement and: *see* stay of
    enforcement in recognition and
    enforcement proceedings
**recognition and enforcement of arbitral
    award (ICSID), applicability**
annulled award   **52**.569, **52**.571, **54**.35–
    6
    partial annulment   **54**.36
award modified by supplementation/
    rectification   **54**.34
discontinuance order   **48**.71
final awards, limitation to   **54**.30
interpretation, revision or annulment decisions
    **50**.28, **54**.33
non-pecuniary obligations
    allowability   **54**.75–80
    discontinuance of inappropriate practices
    **54**.75
    enforceability   **54**.79–80
    inclusion in settlement agreement   **54**.77
    jurisprudence: *Enron*   **54**.78; *Goetz*
    **54**.77–9
    possibilities   **54**.75
    reinstatement of personnel/employment of
    local personnel   **54**.75
    restitution   **54**.75
    specific performance   **54**.75
pecuniary obligations   **54**.5, **54**.46, **54**.72–80,
    **54**.113: *see also* recognition and
    enforcement of arbitral award (ICSID),
    enforcement
    Additional Facility awards compared
    **54**.5
    recognition/enforcement distinguished
    **54**.46
preliminary awards incorporated in final award
    **54**.30
preliminary decision declining jurisdiction
    **54**.31
settlement agreement   **25**.82, **48**.79,
    **54**.32
**recognition and enforcement of arbitral
    award (ICSID), applicable law**
compliance, method   **54**.113
drafting history   **54**.110–12
    Executive Directors' Report   **54**.111

1496 *Index by Subject*

**recognition and enforcement of arbitral award (ICSID), applicable law (*cont.*)**
  enforcement
    *lex fori*  **54**.2, **54**.47, **54**.74, **54**.105, **54**.110–15, **55**.1, **55**.6, **55**.11, **55**.13
    procedural aspects, limitation to **54**.112
  recognition
    Convention  **54**.47
    courts' failure to distinguish  **54**.114
  State immunity under  **55**.1, **55**.11
**recognition and enforcement of arbitral award (ICSID), "Each Contracting State shall recognize…"  54**.23–9, **55**.27
  compliance obligations of parties to award distinguished  **53**.12, **54**.23
  drafting history  **54**.8, **54**.24–5
    Executive Directors' Report  **54**.25
  failure to comply as breach of Convention **54**.28
  nationality requirements and  **54**.26
  "shall enforce the pecuniary obligations" **55**.27
**recognition and enforcement of arbitral award (ICSID), enforcement**
  applicable law, *lex fori*, host State as forum **55**.111–14
  domestic courts' role  **26**.3, **26**.174, **53**.39 n36, **54**.29, **54**.87
    in case of annulled award  **52**.571
  enforcement measures, need for as breach of Article 53 compliance obligation **53**.35–6
  nationals of non-Contracting State as parties **25**.285
  pecuniary obligations, reasons for limitation to **54**.73–4
  State immunity and  **64**.14
    waiver  **26**.182
**recognition and enforcement of arbitral award (ICSID), "enforcement"/"execution", failure to distinguish  54**.64–71
  comparison of different language versions **54**.64–5, **54**.70
  domestic court practice  **54**.67–8, **54**.71
  interchangeability  **54**.70, **54**.114
  jurisprudence
    *LETCO*  **54**.67
    *SOABI* (French proceedings)  **54**.68
  scholarly debate  **54**.69
**recognition and enforcement of arbitral award (ICSID), as final judgment of domestic court  41**.22, **54**.44, **54**.88–91
  drafting history  **54**.88–9

    Executive Directors' Report  **54**.89
  federal constitutions and  **54**.92–6, **69**.5
    drafting history  **54**.92
    United States  **54**.93–8
  position in hierarchy, relevance  **54**.90
  State immunity from execution and  **54**.91, **55**.2
**recognition and enforcement of arbitral award (ICSID), finality/nonreviewability and 54**.81–7, **54**.112
  drafting history  **54**.82–5
  jurisprudence
    *Benvenuti & Bonfant* (French proceedings) **54**.86, **54**.109
    *SOABI* (French proceedings)  **54**.86
**recognition and enforcement of arbitral award (ICSID), procedure  54**.97–105
  applicability to recognition  **54**.45
  certified copies of award  **54**.98–9
    subsequent stay of execution, courts' duty to check  **54**.99
  designation of competent authorities  **54**.2, **54**.106–9
    drafting history  **54**.106
    federal State practice  **54**.108
    manner of compliance  **54**.108–9: difficulties arising from  **54**.109
    States complying (April 2008)  **54**.197
  drafting history  **54**.97
  executive control of proceedings  **55**.24
  implementing measures  **54**.104
  nexus/"connection with underlying claim" requirement  **55**.50–4
  original action, legality of requirement for **54**.95, **54**.105
  simplified procedure  **54**.105
  simultaneous proceedings in several countries **54**.103
    avoidance of double satisfaction  **54**.103
    partial payment in different States  **54**.103
    *res judicata* considerations  **54**.44, **54**.103
  standing  **54**.102
    diplomatic protection and  **54**.102
    State on behalf of constituent subdivision or agency  **54**.102
    succession, problems caused by  **54**.102
    third parties  **54**.102
**recognition and enforcement of arbitral award (ICSID), recognition 54**.42–63
  applicable law, Convention  **54**.47
  definition  **54**.42
  effect  **54**.44, **54**.47
  jurisprudence
    *AIG*  **54**.61–3, **55**.118

*Benvenuti & Bonfant* (French proceedings)
    **54**.50–2, **54**.86
  *LETCO*    **54**.56–60, **54**.96, **54**.105,
    **54**.114
  *SOABI*    **54**.53
  *SOABI* (French proceedings)    **54**.53–4
  need for    **54**.45
    preliminary decision declining jurisdiction
      **54**.45
  obligation    **55**.6
  as preliminary to enforcement    **54**.43, **54**.49,
    **54**.51, **55**.6
    in absence of assets    **54**.49
  procedure    **54**.42
  *res judicata* and    **54**.43–8
  State immunity and    **54**.48, **54**.50–63,
    **55**.6
**recognition and enforcement of arbitral
    award (non-ICSID)    25**.228
  domestic courts    **26**.149–53, **52**.5
  *MINE*    **26**.149–53, **26**.167
  prejudgment attachments distinguished
    **26**.151, **26**.167
**Recognition and Enforcement of Foreign
    Arbitral Awards, New York
    Convention (1958)**
  annulment of award    **52**.130 n170,
    **52**.271 n414, **52**.278 n417, **52**.338
    n520
    stay of enforcement and    **52**.576 n832,
      **52**.627
  applicability
    Additional Facility awards    **54**.5,
      **54**.13–21, **62**.8
    commercial transaction    **54**.18–19
    foreign arbitral awards    **54**.20–1
    in State not party to ICSID Convention
      **54**.5
  grounds for refusal to recognize/enforce
    **52**.6, **52**.118 n163, **54**.14–15
  ICSID Convention, relationship with
    **54**.4–5
  limiting declarations    **54**.16–18
**rectification of award:** *see* supplementation or
    rectification of award
**Redfern Schedule    43**.80
**regional centres    2**.1
**registrar**, Secretary-General    **11**.1
**registration:** *see* request for arbitration
*renvoi*,    **42**.53–5, **42**.161–6: *see also* applicable
    law, in absence of agreement between
    parties, host State law, "including its rules
    on the conflict of laws" (*renvoi*)
**reopening of proceedings:** *see*
    closure/reopening of proceedings

**replacement of conciliator/arbitrator
    following death, incapacity or
    resignation**
  in accordance with original method
    **56**.15–19
  AR 11    **56**.17–19, **58**.18
  drafting history    **56**.17–18
  original failure of party to make
    appointment and    **56**.17–19
*ad hoc* committee
  absence of provision in Convention
    **52**.548–52, **57**.4–5
  distinguished    **56**.4
  conciliation commission, by member of Panel
    **12**.4, **13**.5
  death    **15**.4, **15**.6, **56**.28–30
    *Adriano Gardella*    **56**.30
    *AMT*    **51**.32 n17
    *Holiday Inns*    **56**.29
  drafting history    **56**.3
  incapacity
    definition    **56**.20: circumstances calling for
      resignation distinguished    **56**.20
    special procedure    **56**.20–1: Arbitration
      Rules (1984)    **56**.21
  jurisprudence, *MTD*    **56**.13
  non-frustration principle    **56**.2, **56**.36–7
  resignation: *see* resignation of
    conciliator/arbitrator
  suspension of proceedings (AR 10)    **56**.9
    resumption (AR 12)    **56**.10–13: effect
      **56**.13; repeat of oral proceedings solely at
      request of new conciliator/arbitrator
      **56**.12
**replacement of conciliator/arbitrator
    following disqualification    58**.17–19
  AR 11    **58**.18
  AR 12    **58**.19
  CR 11    **58**.18
  CR 12    **58**.19
  drafting history    **58**.17
  replacement following death, incapacity or
    resignation compared    **58**.18–19
**representation of parties    44**.72–9
  "agents"    **44**.75
  AR 18    **44**.73, **44**.75
  inclusion
    award (AR 47(1)(d))    **44**.77
    request    **36**.33, **44**.74
  jurisprudence
    *Generation Ukraine*    **44**.78
    *Scimitar*    **44**.79
  legal qualifications, desirability    **44**.72
    practice of using lawyers    **44**.76
  scope of authority, need to indicate    **44**.75

**Repsol**

*ad hoc* committee, appointment to   **52**.454

annulment of award, grounds

   manifest excess of powers, failure to apply correct applicable law   **52**.222

   serious departure from fundamental rule of procedure: "serious departure"/"fundamental rule"   **52**.281; standing limits, violation   **52**.333

annulment, grounds, manifest excess of power   **52**.136, **52**.147, **52**.164, **52**.182

annulment, request for, exhaustion of procedural remedies as political imperative   **52**.45

constituent subdivision or agency

   designation as   **25**.250

   status as   **25**.246

constituent subdivision or agency as party to proceedings, changes to administrative structure   **25**.318

delay/refusal to pay advances, effect on costs   **52**.104, **61**.40

*res judicata*, administrative decision and   **52**.182

stay of enforcement in annulment proceedings

   circumstances requiring   **52**.610, **52**.613

   procedure (AR 54)   **52**.605

   security for eventual payment of award   **52**.605, **52**.637–9

**request for arbitration**

   *see also* Institution Rules (IR)

Additional Facility and   **36**.7

defects in, relevance   **36**.38

documentation, relevance   **25**.61

drafting history   **36**.5, **36**.19, **36**.23

drafting, importance   **36**.34

Executive Directors' Report   **36**.11

initiative   **36**.9–10

   constituent subdivision or agency   **36**.9

   investor's right of without authorization from home State   **36**.9

   joint request (IR 1)   **36**.10, **36**.25, **36**.28

as part of written procedure   **44**.84, **44**.85

procedure   **36**.11–13

renewal

   lodging fee, need for   **36**.58

   requirements as for original request   **36**.58

   right to following refusal   **36**.58

time limits   **36**.17

   NAFTA provisions   **36**.17

   parties' agreement   **36**.17

**request for arbitration, required information**   **36**.22–31, **44**.85

approval of consent by subdivision or agency   **25**.479, **25**.915

"arising directly" requirement, information relating to   **25**.86, **25**.123

consent to ICSID jurisdiction, evidentiary documentation, need for   **36**.28

correction   **36**.37

evidence of authority for consent (IR 2(1)(f))   **25**.632, **36**.26, **44**.40

evidence of consent   **25**.437, **25**.479, **25**.915

identity of parties   **25**.36, **25**.214, **25**.258

   intervention/addition after registration of request   **36**.26 n31

informal consultation with Centre   **36**.35–7, **36**.65–7

   *Tokios Tokelés*   **36**.66–7

Institution Rules (IR) as vehicle for determining   **36**.23

instruments recording consent   **25**.379

investor's nationality   **25**.294, **25**.686, **25**.743, **25**.759

   documentation showing agreement to treat as national of another Contracting State   **25**.774, **25**.776

IR 1   **36**.11

IR 2   **36**.24–43

IR 2(f) (2003 addition)   **44**.26, **44**.40

jurisprudence

   *Cable TV*   **36**.39–40

   *CMS*   **36**.27

   *Impregilo*   **36**.27, **36**.41–2

   *Scimitar*   **36**.27

   *SPP*   **36**.26 n31

   *SPP II* (jurisdiction)   **36**.26 n31

   *Vacuum Salt*   **36**.27, **36**.51

   *Vivendi II* (jurisdiction)   **36**.27, **36**.43

legal nature of dispute   **25**.61

nationality of investor   **39**.8

non-compliance, effect   **36**.39–43

optional information   **36**.32–4

   parties' agreement on number and appointment of arbitrators   **36**.32, **36**.33, **37**.16

   procedural agreements   **36**.33: place and language   **36**.33

   representation of parties   **36**.33, **44**.74

procedural nature   **36**.38–43

proof distinguished   **36**.27, **36**.51

purpose of provision   **36**.38

scope of provision   **36**.22

variety of proposals   **36**.23

   *prima facie* proof   **36**.23

waiver, exclusion   **36**.25

**request for arbitration, requirements**

approval of home State, rejection of proposal   **36**.9

copies
  requisite number   **36**.15
  transmission to respondent (IR 5)
    **36**.18–20: as opportunity to settle
    **36**.20; respondent's right to choose
    whether to respond   **36**.20
lodging fee   **36**.16, **36**.58, **59**.8–9
  non-payment, effect   **36**.16
NAFTA provisions   **36**.21
official language, use of   **36**.11, **36**.14,
    **36**.52–3, **44**.62
  effect of choice on language of proceedings
    **36**.14, **44**.62
parties' agreement to modification   **36**.21
supporting documentation (AFR 30)   **36**.15,
    **36**.28
  language   **36**.15
**request for arbitration, Secretary-General's**
    **role**
archive   **11**.8
basis of decision   **36**.48–56
consequences   **36**.62
documentation, relevance   **36**.28, **36**.52
drafting history   **36**.44–5, **36**.48, **36**.57
effect   **36**.20
finality of decision   **36**.57–9
lodging fee, determination   **36**.16
notification   **36**.60–1
  parties' representatives as addressees
    **44**.74
  timing (AR 6(1)(a))   **36**.60
provisional measures and   **36**.63, **47**.48
refusal   **25**.214, **36**.54–5
  "manifestly" outside jurisdiction
    **25**.259, **25**.479, **25**.759, **36**.2, **36**.54,
    **52**.141, **52**.172
  rarity/examples   **36**.55
  renewal of request, right of   **36**.58
registration   **36**.48–63
  determination of jurisdiction distinguished
    **36**.40, **36**.59
  effect of decision   **36**.59, **44**.40
  obligation   **36**.56, **52**.95
respondent's right to challenge request   **36**.50
  effect on right to challenge jurisdiction
    **36**.50
screening   **36**.44–70
  competence, tribunal's right to determine
    and   **36**.59, **41**.9, **41**.11–15, **47**.48,
    **52**.141, **52**.172
  dependence on provision of all required
    information   **36**.25
  designation as constituent subdivision or
    agency and   **25**.259
  finding of conformity, rejection of proposal
    for   **36**.48

