**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NEXTERA ENERGY GLOBAL HOLDINGS
B.V. and NEXTERA ENERGY SPAIN
HOLDINGS B.V.,

                Petitioners,

                v.

KINGDOM OF SPAIN,

                Respondent.

Civil Action No. 19-cv-01618-TSC

---

**SUPPLEMENTAL DECLARATION OF PROFESSOR GEORGE A. BERMANN**

Pursuant to 28 U.S.C. § 1746, I, GEORGE A. BERMANN, declare as follows:

## I.    INTRODUCTION

1. I submit this Supplemental Expert Declaration at the request of counsel for NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (together, "NextEra"), the two Petitioners in this action, in connection with the current proceeding to enforce an arbitral award and to respond to certain matters raised for the first time by Professor Dr. Steffen Hindelang, LLM in his Reply Expert Declaration dated June 29, 2022 ("Hindelang 2022 Reply Decl.") (ECF No. 74-1),[1] and the Kingdom of Spain ("Spain") in its Reply in support of its renewed Motion to Dismiss ("Spain MTD Reply") (ECF No. 74).

---

[1] In addition to Professor Hindelang's 2022 Reply Declaration, I also refer below to (1) Professor Hindelang's May 2, 2022 Declaration (ECF No. 62-1) ("Hindelang Initial 2022 Decl."), and (2) my June 7, 2022 declaration in response (ECF No. 68-1) ("Bermann Initial 2022 Decl.").

2. This Supplemental Expert Declaration is submitted in conjunction with NextEra's proposed Surreply and addresses only the new assertions made by Spain and Professor Hindelang identified in NextEra's accompanying Motion for Leave to File a Surreply as warranting a response on the record by NextEra and/or myself, for the reasons set forth therein. It does not address all of the issues in Professor Hindelang's Reply Declaration (e.g., his arguments about "*lex posterior*" and "conflicts rules," or his claim that payment of the award would constitute an impermissible State aid). My Initial 2022 Declaration covers all of these issues, and Professor Hindelang has not persuasively challenged the opinions I expressed on any of them. Not a single one of Professor Hindelang's challenges to my Initial Declaration withstands scrutiny.

3. Due to the above-mentioned constraints, I strictly confine myself here to the two arguments in Professor Hindelang's submission that are new. My responses to them are, in summary:

(a) **The relevance (if any) of the recent *Green Power* decision.** Although the recent *Green Power* award, which was issued by an arbitral tribunal in Stockholm, upheld an "intra-EU" objection and dismissed a Danish investor's claims against Spain, the award is not relevant to the present analysis for several reasons, most notably that: (i) the *Green Power* arbitration was not governed by the ICSID Convention, meaning that the arbitration was subject to the overall supervision of the Swedish courts at the seat under the Swedish Arbitration Act ("SAA"), and (ii) because it considered Swedish arbitral law and the SAA applicable to the key issue, the *Green Power* tribunal did not address whether, as a question of *international law*, the ECT contains a binding offer to arbitrate. Knowing that a Swedish court could – and if compelled by EU law, would – set aside the award, the tribunal understandably chose not to proceed. By contrast, ICSID Convention Article 54, which is applicable in the present case, mandates that each Contracting State to the ICSID Convention (and thus their courts) enforce an award rendered pursuant to the ICSID Convention as if it were a final judgment of a court in that State, and without review of arbitral jurisdiction, the merits or its own public policy.

---

Although the previous motion sequence (between 2019 and 2020) included three other expert declarations – Professor Hindelang made two expert declarations dated October 11, 2019 (ECF No. 15-6) and February 7, 2020 (ECF No. 25), and I made an expert declaration dated December 19, 2019 (ECF No. 22) – I do not refer to those prior declarations here.

2

(b) **Professor Hindelang's new argument that the ECT contains an "intra-EU carve-out" via an "*inter se*" modification between EU Member States.** Professor Hindelang's Reply Declaration contains an argument not previously advanced by him that the ECT should be read as permitting, and indeed, containing, a "carve-out" barring arbitration of "intra-EU" claims due to an "*inter se*" modification of the ECT between EU Member States. This position is again irrelevant to the issue this Court has to decide. It is also untenable. The ECT contains no such carve-out language and none was ever agreed to – to the contrary, it was expressly rejected. Moreover, the key legal preconditions for an "*inter se*" modification under the Vienna Convention on the Law of Treaties ("the VCLT") are simply not met.

