# EXHIBIT 58

**ENERGY CHARTER**
**SECRETARIAT**

CCDEC 2022

10 GEN

Brussels, 24 June 2022

Related documents:
Room Document 1

# DECISION OF THE ENERGY CHARTER CONFERENCE

**Subject: Public Communication explaining the main changes contained in the agreement in principle**

The Energy Charter Conference at its Ad Hoc Meeting held on 24 June 2022 **approved** the attached Public Communication explaining the main changes contained in the agreement in principle on the modernisation of the ECT.

Keywords: Modernisation, Agreement in Principle

# Finalisation of the negotiations on the Modernisation of the Energy Charter Treaty

Brussels 24 June 2022

The Contracting Parties of the Energy Charter Treaty (ECT) have today reached an agreement in principle, thus concluding the negotiations for a modernised ECT. After the completion of an editorial and legal review, the draft text will be communicated to the Contracting Parties by 22 August 2022 for adoption by the Energy Charter Conference on 22 November 2022. Thereafter, the modernised ECT will enter into force 90 days after the ratification by three-fourths of the Contracting Parties. The agreement in principle is without prejudice regarding its final assessment by the Contracting Parties.

**How the Agreement in Principle was reached**

In November 2017, the Energy Charter Conference confirmed in Ashgabat, Turkmenistan, the launching of a discussion on the potential modernisation of the ECT. After consultations in early 2018, Contracting Parties agreed to address a specific list of topics (CCDEC2018 18).

In Autumn 2019, the Conference approved (CCDEC2019 08) some suggested policy options for each of the agreed topics and the mandate for the Modernisation Group to conclude negotiations expeditiously (CCDEC2019 10).

After the formal start of the negotiations in July 2020, the Modernisation Group held 15 rounds of negotiations, 12 of which were held via videoconference, 2 in hybrid mode and one in person due to pandemic-related travel restrictions (for public summaries of each round see here).

**Summary of the main achievements of the negotiations**

Pending the completion of an editorial and legal review of the text, the following summary presents, in a non-exhaustive manner, the main outcome of the negotiations but does not by any means constitute a legal text. Once the final text for the modernisation of the ECT is confirmed by the conference on 22 November 2022 (see above), it will be immediately published.

**1.    Definitions**

Regarding the meaning of "Charter" (Article 1(1) ECT), it was decided to include a reference to the 2015 International Energy Charter.

Under the topic "Definition of Economic Activity in the Energy Sector", negotiations focused on the scope of the modernised ECT in terms of business activities and sources of energy covered. The definition is now extended to cover the capture, utilisation and

storage of carbon dioxide (CCUS) in order to decarbonise the energy systems. The revised provisions now envisage how investments in different sources of energy will be protected under the ECT against the backdrop of clean energy goals of Contracting Parties.

The result of these intense discussions builds on three pillars:

### Pillar 1: Updated list of Energy Materials and Products
Some Energy Materials and Products are introduced and covered by the investment protection provisions, such as:
- Hydrogen;
- Anhydrous Ammonia;
- Biomass;
- Biogas; and
- Synthetic fuels.

Additional Energy-Related Equipment is introduced and covered by the trade provisions, such as wool, rock-wool and similar mineral wools;and Multiple-walled insulating units of glass.

### Pillar 2: Flexibility
A novel "flexibility mechanism" allows Contracting Parties, based on a Conference decision, to exclude investment protection for fossil fuels in their territories, considering their individual energy security and climate goals. For example, the EU and the UK have opted to carve-out fossil fuel related investments from investment protection under the ECT, including for existing investments after 10 years from the entry into force of the relevant provisions and for new investments made after 15 August 2023 as of that date with limited exceptions.

The envisaged exclusions will not, as a matter of principle, affect investment protection in the territory of other Contracting Parties, unless they opt to apply them vis-à-vis investors from the aforementioned Contracting Parties reciprocally.

### Pillar 3: Review mechanism
Five years after the entry into force of the modernised ECT and thereafter at intervals of five years, or on an earlier date as determined by the Charter Conference, the list of Energy Materials and Products covered under the ECT as well as the application of the Flexibility Mechanism will be reviewed. This will give Contracting Parties the possibility to react to technological as well as political developments.

