# Exhibit A



La jurisprudence francophone des Cours suprêmes



14/07/2022 | LUXEMBOURG | N°116/22

# 🇱🇺 | Luxembourg, Cour de cassation, 14 juillet 2022, 116/22

N° 116 /2022 du 14.07.2022 Numéro CAS-2021-00061 du registre Audience publique de la Cour de cassation du Grand-Duché de Luxembourg du jeudi, quatorze juillet deux mille vingt-deux.

Composition:

Roger LINDEN, président de la Cour, Christiane JUNCK, conseiller à la Cour de cassation, Jean ENGELS, premier conseiller à la Cour d'appel, Michèle HORNICK, conseiller à la Cour d'appel, Joëlle DIEDERICH, conseiller à la Cour d'appel, Serge WAGNER, premier avocat général, Daniel SCHROEDER, greffier à la Cour.

Entre:

l'ETAT DE ROUMANIE, représenté par l
'organe représentatif en justice, avec pour adresse RO-050741 Bucarest, 17, rue Apolodor, sect...

[ Voir plus ]

N° 116 /2022 du 14.07.2022 Numéro CAS-2021-00061 du registre Audience publique de la Cour de cassation du Grand-Duché de Luxembourg du jeudi, quatorze juillet deux mille vingt-deux.

Composition:

Roger LINDEN, président de la Cour, Christiane JUNCK, conseiller à la Cour de cassation, Jean ENGELS, premier conseiller à la Cour d'appel, Michèle HORNICK, conseiller à la Cour d'appel, Joëlle DIEDERICH, conseiller à la Cour d'appel, Serge WAGNER, premier avocat général, Daniel SCHROEDER, greffier à la Cour.

Entre:

l'ETAT DE ROUMANIE, représenté par l'organe représentatif en justice, avec pour adresse RO-050741 Bucarest, 17, rue Apolodor, secteur 5, demandeur en cassation, comparant par Maître Donald VENKATAPEN, avocat à la Cour, en l'étude duquel domicile est élu, assisté de Maître Shiva MIR MOTAHARI, avocat à la Cour, et:

1) M), défendeur en cassation, comparant par la société en commandite simple BONN STEICHEN & PARTNERS, inscrite à la liste V du tableau de l'Ordre des avocats du barreau de Luxembourg, en l'étude de laquelle domicile est élu, représentée aux fins de la présente procédure par Maître Fabio TREVISAN, avocat à la Cour, 2) la COMMISSION EUROPEENNE, établie et ayant son siège à B-1049 Bruxelles, 200, rue de la Loi, représentée par les agents Paul-John Loewenthal et Tim Maxian Rusche, intervenante volontaire conformément à l'article 483 du Nouveau Code de procédure civile, combiné avec l'article 29, paragraphe 2, du Règlement (UE) 2015/1589 du Conseil du 13 juillet 2015, portant modalités d'application de l'article 108 du Traité sur le fonctionnement de l'Union européenne, défenderesse en cassation, comparant par Maître Michel SCHWARTZ, avocat à la Cour, en l'étude duquel domicile est élu.



La jurisprudence francophone des Cours suprêmes

Vu le mémoire en cassation signifié le 9 juin 2021 par l'ETAT DE ROUMANIE à M) et à la COMMISSION EUROPEENNE, déposé le 11 juin 2021 au greffe de la Cour supérieure de justice ;

Vu le mémoire en réponse signifié le 3 août 2021 par M) à l'ETAT DE ROUMANIE et à la COMMISSION EUROPEENNE, déposé le 6 août 2021 au greffe de la Cour ;

Vu le mémoire en réponse signifié le 5 août 2021 par la COMMISSION EUROPEENNE à M) et à l'ETAT DE ROUMANIE, déposé le 6 août 2021 au greffe de la Cour ;

Sur les conclusions du Procureur général d'Etat adjoint John PETRY déposées le 8 février 2022 au greffe de la Cour ;

Vu les notes de plaidoiries de l'ETAT DE ROUMANIE et de M) déposées les 22 et 23 mars 2022 au greffe de la Cour.

Sur les faits Par ordonnance du 8 mai 2015 rectifiée le 22 mai 2015, la présidente du tribunal d'arrondissement de Luxembourg avait déclaré exécutoire au Grand-Duché de Luxembourg la sentence arbitrale n°ARB/05/20 du 11 décembre 2013 rendue par le Centre International pour le Règlement des Différends relatifs aux Investissements (ci-après « le CIRDI »). La Cour d'appel a confirmé cette ordonnance.

Sur le premier moyen de cassation Enoncé du moyen « Tiré de la violation de la loi, in specie de la violation des dispositions du Nouveau Code de Procédure Civile relatives à l'exequatur, plus spécifiquement de la violation des articles 1244 et suivants,1250 et 1251 du Nouveau Code de Procédure Civile ;

En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ayant déclaré, qu': Il s'ensuit que certains développements de l'ETAT DE ROUMANIE,..., qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :

- (…) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (…), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinentes.», déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, ce alors qu'en reportant l'analyse des moyens soulevés par la partie appelante, actuelle demanderesse en cassation, tenant à l'appréciation des illégalités entachant la Sentence, et par voie de conséquence les Ordonnances d'exequatur de celle-ci, notamment les illégalités procédant de la violation du principe de la primauté du droit de l'Union Européenne, dans le cadre de la procédure d'exequatur de ladite Sentence, à un stade ultérieur, plus précisément au moment de l'examen de la validité des actes individuels d'exécution qui viendraient à être posés sur base des Ordonnances d'exequatur, en somme, en se déclarant incompétente ratione tempori, pour apprécier l'existence et la nature des



La jurisprudence francophone des Cours suprêmes

Alors que si l'exécution est illégale, l'apposition de la formule exécutoire par le juge luxembourgeois, l'est a fortiori, et qu'en ne procédant à l'analyse des illégalités entachant la Sentence et les Ordonnances d'exequatur, que tardivement, au moment où les actes d'exécution seront posés, la Cour d'Appel se méprend sur les règles procédurales gouvernant l'exequatur, alors qu'en effet, le Luxembourg ne saurait prêter son concours à l'exécution d'une sentence illégale - en l'occurrence rendue en méconnaissance du droit de l'Union Européenne, bien que, in fine, la nature de l'illégalité important peu, eu égard au moment auquel il convient d'analyser ladite illégalité - le trouble résultant précisément de l'octroi de la force exécutoire sur le territoire du grand-Duché de Luxembourg, à un acte dont l'exécution serait entachée d'illégalité, en somme à un acte rendu en violation du droit de l'Union Européenne, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué l'illégalité entachant la Sentence et les Ordonnances d'exequatur, au stade de l'exequatur même de la Sentence et devant le juge de l'exequatur, lui demandant de procéder à l'analyse de ladite illégalité, avant d'attribuer reconnaissance et force exécutoire à la Sentence sur le territoire du Grand-Duché, dans les termes suivants : L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. », que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...», de sorte que, quant à la question de savoir si, la Cour d'Appel aurait dû procéder à l'analyse de l'existence et de la nature des illégalités soulevées par la partie appelante, actuelle demanderesse en cassation, au stade même de la procédure d'exequatur et préalablement à l'attribution de toute reconnaissance et force exécutoire à la Sentence, prononçant l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, la réponse est positive, de sorte que la Cour d'Appel aurait dû se reconnaître compétente, ratione tempori, pour connaître de l'existence et de la nature des illégalités entachant la Sentence et les Ordonnances d'exequatur.

Réponse de la Cour Il ressort de la discussion du moyen que le demandeur en cassation invoque la violation de l'article 1251 du Nouveau Code de procédure civile qui dispose « Sous réserve des dispositions de conventions internationales, le juge refuse l'exequatur :

... 2° si la sentence ou son exécution est contraire à l'ordre public ou si le litige n'était pas susceptible d'être réglé par la voie d'arbitrage ».

Les juges d'appel ont retenu que l'article 1251 du Nouveau Code de procédure civile ne s'applique que sous la réserve des dispositions de conventions internationales, que la Convention de Washington (ci-après « la Convention ») constitue une telle convention, qu'elle ne prévoit, hormis la condition tirée de l'existence d'une sentence arbitrale,



La jurisprudence francophone des Cours suprêmes

Le refus des juges d'appel d'examiner la conformité au droit de l'Union européenne de la sentence arbitrale se fonde partant sur l'article 54, paragraphe 3, de la Convention, et non sur l'article 1251 du Nouveau Code de procédure civile qui ne fait que renvoyer aux dispositions de conventions internationales.

Le grief est dès lors étranger aux articles visés au moyen.

Il s'ensuit que le moyen est irrecevable.

Sur les deuxième, troisième, quatrième, cinquième et sixième moyens de cassation réunis Enoncé des moyens le deuxième, « Tiré de la violation de la loi, in specie de la violation du principe général de droit constitutionnel tenant à la primauté du droit de l'Union Européenne ;

En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ayant déclaré qu':

caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :

- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réfère, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. », ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union Européenne, notamment en matière d' aide d'Etat déclarée incompatible par la Commission Européenne », déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;

Alors que l'article 49 bis de la Constitution dispose que : L'exercice d'attributions réservées par la Constitution aux pouvoirs législatif, exécutif et judiciaire peut être temporairement dévolu par traité à des institutions de droit international. », consacrant le principe de la prééminence du droit de l'Union Européenne, dans l'ordre juridique national, principe réaffirmé par la jurisprudence dans les termes suivants : ...les traités qui ont institué le droit communautaire ont institué un nouvel ordre juridique au profit duquel les Etats membres ont limité l'exercice de leurs pouvoirs souverains dans les domaines que ces traités déterminent. Cette règle s'impose plus particulièrement lorsque

    La jurisprudence francophone des Cours suprêmes

principe, en le qualifiant d'un principe non écrit de droit constitutionnel », qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. », que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : (…) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (…). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (….) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (…) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale…», de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (), la Cour d'Appel contrevient au principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 11, 18 et 20 à 23 de ses conclusions récapitulatives, tenant à la primauté du droit de l'Union Européenne, les juges d'appel n'ont pas appliqué le principe général de droit constitutionnel relatif à la primauté du droit de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. », le troisième, « Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 351 du Traité sur le Fonctionnement de l'Union Européenne (ci-après ), consacrant le principe de la primauté du droit de l'Union Européenne ;

En ce que la Cour d'appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': Il s'ensuit que certains développements de l'ETAT de ROUMANIE,…, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :

- (…) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (…), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant



La jurisprudence francophone des Cours suprêmes

du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. », ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d' aide d'Etat déclarée incompatible par la Commission Européenne », déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;

Alors que l'article 351 TFUE dispose que : les droits et obligations résultant de conventions conclues antérieurement au 1er janvier 1958 ou, pour les États adhérents, antérieurement à la date de leur adhésion, entre un ou plusieurs États membres, d'une part, et un ou plusieurs États tiers, d'autre part, ne sont pas affectés par les dispositions des traités », qu'aux pages 16 à 18 des conclusions récapitulatives du 15 novembre 2019, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : 1. Quant à l'article 351 TFUE : La partie M) se réfère au recours contre la Décision 2015/1470 et à la relation entre le droit de l'Union Européenne, le TIB et la Convention de Washington. La partie M) cite ensuite le texte de conclusions déposées dans le cadre d'un litige entre la Slovaquie et la Commission Européenne (C-264/09) et estime qu'il s'agirait d'une jurisprudence, alors qu'il ne s'agit que des seules conclusions dans cette affaire et non du jugement définitif. Elle en déduit erronément que toutes conventions conclues antérieurement avant l'adhésion à l'Union Européenne primeraient. Ainsi selon le paragraphe 44 de l'arrêt qui est issu des conclusions, citées par la partie M) : "Or, il y a lieu de rappeler que, dans l'affaire ayant donné lieu à l'arrêt du 4 juillet 2000, Commission/Portugal (C-62/98, Rec. p. I-5171, point 49), la Cour a précisé que, si, dans le cadre de l'article 307 CE, les États membres ont le choix quant aux mesures à adopter afin d'éliminer les incompatibilités existant entre une convention précommunautaire et le traité CE, lorsqu'un État membre rencontre des difficultés rendant la modification d'un accord impossible, il ne saurait être exclu qu'il lui incombe de dénoncer cet accord.". La partie M) se réfère à l'article 351 TFUE, selon lequel les droits et obligations résultant de conventions antérieures à l'adhésion de l'Etat de Roumanie resteraient acquis, sans pour autant en expliquer le contexte international. Il résulte clairement du libellé de l'article 351 TFUE que le TBI n'est pas applicable en l'espèce, étant donné que le TBI est un traité conclu entre deux États membres de l'Union Européenne, à savoir la Suède et la Roumanie, et non un traité "entre un ou plusieurs États membres, d'une part, et un ou plusieurs États tiers, d'autre part". Il en va de même pour la Convention de Washington qui dans un litige intracommunautaire ne sera plus applicable. En effet, selon la Décision 2015/1470, points 130 à 132..., Partant il y a lieu de constater que l'article 351 TFUE ne s'applique pas au cas d'espèce et que la partie M) devra se conformer au droit européen qui affecte également les relations entre l'Etat de Roumanie et la Suède. La partie concluante se rallie à la position de l'Union Européenne selon laquelle - Il n'importe pas de savoir si la Roumanie était membre de l'Union Européenne au moment de la ratification du TBI ; - Il y a primauté du droit de l'Union dès lors que l'État adhère l'Union Européenne, autant pour le TBI que la Convention de Washington ; - Le droit applicable est susceptible d'être modifié par l'adhésion d'un Etat à l'Union européenne et il n'existe donc pas de droit acquis sur la base d'une convention ou d'un traité antérieur, Le tribunal arbitral a outrepassé ses pouvoirs et compétences... », que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 11, 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : La partie M) omet ainsi - volontairement - d'expliquer quel est l'impact de l'Union Européenne sur la Convention. En effet, on ne peut passer à côté de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne (ci-après le "TFUE") (...) Il ressort donc



La jurisprudence francophone des Cours suprêmes

en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...», de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (), la Cour d'Appel contrevient aux dispositions de l'article 351 TFUE, consacrant le principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, alors que la règle de conflits énoncée à l'article 351 TFUE instaure le principe de primauté du droit de l'Union, qui ne cède devant un autre accord bilatéral (ou multilatéral) ayant été conclu par un Etat membre que dans les hypothèses et aux conditions cumulatives préconisées par la même disposition légale, à savoir lorsque les deux conditions cumulatives suivantes sont remplies : la convention bilatérale (ou multilatérale) conclue par l'Etat membre doit avoir été conclue antérieurement à son adhésion, d'une part, et la convention bilatérale (ou multilatérale) doit avoir été conclue entre l'Etat membre et un Etat tiers, d'autre part, que cette règle de conflit de normes fait donc en l'espèce prévaloir le droit de l'Union sur la Convention de Washington, de sorte qu'en faisant primer l'applicabilité des articles 53 et 54 de la Convention de Washington, sur celle du droit de l'Union Européenne, la Cour d'Appel a violé l'article 351 TFUE, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. », le quatrième, « Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 288 du Traité sur le Fonctionnement de l'Union Européenne,(ci-après ), consacrant le principe de la primauté du droit de l'Union Européenne ;

En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': Il s'ensuit que certains développements de l'ETAT de ROUMANIE,..., qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :

- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois,



La jurisprudence francophone des Cours suprêmes

notamment en matière d'aide d'Etat déclarée incompatible par la Commission Européenne », déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;

Alors que l'article 288 TFUE dispose que : Pour exercer les compétences de l'Union, les institutions adoptent des règlements, des directives, des décisions, des recommandations et des avis. (...) La décision est dans tous ses éléments. Lorsqu'elle désigne des destinataires, elle n'est obligatoire que pour ceux-ci. (...) », qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. », que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 11, 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : La partie M) omet ainsi -

volontairement - d'expliquer quel est l'impact de l'Union Européenne sur la Convention. En effet, on ne peut passer à côté de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne (ci-après le "TFUE") (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...», que ledit principe a encore été rappelé, par la partie appelante, actuelle demanderesse en cassation, dans ses conclusions n° 3 du 10 mai 2017 ( à la page 3), dans les termes suivants : L'article 288 du TFUE rend toute décision de la Commission obligatoire... », respectivement dans ses conclusions n° 4 du 18 octobre 2017 ( à la page 4), comme suit : Il est rappelé que la Décision du 30 mars 2015 a force obligatoire et exécutoire par application des articles 288 du TFUE et 299 du TFUE et que ceci a pour effet de lui conférer un caractère contraignant. » et dans ses conclusions n° 6 du 14 août 2018 ( à la page 6), dans les termes suivants : que la Décision du 30 mars 2015 est obligatoire dans tous ces éléments et dans tous les Etats membres en vertu de l'article 288 du TFUE, et ce indépendamment du recours dont elle fait l'objet, qui n'est pas suspensif », de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (), la Cour d'Appel contrevient aux dispositions de l'article 288 TFUE, consacrant le principe de la primauté du droit de l'Union



La jurisprudence francophone des Cours suprêmes

d Appel aurait dû se prononcer sur les prédits moyens de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 11, 18 et 20 à 23 de ses conclusions récapitulatives, et à la page 3 de ses conclusions n° 3, respectivement à la page 4 de ses conclusions n°4 et à la page 6 de ses conclusions n° 6, tenant à la primauté du droit de l'Union Européenne, la Cour d'Appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union Européenne, énoncé à l'article 288 du Traité sur le Fonctionnement de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. », le cinquième, « Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne, consacrant le principe de la primauté du droit de l'Union Européenne ;

En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': Il s'ensuit que certains développements de l'ETAT de ROUMANIE,..., qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :

- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réfère, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par

___ M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. », ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d' aide d'Etat déclarée incompatible par la Commission Européenne », déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;

Alors que suivant les dispositions de l'article 344 TFUE :

membres s'engagent à ne pas soumettre un différend relatif à l'interprétation ou à l'application des traités à un mode de règlement autre que ceux prévus par ceux-

ci. », que pour garantir l'autonomie du l'ordre juridique de l'Union, les traités européens ont instauré un système juridictionnel spécifique, composé des juridictions nationales d'une part, et de la Cour de Justice de l'Union



différend relatif à l'interprétation et à l'application du droit de l'Union à un mode de règlement différent de celui prévu par les traités, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. », que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 11, 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : La partie M) omet ainsi - volontairement - d'expliquer quel est l'impact de l'Union Européenne sur la Convention. En effet, on ne peut passer à côté de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne (ci-après le "TFUE") (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...», de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (), la Cour d'Appel contrevient aux dispositions de l'article 344 TFUE consacrant le principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, alors qu'en vertu du principe de l'autonomie du système juridictionnel Européen, la Cour d'Appel aurait dû prononcer l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 11, 18 et 20 à 23 de ses conclusions récapitulatives, tenant à la primauté du droit de l'Union Européenne, la Cour d'Appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union Européenne, énoncé à l'article 344 du Traité sur le Fonctionnement de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. » et le sixième, « Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 108 du Traité sur le Fonctionnement de l'Union Européenne (ci-après ), consacrant le principe de la primauté du droit de l'Union Européenne ;

En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': Il s'ensuit que certains développements de l'ETAT de ROUMANIE,..., qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :



La jurisprudence francophone des Cours suprêmes

système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. », ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d' aide d'Etat déclarée incompatible par la Commission Européenne », déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;

Alors qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants :

L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. », que cet exposé des motifs constitue le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 22 à 26 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : L'arrêt KLAUSNER du 11 novembre 2015 par lequel la CJUE qui a dit pour droit que le principe d'effectivité s'oppose à une règle nationale qui empêche le juge national de tirer toutes les conséquences de la violation de l'article 108 TFUE en raison de l'autorité de la chose jugée d'une décision juridictionnelle nationale rendue à propos d'un litige étranger au contrôle des aides d'Etat, ..., Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne.... Il ne faut pas perdre de vue en effet que l'arrêt du 18 juin 2019 a annulé uniquement la Décision du 30 mars 2015, mais que subsistent tous les autres actes contraignants pris par la Commission. Il y a en particulier deux actes contraignants qui subsistent à l'heure actuelle, à savoir :1. L'injonction de suspension notifiée à la Roumanie en date du 26 mai 2014 (ci-après "l'Injonction de suspension")... Nonobstant l'annulation de la Décision du 30 mars 2015, cette injonction de suspension existe donc toujours et elle va demeurer jusqu'à ce que l'instruction de la procédure ouverte en vertu de l'article 108 (2) et (3) TFUE, dont la Décision du 30 mars 2015 devait constituer l'épilogue, débouche sur une décision définitive... La décision de la Commission, notifiée à la Roumanie en date du 1er octobre 2014, d'ouvrir, en application de l'article 108 (2) et (3) TFUE, une procédure visant à statuer sur la question de savoir si le paiement des dommages et intérêts auxquels la Sentence arbitrale avait condamné la Roumanie était ou non à assimiler à une aide d'Etat illicite prohibée par l'article 107 TFUE... La décision de la Commission, notifiée à la Roumanie en date du 1er octobre 2014 d'ouvrir, en application de l'article 108 (2) et (3) du TFUE, une procédure visant



La jurisprudence francophone des Cours suprêmes

effet d'imposer la suspension de toute mesure qui aurait pour résultat de distribuer l'aide à l'Etat incriminée tant que n'a pas été rendue de décision définitive de la Commission sur la légalité de la mesure suspectée de constituer une aide d'Etat prohibée. Cette suspension est expressément prévue par l'article 108 (3) TFUE. ... La CJUE a eu l'occasion de confirmer que l'ouverture par la Commission d'une procédure par application de l'article 108 (2) et (3) TFUE oblige non seulement l'Etat concerné, mais également les juridictions de tout autre Etat membre, à ne rien faire qui puisse avoir pour résultat de distribuer l'aide d'Etat considérée comme illégale par la Commission (ou du moins suspectée de l'être durant la phase d'instruction de la procédure)... l'effet utile de l'article 108, paragraphe 3, TFUE serait mis en échec ... les juridictions nationales auraient méconnu leur obligation, imposée par les articles 108, paragraphe 3, TFUE... En attendant qu'intervienne cette décision définitive, tant l'article 108 (3) du TFUE que l'Injonction de suspension font obstacle à toute mise en exécution de la Sentence arbitrale. », de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public Européen, et par là même contraire à l'ordre public des Etats membres, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (), la Cour d'Appel contrevient aux dispositions de l'article 108 TFUE consacrant le principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, alors que, d'une part, en présence de la Décision de la Commission du 30 mars 2015 (n°2015/1470), interdisant à la Roumanie de procéder à toute exécution de la Sentence arbitrale, au motif qu'une telle exécution de la Sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie, que d'autre part, en présence de l'injonction de suspension notifiée à la Roumanie en date du 26 mai 2014 ainsi que de la Décision d'ouverture de la procédure d'examen, notifiée à la Roumanie en date du 1er octobre 2014 et visant à statuer sur la question de savoir si le paiement de dommages et intérêts auxquels la Sentence arbitrale avait condamné la Roumanie, constitue ou non une aide d'Etat illicite prohibée par l'article 107 TFUE, la Cour d'appel aurait dû se prononcer sur les prédits moyens de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 22 à 26 de ses conclusions récapitulatives, tenant à la primauté du droit de l'Union Européenne, la Cour d'appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union Européenne, énoncé à l'article 108 du Traité sur le Fonctionnement de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. ».

Réponse de la Cour Aux termes de l'article 10, alinéa 2, de la loi modifiée du 18 février 1885 sur les pourvois et la procédure en cassation, un moyen ou un élément de moyen ne doit, sous peine d'irrecevabilité, mettre en œuvre qu'un seul cas d'ouverture.

Le demandeur en cassation invoque dans chaque moyen, non subdivisé en branches, d'une part, le vice de fond tiré de la violation du principe de la primauté du droit de l'Union européenne, rattaché respectivement à l'article 49bis de la Constitution et aux articles 351, 288, 344 et 108 TFUE et, d'autre part, le vice de forme tiré du défaut de réponse à conclusions dans lesquelles il avait développé que la reconnaissance de la sentence arbitrale méconnaîtrait ce principe sur base desdites dispositions, partant deux cas d'ouverture distincts.

Il s'ensuit que les moyens sont irrecevables.

Sur les septième et huitième moyens de cassation réunis Enoncé des moyens le septième, « Tiré de la violation de l'article 89 de la Constitution ;

En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu' défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :



La jurisprudence francophone des Cours suprêmes

système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies - arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. », ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union Européenne, notamment en matière d'« aide d'Etat déclarée incompatible par la Commission Européenne » déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur le moyen soulevé à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne ;

Alors qu'aux termes de l'article 89 de la Constitution, Tout jugement est motivé. Il est prononcé en audience publique. », que les juges du fond sont tenus de s'expliquer sur tous les moyens qui leur sont proposés, quel qu'en soit le mérite » et que l'article 49 bis de la Constitution dispose que : L'exercice d'attributions réservées par la Constitution aux pouvoirs législatif, exécutif et judiciaire peut être temporairement dévolu par traité à des institutions de droit international. », consacrant le principe de la prééminence du droit de l'Union Européenne, dans l'ordre juridique national, qu'aux pages 11 et 12 de l'acte d'appel du dix novembre 2015, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie.

A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...», que cet exposé constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : « (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne.

(...) Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (...) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du



La jurisprudence francophone des Cours suprêmes

la positive, alors que …les traités qui ont institué le droit communautaire ont institué un nouvel ordre juridique au profit duquel les Etats membres ont limité l'exercice de leurs pouvoirs souverains dans les domaines que ces traités déterminent. Cette règle s'impose plus particulièrement lorsque le conflit existe entre une norme de droit interne et une norme communautaire puisque les traités qui ont créé le droit communautaire ont institué un nouvel ordre juridique au profit duquel les Etats membres ont limité l'exercice de leurs pouvoirs souverains dans les domaines que ces traités déterminent. », et qu'en refusant de répondre au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, ils n'ont pas suffisamment motivé l'arrêt rapporté, violant ainsi l'article 89 de la Constitution. » et le huitième, « Tiré de la violation de l'article 89 de la Constitution ;

En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu' : Il s'ensuit que certains développements de l'ETAT de ROUMANIE … qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :

- (…) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (…), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réré, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. », ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d' aide d'Etat déclarée incompatible par la Commission Européenne », déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur le moyen soulevé à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne ;

Alors qu'aux termes de l'article 89 de la Constitution, Tout jugement est motivé. Il est prononcé en audience publique. », que les juges du fond sont tenus de s'expliquer sur tous les moyens qui leur sont proposés, quel qu'en soit le mérite » et que l'article 49 bis de la Constitution dispose que : « L'exercice d'attributions réservées par la Constitution aux pouvoirs législatif, exécutif et judiciaire peut être temporairement dévolu par traité à des institutions de droit international. », consacrant le principe de la prééminence du droit de l'Union Européenne, dans l'ordre juridique national, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation a invoqué ce principe dans les termes suivants : « L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. », que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant



La jurisprudence francophone des Cours suprêmes

l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...) Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (...) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...», de sorte qu'en refusant d'examiner les moyens de la partie demanderesse en cassation, notamment le moyen tenant à la primauté du droit de l'Union Européenne, ayant pour conséquence juridique l'annulation, sinon la révocation sinon la réformation des Ordonnances d'exequatur de la Sentence, dont la reconnaissance et l'exécution entraînent la contrariété au droit de l'Union Européenne, partant à l'ordre public d'un Etat membre de l'Union Européenne, les juges d'appel n'ont pas répondu au moyen soulevé par la partie demanderesse en cassation, aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 18 et 20 à 23 de ses conclusions récapitulatives, et qu'en refusant de répondre au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, les juges d'appel n'ont pas répondu aux conclusions de cette dernière, ce qui constitue le vice de forme du défaut de réponse à conclusions, partant ils n'ont pas suffisamment motivé l'arrêt rapporté, violant ainsi l'article 89 de la Constitution. ».

Réponse de la Cour En tant que tiré de la violation de l'article 89 de la Constitution, le moyen vise le défaut de réponse à conclusions, qui est une forme du défaut de motifs, qui est un vice de forme.

Une décision est motivée dès lors qu'elle comporte une motivation, expresse ou implicite, sur le point considéré.

En retenant « Il résulte des articles 53 et 54 de la Convention de Washington que l'unique condition posée à l'obtention de l'exequatur d'une sentence arbitrale réside dans l'existence d'une sentence CIRDI, dont une copie certifiée conforme par le secrétaire général est à soumettre au juge de l'exequatur. Hormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI.

Si l'ETAT de ROUMANIE soutient que l'article 54.-3) de la Convention de Washington (« L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ») renvoie au droit national luxembourgeois, ceci ne vaut que pour l'exécution des jugements. Or et tel qu'indiqué ci-dessus, l'exequatur ne constitue pas, en lui-même, un acte d'exécution.[...] Il s'ensuit que certains développements de l'ETAT de ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, c'est-à-dire, notamment, les questions :[...] -

de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, -

de la contrariété entre le TBI et le droit de l'Union européenne, -

du conflit de normes entre le droit de l'Union européenne et la convention de Washington [...] », les juges d'appel ont répondu aux conclusions du demandeur en cassation.

Il s'ensuit que les moyens ne sont pas fondés.

