# LIONBRIDGE

STATE OF NEW YORK    )
                     )
                     )    ss
COUNTY OF NEW YORK   )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Dutch into English of the attached Writ of Summons.

Laura Musich, Managing Editor
Lionbridge

Sworn to and subscribed before me

this _7th_ day of _January_, 20_23_.

ETHAN WIN LY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LY6323702
Qualified in New York County
My Commission Expires 04-27-2023

**<u>WRIT OF SUMMONS ALSO CONTAINING AN INCIDENTAL CLAIM PURSUANT TO ART. 223 DUTCH CODE OF CIVIL PROCEDURE</u>**

On this day, December twenty second, two thousand and twenty-two

**AT THE REQUEST OF:**

The **<u>KINGDOM OF SPAIN,</u>** herein represented by the Public Prosecutor, the Ministry of Justice of the Kingdom located at 5 Calle Ayala (28001) Madrid, Spain ("<u>Spain</u>"), and solely for the purpose for which this summons is issued, domiciled in Amsterdam at Claude Debussylaan 247 (1082 MC), at the offices of Simmons & Simmons LLP with current account with nationwide coverage number 88170281, from which office Mr. N. Peters is appointed attorney at law;

I, Bas de Veer, assigned bailiff at the offices of Jan Sebastiaan Evers, bailiff in Amsterdam and with offices there at Hogehilweg 4;

<u>SUMMONED:</u>

1.  the private company with limited liability **NEXTERA ENERGY GLOBAL HOLDINGS B.V.** ("<u>NextEra Global</u>"), having its registered office in Amsterdam and its principal place of business at Basisweg 10 (1043 AP), Amsterdam, delivering my writ there and leaving a copy of this summons to:

and

2.  the private company with limited liability **NEXTERA ENERGY SPAIN HOLDINGS B.V.** ("<u>NextEra Spain</u>"), having its registered office in Amsterdam and its principal place of business at Basisweg 10 (1043 AP), Amsterdam, there doing my writ of summons and leaving copies of this writ of summons and of the exhibits referred to therein, preceded by a summary thereof, to:    [stamp:]
    the above address in a closed envelope with reference to the legal provisions because I did not find anybody there to whom I could legally leave a copy.

<u>IN ORDER TO</u>:

On **<u>Wednesday, January 25, 2023</u>** at ten (10:00) a.m. not in person, but represented by an attorney, to appear at the public hearing of the District Court of Amsterdam, which hearing will be held in the courthouse at Parnassusweg 280 (1076 AV) Amsterdam;

## WITH THE NOTICE THAT:

if a defendant fails to appear on the first docketed hearing date or on a docketed hearing date to be defined more specifically by neglecting to appoint a lawyer, or fails to pay the court fee hereinafter referred to in a timely manner, and the prescribed time limits and formalities have been complied with, the court shall default against such defendant and shall grant the claim unless it deems it to be unlawful or unfounded;

if at least one of the defendants has appeared at the hearing, a single verdict will be rendered between all parties, which shall be considered a verdict after trial;

upon appearance in the proceedings, a court fee will be charged to each of the defendants, payable within four weeks from the time of appearing;

the amount of the court fees is listed in the most recent appendix belonging to the Civil Court Fees Act, which can be found on the website: www.kbvg.nl/griffierechtentabel, among others.

If the person is impecunious, a court fee for impecunious persons established by or under the law is levied, if at the time the court fee is levied such person has produced:

(1)     a copy of the decision to grant an addition, as referred to in Article 29 of the Legal Aid Act, or if this is not possible due to circumstances not reasonably attributable to him, a copy of the application, as referred to in Article 24(2) of the Legal Aid Act, or

(2)     a statement from the board of the Legal Aid Board, as referred to in Article 7, third paragraph, subsection e, of the Legal Aid Act, showing that his income does not exceed the income referred to in the order in council under Article 35, second paragraph, of that Act

of defendants who appear before the same attorney and make identical submissions or present identical defenses, a joint court fee is levied only once, based on Article 15 of the Civil Registration Fees Act;

## IN ORDER TO:

On behalf of the plaintiff claim and conclude as follows:

**TABLE OF CONTENTS**

1.    Introduction....................................................................................................5

PART I: FACTS AND CIRCUMSTANCES........................................................6

2.    Parties and the Spanish regulations to promote electricity Exhibit from renewable
energy sources. ..............................................................................................6

3.    ECT arbitration brought by NextEra .....................................................10

4.    The annulment procedure before the ad hoc Committee.....................11

5.    NextEra seeks to enforce the arbitration award in the United States. ...............11

PART III: LEGAL FRAMEWORK AND THE UNLAWFULNESS OF THE
        EXECUTION ....................................................................................12

6.    The concept of state aid. ......................................................................12

7.    Compensation as a substitute for unlawful state aid. ..........................13

8.    (Execution of) an arbitral award as an aid. ..........................................13

9.    Role of the national court......................................................................17

10.    Legitimate trust. ..................................................................................18

11.    Compensation to replace unlawful aid also constitutes unlawful aid..................19

12.    Application of the state aid legal framework to the case. ....................19

13.    Application of the state aid concept to (the enforcement of) the arbitral award...20

14.    Task of the national court ....................................................................22

15.    Conclusion regarding the state aid assessment .................................23

16.    Final comment regarding the state aid assessment............................23

17.    Articles 267 and 344 TFEU also preclude enforcement......................23

18.    Continuing the execution constitutes abuse of execution power.........................27

19.    The abuse of discretion justifies the immediate relief requested........................29

PART III: PROCEDURAL ASPECTS AND PETITUM.....................................29

20.    Spain's claims and the need for penalty payments. ............................29

21.    Cross-border injunction by way of injunction is indicated ...................30

22.    The defense and its rebuttal ................................................................30

23.    A judgment of condemnation must be declared provisionally enforceable..........31

24.    Authority ..........................................................................................31

25.    Offer of proof. ...................................................................................31

FOR THIS REASON......................................................................................31

1.    **Introduction**

1.1    Defendants sub 1 and 2, NextEra Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (collectively "NextEra") invested in the construction of two solar power plants in Spain during the period 2010-2013. In doing so, they intended to take advantage of a ruling of the Kingdom of Spain ("Spain") that provided for the necessary favorable financial conditions. That ruling constituted State aid within the meaning of Article 107(1) of the Treaty on the Functioning of the European Union (TFEU) and had not been notified in advance to the European Commission in accordance with Article 108(3) TFEU. As such, Spain's measure constituted unlawful aid. Spain was therefore not allowed under EU law to implement the regulations and consequently it was not allowed to pay the amount that NextEra believed it was entitled to. The regulations were amended and in 2017 the European Commission declared these amended regulations to be compatible with the internal market (approved) pursuant to Article 107(3) TFEU (**Exhibit 1**).[1]

1.2    NextEra thereupon commenced arbitration proceedings before the arbitral tribunal of the International Centre for Settlement of Investment Disputes ("ICSID"; the arbitral tribunal hereinafter referred to as the "ICSID Arbitral Tribunal") established under the International Energy Charter (hereinafter referred to by its usual English abbreviation as "ECT") seeking damages from Spain. The ICSID Arbitral Tribunal granted this claim. **(Exhibit 2).** An application to the so-called *ad hoc Committee* under the ICSID to set aside the arbitral tribunal's award was subsequently rejected **(Exhibit 3)**.

1.3    NextEra is now seeking authorization from the District Court for the District of Columbia to enforce the aforementioned arbitral award **(Exhibit 4)**. That authorization will allow NextEra to seizure under a warrant of execution on Spain's assets in the United States, or at least outside the European Union.

1.4    In doing so, NextEra seeks to circumvent the prohibition on the provision of state aid - which, as will be explained below, includes compensation in lieu of state aid. Through execution, funds charged to Spain will still benefit NextEra, which constitutes a grant of unlawful aid to NextEra. NextEra thus seeks to have Spain violate its obligations under the TFEU.

1.5    In addition, enforcement of the arbitral award is also contrary to Articles 267 and 344 TFEU. These articles preclude a provision in an international agreement concluded between two member states of the European Union under which an investor from one of these member states, in the event of a dispute about investments in the other member state, may initiate proceedings against the latter state before an arbitral tribunal and that member state has undertaken to accept its authority.[2] The ECT is such an agreement.

---

[1]    Decision of the European Commission of November 10, 2017, SA.40348 (2015/NN) - *Spain Support for electricity generation from renewable energy sources, cogeneration and waste.* https://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf.

[2]    ECJ March 6, 2018, Achmea, C-284/16, ECLI:EU:C:2018:158, par. 32. See also ECJ September 2, 2021, Komstroy, ECLI:EU:C:2021:655 and ECJ October 26, 2021, PL Holdings, ECLI:EU:C:2021:875

1.6    Continuing the execution in defiance of the foregoing constitutes an abuse of right, c.q. abuse of execution power.

1.7    Spain therefore claims to prohibit NextEra and companies associated with these companies from proceeding with the execution of the arbitral award. Spain also requests your Court, by way of an incidental claim, to grant injunctive relief for the duration of the proceedings on the merits,[3] to prevent NextEra from proceeding to execution in the interim, with all the possible irreversible consequences thereof.

1.8    For the sake of completeness, it should be noted that Spain is still pending similar proceedings in the Netherlands against two other companies, in connection with ECT arbitrations brought against it by those parties. The same is happening in other European jurisdictions (Germany and Luxembourg) where the same issues are involved.

1.9    Spain explains its claims below. In Part I, Spain sets out the facts and circumstances relevant to this case, and in Part II, it explains its claims and the legal framework in more detail. Finally, in Part III, Spain formulates its petition and discusses some issues of a procedural nature.

## PART I: FACTS AND CIRCUMSTANCES

**2.    Parties and the Spanish regulations to promote electricity production from renewable energy sources**

2.1    NextEra, during the period 2010-2013, through its subsidiary NextEra Energy España S.L.U. ("NextEra España"), which holds 100% of the shares of the Spain-based companies Planta Termosolar de Extremadura, S.L.U. ("PTE1"), Planta Termosolar de Extremadura 2, S.L.U. ("PTE2"), and NextEra Energy España Operating Services, S.L.U. ("NEEOS") invested in the construction of two concentrated solar power (CSP) plants, which plants are referred to as Termosol 1 and Termosol 2. These plants are owned by PTE1 and PTE2, respectively.

2.2    NextEra Global was founded on March 27, 2008. NextEra Spain was founded on May 7, 2008. Since 2011, NextEra Global has been 100% owned by the Dutch company NextEra Energy Global Holdings Cooperative U.A., which in turn is a subsidiary of NextEra Energy Inc, a U.S.-based company.

2.3    In 2007, Spain introduced a regulation to promote the production of electricity from renewable energy sources. It was regulated by Royal Decrees 661/2007, 1578/2008 and 6/2009 (the "2007 Regulation") and implemented EU Directive 2001/77/EC on renewable energy.[4] The 2007 Regulation was not notified to the European Commission or otherwise assessed by the European Commission under state aid rules, despite recital 12 of Directive 2001/77/EC, which states that *"Articles 87 and 88* [of the Treaty, now Articles 107 and 108 TFEU] *continue to apply to such state aid."*[5] That recital makes it clear that Member States remained obliged to notify their state

---

[3]    It did not seem appropriate to Spain - also in light of the complexity of the case - to submit the case for interlocutory proceedings.

[4]    Directive 2001/77/EC of the European Parliament and of the Council of September 27, 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market, OJ 2001, L283/33.

[5]    See margin number 11 of the European Commission Decision of July 19, 2021, SA.54155, attached as **Exhibit 5**).

aid regulations that they had adopted to convert that directive.

2.4    Under the 2007 regulation, renewable energy producers could choose between two eligibility options. The first option consisted of subsidizing the production of energy from renewable sources by receiving a fixed rate per kWh of energy produced (hereinafter: subsidy option), with the rate updated annually using the consumer price index. The second option consisted of selling the (generated) electricity on the market and then receiving a premium per kWh of electricity sold on top of the market price (premium option).[6]

2.5    Both the subsidy and the premium were calculated based on typical costs and revenues of standard renewable energy installations. In doing so, Spain estimated both the initial investment costs and the operating and maintenance costs of standard installations, as well as the market price.

2.6    The 2007 regulation was financed through net access tariffs imposed on electricity consumers and network users by Spanish Law 54/1997 and Spanish Royal Decree 2017/1997. In doing so, these tariffs were calculated in accordance with a methodology established by the Spanish government. In doing so, Spanish Royal Decree 2017/1997 designated the *Comisión Nacional de Energía* (the National Energy Commission) - an advisory public body included in the (Spanish) National Commission for Markets and Competition (hereinafter "NCMM") – to transfer the collected tariffs, through subsequent settlements, to the beneficiaries of the 2007 regulation. In doing so, the annexes of Royal Decree 2017/1997 defined the beneficiaries of the settlements, determined the applicable mathematical formulas, and regulated the settlement procedure itself, according to predetermined objective parameters.[7]

2.7    Furthermore, under the 2007 regulation, concentrated solar power plants were also entitled to the tariff/premium for fossil fuel/ natural gas generated electricity when used in conjunction with renewable energy sources to ensure stable production and supply, as long as the share of such electricity did not exceed 12% of total electricity produced in the case of the tariff and 15% of total electricity produced in the case of the premium.[8]

2.8    To obtain the aid under the 2007 regulation, potential beneficiaries had to apply to the Spanish Directorate General of Energy Policy and Mining. Those installations that met the eligibility criteria were entered in a pre-allocation register on a first-come, first-served basis. The installations in the register were thus allowed to receive the aid.[9]

---

[6]    See margin number 14 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

[7]    See margin numbers 19 through 21 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

[8]    See margin number 17 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

[9]    See margin number 18 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

2.9     NextEra and its subsidiaries began activities to realize the plants in 2007.

2.10    On May 14, 2009, PTE 1 and PTE 2 requested registration of the first Termosol plant ("Termosol 1") and the second Termosol plant ("Termosol 2"), respectively, in the pre-allocation register.

2.11    In November 2009, Spain established a prioritization of the projects or installations submitted to the Administrative Register for pre-allocation of payment. This prioritization had 4 phases. The prioritization established annual restrictions regarding the start-up and commissioning of the installations registered in the pre-allocation register, so that the installations could not start supplying energy through the distribution or transmission grid before certain dates.

2.12    On December 11, 2009, the Termosol plants were enrolled in the pre-allocation register and assigned to phase 3 of a prioritization schedule.

2.13    On December 16, 2009, PTE1 and PTE2 entered into Engineering, Procurement Support and Construction Support Services Agreements with Sener Ingeniería y Sistemas S.A. ("Sener").

2.14    On December 22, 2009, both PTEs submitted a request to the Spanish Directorate General of Energy Policy and Mines to postpone their construction deadlines for Termosol 1 and Termosol 2, moving instead to Phase 4 prioritization.

2.15    On February 18, 2010, the Spanish Directorate General of Energy Policy and Mines decided to approve the application to transfer the Termosol plants to Phase 4. As a result, the Termosol plants were required to obtain permanent registration in the appropriate register by December 31, 2013.

2.16    On December 2, 2010, PTE1 and PTE2 notified that they were waiving the commissioning dates of Termosol 1 (January 1, 2013) and Termosol 2 (March 15, 2013), which had been set pursuant to the decision of the Spanish Directorate General of Energy Policy and Mines, and requested that the Directorate General communicate the compensation conditions for the operational life of the plant.

2.17    On December 28, 2010, in response to that request, the Directorate General communicated to PTE1 and PTE2 the tariffs, premiums and upper and lower limits and additional provisions applicable to the facilities under the provisions of the fifth transitional provision of RDL 6/2009, as established in Royal Decree 661/2007.

2.18    On April 28, 2011, PTE1 and PTE2 entered into loan agreements to finance the construction of the Termosol plants. The plants were completed in 2013. Termosol 1 received final registration in the RAIPRE on May 29, 2013, whereas Termosol 2 received that registration on June 7, 2013.

2.19    Starting in 2012, Spain introduced several pieces of legislation that modified the 2007 regime, but retained the essential features of that original regime.

2.20    First, Law no. 15/2012 eliminated compensation for electricity generated with natural gas. Then, Law 2/2013 of February 1, 2013, among other things, abolished the

mechanism for the abolished adjustment of feed-in tariffs to the consumer price index and replaced it with a lower index.[10]

2.21    The 2013 regulation provides support for renewable energy installations, among other things.

2.22    Two types of facilities are eligible under the 2013 regulation:

    (A)    Facilities receiving support under this new scheme following the entry into force of Royal Decree 413/2014 on June 11, 2014 ("new facilities"); and

    (B)    Facilities that were already entitled to or already receiving aid from the 2007 scheme when Decree-Law 9/2013 entered into force on July 14, 2013 ("existing Facilities").[11]

2.23    The new 2013 arrangement resulted in an aid adapted to the new features of the regulation.

2.24    The European Commission approved the 2013 regulations as compatible with the internal market by decision of November 10, 2017 (see Exhibit 1).

2.25    All facilities that originally benefited from the 2007 regulation were automatically enrolled in the 2013 regulation. In assessing the compatibility of the regulation, the Commission took into account the sum of payments made to existing facilities under the 2007 and 2013 regulations to verify that there was no overcompensation.[12]

2.26    The European Commission assessed the proportionality of the aid granted to existing facilities in accordance with paragraph 131(a) of the Environmental Aid Guidelines on the basis of the cash-flow calculations of 21 standard facilities. These included revenues from past sales (including those resulting from the 2007 regulations for existing facilities), expected future revenues from sales, initial investment costs, operating costs and the compensation to be granted to each facility for both operation and investment. For all examples provided, the Commission verified that the aid did not exceed what would be necessary to recover the initial investment costs and relevant operating costs, plus a margin of reasonable return based on past and projected costs and market prices. The Commission's 2017 decision concluded that these rates of return were in line with those applicable to similar measures approved by the Commission and did not lead to overcompensation.[13]

---

[10]    See margin number 24 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

[11]    See margin number 28 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

[12]    See margin number 34 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

[13]    See margin number 35 of the European Commission Decision of July 19, 2021, SA.54155, attached as Exhibit 5.

2.27    NextEra claims to have been damaged by the changes to the 2007 regulations, leading to lower aid amounts.

## 3.    The ECT arbitration brought by NextEra

3.1    Then NextEra based on the ECT, which was ratified by the Netherlands and Spain and entered into force for both countries, and the ICSID Convention, issued a request for arbitration to ICSID, which was received by ICSID on May 15, 2014.[14]

3.2    Spain filed a defense, denying the jurisdiction of the ICSID arbitral tribunal.

3.3    The ICSID Arbitral Tribunal issued its *Decision on Jurisdiction, Liability and Principles of Quantum* (ARB/14/11) on March 12, 2019. In it, it held (among other things) that:

   (A)    the ICSID arbitral tribunal had jurisdiction to hear the dispute;

   (B)    Spain failed to comply with its obligation under Article 10(1) ECT to ensure fair and equitable treatment in that it did not protect the legitimate expectations of the Plaintiffs; and

   (C)    That plaintiffs (NextEra) are entitled to damages.

3.4    On May 31, 2019, the ICSID Arbitral Tribunal issued its Final Award. In this final arbitral award, Spain was ordered to pay:

   (A)    an amount of EUR 290.6 million in connection with its violation of Article 10(1) ECT, on which amount interest is payable as of June 30, 2016 (at a rate of 0.234%);

   (B)    an amount of USD 132,368.86 in costs of the arbitration to be increased by interest from the date of the final arbitral award; and

   (C)    an amount of USD 4,147,031.81 + EUR 1,042,135.30, representing one-third of NextEra's legal costs in the arbitration, plus interest from the date of the final arbitral award.

3.5    Thus, the arbitral award results in a payment obligation from Spain to NextEra of currently more than EUR 295 million.

3.6    Spain notified the ICSID Arbitral Tribunal's award in respect of NextEra as aid to the European Commission. The European Commission acknowledged receipt of the notification on March 11, 2020 and registered it under number SA.56676. The European Commission has not yet taken a decision regarding the notified aid.

---

14    Marginal number 6 of the Decision on Jurisdiction, Liability and Principles of Quantum dated March 12, 2019 (ARB/14/11), attached as **Exhibit 6**.

4.    **The annulment proceedings with the *ad hoc* Committee**

4.1    Spain filed an appeal for annulment of the May 31, 2019 arbitral award on September 26, 2019. An annulment procedure before the *Ad Hoc Committee* has a very reticent review framework with a number of exhaustive grounds for annulment laid down in Article 52 (1) of the Convention. Furthermore, it is settled case law under the ICSID that:

> *(1) the grounds listed in Article 52(1) are the only grounds on which an award may be annulled; (2) annulment is an exceptional and narrowly circumscribed remedy and the role of an ad hoc Committee is limited; (3) ad hoc Committees are not courts of appeal, annulment is not a remedy against an incorrect decision, and an ad hoc Committee cannot substitute the Tribunal's determination on the merits for its own; (4) ad hoc Committees should exercise their discretion not to defeat the object and purpose of the remedy or erode the binding force and finality of awards; (5) Article 52 should be interpreted in accordance with its object and purpose, neither narrowly nor broadly; (....)"*[15]

4.2    In its Decision on Annulment of March 18, 2022, the *ad hoc Committee* rejected the appeal for annulment.[16] It did so in the restrained manner customary for the *ad hoc Committee* and held, inter alia, that the ICSID Arbitral Tribunal had not gone beyond its mandate.

5.    **NextEra seeks enforcement of the arbitration award in the United States**

5.1    NextEra filed an action in the District Court for the District of Columbia ("District Court") on June 3, 2019, by which NextEra asks the District Court (i) to enter an order recognizing and affirming the arbitration award and damages awarded by the ICSID Arbitral Tribunal, and (ii) to enter an award in favor of NextEra in the amount of damages awarded by the ICSID Arbitral Tribunal.[17]

5.2    On October 11, 2019, Spain filed a motion to dismiss, or at least staying NextEra's June 3, 2019 request with the District Court and asked the District Court to schedule a hearing.

5.3    On September 30, 2020, the District Court granted Spain's motion to staying the proceedings.[18]

5.4    Following rejection of the appeal to set aside the arbitral award by the *Ad Hoc Committee* on March 18*,* 2022, Spain filed a renewed motion to dismiss NextEra's June 3, 2019 request with the District Court on May 2, 2022.[19]

---

[15]    On this subject, see the ICSID Updated Background Paper on Annulment for the Administrative Council of ICSID from May 2016, para. 74, that can be accessed at https://icsid.worldbank.org/sites/default/files/publications/Background%20Paper%20on%20Annulment%20April%202016%20ENG.pdf.

[16]    *Decision on Annulment* of the ICSID *ad hoc Committee* of March 18, 2022, in the ICSID case with Case No. ARB/14/11, attached as Exhibit 3.

[17]    Nextera claim dated June 3, 2019 in District Court, attached as Exhibit 4.

[18]    Order dated September 30, 2020 from District Court, attached as **Exhibit 7.**

[19]    Motion of Spain dated May 2, 2022 in District Court, attached as **Exhibit 8a**. The accompanying Memorandum of Law in Support of Spain's Motion of May 2, 2022 is attached as **Exhibit 8b.**

5.5    Spain subsequently filed a statement of reply in support of the renewed motion to dismiss NextEra's June 3, 2019 request with the District Court on June 29, 2022.[20]

5.6    The District Court has not yet issued a final judgment.

## PART III: LEGAL FRAMEWORK AND THE ILLEGALITY OF IMPLEMENTATION

## 6.    The concept of state aid

6.1    The concept of state aid is an objective and legal concept directly defined in Article 107(1) TFEU.[21] Article 107(1), TFEU states:

> *"Save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favoring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market."*

6.2    This provision shows that an aid measure exists if the following criteria are met:

(A)    by the government with public funds;

(B)    to an enterprise;

(C)    provides a selective, non-market advantage;

(D)    By which competition is distorted; and

(E)    interstate commerce can be affected.

6.3    A national measure that meets all the above criteria qualifies as an aid measure within the meaning of Article 107(1) TFEU.

