**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEXTERA ENERGY GLOBAL HOLDINGS
B.V.; *and* NEXTERA ENERGY SPAIN
HOLDINGS B.V.,

                Petitioners,

v.

KINGDOM OF SPAIN,

                Respondent.

No.: 1:19-cv-01618-TSC

**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION FOR**
**PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTS ............................................................................................................... 4

    A.  The Underlying Investment and Present Dispute ..................................................... 4

    B.  Further Developments in the EU and the Dutch Action ........................................... 6

ARGUMENT ........................................................................................................................ 7

  I.  Legal Standard for Antisuit Injunction ...................................................................... 7

  II.  An Antisuit Injunction Is Not Warranted Here ......................................................... 9

    A.  An Antisuit Injunction Is Not Necessary to Prevent an Irreparable Miscarriage of
          Justice ..................................................................................................................... 9

    B.  Preventing Spain from Litigating in an EU Court Would Violate Clear Norms and
          Upset International Comity ................................................................................... 17

    C.  Petitioners' Motion Cannot Meet the Test for Ordinary Injunctive Relief ................... 20

  CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Abbott*,
    560 U.S. 1 (2010) ........................................................................................................11

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. MD 06-1775JGVVP, 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) ............................14

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
    138 S. Ct. 1865 (2018) ................................................................................................10

*Bae Ge v. Li Peng*,
    201 F.Supp.2d 14 (D.D.C. 2000) ..................................................................................10

*BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition*
    *Program Admin.*,
    884 F.3d 463 (4th Cir. 2018) ...............................................................................9, 18, 19

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017) ............................................................................................16, 17

*Creighton Ltd. v. Government of Qatar*,
    181 F.3d 118 (D.C. Cir. 1999) ......................................................................................12

*Eastern Airlines, Inc. v. Floyd*,
    499 U.S. 530 (1991) ....................................................................................................11

*El Al Isr. Airlines, Ltd. v. Tseng*,
    525 U.S. 155 (1999) ....................................................................................................11

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) ......................................................................................12

*Goss Int'l Corp v. Man Roland Druckmaschinen Aktiengesellschaft*,
    491 F.3d 355 (8th Cir.2007) .......................................................................................8, 23

*Hilton v. Guyot*,
    159 U.S. 113 (1895) ....................................................................................................18

*Ioannidis/Riga v. M/V Sea Concert*,
    132 F. Supp. 2d 847 (D. Or. 2001) ...............................................................................19

*Labat-Anderson, Inc. v. United States*,
    346 F.Supp.2d 145 (D.D.C. 2004) ................................................................................17

*LAIF X SPRL v. Axtel, S.A. de C.V.*,
  390 F.3d 194 (2d Cir. 2004)................................................................9

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984) ...................................................... *passim*

*Mobil Cerro Negro, Ltd. v. Bolivarian Rep. of Venezuela*,
  863 F.3d 96 (2d Cir. 2017)...............................................................5

*Oetjen v. Cent. Leather Co.*,
  246 U.S. 297 (1918)........................................................................18

*Pennsylvania Mun. Authorities Ass'n v. Horinko*,
  292 F.Supp.2d 95 (D.D.C. 2003) .....................................................17

*Phoenix Consulting Inc v. Republic of Angola*,
  216 F.3d 36 (D.C.C. 2000) .........................................................10, 16

*Price v. Socialist People's Libyan Jamahiriya*,
  389 F.3d 192 (D.C. Cir. 2004) .........................................................16

*Process and Industrial Developments Limited v. Federal Republic of Nigeria*,
  962 F.3d 576 (D.C. Cir. 2020).........................................................16

*Rancho Holdings, LLC v. Manzanillo Associates, Ltd.*,
  2011 WL 1326647 (W.D. Mo. 2011), *aff'd*, 435 Fed. Appx. 566 (8th Cir.
  2011) .............................................................................................8

*Segni v. Com. Off. of Spain*,
  816 F.2d 344 (7th Cir. 1987) ...........................................................16

*Stati v. Republic of Kazakhstan*,
  199 F.Supp.3d 179 (D.D.C. 2016)....................................................11

*Sterling Com. Credit--Michigan, LLC v. Phoenix Indus. I, LLC*,
  762 F. Supp. 2d 8 (D.D.C. 2011).....................................................20

*TECO Guatemala Holdings, LLC v. Rep. of Guatemala*,
  414 F. Supp. 3d 94 (D.D.C. 2019) .....................................................5

*Tidewater Invt. SRL v. Bolivarian Rep. of Venezuela*,
  Civil Action No. 17-1457 (TJK), 2018 WL 6605633 (D.D.C. Dec. 17, 2018) .......................5

*United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*,
  45 F.4th 426 (D.C. Cir. 2022).............................................................9

*Warn v. M/Y Maridome*,
  961 F.Supp. 1357, 1377 (S.D. Cal. 1997)...........................................19

*World Wide Minerals, LTD v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) ................................................................................12

**Statutes**

22 U.S.C. §1650a(a)....................................................................................................4, 13

28 U.S.C. § 1605(a)(1).....................................................................................................11

28 U.S.C. § 1605(a)(6).....................................................................................................10

**Other Authorities**

Brief for the United States and Federal Trade Commission as *Amici Curiae*,
    *Empagran, S.A. v. F. Hoffmann-La Roche, Ltd.*,
    417 F.3d 1267 (D.C.Cir.2005), 2005 WL 388672 .................................................15

Brief for the United States as *Amicus Curiae, BAE Sys. Tech. Sol. & Servs.,*
    884 F.3d 483 (4th Cir. 2018) (No. 17-1070) 2018 WL 551803 ........................15, 19

Respondent the Kingdom of Spain ("Spain") respectfully submits this Memorandum of Law in Opposition of Petitioners' Motion for Preliminary Injunction and Temporary Restraining Order (the "Motion").

