```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2          - - - - - - - - - - - - - - - x
            NEXTERA ENERGY GLOBAL
 3          HOLDINGS B.V., et al.,              CA No:  1:19-cv-01618-TSC
                         Plaintiffs,
 4                                              Washington, D.C.
                                                Monday, February 6, 2023
 5          vs.                                 2:02 p.m.

 6          KINGDOM OF SPAIN,

 7                         Defendant.
            - - - - - - - - - - - - - - - x
 8          _____

 9               TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                 HELD BEFORE THE HONORABLE TANYA S. CHUTKAN
10                      UNITED STATES DISTRICT JUDGE
            _____
11          APPEARANCES:
            For the Plaintiff:  TIMOTHY G. NELSON, ESQ.
12                              BRADLEY KLEIN, ESQ.
                                JOHN BARKMEYER, ESQ.
13                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                One Manhattan West
14                              New York, NY 10001-8602
                                (212) 735-2193
15                              timothy.g.nelson@skadden.com

16          For the Defendant:  MATTHEW J. WELDON, ESQ.
                                THOMAS WARNS, ESQ.
17                              K & L GATES LLP
                                599 Lexington Avenue
18                              New York, NY 10022
                                (212) 536-4042
19                              Matthew.Weldon@klgates.com

20          Amicus:             SALLY PEI, ESQ.
                                ARNOLD & PORTER KAYE SCHOLER LLP
21                              601 Massachusetts Avenue, NW
                                Washington, DC 20001
22                              (202) 942-5000
                                sally.pei@arnoldporter.com
23          Court Reporter:             Lisa A. Moreira, RDR, CRR
                                        Official Court Reporter
24                                      U.S. Courthouse, Room 6718
                                        333 Constitution Avenue, NW
25                                      Washington, DC  20001
                                        (202) 354-3187
```

```
1                       P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  The United States District
3    Court for the District of Columbia is now in session.  The
4    Honorable Tanya S. Chutkan presiding.
5              Good afternoon, Your Honor.  Good afternoon,
6    Counsel.
7              This afternoon this is a motions hearing by video.
8    We have Civil Action No. 19-1618, NextEra Energy Global
9    Holdings BV, et al. vs. The Kingdom of Spain.
10             Will speaking counsel for the petitioner please
11   identify himself and his colleagues for the record.
12             MR. NELSON:  Good afternoon, Your Honor.  My name
13   is Timothy Nelson.  I'm appearing for the petitioners
14   NextEra, and with me is my partner, Bradley Klein from our
15   D.C. office.  We're both with Skadden Arps.
16             And I see there's an issue with the audio and
17   video feed, which I'll fix in a second, but I am on camera.
18             And, Your Honor, the clients represented are on
19   the audio line, and there is Professor George Bermann of
20   Columbia University who has testified in the main briefing,
21   not testifying on this motion.
22             THE COURT:  I'm having a very difficult time
23   hearing you.
24             MR. NELSON:  Your Honor, is that better?  If I
25   turn closer to the audio?
```

```
 1                THE COURT:  Yes, that is better.  Thank you.
 2                MR. NELSON:  I'll make just a few adjustments
 3      here.  Did you hear the appearances that I made, Your Honor?
 4                THE COURT:  I heard that you're speaking for the
 5      petitioner, and you're joined by your partner, Mr. Klein.
 6      But then I couldn't hear very much beyond that.
 7                MR. NELSON:  I said two things.  I said there's
 8      client representatives and Professor George Bermann from
 9      Columbia on the line.  I'm also joined here by my colleague,
10      John Barkmeyer, who is on the papers, and a client
11      representative is on the line.
12                And I was going to say also, because of our audio
13      arrangement, it's automatically feeding to the audio line so
14      you're seeing a big symbol of a telephone.  I'm going to try
15      to get my colleagues to fix that so you can see me rather
16      than the telephone.
17                THE COURT:  Actually, from where I am, I'm not
18      seeing the phone, but I know it was showing up previously on
19      my courtroom deputy's phone.  It comes on and off.
20                MR. NELSON:  Okay.
21                THE COURT:  And for the Kingdom of Spain?
22                MR. WELDON:  Yes, good afternoon, Your Honor; Matt
23      Weldon from K&L Gates on behalf of the Kingdom of Spain.
24      I'm joined by my associate Tom Warns.  We're both based in
25      our New York office.
```

1          We also have a few client representatives joining
2     as well.  You'll see their names.  I won't go through them,
3     but you'll see their names on the Zoom.
4          THE COURT:  All right.  Thank you.
5          So, Mr. Weldon, you'll be speaking, and
6     Mr. Nelson, you'll be speaking; is that correct?
7          MR. NELSON:  Yes.
8          MR. WELDON:  Yes, Your Honor.
9          THE COURT:  All right.  I'm sorry?
10         MS. PEI:  If I may, my name is Sally Pei.  I'm
11    here from Arnold & Porter on behalf of the European
12    Commission.  We had filed a brief at the earlier stage.
13         THE COURT:  I did see your name on the appearance
14    so I was going to inquire.  All right.  Thank you.
15         MS. PEI:  Thank you.
16         THE COURT:  Now, we're here today to discuss
17    NextEra's motion for a preliminary injunction and temporary
18    restraining order, which is ECF No. 78.  I'm going to start
19    by reviewing where things stand in this case.
20         NextEra filed a petition to confirm its ICSID --
21    I-C-S-I-D -- arbitration award in June 2019.  I stayed this
22    case until April 2022 while Spain sought annulment of the
23    award.  After Spain's annulment application was denied, I
24    lifted the stay, and Spain moved to dismiss a petition for
25    lack of jurisdiction in May 2022.

1          The next month NextEra cross-moved for summary

2     judgment.

3          Spain then moved to strike that cross-motion, and

4     NextEra requested leave to file a sur-reply with respect to

5     that motion to strike.

6          All those motions were pending before this Court

7     when, in December, Spain initiated litigation in the

8     Netherlands seeking an antisuit injunction preventing

9     NextEra from seeking to confirm its arbitral award in this

10    or any other court.

11         In response, NextEra now seeks an antisuit

12    injunction against Spain requesting a temporary restraining

13    order and preliminary injunction preventing Spain from

14    pursuing the Dutch action.

15         In a joint status report on January 17th, Spain

16    committed not to seek relief in the Dutch action before

17    March 1, 2023.

18         As a result, I need to -- I'm not going to rule on

19    any -- on NextEra's motion at this hearing, but I do have

20    some -- a few questions for the parties logistically to

21    ensure that we are all on the same page.

22         So am I right in assuming that because Spain has

23    committed not to seek relief in the Dutch action until March

24    1st, there is no need for a temporary restraining order as

25    long as I rule on the preliminary injunction before March

1    1st?

2                Mr. Klein?

3                MR. NELSON:  Mr. Nelson, sorry.

4                THE COURT:  Mr. Nelson, I'm sorry.

5                MR. NELSON:  Your Honor, unfortunately that's not

6    the position from our perspective.  What's happened in the

7    ensuing weeks is that the initial date for NextEra in the

8    Netherlands, in the Amsterdam proceeding, to respond was

9    January the 25th.  We asked for -- NextEra's Dutch counsel

10   asked for the customary two-week extension, and Spain

11   refused to grant one on that response date.  As a result,

12   NextEra is required to file a response on the Amsterdam

13   action this week.

14               We understand from our Dutch counsel, from

15   Netherlands, Netherlands counsel, that notwithstanding the

16   commitment that has been made by Spain not to affirmatively

17   seek or accelerate the action for interim relief, there is a

18   real risk that once NextEra has filed its initial paper,

19   which it's required to file this week, a Dutch judge will

20   *sua sponte* grant relief.  So that's a circumstance that

21   Spain set in train in December, and by refusing even a small

22   extension -- and the Dutch courts gave a one-week

23   extension -- a circumstance is created this week where there

24   is a risk of injury relief being granted *sua sponte*.

25               Now, the temporary retraining order seeks the

1    direction that Spain withdraw its request for interim relief

2    until this Court rules, and so to have perfect and adequate

3    redress, that request for temporary restraining order must

4    still be pressed by us.

5         I do understand if Your Honor says with some force

6    that Spain has committed not to affirmatively accelerate its

7    case and its request for relief before March the 1st, but as

8    I said, that does not remove the intrinsic risk, which Spain

9    created by its own actions, of the Dutch court acting *sua*

10   *sponte* and only by directing Spain to withdraw that request

11   at this time through temporary relief and response date --

12   I'm sorry, I'm just told the response date is now February

13   the 15th.  My apologies.