ICC Rules compared   **36**.4
jurisprudence: *Holiday Inns*   **41**.13; *Mihaly*
    **41**.14; *Plama*   **41**.15
nationality of investor and   **25**.759
nature of role   **25**.214, **41**.94, **52**.141
presumption of accuracy of information
    **36**.51
provisional measures   **47**.48
purpose of provision   **36**.45–6: Executive
    Directors' Report   **36**.45
as replacement for *prima facie* proof
    requirement   **25**.61, **36**.23, **36**.44:
    joinder of objections to jurisdiction and
    merits   **41**.86–92
requests for annulment, revision,
    resubmission or interpretation
    distinguished   **36**.8, **52**.667
resubmission to new tribunal   **52**.667
summary procedure (AR 41(5)) and
    **41**.94
time required for   **36**.56
translation of supporting documentation and
    **36**.52–3
  *SPP*   **36**.53
transmission of copies to respondent
    **36**.18–19
tribunal's exclusive right to determine its own
    competence and
  preliminary nature of Secretary-General's
    role   **41**.11–15, **47**.48, **52**.141, **52**.172:
    Executive Directors' Report   **41**.12
**request for registration:** *see* request for
    arbitration
*res judicata*
administrative decision and   **52**.182
concurrent arbitration provisions   **26**.31
exclusive remedy rule and   **26**.145
failure to recognize as ground for annulment
    **52**.165–6
finality/binding nature of award and   **42**.76,
    **53**.10, **53**.31–2
new facts and   **52**.695
non-pecuniary obligations and   **54**.80
partial annulment and   **52**.497–9, **52**.674–82
recognition of award and   **54**.43–8
  desirability as protection against
    proceedings in another Contracting State
    **54**.44, **54**.103
resubmission of dispute after annulment and
    **52**.10, **52**.674–88, **52**.695
**reservations (ICSID)**   **25**.924
absence of provision for   **68**.3–5
exclusion of classes of dispute as alternative
    **68**.3
admissibility, Article 64 (ICJ) and   **64**.4,
    **68**.4

**reservations (ICSID) (*cont.*)**
applicable law
customary law   **68**.5
VCLT (1969)   **68**.5
Article 64 declaration distinguished   **68**.4
notification of excluded classes of dispute
distinguished   **68**.4
**reservations (treaties)**
customary international law   **68**.5
VCLT (1969)   **25**.924
**resignation of conciliator/arbitrator**   **56**.22–
7
grounds   **56**.22
absence in Convention/Rules of Procedure
**56**.22, **56**.40
conflict of interests   **56**.22
jurisprudence
*ADC*   **56**.25
*Azurix*   **56**.24
*Benvenuti & Bonfant*   **56**.26
*Continental Casualty*   **56**.24
*Generation Ukraine*   **56**.25
*Kaiser Bauxite*   **56**.24
*LETCO*   **56**.24
*MTD*   **56**.27
*Olguín*   **56**.24
*Salini* v. *Jordan*   **56**.24
*SOABI*   **56**.24, **56**.26
*Tokios Tokelès*   **56**.26
*World Duty Free*   **56**.24
procedure (AR 8)   **56**.23, **56**.39–40
disqualification of conciliator/arbitrator
(ICSID 58) distinguished   **58**.9
**resignation of conciliator/arbitrator without
consent, replacement from Panel**
**56**.35–44
conditional resignation, effect   **56**.43
drafting history   **56**.16–17, **56**.36
exceptional nature of procedure   **56**.15,
**56**.19, **56**.35–6
limitation to party appointments   **56**.38
reason for   **56**.35–6: continuity of
membership   **56**.37; non-frustration
**56**.36–7
jurisprudence
*Enron*   **56**.44
*Holiday Inns*   **56**.43
nationals or co-nationals, eligibility   **56**.42
powers of, Chairman   **37**.3, **56**.41–2
procedure
failure to reach agreement, effect
**56**.40
notification to other members of
commission or tribunal or
Secretary-General   **56**.39

refusal of consent, effect   **56**.41
time limits   **56**.42
**resubmission of dispute after annulment**
**11**.9, **52**.569, **52**.656–700
admissibility of
new arguments   **52**.546, **52**.692–3:
estoppel and   **52**.693
new claims   **52**.689–92: claims not
considered by first tribunal   **52**.692
annulment, decision on
finding of invalidity   **52**.10
interpretation of Article 52   **50**.13
scope   **52**.10: annulled part of award
**52**.510, **52**.689
Arbitration Rules (AR), applicability   **44**.6
competence of tribunal, determination by new
tribunal   **41**.4
constitution of new tribunal
in accordance with provisions for
constitution of original tribunal   **52**.668:
modification by parties   **52**.669
counterclaims, relevance   **46**.66
decision as "award"   **48**.2, **48**.25,
**48**.90
annulment   **52**.81–2, **52**.493
certification and dispatch   **49**.8, **49**.25
interpretation of Article 52   **50**.12
revision   **51**.5
supplementation or rectification   **49**.30
discretionary nature   **52**.662
drafting history   **52**.656–7, **52**.675
failure of parties to appear or present case
**45**.6, **45**.48, **45**.86
ILC Model Rules on Arbitral Procedure
(1958) as model   **52**.657
individual opinions   **48**.106
jurisprudence
*Amco II*   **46**.27–8, **46**.66, **46**.91, **52**.165–6,
**52**.658, **52**.664, **52**.671, **52**.673,
**52**.675–8, **52**.685–8, **52**.690–2, **52**.694
*CMS*   **52**.684
*Klöckner I*   **52**.684
*Klöckner II*   **52**.659, **52**.664
*MINE*   **52**.660
*Vivendi II*   **52**.672, **52**.679–82, **52**.695
procedure
AR 55   **52**.665–7
time limits, absence   **52**.666
*res judicata* and   **52**.10, **52**.165–6, **52**.674–88
legal effect of reasoning of *ad hoc*
committee   **52**.663, **52**.683–8
new facts and   **52**.695
Secretary-General's role   **11**.9, **52**.665–7
request for arbitration distinguished   **36**.8,
**52**.667

status of parties, change of status   **52**.670–3
    State succession and   **52**.670
**review of award:** *see* appeal from ICSID award,
    exclusion (ICSID 53(1)); finality/binding
    nature of arbitral award (ICSID);
    recognition and enforcement of arbitral
    award (ICSID), finality/nonreviewability
    and
**revision of award, applicability**
    annulment proceedings   **51**.6, **51**.8, **52**.79,
        **52**.545, **52**.546, **52**.568
    award by new tribunal after annulment
        **51**.5
    conciliation proceedings   **33**.5
    decision
        on costs   **61**.70
        on interpretation   **50**.29
        preliminary decision on jurisdiction   **41**.24,
            **41**.73, **51**.4
        on supplementation or rectification   **51**.6,
            **54**.79
    discontinuance order   **48**.71
    settlement award   **48**.78
**revision of award, decision on**
    annulment   **52**.79, **52**.493
    as "award"   **48**.6, **48**.29, **48**.89, **48**.105,
        **48**.120
    certification and dispatch   **49**.8, **49**.25
    decision on interpretation compared
        **50**.27–9, **51**.25
    inclusion on certified copy of award
        **51**.39
    individual opinions and   **48**.105
    publication   **48**.120
    requirements   **48**.29, **48**.88
**revision of award (general)**
    *see also* stay of enforcement in revision of
        award proceedings
    comparable provisions in other international
        instruments   **51**.1
    definition   **51**.1
    drafting history   **51**.2, **51**.14, **51**.17, **51**.23–4,
        **51**.26
    interpretation distinguished   **51**.7
**revision of award, grounds**
    error of law   **51**.17
    failure to decide all issues   **51**.17
    new fact: *see* revision of award, new fact
**revision of award, jurisprudence**
    *AMT*   **51**.3, **51**.29, **51**.40
    *Siemens*   **51**.12, **51**.29, **51**.41
**revision of award, new fact**
    burden of proof   **51**.18, **51**.24
    critical date (applicant), completion of
        presentation of case   **51**.21

critical date (tribunal), signature and
    transmission of award to
    Secretary-General   **51**.20
duty of parties to bring to attention of tribunal
    **51**.21
fact arising after completion of award   **51**.19
law distinguished   **51**.17
liability to affect award decisively and   **50**.18,
    **51**.14, **51**.16
    affect on reasons and   **51**.18
    fact affecting damages   **50**.18
    fact affecting legal position of parties
        **51**.18
    ICJ jurisprudence, **51**.18 nn10 and   11
    non-existence of decisive fact as   **51**.16
need for   **43**.38, **51**.10, **51**.16
new document as   **51**.18
relating to jurisdiction or merits   **50**.18
unknown to tribunal or applicant   **51**.10,
    **51**.14, **51**.19–24
    attribution by analogy with ILR Articles on
        State Responsibility   **51**.19
    ignorance of other party, relevance   **51**.22
    negligence of applicant and   **51**.10, **51**.14,
        **51**.23–4
**revision of award, procedure and
    administrative matters**
    Arbitration Rules (AR)
        applicability   **44**.6
        AR 50   **51**.9–14
        AR 53   **50**.23–6, **51**.15
    costs and expenses   **61**.63
    failure of party to appear   **45**.48, **45**.86
    individual opinions   **48**.105
    request by party, need for   **51**.8
    required information (AR 50)   **51**.30
        date of discovery of new fact   **51**.10, **51**.13,
            **51**.30
        identification of award   **51**.10, **51**.13,
            **51**.14
        points on which change sought   **51**.10
    Secretary-General's role   **11**.9, **51**.8–12,
        **51**.14, **51**.20, **51**.31
    request for arbitration distinguished   **36**.8
    right to initiate   **51**.8
    stay of annulment proceedings pending
        **51**.12, **51**.41
    termination of tribunal's activity, need for
        **51**.4
    tribunal's right to undertake on own initiative
        **51**.8
**revision of award, request for**
    existence of dispute, relevance   **51**.7
    receipt and registration   **11**.9
    refusal, grounds   **51**.10, **51**.14

**revision of award, submission to original
        tribunal**   **51**.2–3, **51**.32–3
    annulment distinguished   **51**.3, **52**.2
    jurisprudence
        *AMT*   **51**.32
        *Siemens*   **51**.32
    preference for   **51**.3
**revision of award, time limits**   **51**.2–3,
        **51**.26–31
    deferral   **49**.83–5
    drafting history   **51**.26
    relevant dates
        date of award   **51**.13, **51**.27: dispatch
            **51**.28
        discovery of new fact   **51**.10, **51**.13, **51**.27,
            **51**.30
        extension in case of supplementation or
            rectification   **49**.81–5, **51**.28, **53**.59
        signature of award   **48**.37, **49**.10
    time limits for other post-award remedies
        distinguished   **51**.11, **52**.85
*Reynolds*, excluded classes of disputes,
        notification   **25**.938
*RFCC*
    identical tribunals   **26**.128, **26**.129
    non-publication   **52**.26, **52**.34, **52**.567
    rejection of request for   **52**.34
*Rompetrol*, nationality (juridical persons)
        **25**.737–9
*RosInvest*, MFN clause, applicability to dispute
        settlement provisions   **25**.575 n781
**Rules of Procedure:** *see* Additional Facility
        Arbitration Rules; Additional Facility
        Conciliation Rules (2006);
        Administrative and Financial Regulations
        (AFR); Arbitration Rules (AR);
        Conciliation Rules (CR)
*Rumeli Telekom*, private investor,
        government-controlled entity as   **25**.275
**Russia**, signature/ratification   **68**.8

*Saipem*
    consent to ICSID jurisdiction, limitations
        **25**.539
    constituent subdivision or agency, designation
        as and State responsibility for acts of
        distinguished   **25**.234
    disqualification of conciliator or arbitrator,
        grounds, manifest absence of Article 14
        qualities   **57**.32–3
    exclusive remedy rule   **26**.121
    exhaustion of local administrative or judicial
        remedies   **26**.227
    "foreign" investment requirement   **25**.186

"investment", "in accordance with host State
        law"   **25**.201
    judicial decisions as source of international
        law   **42**.187
    jurisdiction, joinder to merits   **41**.91
    legal dispute "arising directly"   **25**.102
    provisional measures, circumstances requiring
        **47**.69
*Salini v. Jordan*
    constituent subdivision or agency, designation
        as and State responsibility for acts of
        distinguished   **25**.234
    disqualification of conciliator or arbitrator,
        grounds, manifest absence of Article 14
        qualities   **57**.27
    existence of legal dispute   **25**.49
    MFN clause, applicability to dispute
        settlement provisions   **25**.572
    resignation of conciliator/arbitrator   **56**.24
*Salini v. Morocco*
    consent to ICSID jurisdiction, limitations
        **25**.527
    constituent subdivision or agency, designation
        as and State responsibility for acts of
        distinguished   **25**.234, **25**.235
    identical tribunals   **26**.128
    "investment"   **25**.127
        criteria/*Salini* test   **25**.154–6, **25**.171,
            **25**.204
        "in accordance with host State law"
            **25**.200
    parallel treaty and contract claims   **26**.76–7
*Saluka*
    ancillary claims, simultaneous determination,
        jurisdiction, need for   **46**.95
    counterclaims   **46**.67, **46**.81
    "investment", "in accordance with host State
        law"   **25**.201
*Santa Elena*
    applicable law, applicable rules of
        international law   **42**.22
    diplomatic protection, exclusion   **27**.46
    evidence, taking of, visit to scene   **43**.123
    existence of dispute, measures to remedy
        dispute, relevance   **25**.75
    interest, claim for   **46**.56
    international law/host State law,
        interrelationship, applicable rules of
        international law   **42**.222
    rectification   **49**.46–8
    supplementation or rectification   **49**.46–8
        costs and expenses   **49**.48, **61**.63
**Saudi Arabia**, notification of excluded classes of
        dispute   **25**.926