## II. <u>OPINION</u>

### A. The *Green Power v. Spain* Award Has No Bearing on the Issue of Whether the Present Award Deserves Enforcement

#### 1. The Issues Raised in the Present Action

4. In my Initial 2022 Declaration, I noted that the present award was rendered under the ICSID Convention. I further noted that the tribunal had the power under Article 41 of the ICSID Convention to determine issues of jurisdiction, which it fully exercised. In doing so, the tribunal carefully considered each of the "intra-EU" objections made by Spain and the European Commission and rejected them in their entirety.[2] I further noted that the ICSID *ad hoc* annulment committee in this case had the authority under Article 52 of the ICSID Convention to review whether the award should be annulled for manifest excess of jurisdiction. In exercising that power, the annulment committee independently considered the same intra-EU objections, including the alleged impact of both the *Achmea* and *Komstroy* decisions, and concluded that the *NextEra* award did not suffer from any jurisdictional defects warranting annulment.[3]

---

[2]  *See* Bermann Initial 2022 Decl. ¶¶ 3, 18, 70.

[3]  *Id.* ¶¶ 3, 31, 70, 82.

5. As I further observed in my Initial 2022 Declaration, the ICSID Convention not only obligates Spain under Article 53 to comply with the award rendered against it,[4] but also obligates courts of other Contracting States under Article 54 to enforce the award in the same manner in which they enforce final judgments of their own courts, provided the party seeking enforcement produces a copy of the ICSID award certified by the Secretary-General.[5]

6. Against that factual background, I thus explained, among other things, that:

(a) By acceding to the ICSID Convention, Spain categorically undertook to comply with ICSID awards rendered against it and acknowledged that other ICSID Contracting States, such as the United States, are obligated to enforce the pecuniary obligations of those awards if they remain unpaid;[6]

(b) Spain's assertions concerning the application of the ECT to intra-EU disputes and its related EU law arguments do not alter that position, because, among other reasons, ICSID Convention awards rendered under the ECT are governed on the international plane by international law, not domestic law;[7] and

(c) Consequently, none of Professor Hindelang's various arguments about the "autonomy" of EU law or the decisions of the CJEU in *Achmea* and *Komstroy* alter

---

[4] Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 575 U.N.T.S. 159 (the "ICSID Convention") (ECF No. 1-5), art. 54; *see also* Bermann Initial 2022 Decl. ¶¶ 19-20, 24.

[5] ICSID Convention, art. 54; *see also* Bermann Initial 2022 Decl. ¶¶ 19-22, 24-25.

[6] Bermann Initial 2022 Decl. ¶¶ 19-22, 24-25.

[7] *Id.* ¶¶ 63-83. Professor Hindelang claims that I deny that EU law is international law. *See* Hindelang 2022 Reply Decl. ¶¶ 9-10, 12, 20, 25, 42-43. This misstates my position and also misapprehends the true status of EU law. Although the suite of treaties establishing the European Union (e.g., the Treaty on the European Union, the "TEU") and organizing its work (e.g., the Treaty on the Functioning of the European Union, the "TFEU") are all instruments of international law, the law that has been promulgated within the EU system ("EU law") has a "dual" or hybrid character – it is *both* international *and* domestic law. Thus, while it is the product of a treaty, EU law is indisputably also the internal law both of the EU and, as such, of the Member States as well. Professor Hindelang himself concedes this dual, hybrid nature of EU law. *Id.* ¶¶ 4, 11. The *NextEra* tribunal joined many others in treating EU law as internal law, not international law. *NextEra Energy Global Holdings B.V. v. Spain*, ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles (ICSID 2019) ("Liability Decision") (ECF No. 1-4, Annex A) ¶ 390.