**2.     Investment Protection**

<u>Definition of Investment</u>: In order to be covered by the Treaty, an investment must, inter alia, explicitly be made or acquired in accordance with the applicable laws[1] of the host Contracting Party, and fulfil an indicative list of characteristics, such as the commitment of capital, the expectation of gain or profit, a certain duration or the assumption of risk. The new definition excludes the coverage of judicial and administrative decisions and arbitral awards as well as limits the coverage of claims to money and credit arising solely from commercial transactions for the sale of goods and services. Specific public debt instruments are excluded from the coverage of the dispute settlement provisions.

<u>Definition of Investor</u>: The new provision excludes the coverage of individuals who hold the nationality, or are permanent residents, of the host Contracting Party at the time of making an Investment. It is now moreover necessary to meet the requirement of substantial business activities by demonstrating the circumstances from the indicative list included in the Treaty (such as physical presence, employment of staff, turnover generation or payment of taxes in the Area of a host Contracting Party).

<u>Clarification of 'most constant protection and security'</u>: It is clarified that this provision concerns the physical security of Investors and Investments.

<u>Transfers related to investments</u>: An exception for serious balance-of-payments difficulties is introduced, together with a specific provision for the safeguard measures in case of serious difficulties in the operation of the economic and monetary union of the European Union or in monetary and exchange rate policies of other Contracting Parties.

<u>Definition of Fair and Equitable Treatment</u>: To increase legal certainty, the new article providing for fair and equitable treatment' under the ECT will provide for a list that designates certain measures or series of measures that constitute a violation of this protection standard. Among such measures or series of measures, the new provision specifies the frustration of Investor's legitimate expectations and it describes circumstances that give rise to Investor's legitimate expectations and the conditions under which legitimate expectations may be considered.

<u>Definition of Indirect Expropriation:</u> The new provision clarifies the notion of 'Direct Expropriation' and further introduces a definition of 'Indirect Expropriation' together with a list of factors that are required to be considered for the determination of the existence of an indirect expropriation in each case (such as economic impact and character of the measure). As a general rule, non-discriminatory measures that are adopted to protect legitimate policy objectives, such as public health, safety and the environment (including with respect to climate change mitigation and adaptation), do not constitute indirect expropriation.

---

[1] The modernised ECT clarifies that the domestic law of a Contracting Party shall not be part of the applicable law and may only be considered as a matter of fact.

Denial of benefits: To ensure effectiveness of the provision, the Treaty envisages the timeline for invoking the denial-of-benefits clause, including possibility to invoke it after the commencement of an arbitral proceeding. The denial-of-benefits clause will not be subject to an advance formal notification. The new provision clarifies the situations when the protection to an Investment may be denied, notably for maintenance of international peace and security, including the protection of human rights.

MFN clause: For greater legal certainty, it is clarified that the most-favoured-nation treatment clause shall not extend to dispute settlement procedures in other international agreements and the substantive provisions in other international agreements in and of themselves do not constitute "treatment" to be accorded under this clause.

Right to regulate: Additional wording in the preamble and throughout the Treaty are introduced to reiterate and strengthen the right of Contracting Parties to regulate within their territories. For legal certainty, a new stand-alone article on the right to regulate is introduced in Part III of the Treaty to reaffirm the Contracting Parties' right to regulate vis-a-vis Investments and Investors in the interest of legitimate public policy objectives. Such objectives may include the protection of the environment, including climate change mitigation and adaptation, protection of public health, safety or public morals. A new structure is introduced in provisions on the exceptions from the Treaty to complement the existing general exceptions building on the provisions of GATT and GATS and clarify a possibility of taking measures for the maintenance of international peace and security.

Umbrella clause: Only a breach of specific written commitments through the exercise of governmental authority will be covered.

### 3. Dispute Settlement

Transparency. The UNCITRAL Rules on Transparency in Treaty-based Investor-State arbitration of 1 April 2014 will apply to arbitral proceedings in disputes between Investors and Contracting Parties with further additions envisaged in the Treaty. A greater transparency is introduced in dispute settlement procedures for disputes between the Contracting Parties ensuring that procedural documents in such disputes are publicly available and that the hearings may be publicly accessible.