Sur les neuvième et dixième moyens de cassation réunis Enoncé des moyens le neuvième, «Tiré de la violation de l'article 89 de la Constitution ;



La jurisprudence francophone des Cours suprêmes

Sentence a été rendue sous l'égide du CIRDI (ci-

après "la Sentence"), en application de la Convention de Washington, à laquelle tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie, sont parties. », constatations qui emportent nécessairement, une acception large de l'exequatur, en ce qu'il constitue non seulement un acte de reconnaissance, mais également une première étape de la procédure d'exécution, entraînant comme conséquences juridiques immédiates et logiques, que, conformément aux dispositions de l'article 54.-3) de la Convention de Washington, il y a applicabilité du droit national, notamment des articles 1244 et suivants, 1250 et 1251 du Nouveau Code de Procédure Civile, à la procédure d'exequatur de la Sentence, notamment quant à l'appréciation des motifs de refus de l'exequatur, les juges d'appel retiennent, quelques lignes plus haut puis quelques lignes plus bas, que ...l'exequatur ne constitue pas, en lui-même, un acte d'exécution... », affirmant ainsi une chose et son contraire, pour en déduire que , rejetant le moyen de la partie appelante, actuelle partie demanderesse en cassation, tenant à l'applicabilité des dispositions de la législation luxembourgeoise à la procédure d'exequatur de la Sentence, notamment quant à l'appréciation des motifs de refus d'exequatur de la Sentence, conformément aux dispositions de l'article 54 (3) de la Convention de Washington, moyen exprimé à de maintes reprises, aussi bien dans son acte d'appel du 10 novembre 2015, aux pages 8, 9, 11et 12, dans les termes suivants : 1) violation de l'article 1251 (1) du NCPC : A supposer que les ordonnances a quo ne doivent pas d'ores et déjà être réformées pour non-respect du formalisme imposé par l'article 1250 NCPC, il est établi que le Juge de l'exequatur n'aurait pas dû accorder une telle reconnaissance de la sentence arbitrale étrangère. Tel qu'indiqué précédemment, l'article 1251 NCPC dispose que l'exequatur doit être refusée : 1° si la sentence peut encore être attaquée devant des arbitres et si les arbitres n'en ont pas ordonné l'exécution provisoire nonobstant appel. Or, la décision arbitrale a fait l'objet d'un recours en annulation en date du 9 avril 2014...De ce fait, la décision arbitrale n'a pas l'autorité de la chose jugée permettant d'obtenir son exequatur alors que la sentence arbitrale est frappée d'un recours en annulation. (...) L'article 1251 NCPC dispose encore que l'exequatur doit être refusé : 2° si la sentence ou son exécution est contraire à l'ordre public ou si le litige n'était pas susceptible d'être réglé par la voie d'arbitrage; Si par impossible Votre Cour devait estimer que la décision n'est pas frappée d'un recours et/ou est exécutoire, il faut encore noter que la décision arbitrale est contraire à l'ordre public international. », que dans ses conclusions récapitulatives du 15 novembre 2019, notamment aux pages 8 et 13, dans les termes suivants : Ensuite, l'article 54 (3) de la Convention de Washington renvoie pour le surplus à la législation nationale :'L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder. », et l'article 54 (3) de la Convention de Washington renvoie clairement à la législation nationale : "L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder." et les articles 1250 NCPC et suivants complètent ces règles, dont l'article 1251 du NCPC prévoyant des raisons de refus de l'exequatur. », refusant ainsi l'applicabilité du droit national, notamment des dispositions précitées du Nouveau Code de Procédure Civile, à la procédure d'exequatur de la Sentence, notamment quant aux motifs de refus de l'exequatur de la Sentence, laquelle applicabilité découle pourtant sans équivoque des dispositions de l'article 54.-3 de la Convention de Washington, pour ainsi rejeter la demande en annulation, sinon en réformation, sinon en révocation des Ordonnances d'exequatur, et déclarer l'appel non fondé, et condamner l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur ;

Alors qu'aux termes de l'article 89 de la Constitution, « Tout jugement est motivé. Il est prononcé en audience publique. », que « deux motifs contradictoires se détruisent et s'annihilent réciproquement, aucun d'entre eux ne pouvant alors être retenu comme fondement de la décision », de sorte que, quant à la question de savoir si, conformément aux dispositions de l'article 54.-3) de la Convention de Washington, il y a applicabilité du droit national luxembourgeois, à l'exequatur d'une sentence arbitrale étrangère, notamment des articles 1244 et suivants, 1250 et 1251 du Nouveau Code de Procédure Civile, la Cour d'Appel aurait dû répondre par la positive, ce alors que les juges d'appel ont retenu, dans le même arrêt, qu'en introduisant une procédure en exéquatur au Luxembourg, M) y a poursuivi (e) » en réalité de la Sentence, assimilant ainsi l'exequatur à l'exécution, partant l'arrêt entrepris est à déclarer comme n'étant pas motivé, au sens des dispositions de l'article 89 de la Constitution , et partant est à annuler pour contravention aux dispositions constitutionnelles précitées. » et le dixième, « Tiré de la violation de l'article 89 de la Constitution ;



La jurisprudence francophone des Cours suprêmes

Sentence a été rendue sous l'égide du CIRDI (ci-

après "la Sentence"), en application de la Convention de Washington, à laquelle tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie, sont parties. », constatations qui emportent nécessairement, une acception large de l'exequatur, en ce qu'il constitue non seulement un acte de reconnaissance, mais également une première étape de la procédure d'exécution, entraînant comme conséquences juridiques immédiates et logiques, que l'exequatur relève aussi bien du domaine de l'immunité de juridiction des Etats, que de celui de leur immunité d'exécution, les juges d'appel énoncent, quelques lignes plus haut puis quelques lignes plus bas, que ...l'exequatur ne constitue pas, en lui-même, un acte d'exécution... », affirmant ainsi une chose et son contraire, pour en déduire que , pour déclarer le moyen tenant à la nullité sinon à la réformation sinon à la révocation des Ordonnances, pour contrariété à l'ordre public et contravention à l'immunité de juridiction et d'exécution de l'Etat de Roumanie, non fondé, rejetant le moyen de la partie appelante, actuelle partie demanderesse en cassation, soulevé d'une part dans son acte d'appel du 10 novembre 2015, sous le titre « II.C.2) immunité de juridiction », dans les termes suivants : La Sentence Arbitrale est encore contraire à l'ordre public en ce que l'Etat de Roumanie bénéficie d'une immunité de juridiction et d'exécution, à moins que cet Etat n'y ait expressément renoncé. Or, en l'espèce, la Roumanie n'a jamais expressément renoncé à son immunité, de sorte que l'exécution de la Sentence violerait l'ordre public. », soulevé d'autre part à la page 20 de ses conclusions récapitulatives du 15 novembre 2019, dans les termes suivants : Premièrement, le TBI a été implicitement écarté par l'adhésion de la Roumanie à l'Union Européenne. Deuxièmement et subsidiairement l'article 7 (5) cité par la partie M) soumet cette immunité à la condition qu'un consentement ait été fourni en application du paragraphe 2 du même article. Il appartient à la partie M) de fournir les éléments confirmant le respect des conditions de ce paragraphe 2. », déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur ;

Alors qu'aux termes de l'article 89 de la Constitution, « Tout jugement est motivé. Il est prononcé en audience publique. », que deux motifs contradictoires se détruisent et s'annihilent réciproquement, aucun d'entre eux ne pouvant alors être retenu comme fondement de la décision » de sorte que, quant à la question de savoir si l'Etat de Roumanie pouvait valablement se prévaloir de son immunité d'exécution, pour soulever la nullité, sinon la réformation, sinon la révocation des Ordonnances, pour être contraires à l'ordre public, la Cour d'Appel aurait dû répondre par la positive, ce alors que les juges d'appel ont retenu, dans le même arrêt, qu'en introduisant une procédure en exéquatur au Luxembourg, M) y a poursuivi (e) » en réalité l'exécution » de la Sentence, assimilant ainsi l'exéquatur à l'exécution, partant l'arrêt entrepris est à déclarer comme n'étant pas motivé, au sens des dispositions de l'article 89 de la Constitution , et partant est à annuler pour contravention aux dispositions constitutionnelles précitées.».

Réponse de la Cour Le demandeur en cassation fait grief aux juges d'appel de s'être déterminés par des motifs contradictoires en ayant retenu, d'une part, que l'exequatur ne constitue pas un acte d'exécution et, d'autre part, que l'exécution de la sentence arbitrale était poursuivie au Luxembourg.

Le grief tiré de la contradiction de motifs, équivalant à un défaut de motifs, ne peut être retenu que si les motifs incriminés sont contradictoires à un point tel qu'ils se détruisent et s'annihilent réciproquement, aucun ne pouvant être retenu comme fondement de la décision.

Les juges d'appel ont d'abord écarté le moyen tiré de l'immunité d'exécution de l'ETAT DE ROUMANIE au motif que « La procédure d'exequatur relève du domaine de l'immunité de juridiction et non du domaine de l'immunité d'exécution.

En effet, l'exequatur ne constitue pas, en lui-même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré. ».

Ils ont ensuite rejeté l'exception tirée de la violation de l'ordre public de l'Etat requis au motif qu'« en cas d'application d'une convention internationale, comme en l'espèce la Convention de Washington, les dispositions de l'article 1251 ne s'appliquent pas et que le juge ne tient compte que des dispositions de la convention ». Ils ont constaté que « la Sentence a été rendue sous l'égide du CIRDI, en application de la Convention de Washington, à laquelle tant la



La jurisprudence francophone des Cours suprêmes

dans l'existence d'une sentence CIRDI, dont une copie certifiée conforme par le secrétaire général est à soumettre au juge de l'exequatur. Hormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI.

Si l'ETAT de ROUMANIE soutient que l'article 54.-3) de la Convention de Washington (« L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ») renvoie au droit national luxembourgeois, ceci ne vaut que pour l'exécution des jugements. Or et tel qu'indiqué ci-dessus, l'exequatur ne constitue pas, en lui-même, un acte d'exécution. ».

Les développements dans lesquels les juges d'appel ont retenu que la Convention de Washington lie « tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie...» avaient pour seul objet de rechercher si cette convention continuait à lier les deux pays, de sorte que l'ajout litigieux selon lequel « l'exécution est poursuivie au Luxembourg », surabondant, ne constitue pas le soutien nécessaire à la décision des juges d'appel de rejeter la fin de non - recevoir tirée de l'immunité d'exécution invoquée par le demandeur en cassation, rejet basé sur le motif, rappelé après le passage critiqué, que « l'exequatur ne constitue pas, en lui - même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré. ».

Les juges d'appel ne se sont partant pas contredits.

Il s'ensuit que les moyens ne sont pas fondés.

Sur le moyen d'office d'ordre public « tiré de la violation des articles 267 et 344 du Traité sur le fonctionnement de l'Union européenne (TFUE) et du principe de droit international public de l'immunité de juridiction des Etats étrangers, en ce que la Cour d'appel, saisie de l'appel contre une ordonnance ayant fait droit à une demande de reconnaissance, sur base de l'article 54 de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, adoptée le 18 mars 1965 à Washington (la « Convention CIRDI »), de la sentence arbitrale n° ARB/05/20, rendue le 11 décembre 2013 par le Centre international pour le règlement des différends dans le cadre d'un litige entre, d'une part, différents investisseurs, dont M), et, d'autre part, la Roumanie, en exécution de la clause d'arbitrage prévue par l'article 7(5) du traité bilatéral d'investissement, conclu le 29 mai 2002, entre les Gouvernements de Suède et de Roumanie (« le TBI »), a écarté l'exception d'immunité de juridiction soulevée par la Roumanie aux motifs que « [a]u vu de la clause d'arbitrage, découlant de l'article 7(5) du TBI à laquelle l'ETAT de ROUMANIE a consenti, celui-ci est à considérer comme ayant expressément renoncé à son immunité de juridiction » , tout en ayant été saisie des questions « de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne » et « de la contrariété entre le TBI et le droit de l'Union européenne » , alors que, première branche, ainsi que la Cour de justice de l'Union européenne l'a dit pour droit dans son arrêt Achmea, du 6 mars 2018 (C-

284/16, ECLI:EU:C:2018:158), les articles 267 et 344 TFUE s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence et que, ainsi que la Cour de justice de l'Union européenne l'a constaté dans son arrêt Commission c/ European Food e.a., du 25 janvier 2022 (C-638/19 P, ECLI:EU:C:2022:50), le consentement que la Roumanie avait donné à la possibilité qu'un litige avec des investisseurs soit porté contre elle dans le cadre de la clause d'arbitrage prévue par l'article 7(5) du TBI est, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité) parce qu'il est contraire aux articles 267 et 344 TFUE, de sorte que ces articles s'opposent à déduire de l'article 7(5) du TBI une renonciation à l'immunité de juridiction et que, en procédant à cette déduction, la Cour d'appel a méconnu ces articles, et que, seconde branche, en déduisant la renonciation par la Roumanie à son immunité de juridiction du consentement donné par celle-ci à l'article 7(5) du TBI, tant bien même que, au regard des arrêts précités de la Cour de justice de l'Union européenne, ce consentement est contraire aux articles 267 et 344 TFUE et, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité Commission c/ European Food e.a., du 25 janvier 2022), la Cour d'appel a méconnu



Il résulte de l'arrêt attaqué que l'ETAT DE ROUMANIE avait invoqué devant les juges d'appel comme moyens de défense à la demande en reconnaissance de la sentence arbitrale tant son immunité de juridiction que la contrariété au droit de l'Union européenne de la clause d'arbitrage prévue à l'article 7(5) du traité bilatéral d'investissement (ci-après « le TBI ») liant le Royaume de Suède à l'Etat de Roumanie.

La contrariété aux articles 267 et 344 TFUE d'une clause d'arbitrage contenue dans un accord international liant deux Etats membres de l'Union européenne a été retenue par la CJUE dans l'arrêt Slowakische Republik-Achmea (ci-après « Achmea ») du 6 mars 2018 (C-284/16, ECLI:C:2018:158.), partant antérieurement au moment où les juges d'appel ont statué.

Dans l'arrêt Achmea, la CJUE a dit pour droit que « les articles 267 et 344 TFUE doivent être interprétés en ce sens qu'ils s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres [de l'Union européenne] [...] aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence ».

Dans l'arrêt Commission c/ European Food, Victor M) e.a.. du 25 janvier 2022 (C-638/19 P, ECLI:EU:C:2022:50), la CJUE a dit pour droit que la solution retenue dans l'arrêt Achmea s'applique à la clause d'arbitrage prévue à l'article 7(5) du TBI précité (points 137 et 138).

Elle a rappelé que « par la conclusion d'un tel accord, les États membres parties à celui-ci consentent à soustraire à la compétence de leurs propres juridictions et, partant, au système de voies de recours juridictionnel que l'article 19, paragraphe 1, second alinéa, TUE leur impose d'établir dans les domaines couverts par le droit de l'Union, des litiges pouvant porter sur l'application ou l'interprétation de ce droit. Un tel accord est donc susceptible d'aboutir à une situation dans laquelle ces litiges ne seraient pas tranchés d'une manière garantissant la pleine efficacité dudit droit (arrêt du 26 octobre 2021, PL Holdings, C-109/20, EU:C:2021:875, point 45 et jurisprudence citée) », aux motifs tirés « d'une part, [que] ce tribunal arbitral ne constitue pas une , au sens de l'article 267 TFUE, et, d'autre part, [que] la sentence arbitrale prononcée par ce dernier n'est soumise, conformément aux articles 53 et 54 de la convention CIRDI, à aucun contrôle par une juridiction de l'Etat membre quant à sa conformité avec le droit de l'Union. » (points 139 et 142).

La CJUE en a conclu que « dès lors que, à compter de l'adhésion de la Roumanie à l'Union, le système des voies de recours juridictionnel prévu par les traités UE et FUE s'est substitué à cette procédure d'arbitrage, le consentement à cet effet donné par cet État est [...] dépourvu de tout objet. » (point 145).

Les juges d'appel ont écarté la fin de non-recevoir tirée de l'immunité de juridiction de l'ETAT DE ROUMANIE opposée à la demande en reconnaissance de la sentence arbitrale au motif que le demandeur en cassation avait renoncé à invoquer l'immunité de juridiction en raison de son accord à voir toiser le différend en application de la clause d'arbitrage contenue à l'article 7(5) du TBI.

Dès lors cependant qu'à partir du 1er janvier 2007, date de l'adhésion de la Roumanie à l'Union européenne, le système des voies de recours juridictionnel propre à l'Union européenne s'est substitué à la procédure d'arbitrage du TBI liant le Royaume de Suède à l'Etat de Roumanie et que le consentement du demandeur en cassation à voir toiser le différend en application de la clause d'arbitrage y contenue est dépourvu de tout objet, les juges d'appel, en statuant comme ils l'ont fait, ont violé tant les articles 267 et 344 TFUE que le principe de droit international public de l'immunité de juridiction de l'ETAT DE ROUMANIE.

Il s'ensuit que l'arrêt encourt la cassation.

Il n'y a pas lieu à renvoi du litige devant la Cour d'appel, étant donné que l'immunité de juridiction de l'ETAT DE ROUMANIE paralyse l'exercice du pouvoir juridictionnel qui résulte de la compétence internationale des juridictions luxembourgeoises.



La jurisprudence francophone des Cours suprêmes

L'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales ne s'oppose cependant pas à une limitation du droit d'accès à un tribunal, découlant de l'immunité des Etats étrangers, dès lors que cette limitation est consacrée par le droit international et ne va pas au-delà des règles de droit international généralement reconnues en matière d'immunité des Etats.

Il n'y a pas lieu, tel que le défendeur en cassation le fait encore valoir, de surseoir à statuer en attendant que la CJUE se soit prononcée sur le mérite d'une question préjudicielle dont elle a été saisie par la Cour d'appel de Bruxelles dans le cadre du litige opposant les mêmes parties, étant donné que la réponse à la question préjudicielle n'est pas susceptible d'influer sur la solution du présent litige.

Sur les demandes en allocation d'une indemnité de procédure Au vu du sort réservé aux dépens, la demande de M) en allocation d'une indemnité de procédure est à rejeter.

Il n'est pas inéquitable de laisser à charge de la COMMISSION EUROPEENNE l'intégralité des frais exposés non compris dans les dépens de sorte que sa demande en allocation d'une indemnité de procédure est à rejeter.

PAR CES MOTIFS, la Cour de cassation :

casse et annule, sans renvoi, l'arrêt numéro 15/21-VIII-Exequatur, rendu le 11 février 2021 sous le numéro 43054 du rôle par la Cour d'appel du Grand-Duché de Luxembourg, huitième chambre, siégeant en matière civile et d'exequatur ;

rejette les demandes en allocation d'une indemnité de procédure ;

condamne le défendeur en cassation M) aux dépens de l'instance en cassation ;

ordonne qu'à la diligence du procureur général d'Etat, le présent arrêt soit transcrit sur le registre de la Cour d'appel du Grand-Duché de Luxembourg et qu'une mention renvoyant à la transcription de l'arrêt soit consignée en marge de la minute l'arrêt annulé.

La lecture du présent arrêt a été faite en la susdite audience publique par le président Roger LINDEN en présence du premier avocat général Serge WAGNER et du greffier Daniel SCHROEDER.

Conclusions du Parquet Général dans l'affaire de cassation ÉTAT DE ROUMANIE c/ 1) M) et 2) COMMISSION EUROPÉENNE (affaire n° CAS 2021-00061 du registre) Sur la recevabilité du pourvoi ................................................................................ 34 Sur le cadre juridique ................................................................................ 34 La protection des investisseurs par des traités bilatéraux d'investissements (ci-après « TBI ») prévoyant en cas de différend le recours à l'arbitrage ................................. 34 La Convention CIRDI ................................................................ 35 Généralités ................................................................ 36 Reconnaissance et exécution des sentences du CIRDI ................................................ 36 Finalité et domaine de l'immunité d'exécution dans le cadre de l'exécution des sentences du CIRDI ................................................................ 39 L'incompatibilité avec le droit de l'Union européenne du recours à l'arbitrage dans le cadre des TBI intra-UE : l'arrêt Achmea ................................................................ 42 Le changement progressif d'attitude de la Commission à l'égard des TBI intra-UE .......... 42 Le constat de la contrariété au droit de l'Union européenne des TBI intra-UE par la Cour de justice dans son arrêt Achmea ................................................................ 43 La portée de l'arrêt Achmea ................................................................ 47 Contrariété au droit de l'Union de toutes les clauses d'arbitrages de TBI intra-UE ? 47 Contrariété au droit de l'Union des clauses d'arbitrages fondées sur la Convention CIRDI ? ................................................................ 49 Applicabilité de la jurisprudence Achmea dans le temps.............................................. 50 Applicabilité dans le temps de la jurisprudence Achmea ................................................ 50 Applicabilité de la jurisprudence Achmea à des sentences arbitrales relatives à des litiges se rapportant en partie à des faits ou actes antérieurs à l'empire du droit de l'Union européenne



La jurisprudence francophone des Cours suprêmes

...................................................................................... 54 La sentence arbitrale du CIRDI ............................................................................. 54 La décision de la Commission qualifiant le versement des dommages et intérêts alloués par cette sentence arbitrale d'aide d'Etat prohibée................................................. 55 La procédure de reconnaissance de la sentence arbitrale à Luxembourg........................... 56 Décisions en matière de reconnaissance ou d'exécution de la sentence arbitrale dans d'autres pays et à Luxembourg ...................................................................... 57 Sur les moyens de cassation de la Roumanie ...................................................... 58 Sur le premier moyen de cassation ....................................................... 58 Grief étranger aux dispositions visées au moyen ...................................................... 58 A titre subsidiaire : Moyen non fondé ........................................ 59 Sur les deuxième au sixième moyens de cassation réunis.................................................. 60 Irrecevabilité des moyens pour mettre simultanément en œuvre plusieurs cas d'ouverture ...................................................................... 64 A titre subsidiaire ...................................................................... 65 Sur le premier grief, tiré de la violation du principe de la primauté du droit de l'Union européenne ...................................................................... 65 Sur le second grief, tiré d'un défaut de réponse à conclusions ................................... 65 A titre principal : Grief ne pouvant être accueilli pour avoir été tiré de la violation de dispositions non pertinentes ...................................................................... 65 A titre subsidiaire : Grief non fondé, la Cour d'appel ayant répondu aux conclusions ...................................................................... 66 Sur les septième et huitième moyens de cassation réunis .................................................. 67 Irrecevabilité des moyens pour mettre simultanément en œuvre plusieurs cas d'ouverture ...................................................................... 23 A titre subsidiaire ...................................................................... 68 Caractère non-fondé du grief tiré d'un défaut de réponse à conclusions ................... 68 Irrecevabilité du grief tiré d'une insuffisance de motifs ............................................ 70 Sur les neuvième et dixième moyens de cassation réunis ...................................... 71 Moyens irrecevables pour critiquer une contradiction entre un motif de droit et un motif de fait ...................................................................... 73 A titre subsidiaire : Moyens non fondés ...................................................................... 74 Conclusion sur les moyens de cassation de la Roumanie ................................................. 75 Sur les moyens de cassation proposées par la Commission 75 Sur les moyens de cassation d'ordre public à soulever d'office ................... 77 Sur la recevabilité des deux moyens proposés ...................................................................... 79 Sur le bien-fondé des deux moyens proposés ...................................................................... 81 Sur la conformité avec le droit international public du refus d'appliquer en l'espèce la Convention CIRDI ...................................................................... 82 Sur la façon de faire prévaloir le droit de l'Union européenne en l'espèce ..................... 87 Le défaut de pertinence en l'espèce du principe d'interprétation conforme .............. 87 La mise en œuvre du principe de primauté par la voie esquissée par la jurisprudence Simmenthal ...................................................................... 88 Conclusion : ...................................................................... 90 Le pourvoi du demandeur en cassation, par dépôt au greffe de la Cour en date du 11 juin 2021 d'un mémoire en cassation, signifié le 9 juin 2021 aux défendeurs en cassation, est dirigé contre un arrêt n° 15/21 – VIII - Exequatur contradictoirement rendu en date du 11 février 2021 sous le numéro 43054 du rôle par la Cour d'appel, huitième chambre, siégeant en matière civile et d'exequatur.

Sur la recevabilité du pourvoi Le pourvoi est recevable en ce qui concerne le délai1.

Le demandeur en cassation a, conformément à l'article 10, alinéa 1, de la loi modifiée du 18 février 1885 sur les pourvois et la procédure en cassation (ci-après « la loi de 1885 »), déposé un mémoire signé par un avocat à la Cour. Ce mémoire a été, conformément à l'article 10, alinéa 1, de la loi de 1885, signifié, antérieurement à son dépôt, aux autres parties en cause.

Le pourvoi est dirigé contre une décision contradictoire rendue en dernier ressort qui tranche tout le principal, de sorte qu'il est également recevable au regard des articles 1er et 3 de la loi de 1885.

Le pourvoi est, partant, recevable.



La jurisprudence francophone des Cours suprêmes

investissements (TBI) en vue de favoriser et encourager les investissements étrangers. Ces traités offrent aux investisseurs de l'un des Etats signataires (l'Etat d'origine) une série de protections et garanties pour leurs investissements dans l'autre 1 L'arrêt attaqué a été signifié au demandeur en cassation en date du 31 mars 2021 (Pièce n° 21 annexée au mémoire en cassation). Le délai du pourvoi est, en application des articles 7, alinéas 1 et 2, de la loi modifiée du 18 février 1885 sur les pourvois et la procédure en cassation et 167, point 1°, premier tiret, du Nouveau Code de procédure civile, de deux mois et quinze jours. Le pourvoi a été formé le 11 juin 2021, donc, eu égard à la date de signification de l'arrêt attaqué au demandeur en cassation (le 31 mars 2021), moins de deux mois et quinze jours après cette signification.

Etat signataire (l'Etat d'accueil). »2. Le nombre des TBI conclus à travers le monde est estimé à 3.0003.

« Les TBI offrent généralement deux types de protection aux investisseurs étrangers. D'une part, des standards minimums de traitement, comme les clauses de « traitement juste et équitable », de « protection contre les expropriations », ou encore de « pleine sécurité et protection » [ainsi que] des garanties de non-discrimination vis-à-vis des nationaux de l'Etat d'accueil ou des investisseurs d'autres Etats, comme les clauses de « traitement national » ou de la « nation la plus favorisée » (NPF). D'autre part, la plupart des TBI contiennent aussi des mécanismes de règlement des différends entre investisseurs et Etats (RDIE), permettant aux investisseurs de l'Etat d'origine de porter un conflit potentiel sur le respect de ces protections par l'Etat d'accueil à leur égard devant plusieurs fors, le plus souvent, au choix du demandeur, les cours et tribunaux de l'Etat d'accueil ou différentes institutions arbitrales. »4.

Les TBI contiennent donc en règle une clause d'arbitrage : « [e]n ce qui concerne les aspects contentieux, les TBI prévoient qu'un investisseur d'un Etat contractant peut, en cas de litige concernant ses investissements sur le territoire de l'autre Etat contractant, introduire un recours contre cet Etat devant un tribunal arbitral »5. « Alors que le droit international public connaît principalement les Etats en tant que sujets, [les] traités d'investissements octroient des droits à des personnes physiques ou morales [privées] qui peuvent s'en prévaloir, généralement devant des tribunaux spéciaux. En effet, en concluant un TBI, les deux Etats s'engagent, par avance, à accepter d'être poursuivis devant un tribunal arbitral par les investisseurs relevant d'un de ces Etats. »6.

Les raisons en sont de « soustraire les litiges d'investissement à la compétence [des] juridictions [étatiques], dans le dessein d'attirer les investisseurs étrangers »7 et de veiller à ce que « [l]e contentieux opposant l'investisseur à l'Etat d'accueil [soit] « dépolitisé », ce qui permettrait d'éviter des tensions entre les Etats contractants »8.

L a C o n v e n t i o n C I R D I La protection des investisseurs et, dans ce cadre, le recours à l'arbitrage est notamment mis en œuvre par la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, fait à Washington le 18 mars 1965 (ci-après « la Convention CIRDI »)9.

2 Guillaume CROISANT et Xavier TATON, L'affaire « M) » : quand le droit européen (des aides d'Etat) rencontre la protection internationale des investissements, Journal du droit européen, 2020, pages 2-13, voir page 2, colonne de droite, deuxième alinéa.

3 Idem, page 2, colonne de droit, avant-dernier alinéa.

4 Idem, page 3, colonne de gauche, deuxième au cinquième alinéa.

5 Nicolas de SADELEER, Le contentieux du droit des investissements dans tous ses état – De la disparition des tribunaux d'investissement intra-UE à l'avènement d'une Cour multilatérale d'investissement, Revue de droit commercial belge (R.D.C.-T.B.H.), 2019, pages 742 à 769, n° 3, page 744.

6 Idem, n° 2, page 744.

7 Idem, n° 3, page 744.

8 Idem, n° 3, page 745.



La jurisprudence francophone des Cours suprêmes

Généralités La Convention CIRDI a mis en place, sous les auspices de la Banque mondiale, un système spécifique de règlement des différends pour les litiges afférents à des opérations d'investissements10. Elle a institué le Centre International pour le Règlement des Différends relatifs aux Investissements (connue sous l'acronyme « CIRDI »)11, dont l'objet est « d'offrir des moyens de conciliation et d'arbitrage pour régler les différends relatifs aux investissements opposant des Etats contractants à des ressortissants d'autres Etats contractants »12. Elle a été ratifiée par 156 Etats13.

« [L]es TBI font le plus souvent référence au [CIRDI] pour le règlement des différends relatifs aux investissements […], qui fait partie du Groupe de la Banque mondiale, et à son règlement d'arbitrage (le Règlement CIRDI). […] La Convention CIRDI et le Règlement CIRDI ne contiennent pas de règles de fond, les protections offertes aux investisseurs étant contenues directement dans le TBI, mais uniquement les règles procédurales ainsi que les règles concernant la compétence applicables aux arbitrages CIRDI. La Convention CIRDI vise également à assurer la reconnaissance et l'exécution, dans les Etats parties, des sentences rendues sous l'égide du CIRDI. »14.