6.4    Article 108(3) TFEU states:

> *"The Commission shall be informed, in sufficient time to enable it to submit its comments, of any plans to grant or alter aid. If it deems that any such plan is not compatible with the internal market having regard to Article 107, it shall without delay initiate the procedure provided for in the preceding paragraph. The Member State concerned shall not put its proposed measures into effect until that procedure has resulted in a final decision."*

6.5    This article section introduces prior control of support measures by the European Commission: every (new) support measure must be notified to the Commission

---

[20]    Memorandum of Reply Spain dated June 29, 2022 to District Court, attached as **Exhibit 9.**
[21]    Court of Justice judgment of December 22, 2008, British Aggregates v. Commission, C-487/06 P, ECLI:EU:C:2008:757, point 111; Court of Justice judgment of May 16, 2000, France v. Ladbroke Racing and Commission, C-83/98, ECLI:EU:C:2000:248, point 25.

beforehand (notification obligation) and cannot be implemented until the Commission has declared the aid compatible (*standstill* obligation).[22]

6.6    An aid measure introduced (implemented) in violation of Article 108(3) TFEU without a prior positive decision of the European Commission constitutes unlawful aid.[23]

6.7    Similarly, if, after investigation, the European Commission does not or does not timely notify aid – therefore illegal aid – as compatible, that does not change the illegality of the aid granted in breach of the notification and standstill obligations. The Court of Justice ruled in this regard:

> "The Commission's final decision does not have the effect of retrospectively covering the invalidity of implementing measures adopted in breach of the prohibition laid down in that provision. Any other interpretation would facilitate the infringement by the Member State concerned of the last sentence of Article 88(3) EC [now Article 107(3) TFEU] and deprive that provision of its useful effect."[24]

## 7.    Compensation as replacement of unlawful state aid

7.1    While companies may apply to national courts to order the payment of damages to which they believe they are entitled, such claims cannot have the effect of circumventing the effective application of the Union's state aid rules.[25]

7.2    In particular, companies that may be entitled under national law to receive aid that has not been notified to and approved by the Commission, but have not received such aid, cannot claim compensation for the amount equal to the amount of aid that has not been received, as this would constitute an indirect award of unlawful aid.[26]

## 8.    (Execution of) an arbitral award as a support measure

8.1    From the judgment of the Court of Justice in the Micula case[27] (hereinafter: Micula judgment) it is clear that the European Commission has jurisdiction to examine whether an award of an arbitral tribunal established under the ICSID Convention by which that tribunal awarded damages to a number of companies constitutes State aid

---

[22]    Unless there is an exception to the notification obligation under a block exemption such as the General Block Exemption Regulation (EU) 651/2014. No exceptions to the notification obligation apply in this case.

[23]    See Article 1(f), Council Regulation (EU) 2015/1589 of July 13, 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union, OJ 2015, L248/9.

[24]    ECJ February 12, 2008, CELF, C-199/06, ECLI:EU:C:2008:79, point 40.

[25]    ECJ June 29 2004, Commission v. Council, C-110/02, ECLI:EU:C:2004:395, point 43; ECJ July 18, 2007, Lucchini, C-119/05, ECLI:EU:C:2007:434, points 59-63; ECJ November 11, 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, points 42-44.

[26]    ECJ November 11, 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, points 42-44. See also Commission Decision April 16, 2004, State aid N 304/2003 – The Netherlands, Aid in favor of Akzo Nobel to reduce the transport of chlorine, marginal 18 and footnote 10. See also Conclusion of Attorney General Ruiz-Jarabo Colomer of April 28, 2005 in Atzeni and Others, C-346/03 and C-529/03, ECLI:EU:C:2005:256, par. 198.

[27]    ECJ January 25, 2022, C-638/19 P, Commission v. European Food and Others, ECLI:EU:C:2022:50.

within the meaning of Article 107(1) TFEU. This entails that given the role of the national court in state aid control, the national court is also empowered to give a judgment on whether such an arbitral tribunal award constitutes state aid within the meaning of Article 107(1) TFEU, and is further obliged to take the necessary measures to ensure compliance with Article 108(3) TFEU.

8.2    The background to the Micula ruling is as follows.

8.3    ICSID Convention, entered into force for Romania on October 12, 1975. By 2022, Sweden and Romania had concluded a Bilateral Investment Treaty (BIT) for the promotion and mutual protection of investments (hereinafter BIT). Article 2(3) of this BIT provides that each contracting party shall at all times ensure fair and equitable treatment of the investments of investors of the other contracting party. The BIT further provides that disputes between investors and contracting countries shall be settled by an arbitral tribunal applying the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (hereinafter: ICSID Convention).[28]

8.4    In 2005, as part of the negotiations for Romania's accession to the European Union, the Romanian government abolished a national incentive regulation that favored certain investors in disadvantaged regions (hereinafter: tax incentive regulation). Several Swedish investors had made investments in a particular region in Romania under that tax incentive regulation. These investors considered that by abolishing the tax incentive regulation, Romania had not fulfilled its obligation to treat the investments they had made fairly and equitably according to the BIT. Accordingly, they requested the establishment of an arbitral tribunal to compensate them for the damages they had suffered due to the abolition of the tax incentive regulation.

8.5    By an arbitral award dated December 11, 2013, this Arbitral Tribunal found that, by abolishing the tax incentive regulation in question, Romania had betrayed the legitimate expectations of the applicants in arbitration, had failed to act transparently by not informing those applicants in a timely manner, and had failed to ensure fair and equitable treatment of those applicants' investments within the meaning of Article 2(3) BIT. The arbitral tribunal therefore ordered Romania to pay the applicants in arbitration damages of approximately €178 million.

8.6    The European Commission then warned Romania that any implementation or execution of the arbitration award would be considered new state aid and had to be notified to the Commission. Romania. The Commission then issued a decision in 2014 ordering Romania to immediately suspend any measure that might lead to the implementation or execution of the arbitral award, as such a measure would amount to unlawful state aid, until the Commission issued a final decision on the compatibility of this measure. Romania nevertheless paid the compensation awarded by the arbitral tribunal to the Swedish investors. By decision of March 30, 2015,[29] the Commission classified the payment of that compensation as state aid within the meaning of Article

---

[28]    The ICSID Convention had entered into force for Romania in 1975, see point 3 Micula judgment.

[29]    Commission Decision (EU) 2015/1470 of March 30, 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral Award Micula v. Romania of December 11, 2013, *Pb.* 2015, L 232/4.

107 TFEU, which was incompatible with the internal market, prohibited its implementation and ordered the recovery of amounts already paid.

8.7    That Commission decision was the subject of several requests for annulment before the General Court of the European Union ("General Court"). The General Court annulled the Commission's decision, in particular because the Commission had applied its powers under the state aid rules retroactively to facts dating to before Romania's accession to the Union on January 1, 2007. In fact, the General Court assumed that the aid in question was granted by Romania on the date the tax incentive regulation was abolished, i.e. in 2005, and not on the date of the arbitral award.

8.8    An important question in this judgment is whether, in the event that damages are awarded by an arbitral award due to the abolition of an incentive (tax) regulation that is in breach of a BIT, State aid within the meaning of Article 107(1) TFEU is granted on the date on which those damages are actually paid in execution of that award because the right to damages definitively arises on the date on which that award of the arbitral tribunal becomes enforceable, or on the date of the abolition of the regulation. In the Micula judgment, the Court reminds that the decisive criterion for determining the time at which State aid is granted is the moment at which the beneficiary of a given measure acquires a firm claim to the aid and the State accordingly undertakes to grant the aid. At that moment, in the Court's view, such a measure may lead to a distortion of competition capable of affecting trade between Member States within the meaning of Article 107(1) TFEU. It was then found that the right to compensation for the loss allegedly suffered by the applicants in arbitration because of the alleged abolition of the (tax) incentive regulation in question, in violation of the BIT, was not granted until the arbitral award. Indeed, only at the end of the arbitration proceedings initiated for that purpose pursuant to the arbitration clause of Article 7 BIT were the applicants in arbitration able to obtain actual payment of such damages. The Court of Justice emphasized that even if the alleged abolition of the (tax) incentive regulation realized in violation of the BIT constituted the damaging event, the right to the compensation in question was granted exclusively by the arbitral award, which, after granting the claim brought by the applicants in arbitration, not only established the existence of this right but also quantified its amount. The Commission was therefore competent to adopt the decision of March 30, 2015 on the basis of Article 108 TFEU.[30]

8.9    This means that an award of an arbitral tribunal ordering a Member State to pay compensation to a company operating in the European Union is subject to State aid control under Articles 107 and 108 TFEU. It has already been explained above that compensation for damages replacing unlawful or incompatible state aid also itself constitutes state aid within the meaning of Article 107(1) TFEU. See chapter 7 above. This also applies if such compensation is awarded by an arbitral tribunal, because even then compensation replaces unlawful or incompatible aid. See also paragraph 77 of the European Commission's Antin decision and paragraphs 100-108 of the European Commission's Micula decision. In both cases, the European Commission ruled that the payment of damages awarded by the arbitral tribunal, through the execution or enforcement of the award, created an advantage for the applicants in arbitration that they would not have been able to obtain under normal market

---

[30]    Paragraph 126 Micula judgment.

conditions, and constitutes State aid because the other conditions of Article 107(1) TFEU are met. This is not altered by the fact that the arbitral tribunal was established under international law.

8.10    It is relevant here that, according to case law of the Court of Justice, an international agreement may not infringe on the system of jurisdiction established by the Treaties and therefore on the autonomy of the legal system of the European Union, the respect of which the Court of Justice ensures, see Achmea judgment para. 32.[31] In that judgment, the Court of Justice ruled that Articles 267 and 344 TFEU preclude a provision in an international agreement concluded between two Member States of the European Union under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter State before an arbitral tribunal and that Member State has undertaken to accept its jurisdiction.[32] By concluding such an agreement, the Member States which are parties to it withdraw from the jurisdiction of their own courts any disputes which may concern the application or interpretation of Union law, such as the rules on State aid, and consequently from the system of remedies which they are required to provide under the second subparagraph of Article 19(1) TEU in the areas covered by that law. Such an international agreement may therefore have the effect of preventing these disputes from being settled in a manner that ensures the full effect of that law.[33] An arbitration clause is therefore incompatible with the principle of loyal cooperation laid down in the first subparagraph of Article 4(3) TEU and negatively affects the autonomy of Union law.[34] This means that an arbitration clause cannot be applied and, in any event, Union law cannot be overruled by an award of the arbitral tribunal. State aid rules therefore remain applicable in the event the arbitral tribunal orders a Member State of the European Union to pay damages.

8.11    In the PL Holdings judgment the Court of Justice further added: "If a Member State which is a party to a dispute which may concern the application and interpretation of European Union law is permitted to submit that dispute to an arbitration body with the same characteristics as the body referred to in an invalid arbitration clause in an international agreement as referred to in point 44 of this judgment, and namely by concluding an ad hoc arbitration agreement the content of which corresponds to that clause, this would in fact have the effect of circumventing the obligations arising for that Member State from the Treaties and, more specifically, from Article 4(3) TEU and Articles 267 and 344 TFEU, as interpreted in the judgment of March 6, 2018, Achmea (C-284/16, EU:C:2018:158)."[35] In that case, the Court of Justice held that Articles 267 and 344 TFEU preclude national legislation allowing a Member State to conclude with an investor from another Member State an ad hoc arbitration agreement allowing the continuation of an arbitration procedure initiated on the basis of an arbitration clause identical in substance to that agreement, included in an international agreement concluded between those two Member States and null and void for being contrary to those articles. In short, it is obvious that circumvention of EU law is not permitted.

---

[31]    ECJ March 6, 2018, Achmea, C-284/16, ECLI:EU:C:2018:158, point 32.

[32]    *Ibid.,* p. 60.

[33]    ECJ February 27, 2018, Associação Sindical dos Juízes Portugueses, C-64/16, ECLI:EU:C:2018:117, point 34; ECJ October 26, 2021, PL Holdings, C-109/20, ECLI:EU:C:2021:875, point 45.

[34]    ECJ October 26, 2021, PL Holdings C-109/20, ECLI:EU:C:2021:875, point 46.

[35]    ECJ October 26, 2021, PL Holdings C-109/20, ECLI:EU:C:2021:875, point 47.

**9.     Role of the national court**

9.1     It follows from the foregoing that Article 108(3) TFEU introduced preventive monitoring of proposed new aid measures. The purpose of this preventive monitoring is to ensure that only aid measures that have been declared compatible with the internal market are put into effect.[36]

9.2     In order to achieve this objective, the implementation of a proposed aid measure must be suspended until the European Commission has ruled by way of a final decision on the compatibility of the aid measure (the *standstill* obligation).[37]

9.3     The task of the national courts rests on the direct effect of the prohibition on the implementation of planned aid measures introduced by Article 108(3) TFEU. The direct effect of this prohibition extends to any aid measure implemented without notification.[38]

9.4     The national court should ensure that, in accordance with national law, all the consequences will be drawn from a breach of the obligation to notify and the *standstill* direction referred to in the last sentence of Article 108(3) TFEU, both as regards the validity of the implementing acts and as regards the recovery of the financial support granted in violation of that provision or any provisional measures.[39]

9.5     In this context, the Court confirmed by way of a preliminary ruling (because in the Court of Justice's view the answer to the questions raised was already apparent from previous judgments delivered by the Court of Justice), that European Union law, in particular Articles 267 and 344 TFEU, must be interpreted as meaning that a court of a Member State having to rule on the enforcement of the arbitral award which was the subject of *Commission Decision (EU) 2015/1470 of March 30, 2015 on State aid* SA.38517 *(2014/C) (ex 2014/NN) enforced by Romania - Arbitral award in Micula v. Romania of December 11, 2013,* should set aside arbitral award and the award cannot in any event be enforced to enable its beneficiaries to obtain payment of the compensation awarded to them.[40]

9.6     Spain also points out that in order to ensure compliance with Article 108(3) TFEU, it is not necessary for the Commission to have found by decision that an aid measure is unlawful. The Eesti Pagar judgment of the Court of Justice shows that even when a Member State (or a judge of that Member State) finds that a measure constitutes an aid measure and has not been notified to the European Commission unlawfully, even in the absence of a decision of the European Commission, the Member State and all

---

[36]     ECJ March 3, 2020, C-75/18, Vodafone Magyarország Mobil Tǎvközlési Zrt., C-75/18, ECLI:EU:C:2020:139, point 19.

[37]     ECJ November 21, 2013, Deutsche Lufthansa, C-284/12, EU:C:2013:755, paragraphs 25 and 26, and ECJ March 5, 2019, Eesti Pagar, C-349/17, ECLI:EU:C:2019:172, point 84).

[38]     ECJ November 21, 2013, Deutsche Lufthansa, C-284/12, ECLI:EU:C:2013:755, point 29, and ECJ March 5, 2019, Eesti Pagar, C-349/17, EU:C:2019:172, point 88.

[39]     ECJ November 21, 2013, Deutsche Lufthansa, C-284/12, ECLI:EU:C:2013:755, point 30, and ECJ March 5, 2019, Eesti Pagar, C-349/17, EU:C:2019:172, point 89.

[40]     September 21, 2022, Romatsa, C-333/19, ECLI:EU:C:2022:749, dictum. The decision is only available in French and is attached as **Exhibit 10a**. An unofficial Dutch translation, made with Deepl and for the reader's convenience, is attached as **Exhibit 10b**.

its organs must take the necessary measures to prevent unlawful aid from being granted or disbursed.[41]

10. **Legitimate trust**

10.1 It is settled case-law of the Court of Justice that, in view of the fundamental role of the notification obligation under Article 108(3) TFEU for the effectiveness of the Commission's compulsory supervision of State aid, beneficiary undertakings cannot have a legitimate expectation as to the lawfulness of an aid measure unless it has been granted in compliance with the notification procedure under Article 108(3) TFEU.[42]

10.2 According to the Court, a prudent businessman should normally be able to ascertain whether the notification procedure has been complied with.[43] If the undertaking has not ascertained this, it is in principle not entitled to rely on legitimate expectations.

10.3 In particular, if aid has been granted that was not previously notified to the Commission, so that it is unlawful under Article 108(3) TFEU, the aid recipient cannot have a legitimate expectation of the lawfulness of the grant of aid at that time except in exceptional circumstances.[44]

10.4 The Court pointed out that Articles 107 and 108 TFEU would lose any useful effect if a Member State whose authorities granted aid in violation of the procedural rules of Article 109 could rely on the legitimate expectations of the recipients of the aid in order to evade its obligation to take the necessary measures to implement a decision by which the Commission orders it to recover or withhold aid.[45]

10.5 It is also settled case law that in order to rely on legitimate expectations in the case of unlawful aid, three conditions must be met. First, the person concerned must have received from the administration precise, unconditional and concordant assurances from *authorised* and reliable sources. Second, these commitments must be capable of creating legitimate expectations on the part of the person to whom they are addressed. Third, the assurances must comply with applicable regulations.[46]

---

[41]    ECJ March 5, 2019, Eesti Pagar, C-349/17, ECLI:EU:C:2019:172, point 91.

[42]    See in this respect: ECJ November 24, 1987, RSV/Commission, 223/85, ECLI:EU:C:1987:502, points 16 and 17; ECJ September 20, 1990, Commission/Germany, C-5/89, EU:C:1990:320, points 14 and 16; ECJ June 13, 2013, HGA and others/Commission, C-630/11 P-C-633/11 P, ECLI:EU:C:2013:387, paragraph 134; ECJ January 27, 1998, Ladbroke Racing/Commission, T-67/94, EU:T:1998:7, point 182; Court October 16, 2014, Alcoa Trasformazioni/Commission, T-177/10, ECLI:EU:T:2014:897, point 61, and Court April 22, 2016, Ireland and Aughinish Alumina v. Commission, T-50/06 RENV II and T-69/06 RENV II, EU:T:2016:227, point 214.

[43]    See, inter alia, ECJ September 20, 1990, Commission/Germany, C-5/89, EU:C:1990:32 point 14.

[44]    ECJ September 20, 1990, Commission/Germany, C-5/89, Eu:C:1990:320, points 14 and 16.

[45]    ECJ September 20, 1990, Commission/Germany, C-5/89, EU:C:1990:320, point 17.

[46]    See, for example: General Court November 15, 2018, Deutsche Telekom, T-207/10, ECLI:EU:T:2018:786, point 46.

10.6    The Court of Justice clarified that national authorities do not count as a competent authority in this context, but that the trust must have been generated by European Union institutions.[47]

## 11.    Damages to replace unlawful aid also constitutes unlawful aid

11.1    Although companies may apply to national courts to order the payment of damages to which they believe they are entitled, such claims cannot have the effect of circumventing the effective application of Union state aid rules.[48]

11.2    In particular, companies that may be entitled under national law to receive aid that has not been notified to and approved by the Commission, but have not received such aid, cannot claim compensation for the amount equal to the amount of aid that has not been received, as this would constitute an indirect award of unlawful aid.[49]

## 12.    Application of the state aid legal framework on the case

### *The 2007 regulation constituted an unlawful aid measure*

12.1    The European Commission has already ruled on the 2007 regulation in its 2017[50] and 2021[51] decisions. In those decisions, the Commission found that the 2007 regulation (and the subsequently amended regulation) constituted aid.

12.2    It is certain that the 2007 regulation was not notified to the European Commission.

12.3    As the above legal framework shows, it is thus established that the 2007 regulation constituted unlawful aid.

### *No legitimate trust*

12.4    As explained above, a beneficiary of a national measure can only claim legitimate expectations if those legitimate expectations have been created by an institution of the European Union. There is nothing to show that the European Commission expressed itself in any way such that NextEra could derive confidence therefrom that the 2007 regulation would not constitute aid or would qualify as legitimate aid.

---

[47]    See, for example, ECJ March 5, 2019, C-349/17, Eesti Pagar, ECLI:EU:C:2019:172, point 101.

[48]    ECJ June 29, 2004, Commission/Council, C-110/02, ECLI:EU:C:2004:395, point 43; ECJ July 18, 2007, Lucchini, C-119/05, ECLI:EU:C:2007:434, points 59-63; ECJ November 11, 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, points 42-44.

[49]    ECJ November 11, 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, points 42-44. See also Commission Decision April 16, 2004, State aid N 304/2003 - The Netherlands, Aid in favor of Akzo Nobel to restrict the transport of chlorine, marg. 18 and footnote 10. See also Conclusion of Attorney General Ruiz-Jarabo Colomer of April 28, 2005 in Atzeni and Others, C-346/03 and C-529/03, ECLI:EU:C:2005:256, point 198.

[50]    Commission Decision of November 10, 2017, SA.40348 (2015/NN) - Spain Support for electricity generation from renewable energy sources, cogeneration and waste, attached as Exhibit 1.

[51]    Decision of the European Commission dated July 19, 2021, SA.54155, attached as Exhibit 5.

12.5    Nor does it appear that NextEra could in any way derive confidence from a statement by the European Commission that an arbitral award (whether of the ICSID Arbitral Tribunal or not) could be considered lawful aid. On the contrary, it even explicitly appears from the European Commission's decision of March 30, 2015[52] cited above (which led to the Micula ruling), i.e. well before the ICSID arbitral tribunal ruling, that the European Commission considers (the execution of) a ruling of an ICSID arbitral tribunal as unlawful aid.

13.    **Application of the state aid concept to (the enforcement of) the arbitral award**

13.1    From the foregoing it is clear that the 2007 regulation constituted unlawful aid and therefore could not result in a grant to NextEra. It also follows from the foregoing that an award of damages in lieu of otherwise unlawful aid itself also constitutes unlawful aid. Thus, an award of damages in lieu of the aid NextEra believed it could receive under the 2007 regulation, while NextEra is not entitled to rely on legitimate expectations in connection therewith, also constitutes unlawful aid.

13.2    It is irrelevant here whether the award of that compensation which serves to replace unlawful State aid is made by an administrative body of the Member State or by a judicial authority. In fact, as indicated above, the courts of the Member States also have the duty to ensure compliance with state aid rules.[53]

13.3    While Member State authorities are obliged to ensure compliance with State aid rules, it is equally true that they cannot conclude treaties whereby they remove the competence to adjudicate such (substitute) damages from national courts and assign it to an arbitral body. In doing so, they could circumvent the obligations arising from the case law of the Court of Justice and thereby nullify the useful effect of the state aid rules, including the notification obligation and the standstill provisions.

13.4    Spain points out that in its 2017 decision, the European Commission already commented on the state aid assessment of an ICSID arbitral tribunal award in a similar case and ruled in this regard as follows (translated):

> *"(160) By way of introduction, the Commission notes that most of the investors who have brought cases against Spain are located in other Member States of the Union. The Commission is of the opinion that any provision providing for investor-state arbitration between two Member States is against Union law; this concerns in particular Article 19(1) TEU, the principles of the freedom of establishment, the freedom to provide services and the free movement of capital, as laid down in the Treaties (in particular Articles 49, 52, 56 and 63 TFEU), as well as Articles 64(2), 65(1), 66, 75, 107, 108, 65 215, 267 and Article 344 TFEU, and the general principles of Union law of primacy, unity and effectiveness of Union law, mutual trust and legal certainty.*

---

[52]    Commission Decision (EU) 2015/1470 of March 30, 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania - Micula v. Romania arbitral award of December 11, 2013, *Pb.* 2015, L 232/4.

[53]    ECJ March 5, 2019, Eesti Pagar, C-349/17, ECLI:EU:C:2019:172, point 91.

*(161)   The conflict concerns both substance and enforcement. On the substance, Union law provides a complete set of rules on investment protection (notably in Articles 49, 52, 56 and 63 TFEU, as well as in Articles 64(2), 65(1), 66, 75 and 215 TFEU). Member States therefore do not have the power to conclude bilateral or multilateral agreements among themselves, as they may thereby affect common rules or alter their scope. As the two sets of investment protection rules potentially applicable between an EU Member State and an investor of another state (i.e. the Treaties and Bilateral Investment Treaties (BITs) within the EU or the ECT in an intra-EU situation) are not identical in substance and are applied by different Courts, there is also a risk of conflict between the international investment treaty and Union law.*

*(162)   As regards enforcement, in a dispute between an investor from a Member State and another Member State or an intra-EU BIT, an arbitral tribunal set up on the basis of the Energy Charter Treaty must apply Union law as the applicable law (both as the international law applicable between the parties and, where appropriate, as the national law of the host State). However, according to the case law, the arbitral tribunal is not a judicial body of a Member State, and therefore cannot refer to the Court, because, in particular, the requirements of permanence, State character and mandatory jurisdiction are not met.*

*(163)   The resulting conflict between treaties must, in accordance with the Court's case law, be resolved on the basis of the principle of primacy in favor of Union law. For these reasons, the ECT does not apply to investors from other Member States bringing a dispute against another Member State.*

*(164)   In any event, there is also essentially no violation of the provisions on fair and equitable treatment. As noted above in paragraph 3.5.2, in the specific situation of the present case, Spain has not violated the principles of legal certainty and legitimate expectations under Union law. In a situation within the EU, Union law forms part of the applicable law, since it constitutes the international law applicable between the parties in case of disputes. Consequently, the principle of fair and equitable treatment, based on the principle of conforming interpretation, cannot have a wider scope than the Union law concepts of legal certainty and legitimate expectations in the context of a state aid regulation. In a non-EU situation, the fair and equitable treatment provision of the ECT is respected since no investor can have a de facto legitimate expectation arising from unlawful state aid. This has been explicitly recognized by arbitral tribunals. In any event, it is settled case law that a measure that does not violate the national provisions on legitimate expectations generally does not violate the provision on fair and equitable treatment.*

*(165)   The Commission recalls that any compensation that an arbitral tribunal would award to an investor based on the fact that Spain modified the economic premium regulation through the notified regulation, would in*

*itself constitute state aid. However, the arbitral tribunals have no authority to authorize the granting of state aid. That is an exclusive competence of the Commission. If they grant compensation, as in the Plaintiff/Spain case, or would do so in the future, such compensation would have to be logged as State aid within the meaning of Article 108(3) TFEU and be subject to the standstill obligation.*

*(166)   Finally, the Commission recalls that this decision is part of Union law and as such is also binding on arbitration courts when they apply Union law. The exclusive forum to challenge its validity are the European judicial* entities."[54]

13.5    In its decision of July 19, 2021, the Commission further held that an ICSID arbitral tribunal ruling in a similar case constitutes aid.[55]

13.6    Spain has notified the ICSID arbitral tribunal's ruling in respect of NextEra to the European Commission. The European Commission acknowledged receipt of the notification on March 11, 2020 and registered it under number SA.56676. The European Commission has not yet taken a decision regarding the notified aid.