## PRELIMINARY STATEMENT

As recognized in the Motion, Petitioners NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (collectively, "Petitioners" or "NextEra") are European Union ("EU") citizens, headquartered in the Netherlands; and Spain is an EU Member State, and was the site of the solar project at the center of the parties' dispute. Indeed, Petitioners incorporated as Dutch BVs specifically so they could gain access to valuable benefits under EU law in connection with the Energy Charter Treaty ("ECT"). Without the Dutch BVs, incorporated within the EU framework, there would be no connection to the ECT at all.

Petitioners are accordingly subject to EU law, though they now seek to evade it. The 28 EU Member States have, as described by Prof. Hindelang, ceded to the EU aspects of sovereignty to establish one integrated Europe, characterized by common laws, values, and a single internal market. ECF No. 62-1 (Hindelang Decl.), ¶ 12. The EU and its citizens are governed by two instruments of international law, the EU Treaties referred to as the TEU and the TFEU. The Court of Justice of the European Union ("CJEU") is the highest court in Europe, and is the final authority on the interpretation and application of EU law, including the application and consequence of the TEU and the TFEU to EU Member States and their citizens.

This present action revolves around certain pivotal decisions of the CJEU related to the application of the TEU, the TFEU, and the ECT, all in the so-called "intra-EU" dispute context (i.e., disputes between citizens of the EU and EU Member States). When this action was filed, this

1

Court and the parties did not have the benefit of numerous post-*Achmea* decisions related to this intra-EU dispute that had been issued by the CJEU. In *Achmea*, the CJEU held that a purported offer to resolve disputes *via* ICSID arbitration in a bilateral investment treaty between the Netherlands and the Slovak Republic ("Dutch-Slovak BIT") was invalid, and in an intra-EU dispute like the Dutch-Slovak BIT there is no predicate agreement to arbitrate that can give rise to jurisdiction of an ICSID tribunal. Petitioners, *inter alia*, differentiated *Achmea* because it involved a bilateral investment treaty, and the ECT is a multilateral investment treaty. Petitioners urged this Court to act quickly given that case law on this issue was developing, and not in Petitioners' favor. However, this Court paused as this thorny issue played out, which is sensible given that the issue involves the ECT, a multilateral treaty that the United States is not a party to, and how the EU Treaties affect the ECT as to intra-EU disputes.

The CJEU went on to expressly hold in *Komstroy* that the principles of *Achmea* did apply equally to the ECT. Thus, it similarly held that there can be no predicate agreement to arbitrate in the ECT that can give rise to jurisdiction of an ICSID tribunal as to intra-EU disputes. Petitioners have sought to distinguish *Komstroy* from this particular case, arguing that the circumstances are different or that particular portions of *Komstroy* decision are dicta. However, around just a month ago, on December 13, 2022, the highly regarded Svea Court of Appeal in Stockholm declared an international award against Spain under the ECT invalid. A true and correct translation of this Svea Court of Appeal decision is annexed hereto as Exhibit A. These developments now provide conclusive, if not dispositive, support for Spain's position in these proceedings.

Consistent with these decisions and the relevant underlying principles, Spain has moved to dismiss these proceeding based upon its sovereign immunity guaranteed under the Foreign Sovereign Immunities Act ("FSIA"). (*See* ECF No. 62-78) (the "Motion to Dismiss"). For the

reasons set forth in the Motion to Dismiss, because there is no valid arbitration agreement here, there is no exception to Spain's sovereign immunity pursuant to the FSIA. Thus, a key question in this dispute is whether the Court should respect the decisions of the CJEU, the resolution of which involve matters "domestic" to the EU, or simply disregard the law (both domestic and international) to which these Petitioners and Spain subjected themselves.

In this context, it is the height of irony that Petitioners, two Dutch BVs, complain that Spain is forum shopping, and seek to enjoin Spain from pursuing litigation within the EU that is not just in Petitioner's home country, the Netherlands, but is even in Petitioners' home city of Amsterdam.[1] Spain initiated the Dutch Action in order to obtain a ruling from an EU court on the fundamental question of whether there is a valid arbitration agreement applicable in this case. The Dutch court is particularly well-suited to address this particular issue with CJEU precedent. The Dutch court, to the extent that questions of EU law are still unsettled, can refer questions of EU law to the CJEU. These two Dutch BVs will be able to make their arguments to their home court. Once the Dutch Action concludes, Petitioners can still seek to enforce the Award, subject of course to any ruling on the merits by the Dutch Action. Comity considerations here are particularly clear and the Court should not seek to create or contradict EU law.

The Petitioners have taken a remarkable position in the Motion—they are fleeing their home jurisdiction, for a forum that is home to neither party, and which has no connection to the dispute whatsoever, aside from being the fora selected by Petitioner to try to enforce the Award. Indeed, Petitioners seek the extreme remedy of an anti-suit injunction to prevent an EU Member State from litigating a dispute *in a court in the EU*. This Circuit's restrictive approach to issuing anti-suit injunctions, as well as principles of international comity, strongly disfavor granting the

---

[11] The Dutch Action was filed in the District Court of Amsterdam, which is less than 10km from Petitioners' principle place of business, also in Amsterdam.

extreme relief sought by Petitioners in the Motion. The concerns for international comity are particularly salient here where Petitioners seek to enjoin a foreign sovereign from litigating in the parties' home jurisdiction. And in any event, the Court cannot issue the relief requested until it establishes its own jurisdiction.

For these reasons, as more fully discussed herein, Petitioners' Motion should be dismissed.

## RELEVANT FACTS

The relevant background facts are set out in greater detail in Spain's Motion to Dismiss. The following is a short summary of the critical facts relevant to this particular Motion, as well as important developments since the Motion to Dismiss was briefed in mid-2022. In sum, although Petitioners contort the parties' history into a warped narrative that "underscores the egregiousness of Spain's tactics," Spain's actions have been consistent throughout the parties' dispute. The injunctive relief sought by the Motion simply reinforces that this dispute should be resolved in the EU, as Spain as argued all along, and it is Petitioners that are trying to circumvent the EU Treaties and their obligations thereunder.