14        THE COURT:  I'm sorry, what did you say the

15   response date is?

16        MR. NELSON:  The response date in the Netherlands

17   is February the 15th.  I apologize.  I misspoke.  I thought

18   it was this week, but it's February the 15th.

19        So as a result of that, there is a window until

20   February the 15th where, as we understand it, there's cover,

21   but after that date there is that intrinsic risk of *sua*

22   *sponte* relief.  And as Your Honor correctly stated, once you

23   get to March the 1st, Spain's commitment such as it is is

24   up.  So there's only a short period of time within which we

25   have full cover, and our request for a TRO does speak to

1    that interim risk between February the 15th and March the

2    1st as well.

3        THE COURT:  Now, what are the parties' positions

4    on whether I need to determine whether I have jurisdiction

5    over the case under the FSIA before I can rule on the

6    preliminary injunction?

7        MR. NELSON:  Our position is very simple, Your

8    Honor.  We will address it today, and I'm confident that at

9    the end of our presentation today you will be satisfied that

10   subject matter jurisdiction exists.

11       Spain's objections to subject matter jurisdiction

12   are borderline frivolous.  They can be dealt with today.  I

13   can deal with them at length -- at such lengths as the Court

14   pleases, but I will deal with them in detail today, and at

15   that point Your Honor can rule concurrently on subject

16   matter jurisdiction and the proprietary relief.  And at that

17   point the conundrum that Spain is posing, that somehow they

18   can veto this injunction application by simply raising the

19   mantra of subject matter jurisdiction, it vanishes, Your

20   Honor.

21       So I think it's very simply dealt with today.  I'm

22   going to deal with it concurrently without submissions on

23   why Your Honor has the power to grant us relief.

24       THE COURT:  Mr. Weldon?

25       MR. WELDON:  Yes, Your Honor, thank you.  If I

1    could just address both of the points that the Court just

2    raised.

3            First of all, related to the Dutch proceedings and

4    how those are going to unfold, we had a very productive

5    conversation with Mr. Nelson and his team when the Dutch

6    action or shortly after the Dutch action was filed.  We

7    committed not to seek emergency relief or some sort of

8    urgent relief that would induce the Dutch court to do

9    anything in the immediate near future.

10           It is my understanding that NextEra BV's, the

11    petitioners in this case, were granted this extension until

12    February 15th to respond to what is essentially a sort of

13    application for interim relief that was filed with the Dutch

14    action sort of summons.  And our anticipation is that, you

15    know, there is not a risk that the Court is going to *sua*

16    *sponte* in the Netherlands issue any order on that requested

17    relief, but rather there will be a hearing after the Dutch

18    BVs make their submission on February 15th, and then

19    thereafter there would be a decision on that application.

20           We also, as part of our discussions, said, well,

21    if it so happens that in mid-February there is still a

22    concern that we're coming close to that March 1st sort of

23    fixed date, firm date, that we would revisit this with the

24    petitioners here and figure out whether we needed to give

25    them some additional comfort or --

1        THE COURT:  It's been my expectation and my plan

2   that I would rule by March 1st, but -- which is why I asked

3   the question about whether basically the status quo would

4   remain until then.  But what I'm hearing is that NextEra is

5   obligated to file a response in the Dutch court by the 15th.

6        MR. WELDON:  That's right.  And there would be a

7   hearing scheduled thereafter.  This is my understanding.

8   And then sometime in the future there would be a decision in

9   the Dutch court.

10        THE COURT:  Mr. -- I'm sorry to interrupt you,

11   Mr. Weldon.

12        Mr. Nelson, what consequences or potential actions

13   could ensue from the filing of the response by February 15th

14   if this Court has not ruled by that date?  What are the

15   ramifications?

16        MR. NELSON:  It places the matter into the hands

17   of a Dutch judicial officer who has the inherent power to

18   grant interim relief.

19        THE COURT:  But --

20        MR. NELSON:  Mr. Weldon may or may not be right

21   that there's a hearing.  But pending the hearing, the judge

22   has the power to act *sua sponte*.

23        I'm sorry, I interrupted you.

24        THE COURT:  No, no, no, go ahead.

25        MR. NELSON:  And while I appreciate that there was

1    a call at which a limited undertaking was negotiated between

2    me and Mr. Weldon, since that date Spain has refused to even

3    a courtesy extension in the Netherlands proceeding.

4         And I submit to you that the idea that this will

5    go at a leisurely pace in the Netherlands is at odds with

6    the explicit words of this petition.  I quote:  It is --

7    this is Spain's words -- of great (urgent) importance that

8    NextEra is prohibited, pending these proceedings, from

9    continuing with the enforcement that has already started.

10   And that's at ECF 78, Your Honor.  That's 78.3, the Dutch

11   writ I'm reading from, at Paragraph 19.1.

12        So the bromides of, well, you know, things might

13   work slowly in the Dutch courts are not -- we don't take any

14   comfort from those blandishments, Your Honor.

15        We are very heartened by Your Honor's statements

16   that you'll rule by March the 1st.  Make no mistake.  That,

17   on this side, is of immense comfort to us.

18        THE COURT:  Well, thank you, I suppose.  It's a

19   little disconcerting to find out that that may be pointless

20   if there's action taken *sua sponte* by the Dutch court before

21   then, but at least I know what we're dealing with.

22        The other question I had is if I granted Spain's

23   motion to dismiss or NextEra's motion for summary judgment,

24   would that moot the motion for preliminary injunction?

25        I mean, I know that Spain argues that a summary

1    judgment motion is not appropriate yet, but set aside that

2    argument for the moment.  Would a ruling on the motion to

3    dismiss or the motion for summary judgment on either side

4    moot the motion for preliminary injunction?

5           Mr. Nelson?

6           MR. NELSON:  Well, I won't speak to the

7    consequences of granting a motion to dismiss.  Maybe that's

8    a hopeful attitude.  I'll start first with granting the

9    cross-motion for summary judgment, which, we submit, is well

10   pled, and dismissing the motion or rejecting the motion to

11   dismiss is something you can do concurrently.

12          Yes, it would moot the present motion for a

13   preliminary injunction insofar as the Dutch action is aimed

14   at halting the current proceedings as pled to answer the

15   ICSID award as a final judgment of the United States.  That

16   would moot the current preliminary injunction.

17          In the interest of candor, I must tell you, Your

18   Honor, it's very likely that Spain will regroup and

19   reconfigure its Dutch action to halt these proceedings.  I

20   don't think they would stop at that point frankly.  And in

21   the interest of candor, I think it's very likely that we

22   would --

23          THE COURT:  You are -- I'm not hearing anything

24   right now.  I've lost audio.

25          We've lost all audio.

```
1              THE COURTROOM DEPUTY:  For Mr. Nelson?

2              MR. WELDON:  We can't hear you, Tim.

3              THE COURT:  I don't think he can hear us.

4              Oh, dear.

5              Stop, stop, stop.

6              MR. NELSON:  Sorry?

7              THE COURT:  Mr. Nelson?

8              MR. NELSON:  Yes.

9              THE COURT:  We lost you at I think it was the

10     second "in all candor."  We lost audio.  Everybody did.  I'm

11     sorry.

12             MR. NELSON:  Okay.  I'm sorry.  Can you hear me

13     now, Your Honor?

14             THE COURT:  I can.

15             MR. NELSON:  Okay.  Because we suspect -- or it's

16     more than a suspicion -- based on past performance Spain is

17     very unlikely to just pack its bags and go away once

18     judgment is given.  It's extremely likely that an attempt

19     will be had in the Dutch proceedings to reconfigure the

20     relief requested to attempt to interdict judgment

21     enforcement proceedings.  And for that reason -- that's why

22     I'm saying in all candor, it is very likely that we will

23     come back to Your Honor and seek some sort of protective

24     measure to stop that happening.

25              But that's a separate motion for another day, and
```

1    we will -- you know, you're correct that it would moot the

2    current PI motion to grant judgment on the cross-motion for

3    summary judgment and a denial of the motion to dismiss.

4              So yes.

5              THE COURT:  Mr. Weldon.

6              MR. WELDON:  So, Your Honor, I don't think that

7    deciding the motions will really address the core issue

8    here, and I think that Mr. Nelson has maybe, you know, hit

9    the nail on the head.  It's not clear to me what effect the

10   Court's injunction would actually have either way.

11             You know, Mr. Nelson talks about, perhaps, the

12   Court in the Netherlands will issue an antisuit injunction

13   *sua sponte*, and I have no basis to believe that will happen.