*Scimitar*
  constituent subdivision or agency, status as
    **25**.246
  failure of claimant to appear    **45**.23
  legal status and capacity of investor, applicable
    law    **42**.159
  representation of parties    **44**.79
  request for arbitration, required information,
    addition of party after registration
    **36**.27
**screening:** *see* request for arbitration,
    Secretary-General's role, screening
**seat (ICSID)**
  place of conciliation/arbitration distinguished
    **2**.3, **62**.13
  regional centres    **2**.1
  relocation, possibility of    **2**.1, **2**.2
    on decision of Administrative Council
      **2**.1
  two-thirds majority requirement    **7**.8
  waiver of State immunity and    **26**.9,
    **26**.10
  World Bank Headquarters    **2**.1–5, **36**.12,
    **62**.13
    relocation, possibility of    **6**.2
**Secretariat**
  costs and expenses: *see* costs, fees and
    expenses (Centre)
  exclusion from arbitration and conciliation
    Panels    **9**.6
  high officials
    concern about proliferation of high officials
      **9**.1
    other officials, uniformity of treatment
      **21**.10
  personal immunities and privileges    **21**.1
    high and other officials, uniformity of
      treatment    **21**.10
  personal immunity from legal process, waiver
    by Secretary-General (AFR 32(1))    **21**.6
  staffing    **9**.5
  tribunal's powers in respect of    **43**.60
**Secretaries to commissions, tribunals and** *ad*
  *hoc* **committees**
  appointment    **59**.11
  attendance at proceedings    **44**.102
  certification and dispatch of decisions on
    jurisdiction    **49**.8
  costs and expenses    **59**.11
    advance payment, responsibility for    **61**.48
**Secretary-General, acting    10**.7–9
  in case of vacancy, absence or inability to act
    of Secretary-General and any Deputy
    Secretaries-General    **10**.9

Deputy Secretary-General    **10**.7–8
  determination of order: by Administrative
    Council in advance    **10**.7–8; by
    Secretary-General    **10**.7; by seniority
    **10**.8; Financial Regulation, 9 (1)    **10**.8;
    on proposal of Chairman    **10**.8
**Secretary-General, powers and functions**
  Additional Facility    **11**.15, **25**.31
    conciliation/arbitration proceedings
      **25**.202, **25**.224
    fact-finding proceedings    **25**.210
  administrative and advisory nature    **11**.1
  advisory
    *ad hoc* committee, designation of members
      **11**.4
    conciliation and administrative Panels,
      designation of members    **11**.4
    disqualification of conciliators and
      arbitrators    **11**.4
  amendment of Convention, communication of
    proposed text to members of
    Administrative Council    **11**.4, **65**.3
  appointing authority in non-ICSID arbitrations
    **11**.2, **25**.227, **25**.229, **25**.302
  appointment to *ad hoc* committee    **11**.5, **11**.8,
    **52**.454
  audit    **11**.6
  budget
    execution    **11**.6
    preparation and submission to
      Administrative Council    **11**.6
  conciliation or arbitration proceedings
    administrative arrangements    **11**.10
    appointment of Secretary    **11**.10
    approval of agreement under Additional
      Facility    **11**.15
    as channel of communication    **11**.11
    costs and expenses    **11**.12
    draft procedural orders    **11**.10
    non-ICSID proceedings: *see* arbitration
      (non-ICSID), Secretary-General as
      appointing authority
    place of proceedings, arrangements for
      **63**.22
    provision of translations, interpretation and
      duplication    **11**.10, **44**.66
    request for: *see* request for arbitration,
      Secretary-General's role
    Secretary of Tribunal's responsibilities
      **11**.12
    convening of meeting of Administrative
      Council    **7**.3, **11**.4
  costs and expenses
    advance payment    **61**.48, **61**.52, **61**.54

**Secretary-General, powers and functions**
        (*cont.*)
    fees and expenses, determination of   **11**.12,
        **60**.3–7, **60**.13
    distribution through Convention   **11**.1
    exclusion of classes of dispute, notification
        **11**.7, **25**.922
    Executive Directors' Report   **11**.1
    information, publication and dissemination
        **11**.14
    legal representative   **11**.1
    non-exhaustive nature of Article 11
        **11**.2
    principal officer of Centre   **11**.1
    publication of award/information relating to
        proceedings   **44**.111, **48**.112
    recording of
        conciliation and arbitration Panels, lists
            **11**.8, **13**.2
        designations of constituent subdivisions and
            agencies   **11**.7, **25**.259
        designations of courts or other competent
            authorities   **11**.7
        implementing measures   **11**.7
        information relating to signature,
            ratification, entry into force, notice of
            denunciation and implementation of
            Convention   **11**.7
        maintenance of archive of documents   **11**.8
        notification of exclusion of territories   **11**.7
        requests for conciliation or arbitration
            **11**.8, **11**.9
    registrar   **11**.1
        authentication of awards, certification of
            copies and dispatch to parties   **11**.9,
            **49**.3–9, **49**.14, **49**.37, **54**.98–9
        receipt and registration of requests for:
            annulment of award   **11**.9, **52**.83–6,
            **52**.95–104, **52**.586; conciliation or
            arbitration   **11**.9; interpretation of award
            **11**.9, **50**.22, **50**.24; resubmission of
            dispute after annulment   **11**.9, **52**.665–7;
            revision of award   **11**.9, **51**.8–12, **51**.14,
            **51**.20, **51**.31; supplementation or
            rectification of award   **11**.9, **49**.34,
            **50**.22
    representation of Centre   **11**.1
        signature of agreements   **11**.3:
            Memorandum of Administrative
            Arrangements with World Bank (1967)
            **11**.3; for provision of facilities under
            Article 63(a)   **11**.3
    screening of requests: *see* request for
        arbitration, Secretary-General's role,
        screening

    sources
        Additional Facility Rules   **11**.2
        Administrative and Financial Regulations
            (AFR)   **11**.2
        Arbitration Rules (AR)   **11**.2
        Conciliation Rules (CR)   **11**.2
        Convention   **11**.2
        Institution Rules (IR)   **11**.2
    staff
        appointment   **11**.1, **11**.5
        conditions of service   **11**.5
        direction   **11**.5
        disciplinary measures   **11**.5
        dismissal   **11**.5
    waiver of immunity of
        Centre (AFR 32(1)(a))   **20**.5
        staff (AFR 32(1))   **21**.6
    written procedure   **44**.84, **44**.92
**Secretary-General/Deputy
        Secretaries-General**
    Deputy Secretaries-General
        1999–2013   **9**.4
        concern about proliferation of high officials
            **9**.1
        Executive Directors' Report   **9**.1–2
        limitation to one   **9**.1–2
        regional appointments   **9**.1
    panel membership, exclusion   **40**.26
    personal immunities and privileges   **21**.1
    personal immunity from legal process, waiver
        by Chairman (AFR 32(2))   **21**.6
    Secretaries-General, 1967–2008   **9**.3
    tax privileges   **24**.4
**Secretary-General/Deputy
        Secretaries-General, conditions of
        service**
    determination by Administrative Council
        **6**.17
    on election   **6**.17
    dismissal, grounds, absence from Convention
        **10**.1
    period of service   **10**.1, **10**.2, **10**.3
        first election   **10**.3
        six years   **10**.3
    proposals by Chairman of Administrative
        Council   **10**.2
**Secretary-General/Deputy
        Secretaries-General, election   6**.2
    Administrative Council's role   **10**.1
    Chairman of Administrative Council's role
        Administrative Council's freedom of action
            and   **10**.1
        nomination of candidates: *see* nomination of
            candidates by Chairman of
            Administrative Council *below*

proposals relating to period of office, waiver
of restriction on other employment and
conditions of service    **10**.2
Secretary-General's independence and
**10**.1
nomination of candidates by Chairman of
Administrative Council    **5**.4, **10**.1,
**10**.2–3
"after consulting the members of the
Administrative Council"    **10**.1:
procedure    **10**.3
number of candidates    **10**.1, **10**.3
qualifications, absence from Convention
**10**.1
required majority    **7**.8
transition arrangements, Executive Directors'
Report    **10**.1
**Secretary-General/Deputy
Secretaries-General, incompatibility of
office    10**.2, **10**.4–6
employment with
Permanent Court of Arbitration    **10**.4
World Bank    **10**.4, **10**.6
political function    **10**.5
waiver of restriction, exclusion    **10**.5
waiver of restriction    **10**.4
Chairman's concurrence, need for    **10**.4
political function    **10**.4
proposals for    **10**.2
World Bank, General Counsel/senior legal
officer    **10**.6
**Security Council decisions and resolutions,
obligation to observe    22**.8, **42**.50
*SEDITEX I*, constitution of commission    **29**.7
*SEDITEX II*
conciliation commission
constitution    **29**.9
failure to reach agreement    **34**.35
procedure    **34**.16
conciliation commission, recommended terms
of settlement    **34**.21
*SEMOS*
costs, fees and expenses, parties' agreement,
clarity, need for    **61**.14
stabilization clause    **42**.126
*Sempra*
ancillary claims    **46**.14
disqualification of conciliator or arbitrator
grounds    **57**.39–40
procedure    **58**.15
foreign control for purposes of treatment as
national of another State, consolidation of
interests of entities not all having
nationality of same State party to BIT
**25**.297, **25**.835–7

"foreign control" test, applicability
**25**.706
fork in the road clauses    **26**.70
identical tribunals    **26**.129, **37**.35
international law, applicability in investment
disputes    **42**.197
international law/host State law,
interrelationship    **42**.243
"investment"    **25**.149
legal dispute "arising directly", general
measures    **25**.111
provisional measures, preservation and
production of evidence    **47**.84
shareholders as parties to dispute
**25**.792
**separability of issues in dispute    26**.31
*Holiday Inns*    **26**.51, **26**.135
*Mobil Oil* (NZ proceedings)
**26**.155
**separate opinions:** *see* individual opinions
**settlement and discontinuance (AR 43)**
**48**.69–87: *see also* consultation or
negotiations obligation; discontinuance of
annulment proceedings; discontinuance
of arbitration proceedings for reasons
other than settlement
annulment and    **52**.74–6, **52**.493, **53**.62
at unilateral request of party (AR 44)    **25**.603,
**48**.83
comparable provisions in other international
instruments    **48**.69
diplomatic protection, revival    **48**.79
discontinuance at request of party (AR 44)
effect    **48**.84
orders noting, annulment and    **48**.83–4,
**52**.74–6
discontinuance order (AR 43(1))    **48**.70–6,
**51**.32 n17, **52**.26
annulment    **48**.71
award, whether    **48**.71
interpretation    **48**.71
reasons, need for    **48**.71
recognition and enforcement    **48**.28,
**48**.71
rectification    **48**.71
revision    **48**.71
discontinuance of proceedings, absence of
provision in Convention    **48**.70
ICSID practice    **48**.86–7
incorporation in award (AR 43(2))    **48**.71,
**48**.72–80
advantages    **54**.32
agreement prior to institution of
proceedings and    **48**.75
confidentiality of awards    **48**.87

**settlement and discontinuance (AR 43)**
(*cont.*)
costs, fees and expenses, apportionment
**48**.71, **48**.73, **48**.77, **61**.11, **61**.65
interpretation and   **48**.78
non-compliance   **48**.79
partial settlement   **48**.74, **48**.76
recognition and enforcement   **25**.82, **48**.79,
**54**.32
rectification   **48**.78
revision   **48**.78
tribunal's right to refuse   **48**.72:
discontinuance order as alternative
**48**.72
jurisprudence: *Fedax*   **48**.76; *Goetz*
**48**.77; *Tanzania Electric*   **48**.74
majority of cases resolved by   **Preamble**
29, **34**.22
object and purpose of Convention and
**48**.80, **48**.87
partial settlement, status   **48**.74:
incorporation into award   **48**.74
pre-hearing conference (AR 21(2))
**48**.81–2
reasons, need for   **48**.69
withdrawal of request for arbitration and
**36**.68
**severability of arbitration clause**   **25**.310,
**25**.450, **25**.622–4
**Seychelles**, signature and ratification of
Convention   **67**.8
*SGS v. Pakistan*
competence, tribunal's right to determine own
**41**.18
consent to ICSID jurisdiction, critical date
**25**.499
consent to ICSID jurisdiction, limitations
**25**.529
consultation or negotiations obligation
**25**.545
diplomatic protection, exclusion   **27**.49
disqualification of conciliator or arbitrator,
grounds, manifest absence of Article 14
qualities   **57**.28
domestic court decisions, effect
**47**.121
exclusive remedy rule, tribunal's right to
determine own jurisdiction and
**26**.160–1
fork in the road clauses   **26**.67
"investment", "in the territory" requirement
**25**.193
parallel treaty and contract claims   **26**.87–8,
**26**.116–17