4

the status of the award in the present case or have any impact on the international law obligations, under the ICSID Convention, of Spain to comply with the award and of the United States to recognize and enforce it.[8]

7. Critically, since the ICSID Convention (unlike the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention")) affords courts of Contracting States no liberty to review the jurisdictional findings of an ICSID tribunal, Professor Hindelang's various arguments (whether based around precepts of "primacy" or "autonomy" of EU law, or on jurisdictional or "public policy" grounds) are in their entirety irrelevant to the current action. Once an ICSID tribunal has ruled, as a jurisdictional and merits matter, that a respondent State has violated the guarantees it gave to an investor under an investment agreement into which it freely entered, Article 54 bars an enforcing court from "second-guessing" the tribunal's determinations.

---

[8] Bermann Initial 2022 Decl. ¶¶ 84-96. Indeed, there is no reason why EU law (whether it is described as "international law" or as something else) should prevail over the ECT as international law, and that is why every ICSID Convention tribunal to consider this question has rejected Spain's position. This is why, even in those few cases which have viewed EU law as part of applicable international law (which are a minority), it has many times over been clarified that EU law does not trump the ICSID Convention or general principles of international law. *See, e.g.*, *RREEF Infrastructure (G.P.) Ltd. v. Kingdom of Spain*, No. ARB/13/30, Decision on Jurisdiction ¶¶ 87-88 (ICSID 2016) (ECF No. 68-28); *Isolux Infrastructure Neth. B.V. v. Kingdom of Spain*, No. 2013/153, Final Award ¶¶ 651-56 (SCC 2016) (ECF No. 68-52).

8.      Professor Hindelang's Reply Declaration now expands on his prior discussions of the *Achmea* judgment,[9] as well as the more recent *Komstroy* judgment,[10] by invoking the recent ECT award in the case of *Green Power Partners v. Spain*.[11] Discussion of *Green Power* needs to be understood in the context of my overall analysis and conclusion – which remains unchanged – that the CJEU decisions on the basis of which that award was rendered (e.g., *Achmea* and *Komstroy*) are neither applicable nor relevant to a case calling for enforcement of a final award rendered under the ICSID Convention.

**2.      The Green Power Case was Not Governed by the ICSID Convention, Did Not Interpret or Apply International Law, and Thus is Not Relevant**

9.      The *Green Power* award arose from an arbitration commenced by two Danish corporations against Spain relating to investments in the solar/renewables sector.[12] The claimants maintained that Spain's treatment of their investment had violated the ECT and entitled them to

---

[9]   In *Achmea*, the CJEU held that arbitration clauses in intra-EU investment treaties should be regarded as incompatible with EU law because they allow tribunals to interpret and apply EU law without the possibility of making a preliminary reference to the CJEU under TFEU Article 267 and receiving guidance from it. *See* Bermann Initial 2022 Decl. ¶ 58; *Slovak Republic v. Achmea B.V.*, No. C-284/16 (CJEU Mar. 6, 2018) ("*Achmea*") (ECF No. 62-47) ¶¶ 58-59, 62. The CJEU relied secondarily in *Achmea* on TFEU Article 344, according to which "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein." *Achmea* ¶¶ 58-59, 62; *see also* Bermann Initial 2022 Decl. ¶¶ 58, 59 n.89.

[10]  In *Komstroy*, the CJEU extended *Achmea's* reasoning to intra-EU disputes under the ECT. *See* Bermann Initial 2022 Decl. ¶ 59; *Republic of Moldova v. Komstroy LLC*, No. C-741/19 (CJEU Sep. 2, 2021) ("*Komstroy*") (ECF No. 62-67) ¶ 66.

[11]  *Green Power Partners K/S SCE Solar Don Benito APS v. Kingdom of Spain*, No. V2016/135, Award (SCC 2022) ("*Green Power*") (ECF 74-2).

[12]  *Green Power* ¶¶ 1, 5.

damages.[13] Importantly, in consenting to arbitrate, they elected (as was their right under Article 26(4)(c) of the ECT) to commence an arbitration before the Arbitration Institution of the Stockholm Chamber of Commerce ("SCC").[14] The claimants also voluntarily proposed that the "seat" of the arbitration be Stockholm, Sweden.[15]

10. As noted in my Initial 2022 Declaration, arbitral awards rendered outside the ICSID Convention (such as awards rendered under the UNCITRAL Rules or the SCC Rules) "are not subject to the same unique status as an ICSID award, and . . . are subject to challenges in the national courts of the arbitral seat, on the grounds that the tribunal lacked jurisdiction."[16] The *Green Power* award, issued in Sweden under the SCC Rules, falls into this category, meaning that: (i) the national courts of Sweden have an overall supervisory power over the arbitration under the SAA and can hear motions to set aside (or "vacate") any resulting award, and (ii) worldwide enforcement of any award is subject to the New York Convention (not the ICSID Convention), which recognizes the power of the courts of the seat – here Sweden – over the proceeding, including the power to set aside any award on a variety of grounds, including lack of jurisdiction

---

[13] *Id.* ¶ 5.