Frivolous claims. To ensure efficiency of arbitral proceedings and reduce the costs of litigation, mechanisms are established for (i) dismissal of claims that are manifestly without legal merits as a matter of substance or jurisdiction at the outset of proceedings and (ii) expedited dismissal of claims unfounded as a matter of law on merits. A special provision is envisaged for dismissal of claims submitted as a result of investment restructuring for the sole purpose of submitting a claim under the Treaty.

Security for costs. A new provision is introduced giving a Contracting Party the possibility to request a claimant to post security for costs in certain cases, such as risks of not honouring an adverse decision on costs.

<u>Third-party funding</u>. The new provision will require both disputing parties to disclose information on a third party financing its litigation costs.

<u>Valuation of damages</u>. The new provision clarifies that an arbitral award may provide for monetary damages or restitution in case of expropriation. Monetary damages are limited to the loss suffered by an Investor and may not include punitive damages. As a general rule, the costs of the proceedings and other reasonable costs shall be borne by the unsuccessful party to the dispute.

## 4. Transit

Some general principles are introduced with respect to:

- facilitation of transparent and non-discriminatory access to existing and future Energy Transport Facilities;
- circumstances when the access could be denied, in which case the reasons should be duly substantiated;
- capacity allocation mechanisms and congestion management procedures for Energy Transport Facilities;
- the objective, transparent and non-discriminatory application of tariffs required for access to or the use of Energy Transport Facilities for transit purposes, as well as the methodologies used for their calculation.

For transit of natural gas and oil, the definitions of "Access to Energy Transport Facilities" and "Available Capacity" were introduced.

Furthermore, the transit provisions were updated with reference to virtual flows and international swap operations, which could be used by Contracting Parties to organise their energy systems.

## 5. Sustainable development and corporate social responsibility

Contracting Parties recognised the urgent need to effectively combat climate change.

A number of provisions were introduced that reaffirm the respective rights and obligations of the Contracting Parties under multilateral environmental and labour agreements, such as the UNFCCC, the Paris Agreement and ILO fundamental conventions, as relevant for the energy sector. They also reiterated their commitment to promoting international trade and investment in the energy sector in a manner that would contribute to the objectives of sustainable development and responsible business practices.
Moreover, the Contracting Parties shall not encourage international trade and investment in energy by lowering their respective environmental and labour protection laws and standards. The Contracting Parties will promote adherence to international standards and

principles of responsible business conduct among the Investors operating within their Areas.

The new provisions on sustainable development and corporate social responsibility further clarify and strengthen the provisions on environmental impact assessment of energy investment projects in accordance with respective laws and regulations of Contracting Parties ensuring higher level of environmental protection and wider public participation.

The Contracting Parties reaffirmed their commitment to clean energy transition, promotion of low-carbon technologies in energy trade and investment, and cooperation in implementing climate change-related policies, where appropriate. A dedicated dispute settlement mechanism will be applicable to disputes between the Contracting Parties regarding the interpretation and application of the new provisions on sustainable development. Such dispute settlement mechanism will include a possibility to refer the matter to a conciliator.

### 6.     Regional Economic Integration Organisation (REIO)

An article has been introduced that clarifies that Articles 7 (Transit), 26 (Investment dispute settlement), 27 (disputes between Contracting Parties), 29 (trade with non-WTO members) shall not apply among Contracting Parties that are members of the same Regional Economic Integration Organisation in their mutual relations. Currently, the European Union is the only REIO Contracting Party.

### 7.     Obsolete provisions

The ECT will also be modernised by the removal of provisions and Annexes that either are no longer applicable due to their transitional nature and updating some references (e.g. in relation to the European Communities).

### 8.     Pre-investment

It was decided to remove the obligation to negotiate the supplementary treaty to provide protection to pre-investment (current Article 10.4), while keeping the existing voluntary (Article 10.6) and best endeavour (Articles 10.2 and 10.5) provisions regarding pre-investment as well as the obligation to notify the Secretariat of any discriminatory measure applied to pre-investment (Article 10.9).