Cette Convention « constitue le premier, et jusqu'à présent le seul, traité international multilatéral de « couverture » (umbrella agreement) instituant un arbitrage international mixte entre personnes privées et Etats en matière d'investissements internationaux »15.

Reconnaissance et exécution des sentences du CIRDI La Convention prévoit un système de voies de recours internes des sentences rendues par le CIRDI. Elle réserve à cette fin aux parties le droit de demander la révision de la sentence, en cas de découverte d'un fait de nature à exercer une influence décisive sur la sentence16. Elle permet en outre aux parties de demander l'annulation de la sentence en cas de vice dans la constitution du tribunal arbitral, d'excès de pouvoir manifeste de ce dernier, de corruption d'un de ses membres, d'inobservation grave d'une règle fondamentale de procédure ou d'un défaut de motifs17. Cette demande en annulation est jugée par un Comité ad hoc auquel aucun des membres du Tribunal ayant rendu la sentence ne peut appartenir et qui peut décider de suspendre l'exécution de la sentence jusqu'au prononcé de la décision relative à la demande18.

La reconnaissance et l'exécution des sentences arbitrales rendues sous l'empire de la Convention CIRDI sont soumises à des conditions dérogatoires du droit commun.

10 Jurisclasseur Droit international, Synthèses – Droit des investissements internationaux, par Mathias AUDIT, actualisé par Julien CAZALA, août 2021, n° 19.

11 Article 1er de la Convention CIRDI.

12 Article 1er, paragraphe 2, de la Convention CIRDI.

13 Database of ICSID Member States | ICSID (worldbank.org) (consultée le 28 janvier 2022).

14 CROISANT et TATON, précité, page 3, colonne de gauche, avant-dernier alinéa.

15 Répertoire Dalloz Droit international, V° Investissements, par Dominique CARREAU, janvier 2020, n° 236.

16 Article 51 de la Convention CIRDI.

17 Article 52 de la Convention CIRDI.

18 Idem.

D'abord, la sentence « est [ainsi que le dispose l'article 53, paragraphe 1, de la Convention] obligatoire à l'égard des parties et ne peut être l'objet d'aucun appel ou autre recours, à l'exception de ceux prévus par la présente Convention [donc exception faite des voies de recours internes à la Convention CIRDI, donc la demande en révision et la demande en annulation évoquées ci-avant] ». Ensuite, l'article 54, paragraphe 1, de la Convention dispose que « [c]haque Etat contractant reconnaît toute sentence rendue dans le cadre de la présente Convention comme obligatoire et assure



conforme », ainsi que le prévoit l'article 54, paragraphe 2. Finalement, s'agissant de l'exécution de la sentence arbitrale, l'article 54, paragraphe 3, dispose que cette exécution « est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », tandis que l'article 55 ajoute que « [a]ucune des dispositions de l'Article 54 ne peut être interprétée comme faisant exception au droit en vigueur dans un Etat contractant concernant l'immunité d'exécution dudit Etat ou d'un Etat étranger ».

Il en suit « que la convention [CIRDI] a institué, en ses articles 53 et 54, un régime autonome et simplifié de reconnaissance et d'exécution qui exclut celui [prévu par le Nouveau Code de procédure civile en matière de reconnaissance et d'exécution des sentences arbitrales internationales] »19.

L'article 54 de celle-ci, avec son obligation imposée aux Etats parties de reconnaître toute sentence comme obligatoire et d'en assurer l'exécution sur son territoire « comme s'il s'agissait d'un jugement définitif d'un tribunal fonctionnant sur le territoire dudit Etat » a pour effet d'éviter « aux sentences le passage par la procédure de l'exequatur devant le juge national […] [ce qui fait] figure d'exception dans le monde de l'arbitrage »20. « L'originalité et l'efficacité de ce système sont dues […] à [cette] obligation »21. Autrement dit, les sentences arbitrales rendues dans le cadre de la Convention sont définitives et exécutoires de plein droit pour les parties contractantes22. Contrairement à ce qui pourrait être admis à première vue, l'article 54 n'aurait pas été inséré dans la Convention aux fins de protéger les investisseurs, mais, au contraire, en vue de protéger les Etats qui voudraient exécuter des sentences arbitrales condamnant des investisseurs négligents au paiement d'indemnités23.

La seule condition pour la « reconnaissance et [l']exequatur est la présentation au juge national compétent d'une copie certifiée conforme de la sentence »24, étant toutefois précisé que « [l]es 19 Cour de cassation française, première chambre civile, 11 juin 1991, n° 90-11.282, Bull. civ. I, n° 193, page 127.

Il est à préciser que le Code de procédure pénale français prévoit au titre des dispositions ainsi écartées, notamment, dans son article 1514 que les sentences arbitrales rendues à l'étranger ou en matière d'arbitrage international « sont reconnues ou exécutées en France […] si cette reconnaissance ou cette exécution n'est pas manifestement contraire à l'ordre public international ». Cette disposition est similaire à l'article 1251, point 2°, du Nouveau Code de procédure civile, qui dispose que « [s]ous réserve des dispositions de conventions internationales, le juge refuse l'exequatur : […] 2° si la sentence ou son exécution est contraire à l'ordre public […] ».

20 Arnaud DE NANTEUIL, Les mécanismes permanents de règlement des différends, une alternative crédible à l'arbitrage d'investissements ?, Journal du droit international (CLUNET), 2017, doctrine 2, n° 26.

21 Andrea GIARDINA, L'exécution des sentences du Centre international pour le règlement des différends relatifs aux investissements, Revue critique de droit international privé, 1982, pages 273 et suivantes, n° 1, page 273.

22 Jurisclasseur Droit international, Fasc. 245 : Arbitrage entre sujets du droit international : Etats et organisations internationales – Principes généraux, par Emmanuel DECAUX et Laurent TRIGEAUD, février 2013, n° 73.

23 Michael DE BOECK, Brussels Court of First Instance acknowledges EU law over ICSID: Intra-EU BIT ICSIS awards not so "Benvenuti" in Belgium, b-Artibra, 2016, pages 35-66, voir n° 4, page 43 et les références y citées.

24 Mauro RUBINO-SAMMARTANO, Arbitrage international, Bruxelles, Bruylant, 2019, n° 39.136, page 1707.

sentences arbitrales CIRDI ne requièrent pas un exequatur, du moment où la Convention de Washington prévoit la reconnaissance automatique des sentences arbitrales pour tous les Etats contractants, et qu'ils sont tenus d'exécuter la sentence arbitrale « comme s'il s'agissait d'une décision définitive d'un tribunal de cet Etat » »25. La Convention a donc adopté « le principe de l'efficacité automatique [des sentences arbitrales du CIRDI] à l'intérieur des ordres de tous les Etats membres »26. L'article 54 constitue une clause de pleine foi et crédit et d'exécution de plein droit27.

Il « impose aux Etats membres de reconnaître dans leur ordre juridique force de chose jugée aux sentences du C.I.R.D.I. et d'assurer l'exécution sur leur territoire des obligations pécuniaires découlant de ces sentences »28, donc



La jurisprudence francophone des Cours suprêmes

plus précisement, « sans aucun autre contrôle que celui de l'existence de la sentence »31.

Il en suit que « aucune véritable procédure d'exequatur n'est nécessaire pour obtenir les effets susmentionnés »32. Au contraire, « toute procédure qui ne serait pas limitée à la vérification de l'authenticité du titre exécutoire, devrait être considérée comme contraire à la Convention [CIRDI] »33, de sorte que « aucune limite ne peut être opposée à la déclaration de reconnaissance et de force exécutoire des sentences du C.I.R.D.I. à l'intérieur des ordres nationaux »34.

La Convention s'oppose dès lors à tout refus de reconnaissance pour des motifs tirés d'ordre public ou de non-respect du droit national ou international35 : « lors de la reconnaissance aucun contrôle ne doit être effectué en ce qui concerne le respect de l'ordre public de l'Etat où la reconnaissance est demandée et, à plus forte raison, en ce qui concerne le respect des lois de cet Etat »36. Les sentences arbitrales rendues sous l'empire de la Convention sont « d'exécution immédiate dans les ordres juridiques internes des Etats parties à la Convention, sans contrôle 25 Idem, n° 39.264, page 1747.

26 GIARDINA, précité, n° 1, page 275, dernier alinéa.

27 DE BOECK, précité, n° 4, page 42 (« Articles 53 and 54 of the ICSID Convention, also referred to as the "full faith and credit-clause" or the "self-enforcement" provision, direct States and national courts treat an ICSID award as binding and final »).

28 GIARDINA, précité, n° 2, page 277, avant-dernier alinéa. Si l'article 54, paragraphe 1, n'impliquait pas l'effet de chose jugée des sentences arbitrales du CIRDI à l'intérieur des ordres juridiques étatiques « [c]ette disposition ne serait qu'une copie inutile de l'article 53 qui déclare déjà l'effet obligatoire de la sentence pour les parties au litige » (idem, page 277, note de bas de page 12).

29 GIARDINA, précité, n° 2, page 280, premier alinéa.

30 Luca LANOË-CAMPBELL, Arrêt Achimea : bouleversement des rapports entre droit international des investissements et droit de l'Union européenne, Journal de l'arbitrage de l'Université de Versailles, n° 1, 2019, étude 8, 3, B, 2°, deuxième alinéa.

31 Répertoire Dalloz Droit international, V° Arbitrage : CIRDI, par Charles LEBEN, mars 2010, n° 263.

32 GIARDINA, précité, n° 3, page 281, avant-dernier alinéa.

33 Idem et loc.cit.

34 Idem, n° 4, page 284, premier alinéa.

35 CIRDI, Electrobel S.A. v. Hungary, ICSID-CASE No. ARB/07/19, Award, 25 novembre 2015, point 3.50, partie III, page 21 (« It is not permissible for that court [enforcing an ICSID award], under the ICSID Convention, to refuse enforcement on the ground of public policy or non-compliance with any national r international law »).

36 Idem, même numéro, même page, dernier alinéa.

possible du respect de l'ordre public international national »37. « Lors de la reconnaissance et de l'exécution, on ne peut [donc] même pas contrôler la conformité des sentences du C.I.R.D.I.

au droit international [ou] à l'ordre public international »38.

Autrement dit, « la reconnaissance et la force exécutoire prévues à l'article 54 doivent être accordées toujours et en tous cas. Aucun argument relatif à l'immunité des Etats ne peut être pris en considération à cette occasion. »39.



dispose toutefois que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder » et son article 55 prévoit que « [a]ucune des dispositions de l'Article 54 ne peut être interprétée comme faisant exception au droit en vigueur dans un Etat contractant concernant l'immunité d'exécution dudit Etat ou d'un Etat étranger ».

D'une façon générale « [...] l'idée fondamentale à la base de tous les régimes des immunités, quels qu'ils soient, consiste à éviter d'apporter des entraves au bon fonctionnement et à l'indépendance de la personne ou de l'entité à qui l'immunité est accordée »40.

Dans la conception contemporaine l'immunité d'exécution des Etats est « limitée à, et couvre seulement, les biens qui – quelle que soit leur origine – sont utilisés à des fins souveraines »41.

C'est le cas « des locaux diplomatiques et consulaires, des fonds gardés dans des comptes courants par la banque centrale, où par une banque pour les ambassades, ou pour des entités qui exercent une portion de souveraineté de leur Etat, pour leur propre usage »42, de sorte que « [e]n règle générale [...], seuls les biens destinés à des fins commerciales sont sujets à exécution »43. Il est à ce titre admis que « lorsqu'une sentence arbitrale a été rendue contre un Etat étranger, des mesures conservatoires ou d'exécution forcée visant un bien appartenant à l'Etat concerné ne peuvent être autorisées par le juge que si le bien en question est spécifiquement utilisé ou destiné à être utilisé par ledit Etat autrement qu'à des fins de service public non commerciales et entretient un lien avec l'entité contre laquelle la procédure a été intentée »44.

Dans cette logique l'exception d'immunité d'exécution a pour finalité d'opérer « la distinction prévue, d'une façon ou d'une autre par tous les textes et les jurisprudences, entre les biens 37 Mathias FORTEAU, L'ordre public « transnational » ou « réellement international », Journal du droit international (CLUNET), 2011, doctrine 1, n° 64.

38 GIARDINA, précité, n° 4, page 285, dernier alinéa.

39 Idem, n° 5, page 288, dernier alinéa.

40 Répertoire Dalloz de droit international, V° Immunités, par Catherine KESSEDJIAN, octobre 2017, n° 8.

41 RUBINO-SAMMARTANO, précité, n° 39.265, pages 1747-48.

42 Idem et loc.cit.

43 Idem et loc.cit.

44 Cour de cassation française, première chambre civile, 7 juillet 2021, 20-15.994, publié au Bulletin.

détenus par l'Etat en sa capacité de souverain et ceux qui sont détenus en sa capacité d'opérateur du commerce international agissant selon les modes de gestion privés »45.

Elle n'est donc pas générale, mais s'applique en raison de la nature des objets sur lesquels l'exécution est poursuivie46.

Ce critère a été retenu par les articles 19 et 21 de la Convention des Nations-Unies sur les immunités juridictionnelles des Etats et de leurs biens, du 2 décembre 200447. Le premier de ces articles dispose que, sauf accord de l'Etat, voire affectation par ce dernier de biens à cette fin, « [a]ucune mesure de contrainte postérieure au jugement [par exemple un jugement reconnaissant une sentence arbitrale], telle que saisie, saisie-arrêt ou saisie-exécution, ne peut être prise contre des biens d'un Etat en relation avec une procédure intentée devant un tribunal d'un autre Etat excepté si et dans la mesure où : [...] c) Il a été établi que les biens sont spécifiquement utilisés ou destinés à être utilisés par l'Etat autrement qu'à des fins de service public non commerciales et sont situés sur le territoire de l'Etat du for, à condition que les mesures de contrainte postérieurement au jugement ne portant que sur des biens qui ont un lien avec l'entité



La jurisprudence francophone des Cours suprêmes

sentence arbitrale faisant l'objet de la demande de reconnaissance. Il est susceptible de soutenir que cette Convention, même si elle n'est à ce jour pas encore entrée en vigueur et ne lie pas le Luxembourg, reflète le droit international coutumier49.

Cette conclusion n'est pas remise en question par la Convention européenne sur l'immunité des Etats, signée à Bâle le 16 mai 1972 et approuvée par le Luxembourg par une loi du 8 juin 198450.

Cette Convention, élaborée au sein du Conseil de l'Europe et approuvée à ce jour par huit pays seulement, dont le Luxembourg, mais, pour ce qui est pertinent dans le cas d'espèce, par aucun des Etats parties au TBI en cause, donc ni par la Suède, ni par la Roumanie, exclut dans son article 23 l'exécution forcée et l'application de mesures conservatoires sur les biens d'un autre Etat, sauf dans les cas et dans la mesure où celui-ci y a expressément consenti par écrit51. Cette disposition ne s'applique cependant, comme toute la Convention, que dans les rapports entre les Etats contractants, à l'exclusion des rapports entre Etats contractants et Etats tiers52, et ne concerne que les jugements rendus en conformité à la Convention, à l'exclusion notamment des sentences arbitrales, qui ne sont pas visées53. Elle s'applique par ailleurs sous la prémisse que la Convention impose en contrepartie aux Etats contractants l'obligation de donner effet aux jugements54. Il s'agit donc d'une solution spécifique exclusivement applicable dans les rapports entre les Etats contractants, ne mettant pas en cause s'agissant des rapports entre Etats 45 Répertoire Dalloz Droit international, V° Arbitrage, précité, n° 268.

46 Répertoire Dalloz de droit international, V° Immunités, précité, n° 122.

47 UNTC (consulté le 31 janvier 2022).

48 Voir également sur ce point : Répertoire Dalloz de droit international, V° Immunités, précité, n° 148.

49 Voir, en ce sens : Cour de cassation française, chambre sociale, 1er juillet 2020, 18-24.643, publié au Bulletin, au sujet de l'article 11 de cette Convention, relative aux immunités des Etats en matière de contrats de travail.

50 Mémorial, A, 1984, n° 61, du 28 juin 1984, page 1005.

51 Article 23 de la Convention européenne sur l'immunité des Etats : « Il ne peut être procédé sur le territoire d'un Etat contractant ni à l'exécution forcée, ni à une mesure conservatoire sur les biens d'un autre Etat contractant, sauf dans les cas et dans la mesure où celui-ci y a expressément consenti par écrit ».

52 La Convention circonscrit la portée de ses dispositions aux rapports entre Etats « contractants ».

53 Exposé des motifs de la Convention (Document parlementaire n° 1946, Compte-rendu 1973, page 734, deuxième alinéa).

54 Idem, même page, premier alinéa.

contractants, tel le Luxembourg, et Etats tiers, telles la Suède et la Roumanie, la pertinence du droit international coutumier, reflété par la Convention précitée des Nations-Unies du 2 décembre 2004.

Il s'ajoute que si les articles 54, paragraphe 3, et 55 de la Convention CIRDI autorisent de subordonner l'exécution d'une sentence arbitrale rendue par le CIRDI au respect de l'immunité d'exécution de l'Etat contre lequel l'exécution est recherchée telle qu'elle est sanctionnée par l'Etat sur le territoire duquel cette exécution a lieu, « [c]ela ne peut arriver, toutefois, que devant les instances nationales tenues d'adopter les mesures concrètes d'exécution des sentences ; et après que la sentence elle-même a été reconnue et déclarée exécutoire dans l'ordre national »55. La réserve tirée de l'exception d'immunité doit, en effet, être comprise comme impliquant « que l'accord arbitral impose l'obligation d'exécuter la sentence éventuelle, et l'article 53 de la convention confirme que la sentence est obligatoire pour les parties en cause et qu'elle doit être exécutée dans les délais prescrits [de sorte que] [l]a non-exécution constitue [...] une violation de cette obligation spécifique permettant l'utilisation, au niveau interétatique, des

    La jurisprudence francophone des Cours suprêmes

Il en sait que la distinction opérée par l'article 54 de la Convention CIRDI entre reconnaissance et exécution des sentences arbitrales, la reconnaissance étant automatique, mais l'exécution étant régie par la législation concernant l'exécution des jugements de l'Etat d'exécution et sous réserve du respect de l'immunité d'exécution des Etats étrangers, a pour objet d'éviter une exécution sur des biens utilisés à des fins souveraines, mais non d'autoriser à l'occasion de l'exécution une révision de la sentence arbitrale57. « Certes, l'exécution d'une sentence CIRDI peut être confrontée aux immunités d'exécution. Toutefois la question de savoir si un Etat jouit ou non de son immunité d'exécution ne permet pas […] de procéder à un contrôle de la sentence CIRDI au regard de l'ordre public international. »58.

L'exception tirée de l'immunité d'exécution ne permet donc pas de remettre en cause le principe de l'obligation d'exécuter la sentence arbitrale. Sa pertinence se limite à refuser l'exécution à l'égard de certains types de biens appartenant à l'Etat contre lequel l'exécution est poursuivie par l'investisseur. L'exception est donc dépourvue de pertinence pour refuser l'exécution d'une sentence pour des motifs d'ordre général, étrangers à la nature des biens visés par l'exécution, par exemple pour un motif tiré de la contrariété de la sentence à l'ordre public international de l'Etat d'exécution, telle la contrariété de la sentence arbitrale au droit de l'Union européenne.

Cette conclusion est confortée par la façon dont il y a lieu de comprendre la portée de l'article 54, paragraphe 3, de la Convention CIRDI, dont la référence à « la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder » s'entend, au regard des travaux préparatoires de la Convention et du libellé de l'article, exclusivement comme référence à des règles de nature procédurale59. Ce motif supplémentaire s'oppose donc également à l'admission, à l'occasion de l'exécution de la 55 GIARDINA, précité, n° 5, page 289, premier alinéa.

56 Idem, n° 6, page 291, dernier alinéa.

57 DE BOECK, précité, n° 4, page 42 (« This distinction between "recognition" and "execution" serves to limit execution on stat assets used for public administration of the state (de iure imperii), but not to allow some form of review. »).

58 LANOË-CAMPBELL, précité, 3, B. 2°, antépénultième alinéa.

59 CIRDI, Sentence arbitrale Electrobel S.A. v. Hungary, précitée, point 3.50, partie III, page 21 (« The reference to the national laws of the enforcing State in Article 54(3), regarding execution of an ICSID award, is limited to laws of a procedural nature only, as established by its drafting history and content »).

sentence arbitrale, de motifs d'inexécution tirés du non-respect par la sentence arbitrale de l'ordre public international de l'Etat dans lequel l'exécution est poursuivie.

Il est finalement à observer qu'il est admis en France par la jurisprudence de la Cour de cassation française depuis son arrêt « Creighton » du 6 juillet 2000 « que l'engagement pris par l'Etat signataire de la clause d'arbitrage d'exécuter la sentence […] impliqu[e] renonciation de cet Etat à l'immunité d'exécution »60. Cette solution est transposable à la Convention CIRDI61. A adopter cette solution, l'acceptation de la clause d'arbitrage par l'Etat signataire vaut renonciation à l'immunité d'exécution, donc prive cet Etat de la possibilité d'invoquer l'immunité d'exécution dans l'Etat sur le territoire duquel l'exécution de la sentence arbitrale est recherchée. Ce motif plaide également contre la possibilité de faire valoir, à l'occasion de l'exécution d'une sentence arbitrale adoptée sur base de la Convention CIRDI dans l'Etat où cette exécution est poursuivie, des motifs tirés de la contrariété de la sentence arbitrale à l'ordre public international de cet Etat, qui a, par hypothèse, déjà préalablement reconnu la sentence.

L'incompatibilité avec le droit de l'Union européenne du recours à l'arbitrage dans le cadre des TBI intra-UE : l'arrêt Achmea Le système décrit ci-avant, dérogatoire au droit commun, de la Convention CIRDI se heurte au droit de l'Union européenne lorsqu'un Etat membre est appelé à reconnaître ou à exécuter une sentence arbitrale rendue sur base d'un TBI conclu entre Etats membres, donc en présence d'un « TBI intra-UE ».



développement, une nouvelle vague de traités vit le jour à la suite de la chute du rideau de fer en 1991. Ces TBI visaient à garantir la sécurité des investissements des pays d'Europe occidentale dans les pays d'Europe centrale [et orientale] qui avant les années 90 avaient connu une économie dirigée. »62.

La Commission européenne (ci-après « la Commission ») a « encouragé à l'origine la conclusion de TBI en vue de préparer l'adhésion des pays de l'Europe centrale et orientale en 2004-2007 »63. Par la suite [u]n nombre important de TBI ont été conclus entre des Etats d'Europe de l'Est, sortant du communisme et désireux d'attirer des investissements étrangers, et des Etats de l'Europe de l'Ouest, voulant offrir des garanties à leurs ressortissants investissant dans ces nouveaux marchés. La majorité de ces traités sont restés en vigueur lors des élargissements de l'Union vers l'Est, en 2004, 2007 et 2013. »64. « La Commission 60 Cour de cassation française, première chambre civile, 6 juillet 2000, 98-19.068, Bull. civ. I, n° 207, page 135.

Voir sur l'évolution sur ce point de la jurisprudence française : Répertoire Dalloz de droit international, V° Immunités, précité, n° 125.

61 Voir dans ce sens : Répertoire Dalloz de droit international, V° Immunités, précité, n° 151.

62 DE SADELEER, précité, n° 2, page 744.

63 Idem, n° 9, page 746.

64 CROISANT et TATON, précité, page 3, colonne de droite, deuxième alinéa.

européenne considère que cet élargissement a rendu caducs les traités conclus entre deux Etats faisant désormais tous les deux partie de l'Union. D'après elle, le droit européen protège suffisamment les investissements intra-UE [...]. [Elle] considère par ailleurs que les TBI intra-

UE « sont contraires au droit de l'Union européenne et risquent de fragmenter le marché unique car, de par leur nature, ils avantagent les investisseurs de certains pays de l'Union européenne, au détriment des autres ». »65.

Cette position critique est à mettre en parallèle avec des critiques plus fondamentales auxquelles le système de la protection des investisseurs et le recours, dans ce cadre, à des arbitrages, a donné lieu. Il a pu être observé que « [l]es termes « protection des investissements » trahissent d'emblée une position politique voire idéologique en faveur de certains opérateurs économiques »66. Cette contestation s'étend tout particulièrement au recours à l'arbitrage en tant que mode de règlement des litiges entre investisseurs et Etats. En effet, « [c]e mécanisme de règlement des différends a fait l'objet, au fil du temps, de critiques de plus en plus vives, notamment de la part de plusieurs groupes d'intérêts et des autorités publiques »67.

Le constat de la contrariété au droit de l'Union européenne des TBI intra-UE par la Cour de justice dans son arrêt Achmea La Cour de justice de l'Union européenne s'est fait l'écho de ces objections et notamment de celles de la Commission en décidant dans son arrêt de Grande chambre du 6 mars 2018, Achmea68, que « [l]es articles 267 et 344 TFUE [Traité sur le fonctionnement de l'Union européenne69] doivent être interprétés en ce sens qu'ils s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres [de l'Union européenne] [...] aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence »70.

Dans l'affaire ayant donné à l'arrêt, la Cour de justice avait été saisie par la Cour fédérale de justice allemande (« Bundesgerichtshof ») dans le cadre d'un litige opposant la Slovaquie à une société commerciale de droit néerlandais, Achmea BV, au sujet d'une sentence arbitrale prévue par un TBI entre les Pays-Bas, la Tchéquie et la Slovaquie, conclu en 1991, donc antérieurement à l'adhésion à l'Union européenne de la Tchéquie et de la Slovaquie71. La sentence arbitrale avait été rendue par un tribunal arbitral ayant statué conformément au règlement d'arbitrage de la Commission des Nations-Unies pour le droit commercial international (CNUDCI)72, donc non comme dans le présent



La jurisprudence francophone des Cours suprêmes

Commission du 23 juillet 2015 relative aux traités bilatéraux à investissement intra-UE.

66 Luigi MALFERRARI, Protection des investissements intra-UE post-Achmea et post avis CETA : entre faux mythes et (dures) réalités, in : Union européenne et protection des investissements, Bruxelles, Bruylant, 2021, pages 43-94, voir page 43, premier alinéa.

67 DE SADELEER, précité, n° 4, page 745.

68 Cour de justice de l'Union européenne, Grande chambre, 6 mars 2018, Achmea, C-284/16, ECLI:C:2018:158.

69 Journal officiel de l'Union européenne C 326 du 26.10.2012, page 47.

70 Dispositif de l'arrêt Achmea.

71 Cette adhésion n'est intervenue que le 1er mai 2004.

72 Point 4 de l'arrêt Achmea précité.

de laquelle elle avait offert des prestations d'assurance maladie privée sur le marché slovaque73.

La société s'était plainte de ce que la Slovaquie était partiellement revenue sur la libéralisation du marché de l'assurance maladie privée et lui avait ainsi causé un préjudice74. Le tribunal arbitral, qui siégeait en Allemagne sur base du droit allemand75, avait écarté une exception d'incompétence invoquée par la Slovaquie sur base du droit de l'Union européenne76 et condamné la Slovaquie à payer à Achmea des dommages et intérêts d'un montant principal de 22,1 millions d'euros77. Contre cette sentence arbitrale la Slovaquie avait introduit un recours en annulation devant les juridictions allemandes et, après avoir vu rejeter son recours, un pourvoi en cassation devant la Cour fédérale de justice allemande78.

Celle-ci saisit la Cour de justice de l'Union européenne de questions préjudicielles aux fins de savoir si « [l]'article 344 TFUE fait [...] obstacle à l'application d'une clause d'un accord bilatéral d'investissement entre les Etats membres de l'Union [...] prévoyant qu'un investisseur d'un Etat contractant peut, en cas de litige concernant des investissements dans l'autre Etat contractant, introduire une procédure contre ce dernier Etat devant un tribunal arbitral, lorsque ledit accord a été conclu avant l'adhésion de l'un des Etats contractants à l'Union, mais que la procédure arbitrale ne sera introduite qu'après cette date [et en cas de réponse négative à cette question si] [l]'article 267 TFUE fait [...] obstacle à l'application d'une telle disposition [...] »79. Il est à préciser que l'article 344 du Traité sur le fonctionnement de l'Union européenne (ci-après « TFUE ») dispose que « [l]es Etats membres s'engagent à ne pas soumettre un différend relatif à l'interprétation ou à l'application des traités à un mode de règlement autre que ceux prévus par ceux-ci » et l'article 267 TFUE consacre la compétence de la Cour de justice de statuer, à titre préjudiciel, sur l'interprétation des traités et sur la validité et l'interprétation des actes pris par les institutions, organes ou organismes de l'Union européenne sur demande préjudicielle d'une juridiction d'un Etat membre.

La Cour de justice rappelle que « un accord international [tel un TBI] ne saurait porter atteinte à l'ordre des compétences fixé par les traités et, partant, à l'autonomie du système juridique de l'Union dont la Cour assure le respect »80, que « [p]our garantir la préservation des caractéristiques spécifiques et de l'autonomie de l'ordre juridique de l'Union, les traités ont institué un système juridictionnel destiné à assurer la cohérence et l'unité dans l'interprétation du droit de l'Union »81, que « [d]ans ce cadre, conformément à l'article 19 TUE [Traité sur l'Union européenne82], il appartient aux juridictions nationales et à la Cour de garantir la pleine application du droit de l'Union dans l'ensemble des Etats membres ainsi que la protection juridictionnelle des droits que les justiciables tirent dudit droit »83 et que « la clef de 73 Point 7 de l'arrêt précité.