## 14.    <u>Task of the national court</u>

14.1    From the foregoing it is clear that decisions of the European Commission – which are, moreover, irrevocable – show that *both* the 2007 regulation *and the* award of damages by the ICSID arbitral tribunal, as well as its execution, should be classified as unlawful aid.

14.2    Case law of the Court of Justice shows that national courts should refrain from taking decisions contrary to a Commission decision and should abide by the Commission's assessment of the existence of state aid.[56]

14.3    Union law requires the national court to take effective measures to prevent the payment of the unlawful aid to its beneficiary.[57]

14.4    In the present case, prohibiting Spain from paying the aid in the form of compensation to NextEra pursuant to the arbitral award is not an effective measure, because once authorization to execute has been irrevocably granted to NextEra by a court of a third country, Spain cannot stop that execution as such.

---

[54]    Commission Decision of November 10, 2017, SA.40348 (2015/NN) - Spain Support for electricity generation from renewable energy sources, cogeneration and waste, attached as Exhibit 1.

[55]    Decision of the European Commission dated July 19, 2021, SA.54155, attached as Exhibit 5.

[56]    ECJ November 1, 2013, Deutsche Lufthansa, C-284/12, ECLI:EU:C:2013:755, point 41.

[57]    See ECJ December 8, 2011, Residex Capital IV, C-275/10, ECLI:EU:C:2011:814, points 44-47. See also: Commission Notice on the Enforcement of State Aid Rules by National Courts, OJEU 2021, C305/1.

14.5   It is for this reason that Spain requests that your Court, as an effective measure to ensure that no payment of unlawful aid is made, impose an injunction on NextEra to proceed with the execution of the arbitral award.

**15.   Conclusion regarding the state aid law assessment**

15.1   On the basis of the foregoing, it must be concluded that, under Union law, your Court must take as a given that the execution of the ICSID arbitral tribunal's decision - whether or not after a national court has granted leave to execute - results in Spain granting unlawful State aid to NextEra. Further, it is clear from Union law that effective measures must subsequently be taken to prevent the provision of that unlawful aid. Since a court injunction prohibiting Spain from granting the aid does not prevent NextEra from continuing to grant that unlawful aid to NextEra through the enforcement of the ICSID Arbitral Tribunal's award rendered in violation of Union law, an injunction prohibiting NextEra from seeking such enforcement constitutes an effective measure to comply with Union law obligations.

**16.   Concluding remarks regarding the state aid legal assessment**

16.1   Spain wishes to point out to your Court that the *Commission's Notice on the Enforcement of State Aid Rules by National Courts*[58] allows your Court to request information from the European Commission or seek an opinion on the application of the state aid rules.

**17.   Articles 267 and 344 TFEU also preclude the execution**

17.1   In addition to Articles 107 and 108 TFEU, Articles 267 and 344 TFEU, as interpreted by the Court of Justice, preclude enforcement of the ICSID Arbitral Tribunal's ruling.

17.2   In the Achmea judgment, the Grand Chamber of the Court of Justice ruled on the incompatibility of Union law with investment arbitrations between Member States and/or residents of Member States. The case concerned a bilateral investment treaty ("<u>BIT</u>") concluded between the Netherlands and Slovakia and, in particular, the question of whether the settlement mechanism for investment disputes between foreign investors and the EU Member States in question (so-called *Investor-State Dispute Settlement)* included therein was compatible with Union law. Invoking Articles 267 and 344 of the TFEU, the ECJ answered this question negatively. The ECJ concluded that settlement mechanisms in Intra-EU BITs impinge on the autonomy of Union law:

> *"Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States,* such as *Article 8 of the Agreement for the Promotion and Reciprocal Protection of Investments between the Kingdom of the Netherlands* and *the Czech and Slovak Federative Republic, under which an investor from one of those Member States, in the event of a dispute concerning investments in the other Member State, may initiate proceedings against the latter State*

---

[58]   OJEU 2021, C305/1.

> *before an arbitral tribunal whose jurisdiction this Member State has undertaken to accept."[59]*

17.3    Its justification included the circumstance that:

> *"(...) the Member States that are a party to the BIT have, by its conclusion, established a mechanism for the resolution of disputes between an investor and a Member State, which may prevent those disputes, although they may relate to the application of Union law, from being resolved in such a way as to ensure the full effect of that law."[60]*

17.4    One factor in this is that arbitral tribunals are not part of the national legal order and therefore cannot, for example, submit preliminary questions to the Court of Justice. This while an agreement – such as a BIT – cannot affect the allocation of responsibilities and powers as laid down in the Union Treaties, such as the powers of the Court of Justice.[61] Furthermore, according to the Court of Justice, the arbitration clause in question undermines not only the principle of mutual trust between Member States, but also the preservation of the distinctive nature of the law established by the Treaties, which is guaranteed by the preliminary ruling procedure of Article 267 TFEU, and consequently that article is incompatible with the principle of loyal cooperation between Member States.

17.5    This landmark ruling enshrined in the EU legal order the incompatibility with EU law of investment arbitration proceedings between member states and/or nationals of another member state. Consequently, the consent of the EU state participating in an arbitration procedure was also deemed (to have been) without effect.

17.6    In a judgment of September 2, 2021, delivered in a case between the Republic of Moldova and Komstroy LLC ("Komstroy"), the Court – following the opinion of A-G Szpunar – confirmed the aforementioned incompatibility.[62] Importantly, the Komstroy judgment concerned an arbitral award rendered under the ECT, similar to the present case. The Court of Justice held, inter alia, that

> *"(...) although the ECT may require Member States, in their relations with investors from non-member countries which are also parties to that Treaty, to comply with the arbitration rules laid down therein in respect of investments made by those investors in those Member States, the maintenance of the autonomy and specificity of European Union law precludes the ECT from imposing the same obligations on the Member States as between themselves. (...) In view of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not applying to disputes between a Member State and an investor from another Member State concerning an investment made by that investor in the former Member State."[63]*

---

[59]    ECJ March 6, 2018, Achmea, C-284/16, EU:C:2018:158, point 62.
[60]    ECJ March 6, 2018, Achmea, C-284/16, EU:C:2018:158, point 56.
[61]    See, e.g., ECJ May 30, 2006, C-459/03, *Commission v Ireland,* EU:C:2006:345; Opinion 2/13, point 180.
[62]    ECJ September 2, 2021, Komstroy, C-741/19, ECLI:EU:C:2021:655.
[63]    ECJ September 2, 2021, Komstroy, C-741/19, ECLI:EU:C:2021:655, points 65 and 66.

17.7   In PL Holdings, the Court of Justice again confirmed this case law.[64] Moreover, in this case the Court of Justice held that there is no reason to limit its interpretation of Articles 267 and 344 TFEU over time.[65] Therefore, the Court of Justice's interpretation of Articles 267 and 344 TFEU with respect to the possibility for Member States to agree on arbitration clauses in treaties was already in place at the time the ECT was entered into and thus also at the time of the investments made by NextEra in Spain.

17.8   Moreover, the Achmea line was recently confirmed in the Micula judgment cited above, which – again similar to the present case – involved a ruling by an ICSID arbitral tribunal.[66] As explained above, that judgment also confirmed that an intra-EU arbitral award granting financial compensation to a European investor constitutes state aid, which is also a violation of EU law.

17.9   Following Achmea (and subsequent case law), case law has also developed in the various Member States in which application of the aforementioned ECJ case law has been made. Spain points in this regard, for example, to the rulings of the Swedish Court of Appeal in which an intra-EU arbitral award was annulled on grounds of arbitrability (an English translation is attached as **Exhibit 11**) and of the Swedish Supreme Court, which annulled the PL Holdings v. Poland intra-EU arbitral award, adhering to the Court of Justice's judgment on violation of public policy (an English translation is attached as **Exhibit 12**).

17.10  Moreover, ECJ case law has also led to far-reaching consequences in the European treaty framework. The starting signal for this was, among other things, a July 19, 2018 call by the European Commission to Member States to terminate intra-EU BITs in view of their *"incontestable incompatibility"* with EU law.[67] At the same time, the European Commission took the position that national courts are obliged to annul arbitral awards rendered under Intra-EU BITs and refuse their enforcement.[68]

17.11  In response, on May 29, 2020, most member states, including Spain and the Kingdom of the Netherlands, concluded an international agreement to terminate bilateral investment treaties between EU member states.[69] This agreement confirmed in Article 4 the willingness of the parties to be bound by the interpretation of the Achmea judgment and the nullity of the arbitration clauses from the moment the last party to the BIT in question became an EU member state. For the Netherlands, this agreement entered into force on March 31, 2021.

17.12  In the run-up to the aforementioned agreement, the Dutch cabinet also explicitly affirmed in the context of the ECT that this agreement should be compatible with

---

[64]   ECJ October 26, 2021, C-109/20, ECLI:EU:C:2021:875, in particular points 44-47.
[65]   ECJ October 26, 2021, C-109/20, ECLI:EU:C:2021:875, points 64, 66 and 69.
[66]   ECJ January 25, 2022, C-638/19 P, Commission v European Food and Others, ECLI:EU:C:2022:50.
[67]   Communication from the Commission to the European Parliament and the Council, Protection of intra-EU investment, COM (2018) 547 final, July 19, 2018, p. 2.
[68]   Ibid. p. 3.
[69]   Available in the Official Journal of the European Union, L 169/1.

the EU treaties, as the EU is a party to the ECT.[70] Arbitrations conducted under the ECT are thus also incompatible with EU law.

17.13    Meanwhile, the ECT has been denounced by many member states. Spain (on October 12, 2022) and the Netherlands (on October 19, 2022) have also announced their withdrawal from the agreement.

17.14    In view of all the above, the enforcement – in addition to constituting a violation of the State aid rules – would also otherwise be in violation of Union law. Indeed, according to the case law of the Court of Justice, the arbitral award rendered between the parties under Article 10, 26(2), 4 lit. a) (i) ECT cannot stand. With a view to the effective enforcement of Union law, the award cannot be recognized and enforced for breach of Union law.

17.15    More specifically, with the incompatibility between the ECT and Union law, it must be assumed that an agreement to arbitrate was lacking from the onset. In addition to the absence of an agreement to arbitrate, the arbitral award (and any enforcement thereof) is also contrary to public policy and the ICSID arbitral tribunal rendered an award in violation of the principle of arbitrability.[71] In this regard, it is worth noting the value of EU law in the Dutch legal order, as also confirmed in the Van Gend en Loos[72] and Costa/Enel judgments.[73] EU law constitutes an autonomous legal order and EU law takes precedence over the national legal order.[74]

17.16    Just recently, an arbitral tribunal in an ICSID arbitration against Spain under the ECT declined jurisdiction, in light of the Achmea and Komstroy judgments. The place of arbitration was Stockholm. To the extent relevant to these proceedings, the arbitral tribunal considered, inter alia, the following:

> *"475. The Tribunal further observes that Swedish law, which is applicable through the operation of Section 48 SAA, recognizes the primacy of EU law. Although the Tribunal is not aware of a decision from the competent Swedish courts specifically addressing the relations between the ECT and EU law, it is conscious that the Svea Court of Appeal withdrew its petition for a preliminary ruling on these relations on the basis of the Komstroy Judgment of the Court of Justice, indicating in this way that its questions were addressed by the Komstroy Judgment. The Tribunal moreover finds guidance in the decision of a court from another EU Member State, the German Bundesgerichtshof which set aside the Achmea award, expressly referring to the primacy of EU law.*
>
> *476. The primacy of EU law has been clearly recognized in all the foregoing cases and, very specifically, precluded the unilateral offer to arbitrate in Article 26 ECT because inconsistent with the autonomy and primacy of EU law.*
>
> *477. It is therefore the unanimous view of the Tribunal that the same*

---

[70]    See Report of a written consultation, February 1, 2021, Parliamentary Papers II 2020/21, 35 649 (R2150), no. 3, p. 15.

[71]    Also particularly in connection with state aid rules, which are not at the free disposal of the parties.

[72]    ECJ February 5, 1963, 26-62, ECLI:EU:C:1963:1 *(Van Gend & Loos),* p. 23.

[73]    ECJ July 15, 1964, 6-64, ECLI: EU:C:1964:66 (Costa/ENEL), p. 1219.

[74]    On these principles, see recently Y.L. Bouzoraa and J. Lindeboom, "The autonomy of the European legal order and the primacy of EU law: substantive and institutional aspects," *AA* 2021-258.

*considerations apply to the offer to arbitrate by Spain under Article 26 ECT. Seated in an EU Member State, it likewise cannot apply the consent to arbitrate by the Respondent and affirm its jurisdiction. <u>Following the reasoning of the CJEU Grand Chamber in the Achmea Judgment and subsequently confirmed in the Komstrov Judgment. this Tribunal considers that the offer of the Respondent, as an EU Member State. to arbitrate under Article 26 ECT a dispute with investors of another EU Member State which would, of necessity, require this Tribunal to interpret and apply the EU Treaties, is precluded. Therefore, there is no unilateral offer by the Respondent which the Claimants could accept.</u>*[75]

17.17   Thus, it is clear that Spain's awards against NextEra under the arbitral award could never be enforced in the European Union in any case. Even if the parties were to conduct the same arbitration again today with an EU state as the place of arbitration, the arbitral tribunal would decline jurisdiction.

17.18   NextEra is an EU national. As such, it is also subject to Union law and the foregoing can be held against it. Indeed, it is established – and Spain's declarations of law also focus on this – that no valid offer of arbitration was ever made by Spain and thus no valid arbitration agreement was ever concluded. NextEra must also be aware of this. Whether a third-party court considers itself bound by that is separate of that. What matters is that NextEra cannot ignore or circumvent that circumstance by seeking enforcement of an invalid arbitral award in another jurisdiction. If it does so, it will commit an abuse of rights, or at least act negligently towards Spain.

17.19   Thereby, Spain has a right and interest in the requested injunction.

**18.    <u>Continuing the execution constitutes abuse of execution power</u>**

18.1    It has been sufficiently explained above that enforcement of the arbitral award is contrary to EU law. This also means that the continuation of enforcement in defiance thereof constitutes an abuse of law, and in particular an abuse of (enforcement) power, and is in any case contrary to the care that is customary in society. This is unlawful vis-à-vis Spain and basis for the requested injunctions and related penalty orders.

18.2    In that connection, reference should be made to Article 3:13(1) and (2) of the Civil Code:

> *"1. One to whom a power is vested may not invoke it if he abuses it.*
>
> *2. A power may be abused, inter alia, by exercising it for no other purpose than to harm another or for any other purpose than that for which it has been granted or in the event that, taking into account the disproportion between the interest in exercising it and the interest which is harmed by it, one could not reasonably have come to that exercise."*

18.3    The present case includes the latter case. The latter case provides for the situation where the person exercising the power know or should know said disparity.[76] There is

---

[75]   Green Power K/S and SCE Solar Don Benito APS v. Kingdom of Spain, SCC Case No. V2016/135. Footnotes omitted from quoted considerations.
[76]   HR May 21, 1999, ECLI:NL: HR:1999:ZC2905 *(Kerkhof and Wekking/Spoelstra).*

an abuse of power if, after weighing both interests with due regard for reasonableness, it appears that there is an impermissible disparity.[77]

18.4    In this case, NextEra knows that the arbitral award is invalid since it was issued without the existence of an underlying arbitration agreement. It also knows, or at least ought to know, that enforcement (forced or otherwise) may result in unlawful State aid, with all its possible consequences for Spain. NextEra is thus aware that there is an impermissible disparity between its interest in enforcing an invalid arbitral award in a foreign jurisdiction and Spain's interest in preventing it from doing so and thus respecting Union law.

18.5    Furthermore, this case clearly involves a manifest error of law by the ICSID Arbitral Tribunal. In fact, the ICSID Arbitral Tribunal issued an arbitral award which is contrary to the State aid rules either in substance or in legal effect. In this context, it should also be noted that the State aid rules can, according to the settled case law of the Court of Justice, overrule the authority of *res judicata* of *inter partes* awards. Logically, therefore, this also applies to arbitral awards rendered in violation of state aid rules as well as arbitral awards rendered in violation of the aforementioned Achmea and Komstroy case law.

18.6    The enumeration in paragraph 2 is not exhaustive. Other criteria can also be applied to arrive at an abuse of power. For example, the Supreme Court considered in its December 31, 2019 summary judgment on the enforcement and suspension of judgments:

> *"In this connection, it is worth noting that the cases mentioned in the judgment of April 22, 1983 in 5.3.3 cited above – the judgment to be enforced is obviously based on a mistake of law or fact, or its enforcement will, as a result of facts occurring or having come to light after the judgment was rendered, give rise to a state of emergency on the part of the person being enforced – are merely examples of a situation in which the party empowered to enforce a judgment taking into account the disparity between the interest in the enforcement and the interest damaged by it, cannot reasonably come to that enforcement and therefore misuses its power. There is no reason to limit said ground for suspension to these cases. After all, there may also be other situations in which, in connection with facts that occurred or came to light after the judgment, there is a misuse of power in accordance with the standard mentioned in Article 3:13 of the Dutch Civil Code."[78]*

In the present case, this misuse of powers can further be found in the circumstance that NextEra knows or should have known that the arbitral awards and their enforcement violate EU law, and deliberately seeks their enforcement in a non-EU country. This while NextEra itself is EU resident and that this whole issue, it should be noted, started because NextEra wanted to make use of subsidy regulations arising from EU law. Also the circumstance that it knows, or at least should know, that it

---

[77]    GS Property Law, Art. 3:13 BW, infra. 47.
[78]    See HR December 20, 2019, ECLI:NL:HR:2019:2026, para. 5.7.2.

might expose Spain to sanctions, plays a role in this.

### 19. The abuse of power justifies the requested immediate provisions

19.1 In view of the foregoing, Spain is also entitled to and has an interest in the requested provisions pursuant to Article 223 of the Dutch Code of Civil Procedure (which are related to the claims on the merits). It is of great (urgent) importance that NextEra is prohibited, pending these proceedings, from continuing with the enforcement that has already started.

19.2 Nor can Spain be required to await the outcome of these (potentially lengthy) proceedings on the merits. The stakes are simply too high for that. If NextEra proceeds with the execution now, Spain may never see its money back, if the verdict is given in its favor at the end of these proceedings. Moreover, NextEra shows that it does not want to wait with the execution, but rather tries to execute as soon as possible, and through a non-EU country.

19.3 This is all the more compelling since there is a real risk of restitution on the part of NextEra. Although NextEra is part of a listed group, the two entities in question only have equity of USD 167,857 (NextEra Spain[79]) and USD 8,176,668 (NextEra Global[80]) respectively, according to their most recently published financial statements. The likelihood is that if NextEra were to recover from Spain in the short term, and Spain were to ultimately prevail in these proceedings, the consequences of enforcement would be irreversible and NextEra would have no recourse.

### PART III: PROCEDURAL ASPECTS AND SUBJECT MATTER

### 20. Spain's claims and the need for penalty payments

20.1 The foregoing has substantiated why the ICSID Arbitral Tribunal's awards under discussion constitute unlawful aid and are also otherwise contrary to Union law in connection with the provisions of the Achmea award, and that execution of those verdicts therefore comes into conflict with Union law.

20.2 Spain thus has the right and interest to seek a declaration that such enforcement is unlawful and that, as an effective measure to prevent acts contrary to the TFEU, NextEra be ordered to withdraw, or at least suspend, the proceedings pending before the District Court of the District of Columbia under no 1:19-cv-01618, as well as NextEra be prohibited from enforcing said arbitral awards until such time as the European Commission declares the aid measure contained in said arbitral awards compatible with the internal market pursuant to Article 107(3) TFEU.

20.3 For the measure to be truly effective, it must be ensured that if NextEra does not withdraw, or at least suspend, the proceedings in the District Court of the District of Columbia, NextEra forfeits a penalty payment adequate to give NextEra sufficient incentive to proceed with withdrawal, or at least suspension.

---

[79]    **Exhibit 13,** excerpt from the Commercial Register of the Chamber of Commerce of NextEra Spain.

[80]    **Exhibit 14,** excerpt from the Commercial Register of the Chamber of Commerce of NextEra Global.

20.4    For the measure to be truly effective, it must also be ensured that if NextEra does proceed with the execution, NextEra will not be in a better position than if it refrains from enforcement in accordance with Union law. It is for this reason that Spain requests that NextEra be ordered to pay a penalty of (at most) EUR 300 million, being the amount that Spain would have to pay NextEra under the arbitral award (EUR 290.6 million), plus costs. The penalty may be lower if NextEra executes for a lower amount. This ensures that NextEra must pay a penalty payment such that it will not be put in a more advantageous position if it proceeds with the execution despite your Court's ruling.

20.5    Since under EU State aid law the concept of an undertaking is not related to a legal entity, but is based on an economic concept of an undertaking, in which it is necessary to assess to which economic entity an advantage (within the meaning of Article 107(1) TFEU) accrues, an effective measure to prevent unlawful aid being granted to NextEra cannot be limited to defendants sub 1 and sub 2. Indeed, under those circumstances, it would not be precluded that another legal entity from the economic relationship to which defendants belong receives the unlawful aid by executing the judgments. To prevent that, an injunction is sought against any company (economically) related to defendants sub 1 and 2. This is in line with the concept of "undertaking" as used in state aid law.

20.6    Since the defendants or their affiliates could already proceed to enforcement pending these proceedings, Spain has the right and interest to seek injunctive relief as provided in Article 223 Dutch Code of Civil Procedure for the duration of the proceedings. After all, if NextEra proceeds to the execution pending these proceedings, there is a risk of irreversible consequences since NextEra may dispose of the assets obtained by execution or otherwise ensure that Spain will no longer be able to recover the assets obtained through the execution, while, moreover, it cannot be ruled out that NextEra will not provide an alternative remedy. The injunctive relief sought is primarily to ensure that NextEra will not pursue the proceedings in the District Court of the District of Columbia and will make every effort to stay those proceedings. To the extent that NextEra would nonetheless continue those proceedings and proceed to execution after authorization is granted, it is important to attach to the injunctive relief a periodic penalty payment that prevents NextEra from acting in violation of the injunctive relief.

21.    **A cross-border ban through a provisional provision is indicated**

21.1    In view of all the foregoing, Spain is entitled to and has an interest in a worldwide injunction prohibiting NextEra from taking implementing measures aimed at enforcing the arbitral award by way of preliminary relief. It is established case law that the Dutch court may issue an injunction aimed at acts abroad, assuming that it has jurisdiction to hear a claim concerning an infringement (here, an unlawful act claim) on the basis of any rule of (universal) international jurisdiction.[81]

22.    **The defense and its rebuttal**

22.1    Some defenses known to Spain have already been refuted above.

---

[81]    See, e.g., HR March 19, 2004, *NJ* 2007, 585 *(Philips/Postech),* cf. P. Vlas.

**23.**    **A guilty verdict must be declared provisionally enforceable**

23.1    A balancing of interests implies that a condemnatory judgment must be declared provisionally enforceable. After all, otherwise those judgments could prove meaningless if NextEra could appeal and then still enforce them pending that appeal.

23.2    Spain has already explained above that there is a real risk of restitution on the part of NextEra. Conversely, there is no risk that Spain – should NextEra ultimately come out on top - will offer no recourse. In that light, Spain's interest in provisionally enforceable judgments outweighs NextEra's as yet unknown interest in not declaring the provisionally enforceable judgments enforceable.

24.    **Authority**

24.1    Since both defendants are domiciled in Amsterdam, your court has jurisdiction over this case.

**25.**    **Proof**

25.1    Spain deems that the Exhibits it has brought into the proceedings sufficiently prove its contentions. Nevertheless, in so far as it has any burden of proof, it offers to provide additional proof of its contentions by any means in law, including by hearing witnesses or experts.