### A.    The Underlying Investment and Present Dispute

Petitioners are entities formed and existing under the laws of the Netherlands. Their Dutch citizenship is an essential aspect of Petitioners' dispute with Spain. Petitioners were created as Dutch companies in order for Petitioners to avail themselves of significant benefits afforded to Petitioners under EU law, including tax laws and freedom of movement of capital within the EU. They also, through this citizenship, formed a connection with the ECT.

Petitioners brought and prevailed in the underlying ICSID arbitration, although throughout that proceeding Spain objected to the Tribunal's jurisdiction on the basis that there was no agreement to arbitrate between the parties.

Seeking to now disassociate from the EU, and circumvent basic principles of foreign

sovereign immunity, Petitioners focus solely on 22 U.S.C. § 1650a(a). Petitioners' Memorandum of Law in Support of Motion for Preliminary Injunction ("MOL"), at 5-6. They say that this Court cannot engage in a substantive review of the merits of the Award or even determine if it has jurisdiction, citing to *TECO*, *Tidewater*, and *Mobil Cerro*.[2] None of these cases states that the Court may not determine whether a valid arbitration agreement exists in relation to the underlying dispute, and in fact stand for the provision that the court must ensure its own jurisdiction. The lynchpin of this Court's jurisdiction (if it exists) is the FSIA, which requires the Court to determine whether a valid arbitration exists.

This is the core of the previously filed, and still pending, Motion to Dismiss before this Court.  On May 2, 2022, Spain filed its renewed Motion to Dismiss, asserting sovereign immunity and arguing that the Court has no jurisdiction under the FSIA, on the basis that there is no valid arbitration agreement. ECF No. 62.  Indeed, Spain has argued that the issues underlying the Petition are not rightly decided in the United States, but should be resolved in the EU.

In response, Petitioners filed an opposition to Spain's Motion to Dismiss, along with a purported "Cross-Motion for Summary Judgment." ECF No. 68 (the "Cross-Motion"). The Cross-Motion seeks a resolution of the Petition on its merits, and asks that the Award "be summarily confirmed." Cross-Motion at 8. While Petitioners initially argued in this proceeding that there was a valid arbitration agreement supporting the Award under EU law, they have now abandoned that position and instead now primarily argue that precedent from the CJEU, the EU's highest Court, should be ignored. The Cross-Motion claims that this Court "need not, for purposes of establishing subject matter jurisdiction, engage in any debate regarding the validity or enforceability of the

---

[2] *TECO Guatemala Holdings, LLC v. Rep. of Guatemala*, 414 F. Supp. 3d 94 (D.D.C. 2019); *Tidewater Invt. SRL v. Bolivarian Rep. of Venezuela*, Civil Action No. 17-1457 (TJK), 2018 WL 6605633 (D.D.C. Dec. 17, 2018); *Mobil Cerro Negro, Ltd. v. Bolivarian Rep. of Venezuela*, 863 F.3d 96 (2d Cir. 2017).

arbitral award." Cross-Motion at 20 (quotations omitted). But there is no debate. The CJEU has clearly found that the ECT does not create a valid arbitration agreement in an intra-EU dispute.

Further, Petitioners continue to misrepresent the precedent in the D.C. Circuit. Petitioners continue to wrongly argue that the Judge Mehta's decision in *Micula v. Gov't of Romania*, No. 1:17-cv-02332-APM, ECF No. 203 (D.D.C. Dec. 22, 2022) has some import to this case. It does not. That decision dealt with very specific circumstances that are not relevant here—the issue in the *Micula* case is that Romania was not actually an EU Member State at the time the underlying dispute arose and only later became an EU Member State. In fact, there, Judge Mehta relied on EU court precedent which had held that since Romania had not been an EU Member State at the time the dispute arose there was no intra-EU issue.

### B. Further Developments in the EU and the Dutch Action

During these proceedings, as noted above, EU case law has developed such that Petitioners' arguments are untenable. For example, the *Komstroy* decision was issued, which completely foreclosed Petitioners' argument that the principles outlined in *Achmea* did not apply to the ECT.

Each day brings greater clarity from the EU courts, and the parties have been updating the Court from time to time about various decisions being issued in Europe. In fact, on December 13, 2022, the Svea Court of Appeal in Stockholm declared an international award against Spain under the ECT invalid on the basis that there was no applicable valid arbitration agreement, in accordance with the holdings of the CJEU in *Achmea* and *Komstroy*. This is an important milestone in that it shows that the consequence of the *Komstroy* decision is that without a valid arbitration agreement the Award is unenforceable.

In order to seek a decision on this point for this present case, on December 22, 2022, Spain filed the Dutch Action in the Netherlands. The Dutch Action seeks to prevent Petitioners from executing a judgment in this Court because enforcement of the ICSID Award in this case

constitutes an unlawful grant of state aid, which would put Spain in violation of its obligations under the Treaty on the Functioning of the EU ("TFEU"). *See* ECF No. 78-3. In other words, Spain seeks relief in the Dutch Action in order to avoid running afoul of its treaty obligations and EU law, which threaten to disrupt Spain's relationships with other Member States of the EU. Spain has filed a request in the Dutch Action to enjoin Petitioners from prosecuting this present proceeding until the Dutch Action has concluded, but it does not seek an order that Petitioners must voluntarily dismiss or otherwise abandon this Action. Once the Dutch Action resolves the core jurisdictional issues presented here in accordance with EU law, Petitioners may seek to enforce the ICSID award here. The Dutch Action does not seek emergency relief, and no ruling is imminent in that case.