14   He suggests that perhaps there is a legitimate basis for the

15   Court to issue an antisuit injunction in the Netherlands.

16             You know, in my experience -- and, you know, I'm

17   no Dutch lawyer, but it's very difficult to get this kind of

18   injunction in a civil law country.  So I don't even know

19   whether there's a likelihood at all that this relief would

20   be granted in the Dutch proceedings.

21             THE COURT:  I assume you wouldn't have sought it

22   if you didn't think there was a chance.

23             MR. WELDON:  I think it would be unprecedented,

24   but I was not involved in that filing, I have to say.

25             What Mr. Nelson, I think, is also suggesting is

1    that, well, regardless of what happens, the petitioners are

2    going to continue to do what they're going to do, and Spain

3    is going to do what it does, and, of course, those are in

4    different jurisdictions.  You know, it does seem quite

5    likely to me that the petitioners continue with their

6    enforcement actions regardless of what happens in the

7    Netherlands, and I say that because it's an interesting

8    situation where we find ourselves because, you know, the

9    fact that they're seeking to enforce the award right now is

10   essentially a violation of EU law and the EU treaty.  So

11   right now they're sort of acting inconsistently with the law

12   at the place where these BVs are citizens.

13            And so what would be different?  Not much.  There

14   would be a court order enjoining them from pursuing

15   enforcement actions, but that's pretty much all established,

16   as far as we can tell, in the jurisprudence in the EU.  And

17   I do want to emphasize, Your Honor, that, you know, by way

18   of a really probably terrible analogy, you know, think

19   about, you know, an investor from New York, you know, suing

20   California, for example, under some sort of agreement, and

21   the U.S. Supreme Court weighing in and saying, no, there

22   cannot be an agreement to arbitrate in these circumstances.

23   And in that case the New York investor runs to Europe and

24   says, "Oh, European Court, enjoin the Courts in the United

25   States from enforcing U.S. law."

 1          So it's really inherently problematic for the

 2   Court to issue this relief, and I think, you know, coming

 3   back to your question, that regardless of how these things

 4   play out in terms of these motions, my sense is the case

 5   will just continue to trod on as it does, and it really

 6   won't help anything in order for not likely either court to

 7   be issuing these kind of injunctions just as a practical

 8   effect.

 9          THE COURT:  All right.  Let's move on to the

10   substantive arguments.

11          Mr. Nelson, as proponent of the motion, you may go

12   ahead.

13          MR. NELSON:  Thank you, Your Honor.

14          Thank you, Your Honor, and I'll deal with some of

15   the comments that were just uttered as we go, if I may?

16          The petitioners here are affiliates of a green

17   energy company that invested in the solar energy sector more

18   than a decade ago only to have Spain alter the legislative

19   apparatus around solar after the fact destroying the value

20   of the investment.  And seeking remedies, our client found

21   that Spain had signed two treaties that are extremely

22   relevant.

23          Now, what was just said by Mr. Weldon, which has

24   zero merit -- the idea that we broke the law by bringing a

25   claim -- has also been litigated twice over, and Spain lost.

1    So let me go to the actual legal standards and the actual

2    treaties that govern the parties' relationships and the

3    reason why it is not right to suggest that an antisuit

4    injunction would be somehow improper or serve no purpose.

5    It is the opposite of that.

6             Spain had signed two treaties in the 1990s, Your

7    Honor.  One is the Convention on the Settlement of

8    Investment Disputes Between States and Nationals of Other

9    States.  That's sometimes known as the Washington

10   Convention, Your Honor, because the arbitral institution it

11   establishes -- ICSID -- is located on 1818 H Street as part

12   of the World Bank Group.  And under the Washington

13   Convention, when member states -- and Spain is a member

14   state -- agree to arbitrate disputes -- and so is the United

15   States and so is the Netherlands -- these disputes are heard

16   by independent arbitral tribunals under a self-contained

17   treaty regime.

18             The D.C. Circuit in *Micula* last year said ICSID

19   law is its own arbitral law, and they were absolutely right.

20   National courts have no supervisory jurisdiction.  They have

21   no jurisdiction to vacate an ICSID award much less declare

22   that the pursuit of an ICSID award is somehow in breach of

23   its own laws, which is what we just heard from Mr. Weldon.

24   No power is forfeited by the express terms of the treaty.

25             And the treaty itself is in the record.  The

1    treaty itself is at ECF 1; that's the ICSID convention.  And

2    it's enshrined in federal law under a special statute passed

3    by Congress in the 1960s.  So the right to award an ICSID

4    award is a right guaranteed by federal law.

5         The second treaty signed by Spain in the '90s was

6    the Energy Charter Treaty -- that's at ECF 16 -- which

7    assures investors, qualifying investors -- and it's been

8    held repeatedly that our clients are qualifying investors

9    under the treaty.  Qualifying investors have certain

10   baseline protections, substantive protections.  And it

11   further provides, in Article 26, that an aggrieved investor

12   can elect and every respondent state consents; and that

13   Spain irrevocably consented to arbitration under a number of

14   systems, including under the ICSID convention, and that's

15   what NextEra chose.

16        Now, when you choose ICSID convention -- there are

17   trade-offs in every choice of an arbitral venue, Your Honor.

18   One of them is a trade-off that you buy into a system where

19   there's an appeal process called "annulment" under Article

20   52.  That's why Your Honor stayed the case in 2020, so that

21   that proceeding could be had.

22        But the other trade-off, though, is that the

23   review procedure is self-contained within the treaty system.

24   No national court can second-guess the merits of an ICSID

25   Convention award.

1           Your Honor's quite right in Your Honor's factual

2   recitation.  An award was rendered in mid-2019, and we came

3   to this Court.  The decision on liability is 249 pages long.

4   It's at ECF 1 through 4.  It comprehensively demolishes

5   everything that Mr. Weldon said earlier about the supposed

6   violation of EU law.  It demolishes everything the EU has

7   said.

8           The EU DC appeared and made -- how should I put

9   this charitably? -- long submissions for ICSID.  Very long.

10  They made very long submissions before the annulment

11  committee by Spain and EC.  They've lost twice over.

12  They're two-time losers, and now they're coming here and

13  suggesting it's improper for us to exercise a federal right

14  to have an award confirmed by this Court.  That makes no

15  sense.

16          The treaty framework -- just to elaborate,

17  because it's absolutely critical to understand exactly why

18  Mr. Weldon has no basis for accusing our client of breaching

19  the agreement.  None.  The treaty framework says a number of

20  things.

21          Article 54 -- and this is part of the trade-off of

22  the ICSID system.  You have to go through a system that's

23  long.  It's more expensive than some of the arbitral

24  systems.  It gives latitude to a state to make all sorts of

25  jurisdictional objections.  But at the end of it, Article 54

1    of the ICSID convention says every member state -- every

2    member state -- shall recognize an award rendered pursuant

3    to this convention as binding and enforce the pecuniary

4    obligations imposed by that award within its territory and,

5    if it were, a final judgment of a court in that state.

6            And Congress has enacted that provision, Article

7    54, *in haec verba*, in Title 22, Section 1650 of the United

8    States Code.  That was done in the '60s because the United

9    States was an early champion of this system.

10           Another provision of the ICSID convention, Article

11   54, holds that an award is binding as between the parties.

12   Mr. Weldon seemed to have forgotten that when he tried to

13   tell you that it was illegal to abide by the award.  It's

14   binding on his client.  It's *res judicata*, Your Honor.

15           Article 26 goes on, or at least -- Article 26 says

16   that if a dispute is governed by the ICSID convention, this

17   operates to the exclusion of every other remedy.  So if you

18   have a dispute that goes into the ICSID system, it can't be

19   relitigated or collaterally challenged in any national

20   court.

21           And the Courts of this district are nothing less

22   than faithful to every word of the ICSID convention.  There

23   is not a single decision of this district denying

24   enforcement of an ICSID award, much less engaging in a

25   campaign to revisit the merits of an ICSID award.

1          And just to take two cases.  We've block cited --

2     there's over a dozen cases, Your Honor, that were cited.  I

3     don't want to overkill.  I'll just take two.  I can take as

4     many as Your Honor pleases, but I'll just take two.