provisional measures
disputed jurisdiction and   **47**.53
modification or revocation by tribunal (AR
39(3))   **47**.61
priority and speed, need for   **47**.43
purpose/rights to be protected   **47**.143
stay of proceedings in domestic
courts/injunction against   **26**.159–61,
**47**.119–25
stay, domestic court intervention   **26**.159–61
*SGS v. Philippines*
consent to ICSID jurisdiction, limitations
**25**.530
consent to ICSID jurisdiction, critical date
**25**.473, **25**.507 n677, **25**.511
non-retroactivity of treaties and   **25**.507
n677
"investment", "in the territory" requirement
**25**.194
judicial decisions as source of international
law   **42**.187
parallel treaty and contract claims   **26**.93–9
procedure, tribunal's discretionary powers
**44**.57
*stare decisis* and   **53**.17
*Siag*
critical date   **25**.683, **25**.754
dual/multiple nationals   **25**.672–4
"foreign" investment requirement   **25**.184
nationality (natural persons)   **25**.683
*Siemens*
ancillary claims, simultaneous determination,
incidental or additional claims arising out
of third party contracts   **46**.42
applicable law, agreement between parties,
implicit agreement   **42**.84
applicable law, jurisdiction   **42**.6
consent to ICSID jurisdiction, limitations
**25**.530
disqualification of conciliator or arbitrator,
grounds, manifest absence of Article 14
qualities   **57**.30–1
disqualification of conciliator or arbitrator,
procedure   **58**.14
evidence, taking of, "at any stage of the
proceedings"   **43**.42
exhaustion of local administrative or judicial
remedies   **26**.204, **26**.205
indirect investment giving rise to jurisdiction
**25**.92
jurisdiction, joinder to merits   **41**.87
revision of award
stay of annulment proceedings pending
**51**.12, **51**.41

submission to original tribunal    **51**.32
time limits and    **51**.29
**signature (ICSID award)**
on decisions other than awards    **48**.39,
**48**.41
interpretation of award    **50**.26
limitation to those voting for award
**48**.34
need for    **48**.34–8
omission    **49**.15
time limits
AR 46    **48**.36, **48**.101–3, **49**.11–24
AR 47    **48**.35
**signature (ICSID Convention)**
*see also* ratification, acceptance or approval
(ICSID Convention)
18 March 1965 Final Clause 1
accession distinguished    **67**.7
effect    **25**.213, **67**.1
Executive Directors' Report    **67**.6
non-Members of World Bank    **6**.2, **67**.3–8
Administrative Council's role    **6**.2,
**67**.7
drafting history    **67**.3–4
parties to the ICJ Statute    **67**.5
Seychelles    **67**.8
Switzerland    **67**.5, **67**.8
notification    **67**.9
*SOABI*
ancillary claims, simultaneous determination
incidental or additional claims arising out of
third party contracts    **46**.36
presentation of ancillary claim, time limits
**46**.21
applicable law
in absence of agreement between parties
**42**.145–6, **42**.149
agreement between parties, timing    **42**.58,
**42**.77 n135
appointment to tribunal by Chairman    **37**.31
n33, **38**.7, **39**.27–30
closure/reopening of proceedings (AR 38)
**49**.21
concurrent reference to domestic courts
**26**.53
consent to ICSID jurisdiction, interpretation,
restrictive/extensive, whether    **25**.589
constitution of tribunal    **37**.34
costs and expenses
expert    **43**.28, **61**.30
procedural misconduct and    **43**.28
evidence, taking of
"at any stage of the proceedings"    **43**.35
at party's request    **43**.49

visit to scene    **43**.123
experts    **43**.99
foreign control for purposes of treatment as
national of another State
critical date    **25**.843, **25**.877
form and extent of control    **25**.854
indirect control    **25**.703, **25**.843–4
nationals of non-Contracting State,
exclusion    **25**.830
as objective requirement/evidence of
**25**.818
"foreign" investment requirement
**25**.184
interest, claim for    **46**.50
international law/host state law,
interrelationship    **42**.213
jurisdiction, joinder to merits    **41**.82
multiple instruments/varying parties
(investment agreements)    **25**.558–9
dispute "arising directly", whether
**25**.96
national of another Contracting State,
agreement to treat as
constitution of tribunal and    **25**.898–9
identification of controlling nationality,
relevance (IR 2(1)(d))    **25**.801–2,
**25**.805
test    **25**.700, **25**.765
nationality (juridical persons), incorporation or
seat as test    **25**.700, **25**.703
recognition and enforcement of arbitral
award (ICSID), State immunity and
**54**.53
resignation of conciliator/arbitrator    **56**.24,
**56**.26
*SOABI* **(French proceedings)**
recognition and enforcement of arbitral award
(ICSID)
"enforcement"/"execution", failure to
distinguish    **54**.68
finality/nonreviewability and    **54**.86
recognition as preliminary to enforcement
**54**.53–5
State immunity and    **54**.53–5
State immunity from execution    **55**.45–6
**Somalia**, Foreign Investment Law 1987
**25**.399
*Soufraki*
*ad hoc* committee, appointment to    **52**.454
*ad hoc* committee, decision, majority decision
requirement    **52**.564
annulment of award (general), appeal
distinguished    **52**.17, **52**.19–20, **52**.22,
**52**.36, **52**.37, **52**.38

*Soufraki (cont.)*
annulment of award, grounds
  failure to state reasons: absence of reasons
    **52**.358; quality/sufficiency of reasons
    **52**.383
  interpretation of Article 52   **52**.17,
    **52**.19–20, **52**.22, **52**.36
  manifest excess of powers   **52**.140, **52**.150,
    **52**.158: failure to apply correct applicable
    law   **52**.184, **52**.204–7, **52**.223–4,
    **52**.243
  multiple grounds/classification difficulties
    **52**.116
arbitral award, interpretation in accordance
  with treaty interpretation rules   **52**.17
evidence, taking of, evaluation/probative value
  **43**.105, **43**.115
nationality (natural persons)   **25**.643, **25**.644,
  **42**.9, **52**.224
  agreement between investor and host State
    **25**.715, **52**.206–7
obligation to annul, whether   **52**.477
stay of enforcement in annulment proceedings
  **52**.585
supplementation or rectification of award
  **49**.65
**South Africa**, non-participation   **68**.8
**sovereign immunity:** *see* State immunity
**Spain**, State immunity from execution
  **55**.64
**Spanish, as authentic language**
  **68**.11
**Specialized Agencies, Convention on
    Privileges and Immunities**, applicability
    to Centre   **18**.1
*SPP*
ancillary claims, simultaneous determination
  incidental or additional claims arising out of
    third party contracts   **46**.38
  presentation of ancillary claim, time limits
    **46**.25
annulment of award, limitation to "awards"
  **52**.66
annulment of preliminary decision on
  jurisdiction   **41**.26
applicable law
  in absence of agreement between parties,
    finding of absence, need for   **42**.134,
    **42**.135
  agreement between parties: implicit
    agreement   **42**.65–7, **42**.76; international
    law/general principles of law, in absence
    of its choice   **42**.107–9; third State law
    **42**.28

appointment of arbitrators, modification of
  nationality provisions   **39**.20
Arbitration Rules (AR), agreement to use
  version in force at time of request   **44**.51
assignment/succession of investor's rights and
  responsibilities   **25**.345–8
competence of tribunal, determination by
  tribunal in case of concurrent arbitration
  provisions   **41**.19
competence, tribunal's right to determine own
  **41**.19
conciliation/arbitration, choice at time of
  consent to jurisdiction   **25**.26
concurrent arbitration provisions
  precedence   **26**.40
  stay of proceedings by one tribunal while
    other decides its jurisdiction   **26**.38–9
  validity, relevance   **26**.34–40
consent to ICSID jurisdiction
  acceptance of offer, need for   **25**.421,
    **26**.34
  after institution of proceedings   **25**.491
  limitations   **25**.519
  national legislation as consent or offer
    **25**.26, **25**.400–4, **25**.491
costs and expenses, "loser pays"   **61**.21
counterclaim arising directly out of the
  subject-matter of the dispute   **46**.88
  n123
criticism of decision   **52**.29
discontinuance of annulment proceedings
  **52**.26
evidence, taking of, at party's request
  **43**.49
evidence, tribunal's discretionary powers
  **43**.13
expert opinion, request for   **43**.13
findings of fact, adoption of findings of
  another forum   **26**.40
ICC proceedings   **26**.35
  annulment of award by French courts
    **26**.36, **26**.40
interest, claim for   **46**.45,
    **46**.54
international law/host State law,
  interrelationship   **42**.219
jurisdiction, objections to, tribunal's obligation
  to consider/decide   **41**.66
nationality (juridical persons), incorporation or
  seat as test   **25**.286, **25**.699
request for arbitration
  required information, addition of party after
    registration   **36**.26 n31
  translation of documentation   **36**.53

state responsibility for acts of officials
    **42**.108–9
stay of enforcement in annulment proceedings
    **52**.592
    procedure (AR 54)   **52**.599: priority of
        request   **52**.599
    security for eventual payment of award
        **52**.634
stay of proceedings (domestic courts)
    **41**.19
UNESCO Convention for the Protection of the
    World Cultural and Natural Heritage
    (1972) as source of international law
    **42**.174
withdrawal of consent to ICSID jurisdiction
    **25**.615–16
*SPP II*
    applicable law (interpretation of consent to
        ICSID jurisdiction)   **25**.583, **42**.4
    consent to ICSID jurisdiction
        interpretation: restrictive/extensive approach
            **25**.590; tribunal's right to determine own
            competence and   **41**.5
    excluded classes of disputes, notification
        **25**.929
    individual opinions, preliminary decision on
        jurisdiction   **48**.104
    nationality (juridical persons), incorporation or
        seat as test   **25**.286, **25**.699
    request for arbitration, required information,
        addition of party after registration   **36**.26
        n31
**Sri Lanka**, Greater Colombo Economic
    Commission Law 1978   **25**.252
**stabilization clause**
    applicable law   **42**.121
        in case of agreement   **42**.117–28
    applicable law and, in absence of agreement
        **42**.160
    description   **42**.117
    jurisprudence
        *AGIP*   **42**.120–1
        *Atlantic Triton*   **42**.26
        *CMS*   **42**.127
        *Duke Energy*   **42**.128
        *Kaiser Bauxite*   **42**.119
        *LETCO*   **42**.122–3
        *MINE*   **42**.124–5
        *Semos*   **42**.126
    Model Clauses (1993)   **42**.118
    object and purpose   **42**.26, **42**.41, **42**.117
    selective use   **42**.119
**staff**
    appointment   **11**.5

conditions of employment, coordination with
    World Bank   **11**.5
disciplinary measures   **11**.5
dismissal   **11**.5
**State agency**
    *see also* constituent subdivision or agency as
        party to proceedings
    public body status, functional test   **25**.367
**State immunity**
    pre-judgment and post-judgment measures
        distinguished   **55**.96
    provisional measures, enforcement of award
        distinguished   **26**.182
**State immunity from execution**
    act of State doctrine   **55**.34
    constituent subdivision or agency, difficulties
        **55**.120
    evolving concept   **55**.12, **55**.14,
        **55**.17–18
        codification attempts   **55**.14–15
    in own courts   **55**.114
    sources of law relating to   **55**.15–16
    State practice   **55**.17–71, **55**.114
**State immunity from execution, constituent
    subdivision or agency**   **55**.115–27
    Canada   **55**.125
    criteria   **55**.120–1
    France   **55**.126
    Germany   **55**.126
    ILC Draft Articles   **55**.127
    Netherlands   **55**.126
    Switzerland   **55**.126
    United Kingdom   **55**.124
    United States   **55**.122–3
**State immunity from execution, criteria**
    ICSID jurisdiction, special nature of and
        **55**.5, **55**.20
    nature/purpose test   **55**.23–5,
        **55**.56–9
    State immunity from jurisdiction as link
        **55**.19–20, **55**.84
        re-examination of merits and   **55**.20,
            **55**.22
        waiver of immunity from jurisdiction and
            **55**.89
**State immunity from execution, international
    instruments relating to**
    European Convention on State Immunity
        (1972)   **55**.14, **55**.49, **55**.85, **55**.91
    ILC Draft Articles   **55**.50–1, **55**.63, **55**.69,
        **55**.86, **55**.127
    UN Convention on Jurisdictional Immunities
        (2004)   **55**.14, **55**.21, **55**.52–3, **55**.63,
        **55**.68, **55**.86–91, **55**.96, **55**.127

**State immunity from execution,**
      **non-derogation**
   applicability
      "award" (Article 53(2))   **53**.60
      Convention as jurisdictional link   **55**.27
      discontinuance order   **48**.71
      jurisdictional immunity, exclusion   **55**.5
      law in force in forum state, limitation to
         **55**.13–16
      recognition of award   **55**.6
   drafting history   **55**.3–4, **55**.9–10
      Executive Directors' Report   **55**.4
      reasons for inclusion   **55**.10
   enforcement of award   **55**.1–2, **55**.13,
      **64**.14
   *MINE*   **26**.150
   recognition and   **54**.48, **54**.50–63,
      **55**.6
   settlement and   **55**.8
      as weakness of ICSID arbitral process   **55**.8
**State immunity from execution, protected**
      **property**   **55**.28–71
   bank accounts   **55**.57–9, **55**.63–7
   burden of proof   **55**.28
   central banks/monetary authorities   **55**.69–71,
      **55**.78, **55**.80, **55**.82, **55**.90, **55**.92
   diplomatic property   **55**.61–7, **55**.80, **55**.83,
      **55**.90, **55**.92
   jurisprudence
      *AIG*   **54**.61–3, **55**.38–9, **55**.70–1,
         **55**.118
      *Benvenuti & Bonfant* (French proceedings)
         **55**.43–4
      *LETCO*   **55**.35–6, **55**.65–7
      *SOABI* (French proceedings)   **55**.45–6
      *Switzerland*   **55**.48
   link between underlying claim and property
      under execution   **55**.29
   military property   **55**.68, **55**.80, **55**.82, **55**.83,
      **55**.90, **55**.92
   sea-going ships, treaty provisions   **55**.55
   specially protected property   **55**.60–71
**State immunity from execution, provisional**
      **measures in domestic courts and**
      **55**.94–8
   exclusive remedy rule and   **55**.96
   waiver   **55**.97–8
      desirability   **26**.182, **55**.98
**State immunity from execution, State practice**
      **55**.17–71
   Australia   **55**.41, **55**.68, **55**.92
   Austria   **55**.64
   France   **55**.42–6
   Germany   **55**.47, **55**.64, **55**.90
   Italy   **55**.54, **55**.64