[14] *Id.* ¶ 6.

[15] *Id.* ¶¶ 12, 147-48.

[16] *See* Bermann Initial 2022 Decl. ¶ 118 n.196. Of course, *Green Power* means that it is no longer the case (as I had previously stated) that "all investor-state tribunals constituted under other arbitral rules" had reached a "unanimous[]" view on the intra-EU objection. *Id.* ¶ 118. But, given that virtually all prior decisions have analyzed the point as a matter of international law, whereas *Green Power* applied a different law, the correctness of those prior decisions remains undisturbed.

and violation of local public policy.[17]  These are critical differences between *Green Power* and the present case.

11. Faced with Spain's objection to jurisdiction based on *Achmea* and *Komstroy*,[18] the *Green Power* tribunal upheld the objection and denied jurisdiction over the claims.[19]  The award is an important ruling that will likely be discussed among practitioners and arbitrators in the years ahead.  However, neither the fact of the award nor its reasoning affects the analysis of whether, as a matter of international law, the *NextEra* award, as an ICSID award, is entitled to enforcement under Article 54 of the ICSID Convention.

12. As a threshold matter, *Green Power* is an entirely isolated ruling, inasmuch as, since the *Achmea* judgment was rendered, arbitral tribunals (both ICSID and non-ICSID) have been asked on numerous occasions to decline jurisdiction on the basis of the intra-EU objection and without exception have refused to do so.[20]  The fact that one tribunal has reached the opposite

---

[17] *See* Bermann Initial 2022 Decl. ¶¶ 21, 23, 85, 58 n.81, 59 n.87.

[18] *See Green Power* ¶¶ 119-121, 135.  The objections Spain raised in *Green Power* are essentially the same intra-EU objections as it here raised in the underlying arbitration and raises again in the present proceeding.

[19] *Id.* ¶ 478.

[20] *See* Bermann Initial 2022 Decl. ¶¶ 37-38, 76, 115, 118-19.  According to Professor Hindelang, the unanimity among ECT tribunals (up to now) on whether the ECT applies to intra-EU disputes "is of no consequence to the case at hand as these decisions do not form binding precedent." Hindelang 2022 Reply Decl. ¶ 23.  But I do not maintain, nor does anyone else as far as I am aware maintain, that arbitral awards constitute "binding precedent" in later cases.  They do not.  Prior awards are cited as nothing more than persuasive authority, and the tribunal in the present case gave no evidence of feeling bound by existing arbitral jurisprudence on intra-EU disputes.  (Incidentally, Professor Hindelang takes this occasion to imply that, when tribunals assert jurisdiction over intra-EU claims over the objections of the respondent EU Member State and the Commission, they evidence nothing more than a "propensity … to preserve their jurisdiction." *Id.* ¶ 23.  There is in fact no justification for Professor Hindelang's supposition that when tribunals affirm their jurisdiction to entertain intra-EU disputes, they do not genuinely believe that to be the right decision.)

result does not alter the fact that all other tribunals have squarely rejected *Achmea* and its rationale and that nothing of substance has occurred since those many rulings to suppose that those tribunals would now decide the matter differently.

13. Further, since any award in *Green Power* would at all times be potentially subject to set-aside proceedings in the Swedish courts,[21] the *Green Power* tribunal had every reason to believe that, had it accepted jurisdiction and rendered an award against Spain, the award would have been set aside by a court of an EU Member State (such as Sweden).[22] After all, that is exactly what happened when the *Achmea* case returned to the German courts and also when two intra-EU awards recently came up for enforcement in France.[23]

14. This concern is clear from the *Green Power* tribunal's reasoning itself. The tribunal first sought to ascertain the law applicable to its jurisdiction. In that context, it highlighted the importance of the case being an SCC proceeding seated in Stockholm (in contrast to an ICSID proceeding).[24] The claimants' choice of SCC proceedings, and of a Stockholm seat, meant that

---

[21] *See supra* ¶ 10.