74 Point 8 de l'arrêt précité.

75 Point 10 de l'arrêt précité.



La jurisprudence francophone des Cours suprêmes

78 Idem et loc.cit.

79 Point 23 de l'arrêt précité.

80 Point 32 de l'arrêt précité.

81 Point 35 de l'arrêt précité.

82 Journal officiel de l'Union européenne C 326 du 26.10.2012, page 13. L'article 19 TUE dispose dans son paragraphe 1 que : « La Cour de justice de l'Union européenne comprend la Cour de justice, le Tribunal et des tribunaux spécialisés. Elle assure le respect du droit dans l'interprétation et l'application des traités. Les Etats membres établissent les voies de recours nécessaires pour assurer une protection juridictionnelle effective dans les domaines couverts par le droit de l'Union. ».

83 Point 36 de l'arrêt Achmea précité.

voûte du système juridictionnel ainsi conçu est constituée par la procédure du renvoi préjudiciel prévue à l'article 267 TFUE »84.

Sur base de ces prémisses elle constate que « les litiges dont est appelé à connaître le tribunal arbitral [institué par le TBI intra-UE en cause] sont susceptibles d'être relatifs à l'interprétation ou à l'application du droit de l'Union »85 parce que « à supposer même que [...] ce tribunal [...] ne soit appelé à se prononcer que sur une violation éventuelle [du TBI], il doit [...] tenir compte notamment du droit en vigueur de la partie contractante concernée ainsi que de tout accord pertinent entre les parties contractantes »86, parmi lesquels figure le droit de l'Union européenne, qui « doit être considéré à la fois comme faisant partie du droit en vigueur dans tout Etat membre et comme étant issu d'un accord international entre les Etats membres »87, ce qui implique « que, à ce double titre, le tribunal arbitral [...] est, le cas échéant, amené à interpréter, voire à appliquer, le droit de l'Union, et, en particulier, les dispositions concernant les libertés fondamentales, dont la liberté d'établissement et le libre circulation des capitaux »88.

Or, un tribunal arbitral institué par un TBI « ne saurait être considéré comme étant une « juridiction d'un des Etats membres » », au sens de l'article 267 TFUE, et n'est dès lors pas habilité à saisir la Cour à titre préjudiciel »89.

Par ailleurs, la sentence arbitrale n'est pas, « conformément, en particulier, à l'article 19 TUE, soumise au contrôle d'une juridiction d'un Etat membre garantissant que les questions de droit de l'Union que ce tribunal pourrait être amené à traiter puissent, éventuellement, être soumises à la Cour dans le cadre d'un renvoi préjudiciel »90. En effet, « la décision du tribunal arbitral [...] est définitive »91 et ne peut faire l'objet de la part des juridictions des Etats membres que d'un « contrôle limité portant, notamment, sur la validité, au regard de la loi applicable, de la convention d'arbitrage ou sur le respect de l'ordre public par la reconnaissance ou l'exécution de la sentence arbitrale »92. Il est à rappeler que le contrôle réservé par la Convention CIRDI aux Etats saisis d'une demande de reconnaissance ou d'exécution est encore beaucoup plus restreint, puisqu'il ne permet pas de refuser une telle demande pour des motifs tirés du respect de l'ordre public international de l'Etat saisi par la demande.

La Cour de justice précise que le contrôle réservé dans le cadre de l'affaire Achmea, même s'il est beaucoup plus large que celui prévu par la Convention CIRDI et correspond à celui applicable en matière d'arbitrage commercial, est insuffisant dans le contexte de litiges relatifs à des TBI intra-UE. Certes, « la Cour a jugé [en matière d'arbitrage commercial] que les exigences tenant à l'efficacité de la procédure arbitrale justifient que le contrôle des sentences arbitrales exercé par les juridictions des Etats membres revête un caractère limité, pourvu que les dispositions fondamentales du droit de l'Union puissent être examinées dans le cadre de ce contrôle et, le cas échéant, faire l'objet d'un renvoi préjudiciel devant la Cour »93. Cette 84 Point 37 de l'arrêt précité.

85 Point 39 de l'arrêt précité.



La jurisprudence francophone des Cours suprêmes

88 Point 42 de l'arrêt précité.

89 Point 49 de l'arrêt précité.

90 Point 50 de l'arrêt précité.

91 Point 51 de l'arrêt précité.

92 Point 53 de l'arrêt précité.

93 Point 54 de l'arrêt précité, se référant notamment à l'arrêt Eco Swiss de la Cour de justice du 1er juin 1999, C-

126/97, ECLI:EU:C:1999 :269, points 35, 36 et 40.

solution ne saurait cependant pas être étendue à la procédure arbitrale prévue par des traités d'investissements entre Etats membres, qui « résulte d'un traité, par lequel des Etats membres consentent à soustraire à la compétence de leurs propres juridictions et, partant, au système des voies de recours juridictionnel que l'article 19, paragraphe 1, second alinéa, TUE94 leur impose d'établir dans les domaines couverts par le droit de l'Union [...] des litiges pouvant porter sur l'application ou l'interprétation de ce droit »95. En effet, « l'arbitrage selon les TBI intra-UE porte sur des questions de droit public, normalement administratif ou constitutionnel, lesquelles ont donc des répercussions sur les intérêts publics : la mise en balance entre, d'une part, de l'intérêt d'un particulier (ici, un investisseur) et, d'autre part, d'un intérêt public légitime est souvent un exercice très délicat. Il n'est donc pas surprenant que les Etats membres aient réservé cette mise en balance à des organes publics tels que les juges nationaux conjointement avec la Cour de justice. Si un tribunal externe au système juridique de l'Union européenne pouvait, par le biais de sentences arbitrales condamnant les institutions publiques à des dommages-intérêts, les obliger à changer ou à retirer les règles qu'elles ont adoptées sur la base d'un processus démocratique poursuivant des intérêts publics, le cadre constitutionnel de l'Union européenne serait compromis. »96.

La Cour de justice conclut « que, par la conclusion du TBI, les Etats membres parties à celui-

ci ont instauré un mécanisme de résolution de litiges opposant un investisseur à un Etat membre susceptible d'exclure que ces litiges, alors même qu'ils pourraient concerner l'interprétation ou l'application du droit de l'Union, soient tranchés d'une manière garantissant la pleine efficacité de ce droit »97, à savoir par « la possibilité de soumettre ces litiges à un organisme qui ne constitue pas un élément du système juridictionnel de l'Union »98 et qui est ainsi dépourvu de qualité pour mettre en œuvre « la procédure du renvoi préjudiciel prévue à l'article 267 TFUE »99. La Cour ajoute que « un accord international, prévoyant la création d'une juridiction chargée de l'interprétation de ses dispositions et dont les décisions lient les institutions, y compris la Cour, n'est [certes], en principe, pas incompatible avec le droit de l'Union »100, mais suppose alors que cette possibilité d'un règlement alternatif de litiges soit « prévue par un accord qui a été conclu [...] par l'Union »101, ce qui n'est pas le cas du TBI en cause102.

La clause d'arbitrage « porte [dès lors] atteinte à l'autonomie du droit de l'Union »103.

94 L'article 19, paragraphe 1, second alinéa, du Traité sur l'Union européenne dispose, pour rappel : « Les Etats membres établissent les voies de recours nécessaires pour assurer une protection juridictionnelle effective dans les domaines couverts par le droit de l'Union ».

95 Point 55 de l'arrêt Achmea précité.

96 MALFERRARI, précité, page 60, dernier alinéa.

97 Point 56 de l'arrêt Achmea précité.

98 Point 58 de l'arrêt précité.



La jurisprudence francophone des Cours suprêmes

101 Point 58 de l'arrêt précité.

102 Cette distinction a encore une fois été rappelée par la Cour de justice dans son avis 1/17 du 30 avril 2019 sur l'Accord économique et commercial global entre le Canada, d'une part, et l'Union européenne et ses Etats membres, d'autre part (AECG), ECLI:EU:C:2019:341. La Cour de justice y constate que l'arrêt Achmea « concernait [...] un accord entre des Etats membres. Or, la question de la compatibilité, avec le droit de l'Union, de l'instauration ou du maintien d'un tribunal d'investissement par un tel accord diffère de celle de la compatibilité, avec ce droit, de l'instauration d'un tel tribunal par un accord entre l'Union et un Etat tiers » (point 127 de l'avis 1/17).

103 Point 59 de l'arrêt Achmea précité.

La Cour retient donc « que les articles 267 TFUE (relatif au renvoi préjudiciel) et 344 TFUE (interdiction pour les Etats membres d'introduire des mécanismes de solution de litiges relatifs aux traités UE autres que ceux prévus dans ces traités) s'opposent à une clause d'arbitrage prévue dans un TBI intra-UE »104. Il en est ainsi, en substance, parce que « deux Etats membres avaient, au moyen d'un accord bilatéral en matière d'investissements, convenu de soustraire le droit de l'Union à la compétence de leurs propres juridictions et donc du dialogue judiciaire entre ces juridictions et la Cour, ce qui était de nature à porter atteinte à l'uniformité et à l'efficacité du droit de l'Union »105.

La portée de l'arrêt Achmea L'arrêt Achmea « a été considéré par certains, notamment dans le milieu des arbitres internationaux, comme un coup de tonnerre dans un ciel bleu »106. Il a pu être qualifié comme expression d'un « conflit de système »107 et comme « collision survenue de plein fouet [...] entre le droit de l'Union et le droit de l'arbitrage des investissements internationaux »108. « Pour une partie des spécialistes du droit des investissements, cet arrêt remet en cause des dispositifs inhérents à la mondialisation de la circulation des capitaux et à la sécurisation des investissements dans les Etats membres de l'Union européenne [...]. Pour d'autres, tout aussi spécialistes du droit des investissements, la solution particulièrement vigoureuse retenue par la Cour de justice, est de nature à limiter la tendance inquiétante à la privatisation de la justice, permettant aux opérateurs économiques de se soustraire à l'application du droit, qu'il soit national ou européen, au profit de solutions qui tendent parfois à confondre compromis et compromission... »109.

Du point de vue de sa portée, l'arrêt Achmea soulève trois questions, à savoir celles de savoir si cette jurisprudence est extrapolable à toutes les clauses d'arbitrage contenues dans des TBI intra-UE, celle complémentaire par rapport à la première question, si elle s'applique aux clauses d'arbitrage fondées sur la Convention CIRDI et enfin celle de savoir quelle est la portée dans le temps de cette jurisprudence.

Contrariété au droit de l'Union de toutes les clauses d'arbitrages de TBI intra-

UE ? L'arrêt Achmea a été compris comme impliquant que « le système [de la protection des investissements intra-UE] parallèle et alternatif au système européen [dans le cadre duquel de tels investissements sont protégés, sous le contrôle de la Cour de justice de l'Union européenne, par le droit de l'Union européenne], à savoir celui des traités bilatéraux d'investissements entre les Etats membres (TBI intra-UE) a été de manière définitive jugé comme étant incompatible 104 MALFERRARI, précité, page 49, premier alinéa.

105 Conclusions de l'avocat général Yves BOT sur l'Avis 1/17 précité, ECLI:EU:C:2019:72, point 104.

106 MALFERRARI, précité, page 53, premier alinéa.

107 Emmanuel GAILLARD, L'affaire Achmea ou les conflits de logiques, Revue critique de droit international privé, 2018, page 616, premier alinéa du Commentaire.

108 Idem et loc.cit.



avec le droit européen » 110. Il a été observé à ce titre que « le terme « s'oppose » qu'emploie la Cour exprime bien la volonté que l'arbitrage ne puisse être choisi comme mode de résolution des différends relatifs aux investissements dans le cadre d'un accord entre Etats membres »111.

La portée générale de l'arrêt a été confirmée par la Cour de justice dans un arrêt postérieur, de Grande chambre, PL Holdings, C-109/20 du 26 octobre 2021112. Ce dernier est relatif à un TBI entre la Belgique, le Luxembourg et la Pologne, conclu en 1987, donc antérieurement à l'adhésion de la Pologne à l'Union européenne, le 1er mai 2004. Le TBI comportait une clause d'arbitrage en exécution de laquelle un litige entre une société luxembourgeoise, PL Holdings, et la Pologne a été tranché par l'Institut d'arbitrage de la Chambre de commerce de Stockholm, dont la sentence arbitrale a été attaquée par la Pologne devant les juridictions suédoises. Celles-

ci admirent que la clause d'arbitrage prévue par le TBI était nulle en application de l'arrêt Achmea113, mais s'interrogèrent si la Pologne n'avait pas en l'espèce tacitement accepté une convention d'arbitrage ad hoc en omettant de contester valablement la compétence du tribunal arbitral sur la base de cette convention114 et si une telle convention n'était pas, nonobstant l'arrêt Achmea, conforme au droit de l'Union européenne. Saisie sur question préjudicielle, la Cour de justice donna une réponse négative en concluant que « [l]es articles 267 et 344 TFUE doivent être interprétés en ce sens qu'ils s'opposent à une législation nationale permettant à un Etat membre de conclure avec un investisseur d'un autre Etat membre une convention d'arbitrage ad hoc rendant possible la poursuite d'une procédure d'arbitrage engagée sur le fondement d'une clause d'arbitrage de contenu identique à la convention, figurant dans un accord international conclu entre ces deux Etats membres et nulle en raison de sa contrariété avec ces mêmes articles »115. Elle précisa que « par la conclusion d'un [...] accord [« international [...] entre deux Etats membres [comportant une disposition] aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige, concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence »116], les Etats membres parties à celui-ci consentent à soustraire à la compétence de leurs propres juridictions et, partant, au système de voies de recours juridictionnel que l'article 19, paragraphe 1, second alinéa, TUE leur impose d'établir dans les domaines couverts par le droit de l'Union [...] des litiges pouvant porter sur l'application ou l'interprétation de ce droit [de sorte que] [u]n tel accord est [...] susceptible d'exclure que ces litiges soient tranchés d'une manière garantissant la pleine efficacité dudit droit »117.

La portée générale de l'arrêt Achmea est également confirmée par la conclusion, en date du 5 mai 2020, entre vingt-trois Etats membres de l'Union européenne, dont le Luxembourg, d'un Accord portant extinction des traités bilatéraux d'investissement entre Etats membres de l'Union européenne118, entré en vigueur le 29 août 2020119. Le but de cet Accord est, ainsi qu'il résulte de ses considérants, de respecter « l'obligation qui incombe aux Etats membres de mettre leur ordre juridique en conformité avec le droit de l'Union, [partant de] tirer les 110 MALFERRARI, précité, page 45, premier alinéa.

111 LANOË-CAMPBELL, précité, 3, B, 1°, troisième alinéa.

112 Cour de justice de l'Union européenne, Grande chambre, 26 octobre 2021, PL Holdings, C-109/20, ECLI:EU:C:2021:875.

113 Point 29 de l'arrêt précité.

114 Points 28 et 29 de l'arrêt précité.

115 Dispositif de l'arrêt précité.

116 Point 44 de l'arrêt précité.

117 Point 45 de l'arrêt précité.

118 Journal officiel de l'Union européenne L 169 du 29.5.2020, page 1.



La jurisprudence francophone des Cours suprêmes

Achmea (arrêt Achmea) »120. Il est cependant à préciser que la Suède, qui est partie au TBI en cause dans la présente espèce, n'est pas partie à cet Accord121, que le TBI en cause en l'espèce ne figure pas parmi ceux répertoriés dans l'Annexe de l'Accord, partant n'est pas visé par ce dernier, et que le Luxembourg, s'il a signé l'Accord ne l'a pas encore ratifié, de sorte que ce dernier n'est pas encore en vigueur à son égard.

Contrariété au droit de l'Union des clauses d'arbitrages fondées sur la Convention CIRDI ? L'arrêt Achmea n'ayant pas été adopté à l'occasion d'une sentence arbitrale rendue sur base de la Convention CIRDI122, il avait été relevé en doctrine que la Cour de justice était restée muette quant au sort de ces sentences123, qui, au regard de l'article 54 de la Convention de Washington, « ne peuvent faire l'objet que de contrôles limités de la part des juridictions nationales »124.

Il a été vu ci-avant que la Cour de justice a motivé la contrariété au droit de l'Union des clauses d'arbitrage contenues dans les TBI intra-UE notamment par le motif tiré du caractère limité du contrôle que les juridictions allemandes étaient en droit d'exercer conformément à leur droit sur la sentence arbitrale rendue dans l'affaire Achmea, qui ne pouvait porter que « sur la validité, au regard de la loi applicable, de la convention d'arbitrage ou sur le respect de l'ordre public par la reconnaissance ou l'exécution de la sentence arbitrale »125. Il a également été vu ci-avant que la reconnaissance et l'exécution des sentences rendues sur base de la Convention CIRDI n'autorisent même pas les juridictions des Etats saisies d'une demande de reconnaissance ou d'exécution de procéder à un tel contrôle minimal. Il était dès lors plausible d'admettre que les clauses d'arbitrage contenues dans des TBI intra-UE régies par la Convention CIRDI étaient a fortiori contraires au droit de l'Union.

La Cour de justice vient de confirmer ce point de vue dans un très récent arrêt de Grande chambre, Commission c/ European Food e.a., C-638/19 P, du 25 janvier 2022126, qui présente la particularité d'avoir été rendu non seulement au sujet d'une clause d'arbitrage contenue dans un TBI intra-UE soumise au régime de la Convention CIRDI, mais de surcroît au sujet de la clause d'arbitrage du TBI en cause dans le présent cas d'espèce, à savoir le TBI conclu le 29 mai 2002 entre la Suède et la Roumanie, ayant donné lieu à la sentence arbitrale du CIRDI du 11 décembre 2013, dont la demande de reconnaissance au Luxembourg sur base de l'article 54 de la Convention CIRDI forme l'objet du litige ayant donné lieu à l'arrêt attaqué par le pourvoi dont vous êtes saisis.

120 Quatrième considérant de l'Accord.

121 Voir les détails concernant la ratification de l'Accord dans : Agreement - Consilium (europa.eu) (consulté le 1er février 2022).

122 La sentence arbitrale en cause dans l'arrêt Achmea a été rendue sur base du règlement d'arbitrage de la Commission des Nations unies pour le droit commercial international (CNUDCI) (voir l'arrêt Achmea, précité, point 4).

123 LANOË-CAMPBELL, précité, 3, A, unique alinéa ; Jonathan WILDEMEERSCH, L'arrêt Achmea, la rigueur des principes au risque d'un certain isolationnisme juridictionnel ?, L'Observateur de Bruxelles, 2018, n° 113, pages 40-44, voir page 42, colonne de gauche, dernier alinéa, et note de bas de page 9.

124 Répertoire Dalloz Droit européen, V° Investissements, par Emanuel CASTELLARIN, novembre 2021, n° 16.

125 Point 53 de l'arrêt Achmea précité.

126 Cour de justice de l'Union européenne, Grande chambre, 25 janvier 2022, Commission c/ European Food e.a., C-638/19 P, ECLI:EU:C:2022:50.

La Cour de justice constate que « il est constant que le tribunal arbitral [donc le CIRDI] auquel a été soumis ce litige ne se situe pas dans le système juridictionnel de l'Union que l'article 19, paragraphe 1, seconde alinéa, TUE impose aux Etats membres d'établir dans les domaines couverts par le droit de l'Union [...] »127. En effet, « d'une part, ce tribunal arbitral ne constitue pas une « juridiction d'un des Etats membres », au sens de l'article 267 TFUE, et, d'autre part, la



La jurisprudence francophone des Cours suprêmes

Elle conclut que « le consentement [par les États membres liés par le TBI, en l'occurrence par la Roumanie, à la possibilité qu'un litige soit porté contre eux dans le cadre de la procédure d'arbitrage prévue par le TBI] est [...] dépourvu de tout objet »129.

Il en suit que la jurisprudence Achmea s'applique aux clauses d'arbitrage fondées sur la Convention CIRDI et, ainsi que la Cour de justice l'a formellement confirmé, à la clause d'arbitrage en cause en l'espèce.

Applicabilité de la jurisprudence Achmea dans le temps La question de l'applicabilité de la jurisprudence Achmea dans le temps se pose d'un double point de vue. Elle se pose, d'une part, au regard de la portée dans le temps des arrêts de la Cour de justice relatifs à l'interprétation du droit de l'Union européenne et, d'autre part, au regard de l'applicabilité dans le temps du droit de l'Union européenne à des faits et actes en partie antérieurs à l'empire de ce droit.

Applicabilité dans le temps de la jurisprudence Achmea La Cour de justice a dans son arrêt Achmea interprété le droit de l'Union européenne.

L'interprétation de ce droit par la Cour de justice « a des effets ex tunc et non ex nunc [puisque] l'interprétation retenue par la Cour s'incorpore dans la norme dès son entrée en vigueur »130.

En effet, « l'interprétation que la Cour donne des règles du droit de l'Union, dans l'exercice de la compétence que lui confère l'article 267 TFUE, éclaire et précise la signification et la portée de ces règles, telles qu'elles doivent ou auraient dû être comprises et appliquées depuis le moment de leur entrée en vigueur »131. « Il s'ensuit que la règle ainsi interprétée peut et doit être appliquée par le juge à des rapports juridiques nés et constitués avant le prononcé de l'arrêt statuant sur la demande d'interprétation si, par ailleurs, les conditions permettant de porter devant les juridictions compétentes un litige relatif à l'application de cette règle se trouvent réunies »132.

127 Point 141 de l'arrêt précité.

128 Point 142 de l'arrêt précité.

129 Point 145 de l'arrêt précité.

130 DE SADELEER, précité, n° 15, page 749.

131 Voir, à titre d'illustration : arrêt PL Holdings précité, point 58, et Cour de justice de l'Union européenne, Grande chambre, 22 juin 2021, Latvijas Republikas Saeima (Points de pénalité), C-439/19, ECLI:EU:C:2021:504, point 132.

132 Point 58 de l'arrêt PL Holdings précité.

Il s'entend que l'arrêt de la Cour de justice qui interprète le droit de l'Union européenne a autorité au-delà du litige dans le cadre duquel il a été adopté.

Applicabilité de la jurisprudence Achmea à des sentences arbitrales relatives à des litiges se rapportant en partie à des faits ou actes antérieurs à l'empire du droit de l'Union européenne Il a été vu ci-avant que la Cour de justice a, par son arrêt de Grande chambre, Commission c/ European Food e.a., C-638/19 P, du 25 janvier 2022 statué sur la sentence arbitrale formant l'objet de la demande de reconnaissance sur laquelle s'est prononcée la Cour d'appel dans l'arrêt attaqué par le pourvoi. Ainsi qu'il sera vu ci-après, cette sentence arbitrale, rendue sur base d'un TBI conclu entre la Suède et la Roumanie, avait alloué à des investisseurs, dont le défendeur en cassation M), des dommages et intérêts par suite de l'abrogation par la Roumanie, en violation du TBI, mais en exécution d'obligations découlant du droit de l'Union européenne, d'incitations fiscales accordées aux investisseurs. La Commission décida que le versement aux investisseurs par la Roumanie des dommages et intérêts ordonné par le tribunal arbitral était à qualifier comme aide d'État prohibée et interdit à la Roumanie de les verser aux bénéficiaires.

Ces derniers attaquèrent cette décision devant le Tribunal de l'Union européenne, qui annula la décision de la Commission133. Sur pourvoi de celle-ci, la Cour de justice annula à son tour, par son arrêt précité, l'arrêt du Tribunal.



jurisprudence Achmea au cas de l'espèce134. L'avocat général concluant dans le cadre du pourvoi avait partagé ce point de vue135. La Commission a rendu attentif à cette problématique dans son Mémoire en réponse, vous invitant à saisir, le cas échéant, la Cour de justice d'une question préjudicielle136.

Celle-ci a résolu cette question délicate d'application de la loi dans le temps dans son arrêt précité du 25 janvier 2022. Elle a constaté que « le Tribunal a [...] commis une erreur de droit lorsqu'il a jugé [...] que l'arrêt du 6 mars 2018, Achmea (C-284/16, EU:C:2018:158), est dépourvu de pertinence en l'espèce »137. En effet, « à compter de la date d'adhésion de la Roumanie à l'Union, le droit de l'Union, notamment les articles 107 et 108 TFUE [relatifs à la prohibition des aides d'Etat], était applicable à cet Etat membre [et] il est constant que l'indemnisation sollicitée par les requérants en arbitrage [dont l'actuel défendeur en cassation M)] ne portait pas exclusivement sur les dommages prétendument subis avant cette date d'adhésion, de sorte que le différend porté devant le tribunal arbitral ne saurait être regardé comme cantonné en tous ses éléments à une période au cours de laquelle la Roumanie, n'ayant 133 Tribunal de l'Union européenne, 18 juin 2019, European Food e.a. c/ Commission, T-624/15, T-694/15 et T-

704/15, ECLI:EU:T:2019:423, le jugement étant reproduit comme pièce n° 6 annexée au mémoire en réponse de M) et comme pièce n° 7 annexée au mémoire en réponse de la Commission.

134 Points 86 et 87 de l'arrêt précité.

135 Conclusions de l'avocat général M. Maciej SZPUNAR présentées le 1er juillet 2021 dans l'affaire C-638/19 P, ECLI:EU:C:2021:529, point 107.

136 Mémoire en réponse de la Commission, pages 24 à 29.

137 Point 137 de l'arrêt précité (rendu sur pourvoi par la Cour justice de l'Union européenne) Commission c/ European Food e.a.

pas encore adhéré à l'Union, n'était pas encore liée par les règles et les principes [rappelés par l'arrêt Achmea] »138.

Il est donc établi que la jurisprudence Achmea s'applique au TBI et à la sentence arbitrale en cause en l'espèce et ce même eu égard à de possibles contestations susceptibles d'être déduites de l'antériorité partielle des faits par rapport à la date d'adhésion de la Roumanie à l'Union européenne.

Les obligations des juridictions des Etats membres découlant de l'arrêt Achmea Le droit de l'Union européenne tel qu'il est interprété par la Cour de justice de l'Union européenne prime le droit contraire des Etats membres. Ce principe s'applique également en ce qui concerne la mise en œuvre de la jurisprudence Achmea.

Principe de primauté du droit de l'Union Le droit de l'Union européenne prime le droit des Etats membres.

En effet, le principe de primauté du droit de l'Union européenne consacre la prééminence du droit de l'Union sur le droit des Etats membres139.

Ce principe impose à toutes les instances des Etats membres, y compris aux juridictions, de donner leur plein effet aux différentes normes de l'Union, le droit des Etats membres ne pouvant affecter l'effet reconnu à ces différentes normes sur le territoire desdits Etats140.

Il implique, d'une part, le principe d'interprétation conforme du droit interne, en vertu duquel la juridiction nationale est tenue de donner au droit interne, dans toute la mesure du possible, une interprétation conforme aux exigences du droit de l'Union et qui permet à la juridiction nationale d'assurer, dans le cadre de ses compétences, la pleine efficacité du droit de l'Union lorsqu'elle tranche le litige dont elle est saisie141.

D'autre part, lorsque le principe d'interprétation conforme du droit interne n'est pas suffisant pour assurer la pleine efficacité du droit de l'Union142, tout juge national, saisi dans le cadre de sa compétence, a, en tant qu'organe d'un



139 Cour de justice de l'Union européenne, 15 juillet 1964, Costa c/ Enel, 6/64, ECLI:EU:C:1964:66, pages 1159 et 1160 et, à titre d'illustration : idem, Grande chambre, 24 juin 2019, Poplawski, C-573/17, ECLI:EU:C:2019:530, point 53 ; idem, Grande chambre, 6 octobre 2020, La Quadrature du Net, C-511/18, C-

512/18 et C-520/18, ECLI:EU:C:2020:791, point 214 ; idem, Grande chambre, 18 mai 2021, Asociatia « Forumul Judecatorilor Din Romana » e.a., C-83/19, C-127/19, C-195/19, C-355/19 et C-397/19, ECLI:EU:C:2021:393, point 244.

140 Voir, à titre d'illustration, les arrêts précités Costa c/ Enel, pages 1159 et 1160, La Quadrature du Net, point 214, et Asociatia « Forumul Judecatorilor Din Romana » e.a, point 244.

141 Voir, à titre d'illustration, les arrêts précités Poplawski, point 55, et Asociatia « Forumul Judecatorilor Din Romana » e.a, point 246.

142 Voir, à ce sujet, à titre d'illustration : l'arrêt précité Poplawski, point 58 ; idem, Grande chambre, 14 mai 2020, Orszagos Idegenrendeszeti, C-924/19 PPU et C-925/19 PPU, ECLI:EU:C:2020:367, point 139 ; et les arrêts précités La Quadrature du Net, point 215, et Asociatia « Forumul Judecatorilor Din Romana » e.a, point 247.

attendre l'élimination préalable de celle-ci par voie législative ou par tout autre procédé constitutionnel143. Ce principe a été consacré par l'arrêt Simmenthal144.

Application de ce principe à la situation visée par la jurisprudence Achmea La Cour de justice a dans l'arrêt Achmea dit pour droit que les articles 267 et 344 TFUE doivent être interprétés en ce sens qu'ils s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence.

Cet arrêt « implique l'exigence pour les juridictions des Etats membres d'annuler, de ne pas reconnaître et de ne pas exécuter les sentences arbitrales rendues sur le fondement de TBI entre Etats membres »145.

Il en suit que « ce que la Cour a décidé, en substance, dans l'arrêt Achmea, c'est effectivement que les litiges opposant un investisseur établi dans un Etat membre de l'Union européenne et un autre Etat membre ne peuvent pas être soumis à une procédure d'arbitrage prévue par un TBI. Par conséquent, sauf à exposer l'Etat dont elles sont les organes à l'introduction d'un recours en manquement pour violation du droit de l'Union sur le fondement de l'article 258 TFUE, les juridictions des Etats membres seront, en principe, tenues de refuser la reconnaissance et l'exécution d'une sentence arbitrale rendue sur le fondement d'un TBI intra-

européen. »146.