25.2    Spain shall submit the Exhibits to this subpoena no later than the first docketed hearing date.

**FOR THIS REASON**

In the incident

It may please Your Court by interlocutory decree on the foregoing grounds and to the extent possible with respect to all claims listed below as provisionally enforceable:

(A)    Order the defendants or any other affiliate of the defendants within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 to take all actions necessary to suspend the proceedings currently pending before the United States District Court for the District of Columbia under case number 1:19-cv-01618 until final judgment is entered in the present action, within 10 days of service of the judgment in the incident, under penalty of a daily penalty of EUR 30,000 for each day or part of a day that Defendants fail to effect such suspension.

(B)    For the duration of the proceedings, prohibit the Defendants or any affiliate of the Defendants within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 from enforcing, or otherwise proceeding in any way to enforce (measures), including taking precautionary measures, anywhere in the world, the arbitral awards rendered by the ICSID Arbitral Tribunal on March 12, 2019 and May 31, 2019;

(C)    Prohibit the defendants or any affiliate of them within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 for the duration of the proceedings to make any attempt anywhere in the world to seek to have

Spain sentenced to pay or otherwise proceeding to enforce the damages awarded by the ICSID Arbitral Tribunal by arbitral awards dated March 12, 2019 and May 31, 2019, including taking conservatory measures;

(D)    Prohibit Defendants or any other affiliate of Defendants within the meaning of Article 3(3) of Annex I to Regulation (EU) No 651/2014, for the duration of the proceedings, from seeking anywhere in the world to seek to have Spain sentenced to pay, or otherwise proceeding to enforce, any damages suffered by NextEra as a result of the changes to the 2007 Regulation, including the taking of precautionary measures;

(E)    To impose on the Defendants or any other affiliated company within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 a lump sum penalty payment in the amount of EUR 300 million or an amount equivalent to the amount obtained by NextEra (whether in parts or not) through the execution, whichever is lower, if NextEra fails to comply with the injunctive relief sought above under B, C and D.

Primarily

It may please Your Court by Judgment on the foregoing grounds and to the extent possible with respect to all claims set forth below to be provisionally enforceable:

(F)    Rule that the 2007 regulation constitutes aid within the meaning of Article 107(1) TFEU;

(G)    Rule that the 2007 regulation was not notified to the Commission in accordance with Article 108(3) TFEU and constitutes illegal state aid;

(H)    Rule that the damages awarded by the ICSID Arbitral Tribunal by arbitral awards of March 12, 2019 and May 31, 2019 constitute aid within the meaning of Article 107(1) TFEU;

(I)    Declare as a matter of law that no valid arbitration agreement was ever reached between Spain and NextEra;

(J)    Rule that the recovery of damages awarded by the ICSID Arbitral Tribunal by arbitral awards of March 12, 2019 and May 31, 2019 is contrary to Union law, so long as the European Commission has not declared those arbitral awards compatible with the internal market;

(K)    Declare as a matter of law that there was no legitimate expectation on the part of the defendants or any affiliate of the defendants within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 that it was entitled to that aid measure contained in the 2007 regulation;

(L)    Direct the Defendants or any other affiliate of them within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 to take all actions necessary to suspend and hold in abeyance the proceedings currently pending before the United States District Court for the District of Columbia under Case No. 1:19-cv-01618, until the European Commission accepts the arbitral awards issued by the ICSID Arbitral Tribunal on March 12, 2019 and May 31, 2019 declared

with the internal market, within 10 days of service of the judgment, under penalty of a daily penalty of EUR 30,000 for each day or part of a day that defendants fail to effect such suspension.

(M)    To order the Defendants or any affiliate of the Defendants within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 to withdraw the proceedings currently pending before the United States District Court for the District of Columbia under case number 1:19-cv-01618, within 10 days after the European Commission declares the March 12, 2019 and May 31, 2019 arbitral awards rendered by the ICSID Arbitral Tribunal to be incompatible with the Internal Market, under penalty of a daily payment of EUR 30,000 per day for each day or part of a day that Defendants fail to effect such suspension.

(N)    Prohibit the Defendants or any other affiliated company within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 from seeking anywhere in the world to enjoin the Kingdom of Spain from paying, or otherwise proceeding to enforce, any damages suffered by NextEra as a result of the changes to the 2007 Regulation;

(O)    Prohibit the Defendants or any affiliate of the Defendants within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 from prohibiting, or otherwise proceeding to enforce anywhere in the world the arbitral awards issued by the ICSID Arbitral Tribunal dated March 12, 2019 and May 31, 2019, or at least prohibit NextEra from enforcing, anywhere in the world, or in any other way proceed to execution of the damages awarded by the ICSID Arbitral Tribunal by arbitral awards of March 12, 2019 and May 31, 2019, until the European Commission has declared those arbitral awards compatible with the internal market;

(P)    Prohibit Defendants or any other affiliate of Defendants within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 from seeking to enjoin Spain, anywhere in the world, from paying, or otherwise proceeding to claim, the damages awarded by the ICSID Arbitral Tribunal by arbitral awards dated March 12, 2019 and May 31, 2019, or at least prohibit NextEra from seeking to enjoin Spain, anywhere in the world, from paying or otherwise proceed to claim, the damages awarded by the ICSID Arbitral Tribunal by arbitral awards of March 12, 2019 and May 31, 2019 until the European Commission declares those arbitral awards compatible with the internal market;

(Q)    To impose on the Defendants or any other affiliated company within the meaning of Article 3(3) of Annex I to Regulation (EU) No. 651/2014 a one-time penalty payment in the amount of EUR 300 million or an amount equivalent to the amount obtained by NextEra (whether in parts or not) through the execution, whichever is lower;

(R)    Order the defendants to pay the legal costs incurred by Spain, including the follow-up costs, the court fees due and the amount of attorney's fees estimated up to this judgment.

The cost of this for me, bailiff, is EUR 103.33

This case is being handled by Simmons & Simmons LLP, Claude Debussylaan 247, 1082 MC, Amsterdam, Mr. N. Peters (telephone number: 020 722 2360; e-mail niek.peters@simmons-simmons.com and Mr. J.J. Bakker (telephone number: 020 722 2353; e-mail: jonathan.bakker@simmons-simmons.com).

## EXHIBIT OVERVIEW

| |
|---|
| 1. European Commission Decision of November 10, 2017, SA.40348 (2015/NN) - Spain Support for electricity generation from renewable energy sources, cogeneration and waste |
| 2. Award from the ICSID dated May 31, 2019, case no. ARB/14/11 |
| 3. Decision on Annulment of the ICSID Ad Hoc Committee of March 18, 2022, Case No. ARB/14/11. |
| 4. Nextera claim in the District Court for the District of Columbia dated June 3, 2022, case no. 1:19-cv-01618 |
| 5. Decision of the European Commission of July 19, 2021, SA.54155 (2021/NN) - Arbitration award to Antin - Spain |
| 6. ICSID's Decision on Jurisdiction, Liability and Principles of Quantum of March 12, 2019, case no. ARB/14/11 |
| 7. Order of the District Court for the District of Columbia dated September 30, 2020, Case No. 1:19-cv-01618-TSC |
| 8a. Motion of Spain to the District Court for the District of Columbia dated May 2, 2022, Case No. 1:19- cv-01618-TSC |
| 8b. Memorandum of Understanding in Support of Spain's Motion to the District Court for the District of Columbia dated May 2, 2022, Case No. 1:19-cv-01618-TSC |
| 9. Statement of Defence Spain to the District Court for the District of Columbia dated June 29, 2022, Case No. 1:19-cv-01618-TSC |
| 10a. Order of the ECJ of September 21, 2022 in Case C-333/19, ECLI:EU:C:2022:749 (Romatsa). |
| 10b. Unofficial Dutch translation, made with Deepl and for the reader's convenience, of ECJ decision of September 21, 2022 in Case C-333/19, ECLI:EU:C:2022:749 (Romatsa) |
| 11. Ruling of the Swedish Court of Appeal of December 13, 2022, case no. T 4658-18 |
| 12. Ruling of the Swedish Supreme Court of December 14, 2022, case no. T 1569-19 |
| 13. Chamber of Commerce excerpt NextEra Energy Spain Holdings B.V. |
| 14. Chamber of Commerce excerpt NextEra Energy Global Holdings B.V. |

## DAGVAARDING TEVENS HOUDENDE INCIDENTELE VORDERING EX ART. 223 RV

Heden, tweeëntwintig december tweeduizend tweeëntwintig

**TEN VERZOEKE VAN:**

Het **KONINKRIJK SPANJE**, te dezen vertegenwoordigd door de Procureur-Generaal, Ministerie van Justitie, van het Koninkrijk gevestigd te 5 Calle Ayala (28001) Madrid, Spanje ("Spanje"), en uitsluitend met het oog op het doel waarvoor deze dagvaarding wordt uitgebracht, woonplaats kiezende te Amsterdam aan de Claude Debussylaan 247 (1082 MC), ten kantore van Simmons & Simmons LLP, met rekening-courant met landelijke dekking met nummer 88170281, van welk kantoor mr. N. Peters als advocaat wordt gesteld;

heb ik, Bas de Veer, toegevoegd gerechtsdeurwaarder ten kantore van Jan Sebastiaan Evers, gerechtsdeurwaarder te Amsterdam en aldaar kantoorhoudende aan de Hogehilweg 4;

## GEDAGVAARD:

1. de besloten vennootschap met beperkte aansprakelijkheid **NEXTERA ENERGY GLOBAL HOLDINGS B.V.** ("NextEra Global"), gevestigd te Amsterdam en kantoorhoudende aan de Basisweg 10 (1043 AP), Amsterdam, aldaar mijn exploot doende en afschrift van deze dagvaarding gelaten aan:

en

2. de besloten vennootschap met beperkte aansprakelijkheid **NEXTERA ENERGY SPAIN HOLDINGS B.V.** ("NextEra Spain"), gevestigd te Amsterdam en kantoorhoudende aan de Basisweg 10 (1043 AP), Amsterdam, aldaar mijn exploot doende en afschrift van deze dagvaarding en van de daarin genoemde producties, voorafgegaan door een overzicht daarvan, gelaten aan:

*voormeld adres in gesloten envelop met daarop de vermeldingen als wettelijk voorgeschreven omdat ik aldaar niemand aantrof aan wie rechtsgeldig afschrift kon worden gelaten*

## OM:

Op **woensdag 25 januari 2023** om tien (10.00) uur 's-ochtends niet in persoon, maar vertegenwoordigd door een advocaat, te verschijnen ter openbare terechtzitting van de Rechtbank Amsterdam, welke zitting wordt gehouden in het gerechtsgebouw aan de Parnassusweg 280 (1076 AV) Amsterdam;

**MET DE AANZEGGING DAT:**

indien een gedaagde niet op de eerste of op een door de rechtbank nader bepaalde roldatum in het geding verschijnt door te verzuimen advocaat te stellen, of het hierna te noemen griffierecht niet tijdig betaalt, en de voorgeschreven termijnen en formaliteiten in acht zijn genomen, de rechtbank verstek tegen die gedaagde zal verlenen en de vordering zal toewijzen tenzij deze haar onrechtmatig of ongegrond voorkomt;

indien ten minste één van de gedaagden ter terechtzitting is verschenen, tussen alle partijen één vonnis zal worden gewezen, dat als een vonnis op tegenspraak wordt beschouwd;

bij verschijning in het geding van ieder van de gedaagden een griffierecht zal worden geheven, te voldoen binnen vier weken te rekenen vanaf het tijdstip van verschijning;

de hoogte van de griffierechten is vermeld in de meest recente bijlage behorend bij de Wet griffierechten burgerlijke zaken, die onder meer is te vinden op de website: www.kbvg.nl/griffierechtentabel

van een persoon die onvermogend is, een bij of krachtens de wet vastgesteld griffierecht voor onvermogenden wordt geheven, indien hij op het tijdstip waarop het griffierecht wordt geheven heeft overgelegd:

(1) een afschrift van het besluit tot toevoeging, bedoeld in artikel 29 van de Wet op de rechtsbijstand, of indien dit niet mogelijk is ten gevolge van omstandigheden die redelijkerwijs niet aan hem zijn toe te rekenen, een afschrift van de aanvraag, bedoeld in artikel 24, tweede lid, van de Wet op de rechtsbijstand, dan wel

(2) een verklaring van het bestuur van de raad voor rechtsbijstand, bedoeld in artikel 7, derde lid, onderdeel e, van de Wet op de rechtsbijstand waaruit blijkt dat zijn inkomen niet meer bedraagt dan de inkomens bedoeld in de algemene maatregel van bestuur krachtens artikel 35, tweede lid, van die wet

van gedaagden die bij dezelfde advocaat verschijnen en gelijkluidende conclusies nemen of gelijkluidend verweer voeren, op basis van artikel 15 van de Wet griffierechten burgerlijke zaken slechts eenmaal een gezamenlijk griffierecht wordt geheven;

**TENEINDE:**

Namens eiseres te horen eisen en te concluderen als volgt:

**INHOUDSOPGAVE**

1.    Inleiding.................................................................................................................5

DEEL I: FEITEN EN OMSTANDIGHEDEN ...........................................................................6

2.    Partijen en de Spaanse regelingen ter bevordering van de elektriciteitsproductie uit
      hernieuwbare energiebronnen ..........................................................................................6

3.    De door NextEra aangespannen ECT-arbitrage ...............................................................10

4.    De vernietigingsprocedure bij de *ad hoc Committee*.........................................................11

5.    NextEra tracht het arbitraal vonnis ten uitvoer te leggen in de Verenigde Staten.............11

DEEL III: JURIDISCH KADER EN DE ONRECHTMATIGHEID VAN DE
TENUITVOERLEGGING ...................................................................................................12

6.    Het begrip staatssteun.....................................................................................................12

7.    Schadevergoeding als vervanging van onrechtmatige staatssteun...................................13

8.    (Uitvoering van) een arbitraal vonnis als steunmaatregel.................................................13

9.    Rol van de nationale rechter ............................................................................................17

10.   Gewettigd vertrouwen......................................................................................................18

11.   Schadevergoeding ter vervanging van onrechtmatige steun vormt ook onrechtmatige
      steun ...............................................................................................................................19

12.   Toepassing van het rechtskader inzake staatssteun op de casus......................................19

13.   Toepassing van het staatssteunbegrip op (de executie van) het arbitrale vonnis.............20

14.   Taak van de nationale rechter ..........................................................................................22

15.   Conclusie ten aanzien van de staatssteunrechtelijke beoordeling ....................................23

16.   Slotopmerking ten aanzien van de staatssteunrechtelijke beoordeling .............................23

17.   De artikelen 267 en 344 VWEU staan eveneens aan tenuitvoerlegging in de weg ...........23

18.   Het voortzetten van de executie levert misbruik van executiebevoegdheid op.................27

19.   De misbruik van bevoegdheid rechtvaardigt de verzochte onmiddellijke voorzieningen
      .......................................................................................................................................29

DEEL III: PROCEDURELE ASPECTEN EN PETITUM .........................................................29

20.   De vorderingen van Spanje en de noodzaak van dwangsommen......................................29

21.   Een grensoverschrijdend verbod bij wege van voorlopige voorziening is geïndiceerd .....30

22.  Het verweer en de weerlegging daarvan ........................................................................ 30

23.  Een veroordelend vonnis moet uitvoerbaar bij voorraad worden verklaard ...................... 31

24.  Bevoegdheid .................................................................................................................... 31

25.  Bewijsaanbod ................................................................................................................... 31

MITSDIEN ................................................................................................................................. 31

1.     **Inleiding**

1.1     Gedaagden sub 1 en 2, NextEra Global Holdings B.V. en NextEra Energy Spain Holdings B.V. (hierna tezamen: "NextEra") hebben in de periode 2010-2013 geïnvesteerd in de bouw van twee zonne-energiecentrales in Spanje. Zij beoogen daarbij gebruik te maken van een regeling van het Koninkrijk Spanje (hierna: "Spanje") die voorzag in de nodige gunstige financiële voorwaarden. Die regeling vormde een steunmaatregel in de zin van artikel 107, lid 1, van het Verdrag betreffende de werking van de Europese Unie (VWEU) en was niet conform artikel 108, lid 3, VWEU vooraf aangemeld bij de Europese Commissie. Daarmee vormde de maatregel van Spanje een onrechtmatige steunmaatregel. Het was Spanje daarom op grond van het Unierecht niet toegestaan de regelgeving ten uitvoer te leggen en derhalve evenmin toegestaan de steun waarop NextEra recht meende te hebben aan haar ten goede te laten komen. De regelingen zijn gewijzigd en de Europese Commissie heeft deze gewijzigde regelingen in 2017 verenigbaar verklaard met de interne markt (goedgekeurd) conform artikel 107, lid 3, VWEU (**Productie 1**).[1]

1.2     NextEra is daarop een arbitrageprocedure gestart bij het op grond van het internationale Energiehandvest (hierna met de gebruikelijke Engelse afkorting aangeduid als "ECT") ingestelde scheidsgerecht van het International Centre for Settlement of Investment Disputes (hierna: "ICSID"; het scheidsgerecht hierna aan te duiden als het "ICSID-scheidsgerecht") waarbij zij schadevergoeding van Spanje heeft gevorderd. Het ICSID-scheidsgerecht heeft deze vordering toegewezen. (**Productie 2**). Een verzoek tot vernietiging van de uitspraak van het scheidsgerecht aan de zogenoemde *ad hoc Committee* onder het ICSID is vervolgens afgewezen (**Productie 3**).

1.3     NextEra vordert thans bij het District Court for the District of Columbia verlof om voornoemd arbitraal vonnis te executeren (**Productie 4**). Dat verlof zal NextEra de mogelijkheid geven executoriaal beslag te leggen op tegoeden van Spanje in de Verenigde Staten, althans buiten de Europese Unie.

1.4     Hiermee probeert NextEra het verbod op het verstrekken van staatssteun – dat, zoals hierna uiteen zal worden gezet, ook betrekking heeft op schadevergoeding die in de plaats komt van staatssteun – te omzeilen. Door executie zullen alsnog gelden ten laste van Spanje ten goede komen aan NextEra hetgeen een verstrekking van onrechtmatige steun aan NextEra inhoudt. NextEra poogt aldus te bewerkstelligen dat Spanje in strijd met haar verplichtingen op grond van het VWEU handelt.

1.5     Daarenboven geldt dat tenuitvoerlegging van het arbitraal vonnis ook in strijd is met de artikelen 267 en 344 VWEU. Deze artikelen verzetten zich tegen een bepaling in een tussen twee lidstaten van de Europese Unie gesloten internationale overeenkomst op grond waarvan een investeerder uit een van deze lidstaten, in geval van een geschil over investeringen in de andere lidstaat, tegen laatstgenoemde staat een procedure kan inleiden voor een scheidsgerecht en deze lidstaat zich ertoe heeft verbonden de bevoegdheid daarvan te aanvaarden.[2] Het ECT is een dergelijke overeenkomst.

---

[1]     Besluit van de Europese Commissie van 10 november 2017, SA.40348 (2015/NN) — *Spain Support for electricity generation from renewable energy sources, cogeneration and waste*. https://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf.

[2]     HvJ 6 maart 2018, Achmea, C-284/16, ECLI:EU:C:2018:158, punt 32. Zie ook HvJ 2 september 2021, Komstroy, ECLI:EU:C:2021:655 en HvJ 26 oktober 2021, PL Holdings, ECLI:EU:C:2021:875.

1.6    Het voortzetten van de executie in weerwil van voorgaande levert misbruik van recht op, c.q. misbruik van executiebevoegdheid.

1.7    Spanje vordert dan ook NextEra en met deze vennootschappen verbonden ondernemingen te verbieden tot executie over te gaan van het arbitrale vonnis. Tevens verzoekt Spanje uw Rechtbank bij wege van incidentele vordering een voorlopige voorziening te treffen voor de duur van de bodemprocedure,[3] om te voorkomen dat NextEra niet tussentijds reeds tot executie overgaat, met alle mogelijke onomkeerbare gevolgen van dien.

1.8    Volledigheidshalve zij opgemerkt dat Spanje in Nederland nog een soortgelijke procedure aanhangig maakt tegen twee andere vennootschappen, in verband met door die partijen tegen haar gevoerde ECT-arbitrages. Hetzelfde gebeurt in andere Europese jurisdicties (Duitsland en Luxemburg) waar dezelfde problematiek speelt.

1.9    Spanje licht hierna haar vorderingen toe. In deel I zet Spanje de voor deze zaak relevante feiten en omstandigheden uiteen en in deel II licht zij haar vorderingen en het juridisch kader nader toe. In deel III, tot slot, formuleert Spanje haar petitum en bespreekt zij enkele onderwerpen van processuele aard.

## DEEL I: FEITEN EN OMSTANDIGHEDEN

2.    **Partijen en de Spaanse regelingen ter bevordering van de elektriciteitsproductie uit hernieuwbare energiebronnen**

2.1    NextEra hebben in de periode 2010-2013 via de dochteronderneming NextEra Energy España S.L.U. ("NextEra España"), die 100% van de aandelen houdt van de in Spanje gevestigde ondernemingen Planta Termosolar de Extremadura, S.L.U. ("PTE1"), Planta Termosolar de Extremadura 2, S.L.U. ("PTE2"), en NextEra Energy España Operating Services, S.L.U. ("NEEOS") geïnvesteerd in de bouw van twee centrales voor geconcentreerde zonne-energie (CSP), welke centrales worden aangeduid als Termosol 1 en Termosol 2. Deze centrales zijn eigendom van respectievelijk PTE1 en PTE2.

2.2    NextEra Global is opgericht op 27 maart 2008. NextEra Spain is op 7 mei 2008 opgericht. Sinds 2011 is NextEra Global voor 100% eigendom van de Nederlandse onderneming NextEra Energy Global Holdings Cooperative U.A., die op haar beurt een dochteronderneming is van NextEra Energy Inc, een in de V.S. gevestigde onderneming.

2.3    In 2007 voerde Spanje een regeling in ter bevordering van de elektriciteitsproductie uit hernieuwbare energiebronnen. Deze was geregeld bij de koninklijke besluiten 661/2007, 1578/2008 en 6/2009 (hierna: de "2007-regeling") en ter uitvoering van EU-richtlijn 2001/77/EG inzake hernieuwbare energie.[4] De 2007-regeling werd niet aangemeld bij de Europese Commissie of anderszins door de Europese Commissie beoordeeld op basis van de staatssteunregels, ondanks overweging 12 van richtlijn 2001/77/EG, waarin staat dat "*de artikelen 87 en 88* [van het Verdrag, thans de artikelen 107 en 108 VWEU] *van toepassing blijven op dergelijke overheidssteun*".[5] Die overweging maakt duidelijk dat de lidstaten

---

3    Het leek Spanje – mede in het licht van de complexiteit van de zaak – niet opportuun om de zaak in een kort geding voor te leggen.

4    Richtlijn 2001/77/EG van het Europees Parlement en de Raad van 27 september 2001 betreffende de bevordering van elektriciteitsopwekking uit hernieuwbare energiebronnen op de interne elektriciteitsmarkt, PbEG 2001, L283/33.

5    Zie randnummer 11 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als **Productie 5**).

verplicht bleven hun staatssteunregelingen die zij ter omzetting van die richtlijn hadden vastgesteld, aan te melden.

2.4    Op basis van de 2007-regeling konden producenten van duurzame energie kiezen tussen twee opties om in aanmerking te komen voor steun. De eerste optie bestond uit een subsidie voor het produceren van energie uit vernieuwbare bronnen, door middel van het ontvangen van een vast tarief per kWh geproduceerde energie (hierna: subsidie-optie), waarbij het tarief jaarlijks werd geactualiseerd aan de hand van de consumentenprijsindex. De tweede optie bestond uit het verkopen van de (opgewekte) elektriciteit op de markt en het vervolgens ontvangen van een premie per kWh verkochte elektriciteit bovenop de marktprijs (premie-optie).[6]

2.5    Zowel de subsidie als de premie werden berekend op basis van typische kosten en inkomsten van standaardinstallaties voor duurzame energie. Spanje schatte daarbij zowel de initiële investeringskosten als de exploitatie- en onderhoudskosten van de standaardinstallaties, alsmede de marktprijs.