The Dutch courts have an interest in regulating the conduct of the Petitioners, parties incorporated in the Netherlands, in accordance with EU law. The Dutch court will determine whether a valid arbitration agreement exists in this case, and in accordance with EU law and the EU Treaties, whether Spain and Petitioners formed a valid arbitration agreement relating to this dispute. That is the court best placed to decide this question. Further, if necessary, the CJEU could be called upon to finally resolve these issues related to the Dutch Action.

Petitioners cannot, and do not, argue that the Dutch court does not have jurisdiction over them. Petitioners cannot, and do not, argue that the Dutch court is not properly in the position to decide whether there is an arbitration agreement between Spain and Petitioners.

## **ARGUMENT**

### I.    **Legal Standard for Antisuit Injunction**

There is a currently a split among the federal Circuits with respect to the authority of a district court to order an antisuit injunction. While some Circuits have adopted a "liberal approach"

in granting an anti-suit injunction, the D.C. Circuit has adopted a "restrictive approach" which creates a higher standard that the party seeking an anti-suit injunction must meet. Samantha Koeninger & Richard Bales, When A U.S. Domestic Court Can Enjoin A Foreign Court Proceeding, 22 Cardozo J. Int'l & Comp. L. 473, 476-77 (2014). Under the restrictive approach, even duplicative or vexatious litigation in a foreign court is not enough by itself to warrant an anti-suit injunction. *Id*. (citing *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984)). One Magistrate Judge helpfully summarized the restrictive (or conservative) approach as follows:

> The Eighth Circuit, in the company of the First, Second, Third, Sixth and D.C. Circuits, has adopted what has been labeled as the 'conservative approach' which emphasizes deference to concerns of international comity and under which a foreign anti-suit injunction will issue only if the movant demonstrates that (1) the foreign action would prevent United States jurisdiction or threaten a vital United States policy, and (2) the domestic interest outweigh concerns of international comity.

> In endorsing the "conservative approach," the Eighth Circuit in *Goss* noted that the conservative approach:

>> (1) 'recognizes the rebuttable presumption against issuing international antisuit injunctions,' (2) 'is more respectful of principles of international comity,' (3) 'compels an inquiring court to balance competing policy considerations,' and (4) 'acknowledges that "issuing an international antisuit injunction is a step that should be taken only with care and great restraint" and with the recognition that international comity is a fundamental principle deserving of substantial deference.'

*Rancho Holdings, LLC v. Manzanillo Associates, Ltd.*, 2011 WL 1326647, at *3 (W.D. Mo. 2011), *aff'd*, 435 Fed. Appx. 566 (8th Cir. 2011) (citing *Goss Int'l Corp v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 360 (8th Cir.2007)).

Thus, courts applying the restrictive approach "emphasize the importance of international comity and consider it to be a main factor in evaluating whether to enjoin the foreign court."

8

Koeninger & Bales, 22 Cardozo J. Int'l & Comp. L at 477; *see also United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 434 (D.C. Cir. 2022) (an antisuit injunction must be considered "with due regard for international comity."); *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 199 (2d Cir. 2004) ("principles of comity counsel that injunctions restraining foreign litigation be used sparingly and granted only with care and great restraint…because an anti-suit injunction, though directed at the litigants, effectively restricts the jurisdiction of the court of a foreign sovereign.") (internal quotations omitted). When an antisuit injunction seeks to prevent a foreign sovereign from litigating a dispute elsewhere, "comity concerns are near their peak." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 480 (4th Cir. 2018).

The D.C. Circuit, in explaining the restrictive approach, has stated "injunctions restraining litigants from proceeding in courts of independent countries are rarely issued." *Laker Airways*, 731 F.2d at 927. One reason "cautioning against exercise of the power is avoiding the impedance of the foreign jurisdiction," as antisuit injunctions "effectively restrict the foreign court's ability to exercise its jurisdiction." *Id*. The D.C. Circuit has not established "precise rules governing the appropriateness of antisuit injunctions." *Id*. Generally, the Court must weigh the equities when a party requests and antisuit injunction, and must only order an antisuit injunction "when required to prevent an irreparable miscarriage of justice." *Id*.

## II.    <u>An Antisuit Injunction Is Not Warranted Here</u>

### A.    **An Antisuit Injunction Is Not Necessary to Prevent an Irreparable Miscarriage of Justice**

Petitioners' primary arguments are that an injunction of the Dutch Action is warranted to "preserve this Court's Jurisdiction" and uphold a mandate that U.S. courts recognize and enforce ICSID Awards. *See* MOL, § I.A. These arguments are exceedingly weak, as this Court does not

have jurisdiction over this enforcement action to begin with, and any interest in enforcing the Award is vastly outweighed by concerns of international comity, including the interest a Dutch court has in resolving intra-EU disputes involving its own citizens.

            1.     *This Court Does Not Have "Validly Invoked Jurisdiction" to Preserve*

Petitioners argue that an anti-suit injunction is necessary to "preserve this Court's jurisdiction" and the Court has a "duty to protect [its] legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." MOL at 10-11 (citing *Laker Airways*, 731 F.2d at 927). This argument is without merit because this Court does not have jurisdiction over Spain or this dispute.

Under the FSIA, a foreign state such as Spain is presumptively immune from jurisdiction in United States courts, and no subject matter jurisdiction exists over a foreign state unless a specified exception in the FSIA applies. *Bae Ge v. Li Peng*, 201 F.Supp.2d 14, 23 (D.D.C. 2000); *see also Phoenix Consulting Inc v. Republic of Angola*, 216 F.3d 36, 39 (D.C.C. 2000). If no exception to Spain's sovereign immunity applies, Spain has "an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Phoenix Consulting*, 216 F.3d at 39.