5          One is Judge Moss in the case, 2019, *TECO against*

6     *Guatemala*, 414 Federal Supplement Third Series 94 at Page

7     101, stressed that the ICSID-enabling statute is even more

8     pro arbitration and pro award enforcement than the Federal

9     Arbitration Act, which, as Your Honor knows, is notoriously

10    pro award enforcement already.  He held, citing a number of

11    prior authorities, but I'll just clean it up as his,

12    Congress -- I'm quoting -- Congress expressly precluded

13    courts from engaging in the more robust, although still

14    extremely limited, form of judicial review applicable under

15    the Federal Arbitration Act.  That's -- close quote.  That's

16    Judge Moss.

17         Judge McFadden, in the 2022 case of *Tethyan*

18    *against Pakistan*, 590 Federal Supplement 262 at 275 of His

19    Honor's opinion said essentially the same thing, and also

20    highlighted a further provision of the ICSID Convention,

21    Article 41.

22         Article 41 of the ICSID Convention states that a

23    tribunal is the judge of its own competence, and as His

24    Honor explained in *Tethyan*, that means and that reference to

25    competence is to jurisdiction and arbitrability.  That

1    means, to quote His Honor, that -- by the way, His Honor

2    wasn't making new law; he was summarizing countless other

3    decisions -- a Court must defer to the tribunal's

4    arbitrability determination, close quote.  That's because a

5    tribunal determines its own jurisdiction in an ICSID

6    dispute.

7             Now, what have we in the Dutch action?  And the

8    Dutch action does a number of things.  It is an ingenious

9    pleading.

10            Mr. Weldon admits it's unprecedented for the Dutch

11   courts to be faced with a petition such as this.  We submit

12   that that fact alone is a fact that should count against

13   Spain, but I'll just describe what the Dutch petition sets

14   out to do.  And this is in Mr. Klein's affidavit or

15   declaration, Docket 78-3, Docket 78-4:

16            There are two writs against each of the NextEra

17   entities, and these writs claim that any attempt to enforce

18   the present award is what is called an abusive right.

19   Recovery on the award, including through the present action,

20   would somehow violate EU law.  The writ also claims that

21   there was never a valid consent to arbitrate before ICSID,

22   which is something that we spent years arguing before ICSID.

23   No account is given to the *res judicata* effect of the

24   findings of the tribunal that, indeed, there was consent to

25   arbitrate.  And the writ seeks -- and this is the ingenious

1   part -- it seeks to go very slow but very fast at the same

2   time.  It says let's begin this action, and then immediately

3   stay the action pending a reference to the European

4   Commission.

5          I'll pause there.

6          European Commission has no role in determining

7   whether an award is valid under the ICSID Convention, nor

8   does the, with great respect, European Court of Justice.

9   None.  Zero.  Okay?

10          The writ, however, seeks to have the issue of

11   whether pursuit of this award is compatible with EU law

12   referred out to the European Commission bureaucracy for an

13   indeterminate amount of time for it to report back who knows

14   when, and then to have further litigation over this idea

15   that there's an abusive right and further litigation over

16   whether the award constitutes improper state aid.

17          Now, I paused there.

18          State aid was one of the arguments -- the idea

19   that the provision of damages would be improper state aid

20   was one of the arguments made during the case, during the

21   arbitration, made at -- in expense of by the European

22   commission.  They lost.

23          Then they went to the annulment committee.

24   Intervened.  Made the same argument.  And they lost.

25          And by the way, these aren't kangaroo courts.

1    These are arbitrators of the highest learning.

2              In the first arbitration there was a New Zealand

3    chair; there was a Canadian appointed by NextEra and a

4    Swiss-French appointed by Spain.  So they appointed an

5    arbitrator.  They appointed a European arbitrator indeed.

6              And in the annulment, there was a Salvadorian

7    committee member.  There's three committee members all

8    appointed, a Singaporean and a South Korean.  These are the

9    most international, the most animate parties that can be

10   assembled under the auspices of the World Bank.  They gave a

11   day in court to Mr. Weldon's client and Ms. Pei's client,

12   and they determined all these issues.

13             But, no, Spain wants to have a lengthy --

14   indeterminate length.  They want to go slow though.  They

15   want there to be a beginning of a lawsuit, and then let's

16   refer it out to the bureaucracy.  Who knows how long that

17   will go?

18             But in the meantime let's go quickly on one thing.

19   Let's go quickly on the action to suspend and hold in

20   abeyance the proceedings currently pending before the United

21   States District Court for the District of Columbia under

22   Case No. 19-CV-1618.  Well, that's this proceeding, Your

23   Honor.  That's Your Honor's court.

24             THE COURT:  Let me interrupt you.

25             MR. NELSON:  They've targeted --

1          THE COURT:  Let me interrupt you, Mr. Nelson, for

2     a minute.

3          MR. NELSON:  Yes.

4          THE COURT:  You rely throughout your briefing

5     on *Micula vs. The Government of Romania* -- that's M-i-c-u-

6     l-a -- and in that case, Judge Mehta's main reason for not

7     embracing the reasoning that Spain advances here about

8     *Achmea* -- that's A-c-h-m-e-a -- was that Romania was not a

9     member of the EU at the time of the events underlying the

10    arbitral award.  But here, Spain was a member of the EU

11    during all relevant times.  So why doesn't the analysis come

12    out the other way?

13         And I'll mention, as you are no doubt aware, that

14    the Circuit noted Judge Mehta's reasoning in its opinion.

15    They obviously didn't address it, but they did note that

16    Judge Mehta had considered that argument.

17         MR. NELSON:  Well, Your Honor, as we read *Micula*,

18    it's very bad for Spain primarily because it reemphasizes --

19    and I'm reading from the opinion from 2019 at 404 Federal

20    Supplement Third that intra-EU arguments, quote, must be

21    taken to ICSID and are not valid grounds upon which to

22    reject converting the award in full to a judgment.  That's

23    the primary holding we submit.

24         Now, as His Honor correctly stated, there were

25    reasons in that case why you shouldn't even get to first

 1    base.  There were reasons in that case why even within the

 2    intellectual construct of this intra-EU argument it couldn't

 3    be run against Romania for the reasons given by His Honor.

 4    But the primary finding is that you don't get to

 5    second-guess any jurisdictional findings of an ICSID

 6    tribunal.  And if you need to go further, Professor Bermann

 7    explains the reasons why the intra-EU argument was correctly

 8    rejected by the ICSID tribunal in this case.

 9            But just to -- I just want to wind it back because

10    *Tethyan* is a more instructive case insofar as it separates

11    two things.  One is the FSIA analysis, and on FSIA, as I'll

12    come to, you don't conduct a de novo review of

13    arbitrability.  The FSIA only looks to whether there's an

14    arbitration agreement proven as in the --

15            THE COURT:  Right.

16            MR. NELSON:  -- an award and a pecuniary

17    obligation and a multilateral convention that provides

18    for --

19            THE COURT:  But I think that a valid -- I mean, I

20    think -- what Spain is holding on is the FSIA requires a

21    valid arbitration award.  And what Spain is saying is there

22    was no valid arbitration award because Spain never had the

23    capacity, the ability, to enter into arbitration because of

24    *Achmea*.

25            MR. NELSON:  And there's two answers to that.

27

1          One is it's already -- the validity of the

2     arbitration agreement -- and this was dealt with in

3     *Tethyan* -- is not something that can be challenged either at

4     the subject matter jurisdiction stage or past that stage

5     because the question of the validity of the agreement in

6     Article 26 is a question that was put to the ICSID tribunal.

7     That tribunal has considered the question of the validity of

8     the agreement and decided, in the exercise of its own

9     exclusive power, to determine its own competence under

10     Article 41, that there indeed is no merit challenge.

11          THE COURT:  Well, isn't that why *Achmea* -- isn't

12     that the reason for the *Achmea* decision, which was the

13     European Union did not want entities like ICSID determining,

14     you know -- determining issues of EU law.

15          I mean, we're sort of going around in a circle

16     here.

17          MR. NELSON:  No, it's not in a circle, Your Honor.

18     *Achmea* does not involve the ICSID Convention.  *Achmea* -- and

19     *Komstroy* does not either, and nor does the new case cited,

20     *NovEnergia* that was cited in the papers by Spain, and nor

21     does *Green Power*.