   Netherlands   **55**.64
   Spain   **55**.64
   United Kingdom   **55**.37–9, **55**.54, **55**.64,
      **55**.69–71
   United States   **55**.30–6, **55**.65–9
**State immunity from execution, waiver**
      **26**.182, **55**.72–110
   applicable law   **55**.100
   arbitration clause/agreement to arbitrate,
      whether   **55**.21, **55**.74, **55**.81,
      **55**.87–8
      provision in   **55**.72–6
      whether   **55**.21, **55**.74, **55**.87–9
   commercial property waiver, purpose   **55**.91
   conditions and limitations   **55**.76, **55**.77–93
   drafting   **55**.99–110
      clarity, need for   **55**.97
      ICSID Model Clauses (1981)   **55**.103
      ICSID Model Clauses (1993)   **55**.109–
         10
   exclusion of provision in Convention
      **55**.9–11
   explicit waiver, desirability   **55**.82, **55**.83,
      **55**.84
   general principles   **55**.93
   international instruments relating to
      European Convention on State Immunity
         (1972)   **55**.85, **55**.91
      ILC Draft Articles   **55**.86
      UN Convention on Jurisdictional
         Immunities (2004)   **55**.86–91, **55**.96
   *LETCO*   **55**.75
   limited use of possibility   **55**.99
   participation in Convention as   **55**.75
   provisional measures in domestic courts
      **55**.94–8
   recognition proceedings   **54**.48
   waiver of immunity from jurisdiction and
      **55**.89
**State immunity from execution, waiver, State**
      **practice**
   Australia   **55**.83
   Canada   **55**.82
   United Kingdom   **55**.79–81
   United States   **55**.77–8, **55**.91,
      **55**.92
**State immunity from jurisdiction**   **26**.9–14,
      **26**.150
   commercial activities   **26**.9, **26**.10
   distorting effect   **26**.4
   domestic court proceedings and   **Preamble**
      19
   UN Convention on Jurisdictional Immunities
      (2004)   **55**.14, **55**.21, **55**.52–3, **55**.63,
      **55**.68, **55**.86–91, **55**.96, **55**.127

waiver, agreement to ICSID arbitration as
    **26**.9–12
**State responsibility**
    for acts of constituent subdivision or agency
        compliance/binding effect of award and
            **53**.14–15, **55**.116
        designation as party distinguished
            **25**.233–7, **53**.15
    for acts of judiciary    **47**.25, **47**.156
    for acts of officials    **42**.10–19
    applicable law    **42**.108
    attribution in context of Article 51 revision
        **51**.19
    changes to administrative structure of
        subdivision or agency    **25**.315
    for compliance with provisional measures
        **47**.25, **47**.156
    customary international law and    **25**.233,
        **42**.196, **42**.197
    for denial of justice    **26**.138
    domestic law, relevance    **47**.25
    ICSID arbitration, applicability of
        international law rules on    **42**.195–7
    ILC Articles on State Responsibility    **25**.233,
        **42**.195–7, **51**.19
    necessity and    **42**.197
    for non-compliance with award    **53**.13
    recognition/enforcement of award and
        **54**.28
    *SPP*    **42**.108–9
**State succession**
    *see also* State succession (parties to the
        dispute)
    consent given by predecessor, effect on
        **25**.304, **25**.306–10
    examples of    **25**.306
    recognition/enforcement of award and
        **54**.102
**State succession (parties to the
    dispute)**    **25**.304, **25**.306–10: *see also*
        State succession
    in case of ratification subsequent to
        independence/merger    **25**.310
        critical date for consent, relevance
            **25**.310
        severability of consent clause and
            **25**.310
        territorial nexus, relevance    **25**.310
    in case of selective declaration of continuation
        **25**.309
    in case of universal succession    **25**.309
        in respect of territories outside area of
            investment    **25**.309
    former constituent subdivisions designated
        under Article 25(1)    **25**.308

formerly dependent States notified under
    Article 70    **25**.308
ICSID practice    **25**.307 n401
submission to new tribunal and    **52**.670
**State succession (treaties)**
    ICSID practice    **25**.307 n401
    selective succession    **25**.309
    territorial criterion    **25**.309,
        **25**.310
    territories covered by specific extension
        **25**.308
    unilateral declaration of willingness to
        continue    **25**.307
    universal succession    **25**.309
    Vienna Convention on Succession of States in
        respect of Treaties (1978)    **25**.307
**stateless persons, exclusion**    **25**.660
**status (ICSID)**
    *see also* immunities and privileges (Centre)
    autonomous    **18**.4: *see also* autonomy of
        ICSID arbitration process
        World Bank–ICSID relationship and    **18**.2,
            **18**.6–7, **64**.19–20
    capacity to
        acquire and dispose of property,
            non-exercise    **18**.5
        contract, publishing contracts    **18**.5
        institute legal proceedings, non-exercise
            **18**.5
        specific provisions    **19**.1
        to be sued    **18**.6–7
    Convention provisions
        international and domestic legal
            personalities distinguished    **18**.2
        need to distinguish from World Bank as
            reason for inclusion    **18**.2
        as sole applicable treaty provisions
            **18**.1
    Conventions on the Privileges and Immunities
        of the UN and Specialized Agencies
        compared    **18**.3
    Executive Directors' Report    **18**.4
    ICJ advisory proceedings and    **64**.18–20
    name
        decision to omit "the"    **1**.2
        spelling of "Centre"    **1**.2
    specialized agencies distinguished    **18**.1,
        **18**.3, **64**.18–20
    in United States    **18**.1 n3
**stay of enforcement in annulment proceedings**
    **51**.3, **52**.3, **52**.573–655, **52**.696–700,
    **53**.51, **53**.54, **54**.38–40
    circumstances requiring    **52**.594, **52**.609–26,
        **52**.698
        absence of provision for    **52**.609

**stay of enforcement in annulment proceedings**
     (***cont.***)
   circumstances requiring (*cont.*)
      jurisprudence: *Amco I*   **52**.610; *CDC*
         **52**.610, **52**.611, **52**.618, **52**.625; *CMS*
         **52**.610, **52**.611, **52**.620–3; *MINE*
         **52**.610, **52**.611, **52**.614, **52**.624; *Mitchell*
         **42**.626, **52**.610, **52**.617, **52**.626; *MTD*
         **52**.610, **52**.611, **52**.619; *Repsol*   **52**.610,
         **52**.613; *Wena Hotels*   **52**.616
      specification by parties, need for   **52**.609
   compliance obligation and   **52**.578–81
   discretionary nature of power   **52**.575,
      **52**.593–4, **52**.698
   drafting history   **52**.574–7
      enforceability during period between
         application and constitution of *ad hoc*
         committee   **52**.576, **53**.48: Convention
         on the Recognition and Enforcement of
         Foreign Arbitral Awards (1958)   **52**.576
         n832
      Preliminary Draft   **52**.573
      provisional measures, rejection   **52**.573,
         **52**.627
   ILC Model Rules of Arbitral Procedure (1958)
         as basis   **52**.573
   jurisprudence
      *Amco I*   **52**.548, **52**.629–30
      *Amco II*   **52**.631, **52**.700
      *CMS*   **52**.588, **52**.606, **52**.651, **52**.655
      *Klöckner I*   **52**.585
      *Klöckner II*   **52**.700
      *Lucchetti*   **52**.585
      *MINE*   **52**.579, **52**.632–3, **52**.654
      *MTD*   **52**.588
      *Soufraki*   **52**.585
      *SPP*   **52**.634
      *Vivendi I*   **52**.585
      *Vivendi II*   **52**.700
   modification   **52**.588
   procedure (AR 54)   **52**.582, **52**.586,
      **52**.595–608
      *ad hoc* committee/tribunal's right of
         initiative   **52**.586, **52**.590
      entry into force   **49**.27, **52**.608
      jurisprudence: *Amco I*   **52**.597; *Amco II*
         **52**.600; *Azurix*   **52**.607; *CDC*   **52**.602;
         *CMS*   **52**.606; *MINE*   **52**.598; *Mitchell*
         **52**.603; *MTD*   **52**.604; *Repsol*   **52**.605;
         *SPP*   **52**.599; *Wena Hotels*   **52**.601
      notification of stay (including provisional),
         modification or termination   **52**.583,
         **52**.608: certified copies of awards
         (AFR 28(2)) and   **52**.608
      priority of request   **52**.595–607, **52**.698

   request, need for   **52**.581, **54**.100
   requirements   **52**.595: opportunity to
      parties to present case   **52**.596; request
      by one of parties   **52**.586–7, **52**.698
   provisional stay   **52**.583–5, **53**.48
      automaticity   **52**.583, **52**.699, **53**.54:
         NAFTA   **53**.56, **54**.101
      in case of partial annulment   **52**.653,
         **52**.696–7, **52**.699
      continuation of stay, request: standing
         **52**.587; time limits for determining
         **52**.612
      extension to award as a whole   **52**.584
      notification (AR 54(2))   **52**.583, **52**.608
      standing   **52**.584
      termination   **52**.582, **52**.586, **52**.588–9,
         **53**.57
   reasons, need for   **48**.91
   security for eventual payment of award
         **52**.627–49
      absence of provision for   **52**.627
      advantages of requirement for   **52**.647–8
      Convention on the Recognition and
         Enforcement of Foreign Arbitral Awards
         (1958)   **52**.627 n907
      jurisprudence: *Amco I*   **52**.629–31; *Amco II*
         **52**.631; *Azurix*   **52**.643–6; *CDC*
         **52**.636; *CMS*   **52**.642; *MINE*
         **52**.632–3; *Mitchell*   **52**.640; *MTD*
         **52**.641; *Repsol*   **52**.605, **52**.637–9; *SPP*
         **52**.634; *Wena Hotels*   **52**.635
      termination of stay, effect   **52**.652
   submission to new tribunal and   **52**.700
   termination   **52**.589, **52**.650–5, **53**.57
      automaticity on date of award/decision
         **52**.650, **52**.696
      partial annulment and   **52**.653–5, **53**.57
   waiver by agreement, *SPP*   **52**.592
**stay of enforcement in interpretation of award**
      **proceedings**   **50**.2, **50**.11, **50**.42–5,
      **52**.577, **53**.51, **53**.52, **53**.59, **54**.38–40
   annulment proceedings distinguished   **50**.43,
      **52**.577
   certified copies of award and   **50**.45
   discretionary   **50**.19
   drafting history   **50**.42
   partial stay   **50**.45
   procedure
      AR 54   **50**.44
      request by party, need for   **50**.45, **54**.100
      tribunal's right to grant on own initiative
         **50**.45
   provisional stay   **50**.43
   termination on date of decision on
         interpretation   **50**.45

termination/modification at request of either
 party   **50**.45
tribunal's exclusive power   **50**.43
**stay of enforcement in recognition and
 enforcement proceedings**   **54**.37–41,
 **54**.99–101
 Executive Directors' Report   **54**.39
 expectation of stay, relevance   **54**.40,
  **54**.100
 *MINE*   **54**.38
 NAFTA   **54**.101
 relevant factors   **54**.41
**stay of enforcement in revision of award
 proceedings**   **51**.2, **51**.3, **52**.574–655,
 **53**.51, **53**.53, **53**.59, **54**.38–40
 annulment/interpretation proceedings
  distinguished   **51**.3, **51**.35
 automaticity
  NAFTA   **53**.56, **54**.101
  on request of applicant   **51**.34, **51**.35,
   **51**.37, **53**.53
 certified copies of award and   **51**.39
 discretionary power of tribunal   **51**.34, **51**.35,
  **51**.38
 drafting history   **51**.34
 partial   **51**.37
 procedure
  AR 54   **51**.36
  notification to parties   **51**.39–40: *AMT*
   **51**.40
 provisional stay   **51**.3, **51**.34,
  **53**.48
 refusal of application for revision   **51**.37
 requirements
  hearing of both parties   **51**.39
  request of party   **51**.38, **54**.100
 termination or modification   **51**.38
  with decision on revision   **51**.39
**stay of proceedings (domestic courts)**
 obligation   **26**.154–61
 provisional measures and   **47**.76,
  **47**.99–134
 tribunal's right to determine own competence
  and   **41**.16–20
  *Mobil Oil* (NZ proceedings)   **41**.17
  *SGS* v. *Pakistan*   **41**.18
  *SPP*   **41**.19
**stay of proceedings (ICSID)**
 domestic court intervention   **26**.154–61
  applicable law, relevance   **26**.157
  as breach of Convention obligations
   **26**.157
  national legislation, relevance   **26**.157
  nationality of tribunal president, relevance
   **26**.157

tribunal's right to determine own
 competence and   **26**.154, **26**.160–1
exclusive remedy rule and   **26**.119–20,
 **26**.154–61, **41**.17, **69**.7
 *Bayindir*   **26**.119–20
 *Mobil Oil* (NZ proceedings)   **26**.154–7,
  **41**.17, **69**.7
 *SGS* v. *Pakistan*   **26**.158–61
failure to make advance payments for fees and
 expenses and   **61**.49, **61**.54
tribunal's right to determine own competence
 and   **41**.16–20
**stay of proceedings (non-ICSID forum)**
 in case of concurrent jurisdiction   **26**.38
 obligation of non-ICSID forum   **26**.6,
  **26**.10
**subrogation in case of insurance indemnity:**
 *see* insurance indemnity, subrogation
*Suez and AGW*
 *amicus curiae* briefs   **44**.125–6
 disqualification of conciliator or arbitrator
  grounds   **57**.41–2
  procedure   **57**.14
 identical tribunals   **26**.130, **37**.35
 procedure, tribunal's discretionary powers
  **44**.58
*Suez et al*.
 *amicus curiae* briefs   **44**.125–6
 "legal dispute"   **25**.66
 "arising directly"   **25**.111
**summary procedure (AR 41(5)):** *see*
 jurisdiction, objections to, summary
 procedure (AR 41(5))
**supplementation or rectification of award**
 agreement of parties relating to   **49**.64–5
 annulment as alternative: *see* annulment of
  award, grounds, failure to deal with every
  question submitted, supplementation or
  rectification and
 applicability
  annulment proceedings   **49**.30, **50**.13,
   **52**.568, **52**.569, **61**.74
  conciliation proceedings   **33**.5
  costs, fees and expenses   **49**.44,
   **61**.68–9
  decision on: interpretation   **50**.29;
   supplementation or rectification   **54**.79
  examples   **49**.40–1
  limited usefulness   **49**.77
  preliminary decisions   **41**.24, **41**.73,
   **49**.31
  provisional measures   **49**.31
  resubmission   **49**.30
  settlement agreement   **48**.78
 Arbitration Rules (AR), application   **44**.6