[22] Professor Hindelang maintains that when an EU Member State court sets aside or refuses to enforce an ECT award, it is only "disapplying" the ECT, not "invalidating" it, and that this makes a difference because the former leaves the ECT intact, while the latter does not. Hindelang 2022 Reply Decl. ¶ 17. But no court setting aside an ECT award would ever suppose that it is invalidating the ECT as a whole, or even invalidating the ECT's dispute resolution provisions as a whole. It would see itself as simply invalidating the award and, at most, "invalidating" the standing offer to arbitrate contained in the ECT *as applied to intra-EU disputes*. Professor Hindelang can call it "disapplying" or "invalidating" as he wishes. The fact remains that a court's set-aside of or refusal to enforce an award based on an intra-EU objection does nothing more or less than deny legal effect to the award.

[23] Spain also is requesting a set-aside of several pending ECT awards that were rendered under the SCC Rules. *See* Bermann Initial 2022 Decl. ¶ 118 n.196.

[24] *Green Power* ¶¶ 161-62. In this context, Professor Hindelang repeatedly cites Article 26(6) of the ECT to argue that the relevant rules of international law referred to in that provision include EU law. Hindelang 2022 Reply Decl. ¶¶ 6, 11, 13, 19, 22. However, he omits to mention that

"*this determination of the seat attracts the application of Swedish arbitration law, particularly the [Swedish Arbitration Act], as the applicable lex arbitri.*"[25]  For the tribunal, this in turn "*attracts the application of EU law, which is part of the law in force in every EU Member State, including Sweden.*"[26]  This meant, according to the *Green Power* tribunal, that EU law applies to jurisdiction in that case,[27] and, as virtually any Member State court would do post-*Achmea*, the Swedish court would necessarily set aside any award finding jurisdiction.  Arbitrators are also constantly told that among their prime obligations is to render an award that will *not* be set aside.

15.     Importantly, in urging that the *Green Power* tribunal adopt this position, Spain itself stressed the difference between SCC proceedings and ICSID proceedings.[28]  The *Green Power* award recalls that Spain argued that "the present arbitration, conducted under the SCC Rules, has its seat in Sweden and is therefore governed by the Swedish Arbitration Act ("SAA")."[29]  Spain urged that this factor distinguished the *Green Power* arbitration from recent ICSID Convention cases such as *Vattenfall v. Germany*, where an ICSID tribunal had rendered a "Decision on the

---

the *Green Power* tribunal, as numerous tribunals before it, in fact decided that Article 26(6) of the ECT does not apply to jurisdictional matters.  *Green Power* ¶¶ 157-58.

[25]  *Id.* ¶ 162 (emphasis added).

[26]  *Id.* ¶ 166 (emphasis added).

[27]  *Id.* ¶ 172.  Although the *Green Power* tribunal also found that the interpretation of Article 26 of the ECT under the VCLT was inconclusive without resorting to EU law, it emphasized that this was so "*in the circumstances of this case*" and referred back to its finding that EU law was applicable on the basis of the arbitration being seated in Sweden.  *Id.* ¶ 412 (emphasis added); *see also id.* ¶¶ 414-15, 439, 441, 475.

[28]  I do not have access to the pleadings in the *Green Power* case; however, the award itself recites the position of Spain and its testifying expert, Professor Hindelang.

[29]  *Id.* ¶ 137; *see also Vattenfall AB v. Germany*, ARB/12/12, Decision on the *Achmea* Issue ¶ 207 (ICSID 2018) ("*Vattenfall*") (ECF No. 68-13).

*Achmea* Issue" rejecting the intra-EU objection.[30] Spain argued that the recent ICSID cases were "governed by the ICSID Convention and not subject to the domestic *lex arbitri* of the seat in an EU Member State. ICSID awards are therefore less relevant for the present proceedings."[31] Thus, Spain itself acknowledged the fundamental difference between an ICSID and a non-ICSID award in terms of the intra-EU objection.