Dès lors « les sentences arbitrales fondées sur de telles clauses arbitrales [intra-UE, qui sont, par hypothèse, contraires au droit de l'Union européenne] ne peuvent être exécutées par des organes des Etats membres, car leur exécution équivaudrait à donner des effets aux clauses arbitrales alors qu'elles sont contraires au droit européen »147.

« [L]'Etat membre, qui aurait été condamné par [un tribunal d'investissement] peut soulever devant la juridiction nationale saisie par l'investisseur en vue d'exécuter la sentence arbitrale l'objection selon laquelle la sentence est contraire à l'ordre public. En effet, il peut être soutenu que l'ordre public a été violé par le tribunal d'investissement dans la mesure où la sentence dont l'exécution est sollicitée s'avère contraire à la jurisprudence Achmea, laquelle condamne l'existence même des tribunaux [d'investissement] intra-UE »148.

Cette obligation de laisser inappliquées les clauses arbitrales intra-UE et de ne conférer aucun effet à des sentences arbitrales rendues sur base de telles clauses résulte de la jurisprudence 143 Idem, 9 mars 1978, Simmenthal, 106/77, ECLI:EU:C:1978:49, point 21, et, à titre d'illustration, les arrêts précités, Poplawski, points 58 et 64 ; Orszagos



La jurisprudence francophone des Cours suprêmes

144 Voir la référence reproduite dans la note précédente.

145 Répertoire Dalloz Droit européen, V° Investissements, précité, n° 16.

146 Jonathan WILDEMEERSCH, précité, page 42, colonne de gauche, dernier alinéa.

147 Idem, page 63, deuxième alinéa.

148 DE SADELEER, précité, n° 28, page 753.

Simmenthal de la Cour de justice149. Elle implique que « les juges de tout Etat membre doivent refuser ex officio d'exécuter [des sentences arbitrales rendues sur base de TBI intra-UE] »150.

La jurisprudence Achmea ayant pour finalité d'éviter que la mise en œuvre de la procédure préjudicielle prévue par l'article 267 TFUE puisse être écartée, il est à rappeler qu'il résulte d'une jurisprudence constante de la Cour de justice qu'une disposition de droit national empêchant la mise en œuvre de cette procédure doit être écartée sans que la juridiction concernée ait à demander ou à attendre l'élimination préalable de cette disposition nationale par la voie législative ou par tout autre procédé constitutionnel151.

Sur les faits Les faits de l'espèce, qui, depuis des années, défraie les chroniques des milieux spécialisés, ont pu être décrits comme caractérisant « une situation on ne peut plus complexe »152.

La sentence arbitrale du CIRDI Selon l'arrêt attaqué et les pièces auxquelles vous pouvez avoir égard, les gouvernements de la Suède et de la Roumanie avaient conclu en date du 29 mai 2002, donc postérieurement à l'adhésion de la Suède à l'Union européenne, intervenue le 1er janvier 1995, mais antérieurement à celle de la Roumanie, intervenue le 1er janvier 2007, un traité bilatéral de promotion et de protection réciproque des investissements (« TBI » (abréviation de « Traité bilatéral d'investissement »)153. Ce dernier dispose dans son article 2, paragraphe 3, que « [c]haque partie contractante assure à tout moment un traitement juste et équitable aux investissements des investisseurs de l'autre partie contractante et n'entrave pas, par des mesures arbitraires ou discriminatoires, l'administration, la gestion, le maintien, l'utilisation, la jouissance ou la cession desdits investissements par lesdits investisseurs »154. Son article 7 comporte une clause d'arbitrage qui prévoit que les différends entre les investisseurs et les pays contractants peuvent notamment être tranchés, sur base et en application de la Convention CIRDI par des arbitres du CIRDI.

Le ressortissant suédois M) avait, ensemble avec d'autres investisseurs, accepté, en contrepartie d'un régime d'incitations fiscales consenti par la Roumanie en 1999 jusqu'en 2009155, de procéder à des investissements dans ce pays, à savoir dans le domaine de la production de 149 Arrêt précité Simmenthal, points 21-24.

150 MALFERRARI, précité, page 66, deuxième alinéa.

151 Voir, à titre d'illustration : Cour de justice de l'Union européenne, 14 décembre 1995, Peterbroeck, C-312/93, ECLI:EU:C:1995:437, point 13 et idem, Grande chambre, 2 mars 2021, A.B. e.a. (Nomination des juges à la Cour suprême – Recours), C-824/19, ECLI:EU:C:2021:153, point 141.

152 Gautier BOURDEAUX, Michel MENJUCQ et Cyril NOURISSAT, Chronique de Droit du commerce international, La semaine juridique – Edition générale, 2019, pages 1499 et suivantes, voir page 1504, colonne de droite, premier alinéa.

153 Le TBI est reproduit comme pièce n° 4 annexée au mémoire en réponse du défendeur en cassation M).

154 Traduction reprise du point 7 de l'arrêt précité Commission c/European Food e.a. de la Cour de justice de l'Union européenne du 25 janvier 2022 (le TBI a été rédigé en langue suédoise et anglaise).

155 Voir les points 173 à 176 de la sentence arbitrale du 11 décembre 2013 (Pièce n° 1 annexée au mémoire en réponse de M)).



La jurisprudence francophone des Cours suprêmes

de ce régime d'incitations fiscales, la Roumanie avait abrogé ce régime en date du 20 août 2004, avec effet au 22 février 2005157.

Suite à cette décision M) saisissait, ensemble avec d'autres investisseurs, conformément à l'article 7 du TBI, en date du 28 juillet 2005, donc antérieurement à l'adhésion de la Roumanie à l'Union européenne158, intervenue le 1er janvier 2007, un tribunal arbitral constitué sous l'égide du CIRDI afin d'obtenir réparation du préjudice causé.

Ce dernier rendait, en date du 11 décembre 2013, une sentence arbitrale constatant que l'abrogation en 2005, donc avant le terme prévu de 2009, du régime d'incitations fiscales avait porté atteinte à la confiance légitime des investisseurs, et condamnait la Roumanie à verser aux investisseurs, dont M), à titre de dommages et intérêts une somme au principal, y non comprise les intérêts de retard, de 376.433.229 lei roumains (RON), équivalant approximativement à 82 millions d'euros159.

L a d é c i s i o n d e l a C o m m i s s i o n q u a l i f i a n t l e v e r s e m e n t d e s d o m m a g e s e t i n t é r ê t s a l l o u é s p a r c e t t e s e n t e n c e a r b i t r a l e d ' a i d e d ' E t a t p r o h i b é e Le 30 mars 2015, la Commission qualifiait dans sa Décision (UE) 2015/1470 du 30 mars 2015 concernant l'aide d'État SA.38517 (2014C) mise en œuvre par la Roumanie (ex 2014/NN)160 le versement de ces dommages-intérêts d'aide d'Etat au sens de l'article 107, paragraphe 1, TFUE et donnait injonction à la Roumanie de s'abstenir de les verser.

Cette décision a été annulée, sur recours des investisseurs, dont M), par arrêt du Tribunal de l'Union européenne du 18 juin 2019161.

Contre cet arrêt, la Commission forma le 27 août 2019 un pourvoi devant la Cour de justice de l'Union européenne, qui donna lieu à une audience de plaidoiries au mois d'avril 2021162.

L'avocat général près de la Cour de justice, M. S), conclut en date du 1er juillet 2021 d'annuler le jugement du Tribunal de l'Union européenne163.

156 Voir notamment les points 14, 20 et 21 de l'arrêt précité Commission c/ European Food e.a..

157 Voir notamment le point 23 de l'arrêt précité.

158 Mémoire en réponse de M), point 3, page 3 ; Mémoire de la Commission, page 24, alinéa 2.

159 Sentence arbitrale (Pièce n° 1 annexée au mémoire en réponse de M)), n° 1328, page 367. Voir également :

Arrêt attaqué, page 2, deuxième alinéa, et Mémoire en réponse de la Commission, page 4, avant-dernier alinéa. Il est à relever que l'arrêt précité Commission c/ European Food e.a. de la Cour de justice du 25 janvier 2022 fait état d'un montant total de dommages et intérêts de 791.882.452 lei roumains (RON), équivalant approximativement à 178 millions d'euros (point 27 de l'arrêt). Ce montant, plus élevé que celui renseigné dans la sentence arbitrale, tient sans doute compte des intérêts de retard dus.

160 Journal officiel de l'Union européenne L 232 du 4.9.2015, page 43. La Décision est reproduite comme pièce n° 5 annexée au mémoire en réponse de M) et comme pièce n° 5 annexée au mémoire en réponse de la Commission.

161 Arrêt précité European Food e.a. c/ Commission, du Tribunal de l'Union européenne.

162 Mémoire de la Commission, page 7, dernier alinéa.

163 Conclusions ECLI:EU:C:2021:529.

La Cour de justice annula l'arrêt attaqué par son arrêt de Grande chambre Commission c/ European Food e.a., C-638/19 P, du 25 janvier 2022. Cet arrêt est annexé aux présentes conclusions.



La jurisprudence francophone des Cours suprêmes

Sur appel de la Roumanie et en présence de la Commission, intervenue volontairement aux fins de soutenir cet appel, la Cour d'appel confirma l'ordonnance entreprise.

A cette fin elle rejeta l'exception d'immunité juridictionnelle qui avait été soulevée par la Roumanie, qui avait soutenu bénéficier d'une telle immunité, à laquelle celle-ci avait affirmé ne pas avoir renoncé en acceptant la clause d'arbitrage prévue par l'article 7(5) du TBI, qui aurait été implicitement abrogé par suite de l'adhésion de la Roumanie à l'Union européenne164.

Pour rejeter cette exception, la Cour d'appel considéra que en souscrivant à la clause d'arbitrage la Roumanie s'était soumise à la juridiction des arbitres et avait renoncé à son immunité juridictionnelle165.

Elle rejeta encore l'exception d'immunité d'exécution qui avait été soulevée par la Roumanie166 au motif que la procédure en cause, relative à l'exequatur de la sentence arbitrale, qui ne constituerait pas en lui-même un acte d'exécution, ne relèverait pas de l'immunité d'exécution167.

Elle rejeta enfin la demande de la Roumanie de déclarer l'ordonnance entreprise nulle pour être contraire à l'article 1250 du Nouveau Code de procédure civile, qui dispose que « [s]ous réserve des dispositions de conventions internationales, le juge refuse l'exequatur : [...] 2° si la sentence ou son exécution est contraire à l'ordre public [...] ». La Roumanie avait à cet effet notamment fait valoir que la sentence arbitrale violerait le droit de l'Union européenne en ce que les dommages et intérêts alloués seraient à qualifier d'aide d'Etat prohibée168. La Cour d'appel constata que l'article 1251 du Nouveau Code de procédure civile ne s'applique, ainsi qu'il résulte de son libellé, que sous réserve des dispositions de conventions internationales, que les articles 53 et 54 de la Convention CIRDI n'autorisent pas un tel contrôle, la reconnaissance des sentences arbitrales du CIRDI n'étant subordonnée qu'à la seule condition de la présentation d'une copie certifiée conforme de la sentence, aucune autre cause de refus n'étant admise169.

Elle ajouta dans un obiter dictum « que certains développements de l'ETAT DE ROUMANIE et de la Commission européenne [...] pourraient présenter un intérêt au niveau du caractère exécutable de la Sentence [dont la question] de la contrariété entre le TBI et le droit de l'Union 164 Arrêt attaqué, page 3, septième alinéa.

165 Idem, page 9, sixième au dernier alinéa.

166 Idem, page 3, septième alinéa.

167 Idem, page 10, trois premiers alinéas.

168 Idem, page 3, quatrième alinéa.

169 Idem, page 10, quatrième alinéa, à page 12, deuxième alinéa.

européenne »170. Elle fonda cette conclusion sur le motif tiré de ce que « l'article 54.-3) de la Convention de Washington [donc la Convention CIRDI] (« L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ») renvoie au droit national luxembourgeois [...] pour l'exécution des jugements »171.

D é c i s i o n s e n m a t i è r e d e r e c o n n a i s s a n c e o u d ' e x é c u t i o n d e l a s e n t e n c e a r b i t r a l e d a n s d ' a u t r e s p a y s e t à L u x e m b o u r g La sentence arbitrale en cause en l'espèce a donné lieu à des procédures de reconnaissance ou d'exécution dans d'autres pays, à savoir en Suède, en Belgique, aux Etats-Unis d'Amérique et au Royaume-Uni, ainsi qu'à Luxembourg.

En Suède, la Cour d'appel de Nacka a, par arrêt du 23 janvier 2019, refusé l'exécution de la sentence arbitrale pour être contraire au droit de l'Union européenne172.



notamment le principe de coopération loyale ou le principe d'autorité de chose jugée, permet qu'une juridiction nationale d'un Etat-membre (autre que la Roumanie) ne respecte pas ses obligations internationales découlant de la Convention du CIRDI dans l'hypothèse où la Commission européenne a adopté une décision postérieurement à la sentence, qui considère que l'exécution forcée de la sentence serait contraire au régime européen des aides d'Etat [...] »173.

Aux Etats-Unis d'Amérique, une juridiction fédérale, la US District Court for the District of Columbia, décida le 11 septembre 2019 que les principes retenus par la Cour de justice dans l'arrêt Achmea ne seraient pas transposables à l'affaire parce que les faits de la cause et la demande d'arbitrage étaient antérieurs à l'adhésion de la Roumanie à l'Union européenne174.

170 Idem, page 11, dernier alinéa.

171 Idem, page 11, deuxième alinéa.

172 Arrêt du 23 janvier 2019, affaire Ä 2550-17, cité par MALFERRARI, précité, page 68, dernier alinéa, et note de bas de page n° 100.

173 Cour d'appel de Bruxelles, 12 mars 2019, 2016/AR/393, Competitio – Revue de la Concurrence Belge, 2019, page 182. Ce renvoi préjudiciel dans une affaire Romatsa e.a. / M) porte le numéro C-333/19 et n'a pas encore donné lieu à ce jour à un arrêt de la Cour de justice, l'instruction de l'affaire ayant été suspendue dans l'attente de l'arrêt précité de la Cour de justice du 25 janvier 2022 Commission c/ European Food e.a. (Mémoire de la Commission, page 11, quatrième alinéa). Voir également sur ce point : MALFERRARI, précité, page 69, premier alinéa.

174 United States District Court for the District of Columbia, 11 septembre 2019, Ion M) et.al. v. Government of Romania, Case No. 17-cv-02332 (APM) 04517389498 (italaw.com) (consulté le 28 janvier 2022) (« Having carefully considered the Achmea decision, this court finds that Romania has failed to carry its burden of showing that Achmea forecloses this court's jurisdiction under the FSIA's [Foreign Service Immunities Act] arbitration exception. [...] the facts here are materially different from Achmea. The applicability of EU law to the dispute in Achmea was clear, as both the challenged government action occurred, and the arbitration proceeding therefore commenced after the Slovak Republic entered the EU. Here, on the the other hand, all key events to the parties' dispute occurred before Romania acceded to the EU on January 1, 2007. [...] » (page 19, avant-dernier et dernier alinéa). Cet arrêt est mentionné par : CROISANT et TATON, précité, page 11, colonne de droite, deuxième alinéa, et par : Répertoire Dalloz Droit européen, V° Investissements, précité, n° 18.

Au Royaume-Uni, la Cour suprême du Royaume-Uni décida, par arrêt du 19 février 2020, que la sentence arbitrale pouvait être exécutée en dépit de la contrariété éventuelle de cette exécution avec le droit de l'Union européenne175.

A Luxembourg, votre Cour rejeta par arrêt du 21 novembre 2019 un pourvoi contre un arrêt de la Cour d'appel ayant ordonné la mainlevée d'une saisie-arrêt pratiquée par M) sur les avoirs de la Roumanie auprès de différents établissements bancaires176.

Sur les moyens de cassation de la Roumanie S u r l e p r e m i e r m o y e n d e c a s s a t i o n Le premier moyen est tiré de la violation des dispositions du Nouveau Code de procédure civile relatives à l'exequatur des sentences arbitrales, plus spécifiquement de ses articles 1244, 1250 et 1251, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que si l'article 1251 précité autorise le juge à refuser l'exequatur d'une sentence arbitrale si celle-ci ou l'exécution de celle-ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a en l'espèce été rendue en application de la Convention CIRDI, que celle-ci ne comporte, sous réserve de l'existence d'une sentence arbitrale, aucune cause de refus d'exequatur et que si l'article 54, paragraphe 3, de celle-ci dispose que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains



La jurisprudence francophone des Cours suprêmes

européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit de l'Union européenne et la Convention CIRDI, alors que si l'exécution de la sentence arbitrale est illégale pour violer le droit de l'Union européenne, l'exequatur de celle-

ci l'est à plus forte raison, la violation du droit de l'Union européenne trouvant sa source dans l'octroi à la sentence arbitrale de la force obligatoire, l'exécution de celle-ci n'en constituant qu'une conséquence nécessaire, de sorte que l'illégalité de la sentence arbitrale est à apprécier au moment de l'exequatur et que son examen ne saurait être reporté au moment de l'exécution.

Grief étranger aux dispositions visées au moyen 175 Cour suprême du Royaume-Uni, 19 février 2020, M) and others v. Romania [2020] UKSC 5, versé comme pièce n° 10 annexée au mémoire en réponse de M). Voir également sur ce point : MALFERRARI, précité, page 69, dernier alinéa ; Lea BERTHIAU-JÉZÉQUEL, Droit de l'Union européenne et arbitrage d'investissement :

suite et fin ?, Revue des Affaires Européennes/Law & European Affairs, 2020, pages 431 à 439, voir n° 8, page 433.

176 Cour de cassation, 21 novembre 2019, n° 157/2019, numéros CAS-2018-00113 + CAS-2019-00033 du registre.

177 Arrêt attaqué, page 11, dernier alinéa.

Le premier moyen est tiré de la violation des dispositions du Nouveau Code de procédure civile relatives à l'exequatur des sentences arbitrales, plus particulièrement des articles 1244, 1250 et 1251 de ce Code. Il critique que la Cour d'appel a refusé d'examiner la conformité au droit de l'Union européenne de la sentence arbitrale dont l'exequatur a été demandé, et notamment au principe de la primauté de ce droit, au motif que cette question est dépourvue de pertinence au stade de l'exequatur, mais n'est, le cas échéant, susceptible de se poser que postérieurement à l'exequatur, au stade de l'exécution de la sentence arbitrale.

Pour refuser d'examiner la conformité de la sentence arbitrale au droit de l'Union européenne la Cour d'appel a constaté que l'article 1251 du Nouveau Code de procédure civile, qui autorise le juge de refuser l'exequatur notamment « si la sentence ou son exécution est contraire à l'ordre public », ne s'applique que « [s]ous réserve des dispositions de conventions internationales », que la Convention CIRDI constitue une telle convention internationale, que celle-ci ne prévoit, hormis la condition tirée de l'existence d'une sentence arbitrale, aucune cause de refus et que d'éventuels causes de refus ne sont susceptibles d'être invoqués, sur base de l'article 54, paragraphe 3, de la Convention CIRDI, qu'au stade de l'exécution de la sentence arbitrale, qui est à distinguer de celui, de l'espèce, de l'exequatur de la sentence178.

Cette conclusion se fonde donc sur l'article 54, paragraphe 3, de la Convention CIRDI. Le grief est, partant, étranger au Nouveau Code de procédure civile, y compris à l'article 1251 de ce Code, qui se limite à réserver les Conventions internationales, donc à renvoyer à celles-ci.

Il a, par ailleurs, pour objet de critiquer une insuffisante prise en considération du droit de l'Union européenne et notamment du principe de la primauté de ce droit. Or, l'obligation des juridictions des Etats membres d'assurer cette prise en considération trouve sa source, non dans le Nouveau Code de procédure pénale, mais dans le droit de l'Union européenne.

Le grief est dès lors étranger aux dispositions visées au moyen.

Il en suit que ce dernier ne saurait être accueilli179.

A titre subsidiaire : Moyen non fondé Le moyen critique une violation des dispositions du Nouveau Code de procédure civile relatives à l'exequatur des sentences arbitrales, plus particulièrement des articles 1244, 1250 et 1251 de ce Code. Ce dernier article autorise le juge saisi de l'exequatur d'une sentence arbitrale de refuser l'exequatur « si la sentence ou son exécution est contraire à l'ordre public »180.



La Cour d'appel a, en l'espèce, constaté que la Convention CIRDI n'autorise pas l'exercice d'un tel pouvoir. Le refus de cet exercice trouve donc sa source dans cette Convention.

178 Idem, page 10, sous « Le cadre juridique », à page 11.

179 Voir, à titre d'illustration : Cour de cassation, 20 mars 2014, n° 36/14, numéro 3330 du registre (réponse au deuxième moyen).

180 Article 1251, point 2°, du Nouveau Code de procédure pénale.

181 Idem, partie introductive de l'article.

Le demandeur en cassation critique dans son moyen que la Cour d'appel a opéré une distinction injustifiée entre l'exequatur et l'exécution de la sentence arbitrale ayant fait l'objet de l'exequatur. Or, cette distinction trouve, dans le raisonnement de la Cour d'appel, sa source dans l'article 54, paragraphe 3, de la Convention CIRDI, qui, tout en refusant, exception faite de la seule exigence de l'existence de la sentence arbitrale, toute cause de refus d'exequatur, permet d'envisager l'application d'éventuelles causes de refus au stade de l'exécution de la sentence.

Le Nouveau Code de procédure civile et notamment son article 1251 sont donc étrangers à la distinction critiquée. Ils n'ont, partant, pas pu être violés.

Dans la mesure où il est soutenu que le principe de primauté du droit de l'Union européenne oblige, le cas échéant, d'écarter la Convention CIRDI et de contrôler, ainsi qu'il est prévu par l'article précité, la compatibilité avec l'ordre public de la sentence arbitrale formant l'objet de l'exequatur, cette solution se fonde sur ce principe, mais non sur cet article ou d'autres dispositions du Code de procédure civile.

Il en suit, à titre subsidiaire, que le moyen, qui est tiré d'une violation de ces dispositions, n'est pas fondé.

S u r l e s d e u x i è m e a u s i x i è m e m o y e n s d e c a s s a t i o n r é u n i s Le deuxième moyen est tiré de la violation du principe général de droit constitutionnel de la primauté du droit de l'Union européenne, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que si l'article 1251 du Nouveau Code de procédure civile autorise le juge à refuser l'exequatur d'une sentence arbitrale si celle-ci ou l'exécution de celle-ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a en l'espèce été rendue en application de la Convention CIRDI, que celle-ci ne comporte, sous réserve de l'existence d'une sentence arbitrale, aucune cause de refus d'exequatur et que si l'article 54, paragraphe 3, de celle-ci dispose que « [l]'exécution en est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur »182, dont les questions de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit de l'Union européenne et la Convention CIRDI, alors que, d'une part, le principe de droit constitutionnel de la primauté du droit de l'Union européenne, à déduire de l'article 49bis de la Constitution, aurait obligé la Cour d'appel de constater, à l'occasion de sa décision relative à l'exequatur de la sentence arbitrale, que l'exequatur de celle-ci a pour effet de méconnaître ce principe et que, d'autre part, la Cour d'appel a omis de répondre aux conclusions du demandeur 182 Arrêt attaqué, page 11, dernier alinéa.

en cassation l'invitant à constater la contrariété d'une décision d'exequatur avec la primauté du droit de l'Union européenne183.


La jurisprudence francophone des Cours suprêmes

procédure civile autorise le juge à refuser l'exequatur à une sentence arbitrale si celle-ci ou l'exécution de celle-ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a en l'espèce été rendue en application de la Convention CIRDI, que celle-ci ne comporte, sous réserve de l'existence d'une sentence arbitrale, aucune cause de refus d'exequatur et que si l'article 54, paragraphe 3, de celle-ci dispose que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur »184, dont les questions de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit de l'Union européenne et la Convention CIRDI, alors que, d'une part, l'article 351 TFUE consacre la primauté du droit de l'Union européenne par rapport à tout traité conclu par un Etat membre, sauf si ce dernier l'a conclu avant son adhésion à l'Union européenne et avec un Etat tiers, condition non respectée par la Convention CIRDI et le TBI, qui ont été conclus par deux Etats membres de l'Union européenne, à savoir la Roumanie et la Suède, ce principe ayant été méconnu par la Cour d'appel et que, d'autre part, la Cour d'appel a omis de répondre aux conclusions du demandeur en cassation l'invitant à répondre à ce moyen185.

183 Mémoire en cassation, page 10, dernier alinéa (énoncé du deuxième moyen) : « [...] les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur [...] » ; idem, page 11, deuxième alinéa (énoncé du deuxième moyen) : « [...] qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : [...], que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel [...], la Cour d'appel contrevient au principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 11, 18 et 20 à 23 de ses conclusions récapitulatives, tenant à la primauté du droit de l'Union Européenne, les juges d'appel n'ont pas appliqué le principe général de droit constitutionnel relatif à la primauté du droit de l'Union européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit ».

184 Arrêt attaqué, page 11, dernier alinéa.

185 Voir notamment le Mémoire en cassation, page 17, dernier alinéa (énoncé du troisième moyen) : « [...] les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur [...] » ; page 20, sous « Développement du troisième moyen de cassation », dernier alinéa : « Il résulte par conséquent de ce qui précède, qu'en refusant de répondre au stade actuel de l'exequatur, au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union européenne [...] les juges d'appel ont violé les dispositions de l'article 351 TFUE, consacrant la primauté du droit de l'Union Européenne, entachant leur arrêt d'une violation de la loi », ensemble avec le même Mémoire, page 18, deuxième alinéa (énoncé du troisième moyen) : « qu'aux pages 16 à 18 des conclusions récapitulatives du 15 novembre 2019, la partie appelante, actuelle demanderesse en cassation, a invoqué dans les termes suivants : [...], que cet exposé des motifs constituait le dispositif nécessaire du dispositif de l'acte d'appel [...], de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur Le quatrième moyen est tiré de la violation de l'article 288 TFUE, qui, selon le demandeur en cassation, consacrerait le principe de la primauté du droit de l'Union européenne, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que l'article 1251 du Nouveau Code de procédure civile autorise le juge à refuser l'exequatur d'une sentence arbitrale si celle-ci ou l'exécution de celle-ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a



auquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur »186, dont les questions de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit de l'Union européenne et la Convention CIRDI, alors que, d'une part, l'article 288 TFUE consacre la primauté du droit de l'Union européenne, qui a été méconnu par la Cour d'appel et que, d'autre part, la Cour d'appel a omis de répondre aux conclusions du demandeur en cassation l'invitant à répondre à ce moyen187.

Le cinquième moyen est tiré de la violation de l'article 344 TFUE, qui, selon le demandeur en cassation, consacrerait le principe de la primauté du droit de l'Union européenne, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que si l'article 1251 du Nouveau Code de procédure civile autorise le juge à refuser l'exequatur d'une sentence arbitrale si celle-ci ou l'exécution de celle-ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a en l'espèce été rendue en application de la Convention CIRDI, que celle-ci ne comporte, sous réserve de l'existence d'une sentence arbitrale, aucune cause de refus d'exequatur et que si l'article 54, paragraphe 3, de celle-ci violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive [...] » ; idem, page 26, quatrième alinéa (développement du quatrième moyen) : « Il résulte par conséquent de ce qui précède, qu'en refusant de répondre au stade de l'exequatur, au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union européenne, [...], les juges d'appel ont violé les dispositions de l'article 288 TFUE, consacrant la primauté du droit de l'Union européenne, entachant leur arrêt d'une violation de la loi ».

186 Arrêt attaqué, page 11, dernier alinéa.

187 Voir notamment le Mémoire en cassation, page 21, premier alinéa (énoncé du quatrième moyen) : « [...] les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur [...] » ; page 28 (énoncé du cinquième moyen) : « [...] qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants :

[...] qu'en refusant de répondre, stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés [...] la Cour d'appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union européenne, énoncé à l'article 344 du Traité sur le Fonctionnement de l'Union Européenne [...] » ; idem, page 31, avant-dernier alinéa (développement du cinquième moyen) : « [i]l résulte par conséquent de ce qui précède, qu'en refusant de répondre au stade actuel de l'exequatur, au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne [...], les juges d'appel ont violé les dispositions de l'article 344 TFUE, consacrant la primauté du droit de l'Union Européenne, entachant leur arrêt d'une violation de la loi. ».

dispose que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur »188, dont les questions de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit de l'Union européenne et la Convention CIRDI, alors que, d'une part, l'article 344 TFUE consacre la primauté du droit de l'Union européenne, qui a été méconnu par la Cour



La jurisprudence francophone des Cours suprêmes

Le sixième moyen est tiré de la violation de l'article 108 TFUE, qui, selon le demandeur en cassation, consacrerait le principe de la primauté du droit de l'Union européenne, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que si l'article 1251 du Nouveau Code de procédure civile autorise le juge à refuser l'exequatur d'une sentence arbitrale si celle-ci ou l'exécution de celle-ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a en l'espèce été rendue en application de la Convention CIRDI, que celle-ci ne comporte, sous réserve de l'existence d'une sentence arbitrale, aucune cause de refus d'exequatur et que si l'article 54, paragraphe 3, de celle-ci dispose que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur »[190], dont les questions de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit de l'Union européenne et la Convention CIRDI, alors que, d'une part, l'article 108 TFUE consacre la primauté du droit de l'Union européenne, qui a été méconnu par la Cour d'appel et que, d'autre part, la Cour d'appel a omis de répondre aux conclusions du demandeur en cassation l'invitant à répondre à ce moyen[191].