2.6    De 2007-regeling werd gefinancierd door middel van de tarieven voor nettoegang die bij de Spaanse Wet 54/1997 en het Spaanse Koninklijk Besluit 2017/1997 aan elektriciteitsverbruikers en netwerkgebruikers werden opgelegd. Deze tarieven werden daarbij berekend conform een door de Spaanse regering vastgestelde methode. Het Spaanse Koninklijk Besluit 2017/1997 wees daarbij de *Comisión Nacional de Energía* (de Nationale Energiecommissie) – een adviserend overheidsorgaan dat is opgenomen in de (Spaanse) Nationale Commissie voor Markten en Mededinging (hierna: "NCMM") – aan om de geïnde tarieven, door middel van latere vereffeningen, aan de begunstigden van de 2007-regeling over te dragen. Daarbij werden in de bijlagen van Koninklijk Besluit 2017/1997 de begunstigden van de verrekeningen gedefinieerd, de toepasselijke mathematische formules bepaald en werd de vereffeningsprocedure zelf, volgens vooraf bepaalde objectieve parameters, geregeld.[7]

2.7    Voorts hadden installaties voor geconcentreerde zonne-energie in het kader van de regeling van 2007 ook recht op het tarief/de premie voor met fossiele brandstoffen/aardgas opgewekte elektriciteit, wanneer zij in combinatie met hernieuwbare energiebronnen werden gebruikt om een stabiele productie en voorziening te waarborgen, zolang het aandeel van die elektriciteit niet meer bedroeg dan 12% van de totale geproduceerde elektriciteit in het geval van het tarief en 15% van de totale geproduceerde elektriciteit in het geval van de premie.[8]

2.8    Om de steun in het kader van de 2007-regeling te kunnen verkrijgen, moesten potentiële begunstigden een aanvraag indienen bij het Spaanse directoraat-generaal Energiebeleid en Mijnbouw. De installaties die aan de subsidiabiliteitscriteria voldeden, werden ingeschreven in een pre-toewijzingsregister volgens het beginsel "wie het eerst komt, het eerst maalt". De installaties in het register mochten dus de steun ontvangen.[9]

---

[6]    Zie randnummer 14 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

[7]    Zie randnummer 19 t/m 21 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

[8]    Zie randnummer 17 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

[9]    Zie randnummer 18 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

2.9     NextEra en haar dochterondernemingen begonnen in 2007 met activiteiten ter realisering van de centrales.

2.10    Op 14 mei 2009 verzochten PTE 1 en PTE 2 om inschrijving van de eerste Termosol-installatie ("Termosol 1") respectievelijk de tweede Termosol-installatie ("Termosol 2") in het pre-toewijzingsregister.

2.11    In november 2009 stelde Spanje een prioritering vast voor de projecten of installaties die bij het administratieve register zijn ingediend voor de voortoewijzing van betaling. Deze prioritering kende 4 fases. Bij de prioritering werden jaarlijkse beperkingen vastgesteld met betrekking tot het opstarten en in bedrijf nemen van de in het pre-toewijzingsregister geregistreerde installaties, zodat die installaties niet vóór bepaalde data zouden kunnen beginnen met de levering van energie via het distributie- of transportnet.

2.12    Op 11 december 2009 werden de Termosol-fabrieken ingeschreven in het pre-toewijzingsregister en ingedeeld in fase 3 van een tijdschema van prioritering.

2.13    Op 16 december 2009 sloten PTE1 en PTE2 Engineering, Procurement Support and Construction Support Services Agreements met Sener Ingeniería y Sistemas S.A. ("Sener").

2.14    Op 22 december 2009 dienden beide PTE's een verzoek in bij het Spaanse Directoraat-Generaal voor Energiebeleid en Mijnen om hun bouwtermijnen voor Termosol 1 en Termosol 2 uit te stellen, en in plaats daarvan over te gaan naar fase 4 van de prioritering.

2.15    Op 18 februari 2010 besloot het Spaanse Directoraat-Generaal voor Energiebeleid en Mijnen tot goedkeuring van de aanvraag om de Termosol-installaties over te brengen naar fase 4. Als gevolg daarvan dienden de Termosol-installaties uiterlijk op 31 december 2013 een permanente registratie in het daartoe bestemde register te verkrijgen.

2.16    Op 2 december 2010 lieten PTE1 en PTE2 weten dat zij afzagen van de datums van ingebruikneming van Termosol 1 (1 januari 2013) en Termosol 2 (15 maart 2013), die waren vastgesteld op grond van het besluit van het Spaanse Directoraat-Generaal voor Energiebeleid en Mijnen en verzochten zij het directoraat-generaal de vergoedingsvoorwaarden voor de operationele levensduur van de installatie mee te delen.

2.17    Op 28 december 2010 heeft het directoraat-generaal in antwoord op dat verzoek aan PTE1 en PTE2 de krachtens de bepalingen van de vijfde overgangsbepaling van RDL 6/2009 op de installaties van toepassing zijnde tarieven, premies en boven- en ondergrenzen en aanvullende bepalingen, zoals vastgesteld in Koninklijk Besluit 661/2007, meegedeeld.

2.18    Op 28 april 2011 sloten PTE1 en PTE2 leningsovereenkomsten af voor de financiering van de bouw van de Termosol-centrales. De centrales zijn in 2013 gerealiseerd. Op 29 mei 2013 kreeg de Termosol 1 een definitieve registratie in het RAIPRE en op 7 juni 2013 ontving Termosol 2 die registratie.

2.19    Spanje heeft vanaf 2012 verschillende wetsbesluiten ingevoerd die de 2007-regeling hebben gewijzigd, maar met behoud van de essentiële kenmerken van die oorspronkelijke regeling.

2.20    Eerst schrapte wet nr. 15/2012 de vergoeding voor met aardgas opgewekte elektriciteit. Vervolgens schafte wet 2/2013 van 1 februari 2013, onder meer het mechanisme voor de

aanpassing van de terugleveringstarieven aan de index van de consumptieprijzen afschaft en verving deze door een lagere index.[10]

2.21   De regeling van 2013 voorziet in steun voor onder andere installaties voor hernieuwbare energie.

2.22   Twee soorten faciliteiten komen in aanmerking voor steun in het kader van de regeling van 2013:

(A)    Faciliteiten die steun krijgen in het kader van deze nieuwe regeling na de inwerkingtreding van Koninklijk Besluit 413/2014 op 11 juni 2014 ("nieuwe faciliteiten"); en

(B)    Voorzieningen die reeds recht hadden op of reeds steun ontvingen uit de regeling van 2007 toen wetsbesluit 9/2013 op 14 juli 2013 in werking trad ("bestaande voorzieningen").[11]

2.23   De nieuwe regelingen van 2013 resulteerden in een steun die aangepast is aan de nieuwe kenmerken van de regeling.

2.24   De Europese Commissie heeft bij besluit van 10 november 2017 de regeling voor 2013 goedgekeurd als verenigbaar met de interne markt (zie Productie 1).

2.25   Alle faciliteiten die oorspronkelijk van de regeling van 2007 profiteerden, werden automatisch ingeschreven in de regeling van 2013. Bij de beoordeling van de verenigbaarheid van de regeling heeft de Commissie rekening gehouden met de som van de betalingen aan bestaande installaties in het kader van de regelingen van 2007 en 2013, om na te gaan of er geen sprake is van overcompensatie.[12]

2.26   De Europese Commissie beoordeelde de evenredigheid van de aan bestaande installaties toegekende steun overeenkomstig punt 131, onder a), van de richtsnoeren inzake staatssteun voor milieubescherming op basis van de cashflowberekeningen van 21 standaardinstallaties. Deze omvatten inkomsten uit verkoop in het verleden (inclusief die welke voortvloeien uit de regeling van 2007 voor bestaande faciliteiten), de verwachte toekomstige inkomsten uit verkoop, de initiële investeringskosten, de exploitatiekosten en de aan elke faciliteit toe te kennen compensatie voor zowel de exploitatie als de investeringen. Voor alle verstrekte voorbeelden ging de Commissie na of de steun niet hoger was dan wat nodig is om de initiële investeringskosten en de relevante operationele kosten terug te verdienen, plus een marge van een redelijk rendement, gebaseerd op de vroegere en geraamde kosten en marktprijzen. In het besluit van de Commissie van 2017 werd geconcludeerd dat deze rendementspercentages in overeenstemming waren met die welke golden voor soortgelijke maatregelen die de Commissie had goedgekeurd en niet tot overcompensatie leidden.[13]

---

[10]   Zie randnummer 24 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

[11]   Zie randnummer 28 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

[12]   Zie randnummer 34 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

[13]   Zie randnummer 35 van het Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

2.27    NextEra stelt door de wijzigingen in de 2007-regeling, leidend tot lagere steunbedragen, schade te hebben geleden.

3.    **De door NextEra aangespannen ECT-arbitrage**

3.1    NextEra heeft vervolgens op basis van het ECT, dat door Nederland en Spanje is geratificeerd en voor beide landen in werking is getreden, en het ICSID-Verdrag een verzoek tot arbitrage ingediend bij het ICSID, welk verzoek op 15 mei 2014 door het ICSID is ontvangen.[14]

3.2    Door Spanje werd verweer gevoerd, waarbij zij de bevoegdheid van het ICSID-scheidgerecht heeft ontkend.

3.3    Het ICSID-scheidsgerecht heeft op 12 maart 2019 haar *Decision on Jurisdiction, Liability and Principles of Quantum* (ARB/14/11) gewezen. Daarin heeft zij (onder andere) geoordeeld dat:

(A)    het ICSID-scheidsgerecht bevoegd was kennis te nemen van het geschil;

(B)    Spanje niet heeft voldaan aan de krachtens artikel 10 lid 1 ECT op haar rustende verplichting om een eerlijke en billijke behandeling, aangezien zij het gewettigd vertrouwen van eisers niet heeft beschermd; en

(C)    dat eisers (NextEra) recht hebben op schadevergoeding.

3.4    Op 31 mei 2019 heeft het ICSID-scheidsgerecht haar Final Award gewezen. In dit arbitrale eindvonnis is Spanje veroordeeld tot betaling van:

(A)    een bedrag van EUR 290,6 miljoen in verband met haar schending van art. 10 lid 1 ECT, over welk bedrag rente verschuldigd is vanaf 30 juni 2016 (tegen een percentage van 0.234%);

(B)    een bedrag van USD 132.368,86 aan kosten van de arbitrage te vermeerderen met rente vanaf de datum van het arbitrale eindvonnis; en

(C)    een bedrag van USD 4.147.031,81 + EUR 1.042.135,30, wat een derde deel vertegenwoordigt van de juridische kosten van NextEra in de arbitrage, te vermeerderen met rente vanaf de datum van het arbitrale eindvonnis.

3.5    Daarmee vloeit uit het arbitrale vonnis een betalingsverplichting van Spanje aan NextEra van thans ruim EUR EUR 295 miljoen voort.

3.6    Spanje heeft de uitspraak van het ICSID-scheidsgerecht ten aanzien van NextEra als steunmaatregel aangemeld bij de Europese Commissie. De Europese Commissie heeft de ontvangst van de aanmelding op 11 maart 2020 bevestigd en geregistreerd onder nummer SA.56676. De Europese Commissie heeft nog geen besluit ten aanzien van de aangemelde steun genomen.

---

[14]    Randnummer 6 van de Decision on Jurisdiction, Liability and Principles of Quantum van 12 maart 2019 (ARB/14/11), bijgevoegd als **Productie 6**.

4.    **De vernietigingsprocedure bij de *ad hoc Committee***

4.1    Spanje heeft op 26 september 2019 beroep tot vernietiging van het arbitrale vonnis van 31 mei 2019 ingesteld. Een vernietigingsprocedure bij de *ad hoc Committee* kent een zeer terughoudend toetsingskader met een aantal limitatieve gronden voor vernietiging die zijn neergelegd in art. 52 (1) van het verdrag. Verder is vaste rechtspraak onder het ICSID dat:

> *(1) the grounds listed in Article 52(1) are the only grounds on which an award may be annulled; (2) annulment is an exceptional and narrowly circumscribed remedy and the role of an ad hoc Committee is limited; (3) ad hoc Committees are not courts of appeal, annulment is not a remedy against an incorrect decision, and an ad hoc Committee cannot substitute the Tribunal's determination on the merits for its own; (4) ad hoc Committees should exercise their discretion not to defeat the object and purpose of the remedy or erode the binding force and finality of awards; (5) Article 52 should be interpreted in accordance with its object and purpose, neither narrowly nor broadly; (…)"[15]*

4.2    Het *ad hoc Committee* heeft in haar Decision on Annulment van 18 maart 2022 het beroep op vernietiging verworpen.[16] Zij heeft dit gedaan op de voor de *ad hoc Committee* gangbare terughoudende wijze en onder meer geoordeeld dat het ICSID-scheidsgerecht niet buiten haar mandaat is getreden.

5.    **NextEra tracht het arbitraal vonnis ten uitvoer te leggen in de Verenigde Staten**

5.1    NextEra heeft op 3 juni 2019 een vordering bij de District Court for the District of Columbia (hierna: "District Court") ingesteld, waarmee NextEra de District Court vraagt (i) een beschikking te geven waarbij het arbitrale vonnis en de toegekende schadevergoeding van het ICSID-scheidsgerecht wordt erkend en bevestigd, en (ii) een vonnis te wijzen ten gunste van NextEra ten bedrage van de door het ICSID-scheidsgerecht toegekende schadevergoeding.[17]

5.2    Spanje heeft op 11 oktober 2019 een motie tot het afwijzen, althans tot het aanhouden, van NextEra's verzoek van 3 juni 2019 bij de District Court ingediend en de District Court verzocht een hoorzitting in te plannen.

5.3    De District Court heeft op 30 september 2020 de motie van Spanje met betrekking tot het aanhouden van de procedure toegewezen.[18]

5.4    Na afwijzing van het beroep tot vernietiging van het arbitrale vonnis door het *ad hoc Committee* op 18 maart 2022, heeft Spanje op 2 mei 2022 een hernieuwde motie tot het afwijzen van NextEra's verzoek van 3 juni 2019 bij de District Court ingediend.[19]

---

[15]    Zie hierover het ICSID Updated Background Paper on Annulment for the Administrative Council of ICSID van mei 2016, para. 74, te raadplegen via https://icsid.worldbank.org/sites/default/files/publications/Background%20Paper%20on%20Annulment%20April%202016%20ENG.pdf.

[16]    *Decision on Annulment* van de ICSID *ad hoc Committee* van 18 maart 2022, in de ICSID zaak met zaaknr. ARB/14/11, bijgevoegd als Productie 3.

[17]    Vordering Nextera van 3 juni 2019 bij District Court, bijgevoegd als Productie 4.

[18]    Beschikking van 30 september 2020 van District Court, bijgevoegd als **Productie 7**.

[19]    Motie Spanje van 2 mei 2022 bij District Court, bijgevoegd als **Productie 8a**. Het bijbehorende Memorandum van Wet ter ondersteuning van de Motie van Spanje van 2 mei 2022 is bijgevoegd als **Productie 8b**.

5.5     Spanje heeft vervolgens op 29 juni 2022 een memorie van antwoord ter ondersteuning van de hernieuwde motie tot het afwijzen van NextEra's verzoek van 3 juni 2019 bij de District Court ingediend.[20]

5.6     Het District Court heeft nog geen eindoordeel gegeven.

## DEEL III: JURIDISCH KADER EN DE ONRECHTMATIGHEID VAN DE TENUITVOERLEGGING

6.      **Het begrip staatssteun**

6.1     Het begrip staatssteun is een objectief en juridisch begrip dat rechtstreeks is omschreven in artikel 107, lid 1, VWEU.[21] Artikel 107, lid 1, VWEU bepaalt:

> *"Behoudens de afwijkingen waarin de Verdragen voorzien, zijn steunmaatregelen van de staten of in welke vorm ook met staatsmiddelen bekostigd, die de mededinging door begunstiging van bepaalde ondernemingen of bepaalde producties vervalsen of dreigen te vervalsen, onverenigbaar met de interne markt, voor zover deze steun het handelsverkeer tussen de lidstaten ongunstig beïnvloedt."*

6.2     Uit deze bepaling blijkt dat sprake is van een steunmaatregel indien aan de volgende criteria is voldaan:

(A)     door de overheid wordt met overheidsmiddelen;

(B)     aan een onderneming;

(C)     een selectief, niet-marktconform voordeel verschaft;

(D)     waardoor de mededinging wordt vervalst; en

(E)     de tussenstaatse handel kan worden beïnvloed.

6.3     Een nationale maatregel die voldoet aan alle genoemde criteria kwalificeert als een steunmaatregel in de zin van artikel 107, lid 1, VWEU.

6.4     Artikel 108, lid 3, VWEU bepaalt:

> *"De Commissie wordt van elk voornemen tot invoering of wijziging van steunmaatregelen tijdig op de hoogte gebracht, om haar opmerkingen te kunnen maken. Indien zij meent dat zulk een voornemen volgens artikel 107 onverenigbaar is met de interne markt, vangt zij onverwijld de in het vorige lid bedoelde procedure aan. De betrokken lidstaat kan de voorgenomen maatregelen niet tot uitvoering brengen voordat die procedure tot een eindbeslissing heeft geleid."*

6.5     Dit artikellid introduceert de voorafgaande controle op steunmaatregelen door de Europese Commissie: elke (nieuwe) steunmaatregel moet vooraf bij de Commissie worden

---

[20]     Memorie van antwoord Spanje van 29 juni 2022 bij District Court, bijgevoegd als **Productie 9**.
[21]     Arrest van het Hof van Justitie van 22 december 2008, British Aggregates/Commissie, C-487/06 P, ECLI:EU:C:2008:757, punt 111; arrest van het Hof van Justitie van 16 mei 2000, Frankrijk/Ladbroke Racing en Commissie, C-83/98, ECLI:EU:C:2000:248, punt 25.

aangemeld (aanmeldverplichting) en kan niet ten uitvoer worden gelegd totdat de Commissie de steun verenigbaar heeft verklaard (*standstill*-verplichting).[22]

6.6    Een steunmaatregel die in strijd met artikel 108, lid 3, VWEU zonder voorafgaand positief besluit van de Europese Commissie is ingevoerd (ten uitvoer wordt gelegd) vormt onrechtmatige steun.[23]

6.7    Ook wanneer de Europese Commissie, na onderzoek, niet of niet tijdig aangemelde steun – dus onrechtmatige steun – verenigbaar verklaart, verandert dat niets aàn de onrechtmatigheid van de in strijd met de aanmeldverplichting en *standstill*-verplichting verstrekte steun. Het Hof van Justitie oordeelde dienaangaande:

> "*De eindbeslissing van de Commissie heeft namelijk niet tot gevolg dat de ongeldigheid van uitvoeringsmaatregelen die in strijd met het in deze bepaling neergelegde verbod zijn vastgesteld, achteraf wordt gedekt. Elke andere uitlegging zou de schending door de betrokken lidstaat van artikel 88, lid 3, laatste volzin, EG* [thans artikel 107, lid 3, VWEU] *in de hand werken en deze bepaling van haar nuttig effect beroven.*"[24]

## 7.    Schadevergoeding als vervanging van onrechtmatige staatssteun

7.1    Hoewel ondernemingen de nationale rechter kunnen vragen de betaling te gelasten van schadevergoeding waarop zij menen recht te hebben, kunnen die vorderingen niet tot gevolg hebben dat de effectieve toepassing van de staatssteunvoorschriften van de Unie wordt omzeild.[25]

7.2    Met name kunnen ondernemingen die krachtens nationaal recht mogelijk gerechtigd zijn steun te ontvangen die niet is aangemeld bij en goedgekeurd door de Commissie, maar die deze steun niet hebben ontvangen, geen schadevergoeding eisen voor het bedrag dat gelijk is aan het bedrag aan niet-ontvangen steun, omdat dit een indirecte toekenning van onrechtmatige steun zou zijn.[26]

## 8.    (Uitvoering van) een arbitraal vonnis als steunmaatregel

8.1    Uit het arrest van het Hof van Justitie in de Micula-zaak[27] (hierna: Micula-arrest) volgt dat de Europese Commissie bevoegd is om te onderzoeken of een uitspraak van een scheidsgerecht dat is ingesteld op grond van het ICSID-Verdrag waarbij dat scheidsgerecht een schadevergoeding heeft toegewezen aan een aantal ondernemingen, een

---

[22]    Tenzij sprake is van een uitzondering op de aanmeldverplichting op grond van een groepsvrijstelling zoals de Algemene Groepsvrijstellingsverordening Vo (EU) 651/2014. In deze zaak zijn geen uitzonderingen op de aanmeldverplichting van toepassing.

[23]    Zie artikel 1, sub f, Verordening (EU) 2015/1589 van de Raad van 13 juli 2015 tot vaststelling van nadere bepalingen voor de toepassing van artikel 108 van het Verdrag betreffende de werking van de Europese Unie, PbEU 2015, L248/9.

[24]    HvJ 12 februari 2008, CELF, C-199/06, ECLI:EU:C:2008:79, punt 40.

[25]    HvJ 29 juni 2004, Commissie/Raad, C-110/02, ECLI:EU:C:2004:395, punt 43; HvJ 18 juli 2007, Lucchini, C-119/05, ECLI:EU:C:2007:434, punten 59-63; HvJ 11 november 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, punten 42-44.

[26]    HvJ 11 november 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, punten 42-44. Zie ook Besluit Commissie 16 april 2004, Steunmaatregel N 304/2003 – Nederland, Steun ten behoeve van Akzo Nobel ter beperking van het transport van chloor, randnummer 18 en voetnoot 10. Zie voorts Conclusie van Advocaat-Generaal Ruiz-Jarabo Colomer van 28 april 2005 in Atzeni e.a., C-346/03 en C-529/03, ECLI:EU:C:2005:256, punt 198.

[27]    HvJ 25 januari 2022, C-638/19 P, Commissie/European Food e.a., ECLI:EU:C:2022:50.

steunmaatregel in de zín van artikel 107, lid 1, VWEU, vormt. Dat brengt met zich dat gezien de rol van de nationale rechter bij het staatssteuntoezicht, de nationale rechter ook bevoegd is om zich uit te laten over de vraag of een dergelijke uitspraak van het scheidsgerecht staatssteun vormt in de zin van artikel 107, lid 1, VWEU, en voorts verplicht is om de nodige maatregelen te treffen om de naleving van artikel 108, lid 3, VWEU, te waarborgen.

8.2    De achtergrond van het Micula-arrest is de volgende.

8.3    Het ICSID-Verdrag, is voor Roemenië op 12 oktober 1975 in werking is getreden. In 2022 hadden Zweden en Roemenië een bilateraal investeringsverdrag (Bilateral Investment Treaty) voor de bevordering en wederzijdse bescherming van investeringen gesloten (hierna: BIT). In Artikel 2, lid 3, van dit BIT is bepaald dat elke verdragsluitende partij te allen tijde een eerlijke en billijke behandeling van de investeringen van investeerders van de andere verdragsluitende partij moet te waarborgen. Verder bepaalt het BIT dat geschillen tussen de investeerders en de verdragsluitende landen worden beslecht door een scheidsgerecht dat het Verdrag inzake de beslechting van geschillen met betrekking tot investeringen tussen staten en onderdanen van andere staten (hierna: ICSID-Verdrag) toepast.[28]

8.4    In 2005 heeft de Roemeense regering in het kader van de onderhandelingen over de toetreding van Roemenië tot de Europese Unie een nationale stimuleringsregeling afgeschaft die bepaalde investeerders in achtergestelde regio's begunstigde (hierna: fiscale stimuleringsregeling). Meerdere Zweedse investeerders hadden op grond van die fiscale stimuleringsregeling investeringen gedaan in een bepaalde streek in Roemenië. Deze investeerders waren van mening dat Roemenië met de afschaffing van de fiscale stimuleringsregeling niet had voldaan aan zijn verplichting om hun gedane investeringen overeenkomstig het BIT eerlijk en billijk te behandelen. Zij hebben dan ook verzocht om oprichting van een scheidsgerecht teneinde vergoeding van de schade die zij hadden geleden door de afschaffing van de fiscale stimuleringsregeling.

8.5    Bij scheidsrechterlijke uitspraak van 11 december 2013 heeft dit scheidsgerecht geoordeeld dat Roemenië, door de betrokken fiscale stimuleringsregeling af te schaffen, het gewettigd vertrouwen van de verzoekers in arbitrage had beschaamd, had verzuimd transparant te handelen door deze verzoekers niet tijdig te informeren en niet had gezorgd voor een eerlijke en billijke behandeling van de investeringen van die verzoekers in de zin van artikel 2, lid 3, BIT. Het scheidsgerecht heeft Roemenië dan ook veroordeeld tot betaling aan verzoekers in arbitrage van een schadevergoeding van circa € 178 miljoen.