As explained in the Motion to Dismiss, there is no exception to the FSIA that applies. Petitioners rely on the exception in 28 U.S.C. § 1605(a)(6), which provides that there is no immunity where there is a case to confirm an arbitral award if there is an agreement to arbitrate. Petition, ¶¶ 7-8 (ECF No. 1). But there is no agreement to arbitrate between Spain and Petitioners. According to the highest authority on the EU Treaties and EU law, the CJEU, no valid arbitration agreement can be formed between Member States and an investor-citizen of another Member State under the ECT. *See Komstroy*. The United States Supreme Court has repeatedly affirmed that courts must grant deference to a foreign sovereign's interpretation of its own laws. *Animal Sci.*

*Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018); *Abbott v. Abbott*, 560 U.S. 1, 16–19 (2010) (citing decisions by courts of England, Israel, Austria, South Africa, Germany, Canada, and France, all parties to the treaty at issue); *El Al Isr. Airlines, Ltd. v. Tseng*, 525 U.S. 155, 175 (1999) (citing judicial decision by the British House of Lords); *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 550–51 (1991) (citing the Supreme Court of Israel).

Petitioners mistakenly limit their arguments to the ICSID Convention. There is a much more fundamental issue here—whether there is an agreement to arbitrate in the ECT. The CJEU has now clearly held that there is not. As explained by Prof. Hindelang, this is not a question confined to the ICSID Convention itself; because Petitioners and Spain are citizens of the EU and an EU Member state, whether they have agreed to arbitrate is regulated by the international law applicable to them. EU Treaties and the interpretation of those treaties by the highest court in the EU, the CJEU, are dispositive. Now, the CJEU has foreclosed Petitioners' arguments.

Petitioners' only other alternative basis for jurisdiction is that Spain waived sovereign immunity under 28 U.S.C. § 1605(a)(1) by acceding to the ICSID Convention. But this argument fails. Another court in this District found that a valid arbitration agreement which binds the foreign sovereign is necessary in order to find a waiver of sovereign immunity under the FSIA. In *Stati v. Republic of Kazakhstan*, 199 F.Supp.3d 179 (D.D.C. 2016), the court listed the instances where the D.C. Circuit had found an implied waiver of foreign sovereign immunity, and did not list mere ratification of the ICSID Convention. *Id*. at 188. In fact, the court explicitly stated that "whether Kazakhstan agreed to arbitration [was] central to the parties' dispute in this case." *Id*. In other words, the court declined to find that Kazakhstan had waived its foreign sovereign immunity defense merely by ratifying the ICSID Convention. Contrary to Petitioners' waiver argument, "[a]n express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and

unmistakable manifestation of the sovereign's intent to waive its immunity." *World Wide Minerals, LTD v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002). Spain's ratification of the ICSID Convention falls far short of an "unmistakable manifestation" of an intent to waive sovereign immunity considering the ICSID Convention disclaims such an intention. The ICSID Convention itself states that "no Contracting State shall by the mere fact of its ratification…of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to…arbitration." ICSID Convention, Preamble.

There is also "virtually unanimous" consensus that the FSIA's "implied waiver provision" must be construed "narrowly." *Creighton Ltd. v. Government of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (observing that "cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed") (citations omitted). In *Creighton*, the D.C. Circuit held that in the context of actions to enforce arbitral awards, a purported waiver requires an affirmative indication that the foreign sovereign intended to waive its immunity with respect to the particular dispute being arbitrated. *Creighton*, 181 F.3d at 122. No waiver can be found here, where Spain asserted foreign sovereign immunity in its first responsive pleading.

Petitioners repeatedly cite to *Laker Airways*, asserting that the D.C. Circuit was "focused on the essentially interdictory nature of the relief sought by defendants" in affirming the issuance of an anti-suit injunction. MOL at 11. But the *Laker Airways* court was particularly concerned that absent an anti-suit injunction, the proceeding in Britain would enjoin the U.S. court and force plaintiff to litigate in "English courts, [which] do not and can not pretend to offer the plaintiffs here the remedies afforded by the American antitrust laws." *Laker Airways*, 731 F.2d at 930. Here,

12

there is no risk that Petitioners will be unable to enforce the Award. The Dutch Action merely seeks to adjudicate fast-evolving issues of EU law before a court that has an interest in the dispute and the application of EU law. Petitioners are free to enforce the Award after the Dutch Action concludes, particularly if the Dutch Action finds that the parties had an agreement to arbitrate under the ECT. Thus, even if the Dutch court issued an injunction that temporarily prevented Petitioners from prosecuting this present case, Petitioners would ultimately be able to pick up where it left off, with the benefit of a definitive ruling from an EU court.[3] The Motion thus is not necessary to prevent a "miscarriage of justice." *See Laker Airways*, 731 F.2d at 927.

> 2.    *There Is No "Vitally Important" National Interest Which this Court Must Protect*

Petitioners also attempt to argue that an anti-suit injunction is necessary to protect a "vitally important" national interest, in this case "the United States' policy of supporting the integrity and enforceability of ICSID awards." MOL at 16. Petitioners assert that Congress signaled that the enforceability of ICSID awards such as Petitioners' award is "vitally important" to the national interest because 22 U.S.C. 1650a(a) states that an award "shall be enforced" by U.S. courts. This argument is flimsy for multiple reasons, and in fact public policy considerations weigh in favor of resolving the parties' jurisdictional dispute in the Dutch Action.

Spain is dubious that, when ratifying the ICSID Convention, the United States Congress was concerned with the ability of Dutch parties to enforce an ICSID award related to a solar project in Spain against a foreign sovereign, or that it is in the national interest for U.S. courts to interpret rapidly developing areas of EU law, and ignore the EU's valid regulation of its own citizens and Member States. Even so, Petitioners' argument fails because the Dutch Action does not thwart this supposed "vitally important" national interest in enforcing ICSID awards—the Dutch Action only

---

[3] Petitioners' ICSID Award continues to accrue interest during the pendency of this dispute.

seeks to resolve part of the enforcement question in the appropriate forum. Again, the Dutch Action is unlike the *Laker Airways* decision that is much-cited by Petitioners, where the defendants attempted to force the plaintiff to litigate in a foreign forum that deprived plaintiff of rights and remedies available under U.S. antitrust laws. Plaintiff in *Laker Airways* had alleged that the defendants had violated the antitrust laws with their conduct in the U.S., specifically through their conduct related to operation of flights between New York and London. By contrast, Petitioners, two Dutch entities, seek to enforce an ICSID Award related to a solar project in Spain against the Spanish government. This dispute has no relationship to the United States whatsoever, save that Petitioners engaged in forum shopping when it chose to bring an enforcement action in this country. Petitioners are the party trying to escape the authority and jurisdiction of their local courts, not the other way around.