22          All of these cases deal with an award that was

23     made under the auspices of either the Stockholm Chamber of

24     Commerce or the UNCITRAL rules, and under those systems an

25     arbitration has to be seated somewhere, and in those cases

1    it was seated in a European city and subjected to the

2    supervisory jurisdiction of the European courts which then

3    subjected it to the ultimate supervision of the ECJ.  And

4    for reasons of its own, which we think were policy driven

5    and not driven by ordinary interpretation principles, it was

6    held that as a matter of EU law those awards would not be

7    enforced.

8            What this tribunal held, which is in line with

9    every single independent commentator to look at the issue

10   and every respected independent commentator with the

11   exception of the paid expert from the Spanish side, the

12   tribunal in this case looked at it objectively.  And Your

13   Honor can satisfy yourself that a full and fair opportunity

14   was given to litigate this point, and an adequately reasoned

15   award was rendered on this point.

16           What they've reasoned was -- I'm sorry, Article 26

17   is in a treaty called the Energy Charter Treaty.  It

18   contains no reservation as to the capacity of states to

19   enter into this treaty.  It has an unqualified submission to

20   ICSID Convention jurisdiction by a member state of ICSID.

21   As a matter of international law, Your Honor, international

22   law, that consent is binding.

23           EU law does not, for present purposes, form part

24   of that international law.  Instead -- and this is -- first,

25   international law is an elementary principle.  There's an

1    elementary principle of law that a state such as Spain

2    cannot rely on internal facets of its own internal law to

3    plead some disability that prevents it from complying with

4    its international obligations.  And for those purposes --

5    and I think correctly -- EU law was treated as part of

6    Spain's internal law.  And for those reasons, the tribunal

7    in our case said we're rejecting the EU's position, and

8    we're rejecting Spain's position.  There is a binding

9    international law consent that is not vitiated by internal

10   EU law.

11          Now, to say that is on a par with every single

12   independent ICSID tribunal to consider the issue, there's

13   been I think one dissent in the body of ICSID jurisprudence.

14   And, Your Honor, were you to second-guess that

15   determination, you would be conducting a de novo review of

16   arbitrability of the kind that the D.C. Circuit in the case

17   of *Chevron against Ecuador* cautioned against.  I can give

18   you the reference to that, Your Honor.

19          THE COURT:  No, I have it.  I have it.  I have it.

20          Because I need to hear from Spain, I'm going to

21   give you -- I know I interrupted you with several

22   questions -- I'm going to give you a few minutes to finish

23   up.

24          MR. NELSON:  Yes.  If I may, the *Laker Airlines*

25   standard is very clear.  It holds that a Court has the

1    ability to restrain foreign proceedings to protect its own

2    jurisdiction, and to prevent the litigants of evasion of the

3    important public policies of the forum.  And in that case

4    the Court enjoined an attempt to co-op the courts of the

5    U.K. to frustrate a proceeding legitimately commenced within

6    this district.

7            Spain's subject matter objection to this is just

8    wrong.  I've explained that the arbitration exception easily

9    applies.  This was reaffirmed by the *P&ID against Nigeria*

10   case decided last year by the D.C. Circuit that says that a

11   movant, a proponent of jurisdiction, need only show the

12   existence of an arbitration agreement, an arbitration award,

13   and a treaty governing the award, and clearly both are

14   present here -- all are present in the case of ICSID.

15           As the Second Circuit said in the case of *Blue*

16   *Ridge*, 735 Federal Third Series Page 72 at 85:  Every court

17   to consider whether awards issued pursuant to the ICSID

18   Convention fall within the arbitral award exception.  The

19   FSIA has concluded that they do, close quote.

20           And as to the dispute over arbitrability, the D.C.

21   Circuit in the *Nigeria* case last year made clear that a

22   dispute over the arbitrability or validity of the

23   arbitration clause, which goes to Your Honor's question, is

24   not something that can be invoked to undermine subject

25   matter jurisdiction.

1          And, as I said, in *Tethyan*, it was reaffirmed per

2     *Chevron and Ecuador* that the FSIA does not require, and, in

3     fact, it precludes a de novo review of arbitrability.

4          Now, just on a couple of other points.  I heard

5     Your Honor's indication.  I just want to touch on two other

6     points.

7          There is a clear threat to Your Honor's

8     jurisdiction.  It couldn't be clearer.  It names names.  It

9     gives serial numbers.

10          This is an attempt to shut us down.  It is a real

11     and present danger, and there's no question either that the

12     public policies of the United States are implicated.  At

13     stake here is the United States policy of supporting the

14     integrity of ICSID awards, something it's done since ICSID

15     was founded in the 1960s and established in this city.  And

16     the policies carry particular weight given that it's now

17     clear that in the half-dozen other cases filed by Spain --

18     we can see an inkling in the *9REN* case -- that similar

19     tactics have been plotted in other cases.

20          And just finally, there was -- and this is a

21     familiar refrain in antisuit cases, Your Honor -- an appeal

22     to comity, and I can do no more than quote what *Laker*

23     said -- this is at Page 737 -- about comity.  There are, I'm

24     quoting, limits to the application of comity.  When the

25     foreign act is inherently inconsistent with the policies

1    underlying comity, domestic recognition could tend either to

2    legitimize the aberration -- and aberration we have here --

3    continue, or to encourage retaliation undercutting the

4    realization of the goals served by comity.  No nation is

5    under unremitting obligation to enforce foreign interests

6    which are fundamentally prejudicial to those of the domestic

7    forum.  Thus, from the earliest times authorities have

8    recognized that the obligation of comity expires when the

9    strong public policies of the forum are vitiated by the

10   foreign act.

11          And just a couple of final points on that.  We're

12   asking for nothing more than a targeted injunction aimed at

13   stopping those parts of the Dutch proceeding that interfere

14   with this case.  As in *Laker*, it's a defensive and tailored

15   injunction.

16          The other point I'd make is there was a lot of ink

17   spilled in Spain's opposition to the effect that somehow we

18   have interjected points of European law that would be better

19   served elsewhere.  Well, two points there.  Number one,

20   that's a reflation of the already discredited forum non

21   conveniens plea which the D.C. Circuit in *Tatneft* has said

22   in a no-go in award enforcement cases.

23          But even more importantly, we, NextEra, did not

24   come to this Court with a brick of authorities on European

25   law, all right?  It's Spain that is trying to insert the

1    European law issues into this case as a tactical ploy to

2    interrupt what should be an ordinary and routine enforcement

3    under Article 54.

4        So the idea that somehow we've invited this Court

5    to delve into EU law issues and that that offends comity,

6    that doesn't cut any ice because that's a self-made problem.

7    Spain is the one that has chosen to put EU law on the table.

8    It forced -- Romania forced Judge Mehta to have to deal with

9    all of those issues in *Micula*.  It's forcing you and, if I

10    may say so, a number of your colleagues to have to battle

11    with brick loads of affidavits on European law in this and

12    other cases.

13        That's a voluntary act by Spain.  They didn't have

14    to do that.  The EU did not have to intervene in this case.

15    All of this is staged and is now being paraded as a huge

16    problem.  It's a self-made problem.  We didn't commit this

17    problem to the Court's attention.  It's being used as a

18    defense.

19        We have to meet the defense, but it shouldn't come

20    into play.  And we submit that a proper adjudication of this

21    case should go no further than to say the award gave a fair

22    hearing.  The award dealt with these issues in depth.

23        The award is binding under Article 54.  It should

24    be given full faith and credit.  The tribunal is the sole

25    judge of its own competence under Article 41.

1          A plea that the tribunal exceeded its powers was

2     heard pursuant to Article 54 of the ICSID Convention and

3     rejected by another panel of eminent jurists.  The award

4     deserves -- in fact Congress mandates full faith and credit

5     be given, and that's it.

6          That's frankly all that needs to be done.  We

7     don't need to frolic and detour into the issues that Spain

8     is seeking to interject.

9          THE COURT:  All right.

10         MR. NELSON:  Thank you, Your Honor.

11         THE COURT:  Thank you.

12         Mr. Weldon, before you begin, I just have a couple

13    of questions.

14         One is you rely on *Achmea* and the *Komstroy*

15    decisions, but those post-dated both NextEra's request for

16    arbitration and the ICSID's tribunal's decision.  So are you

17    arguing that *Achmea* and *Komstroy* operated retroactively to

18    void Spain's participation in the ECT's arbitration

19    provision?  And if so, what's the legal basis for that

20    retroactivity?

21         MR. WELDON:  Thank you, Your Honor.

22         To address your question first, it is our position

23    that the decisions in *Achmea* and *Komstroy* do vitiate any

24    purported agreement to arbitrate that's been, you know,

25    raised and presented by the petitioners in the case.