**supplementation or rectification of award**
    **(*cont.*)**
    award, as part of    **48**.6, **48**.105, **49**.78–80
        annulment and    **52**.77–8, **52**.493
        certification and dispatch (AFR, 28 (2))
            **49**.8, **49**.25, **49**.37, **49**.78, **49**.80
        compliance with Article 48 requirements
            **48**.29
        compliance with award and    **53**.51,
            **53**.64–5
        inclusion on certified copy of award    **49**.37
        interpretation    **54**.79
        publication    **48**.120, **49**.78
        revision    **51**.6, **54**.79
        supplementation or rectification    **49**.79
    comparable provisions in other international
        instruments    **49**.28
    costs, fees and expenses of proceedings,
        rectification of decisions relating to,
        **49**.44, **61**.68–9: *see also* costs, fees and
        expenses (apportionment: arbitration
        proceedings), supplementation,
        interpretation and rectification
        proceedings
    date of
        as date for purposes of revision and
            annulment requests    **49**.81–5
        dispatch of decision    **49**.82
    discontinuance order    **48**.71
    distinguished from
        appeal/review    **49**.28
        interpretation, revision or annulment
            **49**.33
    drafting history    **49**.29, **49**.38, **49**.69
    exclusive remedy, whether    **49**.68–77, **52**.402
    exhaustiveness/reasons requirement (Article
        48(3))    **48**.29, **48**.45, **48**.89, **49**.43,
        **52**.401–2
    individual opinions    **48**.105
    jurisprudence
        *Amco I*    **49**.42–3, **49**.71, **49**.85
        *Amco II*    **49**.42, **52**.78
        *Genin*    **49**.51–3
        *Klöckner I*    **49**.70
        *LETCO*    **49**.44–5, **61**.69
        *LG&E*    **49**.66–7
        *Maffezini*    **49**.49–50
        *MINE*    **49**.72
        *Noble Ventures*    **49**.64
        *Santa Elena*    **49**.46–8
        *Soufraki*    **49**.65
        *Vivendi II*    **49**.54–63, **49**.73–6
        *Waste Management II*    **49**.31 n51
        *Wena Hotels*    **48**.52, **49**.77
    location of provision    **49**.1, **50**.3

omissions and errors    **48**.43, **49**.38–41
    accidental omissions and errors, limitation
        to    **49**.40–1, **49**.69, **49**.71
    calculation of costs    **49**.44–5
    clerical, arithmetic or similar error,
        limitation to    **49**.40, **49**.43, **49**.47, **49**.56,
        **49**.61, **49**.62, **49**.77
    exhaustiveness requirement and    **49**.29,
        **49**.38, **49**.68–77, **52**.401–2, **52**.407
    issues not addressed by parties
        **49**.52–3
    "material" error    **49**.50
    matters touching on merits, exclusion
        **49**.41, **49**.56, **49**.61, **49**.67, **49**.70,
        **49**.77
    summary of arguments    **49**.48, **49**.49
oral submissions, need for    **49**.51
original tribunal, limitation to    **49**.36
    decision by correspondence    **49**.36
parties' right to be heard (AR 49(3))    **49**.35,
    **49**.44
reasons for provision    **49**.29, **52**.400
recognition/enforcement    **54**.34
request by party
    need for    **48**.45, **49**.33, **49**.34
    receipt and registration    **11**.9
    required information    **49**.33
revision/appeal distinguished    **49**.45,
    **49**.73–6
right to be heard (*audiatur et altera pars*) and
    **52**.311
Secretary-General's role    **49**.34
    refusal to register    **49**.34
stay of enforcement and    **53**.51, **53**.59
supplementation and rectification
    distinguished    **49**.39, **50**.33 n29
time limits
    AFR 29    **49**.34
    AR 46    **49**.37
    AR 49    **49**.32, **49**.34, **49**.37, **52**.308
    date of award    **48**.37, **49**.10
    deferment    **49**.10
**Switzerland**
    provisional measures (domestic courts),
        consent to ICSID arbitration as waiver,
        *MINE*    **26**.168
    signature and ratification of Convention
        **67**.5, **67**.8
    State immunity from execution    **55**.24, **55**.48,
        **55**.126
        *MINE*    **26**.150

**Tajikistan**, non-participation    **68**.8
**Tanzania**, National Investment (Promotion and
    Protection) Act 1993    **25**.134

*Tanzania Electric*
    ancillary claims, simultaneous determination,
        presentation of ancillary claim, time
        limits **46**.22
    applicable law, agreement between parties,
        host State law **42**.25
    constituent subdivision or agency, designation
        as and State responsibility for acts of
        distinguished **25**.234
    constituent subdivision or agency as party to
        proceedings, timing of designation
        **25**.262
    evidence, taking of, at party's request **43**.50
    exclusive remedy rule, obligation of domestic
        court to decline jurisdiction **26**.144
    foreign control for purposes of treatment as
        national of another State **25**.823
    national of another Contracting State,
        agreement to treat as **25**.770
        identification of recognized nationality
        **25**.803, **25**.805
    partial settlement **48**.74
    provisional measures
        circumstances requiring **47**.65
        priority and speed, need for **47**.41
        purpose/rights to be protected, preservation
            of rights in dispute **47**.162, **47**.169
        stay of proceedings in domestic
            courts/injunction against **47**.115–16
tax disputes
    "arising directly", whether
        *Amco I* **46**.26, **46**.80
        *Amco II* **25**.97–8, **46**.27–8, **46**.80, **46**.91
        *Kaiser Bauxite* **25**.99
tax privileges (Centre) **24**.1, **24**.2
    comparison with Articles of Agreement of
        World Bank and IMF **24**.2
    local taxes and rates for actual services
        **24**.2
    "operations and transactions" **24**.2
    tax exemption, reason for **24**.2
    UN and Specialized Agencies distinguished
        **24**.2 n1
tax privileges (conciliators, arbitrators and
        members of *ad hoc* committees)
    in country of nationality, World Bank and IMF
        Articles of Agreement as model **24**.3
    fees and expense allowances under Article 60,
        limitation to **24**.6
    parties to proceedings, exclusion **24**.6
    tax exemption distinguished **24**.5, **24**.6
    tax liability in country of
        fiscal domicile **24**.5
        nationality **24**.3
        residence **24**.6

tax privileges (participants in proceedings)
    **24**.1, **24**.6
tax privileges (persons permanently associated
        with Centre's work)
    Chairman and members of Administrative
        Council, restriction to expense
        allowances **8**.2, **24**.3
    Secretary-General and Deputy
        Secretary-General **24**.4
*Tecmed*
    consent to ICSID jurisdiction, critical date
        **25**.512
    *ex aequo et bono* jurisdiction, equitable
        considerations distinguished **42**.270
    independence of arbitrator **40**.24
    non-retroactivity, continuing breach concept
        **25**.512
*Telenor*
    consent to ICSID jurisdiction, limitations
        **25**.539
    jurisdiction, joinder to merits **41**.92
    MFN clause, applicability to dispute
        settlement provisions **25**.574
    private investor, government-controlled entity
        as **25**.274
*Tesoro*
    conciliation, purpose **34**.10
    conciliation commission
        constitution **29**.8
        objection to competence **32**.6–7
        procedure **34**.14–15
        recommended terms of settlement **34**.21
    multiple instruments/varying parties
        (investment agreements) **25**.560, **32**.7
**Thailand**, non-participation **68**.8
**time limits:** *see under separate headings such as
    'supplementation or rectification of
    award'*
**Togo**, Investment Code  1990, **25**.541
*Togo Electricité*, conciliation commission,
        constitution **29**.10
*Tokios Tokelès*
    consent to ICSID jurisdiction, limitations
        **25**.530
    "foreign control" test, applicability
        **25**.705
    "foreign" investment requirement **25**.185
    individual opinions, preliminary decision on
        jurisdiction **48**.104
    "investment", "in accordance with host State
        law" **25**.201
    jurisdiction, objections to, time limits **41**.39
    legal dispute "arising directly" **25**.101
    nationality (juridical persons) **25**.701–2,
        **25**.723, **25**.725–35

*Tokios Tokelês* (*cont.*)
  provisional measures
    binding effect/legal status  **47**.20
    priority and speed, need for  **47**.44
    purpose/rights to be protected, exclusive
      nature of ICSID proceedings  **47**.128–9
    stay of proceedings in domestic
      courts/injunction against  **47**.128–9
  resignation of conciliator/arbitrator  **56**.26
  withdrawal of request for arbitration
    **36**.66–7
*Total*, languages  **44**.70
*Tradex*
  applicable law, intertemporal rule  **25**.509
  consent to ICSID jurisdiction
    BITs as State's offer  **25**.429
    critical date  **25**.480
    effectiveness principle  **25**.593
    limitations  **25**.525
    national legislation as consent or offer
      **25**.395, **25**.417, **25**.508, **25**.525, **26**.43
  evidence, taking of
    "at any stage of the proceedings"  **43**.40
    evaluation/probative value  **43**.14, **43**.110
    tribunal's discretionary powers  **43**.14
    witnesses  **43**.87
  "foreign" investment requirement  **25**.184
  international law/host State law,
    interrelationship  **42**.221
  "investment"  **25**.135–6
  jurisdiction, joinder to merits  **41**.81
  non-retroactivity  **25**.508
  travel difficulties of persons appearing in
    ICSID proceedings  **22**.6
*Trans-Global*, summary procedure (AR 41(5))
  **41**.102 n132
**transparency:** *see* confidentiality of
    proceedings, transparency, balance with;
    publication of award, parties' consent to;
    publication of information about cases
**travel certificates (AFR 31)**  **21**.11, **22**.4, **22**.5
**travel difficulties of persons appearing in
    ICSID proceedings**  **22**.5–8
  UN sanctions and  **22**.8
**treaties**
  amendment, VCLT (1969)  **66**.4 n2
  implementation  **69**.1
  interpretation, rules and principles
    ordinary meaning/object and purpose,
      priority  **47**.19
    *Pey Casado*  **47**.19
    *travaux préparatoires* as aid  **47**.19
  non-retroactivity  **25**.507
  registration
    effect of non-registration  **74**.2

  obligation  **74**.1–2
  reservations: *see* reservations (ICSID);
    reservations (treaties)
  State succession and: *see* State succession
    (treaties)
  third parties and  **19**.3
**treaty-based jurisdiction:** *see* BITs; fork in the
    road clauses; parallel treaty and contract
    claims
**Treaty of Rome (1957)**, recognition and
    enforcement of arbitral award  **54**.6,
    **54**.97, **54**.106, **54**.110
**treaty shopping**  **25**.730–40
**tribunal (ICSID)**
  *see also* conciliation commission; identical
    tribunals
  as *amiable compositeur*  **42**.255, **42**.258,
    **42**.260
  communication with parties,
    Secretary-General's role  **11**.11
  disqualification: *see* disqualification of
    conciliator or arbitrator
  fees of members: *see* costs, fees and expenses
    (conciliators and arbitrators)
  procedural discretion  **44**.55–8
  replacement
    *see also* replacement of
      conciliator/arbitrator following death,
      incapacity or resignation
    AR 7  **37**.52–3, **56**.6
    by member of Panel  **12**.4
  voting methods: *see* arbitral award (ICSID),
    majority decision
**tribunal (ICSID), appointment of nationals,
    limitations on**  **37**.19, **38**.26: *see also*
    tribunal (ICSID), appointment to, by
    Chairman, nationals/co-nationals,
    exclusion
  agreement of parties to sole or each arbitrator
    **39**.23–31
    2003 Arbitration Rules and  **44**.35
    agreement to each and every arbitrator, need
      for  **39**.24–9, **44**.35
    all arbitrators having nationality of
      respondent State  **39**.31
    appointment by Chairman under Article 38,
      exclusion  **39**.26
    appointment by neutral official under
      Article 37, exclusion  **39**.26
    Article 37 agreement on constitution of
      tribunal distinguished  **37**.31, **39**.23
    NAFTA provisions and  **39**.25
  appointment of president and
    appointment of arbitrator by: Chairman
      **39**.18; neutral official  **39**.18

in case of parties' agreement  **39**.18
comparison with
  *ad hoc* committee provisions  **39**.4
  conciliation provisions  **39**.4
  UNCITRAL/ICC  **39**.5, **39**.7
conciliation commission distinguished
  **57**.43
determination of nationality  **39**.8, **57**.45
  Article 25(2)(b) agreement to treat as and
   **39**.8
  IR 2(1)(d)  **39**.8
developing countries, under-representation
  **39**.11
diversity requirement, absence  **39**.11
  ICJ compared  **39**.11
jurisprudence
  *Astaldi*  **39**.31 n25
  *IBM*  **39**.31
  *Mobil Oil* (NZ proceedings)  **39**.18
  *Olguín*  **57**.46
"majority" provision  **39**.12–22
  3-person tribunal  **39**.12–15
  agreement on constitution of tribunal,
   relevance  **39**.17
  alternative proposals  **39**.1
  compromise nature of provision
   **39**.3
  drafting history  **39**.1–2
  dual/multiple nationality and  **39**.10
  justification for  **39**.7
  non-compliance, effect  **39**.9
  order of appointment, relevance: AR 1(3)
   **39**.13–22; 3-person tribunal  **39**.12–15;
   5-person tribunal  **39**.16
  purpose of provision  **39**.2: Executive
   Directors' Report  **39**.6
obligatory nature of provision  **39**.19
  modification of Arbitration Rules and
   **39**.18–22: *Olguín*  **39**.21–2; *SPP*
   **39**.20
parties agreement on composition of tribunal
  (Article 37) distinguished  **37**.31
**tribunal (ICSID), appointment to**
  *see also* tribunal (ICSID), composition,
   number of arbitrators
acceptance, need for  **37**.10, **37**.47–51, **38**.18
  form  **37**.50
  non-acceptance, new appointment in case of
   **37**.51: time limits  **37**.51
by agreement of parties
  replacement of arbitrator before date of
   constitution  **56**.5
  third arbitrator: Article 37(2)(b) default
   formula  **37**.42; *Mobil Oil* (NZ
   proceedings)  **37**.19 n20, **38**.26