16. Having determined the applicable *lex arbitri* was Swedish law, which incorporates EU law, it is not surprising that the *Green Power* tribunal approached the arbitration clause in Article 26 ECT through the lens of EU law.[32] It accordingly held that Spain's offer to arbitrate under the ECT was precluded under EU law and not applicable to intra-EU disputes, with the result that "[s]eated in an EU Member State, [the tribunal] likewise cannot apply the consent to arbitrate by [Spain] and affirm its jurisdiction."[33]

17. It should be evident that the *Green Power* tribunal did not apply the law that, in the view of the *NextEra* tribunal (and the overwhelming majority of other tribunals) should govern a dispute such as this one – namely, whether, *as a matter of international law*, Spain is bound by its consent to arbitrate. In that sense, due to the fortuity of being seated in Sweden (and thus subject to EU law, as part of the *lex arbitri*), the tribunal in *Green Power* did not analyze whether the intra-EU objection (or *Achmea* and *Komstroy*) was consistent with international law.

18. Because it found that EU law was applicable by virtue of the Swedish seat, the *Green Power* tribunal had no occasion to scrutinize whether the reasoning of *Achmea* is defensible

---

[30] *Green Power* ¶ 137.

[31] *Id.*

[32] *Id.* ¶ 412.

[33] *Id.* ¶ 477.

11

as a matter of international law. The CJEU, in its *Achmea* judgment, chose to invoke the doctrines of "primacy" and "autonomy" to justify its holding that intra-EU arbitration is impermissible.[34] But, like all the rest of EU law, these principles are internal to the EU. They may be considered to be part of international law due to the fact that the EU is the product of a treaty, but the fact remains that they primarily function as internal law. Indeed, in *Achmea*, the CJEU traces these principles not to general international law norms, but rather to specific provisions of EU law, namely TFEU Articles 267 and 344.[35] Yet, Article 27 of the VCLT clearly provides that States *may not* invoke their internal law to escape their international law obligations.[36] The *Green Power* tribunal did not purport to address this issue, precisely because it viewed itself as automatically bound by *Achmea* within the Swedish legal hierarchy.

19. Nor did the *Green Power* tribunal question the correctness of *Vattenfall* or other awards rejecting the relevance of the intra-EU objection to arbitrations under the ICSID Convention. Instead, throughout its reasoning, the tribunal was careful to distinguish its findings from cases under the ICSID Convention. Thus, it stated: "[t]his Tribunal, which is concerned with arbitration proceedings between EU investors and an EU Member State, with the arbitration seat in Sweden, another EU Member State, has reached a different conclusion [than did the ICSID Convention cases] in the circumstances of the present case."[37]

---

[34] *See* Bermann Initial 2022 Decl. ¶¶ 58-61; *Achmea* ¶¶ 58-59, 62.

[35] *See Achmea* ¶¶ 58-59, 62. This reinforces the fact that *Achmea* and the CJEU cases that follow – including *Komstroy* and *Poland v. PL Holdings* (ECF No. 62-69) – are pronouncements of a Court that is only an institution of the EU.

[36] *See* Bermann Initial 2022 Decl. ¶ 87.

[37] *Green Power* ¶ 439; *see also id.* ¶ 441 ("The question of whether or not EU law applies to the determination of jurisdiction and, if so, the extent to which it does so, does not arise in the same manner in the circumstances of this arbitration as in ICSID proceedings.").

20. Accordingly, the outcome in *Green Power*, however reasoned, is not instructive on the question that matters for this Court, i.e., whether as a matter of *international (and United States) law*, the award is required to be enforced under Article 54 of the ICSID Convention. As an ICSID Convention award, the award in the present case was not, and cannot be, subject to any set-aside proceedings before any EU Member State court or any national court for that matter. Annulment could be had only within the ICSID annulment procedure itself,[38] a remedy that Spain in fact has exhausted without success.

**B.   Professor Hindelang's New Theory that "Arguendo, EU Law is Applicable to Intra-EU Disputes by Virtue of Article 41(1)(b) of the VCLT"**

21. Professor Hindelang's Reply Declaration contains a new argument about the potential application of Article 41(1)(b) of the VCLT to the present dispute. I reply to the substance of this argument while leaving to one side the issue of whether it was raised in the original arbitration proceedings (which I understand will be the subject of legal briefing).