188 Arrêt attaqué, page 11, dernier alinéa.

189 Voir notamment le Mémoire en cassation, page 26, dernier alinéa (énoncé du cinquième moyen) : « [...] les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur [...] » ; page 21, dernier alinéa énoncé du quatrième moyen) : « [...] qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : [...] et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages [...], qu'aux pages [...], et à la page [...], respectivement à la page [...], la Cour d'appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union européenne [...] ».

190 Arrêt attaqué, page 11, dernier alinéa.

191 Voir notamment le Mémoire en cassation, page 32, dernier alinéa (énoncé du sixième moyen) : « [...] les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur [...] » ; page 33, deuxième alinéa, (énoncé du sixième moyen) : « [...] qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les Dans le deuxième, troisième, quatrième, cinquième et sixième moyen de cassation, le demandeur en cassation critique le refus par la Cour d'appel d'examiner au stade actuel de l'exequatur, ou plus précisément, pour respecter la terminologie de la Convention CIRDI, de la reconnaissance de la sentence arbitrale la conformité de celle-ci au droit de l'Union européenne, et plus particulièrement au principe de la primauté de ce droit. Ce refus est motivé par référence à la Convention CIRDI, rendue applicable par suite de la réserve des Conventions internationales contraires faite par l'article 1251 du Nouveau Code de procédure civile qui, en l'absence de Convention internationale contraire autorise le refus d'exequatur si la sentence ou son exécution est contraire à l'ordre public. Ainsi que la Cour d'appel l'a constaté, la Convention CIRDI n'autorise, exception faite de l'exigence de l'existence de la sentence arbitrale devant faire l'objet de l'exequatur, aucune cause de refus de ce dernier[192]. Se référant à l'article 54, paragraphe 3, de la Convention, elle considère qu'une éventuelle cause de refus n'est susceptible d'être prise en considération qu'au stade de l'exécution de la sentence, qui, selon elle, est étranger au présent stade de l'exequatur[193]. Par ces motifs, elle refuse donc d'examiner la conformité de la sentence ou de l'exécution de celle-ci au droit de l'Union européenne et notamment au principe de la primauté de ce dernier, suggérant que ces griefs pourraient, postérieurement à la présente procédure



La jurisprudence francophone des Cours suprêmes

Ces motifs sont critiqués par les cinq moyens, qui sont d'une formulation et d'une structure similaires et présentent des griefs similaires.

Irrecevabilité des moyens pour mettre simultanément en œuvre plusieurs cas d'ouverture L'article 10, alinéa 2, première phrase, de la loi de 1885 dispose que « [s]ous peine d'irrecevabilité, un moyen ou un élément de moyen ne doit mettre en œuvre qu'un seul cas d'ouverture ». Le terme « cas d'ouverture », repris de l'article 978, alinéa 3, du Code de procédure civile français, est à comprendre comme étant le grief, donc le vice qui, selon le demandeur en cassation, entache la décision attaquée195.

Les cinq moyens soulèvent à chaque fois, sans être subdivisés en branches, donc en « élément[s] de moyen », deux griefs différents :

- d'une part, la violation du principe de la primauté du droit de l'Union européenne, rattaché selon les moyens respectivement au droit constitutionnel luxembourgeois, termes suivants : [...] et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages [...], qu'aux pages [...], la Cour d'appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union européenne [...] ».

192 Arrêt attaqué, page 11, premier alinéa.

193 Idem, même page, deuxième alinéa.

194 Idem, même page, dernier alinéa.

195 Jacques et Louis BORÉ, La cassation en matière civile, Paris, Dalloz, 5e édition, 2015, n° 81.84, page 472.

notamment à l'article 49bis de la Constitution196, et aux articles 351197, 288198, 344199 et 108200 TFUE et - d'autre part, le défaut de réponse aux conclusions dans lesquelles le demandeur en cassation avait développé que la reconnaissance de la sentence arbitrale méconnaîtrait ce principe sur base de ces dispositions.

Ces deux griefs, présentés dans chacun des moyens ensemble, sans subdivision en branches, n'ont pas seulement un objet différent, mais sont de nature différente, le premier grief étant de fond tandis que le second est de nature formelle.

La loi sanctionnant d'irrecevabilité les moyens qui, sans subdivision en branches, mettent en œuvre plusieurs cas d'ouverture, les moyens sont irrecevables.

A titre subsidiaire Comme exposé ci-avant les cinq moyens présentent à chaque fois deux griefs différents : une violation du principe de la primauté du droit de l'Union européenne et une violation de l'obligation de motivation.

A supposer que cette présentation concomitante de deux griefs dans le cadre d'un même moyen non subdivisé en branches soit jugée recevable, il importerait d'examiner successivement chacun de ces deux griefs.

Sur le premier grief, tiré de la violation du principe de la primauté du droit de l'Union européenne En ce qui concerne le premier grief, relatif au principe de primauté du droit de l'Union européenne, il est renvoyé au second moyen d'ordre public à soulever d'office proposé ci-après sous « Sur les moyens de cassation d'ordre public à soulever d'office », qui exprime en substance ce même grief.

Sur le second grief, tiré d'un défaut de réponse à conclusions Le second grief mis en œuvre dans chacun des cinq moyens, à savoir le grief tiré d'un défaut de réponse à conclusions, soulève deux difficultés.

A titre principal : Grief ne pouvant être accueilli pour avoir été tiré de la violation de dispositions non pertinentes 196 Deuxième moyen.



La jurisprudence francophone des Cours suprêmes

199 Cinquième moyen.

200 Sixième moyen.

Les cinq moyens discutés, dans le cadre desquels sont à chaque fois soulevés des griefs d'un défaut de réponse à conclusions, qui constitue une forme de défaut de motifs, partant, un vice de forme201, sont exclusivement tirés de la violation de dispositions de fond, à savoir de la violation du principe de la primauté du droit de l'Union européenne, rattaché selon les moyens respectivement au droit constitutionnel luxembourgeois, notamment à l'article 49bis de la Constitution, et aux articles 351, 288, 344 et 108 TFUE. Ils ne sont, en revanche, pas tirés de la violation des dispositions, tels les articles 89 de la Constitution ou 249, alinéa 1, du Nouveau Code de procédure civile, qui sanctionnent le vice de forme du défaut de motifs.

Les griefs invoqués, d'un défaut de motifs par suite d'un défaut de réponse à conclusions, étant étrangers aux dispositions visées au moyen, ils ne sauraient, être accueillis202.

A titre subsidiaire : Grief non fondé, la Cour d'appel ayant répondu aux conclusions Le défaut de réponse à conclusions constituant une forme de défaut de motifs, partant, un vice de forme, ce grief n'est pas pertinent pour critiquer le bien-fondé de la réponse. En effet, du point de vue de l'obligation de motivation, une décision est régulière en la forme dès qu'elle comporte une motivation, expresse ou implicite, sur le point considéré203.

En l'espèce, la Cour d'appel a répondu aux conclusions d'appel tirées de ce que le principe de la primauté du droit de l'Union européenne oblige, en présence de la Décision de la Commission, de refuser l'exequatur de la sentence arbitrale, que :

« Il résulte des articles 53 et 54 de la Convention de Washington que l'unique condition posée à l'obtention de l'exequatur d'une sentence arbitrale réside dans l'existence d'une sentence CIRDI, dont une copie certifiée conforme par le secrétaire général est à soumettre au juge de l'exequatur. Hormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI.

Si l'L'ETAT de ROUMANIE soutient que l'article 54.-3) de la Convention de Washington (« L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ») renvoie au droit national luxembourgeois, ceci ne vaut que pour l'exécution des jugements. Or tel qu'indiqué ci-dessus, l'exequatur ne constitue pas, en lui-même, un acte d'exécution.

[...] Il s'ensuit que certains développements de l'ETAT de ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, c'est-à-dire, notamment, les questions :

201 Voir, à titre d'illustration : Cour de cassation, 23 décembre 2021, n° 162/2021, numéro CAS-2020-00155 du registre (réponse au premier moyen).

202 Voir, à titre d'illustration, votre arrêt précité n° 36/14, numéro 3330 du registre du 20 mars 2014 (réponse au deuxième moyen).

203 Idem et loc.cit.

[...] - de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, [...] »204.

La Cour d'appel a donc considéré que la question de la primauté du droit de l'Union européenne n'était susceptible de se poser qu'au stade de l'exécution à Luxembourg de la sentence arbitrale et non déjà au stade de la reconnaissance de celle-ci qui, au regard de la Convention CIRDI, ne pourrait être refusée pour un tel motif.



La jurisprudence francophone des Cours suprêmes

formulation quasi-identique et d'objet identique, sont tirés de la violation, par défaut de réponse à conclusions, de l'article 89 de la Constitution, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que si l'article 1251 du Nouveau Code de procédure civile autorise le juge à refuser l'exequatur d'une sentence arbitrale si celle-ci ou l'exécution de celle-

ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a en l'espèce été rendue en application de la Convention CIRDI, que celle-ci ne comporte, sous réserve de l'existence d'une sentence arbitrale, aucune cause de refus d'exequatur et que si l'article 54, paragraphe 3, de celle-ci dispose que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur »205, dont les questions de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit de l'Union européenne et la Convention CIRDI, alors que le demandeur en cassation avait invoqué le principe de la primauté du droit de l'Union européenne, de sorte que la Cour d'appel aurait dû refuser l'exequatur de la sentence arbitrale qui méconnaissait ce principe et qu'en s'abstenant de le faire en ayant eu recours à une motivation de pure forme, tant bien même que le moyen tiré de la primauté du droit de l'Union européenne avait une influence décisive sur la solution du litige, elle n'a pas suffisamment répondu au moyen.

204 Arrêt attaqué, page 11, premier et deuxième et dernier alinéa.

205 Idem, même page, dernier alinéa.

Dans ses septième et huitième moyens le demandeur en cassation reprend le second grief exposé dans le cadre de ses deuxième au sixième moyens, relatif à un défaut de réponse à ses conclusions suivant lesquelles le principe de la primauté du droit de l'Union européenne aurait obligé la Cour d'appel de refuser la reconnaissance de la sentence arbitrale. Si, à la différence du second grief des deuxième au sixième moyens, le grief du défaut de réponse à conclusions est dans les septième et huitième moyens tiré de façon adéquate d'une violation de l'article 89 de la Constitution, la bonne compréhension du moyen est obscurcie en ce que ce dernier critique, outre le défaut de réponse à conclusions, également le caractère insuffisant de la motivation.

Irrecevabilité des moyens pour mettre simultanément en œuvre plusieurs cas d'ouverture Il a été rappelé ci-avant que l'article 10, alinéa 2, première phrase, de la loi de 1885 dispose que « [s]ous peine d'irrecevabilité, un moyen ou un élément de moyen ne doit mettre en œuvre qu'un seul cas d'ouverture » et que le terme « cas d'ouverture », repris de l'article 978, alinéa 3, du Code de procédure civile français, est à comprendre comme étant le grief, donc le vice qui, selon le demandeur en cassation, entache la décision attaquée206.

Les septième et huitième moyens présentent simultanément, sans subdivision en branches, deux griefs différents, à savoir :

- d'une part, le grief d'un défaut de réponse à conclusions et, - d'autre part, de façon contradictoire par rapport au grief précité, celui d'une insuffisance de motivation207, qui est un défaut de base légale, donc une insuffisance des constatations de fait qui sont nécessaires pour statuer sur le droit208.

Les moyens mettant en œuvre, sans subdivision en branches, plusieurs cas d'ouverture, ils sont irrecevables.

A titre subsidiaire Caractère non-fondé du grief tiré d'un défaut de réponse à conclusions Les septième et huitième moyens reprenant le second grief exposé dans le cadre des deuxième au sixième moyens, relatifs à un défaut de réponse aux conclusions invitant la Cour d'appel de refuser l'exequatur de la sentence arbitrale pour être contraire au



206 DORÉ, précité, n° 81.04, page 472.

207 Mémoire en cassation, page 40, premier alinéa (énoncé du septième moyen) et page 44, premier alinéa (énoncé du huitième moyen) : « [...] qu'en refusant de répondre au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, ils n'ont pas suffisamment motivé l'arrêt rapporté, violant ainsi l'article 89 de la Constitution ».

208 Cour de cassation, 4 novembre 2021, n° 132/2021, numéro CAS-2020-00135 du registre (réponse au quatrième moyen).

La Cour d'appel a répondu aux conclusions d'appel tirées de ce que le principe de la primauté du droit de l'Union européenne oblige, en présence de la Décision de la Commission, de refuser l'exequatur de la sentence arbitrale, aux motifs que :

« Il résulte des articles 53 et 54 de la Convention de Washington que l'unique condition posée à l'obtention de l'exequatur d'une sentence arbitrale réside dans l'existence d'une sentence CIRDI, dont une copie certifiée conforme par le secrétaire général est à soumettre au juge de l'exequatur. Hormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI.

Si l'ETAT de ROUMANIE soutient que l'article 54.-3) de la Convention de Washington (« L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ») renvoie au droit national luxembourgeois, ceci ne vaut que pour l'exécution des jugements. Or et tel qu'indiqué ci-dessus, l'exequatur ne constitue pas, en lui-même, un acte d'exécution.

[...] Il s'ensuit que certains développements de l'ETAT de ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, c'est-à-dire, notamment, les questions :

[...] - de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, [...] »209.

Elle a donc considéré que la question de la primauté du droit de l'Union européenne n'était susceptible de se poser qu'au stade de l'exécution à Luxembourg de la sentence arbitrale et non déjà au stade de l'exequatur (ou, dans le contexte de la Convention CIRDI, de la reconnaissance) de celle-ci qui, au regard de la Convention CIRDI, ne pourrait être refusée pour un tel motif.

Par ces motifs elle a donc répondu aux conclusions.

Dans le cadre de la discussion du septième moyen, le demandeur en cassation critique en substance que ces motifs ne seraient que de pure forme, partant équivaudraient à une absence de motifs210.

209 Arrêt attaqué, page 11, premier et deuxième et dernier alinéa.

210 Mémoire en cassation, page 40, sous « Discussion du septième moyen de cassation ».

Il est admis qu'une motivation de pure forme, qui n'est qu'un simulacre de motivation, équivaut à une absence de motifs211. Cette situation se présente lorsque le juge se limite à exposer la prétention de l'une des parties sans fournir une motivation propre212, lorsqu'il fonde sa décision sur une référence aux documents de la cause ou aux débats sans analyser ceux-ci213 ou lorsqu'il se limite à énoncer, sans autre explication supplémentaire, qu'il est entendu que telle thèse d'une partie est fondée214.

La motivation reproduite ci-avant expose une analyse juridique de la Cour d'appel relative à la conciliation de la Convention CIRDI avec le principe de la primauté du droit de l'Union européenne, à savoir que, au regard des



Dans le cadre de la discussion du huitième moyen, le demandeur en cassation critique en substance que ses conclusions auraient appelé une réponse différente de celle retenue par la Cour d'appel, à savoir le rejet de l'exequatur de la sentence arbitrale au regard du principe de primauté du droit de l'Union européenne, ce dont il déduit que la réponse de la Cour d'appel, refusant ce rejet de l'exequatur, n'est pas à considérer comme une motivation valable215. Il critique ainsi en réalité le bien-fondé de la motivation. Or, ainsi qu'il a été rappelé ci-avant, le défaut de réponse à conclusions, qui constitue une variante du défaut de motifs, est un vice de forme. Ce grief est dès lors dépourvu de pertinence pour critiquer le bien-fondé de la motivation.

Il en suit, à titre subsidiaire, que le grief d'un défaut de réponse à conclusions articulé dans les septième et huitième moyens n'est pas fondé.

Irrecevabilité du grief tiré d'une insuffisance de motifs Les septième et huitième moyens sont tirés de la violation de l'article 89 de la Constitution. Le, à chaque fois second, grief d'une insuffisance de motifs présenté dans le cadre de ces deux moyens est étranger à cet article. Le grief articule un défaut de base légale, donc une insuffisance des constations de fait qui sont nécessaires pour statuer sur le droit216, qui est un vice de fond217.

Il en suit, à titre subsidiaire, qu'en tant que basé sur la violation de l'article 89 de la Constitution, qui vise le défaut de motifs, donc un vice de forme, le grief d'une insuffisance de motifs présenté dans ces deux moyens est irrecevable218.

211 BORÉ, précité, n° 77.63, page 407 et, à titre d'illustration : Cour de cassation, 22 février 2007, n° 12/07, numéro 2371 du registre (réponse au moyen unique).

212 BORÉ, précité et loc.cit.

213 Idem et loc.cit.

214 Votre arrêt précité n° 12/07, numéro 2371 du registre, du 22 février 2007.

215 Mémoire en cassation, page 44, sous « Développement du huitième moyen de cassation » à page 46.

216 Voir, à titre d'illustration, votre arrêt précité, n° 132/2021, numéro CAS-2020-00135 du registre du 4 novembre 2021 (réponse au quatrième moyen).

217 Idem, 16 décembre 2021, n° 153/2021, numéro CAS-2020-00126 du registre (réponse au deuxième moyen).

218 Idem, 12 octobre 2017, n° 71/17, numéro 3860 du registre (réponse au deuxième moyen).

S u r  l e s  n e u v i è m e  e t  d i x i è m e  m o y e n s  d e  c a s s a t i o n  r é u n i s  Le neuvième moyen est tiré de la violation, par contradictions de motifs, de l'article 89 de la Constitution, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que si l'article 1251 du Nouveau Code de procédure civile autorise le juge à refuser l'exequatur d'une sentence arbitrale si celle-ci ou l'exécution de celle-ci est contraire à l'ordre public, ce pouvoir n'existe selon cet article que sous réserve des dispositions de conventions internationales, que la sentence arbitrale a en l'espèce été rendue en application de la Convention CIRDI, que celle-ci ne comporte, sous réserve de l'existence d'une sentence arbitrale, aucune cause de refus d'exequatur et que si l'article 54, paragraphe 3, de celle-ci dispose que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder », ce renvoi en l'espèce au droit national se limite à l'exécution des sentences, à distinguer de l'exequatur, qui ne constitue pas, en lui-même, un acte d'exécution, de sorte que « certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur »219, dont les questions de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, la contrariété entre le TBI et le droit de l'Union européenne ou le conflit de normes entre le droit



l'exécution est poursuivie, sont parties »221, alors qu'il est contradictoire de refuser l'application de l'article 54, paragraphe 3, de la Convention CIRDI au motif que l'exequatur de la sentence arbitrale est étranger à l'exécution de celle-ci tout en retenant que le Luxembourg en tant qu'Etat dont les juridictions sont saisies de la demande d'exequatur de la sentence arbitrale est à considérer comme l'« Etat dans lequel l'exécution est poursuivie ».

Le dixième moyen est tiré de la violation, par contradictions de motifs, de l'article 89 de la Constitution, en ce que la Cour d'appel a confirmé l'ordonnance entreprise ayant déclaré exécutoire la sentence arbitrale aux motifs notamment que le demandeur en cassation ne peut pas se prévaloir d'une immunité d'exécution parce que l'immunité d'exécution protège l'Etat étranger contre des actes d'exécution de décisions judiciaires, mais que la procédure en cause est relative à l'exequatur d'une sentence arbitrale et que « l'exequatur ne constitue pas, en lui-

même, un acte d'exécution de nature à provoquer l'immunité d'exécution »222, tout en constatant que « [e]n l'espèce, la Sentence a été rendue sous l'égide du CIRDI, en application de la Convention de Washington, à laquelle tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie, sont parties »223, alors qu'il est contradictoire de refuser l'application de l'immunité d'exécution au motif que l'exequatur de la sentence arbitrale poursuivie par la procédure en cause ne constitue pas un acte d'exécution tout en constatant que cette procédure a pour objet de poursuivre l'exécution de la sentence arbitrale.

219 Arrêt attaqué, page 11, dernier alinéa.

220 Idem, page 10, deuxième alinéa (c'est nous qui soulignons).

221 Idem, même page, sixième alinéa (c'est nous qui soulignons).

222 Idem, même page, deuxième alinéa (c'est nous qui soulignons).

223 Idem, même page, sixième alinéa (c'est nous qui soulignons).

Les neuvième et dixième moyens sont tirés d'une violation de l'article 89 de la Constitution par contradiction de motifs. Ce grief, équivalant à un défaut de motifs, ne peut être retenu que si les motifs incriminés sont contradictoires à un point tel qu'ils se détruisent et s'annihilent réciproquement, aucun ne pouvant être retenu comme fondement de la décision224.

La contradiction critiquée de motifs existerait entre :

- d'une part, le motif par lequel la Cour d'appel a rejeté le moyen d'appel tiré de ce que le demandeur en cassation pourrait se prévaloir d'une immunité d'exécution : « La procédure d'exequatur relève du domaine de l'immunité de juridiction et non du domaine de l'immunité d'exécution. En effet, l'exequatur ne constitue pas, en lui-même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré (Cour de cassation, ch.civile 11 juin 1991, n° de pourvoi 90-11282, cité dans Cour d'appel, 19 décembre 2019, n° 133/19) »225 et - d'autre part, l'un des motifs par lesquels la Cour d'appel a rejeté le moyen d'appel tiré de ce qu'il y avait lieu, sur base de l'article 1251, point 2°, du Nouveau Code de procédure civile, de refuser l'exequatur de la sentence arbitrale parce que celle-ci ou l'exécution de celle-ci serait contraire à l'ordre public : « En l'espèce, la Sentence a été rendue sous l'égide du CIRDI, en application de la Convention de Washington, à laquelle tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie, sont parties. Ces deux pays n'ont jamais dénoncé cette Convention, qui est dès lors toujours en vigueur. »226.

La contradiction consisterait en ce que la Cour d'appel retient dans le premier motif que l'exequatur ne constitue pas, en lui-même, un acte d'exécution et dans le second motif que l'exécution de la sentence arbitrale est poursuivie à Luxembourg. Le demandeur en cassation en déduit que la Cour d'appel aurait affirmé dans le premier motif que l'exequatur ne constitue pas un acte d'exécution de la sentence arbitrale tout en affirmant le contraire dans le second motif, à savoir que l'exequatur constitue un élément de l'exécution de la sentence.



La jurisprudence francophone des Cours suprêmes

de cette convention, à l'exclusion de celles prévues par le Nouveau code de procédure civile [qui, comme la Cour d'appel l'a rappelé, dispose dans son article 1251 que le juge ne peut refuser l'exequatur pour les motifs y énoncés, dont celui d'une contrariété de la sentence arbitrale ou de l'exécution de celle-ci à l'ordre public, que « [s]ous réserve des dispositions de conventions internationales », en l'occurrence sous réserve des dispositions de la Convention CIRDI »]227. Le caractère surabondant du motif critiqué, tiré de ce que le Luxembourg est l'« Etat dans lequel l'exécution est poursuivie »228, est confirmé par l'énoncé fait par la Cour d'appel de l'article 54, paragraphe 1, de la Convention CIRDI, qui dispose, comme la Cour le rappelle, que « [c]haque Etat contractant reconnaît toute sentence rendue dans le cadre de la présente convention comme 224 Voir, à titre d'illustration, votre arrêt précité, n° 132/2021, numéro CAS-2020-00135 du registre du 4 novembre 2021 (réponse au quatrième moyen).

225 Arrêt attaqué, page 10, deuxième alinéa (c'est nous qui soulignons).

226 Idem, même page, sixième alinéa (c'est nous qui soulignons).

227 Idem, même page, septième alinéa.

228 Idem, même page, sixième alinéa.

obligatoire et assure l'exécution sur son territoire des obligations pécuniaires que la sentence impose comme s'il s'agissait d'un jugement définitif d'un tribunal fonctionnel sur le territoire dudit Etat »229. La Cour d'appel constate donc que la Convention s'applique à la reconnaissance d'une sentence arbitrale dans un Etat partie si cette reconnaissance y est demandée.

L'applicabilité de la Convention n'est donc pas subordonnée à la condition supplémentaire que l'exécution de la sentence arbitrale dont la reconnaissance a été demandée dans un Etat partie soit poursuivie dans cet Etat. Il s'entend toutefois, bien entendu, qu'il est difficile de saisir l'intérêt de demander la reconnaissance d'une sentence arbitrale dans un Etat sans vouloir par la suite assurer l'exécution de cette sentence dans cet Etat. Il reste que, dans la logique du raisonnement de la Cour d'appel, la précision que le Luxembourg est l'« Etat dans lequel l'exécution est poursuivie »230 est, dans le contexte de l'objet du motif, de déterminer si le Luxembourg est lié par la Convention CIRDI, sans pertinence. Le caractère surabondant de ce motif n'est cependant pas suffisant pour écarter le grief de contradiction de motifs. Pour atteindre ce résultat il faudrait que tous les motifs allégués de contradictoires soient pareillement surabondants231. Or, en l'espèce, l'autre motif critiqué, tiré de ce que «l'exequatur ne constitue pas, en lui-même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré »232, constitue le soutien nécessaire du rejet par la Cour d'appel de la prétention du demandeur en cassation à une immunité d'exécution. Ce motif n'est donc pas superfétatoire.

Le grief de la contradiction de motifs est cependant à rejeter pour deux motifs.

Moyens irrecevables pour critiquer une contradiction entre un motif de droit et un motif de fait Le grief de la contradiction de motifs est circonscrit à la contradiction de motifs de fait233.

Or, en l'espèce, le premier motif mis en exergue, tiré de ce que « l'exequatur ne constitue pas, en lui-même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré »234 est un motif de droit. Ce n'est que le second motif invoqué, tiré de ce que le Luxembourg est, en l'espèce, l'« Etat dans lequel l'exécution est poursuivie »235 qui est un motif de fait.

La contradiction, à la supposer établie, existe donc entre un motif de droit et un motif de fait.

Une telle contradiction est, le cas échéant, susceptible de donner ouverture à un moyen tiré de la violation d'une loi de fond, mais elle ne constitue pas un vice de forme, donc ne peut pas être attaquée de façon pertinente par le cas d'ouverture de la contradiction de motifs236.



La jurisprudence francophone des Cours suprêmes

229 Idem, même page, avant-dernier alinéa.

230 Idem, même page, sixième alinéa.

231 BORÉ, précité, n° 77.121, pages 413-414.

232 Arrêt attaqué, page 10, deuxième alinéa.

233 BORÉ, précité, n° 77.114, page 413.

234 Arrêt attaqué, page 10, deuxième alinéa.

235 Idem, même page, sixième alinéa.

236 BORÉ, précité, n° 77.113, pages 412-413.

A titre subsidiaire : Moyens non fondés Les moyens se fondent sur la prémisse que la Cour d'appel en retenant que le Luxembourg est l'« Etat dans lequel l'exécution est poursuivie »237 a affirmé que l'exequatur de la sentence arbitrale constitue un élément, une étape, de l'exécution de la sentence. Ainsi compris, ce motif se trouve en contradiction avec le motif par lequel la Cour d'appel a rejeté l'immunité d'exécution réclamée par le demandeur en cassation, à savoir que « l'exequatur ne constitue pas, en lui-même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré »238.

Le motif surabondant tiré de ce que le Luxembourg est l'« Etat dans lequel l'exécution est poursuivie »239 n'est cependant, dans la logique du raisonnement de la Cour d'appel, pas à comprendre comme une référence faite à la procédure d'exequatur. Cette assimilation n'est pas affirmée par la Cour d'appel, qui distingue, au contraire, de façon très claire entre, d'une part, la procédure d'exequatur et, d'autre part, l'exécution de la sentence ayant fait l'objet de l'exequatur. La Cour d'appel, outre de préciser que « l'exequatur ne constitue pas, en lui-même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré »240, renvoie à l'article 54, paragraphe 1, de la Convention CIRDI, qui distingue entre la reconnaissance de la sentence arbitrale et de l'exécution des obligations pécuniaires que la sentence impose241, à l'article 54, paragraphe 2, de cette Convention, qui distingue à nouveau entre reconnaissance et exécution de la sentence242, à l'article 54, paragraphe 3, de cette Convention qui opère un renvoi au droit national pour la seule exécution de la sentence arbitrale, à l'exclusion de la reconnaissance de celle-ci243, et déduit de ces dispositions « que certains développements de l'ETAT DE ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur [dont la question de l'incidence du principe de primauté du droit de l'Union européenne] »244.

A la lumière de cette distinction constante opérée par la Cour d'appel entre l'exequatur de la sentence arbitrale et l'exécution de celle-ci à la suite de l'exequatur, la désignation dans le motif critiqué du Luxembourg comme l'« Etat dans lequel l'exécution est poursuivie »245 se comprend comme l'Etat dans lequel la partie poursuivante envisage de procéder à l'exécution de la sentence arbitrale après avoir obtenu l'exequatur de celle-ci. Il ne faut à cet effet pas perdre de vue que la Convention CIRDI envisage et distingue, ainsi qu'il a été rappelé ci-avant, la reconnaissance, donc l'exequatur, de la sentence arbitrale et l'exécution de la sentence reconnue. Ainsi comprise, la désignation du Luxembourg comme l'« Etat dans lequel l'exécution est poursuivie »246 s'entend de l'Etat dans lequel l'exécution de la sentence arbitrale sera poursuivie après l'exequatur de celle-ci, formant l'objet de la procédure engagée en 237 Arrêt attaqué, page 10, sixième alinéa.

238 Idem, même page, deuxième alinéa.

239 Idem, même page, sixième alinéa.

240 Idem, même page, deuxième alinéa.



La jurisprudence francophone des Cours suprêmes

243 Idem, page 11, deuxième alinéa.

244 Idem, même page, dernier alinéa.

245 Idem, page 10, sixième alinéa.

246 Idem et loc.cit.

l'espèce. Cette désignation n'implique donc aucune assimilation de l'exequatur à l'exécution de la sentence reconnue.

Il en suit, à titre subsidiaire, que les moyens ne sont pas fondés.