8.6    De Europese Commissie heeft Roemenië daarna gewaarschuwd dat elke uitvoering of executie van de scheidsrechterlijke uitspraak zou worden beschouwd als nieuwe staatssteun en bij de Commissie moest worden aangemeld. Roemenië. De Commissie heeft vervolgens in 2014 bij besluit Roemenië gelast elke maatregel die zou kunnen leiden tot de uitvoering of executie van de scheidsrechterlijke uitspraak onmiddellijk op te schorten, aangezien een dergelijke maatregel op onrechtmatige staatssteun zou neerkomen, totdat de Commissie een definitief besluit nam over de verenigbaarheid van deze maatregel. Roemenië heeft desondanks de door het scheidsgerecht aan de Zweedse investeerders toegekende schadevergoeding betaald. Bij besluit van 30 maart 2015[29] heeft de Commissie de betaling van die vergoeding aangemerkt als staatssteun in de zin van artikel 107 VWEU

---

[28]    Het ICSID-Verdrag was voor Roemenië in 1975 in werking getreden, zie punt 3 Micula-arrest.
[29]    Besluit (EU) 2015/1470 van de Commissie van 30 maart 2015 betreffende steunmaatregel SA.38517 (2014/C) (ex 2014/NN) ten uitvoer gelegd door Roemenië – Scheidsrechterlijke uitspraak Micula/Roemenië van 11 december 2013, *Pb.* 2015, L 232/4.

die onverenigbaar is met de interne markt, de uitvoering ervan verboden en de terugvordering van de reeds betaalde bedragen gelast.

8.7    Tegen dat besluit van de Commissie zijn meerdere beroepen tot nietigverklaring ingesteld bij het Gerecht van de Europese Unie (hierna: Gerecht). Het Gerecht heeft het besluit van de Commissie nietig verklaard, met name omdat de Commissie haar bevoegdheden op grond van de staatssteunregels met terugwerkende kracht had toegepast op feiten die dateren van vóór de toetreding van Roemenië tot de Unie op 1 januari 2007. Het Gerecht is er namelijk van uitgegaan dat de betrokken steun door Roemenië is verleend op de datum waarop de fiscale stimuleringsregeling is afgeschaft, te weten in 2005, en niet op de datum van de scheidsgerechtelijke uitspraak.

8.8    Een belangrijke vraag in dit arrest is of ingeval bij een scheidsrechterlijke uitspraak een schadevergoeding is toegekend wegens de afschaffing van een (fiscale) stimuleringsregeling in strijd met een BIT, staatssteun is verleend in de zin van artikel 107, lid 1, VWEU, op de datum waarop die schadevergoeding daadwerkelijk wordt betaald ter uitvoering van die uitspraak omdat het recht op schadevergoeding definitief is ontstaan op de datum waarop die uitspraak van het scheidsgerecht uitvoerbaar is geworden, of op de datum van de afschaffing van de regeling. In het Micula-arrest herinnert het Hof eraan dat het bepalende criterium om vast te stellen op welk tijdstip de staatssteun is toegekend, het moment is waarop de begunstigde onderneming van een bepaalde maatregel een vaste aanspraak op de steun verwerft en de staat zich er dienovereenkomstig toe verbindt de steun te verlenen. Op dat moment kan een dergelijke maatregel naar het oordeel van het Hof van Justitie leiden tot een verstoring van de mededinging die het handelsverkeer tussen de lidstaten ongunstig kan beïnvloeden in de zin van artikel 107, lid 1, VWEU. Vervolgens werd vastgesteld dat het recht op vergoeding van de schade die verzoekers in arbitrage stellen te hebben geleden wegens de beweerdelijk in strijd met het BIT gerealiseerde afschaffing van de betrokken (fiscale) stimuleringsregeling, pas bij de scheidsrechterlijke uitspraak is verleend. Pas na afloop van de daartoe op grond van het arbitragebeding van artikel 7 BIT ingeleide arbitrageprocedure hebben verzoekers in arbitrage namelijk daadwerkelijke betaling van deze schadevergoeding kunnen verkrijgen. Het Hof van Justitie benadrukt dat zelfs al vormt de beweerdelijk in strijd met het BIT gerealiseerde afschaffing van de (fiscale) stimuleringsregeling het schadeveroorzakende feit, het recht op de betrokken schadevergoeding uitsluitend is toegekend bij de scheidsrechterlijke uitspraak, waarbij na toewijzing van de door verzoekers in arbitrage ingestelde vordering niet alleen het bestaan van dit recht is vastgesteld, maar ook het bedrag ervan is gekwantificeerd. De Commissie was dan ook bevoegd om het besluit van 30 maart 2015 vast te stellen op grond van artikel 108 VWEU.[30]

8.9    Dit betekent dat een uitspraak van een scheidsgerecht waarbij een lidstaat wordt veroordeeld tot betaling van een schadevergoeding van een onderneming die actief is in de Europese Unie onderworpen is aan het staatssteuntoezicht van artikel 107 en artikel 108 VWEU. Hiervoor is reeds toegelicht dat schadevergoeding ter vervanging van onrechtmatige of onverenigbare staatssteun, zelf ook als staatssteun in de zin van artikel 107, lid 1, VWEU, oplevert. Zie hoofdstuk 7 hierboven. Dat geldt ook als die schadevergoeding door een scheidsgerecht wordt toegekend, omdat ook dan de schadevergoeding in de plaats komt van onrechtmatige of onverenigbare steunmaatregel. Zie hiervoor ook punt 77 van het Antin-besluit van de Europese Commissie en punt 100-108 van het Micula-besluit van de Europese Commissie. In beide zaken oordeelde de Europese Commissie dat de betaling van een door het scheidsgerecht toegekende schadevergoeding door middel van de uitvoering of executie van de uitspraak, voor de verzoekers in arbitrage een voordeel is ontstaan dat zij niet onder normale

---

[30]    Punt 126 Micula-arrest.

marktomstandigheden zouden hebben verkregen, en staatssteun oplevert omdat aan de overige voorwaarden van artikel 107, lid 1, VWEU wordt voldaan. Dit wordt niet anders doordat het scheidsgerecht is ingesteld onder internationaal recht.

8.10   Hierbij is relevant dat volgens de jurisprudentie van het Hof van Justitie een internationale overeenkomst geen inbreuk mag maken op de in de Verdragen vastgestelde bevoegdheidsregeling en dus op de autonomie van het rechtsstelsel van de Europese Unie waarvan het Hof van Justitie de eerbiediging verzekert, zie het Achmea-arrest punt 32.[31] In dat arrest heeft het Hof van Justitie geoordeeld dat de artikelen 267 en 344 VWEU zich verzetten tegen een bepaling in een tussen twee lidstaten van de Europese Unie gesloten internationale overeenkomst op grond waarvan een investeerder uit een van deze lidstaten, in geval van een geschil over investeringen in de andere lidstaat, tegen laatstgenoemde staat een procedure kan inleiden voor een scheidsgerecht en deze lidstaat zich ertoe heeft verbonden de bevoegdheid daarvan te aanvaarden.[32] Door een dergelijke overeenkomst te sluiten, onttrekken de lidstaten die daarbij partij zijn geschillen die betrekking kunnen hebben op de toepassing of uitlegging van het Unierecht, zoals de regels inzake staatssteun, aan de bevoegdheid van hun eigen rechterlijke instanties en bijgevolg aan het stelsel van rechtsmiddelen dat zij krachtens artikel 19, lid 1, tweede alinea, VEU moeten instellen op de onder dit recht vallende gebieden. Een dergelijke internationale overeenkomst kan dus tot gevolg hebben dat deze geschillen niet worden beslecht op een wijze die de volle werking van dat recht waarborgt.[33] Een arbitragebeding is dan ook niet verenigbaar met het in artikel 4, lid 3, eerste alinea, VEU neergelegde beginsel van loyale samenwerking en doet afbreuk aan de autonomie van het Unierecht.[34] Dat betekent dat een arbitragebeding niet toegepast kan wordt en dat hoe dan ook het Unierecht niet terzijde gesteld kan worden door een uitspraak van het scheidsgerecht. De staatssteunregels blijven dan ook van toepassing in het geval het scheidsgerecht een lidstaat van de Europese Unie veroordeelt tot betaling van een schadevergoeding.

8.11   In het arrest PL Holdings het Hof van Justitie daar verder aan toegevoegd: "Indien een lidstaat die partij is bij een geschil dat betrekking kan hebben op de toepassing en de uitlegging van het Unierecht, dit geschil mag voorleggen aan een arbitrage-instantie met dezelfde kenmerken als de instantie die wordt bedoeld in een nietig arbitragebeding in een internationale overeenkomst als bedoeld in punt 44 van dit arrest, en wel door het sluiten van een ad-hoc arbitrageovereenkomst waarvan de inhoud overeenkomt met dat beding, zou dit er in feite toe leiden dat de verplichtingen worden omzeild die voor die lidstaat voortvloeien uit de Verdragen en, meer in het bijzonder, uit artikel 4, lid 3, VEU en de artikelen 267 en 344 VWEU, zoals uitgelegd in het arrest van 6 maart 2018, Achmea (C-284/16, EU:C:2018:158)."[35] In die zaak is het Hof van Justitie tot het oordeel gekomen dat artikel 267 en artikel 344 VWEU in de weg staan aan een nationale wettelijke regeling op grond waarvan een lidstaat met een investeerder uit een andere lidstaat een ad-hocarbitrageovereenkomst mag sluiten die de voortzetting mogelijk maakt van een arbitrageprocedure die is ingeleid op grond van een arbitragebeding dat inhoudelijk identiek is aan die overeenkomst, dat opgenomen is in een tussen deze twee lidstaten gesloten internationale overeenkomst en nietig is wegens strijdigheid met deze artikelen. Kortom, het is evident dat omzeiling van het EU-recht niet toegestaan is.

---

[31]   HvJ 6 maart 2018, Achmea, C-284/16, ECLI:EU:C:2018:158, punt 32.
[32]   Ibid., p. 60.
[33]   HvJ 27 februari 2018, Associação Sindical dos Juízes Portugueses, C-64/16, ECLI:EU:C:2018:117, punt 34; HvJ 26 oktober 2021, PL Holdings,C-109/20, ECLI:EU:C:2021:875, punt 45.
[34]   HvJ 26 oktober 2021, PL Holdings C-109/20, ECLI:EU:C:2021:875, punt 46.
[35]   HvJ 26 oktober 2021, PL Holdings C-109/20, ECLI:EU:C:2021:875, punt. 47.

9. **Rol van de nationale rechter**

9.1 Uit het voorgaande blijkt dat bij artikel 108, lid 3, VWEU een preventief toezicht op voorgenomen nieuwe steunmaatregelen is ingevoerd. Dit preventieve toezicht strekt ertoe dat alleen steunmaatregelen die verenigbaar zijn verklaard met de interne markt tot uitvoering worden gebracht.[36]

9.2 Teneinde deze doelstelling te bereiken, dient de uitvoering van een voorgenomen steunmaatregel te worden opgeschort totdat de Europese Commissie zich bij wege van een eindbeslissing heeft uitgesproken over de verenigbaarheid van de steunmaatregel (de *standstill*-verplichting).[37]

9.3 De taak van de nationale rechter berust op de rechtstreekse werking van het bij artikel 108, lid 3, VWEU ingestelde verbod op de uitvoering van voorgenomen steunmaatregelen. De rechtstreekse werking van dit verbod strekt zich uit tot elke steunmaatregel die zonder aanmelding tot uitvoering is gebracht.[38]

9.4 De nationale rechter dient te waarborgen dat overeenkomstig het nationale recht alle consequenties zullen worden getrokken uit een schending van de aanmeldingsverplichting en de *standstill*-verplichting als bedoeld in artikel 108, lid 3, laatste volzin, VWEU, zowel wat betreft de geldigheid van de uitvoeringshandelingen als wat betreft de terugvordering van de financiële steun die is verleend in strijd met die bepaling of met eventuele voorlopige maatregelen.[39]

9.5 In dit verband heeft het Hof bij wege van prejudiciële beschikking (omdat naar het oordeel van het Hof van Justitie het antwoord op de gestelde prejudiciële vragen al uit eerdere door het Hof van Justitie gewezen arresten bleek), bevestigd dat het Unierecht, in het bijzonder de artikelen 267 en 344 VWEU, aldus moet worden uitgelegd dat een rechterlijke instantie van een lidstaat dat moet oordelen over de tenuitvoerlegging van het arbitrale vonnis dat het voorwerp was van *besluit (EU) 2015/1470 van de Commissie van 30 maart 2015 betreffende staatssteun SA.38517 (2014/C) (ex 2014/NN) ten uitvoer gelegd door Roemenië - Arbitraal vonnis in de zaak Micula/Roemenië van 11 december 2013*, dat arbitrale vonnis moet vernietigen en het vonnis in geen geval ten uitvoer kan worden gelegd om de begunstigden ervan in staat te stellen de betaling van de hun toegekende schadevergoeding te verkrijgen.[40]

9.6 Spanje wijst er overigens op dat voor het waarborgen van de naleving van artikel 108, lid 3, VWEU, het niet nodig is dat de Commissie bij besluit heeft geoordeeld dat een steunmaatregel onrechtmatig is. Uit het arrest Eesti Pagar van het Hof van Justitie blijkt dat ook wanneer een lidstaat (of een rechter van die lidstaat) constateert dat een maatregel een steunmaatregel vormt en ten onrechte niet is aangemeld bij de Europese Commissie, ook zonder besluit van de Europese Commissie, de lidstaat en al haar organen de nodige

---

[36] HvJ 3 maart 2020, C-75/18, Vodafone Magyarország Mobil Távközlési Zrt., C-75/18, ECLI:EU:C:2020:139, punt 19.

[37] HvJ 21 november 2013, Deutsche Lufthansa, C-284/12, EU:C:2013:755, punten 25 en 26, en HvJ 5 maart 2019, Eesti Pagar, C-349/17, ECLI:EU:C:2019:172, punt 84.

[38] HvJ 21 november 2013, Deutsche Lufthansa, C-284/12, ECLI:EU:C:2013:755, punt 29, en HvJ 5 maart 2019, Eesti Pagar, C-349/17, EU:C:2019:172, punt 88.

[39] HvJ 21 november 2013, Deutsche Lufthansa, C-284/12, ECLI:EU:C:2013:755, punt 30, en HvJ 5 maart 2019, Eesti Pagar, C-349/17, EU:C:2019:172, punt 89.

[40] HvJ 21 september 2022, Romatsa, C-333/19, ECLI:EU:C:2022:749, dictum. De beschikking is alleen beschikbaar in het Frans en is bijgevoegd als **Productie 10a**. Een niet-officiële Nederlandse vertaling, gemaakt met Deepl en voor het gemak van de lezer, is bijgevoegd als **Productie 10b**.

maatregelen moeten nemen om te voorkomen dat on rechtmatige steun wordt toegekend of uitgekeerd.[41]

## 10.    Gewettigd vertrouwen

10.1    Het is vaste jurisprudentie van het Hof van Justitie dat, gelet op de fundamentele rol die de aanmeldingsplicht ex artikel 108, lid 3, VWEU heeft voor de doeltreffendheid van het door de Commissie uitgeoefende dwingende toezicht op de staatssteun, begunstigde ondernemingen geen gewettigd vertrouwen kunnen hebben in de rechtmatigheid van een steunmaatregel, tenzij deze is toegekend met inachtneming van de aanmeldingsprocedure van artikel 108, lid 3, VWEU.[42]

10.2    Volgens het Hof dient een behoedzaam ondernemer normaliter in staat te zijn zich ervan te vergewissen of de aanmeldingsprocedure in acht werd genomen.[43] Wanneer de onderneming zich hiervan niet heeft vergewist, komt haar in beginsel geen beroep op gewettigd vertrouwen toe.

10.3    In het bijzonder kan de steunontvanger, indien steun is toegekend die niet vooraf bij de Commissie was aangemeld, zodat hij op grond van artikel 108, lid 3, VWEU onrechtmatig is, op dat moment geen gewettigd vertrouwen hebben in de rechtmatigheid van de toekenning van de steun tenzij in uitzonderlijke omstandigheden.[44]

10.4    Het Hof heeft erop gewezen dat de artikelen 107 en 108 VWEU elk nuttig effect verliezen, indien een lid-staat wiens instanties een steun in strijd met de procedureregels van artikel 109 hebben toegekend, zich op het gewettigd vertrouwen van de ontvangers van de steun zouden kunnen beroepen om zich te onttrekken aan zijn verplichting, de nodige maatregelen te treffen voor de uitvoering van een beschikking waarbij de Commissie hem gelast de steun terug te vorderen of niet te verstrekken.[45]

10.5    Volgens eveneens vaste jurisprudentie is een beroep op gewettigd vertrouwen in geval van onrechtmatige steun alleen mogelijk indien aan drie voorwaarden is voldaan. In de eerste plaats moet de betrokkene van de administratie nauwkeurige, onvoorwaardelijke en onderling overeenstemmende toezeggingen hebben gekregen, die van *bevoegde* en betrouwbare bronnen afkomstig zijn. In de tweede plaats moeten deze toezeggingen gegronde verwachtingen kunnen wekken bij diegene tot wie zij gericht zijn. In de derde plaats moeten de toezeggingen overeenstemmen met de toepasselijke voorschriften.[46]

---

[41]    HvJ 5 maart 2019, Eesti Pagar, C-349/17, ECLI:EU:C:2019:172, punt 91.

[42]    Zie in deze zin: HvJ 24 november 1987, RSV/Commissie, 223/85, ECLI:EU:C:1987:502, punten 16 en 17; HvJ 20 september 1990, Commissie/Duitsland, C-5/89, EU:C:1990:320, punten 14 en 16; HvJ 13 juni 2013, HGA e.a./Commissie, C-630/11 P–C-633/11 P, ECLI:EU:C:2013:387, punt 134; HvJ 27 januari 1998, Ladbroke Racing/Commissie, T-67/94, EU:T:1998:7, punt 182; Gerecht 16 oktober 2014, Alcoa Trasformazioni/Commissie, T-177/10, ECLI:EU:T:2014:897, punt 61, en Gerecht 22 april 2016, Ierland en Aughinish Alumina/Commissie, T-50/06 RENV II en T-69/06 RENV II, EU:T:2016:227, punt 214.

[43]    Zie o.a. HvJ 20 september 1990, Commissie/Duitsland, C-5/89, EU:C:1990:320, punt 14.

[44]    HvJ 20 september 1990, Commissie/Duitsland, C-5/89, EU:C:1990:320, punten 14 en 16.

[45]    HvJ 20 september 1990, Commissie/Duitsland, C-5/89, EU:C:1990:320, punt 17.

[46]    Zie bijvoorbeeld: Gerecht 15 november 2018, Deutsche Telekom, T-207/10, ECLI:EU:T:2018:786, punt 46.

10.6   Het Hof van Justitie heeft verduidelijkt dat nationale autoriteiten in dit verband niet gelden als bevoegde autoriteit, maar dat het vertrouwen moet zijn opgewekt door instellingen van de Europese Unie.[47]

## 11.   Schadevergoeding ter vervanging van onrechtmatige steun vormt ook onrechtmatige steun

11.1   Hoewel ondernemingen de nationale rechter kunnen vragen de betaling te gelasten van schadevergoeding waarop zij menen recht te hebben, kunnen die vorderingen niet tot gevolg hebben dat de effectieve toepassing van de staatssteunvoorschriften van de Unie wordt omzeild.[48]

11.2   Met name kunnen ondernemingen die krachtens nationaal recht mogelijk gerechtigd zijn steun te ontvangen die niet is aangemeld bij en goedgekeurd door de Commissie, maar die deze steun niet hebben ontvangen, geen schadevergoeding eisen voor het bedrag dat gelijk is aan het bedrag aan niet-ontvangen steun, omdat dit een indirecte toekenning van onrechtmatige steun zou zijn.[49]

## 12.   Toepassing van het rechtskader inzake staatssteun op de casus

### De 2007-regeling vormde een onrechtmatige steunmaatregel

12.1   De Europese Commissie heeft zich reeds uitgelaten over de 2007-regeling in haar besluiten van 2017[50] en 2021.[51] In die besluiten heeft de Commissie vastgesteld dat de 2007-regeling (en de vervolgens gewijzigde regeling) een steunmaatregel vormt.

12.2   Het staat vast dat de 2007-regeling niet is aangemeld bij de Europese Commissie.

12.3   Zoals uit het bovenstaande juridische kader blijkt staat daarmee vast dat de 2007-regeling een onrechtmatige steunmaatregel vormde.

### Geen gewettigd vertrouwen

12.4   Zoals hierboven is uiteengezet kan een begunstigde van een nationale maatregel alleen een beroep doen op gewettigd vertrouwen, indien dat gewettigd vertrouwen is opgewekt door een instelling van de Europese Unie. Uit niets blijkt dat de Europese Commissie zich op enige manier aldus heeft uitgelaten dat NextEra daaraan het vertrouwen kon ontlenen dat de 2007-regeling geen steunmaatregel zou vormen of als rechtmatige steun zou kunnen worden aangemerkt.

---

[47]   Zie bijvoorbeeld HvJ 5 maart 2019, C-349/17, Eesti Pagar, ECLI:EU:C:2019:172, punt 101.

[48]   HvJ 29 juni 2004, Commissie/Raad, C-110/02, ECLI:EU:C:2004:395, punt 43; HvJ 18 juli 2007, Lucchini, C-119/05, ECLI:EU:C:2007:434, punten 59-63; HvJ 11 november 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, punten 42-44.

[49]   HvJ 11 november 2015, Klausner Holz Niedersachsen, C-505/14, ECLI:EU:C:2015:742, punten 42-44. Zie ook Besluit Commissie 16 april 2004, Steunmaatregel N 304/2003 – Nederland, Steun ten behoeve van Akzo Nobel ter beperking van het transport van chloor, randnummer 18 en voetnoot 10. Zie voorts Conclusie van advocaat-generaal Ruiz-Jarabo Colomer van 28 april 2005 in Atzeni e.a., C-346/03 en C-529/03, ECLI:EU:C:2005:256, punt 198.

[50]   Besluit van de Commissie van 10 november 2017, SA.40348 (2015/NN) — Spain Support for electricity generation from renewable energy sources, cogeneration and waste, bijgevoegd als Productie 1.

[51]   Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

12.5   Evenmin blijkt dat NextEra op enige manier het vertrouwen kon ontlenen aan een uitlating van de Europese Commissie dat een arbitraal vonnis (al dan niet van het ICSID-scheidsgerecht) als rechtmatige steun zou kunnen worden beschouwd. Integendeel blijkt zelfs expliciet uit het hiervoor reeds aangehaalde besluit van 30 maart 2015[52] van de Europese Commissie (dat leidde tot het arrest Micula), dus ruim voor de uitspraak van het ICSID-scheidsgerecht, dat de Europese Commissie (de executie van) een uitspraak van een ICSID-scheidsgerecht als onrechtmatige steunmaatregel beschouwt.

13.    **Toepassing van het staatssteunbegrip op (de executie van) het arbitrale vonnis**

13.1   Uit het voorgaande volgt dat de 2007-regeling een onrechtmatige steunmaatregel vormde en derhalve niet tot een verstrekking aan NextEra kon leiden. Uit het voorgaande blijkt tevens dat een schadevergoeding die in de plaats komt van anders onrechtmatig verstrekte steun, zelf eveneens onrechtmatige steun vormt. De toekenning van een schadevergoeding die in de plaats komt van de steun die NextEra meende te kunnen ontvangen op basis van de 2007-regeling, terwijl NextEra in verband daarmee geen beroep toekomt op een gewettigd vertrouwen, vormt daarmee dus eveneens een onrechtmatige steunmaatregel.

13.2   Het doet hierbij niet terzake of de toekenning van die schadevergoeding die dient ter vervanging van onrechtmatige staatssteun plaatsvindt door een administratief orgaan van de lidstaat of door een rechterlijke instantie. Zoals hiervoor reeds is aangegeven geldt immers ook voor de rechterlijke instanties van de lidstaten de plicht om de naleving van de staatssteunregels te waarborgen.[53]

13.3   Daar waar de instanties van lidstaten verplicht zijn ervoor te zorgen dat de naleving van de staatssteunregels gewaarborgd wordt, geldt evenzeer dat zij geen verdragen kunnen sluiten waarbij zij de bevoegdheid om te oordelen over dergelijke (vervangende) schadevergoedingen onttrekken aan de nationale rechter en onderbrengen bij een arbitrale instantie. Aldus zouden zij immers de verplichtingen die uit de jurisprudentie van het Hof van Justitie blijken kunnen omzeilen en daarmee het nuttig effect van de staatssteunregels, daaronder begrepen de aanmeldingsverplichting en de stand still bepalingen teniet kunnen doen.