It is only by virtue of Petitioners' citizenship as EU citizens that this dispute arises as it does, with interpretations of the ECT and EU law front and center. Petitioners incorporated within the EU in order to gain a benefit from the EU legal order, and cannot now remove themselves from it when it suits their interests.

In fact, respecting international comity itself, and allowing parties to litigate disputes involving EU law in EU courts is a national interest for the United States. In one antitrust case, a federal court in the Second Circuit explained how the national interest is served by adjudicating questions of EU law in EU courts, stating "[t]he availability of United States courts to adjudicate issues of EU [] law would not only crowd them with claims that are not connected to the United States, but would also inhibit the development of jurisprudence within the European Union." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775JGVVP, 2008 WL 5958061, at *34 (E.D.N.Y. Sept. 26, 2008), *report and recommendation adopted in part*, No. 06-MD-

1775(JG)(VVP), 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009), *aff'd*, 697 F.3d 154 (2d Cir. 2012).

Indeed, in another case, the United States filed an *amicus* brief which cited foreign shopping by plaintiffs and the need to develop foreign law as one reason that respecting international comity and allowing EU courts to adjudicate EU law served the national interest. *See* Brief for the United States and the U.S. Federal Trade Commission as *Amici Curiae*, *Empagran, S.A. v. F. Hoffmann-La Roche, Ltd.*, 417 F.3d 1267 (D.C.Cir.2005) (No. 01-7115), 2005 WL 388672, at 24-25. This is certainly true in this action, where the recent *Achmea* and *Komstroy* decisions are part of a rapidly developing and changing area of EU law. In another case, the United States filed an *amicus* brief that stated "an antisuit injunction, barring a foreign sovereign from invoking the jurisdiction of its own courts, would be a truly extraordinary remedy with significant consequences for international comity, and its issuance could have significant negative consequences for the U.S. government." *See* Brief for the United States as *Amicus Curiae*, *BAE Sys. Tech. Sol. & Servs.*, 884 F.3d 483 (4th Cir. 2018) (No. 17-1070) 2018 WL 551803, at *2. The United States added that "[a]ttempting to manage a foreign state's conduct in this manner, within its own territory, departs dramatically from ordinary sovereignty norms." *Id*. at *8.

The relief sought by the Motion is even more extreme because it effectively infringes on the sovereignty of three separate sovereigns: first, it infringes on Spain's choice to litigate in the parties' home forum; second, it infringes on the authority of the Dutch court to decide disputes germane to its own citizens; and third, it infringes on the European Union's right to have its courts decide questions related to EU laws and treaties. It also threatens to harm relations with the entire EU if Spain is compelled to make a payment towards the ICSID Award that is in violation of the EU Treaties and constitutes an unlawful grant of state aid.

In reality, the only "vitally important" national interest of the United States present here is

in protecting the FSIA, and in respecting principles of international comity by not meddling in the inner workings of the EU. Petitioners' tactical decision to forum shop and attempt enforcement of the Award in the United States falls far short of a vitally important national interest.

### 3. The Relief Requested by Petitioners is Not Presently Possible

As noted above, the United States has a national interest in enforcing the FSIA. In addition, it is vitally important that Spain's sovereign immunity defense be addressed before this Court entertains any other motion or request for relief, including the Motion.

As the United States Supreme Court has stated, "a court should decide the foreign sovereign's immunity defense '[a]t the threshold' of the action." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1324 (2017) (citing *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983). As stated in the Motion to Dismiss, the doctrine of sovereign immunity is a complete immunity from litigation, and not a mere defense to liability. The "district court must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible; to defer the question is to frustrate the significance and benefit of entitlement to immunity from suit." *Phoenix Consulting,* 326 F.3d at 39; *see also Process and Industrial Developments Limited v. Federal Republic of Nigeria*, 962 F.3d 576, 586 (D.C. Cir. 2020) ("the district court impermissibly ordered Nigeria to brief the merits while its colorable immunity assertions remains pending…").

If a foreign sovereign's sovereign immunity defense is not therefore addressed before the merits of the case, "the purpose to be served by sovereign immunity [would] be unduly compromised." *Price v. Socialist People's Libyan Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004); *see also Phoenix Consulting*, 216 F.3d at 39 ("to defer the question is to frustrate the significance and benefit of entitlement to immunity from suit.") (quotations omitted); *Segni v. Com. Off. of Spain*, 816 F.2d 344, 347 (7th Cir. 1987) ("A foreign government should not be put to the expense

of defending what may be a protracted lawsuit without an opportunity to obtain an authoritative determination of its amenability to suit at the earliest possible opportunity."). The Dutch Action is thus also necessary to prevent the harm that Spain would suffer if the Cross Motion is granted without first resolving Spain jurisdictional arguments.

Other courts in this District have found that jurisdictional defenses must be addressed first when there is a motion to dismiss by one party that is countered by a request for a preliminary injunction. *See Labat-Anderson, Inc. v. United States*, 346 F.Supp.2d 145, 149 (D.D.C. 2004) ("[w]hen presented with a motion for a preliminary injunction and a competing motion to dismiss for lack of jurisdiction, the Court must address the jurisdictional issues first."); *see also Pennsylvania Mun. Authorities Ass'n v. Horinko*, 292 F.Supp.2d 95, 101 (D.D.C. 2003). Those arguments apply with even greater force here, where Spain is entitled to take an immediate appeal of any denial of immunity under the collateral-order doctrine. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1323 (2017).