1          THE COURT:  And they operate to do so

2     retroactively?

3          MR. WELDON:  That is right.  Essentially -- and,

4     you know, I'm no expert on EU law, and, you know, hopefully

5     we'll be able to have a hearing potentially about the motion

6     to dismiss, and you could hear from Dr. Hindelang, who we've

7     presented for the Kingdom of Spain.

8          THE COURT:  I think the caution is I'm not -- I'm

9     not supposed to be delving into questions of EU law here,

10    but be that as it may.  Much as I might look forward to

11    that.

12         MR. WELDON:  I think you shouldn't.  I think in

13    some respects you don't need to, but the way that the EU

14    treaties -- and this is to the best of my understanding --

15    the way that the EU treaties work, which are themselves

16    instruments of international law, is that any purported

17    agreement to arbitrate would be void *ab initio*.  So it would

18    be deemed to have never existed.  And that's based upon the

19    principles of primacy of the EU law and the autonomy of the

20    EU system.

21         So those -- yeah, those decisions don't -- you

22    know, basically those decisions don't void the purported

23    arbitration agreement.  What they make clear is that

24    under the treaties these purported arbitration agreements

25    could have never existed because, as Your Honor correctly

1    noted, that under the EU treaties it is impermissible.  You

2    know, again, making a terrible analogy, it is

3    unconstitutional, as we would say here.

4            It is impermissible under the EU treaties that

5    these arbitration agreements could exist because it would

6    essentially put into the hands of these very respectable

7    international tribunals that Mr. Nelson referred to

8    questions related to EU law that the arbitration -- the

9    governing law of the ECT implicates international law, which

10    includes the EU treaties and EU law.  And, you know, a prime

11    example of, you know, the necessity of these tribunals that

12    have to address EU law is the simple fact that they have to

13    grapple with the question of whether an arbitration

14    agreement exists under EU law.

15            And so what the treaties and this decision of

16    *Achmea* and in *Komstroy* is specifically to the ECT, what they

17    say is that the very function of having elevated these

18    decisions outside of the EU system is not permitted by the

19    treaties and is void *ab initio*.

20            So that's really, in a nutshell, the answer in

21    terms of, you know, what is the effect of these decisions.

22    It's not really those decisions that do anything per se.

23    It's the fact that the EU treaties exist, and those

24    decisions clarify that these kind of agreements are not

25    permissible, and so they are treated as never existing.

```
1              THE COURT:  Excuse me one moment.
2              (Pause)
3              THE COURT:  Okay.  I'm sorry, Mr. Weldon.
4    Continue.  I just needed to get some dates, but go ahead.
5              MR. WELDON:  Excellent, excellent.
6              So, Your Honor, thank you for that question.
7              If you don't have -- if you have a further
8    question, I don't want to interrupt.  But if you do not,
9    then I will proceed.
10             THE COURT:  No, go ahead.  Go ahead.
11             MR. WELDON:  Thank you very much.
12             So just by way of background -- and I think it
13   relates to your question to some degree -- you know, the
14   question is where are these parties?  You know, why are we
15   here in the United States fighting about this?
16             But I do think it's important for the Court to
17   appreciate, which, of course, I think you do, that these
18   parties are citizens of the EU.  Spain is a member state of
19   the EU.  These particular petitioners are Dutch BVs.  They
20   are citizens of the Netherlands; and because of that, they
21   are citizens of the EU.
22             It's a self-contained system within the EU.  There
23   is one common market, which is why you keep hearing about
24   state aid.
25             THE COURT:  But, Mr. Weldon -- and I am going to
```

1    interrupt you -- we're not here -- I mean, it sounds like

2    you're basically trying to undo the arbitral award by saying

3    this doesn't have anything to do with the United States and

4    we shouldn't be in this court.

5            This is not some novel case.  This case represents

6    one in a long line of cases where participants in an

7    arbitration from whatever member countries are signators and

8    participants in ICSID, including this country, have sought

9    to enforce arbitral awards.

10           So the fact that the two parties in this case are

11   EU members is really neither here nor there for purposes of

12   my considering whether *Achmea* retroactively -- you know,

13   retroactively renders the arbitration agreement null and

14   void.

15           MR. WELDON:  I think that notion is not -- not

16   perfectly correct, Your Honor.  And I'll just explain why.

17           Ordinarily I think what you're saying is

18   absolutely true; that if you have countries that are

19   existing on the international plane and they have

20   relationships with each other, then their national law

21   doesn't matter one bit.

22           The situation here is different, and the reason

23   why we're here is because of this so-called intra-EU

24   dispute.  And so these particular parties -- and it's the

25   Kingdom of Spain and these BVs -- subjected themselves to

1    the EU treaties, which is also international law.

2            And so here where -- you know, where Mr. Nelson

3    points to the *Tethyan* case and talks about arbitrability and

4    how that can't be reviewed by the Court, that's not right

5    because we're not talking about arbitrability.

6            As the Court knows, there's a difference between

7    arbitrability meaning, well, there's an arbitration

8    agreement, and whether a particular dispute falls within the

9    scope of that agreement or whether we're talking about an

10   arbitration agreement itself and whether one has been

11   validly formed; and so the issue that presents itself to

12   this Court, which has never happened in any other case that

13   I'm aware of --

14           THE COURT:  Imagine my delight.

15           MR. WELDON:  I understand that position is not a

16   fun one to be in.  I do not envy the Court whatsoever.

17           But what I will say on that point is that, you

18   know, that's precisely why the Kingdom of Spain has said

19   this Court should defer to the EU.  These are parties within

20   the EU system, and they will sort out their issues in terms

21   of analyzing the ICSID award and whether it should be

22   enforced.

23           You know, there's a long line of cases which talk

24   about how the petitioner has to present the notice and the

25   arbitration agreement, and there's a two-step process.

1      That's the first step.

2              But then it's on, in this case, the Kingdom of

3      Spain to come to the Court and to explain why there is no

4      valid arbitration agreement.  We think we've done a very

5      thorough job of that, of trying to explain why in this

6      particular case there is not a valid arbitration agreement.

7              But that is, just to be clear, a completely

8      different question that's addressed in *Tethyan* and other

9      cases that Mr. Nelson has referenced.  Those are about

10     arbitrability.  This one is about whether an arbitration

11     agreement exists.

12             THE COURT:  Why is the Kingdom of Spain raising

13     the issue of the legality or whether Spain had the authority

14     entering into this arbitration agreement now?  *Achmea* was

15     decided in 2018.  This case was filed before me, I believe,

16     in 2019.  Why now?

17             MR. WELDON:  So some --

18             THE COURT:  And have you -- by only raising it

19     now, have you waived it?

20             MR. WELDON:  So there's no -- there's no issue of

21     waiver here, and that was going to be my first point, is

22     that the Kingdom of Spain has raised this issue throughout

23     the arbitration proceedings.

24             THE COURT:  But not before this Court.

25             MR. WELDON:  And before this Court as well.  In

1    the first pleading, we objected to jurisdiction and filed a

2    motion to dismiss.  So -- and that was based upon the

3    principles announced in *Achmea* about the primacy of EU law

4    and the autonomy of the EU system.

5         THE COURT:  Refresh my memory.  And I'm sorry if

6    I'm remembering wrong because that -- my order in that case

7    was a couple of years ago.

8         But when you -- when you challenged the Court's

9    jurisdiction in your opening briefs in the case before me,

10   did you actually cite and rely on *Achmea*?

11        MR. WELDON:  We did, Your Honor, yes.

12        THE COURT:  Okay.  I'm sorry.  I didn't recall.

13        But go ahead.

14        MR. WELDON:  No, that's okay.  That's okay.

15        You know, over the course of time since 2019 the

16   case law has certainly developed, but when the petition was

17   filed, *Achmea* had been issued by the equivalent of the

18   Supreme Court in the European Union, the ECJ, and so that

19   decision was already out there.

20        It's interesting to, over time, see how the case

21   law has developed because the first argument the petitioners

22   made was don't worry about the *Achmea* decision court because

23   it is not applicable to the Energy Charter Treaty because

24   the Energy Charter Treaty is a multilateral investment

25   treaty whereas the *Achmea* decision dealt with a bilateral

1    investment treaty.  What we found is there was clarity in

2    the *Komstroy* decision, and so the case law has developed in

3    the EU to say, through *Komstroy*, what we understand now is

4    that the purported arbitration agreement in the Energy

5    Charter Treaty, the ECT, the same principles apply to that

6    decision, to that multilateral investment treaty, and it is

7    also -- the purported agreement is void *ab initio* as well.