by Chairman  **12**.4, **13**.5, **37**.3, **37**.30, **38**.4,
  **38**.7
90 day time limit for constitution of tribunal
  and  **38**.4, **38**.5–8: difficulty of meeting
  **37**.9, **38**.8; extension or reduction by
  agreement  **38**.5
acceptance by appointee, need for
  **38**.18
in case of failure of: appointing authority to
  make appointment  **38**.4; parties to agree
  on joint appointment  **38**.4, **38**.19;
  party-appointed arbitrators to agree on
  third arbitrator  **38**.4, **38**.19; party to
  make appointment  **Preamble** 34, **5**.4,
  **38**.4, **38**.19
in case of failure to meet time limits: *see,* 90
  day time limit for constitution of tribunal
  and *above*
in case of: refusal of appointment  **37**.51;
  resignation without consent  **5**.4, **37**.3,
  **56**.41–2
consultation by Chairman with both parties,
  need for  **38**.12–14, **40**.10: in case of
  uncooperative party  **38**.14;
  party-appointed arbitrators and
  **38**.13; procedure  **38**.14
*Fedax*  **37**.33 n36
frequency of resort to  **38**.4,
  **38**.22
importance of provision  **38**.1
limitations on choice: 37.3, 38.21: *see also*
  nationals/co-nationals, exclusion *below*;
  appointments by agreement of parties
  distinguished  **38**.26, **38**.27, **40**.8;
  membership of Panel of Arbitrators, need
  for  **38**.21, **38**.25, **40**.1, **40**.2, **40**.8–13
nationals/co-nationals, exclusion  **38**.21,
  **38**.24–7, **39**.18, **40**.10, **57**.44–5:
  applicability to all members of tribunal
  **38**.25; conciliation commission
  distinguished  **38**.24; NAFTA provisions
  distinguished  **38**.27; purpose of
  provision  **38**.24; replacement following
  resignation without consent  **56**.42
obligation to appoint  **38**.15–18:
  designation of president  **38**.20; range of
  possibilities  **38**.19–21
parties' behaviour, relevance, *SOABI*
  **38**.7
request by one or both parties  **37**.8: AR 4
  **38**.10; need for  **38**.9–11; required
  information  **38**.11
Secretary-General's role  **38**.11, **38**.16,
  **38**.18
time limits  **38**.17, **40**.10

**tribunal (ICSID), appointment to (*cont.*)**
by neutral official
choice as: Chairman: *see* by Chairman
*above*; *ex officio* designation   **37**.23;
possibilities   **37**.22–3; risk of refusal
**37**.23; Secretary-General   **37**.24
president   **37**.21
sole arbitrator   **37**.18
third arbitrator   **37**.19
by party-appointed arbitrators   **37**.20
drafting history   **38**.2
expiry of membership of Panel and   **15**.4
public service nature   **60**.9
refusal, right of   **12**.5, **37**.49, **60**.10
fees, relevance   **37**.49
Secretary-General's role   **11**.4, **37**.27
**tribunal (ICSID), appointment to from**
**outside Panel   12**.4, **13**.5
appointment by
Chairman   **13**.5: Articles 37 and 38
appointments distinguished   **40**.8;
designation to Panel and   **40**.11; expiry
of term of office on Panel, effect   **40**.12;
*Kaiser Bauxite*   **40**.9; *MINE*   **40**.9 n3
neutral official chosen by parties as
appointing authority   **40**.7
parties   **40**.1–3: parties' freedom of choice
and   **40**.4–7
Article 14 qualities, need for   **57**.16
drafting history   **40**.2
exclusion of conciliator or arbitrator in same
dispute (AR 1(4))   **35**.2, **40**.25, **52**.669
exclusion of Secretary-General, Deputy
Secretary-General and ICSID staff
**40**.26
Executive Directors' Report   **40**.3
independence of arbitrator and: *see*
independence of arbitrator, appointment
to tribunal from outside Panel and
**tribunal (ICSID), appointment to/constitution,**
**jurisprudence**
*Fedax*   **37**.33
*Joy Mining*   **37**.22
*MINE*   **37**.32
*Mobil Oil* (NZ proceedings)   **37**.19 n20,
**38**.26, **39**.18 n15
*SOABI*   **37**.31 n33, **37**.34, **38**.7, **39**.27–30
**tribunal (ICSID), composition and method of**
**constitution, parties' agreement   37**.7,
**37**.15–35: *see also* tribunal (ICSID),
composition, number of arbitrators
actual appointments distinguished   **37**.31–4
*ad hoc* agreement (AR 2)   **37**.7, **37**.25–35
appointment of third member by two
party-appointed members   **37**.20

binding nature   **37**.28
BITs provisions   **37**.24
communication of agreement to
Secretary-General   **37**.29
identical tribunals for related cases: *see*
identical tribunals
information to be provided at or about time of
request for arbitration   **36**.32, **36**.33,
**37**.16
Model Clauses (1993)   **37**.17–18
NAFTA provisions   **37**.24
nationality requirements (Article 39) and
**37**.31, **39**.23
neutral official as appointing authority
sole arbitrator   **37**.18
third member of tribunal of three   **37**.19
new tribunal to interpret award and   **50**.40
prior agreement   **37**.16, **37**.17–24
Model Clauses (1993)   **37**.17–20
**tribunal (ICSID), composition and method of**
**constitution, parties' failure to agree**
**(Article 37(2)(b) default formula)**
**37**.27–8
drafting history   **37**.42
frequency of use of provision   **37**.46
procedure (AR 3)   **37**.39–45, **39**.17,
**39**.20
expedition   **37**.41
modification by parties   **37**.43
time limits   **37**.40
Secretary-General's role   **37**.45
third arbitrator
agreement of parties, need for   **37**.42
as president   **37**.38: obligatory requirement
**37**.38
timing of resort to   **37**.28, **37**.36–7, **37**.46,
**38**.11
parties' extension of time limits   **37**.37,
**37**.40
UNCITRAL/ICC provisions compared
**37**.37
**tribunal (ICSID), composition, number of**
**arbitrators**
comparable provisions in other international
instruments   **37**.11
sole arbitrator   **37**.11–13
uneven   **37**.11–14
modification by parties, exclusion   **37**.11
**tribunal (ICSID), constitution**
completion of process (AR 6)   **37**.10, **37**.34,
**37**.52, **56**.5
"composition shall remain unchanged" (ICSID
56(1))   **37**.10, **56**.5–13: *see also*
replacement of conciliator/arbitrator
following death, incapacity or resignation

continuity of membership, desirability **56**.5–6, **56**.31, **56**.37

drafting history   **56**.31

temporary inability of arbitrator to work **56**.8

ICSID assistance   **1**.4

principles underlying

Executive Directors' Report   **37**.4

non-frustration of object and purpose of Convention   **37**.2, **37**.3, **38**.1, **45**.5

parties' agreement   **37**.15–16

parties' freedom of choice   **37**.2, **38**.3, **40**.5: appointment of arbitrators from outside Panel and   **40**.5

proper constitution, importance   **37**.5

annulment and   **37**.5

statement of valid constitution   **37**.5

validity of consent to jurisdiction, relevance **41**.6–8

replacement of arbitrator

AR 7   **37**.52–3

by agreement of parties   **37**.52–3, **56**.6

prior to completion of constitution process **37**.52–4, **56**.6

time limits

90 days after notice of registration   **38**.5–8: difficulty of meeting   **37**.9, **38**.8; extension/reduction by parties   **38**.5

appointment by Chairman in case of failure to meet: *see* tribunal (ICSID), appointment to, by Chairman

AR 2   **37**.27–8

"as soon as possible after registration of request"   **37**.6–9: AR 1   **37**.6; extension by parties   **37**.8

date of registration as trigger   **36**.62, **37**.8

usual timescale   **37**.9

veto, right of   **37**.42

**tribunal (ICSID), president**

appointment by

Chairman   **38**.20

neutral official   **37**.21

non-attendance at session, effect   **48**.13

avoidance of party appointed member as **37**.21, **37**.38

in case of parties' failure to agree on number and method

"third arbitrator" as   **37**.38

waiver, exclusion   **37**.38

clear designation, need for   **37**.21

criteria   **37**.21

nationality, relevance   **39**.18

*Mobil Oil* (NZ proceedings)   **39**.18 n15

stay of proceedings   **26**.157

roster   **12**.2 n2, **37**.24

**tribunal (ICSID), qualities/qualifications of arbitrators**   **12**.4

definition by reference to Article 14(1)   **40**.1, **40**.2, **40**.14–15, **52**.123

independence: *see* independence of arbitrator

**tribunal (ICSID), resignation**

conflict of interest   **56**.43

failure to sign declaration of professional, business or other relationships as resignation   **40**.18

without consent   **5**.4

**tribunal (ICSID), role and obligations**

*see also* competence of tribunal, determination by tribunal; jurisdiction

examination of domestic nationality law **42**.9

findings of fact   **26**.40

adoption of findings of another forum **26**.40, **26**.121

**Tunisia**

Encouragement of Investment in Tourism Law 1986, **25**.399

Industrial Investment Code   1987, **25**.399

**Turkey**

declaration relating to Article   64, **64**.4, **68**.4

notification of exclusion of classes of dispute **25**.926

**Uganda**

consent to ICSID arbitration, statutory provisions   **25**.27

Investment Code   1991, **25**.411, **25**.523

**umbrella clauses**   **25**.537, **26**.94, **26**.108

**UN Charter of Economic Rights and Duties of States (1974)**   **Preamble** 17 n11

**UN Charter obligations, primacy**   **22**.8

**UNCITRAL**

arbitration under, ICSID Secretary-General as appointing authority   **11**.16

default option   **26**.20

right to choose   **26**.22

**UNCITRAL Arbitration Rules (1976)**

*ad hoc* arbitration agreements and   **Preamble** 25

ancillary claims, simultaneous determination **46**.3

applicable law   **42**.142

arbitrators

independence of parties   **40**.16

nationality   **39**.5

number and method of appointment   **37**.11, **37**.37, **38**.3

**UNCITRAL Arbitration Rules (1976) (*cont.*)**
  award
    delivery to parties   **49**.2 n3
    requirements: reasons   **48**.54; signature
      **48**.34 n20; writing   **48**.31 n17
  competence of tribunal, determination by
    tribunal   **41**.1
  confidentiality of proceedings   **44**.97 n115
  costs of proceedings   **59**.3 n2
    advance payment   **61**.46
    apportionment   **61**.1
    "loser pays"   **61**.17
  decision by president of tribunal in absence of
    majority   **39**.7
  disqualification of arbitrator   **57**.1 n1
  evidence, taking of   **43**.1
  *ex aequo et bono* jurisdiction   **42**.253 n425
  fees and expenses (conciliators and arbitrators)
    **60**.1
  institution of proceedings   **36**.4
  interpretation of award   **50**.1
  majority decision, failure to reach   **48**.15 n8
  non-cooperating parties   **45**.1
  place of proceedings   **62**.2
  provisional measures   **47**.1
  publication of awards   **48**.108
  severability of arbitration clause   **25**.622
  supplementation or rectification of award
    **49**.28 n46
  vacancy on tribunal   **56**.11 n9, **56**.14
    n11
**UNCITRAL Conciliation Rules   28**.5, **34**.31
  n30, **35**.3
  costs of proceedings, apportionment   **61**.4 n5
**UNCITRAL Model Law (1985)**
  annulment/non-recognition or enforcement of
    award   **52**.6, **52**.118 n163, **52**.130 n170,
    **52**.271 n414, **52**.278 n417, **52**.338 n520
  arbitrator, disqualification   **57**.1 n1
  arbitrators
    independence   **40**.16
    nationality   **39**.5
    number and method of appointment   **37**.11,
      **37**.37, **38**.3
  award
    delivery to parties   **49**.2 n3
    requirements: reasons   **48**.54; signature
      **48**.34 n20; writing   **48**.31 n17
  competence of tribunal, determination by
    tribunal   **41**.1
  decision by president of tribunal in absence of
    majority   **39**.7
  evidence, taking of   **43**.1
  interpretation of award   **50**.1
  non-cooperating parties   **45**.1

place of proceedings   **62**.2
provisional measures   **47**.1
settlement agreements   **48**.69
supplementation or rectification of award
  **49**.28 n46
vacancy on tribunal   **56**.14 n11
**unilateral submission of dispute, acceptability**
  **25**.435
**unilateral undertaking, legal effect**
  **26**.42
**United Kingdom**
  State Immunity Act 1978 /State immunity
    from execution   **54**.61–3, **55**.14,
    **55**.37–9, **55**.54, **55**.62, **55**.64, **55**.69–71,
    **55**.79–81, **55**.118
    separate entities   **55**.124
**United States of America**
  act of State doctrine   **55**.34
  consent to ICSID arbitration, "agreement to
    arbitrate in another country", whether
    **26**.9, **26**.11
  Convention on the Settlement of Disputes Act
    1966, **54**.93–6
  Foreign Sovereign Immunities Act (FSIA)
    **26**.9, **26**.11, **26**.12, **55**.14, **55**.29–36,
    **55**.62, **55**.65–9, **55**.77–8
    1988 Amendment in relation to foreign
      arbitral awards   **55**.32–3
    international agreements, precedence
      **26**.13
    political subdivision or agency or
      instrumentality of foreign State
      **55**.122–3
  *MINE* proceedings   **26**.9–13, **26**.115,
    **62**.5
  recognition and enforcement   **54**.56–60,
    **54**.92–6, **54**.105, **54**.114
    implementing legislation   **69**.5
  State immunity from execution, waiver
    **55**.77–8, **55**.91, **55**.92
  State immunity from jurisdiction
    *see also* Foreign Sovereign Immunities Act
    (FSIA) *above*
    waiver, agreement to ICSID arbitration as
    **26**.9–12
  status of ICSID, under International
    Organizations Immunities Act   **18**.1 n3
**"unity of investment" approach   25**.93–105,
  **25**.561–5, **26**.51, **26**.135
**unjust enrichment   52**.692