22. On this issue, Professor Hindelang's Reply Declaration deviates importantly from his Initial 2022 Declaration. In his Initial 2022 Declaration, Professor Hindelang argued that, as a matter of treaty interpretation, the ECT has no application to intra-EU disputes, as a result of which is there no inconsistency between the ECT and EU law.[39] He took that position despite the absence of a "disconnection clause" which, as I have explained already, (a) the EU typically places in multilateral treaties when it wants the rights and obligations under those treaties not to affect the

---

[38] ICSID Convention, arts. 52, 53.

[39] *See* Hindelang Initial 2022 Decl. ¶¶ 38, 45, 47, 49, 58, 73-74.

rights and obligations between EU Member States,[40] and which (b) the EU tried during negotiation of the ECT, but failed, to insert in the ECT.[41]

23. In his latest Declaration, Professor Hindelang all but abandons this particular treaty interpretation argument, i.e., he no longer appears to maintain that a disconnection clause, though absent from the ECT, should be read into it. He asserts instead that the presence or absence of such a clause is irrelevant because, *as a matter of EU law*, the ECT cannot validly apply to intra-EU disputes.[42]

24. At page 15 onwards of his 2022 Reply Declaration, Professor Hindelang advances a new argument. He contends (under the title "Arguendo, EU law is applicable to intra-EU disputes by virtue of Article 41(1)(b) of the VCLT") that by concluding the EU treaties, EU Member States have modified Article 26(6) of the ECT such that, in matters *inter se*, EU law is always the applicable law in intra-EU disputes.[43] He further argues, in an effort to show that the conditions that VCLT Article 41(1)(b) imposes are satisfied, that "the ECT does not contain an explicit prohibition on *inter se* modification."[44] On that basis, Professor Hindelang disagrees with my observation that the ECT does not contain an "intra-EU carve-out."[45]

---

[40] *See* Bermann Initial 2022 Decl. ¶ 48 & n.65.

[41] *Id.* ¶ 52.

[42] Hindelang 2022 Reply Decl. ¶¶ 72-75.

[43] *Id.* ¶ 28. Spain also mentions this argument in its Reply brief. *See* Spain MTD Reply at 2, 7, 30.

[44] Hindelang 2022 Reply Decl. ¶ 32.

[45] *Id.*

14

25.     As I noted above, the interpretation of the ECT, which has been finally established by the tribunal in this case and reviewed by the annulment committee, is not relevant to the question of whether the award is entitled to enforcement under Article 54 of the ICSID Convention.[46] Thus, my observations above apply equally with respect to Professor Hindelang's Article 41(1)(b) argument.

26.     Its irrelevance aside, in my opinion, Professor Hindelang's argument is seriously flawed. First, as I have noted, there is no "carve-out" in the treaty itself.[47] Here, it is unclear how the EU treaties, which were concluded before the ECT, in 1958 in fact, can be said to have modified Article 26(6) of the ECT. Understandably, they do not even refer to the ECT. Nor does the Treaty of Lisbon amending the TEU and TFEU.[48] Even if they did purport to amend Article 26(6) of the ECT, Article 16 of the ECT ensures that any more favorable rights, including to dispute resolution, afforded to investors under the ECT cannot be derogated from.[49]

27.     In fact, the recent public communication of the Energy Charter Secretariat that the Contracting Parties to the ECT reached an agreement in principle on the modernization of the ECT supports the conclusion that no such carve-out exists, as it would otherwise not be necessary to amend the treaty.[50]

---

[46]   *See supra* ¶¶ 4-7.

[47]   *See* Bermann Initial 2022 Decl. ¶¶ 48-52.

[48]   *See id.* ¶ 81 & n.123.

[49]   *See id.* ¶¶ 79-80.

[50]   *See* Decision of the Energy Charter Conference, dated June 24, 2022 ¶ 6 (Ex. 58, attached hereto) (cited by reference in Spain MTD Reply, at 2 & n.1, 7 & n.2).