C o n c l u s i o n s u r l e s m o y e n s d e c a s s a t i o n d e l a R o u m a n i e Les moyens de cassation invoqués par la Roumanie sont soit irrecevables, soit non fondés.

Sur les moyens de cassation proposées par la Commission La Commission est intervenue sur base de l'article 29, paragraphe 2, du Règlement (UE) 2015/1589 du Conseil du 13 juillet 2015 portant modalités d'application de l'article 108 du traité sur le fonctionnement de l'Union européenne247. L'article 108 TFUE, visé par le Règlement, réglemente la procédure de sanction des aides d'Etat qui sont, au vu de l'article 107, paragraphe 1, TFUE, en principe, prohibées si elles faussent ou menacent de fausser la concurrence en favorisant certaines entreprises ou certaines productions248. La question des aides d'Etat est pertinente parce que, comme rappelé ci-avant dans la partie « Sur les faits », la Commission a adopté le 30 mars 2015 sa Décision (UE) 2015/1470 constatant que le versement par la Roumanie aux investisseurs concernés, dont le défendeur en cassation M), des dommages et intérêts alloués par la sentence arbitrale du CIRDI du 11 décembre 2013 constitue une aide d'Etat prohibée au sens de l'article 107 TFUE et interdisant à la Roumanie de les verser.

L'article 29, paragraphe 2, du Règlement précité dispose que « [l]orsque l'application cohérente de l'article 107, paragraphe 1, ou de l'article 108 du TFUE l'exige, la Commission, agissant de sa propre initiative, peut soumettre des observations écrites aux juridictions des Etats membres responsables de l'application des règles en matière d'aides d'Etat [...] ». Le rôle de la Commission agissant sur base de ce Règlement se limite donc à soumettre des observations, donc à se limiter au rôle d'intervenant volontaire, à l'exclusion de celle de partie au principal.

La Commission ne soutient d'ailleurs pas qu'elle soit une partie au principal. Elle est intervenue pour soutenir la Roumanie dans le but d'« assurer l'application cohérente des règles de l'Union européenne en matière d'aides d'Etat »249 et de vous inviter, indépendamment des moyens de cassations de la Roumanie, à soulever d'office des moyens relatifs à la violation dans l'arrêt attaqué du droit de l'Union européenne250.

N'étant pas une partie au principal, elle n'est pas à considérer comme un demandeur en cassation au principal ou par incident et ne vous saisit pas d'un pourvoi principal ou incident.

247 Journal officiel de l'Union européenne L 248 du 24.9.2015, page 9.

248 Article 107 TFUE : « Article 107. 1. Sauf dérogations prévues par les traités, sont incompatibles avec le marché intérieur, dans la mesure où elles affectent les échanges entre Etats membres, les aides accordées par les Etats ou au moyen de ressources d'Etat sous quelque forme que ce soit qui faussent ou qui menacent de fausser la concurrence en favorisant certaines entreprises ou certaines productions. [...] ».

249 Mémoire de la Commission, page 7, troisième alinéa.

250 Idem, page 8, premier alinéa.

Il en suit que dans la mesure où elle développe des moyens différents de ceux présentés par le demandeur en cassation, ces moyens ne peuvent être pris en considération que dans la mesure où vous êtes vous-mêmes



part, aux moyens de pur droit et, d'autre part, aux moyens d'ordre public.

Le moyen de pur droit est celui qui se fonde exclusivement sur des faits qui résultent des constatations des juges du fond251.

Le moyen d'ordre public, dont les conditions de recevabilité sont plus larges que celles du moyen de pur droit, ne doit se fonder sur aucun fait qui n'ait été soumis aux juges du fond et ne soit dans le débat252. Ce moyen revient à reprocher aux juges du fond de ne pas avoir relevé d'office un moyen qui était apparent par lui-même au vu des éléments dont ils disposaient253.

Le respect du droit de l'Union européenne constitue indiscutablement une question d'ordre public : « [é]tant donné que les principes d'autonomie du droit européen et d'obligation de coopération loyale des Etats membres constituent des principes fondamentaux de l'ordre juridique de l'Union européenne, les juges des Etats membres sont tenus de les inclure dans l'ordre public ou dans des catégories similaires prévues en droit national »254. Ainsi que la Commission l'a relevé à juste titre dans son mémoire255, la Cour de justice a jugé que la contrariété d'une sentence arbitrale au droit de l'Union européenne doit être qualifiée et sanctionnée par le juge national comme méconnaissance de ses règles nationales d'ordre public256. Dans cette logique l'arrêt Achmea « devrait [...] être intégré au sein de la conception d'ordre public pour s'imposer aux Etats membres et avoir un plein effet »257.

La Commission vous invite dans cet ordre d'idées à soulever d'office quatre moyens, qu'elle ne formule cependant pas dans la forme prévue par l'article 10 de la loi de 1885. Ces moyens sont respectivement tirés de la violation de l'immunité juridictionnelle de la Roumanie, ainsi que des articles 4, paragraphe 3, du Traité sur l'Union européenne (ci-après « TUE »), 351, paragraphe 1, TFUE et 267 ainsi que 344 TFUE.

Comme ces moyens ne sont pas formulés de la façon prévue par la loi, ils ne peuvent pas être adoptés tels quels, mais nécessitent une transposition respectant la forme légale imposée.

Ils présentent en outre le désavantage de se répéter en partie et de s'articuler dans un ordre de présentation qui n'est pas de nature à faciliter la compréhension de la logique qui les sous-tend.

Ainsi, le premier moyen proposé, tiré de la violation de l'immunité juridictionnelle de la Roumanie, se fonde sur la méconnaissance de l'arrêt Achmea, donc des articles 267 et 344 TFUE, tandis que le quatrième moyen proposé est à son tour tiré de la violation de ces mêmes articles.

251 BORÉ, précité, n° 82.211, page 491.

252 Idem, n° 82.322, page 498.

253 Idem et loc.cit.

254 MALFERRARI, précité, page 65, dernier alinéa.

255 Mémoire de la Commission, page 8, dernier alinéa.

256 Arrêt précité Eco Swiss, point 41.

257 LANOË-CAMPBELL, précité, 3, B. 1°, avant-dernier alinéa.

Il est dès lors proposé de reprendre leur substance en soulevant les moyens d'office, d'ordre public, proposés ci-après.

Sur les moyens de cassation d'ordre public à soulever d'office II est proposé de soulever d'office deux moyens d'ordre public, le second étant subsidiaire au premier :



La jurisprudence francophone des Cours suprêmes

sur base de l'article 54 de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, adoptée le 18 mars 1965 à Washington (la « Convention CIRDI »), de la sentence arbitrale n° ARB/05/20, rendue le 11 décembre 2013 par le Centre international pour le règlement des différends dans le cadre d'un litige entre, d'une part, différents investisseurs, dont M), et, d'autre part, la Roumanie, en exécution de la clause d'arbitrage prévue par l'article 7(5) du traité bilatéral d'investissement, conclu le 29 mai 2002, entre les Gouvernements de Suède et de Roumanie (« le TBI »), a écarté l'exception d'immunité de juridiction soulevée par la Roumanie aux motifs que « [a]u vu de la clause d'arbitrage, découlant de l'article 7(5) du TBI à laquelle l'ETAT de ROUMANIE a consenti, celui-ci est à considérer comme ayant expressément renoncé à son immunité de juridiction »258, tout en ayant été saisie des questions « de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne »259 et « de la contrariété entre le TBI et le droit de l'Union européenne »260, alors que, première branche, ainsi que la Cour de justice de l'Union européenne l'a dit pour droit dans son arrêt Achmea, du 6 mars 2018 (C-284/16, ECLI:EU:C:2018:158), les articles 267 et 344 TFUE s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence et que, ainsi que la Cour de justice de l'Union européenne l'a constaté dans son arrêt Commission c/ European Food e.a., du 25 janvier 2022 (C-638/19 P, ECLI:EU:C:2022:50), le consentement que la Roumanie avait donné à la possibilité qu'un litige avec des investisseurs soit porté contre elle dans le cadre de la clause d'arbitrage prévue par l'article 7(5) du TBI est, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité) parce qu'il est contraire aux articles 267 et 344 TFUE, de sorte que ces articles s'opposent à déduire de l'article 7(5) du TBI une renonciation à l'immunité de juridiction et que, en procédant à cette déduction, la Cour d'appel a méconnu ces articles, et que, seconde branche, en 258 Arrêt attaqué, page 9, dernier alinéa.

259 Idem, page 11, dernier alinéa, deuxième tiret.

260 Idem, même page, même alinéa, troisième tiret.

déduisant la renonciation par la Roumanie à son immunité de juridiction du consentement donné par celle-ci à l'article 7(5) du TBI, tant bien même que, au regard des arrêts précités de la Cour de justice de l'Union européenne, ce consentement est contraire aux articles 267 et 344 TFUE et, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité Commission c/ European Food e.a., du 25 janvier 2022), la Cour d'appel a méconnu le principe de droit international public de l'immunité de juridiction des Etats étrangers, - à titre subsidiaire, le moyen d'office, d'ordre public, tiré de la violation du principe de primauté du droit de l'Union européenne, en l'occurrence des articles 267 et 344 TFUE, rappelé par la Déclaration 17 relative à la primauté annexée au Traité de Lisbonne modifiant le traité sur l'Union européenne et le traité instituant la Communauté européenne261, en ce que la Cour d'appel a confirmé une ordonnance ayant fait droit à une demande de reconnaissance, sur base de l'article 54 de la Convention CIRDI, de la sentence arbitrale n° ARB/05/20, rendue le 11 décembre 2013 par le Centre international pour le règlement des différends dans le cadre d'un litige entre, d'une part, différents investisseurs, dont M), et, d'autre part, la Roumanie, en exécution de la clause d'arbitrage prévue par l'article 7(5) du TBI, aux motifs que « [i]l résulte des articles 53 et 54 de la Convention de Washington que l'unique condition posée à l'obtention de l'exequatur d'une sentence arbitrale réside dans l'existence d'une sentence CIRDI »262 et que « [h]ormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI »263, de sorte que « les moyens de l'ETAT de ROUMANIE consistant à soulever la violation, du fait de l'exequatur, de certains articles du Nouveau code de procédure civile ne sont pas pertinents et ne seront pas analysés, à savoir la violation de : [...] 3) l'article 1251-2° du Nouveau code de procédure civile, plus précisément la violation de l'ordre public international résultant de la prétendue méconnaissance par la sentence du droit de l'Union européenne [...] »264, dont les questions « de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne »265 et « de la contrariété entre le TBI et le droit de l'Union européenne »266, alors que, suivant la jurisprudence constante de la Cour de justice de l'Union européenne, initiée par l'arrêt Simmenthal du 9 mars 1978 (106/77, EU:C:1978 :49, points 21-24), en vertu du principe de primauté du droit de l'Union européenne, le juge national chargé d'appliquer, dans le cadre de sa compétence, les dispositions du droit de l'Union a l'obligation d'assurer le plein effet de celles-ci en laissant au besoin inappliquée, de sa propre autorité, toute



La jurisprudence francophone des Cours suprêmes

rendue en exécution de la clause d'arbitrage, prévue par l'article 7(5) du TBI, contenue dans un accord international conclu entre des États membres, en l'occurrence entre la Suède et la Roumanie, aux termes de laquelle 261 Journal officiel de l'Union européenne, C 306 du 17.12.2007, page 1, voir page 256.

262 Idem, même page, premier alinéa.

263 Idem et loc.cit.

264 Idem, même page, troisième et sixième alinéa.

265 Idem, même page, dernier alinéa, deuxième tiret.

266 Idem, même page, même alinéa, troisième tiret.

un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence, que la Cour de justice de l'Union européenne a dit pour droit dans son arrêt Achmea, du 6 mars 2018 (C-284/16, ECLI:EU:C:2018:158) que les articles 267 et 344 TFUE s'opposent à une telle clause et qu'elle a constaté dans son arrêt Commission c/ European Food e.a., du 25 janvier 2022 (C-638/19 P, ECLI:EU:C:2022:50) que le consentement que la Roumanie avait donné à la possibilité qu'un litige avec des investisseurs soit porté contre elle dans le cadre de la clause d'arbitrage prévue par l'article 7(5) du TBI est, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité) parce qu'il est contraire aux articles 267 et 344 TFUE, que la Cour d'appel ayant eu l'obligation d'assurer le plein effet de ces articles aurait dû laisser inappliqué de sa propre autorité l'article 54 de la Convention CIRDI, qui s'applique en l'espèce dans les rapports entre Etats membres de l'Union européenne, à savoir entre la Roumanie, la Suède et le Luxembourg, et sert à exécuter une clause d'arbitrage qui est contraire au droit de l'Union européenne, et refuser, par réformation, la reconnaissance de la sentence arbitrale rendue en exécution d'une clause d'arbitrage contraire au droit de l'Union européenne et traduisant un consentement « dépourvu de tout objet », de sorte que, en omettant de ce faire elle a méconnu le principe de primauté du droit de l'Union européenne, en l'occurrence des articles 267 et 344 TFUE.

S u r l a r e c e v a b i l i t é d e s d e u x m o y e n s p r o p o s é s Les deux moyens qu'il vous est proposé de soulever d'office sont des moyens d'ordre public.

Ils se rapportent, d'une part, à la correcte application du droit de l'Union européenne, qui constitue, ainsi qu'il a été développé ci-avant, une question d'ordre public.

La seconde branche du premier moyen, donc du moyen principal, est, d'autre part, tirée de la violation du principe de l'immunité de juridiction des Etats étrangers.

L'immunité est « une « exception préliminaire » qui revêt incontestablement une nature procédurale »267. Elle « n'affecte pas seulement la compétence juridictionnelle du juge mais lui retire le pouvoir de juger »268. Elle constitue une fin de non-recevoir269, qui est « invocable en tout état de cause »270. Le moyen tiré de l'immunité de juridiction existant au profit d'un Etat étranger « doit être relevé d'office, même devant la Cour de cassation »271.

Certes, l'immunité de juridiction dont peut bénéficier un Etat étranger « n'est pas absolue »272, mais « est un privilège qui ne peut être invoqué que par l'Etat qui se croit fondé à s'en 267 Répertoire Dalloz de droit international, V° Immunités, précité, n° 20.

268 Idem, n° 21.

269 Idem et loc.cit.



La jurisprudence francophone des Cours suprêmes

272 Cour de cassation française, première chambre civile, 7 janvier 1992, 90-43.790, Bull. civ. I, n° 3, page 2. Dans le même sens : idem, même chambre, 12 octobre 1999, 97-14.827, Bull. civ. I, n° 262, page 171.

prévaloir »273. Il en suit que « [s]i l'Etat, présent à la procédure, renonce à se prévaloir de l'immunité dont il pourrait se prévaloir, le juge n'a pas à se substituer à lui »274 . Dans un tel cas il a été décidé que, soulevé pour la première fois devant la Cour de cassation, le moyen est nouveau et irrecevable pour être mélangé de fait275.

En l'espèce, la Roumanie a invoqué l'immunité de juridiction276, la Cour d'appel a répondu à ce moyen en le rejetant277 et la Roumanie attaque cet arrêt devant vous. L'obstacle éventuel précité, d'une renonciation de l'Etat étranger à invoquer l'immunité de juridiction, ne se présente donc pas en cause.

Comme précisé ci-avant, le moyen d'ordre public, dont les conditions de recevabilité sont plus larges que celles du moyen de pur droit, ne doit se fonder sur aucun fait qui n'ait été soumis aux juges du fond et ne soit dans le débat278. Il critique l'omission des juges du fond de relever d'office un moyen qui était apparent par lui-même au vu des éléments dont ils disposaient279.

Il résulte des constatations des juges d'appel que la Roumanie et la Commission avaient invoqué la contrariété de la clause d'arbitrage, contenue dans un TBI intra-UE, au droit de l'Union européenne. Cette contrariété aux articles 267 et 344 TFUE a été constatée par l'arrêt Achmea280. Le très récent arrêt Commission c/ European Food e.a. confirme même que cette contrariété s'applique à la clause d'arbitrage de l'espèce. La contrariété de la clause d'arbitrage au droit de l'Union européenne, qui avait été invoquée par les parties et qui, s'agissant de la contrariété de la clause avec les articles 267 et 344 TFUE, avait été dite pour droit par un arrêt de la Cour de justice rendu antérieurement à l'arrêt, était apparente par elle-même, donc aurait, s'agissant de ces articles, dû être, au besoin, relevée d'office.

Le constat de cette contrariété, qui a été dite pour droit par la Cour de justice dans son arrêt Achmea, ne repose sur aucun fait qui n'aurait été soumis aux juges du fond, étant précisé que les arrêts de la Cour de justice interprétant le droit de l'Union européenne font partie de ce droit, donc ne sont pas à considérer comme des éléments de fait, mais relèvent du droit.

273 Arrêt précité n° 90-43.790 de la Cour de cassation française du 7 janvier 1992. Dans le même sens : arrêt précité n° 97-14.827 de la Cour de cassation française du 12 octobre 1999.

274 Répertoire Dalloz de droit international, V° Immunités, précité, n° 27.

275 Arrêt précité n° 97-14.827 de la Cour de cassation française du 12 octobre 1999.

276 Arrêt attaqué, page 3, septième alinéa.

277 Idem, pages 9 et 10, sous « Quant à l'immunité juridictionnelle ».

278 BORÉ, précité, n° 82.322, page 498.

279 Idem et loc.cit.

280 Il ne résulte pas des pièces auxquelles vous pouvez avoir égard que l'arrêt Achmea ait été invoqué par les parties, y compris la Commission, devant les juges du fond, tant même qu'il a été rendu presque trois ans avant l'arrêt attaqué. Eu égard à l'autorité des arrêts de la Cour de justice, notamment ceux rendus sur l'interprétation du droit de l'Union européenne sur base de l'article 267 TFUE, il ne constitue pas un fait, mais un élément de droit, éclairant la correcte interprétation du droit de l'Union européenne et précisant « la portée de la règle de droit, telle qu'elle doit ou aurait dû être comprise et appliquée depuis la date de son entrée en vigueur » (point 58 de l'arrêt précité PL Holdings de la Cour de justice du 26 octobre 2021). Eu égard au caractère d'ordre public du droit de l'Union européenne, l'interprétation apportée par l'arrêt Achmea constitue, compte tenu de surcroît des contestations de la Roumanie et de la Commission au sujet de la conformité du TBI au droit de l'Union européenne, un moyen non seulement d'ordre


La jurisprudence francophone des Cours suprêmes

plus explicite sur cet arrêt, a une pertinence pourtant manifeste) comme un reproche d'ordre déontologique à l'égard de la Cour d'appel.

Le premier moyen est tiré de la violation des articles 267 et 344 TFUE ainsi que du principe de droit international public de l'immunité de juridiction des Etats étrangers. Chacun de ces deux cas d'ouverture fait respectivement l'objet d'une branche du moyen qui lui est exclusivement consacrée.

Le principe de droit international public de l'immunité de juridiction des Etats étrangers ne saurait, faute de texte auquel il se réfère, être associé à un texte. Il ne saurait, en effet, être question de se référer dans cet ordre d'idées à la Convention européenne sur l'immunité des Etats, signée à Bâle le 16 mai 1972 et approuvée par le Luxembourg par une loi du 8 juin 1984, évoquée ci-avant, puisque cette Convention ne s'applique que dans les rapports entre les Etats contractants, parmi lesquels ne figure pas la Roumanie, dont l'immunité de juridiction est en cause en l'espèce. Il n'est pas non plus pertinent de se référer à la Convention des Nations-

Unies sur les immunités juridictionnelles des Etats et de leurs biens, du 2 décembre 2004, qui n'a pas été signée par le Luxembourg. Le principe de l'immunité de juridiction des Etats étrangers a été reconnu par votre Cour dans un arrêt du 19 juin 1908281. La formulation proposée est reprise de la jurisprudence de la Cour de cassation française282.

Le deuxième moyen est tiré de la violation du principe de primauté du droit de l'Union européenne. Ce principe a été créé de façon prétorienne, sans texte formel le consacrant283, par la Cour de justice dans son arrêt Costa c/ Enel du 15 juillet 1964284 et a été constamment rappelé depuis lors. A défaut de texte le consacrant son invocation ne saurait être accompagnée de l'énoncé d'un texte, sauf à faire état de la Déclaration 17 relative à la primauté annexée au Traité de Lisbonne modifiant le traité sur l'Union européenne et le traité instituant la Communauté européenne, qui mentionne ce principe et sauf à préciser que ce dernier concerne dans le présent contexte les articles 267 et 344 TFUE.

Il en suit que les deux moyens sont recevables.

S u r  l e  b i e n - f o n d é  d e s  d e u x  m o y e n s  p r o p o s é s  Le premier moyen, qui est principal par rapport au second, critique que la Cour d'appel a rejeté l'exception d'immunité de juridiction soulevée par la Roumanie au motif que cet Etat a expressément renoncé à cette immunité en consentant à conclure la clause d'arbitrage contenue dans l'article 7(5) du TBI, conclu entre lui et la Suède, donc entre deux Etats membres de l'Union européenne. Or, la Cour de justice a dit pour droit dans son arrêt Achmea qu'une telle clause d'arbitrage, contenue dans un TBI intra-UE, est contraire aux articles 267 et 344 TFUE.

Cette analyse a été réitérée par la Cour de justice par le récent arrêt Commission c/ European Food e.a., confirmant que le consentement de la Roumanie à l'article 7(5) du TBI était, à 281 Cour de cassation, 19 juin 1908, Pas. 8, page 53 (arrêt faisant état du « principe universellement reconnu du droit international [...] de la souveraineté et de l'indépendance des nations l'une à l'égard des autres, principe qui ne permet pas qu'un Etat soit soumis, contre son gré, à la juridiction d'un autre Etat » (idem, page 57, colonne de gauche, avant-dernier alinéa)).

282 Arrêt précité n° 84-16.452 de la Cour de cassation française du 4 février 1986 (« Vu le principe de l'immunité de juridiction des Etats étrangers »). Voir également l'arrêt précité n° 98-19.068 de la même Cour du 6 juillet 2000 (« Vu les principes du droit international régissant les immunités des Etats étrangers » (l'immunité visée étant cependant dans ce cas l'immunité d'exécution)).

283 Jurisclasseur Europe Traité, Fasc. 196 : Ordre juridique de l'Union européenne – Primauté du droit de l'Union européenne, par Rostane MEHDI,. Septembre 2017, n° 3.

284 Arrêt 6/64, ECLI:EU:C:1964:66.

compter de l'adhésion de la Roumanie à l'Union européenne, le 1er janvier 2007, dépourvu de tout objet.



La jurisprudence francophone des Cours suprêmes

part, les dispositions du droit de l'Union européenne, donc les articles 267 et 344 TFUE, qui s'opposent à la clause d'arbitrage (première branche) et, d'autre part, par suite de sa déduction de la renonciation à l'immunité de juridiction d'une clause contraire au droit de l'Union européenne et dépourvue d'objet, le principe consacrant cette immunité (seconde branche).

Le second moyen, qui est subsidiaire au premier, critique que la Cour d'appel a, nonobstant la contrariété de la clause d'arbitrage au droit de l'Union européenne et le défaut d'objet de cette clause depuis l'adhésion de la Roumanie à l'Union européenne, reconnu la sentence arbitrale, donc a appliqué l'article 54 de la Convention CIRDI, qui, ainsi qu'il a été exposé ci-avant, impose la reconnaissance de toute sentence arbitrale du CIRDI sans autoriser une quelconque révision ou un contrôle du respect de l'ordre public international luxembourgeois. Or, le principe de primauté du droit de l'Union européenne l'aurait obligée, sur base de la jurisprudence Simmenthal de la Cour de justice, de refuser de reconnaître la sentence arbitrale, donc d'écarter l'article 54 de la Convention CIRDI.

Sur la conformité avec le droit international public du refus d'appliquer en l'espèce la Convention CIRDI D'une part, la jurisprudence Achmea, confirmée par l'arrêt Commission c/ European Food e.a., s'oppose à reconnaître une sentence arbitrale d'un TBI intra-UE rendue en exécution d'une clause d'arbitrage méconnaissant le droit de l'Union européenne. D'autre part, en revanche, le Luxembourg est tenu par la Convention CIRDI, qui l'oblige à reconnaître sans pouvoir de révision, les sentences arbitrales adoptées dans ce cadre. Il se pose dès lors la question de savoir si l'application correcte du droit de l'Union européenne n'a pas pour effet de violer le droit international public.

La Cour d'appel de Bruxelles s'est posée cette même question en saisissant dans le cadre du même litige la Cour de justice d'une question préjudicielle aux fins de savoir si « le droit de l'Union, notamment le principe de coopération loyale ou le principe d'autorité de chose jugée, permet qu'une juridiction nationale d'un Etat membre (autre que la Roumanie) ne respecte pas ses obligations internationales découlant de la Convention du CIRDI dans l'hypothèse où la Commission européenne a adopté une décision postérieurement à la sentence qui considère que l'exécution forcée de la sentence serait contraire au régime européen des aides d'Etat et ce même si la Commission européenne a participé à la procédure d'arbitrage (en ce compris le recours en annulation à l'encontre de la sentence) et a fait valoir ses moyens relatifs au régime européen des aides d'Etat »285.

285 Arrêt précité 2016/AR/393 de la Cour d'appel de Bruxelles du 12 mars 2019. Comme précisé ci-avant, ce renvoi préjudiciel dans une affaire Romatsa e.a. / M) porte le numéro C-333/19 et n'a pas encore été jugé par la Cour de justice, le jugement ayant été suspendu dans l'attente de son arrêt Commission c/ European Food e.a. rendu le 25 janvier 2022.

Cette question, à laquelle la Cour de justice n'a pas encore donné de réponse, met en exergue un conflit entre la Convention CIRDI et la décision de la Commission qualifiant le versement des dommages et intérêts alloués par la sentence arbitrale rendue en cause comme aide d'Etat prohibée. Comme rappelé ci-avant, cette décision a fait l'objet d'un recours devant le Tribunal de l'Union européenne, qui procéda à son annulation, qui fut cependant à son tour annulée par le très récent arrêt Commission c/ European Food e.a.

Il est cependant proposé par la Commission dans son mémoire et dans le cadre des moyens d'office proposés ci-avant de situer le conflit entre la Convention CIRDI et le droit de l'Union européenne plutôt, et de façon plus fondamentale, sur le terrain de la contrariété de la clause d'arbitrage stipulée en l'espèce, dans le cadre d'un TBI intra-UE, aux articles 267 et 344 TFUE et de l'absence d'objet de cette clause depuis l'adhésion de la Roumanie à l'Union européenne, constatées par la Cour de justice dans ses arrêts Achmea et Commission c/ European Food e.a.

Il reste que même sur ce terrain se pose, le cas échéant, la question de la compatibilité des exigences du droit de l'Union européenne avec celles du droit international public découlant de la Convention CIRDI.

Dans cet ordre d'idées il a pu être relevé que les juridictions nationales des Etats membres sont dans un cas comme celui de l'espèce confrontées « à deux obligations apparaissant contradictoires. D'une part, en vertu de l'article 54 de la Convention CIRDI, le droit international leur impose de reconnaître et d'exécuter la sentence comme s'il s'agissait



Il se pose ainsi la question de la compatibilité du principe de primauté du droit de l'Union européenne et de l'effet des arrêts de la Cour de justice avec les exigences du droit international public au regard des dispositions de l'article 53 de la Convention CIRDI, disposant que la sentence arbitrale « est obligatoire à l'égard des parties et ne peut être l'objet d'aucun appel ou autre recours, à l'exception de ceux prévus par la présente convention »287. En effet, « la juridiction nationale saisie [d'une demande de reconnaissance d'une sentence arbitrale rendue sur base de la Convention CIRDI] se trouve dès lors confrontée à deux obligations contradictoires »288.

Une telle objection méconnaît cependant que les Etats membres de l'Union européenne « ne peuvent pas violer le droit européen s'agissant des matières couvertes par les traités ; il en est ainsi tant pour le droit national interne que pour les traités internationaux conclus par les Etats membres entre eux. Du point de vue du droit international, cela correspond au fait que les Etats membres, dans les traités UE, ont prévu pour les matières couvertes par les traités UE une règle spéciale de conflit : la primauté du droit européen »289.

La primauté du droit de l'Union européenne a été consacrée par la Cour de justice290 et, par la suite, par le droit primaire291.

286 CROISANT et TATON, précité, page 11, colonne de gauche, deuxième alinéa.

287 DE SADELEER, précité, n° 29, page 754.

288 BERTHIAU-JÉZÉQUEL, précité, n° 8, page 433.

289 MALFERRARI, précité, page 55, deuxième alinéa.

290 Arrêt précité Costa c/ ENEL.

291 Traité de Lisbonne modifiant le traité sur l'Union européenne et le traité instituant la Communauté européenne, Déclaration 17 relative à la primauté (Journal officiel de l'Union européenne, C 306 du 17.12.2007, page 1, voir page 256) (cette référence a été rappelée par MALFERRARI, précité, page 56, note de bas de page n° 43).

Cette solution est conforme au droit international public.

Cette conformité résulte de l'article 351 TFUE, qui dispose dans son paragraphe 1 que « [l]es droits et obligations résultant de conventions conclues antérieurement au 1er janvier 1958 [date d'entrée en vigueur du Traité instituant la Communauté économique européenne, devenu le TFUE] ou, pour les Etats adhérents, antérieurement à la date de leur adhésion, entre un ou plusieurs Etats membres, d'une part, et un ou plusieurs Etats tiers, d'autre part, ne sont pas affectés par les dispositions des traités ».