13.4   Spanje wijst erop dat de Europese Commissie zich in haar besluit van 2017 reeds heeft uitgelaten over de staatssteunrechtelijke beoordeling van een vonnis van het ICSID-scheidsgerecht in een vergelijkbare zaak en dienaangaande als volgt oordeelde (vertaald):

> *"(160) Bij wijze van inleiding merkt de Commissie op dat de meeste investeerders die zaken tegen Spanje hebben aangespannen, in andere lidstaten van de Unie zijn gevestigd. De Commissie is van mening dat elke bepaling die voorziet in arbitrage tussen investeerders en staten tussen twee lidstaten in strijd is met het recht van de Unie; Dit betreft in het bijzonder artikel 19, lid 1, VEU, de beginselen van de vrijheid van vestiging, het vrij verrichten van diensten en het vrije verkeer van kapitaal, zoals neergelegd in de Verdragen (met name de artikelen 49, 52, 56 en 63 VWEU), alsmede de artikelen 64, lid 2, 65, lid 1, 66, 75, 107, 108, 65 215, 267 en artikel 344 VWEU, en de algemene beginselen van Unierecht van voorrang, eenheid en doeltreffendheid van het Unierecht, van wederzijds vertrouwen en van rechtszekerheid.*

---

[52]   Besluit (EU) 2015/1470 van de Commissie van 30 maart 2015 betreffende steunmaatregel SA.38517 (2014/C) (ex 2014/NN) ten uitvoer gelegd door Roemenië – Scheidsrechterlijke uitspraak Micula/Roemenië van 11 december 2013, *Pb.* 2015, L 232/4.

[53]   HvJ 5 maart 2019, Eesti Pagar, C-349/17, ECLI:EU:C:2019:172, punt 91.

*(161) Het conflict betreft zowel de inhoud als de handhaving. Wat de inhoud betreft, voorziet het Unierecht in een volledig pakket regels inzake investeringsbescherming (met name in de artikelen 49, 52, 56 en 63 VWEU, alsook in de artikelen 64, lid 2, 65, lid 1, 66, 75 en 215 VWEU). De lidstaten zijn derhalve niet bevoegd om onderling bilaterale of multilaterale overeenkomsten te sluiten, omdat zij daardoor gemeenschappelijke regels kunnen aantasten of de werkingssfeer ervan kunnen wijzigen. Aangezien de twee reeksen regels inzake investeringsbescherming die mogelijk van toepassing zijn tussen een EU-lidstaat en een investeerder van een andere staat (namelijk de Verdragen en bilaterale investeringsverdragen (BIT's) binnen de EU of het EHV in een intra-EU-situatie) inhoudelijk niet identiek zijn en door verschillende rechters worden toegepast, bestaat er ook een risico van conflicten tussen het internationale investeringsverdrag en het recht van de Unie.*

*(162) Wat de tenuitvoerlegging betreft, moet een op basis van het Energiehandvestverdrag opgericht scheidsgerecht in een geschil tussen een investeerder uit een lidstaat en een andere lidstaat of een intra-EU-BIT het recht van de Unie toepassen als toepasselijk recht (zowel als internationaal recht dat tussen de partijen van toepassing is als, in voorkomend geval, als nationaal recht van de gaststaat). Volgens de rechtspraak is het scheidsgerecht echter geen rechterlijke instantie van een lidstaat, en kan het dus niet naar het Hof verwijzen, omdat met name niet is voldaan aan de vereisten van permanentie, staatskarakter en dwingende bevoegdheid.*

*(163) Het daaruit voortvloeiende conflict tussen verdragen moet overeenkomstig de rechtspraak van het Hof worden opgelost op basis van het beginsel van voorrang ten gunste van het recht van de Unie. Om die redenen is het EHV niet van toepassing op investeerders uit andere lidstaten die een geschil tegen een andere lidstaat aanhangig maken.*

*(164) In ieder geval is er ook in wezen geen sprake van schending van de bepalingen inzake eerlijke en billijke behandeling. Zoals hierboven in punt 3.5.2 is uiteengezet, heeft Spanje in de specifieke situatie van het onderhavige geval de beginselen van rechtszekerheid en gewettigd vertrouwen naar Unierecht niet geschonden. In een situatie binnen de EU maakt het recht van de Unie deel uit van het toepasselijke recht, aangezien het het internationale recht vormt dat tussen de partijen bij het geschil van toepassing is. Bijgevolg kan het beginsel van eerlijke en billijke behandeling, op basis van het beginsel van conforme uitlegging, geen ruimere werkingssfeer hebben dan de Unierechtelijke begrippen rechtszekerheid en gewettigd vertrouwen in het kader van een staatssteunregeling. In een situatie buiten de EU wordt de bepaling inzake eerlijke en billijke behandeling van het EHV geëerbiedigd, aangezien geen enkele investeerder feitelijk een gewettigd vertrouwen kan hebben dat voortvloeit uit onrechtmatige staatssteun. Dit is uitdrukkelijk erkend door arbitrale scheidsgerechten. Het is hoe dan ook vaste rechtspraak dat een maatregel die de nationale bepalingen inzake gewettigd vertrouwen niet schendt, in het algemeen de bepaling inzake eerlijke en billijke behandeling niet schendt.*

*(165) De Commissie herinnert eraan dat elke compensatie die een scheidsgerecht aan een investeerder zou toekennen op basis van het feit dat Spanje de economische premieregeling heeft gewijzigd door de aangemelde*

*regeling, op zich staatssteun zou vormen. De arbitragetribunalen zijn echter niet bevoegd om de toekenning van staatssteun toe te staan. Dat is een exclusieve bevoegdheid van de Commissie. Indien zij compensatie toekennen, zoals in de zaak Eiser/Spanje, of dit in de toekomst zouden doen, zou deze compensatie moeten worden aangemeld als staatssteun in de zin van artikel 108, lid 3, VWEU en onderworpen zijn aan de standstill-verplichting.*

*(166) Ten slotte herinnert de Commissie eraan dat dit besluit deel uitmaakt van het recht van de Unie en als zodanig ook bindend is voor arbitragehoven wanneer zij het recht van de Unie toepassen. Het exclusieve forum om de geldigheid ervan aan te vechten zijn de Europese rechterlijke instanties.*"[54]

13.5   In haar besluit van 19 juli 2021 heeft de Commissie voorts geoordeeld dat een uitspraak van een ICSID-scheidsgerecht in een vergelijkbare zaak een steunmaatregel vormt.[55]

13.6   Spanje heeft de uitspraak van het ICSID-scheidsgerecht ten aanzien van NextEra aangemeld bij de Europese Commissie. De Europese Commissie heeft de ontvangst van de aanmelding op 11 maart 2020 bevestigd en geregistreerd onder nummer SA.56676. De Europese Commissie heeft nog geen besluit ten aanzien van de aangemelde steun genomen.

## 14.   **Taak van de nationale rechter**

14.1   Uit het voorgaande volgt dat uit besluiten van de Europese Commissie – die overigens onherroepelijk zijn – blijkt dat *en* de 2007-regeling *en* de toewijzing van een schadevergoeding door het ICSID-scheidsgerecht, alsmede de executie ervan als onrechtmatige steunmaatregel moeten worden aangemerkt.

14.2   Uit de jurisprudentie van het Hof van Justitie blijkt dat de nationale rechter zich ervan moet onthouden beslissingen te nemen die tegen een besluit van de Commissie indruisen en zich dienen te houden aan de beoordeling van de Commissie van de vraag of er sprake is van staatssteun.[56]

14.3   Het Unierecht verlangt dat de nationale rechter doeltreffende maatregelen neemt om de uitkering van de onrechtmatige steun aan de begunstigde ervan te beletten.[57]

14.4   In onderhavig geval is een verbod aan Spanje om de steun in de vorm van een schadevergoeding op grond van het scheidsrechterlijk vonnis aan NextEra te betalen, geen doeltreffende maatregel, omdat Spanje, indien eenmaal onherroepelijk door een rechterlijke instantie van een derde land verlof tot executie is verleend aan NextEra, die executie als zodanig niet kan tegenhouden.

---

[54]   Besluit van de Commissie van 10 november 2017, SA.40348 (2015/NN) — Spain Support for electricity generation from renewable energy sources, cogeneration and waste, bijgevoegd als Productie 1.

[55]   Besluit van de Europese Commissie van 19 juli 2021, SA.54155, bijgevoegd als Productie 5.

[56]   HvJ 1 november 2013, Deutsche Lufthansa, C-284/12, ECLI:EU:C:2013:755, punt 41.

[57]   Zie HvJ 8 december 2011, Residex Capital IV, C-275/10, ECLI:EU:C:2011:814, punten 44-47. Zie ook: Mededeling van de Commissie over de handhaving van de staatssteunregels door nationale rechterlijke instanties, PbEU 2021, C305/1.

14.5    Het is daarom dat Spanje vordert dat uw Rechtbank, als doeltreffende maatregel om te verzekeren dat geen uitkering van onrechtmatige steun plaatsvindt, een verbod aan NextEra oplegt om tot executie van de scheidsrechterlijke uitspraak over te gaan.

## 15.    **Conclusie ten aanzien van de staatssteunrechtelijke beoordeling**

15.1    Op grond van het voorgaande moet geconcludeerd worden dat uw Rechtbank op grond van het Unierecht als gegeven moet beschouwen dat de executie van de uitspraak van het ICSID-scheidsgerecht – al dan niet nadat een nationale rechter verlof tot executie heeft verleend – ertoe leidt dat Spanje onrechtmatige staatssteun verleent aan NextEra. Voorts blijkt uit het Unierecht dat vervolgens doeltreffende maatregelen moeten worden getroffen om de verstrekking van die onrechtmatige steun te voorkomen. Aangezien een rechterlijk verbod aan Spanje om de steun te verstrekken er niet aan in de weg staat dat NextEra door middel van de executie van het in strijd met het Unierecht door het ICSID-scheidsgerecht gewezen vonnis, deze onrechtmatige steun alsnog aan NextEra wordt verstrekt, vormt een verbod aan NextEra om deze executie te vorderen een doeltreffende maatregel om de Unierechtelijke verplichtingen na te komen.

## 16.    **Slotopmerking ten aanzien van de staatssteunrechtelijke beoordeling**

16.1    Spanje wenst uw Rechtbank erop te wijzen dat uw Rechtbank op grond van de *Mededeling van de Commissie over de handhaving van de staatssteunregels door nationale rechterlijke instanties*[58] informatie kan vragen aan de Europese Commissie of advies kan vragen over de toepassing van de staatssteunregels.

## 17.    **De artikelen 267 en 344 VWEU staan eveneens aan tenuitvoerlegging in de weg**

17.1    Behalve de artikelen 107 en 108 VWEU staan ook de artikelen 267 en 344 VWEU, zoals uitgelegd door het Hof van Justitie, in de weg aan tenuitvoerlegging van de uitspraak van het ICSID-scheidsgerecht.

17.2    In het Achmea-arrest heeft de Grote Kamer van het Hof van Justitie zich uitgelaten over de onverenigbaarheid van het Unierecht met investeringsarbitrages tussen lidstaten en/of ingezetenen van lidstaten. In casu ging het om een tussen Nederland en Slowakije gesloten bilateraal investeringsverdrag (hierna: "BIT") en in het bijzonder om de vraag of het daarin opgenomen beslechtingsmechanisme voor investeringsgeschillen tussen buitenlandse investeerders en de EU-lidstaten in kwestie (zogeheten *Investor-State Dispute Settlement*) verenigbaar is met het Unierecht. Met een beroep op de artikelen 267 en 344 van het VWEU beantwoordde het Hof van Justitie deze vraag ontkennend. Het Hof van Justitie concludeerde dat beslechtingsmechanismes in Intra-EU BITs afbreuk doen aan de autonomie van het Unierecht:

> "*De artikelen 267 en 344 VWEU dienen aldus te worden uitgelegd dat zij zich verzetten tegen een bepaling in een tussen lidstaten gesloten internationale overeenkomst, zoals artikel 8 van de Overeenkomst inzake de bevordering en wederzijdse bescherming van investeringen tussen het Koninkrijk der Nederlanden en de Tsjechische en Slowaakse Federatieve Republiek, op grond waarvan een investeerder uit een van deze lidstaten, in geval van een geschil over investeringen in de andere lidstaat, tegen laatstgenoemde staat*

---

[58]    PbEU 2021, C305/1.

> *een procedure kan inleiden voor een scheidsgerecht waarvan deze lidstaat zich ertoe heeft verbonden de bevoegdheid te aanvaarden."[59]*

17.3    De rechtvaardiging daarvoor was onder meer gelegen in de omstandigheid dat:

> *"(...) de lidstaten die partij zijn bij de BIT door de sluiting hiervan een mechanisme voor beslechting van geschillen tussen een investeerder en een lidstaat hebben ingesteld dat mogelijkerwijs belet dat deze geschillen, hoewel zij betrekking kunnen hebben op de toepassing van het Unierecht, op zodanige wijze worden beslecht dat de volle werking van dit recht is gewaarborgd."[60]*

17.4    Daarbij speelt onder meer een rol dat scheidsgerechten geen onderdeel uitmaken van de nationale rechtsorde en daardoor bijvoorbeeld geen prejudiciële vragen aan het Hof van Justitie kunnen voorleggen. Dit terwijl een overeenkomst – zoals een BIT – niet de allocatie van verantwoordelijkheden en bevoegdheden zoals neergelegd in de Unieverdragen kan aantasten, zoals de bevoegdheden van het Hof van Justitie.[61] Verder doet het arbitraal beding in kwestie volgens het Hof van Justitie afbreuk aan het beginsel van wederzijds vertrouwen tussen de lidstaten, maar ook aan de handhaving van het eigen karakter van het door de Verdragen ingestelde recht dat wordt gewaarborgd door de prejudiciële procedure van artikel 267 VWEU, en bijgevolg is dat artikel niet verenigbaar met het tussen de lidstaten geldende beginsel van loyale samenwerking.

17.5    Met dit baanbrekende arrest werd de onverenigbaarheid met het EU-recht van arbitrageprocedures over investeringen tussen lidstaten en/of onderdanen van een andere lidstaat in de rechtsorde van de EU verankerd. Bijgevolg werd ook de instemming van de aan een arbitrageprocedure deelnemende EU-staat geacht zonder effect te zijn (geweest).

17.6    In een arrest van 2 september 2021, gewezen in een geding tussen de Republiek Moldavië en Komstroy LLC (hierna: "Komstroy"), heeft het Hof – de conclusie van A-G Szpunar volgend – voornoemde onverenigbaarheid bevestigd.[62] Van belang daarbij is dat het in het arrest Komstroy een arbitraal vonnis betrof dat gewezen was onder het ECT, gelijk aan onderhavige zaak. Het Hof van Justitie oordeelde onder meer dat

> *"(...) het EHV de lidstaten weliswaar kan verplichten om in hun betrekkingen met investeerders uit derde landen die ook partij zijn bij dit verdrag, de daarin neergelegde arbitrageregeling in acht te nemen met betrekking tot investeringen die deze investeerders in die lidstaten hebben gedaan, maar dat de handhaving van de autonomie en het eigen karakter van het Unierecht eraan in de weg staan dat het EHV de lidstaten onderling dezelfde verplichtingen oplegt. (...) Gelet op het voorgaande dient te worden geconcludeerd dat artikel 26, lid 2, onder c), EHV aldus moet worden uitgelegd dat het niet van toepassing is op geschillen tussen een lidstaat en een investeerder uit een andere lidstaat over een investering die deze investeerder heeft gedaan in eerstgenoemde lidstaat."[63]*

---

[59]    HvJ 6 maart 2018, Achmea, C-284/16, EU:C:2018:158, punt 62.

[60]    HvJ 6 maart 2018, Achmea, C-284/16, EU:C:2018:158, punt 56.

[61]    Zie bijv. HvJ 30 mei 2006, C-459/03, *Commissie v Ierland*, EU:C:2006:345; Opinie 2/13, para. 180.

[62]    HvJ 2 september 2021, Komstroy, C-741/19, ECLI:EU:C:2021:655.

[63]    HvJ 2 september 2021, Komstroy, C-741/19, ECLI:EU:C:2021:655, punt 65 en 66.

17.7    In het arrest PL Holdings bevestigde het Hof van Justitie wederom deze jurisprudentie.[64] Bovendien oordeelde het Hof van Justitie in deze zaak dat er geen reden is zijn uitleg van de artikelen 267 en 344 VWEU te beperken in de tijd.[65] De uitleg die het Hof van Justitie aan de artikelen 267 en 344 VWEU heeft gegeven ten aanzien van de mogelijkheid voor de lidstaten om arbitrale bedingen overeen te komen in verdragen gold derhalve reeds ten tijde van het aangaan van het ECT en daarmee tevens ten tijde van de investeringen die door NextEra in Spanje zijn verricht.

17.8    De Achmea-lijn is bovendien recent bevestigd in het hiervoor reeds aangehaalde Micula-arrest waarin – wederom gelijk aan onderhavige zaak – sprake was van een uitspraak van een ICSID-scheidsgerecht.[66] Zoals hiervoor al toegelicht, werd in dat arrest tevens bevestigd dat een intra-EU arbitraal vonnis waarbij financiële compensatie wordt toegekend aan een Europese investeerder, staatssteun vormt, hetgeen eveneens een schending van het EU-recht is.

17.9    Volgend op Achmea (en latere rechtspraak) is ook in de diverse lidstaten rechtspraak ontwikkeld waarin toepassing is gegeven aan voornoemde rechtspraak van het Hof van Justitie. Spanje wijst in dit verband op bijvoorbeeld de uitspraken van het Zweedse Hof van beroep waarin een intra-EU arbitraal vonnis werd vernietigd op grond van arbitrabiliteit vertaling (een Engelse vertaling is bijgevoegd als **Productie 11**) en van de Zweedse Hoge Raad, waarmee het PL Holdings v. Polen intra-EU arbitraal vonnis is vernietigd, waarbij werd aangesloten bij het oordeel van het Hof van Justitie over schending van de openbare orde  (een Engelse vertaling is bijgevoegd als **Productie 12**).

17.10    Bovendien heeft de rechtspraak van het Hof van Justitie ook geleid tot ingrijpende gevolgen in het Europese verdragskader. Het startschot daartoe vormde onder meer een oproep van de Europese Commissie aan de lidstaten van 19 juli 2018 om intra-EU BIT's te beëindigen gelet op hun "*incontestable incompatibility*" met EU-recht.[67] Tevens nam de Europese Commissie daarbij het standpunt in dat op de nationale rechter de verplichting rust om arbitrale vonnissen gewezen onder Intra-EU BITs te vernietigen en de tenuitvoerlegging daarvan te weigeren.[68]

17.11    Hierop hebben op 29 mei 2020 de meeste lidstaten, waaronder Spanje en het Koninkrijk der Nederlanden, een internationale overeenkomst gesloten om bilaterale investeringsverdragen tussen EU-lidstaten te beëindigen.[69] Deze overeenkomst bevestigde in artikel 4 de bereidheid van de partijen om gebonden te zijn door de uitlegging van het arrest Achmea en de nietigheid van de arbitrageclausules vanaf het moment dat de laatste partij bij de BIT in kwestie lidstaat van de EU werd. Voor Nederland is deze overeenkomst op 31 maart 2021 in werking getreden.

17.12    In de aanloop naar voornoemde overeenkomst heeft het Nederlands kabinet ook in de context van het ECT uitdrukkelijk bevestigd dat deze overeenkomst verenigbaar moet zijn

---

[64]    HvJ 26 oktober 2021, C-109/20, ECLI:EU:C:2021:875, met name punten 44-47.
[65]    HvJ 26 oktober 2021, C-109/20, ECLI:EU:C:2021:875, punten 64, 66 en 69.
[66]    HvJ 25 januari 2022, C-638/19 P, Commissie/European Food e.a., ECLI:EU:C:2022:50.
[67]    Mededeling van de Commissie aan het Europees Parlement en de Raad, Bescherming van investeringen binnen de EU, COM (2018) 547 final, 19 juli 2018, p. 2.
[68]    Ibid. p. 3.
[69]    Te raadplegen in het Official Journal of the European Union, L 169/1.

met de EU-verdragen, nu de EU partij is bij het ECT.[70] Ook arbitrages gevoerd onder het ECT zijn aldus onverenigbaar met het EU-recht.

17.13   Intussen is het ECT door veel lidstaten opgezegd. Spanje (op 12 oktober 2022) en Nederland (op 19 oktober 2022) hebben eveneens hun terugtrekking uit de overeenkomst aangekondigd.

17.14   Gelet op al het voorgaande zou de tenuitvoerlegging – naast dat zij een schending van de staatssteunregels oplevert – ook overigens in strijd komen met het Unierecht. Immers, volgens de rechtspraak van het Hof van Justitie kan het tussen partijen op grond van art. 10, 26 lid 2, 4 lit. a) (i) ECT gewezen arbitraal vonnis geen stand houden. Met het oog op de doeltreffende handhaving van het recht van de Unie kan het vonnis niet worden erkend en ten uitvoer gelegd wegens schending van het recht van de Unie.

17.15   Meer specifiek geldt dat moet worden aangenomen dat met de onverenigbaarheid tussen het ECT en het Unierecht van meet af aan een overeenkomst tot arbitrage heeft ontbroken. Naast het ontbreken van een overeenkomst tot arbitrage, is het arbitraal vonnis (en de eventuele tenuitvoerlegging daarvan) ook in strijd met de openbare orde en heeft het ICSID-scheidsgerecht een uitspraak gedaan in strijd met het beginsel van arbitrabiliteit.[71] In dat verband zij nog gewezen op de waarde van het Unierecht in de Nederlandse rechtsorde, zoals ook bevestigd in de arresten Van Gend en Loos[72] en Costa/Enel.[73] Het EU-recht vormt een autonome rechtsorde en het EU-recht heeft voorrang op de nationale rechtsorde.[74]

17.16   Recent nog heeft een scheidsgerecht in een ICSID-arbitrage tegen Spanje onder het ECT zich onbevoegd verklaard, in het licht van de arresten Achmea en Komstroy. De plaats van arbitrage was Stockholm. Voor zover voor deze procedure relevant, overwoog het scheidsgerecht onder meer als volgt:

> "475. The Tribunal further observes that Swedish law, which is applicable through the operation of Section 48 SAA, recognises the primacy of EU law. Although the Tribunal is not aware of a decision from the competent Swedish courts specifically addressing the relations between the ECT and EU law, it is conscious that the Svea Court of Appeal withdrew its petition for a preliminary ruling on these relations on the basis of the Komstroy Judgment of the Court of Justice, indicating in this way that its questions were addressed by the Komstroy Judgment. The Tribunal moreover finds guidance in the decision of a court from another EU Member State, the German Bundesgerichtshof which set aside the Achmea award, expressly referring to the primacy of EU law.
>
> 476. The primacy of EU law has been clearly recognised in all the foregoing cases and, very specifically, precluded the unilateral offer to arbitrate in Article 26 ECT because inconsistent with the autonomy and primacy of EU law.
>
> 477. It is therefore the unanimous view of the Tribunal that the same considerations apply to the offer to arbitrate by Spain under Article 26 ECT.

---

[70]   Zie Verslag van een schriftelijk overleg, 1 februari 2021, Kamerstukken II 2020/21, 35 649 (R2150), nr. 3, p. 15.
[71]   Ook in het bijzonder in verband met de regels van staatssteun, die niet ter vrije dispositie van partijen staan.
[72]   HvJ 5 februari 1963, 26-62, ECLI:EU:C:1963:1 (Van Gend & Loos), p. 23.
[73]   HvJ 15 juli 1964, 6-64, ECLI: EU:C:1964:66 (Costa/ENEL), p. 1219.
[74]   Zie over die beginselen recent Y.L. Bouzoraa en J. Lindeboom, 'De autonomie van de Europese rechtsorde en de voorrang van EU-recht: materiële en institutionele aspecten', AA 2021-258.

> *Seated in an EU Member State, it likewise cannot apply the consent to arbitrate by the Respondent and affirm its jurisdiction. <u>Following the reasoning of the CJEU Grand Chamber in the Achmea Judgment and subsequently confirmed in the Komstroy Judgment, this Tribunal considers that the offer of the Respondent, as an EU Member State, to arbitrate under Article 26 ECT a dispute with investors of another EU Member State which would, of necessity, require this Tribunal to interpret and apply the EU Treaties, is precluded. Therefore, there is no unilateral offer by the Respondent which the Claimants could accept.</u>"*[75]

17.17 Aldus is duidelijk dat de veroordelingen van Spanje jegens NextEra onder het arbitraal vonnis in ieder geval in de Europese Unie nooit ten uitvoer zullen kunnen worden gelegd. Ook als partijen dezelfde arbitrage thans weer zouden voeren met als plaats van arbitrage een EU-staat, zou het scheidsgerecht zich onbevoegd verklaren.

17.18 NextEra is een EU-onderdaan. Als zodanig is zij ook onderworpen aan het Unierecht en kan voorgaande haar worden tegengeworpen. Vast staat immers – en daarop richten ook Spanjes verklaringen van recht zich – dat er nooit een geldig aanbod tot arbitrage door Spanje is gedaan en dus ook nooit een geldige overeenkomst tot arbitrage tot stand is gekomen. NextEra moet zich daar ook van bewust zijn. Of een derdeland-rechter zich daaraan gebonden acht staat daar dan verder los van. Waar het om gaat is dat NextEra die omstandigheid niet kan negeren c.q. omzeilen door tenuitvoerlegging te vorderen van een ongeldig arbitraal vonnis in een andere jurisdictie. Doet zij dat wel dan maakt zij daarmee misbruik van recht althans handelt zij onzorgvuldig jegens Spanje.