If Spain's sovereign immunity defense is not adjudicated at the outset of this case, one of the goals of the FSIA would be frustrated, as a foreign sovereign would be forced to litigate a dispute when it has complete immunity to it. The Dutch Action should be permitted to resolve the core issues of EU law that are central to Spain's sovereign immunity defense, and this Court could then resolve Spain's FSIA defense while giving collateral estoppel effect to the Dutch court's decision on EU law in the Dutch Action.[4]

### B.    Preventing Spain from Litigating in an EU Court Would Violate Clear Norms and Upset International Comity

In seeking to enjoin Spain from litigating the Dutch Action, Petitioners are seeking an

---

[4] In addition, if this Court has no jurisdiction to decide this dispute, there is no jurisdiction for this Court to "protect," and NextEra's stated justification for this Court to grant the Motion completely collapses.

exceptional and extreme remedy. Petitioners seek to prevent Spain from litigating a dispute concerning the enforcement of an EU Treaty in an EU Court where the counter-party is an EU entity. The Motion is even more unusual in that it seeks to enjoin a foreign sovereign from litigating under its own laws. *See BAE Sys. Tech.*, 884 F.3d at 480 (stating that "because anti-suit injunctions against foreign sovereigns are so unusual" there is "little…precedent [to] guide courts in analysis of this issue."). In addition, because Spain is a foreign sovereign, international comity concerns are further amplified as it seeks to litigate an intra-EU dispute in an EU court. *See id*. ("comity concerns are near their peak" when an injunction seeks to bar a foreign sovereign from litigating a dispute).

Thus, this type of anti-suit injunction flies in the face of the restrictive approach, which centers international comity as the main factor for the Court's consideration. The United States Supreme Court has defined comity as:

> the recognition which one national allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 164 (1895).

In initiating the Dutch Action, Spain seeks a forum in the EU where an intra-EU dispute between an EU Member State and two EU citizens can be resolved in accordance with EU law. As described in the Motion to Dismiss in greater detail, Spain did not consent to arbitrate this dispute under the ECT, and it now seeks to litigate this dispute in an EU forum that is also Petitioners' home forum. Long-standing United States Supreme Court precedent has held that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918). As the United

18

States stated in an *amicus* brief in *BAE Sys. Tech.*, "attempting to enjoin a *foreign sovereign itself* from maintaining a lawsuit in its own courts, and which seeks to enforce a military procurement-related contract entered into *within its own borders* pursuant to its domestic laws…departs dramatically from ordinary sovereignty norms." *See* Brief for the United States as *Amicus Curiae*, *BAE Sys. Tech. Sol. & Servs.*, 884 F.3d 483 (4th Cir. 2018) (No. 17-1070) 2018 WL 551803, at *7-8 (emphasis in original). While the Dutch Action is not in a Spanish court, the same principle should apply here since Spain is an EU Member State and the Dutch Action is pending in an EU court.

Petitioners argue, without a hint of irony, that "[a]ny comity considerations are inherently diminished where, as here, the foreign suit initiated by Spain was filed in the court of another country as a transparent attempt to collaterally attack the Award." MOL at 15. As discussed at length above, *this Action is the foreign suit*—Petitioners are Dutch entities that sought a foreign jurisdiction to enforce its ICSID award, and now seeks to avoid an adjudication in its *own home country*, which is an EU Member State alongside Spain. Petitioners' questionable exposition on the principles of international comity is perhaps unsurprising given that Petitioners have the impossible task of explaining how enjoining a foreign sovereign is not detrimental to international comity.

Finally, the Dutch court has an interest in regulating their own citizens. Indeed, it is widely recognized that courts have an interest in regulating their own citizens. *See, e.g.*, *Ioannidis/Riga v. M/V Sea Concert*, 132 F. Supp. 2d 847, 863 (D. Or. 2001) ("This court has no expertise in foreign law, while courts in Greece and Cyprus are experts at applying their own law. Moreover, Greece has a strong interest in resolving this dispute because one of its own citizens was severely injured."); *Warn v. M/Y Maridome*, 961 F. Supp. 1357, 1377 (S.D. Cal. 1997), *aff'd*, 169 F.3d 625

(9th Cir. 1999) ("Countries have a strong interest in protecting their citizens and in regulating their citizens so that they do not injure others.")

The principles of international comity clearly favor denying the Motion, and instead allowing the Dutch Action to proceed to provide a resolution to a dispute centered on EU law and EU Treaty, which undeniably regulates the relationship between Spain and Petitioners.

### C.    Petitioners' Motion Cannot Meet the Test for Ordinary Injunctive Relief

Setting aside the heightened requirements for granting an anti-suit injunction applicable here, Petitioners still cannot meet the normal requirements for injunctive relief. A preliminary injunction is an "extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Sterling Com. Credit-- Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 12 (D.D.C. 2011). To warrant preliminary injunctive relief, "the moving party must show: (1) that there is a substantial likelihood that it will succeed on the merits of its claims; (2) that it will suffer irreparable harm in the absence of an injunction; (3) that an injunction would not substantially harm the defendant or other interested parties (balance of harms); and (4) that the public interest would be furthered, or at least not adversely affected, by the injunction. *Id.* (citations omitted). "The same standard applies to both temporary restraining orders and to preliminary injunctions." *Id.*

Petitioners, however, fail to meet any of these prongs, and fail to carry their burden of persuasion that this "extraordinary remedy" is warranted.