8         So we've seen the progression of case law.  The

9    most recent one was out of the court in Stockholm which

10   declared that the award that was rendered under this

11   purported arbitration agreement would be void.

12        You know, Mr. Nelson pointed to, well, this is an

13   ICSID award, and that was a Stockholm Chamber of Commerce

14   award.  That's interesting because the only sort of

15   difference he could really cite to is that, well, the ICSID

16   process is, you know, longer and more expensive and things

17   like that.  But that has nothing to do with the underlying

18   principle, which is that these parties and these disputes

19   exist in the context of the European Union, and those

20   decisions have held very clearly by now that there is no

21   valid arbitration agreement in these investment -- these

22   treaties.

23        I want to mention *Micula*, and just briefly because

24   I think, Judge, you have that correct, that Judge Mehta did

25   go through the process.  It does not stand for the

1  proposition that the Court simply rubber stamps an ICSID

2  award because it happens to say "ICSID" on it.  That

3  wouldn't make sense for a lot of reasons.

4       And what Judge Mehta did was, in fact, he looked

5  to European law.  He looked at what was an order issued by a

6  general court within the context of the Court of Justice of

7  the European Union, and he found that because of the timing,

8  the specific timing involved, when Romania was joining the

9  EU, that there was no issue.  And so that's a very unique

10 specific issue that was dealt with in *Micula*, and so that --

11 you know, I disagree very, you know, fervently with the idea

12 that somehow that's a very bad case for Spain.  It deals

13 with a very specific subject matter related to the timing

14 issue, and that has really nothing to do with this case.

15      Again, you know, Mr. Nelson repeatedly, you know,

16 referred to these cases about arbitrability, but that is not

17 this case.  Those cases dealt with arbitrability, not

18 whether a valid arbitration agreement exists.

19      And we talked about this specifically in our reply

20 brief on the motion to dismiss and walked the Court through

21 the cases.  There's that two-step process.  It's for the

22 petitioners to put forward a notice in their purported

23 agreement, and then the burden would shift to Spain, in this

24 case, to come to the Court to show why there is not a valid

25 arbitration agreement.

1          So, you know, even thinking about Judge Mehta in

2     *Micula*, he went through that analysis.  That's analysis that

3     the Court cannot just skip.  Mr. Nelson has invited you to

4     just don't say anything, just say it's an ICSID award.  It

5     was a fair process.  I'm going to enforce it.

6     Unfortunately -- and, again, I have great sympathy for you,

7     Your Honor, but unfortunately you can't just do that.

8          Let me address, just very briefly, the *Laker*

9     *Airlines* standard because I think that that is a standard

10    that is -- basically it just defeats this entire application

11    for a preliminary injunction.  I don't think the Court

12    really has to go much farther than that.

13          I do agree with you, Your Honor, that you can't

14    really -- under the case law, you have to establish your

15    jurisdiction before you issue a preliminary injunction.

16    Mr. Nelson says, well, just issue all of this -- all of

17    these decisions together very quickly.  You know, that is

18    one solution, of course, but I would urge the Court that

19    perhaps restraint in this particular situation might be the

20    best approach.

21          But going directly to the *Laker Airlines* case, you

22    know, that's a case that, one, does not involve a sovereign;

23    but, two, it's really sort of a very different case on its

24    facts, and that was a case that involved the airlines, of

25    course.  And at the time in London there really was

1     basically some kind of cartel really of airlines, and

2     essentially what was happening there is that the court in

3     the U.K. was being used to try to basically cut off the

4     ability of airlines to make use of antitrust laws in the

5     United States.

6          But, again, those airlines are flying back and

7     forth from London to New York, back and forth from London to

8     New York, so there was a connection to New York, which was

9     based upon the underlying merits of the case.  And the Court

10    in there, even, you know, not in the context of a sovereign,

11    talked about the importance of sovereign comity,

12    international comity, and basically talking about -- there's

13    a quote I want to read to you.  It said at Page 921:  The

14    prerogative of a nation to control and regulate activities

15    within its boundaries is an essential definitional element

16    of sovereignty.  Every country has a right to dictate laws

17    governing the conduct of its inhabitants.  Consequently, the

18    territoriality base of jurisdiction is universally

19    recognized.

20         That, in fact, really speaks to this case in a way

21    which I think should resonate with everyone.  I mean, what

22    has been asked by the petitioners here is that you order a

23    court, you know, which is literally a mile away from the

24    headquarters of these petitioners in the Netherlands, to not

25    apply EU law, to not regulate what the citizens can do.  Not

1    only -- you know, we made the point in our briefing.

2    Essentially what they, the petitioners, have asked for in

3    this case is that you offend the sovereignty of three

4    separate entities.  One being Spain.

5          You know, there's a line of cases that talk about

6    sovereigns being able to litigate disputes in foreign

7    countries and that the Courts will not step in to enjoin

8    those kind of activities.

9          THE COURT:  Except -- and those are very laudable,

10   broad-based principles, but that's why the FSIA has an

11   arbitration exemption, and that is why Courts here have

12   considered and enforced arbitral awards among sovereign

13   countries and foreign plaintiffs and parties for years.

14         So while I certainly -- I'm not going to disagree

15   with you regarding your general principles of sovereignty,

16   there's a clearly established exception for jurisdiction in

17   the courts of this country, and has been for many, many

18   years, for arbitration awards.

19         MR. WELDON:  Yes.  So I won't -- yeah, I had like

20   a lot more to say about that, Your Honor, but you get the

21   point.  I can see you absolutely understand that point super

22   clearly, so I won't bother you with those sort of more broad

23   general statements, which I think, as you say, we sort of

24   all generally agree with.  But I will say that, yes, I think

25   the Court is right to think about the Foreign Sovereign

1    Immunities Act and those exceptions.

2          And that sort of brings us -- as you said,

3    actually, earlier in the argument, we'll come full circle

4    back to this idea of, well, is there an arbitration

5    agreement, and that is the thorny issue of EU law which,

6    again, we do not envy Your Honor being in this position, but

7    the problem is is that you can't ignore it, as Mr. Nelson

8    sort of tries to implicate that you can.  You have to

9    address that.  It's a difficult decision.

10         We say, you know -- and this is for another day,

11   I'm sure.  One of the outs that we suggested to the Court

12   is, well, you know, there is this forum non conveniens

13   point, which is not something that has been foreclosed.

14   Mr. Nelson --

15         THE COURT:  Well, the D.C. Circuit might disagree

16   with you.

17         MR. WELDON:  Well, yeah.  Well, I guess our point

18   about that is that the principle in *Tatneft* and some of

19   these other cases is not as broad as the petitioners here

20   would suggest to the Court that it is.  Basically those

21   cases are more narrowly, you know, specific issues.

22         I can go into those, although that was -- forum

23   non was not on my --

24         THE COURT:  As it should not be.  That's fine.

25         MR. WELDON:  Thank you for that, Your Honor.

1        But so we read those as being sort of -- we read

2    the plaintiffs', you know, advancement of those cases to be

3    overly broad.

4        So again, I went back to this fundamental question

5    really where the Court, in order to even issue this

6    preliminary injunction relief, would have to make a finding

7    that under EU law, or whatever law the judge thinks is

8    applicable, that there is a valid arbitration agreement.

9        THE COURT:  Well, I mean, if I follow the D.C.

10   Circuit's law in *LLC SPC Stileks vs. Republic of Moldova*, in

11   that case Moldova also argued that -- one of the parties in

12   that case was *EnerGeo Alliance* and lacked a legal basis to

13   invoke the ECT's arbitration provisions.  The D.C. Circuit

14   construed Moldova's argument going to arbitrability and not

15   FSIA jurisdiction.

16       And why isn't the same true of your argument here?

17       MR. WELDON:  So I think that Moldova case is

18   actually distinguishable because it was not an intra-EU

19   dispute.

20       This is a very specific case that's before Your

21   Honor.  It is very much relegated to these line of cases

22   that are pending.  In the *Micula* case it was about, again,

23   arbitrability, which is different from the question of

24   whether there's a valid arbitration agreement.