*Vacuum Salt*
  choice of forum   **26**.48
  closure/reopening of proceedings (AR 38)
    **49**.21

evidence, taking of
  evaluation/probative value   **43**.108
  tribunal's discretionary powers   **43**.12
foreign control for purposes of treatment as
    national of another State
  critical dates   **25**.821, **25**.878–80, **25**.890
  form and extent of control: decision-making
    structure and management   **25**.856–7;
    effective control   **25**.838
  juridical persons controlled by local
    nationals, exclusion   **25**.827
  as objective requirement/evidence of
    **25**.820–1, **25**.825
jurisdiction, objections to, time limits   **41**.34
national of another Contracting State,
    agreement to treat as
  implicit agreement, possibility of   **25**.785
  test   **25**.765
nationality (natural persons)   **25**.684
  n905
non-attendance of president at a session, effect
  **48**.13
provisional measures
  binding effect/legal status   **47**.17
  disputed jurisdiction and   **47**.50
  incorporation of recommendations in
    agreement between parties   **47**.17
  preservation and production of evidence
    **47**.82
  priority and speed, need for   **47**.40
  stay of proceedings in domestic
    courts/injunction against   **47**.110
request for arbitration
  accuracy of information   **36**.51
  required information, addition of party after
    registration   **36**.27
**videolink/teleconference**   **62**.22, **63**.21
**Vienna Convention on Diplomatic Relations
  (1961)**   **55**.61
**Vienna Convention on the Law of Treaties
  (1969)**
amendments   **25**.941 n1244, **53**.30, **66**.4 n2
applicability
  BITs   **25**.941
  ICSID Convention   **25**.924, **52**.17, **52**.346
    n531, **54**.65, **68**.5
non-retroactivity of treaties   **25**.507 n677
reservations   **25**.924, **68**.5
**Viet Nam**, non-participation   **68**.8
**visits and enquiries:** *see* evidence, taking of,
    visits and enquiries
*Vivendi I*   **26**.81–5
annulment of award
  partial annulment, parties' right to request
    **52**.72, **52**.503, **52**.508

time limits, requirement to provide detailed
    grounds and   **52**.444–5
annulment of award, grounds
  failure to hear other party (*audiatur et altera
    pars*)   **52**.314
  failure to state reasons: absence of reasons
    **52**.355; quality/sufficiency of reasons
    **52**.377, **52**.388
  interpretation of Article 52   **52**.19, **52**.32
  manifest excess of powers   **26**.83–4,
    **52**.139: *infra petita*   **52**.168
  multiple grounds/classification difficulties
    **52**.528
consent to ICSID jurisdiction, limitations
    **25**.528
constituent subdivision or agency, designation
    as and State responsibility for acts of
    distinguished   **25**.234, **25**.236
costs and expenses   **61**.39
disqualification of conciliator or arbitrator
  grounds, manifest absence of Article 14
    qualities   **14**.5, **57**.23–5
  procedure   **44**.7, **57**.5
exhaustion of local administrative or judicial
    remedies   **26**.219–20
foreign control for purposes of treatment as
    national of another State, critical dates
    **25**.882
fork in the road clauses   **26**.62–4
national of another Contracting State,
    agreement to treat as   **25**.773
  test   **25**.765
obligation to annul, whether   **52**.474
parallel treaty and contract claims   **26**.78–85
shareholders as parties to dispute   **25**.793
stay of enforcement in annulment proceedings
    **52**.585
*Vivendi II*
annulment of award, grounds, interpretation of
    Article 52   **52**.24
assignment/succession following institution of
    proceedings, relevance   **25**.357
costs and expenses, procedural misconduct
    and   **61**.32
critical date for determination of jurisdiction
    **25**.40, **25**.357, **25**.755
evidence, taking of
  "at any stage of the proceedings"   **43**.43
  witnesses   **43**.90–1
foreign control for purposes of treatment as
    national of another State, critical dates
    **25**.882
interest, claim for   **46**.59
request for arbitration, required information
    **36**.27, **36**.43

*Vivendi II* (*cont.*)
   resubmission of dispute after annulment
      *res judicata* and    **52**.679–82
      status of parties, change in    **52**.672
      stay of enforcement and    **52**.700
   revision/appeal distinguished
      **49**.73–6
   supplementation or rectification of award
      **49**.54–63
**voting:** *see* Administrative Council, voting;
   arbitral award (ICSID), majority decision

*Waste Management I*, NAFTA concurrent
   arbitration provisions, waiver of right to
   **26**.113
*Waste Management II*
   exhaustion of local administrative or judicial
      remedies    **26**.222, **26**.225
   interpretation of award    **50**.4 n3, **50**.12 n18
   NAFTA concurrent arbitration provisions,
      waiver of right to    **26**.113
   supplementation or rectification    **49**.31 n51
*Wena Hotels*
   annulment of award, interpretation of Article
      52    **52**.19, **52**.32
   annulment of award, grounds
      failure to deal with every question submitted
         **48**.52, **49**.77, **52**.410–12, **52**.432
      failure to hear other party (*audiatur et altera
         pars*)    **52**.313
      failure to state reasons: absence of reasons
         **52**.354; quality/sufficiency of reasons
         **52**.376
      manifest excess of powers    **52**.136, **52**.137,
         **52**.145: failure to apply correct applicable
         law    **52**.215–18
      multiple grounds/classification difficulties
         **52**.417
      serious departure from fundamental rule of
         procedure, failure to comply with
         evidentiary standards    **52**.329
      "serious departure"/"fundamental rule"
         **52**.285
   annulment of award, request, required
      information    **52**.93
   applicable law
      in absence of agreement between parties,
         finding of absence, need for
         **42**.136
      agreement between parties: implicit
         agreement, reliance on particular law in
         submissions before tribunal    **42**.78;
         international law/general principles of
         law, as part of chosen domestic law
         **42**.101

constituent subdivision or agency, designation
   as and State responsibility for acts of
   distinguished    **25**.234
costs and expenses    **61**.39
evidence, tribunal's discretionary powers
   **43**.20, **52**.328, **52**.329
exclusive remedy rule, obligation of domestic
   court to decline jurisdiction    **26**.145–7
exhaustiveness/reasons requirement (Article
   48(3))    **48**.49, **48**.52, **48**.66, **49**.77
"foreign control" test, applicability    **25**.704
"foreign" investment requirement    **25**.184
interest, claim for    **46**.58
international law/host State law,
   interrelationship    **42**.223, **42**.229,
   **42**.236–7
interpretation of award    **50**.4, **50**.5, **50**.6,
   **50**.7–11, **50**.17, **50**.20, **50**.24, **50**.37,
   **50**.40
*res judicata* effect of award    **26**.145
stay of enforcement in annulment proceedings
   circumstances requiring    **52**.616
   procedure (AR 54)    **52**.601
   security for eventual payment of award
   **52**.635
*Western NIS*, consultation or negotiations
   obligation    **25**.547
**withdrawal of consent to ICSID jurisdiction**
   by agreement (AR 43 *and* 44)    **25**.603,
      **48**.83–5
   drafting history    **25**.596
   exhaustion of local administrative or judicial
      remedies and    **26**.193
   indirect withdrawal
      acquisition of host State nationality
         **25**.633
      administrative changes to constituent
         subdivision or agency    **25**.315
      denunciation of Convention    **25**.211,
         **25**.215, **25**.609–11, **66**.7, **72**.2–3
      exclusion of territories    **25**.611
      expropriation leading to deprivation of
         foreign controls    **25**.634,
         **25**.895
      good faith principle    **25**.628–30
      invalidity or termination of investor/host
         State agreement    **25**.620–4
      investor's lack of authority    **25**.632
      national legislation, changes to    **25**.618
      notification of excluded classes of dispute
         (Article 25(4)) as    **25**.607–8, **25**.938–41,
         **45**.49, **45**.80
      State's incapacity to give consent
         **25**.625–31
      termination of treaty offer    **25**.619

withdrawal of designation or approval in respect of constituent subdivision or agency   **25**.267, **25**.612–13, **25**.908

withdrawal of investment authorization   **25**.614–17

withholding of agreement on procedure, exclusion   **44**.18

irrevocability of consent   **Preamble** 33, **25**.267, **25**.419, **25**.475, **25**.596–606, **66**.7

in case of constituent subdivision or agency   **25**.602

critical date   **25**.475, **25**.599–602

decision to include specific statement of principle in Convention   **25**.596

delayed objection to jurisdiction   **25**.604

Executive Directors' Report   **25**.597

new limitations and conditions   **25**.606

*pacta sunt servanda* principle   **25**.598

Preamble   **25**.597

prior to acceptance of offer   **25**.941

refusal of party to cooperate, effect   **25**.605, **45**.5

tribunal's right to determine own competence and   **41**.5

jurisprudence

*Alcoa*   **25**.607

*CSOB*   **25**.619

*Gruslin*   **25**.604

*Holiday Inns*   **25**.601

*IBM*   **25**.629

*SPP*   **25**.615–16

withdrawal of BIT offer distinguished   **25**.450

**withdrawal of request for arbitration**   **36**.64–70

discontinuance of proceedings and   **36**.68

effect on consent to ICSID jurisdiction   **36**.67, **36**.68

IR 8   **36**.64

lodging fee, non-refundability   **36**.16, **36**.66

registration, effect   **36**.20, **36**.64

settlement as basis   **36**.65

time limits   **36**.20, **36**.64

unilateral   **36**.66

in case of joint application   **36**.66

withdrawal of consent to jurisdiction distinguished   **36**.68

**witnesses:** *see* evidence, taking of, witnesses

**World Bank**

Board of Governors, Finance Ministers of countries concerned   **4**.2

capacity to be sued in respect of ICSID   **18**.6–7, **20**.2

headquarters   **2**.2

immunities and privileges: *see* immunities and privileges (World Bank)

non-Members

representation on Administrative Council   **4**.1–4

signature of ICSID Convention   **6**.2, **67**.3–8

President

absence   **5**.3

acting President   **5**.3

*ex officio* Chairman of Administrative Council   **2**.5, **5**.1–4

inability to act   **5**.3

vacancy   **5**.3

**World Bank Guidelines on the Treatment of Foreign Direct Investment (1992)**   **Preamble** 15 n10

applicable law, as   **42**.42

consent to ICSID jurisdiction, non-binding reference   **25**.466

as source of international law   **42**.190

**World Bank–ICSID Memorandum of Administrative Arrangements (1967)**   **Preamble** 31–2, **2**.5, **62**.14, **64**.19

Executive Directors' Report   **6**.15, **17**.4

financial undertakings   **17**.5–6

signature   **11**.3

text   **6**.16 n11

**World Bank–ICSID relationship**   **Preamble** 31–2, **6**.14–16

Administrative Council: *see* Administrative Council

amendment of ICSID Convention and   **66**.3

autonomous status of ICSID and   **18**.2, **64**.19–20

Centre costs, responsibility for: *see* costs, fees and expenses (Centre), World Bank responsibility for

compliance with award and   **53**.40

as depositary for ICSID Convention   **Preamble** 9, **66**.3, **67**.9, **68**.1, **70**.7, **73**.1–3, **75**.1, **Final Clause** 1

legal ties   **Preamble** 32, **2**.4–5, **4**.1–4

advantages   **2**.4, **4**.3

conflict of interest   **2**.4

place of ICSID proceedings and   **63**.23

Secretary-General/Deputy Secretaries-General, dual role   **10**.4, **10**.6

staff conditions of employment, coordination   **11**.5

World Bank as seat   **2**.1–5, **6**.2, **36**.12, **62**.13

*World Duty Free*
  applicable law, agreement between parties,
      third State law   **42**.31
  confidentiality of proceedings/publication
      **44**.121, **47**.150–1
  disqualification of conciliator or arbitrator,
      grounds, manifest absence of Article 14
      qualities   **57**.27 n25
  experts   **43**.103
  "investment", "in accordance with host State
      law"   **25**.201
  provisional measures, purpose/rights to be
      protected   **47**.150–1
  public policy/*ordre public* (international)
      **42**.51
  resignation of conciliator/arbitrator
      **56**.24
  **written/oral procedure**   **44**.80–96
      division   **44**.81
          application to incidental or subsidiary
              procedure   **44**.83
          balance between common and civil law
              approaches   **44**.38
          modification by parties   **44**.81
      jurisprudence
          *Fraport*   **44**.96
          *Noble Ventures*   **44**.94 n110
      oral hearings   **43**.12, **43**.14,
          **44**.93–6
          AR 32   **44**.93, **44**.102
          post-hearing submissions
              **44**.95–6
          private nature/attendance at (AR 32(2))
              44.36, 44.101–6, 47.151: *see also*
              confidentiality of proceedings
          purpose   **44**.94
      timing of decisions on   **44**.86
      written procedure
          number of rounds   **44**.89
          pleadings   **44**.86–92
          request and related procedure as part of (AR
              30 and 31)   **44**.84, **44**.85
          submission, definition   **44**.91
          time limits: AR 26   **44**.87; extension
              **44**.88

**Yemen**
  choice of forum   **26**.46
  Investment Law   1991, **25**.223, **25**.399, **26**.46
  ratification of ICSID Convention
      **26**.46

**Zaire**, Investment Code   1986, **25**.806
*Zhinvali*
  ancillary claims, simultaneous determination,
      incidental or additional claims arising out
      of third party contracts   **46**.40
  annulment of award, grounds, decision *ex
      aequo et bono* without agreement of
      parties   **42**.265
  applicable law (interpretation of consent to
      ICSID jurisdiction)   **25**.584
  claims on behalf of nationals of non-parties to
      BIT   **25**.330–2
  concurrent reference to domestic courts
      **26**.47
  consent to ICSID jurisdiction
      limitations   **25**.520
      national legislation as consent or offer
          **25**.406–8, **25**.418
  costs and expenses, procedural misconduct
      and   **61**.25
  critical date for determination of jurisdiction
      **25**.38
  disqualification of conciliator or arbitrator,
      grounds, manifest absence of Article 14
      qualities   **57**.26
  evidence, taking of, refusal to produce
      documents   **43**.75
  "investment"
      national legislation   **25**.137
      pre-investment activities   **25**.178
  jurisdiction, objections to, time limits
      **52**.174
  provisional measures
      enforcement, domestic courts' role   **47**.30
      priority and speed, need for   **47**.43
      purpose/rights to be protected, preservation
          of rights of third parties   **47**.177
      stay of proceedings in domestic
          courts/injunction against   **47**.126–7