15

28. Second, any suggestion that a "carve-out" was made is incompatible with the conditions of Article 41 of the VCLT ("Agreements to modify multilateral treaties between certain of the parties only"). The article, read in full, says:

> 1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
>
>    (*a*)  the possibility of such a modification is provided for by the treaty; or
>
>    (*b*)  the modification in question is not prohibited by the treaty and:
>
>       (i)  does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>
>       (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> 2. Unless in a case falling under paragraph 1 (*a*) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.[51]

29. As can be seen, Article 41(1)(b) of the VCLT only creates a limited opportunity for States which are party to a multilateral treaty to modify their treaty obligations *inter se* (i.e., as between themselves). They enjoy that opportunity only if certain important conditions are met, i.e., the modification "(i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; [and] (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole."

---

[51] Hindelang 2022 Reply Decl. ¶ 27.

30. Here, the requirement of subsection (ii) cannot be satisfied. Undeniably, any modification of an investment protection treaty that has the effect of depriving investors of the critical rights and protections conferred upon them pursuant to the treaty, such as the right to arbitrate pursuant to Article 26, is "incompatible with the effective execution of the object and purpose of the treaty as a whole," for purposes of Article 41(1)(b) of the VCLT, thus foreclosing any effort by a subset of ECT States to make an "intra-EU carve-out."

31. Third, any modification would be subject to a notification requirement under Article 41(2). No-one has purported to notify the ECT parties of an *inter se* carveout. Professor Hindelang posits that "no particular form" of notification is required,[52] but neither he nor Spain actually identifies any such notification or states the date on which notice was allegedly given.

32. In this regard, the *NextEra* tribunal in this case found that Spain had adduced "no evidence" of the subsequent EU treaties amending the ECT under VCLT Article 41(1)(b).[53]

33. Professor Hindelang seeks to argue that there is no impact on the ECT, because "the very nature of EU law … requires that relations *between* the Member States be governed by EU law to the exclusion, if EU law so requires, of *any* other law."[54] The "consequential effects" of his putative intra-EU carve-out, he says, are "between the EU Member States only."[55]

34. Yet, this argument removes investors entirely from the equation. To be sure, investors are not parties to the ECT, but it is they and their investments that the ECT protects, and

---

[52] Hindelang 2022 Reply Decl. ¶ 38.

[53] Liability Decision ¶ 352.

[54] Hindelang 2022 Reply Decl. ¶ 26 (*quoting* Opinion 2/13, ECLI:EU:C:2014:2454 ¶ 212 (CJEU Dec. 18, 2014) (ECF No. 62-43)) (emphasis in original).

[55] *Id.* ¶ 36.

17

they are most certainly parties to the arbitration agreement once they fulfil the conditions of Article 26 and accept a State's standing offer to arbitrate under the ECT. They are also parties to the underlying disputes themselves. As such, they are plainly granted the rights and remedies contemplated by the ECT. A carve-out of intra-EU disputes therefore would not only affect the "carving-out" States, but also the very parties in whose interest the investment protection provisions in the ECT were established.[56]

## III.  CONCLUSION

35.  For the above reasons, I adhere to the conclusions I stated in my Initial 2022 Declaration. Courts of ICSID Convention Contracting States, like the U.S., are obligated to implement faithfully the treaties, such as the ICSID Convention, to which their country has subscribed. Elevating EU law to a level of international law higher than the international treaties into which the EU and its Member States have themselves entered, and ignoring the reality that EU law is the "internal" law of both, allows them to act in violation of their international obligations whenever they view EU law as justifying them in doing so, whether for "primacy," "autonomy," or other reasons. As noted, when the EU and the Member States operate strictly within the sphere of EU law, they may freely determine for themselves the relationship between and among legal norms, national and international alike. But, international arbitral tribunals are not parts of the EU legal order. They operate under and in keeping with the international

---

[56] Outside of his new Article 41 argument, Professor Hindelang makes little effort to square a carve-out for intra-EU disputes with the text of the ECT. He merely repeats his position that, regardless of how the ECT was drafted or is to be interpreted, it cannot have any application to investment claims by a national of one EU Member State against another EU Member State. These arguments are without merit for the reasons set forth in my Initial 2022 Declaration.

instruments under which they are established (here, the ICSID Convention), as well as under general principles of international law.

36. Courts of third countries, like the U.S., are even more patently not parts of the EU legal order. Their duty is to implement faithfully the treaties, such as the ICSID Convention, to which their country has subscribed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of July 2022,
in Paris, France.

_____
George A. Bermann