Cette disposition, « en sauvegardant uniquement les effets des traités avec des pays tiers en violation du droit européen, indique que, dans les matières couvertes par les traités UE, le droit européen prime les conventions conclues entre Etats membres, que ces dernières aient été conclues avant ou après l'adhésion à l'Union européenne des pays concernés »292. Ainsi, la Cour de justice rappelle dans l'arrêt Achmea « que, selon une jurisprudence constante de Cour, un accord international ne saurait porter atteinte à l'ordre des compétences fixé par les traités et, partant, à l'autonomie du système juridique de l'Union dont la Cour assure le respect »293.

Elle décide de façon constante que les dispositions de traités entre Etats membres « ne peuvent s'appliquer dans les relations entre ces Etats si elles se révèlent contraires au droit communautaire »294.

La primauté du droit de l'Union européenne s'étend donc aux traités internationaux conclus entre les Etats membres. D'une part, « les dispositions d'une convention conclue antérieurement à l'entrée en vigueur du traité [donc du Traité instituant la Communauté économique européenne, devenu le TFUE] ne peuvent être invoquées dans les rapports intracommunautaires »295. D'autre part, cette solution qui, au regard du libellé de l'article 351 TFUE, s'applique aux conventions conclues « antérieurement au 1er janvier 1958 [date d'entrée en vigueur du Traité instituant la



La jurisprudence francophone des Cours suprêmes

Il est à préciser à cet effet que, ainsi que la Cour de justice l'a constaté dans l'arrêt Achmea, le droit de l'Union européenne doit « être considéré à la fois comme faisant partie du droit en vigueur dans tout Etat membre et comme étant issu d'un accord international entre les Etats membres »296. Il ne saurait donc être argumenté « que les Etats membres ou l'Union européenne ne pourraient pas invoquer le droit européen contre le droit international sur la base de la considération que le premier serait du droit interne : le droit européen fait également partie du droit international »297.

Cette solution ne vaut, bien entendu, que dans les rapports entre les Etats membres et non dans ceux entre les Etats membres et des Etats tiers. L'article 351, paragraphe 1, TFUE « vise [en effet] à permettre aux Etats membres de respecter les droits que les Etats tiers tirent, 292 MALFERRARI, précité, page 55, deuxième alinéa et jurisprudence de la Cour de justice y citée à la note de bas de page n° 47.

293 Point 32 de l'arrêt précité Achmea.

294 Cour de justice de l'Union européenne, Grande chambre, 8 septembre 2009, Budějovický Budvar, C-478/07, ECLI:EU:C:2009:521, point 98 et la jurisprudence y citée.

295 Cour de justice de l'Union européenne, 22 octobre 2009, Bogiatzi, C-301/08, ECLI:EU:C:2009:649, point 19 et la jurisprudence y citée.

296 Point 41 de l'arrêt précité Achmea.

297 MALFERRARI, précité, page 56, dernier alinéa.

conformément au droit international, de [...] conventions antérieures [pour les Etats fondateurs, au 1er janvier 1958 ou pour les Etats adhérents, à la date de leur adhésion] »298.

Or, dans le cadre de l'affaire M), la Cour suprême du Royaume-Uni a jugé dans son arrêt du 19 février 2020 que l'obligation d'assurer l'exécution d'une sentence arbitrale rendue sur base de la Convention CIRDI est une obligation à charge de tous les Etats parties due à l'ensemble des Etats parties, y compris des Etats tiers299.

Cette thèse peut paraître discutable au regard des dispositions de la Convention CIRDI. En effet, « seul l'Etat de la nationalité d'un investisseur partie à un différend peut contester le fait que l'Etat contractant partie au litige ne se conforme pas à une sentence. Cette voie spécifique n'est pas ouverte aux autres Etats contractants. Il pourrait donc en être déduit que l'obligation d'exécution n'est due qu'à cet Etat membre, de sorte que la convention CIRDI ne crée pas dans le chef de tous les Etats contractants un droit à ce qu'une sentence soit exécutée, qui impliquerait, pour les Etats membres de l'Union, une obligation correspondant à ce droit »300. Il en suit que dans un cas comme celui de l'espèce, mettant exclusivement en rapport trois Etats membres, à savoir la Roumanie, Etat condamné par la sentence arbitrale rendue sur base du TBI auquel il est partie, la Suède, Etat lié par le TBI et dont un ressortissant – M. M) – s'est vu allouer une indemnité par la sentence arbitrale, et le Luxembourg, Etat dans lequel il a été demandé de reconnaître cette sentence, les droits d'Etats tiers ne sont, à première vue, pas « en cause »301, exception faite de l'intérêt, d'ordre tout à fait général et non circonstancié, de tout Etat partie à une convention de voir respecter celle-ci, qui, à l'admettre, aurait pour effet d'appliquer systématiquement l'article 351 TFUE à toute convention internationale à laquelle sont parties, outre des Etats membres de l'Union européenne, des Etats tiers302. Or, cet intérêt n'a pas été jugé suffisant par la Cour de justice de l'Union européenne pour justifier l'applicabilité de cet article303.

298 Cour de justice de l'Union européenne, 13 janvier 2022, Miur et Ufficio scolastico regionale de la Campania, C-282/19, ECLI:EU:C:2022:3, point 55.

299 Arrêt précité M) and others v. Romania [2020] UKSC 5 de la Cour suprême du Royaume-Uni 19 février 2020, point 107 : « Although these statements [citations tirées des travaux préparatoires de la Convention de Washington] were made in the context of compliance with awards, as opposed to recognition an enforcement, they are powerful



300 BERTRAND JEZEQUEL, précité, n° 96, pages 498-499. Il est à préciser que la Convention CIRDI autorise dans son article 27 les Etats contractants d'accorder la protection diplomatique ou de formuler une revendication internationale dans un seul cas de figure, à savoir en cas de différend entre l'un de leurs ressortissants et un autre Etat contractant qui a pour objet le défaut de respect par cet Etat d'une sentence rendue à l'occasion du différend.

Elle ne réserve donc pas un droit à des Etats contractants tiers d'élever des revendications au sujet du respect de sentences arbitrales ne concernant pas leurs ressortissants. L'article 64 se limite par ailleurs à évoquer sans autre précision que « [t]out différend qui pourrait surgir entre les Etats contractants quant à l'interprétation ou l'application de la présente Convention et qui ne serait pas résolu à l'amiable » est porté devant la Cour internationale de justice. La protection diplomatique est « l'action d'un gouvernement auprès d'un gouvernement étranger pour réclamer à l'égard de ses nationaux ou exceptionnellement, de certaines autres personnes, le respect du droit international ou pour obtenir certains avantages à leur profit » (CROISANT et TATON, précité, page 2, colonne de droite, premier alinéa, citant : J. BASDEVANT, Dictionnaire de la terminologie du droit international, Paris, Sirey, 1960, pages 485).

301 Critère rappelé par : Cour de justice de l'Union européenne, 22 septembre 1988, Ministère public c/ Deserbais, 286/86, ECLI:EU :C :1988 :434, point 18 ; idem, 6 avril 1995, RTE et ITP c/ Commission, C-241/91 P et C-242/91 P, ECLI:EU :C :1995 :98, point 84.

302 Argument pertinent qui a été soulevé par la Roumanie dans le cadre du recours ayant donné lieu à l'arrêt précité M) and others v Romania de la Cour suprême du Royaume-Uni (voir le point 102 de cet arrêt).

303 Voir l'arrêt précité RTE et ITP c/ Commission de la Cour de justice de l'Union européenne, dans lequel celle-

ci a constaté que les droits des Etats tiers à une convention multilatérale n'étaient, dans le cas d'espèce, pas en Toutefois, même à vouloir admettre la thèse exprimée par la Cour suprême du Royaume-Uni, donc à considérer que la reconnaissance et l'exécution de la sentence arbitrale dans le présent cas d'espèce, bien que ne concernant directement que des Etats membres, met également « en cause » des droits d'Etats tiers au regard de l'intérêt de tout Etat contractant, même non concerné par le cas d'espèce, de voir respecter la Convention, il reste que l'exception au principe de primauté du droit de l'Union européenne exprimée par l'article 351 TFUE est circonscrite aux seules « conventions conclues [s'agissant des Etats fondateurs, comme le Luxembourg304] antérieurement au 1er janvier 1958 [date d'entrée en vigueur du Traité instituant la Communauté économique européenne, devenu le TFUE] ». Or, la Convention CIRDI, qui a été adoptée le 18 mars 1965 et a été approuvée par le Luxembourg par une loi du 8 avril 1970305, donc postérieurement au 1er janvier 1958, ne constitue, au regard de sa postériorité par rapport à l'entrée en vigueur du Traité, pas une convention qui autoriserait le Luxembourg à se dispenser du respect du droit de l'Union européenne306. Cette prémisse, qui résulte du libellé de l'article 351 TFUE, a d'ailleurs été expressément acceptée par la Cour suprême du Royaume-Uni307.

Il n'existe donc en l'espèce aucun conflit entre le droit de l'Union européenne et la Convention CIRDI.

Si vous deviez néanmoins avoir des doutes sur ce point vous devriez, à l'instar de la Cour d'appel de Bruxelles, saisir la Cour de justice de l'Union européenne d'une question préjudicielle qui pourrait être libellée comme suit :

« Est-ce que les juridictions des Etats membres de l'Union saisies d'une demande de reconnaissance d'une sentence arbitrale prononcée par un tribunal arbitral sur base de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, conclue à Washington, le 18 mars 1965 (« la Convention CIRDI ») en exécution d'une clause d'arbitrage contenue dans un traité bilatéral d'investissement conclu entre deux Etats membres de l'Union autres que celui de la juridiction saisie, clause à laquelle, au regard de l'arrêt de la Cour de justice du 6 mars 2018, Achmea (C-284/16, ECLI:EU:C:2018:158), s'opposent les articles 267 et 344 du Traité sur le fonctionnement de l'Union européenne, telle la clause d'arbitrage contenue dans le traité bilatéral d'investissement, conclu le 29 mai 2002, entre le gouvernement du Royaume de Suède et le gouvernement roumain, au sujet de laquelle la Cour de justice a constaté dans son arrêt du 25 janvier 2022 Commission/European Food e.a. (C-638/19 P, ECLI:EU:C:2022:50) que l'arrêt Achmea lui était applicable (point 137 de l'arrêt) et qu'elle était, à compter de l'adhésion de la Roumanie à l'Union, dépourvue de tout objet (point 145 de l'arrêt.), sont, aux fins d'assurer le plein effet des



La jurisprudence francophone des Cours suprêmes

304 Le Luxembourg a approuvé le Traité instituant la Communauté économique européenne (devenu le TFUE) par une loi du 30 novembre 1957 (Mémorial, A, 1957, n° 69, page 1415).

305 Mémorial, A, 1970, n° 25, page 536.

306 Voir en ce sens : Mémoire en réponse de la Commission européenne, page 39, deuxième alinéa, premier tiret.

307 Arrêt précité M) and others v. Romania [2020] UKSC 5 de la Cour suprême du Royaume-Uni du 19 février 2020, point 97. La situation du Royaume-Uni se distingue de ce point de vue de celui du Luxembourg, le premier ayant adhéré à la Convention CIRDI avant d'adhérer au Traité (idem, point 59) tandis que le second n'a adhéré à la Convention qu'après avoir adhéré au Traité.

refuser la reconnaissance, tant bien même que les articles 53 et 54 de la Convention CIRDI obligent à reconnaître la sentence arbitrale sans autoriser un quelconque contrôle du respect de l'ordre public international ? Sur la façon de faire prévaloir le droit de l'Union européenne en l'espèce Il a été vu ci-avant que le principe de primauté du droit de l'Union européenne impose aux juridictions des Etats membres deux obligations complémentaires.

Celles-ci doivent au minimum tenter d'interpréter le droit interne d'une façon conforme au droit de l'Union européenne (principe d'interprétation conforme). Si cette méthode s'avère non pertinente, elles sont tenues de laisser inappliquée toute disposition contraire au droit de l'Union (jurisprudence Simmenthal).

Le défaut de pertinence en l'espèce du principe d'interprétation conforme La Convention CIRDI oblige les Etats contractants de reconnaître les sentences arbitrales adoptées dans son cadre sans réserver un quelconque pouvoir de révision. Son article 54 oblige le juge saisi d'une demande de reconnaissance d'une sentence arbitrale d'y faire droit sous la seule réserve de la présentation d'une copie de la sentence certifiée conforme par le Secrétaire général du CIRDI308. L'instance de reconnaissance ne laisse donc aucune place à une interprétation qui permettrait de refuser une demande à cette fin aux fins de se conformer aux exigences du droit de l'Union européenne.

La Cour d'appel a dans son raisonnement esquissé une voie qu'elle croyait être, le cas échéant, apte à réaliser une telle conciliation des intérêts contraires. Elle a, en effet, relevé que les griefs soulevés de la primauté du droit de l'Union européenne sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne et de la contrariété du TBI à ce droit « pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence »309.

Cette lecture se réfère à l'article 54, paragraphe 3, de la Convention CIRDI, qui dispose que « [l]'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder »310. Cet article est complété par l'article 55 de la Convention, qui dispose que « [a]ucune des dispositions de l'Article 54 ne peut être interprétée comme faisant exception au droit en vigueur dans un Etat contractant concernant l'immunité d'exécution dudit Etat ou d'un Etat étranger ». La lecture proposée repose sur la prémisse que si l'instance en reconnaissance n'autorise pas de refuser la reconnaissance de la sentence arbitrale pour des motifs tirés du respect du droit de l'Union européenne, de tels motifs pourraient être soulevés dans le cadre de procédures engendrées par l'exécution à Luxembourg de la sentence arbitrale y ayant été préalablement reconnue.

Or, il a été exposé ci-avant, sous « Finalité et domaine de l'immunité d'exécution dans le cadre de l'exécution des sentences du CIRDI », que la référence faite par les articles 54, paragraphe 3, et 55 de la Convention à la législation régissant l'exécution des jugements et à l'immunité 308 Article 54, paragraphe 2, de la Convention CIRDI.

309 Arrêt attaqué, page 11, dernier alinéa.

310 Idem, même page, deuxième alinéa, dans lequel cette disposition est citée.

d'exécution est à lire dans le contexte du paragraphe 1 de l'article 54, qui dispose que « [c]haque Etat contractant reconnaît toute sentence rendue dans le cadre de la présente Convention comme obligatoire et assure l'exécution sur son territoire des obligations pécuniaires que la sentence impose comme s'il s'agissait d'un jugement définitif d'un



La jurisprudence francophone des Cours suprêmes

Dans cette logique, les références, par l'article 54, paragraphe 3, au droit national relatif à l'exécution et, par l'article 55, à l'immunité d'exécution, ne sont pas à comprendre comme autorisant un refus d'exécution pour des motifs d'ordre public international, tel le respect du droit de l'Union européenne. Le renvoi par l'article 54, paragraphe 3, à « la législation concernant l'exécution des jugements » est à comprendre comme référence aux règles de nature procédurale régissant l'exécution des jugements311. Celle par l'article 55 à l'immunité d'exécution vise à d'éviter une exécution sur les biens utilisés à des fins souveraines312. En revanche, aucune de ces deux dispositions, considérées isolément et, à plus forte raison, en combinaison avec l'article 54, paragraphe 1, n'autorisent de refuser l'exécution d'une sentence arbitrale pour des motifs tirés du respect de l'ordre public international de l'Etat dans lequel l'exécution est poursuivie.

La lecture suggérée par la Cour d'appel, de reporter la question de la conformité de la sentence arbitrale au droit de l'Union européenne du stade de la reconnaissance à celui de l'exécution de la sentence et de sanctionner le non-respect de ce droit, non pas par un refus de reconnaissance, mais par un refus d'exécution de la sentence, n'est pas conciliable avec la Convention.

La primauté du droit de l'Union européenne ne saurait donc être assurée par une interprétation conforme de la Convention.

La mise en œuvre du principe de primauté par la voie esquissée par la jurisprudence Simmenthal La Convention CIRDI étant incompatible avec une interprétation conforme qui permettrait de la concilier avec les exigences contraires du droit de l'Union européenne, le juge national ne peut assurer le respect du principe de primauté de ce droit qu'en recourant aux moyens plus contraignants de la jurisprudence Simmenthal.

Ainsi qu'il a été vu ci-avant, cette dernière oblige le juge national, tenu de faire respecter le principe de primauté et qui n'est pas en mesure d'assurer ce respect par une interprétation confirme des normes à appliquer, de laisser de sa propre autorité inappliquées les dispositions qui s'opposent au droit de l'Union européenne.

La disposition qui est, en l'espèce, en conflit avec ce droit est l'article 54 de la Convention CIRDI, qui oblige le juge national de reconnaître les sentences arbitrales du CIRDI tout en lui 311 CIRDI, Sentence arbitrale Electrobel S.A. v. Hungary, précitée, point 3.50, partie III, page 21 (« The reference to the national laws of the enforcing State in Article 54(3), regarding execution of an ICSID award, is limited to laws of a procedural nature only, as established by its drafting history and content »).

312 DE BOECK, précité, n° 4, page 42 (« This distinction between "recognition" and "execution" serves to limit execution on stat assets used for public administration of the state (de iure imperii), but not to allow some form of review. »).

déniant tout pouvoir de refuser cette reconnaissance pour un quelconque motif tiré du respect de l'ordre public international, tel le non-respect du droit de l'Union européenne.

La jurisprudence Simmenthal oblige le juge national à laisser inappliquée toute disposition éventuellement contraire « de la loi nationale »313 et plus largement « de la législation nationale »314. La Convention CIRDI ne relève pas, au sens formel, de la législation nationale.

Elle constitue un traité international qui lie le Luxembourg parce que ce dernier l'a approuvée.

Elle fait cependant partie du droit applicable par le juge luxembourgeois, donc de ce point de vue du droit national au sens large. Il a par ailleurs été vu ci-avant que, dans la mesure où elle s'applique, comme en l'espèce, dans les rapports entre Etats membres, elle est soumise au principe de primauté du droit de l'Union européenne.

Considérée comme élément du droit applicable par le juge national, soumise à ce titre au principe de primauté du droit de l'Union européenne et étant, sur le point considéré, contraire à ce droit, elle paraît devoir être incluse parmi



La jurisprudence francophone des Cours suprêmes

et ayant par une question complémentaire, qui pourrait être libellée comme suit313 :

« Est-ce que les juridictions des Etats membres de l'Union saisies d'une demande de reconnaissance d'une sentence arbitrale prononcée par un tribunal arbitral sur base de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, conclue à Washington, le 18 mars 1965 (« la Convention CIRDI ») en exécution d'une clause d'arbitrage contenue dans un traité bilatéral d'investissement conclu entre deux Etats membres de l'Union autres que celui de la juridiction saisie, clause à laquelle, au regard de l'arrêt de la Cour de justice du 6 mars 2018, Achmea (C-284/16, ECLI:EU:C:2018:158), s'opposent les articles 267 et 344 du Traité sur le fonctionnement de l'Union européenne, telle la clause d'arbitrage contenue dans le traité bilatéral d'investissement, conclu le 29 mai 2002, entre le gouvernement du Royaume de Suède et le gouvernement roumain, au sujet de laquelle la Cour de justice a constaté dans son arrêt du 25 janvier 2022 Commission/European Food e.a. (C-638/19 P, ECLI:EU:C:2022:50) que l'arrêt Achmea lui était applicable (point 137 de l'arrêt) et qu'elle était, à compter de l'adhésion de la Roumanie à l'Union, dépourvue de tout objet (point 145 de l'arrêt.), sont, aux fins d'assurer le plein effet des dispositions du droit de l'Union, en droit de refuser la reconnaissance, tant bien même que les articles 53 et 54 de la Convention CIRDI obligent à reconnaître la sentence arbitrale sans autoriser un quelconque contrôle du respect de l'ordre public international et tant bien même que la Convention CIRDI ne constitue, du point de vue formel, pas une « loi nationale » telle que visée par l'arrêt Simmenthal de la Cour de justice du 9 mars 1978 (106/77, ECLI:EU:C:1978:49, point 21) ? 313 Point 21 de l'arrêt précité Simmenthal.

314 Point 247 de l'arrêt précité Asociatia « Forumul Judecatorilor Din Romana » e.a. (à titre d'illustration d'une jurisprudence constante).

315 La question supplémentaire suggérée est soulignée dans le texte ci-après.

Conclusion :

Le pourvoi est recevable.

Les moyens du pourvoi sont à rejeter.

Il y a lieu de relever d'office et de déclarer fondés les moyens d'ordre public suivants :

- le moyen d'office, d'ordre public, tiré de la violation des articles 267 et 344 du Traité sur le fonctionnement de l'Union européenne (TFUE) et du principe de droit international public de l'immunité de juridiction des Etats étrangers, en ce que la Cour d'appel, saisie de l'appel contre une ordonnance ayant fait droit à une demande de reconnaissance, sur base de l'article 54 de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, adoptée le 18 mars 1965 à Washington (la « Convention CIRDI »), de la sentence arbitrale n° ARB/05/20, rendue le 11 décembre 2013 par le Centre international pour le règlement des différends dans le cadre d'un litige entre, d'une part, différents investisseurs, dont M), et, d'autre part, la Roumanie, en exécution de la clause d'arbitrage prévue par l'article 7(5) du traité bilatéral d'investissement, conclu le 29 mai 2002, entre les Gouvernements de Suède et de Roumanie (« le TBI »), a écarté l'exception d'immunité de juridiction soulevée par la Roumanie aux motifs que « [a]u vu de la clause d'arbitrage, découlant de l'article 7(5) du TBI à laquelle l'ETAT de ROUMANIE a consenti, celui-ci est à considérer comme ayant expressément renoncé à son immunité de juridiction »316, tout en ayant été saisie des questions « de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne »317 et « de la contrariété entre le TBI et le droit de l'Union européenne »318, alors que, première branche, ainsi que la Cour de justice de l'Union européenne l'a dit pour droit dans son arrêt Achmea, du 6 mars 2018 (C-284/16, ECLI:EU:C:2018:158), les articles 267 et 344 TFUE s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence et que, ainsi que la Cour de justice de l'Union européenne l'a constaté dans son arrêt Commission c/ European Food e.a., du 25 janvier 2022 (C-638/19 P, ECLI:EU:C:2022:50), le consentement que la Roumanie avait donné à la possibilité qu'un litige avec des investisseurs soit porté contre elle dans le cadre de la clause d'arbitrage prévue par l'article 7(5) du TBI est, à



La jurisprudence francophone des Cours suprêmes

Cour d'appel a méconnu ces articles, et que, seconde branche, en 316 Arrêt attaqué, page 9, dernier alinéa.

317 Idem, page 11, dernier alinéa, deuxième tiret.

318 Idem, même page, même alinéa, troisième tiret.

déduisant la renonciation par la Roumanie à son immunité de juridiction du consentement donné par celle-ci à l'article 7(5) du TBI, tant bien même que, au regard des arrêts précités de la Cour de justice de l'Union européenne, ce consentement est contraire aux articles 267 et 344 TFUE et, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité Commission c/ European Food e.a., du 25 janvier 2022), la Cour d'appel a méconnu le principe de droit international public de l'immunité de juridiction des Etats étrangers, - à titre subsidiaire, le moyen d'office, d'ordre public, tiré de la violation du principe de primauté du droit de l'Union européenne, en l'occurrence des articles 267 et 344 TFUE, rappelé par la Déclaration 17 relative à la primauté annexée au Traité de Lisbonne modifiant le traité sur l'Union européenne et le traité instituant la Communauté européenne319, en ce que la Cour d'appel a confirmé une ordonnance ayant fait droit à une demande de reconnaissance, sur base de l'article 54 de la Convention CIRDI, de la sentence arbitrale n° ARB/05/20, rendue le 11 décembre 2013 par le Centre international pour le règlement des différends dans le cadre d'un litige entre, d'une part, différents investisseurs, dont M), et, d'autre part, la Roumanie, en exécution de la clause d'arbitrage prévue par l'article 7(5) du TBI, aux motifs que « [i]l résulte des articles 53 et 54 de la Convention de Washington que l'unique condition posée à l'obtention de l'exequatur d'une sentence arbitrale réside dans l'existence d'une sentence CIRDI »320 et que « [h]ormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI »321, de sorte que « les moyens de l'ETAT de ROUMANIE consistant à soulever la violation, du fait de l'exequatur, de certains articles du Nouveau code de procédure civile ne sont pas pertinents et ne seront pas analysés, à savoir la violation de : [...] 3) l'article 1251-2° du Nouveau code de procédure civile, plus précisément la violation de l'ordre public international résultant de la prétendue méconnaissance par la sentence du droit de l'Union européenne [...] »322, dont les questions « de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne »323 et « de la contrariété entre le TBI et le droit de l'Union européenne »324, alors que, suivant la jurisprudence constante de la Cour de justice de l'Union européenne, initiée par l'arrêt Simmenthal du 9 mars 1978 (106/77, EU:C:1978 :49, points 21-24), en vertu du principe de primauté du droit de l'Union européenne, le juge national chargé d'appliquer, dans le cadre de sa compétence, les dispositions du droit de l'Union a l'obligation d'assurer le plein effet de celles-ci en laissant au besoin inappliquée, de sa propre autorité, toute disposition contraire, sans qu'il ait à demander ou à attendre l'élimination préalable de celle-ci par voie législative ou par tout autre procédé constitutionnel, que la Cour d'appel était saisie d'un appel contre une ordonnance ayant fait droit à une demande de reconnaissance, sur base de l'article 54 de la Convention CIRDI, d'une sentence arbitrale rendue en exécution de la clause d'arbitrage, prévue par l'article 7(5) du TBI, contenue dans un accord international conclu entre les Etats membres, en l'occurrence entre la Suède et la Roumanie, aux termes de laquelle 319 Journal officiel de l'Union européenne, C 306 du 17.12.2007, page 1, voir page 256.

320 Idem, même page, premier alinéa.

321 Idem et loc.cit.

322 Idem, même page, troisième et sixième alinéa.

323 Idem, même page, dernier alinéa, deuxième tiret.

324 Idem, même page, même alinéa, troisième tiret.

un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence, que la Cour de justice de l'Union européenne a dit pour droit dans son arrêt Achmea, du 6 mars 2018 (C-284/16, ECLI:EU:C:2018:158) que les articles 267 et 344 TFUE s'opposent à une telle clause et qu'elle a constaté dans son arrêt Commission c/ European Food e.a., du 25 janvier 2022 (C-638/19 P,



La jurisprudence francophone des Cours suprêmes

de l'arrêt précité) parce qu'il est contraire aux articles 267 et 344 TFUE, que la Cour d'appel ayant eu l'obligation d'assurer le plein effet de ces articles aurait dû laisser inappliqué de sa propre autorité l'article 54 de la Convention CIRDI, qui s'applique en l'espèce dans les rapports entre Etats membres de l'Union européenne, à savoir entre la Roumanie, la Suède et le Luxembourg, et sert à exécuter une clause d'arbitrage qui est contraire au droit de l'Union européenne, et refuser, par réformation, la reconnaissance de la sentence arbitrale rendue en exécution d'une clause d'arbitrage contraire au droit de l'Union européenne et traduisant un consentement « dépourvu de tout objet », de sorte que, en omettant de ce faire elle a méconnu le principe de primauté du droit de l'Union européenne, en l'occurrence des articles 267 et 344 TFUE.

Sinon il y a lieu de saisir la Cour de justice de l'Union européenne sur base de l'article 267 TFUE de la question suivante :

« Est-ce que les juridictions des Etats membres de l'Union saisies d'une demande de reconnaissance d'une sentence arbitrale prononcée par un tribunal arbitral sur base de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, conclue à Washington, le 18 mars 1965 (« la Convention CIRDI ») en exécution d'une clause d'arbitrage contenue dans un traité bilatéral d'investissement conclu entre deux Etats membres de l'Union autres que celui de la juridiction saisie, clause à laquelle, au regard de l'arrêt de la Cour de justice du 6 mars 2018, Achmea (C-284/16, ECLI:EU:C:2018:158), s'opposent les articles 267 et 344 du Traité sur le fonctionnement de l'Union européenne, telle la clause d'arbitrage contenue dans le traité bilatéral d'investissement, conclu le 29 mai 2002, entre le gouvernement du Royaume de Suède et le gouvernement roumain, au sujet de laquelle la Cour de justice a constaté dans son arrêt du 25 janvier 2022 Commission/European Food e.a. (C-638/19 P, ECLI:EU:C:2022:50) que l'arrêt Achmea lui était applicable (point 137 de l'arrêt) et qu'elle était, à compter de l'adhésion de la Roumanie à l'Union, dépourvue de tout objet (point 145 de l'arrêt.), sont, aux fins d'assurer le plein effet des dispositions du droit de l'Union, en droit de refuser la reconnaissance, tant bien même que les articles 53 et 54 de la Convention CIRDI obligent à reconnaître la sentence arbitrale sans autoriser un quelconque contrôle du respect de l'ordre public international et tant bien même que la Convention CIRDI ne constitue, du point de vue formel, pas une « loi nationale » telle que visée par l'arrêt Simmenthal de la Cour de justice du 9 mars 1978 (106/77, ECLI:EU:C:1978:49, point 21) ? ».

Pour le Procureur général d'État Le Procureur général d'État adjoint John PETRY ANNEXE - Arrêt de Grande chambre de la Cour de justice de l'Union européenne Commission c/ European Food e.a., C-638/19 P, du 25 janvier 2022, ECLI:EU:C:2022:50.

## Source

Voir la source

## Origine de la décision

Pays : *Luxembourg*
Juridiction : *Cour de cassation*
Date de la décision : 14/07/2022
Date de l'import : 16/07/2022
Fonds documentaire ❓:



## Numérotation



La jurisprudence francophone des Cours suprêmes





Juricaf est un projet de l'AHJUCAF, l'association des Cours suprêmes judiciaires francophones. Il est soutenu par l'Organisation Internationale de la Francophonie.