17.19 Daarmee heeft Spanje recht op en belang bij het gevorderde verbod.

18. **Het voortzetten van de executie levert misbruik van executiebevoegdheid op**

18.1 Hiervoor is genoegzaam uiteengezet dat tenuitvoerlegging van het arbitraal vonnis in strijd is met EU-recht. Dat maakt ook dat het in weerwil daarvan voortzetten van de executie misbruik van recht oplevert, en in het bijzonder misbruik van (executie)bevoegdheid, en in ieder geval in strijd is met de zorgvuldigheid die het maatschappelijk verkeer betaamt. Dat is onrechtmatig jegens Spanje en grond voor de gevraagde verbodsvorderingen en daaraan gekoppelde dwangsomveroordelingen.

18.2 In dat verband zij gewezen op art. 3:13 lid 1 en 2 BW:

> *"1. Degene aan wie een bevoegdheid toekomt, kan haar niet inroepen, voor zover hij haar misbruikt.*
>
> *2. Een bevoegdheid kan onder meer worden misbruikt door haar uit te oefenen met geen ander doel dan een ander te schaden of met een ander doel dan waarvoor zij is verleend of in geval men, in aanmerking nemende de onevenredigheid tussen het belang bij de uitoefening en het belang dat daardoor wordt geschaad, naar redelijkheid niet tot die uitoefening had kunnen komen."*

18.3 In onderhavige zaak speelt onder meer het laatstgenoemde geval. Dit laatste geval voorziet in de situatie waarin degene die de bevoegdheid uitoefent, de bedoelde onevenredigheid

---

[75]    Green Power K/S and SCE Solar Don Benito APS/Kingdom of Spain, SCC Case No. V2016/135. Voetnoten zijn weggelaten uit de aangehaalde overwegingen.

kent of behoort te kennen.[76] Van misbruik van bevoegdheid is sprake indien na de afweging van beide belangen, met inachtneming van de redelijkheid, blijkt dat sprake is van een ontoelaatbare onevenredigheid.[77]

18.4    In dit geval weet NextEra dat het arbitraal vonnis ongeldig is nu het is gewezen zonder het bestaan van een onderliggende overeenkomst tot arbitrage. Zij weet ook althans behoort te weten dat de (al dan niet gedwongen) tenuitvoerlegging kan leiden tot onrechtmatig staatssteun, met alle mogelijke gevolgen voor Spanje van dien. NextEra is zich er aldus van bewust dat er een ontoelaatbare onevenredigheid bestaat tussen haar belang om een ongeldig arbitraal vonnis in een buitenlandse jurisdictie ten uitvoer te leggen en Spanjes belang om dat te voorkomen en zodoende het Unierecht te respecteren.

18.5    Verder is in dit geval evident sprake van een kennelijke juridische misslag door het ICSID-scheidsgerecht.  Het ICSID-scheidsgerecht heeft namelijk een arbitraal vonnis gewezen dat qua inhoud dan wel wat rechtsgevolg betreft in strijd is met de regels van staatssteun. In dat verband zij ook opgemerkt dat de staatssteunregels naar vaste rechtspraak van het Hof van Justitie het gezag van gewijsde van tussen partijen gewezen vonnissen kunnen doorbreken. Logischerwijs heeft dat dan ook te gelden voor het in strijd met de staatssteunregels gewezen arbitrale vonnis alsmede voor arbitrale vonnissen gewezen in strijd met voornoemde Achmea- en Komstroyrechtspraak.

18.6    De opsomming uit lid 2 is overigens niet limitatief. Ook andere maatstaven kunnen worden aangelegd om tot misbruik van bevoegdheid te komen. Zo overwoog de Hoge Raad in zijn overzichtsarrest van 31 december 2019 over de tenuitvoerlegging en schorsing van vonnissen:

>    "*In dit verband verdient nog opmerking dat de in de hiervoor in 5.3.3 aangehaalde uitspraak van 22 april 1983 genoemde gevallen – de ten uitvoer te leggen uitspraak berust klaarblijkelijk op een juridische of feitelijke misslag, respectievelijk de tenuitvoerlegging zal door na deze uitspraak voorgevallen of aan het licht gekomen feiten klaarblijkelijk aan de zijde van de geëxecuteerde een noodtoestand doen ontstaan – slechts voorbeelden zijn van een situatie waarin de partij die bevoegd is een uitspraak ten uitvoer te leggen, in aanmerking nemende de onevenredigheid tussen het belang bij de uitoefening en het belang dat daardoor wordt geschaad, naar redelijkheid niet tot die uitoefening kan komen en dan dus haar bevoegdheid misbruikt. Er bestaat geen aanleiding de bedoelde schorsingsgrond tot deze gevallen te beperken. Er kunnen zich immers ook andere situaties voordoen waarin in verband met na de uitspraak voorgevallen of aan het licht gekomen feiten sprake is van misbruik van bevoegdheid overeenkomstig de in art. 3:13 BW genoemde maatstaf.*"[78]

In onderhavige zaak kan die misbruik van bevoegdheid verder gevonden worden in de omstandigheid dat NextEra weet althans behoorde te weten dat de arbitrale vonnissen, en de tenuitvoerlegging daarvan in strijd zijn met het EU-recht, en zij welbewust de executie daarvan zoekt in een niet-EU land. Dit terwijl NextEra zelf EU-ingezetene is en deze hele kwestie nota bene is begonnen doordat NextEra gebruik wenste te maken van subsidieregelingen die voortvloeien uit EU-recht. Ook de omstandigheid dat zij weet,

---

76    HR 21 mei 1999, ECLI:NL:HR:1999:ZC2905 (*Kerkhof en Wekking/Spoelstra*).
77    GS Vermogensrecht, art. 3:13 BW, aant. 47.
78    Zie HR 20 december 2019, ECLI:NL:HR:2019:2026, r.o. 5.7.2.

althans behoort te weten, dat zij Spanje mogelijk blootstelt aan sancties, speelt daarbij een rol.

### 19. De misbruik van bevoegdheid rechtvaardigt de verzochte onmiddellijke voorzieningen

19.1 Spanje heeft gelet op het voorgaande ook recht op en belang bij de gevraagde voorzieningen ex art. 223 Rv (welke samenhangen met de vorderingen ten gronde). Het is van groot (spoedeisend) belang dat NextEra een verbod krijgt om hangende deze procedure alsnog doorgaan met de reeds aangevangen tenuitvoerlegging.

19.2 Van Spanje kan ook niet worden gevergd dat zij de uitkomst van deze (mogelijk langdurende) bodemprocedure afwacht. Daarvoor zijn de belangen die op het spel staan simpelweg te groot. Als NextEra nu doorzet met de executie dan ziet Spanje haar geld mogelijk nooit meer terug, als zij aan het einde van deze procedure in het gelijk wordt gesteld. Bovendien geeft NextEra er blijk van niet te willen wachten met de tenuitvoerlegging, maar probeert zij juist zo snel mogelijk te executeren, en wel via een niet-EU land.

19.3 Een en ander klemt temeer nu aan de zijde van NextEra een reëel restitutierisico bestaat. Weliswaar maakt NextEra onderdeel uit van een beursgenoteerd concern, maar de twee entiteiten in kwestie hebben blijkens hun laatst gepubliceerde jaarrekeningen slechts een eigen vermogen van USD 167.857 (NextEra Spain[79]) respectievelijk USD 8.176.668 (NextEra Global[80]). De kans is groot dat indien NextEra zich op korte termijn verhaalt op Spanje, en Spanje uiteindelijk in het gelijk zou worden gesteld in deze procedure, de gevolgen de tenuitvoerlegging onomkeerbaar zijn en NextEra geen verhaal bieden.

## DEEL III: PROCEDURELE ASPECTEN EN PETITUM

### 20. De vorderingen van Spanje en de noodzaak van dwangsommen

20.1 In het voorgaande is onderbouwd waarom de besproken vonnissen van het ICSID-scheidsgerecht een onrechtmatige steunmaatregel vormen en ook overigens in strijd zijn met het Unierecht in verband met het bepaalde in de Achmea-uitspraak, en dat tenuitvoerlegging van die vonnissen derhalve in strijd komt met het Unierecht.

20.2 Spanje heeft aldus het recht en het belang te vorderen dat de onrechtmatigheid van die tenuitvoerlegging wordt vastgesteld en dat als doeltreffende maatregel om met het VWEU strijdige handelingen te voorkomen NextEra wordt geboden de bij het District Court van het District of Columbia lopende procedures onder nummer 1:19-cv-01618 in te trekken, althans op te schorten, alsmede aan NextEra een verbod wordt opgelegd om de bedoelde arbitrale vonnissen te executeren, zolang de Europese Commissie de in die arbitrale vonnissen vervatte steunmaatregel niet verenigbaar met de interne markt heeft verklaard op grond van artikel 107, lid 3, VWEU.

20.3 Om de maatregel daadwerkelijk doeltreffend te maken dient ervoor gezorgd te worden dat wanneer NextEra de procedure bij de District Court van de District of Columbia niet intrekt althans opschort, NextEra een dwangsom verbeurt die afdoende is om NextEra voldoende prikkel te geven om tot intrekking althans schorsing over te gaan.

---

[79]   **Productie 13**, uittreksel uit het handelsregister van het KvK van NextEra Spain.
[80]   **Productie 14**, uittreksel uit het handelsregister van het KvK van NextEra Global.

20.4    Om de maatregel daadwerkelijk doeltreffend te maken dient er voorts voor gezorgd te worden dat wanneer NextEra toch tot executie zou overgaan, NextEra niet in een betere positie komt te verkeren dan wanneer zij conform het Unierecht afziet van executie. Het is om die reden dat Spanje vordert dat NextEra een dwangsom wordt opgelegd van (maximaal) EUR 300 miljoen, zijnde het bedrag dat Spanje op grond van het scheidsrechterlijk vonnis aan NextEra zou moeten betalen (EUR 290,6 miljoen), vermeerderd met kosten. De dwangsom kan lager uitvallen indien NextEra een lager bedrag executeert. Daarmee wordt verzekerd dat NextEra een zodanig dwangsom dient te betalen dat zij niet in een voordeliger positie komt te verkeren wanneer zij ondanks de uitspraak van Uw Rechtbank toch tot executie overgaat.

20.5    Aangezien in de Unierechtelijke staatssteunregels het begrip 'onderneming' niet is gerelateerd aan een juridische entiteit, maar uitgaat van een economisch begrip onderneming, waarin beoordeeld moet worden aan welke economisch eenheid een voordeel (in de zin van artikel 107, lid 1 VWEU) ten goede komt, kan een doeltreffende maatregel die dient te voorkomen dat onrechtmatige steun aan NextEra wordt verstrekt, niet beperkt zijn tot de gedaagden sub 1 en sub 2. Onder die omstandigheden zou immers niet uit te sluiten zijn dat een andere juridische entiteit uit het economisch verband waartoe gedaagden behoren, de onrechtmatige steun ontvangt door de vonnissen te executeren. Om dat te voorkomen, wordt een verbod jegens elke met gedaagden sub 1 en 2 (economisch) verbonden onderneming gevraagd. Daarmee is aansluiting gezocht bij het begrip 'onderneming', zoals dat in het staatssteunrecht wordt gehanteerd.

20.6    Aangezien gedaagden of met hen verbonden ondernemingen hangende deze procedure reeds tot executie zouden kunnen overgaan, heeft Spanje het recht en het belang te vorderen dat voor de duur van de procedure voorlopige voorzieningen worden getroffen als bedoeld in artikel 223 Rv. Wanneer NextEra tot executie overgaat hangende deze procedure bestaat immers het risico dat onomkeerbare gevolgen ontstaan aangezien daar waar NextEra de door executie verkregen activa kan vervreemden of anderszins ervoor kan zorgen dat Spanje de door executie verkregen activa niet meer zal kunnen terugkrijgen, terwijl het bovendien niet kan worden uitgesloten dat NextEra geen alternatief verhaal zal bieden. De verzochte voorlopige voorzieningen dienen er in eerste instantie toe dat NextEra de procedure bij het District Court van het District of Columbia niet zal voortzetten en alles in het werk zal stellen om deze procedure te schorsen. Voor zover NextEra die procedure toch zou voortzetten en na verlof toch tot executie zou overgaan, is het van belang aan de voorlopige voorzieningen een dwangsom te verbinden die NextEra ervan weerhoudt in strijd met de voorlopige voorzieningen te handelen.

21.    **Een grensoverschrijdend verbod bij wege van voorlopige voorziening is geïndiceerd**

21.1    Gelet op al het voorgaande heeft Spanje bij wege van voorlopige voorziening recht op en belang bij een wereldwijd verbod voor NextEra om uitvoeringsmaatregelen te treffen gericht op de tenuitvoerlegging van het arbitraal vonnis. Het is vaste rechtspraak dat de Nederlandse rechter een verbod kan uitspreken gericht op handelingen in het buitenland, aangenomen dat deze op grond van enige regel van (commuun) internationaal bevoegdheidsrecht bevoegd is kennis te nemen van een vordering betreffende een inbreuk (hier een onrechtmatigedaadsvordering).[81]

22.    **Het verweer en de weerlegging daarvan**

22.1    Enige bij Spanje bekende verweren zijn hiervoor reeds weerlegd.

---

[81]    Zie bijv. HR 19 maart 2004, *NJ* 2007, 585 (*Philips/Postech*), m.nt. P. Vlas.

23. **Een veroordelend vonnis moet uitvoerbaar bij voorraad worden verklaard**

23.1 Een belangenafweging brengt met zich dat een veroordelend vonnis uitvoerbaar bij voorraad moet worden verklaard. Anders zouden die veroordelingen immers zinledig kunnen blijken indien NextEra in hoger beroep zou kunnen gaan om vervolgens alsnog ten uitvoer te leggen hangende dat hoger beroep.

23.2 Hiervoor heeft Spanje al toegelicht dat een reëel restitutierisico bestaat aan de zijde van NextEra. Omgekeerd bestaat er geen risico dat Spanje – mocht NextEra uiteindelijk onverhoopt aan het langste eind treken – geen verhaal zal bieden. In dat licht weegt het belang van Spanje op veroordelingen uitvoerbaar bij voorraad zwaarder dan het vooralsnog onbekende belang bij NextEra om de uitvoerbaar bij voorraadverklaring achterwege te laten.

24. **Bevoegdheid**

24.1 Aangezien beide gedaagden gevestigd zijn in Amsterdam is uw rechtbank bevoegd kennis te nemen van deze zaak.

25. **Bewijs**

25.1 Spanje meent met de door haar in het geding te brengen producties haar stellingen afdoende te bewijzen. Niettemin biedt zij aan, voor zover op haar enige bewijslast rust, aanvullend bewijs van haar stellingen te leveren door alle middelen rechtens, ook door het horen van getuigen of deskundigen.

25.2 Spanje overlegt de producties bij deze dagvaarding uiterlijk op de eerste roldatum.

**MITSDIEN**

In het incident

Het Uw Rechtbank moge behagen bij incidenteel vonnis op vorenstaande gronden en voor zover mogelijk ten aanzien van alle hieronder vermelde vorderingen uitvoerbaar bij voorraad:

(A) Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 te gebieden om alle handelingen te verrichten die nodig zijn om de thans bij het United States District Court for the District of Columbia onder zaaknummer 1:19-cv-01618 lopende procedure op te schorten totdat onherroepelijk vonnis is gewezen in het onderhavige geding, binnen 10 dagen na betekening van het vonnis in het incident, op straffe van een dwangsom van EUR 30.000 per dag voor elke dag of dagdeel dat gedaagden die opschortring niet bewerkstelligen.

(B) Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 voor de duur van het geding te verbieden om waar dan ook ter wereld uitvoering te geven, of op enigerlei andere wijze over te gaan tot executie(maatregelen), daaronder begrepen het treffen van conservatoire maatregelen, van de door het ICSID-scheidsgerecht gewezen arbitrale vonnissen van 12 maart 2019 en 31 mei 2019;

(C) Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 voor de duur van het geding

te verbieden om waar dan ook ter wereld te trachten Spanje veroordeeld te krijgen tot het betalen, of op enigerlei andere wijze over te gaan tot het opeisen, van de door het ICSID-scheidsgerecht bij arbitrale vonnissen van 12 maart 2019 en 31 mei 2019 toegekende schadevergoeding, daaronder begrepen het treffen van conservatoire maatregelen;

(D)    Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 voor de duur van het geding te verbieden om waar dan ook ter wereld te trachten Spanje veroordeeld te krijgen tot het betalen, of op enigerlei andere wijze over te gaan tot het opeisen, van de schade die NextEra ten gevolge van de wijzigingen in de 2007-regeling, heeft geleden daaronder begrepen het treffen van conservatoire maatregelen;

(E)    Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 een eenmalige dwangsom op te leggen ter hoogte van EUR 300 miljoen of een bedrag dat overeenkomt met het bedrag dat NextEra (al dan niet in gedeelten) door executie verkrijgt, indien dit lager is, indien NextEra zich niet houdt aan de hiervoor onder B, C en D gevorderde voorlopige voorzieningen.

In de hoofdzaak

Het Uw Rechtbank moge behagen bij vonnis op vorenstaande gronden en voor zover mogelijk ten aanzien van alle hieronder vermelde vorderingen uitvoerbaar bij voorraad:

(F)    Voor recht te verklaren dat de 2007-regeling een steunmaatregel vormt in de zin van artikel 107, lid 1, VWEU;

(G)    Voor recht te verklaren dat de 2007-regeling niet conform artikel 108, lid 3, VWEU bij de Commissie is aangemeld en onrechtmatige staatssteun vormt;

(H)    Voor recht te verklaren dat de door het ICSID-scheidsgerecht bij arbitrale vonnissen van 12 maart 2019 en 31 mei 2019 toegekende schadevergoeding een steunmaatregel vormen in de zin van artikel 107, lid 1, VWEU;

(I)    Voor recht te verklaren dat er nooit een geldige overeenkomst tot arbitrage tot stand is gekomen tussen Spanje en NextEra;

(J)    Voor recht te verklaren dat de invordering van de door het ICSID-scheidsgerecht bij arbitrale vonnissen van 12 maart 2019 en 31 mei 2019 toegekende schadevergoeding in strijd met het Unierecht is, zolang de Europese Commissie die arbitrale vonnissen niet verenigbaar met de interne markt verklaard heeft;

(K)    Voor recht te verklaren dat geen sprake is van een gewettigd vertrouwen bij gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 dat zij op grond van de 2007-regeling aanspraak kon maken op die in die 2007-regeling vervatte steunmaatregel;

(L)    Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 te gebieden om alle handelingen te verrichten die nodig zijn om de thans bij het United States District Court for the District of Columbia onder zaaknummer 1:19-cv-01618 lopende procedure op te schorten en opgeschort te houden, totdat de Europese Commissie de door het ICSID-scheidsgerecht gewezen arbitrale vonnissen van 12 maart 2019

en 31 mei 2019 met de interne markt verklaard heeft, binnen 10 dagen na betekening van het vonnis, op straffe van een dwangsom van EUR 30.000 per dag voor elke dag of dagdeel dat gedaagden die opschortring niet bewerkstelligen.

(M)  Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 te gebieden de thans bij het United States District Court for the District of Columbia onder zaaknummer 1:19-cv-01618 lopende procedure in te trekken, binnen 10 dagen nadat de Europese Commissie de door het ICSID-scheidsgerecht gewezen arbitrale vonnissen van 12 maart 2019 en 31 mei 2019 onverenigbaar met de interne markt verklaard heeft, op straffe van een dwangsom van EUR 30.000 per dag voor elke dag of dagdeel dat gedaagden die opschortring niet bewerkstelligen.

(N)  Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 te verbieden om waar dan ook ter wereld te trachten het Koninkrijk Spanje te veroordelen tot het betalen, of op enigerlei andere wijze over te gaan tot het opeisen, van de schade die NextEra ten gevolge van de wijzigingen in de 2007-regeling, heeft geleden;

(O)  Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 te verbieden om waar dan ook ter wereld uitvoering te geven, of op enigerlei andere wijze over te gaan tot executie, van de door het ICSID-scheidsgerecht gewezen arbitrale vonnissen van 12 maart 2019 en 31 mei 2019, althans NextEra te verbieden om waar dan ook ter wereld uitvoering te geven, of op enigerlei andere wijze over te gaan tot executie, van de door het ICSID-scheidsgerecht bij arbitrale vonnissen van 12 maart 2019 en 31 mei 2019 toegekende schadevergoeding totdat de Europese Commissie die arbitrale vonnissen verenigbaar met de interne markt verklaard heeft;

(P)  Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 te verbieden om waar dan ook ter wereld te trachten Spanje te veroordelen tot het betalen, of op enigerlei andere wijze over te gaan tot het opeisen, van de door het ICSID-scheidsgerecht bij arbitrale vonnissen van 12 maart 2019 en 31 mei 2019 toegekende schadevergoeding, althans NextEra te verbieden om waar dan ook ter wereld te trachten Spanje te veroordelen tot het betalen, of op enigerlei andere wijze over te gaan tot het opeisen, van de door het ICSID-scheidsgerecht bij arbitrale vonnissen van 12 maart 2019 en 31 mei 2019 toegekende schadevergoeding totdat de Europese Commissie die arbitrale vonnissen verenigbaar met de interne markt verklaard heeft;

(Q)  Gedaagden of enige andere met hen verbonden onderneming in de zin van Artikel 3, lid 3, van Bijlage I bij Verordening (EU) Nr. 651/2014 een eenmalige dwangsom op te leggen ter hoogte van EUR 300 miljoen of een bedrag dat overeenkomt met het bedrag dat NextEra (al dan niet in gedeelten) door executie verkrijgt, indien dit lager is;

(R)  Gedaagden te veroordelen tot het betalen van de door Spanje gemaakte proceskosten, waaronder begrepen de nakosten, het verschuldigde griffierecht en het tot aan deze uitspraak begrote bedrag aan salaris van de advocaat.

De kosten dezes zijn voor mij, deurwaarder, EUR 103,33

Deze zaak wordt behandeld door Simmons & Simmons LLP, Claude Debussylaan 247, 1082 MC, Amsterdam, mr. N. Peters (telefoonnummer: 020 722 2360; e-mail niek.peters@simmons-simmons.com en mr. J.J. Bakker (telefoonnummer: 020 722 2353; e-mail: jonathan.bakker@simmons-simmons.com).

## PRODUCTIEOVERZICHT

| |
|---|
| 1. Besluit van de Europese Commissie van 10 november 2017, SA.40348 (2015/NN) – Spain Support for electricity generation from renewable energy sources, cogeneration and waste |
| 2. Award van het ICSID van 31 mei 2019, zaaknr. ARB/14/11 |
| 3. Decision on Annulment van de ICSID ad hoc Committee van 18 maart 2022, zaaknr. ARB/14/11 |
| 4. Vordering van Nextera bij het District Court for the District of Columbia van 3 juni 2022, zaaknr. 1:19-cv-01618 |
| 5. Besluit van de Europese Commissie van 19 juli 2021, SA.54155 (2021/NN) – Arbitration award to Antin – Spain |
| 6. Decision on Jurisdiction, Liability and Principles of Quantum van het ICSID van 12 maart 2019, zaaknr. ARB/14/11 |
| 7. Beschikking van het District Court for the District of Columbia van 30 september 2020, zaaknr. 1:19-cv-01618-TSC |
| 8a. Motie van Spanje bij het District Court for the District of Columbia van 2 mei 2022, zaaknr. 1:19-cv-01618-TSC |
| 8b. Memorandum van Wet ter ondersteuning van de Motie van Spanje bij het District Court for the District of Columbia van 2 mei 2022, zaaknr 1:19-cv-01618-TSC |
| 9. Memorie van antwoord Spanje bij het District Court for the District of Columbia van 29 juni 2022, zaaknr. 1:19-cv-01618-TSC |
| 10a. Beschikking van het HvJ van 21 september 2022 in zaak C-333/19, ECLI:EU:C:2022:749 (Romatsa) |
| 10b. Niet-officiële Nederlandse vertaling, gemaakt met Deepl en voor het gemak van de lezer, van beschikking van het HvJ van 21 september 2022 in zaak C-333/19, ECLI:EU:C:2022:749 (Romatsa) |
| 11. Uitspraak van het Zweedse Hof van beroep van 13 december 2022, zaaknr. T 4658-18 |
| 12. Uitspraak van de Zweedse Hoge Raad van 14 december 2022, zaaknr. T 1569-19 |
| 13. KvK uittreksel NextEra Energy Spain Holdings B.V. |
| 14. KvK uittreksel NextEra Energy Global Holdings B.V. |