> 1.    *There Is Not a Substantial Likelihood that Petitioners Will Succeed on the Merits*

Petitioners cannot show that they are likely to succeed on the merits of their claims. As explained at length in the Motion to Dismiss, Petitioners are unlikely to succeed on their claims that there was an agreement to arbitrate under the ECT between Spain and NextEra, and that Spain

waived its foreign sovereign immunity. Petitioners assert that Spain went through the ICSID annulment process, and Spain's defenses were rejected. However, that ICSID annulment panel did not have the benefit of more recent decisions that have reinforced the *Komstroy* decision, such as *Uniper SE et al. v. the Netherlands* and *RWE AG and RWE Eemshaven Holding II BV v. the Netherlands*. These cases, both decided after the ICSID annulment panel ruled on this ICSID award, are part of a growing body of case law that finds that intra-EU ICSID arbitrations addressing violations of the Energy Charter Treaty (ECT) allegedly committed by that member state are contrary to EU law. And in any event, it is not relevant since the ICSID annulment panel did not have jurisdiction either because there is no valid underlying arbitration agreement.

> 2.   *Petitioners Will Not Suffer Irreparable Harm in the Absence of an Injunction*

Petitioners have also failed to demonstrate irreparable harm in the absence of an injunction. Petitioners claim they will be irreparably harmed if the Dutch Action "indefinitely enjoin[s] NextEra from attempting to enforce the Award." MOL at 20. Petitioners state that they need a preliminary injunction because they "cannot enforce the Award in the United States absent a judgment from a federal court." MOL at 20.

This fails to meet the burden for demonstrating irreparable harm. First, nothing prevents Petitioners from seeking enforcement of its ICSID award once the Dutch Action resolves core issues related to whether the ECT created an agreement to arbitrate at all. As Petitioners acknowledge, at most the Dutch Action may prevent Petitioners from enforcing their ICSID Award in the United States for some time; they will not be prevented from prosecuting this Action permanently unless, of course, the Dutch Action finds that under EU law there was no agreement to arbitrate between the parties.

Second, Petitioners do not face any risk collecting the ICSID award, should they ultimately

prevail. As a sovereign state, there is no basis to argue that Spain will be unable to pay the award. In addition, to the extent that Petitioners argue that a delay in collecting its judgment will cause irreparable harm, this is not legally sufficient. Petitioners' Award is earning interest, which means that Petitioners are compensated for any delay in enforcement.

3.    *An Injunction Issued by This Court Would Substantially Harm Not Only Spain, but also and the United States*

As stated above, Spain would be significantly harmed by the injunctive relief sought by Petitioners. As an EU Member State, Spain has a significant national interest in having an EU court resolve important and evolving questions of EU law. In addition, the United States has a significant interest in enforcing the FSIA within its own borders, and has no interest in upsetting an important ally that seeks an EU forum to resolve an EU dispute. Indeed, if this Court were to enjoin the Dutch Action, it risks upsetting the United States' international relations with not just Spain, but the entire EU, which has a vested interest in regulating the relationship between EU citizen-investors and EU Member States.

These factors clearly tip the balance of equities in Spain's favor. Petitioners offer just two arguments to the contrary. First, Petitioners argue that the Dutch Action "seeks to erase NextEra's right to recover under the Award, as well as the jurisdiction of this Court to enforce that right as Congress requires." MOL at 21. But as explained above, NextEra's right to enforce its ICSID Award will remain intact, and it is doubtful that Congress was concerned with the ability of a European company to enforce an award against a foreign sovereign in these circumstances, especially when the investor and foreign sovereign had both subjected themselves to the EU Treaties to regulate their *inter se* relationship.

Second, Petitioners argue that the Motion will not harm Spain because it does not seek to terminate the Dutch Action, but only seeks to "preserve the rights of the parties to proceed before

this Court as well." MOL at 21 (citing *Teck Metals*, 2009 WL 4716037, at \*4). This minor concession does not outweigh the substantial harm to Spanish and American interests, and improperly ignores this Court's disinterest in creating EU law, and regulating the relationship between Spain and the Petitioners in connection with the dispute resolution provisions of the ECT.

4.    *The Public Interest Would Not Be Furthered by an Injunction*

Finally, as noted above, the public interest would not be served by an injunction. Again, public policy favors Spain's international comity arguments, and counsels against a decision which is likely to harm relations between the United States and Spain. Even if there is a public interest in "encouraging arbitration and the enforcement of international arbitration law as an efficient means of settling disputes," as Petitioners claim (MOL at 22), this interest pales in comparison to the public interest served by allowing an EU court to rule on an intra-EU dispute. After the Dutch Action is concluded, this Court would have the benefit of ruling on NextEra's petition with the benefit of the outcome of the Dutch Action. In addition, the restrictive approach to anti-suit injunctions finds that "international comity is a fundamental principle deserving of substantial deference." *Goss*, 491 F.3d at 360.

## **CONCLUSION**

For all of the above reasons, Petitioners' Motion should be denied. The Dutch court is the more appropriate court to determine this issue between Spain, and EU Member State, and the Petitioners, two Dutch citizens.

Dated: January 26, 2023

Respectfully submitted,

**K&L GATES LLP**

By:    /s/ Matthew J. Weldon

23

Matthew J. Weldon
New York Bar Number 4832408
599 Lexington Avenue
New York, New York 10022
(212) 536-4042
Matthew.Weldon@klgates.com

Brian D. Koosed
D.C. Bar Number 1034733

1601 K Street, N.W.
Washington, D.C. 20006
(202) 778-9204
Brian.Koosed@klgates.com

Michael DeMarco (*pro hac vice*)
New York Bar Number 4142477
1 Lincoln St.
Boston, MA 02111
(617) 951-9111
Michael.DeMarco@klgates.com

*Counsel for Respondent Kingdom of Spain*

## **CERTIFICATE OF SERVICE**

I certify that on January 26, 2023, I caused a true and correct copy of the foregoing to be filed using the Court's Electronic Case Filing System ("ECF"). The document is available for review and downloading via the ECF system, and will be served by operation of the ECF system upon all counsel of record.

/s/ Matthew J. Weldon
Matthew J. Weldon