25       So unfortunately that doesn't give the Court an

1    out.  You still have to address the issue of whether, under

2    the EU treaties, in conjunction with the Energy Charter

3    Treaty, et cetera, whether there is a valid arbitration

4    agreement.  And the terrible thing for you is that in

5    finding that there is an arbitration agreement, if you found

6    that, it would actually be contrary to the highest court in

7    the European Union, which is tasked and has the right to

8    regulate its citizens.

9             And so, you know, again, we come back to this idea

10   of comity where, if you were to find that there is a valid

11   arbitration agreement, you would be essentially telling the

12   Court, the highest court in the EU, that it got their

13   decision wrong.  I just -- we can't imagine that a world

14   exists where that would be the appropriate response.

15            THE COURT:  Well, I'm going to take issue with the

16   criticism that you're finding implied in such a ruling.  I

17   don't think so.  I have to decide my own jurisdiction.

18            The EU makes its decision, but I have to decide

19   whether I have jurisdiction in this case or not, and that is

20   not -- a decision on that is not intended and I don't

21   actually agree would reflect any disagreement in principle

22   with the EU highest court's decision.

23            MR. WELDON:  And, Your Honor, all we ask is that

24   you -- when you're going to make that decision, that you

25   take a look at, you know, what Dr. Hindelang has submitted.

1    And not only that, to the decisions of *Achmea* and *Komstroy*,

2    which really deal with this specific question.

3              And the open -- and have an open mind to those

4    decisions and take those into due consideration.  I would

5    submit that they are, to a very large degree, controlling on

6    the issue.

7              I don't know who else would be more appropriate in

8    making those decisions, but I understand Your Honor's point,

9    and it's well-taken.

10              THE COURT:  Thank you, Mr. Weldon.

11              Mr. Nelson, as proponent of the motion, I'll give

12    you brief rebuttal.

13              MR. NELSON:  Thank you very much, Your Honor.

14              And Your Honor was right to remind Mr. Weldon the

15    D.C. Circuit has spoken on a number of those issues, forum

16    non conveniens issues, repeatedly TMI/Ukraine, Powell,

17    Taftneft/I think Ukraine, and that was last year.  There is

18    no forum non conveniens issue here.

19              Your Honor also absolutely hit the bull's eye when

20    you referred to *LLC Stileks against Moldova*, because in that

21    case -- that case explodes any notion that Your Honor is

22    entering into uncharted territory.  It says, at 878 to

23    879 -- and this is the holding of the D.C. Circuit --

24    Moldova, which was arguing against arbitrability -- by the

25    way, the idea that the consent was void is a question of

1    arbitrability according to a long line of Supreme Court

2    jurisprudence.

3            But Moldova was arguing against arbitrability in

4    that case.  And it was held, quote, Moldova agrees to assign

5    arbitrability determinations to the tribunal under Article

6    26 of the ECT, the same consent instrument at issue here.

7    Returning to the quote:  All parties agree to arbitration

8    under UNCITRAL's rules.

9            Well, that's one of the institutions in the menu.

10   We chose a different institution with different results.

11           Those rules, the D.C. Circuit continued, state

12   that the arbitration tribunal shall have the power to rule

13   on its own jurisdiction.  And in *Chevron* we said the

14   parties' adoption of these rules was clear and unmistakable

15   evidence that the parties agreed to arbitrability.  The

16   conjunction of *Chevron* and Henry Stein means that we must

17   accept the arbitral tribunal's determination that EnerGeo

18   Alliance's claim fell within the ECT.

19           Now, on that Judge McFadden took that decision in

20   *Tethyan.*  So now we return to the ICSID Convention.  And

21   after noting that there are some differences between the two

22   conventions -- all of which cut in our favor, Your Honor,

23   because they counsel even greater deference to reach

24   convention awards -- he looked at the Pakistani objection to

25   arbitrability in that case.  And after reading the very same

1   provisions that Your Honor referenced and that I just

2   quoted, he held, quote, whether or not Pakistan agreed to

3   arbitrate this dispute, it certainly agreed to be bound by

4   the ICSID Convention, including the provisions granting

5   tribunal the authority to decide whether a signatory agreed

6   to arbitrate, and the tribunal found Pakistan agreed to

7   arbitrate the dispute.  Again, that's 590 Federal Supplement

8   Third Series 275.

9           Your Honor, this case that we're putting to you is

10  not unprecedented.  And with all due respect to Mr. Weldon,

11  I'm originally from Australia, and there's an expression in

12  Australia called "crocodile tears," and that is when you

13  express sympathy to someone, and you might not completely

14  mean it.  I'm not -- this is not an aspersion on Mr. Weldon,

15  but I would suggest that any time Spain expresses even a

16  scintilla of regret that Your Honor has to deal with its

17  intra-EU objection, you can raise your eyebrows, judicial

18  eyebrows.

19          THE COURT:  Oh, I do think my position is

20  unenviable, so I'm going to take Mr. Weldon's sympathy as an

21  understanding of the difficulty of my position, although I

22  understand you don't think it's as difficult as he or I may

23  think it is.

24          But, you know, there's a long line of my

25  colleagues in this courthouse that are awaiting -- waiting

1      to see what I'm going to do, which is not really -- I don't

2      usually like to be the first in line in those situations,

3      but here we are.

4              MR. NELSON:  Well, of course, Your Honor, and in

5      that sense -- in that sense -- I do sympathize, although I

6      think the pathway is -- you know, it's mitigated by the

7      clear path.

8              THE COURT:  That's right.

9              MR. NELSON:  Your Honor, just on one or two

10     small -- just small points of detail.

11             One -- on the comity point, *Laker Airlines* is on

12     all fours with our case.  The expressions about comity from

13     Mr. Weldon sounded a lot like the dissent by Circuit Judge

14     Kenneth Starr in that case as then was -- that was a

15     dissent.  And the majority makes it very clear that comity

16     has no place in a case where the other side is seeking to

17     interfere with this Court's jurisdiction.

18             Comity cuts both ways.  You have to ask is the

19     foreign action respecting me, in effect?  And we're seeing a

20     lot of disrespect, we submit.

21             The fact that our client is incorporated in

22     Holland has nothing to do with it, as Your Honor correctly

23     said.  There are 143 member states of the ICSID Convention,

24     or at least there were when we commenced this action.  It

25     has grown since then.  But the member states as of 2019 are

1    at ECF 17.

2            Where would it stop if every enforcement state was

3    able to give an advisory opinion on the matters already

4    covered by the award?  We submit that that was not the

5    intent of the scheme.  But the ICSID Convention -- I'm not

6    asking Your Honor to rubber stamp anything.

7            Judge Moss makes this point in *TECO against*

8    *Guatemala*.  Judge Moss makes the point that in exercising

9    and in granting full faith and credit, you can look at the

10   award and satisfy yourself that there was a full and fair

11   opportunity to be heard on either side, which there

12   unquestionably was.

13           And just as one final point, Your Honor did ask at

14   the beginning of our motion whether there'd been any chance

15   of settlement or mediation.  There was a very terse joint

16   statement.

17           Since then Spain has made a further statement in

18   the parallel case of *9REN against Spain*, which is before

19   Your Honor, Docket 19-civil-1871.  At Docket 50 in that case

20   it was said by Spain:  Spain is unable to participate in

21   mediation to resolve this action to enforce this underlying

22   arbitral award given its obligations under the applicable

23   laws of the European Union.

24           So it's the position of Spain that they won't --

25   they won't pay this award, and they won't even entertain a

1    settlement proposal in mediation because somehow they feel

2    themselves shackled by EU law, which we submit is a very

3    convenient posture to adopt when you have no intention of

4    paying the award.

5              But if Your Honor's original question was testing

6    whether we were at the precipice of a breakthrough and on

7    the bubble, it's not that.  Unfortunately it's not that kind

8    of case for the reasons revealed not by Mr. Weldon but by

9    counsel for Spain in other cases.

10             THE COURT:  All right.  Well, thank you, all.  I

11   appreciate your preparation, your submissions.  I will try

12   and issue a ruling as very soon as I can.  Thank you.

13             MR. NELSON:  Thank you, Your Honor.

14                  (Whereupon the hearing was

15                   concluded at 3:25 p.m.)

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3                  I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          **NOTE:**  This hearing was held remotely by Zoom or some

9      other virtual platform and is subject to the technological

10     limitations of court reporting remotely.

11                  Dated this 8th day of February, 2022.

12

13

14                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
15                              United States Courthouse
                                Room 6718
16                              333 Constitution Avenue, NW
                                Washington, DC 20001

17

18

19

20

21

22

23

24

25